1   ALEX G. TSE (CABN 152348)
    United States Attorney
2
    BARBARA J. VALLIERE (DCBN 439353)
3   Chief, Criminal Division

4   JEFF SCHENK (CABN 234355)
    JOHN C. BOSTIC (CABN 264367)
5   ROBERT S. LEACH (CABN 196191)
    Assistant United States Attorney
6
        150 Almaden Boulevard, Suite 900
7       San Jose, California 95113
        Telephone: (408) 535-5061
8       FAX: (408) 535-5066
        john.bostic@usdoj.gov
9
    Attorneys for United States of America
10

11              UNITED STATES DISTRICT COURT

12              NORTHERN DISTRICT OF CALIFORNIA

13                     SAN JOSE DIVISION

14
    UNITED STATES OF AMERICA,              )   CASE NO. 18-CR-00258 EJD
15                                         )
            Plaintiff,                     )   UNITED STATES' OPPOSITION TO
16                                         )   DEFENDANTS' MOTION FOR CEASE AND
        v.                                 )   DESIST ORDER
17                                         )
    ELIZABETH A. HOLMES and                )   Date:  October 12, 2018
18  RAMESH "SUNNY" BALWANI,                )   Time:  10:00 a.m.
                                           )   Court: Hon. Susan van Keulen
19          Defendants.                    )
                                           )
20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................1

II. FACTUAL & PROCEDURAL BACKGROUND ...................................................2

III. ARGUMENT ..............................................................................................................6

    A. Defendants lack standing to block the grand jury's evidence collection. ....................6

    B. Defendants have the burden of demonstrating an irregularity in the use of the grand jury's broad powers. ...................................................................10

    C. The recent collection of evidence from Theranos was a proper use of the grand jury subpoena in service of an ongoing investigation. .......................................11

IV. CONCLUSION ........................................................................................................15

1

**TABLE OF AUTHORITIES**

2

Page(s)

3

**Cases**

4

*Beverly v. United States*,
5
468 F.2d 732 (5th Cir. 1972) ................................................................. 11

6
*Branzburg v. Hayes*,
7
408 U.S. 665 (1972) ................................................................. 10

8
*In re Grand Jury Proceedings (Johanson)*,
9
633 F.2d 1033 (3d Cir. 1980) ................................................................. 11

10
*Hoffa v. United States*,
385 U.S. 293 (1966) ................................................................. 13

11
*In re Grand Jury (Schmidt & Sons)*,
12
619 F.2d 1022 (3d Cir. 1980) ................................................................. 7

13
*In re Grand Jury Matter (JFK Hospital)*,
14
802 F.2d 96 (3d Cir. 1986) ................................................................. 8

15
*In re Grand Jury Proceedings (FMC Corp.)*,
604 F.2d 804 (3d Cir. 1979) ................................................................. 7
16

17
*In re Grand Jury Proceedings (Pressman)*,
586 F.2d 724 (9th Cir. 1978) ................................................................. passim

18
*In re Grand Jury Proceedings (Sutton)*,
19
658 F.2d 782 (10th Cir. 1981) ................................................................. 14

20
*In re Grand Jury Subpoena Duces Tecum Dated Jan. 2, 1985 (Simels)*,
21
767 F.2d 26 (2d Cir. 1985) ................................................................. 7, 12

22
*In re Grand Jury Subpoena, No. 16-03-217 (Glassdoor)*,
875 F.3d 1179 (9th Cir. 2017) ................................................................. 7
23

24
*In re Hergenroeder*,
555 F.2d 686 (9th Cir. 1977) ................................................................. 10, 11

25
*In re Russo*,
26
448 F.2d 369 (9th Cir. 1971) ................................................................. 13

27
*United States v. (Under Seal)*,
28
714 F.2d 347 (4th Cir 1983) ................................................................. 11, 14

GOVT. OPPOSITION TO MOTION FOR CEASE AND DESIST ORDER
18-CR-00258 EJD

*United States v. Chanen,*
    549 F.2d 1306 (9th Cir. 1977) ................................................................................. 10

*United States v. Claiborne,*
    765 F.2d 784 (9th Cir. 1985) ................................................................................... 14

*United States v. Index Newspapers LLC,*
    766 F.3d 1072 (9th Cir. 2014) ................................................................................. 14

*United States v. Jeter,*
    No. CCB-14-0121, 2015 WL 114118 (D. Md. Jan. 7, 2015) ................................. 13

*United States v. Leung,*
    40 F.3d 577 (2d Cir. 1994)......................................................................... 11, 12, 14

*United States v. Mechanik,*
    475 U.S. 66 (1986).................................................................................................. 10

*United States v. Okun,*
    218 Fed. Appx. 228 (4th Cir. Jun. 11, 2008) ........................................................... 9

*United States v. Punn,*
    737 F.3d 1 (2d Cir. 2013) .................................................................................. 10, 13

*United States v. R. Enters., Inc.,*
    498 U.S. 292 (1991)........................................................................................... 10, 14

*United States v. Ruehle,*
    583 F.3d 600 (9th Cir. 2009) ................................................................................ 8, 9

*United States v. Star,*
    470 F.2d 1214 (9th Cir. 1972) ................................................................................ 13

*United States v. Wadlington,*
    233 F.3d 1067 (8th Cir. 2000) ................................................................................ 11

## I.      INTRODUCTION

Federal criminal law provides many rights to defendants, but for good reason, it does not allow defendants to monitor and impede government investigations.  Defendants Elizabeth Holmes and Ramesh Balwani seek to change that with their pending motion.  Accusing the government of using a grand jury subpoena to prepare for trial, Defendants' motion asks the Court to bar the grand jury from obtaining any additional documents from Theranos via subpoena.  The Court should deny this request for the following reasons.

