1   JOHN D. CLINE (CA State Bar No. 237759)
    One Embarcadero Center, Suite 500
2   San Francisco, CA 94111
    Telephone: (415) 662-2260 │Facsimile: (415) 662-2263
3   Email: cline@johndclinelaw.com

4   KEVIN M. DOWNEY (Admitted Pro Hac Vice)
    LANCE A. WADE (Admitted Pro Hac Vice)
5   SEEMA MITTAL ROPER (Admitted Pro Hac Vice)
    MICHELLE CHEN (Admitted Pro Hac Vice)
6   WILLIAMS & CONNOLLY LLP
    725 Twelfth Street, NW
7   Washington, DC 20005
    Telephone: (202) 434-5000 │Facsimile: (202) 434-5029
8   Email: KDowney@wc.com; LWade@wc.com; SMRoper@wc.com; MChen@wc.com

9   Attorneys for Defendant ELIZABETH A. HOLMES

10

11                         UNITED STATES DISTRICT COURT

12                       NORTHERN DISTRICT OF CALIFORNIA

13                              SAN JOSE DIVISION

14

15  UNITED STATES OF AMERICA,              )   Case No. CR-18-00258-EJD
                                           )
16          Plaintiff,                     )   **MOTION TO COMPEL PRODUCTION OF**
                                           )   **RULE 16 DISCOVERY AND *BRADY***
17      v.                                 )   **MATERIALS**
                                           )
18  ELIZABETH HOLMES and                   )   Date:  April 29, 2019
    RAMESH "SUNNY" BALWANI,                )   Time:  1:30 p.m.
19                                         )   CTRM:  4, 5th Floor
            Defendants.                    )
20                                         )   Hon. Edward J. Davila
    _____)

21

22

23

24

25

26

27

28

1

## NOTICE OF MOTION AND MOTION

2

PLEASE TAKE NOTICE that on April 29, 2019, at 1:30 p.m., or as soon thereafter as the matter

3

may be heard, in Courtroom 4, located at the San Jose Courthouse, 280 South First Street, San Jose, CA

4

95113, Defendant Elizabeth Holmes will move this Court for an order directing the government to

5

produce certain discovery under Rule 16 and to disclose certain materials under *Brady v. Maryland*, 373

6

U.S. 83 (1963).

7

Defendant brings this Motion pursuant to Criminal Local Rules 12-1, 16-2 and 47-1, the Federal

8

Rules of Criminal Procedure, and the United States Constitution.  The Motion is based on this Notice,

9

Memorandum of Points and Authorities, the Declarations of Lance Wade, the record in this case, oral

10

argument as permitted by the Court, and any other matters that the Court deems appropriate.

11

12

DATED: April 15, 2019

13

14

/s/ Lance Wade_____
KEVIN DOWNEY

15

LANCE WADE

16

Attorneys for Elizabeth Holmes

17

18

19

20

21

22

23

24

25

26

27

28

MOTION TO COMPEL PRODUCTION OF RULE 16 DISCOVERY AND BRADY MATERIALS
CR-18-00258 EJD

# TABLE OF CONTENTS

Page

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................................1

FACTUAL BACKGROUND .........................................................................................................2

    I.     The Charges. ...............................................................................................................2

    II.    The Government's Case Rests on Regulatory Agency Materials. .............................2

         A.    FDA. ...............................................................................................................3

         B.    CMS .................................................................................................................4

         C.    CDPH .............................................................................................................5

         D.    SEC .................................................................................................................6

    III.   The Government Artificially Limits the Scope of its Rule 16 and *Brady*
         Obligations. ...................................................................................................................7

GOVERNING LAW .......................................................................................................................8

    I.     Rule 16 ........................................................................................................................8

    II.    *Brady* ........................................................................................................................10

ARGUMENT .................................................................................................................................11

    I.     The Government Must Produce Responsive Documents Maintained by CMS
         and FDA. ....................................................................................................................11

         A.    The Government Has Knowledge of, and Access to, the Requested
            FDA and CMS Documents. .........................................................................11

         B.    The Requested CMS and FDA Documents Are Material and
            Favorable.......................................................................................................14

                1.    CMS and FDA Communications Regarding Theranos with
                    John Carreyrou or the *Wall Street Journal*. ..............................14

                2.    CMS Documents and Communications Regarding Theranos'
                    CLIA Compliance Before and After the 2015 CLIA Survey. .......16

                 3.    CMS and FDA Communications Regarding Theranos with
                    Other Clinical Laboratory Companies. .........................................18

                4.    FDA Documents and Communications Regarding FDA
                    Approval Requirements for Theranos' Proprietary Technology. ...19

    II.    The Government Must Produce Documents Memorializing Communication
         with Witnesses Maintained by the SEC. ...................................................................20

    III.   The Government Must Produce Documents Relating to the 2013 CLIA Survey
         of Theranos Maintained by CMS and/or CDPH. .....................................................22

CONCLUSION ..............................................................................................................................25

1

**<u>TABLE OF AUTHORITIES</u>**

2

**FEDERAL CASES**

3

*Brady v. Maryland*, 373 U.S. 83 (1963) ............................................................ *passim*

4

*Kyles v. Whitley*, 414 U.S. 419 (1995)..........................................................23

5

*United States v. Bergonzi*, 216 F.R.D. 487 (N.D. Cal. 2003) ....................................8

6

*United States v. Bryan*, 868 F.2d 1032 (9th Cir. 1989) ................................... *passim*

7

*United States v. Cerna*, 633 F. Supp. 2d 1053 (N.D. Cal. 2009)........................12, 23, 24

8

*United States v. Feathers*, 2016 WL 7337518 (N.D. Cal. Dec. 19, 2016) ..............21

9

*United States v. Gatto*, 763 F.2d 1040 (9th Cir. 1985) ................................23

10

*United States v. Gupta*, 848 F. Supp. 2d 491 (S.D.N.Y. 2012) ....................21

11

*United States v. Libby*, 429 F. Supp. 2d 1 (D.D.C. 2006)..........................13

12

*United States v. Lindsey*, 850 F.3d 1009 (9th Cir. 2017).........................17

13

*United States v. Liquid Sugars, Inc.*, 158 F.R.D. 466 (E.D. Cal. 1994) ..............23

14

*United States v. McNeil*, 320 F.3d 1034 (9th Cir. 2003) ..........................22

15

*United States v. Muniz-Jaquez*, 718 F.3d 1180 (9th Cir. 2013)........................9, 17

16

*United States v. Olsen*, 704 F.3d 1172 (9th Cir. 2013)...............................11

17

*United States v. PG&E*, 2015 WL 3958111 (N.D. Cal. June 29, 2015)........................24, 25

18

*United States v. Price*, 566 F.3d 900 (9th Cir. 2009).......................10, 11, 23, 24

19

*United States v. Prokop*, 2012 WL 475543 (D. Nev. Feb. 12, 2012) ....................13

20

*United States v. Safavian*, 233 F.R.D. 12 (D.D.C. 2005) ....................10, 11

21

*United States v. Santiago*, 46 F.3d 885 (9th Cir. 1995) ..................1, 9, 10, 12

22

*United States v. Salyer*, 271 F.R.D. 148 (E.D. Cal. 2010)........................10

23

*United States v. Stever*, 603 F.3d 747 (9th Cir. 2010) ........................8, 9, 12

24

*United States v. Stringer*, 535 F.3d 929 (9th Cir. 2008) ........................20

25

*United States v. Swenson*, 2013 WL 4735591 (D. Idaho Sept. 3, 2013) ................13

26

*United States v. Thomas*, 545 F. Supp. 2d 1018 (N.D. Cal. 2008) ..........................9

27

28

*United States v. Trevino*, 556 F.2d 1265 (5th Cir. 1977)............................................................10

*United States v. W. R. Grace & Co.*, 401 F. Supp. 2d 1069 (D. Mont. 2005) ................................. *passim*

*United States v. W. R. Grace & Co.*, 402 F. Supp. 2d 1178 (D. Mont. 2005) ..........................................25

*United States v. Williams*, 2015 WL 3830515 (N.D. Cal. June 19, 2015).................................24

*United States v. Wood*, 57 F.3d 733 (9th Cir. 1995).....................................................11, 14, 18

*United States v. Zuno-Arce*, 44 F.3d 1420 (9th Cir. 1995) .......................................................11

**STATUTES, REGULATIONS, AND RULE**

18 U.S.C. § 1343......................................................................................................................2

18 U.S.C. § 1349......................................................................................................................2

42 U.S.C. § 263a(e)..................................................................................................................5

42 C.F.R. § 493.553 ................................................................................................................5

42 C.F.R. § 493.555(a).............................................................................................................6

42 C.F.R. § 493.555(c)(5).........................................................................................................6

42 C.F.R. § 493.557(b)(9).........................................................................................................6

42 C.F.R. § 493.557(b)(13).......................................................................................................6

42 C.F.R. § 493.557(b)(14).......................................................................................................6

Fed. R. Crim. P. 16 ........................................................................................................ *passim*

## MEMORANDUM OF POINTS AND AUTHORITIES

The government intends to rely at trial on documents created by several federal and state agencies that regulated aspects of or were otherwise involved with Theranos' business. It also may rely on testimony from those agencies' employees. The government has obtained the documents—which number in the hundreds of thousands—and witness interviews through the agencies' extensive voluntary cooperation. Despite that cooperation and the centrality of these agencies to its case, the government has refused repeated requests to produce certain documents material to the preparation of the defense from those same agencies' files or to search those files for favorable material under *Brady v. Maryland*, 373 U.S. 83 (1963). The government asserts that such production and search are not required because the agencies are not part of the "prosecution team," which the government has arbitrarily defined to exclude the very agencies on whose data, documents, and witnesses it has built its case.

The government's artificial limitation of its Rule 16 and *Brady* obligations is wrong—the Ninth Circuit has never recognized the "prosecution team" concept that the government invokes. Rather, the government must produce such documents if it has knowledge of, and access to, the materials sought. *United States v. Santiago*, 46 F.3d 885, 894 (9th Cir. 1995); *United States v. Bryan*, 868 F.2d 1032, 1036 (9th Cir. 1989). As demonstrated below, the government unquestionably has knowledge of, and access to, the requested agency documents because it previously ***asked for and received carte blanche access to*** any and all of these agencies' files as they relate to Theranos and the defendants (Ms. Holmes and Mr. Balwani), and for other reasons. The Court should reject the government's attempt to build its criminal prosecution out of regulatory agency materials while simultaneously denying Ms. Holmes access to those same sources of evidence that she needs to mount a defense.

To that end, this motion seeks the following six narrow categories of documents:

**Category 1**: Any and all correspondence or communications regarding Theranos between the government[1] and John Carreyrou, The *Wall Street Journal*, or their employees, agents, or counsel, and all government documents, communications, correspondence, notes, or recordings (including intra-agency and/or inter-agency correspondence) regarding same.

**Category 2:** Any and all government documents, communications, correspondence, notes, or

---

[1] For the purposes of this motion, the "government" is defined to include the Food and Drug Administration ("FDA"), the Center for Medicare and Medicaid Services ("CMS"); the California Department of Public Health ("CDPH"); and the Securities and Exchange Commission ("SEC").

recordings (including intra-agency and/or inter-agency communications) regarding Theranos' Clinical Laboratory Improvement Amendments ("CLIA") compliance during the time period of the charged conspiracies, including but not limited to those that concern the 2015 CLIA survey of Theranos.

**Category 3**:  Any and all correspondence or communications regarding Theranos between the government and any clinical laboratory company or association affiliated with clinical laboratories (including but not limited to LabCorp, Quest Diagnostics, and the American Clinical Lab Association), or their employees, agents, or counsel, and all government documents, communications, correspondence, notes, or recordings (including intra-agency and/or interagency correspondence) regarding same.

**Category 4**:  Any and all government documents, communications, correspondence, notes, or recordings (including intra-agency and/or inter-agency communications) regarding the FDA's determination of the type of FDA approval required for Theranos' proprietary technology.

**Category 5**:  Any and all FBI 302s or other agency ROIs memorializing government communications with witnesses, and all government documents, communications, correspondence, notes, or recordings (including intra-agency and/or inter-agency correspondence) regarding same.

**Category 6**:  Any and all government documents, communications, correspondence, notes, or recordings (including intra-agency and/or inter-agency communications) regarding the 2013 CLIA survey of Theranos.

## FACTUAL BACKGROUND

### I.    The Charges.

On June 14, 2018, a grand jury returned an indictment charging Ms. Holmes and her co-defendant Ramesh "Sunny" Balwani with two counts of conspiracy to commit wire fraud, 18 U.S.C. § 1349, and nine counts of wire fraud, 18 U.S.C. § 1343, allegedly committed while the two served as Chief Executive Officer (Ms. Holmes) and Chief Operating Officer (Mr. Balwani) of Theranos, Inc. ECF No. 1.  A nearly identical superseding indictment was returned on September 6, 2018, adding reference to an additional investor in Theranos.  ECF No. 39.  The indictment alleges that Ms. Holmes and Mr. Balwani defrauded investors in Theranos by making false and misleading statements regarding, among other things, the capabilities of Theranos' technology, *id.* ¶¶ 11-13, and also defrauded patients and doctors through fraudulent claims about the company's blood tests, *id.* ¶¶ 14-18.

### II.   The Government's Case Rests on Regulatory Agency Materials.

The following agencies likely hold material responsive to the defense's narrowly tailored

requests:  FDA, CMS[2]; CDPH; and SEC.[3]

### A.     FDA

The FDA has a broad regulatory scope that encompassed significant aspects of Theranos' business.  The FDA's mandate includes protecting public health by assuring that medical devices intended for human use are safe and effective.[4]  Additionally, the FDA regulates in-home and laboratory diagnostic tests through its Office of In Vitro Diagnostics and Radiological Health.[5]

The nature of Theranos' business led to extensive interaction with the FDA, beginning as early as 2005 when the company first provided the FDA with information about technology then under development.  Theranos representatives met with FDA employees on many occasions in the following years and made a number of submissions during the time period of the charged conspiracies.  In mid-2015, for example, the FDA cleared Theranos' fingerstick HSV-1 test, which was run on Theranos' proprietary technology with samples collected using Theranos' proprietary collection device.  In August 2015, after being contacted by the media, the FDA conducted an inspection of Theranos' facilities.  These repeated interactions with the FDA generated a large volume of FDA documents and communications regarding Theranos.  The prosecution has produced in discovery over 40,000 pages of FDA documents that it may seek to use in its case-in-chief, including internal FDA communications.

But the FDA's role was not limited to regulating Theranos' business and devices.  The FDA also played a pivotal role in the government's criminal investigation, as the government's public statements and charging documents have long made clear.  Form AO 257, attached to the Superseding Indictment, lists the FDA among the complainants in the case.  ECF No. 39.  And the Department of Justice ("DOJ")

---

[2] FDA and CMS are component entities of the United States Department of Health and Human Services ("HHS").

[3] The defense does not purport to limit the universe of federal or state agencies over whose documents the government has possession, custody, or control for Rule 16 or *Brady* purposes to these four agencies.  Rather, pursuant to Rule 16 and *Brady*, the defense has tailored the present motion to encompass those agencies that are very likely to possess materials falling into one or more of the narrow categories previously requested.

[4] FDA, *What does FDA do?*,
https://www.fda.gov/AboutFDA/Transparency/Basics/ucm194877.htm (last updated Apr. 3, 2019).

[5] FDA, *CDRH Offices:  Office of In Vitro Diagnostics and Radiological Health*,
https://www.fda.gov/aboutfda/centersoffices/officeofmedicalproductsandtobacco
/cdrh/cdrhoffices/ucm115904.htm (last updated Sept. 19, 2018).

press release announcing the indictment in this case was joined by FDA Commissioner Scott Gottlieb.[6] These statements accord with the FDA's key role in developing the government's case. The government's Rule 16 disclosures include memoranda of 41 witness interviews conducted or attended by FDA agents. The government's production of these memoranda evidence not only the government's reliance on FDA fact-finding, but also the high degree of collaboration between DOJ and FDA in that process—at least 27 of those 41 interviews were jointly conducted by FDA and DOJ agents or attorneys. Indeed, as discussed further below, the government has characterized the FDA's Office of Criminal Investigations as part of its "prosecution team."

Furthermore, the Superseding Indictment makes plain the centrality of FDA documents to the case. It alleges that Ms. Holmes and Mr. Balwani falsely "represented to investors that Theranos did not need the [FDA] to approve its proprietary analyzer and tests, but instead that Theranos was applying for FDA approval voluntarily because it was the 'gold standard'; when in truth [they] knew that by late 2013 and throughout 2014, the FDA was requiring Theranos to apply for clearance or approval for its analyzer and tests." ECF No. 39 ¶ 12(F). During the investigation, the government sought to elicit statements from witnesses as to what FDA was "requiring," including statements about internal agency communications. *See* Ex. 1 at 2, 5 (excerpt of FDA interview memorandum of Alberto Gutierrez). The government apparently intends to introduce evidence of the FDA's purported "requirements" at trial.

### B.    CMS

CMS is another HHS entity that interacted with Theranos during the time period covered by the indictment. CMS regulates all laboratory testing performed on humans in the United States through CLIA.[7] All clinical laboratories require a CLIA certificate and are subject to CMS oversight.

Theranos' operation of a clinical laboratory led to substantial contact with CMS. For example, a CMS representative visited Theranos and toured its facilities in 2012. Theranos representatives also met

---

[6] United States Attorney's Office Northern District of California, *Theranos Founder and Former Chief Operating Officer Charged in Alleged Wire Fraud Schemes* (June 15, 2018), https://www.justice.gov/usao-ndca/pr/theranos-founder-and-former-chief-operating-officer-charged-alleged-wire-fraud-schemes.

[7] CMS, *Clinical Laboratory Improvement Amendments (CLIA)*, https://www.cms.gov/Regulations-and-Guidance/Legislation/CLIA/index.html (last updated Mar. 29, 2019).

with CMS employees in late 2013 and early 2014.  As discussed below in the section regarding CDPH, the CDPH's California Laboratory Field Services section conducted a December 2013 inspection of Theranos in collaboration with CMS.  And CMS conducted a survey of Theranos' facilities in September 2015, purportedly spurred by two complaints CMS had received, as well as media stories on Theranos.  CMS also conducted an inspection of Theranos' Arizona laboratory in September 2016.  Ultimately, CMS proposed sanctions in 2016 against Theranos based on the inspections that it performed in 2015 and 2016.

The government's production of CMS materials is highly selective, however.  The prosecution has made three productions of documents it obtained from CMS, totaling over 260,000 pages and an additional 8 GB of data, which it may attempt to offer in its case-in-chief.  These documents largely concern patient lab test results, documents that Theranos submitted to CMS in connection with the 2015 survey, and external CMS communications with Theranos.  Conspicuously missing are any internal agency communications that were created in the many years of CMS' oversight of Theranos.

### C.    CDPH

CMS is not the only agency that oversaw Theranos' CLIA compliance.  Rather, CLIA envisions extensive state-federal cooperation to enforce the federal standards.  To that end, federal law empowers qualified state agencies to issue CLIA accreditation.  *See* 42 U.S.C. § 263a(e) (CLIA accreditation materials may be submitted to an approved "State agency"); *see also* 42 C.F.R. § 493.553 (listing documentation required for an approved "State licensure program" to issue CLIA accreditations).  The federal CMS website directs new applicants for CLIA certifications to file their "CLIA application form" with "the local State Agency for the state in which [their] laboratory resides."[8]

A state agency often is responsible for lab accreditation through this federal-state scheme, but CMS "retains ultimate authority over the applicable CLIA laboratory testing within the State program."[9]

---

[8] CMS, *How to Apply for a CLIA Certificate, Including International Laboratories*, https://www.cms.gov/Regulations-and-Guidance/Legislation/CLIA/How_to_Apply_for_a_CLIA_Certificate_International_Laboratories.html (last updated Nov. 9, 2017).

[9] CMS, *Partners in Laboratory Oversight* (Sept. 2006), https://www.cms.gov/Regulations-and-Guidance/Legislation/CLIA/Downloads/090606-RevPartners-Lab-Oversight.pdf.

1    Accordingly, CMS retains significant control over a state agency's CLIA enforcement standards and

2    over the data it collects.  Federal regulations mandate that CMS ensure that the "State's requirements for

3    laboratories are equal to, or more stringent than," the federal standards.  42 C.F.R. § 493.555(a).  And

4    those same regulations require that the state agency regularly notify CMS of any significant CLIA

5    enforcement actions and to provide to CMS, upon request, any inspection schedules "for validation

6    purposes."  42 C.F.R. § 493.555(c)(5); *see also* 42 C.F.R. § 493.557(b)(9) (requiring state licensure

7    program to submit "information for the review of the State's enforcement procedures for laboratories

8    found to be out of compliance with the State's requirements").  Moreover, state agencies are obligated to

9    take enforcement action on behalf of CMS "against laboratories found by CMS not to be in compliance"

10   with federal standards and to "report these enforcement actions to CMS."  42 C.F.R. § 493.557(b)(13).

