# EXHIBIT 1



# Food and Drug Administration
## OFFICE OF CRIMINAL INVESTIGATIONS
## MEMORANDUM OF INTERVIEW

| | |
|---|---|
| CASE NUMBER: | 2016-MWM-709-0576 |
| CASE TITLE: | THERANOS, INC. |
| DOCUMENT NUMBER: | 258748 |
| PERSON INTERVIEWED: | Alberto Gutierrez, CDRH, OIR |
| PLACE OF INTERVIEW: | FDA White Oak, Silver Spring, MD |
| DATE OF INTERVIEW: | 09/13/2017 |
| TIME OF INTERVIEW: | 1230 EST |
| INTERVIEWED BY: | SA George Scavdis |
| OTHER PERSONS PRESENT: | See below. |

On September 13, 2017, the case agent interviewed Alberto Gutierrez, Director of FDA's Office of In Vitro Diagnostics and Radiological Health (OIR), regarding his interactions with Theranos, Inc. Also present during the interview were the following: AUSA Jeffrey Schenk, United States Attorney's Office for the Northern District of California; Jessica Chan, Securities and Exchange Commission (SEC), Division of Enforcement (DOE); Rahul Kolhatkar, SEC, DOE; Monique Winkler, SEC, DOE; and Kelsey Schaefer, FDA, Office of the Chief Counsel (OCC).



In 2012 or 2013, Gutierrez had an interaction with the United States Department of Defense (DoD). Elizabeth Holmes was trying to provide instruments to the DoD for, what turned out to be, a test or a clinical trial in Afghanistan. The DoD was concerned with how things were being portrayed by Theranos and they contacted FDA. Lt. Schumacher reached out to FDA from the DoD. Schumacher had previously done a detail with FDA. Gutierrez traveled with him to Tampa, FL, to meet with General James Mattis. FDA regulates all tests, but early on in 1976, FDA decided that it would exercise enforcement discretion regarding tests developed within a laboratory (laboratory developed tests or LDTs). LDTs have become a big loophole. In 1988, clinical laboratories became regulated by CMS (Centers for Medicare and Medicaid Services) under CLIA (Clinical Laboratory Improvement Amendments). CLIA mainly regulates laboratory procedures. Tests are classified differently if they are performed by a doctor versus if they are performed by a non-clinician. Tests performed by a non-clinician are called CLIA waived, because there is no expertise required to perform them. To get a test CLIA waived, a company must come through FDA. Theranos was planning to have their instrument run in a pharmacy or in a physician's office. For that to occur, that instrument would have had to be CLIA waived and Theranos would have had to come through FDA to get approval or clearance for that instrument. Gutierrez thinks Theranos decided that, if they could claim their instrument was not a CLIA waived instrument and that it was run by a central laboratory, then they wouldn't have to come through FDA. Theranos was trying to sell to DoD on the notion that, even though they were taking their instrument into the field, the actual test was run at "the mothership," and therefore didn't need a CLIA waiver. FDA didn't buy that argument.





In the end, Theranos was going to have to clear their device with all the tests they were running, whether the submission came with a bundle of tests or with individual submissions for each test. The Nanotainers came in as bundled submissions. Instead of coming in with 100 different submissions, a company can come in with one submission with all the claims they want to market for. During 2013 or 2014, Theranos was told that they needed to come in to FDA for clearance for the Nanotainers. Gutierrez thinks this occurred in a meeting with FDA, Theranos and Jeff Gibbs, a Theranos regulatory consultant at the time. Gibbs is known for taking cases like companies with LDTs, where the law is less clear, and rescuing them. Gibbs is a fairly straight shooter who was doing his job. In one of these interactions, he was asked to do something by Theranos that made him uncomfortable, and he talked to Gutierrez about it. Gutierrez told Gibbs he didn't trust Holmes, and Gibbs dropped her. He remembers the issue being a difference in recollection between what Holmes told Gibbs about an interaction Theranos had with FDA and what Gutierrez told Gibbs about that same interaction. Gibbs began representing Theranos somewhere around 2013. The 510(k)s Theranos eventually sent in came in without the aid of any outside regulatory counsel.

