1   ADAM A. REEVES (NYBN 2363877)
    Attorney for the United States,
2   Acting Under Authority Conferred By 28 U.S.C. § 515

3   HALLIE HOFFMAN (CABN 210020)
    Chief, Criminal Division
4
    JEFF SCHENK (CABN 234355)
5   JOHN C. BOSTIC (CABN 264367)
    ROBERT S. LEACH (CABN 196191)
6   VANESSA BAEHR-JONES (CABN 281715)
    Assistant United States Attorneys
7
        150 Almaden Boulevard, Suite 900
8       San Jose, California 95113
        Telephone: (408) 535-5589
9       FAX: (408) 535-5066
        john.bostic@usdoj.gov
10
    Attorneys for United States of America
11

                    UNITED STATES DISTRICT COURT
12
                  NORTHERN DISTRICT OF CALIFORNIA
13
                        SAN JOSE DIVISION
14

15  UNITED STATES OF AMERICA,              )   **CASE NO. 18-CR-00258 EJD**
                                           )
16          Plaintiff,                     )   **UNITED STATES' OPPOSITION TO**
                                           )   **DEFENDANTS' MOTION TO DISMISS**
17      v.                                 )   **SUPERSEDING INDICTMENT FOR LACK OF**
                                           )   **NOTICE AND, IN THE ALTERNATIVE, FOR A**
18  ELIZABETH HOLMES and RAMESH            )   **BILL OF PARTICULARS (ECF NO. 204)**
    "SUNNY" BALWANI,                       )
19                                         )   Date:   February 10, 2020
            Defendants.                    )   Time:   10:00 a.m.
20  _____    )   Court:  Hon Edward J. Davila

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................................1

II.    BACKGROUND ....................................................................................................2

    A.    Defendants' Fraud as Alleged in the Indictment ...................................2

    B.    Additional Details Readily Apparent from the Government's Document Production ............................................................................................4

III.    ARGUMENT .........................................................................................................7

    A.    The Superseding Indictment Adequately Advises Defendants of the Charges ..................7

    B.    The Government is Not Required to Plead or Prove Specific False Statements ..............11

    C.    A Bill of Particulars is Unnecessary .................................................13

        1.    Defendants Have Received Comprehensive Discovery Disclosing the Full Scope of the Evidence Against Them ............................15

        2.    Defendants Are Not Entitled to the Categories of Information They Demand ............................................................................16

        3.    This Court Has Denied Similar Requests for a Bill of Particulars ...........19

IV.    CONCLUSION....................................................................................................21

# TABLE OF AUTHORITIES

Page(s)

Cases

*Cleveland v. United States*,
531 U.S. 12 (2000)..................................................................................12

*Costello v. United States*,
350 U.S. 359 (1956)................................................................................12

*Lustiger v. United States*,
386 F.2d 132 (9th Cir. 1967) .................................................................12

*Neder v. United States*,
527 U.S. 1 (1999)...............................................................................11, 20

*United States v. Bazezew*,
783 F. Supp. 2d 160 ...............................................................................18

*United States v. Bortonovsky*,
820 F.2d 572 (2d Cir. 1987)........................................................13, 14, 16

*United States v. Buckley*,
689 F.2d 893 (9th Cir. 1982) ..........................................................7, 9, 11

*United States v. Caine*,
270 F. Supp. 801 (S.D.N.Y. 1967)........................................................15

*United States v. Cecil*,
608 F.2d 1294 (9th Cir. 1979) ..................................................................7

*United States v. Clay*,
476 F.2d 1211 (9th Cir. 1973) ..........................................................13, 16

*United States v. Crummer*,
151 F.2d 958 (10th Cir. 1945) ..................................................................7

*United States v. Curtis*,
506 F.2d 985 (10th Cir. 1974) ...............................................................7, 8

*United States v. DiCesare*,
765 F.2d 890 (9th Cir.) ...........................................................................18

*United States v. Du Bo*,
186 F.3d 1177 (9th Cir. 1999) ..................................................................8

*United States v. Feil*,
No. CR 09-00863 JSW, 2010 WL 1525263 (N.D. Cal. Apr. 15, 2010) ...........................18

*United States v. Giese*,
597 F.2d 1170 (9th Cir. 1979) ....................................................12, 13, 14, 16

*United States v. Halbert*,
640 F.2d 1000 (9th Cir. 1981) ................................................................11

*United States v. Keuylian*,
23 F. Supp. 3d 1126 (C.D. Cal. 2014) .....................................................8

*United States v. Laurienti*,
611 F.3d 530 (9th Cir. 2010) ..................................................................19

*United States v. Long*,
706 F.2d 1044 (9th Cir. 1983) ..........................................................13, 16

*United States v. Manarite*,
44 F.3d 1407 (9th Cir. 1995) ............................................................11, 12

*United States v. McDonald*,
209 F. App'x 748 (10th Cir. 2006) .........................................................10

*United States v. Morgenstern*,
933 F.2d 1108 (2d Cir. 1991).................................................................10

*United States v. Nachamie*,
91 F. Supp. 2d 565 (S.D.N.Y. 2000)......................................................17

*United States v. Nance*,
    533 F.2d 699 (D.C. Cir. 1976) .......................................................................................... 8
*United States v. Pheaster*,
    544 F.2d 353 (9th Cir. 1976) ............................................................................................ 9
*United States v. Ryland*,
    806 F.2d 941 (9th Cir. 1986) .......................................................................................... 17
*United States v. Sampson*,
    448 F. Supp. 2d 692 (E.D. Va. 2006) ....................................................................... 14, 15
*United States v. Smith*,
    776 F.2d 1104 (3d Cir. 1985).......................................................................................... 16
*United States v. Trie*,
    21 F. Supp. 2d 7 (D.D.C. 1998) ...................................................................................... 18
*United States v. Trumpower*,
    546 F. Supp. 2d 849 (E.D. Cal. 2008).............................................................................. 14
*United States v. Whiteside*,
    285 F.3d 1345 (11th Cir. 2002) ...................................................................................... 10
*United States v. Woods*,
    335 F.3d 993 (9th Cir. 2003) ................................................................................ 1, 12, 13
*Wilkins v. United States*,
    376 F.2d 552 (5th Cir. 1967) .......................................................................................... 18
*Yeargain v. United States*,
    314 F.2d 881 (9th Cir. 1963) .......................................................................................... 13

Statutes

18 U.S.C. § 1343 ................................................................................................................. 11
28 U.S.C. § 515 .............................................................................................................. 1, 21

Rules

F. R. Evid. 801(d)(2)(E)...................................................................................................... 19
Fed. R. Crim. P. 7(c)(1) .................................................................................................. 1, 7

## I.   INTRODUCTION

The Superseding Indictment contains all the information necessary for Defendants to understand the charges brought against them.  In their instant motion, Defendants speculate about additional details that could be included, but that is not the standard for a motion to dismiss or a request for a bill of particulars.  The sufficiency of an indictment is not determined by whether it could have been drafted with more detail.  Instead, an indictment is adequate if it informs the defendant of the charges in enough detail to avoid unfair surprise at trial and prevent double jeopardy.  A bill of particulars is inappropriate in cases where the charging document accomplishes these goals and allows a defendant to prepare a defense.  In such cases, a defendant's motion to dismiss or demand for a bill should be viewed for what it is:  a premature attack on the evidence or a strategic attempt to limit the government's proof at trial. The Court should permit neither.

