ADAM A. REEVES (NYBN 2363877)
Attorney for the United States,
Acting Under Authority Conferred By 28 U.S.C. § 515

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

JEFF SCHENK (CABN 234355)
JOHN C. BOSTIC (CABN 264367)
ROBERT S. LEACH (CABN 196191)
VANESSA BAEHR-JONES (CABN 281715)
Assistant United States Attorneys

    150 Almaden Boulevard, Suite 900
    San Jose, California 95113
    Telephone: (408) 535-5061
    Fax: (408) 535-5066
    Vanessa.Baehr-Jones@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 18-CR-00258 EJD |
| Plaintiff, | **UNITED STATES' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT IN PART FOR FAILURE TO ALLEGE FALSITY AND MOTION TO STRIKE (ECF 205)** |
| v. | |
| ELIZABETH HOLMES and RAMESH "SUNNY" BALWANI, | |
| Defendants. | Date: February 10, 2020<br>Time: 10:00 a.m.<br>Court: Hon Edward J. Davila |

## INTRODUCTION

Defendants seek to usurp the roles of the Grand and Petit Juries by asking the Court to dismiss counts and strike clauses from the Superseding Indictment, claiming the indictment fails to allege falsity and a duty to disclose. But Defendants articulate the wrong standard. Wire fraud does *not* require specific false statements. Nor is a fiduciary or statutory duty necessary to trigger a duty to disclose omissions. This duty can arise when a defendant tells a "half-truth" and omits material facts. Even considering the allegations defendants move to strike, though, these each allege demonstrably false statements based on a common sense reading of the indictment. The Court should deny the Motion.

## FACTUAL BACKGROUND

### I. The Defendants' Scheme to Defraud Investors

Defendant Holmes founded Theranos in 2003 with the stated mission of revolutionizing medical laboratory testing through allegedly innovative methods for drawing blood. (Superseding Indictment (SI), Dkt. #39, ¶¶ 1, 4.) Defendant Balwani joined the company in 2009, serving in a variety of high-level management roles over the course of the fraud. (*Id.* ¶ 2.) During the company's first ten years, Theranos operated in "stealth mode," as it pursued the development of proprietary technology that could run clinical tests on devices termed the "Edison" and "minilab" using only tiny drops of blood from a patient's finger, stored in a "nanotainer." (*Id.* ¶ 5.) The promise of these devices, though, never matched the reality. (*See id.* ¶¶ 12, 16–18.)

Despite the inaccurate and unreliable results these devices produced, Defendants Holmes and Balwani began a publicity campaign to promote the company in 2013 and to seek additional investors. (*Id.* ¶¶ 6–9, 12–13.) The company published press statements claiming Theranos had "eliminate[ed] the need for larger needles and numerous vials of blood" and could use "blood sample[s] as small as a few drops—1/1000th the size of a typical blood draw." (*Id.* ¶ 7.) Defendant Holmes told the *Wall Street Journal* that Theranos could "run any combination of tests, including sets of follow-up tests" at once, very quickly, all from a single drop of blood. (*Id.* ¶ 8.)

Defendants Holmes and Balwani also misled investors directly, through false and misleading written and verbal communications; marketing materials containing false and misleading statements; and false and misleading financial statements, models, and other information. (*Id.* ¶ 12.) Among the

specifically alleged misleading and false statements are the two challenged in Defendants' instant motion to dismiss the indictment: (1) Paragraphs 12(D), which alleges that Defendants misrepresented Theranos's business relationship with Walgreens; and (2) Paragraph 12(E), which alleges defendants misrepresented the nature of Theranos's business relationship with the U.S. Department of Defense. (*Id.*)  As alleged in the Superseding Indictment ("Indictment"), defendants conveyed to investors that these business relationships were, respectively, "expanding" and "profitable and revenue-generating," when the truth was something else entirely. (*Id.*)  In the case of Walgreens, the rollout of Theranos's retail business in Walgreens stores had stalled. (*Id.*)  With respect to the military, the truth was that Theranos "had limited revenue from military contracts and its technology was not deployed in the battlefield." (*Id.*)

## II.     Defendants' Scheme to Defraud Doctors and Patients

Defendants also misled doctors and patients.  From 2013 to approximately 2016, Defendants advertised and marketed Theranos's technologies to doctors and patients, presenting misleading and false claims about the accuracy and reliability of its blood tests, and omitting the problems and limits of Theranos's technologies. (*Id.* ¶ 14–16.)  Specifically, as alleged in Paragraph 16—which Defendants seek to strike—Defendants misrepresented that Theranos could provide "accurate, fast, reliable, and cheap blood tests and test results."  In truth, Defendants knew that Theranos technology was not "capable of consistently producing accurate and reliable results."  The Indictment further alleges specific blood tests, for which Defendants knew Theranos was not capable of consistently producing accurate and reliable results, including calcium, chloride, potassium, bicarbonate, HIV, Hba1C, hCG, and sodium, among others. (*Id.*)  Notwithstanding the questionable and suspect accuracy of Theranos's test results, Defendants wired these results to patients, including Patients 1 and 2, as alleged in Paragraph 26 of the Indictment. (*Id.* ¶¶ 18, 26.)

