JOHN D. CLINE (CA State Bar No. 237759)
50 California Street, Suite 1500
San Francisco, CA 94111
Telephone: (415) 662-2260 │Facsimile: (415) 662-2263
Email: cline@johndclinelaw.com

KEVIN M. DOWNEY (Admitted Pro Hac Vice)
LANCE A. WADE (Admitted Pro Hac Vice)
AMY MASON SAHARIA (Admitted Pro Hac Vice)
KATHERINE TREFZ (CA State Bar No. 262770)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
Washington, DC 20005
Telephone: (202) 434-5000 │Facsimile: (202) 434-5029
Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

Attorneys for Defendant ELIZABETH A. HOLMES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR-18-00258-EJD-SVK |
| Plaintiff, | **REPLY IN SUPPORT OF MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT** |
| v. | |
| ELIZABETH HOLMES and RAMESH "SUNNY" BALWANI, | Date:      February 10, 2020 |
| Defendants. | Time:      10:00 AM |
| | CTRM:  4, 5th Floor |
| | Hon. Edward J. Davila |

# TABLE OF CONTENTS

Page

I.     THE GOVERNMENT'S LEGAL ARGUMENTS LACK MERIT. .................................................1

II.    THE GOVERNMENT CANNOT USE AN OPPOSITION TO AMEND ITS
       THEORY OF THE CASE. ........................................................................................................2

III.   THE INDICTMENT DOES NOT ALLEGE A SCHEME TO OBTAIN MONEY OR
       PROPERTY FROM DOCTORS AND PATIENTS WHO DID NOT PAY FOR
       THERANOS TESTS. ..............................................................................................................3

       A.    The Law in This Circuit Requires that the Victim Is the Target of the Scheme.................3

       B.    The Indictment Fails To Allege Specific Intent To Collect Money from
             Doctors. ........................................................................................................................6

       C.    The Indictment Fails To Allege Specific Intent To Collect Money from
             Patients Who Did Not Pay Theranos for Their Tests. ....................................................8

IV.    THE INDICTMENT DOES NOT ALLEGE AN INTENT TO DEFRAUD ANY
       PATIENTS. ............................................................................................................................8

CONCLUSION ...................................................................................................................................10

# TABLE OF AUTHORITIES

## CASES

*Cleveland v. United States*, 531 U.S. 12 (2000) ..................................................................1

*Monterey Plaza Hotel L.P. v. Hotel & Rest. Emps. Local 438*, 215 F.3d 923 (9th Cir. 2000)....................4

*Russell v. United States*, 369 U.S. 749 (1962) ..................................................................2

*United States v. Ali*, 620 F.3d 1062 (9th Cir. 2010)..................................................3, 5

*United States v. Bonallo*, 858 F.2d 1427 (9th Cir. 1988)..................................................5

*United States v. Ciccone*, 219 F.3d 1079 (9th Cir. 2000) ..................................................7

*United States v. Crawford*, 239 F.3d 1086 (9th Cir. 2001)..................................................6

*United States v. Dowie*, 411 F. App'x 21 (9th Cir. 2010) ..................................................5

*United States v. Green*, 2007 WL 9706398 (N.D. Cal. June 28, 2007)..................................................6

*United States v. Greenberg*, 835 F.3d 295 (2d Cir. 2016) ..................................................4

*United States v. Harkonen*, 510 F. App'x 633 (9th Cir. 2013) ..................................................6,7

*United States v. Keuylian*, 23 F. Supp. 3d 1126 (C.D. Cal. 2014)..................................................2, 9

*United States v. Kurtz*, 2008 WL 1820903 (W.D.N.Y. Apr. 21, 2008)..................................................9

*United States v. Lew*, 875 F.2d 219 (9th Cir. 1989)..................................................*passim*

*United States v. Lien*, 982 F. Supp. 2d 1184 (E.D. Wash. 2013)..................................................3

*United States v. Mitchell*, 867 F.2d 1232 (9th Cir. 1989) (per curiam) ..................................................2

*United States v. Pheaster*, 544 F.2d 353 (9th Cir. 1976) ..................................................2

