1 | ADAM A. REEVES (NYBN 2363877)
Attorney for the United States,
2 | Acting Under Authority Conferred By 28 U.S.C. § 515

3 | HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division
4 |

5 | JEFF SCHENK (CABN 234355)
JOHN C. BOSTIC (CABN 264367)
ROBERT S. LEACH (CABN 196191)
6 | VANESSA BAEHR-JONES (CABN 281715)
Assistant United States Attorneys
7 |

8 | 150 Almaden Boulevard, Suite 900
San Jose, California 95113
Telephone: (408) 535-5061
9 | Fax: (408) 535-5066
Vanessa.Baehr-Jones@usdoj.gov
10 |

Attorneys for United States of America

**FILED**

**FEB 18 2020**

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA
SAN JOSE OFFICE

343

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 18-CR-00258 EJD |
| Plaintiff, | DECLARATION OF VANESSA BAEHR-JONES IN SUPPORT OF UNITED STATES' SUPPLEMENTAL BRIEF IN OPPOSITION TO DEFENDANT RAMESH BALWANI'S MOTION TO SEVER |
| v. | |
| ELIZABETH HOLMES and RAMESH "SUNNY" BALWANI, | |
| Defendant. | **[FILED PROVISIONALLY UNDER SEAL PURSUANT TO COURT ORDER OF JANUARY 13, 2020]** |

I, Vanessa Baehr-Jones, declare:

1.     I am an Assistant United States Attorney (AUSA) representing the United States of America, the plaintiff in this case.

2.     Attached hereto as Exhibit 1 is a true and correct copy of Defendant Abgail Gonzalez's Notice of Motions and Motions *In Limine*, in the case of *United States v. Gonzalez*, Case No. 3:12-CR-01278-BTM, Dkt. #427.

343

3.      Attached hereto as Exhibit 2 is a true and correct copy of the trial transcript for April 13, 2013, in the case of *United States v. Gonzalez*, Case No. 3:12-CR-01278-BTM.

4.      Attached hereto as Exhibit 3 is a true and correct copy of the Affidavit of Julie Hausman, in the case of *United States v. Carole Swan*, and *Marshall Swan*, Case No. 12-CR-27-JAW, Dkt. #133-1.

5.      Attached hereto as Exhibit 4 is a true and correct copy of the transcript for defendant Carole Swan's sentencing hearing, in the case of *United States v. Carole Swan*, Case No. 12-CR-27-JAW-1, Dkt. #417.

6.      Attached hereto as Exhibit 5 is a true and correct copy the district court's order denying defendant Carole Swan's emergency motion for release pending appeal, in the case of *United States v. Carole Swan*, Case No. 12-CR-27-JAW-1, Dkt. #392.

7.      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed at Oakland, California, on February 18, 2020.

DATED: February 18, 2020

VANESSA BAEHR-JONES
Assistant United States Attorney

DECL. OF VANESSA BAEHR-JONES
18-CR-00258 EJD
FILED UNDER SEAL

# EXHIBIT 1

1   Donald A. Nunn (SBN. 54232)
    Attorney at Law
2   13426 Community Rd.
    Poway, CA 92064
3   Telephone: (858) 748-8612
    Facsimile: (858) 748-3941
4

5   Attorney for: Defendant ABGAIL GONZALEZ (3)

6

7               UNITED STATES DISTRICT COURT

8             SOUTHERN DISTRICT OF CALIFORNIA

9
            (HONORABLE BARRY T. MOSKOWITZ)
10

11  UNITED STATES OF AMERICA,      )  Case No. 12-CR-1278-BTM
                                   )
12              Plaintiff,         )  DATE:  April 22, 2013
                                   )
13                                 )
                                   )
14  VS.                            )  TIME:   9:30 a.m.
                                   )
15  ABGAIL GONZALEZ (3),           )
                                   )
16                                 )  NOTICE OF MOTIONS AND
              Defendant.           )  MOTIONS IN LIMINE:
17                                 )
                                   )      1. TO COMPEL THE
18                                 )         GOVERNMENT TO
                                   )         PRODUCE REDACTED
19                                 )         COPIES OF ALL CO-
                                   )         DEFENDANTS'
20                                 )         STATEMENTS IT INTENDS
                                   )         TO OFFER AT TRIAL AT THE
21                                 )         EARLIEST POSSIBLE DATE;
                                   )
22                                 )      2. TO ALLOW CROSS-
                                   )         EXAMINATION OF AGENTS
23                                 )         AS TO WHY MS. GONZALEZ'
                                   )         INTERVIEW WAS NOT
24                                 )         RECORDED;
                                   )
25                                 )      3. TO ALLOW DIRECT
                                   )         EXAMINATION OF MS.
26                                 )
                                   )
27                                 )
                                   )
28                                 )

                               1
         Notice of Motions *in Limine* and Motions *in Limine*

1         )   GONZALEZ AS TO HER

           )   CHILDHOOD, UPBRINGING,

2         )   AND EDUCATION AND

3         )   DRUG USE;

4         )   4.  TO PRECLUDE EXPERT

           )       TESTIMONY;

5         )   5.  TO PRECLUDE FACT

6         )       WITNESSES FROM

           )       TESTIFYING AS EXPERTS;

7         )   6.  TO PRECLUDE 404(B) AND

8         )       609 EVIDENCE;

9         )   7.  TO ORDER PRODUCTION OF

           )       GRAND JURY

10       )       TRANSCRIPTS;

11       )   8.  TO ADMIT EXCULPATORY

12       )       STATEMENTS;

13       )   9.  TO EXCLUDE ANY

          )       STATEMENTS MADE BY

14       )       DEFENDANT IN VIOLATION

15       )       OF MIRANDA;

16       )   10.TO PRECLUDE CO-

          )       CONSPIRATOR

17       )       STATEMENTS ABSENT

18       )       INDEPENDENT EVIDENCE

          )       OF A CONSPIRACY;

19       )   11.TO EXCLUDE MS.

20       )       GONZALEZ' ALLEGED

          )       ADMISSION REGARDING

21       )       THE LEGALITY OF ACTIONS

22       )       TAKEN BY HER DURING

23       )       HER EMPLOYMENT WITH

          )       "APP" AND/OR "BYW";

24       )   12.TO PRECLUDE

25       )       GOVERNMENT WITNESSES

          )       FROM TESTIFYING ABOUT

26       )       THE TRUTHFULNESS OR

27       )       REASONABLENESS OF MS.

          )       GONZALEZ' INTERVIEW

28

1                                                   ) STATEMENTS OR FROM
                                                    ) MAKING MS. GONZALEZ
2                                                   ) COMMENT ON THE
                                                    ) VERACITY OF
3                                                   ) GOVERNMENT WITNESSES;
                                                    )
4                                                   ) 13. TO PRECLUDE THE USE OF
5                                                   ) GUILT-ASSUMING
                                                    ) HYPOTHETICALS;
6                                                   )
7                                                   ) 14. TO EXCLUDE THE
                                                    ) INDICTMENT FROM THE
8                                                   ) JURY ROOM;
                                                    )
9                                                   ) 15. FOR PRODUCTION OF ANY
                                                    ) SUPPLEMENTAL REPORTS;
10                                                  )
11                                                  ) 16. TO COMPEL THE
                                                    ) GOVERNMENT TO PROVIDE
12                                                  ) ITS EXHIBITS TO DEFENSE
                                                    ) COUNSEL ONE WEEK PRIOR
13                                                  ) TO TRIAL;
                                                    )
14                                                  ) 17. TO PRECLUDE
15                                                  ) PROSECUTORIAL
                                                    ) ARGUMENTS INVITING THE
16                                                  ) JURY TO "CHOOSE WHICH
                                                    ) STORY THEY ARE GOING
17                                                  ) TO BELIEVE";
                                                    )
18                                                  ) 18. TO PRECLUDE EVIDENCE
19                                                  ) NOT PRODUCED IN
                                                    ) DISCOVERY; AND
20                                                  )
                                                    ) 19. TO GRANT LEAVE TO FILE
21   _____                ) FURTHER MOTIONS

22   TO:   LAURA E. DUFFY, UNITED STATES ATTORNEY, AND
23         CHRISTOPHER M. ALEXANDER AND JERRY A. BEHNKE,
24         ASSISTANT UNITED STATES ATTORNEYS:

25         PLEASE TAKE NOTICE that on April 22, 2013 at 9:30 a.m., or as soon

26

27   thereafter as counsel may be heard, the Defendant, ABGAIL GONZALEZ (3), by

28

---

3

*Notice of Motions in Limine and Motions in Limine*

1   and through her attorney, Donald A. Nunn, will ask this Court to enter an order

2   granting the motions *in limine* listed below.

3

4                              **MOTIONS *IN LIMINE***

5        ABGAIL  GONZALEZ,  the  Defendant  in  this  case,  by  and  through  her

6   attorney,  Donald  A.  Nunn,  pursuant  to  the  Amendments  to  the  United  States

7

8   Constitution,  the  Federal  Rules  of  Criminal  Procedure,  and  all  other  applicable

9   statutes, case law, and local rules, hereby moves this Court for an order:

10

11      1.  To compel the government to produce redacted copies of all co-
            defendants' statements it intends to offer at trial at the earliest possible
12          date;
13      2.  To allow cross-examination of agents as to why Ms. Gonzalez' interview
            was not recorded;
14
15      3.  To allow direct examination of Ms. Gonzalez as to her childhood,
            upbringing, and education and drug use;
16      4.  To preclude expert testimony;
17      5.  To preclude fact witnesses from testifying as experts;
18      6.  To preclude 404(B) and 609 evidence;
19      7.  To order production of grand jury transcripts;
        8.  To admit exculpatory statements;
20      9.  To exclude any statements made by defendant in violation of Miranda;
21      10. To preclude co-conspirator statements absent independent evidence of a
            conspiracy;
22      11. To exclude Ms. Gonzalez' alleged admission regarding the legality of
23          actions taken by her during her employment with "APP" and/or "BYW;
24      12. To preclude government witnesses from testifying about the truthfulness
            or reasonableness of Ms. Gonzalez' interview statements or from making
25          Ms. Gonzalez comment on the veracity of government witnesses;
26      13. To preclude the use of guilt-assuming hypotheticals;
27      14. To exclude the indictment from the jury room;
        15. For production of any supplemental reports;
28

---
                                      4

16. To compel the government to provide its exhibits to defense counsel one week prior to trial;

17. To preclude prosecutorial arguments inviting the jury to "choose which story they are going to believe";

18. To preclude evidence not produced in discovery; and

19. To grant leave to file further motions.

These motions are based upon the instant motions and notice of motions *in limine*, the attached statement of facts and memorandum of points and authorities, and any and all other materials that may be adduced at the time of the hearing on these motions.

Dated: <u>April 5, 2013</u>                    Respectfully submitted,

                                                    <u>s/**Donald A. Nunn**</u>
                                                    Donald A. Nunn,
                                                    Attorney for Defendant ABGAIL
                                                        GONZALEZ (3)

**CERTIFICATE OF SERVICE**

I, Donald A. Nunn declare that:

I am, and was at the time of service of the papers herein referred to, over the age of 18 years and not a party to this action; and I am employed in the County of San Diego, California. My business address is 13426 Community Road. Poway, California.

I caused to be served by electronic mail on April 5, 2013:

NOTICE OF MOTIONS *IN LIMINE* AND MOTIONS *IN LIMINE*;
STATEMENT OF FACTS AND MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTIONS *IN LIMINE*

to the following:

- **Christopher Michael Alexander**
  Christopher.M.Alexander@usdoj.gov,jenna.sarinas@usdoj.gov,efile.dkt.gc1@usdoj.gov
- **Jerry A. Behnke**
  jerry.behnke@usdoj.gov,marla.negrete@usdoj.gov,monica.zamora2@usdoj.gov,efile.dkt.gc1@usdoj.gov
- **Gary Paul Burcham**
  gburcham@sbcglobal.net
- **Oliver P Cleary**
  opcleary@pacbell.net,Travis.Paul.Burleigh@gmail.com
- **Jami L Ferrara**
  jamiferrara@msn.com
- **Ricardo M Gonzalez**
  ricardo@attorneygonzalez.com,margaret_aguirre@hotmail.com
- **John Owen Lanahan**
  lawnahan@sbcglobal.net,jlanalaw@aol.com
- **Linda Lopez**
  Linda_Lopez@fd.org,sandra_riley@fd.org

1
- **Timothy G. Richardson , II**
2     tgr@mlgapc.com
3 - **L. Marcel Stewart**
     lmslaw@att.net
4 - **James J Warner**
     jjwarner@jwarnerlaw.com,jjwlaw@jwarnerlaw.com
5 - **Stephen Patrick White**
6     swhite@1950.sdcoxmail.com,margaret_aguirre@hotmail.com,cv621@cox.n
7     et

8

9

10                                   _s/Donald A. Nunn_____
                                     Donald A. Nunn,
11                                   Attorney for Defendant ABGAIL
12                                      GONZALEZ (3)

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Notice of Motions *in Limine* and Motions *in Limine*

1  Donald A. Nunn
   Attorney at Law SBN 54232
2  13426 Community Rd.
   Poway, CA  92064
3  Telephone:  (858) 748-8612
   Facsimile: (858) 748-3941
4

5  Attorney for:  Defendant ABGAIL GONZALEZ (3)

6

7  **UNITED STATES DISTRICT COURT**

8  **SOUTHERN DISTRICT OF CALIFORNIA**

9  **(HONORABLE BARRY T. MOSKOWITZ)**

10

11 UNITED STATES OF AMERICA,      )  Case No. 12-CR-1278-BTM
                                  )
12        Plaintiff,              )  DATE:   April 22, 2013
                                  )
13 VS.                            )  TIME:   9:30 a.m.
                                  )
14                                )
   ABGAIL CONZALEZ (3),           )  STATEMENT OF FACTS AND
15                                )  MEMORANDUM OF POINTS AND
                                  )  AUTHORITITES IN SUPPORT OF
16        Defendant.              )  DEFENDANT'S MOTIONS *IN*
                                  )  *LIMINE*
17 _____    )
18

19                    **INTRODUCTION**

20                 **STATEMENT OF FACTS**

21

22        On April 3, 2012, Defendant, Abgail Gonzalez (3), was indicted along with

23 nine other defendants on charges of mail and wire fraud, aiding and abetting,

24 conspiracy to commit mail and wire fraud, conspiracy to launder money, and

25 money laundering.  The charges arise from Ms. Gonzalez' employment with

26

27

28

Advanced Partnership Properties (APP), which was a mortgage processing center located in El Cajon, California, and BYW Construction (BYW).

The government alleges that fraudulent loan applications were processed through APP. The factual scenario alleged by the government is complex. The 13-page Indictment alleges a scheme and conspiracy to commit fraud relating to real estate transactions involving multiple properties located at 3522 and 3532 Meade Avenue in San Diego. Relating thereto, the Indictment alleges mail and wire fraud, as well as conspiracy to commit mail and wire fraud and conspiracy to launder monetary instruments.

The Indictment further alleges that it was part of the conspiracy for the defendants to deceive and defraud lenders into funding the Meade Avenue property purchases by filling out false loan applications upon which lenders relied to their detriment in approving loans for the property purchases. While the additional allegations in the Indictment are a great deal more complex than this concise summary, the government basically alleges that the defendants conspired to do a large number of other related actions that were all part of a general scheme and conspiracy to acquire real estate purchase loans fraudulently by misrepresenting the borrowers' intention to occupy the property, listing false asset information, misrepresenting borrowers' income, place and duration of employment, and source

1  of down payment, and supplying fraudulent documents including bank records in

2
3  support of the loan applications.

4                                        I.

5      **THE GOVERNMENT MUST PRODUCE REDACTED COPIES OF ALL**
6      **CO-DEFENDANTS' STATEMENTS IT INTENDS TO OFFER AT TRIAL**
7            **AT THE EARLIEST POSSIBLE DATE.**

8          The Government has indicated it intends to offer various statements made

9
10  by Ms. Gonzalez' co-defendants at trial.  At the last Status Hearing, held February

11  25, 2013, the Court and the parties discussed what information must be redacted

12  from those statements prior to trial.  The Court ruled no statements which would

13
14  violate <u>Bruton v. United States,</u> 391 U.S. 123 (1968), would be admitted at trial

15  and directed the Government to redact any codefendant statements it intended to

16
17  offer at trial accordingly.

18          As we are now within 30 days of trial, defense counsel must be provided

19  with all statements the Government intends to offer at trial in the format the

20
21  Government intends to offer them.  In order to adequately prepare for trial,

22  defense counsel must be given a reasonable amount of time to review the redacted

23
24  statements and make any further objections that might be necessary.  Thus,

25  defense counsel requests the Court order the Government to produce redacted

26

27

28

1  copies of all co-defendants' statements it intends to offer at trial at the earliest

2
3  possible date.

4      The government previously filed Case Documents 224-226 and 228-231

5  which were Declarations by the interviewing government agent concerning the
6
7  voluntariness of the interviews conducted with certain of the Defendants.  Copies

8  of the reports prepared by the agents were attached to these filings and redacted
9
   only personal identifiers in compliance with Court redaction rules. The statements
10
11 were not redacted as to inadmissible statements pertaining to Defendant Gonzalez.

12 The defense is asking for fully redacted statements in the form the government
13
   proposes to utilize at trial.
14

15                                    **II.**

16 <u>**DEFENSE COUNSEL MUST BE PERMITTED TO CROSS-EXAMINE**</u>
17 <u>**AGENTS AS TO WHY MS. GONZALEZ' INTERVIEW WAS NOT**</u>
   <u>**RECORDED.**</u>
18
19     On May 12, 2011, IRS Special Agent Darline Toussaint and FBI Special
20
21 Agent James Foushee interviewed Ms. Gonzalez in Chicago, Illinois.  The

22 interview lasted approximately two hours.  Counsel was not present, and the
23
   interview was not recorded.  A Memorandum of the Interview and Agent
24
25 Toussaint's notes have been produced by the government.

26

27

28

As the law currently stands, the failure to record an interview of this nature is not a legal basis for suppression of the statement itself. Up to now, the Ninth Circuit has declined to impose a rule requiring electronic recording even in a custodial setting. United States v. Smith-Baltiher, 424 F.3d 913, 925-26 (9th Cir. 2005).[1] Nevertheless, pursuant to the Sixth Amendment right to confrontation, defense counsel must be permitted to question the persons who conducted the interview as to why it was not recorded.

In United States v. Beckman, 222 F.3d 512, 525-26 (8th Cir. 2000), defense counsel asked the case agent who interviewed the accused and testified at trial whether or not he recorded his interview of the accused. The agent responded negatively. Id. at 525. Once the agent conceded his failure to record the interview,

---

[1] In Smith-Baltiher, the appellant argued his inculpatory statements should have been suppressed because the INS inspector "unreasonably" neglected to electronically record the interview. The panel noted the Ninth Circuit had decided this issue in United States v. Coades, 549 F.2d 1303 (9th Cir. 1977), when it "declined to mandate electronic recording" and determined the Coades decision was binding on the panel deciding Smith-Baltiher. What is significant about Smith-Baltiher holding is that the panel relied on case law that is now nearly forty (40) years old. Technological advancements have now made it possible to record an interview in almost any setting at any time. Further, the panel did not make a determination Coades was still sound law. Rather, it simply noted it was bound by the decision because only the court sitting en banc may overrule a prior decision. In the era of smart phones and blackberries with a multitude of voice recording functions and applications, inexpensive recording devices, the constant presence of recording equipment, the Ninth Circuit may very well be headed towards a new rule on this issue.

defense counsel attempted to elicit testimony from the agent as to <u>why</u> he failed to record the interview. <u>Id</u>. The government objected to the line of questioning, and the court sustained the objections.

On appeal, the Eighth Circuit noted the appellant's position "that the 'ability to tape-record and the conscious choice not to do so were important pieces of information going to the veracity of [the agent's] written report and the credibility of [the agent] in general.'" <u>Id</u>. The court agreed with this position. The court stated: "Testimony regarding the decision not to record a statement, despite access to [necessary] technology, could significantly alter the jury's perception of the accuracy of a [written version of the interview] and of a witness' credibility in general." <u>Id</u>. at 526. The court further noted that the cross-examination of officers on the details of interviews during which accused persons allegedly made inculpatory statements is essential to a defendant's Sixth Amendment right to confront and cross-examine witnesses. <u>Id</u>. Ms. Gonzalez respectfully requests this Court apply these principles to the case at hand and allow defense counsel to question Agents Toussaint and Foushee as to why they did not record their interview of her on May 12, 2011.

The government may attempt to distinguish the circumstances in which Ms. Gonzalez' allegedly made inculpatory statements and those in <u>Beckman</u>. For

example, unlike the appellant in that case, Ms. Gonzalez was not questioned in a traditional "custodial" setting, she had not been arrested, and there were no notes provided from the interview, only a typed report. But those facts were of no consequence in the circuit court's decision. The facts of consequence were that an accused person allegedly made inculpatory statements to a testifying agent who, though he or she had the means to record the interview, made the conscious choice not to do so.

Agents Toussaint and Foushee may have conducted their interview of Ms. Gonzalez' at a restaurant where they had no access to video-recording equipment, but they cannot deny that in 2011 they could have easily made an audio recording of their interview of Ms. Gonzalez if they had chosen to do so. In all likelihood, one or both of them had telephonic devices that would have easily permitted them to record the interview. Furthermore, they could have brought a voice recorder with them to the interview. Given their allegation Ms. Gonzalez voluntarily answered all of their questions, it seems unlikely she would have objected to the interview being recorded.

The government may also argue that Agents Toussaint and Foushee were merely following the policies of the Internal Revenue Service and Federal Bureau of Investigation in not recording the interview, and therefore their "decision" not to

record it is irrelevant.  But merely because something is "policy" or "standard procedure" does not mean the practice as followed in particular situation does not run afoul of the Constitution.  Nor does it necessarily mean that the policy was not relied upon in order to avoid close scrutiny of the circumstances under which Ms. Gonzalez and others allegedly made these inculpatory statements.  This is precisely the situation where close scrutiny is most important.  The discourse should be there, on tape and in print where reasonable, for prosecutors <u>and</u> defense counsel to listen to, to study, and to dissect.  And where, as here, the discourse could have reasonably been recorded and was not, at a minimum defense counsel should be permitted to make relevant inquiries of the interviewing agent(s).

Current case law may not require the suppression of statements interviewing agents unreasonably fail to record, but the Sixth Amendment does require thorough cross-examination on their failure to do so.  Therefore, Ms. Gonzalez respectfully requests the Court permit her to cross-examine Agents Toussaint and Foushee as to why their 2011 interview of her was not recorded.

## III.

### <u>DEFENSE COUNSEL MUST BE PERMITTED IN DEPTH QUESTIONING OF MS. GONZALEZ AS TO HER CHILDHOOD, UPBRINGING, EDUCATION, AND DRUG USE AT THE TIME OF THE ALLEGED CONSPIRACY, ON DIRECT EXAMINATION AS IT IS ESSENTIAL TO HER THEORY OF DEFENSE.</u>

Statement of Facts and Memorandum of Points and Authorities
In Support of Defendant's Motions *in Limine*

1      As previously noted, Ms. Gonzalez is charged with mail and wire fraud,

2

3 aiding and abetting, conspiracy to commit mail and wire fraud, conspiracy to

4 launder money, and money laundering.

5      With respect to conspiracy, "[o]ne becomes a member of a conspiracy by

6

7 willfully participating in the unlawful plan with the intent to advance or further

8 some object or purpose of the conspiracy, even though the person does not have

9

10 full knowledge of all the details of the conspiracy."  9th Cir. Crim. Jury Instr. 8.20

11 (2010) (emphasis added).

12      The Ninth Circuit has declined to specifically define "willfully," because, as

13

14 noted by the Supreme Court, "willful" is a word of "many meanings" and "its

15 construction [is] often…influenced by its context."  Ratzlaf v. United States, 510

16 U.S. 135, 141 (1994).  Recently, in a prosecution for social security fraud, the

17

18 court defined "willfully" as a "culpable state of mind."  United States v. Berry, 683

19 F.3d 1015, 1021 (9th Cir. 2012).  Earlier, in a healthcare fraud case, the court

20

21 defined a "willful" act as one one undertaken with a "bad purpose."  United States

22 v. Awad, 551 F.3d 930, 939 (9th Cir. 2009).  And, in a prosecution for securities

23

24 fraud, the court stated that willfully means "intentionally undertaking an act that

25 one knows to be wrongful," though it does not require that the actor know the

26 conduct was illegal.  United States v. Reyes, 577 F.3d 1069, 1080 (9th Cir. 2009).

27

28

1    In any event, regarding the conspiracy alleged here, the government must prove

2

3    beyond a reasonable doubt that Ms. Gonzalez understood her conduct was wrong

4    at the time she took the alleged actions.

5       Similarly, with respect to the charges of mail and wire fraud, the government

6

7    must prove beyond a reasonable doubt that Ms. Gonzalez "<u>knowingly</u> participated

8    in a scheme or plan to defraud, or a scheme or plan for obtaining money or

9

10    property by means of false or fraudulent pretenses, representations, or promises."

11    9th Cir. Crim. Jury Instr. 8.121 (2010) (emphasis added).  The same is true of

12    money laundering charges.  9th Cir. Crim. Jury Instr. 8.150 (2010).  Our appellate

13

14    court has defined "knowingly" as follows:  "An act is done knowingly if the

15    defendant is aware of the act and does not act through ignorance, mistake, or

16    accident."  9th Cir. Crim. Jury Instr. 5.6 (2010).

17

18       Ms. Gonzalez' theory of defense is that she did not know any actions taken

19    by her at the time she was employed by APP and/or BYW were wrongful, that she

20

21    was essentially duped by Merritt (2) and Jones (1), therefore she did not act

22    knowingly or willfully and is not guilty of any of the crimes alleged in the

23

24    Indictment.  In its Motions in Limine, the government specifically requested

25    defendants' not be permitted to refer to their education at trial.  But, in Ms.

26    Gonzalez' case defense counsel must be permitted to discuss Ms' Gonzalez'

27

28

Statement of Facts and Memorandum of Points and Authorities
In Support of Defendant's Motions *in Limine*

Case 3:12-cr-01278-BTM   Document 427-1   Filed 04/05/13   PageID.1386   Page 11 of 30

educational and personal background in depth as it is critical to her theory of defense.

Ms. Gonzalez had an extraordinarily difficult childhood. This upbringing is the reason why she did not go beyond the eighth grade in school. And, her very limited education goes directly to the issue of her intellectual limitations – i.e., whether she could have and/or should have understood the actions taken by her during her period of employment with APP and BYW were wrong. The treatment she received by those who were supposed to care for and provide for her as a child also explains how and why she would have gone along with Merritt's and Jones' scheme without requiring more information from them while working for their companies. The argument is not that Ms. Gonzalez did not know what she and others were doing during the relevant time period was illegal, but that she lacked the intellectual ability and comprehension skills necessary to even understand the actions taken by her and others were wrongful.

Defendants' level of education is something that comes up at nearly every stage of criminal proceedings. The courts inquire as to defendants' educational background at preliminary proceedings, plea hearings, and sentencing hearings. Probation officers discuss educational history with defendants during all presentence report interviews. One of the first questions defense attorneys ask

when meeting their clients for the first time, even before asking their version of the facts, is: "How far did you go in school?"  This is true in even the simplest of cases.  A primary basis for this inquiry is determining a particular defendants' level of culpability, her ability to understand the wrongfulness of her actions.  There can be no doubt that one's level of education is even more relevant and probative on the issues of knowledge and willfulness in a complex real estate and mortgage fraud case.

Furthermore, in Ms. Gonzalez' case it is not enough to simply inform the jury she only attended school through the eighth grade.  If left only with that fact, the jury will be misled and may well assume Ms. Gonzalez is simply a "dropout" who chose to quit school, and any resulting hardships, including the situation she finds herself in today, is through no one's fault but her own.  This assumption would unfairly prejudice Ms. Gonzalez.  Thus, Ms. Gonzalez should be permitted to explain to the jury why she stopped going to school when she was just fourteen (14) years old, that it was not by choice, but due to the unfortunate circumstances in her life over which she had no control.

Furthermore, the government knows for a fact from its own investigation, that during the time of the alleged conspiracy (specifically during the time when the government has alleged Ms. Gonzalez committed the charged crimes), she was

suffering from a serious drug addiction, that she would report to work "high", and would be immediately sent home by Jones(1) or Merritt(2).  This information is critically probative to the precise issues of knowledge, intent, and willfulness upon which the verdict will turn.  The jury must hear this evidence in order for Ms. Gonzalez' defense to be fully presented to, and understood by, the jury.

Ms. Gonzalez cannot prove her theory of defense without going into the details of her childhood, upbringing,  education, and drug use.  Thus, she respectfully requests the court permit defense counsel to question her on these issues at length on direct examination during trial.

## IV.

### THE COURT SHOULD PRECLUDE EXPERT TESTIMONY.

**A.  All Expert Witnesses Offered Without Requisite Notice To Defendant Violate Federal Rule Of Criminal Procedure 16(a)(1)(E) And Must Be Excluded.**

Federal Rule of Criminal Procedure 16(a)(1)(E) mandates that "[a]t the defendant's request, the government shall disclose to the defendant a written summary of testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case in chief at trial . . . The summary provided under this subdivision shall describe the witnesses' opinions, the bases and the reasons for those opinions, and the witness' qualifications." The

obligation to provide this material is ongoing, continuing prior to and during trial.
Fed. R. Crim. P. 16(c).

When a party fails to comply with the discovery rules set forth in Rule 16,
exclusion is a proper remedy.  Fed. R. Crim. P. 16(d)(2).  <u>See also</u> Advisory
Committee Notes to 1997 Amendment (asserting that "[u]nder rule 16(a)(1)(E), as
amended in 1993, the defense is <u>entitled</u> to disclosure of certain information about
expert witnesses which the government intends to call during the trial" (emphasis
added).

In its Motions <u>in Limine</u> filed November 13, 2012, the Government
indicated it intends to offer testimony of a handwriting expert and possibly
testimony from an "industry expert" regarding the loan application and funding
process.  The government has just provided (April 1) notice regarding the industry
expert.  Nothing has been provided relative to other experts.  The Court should
exclude any expert testimony as to which proper notice was not given.

**B.**     <u>**To The Extent This Court Permits The Government To Introduce
Expert Testimony, A Daubert Hearing Is Required**</u>.

If this Court determines that the government may introduce expert
testimony, Ms. Gonzalez is entitled to a hearing to determine the expert's
qualifications and the relevancy of the expert's proposed testimony.  <u>See</u> Fed. R.
Evid. 702, <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 150 (1999); <u>Daubert v.</u>

<u>Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993).  Ms. Gonzalez specifically requests such a hearing should the government introduce testimony regarding handwriting analysis and/or the loan application and funding process.

Further, with respect to handwriting analysis, "Faced with a proffer of expert scientific testimony, . . . . the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.  This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology can be applied to the facts in issue . . ." <u>Id.</u> at 592-93.

V.

## <u>THE COURT SHOULD PRECLUDE FACT WITNESSES FROM TESTIFYING AS EXPERTS.</u>

The Court should preclude fact witnesses, such as investigating agents, confidential informants, or cooperating defendants from testifying as both fact witnesses and experts.  As the Ninth Circuit acknowledged in <u>United States v. Freeman</u>, 498 F.3d 893 (9th Cir. 2007), and the Second Circuit has reiterated in <u>United States v. Mejia</u>, 545 F.3d 179 (2d Cir. 2008), special dangers arise when investigating agents are permitted to testify as experts.

1   First, agents who testify as experts receive "'unmerited credibility' for lay

2   testimony." Freeman, 498 F.3d at 903.  To this end, the lack of clarity regarding

3

4   the dual roles – expert and lay witness – creates a risk that there will an

5   "imprimatur of scientific or technical validity to the entirety of [the agent's]

6

7   testimony." Id.

8   Second, when agent-experts provide opinion testimony, unless closely

9
    monitored, the agent "'may come dangerously close to usurping the jury's
10

11  function…Such summarizing also implicates Rule 403 as a needless presentation

12  of cumulative evidence and a waste of time.'" Id. (citation omitted).

13
    Third, "the blurred distinction between [an agent's] expert and lay testimony
14

15  may [ ] allow [ ] him to rely upon and convey inadmissible hearsay evidence." Id.

