# EXHIBIT 3

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **Crim. No. 12-CR-27-JAW** |
| | ) | |
| CAROLE SWAN, and | ) | |
| MARSHALL SWAN, | ) | |
| | ) | |
| Defendants | ) | |

## AFFIDAVIT OF JULIE HAUSMAN

NOW COMES Julie Hausman, who does depose and state under oath as follows:

1. I am employed by Safe Voices located at 484 Main St, Lewiston, ME 04240.

2. I have worked with survivors of domestic violence for over 14 years.

3. I met Carole Swan on Tuesday, June 4, 2013 at 223 Main Street, Auburn, Maine 04210.

4. During this meeting, Carole Swan described to me some of the abuse that she has suffered by her husband, Marshall Swan.

5. Based on what Carole told me, I am very concerned for her safety.

6. Carole described red flag behavioral patterns in her husband which are indicative of domestic violence battering.

7. My concerns for her safety are huge because of several things that, to me, raised the level of lethality of the situation. She described a number of extremely abusive situations which project that her husband may be anticipating something and that he is very dangerous.

8. Carole's demeanor, in my experience, is a very fearful women, and understandably so. She was very believable and it is completely understandable why she waited as long as she has before leaving.

9. We discussed a lengthy safety plan which included present and future safety. Due to the level of high lethality in this relationship, I have great concern if Mr. Swan will allow

1

Carole to separate herself from him. Due to the dire nature of her circumstances, I discussed with Carole a Protection from Abuse Order and the increased danger that this step could place her in. I also discussed with Carole that based upon our conversation and my experience, I believe that there is a great possibility that Mr. Swan may have put something within the home in anticipation of her attempting to leave him.

10. In situations such as Carole's, it is not unusual for women to wait years before leaving their abusive partners. We understand that victims of domestic violence are terrified that their partners will kill them if they attempt to leave or once they have left. Carole stated that, in fact, this was why she has not fled the home before now.

11. Carole and I discussed additional reasons why she has waited until now to leave her husband. Those reasons involved her children. Again, Carole's feelings, emotions, and reasoning were consistent with what I would expect to see from someone who has suffered the abuse Carole described.

12. Again, I believe that Carole is in significant danger. I have offered community supports that I believe may be of assistance to Carole. I have safety planned with Carole and I am prepared to support her through whatever steps that she chooses to take along this journey.

On my oath, and to the best of my knowledge, information, and belief, this affidavit is true and accurate.

STATE OF MAINE
County of ___Androscoggin___, ss.

Dated this __26th__ day of June, 2013, at __Auburn__, Maine.

_Julie Hausman_
Julie Hausman

Personally appeared Julie Hausman, who made oath to the foregoing affidavit, before me:

Dated: __June 26, 2013__

_Lisa D. Cates_
Notary Public, State of Maine
My Commission Expires: __09/05/15__

**Lisa D. Cates**
**My Commission Expires**
**September 5, 2015**

2

# EXHIBIT 4

UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

UNITED STATES OF AMERICA     )
                             )      CRIMINAL ACTION
        vs.            )
                             )       Docket No.
                             )
CAROLE SWAN              )      1:12-cr-00027-JAW-1
                           )
           Defendant.    )      SENTENCING

TRANSCRIPT OF PROCEEDINGS

Pursuant to notice, the above-entitled matter came on

for SENTENCING before the HONORABLE JOHN A. WOODCOCK, JR.,

Chief District Judge, in the United States District Court,

Bangor, Maine, on the 13th day of June, 2014, at 1:15 p.m.

APPEARANCES:

For the Government:          Donald E. Clark, Esquire

For the Defendant:           Caleigh S. Milton, Esquire
                            Leonard I. Sharon, Esquire

Recording Equipment Monitor
Julie Walentine

Proceedings recorded by mechanical stenography; transcript
produced by computer.

INDEX OF PROCEEDINGS

Page:

Testimony:   (see below)

INDEX OF WITNESSES

Page:

RODNEY GIGUERE (called by Mr. Clark)

| | |
|---|---|
| Direct Examination by Mr. Clark | 22 |
| Cross-examination by Mr. Sharon | 36 |

MARK STEBBINS (called by Mr. Clark)

| | |
|---|---|
| Direct Examination by Mr. Clark | 37 |

MICHAEL RYAN (called by Mr. Clark)

| | |
|---|---|
| Direct Examination by Mr. Clark | 44 |

INDEX OF EXHIBITS

| Government's Exhibit No. | Description | Offered | Admitted |
|---|---|---|---|
| 312 | Slefkin deed 12/4/73 | 27 | 27 |
| 313 | Slefkin deed 8/1/83 | 28 | 29 |
| 314 | Sgutt deed 3/4/85 | 28 | 29 |
| 315 | Trustee's deed 10/13/97 | 28 | 29 |
| 316 | Quitclaim deed 5/5/98 | 30 | 30 |
| 317 | Quitclaim deed 10/20/98 | 30 | 30 |
| 319 | Property Card | 24 | 24 |
| 320 | Tax Map | 25 | 25 |
| 321 | Satellite Photograph | 25 | 25 |
| 324 | Deed Information | 26 | 26 |
| 325 | Flow Chart | | |

| Defendant's Exhibit No. | Description | Offered | Admitted |
|---|---|---|---|
| 1-14 | Letters | 63 | 63 |
| 15-21 | Medical Records | 63 | 63 |

1              (Defendant present with counsel in open court.)

2         THE COURT:  All right.  We are here in the matter of

3    United States versus Carole Swan, which is 12-cr-27-JAW.

4    Would counsel please enter their appearances?

5         MR. CLARK:  Don Clark for the government, Your

6    Honor.

7         MR. SHARON:  Leonard Sharon for the defendant, Your

8    Honor.

9         THE COURT:  Mr. Clark, have you provided reasonable,

10   accurate, and timely notice of this proceeding to any victims?

11        MR. CLARK:  We have, Your Honor.

12        THE COURT:  Thank you.

13        Ms. Swan, would you stand, ma'am?  Ms. Swan, the

14   purpose of the hearing this afternoon is for me to sentence

15   you.  Before I do that, I am going to hear from your lawyer.

16   I will hear from the prosecutor, and I will hear from you, if

17   you wish to speak to me.  I'm going to start by asking you

18   some questions because I want to be sure you've read and

19   reviewed the presentence report as it has been revised, and I

20   also want to assure myself that you're competent.

21        Your name is Carole Swan; is that correct?

22        THE DEFENDANT:  Yes.

23        THE COURT:  I understand you graduated from the

24   Gardiner Area High School; is that right?

25        THE DEFENDANT:  Yes.

1        THE COURT:  Have you used any alcohol or drugs in

2  the last 24 hours?

3        THE DEFENDANT:  No.

4        THE COURT:  Do you understand why it is you are here

5  today?

6        THE DEFENDANT:  Yes.

7        THE COURT:  Based on your responses and my direct

8  observations, I find you are competent.

9        You're here represented by your attorney,

10  Mr. Sharon, and Ms. Milton; is that correct?

11        THE DEFENDANT:  Yes.

12        THE COURT:  Do you authorize your lawyers to act and

13  speak for you?

14        THE DEFENDANT:  Yes.

15        THE COURT:  Mr. Sharon, has your client received a

16  copy of the written presentence report as revised?

17        MR. SHARON:  Yes, Your Honor.

18        THE COURT:  Have you had enough time to discuss the

19  contents of the report with her?

20        MR. SHARON:  Yes, sir.

21        THE COURT:  Ms. Swan, have you read the report in

22  its entirety?

23        THE DEFENDANT:  Yes, sir.

24        THE COURT:  Including its most recent revisions?

25        THE DEFENDANT:  Yes, sir.

1      THE COURT:  Have you had enough time to discuss the

2  contents with your attorney?

3      THE DEFENDANT:  Yes.

4      THE COURT:  Do you know and understand everything

5  contained in the report?

6      THE DEFENDANT:  I think there is a mistake in it.

7      THE COURT:  Okay.  Do you want to tell me what that

8  mistake is?

9      THE DEFENDANT:  I believe in the financial part,

10  sir.

11      THE COURT:  All right.  Let's -- I'm going to ask

12  that you take a look at the report and what I'm going to do is

13  go through it section-by-section because I -- I am not going

14  to ask you, for example, because you were convicted, you

15  didn't plead guilty to these crimes, I am not going to ask you

16  about the offense conduct.  That's not fair to you because you

17  have a continuing right to remain silent, and I am not going

18  to press you on that.

19      So I'm going to go through the report item-by-item

20  to make sure it's correct and then when we get to the

21  financial issue, you can tell me where you think there is an

22  error.

23      Turning to page 3 of the report, which has

24  identifying data, is that all that correct?

25      THE DEFENDANT:  My address has changed, sir.

1      THE COURT:  Okay.  You are now where?

2      THE DEFENDANT:  472 Windsor Road, Chelsea.

3      THE COURT:  Yeah, I've got -- that's what -- oh, it

4  says 472 Windsor Road, Augusta, and it's actually Chelsea?

5      THE DEFENDANT:  Yes.

6      THE COURT:  Okay.  Is there anything else about

7  page 3?

8      THE DEFENDANT:  No, sir.

9      THE COURT:  Now, on page 4, there is a part A, which

10  talks about the offense, and that basically talks about when

11  you were -- when you first appeared on State related charges,

12  and then it goes through the history of the case.  Have you

13  looked at paragraphs 1 through 5?

14      THE DEFENDANT:  Yes, sir.

15      THE COURT:  And is that all accurate?

16      MR. SHARON:  She points to the fact regarding -- in

17  paragraph 5 regarding the construction where it was originally

18  said it appears that the defendant and husband were involved

19  in that.  That was later, I believe, dealt with in the

20  pretrial -- in the conference -- sentencing conference, Your

21  Honor.

22      THE COURT:  Right.  We might as well address that

23  now so that I can alleviate any concerns that either counsel

24  or you may have regarding the issue with Frank Monroe.

25  You were here during the course of your husband's sentencing,

1    and you heard all that testimony and my findings that he did,

2    in fact, pay an individual to slash Frank Monroe's tires and

3    to damage his equipment.   However, I listened carefully to

4    that testimony, and unless the government is prepared to

5    present other evidence -- is the government prepared to

6    present other evidence on that issue regarding this defendant?

7              MR. CLARK:   No.

8              THE COURT:   My conclusion about that was that you

9    were not directly involved.   There was some evidence that you

10   were present during at least a portion of one of the meetings,

11   but even that witness said that they weren't sure what you

12   heard and what you didn't hear.   And, therefore, it was my

13   conclusion and it is my conclusion that I am not holding you

14   as responsible for what your husband did regarding Frank

15   Monroe and the slash -- and paying someone to slash his tires

16   in an attempt to intimidate him.   Do you understand?

17             THE DEFENDANT:   Yes, sir.

18             THE COURT:   Now, turning to the offense conduct,

19   that's what I am not going to ask you about.

20             THE DEFENDANT:   Okay.

21             THE COURT:   And so we'll skip right through, and I

22   am not going to ask you about the obstruction of justice or

23   your acceptance of responsibility, any of that, or the --

24   obviously, the guideline calculations are something that you

25   don't have any information about anyway.

8

1      I'm going to turn instead to page 16 and 17, which

2  reflects your criminal history, and that indicates basically

3  you do not have a criminal history; is that correct?

4           THE DEFENDANT:  Correct, sir.

5           THE COURT:  Now, the next part of this is what we

6  call offender characteristics, and this talks about where you

7  were brought up and your father and mother, your stepfather,

8  your -- and all sorts of other issues.  Have you had a chance

9  to review that carefully?

10          THE DEFENDANT:  Yes, I have.

11          THE COURT:  And you are going to tell me that there

12  is a mistake on a financial part of this?

13          THE DEFENDANT:  Yes.

14          THE COURT:  What are you referring to, ma'am?

15          THE DEFENDANT:  Under the assets.

16          THE COURT:  Yes, ma'am.

17          THE DEFENDANT:  The vehicle is a 2013.

18          THE COURT:  Okay.  So it says a 2006, one-ton truck,

19  is that what you're referring to or are you referring to the

20  --

21          THE DEFENDANT:  No, at the top, the first one, sir.

22          THE COURT:  Okay.  The 2011?

23          THE DEFENDANT:  That's wrong.

24          THE COURT:  Okay.  And what is the date?

25          THE DEFENDANT:  It's a 2013.

1          THE COURT:  Okay.

2          THE DEFENDANT:  And the balance is around 26,000.

3          THE COURT:  Okay.  Thank you.

4          THE DEFENDANT:  And also there's credit card debt

5     around 56,000.

6          THE COURT:  Okay.  56,000 instead of 1,000?

7          THE DEFENDANT:  Yes.

8          THE COURT:  Okay.

9          THE DEFENDANT:  And also there has been some

10    confusion because my husband had listed a piece of property on

11    his that I hadn't listed on mine, and there is a pit in

12    Windsor that is now in my son's name, and I am not sure of the

13    evaluation.  I am not qualified.  All I have is the tax

14    evaluation.

15         THE COURT:  Okay.  Well, we will talk about that --

16         THE DEFENDANT:  Okay.

17         THE COURT:  -- later on during it.  I'm aware of

18    that issue.  I think Mr. Clark brought that pit issue to my

19    attention just recently; is that right, Mr. Clark?

20         MR. CLARK:  That's correct, Your Honor.

21         THE COURT:  Okay.

22         THE DEFENDANT:  Also, there was a piece of property

23    that I sold in the town of Chelsea, and I thought it got added

24    on here, but it didn't.  It was sold for $9,000 and I got a

25    check for 7,600 after I paid the realtor.

1      THE COURT:  Okay.

2      MR. CLARK:  I think that's in paragraph 88A.

3      THE COURT:  Right.  If you look at paragraph --

4  thank you, Mr. Clark.

5      Paragraph 88A, I think that talks about these two

6  issues.

7      MR. SHARON:  Yes, Your Honor.

8      THE DEFENDANT:  Yes, it does.

9      THE COURT:  Okay.  Is that what you were referring

10  to?

11      THE DEFENDANT:  Yes, sir.

12      THE COURT:  All right.  Is there anything else?

13      THE DEFENDANT:  No, sir.

14      THE COURT:  All right.  Thank you.  You may be

15  seated.

16      Now, I want to be sure that I understand -- counsel

17  have been very helpful.  You have filed memoranda, which I

18  have carefully reviewed, but I want to be sure that I

19  understand what it is, if anything, that is still being

20  contested.  And before we get to that, I want to confirm what

21  I said at the time of the presentence conference.  I believe

22  that the government is correct that I have the authority under

23  the United States Sentencing Guidelines to consider conduct

24  that -- even though she was acquitted of that conduct.  I, as

25  a matter of policy, have never done so, and I don't intend to

1     do so here.  The standard is different.  The standard here is

2     more likely than not.  But it seems to me that if you have

3     gone to trial and a jury has heard a case and the government

4     hasn't proven that case before a jury, that the court should

5     not consider that evidence or hold that evidence against a

6     defendant at the time of sentencing.  Now, where that comes

7     into play is in two areas, one is the Windsor Road culvert

8     issue so-called, and the second is the two acquitted counts on

9     the Federal Workers' Compensation fraud.  Those are both

10    referred to in the presentence report, and although I am aware

11    of all the testimony regarding both, I am not going to hold

12    the evidence underlying those acquitted counts against the

13    defendant, and, therefore, I will not, for example, order

14    restitution to the office of Workers' Compensation Programs

15    for the amounts that are related directly to the acquitted

16    counts for the Workers' Compensation Program, and I am not

17    going to consider the Windsor Road culvert issue for purposes

18    of resolving or attempting to resolve the obstruction of

19    justice charges.

20            Now with that, I understand there is still a

21    substantial disagreement regarding obstruction of justice, and

22    I would be -- is there -- does it -- do -- well, first, let me

23    ask, are there other issues, other than obstruction of justice

24    that counsel believe that the court needs to resolve?

25            MR. CLARK:  Only the question of whether Ms. Swan

1    owns the pit and its value.

2           THE COURT:  Okay.

3           MR. SHARON:  That's correct.

4           THE COURT:  All right.  And turning to the

5    obstruction of justice issue, how do counsel wish to proceed?

6        Mr. Clark, the burden is on you on that issue?

7           MR. CLARK:  Your Honor, we have filed extensive

8    briefs on that issues, and we believe the court has the

9    information to make that finding.  We don't intend to argue it

10   any further.

11          THE COURT:  All right.

12          MR. SHARON:  I agree with Mr. Clark.

13          THE COURT:  All right.  Thank you.  Again, I would

14   like to thank counsel.  The memoranda were very helpful and

15   allowed me to focus my energies on this complicated case.

16   What is at issue here is whether the defendant, Carole Swan,

17   should receive a two-level enhancement for obstructing

18   justice.  There is a provision under Section 3C1.1 of the

19   United States Sentencing Commission Guidelines that address

20   obstruction of justice.  That provision reads, if, (1), the

21   defendant willfully obstructed or impeded or attempted to

22   obstruct or impede the administration of justice with respect

23   to the investigation, prosecution, or sentencing of the

24   instant offense of conviction, and, (2) the obstructive

25   conduct related to (A) defendant's -- the defendant's offense

1    of conviction and any relevant conduct, or (B) a closely

2    related offense, increase by two levels.

3           The guideline commentary contains a number of

4    important principles.  The first is that a denial of guilt

5    does not necessarily constitute obstruction of justice.

6    People tend to remember the same event differently, and there

7    is a difference between perjury and testimony that is

8    generated from confusion, mistake, or faulty memory.

9       Here, the defendant correctly cites United States vs.

10   Dunnigan, at 507 U.S. 87, 117-118, a 1993 Supreme Court case,

11   which was followed by United States vs. Tracy, which is 989

12   F.2d 1279 at 1288-89, a 1993 First Circuit case, as

13   essentially infusing the criminal elements of perjury into

14   those false statements that qualify for obstruction of justice

15   under Section 3C1.1.  Therefore, in order to conclude that a

16   defendant has obstructed justice by falsely testifying, the

17   witness's testimony must first and the court must find that --

18   that the testimony was first false; second, that the false

19   testimony must be about a material matter; and third, that the

20   defendant must have had the willful intent to provide false

21   testimony, and the testimony must not be the result of

22   confusion, mistake, or faulty memory.

