1  ADAM A. REEVES (NYBN 2363877)
   Attorney for the United States,
2  Acting Under Authority Conferred By 28 U.S.C. § 515

3  HALLIE HOFFMAN (CABN 210020)
   Chief, Criminal Division
4
   JEFF SCHENK (CABN 234355)
5  JOHN C. BOSTIC (CABN 264367)
   ROBERT S. LEACH (CABN 196191)
6  VANESSA BAEHR-JONES (CABN 281715)
   Assistant United States Attorneys
7
         150 Almaden Boulevard, Suite 900
8        San Jose, California 95113
         Telephone: (408) 535-5061
9        Fax: (408) 535-5066
         Vanessa.Baehr-Jones@usdoj.gov
10
   Attorneys for United States of America
11
                     UNITED STATES DISTRICT COURT
12
                   NORTHERN DISTRICT OF CALIFORNIA
13
                          SAN JOSE DIVISION
14

15  UNITED STATES OF AMERICA,           )   Case No. 18-CR-00258 EJD
                                        )
16         Plaintiff,                   )   DECLARATION OF VANESSA BAEHR-JONES
                                        )   IN SUPPORT OF UNITED STATES' OPPOSITION
17     v.                               )   TO DEFENDANT ELIZABETH HOLMES'S
                                        )   MOTION TO EXCLUDE EXPERT TESTIMONY
18  ELIZABETH HOLMES and RAMESH         )   OR, IN THE ALTERNATIVE, COMPEL
    "SUNNY" BALWANI,                     )   ADEQUATE RULE 16 DISCLOSURE
19                                      )
           Defendants.                  )
20  _____ )

21

22         I, Vanessa Baehr-Jones, declare:

23         1.      I am an Assistant United States Attorney (AUSA) representing the United States of

24  America, the plaintiff in this case.

25         2.      Attached hereto as Exhibit 1 is a true and correct copy of a Memorandum of Interview

26  (MOI) of Dr. Steve Linnerson.

27         3.      Attached hereto as Exhibit 2 is a true and correct copy of an MOI of Dr. Audra Zachman.

28
   DECL. OF VANESSA BAEHR-JONES
   18-CR-00258 EJD

1        4.      Attached hereto as Exhibit 3 is a true and correct copy of an MOI of Dr. Edward Szmuc.

2        5.      Attached hereto as Exhibit 4 is a true and correct copy of an MOI of Dr. John Couvaras.

3        6.      Attached hereto as Exhibit 5 is a true and correct copy of emails sent and received by

4   Defendant Elizabeth Holmes on September 29, 2014.

5        7.      Attached hereto as Exhibit 6 is a true and correct copy of an MOI of Ms. JoEllen Embry.

6        8.      Attached hereto as Exhibit 7 is a true and correct copy of a Federal Bureau of

7   Investigation 302 Report of Dr. Gerald Asin.

8        9.      Attached hereto as Exhibit 8 is a true and correct copy of a Federal Bureau of

9   Investigation 302 Report of patient E.T.

10       10.     Attached hereto as Exhibit 9 is a true and correct copy of Defendant Ramesh Balwani's

11  Petition to Appeal before the Ninth Circuit Court of Appeals in Case No. 20-80057.

12       11.     Attached hereto as Exhibit 10 is a true and correct copy of a Federal Bureau of

13  Investigation 302 Report of Dr. Curtis Page.

14       12.     I declare under penalty of perjury under the laws of the United States of America that the

15  foregoing is true and correct and that this declaration is executed at Oakland, California, on July 10,

16  2020.

17  DATED: July 10, 2020                                          _____/s/_____

18                                                               VANESSA BAEHR-JONES
                                                                 Assistant United States Attorney
19

20

21

22

23

24

25

26

27

28

DECL. OF VANESSA BAEHR-JONES
18-CR-00258 EJD

postalinspectors.uspis.gov

UNITED STATES POSTAL INSPECTION SERVICE

# MEMORANDUM OF INTERVIEW

......................................

| | | |
|---|---|---|
| CASE NUMBER | : | ▮▮▮▮▮ |
| PERSON INTERVIEWED | : | Steve Linnerson MD |
| PLACE OF INTERVIEW | : | ▮▮▮▮▮ |
| DATE OF INTERVIEW | : | 06/14/19 |
| TIME OF INTERVIEW | : | 12:15-1:20 PM MST |
| INTERVIEWED BY | : | AUSA Robert Leach<br>AUSA John Bostic<br>Postal Inspector Matthew Norfleet |

On June 13, 2019, Assistant U.S. Attorney Robert Leach, Assistant U.S. Attorney John Bostic, and I interviewed Steve Linnerson, MD, regarding his experience with Theranos blood testing. Food and Drug Administration's office of Inspector General Special Agent George Scavdis was present during part of the interview. The following Memorandum of Interview is based on both my field notes and my independent recollection of the interview. During the interview, Linnerson provided the following information:

Linnerson had been interviewed previously by SA Scavdis.

Linnerson was the Managing Partner of his clinic until 2016. After that time, he stayed on as the Chief Operating Officer (COO). There are three offices of SCWC.

Fingerstick blood testing was part of the appeal of Theranos technology when they approached Linnerson's practice group, Southwest Contemporary Women's Care ("SCWC").

SCWC had a Product Committee which would review marketing proposals for new drugs and devices to be used by the clinic. Each office in the group had a representative on the committee. When the practitioners were approached by vendors, they would be referred to the Product Committee, which would review the product and make a recommendation to the partners whether the new products should be used in the practice. The practitioners were "very intelligent," Linnerson sat in on the Product Committee in his capacity as COO. The Product Committee asked vendors to present data because "we [the practitioners] are scientists, we need to see data." "A lot" of the presentations are new medications. New products are "always protected and expensive." Linnerson's preference is to wait until a product has been on the market for some time before using it in practice.

"Labs [didn't] approach" the product committee "ever." When Theranos did approach, the fingerstick technology they described was attractive because "needle-phobia" was an issue for patients. Theranos did present data and claimed they had "met all regulations." Linnerson knew Theranos was "in Walgreens, so some agency must have approved them." Linnerson assumed Theranos was approved by regulators. The data Theranos presented "indicated results were on par to large American labs." The SWCW practitioners were "not pathologists,"



they were "not trained on the data for," a lab like Theranos. They are trained on evaluating drugs. After the presentation, the Product Committee brought Theranos to the partners and recommended that SCWC use Theranos, which it did.

The testing menu was a "big draw" in the medical community. Linnerson was impressed at the costs Theranos offered for tests; cholesterol, for example, was half the cost of the other labs.

The Theranos presentation did not talk about using vein draws. Linnerson only learned that Theranos did vein draws from patients after SCWC began referring them. Theranos representatives told Linnerson "everything is fingerstick. Here is our list."

Linnerson believed Patients chose to use Theranos because of the convenience of the location in the SCWC building.

Linnerson recalled his grandfather told him "if it sounds too good to be true. . ." and in retrospect he believed that Theranos claims were too good to be true. Linnerson said, on the other hand, was "pretty amazed by [his] smartphone, so [he] guessed that's medicine in the future."

As COO of SCWC, Linnerson was also the property manager of the building in which the clinic was located. Theranos rented space in the building downstairs, and told SCWC that their office would be the first medical office with a Theranos test site on premises. However, SCWC did not have a contract with Theranos.

As property manager, Linnerson was aware of the preparations Theranos made to the space, but Theranos said it required a "special room" for its "equipment" which it said was "very proprietary." Linnerson had a master key to open any door in the building during emergencies, except that room within the Theranos office. Linnerson wanted assurance that nothing in the room could create an emergency, and he was told the room contained "just proprietary equipment that runs the tests." Linnerson believed Theranos samples went to Skysong, he thought medical labs occupied entire buildings, and he knew how big the proprietary room in the Theranos office was, so he believed Theranos ran its lab tests at Skysong.

Linnerson knew from his own experience that medical devices had to be FDA approved. When asked if Theranos representatives told him Theranos testing equipment was FDA approved, he recalled that Theranos said it "compared to all national[ly-known] labs."

Linnerson said there is a very powerful explanation for the importance of HCG tests that is something you would teach residents studying obstetrics. The words "you are pregnant" are very thrilling or very frightening" to hear from a doctor.

A 16-cell embryo is called a Morula. From days 14-28, pregnancy occurs in the tube. Around day 28, it migrates and implants; once the embryo implants, the body produces HCG. From weeks four to seven, HCG doubles every 48 hours. Although the absolute value varies between patients, viable pregnancies always show continually-increasing HCG levels. A pregnancy urine test determines whether HCG is present, resulting in a negative test if the HCG level is less than 20, and a positive test if the HCG level is over 20. More precise HCG tests are used to observe 1) losing babies (miscarriages) or 2) outside the uterus (ectopic) pregnancies. Ectopic pregnancies can be tubal or abdominal. Tubal pregnancies can result because gonorrhea and chlamydia cause scarring to the tube, which can cause the pregnancy to get stuck. A stuck pregnancy can cause bleeding, losing the tube, or death. Methotrexate (also called MTX) is a chemotherapy drug prescribed to dissolve ectopic pregnancies.

3

More than one lost pregnancy is a risk factor for future miscarriage. A patient with recurrent miscarriage would know that a decline in HCG means a lost pregnancy, and would expect to go home and bleed.

Medical practitioners would not make a diagnosis off of one HCG test alone. HCG tests are used to monitor a pregnancy until it can be seen on an ultrasound. A dropped HCG value would indicate a bad lab test, not a true HCG value. When a patient is prescribed MTX, the physician would follow the labs until the HCG level is below 20. HCG tests are used to follow treatment of chronic miscarriage.

Linnerson became aware of problematic HCG test results from Theranos through [redacted] 's case. C[redacted] received a Theranos test that showed a drop in HCG levels after several miscarriages. C[redacted] was aware of the significance of HCG testing and was distressed by the result. The result was erroneous, and C[redacted] later gave birth to a baby from that pregnancy. She did not return to the same clinic when she later became pregnant again. DNP Audra, C[redacted] probably primary physician, told Linnerson "she hates me" and [redacted] but Linnerson explained that C[redacted] probably just did not want to return to the same place where she had such an upsetting memory.

Similar results came up at a provider meeting with two other questionable HCG tests. SCWC decided to do a side by side study with other labs to decide whether to continue referring patients to Theranos. The practice had never done anything like that before, but Theranos was so cheap and convenient they wanted to give it a chance. The SCWC Product Committee included Audra and handled all the discussions with Theranos during the study. Linnerson trusted the Product Committee. However, the problems they experienced with Theranos testing were "wild throws outside what [they] were used to seeing, outside [their] collective experience as a group of 20 clinicians."

At the time, Linnerson had 31 years of experience as an OB-GYN. He had been using HCG tests for about 10 years before Theranos, had attended approximately 3,000 deliveries, and ordered probably 5,000 HCG tests, maybe "some less" because of patients whose pregnancies were detectable by ultrasound before they saw him.

The study data would "have to be statistically significant," but Theranos "stood out more than the other two." The study was "really a small sample size" and Linnerson did not recognize the name ARUP. At the time, Linnerson "wondered about the workflow" of Theranos taking fingerstick samples and the other labs using vein draws as part of the study.

After Theranos completed the study, Linnerson's opinion was that the data did not show Theranos performed well enough to recommend using its services. Linnerson "could not see how it got past the FDA." Linnerson had "years of experience" with Sonora Quest Labs without any problems; but had three problems with Theranos in a short period of time, and he saw problems with the study Theranos conducted to try to prove its reliability. Linnerson had always taught new doctors not to "jump on new technology" but to wait three to five years. When reviewing the results of the Theranos side by side study, with "senior people in the room," SCWC said "we're not going to do this to patients."

After deciding to stop referring patients to Theranos for HCG tests, SCWC had to decide whether to use Theranos for other lab tests. Linnerson does not recall speaking to Theranos representatives about SCWC's decision not to use their testing, although he was in contact with them as the property manager. Linnerson thought Audra may have spoken with Theranos about SCWC's decision.

After he was contacted by federal investigators, Linnerson reviewed SCWC records with its information technology staff and found 330 HCG tests ordered from Theranos between 2014 and 2016, along with hemoglobin and some other tests, for "maybe 100 patients."

Linnerson did not recall seeing any news stories about Theranos. He did not recall seeing advertising for Theranos, but he did not recall if he saw it before SCWC began referring patients. After Theranos moved into the building, Linnerson walked downstairs one evening after 5:30 and asked himself "who's getting married" in the lobby, because Theranos was hosting a weekly party with bar tables, cocktails, champagne, and people in black suits. Suits are unusual in Arizona.

In September or October 2016, Theranos stopped operating and bought their way out of the lease. When Linnerson went back into the "special" room where Theranos had changed the lock, "nothing [had] changed."

Matthew Norfleet
United States Postal Inspector

09/12/19



# Food and Drug Administration
## OFFICE OF CRIMINAL INVESTIGATIONS
## MEMORANDUM OF INTERVIEW

**CASE NUMBER:** ███████████

**CASE TITLE:** THERANOS, INC.

**DOCUMENT NUMBER:** ███████

**PERSON INTERVIEWED:** Audra Zachman

**PLACE OF INTERVIEW:** ████████████████████

**DATE OF INTERVIEW:** 06/14/2019

**TIME OF INTERVIEW:** 10:15 AM PST

**INTERVIEWED BY:** ASAIC George Scavdis

**OTHER PERSONS PRESENT:** See below

On June 14, 2019, the case agent interviewed Audra Zachman, nurse practitioner, Southwest Contemporary Women's Care (SCWC), at their office in Tempe, Arizona, regarding Theranos, Inc. Also present during the interview were the following: John Bostic, Assistant United States Attorney (AUSA), United States Attorney's Office for the Northern District of California (USAO/NDC), San Jose Division; Robert Leach, AUSA, USAO/NDC, Oakland Division; and Matthew Norfleet, Special Agent, United States Postal Inspection Service.

Ms. Zachman obtained her Doctorate degree in nursing practice in 2013. Her mother was a nurse practitioner at SCWC, and Ms. Zachman became a nurse practitioner specifically to work in that same office. SCWC was the first place that Ms. Zachman went to work. She went to undergraduate school at Arizona State University, and she started working at SCWC in July 2013.

SCWC has a product committee, of which Ms. Zachman was the head. The purpose of the product committee was to funnel medical sales representatives to Ms. Zachman. The product committee covered all three office locations. A Theranos sales representative dropped off paperwork that went to Ms. Zachman as head of the product committee for her to review. The product committee would filter through requests from companies and then they would meet to compare the competing companies. The main concerns of the product committee were validity, cost, and accessibility. At the time that Ms. Zachman was head of the product committee, there were a total of three people on the committee. Eventually, Courtney Domingo took over for Ms. Zachman as head of the product committee.

Ms. Zachman explained that when the product committee is assessing a drug or device's validity, they are making sure that it is FDA approved and that the testing process has been validated. In terms of laboratory testing, validity would mean that the test is accurate. Validity or accuracy is probably the most important factor when considering a testing laboratory.

Ms. Zachman remembers that the Theranos sales representative came in and gave an e-mail contact. The technology was presented as being "new age". It was presented as being cheaper and as being something that patients could pay cash for if they didn't have insurance. This information was presented at the beginning of Theranos's engagement with the practice.

AUSA Bostic showed Ms. Zachman an e-mail dated June 20, 2014, titled "RE: theranos" bates numbered

LINNERSON-001131 (attachment one). The name Peggy Shuffler is familiar to her. Ms. Zachman's initial contact with Theranos was probably a few days prior to this e-mail.

AUSA Bostic showed Ms. Zachman an e-mail dated July 14, 2014, titled "product committee" bates numbered LINNERSON-000427 (attachment two). She explained that the product committee evolved over the years. This may have been before each office had a representative on the committee. In this e-mail, the product committee is setting up a meeting to have three different testing laboratories come in and present to it. GenPath does blood testing, PAPs, and pathology testing. SCWC was using Sonora Quest and LabCorp. prior to engaging Theranos. GenPath and Theranos were being auditioned to replace Sonora Quest.

AUSA Bostic showed Ms. Zachman an e-mail dated September 5, 2014, titled "RE: theranos- product committee" bates numbered LINNERSON-000451 (attachment three). Ms. Zachman explained that there aren't many testing laboratories, so it wouldn't have been hard for one to get in front of the product committee.  She remembers seeing Elizabeth Holmes on the front of a magazine in the airport and feeling proud that SCWC was partnered with Theranos. This e-mail chain would have been after the product committee's meeting with Theranos.  Theranos provided marketing materials in hardcopy form to the product committee, which Ms. Zachman eventually disposed of. Theranos didn't provide the documents in electronic form.

Theranos told Ms. Zachman that their testing was valid, less expensive, that they were able to use less blood, and that it was more convenient. Theranos also pitched their ability to integrate with SCWC and provide an in-house phlebotomist. They touted their finger stick test and said that patients were more likely to have their blood drawn as a result. Ms. Zachman doesn't recall Theranos showing her photos of their devices. They may have shown her a picture of the blood collection vial, but they never showed her a picture of their blood analyzer. Ms. Zachman feels like they proposed that all their testing could be done via finger stick method during their initial pitch to the product committee. Later, they said not all their tests would be available via finger stick blood draw method. She doesn't recall Theranos making representations about their technology having FDA approval. Ms. Zachman doesn't recall how many people from Theranos presented to the product committee.

AUSA Bostic directed Ms. Zachman back to attachment three. She said she doesn't recall this meeting happening or the details of it. SCWC probably started using Theranos for patient testing before having them provide an in-house phlebotomist.

