FD-302 (Rev. 5-8-10)

OFFICIAL RECORD
Document participants have digitally signed. All signatures have been verified by a certified FBI information system.

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry 03/30/2020

**PATIENT MEDICAL INFORMATION**

This document contains patient medical information protected under the Privacy Act or the Health Insurance Portability and Accountability Act. Such information may be accessed and used only if necessary for the performance of one's official duties and only to persons with a need-to-know. This information must be safeguarded and protected from inadvertent disclosure.

E[redacted] T[redacted], date of birth [redacted], residence address [redacted], Arizona was interviewed in person at Starbucks [redacted] Tempe, Arizona. Also present was Assistant United States Attorney John Bostic. After being advised of the identity of the interviewers and the nature of the interview, T[redacted] provided the following information:

T[redacted] was advised that the interview was voluntary and that lying could be prosecuted.

T[redacted] first learned of Theranos on Facebook. A friend was director of a resource center that was adjacent to a homeless center and posted about Theranos on Facebook. The friend was excited about Theranos' availability, especially the affordable screening.

T[redacted] saw a couple of commercials for Theranos. She recalled being at her father's house one day and seeing a TV commercial for Theranos. Theranos' advertisement promoted blood testing from a single drop of blood. The concept stood out and T[redacted] remembered wondered why everyone else required so much more blood. Elizabeth Holmes was on the cover of magazines.

During the period T[redacted] used Theranos, she was in between insurance coverage and there was a significant price difference to use Theranos. T[redacted] had an annual physical with her primary care physician, Dr. Gerald Asin. During this annual check, T[redacted] picked the blood tests, which

Investigation on 03/05/2020 at Tempe, Arizona, United States (In Person)

File # [redacted] Date drafted 03/06/2020

by Adelaida Hernandez

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

included an HIV/AIDS screening with Theranos. The blood draw occurred in Dr. Asin’s office. T was not sure if it was a vein draw or finger draw. T did not have her blood drawn at Walgreens.

When Dr. Asin told T about the results, Dr. Asin’s immediate response was “this is wrong”. Dr. Asin knew T for years and knew her lifestyle, so he did not think the positive test result was accurate.

When T learned she tested positive for HIV, it was “terrible” and “awful”. T thought she was dying and recalled being emotional. Dr. Asin’s assurance (that the test results could not be accurate) did not make T feel better.

Since she was in between insurance, T could not immediately afford to be retested. It was “awhile” before she could retest. During the period she was waiting to afford the testing, T researched whether she had to report the test results to health officials. It was difficult to not know for sure during the period she was waiting on a retest. . The test results felt like they hung in the air for a while.

Dr. Asin gave T a copy of the test result, which looked like the ones shown to her [Agent’s note: The document was attached to the 1A hereto]. She received a copy of the results. During that period, T had a rental car and accidentally left the results in the trunk, which she realized when the rental car company called her about private personal items being left in the vehicle. The test results also impacted her family. T told her mother and roommate.

When T could afford a retest, she did not consider going back to Theranos. The retest results were negative for any HIV/AIDs. Dr. Asin told T to use a different lab. T did not recall contact with Theranos over the test results.

Later, A check was sent to T from Theranos for reimbursement. T remembered the documents saying something about not admitting wrongdoing. T had paid out of pocket for the Theranos test, likely the same day of her visit in Dr. Asin’s office. The test was $40-$70. T did not recall the specific amount of the price difference between





the Theranos test and other providers.

T did not recall specifics about the evidence of the viral load in the test.

T did not recall the Walgreens partnership with Theranos.

At the time she was tested, there was probably over a year gap between her last annual checkup. Lab tests have been performed before. T did not have a false HIV/AIDS test either before or after Theranos' error. She was not aware of other lab errors, personally, and had not been asked to re-do lab tests before (or after) the Theranos result. Accuracy of the blood test was very important to T and she expected lab tests to be accurate. Lab tests were expected to, and should, be right.