

Office of the Clerk
**United States Court of Appeals for the Ninth Circuit**
Post Office Box 193939
San Francisco, California 94119-3939
415-355-8000

Molly C. Dwyer
Clerk of Court

March 20, 2020

| | |
|---|---|
| No.: | 20-80057 |
| D.C. Nos.: | 2:16-cv-02138-HRH, 2:16-cv-02373-HRH, 2:16-cv-02660-HRH, 2:16-cv-02775-HRH, 2:16-cv-03599-HRH, |
| Short Title: | B.P., et al v. Ramesh Balwani |

Dear Appellant/Counsel

This is to acknowledge receipt of your Petition for Permission to Appeal under Federal Rule of Civil Procedure 23(f).

All subsequent letters and requests for information regarding this matter will be added to your file to be considered at the same time the cause is brought before the court.

The file number and the title of your case should be shown in the upper right corner of your letter to the clerk's office. All correspondence should be directed to the above address pursuant to Circuit Rule 25-1.



Office of the Clerk
**United States Court of Appeals for the Ninth Circuit**
Post Office Box 193939
San Francisco, California 94119-3939
415-355-8000

Molly C. Dwyer
Clerk of Court

---

**ATTENTION ALL PARTIES AND COUNSEL**
**PLEASE REVIEW PARTIES AND COUNSEL LISTING**

---

We have opened this appeal/petition based on the information provided to us by the appellant/petitioner and/or the lower court or agency. EVERY attorney and unrepresented litigant receiving this notice MUST immediately review the caption and service list for this case and notify the Court of any corrections.

Failure to ensure that all parties and counsel are accurately listed on our docket, and that counsel are registered and admitted, may result in your inability to participate in and/or receive notice of filings in this case, and may also result in the waiver of claims or defenses.

PARTY LISTING:
Notify the Clerk immediately if you (as an unrepresented litigant) or your client(s) are not properly and accurately listed or identified as a party to the appeal/petition. To report an inaccurate identification of a party (including company names, substitution of government officials appearing only in their official capacity, or spelling errors), or to request that a party who is listed only by their lower court role (such as plaintiff/defendant/movant) be listed as a party to the appeal/petition as an appellee or respondent so that the party can appear in this Court and submit filings, contact the Help Desk at http://www.ca9.uscourts.gov/cmecf/feedback/ or send a letter to the Clerk. If you or your client were identified as a party to the appeal/petition in the notice of appeal/petition for review or representation statement and you believe this is in error, file a motion to dismiss as to those parties.

COUNSEL LISTING:
In addition to reviewing the caption with respect to your client(s) as discussed above, all counsel receiving this notice must also review the electronic notice of docket activity or the service list for the case to ensure that the correct counsel are

listed for your clients. If appellate counsel are not on the service list, they must file a notice of appearance or substitution immediately or contact the Clerk's office.

NOTE that in criminal and habeas corpus appeals, trial counsel WILL remain as counsel of record on appeal until or unless they are relieved or replaced by Court order. *See* Ninth Circuit Rule 4-1.

REGISTRATION AND ADMISSION TO PRACTICE:
Every counsel listed on the docket must be admitted to practice before the Ninth Circuit AND registered for electronic filing in the Ninth Circuit in order to remain or appear on the docket as counsel of record. *See* Ninth Circuit Rules 25-5(a) and 46-1.2. These are two separate and independent requirements and doing one does not satisfy the other. If you are not registered and/or admitted, you MUST, within 7 days from receipt of this notice, register for electronic filing AND apply for admission, or be replaced by substitute counsel or otherwise withdraw from the case.

If you are not registered for electronic filing, you will not receive further notices of filings from the Court in this case, including important scheduling orders and orders requiring a response. Failure to respond to a Court order or otherwise meet an established deadline can result in the dismissal of the appeal/petition for failure to prosecute by the Clerk pursuant to Ninth Circuit Rule 42-1, or other action adverse to your client.

If you will be replaced by substitute counsel, new counsel should file a notice of appearance/substitution (no form or other attachment is required) and should note that they are replacing existing counsel. To withdraw without replacement, you must electronically file a notice or motion to withdraw as counsel from this appeal/petition and include your client's contact information.

To register for electronic filing, and for more information about Ninth Circuit CM/ECF, visit our website at http://www.ca9.uscourts.gov/cmecf/#section-registration.

To apply for admission, see the instructions and form application available on our website at https://www.ca9.uscourts.gov/attorneys/.

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

NO.

_____

IN RE ARIZONA THERANOS, INC., LITIGATION

_____

Petition to Immediately Appeal from an Order Granting Class Certification
By the United States District Court for the District of Arizona,

No.   2:16-cv-2138-HRH
(Consolidated with:
No.   2:16-cv-2373-HRH
No.   2:16-cv-2660-HRH
No.   2:16-cv-2775-HRH
No.   2:16-cv-3599-HRH)

Honorable H. Russel Holland, United States District Judge

_____

**PETITION FOR PERMISSION TO APPEAL
FILED UNDER SEAL**

_____

Stephen M. Rummage
Fred B. Burnside
Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
Tel: (206) 622-3150
Fax: (206) 757-7700 Fax

Attorneys for Defendant Ramesh Balwani

# TABLE OF CONTENTS

I.  RELIEF REQUESTED .................................................................................1

II.  INTRODUCTION .....................................................................................1

III.  FACTUAL AND PROCEDURAL BACKGROUND ....................................3

  A.  Theranos's Blood Testing Business ...............................................3

  B.  Plaintiffs' Testing Experience .......................................................5

IV.  QUESTIONS SOUGHT TO BE APPEALED...............................................8

V.  ARGUMENT................................................................................................9

  A.  The Order Manifestly Erred in Assessing Predominance. .............9

    1.  Individual Proof Could Lead to Verdicts in Mr. Balwani's Favor as to Large Swaths of the Class. ...............................................................10

    2.  The District Court Committed Manifest Error in Failing to Consider the Impact of Defenses on the Predominance of Common Issues at Trial.............13

  B.  The Order Manifestly Erred in Finding Superiority for the Arizona Claims.................................................................................17

VI.  CONCLUSION.............................................................................................20

4835-5733-1127v.3 0103509-000007

# TABLE OF AUTHORITIES

**Federal Cases**

*Backhaut v. Apple, Inc.*,
   74 F. Supp. 3d 1033 (N.D. Cal. 2014) ................................................................12

*Berger v. Home Depot USA, Inc.*,
   741 F.3d 1061 (9th Cir. 2014) ....................................................................16, 17

*Boyle v. Lorimar Prods., Inc.*,
   13 F.3d 1357 (9th Cir. 1994) ............................................................................20

*Browning-Ferris Inds. v. Kelco Disposal, Inc.*,
   492 U. S. 257 (1989)..........................................................................................19

*Campion v. Old Republic Prot. Co.*,
   272 F.R.D. 517 (S.D. Cal. 2011) ......................................................................12

*Chamberlan v. Ford Motor Co.*,
   402 F.3d 952 (9th Cir. 2005) ..............................................................................9

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013)..............................................................................................15

*Ellis v. Costco Wholesale Corp.*,
   657 F.3d 970 (9th Cir. 2011) ............................................................................16

*Imber-Gluck v. Google Inc.*,
   2015 WL 1522076 (N.D. Cal. 2015) ................................................................18

*In re PPA Prods. Liab. Litig.*,
   214 F.R.D. 614 (W.D. Wash. 2003) ................................................................19

*Kamm v. California City Development Co.*,
   509 F.2d 205 (9th Cir. 1975) ............................................................3, 17, 18, 19

*Martinelli v. Petland, Inc.*,
   274 F.R.D. 658 (D. Ariz. 2011) ........................................................................12

*Mays v. Wal-Mart Stores, Inc.*,
   -- Fed. Appx. --, 2020 WL 1277642 (9th Cir. 2020)..........................................17

i

*Mazza v. American Honda Motor Co., Inc.*,
666 F.3d 581 (9th Cir. 2012) ........................................................................15, 16

*Pac. Mut. Life Ins. Co. v. Haslip*,
499 U.S. 1 (1991)........................................................................................3

*Thornton v. State Farm Mut. Auto Ins. Co.*,
2006 U.S. Dist. LEXIS 83972 (N.D. Ohio 2006)..............................................18

*United States v. Holmes & Balwani*,
No. 18-cr-00258-EJD-SVK, Dkt. 39 (N.D. Cal. 2018)......................................20

*Valentino v. Carter-Wallace*,
97 F.3d 1227 (9th Cir. 1996) ...........................................................................17

*Wal-Mart Inc. v. Dukes*,
564 U.S. 338 (2011)............................................................................3, 14, 17

*Zinser v. Accufix Research Inst., Inc.*,
253 F.3d 1180 (9th Cir. 2001), *amended by* 273 F.3d 1266 (9th
Cir. 2001) ....................................................................................10, 13, 15, 17

**State Cases**

*Peery v. Hansen*,
585 P.2d 574 (Ariz. Ct. App. 1978).................................................................12

**Federal Statutes**

Racketeer Influenced and Corrupt Organizations Act.............................2, 11, 12, 19

Rules Enabling Act ....................................................................................14, 15, 17

**State Statutes**

Arizona Consumer Fraud Act .........................................................................2, 12

California False Advertising Law......................................................................2, 12

California Unfair Competition Law...............................................................2, 12, 16

4835-5733-1127v.3 0103509-000007

## Rules

Federal Rules of Appellate Procedure
  5(a) ...................................................................................................1

Federal Rules of Civil Procedure
  23 .............................................................................................14, 17
  23(a) ...............................................................................................18
  23(b)(3) .....................................................................................*passim*
  23(c) ...............................................................................................14
  23(f).............................................................................................1, 9

## Other Authorities

Restatement (Second) of Torts § 908 (1977), Comment *a* ......................................19

4835-5733-1127v.3 0103509-000007

# I.  RELIEF REQUESTED

Ramesh Balwani seeks permission under Fed. R. Civ. P. 23(f) and Fed. R. App. P. 5(a) to appeal an Order Granting Motion for Class Certification entered by the District Court for the District of Arizona on March 6, 2020 ("Order").

