1   JOHN D. CLINE (CA State Bar No. 237759)
    50 California Street, Suite 1500
2   San Francisco, CA 94111
    Telephone: (415) 662-2260 │Facsimile: (415) 662-2263
3   Email: cline@johndclinelaw.com

4   KEVIN M. DOWNEY (Admitted Pro Hac Vice)
    LANCE A. WADE (Admitted Pro Hac Vice)
5   AMY MASON SAHARIA (Admitted Pro Hac Vice)
    KATHERINE TREFZ (CA State Bar No. 262770)
6   WILLIAMS & CONNOLLY LLP
    725 Twelfth Street, NW
7   Washington, DC 20005
    Telephone: (202) 434-5000 │Facsimile: (202) 434-5029
8   Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

9   Attorneys for Defendant ELIZABETH A. HOLMES

10

11                   UNITED STATES DISTRICT COURT

12                   NORTHERN DISTRICT OF CALIFORNIA

13                          SAN JOSE DIVISION

14

15   UNITED STATES OF AMERICA,          )   Case No. CR-18-00258-EJD
                                        )
16            Plaintiff,                )   **MS. HOLMES' REPLY IN SUPPORT OF**
                                        )   **MOTION TO EXCLUDE EXPERT**
16       v.                             )   **TESTIMONY OR, IN THE ALTERNATIVE,**
                                        )   **COMPEL ADEQUATE RULE 16 DISCLOSURE**
17                                      )
     ELIZABETH HOLMES and              )   Date:     July 20, 2020
18   RAMESH "SUNNY" BALWANI,           )   Time:     10:00 a.m.
                                        )   CTRM:  4, 5th Floor
19            Defendants.               )
                                        )
20                                      )
                                        )   Hon. Edward J. Davila
21                                      )
                                        )
22   _____)

23

24

25

26

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

ARGUMENT .........................................................................................................................2

    I.      The Rule 16 Standards Apply to These Witnesses. ...........................................2

          A.      Rule 16 Applies to All Expert Testimony...............................................2

          B.      The Government Must Provide More Than "Generic" Descriptions. ....5

    II.     The Government's Disclosure Remains Inadequate............................................9

          A.      The Government Failed To Provide a Summary for Its Experts'
                  Opinions and the Bases and Reasons for Those Opinions......................9

          B.      The Government's Discovery Does Not Cure Its Insufficient
                  Disclosure ..............................................................................................9

CONCLUSION.....................................................................................................................11

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO EXCLUDE EXPERT TESTIMONY
OR, IN THE ALTERNATIVE, COMPEL ADEQUATE RULE 16 DISCLOSURE
CR-18-00258 EJD

i

# **TABLE OF AUTHORITIES**

**CASES**

*Fresenius Med. Care Holdings v. Baxter Int'l, Inc.,* 2006 WL 1330002 (N.D. Cal. May 15, 2006) ......... 4

*Goodman v. Staples the Office Superstore, LLC*, 644 F.3d 817 (9th Cir. 2011) ....................................... 4

*United States v. Cerna*, 2010 WL 2347406 (N.D. Cal. June 8, 2010)............................................ 2, 7, 8, 9

*United States v. Figueroa-Lopez*, 125 F.3d 1241 (9th Cir. 1997) ..................................................... *passim*

*United States v. Valdez*, 2019 WL 539074 (N.D. Cal. Feb. 11, 2019) .................................................... 10

*Vollrath Co. v. Sammi Corp.*, 9 F.3d 1455 (9th Cir. 1993)........................................................................ 7

*Walker v. Contra Costa Cty.*, 2006 WL 3371438 (N.D. Cal. Nov. 21, 2006)........................................... 4

**RULES**

Fed. R. Crim. P. 16 ............................................................................................................................. 2, 8

Fed. R. Evid. 701 ............................................................................................................................ 3, 4, 5

Fed. R. Evid. 702 ........................................................................................................................ *passim*

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO EXCLUDE EXPERT TESTIMONY
OR, IN THE ALTERNATIVE, COMPEL ADEQUATE RULE 16 DISCLOSURE
CR-18-00258 EJD

ii

**INTRODUCTION**

Rather than engage with Ms. Holmes' arguments about the infirmities of its Rule 16 disclosure, the government argues for a lesser standard for its "fact" expert witnesses. Gov't Opp'n to Mot. To Exclude Expert Testimony ("Gov't Opp'n), ECF No.441, at 8-10. According to the government, because the at-issue witnesses are percipient witnesses and "are not primarily expert witnesses," its paltry Rule 16 disclosures are sufficient. The Court must reject this argument.

As an initial matter, the government's disclosure makes clear that these witnesses will be proffering expert opinions that go to a core issue in this case: the government's allegation, underlying the alleged patient conspiracy, that Theranos tests were "inaccurate." *Id.* at 1. These are not merely percipient witnesses. The witnesses will use their specialized medical knowledge to reach opinions about complex medical tests. Notably, the government plans to elicit testimony and opinions from these witnesses about specific Theranos tests for which the government's own retained expert was unable to draw conclusions as to accuracy and reliability. The government intends to use their opinions to do what it cannot do with its retained expert's testimony: to urge the jury to conclude that specific Theranos tests were inaccurate and unreliable. As a matter of due process, Ms. Holmes is entitled to adequate disclosure to challenge those core expert assertions, and to ensure that she can vindicate her constitutional rights when confronting these witnesses.

In any event, the Ninth Circuit has rejected the very argument the government presents here. There is no "percipient witness" or "minimal expert testimony" exception to Rule 16. For each witness who provides expert testimony, the government must provide a summary of that witness's opinion and the bases and reasons for the opinion. As the Ninth Circuit has held, "[t]he mere percipience of a witness to the facts on which he wishes to tender an opinion does not trump Rule 702." *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246 (9th Cir. 1997).

The government's opposition leaves many of Ms. Holmes' substantive points unanswered. Ms. Holmes does not know the content of some of the experts' opinions; she does not know the bases and reasons for several of the experts' opinions; and she does not have the basic information required to test

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO EXCLUDE EXPERT TESTIMONY
OR, IN THE ALTERNATIVE, COMPEL ADEQUATE RULE 16 DISCLOSURE
CR-18-00258 EJD

1

1    the reliability or credibility of these experts through "focused cross-examination" or to frame a *Daubert*

2    motion.  *Id.*; *see also United States v. Cerna*, 2010 WL 2347406, at *1 (N.D. Cal. June 8, 2010)  (the

3    summary of the "bases and reasons must be sufficient to allow counsel to frame a *Daubert* motion").

4    And the minimal discovery produced by the government does not provide this missing information.  The

5    Court should exclude these witnesses from providing expert testimony, or, in the alternative, compel

6    adequate disclosures.

7    **ARGUMENT**

8            Federal Rule of Criminal Procedure 16 requires the government to provide, for any witness who

9    may offer expert testimony, a description of the witness's opinions and the bases and reasons for the

10   opinions.  The Rule "'is intended to minimize surprise that often results from unexpected testimony,

11   reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of

12   the expert's testimony through focused cross-examination.'"  *Figueroa-Lopez*, 125 F.3d at 1246

13   (quoting Fed. R. Crim. P. 16 Advisory Committee Note).  The government fails to provide this basic

14   information for many of its witnesses.

