# United States District Court

## FOR THE
## NORTHERN DISTRICT OF CALIFORNIA

## VENUE: SAN JOSE

---

UNITED STATES OF AMERICA,

V.

ELIZABETH A. HOLMES and
RAMESH "SUNNY" BALWANI,

DEFENDANT(S).

---

# SECOND SUPERSEDING INDICTMENT

18 U.S.C. § 1349 – Conspiracy;
18 U.S.C. § 1343 – Wire Fraud;
18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) – Forfeiture

---

A true bill.

   /s/ Foreperson of the Grand Jury

Foreman

---

Filed in open court this __ 14th ____ day of

____ July , 2020

M Jock

Clerk

Sallie Kim

Magistrate Judge Sallie Kim

Bail, $ __ No Process __

1    ADAM A. REEVES
     Attorney for the United States,
2    Acting Under Authority Conferred By 28 U.S.C. § 515

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                      NORTHERN DISTRICT OF CALIFORNIA

10                             SAN JOSE DIVISION

11

12   UNITED STATES OF AMERICA,              )  Case No. CR 18-258 EJD
                                            )
13            Plaintiff,                     )  VIOLATIONS:
                                            )
14            v.                             )  18 U.S.C. § 1349 – Conspiracy; 18 U.S.C. § 1343 –
                                            )  Wire Fraud; 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C.
15   ELIZABETH A. HOLMES and                 )  § 2461(c) – Forfeiture
     RAMESH "SUNNY" BALWANI,                 )
16                                           )  SAN JOSE VENUE
              Defendants.                    )
17   _____ )

18

19            **S E C O N D   S U P E R S E D I N G   I N D I C T M E N T**

20   The Grand Jury charges that, at all relevant times:

21                          Introductory Allegations

22            1.      The defendant Elizabeth A. Holmes ("HOLMES") resided in Los Altos Hills, California,

23   and owned and operated a health care and life sciences company called Theranos, Inc. ("Theranos" or

24   "Company").  HOLMES founded Theranos in 2003, and served in the role of Chief Executive Officer

25   from 2003 through 2018.

26            2.      The defendant Ramesh "Sunny" Balwani ("BALWANI") resided in Atherton, California,

27   and was employed by Theranos from September 2009 through 2016.  BALWANI served in various roles

28   at Theranos: as a member of its Board of Directors, as its President, and as its Chief Operating Officer.

SECOND SUPERSEDING INDICTMENT

3.     Theranos was a corporation organized under the laws of the State of Delaware with its principal place of business in Palo Alto, California.  Theranos opened and maintained a corporate bank account in Palo Alto, California at Comerica Bank.  Comerica Bank is headquartered in Dallas, Texas. When Theranos solicited and received financial investments from investors, the money was deposited into its Comerica Bank account.  Theranos's investors included individuals, entities, certain business partners, members of its board of directors, and individuals and entities who invested through firms formed for the exclusive or primary purpose of investing in Theranos's securities.

<u>The Business of Theranos</u>

4.     Theranos was a private health care and life sciences company.  Its stated mission was to revolutionize medical laboratory testing through allegedly innovative methods for drawing blood, testing blood, and interpreting the resulting patient data—all for the purpose of improving outcomes and lowering health care costs.

5.     During its first ten years, from approximately 2003 to approximately 2013, Theranos operated in what HOLMES called "stealth mode," with little public attention.  While operating in "stealth mode," Theranos pursued the development of proprietary technology that could run clinical tests using only tiny drops of blood instead of the vials of blood typically drawn from an arm vein for traditional analysis.  Theranos also worked to develop a method for drawing only a few drops of capillary blood from a patient's finger using a small lancet, and collecting and storing that blood in a proprietary device called the "nanotainer."  Theranos's stated goal was to produce a second proprietary device that could quickly and accurately analyze blood samples collected in nanotainers.  Theranos referred to these devices using several terms, including "TSPU" (or "Theranos Sample Processing Unit"), "Edison," and "miniLab."

