JOHN D. CLINE (CA State Bar No. 237759)
50 California Street, Suite 1500
San Francisco, CA 94111
Telephone: (415) 662-2260 │Facsimile: (415) 662-2263
Email: cline@johndclinelaw.com

KEVIN M. DOWNEY (Admitted Pro Hac Vice)
LANCE A. WADE (Admitted Pro Hac Vice)
AMY MASON SAHARIA (Admitted Pro Hac Vice)
KATHERINE TREFZ (CA State Bar No. 262770)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
Washington, DC 20005
Telephone: (202) 434-5000 │Facsimile: (202) 434-5029
Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

Attorneys for Defendant ELIZABETH A. HOLMES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR-18-00258-EJD |
| Plaintiff, | **MOTION TO DISMISS SECOND AND THIRD SUPERSEDING INDICTMENTS IN PART FOR LACK OF NOTICE OR, IN THE ALTERNATIVE, FOR A BILL OF PARTICULARS** |
| v. | |
| ELIZABETH HOLMES and RAMESH "SUNNY" BALWANI, | |
| Defendants. | Date:     October 6, 2020 Time:    10:00 AM CTRM:  4, 5th Floor |
| | Hon. Edward J. Davila |

1

## <u>MOTION TO DISMISS</u>

2      PLEASE TAKE NOTICE that on October 6, 2020 at 10:00 a.m., or on such other date and time

3  as the Court may order, in Courtroom 4 of the above-captioned Court, 280 South 1st Street, San Jose,

4  CA 95113, before the Honorable Edward J. Davila, Defendant Elizabeth Holmes will and hereby does

5  respectfully move the Court pursuant to Rules 7 and 12 of the Federal Rules of Criminal Procedure to

6  dismiss the Second and Third Superseding Indictments in part for failure to provide fair notice of the

7  charges against her.  In the alternative, Ms. Holmes moves for an order instructing the government to

8  provide a bill of particulars.  The Motion is based on the below Memorandum of Points and Authorities

9  and Exhibits, the Declaration of Amy Mason Saharia, the record in this case, and any other matters that

10  the Court deems appropriate.

11

12  DATED: August 28, 2020

13

14                                              /s/ Amy Mason Saharia
                                               KEVIN DOWNEY
15                                              LANCE WADE
                                               AMY MASON SAHARIA
16                                              KATHERINE TREFZ
                                               Attorneys for Elizabeth Holmes
17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

MEMORANDUM OF POINTS AND AUTHORITIES ....................................................................1

BACKGROUND ..........................................................................................................................2

ARGUMENT ...............................................................................................................................4

    I.     The Third Superseding Indictment Is Unconstitutionally Vague. ....................................4

          A.     The Indictments' Reference to "Certain Business Partners" Is
                Unconstitutionally Vague. ...................................................................................5

          B.     The Indictments' Reference to "Members of the Board of Directors" Is
                Unconstitutionally Vague. ...................................................................................8

          C.     The Indictments' Reference to "Investors" Is Unconstitutionally
                Vague. ...................................................................................................................9

          D.     The Government's Email Does Not Save Its Unconstitutional
                Indictments.........................................................................................................10

    II.    At a Minimum, the Court Should Order a Bill of Particulars. ........................................11

          A.     The "individuals," "entities," "certain business partners," "members of
                the Board of Directors," and "individuals and entities who invested
                through firms formed for the exclusive or primary purpose of investing
                in Theranos's securities" alleged to be "investors." ................................12

          B.     The "certain business partners" and the nature of their "investments" ................13

          C.     The "members of the Board of Directors" and the nature of their
                "investments".....................................................................................................13

          D.     The alleged misrepresentations made to the various "investors" .........................14

          E.     The basis of any alleged duty to disclose.............................................................15

CONCLUSION............................................................................................................................15

1

## <u>**TABLE OF AUTHORITIES**</u>

2

**CASES**

3

<u>Pages</u>

4   *Cleveland v. United States*, 531 U.S. 12 (2000) ........................................................................ 5

5   *Russell v. United States*, 369 U.S. 74 (1962) ............................................................. 4, 6, 10, 11

6   *United States v. Buckley*, 689 F.2d 893 (9th Cir. 1982) ........................................................... 5

7   *United States v. Caine*, 270 F. Supp. 801 (S.D.N.Y. 1967) .................................................... 12

8   *United States v. Cecil*, 608 F.2d 1294 (9th Cir. 1979) ............................................................ 5

9   *United States v. Gordon*, 844 F.2d 1397  (9th Cir. 1988) ....................................................... 8

10   *United States v. Hussain*, 2017 WL 4865562 (N.D. Cal. Oct. 27, 2017) ................................ 5

11   *United States v. Keith*, 605 F.2d 462 (9th Cir. 1979) ............................................................ 10

12   *United States v. Lindsey*, 850 F.3d 100 (9th Cir. 2017) ........................................................... 5

13   *United States v. Long*, 706 F.2d 1044 (9th Cir. 1983) ........................................................... 11

14   *United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020) ........................................................... 5

15   *United States v. Nat'l Marketing, Inc.*, 306 F. Supp. 1238 (D. Minn. 1969) ........................... 12

16   *United States v. Simmons*, 96 U.S. 360 (1877) ...................................................................... 4

17   *United States v. Trumpower*, 546 F. Supp. 2d 849 (E.D. Cal. 2008) ..................................... 12

18   *United States v. Yefsky*, 994 F.2d 885 (1st Cir. 1993) ............................................................ 5

19   *Will v. United States*, 389 U.S. 90 (1967) ...................................................................... 11, 12

20   *Yeargain v. United States*, 314 F.2d 881 (9th Cir. 1963) ..................................................... 12

21

**RULES**

22   Fed. R. Crim. P. 7 ............................................................................................................ 4, 11

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

The First Superseding Indictment charged Ms. Holmes with engaging in a scheme to defraud "investors" by making false and misleading representations.  It did not disclose the precise misrepresentations that Ms. Holmes allegedly made, but Ms. Holmes at least understood **whom** she was alleged to have defrauded:  Theranos investors.  Ms. Holmes naturally understood that term to have its ordinary meaning—i.e., to refer to the finite set of individuals and entities that invested money in Theranos in return for company securities and were identifiable on the company's stock ledger.

The Second and Third Superseding Indictments ("Indictments") depart from that common-sense meaning.  In those Indictments, the government defines "investors" to include "individuals, entities, certain business partners, members of its board of directors, and individuals and entities who invested through firms formed for the exclusive or primary purpose of investing in Theranos's securities."  *E.g.*, TSI, ECF No. 469, ¶ 3.  That cryptic and tortured definition of the term "investors" raises a host of questions, and—if permitted—would expand exponentially the scope of the alleged scheme to defraud.[1] What does "business partners" mean?  That undefined term could sweep in any number of individuals, companies, or governmental entities with which Theranos engaged in transactions.  Which business partners?  How is the government alleging that such business partners "invested" in Theranos?  An intended deprivation of money or property is central to the wire-fraud statute, and the Indictments do not identify the nature of these partners' "investments."  Which members of the board of directors?  Is the government claiming only that Ms. Holmes defrauded board members in connection with their decisions to purchase company shares, or is the government alleging some other "investment" of money or property?

Although the government first introduced this new definition four months ago in a draft information it provided to the defense, the government did not attempt to explain what it means until a week ago.  In an email dated August 21, 2020, the government said that "certain business partners"

---

[1] As set forth in Ms. Holmes' Motion To Dismiss Counts One and Three through Eight as Duplicitous, filed contemporaneously herewith, the new definition of "investors" renders the investor-related counts duplicitous.  But even if the Court concludes that the Indictments are not duplicitous, they are unconstitutionally vague.

means Walgreens and Safeway, without explaining why it now considers these entities to be investors after treating them as something other than investors for the first two years of this case. And it appeared to suggest that its new definitions of "investors" includes all members of the Board of Directors, whether or not they invested money in Theranos, but this remains unclear. Suffice it to say, even a clear email could not cure the fatal ambiguities in the Indictments. The government's artfully evasive email certainly cannot do so.

Defending oneself from criminal charges should not be a guessing game. The government's new definition of "investors" requires Ms. Holmes to guess what the government means. The Court should dismiss Counts One and Three through Eight as unconstitutionally vague. A bill of particulars cannot cure this egregious ambiguity. Nonetheless, if the Court concludes that the Indictments pass constitutional muster, it should order a bill of particulars in the alternative.

## BACKGROUND

The government first obtained a Superseding Indictment in September 2018, alleging, in relevant part, that "Theranos solicited and received financial investments from investors" as part of a scheme to defraud those investors (*i.e.* deprive them of money). ECF No. 39 ¶ 3. The Superseding Indictment included a section regarding "Theranos's partnership with Walgreens" explaining Theranos' commercial launch and its rollout of Theranos wellness centers in 2013. *Id.* ¶ 10. The government further alleged, in a separate section of the indictment that formed the basis of the alleged scheme to defraud investors, that Theranos misrepresented the status of its "partnership" with Walgreens to "investors." *Id.* ¶ 12(D).

The Walgreens "partnership" was also referenced in the government's 404(b) Notice. Saharia Decl., Ex. A. In that notice, the government alleged that "[i]n pursuing and maintaining Theranos's partnership with Walgreens, Defendants made misrepresentations to Walgreens representatives." *Id.* at 3. Similarly, the government alleged that "[i]n pursuing a partnership between Theranos and Safeway, Defendants made misrepresentations to Safeway representatives." *Id.* Relevant to this motion, the government also alleged in its Rule 404(b) notice that "Defendants deceived Theranos's Board of Directors in furtherance of their schemes to defraud investors and patients," thus distinguishing between Board members and investors. *Id.*

MOTION TO DISMISS SECOND AND THIRD SUPERSEDING INDICTMENTS IN PART FOR LACK OF NOTICE OR, IN THE ALTERNATIVE, FOR A BILL OF PARTICULARS
CR-18-00258 EJD                                     2

1   Just under two years after the Superseding Indictment was returned, and after correspondence

2   and motions practice regarding the Rule 404(b) notice, the government sought the return of a

3   Superseding Information, which, among other things, expanded the term "investor" to include

4   "individuals, entities, certain business partners, members of its board of directors, and individuals and

5   entities who invested through firms formed for the exclusive or primary purpose of investing in

6   Theranos's securities."  ECF No. 390 ¶ 3.  The government Second and Third Superseding Indictments

7   reflect this same definition.  *See* ECF Nos. 449, 469.

8   As soon as the defense became aware of this new definition, it asked the government to clarify

9   its definition of "investors."[2]  On April 24, Ms. Holmes requested that the government identify, among

10  other things, (1) the "[i]ndividuals," "[e]ntities," "certain business partners," "members of Theranos's

11  Board of Directors," and "[i]ndividuals and entities who invested through firms formed for the exclusive

12  or primary purpose of investing in Theranos's securities" alleged to be investors in the draft indictment

13  and (2) the basis for the allegation that "certain business partners" and "members of the Board of

14  Directors" "invested" in Theranos.  *See* Saharia Decl., Ex. B at 2-3.  The government refused her request

15  on May 4, 2020, stating simply that it would respond when a new charging instrument was filed.  *See*

16  Saharia Decl., Ex. C.

17  On August 21, 2020, over three months after the government filed the May 8, 2020 Superseding

18  Information, and one week before this motion was due to be filed, the government responded.  Saharia

19  Decl., Ex. D.  In its August 21 email, the government stated in relevant part that "Theranos investors are

20  easily identifiable from the discovery."  *Id.*  But it did not explain how it is defining "investors."  Using

21  open-ended language, it went on:  "*For example*, a list of Theranos equity investors issued stock

22  certificates is available at THER-0905030."  *Id.* (emphasis added).  Presumably, the government's "For

23  example" limitation means to suggest that "investors" include individuals and entities beyond "equity

24  investors," but it provided the defense no way to ascertain who those other investors are, or the nature of

25  their "investments."

26

27  ───────────────
    [2] The government provided the defense with a draft superseding indictment that is identical to
    the Indictments in all material respects on April 13, 2020.  *See* Saharia Decl., Ex. E.

28  MOTION TO DISMISS SECOND AND THIRD SUPERSEDING INDICTMENTS IN PART FOR LACK OF NOTICE
    OR, IN THE ALTERNATIVE, FOR A BILL OF PARTICULARS
    CR-18-00258 EJD                                3

With respect to "certain business partners," the government wrote that "'[c]ertain business partners' are Safeway and Walgreens."  *Id.*  Safeway and Walgreens, notably, did not own Theranos stock and do not appear on the list of equity investors issued stock certificates cited by the government in its email.  If the meaning of "certain business partners" was so obvious, one wonders why the government did not simply say so in the indictment itself, instead leaving Ms. Holmes to guess for the prior four months.

As for "members of Theranos' Board," the government wrote that members of the Board "are easily identifiable from the discovery provided to you."  *Id.*  It then said, "Indeed, *many* are listed in the stock certificate ledger reflected at THER-0905030."  *Id.* (emphasis added).  That passage suggests that the government considers *all* members of the Board of Directors to be "investors" whether or not they owned stock or invested money to acquire.  If that is the government's position, the nature of these Board members' "investments" is utterly unclear.  Neither the Indictments nor the government's email provide any basis for answering that question.

The best we can tell from the government's email, the government's new definition of "investors" is equity investors and maybe other undefined investors, plus Walgreens and Safeway, plus any individual who ever served on Theranos' Board during the period of the charged conspiracies.

