JOHN D. CLINE (CA State Bar No. 237759)
50 California Street, Suite 1500
San Francisco, CA 94111
Telephone: (415) 662-2260 │ Facsimile: (415) 662-2263
Email: cline@johndclinelaw.com

KEVIN M. DOWNEY (Admitted Pro Hac Vice)
LANCE A. WADE (Admitted Pro Hac Vice)
AMY MASON SAHARIA (Admitted Pro Hac Vice)
KATHERINE TREFZ (CA State Bar No. 262770)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
Washington, DC 20005
Telephone: (202) 434-5000 │ Facsimile: (202) 434-5029
Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

Attorneys for Defendant ELIZABETH A. HOLMES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>ELIZABETH HOLMES and<br>RAMESH "SUNNY" BALWANI,<br><br>　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. CR-18-00258-EJD<br><br>**MOTION TO DISMISS AS DUPLICITOUS COUNTS ONE AND THREE THROUGH EIGHT OF THE SECOND AND THIRD SUPERSEDING INDICTMENTS**<br><br>Date:　　October 6, 2020<br>Time:　　10:00 AM<br>CTRM:  4, 5th Floor<br><br>Hon. Edward J. Davila |

1

## **MOTION TO DISMISS**

2      PLEASE TAKE NOTICE that on October 6, 2020, at 10:00 a.m., or on such other date and time

3   as the Court may order, in Courtroom 4 of the above-captioned Court, 280 South 1st Street, San Jose,

4   CA 95113, before the Honorable Edward J. Davila, Defendant Elizabeth Holmes will and hereby does

5   respectfully move the Court pursuant to Rules 8 and 12 of the Federal Rules of Criminal Procedure to

6   dismiss Counts One and Three through Eight of the Second and Third Superseding Indictments related

7   to "investors" as duplicitous.  These counts impermissibly charge multiple schemes by incorporating

8   five distinct categories of "investors."  The Motion is based on the below Memorandum of Points and

9   Authorities, the Declaration of Amy Mason Saharia, the record in this case, and any other matters that

10  the Court deems appropriate.

11

12  DATED: August 28, 2020

13

14                                          /s/ Amy Mason Saharia
                                            KEVIN DOWNEY
15                                          LANCE WADE
                                            AMY MASON SAHARIA
16                                          KATHERINE TREFZ
                                            Attorneys for Elizabeth Holmes
17

18

19

20

21

22

23

24

25

26

27

28  MOTION TO DISMISS AS DUPLICITOUS COUNTS ONE AND THREE THROUGH EIGHT OF THE SECOND AND
    THIRD SUPERSEDING INDICTMENTS
    CR-18-00258 EJD

# **TABLE OF CONTENTS**

Page

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................................1

BACKGROUND .........................................................................................................................1

ARGUMENT...............................................................................................................................2

     I.      The Investor Counts Are Duplicitous Because They Allege Multiple Schemes. ................4

     II.     The Duplicitous Investor Counts Should Be Dismissed.......................................................8

CONCLUSION.............................................................................................................................9

MOTION TO DISMISS AS DUPLICITOUS COUNTS ONE AND THREE THROUGH EIGHT OF THE SECOND AND THIRD SUPERSEDING INDICTMENTS
CR-18-00258 EJD

i

# TABLE OF AUTHORITIES

## CASES

Pages

*Abney v. United States*, 431 U.S. 651 (1977).............................................................................. 3

*Cleveland v. United States*, 531 U.S. 12 (2000) .......................................................................... 7

*U.S. CFTC v. Paron Cap. Mgmt. LLC*, 2012 WL 2395259 (N.D. Cal. June 25, 2012) ............................. 5

*United States v. Aguilar*, 756 F.2d 1418 (9th Cir. 1985) ............................................................. 3

*United States v. Bryan*, 868 F.2d 1032 (9th Cir. 1989) ............................................................... 6

*United States v. Gordon*, 844 F.2d 1397 (9th Cir. 1988)............................................................ 2, 4, 8

*United States v. Hardy*, 762 F. Supp. 1403 (D. Haw. 1991)...................................................... 3, 4, 8

*United States v. Lindsey*, 850 F.3d 1009 (9th Cir. 2017)............................................................ 7

*United States v. Moran*, 759 F.2d 777 (9th Cir. 1985) ............................................................. 4

*United States v. Morse*, 785 F.2d 771  (9th Cir. 1986)........................................................ 3, 4, 5, 6

*United States v. Ramirez-Martinez*, 273 F.3d 903 (9th Cir. 2001) ............................................... 3

*United States v. Shayota*, 2016 WL 6093237 (N.D. Cal. Oct. 19, 2016) ..................................... 9

*United States v. Smith*, 373 F.3d 561 (4th Cir. 2004) .............................................................. 3

*United States v. Starks*, 515 F.2d 112 (3d Cir. 1975). ............................................................ 8

*United States v. UCO Oil Co.*, 546 F.2d 833 (9th Cir. 1976) .................................................... 3

## STATUTES AND RULES

18 U.S.C. § 1343 ......................................................................................................................... 1

18 U.S.C. § 1349 ......................................................................................................................... 1

Fed. R. Crim. P. 8 ....................................................................................................................... 2

Fed. R. Evid. 401 ........................................................................................................................ 8

Fed. R. Evid. 402 ........................................................................................................................ 8

Fed. R. Evid. 403 ........................................................................................................................ 8

Fed. R. Evid. 404(b)................................................................................................................. 2, 8, 9

## OTHER AUTHORITIES

Black's Law Dictionary (11th Ed. 2019)................................................................................... 4

MOTION TO DISMISS AS DUPLICITOUS COUNTS ONE AND THREE THROUGH EIGHT OF THE SECOND AND
THIRD SUPERSEDING INDICTMENTS
CR-18-00258 EJD

ii

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

Counts One and Three through Eight of the Second and Third Superseding Indictments ("Indictments")—the counts related to an alleged scheme to defraud "investors"—should be dismissed as duplicitous. The alleged "scheme to defraud investors" underlying these counts cannot fairly be read as a single scheme because the Indictments include a new definition of "investors" encompassing five distinct categories of entities and people—a number of which are not actually "investors" under any accepted definition. The government fails to allege any facts demonstrating a nexus between those vague categories to support a single scheme to defraud. Because the investor-related counts cannot fairly be read to charge a single scheme, they must be dismissed as duplicitous.

## BACKGROUND

In September 2018, the government obtained a Superseding Indictment that charged Ms. Holmes and her codefendant with, among other things, one count of conspiracy to commit wire fraud against Theranos "investors," 18 U.S.C. § 1349, and six counts of wire fraud against "investors," 18 U.S.C. § 1343. Superseding Indictment, ECF No. 39. The Superseding Indictment alleged that Ms. Homes engaged in a "scheme, plan, and artifice to defraud investors" that involved making "material false and misleading statements to investors" and "fail[ing] to disclose material facts." *Id.* ¶¶ 11-12. The government then listed nine categories of false or misleading statements or representations, all of which were allegedly made to "investors." *Id.* ¶¶ 12(A)-(I). The alleged "scheme to defraud investors" underlies both the conspiracy count (Count One) and the substantive wire-fraud counts (Counts Three through Eight). The alleged investors were individuals from whom Theranos "solicited and received financial investments" and deposited the investments "into its Comerica Bank account." *Id.* ¶ 3.

The government has sought and obtained a Second and Third Superseding Indictment. Second Superseding Indictment ("SSI"), ECF No. 449, Third Superseding Indictment ("TSI"), ECF No. 469. In a dramatic departure from the Superseding Indictment that was returned in September 2018, the Indictments now define the term "investors" to include five distinct categories: (1) individuals; (2) entities; (3) certain business partners; (4) members of Theranos' board of directors; and (5) "individuals

MOTION TO DISMISS AS DUPLICITOUS COUNTS ONE AND THREE THROUGH EIGHT OF THE SECOND AND THIRD SUPERSEDING INDICTMENTS
CR-18-00258 EJD

and entities who invested through firms formed for the exclusive or primary purpose of investing in Theranos' securities." *Id.* ¶ 3.  The Indictments do not provide any details about how to identify the members of each category.  Theranos did "business" with numerous entities:  Walgreens, Safeway, hospitals, doctors' offices, pharmaceutical companies, and governmental entities, to name a few.

