JOHN D. CLINE (CA State Bar No. 237759)
50 California Street, Suite 1500
San Francisco, CA 94111
Telephone: (415) 662-2260 │Facsimile: (415) 662-2263
Email: cline@johndclinelaw.com

KEVIN M. DOWNEY (Admitted Pro Hac Vice)
LANCE A. WADE (Admitted Pro Hac Vice)
AMY MASON SAHARIA (Admitted Pro Hac Vice)
KATHERINE TREFZ (CA State Bar No. 262770)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
Washington, DC 20005
Telephone: (202) 434-5000 │Facsimile: (202) 434-5029
Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

Attorneys for Defendant ELIZABETH A. HOLMES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>v.<br><br>ELIZABETH HOLMES and<br>RAMESH "SUNNY" BALWANI,<br><br>      Defendants. | Case No. CR-18-00258-EJD<br><br>**MOTION TO DISMISS AS TIME-BARRED COUNTS THREE THROUGH EIGHT AND TEN OF THE SECOND SUPERSEDING INDICTMENT AND COUNTS THREE THROUGH EIGHT, TEN, AND ELEVEN OF THE THIRD SUPERSEDING INDICTMENT**<br><br>Date:     October 6, 2020<br>Time:    10:00 AM<br>CTRM: 4, 5th Floor<br><br>Hon. Edward J. Davila |

1

## **MOTION TO DISMISS**

2      PLEASE TAKE NOTICE that on October 6, 2020, at 10:00 a.m., or on such other date and time

3  as the Court may order, in Courtroom 4 of the above-captioned Court, 280 South 1st Street, San Jose,

4  CA 95113, before the Honorable Edward J. Davila, Defendant Elizabeth Holmes will and hereby does

5  respectfully move the Court pursuant to Rules 8 and 12 of the Federal Rules of Criminal Procedure to

6  dismiss Counts Three through Eight and Ten of the Second Superseding Indictment and Counts Three

7  through Eight, Ten, and Eleven of the Third Superseding Indictment as time-barred under 18 U.S.C.

8  § 3282.  The Motion is based on the below Memorandum of Points and Authorities, the record in this

9  case, and any other matters that the Court deems appropriate.

10

11  DATED: August 28, 2020

12

13                                                        /s/ Amy Mason Saharia
                                                         KEVIN DOWNEY
14                                                        LANCE WADE
                                                         AMY MASON SAHARIA
15                                                        KATHERINE TREFZ
                                                         Attorneys for Elizabeth Holmes
16

17

18

19

20

21

22

23

24

25

26

# **TABLE OF CONTENTS**

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ...............................................................1

BACKGROUND ........................................................................................................................2

ARGUMENT ..............................................................................................................................4

    I.       Counts Three through Eight Are Time-Barred. ........................................................5

    II.      Counts Ten and Eleven Are Time-Barred. ..............................................................8

          A.     The Government's Filing of the Information Did Not Toll the Statute of Limitations for Purposes of 18 U.S.C. § 3282...................................................9

              1.     The filing of an information without the defendant's consent does not satisfy Section 3282................................................................9

              2.     The limited cases that reached the contrary conclusions are irrelevant and/or wrongly decided. .......................................................15

          B.     18 U.S.C. § 3288 Does Not Help the Government. ...............................................20

CONCLUSION ...........................................................................................................................22

MOTION TO DISMISS AS TIME-BARRED COUNTS THREE THROUGH EIGHT AND TEN OF THE SECOND SUPERSEDING INDICTMENT AND COUNTS THREE THROUGH EIGHT, TEN, AND ELEVEN OF THE THIRD SUPERSEDING INDICTMENT
CR-18-00258 EJD

i

1

## <u>TABLE OF AUTHORITIES</u>

2

### CASES

3

Pages

4    *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803 (1989)......................................................14

5    *Jaben v. United States*, 381 U.S. 214 (1965) ................................................................... *passim*

6    *Keene Corp. v. United States*, 508 U.S. 200 (1993) .........................................................14

7    *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 136 S. Ct. 1938 (2016) .................................9

8    *Smith v. United States*, 360 U.S. 1 (1959) ......................................................................11

9    *Toussie v. United States*, 397 U.S. 112 (1970) ...............................................................15

10    *United States v. Beardslee*, 197 F.3d 378 (9th Cir. 1999) ...............................................4

11    *United States v. Burdix-Dana*, 149 F.3d 741 (7th Cir. 1998) ............................... *passim*

12    *United States v. Clawson*, 104 F.3d 250 (9th Cir. 1996) .............................................20, 21

13    *United States v. Clemenic*, 1988 U.S. Dist. LEXIS 12601 (N.D. Ill. Oct. 24, 1988) ..............10

14    *United States v. Cooper*, 956 F.2d 960 (10th Cir. 1992) ................................................18

15    *United States v. Ellis*, 622 F.3d 784 (7th Cir. 2010).......................................................10

16    *United States v. Gonsalves*, 675 F.2d 1050 (9th Cir. 1982).............................................15

17    *United States v. Hsin-Yung*, 97 F. Supp. 2d 24 (D.D.C. 2000).......................................19

18    *United States v. Italiano*, 894 F.2d 1280 (11th Cir. 1990)..............................................6

19    *United States v. Liu*, 731 F.3d 982 (9th Cir. 2013).................................................5, 6, 7

20    *United States v. Machado*, 2005 WL 2886213 (D. Mass. Nov. 3, 2005) ..............11, 18, 19, 20

21    *United States v. Marifat*, 2018 WL 1806690 (E.D. Cal. Apr. 17, 2018) .................................21

22    *United States v. Moore*, 37 F.3d 169 (5th Cir. 1994)......................................................10

23    *United States v. O'Neill*, 463 F. Supp. 1205 (E.D. Pa. 1979)......................................6, 7

24    *United States v. Ratcliff*, 245 F.3d 1246 (11th Cir. 2001) .........................................6, 7

25    *United States v. Salmonese*, 352 F.3d 608 (2d Cir. 2003) ............................................6

26

27    MOTION TO DISMISS AS TIME-BARRED COUNTS THREE THROUGH EIGHT AND TEN OF THE SECOND
SUPERSEDING INDICTMENT AND COUNTS THREE THROUGH EIGHT, TEN, AND ELEVEN OF THE THIRD
SUPERSEDING INDICTMENT

28    CR-18-00258 EJD

ii

Pages

*United States v. Spanier*, 744 F. App'x 351 (9th Cir. 2018) ..........................................................6

*United States v. Stewart*, 425 F. Supp. 2d 727 (E.D. Va. 2006) ..............................................17, 18

*United States v. Tadros*, 310 F.3d 999 (7th Cir. 2002) ...............................................................4

*United States v. Teran*, 98 F.3d 831 (5th Cir. 1996) ..................................................................10

*United States v. Thompson*, 287 F.3d 1244 (10th Cir. 2002) ......................................................10

*United States v. Vitanov*, 2007 WL 1793584 (D. Ariz. June 19, 2007) .......................................7

*United States v. Watson*, 941 F. Supp. 601 (N.D. W. Va. 1996) ...........................................18, 19

*United States v. Wessels*, 139 F.R.D. 607 (M.D. Pa. 1991) ........................................................10

*Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457 (2001) .....................................................14

**CONSTITUTION, STATUTES, AND RULES**

U.S. Const. amend V ...................................................................................................................10

U.S. Const. amend VI .................................................................................................................21

18 U.S.C. § 1343 ..........................................................................................................................2

18 U.S.C. § 3238 ........................................................................................................................19

18 U.S.C. § 3282 ...................................................................................................................*passim*

18 U.S.C. § 3288 ...................................................................................................................*passim*

18 U.S.C. § 3293 ........................................................................................................................14

18 U.S.C. § 3294 ........................................................................................................................14

18 U.S.C. § 3300 ........................................................................................................................14

I.R.C. § 6531 .............................................................................................................................16

Fed. R. Crim. P. 3 ......................................................................................................................12

Fed. R. Crim. P. 4 .................................................................................................................12, 13

Fed. R. Crim. P. 5 .................................................................................................................12, 13

Fed. R. Crim. P. 7 ...............................................................................................................*passim*

MOTION TO DISMISS AS TIME-BARRED COUNTS THREE THROUGH EIGHT AND TEN OF THE SECOND
SUPERSEDING INDICTMENT AND COUNTS THREE THROUGH EIGHT, TEN, AND ELEVEN OF THE THIRD
SUPERSEDING INDICTMENT
CR-18-00258 EJD

iii

Pages

Fed. R. Crim. P. 10 .................................................................................................................9

Fed. R. Crim. P. 58 .................................................................................................................10

Fed. R. Evid. 404 .....................................................................................................................3

**OTHER AUTHORITIES**

Black's Law Dictionary (2020) ...............................................................................................9

Merriam-Webster's Dictionary (2020) ...................................................................................9

Webster's Collegiate Dictionary (2020) ................................................................................9

MOTION TO DISMISS AS TIME-BARRED COUNTS THREE THROUGH EIGHT AND TEN OF THE SECOND
SUPERSEDING INDICTMENT AND COUNTS THREE THROUGH EIGHT, TEN, AND ELEVEN OF THE THIRD
SUPERSEDING INDICTMENT
CR-18-00258 EJD

1

### MEMORANDUM OF POINTS AND AUTHORITIES

Counts Three through Eight and Ten of the Second Superseding Indictment ("SSI") and Counts

Three through Eight, Ten, and Eleven of the Third Superseding Indictment ("TSI"), charging individual

acts of wire fraud, are time-barred.[1]  A five-year statute of limitations governs this case.  *See* 18 U.S.C.

§ 3282.  Counts Three through Eight are based on alleged investor-related wirings that occurred in 2013

and 2014—well more than five years before the grand jury returned the TSI on July 28, 2020.  And

because the TSI charges a scheme to defraud "investors" that is materially broader in length and scope

than the one charged in the (First) Superseding Indictment, the previous indictment does not toll the

statute of limitations for Counts Three through Eight.  If the government wanted to charge wire-fraud

counts based on the new scheme to defraud that it has charged in the TSI, it was required to do so within

five years of the charged wirings.

Counts Ten and Eleven similarly are time-barred.  They charge new counts of wire fraud, based

on new wirings occurring in May 2015—more than five years before the grand jury returned the TSI in

July 2020.  The government has suggested in prior briefing that its filing of an information in May

2020—which it did with full knowledge that Ms. Holmes did not consent to prosecution by

information—served to toll the statute of limitations on these charges.  That is incorrect.  To toll the

statute of limitations, the government must "institute" an information, and an information cannot be

"instituted" without a defendant's waiver of her right to be tried by a grand jury.  The opposite

conclusion would give the government the right to extend the statute of limitations *sua sponte* in any

case, against anyone, just by filing a patently unconstitutional information.  This Court should reject that

dangerous construction of 18 U.S.C. § 3282.

Counts Three through Eight and Ten of the Second Superseding Indictment and Counts Three

through Eight, Ten, and Eleven of the Third Superseding Indictment should be dismissed.

---

[1] Ms. Holmes focuses her argument here on the Counts in the Third Superseding Indictment, but the same reasoning bars the identical Counts that were returned as part of the Second Superseding Indictment, ECF No. 449, on July 14, 2020.

MOTION TO DISMISS AS TIME-BARRED COUNTS THREE THROUGH EIGHT AND TEN OF THE SECOND SUPERSEDING INDICTMENT AND COUNTS THREE THROUGH EIGHT, TEN, AND ELEVEN OF THE THIRD SUPERSEDING INDICTMENT
CR-18-00258 EJD

**BACKGROUND**

<u>Counts Three through Eight</u>.  Counts Three through Eight of the TSI charge wire fraud under 18 U.S.C. § 1343.  Each alleges that Ms. Holmes engaged in a scheme to defraud "investors" and transmitted or caused to be transmitted wire communications in furtherance of that alleged scheme.  TSI, ECF No. 469 ¶ 24.  The TSI alleges six wire communications occurring on the following dates: December 30, 2013; December 31, 2013 (two counts); February 6, 2014; and October 31, 2014 (two counts).  *Id.*

The specific wires charged in Counts Three through Eight were also charged in the Superseding Indictment returned in 2018.  *See* Superseding Indictment, ECF No. 39, ¶ 24.  The alleged scheme to defraud, however, was much narrower.  The Superseding Indictment alleged that the scheme to defraud "investors" took place between 2013 and 2015.  *See* ECF No. 39, ¶ 11 ("From a time unknown but no later than 2013 through 2015 . . . .").  The TSI, returned nearly two years later, doubles the length of the charged conspiracy:  the government now claims that Defendants were engaged in scheme to defraud investors from 2010 to 2015.  *See* TSI ¶ 11 ("From a time unknown but no later than 2010 through 2015 . . . .").  That lengthening of the charged conspiracy sweeps in numerous additional investors and alleged statements to investors, made at a different stage in the company's operations.  Notably, the TSI itself draws a distinction between Theranos' pre-2013 operations and its operations from 2013 onwards.  *See* TSI ¶ 5 ("During its first ten years, from approximately 2003 to 2013, Theranos operated in what HOLMES called 'stealth mode,' with little public attention."); *id.* ¶ 6 ("In and around 2013, Theranos began to publicize its technological advances.").