First, the motion concerns a subpoena addressed to Theranos itself, not to either of the individual Defendants.  The subpoena sought only corporate documents, as opposed to personal documents belonging to Defendants.  In the several months since the subpoena was served, Theranos produced responsive documents without seeking relief from the Court, and the assignee currently in control of Theranos's rights and legal interests has declined to take a position on Defendants' motion.  Because Defendants do not have authority to assert the company's rights—and because they have made no factual showing that their own personal privileges are implicated—they lack standing to invalidate the subpoena to Theranos or prevent Theranos's compliance with the subpoena.

Second, the Court's analysis begins with a presumption that the grand jury is operating within the bounds of the law.  By design, a grand jury has broad powers that enable it to conduct thorough investigations into potential criminal conduct.  Defendants who challenge grand jury subpoenas have the burden of proving a violation of the rules through a particularized factual showing.  Here, Defendants Holmes and Balwani have failed to make such a showing.  Indeed, their entire argument is based on the mere fact that Theranos produced documents to the government three months after the original Indictment.

Finally, the government's use of the grand jury subpoena has been in service of the ongoing and complicated investigation into Theranos and its principal employees.  Even after returning an indictment, grand juries are entitled to continue investigating additional potential crimes committed by the indicted defendants or their associates.  *See In re Grand Jury Proceedings (Pressman)*, 586 F.2d 724, 725 (9th Cir. 1978).  While the Indictment charges Defendants with several offenses, it does not

1   capture every possible piece of criminal conduct in connection with Theranos.  The grand jury is

2   continuing to investigate events beyond those in the Indictment.  Such continued investigation is well

3   within the grand jury's authority, and the Court should allow it to complete its inquiry.

4       For these reasons, discussed in more detail below, the Court should deny Defendants' motion in

5   its entirety.

6   **II.    FACTUAL & PROCEDURAL BACKGROUND**

7       Theranos was founded by Elizabeth Holmes in approximately 2003 and remained in operation

8   until early September 2018.  From early on in the company's history, Theranos attempted to develop

9   technology that could perform clinical tests using tiny drops of blood drawn from a finger stick instead

10  of the vials of blood drawn from an arm vein required by conventional lab tests.  During much of the

11  time period relevant to this case, Holmes was Theranos's Chief Executive Officer and Ramesh Balwani

12  was Chief Operating Officer—second in command at the company.

13      In 2013, Theranos started to advertise its purported technological advances.  Theranos claimed

14  that its proprietary technology yielded lab test results that were more accurate than conventional

15  methods, required less time, and provided substantial cost savings.  During this same time period, from

16  2013 through the first half of 2015, Holmes and Balwani raised hundreds of millions of dollars from

17  investors.  By this time, the company had grown to several hundred employees, and required significant

18  capital to continue operating.

19      In communicating with prospective investors, however, Holmes and Balwani made a series of

20  material misrepresentations about their company.  Defendants claimed, for example, that Theranos's

21  proprietary analyzer device could perform the full range of clinical blood tests using tiny samples drawn

22  from finger sticks, delivering fast and accurate results.  In fact, Theranos's device could perform only a

23  limited number of tests, was plagued by accuracy problems, and was slower than some competing

24  devices.  Due to the limitations of its homegrown analyzer, Theranos depended on third-party,

25  commercially available devices to perform a large percentage of the tests it offered.  Some investors

26  were given technology demonstrations during which they were led to believe that their blood was being

27  analyzed on Theranos's analyzer, when in fact the Theranos device had been programmed merely to

28

simulate running a test, and the investors' samples were analyzed using conventional processes or not at all.  Defendants led investors to believe that Theranos had partnered with the Department of Defense and that the armed forces were using Theranos devices to treat injured soldiers.  The truth was that the company's contracts with the Department of Defense were limited, and the military was not using Theranos technology to treat soldiers.  Defendants told investors that Theranos would generate over $100 million in revenues in 2014 and $1 billion in revenues in 2015.  In reality, Theranos was on track to generate only a few hundred thousand dollars in 2014 and 2015.  Trusting Defendants' statements about Theranos's capabilities and achievements, several individuals and entities invested a total of more than $700 million in Theranos between September 2013 and April 2015.  In so doing, those investors became victims of Defendants' fraudulent scheme.

Theranos began offering lab testing services to patients in September 2013 through a partnership with Walgreens.  In order to attract business, Theranos made explicit and implicit representations to doctors and patients regarding the accuracy, reliability, speed, and affordability of Theranos's testing technology.  Holmes and Balwani knew, though, that Theranos's devices were not capable of producing consistently accurate results, and that the company frequently delivered unreliable results to doctors and patients when testing for potassium, HIV, hCG (pregnancy), Hba1C (blood sugar), and other important analytes.  In turning to Theranos for clinical testing, doctors and patients became victims of another fraud perpetrated by Defendants.

Defendants' fraudulent schemes brought needed cash into the unprofitable company, inflated Theranos's valuation, allowed Theranos to capture market share from competing labs, and increased the company's profile.  The schemes were generally successful until October 2015, when The Wall Street Journal published a lengthy article questioning the veracity of Defendants' previous claims.  Over subsequent months, it gradually came out that the company's technology was not as mature and innovative as Defendants had led people to believe.

In early 2016, federal law enforcement agents and the United States Attorney's Office began investigating whether a federal crime had been committed in connection with Theranos's rise and fall.  Investigators started the process of identifying and interviewing witnesses, and collecting documentary

evidence for possible presentation to the grand jury.

On September 6, 2017, the grand jury issued a subpoena to Theranos itself. (Coopersmith Decl. Exh. A). As described above, the company and its actions were at the center of the grand jury's investigation. Accordingly, the subpoena sought a variety of documentation. For example, because the potential fraud at Theranos related to the state of the company's technology and the specific tests it could perform, the subpoena required production of documents regarding the capabilities of Theranos's devices, including internal assay development reports and validation reports reflecting the company's progress in that regard. Because Defendants had made representations to investors relating to Theranos's revenue and financial health, the subpoena sought financial reports showing the company's true income and debts. Theranos had also touted its relationships with prominent pharmaceutical companies and research institutions, so the grand jury subpoena sought documentation of the nature and extent of those partnerships.