11   State agencies pay fees under contracts with CMS and must "reapply to CMS every 2 years" to renew

12   their status.  42 C.F.R. § 493.557(b)(14).  It is no wonder, then, that CMS employees interviewed by the

13   government in this case describe their state counterparts as acting as CMS "agents" when conducting

14   routine CLIA inspections.

15        The California state agency division with responsibility over Theranos' CLIA compliance was

16   the CDPH's Laboratory Field Services section.  The office's mission "is to ensure compliance with State

17   and federal clinical laboratory laws and regulations" in part by "performing biannual onsite inspections

18   to ensure accuracy and reliability of laboratory test results."[10]  The CDPH conducted an initial survey of

19   Theranos in January 2012 and conducted another in December 2013.  At the culmination of the 2013

20   survey, the CDPH issued a few standard-level deficiencies, which Theranos promptly corrected.  The

21   CDPH then reissued Theranos' CLIA certification.

22        **D.    SEC**

23        The SEC began investigating Theranos immediately following publication of an October 15,

24   2015, *Wall Street Journal* article regarding the company.  The DOJ began its investigation shortly

25   thereafter.  It appears that by early 2016, the SEC and DOJ were jointly investigating the company.  The

26

27
---
[10] CDPH, *Laboratory Field Services*,

28   https://www.cdph.ca.gov/Programs/OSPHLD/LFS/Pages/CLIA.aspx (last updated July 12, 2018).

1   SEC and DOJ's investigation included parallel document requests to Theranos.  *See* Ex. 2 (excerpts

2   from 10/22/15 SEC document request and 1/11/16 DOJ subpoena requesting documents provided to

3   investors).  FBI 302 memoranda identify SEC agents as having participated in at least 57 joint witness

4   interviews with DOJ attorneys or case agents assigned to the government's investigation.  *See, e.g.*, Exs.

5   3 (excerpt of 302 memorandum of Craig Hall); 4 (excerpt of 302 memorandum of Daniel Mosley).  The

6   SEC's investigation led to civil complaints against Theranos, Ms. Holmes, and Mr. Balwani in March

7   2018, three months before the initial indictment was returned in this case.  The SEC's case against

8   Theranos and Ms. Holmes was resolved, while the case against Mr. Balwani remains pending before this

9   Court.  The SEC and DOJ's collaboration nevertheless continues; a deponent in the SEC case recently

10  testified that he had prepared for his deposition on a call attended by **both** SEC and DOJ attorneys.  The

11  SEC also continues to provide the prosecution with documents produced by the SEC in the civil case.

12  **III.    The Government Artificially Limits the Scope of its Rule 16 and *Brady* Obligations.**

13          The government made its first production in this case on August 7, 2018, and has produced

14  documents on a rolling basis thereafter.  Conspicuous gaps exist in the agency records produced.  On

15  February 5, 2019, the defense wrote to the government requesting certain agency materials under Rule

16  16 and *Brady*.  *See* Ex. 5 at 1-2 (collected correspondence with government).  On February 8, 2019, the

17  defense requested five additional categories of agency materials and reiterated that the agencies subject

18  to its request included the FDA, CMS, and SEC, among others.  *See id.* at 3-4.

19          The government responded only to the February 5 letter.  *See id.* at 5-7.  Notably, in its response,

20  the government did not dispute that the requested documents were material to the defense under either

21  Rule 16 or *Brady*.  Rather, the government stated that it was refusing the defense's request based solely

22  on which agency maintained the documents.  The government divided the agencies identified in the

23  defense's letter into two groups:  (1) those that constitute what it defines as the "the 'prosecution

24  team'"—*i.e.*, the United States Attorney's Office, the Federal Bureau of Investigation, the United States

25  Postal Inspection Service, and the FDA's Office of Criminal Investigation, (2) and those that do not—

26  *i.e.*, everything else, including the remainder of the FDA, the SEC, and CMS.  *See id.*  According to the

27  government, its Rule 16 and *Brady* obligations extend only to agencies that are part of what it defines to

28

be the "prosecution team." *Id.* The government cited no authority for this limitation.

On March 27, 2019, the defense replied to the government's letter, explaining that its conception of the "prosecution team" is wrong and reiterating its request for the categories of materials that are the subject of this motion. *See id.* at 8-12. The defense requested that the government meet and confer regarding the requests outlined in that letter, as well as those from the defense's unanswered February 8 letter. *See id.* The parties met and conferred on April 1, 2019, and again four days later on April 5, 2019, during which the government twice reiterated its position that the defense is not entitled to the requested documents. Additionally, during the April 5 conference, the government offered to "voluntarily request" the documents from the relevant agencies but at the same time relayed messages from the agencies suggesting that any such request would be futile. *See id.* at 14-15. According to the government, at least some of the agencies expressed misgivings about producing documents that would go "directly to" the defense. While the agencies complied with the government's requests to produce voluminous documents during the investigation, they indicated that they would be ***less likely*** to agree to produce the requested documents post-indictment to assist in preparing the defense. *See id.* Other agency statements relayed by the government communicated the same point. *See id.*

On April 7, 2019, it being apparent that the defense and the government fundamentally disagreed about the scope of the government's discovery obligations, and given the statements from the agencies suggesting that they are not likely to assist in collecting the requested documents absent a court order, the defense wrote to the government stating its intention to file this motion. *See id.* at 14-15.

## GOVERNING LAW

### I.    Rule 16

Rule 16(a)(1)(E) "grants criminal defendants a broad right to discovery." *United States v. Stever*, 603 F.3d 747, 752 (9th Cir. 2010). The rule requires the production, upon the defendant's request, of documents within the government's possession, custody, or control that are "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E). The standard for materiality is not burdensome; evidence—whether inculpatory or exculpatory—is "material" for purposes of Rule 16 if it is "helpful" to crafting a defense. *Stever*, 603 F.3d at 752 (internal quotation marks omitted); *see also United States v.*

*Bergonzi*, 216 F.R.D. 487, 501 (N.D. Cal. 2003) ("The materiality requirement [of Rule 16], however, is not a 'heavy burden' . . . ."). A defendant need only make a "threshold showing of materiality," which entails "a presentation of facts which would tend to show" that the government possesses helpful information. *Stever*, 603 F.3d at 752 (internal quotation marks omitted). "Rule 16 is thus broader than *Brady*," encompassing not only exculpatory or impeaching information but any documents that are "relevant to developing a possible defense." *United States v. Muniz-Jaquez*, 718 F.3d 1180, 1183 (9th Cir. 2013); *see also United States v. Thomas*, 545 F. Supp. 2d 1018, 1025 (N.D. Cal. 2008) (granting Rule 16 discovery of material "relevant" to anticipated defense argument). The government does not dispute that the documents sought here meet the standard for production—*i.e.*, that they are material to the preparation of the defense. Rather, the government tries to confine its obligations by redefining the standard for possession, custody, and control.

Rule 16(a)(1)(E) sweeps broadly beyond materials in the prosecutor's physical possession to include documents maintained by other government agencies if the prosecutor has knowledge of, and access to, the documents sought. *United States v. Bryan*, 868 F.2d 1032, 1036 (9th Cir. 1989); *see also Stever*, 603 F.3d at 752 ("Information is in the possession of the government if the prosecutor has knowledge of and access to the documents sought by the defendant." (internal quotation marks omitted)). At a minimum, a prosecutor is "deemed to have knowledge of and access to anything in the possession, custody or control of any federal agency participating in the same investigation of the defendant." *Bryan*, 868 F.2d at 1036. But, as the Ninth Circuit has held, agency involvement is a sufficient but not necessary factor in determining a prosecutor's possession, custody, or control over an agency's documents. *See United States v. Santiago*, 46 F.3d 885, 893-94 (9th Cir. 1995) (holding that prosecutor had possession of documents maintained by Bureau of Prisons despite district court's finding that the agency had not participated in the "particular investigation" culminating in the indictment). The Ninth Circuit thus has expressly rejected the proposition, urged by the government here, that the government's Rule 16 obligations are limited to members of the "prosecution team." *See United States v. W. R. Grace & Co.*, 401 F. Supp. 2d 1069, 1078 (D. Mont. 2005) (noting that the "'prosecution team' concept . . . is a product of case law from other circuits" that is incompatible with Ninth Circuit law).

1    A prosecutor's knowledge of, and access to, agency documents can be shown in several ways.

2    As noted above, knowledge of, and access to, agency files is assumed if the agency was involved in

3    more than a minor way with the government's investigation.  *See, e.g.*, *Bryan*, 868 F.2d at 1036 (holding

4    IRS documents discoverable in mail fraud prosecution involving false tax returns); *see also United*

5    *States v. Salyer*, 271 F.R.D. 148, 156 (E.D. Cal. 2010) (contrasting agencies that provide "significant

6    amounts of information to the prosecutor," over whose documents the prosecutor will be deemed to have

7    access, with agencies from which the prosecutor has "obtained a stray document or two," over whose

8    documents he may lack access).  But knowledge and access may also be demonstrated by the fact that

9    the government previously obtained information from an agency for use in its case.  In *Santiago*, the

10   Ninth Circuit found that the prosecutor "certainly" knew about and could access the requested prison file

11   on an inmate witness because the prosecutor had been able to obtain the defendant's prison file from the

12   Bureau of Prisons.  *See* 46 F.3d at 894.  Similarly, in *W. R. Grace* the court held that the government's

13   production to the defense of documents from a federal agency that were favorable to the prosecution

14   demonstrated its knowledge of, and access to, additional, related documents sought by the defense.  *See*

15   401 F. Supp. 2d at 1085; *accord United States v. Trevino*, 556 F.2d 1265, 1272 (5th Cir. 1977)

16   ("Certainly the prosecutor would not be allowed to avoid disclosure of evidence by the simple expedient

17   of leaving relevant evidence to repose in the hands of another agency while utilizing his access to it in

18   preparing his case for trial; such evidence is plainly within his Rule 16 'control.'").

## II.    *Brady*

20   The Due Process Clause of the Fifth Amendment requires disclosure of evidence in the

21   government's possession, custody, or control that is favorable to the accused and material to either guilt

22   or punishment.  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  Evidence is favorable "either because it is

23   exculpatory, or because it is impeaching."  *United States v. Price*, 566 F.3d 900, 907 (9th Cir. 2009)

24   (internal quotation marks omitted).  Before trial, assessing the materiality of potential *Brady* evidence

25   "necessarily is speculative on so many matters that simply are unknown and unknowable until trial

26   begins."  *United States v. Safavian*, 233 F.R.D. 12, 16 (D.D.C. 2005).  For this reason, the Ninth Circuit

27   has indicated that, in the pre-trial context, "the proper test" for materiality "should be an evaluation of

whether the evidence is favorable to the defense" and that any doubts "should be resolved in favor of the defendant and full disclosure made." *Price*, 566 F.3d at 913 n.14 (internal quotation marks omitted); *see also United States v. Olsen*, 704 F.3d 1172, 1183 n.3 (9th Cir. 2013) (citing *Safavian* for this proposition). In this way, the materiality test for *Brady* and Rule 16 collapse in the pre-trial context.

The test for whether the government has "possession, custody, or control" over agency materials for *Brady* purposes is the same one that applies in the Rule 16 context—that is, the government must disclose any *Brady* material housed at government agencies of which it has knowledge and to which it has access. *See Bryan*, 868 F.2d at 1073; *W.R. Grace*, 401 F. Supp. 2d at 1078; *see also United States v. Zuno-Arce*, 44 F.3d 1420, 1427 (9th Cir. 1995) ("Exculpatory evidence cannot be kept out of the hands of the defense just because the prosecutor does not have it, where an investigating agency does."), *overruled on other grounds by Valerio v. Crawford*, 306 F.3d 742, 764 (9th Cir. 2002) (en banc). Any other rule "would undermine *Brady* by" permitting the prosecutor selectively to comb agency files for inculpatory materials while leaving exculpatory or impeachment evidence behind and out of the defense's reach. *Zuno-Arce*, 44 F.3d at 1427. The potential for that type of abuse is particularly acute in complex prosecutions borne of prior regulatory inquiries by federal or state agencies. *See United States v. Wood*, 57 F.3d 733, 737 (9th Cir. 1995). In *Wood*, the Ninth Circuit remanded a conviction for conspiracy to defraud the FDA based on the government's suppression of exculpatory material compiled and maintained by the FDA. *See id.* (holding that, "[f]or *Brady* purposes, the FDA and prosecutor were one" because the agency had "consulted with the prosecutor in the steps leading to [the] prosecution" for violation of a regulatory scheme that it oversaw. The court explained that the "government cannot with its right hand say it has nothing while its left hand holds what is of value," especially where an "agency interested in the prosecution" maintained files containing exculpatory information. *Id.*

## ARGUMENT

## I.    The Government Must Produce Responsive Documents Maintained by CMS and FDA.

### A.    The Government Has Knowledge of, and Access to, the Requested FDA and CMS Documents.

Under Ninth Circuit law, the government has access to, and knowledge of, the requested FDA

1   and CMS documents.  *Stever*, 603 F.3d at 752.  The government itself has demonstrated this knowledge

2   and access in several ways.  First, a U.S. Postal Inspector investigating Theranos (whom the government

3   considers part of the "prosecution team") made a written request for access to nonpublic records and

4   information at the FDA.  *See* Ex. 6.  The inspector's request was broad, covering any and all "[r]ecords

5   and files maintained or created by the [FDA] concerning Theranos" as well as "the access and ability to

6   conduct and participate in interviews of FDA employees concerning their interactions with Theranos."

7   *Id.*  The FDA voluntarily granted that request, *see* Ex. 7, which alone establishes the government's

8   access to these categories of documents under Rule 16.  *See, e.g.*, *Santiago*, 46 F.3d at 894

9   (government's prior request and receipt of related agency materials demonstrates knowledge of and

10  access to that type of document); *W.R. Grace*, 401 F. Supp. 2d at 1079 ("The agencies supplied the

11  requested information to the prosecution and that shows that the prosecution has access to the agencies'

12  files."); *see also United States v. Cerna*, 633 F. Supp. 2d 1053, 1060 (N.D. Cal. 2009) (holding that,

13  under *Brady*, an agency's grant of access to its files indicates the government's possession, custody, and

14  control over favorable information in those files).[11]

15        Second, the United States Attorney's Office issued identical litigation holds to the FDA and

16  CMS in 2017.  *See* Ex. 8.  In his letters to the agencies, Assistant United States Attorney Jeff Schenk

17  explained that the hold applied to "[a]ny and all communication between a Theranos, Inc. employee and

18  an [FDA/CMS] employee" as well as "[a]ny and all communication between [FDA/CMS] employees

19  concerning Theranos, Inc."  *Id.*  These requests demonstrate not only the government's access to CMS

20  and FDA documents falling into these broad categories, but also its literal control over their

21  maintenance.  They also demonstrate the government's determination that CMS and FDA were likely to

22  have information critical to the case such that its destruction could lead to discovery sanctions against

23  the prosecution under Rule 16.  That determination was sound; it is beyond reasonable dispute that these

24  regulatory agencies maintain documents falling within Rule 16's broad definition of materiality given

25

26        [11] Although the defense does not possess a written access request from the government to the
     CMS, the record strongly suggests that a similar request—either written or oral—was made and granted
27   in light of the large volume of CMS material the government has produced to date.  As noted in the text
     above, on July 25, 2017, the government made a broad request to CMS requesting preservation of
28   records, including internal agency communications, dating back to 2003.  *See* Ex. 8.

1    their repeated contact with Theranos as detailed above.  The government has not explained why it

2    believes that it no longer has access to agency documents it ordered preserved less than two years ago.

3          Third, the government's access to CMS and FDA documents is evidenced by the substantial

4    amount of documents from these very agencies it has produced as evidence that it may attempt to offer

5    at trial.  Courts regularly find such productions of purportedly inculpatory material from an agency

6    sufficient to establish access to and knowledge of an agency's files.  *See, e.g.*, *W.R. Grace*, 401 F. Supp.

7    2d at 1085; *United States v. Prokop*, 2012 WL 475543 (D. Nev. Feb. 12, 2012), *aff'd in relevant part*,

8    2012 WL 2375011 (D. Nev. June 22, 2012); *see also United States v. Libby*, 429 F. Supp. 2d 1, 11

9    (D.D.C. 2006) (noting the inequity that would result if the government were able to use agency

10   documents "to investigate the alleged" crime and to "obtain[] the indictment" and yet withhold

11   documents from those agencies in response to a Rule 16 discovery request; "[s]uch a result would

12   clearly conflict with the purpose and spirit of the rules governing discovery in criminal cases").

13         In sum, the government has knowledge of, and access to, the broad categories of Theranos-

14   related documents it has sought and obtained from CMS and FDA.  But, even absent that showing, the

15   government's access and knowledge would be imputed under Ninth Circuit law, at least with respect to

16   the FDA.  *See Bryan*, 868 F.2d at 1036 (knowledge and access assumed for agencies "participating in

17   the same investigation" of a defendant).  As noted above, the FDA participated extensively in the

18   investigation that led to the indictment in this case, including by conducting 27 joint interviews of

19   potential witnesses with the DOJ and interviewing at least 14 more individuals on its own.

20         It thus is sensible that the government has conceded that the FDA's Office of Criminal

21   Investigations is part of what it calls the "prosecution team."  That concession, however, makes its

22   refusal to search the remainder of the FDA's files under Rule 16 or *Brady* all the more puzzling.  The

23   government's attempt to split the FDA in half has no basis in the governing law.  *See United States v.*

24   *Swenson*, 2013 WL 4735591, at *2 (D. Idaho Sept. 3, 2013) (rejecting argument that civil and criminal

25   divisions of IRS should be treated as distinct under Rule 16); *W. R. Grace*, 401 F. Supp. 2d at 1086

26   (rejecting an attempt to partition the EPA criminal investigation unit from "the agency's civil side," and

27   finding that "there is no support in the rules of discovery or the relevant case law for such a

28

distinction").  It also has no basis in the facts of this case, given that the indictment lists the FDA—not

the FDA Office of Criminal Investigations—as a complainant, and that the indictment was announced

under the FDA Commissioner's name.  *See Wood*, 57 F.3d at 737 (the prosecutor and the entire FDA

"were one" for discovery purposes in fraud prosecution implicating FDA regulations).  The

government's concession fully undermines its position that FDA documents are not discoverable under

Rule 16, or that its *Brady* obligations do not extend to the regulatory portions of the FDA.

**B.**      **The Requested CMS and FDA Documents Are Material and Favorable.**

Within the broad categories of Theranos-related documents at the FDA and CMS to which the

government has access—*i.e.*, all "[r]ecords and files maintained or created by the [FDA/CMS]

concerning Theranos"—the defense at this time moves to compel the following four narrow categories

of material CMS and/or FDA documents under Rule 16 and/or favorable material under *Brady*:  (1)

CMS and FDA communications regarding Theranos with John Carreyrou or the *Wall Street Journal*; (2)

CMS documents and communications regarding Theranos' CLIA compliance; (3) CMS and FDA

communications regarding Theranos with other clinical laboratory companies; and (4) FDA documents

and communications regarding its determination of the type of approval required for Theranos'

technology.  Notably, as set forth above, the government has not disputed the materiality of documents

falling into these or the other categories addressed in this motion and has resisted compliance and even

the obligation to search for documents solely on the basis of its flawed "prosecution team" argument.

**1.**      **CMS and FDA Communications Regarding Theranos with John Carreyrou**

**or the *Wall Street Journal*.**

The defense seeks:

> Any and all correspondence or communications regarding Theranos between the government and
> John Carreyrou, The *Wall Street Journal*, or their employees, agents, or counsel, and all
> government documents, communications, correspondence, notes, or recordings (including intra-
> agency and/or inter-agency correspondence) regarding same.

These documents are material under Rule 16 and favorable under *Brady/Giglio*.  John Carreyrou

is a *Wall Street Journal* reporter who authored a series of articles on Theranos starting in late 2015.

Carreyrou's reporting (later published in a *New York Times* bestselling book) and other media coverage

1  state and imply that he was in contact with several Theranos, FDA, and CMS employees beginning in

2  early 2015, including former Theranos employees Tyler Shultz and Erika Cheung and FDA employee

3  Alberto Gutierrez.  Carreyrou's actions, however, went beyond reporting the Theranos story; rather,

4  Carreyrou shaped the story in important respects.  He repeatedly prodded confidential sources to

5  complain about Theranos.  He then lobbied the CMS and FDA to follow up on complaints from his

6  sources.  *See* Exs. 9 (internal CMS communication showing agency following up on complaint after

7  contact from Carreyrou); 10 (internal FDA briefing memo on Theranos indicating that 2015 inspection

8  was prompted by contact from Carreyrou).  Carreyrou also attempted to persuade at least one of his

9  sources to file a complaint with either the FDA or CMS so as to obtain whistleblower protection.[12]  And

10 Carreyrou's *Wall Street Journal* articles indicate that he cultivated multiple sources at CMS and FDA,

11 attributing facts to persons "familiar" with the agencies' concerns or the results of confidential

12 surveys.[13]  Articles published in the Journal in 2016 detailed the findings of leaked agency documents,

13 including the 2015 CMS survey findings,[14] leaks that Carreyrou later attributed to a source "in the

14 federal government who had access to [the documents]."[15]

15      Moreover, CMS and FDA documents indicate that Carreyrou's pursuit of Theranos likely

16 influenced the agencies' handling of matters relating to the company.  In October 2015, for example, an

17 FDA employee wrote that "[e]arlier this summer we learned from a Wall Street Journal reporter of a

18 whistleblower" who raised concerns about Theranos' assays and that "[a] directed inspection was

19 requested" by the agency.  Ex. 10.  Additional statements from CMS and FDA employees indicate the

20 same.  For example, one CMS employee noted, "[i]t would have been normal for the state to survey

21

22     [12] Further, an Arizona physician who assisted Carreyrou with his reporting on Theranos
   contacted a CMS official who, in response to the physician's concerns, advised the physician to submit
23 an anonymous complaint to CMS about Theranos' Arizona laboratory.  The Arizona physician then
   followed the instruction of the CMS official and submitted the anonymous complaint to CMS.  *See* Ex.
24 11 (excerpt of FDA interview memorandum of Dr. Nicole Sundene).