Theranos came in to FDA and showed what their device did by showing videos of how the instrument operated. There was a meeting with FDA, CMS, and Theranos to help Theranos understand what the regulatory path was going to be regarding a CLIA waiver. FDA's original take was that they were to help Theranos do everything they could to get them to give FDA the data. There was a suggestion by Shuren that FDA send someone to Theranos to help them get their data together. Gutierrez has never been asked to do this before. FDA did go to the extent of putting together a request to send someone, but they never actually did. Nobody asked FDA to lower the bar for Theranos, but there was some sensitivity that anything coming out of Palo Alto (Theranos's headquarters) was different and that FDA needed to help them through that. At the time, it wasn't clear whether it was incompetence or naivety as to why Theranos couldn't get FDA the data it needed. Gutierrez pushed for the joint meeting with CMS due to this interaction with the military and this odd business model that Theranos had. Gutierrez conceded that the Theranos model did challenge the typical regulations. The reason CLIA waived devices come to the agency is because it's clear there is not going to be any laboratory oversight for their use. In the case of Theranos, this idea that the device was overseen by an off-site laboratory was a little different, and Gutierrez wanted to make sure that CMS and FDA were on the same page, and that Theranos understood its path forward.





FDA was already concerned with the data for the Nanotainers. After that, two things happened that made it easier for FDA to inspect Theranos. First, Theranos received clearance for its HSV-1. Ironically, this made it easier for FDA to inspect Theranos because it made it harder for Theranos to claim they were an LDT, given that they had just received a device clearance. Second, around the summer of 2015, FDA heard from a reporter from the Wall Street Journal about their concerns regarding Theranos. A Wall Street Journal reporter made a request through FDA's Public Affairs Office, and Gutierrez eventually spoke to him on at least two occasions. Ultimately though, it was the issues in Theranos's data that were the impetus for the inspection. Even before being approached by the Wall Street Journal, FDA already had concerns that were obvious from the data they were seeing.

Normally, either ORA (Office of Regulatory Affairs) or the field conducts FDA inspections. ORA can request a directed inspection and the field then decides when they go in. In this case, ORA sent SMEs (subject matter experts) to inspect Theranos alongside investigators from the field, which was unusual. This was requested by Gutierrez, and he was the one who made the decision to inspect. Gutierrez asked the field to provide investigators, and he decided who from ORA went as SMEs. Gutierrez again noted that this is unusual. The inspection request occurred in December 2014 or in January 2015. Ian Pilcher was going to go and do the inspection, but ORA didn't proceed quickly enough. Inspections are not normally done prior to clearing a 510(k). The fact that Theranos had one test that was working (HSV-1) doesn't mean FDA couldn't go forward with an inspection; the two are unrelated.

Gutierrez chose Pilcher as one of the SMEs to inspect Theranos because he's a very good inspector and because he's worked in industry. When Shuren was suggesting that FDA send someone out to Theranos to help them put their data together, Pilcher is who Gutierrez would have sent. Turning back to that suggestion by Shuren, Gutierrez remarked that it was an unusual request. It would have put that FDA employee in a weird position. Gutierrez was concerned by the request, and he wanted to do it through a more formal means. That's why he ordered the inspection.

FDA rarely sends as many people out on an inspection as it did with Theranos. Prior to the inspection, FDA would have had internal pre-inspection meetings. FDA was interested in figuring out whether Theranos was using their instrument, whether they were using it in all their laboratories, and exactly what they were doing. Gutierrez was in communication with the inspection team every day, as they would call to give him updates. It's not atypical on an inspection like this to do a debriefing every day. The inspection team told Gutierrez