Defendants' motion accuses the Indictment of being "short on details," "bare-bones," "skimpy," containing "paltry" factual allegations, "stingy in detail," and "enigmatic."  The Indictment is none of these things.  The eleven-page charging document easily satisfies the constitutional requirements for indictments because it contains a "plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c)(1).  The Indictment's allegations are stated in sufficient detail to inform Defendants of the charges and allow them to argue double jeopardy.  This is all the Constitution requires, and Defendants cite no binding authority for the proposition that an indictment must quote a defendant's misrepresentations rather than describing them in substance.  In fact, the case law holds otherwise.  Defendants' arguments are particularly misplaced in this case, where the government has charged wire fraud under a theory that does not require it to ever prove—much less allege—any particular false statement.  *See United States v. Woods*, 335 F.3d 993, 1000 (9th Cir. 2003).

The Court should deny Defendants' request for a bill of particulars for similar reasons.  While Defendants take issue with some of the phrases the Indictment uses to describe their misrepresentations, the Indictment puts Defendants on notice regarding the particular false statements they must answer for at trial.  The government has also produced all the evidence currently in its possession relating to Defendants' false statements, and additional details regarding their fraudulent conduct are easily accessible in the discovery.  Under these circumstances, courts routinely deny requests for bills of

particulars.

Indeed, this Court has rejected similar attacks on indictments in recent fraud cases.  In *United States v. Isaac Choi*, No. 17-cr-00308-EJD, and in *United States v. Christian Reimer Stukenbrock*, No. 15-cr-00034-EJD, this Court recognized that an indictment describing the substance of fraudulent misrepresentations, combined with full discovery, is constitutionally sufficient and defeats a bill-of-particulars motion.

For these reasons, discussed in more detail below, the Court should deny Defendants' motion in its entirety.

## II.   BACKGROUND

### A.   Defendants' Fraud as Alleged in the Indictment

The Indictment in this case lays out the key events in the story of Defendants' company Theranos, describing the fraudulent schemes that Holmes and Balwani devised and executed in order to benefit themselves.  As detailed in the Indictment, one of Defendants' fraud schemes targeted investors in Theranos—individuals and entities who entrusted Defendants with hundreds of millions of dollars based on representations made by Defendants and at Defendants' direction.  In a separate but closely related fraud, Defendants targeted doctors and patients who relied on Theranos's testing services to diagnose health conditions and make high-stakes decisions about medical care.  In each of these fraudulent schemes, Defendants misled victims regarding material facts about Theranos and the capabilities of its blood-testing technology.  The effects of Defendants' fraudulent conduct were far-reaching and severe:  investors lost hundreds of millions of dollars in total, and numerous patients received unreliable or wholly inaccurate medical information from Theranos's flawed tests, placing those patients' health at serious risk.

As alleged in the Indictment,[1] Theranos was founded by Holmes in approximately 2003, and drew little public attention for its first ten years.  The company's stated goal was to develop innovative methods for testing tiny blood samples obtained from a fingertip with a small lancet without the need for traditional venous blood draws.  In 2013, Theranos began to publicize its technology and tout its

---

[1]  All facts in the following summary correspond to the allegations in paragraphs 4 through 18 of the Superseding Indictment, ECF No. 39.

purported advantages, all while soliciting massive contributions from investors and gearing up toward the public launch of its testing services.  Beginning in September 2013, Theranos offered blood testing to patients at its "Wellness Centers" in various locations in California and Arizona.

Unbeknownst to those outside the company, Defendants were presenting investors with a deceptive picture of their business and its technology, overstating Theranos's achievements, promising unrealistically favorable developments on the horizon, and misrepresenting the abilities of its proprietary analyzer.  In dealing with doctors and patients, Defendants promoted the company's blood-testing services through explicit and implicit representations that Theranos's test results were reliable and accurate although they knew that was not the case.  Defendants' schemes to defraud involved the following representations, each of which Defendants knew to be false.

| Defendants' Specific False Representations | The Truth |
|---|---|
| Theranos's analyzer could perform the full range of clinical tests with small blood samples from a finger stick | The analyzer could perform only a limited number of tests |
| Theranos's analyzer produced results that were more accurate and reliable than those yielded by conventional methods | The analyzer had accuracy and reliability problems, and was not capable of consistently producing accurate and reliable results for certain blood tests including calcium, chloride, potassium, bicarbonate, HIV, Hba1C, hCG, and sodium<br><br>The information Theranos provided to patients included inaccurate results, improperly adjusted reference ranges, improperly removed "critical" results, and results generated from improperly validated assays |
| Theranos's analyzer allowed testing at a faster speed than previously possible | The analyzer was slower than some competing devices |
| Theranos conducted its patient sample testing using Theranos-manufactured analyzers | Theranos relied on commercially available, third-party-manufactured devices for patient testing |
| Theranos was financially stable and would generate more than $100 million in revenues in 2014 and approximately $1 billion in 2015 | Theranos was on track to generate—and did generate—only a few hundred thousand dollars in revenues in 2014 and 2015 |
| Theranos had an expanding partnership with Walgreens that would soon dramatically increase the number of locations where its testing was | The rollout in Walgreens stores had stalled for a variety of reasons including Walgreens's |

| provided | concerns regarding Theranos's performance |
|---|---|
| Theranos had a profitable business relationship with the Department of Defense under which Theranos analyzers had been deployed for use in the battlefield | The relationship with the Defense Department was limited, and Theranos's technology had not been used in the battlefield by the military |
| Theranos did not need FDA approval for its analyzer and tests, but intended to obtain such approval voluntarily | FDA was requiring Theranos to apply for clearance / approval for its analyzer and tests |
| Theranos's technology had been examined, used, and validated by major pharmaceutical companies and research institutions | Pharmaceutical companies and research institutions never examined, used, or validated Theranos's technology |

Besides repeating the above lies to multiple investors, Defendants also relayed them to members of the media, who then unknowingly published false information about Theranos's activities and technical capabilities.  When potential investors visited Theranos's headquarters, they were shown technology demonstrations during which they were led to believe that blood tests were being conducted on a Theranos-manufactured analyzer when, in reality, the analyzer was running a protocol designed to give the appearance of full operation while no test was actually being run.