The effects of Defendants' fraudulent conduct were far-reaching and severe:  investors lost hundreds of millions of dollars in total, and numerous patients received unreliable or wholly inaccurate medical information from Theranos's flawed tests, placing those patients' health at serious risk.

//

//

# ARGUMENT

## I. Legal Standard

An indictment must contain a "concise and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). It "should be read in its entirety, construed according to common sense, and interpreted to include facts which are necessarily implied." *United States v. Givens*, 767 F.2d 574, 584 (9th Cir. 1985). "An indictment is sufficient if it 'first contains the elements of the offense charged and fairly informs a defendant of the charges against which he [or she] must defend, and, second, enables him [or her] to plead to an acquittal or conviction in bar of future prosecutions for the same offense.'" *United States v. Bonallo*, 858 F.2d 1427, 1430–31 (9th Cir. 1988) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)).

To allege a fraud, the indictment must simply plead the "character" of the scheme. *United States v. Curtis*, 506 F.2d 985, 990 (10th Cir. 1974). There is no need at the pleading stage to allege "evidentiary matters," such as specific times, places, or circumstances. *Id.* In fact, an indictment need not even "specify the theory upon which those facts will be proved at trial" or explain "the evidence upon which the proof will rest." *United States v. Markee*, 425 F.2d 1043, 1047 (9th Cir. 1970).

An indictment must be "liberally construed in favor of validity" and it is only required that the "necessary facts appear *in any form* or *by fair construction* in an indictment." *United States v. Holden*, 806 F.3d 1227, 1233 (9th Cir. 2015) (quoting *United States v. James*, 980 F.2d 1314, 1316–17 (9th Cir. 1992)).

## II. Specific Falsehoods Are Not Required to Allege Wire Fraud

As an initial matter, Defendants have set forth the wrong standard for alleging wire fraud. Defendants rely on isolated language in *Neder v. United States*, 527 U.S. 1, 21–25 (1999), in claiming that "material falsehoods (or omissions) are part of the crime's definition." (Mot. at 3.) The Ninth Circuit specifically rejected such a narrow and incorrect reading of *Neder*'s holding in *United States v. Woods*, 335 F.3d 993, 999 (9th Cir. 2003). There, the Ninth Circuit explained that "*Neder* addressed the materiality of misrepresentation, not the specificity." *Id.* "With regard to specificity, *Neder* reiterated the holding in *Durland v. United States*, 161 U.S. 306 (1896), where the Supreme Court construed the [mail fraud] statute to include[ ] everything designed to defraud by representations as to the past or

present, or suggestions and promises as to the future." *Id.* (internal quotations omitted).  No "specific misrepresentation" is required.  *Id.*  In *United States v. Omer*, the court reiterated this reading of *Neder*, stating that "the materiality of a specific statement need not be pleaded" in a fraud case.  395 F.3d 1087, 1089 (9th Cir. 2005).  All that must be pleaded is a fraudulent "scheme or artifice."  *Id.*  And "deceptive or misleading statements, false statements and half-truths, . . . and concealed, omitted and nondisclosed facts" can all be considered as material evidence of the fraud.  *Woods*, 335 F.3d at 1000.  These various theories are reflected in the Ninth Circuit Model Criminal Jury Instruction, which specifically articulates the "half-truths" theory: "Deceitful statements of half-truths may constitute false or fraudulent representations."  Ninth Cir. Model Crim. J. Inst. 8.124 (wire fraud).

The government can prove wire fraud under different theories and need not exclusively rely on any one theory in arguing the fraud to the jury.  Wire fraud can take the form of (1) a scheme or artifice to defraud, or (2) obtaining money or property by means of false or fraudulent pretenses, representations, or promises.  *United States v. Halbert*, 640 F.2d 1000, 1007 (9th Cir. 1981).  Each constitutes an independent and alternate basis for conviction.  *United States v. Bonanno*, 852 F.2d 434, 441 (9th Cir. 1988).  Here, just like in *Woods*, the Indictment alleges wire fraud under both of these theories.