*United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir. 1970)..................................................10

*United States v. Sadler*, 750 F.3d 585 (6th Cir. 2014)..................................................1, 10

*United States v. Shellef*, 507 F.3d 82 (2d Cir. 2007) ..................................................9, 10

*United States v. Starr*, 816 F.2d 94 (2d Cir. 1987) ..................................................10

*United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016),
    *modified by* 838 F.3d 1168 (11th Cir. 2016)..................................................9, 10

In response to the deficiencies in the counts of the Superseding Indictment (Dk. No. 39) ("Indictment") related to doctors and patients identified by Ms. Holmes, the government rewrites its theory of the case and stretches the wire-fraud statute past its breaking point.  Courts have repeatedly rejected prosecutors' efforts to use the wire-fraud statute to "place under federal superintendence a vast array of conduct traditionally policed by the States." *Cleveland v. United States*, 531 U.S. 12, 27 (2000); *see also, e.g.*, *United States v. Sadler*, 750 F.3d 585, 591 (6th Cir. 2014) (noting that the defendant's "fabrications, objectionable though they may be and punishable under other laws though they may be, fall outside this statute").[1]  This Court should do the same here with respect to the doctor and patient counts.

The gravamen of the doctor and patient counts is that Theranos sold blood tests that may have been inaccurate in some cases.  The government devotes an entire section of its opposition to describing medical harm allegedly caused by Defendants.  Although serious, this allegation is false, as evidenced by the government's decision to charge Ms. Holmes and Mr. Balwani with wire fraud rather than something else.  Moreover, medical harm is irrelevant to the wire-fraud statute, which is concerned with the deprivation of *money or property*.  It requires intent to deprive its target of property through deceit that goes to the heart of the bargain.  The government's failure to plead such intent is fatal to Counts Two and Nine through Eleven of the Indictment.  These counts thus should be dismissed.[2]

## I.    The Government's Legal Arguments Lack Merit.

As an initial matter, the government offers various legal arguments that misconstrue applicable precedent in order to lessen its pleading burden.  Dkt. No. 267 ("Opp'n") 4-5.

First, as it does in response to Ms. Holmes' motion to dismiss the indictment for failure to allege falsity, the government relies on cases that rejected *post-conviction* attacks on the sufficiency of the

---

[1] The Supreme Court may well deliver this same message to the government again in the coming months in the so-called "Bridge-gate" case, which was argued in January 2020.  *See* Ariane de Vogue, Bridgegate scandal:  Supreme Court appears sympathetic to former Chris Christie aides, CNN.com, https://www.cnn.com/2020/01/14/politics/bridgegate-supreme-court/index.html (last updated Jan. 14, 2020).

[2] Even if the Court finds that Counts Two and Nine through Eleven should not be dismissed in their entirety, it should still grant a partial dismissal as to the insufficient allegations and strike the portions of the Indictment that reflect the dismissed allegations.

1    indictment.  Opp'n 4 (citing, *e.g.*, *United States v. Pheaster*, 544 F.2d 353, 361 (9th Cir. 1976)).  For the

2    reasons set forth at pages 1-2 of Ms. Holmes' reply in support of her motion to dismiss the indictment

3    for failure to allege falsity, those cases do not control the inquiry here.

4            Second, the government suggests that the Court should find the Indictment sufficient because the

5    Supreme Court considers it "beneficial" that convictions are upheld despite deficiencies in an

6    indictment.  Opp'n 5 (citing *Russell v. United States*, 369 U.S. 749, 763-64 (1962)).  That is a gross

7    distortion of *Russell*, which stated that "[c]onvictions are no longer reversed because of *minor and*

8    *technical* deficiencies which did not prejudice the accused."  369 U.S. at 763 (emphasis added) (internal

9    quotation marks omitted).  The government's rendition omits the "minor and technical" qualification.

10   The Court went on to caution that "the substantial safeguards to those charged with serious crimes

11   cannot be eradicated under the guise of technical departures from the rules."  *Id.* (internal quotation

12   marks omitted).  And it held that the indictments in that case failed to provide the requisite safeguards,

13   requiring reversal of the convictions.  *Id.* at 771-72.