16
    at 904.  Because the potential for prejudice is great and the need for any expert
17

18  testimony in this case is slight, the Government should not be permitted to elicit

19  opinion testimony from any agent or cooperating witness involved in investigating

20
    this case.
21

22                                    **VI.**

23
    **THIS COURT SHOULD PRECLUDE ANY EVIDENCE UNDER FEDERAL**
24  **RULE OF EVIDENCE 404(B) BECAUSE SUCH EVIDENCE CANNOT**
                 **SURVIVE A 403 BALANCING TEST.**
25

26

27

28

Because the government carries the burden of showing how any other acts evidence is relevant to one or more issues in the case, "it must articulate precisely *the evidential hypothesis* by which a fact or consequence may be inferred from the other acts evidence." United States v. Mehrmanesh, 689 F.2d 822, 830 (9th Cir. 1982) (citing United States v. Hernandez-Miranda, 601 F.2d 1104, 1108 (9th Cir.1979)) (emphasis added); accord United States v. Brooke, 4 F.3d 1480, 1483 (9th Cir. 1993).

Without specifying exactly to which Defendants it was referring, the Government indicated in its Motions in Limine that it intends to introduce "Defendants' multiple transactions as inextricabl[y] intertwined with the charged conduct." In the event, however, that the Court disagrees with that position the Government noted it would offer such evidence under 404(b).

The Government need only prove those acts alleged in the Indictment. To simply "pack on" evidence of other bad acts is wholly unnecessary. Under the circumstances presented here, its probative value is substantially outweighed by the danger of wasting time and needlessly presenting cumulative evidence. Fed. R. Evid. 403. Therefore, it should be excluded.

## VII.

## THE COURT SHOULD ORDER PRODUCTION OF GRAND JURY TRANSCRIPTS.

The Court should order production of grand jury transcripts when the defense can show a particularized need.  The particularized need present in this case is that a witness who likely will testify at the trial of Ms. Gonzalez is also likely to have testified before the grand jury.  The government must produce a transcript of a witness's testimony before the grand jury following the direct examination of a witness at trial.  18 U.S.C. §3500; <u>Dennis v. United States</u>, 384 U.S. 855 (1966); Fed. R. Crim. R. 26.2(f)(3). The defense requests that the government make such transcripts available in advance of trial to facilitate that orderly presentation of evidence and to remove any need for recess in the proceedings for defense counsel to examine the statements pursuant to Federal Rule of Criminal Procedure 26.2(d).

## VIII.

## THE COURT SHOULD ADMIT EXCULPATORY STATEMENTS

### A.  Fairness Dictates that Ms. Gonzalez Be Allowed to Admit Testimony About her Exculpatory Statements to Provide Context to Statements Offered by the Government.

Ms. Gonzalez anticipates the Government will seek to admit testimony about statements allegedly made by her.  She also anticipates the Government will seek to elicit testimony about only part of these statements.  If this turns out to be the case, Ms. Gonzalez requests that testimony about the entirety of her statements be

allowed.  Fairness dictates that Ms. Gonzalez be allowed to put into context any partial statement allegedly made by her that the Government seeks to admit. Under two related principles, this Court has the power to allow testimony about the entirety of Ms. Gonzalez' alleged statements, not just the statements specifically offered by the Government.

### 1.  *"Opened Door" Rationale*

The Ninth Circuit has historically allowed a party to introduce prior statements because they were "part of the same conversation or document from which impeaching inconsistent statements were drawn." United States v. Collicott, 92 F.3d 973, 979-80 (9th Cir. 1996).  Known as the "'opened door' rationale," this principle allows for admission of statements otherwise inadmissible as hearsay. Id. at 980-81.

If, as anticipated, the Government seeks to dislodge and admit a portion of Ms. Gonzalez' statements in an attempt to attack a part of her defense, Ms. Gonzalez must be allowed to introduce the remainder of her statements.  Allowing the Government to leave the impression that, in response to questioning by agents Ms. Gonzalez states one thing, and one thing only, would mislead the jury.  The Government should not be allowed to "pick and choose among prior statements to create an appearance of conflict and then object when this appearance is rebutted

1  by means of a fuller version of the same prior statement." Id. at 980 (quoting

2
3  United States v. Tarantino, 846 F.2d 1384, 1411 (D.C. Cir. 1988)).

4      **2. *Principle of Completeness***

5
6  A principle "intimately related to the 'opened door' rationale" is the

7  "Principle of Completeness." Id. at 982; see also United States v. Li, 55 F.3d 325,

8  329 (7th Cir. 1995).  This principle allows for introduction of a fuller, more

9
10 complete version of a statement to ensure that it is presented in its proper context.

11     As codified by Rule 106, the Principle of Completeness applies only to

12
13 writings and recorded statements admitted into evidence. Collicott, 92 F.3d at 982-

14 83; Li 55 F.3d at 329.  The operation of the Principle of Completeness, however, is

15 not necessarily limited to writings admitted into evidence, but extends to oral

16
17 statements.  See Collicott, 92 F.3d at 983 n.12; Li, 55 F3d at 329.  Rule 611(a)

18 "grants district courts the same authority regarding oral statements which Fed. R.

19 Evid. 106 grants regarding written and recorded statements." Li, 55 F.3d at 329.

20
21 Relevant to this Court's decision whether to admit a fuller version of Ms.

22 Gonzalez' statements is "whether (1) it explains the admitted evidence, (2) places

23
24 the admitted evidence in context, (3) avoids misleading the jury, and (4) ensures a

25 fair and impartial understanding of the evidence." Id.

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Allowing the Government to selectively choose which portions of Ms. Gonzalez' statements the jury will hear will be misleading.  Basic fairness dictates that Ms. Gonzalez be allowed to admit those portions of her statements that will explain and put in context those portions highlighted by the Government.

## IX.

## THE COURT SHOULD EXCLUDE ANY STATEMENTS MADE BY MS. GONZALEZ IN VIOLATION OF MIRANDA.

The Court should exclude any statements made by Ms. Gonzalez in violation of Miranda v. Arizona, 384 U.S. 436 (1966).  Though Agents Toussaint and Foushee advised Ms. Gonzalez she did not have to make a statement on May 12, 2011, they never advised her that they were going to use her statements against her if possible and prosecute her if possible.  The Fifth Amendment requires that no person "be compelled in any criminal case to be a witness against himself." Miranda was plainly intended to apply to situations where an individual is for all intents and purposes "tricked" into providing a statement to agents who fully intend to use that statement against her in a later criminal prosecution.  Therefore, Ms. Gonzalez respectfully requests the Court exclude her statement to Agents Toussaint and Foushee.

# X.

## THE COURT SHOULD PRECLUDE CO-CONSPIRATOR STATEMENTS ABSENT INDEPENDENT EVIDENCE OF A CONSPIRACY.

A co-conspirator's statement is admissible under Fed. R. Evid. 801(d)(2)(E) to show a defendant's participation in a conspiracy.  United States v. Peralta, 941 F.2d 1003, 1007 (9th Cir. 1991).  However, before admitting a statement of a co-conspirator into evidence against a defendant, the Court must have independent evidence of the existence of the conspiracy.  United States v. Layton, 720 F.2d 548, 555 (9th Cir. 1983); and Peralta, 941 F.2d at 1007.  This requires the Government prove three essential elements by a preponderance of the evidence before a co-conspirator's statement is admitted: (1) the existence of a conspiracy; (2) the declarant and the "non-offering party" (defendant) are involved in the conspiracy; and (3) the statements are made during the course and in furtherance of the conspiracy.  Bourjaily v. United States, 107 S. Ct. 2775, 2778 (1987).

A review of the indictment and relevant portions of the discovery reflect a conspiracy not involving Ms. Gonzalez.  The Government should be required to make an offer of proof as to which statements it will be offering against Ms. Gonzalez as there are many co-defendant statements irrelevant to the case against Ms. Gonzalez.

# XI.

## THE COURT SHOULD EXCLUDE ANY STATEMENT ALLEGEDLY MADE BY MS. GONZALEZ REGARDING THE LEGALITY OF ACTIONS TAKEN BY HER DURING HER EMPLOYMENT WITH "APP" AND/OR "BYW" BECAUSE IT IS AN OPINION SHE IS NOT QUALIFIED TO GIVE.

According to Agent Toussaint, during Ms. Gonzalez' interview on May 12, 2011, Ms. Gonzalez "at first stated that she did not realize what she was doing was wrong at the time that she worked with Jones and Merritt; however, she later realized that it was illegal."[2] First, the government should not be permitted to introduced this alleged statement because Ms. Gonzalez did not make it until the latter part of her two-hour interview, after the agents explained everything to her. In addition, it is a legal opinion Ms. Gonzalez is not qualified to give. She is not an expert on the intricacies of the relevant statutes. In fact, she did not even have reference to the elements of a specific crime at the time she made the statement. Further, the statement attributed to her by Agent Toussaint is that she "later realized it was illegal." What is at issue is Ms. Gonzalez' state of mind at the time of the alleged criminal acts. Therefore, this alleged statement should be excluded at trial because she is not qualified by expertise to render such an opinion and because it pertains to her state of mind at a time after the existence of the alleged

---

[2] BYW-RPRTS-000968.

conspiracy, a time which is irrelevant to her guilt or innocence during the time periods charged in the Indictment.

## XII.

### THE COURT SHOULD PRECLUDE GOVERNMENT WITNESSES FROM TESTIFYING ABOUT THE TRUTHFULNESS OR REASONABLENESS OF MS. GONZALEZ' INTERVIEW STATEMENTS OR FROM MAKING MS. GONZALEZ COMMENT ON THE VERACITY OF GOVERNMENT WITNESSES.

Ninth Circuit law precludes government law enforcement witnesses from opining as to the credibility of a witness. See United States v. Sanchez-Lima, 161 F.3d 545, 548 (9th Cir. 1998) ("This court has already held that opinion evidence regarding a witness' credibility is inadmissible."). The Ninth Circuit has also made it clear that questions on cross-examination of a defendant compelling the defendant give his or her opinion regarding the credibility of a government agent are improper. See United States v. Sanchez, 176 F.3d 1214, 1221 (9th Cir. 1999).

Allowing any government witnesses in this case to testify about the truthfulness or reasonableness of any of Ms. Gonzalez' statements or explanations for her actions would be error. Additionally, forcing Ms. Gonzalez, on cross-examination, to comment upon the veracity of a government witness likewise would be improper and should not be permitted. Ms. Gonzalez therefore moves for an order from this Court specifically precluding such testimony or questioning.

# XIII.

## THE COURT SHOULD PRECLUDE GUILT-ASSUMING HYPOTHETICALS BECAUSE THEY ARE CONTRARY TO THE PRESUMPTION OF INNOCENCE.

There are a number of constitutional issues that arise with respect to guilt-assuming hypotheticals.  Perhaps the most glaring problem with such questions is that they are entirely inconsistent with the presumption of innocence to which a defendant is entitled under the law.  As a result, courts have often condemned their use in the strongest terms: "We think, recollecting the trial of Galileo for heresy, the Salem witchcraft trials, and the trial of the Knave of Hearts, where an assumption of guilt was so strong it prompted the Queen to say 'sentence first – verdict afterward,' that to avoid these stains on the fabric of a fair trial courts must diligently guard against this type of unjust questioning."  United States v. Damblu, 134 F.3d 490, 491 (2d Cir. 1998); see also United States v. Mason, 993 F.2d 406, 409 (4th Cir. 1993) ("adherence to a basic concept of our justice system, the presumption of innocence, is not served by this line of questioning"); United States v. Barta, 888 F.2d 1220, 1224 (8th Cir. 1989) (guilt-assuming questions "str[ike] at the very heart of the presumption of innocence which is fundamental to Anglo-Saxon concepts of a fair trial.").

1    The government has asked the Court in its Motions in Limine to "allow
2
3    guilt-assuming hypotheticals…based upon the United States' offer of proof that it
4    will [later] prove Defendants' material false statements and omissions through
5    other witnesses during the trial." In other words, the government has asked the
6
7    Court to permit the presumption of guilt rather than innocence.

8        What the government wants is to be permitted to do imply guilt before guilt
9
10   has been established through the presentation of evidence.  This puts jurors in the
11   frame of mind that the defendants charged here are guilty before the government
12   has actually put on evidence that establishes their guilt.  This is precisely what the
13
14   presumption of innocence is intended to avoid.  To allow the assumption of guilt in
15   order to avoid the "unnecessary recall" of government witnesses is to place
16   efficiency and economy before fundamental fairness.  Therefore, Ms. Gonzalez
17
18   requests the Court to preclude guilt-assuming hypotheticals during the course of
19   trial.
20
21                          **XIV.**
22   **THE COURT SHOULD EXCLUDE THE INDICTMENT FROM THE JURY**
23                          **ROOM.**
24       Ms. Gonzalez urges the Court not to send the Indictment into the Jury Room.
25
26   The language in the instant indictment "tracks" the language of the charged
27   statutes.  Accordingly, it is probable that jurors will be persuaded by the
28

similarities alleged in the indictment returned by the grand jury and the elements which must be proven in the charged statutes to speculate that another jury-the grand jury-already made the relevant determinations in this case.  Similarly, the indictment recites that "the grand jury charges," and this could persuade those jurors without experience with the grand jury system that another jury had already found Ms. Gonzalez guilty.  Ms. Gonzalez also requests that this Court caution the jury that the indictment is not evidence.  See United States v. Utz, 886 F.2d. 1148, 1151-1152 (9th Cir. 1989).

## XV.

## THE COURT SHOULD COMPEL THE GOVERNMENT TO PRODUCE ANY SUPPLEMENTAL REPORTS.

Ms. Gonzalez requests disclosure of any "supplemental reports" generated in this case.  Such reports generally memorialize later investigation of the case and can include information that confirms a defendant's statements.  Ms. Gonzalez believes that such a report is discoverable under Brady v. Maryland, 373 U.S. 83 (1963), and Rule 16.  Additionally, pre-trial disclosure will avoid unnecessary delay at trial should the reports become producible under the Jencks Act, 18 U.S.C. § 3500.  See, e.g., Fed. F. Crim. P. 26.2(d).  If the Government contends that any "supplemental report" generated in this case is not discoverable, Ms. Gonzalez requests that the Court view this report *in camera*.

## XVI.

### THE COURT SHOULD COMPEL THE GOVERNMENT TO PROVIDE ITS EXHIBITS TO DEFENSE COUNSEL ONE WEEK PRIOR TO TRIAL.

In connection with any expert testimony, Ms. Gonzalez asks this Court to order the Government to identify for the defense, no later than one week before trial, its trial exhibits so that defense counsel can review these documents for the authenticity of any signatures of Ms. Gonzalez contained thereon.  Trial is approaching and in order to preserve CJA funds, Ms. Gonzalez moves for this order so that defense counsel can review any additional documents that may be used at trial without wasting CJA resources looking at documents that may not be used in this case.

## XVII.

### THE COURT SHOULD PRECLUDE PROSECUTORIAL ARGUMENTS INVITING THE JURY TO "CHOOSE WHICH STORY THEY ARE GOING TO BELIEVE" AS THEY AMOUNT TO BURDEN SHIFTING.

The Government, often during closing arguments, asks the jury to decide "which story they're going to believe," arguing that this determination will reveal whether the defendant is guilty or innocent.  The government's use of these arguments are blatant misstatements of the law, replace and shift the burden of proof, and must be forbidden.

The Government has the burden of proving Ms. Gonzalez' guilt beyond a reasonable doubt. 9th Cir. Crim. Jury Instr. 3.3 (2010). At issue in this trial is not whether Ms. Gonzalez can convince the jury to believe her version of the facts; the issue is whether the Government has proven theirs beyond a reasonable doubt. Any invitation to pick between two competing stories is misleading and a misstatement of the law. The jury's task is to decide whether the government has proven their case – not whether Ms. Gonzalez has proven hers. Any argument to the contrary should be precluded by this Court.

Similarly, the Government might argue that the defendant "either knew or she didn't [about whether or not she was doing something wrong.]" This too misstates the law. The Government must not only prove that Ms. Gonzalez acted knowingly, <u>they must prove this element beyond a reasonable doubt</u>. To argue that she either "knew or didn't know" ignores the reasonable doubt standard and implies a 50/50 inquiry akin to the preponderance of the evidence standard. Because Ms. Gonzalez is entitled to the correct burden of proof in this criminal prosecution, arguments as to "which story to believe" or "either she knew or didn't know" should not be allowed by this Court.

## XVIII.

## <u>THIS COURT SHOULD PRECLUDE EVIDENCE NOT PRODUCED DURING DISCOVERY.</u>

Statement of Facts and Memorandum of Points and Authorities
In Support of Defendant's Motions *in Limine*

1

2     Pursuant to Rule 16(d)(2), Ms. Gonzalez requests that the Court prohibit

3

      introduction at trial of any documents not yet produced in discovery.  Pursuant to

4

5     Federal Rule of Criminal Procedure 12(d)(2), Ms. Gonzalez requests that the

6     Court order the government to provide her with prompt written notice of its

7

      intention to use any discoverable evidence in its case-in-chief.

8

9                                      XIX.

10    **THIS COURT SHOULD GRANT MS. GONZALEZ LEAVE TO FILE**

11                        **FURTHER MOTIONS**

12         Ms. Gonzalez requests leave to file further motions as may be necessary.

13

14                                     XX.

15                               **CONCLUSION**

16

17         For the foregoing reasons, and for such other reasons as may appear at the

18    hearing on these motions, Ms. Gonzalez respectfully requests that the Court grant

19

      her motions, and accord such other relief as this Court deems just.

20

21    Dated: <u>April 5, 2013</u>.                  Respectfully submitted,

22

23                                  <u>  s/Donald A. Nunn  </u>

                                    Donald A. Nunn,

24                                  Attorney for Defendant ABGAIL

25                                     GONZALEZ (3)

26

27

28

---

                                       30
         Statement of Facts and Memorandum of Points and Authorities
              In Support of Defendant's Motions *in Limine*

# EXHIBIT 2

<pre>
 1                 UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF CALIFORNIA
 2

 3                              )
    UNITED STATES OF AMERICA,   )
 4                              )
                 Plaintiff,     ) Case No. 12cr1278BTM
 5                              )
                                )
 6                  vs.         )
                                )
 7   ABIGAIL GONZALEZ, KENDRICK )
     GREEN,                     )
 8                              )
                 Defendants.    )
 9                              ) San Diego, California
                                )
10                              ) April 13, 2013
                                )
11                              )
                                )
12

13                      Trial, Day 1

14        BEFORE THE HONORABLE BARRY TED MOSKOWITZ
               UNITED STATES DISTRICT JUDGE
15

16   APPEARANCES:

17   For the Plaintiff:           Laura Duffy
                                  Christopher M.  Alexander
18                                Jerry A. Behnke
                                  Assistant United States
19                                Attorney
                                  880 Front Street
20                                San Diego, CA 92102

21
     For the Defendant Gonzalez:  Donald A. Nunn
22                                Amber Rabon
                                  13426 Community Road
23                                Poway, CA 92064

24                                Oliver P. Cleary
     For the Defendant Green:     105 West F Street #41
25                                San Diego, CA 92101
</pre>

```
 1

 2
       Official Reporter:              Barbara Harris CM/RPR/CRR
 3                                     333 West Broadway
                                       San Diego, CA 92101
 4                                     619-990-3116

 5

 6
         San Diego, California   -   April 29, 2013, 11:30 a.m.
 7

 8

 9          THE COURT:  Sorry for the delay.  As you know, I

10   was having some medical results and they didn't like the      21:31:05

11   result the first time so they had to do it over again and it

12   just took longer.  And it's not the most pleasant experience.

13   So sorry for the delay but it's unavoidable.

14          THE CLERK:  Calendar matter number 1, 12cr1758,

15   United States vs. Abigail Gonzalez and Kendrick Green.         21:31:26

16          THE COURT:  Okay.  Appearances, please.

17          MR. NUNN:  Good morning, your Honor.  Donald Nunn

18   for Ms. Gonzalez who is present, as is Amber Rabon.

19          THE COURT:  Okay.  And we will take up the issue of

20   the CJA.  We will do that at the end before we break for       21:31:40

21   lunch.

22          MR. NUNN:  Thank you.

23          MR. CLEARY:  Oliver Cleary on behalf of Kendrick

24   Green.  He is before the court standing to my right on bond.

25          MR. ALEXANDER:  Christopher Alexander for the           21:31:52
```

1    United States.

2              MR. BEHNKE:  And Jerry Behnke for the United

3    States, your Honor.  Good morning.

4              THE COURT:  Let's go over jury selection.  First

5    let's talk about they're going to have -- I don't think we'll   21:32:01

6    get the jury selected today, and they'll have more jurors

7    tomorrow -- right, Rick -- in case we need more than we've

8    got; right?

9              THE CLERK:  We currently have requested 65.  I can

10   let them know today and they can make arrangements.           21:32:20

11             THE COURT:  Okay.

12             MR. NUNN:  Your Honor, may I ask one question

13   before we go there?

14             THE COURT:  Yes.

15             MR. NUNN:  We never did rule on the defense in     21:32:27

16   limine motions.

17             THE COURT:  Right.  Before opening statements we

18   are going to do that.  Is there any that you need decided

19   before jury selection?

20             MR. NUNN:  Absolutely.                             21:32:36

21             THE COURT:  Which one before jury selection?

22             MR. NUNN:  That would be the motion that was filed

23   at 6:30 this morning, but it was in the in limine motions and

24   it was either issue number one or number two in the in limine

25   motions.                                                     21:32:49

4

```
 1              It's the single most important issue I have.

 2              THE COURT:  Well, I did not see what you filed at

 3    six something this morning.

 4              MR. NUNN:  Yes, sir.  It was already addressed in

 5    the in limine motions.  It's just more in depth.          21:33:17

 6              THE COURT:  What is the number on it?

 7              MR. NUNN:  I'm looking for it, your Honor.

 8              THE COURT:  Is it number 475?

 9              MR. NUNN:  The in limine motions, your Honor?

10              THE COURT:  Right.  Is it Document 475?          21:33:34

11              MR. NUNN:  I can't even answer that until I find my

12    in limine motion.  Here it is.  I'm sorry to be disorganized

13    on the very first issue, your Honor.  I haven't laid my hands

14    on it yet.

15              MR. BEHNKE:  I believe this morning's filing is    21:34:08

16    Document 475, your Honor.

17              MR. NUNN:  It was defendant Gonzalez's motions in

18    limine, your Honor.  I can't answer which number it was.

19              THE COURT:  What was the other number, Rick?

20              THE CLERK:  427.                                  21:35:12

21              THE COURT:  Can you print that one out also.

22              THE CLERK:  Yes, sir.

23              MR. NUNN:  427-1 was the one that was filed this

24    morning.  I'm sure the court has already found it, but it was

25    issue number three in the motions in limine, your Honor.    21:38:05
```

| | |
|---|---|
| 1 | THE COURT:  Do you have it, Rick? |
| 2 | THE CLERK:  It's still printing. |
| 3 | THE COURT:  Is it the same as is raised in 475? |
| 4 | MR. NUNN:  Yes, sir. |

5       THE COURT:  So why don't we go with the                21:38:30

6  government's position.  Your position is set forth in the

7  papers?

8       MR. ALEXANDER:  Your Honor, it pretty much is.

9  What we've got here is a couple of issues.  First, what is

10  the defendant charged with; and, namely, what is the       21:38:44

11  relevance of this particular information.

12       THE COURT:  Keep going.  I'm cleaning my glasses

13  but I can still hear.

14       MR. ALEXANDER:  So the idea here is the United

15  States needs to prove, for example, knowledge and intent to  21:39:02

16  defraud.

17       What the relevance is of the defendant's past is at

18  best questionable, and if it did have any relevance the 403

19  concerns would be enormous relative to the information coming

20  in and potentially having a prejudice and bias to the jury.  21:39:30

21       In the United States' motions in limine we did seek

22  to exclude any evidence that would be utilized in order to

23  garner this type of sympathetic evidence.

24       The other concern is that it almost appears that

25  this is a mental defense for which there has been no notice.  21:39:55

1          And finally, there is a concern about, should the

2     defendant even elect to testify, whether she has an

3     appreciation of right and wrong relative to the oath that she

4     intends to take.

5          If she can't appreciate right and wrong in the          21:40:16

6     sense of placing information on an application that is going

7     to be under the penalties of perjury, then the same oath that

8     she is going to take when, or if, she elects to testify,

9     would also be implicated.

10         So for a variety of reasons, your Honor, we          21:40:38

11    certainly think that this evidence goes beyond the scale for

12    what will be admissible under a relevance ground.

13         Even if marginally relevant it's highly prejudicial

14    under 403 grounds.

15         And finally, as to the most recent filing which was 21:41:00

16    this morning, there was lack of notice relative to what is,

17    in essence, a mental defense.

18         MR. NUNN:  Your Honor, first of all, I disagree

19    strenuously with everything that the government just had to

20    say.          21:41:21

21         But, it is not only relevant, it is absolutely

22    critically relevant to the defense's entire theory of

23    defense, which is -- and it is not a mental defense.  It is

24    not a lack of ability to appreciate right and wrong.

25         What it is is an incredibly limited education,          21:41:38

1  which goes directly to the issue of knowledge and willfully

2  in terms of what the government needs to prove relative to

3  the joining of a conspiracy.

4          And I cannot explain to the jury any of this

5  without first being able to go into her educational          21:42:09

6  background in detail.

7          And then the reason that the other things that I

8  want to talk about are relevant is because they explain what

9  happened in her childhood that prevented her from having an

10 education.          21:42:33

11         And so it's not an inability to appreciate right

12 and wrong.  It's a simple-mindedness, as is in the motion

13 that was filed this morning, and the trusting of people who

14 are of superior intellect and superior knowledge.

15         And this will all become clear when she is on the          21:42:51

16 witness stand, but I cannot explain any of this to the jury

17 without the ability to do both the education and the reason

18 why she moved from place to place.

19         And the we also addressed in that, the motion this

20 morning, the 403 issue.  There are times I'm sure the court          21:43:10

21 knows that there has got to be the balancing, is it so

22 prejudicial, but in this case it's relevance clearly

23 outweighs the prejudicial effect of it.

24         And we have no purpose or intent to sway the jury

25 with sympathy.  We only want to explain to them why she had          21:43:31

1    to go from place to place to place to place and why she never

2    got any education.

3              And the thing specifically, so that the court knows

4    what I want to address, and I won't go into the details of

5    it, but, for example, when she was eight or nine years old,          21:43:49

6    she had to leave the mother's home because the stepfather

7    threw her down the stairs and broke both her right arm and

8    her right leg, and then the Department of Children and Family

9    Services took her into their custody.

10             Then they moved her to her grandmother's place, and       21:44:14

11   after a couple of years to her --

12             THE COURT:  Let me ask you this:  Assuming that

13   this is a terrible case of abuse, assuming that fact as true,

14   and right now the only evidence we have of it is your

15   proffered testimony of your client --                                 21:44:31

16             MR. NUNN:  Yes, sir.

17             THE COURT:  But accepting that as true, what's the

18   tie-in to a fraud case, without some mental health person

19   saying this affected her, it stunted her, she has a GAF of

20   below 70.  Her IQ has been stunted; that a person that this         21:44:47

21   happened to would be overly trusting.

22             One may speculate that a person that this all

23   happened to would be unnormally trusting of people because of

24   the way she was treated.

25             The long and short of it is you want the jurors to        21:45:10

1   be amateur psychologists and psychologists here.  You have no

2   expert testimony tying any of that to her mental condition.

3           Now, you have objective evidence which would be

4   admissible, that is, her lack of education.  She could

5   testify as to what grade she completed and if she was in a     21:45:25

6   special education class, et cetera.

7           That goes to her understanding of complicated

8   financial transactions.  That you can get out.

9           But all the evidence about how she was abused by a

10  stepfather, whether she was molested, et cetera, you have      21:45:47

11  nothing to tie that into this case.

12          It's Mr. Nunn on psychology saying that this

13  affected her and made her trust people.

14          And it's a little late.  You would have had to give

15  notice, either of an expert or under the Rule 12 series, and   21:46:06

16  the government would have been also entitled, if the court in

17  its discretion approved it, to an examination.

18          So what I will allow is I will allow specific

19  evidence of her lack of education and other specific things.

20          I really don't have a list of all the things that I   21:46:29

21  can say yes or no to, but in terms of any sexual molestation,

22  any stepfather throwing her down the stairs when she was a

23  child, seems to me to not be relevant without some other

24  connection which you don't have.

25          Furthermore, it is highly, absolutely highly,          21:46:49

1   overwhelmingly prejudicial.  It's a play to the jury.  Let

2   this woman off because she's had a terrible life.  That's

3   exactly what I see without any tie-in.

4         So its prejudicial factors overwhelmingly balances

5   out its probative value.  Without more, it adds very little        21:47:14

6   probative value.

7         What you would need is you would need a

8   psychologist to say, okay, I examined her, she had all these

9   issues, and because of that she would be afraid to ask -- a

10  person in that situation would be afraid to ask questions,         21:47:29

11  would be afraid to say no to anybody.

12        I don't know if that's the case.  But you need some

13  type of evidence like that.  You don't have it.  It's late in

14  the day.  I don't even know if such evidence would exist.

15  And it's just pure speculation that would exist.                   21:47:45

16        So if we're talking about lack of education, lack

17  of employment in the financial area, anything to show that

18  she did not have education and/or experience that related to

19  these types of transactions, that absolutely could come in.

20        But specific instances or -- you can bring in her       21:48:05

21  grades, that she got D's and F's.  That's objective.

22        But as to why, your opinion as to why, I just don't

23  think is admissible.  Its prejudicial value and effect

24  substantially outweighs its probative value.

25        MR. NUNN:  Well, let me just say this and I may        21:48:28

then -- then I'll ask one more question.  I think that the
tie-in is it explains the limited lack of education, but my
question then would be I at least need to be able to also
have her testify I moved at this age from place A to place B
and the series of moves that explains the interruption in the
education.

THE COURT:  Well, if you have the interruption in
the education, why do you need the moves?

MR. NUNN:  Because it explains I went from my
mother's house to my grandmother's house, so I was taken out
of this school, while I didn't go to school while I was at my
mother's house, and then I went to my grandmother's house and
I went to school.  I went to my aunts house.  I didn't go to
school.

I don't see how that prejudices the government at
all.  But it at least allows me to help explain the
interruption in education.

There is nothing 403 that is prejudicial in the
moves, I don't think.

THE COURT:  The government's position on that?

MR. ALEXANDER:  Your Honor, we object to that.  The
key is that what the defense wants to get in is, at least in
their statement, information about her education, but then
there is all this other information that they're trying to
bootstrap into that information.

```
 1            The point I think is crystal clear.  If the defense

 2    wants to get in information about her education, that's fine,

 3    but the further explanation is beyond what is necessary in

 4    order to accomplish the goal.

 5            And the goal here is to, in essence, argue that she  21:50:17

 6    has a lack of education.  And even the educational aspect

 7    relative to the element of the offense becomes somewhat

 8    marginal as far as its relevance.

 9            As long as she can appreciate that the information

10    that she was providing was incorrect, her level of education  21:50:42

11    beyond that is of marginal relevance.

12            So the further explanation as to why there were

13    interruptions I think again is of marginal relevance and

14    again is prejudicial.

15            THE COURT:  The reason for the moves is            21:51:04

16    substantially prejudicial and substantially outweighs any

17    probative value, but she can testify that we moved, that I

18    started the third -- I don't know what grade we're talking

19    about.  But, for example, I started the third grade and then

20    halfway through the third grade we moved and I was not       21:51:23

21    enrolled in another school the rest of the year.

22            You can bring that out to show lack of education

23    and interruption in education.  But what was the last grade

24    she finished?

25            MR. NUNN:  Seventh.                                21:51:39
```

```
 1              THE COURT:  All right.  Doesn't that say it all?

 2    Do you need more than that?  I really think that you have

 3    that -- you have that she did not complete any substantial

 4    education.

 5              The reason for it is much more prejudicial than      21:51:53

 6    probative, and there is no tie-in through a psychologist or

 7    anything else as to how it affects her mental condition.

 8              You would be asking all the jurors to be amateur

 9    psychologists, and essentially say this had to affect her,

10    when we don't know, we don't have an expert here that says it  21:52:14

11    did or did not.

12              MR. NUNN:  Well, can -- I understand, your Honor.

13    I understand the court's ruling on the reasons, but the court

14    has just told me I can't say that we moved from here to here.

15              Can I at least say from my mother's to my            21:52:31

16    grandmother's to my aunt's so that we have a frame of

17    reference?

18              THE COURT:  Why is that probative?

19              MR. NUNN:  Because it helps it flow, your Honor.

20    It helps it flow.  And I don't see how it's prejudicial        21:52:43

21    because I'm not going to be, as the court has ruled, I'm not

22    going to be talking about the molestation or the other

23    things.

24              THE COURT:  I think if she completed high school,

25    she graduated high school, and you wanted to contend that      21:52:55
```

1    that really does not show anything because she really didn't

2    get an education, she was moved from one person to another, I

3    think that would be relevant.