23      Further, the First Circuit has instructed the sentencing

24   court that it must be an independent finding on each element

25   of perjury in a separate, clear finding.  And that a

1    sentencing court should not apply the obstruction of justice

2    enhancement based on perjury, unless it has a firm conviction

3    that the defendant committed perjury.

4         At the outset, I will say that the application of this

5    particular two-level enhancement for obstruction seems

6    unusually clear in this case.   In the court's view, the

7    defendant lied repeatedly throughout the course of her

8    dealings with the judicial process, and the court is, frankly,

9    reluctant to go on and isolate out each of these lies, hold

10   them up, examine them under Dunnigan and recite the elements

11   because I, frankly, do not want to embarrass the defendant any

12   more than her situation calls for, but the defendant herself

13   has demanded that I do so, as is her right.   And, therefore, I

14   will set about the task.

15        MR. SHARON:   Judge, may I address you for one

16   second, please?

17        THE COURT:   Sure.

18        MR. SHARON:   I believe -- Ms. Milton, who wrote the

19   brief note -- thank you for the compliment -- she did spend a

20   lot of time on it -- cited law in there that said if the court

21   believes that the obstruction and that permeates the

22   proceeding, that there is really no need to isolate it.   Based

23   upon that finding, we would accept that finding of yours and

24   abide by your recommendation that it's not necessary at this

25   point.   We would waive that argument and feel that your

1    statement that it does permeate the record and your opinion of

2    that is sufficient to make a finding of fact necessary, if

3    there is any appeal.  We don't believe it's necessary based

4    upon that finding and the case law for you to go through that

5    and, as you said, embarrass her any more than necessary.  So

6    we would waive that argument.

7              THE COURT:  All right.  So the defendant is not

8    requesting that I do what Dunnigan asks me to do and isolate

9    each of these statements, which I have concluded are false --

10             MR. SHARON:  No, Your Honor.

11             THE COURT:  -- and reveal the basis for that?

12             MR. SHARON:  No, Your Honor, we don't believe it's

13   necessary.  We believe your finding of fact is sufficient

14   under the law we cited under the First Circuit Court.

15             THE COURT:  Okay.  Fine.

16             MR. SHARON:  Thank you, Your Honor.

17             THE COURT:  Thank you.

18        Mr. Clark, do you have a position on that?

19             MR. CLARK:  Well, Your Honor, I am reluctant not to

20   have the court go through each and every one of the lies that

21   the defendant offered during the course of this proceeding,

22   but if the defendant is waiving that, I guess we can live with

23   it.

24             THE COURT:  Right.  The only thing I would add that

25   it -- because I think it is important to respond to one of the

1    arguments that has been made, and that is a question of how

2    the court should apply obstruction of justice.  And in the

3    defendant's memorandum of March 12, 2014, she argued that the

4    obstruction of justice enhancement should not be applied to

5    each group and what happened in the probation office guideline

6    calculations is that the probation office treated the three

7    separate categories of crimes, Hobbs Act, tax fraud, and

8    workers' compensation as requiring separate calculations.  And

9    then under what is a somewhat mysterious and complicated

10   formula that is contained in the guidelines, these three

11   groups are added together and an incremental guideline figure

12   is attached to the combination of these groups.

13        As I had understood it, the defendant has no quarrel with

14   the grouping analysis itself or the fact that the Hobbs Act,

15   tax fraud, and workers' compensation counts were treated as

16   separate groups.  However, she says that the obstruction of

17   justice enhancement should be applied to only one -- only once

18   to one group, for example, the Hobbs Act group and not to the

19   others, but I think the conclusion that I have come to in the

20   defendant's waiver of any argument on it undercuts that

21   argument because I have found in effect that her obstruction

22   of justice enhancement would apply to all three groups and,

23   therefore, should be applied under Section 1B1.1(a)(3) and

24   (4).  Is there any argument on that issue?

25        MS. MILTON:  No, Your Honor.

1      THE COURT:  Okay.  The only other -- there are only

2  two other issues, I believe, that were before the court, and

3  you can correct me if I'm wrong, one was a request for

4  reimbursement for expenses that Frank Monroe sustained as a

5  consequence of being a witness in the case and victim.

6      MR. CLARK:  That's correct, Your Honor.  The victim

7  in the case, Frank Monroe, submitted an updated or amended

8  victim impact statement.  As a victim in this case, we believe

9  that he is entitled to reimbursement, and we have put that

10  before the court.

11      THE COURT:  Right.  And what's the defendant's

12  position on that?

13      MR. SHARON:  I believe that's your discretion, Your

14  Honor.

15      THE COURT:  Okay.  Let me be sure we're all on the

16  same page as to what he is requesting.  There are really two

17  separate issues here.  One is that he has requested

18  reimbursement for the $10,000 that he turned over to -- that

19  the jury concluded he turned over by extortion to the

20  defendant.  And I take it that that's not the issue here,

21  there is no issue on that?

22      MR. SHARON:  No, Your Honor.

23      THE COURT:  The request for reimbursement totals

24  $770.90 for mileage and lost income.  And is that the figure

25  that you understand is applicable here, Mr. Clark?

1          MR. CLARK:   No, Judge, that's -- those are the funds

2   that were actually paid or disbursed by the U.S. Marshals

3   Service.

4          THE COURT:   Okay.

5          MR. CLARK:   What he's asking for is contained in his

6   affidavit.   He totals it up to be a total of $26,492.56,

7   including the $10,000.   He seeks an additional reimbursement

8   of $16,492.56, but also recognizes that the court has to back

9   out the $770.90 that the U.S. Marshals paid him.   So I believe

10  the net number that he's seeking inclusive of the $10,000 is

11  $25,721.66.

12         THE COURT:   Well, what's the -- what's the

13  government's view?   Is that an appropriate amount from the

14  government's perspective?

15         MR. CLARK:   Well, Judge, under the mandatory Victims

16  Restitution Act, the victim is entitled to restitution for

17  lost income, transportation, and other expenses incurred

18  during participation in the investigation or prosecution of

19  the offense or attendance at proceedings related to the

20  offense.   That's Title 18 United States Code Section 3663

21  A(b)(4).

22      Judge, obviously in the situation where a victim has

23  asked to be reimbursed under the statutory provision, we

24  have -- we have confirmed that the -- what he has represented

25  in terms of the amount of time or the number of meetings that

1   he recalls taking place did occur.  Obviously, we will leave

2   to the court the issue of how to value that.  I believe he has

3   claimed what he believes to be the fair value of the work that

4   he missed during the times that he had to meet to discuss the

5   case or to attend trial.

6           THE COURT:  Okay.

7           MR. CLARK:  I note, by the way, Judge, that he's not

8   asking for reimbursement for the -- I believe in access of

9   approximately $16,000 in damage that was done to his vehicle.

10          THE COURT:  Right.  Well, she -- I have found that

11  she wasn't involved in that anyway, so I wouldn't order that

12  at least against him.  I may have ordered it against her

13  husband, but it wasn't requested at that time, I don't think.

14          MR. CLARK:  Yeah, it couldn't be, Judge, because he

15  was convicted of offenses for which restitution was not

16  authorized.

17          THE COURT:  Okay.  Fair enough.

18      What's the -- I would like to hear from the defendant as

19  to what her position is regarding that claim for restitution.

20  There is a statutory provision, 18 U.S.C. Section 366 A (sic)

21  that seems to require it.  Is -- what's -- what's your view of

22  that?

23          MR. SHARON:  I think that the government represents

24  that he -- Mr. Monroe accurately represented the amount of

25  meetings he attended.  Obviously, I have no objection to the

1   cost of him attending that.  I'm somewhat reluctant on his

2   estimate of work he lost and I am having a difficult time.  I

.3   realize at sentencing the evidentiary burden is less than what

4   is reasonable and that the hearsay rules don't apply.  I'm

5   just having a difficult time taking a position because I

6   really don't know what that's based or --

7           THE COURT:  Sure.

8           MR. SHARON:  But I accept the government's

9   proposition that he accurately reflects the time spent in

10   meetings and would ask the court to apply its discretion based

11   on the facts contained in the affidavit.

12           THE COURT:  Yeah, I don't -- the only thing I have

13   is an affidavit that was signed by him, and I don't have any

14   countervailing evidence.  That simply sets forth was that he

15   lost $10,000 from extortion, and then he's got a series of

16   trips to Portland where he is charging $150 an hour.  That on

17   its face doesn't seem unreasonable.  I think I'm basically --

18   he signed this under oath.  And unless there is something that

19   you can point me to that would lead me to conclude that it's

20   not accurate, I think I am pretty well -- have to accept the

21   statement here.  There is nothing that -- as I say, there is

22   nothing that jumps out at me as I look at it that says he

23   couldn't have earned $150 an hour in his business and that the

24   trips aren't needed -- he didn't take the trips that he said

25   he took.

1          Do you have anything further?

2               MR. CLARK:  No, Your Honor.

3               THE COURT:  So the -- would you tell me again what

4     the bottom line figure is for -- is it the 16,492.56 that is

5     the victim expenses?

6               MR. CLARK:  Yes, yes.  That would be the victim

7     expenses less the amount reduced by the Marshals Service,

8     which was $770.90, leaving, with respect to the expenses, a

9     net of $15,721.66.

10              THE COURT:  All right.

11              MR. CLARK:  And then the 10,000 of the funds

12    extorted would be added to that.

13              THE COURT:  I will make a finding that under 18

14    U.S.C. Section 366 A (sic) the defendant -- the -- Frank

15    Monroe is entitled to receive reimbursement from the defendant

16    in the total amount of $15,721.66.  And in addition, based on

17    the evidence at trial, the evidence of which the -- formed the

18    basis of the jury's verdict of extortion, that the defendant

19    extorted $10,000 from Mr. Monroe, and, therefore, that is

20    appropriately added to an order of restitution.  Therefore,

21    the total order of restitution to Mr. Monroe will equal

22    $25,721.66.

23              Now, the final issue, as I understand it, is the

24    question of this late-breaking information about the property.

25              MR. CLARK:  Yes, Judge.

1          THE COURT:  And what does the government wish me to

2  do with that?

3          MR. CLARK:  Judge, the government has three short

4  witnesses that would prove it at a hearing.

5          THE COURT:  All right.  You may proceed.

6          MR. CLARK:  Thank you, Your Honor.  The government

7  calls Special Agent Rodney Giguere.

8          THE CLERK:  Do you solemnly swear the testimony you

9  shall give in the matter now in hearing shall be the truth,

10  the whole truth, and nothing but the truth, so help you God?

11          THE WITNESS:  I do.

12          THE CLERK:  Thank you.  Please be seated.  Could you

13  please state your name for the record and spell both your

14  first and last names?

15          THE WITNESS:  Rodney Giguere, R-o-d-n-e-y

16  G-i-g-u-e-r-e.

17  RODNEY GIGUERE, having been duly sworn, was examined and

18  testified as follow:

19                    DIRECT EXAMINATION

20  BY MR. CLARK:

21  .Q     Mr. Giguere, how are you employed?

22  A      I'm a special agent with the Internal Revenue Service,

23  Criminal Investigation Division.

24  Q      How long have you been so employed?

25  A      Approximately, 23 years.

GIGUERE - DIRECT EXAMINATION/CLARK                 23

1   Q      What do you do for the IRS?

2   A      Investigate criminal violations within the internal

3   revenue code.

4   Q      Describe your education.

5   A      I have bachelor's degree in accounting.

6   Q      How many tax fraud investigations have you been involved

7   in?

8   A      Hundreds.

9   Q      During the course of those investigations -- I'm sorry,

10  withdrawn.

11         Did there come a time when you became involved in a tax

12  fraud case involving Carole Swan?

13  A      Yes.

14  Q      What was your role in this case?

15  A      I investigated the tax fraud allegations.

16  Q      And as part of your investigative efforts in this

17  case -- I'm sorry.  As part of your investigation efforts,

18  have you had occasion in this or other cases to trace real

19  estate transactions to determine ownership of real property?

20  A      Yes.

21  Q      Can you briefly describe how you do that?

22  A      Determine it through public records.  Most deed

23  transfers are filed with the registry of deeds, and then

24  ownership records, tax records, and other property cards and

25  things like that are usually on file with the town halls.

1    Q      Did there come a time when you reviewed certain deeds

2    and town records for a gravel pit located at 20 Rod Road in

3    Windsor, Maine, that was owned in whole or in part by Carole

4    Swan?

5    A      Yes.

6               MR. CLARK:   Your Honor, may I approach?

7               THE COURT:   You may.

8    BY MR. CLARK:

9    Q      I'm going to place before you what I've marked as

10   Exhibits 319, 320, 321, 324, and 325.  Have you had an

11   opportunity to review these documents before testifying here

12   today?

13   A      Yes, I have.

14   Q      What is Government Exhibit 319?

15   A      This is the property card maintained with the town of

16   Chelsea for a location known as 20 Rod Road, and this is the

17   property card for the gravel pit.

18   Q      And according to the tax card --

19              MR. CLARK:   I'd offer Government Exhibit 319.

20              THE COURT:   Any objection?

21              MR. SHARON:   No, Your Honor.

22              THE COURT:   It's admitted.

23   BY MR. CLARK:

24   Q      According to Government Exhibit 319, who currently owns

25   the gravel pit?

GIGUERE - DIRECT EXAMINATION/CLARK                    25

1    A      It's currently listed as being owned by Jacob Swan.

2    Q      And who owned it prior to Jacob Swan?

3    A      Carole Swan.

4    Q      And directing your attention to Government Exhibit 320,

5    do you recognize it?

6    A      Yes.

7    Q      What is it?

8    A      This is the -- the map, lot map from the town of

9    Chelsea, depicting the particular location within the town for

10   the gravel pit.

11   Q      And is the gravel pit highlighted on the tax map?

12   A      It is.

13          MR. CLARK:   I'd offer Government Exhibit 320.

14          THE COURT:   Any objection?

15          MR. SHARON:   No, sir.

16          THE COURT:   It's admitted.

17   BY MR. CLARK:

18   Q      What's Government Exhibit 321?

19   A      This an aerial satellite photograph taken off of Google

20   Maps of that same location of the gravel pit.

21          MR. CLARK:   I'd offer Government Exhibit 321.

22          THE COURT:   Any objection?

23          MR. SHARON:   No, Your Honor.

24          THE COURT:   It's admitted.

25   BY MR. CLARK:

GIGUERE - DIRECT EXAMINATION/CLARK                          26

1    Q      Who owned this gravel pit prior to 1997?

2    A      Prior to 1997, it was jointly-owned property.

3    Q      Well, let me ask you this, I would like to direct your

4    attention to Government Exhibits 324 and 325.

5    A      Okay.

6    Q      What is that?

7    A      324 is a -- is a summary of the content of the deed

8    information that I -- that I examined.

9    Q      And 325?

10   A      325 is a pictorial flow chart of that same information.

11          MR. CLARK:  I'd offer government Exhibits 324 and

12   325.

13          THE COURT:  Any objection?

14          MR. SHARON:  No, Your Honor.

15          THE COURT:  Each is admitted.

16   BY MR. CLARK:

17   Q      So now back in 1997, prior to any conveyance, who was

18   the person who owned that property in its entirety?

19   A      Prior to 1997, the property was owned by a Harriet A.

20   Slefkin and a Leonard and Thelma Slefkin.

21   Q      And how did they acquire the property?

22   A      They acquired it from a Doris Bassinet.

23   Q      So the first person in the chain of custody would be

24   Doris Bassinet?

25   A      That's correct.

1   Q      And at some point, did she convey it to the Slefkins and

2   the Kelleys?

3   A      She did.

4   Q      About when did that happen?

5   A      December of 1973, I believe.

6   Q      I'm going to show you what's been marked Government

7   Exhibit 312.

8               MR. CLARK:  May I approach, Your Honor?

9               THE COURT:  You may.

10  BY MR. CLARK:

11  Q      Do you recognize Exhibit 312?

12  A      Yes, I do.

13  Q      What is it?

14  A      This is the transfer of deed from Doris Bazinet to the

15  Slefkins and the Kelley.

16  Q      And that occurred on or about December 4th of 1973?

17  A      That's correct.

18              MR. CLARK:  I'd offer Government Exhibit 312.

19              THE COURT:  Any objection?

20              MR. SHARON:  No.

21              THE COURT:  312 is admitted.

22  BY MR. CLARK:

23  Q      So after that conveyance, it's owned by two families,

24  the Slefkins and the Kelley; is that correct?

25  A      Correct.

1    Q    I would like for you to -- did you trace what happened

2    to the Slefkin half of the property?

3    A    I did.

4    Q    Directing your attention to August of 1983, what

5    happened to the Slefkin half that had been acquired?

6    A    Harry Slefkin transferred his interest to Fannie

7    Slefkin.

8         MR. CLARK:  May I approach, Your Honor?

9         THE COURT:  You may.

10   BY MR. CLARK:

11   Q    I am going to place before you Government Exhibit 313,

12   314, and 315.  Do you recognize them?

13   A    Yes.

14   Q    What are they?

15   A    These are the transfer deeds.

16   Q    Okay.  For the Slefkins' half of the property?

17   A    Right, exactly for the Slefkins' half.

18   Q    So let's start with Government Exhibit -- well,

19   withdrawn.

20        MR. CLARK:  I'd offer at this time Government

21   Exhibits 312, 313, 314, and 315.

22        THE COURT:  I think 312 is already in.

23        MR. CLARK:  Sorry, Judge.  313, 314, and 315.

24        THE COURT:  Any objection?

25        MR. SHARON:  No, sir.

GIGUERE – DIRECT EXAMINATION/CLARK                    29

 1            THE COURT:  Each is admitted.

 2   BY MR. CLARK:

 3   Q      With respect to Government Exhibit 313, what happened

 4   with the Slefkin half?