B█████ G████ was not an IVF patient, and Ms. Zachman was not her treating doctor during her previous pregnancies. AUSA Bostic directed Ms. Zachman to an e-mail dated April 25, 2018, titled "FW: Theranos" bates numbered LINNERSON-001077 through 001078 (attachment four). Ms. Zachman said that Theranos was available to perform testing on the weekends and Sonora Quest was not, so that might explain why Sonora Quest was chosen for Ms. G███ to be tested before Theranos. Ms. Zachman would have confirmed Ms. G███s pregnancy with a urine test in the office, and then would have ordered blood laboratory tests for her based on Ms. G███s history of miscarriages. An HCG value of 1805 tells you that pregnancy has occurred. It doesn't speak to the viability of the pregnancy, but it's a "very positive" result in terms of whether a pregnancy has occurred. It is normal to send a patient who has had previous miscarriages for HCG testing every 48 hours. Ms. G███ was tested by Theranos twice. The two different results had the same value, but the decimal place had moved. A normal health pregnancy will see the HCG value double every 48 hours. It's improbable that the digits for the value would stay the same and just have the decimal place move (i.e. 1,200 vs. 120)

AUSA Bostic directed Ms. Zachman two documents: a Theranos test result bates numbered LINNERSON-001083 and one bates numbered LINNERSON-001085 (attachment five). Ms. Zachman recalls reaching out to Ms. G███ to prepare her that her pregnancy was lost. Ms. Zachman was suspicious of such a large drop in HCG value over a 48-hour period. She would have expected that to be accompanied by significant bleeding, but it was not. Her conversation with Ms. G███ was a difficult conversation to have. This visit with Ms. G████ was important because once a patient has had a fourth miscarriage, that patient is put in a category called "recurrent pregnancy loss", which means that something is going on in the patient's body that is preventing

her from carrying a baby to term. Ms. Zachman ordered additional testing after the Theranos blood test to confirm that a miscarriage had occurred.

ASUA Bostic directed Ms. Zachman to a lab result report bates numbered LINNERSON-001094 (attachment six). She said that this result is a sure signal of pregnancy.  This result caused confusion and embarrassment. She didn't know which result to dismiss at this point. It was at this point that Ms. Zachman started to distrust the Theranos test result. She had never had an unreliable HCG result prior to the Theranos test. In fact, she finds HCG to be a reliable test that laboratories get right. HCG is not a test whose value goes up, and then down, and then back up again. Ms. Zachman wanted Ms. G█████ to repeat the HCG test.  After that repeat, she was eligible for an ultrasound examination. Ms. Zachman was vocal within SCWC about what happened with Ms. G█████'s Theranos HCG test.  She called Theranos to speak with their complaint department, and this led her to send e-mails to Theranos.

AUSA Bostic directed Ms. Zachman to an e-mail dated October 14, 2014, titled "Checking Back" bates numbered LINNERSON-001214 (attachment seven). The Theranos employee in this e-mail, Leslie, is trying to arrange a telephone call with Christian Holmes. Ms. Zachman recalls speaking to someone from Theranos on the telephone about filing a formal complaint about their HCG test. The Theranos response to her was very vague. They responded that the error was a simple laboratory error, that it was a decimal point issue, and that the issue would be addressed. Ms. Zachman said that seeing the exact same value one day and then again two days later would be unlikely and troubling. Theranos's explanation was not plausible to her. She remembers that Theranos said they would get back to her.

AUSA Bostic directed Ms. Zachman to an e-mail dated October 29, 2014, titled "Theranos Lab" bates numbered LINNERSON-001219 (attachment eight). Ms. Zachman recalls this e-mail. She was part of the decision to send this e-mail. She doesn't recall additional telephone calls with Theranos in the weeks following this e-mail. At this time in April, SCWC was still using Theranos for testing but was keeping a watchful eye. Ms. Zachman recalls other inaccuracies with Theranos test results, but none of them were for patients of hers.

AUSA Bostic directed Ms. Zachman to an e-mail dated April 24, 2015, titled "RE: meeting" bates numbered LINNERSON-001268 through 001269 (attachment nine). Ms. Zachman doesn't recall this conversation with Mike Phebus. She thinks this was sent around the time the SCWC study of Theranos was discussed.

AUSA Bostic directed Ms. Zachman to an e-mail chain dated July 16, 2015, titled "FW: SW Contemporary Study" bates numbered LINNERSON-000534 through 000541 (attachment ten). Ms. Zachman said that she was skeptical of Theranos, but hopeful at the time that SCWC proposed doing a study. This was the first time the study was being put together. The idea to conduct a study of Theranos against other testing laboratories was likely a collaborative decision made between her, Ms. Domingo, and Dr. Stephen Linnerson. The goal of the study was to restore SCWC's faith in Theranos's "quants". They decided that the study should be a side by side one. SCWC decided that was what they wanted before they proposed it to Theranos. The plan for the study was to, in-house, compare finger stick draws versus venous draws from two other laboratories and Theranos for any patient that was willing to participate. Ms. Zachman doesn't recall speaking to anyone from Theranos with a medical background about the study. She wasn't a part of the decision to compare Theranos to two laboratories as opposed to one.

Ms. Zachman said, "An OBGYN practice should be able to tell a patient if they're pregnant or not." Regarding Ms. G█████, if Ms. Zachman had relied on the Theranos result and initiated the treatment protocol for a miscarriage, it is very likely Ms. Zachman would have terminated a viable pregnancy.

AUSA Bostic directed Ms. Zachman to an e-mail dated July 29, 2015, titled "Theranos study" bates numbered LINNERSON-000559 (attachment eleven). Ms. Zachman was less involved with the study at this point. She wouldn't have been steering patients to Theranos for testing at this point.  She doesn't recall patients being vocal about receiving venous draws instead of finger stick draws from Theranos. Ms. Domingo made a presentation to SCWC on the results of the study.

AUSA Bostic directed Ms. Zachman to an e-mail dated August 27, 2015, titled "Theranos Study" bates numbered LINNERSON-000578 (Attachment twelve). Ms. Zachman explained that these are the results that the study yielded. She didn't draft the chart that has the results. She doesn't remember conversations that were had where the data was reviewed. The conclusion of the practice was to be more vocal about not using Theranos. The study was a part of that decision. Ms. Zachman's experience with Ms. G███ had a big impact on her advocacy that others should be skeptical of Theranos and not use them.  Ms. Zachman has never had any other problems with HCG tests and other laboratories aside from her experience with Ms. G███ and Theranos.

**SUBMITTED:** Electronically submitted by GEORGE SCAVDIS

GEORGE SCAVDIS, ASSISTANT SPECIAL AGENT IN CHARGE    DATE:   07/15/2019

**APPROVED:**

Electronically approved by MARK MCCORMACK

MARK MCCORMACK, SPECIAL AGENT IN CHARGE    DATE:   07/15/2019

**DISTRIBUTION:**  Orig:  MWFO w/attachments
cc:   Prosecution w/attachments

**ATTACHMENTS:**  1-an e-mail dated June 20, 2014, titled "RE: theranos" bates numbered LINNERSON-001131
2-an e-mail dated July 14, 2014, titled "product committee" bates numbered LINNERSON-000427
3-an e-mail dated September 5, 2014, titled "RE: theranos- product committee" bates numbered LINNERSON-000451
4-an e-mail dated April 25, 2018, titled "FW: Theranos" bates numbered LINNERSON-001077 through 001078
5-a Theranos test result bates numbered LINNERSON-001083 and one bates numbered LINNERSON-001085
6-a lab result report bates numbered LINNERSON-001094
7-an e-mail dated October 14, 2014, titled "Checking Back" bates numbered LINNERSON-001214
8-an e-mail dated October 29, 2014, titled "Theranos Lab" bates numbered LINNERSON-001219
9-an e-mail dated April 24, 2015, titled "RE: meeting" bates numbered LINNERSON-001268 through 001269
10-an e-mail chain dated July 16, 2015, titled "FW: SW Contemporary Study" bates numbered LINNERSON-000534 through 000541
11-an e-mail dated July 29, 2015, titled "Theranos study" bates numbered LINNERSON-000559
12-an e-mail dated August 27, 2015, titled "Theranos Study" bates numbered LINNERSON-000578



**Food and Drug Administration**
**OFFICE OF CRIMINAL INVESTIGATIONS**
**MEMORANDUM OF INTERVIEW**

CASE NUMBER:

CASE TITLE:                THERANOS, INC.

DOCUMENT NUMBER:          280500

PERSON INTERVIEWED:        Dr. Edward Szmuc

PLACE OF INTERVIEW:

DATE OF INTERVIEW:        03/03/2020

TIME OF INTERVIEW:        2:30 PM

INTERVIEWED BY:            ASAIC George Scavdis

OTHER PERSONS PRESENT: See below.

On March 3, 2020, the case agent interviewed Dr. Edward Szmuc regarding Theranos, Inc. Also present during the interview was AUSA John Bostic, United States Attorney's Office for the Northern District of California, San Jose, California.

Dr. Szmuc resides at                      Tempe, Arizona 85284. His cell phone number is
and his email address is

Between the years of 2013 and 2015, Dr. Szmuc had his own practice in Tempe, Arizona, called Dr. Edward Szmuc, MD. Before he ever referred patients to Theranos for blood testing, he utilized mostly Sonora Quest and LabCorp. for his blood testing services. He probably first heard about Theranos from a drug sales representative; he doesn't recall the name of the representative, nor can he recall the date of that first conversation. Dr. Szmuc does recall that the representative came to his office to pitch Theranos's services. He doesn't recall if the representative left behind any marketing materials. The sales representative probably gave Dr. Szmuc an overview about how Theranos could do laboratory tests using fingerstick draws. The representative told Dr. Szmuc that Theranos was partnered with Walgreens to be in their stores, that they could provide results overnight, and that they sent the samples to California to be tested in their laboratory there. Dr. Szmuc doesn't think Theranos offered esoteric tests. He can't recall seeing news coverage or advertising regarding Theranos.

Dr. Szmuc was told by Theranos that they had quality control and that their tests would be accurate. The accuracy of their test was "absolutely" important to him. He had more than one conversation with the Theranos sales representative. His goal was to use Theranos for all of his patient testing. At the time the Theranos representative pitched him, he was happy with Sonora Quest but he had a previous working relationship with the representative. Dr. Szmuc thought that fingerstick draws were a good idea because patients don't like getting stuck with needles. He took it for granted that Theranos's tests would be accurate and tested. AUSA Bostic asked Dr. Szmuc if he recalled being told by the Theranos sales representative that their tests were accurate, and he responded, "For sure." He remembers that Theranos had "big-time" investors. He can't recall any representations made to him by Theranos that their technology or tests were FDA approved.

AUSA Bostic asked Dr. Szmuc what were the other factors that caused him to use Theranos. He responded that the fingerstick blood draw was a big thing, especially with young females who get a lot of bloodwork done

during their pregnancies.  Theranos's association with Walgreens gave him more confidence in Theranos.  Based on his conversation with the Theranos sales representative, he started referring patients to them for blood testing.  At first, Dr. Szmuc would mostly send a few patients to Theranos for "not important" laboratory tests to see what came back.  He most likely asked his patients if they'd like to go to a lab for fingerstick testing, and they 100% would have said, "Yes."  As he got more comfortable, he would refer more patients.  At some point, most of his patients were going to Theranos.

In terms of volume, he estimates that he saw 30 to 40 patients a day, and probably sent 10 to 15 of them to Theranos for laboratory tests.  His practice was to tell his M.A. what labs to order for a patient and the M.A. would do the rest.  Patients would go to Theranos with a laboratory slip and have their blood drawn.  He didn't do any blood draws in his office.  He didn't have any patients who complained about blood draws they received from Theranos.  His office had nothing to do with billing for the Theranos blood tests—that was between the patient and Theranos.

Quantitative HCGs are labs done to either identify an early pregnancy or identify an ectopic pregnancy, which are life threatening pregnancies.  The HCG values he'd expect to see in a normal pregnancy at first is between 2-1,000.  A normal pregnancy doubles every 48 to 72 hours.  The HCG value in an ectopic pregnancy may rise just a little bit or stay the same.  In reference to HCG tests, Dr. Szmuc said "We rely on those tests immensely."  Dr. Szmuc received HCG results back from Theranos that he doubted.  He probably called the sales representative with his concerns about the HCG quantitative values he was seeing.  Theranos's responses back to him did not ally his concerns.  With a test like HCG, a physician must have full confidence, and even one weird result would blow that.

The only problem that Dr. Szmuc ever had with Sonra Quest would be them losing a laboratory sample.  He never had a question regarding their results, and he had been using them for almost 30 years.  HCG is the most important lab work that an OBGYN does.  The results could reveal a life-threatening condition.  The results affect the guidance a physician provides to a patient.  Normally, Dr. Szmuc would order a 3rd HCG test if he suspected an ectopic pregnancy or miscarriage.  He would typically follow the test result down to a negative.  But, if HCGs stayed level, it could indicate an ectopic pregnancy that required either a surgical or a pharmaceutical intervention.

Regarding Theranos's CBC test results, Dr. Szmuc had nothing to compare them too, unlike with HCG quantitative values; therefore, he can't speak to the accuracy of the other tests.  He explained that if a patient has an HCG value of 5,000 and a later value of 100,000, then a 2nd test value in between that of 5,000 indicates a problem with the test itself.

Dr. Szmuc wasn't happy with Theranos after the problems he saw with their HCG results.  He doesn't recall if he stopped sending no-HCG test patients to Theranos after that, but he did not send any more patients for HCG testing.  He doesn't recall any follow-up meetings or in-person meetings with anyone from Theranos other than with his sales representative.  When speaking with his Theranos sales representative about issues, he doesn't recall the representative giving any assurances about the accuracy of the test.  He doesn't remember any explanation for the concerns he raised other than for the representative to say, "We're looking into it."

Dr. Szmuc is currently retired.  He started practicing in 1983.  His first two years, he worked for CIGNA.  After that, he started his own practice.  He later joined Southwest Contemporary Women's Care (SCWC) in 2015, which is where Dr. Szmuc worked prior to his retirement.  It was an easier schedule and he had friends who worked there.  Also, when he had his own practice his wife was his nurse practitioner, but she left to take another job.  SCWC has all his patient records, and he has no objection to the case agent asking them to release those records to the Government for review.

Dr. Szmuc said if an HCG value is "below detectable threshold" then it means a negative for pregnancy.  If he had a situation where a patient had a positive at home pregnancy test and an HCG blood test that said "below detectable threshold," then that would raise a red flag.  If an HCG result comes back as "invalid," then that would be a red flag as well.  He doesn't ever remember seeing that result.

US-REPORTS-0014800

SUBMITTED: Electronically submitted by GEORGE SCAVDIS

GEORGE SCAVDIS, ASSISTANT SPECIAL AGENT IN CHARGE          DATE:    03/16/2020

APPROVED:

Electronically approved by MARK MCCORMACK

MARK MCCORMACK, SPECIAL AGENT IN CHARGE          DATE:    03/17/2020

DISTRIBUTION:    Orig:  MWFO
                 cc:    Prosecution

ATTACHMENTS:  None

US-REPORTS-0014801



# Food and Drug Administration
## OFFICE OF CRIMINAL INVESTIGATIONS
### MEMORANDUM OF INTERVIEW

CASE NUMBER:

CASE TITLE:            THERANOS, INC.

DOCUMENT NUMBER:       260282

PERSON INTERVIEWED:    Dr. John Couvaras, IVF Phoenix

PLACE OF INTERVIEW:    Telephonic

DATE OF INTERVIEW:     11/28/2017

TIME OF INTERVIEW:     0900 EST

INTERVIEWED BY:        SA George Scavdis

OTHER PERSONS PRESENT: See below.

On 11/28/2017, the case agent telephonically interviewed Dr. John Couvaras, IVF Phoenix, regarding a patient of his (G███ ██) who had blood tests performed by Theranos, Inc.

Dr. Couvaras explained that M███ had a blood test with a QBhcg reading of 160 (this test was performed by Sonora Quest Laboratories on 09/03/2014). [Agent note: Human chorionic gondadotropin, hcg, is a hormone produced during pregnancy] He thought "it was a little early, but looking good" in terms of M███ being pregnant. M███ got a repeat blood test, this time through Theranos (this test was performed on 09/06/2014). Dr. Couvaras isn't sure why the second blood test was performed by Theranos and not Sonora Quest, but he thinks M███ may have chosen Theranos for cost reasons. The data from the QBhcg test came back as "negative" for pregnancy. The data went from a reading of 160 to a reading of less than detectable, which Dr. Couvaras considered a "chemical loss." After the Theranos blood test which led Dr. Couvaras to conclude that M███ was no longer pregnant, Dr. Couvaras stopped the current treatment protocol, and began recycling M███ on medicines that a pregnant person shouldn't be taking. Subsequently, M███ called the office and said she hadn't had her period. Dr. Couvaras told her to take another blood test, which she did on 09/22/2014. That test was also performed by Theranos, and the results for progesterone came back as "high" and the results for beta were 2150. When Dr. Couvaras saw those results, his initial thought was that M███ might have an ectopic pregnancy. His notes for M███ stated that they should have M███ come in to the office because they were missing something. She came in to the office on 09/23/2014, and Dr. Couvaras performed an ultrasound on her. The ultrasound revealed that there was a sac in her uterus, and Dr. Couvaras determined that she was six weeks pregnant. The pregnancy they were seeing was in line with the pregnancy projected by the 09/03/2014 Sonora Quest Laboratory results. Dr. Couvaras explained that, with a pregnant patient, you would expect to see the QBhcg value double every two days. That holds true until the value levels off at somewhere between 5,000 and 12,000. If you take the original QBhcg 160 value measured by Sonora Quest and you double it every two days, you would have expected to see a value of between 5,000 and 12,000 at the time of the second Theranos blood test. The second Theranos blood test, though positive for pregnancy (2150), wasn't nearly as high as Dr. Couvaras would have expected it to be. Dr. Couvaras never saw M███ after the 09/23/2014 office visit.