# II.  INTRODUCTION

This case rests on the premise that Plaintiffs and members of their proposed classes purchased blood tests that Theranos, Inc., performed using technology that was not ready for consumer use.  (Mr. Balwani is the former Theranos Chief Operating Officer.)  Plaintiffs explained their theory:

> Theranos attempted to develop robotic, nano-technology to perform routine blood work on "tiny" samples taken from a "fingerstick" draw.  Over the years, the company produced devices, or modified existing devices, to analyze fingerstick blood, but it never successfully built a market-ready nano-technology analyzer. Theranos also designed containers for the tiny samples ... and lancets for the tiny draws, but they too were faulty and were never validated, even though, just like the nano-analyzers, they were used in the Arizona and California markets.

Dkt. 303 4:10-16.  Plaintiffs argued "Theranos's fingerstick blood testing was at all pertinent times still in development … and nowhere near able to serve the essential purpose of reliable blood testing."  *Id*. 4:20-26.

This theory of the case, however, ignores one undisputed fact: Theranos performed most blood tests for Plaintiffs' proposed class—and *all* tests for the last ten months of the class period—using the same *venous* draws and analytical devices that competitive blood testing services use.  Mr. Balwani's defense of Plaintiffs' claims will involve class member by class member cross-examination to

1

show that individual class members throughout the class period received accurate, actionable blood testing results, at a fair price. Plaintiffs' depositions on this theory bore fruit, showing (a) a properly instructed jury could find for Mr. Balwani based on their *individual* testimony and (b) almost all Arizona Plaintiffs had been refunded for their Theranos tests through Theranos's settlement with the Arizona Attorney General.

The district court ignored these issues in certifying classes to pursue claims against Mr. Balwani. Its Order raises issues of recurring significance that will escape review absent prompt consideration. Further, its treatment of predominance and superiority issues is manifestly erroneous.

*First*, applying Rule 23(b)(3), the Order found common issues predominated on claims against Mr. Balwani under the Arizona Consumer Fraud Act, the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), the California Unfair Competition Law ("UCL"), and the California False Advertising Law ("FAL").[1] But in deciding predominance under Rule 23(b)(3), the district court considered *only* Plaintiffs' theory of the case. Tacitly conceding Mr. Balwani's theory of the case would present overwhelming individual issues barring class certification, the district court held his theory made no difference because plaintiffs articulated a "unifying theory"—a theory designed to glide by individual issues. This was manifest error because "a class cannot be certified on the premise that [a

---

[1] The Order also certified battery claims, which are not asserted against Mr. Balwani.

2

defendant] will not be entitled to litigate ... defenses to individual claims." *Wal-Mart Inc. v. Dukes*, 564 U.S. 338, 367 (2011).

*Second*, class action litigation is not superior under Rule 23(b)(3) where it duplicates relief that can be efficiently obtained through other means. The Arizona Attorney General obtained restitution for every Arizona resident (most of the class) who had a Theranos blood test. In light of those refunds, the district court found a class action superior as to Mr. Balwani only because the Arizona class could obtain exemplary and punitive damages not sought by the Attorney General. But punitive and exemplary damages further *society's* interest in punishment and deterrence. *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 22 (1991). The United States will fully vindicate society's interests in the criminal case it brought against Mr. Balwani. The district court manifestly erred in ignoring *Kamm v. California City Development Co.*, 509 F.2d 205 (9th Cir. 1975), and finding a class action a superior method for Arizona class members to proceed against Mr. Balwani.

### III.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Theranos's Blood Testing Business

Theranos operated two federally-certified blood testing labs: a high-complexity lab in California and a moderate-complexity lab in Arizona, which opened in February 2015. Dkt. 293, Ex. 16 at 37 (California); *id.* at 86 (Arizona). Under federal regulations, Theranos could perform its proprietary fingerstick tests *only* in its high-complexity California lab. Dkt. 291-2, Ex. 7 180:6-14. By contrast, the Arizona lab processed samples *only* using FDA-cleared conventional testing equipment—not Theranos fingerstick technology. *Id.* 192:18-21. Further,

3

if a patient sought a test outside Theranos's testing menu, it would send the test for processing at ARUP, a third-party lab in Utah that does not use "Theranos technology." Dkt. 293, Ex. 6 308:22-309:3. Plaintiffs never claimed samples sent to ARUP yielded unreliable results.

Although Plaintiffs' claims focus on Theranos's development of "robotic, nano-technology to perform routine blood work on 'tiny' samples taken from a 'fingerstick' draw," Dkt. 303 4:10-11 (class certification brief), *most of the proposed class*—and almost all named Plaintiffs—had blood taken through a conventional *venous* draw. Although Theranos began with mainly fingerstick tests, 30-40% of tests in 2014 used venous samples. Dkt. 291-2, Ex. 4 129:5-11. By August 2015—*ten months* before the class period's end—Theranos stopped using fingerstick blood altogether, performing tests *only* on venous samples using FDA-cleared devices. Dkt. 291-2, Ex. 46 515:1-9.[2] Further, Theranos's Arizona lab processed *only* venous blood samples on the same unmodified, FDA-cleared commercial devices other labs use. Dkt. 291-2, Ex. 7 192:19-20. Theranos's California lab also processed venous samples, Dkt. 291-2, Ex. 4 299:7-20, analyzed on standard commercial devices, Dkt. 293, Ex. 2 31:22-32:4, 197:1-16. Each FDA-cleared and FDA-approved assay performed in the lab according to manufacturers' specifications, Dkt. 293, Ex. 5 236:17- 237:14, and Plaintiffs never explained how testing on these devices could yield unreliable results.

---

[2] Plaintiffs found a document referring to *one* fingerstick test in September 2015. Dkt. 318 12 n.9. Although likely a data entry error, it does not detract from the point: fingerstick testing ended months before class period ended.

4

Contrary to the Order's suggestion, Order 8-9, the parties are unable to access Theranos's test data, because it resides in encrypted databases. Dkt. 293, Ex. 1 58:9-59:8, 64:12-66:7. As a result, no systematic way exists to determine whether putative class members had venous or fingerstick draws, where their samples were processed, or what devices were used.

### B. Plaintiffs' Testing Experience

Plaintiffs' class certification motion said *nothing* about the individuals the Order appoints as class representatives. *See* Dkt. 303. In fact, many had blood tested using the same testing methods used by Theranos's competitors, including even the same FDA-cleared machines. And they testified in deposition that, for the most part, they received exactly what every blood-testing customer hopes to receive: clinically actionable test results that helped them improve their health.

The following facts about Plaintiffs' testing experiences appeared below in Mr. Balwani's brief. Dkt. 290 8:5-12:21. Plaintiffs never contested these facts[3]:

**A.R.** A.R. had a venous draw in June 2015 at Theranos's only California location, a Palo Alto Walgreens. No doctor told A.R. his Theranos results were unreliable, and his later test results have been consistent with his Theranos results, showing high glucose and cholesterol and low vitamin D. A.R. takes Vitamin D supplements first prescribed after his Theranos test—though now at a different dosage. The Theranos tests prompted a positive change in A.R.'s health care.

---

[3] Plaintiffs' expert never reviewed Plaintiffs' results and has no idea whether they received accurate results, how the results fit into their medical histories, or whether Theranos technology was involved. Dkt. 293, Ex. 8 75:12-22, 78:5-14, 79:16-25.

5

**B.P.**  B.P. initially had fingerstick tests at Theranos; by 2015, B.P. had both fingerstick and venous draws; and by 2016, B.P. had venous draws.  B.P.'s physician never said his Theranos results were inaccurate, they were consistent with prior results from a Theranos competitor.  B.P.'s medical circumstances corroborate Theranos's tests: he was previously diagnosed with diabetes and high cholesterol, which the Theranos tests corroborated.  His records also show his physician prescribed medication for diabetes and cholesterol in 2012, years before he began testing at Theranos.  Based on B.P.'s Theranos testing, his physician increased his diabetes medication, and he remains on that dose.  Although Theranos blood testing results initiated positive changes in B.P.'s health care, B.P. received a full refund for Theranos blood tests from the Attorney General.

**B.B.**  B.B. was tested at Theranos in October 2014 in Gilbert, Arizona. B.B.'s medical provider said her Theranos test results were "in about the same range as [her] prior tests," and B.B. made no "medical decisions that were different from what [she] otherwise would have made" after her Theranos tests.  B.B. received a venous draw, not a fingerstick, and she was refunded for her Theranos tests by the Arizona Attorney General.

**D.L.**  D.L. had venous draws in June and December 2015 in Arizona.  She alleged she received a false diagnosis for Sjogren's Syndrome based on Theranos tests—but five later tests with a Theranos competitors showed Theranos got it right, and D.L.'s 2019 medical chart shows her provider *confirming* that D.L. has Sjogren's Syndrome.  After receiving her Theranos results, D.L. changed her diet, which made her "feel[] much better."  Theranos processed her first test in its

6

Arizona and California labs, but several assays from D.L.'s second Theranos test—including the test for Sjogren's—were processed by ARUP, not Theranos. Although D.L.'s Theranos results first disclosed her Sjogren's syndrome and prompted a beneficial lifestyle change, D.L. received a check from the Arizona Attorney General fully refunding her Theranos tests.