15   **I.      The Rule 16 Standards Apply to These Witnesses.**

16           The government primarily urges this Court to apply a lower standard than articulated under Rule

17   16.  Gov't Opp'n at 8-10.  It argues that for "expert witnesses[] who will be presenting only 'generic'

18   expert testimony, and who will primarily be testifying as percipient witnesses," "all that Rule 16

19   requires" is limited expert notice.  *Id.* at 10.  The Court should reject the government's invitation to

20   create such a standard here.

21           **A.      Rule 16 Applies to All Expert Testimony.**

22           Rule 16 does not distinguish between percipient and retained expert witnesses.  The government

23   cannot skirt Rule 16 by calling these experts percipient witnesses who will provide limited expert

24   testimony.  *Id.* at 8-10.  Such a tactic is foreclosed by both the Federal Rules and Ninth Circuit

25   precedent.  The Advisory Committee Note to Federal Rule of Evidence 701 "makes clear that *any part*

26   *of a witness' testimony* that is based upon scientific, technical, or other specialized knowledge . . . is

27

28   MS. HOLMES' REPLY IN SUPPORT OF MOTION TO EXCLUDE EXPERT TESTIMONY
     OR, IN THE ALTERNATIVE, COMPEL ADEQUATE RULE 16 DISCLOSURE
     CR-18-00258 EJD

governed by the standards of Rule 702 and the corresponding disclosure requirements of the Civil and Criminal Rules." Fed. R. Evid. 701 Advisory Committee Note to 2000 Amendment (emphasis added). The Note explicitly states that "[b]y channeling testimony that is actually expert testimony to Rule 702, the amendment also ensures that a party will not *evade the expert witness disclosure requirements* set forth in Fed. R. Civ. P. 26 and Fed. R. Crim. P. 16 by *simply calling an expert witness in the guise of a layperson*." *Id.* (emphasis added). Any witness who offers testimony based on scientific, technical, or specialized knowledge is subject to Rule 702, and Rule 16's disclosure requirement is tied to Rule 702. Rule 16 applies to any witness who will offer testimony subject to Rule 702.

The Ninth Circuit has reaffirmed this point. In *Figueroa-Lopez*, the court rejected the very argument that the government makes here—*i.e.*, that lay witnesses' opinions are based on their percipient knowledge and therefore are not subject to the same requirements as expert witnesses. 125 F.3d at 1246. The government argued that the testimony of its witnesses, DEA agents, about the defendant's actions was the proper subject of lay opinion testimony because the testimony was based on the agents' direct observations of the defendant. *Id.* at 1243. As a result, the government argued, the witnesses were "percipient witnesses" not subject to the requirements of Rule 702. *Id.*

The Ninth Circuit rejected this position, observing that the "Government's argument simply blurs the distinction between Federal Rules of Evidence 701 and 702." *Id.* Rule 701 limits opinions to those "rationally based on the perception of the witness," and Rule 702, "on the other hand, governs admission of expert opinion testimony concerning '*specialized* knowledge.'" *Id.* (emphasis in original). Critically, the court explained that "the Government's argument subverts the requirements of Federal Rule of Criminal Procedure 16(a)(1)(E). . . [which] requires the Government to 'disclose to the defendant a written summary of [expert] testimony the government intends to use . . . during its case in chief.'" *Id.* That is exactly the circumstance that confronts Ms. Holmes here. The government is attempting to use the label "percipient witness" to avoid its disclosure obligations under Rule 16.

As the court explained, regardless of whether the testimony is based on the witness's perception, if the testimony requires the witness to draw on specialized knowledge, it falls under Rule 702. *Id.; see*

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO EXCLUDE EXPERT TESTIMONY
OR, IN THE ALTERNATIVE, COMPEL ADEQUATE RULE 16 DISCLOSURE
CR-18-00258 EJD

3

*also Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.,* 2006 WL 1330002, at \*3 (N.D. Cal. May 15, 2006) ("Lay opinion testimony is 'not to provide specialized explanations or interpretations that an untrained layman could not make if perceiving the same acts or events.'"(citation omitted)). Accordingly, the court held that "[t]he mere percipience of a witness to the facts on which he wishes to tender an opinion does not trump Rule 702." *Figueroa-Lopez*, 125 F.3d at 1246. "A holding to the contrary would encourage the Government to offer all kinds of specialized opinions without pausing first properly to establish the required qualifications of their witnesses." *Id.*

*Goodman v. Staples the Office Superstore, LLC*, 644 F.3d 817 (9th Cir. 2011), which the government cites for the proposition that "[t]reating physicians 'are not specially hired to provide expert testimony'" and therefore no expert report is required, Gov't Opp'n at 8, is not to the contrary. As an initial matter, *Goodman* construed the civil expert disclosure requirement of Rule 26 of the Federal Rules of Civil Procedure. 644 F.3d at 819. The government provides no authority for the proposition that criminal cases—which concern heightened constitutional protections for the defendant—should borrow standards from the rules of civil procedure when it comes to expert witnesses. But, even if the civil standards were relevant, *Goodman* does not help the government. *Goodman* does not hold that "treating physicians are exempted from expert notice" provisions in all cases. Gov't Opp'n at 8. Just the opposite: *Goodman* explicitly states that when treating physicians testifies on matters outside the treatment of their patients they must provide a report. 644 F.3d at 819-20 ("We hold today that when a treating physician morphs into a witness hired to render expert opinions that go beyond the usual scope of a treating doctor's testimony, the proponent of the testimony must comply with Rule 26(a)(2)."). When a treating physician's testimony extends beyond what he "actually observed and what treatment he provided," a disclosure is required. *Walker v. Contra Costa Cty.*, 2006 WL 3371438, at \*9 (N.D. Cal. Nov. 21, 2006). For the reasons set forth below, the government's experts' testimony goes far beyond what they observed and what treatment they provided.

Relatedly, the government argues that its experts' observations about other laboratories are not opinions at all but merely their own personal observations and therefore fall under Rule 701. Gov't

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO EXCLUDE EXPERT TESTIMONY
OR, IN THE ALTERNATIVE, COMPEL ADEQUATE RULE 16 DISCLOSURE
CR-18-00258 EJD

4

1    Opp'n at 8-9.  However, the government cannot disguise these expert opinions as lay testimony simply

2    because an expert witness is also a percipient witness.  These "observations" are unquestionably based

3    on specialized knowledge.  If the government intends to elicit testimony about the quality, types, and

4    frequency of the errors in different laboratories, specialized knowledge is needed for that opinion to be

5    admissible.  Ms. Embry, for example, opined in her FBI interview that in "approximately 20 years" any

6    errors she had with Sonora Quest and Lab Corp "were administrative errors, not clinical ones."  Gov't

7    Opp'n, Ex. 6 at 1.  That is a specialized opinion:  how did she deduce that Sonora Quest's errors were

8    merely "administrative" errors whereas Theranos' alleged errors were "clinical" ones?  What is the basis

9    for that distinction?  Because of the government's inadequate disclosure, Ms. Holmes can only guess at

10   the answer to that question.  As in *Figueroa-Lopez*, the government's argument "simply blurs the

11   distinction between Federal Rules of Evidence 701 and 702."  125 F.3d at 1246; *see also id.*  (stating

12   that "judges who have heard [specialized] testimony many times . . . must not forget that [their]

13   familiarity with it does not bring it within Rule 701, especially given the purpose of Rule 16").  The

14   government elected to disclose these observations as part of its expert disclosure.  Ms. Holmes is entitled

15   to know the bases and reasons for these opinions so she can fairly challenge them at trial.