6.     In or around 2013, Theranos began to publicize its technological advances.  According to Theranos, its proprietary methods and technologies carried several advantages over conventional blood testing.  For example, Theranos claimed that its laboratory infrastructure yielded test results in less time than conventional labs—requiring hours instead of days.  Theranos claimed that its proprietary technology and methods would minimize the risk of human error and generate results with the highest accuracy.  According to Theranos, the small blood sample size required for Theranos's proprietary tests,

and its method of collecting blood by finger stick, would also benefit elderly individuals with collapsed veins, individuals who required frequent blood tests due to chronic health conditions, and any individual who feared needles.  In addition, Theranos claimed that its blood tests provided substantial cost savings, advertising that it billed all of the tests on the Medicare Clinical Laboratory Fee Schedule at rates 50% or more below the published reimbursement rate.

7.     Prior to its commercial launch, HOLMES heavily promoted Theranos's supposed technological and operational capabilities.  In a September 2013 press release, Theranos claimed that it had "eliminat[ed] the need for larger needles and numerous vials of blood" by relying instead on samples "taken from a tiny finger stick or a micro sample taken from traditional methods."  In another press release, dated November 13, 2013, Theranos touted its use of "blood sample[s] as small as a few drops—1/1000th the size of a typical blood draw."  In that same statement, the Company again declared that it had "eliminate[ed] the need for large needles and numerous vials of blood typically required for diagnostic lab testing."

8.     In addition to directing the actions of the Company, HOLMES also made statements to the media advertising the capabilities of Theranos's technology.  In an interview for a *Wall Street Journal* article published on September 9, 2013, HOLMES said that Theranos could "run any combination of tests, including sets of follow-on tests" at once, very quickly, all from a single small blood sample.

9.     Theranos also used its website to increase awareness of its technology.  On its website, Theranos displayed a nanotainer of blood balanced on a fingertip along with the slogan, "one tiny drop changes everything."  The website also assured visitors that "for the first time," Theranos's laboratory could perform tests "quickly and accurately on samples as small as a single drop."

Theranos's Partnership with Walgreens

10.    As part of its commercial launch, as early as 2010, Theranos pursued a partnership with national pharmacy chain Walgreens.  On September 9, 2013, Theranos announced that it would be rolling out Theranos "Wellness Centers" inside Walgreens retail locations.  In a press release on that date, Theranos promoted its testing services by stating that "consumers can now complete any clinician-directed lab test with as little as a few drops of blood and results available in a matter of hours."

SECOND SUPERSEDING INDICTMENT          3

1    Theranos offered tests to the public beginning in late 2013 through its Wellness Centers located in

2    Walgreens stores in Palo Alto, California as well as in Phoenix, Arizona and surrounding areas.

3    <u>The Scheme to Defraud Investors</u>

4         11.    From a time unknown but no later than 2010 through 2015, HOLMES and BALWANI,

5    and others known and unknown to the Grand Jury, through their company, Theranos, engaged in a

6    scheme, plan, and artifice to defraud investors as to a material matter, and to obtain money and property

7    by means of materially false and fraudulent pretenses, representations, and promises, by making

8    materially false and misleading statements, and failing to disclose material facts with a duty to disclose.

9         12.    Beginning in approximately 2010, HOLMES and BALWANI made materially false and

10   misleading statements to investors and failed to disclose material facts, using, among other things: (1)

11   false and misleading written and verbal communications; (2) marketing materials containing false and

12   misleading statements; (3) false and misleading financial statements, models, and other information; and

13   (4) false and misleading statements to the media.  HOLMES and BALWANI:

14         (A) represented to investors that, at the time the statement was made, Theranos's

15         proprietary analyzer—the TSPU, Edison, or miniLab—was presently capable of accomplishing

16         certain tasks, such as performing the full range of clinical tests using small blood samples drawn

17         from a finger stick and producing results that were more accurate and reliable than those yielded

18         by conventional methods—all at a faster speed than previously possible; when, in truth,

19         HOLMES and BALWANI knew that Theranos's proprietary analyzer had accuracy and

20         reliability problems, performed a limited number of tests, was slower than some competing