## ARGUMENT

## I.    The Third Superseding Indictment Is Unconstitutionally Vague.

Rule 7 mandates that an indictment contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c)(1).  That requirement codifies and enforces "basic principles of fundamental fairness" inherent in the Sixth and Fifth Amendments.  *Russell v. United States*, 369 U.S. 749, 763-66 (1962).  To pass constitutional muster, "'the accused must be apprised by the indictment, with reasonable certainty, of the nature of the accusation against him.'"  *Id.* at 766 (quoting *United States v. Simmons*, 96 U.S. 360, 362 (1877)).  "[C]ryptic form[s] of indictment" fail this standard and enable the prosecution to fill in the indictment's "gaps of proof by surmise or conjecture."  *Id.*  The constitutional notice requirement serves to (1) "enable [the defendant] to prepare his defense," (2) "ensure that the defendant is prosecuted on the basis of facts presented to the

grand jury," (3) "enable him to plead jeopardy against a later prosecution," and (4) "inform the court of the facts alleged so that it can determine the sufficiency of the charge." *United States v. Cecil*, 608 F.2d 1294, 1296 (9th Cir. 1979) (per curiam).  As this Court previously recognized, in assessing the sufficiency of an indictment, the court should read the indictment as a whole and apply common sense. ECF No. 330 at 9 (citing *United States v. Buckley*, 689 F.2d 893, 899 (9th Cir. 1982)).

The government's new, ambiguous definition of "investor" fails these constitutional safeguards.

## A.     The Indictments' Reference to "Certain Business Partners" Is Unconstitutionally Vague.

The government's failure to identify in the Indictments the "certain business partners" Ms. Holmes allegedly defrauded is fatal to Counts One and Three through Eight.

To prevail on a charge of wire fraud, the government must prove:  "(1) the existence of a scheme to defraud; (2) the use of wire, radio, or television to further the scheme; and (3) a specific intent to defraud." *United States v. Lindsey*, 850 F.3d 1009, 1013 (9th Cir. 2017) (internal quotation marks omitted).[3]  As this Court already recognized, a scheme to defraud must have as its object the deprivation of "'property in the hands of the victim.'"  ECF No. 330 at 27 (quoting *Cleveland v. United States*, 531 U.S. 12, 15 (2000)); *see also United States v. Miller*, 953 F.3d 1095, 1102-03 (9th Cir. 2020) (holding that "wire fraud requires the intent to deceive *and* cheat—in other words, to deprive the victim of money or property by means of deception," and abrogating the Ninth Circuit's model jury instruction on wire fraud (emphasis added)).  Accordingly, to defend against an allegation that a defendant engaged in a scheme to defraud, the defendant must know ***whom*** she allegedly intended to defraud.

Read with common sense, the prior indictment charged Ms. Holmes with defrauding "investors"—i.e., the identifiable, finite group of individuals and entities that invested money into Theranos in exchange for company shares.  The prior indictment reinforced that common-sense reading

---

[3] A conspiracy under section 1349 "requires an agreement among two or more persons that would satisfy the elements of the substantive offense" of wire fraud.  *United States v. Hussain*, 2017 WL 4865562, at *5 (N.D. Cal. Oct. 27, 2017).  Accordingly, an indictment charging conspiracy to commit wire fraud must specify the underlying fraud.  *See United States v. Yefsky*, 994 F.2d 885, 893 (1st Cir. 1993) ("We think a mail fraud conspiracy depends so crucially on the underlying fraud that the fraud also must be specified in the applicable count.").

1    in several respects.  First, each substantive wire-fraud count—Counts Three through Eight—involved a

2    transfer of money from an investor to Theranos in exchange for company shares.  Superseding

3    Indictment, ECF No. 39, ¶ 24.  Each individual or entity that initiated the at-issue wires, in other words,

4    received an ownership share in Theranos.  Second, the prior indictment used the terms "investors" and

5    "partner" to mean **different** things.  The indictment alleged that Ms. Holmes defrauded "investors" by

6    making false statements about, among other things, the status of its "partnership with Walgreens."  *Id.*

7    ¶ 12(D).  Ms. Holmes thus naturally understood that the allegedly defrauded "investors" did not include

8    Walgreens or other similar business "partners."

9         Common sense cannot help Ms. Holmes understand the government's new, cryptic definition of

10    "investors."  *Russell*, 369 U.S. at 766.  The Indictments do not define what it means by "business

11    partners."  At best, Ms. Holmes could guess that they include Walgreens, which the Indictments

12    continue to identify as a "partner."[4]  But the charging documents themselves do not identify any

13    additional "partners."  Nor do they identify the nature of the "investments" that these business partners

14    supposedly made—or the at-issue deprivation of money or property—which might help to narrow the

15    potential universe of individuals and entities with which Theranos interacted.  The government,

16    moreover, charges Ms. Holmes with defrauding only "certain" business partners, but it fails to identify

17    which ones.  And as discussed below, trial by email is not constitutionally permissible.

18         To be sure, the notice requirement is not exacting; as this Court previously explained, "[t]he

19    Government must only provide enough facts to apprise a defendant of what defense should be prepared

20    for trial."  ECF No. 330 at 9.  But if any indictment fails this standard, this is it.  Ms. Holmes does not

21    know "what defense should be prepared for trial."  *Id.*  Is she defending an allegation that she defrauded

22    just Walgreens and Safeway?  The Department of Defense?  Doctors' offices that engaged a Theranos

23    technician on-site?  Pharmaceutical companies with which Theranos transacted?  Vendors that provided

24

25         [4] As Ms. Holmes explains in her Motion To Dismiss Counts One and Three through Eight as

26    Duplicitous, an indictment charging a scheme to defraud Walgreens would be time-barred.  The same
      would be true for Safeway and any number of other potential "business partners."  The government's re-

27    definition of "investors" to include such entities thus appears to be an attempted end-run around the
      statute of limitations.

28    MOTION TO DISMISS SECOND AND THIRD SUPERSEDING INDICTMENTS IN PART FOR LACK OF NOTICE
      OR, IN THE ALTERNATIVE, FOR A BILL OF PARTICULARS
      CR-18-00258 EJD                                    6

business services to Theranos?  Neither the Indictments nor common sense provide any answers to these questions.  And the answers to these questions fundamentally shape Ms. Holmes' trial preparations and the scope of the trial.

Each of the purposes motivating the notice requirement requires dismissal here.  First, as just set forth, Ms. Holmes cannot adequately prepare her defense against a charge that she engaged in a scheme to defraud "certain business partners."  The identities of the at-issue business partners will affect Ms. Holmes' trial preparations, including, for example, her preparation to meet the government's case at trial, her identification of relevant witnesses and exhibits, and third-party discovery.  Second, the ambiguity and breadth of this term make it impossible to know whether Ms. Holmes is being prosecuted on the basis of facts presented to the grand jury.  Third, the term is so vague that it could complicate Ms. Holmes' ability to plead jeopardy against a later prosecution—for example, if the government later charged Ms. Holmes with defrauding the Department of Defense, an entity with which Theranos transacted and that is mentioned in the Indictments, would the government disclaim that the Department was a "business partner"?  Finally, and critically, the vague reference to "certain business partners" does not allow the Court to determine the sufficiency of the Indictments.  As this Court already recognized, the wire-fraud statute requires a scheme to defraud victims of *money or property*.  *See* p. 5, *supra*. When the term "investors" had its natural meaning in the prior indictment, it was fairly simple to ascertain that the alleged scheme to defraud "investors" had as its object the deprivation of money or property.  The opacity of the term "business partners" makes that inquiry impossible, because the Indictments contain no details about the nature of the "investments" made by these "business partners."

The government now claims, four months after Ms. Holmes requested information regarding the meaning of "certain business partners," that the term simply means Walgreens and Safeway.  Saharia Decl., Ex. D.  But that is not obvious from the Indictments.  To the contrary, the Indictments point away from construing "investors" to include Walgreens because it alleges that Ms. Holmes made misrepresentations to "investors" about the status of Theranos' partnership with Walgreens—an allegation that makes no sense if Walgreens is itself an investor.[5]  *See e.g.*, TSI, ECF No. 469 ¶¶ 10,

---

[5] Such a broad and vague reach of the definition of "investor" present a substantial risk of a

12(D).  And, as set forth above, absent any clarification of how the government is defining

"investment," there are a host of entities with which Theranos did business that might qualify as a

"certain business partner," many of which are represented on the government's witness list.  Proceeding

to trial on this vague indictment will create the substantial risk that the jury will convict Ms. Holmes

based on relationships with "business partners" that were not the subject of the indictment.

### B.   The Indictments' Reference to "Members of the Board of Directors" Is Unconstitutionally Vague.

The Indictments reference to "members of the Board of Directors" as part of the class of

allegedly defrauded "investors" is likewise unconstitutionally vague.  Some members of the Board of

Directors did invest money into Theranos in exchange for company shares; these individuals would

already have been included in the term "investors," as naturally understood, in the prior indictment.

Although Ms. Holmes initially assumed the government intends for the definition of "investors" to

include only "members of the Board of Directors" who transferred money to Theranos, *see e.g.*, TSI

ECF No. 469, ¶ 3, she cannot be sure, especially in light of its recent email.  The government's new

definition suggests that it intends the definition to sweep into the charging document a broader group of

directors—, this part of the new definition would be superfluous.  But, again, it is impossible to discern

what that other "investment" could be, because the Indictments provide no information.

The government's email confirms the confusion.  Regarding the Board of Directors, the

government stated that "[m]embers of Theranos' board are easily identifiable from the discovery

provided to you.  Indeed, many are listed in the stock certificate ledger."  Saharia Decl., Ex. D.  The

sentence, designed to evade the question, highlights the problem.  Is the government claiming that Ms.

Holmes defrauded every member of the Board of Directors, as the first sentence quoted here states?  Or

is it referring only to those listed in the stock certificate ledger, as the second sentence states in

contradiction to the first?  If the first is the meaning, what is the nature of the alleged investment?  Ms.

Holmes cannot fairly defend against this charge without understanding what is being charged.

Notably, before returning the Indictments, the government disclosed that it intended to introduce

---

nonunanimous jury verdict.  *See United States v. Gordon*, 844 F.2d 1397, 1401-02 (9th Cir. 1988).

evidence that Ms. Holmes allegedly defrauded Board members under Rule 404(b).  *See* Saharia Decl., Ex. A.  The government subsequently represented that the effect of the new indictment is to pull some of the conduct it alleged in its Rule 404(b) notice into the charging document itself.  Hr'g Tr. 23:16-24, July 20, 2020.  That statement illustrates the confusion produced by the Indictments.  The Rule 404(b) notice had nothing to do with "investments" by Board members.  It alleged only that "Defendants deceived Theranos's Board of Directors in furtherance of their schemes to defraud investors and patients," plainly indicating that the directors and investors were distinct groups. Saharia Decl., Ex. A. at 3.  The government's redefinition of "investors" to include Board members suggests that it intends to charge deception of Board members without the requisite connection to deprivation of money or property in their hands.

As with "business partners," each of the purposes motivating the notice requirement requires dismissal here.  *See* p. 6, *supra*.  First, Ms. Holmes cannot adequately prepare her defense against a charge that she engaged in a scheme to defraud Board members without understanding which ones or what the alleged deprivation of money or property is.  Indeed, there were different Board members at different times throughout the company.  Second, the ambiguity of this term makes it impossible to know whether Ms. Holmes is being prosecuted on the basis of facts presented to the grand jury.  Third, the term is so vague that it could complicate Ms. Holmes' ability to plead jeopardy against a later prosecution.  Finally, and critically, the vague reference to "members of the Board of Directors" does not allow the Court to determine the sufficiency of the Indictments.  As just set forth, the government does not explain the nature of the alleged deprivation of money or property in their hands—*e.g.*, whether it is limited to money they gave to Theranos in exchange for corporate shares, or whether the government has some other, more nebulous "investment" in mind, which may well fail under the wire-fraud statute.

### C.   The Indictments' Reference to "Investors" Is Unconstitutionally Vague.

Finally, as the foregoing discussion makes clear, the entire definition of "investors" is unconstitutionally vague.  It fails to provide the constitutionally required notice because it includes "certain business partners" and "members of the Board of Directors," which are themselves

1    unconstitutionally vague.  More fundamentally, however, the new definition of "investors" indicates that

2    the government has redefined that term to mean something broader than the traditional, common-sense

3    understanding—i.e., equity investors—that flowed from the prior indictment.  But the Indictments

4    provide no way to ascertain that broader meaning.  As a result, it is impossible to know which

5    "individuals" and "entities" the government alleges to be investors.  Again, if these terms are limited to

6    individuals and entities purchased Theranos securities, they can be easily identified.  But if the

7    government is now claiming that some other contribution of money or property qualifies as an

8    "investment," as its email suggests, *see* p. 3-4, *supra*, the universe of potentially defrauded individual or

9    entity "investors" is unknowable.  Ms. Holmes cannot adequately litigate at this stage whether such

10   individuals qualify as victims under the wire-fraud statute without knowing who they are and how the

11   government claims they were deprived of money or property.

12       **D.    The Government's Email Does Not Save Its Unconstitutional Indictments.**

13       "[I]t is a settled rule that a bill of particulars cannot save an invalid indictment."  *Russell*, 369

14   U.S. at 769-70; *see also United States v. Keith*, 605 F.2d 462, 464 (9th Cir. 1979).  This is because a bill

15   of particulars cannot ensure that the grand jury considered the facts the government is presenting as the

16   basis for its theory.  *See Russell*, 369 U.S. at 771.  "To allow the prosecutor, or the court, to make a

17   subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment

18   would deprive the defendant of a basic protection which the guaranty of the intervention of a grand jury

19   was designed to secure."  *Id.*  Accordingly, failure of an indictment to detail each element of the charged

20   offense generally constitutes a fatal defect," *Keith*, 605 F.2d at 464, whether or not the court requires a

21   bill of particulars.