The government stated in an email to defense counsel on August 21 that "certain business partners" means Walgreens and Safeway.  Saharia Decl., Ex. A.  However, the Indictments identify only one "partnership" pursued by Theranos—its partnership with Walgreens—and does not allege that Walgreens is one of the "business partner" *investors*.  *E.g.*, TSI, ECF No. 469 ¶ 10.  Similarly, the government's Rule 404(b) notice, which was the subject of correspondence between the parties and motions practice before the filing of the Indictments, referred to the Walgreens and Safeway "partnerships" with no mention of investments.  Saharia Decl., Ex. B at 3.

The Indictments allege that the Walgreens partnership had already stalled by late 2014—more than five years before the filing of the Indictments—due to Walgreens' alleged "concerns with Theranos's performance." *E.g.*, TSI, ECF No. 469 ¶ 12(D).  Had the government, as it should have, charged Ms. Holmes with a separate scheme to defraud Walgreens in the Indictments, that charge would have been time-barred.  Similarly, the new definition of "investor," if permitted, would conveniently enable the government to skirt Rule 404(b) limitations by bootstrapping prior alleged bad acts into the Indictments through expanding the scope of the prior charged scheme.  It thus raises the question of whether the government may have created its new definition of "investor" in an attempt to add into the case charges barred by the statute of limitations and alleged acts barred by the Federal Rules of Evidence—including, but not limited to, charges and acts related to Walgreens.

## ARGUMENT

Rule 8(a) requires that multiple offenses in the same indictment be charged in separate counts. Fed. R. Crim. P. 8(a).  An indictment that contravenes Rule 8(a) by joining two or more distinct offenses in the same count is duplicitous. *United States v. Gordon*, 844 F.2d 1397, 1400 (9th Cir. 1988); *United*

MOTION TO DISMISS AS DUPLICITOUS COUNTS ONE AND THREE THROUGH EIGHT OF THE SECOND AND THIRD SUPERSEDING INDICTMENTS
CR-18-00258 EJD

2

*States v. Ramirez-Martinez*, 273 F.3d 903, 913 (9th Cir. 2001), *overruled on other grounds by United States v. Lopez*, 484 F.3d 1186 (9th Cir. 2007).

Duplicity undermines a defendant's right to a fair trial.  A duplicitous indictment compromises a defendant's Sixth Amendment right to know the charges brought against her, because a conviction on a duplicitous count could be obtained without a unanimous jury verdict as to each of the offenses contained in the count.  *United States v. Aguilar*, 756 F.2d 1418, 1420 n.2 (9th Cir. 1985).  A duplicitous indictment also "eviscerate[s] the defendant's Fifth Amendment protection against double jeopardy, because of a lack of clarity concerning the offense for which he is charged."  *United States v. Hardy*, 762 F. Supp. 1403, 1408 (D. Haw. 1991) (citing *Abney v. United States*, 431 U.S. 651, 654 (1977)).  Duplicity may expose a defendant to trial for offenses otherwise barred by the statute of limitations, as here.  *See United States v. Smith*, 373 F.3d 561, 563 (4th Cir. 2004) ("When an indictment impermissibly joins separate offenses that occurred at different times, prosecution of the earlier acts may be barred by the statute of limitations.").  And duplicity risks prejudicial evidentiary rulings at trial, *see United States v. UCO Oil Co.*, 546 F.2d 833, 835 (9th Cir. 1976), including by sweeping into the case otherwise irrelevant and prejudicial evidence of uncharged conduct.  To avoid these risks, the court must scrutinize the indictment to determine whether it may "fairly be read to charge but one crime in each count."  *United States v. Morse*, 785 F.2d 771, 774 (9th Cir. 1986).

The "investor" counts cannot fairly be read to charge a single scheme.  By broadening the definition of "investor" to include five separate categories, the government impermissibly sweeps multiple purported schemes into a single alleged "scheme to defraud investors."  The Indictments fail to allege any nexus among the various groups identified as "investors" to demonstrate a single "scheme" encompassing all of them.  And, although the government has refused to identify precisely which individuals or entities fall into these groups, it appears clear based on its limited disclosure that some of the groups include individuals or entities that are not investors.  Because the investor counts merge multiple schemes into one, they should be dismissed as duplicitous.

MOTION TO DISMISS AS DUPLICITOUS COUNTS ONE AND THREE THROUGH EIGHT OF THE SECOND AND THIRD SUPERSEDING INDICTMENTS
CR-18-00258 EJD

3

**I.     The Investor Counts Are Duplicitous Because They Allege Multiple Schemes.**

To determine whether a count alleges more than one "scheme," the court must consider whether the indictment on its face alleges "'one overall agreement among the various parties.'"  *Gordon*, 844 F.2d at 1401 (quoting *United States v. Moran*, 759 F.2d 777, 784 (9th Cir. 1985)).  The relevant factors in determining whether there is a single scheme are "the nature of the scheme, the identity of the participants, the quality, frequency and duration of each conspirator's transactions, and the commonality of times and goals."  *Morse*, 785 F.2d at 775-76.  An indictment that fails to "allege any nexus whatsoever, chronological, substantive or otherwise," among transactions, actors, or circumstances of the alleged scheme involves multiple schemes that must be charged in separate counts.  *Hardy*, 762 F. Supp. at 1408.  Because the Indictments fail to allege any nexus among the five categories of individuals and entities it defines as "investors," they charge more than one scheme.

The "nature" of the alleged scheme involving "investors" suggests multiple schemes.  The expansive definition of "investors" incorporates distinct classes of purported victims, not all of whom were in fact *investors*.  The (First) Superseding Indictment alleged that Defendants' scheme to defraud consisted of "soliciting *investments* through making the false and misleading representations set forth in this Indictment."  Superseding Indictment, ECF No. 39, ¶ 20 (emphasis added).  The government attempts to expand that charge exponentially simply by re-defining the term "investor" to encompass additional people and groups—without alleging any facts that support the erroneous claim that *all* of those categories had "investor" relationships with Theranos.

The government's definition of "investor" strains the meaning of that term.  An investor is ordinarily understood as a purchaser of a security or other property with the expectation of earning a profit.  *See Black's Law Dictionary* (11th Ed. 2019), investor.  The Indictments confirm that common sense understanding: each count of alleged wire fraud (Counts Three through Eight) involves transfers of money by individuals or entities in exchange for Theranos securities.  A business partnership, however, may derive from a contractual relationship and involves two parties who agree to undertake a venture with shared benefits and shared risks.  *See Black's Law Dictionary* (11th Ed. 2019), partner.  A

MOTION TO DISMISS AS DUPLICITOUS COUNTS ONE AND THREE THROUGH EIGHT OF THE SECOND AND THIRD SUPERSEDING INDICTMENTS
CR-18-00258 EJD

4

1    business partner is not an *investor. Cf. U.S. CFTC v. Paron Cap. Mgmt. LLC*, 2012 WL 2395259, at \*5

2    (N.D. Cal. June 25, 2012) (holding that commodities statute protecting "investors" from "improper

3    trading practices" did not extend to protect traders from "their business partners").  Even the

4    government's own description of Theranos' partnership with Walgreens (the only "partner" mentioned

5    in the Indictments) fails to suggest that Walgreens *invested* in Theranos.  *E.g.*, TSI, ECF No. 469 ¶ 10

6    ("Theranos pursued a *partnership* with national pharmacy chain Walgreens."  (emphasis added)).  To

7    the contrary, by alleging that Ms. Holmes made misrepresentations to "investors" about Theranos'

8    "partnership" with Walgreens, the Indictments affirmatively suggest that Walgreens is not an investor.