The TSI also broadens the scope of the charged scheme to defraud investors by redefining the term "investors."  Paragraph 3 of the Superseding Indictment stated in relevant part:  "When Theranos solicited and received financial investments from investors, the money was deposited into its Comerica Bank account."  Ms. Holmes understood "investors" to have its common-sense meaning of equity investors—*i.e.*, individuals who gave Theranos money in exchange for equity shares.  Ms. Holmes did

MOTION TO DISMISS AS TIME-BARRED COUNTS THREE THROUGH EIGHT AND TEN OF THE SECOND SUPERSEDING INDICTMENT AND COUNTS THREE THROUGH EIGHT, TEN, AND ELEVEN OF THE THIRD SUPERSEDING INDICTMENT
CR-18-00258 EJD

2

not understand that term to refer to Theranos business partners who did not own equity shares.  Nor did she understand it to include members of Theranos' Board of Directors who did not convey money to Theranos as alleged in paragraph 3 of the Superseding Indictment.  The Superseding Indictment confirmed that common-sense meaning.  First, the wiring alleged in each wire-fraud count (Counts Three through Eight) was a transfer of money to Theranos in exchange for Theranos shares.  Second, the indictment distinguished between "investors" and companies with which Theranos had a business partnership such as Walgreens.  The Superseding Indictment characterized the relationship between Walgreens and Theranos as a "partnership," not as an investor relationship, ECF No. 39, ¶¶ 10, 12(D), and alleged that Ms. Holmes made misrepresentations to "investors" about Theranos' "partnership" with Walgreens, *id.* ¶ 12(D).

The government confirmed this distinction in its brief opposing Ms. Holmes' motion to dismiss for lack of notice, where it described its discovery production as including documents "from Theranos itself, from former employees of the company, from *investors*, from *business partners* of Theranos including its most prominent partner Walgreens," among others.  ECF No. 265, at 4-5 (emphasis added).  The government further confirmed this distinction when it provided notice—months before the return of the TSI—that in addition to the conduct charged in the Superseding Indictment, it intended to introduce evidence of misrepresentations to members of Theranos' Board of Directors "in furtherance of [Defendants'] scheme to defraud investors and patients" and to business partners such as Walgreens and Safeway "[i]n pursuing" "partnerships" (not investments) with these companies pursuant to Federal Rule of Evidence 404(b).  Saharia Decl., Ex. A.

The TSI adds a new sentence to paragraph 3, which reads:  "Theranos's investors included individuals, entities, certain business partners, members of its board of directors, and individuals and entities who invested through firms formed for the exclusive or primary purpose of investing in Theranos's securities."  TSI, ¶ 3.  The TSI does not state which "certain business partners" it is referring

MOTION TO DISMISS AS TIME-BARRED COUNTS THREE THROUGH EIGHT AND TEN OF THE SECOND SUPERSEDING INDICTMENT AND COUNTS THREE THROUGH EIGHT, TEN, AND ELEVEN OF THE THIRD SUPERSEDING INDICTMENT
CR-18-00258 EJD

3

1   to, nor does it state which members of the Theranos Board of Directors are included in this definition.[2]

2   On August 21, the government stated in an e-mail that "certain business partners" means Walgreens and

3   Safeway.  Saharia Decl., Ex. B.  As to Board members, the government vaguely suggested in the same

4   e-mail that it intends to include all Board members, whether or not they transferred money to Theranos

5   in exchange for stock:  "Members of Theranos' board are easily identifiable from the discovery provided

6   to you.  Indeed, many are listed in the stock certificate ledger reflected at THER-0905030."  *Id.*

7          <u>Counts Ten and Eleven</u>.  Counts Ten and Eleven are new charges of wire fraud that did not

8   appear in the Superseding Indictment.  These counts charge Defendants with transmitting or causing to

9   be transmitted wire communications in furtherance of a scheme to defraud patients.  TSI ¶ 26.  The wire

10  communication alleged in Count Ten is the transmission of patient E.T.'s test results on May 11, 2015.

11  *Id.*  The wire communication alleged in Count Eleven is the transmission of patient M.E.'s test results on

12  May 16, 2015.  *Id.*

13         The government first purported to charge these counts in a Superseding Information it filed on

14  May 8, 2020.  ECF Nos. 390, 391.  Before filing that information, the government asked Ms. Holmes

15  (through counsel) whether she would waive her right to a grand-jury indictment, and she responded that

16  she would not.  Decl. of L. Wade in Supp. of Mot. to Dismiss, ECF No. 399-1 ¶ 2.  A grand jury

17  returned the Second Superseding Indictment on July 14, 2020 that contained Count Ten but did not

18  contain Count Eleven.  ECF No. 449, ¶ 26.  The government then added Count Eleven in the Third

19  Superseding Indictment, which was returned on July 28, 2020.

20                                          **ARGUMENT**

21         The statute of limitations applicable to wire fraud is five years.  *See* 18 U.S.C. § 3282.  The

22  limitations period begins to run "when all the elements of the underlying offense have been committed."

23  *United States v. Beardslee*, 197 F.3d 378, 385 (9th Cir. 1999).  For the wire-fraud counts, all of the

24  elements of the alleged offenses were committed as of the dates of the at-issue wirings.  *See, e.g.*, *United*

25  _____

26  [2] Ms. Holmes addresses the duplicitous nature of this definition, and its lack of notice, in separate motions to dismiss.

27  MOTION TO DISMISS AS TIME-BARRED COUNTS THREE THROUGH EIGHT AND TEN OF THE SECOND
    SUPERSEDING INDICTMENT AND COUNTS THREE THROUGH EIGHT, TEN, AND ELEVEN OF THE THIRD
    SUPERSEDING INDICTMENT
28  CR-18-00258 EJD

                                              4

*States v. Tadros*, 310 F.3d 999, 1006 (7th Cir. 2002) (mailings or wiring commence the running of the five-year statute for mail/wire fraud).  And for each of Counts Three through Eight, Ten and Eleven, the at-issue wirings occurred more than five years before the grand jury returned the TSI on July 28, 2020 (and before the grand jury returned the SSI two weeks earlier on July 14, 2020).  The relevant question is thus whether any ground to toll the statute of limitations exists.  None exists:  the counts should be dismissed as time-barred.

## I.      Counts Three through Eight Are Time-Barred.

Counts Three through Eight of the Superseding Indictment charged Defendants with transmitting or causing to be transmitted wire communications in furtherance of a scheme to defraud "investors" from 2013 to 2015.  Those same counts of the TSI charge Defendants with transmitting or causing to be transmitted wire communications in furtherance of a different, broader scheme to defraud "investors" between 2010 and 2015.[3]  Because the TSI broadens and substantially amends the Superseding Indictment, the government cannot rely on the Superseding Indictment to toll the statute of limitations; Counts Three through Eight of the TSI must themselves be timely.  And because the at-issue wirings occurred in 2013 and 2014—more than five years ago—Counts Three through Eight are time-barred.

As a general matter, "the return of an indictment tolls the statute of limitations with respect to the charges contained in the indictment."  *United States v. Liu*, 731 F.3d 982, 996 (9th Cir. 2013) (quoting *United States v. Pacheco*, 912 F.2d 297, 305 (9th Cir. 1990)).  Tolling continues when a superseding indictment *on the same charges* is returned while a previous indictment is still pending; in that case, the superseding indictment is said to relate back to the prior one.  *Id.*  If the superseding indictment "broaden[ed] or substantially amend[ed] the charges in the original indictment, the statute of limitations would not have been tolled as to those charges."  *Id.* (alterations in original) (internal quotation marks

---

[3] The TSI does not indicate when in 2015 the alleged conspiracies and scheme to defraud ended. Depending on the evidence at trial, Ms. Holmes reserves her rights to challenge the conspiracy counts of the operative indictment on statute of limitations grounds as well.

MOTION TO DISMISS AS TIME-BARRED COUNTS THREE THROUGH EIGHT AND TEN OF THE SECOND SUPERSEDING INDICTMENT AND COUNTS THREE THROUGH EIGHT, TEN, AND ELEVEN OF THE THIRD SUPERSEDING INDICTMENT
CR-18-00258 EJD

5

1  omitted).  By contrast, where a superseding indictment simply "duplicate[s] verbatim" the charges from

2  the prior indictment, the statute of limitations on those charges is tolled.  *Id.* (citation omitted).

3       To decide whether a superseding indictment broadens or substantially amends the prior

4  indictment, courts consider "whether the additional pleadings allege violations of a different statute,

5  contain different elements, rely on different evidence, or expose the defendant to a potentially greater

6  sentence." *Id.* at 997 (internal quotation marks omitted).  "[T]he charges are defined not simply by the

7  statute under which the defendant is indicted, but also by the factual allegations that the government

8  relies on to show a violation of the statute." *United States v. Italiano*, 894 F.2d 1280, 1282 (11th Cir.

9  1990) (internal quotation marks omitted).  "The central concern in determining whether the counts in a

10  superseding indictment should be tolled based on similar counts included in the earlier indictment is

11  notice." *Liu*, 731 F.3d at 997.  Accordingly, a superseding indictment that narrows, rather than

12  broadens, the original charges will relate back to the original indictment.  *See, e.g., United States v.*

13  *Salmonese*, 352 F.3d 608, 622 (2d Cir. 2003).  And a superseding indictment that merely provides

14  "additional details" about the same alleged crime is similarly unproblematic.  *United States v. Spanier*,

15  744 F. App'x 351, 354–55 (9th Cir. 2018).

16       Several cases are illustrative.  In *Liu*, the Ninth Circuit held that an indictment charging the

17  defendant with copyright infringement of music did not toll the statute of limitations with respect to

18  copyright infringement of a motion picture because the defendant lacked notice that "he was to be

19  subject to copyright infringement charges involving motion pictures." 731 F.3d at 997.  In *United States*

20  *v. Ratcliff*, 245 F.3d 1246 (11th Cir. 2001), the Eleventh Circuit held that a superseding indictment that

21  dramatically expanded the length of the charged conspiracy, and substantially increased the alleged

22  amount of imported drugs, did not relate back to the earlier indictment for purposes of the statute of

23  limitations.  *Id.* at 1253–54.  And in *United States v. O'Neill*, 463 F. Supp. 1205 (E.D. Pa. 1979), the

24  district court held that a superseding indictment that alleged different misrepresentations, albeit in the

25  same document at issue in the original indictment, substantially amended the charge and did not relate

26

27  MOTION TO DISMISS AS TIME-BARRED COUNTS THREE THROUGH EIGHT AND TEN OF THE SECOND
   SUPERSEDING INDICTMENT AND COUNTS THREE THROUGH EIGHT, TEN, AND ELEVEN OF THE THIRD
28  SUPERSEDING INDICTMENT
   CR-18-00258 EJD

1    back to the original indictment.  *Id.* at 1208; *see also United States v. Vitanov*, 2007 WL 1793584, at *2

2    (D. Ariz. June 19, 2007) (same).  In so holding, the district court emphasized that the relevant inquiry is

3    whether the defendant was on notice, stating:  "Statutes of limitations are intended to insure, Inter alia,

4    that a defendant receives notice, within a prescribed time, of the acts with which he is charged, so that he

5    and his lawyers can assemble the relevant evidence before documents are lost, memory fades, etc."  463

6    F. Supp. at 1208.

7        Here, Counts Three through Eight broaden and substantially amend the charges against Ms.

8    Holmes in two ways.  First, as in *Ratcliff*, the government has substantially expanded the length of the

9    charged scheme to defraud, which is an element of each of the counts.  *See* TSI ¶¶ 11, 24.  The

10   Superseding Indictment charged a scheme to defraud investors from 2013 to 2015; the TSI *doubles* the

11   length of the charged scheme, from 2010 to 2015.  Ms. Holmes lacked any notice that the government

12   was charging her with engaging in a scheme to defraud from 2010 to 2013.  That expansion of the

13   charged scheme sweeps in countless additional investors and representations—none of which Ms.

14   Holmes understood to be part of the charges in this case.  And by expanding the charged scheme

15   backwards in time, the government has prejudiced Ms. Holmes in precisely the way that the statute of

16   limitations is intended to prevent:  by virtue of the government's amendment, Ms. Holmes is facing—for

17   the first time in this case—charges based on conduct that occurred ten years ago, long outside the statute

18   of limitations.  Because the government's dramatic lengthening of the charged scheme broadens and

19   substantially amends the wire-fraud counts, the prior indictment cannot toll the statute of limitations on

20   these counts.