Shortly after serving the subpoena, the government began a series of discussions with Theranos counsel concerning the company's response. (*See* Declaration of John Bostic in Support of Opposition, at ¶ 2). One of Theranos's chief goals in complying with the subpoena was to minimize expense. In order to reduce the burden on the company, the government agreed to extend the compliance deadline and receive Theranos's document production on a rolling basis. (*Id.*). About one year earlier, Theranos had been sued by investor Partner Fund Management ("PFM") for securities fraud and other violations. To satisfy its discovery obligations in that case, Theranos had already compiled numerous documents relating to the topics listed in the September 2017 grand jury subpoena. The government agreed that Theranos could produce from that set of already-collected documents as a first step toward satisfying its obligations under the subpoena. (*Id.*). Critically, the set of documents compiled for discovery in the PFM case did not include anything created after October 2016. (*Id.*). Over the following months, Theranos sent the government a series of document productions. Government counsel communicated regularly with Theranos's lawyers during that time period—by telephone, email, and written letter—as the two parties continued to negotiate Theranos's rolling subpoena response. In those discussions, the government was clear with Theranos that the company would need to collect and produce documents

1   created during the time period from October 2016 to September 2017 in order to comply with the

2   subpoena.  (*Id.* ¶ 3).

3          In the meantime, the government's investigation was providing the grand jury with significant

4   insight into Theranos's operations and Defendants' conduct.  That investigation uncovered substantial

5   evidence that Holmes and Balwani had misled investors, doctors, and patients with the intent to defraud

6   those victims, as described above.  On June 14, 2018, the grand jury returned an Indictment charging

7   Defendants Holmes and Balwani with two counts of conspiracy to commit wire fraud and nine counts of

8   wire fraud.  (Dkt. No. 1).

9          Since the original Indictment, the government has continued its investigation on behalf of the

10  grand jury.  That investigation has included interviewing newly identified witnesses and collecting

11  additional evidence.  (Bostic Decl. ¶ 4).  In particular, the government has worked to complete its

12  collection of necessary evidence from Theranos itself, including relevant documents from the 2016-2017

13  time period not covered in Theranos's earlier productions.  The government and Theranos negotiated at

14  length concerning these materials, seeking to arrive at a resolution that accounted for Theranos's desire

15  to minimize costs while providing the government with the evidence it needed to complete the

16  investigation.  (*Id.* ¶ 5).  Throughout those negotiations, Theranos was represented by several attorneys

17  from Wilmer Hale, and consistently indicated its desire to cooperate with the grand jury subpoena.

18         Toward the end of those negotiations, as the parties were nearing a final agreement, counsel for

19  Balwani sent a letter to the government, copying Theranos's lawyers, objecting to any further production

20  in response to the subpoena.  (*Id.*; Coopersmith Decl. Exh. B).  Theranos then stated that, based on the

21  letter from Balwani's counsel, the company would withhold production of the remaining responsive

22  documents after all, prompting government counsel to inform Theranos that such a course of action

23  would force the government to seek relief from the Court.  (Bostic Decl. ¶ 5).  A copy of that email

24  exchange is attached as Exhibit A to the Declaration of John Bostic, filed herewith.  Theranos responded

25  by confirming that it intended to produce the documents the parties had been discussing.  (Bostic Decl.

26  ¶ 5).

27  / /

28
GOVT. OPPOSITION TO MOTION FOR CEASE AND DESIST ORDER
18-CR-00258 EJD

On September 7, 2018, Defendants filed the instant motion objecting to the government's continued collection of evidence from Theranos on behalf of the grand jury.  (Dkt. No. 40).  Just a few days earlier, on September 4, 2018, Theranos had announced that it intended to liquidate its assets and enter into an assignment for the benefit of creditors.  (Coopersmith Decl. Exh. D).  That assignment is now complete, and Theranos will now enter dissolution.  The company has no employees left, and its board of directors has disbanded.  The assignee selected by Theranos now controls all of the company's assets and legal rights.  That assignee has informed the government that it takes no position on Defendants' pending motion.  (Bostic Decl. ¶ 7).

On September 14, 2018, Theranos made its final production of documents in response to the September 2017 grand jury subpoena.  (*Id.* ¶ 6).  Significantly, Theranos excluded from that production documents containing names from an extensive list of lawyers and law firms retained by the company and the individual Defendants, including the lawyers and firms representing Holmes and Balwani in this case.  (*Id.*).  The recently produced documents remain in government custody, and the government trial team has voluntarily agreed not to review those materials pending the Court's ruling on Defendants' motion.

## III.   ARGUMENT

### A.   Defendants lack standing to block the grand jury's evidence collection.

As an initial matter, the Court should deny the pending motion because it was filed by the individual Defendants and not by Theranos, the actual recipient of the grand jury subpoena.  Theranos, for its part, has already produced the documents in question.  There are obvious reasons why a defendant might want to hinder the government's collection of evidence, but the law requires a moving party to show an individual, cognizable injury before a court will entertain a motion to quash a grand jury subpoena.  Defendants' motion briefly addresses the issue, but ultimately falls short of establishing their standing.

For example, the motion cites a Ninth Circuit case where, according to Defendants, a "website user had third-party standing to challenge [a] grand jury subpoena."  (Mot. at 6).  Defendants misstate the holding of that case, which did not involve a defendant seeking to quash a subpoena on a third party.