25     [13] *See, e.g.*, John Carreyrou, *Hot Startup Theranos Dials Back Lab Tests at FDA's Behest*, Wall
   St. J., Oct. 16, 2015, https://www.wsj.com/articles/hot-startup-theranos-dials-back-lab-tests-at-fdas-
26 behest-1444961864.

27     [14] *See, e.g.*, John Carreyrou, *Regulators Propose Banning Theranos Founder Elizabeth Holmes
   for at Least Two Years*, Wall St. J., Apr. 13, 2016, https://www.wsj.com/articles/regulators-propose-
   banning-theranos-founder-elizabeth-holmes-for-at-least-two-years-1460570869.

28     [15] John Carreyrou, *Bad Blood* 284 (2018).

them in 2015, however, due to the media attention Theranos was receiving at the time and due to the complaints CMS had received about Theranos, it was determined that [CMS] would conduct the survey instead." Ex. 12 (excerpt of FDA interview memorandum of Sarah Bennett). An FDA employee also noted that the agency decided to inspect Theranos after speaking with "a Wall Street Journal reporter" on "at least two occasions." Ex. 1. Carreyrou's involvement with Theranos' regulators was so extensive that on at least one occasion the company first learned of confidential CMS findings from discussions with the *Wall Street Journal*. *See* Ex. 13 (1/22/16 email from Theranos to CMS).

In sum, the government's productions to date (incomplete as they are) reveal a story of the regulators' actions against Theranos that conflicts with the narrative in the government's charging documents and public statements. At trial, the government will attempt to offer CMS and FDA inspection findings as proof of its allegations that Theranos' technology did not function as claimed. In evaluating the government's case, the jury should be aware that an outside actor, eager to break a story (and portray the story as a work of investigative journalism), was exerting influence on the regulatory process in a way that appears to have warped the agencies' focus on the company and possibly biased the agencies' findings against it. Documents showing the agencies' interactions with Carreyrou thus go to the heart of the government's case.

The government's productions to date, however, are likely only the tip of the iceberg. In several instances, the documents refer to or imply the existence of earlier conversations between agency employees and Carreyrou that the defense does not possess. *See, e.g.*, Exs. 9 (email thread containing a copied and pasted snippet of an email from Carreyrou to CMS); 14 (8/12/15 email from Carreyrou to FDA "sum[ming] up" a prior conversation); 15 (9/2/15 internal FDA email revealing advance notice of first Carreyrou article). And, even more tellingly, the government has refused to produce almost any internal CMS and FDA communications. The government does not deny that agency communications with or referencing Carreyrou exist. The Court should compel their production.

### 2. CMS Documents and Communications Regarding Theranos' CLIA Compliance Before and After the 2015 CLIA Survey.

As noted above, CMS conducted CLIA surveys of Theranos in 2015 and 2016 that eventually led

to the company ceasing its laboratory operations.  Under federal law discussed above, CMS retained ultimate authority over Theranos' CLIA compliance throughout the time period of the charged conspiracies and well before it took the reins from the CDPH based in part on media coverage of the company in 2015.  The defense therefore seeks:

> Any and all government documents, communications, correspondence, notes, or recordings (including intra-agency and/or inter-agency communications) regarding Theranos' Clinical Laboratory Improvement Amendments ("CLIA") compliance during the time period of the charged conspiracies, including but not limited to those that concern the 2015 CLIA survey of Theranos.

These documents are material under Rule 16 because they bear directly on a key element of the government's allegations against Ms. Holmes—*i.e.*, that her statements regarding Theranos' laboratory capabilities contained material falsehoods.  *See United States v. Lindsey*, 850 F.3d 1009, 1013-14 (9th Cir. 2017).  Based on the government's voluminous Rule 16 productions of CMS data pertaining to the 2015 survey, it appears that the government will attempt to rely on that survey as proof of the alleged falsehoods.  It follows then that all of the agency's documents pertaining to that survey—including any internal communications—are material under Rule 16.  After all, Rule 16 does not require that documents be exculpatory to be helpful or "relevant to developing a possible defense."  *Muniz-Jaquez*, 718 F.3d at 1183.  The defense cannot determine the full import of the CMS data on which the government apparently intends to construct its case based on only those CMS documents cherry picked by the government.  Rather, the defense needs—and is entitled to—the full picture, even if the additional documents are arguably inculpatory.  Rule 16 does not permit the government selectively to pick and choose which agency documents related to a series of relevant events it wishes to produce.  The government's contortions with respect to this set of documents demonstrate why the Ninth Circuit was correct to reject the "prosecution team" concept as a limitation on Rule 16.

Moreover, CMS documents in the years and months preceding its 2015 and 2016 interventions also are material under Rule 16 and likely exculpatory under *Brady*.  The government's CMS witnesses admit that the agency was motivated to conduct the 2015 survey in part by contact between CMS employees and Carreyrou and media attention.  *See, e.g.*, Ex. 12.  CMS internal documents and communications would demonstrate the degree to which the agency let improper considerations or

1  external pressure cloud its regulatory decisions and bias its findings.  Additionally, if CMS was in

2  receipt of any earlier Theranos data in 2013-2015 (which it almost certainly was due to the reporting

3  requirements imposed by federal law on CDPH to share inspection and enforcement data with CMS)

4  and/or complaints concerning Theranos, and saw nothing out of the ordinary until Carreyrou and the

5  firestorm set off by his reporting spurred the agency to action, the defense is entitled to that information

6  under Rule 16 and *Brady*.  In sum, the government cannot rely on a subset of documents concerning one

7  survey of Theranos to build its case while leaving material documents and exculpatory information to

8  repose at CMS.  *See, e.g.*, *Wood*, 57 F.3d at 737.  The requested documents must be produced.

9        **3.      CMS and FDA Communications Regarding Theranos with Other Clinical**

10                **Laboratory Companies.**

11       The defense also seeks:

12       Any and all correspondence or communications regarding Theranos between the government and
         any clinical laboratory company or association affiliated with clinical laboratories (including but
13       not limited to LabCorp, Quest Diagnostics, and the American Clinical Lab Association), or their
         employees, agents, or counsel, and all government documents, communications, correspondence,
14       notes, or recordings (including intra-agency and/or interagency correspondence) regarding same.

15  These documents are material under Rule 16 and favorable under *Brady* for similar reasons as those

16  showing Carreyrou's contacts with the agencies.  The market for diagnostic testing in the United States

17  is dominated by a few powerful incumbents, namely Laboratory Corporation of America ("LabCorp")

18  and Quest Diagnostics Inc. ("Quest").[16]  The two companies and affiliated trade groups spend millions

19  of dollars every year lobbying law and policy makers.[17]  Theranos' entrance into this market would have

20  threatened their privileged position.  It is not surprising, then, that the government's production of FDA

21  documents contains a complaint that Quest filed against Theranos in August 2015.  That complaint

22  sparked internal debate at the FDA about what next steps, if any, should be taken.  *See* Ex. 16 (9/23/15

23  internal FDA email chain).  The laboratory companies also spoke critically of the company in the media;

24  
25       [16] Robert Michel, *Analysis of Lab Testing Market Reveals Competitive Shifts*, The Dark
         Intelligence Grp. (July 23, 2001), https://www.darkintelligencegroup.com/the-dark-report/clinical-
26       laboratory-trends/analysis-of-lab-testing-market-reveals-competitive-shifts/ (noting that the two
         companies together account for more than 60% of the domestic market for clinical laboratory testing).

27       [17] David Lim, *Clinical Lobbying Spikes as PAMA Cuts Kick into Effect*, MedTech Dive (Feb. 1,
         2019), https://www.medtechdive.com/news/clinical-lab-lobbying-spikes-as-pama-cuts-kick-into-
28       effect/547278/.

a 2014 *New Yorker* article quotes a senior Quest executive disputing certain of Theranos' statements.[18]

The companies likely played an even larger role in the agencies' push to inspect and sanction Theranos in 2015-2016 than has been revealed in the public reporting and the government's incomplete productions.  That outside influence would have the same distorting effect on the regulators' decisions regarding Theranos as did pressure from Carreyrou and the media.  *See* pp. 14-16, *supra*.  Documents showing that Quest, LabCorp, or any related trade organization were interacting with FDA and CMS employees with respect to Theranos, or documents and internal communications showing that FDA and CMS employees were influenced by the pressure that these powerful industry players can (and often do) exert on their regulators are material under Rule 16, favorable under *Brady*, and must be produced.

### 4.    FDA Documents and Communications Regarding FDA Approval Requirements for Theranos' Proprietary Technology.

The defense seeks:

> Any and all government documents, communications, correspondence, notes, or recordings (including intra-agency and/or inter-agency communications) regarding the FDA's determination of the type of FDA approval required for Theranos' proprietary technology.

These documents concern one of the alleged falsehoods in the Superseding Indictment, namely that Ms. Holmes and Mr. Balwani falsely "represented to investors that Theranos did not need the [FDA] to approve its proprietary analyzer and tests" when they knew that the "FDA was requiring Theranos to apply for clearance or approval."  ECF No. 39 ¶ 12(F).  As noted above, the government has sought statements from an FDA employee who is of the opinion that such "requirements" were communicated to Theranos.  *See* Ex. 1 at 3.  But that same FDA employee "conceded that the Theranos model did challenge the typical regulations," such that the required type of approval was debatable.  *See id.* (explaining need for company and agency to get "on the same page" regarding issue).  Moreover, the defense is aware of at least one other FDA employee who took a different position on the question.  The government, however, has not (to the defense's knowledge) interviewed that FDA employee nor has it produced documents concerning her position on Theranos' need for FDA approval.  The requested

---

[18] Ken Auletta, *Blood, Simpler*, New Yorker (Dec. 15, 2014), https://www.newyorker.com/magazine/2014/12/15/blood-simpler.

documents thus may undermine an allegation in the Superseding Indictment and must be produced under Rule 16 and *Brady*.  Moreover, the government must produce even arguably inculpatory documents bearing on this allegation in its possession, custody, or control (as all FDA documents relating to Theranos are) because they would also prove helpful to defending against the charge.  *See* p. 9, *supra*.

## II.    The Government Must Produce Documents Memorializing Communication with Witnesses Maintained by the SEC.

The fifth category of documents the defense seeks are those that unquestionably must be produced in any criminal prosecution—documents memorializing the government's communication with potential trial witnesses.  In particular, the defense moves to compel:

> Any and all FBI 302s or other agency ROIs memorializing government communications with witnesses, and all government documents, communications, correspondence, notes, or recordings (including intra-agency and/or inter-agency communications) regarding same.

Objecting to what should be an uncontroversial request, the government argues that documents of this sort maintained by the SEC are not discoverable because that agency purportedly is not part of the "prosecution team," as defined by the government.  This argument fails for the same two reasons as for the FDA and CMS, either of which is sufficient to warrant production.

First, the government has demonstrated its access to, and knowledge of, documentation concerning the SEC's contact with witnesses in this case.  It knows who the SEC interviewed because the DOJ and SEC interviewed the same witnesses, and **conducted at least 57 of those interviews jointly**.  And it has access to any notes or documents memorializing those communications because, as with the FDA and CMS, the government requested and received access "to the investigative and non-public files of the [SEC] related to" Theranos.  Ex. 17 (government requests and SEC response).  Finally, the government has produced millions of pages of SEC documents as discovery in this case.

Second, the government is deemed to have knowledge of, and access to, SEC documents produced in the joint investigation that it conducted with the SEC.  As detailed above, the DOJ and SEC's collaboration was (and remains) extensive.  That is not uncommon; the DOJ and SEC often pursue charges stemming from the same alleged conduct after conducting contemporaneous, joint investigations.  *See United States v. Stringer*, 535 F.3d 929, 937 (9th Cir. 2008) (discussing long line of

cases concerning potential abuse of this common practice).  In such circumstances, SEC documents often are held to be discoverable under Rule 16 or *Brady* in the criminal case.  *See, e.g.*, *United States v. Feathers*, 2016 WL 7337518, at \*15 (N.D. Cal. Dec. 19, 2016).  Nor does it matter, as the government may assert, that the SEC began investigating a few months before the DOJ's involvement, or that the investigation has led to distinct criminal and civil actions.  *See United States v. Gupta*, 848 F. Supp. 2d 491, 494 (S.D.N.Y. 2012).  As Judge Rakoff explained in *Gupta*, "[a] 'joint investigation' . . . does not require a coterminous investigation," and often will lead to divergent investigatory and charging decisions.  *Id.* at 494-95.  Rather, the focus of the inquiry is on collaborative fact gathering and information sharing, not on what the agencies do with those facts.  *See id.* at 496 (noting that many witnesses were jointly interviewed by DOJ and SEC and rejecting government's argument that SEC was conducting a merely "parallel" investigation and thus was not part of the "prosecution team").  Here, as in *Gupta*, the government's joint fact gathering with the SEC provides it with possession, custody, and control over that agency's documents.  It must produce the narrow category of requested SEC materials.

Recent developments underscore the materiality of these type of SEC documents.  In December 2017, FBI agents and SEC attorneys jointly interviewed potential government witness Craig Hall, whose investments constitute a charged count of wire fraud in the indictment.  According to an FBI 302 memorandum of that interview, Mr. Hall told the government that he had recorded a December 2013 Theranos investor call from his office in Texas, which is a crime under California law forbidding nonconsensual recordings.  *See* Ex. 3.  During his recent deposition in *SEC v. Balwani*, 18-cv-01603-EJD (N.D. Cal.), however, Mr. Hall denied that he had made the recording or that he was in Texas at the time.  The defense is entitled to the SEC's memorandum or notes of this interview to determine whether the FBI's memorandum is inaccurate, or whether Mr. Hall lied to the government.[19]

---

[19] In his recent deposition, Mr. Hall testified that his colleague, Bryan Tolbert, in fact recorded the investor call.  Mr. Tolbert said the same when he was deposed a day earlier.  Mr. Tolbert also stated that he was prepped in advance of that testimony by **both** SEC and DOJ attorneys.  The SEC's notes or other memorialization of the agency's interactions with Mr. Hall and Mr. Tolbert may shed light on how these two witnesses' recollections have shifted over time, and in particular after consultation with representatives of the SEC and DOJ.  The issue surrounding the accuracy of Mr. Hall's statements is only one example of the type of critical Rule 16 and *Brady* material likely contained in the SEC's documents that currently are being withheld.

1  **III.     The Government Must Produce Documents Relating to the 2013 CLIA Survey of Theranos**

2  **Maintained by CMS and/or CDPH.**

3  The final category of documents relates to the 2013 CLIA survey of Theranos conducted

4  pursuant to the federal CLIA regulations.  In particular, the defense seeks:

5       Any and all government documents, communications, correspondence, notes, or recordings
        (including intra-agency and/or inter-agency communications) regarding the 2013 CLIA survey of

6       Theranos.

7  These documents are material under Rule 16 and favorable under *Brady* for several reasons.

8  First, as noted above, the government's Rule 16 disclosures reveal that it may rely on the 2015 CLIA

9  survey as evidence of purported material falsehoods concerning Theranos' clinical laboratory

10 capabilities.  *See* pp. 5, 16, *supra*.  Materials concerning the earlier 2013 survey, which resulted in a few

11 standard-level deficiencies that Theranos promptly corrected and the reissuance of Theranos' CLIA

12 certification, undermine that narrative.  The 2013 survey results by themselves demonstrate that, during

13 a significant portion of the charged conspiracy, Theranos was in compliance with rigorous state and

14 federal standards for a lab of its type and that this result was communicated to the defendants.  Yet the

15 government has produced very few documents concerning that survey.  Moreover, it has produced no

16 internal communications that would be instrumental to understanding the steps taken by the inspectors

17 or placing their findings in context.  For example, internal communications suggesting that the standard-

18 level deficiencies were assessed to be minor, or that Theranos' laboratories were unremarkable in other

19 respects, conflict with the government's conspiracy narrative and thus are material and/or exculpatory.

20 Documents relating to the 2013 survey also bear on the element of intent.  To prove its case, the

21 government must demonstrate that Ms. Holmes acted with the "specific intent" to defraud.  *United*

22 *States v. McNeil*, 320 F.3d 1034, 1040 (9th Cir. 2003).  It bears on Ms. Holmes' intent that, in the midst

23 of the charged conspiracy, she was informed by regulators that the company's laboratories were

24 functional.  That is true even if the government disputes the results and conclusions of the 2013 survey.

25 In sum, the government must produce the requested documents.  Critically, it does not deny that

26 CMS or CDPH employees communicated internally or across the two agencies concerning the extensive

27 2013 and 2015 CLIA surveys, and it does not dispute that records of these communications are material

28

under either Rule 16 or *Brady*.  Rather, it again rests its refusal to produce this category of documents on its incorrect "prosecution team" argument.  In any event, as explained above, the government has knowledge of, and access to, CMS documents, including those relating to any CLIA surveys.  Based on the extensive coordination and information sharing inherent in the state-federal CLIA regulatory scheme, it is likely that documents relating to the 2013 survey are housed at CMS.

Moreover, the prosecution also has knowledge of, and access to, any documents that may be nominally in the possession of CDPH.  As noted above, certification of Theranos' CLIA compliance was a joint endeavor between CMS and CDPH.  When CDPH conducted the 2013 survey, it did so on behalf of CMS as part of a comprehensive federal regulatory scheme that mandates the flow of information from the CDPH up the chain to CMS as the entity ultimately responsible for nationwide CLIA compliance.  *See* p. 6, *supra*.  In consequence, CMS has control over records pertaining to CLIA surveys carried out under its auspices.  That control is evident in the few CDPH documents that have been produced to date.  *See* Ex. 18 (3/10/16 email from CMS to CDPH) ("We have another Theranos request.  This time, it's for the CLIA 116's and any letters related to their application.  At your earliest convenience, can you please email me the signed 116 and any applicable letters that you may have on file?").  In these circumstances, the usual limitation on Rule 16 discovery to federal (as opposed to state) agencies, *see United States v. Gatto*, 763 F.2d 1040, 1049 (9th Cir. 1985), must give way.  Courts recognize that Rule 16 "[is] not so stilted as to" prevent discovery of state agency materials where the facts suggest a degree of federal control over the requested documents that may be lacking in the ordinary case.  *See United States v. Liquid Sugars*, 158 F.R.D. 466, 474-75 (E.D. Cal. 1994) (ordering production of state agency materials that "may not normally be within the control of the government for Rule 16 purposes" where government intended to offer findings by state agency experts at trial).

Even if the Court were to conclude that CDPH documents lay beyond the reach of Rule 16, the requested exculpatory documents still must be disclosed under *Brady*.  It is well established that, unlike in the Rule 16 context, there is no federal-state divide that limits a prosecutor's duty to search for and disclose favorable material over which he has possession, custody, or control.  *See, e.g.*, *Kyles v. Whitley*, 514 U.S. 419, 437 (1995); *Price*, 566 F.3d at 910; *Cerna*, 633 F. Supp. 2d at 1059-60.  In

1   *Cerna*, the court explained that there are "two . . . avenues" by which a state agency will fall under

2   *Brady*'s umbrella:  (1) when the agency acts as the federal government's "lead investigative agent" or

3   (2) when the prosecutor "consults" with the state agency and obtains documents from it.  633 F. Supp.

4   2d at 1059-60.  The court further held, with respect to the latter "avenue," that when "federal

5   authorities" are given access to state agency documents to build a federal criminal prosecution, the

6   federal government "must search for and retrieve defense evidence bearing on the same" topics.  *Id.* at

7   1060; *accord United States v. Williams*, 2015 WL 3830515, at *5 (N.D. Cal. June 19, 2015).  That same

8   reasoning applies to state regulatory agencies that have provided documents to federal authorities for use

9   in a federal criminal prosecution.  *See United States v. PG&E*, 2015 WL 3958111, at *7 (N.D. Cal. June

10  29, 2015) (applying *Cerna* to require disclosure of materials maintained by the California Public

11  Utilities Commission).  Under *Price*, *Cerna*, and *PG&E*, the government must search for *Brady*

12  material—including material relating to the favorable 2013 CLIA survey—maintained by the CDPH

13  given the agency's extensive role in overseeing Theranos and the government's production to the

14  defense of CDPH documents that it may attempt to offer at trial.