Defendants' fraud remained undetected until late 2015, when a journalist published an article exposing several of the misrepresentations discussed above.  By that time, investors had already given Defendants the better part of one billion dollars and thousands of patients had put their trust in Theranos's technology for their blood testing needs.

Defendants were originally indicted in June 2018.  On September 6, 2018, the grand jury returned a Superseding Indictment ("the Indictment') which lays out the above scheme and charges Defendants with two counts of conspiracy to commit wire fraud and nine substantive counts of wire fraud corresponding to specific wire transmittals in furtherance of their schemes to defraud.

**B.    Additional Details Readily Apparent from the Government's Document Production**

The government has conducted a thorough investigation in this case and has taken a liberal view of its discovery obligations, producing to the defense all of the evidence it has collected over the course of its ongoing investigation.  The discovery production includes documents collected from Theranos

1    itself, from former employees of the company, from investors, from business partners of Theranos

2    including its most prominent partner Walgreens, from companies Theranos claimed had validated its

3    technology, from government agencies including FDA and DOD, from marketing companies who

4    worked with Theranos on advertising materials, from patients who had blood tests performed by

5    Theranos, from journalists who interviewed Holmes and Balwani, and from other sources.  Each

6    document in the government's production is bates stamped, with a prefix indicating the source of the

7    document.[2]

8           In addition to documentary evidence collected from relevant sources, the government's

9    investigation has included interviews of victims and others with relevant information about Defendants'

10   conduct, including representatives from the witness categories discussed above.  Each substantive

11   witness interview has been summarized in a report prepared by federal agents, and those reports have

12   been produced to the defense without exception.  Those reports attach—or reference by bates number—

13   the documents agents or prosecutors discussed with the witness during the interview.

14          Thus, a review of the discovery in this case yields additional details regarding the charged

15   conduct.  In particular, the interview reports associated with the victims in this case and the documents

16   attached to those reports disclose the misrepresentations they heard from Defendants and how they were

17   deceived.  For example, one Theranos investor told agents that, on a phone call on December 20, 2013,

18   Holmes claimed that Theranos's technology was being used on military medevac helicopters in

19   Afghanistan and was saving the lives of soldiers.[3]  Another investor representative reported that, based

20   on information from Theranos, she believed the company could perform over 100 tests using blood

21   drawn from a finger stick.[4]  That same witness discussed Theranos's financial health with Holmes and

22   Balwani, who told her in late 2014 that the company would break even that year and earn $1 billion in

23   revenue the following year.  These facts—along with all other statements made by investor victims to

24   government investigators—are easily located in the discovery production.

25

26       [2]  For example, "GSK-" denotes documents obtained from GlaxoSmithKline, "PFE-" denotes

27   documents obtained from Pfizer.

28       [3]  The report of this interview was produced to Defendants at "US-REPORTS-0007005."

    [4]  The report of this interview was produced to Defendants at "US-REPORTS-0004330."

Additionally, many of Theranos's investors were given a slide deck prepared by the company. Various versions of that presentation appear throughout the documents collected from the investors and produced to Defendants. That presentation is brimming with false statements, preserved in their final form approved by Defendants and delivered to victims. For example, in that presentation under an image depicting blood being collected from a finger stick, the text reads "Theranos runs any test available in central laboratories, and processes all sample types." That same page claimed that Theranos processes ensured "the highest levels of accuracy and precision." The presentation later claimed that "All 1000+ currently run tests/CPT codes are available through Theranos." It also boasted of an "unprecedented lack of variation" in Theranos's test results. Not one of these statements was true. Moreover, the presentation included a menu purporting to show a portion of the tests Theranos could perform. In reality many of the categories of tests on that menu were still in the research-and-development stage and could not be performed using a finger stick sample or were not available to patients at all.[5]

Details regarding Defendants' scheme to defraud doctors and patients are similarly accessible in the government's production. A doctor who had experience with Theranos reported that the company told him that their device was FDA-approved and that it had met all the national laboratory standards.[6] Shortly after that doctor began sending patients to Theranos, however, he began receiving erroneous lab results unlike anything he had seen from conventional labs. He discussed the inaccurate results with Theranos and eventually stopped using the company for blood testing.

In July 2019, to aid Defendants in navigating the document production, the government provided the defense with two detailed discovery indexes. The first index allows Defendants to locate documents from a given source in the production, specifying the bates prefix, production size, and date(s) of production for each source. The second index lists the bates number range for each report summarizing

---

[5]  One of many copies of this presentation in the government's production can be found at bates TS-0315637, with the above-described false statements occurring on pages -651, -685, and -703. A senior scientist formerly employed by Theranos has confirmed the falsity of these representations along with many more found in that presentation and similar materials. Reports of his interviews are available to Defendants in the government's production at US-REPORTS-0007668, -7694, and -8040.

[6]  The report of the interview summarizing this doctor's statements can be found at US-REPORTS-0008577.

1    a witness interview conducted by the government, allowing the defense to easily locate such reports and

2    the relevant documents discussed during interviews for any given witness with whom the government

3    has had substantive contact.  The defense has not requested updated versions of these indexes since they

4    were initially turned over, but the government is willing to update them periodically as its investigation

5    continues.

6    ## III.    ARGUMENT

7    ### A.    The Superseding Indictment Adequately Advises Defendants of the Charges

8            Federal Rule of Criminal Procedure 7 states that an indictment must be a "plain, concise, and

9    definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P.

10   7(c)(1).  Consistent with that standard, the Ninth Circuit has held that an indictment fulfills its purpose

11   as long as it "set[s] forth the elements of the offense charged" and "contain[s] a statement of the facts

12   and circumstances that will inform the accused of the specific offense with which he is charged."