Defendants do not address in their Motion how the allegations in the Indictment fail to state a material scheme or artifice to defraud, nor could they make this claim.  Thus, the Court need not consider whether the statements in the challenged allegations allege actual falsity and can deny the motion based on the standard set forth in *Woods* and *Omer*.

**III.     The Superseding Indictment Alleges Material False Statements**

Even if the Court were to consider the allegations, though, they clearly allege falsity.  To allege falsity, the government need only state an apparent false statement that is material.  "[A] false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed."  *Neder*, 527 U.S. at 16 (internal quotations and alterations omitted).

Here, Defendants deceived investors by portraying Theranos as a successful and profitable company that had developed effective and marketable proprietary devices to test blood.  The truth was

that Theranos's actual projected revenues for 2015 were less than 1% of the projected $1 billion in revenues represented to investors. (SI ¶ 12(B).) Theranos's devices had not worked reliably. As a result, Defendants were using third-party, commercially-available analyzers to test patients' blood. (*Id.* ¶ 12(G).) The false statements alleged in the Paragraphs 12(D) and 12(E) furthered this deception by presenting the company in a favorable light to investors. This helped perpetrate the scheme by inducing additional investment in the company.

Defendants nevertheless claim that their misleading and false statement to investors that Theranos and Walgreens "had an expanding partnership" is not actually contradicted by the allegation in Paragraph 12(D) that the Walgreens rollout had, in truth, "stalled." This argument defies common sense. *See United States v. Alber*, 56 F.3d 1106, 1111 (9th Cir. 1995) (indictment must be "construed in accord with common sense"). Certainly, a reasonable person would understand the statement that the partnership was "expanding" to mean that the business relationship with Walgreens was growing. In contrast, learning that the rollout "had stalled" would give the exact opposite impression: that the relationship was plateauing or shrinking. This was a material misrepresentation in furtherance of the scheme.

Defendants further claim that the Indictment does not allege that the Walgreens misrepresentations were made "by someone with knowledge that they were untrue, or even by someone who believed that the planned expansion of Wellness Centers was unlikely to occur." (Mot. at 5.) That is plainly incorrect. All of the misrepresentations listed in the subparagraphs to Paragraph 12 refer back to "HOLMES and BALWANI." (*See* SI ¶ 12.) The Superseding Indictment alleges that the *Defendants* were the ones making these representations, and it further alleges that they knew at the time that the Walgreens rollout had stalled. (*See id.* ¶ 12(D) ("*when*, in truth, HOLMES and BALWANI knew, by late 2014, that Theranos's retail Walgreens rollout had stalled because of several issues, including that Walgreen's executives had concerns with Theranos's performance . . .") (emphasis added).) Defendants may attempt to argue at trial that they did not know that the rollout had stalled—though the government anticipates the evidence will prove otherwise—but the Indictment has plainly alleged in Paragraph 12(D) that *they* made these misrepresentations in support of the fraud.

//

Similarly, the misrepresentation that Theranos had a "profitable and revenue-generating business relationship" with the U.S. Department of Defense directly contrasts with the truth that "Theranos had limited revenue from military contracts." Defendants contend in their Motion these two assertions are "not even in tension." (Mot. at 5.) Again, this argument ignores common sense. The point of these statements was to deceive investors into believing Theranos was profitable when it was not. This allegation must be read as part of the whole indictment, which describes a scheme in which Defendants grossly overstated their profits to investor victims. (*See* SI ¶ 12(B).) Considered in context, the falsity is clear. *See Holden*, 806 F.3d at 1233 (facts may "appear in *any form* or *by fair construction* can be found within the terms of the indictment").

Defendants also lied to doctors and patients. They represented that their devices could provide "accurate, fast, reliable, and cheap blood tests and test results," when the truth was these tests could not "consistently produc[e] accurate and reliable results." (*Id.* ¶ 16.) In their Motion, Defendants question the meaning of the word "consistently" and claim that all blood tests have some error rates. (Mot. at 6.) But the consistency of the results was critical. The goal of the Defendants' marketing campaign was to convince doctors, patients, and their insurance companies to order, use, and pay for Theranos blood tests. (*Id.*) The fact that these tests could *not* perform consistently, in contrast to the marketing, would have torpedoed this marketing campaign. Which patients would want to pay for inconsistent blood test results? Defendants' argument that "consistency" of test results does not matter defies common sense.

Reading the indictment as a whole, the three challenged allegations clearly allege material false statements in furtherance of the two alleged schemes.