14          Third, the government claims that courts do not "dismiss indictments or reverse convictions

15   except in extreme cases."  Opp'n 4.  Other than a string cite to cases where courts *granted* pre-trial

16   motions to dismiss, the government offers no explanation as to how these cases are "extreme" or unique.

17   If anything, the cases indicate that pre-trial dismissal is required whenever the government fails to allege

18   facts sufficient to satisfy the elements of wire fraud.  *See, e.g.*, *United States v. Mitchell*, 867 F.2d 1232,

19   1233-34 (9th Cir. 1989) (per curiam) (dismissing indictment for failure to allege intent to obtain money

20   or property from victim through deceit); *United States v. Keuylian*, 23 F. Supp. 3d 1126, 1129 (C.D. Cal.

21   2014) (dismissing indictment for failure to allege a scheme to deceive any alleged victims).

22   **II.     The Government Cannot Use an Opposition To Amend Its Theory of the Case.**

23          The scheme to defraud doctors and patients described in the government's opposition is a far cry

24   from what is alleged in the Indictment.  The Indictment asserts that "many hundreds" of patients paid or

25   caused insurers to pay Theranos for blood tests as a result of a scheme whereby Ms. Holmes made

26   representations about the accuracy and reliability of its tests with knowledge that the tests were not

27   consistently accurate or reliable.  Indictment ¶¶ 15-22.  The government now claims that the alleged

28

scheme impacted "thousands" of patients by providing them "unreliable blood tests, depriving them of money or property, placing their health at risk and, in many cases, causing actual harm." Opp'n 1, 3-4. The government further asserts for the first time that Ms. Holmes "held out Theranos's tests as suitable for use in patient care," that she intended that patients pay for testing that was "not actually suitable for [their] medical needs," that she knew Theranos' tests "were not reliable enough for medical decision-making," that she intended for doctors to pass along certain representations to their patients, that the tests themselves could not "provide a sound basis for medical treatment," that the tests had "essentially no value," that patients actually received inaccurate test results, and that there were "many cases" where the tests caused actual harm to patients. Opp'n 1, 2, 7-8, 12. None of those allegations appear in the Indictment.

This shift in the nature of the scheme is an improper attempt by the government to amend the Indictment retroactively. An opposition brief cannot change what is contained in the four corners of the Indictment. *See United States v. Lien*, 982 F. Supp. 2d 1184, 1186-87 (E.D. Wash. 2013). The Indictment did not notify Ms. Holmes that she needed to prepare a defense to meet these new allegations. And the government's attempts to justify this shift by resorting to unexplained notions of "common sense" and purportedly "unavoidable inferences," Opp'n 8, cannot save the deficiencies in the Indictment. If anything, the government's decision to put forth a substantially different theory of the case in its opposition brief only further underscores the defects in the Indictment.

### III.   The Indictment Does Not Allege a Scheme To Obtain Money or Property from Doctors and Patients Who Did Not Pay for Theranos Tests.

The Indictment should be dismissed to the extent it alleges a scheme to defraud (1) doctors or (2) patients who did not pay Theranos for their tests because it does not allege facts sufficient to establish that Ms. Holmes acted with the specific intent to obtain money or property from either group.

#### A.   The Law in This Circuit Requires that the Victim Is the Target of the Scheme.

The government recognizes that in this Circuit the specific-intent element of wire fraud requires intent "to obtain money or property from the one who is deceived." *United States v. Lew*, 875 F.2d 219, 221 (9th Cir. 1989); *United States v. Ali*, 620 F.3d 1062, 1071 (9th Cir. 2010) ("[U]nder *Lew*, [the victim

of the alleged scheme] must be the victim from whom property was taken."); *see also Monterey Plaza Hotel L.P. v. Hotel & Rest. Emps. Local 438*, 215 F.3d 923, 926-27 (9th Cir. 2000).  It contends, however, that *Lew* and its progeny allow for "indirect" deprivations.  Opp'n 9-12.  According to the government, the Ninth Circuit takes a "flexible approach" to assessing the relationship between the victim and the property.  Opp'n 10.  There is no support for this proposition in the Ninth Circuit's jurisprudence.[3]