4         But once you bring out the last grade that she

5    attended was seventh grade, I think you have it.  And I don't    21:53:10

6    think that the fact that she was moved from a mother to an

7    aunt or this or that adds anything to that, but it is

8    substantially prejudicial.

9         MR. NUNN:  I don't understand how it's prejudicial,

10   your Honor, honestly.    21:53:26

11        THE COURT:  It tugs at the heart strings.  I

12   already feel sorry for her.  If you don't think that if she

13   is found guilty I am not going to take that into

14   consideration as a mitigating factor, then you don't know me.

15   The jurors are going to take that into account.    21:53:37

16        MR. NUNN:  I do know you and I do know this.

17        THE COURT:  You know I would take that into account

18   and the jurors would take that into account, but that is

19   not -- mitigation and circumstances relevant to the issues of

20   sentencing are not the issues for the jury.    21:53:48

21        And, you know, it's a sad situation, but they have

22   to decide this case based not on sadness or emotion.  And you

23   don't have a psychologist to say the movement -- if you had a

24   psychologist to say she was moved from here to there and that

25   affects -- that stunted her mental growth or had this effect    21:54:09

1    or that effect, I would be with you.  But you don't have

2    that.

3              MR. NUNN:  I don't think that's really what we want

4    to show the jury.

5              THE COURT:  What you want to show the jury is she          21:54:19

6    doesn't have any kind of education other than perhaps what

7    she learned on the street.  And did she even finish the

8    seventh grade?

9              MR. NUNN:  You asked me -- your Honor asked me what

10   was the last grade she finished.  She finished the seventh.        21:54:32

11   She went to a few months of eighth and that was it.

12             THE COURT:  There are very few defendants that we

13   have that are U.S. citizens that have that little education,

14   and so that will stick out like a sore thumb by itself.

15             The rest of it as to why that happened doesn't,          21:54:51

16   unless there is a tie-in by an expert, doesn't really add

17   anything.

18             But it is prejudicial, and it induces the emotion

19   of sympathy, and the jurors are not supposed to decide this

20   case based on sympathy.                                            21:55:11

21             MR. NUNN:  Just so I'm clear, I can ask her when

22   she went from one place to another because --

23             THE COURT:  Right.

24             MR. NUNN:  All right.  Because sometimes she didn't

25   go to school.  So I've got no way to explain it if I can't --      21:55:24

```
 1              THE COURT:  You can bring that out.

 2              MR. NUNN:  All right.

 3              THE COURT:  As support of why she didn't go to

 4   school.  But the fact that she went from a mother to an aunt

 5   to a grandmother, I really don't think adds anything, unless      21:55:34

 6   you have some other evidence that shows that it ties in.

 7              MR. NUNN:  I just think it explains the whole lack

 8   of education, your Honor, and I --

 9              THE COURT:  You do not need an explanation because

10   it's not going to be in dispute.                                  21:55:50

11              MR. NUNN:  Well...

12              THE COURT:  If the government tries to impeach her

13   saying, no, that's not true, she did -- you know, that she

14   was -- while she was in seventh grade she was in the Gate

15   class or something like that, I don't know, or what do they       21:56:05

16   call it, seminar or Gate or whatever, if they start to do

17   something like that, then I'll have to reconsider.

18              MR. NUNN:  Okay.  I understand.

19              THE COURT:  So you can get into her education or

20   lack of education, break in education, and the fact that she      21:56:21

21   moved around, because that is disruption in education.

22              So to say that she completed the sixth grade, but

23   if she moved around multiple times during that period that

24   would show a break in her education and that would have an

25   impact on the education objectively, anybody could see that.      21:56:40
```

1          What else?  So far I have, I'm saying you can't get

2    into molestation, physical abuse.  And how old was she when

3    that happened, the physical abuse?

4          MR. NUNN:  The physical abuse, seven to nine, and

5    then there were repeated molestations, your Honor, following          21:57:17

6    that.

7          THE COURT:  Does that somehow tie into the people

8    who were involved?

9          MR. NUNN:  I think it all ties into why she is who

10   you will see on the witness stand.          21:57:37

11         THE COURT:  But don't you need an expert to talk

12   about that?

13         MR. NUNN:  I don't think so, your Honor.  I

14   think -- I'm not saying that she doesn't have the ability to

15   distinguish right from wrong.          21:57:49

16         I'm saying that she is so entirely simple and

17   uneducated that she couldn't join a conspiracy unless

18   somebody said to her, "Abigail, I want you to do this, it's

19   illegal."

20         Short of that I don't think she has the cognitive          21:58:07

21   --

22         THE COURT:  I still think that you would need some

23   kind of mental health expert to tie in the molestation and

24   physical abuse to her inability to participate in a scheme of

25   dishonesty, whether that would affect her ability to          21:58:23

1    understand what is honest or dishonest.

2            The same way -- exactly what Mr. Alexander said.

3    Does that affect her ability to tell the truth here?  Or if

4    she just goes along with it, if she feels compelled to take

5    the stand because her lawyer tells her to take the stand,      21:58:46

6    does she think that she can lie?

7            It gets into a whole area of total speculation that

8    you would be asking the jurors and the court and yourself to

9    be amateur psychologists, and I just think that that's

10   dangerous, it's way beyond any kind of probative value, and    21:59:02

11   it is substantially prejudicial.

12           MR. NUNN:  Well, the court asked me if there was

13   anything else.  I do intend to ask her if she understood

14   these various things.

15           THE COURT:  Well, obviously you can do that.           21:59:20

16   Obviously you can do that.

17           MR. NUNN:  That's it.  I just --

18           THE COURT:  If you had something to tie in the

19   abuse that she suffered, like sometimes, you know, people get

20   abused and their situation -- and there are situations, and I   21:59:37

21   am not a psychologist, but I see that at sentencing where she

22   gets abused so, therefore, the men that they go to are

23   abusers.

24           Or, you know, the battered women syndrome where

25   they'll do something because of the way they're treated and    21:59:54

1   they feel that there is no way to escape.

2         If there was any of that here we would be in a

3   different situation, but you haven't offered anything like

4   that.

5         MR. NUNN:  I think it will be apparent when she is      22:00:05

6   on the witness stand, your Honor.

7         THE COURT:  Well, without more, ruling without

8   prejudice, you can't get into the molestation, the physical

9   abuse, at seven to nine and who she moved to.

10        Now, what else do you want to get in or those are     22:00:23

11  the only specifics I can rule on?

12        MR. NUNN:  I think so.  I was simply going to offer

13  a reason as to --

14        THE COURT:  You can get into the fact that she was

15  in the custody of either foster care or -- I don't know what  22:00:35

16  they call it in Chicago.

17        MR. NUNN:  Well, she was in foster homes twice and

18  she was also in the custody of the Chicago Department of

19  Children and Family Services.

20        I provided all of that documentation to the          22:00:51

21  government two or three weeks ago.  So am I permitted or not

22  permitted --

23        THE COURT:  What did you call that?

24        MR. NUNN:  Chicago Department of Children and

25  Family Services, I believe.  I might have --                 22:01:03

```
 1              THE COURT:  That would affect interruption in
 2   education.
 3              MR. NUNN:  Because maybe she was in grade six and
 4   --
 5              THE COURT:  You can get into that because that's      22:01:16
 6   the same as moving.  In other words, if they're in DCFS
 7   custody or in foster care, then they're obviously not in the
 8   local school.
 9              MR. NUNN:  So I can ask that?
10              THE COURT:  That deals with objective disruption in  22:01:30
11   the education process.  But as to why --
12              MR. NUNN:  I understand, no why.
13              THE COURT:  All right.  What else on your motion in
14   limine here?
15              MR. NUNN:  May I have just one moment?               22:02:03
16              THE COURT:  Sure.
17              MR. NUNN:  What else on the inn liminis, your
18   Honor?
19              THE COURT:  Yes.  And you need to be careful
20   bringing her testimony out.  It needs to be controlled.  I     22:02:27
21   don't want her to be volunteering.
22              MR. NUNN:  I understand that, your Honor.  I'm not
23   going to ask the questions I'm not supposed to ask.
24              THE COURT:  Well, but she has to understand what
25   she can testify to.  So you need to go over it with her.       22:02:44
```

```
1              And if there is anything else in specifics in
2     preparing her testimony before she actually testifies, you
3     can say, "Judge, he want to get into the following seven
4     things.  Can I get rulings on it?"
5              MR. NUNN:  We will do that to the very best of our      22:02:58
6     ability dealing with the limited educational issue that I've
7     already explained, but I can't imagine that we could have
8     spent more time with her than we already have, but we will do
9     that with regard to the court's ruling this morning.  We
10    spent an amazing amount of time with her.                        22:03:19
11             Your Honor, issue number two in the motion --
12             THE COURT:  Let me just raise this.  I'm concerned,
13    and, you know, she's presumed to be innocent, so there is a
14    presumption that there is not going to be a conviction, but
15    if there were a conviction, I'm concerned about this coming      22:03:54
16    back on the ground that you should have gotten a mental
17    health examination and you didn't, and that that would have
18    -- that that prejudiced her and the case would have come out
19    differently.
20             MR. NUNN:  Well, I don't have an answer to that,        22:04:16
21    your Honor, other than I didn't feel that that type of
22    testimony was going to get us where we needed to be.
23             I think that the jury needs to hear it from the
24    defendant, and that's my point of view on it.  I don't think
25    I need -- well, I don't think I want an expert trying to         22:04:42
```

1    convince the jury.  I want the jury to see it for themselves.

2              THE COURT:  Well, you do have the right to ask the

3    court for funds for such an examination.  I'm sure -- this

4    case isn't going to be over this week.

5              I'm sure there is a doctor who would do the                    22:05:07

6    examination.  For example, Dr. Kalish has often been

7    available to assist, whether it's the government or the

8    defense, on an expedited basis, and he's a psychiatrist.

9    Other psychologists, I'm sure they're available.  And that

10   option still exists.                                                     22:05:33

11             As to whether there would be prejudice to the

12   government and as to whether they could have their own

13   examination, I would have to take that up.

14             The government would have to weigh whether they

15   were going to -- if you want to offer that type of evidence             22:05:47

16   they would have to weigh, I forget whether it's 12.1 or 12.2

17   objections, the untimeliness of it, versus a risk that if

18   they got a conviction it would be overturned for you not

19   doing it many sooner.

20             So do you understand what I'm saying?                         22:06:07

21             MR. NUNN:  Yes, sir.

22             THE COURT:  But the funds would be available for

23   such an examination.

24             MR. NUNN:  I understand.

25             THE COURT:  All right.  If it's a tactical decision            22:06:17

1    not to have one, that's your choice.  But the funds are

2    available for that.

3              MR. NUNN:  Understood.

4              THE COURT:  But it would have to somehow tie in.

5    In the battered women syndrome cases it ties in as to their          22:06:34

6    participation, or whether they viewed it as duress.

7              Somehow it could have to tie into the understanding

8    of whether -- of a particular transaction.

9              But you can have the education, you can have the

10   fact that she was moved around, the lack of education, how           22:06:58

11   long she -- that her education was disrupted because of

12   moving around, being placed in foster care and DCFS custody

13   from time to time.

14             You could put all that in, but that's -- that still

15   doesn't give you an IQ or doesn't give you anything like             22:07:19

16   that, or a GAF, Global, I forget what the A stands for --

17   global assessment of functioning or something like that.  It

18   doesn't give you any of that.

19             MR. NUNN:  Understood.  We'll reevaluate, but to

20   this point it was tactical.                                          22:07:42

21             THE COURT:  Okay.

22             MR. NUNN:  I also want to be able to examine the

23   government's agents as to why, when they interviewed her, it

24   wasn't recorded.

25             THE COURT:  You're free to do that.                        22:08:03

1        MR. NUNN:   Okay.

2        THE COURT:   Now, what else on your motions in

3    limine that you need to know the answer for before we do jury

4    selection?

5        MR. NUNN:   I think that's probably all that I need    22:08:16

6    for my opening statement.

7        I would -- so we're still going to get a ruling on

8    the rest of it at some point?

9        THE COURT:   Before you have your opening statement.

10        MR. NUNN:   Okay.                                      22:08:39

11        THE COURT:   This is just what do you need an answer

12    to before jury selection.

13        MR. NUNN:   I think that's what I needed before jury

14    selection.

15        THE COURT:   Okay?                                     22:08:45

16        MR. NUNN:   Yes, sir.

17        THE COURT:   Now, let's get back to jury selection.

18    The first thing is, how many did we ask for, Rick, 65?

19        THE CLERK:   Yes.

20        THE COURT:   65 jurors, and if we need more we ask     22:08:55

21    for more for tomorrow.  I think we'll know right away whether

22    we are going to lose a lot of jurors because of the length of

23    the trial.

24        I'll tell them that the trial is going to be

25    approximately three weeks long.                           22:09:09

```
 1              MR. ALEXANDER:  And, your Honor, I'm sorry to

 2   interrupt, but Mr. Green's filing on Friday of his trial

 3   brief raised a couple of new issues which seem to have

 4   already been addressed, but now a couple of new issues, and

 5   the first is, and this would be important for us during the      22:09:36

 6   voir dire process --

 7              THE COURT:  Can you hold the thought for a second

 8   in.

 9              MR. ALEXANDER:  Sure.

10              THE COURT:  Let me cover the basic.  So my first       22:09:42

11   question is the jury clerk is going to place the people that

12   she summoned in random order, and you already should have a

13   list of the first --

14              THE CLERK:  They don't have the list yet.

15              THE COURT:  You will be getting the list              22:10:02

16   momentarily of the first 45 people.  So do you accept the

17   randomization of the jury clerk or do you wish the clerk to

18   rerandomize them here?

19              Does the government accept the randomization by the

20   jury clerk?                                                      22:10:20

21              MR. ALEXANDER:  Yes.

22              THE COURT:  Does the defense?

23              MR. NUNN:  Yes, your Honor.

24              MR. CLEARY:  Yes, your Honor.

25              THE COURT:  The next thing is number of alternates.   22:10:26
```

We expect the trial is going to go three weeks.  We are going to be partial on Friday, so we will go from 9:00 to 12:30 on Friday, and then I will take an hour break and do my calendar from 1:30 to 5:00, so to keep it moving.

So I was thinking three alternates, one for each week.  But let me hear your views. `22:10:49`

MR. ALEXANDER:  I agree.

MR. NUNN:  I don't have any issue with that.

MR. CLEARY:  I agree.

THE COURT:  Okay.  So check me if I'm wrong, but if there are three alternates, then I think you get two peremptories each side, if it's three to four.  Let me just look.  Yes, three to four, it's Rule 24, three to four.  Two additional peremptory challenges are permitted when three or four alternates are empanelled. `22:11:05` `22:11:41`

MR. NUNN:  Your Honor, we wanted to address the issue of how many we get to start with.

THE COURT:  I know that, and we will come back to that in a moment.  Okay.

So now how we select the jury.  Everybody will be questioned.  They will be seated in their random order, the number that they have been given. `22:11:56`

Once we have done excusals, once we have done challenges for cause, and once we have done peremptory challenges, the first 12 left will be the jury.  Everybody `22:12:15`

```
 1    understand that?  Yes?
 2              MR. CLEARY:  Yes.
 3              MR. NUNN:  Yes.
 4              MR. ALEXANDER:  Yes.
 5              THE COURT:  And you exercise your peremptories and      22:12:27
 6    your challenges for cause outside the presence of the jury,
 7    except if it's obvious.  If someone says, you know, "I work
 8    for the U.S. Attorney's Office," I would probably do that
 9    excusal right then and there.
10              But other times jurors may say something, for         22:12:44
11    example, a juror may say, "I believe everything a law
12    enforcement officer says, I wouldn't believe anything that a
13    non-law enforcement person says," I'm not going to excuse
14    them in front of the jury because I don't want the jurors to
15    know what the ticket out of here is, or if they want to stay   22:13:01
16    in this case, because they find it rather fascinating, what
17    they should say so they don't get discharged.
18              So all that is done outside the presence of the
19    jury.
20              Okay.  Any questions about that?                      22:13:14
21              MR. NUNN:  No.
22              MR. ALEXANDER:  No.
23              MR. CLEARY:  No, your Honor.
24              THE COURT:  Now let's get to your question, number
25    of peremptories.  The government gets six, and the defense     22:13:23
```

1    gets ten.

2            MR. NUNN:   Ten each, your Honor?

3            THE COURT:   Well, Rule 24(b)(2) says the government

4    has six peremptory challenges and the defendant or defendants

5    jointly have ten peremptory challenges when the defendant is     22:13:47

6    charged with a crime punishable by imprisonment of more than

7    one year.

8            MR. NUNN:   We are asking the court for ten each.

9            THE COURT:   And why is that?

10           MR. NUNN:   The more the better.                          22:13:59

11           THE COURT:   Well, do you have any other reason?

12   Given the rule, why should I deviate from the rule?   I can

13   deviate from the rule, but it would have to be good cause.

14           The "more the better" would mean that I should

15   deviate from the rule in every multi-defendant case.             22:14:16

16           MR. NUNN:   Yes, sir.   Because we're dealing with

17   conspiracy, and I think that there is a lot of esoteric

18   reasons that -- upon which the defense is going to have to

19   make its decisions about who it wants to excuse.   And for

20   that reason I just don't think ten for both defendants          22:14:44

21   jointly is sufficient.

22           THE COURT:   Mr. Cleary, what's your view?

23           MR. CLEARY:   I agree with Mr. Nunn that, due to the

24   complexity and the length of the trial that -- and because

25   there are two defendants, that there should be more            22:15:01

1    peremptories afforded.

2            Because, in fact, if you divide the defendants,

3    they would only get five each and the government would have

4    six.

5            And in relation to Mr. Green versus the government,    22:15:14

6    he would have five, they have six.  I know if you added to

7    Ms. Gonzalez it adds up to ten, but I think he should have --

8    because the system normally -- the reason the defendant has

9    more, is they give the defendant kind of an excuse in jury

10   selection to have a bit more challenges for whatever may come    22:15:36

11   up.

12           THE COURT:  But the rule is counter to that.  The

13   rule says ten jointly.  So your approach wouldn't be

14   appropriate under the rule.

15           And I think that the deeper question is how are you    22:15:51

16   going to exercise them.  There is a view I think in the rule

17   that the peremptories for defendants, they are likely to want

18   to excuse the same person.  And so to just give you extra

19   ones skews the balance that the rules have struck, that gives

20   ten to the defense and only six to the government.    22:16:15

21           There are circumstances where there is good cause

22   to increase the number for the defense, where there are some

23   inconsistencies between the defendants or some types of

24   jurors that one defendant may want to excuse but another

25   defendant may want to keep.    22:16:36

1      That I think is the good cause that you would have

2 to show, and that's what I'm looking for here.

3      MR. NUNN:  That's what I was just going to address,

4 your Honor.  The issues of bias are different for Ms.

5 Gonzalez and Mr. Green, because they are really accused in          22:16:51

6 completely different roles.

7      Mr. Green is accused as a buyer and Ms. Gonzalez is

8 accused as being in league with Ms. Jones and Ms. Merritt.

9 And so the issues that we're looking at in terms of bias or

10 prejudice are entirely different.                                   22:17:11

11      THE COURT:  Well, how would you propose -- if I

12 give you X, assuming X is an even number, how do you propose

13 you and Mr. Cleary exercising those?  A combination of

14 certain jointly and certain separately, or what is your

15 proposal?                                                           22:17:33

16      MR. NUNN:  Well, your Honor, I think we do intend

17 to put our heads together.

18      I would be happy if the court increased it to

19 whatever the court is willing to increase it and we'll work

20 together on that.  But we do have different reasons why we           22:17:46

21 want to excuse certain people.

22      THE COURT:  Well, be a little bit more specific

23 about that.  What is the type of person that you would want

24 to excuse that Mr. Cleary would not?

25      MR. NUNN:  May I have a moment, your Honor?                     22:18:11

```
 1          THE COURT:  Mr. Cleary, maybe you can answer that.
 2   What is the type of person that you would want to excuse that
 3   Mr. Nunn would not?
 4          MR. CLEARY:  Well, for example, one of the
 5   differences between the two defendants is that Ms. Gonzalez     22:18:22
 6   has a lack of education, and Mr. Green is not in the same
 7   position.
 8          So there may be reasons that Mr. Nunn would want to
 9   keep a juror on that has a lack of education, whereas Mr.
10   Green may find that an individual with a lack of education     22:18:40
11   may not be ideal from his perspective because of being unable
12   to relate to Mr. Green, per se, in relation to his education
13   level.
14          I don't oppose the idea of setting some peremptory
15   challenges that we would exercise jointly.  But I think that   22:19:04
16   there should be some peremptory challenges that we exercise
17   independently in case we disagree with a particular juror.
18          THE COURT:  So what is your proposal?
19          MR. CLEARY:  Well, if it has to be an even number,
20   let's say that the government --                               22:19:23
21          THE COURT:  It doesn't have to be.
22          MR. CLEARY:  Let's say we do eight, eight, and
23   eight, that would be 16 for the defense side and eight for
24   the government's side, and then the defendants would be able
25   to exercise maybe eight jointly and then four and four each    22:19:39
```

1    independently, or some proposal like that so that we could

2    have some independent exercising in case we disagreed on a

3    particular juror.

4            THE COURT:  Well, Mr. Nunn, do you want to add

5    anything?                                                    22:19:55

6            MR. NUNN:  Yes.  We also have a drug use issue for

7    Ms. Gonzalez and I don't believe Mr. Green has that.

8            THE COURT:  How is that going to tie in?

9            MR. NUNN:  We might excuse --

10           THE COURT:  Is the government going to offer any     22:20:09

11   such evidence of drug use.

12           MR. NUNN:  It's going to come in, your Honor.

13           MR. ALEXANDER:  We don't intend to introduce it in

14   our case-in-chief.  I guess that was one issue that remained

15   outstanding relative to this defendant, as far as motions in  22:20:22

16   limine were.

17           MR. NUNN:  The government is aware that there was a

18   period of time when Ms. Gonzalez had a cocaine addiction

19   problem, and she would show up at work high and would be sent

20   home and was eventually fired because of it.                 22:20:42

21           The government is aware of that.  It's not

22   something that we are just coming up with now.

23           THE COURT:  So you are going to bring that out.

24           MR. NUNN:  Yes, sir.

25           THE COURT:  The government, they're not going to be   22:20:51

1   bringing it out.

2          MR. NUNN:  Yes, sir, it's going to be brought out.

3          MR. ALEXANDER:  I guess the question is what is the

4   relevance of the drug use?  If the court finds it's relevant

5   then we'll likely address it in our case-in-chief.          22:21:01

6          THE COURT:  It somehow has to be tied in, for

7   example, that "I was high so I just signed off on this" or

8   "just processed this.  I really wasn't paying attention.  All

9   I was thinking about was getting drugs the next day."

10          I suppose since all this goes to the intent to         22:21:16

11   defraud and the understanding of what was going on, I suppose

12   that would be relevant.

13          MR. NUNN:  I would certainly hope so, that it's

14   relevant, because she was not paying attention and she was

15   just...                                                      22:21:36

16          THE COURT:  What if I gave the defense a total of

17   13, of which you would use seven jointly and three

18   separately?

19          MR. NUNN:  I like Mr. Cleary's suggestion, your

20   Honor.                                                       22:21:51

21          THE COURT:  I'm not going to in increase the

22   government's -- it's not going to be eight, eight, and eight.

23   I don't see any reason to increase the government's.

24          Just because I increase for multi-defendants I am

25   not going to increase the government's just because they have  22:22:02

```
1    two assistant U.S. attorneys.  So...
2               MR. CLEARY:  So that's three each separately to be
3    exercised; is that correct, your Honor?
4               THE COURT:  Right.  You know, at the end you could
5    say let's do them together, we agree.                         22:22:16
6               MR. CLEARY:  We may not use them all either.  It's
7    possible.  I would be in agreement with that number, your
8    Honor.
9               THE COURT:  Mr. Nunn?
10              MR. NUNN:  I capitulate, your Honor.               22:22:28
11              MR. ALEXANDER:  Your Honor, what is the sequence of
12   strikes that are likely to occur?  How is that going to work?
13              THE COURT:  Hold on a second.  All right.  The good
14   cause is there are some issues that I think you should have
15   separate ability to strike people separately about the drug   22:22:53
16   issue and the education issue, so I'm going to grant the
17   defense 13.  So that's three extras.
18              If you stipulate otherwise, you can exercise all 13
19   together, you can divide it up differently, but in the lack
20   of a stipulation amongst yourselves, you do seven jointly and 22:23:19
21   three each separately.  There is the 13.
22              But you can, amongst yourselves, change that
23   number, as long as you agree amongst yourselves, and you just
24   have to announce whether you agreed to change it amongst
25   yourselves.  Okay?  You don't have to say what it is.         22:23:46
```

1          Now, once all the jurors have been questioned by

2   me, by the lawyers, and they're outside, then the government

3   will mark down their six challenges and the defense will mark

4   down their 13 challenges.

5          Neither side will know who the other challenges          22:24:05

6   are.  I think sometimes they call that the Arizona method or

7   the blind strike method.

8          Then you will show your challenges to each other

9   and to the court and the court will hear any Batson

10  challenges, will then mark those people off.  We'll know who     22:24:17

11  at that point the first 12 are.  We will declare that they

12  are the 12 regular jurors, and then we will go onto the

13  exercise of peremptories as to the alternates.

14         I don't see any cause for increasing the challenge

15  for the alternates.  But technically the next -- if you each     22:24:35

16  get two challenges, that's four challenges plus we're going

17  to pick three alternates, so one of the next seven people who

18  are remaining after the 12 have been selected are logically

19  going to be one of the alternates.

20         MR. CLEARY:  Is that when we exercise the                 22:24:57

21  challenges as to them?

22         THE COURT:  Yes, after the 12 are picked then we

23  will do the alternates.  Okay?  So you will know who the 12

24  are before you have to exercise as to the alternate.  Any

25  questions?  No.                                                  22:25:08

```
 1              MR. NUNN:  No, your Honor.

 2              THE COURT:  Okay.  And if during the day you

 3    forget, outside the presence of the jury ask me and I'll

 4    explain it again.  All right.  So that took care of those

 5    issues.                                                        22:25:25

 6              Now let's go on to the jury questionnaire so we can

 7    get that typed up.  Does she have the statement?  Can you see

 8    if she has the statement, Rick.  Okay.

 9              MR. NUNN:  Your Honor, I submitted to Rick a few

10    additional questions that I just wanted the court to consider  22:25:48

11    whether they were different from the court's --

12              THE COURT:  Well, take a look at what I have in

13    here.  I'll add after six, the highest level of education.

14    What is the highest level of education that you have

15    completed?  Okay.  What else?                                  22:26:56

16              MR. NUNN:  Is the court asking for suggestions?

17              THE COURT:  Right.  What else would go on the

18    questionnaire?

19              MR. NUNN:  I would ask that the court inquire as to

20    whether anyone has a real estate license.                      22:27:32

21              THE COURT:  That's in number 15, have you been

22    employed or worked as a mortgage broker, real estate agent,

23    lending or loan officer, real estate appraiser, or any other

24    position regarding the purchase, sale, or financing of real

25    estate.                                                        22:27:50
```

```
 1            MR. ALEXANDER:  Your Honor, in light of the court's

 2    ruling relative to drug use, we would ask for a question

 3    regarding drug use history.

 4            MR. NUNN:  Right.  Also, your Honor, whether --

 5            THE COURT:  Hold on.  I can't write and listen.    22:28:31

 6            MR. NUNN:  I understand.  I'll wait.

 7            THE COURT:  So just about the jurors have you ever

 8    suffered from drug abuse, or do you think it's really

 9    relevant whether they had any family members who suffered

10    from it?                                                    22:28:56

11            MR. NUNN:  Yes, I do.

12            THE COURT:  Mr. Alexander?

13            MR. ALEXANDER:  No objection.

14            THE COURT:  That will be 12, have you or any

15    members of your family ever suffered from drug abuse.  Okay. 22:29:33

16    What else?

17            MR. NUNN:  Your Honor, a question about whether any

18    of the jury panelists are acquainted with each other.

19            THE COURT:  And why would that be relevant?

20            MR. NUNN:  Because if two of them happen to know     22:30:01

21    each other then they might, depending on the nature of their

22    relationship, one of them might listen to the other's opinion

23    and not give their own opinion.

24            THE COURT:  Any objection?

25            MR. ALEXANDER:  I don't think it's necessary.        22:30:25
```

```
 1              THE COURT:  You can ask that in voir dire because
 2     the problem is what's going to happen is they're not going to
 3     see all the jurors, so the first, say, several jurors that we
 4     do this afternoon aren't going to know the ones we bring in
 5     tomorrow, and then we run the risk of whether they add it.      22:30:39
 6     So the time to ask that is during attorney voir dire.
 7              MR. NUNN:  All right.
 8              THE COURT:  So you can ask that.
 9              MR. ALEXANDER:  Your Honor, we anticipate that we
10     are going to call coconspirators, and we think it would be      22:30:53
11     appropriate for the court to inquire relative to a co-
12     conspirator, whether a juror would automatically discount
13     their testimony.
14              THE COURT:  That's appropriate for attorney voir
15     dire but not for the court.                                     22:31:13
16              Okay.  Was there anything else you wanted added,
17     Mr. Behnke, Mr. Alexander?
18              MR. ALEXANDER:  Your Honor, relative to the lending
19     institutions, there are some jurors that have strong feelings
20     about Wall Street, bail-outs, that type of, those types of      22:31:27
21     feelings, and we think it would be appropriate for the court
22     to inquire as to whether the jurors would have a problem with
23     the victims that are identified here, being the lending
24     institutions.
25              THE COURT:  It's appropriate for attorney voir        22:31:51
```

```
 1    dire.  I'll let the attorneys cover that.  That's why I'm

 2    giving attorney voir dire, to cover situations like that.

 3    Anything else?  Mr. Nunn?

 4              MR. NUNN:  No, sir.

 5              THE COURT:  Mr. Cleary?                          22:32:07

 6              MR. CLEARY:  There was some issues I wanted to

 7    address regarding the submitted questions from the attorneys

 8    for the government on voir dire.

 9              THE COURT:  We are not there yet.  So now the

10    question is, so I can finalize the questionnaire, is there  22:32:17

11    anything else?

12              I've added what is the highest level of education

13    that you have completed, have you or any members of your

14    family ever suffered from drug abuse?  Anything else that you

15    want added?                                                22:32:39

16              MR. ALEXANDER:  Your Honor, we also anticipate the

17    introduction of the defendants' statements.  We would ask the

18    court to make that inquiry regarding statements.

19              THE COURT:  I think that's another item that if you

20    want to get into it you can get into during attorney voir    22:32:57

21    dire.

22              Okay.  Is there anything else for the jury

23    questionnaire?

24              MR. NUNN:  No, sir.

25              MR. CLEARY:  No, your Honor.                     22:33:07
```

```
 1              THE COURT:  Does she have that statement that I am

 2    going to read to the jury about what the case is about yet,

 3    Rick?

 4              THE CLERK:  She asked which one it was --

 5              THE COURT:  It's the one I hand wrote on the          22:33:19

 6    weekend.  Let's go over the government's proposed questions.

 7    You said you had some objections.

 8              MR. CLEARY:  There was only one, your Honor.  It's

 9    just the issue on number 14 on the government's list of

10    proposed voir dire.                                            22:33:38

11              THE COURT:  Right.  I'll instruct them on

12    reasonable doubt.  I don't want the government to give any

13    instructions on reasonable doubt.

14              So they can't give number 14.  I don't want the

15    government or the defense to be giving any instructions to    22:33:53

16    the jury during voir dire.

17              So, for example, Number seven, does everyone

18    understand the difference between circumstantial and direct

19    evidence?  That's an instruction.

20              If you want me to read the Ninth Circuit             22:34:11

21    instruction to them on circumstantial evidence and ask them

22    whether they would be able to follow it, I can do that, but

23    when you say does everyone understand, it looks like you're

24    instructing them.

25              Number eight, do you understand the court cannot     22:34:25
```

1    consider -- that you cannot consider any feelings or feelings

2    of pity.  You can ask that but in a different way.

3            Do you think that you would be able to put aside --

4    is there anyone here who feels that they would not be able to

5    put aside, but you just can't do it in a way that looks like    22:34:39

6    you are instructing the jury.

7            Number 12 is similar.  It looks like you are

8    instructing the jury.  So number 12 I won't allow in that

9    form.

10           The same thing with 13.  You can ask them, during       22:35:06

11   the trial you will hear the lawyers will make closing

12   arguments, they will make objections.  Will you be -- the

13   judge will tell you that that's not evidence.

14           Will you be able to decide it solely on the

15   evidence, something like that.  Any other objections that you   22:35:25

16   have, Mr. Cleary?

17           MR. CLEARY:  I was just looking over the questions.

18   I'm not sure if question number two is an instruction on the

19   law or not, so I was just raising that issue.