 5   A      Harry Slefkin transferred his ownership interest to

 6   Fannie Slefkin, and that would have occurred on or about

 7   August 1st of 1983.

 8   Q      And referring to Government Exhibit 314, what did Fannie

 9   Slefkin do with the interest she had acquired from Harry

10   Slefkin, as well as her own interest?

11   A      She transferred her interest to a trust, which would

12   have been known as the Scott -- the Fannie Scott trust, and

13   that would have occurred on or about March 4th of 1985.

14   Q      1985 or 1983?

15   A      1985.

16   Q      So from that -- I'm sorry.  So it appears that

17   Ms. Fannie Slefkin must have changed her name to Fannie Scott?

18   A      Yes, according to the deed transfer, there was a name

19   change.  That's correct.

20   Q      And then what happened with respect to the property that

21   had been held in trust with the one-half interest in the

22   property, did that get transferred?

23   A      It did.

24   Q      To who?

25   A      Carole Swan.

GIGUERE - DIRECT EXAMINATION/CLARK                    30

1    Q      And is that reflected in Government Exhibit 315?

2    A      It is.

3    Q      And approximately, when did Carole Swan acquire the

4    Slefkin half of this property from the Scott trust?

5    A      On or about October 13th of 1997.

6    Q      Now, did you also investigate what happened with respect

7    to the Kelley half of this pit?

8    A      I did.

9    Q      And when I say half, am I correct that half the

10   undivided one-half interest in the pit?

11   A      According to the deed information, yes.

12          MR. CLARK:  May I approach, Your Honor?

13          THE COURT:  You may.

14   BY MR. CLARK:

15   Q      I am going to place before you what I have marked as

16   Exhibits 316 and 317 and ask if you recognize those?

17   A      I do.

18   Q      What are they?

19   A      These are the deed transfers, transferring of the

20   ownership of the Kelley half of the pit.

21          MR. CLARK:  I offer Government Exhibits 316 and 317.

22          THE COURT:  Any objection.

23          MR. SHARON:  No, Your Honor.

24          THE COURT:  Each is admitted.

25   BY MR. CLARK:

GIGUERE – DIRECT EXAMINATION/CLARK                    31

1    Q       So what happened in about May of 1998 with respect to

2    the interest held by the Kelley in this pit?

3    A       That was the time when Peter Kelley had transferred the

4    interest, the one-half undivided interest in the pit to Mary

5    Kelley.

6    Q       And what did he do that pursuant to?

7    A       That was pursuant to the will of Thelma Kelley.

8    Q       So did it appear to you that Peter was a personal

9    representative of somebody who was executing the terms of a

10   will?

11   A       That's exactly right, yes.

12   Q       And what did Mary Kelley do with her interest -- her

13   one-half undivided interest in this pit?

14   A       In approximately October, I believe, on or about --

15   approximately, October 20th of 1998, Mary Kelley transferred

16   her one-half ownership to Carole Swan.

17   Q       And so is that record as reflected in Government

18   Exhibit 317?

19   A       It is, yes.

20   Q       So by October of 1998, who owned both halves of the pit?

21   A       Carole Swan.

22   Q       During the time that she acquired them, these two halves

23   of the pit, in about February of last year, who owned them --

24   I'm sorry February 2013?

25   A       Carole Swan.

GIGUERE — DIRECT EXAMINATION/CLARK                                    32

1   Q      What happened in February of 2013?

2   A      On or about February 1st of 2013, half of Carole Swan's

3   interest was transferred to her son, Jacob Swan.

4              MR. CLARK:  May I approach, Your Honor?

5              THE COURT:  You may.

6   BY MR. CLARK:

7   Q      I'll show you Government Exhibit 309 and ask if you

8   recognize it?

9   A      I do.

10  Q      What is it?

11  A      This is the transfer deed transferring that one-half

12  interest from Carole to Jacob.

13  Q      And on that deed, how do you know that she only

14  transferred one-half of her interest?

15  A      Well, it states it on the deed itself.

16  Q      She only transferred one-half?

17  A      That's correct.

18  Q      Now, after this deed was executed -- withdrawn.

19         Was that deed recorded in February of 2013?

20  A      According to the registrar stamp, it appears as though

21  this was recorded on August 26th of 2013.

22  Q      That would have been after Carole Swan was convicted

23  following her two trials?

24  A      Yes.

25             THE COURT:  Following her first trial.

GIGUERE - DIRECT EXAMINATION/CLARK                    33

1          MR. CLARK:   I believe after both, Judge.

2          THE COURT:   No, no, it was September.

3          MR. CLARK:   After the first one.  Sorry, Judge.

4    BY MR. CLARK:

5    Q     Now, did you -- was the deed notarized?

6    A     It was.

7    Q     By who?

8    A     Shannon Parent.

9    Q     And did you have occasion to meet with Ms. Parent?

10   A     I spoke with her over the telephone.

11   Q     What did you ask?

12   A     I just asked her if she had any recollection of the

13   transaction and being a notary for that particular

14   transaction.

15   Q     What did she tell you?

16   A     She said she had a vague recollection.  She recalled

17   that Jake had telephoned her, said that he and his mother were

18   transferring some property, and that they needed a notary for

19   the deed.

20         Shannon said she agreed to do it, and she recalled that

21   Carole and Jacob went to her home or place of business where

22   she notarized the deed and that was it.

23   Q     Did she recall notarizing one or two deeds?

24   A     She -- she recollected only one.

25   Q     So based upon your title investigation, as you sit here

1   today, who do you believe owns the gravel pit?

2   A      I believe it's half owned by Carole and half owned by

3   Jacob.

4   Q      According to your investigation, did Jake Swan pay any

5   consideration for the transfer?

6   A      I don't believe so.   I think according to the transfer

7   tax declaration, I don't believe there was any tax paid.

8             MR. CLARK:   May I approach, Your Honor?

9             THE COURT:   You may.

10  BY MR. CLARK:

11  Q      I'll show you what's been marked Government 318 and ask

12  if you recognize it?

13  A      I do.

14  Q      What is it?

15  A      This is the real estate transfer tax declaration for the

16  transfer of the gravel pit from Carole to Jacob.

17  Q      And does it indicate whether or not any consideration

18  was paid?

19  A      It indicates that there was no consideration paid under

20  the exemption claim or parent to child transfer.

21  Q      Now, you handled the underlying financial investigation

22  in the criminal case involving the Swans?

23  A      I did, yes.

24  Q      And as far as your investigation, did you obtain with

25  subpoenas financial information from Northeast Bank?

GIGUERE - DIRECT EXAMINATION/CLARK                    35

1    A    I did.

2    Q    And based upon your review of the information that

3    Northeast Bank provided, did Carole Swan ever under penalty of

4    perjury represent what she believed to be the value of this

5    pit?

6    A    She did.

7    Q    What did she say was the value of this pit?

8    A    700,000.

9         MR. CLARK:   May I approach, Your Honor?

10        THE COURT:   You may.

11   BY MR. CLARK:

12   Q    I am going to show you Government Exhibit 311 and ask if

13   you recognize it?

14   A    I do.

15   Q    What is it?

16   A    It's a loan application from Marshall and Carole Swan,

17   and it's for a fifth wheel, RV.

18   Q    And in connection with Northeast Bank Savings, is that

19   where you found a statement by Carole Swan valuing the gravel

20   pit at $700,000?

21   A    Well, within this file was a -- another loan file, which

22   appeared to be for a refinance on their residence, and it was

23   within that loan file that the declarations as to the value of

24   the pit were made.

25   Q    And, again, this was the gravel pit that was located in

GIGUERE - DIRECT EXAMINATION/CLARK; CROSS-EXAMINATION/SHARON          36

1   Windsor?

2   A        That's correct.

3               MR. CLARK:   No further questions, Your Honor.

4               THE COURT:   Cross-examination.

5               MR. SHARON:  Yes, just one.

6                           CROSS-EXAMINATION

7   BY MR. SHARON:

8   Q        What year was that loan application taken out, sir?

9   A        The loan application for the RV --

10  Q        Yes, sir.

11  A        -- is 2003.

12  Q        2003?

13  A        Correct.

14  Q        It was at that time that Ms. Swan estimated the value at

15  700,000?

16  A        Yeah, I believe so.

17  Q        What year was that estimated at 700,000?

18  A        I believe in 1998.

19  Q        1998?

20  A        Would have been -- yes.

21  Q        Thank you.

22              THE COURT:   Anything further?

23              MR. CLARK:   No, Judge.

24              THE COURT:   Thank you.  You may stand down, sir.

25              (The witness, Rodney Giguere, left the witness

 1    stand.)

 2              THE COURT:  Next witness.

 3              MR. CLARK:  The government calls Mark Stebbins.

 4              THE CLERK:  Would you please raise your right hand?

 5    Do you solemnly swear that the testimony you shall give in the

 6    matter now in hearing shall be he truth, the whole truth, and

 7    nothing but the truth so help you God?

 8              THE WITNESS:  I do.

 9              THE CLERK:  Thank you.  Please be seated.  Could you

10    please state your name for the record and spell both your

11    first and last name?

12              THE WITNESS:  Mark Stebbins, M-a-r-k

13    S-t-e-b-b-i-n-s.

14              THE COURT:  You may proceed.

15    MARK STEBBINS, having been duly sworn, was examined and

16    testified as follows:

17                         DIRECT EXAMINATION

18    BY MR. CLARK:

19    Q     Mr. Stebbins, how are you employed?

20    A     I work for the State of Maine, Maine Department of

21    Environmental Protection.

22    Q     What do you do for the Department of Environmental

23    Protection?

24    A     I'm the mining coordinator.

25    Q     For the State?

1   A      That's correct.

2   Q      What do you do as a mining coordinator or as the mining

3   coordinator?

4   A      I run the gravel pit program, quarry program, and the

5   metallic mineral mining program for the department.

6   Q      And what do you do in that capacity?

7   A      I'm responsible for licensing, inspection, and

8   enforcement.

9   Q      What's your education?

10  A      I have a BA in geology.

11  Q      And what is geology?

12  A      The study of rocks and minerals, fishing materials.

13  Q      So during the course of your employment, you had

14  occasion to inspect and license gravel mining?

15  A      That's correct.

16  Q      And what do you do that for, why do you inspect gravel?

17  A      Most of the inspections are on facilities that are

18  licensed and required by law to inspect them to see if they're

19  in compliance with the standards contained in the law.

20  Q      As part of your training and experience, have you ever

21  had occasion to calculate the amount of material or gravel in

22  a particular gravel pit?

23  A      I have, mostly area-based stuff.

24  Q      Did there come a time when you were asked to evaluate a

25  gravel pit located at 20 Rod Road in Windsor, Maine, that had

1   been owned in whole or in part by Carole Swan?

2   A      Yes.

3   Q      And did you do that?

4   A      I -- I had been at the Swan pit back in July of 2000 and

5   then in May of 2003, and then I was actually in the vicinity

6   of the Swan pit yesterday, 2014.

7   Q      And can you just briefly explain to us what you did

8   there and what you found?

9   A      Starting with the 2000 time frame?

10  Q      Sure.

11  A      2000 I -- I'm obviously looking to see if the gravel pit

12  required a permit from the state of Maine.  Jurisdictional

13  threshold is 5 acres.  I actually surveyed that property with

14  GPS equipment in 2000.  That's the first time I met Marshall

15  Swan.  At that time, the gravel pit did not require a permit.

16       I went back in May of 2003, I did a follow-up inspection.

17  There had been some recent timber harvesting activity on the

18  parcel.  I re-surveyed the gravel pit, still not over that

19  5-acre jurisdictional threshold.

20       Hadn't been to the property in that amount of time.  I

21  received a call from Michael Ryan, Homeland Security, had

22  asked questions about the Swan pit.  I said, I had been there

23  in the past.  He asked me if I would accompany him to look at

24  adjacent gravel pits in the vicinity of the Swan pit on Weeks

25  Mills Road, 20 Rod Road.

1    Q       And as part of your activity in doing so --

2            MR. CLARK:   Your Honor, may I approach?

3            THE COURT:   You may.

4    BY MR. CLARK:

5    Q    I am showing you what's been marked as Government

6    Exhibit 323 for identification and ask if you recognize it?

7    A    Yes, I do.

8    Q       What is it?

9    A       This is a map that I produced for Michael Ryan for

10   Homeland Security.   This is a picture of the Swan pit.   And on

11   this it actually shows the Swan pit in yellow, the 2013

12   perimeter, and then it shows the Swan pit in a red outline in

13   1976.   In addition, I also laid up the 2-foot contours on this

14   map to show depth and elevation.

15   Q       And why did you do that?

16   A       Mr. Ryan asked me what I thought the phase site was.   I

17   looked at some of my old photos that I took back in 2013.   I

18   was estimating maybe a 40-foot head on the existing pit.

19   After we spoke, I went back to our Arc Map GIS data layers and

20   I actually was able to pull up these 2-foot contours, which

21   were done in May of 2013 by NOAA.   I was able to zoom in and I

22   can actually see the base elevation of the pit.   I can see the

23   top elevation of -- the top of the cut bank and then I could

24   see obviously the elevation as you progress in any direction.

25   Q       And from that, what information did you obtain that was

1    useful in evaluating this pit?

2    A      Actually, I was trying to calculate what material

3    reserves would be left in that pit.

4    Q      And why -- withdrawn.

5           Is the value of a pit, of a gravel pit, related to how

6    much materials are left in it?

7    A      Yes.

8    Q      So what did you do yesterday?

9    A      I actually went out and we were supposed to have access

10   into the Swan pit.  I hadn't seen it since 2003.  You can look

11   at it through air photos and stuff, but it's not like walking

12   the site.  We were denied access.

13          I'm very familiar with the pit to the north, which is not

14   shown on this exhibit, which is 323.  That's the Morris pit.

15   And I'm familiar with the pit directly to the west, which

16   would be the Connor pit.  And we walked in to both of those

17   gravel pits so I could assess what type of materials that I

18   was seeing that was being processed, what was left in the

19   banks to see if there was continuity between the Swan pit, the

20   Connor pit, and the Morris pit.

21   Q      And did you conclude there was continuity between the

22   pits?

23   A      Based on the review of these aerial photos, what I have

24   seen in the past, what I saw for material on the ground, it

25   looks like the material runs in a westerly direction from the

STEBBINS — DIRECT EXAMINATION/CLARK                    42

1   Swan pit to the Connor pit to the north to the Morris pit, and

2   I also laid up the sand and gravel aquifer maps, I don't think

3   you see it on this photo, which actually outlines ice

4   contacts, sand and gravel deposits, which really encompasses

5   this whole area on the Weeks Mill, which be the Morris pit,

6   the Connor pit, and Swan pit, and there is another small pit

7   there too called Canty.

8   Q      And based upon your evaluation yesterday and your

9   knowledge of the area, have you come to a conclusion about

10  approximately how much material is conservatively speaking

11  available in the Swan pit?

12  A      The existing pit that you see outlined in yellow is

13  about 13 acres.  It's a 25-acre parcel based on some of the

14  tax maps.  I did a very conservative estimate going to the

15  west, which would be toward the Connor pit.  I looked at the

16  contour interval, which was about 330 feet.  The base

17  elevation of the Swan pit, the lowest part based on the

18  contours is 252.  I estimated about a 78-foot head between

19  Swan pit and Connor pit.  I took a very conservative estimate,

20  taking a 10-acre expansion, taking into consideration setbacks

21  to the public roads, which is like 100 feet, setbacks from

22  property lines, 50 feet.  I made an assumption that there

23  could be a written agreement obtained between the Connor

24  property and the Swan property so that that boundary line

25  could be removed so all the material could be excavated.  And

1    just based on a 10-acre expansion area, at a 78-foot head, I

2    calculated about 1.2 million cubic yards between the base

3    elevation of the Swan pit going toward the Connor pit.  And

4    that was a very conservative estimate.

5              MR. CLARK:  I have no further questions, Your Honor.

6              THE COURT:  Cross-examination.

7              MR. SHARON:  No, Your Honor.

8              THE COURT:  Thank you.  You may stand down, sir.

9    Thank you.

10             (The witness, Mark Stebbins, left the witness

11   stand.)

12             THE COURT:  Next witness.

13             MR. CLARK:  The government calls Mike Ryan.

14             THE CLERK:  Do you solemnly swear that the testimony

15   you shall give in the matter now in hearing shall be the

16   truth, the whole truth, and nothing but the truth so help you

17   God?

18             THE WITNESS:  Yes.

19             THE CLERK:  Thank you.  Please be seated.  Could you

20   please state your name for the record and spell your first and

21   last name?

22             THE WITNESS:  Michael Ryan, M-i-ch-a-e-l R-y-a-n.

23   MICHAEL RYAN, having been duly sworn, was examined and

24   testified as follows:

25                        DIRECT EXAMINATION

RYAN – DIRECT EXAMINATION/CLARK                      44

1    BY MR. CLARK:

2    Q      How are you employed?

3    A      Special agent with the Department of Homeland Security,

4    Office of Inspector General.

5    Q      What do you do?

6    A      I investigate criminal violations involving homeland

7    security programs and people.

8    Q      How long have you been with homeland security

9    investigations?

10   A      Since April of 2009.

11   Q      Could you just briefly describe your education?

12   A      I have a Bachelor's of Science in Civil Engineering from

13   the United States Coast Guard Academy.

14   Q      Did there come a time when you conducted an

15   investigation into the value of the Swan gravel pit located on

16   20 Rod Road in Windsor, Maine?

17   A      Yes.

18   Q      As part of your investigation, can you just briefly just

19   give us a big picture of what you did to determine what value

20   that pit might be today?

21   A      I contacted local pit owners immediately adjacent to the

22   property.  I talked with contractors, excavation contractors

23   in the central Maine area, also approached several pit

24   appraisers and reviewed some documents held by the town of

25   Windsor.

1   Q      And in addition to that, did you also have occasion to

2   speak to the State of Maine mining director?

3   A      Yes, I did, Mark Stebbins.

4   Q      Now, as part of your interviews, did you interviews

5   Frank Ferraiolo?

6   A      I did.

7   Q      Who is Frank Ferraiolo?

8   A      Frank Ferraiolo is one of the owners of Ferraiolo

9   Construction.

10  Q      Was he familiar with the Swan pit?

11  A      He was familiar with it.  I believe he was last there,

12  physically present probably 10 years ago.