Typically, Dr. Couvaras sends patients to Sonora Quest for bloodwork. Theranos was radically cheaper, so if patients didn't have insurance, sometimes patients would ask if they could go to Theranos for their bloodwork.

US-REPORTS-0006803

The case agent noted that Dr. Couvaras placed M███████on Acyclovir and Lovastatin after the first Theranos blood test that indicated a chemical loss, and he asked Dr. Couvaras what the potential patient impact was of placing a pregnant patient on those medications. Dr. Couvaras said that there is no patient impact when putting a pregnant patient on Acyclovir, but that Lovastatin is contraindicated for pregnant patients. Dr. Couvaras is not sure of the specific "anomaly" that can occur when placing a pregnant patient on Lovastatin, but it is a true contraindication.

Unless it's in the patient notes, Dr. Couvaras can't remember ever talking to anyone from Theranos. Other than M██████, he can't recall any other instances of patients getting inaccurate results from Theranos. He didn't ever recommend patients use Theranos, so he's not sure how often his patients used them; he just presented Theranos as an option to other laboratories.

SUBMITTED: Electronically submitted by GEORGE SCAVDIS

GEORGE SCAVDIS, SPECIAL AGENT                    DATE:   11/30/2017

APPROVED: Electronically approved by MARK MCCORMACK

MARK MCCORMACK, SPECIAL AGENT IN CHARGE          DATE:   12/01/2017

DISTRIBUTION:   Orig: MWFO
                cc:   Prosecution

ATTACHMENTS: None

US-REPORTS-0006804

**To:**        Elizabeth Holmes[eholmes@theranos.com]
**From:**    Sunny Balwani
**Sent:**      Mon 9/29/2014 11:51:07 PM
**Importance:**          Normal
**Subject:**   RE: Customer Issue - GM
**Received:**          Mon 9/29/2014 11:51:07 PM

finding out.

---

**From:** Elizabeth Holmes
**Sent:** Monday, September 29, 2014 4:51 PM
**To:** Sunny Balwani
**Subject:** RE: Customer Issue - GM

How did that happen?

---

**From:** Sunny Balwani
**Sent:** Monday, September 29, 2014 4:45 PM
**To:** Elizabeth Holmes
**Subject:** FW: Customer Issue - GM

please see below.

---

**From:** Kimberly Alfonso
**Sent:** Monday, September 29, 2014 3:04 PM
**To:** Christian Holmes
**Cc:** Sunny Balwani
**Subject:** Customer Issue - GM

Please see below.

Still need info on HCG inquiry from last month too (re: August 20 with 600,000 result from Margaret Gossett, NP).

---

**From:** Eric M. Nelson
**Sent:** Monday, September 29, 2014 2:53 PM
**To:** Mike Phebus
**Cc:** Kimberly Alfonso
**Subject:** FW: Labs-issue-hcg

Mike and Kimberly,

Please see below detailed hcg issue from a fertility office here in Scottsdale.

Thanks,

Eric

---

**From:** Allison Martin [mailto:backdesk1@ivfphoenix.com]
**Sent:** Monday, September 29, 2014 2:26 PM
**To:** Eric M. Nelson
**Subject:** RE: Labs

 THPFM0000288920



Eric,

Thank you so much for dropping off the new order sheets! I am sorry I was unavailable at that time!

We will call the support line, but also wanted to give you a heads up on what happened with the lab. We sent a patient of ours in for her 48 hour repeat on her QBhcg. Her initial test came back at 160 (run at a different lab), and when we sent her back in for her repeat with your lab the results came back at <7.82. Because her test came back negative, we had her discontinue her current medications and began getting her ready for her next cycle.

A few weeks later she went back in for another QBhcg and it came back at over 2000. We brought her in and I scanned her, and there was in fact a baby, and a heartbeat.

Our concern is your lab told us she had a negative pregnancy, we relayed that to our patient and continued our protocol as she wasn't pregnant.

Our patients initials are GM. Date of service was 9/5/14 at 9:12am for a QBhcg which came back at a <7.82

Please pass this along, to ensure that this does not happen to any further patients/clients.

Thank you,

**Allison Martin**

IVF Phoenix & the office of

Dr John L Couvaras, MD FACOG

   

\* Be aware we are a Fragrance free office. Please refrain from wearing perfumes or colognes.

Confidentiality Notice:

The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.

**From:** Eric M. Nelson [mailto:ericn@theranos.com]
**Sent:** Monday, September 29, 2014 11:25 AM
**To:** Allison Martin

Confidential                                                                    THPFM0000288921



Food and Drug Administration
OFFICE OF CRIMINAL INVESTIGATIONS
MEMORANDUM OF INTERVIEW

CASE NUMBER:

CASE TITLE:               THERANOS, INC.

DOCUMENT NUMBER:          280502

PERSON INTERVIEWED:       JoEllen Embry and Raymond Embry

PLACE OF INTERVIEW:

DATE OF INTERVIEW:        03/03/2020

TIME OF INTERVIEW:        4:45 PM

INTERVIEWED BY:           ASAIC George Scavdis

OTHER PERSONS PRESENT: See below.

On March 3, 2020, the case agent interviewed JoEllen Embry and Raymond Embry regarding Theranos, Inc. Also present during the interview was AUSA John Bostic, United States Attorney's Office for the Northern District of California, San Jose, California.

JoEllen Embry is a women's health nurse practitioner and is the owner of Embry Women's Health located

Ms. Embry has been working in women's health since 1983. Since 1996, she has been a nurse practitioner. In February 2014, she opened her own practice. She does everything pertaining to women's health, with an emphasis on endocrine problems.

At one point in time, Ms. Embry was ordering the most Theranos blood tests in the Phoenix, Arizona, area. Ms. Embry said she almost wrote a letter to the Wall Street Journal because she knew something was wrong with Theranos from the first few months that she started using them.

When a patient first comes to Ms. Embry, she orders a large panel of blood tests. Many times, her patients suffer from irregular or no periods, really high testosterone, bald spots, acne, and facial hair. These are all symptoms of polycystic ovarian syndrome (PCOS). Within three or four months of using Theranos, Ms. Embry discovered a problem. Some of her patients have "man levels" of testosterone. A testosterone level of 30 to 40 is normal, and some of the women she saw had a value of 120. She would place them on medication to lower their levels of testosterone. These patients were getting blood tests at Theranos and their testosterone levels were showing a value of less than one.

Ms. Embry used both Sonora Quest and LabCorp. before she used Theranos, and she did so for approximately twenty years. Any errors in lab results with those laboratories were administrative errors, not clinical ones. She had no problems with the results. She said with Sonora Quest, there was a period when parathyroid or prolactin values were coming back for her patients as being slightly elevated. Sonora Quest corrected the problem. Ms. Embry said there could have been a clinical explanation for the elevated values, because often it is correlated to Vitamin D levels in a patient. Once she gets the Vitamin D levels up, the level of prolactin or parathyroid comes back down; that could be an explanation for the Sonra Quest results. This is the only "issue" that she can think of with Sonra Quest lab results, and it only lasted for a short period of time.

US-REPORTS-0014802

Also, it's the only issue she's ever had with any other laboratory, aside from Theranos.  She did not lose confidence in Sonora Quest after this.

Mr. Embry said that the practice reported a patient safety issue on March 11, 2015, to Theranos.  In response, Theranos initiated a conference call that included Elizabeth Holmes's brother (later identified as Christian Holmes, and hereinafter referred to as Mr. Holmes).  The result of that conference call was that it gave the practice enough confidence to continue to use Theranos until the Fall of 2015.  Once Ms. Embry sees a pattern of errors with someone, she calls them on it and gives them a chance to correct the problem.

Ms. Embry said that she was screaming at Mr. Holmes during the conference call.  His response was to say that Theranos had protocols in place.  She asked him, "How can you explain that?"  He responded, "Well, you fixed them."  Mr. Holmes explained the low testosterone values saying, "We found out our machines were not calibrated for venous draws, they were calibrated for finger stick."  Ms. Embry responded, "My patients never had finger stick draws."  Mr. Holmes responded, "We'll figure this out."  Mr. Holmes eventually got back to Ms. Embry and said that it was a calibration issue.  After that, the laboratory results started coming back more in line with what Ms. Embry expected.

Ms. Embry recounted how she first learned of Theranos.  She said that a Theranos sales representative came into the office.  Mr. Embry said the representative was Kyle Johnson and he was a senior account executive. He said Mr. Johnson's first contact with the office was on June 18, 2014.  Ms. Embry said that the finger stick was never a draw for her because she didn't believe Theranos could do it accurately.  She was attracted to the convenience and the affordability of their tests.  Ms. Embry doesn't recall if Mr. Johnson made representations about the accuracy or reliability of Theranos's tests.  She thinks it's implied that if a laboratory is offering lab tests that the results will be accurate.

Mr. Embry said he recalled when officials from the State of Arizona were taking pictures with people from Theranos and he remembers when the partnership with Walgreens went into effect.  Theranos representatives continued to talk about partnerships it had, including a partnership with the Mayo Clinic.  They said they were working together with the Mayo Clinic on certain test expansion.  Theranos talked about the background of their scientists that worked on their machines, and how these were top people in their fields. They talked about their investors and how they were putting money behind Theranos.  Ms. Embry doesn't recall any Theranos representatives ever talking about a partnership with the United States Department of Defense.

Mr. Embry said Theranos talked about validation of their finger stick technology.  In 2014, all the Theranos marketing was about finger stick.  It took him several months to realize that none of their test were being performed via finger stick blood draw.  They gave some indication that their technology was approved by the Government, either through CLIA or the FDA.

Ms. Embry explained that Theranos would interface with her practice, and the practice would get results loaded directly into their system.  At one point, she was sending patients exclusively to Theranos.  The number of tests she ordered per patient was high, and she sent at least 30 separate blood draws to Theranos per week.  None of her patients ever had a finger stick blood draw from Theranos.  Theranos was saying the blood draw would be via finger stick, but when her patients came back, they told Ms. Embry that they had venous blood draws.  Ms. Embry didn't see the finger stick as a big draw.  Theranos told her that testing would be conducted via finger stick blood draw, but she knew with the broad range of tests they were offering that it couldn't be done on finger stick.  However, it was new information to her when her patients came back to her to tell her that they had venous blood draws as opposed to finger sticks.

In the Fall of 2014, everything was "up and running" between her practice and Theranos and that's when she started to notice the issues with the testosterone tests.  She asked her Theranos sales representative about it, and that is when they had the conference call with Mr. Holmes.  The call was initiated by Mr. Holmes calling Ms. Embry on her cell phone.  Ms. Embry explained that testosterone is a key assay for her practice. The error in the Theranos testosterone results was blatantly obvious.  Her patients were coming back with testosterone values less than one and they were growing a beard at the time.  It was literally every patient that

US-REPORTS-0014803

was being tested during this time period.  This issue surfaced in September 2014.

Ms. Embry also had issues with patients she was sending to Theranos who were testing high for calcium. High calcium has to do with the parathyroid gland and is unrelated to PCOS.  Ms. Embry explained that high calcium is unusual and that there was nothing else with her patients that would explain why they would randomly test high for calcium.

When Ms. Embry was talking to Theranos about the testosterone results, she told them that if they didn't fix the issue, that she would stop sending patients to Theranos.  She explained to the case agent that she is adjusting patients' medications based on their lab results, and that could have led to a patient being harmed. The problems with the Theranos testosterone assay caused her to doubt their other assays.

There was a third and final issue with Theranos that ultimately led to Ms. Embry terminating the relationship with Theranos.  She told them that she thought Theranos was dangerous and that her patients could not use their services anymore.  The Theranos sales representative brought her lunch after that and asked her if she saw an e-mail from Theranos that said that some of the lab results weren't accurate.  Ms. Embry asked the representative if he was going to call her patients and tell them that, and he responded that it was her responsibility.

Ms. Embry remembers waking up early on a Friday morning to sign off on lab results and she had 1,500 Theranos labs in her inbox.  Theranos sent her every lab she ever ordered, saying her results were voided. She was already "done" with Theranos at that point.  She never experienced problems like this with previous laboratories.

Ms. Embry talked to the case agent about an experience she had with a testing company called GenPath. She said that all the cervix biopsy results she received back from GenPath were coming back as having chronic cervicitis, or inflammation of the cervix.  Also, all her endometrial biopsies were coming back as having endometritis.  No abnormal cells were showing up on her tests, yet inflammation was showing up.  The head of GenPath called her and said they have processes in place.  She called Women's Health Services and they explained that they thought GenPath was only looking at the top two layers of specimen, so of course they're going to see inflammation.  They said GenPath was being lazy.  Ms. Embry clarified that this is a visual test she is talking about, not a blood test.  Ms. Embry never had any issues with blood testing with any other laboratories like she had with Theranos in all her years of practice.

Ms. Embry said that with the erroneous testosterone results, Theranos was marking on its paperwork that the patients weren't fasting, even in instances where they were in fact fasting.

Mr. Embry said that he sent an e-mail to Theranos warning them that they were sending out inaccurate patient results, and he sent that e-mail on March 11, 2015.  Erin Porter was the name of the Theranos representative that he sent it to.  Overall, there were five different Theranos representatives that interacted with the practice at one point or another.  Her patients continued to use Theranos for STD testing through March 2016.  Ms. Embry probably stopped sending patients to get panels and testosterone tests in March 2015.  Some of her patients went to the Theranos lab draw station located in the Generations Medical Building.  Theranos also did mobile lab draws and went directly to the patients.

Ms. Embry explained that they had an EMR system at the practice, which allowed the provider to fill out the lab test order and then synch that up with Theranos's system.  Through the EMR system, Theranos test results came back to the practice through the portal.  Ms. Embry's practice had nothing to do with the billing of the Theranos blood test.

Ms. Embry said, to this day, she doesn't have any patients that had testosterone as low as Theranos was reporting.

Mr. Embry said that on March 11, 2015, at 1:15 he called and left Theranos a message.  He said the practice can export patient testing data and provide that to the Government.

US-REPORTS-0014804

SUBMITTED: Electronically submitted by GEORGE SCAVDIS

GEORGE SCAVDIS, ASSISTANT SPECIAL AGENT IN CHARGE          DATE:   03/16/2020

APPROVED:

Electronically approved by MARK MCCORMACK

MARK MCCORMACK, SPECIAL AGENT IN CHARGE          DATE:   03/17/2020

DISTRIBUTION:   Orig:  MWFO
cc:    Prosecution

ATTACHMENTS:  None.

US-REPORTS-0014805

FD-302 (Rev. 5-8-10)

OFFICIAL RECORD

## FEDERAL BUREAU OF INVESTIGATION

Date of entry _____03/30/2020_____

### PATIENT MEDICAL INFORMATION

This document contains patient medical information protected under the Privacy Act or the Health Insurance Portability and Accountability Act. Such information may be accessed and used only if necessary for the performance of one's official duties and only to persons with a need-to-know. This information must be safeguarded and protected from inadvertent disclosure.

    Gerald S. Asin, MD, ████████████████████████████████████████ was interviewed in person at his office, ████████████████ Paradise Valley, Arizona. Also present was Assistant United States Attorney Vanessa Baehr-Jones. After being advised of the identity of the interviewers and the nature of the interview, Asin provided the following information:

    Asin was introduced to Theranos by a patient of his, ████████████ (previously ████████, date of birth ████████████████. Before Theranos, ████████ was a drug representative. ████████ provided Asin with several $100 gift cards for Theranos labs. This, coupled with the convenience for his patients that Theranos was located at Walgreens, were part of the reasons Asin started using Theranos for his patients.

    From the beginning, Asin did not see Theranos do fingerstick tests, though he saw Theranos material on their fingerstick tests.

    There were times that Asin used Theranos and Asin did not trust the results. Asin would have the labs rechecked (with a new blood draw) from another lab. Asin recalled that some patients had uncharacteristically high PSA test results from Theranos. A PSA test looked for the possibility of prostate cancer. If the test came back high, the men would have to have a needle inserted from the penis to the prostate. If the PSA test was off, and the number reported as incorrectly high, men could have to go through this unpleasant test unnecessarily. Asin was not sure if a patient had this done, or if he had the numbers re-tested first.

| | | | |
|---|---|---|---|
| Investigation on | 03/04/2020 | at | Paradise Valley, Arizona, United States (In Person) |

File # ████████████████          Date drafted  03/04/2020

by  Adelaida Hernandez

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Asin also found Theranos' diabetic tests to not be as accurate. There
were also some protein and calcium tests that seemed incorrect (because they
were too high). For example, a patient of Asin's, M███████ O███ (date of
birth ███████████, had a high calcium result from a Theranos test. O███████
calcium was being monitored as part of monitoring her parathyroid. Asin had
O████ do another blood test elsewhere. Asin noted that having to get his
patients to redraw blood for a new test, after a Theranos test, was probably
not the most pleasant experience for his patients.

Asin called Theranos' office in California to talk to a pathologist about
Theranos' tests. Asin did not think he received a satisfactory answer from
these calls.

Other patients received what appeared to be normal test results from
Theranos, from Asin's review at the time of the interview. For example, for
███████████████████ (date of birth ██████████ the Theranos test
results appeared normal.

Asin recalled seeing Theranos advertisements expressing that it was a
blood test with a simple fingerstick. Asin thought that Theranos was good
with their image, such as a providing a bottle of water during their blood
draws. Theranos also seemed efficient. Asin remembered hearing that Theranos
could do all the blood tests with a fingerstick test, but they ended up
using vein draws, in Asin's experience. ████████ told Asin that Theranos
could do all the tests from a fingerstick test. Asin had a lot of $100 gift
cards for free Theranos tests so Asin sent a lot of people to Theranos for
tests. Asin also spoke with A████████ about placing a Theranos lab in his
office.  This would have been a great thing, since Asin was a small one-man
practice at the time, and did not have a lab. Looking back, Asin was glad he
did not end up getting a Theranos lab in his practice.