*R.G.*  R.G. in September 2015 had a panel of tests for sexually transmitted diseases.  R.G. claims the only "incorrect" results he received from Theranos were his "HIV results," but that test was *not* run on "Theranos technology": he had a venous sample drawn, which was run on a conventional device.  Unfortunately, R.G.'s conventional HIV level-one screening test result was erroneously released to his Theranos mobile application, and it showed the screening test was positive. R.G. later accessed the full Theranos report on Theranos's website, which showed his level-two confirmatory HIV tests results were *negative*.  A Theranos physician then called R.G. to say his level-two confirmatory results were *positive*.  Twelve minutes later, the physician called back to say he had reported the wrong results and, in fact, R.G.'s level-two results were *negative*, i.e., he did *not* have HIV.  R.G. had a follow up HIV test elsewhere—covered by insurance.

Plaintiffs do not allege Theranos had *any* problems with HIV tests, which it performed on conventional FDA-cleared devices.  Because of R.G.'s individual experience with one physician's quickly corrected confusion, R.G. was refunded *twice*: he received a $121.63 check from Theranos because its physician made an error, and an identical check from the Arizona Attorney General.

7

**S.J.**  S.J. claims she was tested twice, in July and November 2015.  S.J. has never been told her Theranos results were inaccurate.  During her first test, S.J. received a "fingerstick draw" for a diabetes-related test.  Theranos ran S.J.'s test on an FDA-cleared device, not on Theranos technology.  S.J. testified that on a second Theranos visit she received a "fingerstick and urine test."  But no documents corroborate the claim of a second visit, which would be contested at trial.  After the second alleged test, S.J.'s medical provider briefly put her on diabetes medication—which she was off within weeks.  Even though she questions her Theranos results, they were consistent with results from Theranos's competitors.

**S.L.**  S.L. had venous (not fingerstick) blood drawn in February and October 2015 in Arizona.  S.L. has never been told his Theranos results were inaccurate.  Theranos processed S.L.'s February tests in California, and his October tests at the Arizona lab on conventional FDA-cleared machines—although Theranos had S.L.'s second diabetes-related test processed at ARUP.  S.L.'s Theranos results were consistent with later lab results.

## IV.   QUESTIONS SOUGHT TO BE APPEALED

1.     Whether the district court erred in certifying Plaintiffs' proposed classes under Rule 23(b)(3) based on an analysis of predominance that looked *solely* at Plaintiffs theory of the case without considering the impact of individual issues associated with Mr. Balwani's theory of the case?

2.     Whether the district court erred in finding superiority under Rule 23(b)(3) as to Arizona class members suing Mr. Balwani given that (a) Arizona class members were fully refunded for their Theranos tests and (b) punitive and

exemplary damages serve no purpose as to Mr. Balwani, since federal criminal proceedings will vindicate society's interest, if any, in punishment and deterrence?

## V.    ARGUMENT

In exercising its discretion to allow an appeal under Fed. R. Civ. P. 23(f), this Court considers, among other things, whether "the certification decision presents an unsettled and fundamental issue of law relating to class actions, important both to the specific litigation and generally, that is likely to evade end-of-the-case review" or "is manifestly erroneous." *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 959 (9th Cir. 2005). Here, the Order is manifestly erroneous because it ignored Mr. Balwani's defenses in assessing how trial would unfold, in contravention of binding precedent on predominance. Further, state and federal proceedings involving Theranos and Mr. Balwani provide a superior way to adjudicate compensation, punishment, and deterrence—the only matters that could be settled by trial here. The district court manifestly erred when it found a class action would be a superior way to proceed.

### A.    The Order Manifestly Erred in Assessing Predominance.

For a damages claim under Rule 23(b)(3), common issues must predominate at trial. "If the main issues in a case require the separate adjudication of each class member's individual claim or defense, a Rule 23(b)(3) action would be inappropriate." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001), *amended by* 273 F.3d 1266 (9th Cir. 2001) (quotation omitted).

Because of individual issues as to causation, damages, and loss that are central to Mr. Balwani's defense theory, a fact-finder at trial could determine

4835-5733-1127v.3 0103509-000007

Plaintiffs' (and class members') claims only by considering facts unique to each individual. For example, a properly instructed jury *could find* that A.R., D.L., and S.L. *improved* their health through medication or dietary changes after receiving Theranos results, that no evidence suggests those results were inaccurate or unreliable, and that they therefore got what they paid for. Similarly, a jury *could find* based on B.B. and B.P.'s testimony that their Theranos results were consistent with results from other testing services, that they never believed the results were unreliable, and that, in any event, they received full refunds. And while R.G. may argue that he suffered personal anxiety based on the erroneous report of a positive HIV test, a jury could find on an individual basis that he suffered no compensable harm, given the brevity of the confusion and his double-refund.

The district court acknowledged Mr. Balwani's argument but dismissed it out of hand simply because it was incompatible with *Plaintiffs'* theory of the case. Order 12. This was manifest error. The district court had the duty to consider *both* parties' claims and defenses, assess how *both* parties would try their case, and determine whether individual issues would predominate *at trial*, not just during Plaintiffs' case in chief. By considering *only* Plaintiffs' framing of the issues, the district abdicated its responsibility. This Court should accept review, reverse, and remand for consideration of Mr. Balwani's theory of the case.

### 1. Individual Proof Could Lead to Verdicts in Mr. Balwani's Favor as to Large Swaths of the Class.

In the district court, Mr. Balwani explained, claim by claim, how individual proof would be necessary to decide each class member's damages claim, in light of

10

the defenses he will mount at trial. Rather than engage this argument, Plaintiffs relied on a simplistic assertion that they would win because "[e]vidence and expert testimony at trial will show that but for Defendants' concealment of material facts, no reasonable consumer would have purchased the Defendants' tests." Dkt. 318 21:10-12. Plaintiffs argued that even if they received accurate test results (whether from Theranos technology or conventional technology), relied and took action that improved their health as a result, and spent no money for more testing, they are entitled to recover. "Every Class member was injured," Plaintiffs say, "when they unwittingly paid for the unreliable results of Defendants' scientific experiments, instead of obtaining clinically acceptable test results." *Id.* 1:12-14.

But Mr. Balwani has a more nuanced (and realistic) theory. A review of the elements of the claims certified in the Order shows that a properly instructed jury could find in Defendants' favor based on each Plaintiff's and class member's *individual evidence*—a point Plaintiffs (and the district court) did not contest. Given that, Defendants have the right to present that individual evidence as to every class member—a point Plaintiffs (and the district court) *also* did not contest—and that individual evidence would be the focus at trial.

On the RICO claim, Plaintiffs must show a fraudulent scheme using the mails and wires, *and* "that the fraudulent scheme proximately caused Plaintiffs' injuries." *Martinelli v. Petland, Inc*., 274 F.R.D. 658, 660-61 (D. Ariz. 2011). Plaintiffs' testimony shows that, even if they could prove a fraudulent scheme (which they cannot), they may have no injury: a jury could find they received actionable results from their blood tests, which led to beneficial actions such as

11

new prescriptions or changes in diet. Framed in terms of Mr. Balwani's case theory, the RICO claim presents individual issues as to "whether class members were in fact injured by the alleged fraudulent scheme" and those "[i]ndividual issues would overwhelm any trial." *Id.* at 666.

Similarly, Plaintiffs' state statutory fraud claims require showing they did not get what they bargained for. "Plaintiffs must allege … economic injury, e.g., that they 'lost money or property' as a result of relying on … omissions." *Backhaut v. Apple, Inc.*, 74 F. Supp. 3d 1033, 1048 (N.D. Cal. 2014). Courts do not certify California UCL and FAL classes if "where individualized inquiries would be necessary … to determine appropriate restitution." *Campion v. Old Republic Prot. Co.*, 272 F.R.D. 517, 533 n.4, 537 (S.D. Cal. 2011). Likewise, "before a private party may [assert] a claim under the [Arizona Consumer Fraud Act], he must have been damaged by the prohibited practice. A prerequisite to such damages is reliance on the unlawful acts." *Peery v. Hansen*, 585 P.2d 574, 577 (Ariz. Ct. App. 1978).

Thus, a properly instructed jury could find *individual* Plaintiffs (and class members) suffered no harm as a result of any supposedly fraudulent conduct—a major theme of Mr. Balwani's trial defense.[4] That should have disposed of class certification. *See Zinser*, 253 F.3d at 1189

---

[4] Plaintiffs' punitive damages demand is merely a request for relief ancillary to other claims. *See* Dkt. 303 36:19-21. Because the right to recover on those claims must be decided individually, so too must any right to punitive damages.

12

## 2. The District Court Committed Manifest Error in Failing to Consider the Impact of Defenses on the Predominance of Common Issues at Trial.

The district court did not deny a jury could find in Mr. Balwani's favor based on the individual testimony of Theranos customers, including the reliability of their individual test results and the actions they took as a result. Instead, the district court brushed aside these individual issues merely because it deemed them incompatible with *Plaintiffs'* theory of their case:

> Defendants contend that plaintiffs who got accurate reports or who had tests performed by Theranos on standard equipment or by third parties suffered no injury. Those arguments are inapposite, *for they ignore the plaintiffs' unifying theory that had they been informed as to the situation at Theranos, they would not have submitted to any blood testing by Walgreens or Theranos.* Plaintiffs' claims focus on the reliability of Walgreens' and Theranos' blood testing program, not the accuracy of individual reports. Plaintiffs allege that they and the putative class members have all been subject to a course of conduct (blood testing) which did not afford them reliable results.

Order 12 (emphasis added).[5] But a trial would consist not only of "plaintiffs' unifying theory"; if that were all that mattered, classes would *always* be certified. Like any trial, it will *also* include Defendants' properly raised defenses—including the defense theory that *individual* class members have no right to recover because they personally received reliable, clinically actionable results at a competitive price. Mr. Balwani did not ask the district court to decide "whether [plaintiffs'] theory is right or wrong," Order 17 (alteration in original, quotation omitted); he

---

[5] Although this paragraph appears in the Order's discussion of typicality, it mirrors the Order's predominance reasoning. *Compare* Order 12 *with id*. 17-18.

asked only that the district court take into account *his* trial theory, as well as Plaintiffs', and assess its effect on predominance.