16         **B.       The Government Must Provide More Than "Generic" Descriptions.**

17         The government similarly characterizes its experts' testimony as "generic" and, on that basis,

18   argues that Rule 16 requires only a "generic description of the likely witness and that witness's

19   qualifications."  Gov't Opp'n at 9 (citing Fed. R. Crim. P. 16, Advisory Committee Notes to 1993

20   Amendment).  According to the government, "[n]othing in these witnesses' expected testimony will

21   present novel or controversial opinions that might be the subject of a *Daubert* hearing," and therefore a

22   generic description suffices.  *Id.*  That is wishful thinking:  these witnesses are presenting substantive

23   opinions on complex medical questions, and their opinions present serious *Daubert* questions.  At the

24   very minimum, the government needs to provide basic information such as whether the witnesses'

25   opinions are based on known objective facts concerning specific patients and why those facts led them

26   to believe that the Theranos tests were inaccurate.

27

28   MS. HOLMES' REPLY IN SUPPORT OF MOTION TO EXCLUDE EXPERT TESTIMONY
     OR, IN THE ALTERNATIVE, COMPEL ADEQUATE RULE 16 DISCLOSURE
     CR-18-00258 EJD

There is nothing "generic" or routine about the testimony of these witnesses.  The following examples illustrate how the government intends to elicit opinion testimony that goes well beyond the treatment of a specific patient and is not simply "generic":

- The government plans to elicit testimony from Dr. Linnerson about "problematic hCG test results from Theranos," although it has only identified one patient who received a "problematic" result.  *See* Gov't Opp'n at 2.  It also plans to elicit testimony about "the actions he and his clinic took" in setting up "a small study" comparing his clinic's patients hCG results with other laboratories and that the results of the study "failed to restore confidence" in Theranos' tests.  *Id.* at 2-3.  If anything is subject to Rule 702 and *Daubert*, testimony about a medical "study" and the interpretation of the study results surely is.

- The government also plans to elicit testimony from Dr. Zachman about this same study and how she "worked with Dr. Linnerman [sic] and others in the clinic" to conduct the study.  *Id.* at 3.

- Dr. Szmuc worked in the same practice as Drs. Linnerson and Zachman, and the government will attempt to elicit opinions concerning the hypothetical ramifications of inaccurate tests such as ordering "surgical or pharmaceutical intervention."  *Id.* at 4.

- The government plans to elicit from Ms. Embry that Theranos tests could have hypothetically caused patient harm if she adjusted a patient's medication based on a Theranos test.  Gov't Opp'n, Ex. 6 at 3.  It also intends to ask her to opine that any unexpected Theranos results were clinical errors, but that unexpected Sonora Quest results were "administrative errors."  *Id.* at 1.  No basis for that opinion has been described.

- Dr. Page will testify that "he did not understand how Theranos could not have known they had a problem with A1Cs for months."  Gov't Opp'n at 8.  This opinion, if offered, necessarily draws on his specialized knowledge.  This testimony does not merely describe his percipient observations; it opines on what Theranos should have known based on those

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO EXCLUDE EXPERT TESTIMONY
OR, IN THE ALTERNATIVE, COMPEL ADEQUATE RULE 16 DISCLOSURE
CR-18-00258 EJD

1    observations.  And this opinion presents significant questions under *Daubert*, because it is

2    unclear that Dr. Page has a sufficient basis to offer such an opinion.

3    •   The government disclosed that Dr. Asin will opine that a Theranos test result for an HIV test

4        that was reactive for certain antibodies and not reactive for others "did not make sense." *Id.*

5        at 6-7.  This is an expert opinion that draws on his specialized knowledge.  And depending

6        on the principles he applied to reach this opinion, it could well be subject to challenge under

7        *Daubert*.  The government also disclosed that Dr. Asin will opine on a hypothetical invasive

8        procedure that a doctor may order to recheck a PSA test, though he identifies no patient for

9        whom such a procedure was performed.  *Id.* at 7.

10  Contrary to the government's argument, these disclosures indicate that the government intends to elicit

11  medical expert testimony that goes well beyond "merely . . . explaining what the values for [Theranos]

12  tests mean." *Id.* at 9.

13        The government's assertion that the witnesses' expected testimony will not present controversial

14  opinions that might be the subject for a *Daubert* hearing reflects a fundamental misunderstanding of the

15  standards articulated in *Daubert*.  What are the bases for the witnesses' opinions?  Have they relied on

16  sufficiently reliable data in forming their opinions?  What is that data?  To the extent their opinions

17  about the accuracy of Theranos tests rest on isolated patient anecdotes and not a reliable body of data or

18  evidence, their opinions will present serious reliability problems.  *See, e.g.*, *Vollrath Co. v. Sammi*

19  *Corp.*, 9 F.3d 1455, 1462 (9th Cir. 1993).  Ms. Holmes cannot even begin to provide answers for those

20  questions because of the government's failure to provide a sufficiently detailed disclosure.  *See Cerna*,

21  2010 WL 2347406, at *1 (stating that the summary of the "bases and reasons must be sufficient to allow

22  counsel to frame a *Daubert* motion").

23        The experts' opinions, moreover, go to a core issue in this case:  the accuracy and reliability of

24  Theranos tests.  Critically, the government's retained expert, Dr. Stephen Master, has offered only

25  limited opinions about Theranos tests.  In his expert report, Dr. Master fails to offer an actual opinion

26  about whether Theranos' hCG, HIV, A1C or calcium test were accurate and reliable; his report indicates

27

28  MS. HOLMES' REPLY IN SUPPORT OF MOTION TO EXCLUDE EXPERT TESTIMONY
OR, IN THE ALTERNATIVE, COMPEL ADEQUATE RULE 16 DISCLOSURE
CR-18-00258 EJD

7

that he lacks sufficient data to reach an opinion on those subjects.  *See* Declaration of Amy Mason

Saharia ("Saharia Decl."), Ex. A. at 12 (Expert Disclosure of Dr. Stephen Master) (explaining only that

he had "questions" about these tests).  The government apparently intends to use these witnesses to fill

the holes in those opinions.  In fact, the disclosed experts cover all the tests for which Dr. Master was

unable to opine: hCG (Linnerson, Zachman, Szmuc), A1C (Page), HIV (Asin), and calcium (Asin).  *See*

Gov't Opp'n at 2-8.  Their testimony is quintessential expert opinion testimony, and it goes to a core

issue in this case.  The government must be required to comply with Rule 16.

Finally, the government ignores that, even if it were permitted to provide a "generic" description

of its witnesses' opinions, it must *also* provide the bases and reasons for those opinions.  Rule 16

provides three distinct requirements for an expert summary: (1) "the witness's opinions;" (2) "the bases

and reasons for those opinions;" and (3) "the witness's qualifications."  Fed. R. Crim. P. 16(a)(1)(G).

The Advisory Committee Notes to the 1993 Amendment—on which the government relies—allow for a

"generic description" in some instances of the "summary of the expected testimony."  However, for the

"most important" requirement—the "summary of the bases of the expert's opinion"—the Notes do not

allow the government to provide a generic description:

> Without regard to whether a party would be entitled to the underlying bases
> for expert testimony under other provisions of Rule 16, the amendment
> requires a summary of the bases relied upon by the expert. That should
> cover not only written and oral reports, tests, reports, and investigations, but
> any information that might be recognized as a legitimate basis for an
> opinion under Federal Rule of Evidence 703.