21         devices, and could not compete with larger, conventional machines in high-throughput, or the

22         simultaneous testing of blood from many patients, applications;

23         (B) represented to investors that Theranos was presently a financially strong and stable

24         company, including that Theranos would generate over $100 million in revenues and break even

25         in 2014, and that Theranos expected to generate approximately $1 billion in revenues in 2015;

26         when, in truth, HOLMES and BALWANI knew that Theranos had and would generate only

27         modest revenues, roughly a few hundred thousand dollars or so, in 2014 and 2015;

28

SECOND SUPERSEDING INDICTMENT          4

(C) deceived investors through misleading technology demonstrations intended to cause potential investors to believe that blood tests were being conducted on Theranos's proprietary analyzer; when, in truth, HOLMES and BALWANI knew that Theranos's proprietary analyzer was running a "null protocol" during the demonstration to make the analyzer appear to be operating, but was not testing the potential investor's blood, and yet failed to disclose that fact;

(D) represented to investors that Theranos presently had an expanding partnership with Walgreens, that is, Theranos would soon dramatically increase the number of Wellness Centers within Walgreens stores; when, in truth, HOLMES and BALWANI knew, by late 2014, that Theranos's retail Walgreens rollout had stalled because of several issues, including that Walgreens's executives had concerns with Theranos's performance;

(E) represented to investors that Theranos presently had a profitable and revenue-generating business relationship with the United States Department of Defense, and that Theranos's technology had deployed to the battlefield; when, in truth, HOLMES and BALWANI knew that Theranos had limited revenue from military contracts and its technology was not deployed in the battlefield;

(F) represented to investors that Theranos did not need the Food and Drug Administration ("FDA") to approve its proprietary analyzer and tests, but instead that Theranos was applying for FDA approval voluntarily because it was the "gold standard"; when, in truth, HOLMES and BALWANI knew that by late 2013 and throughout 2014, the FDA was requiring Theranos to apply for clearance or approval for its analyzer and tests;

(G) represented to investors that Theranos conducted its patients' tests using Theranos-manufactured analyzers; when, in truth, HOLMES and BALWANI knew that Theranos purchased and used for patient testing third party, commercially-available analyzers;

(H) represented to investors that Theranos's technology had been examined, used, and validated by several national or multinational pharmaceutical companies and research institutions; when, in truth, HOLMES and BALWANI knew that these pharmaceutical companies and research institutions had not examined, used, or validated Theranos's technology; and

1    (I) represented to members of the media for publication many of the false and misleading

2    statements described above within paragraph 12(A) – 12(H), and shared the resulting articles

3    with potential investors both directly and via the Theranos website, knowing their statements to

4    members of the media were false and misleading.

5    13.    After receiving false and misleading statements, misrepresentations, and omissions from

6    HOLMES and BALWANI, persons known to the Grand Jury as Investors 1, 2, 3, 4, 5, and 6 initiated

7    electronic wire transfers for the purpose of investing money in Theranos.  These wires, specifically

8    alleged in paragraph 24 of this Second Superseding Indictment, used a domestic electronic funds

9    transfer system known as the Fedwire system, which is owned and operated by the United States Federal

10   Reserve System.  All Fedwire wire transfers alleged in this Second Superseding Indictment were

11   electronically routed through Fedwire centers in East Rutherford, New Jersey, Dallas, Texas, or outside

12   California and into Theranos's bank account in the Northern District of California.  All of the wire

13   transfers alleged in this Second Superseding Indictment  travelled between one state and another state.

14                                      The Scheme to Defraud Patients

15   14.    Between approximately 2013 and 2016, HOLMES and BALWANI, through

16   advertisements and solicitations, encouraged and induced doctors and patients to use Theranos's blood

17   testing laboratory services.