22       If a bill of particulars cannot save a fatally ambiguous indictment, it is all the more the case that

23   the government cannot cure the deficiencies in the Indictments by an eleventh-hour email—let alone by

24   an ambiguous email.  As the Supreme Court has explained, "[t]he very purpose of the requirement that a

25   man be indicted by grand jury is to limit his jeopardy to offenses charged by a group of his fellow

26   citizens acting independently of either prosecuting attorney or judge."  *Russell*, 369 U.S. at 771.

27   Because of the government's ambiguous and shifting definition of the term investor, the Court can only

28   MOTION TO DISMISS SECOND AND THIRD SUPERSEDING INDICTMENTS IN PART FOR LACK OF NOTICE
     OR, IN THE ALTERNATIVE, FOR A BILL OF PARTICULARS
     CR-18-00258 EJD                          10

1    "guess as to what was in the minds of the grand jury at the time they returned the indictment." *See id.*

2    The grand jury very well could have indicted on a narrower definition of investor than the government is

3    now asserting by email.  There is simply no way to know from the sparse information in the Indictments.

4    And the government's email does not change that fact.

5                                             *        *        *

6          For these reasons, Counts One and Three through Eight, all of which rest on the new definition

7    of "investors," should be dismissed.

8    **II.    At a Minimum, the Court Should Order a Bill of Particulars.**

9          Although a "bill of particulars cannot save an invalid indictment," *Keith*, 605 F.2d at 464, a bill

10   of particulars is warranted here in the event that the Court does not dismiss the Second and Third

11   Superseding Indictments.  *See* Fed. R. Crim. P. 7(f).  A bill of particulars is "appropriate where a

12   defendant requires clarification in order to prepare a defense."  *United States v. Long*, 706 F.2d 1044,

13   1054 (9th Cir. 1983).  The principal purpose of a bill of particulars is "to apprise the defendant of the

14   specific charges being presented to minimize danger of surprise at trial, to aid in preparation and to

15   protect against double jeopardy."  *Id.*  Courts have "very broad discretion" to order a bill of particulars.

16   *Will v. United States*, 389 U.S. 90, 99 (1967).

17         As the Court has already recognized, the scope of this case weighs in favor of a bill of particulars

18   as a general matter.  Even under the prior indictment, "[t]he universe of potential misrepresentations

19   [was] vast."  ECF No. 330 at 15.  The government's expansion of the definition of "investor," and its

20   doubling of the length of the charged conspiracy to defraud investors (from three to six years), multiply

21   the universe of potential misrepresentations even further.  And "discovery in this case is immense."  *Id.*

22   at 16.  At the time of the prior motion to dismiss, the government had produced 20 million pages of

23   documents; the government's production now stands at over 29 million pages.  The defense cannot

24   reasonably scour that production to guess what "investors" are now alleged to be victims if that term

25   means something other than individuals or entities that purchased equity shares.

26         These "realities"—combined with the ambiguous nature of the Indictments—"create a

27   substantial risk that Defendants may be unfairly surprised at trial."  *Id.*  The Court should require the

28   MOTION TO DISMISS SECOND AND THIRD SUPERSEDING INDICTMENTS IN PART FOR LACK OF NOTICE
     OR, IN THE ALTERNATIVE, FOR A BILL OF PARTICULARS

government to provide the following information if it does not dismiss the investor-related counts.

A.   **The "individuals," "entities," "certain business partners," "members of the Board of Directors," and "individuals and entities who invested through firms formed for the exclusive or primary purpose of investing in Theranos's securities" alleged to be "investors."**

As this Court recognized in its prior ruling, the function of a bill of particulars is to allow the defendant to understand "the theory of the government's case."  ECF No. 330 at 12 (emphasis omitted) (quoting *Yeargain v. United States*, 314 F.2d 881, 882 (9th Cir. 1963)).  In light of the government's new, vague definition of "investors," Ms. Holmes cannot understand the theory of the investor-related counts without knowing whom the government is claiming to be "investors."  It is thus critical that the government be required to disclose which "investors" Ms. Holmes is alleged to have defrauded.

As the Supreme Court has indicated, "it is not uncommon" to require disclosure of alleged fraud victims "where this information is necessary or useful in the defendant's preparation for trial."  *Will*, 389 U.S. at 92, 99 (identities of persons alleged to have heard oral misrepresentations by defendant); *see also, e.g.*, *United States v. Trumpower*, 546 F. Supp. 2d 849, 852 (E.D. Cal. 2008) (requiring disclosure of the alleged "victims" of mail/wire fraud); *United States v. Nat'l Marketing, Inc.*, 306 F. Supp. 1238, 1242 (D. Minn. 1969) (requiring disclosure of other "similarly situated" victims); *United States v. Caine*, 270 F. Supp. 801, 806-07 (S.D.N.Y. 1967) (ordering disclosure of the identities of allegedly defrauded customers).  Here, in light of the government's new definition, disclosure of the alleged "investors" is necessary to prepare for trial and to avoid unfair surprise because without such disclosure, the theory of the investor-related counts is unclear.

Of course, this is not to say that an indictment must always identify the alleged victims by name.  Ms. Holmes did not move for disclosure of the names of alleged "investors" in the prior indictment because—based on the indications in the prior indictment—she understood that term to have its common-sense meaning of equity investors and she was able to identify who those investors were.  In contrast, she does not currently understand the scope of the government's definition or the claimed deprivation of money or property, for all the reasons set forth above.  The Court should require a bill of particulars identifying the claimed "investors."

MOTION TO DISMISS SECOND AND THIRD SUPERSEDING INDICTMENTS IN PART FOR LACK OF NOTICE OR, IN THE ALTERNATIVE, FOR A BILL OF PARTICULARS
CR-18-00258 EJD                                      12

### B.   The "certain business partners" and the nature of their "investments."

At a bare minimum, the Court should require the government to disclose formally in a bill of particulars the "certain business partners" alleged to be "investors" and the nature of their supposed "investments."  The Indictments do not define "business partners," and, as set forth above, that vague term could include any number of individuals, companies, or governmental entities, despite what the government's email purports the term to mean presently.

The Indictments provide no clues regarding the "certain" business partners at issue.  Nor do they explain the nature of these business partners' supposed investments, which is critical to determining whether the government adequately alleges that they were deprived of money or property.  The ambiguities introduced by this term are similar to the ambiguities introduced by the government's "implicit representation" theory of wire fraud in the patient-related counts.  In its prior ruling, this Court held that the earlier indictment "lack[ed] any clear explanation of the Government's implicit-misrepresentation case theory," ECF No. 330 at 16.  For that reason (among others), the Court required a bill of particulars enumerating the representations at issue in the patient counts, including "the particular tests the government claimed Theranos was not capable of consistently producing," *id.*  Just as the government was required to identify the "particular tests," the Court should likewise require the government to identify the "certain business partners" at issue and the nature of their supposed investment, so that Ms. Holmes is not "left to guess" the government's new theory.  *Id.*

### C.   The "members of the Board of Directors" and the nature of their "investments."

For the same reasons as with the preceding category, at a bare minimum the government should be required to identify the "members of the Board of Directors" alleged to be "investors" and the nature of their supposed investments.  Ms. Holmes is entitled to know the theory of the government's case as it relates to members of the Board of Directors.  The Indictments "lack[] any clear explanation" of the government's theory as it relates to these individuals; in particular, it does not explain the nature of the claimed deprivation of money or property for these individuals.  The government's email implies that the entire Board meets its definition of investor, but it also notes that "many" members of the Board are identified on a stock certificate ledger.  Saharia Decl., Ex. D.  Rather than clarify, the government's

MOTION TO DISMISS SECOND AND THIRD SUPERSEDING INDICTMENTS IN PART FOR LACK OF NOTICE
OR, IN THE ALTERNATIVE, FOR A BILL OF PARTICULARS
CR-18-00258 EJD                                                            13

1    explanation simply magnifies the vagueness in the Second and Third Superseding Indictments.  Ms.

2    Holmes is entitled to know whether she is defending against claims related to certain Board members'

3    purchases of corporate securities or whether the government will contend at trial that some other money

4    or property is at issue.

5          **D.     The alleged misrepresentations made to the various "investors."**

6          The government's new definition of investors puts at issue any statement made by Ms. Holmes

7    to any individual that falls into one of the five broad categories.  Accordingly, the government should be

8    required to identify the alleged misrepresentations made to each category of "investors."  To be sure, the

9    Court did not previously order a bill of particulars identifying the particular investor-focused

10   misrepresentations because, the Court found, Ms. Holmes was not "left to guess about the Government's

11   investor fraud-case theory."  ECF No. 330 at 16.

12         The government's reformulation of the term investor—and its doubling of the length of the

13   alleged conspiracy from three to six years—significantly changes the landscape.  The government has

14   alleged that Ms. Holmes "made material false and misleading statements to investors and failed to

15   disclose material facts" through "misleading written and verbal communications," "marketing

16   materials," "misleading financial statements, models and other information" and misleading "statements

17   to the media."  *See, e.g.*, TSI, ECF No. 469 ¶ 12.  With the current expansion of both the length of the

18   time frame and the definition of investors, it appears that Ms. Holmes will now be required to defend at

19   trial (a) all statements made to any member of the Board of Directors (although of course most of those

20   statements had nothing to do with soliciting investments from them), business partners, traditional

21   investors, or firms founded to invest in Theranos, that was made in any written or verbal

22   communication, and (b) all statements to the media.  The fact that the Indictments do not provide Ms.

23   Holmes with a basis to determine who falls into these groups (and when) creates the inevitability of

24   unfair surprise at trial.  Accordingly, the Court should order the government to disclose in a bill of

25   particulars (1) the specific implicit and explicit alleged false and fraudulent misrepresentations, (2) what

26   about them is false, (3) who made them, (4) how Defendants caused them to be made, and (5) to whom

27   they were made.  *See* ECF No. 330 at 16 (ordering similar information for patient-related counts).

28   MOTION TO DISMISS SECOND AND THIRD SUPERSEDING INDICTMENTS IN PART FOR LACK OF NOTICE
     OR, IN THE ALTERNATIVE, FOR A BILL OF PARTICULARS

E.      **The basis of any alleged duty to disclose.**

Finally, Ms. Holmes respectfully maintains that the government fails to allege facts giving rise to a duty to disclose to support an omission theory of wire fraud, and has moved to dismiss the Indictments on that basis in a separate motion.  But, if the Court disagrees, at a minimum it should order the government to disclose the basis of its alleged duty to disclose to each group of purported investors.  In its prior ruling, the Court held that it was unnecessary to require the government to identify the basis of the claimed duty to disclose because "Defendants can infer the government's case-theory."  ECF No. 330 at 20.  That is not the case now.  Defendants cannot infer the basis of the government's case theory as to the new categories of "investors" identified in the Indictments.  The government previously claimed that Defendants had an informal fiduciary relationship with investors.  (They did not.)  Does the government claim that Defendants had an informal fiduciary relationship with all purported "investors," even mega-companies like Walgreens and Safeway, as well as billionaires, that were well equipped to perform due diligence?  We have no idea.  The Court should dismiss the Indictments insofar as they allege omissions, but if it does not it should require a bill of particulars identifying the basis of any alleged duty to disclose for each category of investor.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Counts One and Three through Eight of the Second and Third Superseding Indictments or, in the alternative, instruct the government to provide a bill of particulars.

DATED:  August 28, 2020                              Respectfully submitted,


                                                     /s/ Amy Mason Saharia
                                                     KEVIN DOWNEY
                                                     LANCE WADE
                                                     AMY MASON SAHARIA
                                                     KATHERINE TREFZ
                                                     Attorneys for Elizabeth Holmes

MOTION TO DISMISS SECOND AND THIRD SUPERSEDING INDICTMENTS IN PART FOR LACK OF NOTICE OR, IN THE ALTERNATIVE, FOR A BILL OF PARTICULARS
CR-18-00258 EJD                           15

1

**<u>CERTIFICATE OF SERVICE</u>**

2

I hereby certify that on August 28, 2020, a copy of this filing was delivered via ECF on all

3

counsel of record.

4

5

/s/ Amy Mason Saharia

6

AMY MASON SAHARIA
Attorney for Elizabeth Holmes

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION TO DISMISS SECOND AND THIRD SUPERSEDING INDICTMENTS IN PART FOR LACK OF NOTICE
OR, IN THE ALTERNATIVE, FOR A BILL OF PARTICULARS
CR-18-00258 EJD

JOHN D. CLINE (CA State Bar No. 237759)
50 California Street, Suite 1500
San Francisco, CA 94111
Telephone: (415) 662-2260 │Facsimile: (415) 662-2263
Email: cline@johndclinelaw.com

KEVIN M. DOWNEY (Admitted Pro Hac Vice)
LANCE A. WADE (Admitted Pro Hac Vice)
AMY MASON SAHARIA (Admitted Pro Hac Vice)
KATHERINE TREFZ (CA State Bar No. 262770)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
Washington, DC 20005
Telephone: (202) 434-5000 │Facsimile: (202) 434-5029
Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

Attorneys for Defendant ELIZABETH A. HOLMES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR-18-00258-EJD |
| Plaintiff, | |
| v. | **DECLARATION OF AMY MASON SAHARIA IN SUPPORT OF MOTION TO DISMISS SECOND AND THIRD SUPERSEDING INDICTMENTS IN PART FOR LACK OF NOTICE OR, IN THE ALTERNATIVE, FOR A BILL OF PARTICULARS** |
| ELIZABETH HOLMES and RAMESH "SUNNY" BALWANI, | |
| Defendants. | Hon. Edward J. Davila |

I, AMY MASON SAHARIA, declare as follows:

1.      I represent Defendant Elizabeth Holmes and have been admitted to practice *pro hac vice* in the above-captioned matter.  I submit this declaration in support of Ms. Holmes' Motion to Dismiss Second and Third Superseding Indictments in Part for Lack of Notice Or, In the Alternative, A Bill of Particulars ("Motion").  I attest to the following facts upon which the motion relies.