9    *Id.* ¶ 12(D).[1]

10          The same problem arises with respect to the government's attempt to define "investors" to

11   include Theranos' board of directors.  To be sure, a number of Theranos directors did invest money in

12   exchange for Theranos securities, and thus would be investors under the ordinary meaning of that term.

13   But they would already be presumably included in "investors."  The government's specific reference to

14   Theranos' board of directors reflects that it will broaden the meaning of "investors" to cover *additional*

15   directors who do not qualify as "investors" as that term is commonly understood.  The government's

16   August 21 email confirms that intent:  in response to the defense's question about who is included in this

17   category, the government wrote that "[m]embers of Theranos' board are easily identifiable from the

18   discovery provided to you" and that "many are listed in [Theranos'] stock certificate ledger."  Saharia

19   Decl., Ex. A.  The government thus includes in its new definition *all* Board members, whether or not

20   they purchased Theranos equity.

21          To be sure, a single scheme to defraud "investors" might have overlapping goals, times, or

22   transactions.  *United States v. Morse*, a case involving a series of tax shelter schemes, is illustrative.  785

23   F.2d at 774.  In *Morse*, the Ninth Circuit concluded that an indictment that "clearly detailed" four

24

---

25          [1] In prior briefing the government treated "business partners" separately from "investors."  *See*
26   Gov't Opp'n to Def.'s Mot to Dismiss, ECF No. 265 at 4-5 (explaining that the government had
     produced documents collected from *both* investors and business partners "including [Theranos'] most
27   prominent partner Walgreens.").

     MOTION TO DISMISS AS DUPLICITOUS COUNTS ONE AND THREE THROUGH EIGHT OF THE SECOND AND
28   THIRD SUPERSEDING INDICTMENTS
     CR-18-00258 EJD

investment programs devised by the defendants to defraud investors was not duplicitous.  *Id.* at 774, 775.  But the indictment in *Morse* alleged vehicles through which the defendants accomplished the *same type* of harm—namely, defrauding actual investors.  *Id.* at 774.  The same is true in *United States v. Bryan*, another tax shelter case.  868 F.2d 1032, 1038 (9th Cir. 1989).  There, the Ninth Circuit examined an indictment charging the defendants with a single tax-shelter scheme to defraud both taxpayers and the U.S. Treasury, concluding that the indictment was not duplicitous merely because the scheme involved two sets of victims.  *Id.*  In reaching that conclusion, the court reasoned that "illegal tax shelter promotion schemes" often have the intended effect of simultaneously "defrauding the specific taxpayers who are indicted to participate" and "defrauding the United States of tax revenue."  *Id.*

In contrast, the Indictments here provide no such connection among the disparate categories of so-called "investors."  Instead, the government sweeps in multiple possible schemes simply by calling "business partners," directors, and other individuals or entities "investors."  The government does not allege facts from which the Court could conclude that Defendants' alleged scheme to defraud had the same nature and goals across these various groups—i.e., that Defendants "solicited *investments*" from these individuals "through making . . . false and fraudulent representations."  *E.g.*, TSI, ECF No. 469 ¶ 20 (emphasis added).  Theranos' relationships with Walgreens and Safeway—which were jointly planning business endeavors together—were entirely different than its relationships with investors.  The government's prior treatment of "investors" and "business partners" as distinct categories, *see* n.1, *supra*, confirms the point.  And calling all Board members "investors," as the government purports to be doing, makes no sense at all.  As the government implicitly concedes in its e-mail, *see* p. 5, *supra*, not all Board members owned stock (and even fewer transferred money to Theranos in exchange for stock, as Paragraph 3 of the Indictments require).  As a result, an indictment that merges a scheme to defraud "investors" with a scheme to defraud Board members is, by its very nature, duplicitous.

The problems created by this broader, duplicitous definition of "investors" are many.  One issue is that the individuals and entities in each distinct group had access to different information.  Theranos had different contractual relationships with different groups encompassed within the government's new

MOTION TO DISMISS AS DUPLICITOUS COUNTS ONE AND THREE THROUGH EIGHT OF THE SECOND AND THIRD SUPERSEDING INDICTMENTS
CR-18-00258 EJD

6

definition of "investors."  Walgreens, for example, had access to different information than ordinary investors.  Members of the Board of Directors, for example, had access to information that an ordinary investor or business partner would not; Ms. Holmes, moreover, had many conversations with Board members that had nothing to do with soliciting investments.  And Theranos' contractual obligations to these groups varied.  Given these distinctions, the materiality analysis may vary substantially from group to group.  As the Ninth Circuit has held, "a false statement is material if it has a natural tendency to influence, or [is] capable of influencing, the decision of the *decisionmaking body to which it was addressed*."  *United States v. Lindsey*, 850 F.3d 1009, 1013 (9th Cir. 2017) (emphasis added).  Here, the decision making bodies are so distinct that, even considered objectively, information that might have the natural tendency to influence one group might not influence the other.

In addition, the Indictments do not contain allegations that show that the object of the charged conduct as to these distinct groups were the same.  As the Court has already held, the government must allege a scheme to defraud that has as its object the deprivation of "property in the hands of the victim."  ECF No. 330 at 27 (quoting *Cleveland v. United States*, 531 U.S. 12, 15 (2000)).  Under the common-sense definition of investor, the property would be money in exchange for shares of the company.  In its Rule 404(b) notice, the government states that alleged misrepresentations were made to Walgreens and Safeway "[in] pursuing and maintaining" partnerships with the entities—not to obtain investments.  Saharia Decl. Ex. B.  Similarly, it alleges that "Defendants deceived Theranos' Board of Directors in furtherance of their schemes to defraud investors and patients" —not to solicit unidentified "investments" from Board members.  *Id.*  It appears that the government now has yet additional theories of deprivation of money or property, although it has not explained what they are.  If it does, the objects of the charged scheme would improperly diverge, creating two or more conspiracies, not one.

These issues illustrate how these five different categories are too distinct to be part of one unitary scheme.  The government could have charged a separate scheme to defraud "business partners" or an independent scheme to defraud Theranos' directors from the beginning.  It did not.  It should not now be

MOTION TO DISMISS AS DUPLICITOUS COUNTS ONE AND THREE THROUGH EIGHT OF THE SECOND AND THIRD SUPERSEDING INDICTMENTS
CR-18-00258 EJD

permitted to expand the reach of the alleged "scheme to defraud investors," and thus circumvent the statute of limitations, merely by altering its definition of who is an "investor."

**II.     The Duplicitous Investor Counts Should Be Dismissed.**

The expansive definition of "investors" underlying the alleged "scheme to defraud investors" prejudices Ms. Holmes' right to a fair trial, requiring dismissal of the investor-related counts.  The Court need not "roll the dice and preserve the confusion" of these duplicitous counts until after evidence is presented at trial.  *Hardy*, 762 F. Supp. at 1410.  Instead, "in light of potential infringement of [defendant's] rights," the duplicitous counts should be dismissed now.  *Id*.  Requiring Ms. Holmes to defend against multiple schemes to defraud charged as only one scheme will create the very harms that the duplicity doctrine aims to prevent.

First, the broad and vague reach of the definition of "investor" present a substantial risk of a non-unanimous jury verdict.  *See Gordon*, 844 F.2d at 1401-02.  Because the Indictments include five different categories of "investors," one juror could reach a verdict related to a scheme to defraud an individual investor who purchased shares in Theranos—whereas another could conclude that there was a scheme to defraud a "business partner" of Theranos.  Under the government's sweeping definition of "investor," both jurors would find a scheme to defraud "investors," without agreeing on the underlying conduct.