21       Second, as in *Liu*, the government has substantially broadened the scope of the charged conduct

22   by redefining the term "investors."  As set forth above, the government added a new definition of

23   "investors" to include "business partners," which the government has explained in an e-mail means

24   Walgreens and Safeway.  *See* pp. 3–4, *supra*.  For the reasons set forth above, Ms. Holmes lacked any

25   notice under the prior indictment that the government was claiming that Ms. Holmes schemed to defraud

26

27   MOTION TO DISMISS AS TIME-BARRED COUNTS THREE THROUGH EIGHT AND TEN OF THE SECOND
     SUPERSEDING INDICTMENT AND COUNTS THREE THROUGH EIGHT, TEN, AND ELEVEN OF THE THIRD
28   SUPERSEDING INDICTMENT
     CR-18-00258 EJD

1   Walgreens and Safeway.  To the contrary, the prior indictment affirmatively *pointed away* from such a

2   claim, by characterizing the relationship between Theranos and Walgreens as a "partnership" (and not

3   an investor relationship) and by alleging that Ms. Holmes made representations to "investors" about

4   Theranos' "partnership" with Walgreens.  Superseding Indictment, ECF No. 39, ¶¶ 10, 12(D).

5   Similarly, because the prior indictment characterized investors as persons or entities that made "financial

6   investments" of "money" deposited into Theranos' bank account, *see* ECF No. 39, ¶ 3, Ms. Holmes

7   lacked notice that the government was claiming that Board members who did not convey "money" to

8   Theranos in that way were "investors."

9         This is not a case where the government has simply provided more detail about the scheme to

10   defraud alleged in the Superseding Indictment.  Long after the relevant events, the government is

11   attempting to expand dramatically the charged scheme to defraud, both by lengthening its duration and

12   increasing its scope.  If the government wishes to expand the charged scheme to defraud, it cannot rely

13   on the prior, narrower indictment to toll the statute of limitations.  It must show that the broadened

14   charges are independently timely, as of the date of the TSI.  It cannot do that for Counts Three through

15   Eight.  As a result, those counts must be dismissed.

16   **II.     Counts Ten and Eleven Are Time-Barred.**

17         Counts Ten and Eleven charge wire fraud based on alleged wire communications that occurred

18   on May 11 and 16, 2015 in furtherance of a scheme to defraud patients.  Although the government

19   initiated its investigation in 2015, the indictments that charged these wire-fraud counts were not returned

20   until on July 14 and 28, 2020—more than five years after the statute of limitations had expired.  The

21   government has suggested, however, that its filing of an information charging these counts on May 8,

22   2020 tolled the statute of limitations under 18 U.S.C. § 3282, even though no criminal proceedings could

23   occur based on that information since Ms. Holmes did not waive her constitutional right to grand-jury

24

25

26

27   MOTION TO DISMISS AS TIME-BARRED COUNTS THREE THROUGH EIGHT AND TEN OF THE SECOND
    SUPERSEDING INDICTMENT AND COUNTS THREE THROUGH EIGHT, TEN, AND ELEVEN OF THE THIRD
28   SUPERSEDING INDICTMENT
    CR-18-00258 EJD

1   indictment.  This Court should reject that dangerous interpretation of Section 3282.[4]

2   **A.      The Government's Filing of the Information Did Not Toll the Statute of Limitations**
       **for Purposes of 18 U.S.C. § 3282.**

3
4   **1.      The filing of an information without the defendant's consent does not satisfy**
             **Section 3282.**

5       a.      Section 3282 provides that "no person shall be prosecuted, tried, or punished for any

6   offense, not capital, unless the indictment is found or the information is instituted within five years next

7   after such offense shall have been committed."  18 U.S.C. § 3282(a).  Construing this provision must

8   necessarily commence with its plain text.  *See Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 136 S. Ct.

9   1938, 1946 (2016).  Under the plain text, the mere filing of a felony information without consent does

10  not "institute" it.

11      The statutory text leaves no doubt that the charging instrument must be *effective*, and not merely

12  *filed*, to be "instituted."  To "institute" something means to "to originate and get established" or "to set

13  going."  Webster's Collegiate Dictionary (2020) (online version); *see also* Merriam-Webster's

14  Dictionary (2020) (online version) ("to originate and get established;" "to set going").  Similarly,

15  Black's Law Dictionary defines "institute" as "[t]o begin or start; commence."  Black's Law Dictionary

16  (2020) (online version).  Absent a waiver of indictment under Rule 7(b), an information purporting to

17  charge a felony does not "originate," "get established," "set going," "begin," "start," or "commence"

18  anything; it is a legal nullity.  A defendant cannot be arraigned on such an information without waiver,

19  *see* Fed. R. Crim. P. 10 adv. comm. notes to 2002 amendment, and as a result such a document does not

20  _____

21      [4] To the extent the government invokes the pandemic and resulting suspension of grand-jury
    proceedings, that fact does not render these counts timely.  Neither Section 3282 nor Section 3288

22  contains an exception for pandemics or other emergencies, and only Congress can modify the statute of
    limitations in cases of emergencies.  In fact, shortly after the pandemic crisis arose, the Department of

23  Justice asked Congress to give the courts power to suspend statutes of limitations in emergency
    situations.  *See* Department of Justice Proposals for Addressing Issues Created by the COVID-19
    Pandemic, available at https://int.nyt.com/data/documenthelper/6835-combed-doj-coronavirus-

24  legisla/06734bbf99a9e0b65249/optimized/full.pdf#page=1.  Congress rejected that proposal.
    Additionally, the pandemic cannot excuse the government's year-and-a-half delay in attempting to

25  supersede the indictment based on evidence that was long in its possession.  Nothing in the record
    suggests that the pandemic, and not the government's delay or (perhaps) prior unsuccessful attempts to

26  supersede, that created this situation, nor could it given the government's position on grand-jury secrecy.

27  MOTION TO DISMISS AS TIME-BARRED COUNTS THREE THROUGH EIGHT AND TEN OF THE SECOND
    SUPERSEDING INDICTMENT AND COUNTS THREE THROUGH EIGHT, TEN, AND ELEVEN OF THE THIRD

28  SUPERSEDING INDICTMENT
    CR-18-00258 EJD

commence any criminal proceedings. An information is "instituted" only when it is effective to "get established" or "commence" a federal criminal case; and it is effective to do so only when it either charges a misdemeanor or charges a felony and is accompanied by a waiver of indictment. Fed. R. Crim. P. 7(a)(2), 7(b), 58(b)(1).[5]

In fact, courts lack jurisdiction over felony informations where the government has not obtained a valid waiver. *See, e.g., United States v. Teran*, 98 F.3d 831, 835 (5th Cir. 1996) ("In the absence of a valid waiver, the lack of an indictment in a felony prosecution is a defect affecting the jurisdiction of the convicting court."); *United States v. Moore*, 37 F.3d 169, 173 (5th Cir. 1994) ("Unless there is a valid waiver, the lack of an indictment in a federal felony case is a defect going to the jurisdiction of the court." (quoting *United States v. Montgomery*, 628 F.2d 414, 416 (5th Cir. 1980))); *United States v. Wessels*, 139 F.R.D. 607, 609 (M.D. Pa. 1991) ("Unless there is a valid waiver, the lack of an Indictment in a federal felony case is a defect going to the jurisdiction of the court."); *United States v. Clemenic*, 1988 U.S. Dist. LEXIS 12601, at *8 (N.D. Ill. Oct. 24, 1988) ("[A] court only has jurisdiction over felony proceedings brought on the basis of an indictment or brought upon an information where there is a valid waiver of indictment."). As Judge Zobel explained in rejecting the argument advanced by the government here:

> [T]he court has no subject matter jurisdiction over a prosecution in which the government
> has filed an information without obtaining a valid waiver of indictment. The jurisdictional
> nature of the waiver is grounded in the Fifth Amendment, which requires the government
> to prosecute felonies by indictment. Under the Federal Rules of Criminal Procedure, the
> government may prosecute non-capital felonies by information instead, but only when the
> defendant has waived indictment "in open court and after being advised of the nature of
> the charge." Fed. R. [Crim.] P. 7(b). Thus, until a defendant has waived indictment
> pursuant to Rule 7(b), an information filed with the clerk of court cannot perform the same
> charging function as an indictment. Indeed, a court in possession of an information but not

---

[5] Similarly, an indictment is "found" at the earliest when it is returned by a grand jury, as required by the Fifth Amendment. *See, e.g., United States v. Ellis*, 622 F.3d 784, 792 (7th Cir. 2010); *United States v. Thompson*, 287 F.3d 1244, 1251-52 (10th Cir. 2002). An indictment that is merely filed with the court, without having been acted on by the grand jury, has not been "found" and cannot satisfy the statute of limitations.

MOTION TO DISMISS AS TIME-BARRED COUNTS THREE THROUGH EIGHT AND TEN OF THE SECOND SUPERSEDING INDICTMENT AND COUNTS THREE THROUGH EIGHT, TEN, AND ELEVEN OF THE THIRD SUPERSEDING INDICTMENT
CR-18-00258 EJD

in possession of a waiver of indictment lacks subject matter jurisdiction over the case; such an information is virtually meaningless.

*United States v. Machado*, 2005 WL 2886213, at *2 (D. Mass. Nov. 3, 2005).

*Smith v. United States*, 360 U.S. 1 (1959), underscores the invalidity of a waiver-less information purporting to charge a felony.  In *Smith*, the government purported to charge a capital offense by information after obtaining a waiver of indictment.  Under Fed. R. Crim. P. 7(a) as it then stood, a capital offense could only be prosecuted by indictment; a defendant charged with a capital offense could not waive indictment.  Because Rule 7(a) did not permit the district court to proceed by information, even with a waiver, the Supreme Court concluded that "the United States Attorney did not have authority to file an information in this case and the waivers made by petitioner were not binding and *did not confer power on the convicting court to hear the case*."  360 U.S. at 10 (emphasis added).

The *Smith* analysis applies equally here.  Just as in *Smith*, where Rule 7(a) prescribed the method of initiating capital charges, here Rules 7(a) and 7(b) prescribe the method of instituting non-capital felony charges:  either an indictment or an information accompanied by a waiver of indictment.  And just as in *Smith*, where the failure to initiate capital charges as Rule 7(a) prescribed meant that the government lacked authority to file the information and to confer power on the court to proceed, here the failure to initiate non-capital felony charges as Rules 7(a) and 7(b) prescribe means that the government lacked authority to file the information and to confer power on the Court to proceed on the felony charges that the information purports to charge.  Because this meaningless information was powerless to "institute" anything, it cannot satisfy Section 3282.

b.      Supreme Court precedent construing the very same word in a different statute of limitations compels this conclusion.  In *Jaben v. United States*, 381 U.S. 214 (1965), the Court interpreted the word "instituted" in the statute of limitations governing felony tax evasion, which provided that "[w]here a complaint is instituted before a commissioner of the United States within the period above limited, the time shall be extended until the date which is 9 months after the date of the

MOTION TO DISMISS AS TIME-BARRED COUNTS THREE THROUGH EIGHT AND TEN OF THE SECOND SUPERSEDING INDICTMENT AND COUNTS THREE THROUGH EIGHT, TEN, AND ELEVEN OF THE THIRD SUPERSEDING INDICTMENT
CR-18-00258 EJD

11

making of the complaint before the commissioner of the United States." *Id.* at 215-16 (quoting I.R.C. § 6531). The day before the statute of limitations was to expire, the government filed a complaint against the defendant; a grand jury then returned an indictment after the statute of limitations had expired; and the government invoked the 9-month grace period to argue that the indictment was timely. *Id.* at 216. As relevant here, the government argued that the mere *filing* a complaint as defined in Rule 3 of the Federal Rules of Criminal Procedure operated to invoke the 9-month grace period under the relevant statute. *Id.* at 217. Accordingly, the government contended, it was irrelevant whether the complaint was sufficient to trigger further proceedings under Rules 4 and 5—*i.e.*, whether it showed probable cause, a necessary condition to issuance of an arrest warrant and a preliminary hearing. *Id.*; *see also* Fed. R. Crim. P. 4–5.