Instead, that case involved a website invoking the rights of its users in moving to quash a subpoena *served on the website itself*. *In re Grand Jury Subpoena, No. 16-03-217 (Glassdoor)*, 875 F.3d 1179, 1183 (9th Cir. 2017). As the recipient of the subpoena in that case, the Glassdoor website had standing to object because it "established an injury in fact of its own," and had a "sufficiently close relationship to its users," who would face genuine obstacles in asserting their own rights. *Id.* at 1183 n.2. The same cannot be said of the parties in this case. There are no subpoenas directed at Defendants themselves, they have failed to demonstrate an injury of their own, and they have an insufficient relationship with Theranos to invoke its rights.

The other cases cited in Defendants' brief are similarly inapposite. The *Simels* case, discussed in more detail in Section III.C., contains no analysis of the standing issue. *In re Grand Jury Subpoena Duces Tecum Dated Jan. 2, 1985 (Simels)*, 767 F.2d 26 (2d Cir. 1985). Although *Simels* involved a defendant challenging a subpoena to a third party, the third party in that case was the lawyer representing the defendant in the pending prosecution. *Id.* at 28. Serving a grand jury subpoena on a defendant's own counsel raises obvious privilege concerns and Sixth Amendment issues not present here. *See id.* at 29. It is neither surprising nor instructive that the Second Circuit implicitly found standing in that case.

*Schmidt & Sons*, which takes perhaps the most liberal view of any case on this topic, is easily distinguishable. *In re Grand Jury (Schmidt & Sons)*, 619 F.2d 1022 (3d Cir. 1980). In that case, an employer was permitted to challenge subpoenas served on six of its employees, based on the employers contractual "property interest… in the services of employees presently under subpoena." *Id.* at 1026.[1] Here, there is no argument that Theranos's compliance with the subpoena imposed a burden on the individual Defendants. Instead, Defendants have imposed the burden on themselves by choosing to litigate this issue when Theranos consistently elected not to litigate it.

Unlike the moving parties in the cases discussed above, the Defendants currently have no relationship with the now defunct company that received the grand jury subpoena. Balwani, whose

---

[1] This holding represents a curious departure from the general rule that an employer lacks standing to block a subpoena served on an employee. *See, e.g.*, *In re Grand Jury Proceedings (FMC Corp.)*, 604 F.2d 804, 805 (3d Cir. 1979) (acknowledging rule and citing precedent).

lawyers were first to object to post-indictment document production by Theranos, has not worked at the company for more than two years.  Holmes stepped down as CEO in June of this year, and has not been an employee of the company since she was indicted.  While she continued to act as chair of the company's board of directors, that board no longer exists.  Thus, neither Defendant is in a position to speak for Theranos or assert any rights of the company.  Indeed, the only entity authorized to assert those rights is the assignee, which has expressly declined to take a position on Defendant's request to block production of company documents.  The Court should therefore disregard Defendants' arguments to the extent they are based on the company's attorney-client privilege.  That ruling would be consistent with *In re Grand Jury Matter (JFK Hospital)*, 802 F.2d 96, 99 (3d Cir. 1986), where a hospital received a grand jury subpoena, and the chairman of the hospital's board moved to quash.  On appeal, the court held that the chair of the board lacked standing because he "failed to assert any *personal* property right or privilege at stake."  *Id.* at 99 (emphasis added).

        In their effort to cobble together standing, Defendants argue that Theranos's recent production "likely include[s] documents protected from disclosure by joint attorney-client privileges and/or common interest/joint defense privileges that belong to the Defendants."  (Mot. at 6-7).  Defendants choose not to provide any factual basis or evidence in support of this claim.  For this reason too, Defendants' standing argument must fail.  "A party asserting the attorney-client privilege has the burden of establishing the relationship *and* the privileged nature of the communication."  *United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009) (quotation omitted).  The mere fact that Theranos employed lawyers is not enough to satisfy Defendants' burden to establish the existence of some privilege harmed by the recent production.  *See id.* ("The fact that a person is a lawyer does not make all communications with that person privileged," and the burden is on the proponent of the privilege to establish all necessary elements.) (quotation omitted).  Because the privilege works as an "obstacle to the investigation of the truth," "it ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle."  *Id.* (quotation omitted).  If Defendants wish to base standing on an alleged violation of their privilege, the law requires much more than the assertions in their motion.

/ /

1    Defendants' privilege argument is even more dubious in light of the fact that the grand jury's

2  subpoena targeted only Theranos corporate documents.  In the absence of any contrary evidence, the

3  Court should assume that any confidential legal communications in Theranos's recent production

4  implicate the company's privilege, and not that of the individual Defendants.[2]  In *Ruehle*, the CFO of a

5  large corporation sought to prevent use of his communications with outside lawyers hired by the

6  company.  *Id.* at 605.  The Ninth Circuit rejected the CFO's attempts to characterize those

7  communications as privileged, noting that the CFO never told the company's lawyers that he was

8  seeking legal advice in his individual capacity.  *Id.* at 604.  On the facts of that case, the CFO could not

9  have reasonably believed that his communications with the company's lawyers were confidential.  *Id.* at

10  609.

11    In another instructive case, a court considered whether the CEO and sole shareholder of a

12  company under investigation had standing to quash a grand jury subpoena to his in-house counsel.

13  *United States v. Okun*, 218 Fed. Appx. 228 (4th Cir. Jun. 11, 2008).  The CEO in that case attempted to

14  quash the subpoena based on personal attorney-client privilege and common interest privilege.  *Id.* at

15  229.  Despite the CEO's testimony that he believed he had a personal attorney-client relationship with

16  in-house counsel, the court found that he had failed to establish the existence of any such privilege.  *Id.*

17  at 230.  The court also rejected the CEO's alternative argument that his communications with company

18  counsel should be protected by a common interest privilege between himself and his company, because

19  he had failed to establish that he and the company were represented by separate counsel engaged in a

20  joint strategy.  *Id.* at 231-32.  On that basis, the appeals court affirmed the district court's denial of the

21  CEO's motion to quash.  Here, Defendants have similarly failed to demonstrate the existence of any

22  personal privilege that was impacted by the grand jury's subpoena.  Their conclusory statements

23  invoking those privileges do not come close to meeting the requirements discussed above.