15                                              * * * *

16          Finally, it bears highlighting the troubling statements from the agencies that the government

17  relayed during the April 5, 2019 meet and confer discussed above.  During that conference, the

18  government stated that it had managed to have detailed discussions with several of the relevant agencies

19  concerning the defense's requests within 72 hours of the parties' initial conference on the subject.  As

20  the defense pointed out in its follow-up letter of April 7, 2019, that is further evidence of the

21  government's knowledge of, and access to, the agencies' documents.  *See* Ex. 5 at 14-15.  But the

22  government's description of its conversations with the agencies raises doubt that the government and the

23  agencies take seriously their obligations under Rule 16, the Constitution, and the governing case law.

24          In particular, the government offered to request—on a voluntary basis—documents from the

25  relevant agencies to "see what [it] can obtain," but coupled that offer with the caveat that the agencies

26  had expressed unwillingness to comply with any such request for several improper reasons.  *See id.* at

27  14-15 (detailing these reasons).  Most troublingly, the government stated that the agencies are less likely

28

to produce documents knowing those documents will go "directly to" the defense.  *Id.* at 15.  This and other information relayed from the agencies shows that the government's offer is inadequate to satisfy its obligations as articulated in the Ninth Circuit case law discussed above.

The government's half-hearted offer and the message it related from the agencies only underscore the need for a court order clarifying the government's and the agencies' obligations.  Courts in this Circuit have issued forceful, clear orders compelling disclosure of agency documents and exculpatory information contained therein so as to minimize the risk of delay or noncompliance that may arise when prosecutors are tasked with working with other government entities to collect documents helpful to the defense.  *See PG&E*, 2015 WL 3958111, at *8 ("Accordingly, the Government shall review all previous requests made to the [agency] to ensure that they sought all information on the subjects requested, both inculpatory and exculpatory.  No later than three weeks after the entry of this Order, the Government shall file a declaration indicating the completion of this review.  Furthermore, when making future requests to the [agency], the Government shall request both exculpatory and inculpatory information related to the subject matter of the requests."); *United States v. W. R. Grace & Co.*, 402 F. Supp. 2d 1178, 1180 (D. Mont. 2005) ("No more than ten days after the January 13, 2006 deadline for compliance with its *Brady* obligations, the government shall file a separate affidavit for each federal agency listed in the Court's November 23, 2005 Order, describing the process of *Brady* compliance with regard to that agency.  The description shall include the type of search used, the places searched, the number of individuals involved in the search, and the name of the person with primary responsibility for conducting the search within the particular agency named.").

The Court similarly should order immediate production and/or disclosure of the requested materials coupled with clear reporting requirements like those in *PG&E* and *W. R. Grace*.  The order should also make clear that any objections from the agency must be grounded in the Rules of Criminal Procedure, and not on an improper desire to impede Ms. Holmes in crafting her defense after having voluntarily assisted the government in building its case.

## CONCLUSION

The Court should order the production of the six narrow categories of documents sought herein.

1

2    DATED: April 15, 2019                    Respectfully submitted,

3

4                                             /s/ Lance Wade
                                              KEVIN DOWNEY
5                                             LANCE WADE
                                              Attorneys for Elizabeth Holmes
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   JOHN D. CLINE (CA State Bar No. 237759)
    One Embarcadero Center, Suite 500
2   San Francisco, CA 94111
    Telephone: (415) 662-2260 │Facsimile: (415) 662-2263
3   Email: cline@johndclinelaw.com

4   KEVIN M. DOWNEY (Admitted Pro Hac Vice)
    LANCE A. WADE (Admitted Pro Hac Vice)
5   SEEMA MITTAL ROPER (Admitted Pro Hac Vice)
    MICHELLE CHEN (Admitted Pro Hac Vice)
6   WILLIAMS & CONNOLLY LLP
    725 Twelfth Street, NW
7   Washington, DC 20005
    Telephone: (202) 434-5000 │Facsimile: (202) 434-5029
8   Email: KDowney@wc.com; LWade@wc.com; SMRoper@wc.com; MChen@wc.com

9   Attorneys for Defendant ELIZABETH A. HOLMES

10

11                      UNITED STATES DISTRICT COURT

12                    NORTHERN DISTRICT OF CALIFORNIA

13                            SAN JOSE DIVISION

14

15   UNITED STATES OF AMERICA,          )   Case No. CR-18-00258-EJD
                                        )
16          Plaintiff,                  )   **DECLARATION OF LANCE WADE IN**
                                        )   **SUPPORT OF MS. HOLMES' MOTION TO**
17      v.                              )   **COMPEL PRODUCTION OF RULE 16**
                                        )   **DISCOVERY AND** *BRADY* **MATERIALS**
18   ELIZABETH HOLMES and              )
     RAMESH "SUNNY" BALWANI,           )   Date:  April 29, 2019
19                                      )   Time:  2:00 p.m.
            Defendants.                 )   CTRM:  4, 5th Floor
20   _____)   Hon. Edward J. Davila

21

22          I, LANCE WADE, declare as follows:

23          1.      I represent Defendant Elizabeth Holmes and have been admitted to practice *pro hac vice*

24   in the above-captioned matter.  Pursuant to Criminal Local Rule 16-2, I submit this declaration in

25   support of Ms. Holmes' Motion To Compel Production of Rule 16 Discovery and *Brady* Materials ("the

26   Motion").

27          2.      On April 1 and April 5, 2019, pursuant to Criminal Local Rule 16-1(a), counsel for the

28

1   Defendants and the government met and conferred regarding the government's discovery obligations in

2   this case.  Attending these conferences were:  Lance Wade, Seema Mittal Roper, and Michelle Chen,

3   attorneys for Ms. Holmes; Steven A. Cazares, Jeffrey B. Coopersmith, and Kelly M. Gorton, attorneys

4   for Mr. Balwani; and Assistant United States Attorneys Jeff Schenk, John C. Bostic, and Robert S.

5   Leach (Mr. Leach was present for only the April 5, 2019 conference).

6           3.      Counsel for the defense and government discussed the government's discovery

7   obligations under Federal Rule of Criminal Procedure 16 with respect to previously requested categories

8   of documents from certain federal and state agencies.  It was agreed upon that the government must

9   produce under Rule 16 documents over which it has possession, custody, or control.

10          4.      The parties disagreed, however, whether the requested agency documents are in fact

11  within the government's possession, custody, or control under the law of the Ninth Circuit.  In

12  particular, the parties did not resolve whether responsive documents of the Food and Drug

13  Administration ("FDA"), the Center for Medicare and Medicaid Services ("CMS"); the California

14  Department of Public Health ("CDPH"); and the Securities and Exchange Commission ("SEC") are

15  producible under Rule 16 in this case.  That is the primary disputed matter that requires the

16  determination of the Court.

17

18          I declare under penalty of perjury under the laws of the United States that the foregoing is true

19  and correct to the best of my knowledge.

20          Executed this _15th_ day of April in Washington, D.C.

21

22

23                                                  LANCE WADE
                                                    Attorney for Elizabeth Holmes
24

25

26

27

28

DECLARATION IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF RULE 16 DISCOVERY AND BRADY
MATERIALS
CR-18-00258 EJD                                 2

1   JOHN D. CLINE (CA State Bar No. 237759)
    One Embarcadero Center, Suite 500
2   San Francisco, CA 94111
    Telephone: (415) 662-2260 │Facsimile: (415) 662-2263
3   Email: cline@johndclinelaw.com

4   KEVIN M. DOWNEY (Admitted Pro Hac Vice)
    LANCE A. WADE (Admitted Pro Hac Vice)
5   SEEMA MITTAL ROPER (Admitted Pro Hac Vice)
    MICHELLE CHEN (Admitted Pro Hac Vice)
6   WILLIAMS & CONNOLLY LLP
    725 Twelfth Street, NW
7   Washington, DC 20005
    Telephone: (202) 434-5000 │Facsimile: (202) 434-5029
8   Email: KDowney@wc.com; LWade@wc.com; SMRoper@wc.com; MChen@wc.com

9   Attorneys for Defendant ELIZABETH A. HOLMES

10

11                        UNITED STATES DISTRICT COURT

12                     NORTHERN DISTRICT OF CALIFORNIA

13                              SAN JOSE DIVISION

14

15   UNITED STATES OF AMERICA,              )   Case No. CR-18-00258-EJD
                                            )
16           Plaintiff,                     )   **DECLARATION OF LANCE WADE IN**
                                            )   **SUPPORT OF MS. HOLMES' MOTION TO**
16       v.                                 )   **COMPEL PRODUCTION OF RULE 16**
                                            )   **DISCOVERY AND** *BRADY* **MATERIALS**
17   ELIZABETH HOLMES and                   )
18   RAMESH "SUNNY" BALWANI,                )   Date:  April 29, 2019
                                            )   Time:  2:00 p.m.
19           Defendants.                    )   CTRM:  4, 5th Floor
                                            )
20   _____       )   Hon. Edward J. Davila

21

22           I, LANCE WADE, declare as follows:

23           1.      I represent Defendant Elizabeth Holmes and have been admitted to practice *pro hac vice*

24   in the above-captioned matter.  I submit this declaration in support of Ms. Holmes' Motion To Compel

25   Production of Rule 16 Discovery and *Brady* Materials (the "Motion").  I attest to the following facts

26   upon which the Motion relies:

27           2.      The government has produced in discovery over 40,000 pages of Food and Drug

28

Administration ("FDA") documents, including internal FDA communications.

3.      The government's Rule 16 productions include memoranda of 41 witness interviews conducted or attended by FDA agents.  At least 27 of those 41 interviews were jointly conducted by FDA and Department of Justice ("DOJ") agents or attorneys.

4.      The government has made three productions of documents it obtained from the Center for Medicare and Medicaid Services ("CMS"), totaling over 260,000 pages and an additional 8 GB of data. These documents largely concern patient lab test results, documents that Theranos, Inc. ("Theranos") submitted to CMS, and external CMS communications with Theranos.

5.      FBI 302 memoranda produced in discovery identify Securities and Exchange Commission ("SEC") agents as having participated in at least 57 joint witness interviews with DOJ attorneys or case agents assigned to the government's investigation.

6.      The undersigned has reviewed documents produced pursuant to the protective order in a related case that contain communications between John Carreyrou of the *Wall Street Journal* and a source in which Carreyrou encouraged the source to file a complaint with either the FDA or CMS so as to obtain whistleblower protection.  The defense can submit these documents under seal or directly to chambers upon the Court's request.

7.      Attached to the Motion are 18 exhibits containing copies of documents produced as discovery in this case.  The contents of each are as follows:

        a.      Exhibit 1 is a true and correct copy of an excerpt of an FDA memorandum of a September 13, 2017 interview of Alberto Gutierrez of FDA

        b.      Exhibit 2 is a true and correct copy of excerpts from an October 22, 2015 Document Request from the SEC to Theranos and a January 11, 2016 Grand Jury Subpoena issued to Theranos.

        c.      Exhibit 3 is a true and correct copy of an excerpt of an FBI Form 302 memorandum of a December 20, 2017 interview of Craig Hall, a Theranos investor.

        d.      Exhibit 4 is a true and correct copy of an excerpt of an FBI Form 302 memorandum of a January 26, 2017 interview of Daniel Mosley, a Theranos investor.

1          e.      Exhibit 5 is a true and correct copy of a series of correspondence between the

2 undersigned and counsel for the government concerning the subject matter of this Motion:  (1) a

3 February 5, 2019 letter from the undersigned to the government; (2) a February 8, 2019 letter from the

4 undersigned to the government; (3) a February 22, 2019 letter from the government to counsel for Ms.

5 Holmes; (4) a March 27, 2019 letter from the undersigned to the government; (5) a March 27, 2019

6 email from the undersigned to the government.; (6) an April 5, 2019 email from the government to the

7 defense, and; (7) an April 7, 2019 letter from the undersigned to the government.

8          f.      Exhibit 6 is a true and correct copy of a March 27, 2017 letter from a United

9 States Postal Inspection Service ("USPIS") Inspector to an employee at the FDA.

10         g.      Exhibit 7 is a true and correct copy of an April 7, 2017 letter from an FDA

11 employee to a USPIS Inspector.

12         h.      Exhibit 8 is a true and correct copy of litigation hold letters sent by Assistant

13 United States Attorney Jeff Schenk to the FDA and CMS in 2017.

14         i.      Exhibit 9 is a true and correct copy of a series of CMS email communications in

15 June 2015.  The grey redactions were implemented by the government prior to production to the

16 defense.

17         j.      Exhibit 10 is a true and correct copy of an internal FDA "Briefing Memo" on

18 Theranos dated October 2, 2015.

19         k.      Exhibit 11 is a true and correct copy of an excerpt of an FDA memorandum of a

20 November 8, 2017 interview of Dr. Nicole Sundene, an Arizona physician.

21         l.      Exhibit 12 is a true and correct copy of an excerpt of an FDA memorandum of a

22 September 12, 2017 interview of Sarah Bennett of CMS.

23         m.      Exhibit 13 is a true and correct copy of a January 22, 2016 email from Theranos

24 to Gary Yamamoto of CMS.

25         n.      Exhibit 14 is a true and correct copy of an August 12, 2015 email exchange

26 between FDA employees and Mr. Carreyrou.

27         o.      Exhibit 15 is a true and correct copy of an excerpt from an internal FDA email

28

1  exchange in September 2015.

2       p.    Exhibit 16 is a true and correct copy of an email exchange among FDA

3  employees in September 2015.

4       q.    Exhibit 17 is a true and correct copy of a series of correspondence between

5  government investigators—including at the USPIS and the Federal Bureau of Investigation—and a

6  representative at the SEC.

7       r.    Exhibit 18 is a true and correct copy of an email exchange between a CMS

8  employee and an employee at the California Department of Public Health ("CDPH").

9       8.    All exhibits have been redacted to omit personal identifying information as well as

10  information not relevant to the Motion.

11

12       I declare under penalty of perjury under the laws of the United States that the foregoing is true

13  and correct to the best of my knowledge.

14       Executed this 15th day of April in Washington, D.C.

15

16                                        _____

17                                        LANCE WADE
                                          Attorney for Elizabeth Holmes

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1



## Food and Drug Administration
### OFFICE OF CRIMINAL INVESTIGATIONS
### MEMORANDUM OF INTERVIEW

| CASE NUMBER: | 2016-MWM-709-0576 |
|---|---|
| CASE TITLE: | THERANOS, INC. |
| DOCUMENT NUMBER: | 258748 |
| PERSON INTERVIEWED: | Alberto Gutierrez, CDRH, OIR |
| PLACE OF INTERVIEW: | FDA White Oak, Silver Spring, MD |
| DATE OF INTERVIEW: | 09/13/2017 |
| TIME OF INTERVIEW: | 1230 EST |
| INTERVIEWED BY: | SA George Scavdis |

OTHER PERSONS PRESENT: See below.

On September 13, 2017, the case agent interviewed Alberto Gutierrez, Director of FDA's Office of In Vitro Diagnostics and Radiological Health (OIR), regarding his interactions with Theranos, Inc. Also present during the interview were the following: AUSA Jeffrey Schenk, United States Attorney's Office for the Northern District of California; Jessica Chan, Securities and Exchange Commission (SEC), Division of Enforcement (DOE); Rahul Kolhatkar, SEC, DOE; Monique Winkler, SEC, DOE; and Kelsey Schaefer, FDA, Office of the Chief Counsel (OCC).



In 2012 or 2013, Gutierrez had an interaction with the United States Department of Defense (DoD). Elizabeth Holmes was trying to provide instruments to the DoD for, what turned out to be, a test or a clinical trial in Afghanistan. The DoD was concerned with how things were being portrayed by Theranos and they contacted FDA. Lt. Schumacher reached out to FDA from the DoD. Schumacher had previously done a detail with FDA. Gutierrez traveled with him to Tampa, FL, to meet with General James Mattis. FDA regulates all tests, but early on in 1976, FDA decided that it would exercise enforcement discretion regarding tests developed within a laboratory (laboratory developed tests or LDTs). LDTs have become a big loophole. In 1988, clinical laboratories became regulated by CMS (Centers for Medicare and Medicaid Services) under CLIA (Clinical Laboratory Improvement Amendments). CLIA mainly regulates laboratory procedures. Tests are classified differently if they are performed by a doctor versus if they are performed by a non-clinician. Tests performed by a non-clinician are called CLIA waived, because there is no expertise required to perform them. To get a test CLIA waived, a company must come through FDA. Theranos was planning to have their instrument run in a pharmacy or in a physician's office. For that to occur, that instrument would have had to be CLIA waived and Theranos would have had to come through FDA to get approval or clearance for that instrument. Gutierrez thinks Theranos decided that, if they could claim their instrument was not a CLIA waived instrument and that it was run by a central laboratory, then they wouldn't have to come through FDA. Theranos was trying to sell to DoD on the notion that, even though they were taking their instrument into the field, the actual test was run at "the mothership," and therefore didn't need a CLIA waiver.  FDA didn't buy that argument.



US-REPORTS-0006454



In the end, Theranos was going to have to clear their device with all the tests they were running, whether the submission came with a bundle of tests or with individual submissions for each test. The Nanotainers came in as bundled submissions. Instead of coming in with 100 different submissions, a company can come in with one submission with all the claims they want to market for. During 2013 or 2014, Theranos was told that they needed to come in to FDA for clearance for the Nanotainers. Gutierrez thinks this occurred in a meeting with FDA, Theranos and Jeff Gibbs, a Theranos regulatory consultant at the time. Gibbs is known for taking cases like companies with LDTs, where the law is less clear, and rescuing them. Gibbs is a fairly straight shooter who was doing his job. In one of these interactions, he was asked to do something by Theranos that made him uncomfortable, and he talked to Gutierrez about it. Gutierrez told Gibbs he didn't trust Holmes, and Gibbs dropped her. He remembers the issue being a difference in recollection between what Holmes told Gibbs about an interaction Theranos had with FDA and what Gutierrez told Gibbs about that same interaction. Gibbs began representing Theranos somewhere around 2013. The 510(k)s Theranos eventually sent in came in without the aid of any outside regulatory counsel.

Theranos came in to FDA and showed what their device did by showing videos of how the instrument operated. There was a meeting with FDA, CMS, and Theranos to help Theranos understand what the regulatory path was going to be regarding a CLIA waiver. FDA's original take was that they were to help Theranos do everything they could to get them to give FDA the data. There was a suggestion by Shuren that FDA send someone to Theranos to help them get their data together. Gutierrez has never been asked to do this before. FDA did go to the extent of putting together a request to send someone, but they never actually did. Nobody asked FDA to lower the bar for Theranos, but there was some sensitivity that anything coming out of Palo Alto (Theranos's headquarters) was different and that FDA needed to help them through that. At the time, it wasn't clear whether it was incompetence or naivety as to why Theranos couldn't get FDA the data it needed. Gutierrez pushed for the joint meeting with CMS due to this interaction with the military and this odd business model that Theranos had. Gutierrez conceded that the Theranos model did challenge the typical regulations. The reason CLIA waived devices come to the agency is because it's clear there is not going to be any laboratory oversight for their use. In the case of Theranos, this idea that the device was overseen by an off-site laboratory was a little different, and Gutierrez wanted to make sure that CMS and FDA were on the same page, and that Theranos understood its path forward.



US-REPORTS-0006455



FDA was already concerned with the data for the Nanotainers. After that, two things happened that made it easier for FDA to inspect Theranos. First, Theranos received clearance for its HSV-1. Ironically, this made it easier for FDA to inspect Theranos because it made it harder for Theranos to claim they were an LDT, given that they had just received a device clearance. Second, around the summer of 2015, FDA heard from a reporter from the Wall Street Journal about their concerns regarding Theranos. A Wall Street Journal reporter made a request through FDA's Public Affairs Office, and Gutierrez eventually spoke to him on at least two occasions. Ultimately though, it was the issues in Theranos's data that were the impetus for the inspection. Even before being approached by the Wall Street Journal, FDA already had concerns that were obvious from the data they were seeing.

Normally, either ORA (Office of Regulatory Affairs) or the field conducts FDA inspections. ORA can request a directed inspection and the field then decides when they go in. In this case, ORA sent SMEs (subject matter experts) to inspect Theranos alongside investigators from the field, which was unusual. This was requested by Gutierrez, and he was the one who made the decision to inspect. Gutierrez asked the field to provide investigators, and he decided who from ORA went as SMEs. Gutierrez again noted that this is unusual. The inspection request occurred in December 2014 or in January 2015. Ian Pilcher was going to go and do the inspection, but ORA didn't proceed quickly enough. Inspections are not normally done prior to clearing a 510(k). The fact that Theranos had one test that was working (HSV-1) doesn't mean FDA couldn't go forward with an inspection; the two are unrelated.