13   *United States v. Cecil*, 608 F.2d 1294, 1296 (9th Cir. 1979).  An indictment is acceptable "if it contains

14   the elements of the charged crime in adequate detail to inform the defendant of the charge and to enable

15   him to plead double jeopardy."  *United States v. Buckley*, 689 F.2d 893, 896 (9th Cir. 1982).  Two

16   "corollary purposes" of an indictment are  (1) "to ensure that the defendants are being prosecuted on the

17   basis of the facts presented to the grand jury," and (2) "to allow the court to determine the sufficiency of

18   the indictment."  *Id.*  Before trial, those goals are deemed accomplished as long as the indictment

19   satisfies the primary requirements.  *Id.* at 896 n.3.  The corollary purposes become more important after

20   trial, "when the theory on which the Government has obtained a conviction is clear."  *Id.*

21           Although a fraud indictment must put a defendant on notice as explained above, the fraudulent

22   scheme itself "need not be pleaded with all the certainty in respect of time, place, and circumstance

23   requisite in charging the [jurisdictional element of the crime]."  *United States v. Curtis*, 506 F.2d 985,

24   990 (10th Cir. 1974) (quoting *United States v. Crummer*, 151 F.2d 958, 963 (10th Cir. 1945)).  The

25   government "need not allege its theory of the case or supporting evidence" in an indictment.  *Buckley*,

26   689 F.2d at 897.  In *Buckley*, the Ninth Circuit applied these principles and reversed the dismissal of a

27   criminal case, holding that the indictment provided the defendant with sufficient notice despite the

28   court's harsh criticism that the indictment was "lengthy, confusing, and largely irrelevant."  *Buckley*,

689 F.2d at 899.

Here, the Indictment outlines Defendants' overall schemes to defraud investors and patients, and goes on to describe at least nine particular false statements that Defendants repeated to victims throughout the relevant time period. Not only does the Indictment disclose those misrepresentations, it specifies the manner in which each one was false. (See chart in Section II.A above). That these misrepresentations may not be verbatim quotes does not hinder Defendants in understanding the charges or arguing double jeopardy in the future if needed. The substance of the misrepresentations and the identities of the targets are plainly sufficient for these purposes. Requiring more would go beyond the mere notice requirements contemplated by Rule 7 and would amount to compelling early disclosure of the government's trial evidence.

Because the Indictment informs Defendants of the charges in sufficient detail, and lays out the substance of their various misrepresentations, it stands in stark contrast to the indictments that other courts have held insufficient. For example, in *Curtis*, an out-of-circuit case cited by Defendants, the indictment referenced "false and misleading representations about the services of a computer matching service for single persons" but did not state what those false representations were, and otherwise "plead[ed] little more than the statutory language." *United States v. Curtis*, 506 F.2d 985, 988-89, 992 (10th Cir. 1974). The Tenth Circuit in that case cited favorably a form indictment appended to the Federal Rules of Criminal Procedure. *Id.* at 987. That form indictment alleges false statements in substance only and not by quotation, and discloses far less detail than the Indictment in this case. *Id.* at 987-88. Similarly, in *Keuylian*, a district court dismissed an indictment alleging that the defendant "executed a scheme to defraud" but completely failing to describe any misrepresentation or other act of deception beyond simple breach of contract. *United States v. Keuylian*, 23 F. Supp. 3d 1126, 1128 (C.D. Cal. 2014).[7] In *Du Bo*, the challenged indictment simply neglected to allege the mens rea element. *United States v. Du Bo*, 186 F.3d 1177, 1179 (9th Cir. 1999). The indictment in *Nance* alleged that a defendant "made the following representations…" but mistakenly omitted any descriptions of those representations. *United States v. Nance*, 533 F.2d 699, 700-02 (D.C. Cir. 1976). Here, the Indictment

---

[7] The court in *Keuylian* favorably cited an Information previously filed in that case, which alleged the defendant's misrepresentations by substance rather than verbatim. *Id.* at 1127, 1129.

1   does not include any such glaring defects.

2        Nonetheless, Defendants quibble with the language the Indictment uses to describe their

3   misrepresentations.  Despite their feigned confusion, the terms in the Indictment generally have their

4   usual meaning, and the allegations as a whole are more than sufficient to put Defendants on notice of the

5   charges against them as required by the cases discussed above.  The Ninth Circuit advises that an

6   indictment should be "read as a whole," "read to include facts which are necessarily implied," and

7   "construed according to common sense."  *Buckley*, 689 F.2d at 899.  "A challenge to the sufficiency of

8   an indictment is not a game in which the lawyer with the sharpest eye or the cleverest argument can gain

9   reversal for his client.".  *See United States v. Pheaster*, 544 F.2d 353, 360 (9th Cir. 1976).  Under these

10  principles, Defendants' arguments fail.  Common sense is all that is required for a full understanding of

11  the allegations in this case.

12       For example, Defendants object to the phrase "proprietary analyzer" in the Indictment, arguing

13  that Theranos's technology comprised many assays, devices, and protocols.  The Indictment itself

14  accounts for this fact, stating that Theranos referred to its proprietary devices using several terms

15  (paragraph 5) and using the term "proprietary analyzer" to describe those devices collectively

16  (paragraph 12(A)).  Similarly, Defendants complain that it is unclear what the Indictment means when it

17  repeats Defendants' claim that their analyzer could perform the full range of clinical tests.  Defendants

18  themselves used similar language when describing what their technology could do, as discussed above

19  in Section II.B.[8]  Defendants also complain that the Indictment does not specify the timing of their

20  claims about what their analyzer could do.  The Indictment does not attach dates to those

21  misrepresentations because Defendants repeated these misleading statements throughout the relevant

22  time period.  Moreover, despite Defendants' argument, the truth or falsity of a given statement in this

23  category does not depend on its precise timing; Theranos's devises were *never* capable of doing the

24  things Defendants claimed they could do.

25

26      [8]  Holmes also made this misrepresentation publicly.  For example, on July 9, 2014, in USA
Today, Holmes was quoted as claiming that Theranos had "worked to redevelop *all of the tests run in a*

27  *traditional laboratory* to be able to take a tiny sample, a few droplets of blood."  [cite] (emphasis
added).  During a TEDMED talk on March 17, 2015, Holmes said that Theranos had "made it possible

28  to run comprehensive laboratory tests from a tiny sample or a few drops of blood that could be taken
from a finger."

Defendants take issue with the Indictment's allegations regarding false statements concerning Theranos's expanding partnership with Walgreens and claims that the company was about to dramatically increase the number of Theranos testing locations.  According to Defendants, it is impossible to know the meaning of this allegation without the exact words Defendants used.  This complaint is simply a repackaged version of Defendants' general argument that they cannot be charged with fraud unless the Indictment discloses the exact words they used to deceive their victims.  The case law requires the opposite conclusion.  An indictment is sufficient if it alleges the substance of a defendant's fraudulent statements.

Defendants next argue that they could not have made fraudulent statements regarding the FDA's oversight of Theranos because the regulatory requirements for LDTs (Laboratory Developed Tests) is unclear.  Defendants are free to assert this defense at trial, but it misses the point of the charges.  Regardless of the state of the law on LDTs in general, the Indictment alleges that FDA "*was requiring* Theranos to apply for clearance or approval for its analyzer and tests." (Indictment at ¶ 12(F)) (emphasis added).  Defendants admit that the agency has discretion to make such an enforcement decision.  The evidence at trial will show that the FDA informed Theranos of the agency's requirements, which Defendants chose to misrepresent when speaking to victims.  This case is therefore different from *Whiteside*, cited by Defendants, which involved no similar direction from a regulatory agency.  *United States v. Whiteside*, 285 F.3d 1345 (11th Cir. 2002).