**IV.  Defendants' Misleading Statements Are Also Fraudulent Under a "Half-Truths" Theory**

As set forth above, the government need not rely on directly contradicting statements in order to allege wire fraud. Even assuming that these allegations describe half-truths, the government has still alleged misrepresentations in furtherance of the fraud. *See United States v. Beecroft*, 608 F.2d 753, 757 (9th Cir. 1979) ("Deceitful statements of half-truths or the concealment of material facts is actual fraud under the statute."); Ninth Cir. Model Crim. J. Inst. 8.124 ("Deceitful statements of half-truths may constitute false or fraudulent representations.").

//

Considering the three allegations, each could be considered to allege fraud under a half-truths theory. The representation of an "expanding partnership" between Theranos and Walgreens left out the fact that the rollout "had stalled." (SI ¶ 12(D).) This was a critical omission. The representation of an "expanding partnership" misconstrued the nature of the relationship as part of the scheme to convince investors Theranos was and would be profitable in order to get them to invest. Similarly, the representation that Theranos has a "profitable and revenue-generating business relationship" with the U.S. military left out the fact that their revenues from military contracts were actually limited. Again, this omission was part of the deception about the relative profitability of the company. Finally, the representations to doctors and patients about the accuracy and reliability of the Theranos blood tests and test results omitted the truth that Theranos was incapable of providing consistently accurate and reliable results. Even if the representations had elements of truth—an actual business relationship existed between Theranos and Walgreens, and some portion of blood tests were accurate—the material omissions made these mere half-truths meant to deceive. *See, e.g.*, *Lustiger v. United States*, 386 F.2d 132, 136 (9th Cir. 1967) ("While the statements in the advertising materials may not have been literally false, taken as a whole they were fraudulently misleading and deceptive.").

## V. The Superseding Indictment Alleges a Duty to Disclose

Considering the allegations under a half-truths theory, Defendants' contention that the government has not alleged a duty to disclose also fails. This is because "even in the absence of a trust relationship," a defendant "cannot affirmatively tell a misleading half-truth about a material fact to a potential investor." *United States v. Laurienti*, 611 F.3d 530, 541 (9th Cir. 2010). The duty to disclose in such circumstances "arises from the telling of a half-truth, independent of any responsibilities arising from a trust relationship." *Id.*

Here, Defendants had a duty to disclose the truth about their business dealings with Walgreens and the military once they made the inflated representations about their "expanding relationship" and profitability because these facts would have been material to investors. This applies equally to half-truths made to the doctors and patients. Representing their tests as "accurate" and "reliable" created a duty for defendants to disclose the evidence—evidence which defendants were actively attempting to conceal from regulators—that their blood tests were *not* consistently accurate and reliable.

The government has also adequately alleged an omissions theory with respect to the investor fraud because there was a "duty of trust" where Defendants "purportedly acted for the benefit of investors," and "induce[d investors] to relax [their ordinary] care and vigilance." *United States v. Shields*, 844 F.3d 819, 823 (9th Cir. 2016). Specifically, as alleged in Paragraph 12(C), Defendants gave deceptive technology demonstrations for the investors to reassure them that the Theranos proprietary technology was working. Instead of running the investors' blood, though, the analyzer was running a "null protocol" during the demonstration. Defendants also misled investors that Theranos did not need the Food and Drug Administration ("FDA") to approve its proprietary analyzer and tests. Defendants told investors that Theranos was voluntarily applying for FDA approval, when in truth, the FDA had required Theranos to apply for clearance or approval for its analyzer and tests. (SI ¶ 12(F).) This misrepresentation certainly had the effect of inducing investors to relax their ordinary care and vigilance when it came to concern about regulatory approvals. These are just a few examples of the many alleged misrepresentations that misled investors and led them to trust Defendants such that a duty to disclose arose.

Finally, as stated above, the government need not commit at the pleading stage—or even at trial—as to which theory of fraud supports Defendants' guilt. The jury is permitted to decide whether the alleged misrepresentations are entirely false or half-truths that give rise to a duty to disclose. The government need only prove the elements of wire fraud. These elements are properly alleged in the Indictment. Accordingly, the Court should decline to dismiss any counts or strike any of the challenged allegations.

//

//

//

# CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss the Superseding Indictment in Part for Failure to Allege Falsity and Motion to Strike.

DATED: January 13, 2020

Respectfully submitted,

ADAM A. REEVES
Attorney for the United States,
Acting Under Authority Conferred
By 28 U.S.C. § 515


  */s/ Vanessa Baehr-Jones*
JEFF SCHENK
JOHN C. BOSTIC
ROBERT S. LEACH
VANESSA BAEHR-JONES
Assistant United States Attorneys