This case lines up with *Lew*, where an attorney was charged with mail fraud for making false statements to the U.S. Department of Labor in order to obtain money from his clients.  875 F.2d at 220.  The Ninth Circuit vacated the convictions because a jury instruction describing the scheme as "mak[ing] false statements to the United States for the purpose of obtaining money from [the] defendant's clients" allowed the jury to convict the defendant "for conduct not within the reach of" the statute.  *Id.* at 221-22.  Likewise, the Indictment here encompasses (1) false statements ***to doctors*** for the purpose of obtaining money ***from patients***; and (2) false statements to ***non-paying patients*** for the purpose of obtaining money from their ***insurers***.  *See* Indictment ¶¶ 14-18.  Because both scenarios lack the required convergence between the target of the deceit and the alleged property deprivation, the Indictment unlawfully attempts to criminalize conduct that is beyond the reach of the wire-fraud statute.  *Lew*, 875 F.2d at 222.

The government's attempts to distinguish *Lew* are unavailing.  First, the government argues that there will be "no need" for an instruction inconsistent with *Lew* because it has alleged only that Ms. Holmes made representations to "customers" for the purposes of obtaining their property.  Opp'n 10.  But, under *Lew*, the only "customers" who arguably could be victims of wire fraud here are patients who paid out of pocket for blood tests.[4]  The government cannot charge a scheme to defraud doctors and patients who did not pay Theranos for their tests.

---

[3] As the government recognizes, the Ninth Circuit's requirement that there be a relationship between the victim and the property at issue distinguishes it from several other circuits.  Opp'n 11 n.6; *see United States v. Greenberg*, 835 F.3d 295, 306 (2d Cir. 2016).

[4] Even for this limited group, the Indictment fails to allege wire fraud because, as set forth in Part IV, *infra*, the Indictment does not allege intent to defraud any patients.

1    Second, the government claims that there is an exception to *Lew* where property is obtained from

2    a victim through "third party distributors."  Opp'n 10 (citing *Ali*, 620 F.3d at 1067-68).[5]  *Ali* does not

3    create the exception that the government suggests.  In that case, the defendants deprived Microsoft of its

4    "right to full payment" by using companies they owned or purchased to abuse a Microsoft authorized

5    reseller program.  620 F.3d at 1070.  Applying *Lew*, the Court found that Microsoft was the both the

6    victim of the scheme and the entity from which the property was taken even though the property was

7    transferred from Microsoft to the defendants through a "third party distributor."  *See id.* at 1071

8    ("Further, under *Lew*, Microsoft [as the deceived party] must be the victim from whom property was

9    taken.").  Because the victim in *Ali* was both the target of the scheme and the source of the property, it

10   has no bearing here.  The government has not even attempted to explain how this "third party

11   distributor" theory would work in this case.  The third parties in *Ali* were companies owned or purchased

12   by the defendants in furtherance of their scheme.  *Ali*, 620 F.3d at 1071.  The government has not

13   identified any comparable third party in this case.

14       The government's reliance on *Bonallo*, a pre-*Lew* decision, is likewise misplaced.  Opp'n 11; *see*

15   *United States v. Bonallo*, 858 F.2d 1427 (9th Cir. 1988).  *Bonallo* involved "a scheme to defraud a bank"

16   by making unlawful ATM withdrawals from customer accounts.  *Id.* at 1428-29.  The court recognized

17   that the bank was the both the victim of the scheme and the party deprived of property.  *Id.* at 1434 n.9.

18   Indeed, *Lew* distinguished *Bonallo* for exactly this reason.  *Lew*, 875 F.2d at 222 ("*Bonallo* contained the

19   element that was missing . . . an intent to obtain money or property from the victim of the deceit.").

20   There is no such allegation in the Indictment with respect to the doctors or non-paying patients.[6]

21       Finally, the government mischaracterizes Ms. Holmes as arguing that the government must

22   allege and prove (1) "the identity of the fraud victim or the victim's ownership of the property" and

23

---

24   [5] The government also argues that *Ali* allows the government to proceed with a wire-fraud claim
25   without identifying a particular false statement.  Opp'n 10.  As addressed in Ms. Holmes' reply in
     support of her motion to dismiss the superseding indictment for failure to allege falsity, that argument is
26   irrelevant here.