20           THE COURT:  No I don't see anything improper with       22:35:54

21   that.  Anything else?

22           MR. CLEARY:  No, your Honor.

23           THE COURT:  Mr. Nunn?

24           MR. NUNN:  Not about the government's.  I have

25   questions about --                                              22:36:09

1        THE COURT:  On the government's.

2        MR. NUNN:  No.

3        THE COURT:  So now we will go to Mr. Nunn's.  Does

4    the government have any objection?

5        MR. NUNN:  Actually they don't have all of mine,    22:36:25

6    your Honor.

7        THE COURT:  You don't have his?

8        MR. NUNN:  No.  The why don't we -- we'll pick up

9    with the -- we need to have government have an opportunity to

10   look at Mr. Nunn's questions.                               22:36:50

11       I didn't see anything, any problem with that, but I

12   would certainly entertain the government's objections.  And

13   you submitted some, too, right?

14       MR. CLEARY:  Yes, I did, your Honor, in the trial

15   brief I filed.                                              22:37:02

16       THE COURT:  Right.  So we'll have to go over those.

17   But let's get the process of picking the jury started, and

18   then we'll -- we are not going to get to attorney voir dire

19   today any way, so here is what I would tell the jury the case

20   is about.                                                   22:37:18

21       The indictment accuses Abigail Gonzalez and others

22   of setting up a mortgage processing company named Advanced

23   Partnership Properties and a company known as BYW

24   Construction, Inc.

25       The indictment accuses Ms. Gonzalez and others with 22:37:30

```
 1   processing materially false mortgage loan applications for

 2   condominiums at 3522 and 3532 Meade Avenue.

 3              MR. NUNN:   Meade is misspelled, your Honor.

 4              THE COURT:   Do you each have a copy of this, by the

 5   way?                                                    22:37:48

 6              MR. NUNN:   Yes.

 7              THE COURT:   It's M-e-a-d-e.

 8              MR. NUNN:   Yes.

 9              THE COURT:   Okay.   Avenue in San Diego.   The

10   indictment alleges that Ms. Gonzalez and those conspiring   22:37:54

11   with her knew that the mortgage loan applications were false.

12              The indictment accuses Mr. Kendrick Green with

13   knowingly participating in the alleged false mortgage loan

14   application scheme by submitting false loan applications and

15   receiving funds to purchase condominiums and cash.         22:38:09

16              So it's receiving -- it's receiving cash and funds

17   to purchase condominiums.

18              Any objection to this brief statement so the jurors

19   will know if they know anything about the case?

20              MR. NUNN:   No, sir.                              22:38:44

21              THE COURT:   Mr. Cleary?

22              MR. CLEARY:   Does that statement at the end there

23   make sense, to receive funds to purchase condominiums and

24   cash?

25              THE COURT:   No, it did not the way it was, so I   22:38:55
```

1    changed it.  It's already changed.

2            The indictment accuses Mr. Kendrick Green with

3    knowingly participating in the alleged false mortgage loan

4    application scheme by submitting false loan applications and

5    receiving cash and funds to purchase condominiums.                    22:39:08

6            MR. CLEARY:  I got it.  Okay.  That's fine, your

7    Honor.

8            THE COURT:  The government's position?

9            MR. ALEXANDER:  Your Honor, regarding the second

10   sentence, the defendants, in particular Mr. Green, purchased    22:39:22

11   properties not just at 3522 and 3532, but also at other

12   locations within San Diego.

13           THE COURT:  Is there going to be evidence of that?

14           MR. ALEXANDER:  Yes.  And as far as the scheme, the

15   scheme was broader than the condominium complex.                22:39:54

16           THE COURT:  So it should say applications for

17   condominiums at 3522 and 3532 Meade Avenue in San Diego

18   and --

19           MR. ALEXANDER:  Other properties within San Diego

20   County.                                                         22:40:18

21           THE COURT:  Okay, I'll add that.  Anything else?

22   Mr. Nunn, any problems with this?

23           MR. NUNN:  No, sir.

24           THE COURT:  Okay.  And before preliminary

25   instructions we will talk about what part of the indictment    22:40:44

1    I'm going to read to the jury.  Obviously I'm not going to

2    read the whole thing.

3            Okay, we will see you at 1:45.

4            MR. NUNN:  Thank you.

5            THE COURT:  Now, you'll have the jurors come up at    22:41:02

6    1:45.

7            THE CLERK:  I have already sent a message that they

8    are to be here then.

9            THE COURT:  And we will start with the jury

10   selection at 1:45.                                             22:41:09

11           MR. CLEARY:  Can we remove the list from the

12   courtroom to fill in our stickies?

13           THE COURT:  Sure.  They're yours.

14                        (Noon recess.)

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  I see all counsel and parties are
 2    present.  A couple -- the clerk is going to hand you the
 3    revised questionnaire.
 4              I just want to go over a couple of things before we
 5    actually call the jurors in.  Who is going to be sitting at      23:59:29
 6    the government table, assisting the government?
 7              MR. ALEXANDER:  Well, I guess --
 8              THE COURT:  I just need to know their names to
 9    introduce them to the jury.
10              MR. ALEXANDER:  Paralegal Nazish Karim (phonetic.)     23:59:53
11              AGENT TOUSSAINT:  Darline Toussaint, IRS Special
12    Agent.
13              THE COURT:  And is she the case agent?
14              MR. ALEXANDER:  Yes.
15              THE COURT:  So you're both going to be here during     00:00:32
16    the trial?  So I'm going to introduce you.  Just stand up,
17    look -- there will be jurors in the jury box, behind the
18    government table, and behind the defense table.  Just look
19    around in case anybody knows you.
20              MR. ALEXANDER:  After the court introduces them may    00:00:46
21    they be excused?
22              THE COURT:  Of course.  And who are you going to
23    have?  You are going to have, and we didn't take care of
24    this, but -- the CJA thing, but don't let me leave without
25    taking care of it at the end of the day.  I think it will be     00:01:04
```

1    pretty quick.

2              MR. NUNN:   Thank you.

3              THE COURT:   That's Amber Rabon.

4              MS. RABON:   Rabon.

5              THE COURT:   I'm sorry, Rabon.   And who else are you   00:01:12

6    going to have?

7              MR. NUNN:   Just Abigail.

8              THE COURT:   I'm going to introduce her.   Ms.

9    Gonzalez, and Mr. Green, at a certain point I will introduce

10   you and ask you to stand up and look around to see if any of   00:01:23

11   the jurors know you or think they know you.   Okay?

12             So you have to look over at the jury box, behind

13   the government and behind the defense table.

14             In terms of witnesses, is this the most recent list

15   from the government?   00:01:44

16             MR. ALEXANDER:   Yes, your Honor.   And the court

17   will note that there are still some lending institutions that

18   have not finalized who they intend to send.

19             THE COURT:   I am not going to mention a name there.

20   How about as to the defense?   I have -- Mr. Cleary, you have   00:01:57

21   Rudolph Green, Gloria Green, Daria Johnson, Donald Shore,

22   Aaron Jones, Kyle Scroggins, Angela Clark and Steven

23   Littlefield.   Anybody else?

24             MR. CLEARY:   I believe I have to put Dan Close on

25   the witness list.   He is contained in my --   00:02:19

1          THE COURT:  How do you spell his last name?

2          MR. CLEARY:  It's D-a-n --

3          THE COURT:  Daniel; right?

4          MR. CLEARY:  C-l-o-s-e.

5          THE COURT:  Anybody else?                    00:02:31

6          MR. CLEARY:  Did the court include Steven

7    Littlefield?

8          THE COURT:  Yes.

9          MR. CLEARY:  And I think that's it, your Honor.

10         THE COURT:  Okay.  Mr. Nunn?                  00:02:45

11         MR. NUNN:  I'm sorry, your Honor?

12         THE COURT:  Your witnesses.

13         MR. NUNN:  Yes.  Your Honor, aside from Ms.

14   Gonzalez, we have attorney John Howard who was the corporate

15   attorney for BYW --                                00:03:00

16         THE COURT:  You don't have to say who they are.

17         MR. NUNN:  And then Stacey Jones, we all know what

18   that's about, and then --

19         THE COURT:  Wait a minute.  That's not the number

20   one defendant; right?                              00:03:19

21         MR. NUNN:  Yes, it is.

22         THE COURT:  Hasn't she asserted the Fifth?

23         MR. NUNN:  I am just letting you know she is still

24   on my subpoena list.

25         THE COURT:  I won't introduce her because she is    00:03:26

```
1    not go going to be called; right?
2            MR. NUNN:  Right.  Then the other person would be
3    an individual named George Love who may or may not be here.
4            THE COURT:  Okay.  All right.
5            MR. ALEXANDER:  Your Honor, actually this gets back   00:03:45
6    to the point that I raised earlier, but we didn't actually
7    address.
8            Mr. Cleary has indicated that he would potentially
9    call two government agents.  We didn't move to quash the
10   subpoena because we were uncertain as to what was going to be   00:04:00
11   asserted as far as their testimony.
12           We got some clarification with the trial brief that
13   was filed on Friday.  It appears that Mr. Cleary intends to
14   introduce statements by other borrowers, not through the
15   other borrowers but through the agents themselves.   00:04:26
16           THE COURT:  Well, we will worry about that when we
17   get -- we will worry about that at a convenient period of
18   time before we get there.
19           MR. ALEXANDER:  Yes.
20           THE COURT:  Okay.  So when you think we're getting   00:04:38
21   close to that if you want to raise that so it will be
22   addressed.
23           MR. ALEXANDER:  Yes.
24           THE COURT:  Okay.  Any other questions before we
25   bring the jury in?  No?   00:04:52
```

```
 1              Okay.  We're going to use your seating chart;
 2    right?
 3              THE CLERK:  We are.
 4              THE COURT:  Certain of the jurors have been
 5    limited, and I don't know if they are on the list here, to    00:06:03
 6    one week.
 7              (The jury panel was seated.)
 8              THE COURT:  Ladies and gentlemen, good afternoon.
 9    Please have a seat, everybody.  My name is Barry Ted
10    Moskowitz.  I'm the chief district judge.                     00:15:03
11              And we are going to this afternoon and tomorrow
12    pick a jury of 15 persons to try a criminal case.
13              I'm going to tell you a little bit about the
14    criminal case in a moment, but before I tell you anything
15    about the case or ask you any questions, I want you to -- you 00:15:18
16    need to all take an oath that you will truthfully answer the
17    questions put to you bearing upon your qualifications to
18    serve as a juror in this case.
19              So if you could please all stand and raise your
20    right hand, and stat oath.                                    00:15:34
21              (The jury panel was duly sworn.)
22              THE COURT:  Okay.  You can have a seat.  Now, is
23    there anyone who is having any difficulty hearing me?  Please
24    raise your hand.  I see one hand.
25              Sir, do you have a hearing difficulty that we could 00:16:05
```

1    assist with?

2            PROSPECTIVE JUROR MARKLE:  Yes, I'm hard of

3    hearing.

4            THE COURT:  We have a device that should help you.

5    Rick will get it for you in a moment.                        00:16:15

6            Let me ask you this question.  Please raise your

7    hand, everybody in the jury box over here, if you have been

8    able to hear everything I have said so far.

9            Okay.  And that's everybody except that one

10   gentleman.  And your name is, sir?                           00:16:31

11           PROSPECTIVE JUROR MARKLE:  Sir?

12           THE COURT:  What is your name, sir?

13           PROSPECTIVE JUROR MARKLE:  Rick Markle.

14           THE COURT:  We are going to try this device.  The

15   way it works, this is like an antenna for a PA radio system. 00:16:42

16   This is like a receiver, so hopefully it should work very

17   well, but this is a brand new courthouse and courtroom so

18   there could be a little glitch.

19           If you serve as a juror and you have trouble

20   hearing anything, just raise your hand and we will make sure 00:17:00

21   that it gets repeated for you.

22           And the box back here, please raise your hand if

23   you have been able to hear everything I have said so far.

24                     (Affirmative response.)

25           THE COURT:  That's everyone.  And in the group back  00:17:13

```
 1   here, please raise your hand if you have been able to hear
 2   everything so far.  Okay.
 3              It's Mr. Markle; right?
 4              PROSPECTIVE JUROR MARKLE:  Yes.
 5              THE COURT:  Were you able to hear the oath?         00:18:08
 6              PROSPECTIVE JUROR MARKLE:  Yes, a little bit
 7   better, sir.
 8              THE COURT:  And is there anyone here, please raise
 9   your hand, if you did not take the oath.  I see no hands
10   raised.                                                       00:18:18
11              Does that work?
12              THE CLERK:  It's picking up background.  I can't
13   get it to switch to Channel 2 willed pick up directly from
14   the mic's.  If I can make a quick phone call I think I can
15   have it.                                                      00:19:12
16              THE COURT:  Okay, Mr. Markle.  I'm trying to think
17   of what we could do just until we get the device working
18   properly.  Are you able to hear me better if I'm right into
19   the microphone?
20              PROSPECTIVE JUROR MARKLE:  Yes, your Honor.        00:19:29
21              THE COURT:  We'll work on the device.  This is --
22   they have multiple channels and it's beyond my capacity to
23   understand, so they're going to call one of the technical
24   people.  But if you didn't hear something can you raise your
25   hand right away.                                              00:19:44
```

```
1              PROSPECTIVE JUROR MARKLE:  Yes, sir.

2              THE COURT:  Ladies and gentlemen, the first thing I

3    want to cover with you is the length of the trial.  The

4    normal trial week will be from Monday through Friday, and

5    then Friday afternoon I'll hear other unrelated matters in        00:20:00

6    other cases.

7              So we would be going -- we usually start around

8    9:30 and we go to about 4:30.  So we expect the case to be

9    presented to you over a three-week period, so that's this

10   week, next week, and the week after.                              00:20:18

11             Is there anyone, given the schedule, who could not

12   serve on this jury?  If so, please raise your hand.

13             Okay.  Let me take if you one at a time.  Juror

14   number 3, Mr. Crawford.  And it's John Crawford; right?

15             PROSPECTIVE JUROR CRAWFORD:  That would be correct.     00:20:40

16             THE COURT:  What would be the reason?

17             PROSPECTIVE JUROR CRAWFORD:  I have a trip planned

18   to Europe.  I'm also going to my son's graduation on the east

19   coast.

20             THE COURT:  When is that?                               00:20:47

21             PROSPECTIVE JUROR CRAWFORD:  I leave on the 9th.

22             THE COURT:  The 9th of June or May?

23             PROSPECTIVE JUROR CRAWFORD:  May.

24             THE COURT:  So I think -- did you advise the jury

25   clerk of this in advance?                                         00:20:56
```

1          PROSPECTIVE JUROR CRAWFORD:  Yes, I did.

2          THE COURT:  And did they give you a one-week

3    limitation?

4          PROSPECTIVE JUROR CRAWFORD:  They said they did not

5    think it would be a problem, that they would be able to          00:21:03

6    accommodate me.

7          THE COURT:  So the graduation is on -- during the

8    week?

9          PROSPECTIVE JUROR CRAWFORD:  It's on -- it's on

10   Friday and Saturday.                                             00:21:16

11         THE COURT:  And is it local or distant?

12         PROSPECTIVE JUROR CRAWFORD:  No, it's in Durham,

13   North Carolina.

14         THE COURT:  That's distant.  And then you said

15   you're going to Europe on the 9th?                              00:21:28

16         PROSPECTIVE JUROR CRAWFORD:  From there I'm going

17   on to Europe, yes.

18         THE COURT:  Under those circumstances is there any

19   objection to excusing Mr. Crawford?

20         MR. ALEXANDER:  No, your Honor.                           00:21:39

21         MR. NUNN:  No, sir.

22         MR. CLEARY:  No, your Honor.

23         THE COURT:  Okay.  Can you report to the jury clerk

24   and explain the reason why you were excused in this case.

25         PROSPECTIVE JUROR CRAWFORD:  Yes.                         00:21:50

1          THE COURT:  Okay.  Thank you.  Leave the

2    microphone, Mr. Crawford.  Thank you.

3          PROSPECTIVE JUROR BURGRAFF:  Tyler Burgraff.  I

4    have a business travel from the 9th to the 17th.

5          THE COURT:  And is that something that could be          00:22:08

6    rearranged?

7          PROSPECTIVE JUROR BURGRAFF:  No, it's a training

8    seminar in Maryland and my plane ticket and hotel is already

9    paid for.

10          THE COURT:  Okay.  Is there any objection to          00:22:21

11    excusing Mr. Burgraff?

12          MR. ALEXANDER:  No, your Honor.

13          MR. NUNN:  No, your Honor.

14          MR. CLEARY:  No, your Honor.

15          THE COURT:  Okay.  Thank you.  Please let the clerk   00:22:28

16    know.  Who is next?

17          PROSPECTIVE JUROR TORN:  Alexa Torn.  It's a

18    financial hardship for me.  My employer would only pay a

19    maximum of two weeks, so anything beyond that I wouldn't get

20    paid.                                                        00:22:43

21          And I'm a sole provider for myself, and as well as

22    my work situation.  They wouldn't be able to meet their

23    staffing need beyond two weeks at the maximum.

24          THE COURT:  Okay.  Does either side wish to make

25    further inquiry of Ms. Burgraff concerning -- it's Torn,     00:23:01

1   excuse me, concerning this.

2        MR. ALEXANDER:  No, your Honor.

3        MR. NUNN:  No, your Honor.

4        MR. CLEARY:  No, your Honor.

5        THE COURT:  Is it the parties' position -- does      00:23:09

6   anybody object to her being excused?

7        MR. ALEXANDER:  No, your Honor.

8        MR. NUNN:  No, your Honor.

9        MR. CLEARY:  No, your Honor.

10        THE COURT:  All right.  We will excuse you.  Please  00:23:18

11   notify the clerk.

12        Okay.  Who is next?

13        PROSPECTIVE JUROR SMOCK:  Hi.

14        THE COURT:  Are you Ms. Smock?

15        PROSPECTIVE JUROR SMOCK:  Yes.  It's also a          00:23:32

16   financial hardship.  My work only pays one week.  My husband

17   has cancer.  I need to be more available.

18        I couldn't do three weeks.  I could do a week and a

19   half or something, but not three weeks.

20        THE COURT:  Okay.  Does the government have any       00:23:48

21   objection to excusing Ms. Smock?

22        MR. ALEXANDER:  No.

23        THE COURT:  Does the defense?

24        MR. NUNN:  No objection.

25        MR. CLEARY:  No, your Honor.                          00:23:55

```
 1          PROSPECTIVE JUROR SMOCK:  Thank you.

 2          THE COURT:  Thank you.  Notify the clerk of that.

 3    Okay.  Next.

 4          PROSPECTIVE JUROR PANTOVIC:  Vicky Pantovic.  I run

 5    an elder care facility, and I have been available for the      00:24:09

 6    whole month of April, but I don't think I would be available

 7    to do three more weeks.  I've got one of my residents on

 8    hospice, so I kind of need to be there.

 9          THE COURT:  We'll make further inquiry because that

10    would involve a discussion about your job and things like      00:24:35

11    that and about the person who is in hospice care.  Okay?  So

12    we'll come back to you on that.

13          Okay.  Let's see who else.

14          PROSPECTIVE JUROR NAVARRETTE:  My name is John

15    Navarrette and I'm self-employed.  I am not being reimbursed   00:24:52

16    for jury service.  I'm a real estate broker and I'm a one-man

17    office.

18          THE COURT:  Okay.  And we will need to ask you some

19    further questions about that.  Okay?  So we'll get back to

20    you.                                                           00:25:14

21          Mr. Markle, how is that device working?

22          PROSPECTIVE JUROR MARKLE:  It's working okay, sir.

23          THE COURT:  Just raise your hand if there is any

24    kind of problem or you can't hear anything.

25          PROSPECTIVE JUROR MARKLE:  Okay.                         00:25:25
```

```
 1              THE COURT:  Okay.

 2              PROSPECTIVE JUROR TATE:  I'm Charlene Tate and I

 3   teach an ESL class, and it would be hard to get a substitute

 4   for three weeks.

 5              THE COURT:  What school system?                    00:25:35

 6              PROSPECTIVE JUROR TATE:  Crawford.

 7              THE COURT:  So San Diego Unified School District?

 8              PROSPECTIVE JUROR TATE:  Yes.

 9              THE COURT:  My wife teaches in the San Diego

10   Unified School District and she's been on several occasions   00:25:48

11   called for long trials and they seem to make arrangements.

12              Do you think -- and I have no idea whether you are

13   going to get picked, but if you get picked would they be able

14   to make similar arrangements as they have made for her?

15              PROSPECTIVE JUROR TATE:  Possibly.  But it's a     00:26:05

16   specialized -- it's not just, you know, a regular teacher, so

17   it's a little bit harder.

18              THE COURT:  Right.  Well, let's see.  Let's see

19   where we are and we will come back to you on that.  You would

20   have to, I guess, make some inquiry.  Okay.                   00:26:23

21              PROSPECTIVE JUROR JACOBS:  My name is Lisa Jacobs

22   and my employer only does cover one week of jury service.

23   And I'm in the middle of a few major negotiations.

24              I work for Eldrick Communications, so three weeks

25   'is a little longer than I have.                              00:26:45
```

```
 1              THE COURT:  Okay.  The question is -- I know you
 2   would only get paid for the one week, but for the other two
 3   weeks how much of a financial hardship would it be?
 4              PROSPECTIVE JUROR JACOBS:  I would have to check
 5   and see what I have in my vacation, but that's the main          00:27:03
 6   thing, as far as the vacation schedules and kids graduating
 7   from Marine Corps basic training, and so forth.
 8              So I would be using up all my vacation that I need
 9   for later on for graduations.
10              THE COURT:  We will come back to you on that and we   00:27:29
11   will need to ask you some further questions.
12              PROSPECTIVE JUROR MARKLE:  My name is Rick Markle.
13   I work for Pepsi Bottling Group.  My employer only covers for
14   one week of jury service, and I'm the sole proprietor of my
15   family and I would not be able to get by being unpaid for two   00:27:46
16   additional weeks.
17              THE COURT:  Okay.  We would have to ask you some
18   further questions about that.  We would do it individually.
19              In other words, I have to make an inquiry about
20   your income and your expenses in general to see if it would     00:28:06
21   be, in fact, a hardship.
22              Okay.  So we would do that individually because
23   that's your personal business.  So we will come back to you
24   on that.
25              Who else is there?                                   00:28:19
```

```
 1            PROSPECTIVE JUROR JERJEES:  My name is Matthew

 2    Jerjees.  I'm a real estate agent.  I have a couple of deals

 3    that are open right now.

 4            And I'm the only sole provider of my family's

 5    income and I do not have any assistant to follow up on it.  I    00:28:30

 6    am able to attend a couple of days but not throughout the

 7    whole three weeks.

 8            THE COURT:  Okay.  Well, we will come back to you

 9    on that.  Okay.  Is there anyone else there?

10            PROSPECTIVE JUROR MAEDA:  Hi.  My name is Claudia    00:28:43

11    Maeda.  I actually - I'm from Calexico.  I actually have a

12    special situation as far as I'm in my first pregnancy, with

13    special medical conditions that I would rather speak to you

14    about or someone else about, it's a little personal.

15            And I have two uncles who are -- one is a fire    00:29:01

16    chief and one is a police officer.  My father-in-law is a

17    retired police chief and that --

18            THE COURT:  Let me just ask you, because you

19    wouldn't be disqualified from serving on a jury if you have a

20    relative or friend in law enforcement, but did the doctor    00:29:20

21    tell you in particular about travel restrictions or

22    restriction-s, I mean, without telling us the condition, did

23    the doctor give you any restrictions?

24            PROSPECTIVE JUROR MAEDA:  Not -- just I have to

25    take it easy, but I would need to go to the restroom a lot.    00:29:35
```

1    I don't know if that would be a problem.

2             THE COURT:  Well, that wouldn't be a problem.   I'm

3    more concerned if there is, you know, anything that could

4    affect your pregnancy by you sitting on the jury.

5             Did you mention to the doctor that you were going        00:29:53

6    to --

7             PROSPECTIVE JUROR MEADA:  No.   I actually have an

8    appointment on Wednesday.

9             THE COURT:  Okay.  So even if you told me what the

10   specific condition is I'm not sure that it would help me        00:30:01

11   because I'm more concerned for you.  If jury duty could in

12   any way impact your pregnancy it wouldn't be a good thing to

13   do it, whether it's for a week or three weeks.  So you're

14   from Calexico; right?

15            PROSPECTIVE JUROR MAEDA:  Yes.                          00:30:23

16            THE COURT:  So what would you do?  You would stay

17   here?  I think they compensate you for staying in San Diego

18   during the week.

19            PROSPECTIVE JUROR MAEDA:  Yes.

20            THE COURT:  And would that create any kind of           00:30:31

21   problem?

22            PROSPECTIVE JUROR MAEDA:  Just it would have to

23   be -- I wouldn't be driving back and forth, which is good,

24   but like I say, I have that checkup appointment on Wednesday

25   at 3:30.                                                        00:30:44

```
1              THE COURT:  Okay.  And that I assume is in the

2    valley.

3              PROSPECTIVE JUROR MAEDA:  Yes.

4              THE COURT:  And how often do you have other

5    appointments?                                              00:30:52

6              PROSPECTIVE JUROR MAEDA:  This is my first

7    pregnancy so I don't know how that works.

8              THE COURT:  How far along are you?

9              PROSPECTIVE JUROR MAEDAS:  14 weeks.

10             THE COURT:  Under the circumstances why don't we  00:31:01

11   just take that up a little further privately.  Okay?

12             PROSPECTIVE JUROR MAEDAS:  Yes.  Thank you.

13             THE COURT:  Okay.  So why don't you hold that

14   thought.  All right.  So if we can pass the microphone to the

15   group in the back.                                         00:31:25

16             Oh, I'm sorry, we have another juror.  You're Mr.

17   Vilches.

18             PROSPECTIVE JUROR VILCHES:  Right.  Similarly to

19   others, I only get paid for one week and I'm the sole

20   provider.  It would create a financial hardship for the other 00:31:41

21   two weeks.

22             THE COURT:  Well, I'll have to, you know, ask you

23   some personal questions about that.

24             PROSPECTIVE JUROR VILCHES:  Thank you.

25             THE COURT:  So hold the thought.  If we can pass  00:31:51
```

63

1    the microphone all the way over to the back there.   Okay.

2    You're --

3              PROSPECTIVE JUROR LANCASTER:  Valorie Lancaster.

4              THE COURT:   Okay.

5              PROSPECTIVE JUROR LANCASTER:  My employer    pays        00:32:10

6    for two weeks and the other week would have to come out of my

7    personal time.

8              I was planning on using the personal time to

9    volunteer for my sons Cub Scout day camp during the summer.

10   So otherwise I'm the sole provider of three kids, so --          00:32:31

11             THE COURT:  Well, I'll have to ask you, you're Ms.

12   Lancaster, some questions individually.

13             PROSPECTIVE JUROR LANCASTER:   Okay.

14             THE COURT:  So hold that thought.

15             PROSPECTIVE JUROR BURKLE:   I'm Dave Burkle.   I'm     00:32:48

16   hosting a business conference at my employer here in San

17   Diego on May 13th and 14th, and I have a business trip to New

18   York from the 15th through the 21st for a conference.

19             THE COURT:  Let me just look at that.   You said

20   May --                                                            00:33:10

21             PROSPECTIVE JUROR BURKLE:   13th and 1th4, and then

22   15th through the 21st.

23             THE COURT:  Is there any way that you could either

24   postpone that or not be involved in that?

25             PROSPECTIVE JUROR BURKLE:   No.  I'm the host of it.  00:33:29

```
1           THE COURT:  All right.  Well, that certainly would

2   fall during the trial?  And then the travel is already paid

3   for?

4           PROSPECTIVE JUROR BURKLE:  Yes.  It's a fixed

5   conference date again.                                      00:33:43

6           THE COURT:  Is there any objection to excusing Mr.

7   Burkle, juror number 22?

8           MR. ALEXANDER:  No, your Honor.

9           MR. NUNN:  No, your Honor.

10          MR. CLEARY:  No, your Honor.                        00:33:52

11          THE COURT:  Okay.  Please notify the clerk.  Let's

12  keep going.

13          PROSPECTIVE JUROR FLEEMAN:  My name is Anthony

14  Fleeman.  I am scheduled to go to China from May 15th to June

15  1st.  I already paid for my plane ticket, bought my visa and 00:34:14

16  my land pass in china.  So if the trial goes through that

17  date that would cause a dilemma.

18          THE COURT:  And when were you leaving, Mr. Fleeman?

19          PROSPECTIVE JUROR FLEEMAN:  The 15th, flying out of

20  San Diego to L.A. and then from L.A. to Hong Kong.          00:34:32

21          THE COURT:  It's already paid for and scheduled?

22          PROSPECTIVE JUROR FLEEMAN:  Yes, sir.

23          THE COURT:  Any objection to excusing Mr. Fleeman?

24          MR. ALEXANDER:  No, your Honor.

25          MR. NUNN:  No, your Honor.                          00:34:42
```

| | |
|---|---|
| 1 | MR. CLEARY:  No, your Honor. |
| 2 | THE COURT:  Okay.  Thank you. |
| 3 | PROSPECTIVE JUROR SCULLY:  Sean Scully.  The |
| 4 | company only pays for two weeks, and I also have a trip that |
| 5 | is paid for on the 17th and 18th of May. |
| 6 | Along with that, my position, we're in the middle |
| 7 | of a major restructure within our district. |
| 8 | THE COURT:  And when do you leave on that trip? |
| 9 | PROSPECTIVE JUROR SCULLY:  Thursday the 17th. |
| 10 | THE COURT:  The 17th I think is a Friday. |
| 11 | PROSPECTIVE JUROR SCULLY:  Thursday, Friday. |
| 12 | THE COURT:  So you are leaving on a Thursday.  That |
| 13 | would be the 16th. |
| 14 | PROSPECTIVE JUROR SCULLY:  Yes, sir. |
| 15 | THE COURT:  That's fine.  We could be done with the |
| 16 | trial by then, but it's unclear.  Because I think the trial |
| 17 | will go into the third week but it may not take the whole |
| 18 | third week. |
| 19 | So what's the government's position on --it's Mr. |
| 20 | Scully? |
| 21 | PROSPECTIVE JUROR SCULLY:  Yes, sir. |
| 22 | MR. ALEXANDER:  Your Honor, we have no objection. |
| 23 | THE COURT:  Mr. Nunn? |
| 24 | MR. NUNN:  I have no objection, your Honor. |
| 25 | MR. CLEARY:  No objection. |

00:34:51

00:35:09

00:35:20

00:35:39

00:35:46

```
 1            THE COURT:  Okay, thank you.  So let the clerk
 2   know.
 3            PROSPECTIVE JUROR RICE:  Windell Rice is my name
 4   and I'm a sole proprietor.  And I have two full-time
 5   employees that are out in the field every day, so today      00:36:02
 6   basically my office is unmanned, and to do that for three
 7   weeks would jeopardize my company as well as my employees.
 8            THE COURT:  What kind of company is it?
 9            PROSPECTIVE JUROR RICE:  Gemini Pest Control,
10   termite and pest control.                                    00:36:18
11            And then I have to do weekly filings of activity
12   reports that is done on line with the State Pest Control
13   Board, as well as file pesticide use reports records with the
14   County Agriculture Department.
15            And I have a graduation.  My son is graduating with  00:36:33
16   his master's degree on the 20th and 21st, which may be toward
17   the end or maybe even the trial would be over by then, but
18   that's in northern California.
19            And my -- a while back I had a leaky blood vessel
20   in my left eye and I periodically see a retina specialist for 00:36:52
21   that, and the appointment has been made for some time and
22   that is for Tuesday, the 8th.
23            And on that day also my wife is having
24   reconstructive ankle surgery and we have an appointment to
25   meet with the doctor prior to the surgery to go over what is  00:37:11
```

```
1    going to be happening and what we need to do.

2          And then she has injections in her neck for -- and

3    her spine for pain management, and we have an appointment on

4    Wednesday to do that, and she can't drive herself because she

5    has to take --                                          00:37:32

6          THE COURT:  Well --

7          PROSPECTIVE JUROR RICE:  -- Valium before.

8          THE COURT:  You have a pretty extensive list over

9    the next three weeks.

10         Does the government have any objection to excusing   00:37:40

11   Mr. Rice?

12         MR. ALEXANDER:  No, your Honor.

13         MR. NUNN:  No, your Honor.

14         MR. CLEARY:  No, your Honor.

15         PROSPECTIVE JUROR RICE:  Thank you very much.       00:37:45

16         THE COURT:  Mr. Rice, yours is kind of an unusual

17   situation.  When you go down to the jury clerk, you ought to

18   get your jury service postponed several months because you're

19   busy with medical issues of your own and your wife's over the

20   next couple weeks, really the next month or so.           00:38:02

21         So you ought to mention that.  And my

22   recommendation to you is get it postponed for a substantial

23   period of time.