13  Q      Did he indicate to you what he would be willing to pay

14  for that pit on a per cubic foot or per cubic yard basis?

15  A      Yes, he did.  He said between 20 to $0.30 per cubic

16  yard.

17  Q      So if we assume that there was 1.2 million cubic yards

18  in that pit today, was he essentially saying that he would be

19  willing to pay 240- to $360,000 for the pit?

20  A      That's correct.

21  Q      Did you interview Steve McGee?

22  A      I did.

23  Q      Who is Steve McGee?

24  A      He's the owner of McGee Construction.

25  Q      Was he familiar with the Swan pit?

1    A       He was familiar with the Swan pit.

2    Q       Does he have occasion -- did he have occasion to make a

3    purchase out of the Swan pit?

4    A       He -- he had been present at the Swan pit.   I don't

5    recall specifically if he purchased stumpage from the Swan

6    pit.

7    Q       When you say purchase stumpage, what do you mean?

8    A       Go and buy gravel in bulk for use on other projects.

9    Q       So this is sort of a different buyer than would be

10   someone like Frank Ferraiolo who would buy the whole pit, this

11   would be somebody who would just be buying by the cubic yard?

12   A       Well, I thought Mr. McGee had interest in both stumpage,

13   sources of gravel for his projects, and also purchasing the

14   pit.

15   Q       And what did he tell you that he would estimate that he

16   would pay per cubic yard of material out of the Swan pit?

17   A       I believe he said approximately a $1.75 per cubic yard.

18   Q       And did he indicate to you what he thought the Swan pit

19   was worth based upon his knowledge of it?

20   A       Yeah, in terms of purchasing the pit, 350,000 to half a

21   million.

22   Q       Did you interview Ed Hubbard?

23   A       I did.

24   Q       Who is Ed Hubbard?

25   A       He runs the Morris pit, which is directly north of the

1     Swan pit.

2     Q     Had he had occasion to look over the Swan pit over the

3     last 20 years?

4     A     He did.   He claimed to have known it very well.

5     Q     Did he indicate to you what he believed to be a fair

6     price for the Swan pit?

7     A     He did.   He indicated that he would advertise the Swan

8     pit at $1 per cubic yard, but would not sell it for anything

9     less than $0.75 per cubic yard.

10    Q     So his value, assuming at least 1 million cubic yards

11    would be in excess of 750,000?

12    A     Correct.

13    Q     Did you interview John Sturgeon?

14    A     I did.

15    Q     Who is John Sturgeon?

16    A     He is a project manager for Sargent Corporation formerly

17    known as H.E. Sargent.

18    Q     Did Sargent purchase gravel out of the Swan pit?

19    A     They did.

20    Q     Would that have been in approximately 2011 and 2012?

21    A     Yes, August of 2011 to September 2012.

22          MR. CLARK:   May I approach, Your Honor?

23          THE COURT:   You may.

24    BY MR. CLARK:

25    Q     I'll show you what's been marked Government Exhibit 322

1    for identification and ask if you recognize it?

2    A     I do.

3    Q     What is it?

4    A     It is a break down of purchases from the Swan pit in

5    2011 to 2012.

6    Q     That would have been by Sargent?

7    A     By Sargent Corporation.

8    Q     And did you have an opportunity to review that document

9    before your testimony?

10   A     I did.

11   Q     What did Sargent pay per cubic yard for the material

12   that it was purchasing out of the Swan pit in 2011, 2012?

13   A     Based on my analysis, they purchased just over 100,000

14   cubic yards and paid over $212,000.  If you do the math, it

15   comes to roughly a 1.87 per cubic yard.  Within that $1.87,

16   there is some allowances for tax and related equipment

17   charges, but $1.87 is what the documents show.

18   Q     Did you ask him whether or not he thought that the

19   current -- withdrawn.

20         How, if at all, did he react when he was asked whether

21   the Swan pit was $40,000?

22   A     He said that was low.

23   Q     Did you interview Tim LePage?

24   A     I did.

25   Q     Who is Mr. LePage?

```
 1   A      He is a project superintendent for Sargent Corporation.

 2   Q      Is he familiar with the Swan pit?

 3   A      Yes.  He oversaw some of the stumpage that they drew out

 4   of there in 2011 and 2012.

 5   Q      Did you ask him whether or not he thought that the Swan

 6   pit's current value was $40,000?

 7   A      Yes, at that point, he laughed and said he would

 8   purchase it.

 9   Q      Did he indicate to you what he thought a fair market

10   price for the Swan pit would be?

11   A      He didn't, other than to say $0.25 to $0.30 per cubic

12   yard and he went on to say that he would buy it right now for

13   $100,000.

14              MR. CLARK:  No further questions.

15              THE COURT:  Cross-examination.

16              MR. SHARON:  No, Your Honor.

17              THE COURT:  Thank you.  You may stand down, sir.

18   Thank you.

19              (The witness, Michael Ryan, left the witness stand.)

20              MR. CLARK:  The government rests.

21              MR. SHARON:  We have no testimony about that, Your

22   Honor.

23              THE COURT:  All right.  What should I make of this?

24              MR. CLARK:  Judge, we believe that the -- we have

25   proved that Carole Swan is at least a 50 percent owner of the
```

1    gravel pit.  We believe that, in fact, she should be -- she

2    should be considered to be the 100 percent owner of the gravel

3    pit because following her indictment in this case, following

4    the superseding indictment in this case, she conveyed a one-

5    half interest in it to her son at a time when she had to know

6    that she was facing millions of dollars in fines and

7    restitution, which was mandatory.  That deed was not recorded,

8    so officially under Maine law, I do not believe it was

9    recognizable until it was recorded in August at the time at

10   which she was convicted already of the tax charges and the

11   workers' compensation charges, which would in and of

12   themselves render her subject to restitution in an amount

13   significantly more than the $5,000 net worth that she claims.

14            MR. SHARON:  I have no argument.

15            THE COURT:  All right.  So this actually goes to the

16   amount of fine that should be imposed on her; is that correct?

17            MR. CLARK:  It goes to the amount of fine and also

18   what sentence should be imposed.

19            THE COURT:  Okay.  Thank you.

20       Are there any other issues from the government's

21   perspective?

22            MR. CLARK:  No, Your Honor.

23            THE COURT:  Any other issues from the defense?

24            MR. SHARON:  No, sir.

25            THE COURT:  It may be helpful to counsel that I do

1   the sentencing findings here because the findings are slightly

2   different with the exclusion of the acquitted conduct.  Let me

3   run through this and give you an opportunity to respond to it.

4   Under group 1 which is Counts 1, 2, and 3, the Hobbs Act

5   extortion under color of official right, the United States

6   Sentencing Commission Guideline for violation of 18 U.S.C.

7   Section 1951(a) is found in United States Sentencing

8   Guidelines Section 2C1.1(a)(1) it calls for a base offense

9   level of 14.  As the offense involved more than 1 extortion

10   attempt, 2 levels are added, bringing the offense level to 16.

11   Using the table found in Section 2B1.1(b)(1)(C), as the total

12   value of the payments demanded, including the attempted

13   extortion was $20,000, 4 levels are added, bringing the

14   offense level to 20.  Pursuant to Section 2C1.1(b)(3) as the

15   defendant was an elected public official, 4 levels are added,

16   bringing the offense level to 24.  Pursuant to United States

17   Sentencing Guidelines Section 3C1.1 as the defendant

18   obstructed justice, 2 levels are added, bringing the offense

19   level to 26.

20       Group two.  Counts 4, 5, 6, 7, and 8, tax fraud and false

21   statements.  The United States Sentencing Commission Guideline

22   for violation of 26 U.S.C. Section 7206(1) is found in

23   Section 2T1.1 and Section 2T4.1(F) and calls for a base

24   offense level of 16.  As the defendant has obstructed justice,

25   there is a 2-level increase, bringing the offense level to 18.

1        Group three.   Counts 9 and 11, false statement to obtain

2   Federal Workers' Compensation.   The United States Sentencing

3   Commission Guideline for violation of 18 U.S.C. Section 1920

4   is found in United States Sentencing Guideline

5   Section 2B1.1(A)(2) and calls for base offense level of 6.

6   Pursuant to Section 2B1.1(b)(1)(G) as the total loss in this

7   case was $75,765.28, 8 levels are added, bringing the offense

8   level to 14.   As the defendant has obstructed justice, there

9   is a 2-level increase bringing offense level to 16.

10        Multiple count adjustment.   The adjusted offense level

11   for group 1 is 26.   The adjusted offense level for group 2 is

12   18.   The adjusted offense level for group 3 is 16.   As the

13   greater offense level is 26, making the combined adjusted

14   offense level 27.   The defendant's criminal history category

15   is category I.   For a total offense level of 27 and a criminal

16   history category of I, the applicable guideline range for

17   imprisonment is 70 to 87 months.   The defendant is not

18   eligible for probation.   Supervised release is 1 to 3 years.

19   The fine range is from $12,500 to $125,000.   Ms. Swan does

20   have the ability to pay a fine.   Restitution shall be ordered

21   in the total amount -- I have here of $91,396.18, but I need

22   to revise that, don't I, based on -- what would the current

23   figure be?

24        MR. CLARK:   Your Honor, that is correct.   The total

25   figure of what we heard today 106,346.18.

1                    THE COURT:   Thank you.

2           A special assessment fee of $100 per count for a total of

3      $1,000 is mandatory.

4           Is there any objection to these findings on the part of

5      the government?

6                    MR. CLARK:   No, Judge.

7                    THE COURT:   On the part of the defendant?

8                    MR. SHARON:   No, Your Honor.

9                    THE COURT:   Mr. Clark, would you like to be heard on

10     sentence?

11                   MR. CLARK:   Yes, Your Honor.   Your Honor, Carole

12     Swan is before the court today to be sentenced for extorting

13     Frank Monroe Construction on three occasions as an elected

14     public official, for filing five false income tax returns for

15     calendar years 2006 to 2010, and for workers' compensation

16     fraud.   And that's exactly what she did.   Between 2010 and

17     2011, she extorted Frank Monroe's business three times.   And

18     Frank Monroe was an easy mark for this defendant.   He had a

19     valuable sand contract and he had a huge investment in plowing

20     and sanding equipment.   So when Carole Swan, Chelsea's 20-year

21     selectman and de facto road commissioner, demanded payment to

22     keep his contracts, she got paid.   That's precisely how Carole

23     Swan worked.   Because if you didn't do what Carole Swan told

24     you to do in Chelsea, you paid the price.   She was the

25     puppeteer.   Everyone else, including Frank Monroe, were

1     puppets to be manipulated.  But as she admitted in her

2     interview at the Kennebec Sheriff's Office after she was

3     caught red-handed extorting $10,000 from Frank Monroe, she

4     admitted she expected to receive $10,000 that day.  She had a

5     psychological problem for it and needed counseling --

6     counseling for it.  She had received payments from other

7     contractors to grease the wheels.  She had taken 25- to

8     $30,000 over the years for greasing the wheels and looking the

9     other way on construction jobs.  And as she said, she was the

10    guilty one.  And what she said then was true.  And those were

11    the last true words spoken by this corrupt public official in

12    this proceeding.

13         So the first point here is that Carole Swan has been a

14    corrupt public official for a very long time.  It didn't start

15    with Frank Monroe, but it ended with him.  And Carole Swan is

16    a serial, pathological liar.  Carole Swan took that witness

17    stand three times.  And all three times, she falsely testified

18    under oath that she was not extorting Frank Monroe, but she

19    was, in fact, investigating him for delivering short loads of

20    sand.  She said Frank Monroe was bribing her to keep his theft

21    of sand a secret.  And then she said that she didn't tell the

22    Kennebec Deputy Sheriffs about her investigation of Frank

23    Monroe during the interview because Greg Lumbert worked for

24    both Monroe and the Kennebec Sheriff.

25         She also falsely testified that she did not lie to obtain

1    workers' compensation benefits.   She also falsely testified

2    that she had no idea how much Marshall Swan or Swan

3    Construction made and that her tax returns were not false.

4        We have detailed her false testimony in our sentencing

5    briefs, and we will not repeat it here.   Suffice it to say,

6    however, that her extensive testimony was false, perjurious,

7    was rejected by Magistrate Judge Kravchuk and a jury twice and

8    was certainly the basis for this court to find that her

9    obstruction of justice was pervasive.

10       So the second point is that Carole Swan obstructed the

11   prosecution of this criminal proceeding on multiple occasions.

12       Now, Carole Swan's extortion of Frank Monroe was

13   criminal, but Carole Swan was not just an ordinary criminal.

14   Time and again she sought to humiliate Frank Monroe.   The

15   defendant's negative impact on Monroe's life cannot be

16   overstated.

17       Frank Monroe was a victim of Carole Swan's extortion, but

18   Carole Swan made sure that he was vilified in the press as a

19   cheater and a briber, and that is simply not true.   It's not

20   true now and it never was true.

21       The defendant destroyed Frank Monroe's family.   She did

22   everything she could do to destroy his reputation in the

23   community.   And her efforts continue right through to today's

24   proceeding.

25       Frank Monroe has suffered years of local ridicule with

1   people claiming that he was at fault and that he bribed her

2   and that wasn't the case.

3        And as this court knows, it's critical for people like

4   Frank Monroe to be willing to step up and bring people like

5   Carole Swan to justice.   That Carole Swan subjected Frank

6   Monroe to false claims that he was delivering short loads of

7   sand and bribing her over the past three years is

8   unconscionable.

9        So the third point is that corrupt public officials who

10  blame their victims for their crimes should receive very

11  lengthy sentences.

12       And as I said, the defendant's efforts to deceive

13  continue even to this day.   The defendant has not accepted

14  responsibility for her conduct.   Instead, she offers a

15  forensic evaluation from Peter Donnelly, based on one,

16  three-hour evaluation he conducted on December 30th of 2013,

17  after her multiple convictions for extortion, tax, and

18  workers' compensation fraud.

19       In the defendant's version of the allegations, she

20  contends, I didn't know I was doing anything wrong with

21  worker's comp.   I can't balance a checkbook.

22       On the tax charges she says, that in her husband's

23  business, the books really didn't get done.

24       And on the extortion charges, she says, there is a sand

25  guy who was shorting the town by using our sand in other

1    towns, he was giving me money.  I kept it.  I told the town

2    clerk that I was going to turn him in, but I waited too long

3    to do so.  I developed a relationship with him.  I soaked up

4    the attention that he gave me, that I wasn't getting at home.

5         Your Honor, you heard the tape recordings where she said

6    she didn't want to talk on the phone.  You heard the interview

7    in which she admitted she was guilty.  Then you listened to

8    the defendant testify falsely.  You watched as she

9    intentionally defied your order not to testify about acquitted

10   conduct at her -- conduct at her second trial, and despite her

11   attorneys' instruction not to do so.  So the fourth point here

12   is that the defendant's effort to manipulate and deceive

13   continues even to this day as she faces sentencing.

14        Now, in addition to Carole Swan's criminal extortion and

15   her abuse of her victim, we now know that over a five-year

16   period she failed to report conservatively speaking about

17   $650,000 in income, almost all of which she personally handled

18   as the bookkeeper for Swan Construction thereby evading

19   $145,000 in taxes.  We say conservatively speaking because, as

20   this court is aware from the trial testimony, this case was

21   proved by specific items of income that were not reported.

22   Some income could not be proved at trial due to unavailable

23   witnesses, and no deduction has yet been made for the hobby

24   harness horse racing business that Carole Swan testified she

25   did not own, she was not actively engaged in, that never

1   earned a profit, but yet produced deductible tax losses of

2   $173,000 over five years.  So the tax loss in which the tax

3   sentencing range is based is extremely conservative.

4       And the fifth point is that the defendant's fraudulent

5   activities were as you -- as they were for her husband and as

6   you found a way of life.

7       Now, in addition to Swan's criminal extortion and her tax

8   fraud way of life, the defendant was also defrauding the

9   workers' compensation program.  She lied on August 1, 2008,

10  and again on May 7, 2010, when she claimed to be unemployed

11  and unable to work and when she failed to report her ownership

12  interest and active participation in the operation of Swan

13  Construction, her ownership of her harness horse racing

14  business that she was writing off, and when she failed to

15  disclose her activities as a selectman and assessor for

16  Chelsea, particularly her activities in connection with the

17  Windsor Road culvert, which took place between April of 2007,

18  and April of 2008.

19      Recall the testimony of Peter Hanson describing her

20  climbing down into the crater left by the washed out Windsor

21  Road culvert bridge and all of the Chelsea coworkers and her

22  best friend and sister-in-law who all testified they never

23  even noticed any disability or inability to raise her right

24  arm.

25      She lied to the workers' compensation program when she

1    failed to disclose the $3,000 she extorted from Frank Monroe

2    in March of 2010.  And she lied in May of 2010 when she wrote,

3    I do not work.  I cannot work.  I cannot even clean my house

4    or blow dry my hair.

5        And we all watched as the defendant feigned being unable

6    to lift her right arm or walk at her trial on workers'

7    compensation fraud, only to witness her miraculous recovery at

8    the second trial on extortion when her claimed disability was

9    no longer required or apparent.

10       The defendant's conduct over the course of two trials is

11   best described in two words, insatiable greed.  We know now

12   that the defendant viewed the town of Chelsea's road budget as

13   Swan Construction's own private treasure chest.  She was a

14   selectman and for an extended period of time, the de facto

15   road commissioner.  No other contractor had a chance of

16   getting any meaningful roadwork in Chelsea without

17   subcontracting with Swan Construction.  The defendant made

18   sure Swan Construction got the bulk of the road contracts in

19   Chelsea by twisting the arms of Chelsea's road commissioner or

20   elected selectmen, such as Selectman Richard Danforth and Guy

21   Berthiaume, as they both testified.

22       Carole Swan pocketed over $75,000 tax free for lost wage

23   benefits, falsely claiming to be completely unable to work and

24   disabled, all the while she was the office manager for Swan

25   Construction doing the banking, dealing with the taxes, and

1    working as a selectman and the town assessor, steering

2    contracts to Swan Construction, like the Windsor Road culvert

3    project, and charging Chelsea $130,000 for a $58,000 culvert.