Asin recalled his patient, E███ T████████, having a HIV test that said it
was reactive for HIV 1+2 antibodies, but non-reactive for HIV 1 antibody and
HIV 2 antibody, separately. Asin said this test result did not make any
sense, as it was not possible for the blood to have a combination of HIV 1
and 2, but not have either HIV 1 or 2 individually. T███████ had requested
███████████████████████████████████████████████████████████████████

Continuation of FD-302 of (U) Interview of Dr. Gerald S. Asin          , On  03/04/2020  , Page   3 of 3

Asin thought he started with Theranos around 2013 and ended in 2016. Asin remembered that in 2016 there was a lot of "noise" about Theranos' test results, so Asin would tell patients that he was not sure they could trust the Theranos test results. Asin slowed down the use of Theranos, but the price was "so damn good" he did not stop using them. Asin felt like Theranos was not the gold standard, like you might want for a peer reviewed study, but it was probably okay for being so cheap.

Asin would have his patients retest at a place like Sonora Quest, like for the protein/calcium tests and PSA tests.

Asin remembered that his own PSA seemed higher than was right from a Theranos test.

Asin provided Theranos records from some of his patient files [Agent's note: The documents were attached to 1A hereto].

FD-302 (Rev. 5-8-10)



## FEDERAL BUREAU OF INVESTIGATION

Date of entry _____03/30/2020_____

### PATIENT MEDICAL INFORMATION

This document contains patient medical information protected under the Privacy Act or the Health Insurance Portability and Accountability Act. Such information may be accessed and used only if necessary for the performance of one's official duties and only to persons with a need-to-know. This information must be safeguarded and protected from inadvertent disclosure.



████████████, date of birth ██████████████, residence address ████████████ ██ ██████████████████████, Arizona was interviewed in person at Starbucks ██████████████████████ Tempe, Arizona. Also present was Assistant United States Attorney John Bostic. After being advised of the identity of the interviewers and the nature of the interview, ████████ provided the following information:

████████ was advised that the interview was voluntary and that lying could be prosecuted.

████████ first learned of Theranos on Facebook. A friend was director of a resource center that was adjacent to a homeless center and posted about Theranos on Facebook. The friend was excited about Theranos' availability, especially the affordable screening.

████████ saw a couple of commercials for Theranos. She recalled being at her father's house one day and seeing a TV commercial for Theranos. Theranos' advertisement promoted blood testing from a single drop of blood. The concept stood out and ████████ remembered wondered why everyone else required so much more blood. Elizabeth Holmes was on the cover of magazines.

During the period ████████ used Theranos, she was in between insurance coverage and there was a significant price difference to use Theranos. ████████ had an annual physical with her primary care physician, Dr. Gerald Asin. During this annual check, ████████ picked the blood tests, which



Investigation on ___03/05/2020___ at ___Tempe, Arizona, United States (In Person)___

File # ██████████████

Date drafted ___03/06/2020___

by ___Adelaida Hernandez___

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.



Continuation of FD-302 of  (U) Interview of ███████████████ , On  03/05/2020 , Page   2 of 3

included an HIV/AIDS screening with Theranos. The blood draw occurred in Dr.
Asin's office. T███████ was not sure if it was a vein draw or finger draw.
T██████ did not have her blood drawn at Walgreens.

When Dr. Asin told T███████ about the results, Dr. Asin's immediate
response was "this is wrong". Dr. Asin knew T█████████ for years and knew her
lifestyle, so he did not think the positive test result was accurate.

When T████████ learned she tested positive for HIV, it was "terrible" and
"awful". T████████ thought she was dying and recalled being emotional. Dr.
Asin's assurance (that the test results could not be accurate) did not make
T██████ feel better.

Since she was in between insurance, T█████████ could not immediately afford
to be retested. It was "awhile" before she could retest. During the period
she was waiting to afford the testing, T█████████ researched whether she had
to report the test results to health officials. It was difficult to not know
for sure during the period she was waiting on a retest. ████████████████████
████████████████████████████████████████████████████████████████████████████
███████████████████████████. The test results felt like they hung in the air
for a while.

Dr. Asin gave T████████ a copy of the test result, which looked like the
ones shown to her [Agent's note: The document was attached to the 1A
hereto]. She received a copy of the results. During that period, T████████
had a rental car and accidentally left the results in the trunk, which she
realized when the rental car company called her about private personal items
being left in the vehicle. The test results also impacted her family.
T██████ told her mother and roommate.

When T████████ could afford a retest, she did not consider going back to
Theranos. The retest results were negative for any HIV/AIDs.  Dr. Asin told
T██████ to use a different lab. T█████████ did not recall contact with
Theranos over the test results.

Later, A check was sent to T████████ from Theranos for reimbursement.
T████████ remembered the documents saying something about not admitting
wrongdoing. T████████ had paid out of pocket for the Theranos test, likely
the same day of her visit in Dr. Asin's office. The test was $40-$70.
T████████ did not recall the specific amount of the price difference between



Continuation of FD-302 of    (U) Interview of ███████████    , On  03/05/2020  , Page   3 of 3

the Theranos test and other providers.

T█████ did not recall specifics about the evidence of the viral load in the test.

T█████ did not recall the Walgreens partnership with Theranos.

At the time she was tested, there was probably over a year gap between her last annual checkup. Lab tests have been performed before. T█████ did not have a false HIV/AIDS test either before or after Theranos' error. She was not aware of other lab errors, personally, and had not been asked to re-do lab tests before (or after) the Theranos result. Accuracy of the blood test was very important to T█████ and she expected lab tests to be accurate. Lab tests were expected to, and should, be right.



Office of the Clerk
**United States Court of Appeals for the Ninth Circuit**
Post Office Box 193939
San Francisco, California 94119-3939
415-355-8000

Molly C. Dwyer
Clerk of Court

March 20, 2020

| | |
|---|---|
| No.: | 20-80057 |
| D.C. Nos.: | 2:16-cv-02138-HRH, 2:16-cv-02373-HRH, 2:16-cv-02660-HRH, 2:16-cv-02775-HRH, 2:16-cv-03599-HRH, |
| Short Title: | B.P., et al v. Ramesh Balwani |

Dear Appellant/Counsel

This is to acknowledge receipt of your Petition for Permission to Appeal under Federal Rule of Civil Procedure 23(f).

All subsequent letters and requests for information regarding this matter will be added to your file to be considered at the same time the cause is brought before the court.

The file number and the title of your case should be shown in the upper right corner of your letter to the clerk's office. All correspondence should be directed to the above address pursuant to Circuit Rule 25-1.



Office of the Clerk
**United States Court of Appeals for the Ninth Circuit**
Post Office Box 193939
San Francisco, California 94119-3939
415-355-8000

Molly C. Dwyer
Clerk of Court

---

**ATTENTION ALL PARTIES AND COUNSEL**
**PLEASE REVIEW PARTIES AND COUNSEL LISTING**

---

We have opened this appeal/petition based on the information provided to us by the appellant/petitioner and/or the lower court or agency. EVERY attorney and unrepresented litigant receiving this notice MUST immediately review the caption and service list for this case and notify the Court of any corrections.

Failure to ensure that all parties and counsel are accurately listed on our docket, and that counsel are registered and admitted, may result in your inability to participate in and/or receive notice of filings in this case, and may also result in the waiver of claims or defenses.

PARTY LISTING:
Notify the Clerk immediately if you (as an unrepresented litigant) or your client(s) are not properly and accurately listed or identified as a party to the appeal/petition. To report an inaccurate identification of a party (including company names, substitution of government officials appearing only in their official capacity, or spelling errors), or to request that a party who is listed only by their lower court role (such as plaintiff/defendant/movant) be listed as a party to the appeal/petition as an appellee or respondent so that the party can appear in this Court and submit filings, contact the Help Desk at http://www.ca9.uscourts.gov/cmecf/feedback/ or send a letter to the Clerk. If you or your client were identified as a party to the appeal/petition in the notice of appeal/petition for review or representation statement and you believe this is in error, file a motion to dismiss as to those parties.

COUNSEL LISTING:
In addition to reviewing the caption with respect to your client(s) as discussed above, all counsel receiving this notice must also review the electronic notice of docket activity or the service list for the case to ensure that the correct counsel are

listed for your clients. If appellate counsel are not on the service list, they must file a notice of appearance or substitution immediately or contact the Clerk's office.

NOTE that in criminal and habeas corpus appeals, trial counsel WILL remain as counsel of record on appeal until or unless they are relieved or replaced by Court order. *See* Ninth Circuit Rule 4-1.

REGISTRATION AND ADMISSION TO PRACTICE:
Every counsel listed on the docket must be admitted to practice before the Ninth Circuit AND registered for electronic filing in the Ninth Circuit in order to remain or appear on the docket as counsel of record. *See* Ninth Circuit Rules 25-5(a) and 46-1.2. These are two separate and independent requirements and doing one does not satisfy the other. If you are not registered and/or admitted, you MUST, within 7 days from receipt of this notice, register for electronic filing AND apply for admission, or be replaced by substitute counsel or otherwise withdraw from the case.

If you are not registered for electronic filing, you will not receive further notices of filings from the Court in this case, including important scheduling orders and orders requiring a response. Failure to respond to a Court order or otherwise meet an established deadline can result in the dismissal of the appeal/petition for failure to prosecute by the Clerk pursuant to Ninth Circuit Rule 42-1, or other action adverse to your client.

If you will be replaced by substitute counsel, new counsel should file a notice of appearance/substitution (no form or other attachment is required) and should note that they are replacing existing counsel. To withdraw without replacement, you must electronically file a notice or motion to withdraw as counsel from this appeal/petition and include your client's contact information.

To register for electronic filing, and for more information about Ninth Circuit CM/ECF, visit our website at http://www.ca9.uscourts.gov/cmecf/#section-registration.

To apply for admission, see the instructions and form application available on our website at https://www.ca9.uscourts.gov/attorneys/.

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

NO.

_____

IN RE ARIZONA THERANOS, INC., LITIGATION

_____

Petition to Immediately Appeal from an Order Granting Class Certification
By the United States District Court for the District of Arizona,

No.    2:16-cv-2138-HRH
(Consolidated with:
No.    2:16-cv-2373-HRH
No.    2:16-cv-2660-HRH
No.    2:16-cv-2775-HRH
No.    2:16-cv-3599-HRH)

Honorable H. Russel Holland, United States District Judge

_____

**PETITION FOR PERMISSION TO APPEAL
<u>FILED UNDER SEAL</u>**

_____

Stephen M. Rummage
Fred B. Burnside
Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
Tel: (206) 622-3150
Fax: (206) 757-7700 Fax

Attorneys for Defendant Ramesh Balwani

# TABLE OF CONTENTS

I.  RELIEF REQUESTED ...................................................................................1

II.  INTRODUCTION .......................................................................................1

III.  FACTUAL AND PROCEDURAL BACKGROUND ...................................3

  A.  Theranos's Blood Testing Business .................................................3

  B.  Plaintiffs' Testing Experience .......................................................5

IV.  QUESTIONS SOUGHT TO BE APPEALED..............................................8

V.  ARGUMENT...............................................................................................9

  A.  The Order Manifestly Erred in Assessing Predominance. .............9

    1.  Individual Proof Could Lead to Verdicts in Mr. Balwani's Favor as to Large Swaths of the Class. ...............................................................10

    2.  The District Court Committed Manifest Error in Failing to Consider the Impact of Defenses on the Predominance of Common Issues at Trial.............13

  B.  The Order Manifestly Erred in Finding Superiority for the Arizona Claims...................................................................17

VI.  CONCLUSION............................................................................................20

4835-5733-1127v.3 0103509-000007

# TABLE OF AUTHORITIES

**Federal Cases**

*Backhaut v. Apple, Inc.*,
    74 F. Supp. 3d 1033 (N.D. Cal. 2014) .................................................................12

*Berger v. Home Depot USA, Inc.*,
    741 F.3d 1061 (9th Cir. 2014) ..................................................................16, 17

*Boyle v. Lorimar Prods., Inc.*,
    13 F.3d 1357 (9th Cir. 1994) ............................................................................20

*Browning-Ferris Inds. v. Kelco Disposal, Inc.*,
    492 U. S. 257 (1989).........................................................................................19

*Campion v. Old Republic Prot. Co.*,
    272 F.R.D. 517 (S.D. Cal. 2011) .....................................................................12

*Chamberlan v. Ford Motor Co.*,
    402 F.3d 952 (9th Cir. 2005) ..............................................................................9

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)............................................................................................15

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011) ............................................................................16

*Imber-Gluck v. Google Inc.*,
    2015 WL 1522076 (N.D. Cal. 2015) ................................................................18

*In re PPA Prods. Liab. Litig.*,
    214 F.R.D. 614 (W.D. Wash. 2003) .................................................................19

*Kamm v. California City Development Co.*,
    509 F.2d 205 (9th Cir. 1975) ...........................................................3, 17, 18, 19

*Martinelli v. Petland, Inc.*,
    274 F.R.D. 658 (D. Ariz. 2011) .......................................................................12

*Mays v. Wal-Mart Stores, Inc.*,
    -- Fed. Appx. --, 2020 WL 1277642 (9th Cir. 2020)........................................17

i

*Mazza v. American Honda Motor Co., Inc.*,
666 F.3d 581 (9th Cir. 2012) ........................................................................15, 16

*Pac. Mut. Life Ins. Co. v. Haslip*,
499 U.S. 1 (1991).........................................................................................3

*Thornton v. State Farm Mut. Auto Ins. Co.*,
2006 U.S. Dist. LEXIS 83972 (N.D. Ohio 2006)...............................................18

*United States v. Holmes & Balwani*,
No. 18-cr-00258-EJD-SVK, Dkt. 39 (N.D. Cal. 2018)......................................20

*Valentino v. Carter-Wallace*,
97 F.3d 1227 (9th Cir. 1996) ..........................................................................17

*Wal-Mart Inc. v. Dukes*,
564 U.S. 338 (2011)...........................................................................3, 14, 17

*Zinser v. Accufix Research Inst., Inc.*,
253 F.3d 1180 (9th Cir. 2001), *amended by* 273 F.3d 1266 (9th
Cir. 2001) .......................................................................10, 13, 15, 17

**State Cases**

*Peery v. Hansen*,
585 P.2d 574 (Ariz. Ct. App. 1978)...................................................................12

**Federal Statutes**

Racketeer Influenced and Corrupt Organizations Act.............................2, 11, 12, 19

Rules Enabling Act ................................................................................14, 15, 17

**State Statutes**

Arizona Consumer Fraud Act ...................................................................2, 12

California False Advertising Law.................................................................2, 12

California Unfair Competition Law.............................................................2, 12, 16

**Rules**

Federal Rules of Appellate Procedure
    5(a) ..................................................................................................1

Federal Rules of Civil Procedure
    23...............................................................................................14, 17
    23(a) ...............................................................................................18
    23(b)(3) .....................................................................................*passim*
    23(c) ...............................................................................................14
    23(f)...............................................................................................1, 9

**Other Authorities**

Restatement (Second) of Torts § 908 (1977), Comment *a* ......................................19

4835-5733-1127v.3 0103509-000007

# I.    RELIEF REQUESTED

Ramesh Balwani seeks permission under Fed. R. Civ. P. 23(f) and Fed. R. App. P. 5(a) to appeal an Order Granting Motion for Class Certification entered by the District Court for the District of Arizona on March 6, 2020 ("Order").

# II.    INTRODUCTION

This case rests on the premise that Plaintiffs and members of their proposed classes purchased blood tests that Theranos, Inc., performed using technology that was not ready for consumer use.  (Mr. Balwani is the former Theranos Chief Operating Officer.)  Plaintiffs explained their theory:

> Theranos attempted to develop robotic, nano-technology to perform routine blood work on "tiny" samples taken from a "fingerstick" draw.  Over the years, the company produced devices, or modified existing devices, to analyze fingerstick blood, but it never successfully built a market-ready nano-technology analyzer.  Theranos also designed containers for the tiny samples ... and lancets for the tiny draws, but they too were faulty and were never validated, even though, just like the nano-analyzers, they were used in the Arizona and California markets.

Dkt. 303 4:10-16.  Plaintiffs argued "Theranos's fingerstick blood testing was at all pertinent times still in development … and nowhere near able to serve the essential purpose of reliable blood testing."  *Id*. 4:20-26.

This theory of the case, however, ignores one undisputed fact: Theranos performed most blood tests for Plaintiffs' proposed class—and *all* tests for the last ten months of the class period—using the same *venous* draws and analytical devices that competitive blood testing services use.  Mr. Balwani's defense of Plaintiffs' claims will involve class member by class member cross-examination to

1

show that individual class members throughout the class period received accurate, actionable blood testing results, at a fair price.  Plaintiffs' depositions on this theory bore fruit, showing (a) a properly instructed jury could find for Mr. Balwani based on their *individual* testimony and (b) almost all Arizona Plaintiffs had been refunded for their Theranos tests through Theranos's settlement with the Arizona Attorney General.

The district court ignored these issues in certifying classes to pursue claims against Mr. Balwani.  Its Order raises issues of recurring significance that will escape review absent prompt consideration.  Further, its treatment of predominance and superiority issues is manifestly erroneous.

*First*, applying Rule 23(b)(3), the Order found common issues predominated on claims against Mr. Balwani under the Arizona Consumer Fraud Act, the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), the California Unfair Competition Law ("UCL"), and the California False Advertising Law ("FAL").[1]  But in deciding predominance under Rule 23(b)(3), the district court considered *only* Plaintiffs' theory of the case.  Tacitly conceding Mr. Balwani's theory of the case would present overwhelming individual issues barring class certification, the district court held his theory made no difference because plaintiffs articulated a "unifying theory"—a theory designed to glide by individual issues. This was manifest error because "a class cannot be certified on the premise that [a

---

[1] The Order also certified battery claims, which are not asserted against Mr. Balwani.