The law required the district court to do so. A central function of the class certification inquiry is to ascertain "the nature of the issues that actually will be presented at trial," Adv. Comm. note to 2003 Amendment to Rule 23(c), without regard to which party introduces the issues at trial. The assessment of trial issues requires the court to "determine the nature of the claims *and defenses* and how they will be presented at trial, whether there are common issues that can be tried on a class-wide basis, and whether those common issues predominate and class treatment is a superior method of resolving them." Manual for Complex Litigation (4th ed. 2004) § 21.21 (emphasis added).

The Supreme Court's class certification decisions make defenses central to the class certification inquiry. In *Dukes*, the Supreme Court held that "a class cannot be certified on the premise that [a defendant] will not be entitled to litigate its statutory defenses to individual claims." 564 U.S. at 367. Rule 23 cannot be used to limit defense theories a defendant could assert in an individual action, a requirement flowing from the Rules Enabling Act, which forbids interpreting Rule 23 to "abridge, enlarge or modify any substantive right"—such as the right to litigate a claim effectively. *Id.* (quoting 28 U.S.C. § 2072(b); citing *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 845 (1999)). And *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), reemphasized that defenses get equal attention. In *Comcast*, plaintiffs proffered a damages model, which Comcast attacked. As here, the district court rejected Comcast's argument, finding it had "no place in the class

14

certification inquiry." The Supreme Court rebuffed that approach, criticizing the refusal "to entertain arguments against respondents' damages model that bore on the propriety of class certification[.]" *Id.*, 569 U.S. at 32-35.

Consistent with Supreme Court guidance (and the Rules Enabling Act), this Court has made clear that district courts *must* assess the impact of a defendant's theory of a case in deciding whether to certify. For example:

- In *Zinser*, plaintiffs had a unifying theory that defects in pacemaker leads made them unreliable because "deformation of the 'J' wire [in the lead] decreases its resistance to fatigue," which may "caus[e] injury to patients if the wire protrudes through the insulation." *Zinser*, 253 F.3d at 1192. But defendants' theory of the case was different: they argued difficulties in "establish[ing] a common cause of injury because many factors may contribute to 'J' wire deformation, including manufacturing and shipping history and handling of the lead by physicians or staff." *Id.* Rather than dismiss defendants' theory as incompatible with plaintiffs' theory, this Court affirmed denial of certification.

- In *Mazza v. American Honda Motor Co., Inc.*, 666 F.3d 581 (9th Cir. 2012), plaintiffs' theory was that Honda consistently omitted warnings about a high-end braking system's shortcomings. But this Court reversed certification because of individual issues raised by *defendants*' case theory: that many members of the proposed class could not recover because they were not exposed to allegedly misleading advertising or "learned of the [braking system's] allegedly omitted limitations before they purchased or leased the CMBS system." *Id.* at 596.

15

- In *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir. 2011), this Court reversed a certification order that failed to consider the impact of individual defenses on typicality. The Court made clear that the district court needed "to consider the effect that defenses unique to the named Plaintiffs' claims have on [typicality]." *Id.* at 974 (citation omitted).

- In *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061 (9th Cir. 2014), plaintiffs' theory was that Home Depot always charged customers for "damage waivers" on rented tools, even though the waiver was optional. But Home Depot's defense theory was that some contracts alerted customers to the waiver's optional nature, raising individual issues not susceptible to class treatment. Holding that "class certification of UCL claims is available only to those class members who were actually exposed to the business practices at issue," the Court found the contract variations made individual issues predominate. *Id.* at 1068-69.

The district court manifestly erred when it declined to consider how the parties would try the case in light of Mr. Balwani's right to present concrete proof showing that thousands of individual class members (indeed, *most* class members) received clinically actionable test results at a fair price, no matter what Plaintiffs may try to prove about the reliability of Theranos testing *in the abstract*. Plaintiffs' testimony showed the viability of this defense theory, as a jury could reject *each* named Plaintiff's claims based on individual testimony. Further, a jury could find most of the class was not "exposed to the business practices at issue," *Berger*, 741 F.3d at 1068, because they had venous draws analyzed on

16

conventional machines or had samples sent to ARUP—the reliability of which has *never* been questioned.

It makes no difference that Plaintiffs would prefer the jury to "focus on the reliability of Walgreens' and Theranos' blood testing program" in broad strokes rather than on "the accuracy of individual reports." Order 12. Each party is entitled to its theory of the case, and it would violate the Rules Enabling Act to deprive Mr. Balwani of his ability to present his theory to the jury. *Dukes*, 564 U.S. at 367. This Court recently reversed a class certification order, recognizing that the "rigorous analysis" required by Rule 23 means the Court "should not uncritically accept the plaintiff's preferred inferences." *Mays v. Wal-Mart Stores, Inc.*, -- Fed. Appx. --, 2020 WL 1277642, *1 (9th Cir. 2020). Because the district court did so here, this Court should grant the petition.

### B. The Order Manifestly Erred in Finding Superiority for the Arizona Claims.

Rule 23(b)(3) requires the district court to "find that a class action is superior to other methods of adjudication." *Valentino v. Carter-Wallace*, 97 F.3d 1227, 1234 (9th Cir. 1996). The purpose is to "assur[e] judicial economy and reduc[e] the possibility of multiple lawsuits." *Zinser*, 253 F.3d at 1191 (quotation omitted). Rule 23(b)(3) thus requires courts to consider the "the extent and nature of any litigation concerning the controversy already begun by or against class members."

The Arizona Attorney General sued Theranos on behalf of Arizona-based Theranos consumers—where 40 of the 41 Walgreens testing centers were located—and Theranos settled by refunding *all* Arizona consumers for their tests.

17

Dkt. 293, Ex. 20. A class action to facilitate *further* litigation on claims of Arizona class members would not be superior.

This Court applied this principle in *Kamm v. California City Development Co.*, 509 F.2d 205 (9th Cir. 1975), where plaintiffs sued on behalf of a proposed class, accusing real estate promoters of fraud. *Id*. at 206–07. The district court "assumed that the alleged class satisfied all of the prerequisites" of Rule 23, but held a class action not superior because California's Attorney General filed suit "with respect to the same controversy and relief had been obtained." *Id*. at 207. Although the Attorney General action would *not* protect "all members of the class" or "recover an amount ... even close to that sought in the class action," *id*. at 211, this Court held "[a] class action would require a substantial expenditure of judicial time which would largely duplicate and possibly to some extent negate the work" done by the Attorney General," *id*. at 212. "[T]he class action was not a superior method of resolving the controversy." [6] *Id*.; *see Imber-Gluck v. Google Inc.*, 2015 WL 1522076 (N.D. Cal. 2015) (denying certification in light of FTC settlement); *In re PPA Prods. Liab. Litig*., 214 F.R.D. 614, 622 (W.D. Wash. 2003) (no superiority because of product refund program).

The district court acknowledged the Attorney General's litigation "required [Theranos] to reimburse potential Arizona class members for the cost of blood

---

[6] Allowing class actions after a government resolution discourages efficient government enforcement, "since the accused may not wish to settle with the state only to have the state settlement operate as a floor on liability or otherwise be used against it." *Thornton v. State Farm Mut. Auto Ins. Co.*, 2006 U.S. Dist. LEXIS 83972, *7-*13 (N.D. Ohio 2006) (citing cases).

18

tests." Order 19. Ignoring *Kamm*'s holding that superiority is lacking *even if* the recovery in a government action was not "even close to that sought in the class action," 509 F.2d at 211, the district court found a duplicative class action could proceed for Arizona class members because the Attorney General's litigation did not "comprehend the full scope of damages that might be available" to the class. Order 19. The Court referred to the possibility of treble damages under RICO or punitive damages for Arizona statutory fraud claims.[7] *Id.*

The district court erred when it justified class certification as a vehicle to allow Plaintiffs to pursue punitive and exemplary damages, in addition to the full monetary compensation already achieved by the Attorney General. "[P]unitive damages advance the interests of punishment and deterrence, which are also among the interests advanced by the criminal law." *Browning-Ferris Inds. v. Kelco Disposal, Inc*., 492 U. S. 257, 275 (1989); *see also* Restatement (Second) of Torts § 908 (1977), comment *a,* at 464 (purpose of punitive damages "the same" as "that of a fine imposed after a conviction of a crime"). These interests in punishment and deterrence reflect "society's goals," not the interests of individual (or class) litigants. *Boyle v. Lorimar Prods., Inc.*, 13 F.3d 1357, 1360 (9th Cir. 1994) (punitive awards must "not exceed an amount necessary 'to accomplish society's goals of punishment and deterrence.'") (quoting *Pacific Mutual Life Ins. Co. v. Haslip*, 499 U.S. 1, 21 (1991)).

---

[7] The Order also referred to punitive damages on the medical battery claim—but that claim is not asserted against Mr. Balwani.

Arizona Plaintiffs and class members already received full compensation through the Attorney General's action. And "society's goals of punishment and deterrence" as to Mr. Balwani will be addressed—if necessary—in the criminal proceedings against Mr. Balwani, *United States v. Holmes & Balwani*, No. 18-cr-00258-EJD-SVK, Dkt. 39 (N.D. Cal. 2018) (Superseding Indictment). The Arizona class cannot claim this action is a "superior" way to proceed against Mr. Balwani, given that they have been fully compensated, and society's interest in punishment and deterrence will be vindicated elsewhere.

## VI.    CONCLUSION

Mr. Balwani respectfully asks the Court to grant his petition for immediate appeal and reverse the Order.

RESPECTFULLY SUBMITTED this 20th day of March 2020.