Fed. R. Crim. P. 16 Advisory Committee Notes to 1993 Amendment.

*United States v. Cerna*, the case on which the government relies for its "generic" argument,

proves the point.  It states that "where a witness is so 'generic' and routine (such as a DEA laboratory

chemist) that the testimony will be largely predictable, a shorthand summary of the witness's

*qualifications and testimony* may be adequate."  2010 WL 2347406, at \*1 (emphasis added).  However,

the "summary of bases relied upon by the expert 'should cover . . . any information that might be

recognized as a legitimate basis for an opinion under Federal Rule of Evidence 703.'"  *Id.* (citing Fed. R.

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO EXCLUDE EXPERT TESTIMONY
OR, IN THE ALTERNATIVE, COMPEL ADEQUATE RULE 16 DISCLOSURE
CR-18-00258 EJD

8

Crim. P. 16 Advisory Committee Notes to 1993 Amendment).  The government cannot escape this requirement by labeling its expert witnesses' testimony as "generic."

**II.    The Government's Disclosure Remains Inadequate.**

    **A.    The Government Failed To Provide a Summary for Its Experts' Opinions and the Bases and Reasons for Those Opinions.**

For the reasons set forth in Ms. Holmes' motion, the government's disclosure is, and remains, inadequate.  *See* Def.'s Mot. To Exclude Expert Testimony ("Def.'s Mot."), ECF No. 435.  *First*, for two witnesses, Dr. Page and Dr. Asin, it does not provide an opinion at all— it just states that the witnesses will testify about certain tests.  *Id.* at 3-4.  *Second*, the government failed to provide the bases and reasons for many of the opinions that it does identify.  *Id.* at 3-7.  And, for the reasons set forth above, these opinions go far beyond percipient testimony of a treating physician.

Rule 16 demands more.  The government has not provided and is required to provide the following:

    1. An explicit opinion for each Theranos test referenced in each witness's summary;

    2. The specific patients and test results on which the witnesses are basing their opinions (or it should clarify that there are no specific patients);

    3. The bases of and reasons for their conclusions that such test results were inaccurate or unreliable; and

    4. The bases of and reasons for their opinions regarding the accuracy of other laboratories' tests.

This should not be a difficult task.  If the government is going to proffer these witnesses to offer opinions about a central allegation—that Theranos tests were inaccurate and unreliable—as its opposition and disclosure indicate it will, the Constitution and Rule 16 entitle Ms. Holmes to this bare minimum of information.

    **B.    The Government's Discovery Does Not Cure Its Insufficient Disclosure.**

The government tries to paper over the obvious gaps in its disclosure by pointing generally to discovery in this case.  *See* Gov't Opp'n at 9.  Although discovery may provide context for the summary of the witnesses' testimony, "the production of additional documents cannot satisfy a rule that requires a

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO EXCLUDE EXPERT TESTIMONY OR, IN THE ALTERNATIVE, COMPEL ADEQUATE RULE 16 DISCLOSURE
CR-18-00258 EJD

9

"summary" that "describe[s] . . . the *bases and reasons* for [the expert witness's] opinions." *United States v. Valdez*, 2019 WL 539074, at *3 (N.D. Cal. Feb. 11, 2019) (emphasis added).  The government has not shown, and cannot show, that the discovery discloses the bases and reasons for the doctors' opinions, for several reasons:

1. The government's one-paragraph defense of its disclosures says nothing about providing the bases and reasons for its witnesses' opinions.  The government refuses to confront this requirement and for that reason alone its arguments must fail.

2. The government seizes on its assertion that it has "provided all the relevant discovery in its custody and control relating to doctor witnesses, as well as their patients."  Gov't Opp'n at 9.  But this discovery is extremely limited.  Across the seven experts, the collective interview memoranda name *four* total patients.  A number of these experts did not name a single patient who formed the basis for their opinions.  The government has produced a grand total of *two* interview memoranda for patients of these experts.  And, in many cases, the government collected *no* or extremely limited documents from these experts.  This limited amount of disclosure does not help Ms. Holmes figure out the basis and reasons for these experts' opinions.

3. With respect to the two experts for which the government did not even disclose an opinion for certain tests (Dr. Page and Dr. Asin), the government points to its discovery production, including its FBI 302 interview memoranda.  But Dr. Page's and Dr. Asin's disclosures do not fix this problem.  Dr. Page's 302 says nothing about what his opinion will be for complete blood count (CBC) tests. *Id.* at 7-8.  For Dr. Asin, the government states that Dr. Asin "recalled" that Theranos diabetic tests did not "seem as accurate, and protein and calcium tests that seemed incorrect as well," but that barebones assertion come nowhere close to complying with Rule 16. *Id.* at 7.  It says nothing about why or how he reached that opinion.

4. The government complains that it does not have the ability to search for patients in Theranos' database. *Id.* at 7 n.1.[1]  But the government's inability to substantiate its experts' "opinions"

---

[1] It bases this assertion on a statement made in a civil case about a civil litigant's attempt to access the database.  The government, which has highly sophisticated data recovery abilities, says nothing about its

1  with data does not allow it to circumvent Rule 16 (or the *Daubert* standards for that matter).  The

2  government argues that it has to "piece together" test results from records patients may have kept or

3  from records within doctors' offices.  *Id.*  But, as just set forth, it has not consistently done so.  If it had

4  done so, it presumably would have identified actual patients in its disclosures.  Equally importantly, if

5  that is so, the same holds true for Ms. Holmes.  Ms. Holmes cannot "piece together" the bases for these

6  experts' opinions without a complete and accurate disclosure, and the government should not be

7  permitted to substitute vague opinions for the investigative work it needs to do to prove its case.  Ms.

8  Holmes needs to know which records and patients form the bases for these experts' opinions, to avoid

9  unfair surprise at trial and to enable her to serve Rule 17 subpoenas to access relevant evidence.

10       The government's opposition and discovery resolve none of these problems.  The Court should

11  exclude the testimony of the government's experts.  In the alternative, the Court should order the

12  government to provide an adequate disclosure.

13                                    **CONCLUSION**

14       For these reasons, this Court should grant Ms. Holmes' motion.

15

16  DATED:  July 13, 2020                    Respectfully submitted,

17                                    /s/ Amy Mason Saharia
                                     KEVIN DOWNEY
18                                    LANCE WADE
                                     AMY MASON SAHARIA
19                                    KATHERINE TREFZ
                                     Attorneys for Elizabeth Holmes
20

21

22

23

24

25

26  _____

27  own attempts, if any, to access the patient database.

    MS. HOLMES' REPLY IN SUPPORT OF MOTION TO EXCLUDE EXPERT TESTIMONY
28  OR, IN THE ALTERNATIVE, COMPEL ADEQUATE RULE 16 DISCLOSURE
    CR-18-00258 EJD

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on July 13, 2020 a copy of this filing was delivered via ECF on all counsel of record.