18   15.    HOLMES and BALWANI devised a scheme to defraud patients, through advertisements

19   and marketing materials, through explicit and implicit claims concerning Theranos's ability to provide

20   accurate, fast, reliable, and cheap blood tests and test results, and through omissions concerning the

21   limits of and problems with Theranos's technologies.  Based on these representations, many hundreds of

22   patients paid Theranos, or Walgreens acting on behalf of Theranos, for blood tests and test results,

23   sometimes following referrals from their defrauded doctors.

24   16.    Despite representing to doctors and patients that Theranos could provide accurate, fast,

25   reliable, and cheap blood tests and test results, HOLMES and BALWANI knew—through, among other

26   means, their involvement in Theranos's day-to-day operations and their knowledge of complaints

27   received from doctors and patients—that Theranos's technology was, in fact, not capable of consistently

28   producing accurate and reliable results.  In particular, HOLMES and BALWANI knew that Theranos

SECOND SUPERSEDING INDICTMENT              6

was not capable of consistently producing accurate and reliable results for certain blood tests, including but not limited to bicarbonate, calcium, chloride, cholesterol/HDL/LDL, gonorrhea, glucose, HbA1c, hCG, HIV, LDH, potassium, PSA, PT/INR, sodium, testosterone, TSH, vitamin D (25-OH), and all assays conducted on Theranos's TSPU version 3.5, including estradiol, prolactin, SHBG, thyroxine (T4/free T4), triiodothyronine, and vitamin B-12.

17.     Despite their knowledge of Theranos's accuracy and reliability problems, HOLMES and BALWANI used interstate electronic wires to purchase advertisements intended to induce individuals to purchase Theranos blood tests at Walgreens stores in California and Arizona.  Through these advertisements, HOLMES and BALWANI explicitly represented to individuals that Theranos's blood tests were cheaper than blood tests from conventional laboratories to induce individuals to purchase Theranos's blood tests.  HOLMES and BALWANI held Theranos's blood tests out to individuals as accurate and reliable.  HOLMES and BALWANI:

(A)     transmitted, caused to be transmitted, or otherwise delivered to doctors and patients, including in the form of marketing materials and advertisements, materially false and misleading information concerning the accuracy and reliability of Theranos's blood testing services;

(B)     posted on the Theranos website, or otherwise represented to a broad audience including doctors and patients, materially false and misleading information concerning the accuracy and reliability of Theranos's blood testing services;

(C)     transmitted, caused to be transmitted, or otherwise delivered to doctors and patients Theranos blood test results where HOLMES and BALWANI knew that the tests performed on Theranos technology contained or were likely to contain:

(1)     inaccurate and unreliable results;

(2)     improperly adjusted reference ranges;

(3)     improperly removed "critical" results; and

(4)     results generated from improperly validated assays.

18.     Knowing that the accuracy and reliability of Theranos test results was questionable and suspect, HOLMES and BALWANI oversaw the electronic wiring of test results to patients, including persons known to the Grand Jury as Patients B.B and E.T. in paragraph 26 of this Second Superseding

1  Indictment.  These wires, specifically, the wires alleged in paragraph 26 of this Second Superseding

2  Indictment, travelled between one state and another.

3  COUNT ONE:  18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud against Theranos Investors)

4        19.    Paragraphs 1 through 18 are realleged and incorporated as if fully set forth herein.

5        20.    From a time unknown but no later than approximately 2010 through approximately 2015,

6  within the Northern District of California, and elsewhere, the defendants,

7                          ELIZABETH A. HOLMES and
                          RAMESH "SUNNY" BALWANI,
8

9  and others known and unknown to the Grand Jury, did knowingly and intentionally conspire and agree

10  together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section

11  1343, by devising a scheme and artifice to defraud as to a material matter and to obtain money by means

12  of materially false and fraudulent representations, specifically by soliciting investments through making

13  the false and fraudulent representations as set forth in this Second Superseding Indictment.

14        All in violation of Title 18, United States Code, Section 1349.

15  COUNT TWO:  18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud against Theranos Patients)

16        21.    Paragraphs 1 through 18 are realleged and incorporated as if fully set forth herein.