2.      Attached to the motion are five exhibits.  The content of the exhibits are as follows:

a.      Exhibit A is a true and correct copy of a March 6, 2020, letter from Assistant United States Attorney John Bostic providing notice of evidence the government intends to introduce at trial pursuant to Federal Rule of Evidence 404(b).

b.      Exhibit B is a true and correct copy of an April 24, 2020, letter from Lance Wade to government counsel concerning the allegations in the government's draft Superseding Information.

c.      Exhibit C is a true and correct copy of a May 4, 2020, email from Assistant United States Attorney Robert Leach to Lance Wade.

d.      Exhibit D is a true and correct copy of an August 21, 2020, email from Assistant United States Attorney Robert Leach to Lance Wade.

e.      Exhibit E is a true and correct copy of the government's draft Superseding Information provided to defense counsel by Assistant United States Attorney Robert Leach on April 13, 2020.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed this 28th day of August, 2020 in Chevy Chase, MD.

AMY MASON SAHARIA
Attorney for Elizabeth Holmes

DECLARATION OF AMY MASON SAHARIA IN SUPPORT OF MOTION TO DISMISS SECOND AND THIRD SUPERSEDING INDICTMENTS IN PART FOR LACK OF NOTICE OR, IN THE ALTERNATIVE, FOR A BILL OF PARTICULARS
CR-18-00258 EJD             2

# Exhibit A



**U.S. Department of Justice**

*United States Attorney*
*Northern District of California*

| | |
|---|---|
| *150 Almaden Boulevard, Suite 900* | *(408) 535-5061* |
| *San Jose, California 95113* | *Fax:(408) 535-5066* |

March 6, 2020

**VIA EMAIL**

Lance Wade
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, DC 20005

Jeffrey B. Coopersmith
Orrick Herrington & Sutcliffe LLP
701 5th Avenue, Suite 5600
Seattle, WA 98104-7097

    Re: <u>United States v. Elizabeth Holmes and Ramesh "Sunny" Balwani</u>
       CR-18-00258-EJD
       Notice re Government's Intent to Introduce Certain Evidence

Dear Counsel:

  We write to provide notice that the government may seek to introduce certain evidence in its case in chief in the above-referenced matter. This evidence is relevant to the charges in this case and is admissible to show, among other things, Defendants' motive, opportunity, intent, preparation, plan, knowledge, identity, consciousness of guilt, or absence of mistake or accident. See Fed. R. Evid. 404(b).

  Please note that, by providing this disclosure, the government is not conceding that this evidence is admissible only under the provisions of Rule 404(b). The government may also assert that this evidence is admissible as direct evidence of the charged conduct, that it is inextricably intertwined with the events charged in the operative Indictment, or that it shows a continuing course of conduct otherwise admissible under Rules 401 and 402.

  The facts summarized below are supported by the evidence in the government's discovery production, including witness statements as reflected in summary memoranda and source documents such as emails, laboratory reports, and business records.

  This notice supplements the previous 404(b) disclosures that have accompanied the government's discovery productions in this case. The government reserves the right to introduce additional evidence covered by those previous disclosures, and further reserves the right to amend this notice in advance of trial based on its continuing investigation and trial preparation.

1. **False and misleading representations directed at insured patients.**  As part of Defendants' scheme to defraud patients, they falsely represented to patients that Theranos's tests were accurate, reliable, and suitable for use in the clinical context, when Defendants knew that Theranos's tests were not properly validated and suffered from accuracy problems that rendered them unreliable and not suitable for informing clinical treatment decisions.  Defendants caused Theranos to misrepresent the accuracy and reliability of its tests in advertisements and other promotional materials distributed electronically and in print, and further misled patients as to the nature of Theranos's tests by offering their tests for use in the clinical context, necessarily implying that Theranos's tests could be relied upon for medical decision-making.  Patients who questioned or complained about Theranos's test results were falsely told that the company was having temporary, isolated problems with individual assays, were falsely assured that Theranos's tests could be relied upon, or were given other excuses that masked the limitations of Theranos's technology.  Defendants also misled insured and uninsured patients regarding the methods of blood collection used by Theranos, causing patients to believe that they could have any blood test performed using a finger-stick when Theranos relied on vein draws for a substantial portion of its tests.  These misrepresentations were directed at all potential customers of Theranos, including patients with and without medical insurance that might cover the cost of Theranos's tests.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, doctors and patients who patronized Theranos, marketing personnel employed or retained by Theranos, and former employees of Theranos.

2. **False and misleading representations directed at doctors.**  As part of Defendants' scheme to defraud patients, they falsely represented to doctors that Theranos's tests were accurate, reliable, and suitable for use in the clinical context, when Defendants knew that Theranos's tests were not properly validated and suffered from accuracy problems that rendered them unreliable and not suitable for informing clinical treatment decisions. Defendants' misrepresentations came in multiple forms, including advertising and promotional materials distributed electronically and in print, directed at doctors and health professionals acting as patient representatives who would later advise patients as to which blood testing services they should use.  Defendants also caused misrepresentations to be directed at doctors during real-time conversations between doctors and Theranos representatives.  For example, Dr. Linnerson in the Phoenix area was falsely told by Theranos representatives that the company's tests had obtained FDA approval.  Similarly, doctors who questioned or complained about Theranos's test results were falsely told that the company was having temporary, isolated problems with individual assays, were falsely assured that Theranos's tests could be relied upon, or were given other excuses that masked the limitations of Theranos's technology.  Other doctors were deceived as to the equipment and methods used for Theranos's tests, with the company withholding information necessary for doctors to place those test results in context.  See below. Defendants also misled doctors regarding the methods of blood collection used by Theranos, causing doctors to believe that patients could have any blood test performed using a finger-stick when Theranos relied on vein draws for a substantial portion of its tests.  Similarly, Defendants misled some doctors regarding the equipment on which Theranos's tests would be run and the location of that equipment.  Specifically, when Theranos partnered with doctors' offices to provide testing services in-house, Theranos would acquire office space within or near the doctor's practice and lead the doctor to believe that Theranos was maintaining and operating one of its small, Theranos-manufactured analyzers onsite.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but

not limited to, doctors and patients who patronized Theranos, marketing personnel employed or retained by Theranos, and former employees of Theranos.

3. **False and misleading representations made to Theranos's Board of Directors.** Defendants deceived Theranos's Board of Directors in furtherance of their schemes to defraud investors and patients.  In particular, Defendants misrepresented the capabilities of Theranos's technology to the Board, making false claims about matters including:  the capabilities of Theranos's analyzers; the accuracy and reliability of Theranos's tests; the existence of data proving the accuracy and reliability of Theranos's tests; the extent to which Theranos relied on third-party analyzers; the extent to which Theranos relied on vein draws; the nature of FDA's approval requirements for Theranos's tests; the extent to which Theranos's technology had been validated by other entities and organizations including hospitals; the success of Theranos's relationship with Walgreens; the revenues and financial health of the company; the truth of facts reported in the *Wall Street Journal*'s October 15, 2015 article discussing Theranos; and Defendants' willingness to submit Theranos's devices for independent testing or conduct comparison testing matching Theranos's test results against those from conventional labs.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, members of Theranos's Board of Directors.

4. **False and misleading representations made to Walgreens.**  In pursuing and maintaining Theranos's partnership with Walgreens, Defendants made misrepresentations to Walgreens representatives about matters including:  the number of tests Theranos's analyzer could perform using a sample drawn from a finger-stick; the number of assays Theranos's devices could conduct on a single sample; whether Theranos's technology was mature and ready for commercial launch; the existence of technological boundaries affecting Theranos's ability to scale up its testing services; the accuracy and reliability of Theranos's tests and whether those tests were as accurate as or more reliable than competing tests from conventional labs; the extent to which Theranos relied on third-party analyzers; the extent to which Theranos relied on vein draws; the nature of FDA's approval requirements for Theranos's tests; whether Theranos conducted adequate proficiency testing;  the extent to which Theranos's technology had been validated by other entities and organizations including pharmaceutical companies and research universities who had purportedly used Theranos's testing services for clinical trials or other studies; the purported use of Theranos's technology by the United States military; Theranos's ability to provide decentralized testing services at the point of care and the company's experience operating under that model; and the profitability and financial health of the company.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to former Theranos employees as well as Walgreens personnel.

5. **False and misleading representations made to Safeway.**  In pursuing a partnership between Theranos and Safeway, Defendants made misrepresentations to Safeway representatives about matters including:  the number of tests Theranos's analyzer could perform; the number of assays Theranos's devices could conduct on a single sample; the accuracy and reliability of Theranos's tests; whether Theranos's technology was ready for commercial launch; the extent to which Theranos relied on third-party analyzers; the extent to which Theranos relied on vein draws; the nature of regulatory approval requirements for Theranos's tests; the extent to which Theranos's technology had been validated by other entities and organizations including pharmaceutical companies and research universities; the use of Theranos technology by the military; and the financial

health and projected profitability of the company.  Additionally, Holmes agreed to provide a Theranos analyzer to UCSF so that they could evaluate Theranos's technology partly for Safeway's benefit.  Theranos, however, never provided UCSF with a device to review.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees and Safeway representatives.

6. **False and misleading representations made to journalists.**  In promoting Theranos's business, Defendants and their representatives were interviewed by journalists and made a number of false and misleading statements to those journalists regarding the state of Theranos's business and the capabilities of Theranos's technology.  For example, Holmes made several misrepresentations to reporter Roger Parloff, including:  (1) that Theranos's level of quality and low coefficient of variation was revolutionary for a certified lab; (2) that Theranos had done 70 or more tests from a single microsample; (3) that Theranos was different from labs that used large machines in a centralized process; (4) that Theranos was exceeding requirements for proficiency testing; (5) that Theranos's platform could do all of the several hundred tests offered by Quest in a regional lab; (6) that Theranos had a single device that could perform any test; and (7) that Theranos's clinical laboratory consisted of hundreds of Theranos analyzer devices.  Simultaneously, Defendants did not correct the false conclusions that journalists reached based on Defendants statements, failing to clarify, for example, that Theranos's analyzer could perform only a limited number of assays and the company relied on third-party analyzers for a significant portion of its tests.  Moreover, when Defendants saw false statements about Theranos's capabilities repeated in press coverage, they did not correct those reports.  This remained the case even when other employees brought the inaccurate statements to their attention—for example, Theranos attorney Brad Arington confronted Holmes about multiple false statements in Roger Parloff's June 2014 *Fortune* article about Theranos.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees and attorneys as well as journalists who covered Theranos and conducted interviews of either Defendant.

7. **Fostering culture of secrecy and forcing employees and others to sign non-disclosure agreements.**  In order to prevent the spread of information regarding problems at Theranos, Defendants required employees to sign strict non-disclosure agreements.  Similar agreements were prerequisites to board members, potential investors, and other visitors obtaining information about the company, its technology, and its business.  Similarly, in their roles controlling the day-to-day operations of Theranos and overseeing the company's employees, Defendants took steps to silo information within Theranos, discouraging employees from sharing information about their work with other employees in the company and fostering a culture of internal secrecy.  These actions minimized the number of Theranos employees who were aware of problems relating to the company's research and development practices, technological capabilities, clinical laboratory practices, and business relationships.  In particular, Defendants discouraged employees from sharing information regarding Theranos's use of third-party analyzers for its tests, taking specific steps to conceal this fact from employees who did not already know.  Those steps included renaming third-party devices in Theranos's information management systems and assigning them code names so that employees who accessed these systems could not determine that those devices had in fact been manufactured by third-party companies.  Defendants were so restrictive in controlling employees' statements about Theranos that they required some employees to remove references to Theranos from the employees' LinkedIn profiles.  Defendants were similarly secretive

with investors, refusing to disclose to representatives like Lisa Peterson the identities of other investors in the company.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees and investors as well as potential and actual strategic partners of Theranos.

8. **Restricting access to laboratory areas within Theranos.**  Defendants set policies at Theranos that severely restricted access to the laboratory areas where Theranos tested patient samples.  Employees who did not work in the clinical laboratory generally were not able to access the areas, and visitors generally were not allowed to view those areas.  These policies and practices prevented the dissemination of knowledge regarding problems with Theranos's proprietary analyzers as well as Theranos's use of third-party devices for many of its tests.  Similarly, while withholding access to the actual clinical lab, Defendants misled visitors to Theranos by intentionally giving them the impression that the clinical lab consisted of multiple Theranos TSPUs and did not include other conventional devices.  For example, when Vice President Biden visited Theranos in July 2015, Theranos did not show visitors the CLIA lab where patient sample testing was performed, but set up a room containing a large number of Theranos TSPU boxes on shelves, intending that visitors believe they were viewing the machines that ran Theranos's clinical tests.  Within Theranos's Normandy laboratory, Balwani ordered that wall dividers be installed to hide the Tecan devices Theranos used to dilute its samples.  When Holmes was interviewed by Roger Parloff following his visit to Theranos's facilities, she responded to his request to see the lab by indicating that he had essentially already seen the lab because he had seen a room with multiple TSPU devices.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees, potential and actual strategic partners of Theranos, journalists, and others who visited Theranos.

9. **Harassing, threatening, or otherwise influencing doctors or patients who had negative experiences with Theranos.**  When doctors or patients made public statements about inaccurate Theranos test results and other negative experiences with the company, Defendants and their agents engaged in harassing, threatening, or other improper behavior in an effort to dissuade those providers from generating negative publicity for Theranos.  For example, when Arizona provider Dr. Nicole Sundene was cited in a *Wall Street Journal* article after providing information about an unreliable Theranos test result, Balwani visited her offices in person along with Christian Holmes and berated her and her staff, threatening to sue her.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees as well as doctors and patients who patronized Theranos's testing services.