Second, the expansive definition of "investor" risks prejudicial evidentiary rulings.  *See United States v. Starks*, 515 F.2d 112, 116 (3d Cir. 1975).  "[E]vidence admissible on one offense might be inadmissible on the other."  *Id.* at 116-17.  The expanded meaning of "investor" could allow the government to admit evidence that may otherwise be irrelevant under Rule 401 or of minimal probative value and therefore excluded under Rules 402 or 403.  It could also permit the government to circumvent Rule 404(b) for certain "other acts" evidence.  For example, under the government's broad definition of "investor," evidence of a transaction with a business partner such as a pharmaceutical company may avoid scrutiny as an "other act" under Rule 404(b).  But if the term "investor" were limited to include people or entities who purchased shares of Theranos evidence of a misrepresentation

MOTION TO DISMISS AS DUPLICITOUS COUNTS ONE AND THREE THROUGH EIGHT OF THE SECOND AND THIRD SUPERSEDING INDICTMENTS
CR-18-00258 EJD

to a non-investor business partner would likely be considered an "other act" that may well be inadmissible under Rule 404(b).  *See, e.g.*, *United States v. Shayota*, 2016 WL 6093237, at *4 (N.D. Cal. Oct. 19, 2016) (holding inadmissible under Rule 404(b) evidence of an "other act" in which the "only connection between these two acts" was that the defendant "engaged in some sort of fraud").  Because the duplicitous investor counts infringe Ms. Holmes' right to a fair trial, they should be dismissed.

Finally, as discussed above, the government's expansion of the meaning of "investor" appears designed to smuggle into the case otherwise-time-barred claims and relieve the government of the proscriptions of Rule 404(b).  Theranos began discussions with Walgreens, for example, in 2010.  The government itself alleges that the relationship had stalled by 2014.  *E.g.*, TSI, ECF No. 469 ¶ 12(D).  If the government is allowed to add claims regarding Walgreens by the expedient of calling Walgreens an "investor," after treating Walgreens as something other than an "investor" for the first two years of this case, Ms. Holmes will now face for the first time claims relating to conduct that occurred well more than five years ago.  Additionally, if the government's expansive definition of investor is allowed to stand, the government would circumvent the requirements of Rule 404(b) with just a stroke of its pen.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Counts One and Three through Eight of the Second and Third Superseding Indictments as duplicitous.


DATED:  August 28, 2020                                    Respectfully submitted,


                                                           /s/ Amy Mason Saharia
                                                           KEVIN DOWNEY
                                                           LANCE WADE
                                                           AMY MASON SAHARIA
                                                           KATHERINE TREFZ
                                                           Attorneys for Elizabeth Holmes

MOTION TO DISMISS AS DUPLICITOUS COUNTS ONE AND THREE THROUGH EIGHT OF THE SECOND AND THIRD SUPERSEDING INDICTMENTS
CR-18-00258 EJD

1

**<u>CERTIFICATE OF SERVICE</u>**

2
     I hereby certify that on August 28, 2020 a copy of this filing was delivered via ECF on all

3
counsel of record.

4

5
                         /s/ Amy Mason Saharia

6
                         AMY MASON SAHARIA

7
                         Attorney for Elizabeth Holmes

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
MOTION TO DISMISS AS DUPLICITOUS COUNTS ONE AND THREE THROUGH EIGHT OF THE SECOND AND
THIRD SUPERSEDING INDICTMENTS
CR-18-00258 EJD

1  JOHN D. CLINE (CA State Bar No. 237759)
   50 California Street, Suite 1500
2  San Francisco, CA 94111
   Telephone: (415) 662-2260 │ Facsimile: (415) 662-2263
3  Email: cline@johndclinelaw.com

4  KEVIN M. DOWNEY (Admitted Pro Hac Vice)
   LANCE A. WADE (Admitted Pro Hac Vice)
5  AMY MASON SAHARIA (Admitted Pro Hac Vice)
   KATHERINE TREFZ (CA State Bar No. 262770)
6  WILLIAMS & CONNOLLY LLP
   725 Twelfth Street, NW
7  Washington, DC 20005
   Telephone: (202) 434-5000 │ Facsimile: (202) 434-5029
8  Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

9  Attorneys for Defendant ELIZABETH A. HOLMES

10

11                    UNITED STATES DISTRICT COURT

12                   NORTHERN DISTRICT OF CALIFORNIA

13                          SAN JOSE DIVISION

14

15  UNITED STATES OF AMERICA,            )  Case No. CR-18-00258-EJD
                                         )
16          Plaintiff,                   )  **DECLARATION OF AMY MASON SAHARIA**
                                         )  **IN SUPPORT OF MOTION TO DISMISS AS**
17     v.                                )  **DUPLICITOUS COUNTS ONE AND THREE**
                                         )  **THROUGH EIGHT OF THE SECOND AND**
18  ELIZABETH HOLMES and                 )  **THIRD SUPERSEDING INDICTMENTS**
    RAMESH "SUNNY" BALWANI,              )
19                                       )
            Defendants.                  )  Hon. Edward J. Davila
20                                       )
                                         )
21  _____)

22

23          I, AMY MASON SAHARIA, declare as follows:

24          1.      I represent Defendant Elizabeth Holmes and have been admitted to practice *pro hac vice*

25  in the above-captioned matter.  I submit this declaration in support of Ms. Holmes' Motion to Dismiss as

26  Duplicitous Counts One and Three Through Eight of the Second and Third Superseding Indictments

27  ("Motion").  I attest to the following facts upon which the motion relies.

28

2.     Attached to the motion are two exhibits.  The content of the exhibits are as follows:

a.     Exhibit A is a true and correct copy of an August 21, 2020, email from Assistant United States Attorney Robert Leach to Lance Wade.

b.     Exhibit B is a true and correct copy of a March 6, 2020, letter from Assistant United States Attorney John Bostic providing notice of evidence the government intends to introduce at trial pursuant to Federal Rule of Evidence 404(b).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.


Executed this 28th day of August, 2020 in Chevy Chase, MD.



_____
AMY MASON SAHARIA
Attorney for Elizabeth Holmes

# Exhibit A

| From: | Leach, Robert (USACAN) <Robert.Leach@usdoj.gov> |
|---|---|
| Sent: | Friday, August 21, 2020 5:53 PM |
| To: | Wade, Lance; Downey, Kevin; Saharia, Amy; Trefz, Katherine |
| Cc: | Coopersmith, Jeffrey; Schenk, Jeffrey (USACAN); Bostic, John (USACAN); Baehr-Jones, Vanessa (USACAN) |
| Subject: | FW: US v. Holmes |

Dear Lance,

Thank you for checking in on this.  I hope you and your team are well too.

On May 10, 2019, you wrote to us seeking essentially the same information with respect to the Superseding Indictment.  Dkt. 204-2.  Unsatisfied with the government's response, Ms. Holmes moved to dismiss the indictment and for a bill of particulars.  Dkt. 204, 204-3.  On February 11, 2020, the Court denied the motion to dismiss and ordered the government to produce a bill of particulars only "as to the specific misrepresentations underlying the doctor-patient fraud and the names of any co-conspirators supporting count one."  Dkt. 330 at 39.  On March 26, 2020, the government served and lodged for filing under seal a bill of particulars conforming to the Court's order.

The changes reflected the Third Superseding Indictment are limited.  Paragraph 3 adds a sentence:  "Theranos's investors included individuals, entities, certain business partners, members of its board of directors, and individuals and entities who invested through firms formed for the exclusive or primary purpose of investing in Theranos's securities."  Paragraph 10 adds the words "as early as 2010."  Paragraphs 11, 12, and 20 change the date 2013 to 2010.  Paragraph 13 adds the words "or outside California."  Paragraph 16 adds the words "through, among other means, their involvement in Theranos's day-to-day operations and their knowledge of complaints received from doctors and patients" and identifies specific tests that were also listed in the government's bill of particulars.  Paragraph 18 lists new victims:  B.B., ET., and M.E.  Paragraph 26 adds the phrase "telephonic communications regarding lab test results" and alleges counts relating to B.B., E.T. and M.E., rather than Patients 1 and 2.  In addition, there are minor changes to Paragraphs 1, 2, 7, and 15 and the word "Third" is added before the words "Superseding Indictment."