The Supreme Court emphatically rejected the government's argument. As the Court explained, "[t]he Government would . . . totally ignore the further steps in the complaint procedure required by [the] Rules." 381 U.S. at 217. By ignoring "the requirements of the Rules that follow," the government's position "would deprive the institution of the complaint before the Commissioner of any independent meaning which might rationally have led Congress to fasten upon it as the method for initiating the nine-month extension." *Id.* Moreover, the Court observed, the government's interpretation "provides no safeguard whatever to prevent the Government from filing a complaint at a time when it does not have its case made, and then using the nine-month period to make it." *Id.* at 220. The Court highlighted the dangerous implications of the government's position:

> [I]t follows from its position that once having filed a complaint, the Government need not further pursue the complaint procedure at all, and, in the event that the defendant pressed for a preliminary hearing and obtained a dismissal of the complaint, that the Government could nonetheless rely upon the complaint . . . as having extended the limitation period.

*Id.* at 218.

Rejecting the government's position, the Court interpreted the word "instituted" to require that the complaint be "adequate *to begin effectively* the criminal process prescribed by the Federal Criminal

MOTION TO DISMISS AS TIME-BARRED COUNTS THREE THROUGH EIGHT AND TEN OF THE SECOND SUPERSEDING INDICTMENT AND COUNTS THREE THROUGH EIGHT, TEN, AND ELEVEN OF THE THIRD SUPERSEDING INDICTMENT
CR-18-00258 EJD

12

Rules." *Id.* at 220 (emphasis added).  Thus, only a complaint that was "sufficient to justify the next steps in the process—those of notifying the defendant and bringing him before the Commissioner for a preliminary hearing"—could invoke the nine-month grace period.  *Id*; *see also id.* at 227 (Goldberg, J., concurring in part and dissenting in part) ("[T]he view that I would accept as correct is that the only complaint that tolls the statute is one that begins effectively the criminal process prescribed by the Federal Rules.").  The Court thus proceeded to determine whether the complaint showed probable cause and, concluding that it did, it held that the government had properly invoked the nine-month grace period.  *Id.* at 225 (majority op.).

*Jaben* requires rejecting the government's argument that the filing of an information without the defendant's consent satisfies, and thus tolls, the statute of limitations under Section 3282.  *Jaben* rejected the position, urged by the government in this case, that the mere filing of a complaint "institutes" it.  To the contrary, the Court required that the filed complaint be "adequate to begin effectively the criminal process prescribed by the Federal Criminal Rules."  *Id.* at 220.  A felony information to which a defendant does not consent is not "adequate to begin effectively the criminal process prescribed by the Federal Criminal Rules."  *Id.*  Rule 7(b) permits prosecution by felony information only if a defendant waived prosecution by indictment in open court.  *See* Fed. R. Crim. P. 7(b).  Because Ms. Holmes did not waive prosecution by indictment—a fact the government knew when it filed the information—the information was not "instituted" for purposes of Section 3282.

The government's position here would produce the very same concerns that motivated the Court in *Jaben* to reject that position.  The Court explained that the nine-month grace period was not intended "to grant the Government greater time in which to make its case (a result which could have been accomplished simply by making the normal period of limitation six years and nine months)."  381 U.S. at 219.  By construing "instituted" to mean the filing of the complaint supported by probable cause, thus satisfying Rules 4 and 5, the Court read the statute to require a "safeguard" "to prevent the Government from filing a complaint at a time when it does not have its case made."  *Id.* at 220.  Construing

MOTION TO DISMISS AS TIME-BARRED COUNTS THREE THROUGH EIGHT AND TEN OF THE SECOND SUPERSEDING INDICTMENT AND COUNTS THREE THROUGH EIGHT, TEN, AND ELEVEN OF THE THIRD SUPERSEDING INDICTMENT
CR-18-00258 EJD

13

"instituted" in Section 3282 to mean the mere filing of an information—absent the defendant's consent—would provide no "safeguard" whatsoever.  It would give the government free reign to extend the statute of limitations, on its own, any time it has not yet proven its case to a grand jury within the five-year limitations period.  As the Court observed in *Jaben*, if Congress had intended to accomplish that radical result, it would have said so expressly, rather than through the use of the word "instituted."  *See Whitman v. Am. Trucking Ass'ns, Inc*., 531 U.S. 457, 468 (2001) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.").

   c. The broader statutory scheme further confirms this reading of Section 3282.  *See Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.").  In other sections of the same chapter of Title 18, Congress chose to base the statute of limitations on the "filing" of an information.  *See* 18 U.S.C. § 3293 ("No person shall be prosecuted, tried, or punished for a violation of, or conspiracy to violate [various laws relating to financial institutions] . . . unless the indictment is returned or the information is filed within 10 years after the commission of the offense."); *id.* § 3294 ("No person shall be prosecuted, tried, or punished for a violation of or conspiracy to violate section 668 [regarding the theft of major artwork] unless the indictment is returned or the information is filed within 20 years after the commission of the offense."); *id.* § 3300 ("No person may be prosecuted, tried, or punished for a violation of section 2442 [regarding the recruitment or use of child soldiers] unless the indictment or the information is filed not later than 10 years after the commission of the offense.").  Congress knows how to write statutes of limitations that are satisfied by the "filing" of an information.  Reading "instituted" to mean "filed" would violate the fundamental canon that "[w]here Congress includes particular language in one section of a statute but omits it in another . . . , it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) (second

MOTION TO DISMISS AS TIME-BARRED COUNTS THREE THROUGH EIGHT AND TEN OF THE SECOND SUPERSEDING INDICTMENT AND COUNTS THREE THROUGH EIGHT, TEN, AND ELEVEN OF THE THIRD SUPERSEDING INDICTMENT
CR-18-00258 EJD

14

1   alteration in original) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).

2          d.      Finally, if any doubt remained, the well-established principle that "criminal limitations

3   statutes are to be liberally interpreted in favor of repose" would require adopting Ms. Holmes' reading

4   of the statute.  *Toussie v. United States*, 397 U.S. 112, 115 (1970) (internal quotation marks omitted)

5   (citing *United States v. Habig*, 390 U.S. 222, 227 (1968)); *see also United States v. Gonsalves*, 675 F.2d

6   1050, 1055 (9th Cir. 1982).  This principle is grounded in the basic purpose of criminal statutes of

7   limitations—"to protect individuals from having to defend themselves against charges when the basic

8   facts may have become obscured by the passage of time and to minimize the danger of official

9   punishment because of acts in the far-distant past." *Toussie*, 397 U.S. at 114-15.  Construing Section

10  3282 to permit the government to toll the statute of limitations by filing an information without the

11  defendant's consent would undermine the very purpose of statutes of limitations.

12         This principle should apply with special force here in light of the constitutional implications of

13  the government's position.  The requirement of a grand-jury indictment for felonies is protected by the

14  Constitution and may be excused in only one situation:  where the defendant consents.  Ms. Holmes'

15  reading of Section 3282 protects that right by ensuring that, within five years of the accrual of a criminal

16  offense, the government must either persuade a grand jury to return an indictment or persuade the

17  defendant to waive her right to indictment.  The government's reading, by contrast, would permit the

18  government to extend the statute of limitations unilaterally, even when it has not made its case, by the

19  expedient of filing an information without the defendant's consent.  That is not, and cannot be, the law.

20              **2.      The limited cases that reached the contrary conclusions are irrelevant and/or
                         wrongly decided.**
21

22         Only a handful of cases have considered the meaning of "instituted" in Section 3282, and none

23  binds this Court.  The cases are split.  The cases that adopted the government's position were wrongly

24  decided and/or arose in far different procedural postures, and this Court should reject them.

25

26

27  MOTION TO DISMISS AS TIME-BARRED COUNTS THREE THROUGH EIGHT AND TEN OF THE SECOND
    SUPERSEDING INDICTMENT AND COUNTS THREE THROUGH EIGHT, TEN, AND ELEVEN OF THE THIRD
28  SUPERSEDING INDICTMENT
    CR-18-00258 EJD

a.      The principal case accepting the government's position is *United States v. Burdix-Dana*, 149 F.3d 741 (7th Cir. 1998).  In *Burdix-Dana*, the government filed a waiverless information charging the defendant with a felony.  *Id.* at 742.  Two weeks later, a grand jury returned an indictment charging the same felony.  *Id.*  The information was filed within five years of the statute of limitations; the indictment was untimely.  *Id.*  The district court later dismissed the information.  The defendant moved to dismiss the indictment as untimely; in response, The government argued that the filing of the information "instituted" it for purposes of Section 3282 and that, upon dismissal of the "instituted" information, it was entitled to invoke the six-month grace period provided under Section 3288.

On appeal, the Seventh Circuit held that the filing of the information served to "institute" it under Section 3282.  It further held, with virtually no discussion of the text of Section 3288, that the government was entitled to invoke Section 3288.  *Burdix-Dana*'s cursory reasoning is unpersuasive for a host of reasons.  First, the Seventh Circuit ignored the plain meaning of the term "instituted."  It did not discuss that word's ordinary meaning or consult dictionary definitions.  Instead, it simply equated that term with "filed."  Second, and relatedly, the Seventh Circuit overlooked the fact that Congress used the term "filed" in other statutes of limitations, which confirms that Congress would have chosen "filed" if that had been its intent.

Third, the *Burdix-Dana* court relegated *Jaben* to a footnote, ignored the analysis in that case, and simply declared without any explanation that "[t]he considerations that led the Court to its conclusion in *Jaben* were specific to the statute under review, and therefore the case is distinguishable from the one we currently address."  *Id.* at 742 n.1.  The Seventh Circuit did not even acknowledge that *Jaben* construed the very same word "instituted" in a statute of limitations.  As discussed above, *Jaben*'s analysis of "instituted" in Section 6531 fits squarely with Section 3282(a), and the considerations that led the Court to require an effective complaint in that case apply with full force here.

Fourth, the Seventh Circuit violated the principle that criminal statutes of limitations must be liberally construed in favor of repose.  The court never mentioned that principle.  It observed that "the

MOTION TO DISMISS AS TIME-BARRED COUNTS THREE THROUGH EIGHT AND TEN OF THE SECOND SUPERSEDING INDICTMENT AND COUNTS THREE THROUGH EIGHT, TEN, AND ELEVEN OF THE THIRD SUPERSEDING INDICTMENT
CR-18-00258 EJD

16

statutory language does not compel" the reading of Section 3282(a) that the defense urged, 149 F.3d at 743, but that (in addition to being wrong) has it backwards.  Because statutes of limitations must be construed liberally in favor of repose, the Seventh Circuit should have adopted the meaning of "instituted" that the defense advanced, unless the statutory language *compelled* the government's reading—which it does not.

Fifth, the Seventh Circuit acknowledged the troubling policy concerns that its interpretation raised but simply dismissed them.  It observed that "by equating 'instituted' with 'filed' and then applying 18 U.S.C. § 3288,  we have allowed prosecutors to file an information, wait indefinitely, then present the matter to a grand jury well beyond the statute of limitations but within six months of the dismissal of the information." *Id*. at 743.  The court downplayed that problem, however, because the defendant does not have to "rest[] on her rights" and could instead move for dismissal of the information.  *Id*.  That ignores the fact that even if the defendant could obtain a dismissal the day the information was filed—an impossibility, given the need for briefing and decision—the prosecutor would still have obtained an automatic six-month extension of the limitations period under Section 3288 under that interpretation.  This is the same policy concern that motivated the Supreme Court to construe "instituted" to require an *effective* complaint in *Jaben*.

Finally, the Seventh Circuit failed to consider the text of Section 3288 and decided, with virtually no analysis, that Section 3288 provided the government an automatic six-month grace period upon dismissal of an information filed without consent.  As discussed in more detail below in Section II.B, that reading of Section 3288 is incorrect.

In sum, *Burdix-Dana* failed to engage with the many reasons why "instituted" cannot mean "filed" in Section 3282, and this Court should reject its flawed analysis.

b.      A few other courts have construed "instituted" to include an information filed without a defendant's consent, but in different circumstances.  In *United States v. Stewart*, 425 F. Supp. 2d 727 (E.D. Va. 2006), an information was filed and the defendant signed an indictment waiver outside open

MOTION TO DISMISS AS TIME-BARRED COUNTS THREE THROUGH EIGHT AND TEN OF THE SECOND
SUPERSEDING INDICTMENT AND COUNTS THREE THROUGH EIGHT, TEN, AND ELEVEN OF THE THIRD
SUPERSEDING INDICTMENT
CR-18-00258 EJD

1    court before the statute of limitations had run, but the waiver in open court required by Rule 7(b) did not

2    occur until after the statute had run.  *Id.* at 728.  The court acknowledged that the defendant's position—

3    that an information could not be instituted until the open-court waiver required by Rule 7(b) had

4    occurred—was the "better argument" based on "[a] plain and common-sense reading of Rule 7(b) and

5    § 3282."  *Id.* at 731.  The court noted that Judge Zobel had accepted those arguments in the *Machado*

6    case, discussed below, and found Judge Zobel's decision "well-reasoned."  *Id.* at 733.  Nonetheless,

7    because the "majority" of the "sparse" cases on point, including *Burdix-Dana*, favored the government,

8    the court (oddly) held that "the doctrine of stare decisis requires the Court to find that the filing of the

9    criminal information with the clerk's office tolled the statute of limitations."  *Id.* at 731, 734.