24

25    [2]  Defendants acknowledge that Theranos used search-term based filters to exclude potentially
   privileged material from its production to the government.  (Mot. at 7; Bostic Decl. ¶ 6).  Although
26  Defendants are not satisfied with this approach, they have given the Court no reason to doubt the
   efficacy of those measures, and have offered no evidence that the production includes privileged
27  materials at all.  Moreover, the defense is incorrect when it states that the government has decided not to
   use a taint or filter team to review this material.  The government is still considering that step as a
28  possible means to address privilege concerns.

1    Accordingly, the Court should deny Defendants' motion for a cease and desist order on the

2    grounds that Defendants lack standing to make such a request.

3    **B.    Defendants have the burden of demonstrating an irregularity in the use of the grand jury's broad powers.**

4    Even if Defendants had blanket standing to challenge grand jury subpoenas served on third

5    parties, they could not quash the subpoena to Theranos.  The law gives grand juries wide latitude as they

6    investigate possible crimes.  Unlike a court, "whose jurisdiction is predicated on a specific case or

7    controversy, the grand jury can investigate merely on suspicion that the law is being violated, or even

8    just because it wants assurance that it is not."  *United States v. R. Enters., Inc.*, 498 U.S. 292, 297

9    (1991).  The Supreme Court has recognized that, due to its function, the grand jury "paints with a broad

10   brush."  *Id.*  A grand jury investigation "is not fully carried out until every available clue has been run

11   down and all witnesses examined in every proper way to find if a crime has been committed."  *Id.*

12   (quoting *Branzburg v. Hayes*, 408 U.S. 665, 701 (1972)).  The Ninth Circuit advises that courts should

13   tread lightly in their supervision of the grand jury's work:

14
15           [G]iven the constitutionally-based independence of each of the three
             actors court, prosecutor and grand jury we believe a court may not
16           exercise its "supervisory power" in a way which encroaches on the
             prerogatives of the other two unless there is a clear basis in fact and law
             for doing so.
17
18   *United States v. Chanen*, 549 F.2d 1306, 1312 (9th Cir. 1977); *see also In re Hergenroeder*, 555 F.2d

19   686 (9th Cir. 1977) (observing that, in the Ninth Circuit, "supervision of the grand jury by the district

20   court is more narrowly construed" than it appears to be in other jurisdictions).

21   Consistent with these principles, the law includes a presumption, "absent a strong showing to the

22   contrary, that a grand jury acts within the legitimate scope of its authority."  *R. Enters., Inc.*, 498 U.S. at

23   300; *see also United States v. Mechanik*, 475 U.S. 66, 75 (1986) (O'Connor, J., concurring in judgment)

24   ("The grand jury proceeding is accorded a presumption of regularity, which generally may be dispelled

25   only upon particularized proof of irregularities in the grand jury process").  This rule applies with full

26   force in the context of challenges to grand jury subpoenas.  "[A] grand jury subpoena issued through

27   normal channels is presumed to be reasonable, and the burden of showing unreasonableness must be on

28   the recipient who seeks to avoid compliance."  *R. Enters., Inc.*, 498 U.S. at 301; *see also United States v.*

GOVT. OPPOSITION TO MOTION FOR CEASE AND DESIST ORDER
18-CR-00258 EJD

1   *Punn*, 737 F.3d 1, 6 (2d Cir. 2013) (To satisfy the burden of proving subpoena misuse, "the defendant

2   must present particularized proof of an improper purpose."); *Beverly v. United States*, 468 F.2d 732, 743

3   (5th Cir. 1972) ("[T]he well recognized presumption as to the regularity of the acts of public officials—

4   here the grand jury and its advisors—bears heavily against the appellants on this issue."); *United States*

5   *v. Wadlington*, 233 F.3d 1067, 1073 (8th Cir. 2000) ("[G]rand jury proceedings are afforded a strong

6   presumption of regularity, and a defendant seeking to overcome that presumption faces a heavy

7   burden.") (quotation omitted).

8        Courts hearing challenges to grand jury proceedings generally do not require the government to

9   submit affidavits defending the grand jury's actions. *See, e.g.*, *Hergenroeder*, 555 F.2d at 686

10   (concluding that there should be no rule requiring "disclaiming affidavits" in routine grand jury

11   investigations in light of the "presumption that the government obeys the law").

12        As discussed below, Defendants cannot satisfy their burden to show grand jury misuse on the

13   facts of this case, mandating denial of their motion.

14   **C.    The recent collection of evidence from Theranos was a proper use of the grand jury subpoena in service of an ongoing investigation.**

15        It is true that a grand jury subpoena cannot be used for the sole or dominant purpose of preparing

16   an indicted case for trial.  The Court should still deny Defendants' motion, however, because the

17   government has complied with that rule.  An indictment does not bar the grand jury's investigation of

18   other areas of criminal liability for which the defendant or others may be accountable.  *In re Grand Jury*

19   *Proceedings (Pressman)*, 586 F.2d 724, 725 (9th Cir. 1978).  If the grand jury is continuing its

20   investigation into additional criminal activity, a subpoena issued pre-indictment remains valid.  *In re*

21   *Grand Jury Proceedings (Johanson)*, 633 F.2d 1033, 1040 (3d Cir. 1980).  The standard for continuing

22   investigations is permissive.  Courts have held that, even where a subpoena is used for a combination of

23   proper and improper purposes, the existence of the legitimate purpose is "reason enough not to quash the

24   subpoena."  *United States v. (Under Seal)*, 714 F.2d 347, 349 (4th Cir 1983).  As long as the

25   investigation is not primarily motivated by an improper purpose, evidence obtained through the

26   continued investigation may be offered at trial on the initial charges.  *United States v. Leung*, 40 F.3d

27   577, 581 (2d Cir. 1994).