Gutierrez chose Pilcher as one of the SMEs to inspect Theranos because he's a very good inspector and because he's worked in industry. When Shuren was suggesting that FDA send someone out to Theranos to help them put their data together, Pilcher is who Gutierrez would have sent. Turning back to that suggestion by Shuren, Gutierrez remarked that it was an unusual request. It would have put that FDA employee in a weird position. Gutierrez was concerned by the request, and he wanted to do it through a more formal means. That's why he ordered the inspection.

FDA rarely sends as many people out on an inspection as it did with Theranos. Prior to the inspection, FDA would have had internal pre-inspection meetings. FDA was interested in figuring out whether Theranos was using their instrument, whether they were using it in all their laboratories, and exactly what they were doing. Gutierrez was in communication with the inspection team every day, as they would call to give him updates. It's not atypical on an inspection like this to do a debriefing every day. The inspection team told Gutierrez

US-REPORTS-0006457

# EXHIBIT 2

**Document Request to Theranos, Inc.**
In the Matter of Theranos, Inc. (MSF-4030)
October 22, 2015

<u>DEFINITIONS</u>

A. "DOCUMENT" and "DOCUMENTS" mean any and all records, whether drafts or final versions, originals or annotated or non-identical copies, however and by whomever created, produced, or stored (manually, mechanically, electronically, or otherwise), including, but not limited to, books, papers, files, notes, account statements, confirmations, drawings, graphs, charts, photographs, sound recordings, images, reports, correspondence, letters, memoranda, electronic files, computer records, computer programs, e-mail, Internet sites, World Wide Web pages, ledger sheets, telegrams, telexes, telephone bills, messages or logs, handwritten notes, minutes of conversations or meetings, contracts, agreements, calendars, datebooks, diaries, records of billings, checks, receipts, wire transfers, drafts for money, records of payment, data, magnetic tape, tape recordings, disks, diskettes, diskpacks or other electronic media, back-up tapes, microfilm, microfiche, and other storage devices. "DOCUMENT" and "DOCUMENTS" shall also include all "writings," "recordings," and "photographs" as defined by Rule 1001 of the Federal Rules of Evidence and all "electronically stored information," "documents," and "tangible things" as those terms are used in Rules 26 and 34 of the Federal Rules of Civil Procedure.

B. "COMMUNICATIONS" means any and all written, oral, telephonic or other utterances of any nature whatsoever, shared, shown and/or transferred between and/or among any two or more persons or entities, including, without limitation, any statements, inquiries, discussions, conversations, dialogues, correspondence, consultations, negotiations, agreements, understandings, meetings, letters, e-mails, notations, telegrams, advertisements, interviews and all other documents.

C. "REGARDING," "RELATE TO," "REFER TO," "CONCERNING," "REFERRING TO," "RELATING TO," and "REFERENCING" mean referring to, pertaining to, relating to, alluding to, bearing upon, commenting upon, touching upon, regarding, concerning, recording, referencing, evidencing, constituting, substantiating, supporting, contradicting, discussing, mentioning, including, showing, demonstrating, reflecting, or otherwise affecting (directly or indirectly).

D. "THERANOS," "YOU," and "YOUR" means Theranos, Inc., the entity and its divisions, groups, subsidiaries, predecessors, successors and affiliates, as well as current and former officers, directors, members, general and limited partners, employees, attorneys, accountants, agents, representatives, and any person acting on behalf of Theranos, Inc. with express, implied or apparent authority to do so or under its direction or control.

<u>DOCUMENTS TO BE PRODUCED</u>

1. DOCUMENTS sufficient to identify all divisions within Theranos currently, the responsibilities of each division, and reporting lines, including, but not limited to, organizational charts.

2. DOCUMENTS sufficient to identify all current Theranos employees, including names, divisions, titles, and reporting lines.

3. Theranos' capitalization table, showing all investors and number of shares owned by each investor.

4. DOCUMENTS sufficient to show contact information for every Theranos investor (including physical address, phone number, and email address), the date of investment, and investment amount, regardless of whether that person or entity is still invested in Theranos.

5. All DOCUMENTS regarding any fundraising efforts by Theranos from January 1, 2010 to the date of production, including, but not limited to, marketing materials shown to prospective investors, offering materials, and notes taken of meetings with investors.

6. All iterations of Theranos' website from January 1, 2010 to the present.



*United States Attorney*
*Northern District of California*

---

*11th Floor, Federal Building*
*450 Golden Gate Ave., Box 36055*
*San Francisco, CA 94102-3495*

*(415)436-7200*
*FAX: (415) 436-7234*

January 11, 2016

Custodian of Records
Theranos, Inc.
c/o Peter Skinner, Esq.



**Re: Grand Jury Subpoena Investigation #2016R00024-1**

Dear Sir or Madam:

You have received a grand jury subpoena duces tecum in connection with the above-numbered grand jury investigation. The subpoena has been issued in furtherance of that investigation.

This letter is written to advise you that disclosure of the subpoena and your response to it to any third parties may impede or obstruct the investigation. Therefore, we ask you not to disclose the existence of the subpoena or the nature of your response to it to any person for the indefinite future.

If you have any questions about this request, please telephone me at ██████████.

Very truly yours,

BRIAN J. STRETCH
Acting United States Attorney

ROBERT S. LEACH
Assistant United States Attorney

RSL:bk
Enclosures

AO 110  (Rev. 06/09) Subpoena to Testify Before a Grand Jury

USAO NO. 2016R00024-1     GJ 14-3

# UNITED STATES DISTRICT COURT
for the

Northern District of California

### SUBPOENA TO TESTIFY BEFORE A GRAND JURY

To:  Custodian of Records
Theranos, Inc.
c/o Peter Skinner, Esq. - Bois, Schiller & Flexner LLP, 575 Lexington Avenue, 7th Floor, New York, NY  10022

   **YOU ARE COMMANDED** to appear in this United States district court at the time, date, and place shown below to testify before the court's grand jury.  When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place:  United States District Court<br>Federal Building & Courthouse, Grand Jury Room A, 17<br>450 Golden Gate Avenue<br>San Francisco, CA  94102 | Date and Time:<br><br>01/28/2016 9:30 am |
|---|---|

   You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:

**\*\*PLEASE SEE ATTACHED\*\***



Date:  _____01/11/2016_____

*CLERK OF COURT*

_____
*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the United States attorney, or assistant United States attorney, who requests this subpoena, are:
Robert S. Leach, AUSA
U.S. Attorney's Office
450 Golden Gate Avenuen, 11th Floor, San Francisco, CA  94102, Ph:  (415) 436-7534
This subpoena is issued on application of the United States of America.
BRIAN J. STRETCH
ACTING UNITED STATES ATTORNEY



**U.S. Department of Justice**

*United States Attorney*
*Northern District of California*

---

*11ᵗʰ Floor, Federal Building*                                          *(415)436-7200*
*450 Golden Gate Ave., Box 36055*                              *FAX: (415) 436-7234*
*San Francisco, CA 94102-3495*

# ADVICE OF RIGHTS

In accordance with Department of Justice regulations, this form is attached to all federal grand jury subpoenas, regardless of the status, culpability, or involvement of the person who receives a subpoena.

1.    The grand jury is conducting an investigation of possible violations of federal criminal law involving securities fraud, wire fraud, mail fraud, false statements, the Federal Food, Drug, and Cosmetic Act, and other offenses.

2.    A witness before the grand jury may refuse to answer any questions if a truthful answer to the question would tend to incriminate the witness.

3.    Anything said by a witness before the grand jury may be used against the witness by a grand jury or in a subsequent legal proceeding.

4.    If a witness has retained counsel, the grand jury will permit the witness a reasonable opportunity to step outside the grand jury to consult with counsel if the witness so desires.

## ATTACHMENT A

Custodian of Records
Theranos, Inc.
c/o Peter Skinner, Esq.
Boies, Schiller & Flexner LLP
575 Lexington Avenue, 7th Floor
New York, NY 10022
Fax:  (212) 446-2350

1.      Documents sufficient to identify all shareholders of Theranos.
2.      Documents sufficient to identify any bank accounts or lines of credit of Theranos.
3.      Documents sufficient to identify all securities offerings by Theranos.
4.      With respect to any securities offering, a copy of the prospectus and any other offering
        materials used.
5.      All documents relating to any business arrangement between Theranos and Walgreens,
        including, without limitation, all agreements with Walgreens, all communications with
        Walgreens relating to any business arrangement, and all documents relating to Theranos'
        performance under any agreement.
6.      All documents relating to any business arrangement between Theranos and Safeway,
        including, without limitation, all agreements with Safeway, all communications with
        Safeway relating to any business arrangement, and all documents relating to Theranos'
        performance under any agreement.
7.      All documents relating to any communications between Theranos and Novartis AG,
        including, but not limited to, notes or e-mails summarizing or describing meetings with
        Novartis.
8.      All documents relating to any communications between Theranos and the Cleveland
        Clinic.

# EXHIBIT 3

FD-302 (Rev. 5-8-10)



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry     01/29/2018

     CRAIG HALL (HALL) was interviewed via telephone. Securities and
Exchange Commission (SEC) Attorney Rahul Kolhatkar, SEC Attorney Jessica
Chan, SEC Assistant Regional Director Monique Winkler, SEC Accountant
Michael Foley, and SEC Trial Attorney Jason Habermyer were present during
the interview. After being advised of the identities of the interviewers
and the nature of the interview, HALL provided the following information:



Investigation on   12/20/2017   at   San Francisco, California, United States (In Person)

File #   318A-SF-7315857            Date drafted   12/20/2017

by   CAMERON W W PURVES, Mario C. Scussel

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

US-REPORTS-0007005



   HALL felt like he was given a short amount of time to decide on his
investment in 2013. HALL had a phone call with HOLMES and invested his
additional funds through CHRIS. HOLMES had a call on December 20, 2013
with CHRIS' clients, including HALL. HALL was excited about THERANOS at
the time and he thought the investment was an incredible opportunity. HALL
thought there was validation of the overall concept based on the THERANOS
board and the work with the military. HALL contacted HOLMES less than
three times before the December 20, 2013 call. There was a substantial
lapse of time before the December call.

   HALL made the recording of the December call by using his speaker
phone. HALL taped the call because he thought he would not remember
everything said on the call. DON BROWN (BROWN) was the President of HALL's
company and he also invested some money in THERANOS. HALL never shared the
recording with anybody else. The recording may have been stored in an
envelope in his secretary's files. It was uncommon for HALL to record
telephone calls, but he has done it a handful of other times. HALL made
the recording while he was in his offices in Dallas, Texas. The production
to the Government was a copy of the recording, somebody still had the
original cassette. HALL had not listened to the recording in awhile, but
he did listen to it in order to prepare for this interview.

US-REPORTS-0007006

# EXHIBIT 4

FD-302 (Rev. 5-8-10)


OFFICIAL RECORD

## FEDERAL BUREAU OF INVESTIGATION

Date of entry       03/15/2017

        DANIEL MOSLEY (MOSLEY) was interviewed at the San Francisco Regional
Office of the Securities and Exchange Commission (SEC).  Also present
during the interview representing MOSLEY, were John Buretta and Morgan
Cohen of Cravath, Swaine & Moore LLP (Cravath).  Rahul Kolhatkar, Jessica
Chan and Michael Foley of the SEC were also present.  United States Postal
Inspection Service, Postal Inspector Christopher McCollow was present
during the interview.  After being advised of the identities of the
interviewers and the nature of the interview, MOSLEY provided the
following information:



Investigation on   01/26
                   72017          at   San Francisco, California, United States (In Person)

File #  318A-SF-7315857                                  Date drafted   01/26/2017

by   CAMERON W W PURVES, Mario C. Scussel

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

US-REPORTS-0002767

# EXHIBIT 5

LAW OFFICES

# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

LANCE WADE
(202) 434-5755
lwade@wc.com

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

February 5, 2019

<u>Via Email</u>

Mr. John C. Bostic, Esquire
Mr. Jeffrey Schenk, Esquire
Mr. Robert Leach, Esquire
Assistant United States Attorneys
United States Attorney's Office
Northern District of California
150 Almaden Blvd. Suite 900
San Jose, CA 95113

Re:    <u>United States v. Elizabeth Holmes and Ramesh "Sunny" Balwani, No. CR-
18-00258-EJD (N.D. Cal.)</u>

Dear Counsel:

We are writing to raise certain outstanding discovery issues.

We have not located within the materials produced to date any documents or other materials produced by John Carreyrou (or any business entity owned by or affiliated with Carreyrou), the Wall Street Journal, Penguin Random House, or Eric Lupfer of Fletcher & Company ("Carreyrou Entities"), or any Federal Bureau of Investigation 302s or other agency reports of investigation ("ROIs") memorializing government communications with witnesses from any of these entities.  Please produce copies of all documents, 302s, ROIs, and notes relating to the government's efforts to obtain evidence from the Carreyrou Entities, as well as all communications with the Carreyrou Entities or their counsel.

Second, apart from a limited amount of FOIA-related correspondence, we have not received in discovery documents from federal agencies reflecting any and all communications between the Carreyrou Entities and the government (including all relevant government agencies and members of the prosecution team, including the Securities and Exchange Commission, the Department of Health and Human Services ("DHHS") (including the DHHS Office of Inspector General, Centers for Medicare and Medicaid Services, and the Food and Drug Administration), and the Department of Defense).  Please produce all such communications.

WILLIAMS & CONNOLLY LLP
John Bostic, Jeffrey Schenk, and Robert Leach
February 5, 2019
Page 2


If you have already produced any of the above-requested materials, please direct us to the volume of production in which they can be located and the corresponding bates numbers; if you have not collected any of these materials as part of your investigation, please advise accordingly.

Very truly yours,

Lance A. Wade


cc: Mr. Jeffrey Coopersmith (counsel for Mr. Balwani)

LAW OFFICES

# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

LANCE WADE
(202) 434-5755
lwade@wc.com

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

February 8, 2019

Via Email

Mr. John C. Bostic, Esquire
Mr. Jeffrey Schenk, Esquire
Mr. Robert Leach, Esquire
Assistant United States Attorneys
United States Attorney's Office
Northern District of California
150 Almaden Blvd. Suite 900
San Jose, CA 95113

Re:   United States v. Elizabeth Holmes and Ramesh "Sunny" Balwani, No. CR-
18-00258-EJD (N.D. Cal.)

Dear Counsel:

Pursuant to Rule 16 of the Federal Rules of Criminal Procedure and *Brady v. Maryland*, 373 U.S. 83 (1963), please provide us with copies of the following:

1. any and all correspondence or communications regarding Theranos between any clinical laboratory company or association affiliated with clinical laboratories (including but not limited to LabCorp, Quest Diagnostics, and the American Clinical Lab Association) or their employees, agents, or counsel and the U.S. Attorney's Office ("USAO"), the Federal Bureau of Investigation ("FBI"), the United States Postal Inspection Service ("USPIS"), the Securities and Exchange Commission ("SEC"), the Department of Defense ("DOD") (including but not limited to departments within the DOD, such as the U.S. Army and the U.S. Navy), and the Department of Health and Human Services ("DHHS") (including but not limited to agencies within DHHS, such as the Food and Drug Administration and the Centers for Medicare and Medicaid Services) (collectively "Federal Agencies");

2. any and all correspondence or communications regarding Theranos between Walgreens or its employees, agents, or counsel and the Federal Agencies;

3

WILLIAMS & CONNOLLY LLP
John Bostic, Jeffrey Schenk, and Robert Leach
February 8, 2019
Page 2

     3.   any and all correspondence or communications regarding Theranos between Partner
           Fund Management or its employees, agents, or counsel and the Federal Agencies;

     4.   any and all intra-agency and/or inter-agency correspondence regarding Theranos
           between or among the Federal Agencies; and

     5.   any and all correspondence or communications regarding Theranos between the
           Federal Agencies and physicians, hospitals, health care systems, and/or Theranos
           business partners.

     If you have already produced these materials, please direct us to the volume of production
in which they can be located and their corresponding bates numbers.  We appreciate your
attention to this matter.

                      Very truly yours,

                      Lance A. Wade

cc: Mr. Jeffrey Coopersmith (counsel for Mr. Balwani)



*United States Attorney*
*Northern District of California*

1301 Clay Street, Suite 340S         (510) 637-3680
Oakland, California 94612       FAX:(510) 637-3724

February 22, 2019

*By Email*

Kevin Downey, Esq.
Lance Wade, Esq.
Seema Mittal Roper, Esq.
Michelle Chen, Esq.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, DC 20005

   Re: *United States v. Holmes & Balwani*, CR 18-258 EJD

Dear Counsel:

  We write in response to your letter dated February 5, 2019. Without agreeing that such information is discoverable under Rule 16 and/or *Brady*, we advise as follows:

  The government has not interviewed John Carreyrou, nor has the government requested documents from him, so there are no 302s, ROIs, or notes to produce. The government has not interviewed nor has it requested documents from Penguin Random House or Eric Luper. The government has not interviewed nor has it requested documents from *The Wall Street Journal* ("*WSJ*") or its representatives about Mr. Carreyrou or his reporting. The government did obtain statements and documents relating to Rupert Murdoch's investment in Theranos. We believe these have been produced.

  You also have requested "communications between the Carreyrou Entities and . . . all relevant government agencies." Again, we do not believe such information is discoverable under Rule 16 and/or *Brady*. In any event, with respect to the United States Attorney's Office ("USAO"), the Federal Bureau of Investigation ("FBI"), the United States Postal Inspection Service ("USPIS"), and the Food and Drug Administration, Office of Criminal Investigation ("FDA-CI") (collectively, the "prosecution team"):

  • On or about April 15, 2016, Mr. Carreyrou left a voice message for an AUSA on the investigation. The voice message stated, in substance, that Mr. Carreyrou understood the

1

AUSA was heading up an investigation into Theranos; that Mr. Carreyrou had been a reporter on the story; that the *WSJ* was going to issue a public report in the coming days about the federal investigation; and that he wanted to ask questions.

- On or about April 15, 2016, Christopher Weaver from the *WSJ* sent a message via LinkedIn to an AUSA stating in substance:

> I'm a reporter at the Wall Street Journal. We're looking into a matter concerning Theranos. We're aware that DOJ in SF is looking into the company, and had heard that you were one of a couple AUSAs taking a look at records related to the firm. I'd hoped to catch up with you before we publish to at minimum give you a head's up about what we're hearing and see if there is any context you want to give-though of course I realize the dept's limitations.

> Will leave a voicemail message at your office too. Hope to talk. You can reach me at 212-*** or any time on cell at 917-***.

- On or about April 15, 2016, Mr. Weaver sent two emails to a Postal Inspector on the investigation stating in substance:

> I'm a reporter here at the Wall Street Journal. A colleague and I have been working on stories about Theranos. We have learned that the Postal Inspection Service is among the agencies investigating Theranos and that USPIS has been referenced on subpoenas. I've also heard that you are one of the investigators looking into the case.

> We may write about this investigation soon. I'd really like to speak with you briefly before we publish any story about it, first to give you a head's up about what we intend to report, and second, to see if there is any context you may be in a position to provide.

- On or about April 16, 2016, Mr. Weaver sent a LinkedIn message to an AUSA stating in substance: "Obviously never heard back after sending my earlier message and call, but I wanted to make sure you saw a story we published in today's paper concerning, among other things, DOJ's investigation of Theranos. Here's the link if not: http://on.wsj.com/1SVY97G Would love to chat any time."

- On or about January 12, 2017, Mr. Weaver wrote an AUSA on the investigation stating in substance: "I'm a reporter here at the Journal. I think a colleague of mine may have tried to reach you some time ago. I'm writing to ask if you might take a call from me. I'd like to ask about Theranos. Please let me know or see my numbers below." Mr. Weaver left a voicemail with a similar message to an AUSA.

- Mr. Carreyrou sent a LinkedIn request to an FBI agent that was not accepted.

2

•  The FBI media office made an on the record comment to Mr. Carreyrou after the indictment was unsealed.  This is available from public sources.

Beyond these emails and voicemails, we are not aware of any communications involving Mr. Carreyrou or other *WSJ* reporters relating to the investigation or prosecution in the possession, custody, or control of the prosecution team.

The Securities and Exchange Commission ("SEC"), the Department of Health and Human Services and its agencies (other than FDA-CI), and the Department of Defense ("DOD") are not members of the prosecution team.  To the extent those agencies have responsive documents, they are not in the possession, custody, or control of the prosecution team. Nevertheless, as a courtesy, the government forwarded your letter to the staff of the SEC and inquired whether it had responsive documents.  On February 7, 2019, the SEC staff advised: "The SEC has no responsive documents and has had no contact with Carreyrou."  We also understand that Mr. Balwani issued subpoenas in the parallel SEC case to the Food and Drug Administration ("FDA"), DOD, and Centers for Medicare and Medicaid Services ("CMS") for all communications with any member of the media referring or relating to Theranos, Ms. Holmes, or Mr. Balwani, including but not limited to any of communications with Mr. Carreyrou, or any reporters, board members, employees, or editors from the *WSJ*.  We anticipate the SEC will provide to the government any documents produced in response to those subpoenas; the government will produce any documents it receives to you.

Very truly yours,

DAVID L. ANDERSON
United States Attorney

ROBERT S. LEACH
JEFFREY SCHENK
JOHN C. BOSTIC
Assistant United States Attorneys

Cc    Jeff Coopersmith, Esq.