As to doctors and patients who relied on Theranos's test results, Defendants contend that the Indictment's allegations are vague, leaving them to wonder whether the alleged misrepresentations were implicit.  (Mot. at 7-8).[9]  A more careful reading of the Indictment answers Defendants' questions.  Paragraphs 15 and 16 allege that Defendants defrauded patients through "explicit and implicit claims" about the company's ability to provide accurate and reliable blood tests—claims which were false because Defendants knew that their technology could not consistently produce such results for certain

---

[9]  Defendants do not argue, because they cannot, that implicit misrepresentations are incapable of forming the basis of a fraud conviction.  *See, e.g.*, *United States v. Morgenstern*, 933 F.2d 1108, 1113 (2d Cir. 1991) (affirming bank fraud conviction based on implicit misrepresentation); *United States v. McDonald*, 209 F. App'x 748, 751 (10th Cir. 2006) (same, collecting cases re implicit misrepresentations).

assays identified by name in the Indictment.  Reading the Indictment "as a whole," including "facts which are necessarily implied," *see Buckley*, 689 F.2d at 899, it is obvious that Defendants are charged with implicitly and explicitly claiming that Theranos could consistently produce accurate and reliable results when in fact it could not.  Paragraph 9 of the Indictment includes an example of an explicit statement, quoting a claim from Theranos's public website that the company's lab could perform tests "quickly *and accurately* on samples as small as a single drop."  (emphasis added).  Defendants seem to argue that such statements are too vague to be true or false.  The evidence at trial will prove that they were part of Defendants' scheme to defraud, and were intended to mislead potential investors and customers.[10]

## B.    The Government is Not Required to Plead or Prove Specific False Statements

Defendant's motion rests on the central argument that the government has failed to provide Defendants with sufficient information concerning an essential element of the offense, specifically, the precise wording of Defendants' false statements and the circumstances surrounding those statements.[11] As explained above, the Indictment clearly discloses the substance of those statements in sufficient detail.  It is also worth noting, however, that Defendants are charged with engaging in a scheme to defraud—an offense that does not require the government to allege or prove specific false statements. An individual can commit wire fraud in violation of 18 U.S.C. § 1343 in two ways:  (1) by participating in "a scheme or artifice to defraud" or (2) by "obtaining money or property by means of false or fraudulent pretenses, representations, or promises."  *United States v. Halbert*, 640 F.2d 1000, 1007 (9th Cir. 1981).[12]  Significantly, a defendant's conduct can constitute a scheme or artifice to defraud

---

[10]  Defendants' scheme to defraud patients is discussed in greater detail in the government's opposition to Defendants' Motion to Dismiss Counts Two and Nine through Eleven of Superseding Indictment, filed herewith.

[11]  Defendants' citation to *Neder* and its progeny is inapposite.  That case simply held that materiality of falsehood was an element of the federal wire fraud statute.  *Neder v. United States*, 527 U.S. 1, 25 (1999).  *Neder* does not hold that an Indictment must reproduce a defendant's fraudulent statements verbatim.  The government does not contest that it must prove materiality, the Indictment expressly alleges materiality, and the misrepresentations described in the Indictment are material on their face.  Of course, it will ultimately be up to the jury to find that this element is met.

[12]  Although this language is actually addressing mail fraud under section 1341, "[t]he mail fraud and wire fraud statutes share identical language regarding the scheme requirements, so the wire fraud statute is read in light of the case law on mail fraud.  *United States v. Manarite*, 44 F.3d 1407, 1412 (9th Cir. 1995), as amended on denial of reh'g (Mar. 15, 1995) (quotation omitted).

"whether or not any specific misrepresentations are involved." *Id.* (citing cases).  Even when a defendant is charged under both the scheme and false statements theories of fraud, a wire fraud conviction does not require proof of a specific false statement.  *United States v. Woods*, 335 F.3d 993, 1000 (9th Cir. 2003)[13]; *see also Lustiger v. United States*, 386 F.2d 132, 138 (9th Cir. 1967) ("If a scheme is devised with the intent to defraud," and the jurisdictional element is met, "the fact that there is no misrepresentation of a single existing fact is immaterial.").

In this case, the Indictment charges Defendants with both engaging in a scheme to defraud and obtaining money by means of materially false representations.  Accordingly, neither the Indictment, nor the discovery in this case, nor the eventual proof at trial needs to include details regarding the exact words Defendants used to defraud their victims or the times and places Defendants uttered those words. Because specific false statements are not an element of the offense in this case, Defendants cannot compel disclosure of additional details regarding specific false statements.  *See United States v. Giese*, 597 F.2d 1170, 1180 (9th Cir. 1979) (finding indictment legally sufficient, affirming denial of bill of particulars motion, and stating that the "information available to appellant was actually more than he had a right to demand, for there is no requirement in conspiracy cases that the government disclose even all the overt acts in furtherance of the conspiracy").  The purpose of a charging document or a bill of particulars is to inform the defendant of the nature of the charges against him, and that goal has already been accomplished by the Indictment here—especially in light of the fact that those charges do not require specific false statements by Defendants.

Given the detailed Indictment and comprehensive discovery in this case, Defendant's arguments boil down to a complaint that the government's evidence will be insufficient to establish that Defendants committed a fraud.  A motion to dismiss is not the appropriate vehicle for such a complaint.  And, of course, indictments are not subject to challenge "on the ground that there was inadequate or incompetent evidence before the grand jury." *Costello v. United States*, 350 U.S. 359, 363 (1956).

---

[13]  The *Woods* opinion recognizes two forms that wire fraud can take:  (1) a scheme or artifice to defraud, or (2) obtaining money or property by means of false or fraudulent pretenses, representations, or promises. *Id.* at 1000 n.4.  *Woods* postdates the Supreme Court's decision in *Cleveland v. United States*, 531 U.S. 12 (2000), cited by Defendants for the proposition that wire fraud does not encompass two distinct types of schemes to defraud.  In fact, *Cleveland* merely states that the two theories should not be construed independently.  *Cleveland*, 531 U.S. at 26.

1   Accordingly, the Court should deny Defendants' motion to dismiss the Indictment.

2   ### C.   A Bill of Particulars is Unnecessary

3   Rule 7(f) provides that a court may direct the government to file a bill of particulars.  A motion

4   for a bill of particulars is appropriate where a defendant requires clarification in order to prepare a

5   defense.  *United States v. Long*, 706 F.2d 1044, 1054 (9th Cir. 1983).  The bill of particulars itself is

6   "designed to apprise the defendant of the specific charges being presented to minimize danger of

7   surprise at trial, to aid in preparation and to protect against double jeopardy."  *Id.*  A court should order a

8   bill of particulars only when the indictment is "too vague and indefinite for such purposes."  *United*

9   *States v. Giese*, 597 F.2d 1170, 1180 (9th Cir. 1979) (quotation omitted).  A bill of particulars is not

10  meant to give the defense a preview of the government's proof at trial.  "A defendant is not entitled to

11  know all the evidence the government intends to produce, but only the theory of the government's case."