     [6] The unpublished *Dowie* decision cited by the government is distinguishable on the same basis.
27   Opp'n 10; *see United States v. Dowie*, 411 F. App'x 21, 28 (9th Cir. 2010) (noting that a water utility
     was the victim of the deceit and deprived of "budgetary funds" even though those funds were managed
28   by the city, a separate entity).

REPLY IN SUPPORT OF MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN
CR-18-00258 EJD SVK

(2) that Ms. Holmes "actually obtained property directly from the victim." Opp'n 11. This contention

misunderstands both Ms. Holmes' argument and *Lew*. *Lew* concerned the element of specific intent to

defraud, holding that the defendant must have the intent to deprive the deceived party of money or

property. *See* 875 F.2d at 222. Ms. Holmes does not argue that *Lew* requires a successful scheme or

proof of a particular victim's identity. What *Lew* does require, and what the Indictment lacks, is an

allegation that Ms. Holmes had the intent to deprive the victims of the alleged scheme of *their* money or

property through deceit. The single case cited by the government provides no support for its contrary

position. Opp'n 11 (discussing *United States v. Crawford*, 239 F.3d 1086 (9th Cir. 2001)). *Crawford*

had nothing to do with the convergence requirement. Instead, it addressed whether the government must

prove the defendant's knowledge of the victim's identity or whether it sufficed to prove intent to defraud

a particular victim or group of victims. *Crawford*, 239 F.3d at 1092-93; *see also United States v. Green*,

2007 WL 9706398, at *2 (N.D. Cal. June 28, 2007) (interpreting *Crawford* to establish "that the

prosecution need not prove beyond a reasonable doubt the *identity* of the victim" but noting that there

must still "be a victim"). Therefore, even if the government need not prove the specific identity of a

particular victim, it must still prove that the victim was both the intended target of the deceit and the

person or entity whom the defendant sought to deprive of property.

**B.     The Indictment Fails To Allege Specific Intent To Collect Money from Doctors.**

The government cannot explain how the Indictment alleges that Ms. Holmes acted with specific

intent to obtain money or property from doctors. At most, the Indictment alleges that Ms. Holmes

encouraged and induced doctors to refer patients to Theranos for blood testing. Indictment ¶¶ 14, 15,

22. That does not allege a property deprivation.

According to the government, this "conclusory factual argument" requires the Court to "prejudge

the evidence," Opp'n 12, suggesting that perhaps Theranos did obtain property from doctors. But the

Indictment does not allege that it did, and one cannot deduce that counterintuitive proposition from the

Indictment.

The government suggests that *United States v. Harkonen*, 510 F. App'x 633 (9th Cir. 2013),

supports its contention that doctors are appropriate victims in this case. Opp'n 12. *Harkonen*, an

1  unpublished case, involved a defendant who challenged his wire-fraud conviction arising from a

2  misleading statement in a press release about a pharmaceutical product.  *Id.* at 636.  The sole issue on

3  appeal was whether the evidence proved that he was a knowing participant in the scheme.  *Id.*  In the

4  course of deciding that issue, the Ninth Circuit merely observed that the defendant knew the press

5  release was capable of "influencing the decisions of doctors."  *Id.*  It did not address the issues raised by

6  Ms. Holmes:  whether doctors are proper victims of a scheme and whether inducing doctors to act is

7  sufficient to establish wire fraud.  *See id.*  The government does not explain how *Harkonen* addresses

8  these questions.

9        Alternatively, the government seeks to salvage the references to doctors in the Indictment by

10  reframing them as unwilling participants in the alleged scheme.  Under this new theory, the alleged

11  representations to doctors are relevant "to the extent [Ms. Holmes] intended doctors to pass along

12  fraudulent information to their patients."  Opp'n 12.  There is no notice of this theory in the Indictment.