24         PROSPECTIVE JUROR RICE:  Thank you, sir.

25         THE COURT:  Okay?                                   00:38:15
```

```
 1              PROSPECTIVE JUROR RICE:  All right.

 2              THE COURT:  Is there anyone else in that section?

 3    If you can pass the microphone to the first row of this

 4    section.

 5              PROSPECTIVE JUROR MASINO:  Hi.  My name is Tonya        00:38:27

 6    Masino.  I'm a physician.  I would -- for the Department of

 7    Veterans' Affairs.

 8              I see about ten to 12 patients a day.  Since my

 9    patients wait two months to see me, three weeks away from

10    work would be a hardship for my patients.                        00:38:42

11              I have a conference planned May 17th through the

12    22nd in San Francisco which is not reimbursed.  Just some

13    things to be aware of.

14              THE COURT:  We will ask you some questions about

15    that in a moment.  Okay.  If you could pass the microphone.      00:39:02

16              PROSPECTIVE JUROR PEPPERS:  Your Honor, my name is

17    Tom Peppers.  I work for a military contractor.  They pay for

18    two weeks of jury duty.  I would have to take my PTO for the

19    third week.

20              THE COURT:  What is PTO?                                00:39:22

21              PROSPECTIVE JUROR PEPPERS:  Personal time off

22    acquired.

23              THE COURT:  Okay.  I'll have to ask you some

24    individual questions about that.

25              PROSPECTIVE JUROR PEPPERS:  Thank you.                  00:39:33
```

1          THE COURT:  Okay.

2          PROSPECTIVE JUROR LENNAN:  Hai.  I'm Pam Lennan.  I

3    have a deferred travel for the month of March because my

4    husband was doing the same thing in March and in April.  So

5    what I ended up doing was reverse the travel.                    00:39:50

6          So I have people from India and Brazil showing up

7    on May 13th and they're meeting with me.

8          THE COURT:  Is there any kind of accommodation that

9    could be made, because May 13th would be during the third

10   week?                                                            00:40:10

11         PROSPECTIVE JUROR LENNAN:  Yeah, I postponed it as

12   far as I could.  I wanted to do this in the month of March.

13   So it's been postponed for many weeks and I pushed it out as

14   far as I could.

15         They purchased their tickets and I don't think they    00:40:25

16   can change that.  I've asked them two times to do it, so they

17   have already accommodated me two times.

18         THE COURT:  And what would your meetings entail?

19   Is it something that could be done in the evenings?

20         PROSPECTIVE JUROR LENNAN:  I don't think so.  I           00:40:39

21   wouldn't know what they would do during the day while they

22   waited for me to come back.

23         I have had meetings in the evenings.  For example,

24   I'll have a meeting tonight in the evening.  That's perfectly

25   fine.  I have 9:00 p.m. meetings with India for two times a     00:40:56

```
1    week.  So I can still do those meetings.

2            But its the on-site once they are coming to see me.

3    And I have pushed it out as far as I could to make business

4    sense of what we're trying to accomplish.

5            THE COURT:  Okay.  And you said it's been pushed      00:41:10

6    out twice?

7            PROSPECTIVE JUROR LENNAN:  Yeah, because my husband

8    was here the month of March.  He did this whole thing the

9    month of March, and I am doing it the month of April.

10           THE COURT:  And is there someone else who could       00:41:23

11   stand in for you at those meetings?

12           PROSPECTIVE JUROR LENNAN:  We have a small team and

13   I'm the point person on it.

14           THE COURT:  And what's your name again?

15           PROSPECTIVE JUROR LENNAN:  Pam Lennan.              00:41:42

16           THE COURT:  Okay.  You're juror number 29.  And

17   that's just on one day?

18           PROSPECTIVE JUROR LENNAN:  It's the entire week.

19           THE COURT:  The entire week.  So you would be out

20   the entire week.                                            00:42:05

21           PROSPECTIVE JUROR LENNAN:  That's correct.

22           THE COURT:  All right.  Does the government have

23   any objection to excusing Ms. Lennan?

24           MR. ALEXANDER:  No, your Honor.

25           MR. NUNN:  No, your Honor.                          00:42:14
```

```
 1              MR. CLEARY:  No, your Honor.

 2              THE COURT:  Okay.  Could you notify the clerk of

 3   this.

 4              PROSPECTIVE JUROR LENNAN:  Yes.

 5              THE COURT:  So, again, I suggest that maybe you        00:42:21

 6   consider postponing your jury service, although it's possible

 7   you could get a trial that only goes one week.

 8              You should talk to the clerk about either getting

 9   an excusal for more than a week -- in other words, they would

10   limit you to one week, under the circumstances, or             00:42:42

11   rescheduling your service.  Okay?

12              PROSPECTIVE JUROR LENNAN:  Okay.

13              THE COURT:  Okay.  Thank you.  All right.  Anyone

14   else there?

15              PROSPECTIVE JUROR BOWLEY:  My name is Gene Bowley,    00:42:54

16   Jr.  This will cause financial hardship.  I have a wife, two

17   kids.  I am not being paid for today.  I don't get paid to be

18   on jury duty.

19              THE COURT:  You don't get paid at all?

20              PROSPECTIVE JUROR BOWLEY:  No.                        00:43:07

21              THE COURT:  What kind of job do you have?

22              PROSPECTIVE JUROR BOWLEY:  Machinist.

23              THE COURT:  What is the name of the company?

24              PROSPECTIVE JUROR BOWLEY:  Don Caster's (phonetic.)

25              THE COURT:  And they don't give you compensation      00:43:14
```

1   for --

2         PROSPECTIVE JUROR BOWLEY:  No, sir.

3         THE COURT:  So what happens if you are on jury

4   duty -- have you been on jury duty before, by the way?

5         PROSPECTIVE JUROR BOWLEY:  I have been called but I   00:43:24

6   have never had to come to this point, no.

7         THE COURT:  And does your wife work?

8         PROSPECTIVE JUROR BOWLEY:  No, she does not.

9         THE COURT:  And how many children do you have?

10        PROSPECTIVE JUROR BOWLEY:  Two children.   00:43:34

11        THE COURT:  And so you're the sole support.

12        PROSPECTIVE JUROR BOWLEY:  Yes, I am.

13        THE COURT:  So three weeks would be --

14        PROSPECTIVE JUROR BOWLEY:  Three weeks, I couldn't

15  pay my bills.   00:43:43

16        THE COURT:  Does the government have any objection

17  as to Mr. Bowley being excused?

18        MR. ALEXANDER:  No.

19        MR. NUNN:  No, sir.

20        THE COURT:  Did you mention this to the jury clerk?   00:43:49

21        PROSPECTIVE JUROR BOWLEY:  Yes, I did.

22        THE COURT:  Did they give you the one-week

23  limitation.

24        PROSPECTIVE JUROR BOWLEY:  No.  She just said that

25  there is no excuse.   00:43:57

```
 1              THE COURT:  Okay.  Tell her I excuse you from the
 2    three-week trial.
 3              PROSPECTIVE JUROR BOWLEY:  Thank you.
 4              PROSPECTIVE JUROR MILLER:  My name is James Miller.
 5    I have a business trip planned for May 8th through the 15th.   00:44:14
 6    I'll be in Orlando.
 7              THE COURT:  And is that something that can be
 8    rescheduled?
 9              PROSPECTIVE JUROR MILLER:  It was originally for
10    this week and I had to move it into next week as far as I      00:44:28
11    could.
12              THE COURT:  And has it already been paid for?
13              PROSPECTIVE JUROR MILLER:  Yes, it has.
14              THE COURT:  What's the government's position?  Do
15    you have any objection to excusing Mr. Miller?                 00:44:42
16              MR. ALEXANDER:  No, your Honor.
17              THE COURT:  Mr. Nunn?
18              MR. NUNN:  No objection.
19              THE COURT:  Mr. Cleary?
20              MR. CLEARY:  No objection.                           00:44:49
21              THE COURT:  All right.  Please let the clerk know.
22              PROSPECTIVE JUROR MORENO:  Your Honor, I'm not sure
23    I actually have a valid reason not to, but my wife is
24    surprising -- my birthday is this Saturday.  She is
25    surprising me with we are going to Palm Springs.  So she       00:45:04
```

1    already booked a hotel for us.

2          THE COURT:  And when is that for?

3          PROSPECTIVE JUROR MORENO:  This Saturday.  We are

4    leaving Friday and coming back on Monday.

5          THE COURT:  Because Friday we'll be done by 12:30,    00:45:16

6    so would that give you enough time to get out there?

7          PROSPECTIVE JUROR MORENO:  But I have to be back

8    Monday when?

9          THE COURT:  We would start Monday at 9:30.

10          PROSPECTIVE JUROR MORENO:  Okay.    00:45:32

11          THE COURT:  Do you think you could do that?

12          PROSPECTIVE JUROR MORENO:  Yeah, I think I should

13    be able to.

14          THE COURT:  And you are Mr. Moreno?

15          PROSPECTIVE JUROR MORENO:  Yes.    00:45:41

16          THE COURT:  And this is your birthday that is

17    coming up?

18          PROSPECTIVE JUROR MORENO:  Saturday.

19          THE COURT:  Okay.  Well, happy birthday on

20    Saturday.  Okay.  If you are on the jury remind me of that.    00:45:48

21    I may have some flexibility as to when we start, if you are

22    coming back Monday morning.  I'll see what we could do, okay,

23    to try to help you out.

24          Okay.  It's your 30th birthday?

25          PROSPECTIVE JUROR MORENO:  Yeah.    00:46:09

```
 1          THE COURT:  Okay.  Anyone else?  Okay.  Now, we
 2   have ten more jurors, because we let several jurors go, and
 3   we have 11 jurors that I'm going to have to ask questions
 4   personally to see whether we can let go.  We are going to
 5   need more jurors.                                            00:46:35
 6          So I'm going to bring those jurors in.  We will
 7   give them the oath.  I'll ask them the same questions, and
 8   then I'll know all the jurors that I have to talk to
 9   individually.
10          And then once we have essentially cleared the       00:46:47
11   jurors who can't serve on this jury then we will get into all
12   the other questions, and we will proceed.
13          So if you can bring in the other jurors, Rick.
14          THE CLERK:  Yes, sir.  I'm trying to -- I have to
15   recirculate the list so we can know who they are.           00:47:06
16      (Prospective jurors were called and seated.)
17          THE COURT:  Okay, ladies and gentlemen, we have ten
18   new jurors.  We want to get you up to the point that the
19   other prospective jurors are at.
20          So, good afternoon.  My name is Barry Ted            00:51:34
21   Moskowitz.  I'm the chief district judge of the district and
22   I will be presiding over this case.
23          We are going to ask that you take an oath to
24   truthfully answer the questions put to you bearing upon your
25   qualifications to serve as jurors.                          00:51:48
```

```
 1              But first if you could raise your hand if you have
 2    heard everything I've said.
 3                    (Affirmative response.)
 4              THE COURT:  Yes, I see every hand has been up.
 5    Okay.                                                        00:52:04
 6              Do any of you, the ten new jurors that we just
 7    brought in, do any of you have any hearing impairment that
 8    you would like assistance with?  If so, please raise your
 9    hand.
10              Okay.  And your name, sir?                         00:52:14
11              PROSPECTIVE JUROR JONES:  Gary Jones.
12              THE COURT:  Let's see if this device works for you.
13    It's like a receiver.  The ceiling has like a transmitter in
14    it.  How is it working?  Good.
15              For the jurors who are using this device, there are 00:52:39
16    times that the lawyers and I have to have a conference
17    outside the presence of the jury, either when you go back to
18    the jury room or we do it at sidebar.
19              You would have to take your device off.
20    Otherwise you essentially would be eavesdropping on          00:52:53
21    everything we're saying.  So please keep that in mind.
22              Okay.  All right.  The ten new jurors, if you could
23    stand and raise your right hand and take the oath.
24         (The prospective jurors were duly sworn.)
25              THE COURT:  Okay.  You can have a seat.  Was there 00:53:22
```

1    any of the ten jurors who did not take the oath?  Please

2    raise your hand.  I see no hands raised.

3            How is that device working?  Good?  Okay.

4            This is a criminal case.  We are going to pick 15

5    jurors.  The first thing I want to know, and I want to go                00:53:38

6    over it with you, is the length -- that I want to let you

7    know and I want to go over with you is the length of the

8    trial.

9            We expect the trial to take place over the next

10   three weeks.  Whether it will last all three weeks or not, we           00:53:50

11   don't know, but it will certainly be during the course of

12   this week, next week, and into the week after that.

13           The schedule will be Monday through Friday,

14   although Friday we will end at 12:30 and I will, from 1:30 to

15   5:00, I will do other cases.                                            00:54:09

16           So of the ten new jurors, is there any juror who

17   could not serve on this trial given the schedule that I have

18   mentioned?  If so, please raise your hand.

19           Okay.  Do you want to pass the microphone back

20   there.  It's Ms. Jecker first.                                         00:54:22

21           PROSPECTIVE JUROR MATTHEWS:  William Matthews.

22           THE COURT:  I guess you're first.

23           PROSPECTIVE JUROR MATTHEWS:  Yes, sir.  A

24   scheduling conflict on Wednesday, your Honor.  I have a

25   special needs child and we have a very important meeting.  He          00:54:38

1    is transitioning into high school next year and we have about

2    six or seven individuals all scheduled to meet on that

3    particular morning.

4              THE COURT:  Which Wednesday?

5              PROSPECTIVE JUROR MATTHEWS:  It's this coming          00:54:51

6    Wednesday, your Honor.

7              THE COURT:  The day after tomorrow?

8              PROSPECTIVE JUROR MATTHEWS:  Yes, sir.

9              THE COURT:  What time?

10             PROSPECTIVE JUROR MATTHEWS:  9:00 a.m., your Honor. 00:54:55

11             THE COURT:  For how long do you think that will be?

12             PROSPECTIVE JUROR MATTHEWS:  Approximately two

13   hours.

14             THE COURT:  So you would be leaving at 11:00 or you

15   could be here at 11:00?                                        00:55:06

16             PROSPECTIVE JUROR MATTHEWS:  Your Honor, I live in

17   Vista, North County, so it would take me about an hour to get

18   here.

19             THE COURT:  So essentially it would eliminate all

20   of Wednesday.                                                  00:55:14

21             PROSPECTIVE JUROR MATTHEWS:  Yes, sir.  I'm sorry.

22             THE COURT:  Is there another alternative date that

23   you could arrange for this?

24             PROSPECTIVE JUROR MATTHEWS:  I can make an attempt,

25   your Honor.                                                    00:55:24

```
 1            THE COURT:  Okay.  Could I ask that you check on

 2   that a little later.  I don't think we'll need to know the

 3   answer until towards the end of the day.

 4            PROSPECTIVE JUROR MATTHEWS:  Will do.

 5            THE COURT:  Okay.  I don't want to dictate their     00:55:36

 6   schedule, but it would be perfect if they could do it Friday

 7   afternoon.

 8            PROSPECTIVE JUROR MATTHEWS:  Thank you.

 9            THE COURT:  But if they can't, they can't,

10   independent.                                                 00:56:02

11            And you are Ms. Jecker?  I'm sorry, I couldn't hear

12   you.

13            PROSPECTIVE JUROR JECKER:  I'm a primary provider

14   for my family.  My husband has an auto immune disease and

15   over the next couple of weeks we have some very serious      00:56:19

16   doctors' appointments that I have to attend, I have to take

17   him to.

18            THE COURT:  You have to take him to those

19   appointments?

20            PROSPECTIVE JUROR JECKER:  They can't be            00:56:26

21   rescheduled.  They have been scheduled for the last four

22   months.

23            THE COURT:  Okay.  And over the next three weeks

24   you have several of those appointments?

25            PROSPECTIVE JUROR JECKER:  Yes, about four.         00:56:35
```

```
 1              THE COURT:  Is there any objection to excusing Ms.
 2   Jecker by the United States?
 3              MR. ALEXANDER:  No, your Honor.
 4              MR. NUNN:  No, sir.
 5              MR. CLEARY:  No, your Honor.                        00:56:44
 6              THE COURT:  Okay.  Thank you.  Can you let the jury
 7   clerk know that perhaps they should reschedule your jury
 8   service for some point in the future.
 9              PROSPECTIVE JUROR JECKER:  Yes.
10              THE COURT:  Okay.  Good luck with your husband.     00:56:55
11              PROSPECTIVE JUROR JECKER:  Thank you.
12              PROSPECTIVE JUROR HAYS:  Hello.  John Hays.  Yes,
13   on May 10th I have a missions trip planned to Mexico, for
14   May 10th and 11th, and I'm also -- on the 21st of May I have
15   a business trip to the Baltimore, Maryland area.              00:57:17
16              THE COURT:  I don't think we'll get to May 21st, so
17   I don't think that's a problem.  But what was the May 10th
18   and 11th?
19              PROSPECTIVE JUROR HAYS:  I have a missions trip
20   with my church to Mexico.                                     00:57:32
21              THE COURT:  Is it possible for you to reschedule
22   that?
23              PROSPECTIVE JUROR HAYS:  No, it's firm.  There is
24   about 50 people who are going, so I'm not the coordinator.
25   So I've already paid for the trip and I'm set to go.          00:57:51
```

```
 1              THE COURT:  And is there another trip you could go
 2   on instead of that, another mission trip?
 3              PROSPECTIVE JUROR HAYS:  There will be another one
 4   in September.
 5              THE COURT:  So would it be possible to go on that      00:58:09
 6   one instead of this one?
 7              PROSPECTIVE JUROR HAYS:  Yes, it would.
 8              THE COURT:  How much of an inconvenience would that
 9   be to you or to your church?
10              PROSPECTIVE JUROR HAYS:  I paid 175.                   00:58:20
11              THE COURT:  And do you think that they could apply
12   that to the September trip, if necessary?
13              PROSPECTIVE JUROR HAYS:  I'm not really sure.
14              THE COURT:  Okay.  Would there be any other
15   difficulty in you serving on the jury?                           00:58:41
16              PROSPECTIVE JUROR HAYS:  I'm sorry, I couldn't hear
17   you.
18              THE COURT:  Would there be any other difficulty
19   with you serving on the jury in terms of scheduling?
20              PROSPECTIVE JUROR HAYS:  Other than my business       00:58:50
21   trip on the 21st that I have back to Baltimore.
22              THE COURT:  I don't think that that's going to be a
23   problem.  I think we'll be done sufficiently in advance of
24   that.
25              PROSPECTIVE JUROR HAYS:  Okay.                        00:59:03
```

```
 1                THE COURT:  Okay.  Thank you.

 2                PROSPECTIVE JUROR ELLISON:  On --

 3                THE COURT:  Okay, go ahead.

 4                PROSPECTIVE JUROR ELLISON:  I have a business trip.

 5                THE COURT:  Your name first.                        00:59:22

 6                PROSPECTIVE JUROR ELLISON:  I'm James Wyatt

 7   Ellison.  I have a business trip on May 7th through the 11th

 8   that has already been booked to Florida.  I was hoping to

 9   make that.

10                It's time sensitive to be able to see -- I am in    00:59:33

11   entertainment and there is a new show going in one of the

12   parks out there and we are monitoring their rehearsal

13   schedule because we are bringing that same show to San Diego

14   in about a month.

15                THE COURT:  So you couldn't reschedule the trip,    00:59:48

16   you would have to be there at that time?

17                PROSPECTIVE JUROR ELLISON:  Exactly.

18                THE COURT:  Is there someone who could go in your

19   stead?

20                PROSPECTIVE JUROR ELLISON:  Possibly.  We could     00:59:55

21   look into that.  The tickets have already been bought, so I'm

22   not sure if the tickets are transferrable to another person,

23   but we can look into it.

24                THE COURT:  Okay.  Let me keep that in mind.  Was

25   there anyone else?  Okay.  No.                                   01:00:16
```

```
 1              Does anyone else here who didn't previously request
 2      to be excused now think that they need to be?  I do not see
 3      any other hands.
 4              So if you could wait outside and the clerk will
 5      bring you in one at a time.  Just come up to -- I looked too    01:00:32
 6      quickly over there.  Ms. Garcia.
 7              PROSPECTIVE JUROR GARCIA:  I have a daughter who is
 8      graduating from sixth grade.  I do not know the date.  Mid
 9      May maybe, I don't know.  Right now I do not know when
10      exactly.                                                        01:00:52
11              THE COURT:  What school system?
12              PROSPECTIVE JUROR GARCIA:  Vista Magnet School,
13      Vista School District.
14              THE COURT:  And they graduate in May?
15              PROSPECTIVE JUROR GARCIA:  There is a ceremony that     01:01:00
16      I need to attend.  I'm the only parent.  My husband was
17      deported.
18              THE COURT:  So if I guaranteed you could attend
19      that, would you be able to serve on the jury?
20              PROSPECTIVE JUROR GARCIA:  Yes.                         01:01:13
21              THE COURT:  You just have to let me know.  You
22      would have to let me know several days in advance.
23              PROSPECTIVE JUROR GARCIA:  Yes.
24              THE COURT:  Okay.
25              PROSPECTIVE JUROR GARCIA:  Thank you.                   01:01:20
```

```
 1              THE COURT:  You're not going to miss -- it's your
 2   daughter?
 3              PROSPECTIVE JUROR GARCIA:  Yes.
 4              THE COURT:  You are not going to miss her sixth
 5   grade graduation.  Okay.  Is there anyone else?  Okay.          01:01:26
 6              If I could ask you to wait outside I'll take --
 7   I'll ask Mr. Vilches to stay first.
 8              So when you come back in, the clerk will call your
 9   name, just come up to the podium, and we will have some
10   follow-up questions for you.                                   01:01:41
11              (The prospective panel let the courtroom.)
12              THE COURT:  Mr. Vilches, I have forgotten what your
13   concerns were.
14              PROSPECTIVE JUROR VILCHES:  Do I need that
15   microphone?                                                    01:02:41
16              THE COURT:  Why don't you come on up.  You'll be
17   heading out after we talk to you.  So why don't you just go
18   up to the podium.  I think you can get out that way.
19              PROSPECTIVE JUROR VILCHES:  To confirm, I am pretty
20   sure the company only pays one week, and since it's a          01:03:05
21   three-week trial, the other two weeks --
22              THE COURT:  What do you do?
23              PROSPECTIVE JUROR VILCHES:  I'm a corporate
24   financial accountant.  I work for a mental health care and I
25   review the financial statements of the company.               01:03:16
```

```
 1              THE COURT:  Can you tell me what your net pay, your
 2    take home pay, per month is.
 3              PROSPECTIVE JUROR VILCHES:  Well, gross pay is
 4    about 99,000, pretty much $100,000 a year.  Net pay is about,
 5    I don't know, I'm not -- I think it's about 27,00, $2800        01:03:31
 6    every two weeks.
 7              THE COURT:  Does your wife work?
 8              PROSPECTIVE JUROR VILCHES:  No, she does not, and I
 9    just basically separated recently, so going into this month
10    I'm paying full expenses out of the mortgage and then my own    01:03:45
11    personal apartment, too.
12              THE COURT:  And do you have children?
13              PROSPECTIVE JUROR VILCHES:  I do.  I have a
14    four-year old and a 12-year old.
15              THE COURT:  And do you have any other source of       01:03:55
16    income?
17              PROSPECTIVE JUROR VILCHES:  No other source of
18    income.  I did some personal tax returns this year, but it's
19    past that point.
20              THE COURT:  Does the government have any questions?   01:04:05
21              MR. ALEXANDER:  No, your Honor.  Thank you.
22              THE COURT:  Mr. Nunn?
23              MR. NUNN:  No, your Honor.
24              THE COURT:  Mr. Cleary?
25              MR. CLEARY:  No questions.                            01:04:11
```

1          THE COURT:  Any objections to excusing Mr. Vilches?

2          MR. ALEXANDER:  No, your Honor.

3          MR. NUNN:  No, sir.

4          MR. CLEARY:  No, your Honor.

5          THE COURT:  Thank you.  Can you tell this to the          01:04:16

6   jury clerk so maybe they can give you a one-week trial

7   limitation.

8          PROSPECTIVE JUROR VILCHES:  Thank you.

9          THE COURT:  Okay.  Good luck, sir.

10          PROSPECTIVE JUROR VILCHES:  Thanks.          01:04:25

11          THE COURT:  Rick, do you want to bring in Number

12   eight who is Vicky Pantovic.

13          THE CLERK:  Yes.

14          THE COURT:  Ms. Pantovic, what was the basis for

15   your --          01:05:07

16          PROSPECTIVE JUROR PANTOVIC:  Where am I supposed to

17   be?  Here?  What was that?

18          THE COURT:  What is the basis for your request?

19          PROSPECTIVE JUROR PANTOVIC:  I own an elder care

20   facility, and basically I have been self-employed, and so I          01:05:15

21   work seven days a week.

22          THE COURT:  How many people are in the facility?

23          PROSPECTIVE JUROR PANTOVIC:  I have four residents.

24   I have employees but, you know --

25          THE COURT:  How many residents?          01:05:26

1    PROSPECTIVE JUROR PANTOVIC:  Four, and I'm

2    responsible for their care.

3         THE COURT:  And who helps you with that?

4         PROSPECTIVE JUROR PANTOVIC:  My daughter is there

5    right now and I have a few other employees, and I've had to    01:05:35

6    have them on the back burner this whole month of April

7    thinking I might get called.

8         I don't think I could do it for another month or

9    three weeks.

10        THE COURT:  Questions by the government?    01:05:50

11        MR. ALEXANDER:  None, your Honor.

12        THE COURT:  Mr. Nunn?

13        MR. NUNN:  No, your Honor.

14        THE COURT:  Mr. Cleary?

15        MR. CLEARY:  No, your Honor.  Thank you.    01:05:57

16        THE COURT:  So it's not a financial issue.

17        PROSPECTIVE JUROR PANTOVIC:  No, it's not a

18   financial.  Well, part of it is just because when I work I

19   don't have to pay somebody, so I guess it is financial too.

20        THE COURT:  So what are your daily responsibilities    01:06:09

21   that you couldn't do?

22        PROSPECTIVE JUROR PANTOVIC:  Well, the care of

23   residents, showering, bathing, medication.

24        THE COURT:  So you are directly involved.

25        PROSPECTIVE JUROR PANTOVIC:  Yes in everyday life.    01:06:20

88

 1              THE COURT:  Any objection by the government to

 2    excusing Ms. Pantovic?

 3              MR. ALEXANDER:  No, your Honor.

 4              MR. NUNN:  No objection.

 5              THE COURT:  Mr. Cleary?                          01:06:30

 6              MR. CLEARY:  No objection.

 7              THE COURT:  Okay.

 8              PROSPECTIVE JUROR PANTOVIC:  Thank you.

 9              THE COURT:  Can you let the jury clerk know that.

10              PROSPECTIVE JUROR PANTOVIC:  Sure.              01:06:35

11              THE COURT:  Okay.  Number nine, Mr. Navarrette.

12    Okay, Mr. Navarrette.

13              PROSPECTIVE JUROR NAVARRETTE:  Yes, sir.

14              THE COURT:  What would be the basis of your

15    request?                                                 01:07:26

16              PROSPECTIVE JUROR NAVARRETTE:  I'm self-employed,

17    and I'm not -- I don't have any jury duty pay.

18              THE COURT:  What do you do?  You're a real estate

19    broker?

20              PROSPECTIVE JUROR NAVARRETTE:  I'm a real estate  01:07:36

21    broker, yes, and I have my own office.  It's not so much of a

22    hardship for me, your Honor, but I do have a one-week

23    limitation that was granted to me, and I'm good up until the

24    last week of May, and the last week of May I have a vacation

25    scheduled.                                               01:07:58

```
1              THE COURT:  I don't think it's going to impact

2    that.  But the question is, could you serve for the next --

3    this week and the two weeks after?

4              PROSPECTIVE JUROR NAVARRETTE:  Yes, I think it will

5    be okay.                                                        01:08:08

6              THE COURT:  So you could serve?

7              PROSPECTIVE JUROR NAVARRETTE:  Yes, sir.

8              THE COURT:  And how about your real estate

9    business, how would you be able to --

10             PROSPECTIVE JUROR NAVARRETTE:  I'll be able to        01:08:15

11   manage.

12             THE COURT:  Okay.  And so your vacation is --

13             PROSPECTIVE JUROR NAVARRETTE:  It's the last week

14   of May.

15             THE COURT:  So --                                     01:08:22

16             PROSPECTIVE JUROR NAVARRETTE:  And I hope my cell

17   phone doesn't ring, but I was trying to reach my wife to get

18   the exact date.

19             THE COURT:  The last week starts on the 27th with

20   Memorial Day.                                                   01:08:34

21             PROSPECTIVE JUROR NAVARRETTE:  It will be the week

22   before Memorial Day.

23             THE COURT:  The 20th?

24             PROSPECTIVE JUROR NAVARRETTE:  Yes, sir.

25             THE COURT:  Do you know when that week is it          01:08:48
```

1    starts?

2              PROSPECTIVE JUROR NAVARRETTE:   It will probably

3    start the middle of the week, like on a Wednesday or

4    Thursday.

5              THE COURT:   Like the 22nd, 23rd?                    01:08:57

6              PROSPECTIVE JUROR NAVARRETTE:   Yes, sir.

7              THE COURT:   I think we should be okay.  So you can

8    do it?

9              PROSPECTIVE JUROR NAVARRETTE:   Yes, I can do it.  I

10   just don't want to be rushed at home.  I know that if I'm    01:09:05

11   selected on the jury I want to be fair.  I don't want any

12   outside sources rushing me, especially when I'm serving.

13             THE COURT:   And what do you mean, rushing you at

14   home.

15             PROSPECTIVE JUROR NAVARRETTE:   Well, you go home    01:09:24

16   and my wife is going to be asking, "How is everything going?"

17   I can't discuss anything about the trial, and I know she is

18   going to be asking me, "Is it going to go beyond, is it going

19   to affect our vacation?"

20             And all I'm going to say is it's up in the air, and 01:09:36

21   I don't want that to bother me.  But I'll see if I can get

22   it -- get her vacation rescheduled, maybe pushed another week

23   further back.

24             THE COURT:   Okay.  Thank you.  I appreciate that.

25             PROSPECTIVE JUROR NAVARRETTE:   Yes, sir.           01:09:53

1          THE COURT:  Okay.  And if we finalize what your

2   vacation is and you're on the jury, if it's one of those

3   vacations that can't be changed, then so be it, you'll make

4   the vacation.  You should sit through the trial not worrying

5   about it.                                               01:10:10

6          PROSPECTIVE JUROR NAVARRETTE:  Absolutely.

7          THE COURT:  You're doing much to help the court

8   system by arranging your schedule, so we would honor your

9   vacation.  You just have to let us know about it.

10         PROSPECTIVE JUROR NAVARRETTE:  All right.  Thank    01:10:23

11  you.

12         (The prospective juror left the courtroom.)

13         THE COURT:  Okay.  Any objection to keeping him

14  with the provision that we would excuse him if it goes over

15  and his vacation starts, replace him with an alternate?    01:10:46

16         MR. ALEXANDER:  I guess my concern would be if, for

17  example, they started deliberations, I don't know how the

18  court would want to address that.

19         THE COURT:  Well, before deliberations, if we

20  thought that it could impact his vacation, we would have to  01:11:09

21  excuse him and replace him with an alternate.

22         I'm thinking that maybe we should take four

23  alternates.

24         MR. ALEXANDER:  We have no objection, your Honor.

25         THE COURT:  Mr. Nunn?                             01:11:25

1          MR. NUNN:  Your Honor, I have a complicated answer.

2   The answer is obviously we haven't had a chance to inquire of

3   him yet, but I may not want to let him go.

4          And if he's under that kind of pressure he has to

5   go, so I don't know how I feel about it.  I don't know how to    01:11:40

6   answer your Honor's question.  I guess the court would just

7   have to make that call.

8          THE COURT:  Right.  Well, we run the risk, and I

9   don't think so, hopefully we're going to be done by then, but

10  we do run that risk.                                             01:12:01

11         MR. NUNN:  I understand.  I'm hesitating to give

12  the court other than an answer that says yes, I have no

13  objection.  Because of his profession he's going to

14  understand the whole picture.  Does the court want a further

15  answer from me?                                                  01:12:29

16         THE COURT:  Not unless you change your answer.

17         MR. NUNN:  No, sir.

18         THE COURT:  And I wouldn't ask you to do that.  Mr.

19  Cleary?

20         MR. CLEARY:  I have no objection, your Honor.            01:12:39

21         THE COURT:  So you don't object that if he is on

22  the jury and it runs into his vacation we will replace him

23  with an alternate?

24         MR. CLEARY:  If that happens, so be it.

25         THE COURT:  So you may very well have that             01:12:50

1    objection and reserve it, and I respect that.  So let's see

2    whether he can report back tomorrow as to whether he can

3    modify the vacation.

4            Okay.  All right.  Did you want to bring in Number

5    16, which is a juror Lisa Jacobs.                              01:13:07

6            THE CLERK:  Yes.  While we are doing this, what

7    about 49, the Florida trip, the performance, did the parties

8    agree to excuse him?

9            MR. ALEXANDER:  No objection.

10           MR. NUNN:  No objection.                               01:13:29

11           MR. CLEARY:  I have no objection.

12           THE COURT:  He's the one who has to go watch a

13   performance.

14           MR. NUNN:  I have no objection.

15           THE COURT:  Okay.                                      01:13:36

16       (The prospective juror entered the courtroom.)

17           THE COURT:  Ms. Jacobs, what's the basis for your

18   request again?

19           PROSPECTIVE JUROR JACOBS:  I am a senior contracts

20   manager at Eldrick Communication.  We do have one week        01:13:57

21   vacation.  The other would be using my vacation time.

22           And one of the things I was trying to do was figure

23   out how I can accommodate the work flow over the next couple

24   of weeks because, again, I'll try to figure out if I could go

25   to work early.  What exactly are the court hours?             01:14:11

1           THE COURT:  We would usually start at 9:30, take a

2    break somewhere around 12:30 to 1:45, and then we would end

3    around 4:30, and then on Friday we would end at 12:30.

4           PROSPECTIVE JUROR JACOBS:  What I would trying to

5    do was make some phone calls and figure out if I could go to

6    work on the way, because I work in Kearny Mesa, and do my

7    hours there.

8           Because honestly that's the main thing, is I do

9    have kids in college and I have to take them back and forth

10   to East Coast.  So I was just trying to figure out how to

11   accommodate.

12          I was expecting a week, maybe a little more, but

13   three is a little longer.

14          THE COURT:  I understand that and respect that.  Do

15   you think you can possibly do it or do you think that --

16          PROSPECTIVE JUROR JACOBS:  I'm thinking I can if it

17   is 9:30, I could do a few hours before work and then a few

18   hours after work and work on weekends and whatnot.

19          THE COURT:  Okay.  So if anything changes in that

20   regard, will you let me know before we finally select the

21   jury, which would be tomorrow?

22          PROSPECTIVE JUROR JACOBS:  Perfect.  Okay.

23          THE COURT:  Thank you very much.  Okay.

24          Do you want to bring in juror number 14, Mr.

25   Markle.