4         In short, this millionaire defendant was collecting

5    disability that she did not deserve, cheating on her taxes,

6    but that wasn't enough.  She had to extort Frank Monroe.

7         So the sixth point is that this is not a heartland case

8    because of the defendant's insatiable greed.  The defendant's

9    crimes take place against a backdrop of insatiable greed,

10   public corruption, and other contempt for the victim of her

11   crimes, and they cry out for specific deterrence.  And this

12   court knows all too well of the corrosive effect that this

13   type of criminal activity has on small Maine communities.

14   When millionaire elected public officials extort local

15   contractors, paying no income taxes, fraudulently collect

16   disability benefits, and live large with beautiful homes, new

17   luxury automobiles every other year, built-in swimming pools,

18   and gravel pits worth a half a million dollars, it destroys

19   the public confidence in our political system, our tax system,

20   and our disability programs.

21        But more than that, in this case, the defendant's

22   activities destroyed her own town.  Her steering of stacked

23   contracts to Swan Construction resulted in multiple payments

24   under $10,000 to skirt the Town's bidding ordinance was

25   corrosive.  Her steering of the Windsor Road culvert project

1    to Swan Construction was corrosive.  But perhaps most

2    corrosive of all was her delivery of a two-year plowing

3    extension contract to Frank Monroe when the board of selectmen

4    had only authorized a one-year extension.  That was probably

5    the most corrosive, because it resulted in a $100,000 lawsuit

6    having been filed by Frank Monroe against the town of Chelsea.

7    Frank Monroe, as a result of that, lost a very valuable

8    plowing contract, and Chelsea recently had to pay him $20,000

9    to settle his claim.  And all -- why, why did this happen?

10   Because Carole Swan lied to the Town about what the contract

11   she had entered into with Frank Monroe was and lied to Frank

12   Monroe about what the contract that had been authorized by the

13   town of Chelsea -- they had agreed to enter into.

14        So this is a case that calls out, it cries out for

15   general deterrence, in addition to specific deterrence.

16   Elected public officials who extort local contractors must

17   understand that prosecutions and serious prison terms will

18   flow from that conduct.  Some people claim that small

19   businesses are the agents of growth in this country, and

20   that's precisely what the defendant ran.  Swan Construction

21   was a small business that generated up to a million dollars a

22   year in revenue according to the defendant.  But we know now

23   that this small businesswoman paid almost no income taxes for

24   five years because she was cleating.

25        Similarly situated small businesses have to know that if

1   they cheat on their taxes, underreporting income, and

2   overstating deductions for five years, they are going to go to

3   jail for a long time.

4        So if this were just an extortion and a tax and

5   disability fraud case, a sentence at the high end of the

6   guideline would have been appropriate.

7        But that wasn't enough.  As part of the presentence

8   investigation in this case, the defendant lied to the U.S.

9   Probation Office about her assets, falsely claiming to be

10  unable to pay a fine.  According to the presentence

11  investigation report, based on the information that she had

12  provided to them, the defendant -- or the probation office

13  concluded that the defendant did not have the ability to pay a

14  fine because she had assets of $36,135 -- thousand,

15  liabilities of $28,978 and a net worth of $5,909.

16       The initial PSR report was prepared in December of 2013

17  and the revised report was prepared in January of 2014.  But

18  as the court now knows, this defendant failed to report her

19  ownership of 50 percent of a gravel pit that she had valued at

20  $700,000, and she conveyed 50 percent of that gravel pit for

21  no consideration to her son by deed dated February of 2013,

22  but not recorded until August of 2013, following her

23  conviction or the conviction in her first trial.

24       And she also failed to report her ownership of real

25  property located on McLaughlin Circle in Chelsea, which was

1    sold in April of 2014.

2         With all that, Your Honor, because of her false

3    testimony, the defendant faces a sentencing range under the

4    guidelines of 78 to 87 months.  We recommend a sentence of at

5    least 10 years in prison and a $125,000 fine.

6         THE COURT:  Thank you.

7    Mr. Sharon.

8         MR. SHARON:  Yes, we have some people we would like

9    you to hear from, Your Honor, please.

10        THE COURT:  Sure.  And by the way, I should note

11   that I have received a packet of information from you,

12   Mr. Sharon --

13        MR. SHARON:  Yes, Your Honor.

14        THE COURT:  -- that sets forth 21 separate exhibits.

15        MR. SHARON:  I'd move for the admission of it,

16   please, Your Honor.

17        THE COURT:  All right.  And you have seen each of

18   those, Mr. Clark?

19        MR. CLARK:  I have, Your Honor.

20        THE COURT:  And do you have any objection to them?

21        MR. CLARK:  No.

22        THE COURT:  Each is admitted.  I will note for the

23   record that Exhibits 15 through 21 are all medical or

24   psychiatric records and under the teaching of the Kravetz

25   case, I find that the public interest in those personal

1    records is exceeded by the need for privacy of her medical and

2    psychiatric condition and, therefore, I am sealing each of

3    those Exhibits 15 through 21 under Kravetz.

4          The remaining Exhibits 1 through 14, which are letters

5    from family members, friends, and others, are open to the

6    public.

7          MR. CLARK:  Just one other point, Your Honor, that we did

8    not object to their admission does not mean we agree with

9    them, particularly with respect to Government Exhibit 20,

10   which is Dr. Donnelly's psychological report.  We would ask

11   that the court read that document in the context of the

12   defendant's version of the allegations.

13         THE COURT:  Right.  No, I read the -- I read the

14   report with my full understanding of this long and complicated

15   case.

16         Mr. Sharon.

17         MR. SHARON:  Yes, Your Honor.  I'll call Linda

18   Sadoff.

19         Please identify yourself to the court, please.

20         THE WITNESS:  Yes.  Good afternoon, Your Honor.  My

21   name is Linda, L-i-n-d-a, Sadoff, S-a-d-o-f-f.

22         MR. SHARON:  Can you tell the court, please, your

23   relationship to this case and to Carole Swan.

24         THE WITNESS:  Yes, I am a psychotherapist.  I

25   maintain a private practice in Hallowell, Maine.  And Carole

1   Swan participated in counseling with me over approximately an

2   eight-month period commencing in August 2013 until recently.

3        And, Your Honor, I have maintained my psychotherapy

4   practice for 14 years.  Prior to that time, I was an attorney

5   practicing in state and federal courts in Maine, representing

6   individuals, and I'm currently a member of the bar

7   association, but I am no longer in the active practice of law.

8                THE COURT:  All right.

9                THE WITNESS:  If there is a single issue that I

10  would like to speak to, Your Honor, it is my observation from

11  my work with Ms. Swan starting in August is that she is a work

12  in progress; that she very actively participated in her

13  counseling with my office, in my office.  The issues that we

14  focused on were the impact of the childhood sexual abuse and

15  the impact of the domestic violence.

16       We also addressed what kind of person Carole wanted to be

17  solidifying, I believe, an intention to working toward

18  becoming the best person that she could possibly be.  We did

19  not address to any significant extent the circumstances which

20  are subject to the litigation before this court.

21       Ms. Swan arrived highly-motivated for most sessions.

22  Typically, she would begin a session with a question.  She

23  might say, last week you spoke about the cycle of the abuse.

24  I have been thinking about it all week.  I have got a

25  question.  Her question might be, how did I ever end up in

1   this relationship?  Why did I remain in this relationship for

2   so long?  What will be the impact on my sons of having

3   observed the abuse that they observed?

4       She struggled -- and this was really the primary focus,

5   she struggled with the question as to whether or not to remain

6   in this marriage.  She struggled with the dichotomy between

7   the fact that she had been subjected to terrible psychological

8   and physical abuse, but at the same time, she was very

9   attached to her husband.  She loved her husband.  And so this

10  was really what she was struggling with.

11      They did not live together until a few months ago, it is

12  my understanding, when she moved back into the family home in

13  part so that she could be closer to her sons to whom she is

14  very devoted.  And so -- and then she very much valued

15  maintaining an effect of a co-parenting relationship and

16  ultimately decided the further decision about divorce so that

17  her sons would not be subjected to the stress given all that

18  her sons have been through.

19      And then finally she engaged in some future oriented

20  thinking.  We anticipated how she might use her time of

21  incarceration in a positive and constructive way, learning

22  more skills, perhaps -- perhaps learning how she could

23  understand more about her own domestic abuse so perhaps to be

24  helpful to other women.

25      So in conclusion, Your Honor, in imposing sentence today,

1    I appreciate that the court will be considering a variety of

2    very compelling considerations.  What I wanted to share was my

3    observation in working with Carole Swan since this past

4    August, at least in her counseling, that she was very much a

5    work in active progress, becoming more reflective about

6    herself.  And hopefully, and my confidence, hopeful confidence

7    is that she will take that into the future.

8         Thank you very much, Your Honor.

9              THE COURT:  Thank you very much, ma'am.

10             MR. SHARON:  Thank you, Your Honor.  I would ask

11   John Swan.

12             THE WITNESS:  Good afternoon, Your Honor.

13             THE COURT:  Good afternoon.

14             THE WITNESS:  My name is John Swan, and I am

15   Carole's son.  I was recently reading through some quotes

16   online when one jumped out at me.  A famous Lebanese author,

17   Kahlil Gibran once declared, you give but little when you give

18   of your possessions.  It is when you give of yourself that you

19   truly give.

20        This quote reminded me of my mom for multiple reasons.

21   There have been countless times when either I've broke or lost

22   something in my life which caused me to become quite upset.

23   One thing my mom has always told me, though, is that items do

24   not last forever, but people can make memories that do last

25   forever.

1    My mom has always made it a point to help me realize that

2    at the end of the day, it's not how many items you have or

3    what kind of clothes you wear, but instead life is all about

4    what is in your head.

5    Memories have the ability to last a lifetime.  Without my

6    mother reminding me of this, I would not have such a great

7    appreciation for life and all the people that are along for

8    the ride with me through all of the ups and downs that it

9    reveals.

10   The quote also applies to my mom in the aspect of giving

11   back to your community.  My mother has spent countless hours

12   fundraising and putting time into planning and executing

13   various town events.  I am fortunate to have been able to help

14   my mom in numerous volunteer opportunities.  A couple of the

15   things that I was able to contribute to in the community with

16   my mom includes decorating the Welcome to Chelsea signs with

17   flowers in the summer and wreaths in the winter, and helping

18   with Chelsea Cares Fund suppers to raise money for town

19   citizens in desperate need of essential things, such as heat

20   or medicine.

21   However, where I really learned the importance of giving

22   back to the community was through the annual Fun Run at the

23   Chelsea school.  For many years, the school donated one bike

24   to raffle off for the children, but then my mom came along.

25   My mother went around to local businesses and managed to get

1   eight additional bikes donated for the Fun Run to raffle off

2   for the children.  But then my mom -- excuse me.  So to get

3   the eight additional bikes donated for the Fun Run so that

4   each grade, kindergarten all the way up to eighth could have a

5   student receive a bike.  One year when the bikes were being

6   raffled off, my name was the last one called.  The bike that

7   was left happened to be the one that my father donated also.

8   I thought that it was a cool bike at the time, but when my

9   name was called, I looked at my mom and said, I already have a

10  bike.

11      Knowing that my mom had put so much time into the Fun

12  Run, I told them to raffle it off again.  I knew that there

13  were other kids who would really enjoy the bike because they

14  might not have had one.  That was when I truly understood the

15  feeling of giving back.  That was one of the best things that

16  I have ever felt and without my mom, I never would have

17  experienced that feeling.

18      My mom has also been extremely giving as a mother.  From

19  the time that I started having homework when I was little, I

20  would come home and my mom would help me with it.  When I

21  reached about third or fourth grade, it got to the point where

22  my mom struggled to help me with my homework.  Even though she

23  couldn't always help me figure out how to complete my

24  homework, my mom would lay down on the couch right behind

25  where I sat at the dining room table to complete my

1    assignments.  One of the first questions she would always ask

2    me when I got home or when she picked me up from school was,

3    how much homework do you have?  My mother was extremely

4    influential in establishing my strong work ethic with

5    homework.

6         But whether it was homework, sports, or more recently

7    picking a college last year, my mom has been supportive of my

8    dreams and desires every step of the way.  I have never had to

9    question whether or not my mom would help me achieve my goals

10   because she has always been there for me.

11        My mother is the most generous person that I have ever

12   met, there is no question about that.  At times she has been

13   too generous and too tough for her own good.

14        With the combination of a major injury, fibromyalgia, and

15   stomach blockages that once sent her by ambulance to Boston,

16   my mom has hidden the pain from my brother and I because she

17   has never wanted us to worry about anything.

18        Even though my mother doesn't like me to worry, I find

19   myself doing quite a bit of it lately.  I worry that I am

20   going to be without both of my parents for what I consider to

21   be a substantial amount of time.  If there is any way possible

22   for me to have one parent remain a part of my everyday life,

23   Your Honor, I would appreciate it if that option was explored.

24   Thank you.

25             THE COURT:  Thank you.

71

1          MR. SHARON:  Another family member, Your Honor.

2     Sharon Nichols.

3          THE WITNESS:  Good afternoon, sir.

4          THE COURT:  Good afternoon.

5          THE WITNESS:  My name is Sharon Nichols.  I'm Carole

6     Swan's older sister, so, therefore, obviously I have known her

7     all her life.

8          When Johnny told you that she is the kindest person that

9     he knows, I have to tell you that he's telling you the

10    absolute truth.  She is the kindest person that I know.

11         She has been accused of being the most horrible liar in

12    the world.  I am telling you, sir, there is so much truth to

13    these allegations of the pain that this woman has suffered all

14    her life.  She spent the first several years of her life with

15    me finishing her sentences.  She couldn't speak.  She hid from

16    people.  She was a timid, little girl who couldn't convey even

17    to her most loved family what she was trying to tell them.

18    She hid from the school bus, not daring to go to school.  She

19    has known pain and abuse that is beyond what you can imagine.

20    And I am telling you the God honest truth.

21         God bless her husband, I'm sure the man is very ill, but

22    if you could witness what I have witnessed and the fact that

23    my sister never had the strength to remove herself from these

24    situations because she never had any self esteem, she has been

25    so injured through her life.

1       One salvation was being able to be responsible for

2   herself.  At the age of 17, she was supporting herself with

3   two jobs, trying to go to school.  And due to her inability to

4   speak, she had lots of learning disabilities with reading.  I

5   spent hours reciting homework to her, as did other family

6   members.

7       She worked so hard, but I think a lot of that led her to

8   feeling she just wanted people to love her.  She has helped

9   countless, countless family members that have suffered from

10  depression and their inability to function.  Myself, I lost a

11  husband and had a young daughter.  I was alone with $28 in the

12  bank, just getting by paycheck-to-paycheck, and my sister came

13  to me and she said, we will survive this.  If I have to work

14  around the clock, I can survive on three hours of sleep.  That

15  child will feel loved.  She won't feel rejected.  She will be

16  a productive person.  And I will be there for you every step

17  of the way.

18      And, Your Honor, she has been every day.  No matter --

19  all the children in the family she calls to see, are they

20  happy?  She can recite to you every birthday of every child.

21      But she entered into a relationship where she was

22  horribly abused.  I have defended her from her husband.  I

23  have removed her.  I have bought her bigger sunglasses to

24  cover black eyes.  I have seen the bruises when her shirt

25  would lift, and you know what she would say to me, it was my

1    fault, I said something wrong.

2        So when -- I'm sure a lot of her crime is to avoid the

3    pain.  And it got to the point where she was so embarrassed,

4    she couldn't share it with us.  She couldn't share it with her

5    own children.  And I know that errors were made, but I know my

6    sister spent years, years -- she would start to tell me

7    something -- she would repeat herself like three times within

8    an hour, telling me the same thing.  She did not know a lot of

9    what was going on around her, day after day.  Her injuries,

10   her so-called, known injuries -- I have seen times when she

11   would take Johnny to a baseball game and her health was so bad

12   she couldn't sit with the other mothers on the stand.  She

13   would have to lie down in her vehicle while Johnny practiced

14   ball.

15       I am sorry if I am taking too much of your time, but I

16   feel that this is so important.  If there is any mercy or if

17   there is a God anywhere, can someone please help with her

18   pain?  She has given so much.  She has been so abused.  And I

19   am so proud of how hard she has worked to try to recognize

20   what her problems are and to make a difference for herself and

21   for all of us that love her.

22       And so when she came to Bangor last year, she looked at

23   me and she said, oh, my God, I never knew that I could get

24   away.  She said, I'm probably headed to jail and I have a

25   sense of relief because my children are with me.  We are

1    protected, and we're safe.

2          Can you just imagine feeling that way all your life?

3    It's been an atrocity.

4          Thank you, sir.

5              THE COURT:   Thank you, ma'am.

6              THE WITNESS:   Your Honor, I am Patricia McLaughlin,

7    Carole Swan's mother.   I would like to offer to you some

8    information pertaining to my daughter's life.   I have watched

9    her over the past 20 years and have seen the suffering she has

10   endured from the injuries she received while delivering mail.

11   She has gone through surgery, therapy.   When that didn't work,

12   she started on injections that would put her on the couch for

13   two days.   I know because I would have to go and stay with her

14   while Johnny went to school, all the while the doctors would

15   give her more pills for pain to take.

16         Between the pains and her abuse, I understand her life

17   being in such a turmoil.   Let's touch on the abuse she has

18   suffered by the hands of her husband.   I won't go into that

19   because I know you have heard it all before.

20         I have noticed through counseling she is a much calmer

21   person, also not repeating things that she had told you a few

22   minutes ago.

23         Her life with Marshall was to do what he said.

24   Everything had to be done to make him look good.   I feel very

25   strong -- strongly this whole mess was dictated by him.

1    Has anyone thought what this might do to their sons?

2    Johnny needs to finish his college education.  He's been a top

3    student all through the school years.  He knew this would

4    bring happiness into his mother's life, and she was always

5    there to cheer him on.  No mother to call and tell what good

6    grades you get and test results and so on.  Even through all

7    of this, he has completed his freshman year at Thomas College

8    with a 4.0 average and the presidential award.