2

defendant] will not be entitled to litigate ... defenses to individual claims." *Wal-Mart Inc. v. Dukes*, 564 U.S. 338, 367 (2011).

**Second**, class action litigation is not superior under Rule 23(b)(3) where it duplicates relief that can be efficiently obtained through other means.  The Arizona Attorney General obtained restitution for every Arizona resident (most of the class) who had a Theranos blood test.  In light of those refunds, the district court found a class action superior as to Mr. Balwani only because the Arizona class could obtain exemplary and punitive damages not sought by the Attorney General.  But punitive and exemplary damages further *society's* interest in punishment and deterrence. *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 22 (1991).  The United States will fully vindicate society's interests in the criminal case it brought against Mr. Balwani.  The district court manifestly erred in ignoring *Kamm v. California City Development Co.*, 509 F.2d 205 (9th Cir. 1975), and finding a class action a superior method for Arizona class members to proceed against Mr. Balwani.

## III.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Theranos's Blood Testing Business

Theranos operated two federally-certified blood testing labs: a high-complexity lab in California and a moderate-complexity lab in Arizona, which opened in February 2015.  Dkt. 293, Ex. 16 at 37 (California); *id*. at 86 (Arizona). Under federal regulations, Theranos could perform its proprietary fingerstick tests *only* in its high-complexity California lab.  Dkt. 291-2, Ex. 7 180:6-14.  By contrast, the Arizona lab processed samples *only* using FDA-cleared conventional testing equipment—not Theranos fingerstick technology.  *Id*. 192:18-21.  Further,

3

if a patient sought a test outside Theranos's testing menu, it would send the test for processing at ARUP, a third-party lab in Utah that does not use "Theranos technology." Dkt. 293, Ex. 6 308:22-309:3. Plaintiffs never claimed samples sent to ARUP yielded unreliable results.

Although Plaintiffs' claims focus on Theranos's development of "robotic, nano-technology to perform routine blood work on 'tiny' samples taken from a 'fingerstick' draw," Dkt. 303 4:10-11 (class certification brief), *most of the proposed class*—and almost all named Plaintiffs—had blood taken through a conventional *venous* draw. Although Theranos began with mainly fingerstick tests, 30-40% of tests in 2014 used venous samples. Dkt. 291-2, Ex. 4 129:5-11. By August 2015—*ten months* before the class period's end—Theranos stopped using fingerstick blood altogether, performing tests *only* on venous samples using FDA-cleared devices. Dkt. 291-2, Ex. 46 515:1-9.[2] Further, Theranos's Arizona lab processed *only* venous blood samples on the same unmodified, FDA-cleared commercial devices other labs use. Dkt. 291-2, Ex. 7 192:19-20. Theranos's California lab also processed venous samples, Dkt. 291-2, Ex. 4 299:7-20, analyzed on standard commercial devices, Dkt. 293, Ex. 2 31:22-32:4, 197:1-16. Each FDA-cleared and FDA-approved assay performed in the lab according to manufacturers' specifications, Dkt. 293, Ex. 5 236:17- 237:14, and Plaintiffs never explained how testing on these devices could yield unreliable results.

---

[2] Plaintiffs found a document referring to *one* fingerstick test in September 2015. Dkt. 318 12 n.9. Although likely a data entry error, it does not detract from the point: fingerstick testing ended months before class period ended.

Contrary to the Order's suggestion, Order 8-9, the parties are unable to access Theranos's test data, because it resides in encrypted databases. Dkt. 293, Ex. 1 58:9-59:8, 64:12-66:7. As a result, no systematic way exists to determine whether putative class members had venous or fingerstick draws, where their samples were processed, or what devices were used.

## B.     Plaintiffs' Testing Experience

Plaintiffs' class certification motion said *nothing* about the individuals the Order appoints as class representatives. *See* Dkt. 303. In fact, many had blood tested using the same testing methods used by Theranos's competitors, including even the same FDA-cleared machines. And they testified in deposition that, for the most part, they received exactly what every blood-testing customer hopes to receive: clinically actionable test results that helped them improve their health.

The following facts about Plaintiffs' testing experiences appeared below in Mr. Balwani's brief. Dkt. 290 8:5-12:21. Plaintiffs never contested these facts[3]:

***A.R.***   A.R. had a venous draw in June 2015 at Theranos's only California location, a Palo Alto Walgreens. No doctor told A.R. his Theranos results were unreliable, and his later test results have been consistent with his Theranos results, showing high glucose and cholesterol and low vitamin D. A.R. takes Vitamin D supplements first prescribed after his Theranos test—though now at a different dosage. The Theranos tests prompted a positive change in A.R.'s health care.

---

[3] Plaintiffs' expert never reviewed Plaintiffs' results and has no idea whether they received accurate results, how the results fit into their medical histories, or whether Theranos technology was involved. Dkt. 293, Ex. 8 75:12-22, 78:5-14, 79:16-25.

5

**B.P.**  B.P. initially had fingerstick tests at Theranos; by 2015, B.P. had both fingerstick and venous draws; and by 2016, B.P. had venous draws.  B.P.'s physician never said his Theranos results were inaccurate, they were consistent with prior results from a Theranos competitor.  B.P.'s medical circumstances corroborate Theranos's tests: he was previously diagnosed with diabetes and high cholesterol, which the Theranos tests corroborated.  His records also show his physician prescribed medication for diabetes and cholesterol in 2012, years before he began testing at Theranos.  Based on B.P.'s Theranos testing, his physician increased his diabetes medication, and he remains on that dose.  Although Theranos blood testing results initiated positive changes in B.P.'s health care, B.P. received a full refund for Theranos blood tests from the Attorney General.

**B.B.**  B.B. was tested at Theranos in October 2014 in Gilbert, Arizona. B.B.'s medical provider said her Theranos test results were "in about the same range as [her] prior tests," and B.B. made no "medical decisions that were different from what [she] otherwise would have made" after her Theranos tests.  B.B. received a venous draw, not a fingerstick, and she was refunded for her Theranos tests by the Arizona Attorney General.

**D.L.**  D.L. had venous draws in June and December 2015 in Arizona.  She alleged she received a false diagnosis for Sjogren's Syndrome based on Theranos tests—but five later tests with a Theranos competitors showed Theranos got it right, and D.L.'s 2019 medical chart shows her provider *confirming* that D.L. has Sjogren's Syndrome.  After receiving her Theranos results, D.L. changed her diet, which made her "feel[] much better."  Theranos processed her first test in its

6

Arizona and California labs, but several assays from D.L.'s second Theranos test—including the test for Sjogren's—were processed by ARUP, not Theranos. Although D.L.'s Theranos results first disclosed her Sjogren's syndrome and prompted a beneficial lifestyle change, D.L. received a check from the Arizona Attorney General fully refunding her Theranos tests.

*R.G.*  R.G. in September 2015 had a panel of tests for sexually transmitted diseases.  R.G. claims the only "incorrect" results he received from Theranos were his "HIV results," but that test was *not* run on "Theranos technology": he had a venous sample drawn, which was run on a conventional device.  Unfortunately, R.G.'s conventional HIV level-one screening test result was erroneously released to his Theranos mobile application, and it showed the screening test was positive. R.G. later accessed the full Theranos report on Theranos's website, which showed his level-two confirmatory HIV tests results were *negative*.  A Theranos physician then called R.G. to say his level-two confirmatory results were *positive*.  Twelve minutes later, the physician called back to say he had reported the wrong results and, in fact, R.G.'s level-two results were *negative*, i.e., he did *not* have HIV.  R.G. had a follow up HIV test elsewhere—covered by insurance.

Plaintiffs do not allege Theranos had *any* problems with HIV tests, which it performed on conventional FDA-cleared devices.  Because of R.G.'s individual experience with one physician's quickly corrected confusion, R.G. was refunded *twice*: he received a $121.63 check from Theranos because its physician made an error, and an identical check from the Arizona Attorney General.

*S.J.* S.J. claims she was tested twice, in July and November 2015. S.J. has never been told her Theranos results were inaccurate. During her first test, S.J. received a "fingerstick draw" for a diabetes-related test. Theranos ran S.J.'s test on an FDA-cleared device, not on Theranos technology. S.J. testified that on a second Theranos visit she received a "fingerstick and urine test." But no documents corroborate the claim of a second visit, which would be contested at trial. After the second alleged test, S.J.'s medical provider briefly put her on diabetes medication—which she was off within weeks. Even though she questions her Theranos results, they were consistent with results from Theranos's competitors.

*S.L.* S.L. had venous (not fingerstick) blood drawn in February and October 2015 in Arizona. S.L. has never been told his Theranos results were inaccurate. Theranos processed S.L.'s February tests in California, and his October tests at the Arizona lab on conventional FDA-cleared machines—although Theranos had S.L.'s second diabetes-related test processed at ARUP. S.L.'s Theranos results were consistent with later lab results.

## IV. QUESTIONS SOUGHT TO BE APPEALED

1.   Whether the district court erred in certifying Plaintiffs' proposed classes under Rule 23(b)(3) based on an analysis of predominance that looked *solely* at Plaintiffs theory of the case without considering the impact of individual issues associated with Mr. Balwani's theory of the case?

2.   Whether the district court erred in finding superiority under Rule 23(b)(3) as to Arizona class members suing Mr. Balwani given that (a) Arizona class members were fully refunded for their Theranos tests and (b) punitive and

8

exemplary damages serve no purpose as to Mr. Balwani, since federal criminal proceedings will vindicate society's interest, if any, in punishment and deterrence?

## V.    ARGUMENT

In exercising its discretion to allow an appeal under Fed. R. Civ. P. 23(f), this Court considers, among other things, whether "the certification decision presents an unsettled and fundamental issue of law relating to class actions, important both to the specific litigation and generally, that is likely to evade end-of-the-case review" or "is manifestly erroneous." *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 959 (9th Cir. 2005). Here, the Order is manifestly erroneous because it ignored Mr. Balwani's defenses in assessing how trial would unfold, in contravention of binding precedent on predominance. Further, state and federal proceedings involving Theranos and Mr. Balwani provide a superior way to adjudicate compensation, punishment, and deterrence—the only matters that could be settled by trial here. The district court manifestly erred when it found a class action would be a superior way to proceed.

### A.    The Order Manifestly Erred in Assessing Predominance.

For a damages claim under Rule 23(b)(3), common issues must predominate at trial. "If the main issues in a case require the separate adjudication of each class member's individual claim or defense, a Rule 23(b)(3) action would be inappropriate." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001), *amended by* 273 F.3d 1266 (9th Cir. 2001) (quotation omitted).

Because of individual issues as to causation, damages, and loss that are central to Mr. Balwani's defense theory, a fact-finder at trial could determine

Plaintiffs' (and class members') claims only by considering facts unique to each individual. For example, a properly instructed jury *could find* that A.R., D.L., and S.L. *improved* their health through medication or dietary changes after receiving Theranos results, that no evidence suggests those results were inaccurate or unreliable, and that they therefore got what they paid for. Similarly, a jury *could find* based on B.B. and B.P.'s testimony that their Theranos results were consistent with results from other testing services, that they never believed the results were unreliable, and that, in any event, they received full refunds. And while R.G. may argue that he suffered personal anxiety based on the erroneous report of a positive HIV test, a jury could find on an individual basis that he suffered no compensable harm, given the brevity of the confusion and his double-refund.

The district court acknowledged Mr. Balwani's argument but dismissed it out of hand simply because it was incompatible with *Plaintiffs'* theory of the case. Order 12. This was manifest error. The district court had the duty to consider *both* parties' claims and defenses, assess how *both* parties would try their case, and determine whether individual issues would predominate *at trial*, not just during Plaintiffs' case in chief. By considering *only* Plaintiffs' framing of the issues, the district abdicated its responsibility. This Court should accept review, reverse, and remand for consideration of Mr. Balwani's theory of the case.

### 1. Individual Proof Could Lead to Verdicts in Mr. Balwani's Favor as to Large Swaths of the Class.

In the district court, Mr. Balwani explained, claim by claim, how individual proof would be necessary to decide each class member's damages claim, in light of

10

the defenses he will mount at trial. Rather than engage this argument, Plaintiffs relied on a simplistic assertion that they would win because "[e]vidence and expert testimony at trial will show that but for Defendants' concealment of material facts, no reasonable consumer would have purchased the Defendants' tests." Dkt. 318 21:10-12. Plaintiffs argued that even if they received accurate test results (whether from Theranos technology or conventional technology), relied and took action that improved their health as a result, and spent no money for more testing, they are entitled to recover. "Every Class member was injured," Plaintiffs say, "when they unwittingly paid for the unreliable results of Defendants' scientific experiments, instead of obtaining clinically acceptable test results." *Id.* 1:12-14.

But Mr. Balwani has a more nuanced (and realistic) theory. A review of the elements of the claims certified in the Order shows that a properly instructed jury could find in Defendants' favor based on each Plaintiff's and class member's *individual evidence*—a point Plaintiffs (and the district court) did not contest. Given that, Defendants have the right to present that individual evidence as to every class member—a point Plaintiffs (and the district court) *also* did not contest—and that individual evidence would be the focus at trial.

On the RICO claim, Plaintiffs must show a fraudulent scheme using the mails and wires, *and* "that the fraudulent scheme proximately caused Plaintiffs' injuries." *Martinelli v. Petland, Inc.*, 274 F.R.D. 658, 660-61 (D. Ariz. 2011). Plaintiffs' testimony shows that, even if they could prove a fraudulent scheme (which they cannot), they may have no injury: a jury could find they received actionable results from their blood tests, which led to beneficial actions such as

11

new prescriptions or changes in diet. Framed in terms of Mr. Balwani's case theory, the RICO claim presents individual issues as to "whether class members were in fact injured by the alleged fraudulent scheme" and those "[i]ndividual issues would overwhelm any trial." *Id.* at 666.

Similarly, Plaintiffs' state statutory fraud claims require showing they did not get what they bargained for. "Plaintiffs must allege … economic injury, e.g., that they 'lost money or property' as a result of relying on … omissions." *Backhaut v. Apple, Inc.*, 74 F. Supp. 3d 1033, 1048 (N.D. Cal. 2014). Courts do not certify California UCL and FAL classes if "where individualized inquiries would be necessary … to determine appropriate restitution." *Campion v. Old Republic Prot. Co.*, 272 F.R.D. 517, 533 n.4, 537 (S.D. Cal. 2011). Likewise, "before a private party may [assert] a claim under the [Arizona Consumer Fraud Act], he must have been damaged by the prohibited practice. A prerequisite to such damages is reliance on the unlawful acts." *Peery v. Hansen*, 585 P.2d 574, 577 (Ariz. Ct. App. 1978).

Thus, a properly instructed jury could find *individual* Plaintiffs (and class members) suffered no harm as a result of any supposedly fraudulent conduct—a major theme of Mr. Balwani's trial defense.[4] That should have disposed of class certification. *See Zinser*, 253 F.3d at 1189

---

[4] Plaintiffs' punitive damages demand is merely a request for relief ancillary to other claims. *See* Dkt. 303 36:19-21. Because the right to recover on those claims must be decided individually, so too must any right to punitive damages.

12

### 2. The District Court Committed Manifest Error in Failing to Consider the Impact of Defenses on the Predominance of Common Issues at Trial.

The district court did not deny a jury could find in Mr. Balwani's favor based on the individual testimony of Theranos customers, including the reliability of their individual test results and the actions they took as a result. Instead, the district court brushed aside these individual issues merely because it deemed them incompatible with *Plaintiffs'* theory of their case:

> Defendants contend that plaintiffs who got accurate reports or who had tests performed by Theranos on standard equipment or by third parties suffered no injury. Those arguments are inapposite, *for they ignore the plaintiffs' unifying theory that had they been informed as to the situation at Theranos, they would not have submitted to any blood testing by Walgreens or Theranos.* Plaintiffs' claims focus on the reliability of Walgreens' and Theranos' blood testing program, not the accuracy of individual reports. Plaintiffs allege that they and the putative class members have all been subject to a course of conduct (blood testing) which did not afford them reliable results.

Order 12 (emphasis added).[5] But a trial would consist not only of "plaintiffs' unifying theory"; if that were all that mattered, classes would *always* be certified. Like any trial, it will *also* include Defendants' properly raised defenses—including the defense theory that *individual* class members have no right to recover because they personally received reliable, clinically actionable results at a competitive price. Mr. Balwani did not ask the district court to decide "whether [plaintiffs'] theory is right or wrong," Order 17 (alteration in original, quotation omitted); he

---

[5] Although this paragraph appears in the Order's discussion of typicality, it mirrors the Order's predominance reasoning. *Compare* Order 12 *with id.* 17-18.

4835-5733-1127v.3 0103509-000007

asked only that the district court take into account *his* trial theory, as well as Plaintiffs', and assess its effect on predominance.

The law required the district court to do so. A central function of the class certification inquiry is to ascertain "the nature of the issues that actually will be presented at trial," Adv. Comm. note to 2003 Amendment to Rule 23(c), without regard to which party introduces the issues at trial. The assessment of trial issues requires the court to "determine the nature of the claims *and defenses* and how they will be presented at trial, whether there are common issues that can be tried on a class-wide basis, and whether those common issues predominate and class treatment is a superior method of resolving them." Manual for Complex Litigation (4th ed. 2004) § 21.21 (emphasis added).