> Davis Wright Tremaine LLP
> Attorneys for Ramesh ("Sunny") Balwani
>
>
> By */s/ Stephen M. Rummage*
>      Stephen M. Rummage
>      Fred B. Burnside
>      Davis Wright Tremaine LLP
>      920 Fifth Avenue, Suite 3300
>      Seattle, Washington  98104-1610
>      Tel: (206) 622-3150
>      Fax: (206) 757-7700

20

## CERTIFICATE OF COMPLIANCE

The foregoing Petition for Permission to Appeal contains less than 5,200 words, excluding the items exempted by Fed. R. App. P. 32(f). The petition's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6). I certify that this petition complies with FRAP 5(c)(1).

DATED this 20th day of March 2020.

DAVIS WRIGHT TREMAINE LLP
Attorneys for Ramesh ("Sunny") Balwani


By *s/ Stephen M. Rummage*
     Stephen M. Rummage

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 15. Certificate of Service for Electronic Filing

**9th Cir. Case Number(s)** _____

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**
[ **X** ] I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**
[  ] I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

<br><br><br><br><br>

**Description of Document(s)** *(required for all documents)***:**

**PETITION FOR PERMISSION TO APPEAL <u>FILED UNDER SEAL</u>**

<br><br>

**Signature** s/Stephen M. Rummage _____    **Date** __March 20, 2020__

22

4835-5733-1127v.3 0103509-000007

**Exhibit A**

**\*\* SEALED \*\***

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| In re | ) | No. 2:16-cv-2138-HRH |
| | ) | (Consolidated with |
| Arizona THERANOS, INC., Litigation | ) | No. 2:16-cv-2775-HRH |
| | ) | – and – |
| | ) | No. 2:16-cv-3599-HRH) |

### O R D E R

### Motion for Class Certification

Plaintiffs move pursuant to Rule 23(a) and (b)(3) for class certification.[1] The motion is opposed by defendants Walgreens Boots Alliance, Inc., and Walgreen Arizona Drug Company,[2] Elizabeth Holmes,[3] and Ramesh Balwani.[4] Defendant Theranos, Inc. has been dissolved with an assignment for the benefit of creditors who are not active participants in this litigation.

Oral argument was requested on the motion for class certification. On January 23, 2020, the court heard oral argument, and a transcript of those proceedings has been available to the court and parties.[5]

---

[1]Docket No. 303.

[2]Docket No. 322.

[3]Docket No. 288.

[4]Docket No. 290.

[5]Docket No. 368.

SEALED Order – Motion for Class Certification                                    - 1 -

Plaintiffs are:

A.R. (a resident and citizen of San Jose, California), B.P. (a resident and citizen of Chandler, Arizona), B.B. (a resident and citizen of Phoenix, Arizona), D.L. (a resident and citizen of Maricopa, Arizona), R.G. (a resident and citizen of Gilbert, Arizona), S.J. (a resident and citizen of Mesa, Arizona), and S.L. (a resident and citizen of Chandler, Arizona). Plaintiffs are individuals who purchased Theranos blood testing services at Walgreens stores between November 2013 and June 2016.

Defendants are:

Theranos, Inc. Theranos, Inc., was a Palo Alto, California, corporation which operated laboratories in Newark, California, and Scottsdale, Arizona. In September 2018, Theranos, Inc. was dissolved and "its assets have been assigned to Theranos, LLC, for the benefit of Theranos, Inc.[] creditors."[6]

Walgreens Boots Alliance, Inc. This Deerfield, Illinois corporation operates the Walgreens retail pharmacy chain in the United States.

Walgreen Arizona Drug Company. This Arizona corporation, a wholly-owned subsidiary of Walgreens Boots Alliance, Inc., operates Walgreens retail stores in Arizona. In this order, these two Walgreens companies are referred to collectively as "Walgreens."

Elizabeth Holmes (a resident and citizen of California). Holmes was the founder of Theranos and at relevant times was Theranos' chief executive officer.

Ramesh ("Sunny") Balwani (a resident and citizen of California). Balwani was the president and chief operating officer of Theranos.

---

[6]Order re Motion to Withdraw at 1, Docket No. 232.

SEALED Order – Motion for Class Certification                                    - 2 -

## Background

Plaintiffs' claims in this case arise out a blood testing program which was developed by Theranos and marketed to consumers by Walgreens and Theranos in Walgreens' retail stores. Plaintiffs assert fourteen causes of action in their second amended complaint but they are only seeking class certification as to six of their claims. At oral argument, counsel for plaintiffs confirmed that class certification is not sought for plaintiffs' second, fourth, fifth, sixth, seventh, eighth, twelfth, or thirteenth causes of action. Plaintiffs do seek class certification concerning their first cause of action for violation of the Arizona Consumer Fraud Act,[7] their third cause of action for battery, their ninth cause of action for racketeering in violation of 18 U.S.C. § 1962(c), their tenth cause of action for violation of California's Unfair Competition Law, their eleventh cause of action for violation of California's False Advertising Law, and their fourteenth cause of action for medical battery.[8]

Plaintiffs seek compensatory or general damages, punitive or exemplary damages, and treble damages where authorized by law or statute. However, at oral argument, counsel for plaintiffs also represented that plaintiffs have agreed not to pursue any damages for emotional distress, retesting or medical care.[9]

Plaintiffs' claims as to which certification is sought are based on the general theory that the Theranos blood testing services were not market-ready, but were still in

---

[7]The court assumes that plaintiffs' CFA claim is limited to an omission-based claim as plaintiffs state in a footnote that they are not seeking certification of their CFA claim "arising out of Defendants' affirmative misrepresentations." Plaintiffs' Memorandum in Support of Motion for Class Certification at 20, n.62, Docket No. 303.

[8]Tr. of Oral Argument at 6, Docket No. 368.

[9]Plaintiffs do intend to seek "dignity" harm, presumed damages in connection with the battery claims. Tr. of Oral Argument at 6-8, Docket No. 368.

SEALED Order – Motion for Class Certification                    - 3 -

development[10] and thus not capable of producing reliable results. Plaintiffs support this theory with the testimony of their expert, Dr. Geoffrey Baird. Dr. Baird has opined that "Theranos testing was not able to serve a diagnostic purpose when Theranos and Walgreens took blood from Walgreens customers."[11] Plaintiffs' claims against Walgreens are, to a large degree, based on their contention that, given what Walgreens knew, or should have known, it was reckless for Walgreens to market Theranos blood testing in its stores. Dr. Baird further opined that "no reasonably knowledgeable participant in the diagnostic testing industry would have believed Theranos's testing to be capable of providing clinically useful and/or diagnostic test results at any time."[12] Because plaintiffs contend that Walgreens knew, or should have known, that the Theranos testing was not reliable, they contend that Walgreens and Theranos were acting in concert.

Although slow in developing, plaintiffs' legal theory is that "the Class Members' unity of interest arises from the fact that all of their blood tests lacked the reliability needed for the

---

[10]In March 2018, the SEC charged Theranos, Holmes, and Balwani "with massive fraud." Exhibit 25, Declaration of Kara McCall, Docket No. 295. The SEC claimed

> that Theranos, Holmes, and Balwani made numerous false and misleading statements in investor presentations, product demonstrations, and media articles by which they deceived investors into believing that its key product -- a portable blood analyzer -- could conduct comprehensive blood tests from finger drops of blood, revolutionizing the blood testing industry.

Id. But, "in truth, according to the SEC complaint, Theranos' proprietary analyzer could complete only a small number of tests, and the company conducted the vast majority of patient tests on modified and industry-standard commercial analyzers manufactured by others." Id. The SEC settled with Holmes and Theranos but continues to litigate its claims against Balwani. Id. In June 2018, Holmes and Balwani were indicted on multiple counts of wire fraud. These charges remain pending.

[11]Expert Report of Geoffrey S. Baird, M.D., Ph.D. [etc.] at 19, Docket No. 262-1.

[12]Id. at 34.

(36 of 56)

Case 5:18-cv-06259-EJD Document 344-1 Filed 07/10/20 Page 36 of 56
Case 2:16-cv-02188-HRH Document 369 Filed 03/06/20 Page 5 of 25

clinical diagnostic purposes for which those tests . . . were intended." [13]  Plaintiffs' claims

for which they seek certification are founded upon the foregoing contention, not the question

of whether the test results received by individual plaintiffs were or were not accurate.

Plaintiffs seek to certify a Class and three Subclasses.  The proposed Class consists

of "[a]ll purchasers of Theranos testing services, including consumers who paid out-of-

pocket, through health insurance, or through any other collateral source"[14] pursuing a RICO

claim against all defendants.  The proposed Edison Subclass consists of "[a]ll purchasers of

Theranos testing services who were subjected to 'tiny' blood draws"[15] pursuing battery and

medical battery claims against Walgreens and Theranos.  The proposed Arizona Subclass

consists of "[a]ll purchasers of Theranos testing services in Arizona"[16] pursuing an omission-

based Arizona Consumer Fraud Act (CFA) claim against all defendants.   The proposed

California Subclass consists of "[a]ll purchasers of Theranos testing services in California"[17]

pursuing California Unfair Competition and False Advertising claims against all defendants.

## Discussion

"A representative plaintiff may sue on behalf of a class when the plaintiff affirma-

tively demonstrates the proposed class meets the four threshold requirements of Federal Rule

of Civil Procedure 23(a):  numerosity, commonality, typicality, and adequacy of representa-

---

[13]Plaintiffs' Reply in Support of Motion for Class Certification at 3, Docket No. 344.

[14]Plaintiffs' Memorandum in Support of Motion for Class Certification at 20, Docket No. 303.

[15]Id.

[16]Id.

[17]Plaintiffs' Memorandum in Support of Motion for Class Certification at 20, n.62, Docket No. 303.