<u>/s/ Amy Mason Saharia</u>
AMY MASON SAHARIA
Attorney for Elizabeth Holmes

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO EXCLUDE EXPERT TESTIMONY
OR, IN THE ALTERNATIVE, COMPEL ADEQUATE RULE 16 DISCLOSURE
CR-18-00258 EJD

1   JOHN D. CLINE (CA State Bar No. 237759)
    50 California Street, Suite 1500
2   San Francisco, CA 94111
    Telephone: (415) 662-2260 │Facsimile: (415) 662-2263
3   Email: cline@johndclinelaw.com

4   KEVIN M. DOWNEY (Admitted Pro Hac Vice)
    LANCE A. WADE (Admitted Pro Hac Vice)
5   AMY MASON SAHARIA (Admitted Pro Hac Vice)
    KATHERINE TREFZ (CA State Bar No. 262770)
6   WILLIAMS & CONNOLLY LLP
    725 Twelfth Street, NW
7   Washington, DC 20005
    Telephone: (202) 434-5000 │Facsimile: (202) 434-5029
8   Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

9   Attorneys for Defendant ELIZABETH A. HOLMES

10

11                    UNITED STATES DISTRICT COURT

12                  NORTHERN DISTRICT OF CALIFORNIA

13                          SAN JOSE DIVISION

14

15   UNITED STATES OF AMERICA,          )   Case No. CR-18-00258-EJD
                                         )
16            Plaintiff,                 )   **DECLARATION OF AMY MASON SAHARIA**
                                         )   **IN SUPPORT OF REPLY**
17      v.                               )
                                         )
18   ELIZABETH HOLMES and                )   Hon. Edward J. Davila
     RAMESH "SUNNY" BALWANI,             )
19                                       )
              Defendants.                )
20                                       )
                                         )
21   _____  )

22

23        I, AMY MASON SAHARIA, declare as follows:

24        1.      I represent Defendant Elizabeth Holmes and have been admitted to practice *pro hac vice*

25   in the above-captioned matter.  I submit this declaration in support of Ms. Holmes' Reply in Support of

26   Ms. Holmes' Motion To Exclude Expert Testimony Pursuant to Rule 16.  I attest to the following facts

27   upon which the motion relies.

28        2.      Attached to the Reply is one exhibit.

1          a.     Exhibit H is a true and correct copy of the expert report of Dr. Stephen Master,

2   the government's retained expert.  The two appendices to the report, Dr. Master's Curriculum Vitae and

3   list of documents provided by the government, have been omitted.

4        I declare under penalty of perjury under the laws of the United States that the foregoing is true

5   and correct to the best of my knowledge.

6

7        Executed this 13th day of July, 2020 in Southampton, NY.

8

9

10                          AMY MASON SAHARIA
                            Attorney for Elizabeth Holmes

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit H

*United States v. Elizabeth Holmes & Ramesh Balwani*, CR 18-258 EJD (N.D. Cal.),
Expert Report of Stephen Master, MD, PhD, FCAP, FAACC

March 6, 2020

I. Qualifications

I received my undergraduate degree in molecular biology from Princeton University and

my MD and PhD (cell and molecular biology) from the University of Pennsylvania School of

Medicine.  I then did a residency in Clinical Pathology at the Hospital of the University of

Pennsylvania, including time serving as Chief Resident in Clinical Pathology.  After completing

my residency, I spent a postdoctoral year as a research associate at Penn prior to joining the

faculty as Assistant Professor of Pathology and Laboratory Medicine.  During my time at Penn, I

was appointed Medical Director of the Endocrinology Laboratory at the Hospital of the

University of Pennsylvania, and I also spent 5 years as director of the University of Pennsylvania

translational core laboratory.  In 2015 I moved to Cornell as a faculty member at Weill Cornell

Medical Center in New York City, where I was director of the Central Laboratory and Chief of

Clinical Chemistry Laboratory Services at Weill Cornell Medicine / New York Presbyterian

Hospital.  In 2018 I returned to Philadelphia at the Children's Hospital of Philadelphia, where I

currently serve as Chief of the Division of Laboratory Medicine, Medical Director of the Michael

Palmieri Laboratory for Metabolic and Advanced Diagnostics, and Associate Professor of

Pathology and Laboratory Medicine at the Perelman School of Medicine, University of

Pennsylvania.

I am Board Certified by the American Board of Pathology (ABP) in Clinical Pathology, and I have additional subspecialty Board Certification from ABP in Clinical Informatics.  I hold an active medical license in Pennsylvania.  I am a Fellow of the College of American Pathologists as well as of the Academy of the American Association for Clinical Chemistry.  I serve on the Board of Editors of the journal *Clinical Chemistry*, as well being an Associate Editor of *Clinical Proteomics* and Section Editor in Clinical Chemistry for the *Archives of Pathology and Laboratory Medicine*.  I have been active professionally in the American Association for Clinical Chemistry, having served on their Board of Directors for five years.  I serve as a member of the Harmonization Oversight Group of the International Council for the Harmonization of Clinical Laboratory Results.  I currently have over 75 publications, including original research articles, reviews, and book chapters.  In addition, I have lectured extensively at a national and international level on a variety of subjects related to Clinical Chemistry, including new paradigms for quality control.  Of note, I was a member of the panel that facilitated questions and answers following the Theranos presentation at the 2016 annual meeting of the American Association for Clinical Chemistry.

My CV is attached as Appendix A.


II.  Scope of Assignment

I have been retained by the United States Attorney's Office for the Northern District of California to testify as an expert witness in this matter.  For purposes of this report, I was asked to provide opinions on whether Theranos was market ready and able to produce accurate and reliable fingerstick results for tests such as Vitamin D, chloride, potassium, bicarbonate, HIV,

HbA1c, hCG, cholesterol, and sodium, whether Theranos adhered to normal industry standards

for clinical laboratory testing from 2013-2015, and whether any lack of adherence had the

potential to adversely impact test accuracy and reliability.  This report is intended to summarize

my opinions and my anticipated testimony.  I reserve the right to supplement or revise this

report or to address additional questions if asked and based on additional information received

and the evidence presented at trial.  My compensation is $400 per hour.  This report and the

opinions contained herein are based on my training in clinical pathology and chemistry, my

experience as a laboratory medical director, and my knowledge of standards and best practices

as established by federal regulations and by the College of American Pathologists ("CAP").  I

also considered publicly available information, scholarly research, and materials produced in

discovery in this case, which are identified in Appendix B.


III.  Background on Blood Testing

*Blood Testing: Samples*

Modern blood testing in the clinical laboratory begins with collection of a patient

sample.  Traditionally, this is performed using a needle that punctures a vein in the arm, and

this process is called venipuncture.  The blood that is collected from the vein in this way is

called venous blood.  A second way of collecting blood involves using a sharp lancet to puncture

the end of a finger or (in the case of a newborn) the heel of a foot.  The blood that is collected

from these sources is known as capillary blood, because it comes from the very small blood

vessels known as capillaries.  In certain hospital settings, blood is collected from an artery

("arterial blood").  As oxygen-filled blood travels through arteries, then into capillaries, and

finally into veins for its return trip to the heart, tissues along the way can take up or secrete substances.  As a result, there can be differences between arterial, capillary, and venous blood.

It is also worth noting that both arterial and venous blood samples are obtained using a needle inserted into a large enough blood vessel that there is very little concern about inadvertently collecting a significant amount of unwanted material.  In the case of capillary blood, however, the fingerstick can, under some circumstances, break apart cells and/or release fluid that does not come directly from the blood vessel (capillary) itself.  This may have more of an effect on some analytes than on others.  For example, blood glucose testing from a fingerstick is widely accepted except in certain situations where a patient is not adequately delivering blood to their fingertips.  Conversely, because the inside of a cell contains more potassium than the outside of a cell, breaking apart many cells could theoretically increase the amount of potassium in a sample (note that the same is true for any blood sample—arterial, venous, or capillary—if the red blood cells are broken apart; this is known as "hemolysis").