17        22.    From in or about 2013 through 2016, within the Northern District of California, and

18  elsewhere, the defendants,

19                          ELIZABETH A. HOLMES and
                          RAMESH "SUNNY" BALWANI,
20

21  and others known and unknown to the Grand Jury, did knowingly and intentionally conspire and agree

22  together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section

23  1343, by devising a scheme and artifice to defraud as to a material matter and to obtain money by means

24  of materially false and fraudulent representations, specifically by soliciting, encouraging, or otherwise

25  inducing doctors to refer and patients to pay for and use its laboratory and blood testing services under

26  the false and fraudulent pretense that Theranos technology produced reliable and accurate blood test

27  results.

28        All in violation of Title 18, United States Code, Section 1349.

SECOND SUPERSEDING INDICTMENT          8

COUNTS THREE THROUGH EIGHT:  18 U.S.C. § 1343 (Wire Fraud)

23.     Paragraphs 1 through 22 are realleged and incorporated as if fully set forth herein.

24.     On or about the dates set forth below, within the Northern District of California, and elsewhere, the defendants,

ELIZABETH A. HOLMES and
RAMESH "SUNNY" BALWANI,

for the purpose of executing the material scheme and artifice to defraud investors, and for obtaining money and property from investors by means of materially false and fraudulent pretenses, representations, promises, and material omissions with a duty to disclose, did knowingly transmit and cause to be transmitted by means of wire communication in interstate commerce certain writings, signs, signals, and pictures, that is, electronic funds transfers and payments from investor bank accounts to Theranos, as further set forth below:

| COUNT | DATE | ITEM WIRED | WIRED FROM | WIRED TO |
|---|---|---|---|---|
| 3 | 12/30/2013 | $99,990 | Investor #1's Charles Schwab/Wells Fargo Bank account | Theranos's Comerica Bank account |
| 4 | 12/31/2013 | $5,349,900 | Investor #6's Pacific Western Bank account | Theranos's Comerica Bank account |
| 5 | 12/31/2013 | $4,875,000 | Investor #2's Texas Capital Bank account | Theranos's Comerica Bank account |
| 6 | 2/6/2014 | $38,336,632 | Investor #3's Citibank account | Theranos's Comerica Bank account |
| 7 | 10/31/2014 | $99,999,984 | Investor #4's Northern Chicago Bank account | Theranos's Comerica Bank account |
| 8 | 10/31/2014 | $5,999,997 | Investor #5's JP Morgan Chase account | Theranos's Comerica Bank account |

Each in violation of Title 18, United States Code, Section 1343.

COUNTS NINE THROUGH ELEVEN:  18 U.S.C. § 1343 (Wire Fraud)

25.     Paragraphs 1 through 24 are realleged and incorporated as if fully set forth herein.

26.     On or about the dates set forth below, within the Northern District of California, and elsewhere, the defendants,

ELIZABETH A. HOLMES and
RAMESH "SUNNY" BALWANI,

for the purpose of executing the material scheme and artifice to defraud doctors and patients, and for obtaining money and property from patients by means of materially false and fraudulent pretenses, representations, promises, and material omissions with a duty to disclose, did knowingly transmit and cause to be transmitted by means of wire communication in interstate commerce certain writings, signs, signals, and pictures, that is, laboratory and blood test results and payments for the purchase of advertisements soliciting patients and doctors for its laboratory business, as further set forth below, in violation of Title 18, United States Code, Section 1343:

| COUNT | DATE | WIRED FROM | WIRED TO | DESCRIPTION |
|---|---|---|---|---|
| 9 | 10/12/2015 | Arizona | California | Telephone call from Patient B.B to Theranos regarding laboratory blood test results |
| 10 | 5/11/2015 | California | Arizona | Patient E.T.'s laboratory blood test results |
| 11 | 8/3/2015 | Theranos's Wells Fargo Bank account in California | Horizon Media, Inc.'s J.P. Morgan Chase Bank account in New York | Electronic Funds Transfer in the amount of $1,126,661.00 to purchase advertisements for Theranos Wellness Centers |

Each in violation of Title 18, United States Code, Section 1343.