10. **Threatening, influencing, or vilifying journalists in response to negative coverage of Theranos.**  When journalists investigated Theranos and wrote articles exposing misrepresentations made by Defendants concerning Theranos's business and technology, Defendants and their agents threatened and other attempted to improperly influence those journalists in an effort to suppress negative publicity.  For example, when Defendants learned that a reporter from the *Wall Street Journal* was investigating the company and planning to publish an article reporting unfavorable facts about the company and its technology, Defendants directed attorneys to reach out to the *Wall Street Journal* and attempt to dissuade the publication from releasing the article.  In a meeting with the reporter, John Carreyrou, his editor, and the publication's lawyers, Theranos's attorneys

insisted that the publication not move forward with the article, incorrectly claiming that it was based on false information.  Holmes also attempted to persuade Rupert Murdoch exercise his power as owner of the *Journal* to kill the story before it could be published. Defendants also vilified journalists who printed negative articles about Theranos, blaming them for skepticism regarding Theranos and its technology in an effort to deflect blame and accountability from themselves and their company.  For example, following publication of the October 15, 2015 *Wall Street Journal* article revealing problems with Theranos's blood testing services, Defendants on at least two occasions led employees in a chant of "Fuck you, Carreyrou," directed at the journalist who investigated and authored the article.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees, attorneys representing Theranos or relevant news publications, and journalists who investigated and covered Theranos.

11. **Blaming and vilifying competing companies.**  When Theranos was the subject of regulatory scrutiny or negative publicity, Defendants attributed blame to competing companies like Quest and LabCorp, stating and implying that those companies were influencing the government and/or the media.  For example, after October 2015, when Theranos became the target of unfavorable reporting exposing problems with the company's operations, Holmes led employees in a chant of "Fuck you, SonoraQuest." Defendants made statements during this time period arguing that Theranos had been unfairly targeted for criticism as a result of action by competitors given Theranos's potential to disrupt the blood testing industry.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees as well as journalists who covered Theranos.

12. **Threatening or intimidating employees and former employees.**  Defendants and their agents directed threats and intimidating language at current and former Theranos employees in an effort to discourage employees from disseminating facts about the problems facing the company's technology and business.  On multiple occasions, when employees left the company voluntarily or were terminated, Defendants corresponded or met with those employees to deliver stern reminders of the employee's obligations under nondisclosure agreements and threatened employees with consequences should they reveal any nonpublic information about Theranos's technology or business practices. When Dr. Adam Rosendorff resigned from Theranos, Balwani became angry Rosendorff had forwarded work emails to his personal account out of a fear that regulatory authorities might investigate Theranos's practices.  Balwani insisted that Rosendorff sign a legal document confirming deletion of the emails.  This exchanges caused Rosendorff to feel threatened.  On other occasions, Defendants reacted angrily and attempted to threaten or intimidate employees whom they suspected to be the sources of negative publicity concerning Theranos.  For example, following their review of some or all of the October 15, 2015 *Wall Street Journal* article discussing Theranos, Defendants directed board member George Schultz and Theranos attorneys to meet with Theranos employee Tyler Schultz because they believed some of the information in the article was provided by him.  George Schultz conveyed to Tyler Schultz the warning from Defendants that Tyler's career would be adversely affected if he continued to share information about Theranos.  During that conversation, Theranos lawyers waited at the house of Tyler Schultz's grandfather, subsequently ambushing Tyler Schultz and threatened him with legal action.  On another occasion, Balwani became aware of a negative review of Theranos as an employer posted on website glassdoor.com.  In response, Balwani aggressively interrogated several employees in an unsuccessful effort to determine the

source of the review and discourage further negative reviews. Generally, Holmes and Balwani fostered a culture that strongly discouraged skepticism or dissent from employees, enforcing that culture by reacting with hostility and intimidation to any questioning. The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees and members of the Board.

13. **False and misleading representations made to FDA, CMS, CDPH, and other regulatory organizations.** When Theranos was the subject of inspections by CMS and other regulatory organizations, Defendants' agents presented regulators with selected, non-comprehensive data of Theranos's test results in an effort to mask accuracy and consistency problems with Theranos's assays. Additionally, Theranos failed to develop, maintain, and follow appropriate standard operating procedures for its clinical lab, but drafted and/or approved such SOPs immediately before or during regulatory inspections in an effort to conceal this oversight. In connection with an inspection by CDPH, Balwani and others misled an inspector into believing that the Theranos CLIA laboratory was limited to a single area. The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees as well as regulatory agency personnel.

14. **Violations of industry standards and government regulations or rules regarding research and development procedures, medical devices and clinical laboratory practices.** In furtherance of their scheme to defraud, Defendants disregarded and failed to conform to industry standards as well as government regulations or rules regarding research and development procedures, medical devices and clinical laboratory standards. For example, in conducting research and development purportedly aimed at validating its assays, Theranos failed to conduct adequate validation studies, relying on insufficient data to claim that their tests were valid, accurate, and reliable. Theranos also cut corners in its Arizona research and development testing, failing to implement a clear protocol for informed consent for trial participants and fostering a coercive environment for testing. Theranos's CLIA lab was the site of several violations of these rules and standards including the use of expired reagents, failure to implement and carry out proper proficiency testing and quality control processes, and inadequate record-keeping. Under Defendants' supervision, Theranos's CLIA lab also improperly failed to develop, maintain, and follow adequate standard operating procedures for its clinical tests. Defendants also exercised an improper degree of control and influence over the operation of Theranos's CLIA lab despite their lack of medical education or training. Defendants, and Balwani in particular, were deeply involved in clinical decisions that should have been left to the discretion of the laboratory director—even overruling the laboratory director at times. In exercising that control, Defendants consistently made decisions that prioritized preserving Theranos's reputation and secrecy at the expense of providing complete information to doctors and patients. The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees as well as regulatory agency personnel, and expert witnesses.

15. **Altering or tampering with third-party medical devices.** Theranos's in-house manufactured analyzer—called the Edison, miniLab, or TSPU—was incapable of performing a large proportion of the clinical blood tests Theranos offered. The Theranos devices were also incapable of handling high-throughput activity required to support Theranos's business model. In response, Defendants caused Theranos to acquire several commercially available blood analyzer devices manufactured by third parties. Theranos

then altered and tampered with those devices by modifying them to run on smaller and/or diluted blood samples, contrary to industry standards and the manufacturers' intended use for such devices. The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees.

16. **Multiplexing test results and disregarding outliers to mask inconsistency.** In its clinical testing and/or its proficiency testing, Theranos operated its analyzers according to a protocol that included running each assay multiple times and then multiplexing the results in order to derive the final, reported result. As part of that protocol, so-called outlier results—individual results that deviated from the other results for a given assay on a given sample—were discarded and not accounted for. This approach tended to mask consistency problems with Theranos's tests. The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees.

17. **Improperly setting and altering reference ranges.** Theranos's lab practices deviated from industry standards and standard testing protocols approved by FDA and validated by the industry. In setting the reference ranges for its tests, Theranos improperly relied on reference ranges for common, FDA-approved tests and/or conducted insufficient studies to set and adjust its own reference ranges. Similarly, after Theranos began offering and providing clinical blood testing services, the company improperly adjusted reference ranges based on individual clinical results—without conducting sufficient studies to justify such an adjustment—in order to bring out-of-range results back into the newly adjusted "normal" range and avoid abnormal results to patients. The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees and expert witnesses.

18. **Withholding critical test results and other important information from doctors and patients.** In an effort to avoid additional scrutiny of its blood test results and laboratory practices, Theranos sometimes withheld test results that were in the "critical" range for a given analyte, i.e., results that indicated a patient might need urgent medical care. Additionally, Theranos withheld information from doctors and patients indicating what type of analyzer had been used for a given test, depriving doctors and patients of the facts needed to place certain assay results into context—for example, when multiple samples from a single patient had been run on different types of analyzers leading to otherwise unexplainable discrepancies in results. Theranos also withheld from doctors and patients the fact that Theranos's tests were not FDA approved, that Theranos relied on third-party analyzers for many of its tests, and other key facts regarding problems with their laboratory practices. The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees, expert witnesses, and doctors and patients who patronized Theranos's testing services.

19. **Declining to conduct or agree to meaningful comparative tests.** Despite the fact that Theranos's analyzers and testing procedures varied from industry standards and conventional, FDA-approved tests, Defendants declined to conduct sufficient comparative tests establishing that Theranos's test results delivered accurate and reliable results when compared to competing technology. Similarly, Theranos failed to conduct comprehensive and accurate comparison tests establishing that its assays could reliably be conducted on finger-stick samples as opposed to vein draws. Defendants also refused

to commission or authorize such comparative testing through Sarah Cannon, Cleveland Clinic, UCSF, or other independent third-parties, to publish the results of any such testing, and to provide that information to the company's board.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees, expert witnesses, representatives of potential and actual strategic partners of Theranos, and members of the Theranos Board.

20. **Decommissioning Theranos's Laboratory Information System database.**  Theranos maintained its clinical test data in a software database it called the Laboratory Information System ("LIS").  In October 2016, Theranos announced that it would cease offering clinical lab testing services.  Following that decision but before the company ceased operation in 2018, Theranos "decommissioned" its LIS, rendering it nonfunctional and converting the data to a format that is not readily retrievable.  This decision had the effect of obscuring or destroying detailed information regarding the specific tests Theranos conducted during the years of its clinical testing operation, hindering the government's investigation of Defendants.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees and representatives of the Theranos assignee.

21. **Obtaining personal benefit from position at Theranos.**  In addition to their salaries and other direct compensation, Defendants also obtained significant additional benefits from their positions at Theranos.  For example, the company regularly paid for luxury travel and accommodations for Holmes.  Additionally, Holmes routinely required her office assistant to perform a large number of personal tasks seemingly unrelated to the business of Theranos, including shopping for and returning household items, clothing, luxury fashion accessories, and beauty products.  Finally, both Holmes and Balwani were he beneficiaries of increased local and national standing as a result of their association with Theranos.  Holmes was featured in numerous publications and lauded as a visionary.  Defendants also associated with celebrities, dignitaries, and other wealthy and powerful individuals who were interested in Theranos.  Holmes collected a substantial salary from Theranos, which enabled her to live a luxurious lifestyle, driving a luxury SUV, renting an expensive home, and purchasing expensive merchandise.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees, journalists who investigated Theranos, members of the Theranos Board, and potential and actual investors in Theranos.

22. **Concealing the romantic relationship between Holmes and Balwani from investors and others.**  During much of the relevant time period, Defendants Holmes and Balwani were romantically involved.  This relationship was actively concealed from others to whom its existence would have been material, including:  prospective and actual investors; members of the Board of Directors; representatives of Walgreens, Safeway, and other partner organizations; Theranos employees; and journalists.  Defendants took steps to hide the existence of this relationship, such as commuting to work separately and avoiding being seen together outside of work.  On at least one occasion, when questioned by a journalist as to whether she was in a relationship, Holmes falsely stated that she was not.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees as well as members of the Board of Directors, potential and actual

investors in Theranos, potential and actual strategic partners of Theranos, and journalists who interviewed Defendants.

Very truly yours,

ADAM A. REEVES
Attorney for the United States,
Acting Under Authority Conferred
By 28 U.S.C. § 515


/s/
JOHN C. BOSTIC
Assistant United States Attorney

# Exhibit B

LAW OFFICES

# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

LANCE WADE
(202) 434-5755
lwade@wc.com

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

April 24, 2020

Via Email

Mr. John C. Bostic, Esquire
Mr. Robert Leach, Esquire
Ms. Vanessa Baehr-Jones, Esquire
Mr. Jeffrey Schenk, Esquire
Assistant United States Attorneys
United States Attorney's Office
Northern District of California
150 Almaden Blvd. Suite 900
San Jose, CA 95113

> Re:   United States v. Elizabeth Holmes and Ramesh "Sunny" Balwani
>       No. CR-18-00258-EJD (N.D. Cal.)

Dear Counsel:

Please provide the following information with respect to the proposed Superseding Information you sent to us on April 13, 2020:

1. Please identify the patients in Counts 9 and 10;

2. Please identify the "laboratory or blood test results" at issue in Counts 9 and 10;

3. Please identify all "assays" alleged to be "conducted on Theranos's TSPU version 3.5" in ¶ 16.

4. Please identify all of the following whom you consider to be "investors" within the definition set forth in ¶ 3:

   a. Individuals;

   b. Entities;

   c. Certain business partners;

WILLIAMS & CONNOLLY LLP

Vanessa Baehr-Jones, Esq., *et al.*
April 24, 2020
Page 2

    d.  Members of Theranos's Board of Directors; and

    e.  Individuals and entities who invested through firms formed for the exclusive or primary purpose of investing in Theranos's securities.

5.  For items 4.c (Certain business partners) and 4.b (Members of Theranos's Board of Directors) above, please identify the basis for the allegation that they "invested" in Theranos.

6.  Please identify with respect to Count 1, in particular, which "investors" you allege were defrauded, as alleged in the proposed Superseding Information, that were not alleged to have been defrauded under the Superseding Indictment (doc. 39).

7.  Please identify with respect to Count 1, in particular, which "materially false and fraudulent representations" are included in the proposed Superseding Information that were not included in the Superseding Indictment (doc. 39).

8.  Please identify with respect to Count 1, in particular, which allegedly material omissions, if any, are encompassed within the proposed Superseding Information that were not included in the Superseding Indictment (doc. 39).  For each allegedly material omission you identify, please provide the basis for a duty to disclose with respect to that omission.

In addition, given that your changes to the proposed Superseding Information affect Counts 1, 2, 9, and 10 of the prior Superseding Indictment, please update the Bill of Particulars served on March 23.  Please also update your answers to the following requests – which we made previously.