Theranos's investors are easily identifiable from the discovery that has been provided to you.  For example, a list of Theranos equity investors issued stock certificates is available at THER-0905030.  "Certain business partners" are Safeway and Walgreens.  Members of Theranos' board are easily identifiable from the discovery provided to you.  Indeed, many are listed in the stock certificate ledger reflected at THER-0905030.  "Firms formed for the exclusive or primary purpose of investing in Theranos's securities" are also easily identifiable from the discovery and include Peer Ventures Group IV, L.P., Peer Ventures Group III, L.P., Lucas Venture Group XI, L.P., and Lucas Venture Group IV, L.P.

B.B. is ███████████.  E.T. is ███████████.  M.E. is ███████████.

An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c)(1).  The Third Superseding Indictment satisfies this requirement.  In addition, you have an early Jencks disclosure, the government's Rule 404(b) disclosure, its Rule 16 expert disclosure, its exhibit list, and its witness list, not to mention all of the discovery produced to date.  Further explanation of the Third Superseding Indictment is wholly unnecessary for Ms. Holmes to understand the charges and present a defense.

Best regards,

*******************************
Robert S. Leach
Assistant United States Attorney

United States Attorney's Office
 Northern District of California
1301 Clay Street, Suite 340S
Oakland, California 94612
(510) 637-3918 -- Office
(415) 793-2945 – Cell

---

**From:** Wade, Lance <LWade@wc.com>
**Sent:** Wednesday, August 19, 2020 12:51 PM
**To:** Leach, Robert (USACAN) <RLeach@usa.doj.gov>; Schenk, Jeffrey (USACAN) <JSchenk@usa.doj.gov>; Baehr-Jones, Vanessa (USACAN) <vbaehr-jones@usa.doj.gov>; Bostic, John (USACAN) <jbostic@usa.doj.gov>
**Cc:** Downey, Kevin <KDowney@wc.com>; Saharia, Amy <ASaharia@wc.com>; Trefz, Katherine <KTrefz@wc.com>
**Subject:** RE: US v. Holmes

Bob,

I hope you are well.  I write in response to your May 4 e-mail below.  The government returned a superseding indictment more than a month ago.  Please let me know when we can expect a response to my April 24 letter, reattached hereto.

Thanks.

--Lance


**Lance Wade**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington DC 20005
(P) 202-434-5755 | (F) 202-434-5029
lwade@wc.com  |  www.wc.com/lwade

---

**From:** Leach, Robert (USACAN) <Robert.Leach@usdoj.gov>
**Sent:** Monday, May 4, 2020 6:25 PM
**To:** Wade, Lance <LWade@wc.com>; Schenk, Jeffrey (USACAN) <Jeffrey.B.Schenk@usdoj.gov>; Baehr-Jones, Vanessa (USACAN) <Vanessa.Baehr-Jones@usdoj.gov>; Bostic, John (USACAN) <John.Bostic@usdoj.gov>
**Cc:** Downey, Kevin <KDowney@wc.com>; Saharia, Amy <ASaharia@wc.com>; Trefz, Katherine <KTrefz@wc.com>
**Subject:** RE: US v. Holmes

Lance:

I hope you are well.  We will respond if and when a new charging instrument is filed.  I will say now, though, your letter seems to seek a great deal that was denied in the motion for a bill of particulars.

Best regards,
Bob

---

**From:** Wade, Lance <LWade@wc.com>
**Sent:** Thursday, April 30, 2020 1:42 PM

**To:** Leach, Robert (USACAN) <RLeach@usa.doj.gov>; Schenk, Jeffrey (USACAN) <JSchenk@usa.doj.gov>; Baehr-Jones, Vanessa (USACAN) <vbaehr-jones@usa.doj.gov>; Bostic, John (USACAN) <jbostic@usa.doj.gov>
**Cc:** Downey, Kevin <KDowney@wc.com>; Saharia, Amy <ASaharia@wc.com>; Trefz, Katherine <KTrefz@wc.com>
**Subject:** RE: US v. Holmes

Counsel:

Good afternoon.  I just wanted to follow-up on the attached letter and inquire as to when we might expect a response.

Many thanks.

--Lance

**Lance Wade**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington DC 20005
(P) 202-434-5755 | (F) 202-434-5029
lwade@wc.com  |  www.wc.com/lwade

---

**From:** Wade, Lance
**Sent:** Thursday, April 9, 2020 9:22 PM
**To:** 'Leach, Robert (USACAN)' <Robert.Leach@usdoj.gov>; Schenk, Jeffrey (USACAN) <Jeffrey.B.Schenk@usdoj.gov>; Baehr-Jones, Vanessa (USACAN) <Vanessa.Baehr-Jones@usdoj.gov>; Bostic, John (USACAN) <John.Bostic@usdoj.gov>
**Cc:** Wade, Lance <LWade@wc.com>; Downey, Kevin <KDowney@wc.com>; Saharia, Amy <ASaharia@wc.com>; Trefz, Katherine <KTrefz@wc.com>
**Subject:** US v. Holmes

Please see the attached.


**Lance Wade**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington DC 20005
(P) 202-434-5755 | (F) 202-434-5029
lwade@wc.com  |  www.wc.com/lwade

---

This message and any attachments are intended only for the addressee and may contain information that is privileged and confidential. If you have received this message in error, please do not read, use, copy, distribute, or disclose the contents of the message and any attachments. Instead, please delete the message and any attachments and notify the sender immediately. Thank you.

# Exhibit B



**U.S. Department of Justice**

*United States Attorney*
*Northern District of California*

| | |
|---|---|
| *150 Almaden Boulevard, Suite 900* | *(408) 535-5061* |
| *San Jose, California 95113* | *Fax:(408) 535-5066* |

March 6, 2020

**VIA EMAIL**

Lance Wade
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, DC 20005

Jeffrey B. Coopersmith
Orrick Herrington & Sutcliffe LLP
701 5th Avenue, Suite 5600
Seattle, WA 98104-7097

       Re:    <u>United States v. Elizabeth Holmes and Ramesh "Sunny" Balwani</u>
               CR-18-00258-EJD
               Notice re Government's Intent to Introduce Certain Evidence

Dear Counsel:

     We write to provide notice that the government may seek to introduce certain evidence in its case in chief in the above-referenced matter. This evidence is relevant to the charges in this case and is admissible to show, among other things, Defendants' motive, opportunity, intent, preparation, plan, knowledge, identity, consciousness of guilt, or absence of mistake or accident. See Fed. R. Evid. 404(b).

     Please note that, by providing this disclosure, the government is not conceding that this evidence is admissible only under the provisions of Rule 404(b). The government may also assert that this evidence is admissible as direct evidence of the charged conduct, that it is inextricably intertwined with the events charged in the operative Indictment, or that it shows a continuing course of conduct otherwise admissible under Rules 401 and 402.

     The facts summarized below are supported by the evidence in the government's discovery production, including witness statements as reflected in summary memoranda and source documents such as emails, laboratory reports, and business records.

     This notice supplements the previous 404(b) disclosures that have accompanied the government's discovery productions in this case. The government reserves the right to introduce additional evidence covered by those previous disclosures, and further reserves the right to amend this notice in advance of trial based on its continuing investigation and trial preparation.

1

1. **False and misleading representations directed at insured patients.**  As part of Defendants' scheme to defraud patients, they falsely represented to patients that Theranos's tests were accurate, reliable, and suitable for use in the clinical context, when Defendants knew that Theranos's tests were not properly validated and suffered from accuracy problems that rendered them unreliable and not suitable for informing clinical treatment decisions.  Defendants caused Theranos to misrepresent the accuracy and reliability of its tests in advertisements and other promotional materials distributed electronically and in print, and further misled patients as to the nature of Theranos's tests by offering their tests for use in the clinical context, necessarily implying that Theranos's tests could be relied upon for medical decision-making.  Patients who questioned or complained about Theranos's test results were falsely told that the company was having temporary, isolated problems with individual assays, were falsely assured that Theranos's tests could be relied upon, or were given other excuses that masked the limitations of Theranos's technology.  Defendants also misled insured and uninsured patients regarding the methods of blood collection used by Theranos, causing patients to believe that they could have any blood test performed using a finger-stick when Theranos relied on vein draws for a substantial portion of its tests.  These misrepresentations were directed at all potential customers of Theranos, including patients with and without medical insurance that might cover the cost of Theranos's tests.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, doctors and patients who patronized Theranos, marketing personnel employed or retained by Theranos, and former employees of Theranos.