10   *United States v. Watson*, 941 F. Supp. 601 (N.D. W. Va. 1996), involves virtually the same

11   situation.  In *Watson*, the defendant entered a written plea agreement with the government, and the

12   government filed an information before the statute of limitations had expired, but the hearing at which

13   he would waive his grand-jury right was not scheduled until after the statute had run.  *Id.* at 601–02.

14   Rejecting the defendant's motion to dismiss, the court held that the filing of the information "instituted"

15   it under Section 3282.[6]

16   Whatever the merit of those decisions, they do not apply here.  In those cases, the defendants had

17   agreed to waive their indictment right before the statute of limitations had run, and the only issue

18   confronting the courts was whether the defendants should be permitted to assert the statute of limitations

19

20   _____

     [6] The Watson court relied on *United States v. Cooper*, 956 F.2d 960 (10th Cir. 1992).  In *Cooper*,

21   a defendant agreed to plead guilty before the statute of limitations had expired, but the information was
     filed only after the statute had run.  *Id.* at 960.  The Tenth Circuit held that the untimely filing of the

22   information barred prosecution, notwithstanding the defendant's agreement to plead guilty.  *Id.* at 963.
     In dicta, it observed that the district court was wrong to suggest that the information could not be filed

23   until the defendant waived his grand jury right in open court.  It stated:  "Rule 7(b) does not prohibit the
     filing of an information in the absence of waiver of indictment by the defendant.  Instead, the rule

24   proscribes prosecution without waiver.  Therefore, the information could have been filed within the
     period of limitations, thus providing a valid basis for the prosecution."  *Id.* at 962-63 (emphases and

25   footnote omitted).  As is often the case with dicta, the court did not consider, or even cite, Section 3282.
     In any event, whether an information filed before the statute of limitations has run is "instituted" where

26   the government has already obtained an agreement to waive the grand jury right is not presented by this
     case.

27   MOTION TO DISMISS AS TIME-BARRED COUNTS THREE THROUGH EIGHT AND TEN OF THE SECOND
     SUPERSEDING INDICTMENT AND COUNTS THREE THROUGH EIGHT, TEN, AND ELEVEN OF THE THIRD

28   SUPERSEDING INDICTMENT
     CR-18-00258 EJD

1    when the open-court waiver did not occur until after the statute had run.  This case does not present the

2    question whether an "information" filed under such circumstances is "instituted" for purposes of the

3    statute of limitations.  The government knew full well that Ms. Holmes did not waive her indictment

4    right when it filed the information in this case.  It did not file the information with the good-faith

5    expectation that Ms. Holmes would consent to prosecution by information.  Rather, it filed the

6    information as a tactic to get around the statute of limitations without her consent.[7]

7         c.    The best-reasoned case, *United States v. Machado*, 2005 WL 2886213 (D. Mass. Nov. 3,

8    2005), rejected *Burdix-Dana*.  In *Machado*, the government filed an information before the statute of

9    limitations expired, but the defendant did not waive his indictment right until after the statute had run.

10   Judge Zobel held that the filing of the information did not "institute" it for purposes of Section 3282 and

11   thus dismissed the charges as time-barred.  *Id.* at *3.  Unlike the *Burdix-Dana* court, Judge Zobel used

12   standard tools of statutory construction to determine the plain meaning of "institute."  *Id.* at *2

13   (consulting dictionary definitions).  Also, unlike the *Burdix-Dana* court, she observed that a "court in

14   possession of an information but not in possession of a waiver of indictment lacks subject matter

15   jurisdiction over the case; such an information is 'virtually meaningless.'"  *Id.* (quoting *United States v.*

16   *Wessels*, 139 F.R.D. 607, 609 (M.D. Pa. 1991)).  Based on that analysis, Judge Zobel reasoned that

17   "[s]ince an information is the functional and constitutional equivalent of an indictment only when

18   accompanied by a valid waiver of indictment, no reason exists why that rule should not apply in the

19   statute of limitations context."  *Id.* at *2.  She acknowledged, and rejected, *Burdix-Dana*, noting its "lack

20   of logic and reason," and observing that the case "only emphasizes the potential dangers of the

21

22        [7] *United States v. Hsin-Yung*, 97 F. Supp. 2d 24 (D.D.C. 2000), cited in *Watson*, is even further
     afield.  The case involved a venue question under 18 U.S.C. § 3238, which authorizes the government to
23   "file[]" an information in the District of Columbia in certain circumstances.  The defendants argued that
     venue was improper in the District of Columbia because the government had not obtained indictment
24   waivers when it filed the informations.  The district court rejected that argument, stating that "Rule 7(b)
     does not prohibit the filing of an information in the absence of waiver of indictment by the defendant.
25   Instead, the rule proscribes prosecution without waiver."  *Id.* at 28 (emphases and citation omitted).
     That case, which involved a statute using the word "filed," has no bearing on the meaning of the word
26   "instituted" under Section 3282.

27   MOTION TO DISMISS AS TIME-BARRED COUNTS THREE THROUGH EIGHT AND TEN OF THE SECOND
     SUPERSEDING INDICTMENT AND COUNTS THREE THROUGH EIGHT, TEN, AND ELEVEN OF THE THIRD
28   SUPERSEDING INDICTMENT
     CR-18-00258 EJD

government's approach." *Id.* at *3.  This Court should follow *Machado* and reject the government's

flawed, dangerous position.

### B.      18 U.S.C. § 3288 Does Not Help the Government.

Nor does 18 U.S.C. § 3288 save these untimely counts.  Section 3288 provides:

> Whenever an indictment or information charging a felony is dismissed for any reason after
> the period prescribed by the applicable statute of limitations has expired, a new indictment
> may be returned in the appropriate jurisdiction within six calendar months of the date of
> the dismissal of the indictment or information . . . or, if no regular grand jury is in session
> in the appropriate jurisdiction when the indictment or information is dismissed, within six
> calendar months of the date when the next regular grand jury is convened, which new
> indictment shall not be barred by any statute of limitations.  This section does not permit
> the filing of a new indictment or information where the reason for the dismissal was the
> failure to file the indictment or information within the period prescribed by the applicable
> statute of limitations, or some other reason that would bar a new prosecution.

The government may argue, relying on *Burdix-Dana*, that dismissal of the information would entitle it to

invoke the six-month grace period provided by this section.  That is wrong, for several reasons.

For starters, the information has not been dismissed.  Although Ms. Holmes moved to dismiss

the information, *see* ECF No. 399, the government took the position that the return of the Second

Superseding Indictment mooted that motion and that the court should not dismiss the information.  Hr'g

Tr. 13:9–14:2, Jul. 20, 2020.  Having taken that position, the government cannot now argue the opposite.

Second, the six-month grace period is not automatic; the statute provides that the government

cannot invoke the grace period "where the reason for the dismissal" is "some . . . reason that would bar a

new prosecution."  (The *Burdix-Dana* court ignored this requirement entirely.)  The Ninth Circuit

construes this phrase to "cut[] off the six-month grace period" for the government "where the defect—

whether it's a limitation problem 'or some other' problem—is not capable of being cured."  *United*

*States v. Clawson*, 104 F.3d 250, 252 (9th Cir. 1996) (citation omitted).  Here, if the information had

been dismissed, it would have been on the ground that the government is not permitted to prosecute Ms.

Holmes for felonies by information without her consent.  That defect is not capable of being cured; the

government can never charge and prosecute felonies by information without a defendant's valid waiver

MOTION TO DISMISS AS TIME-BARRED COUNTS THREE THROUGH EIGHT AND TEN OF THE SECOND
SUPERSEDING INDICTMENT AND COUNTS THREE THROUGH EIGHT, TEN, AND ELEVEN OF THE THIRD
SUPERSEDING INDICTMENT
CR-18-00258 EJD

of indictment, and Ms. Holmes will not consent.  As a result, the government cannot rely on Section 3288.

Third, and similarly, because an information filed without consent is not "initiated" for purposes of Section 3282, the dismissal of such an ineffective information cannot possibly trigger Section 3288. "[The] underlying concept of § 3288 is that if the defendant was indicted within time, then approximately the same facts may be used for the basis of any new indictment [obtained after the statute has run], if the earlier indictment runs into legal pitfalls." *Clawson*, 104 F.3d at 251 (quoting *United States v. Charnay*, 537 F.2d 341, 354 (9th Cir. 1976)).  Ms. Holmes was neither indicted nor charged by an information with her consent on Counts Ten and Eleven "within time"; as a result, Section 3288 does not apply.  The dismissal of an information that the government knows the defendant does not consent to, which cannot initiate criminal proceedings, is not the kind of "legal pitfall" that Section 3288 is intended to address.  *Id.*  If it were, the government could buy itself a minimum six-month extension of the statute of limitations literally in every single case simply by filing an information without consent. For all the reasons set forth above, that reading of Sections 3282 and 3288 would violate the principle that statutes of limitations must be read in favor of repose, and would create a massive end-run around the five-year statute of limitations chosen by Congress.[8]  If Congress wanted to give the government a way to extend the statute of limitations on its own, simply by filing an information that violates the Sixth Amendment right to an indictment by grand jury, it would have said so.

---

[8] The Eastern District of California endorsed the *Burdix-Dana* court's reading of Section 3288 but in completely different circumstances than those here.  In *United States v. Marifat*, 2018 WL 1806690 (E.D. Cal. Apr. 17, 2018), the defendant waived his grand-jury right and pleaded guilty to an information, all of which occurred within the statute of limitations.  *Id.* at *1. Six years later, the court permitted defendant to withdraw his guilty plea as involuntary and dismissed the information.  The court held that Section 3288 permitted the government to re-indict the defendant within the six-month grace period.  There, the court unquestionably had jurisdiction over the case based on the defendant's waiver of indictment; the defect was that the defendant's guilty plea was invalid.  Here, Ms. Holmes did not waive her grand-jury right.

MOTION TO DISMISS AS TIME-BARRED COUNTS THREE THROUGH EIGHT AND TEN OF THE SECOND SUPERSEDING INDICTMENT AND COUNTS THREE THROUGH EIGHT, TEN, AND ELEVEN OF THE THIRD SUPERSEDING INDICTMENT
CR-18-00258 EJD

1

**CONCLUSION**

2    For the foregoing reasons, the Court should dismiss Counts Three through Eight and Ten of the

3 Second Superseding Indictment and Counts Three through Eight, Ten, and Eleven of the Third

4 Superseding Indictment as time-barred.

5

6 DATED:  August 28, 2020       Respectfully submitted,

7

8                /s/ Amy Mason Saharia
                KEVIN DOWNEY
9                LANCE WADE
                AMY MASON SAHARIA
10              KATHERINE TREFZ
                Attorneys for Elizabeth Holmes

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27 MOTION TO DISMISS AS TIME-BARRED COUNTS THREE THROUGH EIGHT AND TEN OF THE SECOND
  SUPERSEDING INDICTMENT AND COUNTS THREE THROUGH EIGHT, TEN, AND ELEVEN OF THE THIRD
28 SUPERSEDING INDICTMENT
  CR-18-00258 EJD

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 28, 2020 a copy of this filing was delivered via ECF on all counsel of record.