28

Thus, in *Leung*, the district court and Second Circuit upheld grand jury subpoenas issued after the defendant was indicted. *Id.*  Like Holmes and Balwani, the defendant in that case argued that the post-indictment subpoenas were suspicious based on their timing alone. *Id.* at 582.  The Court disagreed, holding that the timing of the subpoenas was not enough to undermine the presumption of regularity attaching to grand jury proceedings. *Id* at 581.  A similar result is appropriate here.

Defendants' cited cases do not change the analysis.  For example, Defendants rely on *Simels* as a rare example of a case where a defendant was able to show that a grand jury subpoena was being used for trial preparation.  That case, however, involved a very unique set of facts.  In *Simels*, a defendant was indicted on narcotics charges. *In re Grand Jury Subpoena Duces Tecum Dated Jan. 2, 1985 (Simels)*, 767 F.2d 27 (2d Cir. 1985).  Shortly after a superseding indictment was returned, the government sent a *trial* subpoena to the lawyer representing the defendant, demanding production of documentation relating to payment. *Id.* at 28.  This move drew objections from the subpoenaed lawyer and from the defense bar. *Id.*  In defending the trial subpoena, the prosecutor asserted that it was served "solely for evidentiary purposes" to gather admissible evidence that would help meet the government's burden on an element of a charged offense. *Id.* at 29.  The trial subpoena was adjourned pending reconsideration by the United States Attorney for that district. *Id.* at 28.  Shortly thereafter, the defense lawyer received a grand jury subpoena seeking the same materials called for by the trial subpoena. *Id.*

This case is different from *Simels* in at least two ways.  First, it was relatively easy for the defendant in *Simels* to show that prejudice might result from a subpoena targeting his lawyer and seeking information relating to the representation.  Here, in contrast, Defendants offer only vague speculation about what sensitive materials might be in Theranos's recent production.  Second, the *Simels* case involved affirmative evidence from which the court could find that the government was using the grand jury subpoena for trial preparation.  In this case, there is no evidence suggesting an improper motive.  Ultimately, a comparison of this case to *Simels* shows how far Defendants are from meeting their burden.

*United States v. Jeter*, an unpublished case from the District of Maryland, is the only case cited by Defendants where a court suggested that a grand jury could not obtain post-indictment compliance

with a pre-indictment subpoena. *Jeter* also is markedly different from this case.  In *Jeter*, the defendant was arrested for unlawful gun possession, and the government served a subpoena for the defendant's phone. *United States v. Jeter*, No. CCB-14-0121, 2015 WL 114118, *1 (D. Md. Jan. 7, 2015).  That defendant was indicted after the subpoena was served but before the phone was produced. *Id.*  Though the court declined to suppress any evidence, it concluded that it was improper for the government to receive the subpoenaed phone after the indictment. *Id.* at *2-3.  After the defendant had been charged with the simple, discrete crime of illegal gun possession, the court presumably concluded that the grand jury could not have been investigating additional criminal conduct.

The fraud perpetrated in this case, though, was anything but simple.  The story of Theranos stretches over several busy years and involves dozens of people.  The operative Indictment captures only part of that story, and the government is continuing to investigate events and individuals not described in the Indictment.  In particular, as explained above, the documents recently received from Theranos are from a time period after the latest count in the Indictment.  The nature of this case requires continued investigation beyond the indicted conduct.  Thus, this case is also distinguishable from *Star*, where the government "offered no other justification" for a grand jury subpoena other than pretrial discovery into a defendant's possible alibis. *United States v. Star*, 470 F.2d 1214, 1217 (9th Cir. 1972).

If courts adopted Defendants' reasoning, it would be nearly impossible for any grand jury investigation to continue past the first indictment, which could foreclose investigation of offenses like obstruction and money laundering.  Such a rule would give defense-friendly witnesses the power to delay indictments by resisting subpoenas, and would force the government to cut its investigations short as soon as an indictment became necessary.  Either result would hamper the grand jury's law enforcement mission.  "The effective functioning of a grand jury would be seriously affected if it was required to delay its return of an indictment to await an attempt to obtain evidence from a recalcitrant witness." *In re Russo*, 448 F.2d 369, 374 (9th Cir. 1971) (disapproved on other grounds).  At the same time, the government is under no duty to halt a criminal investigation the moment it has the minimum evidence necessary to establish probable cause. *Hoffa v. United States*, 385 U.S. 293, 310 (1966).

/ /

Defendants assert that the government's continuing investigation "does not relate to any superseding indictment." (Mot. at 7). Putting aside the fact that Defendants have no way of knowing whether the government is planning another superseding indictment, Defendant's argument also misstates the law. Courts recognize that a grand jury investigation "is not improper merely because it does not result in formal charges." *Leung*, 40 F.3d at 581-82.

Defendants also suggest that the Court should consider whether the grand jury has turned over since opening the investigation into Theranos. (Mot. at 4 n.1). In this case, the grand jury that commenced the investigation of Theranos is the same grand jury that handed down both the original and superseding indictments. That grand jury remains empaneled as of the date of this filing. Even if a new grand jury had taken over the investigation, though, that fact would not revive Defendants' arguments. The government routinely transfers investigation and evidence from expiring grand juries to successor grand juries. *See United States v. Claiborne*, 765 F.2d 784, 794 (9th Cir. 1985) (holding that the presentation of evidence to three grand juries in one case violated no procedural rule); *In re Grand Jury Proceedings (Sutton)*, 658 F.2d 782, 783 (10th Cir. 1981) (not improper to share evidence with successor grand jury even if not presented to preceding grand jury).