3

LAW OFFICES

# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

LANCE WADE
(202) 434-5755
lwade@wc.com

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

March 27, 2019

<u>Via Email</u>

Mr. John C. Bostic, Esquire
Mr. Jeffrey Schenk, Esquire
Mr. Robert Leach, Esquire
Assistant United States Attorneys
United States Attorney's Office
Northern District of California
150 Almaden Blvd. Suite 900
San Jose, CA 95113

      Re:    <u>United States v. Elizabeth Holmes and Ramesh "Sunny" Balwani, No. CR-
18-00258-EJD (N.D. Cal.)</u>

Dear Counsel:

    I write to follow-up on certain outstanding discovery issues, and in response to your letters dated February 22 and February 28, 2019, responding to certain discovery requests. We request a meet and confer on the items below prior to April 1, 2019. If we do not reach agreement, we will file a motion to compel production of these materials prior to the April 22, 2019 status conference in the above-captioned matter.

    As used in this letter, the term "Government" refers to the prosecution and all government agencies for which the prosecution has knowledge of and access to documents and information, including but not limited to the Department of Justice ("DOJ") (including the United States Attorney's Office ("USAO")), the Federal Bureau of Investigation ("FBI"), the United States Postal Inspection Service ("USPIS"), the Securities and Exchange Commission ("SEC"), the Department of Health and Human Services ("DHHS") (including but not limited to the DHHS Office of Inspector General ("OIG") and agencies within DHHS, such as Centers for Medicare and Medicare Services ("CMS"), and the Food and Drug Administration ("FDA")), and the Department of Defense ("DOD") (including but not limited to departments within DOD, such as the U.S. Army and U.S. Navy).

    In your February 22, 2019 letter, you stated that the USAO, the FBI, the USPIS, and the FDA, Office of Criminal Investigation ("FDA-CI") are members of the prosecution team. You

WILLIAMS & CONNOLLY LLP
John Bostic, Jeffrey Schenk, and Robert Leach
March 27, 2019
Page 2

also stated that the SEC, the DHHS and its agencies (other than FDA-CI), and the DOD are not members of the prosecution team. However, on February 28, 2019, you produced to us certain access request letters, demonstrating that the prosecution team (as you have defined it) has knowledge of and access to documents and information from at least the FDA, CMS, DHHS, and the SEC. It is our understanding that the SEC, in turn, has access to documents and information from at least the FDA, CMS, and the DOD. In addition, you have produced to us certain reports of investigation ("ROIs") from the DHHS OIG, FDA, and SEC, as well as documents you obtained from the SEC, FDA, and CMS. These agencies have undoubtedly participated in your investigation. The prosecution cannot access documents favorable to its case from agencies while at the same denying the defense access to other documents material to the defense from those same agencies.

Pursuant to Rule 16 of the Federal Rules of Criminal Procedure, *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), please produce copies of all materials falling within the four enumerated categories below.

1. **Any and all correspondence or communications regarding Theranos between the Government and John Carreyrou, The Wall Street Journal, or their employees, agents, or counsel, and all Government documents, communications, correspondence, notes, or recordings (including intra-agency and/or inter-agency correspondence) regarding same.** We made this request in a February 5, 2019 letter.

2. **Any and all correspondence or communications regarding Theranos between the Government and any clinical laboratory company or association affiliated with clinical laboratories (including but not limited to LabCorp, Quest Diagnostics, and the American Clinical Lab Association), or their employees, agents, or counsel, and all Government documents, communications, correspondence, notes, or recordings (including intra-agency and/or inter-agency correspondence) regarding same.** We made this request in a February 8, 2019 letter, to which you have not yet responded.

3. **Any and all Government documents, communications, correspondence, notes, or recordings (including intra-agency and/or inter-agency correspondence) regarding the 2013 CLIA survey of Theranos.** This includes materials from CMS's agent, the California Department of Public Health ("CDPH"), which conducted the survey.

4. **Any and all FBI 302s or other agency ROIs memorializing Government communications with witnesses, and all Government documents, communications, correspondence, notes, or recordings (including intra-agency and/or inter-agency correspondence) regarding same.**

WILLIAMS & CONNOLLY LLP
John Bostic, Jeffrey Schenk, and Robert Leach
March 27, 2019
Page 3

If you have completed production of any of the above-requested materials, please direct us to the volume(s) of production in which they can be located and the corresponding Bates numbers.  If you have not searched for or collected any of these materials as part of your investigation, or are withholding any of these materials from production, please advise accordingly.

Your production to date, particularly of documents falling within categories 1–3 above, is clearly inadequate.  For example, we did not see documents from any of these categories in CMS's production.  Indeed, CMS's production appears to contain emails only (a) from five custodians, (b) with Theranos, (c) from 2015 onward.  Neither the productions from CDPH nor CMS contain any contemporaneous documents regarding CDPH's 2013 CLIA survey of Theranos, aside from copies of the Form CMS 2567 dated December 3, 2013.  Please explain how custodians were selected, and how emails were collected, searched for, reviewed, and produced by CMS.  Were notes, text messages, recordings, or other documents searched for, collected, or reviewed?  For what time period? We also saw very few documents from categories 1–3 in the FDA's production.  Please inform us of the parameters of any document collection, search, review, and production by the FDA.

Please provide your availability for a meet and confer as soon as possible.

Very truly yours,

Lance A. Wade

cc: Mr. Jeffrey Coopersmith (counsel for Mr. Balwani)



**From:** Wade, Lance
**Sent:** Wednesday, March 27, 2019 3:27 PM
**To:** Chen, Michelle <MChen@wc.com>; Bostic, John (USACAN) <John.Bostic@usdoj.gov>; Jeffrey.B.Schenk@usdoj.gov; Leach, Robert (USACAN) <Robert.Leach@usdoj.gov>
**Cc:** Coopersmith, Jeff <JeffCoopersmith@dwt.com>; Downey, Kevin <KDowney@wc.com>; Roper, Seema Mittal <smroper@wc.com>
**Subject:** RE: United States v. Elizabeth Holmes and Ramesh "Sunny" Balwani, No. CR-18-00258-EJD (N.D. Cal.)

Counsel:

To be clear, our requested meet and confer (and our motion, should it become necessary) may also cover items raised in my 2/8/19 letter on this topic.

Regards,


**Lance Wade**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington DC 20005
(P) 202-434-5755 | (F) 202-434-5029
lwade@wc.com  |  www.wc.com/lwade

---

**From:** Chen, Michelle
**Sent:** Wednesday, March 27, 2019 9:53 AM
**To:** Bostic, John (USACAN) <John.Bostic@usdoj.gov>; Jeffrey.B.Schenk@usdoj.gov; Leach, Robert (USACAN) <Robert.Leach@usdoj.gov>
**Cc:** Coopersmith, Jeff <JeffCoopersmith@dwt.com>; Wade, Lance <LWade@wc.com>; Downey, Kevin <KDowney@wc.com>; Roper, Seema Mittal <smroper@wc.com>
**Subject:** United States v. Elizabeth Holmes and Ramesh "Sunny" Balwani, No. CR-18-00258-EJD (N.D. Cal.)

Counsel,

Please see the attached correspondence.

Thanks,
Michelle

**Michelle Chen**
**Associate | Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington, DC 20005
(P) 202-434-5483 | (F) 202-434-5029
mchen@wc.com | www.wc.com/mchen

| From: | Bostic, John (USACAN) |
|---|---|
| To: | Cazares, Steve; Coopersmith, Jeff; Chen, Michelle; Wade, Lance; Downey, Kevin; Roper, Seema Mittal; Gorton, Kelly |
| Cc: | Schenk, Jeffrey (USACAN); Leach, Robert (USACAN) |
| Subject: | U.S. v. Holmes and Balwani - discovery |
| Date: | Friday, April 05, 2019 10:16:40 PM |

Counsel,

Thank you again for taking the time to speak with us today.  Because there was some minor confusion toward the end of our call, I wanted to follow up and provide a very brief summary of our position relating to your request that we obtain additional documents from several government agencies including the FDA, CMS, and DOD.

Under our reading of the relevant case law, the documents described in your March 27 letter are not in the possession, custody, or control of the prosecution.  For the reasons explained in more detail on our call, the prosecution would face difficulty obtaining these documents from the respective custodian agencies, and we could not guarantee success in obtaining everything the defense is requesting.  Simply put, the prosecution lacks access to the agency documents you seek, and production of those documents is under the control of the respective agencies.  Nonetheless, as a courtesy and to avoid unnecessary motion practice, the prosecution is willing to request these documents from the agencies and produce to you whatever materials we are able to obtain from them.  Were you inclined to accept that offer, we would request that you hold off on filing a motion to compel to allow that process to play out.  Following today's call, I understand that you are not satisfied with that proposal and intend to move forward with a motion to compel.

As always, we are available at your convenience should you wish to discuss the matter further.

Best,
John


John C. Bostic
Assistant United States Attorney
Northern District of California
150 Almaden Blvd. | San Jose, CA 95113
Tel.:  (408) 535-5589 | Fax:  (408) 535-5066
Email:  john.bostic@usdoj.gov

LAW OFFICES

# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

LANCE WADE
(202) 434-5755
lwade@wc.com

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

April 7, 2019

<u>Via Email</u>

Mr. John C. Bostic, Esquire
Mr. Jeffrey Schenk, Esquire
Mr. Robert Leach, Esquire
Assistant United States Attorneys
United States Attorney's Office
Northern District of California
150 Almaden Blvd. Suite 900
San Jose, CA 95113

  Re: <u>United States v. Elizabeth Holmes and Ramesh "Sunny" Balwani. No. CR- 18-00258-EJD (N.D. Cal.)</u>

Dear Counsel:

   I write in response to your April 5, 2019 email.

   First, we appreciate that within 72 hours of our April 1 meet and confer, the government managed to have detailed discussions with the relevant agencies about the defense's discovery requests.  That quick turnaround only underscores the degree to which the government has knowledge of, and access to, the requested documents and is consistent with other evidence of the government's possession, custody, or control of those agencies' documents pertaining to this case.  We also appreciate that you have not contested the materiality under Fed. R. Crim. P. 16 of any of the requested documents, as it is obvious that they are material to preparation of the defense.

   Moreover, while we also appreciate your offer to request—on a voluntary basis—documents from the relevant agencies to "see what [you] can obtain," we do not think that the offer satisfies your obligations under Rule 16, the Constitution, and the governing case law.  We are particularly concerned by certain statements from the agencies that you relayed on the call, including that the agencies:  (1) are likely to raise confidentiality and other objections that are no basis for resisting Rule 16 discovery; (2) having previously voluntarily undertaken voluminous productions at the government's urging, now would be less inclined to search for documents responsive to the defense's narrow requests; (3) are less motivated to produce documents post-

WILLIAMS & CONNOLLY LLP

April 7, 2019
Page 2

indictment than they were when they received requests in aid of the government's investigation and charging decisions, and, perhaps most troublingly; (4) are less likely to produce documents knowing that those documents will go "directly to" the defense.

In light of these statements from the agencies and your own statements on the April 5 call and in your follow-up email, it is apparent that the government is unwilling to accept the responsibilities set forth in governing Ninth Circuit law.  And it also appears that the agencies with which you recently communicated are unwilling—absent a court order—to do their part to meet those obligations.  Mindful of all this, and of the fact that pursuing futile, informal "requests" will only further delay discovery in this case that now has been ongoing for nearly a year, we do intend to file a motion with the Court.

Finally, we request that you advise the agencies of our forthcoming motion so that they may begin collection and prepare to produce the requested documents expeditiously. This will serve to advance the pre-trial phase of the case and avoid further discovery delays.

Very truly yours,

/s/
Lance Wade

cc: Mr. Jeffrey Coopersmith (counsel for Mr. Balwani)

# EXHIBIT 6

USPS TRACKING #    **9114 999 ⌐ 423 8766 9268 39**
& CUSTOMER         For Track ... quires go to USPS.com
RECEIPT            or call 1-800-...-1811.



UNITED STATES POSTAL INSPECTION SERVICE

SAN FRANCISCO DIVISION

**COPY**

March 27, 2017

Lauren DiPaola
Testimony Specialist
Office of Regulatory Affairs
Office of Policy and Risk Management
U.S. Food and Drug Administration
12420 Parklawn Dr
Element Bldg., Rm. 4042
Rockville, MD 20857-1740

Dear Ms. DiPaola:

The United States Postal Inspection Service (USPIS) requests access to the following non-public information pursuant to 21 C.F.R. § 20.85: Records and files maintained or created by the U.S. Food and Drug Administration (FDA) concerning Theranos. Additionally, USPIS requests the access and ability to conduct and participate in interviews of FDA employees concerning their interactions with Theranos.

The purpose for which the information is requested is to assist in the USPIS investigation of whether Theranos violated relevant sections of the United States Criminal Code, specifically Title 18 U.S.C. §§ 1341-1351. The records will only be used for the following authorized law enforcement activity: to determine whether Theranos or any employee acting on Theranos' behalf committed any violations of the criminal code and for other related criminal or civil law enforcement matters.

I certify that the law enforcement activity is authorized by law, that the records or information will be used only for the stated purpose and will not be disclosed outside USPIS without the prior written permission of the Food and Drug Administration. I also certify that disclosure within USPIS will be limited to the specific purpose stated above, and that I will provide a copy of this letter to any person(s) with whom I share the non-public information.

I understand that 21 U.S.C. § 331(j) of the Federal Food, Drug, and Cosmetic Act prohibits disclosure of trade secret information outside the Department of Health and Human Services. If you have any questions, please contact me at ███████████ or by email at

Sincerely,

*[signature]*

Christopher McCollow
United States Postal Inspector

cc:     Kelsey A. Schaefer, Office of Chief Counsel, Food & Drug Administration

2501 RYDIN RD, FL 2S
RICHMOND, CA 94804-9712
PHONE: 510-558-4300
FAX: 510-558-4271

# EXHIBIT 7



April 7, 2017

Christopher McCollow
United States Postal Inspector
San Francisco Division
U.S. Postal Inspection Service
2501 Rydin Rd, FL 2S
Richmond, CA 94804-9712

Dear Mr. McCollow:

This letter is in response to your March 27, 2017, request for disclosure of Food and Drug Administration (FDA) nonpublic records and/or information. You requested records or information, which may be currently under evaluation by the FDA, concerning Theranos. Additionally USPIS requests the access and ability to conduct and participate in interviews of FDA employees concerning their interactions with Theranos.

The purpose for which the information is being requested is to assist in the USPIS of whether Theranos violated relevant sections of the United States Criminal Code, specifically Title 18 U.S.C. §§ 1341-1351. The records will be used for the following law enforcement activity: to determine whether the United States has any civil or administrative monetary claim under the False Claims Act, 31 U.S.C. §§ 3729-3733.

In accordance with Title 21, Code of Federal Regulations, section 20.85 (21 CFR §20.85,) I have authorized Stacy Taylor, at the Center for Devices and Radiological Health and Quinna Douglas at the Center for Biologics Evaluation and Research and any other employee(s) who may have custody of responsive records and/or information to provide the information that you requested.

Please note that this authorization does not extend to trade secret information, disclosure of which outside the Department of Health and Human Services is prohibited by law (21 U.S.C. 331(j)), or to other information disclosure of which is otherwise prohibited by law or regulation (18 U.S.C. 1905 and 21 CFR 20.85). If the USPIS is interested in interviewing or meeting with FDA employees, please contact the Office of Chief Counsel.

You are reminded that FDA's responsive information and records that are exempt from disclosure to the public shall not be further disclosed to other personnel outside of your office without FDA's written permission.

U.S. Food & Drug Administration
12420 Parklawn Dr.
Rockville, MD 20857
www.fda.gov

US-MISC-000001

Page 2 -   Christopher McCollow, United States Postal Inspector
           San Francisco Division, U.S. Postal Inspection Service

If you have any questions, please call Lori Poirier at ███████

Sincerely,

Digitally signed by Armando P. Zamora -S
DN: c=US, o=U.S. Government, ou=HHS,
ou=FDA, ou=People,
0.9.2342.19200300.100.1.1=1300083140,
cn=Armando P. Zamora -S
Date: 2017.04.07 14:12:13 -04'00'

for   Douglas Stearn
      Director
      Office of Enforcement and Import Operations
      Office of Regulatory Affairs
      U. S. Food and Drug Administration

# EXHIBIT 8



*United States Attorney*
*Northern District of California*

*150 Almaden Boulevard, Suite 900*
*San Jose, California 95113*

*(408) 535-5061*
*FAX: (408) 535-5066*

June 29, 2017

**VIA U.S. MAIL AND EMAIL**

Elizabeth Dickinson, Esq.
Chief Counsel
Food and Drug Administration
10903 New Hampshire Ave
Silver Spring, MD 20993-0002

      **Re: *Theranos, Inc.***

Dear Counsel:

      Our Office has a pending criminal investigation of Theranos, Inc. We have determined that the United States reasonably anticipates litigation. For this reason, we are informing you of the obligation of the Food and Drug Administration ("FDA") to put in place a litigation hold at this time. The relevant period for this hold is January 1, 2003, to the present. The allegations being investigated in this matter include false statements made by Theranos employees to among others, potential investors, and state and federal regulators, concerning their technology. Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a litigation hold to ensure the preservation of documents relevant to claims or defenses. *Zubulake v. UBS Warburg LLC et al.,* 220 F.R.D. 212, 218 (S.D.N.Y. ~003). FDA's litigation preservation obligations supersede any existing statutory or regulatory retention period or destruction schedule for electronically stored information ("ESI") or documents, as those terms are used broadly under the Federal Rules of Civil Procedure and case law.

      It is imperative that FDA understand its obligations and take necessary and appropriate steps to preserve all information that it determines is potentially relevant to any party's claim or defense. Under the Federal Rules of Civil Procedure, relevant information includes even that which may not be admissible at trial, if the information may lead to the discovery of admissible evidence. As defenses become known, we may need to change the scope of the litigation hold and we will periodically evaluate the scope of the litigation hold with you as described below.

We are happy to discuss this with you, but at this time we believe that information to be preserved at this time in this litigation should include:

- Any and all communication between a Theranos, Inc. employee and an FDA employee;
- Any and all communication between FDA employees concerning Theranos, Inc.

The determination of what information may be potentially relevant to claims or defenses is based upon content and substance and generally does not depend on the type of medium on which the information exists. When possible, ESI should be preserved in its originally-created or native format, along with related metadata, to enable efficient discovery review. For email, creation of electronic folders into which pertinent emails can be easily moved may be one method for preservation in native format, but you will need to determine the capabilities of your information technology system. The litigation hold need not apply to inaccessible disaster recovery tapes unless they are the only source of information for the key employees who are subject to the hold. *Zubulake,* 220 F.R.D. at 218; *see also Zubulake v. UBS Warburg LLC, et al.,* 229 F.R.D. 422, 433-34 (S.D.N.Y. 2004). If the disaster recovery tapes are the only source of information for the key employees who are subject to the hold, please inform the United States Attorney's Office for the Northern District of California promptly so we may address this issue as appropriate.

Given the obligation to preserve ESI, we strongly recommend that you consult with your agencies' Information Technology personnel at the initial stages of the document preservation process. This will aid in identifying both relevant custodians and all sources of ESI relating to those individuals. Our Office's Information Technology personnel would be happy to confer with your agency as necessary to ensure that proper systems are put in place.

Preservation must occur regardless of whether the information may ultimately be withheld as privileged, protected, or confidential, or ultimately determined to be unduly burdensome to produce. Such determinations will be made later, before discovery is provided to the defendant(s) and after we consult with you.

You must take affirmative steps to ensure that all employees subject to the litigation hold understand and comply with the litigation hold, and provide employees further instruction, direction and oversight. *Zubulake v. UBS Warburg LLC, et al.,* 229 F.R.D. at 432-33. There must be sufficient supervision to ensure the accuracy and integrity of the preservation process for the duration of the litigation hold. Please contemporaneously document your litigation hold procedures and supervision so that any later challenges to the scope of the hold or methods used may be reasonably defended. Toward this end, I request that you take the following actions, at a minimum, to preserve potentially relevant information that is subject to the litigation hold:

1. Identify and provide a list of all key FDA employees who may have information subject to the litigation hold. This may include your Records Officer, Freedom of Information Act Officer, and Information Technology Staff.
2. Provide me copies of initial and supplemental instructions for the litigation hold, and the list of employees who received the litigation hold, so that we may work

together to ensure they complied with these instructions.  Preferably, we can review these together in advance of their issuance.

3. Contact the identified employees in written form within a reasonable period of time and explain to them their obligation to preserve information that is subject to the litigation hold in accordance with the discussion in the paragraphs above. Identified employees should acknowledge their receipt and understanding of their preservation obligations.

4. After consultation with the U.S. Attorney's Office, determine whether it is prudent to periodically reissue the litigation hold instructions to affected FDA employees.

5. After consultation with the U.S. Attorney's Office, determine whether the scope of the hold should be broadened or narrowed as the litigation progresses.