12  *Yeargain v. United States*, 314 F.2d 881, 882 (9th Cir. 1963).  "[I]f the information sought by defendant

13  is provided in the indictment or in some acceptable alternate form, no bill of particulars is required."

14  *United States v. Bortonovsky*, 820 F.2d 572, 574 (2d Cir. 1987).

15  One important reason to limit the use of the bill is "to avoid freezing the government's case as a

16  result of the rule that evidence at trial must conform to the bill."  Wright, 1 Fed. Prac. & Proc. Crim.

17  § 130 (4th ed.).  The decision whether to grant a request for a bill of particulars is within the trial court's

18  discretion, and such decisions are disturbed only for abuse of discretion.  *Long*, 706 F.2d at 1054; *United*

19  *States v. Clay*, 476 F.2d 1211, 1215 (9th Cir. 1973).

20  As discussed above, the Indictment satisfies the constitutional requirements of putting

21  Defendants on notice regarding the charges and enabling them to argue double jeopardy.  Along with the

22  discovery in this case, the Indictment also contains enough detail to minimize the danger of surprise at

23  trial.  Not only does the Indictment describe Defendants' schemes to defraud investors and patients, it

24  details the specific misrepresentations Defendants used to fool their victims, including allegations as to

25  why those representations were false.  A bill of particulars cannot require additional detail about the

26  content of those false statements in a case where the government is not required to prove false

27  statements at all.  *See Woods*, 335 F.3d at 1000 (discussed above).  Nor is the government required to

28  determine and disclose the exact timing and surrounding circumstances of each misrepresentation.  *See*

1   *Giese*, 597 F.2d at 1180 ("Appellant's request for the 'when, where, and how' of every act in

2   furtherance of the conspiracy was equivalent to a request for complete discovery of the government's

3   evidence, which is not a purpose of the bill of particulars.").

4          The cases cited by Defendants—in which courts ordered bills of particulars to supplement

5   minimalist indictments—are easily distinguished.  For example, in *Bortonovsky*, an out-of-circuit case,

6   the indictment charged the defendants with submitting false claims for burglary losses, but did not

7   specify which of fifteen burglaries the defendants had fabricated, requiring the defense to waste effort

8   proving that many of the claimed burglaries actually had occurred.  *United States v. Bortonovsky*, 820

9   F.2d 572, 574-75 (2d Cir. 1987).  The prejudice to the defense in that case arose partly because defense

10  counsel "had only four days within which to prepare a defense."  *Id.* at 575.  Here, in contrast, the

11  Indictment gives notice of specific misrepresentations Defendants will need to address at trial, and

12  defense counsel has had ample time to review the discovery detailing the misrepresentations and prepare

13  defenses, if any, to these charges.

14          In *Trumpower*, the court required a bill of particulars in a money laundering case where the

15  laundered funds were allegedly derived from a scheme involving fraud, although there were "no

16  substantive mail or wire fraud charges alleged."  *United States v. Trumpower*, 546 F. Supp. 2d 849, 851

17  (E.D. Cal. 2008).  The indictment in that case did not contain any "pleading of the factual circumstances

18  of the specific mail or wire fraud that produced [the allegedly laundered] funds," alleging the existence

19  of a fraudulent scheme "only in completely generic terms."  *Id.* at 851-52.  In contrast, the Indictment in

20  this case charges Defendants with nine substantive counts of wire fraud distinguished by date and other

21  identifying details including, where applicable, wire transfer amount and bank information.  The

22  Indictment also pleads the factual circumstances of the schemes to defraud, explaining several categories

23  of Defendants' false representations to investors and patients.  This level of specificity goes far beyond

24  the "completely generic terms" at issue in *Trumpower*.

25          In the *Sampson* case from the Eastern District of Virginia, an indictment alleged that the

26  defendant committed mail fraud by "delivering fraudulent documents relating to a 2004 Yukon Denali

27  through DHL Express Delivery Service."  *United States v. Sampson*, 448 F. Supp. 2d 692, 696 (E.D. Va.

28  2006).  The indictment in that case "fail[ed] to state which specific documents were fraudulent, and what

was allegedly fraudulent about the documents at issue." *Id.*  Here, the Indictment contains much more than bare allegations about unspecified "fraudulent documents."  Instead, it alleges the actual substance of Defendants' misrepresentations and how they fit into the larger schemes to defraud.

In *Caine*, a district court in the Southern District of New York ordered a bill of particulars setting forth a defendant's fraudulent representations where the indictment merely referenced "false and misleading representations as to the nature of the fish lures which would be supplied" in response to mail orders  without explaining *how* those representations were false and misleading.  *United States v. Caine*, 270 F. Supp. 801, 803 (S.D.N.Y. 1967).[14]  As shown above in Section II.A, the Indictment here does not suffer from the same deficiency.

The timing of Defendants' motion also weighs against their arguments.  This case was originally indicted in June of 2018—approximately eighteen months before Defendants got around to filing their motion requesting a bill of particulars.  In the year and a half since the Indictment, Defendants have conducted their own investigation of the charges and litigated the case, generating potential defenses and raising disputes concerning the government's use of the grand jury and the scope of the government's discovery obligations.  Such a delay in seeking a bill of particulars, and Defendants' active litigation of this case in the meantime, are plainly inconsistent with Defendants' current claims that they do not understand the charges in the Indictment.  If the Indictment were so unclear, one would expect Defendants to have raised their complaints at the outset of this case.  Indeed, the Federal Rules of Criminal Procedure contemplate a bill-of-particulars motion being filed immediately after the indictment.  Rule 7 of the Federal Rules of Criminal Procedure provides that a defendant "may move for a bill of particulars before or within 14 days after arraignment or at a later time if the court permits."  Fed. R. Crim. P. 7.

### 1. Defendants Have Received Comprehensive Discovery Disclosing the Full Scope of the Evidence Against Them

The details of the charged offense that are not self-evident in the Indictment have already been disclosed in the comprehensive discovery in this case.  The Ninth Circuit has stated in the clearest of

---

[14]  That court nonetheless held that the indictment in that case met the standard of informing the defendant with sufficient particularity of the scheme to defraud to enable his defense and prevent double jeopardy, and denied a motion to dismiss.  *Id.* at 803-04.