13  The Indictment does not allege that Ms. Holmes intended for doctors to pass along fraudulent

14  information.  Instead, it alleges that Ms. Holmes separately targeted each group.  *E.g.*, Indictment ¶ 14

15  (alleging that Ms. Holmes "encouraged and induced *doctors and patients*"); *id.* ¶ 22 ("by soliciting,

16  encouraging, or otherwise inducing *doctors to refer and patients to pay*").  To the extent there is any

17  connection alleged between doctors and patients, it is only that doctors referred patients to Theranos—

18  not that they relayed any supposedly false representations.  *E.g.*, Indictment ¶ 15 (claiming that patients

19  "sometimes follow[ed] referrals from their defrauded doctors").

20        The government also fails to muster any analogous legal authority to support its new theory.  The

21  government claims that Ms. Holmes' alleged representations are relevant even if not made directly to a

22  victim, so long as she "was the source of the misleading information."  Opp'n 12-13.  The single case

23  that the government cites—*United States v. Ciccone*, 219 F.3d 1079 (9th Cir. 2000)—is easily

24  distinguished.  *Ciccone* involved a telemarketing scheme where the defendant's employees made

25  misrepresentations to victims at the defendant's direction.  *Id.* at 1083-85.  There was no such

26  relationship between Ms. Holmes and the independent doctors she is claimed to have misled.  Even

27  under this alternative theory, the alleged scheme to defraud doctors should be dismissed.

28

**C.      The Indictment Fails To Allege Specific Intent To Collect Money from Patients Who Did Not Pay Theranos for Their Tests.**

Both the Indictment and the opposition acknowledge that many of the alleged patient victims did not pay Theranos for their tests.  Indictment ¶ 15; Opp'n 1, 11-12.  The government summarily dismisses this issue, arguing that it "does not matter" whether the patients or their insurers ultimately paid for their tests.  Opp'n 11.  As discussed above, it does matter under *Lew*.  *See* Part III.A, *supra*.

The government downplays this problem on the ground that Ms. Holmes acted with intent to separate patients from their money and that it is her intent "that controls the analysis here."  Opp'n 12.  The question at this stage, however, is what the government has alleged about that intent in the Indictment.  The Indictment alleges that Ms. Holmes targeted patients with misrepresentations in order to obtain money and property from their insurers.  *See* Indictment ¶¶ 15, 26.  That allegation is legally insufficient to support a charge for wire fraud and should be dismissed.  *See Lew*, 875 F.2d at 222.

The government further contends that to the extent insurers paid Theranos, those payments were "ultimately derived from, and indirectly reimbursed by, the covered patients."  Opp'n 12.  The government has not proffered any legal authority to support such a tenuous connection between the alleged victim and the property deprivation.  In any event, this argument ignores the realities of health insurance.  Premium payments from patients to their insurers cover a broad range of medical care. Insured patients are required to make premium payments regardless of whether they received blood testing services and regardless of whether they went to Theranos for blood tests.  The government cannot credibly allege that Ms. Holmes "deprived" anyone of property in the form of a health insurance premium when that premium would have been paid in any event.  For these reasons, the Indictment should be dismissed insofar as it charges a scheme to defraud patients who did not pay Theranos for their blood tests.

**IV.      The Indictment Does Not Allege an Intent To Defraud Any Patients.**

The Indictment should be dismissed as it relates to *all* patients for the independent reason that it does not sufficiently allege that Ms. Holmes acted with an intent to deceive patients as to the nature of their bargain with Theranos.  The government's responses on this point are unavailing.

REPLY IN SUPPORT OF MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN
CR-18-00258 EJD SVK

First, the government concedes that the Indictment must allege specific intent to obtain money or property by deception that goes to "the value of the bargain" struck with patients.  Opp'n 7; *see United States v. Takhalov*, 827 F.3d 1307, 1312-14 (11th Cir. 2016).  The government claims that the deception alleged in this case meets that standard, but it is unable to justify its position based on the allegations in the Indictment.  *See* Opp'n 6-8.  Instead, the government advances a new theory—one that goes well beyond the Indictment—to explain why the alleged deception goes to the value of the bargain.  Whereas the Indictment alleges misrepresentations regarding the accuracy and reliability of Theranos blood tests with the knowledge that Theranos could not consistently provide accurate and reliable results, *e.g.*, Indictment ¶¶ 15-16, the opposition alleges for the first time that:

- every test was inherently unreliable and could not be "trusted to convey correct information";
- every test was worthless and could not "provide a sound basis for medical treatment decisions";
- Ms. Holmes held out Theranos' services "for use in clinical settings" and "intended that patients would pay for testing that was not actually suitable for [their] medical needs";
- Ms. Holmes knew Theranos' tests were "not reliable enough for medical decision-making"; and
- the scheme is evidenced by Theranos' voiding "years of results from its proprietary analyzers" and refunding "test fees."

Opp'n 1, 7.[7]  The government does not even attempt to ground these claims in the Indictment, and it cannot now rely on them to argue that the alleged deception goes to the value of the bargain.[8]  *See United States v. Shellef*, 507 F.3d 82, 108-09 (2d Cir. 2007); *United States v. Kurtz*, 2008 WL 1820903, at *6 (W.D.N.Y. Apr. 21, 2008); *see also Keuylian*, 23 F. Supp. 3d at 1129-30.

Second, the government attempts to distinguish the legal authority cited by Ms. Holmes as cases "in which a party was tricked into engaging in what the defendant intended to be a fair transaction." Opp'n 7 n.4.  But that is at most what the government has alleged in the Indictment.  The Indictment

---

[7] The government's continued use of vague terms and phrases to describe Ms. Holmes' conduct and knowledge of the alleged falsity—*e.g.*, that she "held out" Theranos' services, and that she knew the tests were "not reliable enough for medical decision-making," that tests were "not capable of consistently producing accurate and reliable results," and that the "technology suffered from recurring problems," *see* Opp. 1-2—only further proves the deficiencies in the Indictment.  *See* Mot. 12.  Ms. Holmes addresses the government's flawed theory of "implicit" representations in the reply in support of her motion to dismiss the superseding indictment for lack of notice.

[8] For example, the Indictment identifies only eight tests where Ms. Holmes allegedly "knew that Theranos was not capable of consistently producing accurate and reliable results."  Indictment ¶ 16.  The new theory in the opposition suggests that the government envisions a much broader scheme that encompasses every test ever offered to the public by Theranos.

1   does not allege that Ms. Holmes did not intend to provide accurate and reliable test results, or that

2   Theranos could not provide accurate and reliable results.  It alleges only that Theranos could not do so

3   "consistently."  *See* Indictment ¶ 16.  But the Indictment neither defines that term nor identifies what

4   level of consistency a reasonable patient would expect given that all blood tests have error rates.  The

5   Indictment does not otherwise allege an intent to deceive patients about the price or an inherent

6   characteristic of the product.  It thus lacks allegations of fact to support the requisite intent to defraud

7   under the wire-fraud statute.  *See Takhalov*, 827 F.3d at 1313-14 (requiring an allegation about either the

8   price or an inherent characteristic of the good); *see also Sadler*, 750 F.3d at 590-91; *Shellef*, 507 F.3d at

9   108-09; *United States v. Starr*, 816 F.2d 94, 98-99 (2d Cir. 1987); *United States v. Regent Office Supply*

10  *Co.*, 421 F.2d 1174, 1182 (2d Cir. 1970).

11  **CONCLUSION**

12       For these reasons and those set forth in the opening motion, the Court should dismiss Counts

13  Two and Nine through Eleven of the Indictment.

14

15  DATED:  January 27, 2020                  Respectfully submitted,

16

17                           /s/ Amy Mason Saharia

18                           KEVIN DOWNEY
                               LANCE WADE

19                           AMY MASON SAHARIA
                               KATHERINE TREFZ

20                           Attorneys for Elizabeth Holmes

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 27, 2020, a copy of this filing was delivered via ECF on all counsel of record.

/s/ Amy Mason Saharia
AMY MASON SAHARIA
Attorney for Elizabeth Holmes

REPLY IN SUPPORT OF MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN
CR-18-00258 EJD SVK