```
1              Mr. Markle, you said that you work for Pepsi?

2         PROSPECTIVE JUROR MARKLE:  Yes, sir.

3         THE COURT:  And what do you do for Pepsi?

4         PROSPECTIVE JUROR MARKLE:  I have been there for

5  five and a half years.                                     01:15:57

6         THE COURT:  What do you do?

7         PROSPECTIVE JUROR MARKLE:  I'm a truck driver.

8         THE COURT:  And how much do you make in take-home

9  each month or every two weeks?

10        PROSPECTIVE JUROR MARKLE:  It was roughly about --  01:16:08

11 it's roughly 800 a week, so...

12        THE COURT:  Okay.  Does your wife work?

13        PROSPECTIVE JUROR MARKLE:  Yes, but part-time, sir.

14        THE COURT:  And what does she do?

15        PROSPECTIVE JUROR MARKLE:  She works for a place    01:16:30

16 called JA Business Towns, kind of an education thing.  She

17 works 20 hours a week.

18        THE COURT:  And do you know how much money she

19 makes?

20        PROSPECTIVE JUROR MARKLE:  She makes $10 an hour,   01:16:42

21 sir.

22        THE COURT:  Do you have children?

23        PROSPECTIVE JUROR MARKLE:  Yes, two.

24        THE COURT:  And do you have any other source of

25 income?                                                    01:16:50
```

```
 1              PROSPECTIVE JUROR MARKLE:  No.

 2              THE COURT:  So how much jury time do you get?

 3              PROSPECTIVE JUROR MARKLE:  I get four more days

 4     including today, one week.

 5              THE COURT:  So this will be a hardship if you had    01:16:59

 6     to go for two weeks without pay?

 7              PROSPECTIVE JUROR MARKLE:  It would be extremely

 8     hard, sir.

 9              THE COURT:  Does the government have any questions?

10              MR. ALEXANDER:  No, your Honor.                     01:17:09

11              THE COURT:  Mr. Nunn?

12              MR. NUNN:  No, your Honor.

13              THE COURT:  Mr. Cleary?

14              MR. CLEARY:  No, your Honor.

15              THE COURT:  Any objection to excusing Mr. Markle?   01:17:14

16              MR. ALEXANDER:  No, your Honor.

17              MR. NUNN:  No, your Honor.

18              MR. CLEARY:  No, your Honor.

19              THE COURT:  Thank you.  Please let the jury clerk

20     know, and why don't you just leave the headset right there. 01:17:22

21              PROSPECTIVE JUROR MARKLE:  Thank you, your Honor.

22              THE COURT:  Bring in number 12, Mr. Jerjees.

23              Mr. Jerjees, you're a real estate agent?

24              PROSPECTIVE JUROR JERJEES:  Yes, sir, I am.

25              THE COURT:  Tell me a little bit about your         01:18:07
```

1   business.

2           PROSPECTIVE JUROR JERJEES:  Well, I have -- I'm a

3   part-time real estate and my broker is not involved with my

4   transactions.  He only supervises it when the deal goes

5   through.  I'm responsible to show my clients and so forth.          01:18:18

6           And I have a client visiting from another state to

7   look for a place here, and that would occupy me from showing

8   him what he is here for.

9           I also have a distribution route that I own, that

10  between time to time I manage to distribute my product also.        01:18:38

11          THE COURT:  And any other source of income?

12          PROSPECTIVE JUROR JERJEES:  No, that's the only

13  source.

14          THE COURT:  And last year what was your gross

15  income?                                                             01:18:50

16          PROSPECTIVE JUROR JERJEES:  You mean how much did I

17  make?

18          THE COURT:  Right.  You know, that you recorded on

19  your tax return.

20          PROSPECTIVE JUROR JERJEES:  About 82,000 I think.          01:18:58

21          THE COURT:  And does your wife work?

22          PROSPECTIVE JUROR JERJEES:  No, sir.

23          THE COURT:  Do you have children at home?

24          PROSPECTIVE JUROR JERJEES:  Yes, I do.

25          THE COURT:  How many?                                       01:19:04

1      PROSPECTIVE JUROR JERJEES:  Two, a boy and a girl.

2      THE COURT:  Any other source of income?

3      PROSPECTIVE JUROR JERJEES:  No, sir, that's all.

4      THE COURT:  So, and what do you distribute?

5      PROSPECTIVE JUROR JERJEES:  I distribute incense        01:19:12

6  products and I have product that I purchase from a wholesaler

7  in L.A., which I go every Friday about to buy product for a

8  whole week and distribute throughout San Diego.

9      THE COURT:  Okay.  Does the government have any

10  questions?                                                 01:19:28

11      MR. ALEXANDER:  No, your Honor.  Thank you.

12      THE COURT:  Mr. Nunn?

13      MR. NUNN:  No, your Honor.

14      THE COURT:  Mr. Cleary?

15      MR. CLEARY:  I was just unclear a little bit about     01:19:33

16  the real estate.  Is he a broker or does he work for --

17      PROSPECTIVE JUROR JERJEES:  No, sir, I'm an agent.

18  My license hangs with a broker who is not involved with -- he

19  only gets involved as I put the offer through.

20      MR. CLEARY:  Okay.                                     01:19:46

21      PROSPECTIVE JUROR JERJEES:  But I'm responsible for

22  showing whatever clients that I have and so forth.

23      MR. CLEARY:  And you have a client coming in from

24  out of town?

25      PROSPECTIVE JUROR JERJEES:  Yes, sir.                  01:19:55

```
1              THE COURT:  Any objection by the government to
2    excusing Mr. Jerjees?
3              MR. ALEXANDER:  No, your Honor.
4              THE COURT:  Mr. Nunn?
5              MR. NUNN:  No, your Honor.                        01:20:02
6              THE COURT:  Mr. Cleary?
7              MR. CLEARY:  No, your Honor.
8              THE COURT:  Thank you.  We are going to excuse you.
9    Okay.
10             Next is juror Number 10, Claudia Maeda.          01:20:11
11             THE COURT:  Ms. Maeda, what is the basis for your
12   request?
13             PROSPECTIVE JUROR MAEDA:  I have something where I
14   bleed from my uterus, and I'm spotting right now, and if it
15   goes red I have to go to the ER, because I'm under 20 weeks. 01:21:01
16             THE COURT:  So that can happen at any time?
17             PROSPECTIVE JUROR MAEDA:  When it first happened --
18   it's my first pregnant and I'm also an IVS patient pregnancy.
19             THE COURT:  Does the government have any objection
20   to her being excused or any questions?                     01:21:19
21             MR. ALEXANDER:  No, your Honor.
22             MR. NUNN:  No, your Honor.
23             MR. CLEARY:  No objection, your Honor.
24             THE COURT:  Any objection to her being excused?
25             MR. NUNN:  No, your Honor.                        01:21:27
```

```
 1              THE COURT:  Mr. Cleary?
 2              MR. CLEARY:  No objection.
 3              THE COURT:  I don't think this is the time for you
 4    to be on jury duty far away from home.  If you would have to
 5    go to the ER it would not be a place where your doctors would   01:21:35
 6    be.  Your pregnancy is just more important.
 7              PROSPECTIVE JUROR MAEDA:  I appreciate it.  Thank
 8    you.
 9              THE COURT:  Okay.  Please have a safe trip home,
10    and would you mention this to the jury clerk and tell her       01:21:44
11    that I suggested that they excuse you for jury service until
12    well after your pregnancy.
13              PROSPECTIVE JUROR MAEDA:  Okay, I appreciate it.
14              THE COURT:  This could be a problem.  I know you
15    are thinking of your baby.  I wish you the best of luck and     01:22:00
16    hope the baby is very healthy and gives you a lot of
17    pleasure.
18              PROSPECTIVE JUROR MAEDA:  Thank you.
19              THE COURT:  Okay.  Okay, juror number 21, Valorie
20    Lancaster.                                                      01:22:20
21              Ms. Lancaster, what would be basis for your
22    request?
23              PROSPECTIVE JUROR LANCASTER:  My employer pays me
24    for two weeks, so anything after that would come out of my
25    vacation.                                                       01:22:57
```

```
 1                I had already set aside plans to use my vacation to
 2      volunteer at a cun scout day camp in June.
 3                THE COURT:  What do you do for a living?
 4                PROSPECTIVE JUROR LANCASTER:  I am a project
 5      management assistant at San Diego Gas and Electric.              01:23:10
 6                THE COURT:  And how much do you make?  Do they pay
 7      you every other week?
 8                PROSPECTIVE JUROR LANCASTER:  Biweekly.  My take-
 9      home pay is probably about 1400.
10                THE COURT:  Okay.  And does your husband work?         01:23:28
11                PROSPECTIVE JUROR LANCASTER:  I'm not married.
12                THE COURT:  And do you have children?
13                PROSPECTIVE JUROR LANCASTER:  I have three.
14                THE COURT:  Okay.  And do you have any other source
15      of income?                                                       01:23:35
16                PROSPECTIVE JUROR LANCASTER:  No.
17                THE COURT:  So you do three children on basically
18      approximately 2800 to 3000 a month?
19                PROSPECTIVE JUROR LANCASTER:  Approximately, yeah.
20                THE COURT:  And how much vacation time do you get?     01:23:47
21                PROSPECTIVE JUROR LANCASTER:  I think I have --
22      well, I have three weeks.
23                THE COURT:  And you're using a week to do the cub
24      scout camp.
25                PROSPECTIVE JUROR LANCASTER:  Yeah.                    01:24:05
```

1          THE COURT:  So essentially being on this trial

2     would cost you a week of vacation.

3          PROSPECTIVE JUROR LANCASTER:  Yeah.

4          THE COURT:  Does the government have any questions?

5          MR. ALEXANDER:  No, your Honor.  Thank you.          01:24:18

6          THE COURT:  Counsel?

7          MR. NUNN:  No, sir.

8          MR. CLEARY:  No, your Honor.

9          THE COURT:  So are you asking to be excused for

10    that reason?                                              01:24:25

11         PROSPECTIVE JUROR LANCASTER:  Well, I'm just

12    letting you know.  I did receive a questionnaire prior to my

13    jury service asking me if I was available and I did put that

14    reason down on that questionnaire.

15         THE COURT:  Right.                                   01:24:40

16         PROSPECTIVE JUROR LANCASTER:  For my refusal, yeah.

17         THE COURT:  Any objection by the government to

18    excusing her?

19         MR. ALEXANDER:  No, your Honor.

20         MR. NUNN:  No, your Honor.                           01:24:51

21         MR. CLEARY:  No, your Honor.

22         THE COURT:  Okay.  Thank you.  You're excused.

23    Please let the jury clerk know.

24         PROSPECTIVE JUROR LANCASTER:  All right.  Thank

25    you.                                                      01:24:59

```
 1              THE COURT:  Number 26, Ms. Masino.  Ms. Masino,
 2   what would be basis for your request?
 3              PROSPECTIVE JUROR MASINO:  I'm a physician.  I work
 4   for the Department of Veteran Affairs as a psychiatrist, and
 5   we have RSPT clinic.                                        01:25:46
 6              As I said before, I see about ten to 12 patients a
 7   day.  Often patients wait about two months for appointments.
 8   So three weeks of absent clinic would be a hardship for my
 9   patients and quite difficult to reschedule.
10              THE COURT:  Do they have anybody who could cover   01:26:05
11   for you?
12              PROSPECTIVE JUROR MASINO:  Not specifically to see
13   all of my patients.  Maybe to field phone calls, you know,
14   refill medications, but not really to cover.
15              THE COURT:  What do they do when you take a        01:26:18
16   vacation?
17              PROSPECTIVE JUROR MASINO:  I'm not scheduled with
18   patients, so nobody is booked, and I generally don't take off
19   more than a week at a time.
20              THE COURT:  Any questions by the government?       01:26:32
21              MR. ALEXANDER:  No, your Honor.  Thank you.
22              THE COURT:  Mr. Nunn?
23              MR. NUNN:  No, your Honor.
24              THE COURT:  Mr. Cleary?
25              MR. CLEARY:  No thank you, your Honor.             01:26:40
```

```
 1              THE COURT:  Okay.  Why don't you step outside and
 2    we'll let you know in a few moments.
 3              PROSPECTIVE JUROR MASINO:  Thank you.
 4              (The prospective juror left the courtroom.)
 5              THE COURT:  Okay.  Mr. Nunn, I got a little body     01:26:59
 6    language from you indicating that you may have a problem with
 7    her being excused, so I didn't want to do it in front of her.
 8              MR. NUNN:  Thank you, your Honor.  I do.  I
 9    appreciate that.
10              THE COURT:  And anybody, if you want to oppose her   01:27:11
11    being -- any juror being excused, you shouldn't have to do it
12    in front of the jurors.
13              Where it's obvious I'm kind of doing it in front of
14    jurors is because I don't think there is going to be an
15    issue.  But if you would just, you know, say something to me   01:27:24
16    like, "Your Honor, could we just discuss this for a moment,"
17    or something and I'll tell her -- we'll talk about this, just
18    to let me know because you shouldn't have to say in front of
19    her, "No, I'm not going to excuse you" and then she ends up
20    on the jury or you end up having to use a peremptory.          01:27:45
21              MR. NUNN:  Thank you, your Honor, I appreciate
22    that.
23              THE COURT:  So, go ahead.  It looks like you have a
24    problem.
25              MR. NUNN:  Yes, sir.  I would oppose her being       01:27:54
```

```
 1    excused.  It sounded like she could probably work it out.
 2              THE COURT:  Well, it sounded to me that she can
 3    work it out with advance notice when they didn't schedule
 4    patients for her, but she scheduled -- she is scheduled for
 5    patients and the only time that she is out in a block of time    01:28:17
 6    is one week at a time.
 7              MR. NUNN:  Well, I'm not going to mess with her
 8    scheduling.  Did she say "accident?"  I didn't get exactly
 9    what she said, the nature of her patients.
10              THE COURT:  She's a psychiatrist.    01:28:33
11              MR. NUNN:  She said something about accident.  I
12    was wondering if her patients were -- I'm fine with it, your
13    Honor.  She needs to do what she needs to do.  Thank you for
14    holding up on that.  I appreciate it.
15              THE COURT:  The government's position?    01:28:49
16              MR. ALEXANDER:  No objection to her being excused.
17              THE COURT:  Mr. Cleary?
18              MR. CLEARY:  No objection, your Honor.
19              THE COURT:  So you are not objecting?
20              MR. NUNN:  Yes, sir, I'm not objecting.    01:28:57
21              THE COURT:  And that was number?
22              MR. ALEXANDER:  26.
23              THE COURT:  Okay.  Do you want to bring in number
24    27 and let 26 know that she is excused.
25              Mr. Peppers, what would be the nature of your    01:29:51
```

1   request for an excusal?

2           PROSPECTIVE JUROR PEPPERS:  I have -- my company is

3   a services company and they pay for two weeks.  I just

4   verified that.

5           I also verified something else.  May I ask you,          01:30:05

6   your Honor, a question?

7           THE COURT:  Sure.

8           PROSPECTIVE JUROR PEPPERS:  Do you expect the third

9   week to be a full week?

10          THE COURT:  Say that again.                              01:30:15

11          PROSPECTIVE JUROR PEPPERS:  Do you expect the third

12  week to be a full week?

13          THE COURT:  I don't know.  It could be.  I'm hoping

14  that it's not, but I don't know.

15          PROSPECTIVE JUROR PEPPERS:  To explain what I'm         01:30:23

16  asking, sir, is my company where I work, I work what is

17  called a 9/80 work schedule.  It's where we work Monday

18  through Friday, the pay period, two weeks, nine hours, work

19  one Friday eight hours the other Friday we are off.

20          So, therefore, that week that third week being a        01:30:40

21  short week like this week I would only need four days of my

22  PTO for a full week of my personal time off.  So I would like

23  to withdraw.  I can handle that.

24          THE COURT:  You can handle it?  You think you could

25  serve as a juror?                                               01:30:59

```
 1              PROSPECTIVE JUROR PEPPERS:  Yes, sir.

 2         THE COURT:  Okay.  Thank you very much.

 3         PROSPECTIVE JUROR PEPPERS:  Thank you, sir.

 4         (The prospective juror left the courtroom.)

 5         THE COURT:  34 we already excused.  So I think the    01:31:13

 6    next one is 50.  It's the special needs meeting.

 7              I think my suggestion is we leave him on the jury

 8    and it could -- if he makes it on the jury we would have to

 9    give him the time off, but let me entertain your views.

10         MR. ALEXANDER:  Your Honor, we have no objection.    01:31:39

11    And I just wanted to remind the court that May the 6th I'm

12    scheduled for a Ninth Circuit oral argument.

13         THE COURT:  Are you beyond the point that they

14    would tell you that it's on the papers?

15         MR. ALEXANDER:  I'm fairly certain at this point.    01:31:56

16         THE COURT:  What day is May 6th?

17         MR. ALEXANDER:  That's Monday.

18         THE COURT:  This coming Monday?

19         MR. ALEXANDER:  Yes.

20         THE COURT:  It's in Pasadena?                        01:32:09

21         MR. ALEXANDER:  Yes.

22         THE COURT:  Would you be back in the afternoon?

23         MR. ALEXANDER:  Theoretically, yes.

24         THE COURT:  Do you know what time your argument is?

25         MR. ALEXANDER:  You've served.  You know the deal.   01:32:22
```

1    They're kind of stacked.

2              THE COURT:  Right.

3              MR. ALEXANDER:  I imagine it would begin either at

4    n9:00 or 9:30.  I don't know where in sequence I would be.

5              THE COURT:  Would it be possible for Mr. Behnke to     01:32:36

6    handle it without you or not?

7              MR. ALEXANDER:  Well, I have no doubt of his

8    capabilities.  I would just prefer to be here.  I'm going to

9    be giving closing argument, your Honor.

10             Another issue, your Honor, is that we have been       01:33:03

11   stacking our witnesses with the expectation that we would be

12   dark that Monday.

13             THE COURT:  Rick, maybe we can just flip Friday to

14   Monday and go a full day on Friday.

15             THE CLERK:  Which day would that be, the 10th?        01:33:24

16             THE COURT:  This Friday, which would be the 3rd to

17   the 6th.

18             THE CLERK:  That is certainly easier for me to just

19   move the full calendar than move part of it.

20             THE COURT:  Okay.  So what about our fellow with      01:33:43

21   the special needs meeting, lose a half a day or let him go?

22             MR. NUNN:  My only thought, your Honor, is while

23   certainly what your Honor was proposing is reasonable, I'm

24   only concerned if we get two or three of those things going

25   with different jurors then we're ensuring that the trial is    01:34:04

```
1   going to go longer.

2           THE COURT:  So you're recommending excusing number

3   50?

4           MR. NUNN:  Yes.

5           THE COURT:  All right.  Unless he can move it.        01:34:15

6           MR. NUNN:  Yes, sir.

7           THE COURT:  The government's position?

8           MR. ALEXANDER:  Your Honor, we have no objection

9   either way.  I think the court had suggested to him the

10  possibility of moving it to Friday, the 3rd, but I think that  01:34:28

11  would -- if the court is going to move his calendar then we

12  would have to --

13          THE COURT:  See if he can move it to the 6th.

14          MR. ALEXANDER:  Exactly.

15          THE COURT:  Mr. Cleary?                               01:34:38

16          MR. CLEARY:  No position, your Honor.

17          THE COURT:  Can you bring number 50 in for a

18  moment.  While he is bringing him in, what about 47, the

19  mission trip to Mexico?  He could go in September.  He would

20  lose $175 perhaps.                                           01:35:01

21          MR. NUNN:  I'm neutral, your Honor.  I have no

22  objection either way.

23          THE COURT:  Hold on.  Mr. Matthews.

24          PROSPECTIVE JUROR MATTHEWS:  Yes, your Honor.

25          THE COURT:  The question is do you think it would    01:35:20
```

1    be possible -- when is the meeting?

2              PROSPECTIVE JUROR MATTHEWS:  I will certainly make

3    that attempt, your Honor.  There is a number of people that

4    have to be contacted.

5              THE COURT:  Because it appears that because of the    01:35:29

6    lawyers' schedules that at this point we probably would go a

7    full day on Friday and not have court on Monday.

8              So you would have the whole day of Monday.  Do you

9    think it's possible to --

10             PROSPECTIVE JUROR MATTHEWS:  I can certainly make    01:35:43

11   the attempt, your Honor.

12             THE COURT:  Because our concern is if it's up in

13   Vista we're talking about a half day.

14             PROSPECTIVE JUROR MATTHEWS:  Yes, sir.

15             THE COURT:  And it's not the type of thing that you  01:35:54

16   want to be in the meeting and cut it short.

17             PROSPECTIVE JUROR MATTHEWS:  It's a rather

18   important meeting.

19             THE COURT:  It is.  So do you think you could see

20   if they could move it to the 6th?                              01:36:02

21             PROSPECTIVE JUROR MATTHEWS:  I can certainly try,

22   your Honor.  Your Honor, might I also make a disclosure?  Is

23   it Mr. Cleary at the end of the table?

24             THE COURT:  It is.

25             PROSPECTIVE JUROR:  He and I have met on a couple    01:36:11

1    of occasions professionally.  I don't know if he recalls.

2    But I just wanted to make that disclosure up front as well.

3              THE COURT:   What do you do?

4              PROSPECTIVE JUROR MATTHEWS:   I'm a deputy public

5    defender for the County of San Diego.                      01:36:23

6              THE COURT:   Where do you work?

7              PROSPECTIVE JUROR MATTHEWS:   In the Vista

8    courthouse primarily.

9              THE COURT:   And is there anything about Mr. Cleary

10   or your relationship with him that would affect your ability   01:36:31

11   to be absolutely fair and impartial?

12             PROSPECTIVE JUROR MATTHEWS:   He has always been a

13   gentleman as far as I know, your Honor.

14             THE COURT:   Okay.  But that wouldn't give him an

15   edge, would it?                                            01:36:41

16             PROSPECTIVE JUROR MATTHEWS:   Not at all, your

17   Honor.

18             THE COURT:   All right.  So why don't you see

19   whether it's possible, but don't make the move.  If it's

20   possible -- don't make the move yet because what if you don't   01:36:51

21   get selected on the jury.

22             PROSPECTIVE JUROR MATTHEWS:   That's very true.  And

23   I don't know how soon I would have to make that

24   determination.  A number of people would have to be

25   contacted, not only the school district but the region.   01:37:04

```
 1              They have this organization that is a group of
 2    individuals that assists in those programs.  We have
 3    therapists, so...
 4              THE COURT:  Do you want to get the process started?
 5              PROSPECTIVE JUROR MATTHEWS:  I can certainly do          01:37:14
 6    that.
 7              THE COURT:  And then let us know tomorrow.
 8              PROSPECTIVE JUROR MATTHEWS:  Will do, your Honor.
 9              THE COURT:  All right.  Thank you.
10              PROSPECTIVE JUROR MATTHEWS:  Thank you, sir.            01:37:21
11          (The prospective juror left the courtroom.)
12              THE COURT:  Okay.  The mission trip to Mexico.
13              MR. ALEXANDER:  Your Honor, we have no objection
14    either way.  It certainly sounds like he could serve, but
15    it's $175.                                                       01:37:51
16              MR. NUNN:  I have no position either way, your
17    Honor.
18              MR. CLEARY:  I don't have a position either.
19              THE COURT:  So if he comes in here and says, "Look,
20    I would rather not serve, I would rather not switch the trip,   01:38:01
21    any objection to him being excused?
22              MR. NUNN:  No, sir.
23              MR. CLEARY:  No, sir.
24              MR. ALEXANDER:  No.
25              THE COURT:  Okay.  Bring number 47 in.  We only        01:38:10
```

```
 1   have one more and we have already decided to excuse him.

 2   He's the Florida entertainment trip.

 3            (The prospective juror entered the courtroom.)

 4            THE COURT:  Mr. Hays, what do you think about the

 5   possibility of serving on the jury and moving your trip?  Did   01:38:43

 6   you think -- this is the mission trip; right?

 7            PROSPECTIVE JUROR HAYS:  I'm sorry, that's the

 8   mission trip?

 9            THE COURT:  Yes.  How much of an imposition is that

10   going to be, or how possible is that?                           01:38:56

11            PROSPECTIVE JUROR HAYS:  I mean, it's not a huge

12   deal.  They'll still have probably another 49 people going,

13   so I can see if I can get a refund or whatever.  I'm not

14   really sure.

15            THE COURT:  But do you think you could do it, you      01:39:16

16   could serve on the jury?  I don't know if you'll get picked,

17   but if you do get picked do you think you could serve?

18            PROSPECTIVE JUROR HAYS:  I would.  Obviously, I

19   would, sir.  Could I --

20            THE COURT:  You were saying "Could I."                 01:39:31

21            PROSPECTIVE JUROR HAYS:  I was thinking about maybe

22   making a phone call to see if I could get refunded or sponsor

23   someone else or something like that.

24            THE COURT:  Would they, that amount of money, make

25   a --                                                            01:39:45
```

```
 1              PROSPECTIVE JUROR HAYS:  It's not a fortune, but
 2    it's a little bit.  It's just something we do to help out the
 3    poor, you know --
 4              THE COURT:  Right.
 5              PROSPECTIVE JUROR HAYS:  -- disadvantaged folks in   01:39:57
 6    Mexico.
 7              THE COURT:  I appreciate that.  And just my
 8    question is, do you think you could go in September and serve
 9    on the jury in this case?
10              PROSPECTIVE JUROR HAYS:  Yeah, I could certainly go 01:40:12
11    in September.
12              THE COURT:  All right.  Why don't you wait outside.
13              PROSPECTIVE JUROR HAYS:  Okay.
14              THE COURT:  And why don't you make that call and
15    then let me know if that's a deciding issue.                 01:40:22
16              Okay, number 49.
17              THE CLERK:  Juror Andre Padilla just approached me
18    in the hall stating that he only gets ten days and wants to
19    talk to me about it.
20              Number 49 first, and then which one -- I'll look    01:40:34
21    for Padilla, which number he is.
22              MR. ALEXANDER:  Number 28.
23              THE COURT:  Okay.  So 49 and then 28.
24              Mr. Ellison, did you give any thought as to whether
25    someone else could cover or would that be a big issue?       01:41:39
```

```
1              PROSPECTIVE JUROR ELLISON:  I did, and I made some

2    phone calls, and unfortunately that is going to be a problem.

3              I am new to the job and it's more of an executive

4    role of going out and seeing this show that is a $10,000,000

5    project over two different parks.  And we are watching their    01:41:53

6    dress rehearsals and then the first rehearsals with the cast

7    to take all that knowledge back to our site.

8              THE COURT:  Okay.  Is this with Sea World?

9              PROSPECTIVE JUROR ELLISON:  Yeah.

10             THE COURT:  Does the government have any objection    01:42:07

11   to him being excused?

12             MR. ALEXANDER:  No, your Honor.

13             MR. NUNN:  No, your Honor.

14             THE COURT:  Mr. Cleary?

15             MR. CLEARY:  No, your Honor.                         01:42:13

16             THE COURT:  Okay.  We'll excuse you.  Thank you.

17             PROSPECTIVE JUROR ELLISON:  Thank you.

18             THE COURT:  Okay.  And Mr. Padilla.

19             PROSPECTIVE JUROR PADILLA:  Hello.

20             THE COURT:  What would be the basis for your         01:42:54

21   request?

22             PROSPECTIVE JUROR PADILLA:  When we were on break I

23   went out there and e-mailed my office and found out we only

24   get paid for ten days of jury service.