9        If you could only see how surest with rehabilitation that

10   Carole is, I am sure this family could come together and pay

11   the restitutions within a few days.

12       I take full responsibility for the part I have played in

13   making Carole's life so mixed up.  For that, I am truly sorry.

14       I am sure I sound like all elderly mothers, wondering if

15   they will live long enough to see their child again, who I

16   love very much, and worry about if her health in prison will

17   ever be addressed.

18       I ask that some of the good that Carole has done to be

19   taken into consideration, that her sentence be given in a fair

20   way and not exceed her husband's.  I am sure you will be fair.

21   Thank you, Your Honor.

22           THE COURT:  Thank, you ma'am.

23           MR. SHARON:  Thank you, Your Honor.

24       Jerry Morin, please.

25           THE WITNESS:  Your Honor, I have been in the family

1   for 22 years.  Carole was there when me and my wife got

2   married, helped me move into town so I could pursue concrete

3   with them, helped me straighten out my life by hard work,

4   working along with building and pouring concrete, told me to

5   get my GED and I did.  I got it in New Hampshire when I was

6   doing time, put me in some work with some other family members

7   like her mom and her son, Jake.

8         She's always shown me love and respect.  Since I have

9   been with the family, I have been in zero trouble.  I love

10  them all.

11        Thank you for the opportunity to speak, sir.

12            THE COURT:  Thank you, sir.

13            THE WITNESS:  Yeah.

14            THE WITNESS:  Earl Vannah.  I want to say I have

15  been a contractor for the town of Chelsea in the past for

16  winter -- winter work and for summer work.  I have worked for

17  them when Carole was a selectman there, and I have worked for

18  them since she's been gone.  And in all of the times that I

19  have done any work for them and stuff, I have always dealt

20  directly with whoever happened to be the town manager at the

21  time and really never had any direct contact for any reason

22  with Carole Swan or any of the other selectman.  It was always

23  with the acting town manager at the time.  And that's what I

24  would like to say.

25            THE COURT:  All right.  Thank you very much, sir.

1          THE WITNESS:  Yeah.

2          MR. SHARON:  Ms. Vannah.

3          THE WITNESS:  Good afternoon, Your Honor.

4          THE COURT:  Good afternoon.  Would you state your

5     name for the record?

6          THE WITNESS:  Heather Vannah.

7          THE COURT:  Yes, ma'am.

8          THE WITNESS:  I would like to touch on a couple of

9     things.  I am good friends with Carole.  I am good friends

10    with her two sons.  I am going to try not to be emotional.

11    But where I am coming from today is when I was a young adult,

12    I had a parent who went to prison and it had a huge affect on

13    my life.  So if I can just ask that you can spare, have any

14    mercy, or compassion for this family and these two boys, I

15    just ask that.  Thank you.

16         THE COURT:  Thank you, ma'am.

17         THE WITNESS:  Good afternoon, Your Honor.  My name

18    is a Loren Rideout.  I have known the Swan family as long as I

19    can remember.  I grew more close to the Swans as I became a

20    young adult.  I got the privilege to watch both of the boys

21    grow up.  My grandfather worked along with Marshall for many

22    years.  I always felt like Carole was a second mother to me.

23    I have so many fond memories of Carole, from the time the

24    camper came unhooked off the truck on the way back from

25    Fryeburg, to many other family events, to even current times.

1    Jake has become my best friend.  Carole was the best mother to

2    the two boys I have ever met.  There is nothing she wouldn't

3    do for her family.

4         She even treated me just as I son.  One particular time

5    comes to mind, me and Marshall had been working around the

6    clock doing snow removal, and she was good enough to put me up

7    on her couch, wash my clothes, and make us both a lunch.

8         I could fill page after page, but I don't want to take

9    all the court's time.  Carole Swan is a good person, good

10   enough to have a Thanksgiving dinner for the town people that

11   didn't have one at the school.

12        I feel that people make mistakes in life, everybody does.

13   But Carole is a good person who has overcome many, many

14   obstacles that I don't think you have to be from this

15   courtroom, can understand or never will.

16        I'm very thankful that God sent me to know the Swans, and

17   I'll always be proud to call them my friends.  Thank you.

18              THE COURT:  Thank you, sir.

19              MR. SHARON:  Wayne Libby.

20              THE WITNESS:  My name is Wayne Libby.  I have known

21   Carole Swan for over 30 years.  In all of the occurrences that

22   I have had to meet with her regarding work or anything else,

23   she has always treated me fairly and honestly.

24        Probably 20 years ago I noticed a lot of bruises on her.

25   I did ask her about it and she told me she was clumsy, that

1    she had fallen.   And it just goes to point out her character,

2    I think.

3        She was honest with me always.   I'm not saying she never

4    disagreed with me.   I have done some work for her, and she

5    thought my bill was too high, but she ended up paying it and

6    letting me know she disapproved of it.

7        I done some work for the town of Chelsea, and she was

8    aware of it.   She was the one that had contacted me about it

9    regarding quantities of materials that the Town had been

10   billed for.   She was very concerned as to whether it was

11   accurate or overbilling the Town.

12       And I just like to say that that's my opinion of her.

13   Thank you.

14            THE COURT:   Thank you, sir.

15            MR. SHARON:   Donna Williams, Your Honor.

16            THE WITNESS:   Your Honor, my name is Donna Williams.

17   I am here in support of my friend, Carole Swan.   We have been

18   friends for 20 years.   Anyone reading the too many articles in

19   the press could assume Carole Swan is a very different person

20   than she truly is.   I want to tell you about the woman who is

21   really Carole Swan.   She is a mom, loving and nurturing.   She

22   is a wife, faithful, and very loyal.   She is a daughter, a

23   sister, an aunt, a pillar for her family.   She is a

24   grandmother, proud and caring.   She is a friend, supportive

25   and giving.   She is a real person.   She loves.   She laughs.

1    She cries.  She cooks.  She shops.  And she provides a home.

2    She is needed and loved by family and friends.

3         Thank you for listening.

4              THE COURT:  Thank you very much, ma'am.

5              MR. SHARON:  I have one last witness, Your Honor.

6              THE WITNESS:  Hello, Your Honor.  My name is Hilary

7    Belanger.  I had written a letter that I believe you are

8    familiar with.

9              THE COURT:  Yes, I read that.

10             THE WITNESS:  To give you an idea of my credentials,

11   as you have heard from others, I am a mother.  I also

12   graduated from Farmington in 2001 with a Bachelor of Science

13   in education, as well as psychology.

14        Part of what has driven me to know more of those

15   disciplines is to understand why my family has been through

16   the pain that they have and to try to break that cycle and

17   stop it from happening any further.

18        I have two children of my own and something that I have

19   learned from my aunt is the importance of self-confidence.

20   She instilled it in me at a young age because she felt that I

21   deserved better.  I would hope that for my children that goal

22   of instilling self-confidence in them would allow them the

23   strength to be the best people that they can be, as well.

24        I believe that a very strong part of helping her is going

25   to be to restore some of her self-confidence to break this

1 cycle.

2  It is my hope that going forward from here that we can

3 realize all of these wonderful positive qualities that are

4 within her and that she can find the strength to realize them,

5 as well.

6  Thank you for hearing me.

7   THE COURT:  Thank you.

8   MR. SHARON:  Your Honor, there are other folks here,

9 some of whom have written letters, some who have not.  They

10 are here in support but not need to be heard, Your Honor.  I

11 think that their presence is sufficient to show the court

12 their support.

13   THE COURT:  All right.  Thank you.  Mr. Sharon,

14 would you like to be heard yourself.

15   MR. SHARON:  I would like my client to address the

16 court.

17   THE COURT:  That's fine.

18   MR. SHARON:  Thank you.

19   THE DEFENDANT:  I am desperately sorry for all of

20 this.  I never ever thought that I would hurt my family, my

21 community.  I can't talk.  I'm sorry.

22   MR. SHARON:  May I have about a five-minute,

23 ten-minute recess, Your Honor?

24   THE COURT:  Sure.  We're going to take a recess.

25 You will let me know when you're ready, Mr. Sharon?

1              MR. SHARON:  I will, Your Honor.  Thank you.

2              (Whereupon court was recessed at 3:19 p.m. and

3     reconvened at 3:33 p.m.)

4              THE COURT:  Mr. Sharon.

5              MR. SHARON:  Yes, Your Honor.

6              THE DEFENDANT:  I am desperately sorry for all my

7     mistakes.  I want to accept responsibility.  And I am the most

8     sorry for hurting my town who I love.  I did not want to tear

9     my town apart.  And I just want to say that I want everyone to

10    go forward.  I want to pay my restitution.  I want to pay my

11    fines, whatever it is so everyone can move forward.  I am very

12    sorry to everyone that's been hurt.  I am very sorry to take

13    your time on something that's so foolish over money.  I'm

14    sorry for all of it.

15             THE COURT:  Thank you.

16        Mr. Sharon.

17             MR. SHARON:  Yes, Your Honor.  Your Honor, I

18    believe -- I have read your comments in Marshall's sentencing

19    because I was -- I don't like to repeat what you already know,

20    but I think you -- as usual you hit the nail on the head.

21    This behavior divided the power right down the middle, into a

22    fault -- as you said, right at the fault line.

23             But as is common when there is a cataclysmic reaction

24    like this within the town, there is maximization and

25    minimization.  And God bless my side of the fault line.  I

1    think that one of the reasons why she sits here today is

2    because of some of the minimization of people's reaction to

3    what Carole did.

4         But it's really too easy to say that these folks on the

5    other side who vested her with the power -- I'm not saying the

6    people who voted her in, but the people that were only too

7    happy to call her up and say, go out and take a look at the

8    pothole.  Go out and take a look at the road.

9         She wasn't forcing anybody into making her the de facto

10   road commissioner.  They made her the road commissioner

11   because she was there.  She was willing to do it.  She was

12   happy to do it.

13        But what happened here?  How can this occur?  How can

14   both sides be right?  Well, it's easy to find that both sides

15   are right because the people who see the good side of Carole

16   see her when it's not necessary for her to exert and deal with

17   unbridled power.

18        Judge Singal referred to in a sentencing of a podiatrist

19   I represented who abused his prescription powers, he referred

20   to the powers that are given certain people, judges, lawyers,

21   doctors, politicians as awful powers.  Powers that are so

22   easily abused for profit, for greed, and for narcissism.

23        In this instance, Your Honor, Carole Swan for the first

24   time in her life when she was elected had some power, but

25   where would she learn to deal with that power?  How did she

1  learn to deal with power from people who had power that was

2  unchecked?  Her stepfather impregnates her and then tells her

3  to lie about it.  So that's the first lesson she learns, when

4  there is power within an organization, within a family that

5  you abuse that power.

6      And what is the lesson that she learned from her husband?

7  The lesson on how you deal with power and how you deal with

8  problems and how you solve problems, you've heard it.  You've

9  heard what happened.  This is no excuse, but you are -- the

10  government on one side deals with the guidelines, which gives

11  a formalistic approach to the harm that has been caused to the

12  community.

13      But in sentencing a person, you have to help decide what

14  is the punishment necessary so when this does come to rest,

15  that this is a person that will no longer be a threat to the

16  community.  Dr. Sadoff put it quite right when she said that

17  she is a work in progress.  Imagine that, a woman of her age

18  being a work in progress, that finally understands what

19  brought her here.

20      I believe that the lessons that have been taught her and

21  the lessons that she absorbed and that she took into a

22  position of power where whenever there is an ability to choose

23  a right way and a wrong way, you take the easy way.

24      What need was there for this family to avoid paying

25  income taxes?  Don Clark hit it right on the head.  These

1    people didn't need to do that.  They made money.  They did

2    good work.  They made money legitimately.  This was not

3    stacking contracts.  The city -- the town knew this.  They

4    authorized it.  They gave the contracts to Marshall Swan, and

5    he did a good job, and these people could have done quite well

6    off.  She could have served this community -- she did good for

7    the community, there is no question about it.  You have heard

8    of some -- from the people there is no question that she did

9    help the community.

10       But in the same time, when she was singularly unable to

11   deal with the power that was invested to her, she corrupted

12   that power, and she -- and when you take that into account

13   that -- you need to take into account the formalization of

14   what brings her, this human being into this court and the

15   lessons that have to be taught to a community and the lessons

16   that have to be taught to a family to be vigilant for this

17   abuse because abuse does -- as you can see, just doesn't

18   cause harm within the family, it causes harm outside the

19   family because sometimes people who are abused become abusers.

20   The puppeteers -- the puppets become the puppeteers.

21       This woman never had any power within her family.  You

22   heard her testify.  Much of what you didn't believe.  Much of

23   what the jury didn't believe.  But there is no question it was

24   abuse.

25       There is no question that she was injured at work.  There

1   is not a question that she wasn't disabled.  The question is

2   whether she was reporting her abilities.  And, again, this is

3   the problem, when you can -- it would have been a very simple

4   matter for her to say those things as to what she was doing,

5   but she chose not to.

6        And what I am saying is that she was solely unequipped

7   based upon her upbringing, based on who she was, to deal with

8   the power of the elected official that she was given for

9   18 years and that the town invested in her.  And this is what

10  happens sometimes when people who are unable to promulgate the

11  power, who don't have the moral compass to deal with that

12  power and don't have the moral compass to help you assist

13  someone, help them assist themselves in deciding what is right

14  and wrong, you choose the wrong path.  This is a lesson that

15  has to be taught based upon the totality of the circumstances

16  of her life, that how you make the right choice based on

17  honesty and not convenience.

18       And I believe that this is one of the problems that

19  happened with this woman in this society, that she was not

20  given the power.  She was not given the true support she needs

21  to deal with the awful power that was handed to her as an

22  elected official.

23       And I think you hit it right on the head, that arrogance

24  come from the unbridled use of power, and that's what happened

25  here.  You said it best, that Marshall Swan and Carole Swan

1   appeared to have thought that they became the town of Chelsea
2   and what was good for them was good for the town of Chelsea.
3   And that sometimes isn't true.
4       So I ask you to look at all the letters and all the
5   people who believe her to be a good person, because she is a
6   good person to them, because she didn't have to use power.
7   She used her heart, and she has a good heart.  But she is
8   never able to translate her heart into her moral compass.  And
9   when she combines those two things after you determine what
10   punishment is needed under the totality of the sentencing
11   guidelines, under the advisory guidelines, under what the
12   government has said, when you look at the totality of that,
13   what has to somehow merge in the future is the heart of a good
14   person, but to have a moral compass that will help her make
15   decisions, not from her heart, but from an honest human being
16   who was taught that power must be wielded and power must be
17   used sparingly.  And before you can take that power and before
18   you even accept the awful powers that are given you, you must
19   be darn sure that you have the compass and you have the
20   strength to deal with that.  And I think that that is what is
21   going to have to happen in the future, that she be given the
22   strength through counseling, through -- I think an education
23   has been given to people on her side that they have to watch
24   out for her, they have to be vigilant to what is going on in
25   her house, and they can't just slough it off, as poor Carole

1    is injured and poor Carole is being abused.  They have to be

2    vigilant that these can corrupt -- this kind of abuse can

3    corrupt a person as much as injure them.

4         And when you look at that, please look at the totality of

5    this and then look at what she has done and how she has hurt

6    the community and balance those two things and determine what

7    is going to happen when the dust settles here and all payments

8    are made, all fines are paid, and she comes back out into

9    society, hopefully, a whole person who can deal in society and

10   be a family person and be a member of the community.

11        Her reputation, her husband's reputation are gone, and

12   rightfully so.  I mean, you don't -- when you -- the people --

13   you have clay feet in this instance, and you can't complain

14   about it.

15        Mr. Monroe's reputation was solid, no question about it.

16   He didn't deserve that.  These people's reputations were taken

17   out by themselves because they were wholly incapable of

18   dealing with the power that was given to them.  But taking all

19   that into account, I would just ask you to balance the

20   sentence of her husband, balance what she has done, and

21   balance the problems she had in her life and you determine

22   what is necessary to express the harm that she's done, as well

23   as taking into account that the harm that has been done to her

24   and her upbringing.  Thank you.  I know it's a difficult task.

25   I'm not saying it's easy, and I know it's made more difficult

1    by the trial, and I appreciate all that.  I appreciate the

2    patience and I'd just ask you to use the awful powers that are

3    given you and look -- because it is complex and it's not quite

4    as black and white as the government would like to make it out

5    to be.

6              THE COURT:  All right.  Thank you very much,

7    Mr. Sharon.  I appreciate your comments.  Anything further

8    from -- Mr. Sharon, anything further?

9              MR. SHARON:  No, I am all set, Judge.

10             THE COURT:  Anything further, Mr. Clark?

11             MR. CLARK:  Briefly, Your Honor, three quick points.

12   Marshall Swan never did admit that he abused his wife to the

13   extent she testified to or claims that he did.  He publically

14   denied doing that.

15        Your Honor, you cannot believe a single word that Carole

16   Swan speaks.  When her lips are moving, she is lying.  And I

17   do not believe that anything that she represented to anyone in

18   this case as contained in the exhibits before the court.

19        And finally, Carole Swan wasn't given power by the town

20   of Chelsea.  She took it.  She took it by having town managers

21   fired one after another so that she was the only one that

22   could control that road budget.  I say that very briefly.

23        In addition, Your Honor, I am sure you are going to ask,

24   but there are some victims, real victims.  Carole Swan is not

25   the victim.  There are real victims in this courtroom who

1    would like to address the court.

2              THE COURT:  Certainly.  You may proceed.

3              MR. CLARK:  For the town of Chelsea, Your Honor,

4    Mr. Danforth I believe is a current elected selectman.

5              THE WITNESS:  Richard Danforth, selectman for the

6    town of Chelsea.  Honorable Judge Woodcock, the actions of

7    Mrs. Swan have greatly affected me and the town I live in.  I

8    was not aware of how much her actions affected me until the

9    trial was over.  Since she committed these crimes, neighbor

10   has pitted against neighbor, friend against friend.  This

11   ordeal has constantly been on my mind, affecting both my home

12   life and work.  Now that the final step is almost complete, I

13   take solace that justice will be served and the healing

14   process will continue.