The Supreme Court's class certification decisions make defenses central to the class certification inquiry. In *Dukes*, the Supreme Court held that "a class cannot be certified on the premise that [a defendant] will not be entitled to litigate its statutory defenses to individual claims." 564 U.S. at 367. Rule 23 cannot be used to limit defense theories a defendant could assert in an individual action, a requirement flowing from the Rules Enabling Act, which forbids interpreting Rule 23 to "abridge, enlarge or modify any substantive right"—such as the right to litigate a claim effectively. *Id.* (quoting 28 U.S.C. § 2072(b); citing *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 845 (1999)). And *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), reemphasized that defenses get equal attention. In *Comcast*, plaintiffs proffered a damages model, which Comcast attacked. As here, the district court rejected Comcast's argument, finding it had "no place in the class

14

certification inquiry." The Supreme Court rebuffed that approach, criticizing the refusal "to entertain arguments against respondents' damages model that bore on the propriety of class certification[.]" *Id.*, 569 U.S. at 32-35.

Consistent with Supreme Court guidance (and the Rules Enabling Act), this Court has made clear that district courts *must* assess the impact of a defendant's theory of a case in deciding whether to certify. For example:

- In *Zinser*, plaintiffs had a unifying theory that defects in pacemaker leads made them unreliable because "deformation of the 'J' wire [in the lead] decreases its resistance to fatigue," which may "caus[e] injury to patients if the wire protrudes through the insulation." *Zinser*, 253 F.3d at 1192. But defendants' theory of the case was different: they argued difficulties in "establish[ing] a common cause of injury because many factors may contribute to 'J' wire deformation, including manufacturing and shipping history and handling of the lead by physicians or staff." *Id.* Rather than dismiss defendants' theory as incompatible with plaintiffs' theory, this Court affirmed denial of certification.

- In *Mazza v. American Honda Motor Co., Inc.*, 666 F.3d 581 (9th Cir. 2012), plaintiffs' theory was that Honda consistently omitted warnings about a high-end braking system's shortcomings. But this Court reversed certification because of individual issues raised by *defendants*' case theory: that many members of the proposed class could not recover because they were not exposed to allegedly misleading advertising or "learned of the [braking system's] allegedly omitted limitations before they purchased or leased the CMBS system." *Id.* at 596.

15

- In *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir. 2011), this Court reversed a certification order that failed to consider the impact of individual defenses on typicality. The Court made clear that the district court needed "to consider the effect that defenses unique to the named Plaintiffs' claims have on [typicality]." *Id.* at 974 (citation omitted).

- In *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061 (9th Cir. 2014), plaintiffs' theory was that Home Depot always charged customers for "damage waivers" on rented tools, even though the waiver was optional. But Home Depot's defense theory was that some contracts alerted customers to the waiver's optional nature, raising individual issues not susceptible to class treatment. Holding that "class certification of UCL claims is available only to those class members who were actually exposed to the business practices at issue," the Court found the contract variations made individual issues predominate. *Id.* at 1068-69.

The district court manifestly erred when it declined to consider how the parties would try the case in light of Mr. Balwani's right to present concrete proof showing that thousands of individual class members (indeed, *most* class members) received clinically actionable test results at a fair price, no matter what Plaintiffs may try to prove about the reliability of Theranos testing *in the abstract*. Plaintiffs' testimony showed the viability of this defense theory, as a jury could reject *each* named Plaintiff's claims based on individual testimony. Further, a jury could find most of the class was not "exposed to the business practices at issue," *Berger*, 741 F.3d at 1068, because they had venous draws analyzed on

16

conventional machines or had samples sent to ARUP—the reliability of which has *never* been questioned.

It makes no difference that Plaintiffs would prefer the jury to "focus on the reliability of Walgreens' and Theranos' blood testing program" in broad strokes rather than on "the accuracy of individual reports." Order 12. Each party is entitled to its theory of the case, and it would violate the Rules Enabling Act to deprive Mr. Balwani of his ability to present his theory to the jury. *Dukes*, 564 U.S. at 367. This Court recently reversed a class certification order, recognizing that the "rigorous analysis" required by Rule 23 means the Court "should not uncritically accept the plaintiff's preferred inferences." *Mays v. Wal-Mart Stores, Inc.*, -- Fed. Appx. --, 2020 WL 1277642, *1 (9th Cir. 2020). Because the district court did so here, this Court should grant the petition.

### B. The Order Manifestly Erred in Finding Superiority for the Arizona Claims.

Rule 23(b)(3) requires the district court to "find that a class action is superior to other methods of adjudication." *Valentino v. Carter-Wallace*, 97 F.3d 1227, 1234 (9th Cir. 1996). The purpose is to "assur[e] judicial economy and reduc[e] the possibility of multiple lawsuits." *Zinser*, 253 F.3d at 1191 (quotation omitted). Rule 23(b)(3) thus requires courts to consider the "the extent and nature of any litigation concerning the controversy already begun by or against class members."

The Arizona Attorney General sued Theranos on behalf of Arizona-based Theranos consumers—where 40 of the 41 Walgreens testing centers were located—and Theranos settled by refunding *all* Arizona consumers for their tests.

17

Dkt. 293, Ex. 20. A class action to facilitate *further* litigation on claims of Arizona class members would not be superior.

This Court applied this principle in *Kamm v. California City Development Co.*, 509 F.2d 205 (9th Cir. 1975), where plaintiffs sued on behalf of a proposed class, accusing real estate promoters of fraud. *Id.* at 206–07. The district court "assumed that the alleged class satisfied all of the prerequisites" of Rule 23, but held a class action not superior because California's Attorney General filed suit "with respect to the same controversy and relief had been obtained." *Id.* at 207. Although the Attorney General action would *not* protect "all members of the class" or "recover an amount ... even close to that sought in the class action," *id.* at 211, this Court held "[a] class action would require a substantial expenditure of judicial time which would largely duplicate and possibly to some extent negate the work" done by the Attorney General," *id.* at 212. "[T]he class action was not a superior method of resolving the controversy."[6] *Id.*; *see Imber-Gluck v. Google Inc.*, 2015 WL 1522076 (N.D. Cal. 2015) (denying certification in light of FTC settlement); *In re PPA Prods. Liab. Litig.*, 214 F.R.D. 614, 622 (W.D. Wash. 2003) (no superiority because of product refund program).

The district court acknowledged the Attorney General's litigation "required [Theranos] to reimburse potential Arizona class members for the cost of blood

---

[6] Allowing class actions after a government resolution discourages efficient government enforcement, "since the accused may not wish to settle with the state only to have the state settlement operate as a floor on liability or otherwise be used against it." *Thornton v. State Farm Mut. Auto Ins. Co.*, 2006 U.S. Dist. LEXIS 83972, *7-*13 (N.D. Ohio 2006) (citing cases).

18

tests." Order 19. Ignoring *Kamm*'s holding that superiority is lacking *even if* the recovery in a government action was not "even close to that sought in the class action," 509 F.2d at 211, the district court found a duplicative class action could proceed for Arizona class members because the Attorney General's litigation did not "comprehend the full scope of damages that might be available" to the class. Order 19. The Court referred to the possibility of treble damages under RICO or punitive damages for Arizona statutory fraud claims.[7] *Id.*

The district court erred when it justified class certification as a vehicle to allow Plaintiffs to pursue punitive and exemplary damages, in addition to the full monetary compensation already achieved by the Attorney General. "[P]unitive damages advance the interests of punishment and deterrence, which are also among the interests advanced by the criminal law." *Browning-Ferris Inds. v. Kelco Disposal, Inc*., 492 U. S. 257, 275 (1989); *see also* Restatement (Second) of Torts § 908 (1977), comment *a,* at 464 (purpose of punitive damages "the same" as "that of a fine imposed after a conviction of a crime"). These interests in punishment and deterrence reflect "society's goals," not the interests of individual (or class) litigants. *Boyle v. Lorimar Prods., Inc.*, 13 F.3d 1357, 1360 (9th Cir. 1994) (punitive awards must "not exceed an amount necessary 'to accomplish society's goals of punishment and deterrence.'") (quoting *Pacific Mutual Life Ins. Co. v. Haslip*, 499 U.S. 1, 21 (1991)).

---

[7] The Order also referred to punitive damages on the medical battery claim—but that claim is not asserted against Mr. Balwani.

Arizona Plaintiffs and class members already received full compensation through the Attorney General's action. And "society's goals of punishment and deterrence" as to Mr. Balwani will be addressed—if necessary—in the criminal proceedings against Mr. Balwani, *United States v. Holmes & Balwani*, No. 18-cr-00258-EJD-SVK, Dkt. 39 (N.D. Cal. 2018) (Superseding Indictment). The Arizona class cannot claim this action is a "superior" way to proceed against Mr. Balwani, given that they have been fully compensated, and society's interest in punishment and deterrence will be vindicated elsewhere.

## VI. CONCLUSION

Mr. Balwani respectfully asks the Court to grant his petition for immediate appeal and reverse the Order.

RESPECTFULLY SUBMITTED this 20th day of March 2020.

> Davis Wright Tremaine LLP
> Attorneys for Ramesh ("Sunny") Balwani
>
>
> By */s/ Stephen M. Rummage*
> Stephen M. Rummage
> Fred B. Burnside
> Davis Wright Tremaine LLP
> 920 Fifth Avenue, Suite 3300
> Seattle, Washington 98104-1610
> Tel: (206) 622-3150
> Fax: (206) 757-7700

4835-5733-1127v.3 0103509-000007

## CERTIFICATE OF COMPLIANCE

The foregoing Petition for Permission to Appeal contains less than 5,200 words, excluding the items exempted by Fed. R. App. P. 32(f). The petition's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6). I certify that this petition complies with FRAP 5(c)(1).

DATED this 20th day of March 2020.

DAVIS WRIGHT TREMAINE LLP
Attorneys for Ramesh ("Sunny") Balwani


By *s/ Stephen M. Rummage*
   Stephen M. Rummage

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 15. Certificate of Service for Electronic Filing

**9th Cir. Case Number(s)** _____

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**
[ **X** ] I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**
[  ] I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

```



```

**Description of Document(s)** *(required for all documents)***:**

```

    PETITION FOR PERMISSION TO APPEAL <u>FILED UNDER SEAL</u>

```

**Signature** s/Stephen M. Rummage _____     **Date**  March 20, 2020

# Exhibit A

**\*\* SEALED \*\***

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| In re | ) | No. 2:16-cv-2138-HRH |
| | ) | (Consolidated with |
| Arizona THERANOS, INC., Litigation | ) | No. 2:16-cv-2775-HRH |
| | ) | – and – |
| | ) | No. 2:16-cv-3599-HRH) |

## O R D E R

### Motion for Class Certification

Plaintiffs move pursuant to Rule 23(a) and (b)(3) for class certification.[1] The motion is opposed by defendants Walgreens Boots Alliance, Inc., and Walgreen Arizona Drug Company,[2] Elizabeth Holmes,[3] and Ramesh Balwani.[4] Defendant Theranos, Inc. has been dissolved with an assignment for the benefit of creditors who are not active participants in this litigation.

Oral argument was requested on the motion for class certification. On January 23, 2020, the court heard oral argument, and a transcript of those proceedings has been available to the court and parties.[5]

---

[1] Docket No. 303.

[2] Docket No. 322.

[3] Docket No. 288.

[4] Docket No. 290.

[5] Docket No. 368.

SEALED Order – Motion for Class Certification                                    - 1 -

Plaintiffs are:

A.R. (a resident and citizen of San Jose, California), B.P. (a resident and citizen of Chandler, Arizona), B.B. (a resident and citizen of Phoenix, Arizona), D.L. (a resident and citizen of Maricopa, Arizona), R.G. (a resident and citizen of Gilbert, Arizona), S.J. (a resident and citizen of Mesa, Arizona), and S.L. (a resident and citizen of Chandler, Arizona). Plaintiffs are individuals who purchased Theranos blood testing services at Walgreens stores between November 2013 and June 2016.

Defendants are:

Theranos, Inc. Theranos, Inc., was a Palo Alto, California, corporation which operated laboratories in Newark, California, and Scottsdale, Arizona. In September 2018, Theranos, Inc. was dissolved and "its assets have been assigned to Theranos, LLC, for the benefit of Theranos, Inc.[] creditors."[6]

Walgreens Boots Alliance, Inc. This Deerfield, Illinois corporation operates the Walgreens retail pharmacy chain in the United States.

Walgreen Arizona Drug Company. This Arizona corporation, a wholly-owned subsidiary of Walgreens Boots Alliance, Inc., operates Walgreens retail stores in Arizona. In this order, these two Walgreens companies are referred to collectively as "Walgreens."

Elizabeth Holmes (a resident and citizen of California). Holmes was the founder of Theranos and at relevant times was Theranos' chief executive officer.

Ramesh ("Sunny") Balwani (a resident and citizen of California). Balwani was the president and chief operating officer of Theranos.

---

[6]Order re Motion to Withdraw at 1, Docket No. 232.

SEALED Order – Motion for Class Certification
- 2 -

## Background

Plaintiffs' claims in this case arise out a blood testing program which was developed by Theranos and marketed to consumers by Walgreens and Theranos in Walgreens' retail stores. Plaintiffs assert fourteen causes of action in their second amended complaint but they are only seeking class certification as to six of their claims. At oral argument, counsel for plaintiffs confirmed that class certification is not sought for plaintiffs' second, fourth, fifth, sixth, seventh, eighth, twelfth, or thirteenth causes of action. Plaintiffs do seek class certification concerning their first cause of action for violation of the Arizona Consumer Fraud Act,[7] their third cause of action for battery, their ninth cause of action for racketeering in violation of 18 U.S.C. § 1962(c), their tenth cause of action for violation of California's Unfair Competition Law, their eleventh cause of action for violation of California's False Advertising Law, and their fourteenth cause of action for medical battery.[8]

Plaintiffs seek compensatory or general damages, punitive or exemplary damages, and treble damages where authorized by law or statute. However, at oral argument, counsel for plaintiffs also represented that plaintiffs have agreed not to pursue any damages for emotional distress, retesting or medical care.[9]

Plaintiffs' claims as to which certification is sought are based on the general theory that the Theranos blood testing services were not market-ready, but were still in

---

[7]The court assumes that plaintiffs' CFA claim is limited to an omission-based claim as plaintiffs state in a footnote that they are not seeking certification of their CFA claim "arising out of Defendants' affirmative misrepresentations." Plaintiffs' Memorandum in Support of Motion for Class Certification at 20, n.62, Docket No. 303.

[8]Tr. of Oral Argument at 6, Docket No. 368.

[9]Plaintiffs do intend to seek "dignity" harm, presumed damages in connection with the battery claims. Tr. of Oral Argument at 6-8, Docket No. 368.

SEALED Order – Motion for Class Certification                    - 3 -

development[10] and thus not capable of producing reliable results. Plaintiffs support this theory with the testimony of their expert, Dr. Geoffrey Baird. Dr. Baird has opined that "Theranos testing was not able to serve a diagnostic purpose when Theranos and Walgreens took blood from Walgreens customers."[11] Plaintiffs' claims against Walgreens are, to a large degree, based on their contention that, given what Walgreens knew, or should have known, it was reckless for Walgreens to market Theranos blood testing in its stores. Dr. Baird further opined that "no reasonably knowledgeable participant in the diagnostic testing industry would have believed Theranos's testing to be capable of providing clinically useful and/or diagnostic test results at any time."[12] Because plaintiffs contend that Walgreens knew, or should have known, that the Theranos testing was not reliable, they contend that Walgreens and Theranos were acting in concert.

Although slow in developing, plaintiffs' legal theory is that "the Class Members' unity of interest arises from the fact that all of their blood tests lacked the reliability needed for the

---

[10]In March 2018, the SEC charged Theranos, Holmes, and Balwani "with massive fraud." Exhibit 25, Declaration of Kara McCall, Docket No. 295. The SEC claimed

> that Theranos, Holmes, and Balwani made numerous false and misleading statements in investor presentations, product demonstrations, and media articles by which they deceived investors into believing that its key product -- a portable blood analyzer -- could conduct comprehensive blood tests from finger drops of blood, revolutionizing the blood testing industry.

Id. But, "in truth, according to the SEC complaint, Theranos' proprietary analyzer could complete only a small number of tests, and the company conducted the vast majority of patient tests on modified and industry-standard commercial analyzers manufactured by others." Id. The SEC settled with Holmes and Theranos but continues to litigate its claims against Balwani. Id. In June 2018, Holmes and Balwani were indicted on multiple counts of wire fraud. These charges remain pending.

[11]Expert Report of Geoffrey S. Baird, M.D., Ph.D. [etc.] at 19, Docket No. 262-1.

[12]Id. at 34.

SEALED Order – Motion for Class Certification                                      - 4 -

clinical diagnostic purposes for which those tests . . . were intended." [13]  Plaintiffs' claims

for which they seek certification are founded upon the foregoing contention, not the question

of whether the test results received by individual plaintiffs were or were not accurate.

Plaintiffs seek to certify a Class and three Subclasses. The proposed Class consists

of "[a]ll purchasers of Theranos testing services, including consumers who paid out-of-

pocket, through health insurance, or through any other collateral source"[14] pursuing a RICO

claim against all defendants. The proposed Edison Subclass consists of "[a]ll purchasers of

Theranos testing services who were subjected to 'tiny' blood draws"[15] pursuing battery and

medical battery claims against Walgreens and Theranos. The proposed Arizona Subclass

consists of "[a]ll purchasers of Theranos testing services in Arizona"[16] pursuing an omission-

based Arizona Consumer Fraud Act (CFA) claim against all defendants. The proposed

California Subclass consists of "[a]ll purchasers of Theranos testing services in California"[17]

pursuing California Unfair Competition and False Advertising claims against all defendants.

## Discussion

"A representative plaintiff may sue on behalf of a class when the plaintiff affirma-

tively demonstrates the proposed class meets the four threshold requirements of Federal Rule

of Civil Procedure 23(a): numerosity, commonality, typicality, and adequacy of representa-

---

[13] Plaintiffs' Reply in Support of Motion for Class Certification at 3, Docket No. 344.