SEALED Order – Motion for Class Certification                                           - 5 -

tion." Sali v. Corona Regional Med. Ctr., 909 F.3d 996, 1002 (9th Cir. 2018). Rule 23(a)

provides:

> (a) Prerequisites. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

"Additionally, a plaintiff seeking certification under Rule 23(b)(3)," which plaintiffs

do here, "must demonstrate that 'questions of law or fact common to class members

predominate over any questions affecting only individual members, and that a class action

is superior to other available methods for fairly and efficiently adjudicating the contro-

versy.'" Sali, 909 F.3d at 1002 (quoting In re Hyundai and Kia Fuel Econ. Litig., 881 F.3d

679, 690-91 (9th Cir. 2018)). Rule 23(b)(3) provides that if the prerequisites of Rule 23(a)

are satisfied, then "[a] class action may be maintained" if:

> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

If the prerequisites are satisfied and if the findings pursuant to Rule 23(b)(3) are made, then the court may enter a certification order defining the class or classes and appointing class counsel. Such an order "must define the class and the class claims, issues, or defenses, and must appoint class counsel under Rule 23(g)." Fed. R. Civ. P. 23(c)(1)(B).

Although "[t]he Ninth Circuit has not articulated the applicable standard of proof for the Rule 23 requirements, . . . at least four circuits have adopted a preponderance of the evidence standard," and "[t]his standard appears to be the trend in federal courts[.]" Smilovits v. First Solar, Inc., 295 F.R.D. 423, 427 (D. Ariz. 2013) (internal citations omitted). This standard "merely requires that [plaintiffs] demonstrate that it is more likely than not that a particular requirement of Rule 23[] has been satisfied." Id. (citation omitted).

Based upon the record before the court through and including oral argument, the court makes the following findings.

I.  Rule 23(a) Prerequisites

A.  Numerosity

"A proposed class satisfies the numerosity requirement if class members are so numerous that joinder would be impractical." Knapper v. Cox Communications, Inc., 329 F.R.D. 238, 241 (D. Ariz. 2019). "While no absolute limit exists, numerosity is met when general knowledge and common sense indicate that joinder would be impracticable." Id. "Generally, forty or more members will satisfy the numerosity requirement." Id.

The court finds that the numerosity requirement has been met as to the proposed Class. There is no dispute that thousands of individuals purchased Theranos blood testing services.

The Arizona Attorney General has identified 175,000 Arizona consumers[18] who purchased Theranos blood tests. Numerosity is established for purposes of the proposed Arizona Subclass.

As regards the California purchasers of Theranos tests, plaintiffs have represented that there are "thousands" of California purchasers.[19] Plaintiffs have offered but have not provided the court with spreadsheets from Theranos which, plaintiffs contend, would assure the court that the numerosity prerequisite was met for purposes of the California Subclass. Defendants have not contended that there are not thousands of California class members. The court finds it to be more probable than not that the numerosity prerequisite is met for purposes of the proposed California Subclass.

As for the Edison Subclass, plaintiffs argue, and the defendants have not suggested otherwise, that the Edison Subclass has thousands of members because in 2014 and 2015, 60% of patient visits included tiny blood draws. Plaintiffs have represented that there are Theranos data bases from which the number of Edison or tiny blood draw patients can be

---

[18]Exhibit 24, McCall Declaration, Docket No. 295. These individuals were identified as a result of litigation brought by the Arizona Attorney General against Theranos. In April 2017, Theranos and the Arizona Attorney General entered into a Consent Decree, the terms of which required Theranos to pay restitution in the amount of $4,652,000 to Arizona consumers who had purchased Theranos blood testing services. "The Settlement [was] designed to provide a full refund to all eligible consumers." Exhibit 23, McCall Declaration, Docket No. 295.

[19]Plaintiffs' Memorandum in Support of Motion for Class Certification at 20, Docket No. 303.

determined and have offered some evidence to support this representation.[20] The court finds it more probable than not that the numerosity prerequisite is met for purposes of the proposed Edison Subclass.

### B. Commonality

"Commonality requires the plaintiff to show that the class members' claims 'depend upon a common contention . . . of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" Sandoval v. County of Sonoma, 912 F.3d 509, 518 (9th Cir. 2018) (quoting Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011)). "'What matters to class certification . . . is not the raising of common questions – even in droves – but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.'" Parsons v. Ryan, 754 F.3d 657, 675 (9th Cir. 2014) (quoting Dukes, 564 U.S. at 350). "Plaintiffs need not show, however, that 'every question in the case, or even a preponderance of questions, is capable of class wide resolution. So long as there is even a single common question, a would-be class can satisfy the commonality requirement of Rule 23(a)(2).'" Id. (quoting Wang v. Chinese Daily News, Inc., 737 F.3d 538, 544 (9th Cir. 2013)). "Thus, '[w]here the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class, commonality exists.'" Id. (quoting Evon v. Law Offices of Sidney Mickell, 688 F.3d 1015, 1029 (9th Cir. 2012)). However, "'[c]ommonality requires the plaintiff to demonstrate the class members have suffered the same injury.'" Evon, 688 F.3d at 1029 (quoting Dukes, 564 U.S. at 350).

---

[20]Tr. of Videotaped Deposition of Sekhar Variam at 74:2-8, Exhibit 52, Amended Sobol Declaration, Docket No. 263.

As finally structured by plaintiffs in their motion for class certification and oral argument, plaintiffs present a substantially narrowed theory of their case, the merits of which are not before the court at this time. Plaintiffs are not basing their several fraud claims upon contentions that plaintiffs' test results were inaccurate. Founded primarily upon the opinions of Dr. Geoffrey Baird, the underlying theory of all six claims as to which class certification is sought is that no one would have submitted to blood testing by Walgreens/Theranos had they known that Theranos' blood testing services were (as plaintiffs contend) a massive fraud.

As now structured, resolution of plaintiffs' claims will depend not upon individual experiences, but rather upon defendants' alleged deception as to the efficacy of the mini-lab program. Plaintiffs' theory of their claims presents a core of factual and legal issues: was the Theranos blood testing program market-ready? If not, would anyone deem Theranos/Walgreens' blood test results reliable? The focus is on defendants' conduct, not plaintiffs' experiences. Resolution of the plaintiffs' contention that defendants' test results were all unreliable is central to the validity of all of plaintiffs' claims as to which certification is sought.[21]

The court finds that the commonality prong of Rule 23(a) has been established by a preponderance of the evidence.

C.   Typicality

"'[R]epresentative claims are typical if they are reasonably coextensive with those of absent class members; they need not be substantially identical.'" Parsons, 754 F.3d at 685

---

[21]As for the proposed Edison subclass, the alleged deception about the reliability of the blood testing done by Theranos and Walgreens arguably vitiated plaintiffs' consent for testing.

SEALED Order – Motion for Class Certification                                      - 10 -

(quoting Hanlon v. Chrysler Corp., 150 F.3d 1011, 1020 (9th Cir. 1998)). "The test of typicality is 'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" Id. (quoting Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992)). "Thus, '[t]ypicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought.'" Id. (quoting Hanon, 976 F.2d at 508). "The requirement of typicality is not primarily concerned with whether each person in a proposed class suffers the same type of damages; rather, it is sufficient for typicality if the plaintiff endured a course of conduct directed against the class." Just Film, Inc. v. Buono, 847 F.3d 1108, 1118 (9th Cir. 2017). But, the typicality requirement is not met "'where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation.'" Hanon, 976 F.2d at 508 (quoting Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d 176, 180 (2d Cir. 1990)).

As discussed above, plaintiffs have settled on a single theory of the claims as to which they seek class certification. Supported by the testimony of Dr. Baird,[22] plaintiffs contend that they were all subject to the same course of conduct by Walgreens and Theranos: the alleged deception as to the reliability of blood testing by Theranos and Walgreens. Plaintiffs argue that they would not have submitted to blood testing by Walgreens and Theranos had they known that Theranos' blood testing scheme was fraudulent.

---

[22]By order of January 13, 2020, the court denied Walgreens' motion to exclude the testimony of Dr. Baird for purposes of plaintiffs' class certification motion. Docket No. 357. It is Dr. Baird's opinion that: "[w]ith the information available to Walgreens, no reasonably knowledgeable participant in the diagnostic testing industry would have believed Theranos's testing to be capable of providing clinically useful and/or diagnostic test results at any time." Baird Expert Report at 34, Docket No. 262-1.

Defendants' arguments focus upon questions of the accuracy of Theranos' blood testing. Defendants contend that plaintiffs who got accurate reports or who had tests performed by Theranos on standard equipment or by third parties suffered no injury. Those arguments are inapposite, for they ignore the plaintiffs' unifying theory that had they been informed as to the situation at Theranos, they would not have submitted to any blood testing by Walgreens or Theranos. Plaintiffs' claims focus on the reliability of Walgreens' and Theranos' blood testing program, not the accuracy of individual reports. Plaintiffs allege that they and the putative class members have all been subject to a course of conduct (blood testing) which did not afford them reliable results.

The court finds that the typicality prerequisite for class certification has been established.

D.   Adequacy

The "adequacy requirement . . . 'serves to uncover conflicts of interest between named parties and the class they seek to represent' as well as the 'competency and conflicts of class counsel.'" In re Hyundai and Kia Fuel Economy Litig., 926 F.3d at 566 (quoting Amchem Products, Inc. v. Windsor, 521 U.S. 591, 625, 626 n.20 (1997)). "To determine legal adequacy," the court "resolve[s] two questions: '(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" Id. (quoting Hanlon, 150 F.3d at 1020).

No defendant has questioned the competency of plaintiffs' counsel, nor has there been demonstrated any conflict of interest between counsel and the class. Counsel for plaintiffs have and will continue to vigorously prosecute this case if class certification is granted.