Under normal circumstances, blood is removed from the body begins to clot.  Given this issue, there are three primary ways that blood is handled for medical testing.  The first method involves testing the blood before it has a chance to clot, and this whole-blood method is the basis of some portable ("point-of-care") test devices such as glucose meters.  In the second method, blood is drawn into a tube where it is allowed to clot, and then this collection tube is spun in a device known as a centrifuge.  This spinning causes the clot itself to move to the bottom of the tube, and the remaining fluid, known as "serum", can be used for testing.  In the third method, the tube into which the blood is drawn contains what is known as an anticoagulant, which prevents clotting from taking place.  There are several widely-used

anticoagulants, including heparin, EDTA, and citrate.  When anticoagulated blood is spun in a centrifuge, the blood cells move to the bottom of the tube, and the remaining fluid is known as "plasma".  Of note, different tests that are performed on may have different requirements in terms of the type of anticoagulant that is acceptable.

Once an appropriate sample has been obtained, blood can be tested in a variety of ways.  A test for a given substance in the blood (or characteristic of the blood) is known as an "assay", and the substance being measured is known as the "analyte".  So, for example, an assay for Vitamin D is a laboratory test where Vitamin D (the analyte) is measured in a sample. The instrument that performs the testing is considered a medical device, because it is used to diagnose a disease or other condition, and other components of blood testing, such as the tubes into which blood is drawn, are also considered medical devices.  There are a variety of ways that testing is actually performed, such as monitoring a chemical reaction that produces a detectable change in light absorption, measuring the binding of an antibody to an analyte, or making copies of DNA or RNA such that a specific sequence can be detected.  Most clinical laboratories utilize commercial instruments that accept a blood tube or smaller container, acquire up a small amount for testing, and return a result.

When the results of a blood test are reported, any quantitative result must include the "reference range" for that assay.  This represents the expected normal range for the assay, and is determined by measuring results from a large group of healthy individuals.  Upper and lower values of the normal range are set so that 95% of normal individuals fall in that range. Clinicians can use the reference range to determine if there is likely to be a significant abnormality in a patient's lab result.

*Blood Testing: Assay Performance*

There are two basic concepts that characterize the performance of a laboratory test: accuracy and precision.  Accuracy refers to how close the result comes to the "true" amount of the analyte in a blood sample.  That is, if a gold-standard reference assay measures that a patient has 30 ng/mL of Vitamin D in their plasma, then we would expect that an accurate laboratory assay should also return a result that is close to 30 ng/mL.  If the typical result from a given assay returns 28 ng/mL, we say that this assay is exhibiting "bias".  A certain amount of bias is a normal and expected feature of laboratory tests; however, the degree of bias that is allowed depends on a number of issues, including the clinical implications for the patient.

Precision refers to the degree to which a laboratory test gives the same result when it measures an identical sample many times.  As with accuracy/bias, all laboratory tests have a certain amount of inherent imprecision.  To use one analogy from outside the laboratory, when a patient has their temperature measured, we understand that there is some variability.  One time it read 98.6˚F, and if it is remeasured immediately it might be 98.7, 98.5, or some other value that is close to the "true" temperature.  This does not mean that the patient's temperature is actually changing; it simply may reflect slight variations in measurement.  Similarly, laboratory tests will differ from measurement to measurement, simply due to random chance.  The amount that a test can change from run to run when measuring the same sample over and over can be expressed as the "percent coefficient of variation" (%CV).  If a test has a 5% CV, then most of the time (68% of the time) the measured value will be between 5% of the expected value.  For example, if the expected value of the test is 100, then most of the time the

measured value will be between 95 and 105 (this is equivalent to saying that it will be within 1 SD at this expected value).  Less frequently (27% of the time) it may be further away than 95-105, but still between 90 and 110.  However, 95% of the time it will be between 90 and 110. Because the imprecision of the test influences its interpretation, it is important that this variation be carefully controlled and understood.  Typically, for a quantitative analyte in the clinical lab, the maximum imprecision at which a value would be reported is 20%CV, and it is much more common to have imprecision that is significantly less than 10%.

Accuracy and precision are linked, because the most important question is whether a lab test can accurately guide patient care.  The concept of total allowable error (TEa) captures this by asking how close to the "true" value a lab measurement can be while still being appropriate for clinical use.  The total error in a measurement is a combination of the bias and imprecision.  Even an assay with no bias can be unacceptable if the imprecision is too high. Similarly, an assay that is perfectly precise, but which has excessive bias, will give an answer that is medically misleading.  To fit within the TEa, the more bias an assay has, the more precise it has to be; the more imprecise it is, the less bias it can tolerate.  If an assay is shown in practice to have excessive bias or imprecision, it is not suitable for clinical use.

Another fundamental factor that affects lab performance is the presence of interferences, including hemolysis (a breaking apart of the red blood cells that releases hemoglobin), icterus (interference from a substance known as bilirubin), and lipemia (excessive fat in the blood).  Because these interferences can significantly affect the laboratory value, it is important the degree to which each assay is affected, as well as to develop a mechanism to detect the presence of these interferences in a patient sample.

7

*Blood Testing: Regulation*

In the US, clinical testing is regulated by the Clinical Laboratory Improvements Amendments (CLIA), which specifies the legal requirements for engaging in medical testing and is broadly administered under the Center for Medicare and Medicaid Services (CMS).  Labs that wish to do testing must acquire a CLIA certificate, and the type of CLIA certificate they obtain determines the type of testing that they are allowed to perform.  Laboratories that engage in medium- or high-complexity testing must not only obtain the appropriate type of certificate, but are also subjected to regular inspections by the state / CMS or by a team sent from an approved accrediting agency.

The US Food and Drug Administration (FDA) classifies the degree of complexity (for example, medium- or high-complexity) associated with laboratory tests that they have approved or cleared.  These classifications not only determine which laboratories can run the tests, but also specify the personnel requirements to run or oversee the tests.  Tests become FDA-approved or cleared through a formal approval process that involves submission of specific types of data demonstrating important characteristics of the test, such as accuracy, precision, and the range of values over which the test gives valid results.  FDA approval or clearance allows a manufacturer to legally sell the test to others, and CLIA specifies that a lab running an FDA-approved test must first verify the performance of the test in their own laboratory to ensure that it matches the specifications.

Although the majority of tests in most laboratories are FDA-approved or cleared assays, there is a provision under CLIA for laboratories to develop their own in-house tests, known as

lab-developed tests (LDTs).  LDTs are automatically classified as high-complexity tests, and thus no LDTs could ever be legally run in a laboratory that was only certified for medium-complexity testing.  LDTs can, of course, be an entirely new test that is created by a high-complexity laboratory; however, any alteration to an FDA-approved or cleared test (such as a new sample type) makes that test into an LDT.  In my experience, a disclaimer is always added to LDT results indicating that the test is not FDA approved or cleared, but has been validated by the laboratory.