SECOND SUPERSEDING INDICTMENT              10

1  FORFEITURE ALLEGATION:        18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) (Forfeiture of
                                 Wire Fraud Proceeds)
2

3       27.    The allegations of paragraphs 1 through 26 of this Second Superseding Indictment are

4  realleged and by this reference fully incorporated herein for the purposes of alleging forfeiture pursuant

5  to the provisions of 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

6       28.    Upon a conviction for the offense alleged in Counts One through Eleven, the defendants,

7
                                ELIZABETH A. HOLMES and
8                               RAMESH "SUNNY" BALWANI,

9  shall forfeit to the United States all property, constituting and derived from proceeds traceable to said

10 offenses, including but not limited to the following property:

11      (a)    a sum of money equal to the amount of proceeds obtained as a result of the offense.

12      If any of said property, as a result of any act or omission of the defendant-

13      (a)    cannot be located upon the exercise of due diligence;

14      (b)    has been transferred or sold to or deposited with, a third person;

15      (c)    has been placed beyond the jurisdiction of the Court;

16      (d)    has been substantially diminished in value; or

17      (e)    has been commingled with other property which cannot be subdivided without difficulty;

18 Any and all interest defendant has in any other property (not to exceed the value of the above forfeitable

19 property), shall be forfeited to the United States pursuant to Title 21, United States Code, Section

20 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1).

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

SECOND SUPERSEDING INDICTMENT        11

1    The forfeiture is authorized by Title 18, United States Code, Section 981(a)(1)(C) and Title 28,

2    United States Code, Section 2461(c); Title 21, United States Code, Section 853(p) as incorporated by

3    Title 18, United States Code, Section 982(b)(1); and the Federal Rules of Criminal Procedure 32.2.

4    DATED:   July 14, 2020                          A TRUE BILL

5

6                                                    _____/s/_____
                                                     FOREPERSON

7    ADAM A. REEVES
     Attorney for the United States,
8    Acting Under Authority Conferred By 28 U.S.C. § 515

9    /s Robert S. Leach
     _____
10   JEFFREY SCHENK
     ROBERT S. LEACH
11   JOHN C. BOSTIC
     VANESSA BAEHR-JONES
12   Assistant United States Attorneys

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND SUPERSEDING INDICTMENT              12

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT  ☐ INFORMATION  ☒ INDICTMENT

☒ SUPERSEDING

### OFFENSE CHARGED

18 U.S.C. § 1349 – Conspiracy;
18 U.S.C. § 1343 – Wire Fraud;
18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) – Forfeiture

☐ Petty
☐ Minor
☐ Misde-
   meanor
☒ Felony

PENALTY:  All per count:
20 years imprisonment
$250,000 fine
3 years supervised release
$100 special assessment

⊞

Name of District Court, and/or Judge/Magistrate Location

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

### DEFENDANT - U.S

► Elizabeth Holmes

DISTRICT COURT NUMBER

CR 18-00258 EJD

### PROCEEDING

Name of Complainant Agency, or Person (& Title, if any)

FBI, USPS, FDA

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:

☐ U.S. ATTORNEY  ☐ DEFENSE

} SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

} MAGISTRATE CASE NO.

Name and Office of Person Furnishing Information on this form     ADAM A. REEVES

Acting  ☒ U.S. Attorney  ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned)     Robert Leach, AUSA

### DEFENDANT

**IS *NOT* IN CUSTODY**
Has not been arrested, pending outcome this proceeding.
1) ☐  If not detained give date any prior summons was served on above charges ►

2) ☐  Is a Fugitive

3) ☒  Is on Bail or Release from (show District)

NDCA

**IS IN CUSTODY**

4) ☐  On this charge

5) ☐  On another conviction

6) ☐  Awaiting trial on other charges

} ☐ Federal ☐ State

If answer to (6) is "Yes", show name of institution

Has detainer been filed?  ☐ Yes  ☐ No
} If "Yes" give date filed

**DATE OF ARREST** ►     Month/Day/Year

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED TO U.S. CUSTODY** ►     Month/Day/Year