9.  With respect to Count 1, ¶ 20, please identify each "materially false and fraudulent representation" alleged to have been made by Ms. Holmes or any alleged co-conspirator in the course of "soliciting investments" in Theranos, including for each (a) who made the representation, (b) the precise content of the representation, (c) the form of the representation (i.e., oral or written), (d) the date of the representation, (e) to whom the representation is alleged to have been made, and (f) the manner in which the statement is claimed to be false and fraudulent.  Moreover, please clarify the following points.

    a.  Regarding each alleged "false and misleading statements to investors" in ¶ 12, please identify (a) who made the statement, (b) the precise content of the statement, (c) the form of the statement (i.e., oral or written), (d) when the statement was made, (e) to whom the statement was made, and (f) the manner in which the statement is claimed to be false and fraudulent.  Moreover, please identify the precise allegedly false and misleading "written and verbal

WILLIAMS & CONNOLLY LLP

Vanessa Baehr-Jones, Esq., *et al.*
April 24, 2020
Page 3

communications", "marketing materials", "financial statements, models, and other information", and "statements to the media" referenced in ¶ 12.

b.  Regarding the alleged representation[1] in ¶ 12(A), please identify (a) who made the representation, (b) precisely what is alleged to have been represented concerning which "tasks" Theranos' "proprietary analyzer" was "presently capable of accomplishing," (c) which "proprietary analyzer" the representation pertained to, (d) precisely what is alleged to have been represented concerning the analyzer's ability to "produc[e] results that were more accurate and reliable than those yielded by conventional methods—all at a faster speed that previously possible," (e) the form of the representation (i.e., oral or written), (f) when that representation is alleged to have been made, (g) to whom it was alleged to have been made, and (h) the manner in which the representation is claimed to be false and fraudulent.

c.  Regarding the alleged representation in ¶ 12(B), please identify (a) who made the representation, (b) precisely what is alleged to have been represented concerning 2014 and 2015 revenue projections for Theranos, (c) the form of the representation (i.e., oral or written), (d) when that representation is alleged to have been made, (e) to whom it was alleged to have been made, and (f) the manner in which the representation is claimed to be false and fraudulent.

d.  Regarding the allegedly misleading demonstrations in ¶ 12(C), please identify for each (a) the date of the demonstration, (b) the audience for the demonstration, (c) Ms. Holmes' alleged role in the demonstration, (d) any statements by Ms. Holmes or any alleged co-conspirators alleged to be false or misleading during the demonstration, and (e) the manner in which the representation is claimed to be misleading.

e.  Regarding the alleged representation in ¶ 12(D), please identify (a) who made the representation, (b) precisely what is alleged to have been represented concerning Theranos' "expanding partnership with Walgreens", (c) the form of the representation (i.e., oral or written), (d) when that representation is alleged to have been made, (e) to whom it was alleged to have been made, and (f) the manner in which the representation is claimed to be false and fraudulent.

---

[1] It is unclear whether the allegations in this and other paragraphs in the Indictment purport to cover a single statement by Ms. Holmes, or whether they purport to paraphrase multiple statements.  To the extent that the latter is true, Ms. Holmes seeks the requested information for each allegedly false or fraudulent statement.

WILLIAMS & CONNOLLY LLP

Vanessa Baehr-Jones, Esq., *et al.*
April 24, 2020
Page 4

f.  Regarding the alleged representation in ¶ 12(E), please identify (a) who made the representation, (b) precisely what is alleged to have been represented concerning Theranos' relationship with the United States Department of Defense and the deployment of Theranos' technology to the battlefield, (c) the form of the representation (i.e., oral or written), (d) when that representation is alleged to have been made, (e) to whom it was alleged to have been made, and (f) the manner in which the representation is claimed to be false and fraudulent.

g.  Regarding the alleged representation in ¶ 12(F), please identify (a) who made the representation, (b) precisely what is alleged to have been represented concerning the need for FDA "approval", (c) the form of the representation (i.e., oral or written), (d) when that representation is alleged to have been made, (e) to whom it was alleged to have been made, and (f) the manner in which the representation is claimed to be false and fraudulent.  In addition, please identify the date and content of any communication from the FDA that it "was requiring Theranos to apply for clearance or approval for its analyzer and tests."

h.  Regarding the alleged representation in ¶ 12(G), please identify (a) who made the representation, (b) precisely what is alleged to have been represented concerning the use of "Theranos-manufactured analyzers" for patient tests, (c) the form of the representation (i.e., oral or written), (d) when that representation is alleged to have been made, (e) to whom it was alleged to have been made, and (f) the manner in which the representation is claimed to be false and fraudulent.

i.  Regarding the alleged representation in ¶ 12(H), please identify (a) who made the representation, (b) precisely what is alleged to have represented concerning the examination, use, and validation of Theranos' technology by third parties, (c) the form of the representation (i.e., oral or written), (d) when that representation is alleged to have been made, (e) to whom it was alleged to have been made, and (f) the manner in which the representation is claimed to be false and fraudulent.

j.  Regarding the allegations in ¶ 12(I), please identify (a) the representations to the media that are alleged to contain false and misleading statements, (b) who made the representations, (c) the form of the representations (i.e., oral or written), (d) when the representations are alleged to have been made, (e) to whom it is alleged to have been made, and (f) the manner in which the representation is claimed to be false and fraudulent.  Moreover, for each alleged instance when Ms. Holmes or any alleged co-conspirator allegedly shared media articles with investors and/or potential investors, please identify

WILLIAMS & CONNOLLY LLP

Vanessa Baehr-Jones, Esq., *et al*.
April 24, 2020
Page 5

(a) the shared article, (b) the date it was shared, (c) by who it was shared, and (d) with whom it was shared.

10. With respect to Count 1, ¶ 20, please clarify whether the government maintains that the charged conspiracy featured allegedly material omissions.  If so, please identify each alleged omission, including (a) who made the alleged omission, (b) precisely what is alleged to have omitted, (c) when that omission is alleged to have occurred, (d) the nature of the alleged duty to disclose, (e) to whom that duty allegedly was owed and to whom the omission is alleged to have been directed, and (f) the manner in which the omission is claimed to be fraudulent.

11. With respect to Count 2, ¶ 22, please identify any alleged co-conspirators of Ms. Holmes in addition to Mr. Balwani.

12. With respect to Count 2, ¶ 22, please identify each and every "false and fraudulent representation" alleged to have been made by Ms. Holmes or any alleged co-conspirator to solicit, encourage, or otherwise induce doctors to refer patients and patients to pay for and use Theranos' tests, including for each (a) who made the representation, (b) the precise content of the representation, (c) the form of the representation (i.e., oral or written), (d) the date of the representation, (e) to whom the representation is alleged to have been made, and (f) the manner in which the representation is claimed to have been false and fraudulent.

13. With respect to Count 2, ¶ 22, please clarify whether the government maintains that the charged conspiracy featured allegedly material omissions.  If so, please identify each alleged omission, including (a) who made the alleged omission, (b) precisely what is alleged to have omitted, (c) when that omission is alleged to have occurred, (d) the nature of the alleged duty to disclose, (e) to whom that duty allegedly was owed and to whom the omission is alleged to have been directed, and (f) the manner in which the omission is claimed to be fraudulent.

14. Please identify the allegedly false and misleading representations in "advertising and marketing materials" or on the Theranos website and other false and misleading misrepresentations referenced in ¶¶ 14-15 and 17, including (a) the precise content of all such representations, (b) the date of the representations, (c) the person who made the representations, (d) the recipients of the representations, (e) the manner in which the representations was conveyed to doctors and patients, and (f) the manner in which the representations are alleged to have been false and misleading.

15. With respect to Counts 9-10, ¶ 26, please identify (a) the name of each referenced patient and his or her doctor (if the patient consulted a doctor), (b) the identity of the person or entity that paid for Theranos testing in connection with such patient, (c) which allegedly false or fraudulent representations each patient or associated doctor is alleged to have been aware of, and, to the extent those representations are different

WILLIAMS & CONNOLLY LLP

Vanessa Baehr-Jones, Esq., *et al*.
April 24, 2020
Page 6

from those subject to the prior requests, (d) the manner in which those representations are alleged to have been false and fraudulent.

16. With respect to Counts 9-10, ¶ 26, to the extent the Indictment alleges that the patients and doctors referenced in these counts were defrauded by "material omissions with a duty to disclose," please identify each alleged omission, including (a) who made the alleged omission, (b) precisely what Ms. Holmes is alleged to have omitted, (c) when that omission is alleged to have occurred, (d) the nature of the alleged duty to disclose, (e) to whom that duty allegedly was owed and to whom the omission is alleged to have been directed, and (f) the manner in which the omission is claimed to be fraudulent.

We would appreciate your prompt response to these requests.

Sincerely,

Lance Wade

# Exhibit C

| | |
|---|---|
| **From:** | Leach, Robert (USACAN) <Robert.Leach@usdoj.gov> |
| **Sent:** | Monday, May 4, 2020 6:25 PM |
| **To:** | Wade, Lance; Schenk, Jeffrey (USACAN); Baehr-Jones, Vanessa (USACAN); Bostic, John (USACAN) |
| **Cc:** | Downey, Kevin; Saharia, Amy; Trefz, Katherine |
| **Subject:** | RE: US v. Holmes |

Lance:

I hope you are well.  We will respond if and when a new charging instrument is filed.  I will say now, though, your letter seems to seek a great deal that was denied in the motion for a bill of particulars.

Best regards,
Bob

**From:** Wade, Lance <LWade@wc.com>
**Sent:** Thursday, April 30, 2020 1:42 PM
**To:** Leach, Robert (USACAN) <RLeach@usa.doj.gov>; Schenk, Jeffrey (USACAN) <JSchenk@usa.doj.gov>; Baehr-Jones, Vanessa (USACAN) <vbaehr-jones@usa.doj.gov>; Bostic, John (USACAN) <jbostic@usa.doj.gov>
**Cc:** Downey, Kevin <KDowney@wc.com>; Saharia, Amy <ASaharia@wc.com>; Trefz, Katherine <KTrefz@wc.com>
**Subject:** RE: US v. Holmes

Counsel:

Good afternoon.  I just wanted to follow-up on the attached letter and inquire as to when we might expect a response.

Many thanks.

--Lance

**Lance Wade**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington DC 20005
(P) 202-434-5755 | (F) 202-434-5029
lwade@wc.com  |  www.wc.com/lwade

**From:** Wade, Lance
**Sent:** Thursday, April 9, 2020 9:22 PM
**To:** 'Leach, Robert (USACAN)' <Robert.Leach@usdoj.gov>; Schenk, Jeffrey (USACAN) <Jeffrey.B.Schenk@usdoj.gov>; Baehr-Jones, Vanessa (USACAN) <Vanessa.Baehr-Jones@usdoj.gov>; Bostic, John (USACAN) <John.Bostic@usdoj.gov>
**Cc:** Wade, Lance <LWade@wc.com>; Downey, Kevin <KDowney@wc.com>; Saharia, Amy <ASaharia@wc.com>; Trefz, Katherine <KTrefz@wc.com>
**Subject:** US v. Holmes

Please see the attached.

**Lance Wade**
**Williams & Connolly LLP**

725 Twelfth Street, N.W., Washington DC 20005
(P) 202-434-5755 | (F) 202-434-5029
lwade@wc.com | www.wc.com/lwade

---

This message and any attachments are intended only for the addressee and may contain information that is privileged and confidential. If you have received this message in error, please do not read, use, copy, distribute, or disclose the contents of the message and any attachments. Instead, please delete the message and any attachments and notify the sender immediately. Thank you.

# Exhibit D

| From: | Leach, Robert (USACAN) <Robert.Leach@usdoj.gov> |
|---|---|
| Sent: | Friday, August 21, 2020 5:53 PM |
| To: | Wade, Lance; Downey, Kevin; Saharia, Amy; Trefz, Katherine |
| Cc: | Coopersmith, Jeffrey; Schenk, Jeffrey (USACAN); Bostic, John (USACAN); Baehr-Jones, Vanessa (USACAN) |
| Subject: | FW: US v. Holmes |

Dear Lance,

Thank you for checking in on this.  I hope you and your team are well too.

On May 10, 2019, you wrote to us seeking essentially the same information with respect to the Superseding Indictment.  Dkt. 204-2.  Unsatisfied with the government's response, Ms. Holmes moved to dismiss the indictment and for a bill of particulars.  Dkt. 204, 204-3.  On February 11, 2020, the Court denied the motion to dismiss and ordered the government to produce a bill of particulars only "as to the specific misrepresentations underlying the doctor-patient fraud and the names of any co-conspirators supporting count one."  Dkt. 330 at 39.  On March 26, 2020, the government served and lodged for filing under seal a bill of particulars conforming to the Court's order.

The changes reflected the Third Superseding Indictment are limited.  Paragraph 3 adds a sentence:  "Theranos's investors included individuals, entities, certain business partners, members of its board of directors, and individuals and entities who invested through firms formed for the exclusive or primary purpose of investing in Theranos's securities."  Paragraph 10 adds the words "as early as 2010."  Paragraphs 11, 12, and 20 change the date 2013 to 2010.  Paragraph 13 adds the words "or outside California."  Paragraph 16 adds the words "through, among other means, their involvement in Theranos's day-to-day operations and their knowledge of complaints received from doctors and patients" and identifies specific tests that were also listed in the government's bill of particulars.  Paragraph 18 lists new victims:  B.B., ET., and M.E.  Paragraph 26 adds the phrase "telephonic communications regarding lab test results" and alleges counts relating to B.B., E.T. and M.E., rather than Patients 1 and 2.  In addition, there are minor changes to Paragraphs 1, 2, 7, and 15 and the word "Third" is added before the words "Superseding Indictment."