2. **False and misleading representations directed at doctors.**  As part of Defendants' scheme to defraud patients, they falsely represented to doctors that Theranos's tests were accurate, reliable, and suitable for use in the clinical context, when Defendants knew that Theranos's tests were not properly validated and suffered from accuracy problems that rendered them unreliable and not suitable for informing clinical treatment decisions.  Defendants' misrepresentations came in multiple forms, including advertising and promotional materials distributed electronically and in print, directed at doctors and health professionals acting as patient representatives who would later advise patients as to which blood testing services they should use.  Defendants also caused misrepresentations to be directed at doctors during real-time conversations between doctors and Theranos representatives.  For example, Dr. Linnerson in the Phoenix area was falsely told by Theranos representatives that the company's tests had obtained FDA approval.  Similarly, doctors who questioned or complained about Theranos's test results were falsely told that the company was having temporary, isolated problems with individual assays, were falsely assured that Theranos's tests could be relied upon, or were given other excuses that masked the limitations of Theranos's technology.  Other doctors were deceived as to the equipment and methods used for Theranos's tests, with the company withholding information necessary for doctors to place those test results in context.  See below.  Defendants also misled doctors regarding the methods of blood collection used by Theranos, causing doctors to believe that patients could have any blood test performed using a finger-stick when Theranos relied on vein draws for a substantial portion of its tests.  Similarly, Defendants misled some doctors regarding the equipment on which Theranos's tests would be run and the location of that equipment.  Specifically, when Theranos partnered with doctors' offices to provide testing services in-house, Theranos would acquire office space within or near the doctor's practice and lead the doctor to believe that Theranos was maintaining and operating one of its small, Theranos-manufactured analyzers onsite.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but

not limited to, doctors and patients who patronized Theranos, marketing personnel employed or retained by Theranos, and former employees of Theranos.

3. **False and misleading representations made to Theranos's Board of Directors.** Defendants deceived Theranos's Board of Directors in furtherance of their schemes to defraud investors and patients.  In particular, Defendants misrepresented the capabilities of Theranos's technology to the Board, making false claims about matters including:  the capabilities of Theranos's analyzers; the accuracy and reliability of Theranos's tests; the existence of data proving the accuracy and reliability of Theranos's tests; the extent to which Theranos relied on third-party analyzers; the extent to which Theranos relied on vein draws; the nature of FDA's approval requirements for Theranos's tests; the extent to which Theranos's technology had been validated by other entities and organizations including hospitals; the success of Theranos's relationship with Walgreens; the revenues and financial health of the company; the truth of facts reported in the *Wall Street Journal*'s October 15, 2015 article discussing Theranos; and Defendants' willingness to submit Theranos's devices for independent testing or conduct comparison testing matching Theranos's test results against those from conventional labs.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, members of Theranos's Board of Directors.

4. **False and misleading representations made to Walgreens.**  In pursuing and maintaining Theranos's partnership with Walgreens, Defendants made misrepresentations to Walgreens representatives about matters including:  the number of tests Theranos's analyzer could perform using a sample drawn from a finger-stick; the number of assays Theranos's devices could conduct on a single sample; whether Theranos's technology was mature and ready for commercial launch; the existence of technological boundaries affecting Theranos's ability to scale up its testing services; the accuracy and reliability of Theranos's tests and whether those tests were as accurate as or more reliable than competing tests from conventional labs; the extent to which Theranos relied on third-party analyzers; the extent to which Theranos relied on vein draws; the nature of FDA's approval requirements for Theranos's tests; whether Theranos conducted adequate proficiency testing;  the extent to which Theranos's technology had been validated by other entities and organizations including pharmaceutical companies and research universities who had purportedly used Theranos's testing services for clinical trials or other studies; the purported use of Theranos's technology by the United States military; Theranos's ability to provide decentralized testing services at the point of care and the company's experience operating under that model; and the profitability and financial health of the company.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to former Theranos employees as well as Walgreens personnel.

5. **False and misleading representations made to Safeway.**  In pursuing a partnership between Theranos and Safeway, Defendants made misrepresentations to Safeway representatives about matters including:  the number of tests Theranos's analyzer could perform; the number of assays Theranos's devices could conduct on a single sample; the accuracy and reliability of Theranos's tests; whether Theranos's technology was ready for commercial launch; the extent to which Theranos relied on third-party analyzers; the extent to which Theranos relied on vein draws; the nature of regulatory approval requirements for Theranos's tests; the extent to which Theranos's technology had been validated by other entities and organizations including pharmaceutical companies and research universities; the use of Theranos technology by the military; and the financial

health and projected profitability of the company.  Additionally, Holmes agreed to
provide a Theranos analyzer to UCSF so that they could evaluate Theranos's technology
partly for Safeway's benefit.  Theranos, however, never provided UCSF with a device to
review.  The government may introduce these and similar facts through produced
documents as well as through testimony from witnesses including, but not limited to,
former Theranos employees and Safeway representatives.

6. **False and misleading representations made to journalists.**  In promoting Theranos's
business, Defendants and their representatives were interviewed by journalists and made
a number of false and misleading statements to those journalists regarding the state of
Theranos's business and the capabilities of Theranos's technology.  For example, Holmes
made several misrepresentations to reporter Roger Parloff, including:  (1) that Theranos's
level of quality and low coefficient of variation was revolutionary for a certified lab; (2)
that Theranos had done 70 or more tests from a single microsample; (3) that Theranos
was different from labs that used large machines in a centralized process; (4) that
Theranos was exceeding requirements for proficiency testing; (5) that Theranos's
platform could do all of the several hundred tests offered by Quest in a regional lab; (6)
that Theranos had a single device that could perform any test; and (7) that Theranos's
clinical laboratory consisted of hundreds of Theranos analyzer devices.  Simultaneously,
Defendants did not correct the false conclusions that journalists reached based on
Defendants statements, failing to clarify, for example, that Theranos's analyzer could
perform only a limited number of assays and the company relied on third-party analyzers
for a significant portion of its tests.  Moreover, when Defendants saw false statements
about Theranos's capabilities repeated in press coverage, they did not correct those
reports.  This remained the case even when other employees brought the inaccurate
statements to their attention—for example, Theranos attorney Brad Arington confronted
Holmes about multiple false statements in Roger Parloff's June 2014 *Fortune* article
about Theranos.  The government may introduce these and similar facts through
produced documents as well as through testimony from witnesses including, but not
limited to, former Theranos employees and attorneys as well as journalists who covered
Theranos and conducted interviews of either Defendant.

7. **Fostering culture of secrecy and forcing employees and others to sign non-disclosure
agreements.**  In order to prevent the spread of information regarding problems at
Theranos, Defendants required employees to sign strict non-disclosure agreements.
Similar agreements were prerequisites to board members, potential investors, and other
visitors obtaining information about the company, its technology, and its business.
Similarly, in their roles controlling the day-to-day operations of Theranos and overseeing
the company's employees, Defendants took steps to silo information within Theranos,
discouraging employees from sharing information about their work with other employees
in the company and fostering a culture of internal secrecy.  These actions minimized the
number of Theranos employees who were aware of problems relating to the company's
research and development practices, technological capabilities, clinical laboratory
practices, and business relationships.  In particular, Defendants discouraged employees
from sharing information regarding Theranos's use of third-party analyzers for its tests,
taking specific steps to conceal this fact from employees who did not already know.
Those steps included renaming third-party devices in Theranos's information
management systems and assigning them code names so that employees who accessed
these systems could not determine that those devices had in fact been manufactured by
third-party companies.  Defendants were so restrictive in controlling employees'
statements about Theranos that they required some employees to remove references to
Theranos from the employees' LinkedIn profiles.  Defendants were similarly secretive

4

with investors, refusing to disclose to representatives like Lisa Peterson the identities of other investors in the company.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees and investors as well as potential and actual strategic partners of Theranos.