/s/ Amy Mason Saharia
AMY MASON SAHARIA
Attorney for Elizabeth Holmes

MOTION TO DISMISS AS TIME-BARRED COUNTS THREE THROUGH EIGHT AND TEN OF THE SECOND SUPERSEDING INDICTMENT AND COUNTS THREE THROUGH EIGHT, TEN, AND ELEVEN OF THE THIRD SUPERSEDING INDICTMENT
CR-18-00258 EJD

1   JOHN D. CLINE (CA State Bar No. 237759)
    50 California Street, Suite 1500
2   San Francisco, CA 94111
    Telephone: (415) 662-2260 │Facsimile: (415) 662-2263
3   Email: cline@johndclinelaw.com

4   KEVIN M. DOWNEY (Admitted Pro Hac Vice)
    LANCE A. WADE (Admitted Pro Hac Vice)
5   AMY MASON SAHARIA (Admitted Pro Hac Vice)
    KATHERINE TREFZ (CA State Bar No. 262770)
6   WILLIAMS & CONNOLLY LLP
    725 Twelfth Street, NW
7   Washington, DC 20005
    Telephone: (202) 434-5000 │Facsimile: (202) 434-5029
8   Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

9   Attorneys for Defendant ELIZABETH A. HOLMES

10

11                        UNITED STATES DISTRICT COURT

12                     NORTHERN DISTRICT OF CALIFORNIA

13                              SAN JOSE DIVISION

14
    UNITED STATES OF AMERICA,            )   Case No. CR-18-00258-EJD
15                                       )
            Plaintiff,                   )   **DECLARATION OF AMY MASON SAHARIA
16                                       )   IN SUPPORT OF MOTION TO DISMISS AS
        v.                               )   TIME-BARRED COUNTS THREE THROUGH
17                                       )   EIGHT AND TEN OF THE SECOND
    ELIZABETH HOLMES and                 )   SUPERSEDING INDICTMENT AND COUNTS
18  RAMESH "SUNNY" BALWANI,              )   THREE THROUGH EIGHT, TEN, AND
                                         )   ELEVEN OF THE THIRD SUPERSEDING
19          Defendants.                  )   INDICTMENT**
                                         )
20                                       )   Hon. Edward J. Davila
                                         )
21  _____ )

22

23          I, AMY MASON SAHARIA, declare as follows:

24          1.      I represent Defendant Elizabeth Holmes and have been admitted to practice *pro hac vice*

25  in the above-captioned matter.  I submit this declaration in support of Ms. Holmes' Motion to Dismiss as

26  Time-Barred Counts Three Through Eight and Ten of the Second Superseding Indictment and Counts

27  Three Through Eight, Ten and Eleven of the Third Superseding Indictment ("Motion").  I attest to the

28

1  following facts upon which the motion relies.

2        2.     Attached to the motion are two exhibits.  The content of the exhibits are as follows:

3        a.     Exhibit A is a true and correct copy of a March 6, 2020, letter from Assistant

4  United States Attorney John Bostic providing notice of evidence the government intends to introduce at

5  trial pursuant to Federal Rule of Evidence 404(b).

6        b.     Exhibit B is a true and correct copy of an August 21, 2020, email from Assistant

7  United States Attorney Robert Leach to Lance Wade.

8       I declare under penalty of perjury under the laws of the United States that the foregoing is true

9  and correct to the best of my knowledge.

10

11       Executed this 28th day of August, 2020 in Chevy Chase, MD.

12

13

14                                        AMY MASON SAHARIA
                                      Attorney for Elizabeth Holmes

15

16

17

18

19

20

21

22

23

24

25

26

27

28  DECLARATION OF AMY MASON SAHARIA IN SUPPORT OF MOTION TO DISMISS AS TIME-BARRED COUNTS THREE THROUGH EIGHT AND TEN OF THE SECOND SUPERSEDING INDICTMENT AND COUNTS THREE THROUGH EIGHT, TEN, AND ELEVEN OF THE THIRD SUPERSEDING INDICTMENT
CR-18-00258 EJD              2

# Exhibit A



**U.S. Department of Justice**

*United States Attorney*
*Northern District of California*

| | |
|---|---|
| *150 Almaden Boulevard, Suite 900* | *(408) 535-5061* |
| *San Jose, California 95113* | *Fax:(408) 535-5066* |

March 6, 2020

**VIA EMAIL**

Lance Wade
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, DC 20005

Jeffrey B. Coopersmith
Orrick Herrington & Sutcliffe LLP
701 5th Avenue, Suite 5600
Seattle, WA 98104-7097

Re:   <u>United States v. Elizabeth Holmes and Ramesh "Sunny" Balwani</u>
CR-18-00258-EJD
Notice re Government's Intent to Introduce Certain Evidence

Dear Counsel:

We write to provide notice that the government may seek to introduce certain evidence in its case in chief in the above-referenced matter.  This evidence is relevant to the charges in this case and is admissible to show, among other things, Defendants' motive, opportunity, intent, preparation, plan, knowledge, identity, consciousness of guilt, or absence of mistake or accident. See Fed. R. Evid. 404(b).

Please note that, by providing this disclosure, the government is not conceding that this evidence is admissible only under the provisions of Rule 404(b).  The government may also assert that this evidence is admissible as direct evidence of the charged conduct, that it is inextricably intertwined with the events charged in the operative Indictment, or that it shows a continuing course of conduct otherwise admissible under Rules 401 and 402.

The facts summarized below are supported by the evidence in the government's discovery production, including witness statements as reflected in summary memoranda and source documents such as emails, laboratory reports, and business records.

This notice supplements the previous 404(b) disclosures that have accompanied the government's discovery productions in this case.  The government reserves the right to introduce additional evidence covered by those previous disclosures, and further reserves the right to amend this notice in advance of trial based on its continuing investigation and trial preparation.

1

1. **False and misleading representations directed at insured patients.**  As part of Defendants' scheme to defraud patients, they falsely represented to patients that Theranos's tests were accurate, reliable, and suitable for use in the clinical context, when Defendants knew that Theranos's tests were not properly validated and suffered from accuracy problems that rendered them unreliable and not suitable for informing clinical treatment decisions.  Defendants caused Theranos to misrepresent the accuracy and reliability of its tests in advertisements and other promotional materials distributed electronically and in print, and further misled patients as to the nature of Theranos's tests by offering their tests for use in the clinical context, necessarily implying that Theranos's tests could be relied upon for medical decision-making.  Patients who questioned or complained about Theranos's test results were falsely told that the company was having temporary, isolated problems with individual assays, were falsely assured that Theranos's tests could be relied upon, or were given other excuses that masked the limitations of Theranos's technology.  Defendants also misled insured and uninsured patients regarding the methods of blood collection used by Theranos, causing patients to believe that they could have any blood test performed using a finger-stick when Theranos relied on vein draws for a substantial portion of its tests.  These misrepresentations were directed at all potential customers of Theranos, including patients with and without medical insurance that might cover the cost of Theranos's tests.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, doctors and patients who patronized Theranos, marketing personnel employed or retained by Theranos, and former employees of Theranos.

2. **False and misleading representations directed at doctors.**  As part of Defendants' scheme to defraud patients, they falsely represented to doctors that Theranos's tests were accurate, reliable, and suitable for use in the clinical context, when Defendants knew that Theranos's tests were not properly validated and suffered from accuracy problems that rendered them unreliable and not suitable for informing clinical treatment decisions.  Defendants' misrepresentations came in multiple forms, including advertising and promotional materials distributed electronically and in print, directed at doctors and health professionals acting as patient representatives who would later advise patients as to which blood testing services they should use.  Defendants also caused misrepresentations to be directed at doctors during real-time conversations between doctors and Theranos representatives.  For example, Dr. Linnerson in the Phoenix area was falsely told by Theranos representatives that the company's tests had obtained FDA approval.  Similarly, doctors who questioned or complained about Theranos's test results were falsely told that the company was having temporary, isolated problems with individual assays, were falsely assured that Theranos's tests could be relied upon, or were given other excuses that masked the limitations of Theranos's technology.  Other doctors were deceived as to the equipment and methods used for Theranos's tests, with the company withholding information necessary for doctors to place those test results in context.  See below.  Defendants also misled doctors regarding the methods of blood collection used by Theranos, causing doctors to believe that patients could have any blood test performed using a finger-stick when Theranos relied on vein draws for a substantial portion of its tests.  Similarly, Defendants misled some doctors regarding the equipment on which Theranos's tests would be run and the location of that equipment.  Specifically, when Theranos partnered with doctors' offices to provide testing services in-house, Theranos would acquire office space within or near the doctor's practice and lead the doctor to believe that Theranos was maintaining and operating one of its small, Theranos-manufactured analyzers onsite.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but

not limited to, doctors and patients who patronized Theranos, marketing personnel employed or retained by Theranos, and former employees of Theranos.

3. **False and misleading representations made to Theranos's Board of Directors.** Defendants deceived Theranos's Board of Directors in furtherance of their schemes to defraud investors and patients.  In particular, Defendants misrepresented the capabilities of Theranos's technology to the Board, making false claims about matters including:  the capabilities of Theranos's analyzers; the accuracy and reliability of Theranos's tests; the existence of data proving the accuracy and reliability of Theranos's tests; the extent to which Theranos relied on third-party analyzers; the extent to which Theranos relied on vein draws; the nature of FDA's approval requirements for Theranos's tests; the extent to which Theranos's technology had been validated by other entities and organizations including hospitals; the success of Theranos's relationship with Walgreens; the revenues and financial health of the company; the truth of facts reported in the *Wall Street Journal*'s October 15, 2015 article discussing Theranos; and Defendants' willingness to submit Theranos's devices for independent testing or conduct comparison testing matching Theranos's test results against those from conventional labs.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, members of Theranos's Board of Directors.

4. **False and misleading representations made to Walgreens.**  In pursuing and maintaining Theranos's partnership with Walgreens, Defendants made misrepresentations to Walgreens representatives about matters including:  the number of tests Theranos's analyzer could perform using a sample drawn from a finger-stick; the number of assays Theranos's devices could conduct on a single sample; whether Theranos's technology was mature and ready for commercial launch; the existence of technological boundaries affecting Theranos's ability to scale up its testing services; the accuracy and reliability of Theranos's tests and whether those tests were as accurate as or more reliable than competing tests from conventional labs; the extent to which Theranos relied on third-party analyzers; the extent to which Theranos relied on vein draws; the nature of FDA's approval requirements for Theranos's tests; whether Theranos conducted adequate proficiency testing;  the extent to which Theranos's technology had been validated by other entities and organizations including pharmaceutical companies and research universities who had purportedly used Theranos's testing services for clinical trials or other studies; the purported use of Theranos's technology by the United States military; Theranos's ability to provide decentralized testing services at the point of care and the company's experience operating under that model; and the profitability and financial health of the company.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to former Theranos employees as well as Walgreens personnel.

5. **False and misleading representations made to Safeway.**  In pursuing a partnership between Theranos and Safeway, Defendants made misrepresentations to Safeway representatives about matters including:  the number of tests Theranos's analyzer could perform; the number of assays Theranos's devices could conduct on a single sample; the accuracy and reliability of Theranos's tests; whether Theranos's technology was ready for commercial launch; the extent to which Theranos relied on third-party analyzers; the extent to which Theranos relied on vein draws; the nature of regulatory approval requirements for Theranos's tests; the extent to which Theranos's technology had been validated by other entities and organizations including pharmaceutical companies and research universities; the use of Theranos technology by the military; and the financial

health and projected profitability of the company.  Additionally, Holmes agreed to
provide a Theranos analyzer to UCSF so that they could evaluate Theranos's technology
partly for Safeway's benefit.  Theranos, however, never provided UCSF with a device to
review.  The government may introduce these and similar facts through produced
documents as well as through testimony from witnesses including, but not limited to,
former Theranos employees and Safeway representatives.

6.  **False and misleading representations made to journalists.**  In promoting Theranos's
business, Defendants and their representatives were interviewed by journalists and made
a number of false and misleading statements to those journalists regarding the state of
Theranos's business and the capabilities of Theranos's technology.  For example, Holmes
made several misrepresentations to reporter Roger Parloff, including:  (1) that Theranos's
level of quality and low coefficient of variation was revolutionary for a certified lab; (2)
that Theranos had done 70 or more tests from a single microsample; (3) that Theranos
was different from labs that used large machines in a centralized process; (4) that
Theranos was exceeding requirements for proficiency testing; (5) that Theranos's
platform could do all of the several hundred tests offered by Quest in a regional lab; (6)
that Theranos had a single device that could perform any test; and (7) that Theranos's
clinical laboratory consisted of hundreds of Theranos analyzer devices.  Simultaneously,
Defendants did not correct the false conclusions that journalists reached based on
Defendants statements, failing to clarify, for example, that Theranos's analyzer could
perform only a limited number of assays and the company relied on third-party analyzers
for a significant portion of its tests.  Moreover, when Defendants saw false statements
about Theranos's capabilities repeated in press coverage, they did not correct those
reports.  This remained the case even when other employees brought the inaccurate
statements to their attention—for example, Theranos attorney Brad Arington confronted
Holmes about multiple false statements in Roger Parloff's June 2014 *Fortune* article
about Theranos.  The government may introduce these and similar facts through
produced documents as well as through testimony from witnesses including, but not
limited to, former Theranos employees and attorneys as well as journalists who covered
Theranos and conducted interviews of either Defendant.