Although not required, the government is submitting a declaration averring that its post-indictment use of the grand jury subpoena has been in service of an ongoing investigation into criminal conduct beyond what is charged in the Indictment, and not for the sole or dominant purpose of preparing the case for trial. (Bostic Decl. ¶ 4). The government's responsibility to preserve the secrecy of the investigation prevents a more detailed disclosure,[3] but this level of general assurance has sufficed in similar cases. *See, e.g.*, *In re Grand Jury Proceedings (Pressman)*, 586 F.2d at 725 (Where the defendants accused the government of misusing the grand jury to collect trial evidence, the court noted that the government denied the assertion and the defendants had supplied no evidence); *United States v. (Under Seal)*, 714 F.2d at 350 (a subpoena may issue based on the government averring "that it is sought

---

[3] *See R. Enters., Inc.*, 498 U.S. at 299 ("Requiring the Government to explain in too much detail the particular reasons underlying a subpoena threatens to compromise the indispensable secrecy of grand jury proceedings.") (quotation omitted); s*ee also United States v. Index Newspapers LLC*, 766 F.3d 1072, 1084 (9th Cir. 2014) (discussing the reasons why grand jury secrecy is important).

GOVT. OPPOSITION TO MOTION FOR CEASE AND DESIST ORDER
18-CR-00258 EJD

1  in good faith to aid the grand jury's investigation" even where circumstances suggest the subpoena

2  might also be used to collect civil discovery).[4]

3        Accordingly, the Court should deny Defendants' motion because the evidence before the Court

4  supports the government's representation that its use of the grand jury subpoena has been in furtherance

5  of the ongoing investigation into events and individuals not named in the operative Indictment.

6  **IV.    CONCLUSION**

7        On the facts of this case, Defendants cannot carry their burden to show any misuse of the grand

8  jury subpoena.  Accordingly, the Court should deny Defendants' motion.

9

10  DATED:  September 24, 2018                    Respectfully Submitted,

11                                               ALEX G. TSE
                                                 United States Attorney
12

13                                                 /s/
                                                 _____
14                                               JEFF SCHENK
                                                 JOHN C. BOSTIC
15                                               ROBERT S. LEACH
                                                 Assistant United States Attorneys

16

17

18

19

20

21

22

23

24

25

26      _____

        [4]  Should the Court disagree with the government and find that Defendants have met their burden
27  to make a showing of grand jury misuse, the government is prepared to submit additional facts to the
    Court under seal detailing the scope of the ongoing investigation.  The government respectfully requests
28  the opportunity to make such a submission in advance of any adverse ruling.

GOVT. OPPOSITION TO MOTION FOR CEASE AND DESIST ORDER
18-CR-00258 EJD

1  ALEX G. TSE (CABN 152348)
   United States Attorney
2
   BARBARA J. VALLIERE (DCBN 439353)
3  Chief, Criminal Division

4  JEFF SCHENK (CABN 234355)
   JOHN C. BOSTIC (CABN 264367)
5  ROBERT S. LEACH (CABN 196191)
   Assistant United States Attorney
6
       150 Almaden Boulevard, Suite 900
7      San Jose, California 95113
       Telephone: (408) 535-5061
8      FAX: (408) 535-5066
       john.bostic@usdoj.gov
9
   Attorneys for United States of America
10

11              UNITED STATES DISTRICT COURT

12             NORTHERN DISTRICT OF CALIFORNIA

13                  SAN JOSE DIVISION

14

15  UNITED STATES OF AMERICA,            )   CASE NO. 18-CR-00258 EJD
                                         )
16          Plaintiff,                   )   DECLARATION OF JOHN BOSTIC IN SUPPORT
                                         )   OF UNITED STATES' OPPOSITION TO
17     v.                                )   DEFENDANTS' MOTION FOR CEASE AND
                                         )   DESIST ORDER
18  ELIZABETH A. HOLMES and              )
    RAMESH "SUNNY" BALWANI,              )   Date:   October 12, 2018
19                                       )   Time:   10:00 a.m.
            Defendants.                  )   Court:  Hon. Susan van Keulen
20                                       )

21  I, JOHN C. BOSTIC, declare as follows:

22       1.      I am an Assistant United States Attorney in the Northern District of California, licensed

23  and admitted to practice before this Court.  I submit this declaration in support of the government's

24  Opposition to Defendants' Motion for Cease and Desist Order.

25       2.      On September 6, 2017, a grand jury in the Northern District of California served a

26  subpoena on Theranos.  After serving the subpoena, the government had a series of discussions with

27  Theranos counsel regarding the company's response.  According to Theranos's lawyers, one of the

28
   BOSTIC DECLARATION RE MOTION FOR CEASE AND DESIST ORDER
   18-CR-00258 EJD
                                            1

1   company's chief goals in responding to the subpoena was to minimize expense.  In an effort to

2   accommodate that goal, the government extended Theranos's compliance deadline and agreed to accept

3   Theranos's responsive production on a rolling basis.  The government also agreed that, as a first step in

4   complying with the subpoena, Theranos could produce documents from a set it had already compiled in

5   connection with its litigation against investor Partner Fund Management.  Theranos lawyers informed

6   the government that this set of documents did not include any materials created after October 2016,

7   when that collection had occurred.

8        3.     Over the following months, Theranos sent the government a series of document

9   productions.  Government counsel communicated regularly with Theranos's lawyers during that time

10  period—by telephone, email, and written letter—as the two parties continued to negotiate Theranos's

11  rolling subpoena response.  In those discussions, the government was clear with Theranos that the

12  company would need to collect and produce documents created during the time period from October

13  2016 to September 2017 in order to comply with the subpoena.