6. Work with your agency's Human Resources and Information Technology Offices to put in place steps to ensure that when employees who are subject to the ligation hold leave the agency, their information subject to the litigation hold continues to be preserved.

If there is doubt as to whether any particular information should be subject to the litigation hold, please preserve the information until you and I have had an opportunity to consult.

Our Office appreciates that these requests may impose a substantial burden on FDA.  If necessary, we can explore relief, such as narrowing of the scope of the litigation hold or relevant time-period.

I will contact you to discuss this matter further.  Please do not hesitate to contact me if you have questions.  I can be reached at ███████████ or ████████████████

Very truly yours,
BRIAN J. STRETCH
United States Attorney


JEFF SCHENK
Assistant United States Attorney



*United States Attorney*
*Northern District of California*

---

*150 Almaden Boulevard, Suite 900*                                  *(408) 535-5061*
*San Jose, California 95113*                                        *FAX: (408) 535-*
                                                                    *5066*

July 25, 2017

**VIA U.S. MAIL AND EMAIL**

Lindsay L. Turner, Esq.
Office of the General Counsel – CMS Division
U.S. Department of Health and Human Services
**VIA ELECTRONIC MAIL**: ███████████████

   **Re: *Theranos, Inc.***

Dear Counsel:

   Our Office has a pending criminal investigation of Theranos, Inc.  We have determined that the United States reasonably anticipates litigation.  For this reason, we are informing you of the obligation of the Centers for Medicare & Medicaid Services ("CMS") to put in place a litigation hold at this time. The relevant period for this hold is January 1, 2003, to the present. The allegations being investigated in this matter include false statements made by Theranos employees to among others, potential investors, and state and federal regulators, concerning their technology.  Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a litigation hold to ensure the preservation of documents relevant to claims or defenses. *Zubulake v. UBS Warburg LLC et al.,* 220 F.R.D. 212, 218 (S.D.N.Y. ~003).  CMS's litigation preservation obligations supersede any existing statutory or regulatory retention period or destruction schedule for electronically stored information ("ESI") or documents, as those terms are used broadly under the Federal Rules of Civil Procedure and case law.

   It is imperative that CMS understand its obligations and take necessary and appropriate steps to preserve all information that it determines is potentially relevant to any party's claim or defense.  Under the Federal Rules of Civil Procedure, relevant information includes even that which may not be admissible at trial, if the information may lead to the discovery of admissible evidence.  As defenses become known, we may need to change the scope of the litigation hold and we will periodically evaluate the scope of the litigation hold with you as described below.

We are happy to discuss this with you, but at this time we believe that information to be preserved at this time in this ligation should include:

- Any and all communication between a Theranos, Inc. employee and an CMS employee;
- Any and all communication between CMS employees concerning Theranos, Inc.

The determination of what information may be potentially relevant to claims or defenses is based upon content and substance and generally does not depend on the type of medium on which the information exists. When possible, ESI should be preserved in its originally-created or native format, along with related metadata, to enable efficient discovery review. For email, creation of electronic folders into which pertinent emails can be easily moved may be one method for preservation in native format, but you will need to determine the capabilities of your information technology system. The litigation hold need not apply to inaccessible disaster recovery tapes unless they are the only source of information for the key employees who are subject to the hold. *Zubulake,* 220 F.R.D. at 218; *see also Zubulake v. UBS Warburg LLC, et al.,* 229 F.R.D. 422, 433-34 (S.D.N.Y. 2004). If the disaster recovery tapes are the only source of information for the key employees who are subject to the hold, please inform the United States Attorney's Office for the Northern District of California promptly so we may address this issue as appropriate.

Given the obligation to preserve ESI, we strongly recommend that you consult with your agencies' Information Technology personnel at the initial stages of the document preservation process. This will aid in identifying both relevant custodians and all sources of ESI relating to those individuals. Our Office's Information Technology personnel would be happy to confer with your agency as necessary to ensure that proper systems are put in place.

Preservation must occur regardless of whether the information may ultimately be withheld as privileged, protected, or confidential, or ultimately determined to be unduly burdensome to produce. Such determinations will be made later, before discovery is provided to the defendant(s) and after we consult with you.

You must take affirmative steps to ensure that all employees subject to the litigation hold understand and comply with the litigation hold, and provide employees further instruction, direction and oversight. *Zubulake v. UBS Warburg LLC, et al.,* 229 F.R.D. at 432-33. There must be sufficient supervision to ensure the accuracy and integrity of the preservation process for the duration of the litigation hold. Please contemporaneously document your litigation hold procedures and supervision so that any later challenges to the scope of the hold or methods used may be reasonably defended. Toward this end, I request that you take the following actions, at a minimum, to preserve potentially relevant information that is subject to the litigation hold:

1. Identify and provide a list of all key CMS employees who may have information subject to the litigation hold. This may include your Records Officer, Freedom of Information Act Officer, and Information Technology Staff.
2. Provide me copies of initial and supplemental instructions for the litigation hold, and the list of employees who received the litigation hold, so that we may work

together to ensure they complied with these instructions.  Preferably, we can review these together in advance of their issuance.

3. Contact the identified employees in written form within a reasonable period of time and explain to them their obligation to preserve information that is subject to the litigation hold in accordance with the discussion in the paragraphs above. Identified employees should acknowledge their receipt and understanding of their preservation obligations.

4. After consultation with the U.S. Attorney's Office, determine whether it is prudent to periodically reissue the litigation hold instructions to affected CMS employees.

5. After consultation with the U.S. Attorney's Office, determine whether the scope of the hold should be broadened or narrowed as the litigation progresses.

6. Work with your agency's Human Resources and Information Technology Offices to put in place steps to ensure that when employees who are subject to the ligation hold leave the agency, their information subject to the litigation hold continues to be preserved.

If there is doubt as to whether any particular information should be subject to the litigation hold, please preserve the information until you and I have had an opportunity to consult.

Our Office appreciates that these requests may impose a substantial burden on CMS.  If necessary, we can explore relief, such as narrowing of the scope of the litigation hold or relevant time-period.

I will contact you to discuss this matter further.  Please do not hesitate to contact me if you have questions.  I can be reached at ███████ or ███████████

Very truly yours,
BRIAN J. STRETCH
United States Attorney


/s/
JEFF SCHENK
Assistant United States Attorney

# EXHIBIT 9

(b)(6); (b)(7)(C)

**From:** (b)(6); (b)(7)(C)
**Sent:** Monday, June 29, 2015 5:53 AM
**To:** (b)(6); (b)(7)(C)
**Subject:** FW: Theranos complaint back in April 2014

Here is the complaint info.

**From:** (b)(6); (b)(7)(C)
**Sent:** Monday, June 29, 2015 8:48 AM
**To:** Dyer, Karen (CMS/CCSQ)
**Cc:** (b)(6); (b)(7)(C)
**Subject:** FW: Theranos complaint back in April 2014

FYI

**From:** Shulman, Stephanie (HEALTH)
**Sent:** Monday, June 29, 2015 8:26 AM
**To:** (b)(6); (b)(7)(C)
**Subject:** RE: Theranos complaint back in April 2014

Hi (b)(6); (b)(7)(

The original complaint was received on (b)(6); (b)(7)(C)   (b)(6); (b)(7)(C)  contacted our Laboratory Investigative Unit and stated " (b)(6); (b)(7)(C)  would like to submit an anonymous complaint about the (b)(6); (b)(7)( handled the proficiency testing samples in February. My main issue is (b)(6); (b)(7)( run patient samples on a technology (b)( developed, but then run the proficiency testing samples on machines that (b)(6); (b)(7) purchased from companies like Immulite and Diasorin. (b)(6); (b)(7) inquired about the legality (b)(6); (b)(7)( was told that since our system has no peer group (b)( cannot be adequately evaluated by proficiency testing programs, which compare peer groups. (b)( (b)( wondering if this could really be true.  Secondly, the samples were also split so that we could run the samples on (b)( (b)(7 developed technology and then compare the results to the results (b)( (b)( obtained from the purchased technologies. (b)( (b)(7 uncomfortable with these practices, so feel the need to submit a formal complaint.  Thank you."

Our Laboratory Investigative Unit responded to the complainant by requesting additional information:
- what were the tests?
- when did patient testing begin using the in-house method?
- what testing platform is being used now?
- are NY state samples currently being tested?

An additional email was received from the complainant on (b)(6); (b)(7)(C stating " (b)( ran tests for Vitamin D, TSH, TPSA, and fT4. (b)( also had PT testing through API so (b)( not sure if these were all through NY. Patient testing for Vitamin D using the in-house method began in September 2013, the other tests came afterward but (b cannot find the exact dates. (b)( are currently running these tests and others on the in-house technology despite our results not correlating with results from the FDA approved devices during proficiency testing (determined by sample splitting). Thank you."

Since the laboratory only applied for a NYS permit to perform FDA-approved tests and was not performing testing on NYS samples since it did not yet hold a permit, the allegations were not applicable to us.   Our staff performed a survey of the laboratory on 4/3-4/4/13.  No testing was being performed on NYS samples.  The survey was a little out of the norm since their attorney followed the surveyor everywhere.....

Please let me know if you have any questions.

1

Stephanie

Stephanie Shulman, M.P.H., M.S., M.T. (ASCP)
Director, Clinical Laboratory Evaluation Program

**Wadsworth Center, New York State Department of Health**
Phone ████████████████████████████
Fax: (518) 485-5414

www.wadsworth.org

**NEW YORK STATE** | **Department of Health** | **Wadsworth Center**

**From:** (b)(6); (b)(7)(C)
**Sent:** Friday, June 26, 2015 11:58 AM
**To:** Shulman, Stephanie (HEALTH)
**Cc:** Dyer, Karen (CMS/CCSQ)
**Subject:** Theranos complaint back in April 2014

Hi Stephanie,

I'm trying to obtain the ⬜ (b)(6); (b)(7)(C) ⬜ that was received by your office, and then forwarded to CMS. Would you be able to forward us the original complaint?

Thanks very much!



Division of Laboratory Services
CMS/SCG/CCSQ
7500 Security Boulevard

(b)(6); (b)(7)(C)

Please visit the CLIA website at www.cms.gov/CLIA/

CONFIDENTIAL COMMUNICATION
This transmission contains confidential and/or proprietary information and that is intended only for the use of the individual or entity to whom it is addressed.  If you are not the intended recipient, or the person responsible for receiving and/or delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of any information contained in this transmission is strictly prohibited.  If you have received this transmission in error, please immediately notify the sender by return e-mail and delete the original message. Thank you.

(b)(6); (b)(7)(C)

**From:** (b)(6); (b)(7)(C)
**Sent:** Friday, June 12, 2015 7:33 AM
**To:** (b)(6); (b)(7)(C)
**Subject:** RE: Theranos complaint?

(b)(6); (b)(7)(C)

I checked my emails and I do not have any information on Jan. (b)(6); (b)(7)(C)
Welcome back,

(b)(6); (b)(7)(C)

**From:** (b)(6); (b)(7)(C)
**Sent:** Friday, June 12, 2015 7:28 AM
**To:** (b)(6); (b)(7)(C)
**Cc:** Dyer, Karen (CMS/CCSQ); (b)(6); (b)(7)(C)
**Subject:** RE: Theranos complaint?

Received no complaint from the NY SA concerning Theranos.

**From:** (b)(6); (b)(7)(C)
**Sent:** Friday, June 12, 2015 7:26 AM
**To:** (b)(6); (b)(7)(C)
**Cc:** Dyer, Karen (CMS/CCSQ); (b)(6); (b)(7)(C)
**Subject:** RE: Theranos complaint?

FYI  So this is what our OC shared with us. Complaint timeframe was around January 2015.  I asked Stephanie recently about it, and she confirmed the complaint was forwarded to RO9 office, but couldn't recall the who it was forwarded to.

So, your office didn't get this complaint about PT samples not being handled in the same manner as patient samples? Trying to understand what happened with this complaint.

Apparently, Theranos is using their LDT device for a small number of tests to report out patient results, such as measuring the patient's potassium level. I've asked the Theranos counsel for a list of those tests that are LDTs and being offered as CLIA tests.

(b)(6); (b)(7)(C)

**********************************************************************************************************
*************************************************

Lauren,
Hi. I just left a message on your voicemail. I'm working on an article about Theranos Inc., the Palo Alto, Calif. blood-testing company.
I have information showing that (b)(6); (b)(7)(C) filed a complaint last year with the New York state health department about the fact that Theranos was allegedly gaming proficiency-testing protocols. The NY state health department's laboratory investigative unit passed the complaint onto CMS, which is the federal entity that regulates labs under CLIA.
My question is: What did CMS do about this complaint? Did it look into it? Launch an investigation? Is there someone in the CMS division that regulates labs that you could put me on the phone with to discuss this?
I'm going to forward you several emails, including the employee's original emailed complaint to NY state and NY state's email to me confirming that it passed the employee's complaint onto CMS.

1

Feel free to give me a call when you get this.
Thanks,
John

John Carreyrou
The Wall Street Journal
Office: ███████████

---

**From:** Yamamoto, Gary K. (CMS/CQISCO)
**Sent:** Friday, June 12, 2015 9:09 AM
**To:** Keller, Penny (CMS/CCSQ)
**Cc:** Dyer, Karen (CMS/CCSQ); Fuller, Karen M. (CMS/CQISCO)
**Subject:** RE: Theranos complaint?

Penny,

We've received no complaint against Theranos from the NYSDH.

Gary

**From** (b)(6); (b)(7)(C)
**Sent:** Monday, June 08, 2015 7:45 AM
**To:** (b)(6); (b)(7)(C)
**Cc:** Dyer, Karen (CMS/CCSQ); (b)(6); (b)(7)(C)
**Subject:** Theranos complaint?

H)(6); (b)(7)((

We understand that the NYSDH folks got a complaint about Theranos, and it was forwarded to your office. Do you know anything about the complaint? There's a journalist who's asking us about this complaint which we haven't seen at CO, and we're trying to figure out what this is all about. I don't think this is related to the inquiry back in 2012 which Gary handled at our request.

Thanks very much!

(b)(6); (b)(7)(C)

Division of Laboratory Services
CMS/SCG/CCSQ
7500 Security Boulevard

(b)(6); (b)(7)(C)

Please visit the CLIA website at www.cms.gov/CLIA/

CONFIDENTIAL COMMUNICATION
This transmission contains confidential and/or proprietary information and that is intended only for the use of the individual or entity to whom it is addressed.  If you are not the intended recipient, or the person responsible for receiving and/or delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of any

2

information contained in this transmission is strictly prohibited.  If you have received this transmission in error, please immediately notify the sender by return e-mail and delete the original message. Thank you.

.

# EXHIBIT 10

**Briefing Memo: Theranos, Inc.**
October 2, 2015
Contact: Alberto Gutierrez, CDRH/OIR

US-FDA-0023970



Earlier this summer we learned from a Wall Street Journal reporter of a whistleblower who, among other concerns, also raised red flags about the performance of some of Theranos' chemistry-based assays.  A directed inspection was requested and investigators, including 3 scientists from CDRH/OIR, simultaneously inspected 2 Theranos sites in California and one in Arizona from August 24 to September 16, 2015.



The Wall Street article is supposed to publish next week.



US-FDA-0023971

# EXHIBIT 11



**Food and Drug Administration**
OFFICE OF CRIMINAL INVESTIGATIONS
MEMORANDUM OF INTERVIEW

| | |
|---|---|
| CASE NUMBER: | 2016-MWM-709-0576 |
| CASE TITLE: | THERANOS, INC. |
| DOCUMENT NUMBER: | 259857 |
| PERSON INTERVIEWED: | Dr. Nicole Sundene, Fountain Hills Women's Health |
| PLACE OF INTERVIEW: | Telephonic |
| DATE OF INTERVIEW: | 11/08/2017 |
| TIME OF INTERVIEW: | 1500 EST |
| INTERVIEWED BY: | SA George Scavdis |
| OTHER PERSONS PRESENT: | None |





The case agent asked Dr. Sundene how she got involved with Carreyrou.  She explained that there was a phlebotomist in town who she knew and who she sends patients to, and she asked him if he was going to be working with Theranos.  He said he wasn't and that a lot of doctors in town were against Theranos.  This was at a time when Dr. Sundene didn't know anything about Theranos.  When the incident with Glunz happened, she texted this phlebotomist and asked him if other doctors were having problems with Theranos results on CBC and chemistry panels.  He must have given her contract information to Carreyrou.

Dr. Sundene went with Carreyrou to have their blood drawn by Theranos in March or April of 2015.  They then had their blood drawn by LabCorp. to compare the results.  When Theranos drew her blood, they did a venous blood draw.  She asked them why they weren't doing a finger stick, and they told her it was because they were all out of Nanotainers.  She and Carreyrou had their blood drawn at the Walgreens across the street from her office.  After she saw that the Theranos laboratory in California had been shut down, she called Carreyrou and asked how their Arizona laboratory could still be running.  He told her it was because no one had made a complaint with CMS.  He said that he couldn't do it because it would be a conflict of interest and because he didn't live in Arizona.  She called Gary Yamamoto at CMS and spoke to him on the phone.  He told her that she should write her complaint in the form of an anonymous letter and then send it to him, which she ultimately did.



US-REPORTS-0006800

# EXHIBIT 12



# Food and Drug Administration
## OFFICE OF CRIMINAL INVESTIGATIONS
## MEMORANDUM OF INTERVIEW

CASE NUMBER:     2016-MWM-709-0576

CASE TITLE:      THERANOS, INC.

DOCUMENT NUMBER:   258754

PERSON INTERVIEWED:  Sarah Bennett, CMS/Division of Laboratory Services

PLACE OF INTERVIEW:  CMS, 7500 Security Blvd., Woodlawn, MD

DATE OF INTERVIEW:   09/12/2017

TIME OF INTERVIEW:   1000 EST

INTERVIEWED BY:    SA George Scavdis

OTHER PERSONS PRESENT: See below

On September 12, 2017, the case agent interviewed Sarah Bennett, Centers for Medicare and Medicaid Services (CMS), regarding a CLIA (Clinical Laboratory Improvement Amendments) survey she conducted of Theranos, Inc.'s (Theranos) high complexity laboratory in 2015. Bennett is a medical technologist in CMS's Division of Laboratory Services (DLS). Also present during the interview were the following: AUSA Jeffrey Schenk, United States Attorney's Office for the Northern District of California; Jessica Chan, Securities and Exchange Commission (SEC), Division of Enforcement (DOE); Rahul Kolhatkar, SEC, DOE; Monique Winkler, SEC, DOE; Gary Williams, HHS, Office of the General Counsel (OGC); and Kelsey Schaefer, FDA, Office of the Chief Counsel (telephonically).



US-REPORTS-0006781



In order to become a CLIA certified laboratory, a laboratory first completes and submits a CMS Form 116 (CLIA Application for Certification). When the Form 116 gets filed and approved, the system generates a CLIA number. Within 3 to 12 months after the generation of the CLIA number, the state conducts a survey of the laboratory, which results in either a finding of compliance or in a finding of deficiency. CMS collects a laboratory's Form 116 each time it conducts a survey. If a laboratory makes certain changes, like replacing its laboratory director, then it must complete and submit a new Form 116. CMS typically doesn't get that first Form 116 generated by a laboratory, because the initial survey is conducted by the state. The first two surveys of Theranos were done by the State of California, and CMS did the third. The first state survey occurred in either 2011 or 2012, and the second one occurred in 2013. It would have been normal for the state to survey them in 2015, however, due to the media attention Theranos was receiving at the time and due to the complaints CMS had received about Theranos, it was determined that Bennett and the CMS regional office (Yamamoto) would conduct the survey instead.

US-REPORTS-0006782

# EXHIBIT 13

**Yamamoto, Gary K. (CMS/CQISCO)**

| | |
|---|---|
| **From:** | Heather King ███████████████ |
| **Sent:** | Friday, January 22, 2016 4:01 PM |
| **To:** | Yamamoto, Gary K. (CMS/CQISCO) |
| **Subject:** | Theranos – time sensitive |
| | |
| **Importance:** | High |

Gary – Per our conversation this afternoon, the Wall Street Journal told us today that CMS has found condition-level deficiencies at our Newark lab and said that they are running their story on our Newark lab survey results, for which they have sources, on Monday. This is obviously very concerning and damaging to us, especially as they were told this before even we ourselves received the survey results. While I understand this is a Friday and there are weather issues on the east coast, I need to speak to your colleagues today or tomorrow at the latest. My numbers are below.

Thank you for bringing this to the attention of your colleagues at CMS right away.

Sincerely,
Heather King
General Counsel
Theranos, Inc.
████████████work
████████████cell

# EXHIBIT 14

| | |
|---|---|
| **From:** | Gutierrez, Alberto |
| **To:** | Chan, Yung; Pilcher, Ian; Beck, Stayce E |
| **Cc:** | Lias, Courtney H |
| **Subject:** | FW: |
| **Date:** | Wednesday, August 12, 2015 11:30:37 AM |

Instruments/reagents Theranos has modified to run as LDTs.