1  terms that "full discovery also obviates the need for a bill of particulars." *Giese*, 597 F.2d at 1180; *see*

2  *also Long*, 706 F.2d at 1054 ("Full discovery will obviate the need for a bill of particulars"); *Clay*, 476

3  F.2d at 1215 (affirming denial of motion for a bill of particulars specifying the "day, time, and place of

4  the commission of the offenses alleged in the indictment, and [defendant's] role or participation therein"

5  in light of the fact that full discovery was permitted).

6          As discussed above, the government's discovery production in this case has supplied Defendants

7  with all the information they need to prepare their defense and avoid unfair surprise at trial.  Defendants

8  are quick to complain about the volume of discovery—while simultaneously demanding additional

9  documents from custodians like the FDA—but the facts sought by Defendants' motion are easily

10 retrievable from the discovery.  As illustrated in Section II.B above, the key evidence in this case

11 relating to Defendants' fraudulent conduct is summarized in the reports of witness interviews, and those

12 reports attach the documents discussed with those witnesses.  Because the government has not withheld

13 any such information, and has aided the defense in navigating it and locating specific items, Defendants

14 are well-situated to answer their own questions by referring to the evidence itself.

15         The defense cites cases that deviate from the general rule that discovery obviates the need for a

16 bill, but those cases are not instructive.  For example, as discussed above, the *Bortonovsky* case involved

17 unique facts and an extremely limited time period not present here, and that Second Circuit case is not

18 binding on this Court.  *Bortonovsky*, 820 F.2d at 574-75.

19         Not only do the Indictment and discovery satisfy the purpose of a bill of particulars, they also

20 contain all the information concerning Defendants' criminal conduct known to the government.  Thus,

21 the defense is on equal footing with the government in its ability to review the evidence and locate

22 relevant inculpatory and exculpatory items.

23                 **2.     Defendants Are Not Entitled to the Categories of Information They Demand**

24         A bill of particulars is not intended as a tool for "complete discovery of the government's

25 evidence." *Giese*, 597 F.2d 1170, 1180; *see also United States v. Smith*, 776 F.2d 1104, 1111 (3d Cir.

26 1985) (a bill of particulars is not the "equivalent of civil discovery" and "is not intended to provide the

27 defendant with the fruits of the government's investigation").  But it is clear from Defendants' motion

28 that they are attempting to use it as a discovery device.  Below, the government addresses the specific

1  categories of information defendants improperly include in their request.

2      *Details Regarding False Representations* – As discussed above and as shown by the case law, it

3  is entirely proper for an indictment to describe a fraud defendant's misrepresentations in substance

4  without including verbatim quotes.  Moreover, the discovery in this case includes reports summarizing

5  all interviews of victim witnesses—the targets of Defendants' fraud.  Defendants need only review those

6  reports to learn what those witnesses told investigators about Defendants' misrepresentations.  The

7  Court should decline to order a bill of particulars on this topic.

8      *Names of Investor, Doctor, and Patient Victims Who May Testify as to Having Been Deceived* –

9  There is no need for the Court to order a bill of particulars informing the defense of which victims might

10  testify at trial.  Courts recognize that "the proper scope and function of a bill of particulars is not to

11  obtain disclosure of evidence or witnesses to be offered by the Government at trial."  *United States v.*

12  *Nachamie*, 91 F. Supp. 2d 565, 570 (S.D.N.Y. 2000); *see also*, *United States v. Ryland*, 806 F.2d 941,

13  942 (9th Cir. 1986) (a defendant is "not entitled to know the contents of the testimony of each of the

14  government witnesses before trial").  Moreover, Defendants are already well aware of the victims whom

15  the government has interviewed as part of its investigation.  Although the Indictment protects the

16  identities of specific victims through anonymization, the government disclosed to the defense the

17  identities of victims referenced in the Indictment more than a year ago pursuant to its discovery

18  obligations.  The government has provided the defense with reports detailing the substance of those

19  interviews, so Defendants also are fully aware of the statements those victims made to government

20  investigators and any other information they provided.  Because they have those reports as well as agent

21  notes from those interviews and copies of any documents discussed with those witnesses, Defendants

22  have full access to all of the information in the government's possession concerning the victims and how

23  they might testify about Defendants' deception.  To the extent Defendants are seeking information as to

24  which of the many victims the prosecution intends to actually call at trial, this request is premature and

25  duplicative of other deadlines in the case.  The government is still interviewing and evaluating potential

26  witnesses, and has not yet made its final decisions as to whom it will call at trial.  The Court has set a

27  relatively early deadline of May 1, 2020 in this case for the government to disclose its trial witness list.

28  The government's witness list will be provided to Defendants at the time determined by the Court and,

1  combined with the interview reports and associated documents, will give Defendants the information

2  they need to continue preparing for trial.

3       *Names of Co-conspirators* – Although Defendants cite a handful of district court cases where

4  courts required the government to disclose the identities of coconspirators, the majority of these cases

5  are out of district, and all are distinguishable.  In *United States v. Bazezew*, for example, *sixteen*

6  defendants were charged with engaging in a bribery scheme, and the court ordered a limited bill of

7  particulars identifying coconspirators and describing overt acts because the indictment in that case

8  provided "very little information" regarding the actions of the various coconspirators during the key

9  time period.  *United States v. Bazezew*, 783 F. Supp. 2d 160, 168-69 (D.D.C. (May 11, 2011)

10  (recognizing, however, that a bill of particulars "is not a discovery device or a tool for allowing the

11  defense to preview the government's theories of the government's evidence"); *see also United States v.*

12  *Trie*, 21 F. Supp. 2d 7 (D.D.C. 1998) (granting request where case involved 18 coconspirators and failed

13  to identify false statements).  In contrast to these opinions, the Ninth Circuit's view on this issue is

14  unambiguous and does not support Defendants' argument.  In *United States v. DiCesare*, the Ninth

15  Circuit acknowledged that a defendant was seeking a bill of particulars for three reasons, one of which

16  was "to obtain the names of any unknown coconspirators."  *United States v. DiCesare*, 765 F.2d 890,

17  897–98 (9th Cir.), *amended*, 777 F.2d 543 (9th Cir. 1985).  According to the Ninth Circuit, "these

18  reasons… *do not warrant a bill of particulars*."  *Id.* (emphasis added) (citing *Wilkins v. United States*,

19  376 F.2d 552, 562-63 (5th Cir. 1967), *cert. denied*, 389 U.S. 964 (1967)).[15]  There is no reason for the

20  Court to disregard the Ninth Circuit's guidance in this case.

21       Defendants say they are worried that, at trial, the government will offer statements from

22  unnamed coconspirators as evidence of the fraudulent schemes, and that the absence of coconspirator

23  names in the Indictment means that the group of potential speakers is "an unbounded set."  (Mot. at 12).

24  Defendants fear of surprise is unfounded.  The Local Criminal Rules in this District already require a

25  detailed pre-trial disclosure of any coconspirator statements the government intends to offer at trial.