25             THE COURT:  What do you do for a living?            01:43:03
```

1          PROSPECTIVE JUROR PADILLA:  I am a video editor at

2    Sony, Sony On Line Entertainment, and I run a small

3    department of other video editors.

4          THE COURT:  What is your take-home pay?  Do you get

5    paid every two weeks?                                    01:43:14

6          PROSPECTIVE JUROR PADILLA:  Yes.

7          THE COURT:  What do you take home?

8          PROSPECTIVE JUROR PADILLA:  What I take home is

9    3300.

10          THE COURT:  And are you married?                   01:43:19

11          PROSPECTIVE JUROR PADILLA:  Yes.  Three kids at

12    home, homeowner.

13          THE COURT:  And does your wife work?

14          PROSPECTIVE JUROR PADILLA:  Yes.

15          THE COURT:  And what does she do?                  01:43:26

16          PROSPECTIVE JUROR PADILLA:  She is in publishing.

17          THE COURT:  And how much does she take home?

18          PROSPECTIVE JUROR PADILLA:  It's like 900 every two

19    weeks.

20          THE COURT:  So basically you have about 4000, 4200  01:43:37

21    every two weeks.

22          PROSPECTIVE JUROR PADILLA:  Every two weeks.

23          THE COURT:  And so if you had to serve another five

24    days without compensation, other than, you know, you do get a

25    jury fee --                                              01:43:55

```
 1              PROSPECTIVE JUROR PADILLA:  I can dip into my PTO,
 2   paid time off balance.  That's mainly vacation pay.
 3              THE COURT:  How much do you have there?
 4              PROSPECTIVE JUROR PADILLA:  Like 33 days.  So I
 5   have a significant amount saved up, but it's, you know,        01:44:07
 6   that's my vacation time.  If I quit like, that's -- if I quit
 7   that's like a balance that is owed to me.
 8              THE COURT:  What is the government's position?
 9              MR. ALEXANDER:  Your Honor, we have no objection.
10              MR. NUNN:  No objection, your Honor.              01:44:23
11              THE COURT:  Mr. Cleary?
12              MR. CLEARY:  No objection.
13              THE COURT:  Let me, although none of the attorneys
14   have an objection, given -- how much would this impact you if
15   you had to dip into your vacation pay?                       01:44:39
16              PROSPECTIVE JUROR PADILLA:  I would lose a week.
17              THE COURT:  And how much of an affect, if you have,
18   you said, 33 --
19              PROSPECTIVE JUROR PADILLA:  33 days I think the
20   last time I checked.                                         01:44:51
21              THE COURT:  And --
22              PROSPECTIVE JUROR PADILLA:  I have some vacations
23   coming up in the summer, but I should still be okay.  It's
24   just like sickness or --
25              THE COURT:  So if I asked you to stay in here to   01:45:01
```

```
1    see if you get selected do you think that that would be a big
2    financial problem for you?
3           PROSPECTIVE JUROR PADILLA:   I don't think it would
4    be a big financial problem.
5           THE COURT:   My concern is not to just have people     01:45:12
6    on the jury who have substantial means or not because that
7    wouldn't be a fair cross-section.
8           So I know it's an imposition.   I don't know whether
9    you will ultimately get selected, but could I ask you to stay
10   with that?                                                    01:45:29
11          PROSPECTIVE JUROR PADILLA:   Okay.
12          THE COURT:   All right.   Thank you.
13          (The prospective juror left the courtroom.)
14          THE COURT:   So does anybody object?   His take-home,
15   his family take-home, is fairly substantial.   He does have   01:45:46
16   substantial reserve in terms of vacation pay.   He's not
17   trying really hard to get off.
18          So any objection to leaving him on at this point?
19          MR. ALEXANDER:   No, your Honor.
20          MR. NUNN:   No, your Honor.                            01:46:03
21          MR. CLEARY:   No, your Honor.
22          THE COURT:   Okay.   I think that's it.   So why don't
23   we take a -- we're not going to have enough jurors, so we are
24   going to need more for tomorrow.
25          Let's go over the list to make sure we are all on      01:46:15
```

1    the same page.

2            The following have been excused:  1, 3, 4, 5, 7, 8,

3    10, 12, 14, 21, 22, 26, 29, 31, 34, 36, 37, 42, 46, and 49.

4    Does everybody agree?

5            MR. CLEARY:  Yes, your Honor.                          01:46:50

6            THE COURT:  Does the government agree with that?

7            MR. ALEXANDER:  Yes, your Honor.

8            MR. NUNN:  Yes, your Honor.

9            THE COURT:  Okay.  So how many --

10           THE CLERK:  20, your Honor.                            01:47:17

11           THE COURT:  So 20 -- so we have -- so we have 35

12   left at this point.  The number of jurors left after

13   challenges for cause are 39.  Twelve jurors.  We will go with

14   four alternates.  Just in case anything happens I think it's

15   like an insurance policy.                                     01:48:08

16           Anybody object to that?

17           MR. CLEARY:  No objection.

18           MR. NUNN:  No, your Honor.

19           MR. ALEXANDER:  No, your Honor.

20           THE COURT:  Okay.  13 challenges.  I gave 13          01:48:14

21   peremptories to the defense, six to the government, and then

22   four peremptory challenge for alternates, so that's 39 jurors

23   minimum that we need, and right now we're down to 35.

24           So I'm going to ask that you bring in 25 more

25   jurors for tomorrow.                                          01:48:40

```
 1              All right.  We'll get everybody together on the

 2     same -- we'll get everybody in the same position before

 3     attorney voir dire, but the 25 other jurors don't have to be

 4     present when we are going through the questionnaire.

 5              Okay?  All right.  Take a ten-minute recess.  Do      01:48:56

 6     you want to tell them ten minutes and then we will pick up at

 7     4:00 and go until 5:00.

 8              THE CLERK:  Yes, sir.

 9              MR. CLEARY:  Could I ask a question about filling

10     in the jurors who have been excused?  Do we just go from the   01:49:47

11     numerical order --

12              THE COURT:  No, they stay in the same seats, same

13     numbers.  Tomorrow we will have to move them, but let's leave

14     everybody where they are, but they keep the same number.

15              MR. CLEARY:  So just added onto the end there.        01:50:03

16              THE COURT:  Right.  Okay.  Okay.  Do you want to

17     bring the jurors in.

18              (The jury panel entered the courtroom.)

19              THE COURT:  Okay.  I see -- it looks like everyone

20     is back.                                                       02:06:45

21              Ladies and gentlemen, the jury selection process is

22     going to be in three phases.  The first phase I'm going to

23     tell you some general information about the case ask you some

24     general questions as a group.

25              Then we are going to hand out a questionnaire for     02:07:01
```

1    you to answer out loud.  Everybody will answer the

2    questionnaire.

3            Tomorrow we are going to bring in some more jurors,

4    so at the end we have enough jurors for the lawyers to select

5    from.                                                      02:07:15

6            We will bring those jurors up to where you are.

7    After everyone answers the questionnaire, then the lawyers

8    will each have, for each party, 15 minutes for the

9    government, 15 minutes for each of the defense lawyers, to

10   ask you any follow-up questions.                           02:07:30

11           And then the lawyers will pick the people who are

12   going to serve on the jury.

13           I said we are going to pick 15.  We will actually

14   pick 16.  So you know that there are going to be 12 jurors

15   who will deliberate.  Four of them, four of the 16, will be  02:07:46

16   alternates.

17           We don't tell you who the alternates are until you

18   go to deliberate.  So everyone should count on being one of

19   the regular jurors.

20           So when we -- let me start by telling you some      02:08:00

21   information about the case.  Again, I am Judge Barry Ted

22   Moskowitz and I will be presiding over this case.

23           This is a criminal case.  The defendants Abigail

24   Gonzalez and Kendrick Green have been accused in an

25   indictment of conspiracy to commit mail and wire fraud and   02:08:19

1    money laundering.

2            The indictment alleges that these offenses took

3    place beginning in or about May 2006, through November 2007,

4    within the Southern District of California.

5            The indictment accuses Abigail Gonzalez and others    02:08:34

6    of setting up a mortgage processing company named Advance

7    Partnership Properties and a company known as BYW

8    Construction, Inc.

9            The indictment accuses Ms. Gonzalez and others with

10   processing materially false loan mortgage loan applications    02:08:50

11   for condominiums at 3522 and 3532 Meade in San Diego, and

12   other properties in San Diego County.

13           The indictment alleges that Ms. Gonzalez and those

14   conspiring with her knew that the mortgage loan applications

15   were false.                                                    02:09:12

16           The indictment accuses Mr. Kendrick Green with

17   knowingly participating in the alleged false mortgage loan

18   application scheme by submitting false mortgage loan

19   applications and receiving cash and funds to purchase

20   condominiums.                                                  02:09:27

21           The indictment is only the accusation that brings

22   the case to trial.  The indictment is not itself evidence of

23   any wrongdoing.

24           Both Ms. Gonzalez and Mr. Green have pled not

25   guilty to all the charges in the indictment, and they are     02:09:39

1  presumed to be innocent unless you conclude during your

2  deliberations that the government has proven their guilt

3  beyond a reasonable doubt.

4         So, the first question that I would like to ask you

5  is do any of you know anything about this case?  If so,            02:09:53

6  please raise your hand.

7         I see one hand raised.  And your name, sir.

8         PROSPECTIVE JUROR MORENO:  Eduardo Moreno.

9         THE COURT:  Mr. Moreno, without telling me anything

10  that you know about the case, how do you know something about       02:10:09

11  the case?

12         PROSPECTIVE JUROR MORENO:  Well, actually I'm not

13  100 percent positive, but wasn't this in the news?

14         THE COURT:  Not that I recall.

15         PROSPECTIVE JUROR MORENO:  Then that's about the           02:10:22

16  knowledge that I have, that I would have.

17         THE COURT:  Okay.  And do you remember any of the

18  names of the people who were in the news?

19         PROSPECTIVE JUROR MORENO:  No, I do not.

20         THE COURT:  Do you remember any of the details?            02:10:33

21         PROSPECTIVE JUROR MORENO:  I remember some woman,

22  some lady, actually made some false mortgage loans.  Maybe it

23  was a different case.  I don't know.

24         THE COURT:  I think it was a different case.

25         PROSPECTIVE JUROR MORENO:  Okay.                           02:10:52

1        THE COURT:  I don't recall anything being in the

2   news about this case.

3        PROSPECTIVE JUROR MORENO:  All right.

4        THE COURT:  If you sat as a juror in this case

5   could you decide the case solely from the evidence presented    02:11:00

6   here and not rely upon anything you may have heard in the

7   news?

8        PROSPECTIVE JUROR MORENO:  Right off the bat I'll

9   be honest.  I think, you know, I probably would think she was

10  guilty.  I mean...    02:11:18

11       THE COURT:  You haven't heard any evidence.

12       PROSPECTIVE JUROR MORENO:  Well, I'm sorry, you're

13  right.  I just, gut feel, is like how did this transpire?

14       THE COURT:  Well, that's the question.  Remember,

15  everybody is presumed to be innocent.    02:11:35

16       PROSPECTIVE JUROR MORENO:  Okay.

17       THE COURT:  And that presumption can only be

18  overcome --

19       PROSPECTIVE JUROR MORENO:  It's just -- I just kind

20  of vaguely remember some story out there.    02:11:43

21       THE COURT:  There may have be some stories about

22  other cases.

23       PROSPECTIVE JUROR MORENO:  Okay.

24       THE COURT:  But you would have to decide this case

25  solely on the evidence presented here in the courtroom.  You    02:11:50

```
 1    couldn't rely upon anything else.  Do you think you could do
 2    that?
 3              PROSPECTIVE JUROR MORENO:  Yes.
 4              THE COURT:  So if you are deciding the case, and
 5    you say, you know, I have a vague recollection of hearing        02:12:05
 6    something about something similar to this, but it wasn't in
 7    the courtroom as part of the evidence, would you be able to
 8    put that aside and not consider it?
 9              PROSPECTIVE JUROR MORENO:  Yes, I would not.
10              THE COURT:  Because anything -- when something is      02:12:21
11    presented in this courtroom the people get to question and
12    cross examine it, you get to see it, you get to observe the
13    witness's testimony, and you get to decide whether you
14    believe or disbelieve the testimony.
15              If it's something in the newspaper and it's just an    02:12:38
16    accusation, there is no way for you to know whether that's
17    true or not true.
18              Do you understand?  Do you agree with that?
19              PROSPECTIVE JUROR MORENO:  Yes.
20              THE COURT:  So it would be absolutely unfair to        02:12:52
21    consider anything that wasn't in the courtroom subject to the
22    rigors of being tested for accuracy.
23              So would you agree to decide the case solely on the
24    evidence presented here?
25              PROSPECTIVE JUROR MORENO:  Yes, I would.               02:13:06
```

1           THE COURT:   Okay.   Is there anybody else who thinks

2    they know anything about this case?   I don't see any other

3    hands raised.

4           Again, I am Barry Ted Moskowitz and I am the chief

5    district judge in this district.   And with me is Mr. Rick       02:13:20

6    Messig, who is our deputy clerk of court, and our court

7    reporter, Barbara Harris.

8           Do any of you know any of us or any members of our

9    family or friends?   If so, please raise your hand.

10          Okay.   I see no hand raised.                             02:13:35

11          Now, the United States is represented by Mr.

12   Christopher M. Alexander and Mr. Jerry A Behnke, who I will

13   ask to stand.

14          Do any of you know these Assistant United States

15   Attorneys or any members of their family or friends?   If so,   02:13:49

16   please raise your hand.

17          Thank you.   I see no hands raised.

18          Now assisting the United States attorneys from time

19   to time during the trial will be Nazish Karim and Darline

20   Toussaint, who I would ask to stand.                            02:14:06

21          Do any of you know Ms. Toussaint or Ms. Karim or

22   any of their family or friends?   If so, please raise your

23   hand.

24          Okay, I see no hands raised.

25          Now, let me introduce the defense counsel.               02:14:19

1    Representing Abigail Gonzalez is Donald Nunn, and with him is

2    Amber Rabon who will be assisting him, also an attorney.

3            Do any of you know Mr. Nunn or Ms. Rabon or any

4    members of their family or friends?  If so, please raise your

5    hand.                                                              02:14:37

6            I see no hands raised.

7            I will introduce Ms. Gonzalez.  Abigail Gonzalez,

8    if you could stand up.  This is Abigail Gonzalez.

9            Do any of you know Ms. Gonzalez or any members of

10   her family or friends?  If so, please raise your hand.            02:14:49

11           I see no hands raised.

12           I'll introduce Mr. Green's attorney, Oliver Cleary.

13   This is Mr. Cleary.  Do any of you know Mr. Cleary or any

14   members of his family or friends?  If so, please raise are

15   hand.                                                              02:15:06

16           I see juror number 50 has raised his hand.  And how

17   do you know Mr. Cleary?

18           PROSPECTIVE JUROR MATTHEWS:  Professionally, your

19   Honor.

20           THE COURT:  Okay.                                          02:15:19

21           PROSPECTIVE JUROR MATTHEWS:  I'm also a defense

22   attorney.  I know Mr. Cleary informally on a professional

23   basis.

24           THE COURT:  Did you ever handle any cases with him?

25           PROSPECTIVE JUROR MATTHEWS:  Not to my                     02:15:30

1  recollection, your Honor.

2          THE COURT:  And did you ever handle any cases

3  against him?

4          PROSPECTIVE JUROR MATTHEWS:  No, your Honor.

5          THE COURT:  Now, you're an assistant public          02:15:36

6  defender up in Vista?

7          PROSPECTIVE JUROR MATTHEWS:  Deputy public

8  defender, yes.

9          THE COURT:  Deputy public defender up in Vista.

10  And in the course of your handling cases up there or anywhere  02:15:46

11  where you may have come into contact with Mr. Cleary, is

12  there anything about your contact or relationship that would

13  affect your ability to be absolutely fair and impartial?

14          PROSPECTIVE JUROR MATTHEWS:  No, your Honor.

15          THE COURT:  Okay.  Do either Mr. Cleary, Mr. Nunn,    02:16:00

16  or Mr. Alexander or Mr. Behnke have any further questions of

17  Mr. Matthews about his connection to Mr. Cleary?

18          MR. NUNN:  No.

19          MR. ALEXANDER:  No.

20          THE COURT:  Do you ever socialize with Mr. Cleary?    02:16:15

21          PROSPECTIVE JUROR MATTHEWS:  I haven't had the

22  pleasure, your Honor.

23          THE COURT:  Okay.  Thank you.  Now let me introduce

24  Kendrick Green.

25          PROSPECTIVE JUROR GATES:  Your Honor, on the same     02:16:24

1  topic, I'm a deputy public defender.  I see Mr. Cleary from

2  time to time in the presiding department downtown.

3          THE COURT:  And you are a federal -- not a federal.

4  A deputy public defender also?

5          PROSPECTIVE JUROR GATES:  I am.                    02:16:48

6          THE COURT:  And how long have you known Mr. Cleary?

7          PROSPECTIVE JUROR GATES:  Maybe five or six years,

8  I have been aware of him.  And I know his dad.  I believe

9  it's his dad.  So I'm aware of the family name.  I'm aware of

10  the practice.                                             02:17:05

11          I see Oliver, like I say, in court, in passing.

12          THE COURT:  I don't want to guess, but who is his

13  dad?

14          PROSPECTIVE JUROR GATES:  I think it's John Cleary.

15          THE COURT:  Okay.  Is that correct?              02:17:16

16          MR. CLEARY:  Yes, my father's name is John Cleary.

17  Yes.

18          THE COURT:  And did you ever have any cases with

19  Mr. Cleary, the father, or Oliver Cleary?

20          PROSPECTIVE JUROR GATES:  No.                     02:17:28

21          THE COURT:  Is there anything about either of them

22  and their reputations that would affect your ability to be

23  absolutely fair and impartial to both sides in this case?

24          PROSPECTIVE JUROR GATES:  No.

25          THE COURT:  Did you ever have any cases with Oliver 02:17:37

1    Cleary?

2             PROSPECTIVE JUROR GATES:  No.

3             THE COURT:  Either with him jointly or against him?

4             PROSPECTIVE JUROR GATES:  No.

5             THE COURT:  Okay.  Any further questions for Mr.

6    Gates?  Mr. Cleary?

7             MR. CLEARY:  No questions.

8             THE COURT:  Mr. Nunn?

9             MR. NUNN:  No, your Honor.

10            THE COURT:  And Mr. Alexander?

11            MR. ALEXANDER:  No, your Honor.

12            THE COURT:  Okay.  Thank you.  We are up to Mr.

13   Green.

14            Mr. Green again, if you could stand and look

15   around.  Do any of you know Kendrick Green or any members of

16   his family or friends?  If so, please raise your hand.

17            Thank you.  I see no hands raised.

18            Now I'm going to be through the witnesses, the

19   witness list.

20            Now not everybody is likely to testify, but these

21   are the possible witnesses.  So the question is do you know

22   any of these people or any members of their family or

23   friends.

24            And I'm going to pause after mentioning some of

25   them and ask you if you know any of them.

1          Susan Macias from the department of housing and

2     Urban Development.   Joanna Megha from JPMorgan Chase.

3     Patricia Forcier from the mortgage department of IT Deutshe

4     Bank.

5          Helen Placente.  Gordon Simon, Andre Simon, Darline   02:18:59

6     Toussaint.   And Dana Zysk from the Freddie Mac Mortgage

7     Company.

8          Do any of you know any of these people or any

9     members of their family or friends?  If so, please raise your

10    hand.                                                       02:19:19

11         Okay.  I see no hand raised.  Let me continue.

12         Irma Valdez from Signature Group Holdings.  Chrissi

13    Rhea from Mortgage Investors Group.  Rick Payer, Mortgage

14    Investors Group.

15         Helen King from New Century Liquidating Trust.          02:19:32

16    Melissa Watt, Angela Clark, from the IRS.

17         Do any of you know any of these people or any

18    members of their family or friends?  If so, please raise your

19    hand.

20         I see no hands raised.                                  02:19:48

21         Maggie Velasquez.  Dana Merritt who was formerly

22    known as Dana Hayden.  Lucia Siebern from the County

23    Recorder's Office.

24         Mark Gold from the Federal Reserve Bank.  Beverly

25    White from JPMorgan Chase.                                   02:20:05

132

 1           Dale West from EECU.  Tim Mathers, an IRS employee.

 2   Mario Butterfield, Don Shore, Dorita Edwards.

 3           Do any of you know any of these people or members

 4   of their family or friends?  If so, please raise your hand.

 5           I see no hands raised.                              02:20:27

 6           Further potential witnesses, Rudolph Green, Gloria

 7   Green, Daria Johnson, Donald Shore, Baron (phonetic) Jones,

 8   J. Kyle Scroggins, Jr., Angela Clark, Steven Littlefield.

 9           Do any of you know any of these people or any

10   members of their family or friends?  If so, please raise your  02:20:50

11   hand.

12           I see no hand raised.

13           Daniel Close, John Howard, and George Love.  Do any

14   of you know any of these people or any members of their

15   family or friends?  If so, please raise your hand.           02:21:02

16           I see one hand raised up.  And your name, sir?

17           PROSPECTIVE JUROR ALLYN:  Richard Allyn.  The name

18   John Howard is a person I work with, but I don't know, it's a

19   common name, so I'm not sure.

20           THE COURT:  Mr. Howard, let me ask, Mr. Nunn, what    02:21:17

21   does Mr. Howard do?

22           MR. NUNN:  Mr. Howard is a business attorney in San

23   Diego.

24           PROSPECTIVE JUROR ALLYN:  No, no, no, that's a

25   different John Howard.  Thank you.                           02:21:28

```
 1              THE COURT:  Okay.  Now have any of you had any
 2   experiences in your life which you think might influence you
 3   one way or the other in this case?  If so, please raise your
 4   hand.
 5              I see no hands raised.                                02:21:45
 6              Do any of you have any hearing, sight, or other
 7   impairment of any kind, be it physical or mental, that would
 8   make it difficult for you to sit as a juror in this case?  If
 9   so, please raise your hand.
10              I see one hand raised.  And is it Mr. Peppers?        02:22:00
11              PROSPECTIVE JUROR PEPPERS:  Yes, sir.
12              THE COURT:  And what might that be issue be?
13              PROSPECTIVE JUROR:  I have it from time to time, if
14   that's okay, but I have arthritis.
15              THE COURT:  So if you were to -- hold the             02:22:13
16   microphone for a second.  How would that impact your ability
17   to serve as a juror?
18              PROSPECTIVE JUROR PEPPERS:  I don't think it would,
19   but it's just letting you know that I might scoot around in a
20   chair a bit.                                                    02:22:24
21              THE COURT:  That's no problem.  And is there
22   anything, if you are selected at a juror, that we can do to
23   make it more comfortable and convenient for you?
24              PROSPECTIVE JUROR PEPPERS:  When I sit for a long
25   time, having arthritis, I tend to tighten up and take little    02:22:35
```

1    bit of time to get moving.

2              THE COURT:  Well, however long it takes you I can

3    tell you that it takes me longer.  I have a rare neurological

4    disability, so it's difficult for me to walk.

5              So I am sympathetic with you.  That's why I'm                02:22:56

6    asking is there anything we can do if you are sitting in the

7    jury box.  If you wanted to get up, or if there is a certain

8    point that you need to stand up would you be willing to say,

9    "Judge, could we take a break now?"

10             PROSPECTIVE JUROR PEPPERS:  I can do that.  It's            02:23:10

11   just -- all I ask is as long as you've got patience I'm okay.

12             THE COURT:  That I have plenty of.  Okay.  Now was

13   there anyone else who had any hearing, sight, or other

14   impairment of any kind, be it physical or mental, that would

15   make it difficult for you to sit as a juror in this case?  If   02:23:26

16   so, please raise your hand.

17             I see no hands raised.

18             Now, do any of you know any reason at all why you

19   could not be absolutely fair and impartial to both the

20   government and the defendant in deciding this case?  If so,       02:23:37

21   please raise your hand.

22             I see one hand raised.  And your name, sir?

23             PROSPECTIVE JUROR WILLIAMS:  Leon Williams.  I

24   worked in a mortgage company about five years ago, and I kind

25   of have seen them do kind of fraudulent things and I don't        02:23:58

```
 1    think I would be impartial to Ms. --
 2              THE COURT:  You're Mr. Williams?
 3              PROSPECTIVE JUROR WILLIAMS:  Yes.
 4              THE COURT:  What was the name of the --
 5              PROSPECTIVE JUROR WILLIAMS:  Cairo (phonetic) Bank.    02:24:07
 6    And I heard and saw them doing things that were under --
 7    shady or fraudulent, if you will, with my own eyes, and I
 8    don't think I would be good to her.
 9              THE COURT:  Would you be able to put that out of
10    your mind and decide this case solely on the evidence          02:24:22
11    presented here?
12              PROSPECTIVE JUROR WILLIAMS:  I believe I would be
13    able to, but in the back of my mind it would still be there.
14    And I wouldn't want to be unfair to her, her chances.
15              THE COURT:  Mr. Alexander, do you have any          02:24:36
16    questions for are Mr. Williams?
17              MR. ALEXANDER:  No, your Honor.
18              THE COURT:  Mr. Nunn?  Did you want to do it maybe
19    towards -- right, we will let all the other jurors go, when
20    we have about five minutes left.                              02:24:53
21              MR. NUNN:  Thank you.
22              THE COURT:  So we are going to ask you some
23    follow-up questions.  Don't let me forget.  We are going to
24    stop at about 5:00, so somewhere maybe about ten to 5:00 we
25    will let the other jurors go and ask you some individual      02:25:05
```

1    questions about that.  Okay.

2            Now, since this is a criminal case, there are two

3    basic rules that we all have to keep in mind.  First, a

4    defendant is presumed to be innocent unless and until the

5    government proves his or her guilt beyond a reasonable doubt.  02:25:22

6            The presumption of innocence applies unless you

7    conclude during your deliberations unanimously that the

8    government has proved all the elements of an offense beyond a

9    reasonable doubt.

10           The indictment is only an accusation.  An          02:25:35

11   indictment does not prove anything.  The defendant,

12   therefore, starts out with a clean slate.

13           Second, to convict a defendant the government must

14   prove beyond a reasonable doubt that the defendant is guilty.

15           A defendant has a right to remain silent and never  02:25:49

16   has to prove his or her innocence or present any evidence.

17           That a defendant may not testify is not to be

18   considered by you or held against the defendant in any way.

19           Is there anyone here who feels that if selected to

20   serve on the jury they could not be absolutely faithful to   02:26:06

21   those rules and apply them?  If so, please raise your hand.

22           Okay.  I see no hands raised.

23           I'm going to ask Mr. Messig to hand out -- I'm

24   sorry, I looked -- I guess you raised your hand after I

25   scanned over there.  Go ahead.  You're miss Garcia; correct?  02:26:24

1    PROSPECTIVE JUROR GARCIA:  Yes.  I would like to

2    speak to somebody about this in a personal time.

3    I did something in the past that I served like two

4    weeks for, and I don't know if that would --

5    THE COURT:  Was it a misdemeanor?                    02:26:53

6    PROSPECTIVE JUROR GARCIA:  Yes, it was a

7    misdemeanor.

8    THE COURT:  And what was it?

9    PROSPECTIVE JUROR GARCIA:  I cashed a check that

10   wasn't mine.                                         02:27:01

11   THE COURT:  Okay.  And how long ago was that?

12   PROSPECTIVE JUROR GARCIA:  When I was around 30 or

13   so.

14   THE COURT:  I don't want to try to pry about your

15   age, but how long ago was that?                      02:27:18

16   PROSPECTIVE JUROR GARCIA:  You know what?  It was

17   more than five years.

18   THE COURT:  Okay.  And where was that?  Was that in

19   state?

20   PROSPECTIVE JUROR GARCIA:  In Vista.                 02:27:37

21   THE COURT:  Okay.  And did you plead guilty or did

22   you have a jury trial?

23   PROSPECTIVE JUROR GARCIA:  Guilty.

24   THE COURT:  And it was treated as a misdemeanor?

25   PROSPECTIVE JUROR GARCIA:  Yes.                      02:27:48

```
 1              THE COURT:  And what was the sentence?

 2              PROSPECTIVE JUROR GARCIA:  Community service and

 3    then time served, which was like one and a half weeks, I

 4    think.

 5              THE COURT:  Okay.  And did you have a lawyer?          02:28:00

 6              PROSPECTIVE JUROR GARCIA:  Public defender.

 7              THE COURT:  It wasn't the gentleman sitting in the

 8    back, was it?

 9              PROSPECTIVE JUROR GARCIA:  No.

10              THE COURT:  And is there anything about that          02:28:10

11    experience, how you were treated by the arresting officers,

12    the lawyers, the court, that would in any way affect your

13    ability to be absolutely fair and impartial to both sides?

14              PROSPECTIVE JUROR GARCIA:  It was just a gold chain

15    that wasn't returned.  That's it.                               02:28:26

16              THE COURT:  And it wasn't returned by -- who kept

17    it?  Was it the police?

18              PROSPECTIVE JUROR GARCIA:  The sheriff Buther

19    (phonetic), I think.  That's all I know.

20              THE COURT:  Did you make a claim with the sheriff?    02:28:38

21              PROSPECTIVE JUROR GARCIA:  Yes, I did.

22              THE COURT:  And what was the result of that?

23              PROSPECTIVE JUROR GARCIA:  Nothing was returned.

24    That's it.

25              THE COURT:  Okay.  And you said it was at least       02:28:45
```

1    five years ago.  Was it between --

2              PROSPECTIVE JUROR GARCIA:  It was more than five

3    years ago.

4              THE COURT:  Was it between five and ten or ten and

5    15?                                                          02:28:54

6              PROSPECTIVE JUROR GARCIA:  Five and ten.

7              THE COURT:  Did you form an opinion as to how you

8    were treated by the court, the arresting officers, the

9    lawyers, on both sides?

10             PROSPECTIVE JUROR GARCIA:  No.  Things happened for  02:29:13

11   a reason, that's all.

12             THE COURT:  Is there anything about that situation

13   that would affect your ability to be absolutely fair and

14   impartial to both sides in this case?

15             PROSPECTIVE JUROR GARCIA:  No.                     02:29:25

16             THE COURT:  Okay.  Do you want to hand the

17   questionnaire out.  Now, if anybody needs a pen.  Once you

18   have the questionnaire take a look at it.  I suggest you jot

19   down some notes on it.

20             We are not going to collect the questionnaire, but  02:30:19

21   if you have something to help you get through the questions

22   quickly, that would help us all.

23             MR. ALEXANDER:  Your Honor, may the two assistants

24   be excused?

25             THE COURT:  We only needed them here to introduce  02:30:38

1   them for the jury, but when they come and go is yours and Mr.

2   Behnke's say.

3          MR. ALEXANDER:  Thank you, your Honor.

4          THE COURT:  Thank you for asking.

5          Now let me just go over -- you don't all have the            02:31:11

6   questionnaire, but let me tell you a few things about it.

7          First, a lot of the questions call for yes/no

8   answers.  You should answer that way unless you feel that you

9   would be more comfortable answering in a different way.  That

10  would be all right.  You can just give us the number and the    02:31:26

11  answer to the question.

12         Number 11 asks have you or any of your relatives

13  ever been charged with a crime.  If so, what crime.  So if

14  you have ever been charged or, to your knowledge, any of your

15  relatives have ever been charged with a crime, even if it was  02:31:48

16  dismissed or you were found not guilty, you should tell us

17  about it.

18         If you just tell us about your third cousin or your

19  uncle and you don't tell us anything else, you are impliedly

20  telling us that you have never been charged with a crime, and  02:32:01

21  to your knowledge none of your other relatives have.

22         Number 12 is similar.  Have you or any members of

23  your family ever suffered from drug abuse?  It asks about you

24  and any members of your family, obviously to your knowledge.

25         Drug abuse does not include alcoholism, and does        02:32:21

1    not include having used a controlled substance.  It's a

2    question in your mind has that use resulted in drug abuse.

3         So if you or any of your relatives have tried a

4    controlled substance but it didn't rise to the level in your

5    opinion of drug abuse, you don't have to provide that                02:32:42

6    information.

7         Now, number 14, will you accept the law as I give

8    it to you and disregard any idea, notion, you have about what

9    the law is or should be?

10        During the course of the trial and at the end of          02:32:55

11   the trial I will be giving you instructions on the law, and

12   it's necessary that you follow them, because you have to make

13   a determination what the facts are and apply that law to the

14   facts as I instruct you.

15        So if you feel that you cannot do that because you        02:33:11

16   have some reservations about the law or you think it should

17   be different, then you should let us know.

18        15, in evaluating the testimony of a police officer

19   or a law enforcement officer would you give any more or less

20   weight or credibility to that testimony as compared to any         02:33:28

21   other witness, this means just because they are a law

22   enforcement officer would you automatically tend to believe

23   them or would you automatically tend to disbelieve them

24   compared to the testimony of another witness.

25        So in evaluating the testimony of a police officer       02:33:45

```
 1   or law enforcement officer, would you give more or less

 2   weight or credibility to that testimony as compared to any

 3   other witness, and it should say just because of their

 4   position in law enforcement.

 5           I think the rest of the questions are fairly          02:34:00

 6   self-explanatory.

 7           If we are ready with Ms. Garcia.

 8           PROSPECTIVE JUROR GARCIA:  Yes.

 9           THE COURT:  Okay.  Ready to go?

10           PROSPECTIVE JUROR GARCIA:  Do I just go through the   02:34:11

11   list?

12           THE COURT:  Yes, please.

13           PROSPECTIVE JUROR GARCIA:  My name is Valentina

14   Garcia.  I live in San Diego County.

15           THE COURT:  What part?                                02:34:21

16           PROSPECTIVE JUROR GARCIA:  North County.

17           THE COURT:  Okay.

18           PROSPECTIVE JUROR GARCIA:  I'm a graphic artist.

19   No.  I am married, but my husband was deported.  I have two

20   children.  They're in school.                                02:34:36

21           THE COURT:  And why did your husband get deported?

22           PROSPECTIVE JUROR GARCIA:  I think a felony and he

23   was deported after time served.