15        It is difficult to ascertain how deep or involved her

16   deceit really was.  The crimes she committed are severe, but

17   what disturbs me the most is, as public officials, we are

18   expected and should be held to a higher standard.  If we do

19   not abide by a code of ethics, our whole system fails.  We are

20   supposed to put our personal gains aside and serve, to the

21   best of our ability, the people who elected us.

22        She broke that bond of trust.  The fact that she refused

23   to resign her selectman position upon her arrest, causing the

24   town to incur extra legal fees is an example of the arrogance

25   she possessed.

1       I thoroughly enjoy being a selectman for my town.

2   Mrs. Swan's action cast a cloud over my credibility and the

3   ability to serve as selectman.  My joy in serving on the board

4   of selectmen is now tempered, but I do appreciate the chance

5   to once again serve my community.

6       While I and others may have an opinion on the terms of

7   Mrs. Swan's sentencing, I am putting my trust in the process.

8   The only thing I can hope for is to happen is that a message

9   will be heard to all elected officials.  We are elected to

10  serve the people, not serve ourselves.

11              THE COURT:  Thank you, sir.

12              MR. CLARK:  Frank Monroe, Your Honor.

13              THE WITNESS:  Frank Monroe.  Good day, Judge

14  Woodcock.

15              THE COURT:  Afternoon.

16              THE WITNESS:  I have listened to a lot of testimony

17  through all three trials.  Some of this that's been said today

18  about her is -- is heart-touching, is true, probably to a

19  point.  I have known them kids of hers since they was probably

20  six or eight years old.  They come down to my shop.  I would

21  make of them.  My father would make of them.

22      I don't know what went on in their house.  I have only

23  heard.  Okay.  It's sad that this has happened.

24      But being as a parent, this crime that she has committed

25  against me, my business, how it's affected me, it has tore my

 1   family apart.  Needless to say, how do you explain to your
 2   seven year old son, you get ready to go to church, your tires
 3   are flat.  Carole Swan may not have done that act, but I was
 4   here and I heard the testimony that she was present at some of
 5   them conversations.  That being said, okay, being the person
 6   that she said she is and that people say she is, why didn't
 7   she say -- because she knew them people -- don't do that,
 8   that's wrong?  Don't go to Frank Monroe's.  We're going to do
 9   this the right way.
10        But it didn't happen.  There was no remorse.  I have seen
11   no remorse, and I am speaking to the court, nobody else.  I
12   haven't seen it.  But my family has suffered.  It isn't about
13   the dollar amount.  The dollar amount here is -- is ludicrous.
14        Two families that I know of are destroyed because of it,
15   because of this crime.  Some of this crime could have been
16   avoided, I believe, on the behalf of the way the town
17   operated, you know, but Carole did take that power.  She did
18   use that power.  She used it against me.  She used it against
19   a lot of people.
20        Okay.  That is all fine and it's all been proven.  It's
21   not fine, but in a matter of speaking.  But it does bother me
22   how this has affected my son.  We had to have cameras put in
23   in my house from FBI, they put them in.  How do you explain to
24   your son?  He shouldn't have to live under cameras.  That was
25   before we learned of who the people was that did the damage.

1    You know, that's all intimidation.  You know, that stuck in

2    his head.  He won't sleep in his own room alone.  He has to

3    sleep with one of his step-brothers to say -- that are like

4    his step-brothers or me for two years, okay, his mother --

5    that issue had developed and she moved out through all this,

6    it was him and I.

7         Okay.  He has issues, not mental issues, but he has trust

8    issues to the fact that if he sees a car down to my garage,

9    okay, he says, want me to get the shotgun?  He shouldn't have

10   to.  He's 10.  He shouldn't have to be that way.  He only has

11   this intimidation factor installed in him because of their

12   actions, that Carole Swan did and Marshall Swan did.

13        I kept my mouth shut because of my choice and because of

14   the federal government for three years.  I have waited for

15   this opportunity to speak.  I didn't even tell you -- read

16   what was on here because I didn't like it, and I went over it

17   with my lawyer and I don't think it says what it needs to say.

18   What I have said today, I meant.  And I hope that this court

19   as bad as it hurts, times her -- gives her the most stiff

20   sentence they can because my family was ripped apart because

21   of her.  Now it's her family's turn.  Thank you.

22             THE COURT:  Thank you, Mr. Monroe.

23             MR. CLARK:  Nothing further, Your Honor.

24             THE COURT:  Thank you.

25        Anything further, Mr. Sharon?

1    MR. SHARON:  No, Your Honor.

2    THE COURT:  I will see probation briefly at sidebar

3  here.

4    (Whereupon there was a meeting held at sidebar off

5  the record.)

6    THE COURT:  The court has carefully reviewed the

7  contents of the written presentence investigation report and

8  takes those contents into account in determining sentence.

9  The court has considered what it has heard from counsel in the

10  course of these proceedings and at the presentence conference,

11  the evidence presented at this hearing, including the contents

12  of the allocution of this defendant.  There are no further

13  disputed matters.  The court has already made its guideline

14  calculations.

15    I have taken into consideration each of the factors set

16  forth in 18 U.S.C.  Section 3553(a), including the obligation

17  to impose a sentence that is sufficient but no greater than

18  necessary to achieve the purposes of the law.

19    Although, I have taken into account each of the statutory

20  factors, I have concentrated on the history and

21  characteristics of the defendant, the nature and circumstances

22  of the offenses, the need to reflect the seriousness of the

23  offenses, to promote respect for the law, and to provide just

24  punishment for the offenses.

25    Finally, I have considered the need to provide proper

1   restitution to any victims.

2       I have started with the recalculated guideline range of

3   70 to 87 months, which is advisory.

4       Turning to the history and characteristics of the

5   defendant.  The defendant is a 56-year old resident of

6   Chelsea, Maine.  She was born in Gardiner, Maine.  Her father,

7   George Blodgett, and her mother, Patricia Blodgett -- her

8   mother has spoken here today -- were divorced when the

9   defendant was eight years old.

10      Although the presentence report states that the defendant

11  had no relationship with her father after the divorce, the

12  defendant's sentencing memorandum indicates that she

13  maintained some contact after the divorce, but that the

14  contact gradually lessened.  Tragically, the defendant's

15  father died of a self-inflicted shotgun wound in 2004.

16      The defendant's mother remarried a man named Earl

17  McLaughlin, who became the defendant's substitute father

18  figure.  She and her older sister, Sharon, from whom we have

19  heard today, and her brother, George, who goes by the name

20  Lee, lived with their mother and Mr. McLaughlin.

21      The defendant has a younger, half-sister, Kelley, from

22  her mother's marriage to Mr. McLaughlin.

23      Unfortunately, Mr. McLaughlin was an alcoholic.

24  Initially, he beat their mother, and the children were scared

25  of him.  When the defendant was in the six-grade,

1    Mr. McLaughlin stopped drinking, but her mother was

2    preoccupied with keeping him sober, and she spent almost all

3    of her time and energy with him.  This left the household

4    chores to the children.  Carole spent much of her time working

5    around projects around the house and taking care of the

6    younger kids.  She also developed a stuttering problem, we

7    have heard about that, which later improved with therapy, but

8    she did not do well in school.

9        In 1972 she started high school and things began well.

10   She had a boyfriend and she had fun with him on the weekends.

11   However, during her sophomore year, Mr. McLaughlin began

12   sexually abusing her.  Ultimately, as we have heard, she

13   became pregnant with her stepfather's child.  She was told to

14   get an abortion and to tell people that it was her boyfriend's

15   child.  Her boyfriend broke up with her as a result, and even

16   after the pregnancy was terminated the molestation continued.

17       Mr. McLaughlin died a number of years ago.  It was in her

18   senior year that the defendant met Marshall Swan.  The

19   defendant moved in with him in 1979, and they were married in

20   1985.  They have two sons, Jake, who is 28-year old, and John,

21   who spoke today, who is 18.

22       At both trials, the defendant testified at some length

23   about Marshall's controlling and abusive conduct towards her.

24   The defendant graduated from Gardiner High School in 1976.  At

25   some point, the defendant got a job working for the postal

1    service, and she sustained a work injury to her right

2    shoulder, ultimately leaving work.  She was approved for and

3    received workers' compensation disability benefits.

4    Meanwhile, her husband, who is by all accounts, an extremely

5    hard working and competent contractor.  He began to experience

6    substantial success in his contracting business, Marshall Swan

7    Construction.

8         The defendant was the office person for his business,

9    answering the phone, preparing invoices, receiving payments,

10   and doing the books.  The defendant at some point also became

11   involved in a horse racing business.

12        During the period from 2003 to 2013, she received

13   disability benefits at the end totaling about $44,000 a year.

14        The defendant has some physical problems.  In 2008 she

15   underwent a gastric bypass and is currently diagnosed with

16   fibromyalgia, occipital neuralgia, right shoulder sympathic

17   mediated pain syndrome, and right sacroiliac joint

18   dysfunction.  She takes about five medications daily.

19        More recently based on the -- an interview with a

20   psychologist, she was diagnosed with PTSD and depression, and

21   she is receiving two psychotropic medications per day.

22        She was first elected to the board of selectmen for the

23   town of Chelsea in 1992 and was consistently reelected until

24   she resigned in 2011 as a result of the police investigation.

25        She turned out to be -- and this is an understatement --

1  a force to be reckoned with on the board of selectmen.   During

2  her early years, she uncovered some fraud by one of the town

3  employees.   She was in the words of her attorney, Robert

4  Stolt, tenacious.   And she pursued that issue against the town

5  employee despite fierce blow-back from a number of people in

6  the town.        She was ultimately proven right and received

7  recognition from her fellow citizens.

8       In her memorandum, the defendant has set forth her

9  history of good works for the town of Chelsea, which the court

10  accepts.   And the court has received 14 letters that friends

11  and family have written to the court concerning her character

12  and the medical records that the defendant has presented.   The

13  court has also listened carefully to the statements of support

14  today for Ms. Swan.

15       Turning to the nature and circumstances of the offense,

16  under a superseding indictment, the defendant was charged with

17  three counts of Hobbs Act extortion, five counts of false tax

18  returns, four counts of false statements to obtain workers'

19  compensation, one count of fraud against a local government.

20       Her husband, Marshall Swan, was also indicted for tax

21  fraud and local government fraud.

22       The entire case was scheduled to go to trial against both

23  defendants on July 8, 2013.   However, on July 1, 2013, the

24  defendant filed a trial brief that asserted that she had acted

25  because of her fear and lack of control from spousal abuse.

1    Marshall Swan, reviewing that memorandum, move to sever his

2    case from hers and the court granted that motion, concluding

3    that he should not have to defend himself against both the

4    government's and his wife's charges at the same time.

5        The defendant also earlier moved to sever the extortion

6    charge from the federal -- and the federal program charge from

7    the tax fraud and workers' compensation charge.  She said she

8    wanted to testify only on the extortion charge and not on the

9    others.  The court granted the severance on that basis,

10   severing the extortion charge from the other charges.

11       The first trial on the tax fraud and workers'

12   compensation fraud and government fraud charges went forward

13   on July 8, 2013.  On July 26, 2013, a federal jury convicted

14   the defendant of all 5 tax fraud counts from the tax years

15   2006 through to 2010.  The jury found the defendant guilty on

16   two counts of false statements in connection with the workers'

17   compensation fraud, and not guilty on the remaining two counts

18   of workers' compensation fraud.  Finally, the jury found the

19   defendant not guilty of the federal program fraud.

20       Despite her earlier expressed desire not to testify, the

21   defendant actually took the stand and testified at the July

22   trial.

23       A second trial was held from September 10, 2013, to

24   September 17, 2013.  The defendant testified at that trial.

25   The jury found the defendant guilty of all three counts of

1   Hobbs Act extortion.

2       The defendant's convictions, therefore, fit into three

3   different categories.   The tax fraud counts are

4   self-explanatory, the government proved beyond a reasonable

5   doubt that the defendant and her husband failed to report

6   $648,573.78 in income from tax years 2006 through 2010.   This

7   resulted in an underpayment of taxes in the amount of

8   $145,404.

9       The workers' compensation fraud counts reflect the

10  defendant failed to inform the office of workers' compensation

11  programs about the work she had been doing for the town and

12  for Marshall Swan Construction, that she exaggerated the

13  nature and severity of her disability, and failed to report

14  the money she had extorted from Frank Monroe.

15      The Frank Monroe extortion is a complicated tale, but it

16  boils down to the defendant demanding and receiving from a

17  local contractor, Frank Monroe, who has been here in the court

18  today, and who spoke to the court, in exchange for influencing

19  the town of Chelsea to contract with him two payments, one of

20  $3,000 and another of $7,000 fall into that category.   The

21  third payment is different and more, in the court's view,

22  egregious.   The defendant told Mr. Monroe to bill the town for

23  sand he had not delivered and demanded $10,000.   Mr. Monroe

24  had capitulated, I think to his regret, to her earlier demands

25  for kickbacks, but he could not bring himself to bill the town

1    for phantom sand.  He went to the police.  And the police then

2    set up a sting.  They listened to her on wire taps, and they

3    watched as he tossed a bag that the defendant thought had

4    around $10,000 in it into her motor vehicle.  She was brought

5    to the county sheriff's office and essentially at the county

6    sheriff's office confessed to that crime.

7         The court has also considered the seriousness of the

8    offense, the need to promote respect for the law, and to

9    provide just compensation.  It is striking, particularly as a

10   long- term member of the board of selectmen of the town of

11   Chelsea, that all her crimes involve cheating the government,

12   the tax fraud, workers' compensation fraud, and extortion.

13   The court has considered that these crimes took place over

14   many years, that the defendant had full opportunity to

15   reconsider and did not, did not self-report, and she stopped

16   only because she was caught.

17        The court has considered that the money is substantial,

18   underreporting $648,000 is, for most Maine people, a small

19   fortune.  And during that time, she received at least $100,000

20   more from workers' compensation fraud.  And as we have heard,

21   $10,000 more from Frank Monroe, a sum that was going to be

22   another $10,000.  And during all this time, as has been

23   pointed out, the defendant was an elected town official and

24   owed and breached a primary duty of honesty to the citizens

25   who elected her to her position.  She also had a duty of

1    trust, which she breached in her dealings with Frank Monroe.

2         I do want to talk for a moment, Ms. Swan, about the issue

3    that Mr. Clark has brought up, and that concerns your

4    testimony.  Essentially what you should know is I have sat

5    through a lot of your testimony, and Mr. Clark describes you

6    as somebody who is virtually a pathological liar.  I have to

7    tell you that I agree with him.

8         I have to tell you, Ms. Swan, that you are one of the

9    least credible witnesses I have ever seen in any court, both

10   during the long period that I practiced law and during the

11   period that I have been a judge.  You lied, in my view,

12   repeatedly on matters, big and small during the course of the

13   two trials before a federal jury.

14        I would point out that, unlike your husband, who did not

15   take the stand, you had a perfect right and you could have

16   simply put the government to its proof and remain seated, and

17   Mr. Sharon, who is a fine lawyer, could have tested the

18   government's case, but you chose to do something else.

19        You chose in two trials to take the stand, to swear to

20   tell the truth, and once you did that, you were duty-bound and

21   legally bound to tell the truth, and yet you lied.

22        I also want to tell you my impressions of you, Ms. Swan.

23   I agree with Mr. Sharon that you are an unusually complicated

24   person.  And determining the correct sentence to impose upon

25   you is not an easy task because I am sympathetic to much of

1    your life story.  You did not have an easy time growing up,

2    particularly after your mother's remarriage.  I am very sorry

3    to learn that you had been sexually abused by your stepfather

4    as a teenager and when that happened, you were not supported

5    by your mother.  It sounds like when you were a child, you

6    were made to work very, very hard, which is not a bad thing in

7    and of itself, but it seemed that from the presentence report

8    and the information your lawyer has provided, that your mother

9    and stepfather squeezed the joy out of childhood for you.

10       And you and Marshall, I think to your credit, built up a

11    very successful business.  And that was by dint of hard work.

12    And I credit, not simply Marshall with that, but also with

13    you.  I credit you with that.  Neither of you came from any

14    significant wealth, and you achieved much of your wealth, but

15    not all of it, because you worked hard for it.

16       I also acknowledge that your work on the board of

17    selectmen had an extremely seamy side, which we will talk

18    about, but I have no doubt that over the course of the whole

19    19 years while you were working on the board of selectman,

20    that you did a fair amount of good for the town of Chelsea.

21    Your investigation into the financial fraud of the town clerk

22    is an example of that, but it didn't stop with that.  From the

23    testimony of everybody who came before the court, there was

24    not much that happened in the municipal affairs of the town of

25    Chelsea that escaped your watchful eye.  Incidentally, your

1    ability to watch carefully the budget of the town of Chelsea,

2    to haunt the contractors from the town of Chelsea, to make

3    sure that the nickles and dimes were properly being spent for

4    the town of Chelsea is one of the reasons that, I think, that

5    you fully and intentionally failed to pay in full your income

6    taxes.  It's inconceivable to me, Ms. Swan, that you were so

7    careful for the municipal affairs that you didn't know what

8    you were doing and misrepresenting as much as 50 percent of

9    your income in given years to the United States government.

10       I also accept your description of your marriage with

11   Marshall and his controlling and abusive conduct.  I am sorry

12   you had to go through that.  I listened not only to your

13   testimony, but also your sons' testimony.  I don't think that

14   they were lying.  I think they were telling the truth on that.

15   And I do agree that when you testified about Marshall's

16   actions within your marriage, you were telling me the truth

17   and you were telling the jury the truth.

18       I have ordered, as you know, because you were at his

19   sentencing, your husband to undergo batterer's counseling.

20   And I am going to order you to undergo mental health

21   counseling.  And I hope that both you and he will begin to

22   understand this awful phenomenon and learn how to avoid it and

23   deal with it.

24       It strikes me that your lawyer, Mr. Sharon, was exactly

25   correct in saying that in some ways your life story explains

1    why you're here today because part of your life has always

2    been controlled either by your mother or stepfather or by your

3    husband.   And when you were elected to the board of selectmen

4    for the town of Chelsea, you began to realize for the very

5    first time in your life that you could exert control over

6    others, and you misused that public trust.