[14] Plaintiffs' Memorandum in Support of Motion for Class Certification at 20, Docket No. 303.

[15] Id.

[16] Id.

[17] Plaintiffs' Memorandum in Support of Motion for Class Certification at 20, n.62, Docket No. 303.

SEALED Order – Motion for Class Certification                                   - 5 -

tion." Sali v. Corona Regional Med. Ctr., 909 F.3d 996, 1002 (9th Cir. 2018).  Rule 23(a)

provides:

> (a) Prerequisites.  One or more members of a class may sue
> or be sued as representative parties on behalf of all members
> only if:
>
> (1) the class is so numerous that joinder of all members is
> impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are
> typical of the claims or defenses of the class;  and
>
> (4) the representative parties will fairly and adequately
> protect the interests of the class.

"Additionally, a plaintiff seeking certification under Rule 23(b)(3)," which plaintiffs

do here, "must demonstrate that 'questions of law or fact common to class members

predominate over any questions affecting only individual members, and that a class action

is superior to other available methods for fairly and efficiently adjudicating the contro-

versy.'" Sali, 909 F.3d at 1002 (quoting In re Hyundai and Kia Fuel Econ. Litig., 881 F.3d

679, 690-91 (9th Cir. 2018)).  Rule 23(b)(3) provides that if the prerequisites of Rule 23(a)

are satisfied, then "[a] class action may be maintained" if:

> (3) the court finds that the questions of law or fact common
> to class members predominate over any questions affecting
> only individual members, and that a class action is superior to
> other available methods for fairly and efficiently adjudicating
> the controversy.  The matters pertinent to these findings
> include:
>
> (A) the class members' interests in individually controlling
> the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the
> controversy already begun by or against class members;

SEALED Order – Motion for Class Certification                                    - 6 -

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

If the prerequisites are satisfied and if the findings pursuant to Rule 23(b)(3) are made, then the court may enter a certification order defining the class or classes and appointing class counsel. Such an order "must define the class and the class claims, issues, or defenses, and must appoint class counsel under Rule 23(g)." Fed. R. Civ. P. 23(c)(1)(B).

Although "[t]he Ninth Circuit has not articulated the applicable standard of proof for the Rule 23 requirements, . . . at least four circuits have adopted a preponderance of the evidence standard," and "[t]his standard appears to be the trend in federal courts[.]" Smilovits v. First Solar, Inc., 295 F.R.D. 423, 427 (D. Ariz. 2013) (internal citations omitted). This standard "merely requires that [plaintiffs] demonstrate that it is more likely than not that a particular requirement of Rule 23[] has been satisfied." Id. (citation omitted).

Based upon the record before the court through and including oral argument, the court makes the following findings.

I.     Rule 23(a) Prerequisites

A.     Numerosity

"A proposed class satisfies the numerosity requirement if class members are so numerous that joinder would be impractical." Knapper v. Cox Communications, Inc., 329 F.R.D. 238, 241 (D. Ariz. 2019). "While no absolute limit exists, numerosity is met when general knowledge and common sense indicate that joinder would be impracticable." Id. "Generally, forty or more members will satisfy the numerosity requirement." Id.

The court finds that the numerosity requirement has been met as to the proposed Class. There is no dispute that thousands of individuals purchased Theranos blood testing services.

The Arizona Attorney General has identified 175,000 Arizona consumers[18] who purchased Theranos blood tests. Numerosity is established for purposes of the proposed Arizona Subclass.

As regards the California purchasers of Theranos tests, plaintiffs have represented that there are "thousands" of California purchasers.[19] Plaintiffs have offered but have not provided the court with spreadsheets from Theranos which, plaintiffs contend, would assure the court that the numerosity prerequisite was met for purposes of the California Subclass. Defendants have not contended that there are not thousands of California class members. The court finds it to be more probable than not that the numerosity prerequisite is met for purposes of the proposed California Subclass.

As for the Edison Subclass, plaintiffs argue, and the defendants have not suggested otherwise, that the Edison Subclass has thousands of members because in 2014 and 2015, 60% of patient visits included tiny blood draws. Plaintiffs have represented that there are Theranos data bases from which the number of Edison or tiny blood draw patients can be

---

[18]Exhibit 24, McCall Declaration, Docket No. 295. These individuals were identified as a result of litigation brought by the Arizona Attorney General against Theranos. In April 2017, Theranos and the Arizona Attorney General entered into a Consent Decree, the terms of which required Theranos to pay restitution in the amount of $4,652,000 to Arizona consumers who had purchased Theranos blood testing services. "The Settlement [was] designed to provide a full refund to all eligible consumers." Exhibit 23, McCall Declaration, Docket No. 295.

[19]Plaintiffs' Memorandum in Support of Motion for Class Certification at 20, Docket No. 303.

SEALED Order – Motion for Class Certification - 8 -

determined and have offered some evidence to support this representation.[20] The court finds it more probable than not that the numerosity prerequisite is met for purposes of the proposed Edison Subclass.

### B. Commonality

"Commonality requires the plaintiff to show that the class members' claims 'depend upon a common contention . . . of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" Sandoval v. County of Sonoma, 912 F.3d 509, 518 (9th Cir. 2018) (quoting Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011)). "'What matters to class certification . . . is not the raising of common questions – even in droves – but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.'" Parsons v. Ryan, 754 F.3d 657, 675 (9th Cir. 2014) (quoting Dukes, 564 U.S. at 350). "Plaintiffs need not show, however, that 'every question in the case, or even a preponderance of questions, is capable of class wide resolution. So long as there is even a single common question, a would-be class can satisfy the commonality requirement of Rule 23(a)(2).'" Id. (quoting Wang v. Chinese Daily News, Inc., 737 F.3d 538, 544 (9th Cir. 2013)). "Thus, '[w]here the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class, commonality exists.'" Id. (quoting Evon v. Law Offices of Sidney Mickell, 688 F.3d 1015, 1029 (9th Cir. 2012)). However, "'[c]ommonality requires the plaintiff to demonstrate the class members have suffered the same injury.'" Evon, 688 F.3d at 1029 (quoting Dukes, 564 U.S. at 350).

---

[20]Tr. of Videotaped Deposition of Sekhar Variam at 74:2-8, Exhibit 52, Amended Sobol Declaration, Docket No. 263.

SEALED Order – Motion for Class Certification      - 9 -

As finally structured by plaintiffs in their motion for class certification and oral argument, plaintiffs present a substantially narrowed theory of their case, the merits of which are not before the court at this time. Plaintiffs are not basing their several fraud claims upon contentions that plaintiffs' test results were inaccurate. Founded primarily upon the opinions of Dr. Geoffrey Baird, the underlying theory of all six claims as to which class certification is sought is that no one would have submitted to blood testing by Walgreens/Theranos had they known that Theranos' blood testing services were (as plaintiffs contend) a massive fraud.

As now structured, resolution of plaintiffs' claims will depend not upon individual experiences, but rather upon defendants' alleged deception as to the efficacy of the mini-lab program. Plaintiffs' theory of their claims presents a core of factual and legal issues: was the Theranos blood testing program market-ready? If not, would anyone deem Theranos/Walgreens' blood test results reliable? The focus is on defendants' conduct, not plaintiffs' experiences. Resolution of the plaintiffs' contention that defendants' test results were all unreliable is central to the validity of all of plaintiffs' claims as to which certification is sought.[21]

The court finds that the commonality prong of Rule 23(a) has been established by a preponderance of the evidence.

C.    Typicality

"'[R]epresentative claims are typical if they are reasonably coextensive with those of absent class members; they need not be substantially identical.'" Parsons, 754 F.3d at 685

---

[21]As for the proposed Edison subclass, the alleged deception about the reliability of the blood testing done by Theranos and Walgreens arguably vitiated plaintiffs' consent for testing.

SEALED Order – Motion for Class Certification                                    - 10 -

(quoting Hanlon v. Chrysler Corp., 150 F.3d 1011, 1020 (9th Cir. 1998)). "The test of typicality is 'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" Id. (quoting Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992)). "Thus, '[t]ypicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought.'" Id. (quoting Hanon, 976 F.2d at 508). "The requirement of typicality is not primarily concerned with whether each person in a proposed class suffers the same type of damages; rather, it is sufficient for typicality if the plaintiff endured a course of conduct directed against the class." Just Film, Inc. v. Buono, 847 F.3d 1108, 1118 (9th Cir. 2017). But, the typicality requirement is not met "'where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation.'" Hanon, 976 F.2d at 508 (quoting Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d 176, 180 (2d Cir. 1990)).

As discussed above, plaintiffs have settled on a single theory of the claims as to which they seek class certification. Supported by the testimony of Dr. Baird,[22] plaintiffs contend that they were all subject to the same course of conduct by Walgreens and Theranos: the alleged deception as to the reliability of blood testing by Theranos and Walgreens. Plaintiffs argue that they would not have submitted to blood testing by Walgreens and Theranos had they known that Theranos' blood testing scheme was fraudulent.

---

[22]By order of January 13, 2020, the court denied Walgreens' motion to exclude the testimony of Dr. Baird for purposes of plaintiffs' class certification motion. Docket No. 357. It is Dr. Baird's opinion that: "[w]ith the information available to Walgreens, no reasonably knowledgeable participant in the diagnostic testing industry would have believed Theranos's testing to be capable of providing clinically useful and/or diagnostic test results at any time." Baird Expert Report at 34, Docket No. 262-1.

Defendants' arguments focus upon questions of the accuracy of Theranos' blood testing. Defendants contend that plaintiffs who got accurate reports or who had tests performed by Theranos on standard equipment or by third parties suffered no injury. Those arguments are inapposite, for they ignore the plaintiffs' unifying theory that had they been informed as to the situation at Theranos, they would not have submitted to any blood testing by Walgreens or Theranos. Plaintiffs' claims focus on the reliability of Walgreens' and Theranos' blood testing program, not the accuracy of individual reports. Plaintiffs allege that they and the putative class members have all been subject to a course of conduct (blood testing) which did not afford them reliable results.

The court finds that the typicality prerequisite for class certification has been established.

### D.   Adequacy

The "adequacy requirement . . . 'serves to uncover conflicts of interest between named parties and the class they seek to represent' as well as the 'competency and conflicts of class counsel.'" In re Hyundai and Kia Fuel Economy Litig., 926 F.3d at 566 (quoting Amchem Products, Inc. v. Windsor, 521 U.S. 591, 625, 626 n.20 (1997)). "To determine legal adequacy," the court "resolve[s] two questions: '(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" Id. (quoting Hanlon, 150 F.3d at 1020).

No defendant has questioned the competency of plaintiffs' counsel, nor has there been demonstrated any conflict of interest between counsel and the class. Counsel for plaintiffs have and will continue to vigorously prosecute this case if class certification is granted.

SEALED Order – Motion for Class Certification                                    - 12 -

Questions have arisen as to potential conflicts of interest between named parties and the putative class members. Prior to oral argument, the court was sufficiently concerned about plaintiffs' decision not to "pursue damages resulting from harm to their health, emotional damages, or the cost of subsequent necessary medical treatment"[23] that the matter was called to the attention of the parties shortly before oral argument.[24] The court observed that plaintiffs' approach to emotional distress (etc.) damages "appears to split plaintiffs' various claims with named plaintiffs[,] reserving emotional distress, etc., for themselves and not pursuing these claims for the class."[25] The parties' briefing and oral argument has addressed this concern.

Counsel for plaintiffs represents that all of the plaintiffs have committed to not pursuing emotional distress, etc., damages if class certification is granted.[26] The court accepts counsel's representation and finds that there is no conflict between named plaintiffs and the putative class members.

However, the foregoing does not fully resolve the adequacy question. Walgreens contends that the named plaintiffs and counsel are abandoning individual claims of putative class members to pursue individual claims on their own under circumstances which will, if class certification is granted, create a res judicata problem. Walgreens argues that "[p]laintiffs' sacrifice of possible valuable claims of the putative class members renders their

---

[23]Plaintiffs' Memorandum in Support of Motion for Class Certification at 26, n.67, Docket No. 303.

[24]Order from Chambers (Jan. 14, 2020) at 2, Docket No. 359.

[25]Id.

[26]Tr. of Oral Argument at 6, Docket No. 368. This waiver includes claims for damages for retesting or medical follow-up.

representation inadequate."[27]  But, "[t]he fact that counsel have not tried to press claims . . . which they believe (and justifiably so) are unsuitable for class treatment does not make them inadequate." Sullivan v. Chase Inv. Services of Boston, Inc., 79 F.R.D. 246, 258 (D.C. Cal. 1978).

Surely some putative class members have incurred costs for retesting or medical follow-up, and some no doubt have experienced emotional distress as a consequence of dealings with Walgreens and Theranos. We cannot know the possible value of potential emotional distress claims; but if and to the extent that putative class members have such claims, they would, if a Rule 23(b)(3) class is certified, be afforded an opportunity to "opt out" should they wish to pursue individual claims rather than participate in a class action. Claims for retesting or medical follow-up would surely be so small as to be inactionable as a practical matter.

Counsel's decision not to press claims for emotional distress, etc. damages was prudent because those claims would be unsuitable for class treatment. With confirmation that named plaintiffs do not intend to seek emotional distress damages or out-of-pocket costs for retesting or medical treatment, there is no conflict between named plaintiffs and the putative class.

The court finds that the adequacy prerequisite is established.

II.     Rule 23(b)(3) Requirements

Having met the Rule 23(a) prerequisites, plaintiffs must show that they also meet the Rule 23(b)(3) requirements. Rule 23(b)(3) requires that "the plaintiff . . . establish 'that the questions of law or fact common to class members predominate over any questions affecting

---

[27]Walgreens' Opposition to Plaintiffs' Motion for Class Certification at 32, Docket No. 322.

SEALED Order – Motion for Class Certification                                    - 14 -

only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'" Just Film, 847 F.3d at 1115 (quoting Fed. R. Civ. P. 23(b)(3)).

A. Predominance

"'The predominance inquiry focuses on the relationship between the common and individual issues and tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" Senne v. Kansas City Royals Baseball Corp., 934 F.3d 918, 927 (9th Cir. 2019) (quoting Vinole v. Countrywide Home Loans, Inc., 571 F.3d 935, 944 (9th Cir. 2009)). "In determining whether the predominance requirement is met, courts have a 'duty to take a close look at whether common questions predominate over individual ones' to ensure that individual questions do not 'overwhelm questions common to the class.'" Id. (quoting Comcast Corp. v. Behrend, 569 U.S. 27, 34 (2013)). "If the main issues in a case require the separate adjudication of each class member's individual claim or defense, a Rule 23(b)(3) action would be inappropriate[.]" Zinser v. Accufix Research Institute, Inc., 253 F.3d 1180, 1189 (9th Cir. 2001) (citation omitted). "[T]he predominance criterion is far more demanding" than the typicality and commonality requirements of Rule 23(a). Amchem Products, 521 U.S. at 624.

Plaintiffs argue that all of the claims for which they seek certification are well-suited to class-wide adjudication through common proof and will not depend on the individual circumstances of the putative Class members. Defendants disagree.

Plaintiffs seek class certification as to their RICO claim, three statutory claims, and two battery claims. The RICO and statutory fraud/false advertising claims are all founded upon fraud; and these claims, as well as the two battery claims, are all founded upon the fact question of whether or not Theranos' blood testing program was market-ready. Plaintiffs

SEALED Order – Motion for Class Certification                                    - 15 -

claim that the program was not market-ready due to problems with the technology, facilities, equipment, and personnel and that defendants misled all of their customers as to the reliability of the blood testing program. The focus of plaintiffs' case will be common proof as to the efficacy of the Theranos/Walgreens blood testing program. The accuracy of individual tests is not relevant to plaintiffs' theory that no one could rely upon blood testing done by Theranos and Walgreens.

Plaintiffs have structured their claims (and in particular the RICO and battery claims) in a fashion which will more probably than not minimize, if not completely eliminate, individual issues or claims. For example, plaintiffs' RICO and statutory claims will seek compensatory damages limited to the cost of tests performed by Theranos and Walgreens, and, where available as a matter of law, punitive or exemplary damages and multiple damages, all of which can be determined on a class basis.[28] Plaintiffs (both named and putative class members) will not seek damages for emotional distress, additional testing, or follow-up medical care which are likely to vary widely as to each individual. Such damages are not suitable for class action.

Plaintiffs also seek battery damages on a class-wide basis and contend that no individualized showing of harm is necessary. This too is an appropriate election in support of a class action. "The traditional rule for battery cases is that general damages or presumed damages of a substantial amount can be recovered merely upon showing that the tort was committed at all." Johnson v. Pankratz, 2 P.3d 1266, 1269 (Ariz. Ct. App. 2000) (citation

---

[28]The cost of individual blood testing will of course vary; but that information is readily available from defendants' records. The fact that some Arizona plaintiffs have been reimbursed for the cost of their testing as a result of litigation commenced by the Attorney General of the State of Arizona will give rise to potential offsets if plaintiffs prevail. The latter will be a matter for claims administration.

omitted).   Plaintiffs are seeking "dignity damages," measured by an "ordinary person" standard and not each individual's experience.  Id.  Thus, no individualized inquiry as to damages will be required.  See, e.g., Mays v. Wal-Mart Stores, Inc., 330 F.R.D. 562, 581 (C.D. Cal. 2019) (because statutory claim challenging inaccuracy of wage statements relied on "reasonable person" standard, "[the p]laintiff can demonstrate injury for the alleged violation . . . on a class-wide basis").   As to plaintiffs' battery claims, it is plaintiffs' contention that their consent to treatment was voided because of their mistaken belief, based upon Theranos/Walgreens' misrepresentations concerning the blood testing program. Plaintiffs' battery claims, like the other four claims for which they seek certification, are founded upon the same, common issue of the reliability of the Theranos/Walgreens' blood testing program.