Questions have arisen as to potential conflicts of interest between named parties and the putative class members. Prior to oral argument, the court was sufficiently concerned about plaintiffs' decision not to "pursue damages resulting from harm to their health, emotional damages, or the cost of subsequent necessary medical treatment"[23] that the matter was called to the attention of the parties shortly before oral argument.[24] The court observed that plaintiffs' approach to emotional distress (etc.) damages "appears to split plaintiffs' various claims with named plaintiffs[,] reserving emotional distress, etc., for themselves and not pursuing these claims for the class."[25] The parties' briefing and oral argument has addressed this concern.

Counsel for plaintiffs represents that all of the plaintiffs have committed to not pursuing emotional distress, etc., damages if class certification is granted.[26] The court accepts counsel's representation and finds that there is no conflict between named plaintiffs and the putative class members.

However, the foregoing does not fully resolve the adequacy question. Walgreens contends that the named plaintiffs and counsel are abandoning individual claims of putative class members to pursue individual claims on their own under circumstances which will, if class certification is granted, create a res judicata problem. Walgreens argues that "[p]laintiffs' sacrifice of possible valuable claims of the putative class members renders their

---

[23]Plaintiffs' Memorandum in Support of Motion for Class Certification at 26, n.67, Docket No. 303.

[24]Order from Chambers (Jan. 14, 2020) at 2, Docket No. 359.

[25]Id.

[26]Tr. of Oral Argument at 6, Docket No. 368. This waiver includes claims for damages for retesting or medical follow-up.

SEALED Order – Motion for Class Certification                                    - 13 -

representation inadequate."[27]  But, "[t]he fact that counsel have not tried to press claims . . . which they believe (and justifiably so) are unsuitable for class treatment does not make them inadequate." Sullivan v. Chase Inv. Services of Boston, Inc., 79 F.R.D. 246, 258 (D.C. Cal. 1978).

Surely some putative class members have incurred costs for retesting or medical follow-up, and some no doubt have experienced emotional distress as a consequence of dealings with Walgreens and Theranos.  We cannot know the possible value of potential emotional distress claims; but if and to the extent that putative class members have such claims, they would, if a Rule 23(b)(3) class is certified, be afforded an opportunity to "opt out" should they wish to pursue individual claims rather than participate in a class action. Claims for retesting or medical follow-up would surely be so small as to be inactionable as a practical matter.

Counsel's decision not to press claims for emotional distress, etc. damages was prudent because those claims would be unsuitable for class treatment.  With confirmation that named plaintiffs do not intend to seek emotional distress damages or out-of-pocket costs for retesting or medical treatment, there is no conflict between named plaintiffs and the putative class.

The court finds that the adequacy prerequisite is established.

II.      Rule 23(b)(3) Requirements

Having met the Rule 23(a) prerequisites, plaintiffs must show that they also meet the Rule 23(b)(3) requirements.  Rule 23(b)(3) requires that "the plaintiff . . . establish 'that the questions of law or fact common to class members predominate over any questions affecting

---

[27]Walgreens' Opposition to Plaintiffs' Motion for Class Certification at 32, Docket No. 322.

only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'" Just Film, 847 F.3d at 1115 (quoting Fed. R. Civ. P. 23(b)(3)).

### A. Predominance

"'The predominance inquiry focuses on the relationship between the common and individual issues and tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" Senne v. Kansas City Royals Baseball Corp., 934 F.3d 918, 927 (9th Cir. 2019) (quoting Vinole v. Countrywide Home Loans, Inc., 571 F.3d 935, 944 (9th Cir. 2009)). "In determining whether the predominance requirement is met, courts have a 'duty to take a close look at whether common questions predominate over individual ones' to ensure that individual questions do not 'overwhelm questions common to the class.'" Id. (quoting Comcast Corp. v. Behrend, 569 U.S. 27, 34 (2013)). "If the main issues in a case require the separate adjudication of each class member's individual claim or defense, a Rule 23(b)(3) action would be inappropriate[.]" Zinser v. Accufix Research Institute, Inc., 253 F.3d 1180, 1189 (9th Cir. 2001) (citation omitted). "[T]he predominance criterion is far more demanding" than the typicality and commonality requirements of Rule 23(a). Amchem Products, 521 U.S. at 624.

Plaintiffs argue that all of the claims for which they seek certification are well-suited to class-wide adjudication through common proof and will not depend on the individual circumstances of the putative Class members. Defendants disagree.

Plaintiffs seek class certification as to their RICO claim, three statutory claims, and two battery claims. The RICO and statutory fraud/false advertising claims are all founded upon fraud; and these claims, as well as the two battery claims, are all founded upon the fact question of whether or not Theranos' blood testing program was market-ready. Plaintiffs

SEALED Order – Motion for Class Certification                                    - 15 -

claim that the program was not market-ready due to problems with the technology, facilities, equipment, and personnel and that defendants misled all of their customers as to the reliability of the blood testing program. The focus of plaintiffs' case will be common proof as to the efficacy of the Theranos/Walgreens blood testing program. The accuracy of individual tests is not relevant to plaintiffs' theory that no one could rely upon blood testing done by Theranos and Walgreens.

Plaintiffs have structured their claims (and in particular the RICO and battery claims) in a fashion which will more probably than not minimize, if not completely eliminate, individual issues or claims. For example, plaintiffs' RICO and statutory claims will seek compensatory damages limited to the cost of tests performed by Theranos and Walgreens, and, where available as a matter of law, punitive or exemplary damages and multiple damages, all of which can be determined on a class basis.[28] Plaintiffs (both named and putative class members) will not seek damages for emotional distress, additional testing, or follow-up medical care which are likely to vary widely as to each individual. Such damages are not suitable for class action.

Plaintiffs also seek battery damages on a class-wide basis and contend that no individualized showing of harm is necessary. This too is an appropriate election in support of a class action. "The traditional rule for battery cases is that general damages or presumed damages of a substantial amount can be recovered merely upon showing that the tort was committed at all." Johnson v. Pankratz, 2 P.3d 1266, 1269 (Ariz. Ct. App. 2000) (citation

---

[28]The cost of individual blood testing will of course vary; but that information is readily available from defendants' records. The fact that some Arizona plaintiffs have been reimbursed for the cost of their testing as a result of litigation commenced by the Attorney General of the State of Arizona will give rise to potential offsets if plaintiffs prevail. The latter will be a matter for claims administration.

SEALED Order – Motion for Class Certification                           - 16 -

omitted).  Plaintiffs are seeking "dignity damages," measured by an "ordinary person" standard and not each individual's experience.  Id.  Thus, no individualized inquiry as to damages will be required.  See, e.g., Mays v. Wal-Mart Stores, Inc., 330 F.R.D. 562, 581 (C.D. Cal. 2019) (because statutory claim challenging inaccuracy of wage statements relied on "reasonable person" standard, "[the p]laintiff can demonstrate injury for the alleged violation . . . on a class-wide basis").  As to plaintiffs' battery claims, it is plaintiffs' contention that their consent to treatment was voided because of their mistaken belief, based upon Theranos/Walgreens' misrepresentations concerning the blood testing program. Plaintiffs' battery claims, like the other four claims for which they seek certification, are founded upon the same, common issue of the reliability of the Theranos/Walgreens' blood testing program.

Walgreens' arguments in opposition to class certification are, by and large, founded upon the contention that some of the plaintiffs and putative class members received accurate test results, and that not all blood testing was done at a Theranos lab or done by the Edison device.  These arguments are flawed because plaintiffs' claims are based upon the contention that they have been damaged because of unreliable tests.  Plaintiffs aptly point out that reliability is not the same thing as accuracy.  Plaintiffs' theory of liability is not based upon allegations that the blood tests were not accurate.

At this juncture, "[t]he crucial point is [not] whether [plaintiffs'] theory is right or wrong," but whether "it is something that can be decided on a class-wide basis."  In re Optical Disk Drive Antitrust Litig., Case No. 3:10-md-2143 RS, 2016 WL 467444, at *11 (N.D. Cal. Feb. 8, 2016).  The court finds that common proof, and therefore common issues of fact, predominate as to plaintiffs' RICO claim, the statutory claims, and the battery claims.

B.      Superiority

"In determining superiority, courts must consider the four factors of Rule 23(b)(3)."

Zinser, 253 F.3d at 1190. These factors are:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). "A consideration of these factors requires the court to focus on the efficiency and economy elements of the class action so that cases allowed under subdivision (b)(3) are those that can be adjudicated most profitably on a representative basis." Zinser, 253 F.3d at 1190 (citation omitted).

1. Rule 23(b)(3)(A)

"The first factor is the interest of each member in 'individually controlling the prosecution or defense of separate actions.'" Id. (quoting Fed. R. Civ. P. 23(b)(3)(A)). "Where damages suffered by each putative class member are not large, this factor weighs in favor of certifying a class action." Id.

Litigation costs in this case have been and will continue to be substantial. Given the limitations on compensatory damages to which the plaintiffs have agreed (claims for emotional distress, follow-up blood tests, and/or further medical evaluation are not being pursued), what is left are individual plaintiffs' claims for the cost of blood testing by Walgreens and Theranos, an amount that is relatively small. For example, plaintiff D.L. paid

SEALED Order – Motion for Class Certification                    - 18 -

$166.24 for Theranos blood testing.[29] Other plaintiffs could have paid much less, given that the average reimbursement check as a result of the Consent Decree obtained by the Arizona Attorney General was $60.92.[30] As a consequence, there is a substantial disparity between litigation costs and what plaintiffs hope to recover. It is unlikely that individual claims would ever be pursued.

This factor weighs in favor of finding that a class action would be superior.

### 2. Rule 23(b)(3)(B)

"The second factor is 'the extent and nature of any litigation concerning the controversy already commenced by or against members of the class.'" Zinser, 253 F.3d at 1191 (quoting Fed. R. Civ. P. 23(b)(3)(B)). "This factor counsels against certification if, despite the class action, a multiplicity of suits will continue through judicial proceedings." Protectmarriage.Com v. Bowen, 262 F.R.D. 504, 509 (E.D. Cal. 2009).