One practical significance of LDT classification is that CLIA requires additional experiments in order to determine that an LDT is suitable for clinical use.  Rather than simply verifying existing performance specifications as with an FDA-approved test, an LDT requires validation not only of accuracy, precision, and reportable range, but also of interferences and other factors.  Additionally, the reference range must be established, which typically takes many more samples than would be required to simply verify a reference range that had previously been approved by the FDA.  As a benchmark, while verification of an established, FDA-approved reference range can be performed with 20 samples, it is typical to use 120 samples to establish a new reference range for an LDT.

A second major requirement of CLIA is a designated laboratory director, who is legally and medically responsible for results that are returned from the laboratory.  The director is ultimately responsible for all aspects of testing, including the analytical portions as well as reporting of results.  Because the laboratory director is ultimately responsible for determining that the results are appropriate for medical use, it is critical that they be given appropriate authority to ensure that staffing, processes, instrumentation, and other resources are

sufficient.  Further, for a high-complexity laboratory that is developing LDTs, the operation of

those LDTs and their maintenance is the responsibility of the laboratory director.

A third requirement of CLIA is that laboratories engage in proficiency testing (PT).

Proficiency testing is intended to ensure that different labs return values that match each other

to a significant degree.  Typically, identical samples are sent to multiple laboratories, and they

are each required to run that sample exactly as they would a patient sample.  PT results are

then sent back to be graded and compared to the results from other laboratories.  If the lab

returns values that are similar to what other labs have reported, they have passed their

proficiency testing for that analyte.  For a set of common analytes, CLIA mandates that the lab

enroll in an accredited PT program.  Under certain (relatively rare) circumstances where PT is

not available for a given analyte, it may be appropriate to document alternative ways of

assessing PT using patient samples that are exchanged between laboratories or to compare

patient samples to an existing assay for the same analyte.

In addition to proficiency testing, which occurs only a few times a year, CLIA also

mandates that a lab perform a quality control check at various intervals (daily, or even more

often).  Quality control (QC) is intended to ensure that the equipment and assay process are

functioning appropriately, and that nothing has changed that would affect patient results.

Typically, the lab has a standard set of quality control materials for each assay, and these cover

the important ranges that may be seen in patient samples (for example, one quality control

sample at the low end of the measurement range, and one at the high end).  When the assay is

established, the lab establishes an acceptable range for the quality control.  If a quality control

specimen is too far away from this acceptable range, specified rules are applied to determine if

the assay is "out of control".  An assay that fails quality control requires some sort of

intervention, whether that is recalibration of the assay, or something more significant.  If an

assay is found to be out of control after continuously running samples, the lab would need to

determine whether the issues with the assay affected patient results that should be corrected

or cancelled.

IV.  Summary of Opinions

*Preliminary comments*

Based on the documents that I reviewed, my understanding is that there were two

primary methods that Theranos employed to measure analytes from fingerstick blood samples

collected in small devices ("CTNs").  First, they had developed an instrument (often referred to

as "Edison", version 3.5) that performed immunoassays.  Second, they used Tecan liquid

handlers to dilute small samples and run them on traditional clinical chemistry analyzers

obtained from other vendors (predominantly Siemens Diagnostics).  Because neither of these

approaches used unmodified, FDA-cleared or approved assays in an unmodified form, they are

both considered laboratory-developed tests (note that I am not here taking a position on the

FDA's role in regulating these laboratory-developed test, simply pointing out their classification

under CLIA).  There is a third class of testing that Theranos was performing using traditional

venous samples on FDA-approved or cleared instruments from third-party vendors.  I will not

make many comments about this last class of testing, since it is identical to the testing

performed in most labs in the U.S.

Related to this discussion, it is my opinion that, when considering the two Theranos methods for testing fingerstick samples, only the first method employing an Edison-style (or, later in 2016, miniLab-style) instrument could ever, under any conceivable future model, have been developed into an instrument that could be deployed at a remote site in closer proximity to the patient (i.e. not at a central reference lab site).

*Assessment of Theranos blood testing technology*

In my opinion, Theranos was not market ready and able to produce accurate and reliable fingerstick results for tests such as Vitamin D, chloride, potassium, bicarbonate, cholesterol, and sodium.  In addition, there are substantial questions about the ability of their laboratory to provide patient-appropriate results for calcium, HIV, HbA1c, and hCG.  In the following section, I will provide some of the primary reasons and evidence that support this opinion.

In order to produce accurate and reliable results, a clinical assay must typically agree with the accepted results from a gold standard (accuracy), and it also must be able to do this reproducibly (reliable).  This reproducibility is referred to as precision, the imprecision of an assay can be measured as %CV.  As a benchmark, for example, a 2010 publication testing a commercially-available vitamin D assay showed a %CV of roughly 12-18%.  Theranos had a standard operating procedure protocol that indicated that validated assays must have 15%CV, with a possibility of 20%CV at the extremes of the assay.  However, the report of the CMS inspection from 2015 shows that, in the course of routine operations, Theranos QC measurements for this assay on a single instrument demonstrated a CV as high as 63.8%.  This

was not limited to a single instrument; of the other two instruments documented in the CMS

report, one showed a CV of 31.9%, and the other still exceeded the written Theranos standard.

This suggests a broader problem with Theranos manufacturing and maintenance, whether at

the level of the Edison itself or of the reagent/consumable production.  This problem was not

confined to a single assay: the CMS report documents similar issues with assays for Vitamin B12

and SHBG (sex hormone binding globulin), which were also run on the Edison.  The precision

issues with Vitamin B12 were documented on 5 different instruments, further supporting the

opinion that this was a widespread issue rather than a single "bad" instrument or assay.  An

internal Theranos email from 2014 reports that 26% of QC runs failed across 7 assays running

on the Edison platform.  Theranos themselves subsequently (and appropriately) voided all tests

performed on this platform, effectively acknowledging that the results were not sufficiently

accurate and reproducible for patient care.

    The CMS QC data also demonstrates problems with the accuracy of Edison assays that

were in operational use for patient samples.  The CMS report documents a Vitamin D

instrument assay that delivered QC results >2SD from the target mean for 15 days in a row,

suggesting a bias in the instrument.  It is not possible to be certain whether this was due to

inherent issues with the technology, or with poor lab operational practice (although both cases

can adversely affected the quality of the clinical laboratory results).  However, the same

phenomenon is seen in multiple other instruments running multiple other assays, showing at a

minimum that the accuracy of the instruments was not consistent.  Furthermore, testimony

from the laboratory director (Adam Rosendorff) indicated that it would be lab policy to

recalibrate an instrument that was failing QC, and we know from other testimony of an

example when QC was persistently out of control to the extent that points were removed from the calculation in bring the QC numbers into conformity.  For these reasons, it is reasonable to conclude that the instrument problems were not merely a result of poor operational practice, but were related to the quality of the instruments and assays themselves.

Precision and accuracy issues also affected fingerstick assays that were diluted on the Tecan liquid handler and measured on modified third-party instruments.  For example, a published report from a group at the Icahn School of Medicine demonstrated a significant negative bias in the measurement of cholesterol by Theranos compared with both Quest and LabCorp.  Although it is clearly the case for many analytes that there are issues of standardization and harmonization between assays used by various clinical laboratories, this amount of difference in cholesterol levels was beyond what would be expected given the standards of the field.  Additionally, inaccuracies in a lipid testing result were brought to the attention of the laboratory director in late 2014, who noted that they were inconsistent with commonly-utilized estimates of the relationship between the various components of the lipid test (such as cholesterol).  These strands of evidence support the idea that there were significant accuracy limitations to the Theranos fingerstick cholesterol test.