☐ This report amends AO 257 previously submitted

### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:

☐ SUMMONS  ☒ NO PROCESS*  ☐ WARRANT     Bail Amount: _____

If Summons, complete following:
☐ Arraignment  ☐ Initial Appearance

Defendant Address:

* Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Date/Time: _____     Before Judge: _____

Comments:

# DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT  ☐ INFORMATION  ☒ INDICTMENT

☒ SUPERSEDING

Name of District Court, and/or Judge/Magistrate Location

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

## OFFENSE CHARGED

18 U.S.C. § 1349 – Conspiracy;
18 U.S.C. § 1343 – Wire Fraud;
18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) – Forfeiture

☐ Petty
☐ Minor
☐ Misde-meanor
☒ Felony

PENALTY:  All per count:
20 years imprisonment
$250,000 fine
3 years supervised release
$100 special assessment

[+]

### DEFENDANT - U.S

► Ramesh "Sunny" Balwani

DISTRICT COURT NUMBER

CR 18-00258 EJD

## PROCEEDING

Name of Complainant Agency, or Person (& Title, if any)

FBI, USPS, FDA

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:

☐ U.S. ATTORNEY  ☐ DEFENSE

} SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant

} MAGISTRATE CASE NO.

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

Name and Office of Person
Furnishing Information on this form       ADAM A. REEVES

Acting ☒ U.S. Attorney  ☐ Other U.S. Agency

Name of Assistant U.S.
Attorney (if assigned)       Robert Leach, AUSA

## DEFENDANT

### IS NOT IN CUSTODY

1) ☐ Has not been arrested, pending outcome this proceeding.
If not detained give date any prior
summons was served on above charges ► _____

2) ☐ Is a Fugitive

3) ☒ Is on Bail or Release from (show District)

NDCA

### IS IN CUSTODY

4) ☐ On this charge

5) ☐ On another conviction

6) ☐ Awaiting trial on other charges

} ☐ Federal ☐ State

If answer to (6) is "Yes", show name of institution

_____

Has detainer ☐ Yes   } If "Yes"
been filed?  ☐ No        give date
                          filed   _____

DATE OF
ARREST ►        Month/Day/Year
_____

Or... if Arresting Agency & Warrant were not

DATE TRANSFERRED ►   Month/Day/Year
TO U.S. CUSTODY    _____

☐ This report amends AO 257 previously submitted

## ADDITIONAL INFORMATION OR COMMENTS

PROCESS:

☐ SUMMONS  ☒ NO PROCESS*  ☐ WARRANT

If Summons, complete following:
☐ Arraignment  ☐ Initial Appearance

Defendant Address:

Comments:

Bail Amount: _____

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Date/Time: _____   Before Judge: _____

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

## CRIMINAL COVER SHEET

***Instructions:*** *Effective November 1, 2016, this Criminal Cover Sheet must be completed and submitted, along with the Defendant Information Form, for each new criminal case.*

**CASE NAME:**

USA v.  Elizabeth A. Holmes, et al.

**CASE NUMBER:**

CR  18-258 EJD

| | | |
|---|---|---|
| **Is This Case Under Seal?** | Yes | No ✔ |
| **Total Number of Defendants:** | 1 | 2-7 ✔    8 or more |
| **Does this case involve ONLY charges under 8 U.S.C. § 1325 and/or 1326?** | Yes | No ✔ |
| **Venue (Per Crim. L.R. 18-1):** | SF | OAK    SJ ✔ |
| **Is this a potential high-cost case?** | Yes | No ✔ |
| **Is any defendant charged with a death-penalty-eligible crime?** | Yes | No ✔ |
| **Is this a RICO Act gang case?** | Yes | No ✔ |

**Assigned AUSA (Lead Attorney):** Robert Leach

**Date Submitted:** 7/14/2020

**Comments:**

Form CAND-CRIM-COVER (Rev. 11/16)

RESET FORM    SAVE PDF