Theranos's investors are easily identifiable from the discovery that has been provided to you.  For example, a list of Theranos equity investors issued stock certificates is available at THER-0905030.  "Certain business partners" are Safeway and Walgreens.  Members of Theranos' board are easily identifiable from the discovery provided to you.  Indeed, many are listed in the stock certificate ledger reflected at THER-0905030.  "Firms formed for the exclusive or primary purpose of investing in Theranos's securities" are also easily identifiable from the discovery and include Peer Ventures Group IV, L.P., Peer Ventures Group III, L.P., Lucas Venture Group XI, L.P., and Lucas Venture Group IV, L.P.

B.B. is ▮▮▮▮▮▮▮▮.  E.T. is ▮▮▮▮▮▮▮▮.  M.E. is ▮▮▮▮▮▮▮▮.

An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c)(1).  The Third Superseding Indictment satisfies this requirement.  In addition, you have an early Jencks disclosure, the government's Rule 404(b) disclosure, its Rule 16 expert disclosure, its exhibit list, and its witness list, not to mention all of the discovery produced to date.  Further explanation of the Third Superseding Indictment is wholly unnecessary for Ms. Holmes to understand the charges and present a defense.

Best regards,

*********************************
Robert S. Leach
Assistant United States Attorney

United States Attorney's Office
 Northern District of California
1301 Clay Street, Suite 340S
Oakland, California 94612
(510) 637-3918 -- Office
(415) 793-2945 – Cell

---

**From:** Wade, Lance <LWade@wc.com>
**Sent:** Wednesday, August 19, 2020 12:51 PM
**To:** Leach, Robert (USACAN) <RLeach@usa.doj.gov>; Schenk, Jeffrey (USACAN) <JSchenk@usa.doj.gov>; Baehr-Jones, Vanessa (USACAN) <vbaehr-jones@usa.doj.gov>; Bostic, John (USACAN) <jbostic@usa.doj.gov>
**Cc:** Downey, Kevin <KDowney@wc.com>; Saharia, Amy <ASaharia@wc.com>; Trefz, Katherine <KTrefz@wc.com>
**Subject:** RE: US v. Holmes

Bob,

I hope you are well.  I write in response to your May 4 e-mail below.  The government returned a superseding indictment more than a month ago.  Please let me know when we can expect a response to my April 24 letter, reattached hereto.

Thanks.

--Lance


**Lance Wade**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington DC 20005
(P) 202-434-5755 | (F) 202-434-5029
lwade@wc.com | www.wc.com/lwade

---

**From:** Leach, Robert (USACAN) <Robert.Leach@usdoj.gov>
**Sent:** Monday, May 4, 2020 6:25 PM
**To:** Wade, Lance <LWade@wc.com>; Schenk, Jeffrey (USACAN) <Jeffrey.B.Schenk@usdoj.gov>; Baehr-Jones, Vanessa (USACAN) <Vanessa.Baehr-Jones@usdoj.gov>; Bostic, John (USACAN) <John.Bostic@usdoj.gov>
**Cc:** Downey, Kevin <KDowney@wc.com>; Saharia, Amy <ASaharia@wc.com>; Trefz, Katherine <KTrefz@wc.com>
**Subject:** RE: US v. Holmes

Lance:

I hope you are well.  We will respond if and when a new charging instrument is filed.  I will say now, though, your letter seems to seek a great deal that was denied in the motion for a bill of particulars.

Best regards,
Bob

---

**From:** Wade, Lance <LWade@wc.com>
**Sent:** Thursday, April 30, 2020 1:42 PM

**To:** Leach, Robert (USACAN) <RLeach@usa.doj.gov>; Schenk, Jeffrey (USACAN) <JSchenk@usa.doj.gov>; Baehr-Jones, Vanessa (USACAN) <vbaehr-jones@usa.doj.gov>; Bostic, John (USACAN) <jbostic@usa.doj.gov>
**Cc:** Downey, Kevin <KDowney@wc.com>; Saharia, Amy <ASaharia@wc.com>; Trefz, Katherine <KTrefz@wc.com>
**Subject:** RE: US v. Holmes

Counsel:

Good afternoon.  I just wanted to follow-up on the attached letter and inquire as to when we might expect a response.

Many thanks.

--Lance

**Lance Wade**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington DC 20005
(P) 202-434-5755 | (F) 202-434-5029
lwade@wc.com  |  www.wc.com/lwade

---

**From:** Wade, Lance
**Sent:** Thursday, April 9, 2020 9:22 PM
**To:** 'Leach, Robert (USACAN)' <Robert.Leach@usdoj.gov>; Schenk, Jeffrey (USACAN) <Jeffrey.B.Schenk@usdoj.gov>; Baehr-Jones, Vanessa (USACAN) <Vanessa.Baehr-Jones@usdoj.gov>; Bostic, John (USACAN) <John.Bostic@usdoj.gov>
**Cc:** Wade, Lance <LWade@wc.com>; Downey, Kevin <KDowney@wc.com>; Saharia, Amy <ASaharia@wc.com>; Trefz, Katherine <KTrefz@wc.com>
**Subject:** US v. Holmes

Please see the attached.

**Lance Wade**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington DC 20005
(P) 202-434-5755 | (F) 202-434-5029
lwade@wc.com  |  www.wc.com/lwade

---

This message and any attachments are intended only for the addressee and may contain information that is privileged and confidential. If you have received this message in error, please do not read, use, copy, distribute, or disclose the contents of the message and any attachments. Instead, please delete the message and any attachments and notify the sender immediately. Thank you.

# Exhibit E

ADAM A. REEVES
Attorney for the United States,
Acting Under Authority Conferred By 28 U.S.C. § 515

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No.: CR 18-00258-EJD |
| Plaintiff, | <u>VIOLATIONS</u>: |
| v. | 18 U.S.C. § 1349 – Conspiracy; 18 U.S.C. § 1343 – Wire Fraud; 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) – Forfeiture |
| ELIZABETH A. HOLMES and RAMESH "SUNNY" BALWANI, | SAN JOSE VENUE |
| Defendants. | |

**S U P E R S E D I N G   I N F O R M A T I O N**

The Attorney for the United States charges that, at all relevant times:

<u>Introductory Allegations</u>

1.     The defendant Elizabeth A. Holmes ("HOLMES") resided in Los Altos Hills, California, and owned and operated a health care and life sciences company called Theranos, Inc. ("Theranos" or "Company").  HOLMES founded Theranos in 2003, and served in the role of Chief Executive Officer from 2003 through the present.

2.     The defendant Ramesh "Sunny" Balwani ("BALWANI") resided in Atherton, California, and was employed by Theranos from September 2009 through 2016.  BALWANI served in various roles at Theranos: as a member of its Board of Directors, as its President, and as its Chief Operating Officer.

3.      Theranos was a corporation organized under the laws of the State of Delaware with its principal place of business in Palo Alto, California.  Theranos opened and maintained a corporate bank account in Palo Alto, California at Comerica Bank.  Comerica Bank is headquartered in Dallas, Texas. When Theranos solicited and received financial investments from investors, the money was deposited into its Comerica Bank account.  Theranos's investors included individuals, entities, certain business partners, members of its board of directors, and individuals and entities who invested through firms formed for the exclusive or primary purpose of investing in Theranos's securities.

<u>The Business of Theranos</u>

4.      Theranos was a private health care and life sciences company.  Its stated mission was to revolutionize medical laboratory testing through allegedly innovative methods for drawing blood, testing blood, and interpreting the resulting patient data—all for the purpose of improving outcomes and lowering health care costs.

5.      During its first ten years, from approximately 2003 to approximately 2013, Theranos operated in what HOLMES called "stealth mode," with little public attention.  While operating in "stealth mode," Theranos pursued the development of proprietary technology that could run clinical tests using only tiny drops of blood instead of the vials of blood typically drawn from an arm vein for traditional analysis.  Theranos also worked to develop a method for drawing only a few drops of capillary blood from a patient's finger using a small lancet, and collecting and storing that blood in a proprietary device called the "nanotainer."  Theranos's stated goal was to produce a second proprietary device that could quickly and accurately analyze blood samples collected in nanotainers.  Theranos referred to these devices using several terms, including "TSPU" (or "Theranos Sample Processing Unit"), "Edison," and "miniLab."

6.      In or around 2013, Theranos began to publicize its technological advances.  According to Theranos, its proprietary methods and technologies carried several advantages over conventional blood testing.  For example, Theranos claimed that its laboratory infrastructure yielded test results in less time than conventional labs—requiring hours instead of days.  Theranos claimed that its proprietary technology and methods would minimize the risk of human error and generate results with the highest accuracy.  According to Theranos, the small blood sample size required for Theranos's proprietary tests,

1  and its method of collecting blood by finger stick, would also benefit elderly individuals with collapsed

2  veins, individuals who required frequent blood tests due to chronic health conditions, and any individual

3  who feared needles.  In addition, Theranos claimed that its blood tests provided substantial cost savings,

4  advertising that it billed all of the tests on the Medicare Clinical Laboratory Fee Schedule at rates 50%

5  or more below the published reimbursement rate.

6       7.     Prior to its commercial launch, HOLMES heavily promoted Theranos's supposed

7  technological and operational capabilities.  In a September 2013 press release, Theranos claimed that it

8  had "eliminat[ed] the need for larger needles and numerous vials of blood" by relying instead on

9  samples "taken from a tiny finger stick or a micro sample taken from traditional methods."  In another

10  press release, dated November 13, 2013, Theranos touted its use of "blood sample[s] as small as a few

11  drops—1/1000th the size of a typical blood draw."  In that same statement, the Company again declared

12  that it had "eliminate[ed] the need for large needles and numerous vials of blood typically required for

13  diagnostic lab testing."

14       8.     In addition to directing the actions of the Company, HOLMES also made statements to

15  the media advertising the capabilities of Theranos's technology.  In an interview for a *Wall Street*

16  *Journal* article published on September 9, 2013, HOLMES said that Theranos could "run any

17  combination of tests, including sets of follow-on tests" at once, very quickly, all from a single small

18  blood sample.

19       9.     Theranos also used its website to increase awareness of its technology.  On its website,

20  Theranos displayed a nanotainer of blood balanced on a fingertip along with the slogan, "one tiny drop

21  changes everything."  The website also assured visitors that "for the first time," Theranos's laboratory

22  could perform tests "quickly and accurately on samples as small as a single drop."

23                    Theranos's Partnership with Walgreens

24       10.    As part of its commercial launch, as early as 2010, Theranos pursued a partnership with

25  national pharmacy chain Walgreens.  On September 9, 2013, Theranos announced that it would be

26  rolling out Theranos "Wellness Centers" inside Walgreens retail locations.  In a press release on that

27  date, Theranos promoted its testing services by stating that "consumers can now complete any clinician-

28  directed lab test with as little as a few drops of blood and results available in a matter of hours."

1   Theranos offered tests to the public beginning in late 2013 through its Wellness Centers located in

2   Walgreens stores in Palo Alto, California as well as in Phoenix, Arizona and surrounding areas.

3                                   The Scheme to Defraud Investors

4          11.     From a time unknown but no later than 2010 through 2015, HOLMES and BALWANI,

5   and others known and unknown to the Attorney for the United States, through their company, Theranos,

6   engaged in a scheme, plan, and artifice to defraud investors as to a material matter, and to obtain money

7   and property by means of materially false and fraudulent pretenses, representations, and promises, by

8   making materially false and misleading statements, and failing to disclose material facts with a duty to

9   disclose.

10         12.     Beginning in approximately 2010, HOLMES and BALWANI made materially false and

11  misleading statements to investors and failed to disclose material facts, using, among other things: (1)

12  false and misleading written and verbal communications; (2) marketing materials containing false and

13  misleading statements; (3) false and misleading financial statements, models, and other information; and

14  (4) false and misleading statements to the media.  HOLMES and BALWANI:

15             (A) represented to investors that, at the time the statement was made, Theranos's

16             proprietary analyzer—the TSPU, Edison, or miniLab—was presently capable of accomplishing

17             certain tasks, such as performing the full range of clinical tests using small blood samples drawn

18             from a finger stick and producing results that were more accurate and reliable than those yielded

19             by conventional methods—all at a faster speed than previously possible; when, in truth,

20             HOLMES and BALWANI knew that Theranos's proprietary analyzer had accuracy and

21             reliability problems, performed a limited number of tests, was slower than some competing

22             devices, and could not compete with larger, conventional machines in high-throughput, or the

23             simultaneous testing of blood from many patients, applications;

24             (B) represented to investors that Theranos was presently a financially strong and stable

25             company, including that Theranos would generate over $100 million in revenues and break even

26             in 2014, and that Theranos expected to generate approximately $1 billion in revenues in 2015;

27             when, in truth, HOLMES and BALWANI knew that Theranos had and would generate only

28             modest revenues, roughly a few hundred thousand dollars or so, in 2014 and 2015;

SUPERSEDING INFORMATION                        4

(C) deceived investors through misleading technology demonstrations intended to cause potential investors to believe that blood tests were being conducted on Theranos's proprietary analyzer; when, in truth, HOLMES and BALWANI knew that Theranos's proprietary analyzer was running a "null protocol" during the demonstration to make the analyzer appear to be operating, but was not testing the potential investor's blood, and yet failed to disclose that fact;

(D) represented to investors that Theranos presently had an expanding partnership with Walgreens, that is, Theranos would soon dramatically increase the number of Wellness Centers within Walgreens stores; when, in truth, HOLMES and BALWANI knew, by late 2014, that Theranos's retail Walgreens rollout had stalled because of several issues, including that Walgreens's executives had concerns with Theranos's performance;

(E) represented to investors that Theranos presently had a profitable and revenue-generating business relationship with the United States Department of Defense, and that Theranos's technology had deployed to the battlefield; when, in truth, HOLMES and BALWANI knew that Theranos had limited revenue from military contracts and its technology was not deployed in the battlefield;

(F) represented to investors that Theranos did not need the Food and Drug Administration ("FDA") to approve its proprietary analyzer and tests, but instead that Theranos was applying for FDA approval voluntarily because it was the "gold standard"; when, in truth, HOLMES and BALWANI knew that by late 2013 and throughout 2014, the FDA was requiring Theranos to apply for clearance or approval for its analyzer and tests;

(G) represented to investors that Theranos conducted its patients' tests using Theranos-manufactured analyzers; when, in truth, HOLMES and BALWANI knew that Theranos purchased and used for patient testing third party, commercially-available analyzers;

(H) represented to investors that Theranos's technology had been examined, used, and validated by several national or multinational pharmaceutical companies and research institutions; when, in truth, HOLMES and BALWANI knew that these pharmaceutical companies and research institutions had not examined, used, or validated Theranos's technology; and

(I) represented to members of the media for publication many of the false and misleading statements described above within paragraph 12(A) – 12(H), and shared the resulting articles with potential investors both directly and via the Theranos website, knowing their statements to members of the media were false and misleading.