8. **Restricting access to laboratory areas within Theranos.**  Defendants set policies at Theranos that severely restricted access to the laboratory areas where Theranos tested patient samples.  Employees who did not work in the clinical laboratory generally were not able to access the areas, and visitors generally were not allowed to view those areas.  These policies and practices prevented the dissemination of knowledge regarding problems with Theranos's proprietary analyzers as well as Theranos's use of third-party devices for many of its tests.  Similarly, while withholding access to the actual clinical lab, Defendants misled visitors to Theranos by intentionally giving them the impression that the clinical lab consisted of multiple Theranos TSPUs and did not include other conventional devices.  For example, when Vice President Biden visited Theranos in July 2015, Theranos did not show visitors the CLIA lab where patient sample testing was performed, but set up a room containing a large number of Theranos TSPU boxes on shelves, intending that visitors believe they were viewing the machines that ran Theranos's clinical tests.  Within Theranos's Normandy laboratory, Balwani ordered that wall dividers be installed to hide the Tecan devices Theranos used to dilute its samples.  When Holmes was interviewed by Roger Parloff following his visit to Theranos's facilities, she responded to his request to see the lab by indicating that he had essentially already seen the lab because he had seen a room with multiple TSPU devices.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees, potential and actual strategic partners of Theranos, journalists, and others who visited Theranos.

9. **Harassing, threatening, or otherwise influencing doctors or patients who had negative experiences with Theranos.**  When doctors or patients made public statements about inaccurate Theranos test results and other negative experiences with the company, Defendants and their agents engaged in harassing, threatening, or other improper behavior in an effort to dissuade those providers from generating negative publicity for Theranos.  For example, when Arizona provider Dr. Nicole Sundene was cited in a *Wall Street Journal* article after providing information about an unreliable Theranos test result, Balwani visited her offices in person along with Christian Holmes and berated her and her staff, threatening to sue her.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees as well as doctors and patients who patronized Theranos's testing services.

10. **Threatening, influencing, or vilifying journalists in response to negative coverage of Theranos.**  When journalists investigated Theranos and wrote articles exposing misrepresentations made by Defendants concerning Theranos's business and technology, Defendants and their agents threatened and other attempted to improperly influence those journalists in an effort to suppress negative publicity.  For example, when Defendants learned that a reporter from the *Wall Street Journal* was investigating the company and planning to publish an article reporting unfavorable facts about the company and its technology, Defendants directed attorneys to reach out to the *Wall Street Journal* and attempt to dissuade the publication from releasing the article.  In a meeting with the reporter, John Carreyrou, his editor, and the publication's lawyers, Theranos's attorneys

5

insisted that the publication not move forward with the article, incorrectly claiming that it was based on false information.  Holmes also attempted to persuade Rupert Murdoch exercise his power as owner of the *Journal* to kill the story before it could be published.  Defendants also vilified journalists who printed negative articles about Theranos, blaming them for skepticism regarding Theranos and its technology in an effort to deflect blame and accountability from themselves and their company.  For example, following publication of the October 15, 2015 *Wall Street Journal* article revealing problems with Theranos's blood testing services, Defendants on at least two occasions led employees in a chant of "Fuck you, Carreyrou," directed at the journalist who investigated and authored the article.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees, attorneys representing Theranos or relevant news publications, and journalists who investigated and covered Theranos.

11. **Blaming and vilifying competing companies.**  When Theranos was the subject of regulatory scrutiny or negative publicity, Defendants attributed blame to competing companies like Quest and LabCorp, stating and implying that those companies were influencing the government and/or the media.  For example, after October 2015, when Theranos became the target of unfavorable reporting exposing problems with the company's operations, Holmes led employees in a chant of "Fuck you, SonoraQuest."  Defendants made statements during this time period arguing that Theranos had been unfairly targeted for criticism as a result of action by competitors given Theranos's potential to disrupt the blood testing industry.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees as well as journalists who covered Theranos.

12. **Threatening or intimidating employees and former employees.**  Defendants and their agents directed threats and intimidating language at current and former Theranos employees in an effort to discourage employees from disseminating facts about the problems facing the company's technology and business.  On multiple occasions, when employees left the company voluntarily or were terminated, Defendants corresponded or met with those employees to deliver stern reminders of the employee's obligations under nondisclosure agreements and threatened employees with consequences should they reveal any nonpublic information about Theranos's technology or business practices.  When Dr. Adam Rosendorff resigned from Theranos, Balwani became angry Rosendorff had forwarded work emails to his personal account out of a fear that regulatory authorities might investigate Theranos's practices.  Balwani insisted that Rosendorff sign a legal document confirming deletion of the emails.  This exchanges caused Rosendorff to feel threatened.  On other occasions, Defendants reacted angrily and attempted to threaten or intimidate employees whom they suspected to be the sources of negative publicity concerning Theranos.  For example, following their review of some or all of the October 15, 2015 *Wall Street Journal* article discussing Theranos, Defendants directed board member George Schultz and Theranos attorneys to meet with Theranos employee Tyler Schultz because they believed some of the information in the article was provided by him.  George Schultz conveyed to Tyler Schultz the warning from Defendants that Tyler's career would be adversely affected if he continued to share information about Theranos.  During that conversation, Theranos lawyers waited at the house of Tyler Schultz's grandfather, subsequently ambushing Tyler Schultz and threatened him with legal action.  On another occasion, Balwani became aware of a negative review of Theranos as an employer posted on website glassdoor.com.  In response, Balwani aggressively interrogated several employees in an unsuccessful effort to determine the

source of the review and discourage further negative reviews.  Generally, Holmes and Balwani fostered a culture that strongly discouraged skepticism or dissent from employees, enforcing that culture by reacting with hostility and intimidation to any questioning.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees and members of the Board.

13. **False and misleading representations made to FDA, CMS, CDPH, and other regulatory organizations.**  When Theranos was the subject of inspections by CMS and other regulatory organizations, Defendants' agents presented regulators with selected, non-comprehensive data of Theranos's test results in an effort to mask accuracy and consistency problems with Theranos's assays.  Additionally, Theranos failed to develop, maintain, and follow appropriate standard operating procedures for its clinical lab, but drafted and/or approved such SOPs immediately before or during regulatory inspections in an effort to conceal this oversight.  In connection with an inspection by CDPH, Balwani and others misled an inspector into believing that the Theranos CLIA laboratory was limited to a single area.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees as well as regulatory agency personnel.

14. **Violations of industry standards and government regulations or rules regarding research and development procedures, medical devices and clinical laboratory practices.**  In furtherance of their scheme to defraud, Defendants disregarded and failed to conform to industry standards as well as government regulations or rules regarding research and development procedures, medical devices and clinical laboratory standards.  For example, in conducting research and development purportedly aimed at validating its assays, Theranos failed to conduct adequate validation studies, relying on insufficient data to claim that their tests were valid, accurate, and reliable.  Theranos also cut corners in its Arizona research and development testing, failing to implement a clear protocol for informed consent for trial participants and fostering a coercive environment for testing.  Theranos's CLIA lab was the site of several violations of these rules and standards including the use of expired reagents, failure to implement and carry out proper proficiency testing and quality control processes, and inadequate record-keeping.  Under Defendants' supervision, Theranos's CLIA lab also improperly failed to develop, maintain, and follow adequate standard operating procedures for its clinical tests.  Defendants also exercised an improper degree of control and influence over the operation of Theranos's CLIA lab despite their lack of medical education or training.  Defendants, and Balwani in particular, were deeply involved in clinical decisions that should have been left to the discretion of the laboratory director—even overruling the laboratory director at times.  In exercising that control, Defendants consistently made decisions that prioritized preserving Theranos's reputation and secrecy at the expense of providing complete information to doctors and patients.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees as well as regulatory agency personnel, and expert witnesses.