7.  **Fostering culture of secrecy and forcing employees and others to sign non-disclosure
agreements.**  In order to prevent the spread of information regarding problems at
Theranos, Defendants required employees to sign strict non-disclosure agreements.
Similar agreements were prerequisites to board members, potential investors, and other
visitors obtaining information about the company, its technology, and its business.
Similarly, in their roles controlling the day-to-day operations of Theranos and overseeing
the company's employees, Defendants took steps to silo information within Theranos,
discouraging employees from sharing information about their work with other employees
in the company and fostering a culture of internal secrecy.  These actions minimized the
number of Theranos employees who were aware of problems relating to the company's
research and development practices, technological capabilities, clinical laboratory
practices, and business relationships.  In particular, Defendants discouraged employees
from sharing information regarding Theranos's use of third-party analyzers for its tests,
taking specific steps to conceal this fact from employees who did not already know.
Those steps included renaming third-party devices in Theranos's information
management systems and assigning them code names so that employees who accessed
these systems could not determine that those devices had in fact been manufactured by
third-party companies.  Defendants were so restrictive in controlling employees'
statements about Theranos that they required some employees to remove references to
Theranos from the employees' LinkedIn profiles.  Defendants were similarly secretive

with investors, refusing to disclose to representatives like Lisa Peterson the identities of other investors in the company. The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees and investors as well as potential and actual strategic partners of Theranos.

8. **Restricting access to laboratory areas within Theranos.** Defendants set policies at Theranos that severely restricted access to the laboratory areas where Theranos tested patient samples. Employees who did not work in the clinical laboratory generally were not able to access the areas, and visitors generally were not allowed to view those areas. These policies and practices prevented the dissemination of knowledge regarding problems with Theranos's proprietary analyzers as well as Theranos's use of third-party devices for many of its tests. Similarly, while withholding access to the actual clinical lab, Defendants misled visitors to Theranos by intentionally giving them the impression that the clinical lab consisted of multiple Theranos TSPUs and did not include other conventional devices. For example, when Vice President Biden visited Theranos in July 2015, Theranos did not show visitors the CLIA lab where patient sample testing was performed, but set up a room containing a large number of Theranos TSPU boxes on shelves, intending that visitors believe they were viewing the machines that ran Theranos's clinical tests. Within Theranos's Normandy laboratory, Balwani ordered that wall dividers be installed to hide the Tecan devices Theranos used to dilute its samples. When Holmes was interviewed by Roger Parloff following his visit to Theranos's facilities, she responded to his request to see the lab by indicating that he had essentially already seen the lab because he had seen a room with multiple TSPU devices. The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees, potential and actual strategic partners of Theranos, journalists, and others who visited Theranos.

9. **Harassing, threatening, or otherwise influencing doctors or patients who had negative experiences with Theranos.** When doctors or patients made public statements about inaccurate Theranos test results and other negative experiences with the company, Defendants and their agents engaged in harassing, threatening, or other improper behavior in an effort to dissuade those providers from generating negative publicity for Theranos. For example, when Arizona provider Dr. Nicole Sundene was cited in a *Wall Street Journal* article after providing information about an unreliable Theranos test result, Balwani visited her offices in person along with Christian Holmes and berated her and her staff, threatening to sue her. The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees as well as doctors and patients who patronized Theranos's testing services.

10. **Threatening, influencing, or vilifying journalists in response to negative coverage of Theranos.** When journalists investigated Theranos and wrote articles exposing misrepresentations made by Defendants concerning Theranos's business and technology, Defendants and their agents threatened and other attempted to improperly influence those journalists in an effort to suppress negative publicity. For example, when Defendants learned that a reporter from the *Wall Street Journal* was investigating the company and planning to publish an article reporting unfavorable facts about the company and its technology, Defendants directed attorneys to reach out to the *Wall Street Journal* and attempt to dissuade the publication from releasing the article. In a meeting with the reporter, John Carreyrou, his editor, and the publication's lawyers, Theranos's attorneys

insisted that the publication not move forward with the article, incorrectly claiming that it was based on false information. Holmes also attempted to persuade Rupert Murdoch exercise his power as owner of the *Journal* to kill the story before it could be published. Defendants also vilified journalists who printed negative articles about Theranos, blaming them for skepticism regarding Theranos and its technology in an effort to deflect blame and accountability from themselves and their company. For example, following publication of the October 15, 2015 *Wall Street Journal* article revealing problems with Theranos's blood testing services, Defendants on at least two occasions led employees in a chant of "Fuck you, Carreyrou," directed at the journalist who investigated and authored the article. The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees, attorneys representing Theranos or relevant news publications, and journalists who investigated and covered Theranos.

11. **Blaming and vilifying competing companies.** When Theranos was the subject of regulatory scrutiny or negative publicity, Defendants attributed blame to competing companies like Quest and LabCorp, stating and implying that those companies were influencing the government and/or the media. For example, after October 2015, when Theranos became the target of unfavorable reporting exposing problems with the company's operations, Holmes led employees in a chant of "Fuck you, SonoraQuest." Defendants made statements during this time period arguing that Theranos had been unfairly targeted for criticism as a result of action by competitors given Theranos's potential to disrupt the blood testing industry. The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees as well as journalists who covered Theranos.

12. **Threatening or intimidating employees and former employees.** Defendants and their agents directed threats and intimidating language at current and former Theranos employees in an effort to discourage employees from disseminating facts about the problems facing the company's technology and business. On multiple occasions, when employees left the company voluntarily or were terminated, Defendants corresponded or met with those employees to deliver stern reminders of the employee's obligations under nondisclosure agreements and threatened employees with consequences should they reveal any nonpublic information about Theranos's technology or business practices. When Dr. Adam Rosendorff resigned from Theranos, Balwani became angry Rosendorff had forwarded work emails to his personal account out of a fear that regulatory authorities might investigate Theranos's practices. Balwani insisted that Rosendorff sign a legal document confirming deletion of the emails. This exchanges caused Rosendorff to feel threatened. On other occasions, Defendants reacted angrily and attempted to threaten or intimidate employees whom they suspected to be the sources of negative publicity concerning Theranos. For example, following their review of some or all of the October 15, 2015 *Wall Street Journal* article discussing Theranos, Defendants directed board member George Schultz and Theranos attorneys to meet with Theranos employee Tyler Schultz because they believed some of the information in the article was provided by him. George Schultz conveyed to Tyler Schultz the warning from Defendants that Tyler's career would be adversely affected if he continued to share information about Theranos. During that conversation, Theranos lawyers waited at the house of Tyler Schultz's grandfather, subsequently ambushing Tyler Schultz and threatened him with legal action. On another occasion, Balwani became aware of a negative review of Theranos as an employer posted on website glassdoor.com. In response, Balwani aggressively interrogated several employees in an unsuccessful effort to determine the

source of the review and discourage further negative reviews.  Generally, Holmes and
Balwani fostered a culture that strongly discouraged skepticism or dissent from
employees, enforcing that culture by reacting with hostility and intimidation to any
questioning.  The government may introduce these and similar facts through produced
documents as well as through testimony from witnesses including, but not limited to,
former Theranos employees and members of the Board.

13. **False and misleading representations made to FDA, CMS, CDPH, and other
    regulatory organizations.**  When Theranos was the subject of inspections by CMS and
    other regulatory organizations, Defendants' agents presented regulators with selected,
    non-comprehensive data of Theranos's test results in an effort to mask accuracy and
    consistency problems with Theranos's assays.  Additionally, Theranos failed to develop,
    maintain, and follow appropriate standard operating procedures for its clinical lab, but
    drafted and/or approved such SOPs immediately before or during regulatory inspections
    in an effort to conceal this oversight.  In connection with an inspection by CDPH,
    Balwani and others misled an inspector into believing that the Theranos CLIA laboratory
    was limited to a single area.  The government may introduce these and similar facts
    through produced documents as well as through testimony from witnesses including, but
    not limited to, former Theranos employees as well as regulatory agency personnel.

14. **Violations of industry standards and government regulations or rules regarding
    research and development procedures, medical devices and clinical laboratory
    practices.**  In furtherance of their scheme to defraud, Defendants disregarded and failed
    to conform to industry standards as well as government regulations or rules regarding
    research and development procedures, medical devices and clinical laboratory standards.
    For example, in conducting research and development purportedly aimed at validating its
    assays, Theranos failed to conduct adequate validation studies, relying on insufficient
    data to claim that their tests were valid, accurate, and reliable.  Theranos also cut corners
    in its Arizona research and development testing, failing to implement a clear protocol for
    informed consent for trial participants and fostering a coercive environment for testing.
    Theranos's CLIA lab was the site of several violations of these rules and standards
    including the use of expired reagents, failure to implement and carry out proper
    proficiency testing and quality control processes, and inadequate record-keeping.  Under
    Defendants' supervision, Theranos's CLIA lab also improperly failed to develop,
    maintain, and follow adequate standard operating procedures for its clinical tests.
    Defendants also exercised an improper degree of control and influence over the operation
    of Theranos's CLIA lab despite their lack of medical education or training.  Defendants,
    and Balwani in particular, were deeply involved in clinical decisions that should have
    been left to the discretion of the laboratory director—even overruling the laboratory
    director at times.  In exercising that control, Defendants consistently made decisions that
    prioritized preserving Theranos's reputation and secrecy at the expense of providing
    complete information to doctors and patients.  The government may introduce these and
    similar facts through produced documents as well as through testimony from witnesses
    including, but not limited to, former Theranos employees as well as regulatory agency
    personnel, and expert witnesses.

15. **Altering or tampering with third-party medical devices.**  Theranos's in-house
    manufactured analyzer—called the Edison, miniLab, or TSPU—was incapable of
    performing a large proportion of the clinical blood tests Theranos offered.  The Theranos
    devices were also incapable of handling high-throughput activity required to support
    Theranos's business model.  In response, Defendants caused Theranos to acquire several
    commercially available blood analyzer devices manufactured by third parties.  Theranos

then altered and tampered with those devices by modifying them to run on smaller and/or diluted blood samples, contrary to industry standards and the manufacturers' intended use for such devices. The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees.

16. **Multiplexing test results and disregarding outliers to mask inconsistency.** In its clinical testing and/or its proficiency testing, Theranos operated its analyzers according to a protocol that included running each assay multiple times and then multiplexing the results in order to derive the final, reported result. As part of that protocol, so-called outlier results—individual results that deviated from the other results for a given assay on a given sample—were discarded and not accounted for. This approach tended to mask consistency problems with Theranos's tests. The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees.

17. **Improperly setting and altering reference ranges.** Theranos's lab practices deviated from industry standards and standard testing protocols approved by FDA and validated by the industry. In setting the reference ranges for its tests, Theranos improperly relied on reference ranges for common, FDA-approved tests and/or conducted insufficient studies to set and adjust its own reference ranges. Similarly, after Theranos began offering and providing clinical blood testing services, the company improperly adjusted reference ranges based on individual clinical results—without conducting sufficient studies to justify such an adjustment—in order to bring out-of-range results back into the newly adjusted "normal" range and avoid abnormal results to patients. The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees and expert witnesses.

18. **Withholding critical test results and other important information from doctors and patients.** In an effort to avoid additional scrutiny of its blood test results and laboratory practices, Theranos sometimes withheld test results that were in the "critical" range for a given analyte, i.e., results that indicated a patient might need urgent medical care. Additionally, Theranos withheld information from doctors and patients indicating what type of analyzer had been used for a given test, depriving doctors and patients of the facts needed to place certain assay results into context—for example, when multiple samples from a single patient had been run on different types of analyzers leading to otherwise unexplainable discrepancies in results. Theranos also withheld from doctors and patients the fact that Theranos's tests were not FDA approved, that Theranos relied on third-party analyzers for many of its tests, and other key facts regarding problems with their laboratory practices. The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees, expert witnesses, and doctors and patients who patronized Theranos's testing services.

19. **Declining to conduct or agree to meaningful comparative tests.** Despite the fact that Theranos's analyzers and testing procedures varied from industry standards and conventional, FDA-approved tests, Defendants declined to conduct sufficient comparative tests establishing that Theranos's test results delivered accurate and reliable results when compared to competing technology. Similarly, Theranos failed to conduct comprehensive and accurate comparison tests establishing that its assays could reliably be conducted on finger-stick samples as opposed to vein draws. Defendants also refused

to commission or authorize such comparative testing through Sarah Cannon, Cleveland Clinic, UCSF, or other independent third-parties, to publish the results of any such testing, and to provide that information to the company's board.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees, expert witnesses, representatives of potential and actual strategic partners of Theranos, and members of the Theranos Board.

20. **Decommissioning Theranos's Laboratory Information System database.**  Theranos maintained its clinical test data in a software database it called the Laboratory Information System ("LIS").  In October 2016, Theranos announced that it would cease offering clinical lab testing services.  Following that decision but before the company ceased operation in 2018, Theranos "decommissioned" its LIS, rendering it nonfunctional and converting the data to a format that is not readily retrievable.  This decision had the effect of obscuring or destroying detailed information regarding the specific tests Theranos conducted during the years of its clinical testing operation, hindering the government's investigation of Defendants.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees and representatives of the Theranos assignee.