14       4.     Following the original Indictment in June 2018, the government has continued its

15  investigation on behalf of the grand jury.  That investigation has included interviewing newly identified

16  witnesses and collecting additional evidence.  The government's post-indictment use of the grand jury

17  subpoena has not been for the sole or dominant purpose of preparing the case for trial, but has been in

18  service of an ongoing investigation into criminal conduct beyond what is charged in the Indictment.

19       5.     In particular, the government worked to complete its collection of necessary evidence

20  from Theranos, including relevant documents from the 2016-2017 time period not covered in Theranos's

21  earlier productions.  The government and Theranos negotiated at length regarding these documents.

22  Throughout those negotiations, Theranos was represented by several attorneys from Wilmer Hale, and

23  consistently indicated its desire to cooperate with the grand jury subpoena.  As the parties were nearing a

24  final agreement, counsel for Balwani sent a letter to the government, copying Theranos's lawyers,

25  objecting to any further production in response to the subpoena.  In response, Theranos counsel stated

26  that the company would withhold production of the remaining responsive documents.  The government

27  then informed Theranos that such a course of action would force the government to seek relief from the

28

BOSTIC DECLARATION RE MOTION FOR CEASE AND DESIST ORDER
18-CR-00258 EJD

1   Court.  A true and correct copy of that email exchange is attached hereto as **Exhibit A**.  Theranos

2   responded by confirming that it intended to produce the documents the parties had been discussing.

3         6.     On September 14, 2018, Theranos made its final production of documents in response to

4   the September 2017 grand jury subpoena.  Theranos counsel has informed me that Theranos excluded

5   from that production documents containing names from an extensive list of lawyers and law firms

6   retained by the company and the individual Defendants, including the lawyers and firms representing

7   Holmes and Balwani in this case.

8         7.     On September 21, 2018, I spoke with counsel representing the assignee who is now in

9   control of Theranos's assets and legal rights as the company goes through dissolution.  On that date,

10  counsel informed me that the assignee takes no position on Defendant's pending motion for a cease and

11  desist order.

12       I declare under penalty of perjury under the laws of the United States that the foregoing is true

13  and correct to the best of my knowledge.

14       Executed this 24th day of September in San Jose, California.

17                              JOHN C. BOSTIC

BOSTIC DECLARATION RE MOTION FOR CEASE AND DESIST ORDER
18-CR-00258 EJD

# EXHIBIT A

## Bostic, John (USACAN)

| | |
|---|---|
| **From:** | Bostic, John (USACAN) |
| **Sent:** | Saturday, September 01, 2018 4:37 PM |
| **To:** | 'Mugmon, Michael' |
| **Cc:** | 'Moran, Katie'; Schenk, Jeffrey (USACAN); 'Davies, Christopher'; 'Strickland, Thomas'; Leach, Robert (USACAN) |
| **Subject:** | RE: Grand Jury Subpoena Investigation #2016R00024 - Theranos, Inc. |

Michael,

Thanks for your email updating us on Theranos's intentions regarding the materials still outstanding under the grand jury subpoena.  While I understand your desire to minimize the burden on your client, I think the position outlined in your email is the wrong one for two important reasons.

First, Mr. Balwani's counsel is incorrect that the government is making improper use of the grand jury subpoena.  A subpoena does not become unenforceable simply because an indictment has come down.  Even after indictment, there is "no bar to investigation of other areas of criminal liability for which the defendants or co-defendants may be accountable." *In re Grand Jury Proceedings*, 586 F.2d 724, 725 (9th Cir. 1978).  "Indeed, the duties of the grand jury are not performed until every clue and all witnesses are examined in order to charge the proper person with the appropriate crime." *Id.*  It is thus a recognized rule that "the return of an indictment does not provide any legal basis for a subpoenaed witness to refuse to comply with the grand jury subpoena so long as a lawful grand jury proceeding continues." *In re Grand Jury Proceedings*, 632 F.2d 1033, 1041 (3d Cir. 1980) (collecting cases).  This reasoning applies with even greater force where the government served its subpoena months before the indictment but accommodated the recipient's request to respond by rolling production.

Second, please remember that the obligations imposed by the pending subpoena are solely the responsibility of Theranos.  There are obvious reasons why Mr. Balwani's lawyers might wish to limit the grand jury's evidence collection.  The company, however, must make its own decision about whether to comply with the subpoena.  Because the pending subpoena is a matter between the government and Theranos itself, it is inappropriate for the company to condition its compliance on the government reaching a side agreement with a third party.  Therefore, rather than negotiating this issue with Mr. Balwani's lawyers, we intend to seek relief from the court.  We are still open to a negotiated resolution, but we're conscious of the fact that the company's dwindling resources leave us with limited time.  Please contact me by close of business on September 4 if you wish to avoid motion practice.

Regards,
John

---

**From:** Mugmon, Michael [mailto:Michael.Mugmon@wilmerhale.com]
**Sent:** Friday, August 31, 2018 7:47 PM
**To:** Bostic, John (USACAN) <jbostic@usa.doj.gov>
**Cc:** Moran, Katie <Katie.Moran@wilmerhale.com>; Schenk, Jeffrey (USACAN) <JSchenk@usa.doj.gov>; Davies, Christopher <Christopher.Davies@wilmerhale.com>; Strickland, Thomas <Thomas.Strickland@wilmerhale.com>
**Subject:** Re: Grand Jury Subpoena Investigation #2016R00024 - Theranos, Inc.

John,

We sent you the transcripts yesterday. With regard to the non-privileged email communications from 2016-17, we have now seen the letter that Jeff Coopersmith sent your office today. In light of his having raised the issue regarding the

propriety of DOJ's seeking these documents, we do not believe that it is prudent to produce them or any portion of them until you and he have resolved the concern in such a way that requires the production of all or some of them. Please advise us when the issue is resolved.

Best regards,
Michael