Alberto

**From:** Carreyrou, John ██████████████████████
**Sent:** Wednesday, August 12, 2015 10:31 AM
**To:** Gutierrez, Alberto; Dooren, Jennifer
**Subject:**

So to sum up:

- All chemistry assays on the Siemens Advia
- Vitamin D on the DiaSorin
- Cell blood counts on the BD LSR Fortessa

US-FDA-0015073

# EXHIBIT 15

| **From:** | Gutierrez, Alberto |
| **To:** | Rogers, Michael |
| **Cc:** | Laska, Susan F |
| **Subject:** | RE: Theranos inspection |
| **Date:** | Wednesday, September 02, 2015 12:45:00 PM |

Just so you know.  The Wall Street Journal should be publishing an investigative piece soon on this company with evidence of erroneous test results, deception, selectively using data and other issues.  We had our own evidence of concerning results and wanted to make sure that patients were not being harmed.  The result of the inspection is that we will ask the company to stop using the nanotainers.  If not, likely heading towards a warning letter.

Alberto



US-FDA-0020374

# EXHIBIT 16

| From: | Davis, Kim |
|---|---|
| To: | Woods, James L.; Gutierrez, Alberto; Rodriguez, Michelle |
| Cc: | Lias, Courtney H; Serrano, Katherine M; McFarland, Scott; Scherf, Uwe; Elder, Ileana |
| Subject: | RE: DMD Quest complaint and Theranos |
| Date: | Wednesday, September 23, 2015 5:49:16 PM |
| Attachments: | CPT1500745 complaint ack letter.pdf |

Hi all,

Just to clarify:

There are 2 complaints regarding Theranos.

The 1st complaint was received from James Ruger at Quest. It was sent to Jan Welch, dated Aug 19, 2015. An acknowledgement letter dated Aug 24 was sent to Mr. Ruger by the Allegation of Regulatory Misconduct Branch. This acknowledgement letter (attached) is very generic and does not mention Theranos. Refer to CPT1500745. The Allegation of Regulatory Misconduct Branch subsequently forwarded the complaint to OIR for follow up.

The 2nd complaint was from Jeffrey Senger at Sidley Austin LLC. This was sent as an email to Uwe on Sep 18, 2015 and it included the complaint letter from Mr. Ruger as an attachment; it also referenced the above CPT number. So this is the complaint for which we would send an acknowledgement letter.

Michelle Rodriguez is the lead reviewer for both complaints. She has initiated GenDoc GEN1500635 to document the investigation.

We could use the very generic language in the CPT1500745 acknowledgement letter as a template for a complaint acknowledgement letter to Mr. Senger.

Thanks,
Kim

Kim Davis
Acting Postmarket Team Lead
Division of Microbiology Devices

U.S. Food and Drug Administration
CDRH/OIR/DMD
10903 New Hampshire Ave.
Bldg 66, Room 4574
Silver Spring, MD 20993
Phone: ████████████
Fax: (301) 847-8512
████████████████

Excellent customer service is important to us. Please take a moment to provide feedback regarding the customer service you have received: *CDRH Customer Service*

This e-mail message is intended for the exclusive use of the recipient(s) named above. It may contain information that is protected, privileged, or confidential, and it should not be disseminated, distributed, or copied to persons not authorized to receive such information. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think you have received this e-mail message in error, please e-mail the sender immediately.

**From:** Woods, James L.
**Sent:** Wednesday, September 23, 2015 4:52 PM
**To:** Gutierrez, Alberto; Rodriguez, Michelle
**Cc:** Lias, Courtney H; Serrano, Katherine M; McFarland, Scott; Scherf, Uwe; Elder, Ileana; Davis, Kim
**Subject:** RE: DMD Quest complaint and Theranos

Do we want to send  Quest more than our typical acknowledgement letter which not only thanks them for bringing this issue to our attention but provides wiggle room if we choose not to investigate? I am concern that if we tell Quest we are going to investigate this issue , Quest may some how choose to take our communication and send it to their customers or Theranos customers.

**From:** Gutierrez, Alberto
**Sent:** Wednesday, September 23, 2015 4:32 PM
**To:** Woods, James L.; Rodriguez, Michelle
**Cc:** Lias, Courtney H; Serrano, Katherine M; McFarland, Scott; Scherf, Uwe; Elder, Ileana; Davis, Kim
**Subject:** RE: DMD Quest complaint and Theranos

Not quite. I think we still need to deal with the Theranos website and thought we do not believe the specific points they made are on target (they do not have enough background as to what the firm is doing to actually know), they are on target that the website is deceptive.  I would just let them know that we are investigating.

Alberto

**From:** Woods, James L.
**Sent:** Wednesday, September 23, 2015 4:18 PM
**To:** Gutierrez, Alberto; Rodriguez, Michelle
**Cc:** Lias, Courtney H; Serrano, Katherine M; McFarland, Scott; Scherf, Uwe; Elder, Ileana; Davis, Kim
**Subject:** RE: DMD Quest complaint and Theranos

So we should go ahead and send Quest an acknowledgement letter for the complaint however based on our evaluation of the complaint no follow-up should be conducted. Is that what we want to do at this time? thanks

**From:** Gutierrez, Alberto
**Sent:** Wednesday, September 23, 2015 4:12 PM
**To:** Woods, James L.; Rodriguez, Michelle
**Cc:** Lias, Courtney H; Serrano, Katherine M; McFarland, Scott; Scherf, Uwe; Elder, Ileana; Davis, Kim
**Subject:** RE: DMD Quest complaint and Theranos

I think that Theranos has been misleading, but it is not the statements below that concern me. I think the statements below though incorrect, they are not outright lies and difficult to hang much

on.  Much more deceptive is the idea they leave that they can perform all test with the nanotainers currently.

Alberto

---

**From:** Woods, James L.
**Sent:** Wednesday, September 23, 2015 4:04 PM
**To:** Rodriguez, Michelle
**Cc:** Lias, Courtney H; Gutierrez, Alberto; Serrano, Katherine M; McFarland, Scott; Scherf, Uwe; Elder, Ileana; Davis, Kim
**Subject:** RE: DMD Quest complaint and Theranos

Hello everyone: Do we agree with Quest these statements made by Theranos rise to the level of false and misleading claims( misbranding charge 502(a) of the Act or exaggeration claims that are typical of the IVD industry when a firm receives 510(k) clearance from the Agency and are ignored by the Agency in bringing some action toward them?  thanks

---

**From:** Rodriguez, Michelle
**Sent:** Wednesday, September 23, 2015 2:53 PM
**To:** Woods, James L.
**Cc:** Lias, Courtney H; Gutierrez, Alberto; Serrano, Katherine M; McFarland, Scott; Scherf, Uwe; Elder, Ileana; Davis, Kim
**Subject:** RE: DMD Quest complaint and Theranos

HI James,

The initial complaint by Quest and later by a law firm (Sidley Austin LLP) is for false and misleading claims Theranos is making on its website.  For example, "Theranos receives FDA clearance for review and validation of revolutionary finger stick technology, test, and associated test system" suggesting that FDA's clearance included the company's technology platform, instead of indicating that the clearance was specific to the HSV-1 test.

Also, a press release listed on Theranos' "News" page include statements such as:
"The FDA recently cleared Theranos' finger stick blood test
technology and underlying system on which those tests are run,
and approved a waiver that paves the way for putting Theranos'
tests in the field at point of care, a major milestone for the
company and the national preventive care landscape."

The complaint also indicates that these claims are being addressed directly to consumers, specifically those in Arizona, where recent legislation permits consumers to obtain lab tests without a prescription.

I am attaching the complaint FYI.

Thanks,
Michelle

---

**From:** Woods, James L.
**Sent:** Wednesday, September 23, 2015 1:55 PM
**To:** Elder, Ileana; Davis, Kim; Rodriguez, Michelle
**Cc:** Lias, Courtney H; Gutierrez, Alberto; Serrano, Katherine M; McFarland, Scott
**Subject:** RE: DMD Quest complaint and Theranos

Hello Ileana, Kim and Michelle: Can one of you state what exactly the complaint from Quest was? thanks

---

**From:** Elder, Ileana
**Sent:** Wednesday, September 23, 2015 12:58 PM
**To:** Woods, James L.
**Cc:** Lias, Courtney H; Gutierrez, Alberto; Serrano, Katherine M
**Subject:** DMD Quest complaint and Theranos

FYI

DMD (Kim and Michelle) has been seeking feedback on Theranos to determine how to handle Quest's complaint about Theranos website. I believe they were instructed not to issue an Ack letter to Quest or to follow up with Theranos pending the inspections. I asked them to talk to you, James for next steps but let me know if there is anything else chemistry should do. Thanks

Ileana Elder, Ph.D., RAC, CQA
Postmarket Team Leader
FDA-CDRH-OIR-DCTD
W066-5609 ▓▓▓▓▓▓▓▓▓▓

*Excellent customer service is important to us. Please take a moment to provide feedback* HERE *regarding the customer service you have received.*

# EXHIBIT 17

USPS TRACKING #  9114 9999 4423 8766 9548 87
& CUSTOMER          For Tracking or inquiries go to USPS.com
RECEIPT              or call 1-800-222-1811.

## ACCESS REQUEST BY FEDERAL AGENCY OTHER THAN A FINANCIAL INSTITUTION SUPERVISORY AGENCY

*This form letter should be addressed to the Commission by other Federal agencies seeking access to nonpublic files, and should be signed or ratified by an official in a sufficiently senior or supervisory position to enforce the representations made. The form is intended only for use in connection with access requests to be processed by the Division of Enforcement.*

Re:  In the Matter of Theranos, Inc. (SF-4030)

Dear Ms. Monique Winkler:

We request access to the investigative and other non-public files of the U.S. Securities and Exchange Commission (the "Commission") related to the captioned matter.  This request is made in connection with an ongoing lawful investigation or official proceeding inquiring into a violation of, or failure to comply with, a criminal or civil statute or regulation, rule or order issued pursuant thereto, being conducted by the United States Postal Inspection Service.

We understand that the files in this matter contain "financial records" of "customers," as those terms are defined in the Right to Financial Privacy Act of 1978 [12 U.S.C. §§3401-22]. We have reason to believe that that information is relevant to our investigation and/or proceeding.

We will establish and maintain such safeguards as are necessary and appropriate to protect the confidentiality of files to which access is granted and information derived therefrom. The files and information may, however, be used for the purpose of our investigation and/or proceeding and any resulting proceedings.  They also may be transferred to criminal law enforcement authorities and self-regulatory organizations subject to our oversight.  We shall notify you of any such transfer and use our best efforts to obtain appropriate assurances of confidentiality.

Other than as set forth in the preceding paragraph, we will:

make no public use of these files or information without prior approval of your staff;

notify you of any legally enforceable demand for the files or information prior to complying with the demand, and assert such legal exemptions or privileges on your behalf as you may request; and

not grant any other demand or request for the files or information without prior notice to and lack of objection by your staff.

We recognize that until this matter has been closed, the Commission continues to have an interest and will take further investigatory or other steps as it considers necessary in the discharge of its duties and responsibilities.

US-MISC-000016

Should you have any questions, please contact:

William Zemblidge
US Postal Inspector/Team Leader
Phone: ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮

Christopher McCollow
US Postal Inspector
Phone: ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮

Thank you for you assistance with this matter.

William Zemblidge
US Postal Inspector

Christopher McCollow
US Postal Inspector



Federal Bureau of Investigation
450 Golden Gate Avenue
San Francisco, CA 94102

February 19, 2016

Monique C. Winkler
Assistant Regional Director
U.S. Securities and Exchange Commission
44 Montgomery Street, Suite 2800
San Francisco, CA 94104

Re: Theranos, Inc. SF-4030

Dear Ms. Winkler:

We request access to the investigative and other non-public files of the Securities and Exchange Commission (the "Commission") related to the captioned matter. This request is made in connection with an ongoing lawful investigation into possible securities fraud, as well as other possible violations, being conducted by the Federal Bureau of Investigation.

We understand that the files in this matter might contain "financial records" of "customers," as those terms are defined in the Right to Financial Privacy Act of 1978 (12 U.S.C. §§ 3401-22). We have reason to believe that the information is relevant to our investigation and/or proceeding.

We will establish and maintain such safeguards as are necessary and appropriate to protect the confidentiality of files to which access is granted and information derived therefrom. The files and information may, however, be used for the purpose of our investigation and/or proceeding and any resulting proceedings. They also may be transferred to criminal law enforcement authorities and self-regulatory organizations subject to our oversight. We shall notify you of any such transfer and use our best efforts to obtain appropriate assurances of confidentiality.

Other than as set forth in the preceding paragraph, we will:

(1) make no public use of these files or information without prior approval of your staff;

(2) notify you of any legally enforceable demand for the files or information prior to complying with the demand, and assert such legal exemptions or privileges on your behalf as you may request; and

1

US-MISC-000018

(3) not grant any other demand or request for the files or information without prior notice to and lack of objection by your staff.

We recognize that until this matter has been closed, the Commission continues to have an interest and will take further investigatory or other steps as it considers necessary in the discharge of its duties and responsibilities.

Should you have any questions, please contact FBI Special Agent Mario C. Scussel at

Sincerely,

David J. Johnson
Special Agent in Charge

By:
Ronan P. Byrne
Supervisory Special Agent

2

US-MISC-000019



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**SAN FRANCISCO REGIONAL OFFICE**
**44 Montgomery Street**
SUITE 2800
SAN FRANCISCO, CALIFORNIA 94104

DIRECT DIAL: (415) 705-2500
FAX NUMBER: (415) 705-2501

February 23, 2016

VIA EMAIL
Ronan P. Byrne
Supervisory Special Agent
Federal Bureau of Investigation
450 Golden Gate Avenue
San Francisco, CA 94102-3495

Re: <u>Theranos Inc., SF-04030</u>

Dear Mr. Byrne:

Your request, by letter dated February 19, 2016, for access to Commission files has been granted, in reliance upon the assurances regarding use and confidentiality set forth in your letter. The Commission makes no recommendation with respect to investigation or prosecution by your agency. In addition, unless and until this matter is closed, the Commission continues to have an interest and will take such further investigatory or other steps, as it considers necessary in the discharge of its duties and responsibilities.

We will identify any information disclosed to you that is subject to the Right to Financial Privacy Act of 1978 [12 U.S.C. 3401-22] (RFPA). If we disclose "financial records" of a "customer" to another federal agency, the customer generally must be notified of the disclosure within 14 days. This notice is not required when we disclose to: (i) federal financial institution supervisory agencies or the Commodity Futures Trading Commission pursuant to Section 1112(e) of the RFPA [12 U.S.C. 3412(e)]; the Criminal Investigative Division of the Internal Revenue Service for criminal investigative purposes relating to money laundering or other financial crimes pursuant to Section 1112(f) of the RFPA [12 U.S.C. 3412(f)]; the Department of Justice pursuant to Section 21(h) of the Securities Exchange Act of 1934 [15 U.S.C. 78u(h)]; or any person other than a federal agency.

US-MISC-000020

Ronan P. Byrne
February 23, 2016
Page 2


    The files to which access has been granted are being retained by the San Francisco Regional Office of the Commission.  Your representative should contact Jessica Chan at ███ ████ to make arrangements to review the files.  I would also appreciate it if you would inform Ms. Chan in the event that your agency institutes public proceedings based upon information that you obtain as a result of this grant of access.

                                            Very truly yours,

                                            Monique C. Winkler
                                            Assistant Regional Director

# EXHIBIT 18

| | |
|---|---|
| **From:** | McCallum, Donna (CDPH-OSPHLD-LFS) |
| **To:** | Uttchin, Venus (CMS/CQISCO) |
| **Subject:** | RE: Theranos signed 116 and related letters |
| **Date:** | Wednesday, March 16, 2016 4:44:25 PM |

You should check with your CMS CLIA staff. We received no letters or CMS 116 concerning the most recent inspection. That was done by Region IX and Central Office.

Thanks,

Donna

**From:** Uttchin, Venus (CMS/CQISCO) [mailto:Venus.Uttchin@cms.hhs.gov]
**Sent:** Thursday, March 10, 2016 10:35 AM
**To:** McCallum, Donna (CDPH-OSPHLD-LFS)
**Subject:** Theranos signed 116 and related letters

Good morning!

We have another Theranos request. This time, it's for the CLIA 116's and any letters related to their application. At your earliest convenience, can you please email me the signed 116 and any applicable letters that you may have on file? THANK YOU SO MUCH, Donna, for your help!

**Venus Uttchin, BSN, MPH**
Lieutenant, US Public Health Service
Centers for Medicare and Medicaid Services
Division of Survey and Certification
90 7th St Suite 5-300
San Francisco, CA. 94103
█████████
Email: ████████████████████

CDPH-002311

1   JOHN D. CLINE (CA State Bar No. 237759)
    One Embarcadero Center, Suite 500
2   San Francisco, CA 94111
    Telephone: (415) 662-2260 │Facsimile: (415) 662-2263
3   Email: cline@johndclinelaw.com

4   KEVIN M. DOWNEY (Admitted Pro Hac Vice)
    LANCE A. WADE (Admitted Pro Hac Vice)
5   SEEMA MITTAL ROPER (Admitted Pro Hac Vice)
    MICHELLE CHEN (Admitted Pro Hac Vice)
6   WILLIAMS & CONNOLLY LLP
    725 Twelfth Street, NW
7   Washington, DC 20005
    Telephone: (202) 434-5000 │Facsimile: (202) 434-5029
8   Email: KDowney@wc.com; LWade@wc.com; SMRoper@wc.com; MChen@wc.com

9   Attorneys for Defendant ELIZABETH A. HOLMES

10

11                    UNITED STATES DISTRICT COURT

12                   NORTHERN DISTRICT OF CALIFORNIA

13                         SAN JOSE DIVISION

14

15  UNITED STATES OF AMERICA,          )   Case No. CR-18-00258-EJD
                                       )
16          Plaintiff,                 )   **[PROPOSED] ORDER GRANTING MOTION
                                       )   TO COMPEL PRODUCTION OF RULE 16
                                       )   DISCOVERY AND *BRADY* MATERIALS**
17      v.                             )
                                       )
18  ELIZABETH HOLMES and               )
    RAMESH "SUNNY" BALWANI,            )
19                                     )
            Defendants.                )
                                       )   Hon. Edward J. Davila
20  _____)

21

22          This CAUSE having come before the Court upon Defendant Elizabeth Holmes' Motion To

23  Compel Production of Rule 16 Discovery and *Brady* Materials.  After due consideration of the filings,

    the governing law, and the argument of the parties,

24
            IT IS HEREBY ORDERED that Ms. Holmes' motion is GRANTED.  The government is
25
    ORDERED to produce the following categories of documents under Rule 16 held by the agencies
26
    identified in Ms. Holmes' motion and to search for and disclose any *Brady* materials in those agencies'
27

28

files:

**Category 1**:  Any and all correspondence or communications regarding Theranos between the government and John Carreyrou, The *Wall Street Journal*, or their employees, agents, or counsel, and all government documents, communications, correspondence, notes, or recordings (including intra-agency and/or inter-agency correspondence) regarding same.

**Category 2**: Any and all government documents, communications, correspondence, notes, or recordings (including intra-agency and/or inter-agency communications) regarding Theranos' Clinical Laboratory Improvement Amendments ("CLIA") compliance during the time period of the charged conspiracies, including but not limited to those that concern the 2015 CLIA survey of Theranos.

**Category 3**:  Any and all correspondence or communications regarding Theranos between the government and any clinical laboratory company or association affiliated with clinical laboratories (including but not limited to LabCorp, Quest Diagnostics, and the American Clinical Lab Association), or their employees, agents, or counsel, and all government documents, communications, correspondence, notes, or recordings (including intra-agency and/or interagency correspondence) regarding same.

**Category 4**:  Any and all government documents, communications, correspondence, notes, or recordings (including intra-agency and/or inter-agency communications) regarding the FDA's determination of the type of FDA approval required for Theranos' proprietary technology.

**Category 5**:  Any and all FBI 302s or other agency ROIs memorializing government communications with witnesses, and all government documents, communications, correspondence, notes, or recordings (including intra-agency and/or inter-agency correspondence) regarding same.

**Category 6**:  Any and all government documents, communications, correspondence, notes, or recordings (including intra-agency and/or inter-agency communications) regarding the 2013 CLIA survey of Theranos.

IT IS FURTHER ORDERED that the government shall review all previous requests made to the subject agencies to ensure that it sought all information on the subjects requested, both inculpatory and exculpatory.  No later than four weeks after the entry of this Order, the government shall file a

declaration indicating the completion of this review.  That declaration shall describe the process of compliance with regard to each agency, including the type of search used, the places searched, the number of individuals involved in the search, and the name of the person with primary responsibility for conducting the search within the particular agency.

When making future requests to the subject agencies, the government shall request both exculpatory and inculpatory information related to the subject matter of the requests.  Any objections from the government on the agencies' behalf or from the agencies themselves must be grounded in the Rules of Criminal Procedure and be consistent with the government's obligations under Rule 16 and *Brady v. Maryland*, 373 U.S. 83 (1963).

**IT IS SO ORDERD.**


Dated _____


_____
Hon. Edward J. Davila
United States District Judge