26  Specifically, Rule 16-1(c)(4) provides that, pursuant to a schedule set by the Court, the government must

27

28  _____

   [15]  *See also United States v. Feil*, No. CR 09-00863 JSW, 2010 WL 1525263, *3 (N.D. Cal. Apr.
   15, 2010) ("In general, a bill of particulars is not warranted to obtain the names of co-conspirators….").

1   disclose a "summary of any statement the government intends to offer under F. R. Evid. 801(d)(2)(E) in

2   sufficient detail that the Court may rule on the admissibility of the statement."  The current deadline for

3   that disclosure in this case is May 1, 2020—well in advance of trial.  Accordingly, Defendants do not

4   need a bill of particulars addressing this issue, even if the law supported their request for one.

5       *Details Regarding Defendants' Duty to Disclose and Material Omissions* – Defendants ask for a

6   bill of particulars detailing their alleged duty to disclose and material omissions.  The Indictment,

7   though, already alleges the facts that Defendants withheld from victims, such as the facts that Theranos

8   relied on third-party analyzers for its tests and that its Walgreens rollout had stalled.  Further, the

9   government is not required to plead or prove the existence of a trust relationship creating a duty to

10  disclose when a defendant uses misleading half-truths in a scheme to defraud, as Defendants did here.

11  *See United States v. Laurienti*, 611 F.3d 530, 541 (9th Cir. 2010).  These issues are discussed in greater

12  detail in the government's Opposition to Defendants' Motion to Dismiss Superseding Indictment in Part

13  for Failure to Allege Falsity and Motion to Strike (ECF No. 205), filed herewith.

14          **3.      This Court Has Denied Similar Requests for a Bill of Particulars**

15      Consistent with the principles discussed above, this Court has previously denied motions for a

16  bill of particulars in cases similar to this one.  In *United States v. Isaac Choi*, the defendant was indicted

17  for several counts of wire fraud after devising and executing a scheme to recruit employees and obtain

18  money "under false pretenses and promises regarding the financial support for and stability of" his

19  company.  Indictment (ECF. No. 1), *United States v. Isaac Choi*, No. 17-cr-00308-EJD (N.D. Cal. Jun.

20  1, 2017).  The government also alleged that the scheme included "maintain[ing] the employment of

21  various [company] employees by falsely claiming to have paid their earned salaries, bonuses, and other

22  compensation."  *Id.*  The indictment went on to generally describe the substance of that defendant's

23  misrepresentations.  For example, it alleged that, "[b]eginning in or around December 2015, while

24  speaking with investors and employees of [the company], Choi falsely claimed that he had access to

25  significant personal wealth and was investing significant amounts of money into the company."  *Id.* at

26  ¶ 5.  The indictment similarly alleged that "[o]n multiple occasions, Choi induced [company] employees

27  to loan money to or invest in [the company] by falsely claiming that the money he intended to invest

28  would shortly be forthcoming."  *Id.* at ¶ 7.  These misrepresentations and others were described in the

1  Choi indictment by general substance.  The Choi indictment did not lay out the exact wording used, the

2  dates and times of the misrepresentations, or the precise identities of the listeners.

3      In denying Choi's motion for a bill of particulars as to the defendant's false statements, this

4  Court noted that discovery had been produced to the defendant.  Order Denying Defendant's Motion for

5  Bill of Particulars (ECF. No. 32), *United States v. Isaac Choi*, No. 17-cr-00308-EJD (N.D. Cal. Dec. 29,

6  2017).  The Court also relied on the government's representation that the statements described in the

7  paragraphs of the indictment cited above "form[ed] the core of its case" against the defendant.  *Id.*  On

8  those facts, the Court found that the defendant already had the information he needed to prepare for trial

9  and prevent double jeopardy.  *Id.*

10     Similarly, in *United States v. Christian Reimer Stukenbrock*, this Court denied a defendant's

11  motion for a bill of particulars where a five-page indictment described the defendant's scheme to

12  defraud, listed the charges against the defendant, and identified specific financial transactions in

13  connection with the charged wire fraud counts.  Order Denying Defendant's Motion for Bill of

14  Particulars (ECF No. 143), *United States v. Christian Reimer Stukenbrock*, No. 15-cr-00034-EJD (N.D.

15  Cal. Jun. 26, 2018).  The indictment in that case alleged a scheme to defraud that spanned at least five

16  years, and charged the defendant with defrauding an investor "by promising to invest [the victim's]

17  money in specified companies on behalf of [the victim] and instead diverting a large share of the

18  investment monies to himself."  Indictment (ECF No. 1), *Stukenbrock*, No. 15-cr-00034-EJD.  That

19  indictment further alleged that the defendant "promised to invest all the money in the partner companies,

20  save for at most 5% of the investment funds, which he represented would be used for the operating

21  expenses of [his investment company]."  *Id.*  That indictment contained few additional details regarding

22  the defendant's representations or other statements to the victim.  Nonetheless, this Court followed the

23  case law discussed above and rejected Stukenbrock's complaint that the indictment failed to identify any

24  specific fraudulent statements or the details surrounding such statements, including when and where the

25  statements were made and whether anyone was a witness to those statements.  *Id.* at 3.

26     That same reasoning applies here and warrants denial of Defendants' motion.  In this case, as in

27  *Choi* and *Stukenbrock*, the government has charged Defendants with schemes culminating in specific

28  instances of wire fraud.  The Indictment lays out the nature and objective of the scheme, and also

describes in substance the misrepresentations Defendants made to the victims in furtherance of the scheme.  In fact, the Indictment in this case goes into significantly more detail regarding the alleged false statements than its counterparts in *Choi* and *Stukenbrock*.  As in those earlier cases, the misrepresentations described in the Indictment form the core of the government's case against Defendants.  Thus, the Indictment here accomplishes its purpose of providing notice of the charges.  The discovery, including detailed reports memorializing the government's interviews of victims and other witnesses, provides additional context regarding the charged conduct.  The law requires nothing more.

## IV.     CONCLUSION

The Indictment in this case satisfies constitutional standards and, along with the thorough discovery produced by the government, informs Defendants of the charges in enough detail for them to prepare for trial and avoid double jeopardy.  Accordingly, the Court should disregard Defendants' feigned confusion and deny their motion to dismiss or for a bill of particulars.

DATED:  January 13, 2020                              Respectfully submitted,

                                                      ADAM A. REEVES
                                                      Attorney for the United States
                                                      Acting Under Authority Conferred
                                                      by 28 U.S.C. § 515

                                                        */s/*
                                                      JEFF SCHENK
                                                      JOHN C. BOSTIC
                                                      ROBERT S. LEACH
                                                      VANESSA BAEHR-JONES
                                                      Assistant United States Attorneys