24           THE COURT:  What was the felony?

25           PROSPECTIVE JUROR GARCIA:  He had some -- an amount   02:34:55
```

1    of drugs.

2                THE COURT:  Okay.  Is there anything -- was that

3    drug case as to your husband here in federal court or

4    superior, state court?

5                PROSPECTIVE JUROR GARCIA:  He was moved to Central    02:35:07

6    and he was deported from there.  That's all I know.

7                THE COURT:  Is there anything about that

8    circumstance that you think would affect your ability to be

9    absolutely fair and impartial to both sides?

10               PROSPECTIVE JUROR GARCIA:  No.                        02:35:20

11               THE COURT:  How long ago was that?

12               PROSPECTIVE JUROR GARCIA:  He recently got deported

13   like a year ago, but he was here illegally for ten years.

14               THE COURT:  Okay.  Keep going.

15               PROSPECTIVE JUROR GARCIA:  Number eight, I have       02:35:40

16   some --

17               THE COURT:  Well, what about number four?  Pick up

18   with number four.

19               PROSPECTIVE JUROR GARCIA:  No.  Yes I'm married.

20               THE COURT:  Right, you covered that.  Going to        02:35:49

21   seven.  How about 6, do you have any children?

22               PROSPECTIVE JUROR GARCIA:  I have two children.

23   They are not employed.  They go to school.

24               THE COURT:  Okay.

25               PROSPECTIVE JUROR GARCIA:  No on seven.  I have       02:36:02

1    some college, community college.

2              THE COURT:  So you graduated high school?

3              PROSPECTIVE JUROR GARCIA:  Yes.

4              THE COURT:  And what did you study in community

5    college?                                                      02:36:15

6              PROSPECTIVE JUROR GARCIA:  I got a B in calculus

7    and that's as high as I got.  Just general education.

8              THE COURT:  So did you get a AA degree?

9              PROSPECTIVE JUROR GARCIA:  No, I didn't.

10             THE COURT:  Okay.                                    02:36:29

11             PROSPECTIVE JUROR GARCIA:  I never served on a

12   jury.  No, to A, B and C.

13             THE COURT:  Okay.

14             PROSPECTIVE JUROR GARCIA:  I've never been a

15   witness.                                                      02:36:46

16             THE COURT:  You told us about the check charge and

17   about your husband.  Is there anything else that you have

18   ever been charged with?

19             PROSPECTIVE JUROR GARCIA:  No, just that case that

20   was a check.                                                  02:37:00

21             THE COURT:  Right.  Any other relatives ever been

22   charged with a crime?

23             PROSPECTIVE JUROR GARCIA:  Not my immediate family.

24             THE COURT:  How about your extended family?

25             PROSPECTIVE JUROR GARCIA:  My aunts' side, my       02:37:08

```
 1    cousins, they have been charged with --
 2            THE COURT:  What did they get charged with?
 3            PROSPECTIVE JUROR GARCIA:  Drugs, fraudulent
 4    checks.  Mostly drugs.
 5            THE COURT:  Is there anything about those          02:37:31
 6    circumstances that you think would affect your ability to be
 7    absolutely fair and impartial to both sides?
 8            PROSPECTIVE JUROR GARCIA:  No.  Number 12, no.  And
 9    13, just about that gold chain.
10            THE COURT:  Right.                                  02:37:55
11            PROSPECTIVE JUROR GARCIA:  14, yes.  15, yes.
12            THE COURT:  Would you give more or less weight or
13    credibility to the testimony of a law enforcement officer?
14    Compared to any other witness?
15            PROSPECTIVE JUROR:  I would say yes.               02:38:30
16            THE COURT:  And would it be more or less?
17            PROSPECTIVE JUROR GARCIA:  More.  16, no.  17, no.
18    18, no.  19, no.  20, yes.  21, yes.
19            THE COURT:  Okay.  Thank you.  No, we'll go this
20    way.  So the next person would be Mr. Lopez.                02:39:16
21            PROSPECTIVE JUROR LOPEZ:  My name is Victor Lopez.
22    And I live in Imperial Valley.  I'm a mechanic for a school
23    district.
24            I worked for the California Highway Patrol two
25    years as an inspector.                                      02:39:40
```

1          I'm married.  I have three children.

2          THE COURT:  What did you do for the Highway Patrol?

3          PROSPECTIVE JUROR LOPEZ:  I worked in the scale

4    doing inspections on the big semi trucks.

5          THE COURT:  Did you serve as a law enforcement          02:39:55

6    officer?

7          PROSPECTIVE JUROR LOPEZ:  Not in that, sir.  It was

8    a non-uniformed employee.

9          I have high school.  I never have been in a jury

10   before.          02:40:18

11         My brother-in-law was convicted of selling

12   narcotics.

13         THE COURT:  And where was that?

14         PROSPECTIVE JUROR LOPEZ:  That was probably more

15   than ten years ago in the San Francisco area.          02:40:34

16         THE COURT:  Is there anything about that case that

17   would affect your ability to be absolutely fair and impartial

18   in this case?

19         PROSPECTIVE JUROR LOPEZ:  No.  All I hear was that

20   he was in jail for that reason.          02:40:47

21         My older brother was in prison due to the same

22   circumstance et cetera, too, and he was living in Santa Ana,

23   in Orange County.

24         THE COURT:  Is there anything about that case as to

25   your older brother that would affect your ability to be          02:41:07

```
 1    absolutely fair and impartial to both sides?

 2              PROSPECTIVE JUROR LOPEZ:   No.

 3              THE COURT:   Okay.

 4              PROSPECTIVE JUROR LOPEZ:   Drugs, and the family, my

 5    older brother did have a problem with drug abuse.              02:41:19

 6              And I never had any disputes with any officers.

 7              14, yes, I believe.   15, I believe in police.

 8              I never had any dispute with any agencies.

 9              THE COURT:   On 15, would you give more -- if two

10    people testified as to the same subject, the observations,    02:41:58

11    and one was a police officer and one was not a police

12    officer, would you -- when you evaluate their testimony you

13    would have to look at a lot of factors, including what they

14    observed, their ability to observe, any bias or prejudice,

15    several factors.                                               02:42:18

16              Would you take into account the fact that one was a

17    police officer and give more weight to their testify as

18    compared to any other witness's testimony?

19              PROSPECTIVE JUROR LOPEZ:   Yes, sir, I believe in

20    the testimony of the officer.                                  02:42:32

21              17, I never worked in any kind of a mortgage or

22    real estate place.

23              18, yes, I have bought my second house; that one

24    and I sold it and I bought my second house.   I don't have any

25    foreclose or default, but I did make, what do they call it,   02:43:00
```

1    like a hardship type of thing with my mortgage people, and

2    they fought with me for payment and the stuff like that, but

3    my house never went to default or to foreclose.

4              THE COURT:  Were you ever in a position where you

5    were not paying the monthly payments?                        02:43:25

6              PROSPECTIVE JUROR LOPEZ:  I always paid my monthly

7    payments, but I would not make -- I went and made agreements

8    with the bank.

9              THE COURT:  A loan modification?

10             PROSPECTIVE JUROR LOPEZ:  It's a loan modification, 02:43:38

11   sir.

12             THE COURT:  Okay.  I think you're up to number 20.

13             PROSPECTIVE JUROR LOPEZ:  Yes.  On the number 20,

14   due to the problems that I had when I bought my second house,

15   that the price went very high and everything else, I don't    02:44:05

16   know if I'm a perfectly fair person on this particular case

17   regarding a mortgage and loans and everything else.

18             THE COURT:  Well, why do you think that?

19             PROSPECTIVE JUROR LOPEZ:  I don't know.  I just

20   feel like the people, like the person that did my mortgage,   02:44:28

21   my second mortgage on the house that I bought, did a whole

22   bunch of different things in order for me to get the loan,

23   which I believe I couldn't, I couldn't somehow qualify, and

24   somehow I got in too much trouble.

25             And then after that I had to pay the consequences   02:44:48

1   and -- pay the mortgage, I mean, which it was very expensive.

2          THE COURT:  So you think that would affect your

3   ability to be absolutely fair and impartial to both sides in

4   this case?

5          PROSPECTIVE JUROR LOPEZ:  I believe it will.          02:44:59

6          THE COURT:  And how about number 21?

7          PROSPECTIVE JUROR LOPEZ:  Well, yes.

8          THE COURT:  Okay.  Does anybody, either the

9   government or the defense, have any follow-up questions on

10  the last issue, his answer to number 20?                    02:45:26

11         I note that he is from Imperial California, so he

12  has traveled a long distance.

13         Does the government have any follow-up questions?

14         MR. ALEXANDER:  No, your Honor.

15         THE COURT:  Mr. Nunn?                                 02:45:38

16         MR. NUNN:  Yes, your Honor.

17         THE COURT:  Go ahead.

18         MR. NUNN:  Mr. Lopez, it sound like you kind of

19  blame or have some animosity toward the person who got you

20  into your loan?                                             02:45:58

21         PROSPECTIVE JUROR LOPEZ:  Yes.

22         MR. NUNN:  Thank you, your Honor.  No further

23  questions.

24         THE COURT:  Mr. Cleary?

25         MR. CLEARY:  No questions, your Honor.                02:46:04

1          THE COURT:  Okay.  In light of his answer to number

2     20, does the government have any objection if we excuse Mr.

3     Lopez?

4          MR. ALEXANDER:  No, your Honor.

5          THE COURT:  Mr. Nunn?                                02:46:15

6          MR. NUNN:  No, your Honor.

7          THE COURT:  Mr. Cleary?

8          MR. CLEARY:  No objection.

9          THE COURT:  Normally I would wait until further on,

10    but you are coming all the way from Imperial, so we are going  02:46:20

11    to excuse you based upon your experiences and your answer to

12    number 20.

13         Please report to the jury clerk for any further

14    assignment.

15         PROSPECTIVE JUROR LOPEZ:  Thank you, your Honor.     02:46:32

16         THE COURT:  Give the microphone over to Mr.

17    Navarrette.

18         PROSPECTIVE JUROR NAVARRETTE:  My name is John

19    Navarrette, and I'm from Oceanside.  It's the North County.

20    And I am a real estate broker.                           02:46:50

21         THE COURT:  How long have you been in that

22    business?

23         PROSPECTIVE JUROR NAVARRETTE:  I have been in the

24    business since the nineties; over 20 years.

25         I never worked for law enforcement.                 02:47:03

1        My wife works for a financial company.  Number

2   six --

3        THE COURT:  What kind of financial company?

4        PROSPECTIVE JUROR NAVARRETTE:  She works as a bank

5   teller.                                                       02:47:18

6        THE COURT:  What did you do before real estate?

7        PROSPECTIVE JUROR NAVARRETTE:  Broadcast

8   engineering.

9        THE COURT:  Okay.

10       PROSPECTIVE JUROR NAVARRETTE:  Yes.  Broadcast        02:47:32

11  engineering.  I was a technical director.

12       I don't have any -- let's see.  Do you have any

13  relatives, close friends, that are now or have ever been

14  employed -- no, I don't have any relatives that are in law

15  enforcement, except maybe two in security, hospital security. 02:47:51

16  I have a nephew that works with security.

17       THE COURT:  Okay.  And were you ever in law

18  enforcement?

19       PROSPECTIVE JUROR NAVARRETTE:  No.  The highest

20  level of education that I have completed was radio         02:48:06

21  operational engineering school after high school.  That was

22  probably equivalent to an AA.

23       THE COURT:  And do you have any children?

24       PROSPECTIVE JUROR NAVARRETTE:  Yes, I have adult

25  children.                                                    02:48:22

1             THE COURT:  Okay.

2             PROSPECTIVE JUROR NAVARRETTE:  Yes, I have served

3    on a jury before, it was a civil case, trial by jury.

4             THE COURT:  Did you remember what the case was

5    about?                                                        02:48:35

6             PROSPECTIVE JUROR NAVARRETTE:  It was about a

7    company, a hotel firm, that was indicted for -- that was --

8    there was an accident on one of the -- at one of the hotel

9    chains.

10            THE COURT:  So it was a suit for money?             02:48:56

11            PROSPECTIVE JUROR NAVARRETTE:  Yes.

12            THE COURT:  And did the jury reach a verdict?

13            PROSPECTIVE JUROR NAVARRETTE:  No, it was thrown

14   out of court.

15            THE COURT:  Okay.  Now, so you didn't have to       02:49:03

16   deliberate and decide the case?

17            PROSPECTIVE JUROR NAVARRETTE:  No, we never did.

18            And I have never been a witness in a case.

19            Number 11, I don't have relatives that have been

20   charged with a crime.  12, no.                               02:49:19

21            THE COURT:  And how about yourself on number 11?

22            PROSPECTIVE JUROR NAVARRETTE:  No.

23            THE COURT:  Okay.

24            PROSPECTIVE JUROR NAVARRETTE:  Or any members of my

25   family suffered from drug abuse.                             02:49:32

1    Number 13.  No, I never have had any disputes with
2    law enforcement.
3    And, yes, I will accept the law as given and
4    disregard any notion about what the law, it should be.
5    Number 15, no.  In evaluating the testimony of a          02:50:01
6    police officer, I would not give more or less weight or
7    credibility than any other witness.
8    Number 16, individual disputes with other
9    government agencies, no.
10    17, I have never been employed as a mortgage          02:50:27
11    broker.  I am a real estate agent, but I never put together
12    any loans.
13    Number 18, yes, I have purchased real estate as an
14    investment.
15    19, no, I have never had property foreclosed or          02:50:48
16    defaulted.
17    And number 20, yes, I could be fair and impartial
18    in this particular case to both the government and the
19    defendant.
20    And yes, number 21.  Yes, I could decide without          02:51:06
21    any sympathy or prejudice.
22    THE COURT:  Okay.  Thank you.  Could you pass the
23    microphone over to Mr. Lopez.
24    PROSPECTIVE JUROR LOPEZ:  My name is Miguel Lopez.
25    I live in University City, San Diego.          02:51:29

```
 1            I'm a retired teacher.

 2            I have never worked for a law enforcement agency.

 3    I'm married.

 4            THE COURT:  What did you teach?

 5            PROSPECTIVE JUROR LOPEZ:  Pardon?                    02:51:44

 6            THE COURT:  What did you teach.

 7            PROSPECTIVE JUROR LOPEZ:  Spanish.  I'm married.

 8    My wife is an accountant.  I have no children.

 9            No relatives or friends in law enforcement.  I have

10    a graduate degree in Spanish.                               02:52:04

11            I have never served on a jury before.

12            I have never been a witness either.  None of my

13    relatives have been charged with a crime.

14            THE COURT:  How about yourself?

15            PROSPECTIVE JUROR LOPEZ:  No.                        02:52:23

16            No members of my family have suffered from drug

17    abuse.

18            I have never had a dispute with law enforcement

19    officer.

20            I will accept your interpretation of the law and    02:52:41

21    disregard any idea or notion about what it should be.

22            And when evaluating the testimony of a police

23    officer, I would not give it any more or less weight than any

24    other witness.

25            I have never had any disputes with any agency of    02:53:01
```

1    the U.S. government.

2            I've never been employed as a mortgage broker, real

3    estate agent, et cetera.

4            I have never purchased or sold real estate as an

5    investment; never defaulted or been foreclosed either on a

6    real estate loan.

7            I think I could be fair and impartial in this case

8    to both parties.

9            And I would to my best, and I think I could decide

10   this case dispassionately and without any sympathy or

11   prejudice.

12           THE COURT:   Okay.   Thank you.

13           Ladies and gentlemen, we are going to stop at this

14   point.   I'll ask Ms. Garcia just to stay for a couple of

15   follow-up questions.

16           In terms of the schedule, a bit of a modification.

17   One of the lawyers in the case has to argue a case before the

18   court of appeals on Monday up in Pasadena, the U.S. Court of

19   Appeals.   So I think it would be risky to say let's pick up

20   in the afternoon so -- because they may not be back.

21           So this is what we are going to do.   We will have a

22   full day on Friday and we will not have any court on Monday.

23   And then we will go half a day the following Friday.

24           So it doesn't really change the schedule at all in

25   terms of the length of the trial, but we will go, instead of

1    going a halfway Friday, we will go a full day on Friday.

2            So please be here at 9:30 tomorrow.  Be outside and

3    ready to go.  We will finish with this group and then we will

4    bring the other 20 jurors in.  So take home the questionnaire

5    and go over it and be prepared, again, so we can get through      02:54:56

6    it as quickly as possible.

7            You don't have to repeat the questions.  If it is a

8    yes/no answer you can just give the number and the yes/no

9    answer.  But if you feel more comfortable answering in a

10   different way, you can do that.                                   02:55:13

11           Have a safe trip home, an enjoyable evening.  We

12   will see you 9:30 tomorrow.

13           THE CLERK:  A juror wants to talk to you about

14   leaving Friday.

15           THE COURT:  Just hang on, sir.  Okay.  Is it Mr.--       02:55:52

16           PROSPECTIVE JUROR MORENO:  Moreno.

17           THE COURT:  I'm trying to see what number you are.

18           PROSPECTIVE JUROR MORENO:  41.

19           THE COURT:  41.  Right.  Okay.  The clerk said you

20   had a concern about Friday.                                      02:56:27

21           PROSPECTIVE JUROR MORENO:  You probably forgot.

22   I'm the birthday boy.

23           THE COURT:  Oh, Las Vegas.

24           PROSPECTIVE JUROR MORENO:  Palm Springs.

25           THE COURT:  Palm Springs, sorry.                         02:56:40

```
 1              PROSPECTIVE JUROR MORENO:  You said I could
 2   probably leave early on Friday, but you're saying now that --
 3              THE COURT:  Would 4:30 be a problem for you?
 4              PROSPECTIVE JUROR MORENO:  Honestly, your Honor, I
 5   was actually hoping to leave early before I could get -- to      02:56:50
 6   beat traffic.
 7              THE COURT:  Because I couldn't give up much of
 8   Friday because unfortunately I have to give up Monday --
 9              PROSPECTIVE JUROR MORENO:  Okay.
10              THE COURT:  -- for another lawyer.  Is that going     02:57:08
11   to be a problem?
12              PROSPECTIVE JUROR MORENO:  Actually --
13              THE COURT:  Be honest.  Don't be afraid to tell me.
14              PROSPECTIVE JUROR MORENO:  Yes, it would.
15              THE COURT:  Okay.  Because you had plans for the --   02:57:26
16              PROSPECTIVE JUROR MORENO:  I had plans, previously.
17              THE COURT:  So you had planned to be there in the
18   evening.  What time had you planned to leave before?
19              PROSPECTIVE JUROR MORENO:  No later than noon.  But
20   you had already told me, let's make it 12:30.  I was going to    02:57:39
21   make -- you know, I was going to be okay with that, but now
22   you're saying that you are going to use the whole Friday.
23              THE COURT:  Right.  We would go until 4:30.  Any
24   questions from any of the lawyers?  Mr. Alexander?
25              MR. ALEXANDER:  No, your Honor.                       02:57:56
```

1          PROSPECTIVE JUROR MORENO:  While I have a chance,

2     could I make -- number 19?

3          THE COURT:  Sure.  Let me see, yes.

4          PROSPECTIVE JUROR MORENO:  Have you ever had

5     property foreclosed or defaulted on a loan.  The answer is          02:58:05

6     no, but I'm in the process of refinancing my home and I have

7     gone to four lenders and right now I have an uneasiness about

8     lenders and I think it's going -- my focus is going to be

9     somewhere else when we are dealing with this.  So I'm not

10    sure that's --          02:58:31

11         THE COURT:  What do you mean you have an

12    "uneasiness" about lenders?

13         PROSPECTIVE JUROR MORENO:  I think they're

14    obviously -- they're there to make money, but I don't think

15    they're trying to -- I think they're, whatever, you know, I          02:58:41

16    hate to say the word prey, but right now I have this

17    uneasiness about lenders.  I don't know how else to explain

18    it.

19         THE COURT:  Mr. Alexander, did you want to ask any

20    follow-up questions about anything?          02:59:00

21         MR. ALEXANDER:  No, your Honor.

22         THE COURT:  Mr. Nunn?

23         MR. NUNN:  No, your Honor.

24         THE COURT:  Mr. Cleary?

25         MR. CLEARY:  No questions.          02:59:06

| | |
|---|---|
| 1 | THE COURT:  Could I ask you to step outside for |
| 2 | just a moment. |
| 3 | PROSPECTIVE JUROR MORENO:  Sure. |
| 4 | THE COURT:  M. Garcia, could I ask you to just step |
| 5 | outside for a moment.  We'll be right with you. |
| 6 | (The prospective jurors left the courtroom. ) |
| 7 | THE COURT:  Okay.  What about Mr. Moreno, 41? |
| 8 | MR. NUNN:  Well, your Honor, he said, number one, |
| 9 | Friday was a problem, so I think he could be excused on that. |
| 10 | And, number two, I think he is a challenge for |
| 11 | cause.  He's made it clear enough to me that he's going to |
| 12 | prejudge it. |
| 13 | THE COURT:  So what is your request? |
| 14 | MR. NUNN:  Excuse him for cause or let him go based |
| 15 | on his conflict, either one. |
| 16 | THE COURT:  Mr. Cleary? |
| 17 | MR. CLEARY:  Your Honor, I'm neutral on him.  So... |
| 18 | THE COURT:  Well, do you object to Mr. Nunn's |
| 19 | request? |
| 20 | MR. CLEARY:  No, your Honor, I don't object. |
| 21 | MR. ALEXANDER:  No objection, your Honor. |
| 22 | THE COURT:  Pardon me? |
| 23 | MR. ALEXANDER:  No objection, your Honor. |
| 24 | THE COURT:  What about -- so we will excuse him for |
| 25 | cause.  I think the last statement is troubling, and I think |

02:59:18

02:59:58

03:00:13

03:00:23

03:00:31

1    it's going to be hard picking a jury because there are going

2    to be a lot of people with these problems who have refinanced

3    and felt cheated, and I just think this is going to be a

4    difficult case.

5            MR. NUNN:  Harder than I thought, your Honor.                03:00:47

6            THE COURT:  Harder than I thought, or than we both

7    thought.  So what about juror number two?  She did say that

8    she would -- she said yes on 14.

9            She's the one with the misdemeanor check

10   conviction, deported husband, and she said she would give        03:01:04

11   more weight to the police.

12           So I hate to make people come back, so I figured if

13   there is going to be any request to rehabilitate or to ask

14   her further questions to see whether she would be excused we

15   could take it up now.                                             03:01:22

16           What's the defense position?

17           MR. NUNN:  Well, the first response is she can't be

18   fair and impartial if she is going to give more weight to the

19   testimony of a police officer, so I don't feel like trying to

20   rehabilitate her, your Honor.  I would challenge for cause.       03:01:40

21           THE COURT:  Mr. Cleary?

22           MR. CLEARY:  No objection.

23           THE COURT:  Do you agree with Mr. Nunn?

24           MR. NUNN:  Yes, your Honor.

25           THE COURT:  Mr. Alexander?                                 03:01:52

1          MR. ALEXANDER:  Your Honor, I think this witness,

2   or this prospective juror, should be given an opportunity to

3   be rehabilitated.

4          THE COURT:  Okay.  Bring her back in.

5               (The juror entered the courtroom.)                03:02:10

6          THE COURT:  Do you want to tell Mr. Moreno that he

7   is excused and he needs to report to the jury clerk.

8          THE CLERK:  Yes, sir.

9          THE COURT:  Ms. Garcia, if you can come up to the

10   podium.  Let me ask you a couple of follow-up questions.     03:02:36

11          On number 14 -- on number 15, excuse me, in

12   evaluating the testimony of a police officer or law

13   enforcement officer, would you give any more or less weight

14   or credibility to that testimony compared to any other

15   witness?  What do you think about that question?            03:02:53

16          PROSPECTIVE JUROR GARCIA:  I'm a person that would

17   believe the evidence pretty much.  I wouldn't make an opinion

18   about anything until I see the evidence.

19          THE COURT:  Well, there are going to be law

20   enforcement people that are going to testify and there are   03:03:13

21   going to be non-law enforcement people that are going to

22   testify.

23          Just because someone is in law enforcement, whether

24   they work for the IRS or another agency, would you tend to

25   believe their testimony just because they work for the agency  03:03:25

```
1    compared to the other witness, or would you be able to

2    evaluate their testimony based upon all the factors that you

3    would be instructed, for example, their opportunity to

4    observe, whether they had any bias or prejudice, whether they

5    made inconsistent statements in the past, what their demeanor   03:03:48

6    was on the witness stand, did they have a good opportunity to

7    observe and know the things testified to, any other factors

8    that bear on believability.

9         Would you be able to look at the testimony with all

10   those factors, or do you think that, just because of their     03:04:04

11   official position, it would cause you to tend to believe

12   their testimony?

13        PROSPECTIVE JUROR GARCIA:  The position wouldn't

14   have anything to do with my decision.  I would go by what

15   they say under oath.  I don't know.                             03:04:23

16        THE COURT:  Well, but let me give you an example.

17   Say a policeman and a non-policeman are having coffee

18   together, and they both walk out of the coffee store and they

19   are standing on the corner and they are both looking at the

20   intersection.                                                   03:04:42

21        Both are looking at it for the exact same time.

22   Both have exactly the same vision.  And a car goes through

23   the intersection and the police officer says, "Hey, they just

24   went through a red light," and he signals to give them a

25   ticket.                                                         03:04:56
```

```
 1              And the person who is with the police officer said,
 2     "Actually the light was still amber when they went through."
 3              Now you're the judge, and, you know, you have the
 4     red light case before you.
 5              PROSPECTIVE JUROR GARCIA:  I would believe the          03:05:10
 6     officer because he is the officer and he would abide by the
 7     law.
 8              THE COURT:  Okay.  Mr. Alexander, do you have any
 9     follow-up questions?
10              MR. ALEXANDER:  Ms. Garcia, would you also look to      03:05:20
11     see whether the officer was perhaps -- at the officer's
12     appearance and demeanor while testifying?  If the officer,
13     say had a problem with their vision or something like that,
14     would that impact your evaluation of that officer's
15     testimony?                                                      03:05:47
16              PROSPECTIVE JUROR GARCIA:  I wouldn't -- the way he
17     would answer the question?  I would think that that would be
18     part of the way that I would use to form an opinion.
19              But meaning race, anything like that, that wouldn't
20     come to a factor at all.                                        03:06:11
21              MR. ALEXANDER:  I have no further questions.
22              THE COURT:  Mr. Nunn, anything further?
23              MR. NUNN:  No, your Honor.
24              THE COURT:  Mr. Cleary?
25              MR. CLEARY:  No.                                       03:06:21
```

```
 1              THE COURT:  You had one.  Go ahead.

 2              PROSPECTIVE JUROR GARCIA:  I was a little confused

 3    when earlier when you were asking me questions about the

 4    dates.  My eighth grader is going to graduate on May 30th.

 5    That's all.                                                    03:06:34

 6              THE COURT:  Okay.  So that's not going to be a

 7    problem at all.  If you could just wait outside we'll be

 8    right with you.

 9              (The prospective juror left the courtroom.)

10              THE COURT:  Okay.  Argument.                         03:06:48

11              MR. NUNN:  Yes, your Honor.  I would renew my

12    challenge for cause.

13              All things being equal, I think in response to the

14    last question that the court asked her she said if everything

15    else was equal I'm going to believe the police officer.       03:06:59

16              THE COURT:  Mr. Cleary?

17              MR. CLEARY:  I agree with Mr. Nunn.

18              THE COURT:  Mr. Alexander?

19              MR. ALEXANDER:  Nothing further.

20              THE COURT:  All right.  The request to excuse her    03:07:06

21    for cause is granted.  Could you let her know.

22              THE CLERK:  Yes, sir.

23              THE COURT:  Now, if I could ask the government just

24    to step outside for a moment so I could take up the CJA

25    issue.  I will be short, and then you can come back and get    03:07:19
```

1    your materials.

2              Unless you don't mind -- they don't mind you

3    hearing.  All we are going to do -- what I want to talk to

4    you about is rate and how much is paralegal and how much is

5    legal.                                                        03:07:33

6              MR. NUNN:  But I did have one other thing I wanted

7    to take up before they left.

8              THE COURT:  It had better be quick because I

9    promised my staff that we would be done at 5:00.

10             MR. NUNN:  The only other thing I wanted to bring   03:07:45

11   up --

12             THE COURT:  The juror needs to get her backpack.

13   Okay.  Go ahead.  She has been excused, so you can go ahead.

14             MR. NUNN:  With regard to the motion we were

15   discussing this morning about the background --                03:08:00

16             THE COURT:  Right.

17             MR. NUNN:  -- all I wanted to say is that the court

18   had originally asked us last week to put down by tomorrow

19   morning specifically what we were after.

20             So I did not want the court to have the impression   03:08:14

21   that we were late in that request, but I just wanted to ask

22   the court if the court could take a closer look at that

23   because we put everything we had into it.  I won't argue with

24   whatever the court's decision.

25             THE COURT:  I read your papers, if that's what       03:08:28

```
 1    you're asking.

 2              MR. NUNN:  Yes, sir.  The ones that were filed this

 3    morning.

 4              THE COURT:  Right.  I think it was about 12 pages.

 5              MR. NUNN:  Yes, sir.                              03:08:35

 6              THE COURT:  I read it.

 7              MR. NUNN:  All right.  Thank you.

 8              THE COURT:  I gave you a ruling.

 9              MR. NUNN:  I understand.

10              THE COURT:  If there is something specific about   03:08:41

11    it -- I ruled on certain characteristics.  If there is

12    something more specific --

13              MR. NUNN:  No, sir.

14              THE COURT:  Some other incident or what else.

15              MR. NUNN:  I just wanted to make sure that the     03:08:53

16    court had had the full opportunity to fully analyze what we

17    were trying to say our case is and why it was relevant.

18              THE COURT:  I understand.  Your case has to do with

19    her circumstances, indicating that she had lack of knowledge

20    and lack of intent.                                         03:09:11

21              But without some other tie-in, any abuse to her I

22    don't think necessarily deals with lack of knowledge and lack

23    of intent.

24              That's why I asked if you wanted to seek to get an

25    expert or something in that regard to tie it in.            03:09:27
```

```
 1              MR. NUNN:  I understand, your Honor.  But we have a

 2    different point of view on where we're going.  So I

 3    understand the court's ruling.  You have answered it.  Thank

 4    you.

 5              THE COURT:  And you are free to raise it again          03:09:42

 6    before she testifies.

 7              MR. NUNN:  That's what we hope --

 8              THE COURT:  After the government's case I will see

 9    more, there will be a better record.  You are free to get

10    reconsideration at that time.                                     03:09:52

11              MR. NUNN:  Thank you.

12              THE COURT:  Okay.  All right.

13              MR. ALEXANDER:  Your Honor, I just want to make

14    sure, you know, during the government's case-in-chief that

15    there are no cross examination questions relative to this        03:10:02

16    type of information.

17              THE COURT:  Not without him requesting permission

18    from the jury on the specific things I have excluded without

19    prejudice.

20              Okay.  Could I ask -- do you want them to step         03:10:16

21    outside or do you not care?

22              MR. NUNN:  I don't particularly care.

23              THE COURT:  So it doesn't have to be done ex parte.

24              MR. NUNN:  It probably would be better.

25              THE COURT:  Just step outside for a moment.  I will    03:10:32
```

```
 1    be real quick.

 2                    (Ex parte matter.)

 3            THE COURT:  So the question is, if she is going to

 4    be sitting here at trial serving as an assistant, a

 5    paralegal, which I think is appropriate, the rate would be     03:10:51

 6    $45 an hour.  If she is going to do legal work, the rate

 7    would be $75 an hour.

 8            So we need to know which is which, or I could just

 9    do an estimate at $45 an hour.

10            MR. NUNN:  Your Honor, I'll let Ms. Rabon speak for    03:11:07

11    herself in that regard, but I think she would be happy with

12    anything.

13            I just want to let the court know she is working

14    very, very hard and she is doing both.  She is much more than

15    an assistant.  She is doing legal work and she is a great      03:11:22

16    deal of assistance.

17            THE COURT:  Well, you know she said she is willing

18    to do this pro bono and on a voluntary basis.

19            MR. NUNN:  Yes, sir.

20            THE COURT:  So what do you need?  I mean, if she is     03:11:34

21    a volunteer, she could say I don't have the time to do this

22    or that.  If she is going to volunteer she is going to

23    volunteer.

24            But if she is going to get paid then she is

25    obligated to do the work.  And so I need to know what --       03:11:47
```

```
1    maybe you can tell me tomorrow what your specific request is.

2            If it's just to sit here through the trial, that

3    would seem to me more paralegal.  It doesn't seem to me that

4    you need an extra lawyer.  Because you have Mr. Cleary also,

5    and, you know, together you can consult on instructions, et    03:12:09

6    cetera.

7            MR. NUNN:  I think we would be fine with the

8    paralegal rate, your Honor.

9            MS. RABON:  Absolutely, your Honor, I would be fine

10   with that.                                                    03:12:19

11           THE COURT:  All right.  So I'll try to figure that

12   out, and I'll put that in the order.

13           MR. NUNN:  That's appreciated, your Honor.  Thank

14   you very much.

15           MS. RABON:  Thank you, your Honor.                    03:12:40

16           THE COURT:  Okay.  Thank you.  We're in recess.

17           MR. CLEARY:  9:30 tomorrow morning.

18           THE COURT:  9:30.

19                (This matter was in recess.)

20

21

22

23

24

25
```

1

2

3                          **CERTIFICATION**

4

5              *I hereby certify that I am a duly appointed,*

6    *qualified and acting official court reporter for the United*

7    *States District Court; that the foregoing is a true and*

8    *correct transcript of the proceedings had in the*

9    *aforementioned cause; that said transcript is a true and*

10   *correct transcription of my stenographic notes; and that the*

11   *format used herein complies with the rules and requirements*

12   *of the United States Judicial Conference.*

13

14   Dated:   March 31, 2014 at San Diego, California

15

16

17

18   S/Barbara Harris

19

20   Barbara Harris, Official Reporter

21

22

23

24

25