7        There is a saying in Africa that every small boy needs a

8    small boy.   And I think for you Frank Monroe and other members

9    of the town of Chelsea were your small boys, that you were --

10   you found that you could push them around, and you enjoyed it.

11   I also think for whatever reason that you have come to have an

12   extremely strong sense of entitlement simply because of who

13   you were and what you and your husband had achieved that the

14   rules that apply to everyone else did not apply to Carole

15   Swan.   But what you should know, under no uncertain terms, is

16   this, whatever happened to you and whatever you achieved, did

17   not give you the right to commit crimes.

18       And here I have found watching you throughout many, many

19   days that you present a very striking and unusual combination

20   of self-pity and aggressiveness.   I've watched you cry on the

21   stand.   I watched you cry today.   I have also watched you look

22   at people, including specifically Frank Monroe, with a look

23   that is so steely and so hard and so hateful that if looks

24   could kill, he would not be here today.   I have also watched

25   you, as I have said repeatedly, willfully and deliberately lie

1    on the stand.

2         I want to tell you, because I think the people of this --

3    in this courtroom and the people of Chelsea ought to know it,

4    is that regarding Frank Monroe, I agree with what -- with much

5    of what Mr. Clark said about Frank Monroe.  The contracting

6    business is a tough business.  If you have heavy equipment in

7    their yard, it has to be used because you have to pay for it.

8    And you know that because you were Marshall Swan Contracting &

9    Construction's bookkeeper and you knew it.  And what you know

10   is the economic imperative haunts a contractor.  And because

11   of that, because you knew the bank would not wait for Frank

12   Monroe to get the next job, you knew he was vulnerable.  And

13   you picked your target.  And you went after it.

14        Now, Frank Monroe is willing to go only so far.  And I

15   think among the most shocking episodes of this entire sorry

16   affair when he reported your crime to the police, you savaged

17   him.  I sat here in the courtroom and I listened to witness

18   after witness come forward and testify that Frank Monroe is a

19   liar, that Frank Monroe has a bad reputation.  And you allowed

20   your attorney to call one after another of these witnesses to

21   testify against Frank Monroe when you knew in your heart of

22   hearts, Ms. Swan, that he was telling the truth.

23        The irony in this case is that Frank Monroe turned out to

24   be to you what you were to the town clerk when you first came

25   to power in the town of Chelsea.  And I will say unequivocally

107

1    to the people in this town, whether you're on one side or the

2    other of this sorry affair, that Frank Monroe is a local hero

3    because he went to the police when he had to go to the police.

4    He was not intimidated by the fact that people slashed his

5    tires and broke the windows in his equipment.  He stood the

6    course.  He testified in this case against the hateful looks

7    that you were shooting across the courtroom at him and he did

8    what honest and good citizens do.  He made sure that justice

9    was done.  And for you to have treated him as you did, speaks

10   poorly, Ms. Swan, for you.

11        I will make two final points.  One point is that no one

12   is required to run for public office.  You take a public

13   office because you were voted into public office by your

14   fellow citizens, and you owe them a duty of honesty.  And you

15   breached that duty.  And when you, as a member of the board of

16   selectmen for the town of Chelsea breach a duty of that sort

17   and do so repeatedly, you bring into question for all of our

18   citizens, the honesty of their government.

19        I agree with Mr. Danforth that elected officials owe a

20   higher duty than your average citizen, and you breached that

21   duty.

22        Finally, you've done a terrible amount of damage to the

23   town that you say you love so well.  This courtroom with its

24   wide center aisle is symbolic of the town of Chelsea.  You

25   could line the people up in the town of Chelsea and there

1    would be a pro Carole fashion and anti Carole fashion.

2         Your convictions, Ms. Swan, have confirmed the worst

3    beliefs about you of some.  And they have dashed the faith of

4    your supporters.

5         What I suggest you need to do is to recognize the harm

6    you've caused to your community.  And the first step, which I

7    did not hear you say today, is to call off the dogs on Frank

8    Monroe.  It seems to me that this town, the town that you have

9    spent most of your adult life in, needs to heal.  And unless

10   you stand up and tell the people who believe in you that it's

11   time to move on, they are going to remain angry, disappointed

12   at their fellow citizens.  You, Ms. Swan, are the person who

13   can heal the town and I am going to ask you do that, but you

14   can only do so once you finally have recognized that it is

15   you, not anyone else, who is responsible for the crimes you've

16   committed.

17        What I am going to do in terms of the sentence I am

18   imposing today is as follows, I am going to order restitution.

19   That is mandatory under the law.  If you have committed a

20   crime and you've caused someone to be a victim of the crime,

21   the law requires restitution.  The restitution I am going to

22   order in accordance with the findings I made earlier today are

23   $25,000 to Frank Monroe, $4,000 to the town of Chelsea,

24   $75,000 to the Department of Labor.

25        I am required to impose a special assessment of a

1    thousand dollars, I will do that.

2         In terms of supervised release, I am going to place you

3    on supervised release after you get out of jail.   I am going

4    to require that you comply with the terms of supervised

5    release.   As I have mentioned to you, I think that you need to

6    continue with your mental health treatment.   I'm going to

7    order that you do so.

8         I am going to require that you come clean on your

9    financial affairs.   I've heard today for the very first time

10   that you have misrepresented things to the probation officer

11   concerning the property that you own and the value of that

12   property.   And had Mr. Clark not investigated it and had the

13   officers, the federal officers we heard from today not

14   thoroughly investigated this matter, I would have walked away

15   with a misimpression based on your continuing the lies that

16   you had only $5,000 in assets.   That's false.   It's very clear

17   from the evidence that Mr. Clark presented today that you have

18   substantial assets with which to pay a fine.

19        And I would like to thank you Mr. Clark and the officers

20   for thoroughly investigating this case in general and also for

21   ferreting out the fact that the defendant herself had

22   misrepresented to the probation officer the extent of her

23   assets.

24        I will tell you, Ms. Swan, that it is astonishing to me,

25   that having been convicted of two crimes that you would

1    continue to lie and hide your assets in the hope that you

2    would continue to avoid justice.

3        I am going to fine you, based on what I have heard today,

4    the very top of the fine range of $125,000.

5        In terms of the amount of time you are going to spend in

6    prison, I have considered all the factors that Mr. Clark has

7    mentioned and that your lawyer, Mr. Sharon, has mentioned and

8    in balancing those factors I am placing you in jail for a

9    total period of time of 87-months, which is the highest end of

10   the guideline range applicable to your case.

11       You will stands for the imposition of sentence.  The

12   defendant is hereby committed to the custody of the United

13   States Bureau of Prisons to be imprisoned for a total term of

14   87 months on each of counts 1 through 3 to be served

15   concurrently; 36 months on each of counts 4 through 8 to be

16   served concurrently; and 60 months on each of counts 9 and 11

17   to be served concurrently.

18       The court recommends to the Bureau of Prisons that the

19   defendant be placed in a Bureau of Prisons facility that can

20   address her medical needs.

21       Upon release from imprisonment, the defendant shall be on

22   supervised release for a term of 3 years on each of counts 1

23   through 3, 9 and 11 to be served concurrently and 1 year on

24   each of counts 4 through 8 to be served concurrently.

25       The defendant shall report to the probation office in the

1    district to which the defendant is released within 72 hours of

2    release from the custody of the Bureau of Prisons.

3        The defendant shall not commit another federal, state, or

4    local crime.  The defendant shall not illegally possess a

5    controlled substance.  The defendant shall cooperate in the

6    collection of DNA as directed by the probation officer.  The

7    defendant shall not possess a firearm, ammunition, destructive

8    device, or any other dangerous weapon.

9        This judgment imposes both a fine and a restitution

10   obligation.  And it shall be a condition of supervised release

11   that the defendant pay any such fine and restitution that

12   remains unpaid at the commencement of the term of supervised

13   release in accordance with the schedule of payments set forth

14   in the criminal monetary penalty sheet of this judgment.

15       The defendant shall comply with the standard conditions

16   that have been adopted by this court.  The defendant shall

17   also comply with the following additional conditions, one, the

18   defendant shall provide the supervising officer any requested

19   financial information.  Two, the defendant shall report to the

20   supervising officer any financial gains, including income tax

21   refunds, lottery winnings, inheritances, and judgments,

22   whether expected or unexpected.  The defendant shall apply

23   them to any outstanding court ordered financial obligations.

24   Three, the defendant shall not incur new credit charges or

25   open additional lines of credit without the supervising

1   officer's advance approval.   Four, the defendant shall

2   participate in mental health treatment as directed by the

3   supervising officer until released from the program by the

4   supervising officer.   The defendant shall pay or co-pay for

5   services during such treatment to the supervising officers

6   satisfaction; five, the defendant shall not use or possess any

7   controlled substances, alcohol or other intoxicant, and shall

8   participate in a program of drug and alcohol abuse therapy to

9   the satisfaction of the supervising officer.   This shall

10  include testing to determine if the defendant has used drugs

11  or intoxicants.   The defendant shall submit to one test within

12  15 days of her release from prison and at least 2, but not

13  more than 120 tests per calendar year thereafter as directed

14  by the supervising officer.   The defendant shall pay or co-pay

15  for services during such treatment to the supervising

16  officer's satisfaction.   The defendant shall not obstruct or

17  tamper or try to obstruct or tamper in any way with any tests.

18  Six, the defendant shall satisfy all tax liabilities to the

19  Internal Revenue Service and comply with any tax repayment

20  schedule established by the IRS.   Seven, the defendant shall

21  report to the IRS and file true and accurate returns for tax

22  years 2006 through 2010 within 30 days of release from

23  incarceration or as otherwise directed by the supervising

24  officer.   A criminal monetary penalty is assessed on counts 1,

25  2, 3, 4, 5, 6, 7, 8, 9, and 11 in the total amount of $1,000

1   at $100 per count.

2       The court imposes a fine in the amount of $125,000.  The

3   court finds the defendant does not have the ability to pay

4   interest on the fine and the interest requirement is waived.

5       The court orders restitution on count 1 in the amount of

6   $3,000, on count 2 in the amount of $11,860, and on count 3 in

7   the amount of $15,721.66.  The court orders restitution on

8   count 9 in the amount of 31,000 -- of $41,469.59, and on

9   count 11 in the amount of $34,295.69, for a total of

10  $106,346.94.

11      The court finds -- the court orders the defendant to make

12  restitution to the following payees in the amounts listed

13  below.  If the defendant makes a partial payment, each payee

14  shall receive an approximately proportional payment, unless

15  specified otherwise in the priority order or percentage

16  payment column -- percentage payment column below.  Victim

17  name, Frank Monroe at 183 Augusta Road, Whitefield, Maine,

18  04353 in the amount of $25,721.  To the town of Chelsea,

19  Maine, 560 Togus Road, Chelsea, Maine, 04330-1272, in the

20  amount of $4,860.  The United States Department of Labor,

21  OWCP, P.O. Box 37117, Washington D.C., 2003-7117, attention

22  PCC, in the amount of $75,765.28.

23      The court finds the defendant does not have the ability

24  to pay interest on the restitution, and the interest

25  requirement is waived.

1        The payment shall be applied in the following order, one

2   to the assessment, two to the restitution, and three to the

3   fine principal.

4        Payment of the total fine and other criminal monetary

5   penalties shall be due in full immediately.  Any amount the

6   defendant is unable to pay now is due and payable during the

7   term of incarceration.  Upon release from incarceration, any

8   remaining balance shall be paid in monthly installments to be

9   initially determined in amount by the supervising officer.

10  Said payments are to be made during the period of supervised

11  release, subject always to review by the sentencing judge on

12  request by either the defendant or the government.

13       Is there any objection to the terms of supervised release

14  on the part of the defendant?

15            MR. SHARON:  No, sir.

16            THE COURT:  Ms. Swan, I must advise you, you have a

17  right to appeal these convictions and sentence.  If you wish

18  to do so, in order to effectively exercise that right of

19  appeal, you must cause to be filed with the clerk of this

20  court within 14 days of today, and not thereafter, a written

21  notice of appeal.  Do you understand?

22            THE DEFENDANT:  Yes, sir.

23            THE COURT:  I advise you if you fail to timely file

24  the written notice of appeal, you have given up your right to

25  appeal this sentence and your convictions.  Do you understand?

```
 1              THE DEFENDANT:  Yes, sir.

 2              THE COURT:  If you cannot afford to file the appeal,

 3    you can appeal without cost to you.  And on your request, the

 4    clerk will immediately prepare and file a notice of appeal on

 5    your behalf.  Do you understand?

 6              THE DEFENDANT:  Yes.

 7              THE COURT:  Is there anything further to come before

 8    the court at this time from the government?

 9              MR. CLARK:  No, Your Honor.

10              THE COURT:  Anything on the part of the -- did I

11    miss something?  Oh, the count -- the court imposes the fine

12    on count 1.

13         Anything further from the defendant?

14              MR. SHARON:  No, Your Honor.

15              THE COURT:  What do you want to do about -- is she

16    ready to go to prison today?

17              MR. SHARON:  Well, I suspect based on what -- the

18    prior sentence, she is ready, and I will leave that up to your

19    discretion.

20              THE COURT:  Right.  Well, let me explain where I am

21    on that.

22              MR. SHARON:  Yes, Your Honor.

23              THE COURT:  The reason that I had Marshall Swan go

24    immediately to prison is because I made a finding that he

25    intimidated Frank Monroe.
```

1          MR. SHARON:  Yes, Your Honor.

2          THE COURT:  And I thought that he needed to be

3    brought up -- brought up short --

4          MR. SHARON:  Yes, Your Honor.

5          THE COURT:  -- because what he had done went right

6    to the very heart of the judicial system.

7          MR. SHARON:  I think in my client's benefit, it

8    would be -- it more -- it would be better for her if you would

9    allow her to self-report.

10          MR. CLARK:  We object to that, Your Honor.

11          THE COURT:  All right.  On what basis?

12          MR. CLARK:  Under the statute, 8 U.S.C. 3143, a

13    defendant who has been sentenced shall be detained unless

14    the -- shall be detained.  There is no appeal here.  There is

15    no petition for writ of certiorari.  And there is certainly no

16    extenuating circumstances, which would make it under the

17    appeal provision of 3145 --

18          THE COURT:  Yeah, but I don't --

19          MR. CLARK:  -- clearly shown that there are

20    exceptional reasons why her detention would not be

21    appropriate.

22          MR. SHARON:  Yes, I don't think that's the standard.

23    We're not asking for any appellate law on that.

24          The only reason I bring in, Your Honor, is that I think

25    the court's aware of the shuffling that has to go on once you

1    are assigned, and I think that, in all respect, for her health

2    would allow -- be better served if she could report.  I think

3    that at least the reports that I have given you from

4    Mr. Bussert, who indicates that she may be going all the way

5    to Texas because that is the only women's facility.  So I

6    think it would be more beneficial, given your discretion, to

7    allow her to self-report.

8              THE COURT:  All right.

9              MR. CLARK:  I do believe that Frank Monroe is still

10    a person who is a victim of this defendant and still faces

11    retaliation, and if this defendant is released we fear for his

12    safety.

13              THE COURT:  All right.  I understand your concerns,

14    Mr. Clark, I understand that very well.

15         Let me first explain to you, Ms. Swan, what your choices

16    are.  You can -- if I do let you out today, you will be on

17    bail.  You will be on bail under the same terms and conditions

18    as I previously imposed.

19              THE DEFENDANT:  Okay.

20              THE COURT:  Now, I can tell you unequivocally, that

21    if you're out on bail and if I hear one word that you're going

22    after Frank Monroe, even Mr. Sharon is not going to be able to

23    convince me that you don't immediately go to jail.  Do you

24    understand what I have said?

25              THE DEFENDANT:  Yes, I do, sir.

1       THE COURT:  The other thing you have to understand

2  is this, I don't know -- my job is done when I sentence you.

3  I can make recommendations to the Bureau of Prisons, but it's

4  up to the Bureau of Prisons is the one that decides where you

5  end up in prison.

6       I think Mr. Sharon may well be right that you will -- you

7  may be, and I don't know, I don't control it, you may end up

8  in Texas.  If you are assigned to Texas, you can get a free

9  ride today.  They will take you down.  But what happens is it

10 goes through the process and you get designated and you will

11 be alerted to where you're supposed to report.

12      And I will not hear you tell me you can't get to Texas.

13 If you want to self-report, then it's on your tab.  You're

14 going to have to get there, or you can get a free ride today

15 and start your sentence.  But I am not going to hear

16 Mr. Sharon come back to me and say, oh, she can't get to

17 Texas.

18      MR. SHARON:  I won't do that, Your Honor.

19      THE DEFENDANT:  Self-report.

20      THE COURT:  All right.

21      MR. SHARON:  Thank you, Judge.

22      THE COURT:  Now, I don't -- with due respect to you,

23 Mr. Clark, I don't think the provisions of that detention

24 apply to -- a delay in sentence is done all the time.  And I

25 don't think that those are the correct provisions to apply

1    here.  I don't think I have to find exceptional circumstances,

2    and I -- I will release her.

3        Today is the 13th.  I will give her 60 days to report.

4    The defendant shall report to the institution designated by

5    the Bureau of Prisons by 2:00 p.m. on Friday, August 15, 2014.

6        Do you understand?

7            THE DEFENDANT:  Yes, sir.

8            THE COURT:  Is there anything further from the

9    defendant?

10           MR. SHARON:  Nothing, Your Honor.  Thank you.

11           THE COURT:  I just have a final word to the people

12   in the community.  I hope that this sentence hearing today and

13   all this very tough process for both the Swan supporters and

14   for the people who did not support Ms. Swan, gives you a sense

15   of closure and that the town of Chelsea moves on and becomes

16   the town that you all want it to be.

17       Court will stand in recess.

18           (Proceedings concluded at 4:56 p.m.)

19

20

21

22

23

24

25

1                              CERTIFICATION

2          I do certify that the foregoing is a correct transcript,

3   to the best of my skill and ability, from the electronic sound

4   recording of the proceedings in the above-entitled matter.

5

6

7   /s/ Melissa L. Merenberg                        11/14/14
    Melissa L. Merenberg, RPR                        Date
8   Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25