Walgreens' arguments in opposition to class certification are, by and large, founded upon the contention that some of the plaintiffs and putative class members received accurate test results, and that not all blood testing was done at a Theranos lab or done by the Edison device.  These arguments are flawed because plaintiffs' claims are based upon the contention that they have been damaged because of unreliable tests.  Plaintiffs aptly point out that reliability is not the same thing as accuracy.  Plaintiffs' theory of liability is not based upon allegations that the blood tests were not accurate.

At this juncture, "[t]he crucial point is [not] whether [plaintiffs'] theory is right or wrong," but whether "it is something that can be decided on a class-wide basis."  In re Optical Disk Drive Antitrust Litig., Case No. 3:10-md-2143 RS, 2016 WL 467444, at *11 (N.D. Cal. Feb. 8, 2016).  The court finds that common proof, and therefore common issues of fact, predominate as to plaintiffs' RICO claim, the statutory claims, and the battery claims.

SEALED Order – Motion for Class Certification                    - 17 -

B.    Superiority

"In determining superiority, courts must consider the four factors of Rule 23(b)(3)."
Zinser, 253 F.3d at 1190.  These factors are:

> (A)  the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B)  the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C)  the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D)  the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).  "A consideration of these factors requires the court to focus on the
efficiency and economy elements of the class action so that cases allowed under subdivision
(b)(3) are those that can be adjudicated most profitably on a representative basis."  Zinser,
253 F.3d at 1190 (citation omitted).

1.  Rule 23(b)(3)(A)

"The first factor is the interest of each member in 'individually controlling the
prosecution or defense of separate actions.'"  Id. (quoting  Fed. R. Civ. P. 23(b)(3)(A)).
"Where damages suffered by each putative class member are not large, this factor weighs in
favor of certifying a class action."  Id.

Litigation costs in this case have been and will continue to be substantial.  Given the
limitations on compensatory damages to which the plaintiffs have agreed (claims for
emotional distress, follow-up blood tests, and/or further medical evaluation are not being
pursued), what is left are individual plaintiffs' claims for the cost of blood testing by
Walgreens and Theranos, an amount that is relatively small.  For example, plaintiff D.L. paid

$166.24 for Theranos blood testing.[29] Other plaintiffs could have paid much less, given that the average reimbursement check as a result of the Consent Decree obtained by the Arizona Attorney General was $60.92.[30] As a consequence, there is a substantial disparity between litigation costs and what plaintiffs hope to recover. It is unlikely that individual claims would ever be pursued.

This factor weighs in favor of finding that a class action would be superior.

## 2. Rule 23(b)(3)(B)

"The second factor is 'the extent and nature of any litigation concerning the controversy already commenced by or against members of the class.'" Zinser, 253 F.3d at 1191 (quoting Fed. R. Civ. P. 23(b)(3)(B)). "This factor counsels against certification if, despite the class action, a multiplicity of suits will continue through judicial proceedings." Protectmarriage.Com v. Bowen, 262 F.R.D. 504, 509 (E.D. Cal. 2009).

The court has not been made aware of any individual litigation between a potential class member and any of the defendants. However, the Attorney General of the State of Arizona did commence litigation against Theranos, in which Theranos was required to reimburse potential Arizona class members for the cost of blood tests. That litigation did not comprehend the full scope of damages that might be available if plaintiffs' motion for class certification is granted. Treble damages are potentially available if a RICO claim is established, and punitive damages are potentially available if a battery/medical battery claim

---

[29]Exhibit 23, McCall Declaration, Docket No. 295.

[30]Dec. 14, 2017 Press Release, available at http://azag.gov/press-release/76000-arizonians-receive-46-million-Theranos-refund-checks (last visited 3/3/2020).

SEALED Order – Motion for Class Certification                                          - 19 -

and/or an Arizona statutory fraud claim is established.[31]  In addition, the Attorney General's action did not provide any relief to any plaintiff for battery or medical battery suffered by members of the putative Edison Subclass.  Likewise, Walgreens, Holmes, and Balwani were not involved in the Arizona Attorney General's enforcement action.

Because it is entirely clear that a multiplicity of individual suits against one or more of the defendants is highly unlikely, this factor weighs in favor of finding that a class action would be superior.

### 3.  Rule 23(b)(3)(C)

"The third factor is 'the desirability or undesirability of concentrating the litigation of the claims in the particular forum.'"  Zinser, 253 F.3d at 1191 (quoting Fed. R. Civ. P. 23(b)(3)(C)).

Plaintiffs are both Arizona and California residents and are asserting claims under both Arizona and California law.  None of the defendants resides in Arizona; however, as to the Arizona plaintiffs, Arizona was the center of Theranos' and Walgreens' initial roll-out of the blood testing program.  Theranos had a subsidiary testing program and a laboratory in Palo Alto, California.

There may be substantial evidence in other jurisdictions.  Nevertheless, the court finds it unlikely that related private litigation would be instituted anywhere else; and what plaintiffs propose in this case will in fact concentrate private, civil litigation in this court.

This factor weighs in favor of finding a class action in Arizona to be superior.

---

[31]Punitive damages are not available under California's Unfair Competition Law or False Advertising Law.  Anunziato v. Emachines, Inc., 402 F. Supp. 2d 1133, 1137 (C.D. Cal. 2005).

SEALED Order – Motion for Class Certification                    - 20 -

4.  Rule 23(b)(3)(D)

"The fourth factor is 'the difficulties likely to be encountered in the management of a class action.'"  Zinser, 253 F.3d at 1192 (quoting Fed. R. Civ. P. 23(b)(3)(D)).  "If each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually, a class action is not 'superior.'"  Id.

As finally proposed by plaintiffs in their motion for class certification and oral argument, the right to recovery by individual class members will depend upon common evidence.  To the extent that individualized proof of claims may have to be established, the court finds that evidence of the limited compensatory damage claims which class plaintiffs are asserting will be found in Walgreens' and Theranos' records.  Recourse to individual records will not be necessary.

Plaintiffs' theory of their case – that the Theranos blood testing program was not market-ready and thus not reliable – will require common proof as to Walgreens' and Theranos' operation of blood testing, not the circumstances of individual plaintiffs.  The accuracy of individual blood test reports is not at issue.  Rather, plaintiffs contend that none of them would have relied on any of the Theranos/Walgreens blood tests had they known about the myriad of problems with the Theranos blood testing program.  With the plaintiffs' class action claims thus circumscribed, and with compensatory damages excluding those for emotional distress, retesting, and medical follow-up, the development and presentation of class plaintiffs' RICO and statutory fraud claims will not present management problems – they will not present numerous or substantial separate issues.  The fact that the statutory fraud claims involve the law of two different states will not create a management problem because Arizona and California laws upon which the statutory claims are based are not substantially different.

SEALED Order – Motion for Class Certification                                      - 21 -

The court is unpersuaded that the calculation of class members' damages would render class certification unmanageable in this case. Again, as the case has finally been structured by plaintiffs, class plaintiffs' compensatory damages can be established through Walgreens' and Theranos' records and will not depend upon individual proof. In the claims administration process, it will be necessary to take account of refunds received by class plaintiffs as a consequence of the Arizona Attorney General's litigation. As for the battery/ medical battery claims of plaintiffs, individualized presentations will not be necessary, for plaintiffs, as discussed above, are seeking general damages. If plaintiffs prevail and recover general damages for battery or if they prevail and recover treble or punitive damages, the individual allocation of such recoveries is a matter for claims administration and will not render a trial unmanageable. The fact that some separate calculations will be necessary does not defeat certification. Yokoyama v. Midland Nat'l Life Ins. Co., 594 F.3d 1087, 1094 (9th Cir. 2010).

With the plaintiffs' claims as to which certification is sought reduced to the RICO, the Arizona and California statutory fraud, and the battery medical battery claims, the court finds that this fourth factor – manageability of the case – is established.

All four superiority factors weigh in favor of finding a class action superior as to the six claims for which plaintiffs seek certification. Thus, the court finds that plaintiffs have established by a preponderance of the evidence that a class action would be superior as to those six claims.

III.    Class Definitions

Plaintiffs' second amended complaint proposes class and subclasses defined as follows.

> Class: All purchasers of Theranos testing services, including consumers who paid out-of-pocket, through health insurance, or through any other collateral source (collectively, "purchasers").
>
> Arizona Subclass: All purchasers of Theranos testing services in Arizona.
>
> California Subclass: All purchasers of Theranos testing services in California.
>
> Edison Subclass: All purchasers of Theranos testing services who were subjected to "tiny" blood draws.[32]

The parties disagree as to whether plaintiffs have adequately defined ascertainable classes. In the Ninth Circuit, there is no "ascertainability" requirement. Briseno v. ConAgra Foods, Inc., 844 F.3d 1121, 1124-25 n.4 (9th Cir. 2017). Rather, the "only issue" for the court to decide is whether there is "an administratively feasible way to identify class members." Id. Here, the court finds that discovery and discoverable records of Walgreens and Theranos and records of the Arizona Attorney General's reimbursement litigation are sufficiently detailed as to make it administratively feasible to identify class members.

IV.    Rule 23(g): Identification of Class Representatives; Appointment of Class Counsel.

At the conclusion of their motion for class certification, counsel move for the appointment of class representatives and class counsel. This motion is granted.

Class representatives for the Class are A.R., B.P., B.B., D.L., R.G., S.J., and S.L.

Class representatives for the Arizona Subclass are B.P., B.B., D.L., R.G., S.J. and S.L.

The class representative for the California Subclass is A.R.

Class representatives for the Edison Subclass are B.P. and S.J.

The law firms of Lieff Cabraser Heimann & Bernstein, LLP, and Keller Rohrback, LLP, seek appointment as class counsel. Defendants have not taken a position with respect

---

[32]Second Amended Consolidated Class Action Complaint at 86, Docket No. 159.

SEALED Order – Motion for Class Certification                                    - 23 -

to this appointment.  Based upon experience with the Keller firm in a prior case and with both firms in the several years that this case has been pending, the court is satisfied that the Lieff and the Keller firms are highly experienced class action counsel, both of which have the necessary resources and knowledge for the effective management and presentation of this case.  The law firms of Lieff Cabraser Heimann & Bernstein, LLP, and Keller Rohrback, LLP, are hereby appointed as class counsel.

### Conclusion

The court, having found that the prerequisites for a Rule 23(a) class action have been established, and that the Rule 23(b)(3) requirements that questions of law and fact common to class members predominate over questions affecting only individual members and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy have been established, grants plaintiffs' motion for class certification as to:

(1)     Plaintiffs' First Cause of Action (omission-based Arizona Consumer Fraud Act claim),

(2)     Plaintiffs' Third Cause of Action (battery claim),

(3)     Plaintiffs' Ninth Cause of Action (RICO claim),

(4)     Plaintiffs' Tenth Cause of Action (California Unfair Competition Law claim),

(5)     Plaintiffs' Eleventh Cause of Action (California False Advertising Law claim), and

(6)     Plaintiffs' Fourteenth Cause of Action (medical battery claim).

The certified classes are:

> Class: All purchasers of Theranos testing services, including consumers who paid out-of-pocket, through health insurance, or through any other collateral source (collectively, "purchasers")

SEALED Order – Motion for Class Certification                                    - 24 -

between November 2013 and June 2016. The Class is limited to pursuing a RICO claim against all defendants and is precluded from seeking damages for emotional distress, retesting and/or subsequent medical care.

Arizona Subclass: All purchasers of Theranos testing services in Arizona between November 2013 and June 2016. The Arizona Subclass is limited to pursuing an omission-based Arizona Consumer Fraud Act claim against all defendants and is precluded from seeking damages for emotional distress, retesting and/or subsequent medical care.

California Subclass: All purchasers of Theranos testing services in California, between September 2013 and June 2016. The California Subclass is limited to pursuing California Unfair Competition Law and False Advertising Law claims against all defendants and is precluded from seeking damages for emotional distress, retesting and/or subsequent medical care.

Edison Subclass: All purchasers of Theranos testing services who were subjected to "tiny" blood draws between September 2013 and June 2016. The Edison Subclass is limited to pursuing battery and medical battery claims against defendants Theranos and Walgreens and is precluded from seeking damages for emotional distress, retesting and/or subsequent medical care.

Class representatives are:

Class representatives for the Class are A.R., B.P., B.B., D.L., R.G., S.J., and S.L.

Class representatives for the Arizona Subclass are B.P., B.B., D.L., R.G., S.J. and S.L.

The class representative for the California Subclass is A.R.

Class representatives for the Edison Subclass are B.P. and S.J.

Class counsel are the law firms of: Lieff Cabraser Heimann & Bernstein, LLP, and

Keller Rohrback, LLP.

DATED at Anchorage, Alaska, this 5th day of March, 2020.

/s/ H. Russel Holland
United States District Judge

SEALED Order – Motion for Class Certification - 25 -

FD-302 (Rev. 5-8-10)

**FEDERAL BUREAU OF INVESTIGATION**



Date of entry    04/01/2020

Curtis Page                                              was interviewed in person
                                          Tempe, Arizona. Also present
was Special Agent George Scavdis, Food and Drug Administration Office of
Criminal Investigations. After being advised of the identity of the
interviewers and the nature of the interview, Page provided the following
information:

Page was part of an Accountable Care Organization, called Commonwealth
Primary Care, which partnered with healthcare providers and vendors, like
Theranos. Theranos also had a lab in Page's office. Theranos charged 50% of
Medicare rates, which was far less than Sonora Quest and LabCorp. Theranos
was cheaper, easier, and cost less, than the other labs.

In Page's office, Theranos was very secretive. Everything in Theranos'
space was under lock and key, such as the cabinets. Theranos said it was
because of their proprietary technology, but Page did not understand what
this meant. There were no Theranos' testing devices in Page's office and the
blood was taken by vein draw, not through Theranos' finger draw device, in
his office. Theranos' phlebotomist was in Page's office to draw the blood
for about one and a half years. Since Theranos drew the blood in the office,
Page was not sure exactly what was under lock and key in the room. Theranos
did not say what was proprietary and did not mention reagents.

Theranos said they would be drawing blood from patients' finger tips and
testing on these micro samples, but that never happened. Theranos' rates
remained 50% of Medicare's rates.

There were a lot of abnormal A1C test results, which Page brought up to
Theranos. Theranos conducted an investigation and blamed Siemens' devices.
Theranos fixed the device and re-did the tests, notifying the doctors by
letters. Page was concerned that he had to point out the issue and wondered

| Investigation on | 03/05/2020 | at | Tempe, Arizona, United States (In Person) | |
|---|---|---|---|---|

| File # | | Date drafted | 03/05/2020 |
|---|---|---|---|

by  Adelaida Hernandez

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

about the status of Theranos' quality checks. The matter was handled in a
"very hush, hush" manner, where Theranos did not take responsibility.

    Theranos presented to the ACO's board a couple of times, telling them
about how Theranos' rates were 50% of Medicare rates and the testing on
micro samples of blood. Doctors were among the ACO's board, which were
present for the presentation. Lance Donkerbrook was the Chief Operating
Officer of the ACO at the time, and was now it's Chief Executive Officer.
Page was present at some of these meetings.

    After Theranos' went into Page's office, Page asked about Theranos'
finger draw. Theranos explained it was for certain tests, without providing
details on which (or how many) tests. Eventually, Theranos completely
abandoned the finger draw. Page did not specifically recall discussions
about Theranos' accuracy or FDA approval. Page thought Theranos said they
were in the process of FDA approval and it was merely a matter of time. Page
met once with Elizabeth Holmes, who came to one of the meetings.

    Theranos seemed innovated and disruptive, which was the kind of vendor the
ACO looked for. Of course, accuracy of the blood tests were important.
Theranos' Board of Directors, such as Henry Kissinger, impressed Page and
made Theranos seem legitimate. Theranos presented information about their
Board of Directors to the ACO in its meetings.  Holmes, at a meeting, spoke
emotionally about losing her father, or a relative, to a bad lab test. In
total, Theranos had four to five meetings with the ACO's board.

    Page ordered general reference tests, such as CBCs and A1Cs. The other
Theranos blood tests, except the A1Cs, seemed fine. The A1C issue took two
to three months for Theranos to admit something was wrong. Mike Phebus was
Theranos' sales representative that spoke with Page.  Phebus told Page that
Theranos was looking at the issue. Eventually, Theranos said it was the
Siemens machine and Theranos had switched devices. Page repeated he did not
understand how Theranos did not recognize the issue.

    Considering all of Theranos' investors, the investments they made,
Theranos' equipment, the information in the media about Theranos, it never
occurred to Page that the test result would be anything but accurate. The
A1C issue was six months to a year before the Wall Street Journal article.
About 200 patients' A1Cs seemed impacted. For those patients, their blood

Continuation of FD-302 of  (U) Interview of Curtis Page                        , On  03/05/2020  , Page   3 of 3

was run through another lab free of charge (and Theranos refunded their
test). Page still thought there was a noticeable delay before Theranos
acknowledged and fixed the problem. These patients all had vein draws.
Page's office continued to use Theranos after these issues. Sometime after
the Wall Street Journal article, Page's office stopped using Theranos.

    Page did not know if other tests had problems.

    Page had an email from around August 2016, requesting A1C data from
Theranos for a list of patients. There were about 7,000 patient results in
the email.

    When Page learned about the sanctions against Theranos, Theranos blamed
all the sanctions on the lab in Newark, California. Theranos told Page that
all of his patients' test results had been run through Arizona, and that the
sanctions had nothing to do with the Arizona lab. The Arizona lab had
different machines, so Theranos' lab sanctions did not impact Arizona.