The court has not been made aware of any individual litigation between a potential class member and any of the defendants. However, the Attorney General of the State of Arizona did commence litigation against Theranos, in which Theranos was required to reimburse potential Arizona class members for the cost of blood tests. That litigation did not comprehend the full scope of damages that might be available if plaintiffs' motion for class certification is granted. Treble damages are potentially available if a RICO claim is established, and punitive damages are potentially available if a battery/medical battery claim

---

[29]Exhibit 23, McCall Declaration, Docket No. 295.

[30]Dec. 14, 2017 Press Release, available at http://azag.gov/press-release/76000-arizonans-receive-46-million-Theranos-refund-checks (last visited 3/3/2020).

and/or an Arizona statutory fraud claim is established.[31]  In addition, the Attorney General's action did not provide any relief to any plaintiff for battery or medical battery suffered by members of the putative Edison Subclass.  Likewise, Walgreens, Holmes, and Balwani were not involved in the Arizona Attorney General's enforcement action.

Because it is entirely clear that a multiplicity of individual suits against one or more of the defendants is highly unlikely, this factor weighs in favor of finding that a class action would be superior.

### 3.  Rule 23(b)(3)(C)

"The third factor is 'the desirability or undesirability of concentrating the litigation of the claims in the particular forum.'"  Zinser, 253 F.3d at 1191 (quoting Fed. R. Civ. P. 23(b)(3)(C)).

Plaintiffs are both Arizona and California residents and are asserting claims under both Arizona and California law.  None of the defendants resides in Arizona; however, as to the Arizona plaintiffs, Arizona was the center of Theranos' and Walgreens' initial roll-out of the blood testing program.  Theranos had a subsidiary testing program and a laboratory in Palo Alto, California.

There may be substantial evidence in other jurisdictions.  Nevertheless, the court finds it unlikely that related private litigation would be instituted anywhere else; and what plaintiffs propose in this case will in fact concentrate private, civil litigation in this court.

This factor weighs in favor of finding a class action in Arizona to be superior.

---

[31]Punitive damages are not available under California's Unfair Competition Law or False Advertising Law.  Anunziato v. Emachines, Inc., 402 F. Supp. 2d 1133, 1137 (C.D. Cal. 2005).

4.  Rule 23(b)(3)(D)

"The fourth factor is 'the difficulties likely to be encountered in the management of a class action.'"  Zinser, 253 F.3d at 1192 (quoting Fed. R. Civ. P. 23(b)(3)(D)).  "If each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually, a class action is not 'superior.'"  Id.

As finally proposed by plaintiffs in their motion for class certification and oral argument, the right to recovery by individual class members will depend upon common evidence.  To the extent that individualized proof of claims may have to be established, the court finds that evidence of the limited compensatory damage claims which class plaintiffs are asserting will be found in Walgreens' and Theranos' records.  Recourse to individual records will not be necessary.

Plaintiffs' theory of their case – that the Theranos blood testing program was not market-ready and thus not reliable – will require common proof as to Walgreens' and Theranos' operation of blood testing, not the circumstances of individual plaintiffs.  The accuracy of individual blood test reports is not at issue.  Rather, plaintiffs contend that none of them would have relied on any of the Theranos/Walgreens blood tests had they known about the myriad of problems with the Theranos blood testing program.  With the plaintiffs' class action claims thus circumscribed, and with compensatory damages excluding those for emotional distress, retesting, and medical follow-up, the development and presentation of class plaintiffs' RICO and statutory fraud claims will not present management problems – they will not present numerous or substantial separate issues.  The fact that the statutory fraud claims involve the law of two different states will not create a management problem because Arizona and California laws upon which the statutory claims are based are not substantially different.

The court is unpersuaded that the calculation of class members' damages would render class certification unmanageable in this case. Again, as the case has finally been structured by plaintiffs, class plaintiffs' compensatory damages can be established through Walgreens' and Theranos' records and will not depend upon individual proof. In the claims administration process, it will be necessary to take account of refunds received by class plaintiffs as a consequence of the Arizona Attorney General's litigation. As for the battery/ medical battery claims of plaintiffs, individualized presentations will not be necessary, for plaintiffs, as discussed above, are seeking general damages. If plaintiffs prevail and recover general damages for battery or if they prevail and recover treble or punitive damages, the individual allocation of such recoveries is a matter for claims administration and will not render a trial unmanageable. The fact that some separate calculations will be necessary does not defeat certification. <u>Yokoyama v. Midland Nat'l Life Ins. Co.</u>, 594 F.3d 1087, 1094 (9th Cir. 2010).

With the plaintiffs' claims as to which certification is sought reduced to the RICO, the Arizona and California statutory fraud, and the battery medical battery claims, the court finds that this fourth factor – manageability of the case – is established.

All four superiority factors weigh in favor of finding a class action superior as to the six claims for which plaintiffs seek certification. Thus, the court finds that plaintiffs have established by a preponderance of the evidence that a class action would be superior as to those six claims.

III. <u>Class Definitions</u>

Plaintiffs' second amended complaint proposes class and subclasses defined as follows.

> Class: All purchasers of Theranos testing services, including consumers who paid out-of-pocket, through health insurance, or through any other collateral source (collectively, "purchasers").
>
> Arizona Subclass: All purchasers of Theranos testing services in Arizona.
>
> California Subclass: All purchasers of Theranos testing services in California.
>
> Edison Subclass: All purchasers of Theranos testing services who were subjected to "tiny" blood draws.[32]

The parties disagree as to whether plaintiffs have adequately defined ascertainable classes. In the Ninth Circuit, there is no "ascertainability" requirement. Briseno v. ConAgra Foods, Inc., 844 F.3d 1121, 1124-25 n.4 (9th Cir. 2017). Rather, the "only issue" for the court to decide is whether there is "an administratively feasible way to identify class members." Id. Here, the court finds that discovery and discoverable records of Walgreens and Theranos and records of the Arizona Attorney General's reimbursement litigation are sufficiently detailed as to make it administratively feasible to identify class members.

IV.   Rule 23(g): Identification of Class Representatives; Appointment of Class Counsel.

At the conclusion of their motion for class certification, counsel move for the appointment of class representatives and class counsel. This motion is granted.

Class representatives for the Class are A.R., B.P., B.B., D.L., R.G., S.J., and S.L.

Class representatives for the Arizona Subclass are B.P., B.B., D.L., R.G., S.J. and S.L.

The class representative for the California Subclass is A.R.

Class representatives for the Edison Subclass are B.P. and S.J.

The law firms of Lieff Cabraser Heimann & Bernstein, LLP, and Keller Rohrback, LLP, seek appointment as class counsel. Defendants have not taken a position with respect

---

[32]Second Amended Consolidated Class Action Complaint at 86, Docket No. 159.

to this appointment. Based upon experience with the Keller firm in a prior case and with both firms in the several years that this case has been pending, the court is satisfied that the Lieff and the Keller firms are highly experienced class action counsel, both of which have the necessary resources and knowledge for the effective management and presentation of this case. The law firms of Lieff Cabraser Heimann & Bernstein, LLP, and Keller Rohrback, LLP, are hereby appointed as class counsel.

Conclusion

The court, having found that the prerequisites for a Rule 23(a) class action have been established, and that the Rule 23(b)(3) requirements that questions of law and fact common to class members predominate over questions affecting only individual members and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy have been established, grants plaintiffs' motion for class certification as to:

(1)    Plaintiffs' First Cause of Action (omission-based Arizona Consumer Fraud Act claim),

(2)    Plaintiffs' Third Cause of Action (battery claim),

(3)    Plaintiffs' Ninth Cause of Action (RICO claim),

(4)    Plaintiffs' Tenth Cause of Action (California Unfair Competition Law claim),

(5)    Plaintiffs' Eleventh Cause of Action (California False Advertising Law claim), and

(6)    Plaintiffs' Fourteenth Cause of Action (medical battery claim).

The certified classes are:

> Class: All purchasers of Theranos testing services, including consumers who paid out-of-pocket, through health insurance, or through any other collateral source (collectively, "purchasers")

SEALED Order – Motion for Class Certification                                    - 24 -

between November 2013 and June 2016. The Class is limited to pursuing a RICO claim against all defendants and is precluded from seeking damages for emotional distress, retesting and/or subsequent medical care.

Arizona Subclass: All purchasers of Theranos testing services in Arizona between November 2013 and June 2016. The Arizona Subclass is limited to pursuing an omission-based Arizona Consumer Fraud Act claim against all defendants and is precluded from seeking damages for emotional distress, retesting and/or subsequent medical care.

California Subclass: All purchasers of Theranos testing services in California, between September 2013 and June 2016. The California Subclass is limited to pursuing California Unfair Competition Law and False Advertising Law claims against all defendants and is precluded from seeking damages for emotional distress, retesting and/or subsequent medical care.

Edison Subclass: All purchasers of Theranos testing services who were subjected to "tiny" blood draws between September 2013 and June 2016. The Edison Subclass is limited to pursuing battery and medical battery claims against defendants Theranos and Walgreens and is precluded from seeking damages for emotional distress, retesting and/or subsequent medical care.

Class representatives are:

Class representatives for the Class are A.R., B.P., B.B., D.L., R.G., S.J., and S.L.

Class representatives for the Arizona Subclass are B.P., B.B., D.L., R.G., S.J. and S.L.

The class representative for the California Subclass is A.R.

Class representatives for the Edison Subclass are B.P. and S.J.

Class counsel are the law firms of: Lieff Cabraser Heimann & Bernstein, LLP, and

Keller Rohrback, LLP.

DATED at Anchorage, Alaska, this 5th day of March, 2020.

/s/ H. Russel Holland
United States District Judge

SEALED Order – Motion for Class Certification                    - 25 -