In April 2014, potassium fingerstick measurements were shown to be abnormally high 17% of the time.  In a healthy population, one would expect to see ~2.5% abnormally high values, and even accounting for prevalence of illness the percentage of high values indicates a fundamental issue with the assay as it was being performed.  There are at least two possible explanations for this: the Theranos assay had significant positive bias (i.e. was inaccurate), or the fingerstick collection modality, possibly including the CTN, led to high hemolysis rates which

14

artifactually elevated the potassium.  If the latter was the case, the laboratory clearly did not have a robust method of detecting these hemolyzed samples prior to testing.  In either case, Theranos was not providing an accurate potassium test during this time frame.

Other electrolyte measurements (e.g. sodium, chloride) were the subject of "frequent complaints" from customers according to internal Theranos emails.  In an email dated October 27, 2014 from the laboratory director (Adam Rosendorff) to Sunny Balwani and Elizabeth Holmes, Dr. Rosendorff indicates that the laboratory had instituted a policy of canceling significantly high or low sodium values because "…we have no way of knowing for sure whether the result is truly abnormal or artifactual to the assay, or related to a specimen integrity issue."

More generally, there are inherent limitations to the approach that Theranos had taken for small-volume testing using diluted specimens compared with the original assays.  Because a less concentrated specimen is more difficult to detect at low levels, both the precision and lower limit of detection would be expected to be inferior.  While there might be technical solutions to ameliorate this problem, Theranos' own internal documents discuss degradation of precision due to a variety of factors in their process, as well as plans to decrease the amount of dilution in order to improve performance.

Based on customer complaints and Theranos internal investigations, there were significant issues with calcium, HIV, HbA1c, and hCG assays during the time that these were performed on fingerstick samples.  In some cases, there are insufficient additional details in the material I have reviewed to determine the cause of these issues, the relationship to either the sample type or Theranos technology, or the resolution of the problems.  HbA1c issues appear to be due to organizational problems with tests being done on different platforms, and

Theranos' practice of not reporting whether the result was obtained from fingerstick or venous blood exacerbated the confusion.  In the case of hCG, multiple inaccurate results had significant and negative clinical implications for patients.  Although in many cases I have not been able to identify a clear paper trail demonstrating the root cause of these inaccuracies, it is noteworthy that HIV, HbA1c, and hCG do not appear on the list of LDTs provided to the FDA by Theranos on 8/26/2015, and thus they had not been found to be suitable for continued clinical use by that point.

As mentioned above, the testimony of Adam Rosendorff indicates that Theranos did not adequately distinguish on reports whether a reported value came from a fingerstick or venous sample, and the reference ranges were not all appropriately adjusted to account for fingersticks.  This is evident in an examination of the primary documents.  For example, in the Theranos validation document for chloride, the same reference range was used for venous and fingerstick.  However, visual inspection shows a clear positive bias in the fingerstick samples.  By obscuring the nature of the sample and not providing an adjusted reference range, a clinician or patient would be unable to distinguish a true change vs. a difference that is due to the differing nature of venous and capillary blood and/or the assay.

Internal emails and documentation show that Theranos were struggling with a number of ongoing technical issues involving hemolysis, sample leakage, variations in materials that affected function, and other issues with the CTN.  This is consistent with the issues surrounding potassium (see above).  An internal company email from 2016 refers to fundamental design issues in the EDTA-containing collection device that cause hemolysis.

In 2016, in a public session at the Annual Meeting of the American Association for Clinical Chemistry, Theranos publicly announced an additional instrument (the "miniLab") that they had not previously used in clinical testing through 2013-2015.  Although some performance data were shown for a small number of assays, there were no clear data on the robustness of the machines in an operational setting, which would raise concerns based on the fact that previous Edison instruments that had reportedly passed validation were nonetheless shown by the QC performance to not yield reproducibly accurate, reliable results.  During the presentation, Theranos also acknowledged that what they showed was not ready for patient testing.

*Assessment of Theranos laboratory performance relative to industry standards*

In my opinion, Theranos did not adhere to normal industry standards for clinical laboratory testing from 2013-2015.  Further, this lack of adherence had the potential to adversely impact test accuracy and reliability.

In documented cases, it was noted that the Theranos QC system for Edison devices did not prevent samples from being run when the QC was out of the appropriate specifications.  On pp. 37-41 of the CMS report, the inspectors documented a large number of instances where the QC system designed to prevent running samples on an out-of-control instrument did not function.  Running patient samples when QC is giving values out of the acceptable range directly impacts the accuracy and reliability of the results that are returned to the patient or clinician.

Theranos did not appropriately engage in proficiency testing.  From the testimony of the lab director at the time, Adam Rosendorff, proficiency testing was only performed using unmodified third-party, FDA-approved platforms.  Proficiency testing for Theranos-modified third-party platforms and for the Edison was not performed, even when the Theranos-modified test became the primary test for the laboratory.  Additionally, Theranos developed an internal rationale for utilize so-called alternative proficiency testing.  In my opinion, it is not consistent with the standards of the field for a laboratory to unilaterally decide that they should be exempt from properly participating in PT for a listed CLIA analyte.  There are clear examples where a sufficient peer group does not exist for a method, and the authorized PT provider simply groups the results with others running the same analyte on a different platform.  In my opinion, the burden of proof would be on the laboratory to demonstrate to the PT provider that a significant commutability issue exists for their method.  Even granting Theranos' interpretation, however, alternative proficiency testing was not appropriately performed (to the laboratory director's knowledge) at any point prior to October 2014, and thus Theranos was not appropriately ensuring the ongoing accuracy of their assays.  The CMS report makes a similar point (not with PT *per se*, but with instrument-to-instrument comparison) for individual Edison analyzers.  Theranos did not adhere to industry standards, and this had the potential to adversely affect the accuracy of their results.  Additionally, if and when Theranos reported results of proficiency testing, those results were not derived from Theranos technology.

As recently as Fall 2015, Theranos did not have FDA approval or clearance for their CTN. This is significant, because (as described above) internal emails and documentation show that they were struggling with a number of ongoing technical issues involving hemolysis, sample

leakage, variations in materials that affected function, and other issues.  These issues in and of themselves could affect the accuracy and reliability of their results.  Further, however, from a regulatory perspective Theranos argued that their collection device, which was used in settings far removed from their high-complexity laboratory, fell under the umbrella of their laboratory-developed test.  In my experience, I am unaware of any laboratory that has similarly attempted to extend the boundaries of their lab-developed test in this way.  Thus, it is my opinion that this is not in accordance with normal industry standards, and, based on the reported issues, the lack of demonstrating performance data sufficient to obtain FDA clearance for use of this device had the potential to negatively impact their test results.

Finally, as stated in the section on the regulation of blood testing, in my experience a disclaimer is always added to LDT results indicating that the test is not FDA approved or cleared, but has been validated by the laboratory.  There was no indication on the report to a clinician that would indicate that a given test was not FDA approved or cleared, or would allow a clinician to distinguish in any way between tests that Theranos was performing by their own methods and tests that Theranos was performing using traditional, approved third-party analyzers.  The lab director, Adam Rosendorff, who is responsible for the reporting of results, raised this issue; however, he was told by Mr. Balwani that such a disclaimer was not required.