13.     After receiving false and misleading statements, misrepresentations, and omissions from HOLMES and BALWANI, persons known to the Attorney for the United States as Investors 1, 2, 3, 4, 5, and 6 initiated electronic wire transfers for the purpose of investing money in Theranos.  These wires, specifically alleged in paragraph 24 of this Superseding Information, used a domestic electronic funds transfer system known as the Fedwire system, which is owned and operated by the United States Federal Reserve System.  All Fedwire wire transfers alleged in this Superseding Information were electronically routed through Fedwire centers in East Rutherford, New Jersey and/or Dallas, Texas and into Theranos's bank account in the Northern District of California.  All of the wire transfers alleged in this Superseding Information travelled between one state and another state.

<u>The Scheme to Defraud Patients</u>

14.     Between approximately 2013 and 2016, HOLMES and BALWANI, through advertisements and solicitations, encouraged and induced doctors and patients to use Theranos's blood testing laboratory services.

15.     HOLMES and BALWANI devised a scheme to defraud patients, through advertisements and marketing materials, through explicit and implicit claims concerning Theranos's ability to provide accurate, fast, reliable, and cheap blood tests and test results, and through omissions concerning the limits of and problems with Theranos's technologies.  Based on these representations, many hundreds of patients paid Theranos, or Walgreens acting on behalf of Theranos, for blood tests and test results, sometimes following referrals from their defrauded doctors.

16.     Despite representing to doctors and patients that Theranos could provide accurate, fast, reliable, and cheap blood tests and test results, HOLMES and BALWANI knew—through, among other ways, their involvement in Theranos's day-to-day operations and their knowledge of complaints received from doctors and patients—that Theranos's technology was, in fact, not capable of consistently producing accurate and reliable results.  In particular, HOLMES and BALWANI knew that Theranos

1   was not capable of consistently producing accurate and reliable results for certain blood tests, including

2   but not limited to bicarbonate, calcium, chloride, cholesterol/HDL/LDL, gonorrhea, glucose, HbA1c,

3   hCG, HIV, LDH, potassium, PSA, PT/INR, sodium, testosterone, TSH, vitamin D (25-OH), and all

4   assays conducted on Theranos's TSPU version 3.5, including estradiol, prolactin, SHBG, thyroxine

5   (T4/free T4), triiodothyronine, and vitamin B-12.

6          17.     Despite their knowledge of Theranos's accuracy and reliability problems, HOLMES and

7   BALWANI used interstate electronic wires to purchase advertisements intended to induce individuals to

8   purchase Theranos blood tests at Walgreens stores in California and Arizona.  Through these

9   advertisements, HOLMES and BALWANI explicitly represented to individuals that Theranos's blood

10  tests were cheaper than blood tests from conventional laboratories to induce individuals to purchase

11  Theranos's blood tests.  HOLMES and BALWANI held Theranos's blood tests out to individuals as

12  accurate and reliable.  HOLMES and BALWANI:

13         (A)    transmitted, caused to be transmitted, or otherwise delivered to doctors and patients,

14                including in the form of marketing materials and advertisements, materially false and misleading

15                information concerning the accuracy and reliability of Theranos's blood testing services;

16         (B)    posted on the Theranos website, or otherwise represented to a broad audience including

17                doctors and patients, materially false and misleading information concerning the accuracy and

18                reliability of Theranos's blood testing services;

19         (C)    transmitted, caused to be transmitted, or otherwise delivered to doctors and patients

20                Theranos blood test results where HOLMES and BALWANI knew that the tests performed on

21                Theranos technology contained or were likely to contain:

22                       (1)    inaccurate and unreliable results;

23                       (2)    improperly adjusted reference ranges;

24                       (3)    improperly removed "critical" results; and

25                       (4)    results generated from improperly validated assays.

26         18.     Knowing that the accuracy and reliability of Theranos test results was questionable and

27  suspect, HOLMES and BALWANI oversaw the electronic wiring of test results to patients, including

28  persons known to the Attorney for the United States as Patients B.B and E.T. in paragraph 26 of this

1  Superseding Information.  These wires, specifically, the wires alleged in paragraph 26 of this

2  Superseding Information, travelled between one state and another.

3  <u>COUNT ONE</u>:  18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud against Theranos Investors)

4       19.    Paragraphs 1 through 18 are realleged and incorporated as if fully set forth herein.

5       20.    From a time unknown but no later than approximately 2010 through approximately 2015,

6  within the Northern District of California, and elsewhere, the defendants,

7  ELIZABETH A. HOLMES and<br>RAMESH "SUNNY" BALWANI,

8

9  and others known and unknown to the Attorney for the United States, did knowingly and intentionally

10  conspire and agree together and with each other to commit wire fraud, in violation of Title 18, United

11  States Code, Section 1343, by devising a scheme and artifice to defraud as to a material matter and to

12  obtain money by means of materially false and fraudulent representations, specifically by soliciting

13  investments through making the false and fraudulent representations as set forth in this Superseding

14  Information.

15      All in violation of Title 18, United States Code, Section 1349.

16  <u>COUNT TWO</u>:  18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud against Theranos Patients)

17       21.    Paragraphs 1 through 18 are realleged and incorporated as if fully set forth herein.

18       22.    From in or about 2013 through 2016, within the Northern District of California, and

19  elsewhere, the defendants,

20  ELIZABETH A. HOLMES and<br>RAMESH "SUNNY" BALWANI,

21

22  and others known and unknown to the Attorney for the United States, did knowingly and intentionally

23  conspire and agree together and with each other to commit wire fraud, in violation of Title 18, United

24  States Code, Section 1343, by devising a scheme and artifice to defraud as to a material matter and to

25  obtain money by means of materially false and fraudulent representations, specifically by soliciting,

26  encouraging, or otherwise inducing doctors to refer and patients to pay for and use its laboratory and

27  blood testing services under the false and fraudulent pretense that Theranos technology produced

28  reliable and accurate blood test results.

All in violation of Title 18, United States Code, Section 1349.

COUNTS THREE THROUGH EIGHT:  18 U.S.C. § 1343 (Wire Fraud)

23.     Paragraphs 1 through 22 are realleged and incorporated as if fully set forth herein.

24.     On or about the dates set forth below, within the Northern District of California, and elsewhere, the defendants,

ELIZABETH A. HOLMES and
RAMESH "SUNNY" BALWANI,

for the purpose of executing the material scheme and artifice to defraud investors, and for obtaining money and property from investors by means of materially false and fraudulent pretenses, representations, promises, and material omissions with a duty to disclose, did knowingly transmit and cause to be transmitted by means of wire communication in interstate commerce certain writings, signs, signals, and pictures, that is, electronic funds transfers and payments from investor bank accounts to Theranos, as further set forth below:

| COUNT | DATE | ITEM WIRED | WIRED FROM | WIRED TO |
|---|---|---|---|---|
| 3 | 12/30/2013 | $99,990 | Investor #1's Charles Schwab/Wells Fargo Bank account | Theranos's Comerica Bank account |
| 4 | 12/31/2013 | $5,349,900 | Investor #6's Pacific Western Bank account | Theranos's Comerica Bank account |
| 5 | 12/31/2013 | $4,875,000 | Investor #2's Texas Capital Bank account | Theranos's Comerica Bank account |
| 6 | 2/6/2014 | $38,336,632 | Investor #3's Citibank account | Theranos's Comerica Bank account |
| 7 | 10/31/2014 | $99,999,984 | Investor #4's Northern Chicago Bank account | Theranos's Comerica Bank account |
| 8 | 10/31/2014 | $5,999,997 | Investor #5's JP Morgan Chase account | Theranos's Comerica Bank account |

Each in violation of Title 18, United States Code, Section 1343.

COUNTS NINE THROUGH ELEVEN:  18 U.S.C. § 1343 (Wire Fraud)

25.      Paragraphs 1 through 24 are realleged and incorporated as if fully set forth herein.

26.      On or about the dates set forth below, within the Northern District of California, and elsewhere, the defendants,

ELIZABETH A. HOLMES and<br>
RAMESH "SUNNY" BALWANI,

for the purpose of executing the material scheme and artifice to defraud doctors and patients, and for obtaining money and property from patients by means of materially false and fraudulent pretenses, representations, promises, and material omissions with a duty to disclose, did knowingly transmit and cause to be transmitted by means of wire communication in interstate commerce certain writings, signs, signals, and pictures, that is, laboratory and blood test results and payments for the purchase of advertisements soliciting patients and doctors for its laboratory business, as further set forth below, in violation of Title 18, United States Code, Section 1343:

| COUNT | DATE | WIRED FROM | WIRED TO | DESCRIPTION |
|---|---|---|---|---|
| 9 | 10/12/2015 | Arizona | California | Telephone call from Patient B.B to Theranos regarding laboratory blood test results |
| 10 | 5/11/2015 | California | Arizona | Patient E.T.'s laboratory blood test results |
| 11 | 8/3/2015 | Theranos's Wells Fargo Bank account in California | Horizon Media, Inc.'s J.P. Morgan Chase Bank account in New York | Electronic Funds Transfer in the amount of $1,126,661.00 to purchase advertisements for Theranos Wellness Centers |

Each in violation of Title 18, United States Code, Section 1343.

FORFEITURE ALLEGATION:        18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) (Forfeiture of Wire Fraud Proceeds)

27.     The allegations of paragraphs 1 through 26 of this Superseding Information are realleged and by this reference fully incorporated herein for the purposes of alleging forfeiture pursuant to the provisions of 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

28.     Upon a conviction for the offense alleged in Counts One through Eleven, the defendants,

ELIZABETH A. HOLMES and
RAMESH "SUNNY" BALWANI,

shall forfeit to the United States all property, constituting and derived from proceeds traceable to said offenses, including but not limited to the following property:

(a)     a sum of money equal to the amount of proceeds obtained as a result of the offense.

If any of said property, as a result of any act or omission of the defendant-

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to or deposited with, a third person;

(c)     has been placed beyond the jurisdiction of the Court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be subdivided without difficulty;

Any and all interest defendant has in any other property (not to exceed the value of the above forfeitable property), shall be forfeited to the United States pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1).

The forfeiture is authorized by Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c); Title 21, United States Code, Section 853(p) as incorporated by Title 18, United States Code, Section 982(b)(1); and the Federal Rules of Criminal Procedure 32.2.

DATED:                                          ADAM A. REEVES
                                                Attorney for the United States,
                                                Acting Under Authority Conferred by 28 U.S.C. § 515


                                                _____
                                                ROBERT LEACH
                                                JOHN BOSTIC
                                                VANESSA BAEHR-JONES
                                                JEFF SCHENK
                                                Assistant United States Attorneys

JOHN D. CLINE (CA State Bar No. 237759)
50 California Street, Suite 1500
San Francisco, CA 94111
Telephone: (415) 662-2260 │ Facsimile: (415) 662-2263
Email: cline@johndclinelaw.com

KEVIN M. DOWNEY (Admitted Pro Hac Vice)
LANCE A. WADE (Admitted Pro Hac Vice)
AMY MASON SAHARIA (Admitted Pro Hac Vice)
KATHERINE TREFZ (CA State Bar No. 262770)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
Washington, DC 20005
Telephone: (202) 434-5000 │ Facsimile: (202) 434-5029
Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

Attorneys for Defendant ELIZABETH A. HOLMES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. CR-18-00258-EJD |
| Plaintiff, | ) |
| | ) **[PROPOSED] ORDER GRANTING MOTION** |
| v. | ) **TO DISMISS SECOND AND THIRD** |
| | ) **SUPERSEDING INDICTMENTS IN PART FOR** |
| ELIZABETH HOLMES and | ) **LACK OF NOTICE** |
| RAMESH "SUNNY" BALWANI, | ) |
| | ) Hon. Edward J. Davila |
| Defendants. | ) |
| | ) |
| | ) |
| _____ | ) |

1       This **CAUSE** having come before the Court upon Defendant Elizabeth A. Holmes' Motion to

2 Dismiss the Second and Third Superseding Indictments In Part For Lack of Notice.  After due

3 consideration of the filings, the governing law, and the argument of the parties:

4       **IT IS HEREBY ORDERED** that Ms. Holmes' motion is **GRANTED**, and that Counts One and

5 Three through Eight of the Second and Third Superseding Indictments are **DISMISSED**.

6

7       **IT IS SO ORDERED.**

8

9 Dated: _____

10

11                                     _____

                                      Hon. Edward J. Davila

12                                       United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28 [PROPOSED] ORDER GRANTING MOTION TO DISMISS SECOND AND THIRD SUPERSEDING
INDICTMENTS IN PART FOR LACK OF NOTICE
CR-18-00258 EJD