15. **Altering or tampering with third-party medical devices.**  Theranos's in-house manufactured analyzer—called the Edison, miniLab, or TSPU—was incapable of performing a large proportion of the clinical blood tests Theranos offered.  The Theranos devices were also incapable of handling high-throughput activity required to support Theranos's business model.  In response, Defendants caused Theranos to acquire several commercially available blood analyzer devices manufactured by third parties.  Theranos

7

then altered and tampered with those devices by modifying them to run on smaller and/or diluted blood samples, contrary to industry standards and the manufacturers' intended use for such devices. The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees.

16. **Multiplexing test results and disregarding outliers to mask inconsistency.** In its clinical testing and/or its proficiency testing, Theranos operated its analyzers according to a protocol that included running each assay multiple times and then multiplexing the results in order to derive the final, reported result. As part of that protocol, so-called outlier results—individual results that deviated from the other results for a given assay on a given sample—were discarded and not accounted for. This approach tended to mask consistency problems with Theranos's tests. The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees.

17. **Improperly setting and altering reference ranges.** Theranos's lab practices deviated from industry standards and standard testing protocols approved by FDA and validated by the industry. In setting the reference ranges for its tests, Theranos improperly relied on reference ranges for common, FDA-approved tests and/or conducted insufficient studies to set and adjust its own reference ranges. Similarly, after Theranos began offering and providing clinical blood testing services, the company improperly adjusted reference ranges based on individual clinical results—without conducting sufficient studies to justify such an adjustment—in order to bring out-of-range results back into the newly adjusted "normal" range and avoid abnormal results to patients. The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees and expert witnesses.

18. **Withholding critical test results and other important information from doctors and patients.** In an effort to avoid additional scrutiny of its blood test results and laboratory practices, Theranos sometimes withheld test results that were in the "critical" range for a given analyte, i.e., results that indicated a patient might need urgent medical care. Additionally, Theranos withheld information from doctors and patients indicating what type of analyzer had been used for a given test, depriving doctors and patients of the facts needed to place certain assay results into context—for example, when multiple samples from a single patient had been run on different types of analyzers leading to otherwise unexplainable discrepancies in results. Theranos also withheld from doctors and patients the fact that Theranos's tests were not FDA approved, that Theranos relied on third-party analyzers for many of its tests, and other key facts regarding problems with their laboratory practices. The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees, expert witnesses, and doctors and patients who patronized Theranos's testing services.

19. **Declining to conduct or agree to meaningful comparative tests.** Despite the fact that Theranos's analyzers and testing procedures varied from industry standards and conventional, FDA-approved tests, Defendants declined to conduct sufficient comparative tests establishing that Theranos's test results delivered accurate and reliable results when compared to competing technology. Similarly, Theranos failed to conduct comprehensive and accurate comparison tests establishing that its assays could reliably be conducted on finger-stick samples as opposed to vein draws. Defendants also refused

to commission or authorize such comparative testing through Sarah Cannon, Cleveland Clinic, UCSF, or other independent third-parties, to publish the results of any such testing, and to provide that information to the company's board.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees, expert witnesses, representatives of potential and actual strategic partners of Theranos, and members of the Theranos Board.

20. **Decommissioning Theranos's Laboratory Information System database.**  Theranos maintained its clinical test data in a software database it called the Laboratory Information System ("LIS").  In October 2016, Theranos announced that it would cease offering clinical lab testing services.  Following that decision but before the company ceased operation in 2018, Theranos "decommissioned" its LIS, rendering it nonfunctional and converting the data to a format that is not readily retrievable.  This decision had the effect of obscuring or destroying detailed information regarding the specific tests Theranos conducted during the years of its clinical testing operation, hindering the government's investigation of Defendants.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees and representatives of the Theranos assignee.

21. **Obtaining personal benefit from position at Theranos.**  In addition to their salaries and other direct compensation, Defendants also obtained significant additional benefits from their positions at Theranos.  For example, the company regularly paid for luxury travel and accommodations for Holmes.  Additionally, Holmes routinely required her office assistant to perform a large number of personal tasks seemingly unrelated to the business of Theranos, including shopping for and returning household items, clothing, luxury fashion accessories, and beauty products.  Finally, both Holmes and Balwani were he beneficiaries of increased local and national standing as a result of their association with Theranos.  Holmes was featured in numerous publications and lauded as a visionary.  Defendants also associated with celebrities, dignitaries, and other wealthy and powerful individuals who were interested in Theranos.  Holmes collected a substantial salary from Theranos, which enabled her to live a luxurious lifestyle, driving a luxury SUV, renting an expensive home, and purchasing expensive merchandise.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees, journalists who investigated Theranos, members of the Theranos Board, and potential and actual investors in Theranos.

22. **Concealing the romantic relationship between Holmes and Balwani from investors and others.**  During much of the relevant time period, Defendants Holmes and Balwani were romantically involved.  This relationship was actively concealed from others to whom its existence would have been material, including:  prospective and actual investors; members of the Board of Directors; representatives of Walgreens, Safeway, and other partner organizations; Theranos employees; and journalists.  Defendants took steps to hide the existence of this relationship, such as commuting to work separately and avoiding being seen together outside of work.  On at least one occasion, when questioned by a journalist as to whether she was in a relationship, Holmes falsely stated that she was not.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees as well as members of the Board of Directors, potential and actual

investors in Theranos, potential and actual strategic partners of Theranos, and journalists who interviewed Defendants.

Very truly yours,

ADAM A. REEVES
Attorney for the United States,
Acting Under Authority Conferred
By 28 U.S.C. § 515


/s/
JOHN C. BOSTIC
Assistant United States Attorney

1  JOHN D. CLINE (CA State Bar No. 237759)
   50 California Street, Suite 1500
2  San Francisco, CA 94111
   Telephone: (415) 662-2260 │ Facsimile: (415) 662-2263
3  Email: cline@johndclinelaw.com

4  KEVIN M. DOWNEY (Admitted Pro Hac Vice)
   LANCE A. WADE (Admitted Pro Hac Vice)
5  AMY MASON SAHARIA (Admitted Pro Hac Vice)
   KATHERINE TREFZ (CA State Bar No. 262770)
6  WILLIAMS & CONNOLLY LLP
   725 Twelfth Street, NW
7  Washington, DC 20005
   Telephone: (202) 434-5000 │ Facsimile: (202) 434-5029
8  Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

9  Attorneys for Defendant ELIZABETH A. HOLMES

10

11            UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13               SAN JOSE DIVISION

14

15  UNITED STATES OF AMERICA,            )  Case No. CR-18-00258-EJD
                                         )
16            Plaintiff,                 )  **[PROPOSED] ORDER GRANTING MS.**
                                         )  **HOLMES' MOTION TO DISMISS AS**
17       v.                              )  **DUPLICITOUS COUNTS ONE AND THREE**
                                         )  **THROUGH EIGHT OF THE SECOND AND**
18  ELIZABETH HOLMES and                 )  **THIRD SUPERSEDING INDICTMENTS**
    RAMESH "SUNNY" BALWANI,              )
19                                       )  Hon. Edward J. Davila
            Defendants.                  )
20                                       )
                                         )
21  _____ )

22

23

24

25

26

27

28

1    This **CAUSE** having come before the Court upon Defendant Elizabeth A. Holmes' Motion to

2  Dismiss as Duplicitous Counts One and Three through Eight of the Second and Third Superseding

3  Indictments.  After due consideration of the filings and the governing law, and the argument of the

4  parties:

5    **IT IS HEREBY ORDERED** that Ms. Holmes' motion is **GRANTED**, and that Counts One and

6  Three through Eight of the Second and Third Superseding Indictments are hereby **DISMISSED**.

7

8    **IT IS SO ORDERED.**

9

10  Dated: _____

11

12                                                                        _____
                                                                          Hon. Edward J. Davila
13                                                                        United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28  [PROPOSED] ORDER GRANTING MOTION TO DISMISS AS DUPLICITOUS COUNTS ONE AND THREE
    THROUGH EIGHT OF THE SECOND AND THIRD SUPERSEDING INDICTMENTS
    CR-18-00258 EJD

                                                      1