21. **Obtaining personal benefit from position at Theranos.**  In addition to their salaries and other direct compensation, Defendants also obtained significant additional benefits from their positions at Theranos.  For example, the company regularly paid for luxury travel and accommodations for Holmes.  Additionally, Holmes routinely required her office assistant to perform a large number of personal tasks seemingly unrelated to the business of Theranos, including shopping for and returning household items, clothing, luxury fashion accessories, and beauty products.  Finally, both Holmes and Balwani were he beneficiaries of increased local and national standing as a result of their association with Theranos.  Holmes was featured in numerous publications and lauded as a visionary.  Defendants also associated with celebrities, dignitaries, and other wealthy and powerful individuals who were interested in Theranos.  Holmes collected a substantial salary from Theranos, which enabled her to live a luxurious lifestyle, driving a luxury SUV, renting an expensive home, and purchasing expensive merchandise.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees, journalists who investigated Theranos, members of the Theranos Board, and potential and actual investors in Theranos.

22. **Concealing the romantic relationship between Holmes and Balwani from investors and others.**  During much of the relevant time period, Defendants Holmes and Balwani were romantically involved.  This relationship was actively concealed from others to whom its existence would have been material, including:  prospective and actual investors; members of the Board of Directors; representatives of Walgreens, Safeway, and other partner organizations; Theranos employees; and journalists.  Defendants took steps to hide the existence of this relationship, such as commuting to work separately and avoiding being seen together outside of work.  On at least one occasion, when questioned by a journalist as to whether she was in a relationship, Holmes falsely stated that she was not.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees as well as members of the Board of Directors, potential and actual

9

investors in Theranos, potential and actual strategic partners of Theranos, and journalists who interviewed Defendants.

Very truly yours,

ADAM A. REEVES
Attorney for the United States,
Acting Under Authority Conferred
By 28 U.S.C. § 515


/s/
JOHN C. BOSTIC
Assistant United States Attorney

# Exhibit B

| From: | Leach, Robert (USACAN) <Robert.Leach@usdoj.gov> |
|---|---|
| Sent: | Friday, August 21, 2020 5:53 PM |
| To: | Wade, Lance; Downey, Kevin; Saharia, Amy; Trefz, Katherine |
| Cc: | Coopersmith, Jeffrey; Schenk, Jeffrey (USACAN); Bostic, John (USACAN); Baehr-Jones, Vanessa (USACAN) |
| Subject: | FW: US v. Holmes |

Dear Lance,

Thank you for checking in on this.  I hope you and your team are well too.

On May 10, 2019, you wrote to us seeking essentially the same information with respect to the Superseding Indictment.  Dkt. 204-2.  Unsatisfied with the government's response, Ms. Holmes moved to dismiss the indictment and for a bill of particulars.  Dkt. 204, 204-3.  On February 11, 2020, the Court denied the motion to dismiss and ordered the government to produce a bill of particulars only "as to the specific misrepresentations underlying the doctor-patient fraud and the names of any co-conspirators supporting count one."  Dkt. 330 at 39.  On March 26, 2020, the government served and lodged for filing under seal a bill of particulars conforming to the Court's order.

The changes reflected the Third Superseding Indictment are limited.  Paragraph 3 adds a sentence:  "Theranos's investors included individuals, entities, certain business partners, members of its board of directors, and individuals and entities who invested through firms formed for the exclusive or primary purpose of investing in Theranos's securities."  Paragraph 10 adds the words "as early as 2010."  Paragraphs 11, 12, and 20 change the date 2013 to 2010.  Paragraph 13 adds the words "or outside California."  Paragraph 16 adds the words "through, among other means, their involvement in Theranos's day-to-day operations and their knowledge of complaints received from doctors and patients" and identifies specific tests that were also listed in the government's bill of particulars.  Paragraph 18 lists new victims:  B.B., ET., and M.E.  Paragraph 26 adds the phrase "telephonic communications regarding lab test results" and alleges counts relating to B.B., E.T. and M.E., rather than Patients 1 and 2.  In addition, there are minor changes to Paragraphs 1, 2, 7, and 15 and the word "Third" is added before the words "Superseding Indictment."

Theranos's investors are easily identifiable from the discovery that has been provided to you.  For example, a list of Theranos equity investors issued stock certificates is available at THER-0905030.  "Certain business partners" are Safeway and Walgreens.  Members of Theranos' board are easily identifiable from the discovery provided to you.  Indeed, many are listed in the stock certificate ledger reflected at THER-0905030.  "Firms formed for the exclusive or primary purpose of investing in Theranos's securities" are also easily identifiable from the discovery and include Peer Ventures Group IV, L.P., Peer Ventures Group III, L.P., Lucas Venture Group XI, L.P., and Lucas Venture Group IV, L.P.

B.B. is ███████████.  E.T. is ███████████.  M.E. is ███████████.

An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c)(1).  The Third Superseding Indictment satisfies this requirement.  In addition, you have an early Jencks disclosure, the government's Rule 404(b) disclosure, its Rule 16 expert disclosure, its exhibit list, and its witness list, not to mention all of the discovery produced to date.  Further explanation of the Third Superseding Indictment is wholly unnecessary for Ms. Holmes to understand the charges and present a defense.

Best regards,

*******************************
Robert S. Leach
Assistant United States Attorney

United States Attorney's Office
 Northern District of California
1301 Clay Street, Suite 340S
Oakland, California 94612
(510) 637-3918 -- Office
(415) 793-2945 – Cell

---

**From:** Wade, Lance <LWade@wc.com>
**Sent:** Wednesday, August 19, 2020 12:51 PM
**To:** Leach, Robert (USACAN) <RLeach@usa.doj.gov>; Schenk, Jeffrey (USACAN) <JSchenk@usa.doj.gov>; Baehr-Jones, Vanessa (USACAN) <vbaehr-jones@usa.doj.gov>; Bostic, John (USACAN) <jbostic@usa.doj.gov>
**Cc:** Downey, Kevin <KDowney@wc.com>; Saharia, Amy <ASaharia@wc.com>; Trefz, Katherine <KTrefz@wc.com>
**Subject:** RE: US v. Holmes

Bob,

I hope you are well.  I write in response to your May 4 e-mail below.  The government returned a superseding indictment more than a month ago.  Please let me know when we can expect a response to my April 24 letter, reattached hereto.

Thanks.

--Lance


**Lance Wade**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington DC 20005
(P) 202-434-5755 | (F) 202-434-5029
lwade@wc.com | www.wc.com/lwade

---

**From:** Leach, Robert (USACAN) <Robert.Leach@usdoj.gov>
**Sent:** Monday, May 4, 2020 6:25 PM
**To:** Wade, Lance <LWade@wc.com>; Schenk, Jeffrey (USACAN) <Jeffrey.B.Schenk@usdoj.gov>; Baehr-Jones, Vanessa (USACAN) <Vanessa.Baehr-Jones@usdoj.gov>; Bostic, John (USACAN) <John.Bostic@usdoj.gov>
**Cc:** Downey, Kevin <KDowney@wc.com>; Saharia, Amy <ASaharia@wc.com>; Trefz, Katherine <KTrefz@wc.com>
**Subject:** RE: US v. Holmes

Lance:

I hope you are well.  We will respond if and when a new charging instrument is filed.  I will say now, though, your letter seems to seek a great deal that was denied in the motion for a bill of particulars.

Best regards,
Bob

---

**From:** Wade, Lance <LWade@wc.com>
**Sent:** Thursday, April 30, 2020 1:42 PM

**To:** Leach, Robert (USACAN) <RLeach@usa.doj.gov>; Schenk, Jeffrey (USACAN) <JSchenk@usa.doj.gov>; Baehr-Jones, Vanessa (USACAN) <vbaehr-jones@usa.doj.gov>; Bostic, John (USACAN) <jbostic@usa.doj.gov>
**Cc:** Downey, Kevin <KDowney@wc.com>; Saharia, Amy <ASaharia@wc.com>; Trefz, Katherine <KTrefz@wc.com>
**Subject:** RE: US v. Holmes

Counsel:

Good afternoon.  I just wanted to follow-up on the attached letter and inquire as to when we might expect a response.

Many thanks.

--Lance

**Lance Wade**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington DC 20005
(P) 202-434-5755 | (F) 202-434-5029
lwade@wc.com  |  www.wc.com/lwade

---

**From:** Wade, Lance
**Sent:** Thursday, April 9, 2020 9:22 PM
**To:** 'Leach, Robert (USACAN)' <Robert.Leach@usdoj.gov>; Schenk, Jeffrey (USACAN) <Jeffrey.B.Schenk@usdoj.gov>; Baehr-Jones, Vanessa (USACAN) <Vanessa.Baehr-Jones@usdoj.gov>; Bostic, John (USACAN) <John.Bostic@usdoj.gov>
**Cc:** Wade, Lance <LWade@wc.com>; Downey, Kevin <KDowney@wc.com>; Saharia, Amy <ASaharia@wc.com>; Trefz, Katherine <KTrefz@wc.com>
**Subject:** US v. Holmes

Please see the attached.

**Lance Wade**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington DC 20005
(P) 202-434-5755 | (F) 202-434-5029
lwade@wc.com  |  www.wc.com/lwade

---

This message and any attachments are intended only for the addressee and may contain information that is privileged and confidential. If you have received this message in error, please do not read, use, copy, distribute, or disclose the contents of the message and any attachments. Instead, please delete the message and any attachments and notify the sender immediately. Thank you.

1  JOHN D. CLINE (CA State Bar No. 237759)
   50 California Street, Suite 1500
2  San Francisco, CA 94111
   Telephone: (415) 662-2260 │Facsimile: (415) 662-2263
3  Email: cline@johndclinelaw.com

4  KEVIN M. DOWNEY (Admitted Pro Hac Vice)
   LANCE A. WADE (Admitted Pro Hac Vice)
5  AMY MASON SAHARIA (Admitted Pro Hac Vice)
   KATHERINE TREFZ (CA State Bar No. 262770)
6  WILLIAMS & CONNOLLY LLP
   725 Twelfth Street, NW
7  Washington, DC 20005
   Telephone: (202) 434-5000 │Facsimile: (202) 434-5029
8  Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

9  Attorneys for Defendant ELIZABETH A. HOLMES

10

11                    UNITED STATES DISTRICT COURT

12                    NORTHERN DISTRICT OF CALIFORNIA

13                          SAN JOSE DIVISION

14
   UNITED STATES OF AMERICA,              )  Case No. CR-18-00258-EJD
15                                         )
            Plaintiff,                     )  **[PROPOSED] ORDER GRANTING MOTION**
16                                         )  **TO DISMISS AS TIME-BARRED COUNTS**
        v.                                 )  **THREE THROUGH EIGHT AND TEN OF THE**
17                                         )  **SECOND SUPERSEDING INDICTMENT AND**
   ELIZABETH HOLMES and                    )  **COUNTS THREE THROUGH EIGHT, TEN,**
18 RAMESH "SUNNY" BALWANI,                 )  **AND ELEVEN OF THE THIRD SUPERSEDING**
                                           )  **INDICTMENT**
19          Defendants.                    )
                                           )
20                                         )  Hon. Edward J. Davila
                                           )
21 _____ )

22

23

24

25

26

27

28 [PROPOSED] ORDER GRANTING MOTION TO DISMISS AS TIME-BARRED COUNTS THREE
   THROUGH EIGHT AND TEN OF THE SECOND SUPERSEDING INDICTMENT AND COUNTS THREE
   THROUGH EIGHT, TEN, AND ELEVEN OF THE THIRD SUPERSEDING INDICTMENT
   CR-18-00258-EJD

1   This **CAUSE** having come before the Court upon Defendant Elizabeth A. Holmes' Motion to

2   Dismiss as Time-Barred Counts Three Through Eight and Ten of the Second Superseding Indictment

3   and Counts Three Through Eight, Ten and Eleven of the Third Superseding Indictment.  After due

4   consideration of the filings, the governing law, and the argument of the parties:

5   **IT IS HEREBY ORDERED** that Ms. Holmes' motion is **GRANTED**, and that Counts Three

6   Through Eight and Ten of the Second Superseding Indictment and Counts Three Through Eight, Ten

7   and Eleven of the Third Superseding Indictment are **DISMISSED**.

8

9   **IT IS SO ORDERED.**

10

11  Dated: _____

12

13  _____

14  Hon. Edward J. Davila
    United States District Judge

15

16

17

18

19

20

21

22

23

24

25

26

27  [PROPOSED] ORDER GRANTING MOTION TO DISMISS AS TIME-BARRED COUNTS THREE
    THROUGH EIGHT AND TEN OF THE SECOND SUPERSEDING INDICTMENT AND COUNTS THREE
28  THROUGH EIGHT, TEN, AND ELEVEN OF THE THIRD SUPERSEDING INDICTMENT
    CR-18-00258 EJD