1   ADAM A. REEVES (NYBN 2363877)
    Attorney for the United States,
2   Acting Under Authority Conferred By 28 U.S.C. § 515

3   HALLIE HOFFMAN (CABN 210020)
    Chief, Criminal Division
4
    JEFF SCHENK (CABN 234355)
5   JOHN C. BOSTIC (CABN 264367)
    ROBERT S. LEACH (CABN 196191)
6   VANESSA BAEHR-JONES (CABN 281715)
    Assistant United States Attorneys
7
        150 Almaden Boulevard, Suite 900
8       San Jose, California 95113
        Telephone: (408) 535-5061
9       Fax: (408) 535-5066
        Robert.Leach@usdoj.gov
10
    Attorneys for United States of America
11

                        UNITED STATES DISTRICT COURT
12
                     NORTHERN DISTRICT OF CALIFORNIA
13
                            SAN JOSE DIVISION
14

15  UNITED STATES OF AMERICA,              )  Case No. 18-CR-00258 EJD
                                           )
16           Plaintiff,                     )  SEPTEMBER 18, 2020 DECLARATION OF
                                           )  AUSA ROBERT S. LEACH IN SUPPORT OF
17       v.                                 )  UNITED STATES' OPPOSITION TO
                                           )  DEFENDANTS' MOTION TO DISMISS
18  ELIZABETH HOLMES and RAMESH            )  COUNTS ONE AND THREE THROUGH
    "SUNNY" BALWANI,                        )  EIGHT OF THE SECOND AND THIRD
19                                          )  SUPERSEDING INDICTMENTS
             Defendants.                    )
20                                          )  Date:   October 6, 2020
                                           )  Time:   10:00 a.m.
21                                          )  Court:  Hon. Edward J. Davila
                                           )
22  _____ )

23          I, Robert S. Leach, declare as follows:

24          1.      I am an Assistant United States Attorney with the United States Attorney's Office for the

25  Northern District of California ("USAO").  I am one of the prosecutors assigned to this matter and have

26  been since 2016.  I make this declaration in support of the United States' Opposition to Defendants'

27  Motion to Dismiss Counts One and Three Through Eight of the Second and Third Superseding

28  Indictments.

2.      Attached as Exhibit A is a true and correct copy of SWYSEC_000000001 to SWYSEC_000000051, which I understand was produced by Safeway to the Securities and Exchange Commission ("SEC").

3.      Attached as Exhibit B is a true and correct copy of SWYSEC_000000061 to SWYSEC_000000072, which I understand was produced by Safeway to the SEC.

4.      Attached as Exhibit C is a true and correct copy of SWYSEC_000000073 to SWYSEC_000000082, which I understand was produced by Safeway to the SEC.

5.      Attached as Exhibit D is a true and correct copy of WAG-TH-00000050 to WAG-TH-00000086, which I understand was produced by Walgreens to the SEC.

6.      Attached as Exhibit E is a true and correct copy of WAG-TH-00000099 to WAG-TH-00000104, which I understand was produced by Walgreens to the SEC.

7.      Based on documents I have reviewed, including TS-0041957, I understand that in or about March 2014, R.B. and S.B. invested approximately $5 million at or around the time R.B. became a board member of Theranos.

8.      Based on documents I have reviewed and an interview conducted by the government, in or about December 2014, H.K. caused a trust titled "H.K. 2014 Grandchildren's Trust" to invest approximately $3 million while H.K. was a board member.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 18th day of September 2020.

/s Robert S. Leach
_____
ROBERT S. LEACH
Assistant United States Attorney

# Exhibit A



**THERANOS MASTER PURCHASE AGREEMENT**

This Master Purchase Agreement ("Agreement") dated September _20_, 2010 ("Effective Date") is by and between:

| SAFEWAY | | | |
|---|---|---|---|
| Full Legal Name | Safeway Inc. | Safeway Signatory | Steven A. Burd |
| Jurisdiction of Incorporation | Delaware | Title | Chief Executive Officer |
| Principal Business Address | 5918 Stoneridge Mall Road Pleasanton, CA 94588-3229 | Telephone | (925) 467-3866 |
| Company Phone Number | (925) 467-3000 | Email | steve.burd@safeway.com |
| Company Fax Number | (925) 467-3230 | | |
| **THERANOS** | | | |
| Full Legal Name | Theranos, Inc. | Theranos Signatory | Elizabeth Holmes |
| Jurisdiction of Incorporation | Delaware | Title | President and CEO |
| Principal Business Address | 3200 Hillview Avenue Palo Alto, CA 94304 | Telephone | 650-470-6111 |
| Company Phone Number | 650-838-9292 | Email | eholmes@theranos.com |
| Company Fax Number | 650-838-9165 | | |

This Agreement is comprised of:

Schedule A:  Program Overview
Schedule B:  Purchasing Terms and Conditions
Schedule C:  Support and Maintenance Terms
Schedule D:  Pricing
Schedule E:  Definitions
Schedule F-1:  Initial Note
Schedule F-2:  Additional Note
Schedule G:  Food Retailers
Schedule H: Theranos Pharmaceutical Clinical Trials Infrastructure



The parties agree to the terms set forth in this Agreement, including each attached Schedule, each of which is fully incorporated herein by reference.  This Agreement may be signed in counterparts each of which will be deemed an original and together shall constitute one and the same Agreement.

| SAFEWAY INC. | THERANOS, INC. |
|---|---|
| _____<br>(Authorized Representative - Signature) | _____<br>(Authorized Representative - Signature) |
| _____<br>(Authorized Representative – Printed) | _ELIZABETH  HOLMES_____<br>(Authorized Representative – Printed) |
| _____<br>(Title) | _PRESIDENT  &  CEO_____<br>(Title) |

HIGHLY CONFIDENTIAL                                                                                    SWYSEC_000000002



*theranos*
redefining healthcare

**SCHEDULE A**

**PROGRAM OVERVIEW**

This Schedule sets forth the Program, including the objectives of the Program. The terms and conditions governing this Schedule are set forth in Schedule B, attached. If and to the extent this Schedule provides additional terms and/or conflicting terms to the terms and conditions set forth in Schedule B, the terms of Schedule B will prevail. The capitalized terms as used in this Agreement are defined in the body of this Agreement and in Schedule E, attached.

**1. Background.**

Theranos has developed, and is developing, generations of "mini-lab" devices that can run any blood test in real-time for less than the traditional cost of central lab tests. The Theranos Systems will run routine laboratory tests and proprietary tests that detect the appearance of diseases, enabling early intervention and initiation of treatment long before complications emerge.



In-store blood testing from a single finger-stick could transform the role of retailers and pharmacies in healthcare. It is estimated that 80% of physicians' diagnoses are a result of laboratory tests. By putting the right tools and information in the hands of clinicians at a retail pharmacy, Theranos could play a major role in realizing the true potential of pharmacies in improving patient health and reducing national healthcare costs. In addition to driving new traffic into stores and increasing ownership of the totality of health needs for store customers, pharmacies will fundamentally improve patient outcomes, be better predictors of the health of consumers, and reduce the costs of healthcare.

In introducing Theranos Systems at Safeway, Safeway could become the hub for early detection and treatment of critical ailments to prevent the complications that lead to extraordinary healthcare costs and, ultimately, fatalities.

Equally, the Theranos infrastructure at Safeway is a powerful clinical studies infrastructure for pharmaceutical drug development, post-marketing, and safety studies. Theranos' investment in clinical development over the past six years can be applied to making Safeway a hub for pharmaceutical programs consistent with the terms outlined in Schedule H.

Theranos Systems installed at Safeway's stores could bring cutting edge, personalized, and preventive healthcare into pharmacies without the need for complex infrastructure and the overhead associated with it. Safeway will enable fast, efficient and scalable health services at a convenient location; this service will quickly drive even more new, predictable and repeat customer traffic in stores.

The ability to run blood tests from a finger-stick in thirty (30) minutes or less at Safeway's stores creates a new workflow and a new diagnostic paradigm for health care. Patients will be able to come to Safeway for most of their health needs. The time saved will reduce visits to hospitals and paperwork prone to medical errors, while enabling more accurate and earlier treatment, improving the outcomes of the patients who get this service at Safeway.

Individuals' biochemical profiles will link to targeted recommendations through "smart" software and self-learning software applications that facilitate behavior modification. Health information and nutritional recommendations provide insight into improvements in lifestyle, diet, and other resources available through Safeway's stores. Safeway's *Health Assistant* software will provide "smart" individualized support, links to prescriptions and health resources through mobile and online portals for a total customer

-3-



lifestyle/health solution. Trusted health solutions could build customer loyalty and result in Safeway becoming the center for continuity of care for store customers and members.

2. **Program Objectives.** The objectives of this Program include:

    a. Make blood testing faster and far more accessible, effective, and actionable by introducing a more cost-effective, real-time blood testing service at Safeway stores nationwide and, if the parties later agree, in Canada, to the extent permissible under applicable laws and regulations of various jurisdictions.  Substantially similar methodology will be employed with respect to disease predictive tests as they become available.

    b. Empower Safeway and Safeway Health LLC or its successor(s) ("Safeway Health") to play a more active role in patient health management and well-being. Theranos Systems include a decision support system, which will be accessible through the touch screens on the devices or through the web browser.  This decision support system will deliver real-time, actionable information to clinicians and consumers by providing analysis, interpretations and recommendations for behavior modification based on patient test results.

    c. Generate health care cost savings by reducing direct out-of-pocket costs of lab tests and visits.

    d. Early intervention and reduced hospitalization through early detection of the onset of disease.

    e. Introduce a new revenue and profit stream for Safeway through this disruptive technology, associated services, and distribution rights to other retail grocers.

3. **Program Managers.** Each party will assign a program manager to this Program.  The responsibilities of each party's program manager include:  (i) serve as the interface with the other party; (ii) develop a mutually agreed upon detailed "Program Plan," including milestones and deliverables (the "Program Schedule"), and success/acceptance criteria for each milestone; (iii) work to ensure that each party has committed the resources necessary to meet the objectives and timeline of the Program; (iv) prepare regularly-scheduled status reports on the Program, on an agreed-upon time-frame; (v) identify, schedule and confirm availability of resources, including management, to provide agreed-upon services and deliverables; (vi) assist in resolving issues, and escalate, as appropriate, within such party; and (vii) execute the change process, as more fully described in Section 5, below, as warranted.  The parties acknowledge that the Program Plan is subject to change as the Program progresses.

4. **Reviews.** The appropriate Representatives from each party will meet on a regularly-scheduled basis to be determined to review the status of the Program.

5. **Change Process.** Either party may seek to change the scope of the Program for any of a number of reasons, including, but not limited to, the following:  (i) discretionary changes to the Program Schedule; (ii) discretionary changes to the scope of the Program Plan; (iii) non-availability of products, resources or services beyond the requesting party's reasonable control; (iv) environmental or architectural impediments not previously identified; or (v) lack of access to personnel or premises necessary to complete the Program.  If a party seeks to materially change the parameters of the Program, this request will be discussed by the appropriate Representatives promptly, but in any event no later than the next regularly-scheduled Program review. All changes to the Program Plan must be accepted in writing by both parties.

HIGHLY CONFIDENTIAL

SWYSEC_000000004



6.  **Convertible Notes.**

    a.  **Option Agreement**.  On July 30, 2010, Theranos and Safeway entered into that certain Option Agreement (the "Option Agreement") pursuant to which Theranos granted Safeway an option to purchase the Initial Note and the Additional Note (each as defined in the Option Agreement).  Except as provided in Section 6.c., the Option Agreement shall remain in full force and effect and shall not be amended, modified or superseded by this Agreement.

    b.  **Initial Note.**

        i.  **Issuance of Initial Note**.  Pursuant to the Option Agreement, Safeway shall have the right to purchase the Initial Note at any time during the period commencing with the execution of this Agreement and ending on the date that is thirty (30) calendar days following the date on which Safeway receives written notice from Theranos of the receipt of the Regulatory Approvals.  The form of Initial Note is attached as Schedule F-1.

        ii.  **Payment for Initial Note**.  Safeway may pay the Initial Note Purchase Price (as defined in the Option Agreement), at Safeway's sole discretion, in cash, check or wire transfer or, in the event that Safeway has paid the Initial Inventory Payment, by applying the amount of such Initial Inventory Payment toward the Initial Note purchase.  For example, if Safeway has paid $10 million for the Initial Inventory Payment and elects to purchase the Initial Note, then Safeway could apply the entire amount of the Initial Inventory Payment (less any portion of the Initial Inventory Payment that has been delivered to Safeway in the form of Inventory) toward the Initial Note Purchase Price and no additional cash payment would be required from Safeway in order to purchase the Initial Note.

        iii.  **Conversion.**  The Initial Note will be convertible into 666,667 shares of Series C-1 Preferred Stock of Theranos ("Series C-1") (subject to adjustment as set forth below) at Safeway's option after Safeway has made the Third Inventory Payment pursuant to Section 10.c. of Schedule B and on the terms and subject to the conditions set forth in the Initial Note.  The number of shares of Series C-1 to be issued upon conversion of the Initial Note shall be equal to the quotient obtained by dividing (i) the entire principal amount of the Initial Note by (ii) the per share price of Series C-1.  On conversion of the Initial Note, accrued interest shall be repaid in cash.  The Series C-1 will have certain Dividend, Liquidation and Conversion Rights as set forth in Theranos' charter in the form agreed upon by Safeway and Theranos and delivered by Theranos to Safeway concurrently herewith (the "Charter").

    c.  **Additional Convertible Note.**

        i.  **Issuance of Additional Note**.  Clause (ii) of Section 1.4 of the Option Agreement is hereby amended to provide as follows with respect to Safeway's exercise of the option to purchase the Additional Note:   Subject to the terms and conditions of the Option Agreement, Safeway is entitled to purchase the Additional Note at any time from the Start Date to the Option Expiration Date.  The "Start Date" shall mean the earlier of (i) the closing of Theranos' next round of equity financing and (ii) June 30, 2011.  The "Option Expiration Date" shall mean thirty (30) calendar days following the later of (x) the Start Date and (y) the date on which Safeway receives the Regulatory Approval Notice (as defined in the Option Agreement).  The form of Additional Note is attached as Schedule F-2.

HIGHLY CONFIDENTIAL      SWYSEC_000000005



ii. **Payment for Additional Note**.  Safeway may pay the Additional Note Purchase Price (as defined in the Option Agreement), at Safeway's sole discretion, in cash, check or wire transfer or, in the event that Safeway has paid any of the Inventory Payment, by applying the amount of such Inventory Payment toward the Additional Note Purchase Price to the extent any such Inventory Payment was not applied to the purchase of the Initial Note.  For example, if Safeway has paid $20 million for the Second Inventory Payment and elects to purchase the Additional Note, then Safeway could apply $15 million of the Second Inventory Payment (less any portion of the Second Inventory Payment that has been delivered to Safeway in the form of Inventory) toward the Additional Note Purchase Price and no additional cash payment would be required from Safeway in order to purchase the Additional Note.

iii. **Conversion.**  The Additional Note will be convertible into either (i) shares of the equity security issued by Theranos in its next equity financing ("New Equity"), or (ii) if Theranos' next equity financing does not occur by June 30, 2011, in Safeway's sole discretion, the Additional Note shall be convertible into shares of a series of preferred stock of Theranos equivalent to the Series C-1, with the same Dividend, Liquidation and Conversion Rights as the Series C-1, as set forth in the Charter (the "Series C-2") (subject to adjustment as set forth below).  The Additional Note will be convertible at Safeway's option after Safeway has made the Third Inventory Payment pursuant to Section 10.c. of Schedule B and on the terms and subject to the conditions set forth in the Additional Note.  The number of shares of the New Equity or the Series C-2 to be issued upon conversion of the Additional Note shall be equal to the quotient obtained by dividing (i) the entire principal amount of the Additional Note by (ii) the Additional Note Per Share Price (as defined herein).  On conversion of the Additional Note, accrued interest shall be repaid in cash.  "Additional Note Per Share Price" shall mean, in the event the Additional Note is convertible into the New Equity, the lowest price per share paid in such issuance, and, in the event the Additional Note is convertible into shares of Series C-2, the per share price of Series C-2 as determined in good faith by the Theranos Board of Directors as of June 30, 2011.

d. **Due Diligence.**  Theranos shall: (i) provide Safeway with access to Theranos' internal projections through the next three (3)- to five (5)-year period; and (ii) facilitate a telephone conference call between Theranos' FDA facilitator/consultant and Safeway's outside legal counsel to discuss the regulatory approval process so that Safeway's outside legal counsel can understand and assist with such process (the information, actions and materials described in clauses (i) and (ii), collectively, the "Diligence Materials").  Theranos shall make the Diligence Materials available sufficiently in advance so that Safeway's due diligence review can be completed within sixty (60) calendar days following the Effective Date.

e. **Adjustments to Conversion**.  Notwithstanding anything herein to the contrary, if Theranos issues shares of preferred stock or other securities conferring the right to purchase shares of preferred stock of Theranos or securities convertible into, or exchangeable for (with or without additional consideration), preferred stock of Theranos at any time prior to the conversion of the Initial Note or the Additional Note, as applicable, then the conversion price shall not be greater than the lowest price per share paid in such issuance.  If Theranos shall at any time prior to the issuance of the preferred stock or other shares issuable upon conversion of the Initial Note or the Additional Note, as applicable, subdivide such shares (by stock split, stock dividend or the like), or combine such shares (by reverse split or the like), the number of shares issuable on the conversion of the Initial Note or the Additional Note, as applicable, shall be proportionately increased in the case of a subdivision or stock dividend, or proportionately decreased in the case of a combination.  Appropriate adjustments shall also be made to the conversion price payable per share, but the aggregate conversion price

HIGHLY CONFIDENTIAL                                                                            SWYSEC_000000006



payable for the total number of shares issuable upon conversion of the Initial Note or the Additional Note (as adjusted) shall remain the same.

f. **Sale of Initial Note to Theranos**. Theranos is obligated to re-pay the Initial Note at the price at which it was issued (regardless of the form of payment), specifically ten million dollars ($10 million), plus any accrued interest, within thirty (30) calendar days from the date of expiration or termination of this Agreement so long as the Initial Note is then outstanding.

g. **Sale of Additional Note to Theranos**. Theranos is obligated to re-pay the Additional Note at the price at which it was issued (regardless of the form of payment), specifically fifteen million dollars ($15 million), plus any accrued interest, within thirty (30) calendar days from the date of expiration or termination of this Agreement so long as the Additional Note is then outstanding.

7. **Board Representation.** Theranos acknowledges that it has a genuine interest in having Steve Burd serve on the Theranos Board of Directors and Theranos shall try to grant Steve Burd the right to serve as a member of Theranos' Board of Directors.

8. **Safeway Board Approval.** Theranos acknowledges that Safeway's entry into the Agreement shall be subject to the approval of the Safeway Board of Directors.

*[remainder of page intentionally left blank]*

HIGHLY CONFIDENTIAL                                                                                      SWYSEC_000000007



**SCHEDULE B**

**PURCHASING TERMS AND CONDITIONS**

1.  **Scope.** The terms and conditions set forth in this Schedule apply to this Agreement, including each attached Schedule or other attachment. To the extent a Schedule or other attachment provides additional terms and/or conflicting terms to the terms and conditions set forth in this Schedule B, the terms of this Schedule B will prevail.

2.  **Best Price Guarantee.** For all Cartridges defined as Available Cartridges, as well as for all other elements of Theranos Systems provided to retailers, Theranos agrees that no United States retailer or any entity operating in a retail environment selling Theranos Systems or any doctor or medical office, clinic or hospital will receive lower prices than Safeway (including Safeway Network Partners (as defined below) that agree to up-front financial commitments on the same proportionate basis as Safeway (i.e., an average of $30,000 per pharmacy); *provided, however*, that Theranos Systems may be sold (or delivered free of charge) at prices lower than those charged to Safeway and Safeway Network Partners (a) for strategic or promotional purposes to leading medical practitioners or industry thought leaders in limited quantities at select locations and (b) to intensive care units and emergency rooms. Available Cartridges include all Cartridges of Theranos Systems, including first-generation Cartridges, defined as follows: all routine laboratory Tests represented by existing CPT codes; diagnostic Tests not represented by existing CPT codes (influenza/strep, pregnancy, fertility, pre-natal/trimester, STD, compliance, drug efficacy); and predictive Tests not represented by existing CPT codes (diabetes/pre-diabetes, congestive heart failure, breast cancer, ovarian cancer, prostate cancer, colorectal cancer).

3.  **Program Phases.**

a.  **Pilot Program.** Safeway plans to run a pilot of the Program in one or more locations prior to the commercial launch of the Program.

b.  **Pre-Pilot Period.** Prior to the launch of the pilot of the Program, the parties will have taken the following actions:

    i.   Theranos will secure the Regulatory Approvals and Safeway will secure any approvals required for the pilot of the Program under CLIA and other applicable laws, rules and regulations.

    ii.  Theranos will customize the Theranos Systems for Safeway and will create software that provides for online adjudication of claims or other method of payment and reimbursement that allows Safeway to recognize the retail price of the Test as revenue, and to pay Theranos for the cost of goods from that revenue. Theranos will facilitate the integration of the Theranos Systems and Software in the Safeway stores selected for the pilot of the Program on substantially the same timeline as it facilitates such integration in Walgreens stores.

    iii. Theranos will negotiate reimbursement rates with payors (insurance companies, Medicare and Medicaid) at 35% below the prices charged by the leading retail blood test laboratories, permitting Safeway to earn an average gross dollar margin (reimbursement rate minus Theranos cost per test) of ten dollars ($10) or more.

    iv.  Theranos will obtain insurer acceptance from insurers covering at least 30% of covered lives in the geographic area of the pilot of the Program and secure doctor office distribution of blood test forms for 90% of such covered group.

    v.   Theranos will meet agreed upon service standards, including the provision of blood test results in 30 minutes or less, and satisfactory service and support of the Deliverables.

Theranos and Safeway Confidential and Proprietary

HIGHLY CONFIDENTIAL                                                        SWYSEC_000000008


*redefining healthcare*

vi. Theranos will repair or replace at its own expense any Devices that do not conform with all applicable specifications agreed upon by the parties or required by regulatory authorities and for which there is no back-up Device available within twenty-four (24) hours from receipt of notice.

vii. Safeway will work with Theranos in its government interactions to prepare for launch of the systems.

viii. Safeway will assist Theranos in development of a branding strategy, consistent with the objectives described in Section 6 below, including the establishment of criteria for the look and feel of the in-store experience and deployment of the Device at all points of distribution.  Safeway will also assist Theranos in the development of its consumer marketing plan.

ix. Safeway will perform any remodeling or other enhancements necessary for the pilot of the Program and develop a marketing plan for the pilot of the Program.

Notwithstanding the foregoing, the parties' sole remedy for non-performance of the obligations set forth in this Section 3.b. above shall be Termination for Cause pursuant to and in accordance with Section 26.c, and, for the avoidance of doubt, the parties shall not be entitled to indemnification for breach of such obligations.

c. **Pilot Period.**  Subject to Safeway end-of-year information technology constraints, the parties anticipate that the pilot of the Program will begin as soon as commercially reasonable after the parties have obtained the Regulatory Approvals. The pilot is expected to start no earlier than January 15, 2011. Safeway will select the Safeway locations to be included in the pilot of the Program in consultation with Theranos.  The parties' expectation is that the pilot will last for approximately ninety (90) calendar days, and that the pilot of the Program at Safeway will run concurrently with any pilot of the Program conducted by Walgreens.  Upon completion of the pilot of the Program, the parties will analyze the results of the pilot, and Safeway will determine in its sole discretion whether the pilot of the Program has met Safeway's requirements to proceed with commercial deployment of the Theranos Systems in accordance with the criteria set forth in this Agreement.  Safeway shall provide written notice to Theranos within ten (10) business days of such determination.  If Safeway determines the pilot to be successful, the parties will commence the launch of the Program.

d. **Program Launch.**  The launch of the Program will not occur at Walgreens stores prior to the launch of the Program at Safeway stores.  Prior to the launch of the Program, the parties' respective responsibilities and obligations pursuant to this Agreement shall include the following:

i. Unless expressly modified in this subsection 3.d., the parties' respective responsibilities and obligations during the pre-pilot period, as described in subsection 3.b. above, shall continue to be applicable to the launch of the Program.

ii. Theranos will arrange for payor reimbursement from at least 50% of private sector payors, with a goal to arrange for payor reimbursement from at least 80% of private sector payors at program launch.  Safeway will assist in such effort, using its contacts with health care executives.

iii. Theranos will have arranged for reimbursement from Medicare and Medicaid.

iv. Theranos will have negotiated reimbursement rates with payors (insurance companies, Medicare and Medicaid) at 35% below the prices charged by the leading retail blood test laboratories, permitting Safeway and the Safeway Network Partners to earn an average gross dollar margin (reimbursement rate <u>minus</u> Theranos cost per test) of ten dollars ($10) or more.

v. Theranos will arrange for blood test forms to be distributed in at least 50% of all doctors' offices, with a goal to arrange for blood test forms to be distributed in at least 90% of all doctors' offices at program launch.

HIGHLY CONFIDENTIAL                                                                                    SWYSEC_000000009


*theranos*
*redefining healthcare*

    **vi.** Safeway and the Safeway Network Partners will have obtained CLIA waivers necessary for the performance of the blood tests at the Safeway Network (as defined below) stores that will participate in the launch of the Program.

**4.** **Safeway Network.**

**a.** **Safeway Network.** The "Safeway Network" shall consist of Safeway locations and the locations of other food retailers that deploy the Theranos Systems. Safeway shall determine the food retail locations that participate in the Safeway Network by selecting locations from the companies that are listed on Schedule G ("Safeway Network Partners") as approved by Theranos, such approval not to be unreasonably conditioned, delayed or withheld. The food retailers listed on Schedule G shall not be entitled to deploy the Theranos Systems unless and until one or more locations of such retailers has been selected by Safeway for inclusion in the Safeway Network.

**b.** **Network Management and Royalties.** Safeway, or at its option Safeway Health, shall manage the process of selecting and negotiating with Safeway Network Partners. Safeway will collect a per Test royalty for Tests sold to Safeway Network Partners, and the amount of such royalty may be determined by Safeway on a case by case basis. Safeway Network Partners will be prepared with CLIA waivers prior to any deployment of Theranos Systems at such Safeway Network Partner locations.

**c.** **Network Integration.** For each Safeway Network Partner, Theranos will need to complete substantial customization work which will be factored into the timing of selection and expansion. Theranos, in its reasonable judgment, will control the timing of launch of its diagnostic and predictive tests into the broader network and may likely only launch the diagnostic and predictive tests at other locations six (6) and twelve (12) months respectively after launch at Safeway and Walgreens. Notwithstanding the foregoing, within the three (3)- to four (4)-month period following the stabilization of the Software in Safeway and Walgreens stores as recognized in writing by Theranos in its good faith, reasonable judgment, Theranos will complete the integration of the Software for two (2) large Safeway Network Partners selected by Safeway, anticipated to be Ahold and Publix. Theranos will then proceed with the integration of other Safeway Network Partners as follows on schedules mutually agreeable to Theranos and Safeway in writing, with a goal of achieving the following: (i) within seventy-five (75) days after the integration of the two (2) large Safeway Network Partners above, Theranos will complete integration of three (3) additional Safeway Network Partners selected by Safeway; (ii) within seventy-five (75) days after the integration of the three (3) additional Safeway Network Partners in clause (i), integration of three (3) additional Safeway Network Partners selected by Safeway; and (iii) within seventy-five (75) days after the integration of the three (3) additional Safeway Network Partners in clause (ii), integration of six (6) additional Safeway Network Partners selected by Safeway. It is anticipated that the first grouping of three (3) additional Safeway Network Partners shall consist of Giant Eagle, Hy Vee and SuperValu, the second grouping of three (3) additional Safeway Network Partners shall consist of Albertsons, Delhaize and Meijer and the third grouping of six (6) additional Safeway Network Partners shall consist of A&P, Harris Teeter, Price Chopper, Schnucks, Wegmans and Weis. Theranos will use commercially reasonable efforts to complete the integration of Theranos Systems at the 3,528 initial Safeway Network locations, assuming reasonable up-front financial commitments are made by the Safeway Network Partners as a group, within one (1) year after successful completion of the pilot in Safeway stores. Theranos shall not deploy the Theranos Systems in any retailer other than Safeway, the Safeway Network and Walgreens (a) until at least six months after the Program launch at Safeway and Walgreens stores, and (b) until Publix and Ahold have launched the Program. Thereafter, Theranos may deploy the Theranos Systems at retailers other than Safeway, Walgreens and the retailers on Schedule G (which are subject to Safeway's selection) only if (x) the aggregate number of such other retailer locations deploying the Theranos Systems is no more than 50% of the aggregate number of Safeway Network locations (including Safeway stores) deploying the Theranos Systems at any given time, and (y) the expansion of the Theranos Systems to such other retailers would not be reasonably likely to create an overbuilt retail market (considering, among other things, the demand for the Theranos Systems at existing retailers and

HIGHLY CONFIDENTIAL    SWYSEC_000000010


*theranos*
redefining healthcare

the Program profitability at existing retailers).  The restrictions of the foregoing sentence shall expire once all 3,528 initial Safeway Network locations have launched the Program.

5. **Food Retailer Exclusivity.**  Except as specifically provided in this Agreement, Safeway shall have the exclusive right to deploy Theranos Systems in the food retail channel.  Such exclusive right shall include the ability to select the Safeway Network Partner locations to be among the locations that deploy Theranos Systems.  As a result, except as specifically provided in this Agreement, Theranos will not make the Theranos Systems available to any food retailers other than (i) Safeway and (ii) the Safeway Network Partners selected and designated by Safeway.  For purposes hereof, "food retail channel" and "food retailers" shall mean only the parties listed on Exhibit G hereto as may be supplemented by agreement of Safeway and Theranos by amending this Agreement.

6. **First Announcement Rights.**  Theranos will provide Safeway with the right of First Announcement in the United States.  In this Agreement, the "right of First Announcement" means that Safeway has the exclusive right with Walgreens to announce and conduct any new Tests in the United States during the ninety (90) calendar day period immediately following the date on which such new Test first becomes commercially available.  Any Tests developed after the execution of this Agreement that are not specifically listed in the definitions of diagnostic and predictive Tests in Section 2 and are subject to development or licensing agreements with pharmaceutical companies and/or United States or foreign government agencies will not be subject to the right of First Announcement above.

7. **Branding.**  Subject to the results of market research at Theranos' discretion, the parties' expectation is that the Devices and Theranos Systems service areas will be branded with the "Theranos" name, which shall be a high quality brand providing users with a uniform experience across locations.  Uniform branding criteria will be executed at all points of Theranos' distribution.  Theranos has determined that the Devices will not be available at retail locations operated, directly or indirectly, by the U.S. Department of Defense, laboratories or retail locations operated, directly or indirectly, by Quest Diagnostics or LabCorp, mass merchandisers or discount retailers, including but not limited to super centers, club stores and dollar stores, provided that, subject to Section 4.c. above, Theranos may determine in its sole discretion to make the Devices available at Walmart and/or Target no earlier than six (6) months after the commercial launch of the Program at Safeway or Walgreens.  Additionally, Theranos will only launch its diagnostic and predictive Tests at Walmart six (6) months after launch of each of these Tests at Safeway or Walgreens.

8. **Safeway Deployment Outside Pharmacies and Outside the United States.**

a.  Safeway pharmacies are occasionally hired by employers for brief engagements to provide tests, vaccinations or other services on site at the employers' premises.  Nothing in this Agreement shall prevent Safeway pharmacies from deploying the Theranos Systems during such brief engagements at such employer sites.  Nor shall anything in this Agreement prevent Safeway from deploying Theranos Systems in its offices or work locations so that its employees may obtain tests there.

b.  Theranos agrees that prior to entering into any agreement with any retailer, pharmacy, grocer, mass merchant or any entity operating in a retail environment to deploy or install Theranos Systems in Canada, and prior to deploying or installing Theranos Systems in Canada on its own in any retail environment, Theranos will first discuss in good faith with Safeway extending the territory of this Agreement to apply to retail opportunities in Canada on substantially the same terms and conditions as set forth in this Agreement for the United States.

9. **Safeway Health.** Theranos will customize agreed upon proprietary products and services for Safeway Health in accordance with specifications and guidelines established and agreed upon in advance by Safeway Health, and Safeway Health shall have the right to deploy the Theranos Systems at client facilities.

HIGHLY CONFIDENTIAL                                                                                                   SWYSEC_000000011



**10. Inventory Pre-Purchases.**

a. **Initial Pre-Purchase.** Upon execution of this Agreement, Safeway will pay ten million dollars ($10 million) to Theranos to pre-purchase approximately 715,000 units (the "Initial Inventory Payment") of Cartridge inventory ("Inventory").

b. **Regulatory Approvals Pre-Purchase Commitment.** Upon receipt of the Regulatory Approvals, Safeway agrees to pay an additional twenty million dollars ($20 million) to Theranos to pre-purchase an additional approximate 1,430,000 units of Inventory (the "Second Inventory Payment").

c. **Pilot Success Pre-Purchase Commitment.** Upon Safeway notifying Theranos that it has determined, in its sole discretion, that the pilot of the Program has been successful, Safeway agrees to pay an additional twenty-five million dollars ($25 million) to Theranos to pre-purchase an additional approximate 1,785,715 units of Inventory (the "Third Inventory Payment" and collectively with the Initial Inventory Payment and the Second Inventory Payment, the "Inventory Payments").

d. **Purchase of Initial Note or Additional Note.** In lieu of paying cash for all or a portion of the Second Inventory Payment or the Third Inventory Payment, Safeway shall have the right to pay Theranos the Additional Note Purchase Price in cash or wire transfer, subject to the terms of Schedule A and the Option Agreement, and shall be deemed to have fulfilled its obligations under this Section 10 with respect to the payment that is applied to the Additional Note Purchase Price. For example, in lieu of paying $20 million in cash for the Second Inventory Payment, Safeway would have the right to pay $15 million in cash for the Additional Note Purchase Price plus $5 million in cash for the remainder of the Second Inventory Payment.

e. **Safeway Network Partner Pre-Purchases.** Safeway will seek to negotiate for pre-purchases of Inventory by Safeway Network Partners of larger scale, with any pre-purchase amounts to be paid directly by the partners to Theranos.

f. **Letters of Credit.** Theranos agrees that, concurrently with the execution of this Agreement, , Theranos will obtain a letter of credit issued by a bank (such bank and the form of letter of credit to be reasonably acceptable to Safeway) in an amount of $10,000,000 payable to Safeway in the event that Theranos does not make full and timely payment of its monetary obligations to Safeway arising under Section 26(d) of this Schedule B, including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or similar proceeding, regardless of whether allowed or allowable in such proceeding (the "$10 Million Letter of Credit"). Theranos will maintain the $10 Million Letter of Credit until the later of (i) the date the Third Inventory Payment has been made, (ii) if Safeway has purchased the Initial Note, the date the entire outstanding principal amount of the Initial Note is converted into equity securities of Theranos or (iii) if Safeway has purchased the Initial Note, the date the entire outstanding principal amount of the Initial Note and interest thereon is repaid to Safeway by Theranos. Prior to or concurrently with the payment by Safeway of the Second Inventory Payment, Theranos will obtain a letter of credit issued by a bank (such bank and the form of letter of credit to be reasonably acceptable to Safeway) in an amount of $20,000,000 payable to Safeway in the event that Theranos does not make full and timely payment of its monetary obligations to Safeway arising under Section 26(d) of this Schedule B, including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or similar proceeding, regardless of whether allowed or allowable in such proceeding (the "$20 Million Letter of Credit"). Theranos will maintain the $20 Million Letter of Credit until the later of (i) the date the Third Inventory Payment has been made, (ii) if Safeway has purchased the Additional Note, the date the entire outstanding principal amount of the Additional Note is converted into equity securities of Theranos or (iii) if Safeway has purchased the Additional Note, the date the entire outstanding principal amount of the Additional Note and interest thereon is repaid to Safeway by Theranos.

HIGHLY CONFIDENTIAL      SWYSEC_000000012


*theranos*
redefining healthcare

11. **Ordering.** The parties will agree upon the specific procedures of the ordering process during or after the pilot phase. It is contemplated that Safeway will execute purchase orders for the Deliverables, and that there will be an acknowledgement of such orders by Theranos. It is further contemplated that: (i) Theranos will have the ability to notify Safeway of product changes, and Safeway will have an opportunity to comment on whether changes are suitable for its purposes; and (ii) Safeway will have the opportunity to make timely cancellations of orders, but Theranos will have the ability to recover its manufacturing costs (including appropriate overhead) from Safeway in the event that Safeway cancellations cause the inventory to be unusable or unsaleable, or in the event that Theranos' attempts to mitigate loss fail to recover the full manufacturing costs.

12. **Invoicing.** Theranos will issue invoices as follows:

| Deliverable (as applicable) | Invoice |
|---|---|
| Cartridges | Shipment date |
| Devices | No invoice, as Safeway will not be separately charged for Devices |
| Training (installation and use of Devices)*<br><br>*Theranos will train applicable Safeway personnel and will assist Safeway in developing appropriate training materials, videos, and literature to operate Devices and run the Tests. Additionally, Theranos will provide periodic trainer updates as new versions of Devices and Tests require it. | No invoice, as Safeway will not be separately charged for Training |

13. **Payment.** All payments are due within thirty (30) calendar days from the receipt of invoice.

14. **Purchase Price.** Upon Safeway notifying Theranos of the successful conclusion of the pilot phase, the parties will negotiate and agree upon pricing for the newly Available Cartridges and the associated Tests. The agreed-upon pricing schedule will be reduced to writing, and this Agreement will be amended by including the pricing in Schedule D. The price to be agreed upon by the parties will not include applicable taxes, custom duties, transportation, or special handling. If Theranos has the legal obligation to collect any taxes, duties or charges of any kind imposed by any country, federal, state, or local government entity, the appropriate amount shall be added to Safeway's invoice and shall be paid by Safeway unless Safeway provides Theranos with a valid tax exemption certificate authorized by the appropriate taxing authority. Theranos has notified Safeway that it has adopted a unilateral Sales Policy by which Theranos intends to do business, and that as part of this Sales Policy, Theranos has decided to suggest retail prices ("SRP") for its Tests. Theranos has further notified Safeway that it has reserved the right, at its sole discretion, not to renew any purchase agreement with any retailer that elects to sell Tests in a manner that is inconsistent with Theranos' Sales Policy, including offering resale prices below SRP.

15. **Currency.** All prices and fees set forth in this Agreement are stated in U.S. dollars. Payment will be in U.S. dollars.

HIGHLY CONFIDENTIAL                                                                                            SWYSEC_000000013


*theranos*
*redefining healthcare*

**16. Billing Software.** Should Safeway choose to use TheranOS billing software to automatically bill payors for Tests performed at Safeway stores, Theranos will then bill payors directly for payment to be made to Safeway.

**17. Delivery.** Delivery of Cartridges and any other Theranos Deliverables to which Safeway will acquire title will be shipped *DDP* (Incoterms 2000) to Safeway's facilities specified in the applicable purchase order ("Delivery Point"). Theranos will deliver the applicable Deliverables in accordance with the date specified in the applicable Purchase Order. Time is of the essence for all deliveries. Title for the Deliverable, assuming title is transferring in accordance with this Agreement, excluding any Software, and risk of loss or damage to the Deliverable will pass to Safeway upon Theranos' delivery of the Deliverable to the Delivery Point. Theranos shall be responsible for paying all freight, handling, shipping and insurance charges to the Delivery Point. Theranos will notify Safeway immediately if a delivery cannot be made on time and Theranos will bear all costs of expediting shipments for any late deliveries.

**18. Shipment.** In the absence of specific shipping instructions from Safeway, Theranos will ship by the method it deems most advantageous. Transportation costs will be included in the price per Test, unless Safeway requests special shipping instructions. If Safeway requests special shipment, the associated costs will be collected, or, if prepaid, will be subsequently invoiced to Safeway. Unless otherwise specified, the Cartridges will be shipped in Theranos' standard commercial packaging. When special packaging is, in the reasonable opinion of Theranos, required under the circumstances, Theranos will issue an invoice to Safeway for the cost of the same. In the event any of Theranos' production facilities are located in close proximity to Safeway's distribution centers, special arrangements can be provided for direct transfer of Cartridges into Safeway's distribution centers.

**19. Devices.**

**a.** Except as provided in Sections 8 and 9 of this Schedule B above, any Devices, Cartridges and other Deliverables provided by Theranos to Safeway shall be used only by Safeway's employees, contractors and/or agents for offering the use of the Theranos Systems and associated Theranos services to in-store customers at Safeway's on-premise pharmacies and Safeway stores for the purposes of this Program and not for use in any other programs, including, without limitation, drug-specific programs for payors or pharmaceutical companies. Safeway agrees to take commercially reasonable steps to protect the Devices from theft or use contrary to the provisions of this Agreement. Safeway agrees not to disassemble or otherwise reverse engineer the Devices or any component thereof. Safeway is not authorized to sell, rent, transfer, license, or distribute the Devices, unless specifically authorized by Theranos in writing.

**b.** Theranos shall at all times retain ownership of the Devices and shall maintain its own insurance for loss, damage, theft or destruction of the Devices while they are in the possession of Safeway and during transportation to and from Safeway's premises (or other mutually agreed premises). Safeway agrees to use its commercially reasonable efforts, consistent with the efforts it takes for the pharmacies and stores where the Devices are located, to protect the Devices against loss, damage, theft or destruction, ordinary wear and tear excepted. As Theranos develops upgrades and enhancements to the Devices, the parties will agree on a deployment schedule for such next-generation Devices. Safeway shall permit any authorized representative of Theranos to inspect the Devices, upon advance written notice and during business hours, at any time prior to the return of such Devices to Theranos, at Safeway's facilities or any other location at which the particular Program is being conducted. If Safeway is unable to return the Devices in accordance with this Agreement, Safeway will permit Theranos, on dates and times to be agreed upon, to access Safeway's premises for the purposes of repossessing such Devices at Theranos' expense.

**c.** If Safeway experiences any problems with the deployed Devices, Theranos will repair or replace the Device as soon as possible after being notified of the problem, in accordance with Schedule C; provided, however, that in all events Theranos shall repair or replace at its own expense any Devices that do not

Theranos and Safeway Confidential and Proprietary                                                                    -14-



conform with all applicable specifications agreed upon by the parties or required by regulatory authorities and for which there is no back-up Device available within twenty-four (24) hours from receipt of notice.

**d.** Upon expiration or termination of this Agreement, Safeway shall ensure that all Safeway employees, contractors and/or agents cease using the Devices and Client Accessible Software, and Safeway shall return to Theranos or destroy all authorization codes allowing users to access the Software. Upon expiration or termination of the Agreement, Theranos shall arrange for the prompt transport of all Devices from Safeway to Theranos in accordance with schedules to be agreed upon by the parties, and in any event shall remove all Devices from Safeway facilities within thirty (30) calendar days following the expiration or termination of this Agreement.

**20. Warranty.**

**a.** Theranos represents and warrants that all Deliverables delivered to Safeway will conform at all times with all applicable specifications agreed upon by the parties, including without limitation the provision of blood test results in thirty (30) minutes or less, or required by regulatory authorities. Notwithstanding the foregoing, the Cartridges may only have a limited "shelf-life," meaning an approved time during which they may be used. Therefore, the Cartridges will be subject to the foregoing warranty only for the duration of the applicable shelf-life ("Cartridge Warranty Period"). Theranos shall promptly, but in no event in more than thirty (30) calendar days from receipt of notice, repair or replace at its own expense any Deliverables that do not conform with this warranty, or at Safeway's request refund the payment price for the applicable defective Deliverables.

**b.** Each party warrants that: (i) it has the legal authority to enter into this Agreement; and (ii) the execution, delivery, and performance of this Agreement by it and its obligations hereunder do no conflict with any agreement, instrument or understanding to which it is a party or by which it may be bound.

**c.** Each party will perform its obligations under this Agreement: (i) in a timely and professional manner; (ii) in conformance with that level of care and skill ordinarily exercised by other professional companies of a similar size and in similar circumstances; and (iii) in compliance with all applicable laws, including as to Theranos, all laws and regulations applicable to the Devices and the services offered by Theranos, and all laws and regulations applicable to the privacy of medical information.

**d. Disclaimer. EXCEPT AS OTHERWISE SET FORTH IN THIS AGREEMENT, EACH PARTY EXPRESSLY EXCLUDES AND DISCLAIMS ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, REGARDING ANY PRODUCTS OR SERVICES PROVIDED UNDER THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY, OF FITNESS FOR A PARTICULAR PURPOSE, NONINFRINGEMENT, AND ANY WARRANTY THAT MAY ARISE BY REASON OF USAGE OR TRADE OR COURSE OF DEALING.**

**21. Licenses.**

**a. Theranos License Grant.** Theranos hereby grants to Safeway a non-exclusive, royalty free, non-transferable license, without the right to sublicense, to use, in accordance with, and solely for the purposes specified in this Agreement and only for the term of this Agreement: (i) Software installed on Devices, for use by Safeway employees, contractors and agents who are obligated by confidentiality obligations to Safeway consistent with the terms of this Agreement; (ii) Software related to the TheranOS which may be accessed through the Devices or at a designated website or IP address, disc, programs or other designated location; and (iii) access to and use of the TheranOS via the Theranos web portal. Theranos will grant similar licenses and indemnification rights, and will make similar representations and warranties, as those included in this Agreement to the food retailers listed on Schedule G as designated in writing by Safeway and agreed upon by Theranos, such agreement not to be unreasonably conditioned, delayed or withheld.

HIGHLY CONFIDENTIAL                                                                                          SWYSEC_000000015



**b.** **Ownership.** Theranos and its licensors shall at all times retain sole and exclusive ownership of all Software and, as between the parties, all Software is Theranos Confidential Information. Safeway shall use commercially reasonable efforts to prevent unauthorized access to, or use of, the Software, and agrees to notify Theranos promptly of any such unauthorized use. Safeway shall not: (i) disassemble, decompile or otherwise reverse engineer the Software, (ii) modify, copy, sell, rent, transfer, reproduce or distribute the Software, except as specifically provided in the Agreement, (iii) use the Software to provide processing services to third parties or otherwise use the Software on a "service bureau" basis except for the purpose of offering the Theranos services to customers at Safeway locations where the device is installed, or (iv) create Internet "links" to or from the Software, or "frame" or "mirror" any of Safeway's content which forms part of the Software. Theranos reserves all rights in the Software not expressly granted herein.

**c.** **Grant of License to Use De-Identified Data.** Safeway hereby grants to Theranos a perpetual, irrevocable, worldwide, royalty-free, and non-exclusive license to integrate, use and disclose in TheranOS Safeway data provided under, related to or generated in connection with this Agreement for use in TheranOS' analytical engine to the extent permitted by law. Any such TheranOS data shall be "de-identified" in accordance with the Health Insurance Portability and Accountability Act of 1996, its implementing regulations and comparable state law, each as amended (collectively, "HIPAA"). Theranos shall not use, disclose (except for the purposes of performing therapeutic and disease management programs), sell, or otherwise convey the de-identified data to any third party, and any resulting analyses shall not contain, any personally identifying information regarding individual participants or any information identifying Safeway or Safeway compounds, except in connection with the provision of any professional services to Safeway under this Agreement.

**d.** **Grant of License to Safeway to Use Data.** Theranos hereby grants to Safeway a perpetual, irrevocable, worldwide, royalty-free, and non-exclusive license to use and disclose data provided under, related to or generated in connection with this Agreement to the extent permitted by law for use in exercising its rights and fulfilling its obligations under this Agreement, for use in providing patient care at Safeway locations and for any other uses and disclosures consistent with its obligations as a health care provider in accordance with federal or state laws so long as such data is not sold to any entity or used by or disclosed to any entity (other than Safeway or its affiliates) for any other purpose not required by federal or state laws. Any resulting analyses done by Safeway shall not contain any personally identifying information regarding individual participants except in accordance with HIPAA and in connection with Safeway's activities as a health care provider.

**e.** **HIPAA Matters.** Each party represents that it is a "health care provider" and "covered entity" as defined under HIPAA, and agrees that it will use and disclose "protected health information" as defined under HIPAA ("PHI") of the other party in compliance with HIPAA. The parties contemplate that the uses and disclosures of PHI contemplated by this Agreement do not require the parties to enter into a business associate agreement or to acquire prior patient authorization meeting HIPAA requirements. Notwithstanding the foregoing, Theranos shall acquire a HIPAA-compliant patient authorization from each patient receiving services contemplated under this Agreement, permitting all uses and disclosures of such patient's PHI as contemplated by this Agreement by each party hereto. Each party agrees not to use or further disclose PHI of the other party other than as expressly permitted or required by this Agreement or by law. If the parties' contemplated use or disclosure of PHI changes (e.g., if Theranos becomes Safeway's HIPAA business associate by virtue of providing billing services for Safeway), or if HIPAA is hereafter changed or modified, so as to require during the term of this Agreement an amendment, modification or change to the terms of this Agreement in order to comply with such change or modification in contemplated use or disclosure or legal requirement, the parties shall cooperate with one another in modifying or amending this Agreement, if necessary, to comply with such change or modification.

**22.** **Property Ownership.** As between Safeway and Theranos, all inventions and improvements developed in connection with Deliverables or as a result of the services provided by Theranos to Safeway during the

HIGHLY CONFIDENTIAL                                                                                              SWYSEC_000000016



*theranos*
redefining healthcare

term of this Agreement and thereafter, whether by Safeway or Theranos, or by the parties jointly, directed to: (i) any part or the whole of the Theranos System or any improvements thereto, including, without limitation, the TheranOS analytical engine and the algorithms therein; or (ii) the generation of assays for use in conjunction with the Theranos System, shall be the sole and exclusive property of Theranos. The following information is the sole and exclusive property and Confidential Information of Theranos: (a) all PHI collected by the Device and by Safeway in performing the Program; and (b) all PHI that has been de-identified by Theranos. At Safeway's request, Theranos will provide Safeway with the reports generated on Theranos Systems from Safeway locations for use in exercising its rights and fulfilling its obligations under this Agreement, for use in providing patient care at Safeway locations and for any other uses and disclosures consistent with its ordinary course activities as a health care provider so long as such reports and the data therein are not sold to any entity or used or disclosed to any entity (other than Safeway or its affiliates) for any other purpose.

**23. Confidentiality.**

**a.  Use and Protection.**  Each party will use a reasonable degree of care to maintain all Confidential Information of the other in trust and confidence and will neither disclose to any third party nor use any Confidential Information of the other for any unauthorized purpose or without the other party's express prior written consent.  Each party may only disclose Confidential Information of the other to those of Recipient's employees and representatives on a need-to-know basis, and may use such Confidential Information only to the extent required to perform this Agreement.  Confidential Information may not be used for any purpose or in any manner that would constitute a violation of any laws or regulations, including, without limitation, the export control laws of the United States.  Unless otherwise stated in this Agreement, no rights or licenses to intellectual property in Confidential Information is granted by either party to the other under this Agreement, whether express, implied or otherwise.  All Confidential Information will remain the property of Discloser (and its licensors, if any), including, but not limited to, any right to make, use or sell any product embodying any Confidential Information.

**b.  Term of Confidentiality.**  The obligations imposed on Recipient shall survive until such time as Discloser's Confidential Information disclosed to Recipient under this Agreement becomes publicly available and/or made generally known through no action or inaction of Recipient or its Representatives. Except as required to comply with obligations or requirements imposed on Recipient as a healthcare provider, and subject to the restrictions set forth in Section 21 and 22, as applicable, Recipient and its Representatives will return or destroy/erase all of Discloser's Confidential Information, including any and all information in whatever form generated making use of or reflecting Discloser's Confidential Information, except one copy for archival purposes, within thirty (30) business days of request of Discloser, or thirty (30) business days from termination or expiration of this Agreement.  In addition, and notwithstanding any of the foregoing, if the value of products or services provided by Theranos, or by an organization related to Theranos, to Safeway pursuant to this Agreement is $10,000 or more over any twelve-month period, Theranos agrees that, until four years after the furnishing of the services contemplated hereunder, Theranos shall, upon written request, make available to the Secretary of the United States Department of Health and Human Services (the "Secretary"), the Secretary's duly authorized representative, the Comptroller General, or the Comptroller General's duly authorized representative, such books, documents and records as may be necessary to certify the nature and extent of the costs of such products or services.

**24. Indemnification.**

**a.  Intellectual Property Indemnity.**  Theranos ("Indemnitor") shall indemnify and hold harmless Safeway and its Representatives ("Indemnitees") from and against any and all liabilities, losses, damages, costs and expenses (including without limitation reasonable attorneys fees) incurred by the Indemnitees that a court awards against Indemnitees as the result of any third-party claim, action, suit or proceeding alleging that any of Indemnitor's Deliverables provided or sold to Indemnitees infringes any patent, copyright, trademark, or other non-trade secret intellectual property or proprietary right, or misappropriates any trade

HIGHLY CONFIDENTIAL                                                                                    SWYSEC_000000017



secret, provided that this Section sets forth Indemnitees' sole and exclusive remedies therefor. Indemnitor shall defend all such actions at its own expense with counsel reasonably acceptable to Safeway. Without limiting the foregoing, should the accused Deliverable become, or in Indemnitor's opinion be likely to become, the subject of a claim of infringement or misappropriation, Indemnitor shall, at its option, either: (i) procure for Indemnitee(s) the right to continue using the Deliverable, or (ii) modify the Deliverable to make it non-infringing without affecting its regulatory approvals or materially affecting its functionality or performance. If neither of the foregoing alternatives is reasonably available to Indemnitor, then Indemnitor will grant Indemnitee(s) a refund for the purchase price or fees paid by Safeway for the affected Deliverables depreciated, if applicable, on a five-year straight-line basis and accept return of the relevant Deliverable. The foregoing indemnification does not extend to any claim of infringement which is based, in whole or in part, upon (A) any claim arising out of a modification by Indemnitee of the Deliverable, (B) any claim arising out of the combination, operation or use of the Deliverable with other devices not furnished or specified  by Indemnitor and such claim would not have arisen had such combination, operation or use not occurred; or (C) use of the Deliverable in a manner other than as specified by Indemnitor.

b. **General Indemnity.**

   i. **Theranos' Obligations.** Theranos ("Indemnitor") shall defend, indemnify and hold harmless Safeway and its Representatives ("Indemnitee(s)") against and from any third-party claim in which the Indemnitee is named as a result of a claim arising out of or related to (A) Theranos' breach of this Agreement; (B) any error or misdiagnosis resulting from the Theranos Systems (provided that such error or misdiagnosis is not primarily due to user error); or (C) Theranos' negligence or intentional misconduct, while performing its obligations under this Agreement, resulting in death, personal injury or tangible property damage. This indemnity obligation is expressly contingent upon Indemnitee(s) following the Indemnity Procedure set forth in Section 24.c. below.

   ii. **Safeway's Obligations.** Safeway ("Indemnitor") shall defend, indemnify and hold harmless Theranos and its Representatives ("Indemnitee(s)") against and from any third-party claim, in which the Indemnitee is named as a result of a claim arising out of or related to:  (A) Safeway's breach of this Agreement, or its negligence or intentional misconduct, while performing its obligations under this Agreement, resulting in death, personal injury or tangible property damage; or (B) the development, manufacture, use, sale, offer for sale, marketing or testing of any product or service by or under Safeway's control related to Safeway's services, including, but not limited to, any claim for personal injury or property damage related thereto. This indemnity obligation is expressly contingent upon the Indemnitee(s) following the Indemnity Procedure set forth in Section 24.c. below.

c. **Indemnity Procedure.** Each Indemnitor's indemnity obligations as set forth in Section 24.b. above is expressly contingent upon the Indemnitee giving Indemnitor:  (i) prompt written notice of the claim within thirty (30) calendar days of the claim being made, and furnishing Indemnitor with a copy of the claim, along with a copy of each communication, notice or other document relating to the claim; (ii) full control over the defense or settlement thereof; and (iii) all reasonable information and assistance (at Indemnitor's expense, excluding time spent by employees or consultants of the Indemnitee) to handle the defense and settlement thereof.

25. **Limitation of Liability.  IN NO EVENT SHALL (A) EITHER PARTY HAVE ANY LIABILITY TO THE OTHER PARTY FOR ANY LOST PROFITS, LOSS OF DATA, LOSS OF USE, COSTS OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES, OR ANY INDIRECT, SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES, UNDER ANY THEORY OF LIABILITY AND WHETHER OR NOT THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES; AND (B) EITHER PARTY'S AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, UNDER ANY THEORY OF LIABILITY, EXCEED FIVE MILLION U.S. DOLLARS ($5 MILLION); PROVIDED, HOWEVER, THAT THE LIMITATIONS SET FORTH IN (A) AND (B) OF THIS**

HIGHLY CONFIDENTIAL                                                                                      SWYSEC_000000018



**SECTION SHALL NOT APPLY TO:  (X) LIABILITY OR DAMAGES ARISING FROM OR RELATED TO A BREACH OF  SECTIONS 22 AND 23 (A BREACH OF SAFEWAY'S PROPERTY OR THERANOS' PROPERTY, A BREACH OF A PARTY'S CONFIDENTIALITY OBLIGATIONS); OR (Y) LIABILITY OR DAMAGES ARISING FROM OR RELATED TO A PARTY'S GROSS NEGLIGENCE OR WILFULL MISCONDUCT; OR (Z) LIMIT THE INDEMNIFICATION OBLIGATIONS WITH RESPECT TO AMOUNTS OWING TO THIRD PARTIES.**

**26.  Term and Termination.**

a.  **Term.**  This Agreement will be in effect for three (3) years following the actual launch of the Program. Within six (6) months after successful completion of the pilot of the Program, the parties will jointly, in the exercise of good faith, establish commercially reasonable performance criteria relating to subjects that may include the following:  (a) environment standards; (b) service level standards; (c) meeting demand; (d) sales to Safeway Network Partners; (e) inclusion of sufficient number of Safeway Network Partners and locations; (f) pricing and profitability; (g) making announcement rights available to sponsoring companies and other organizations; (h) Safeway's full adoption of Theranos' array of technology; (i) management and personnel overseeing the program; (j) Safeway's support with governmental relationships; (k) Safeway's support with payors; and (l) Safeway's marketing support) (the "Performance Criteria").  If the Performance Criteria have been satisfied, there will be automatic three (3)-year extensions of the term of this Agreement; provided, however, that any time during the term of this Agreement, either party shall notify the other in writing of any claimed failure to meet the Performance Criteria.  The party receiving such a notice shall within fourteen (14) calendar days propose amendments to the Agreement or any other changes to remedy any deficiency in the Performance Criteria.  If the party receiving such a notice cannot remedy the deficiency in the Performance Criteria, or its proposed change is not reasonably likely to remedy the deficiency in the Performance Criteria in the foreseeable future, the parties shall elevate the negotiations to the CEOs of both parties in an effort to reach resolution.  If thereafter a deficiency in the Performance Criteria continues to exist and the receiving party has failed to agree to amendments or changes that cure or would be reasonably likely in the foreseeable future to cure the deficiency in the Performance Criteria, the party giving notice may terminate the Agreement by giving notice thereof no less than thirty (30) calendar days.

b.  **Termination without Cause.**

    i.  In the event that Safeway determines in its sole discretion that the pilot of the Program has been unsuccessful, Safeway has the right to terminate this Agreement without cause on thirty (30) calendar days' prior written notice to Theranos.  Upon any such termination, Theranos shall promptly return all prepayment amounts attributable to undelivered Inventory under Section 10 above.

    ii.  Safeway has the right to terminate this Agreement on thirty (30) calendar days' prior written notice to Theranos in the event (i) the FDA notifies Theranos and/or Safeway that it is initiating or threatening to initiate regulatory action or assertion of jurisdiction on the basis that the Theranos System is a "medical device" under the Federal Food, Drug and Cosmetic Act and Theranos is unable to obtain FDA clearance or approval within six (6) months from the date of such notification; (ii) the FDA or another governmental authority otherwise seeks to prohibit, restrain, or impose limitations on the ability of Theranos and/or Safeway to fully exercise and implement the pilot of the Program and/or the launch of the Program as contemplated herein and Theranos and/or Safeway is not able to reach a satisfactory resolution with the FDA or such other governmental authority within six (6) months from the date of notification by the FDA or such other governmental authority; (iii) Theranos does not obtain the Regulatory Approvals within one (1) year from the Effective Date; or (iv) Safeway does not obtain any approvals required for the pilot of the Program under CLIA and other applicable laws, rules and regulations within one (1) year from the Effective Date.

HIGHLY CONFIDENTIAL                                                                                                      SWYSEC_000000019



*theranos*
redefining healthcare

c. **Termination for Cause.** If either party breaches a material provision of this Agreement (including without limitation a material failure to satisfy the Performance Criteria) and fails to cure such breach within thirty (30) calendar days after receiving written notice of the breach, the non-breaching party shall have the right to terminate this Agreement at any time; provided if a breach cannot be cured within thirty (30) calendar days but is capable of cure, the breaching party will not be in default if, within thirty (30) calendar days of receiving notice of breach, in good faith, it begins and continues to attempt to cure the breach. In such case, the breaching party will have a reasonable time to cure the breach before being in default. If a Safeway Network Partner materially breaches its obligations to Theranos, Theranos may terminate its agreement with such Safeway Network Partner for cause, but such Safeway Network Partner's breach shall not be deemed a breach by Safeway. Notwithstanding anything to the contrary herein, Safeway's breach of a payment obligation constitutes a default after the payment is due if Safeway's payment obligation is not satisfied within ten (10) business days of receiving written notice from Theranos of such default and its intent to terminate the Agreement, in which case Theranos has the right to terminate this Agreement immediately.

d. **Obligations upon Termination.**
  i. Theranos' Obligations to Safeway:
    1. Upon expiration of the term of this Agreement or in the event this Agreement is terminated for any reason, Theranos will, within thirty (30) calendar days of the expiration or termination date, refund (a) all sums paid by Safeway for pre-purchased Inventory that has been bought but not used and (b) any and all other sums paid by Safeway pursuant to this Agreement.
    2. In addition, upon expiration of the term of this Agreement or in the event this Agreement is terminated for any reason, Theranos will re-purchase the Initial Note (if still outstanding) at the price at which the Initial Note was issued, specifically ten million dollars ($10 million), plus any accrued interest, within thirty (30) calendar days of the expiration or termination date.
    3. In addition, upon expiration of the term of this Agreement or in the event this Agreement is terminated for any reason, Theranos will re-purchase the Additional Note (if still outstanding) at the price at which the Additional Note was issued, specifically fifteen million dollars ($15 million), plus any accrued interest, within thirty (30) calendar days of the expiration or termination date.
    4. Within thirty (30) calendar days of the expiration or termination date, Theranos will provide Safeway with an invoice setting forth any amounts owed, but not yet paid, prior to the expiration or termination date, including any additional expenses Theranos incurred with respect to non-cancellable commitments attributable to the termination of this Agreement.
  ii. Upon expiration or termination, Theranos may enter Safeway's facilities, at a time and date to be reasonably agreed upon, and remove the Devices installed on Safeway's premises as set forth above.

e. **Survival of Provisions.** Those Sections entitled "Convertible Notes," "Devices," "Warranty," "Licenses," "Property Ownership," "Confidentiality," "Indemnification," "Limitation of Liability," "Term and Termination," and "Miscellaneous," Schedule E ("Definitions"), Schedule F-1 ("Initial Note") and Schedule F-2 ("Additional Note") shall survive the cancellation or termination of this Agreement for any reason.

**27. Miscellaneous.**

a. **Governing Law; Jurisdiction.** This Agreement will be interpreted and governed by the laws of the State of California without reference to its conflict of laws principles. For any disputes arising out of this Agreement, the parties consent to the personal and exclusive jurisdiction of, and venue in, the state and federal courts within Santa Clara County, California.

HIGHLY CONFIDENTIAL                                                                    SWYSEC_000000020



b. **Compliance with Laws; Export Requirements.** The parties will comply with all applicable laws and regulations, including but not limited to, all United States and foreign export control laws or regulations applicable to the performance of this Agreement.

c. **Independent Contractor.** The parties are independent contractors, and the relationship of the parties under this Agreement will not be construed to create any other relationship, as partners, joint venturers, principal and agent, or otherwise. Neither party has the authority to represent the other as to any matters.

d. **Entire Agreement.** The terms and conditions contained in this Agreement constitute the entire agreement between the parties and supersede all previous agreements and understandings, whether oral or written, between the parties hereto with respect to the subject matter of this Agreement, and no agreement or understanding varying or extending the same shall be binding upon either party unless in a written document signed by both parties.

e. **Force Majeure.** Non-performance of either party, except for non-performance of Safeway's payment obligations, shall be excused to the extent that performance is rendered impossible by any other reason where failure to perform is beyond the control of the non-performing party.

f. **Assignment.** Neither party may assign, delegate or otherwise transfer this Agreement or any of its rights or obligations under this Agreement without the other party's prior written approval, which approval will not be unreasonably withheld, delayed or conditioned. Any such attempt to do so will be ineffective. Notwithstanding the foregoing, either party may assign, delegate or otherwise transfer this Agreement by operation of law or otherwise, to: (i) any person or entity that becomes a successor entity of the assigning party, in connection with a Change of Control or (ii) a sister company or subsidiary wholly owned by a party or its affiliates. This Agreement will bind and inure to the benefit of the respective successors and permitted assigns of the parties hereto, whether so expressed or not.

g. **Notices.** All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing and faxed, mailed or delivered to each party at the respective addresses of the parties as set forth on the cover page of this Agreement, or such other address as a party may specify. All such notices and communications will be deemed effectively given the earlier of (i) when delivered personally, (ii) one (1) business day after being delivered by facsimile (with receipt of appropriate confirmation), (iii) one (1) business day after being deposited with an overnight courier service of recognized standing or (iv) four (4) calendar days after being deposited in the U.S. mail, first class with postage prepaid.

h. **Prevailing Party.** In any suit or proceeding relating to this Agreement, the prevailing party will have the right to recover from the other its costs and reasonable fees and expenses of attorneys, accountants, and other professionals incurred in connection with the suit or proceeding, including costs, fees and expenses upon appeal.

i. **Amendment; Waiver.** No modification to this Agreement, or any waiver of any rights shall be effective unless assented to in writing by the party to be charged.

j. **Severability.** If any portion of this Agreement is held invalid, the parties agree that such invalidity shall not affect the validity of the remaining portions of this Agreement, and the parties shall seek in good faith to agree to substitute for the invalid provision a valid provision that most closely approximates the economic effect and intent of the invalid provision.

k. **Safeway Subsidiaries.** For purposes of this Agreement, references to the stores, operations, employees and the like of "Safeway" shall refer also to Safeway's current and future subsidiaries, including, but not limited to, stores operated under the names "Vons," "Dominick's," "Randalls," "Tom Thumb," "Genuardi's," "Pak'N Save," "Pavilions" and "Carr's Quality Centers." Safeway's subsidiaries which operate stores in which the Program is implemented shall have all of rights of Safeway under this Agreement.

Theranos and Safeway Confidential and Proprietary

HIGHLY CONFIDENTIAL

SWYSEC_000000021



I.   **Integration.**   Each party agrees that this Agreement, including all Schedules, embodies the entire understanding between the parties and supersedes and replaces any and all prior understandings, arrangements, and agreements, whether oral or in writing, relating to the subject matter hereof.

*[remainder of page intentionally left blank]*

HIGHLY CONFIDENTIAL                                                            SWYSEC_000000022


**theranos**
*redefining healthcare*

## SCHEDULE C

## SUPPORT AND MAINTENANCE TERMS

**1.       Support and Maintenance:  Hardware and Software.**

**1.1       Client Services.**

Theranos will use commercially reasonable efforts to provide Safeway users 24x7 Hardware and Software support and maintenance.  Support and maintenance services include, but are not limited to, use of and access to the Software and TheranOS, and associated enhancements and updates; on-demand, interactive services; and diagnosis of problems or issues associated with the Hardware or Software and resolution of verifiable problems.  Theranos will designate a dedicated Client Solutions manager to Safeway.  The Client Solutions manager will be responsible for assisting in the management of Safeway's support and maintenance requests.  Support and maintenance services will be available by telephone, email, and via TheranOS Real-Time Support online.  In responding to Safeway's support inquiries, Theranos will use the guidelines set forth in this Schedule.

**1.2       Reactive Incident Management Guidelines.**

Theranos will use commercially reasonable efforts to respond to Safeway's inquiry on a same-day basis via email or phone.  Each inquiry will be assigned a priority level (set forth below), and Theranos will use commercially reasonable efforts to resolve the request in accordance with the associated timelines:

- **Priority 1** – Use of the Theranos Systems is severely impacted.  Important features/critical functions are not available, or system freezes or crashes. These situations will be treated as emergencies; reasonable efforts are made to respond to Priority 1 service requests within one (1) hour. Client Solutions will work 24x7 with Safeway until the issue is resolved or as long as useful progress can be made and fixes can be applied; provided, however, that in all events Theranos shall repair or replace at its own expense any Devices that do not conform with all applicable specifications agreed upon by the parties or required by regulatory authorities and for which there is no back-up Device available within twenty-four (24) hours from receipt of notice.

- **Priority 2** – Safeway experiences a minor loss of service or requests information, an enhancement, or documentation clarification but there is no impact on the operation of the Software.  Reasonable efforts are made to respond to Priority 2 service requests within three (3) business hours.  Examples of Priority 2 support inquiries include: help with web portal access, and instructions on using the TheranOS features. Theranos will use commercially reasonable efforts to update Safeway via email or phone (if email is not available) on the status of the inquiry and resolution within one (1) business day.

**3.       Deployment Services.**

At Safeway's written request, as noted on a purchase order, Theranos, at its cost, shall deploy and install the Devices on Safeway's premises.

**4.       Training.**

Theranos and Safeway will mutually agree upon the scope of training that Theranos will offer to Safeway at no cost to Safeway, subject to the exclusions described in Schedule D.

Theranos and Safeway Confidential and Proprietary

HIGHLY CONFIDENTIAL                                                                                                    SWYSEC_000000023


*theranos*
redefining healthcare

### SCHEDULE D

### PRICING

Final pricing for the Deliverables shall be agreed upon at or near the conclusion of the pilot phase of the project.  At that time, this Schedule will be completed accordingly, and this Agreement amended, if warranted. Pricing will not be finalized unless and until it is reduced to writing, and signed by an authorized representative(s) of each party.

For planning purposes, sample price ranges for all available Tests and Cartridges are as follows:

| | | Pricing Proposal | |
|---|---|---|---|
| Code | Procedure | 50% of Medicare | 50% of Medicaid |
| 80061 | Lipid Panel | $9.60 | $6.94 |
| 80053 | Comprehen Metabolic Panel | $6.11 | $5.85 |
| 85025 | Complete CBC w Auto Diff WBC | $5.57 | $4.30 |
| 80050 | General Health Panel | n/a | n/a |
| 84443 | Assay Thyroid Stim Hormone | $11.99 | $9.29 |
| 88175 | Cytopath C/V Auto Fluid Redo | $18.97 | $14.81 |
| 83036 | Glycosylated Hemoglobin Test | $6.95 | $5.37 |
| 81001 | Urinalysis, Auto w Scope | $2.27 | $1.75 |
| 84153 | Assay of Psa, Total | $13.17 | $10.17 |
| 87086 | Urine Culture/Colony Count | $5.79 | $3.80 |
| 84439 | Assay of Free Thyroxine | $6.27 | $4.99 |
| 87621 | HPV, DNA, Amp Probe | $25.14 | $19.40 |
| 85610 | Prothrombin Time | $2.81 | $2.17 |
| 82306 | Vitamin D, 25 Hydroxy | $19.46 | $12.40 |
| 88142 | Cytopath, C/V, Thin Layer | $14.51 | $11.20 |
| 85652 | RBC Sed Rate, Automated | $1.94 | $1.49 |
| 87491 | Chylmd Trach, DNA, Amp Probe | $25.14 | $19.40 |
| 87591 | N.gonorrhoeae, DNA, Amp Prob | $25.14 | $19.40 |
| 84436 | Assay of Total Thyroxine | $4.92 | $3.80 |
| 87070 | Culture, Bacteria, Other | $6.17 | $4.76 |
| 80101 | Drug Screen, Single | $9.86 | $7.61 |
| 80048 | Metabolic Panel Total CA | $4.58 | $4.68 |
| 85027 | Complete CBC, Automated | $4.64 | $3.58 |
| 84550 | Assay of Blood/Uric Acid | $3.24 | $2.50 |
| 81003 | Urinalysis, Auto, wo Scope | $1.61 | $1.24 |
| 87088 | Urine Bacteria Culture | $4.60 | $3.04 |
| 82570 | Assay of Urine Creatinine | $3.71 | $2.66 |
| 82043 | Microalbumin, Quantitative | $3.99 | $3.20 |
| 83540 | Assay of Iron | $4.64 | $3.58 |
| 82248 | Bilirubin, Direct | $3.31 | $2.78 |
| 80076 | Hepatic Function Panel | $4.58 | $4.52 |
| 83901 | Molecule Nucleic Ampli Addon | $7.29 | $9.27 |
| 87186 | Microbe Susceptible, Mic | $6.19 | $4.78 |
| 86003 | Allergen Specific Ige | $3.43 | $2.89 |
| 86703 | HIV-1/HIV-2, Single Assay | $9.83 | $6.33 |
| 82607 | Vitamin B-12 | $10.80 | $8.33 |
| 86140 | C-Reactive Protein | $3.71 | $2.86 |

Theranos and Safeway Confidential and Proprietary

-24-

HIGHLY CONFIDENTIAL



*theranos*
*redefining healthcare*

| 84479 | Assay of Thyroid (T3 or T4) | $4.64 | $3.58 |
|---|---|---|---|
| 82728 | Assay of Ferritin | $9.76 | $7.53 |
| 87077 | Culture Aerobic Identify | $5.79 | $4.47 |
| 84403 | Assay of Total Testosterone | $18.49 | $14.27 |
| 86038 | Antinuclear Antibodies | $8.66 | $6.68 |
| 84460 | Alanine Amino (Alt) (Sgpt) | $3.79 | $2.93 |
| 83550 | Iron Binding Test | $5.02 | $3.98 |
| 87081 | Culture Screen Only | $4.75 | $3.67 |
| 82550 | Assay of Ck (Cpk) | $4.67 | $3.61 |
| 83001 | Gonadotropin (Fsh) | $12.27 | $10.28 |
| 84702 | Chorionic Gonadotropin Test | $6.26 | $7.04 |
| 84450 | Transferase (Ast) (Sgot) | $3.71 | $2.86 |

**Exclusions.** The prices to be negotiated will not include costs and expenses Theranos will incur in performing the obligations outlined in this Agreement. These costs include, but are not limited to, Theranos personnel travel and lodging and meals (including travel to all of Safeway's sites where in-person training will be conducted and Devices installed); provided that travel- and training-related expenses shall be subject to Safeway's prior written approval. It is the parties' intention that Theranos personnel will not be required to travel to every store at which the Devices are deployed and that Theranos will design a trainer program and instruct its trainers to utilize video and other virtual meeting tools such that training sessions will not require significant travel. Theranos will invoice for these costs as they are incurred, and Safeway agrees to pay such invoices in accordance with the payment terms outlined in Schedule B.

*[remainder of page intentionally left blank]*

HIGHLY CONFIDENTIAL                                                                                          SWYSEC_000000025



## SCHEDULE E

## DEFINITIONS

Capitalized terms, as used within this Agreement, including any Schedule or attachment, have the following meanings, unless otherwise indicated:

1. "**Assay**" means any method used for the detection of an analyte (e.g., a biomarker) or multiplexed set of analytes and/or measuring their concentration in a matrix, including, but not limited to, human blood.

2. "**Available Cartridges**" shall have the meaning set forth in Schedule B.

3. "**business day**" means any day that is not a Saturday, Sunday or day on which banks in the State of California are closed.

4. "**Cartridge**" means Theranos' analytical chips containing biological fluid processing technology and Assays to measure, among other matters, the concentration of specific analytes, including biomarkers in a biological fluid sample.

5. "**Change of Control**" of a person means (i) any reorganization, merger or consolidation of such person, other than a transaction or series of related transactions in which the holders of the voting securities of such person outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of such person or such other surviving or resulting entity or (ii) a sale, lease or other disposition of all or substantially all of the assets of such person.

6. "**Client Accessible Software**" means Software related to the TheranOS which may be accessed through the Devices or at a designated website or IP address, disc, programs or other designated location.

7. "**Confidential Information**" means this Agreement and all the terms herein and all information Discloser discloses to Recipient in connection with the performance of this Agreement. Confidential Information may not be marked as such at the time of disclosure and will still be considered Confidential Information so long as Discloser identified or designated the information as confidential at the time of disclosure (or like designation), or Discloser disclosed the information in circumstances of confidence, or the information would be understood by the parties exercising reasonable business judgment to be confidential. "Confidential Information" does not include information which: (a) is or becomes generally known through no fault of Recipient; (b) is known to Recipient at the time of disclosure, as evidenced by its records; (c) is hereafter furnished to Recipient by a third party as a matter of right and without restriction on disclosure; (d) is independently developed by Recipient without any breach of this Agreement; (e) is, in response to a valid order of a court or other governmental body, or is otherwise required by law to be, disclosed, provided Recipient, as the responding party, gives sufficient notice to Discloser to enable it to take protective measures; or (f) is otherwise necessary to establish rights or enforce obligations under this Agreement, but only to the extent that any such disclosure is necessary.

8. "**Device**" means Theranos' reader capable of running Cartridges, extracting data from a Cartridge or other analytical device, transmitting data to a database hosted by Theranos, communicating with authorized parties and providing analytical information.

9. "**Deliverable**" means any Hardware, Software, Cartridge, Device, Theranos System, Support and Maintenance Services and/or training to be provided by Theranos to Safeway under this Agreement.

10. "**Discloser**" means the party disclosing Confidential Information.

11. "**Hardware**" means equipment and hardware Theranos is to deliver pursuant to this Agreement.

-26-

Theranos and Safeway Confidential and Proprietary


*redefining healthcare*

12. "**Program**" means the project outlined in Schedule A.

13. "**Program Schedule**" has the meaning set forth in Schedule A.

14. "**Recipient**" means the party receiving Confidential Information from Discloser.

15. "**Regulatory Approvals**" means Theranos having received such clearances, approvals, authorizations, waivers, licenses, registrations and permits under applicable laws, rules and regulations, including without limitation, the Clinical Laboratory Improvement Amendments of 1988 and the regulations promulgated thereunder ("CLIA"), and/or the Federal Food, Drug and Cosmetic Act and the regulations promulgated thereunder, as necessary to use the Device at retail for Current Procedural Terminology (CPT) codes representing at least ninety percent (90%) of retail lab volume.

16. "**Representatives**" mean each party's employees, directors, officers, contractors, consultants, stockholders and agents.

17. "**Software**" means Theranos computer programs or programming in object code format, to be delivered pursuant to this Agreement including the TheranOS, whether incorporated in the Hardware or delivered separately, and whether or not there is a separate charge therefor.  The term "**Software**" also includes updates, enhancements and new versions delivered pursuant to this Agreement.

18. "**Support and Maintenance Services(s)**" means support and maintenance services that Theranos will provide Safeway, as more fully set forth in Schedule C.

19. "**Test**" means (a) in the context of routine laboratory analyses, a combination of one or more Assays that match existing CPT codes for laboratory analyses as defined by the American Medical Association or (b) in the context of diagnostic or predictive tests, a Cartridge.

20. "**TheranOS**" means Theranos' ambulatory bioinformatics communication system, database, analytical engine, algorithms and methodologies, web or device accessible Software, and related statistical and other analysis methods, data repositories, data, and technologies.

21. "**Theranos System**" means the system comprising the Assays, Cartridges, Device(s), and the TheranOS, and any other components developed by or for Theranos facilitating the operation of any of the foregoing, alone or in any combination.

*[remainder of page intentionally left blank]*

Theranos and Safeway Confidential and Proprietary

HIGHLY CONFIDENTIAL

SWYSEC_000000027



*theranos*
redefining healthcare

**SCHEDULE F-1**

**FORM OF INITIAL NOTE**

**CONVERTIBLE NOTE**

**THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, OR UNDER THE SECURITIES LAWS OF CERTAIN STATES.  THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.  THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE ISSUER THAT SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS.**

**THERANOS, INC.**

**CONVERTIBLE PROMISSORY NOTE**

$10,000,000                                                                    September __, 2010

FOR VALUE RECEIVED, Theranos, Inc., a Delaware corporation (the "Company") promises to pay to Safeway Inc., a Delaware corporation ("Investor"), or its registered assigns, in lawful money of the United States of America the principal sum of Ten Million Dollars ($10,000,000), or such lesser amount as shall equal the outstanding principal amount hereof, together with interest from the date of this Convertible Promissory Note (this "Note") on the unpaid principal balance at a rate equal to 0.79 percent (0.79%) per annum, computed on the basis of the actual number of days elapsed and a year of 365 days.  All unpaid principal, together with any then unpaid and accrued interest and other amounts payable hereunder, shall be due and payable on the Maturity Date (as defined below) in accordance with the terms hereof.  This Note is issued pursuant to that certain Master Purchase Agreement by and between the Company and Investor dated September __, 2010 (the "Master Purchase Agreement").  All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Master Purchase Agreement.

The following is a statement of the rights of Investor and the conditions to which this Note is subject, and to which Investor, by the acceptance of this Note, agrees:

1.      **Payments.**

(a)  Interest.  Accrued interest on this Note shall be payable on the Maturity Date.

(b)  The "Maturity Date" shall be the earlier of:

      i.   the date of the Company's Initial Public Offering;

      ii.  the effective date of a Change of Control of the Company;

      iii. thirty (30) calendar days following expiration or termination of the Master Purchase Agreement;

-28-



iv.  when, upon or after the occurrence of an Event of Default, the amounts due and payable under this Note are declared due and payable by Investor or made automatically due and payable in accordance with the terms hereof; or

v.  September ___, 2015.

(c)  <u>No Usury</u>.  This Note is hereby expressly limited so that in no event whatsoever, whether by reason of deferment or advancement of loan proceeds, acceleration of maturity of the loan evidenced hereby, or otherwise, shall the amount paid or agreed to be paid to Investor hereunder for the loan, use, forbearance or detention of money exceed the maximum interest rate permitted by the laws of the State of California.  If at any time the performance of this Note, or any provision hereof, involves a payment exceeding the limit of the price that may be validly charged for the loan, use, forbearance or detention of money under applicable law, then automatically and retroactively, ipso facto, the obligation to be performed shall be reduced to such limit, it being the specific intent of the Company and Investor that all payments under this Note are to be credited first to interest as permitted by law, but not in excess of (i) the agreed rate of interest set forth in this Note, or (ii) that permitted by law, whichever is the lesser, and the balance toward the reduction of principal.  The provisions of this paragraph shall never be superseded or waived and shall control every other provision of this Note.

(d)  <u>Voluntary Prepayment</u>. Unless waived in writing by the Company, if the Third Inventory Payment is not made in accordance with, and subject to, the Master Purchase Agreement within thirty (30) days after the Company notifies Investor in writing that such Third Inventory Payment is due pursuant to the Master Purchase Agreement, the Company has the right to repay this Note without penalty, in whole or in part, plus any accrued and unpaid interest on the portion being prepaid, and Investor is obligated to accept full repayment of the Note within thirty (30) calendar days from the date of Company's written request.

(e)  <u>Events of Default</u>.  The occurrence of any of the following shall constitute an "Event of Default" under this Note:

   i.  <u>Acceleration due to Bankruptcy or Insolvency Proceedings</u>.  (A) The Company shall apply for or consent to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, be unable, or admit in writing its inability, to pay its debts generally as they mature, make a general assignment for the benefit of itself or any of its creditors, be dissolved or liquidated, become insolvent (as such term may be defined or interpreted under any applicable statute), commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it, or take any action for the purpose of effecting any of the foregoing; or (B) proceedings for the appointment of a receiver, trustee, liquidator or custodian of the Company or of all or a substantial part of the property thereof, or an involuntary case or other proceedings seeking liquidation, reorganization or other relief with respect to the Company or the debts thereof under any bankruptcy, insolvency or other similar law now or hereafter in effect shall be commenced and an order for relief entered or such proceeding shall not be dismissed or discharged within thirty (30) calendar days of commencement;

   ii.  <u>Failure to Pay</u>.  The Company shall fail to pay (A) when due any principal or interest payment on the due date hereunder or (B) any other payment required under the terms of this Note on the date due and such payment shall not have



been made within thirty (30) calendar days of the Company's receipt of Investor's written notice to the Company of such failure to pay;

iii. <u>Covenant</u>.  The Company fails or neglects to perform, keep or observe any other term, provision, covenant or agreement contained in this Note and as to any such default under such other term, provision, condition, covenant or agreement that can be cured, has failed to cure such default within thirty (30) calendar days after the occurrence of such default;

iv. <u>Attachments; Levies</u>.  Any material portion of the Company's assets is attached, seized, subjected to writ or distress warrant, or is levied upon, or comes into the possession of any trustee, receiver or person acting in a similar capacity and such attachment, seizure, writ or distress warrant or levy has not been removed, discharged or rescinded within thirty (30) calendar days, or the Company is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of its business affairs, or a judgment or other claim becomes a lien or encumbrance upon any material portion of the Company's assets, or a notice of lien, levy or assessment is filed of record with respect to any of the Company's assets by the United States government, or any department, agency, or instrumentality thereof, or by any state, county, municipal, or governmental agency, and the same is not paid within thirty (30) calendar days after the Company receives notice thereof; or

v. <u>Enforceability</u>.  This Note shall in any material respect cease to be, or the Company asserts that this Note is not, a legal, valid and binding obligation of the Company enforceable in accordance with its terms.

(f) <u>Rights of Investor upon Default</u>. Upon the occurrence or existence of any Event of Default (other than an Event of Default described in Section 1(c)(i)) and at any time thereafter during the continuance of such Event of Default, Investor may, by written notice to the Company, declare all outstanding Obligations payable by the Company hereunder to be immediately due and payable without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived.  Upon the occurrence or existence of any Event of Default described in Section 1(c)(i), immediately and without notice, all outstanding Obligations payable by the Company hereunder shall automatically become immediately due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived.  In addition to the foregoing remedies, upon the occurrence or existence of any Event of Default, Investor may exercise any other right power or remedy granted to it by this Note or otherwise permitted to it by law, either by suit in equity or by action at law, or both.

**2.      Representations and Warranties of the Company**.  The Company hereby represents and warrants to Investor as of the date of issuance as follows:

(a) <u>Organization and Standing; Certificate of Incorporation and Bylaws</u>.   The Company is a corporation duly organized and existing under the laws of the jurisdiction of its incorporation and is in good standing under such laws.  The Company has the requisite corporate power and authority to own and operate its properties and assets, and to carry on its business as presently conducted.

(b) <u>Corporate Power</u>.   The Company has all requisite corporate power to execute, issue, sell, perform under, and deliver this Note.  This Note constitutes a valid and legally binding obligation of the Company, enforceable against the Company in accordance with its terms, subject, as to enforcement of remedies, to applicable bankruptcy, insolvency, moratorium, reorganization and similar laws affecting creditors' rights generally and to general equitable principles of law.

HIGHLY CONFIDENTIAL                                                                          SWYSEC_000000030



**theranos**
redefining healthcare

(c) <u>No Violation or Default</u>.  The Company is not in violation of or default on any term of its Certificate of Incorporation or Bylaws, or other charter documents, as each is in effect on the date hereof, or, to the Company's knowledge, any provision of any mortgage, indenture, contract, agreement, instrument, judgment, decree, order, rule or regulation or other restriction to which the Company is a party or by which it is bound, the breach of or default under which would have a material adverse effect on the condition, financial or otherwise, business or operations of the Company or, to the Company's knowledge, of any provision of any federal, state or other applicable statute, rule or regulation applicable to the Company a violation of which would have a material adverse effect on the condition, financial or otherwise, business or operations of the Company.

(d) <u>No Conflict</u>.  The execution, delivery and performance by the Company of this Note will not conflict with, or result in a breach of any of the terms of, or constitute a default under, (i) to the Company's knowledge, any provision of any federal, state or other applicable statute, rule or regulation applicable to the Company the violation of which would have a material adverse effect on the condition, financial or otherwise, business or operations of the Company, (ii) the Company's Certificate of Incorporation or Bylaws, as amended and in effect on the date hereof, or (iii) to the Company's knowledge, any provision of any mortgage, indenture, contract, agreement, instrument, judgment, decree, order, rule or regulation or other restriction to which the Company is a party or by which it is bound, the breach of or default under which would have a material adverse effect on the condition, financial or otherwise, business or operations of the Company, or result in the creation of any mortgage, pledge, lien, encumbrance or charge upon any of the properties or assets of the Company pursuant to any such term.

(e) <u>Capitalization; Preemptive Rights; Compliance with Securities Laws</u>.

   i.  Concurrently with the execution and delivery of this Note and immediately prior to the conversion of this Note, the Company shall deliver to the Investor a copy of the Charter and a schedule showing the capitalization of the Company as of such date, certified by the President or Chief Financial Officer of the Company as being true and correct.  Such capitalization schedule shall include (A) the number of shares of each series and class of preferred stock (the "Existing Preferred Stock") that are issued and outstanding as of such date; (B) the number of shares of each series and class of Common Stock (such Common Stock together with the Existing Preferred Stock, the "Shares") that are issued and outstanding as of such date; (C) the number of Shares or other securities that the Company has reserved for issuance upon conversion of each class and series of the Shares; (D) the number of Shares or other securities reserved for issuance to employees, consultants and directors pursuant to each outstanding stock option or other equity incentive plan and the number of Shares or other securities issuable upon exercise or conversion of issued and outstanding options or other securities outstanding under each such plan; and (E) the number of Shares or other securities reserved for issuance upon exercise or conversion of outstanding warrants or other securities exercisable for or convertible into Shares or other securities.

   ii.  All issued and outstanding shares of the Company's Common Stock and Existing Preferred Stock (i) have been duly authorized and validly issued and are fully paid and nonassessable and have been approved by all requisite stockholder action, and (ii) were issued in compliance with all applicable state and federal laws concerning the issuance of securities.

   iii.  The shares of the Series C-1 (as defined below), when issued and delivered in compliance with the provisions of this Note will be validly issued, fully paid and nonassessable.  The reservation of shares of Common Stock for issuance upon conversion of the Series C-1 (the "Conversion Shares") have been duly and validly reserved and, when issued in compliance with the provisions of this Note, the Charter

HIGHLY CONFIDENTIAL                                                                      SWYSEC_000000031



and applicable law, will be validly issued, fully paid and nonassessable. The Series C-1 and the Conversion Shares will be free of any liens or encumbrances, other than any liens or encumbrances created by or imposed upon the Investor; provided, however, that the Series C-1 and the Conversion Shares are subject to restrictions on transfer under U.S. state and/or federal securities laws and as set forth herein and in the applicable rights agreement.

 iv. Except for the conversion privileges of the Existing Preferred Stock, the rights provided pursuant to the applicable rights and co-sale agreements, or as otherwise described in this Note, there are no options, warrants or other rights to purchase any of the Company's authorized and unissued capital stock

(f) <u>Litigation</u>.  There are no actions, suits, proceedings or investigations pending against the Company or its properties (nor has the Company received written notice of any threat thereof) before any court or governmental agency, including, without limitation, any action that questions the validity of the Master Purchase Agreement or this Note or the right of the Company to enter into them, or the right of the Company to perform its obligations contemplated thereby.  The Company is not a party or subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality

(g) <u>Intellectual Property</u>.

 i. Rights. The Company owns or possesses or can obtain on commercially reasonable terms sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses (software or otherwise), information, processes and other proprietary rights ("Intellectual Property") necessary to the business of the Company as presently conducted and as now proposed to be conducted in the Company's business plan or other written materials provided to Investor. The Company has not violated or infringed, and by operating its business as currently proposed to be conducted will not violate or infringe, any Intellectual Property of any other person or entity; provided, however, that the Company's representation in this sentence is made only to the Company's knowledge with respect to patent rights and trademark rights. The Company owns all right, title, and interest in and to each such patent and patent application. The Company has not received any communications alleging that the Company has violated or infringed on any Intellectual Property of any other person or entity.

 ii. Licenses; Other Agreements. The Company has not granted, and there are not outstanding, any options, licenses or agreements relating to the Intellectual Property, and the Company is not bound by or a party to any options, licenses or agreements with respect to the Intellectual Property of any other person or entity.

 iii. Proprietary Information and Invention Assignment. Each current and former employee and consultant of the Company has executed a confidential information and invention assignment agreement, substantially in the form delivered to counsel for Investor. No employee has excluded any inventions or intellectual property from assignment to the Company under such confidential information and invention assignment agreement. The Company is not aware that any employee or consultant of the Company is obligated under any agreement (including licenses, covenants or commitments of any nature) or subject to any judgment, decree or order of any court or administrative agency, or any other restriction that would interfere with the use of his or her best efforts to carry out his or her duties for the Company or to promote the interests of the Company or that would conflict with the Company's business as proposed to be conducted. The carrying on of the Company's business by the employees and consultants of the Company and the

HIGHLY CONFIDENTIAL             SWYSEC_000000032



conduct of the Company's business as presently proposed, will not, to the Company's knowledge, conflict with or result in a material breach of the terms, conditions or provisions of, or constitute a default under, any material contract, covenant or instrument under which any of such employees or consultants or the Company is now obligated. The Company does not presently believe it is or will be necessary to utilize any inventions of any existing employees of the Company made prior to their employment by the Company. To the Company's knowledge, at no time during the conception of or reduction of any of the Company's proprietary assets to practice was any developer, inventor or other contributor thereto subject to any employment agreement or invention assignment or nondisclosure agreement or other obligation with any third party that could reasonably be expected to adversely affect the Company's rights in such proprietary assets.

(h)  <u>Interest Rate</u>.  Theranos has not issued any promissory note or other debt instrument to a retailer or other partner with an interest rate greater than 0.79% per annum.

(i)  <u>Disclosure</u>.  The Company has fully provided Investor with information that Investor has requested for deciding whether to purchase the Securities (as defined below) and all information that the Company believes is reasonably necessary to enable Investor to make such decision. Neither this Note, nor any other agreements, statements or certificates made or delivered in connection herewith or therewith contains any untrue statement of a material fact or, when taken together, omits to state a material fact necessary to make the statements herein or therein, in light of the circumstances under which they were made, not misleading.

3.  Representations and Warranties of Investor.  Investor hereby represents and warrants to the Company with respect to the sale of this Note, and the issuance of the securities issuable upon conversion of this Note (and any shares of common stock or other securities issued upon conversion of such securities) (collectively, the "Securities") as of the date of issuance as follows:

(a)  <u>Authorization</u>.  Investor has the full power and authority to enter into this Note and this Note constitutes a valid and legally binding obligation of Investor, enforceable against Investor in accordance with its terms, subject, as to enforcement of remedies, to applicable bankruptcy, insolvency, moratorium, reorganization and similar laws affecting creditors' rights generally and to general equitable principles of law.

(b)  <u>Experience</u>.  Investor is experienced in investing in the securities of development stage companies such as the Company and acknowledges that investment in the Securities involves a number of significant risks.  Investor is able to fend for itself, can bear the economic risk of its investment, including the full loss of its investment, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in the Securities.  Investor also represents it was not organized solely for the purpose of acquiring the Securities.

(c)  <u>Purchase Entirely for Its Own Account</u>. Investor is acquiring the Securities for investment for its own account and not with the view to, or for resale in connection with, any distribution thereof. Investor understands that the Securities to be purchased have not been registered under the Securities Act of 1933, as amended (the "Act"), by reason of a specific exemption from the registration provisions of the Act which depends upon, among other things, the bona fide nature of the investment intent as expressed herein.

(d)  <u>Rule 144</u>.  Investor acknowledges that the Securities are "restricted securities" under Rule 144 promulgated under the Act inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that under such laws and applicable regulations such Securities may not be transferred or resold except as permitted under the Act and the

Theranos and Safeway Confidential and Proprietary                                                        -33-

HIGHLY CONFIDENTIAL


*redefining healthcare*

applicable state securities laws, pursuant to registration or an exemption therefrom.  Investor represents that it is aware of the provisions of Rule 144 promulgated under the Act and understands the resale limitations imposed thereby and by the Act.  Investor also understands that the Company is entering into this Note in reliance upon Investor's representations and warranties contained herein, and that any federal or state exemption is contingent upon, the accuracy of Investor's representations and warranties in this Note.

(e) <u>No Public Market</u>.  Investor understands that no public market now exists for any of the securities issued by the Company and that there can be no assurance that a public market will ever exist for the Securities.  Accordingly, Investor understands that it may be required to hold the Securities indefinitely.

(f) <u>Accredited Investor</u>.  Investor represents that it is an "accredited investor" within the meaning of Rule 501 of Regulation D promulgated by the Securities and Exchange Commission under the Act.

**4.       Conversion.**

(a) <u>Optional Conversion</u>. At any time on or following the occurrence of a Conversion Event, Investor may elect to convert the entire outstanding principal amount of this Note into fully paid and nonassessable shares of the Company's Series C-1 Preferred Stock (the "Series C-1") at the Conversion Price.  All accrued and unpaid interest on this Note shall be paid in full in cash and not in shares of capital stock upon the occurrence of a Conversion Event.

(b) <u>Conversion Procedure</u>.

    i.   <u>Conversion Pursuant to Section 4(a)</u>.  Before Investor shall be entitled to convert this Note into shares of Series C-1, it shall surrender this Note (or a notice to the effect that the original Note has been lost, stolen or destroyed and an agreement acceptable to the Company whereby the holder agrees to indemnify the Company from any loss incurred by it in connection with this Note) and give written notice to the Company at its principal corporate office of the election to convert the same pursuant to Section 4(a).  Upon such conversion of this Note, Investor hereby agrees to execute and deliver to the Company a purchase agreement and other ancillary agreements (including, without limitation, an investor rights agreement providing for customary registration, information and preemptive rights), with customary representations and warranties and transfer restrictions (including, without limitation, a 180-day lock-up agreement in connection with an Initial Public Offering).  The Company shall, as soon as practicable thereafter, issue and deliver to such Investor a certificate or certificates for the number of shares of Series C-1 to which Investor shall be entitled upon such conversion, including a check payable to Investor for any cash amounts payable as described in Section 4(b)(ii).  On and after the date of conversion the Persons who have received the shares of Series C-1 issuable upon such conversion shall be treated for all purposes as the record holder of such shares.

    ii.   <u>Fractional Shares; Interest; Effect of Conversion</u>. No fractional shares shall be issued upon conversion of this Note.  In lieu of the Company issuing any fractional shares to Investor upon the conversion of this Note, the Company shall pay to Investor an amount equal to the product obtained by multiplying the applicable Conversion Price by the fraction of a share not issued pursuant to the previous sentence.  The Company shall pay to Investor any interest accrued on the amount converted and on the amount to be paid to Investor pursuant to the previous sentence in cash and not in shares of capital stock upon the conversion of this Note.  Upon conversion of this Note in full and the payment of the amounts specified in this Section 4, the Company shall be forever released from all

HIGHLY CONFIDENTIAL                                                                      SWYSEC_000000034



its obligations and liabilities under this Note and this Note shall be deemed of no further force or effect, whether or not the original of this Note has been delivered to the Company for cancellation.

iii.  <u>Adjustments</u>.  Notwithstanding anything herein to the contrary, if the Company issues shares of preferred stock or other securities conferring the right to purchase shares of preferred stock of the Company or securities convertible into, or exchangeable for (with or without additional consideration), preferred stock of the Company at any time prior to the conversion of this Note, then the conversion price shall not be greater than the lowest price per share paid in such issuance.  If the Company shall at any time prior to the issuance of the shares of Series C-1 or other shares issuable upon conversion of this Note subdivide such shares (by stock split, stock dividend or the like) or combine such shares (by reverse split or the like), the number of such shares issuable on the conversion of this Note shall be proportionately increased in the case of a subdivision or stock dividend, or proportionately decreased in the case of a combination.  Appropriate adjustments shall also be made to the purchase price payable per share, but the aggregate purchase price payable for the total number of shares issuable upon conversion of this Note (as adjusted) shall remain the same.

5.      **Definitions.** As used in this Note, the following capitalized terms have the following meanings:

"Conversion Event" shall mean the payment by Investor (or an affiliate of Investor) of the Third Inventory Payment (subject to Section 10 of Schedule B of the Master Purchase Agreement).

"Conversion Price" shall be $15.00, subject to adjustment as set forth in this Note.

"Initial Public Offering" shall mean the closing of the Company's first firm commitment underwritten initial public offering of the Company's Common Stock pursuant to a registration statement filed under the Securities Act.

"Investor" shall mean the Person specified in the introductory paragraph of this Note or any Person who shall at the time be the registered holder of this Note.

"Obligations" shall mean and include all loans, advances, debts, liabilities and obligations, howsoever arising, owed by the Company to Investor of every kind and description (whether or not evidenced by any note or instrument and whether or not for the payment of money), now existing or hereafter arising under or pursuant to the terms of this Note, including, all interest, fees, charges, expenses, attorneys' fees and costs and accountants' fees and costs chargeable to and payable by the Company hereunder and thereunder, in each case, whether direct or indirect, absolute or contingent, due or to become due, and whether or not arising after the commencement of a proceeding under Title 11 of the United States Code (11 U. S. C. Section 101 et seq.), as amended from time to time (including post-petition interest) and whether or not allowed or allowable as a claim in any such proceeding.

"Person" shall mean and include an individual, a partnership, a corporation (including a business trust), a joint stock company, a limited liability company, an unincorporated association, a joint venture or other entity or a governmental authority.

"Securities Act" shall mean the Securities Act of 1933, as amended.

HIGHLY CONFIDENTIAL                                                                                                    SWYSEC_000000035


*theranos*
*redefining healthcare*

**6.**    **Miscellaneous.**

(a)  <u>Successors and Assigns; Transfer of this Note or Securities Issuable on Conversion Hereof</u>.

      i.   Subject to the restrictions on transfer described in this Section 4(a), the rights and obligations of the Company and Investor shall be binding upon and benefit the permitted successors, assigns, heirs, administrators and transferees of the parties.

      ii.  Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, in whole or in part, by Investor to any legal entity or person, other than a wholly-owned subsidiary of Investor or in connection with a Change of Control of Investor.

      iii. Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, by operation of law or otherwise, in whole or in part, by the Company.

(b)  <u>Waiver and Amendment</u>.  Any provision of this Note may be amended, waived or modified upon the written consent of the Company and Investor.

(c)  <u>Notices</u>.  All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing and faxed, mailed or delivered to each party at the respective addresses of the parties as set forth in the signature page to this Note, or such other address as a party may specify.  All such notices and communications will be deemed effectively given the earlier of (i) when delivered personally, (ii) one (1) business day after being delivered by facsimile (with receipt of appropriate confirmation), (iii) one (1) business day after being deposited with an overnight courier service of recognized standing or (iv) four (4) calendar days after being deposited in the U.S. mail, first class with postage prepaid.

(d)  <u>Payment</u>.  Unless converted into the Company's equity securities pursuant to the terms hereof, payment shall be made in lawful tender of the United States.

(e)  <u>Governing Law; Jurisdiction</u>.  This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of California, without regard to the conflicts of law provisions of the State of California, or of any other state. For any disputes arising out of or in connection with this Note, the parties consent to the personal and exclusive jurisdiction of, and venue in, the state and federal courts within Santa Clara County, California.

(f)  <u>Counterparts</u>.  This Note may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Note.

(g)  <u>California Corporate Securities Law</u>.

      THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS NOTE HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF SUCH SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO SUCH QUALIFICATION IS UNLAWFUL UNLESS THE SALE OF SECURITIES IS EXEMPT FROM SUCH QUALIFICATION.  THE RIGHTS OF ALL PARTIES TO THIS NOTE ARE EXPRESSLY CONDITIONED UPON SUCH QUALIFICATION BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT.

HIGHLY CONFIDENTIAL                                                                SWYSEC_000000036



(h) <u>Severability</u>.  In the event that any provision of this Note becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, this Note shall continue in full force and effect without said provision; provided that no such severability shall be effective if it materially changes the economic benefit of this Note to any party.

(i) <u>Survival of Representations and Warranties</u>.  The representations and warranties of the parties contained in or made pursuant to this Note shall survive the execution and delivery of this Note.

*[remainder of page intentionally left blank]*

HIGHLY CONFIDENTIAL                                                                     SWYSEC_000000037



theranos
redefining healthcare

The Company has caused this Note to be issued as of the date first written above.

> THERANOS, INC.,
> a Delaware corporation
>
> By:_____
> Its:_____
> Address: 3200 Hillview Avenue
>         Palo Alto, CA  94304

Acknowledged and accepted by Investor:
SAFEWAY INC.

By:_____
Its:_____
Address:  5918 Stoneridge Mall Road
         Pleasanton, CA  94588

Theranos and Safeway Confidential and Proprietary

HIGHLY CONFIDENTIAL

-38-



**SCHEDULE F-2**

**FORM OF ADDITIONAL NOTE**

**CONVERTIBLE NOTE**

**THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE ISSUER THAT SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS.**

**THERANOS, INC.**

**CONVERTIBLE PROMISSORY NOTE**

$15,000,000                                                         _____, 201_

FOR VALUE RECEIVED, Theranos, Inc., a Delaware corporation (the "Company") promises to pay to Safeway Inc., a Delaware corporation ("Investor"), or its registered assigns, in lawful money of the United States of America the principal sum of Fifteen Million Dollars ($15,000,000), or such lesser amount as shall equal the outstanding principal amount hereof, together with interest from the date of this Convertible Promissory Note (this "Note") on the unpaid principal balance at a rate equal to 0.79 percent (0.79%) per annum, computed on the basis of the actual number of days elapsed and a year of 365 days. All unpaid principal, together with any then unpaid and accrued interest and other amounts payable hereunder, shall be due and payable on the Maturity Date (as defined below) in accordance with the terms hereof. This Note is issued pursuant to that certain Master Purchase Agreement by and between the Company and Investor dated September __ , 2010 (the "Master Purchase Agreement"). All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Master Purchase Agreement.

The following is a statement of the rights of Investor and the conditions to which this Note is subject, and to which Investor, by the acceptance of this Note, agrees:

1. **Payments.**

   (a) <u>Interest</u>.  Accrued interest on this Note shall be payable on the Maturity Date.

   (b) <u>The "Maturity Date" shall be the earlier of</u>:

        i.  the date of the Company's Initial Public Offering;

        ii.  the effective date of a Change of Control of the Company;

        iii.  thirty (30) calendar days following expiration or termination of the Master Purchase Agreement;

Theranos and Safeway Confidential and Proprietary

HIGHLY CONFIDENTIAL                                         SWYSEC_000000039



*theranos*
redefining healthcare

    iv.   when, upon or after the occurrence of an Event of Default, the amounts due and payable under this Note are declared due and payable by Investor or made automatically due and payable in accordance with the terms hereof; or

    v.   _____, 201_[1].

(c) <u>No Usury</u>.  This Note is hereby expressly limited so that in no event whatsoever, whether by reason of deferment or advancement of loan proceeds, acceleration of maturity of the loan evidenced hereby, or otherwise, shall the amount paid or agreed to be paid to Investor hereunder for the loan, use, forbearance or detention of money exceed the maximum interest rate permitted by the laws of the State of California.  If at any time the performance of this Note, or any provision hereof, involves a payment exceeding the limit of the price that may be validly charged for the loan, use, forbearance or detention of money under applicable law, then automatically and retroactively, ipso facto, the obligation to be performed shall be reduced to such limit, it being the specific intent of the Company and Investor that all payments under this Note are to be credited first to interest as permitted by law, but not in excess of (i) the agreed rate of interest set forth in this Note, or (ii) that permitted by law, whichever is the lesser, and the balance toward the reduction of principal.  The provisions of this paragraph shall never be superseded or waived and shall control every other provision of this Note.

(d) <u>Voluntary Prepayment</u>.  Unless waived in writing by the Company, if the Third Inventory Payment is not made in accordance with, and subject to, the Master Purchase Agreement within thirty (30) days after the Company notifies Investor in writing that such Third Inventory Payment is due pursuant to the Master Purchase Agreement, the Company has the right to repay this Note without penalty, in whole or in part, plus any accrued and unpaid interest on the portion being prepaid, and Investor is obligated to accept full repayment of the Note within thirty (30) calendar days from the date of Company's written request.

(e) <u>Events of Default</u>.  The occurrence of any of the following shall constitute an "Event of Default" under this Note:

    i.   <u>Acceleration due to Bankruptcy or Insolvency Proceedings</u>.  (A) The Company shall apply for or consent to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, be unable, or admit in writing its inability, to pay its debts generally as they mature, make a general assignment for the benefit of itself or any of its creditors, be dissolved or liquidated, become insolvent (as such term may be defined or interpreted under any applicable statute), commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it, or take any action for the purpose of effecting any of the foregoing; or (B) proceedings for the appointment of a receiver, trustee, liquidator or custodian of the Company or of all or a substantial part of the property thereof, or an involuntary case or other proceedings seeking liquidation, reorganization or other relief with respect to the Company or the debts thereof under any bankruptcy, insolvency or other similar law now or hereafter in effect shall be commenced and an order for relief entered or such proceeding shall not be dismissed or discharged within thirty (30) calendar days of commencement;

    ii.   <u>Failure to Pay</u>.  The Company shall fail to pay (A) when due any principal or interest payment on the due date hereunder or (B) any other payment required under the terms of this Note on the date due and such payment shall not have been made within thirty

---

[1] Five-year anniversary of issuance of Additional Note.

Theranos and Safeway Confidential and Proprietary

-40-

HIGHLY CONFIDENTIAL


*redefining healthcare*

(30) calendar days of the Company's receipt of Investor's written notice to the Company of such failure to pay;

iii. <u>Covenant</u>. The Company fails or neglects to perform, keep or observe any other term, provision, covenant or agreement contained in this Note and as to any such default under such other term, provision, condition, covenant or agreement that can be cured, has failed to cure such default within thirty (30) calendar days after the occurrence of such default;

iv. <u>Attachments; Levies</u>. Any material portion of the Company's assets is attached, seized, subjected to writ or distress warrant, or is levied upon, or comes into the possession of any trustee, receiver or person acting in a similar capacity and such attachment, seizure, writ or distress warrant or levy has not been removed, discharged or rescinded within thirty (30) calendar days, or the Company is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of its business affairs, or a judgment or other claim becomes a lien or encumbrance upon any material portion of the Company's assets, or a notice of lien, levy or assessment is filed of record with respect to any of the Company's assets by the United States government, or any department, agency, or instrumentality thereof, or by any state, county, municipal, or governmental agency, and the same is not paid within thirty (30) calendar days after the Company receives notice thereof; or

v. <u>Enforceability</u>. This Note shall in any material respect cease to be, or the Company asserts that this Note is not, a legal, valid and binding obligation of the Company enforceable in accordance with its terms.

(f) <u>Rights of Investor upon Default</u>. Upon the occurrence or existence of any Event of Default (other than an Event of Default described in Section 1(c)(i)) and at any time thereafter during the continuance of such Event of Default, Investor may, by written notice to the Company, declare all outstanding Obligations payable by the Company hereunder to be immediately due and payable without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived. Upon the occurrence or existence of any Event of Default described in Section 1(c)(i), immediately and without notice, all outstanding Obligations payable by the Company hereunder shall automatically become immediately due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived. In addition to the foregoing remedies, upon the occurrence or existence of any Event of Default, Investor may exercise any other right power or remedy granted to it by this Note or otherwise permitted to it by law, either by suit in equity or by action at law, or both.

2. **Representations and Warranties of the Company**. The Company hereby represents and warrants to Investor as of the date of issuance as follows:

(a) <u>Organization and Standing; Certificate of Incorporation and Bylaws</u>. The Company is a corporation duly organized and existing under the laws of the jurisdiction of its incorporation and is in good standing under such laws. The Company has the requisite corporate power and authority to own and operate its properties and assets, and to carry on its business as presently conducted.

(b) <u>Corporate Power</u>. The Company has all requisite corporate power to execute, issue, sell, perform under, and deliver this Note. This Note constitutes a valid and legally binding obligation of the Company, enforceable against the Company in accordance with its terms, subject, as to enforcement of remedies, to applicable bankruptcy, insolvency, moratorium, reorganization and similar laws affecting creditors' rights generally and to general equitable principles of law.

Theranos and Safeway Confidential and Proprietary

HIGHLY CONFIDENTIAL                                                                       SWYSEC_000000041


*theranos*
redefining healthcare

(c) <u>No Violation or Default</u>. The Company is not in violation of or default on any term of its Certificate of Incorporation or Bylaws, or other charter documents, as each is in effect on the date hereof, or, to the Company's knowledge, any provision of any mortgage, indenture, contract, agreement, instrument, judgment, decree, order, rule or regulation or other restriction to which the Company is a party or by which it is bound, the breach of or default under which would have a material adverse effect on the condition, financial or otherwise, business or operations of the Company or, to the Company's knowledge, of any provision of any federal, state or other applicable statute, rule or regulation applicable to the Company a violation of which would have a material adverse effect on the condition, financial or otherwise, business or operations of the Company.

(d) <u>No Conflicts</u>. The execution, delivery and performance by the Company of this Note will not conflict with, or result in a breach of any of the terms of, or constitute a default under, (i) to the Company's knowledge, any provision of any federal, state or other applicable statute, rule or regulation applicable to the Company the violation of which would have a material adverse effect on the condition, financial or otherwise, business or operations of the Company, (ii) the Company's Certificate of Incorporation or Bylaws, as amended and in effect on the date hereof, or (iii) to the Company's knowledge, any provision of any mortgage, indenture, contract, agreement, instrument, judgment, decree, order, rule or regulation or other restriction to which the Company is a party or by which it is bound, the breach of or default under which would have a material adverse effect on the condition, financial or otherwise, business or operations of the Company, or result in the creation of any mortgage, pledge, lien, encumbrance or charge upon any of the properties or assets of the Company pursuant to any such term.

(e) <u>Capitalization; Preemptive Rights; Compliance with Securities Laws</u>.

    i. Concurrently with the execution and delivery of this Note and immediately prior to the conversion of this Note, the Company shall deliver to the Investor a copy of the Charter and a schedule showing the capitalization of the Company as of such date, certified by the President or Chief Financial Officer of the Company as being true and correct. Such capitalization schedule shall include (A) the number of shares of each series and class of preferred stock (the "Existing Preferred Stock") that are issued and outstanding as of such date; (B) the number of shares of each series and class of Common Stock (such Common Stock together with the Existing Preferred Stock, the "Shares") that are issued and outstanding as of such date; (C) the number of Shares or other securities that the Company has reserved for issuance upon conversion of each class and series of the Shares; (D) the number of Shares or other securities reserved for issuance to employees, consultants and directors pursuant to each outstanding stock option or other equity incentive plan and the number of Shares or other securities issuable upon exercise or conversion of issued and outstanding options or other securities outstanding under each such plan; and (E) the number of Shares or other securities reserved for issuance upon exercise or conversion of outstanding warrants or other securities exercisable for or convertible into Shares or other securities.

    ii. All issued and outstanding shares of the Company's Common Stock and Existing Preferred Stock (i) have been duly authorized and validly issued and are fully paid and nonassessable and have been approved by all requisite stockholder action, and (ii) were issued in compliance with all applicable state and federal laws concerning the issuance of securities.

    iii. The shares of the Preferred Stock (as defined below), when issued and delivered in compliance with the provisions of this Note will be validly issued, fully paid and nonassessable. The reservation of shares of Common Stock for issuance upon conversion of the Preferred Stock (the "Conversion Shares") have been duly and validly reserved and, when issued in compliance with the provisions of this Note, the Charter and applicable law, will be validly issued, fully paid and nonassessable. The Preferred Stock and the Conversion Shares will be free of any liens or encumbrances, other than

Theranos and Safeway Confidential and Proprietary

-42-



any liens or encumbrances created by or imposed upon the Investor; provided, however, that the Preferred Stock and the Conversion Shares are subject to restrictions on transfer under U.S. state and/or federal securities laws and as set forth herein and in the applicable rights agreement.

    iv.   Except for the conversion privileges of the Existing Preferred Stock, the rights provided pursuant to the applicable rights and co-sale agreements, or as otherwise described in this Note, there are no options, warrants or other rights to purchase any of the Company's authorized and unissued capital stock

(f)   <u>Litigation</u>.   There are no actions, suits, proceedings or investigations pending against the Company or its properties (nor has the Company received written notice of any threat thereof) before any court or governmental agency, including, without limitation, any action that questions the validity of the Master Purchase Agreement or this Note or the right of the Company to enter into them, or the right of the Company to perform its obligations contemplated thereby. The Company is not a party or subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality

(g)   <u>Intellectual Property</u>.

    i.   <u>Rights</u>. The Company owns or possesses or can obtain on commercially reasonable terms sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses (software or otherwise), information, processes and other proprietary rights ("Intellectual Property") necessary to the business of the Company as presently conducted and as now proposed to be conducted in the Company's business plan or other written materials provided to Investor. The Company has not violated or infringed, and by operating its business as currently proposed to be conducted will not violate or infringe, any Intellectual Property of any other person or entity; provided, however, that the Company's representation in this sentence is made only to the Company's knowledge with respect to patent rights and trademark rights. The Company owns all right, title, and interest in and to each such patent and patent application. The Company has not received any communications alleging that the Company has violated or infringed on any Intellectual Property of any other person or entity.

    ii.   <u>Licenses; Other Agreements</u>. The Company has not granted, and there are not outstanding, any options, licenses or agreements relating to the Intellectual Property, and the Company is not bound by or a party to any options, licenses or agreements with respect to the Intellectual Property of any other person or entity.

    iii.   <u>Proprietary Information and Invention Assignment</u>. Each current and former employee and consultant of the Company has executed a confidential information and invention assignment agreement, substantially in the form delivered to counsel for Investor. No employee has excluded any inventions or intellectual property from assignment to the Company under such confidential information and invention assignment agreement. The Company is not aware that any employee or consultant of the Company is obligated under any agreement (including licenses, covenants or commitments of any nature) or subject to any judgment, decree or order of any court or administrative agency, or any other restriction that would interfere with the use of his or her best efforts to carry out his or her duties for the Company or to promote the interests of the Company or that would conflict with the Company's business as proposed to be conducted. The carrying on of the Company's business by the employees and consultants of the Company and the conduct of the Company's business as presently proposed, will not, to the Company's knowledge, conflict with or result in a material breach of the terms, conditions or provisions of, or constitute a default under, any material contract, covenant or instrument under which any of such employees or consultants or the Company is now obligated. The

HIGHLY CONFIDENTIAL



Company does not presently believe it is or will be necessary to utilize any inventions of any existing employees of the Company made prior to their employment by the Company. To the Company's knowledge, at no time during the conception of or reduction of any of the Company's proprietary assets to practice was any developer, inventor or other contributor thereto subject to any employment agreement or invention assignment or nondisclosure agreement or other obligation with any third party that could reasonably be expected to adversely affect the Company's rights in such proprietary assets.

(h) <u>Interest Rate</u>.  Theranos has not issued any promissory note or other debt instrument to a retailer or other partner with an interest rate greater than 0.79% per annum.

(i) <u>Disclosure</u>.   The Company has fully provided Investor with information that Investor has requested for deciding whether to purchase the Securities (as defined below) and all information that the Company believes is reasonably necessary to enable Investor to make such decision. Neither this Note, nor any other agreements, statements or certificates made or delivered in connection herewith or therewith contains any untrue statement of a material fact or, when taken together, omits to state a material fact necessary to make the statements herein or therein, in light of the circumstances under which they were made, not misleading.

**3.**   **Representations and Warranties of Investor**.  Investor hereby represents and warrants to the Company with respect to the sale of this Note, and the issuance of the securities issuable upon conversion of this Note (and any shares of common stock or other securities issued upon conversion of such securities) (collectively, the "Securities") as of the date of issuance as follows:

(a) <u>Authorization</u>.  Investor has the full power and authority to enter into this Note and this Note constitutes a valid and legally binding obligation of Investor, enforceable against Investor in accordance with its terms, subject, as to enforcement of remedies, to applicable bankruptcy, insolvency, moratorium, reorganization and similar laws affecting creditors' rights generally and to general equitable principles of law.

(b) <u>Experience</u>.   Investor is experienced in investing in the securities of development stage companies such as the Company and acknowledges that investment in the Securities involves a number of significant risks.  Investor is able to fend for itself, can bear the economic risk of its investment, including the full loss of its investment, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in the Securities. Investor also represents it was not organized solely for the purpose of acquiring the Securities.

(c) <u>Purchase Entirely for Its Own Account</u>. Investor is acquiring the Securities for investment for its own account and not with the view to, or for resale in connection with, any distribution thereof. Investor understands that the Securities to be purchased have not been registered under the Securities Act of 1933, as amended (the "Act"), by reason of a specific exemption from the registration provisions of the Act which depends upon, among other things, the bona fide nature of the investment intent as expressed herein.

(d) <u>Rule 144</u>.  Investor acknowledges that the Securities are "restricted securities" under Rule 144 promulgated under the Act inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that under such laws and applicable regulations such Securities may not be transferred or resold except as permitted under the Act and the applicable state securities laws, pursuant to registration or an exemption therefrom.  Investor represents that it is aware of the provisions of Rule 144 promulgated under the Act and understands the resale limitations imposed thereby and by the Act.  Investor also understands that the Company is entering into this Note in reliance upon Investor's representations and warranties contained herein, and that any federal or state exemption is contingent upon, the accuracy of Investor's representations and warranties in this Note.

Theranos and Safeway Confidential and Proprietary

HIGHLY CONFIDENTIAL                                                                                     SWYSEC_000000044


*theranos*
redefining healthcare

(e) <u>No Public Market</u>.  Investor understands that no public market now exists for any of the securities issued by the Company and that there can be no assurance that a public market will ever exist for the Securities.  Accordingly, Investor understands that it may be required to hold the Securities indefinitely.

(f) <u>Accredited Investor</u>.  Investor represents that it is an "accredited investor" within the meaning of Rule 501 of Regulation D promulgated by the Securities and Exchange Commission under the Act.

**4.  Conversion.**

(a) <u>Optional Conversion</u>. At any time on or following the occurrence of a Conversion Event, Investor may elect to convert the entire outstanding principal amount of this Note into fully paid and nonassessable shares of the Company's [name of equity security] (the "Preferred Stock") at the Conversion Price.  All accrued and unpaid interest on this Note shall be paid in full in cash and not in shares of capital stock upon the occurrence of a Conversion Event.

(b) Conversion Procedure.

　　　i.  <u>Conversion Pursuant to Section 4(a).</u>  Before Investor shall be entitled to convert this Note into shares of Preferred Stock, it shall surrender this Note (or a notice to the effect that the original Note has been lost, stolen or destroyed and an agreement acceptable to the Company whereby the holder agrees to indemnify the Company from any loss incurred by it in connection with this Note) and give written notice to the Company at its principal corporate office of the election to convert the same pursuant to Section 4(a). Upon such conversion of this Note, Investor hereby agrees to execute and deliver to the Company a purchase agreement and other ancillary agreements (including, without limitation, an investor rights agreement providing for customary registration, information and preemptive rights), with customary representations and warranties and transfer restrictions (including, without limitation, a 180-day lock-up agreement in connection with an Initial Public Offering).  The Company shall, as soon as practicable thereafter, issue and deliver to such Investor a certificate or certificates for the number of shares of Preferred Stock to which Investor shall be entitled upon such conversion, including a check payable to Investor for any cash amounts payable as described in Section 4(b)(ii). On and after the date of conversion the Persons who have received the shares of Preferred Stock issuable upon such conversion shall be treated for all purposes as the record holder of such shares.

　　　ii.  <u>Fractional Shares; Interest; Effect of Conversion</u>. No fractional shares shall be issued upon conversion of this Note.  In lieu of the Company issuing any fractional shares to Investor upon the conversion of this Note, the Company shall pay to Investor an amount equal to the product obtained by multiplying the applicable Conversion Price by the fraction of a share not issued pursuant to the previous sentence. The Company shall pay to Investor any interest accrued on the amount converted and on the amount to be paid to Investor pursuant to the previous sentence in cash and not in shares of capital stock upon the conversion of this Note.  Upon conversion of this Note in full and the payment of the amounts specified in this Section 4, the Company shall be forever released from all its obligations and liabilities under this Note and this Note shall be deemed of no further force or effect, whether or not the original of this Note has been delivered to the Company for cancellation.

　　　iii.  <u>Adjustments</u>.  Notwithstanding anything herein to the contrary, if the Company issues shares of preferred stock or other securities conferring the right to purchase shares of preferred stock of the Company or securities convertible into, or exchangeable for (with or without additional consideration), preferred stock of the Company at any time prior to the conversion of this Note, then the conversion price shall not be greater than the lowest

-45-



price per share paid in such issuance.  If the Company shall at any time prior to the issuance of the Preferred Stock or other shares issuable upon conversion of this Note subdivide such shares (by stock split, stock dividend or the like), or combine such shares (by reverse split or the like), the number of such shares issuable on the conversion of this Note shall be proportionately increased in the case of a subdivision or stock dividend, or proportionately decreased in the case of a combination.  Appropriate adjustments shall also be made to the purchase price payable per share, but the aggregate purchase price payable for the total number of shares issuable upon conversion of this Note (as adjusted) shall remain the same.

5.  **Definitions.** As used in this Note, the following capitalized terms have the following meanings:

"Conversion Event" shall mean the payment by Investor (or an affiliate of Investor) of the Third Inventory Payment (subject to Section 10 of Schedule B of the Master Purchase Agreement).

"Conversion Price" shall mean $_____, subject to adjustment as set forth in this Note.

"Initial Public Offering" shall mean the closing of the Company's first firm commitment underwritten initial public offering of the Company's Common Stock pursuant to a registration statement filed under the Securities Act.

"Investor" shall mean the Person specified in the introductory paragraph of this Note or any Person who shall at the time be the registered holder of this Note.

"Obligations" shall mean and include all loans, advances, debts, liabilities and obligations, howsoever arising, owed by the Company to Investor of every kind and description (whether or not evidenced by any note or instrument and whether or not for the payment of money), now existing or hereafter arising under or pursuant to the terms of this Note, including, all interest, fees, charges, expenses, attorneys' fees and costs and accountants' fees and costs chargeable to and payable by the Company hereunder and thereunder, in each case, whether direct or indirect, absolute or contingent, due or to become due, and whether or not arising after the commencement of a proceeding under Title 11 of the United States Code (11 U. S. C. Section 101 et seq.), as amended from time to time (including post-petition interest) and whether or not allowed or allowable as a claim in any such proceeding.

"Person" shall mean and include an individual, a partnership, a corporation (including a business trust), a joint stock company, a limited liability company, an unincorporated association, a joint venture or other entity or a governmental authority.

"Securities Act" shall mean the Securities Act of 1933, as amended.

6.  **Miscellaneous.**

(a)  Successors and Assigns; Transfer of this Note or Securities Issuable on Conversion Hereof.

    i.  Subject to the restrictions on transfer described in this Section 4(a), the rights and obligations of the Company and Investor shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties.

    ii.  Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, in whole or in part, by Investor to any legal entity or person, other than a wholly-owned subsidiary of Investor or in connection with a Change of Control of Investor.

Theranos and Safeway Confidential and Proprietary

HIGHLY CONFIDENTIAL

SWYSEC_000000046



iii.  Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, by operation of law or otherwise, in whole or in part, by the Company.

(b)  <u>Waiver and Amendment</u>.  Any provision of this Note may be amended, waived or modified upon the written consent of the Company and Investor.

(c)  <u>Notices</u>.  All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing and faxed, mailed or delivered to each party at the respective addresses of the parties as set forth in the signature page to this Note, or such other address as a party may specify.  All such notices and communications will be deemed effectively given the earlier of (i) when delivered personally, (ii) one (1) business day after being delivered by facsimile (with receipt of appropriate confirmation), (iii) one (1) business day after being deposited with an overnight courier service of recognized standing or (iv) four (4) calendar days after being deposited in the U.S. mail, first class with postage prepaid.

(d)  <u>Payment</u>.  Unless converted into the Company's equity securities pursuant to the terms hereof, payment shall be made in lawful tender of the United States.

(e)  <u>Governing Law; Jurisdiction</u>.  This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of California, without regard to the conflicts of law provisions of the State of California, or of any other state. For any disputes arising out of or in connection with this Note, the parties consent to the personal and exclusive jurisdiction of, and venue in, the state and federal courts within Santa Clara County, California.

(f)  <u>Counterparts</u>.  This Note may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Note.

(g)  <u>California Corporate Securities Law</u>.

> THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS NOTE HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF SUCH SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO SUCH QUALIFICATION IS UNLAWFUL UNLESS THE SALE OF SECURITIES IS EXEMPT FROM SUCH QUALIFICATION.  THE RIGHTS OF ALL PARTIES TO THIS NOTE ARE EXPRESSLY CONDITIONED UPON SUCH QUALIFICATION BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT.

(h)  <u>Severability</u>.  In the event that any provision of this Note becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, this Note shall continue in full force and effect without said provision; provided that no such severability shall be effective if it materially changes the economic benefit of this Note to any party.

(i)  <u>Survival of Representations and Warranties</u>.  The representations and warranties of the parties contained in or made pursuant to this Note shall survive the execution and delivery of this Note.

*[remainder of page intentionally left blank]*

The Company has caused this Note to be issued as of the date first written above.

THERANOS, INC.,
a Delaware corporation

By:_____
Its:_____
Address: 3200 Hillview Avenue
           Palo Alto, CA  94304

Acknowledged and accepted by Investor:
SAFEWAY INC.

By:_____
Its:_____
Address:  5918 Stoneridge Mall Road
          Pleasanton, CA  94588

Theranos and Safeway Confidential and Proprietary

HIGHLY CONFIDENTIAL

SWYSEC_000000048

**SCHEDULE G**

**Food Retailers**

Blackhawk Network Participants

Affiliated Foods Southwest, Inc.
Ahold USA
Albertsons LLC
Alex Lee Inc. (incl. Lowe's Food Stores)
Arden Group Inc. (Gelsons)
Associated Food Stores (Salt Lake City)
Associated Grocers, Inc. (Baton Rouge)
Associated Grocers of the South, Inc. (Birmingham)
Associated Wholesale Grocers, Inc.
Associated Wholesalers, Inc.
B & R Stores Inc.
Bashas' Inc.
Bi-Lo, LLC
Big Y Foods Inc.
Binghampton Giant Market, Inc.
Brookshire Grocery Co.
Buehler Food Markets Inc.
Butera Finer Foods, Inc.
C&S Wholesale Grocers Inc. (incl. Grand Union)
Certco Inc. (Madison, WI distributor)
Costco Cos.
D'Agostino Supermarkets Inc.
Dave's Supermarkets, Inc.
Delhaize America Inc (Food Lion, Hannaford, Sweetbay, Kash and Karry)
Foodland Super Markets Ltd.(Honolulu)
Foodmaster Super Markets
Fresh & Easy Neighborhood Market, Inc. (Tesco)
Gerlands Food Fair Inc.
Giant Eagle Inc
Golub Corp. (Price Chopper)
Great A & P Tea Co. (incl. Pathmark)
Grocery Outlet, Inc.
H E Butt Grocery Co.
Haggens Inc.
Harmon City Inc.
Harps Food Stores Inc.
Heinen's Inc.
Hy Vee, Inc.
Ingles Markets Inc.
J.H. Harvey Co., LLC (Harvey's Supermarkets, part of Delhaize)
J. Winkler & Sons Inc. (Indiana)
Key Food Stores Co-op Inc. (NJ)
King Kullen Grocery Co. Inc.
Kings Super Markets Inc.
Kroger Co.
KVAT  Food Stores Inc.
Laurel Grocery Company LLC

Marsh Supermarkets Inc.
McKeever Enterprises, Inc.
Meijer, Inc.
Minyard Food Stores Inc.
Moran Foods, Inc.
Nash Finch Co.
Norkus Enterprises Inc. (Foodtown)
Penn Traffic Co.
Piggly Wiggly Holdings, LLC (South Carolina)
Piggly Wiggly Midwest, LLC
Publix Super Markets Inc.
QSI, Inc. (Times Supermarket, Hawaii)
Quick Chek Corporation
Raleys Supermarkets
Reasor's LLC.
Ridley's Food Corp.
Riesbeck Food Markets Inc.
Rosauers Supermarkets Inc.
Roundy's Supermarkets
Rouse Enterprises LLC
Ruddick Corp. (Harris Teeter)
Safeway Inc.
Save Mart Supermarkets Inc.
Schnuck Markets Inc.
Sears Holding Corp. (incl. K-Mart)
ShopKo Stores Inc.
Southern Family Markets LLC (part of C&S)
Stater Bros. Markets
SuperValu Inc.
Tops Markets LLC
Ukrops Super Markets Inc. (now Ahold USA)
Unified Grocers, Inc.
United Supermarkets, LLC
Wakefern Food Corp.
Wegmans Food Markets Inc.
Weis Markets Inc.
Winn-Dixie Stores, Inc.
Woodmans Food Markets Inc.

In the event that Safeway's Blackhawk Network subsidiary adds one or more new partners to its network, Safeway will provide written notice thereof to Theranos, and this Schedule G will be amended to reflect the addition of such new partner(s) without any further action of the parties.

-50-

HIGHLY CONFIDENTIAL                    SWYSEC_000000050

## SCHEDULE H

## THERANOS PHARMACEUTICAL CLINICAL TRIALS INFRASTRUCTURE

Final terms for extending Theranos' clinical trials infrastructure to Safeway's stores shall be agreed upon following execution of this Agreement.  At that time, this Schedule will be completed accordingly, and this Agreement amended, if warranted.

-51-

# Exhibit B

## CONVERTIBLE NOTE

**THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, OR UNDER THE SECURITIES LAWS OF CERTAIN STATES.  THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.  THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE ISSUER THAT SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS.**

### THERANOS, INC.

### CONVERTIBLE PROMISSORY NOTE

$10,000,000                                                                             December 30, 2011


FOR VALUE RECEIVED, Tehran's, Inc., a Delaware corporation (the "Company") promises to pay to Safeway Inc., a Delaware corporation ("Investor"), or its registered assigns, in lawful money of the United States of America the principal sum of Ten Million Dollars ($10,000,000), or such lesser amount as shall equal the outstanding principal amount hereof, together with interest from the date of this Convertible Promissory Note (this "Note") on the unpaid principal balance at a rate equal to 0.79 percent (0.79%) per annum, computed on the basis of the actual number of days elapsed and a year of 365 days.  All unpaid principal, together with any then unpaid and accrued interest and other amounts payable hereunder, shall be due and payable on the Maturity Date (as defined below) in accordance with the terms hereof.  This Note is issued pursuant to that certain Master Purchase Agreement by and between the Company and Investor dated September 20, 2010 (the "Master Purchase Agreement").  All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Master Purchase Agreement.

The following is a statement of the rights of Investor and the conditions to which this Note is subject, and to which Investor, by the acceptance of this Note, agrees:

1.      **Payments.**

(a) Interest.  Accrued interest on this Note shall be payable on the Maturity Date.

(b) The "Maturity Date" shall be the earlier of:

  i.   the date of the Company's Initial Public Offering;

  ii.  the effective date of a Change of Control of the Company;

  iii. thirty (30) calendar days following expiration or termination of the Master Purchase Agreement;

  iv.  when, upon or after the occurrence of an Event of Default, the amounts due and payable under this Note are declared due and payable by Investor or made automatically due and payable in accordance with the terms hereof; or

  v.   December 30, 2016.

(c) <u>No Usury</u>.  This Note is hereby expressly limited so that in no event whatsoever, whether by reason of deferment or advancement of loan proceeds, acceleration of maturity of the loan evidenced hereby, or otherwise, shall the amount paid or agreed to be paid to Investor hereunder

for the loan, use, forbearance or detention of money exceed the maximum interest rate permitted by the laws of the State of California.  If at any time the performance of this Note, or any provision hereof, involves a payment exceeding the limit of the price that may be validly charged for the loan, use, forbearance or detention of money under applicable law, then automatically and retroactively, ipso facto, the obligation to be performed shall be reduced to such limit, it being the specific intent of the Company and Investor that all payments under this Note are to be credited first to interest as permitted by law, but not in excess of (i) the agreed rate of interest set forth in this Note, or (ii) that permitted by law, whichever is the lesser, and the balance toward the reduction of principal.  The provisions of this paragraph shall never be superseded or waived and shall control every other provision of this Note.

(d)  Voluntary Prepayment.  Unless waived in writing by the Company, if the Third Inventory Payment is not made in accordance with, and subject to, the Master Purchase Agreement within thirty (30) days after the Company notifies Investor in writing that such Third Inventory Payment is due pursuant to the Master Purchase Agreement, the Company has the right to repay this Note without penalty, in whole or in part, plus any accrued and unpaid interest on the portion being prepaid, and Investor is obligated to accept full repayment of the Note within thirty (30) calendar days from the date of Company's written request.

(e)  Events of Default.  The occurrence of any of the following shall constitute an "Event of Default" under this Note:

   i.   Acceleration due to Bankruptcy or Insolvency Proceedings.  (A) The Company shall apply for or consent to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, be unable, or admit in writing its inability, to pay its debts generally as they mature, make a general assignment for the benefit of itself or any of its creditors, be dissolved or liquidated, become insolvent (as such term may be defined or interpreted under any applicable statute), commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it, or take any action for the purpose of effecting any of the foregoing; or (B) proceedings for the appointment of a receiver, trustee, liquidator or custodian of the Company or of all or a substantial part of the property thereof, or an involuntary case or other proceedings seeking liquidation, reorganization or other relief with respect to the Company or the debts thereof under any bankruptcy, insolvency or other similar law now or hereafter in effect shall be commenced and an order for relief entered or such proceeding shall not be dismissed or discharged within thirty (30) calendar days of commencement;

   ii.  Failure to Pay.  The Company shall fail to pay (A) when due any principal or interest payment on the due date hereunder or (B) any other payment required under the terms of this Note on the date due and such payment shall not have been made within thirty (30) calendar days of the Company's receipt of Investor's written notice to the Company of such failure to pay;

   iii. Covenant.  The Company fails or neglects to perform, keep or observe any other term, provision, covenant or agreement contained in this Note and as to any such default under such other term, provision, condition, covenant or agreement that can be cured, has failed to cure such default within thirty (30) calendar days after the occurrence of such default;

   iv.  Attachments; Levies.  Any material portion of the Company's assets is attached, seized, subjected to writ or distress warrant, or is levied upon, or comes into the possession of any trustee, receiver or person acting in a similar capacity and

SWYSEC_000000062

such attachment, seizure, writ or distress warrant or levy has not been removed, discharged or rescinded within thirty (30) calendar days, or the Company is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of its business affairs, or a judgment or other claim becomes a lien or encumbrance upon any material portion of the Company's assets, or a notice of lien, levy or assessment is filed of record with respect to any of the Company's assets by the United States government, or any department, agency, or instrumentality thereof, or by any state, county, municipal, or governmental agency, and the same is not paid within thirty (30) calendar days after the Company receives notice thereof; or

    v.   <u>Enforceability</u>. This Note shall in any material respect cease to be, or the Company asserts that this Note is not, a legal, valid and binding obligation of the Company enforceable in accordance with its terms.

(f)  <u>Rights of Investor upon Default</u>. Upon the occurrence or existence of any Event of Default (other than an Event of Default described in Section 1(c)(i)) and at any time thereafter during the continuance of such Event of Default, Investor may, by written notice to the Company, declare all outstanding Obligations payable by the Company hereunder to be immediately due and payable without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived. Upon the occurrence or existence of any Event of Default described in Section 1(c)(i), immediately and without notice, all outstanding Obligations payable by the Company hereunder shall automatically become immediately due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived. In addition to the foregoing remedies, upon the occurrence or existence of any Event of Default, Investor may exercise any other right power or remedy granted to it by this Note or otherwise permitted to it by law, either by suit in equity or by action at law, or both.

**2.**    **Representations and Warranties of the Company**. The Company hereby represents and warrants to Investor as of the date of issuance as follows:

(a)  <u>Organization and Standing; Certificate of Incorporation and Bylaws</u>. The Company is a corporation duly organized and existing under the laws of the jurisdiction of its incorporation and is in good standing under such laws. The Company has the requisite corporate power and authority to own and operate its properties and assets, and to carry on its business as presently conducted.

(b)  <u>Corporate Power</u>. The Company has all requisite corporate power to execute, issue, sell, perform under, and deliver this Note. This Note constitutes a valid and legally binding obligation of the Company, enforceable against the Company in accordance with its terms, subject, as to enforcement of remedies, to applicable bankruptcy, insolvency, moratorium, reorganization and similar laws affecting creditors' rights generally and to general equitable principles of law.

(c)  <u>No Violation or Default</u>. The Company is not in violation of or default on any term of its Certificate of Incorporation or Bylaws, or other charter documents, as each is in effect on the date hereof, or, to the Company's knowledge, any provision of any mortgage, indenture, contract, agreement, instrument, judgment, decree, order, rule or regulation or other restriction to which the Company is a party or by which it is bound, the breach of or default under which would have a material adverse effect on the condition, financial or otherwise, business or operations of the Company or, to the Company's knowledge, of any provision of any federal, state or other applicable statute, rule or regulation applicable to the Company a violation of which would have a material adverse effect on the condition, financial or otherwise, business or operations of the Company.

(d)  <u>No Conflict</u>. The execution, delivery and performance by the Company of this Note will not conflict with, or result in a breach of any of the terms of, or constitute a default under, (i) to the Company's knowledge, any provision of any federal, state or other applicable statute, rule or regulation applicable to the Company the violation of which would have a material adverse effect

SWYSEC_000000063

on the condition, financial or otherwise, business or operations of the Company, (ii) the Company's Certificate of Incorporation or Bylaws, as amended and in effect on the date hereof, or (iii) to the Company's knowledge, any provision of any mortgage, indenture, contract, agreement, instrument, judgment, decree, order, rule or regulation or other restriction to which the Company is a party or by which it is bound, the breach of or default under which would have a material adverse effect on the condition, financial or otherwise, business or operations of the Company, or result in the creation of any mortgage, pledge, lien, encumbrance or charge upon any of the properties or assets of the Company pursuant to any such term.

(e) <u>Capitalization; Preemptive Rights; Compliance with Securities Laws</u>.

   i.   Concurrently with the execution and delivery of this Note and immediately prior to the conversion of this Note, the Company shall deliver to the Investor a copy of the Charter and a schedule showing the capitalization of the Company as of such date, certified by the President or Chief Financial Officer of the Company as being true and correct.  Such capitalization schedule shall include (A) the number of shares of each series and class of preferred stock (the "Existing Preferred Stock") that are issued and outstanding as of such date; (B) the number of shares of each series and class of Common Stock (such Common Stock together with the Existing Preferred Stock, the "Shares") that are issued and outstanding as of such date; (C) the number of Shares or other securities that the Company has reserved for issuance upon conversion of each class and series of the Shares; (D) the number of Shares or other securities reserved for issuance to employees, consultants and directors pursuant to each outstanding stock option or other equity incentive plan and the number of Shares or other securities issuable upon exercise or conversion of issued and outstanding options or other securities outstanding under each such plan; and (E) the number of Shares or other securities reserved for issuance upon exercise or conversion of outstanding warrants or other securities exercisable for or convertible into Shares or other securities.

   ii.  All issued and outstanding shares of the Company's Common Stock and Existing Preferred Stock (i) have been duly authorized and validly issued and are fully paid and nonassessable and have been approved by all requisite stockholder action, and (ii) were issued in compliance with all applicable state and federal laws concerning the issuance of securities.

   iii. The shares of the Series C-1 (as defined below), when issued and delivered in compliance with the provisions of this Note will be validly issued, fully paid and nonassessable.  The reservation of shares of Common Stock for issuance upon conversion of the Series C-1 (the "Conversion Shares") have been duly and validly reserved and, when issued in compliance with the provisions of this Note, the Charter and applicable law, will be validly issued, fully paid and nonassessable. The Series C-1 and the Conversion Shares will be free of any liens or encumbrances, other than any liens or encumbrances created by or imposed upon the Investor; provided, however, that the Series C-1 and the Conversion Shares are subject to restrictions on transfer under U.S. state and/or federal securities laws and as set forth herein and in the applicable rights agreement.

   iv.  Except for the conversion privileges of the Existing Preferred Stock, the rights provided pursuant to the applicable rights and co-sale agreements, or as otherwise described in this Note, there are no options, warrants or other rights to purchase any of the Company's authorized and unissued capital stock

(f) <u>Litigation</u>.   There are no actions, suits, proceedings or investigations pending against the Company or its properties (nor has the Company received written notice of any threat thereof) before any court or governmental agency, including, without limitation, any action that questions the validity of the Master Purchase Agreement or this Note or the right of the Company to enter into them, or the right of the Company to perform its obligations contemplated thereby.  The

SWYSEC_000000064

Company is not a party or subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality

(g) Intellectual Property.

    i. Rights. The Company owns or possesses or can obtain on commercially reasonable terms sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses (software or otherwise), information, processes and other proprietary rights ("Intellectual Property") necessary to the business of the Company as presently conducted and as now proposed to be conducted in the Company's business plan or other written materials provided to Investor. The Company has not violated or infringed, and by operating its business as currently proposed to be conducted will not violate or infringe, any Intellectual Property of any other person or entity; provided, however, that the Company's representation in this sentence is made only to the Company's knowledge with respect to patent rights and trademark rights. The Company owns all right, title, and interest in and to each such patent and patent application. The Company has not received any communications alleging that the Company has violated or infringed on any Intellectual Property of any other person or entity.

    ii. Licenses; Other Agreements. The Company has not granted, and there are not outstanding, any options, licenses or agreements relating to the Intellectual Property, and the Company is not bound by or a party to any options, licenses or agreements with respect to the Intellectual Property of any other person or entity.

    iii. Proprietary Information and Invention Assignment. Each current and former employee and consultant of the Company has executed a confidential information and invention assignment agreement, substantially in the form delivered to counsel for Investor. No employee has excluded any inventions or intellectual property from assignment to the Company under such confidential information and invention assignment agreement. The Company is not aware that any employee or consultant of the Company is obligated under any agreement (including licenses, covenants or commitments of any nature) or subject to any judgment, decree or order of any court or administrative agency, or any other restriction that would interfere with the use of his or her best efforts to carry out his or her duties for the Company or to promote the interests of the Company or that would conflict with the Company's business as proposed to be conducted. The carrying on of the Company's business by the employees and consultants of the Company and the conduct of the Company's business as presently proposed, will not, to the Company's knowledge, conflict with or result in a material breach of the terms, conditions or provisions of, or constitute a default under, any material contract, covenant or instrument under which any of such employees or consultants or the Company is now obligated. The Company does not presently believe it is or will be necessary to utilize any inventions of any existing employees of the Company made prior to their employment by the Company. To the Company's knowledge, at no time during the conception of or reduction of any of the Company's proprietary assets to practice was any developer, inventor or other contributor thereto subject to any employment agreement or invention assignment or nondisclosure agreement or other obligation with any third party that could reasonably be expected to adversely affect the Company's rights in such proprietary assets.

(h) Interest Rate. Theranos has not issued any promissory note or other debt instrument to a retailer or other partner with an interest rate greater than 0.79% per annum.

(i) Disclosure.   The Company has fully provided Investor with information that Investor has requested for deciding whether to purchase the Securities (as defined below) and all information that the Company believes is reasonably necessary to enable Investor to make such decision. Neither this Note, nor any other agreements, statements or certificates made or delivered in connection herewith or therewith contains any untrue statement of a material fact or, when taken

SWYSEC_000000065

together, omits to state a material fact necessary to make the statements herein or therein, in light of the circumstances under which they were made, not misleading.

3.     Representations and Warranties of Investor.  Investor hereby represents and warrants to the Company with respect to the sale of this Note, and the issuance of the securities issuable upon conversion of this Note (and any shares of common stock or other securities issued upon conversion of such securities) (collectively, the "Securities") as of the date of issuance as follows:

(a)  Authorization.  Investor has the full power and authority to enter into this Note and this Note constitutes a valid and legally binding obligation of Investor, enforceable against Investor in accordance with its terms, subject, as to enforcement of remedies, to applicable bankruptcy, insolvency, moratorium, reorganization and similar laws affecting creditors' rights generally and to general equitable principles of law.

(b)  Experience.   Investor is experienced in investing in the securities of development stage companies such as the Company and acknowledges that investment in the Securities involves a number of significant risks.  Investor is able to fend for itself, can bear the economic risk of its investment, including the full loss of its investment, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in the Securities.  Investor also represents it was not organized solely for the purpose of acquiring the Securities.

(c)  Purchase Entirely for Its Own Account.  Investor is acquiring the Securities for investment for its own account and not with the view to, or for resale in connection with, any distribution thereof. Investor understands that the Securities to be purchased have not been registered under the Securities Act of 1933, as amended (the "Act"), by reason of a specific exemption from the registration provisions of the Act which depends upon, among other things, the bona fide nature of the investment intent as expressed herein.

(d)  Rule 144.  Investor acknowledges that the Securities are "restricted securities" under Rule 144 promulgated under the Act inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that under such laws and applicable regulations such Securities may not be transferred or resold except as permitted under the Act and the applicable state securities laws, pursuant to registration or an exemption therefrom.  Investor represents that it is aware of the provisions of Rule 144 promulgated under the Act and understands the resale limitations imposed thereby and by the Act.  Investor also understands that the Company is entering into this Note in reliance upon Investor's representations and warranties contained herein, and that any federal or state exemption is contingent upon, the accuracy of Investor's representations and warranties in this Note.

(e)  No Public Market.  Investor understands that no public market now exists for any of the securities issued by the Company and that there can be no assurance that a public market will ever exist for the Securities.  Accordingly, Investor understands that it may be required to hold the Securities indefinitely.

(f)  Accredited Investor.  Investor represents that it is an "accredited investor" within the meaning of Rule 501 of Regulation D promulgated by the Securities and Exchange Commission under the Act.

4.     Conversion.

(a)  Optional Conversion. At any time on or following the occurrence of a Conversion Event, Investor may elect to convert the entire outstanding principal amount of this Note into fully paid and nonassessable shares of the Company's Series C-1 Preferred Stock (the "Series C-1") at the Conversion Price.  All accrued and unpaid interest on this Note shall be paid in full in cash and not in shares of capital stock upon the occurrence of a Conversion Event.

SWYSEC_000000066

(b) <u>Conversion Procedure</u>.

    i.  <u>Conversion Pursuant to Section 4(a)</u>.  Before Investor shall be entitled to convert this Note into shares of Series C-1, it shall surrender this Note (or a notice to the effect that the original Note has been lost, stolen or destroyed and an agreement acceptable to the Company whereby the holder agrees to indemnify the Company from any loss incurred by it in connection with this Note) and give written notice to the Company at its principal corporate office of the election to convert the same pursuant to Section 4(a).  Upon such conversion of this Note, Investor hereby agrees to execute and deliver to the Company a purchase agreement and other ancillary agreements (including, without limitation, an investor rights agreement providing for customary registration, information and preemptive rights), with customary representations and warranties and transfer restrictions (including, without limitation, a 180-day lock-up agreement in connection with an Initial Public Offering).  The Company shall, as soon as practicable thereafter, issue and deliver to such Investor a certificate or certificates for the number of shares of Series C-1 to which Investor shall be entitled upon such conversion, including a check payable to Investor for any cash amounts payable as described in Section 4(b)(ii).  On and after the date of conversion the Persons who have received the shares of Series C-1 issuable upon such conversion shall be treated for all purposes as the record holder of such shares.

    ii.  <u>Fractional Shares; Interest; Effect of Conversion</u>.  No fractional shares shall be issued upon conversion of this Note.  In lieu of the Company issuing any fractional shares to Investor upon the conversion of this Note, the Company shall pay to Investor an amount equal to the product obtained by multiplying the applicable Conversion Price by the fraction of a share not issued pursuant to the previous sentence.  The Company shall pay to Investor any interest accrued on the amount converted and on the amount to be paid to Investor pursuant to the previous sentence in cash and not in shares of capital stock upon the conversion of this Note.  Upon conversion of this Note in full and the payment of the amounts specified in this Section 4, the Company shall be forever released from all its obligations and liabilities under this Note and this Note shall be deemed of no further force or effect, whether or not the original of this Note has been delivered to the Company for cancellation.

    iii.  <u>Adjustments</u>.  Notwithstanding anything herein to the contrary, if the Company issues shares of preferred stock or other securities conferring the right to purchase shares of preferred stock of the Company or securities convertible into, or exchangeable for (with or without additional consideration), preferred stock of the Company at any time prior to the conversion of this Note, then the conversion price shall not be greater than the lowest price per share paid in such issuance.  If the Company shall at any time prior to the issuance of the shares of Series C-1 or other shares issuable upon conversion of this Note subdivide such shares (by stock split, stock dividend or the like) or combine such shares (by reverse split or the like), the number of such shares issuable on the conversion of this Note shall be proportionately increased in the case of a subdivision or stock dividend, or proportionately decreased in the case of a combination.  Appropriate adjustments shall also be made to the purchase price payable per share, but the aggregate purchase price payable for the total number of shares issuable upon conversion of this Note (as adjusted) shall remain the same.

**5.**    **Definitions.**  As used in this Note, the following capitalized terms have the following meanings:

"Conversion Event" shall mean the payment by Investor (or an affiliate of Investor) of the Third Inventory Payment (subject to Section 10 of Schedule B of the Master Purchase Agreement).

"Conversion Price" shall be $15.00, subject to adjustment as set forth in this Note.

SWYSEC_000000067

"Initial Public Offering" shall mean the closing of the Company's first firm commitment underwritten initial public offering of the Company's Common Stock pursuant to a registration statement filed under the Securities Act.

"Investor" shall mean the Person specified in the introductory paragraph of this Note or any Person who shall at the time be the registered holder of this Note.

"Obligations" shall mean and include all loans, advances, debts, liabilities and obligations, howsoever arising, owed by the Company to Investor of every kind and description (whether or not evidenced by any note or instrument and whether or not for the payment of money), now existing or hereafter arising under or pursuant to the terms of this Note, including, all interest, fees, charges, expenses, attorneys' fees and costs and accountants' fees and costs chargeable to and payable by the Company hereunder and thereunder, in each case, whether direct or indirect, absolute or contingent, due or to become due, and whether or not arising after the commencement of a proceeding under Title 11 of the United States Code (11 U. S. C. Section 101 et seq.), as amended from time to time (including post-petition interest) and whether or not allowed or allowable as a claim in any such proceeding.

"Person" shall mean and include an individual, a partnership, a corporation (including a business trust), a joint stock company, a limited liability company, an unincorporated association, a joint venture or other entity or a governmental authority.

"Securities Act" shall mean the Securities Act of 1933, as amended.

## 6.      Miscellaneous.

(a)  Successors and Assigns; Transfer of this Note or Securities Issuable on Conversion Hereof.

    i.   Subject to the restrictions on transfer described in this Section 4(a), the rights and obligations of the Company and Investor shall be binding upon and benefit the permitted successors, assigns, heirs, administrators and transferees of the parties.

    ii.  Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, in whole or in part, by Investor to any legal entity or person, other than a wholly-owned subsidiary of Investor or in connection with a Change of Control of Investor.

    iii. Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, by operation of law or otherwise, in whole or in part, by the Company.

(b)  Waiver and Amendment.  Any provision of this Note may be amended, waived or modified upon the written consent of the Company and Investor.

(c)  Notices.  All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing and faxed, mailed or delivered to each party at the respective addresses of the parties as set forth in the signature page to this Note, or such other address as a party may specify.  All such notices and communications will be deemed effectively given the earlier of (i) when delivered personally, (ii) one (1) business day after being delivered by facsimile (with receipt of appropriate confirmation), (iii) one (1) business day after being deposited with an overnight courier service of recognized standing or (iv) four (4) calendar days after being deposited in the U.S. mail, first class with postage prepaid.

(d)  Payment.  Unless converted into the Company's equity securities pursuant to the terms hereof, payment shall be made in lawful tender of the United States.

(e)  Governing Law; Jurisdiction.  This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of California,

without regard to the conflicts of law provisions of the State of California, or of any other state. For any disputes arising out of or in connection with this Note, the parties consent to the personal and exclusive jurisdiction of, and venue in, the state and federal courts within Santa Clara County, California.

(f) <u>Counterparts</u>.  This Note may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Note.

HIGHLY CONFIDENTIAL

(g) <u>California Corporate Securities Law</u>.

THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS NOTE HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF SUCH SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO SUCH QUALIFICATION IS UNLAWFUL UNLESS THE SALE OF SECURITIES IS EXEMPT FROM SUCH QUALIFICATION.  THE RIGHTS OF ALL PARTIES TO THIS NOTE ARE EXPRESSLY CONDITIONED UPON SUCH QUALIFICATION BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT.

(h) <u>Severability</u>.  In the event that any provision of this Note becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, this Note shall continue in full force and effect without said provision; provided that no such severability shall be effective if it materially changes the economic benefit of this Note to any party.

(i) <u>Survival of Representations and Warranties</u>.  The representations and warranties of the parties contained in or made pursuant to this Note shall survive the execution and delivery of this Note.

*[remainder of page intentionally left blank]*

The Company has caused this Note to be issued as of the date first written above.

THERANOS, INC.,
a Delaware corporation

By:_____

Its:_____ CEO

Address: 3200 Hillview Avenue
Palo Alto, CA  94304

Acknowledged and accepted by Investor:
SAFEWAY INC.

By:_____

Its:_____

Address:  5918 Stoneridge Mall Road
Pleasanton, CA  94588

SWYSEC_000000071

HIGHLY CONFIDENTIAL

# Exhibit C

## CONVERTIBLE NOTE

**THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE ISSUER THAT SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS.**

### THERANOS, INC.

### CONVERTIBLE PROMISSORY NOTE

$15,000,000                                                                                         December 30, 2011

FOR VALUE RECEIVED, Theranos, Inc., a Delaware corporation (the "Company") promises to pay to Safeway Inc., a Delaware corporation ("Investor"), or its registered assigns, in lawful money of the United States of America the principal sum of Fifteen Million Dollars ($15,000,000), or such lesser amount as shall equal the outstanding principal amount hereof, together with interest from the date of this Convertible Promissory Note (this "Note") on the unpaid principal balance at a rate equal to 0.79 percent (0.79%) per annum, computed on the basis of the actual number of days elapsed and a year of 365 days. All unpaid principal, together with any then unpaid and accrued interest and other amounts payable hereunder, shall be due and payable on the Maturity Date (as defined below) in accordance with the terms hereof. This Note is issued pursuant to that certain Master Purchase Agreement by and between the Company and Investor dated September 20, 2010 (the "Master Purchase Agreement"). All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Master Purchase Agreement.

The following is a statement of the rights of Investor and the conditions to which this Note is subject, and to which Investor, by the acceptance of this Note, agrees:

1.  **Payments.**

(a)  <u>Interest</u>.  Accrued interest on this Note shall be payable on the Maturity Date.

(b)  <u>The "Maturity Date" shall be the earlier of</u>:

    i.   the date of the Company's Initial Public Offering;

    ii.   the effective date of a Change of Control of the Company;

    iii.   thirty (30) calendar days following expiration or termination of the Master Purchase Agreement;

    iv.   when, upon or after the occurrence of an Event of Default, the amounts due and payable under this Note are declared due and payable by Investor or made automatically due and payable in accordance with the terms hereof; or

    v.   December 30, 2016.

(c)  <u>No Usury</u>.  This Note is hereby expressly limited so that in no event whatsoever, whether by reason of deferment or advancement of loan proceeds, acceleration of maturity of the loan evidenced hereby, or otherwise, shall the amount paid or agreed to be paid to Investor hereunder

for the loan, use, forbearance or detention of money exceed the maximum interest rate permitted by the laws of the State of California. If at any time the performance of this Note, or any provision hereof, involves a payment exceeding the limit of the price that may be validly charged for the loan, use, forbearance or detention of money under applicable law, then automatically and retroactively, ipso facto, the obligation to be performed shall be reduced to such limit, it being the specific intent of the Company and Investor that all payments under this Note are to be credited first to interest as permitted by law, but not in excess of (i) the agreed rate of interest set forth in this Note, or (ii) that permitted by law, whichever is the lesser, and the balance toward the reduction of principal. The provisions of this paragraph shall never be superseded or waived and shall control every other provision of this Note.

(d) <u>Voluntary Prepayment</u>. Unless waived in writing by the Company, if the Third Inventory Payment is not made in accordance with, and subject to, the Master Purchase Agreement within thirty (30) days after the Company notifies Investor in writing that such Third Inventory Payment is due pursuant to the Master Purchase Agreement, the Company has the right to repay this Note without penalty, in whole or in part, plus any accrued and unpaid interest on the portion being prepaid, and Investor is obligated to accept full repayment of the Note within thirty (30) calendar days from the date of Company's written request.

(e) <u>Events of Default</u>. The occurrence of any of the following shall constitute an "Event of Default" under this Note:

    i. <u>Acceleration due to Bankruptcy or Insolvency Proceedings</u>. (A) The Company shall apply for or consent to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, be unable, or admit in writing its inability, to pay its debts generally as they mature, make a general assignment for the benefit of itself or any of its creditors, be dissolved or liquidated, become insolvent (as such term may be defined or interpreted under any applicable statute), commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it, or take any action for the purpose of effecting any of the foregoing; or (B) proceedings for the appointment of a receiver, trustee, liquidator or custodian of the Company or of all or a substantial part of the property thereof, or an involuntary case or other proceedings seeking liquidation, reorganization or other relief with respect to the Company or the debts thereof under any bankruptcy, insolvency or other similar law now or hereafter in effect shall be commenced and an order for relief entered or such proceeding shall not be dismissed or discharged within thirty (30) calendar days of commencement;

    ii. <u>Failure to Pay</u>. The Company shall fail to pay (A) when due any principal or interest payment on the due date hereunder or (B) any other payment required under the terms of this Note on the date due and such payment shall not have been made within thirty (30) calendar days of the Company's receipt of Investor's written notice to the Company of such failure to pay;

    iii. <u>Covenant</u>. The Company fails or neglects to perform, keep or observe any other term, provision, covenant or agreement contained in this Note and as to any such default under such other term, provision, condition, covenant or agreement that can be cured, has failed to cure such default within thirty (30) calendar days after the occurrence of such default;

    iv. <u>Attachments; Levies</u>. Any material portion of the Company's assets is attached, seized, subjected to writ or distress warrant, or is levied upon, or comes into the possession of any trustee, receiver or person acting in a similar capacity and such attachment, seizure, writ or distress warrant or levy has not been removed, discharged or rescinded within thirty (30) calendar days, or the Company is enjoined, restrained, or in any way

SWYSEC_000000074

prevented by court order from continuing to conduct all or any material part of its business affairs, or a judgment or other claim becomes a lien or encumbrance upon any material portion of the Company's assets, or a notice of lien, levy or assessment is filed of record with respect to any of the Company's assets by the United States government, or any department, agency, or instrumentality thereof, or by any state, county, municipal, or governmental agency, and the same is not paid within thirty (30) calendar days after the Company receives notice thereof; or

    v.   <u>Enforceability</u>.  This Note shall in any material respect cease to be, or the Company asserts that this Note is not, a legal, valid and binding obligation of the Company enforceable in accordance with its terms.

(f)   <u>Rights of Investor upon Default</u>.  Upon the occurrence or existence of any Event of Default (other than an Event of Default described in Section 1(c)(i)) and at any time thereafter during the continuance of such Event of Default, Investor may, by written notice to the Company, declare all outstanding Obligations payable by the Company hereunder to be immediately due and payable without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived.  Upon the occurrence or existence of any Event of Default described in Section 1(c)(i), immediately and without notice, all outstanding Obligations payable by the Company hereunder shall automatically become immediately due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived.  In addition to the foregoing remedies, upon the occurrence or existence of any Event of Default, Investor may exercise any other right power or remedy granted to it by this Note or otherwise permitted to it by law, either by suit in equity or by action at law, or both.

**2.   Representations and Warranties of the Company**.  The Company hereby represents and warrants to Investor as of the date of issuance as follows:

(a)   <u>Organization and Standing; Certificate of Incorporation and Bylaws</u>.  The Company is a corporation duly organized and existing under the laws of the jurisdiction of its incorporation and is in good standing under such laws.  The Company has the requisite corporate power and authority to own and operate its properties and assets, and to carry on its business as presently conducted.

(b)   <u>Corporate Power</u>.  The Company has all requisite corporate power to execute, issue, sell, perform under, and deliver this Note.  This Note constitutes a valid and legally binding obligation of the Company, enforceable against the Company in accordance with its terms, subject, as to enforcement of remedies, to applicable bankruptcy, insolvency, moratorium, reorganization and similar laws affecting creditors' rights generally and to general equitable principles of law.

(c)   <u>No Violation or Default</u>.  The Company is not in violation of or default on any term of its Certificate of Incorporation or Bylaws, or other charter documents, as each is in effect on the date hereof, or, to the Company's knowledge, any provision of any mortgage, indenture, contract, agreement, instrument, judgment, decree, order, rule or regulation or other restriction to which the Company is a party or by which it is bound, the breach of or default under which would have a material adverse effect on the condition, financial or otherwise, business or operations of the Company or, to the Company's knowledge, of any provision of any federal, state or other applicable statute, rule or regulation applicable to the Company a violation of which would have a material adverse effect on the condition, financial or otherwise, business or operations of the Company.

(d)   <u>No Conflicts</u>.  The execution, delivery and performance by the Company of this Note will not conflict with, or result in a breach of any of the terms of, or constitute a default under, (i) to the Company's knowledge, any provision of any federal, state or other applicable statute, rule or regulation applicable to the Company the violation of which would have a material adverse effect on the condition, financial or otherwise, business or operations of the Company, (ii) the Company's Certificate of Incorporation or Bylaws, as amended and in effect on the date hereof, or (iii) to the Company's knowledge, any provision of any mortgage, indenture, contract,

       

agreement, instrument, judgment, decree, order, rule or regulation or other restriction to which the Company is a party or by which it is bound, the breach of or default under which would have a material adverse effect on the condition, financial or otherwise, business or operations of the Company, or result in the creation of any mortgage, pledge, lien, encumbrance or charge upon any of the properties or assets of the Company pursuant to any such term.

(e) Capitalization; Preemptive Rights; Compliance with Securities Laws.

i. Concurrently with the execution and delivery of this Note and immediately prior to the conversion of this Note, the Company shall deliver to the Investor a copy of the Charter and a schedule showing the capitalization of the Company as of such date, certified by the President or Chief Financial Officer of the Company as being true and correct. Such capitalization schedule shall include (A) the number of shares of each series and class of preferred stock (the "Existing Preferred Stock") that are issued and outstanding as of such date; (B) the number of shares of each series and class of Common Stock (such Common Stock together with the Existing Preferred Stock, the "Shares") that are issued and outstanding as of such date; (C) the number of Shares or other securities that the Company has reserved for issuance upon conversion of each class and series of the Shares; (D) the number of Shares or other securities reserved for issuance to employees, consultants and directors pursuant to each outstanding stock option or other equity incentive plan and the number of Shares or other securities issuable upon exercise or conversion of issued and outstanding options or other securities outstanding under each such plan; and (E) the number of Shares or other securities reserved for issuance upon exercise or conversion of outstanding warrants or other securities exercisable for or convertible into Shares or other securities.

ii. All issued and outstanding shares of the Company's Common Stock and Existing Preferred Stock (i) have been duly authorized and validly issued and are fully paid and nonassessable and have been approved by all requisite stockholder action, and (ii) were issued in compliance with all applicable state and federal laws concerning the issuance of securities.

iii. The shares of the Preferred Stock (as defined below), when issued and delivered in compliance with the provisions of this Note will be validly issued, fully paid and nonassessable. The reservation of shares of Common Stock for issuance upon conversion of the Preferred Stock (the "Conversion Shares") have been duly and validly reserved and, when issued in compliance with the provisions of this Note, the Charter and applicable law, will be validly issued, fully paid and nonassessable. The Preferred Stock and the Conversion Shares will be free of any liens or encumbrances, other than any liens or encumbrances created by or imposed upon the Investor; provided, however, that the Preferred Stock and the Conversion Shares are subject to restrictions on transfer under U.S. state and/or federal securities laws and as set forth herein and in the applicable rights agreement.

iv. Except for the conversion privileges of the Existing Preferred Stock, the rights provided pursuant to the applicable rights and co-sale agreements, or as otherwise described in this Note, there are no options, warrants or other rights to purchase any of the Company's authorized and unissued capital stock

(f) Litigation. There are no actions, suits, proceedings or investigations pending against the Company or its properties (nor has the Company received written notice of any threat thereof) before any court or governmental agency, including, without limitation, any action that questions the validity of the Master Purchase Agreement or this Note or the right of the Company to enter into them, or the right of the Company to perform its obligations contemplated thereby. The Company is not a party or subject to the provisions of any order, writ, injunction, judgment or decree of any court or agency or instrumentality

SWYSEC_000000076

(g) <u>Intellectual Property</u>.

  i.  <u>Rights</u>. The Company owns or possesses or can obtain on commercially reasonable terms sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses (software or otherwise), information, processes and other proprietary rights ("Intellectual Property") necessary to the business of the Company as presently conducted and as now proposed to be conducted in the Company's business plan or other written materials provided to Investor. The Company has not violated or infringed, and by operating its business as currently proposed to be conducted will not violate or infringe, any Intellectual Property of any other person or entity; provided, however, that the Company's representation in this sentence is made only to the Company's knowledge with respect to patent rights and trademark rights. The Company owns all right, title, and interest in and to each such patent and patent application. The Company has not received any communications alleging that the Company has violated or infringed on any Intellectual Property of any other person or entity.

  ii.  <u>Licenses; Other Agreements</u>. The Company has not granted, and there are not outstanding, any options, licenses or agreements relating to the Intellectual Property, and the Company is not bound by or a party to any options, licenses or agreements with respect to the Intellectual Property of any other person or entity.

  iii.  <u>Proprietary Information and Invention Assignment</u>. Each current and former employee and consultant of the Company has executed a confidential information and invention assignment agreement, substantially in the form delivered to counsel for Investor. No employee has excluded any inventions or intellectual property from assignment to the Company under such confidential information and invention assignment agreement. The Company is not aware that any employee or consultant of the Company is obligated under any agreement (including licenses, covenants or commitments of any nature) or subject to any judgment, decree or order of any court or administrative agency, or any other restriction that would interfere with the use of his or her best efforts to carry out his or her duties for the Company or to promote the interests of the Company or that would conflict with the Company's business as proposed to be conducted. The carrying on of the Company's business by the employees and consultants of the Company and the conduct of the Company's business as presently proposed, will not, to the Company's knowledge, conflict with or result in a material breach of the terms, conditions or provisions of, or constitute a default under, any material contract, covenant or instrument under which any of such employees or consultants or the Company is now obligated. The Company does not presently believe it is or will be necessary to utilize any inventions of any existing employees of the Company made prior to their employment by the Company. To the Company's knowledge, at no time during the conception of or reduction of any of the Company's proprietary assets to practice was any developer, inventor or other contributor thereto subject to any employment agreement or invention assignment or nondisclosure agreement or other obligation with any third party that could reasonably be expected to adversely affect the Company's rights in such proprietary assets.

(h) <u>Interest Rate</u>. Theranos has not issued any promissory note or other debt instrument to a retailer or other partner with an interest rate greater than 0.79% per annum.

(i) <u>Disclosure</u>. The Company has fully provided Investor with information that Investor has requested for deciding whether to purchase the Securities (as defined below) and all information that the Company believes is reasonably necessary to enable Investor to make such decision. Neither this Note, nor any other agreements, statements or certificates made or delivered in connection herewith or therewith contains any untrue statement of a material fact or, when taken together, omits to state a material fact necessary to make the statements herein or therein, in light of the circumstances under which they were made, not misleading.

HIGHLY CONFIDENTIAL

3. **Representations and Warranties of Investor**. Investor hereby represents and warrants to the Company with respect to the sale of this Note, and the issuance of the securities issuable upon conversion of this Note (and any shares of common stock or other securities issued upon conversion of such securities) (collectively, the "Securities") as of the date of issuance as follows:

(a) Authorization.   Investor has the full power and authority to enter into this Note and this Note constitutes a valid and legally binding obligation of Investor, enforceable against Investor in accordance with its terms, subject, as to enforcement of remedies, to applicable bankruptcy, insolvency, moratorium, reorganization and similar laws affecting creditors' rights generally and to general equitable principles of law.

(b) Experience.   Investor is experienced in investing in the securities of development stage companies such as the Company and acknowledges that investment in the Securities involves a number of significant risks. Investor is able to fend for itself, can bear the economic risk of its investment, including the full loss of its investment, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in the Securities. Investor also represents it was not organized solely for the purpose of acquiring the Securities.

(c) Purchase Entirely for Its Own Account. Investor is acquiring the Securities for investment for its own account and not with the view to, or for resale in connection with, any distribution thereof. Investor understands that the Securities to be purchased have not been registered under the Securities Act of 1933, as amended (the "Act"), by reason of a specific exemption from the registration provisions of the Act which depends upon, among other things, the bona fide nature of the investment intent as expressed herein.

(d) Rule 144.   Investor acknowledges that the Securities are "restricted securities" under Rule 144 promulgated under the Act inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that under such laws and applicable regulations such Securities may not be transferred or resold except as permitted under the Act and the applicable state securities laws, pursuant to registration or an exemption therefrom.   Investor represents that it is aware of the provisions of Rule 144 promulgated under the Act and understands the resale limitations imposed thereby and by the Act.   Investor also understands that the Company is entering into this Note in reliance upon Investor's representations and warranties contained herein, and that any federal or state exemption is contingent upon, the accuracy of Investor's representations and warranties in this Note.

(e) No Public Market.   Investor understands that no public market now exists for any of the securities issued by the Company and that there can be no assurance that a public market will ever exist for the Securities.   Accordingly, Investor understands that it may be required to hold the Securities indefinitely.

(f) Accredited Investor.   Investor represents that it is an "accredited investor" within the meaning of Rule 501 of Regulation D promulgated by the Securities and Exchange Commission under the Act.

4. **Conversion.**

(a) Optional Conversion. At any time on or following the occurrence of a Conversion Event, Investor may elect to convert the entire outstanding principal amount of this Note into fully paid and nonassessable shares of the Company's Series C-1 Preferred Stock (the "Preferred Stock") at the Conversion Price.   All accrued and unpaid interest on this Note shall be paid in full in cash and not in shares of capital stock upon the occurrence of a Conversion Event.

(b) Conversion Procedure.

SWYSEC_000000078

i.   <u>Conversion Pursuant to Section 4(a).</u>   Before Investor shall be entitled to convert this Note into shares of Preferred Stock, it shall surrender this Note (or a notice to the effect that the original Note has been lost, stolen or destroyed and an agreement acceptable to the Company whereby the holder agrees to indemnify the Company from any loss incurred by it in connection with this Note) and give written notice to the Company at its principal corporate office of the election to convert the same pursuant to Section 4(a). Upon such conversion of this Note, Investor hereby agrees to execute and deliver to the Company a purchase agreement and other ancillary agreements (including, without limitation, an investor rights agreement providing for customary registration, information and preemptive rights), with customary representations and warranties and transfer restrictions (including, without limitation, a 180-day lock-up agreement in connection with an Initial Public Offering). The Company shall, as soon as practicable thereafter, issue and deliver to such Investor a certificate or certificates for the number of shares of Preferred Stock to which Investor shall be entitled upon such conversion, including a check payable to Investor for any cash amounts payable as described in Section 4(b)(ii). On and after the date of conversion the Persons who have received the shares of Preferred Stock issuable upon such conversion shall be treated for all purposes as the record holder of such shares.

ii.  <u>Fractional Shares; Interest; Effect of Conversion.</u>  No fractional shares shall be issued upon conversion of this Note. In lieu of the Company issuing any fractional shares to Investor upon the conversion of this Note, the Company shall pay to Investor an amount equal to the product obtained by multiplying the applicable Conversion Price by the fraction of a share not issued pursuant to the previous sentence. The Company shall pay to Investor any interest accrued on the amount converted and on the amount to be paid to Investor pursuant to the previous sentence in cash and not in shares of capital stock upon the conversion of this Note. Upon conversion of this Note in full and the payment of the amounts specified in this Section 4, the Company shall be forever released from all its obligations and liabilities under this Note and this Note shall be deemed of no further force or effect, whether or not the original of this Note has been delivered to the Company for cancellation.

iii. <u>Adjustments.</u>  Notwithstanding anything herein to the contrary, if the Company issues shares of preferred stock or other securities conferring the right to purchase shares of preferred stock of the Company or securities convertible into, or exchangeable for (with or without additional consideration), preferred stock of the Company at any time prior to the conversion of this Note, then the conversion price shall not be greater than the lowest price per share paid in such issuance.  If the Company shall at any time prior to the issuance of the Preferred Stock or other shares issuable upon conversion of this Note subdivide such shares (by stock split, stock dividend or the like), or combine such shares (by reverse split or the like), the number of such shares issuable on the conversion of this Note shall be proportionately increased in the case of a subdivision or stock dividend, or proportionately decreased in the case of a combination.  Appropriate adjustments shall also be made to the purchase price payable per share, but the aggregate purchase price payable for the total number of shares issuable upon conversion of this Note (as adjusted) shall remain the same.

**5.  Definitions.** As used in this Note, the following capitalized terms have the following meanings:

"Conversion Event" shall mean the payment by Investor (or an affiliate of Investor) of the Third Inventory Payment (subject to Section 10 of Schedule B of the Master Purchase Agreement).

"Conversion Price" shall mean $75.00, subject to adjustment as set forth in this Note.

"Initial Public Offering" shall mean the closing of the Company's first firm commitment underwritten initial public offering of the Company's Common Stock pursuant to a registration statement filed under the Securities Act.

"Investor" shall mean the Person specified in the introductory paragraph of this Note or any Person who shall at the time be the registered holder of this Note.

"Obligations" shall mean and include all loans, advances, debts, liabilities and obligations, howsoever arising, owed by the Company to Investor of every kind and description (whether or not evidenced by any note or instrument and whether or not for the payment of money), now existing or hereafter arising under or pursuant to the terms of this Note, including, all interest, fees, charges, expenses, attorneys' fees and costs and accountants' fees and costs chargeable to and payable by the Company hereunder and thereunder, in each case, whether direct or indirect, absolute or contingent, due or to become due, and whether or not arising after the commencement of a proceeding under Title 11 of the United States Code (11 U. S. C. Section 101 et seq.), as amended from time to time (including post-petition interest) and whether or not allowed or allowable as a claim in any such proceeding.

"Person" shall mean and include an individual, a partnership, a corporation (including a business trust), a joint stock company, a limited liability company, an unincorporated association, a joint venture or other entity or a governmental authority.

"Securities Act" shall mean the Securities Act of 1933, as amended.

## 6.  Miscellaneous.

(a) Successors and Assigns; Transfer of this Note or Securities Issuable on Conversion Hereof.

    i. Subject to the restrictions on transfer described in this Section 4(a), the rights and obligations of the Company and Investor shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties.

    ii. Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, in whole or in part, by Investor to any legal entity or person, other than a wholly-owned subsidiary of Investor or in connection with a Change of Control of Investor.

    iii. Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, by operation of law or otherwise, in whole or in part, by the Company.

(b) Waiver and Amendment.  Any provision of this Note may be amended, waived or modified upon the written consent of the Company and Investor.

(c) Notices.  All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing and faxed, mailed or delivered to each party at the respective addresses of the parties as set forth in the signature page to this Note, or such other address as a party may specify.  All such notices and communications will be deemed effectively given the earlier of (i) when delivered personally, (ii) one (1) business day after being delivered by facsimile (with receipt of appropriate confirmation), (iii) one (1) business day after being deposited with an overnight courier service of recognized standing or (iv) four (4) calendar days after being deposited in the U.S. mail, first class with postage prepaid.

(d) Payment.  Unless converted into the Company's equity securities pursuant to the terms hereof, payment shall be made in lawful tender of the United States.

(e) Governing Law; Jurisdiction.  This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of California, without regard to the conflicts of law provisions of the State of California, or of any other state. For any disputes arising out of or in connection with this Note, the parties consent to the personal and exclusive jurisdiction of, and venue in, the state and federal courts within Santa Clara County, California.

SWYSEC_000000080

(f) <u>Counterparts</u>.  This Note may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Note.

(g) <u>California Corporate Securities Law</u>.

> THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS NOTE HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF SUCH SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO SUCH QUALIFICATION IS UNLAWFUL UNLESS THE SALE OF SECURITIES IS EXEMPT FROM SUCH QUALIFICATION.  THE RIGHTS OF ALL PARTIES TO THIS NOTE ARE EXPRESSLY CONDITIONED UPON SUCH QUALIFICATION BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT.

(h) <u>Severability</u>.  In the event that any provision of this Note becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, this Note shall continue in full force and effect without said provision; provided that no such severability shall be effective if it materially changes the economic benefit of this Note to any party.

(i) <u>Survival of Representations and Warranties</u>.  The representations and warranties of the parties contained in or made pursuant to this Note shall survive the execution and delivery of this Note.

*[remainder of page intentionally left blank]*

The Company has caused this Note to be issued as of the date first written above.

THERANOS, INC.,
a Delaware corporation

By:_____
Its:_____ CEO
Address: 3200 Hillview Avenue
Palo Alto, CA 94304

Acknowledged and accepted by Investor:
SAFEWAY INC.

By:_____
Its:_____
Address: 5918 Stoneridge Mall Road
Pleasanton, CA 94588

Theranos Internal Only

SWYSEC_000000082

# Exhibit D

# AMENDED AND RESTATED
# THERANOS MASTER SERVICES AGREEMENT

Whereas the parties entered into the Theranos Master Purchase Agreement ("Original Agreement") dated July 30, 2010;

Whereas the parties agree that because of certain changes in circumstances, it is necessary to terminate the Original Agreement and replace it with this Agreement (as defined below;

This Amended and Restated Master Services Agreement ("Agreement") dated June __5__ , 2012 ("Effective Date") is by and between:

| WALGREENS | | | |
|---|---|---|---|
| Full Legal Name | Walgreen Co. | Client Signatory | Wade Miquelon |
| Jurisdiction of Incorporation | Illinois | Title | Executive Vice President & Chief Financial Officer |
| Principal Business Address | 200 Wilmot Road Deerfield, IL 60015 | Telephone | 847.315.3090 |
| Company Phone Number | 847.914.2500 | Email | wade.miquelon@walgreens.com |
| Company Fax Number | 847.914.2804 | | |
| **THERANOS** | | | |
| Full Legal Name | Theranos, Inc. | Theranos Signatory | Elizabeth Holmes |
| Jurisdiction of Incorporation | Delaware | Title | President and CEO |
| Principal Business Address | 3200 Hillview Avenue Palo Alto, CA 94304 | Telephone | 650-470-6111 |
| Company Phone Number | 650-838-9292 | Email | eholmes@theranos.com |
| Company Fax Number | 650-838-9165 | | |

This Agreement is comprised of:
Schedule A:  Program Overview
Schedule B:  Service Terms and Conditions
Schedule C:  Support and Maintenance Terms
Schedule D:  Walgreens Service Pricing
Schedule E:  Definitions
Schedule F:  Pilot
Schedule G: HIPAA Business Associate Agreement
Schedule H-1: Convertible Promissory Note
Schedule H-2: Certificate Evidencing Right to Purchase Convertible Promissory Note
Schedule I: Theranos Pharmaceutical Clinical Trials Infrastructure
Schedule J: Test Menu

The parties agree to the terms set forth in this Agreement, including each attached Schedule, each of which is fully incorporated herein by reference.  This Agreement may be signed in counterparts each of which will be deemed an original and together shall constitute one and the same Agreement.

| WALGREEN CO. | THERANOS, INC. |
|---|---|
| | *Elizabeth Holmes* |
| (Authorized Representative - Signature) | (Authorized Representative - Signature) |
| | Elizabeth Holmes |
| (Authorized Representative – Printed) | (Authorized Representative – Printed) |
| | CEO |
| (Title) | (Title) |

Confidential Treatment Requested by Walgreen Co.                    WAG-TH-00000051

| WALGREEN CO. | THERANOS, INC. |
|---|---|
| (Authorized Representative - Signature) | (Authorized Representative - Signature) |
| WADE D. MIQUELON | |
| (Authorized Representative – Printed) | (Authorized Representative – Printed) |
| CFO | |
| (Title) | (Title) |

CTK-LAW

Theranos and Walgreens Confidential and Proprietary

Confidential Treatment Requested by Walgreen Co.

## SCHEDULE A

## PROGRAM OVERVIEW

This Schedule sets forth the Program, including the objectives of the Program and shall be used only for illustrative purposes.  The terms and conditions governing this Schedule are set forth in Schedule B, attached.  Schedule A is intended to be used for each parties understanding of the relationship and shall not govern nor bind either party's actions.  If and to the extent this Schedule provides additional terms and/or conflicting terms to the terms and conditions set forth in Schedule B, the terms of Schedule B will prevail.  The capitalized terms as used in this Agreement are defined in Schedule E, attached.

1.  **Intentionally Deleted.**
2.  **Program Objectives.**  The objectives of this Program include:

   a.  Make  testing less invasive, faster and far more accessible, effective, and actionable by introducing a more cost-effective, blood testing service at Walgreens stores and Walgreens' other clinical operations nationwide (which, by example, include, but are not limited to infusion centers and CSG/ESG clinics).  Other types of specimens collected will be nasal and throat swabs as well as urine samples.

   b.  Empower Walgreens to play a more active role in patient health management and well-being. Theranos Systems include a decision support system, which will be accessible through the touch screens on the devices, including any on-site interface provided by Theranos, or through the web browser.  This decision support system will deliver real-time, actionable information to the clinicians in the pharmacy and other Walgreens clinical locations by providing analysis, interpretations and recommendations based on patient test results.

   c.  Generate health care cost savings by reducing direct out-of-pocket costs of lab tests and visits.

   d.  Early intervention and reduced hospitalization through early detection of the onset of disease.

   e.  Introduce a new revenue stream for Walgreens through this disruptive technology and associated services.

3.  **Phased Disruption.**  As Theranos continues to develop disruptive technology, the parties agree to discuss terms by which such innovations can be made commercially available through Walgreens.  Notwithstanding the previous, the parties acknowledge the mutual desire to bring Theranos' technology to market as quickly as is reasonably possible.  With that in mind, at the commencement of this Agreement, it is the parties' intention for Walgreens to act as a patient service center and collect blood samples via finger-stick technology, small samples of urine, saliva, feces, or swabs, with laboratory testing to be performed by Theranos at a CLIA certified offsite laboratory ("PSC Phase").  At such point that the Theranos System is approved for use in a retail setting by appropriate regulatory bodies, the parties will determine which Walgreens locations, if any, should deploy the Theranos System, with Theranos acting as the CLIA certified laboratory at the retail and/or employer setting ("Onsite Phase").

4.  **Program Managers.**  Each party will assign a program manager to this Program.  The responsibilities of each party's program manager include:  (i) serve as the interface between the other party; (ii) develop a mutually agreed upon detailed business plan including milestones, projections/forecasts and deliverables, and success/acceptance criteria for each milestone (details of the business plan and any applicable schedule shall be memorialized in an amendment to this Agreement); (iii) ensure that Theranos and Walgreens have committed the necessary resources necessary to meet the objectives and timeline of the Program; (iv) prepare regularly-scheduled status reports on the Program, on an agreed-upon time-frame; (v) identify, schedule and confirm availability of resources, including management, to provide agreed-upon services and deliverables; and (vi) assist in resolving issues, and escalate, as appropriate, within the other party.  The parties acknowledge that the Program Plan is subject to change as the Program progresses.  Notwithstanding anything to the contrary in this Schedule A, all terms of the relationship shall be detailed in Schedules B through J or by an amendment to this Agreement.

5.  **Reviews.**  The appropriate Program Managers and Representatives from each party will meet on at least a bi-weekly basis at least until the Pilot commences, to develop the project and review the entire status of the Program.

*[remainder of page intentionally left blank]*

Theranos and Walgreens Confidential and Proprietary

**Confidential Treatment Requested by Walgreen Co.**                                    **WAG-TH-00000053**

# SCHEDULE B

## SERVICE TERMS AND CONDITIONS

1. **Scope**.  The terms and conditions set forth in this Schedule apply to this Agreement, including each attached Schedule or other attachment.  To the extent a Schedule or other attachment provides additional terms and/or conflicting terms to the terms and conditions set forth in this Schedule B, the terms of this Schedule B will prevail.

2. **Service Fee Guarantee.** During the PSC Phase, Theranos agrees that no other United States retail pharmacy, grocer, mass merchant, or physician office(s) will be able to procure the right to act as a PSC for Theranos or the right to obtain services from Theranos as they relate to the collection of specimens for service(s) for a compensation amount per Test that exceeds the compensation amount available to Walgreens for those services.  Any promotional strategic contracts with thought leaders, physicians or charitable work shall not be subject to the Service Fee Guarantee, provided service fees paid for such services below the Walgreens fee, are not material to Theranos for any given twelve (12) month period.

    With respect to Predictive Tests, the parties agree that Theranos shall have an independent auditor, acceptable to Walgreens, certify to Walgreens that the service fee provided to Walgreens during the PSC Phase conforms with this Section 2.  Should the results of such audit show that Walgreens was paid a lesser service fee than what is provided for in this Section, Theranos shall supplement such service fee  within thirty (30) days of such certification.  Said certification shall be made twice:  Within sixty (60) days of the date that is six (6) months after the date Walgreens' exclusivity period on each new Predictive Test completes, and within sixty (60) days of the date that is twelve (12) months after the date Walgreens' exclusivity period on such Test completes.

3. **Exclusivity**.

    a. **Central Labs and PBMs.** Theranos agrees not to make the Theranos System available for sale to, distribution to, or for use (through collection of blood samples, other specimens or otherwise) in delivering Tests to (a) any central lab company (including but not limited to Quest Diagnostics Inc., Laboratory Corporation of America Holdings, and all their related entities, as well as any other non-hospital company doing business as a centralized commercial laboratory), and (b) any pharmacy benefit manager (PBM) (including but not limited to Medco Health Solutions Inc., Express Scripts, Inc., and all their related entities, as well as any other company doing business as a pharmacy benefit manager). Notwithstanding the previous, the following exception shall apply: in geographic areas where Theranos has not yet launched through Walgreens stores, the above restriction around central lab companies shall not apply until Theranos launches through Walgreens stores in a given geography.

    b. **Retail Pharmacies, Grocers and Mass Merchants.** For all retail pharmacy companies (for purposes of this Agreement, the retail drug store division of CVS Caremark Corporation will be considered as a retail pharmacy), grocers, and retail mass merchants, including, but not limited to Wal-Mart Stores, Inc., and its related entities ("Wal-Mart"), Theranos may provide testing services  as follows:

        i. For Routine and Specialty Tests:  For the PSC Phase, six (6) months after successful completion of the Pilot, and, if Walgreens commits to proceed with the Onsite Phase within sixty (60) days of notice by Theranos, along with written evidence that the FDA has no objections to the commercial use of the Theranos System in a retail pharmacy setting, six (6) months from that date of initiation of the Onsite Phase. Assuming Walgreens decides to proceed to the Onsite Phase, the parties shall work together to plan scale, provided that the parties agree that the initiation of the Onsite Phase shall take place at the end of the sixty (60) day notice period;

        ii. For Theranos Predictive Tests: Twelve (12) months after the date that each of the following new Tests are available:  diabetes/pre-diabetes, congestive heart failure, women's cancer and men's cancer.  For purposes of this Section, available shall mean the date upon which Theranos secures a major payor's reimbursement for such Test, provided that such Test is not available on a direct to consumer basis.  For purposes of this Agreement, the term "major payor" shall mean one of any of the following companies:  UnitedHealth Group, WellPoint, Inc., Kaiser Foundation Group, Aetna Group, Humana Group, HCSC, Coventry Corp., Highmark Group, Independence Blue Cross Group, and Blue Shield of CA Group.  To illustrate this exclusivity, assume a women's cancer test is made available to Walgreens on 1/1/2011.  Walgreens' exclusivity right to

**Confidential Treatment Requested by Walgreen Co.**                                                                    **WAG-TH-00000054**

secure and offer said test would expire on 1/1/2012.  Then if a men's cancer test is introduced on 1/1/2012, Walgreens' exclusivity right to secure and offer said test would expire on 1/1/2013.

Any tests developed after the execution of this Agreement that are not specifically listed in the definitions of Specialty and Predictive Tests/Cartridges and are subject to development or licensing agreements with pharmaceutical companies and/or United States or foreign government agencies will not be subject to the exclusivity terms listed above.

For purposes of this Agreement, one other United States retail grocer, but specifically excluding any mass merchant, selected by Theranos in its discretion, and its related entities will not be subject to Schedule B, Section 3.b.  During the time of exclusivity, Theranos retains the right to pilot with other companies. Such pilots shall be no greater in number of stores or locations than as defined in Schedule F.

c.   **Walgreens Exclusivity**        Provided that Theranos is able to perform all Routine and Specialty Tests and any other predictive test that are commercially available in a given jurisdiction with equivalent test quality, pricing and patient service as compared to existing laboratory service providers, Walgreens agrees that it shall not offer laboratory services in Walgreens stores.   Notwithstanding the previous, the following exceptions shall apply:  (i) To the extent Theranos is not able to offer Routine and Specialty Tests, and/or other commercially available predictive tests in a given jurisdiction, then Theranos shall have a period of three (3) months to secure necessary regulatory agency approvals to provide such Routine and Specialty Tests and/or predictive tests; (ii) sale of over the counter/point of care tests which are available without a clinician order, shall not be applicable to the exclusivity provided in this subsection (c).   Should Theranos fail to obtain such regulatory agency approvals, Theranos shall contract with a local provider of laboratory services, such provider to have obtained all necessary regulatory approvals necessary to provide laboratory services, to provide such test(s) at Walgreens. Should Theranos not be able to reach an agreement with a local provider of laboratory services, Walgreens shall have the right to work with other providers of laboratory services for all tests in that jurisdiction.  Notwithstanding the previous sentence, to the extent that Theranos can provide laboratory services in a given jurisdiction, Walgreens shall still rely on Theranos to provide laboratory services for the tests it is authorized to perform.    At such time that Theranos obtains the ability to provide services in the jurisdiction at issue, at equivalent levels of quality, pricing and services as compared to the existing laboratory service providers and provides notice to Walgreens of the same, Walgreens agrees that it will not renew its contract with the alternate service provider and will transition its lab offerings back to Theranos in a period of not greater than ninety (90) days; and (iii) To the extent any of Walgreens' employer clients direct Walgreens to contract with another laboratory service provider, the above exclusive shall not apply to the patients that Walgreens serves under that contract. During the term, Walgreens agrees that it shall not operate as a laboratory.   Except as otherwise provided for in this Agreement as it relates to over the counter/point of care tests available without a clinician order, or in instances in which Theranos cannot provide services, Walgreens agrees that it shall not direct patients of the Theranos laboratory to non-Theranos laboratory services.

4.   **First Announcement Rights.** Theranos will not authorize any other  United States retail pharmacy, grocer, or mass merchant to announce availability of the newly Available Cartridges  and/or Tests before Walgreens, in accordance with and as applicable under the Exclusivity terms described more fully in Schedule B, Section 3.

5.   **Theranos Pharmaceutical Clinical Trials Infrastructure.** As part of its ongoing business partnerships with pharmaceutical companies, Theranos will extend its clinical trials infrastructure to include Walgreens stores so that pharmaceutical clinical trial patients will have the option to have their specimens collected  at a Walgreens location. Following execution of this Agreement, Theranos and Walgreens will negotiate the terms and conditions between Theranos and Walgreens for the clinical trial work which will then be described and agreed upon in writing in Schedule I.

6.   **Innovation Fee**.

Theranos and Walgreens Confidential and Proprietary                                                          -5-

(a) Walgreens agrees to pay to Theranos an Innovation Fee ("Innovation Fee") for up to $100 million dollars.  The Innovation fee is being paid to Theranos in exchange for the following terms granted to Walgreens in this Agreement: (i) exclusivity; (ii) price protection; (iii) first announcement rights; infrastructure costs associated with building out the Theranos laboratory structure to support Walgreens' scale; and other good and valuable consideration. Distribution of the Innovation Fee shall be as follows:

| | | |
|---|---|---|
| (i) | $25 million shall be distributed to Theranos within five (5) days of the due diligence items/visits detailed in 6(b) below,  being completed; |
| (ii) | $25 million shall be distributed to Theranos within five (5) days of reaching ten (10) patients per store per day on average during the pilot; |
| (iii) | Upon successful Pilot completion and initiation of Program launch, Walgreens shall commit to a final distribution of $50 million. |

(b)  Within thirty (30) days of the Effective Date for items (i-iii and vi), and seventy-five (75) days for items (iv-v), Theranos shall make available or provide access to the following due diligence items for Walgreens' review.  Upon receipt, and confirmation of these due diligence items, Walgreens will direct the escrow agent to release the initial $25 million distribution:

| | | |
|---|---|---|
| (i) | Covered Lives-    Theranos shall provide written evidence of contracts with payors that provide coverage in the Pilot Market.  Such written evidence shall demonstrate Theranos' ability to process claims, bill and reimburse Walgreens for its services within the Pilot Market; |
| (ii) | Test Menu-    Theranos will provide Walgreens with a copy of the Test Menu  (incorporated as Schedule J) and operations manual that the Theranos trained Walgreens technician will utilize during the PSC. |
| (iii) | Laboratory in Good Standing-    Theranos shall provide to Walgreens copies of the CLIA inspection report and any interim exception reports, proficiency testing results for all tests on the Test Menu, and any correlation studies. |
| (iv) | PSC Expectations-    Theranos shall provide Walgreens with a written copy of the standard operating procedures/protocol expectations for the PSC.  Additionally, Theranos shall provide to Walgreens the front end IT requirements consisting of screen shots PSC personnel will use and/or required fields for patient data entry.  After Walgreens' initial review of the materials, Walgreens shall provide its initial comments, and the parties shall work together to mutually revise the materials as is necessary. |
| (v) | Facilities Visit-    Theranos shall permit Walgreens' staff to visit the following Theranos facilities:  lab operations, call center, IT and billing.  During the visit, Walgreens shall not have unfettered access to Theranos' facilities, but rather, the visit shall include opportunities for Walgreens to confirm for itself in a visual sense that Theranos has the capabilities to carry out its obligations under this Agreement.  For purposes of clarity, such visit will not be for purposes of an audit, but rather to see the Theranos operations in action. |
| (vi) | Pricing/Fee/Collectability-  The parties shall confirm the Pricing detailed in Section 11 below and the Innovation Fee are consistent with the fair market values for such Pricing and Innovation Fee. Walgreens will engage a third party consultant to determine the fair market value of the services provided by Walgreens to Theranos and the Innovation Fee provided to Theranos ("FMV Study"). Further, the parties shall agree upon the appropriate measure in order to  measure collectability as it relates to the initial $25M payment. |

(c)  If Theranos realizes at least $1.75 billion in net revenue domestically  from laboratory services it provides at all of its laboratory locations that utilize the Theranos System within twelve (12) months after the date that Theranos Tests are available in at least 1,000 Walgreens locations, Theranos will earn $50 million of the Innovation Fee. If the final $50 million distribution is made and Theranos realizes at least $2.5 billion in net revenue from laboratory locations

Confidential Treatment Requested by Walgreen Co.                                                                      WAG-TH-00000056

that utilize the Theranos System within eighteen (18) months after the date that Theranos Tests are available in at least 1,000 Walgreens locations, Theranos will earn the second $50 million of the Innovation Fee. If the aforementioned milestones are not realized, Theranos will refund the entire Innovation Fee dollar for dollar back to Walgreens on a per test consumed basis, with at least $50 million being credited in the first twelve (12) months after Program launch.  For purposes of clarity, the refund per patient shall be the Theranos Fee divided by the number of patients actually served during the applicable time period

7.   **Ordering.**    All Theranos Tests will be ordered electronically using Theranos software and/or equipment in the stores or ESG location, and Theranos will be able to receive and process this electronic order.  As soon as is reasonably possible, and to the extent possible, the Walgreens' systems and Theranos' systems will be integrated in order to provide a seamless patient experience and optimizing operations by reduce dual entry for laboratory services as well as other Walgreens services (e.g. pharmacy, Take Care Clinics, etc.).

8.   **Scheduling and Cancellation**.  Intentionally Deleted.

9.   **Invoicing**.  Walgreens will issue invoices to Theranos as follows:

| Deliverable (as applicable) | Invoice |
|---|---|
| Services | At the beginning of each month, as may be amended from time to time based on mutual agreement of the parties in writing.  The invoice will specify by CPT code the number of successful Tests that generated a Result performed during prior calendar month, by store location, multiplied by the pricing for each such Test as set forth on Schedule D. |

10.  **Payment**.  Commencing with the Pilot Phase through the first twelve (12) months post Pilot, Theranos shall compensate Walgreens Services as described in Section 15 of this Agreement, as follows: within seven (7) days of receipt of payment from the payor or patient.  After the first twelve (12) months post Pilot, Theranos shall compensate Walgreens for Walgreens Services no later than forty-five (45) days after Walgreens has collected said specimen.

If after ten (10) days written notice to Theranos that a payment is overdue and such Invoice remains unpaid,  late payments will be charged interest at 1% per month until paid in full (or, if less, the maximum allowed under applicable law).

11.  **Pricing**.
The parties agree that Walgreens shall receive, a fair market value fee for the Walgreens Services, which the parties estimate will fall within a range of $10.00-$16.00/per patient ("the Pricing").  The price to be agreed upon by the parties will not include applicable taxes, or custom duties.  Based on the results of the FMV Study, Walgreens and Theranos shall amend this Agreement, upon terms to be mutually agreed upon, by including pricing based on the services provided by Walgreens in Schedule D, including a procedure to deal with any inability to realize pricing. Should the parties be unable to agree upon pricing, the parties shall engage in the process laid out in Section 24(b) of this Agreement.

12.  **Discounts.**   The parties agree that any discounts or reductions in price offered or provided to Walgreens hereunder are intended to comply with all applicable federal, state and local laws, statutes, rules and regulations, as such are amended from time to time, including but not limited to the Federal Anti-Kickback Statute [42 U.S.C. 1320a-7b(b)], and specifically the Discount Safe Harbor under the Federal Anti-Kickback Statute and its implementing regulations (the "Discount Safe Harbor"), as well as similar State law exceptions.  Thus, with respect to the foregoing, the parties shall comply with all relevant obligations under the Discount Safe Harbor as well as all similar State law exceptions. The parties shall do nothing to impede the other party's ability to meet all of its obligations under the Discount Safe Harbor and any similar State law safe harbors and exceptions as contemplated herein.  The parties shall take all necessary steps to comply with the Discount Safe Harbor and any similar State law safe harbors and exceptions. The parties agree to timely produce any information or documentation requested or that is required for purposes of compliance with the Discount Safe Harbor and similar State law safe harbors and exceptions.

**Confidential Treatment Requested by Walgreen Co.**                                                        **WAG-TH-00000057**

**13. Currency.** All prices and fees set forth in this Agreement are stated in U.S. dollars. Payment will be in U.S. dollars.

**14. Theranos Services.** Theranos shall provide Walgreens with the services set forth in this Section 14.

**a. Limitation.** Theranos will ensure that, with respect to Walgreens Customers, the Theranos System will only be utilized to perform Ordered Tests, provided that Theranos shall run calibration tests remotely on the Theranos System. At such time that direct to consumer testing is approved by the applicable regulatory body, Walgreens will collect samples ordered directly by patients and Theranos will provide laboratory services for such samples.

**b. Reports.**

    **i. Generation.** Theranos will use commercially reasonable efforts to generate a Result for each Ordered Test.

    **ii. Transmission.** Theranos will use commercially reasonable efforts to, within one (1) hour of generating a Result, transmit the Report to the Ordering Practitioner either by a secure website portal, secure electronic transmission or facsimile. In accordance with the relevant provisions in this Agreement, all Results provided to clinicians from samples collected at Walgreens, will be provided to Walgreens. Results from other Tests not performed at Walgreens Locations will only be provided to Walgreens upon receipt of patient consent and in compliance with HIPAA and all applicable federal and state regulations. Theranos agrees that any patient authorization or consent that it may seek to obtain from a potential Walgreens patient will not include any provision offering the patient the opportunity to block, prohibit or in any way restrict release of the Report to Walgreens. Theranos agrees that it will use commercially reasonable efforts to deliver Reports to authorized Ordering Practitioners within four (4) hours of the sample arriving at the laboratory.

    **iii. Critical Values.** In the event a Result reflects one or more values at such variance with normal as to be potentially life-threatening ("Critical Value"), Theranos will be solely responsible for notifying the appropriate personnel according to its obligations as a CLIA-certified lab under federal and state law and using commercially reasonable efforts to verify that the Ordering Practitioner received notification of the Critical Value. Should direct to consumer testing be made available under this Agreement, Theranos shall notify the patient directly of any Result that is classified as a Critical Value.

    **iv. Consultation.** Theranos will maintain a toll-free phone number and email address that Ordering Practitioners can contact with questions or requests for professional consultation regarding a Report. The toll-free number shall, at a minimum, be staffed 7 days per week from 5 am to 11 pm central. Theranos will ensure that all requests for professional consultation are responded to promptly by an appropriately licensed and qualified health care professional.

    **v. Public Health Reporting.** To the extent required by state or local law and/or regulations applicable to each Walgreens location utilizing the Theranos System, Theranos will prepare and submit any and all Reports, or other information or forms that may be required to disclose to a health department or other government agency as a result of performing certain Tests.

    **vi. Ownership and Retention.** For the duration of this Agreement and in accordance with: (a) the terms set forth in the HIPAA Business Associate Agreement attached hereto as Schedule G; (b) federal and state laws governing document retention by health care providers; and (c) Medicare, Medicaid and all other third-party payor document retention requirements, Theranos will electronically maintain and store all Reports.

    **vii. Walgreens' Retention Right:** Walgreens, without first obtaining patient consent, may maintain, use and disclose Reports for purposes of complying with applicable federal and state legal requirements including, but not limited, to: (i) licensure; (ii) record retention; (iii) patient privacy and confidentiality; (iv) Medicare, Medicaid and any other federal or state health care programs; (v) subpoena or court order.

**c. Billing.** The following shall apply during the PSC Phase. Should the parties agree to provide laboratory services in the Onsite Phase, the parties will agree on mutually acceptable billing terms.

    **i. Provider.** The parties acknowledge and agree that Theranos will be the provider of clinical laboratory services under this Agreement. Theranos acknowledges and agrees that Walgreens will be the provider of the specimen collection services performed at Walgreen's locations. As the provider of laboratory services, all claims for payment submitted to patients and/or third-party payors will be submitted by Theranos. Walgreens acknowledges and agrees that it will not submit under its name or tax id number any claims for

Theranos and Walgreens Confidential and Proprietary                       -8-

**Confidential Treatment Requested by Walgreen Co.**                   **WAG-TH-00000058**

payment to any customers or third-party payors for Tests.  Walgreens shall look solely to Theranos for payment of the items and services it provides to patients pursuant to this Agreement.

d.  **HIPAA.**  The parties acknowledge that as a result of providing the services described above in Sections 14.b and c, each party will be acting as a Business Associate of the other party and will contemporaneously with this Agreement execute the HIPAA Business Associate Agreement attached hereto as Schedule G**.**

15.  **Walgreens Services.**  Walgreens will assign to Theranos specifically trained technicians ("Walgreen Technicians") utilizing a training and certification program provided by Theranos. These technicians will provide laboratory patient services, as directed by Theranos during such times that Walgreens is interacting with a patient in order to provide patient services. Walgreen Technicians will professionally handle the patients needing laboratory services. Walgreen Technicians will draw blood using the finger stick technique; Walgreen Technicians will collect the proper other specimens according to the directions provided by Theranos. Walgreen Technicians will also obtain the patient's demographic and insurance information, which will be entered into the system that is available.  If applicable, the Walgreen Technician will collect any co-pay. In addition the Walgreen Technician will take the order that came from the practitioner and enter the information from that form into the system. The Walgreen Technician will then provide information to the patient about how the patient can obtain results of the testing.  The Walgreen Technician will properly store and prepare the specimen for pick-up according to the directions provided by Theranos.  At the completion of the patient interaction, the Walgreen Technician will prepare the area for the next patient.

    i.  **Patient Service Centers.** Walgreens locations serving as Theranos Patient Service Centers will be patient service centers which provide for the collection and processing of human blood, urine, feces, or other matrices for analysis by Theranos' CLIA certified laboratory. The physical locations for Theranos Patient Service Centers must conform to Theranos standards, with the parties to agree upon any deviations on a site specific basis.  The parties agree that they shall memorialize such standards in writing. Theranos laboratory supervisors or designated supervisory qualified staff will oversee the sites and make monthly on-site visits to each Theranos Patient Service Center. Theranos laboratory personnel will perform on-site inspections of all Theranos Patient Service Centers on an ongoing basis.

    ii.  **Patient Service Center Personnel.** Walgreens technicians selected by Theranos and Walgreens will act as operators of the Theranos CLIA laboratory. Said technicians will be certified by the Theranos CLIA laboratory for the performance of sample collection and processing. All certifications must be complete prior to launch of the Theranos infrastructure in Walgreens Locations. All Theranos trained and certified technicians in Walgreens Locations will be trained in Theranos Procedure Manuals and Accession Records for specimen collection stations. Only certified Theranos technicians following approved Theranos protocols may collect samples and interact with patients in Theranos Patient Service Centers. The Theranos Patient Service Centers may not be used to collect samples for any non-Theranos laboratory tests.  For purposes of clarity, the parties acknowledge that as of the date of this Agreement, Walgreens is conducting health testing screening.  Such screening shall not violate this subsection, provided that the testing activities are performed in a matter such that the patient will not perceive the service to be a Theranos service.

The parties agree and acknowledge, that when required by law, clinicians working at Walgreens' ESG/CSG locations will give patients the option to have their laboratory services performed at a lab/PSC of their choosing.

16.  **Delivery.**
Theranos shall deliver sample tubes, lancets/blood collecting devices (finger stick devices), bandages and all other necessary supplies to Walgreens locations on an as needed basis.  Walgreens will notify Theranos when it has 20% remaining stock of collection vessels/finger stick devices available for use.  Theranos shall deliver replacement supplies within 1days of receipt of such notice.

17.  **Shipment.**  Theranos shall arrange for specimens to be picked up at least once per day, and in locations that collect at least 50 specimens per day before Noon local time, there shall be at least two pick-ups per day

With respect to the Onsite Phase, the following shall apply:  In the absence of specific shipping instructions from Walgreens, Theranos will ship by the method it deems most advantageous.  Transportation costs will be at Theranos' sole cost and expense, unless Walgreens requests special shipping instructions.  If Walgreens requests special shipment, the associated costs will be collect, or, if prepaid, will be subsequently invoiced to Walgreens.  Unless otherwise specified, the Cartridges will be shipped in Theranos' standard commercial packaging, with each cartridge and cartridge package properly labeled. When special packaging is, in the reasonable opinion of Theranos, required

**Confidential Treatment Requested by Walgreen Co.**                                                          **WAG-TH-00000059**

under the circumstances, Theranos will issue an invoice to Walgreens for the cost of the same. In the event any of Theranos' production facilities are located in close proximity to Walgreens' distribution centers, special facilities can be provided for direct transfer of Cartridges into Walgreens' distribution centers.

**18. Devices.**

a. Any Devices, Cartridges and other Deliverable s provided by Theranos to Walgreens, including, but not limited to any finger stick collection devices, shall only be used by Walgreens' employees, contractors and/or agents for Walgreens' internal business purposes, solely for use at Walgreens' Locations. Walgreens agrees to take all reasonable steps to protect the Devices from theft or use contrary to the provisions of this Agreement. Walgreens agrees not to disassemble or otherwise reverse engineer the Devices or any component thereof. Walgreens is not authorized to sell, rent, transfer, license, or distribute the Devices or Cartridges or any other Deliverable, unless specifically authorized by Theranos in writing.

b. Theranos shall at all times retain ownership of the Devices; provided however that Walgreens assumes the entire risk of loss, damage, theft or destruction of the Devices while they are in the possession of Walgreens and shall pay the full cost of any Devices not returned in good condition (ordinary wear and tear excepted). Prior to the commencement of the Onsite Phase, Theranos will provide Walgreens with a statement certifying the cost component value of the Device for Walgreens' insurance purposes. As Theranos develops upgrades and enhancements to the Devices, the parties will agree on a deployment schedule for such next-generation Devices. Walgreens shall permit any authorized representative of Theranos to inspect the Devices, during normal business hours after first sending written notice of such inspection prior to the return of such Devices to Theranos, at Walgreens' facilities or any other location at which the particular Program is being conducted. If Walgreens is unable to return the Devices in accordance with this Agreement, Walgreens will permit Theranos, on dates and times to be agreed upon, to access Walgreens' premises for the purposes of repossessing such Devices.

c. If Walgreens experiences any problems with the deployed Devices, then, subject to Walgreens' responsibilities in Section 17.b, Theranos will repair or replace the Device as soon as reasonably possible after being notified of the problem, in accordance with Schedule C.

d. Upon expiration or termination of this Agreement, Walgreens shall ensure that all Walgreens employees, contractors and/or agents cease using the Devices and Client Accessible Software, and Walgreens shall return to Theranos all authorization codes allowing users to access the Software, TheranOS, and all Devices as set forth in Section 23.d.

**19. Warranty.**

a. During the Onsite Phase the following shall apply: All Cartridges provided to Walgreens will be new and will contain the functionality, and will operate in accordance with, and conform to, the applicable specifications with shelf life of at least 90% of useful life as further specified in the procurement documentation. Walgreens will maintain the Cartridges in the environment specified in the Documentation that ships with the Cartridges or is otherwise made available to Walgreens.

b. Each party warrants that: (i) it has the legal authority to enter into this Agreement; and (ii) the execution, delivery, and performance of this Agreement by it and its obligations hereunder do no conflict with any agreement, instrument or understanding to which it is a party or by which it may be bound.

c. Each party will perform its obligations under this Agreement: (i) in a timely and professional manner; (ii) in conformance with that level of care and skill ordinarily exercised by other professional companies or a similar size and in similar circumstances; and (iii) in compliance in all material respects with all applicable laws.

d. **Disclaimer. EXCEPT AS OTHERWISE SET FORTH IN THIS AGREEMENT, THERANOS EXPRESSLY DISCLAIMS ALL OTHER EXPRESS, IMPLIED, OR OTHER WARRANTIES, INCLUDING THE WARRANTIES OF NON-INFRINGEMENT, MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.**

**20. Licenses.**

a. **Theranos License Grant.** Theranos hereby grants to Walgreens a non-exclusive, worldwide, multi-site, enterprise wide, royalty free, non-transferable license, without the right to sublicense, to use, in accordance with, and solely to perform its obligations in this Agreement and only for the term of this Agreement: (a) Software

Theranos and Walgreens Confidential and Proprietary

-10-

installed on Ordering Devices, solely for use of the Device by Walgreens employees, contractors and agents who are obligated in writing by confidentiality obligation at least as protective of Theranos and its Confidential Information as this Agreement; and (b) Software related to the TheranOS which may be accessed through the Devices or at a designated website or IP address, disc, programs or other designated location ("Client Accessible Software").  In this Agreement, "Software" means computer programs, object code and related materials, in machine readable or printed form, including the TheranOS, and any updates or upgrades thereto. The term **"Software"** also includes updates, enhancements and new versions delivered pursuant to this Agreement. Without Walgreen's prior written approval, Theranos will not use in performing the Services, and the Deliverables will not incorporate, link to, call, or depend in any way upon, any software or other intellectual property that is subject to an Open Source or Copyleft license (including the GNU General Public License) or any other agreement that may give rise to any third party's right to use any Deliverables or to limit Walgreen's right to use, such software and other intellectual property in any respect.

b.   **Ownership**.  Theranos and its licensors shall at all times retain sole and exclusive ownership of all Software and, as between the parties, all Software is Theranos Confidential Information.  Walgreens shall use commercially reasonable efforts to prevent unauthorized access to, or use of, the Software, and notify Theranos promptly of any such unauthorized use.  Walgreens shall not:  (a) allow access to the Client Accessible Software by more than the number of concurrent users agreed upon in writing by the parties, (b) disassemble, decompile or otherwise reverse engineer the Software, (c) modify, copy (except for backup, archival, distribution of software to authorized users, disaster recovery, testing, training and other similar uses), sell, rent, transfer, reproduce or distribute the Software, except as specifically provided in the Agreement, (d) use the Software to provide processing services to third parties or otherwise use the Software on a "service bureau" basis, or (e) create Internet "links" to or from the Software, or "frame" or "mirror" any of Walgreens' content which forms part of the Software.  Walgreens shall at all times comply with terms and conditions applicable to third party software provided with the Software.  Theranos reserves all rights in the Software not expressly granted herein.

c.   **Walgreens License Grant**.  Walgreens hereby grants to Theranos a perpetual, irrevocable, worldwide, royalty-free, and non-exclusive license to integrate, use and disclose in TheranOS Walgreens' data provided under, related to or generated in connection with this Agreement for use in TheranOS' analytical engine to the extent permitted by law, provided that where applicable under federal and state law, Theranos obtain patient consent to use such data and that Theranos does not disclose, and any resulting analyses do not contain, any personally identifying information regarding individuals or any information identifying Walgreens or Walgreens compounds, except in connection with the provision of any Professional Services to Walgreens under this Agreement.

d.   **Lab Certifications**.        Prior to commencement of the Pilot, Theranos shall provide a copy of the full CLIA Inspection report and PT results to Walgreens for its review.  Only, In the event the report is not made available to Walgreens, or should Walgreens, in its reasonable discretion, determine that such report contains information which calls into question any significant quality issues with the Theranos methodology. then Walgreens, at its cost, shall have the right to conduct an internal correlation study to verify the Theranos platform sensitivity and specificity with respect to the Test Menu offered by Theranos.  A copy of the Test Menu is attached to this Agreement as Schedule J.  Walgreens and Theranos will mutually agree upon the third party/research institution to assist Walgreens with this study if necessary.  Prior to commencement of any work on Walgreens' behalf, such third party shall enter into a binding non-disclosure agreement with Theranos.  Should Theranos receive notice of an inspection and/or the results of an inspection that could potentially impact Walgreens' ability to provide services under this Agreement, then Theranos agrees that it shall provide a copy of such inspection report and where relevant, PT results to Walgreens.  If after written notice to Theranos, there exists any issue that impacts Walgreens' ability to provide services to Theranos under this Agreement, or that impacts the patient experience and such issue remains uncured after thirty days' written notice, then Walgreens shall have the right to visit the relevant portions of Theranos' facilities (including, but not limited to, laboratory facilities, call center, billing, logistics) in order to better understand the issue and the steps being taken to resolve such issue.

e.   **Property Ownership/Use**.

(i)      Walgreens will not use, disclose, share or sell Theranos Intellectual Property, including Processed Data, to other individuals or entities, except as otherwise specified in this Agreement;

(ii)     Walgreens, will not, without first obtaining Theranos' consent, which consent shall not be unreasonably withheld, use the Theranos Systems, Results, Reports or Processed Data with, or for the benefit of, pharmaceutical companies or payors to design, and subsequently implement programs, which are directed and funded by the respective pharmaceutical company or payor, relating to programs for

**Confidential Treatment Requested by Walgreen Co.**                                                          **WAG-TH-00000061**

approved or developing pharmaceuticals, including usage or new indications that have not been approved by the applicable regulatory body, provided that Walgreens shall not need consent from Theranos in order to administer Tests based on Federal requirements and/or drug labeling. Walgreens may use the Theranos System for its proprietary and internally administered Medication Compliance/Adherence, Medication Persistence, MTM or other clinical management programs that do not require consent as detailed above, provided that Walgreens will not give pharmaceutical companies possession of Results and Reports.

Subject to a Non-Disclosure agreement, pharmaceutical companies will have the right to receive summarized results and have the right to visually inspect the de-identified Results in order to verify the summarized results. Walgreens agrees that any disclosure of the summarized results shall restrict against any further use, sale or disclosure of such results to a third party. Walgreens shall, on a semi-annual basis, inform Theranos of the active Medication Compliance/Adherence, Medication Persistence, MTM programs and other clinical management programs that do not require Theranos' consent, or have been consented to by Theranos that Walgreens is currently engaged in. The parties agree and acknowledge that Theranos' consent shall not be necessary to enter into a program with a pharmaceutical company that necessitates that a Test be performed prior to any dispensation of medications based on Federal requirements or drug labeling.

Walgreens and Theranos agree that they shall engage in discussions during the Pilot to reach mutually acceptable terms and conditions by which Walgreens may share data with Theranos used in connection with the Medication Compliance/Adherence, Medication Persistence and MTM programs for the limited purpose of strengthening the overall accuracy and clinical quality of the algorithms used in the Theranos System. Theranos agrees that any information licensed to Theranos will be limited to use in Theranos' model.

(iii)    Subject to patient consent and with the exception of anonymous testing, Theranos hereby provides Walgreens a perpetual, irrevocable, worldwide license to use and add Results which are collected at Walgreens Locations to its clinical databases and use said Results to provide medical care to its customers, provided such Result is not disclosed and no access is provided for any purpose to another entity besides Walgreens except as specified below.

(iv)    With respect to pharmaceutical companies, provided Walgreens obtains the patient's consent, Walgreens will only use de-identified Results and Processed Data for marketing and selling clinical programs, research programs or as otherwise agreed. Walgreens will not give these entities possession of the de-identified Results or Processed Data. Subject to a Non-Disclosure agreement, pharmaceutical companies would have the ability to receive summarized results and could look over the de-identified Results so that they could verify the summarized results. Walgreens agrees that any disclosure of summarized results shall restrict against any further use, sale or disclosure of such results.

(v)    Notwithstanding anything to the contrary in Section 19(d)(ii), the parties agree that with respect to payors, including employers and the government who are not currently paying for tests, Walgreens may use de-identified Results and Processed Data for marketing and selling clinical programs, so long as Walgreens will not give these entities possession of the detailed de-identified Results and Processed Data.

(vi)    Intentionally Deleted.

(vii)    Provided Walgreens obtains the patient's consent, Walgreens may sublicense Results and Reports to employers for employee health screening, drug screening, and other similar employment related programs, provided that the use of these Results and Reports is restricted to assessing compliance with a company's human resource policies for each specific patient for whom such Results and Reports are provided in accordance with federal and state laws. Walgreens agrees that any disclosure of identified Results or Processed Data shall restrict against any further use, sale, disclosure or sublicensing of such Results or Reports, including any blinding, aggregating, or analysis of the Results and Reports.

(viii)    Provided Walgreens obtains the patient's consent to do so, any Results or Processed Data shared with academic researchers will be provided under a clear NDA that will not allow them to do data mining. For clarity, these Results or Processed Data cannot be used for developing or identifying new biomarkers, including without limitation for purposes of monitoring disease progression or regression. Any such biomarkers which are identified or other intellectual property developed in association with Theranos data are the sole and exclusive property of Theranos.

Confidential Treatment Requested by Walgreen Co.                                                    WAG-TH-00000062

(ix)    To the extent such Results or Processed Data have not been previously published, any publications around such Results or Processed Data shared in strategic clinical relationships must be approved in writing by Theranos and where required by Theranos must acknowledge Theranos as a contributor. Notwithstanding the previous, Theranos agrees, that to the extent such publication will not result in the disclosure of Theranos confidential information, that it shall not unreasonably withhold its consent to such publication.

(x)    As between Walgreens and Theranos:  (a) all data on Theranos Systems, including Results and Reports, and (b) all inventions and improvements developed in connection with the Deliverables or as a result of the services provided by Theranos to Walgreens during the term of this Agreement and thereafter, whether by Walgreens or Theranos, or by the parties jointly, if solely, directed to: (i) any part or the whole of the Theranos System or any improvements thereto, including, without limitation, the TheranOS analytical engine and the algorithms therein; or (ii) the generation of assays for use in conjunction with the Theranos System, shall be the sole and exclusive property of Theranos. Walgreens shall promptly disclose to Theranos in writing any inventions described in the preceding sentence, and Walgreens hereby assigns to Theranos any right, title or interest it may have in such inventions.

f.   **Confidentiality.**

i.   **Use and Protection.**  Each party will use a commercially reasonable degree of care to maintain all Confidential Information of the other in trust and confidence and will neither disclose to any third party nor use any Confidential Information of the other for any unauthorized purpose or without the other party's express prior written consent.  Each party may only disclose Confidential Information of the other to those of Recipient's employees and representatives on a need-to-know basis, and may use such Confidential Information only to the extent required to perform this Agreement.  Confidential Information may not be used for any purpose or in any manner that would constitute a violation of any laws or regulations, including, without limitation, the export control laws of the United States.  Unless otherwise stated in this Agreement, no rights or licenses to intellectual property in Confidential Information is granted by either party to the other under this Agreement, whether express, implied or otherwise.  Unless otherwise stated in this Agreement, all Confidential Information will remain the property of the Discloser (and its licensors, if any), including, but not limited to, any right to make, use or sell any product embodying any Confidential Information.  **All Confidential Information disclosed under this Agreement is provided on an "AS IS" basis, with no warranty, assurance, guarantee or inducement of any kind.**  In addition, Recipient shall be entitled to disclose Confidential Information to the extent required in response to a valid order of a court or other governmental body or is otherwise required by law to be disclosed, provided Recipient, as the responding party, gives sufficient notice to Discloser to enable it to take protective measures.

ii.   **Terms of Agreement**.  Notwithstanding the foregoing, either party may disclose the terms or conditions of this Agreement only: (a) on a need-to-know and confidential basis to its legal, financial, and other professional advisors to the extent such disclosure is reasonably necessary, (b) as required by any court or other governmental body; (c) as otherwise required by law, including applicable securities and other law and regulation, including rules or regulations of any applicable securities exchange; (d) during the course of litigation so long as the disclosure of such terms and conditions are restricted in the same manner as is the confidential information of other litigating parties and so long as (1) the restrictions are embodied in a court-entered protective order limiting disclosure to outside counsel and (2) the disclosing party informs the other party in writing at least ten (10) business days in advance of the disclosure and discusses the nature and contents of the disclosure, in good faith, with the other party and (e) only on a need-to-know and confidential basis, to a third party in connection with an equity investment in such party, a merger, consolidation or similar transaction by such party, or the sale of all or substantially all of the assets of such party.  In addition, Walgreens shall not disclose any of the terms or conditions of Section 3.a or 3.b of this Schedule B except, and only to the extent, it must do so pursuant to one of the preceding exceptions and only after informing Theranos in writing at least ten (10) business days in advance of the disclosure and discussing the nature confidentiality, and contents of the disclosure, in good faith, with Theranos, provided that Walgreens shall not be prevented from making said disclosure if a judicial and/or governmental order demands production prior to such ten (10) business day notice period expiring.

**Confidential Treatment Requested by Walgreen Co.**                                                    **WAG-TH-00000063**

**iii. Term of Confidentiality**.   The obligations imposed on Recipient shall survive until such time as Discloser's Confidential Information disclosed to Recipient under this Agreement becomes publicly available and/or made generally known through no action or inaction of Recipient or its Representatives.   Recipient and its Representatives will return or destroy/erase all of Discloser's Confidential Information, including any and all information in whatever form generated making use of or reflecting Discloser's Confidential Information, except one copy for archival purposes, within thirty (30) business days of request of Discloser, or thirty (30) business days from termination or expiration of this Agreement.

**iv. Confidentiality Protocol**. Should Walgreens desire to communicate with any third parties in order to cultivate a larger customer base as it relates to the Theranos System and/or Tests offered by Theranos, Walgreens, prior to engaging in such discussions shall do the following:  (i) Walgreens shall have the receiving party sign a Non-Disclosure Agreement (in a form to be approved by Theranos and Walgreens).  Theranos' identity will not be revealed until the agreement has been executed by both Walgreens and the receiving party; (ii) Walgreens will submit the form to Theranos, along with notations of any deviations from the agreed upon form;  (iii) Within ten (10) days of receiving the NDA, Theranos shall either provide Walgreens with a signed copy, or advise in writing as to why the NDA is unacceptable.  The parties shall separately agree on a set of materials that can be provided to third parties upon execution of a mutually acceptable NDA.

**21.     Convertible Note.**      In partial consideration for Walgreens' commitments set forth in this Agreement, within fourteen days of the Effective Date, Walgreens shall have the right to purchase, or cause its affiliate WVC Investments, LLC to purchase, a convertible promissory note in the principal amount of $40 million in substantially the form set forth in Schedule H-1 (the "Convertible Note").  The Convertible Note shall bear interest at the rate of 0.79% and shall mature on the Maturity Date (as such term is defined in the Convertible Note).  The outstanding principal on the Convertible Note will be convertible into Series C-1 preferred shares (the "Series C-1") of Theranos upon the occurrence of a Conversion Event (as such term is defined in the Convertible Note).  Upon conversion, Walgreens' preferred shares will have certain Dividend, Liquidation, and Conversion Rights as set forth in Theranos' charter in the form provided to Walgreens. To exercise its right to purchase the Convertible Note within the time period described above, Walgreens shall execute and deliver to the Company a certificate in the form set forth on Schedule H-2.

**22. Indemnification.**

**22.1 Defense and Indemnification.** (i)Theranos will defend, indemnify and hold harmless Walgreens and its Affiliates, and their respective personnel, successors and assigns ("Walgreens Indemnitees"), against any claims, demands, suits, or causes of action by third parties, (the "Claims"), to the extent resulting or claimed to result from (a) any act or omission of Theranos or its personnel under or in connection with this Agreement; (b) any breach of this Agreement (including any Procurement Document and/or inaccurate or improper claims submissions caused by the TheranOS billing software) by Theranos or its personnel; (c) the violation of any intellectual property rights of Third Parties caused by Theranos, its personnel or resulting from Walgreens's use of the Theranos System, Services, Devices or Deliverables; (d) any malpractice, misdiagnosis and/or wrongful diagnosis or any other claim caused by a Test; or (e) the violation by Theranos or its Personnel of any law or regulation, provided that Theranos shall have no liability or obligation with respect to such Claim to the extent the Claim results from (1) any act or omission of Walgreens or its personnel (including without limitation the modification or combination of Deliverables or other items by or for Walgreens); (2) breach of this Agreement by Walgreens; (3) the violation by Walgreens of any law or regulation; or (4) misuse, failure to properly use, or improper disclosure by Walgreens or its personnel of any data provided by Theranos or generated or otherwise available in connection with the Theranos System or this Agreement.  Theranos will not be liable for damage to third parties to the extent such damage was caused by the negligence or willful misconduct of Walgreens as determined in a final, non-appealable order of a court of competent jurisdiction.  (ii) Walgreens will defend, indemnify and hold harmless Theranos and its Affiliates, and their respective personnel, successors and assigns ("Theranos Indemnitees") against all liabilities, damages, awards, losses, costs and expenses (including costs and attorney's fees) arising out of any claims, demands, suits or causes of action by third parties ("Claims"), which result or are claimed to result in whole or in part from (a) any act or omission of Walgreens or its personnel (including without limitation the modification or combination of Deliverable or other items by or for Walgreens); (b) breach of this Agreement by Walgreens; (c) the violation by Walgreens of any law or regulation; or (d) misuse, failure to properly use, or improper disclosure by Walgreens or its personnel of any data provided by Theranos or generated or otherwise available in connection with the Theranos System or this Agreement.  However, Walgreens will not be liable for damage to third parties to the extent such damage was caused by the negligence or willful misconduct of Theranos as determined in a final, non-appealable order of a court of

**Confidential Treatment Requested by Walgreen Co.**                                                          **WAG-TH-00000064**

competent jurisdiction.  (iii) Notwithstanding anything to the contrary, (a) to the extent that any Claim subject to Section 21.1(i) is brought by a Third Party against both parties, Theranos will have the duty to defend Walgreens, provided that Theranos will not be responsible for the defense costs to the extent such Claim was caused by the negligence or willful misconduct of Walgreens as determined in a final, non-appealable order of a court of competent jurisdiction; and (b) to the extent that any Claim solely subject to Section 21.1(ii) is brought by a Third Party against both parties, Walgreens will have the duty to defend Theranos, provided that Walgreens will not be responsible for the defense costs to the extent such Claim was caused by the negligence or willful misconduct of Theranos as determined in a final, non-appealable order of a court of competent jurisdiction.

**22.2    Infringement.**  In the event the Theranos System is held to constitute an infringement, or if Walgreens is enjoined from using the Theranos System, Theranos, at its own expense, will first use reasonable and prompt efforts to:  (a) procure for Walgreens the right to continue to use the Theranos System; (b) modify the Theranos System so that it is non-infringing and of at least equivalent performance and functionality; (c) provide functionally equivalent replacement product(s) to Walgreens; or (d) upon adequate showing to Walgreens that none of the foregoing options are commercially feasible pay to Walgreens a liquidated damage as follows:  (i) Between the date this Agreement is fully executed and the end of the Pilot, Walgreens shall be entitled to $0.00 as a liquidated damage; (ii) Between the end of the Pilot, and as applicable, the refund of the payment of Walgreens first $50 million of the  Innovation Fee commitment, Walgreens shall be entitled to receive the lesser of actual damages incurred as a result of such termination, or $20,000,0000; and (iii) After as applicable, the refund of the payment of Walgreen's second $50 million Innovation Feet, Walgreens shall be entitled to receive the lesser of actual damages incurred as a result of such termination, or $40,000,000.  Walgreens's rights under this Section will be in addition to and will not limit Walgreens's rights under the Section regarding Defense and Indemnification above.  Except as otherwise contemplated in this Agreement, this Section regarding Indemnity does not apply to any infringement caused by any combination of any Theranos System with any item not supplied by Theranos or any modification of any Theranos System other than by Theranos.  For purposes of this section "actual damages incurred" shall not include indirect, incidental, or consequential damages of any kind or nature whatsoever.  Actual damages shall include, but not be limited to, run-rate labor losses, capex, and investments made to individual Walgreens' locations to accommodate the Theranos System.

22.3    **Procedures.**  The indemnifying party has the right to control the defense and settlement of any Claim; provided, however, that the other party will have the right to participate in such defense, at its expense, and in selection of counsel, and to approve any settlement proposed by the indemnifying party (such approval not to be unreasonably withheld or delayed).  Upon the indemnifying party's' request, the other party will reasonably cooperate in such defense and the indemnifying party will reimburse the party for its reasonable out-of-pocket expenses in providing such cooperation.  Each party will provide prompt notification of any Claim; provided, however, that any reasonable delay by such party in giving such notice will not relieve the indemnifying party of its obligations pursuant to this Section regarding Indemnity, except to the extent that the indemnifying party demonstrates actual damage caused by such delay.

22.4    **Independent Obligation.**  The obligations of each party to defend, indemnify and hold harmless, their respective indemnified parties under this Section regarding Indemnity, will be independent of each other and any other obligation of the parties hereunder, provided that this Section 21 shall constitute Theranos' sole obligation and liability, and Walgreens' exclusive remedy, with respect to Third Party claims for violation of any intellectual property rights.

**23.    Limitation of Liability.**  In no event shall either party be liable to the other party or any other person or entity for any costs of substitute products or services or special, exemplary, indirect, incidental, consequential or punitive damages of any kind or nature whatsoever (including, without limitation, lost revenues, profits, savings or business, or contribution or indemnity in respect of any claim against the party) or loss of records or data, whether in an action based on contract, warranty, strict liability, tort (including, without limitation, negligence) or otherwise, even if such party has been informed in advance of the possibility of such damages or such damages could have been reasonably foreseen by such party.  In no event shall Theranos' liability to Walgreens or any other person or entity arising out of or in connection with this Agreement or the Services exceed $40,000,000, whether such liability is based on an action in contract, warranty, strict liability or tort (including, without limitation, negligence) or otherwise.  In no event shall Walgreen's liability to Theranos or any other person or entity arising out of or in connection with this Agreement or the Services exceed $40,000,000, whether such liability is based on an action in contract, warranty, strict liability or tort (including, without limitation, negligence) or otherwise.  Notwithstanding the foregoing, the limitations of liability and disclaimers of damages set forth in this Section will not apply to claims:  (i) resulting from fraud or willful or intentional conduct of, or bodily injury (including

Theranos and Walgreens Confidential and Proprietary

-15-

death) or property damage caused by, a party; (ii) that are the subject of indemnification under this Agreement; (iii) for breach of a Party's confidentiality obligations under this Agreement or (iv) for violation of any intellectual property rights of Third Parties caused by Theranos, its personnel or resulting from Walgreens' use of the Theranos System, Services or Deliverables.  Except as otherwise allowed under this Agreement, Walgreens liability to Theranos shall not be limited with respect to claims regarding Walgreen's use or misuse of Theranos Intellectual Property, trade secrets and/or Confidential Information.  Notwithstanding the foregoing, Walgreens shall not be liable to Theranos to the extent such damage was caused by the acts or omissions of Theranos as determined in a final, non-appealable order of a court of competent jurisdiction.  The limitations specified in this Section will survive and apply even if any limited remedy specified in this Agreement is found to have failed of its essential purpose.

**24.  Term and Termination.**

    a.   **Term.**  Assuming this Agreement is not terminated pursuant to Section 24(c) below, this Agreement will be in effect until three (3) years from  successful completion of the Pilot.  At the end each year of the Term, the Term of this Agreement shall automatically extend for one (1) additional year, unless either party provides written notice to the other of its intent not to renew at least ninety (90) days prior to the anniversary date of the day upon which the Pilot was completed.  For purposes of clarity, assume the following example:  The Pilot is successfully completed on January 1, 2013.  The term would then run through and including December 31, 2016.  Unless either party gives notice to the other 90 days prior to December 31, 2014, the Term would automatically extend to December 31, 2017.

    b.   **Termination due to unsatisfactory Pilot or inability to realize Pricing.**  Should Walgreens or Theranos determine that the success criteria for the Pilot has not been satisfied, Walgreens or Theranos shall have the right to terminate this Agreement.    Should Theranos terminate the Agreement, Theranos shall , within fourteen days of providing notice of termination, refund the Innovation Fee, and Theranos shall have the option to repurchase the Convertible Note detailed in Section 21 of this Agreement.  Should Walgreens terminate the Agreement, Walgreens shall forgive $25 million of the Innovation Fee, and Theranos shall pay off the remaining balance as detailed below in 24(d)(i).  Further, if Walgreens terminates the Agreement, Theranos shall have the option to repurchase the Convertible Note detailed in Section 21 of this Agreement.   In the event the parties fail to agree on either of the following issues:  (i) failure to agree on the fair market fee to be paid to Walgreens within fourteen (14) days of receipt of the FMV Report; and (ii) failure to agree to agree on revisions to Pricing within ninety (90) days after one party notifies the other in writing of a need to revise Pricing due to a governmental action, including, but not limited to, an audit, investigation, inquiry, change of law, issuance of new guidance or interpretation of law, then either party shall have the right to terminate this Agreement.

    c.   **Termination for Cause.**  If either party breaches a material provision of this Agreement and fails to cure such breach within thirty (30) calendar days after receiving written notice of the breach, the non-breaching party shall have the right to terminate this Agreement at any time until such cure; provided that a breach cannot be cured within thirty (30) calendar days but is capable of cure, the breaching party will not be in default if, within thirty (30) calendar days of receiving notice of breach, in good faith, it begins and continues to attempt to cure the breach.  In such case, the breaching party will have a reasonable time to cure the breach, but not to exceed sixty (60) days, before being in default.  Notwithstanding anything to the contrary herein, Walgreens' breach of payment obligation constitutes a default ten (10) business days after written notice from Theranos that the payment is due.  Should Walgreens fail to make such payment, or fail to respond in writing with its good faith objection to such invoice within such ten (10) day notice period, then Theranos shall have the right to terminate this Agreement immediately.

    d.   **Obligations upon Termination.**
        i.  Theranos' Obligations to Walgreens:
            1.  In the event Walgreens terminates this Agreement pursuant to Sections 24.b or 24.c or Theranos terminates this Agreement pursuant to Section 23.b, then within one hundred eighty (180) calendar days of the termination date Theranos will refund the Innovation Fee as detailed in subsections (b), as applicable, and (c).
        ii.  Walgreens' Obligations to Theranos:
            1.  In the event this Agreement is terminated by Theranos pursuant to Section 24.c Theranos shall retain the initial $25 million distribution of the Innovation Fee..
        iii.  Upon termination, Theranos may enter Walgreens' facilities, at a time and date to be reasonably agreed upon, and remove the Devices installed on Walgreens' premises.

**Confidential Treatment Requested by Walgreen Co.**        **WAG-TH-00000066**

      **f.**      **Survival of Provisions**.  Those Sections entitled "Reports," "Devices," "Warranty," "Licenses Sections b, c, d, and e," "Indemnification," "Limitation of Liability," "Term and Termination," "Miscellaneous" Schedule E ("Definitions") , and all accrued payment obligations of Walgreens, shall survive the expiration or termination of this Agreement for any reason.

**25.**      **Marketing/Sales**. The parties agree that during the term of the Agreement, Theranos shall be responsible for sales/marketing efforts with respect to physician sales.  Walgreens shall bear responsibility for sales/marketing efforts within/to Walgreens' locations.  The parties shall each be responsible for sales/marketing efforts with respect to consumer marketing.  The parties agree that prior to the commencement of the Pilot a sales/marketing playbook shall be developed and agreed upon.  Such playbook will lay out the framework by which each party will carry out its sales/marketing efforts and the messaging that will be used by each respective party. All Theranos locations will be branded with the Theranos name and meet Theranos service center standards.

**26.**      **Miscellaneous.**

**Governing Law/Venue.**  This Agreement will be interpreted and governed by the laws of the State of Delaware without reference to its conflict of laws principles.  The parties irrevocably consent to the sole and exclusive jurisdiction of and venue in the district court for Delaware.

**a.**    **Independent Contractor**.  Theranos is an independent contractor, and the relationship of the parties under this Agreement will not be construed to create any other relationship, as partners, joint venturers, principal and agent, or otherwise.  Neither party has the authority to represent the other as to any matters.

**b.**    **Entire Agreement.**  The terms and conditions contained in this Agreement, including all Schedules, constitute the entire agreement between the parties and supersede all previous agreements and understandings, whether oral or written, between the parties hereto with respect to the subject matter of this Agreement and no agreement or understanding varying or extending the same shall be binding upon either party unless in a written document signed by both parties.

**c.**    **Force Majeure.**  Non-performance of either party, except Walgreens' payment obligation, shall be excused to the extent that performance is rendered impossible by any other reason where failure to perform is beyond the reasonable control of the non-performing party.  Notwithstanding the previous, the parties acknowledge and agree that if non-performance due to a force majeure event exceeds ninety (90) days, then on written notice to the party suffering the force majeure event at any time prior to resumption of performance by such party, the other party shall be entitled to terminate this Agreement.

**d.**    **Assignment.**  Neither party may assign, delegate or otherwise transfer this Agreement or any of its rights or obligations under this Agreement without the other party's prior written approval, which approval will not be unreasonably withheld, delayed or conditioned.  Any such attempt to do so will be ineffective.  Notwithstanding the foregoing, either party may assign, delegate or otherwise transfer this Agreement by operation of law or otherwise, to: (i) any person or entity that becomes a successor entity, in connection with a change of control (which will include a direct or indirect transfer of all or substantially all of the party's' stock or assets to a third-party, a merger, reorganization or other such transaction) or (ii) a sister company or wholly-owned subsidiary.  Notwithstanding any Change of Control, the parties agree that any successor entity will comply with the terms of this Agreement.

**e.**    **Notices.**  All notices and other communications pertaining to this Agreement will be in writing and will be deemed delivered upon personal delivery, or refusal of delivery, via certified mail, return receipt requested, postage prepaid. All notices of communications between Walgreens and Theranos pertaining to this Agreement will be directed to the address specified on cover page of this Agreement, or such other address as a party may specify.

**f.**    **Prevailing Party.**  In any suit or proceeding relating to this Agreement the prevailing party will have the right to recover from the other its costs and reasonable fees and expenses of attorneys, accountants, and other professionals incurred in connection with the suit of proceeding, including costs, fees and expenses upon appeal.

**g.**    **Amendment; Waiver.**  No modification to this Agreement, or any waiver of any rights shall be effective unless assented to in writing by the party to be charged and shall not constitute the waiver of any other right hereunder or any subsequent breach or default.

**Confidential Treatment Requested by Walgreen Co.**      **WAG-TH-00000067**

h.   **Severability.** If any portion of this Agreement is held invalid or to be out of compliance with federal or state law, the parties agree that such invalidity shall not affect the validity of the remaining portions of this Agreement, and the parties shall seek in good faith if possible to agree to substitute for the invalid provision a valid provision that most closely approximates the economic effect and intent of the invalid provision.

i.   **Publicity.** Neither party will use the name(s), trademark(s) or trade name(s), whether registered or not, of the other party in publicity or press releases or advertising or in any manner (except as such disclosure may be required by applicable law or the rules or regulations of any applicable securities exchange or regulatory or governmental authority to which the relevant party is subject or submits, wherever situated), including customer lists, without that party's prior written consent.  Consent of Walgreens shall not be valid unless obtained from Walgreen's Chief Information Officer and Director of Corporate Communications, which consent may be withheld in Walgreen's sole discretion.

j.   **Export and Import Requirements.**  Theranos will prepare, maintain and, to the extent required under applicable law, submit to the applicable customs authorities, all necessary information and documentation to comply with the applicable customs and export and import requirements of each country from which any software, products, or other materials developed under this Agreement will be exported and each country into which they will be imported.  Theranos will comply with all other applicable customs, technical compliance and country of origin requirements of each country into which any software, products, or other materials are to be imported.

k.   **Compliance With Laws.**  Each party will comply with all applicable laws, ordinances, rules, and regulations governing its duties or responsibilities under this Agreement, including but not limited to, all United States and foreign export control laws or regulations.  Without limiting the generality of the foregoing, each party represents that in the performance of its obligations under this Agreement, it will fully comply with the Health Insurance Portability and Accountability Act of 1996 ("**HIPAA**") and the standards issued by the US Department of Health and Human Services at 45 C.F.R. Parts 160 and 164, to protect the security and privacy of individually identifiable health information generated by or received from the other party,  whether such party is acting in the capacity of a covered entity, business associate, health care provider or any other capacity..

   o.   **EEOC Compliance.**  In connection with its performance of the Agreement, Theranos shall comply with the **applicable** provisions of Executive Order 11246 and the regulations issued pursuant thereto (generally Part 60-1 of Title 41 of the Code of Federal Regulations), **unless exempted by said regulations,** particularly the provisions of the Equal Opportunity Clause (41 CFR Section 60-1.4(a)), which are incorporated herein by reference; the provisions and regulations pertaining to nondiscrimination and affirmative action in employment (41 CFR Sections 60-1.4, 1.40, 1.41 and 1.42), and the filing of Standard Form 100 (EEO-1).  Theranos certifies, in accordance with the requirements of  41 CFR Section 60-1.8), that its facilities for employees are not segregated.  In addition, unless exempted by said regulations, Theranos shall comply with the applicable provisions of the Affirmative Action Clause for Workers with Disabilities (41 CFR Section 60-741.5), and for Special Disabled Veterans and Veterans of the Vietnam Era (41 CFR Section 60-250.5), which are also incorporated herein by reference.

   p.   **Insurance.**  Theranos will maintain at its expense the following insurance during the term of this Agreement:

   (i)   Workers' Compensation in the statutory limits required by the state or states in which work is performed under this Agreement (including all/other states endorsement) and Employers' Liability with minimum limits of $1,000,000;

   (ii)   Commercial General Liability with minimum limits of $2,000,000 per occurrence and $4,000,000 in the aggregate (to include bodily injury, property damage, products/completed operations, and contractual liability on a blanket basis for liability assumed hereunder); (iii)   Excess   liability insurance with minimum limits of $5,000,000 in the aggregate; and

   (iv)   Professional Liability (errors & omissions) with minimum limits of $2,000,000.

   q.   **Policy Requirements.**  .  All policies will be primary and at Theranos' sole expense.  Walgreens will be included as an additional insured on all coverage listed above with the exception of Workers' Compensation and Professional Liability.  All policies will include provisions that the insurers waive the rights of recovery or subrogation against Walgreens.  Insurance coverage will be in a form and carrier acceptable to Walgreens with a minimum A.M. Best rating of A-/IX or higher.  The insolvency, bankruptcy or failure of any insurance company shall not relieve Theranos of any of its obligations

**Confidential Treatment Requested by Walgreen Co.**                                                          **WAG-TH-00000068**

herein.  Within fourteen (14) days of a request by Walgreens, Theranos shall provide certified copies of the actual policies of insurance including all endorsements and riders.  If any of the above policies are written on a "claims-made" basis, Theranos shall (i) ensure that continuous coverage is maintained or an extended coverage period will be exercised for a period of not less than three (3) years beyond the expiration or termination of this Agreement; and (ii) in the event a "claims-made" policy is not renewed or replaced, ensure that such policy must have an extended reporting period of three (3) years.

r.   **Theranos Data Security Reviews.**  Theranos will conduct its own periodic reviews or examinations of its data security procedures, consistent with prevailing industry good practices.  If any such review or examination indicates  that the procedures have or are likely to fail, Theranos will promptly notify Walgreens, providing pertinent details to the extent reasonable so that Walgreens can take steps to avoid or minimize the adverse impacts.  Theranos will also take reasonable steps to correct the errors or problems as soon as reasonably possible or otherwise cooperate reasonably with Walgreens to resolve the situation.  Furthermore, prior to and as a condition of Theranos bringing any hardware device onto Walgreen's premises to connect to Walgreen's internal computer network, Theranos shall provide Walgreens with a complete inventory of all such hardware devices, including manufacturer, model name and number, device type, and Media Access Control (MAC) address of each such device.  Walgreens shall at all times have the right to physically inspect any hardware device that is or has been connected to Walgreen's internal computer network in order to ensure compliance with provision of this Section 26.r.

*[remainder of page intentionally left blank]*

**Confidential Treatment Requested by Walgreen Co.**                                        **WAG-TH-00000069**

## SCHEDULE C

## THERANOS SYSTEM SUPPORT AND MAINTENANCE TERMS

**1.      Support and Maintenance:  Hardware and Software.** Theranos and Walgreens will work together prior to Pilot initiation to cement the workflow around implementation of these Services.

**1.1      Client Services.**

Theranos, at its cost, will use commercially reasonable efforts to provide Walgreens Users 24x7 Hardware and Software support and maintenance.  Support and maintenance services include, but are not limited to, use of and access to the Software and TheranOS, and associated enhancements and updates; on-demand, interactive services; and diagnosis of problems or issues associated with the Hardware or Software and resolution of verifiable problems.  Theranos will designate a dedicated Client Solutions manager to Walgreens.  The Client Solutions manager will be responsible for assisting in the management of Walgreens' support and maintenance requests.  Support and maintenance services will be available by telephone, email, and via TheranOS Real-Time Support online.  In responding to Walgreens' support inquiries, Theranos will use the guidelines set forth in this Schedule.

**1.2      Reactive Incident Management Guidelines.**

Theranos, at its cost, will or will direct a service provider to use commercially reasonable efforts to respond to Walgreens' inquiry on a same-day basis via email or phone.  Each inquiry will be assigned a priority level (set forth below), and Service Provider will use commercially reasonable efforts to resolve the request in accordance with the associated timelines:

- **Priority 1** – Use of the Theranos System, as that term is defined in this Agreement, is severely impacted.  Important features/critical functions are not available, or system freezes or crashes. These situations will be treated as emergencies; reasonable efforts are made to respond to Priority 1 service requests within one (1) hour. Client Solutions will work 24x7 with Walgreens until the issue is resolved or as long as useful progress can be made and fixes can be applied.

- **Priority 2** – Walgreens experiences a minor loss of service or request information, an enhancement, or documentation clarification but there is no impact on the operation of the Software.  Reasonable efforts are made to respond to Priority 2 service requests within 3 business hours.  Examples of Priority 2 support inquiries include: help with web portal access, and instructions on using the TheranOS features. Service Provider will use commercially reasonable efforts to update Walgreens via email or phone (if email is not available) on the status of the inquiry and resolution within one business day.

**3.      Deployment Services.**

At Walgreens' written request, as noted on a purchase order, Theranos, at its cost shall deploy and install the Devices on Walgreens' premises.

**4.      Training.**

Theranos and Walgreens will mutually agree upon the scope of training that Theranos will offer to Walgreens at no cost to Walgreens.

*[remainder of page left intentionally blank]*

Theranos and Walgreens Confidential and Proprietary

**Confidential Treatment Requested by Walgreen Co.**                                    **WAG-TH-00000070**

**SCHEDULE D**

**WALGREENS SERVICE PRICING**

PRICING TO BE AGREED UPON

*[remainder of page intentionally left blank]*

**Confidential Treatment Requested by Walgreen Co.**                                                    **WAG-TH-00000071**

## SCHEDULE E

## DEFINITIONS

Capitalized terms, as used within this Agreement, including any Schedule or attachment, have the following meanings, unless otherwise indicated:

1.  "**Affiliate**" means any legal entity(ies) which is directly or indirectly controlled by or under common Control with a party or Controls a party to this Agreement but only so long as such control exists.

2.  "**Assay**" means any method used for the detection of an analyte (e.g., a biomarker) or multiplexed set of analytes and/or measuring their concentration in a matrix, including, but not limited to, human blood.

3.  "**Calibration**" means processes and controls for optimizing the performance of the Theranos System which do not require running of any Tests that are not ordered tests.

4.  "**Cartridge**" means Theranos' analytical chips containing biological fluid processing technology and Assays to measure, among other matters, the concentration of specific analytes, including biomarkers in a biological fluid sample.

5.  "**Change of Control**" means (i)  any reorganization, merger or consolidation of the Company, other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity or (ii) a sale, lease or other disposition of all or substantially all of the assets of the Company.

6.  "**Client Accessible Software**" means Software related to the TheranOS which may be accessed through the Devices or at a designated website or IP address, disc, programs or other designated location ("Client Accessible Software").

7.  "**Confidential Information**" means this Agreement, all information Discloser discloses to Recipient in connection with the performance of this Agreement.  Confidential Information may not be marked as such at the time of disclosure and will still be considered Confidential Information so long as Discloser identified or designated the information as confidential at the time of disclosure (or like designation), or Discloser disclosed the information in circumstances of confidence, or the information would be understood by the parties exercising reasonable business judgment to be confidential.  "Confidential Information" does not include information which:  (a) is or becomes generally known through no fault of Recipient; (b) is known to Recipient without restriction on disclosure, at the time of disclosure, as evidenced by its records; (c) is hereafter furnished to Recipient by a third party as a matter of right and without restriction on disclosure; (d) is independently developed by Recipient without any breach of this Agreement or, (e) is otherwise necessary to establish rights or enforce obligations under this Agreement, but only to the extent that any such disclosure is necessary.  Results and Reports shall be included in the definition of Theranos' Confidential Information, provided that such classification shall not reduce Walgreens' rights of use as described within this Agreement.

8.  "**Control, Controls** or **Controlled**" mean owning or controlling directly or indirectly more than 50% of shares, partnership interests, membership shares, ownership interests or voting rights of such controlling or controlled entity.

9.  "**Device**" means Theranos' analyzer, the Theranos patient interface and sample collection tools.

10.  "**Deliverable**" means any Hardware, Software, Cartridge, Device, Theranos System, Support and Maintenance Services and/or training to be provided by Theranos to Walgreens under this Agreement.

11.  "**Delivery Date**" means the date on which Theranos will ship the Cartridges to Walgreens, or otherwise make the Deliverable available to Walgreens at Theranos' manufacturing facilities.

12.  "**Discloser**" means the party disclosing Confidential Information.

**Confidential Treatment Requested by Walgreen Co.**                                                     **WAG-TH-00000072**

13. **"Documentation"** means user manuals and technical notes for the Theranos System regarding the use and maintenance of the Theranos System.

14. "**Hardware**" means equipment and hardware Theranos is to deliver pursuant to this Agreement.

15. "**Medication Compliance/Adherence**" means the act of conforming to the recommendations made by the clinician with respect to timing, dosage, and frequency of medication taking within the guidelines approved by the FDA or as set forth in that medication's labeling.

16. "**Medication Persistence**" means the duration of time from initiation to discontinuation of administration of medications.

17. "**MTM**" or "**Medication Therapy Management**" means services provided by Walgreens in order to help consumers get the best results from medications through enhancing consumer understanding of medication therapy, increasing consumer adherence to medications, controlling costs, and preventing drug complications, conflicts, and interactions.

18. "**Ordered Tests**" means Tests that were: (i) ordered or authorized by an Ordering Practitioner or other individual permitted under federal and state law to order clinical laboratory tests; and (ii) initiated by a Walgreens employee or agent by entering the Tests specified on the order into the Device.

19. "**Ordering Practitioner**" means a licensed physician, osteopathic physician, physician assistant, nurse practitioner, or any other health care professional who is authorized under federal and state law to order clinical laboratory tests and who ordered one or more Tests.

20. "**Pilot**" means the pilot program as set forth in Schedule F.

21. "**Payment Refund Obligation**" means the conditional obligation to refund the pre-purchase payments if the pilot is not successful.

22. "**Payment Refund Obligation Termination**" means the earlier of (i) the date on which the success criteria for the pilot have been satisfied, or (ii) the date on which Theranos has refunded the amounts due under the Payment Refund Obligation.

23. "**Predictive Test**" means a test for diabetes/pre-diabetes, congestive heart failure, women's caner, men's cancer or other such Theranos proprietary test.

24. "**Processed Data**" means information generated by Theranos utilizing Theranos IP such as predictive modeling.

25. "**Program**" means the project outlined in Schedule A, but shall not include the Pilot for purposes of the Innovation Fee.

26. "**PSC**" means patient service center.

27. "**Recipient**" means the party receiving Confidential Information from Discloser.

28. "**Report(s)**" means the collective Routine Reports, Specialty Test Results and Predictive Results provided to Walgreens.

29. "**Representatives**" mean each party's employees, directors, officers, contractors, consultants, stockholders and agents.

30. "**Result(s)**" means the collective Routine and/or Specialty Results, and Predictive Results provided to Walgreens.

31. "**Routine "Test**" means a combination of one or more Assays that match existing Current Procedural Terminology (CPT) codes for laboratory analyses as defined by the American Medical Association.

Confidential Treatment Requested by Walgreen Co.                                                           WAG-TH-00000073

32. **"Services"** means all services related to the Cartridges, Tests, and Theranos System described in this Agreement including but not limited to the services described in Schedule B, Section 14 and Schedule C.

33. "**Software**" means computer programs, object code and related materials, in machine readable or printed form, including the TheranOS, and any updates or upgrades thereto. . The term **"Software"** also includes updates, enhancements and new versions delivered pursuant to this Agreement.

34. "**Specialty Test**" means laboratory tests, including, but not limited to, influenza/strep, pregnancy, fertility, pre-natal/trimester, STD, compliance, drug efficacy and all available esoteric Tests (the parties agree that they will memorialize the CPT codes that are include all Specialty Tests as such codes become available).

35. **"Support and Maintenance Services(s)"** means support and maintenance services that Theranos will may provide Walgreens, as more fully set forth in Schedule C.

36. **"Test"** means a) in the context of routine laboratory analyses: a combination of one or more Assays that match existing Current Procedural Terminology (CPT) codes for laboratory analyses as defined by the American Medical Association and that have been granted CLIA-waived status by FDA or b) in the context of Predictive tests: a Cartridge, software program, information system or any other product necessary to perform a Predictive test that has been granted CLIA-waived status by FDA.

37. "**TheranOS**" means Theranos' ambulatory bioinformatics communication system, database, analytical engine, algorithms and methodologies, web or device accessible Software, and related statistical and other analysis methods, data, data repositories and technologies.

38. **"Theranos Intellectual Property"** means all algorithms, analytical methodologies, data collection processes, software, hardware, Results, Reports, and Processed Data.

39. "**Theranos System**" means the system comprising the Assays, Cartridges, Device(s), and the TheranOS, and any other components developed by or for Theranos facilitating the operation of any of the foregoing, alone or in any combination.

40. **"Routine Results"** means the numerical outcome (raw data points) of a Routine laboratory Test originated at a Walgreens' Location.

41. **"Routine Report"** means the documentation provided to the ordering clinician and Walgreens for a laboratory test originated at a Walgreens Location.  A Report for a Routine test is made up of  the following three (3) components: (i) a Routine Result; (ii) trending information for that given patient and (iii) analysis, including, but not limited to, predictive modeling.

42. **"Specialty Result"** or **Predictive Result"** means the documentation provided to the ordering clinician and Walgreens for a Specialty Test or Predictive Test originated at a Walgreens Location.  A Specialty or Predictive Result is made up of analysis only.

43. **"Walgreens"** means Walgreen Co. and its wholly owned subsidiaries.

44. **"Walgreens Location"** means a clinical or retail location including employer sites and academic research centers.

**Confidential Treatment Requested by Walgreen Co.**                                        **WAG-TH-00000074**

## SCHEDULE F
## PILOT

Theranos and Walgreens will enter into a written Pilot agreement on mutually acceptable terms.  The terms of the Pilot agreement shall address the following objectives:

- Exceeding customer expectations for lab Services;
- Evaluating operating feasibility of delivering the Services within Walgreens locations;
- Evaluating the capacity/capability of supporting systems
- Ensuring payors will pay for lab Tests and that A/R will be collected.

The Pilot agreement will include, but not be limited to, the following provisions:

- The Pilot will include all Routine and Specialty tests as specified in Schedule B, Section 2 of the Agreement.
- The services will be offered in all stores (including 24 hour stores) in the pilot market to be mutually agreed upon between the parties ("Pilot Market").  The services will be available during normal store hours.
- The Pilot for store locations will commence no sooner than September 15, 2012, provided that the following three criteria must be met: (i) Theranos shall first obtain all necessary approvals to provide laboratory services in the State of California;  (i) payor coverage that will be reasonably expected to produce the 15 patient average per day per store goal; and (ii) Theranos must show Walgreens, to its reasonable satisfaction, that the Theranos System is fully functional and operational, including, but not limited to, billing software necessary to support the Pilot markets, and that Theranos' ability to process Tests is adequate to support reaching the 15 patient average per store per day goal.  While the Parties intend the Pilot to start no sooner than September 15, 2012 the actual start date of the Pilot will be agreed upon and memorialized by the parties once these three (3) requirements are satisfied. The Services will be offered for a period of 90 days unless extended in writing upon mutual agreement of both parties if the success criteria below have not yet been met.  At such time as Theranos has satisfied the above requirements, Theranos shall provide written notice to Walgreens of the same.  Walgreens shall commence the Pilot within forty-five (45) days of such notice.  In order for Pilot to commence, Theranos must accredit the PSC locations and staff and all such locations must meet Theranos Lab Standards as defined in this Agreement. Both parties agree that they shall make commercially reasonable efforts to ensure that the Pilot will commence after September 15, 2012, but no later than February 1, 2013.
- The services will be offered in at least one (1) Employer Solutions Group ("ESG") locations.  The Pilot for the ESG location will commence on a mutually agreeable date.
- Should Theranos fail to meet its requirements under this Schedule F prior to April 1, 2013, Walgreens shall have the option to terminate this Agreement pursuant to Schedule B, Section 24(c).  Should Theranos comply with the requirements under this Schedule F and Walgreens fails to commence the Pilot, then Theranos shall have the option to terminate this Agreement.

The following criteria, among other criteria developed and agreed upon in writing by the parties, will be utilized to evaluate pilot success for purposes of Schedule B, Section 24(b) and 24(d)(i) of this Agreement. When the following criteria have been met, the pilot will be deemed successful. Both parties will confirm pilot success in writing and Walgreens will notify Theranos in writing of its intent to proceed with deployment at whatever pace Walgreens deems appropriate within thirty (30) calendar days from successful pilot completion:

- Walgreens Service Fee received during the pilot timeframe shall be at least $10.00 per patient, in accordance with the Pricing agreed upon per the terms of this Agreement.

- Other criteria mutually agreed to in writing by both parties prior to the commencement of the pilot.

National rollout criteria:
- Assuming adequate payor coverage, Theranos must demonstrate to Walgreens' reasonable satisfaction that it can support 100,000 Tests per day within three (3) months after successful completion of the Pilot to support full roll out of the program post Pilot.  In a subsequent amendment, the parties shall document terms regarding national roll-out schedule, expectations, etc.
- Theranos and Walgreens mutually agree upon expansion criteria for nationwide rollout of the program post Pilot.

Theranos and Walgreens Confidential and Proprietary                                    -25-

**Confidential Treatment Requested by Walgreen Co.**                                    **WAG-TH-00000075**

Should the Pilot success criteria not be initially met within ninety (90) days of the Pilot commencement, the parties agree that they shall not terminate this Agreement, so long as at least three (3) patients per day have had laboratory services provided at Walgreens.  In good faith, the parties shall work together to identify the problems that prevented the Pilot from being successful.  If after twelve (12) months of continued efforts to address the issues identified in the Pilot, the parties are unable to resolve the Pilot issues, the parties will have the right to terminate this Agreement pursuant to Section 24(c) of this Agreement.

**Confidential Treatment Requested by Walgreen Co.**                                   **WAG-TH-00000076**

**SCHEDULE G**
**HIPAA BUSINESS ASSOCIATE AGREEMENT**

TO COME.

**Confidential Treatment Requested by Walgreen Co.**                                        **WAG-TH-00000077**

SCHEDULE H-1
CONVERTIBLE PROMISSORY NOTE

**THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE ISSUER THAT SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS.**

**THERANOS, INC.**

**CONVERTIBLE PROMISSORY NOTE**

$40,000,000                                                                    [DATE]

FOR VALUE RECEIVED, Theranos, Inc., a Delaware corporation (the "Company") promises to pay to WVC Investments, LLC ("Investor"), or its registered assigns, in lawful money of the United States of America the principal sum of Forty Million Dollars ($40,000,000), or such lesser amount as shall equal the outstanding principal amount hereof, together with interest from the date of this Convertible Promissory Note (this "Note") on the unpaid principal balance. All unpaid principal, together with any then unpaid and accrued interest and other amounts payable hereunder, shall be due and payable on the Maturity Date (as defined below) in accordance with the terms hereof. This Note is issued pursuant to that certain Amended and Restated Theranos Master Services Agreement by and between the Company and Investor dated [ 6/5/12 ] (the "Agreement"). All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement.

The following is a statement of the rights of Investor and the conditions to which this Note is subject, and to which Investor, by the acceptance of this Note, agrees:

1.      **Payments.**

(a)   Interest.  This Note shall bear interest at the rate of 0.79% per annum, which interest shall accrue annually.  Accrued interest on this Note shall be payable on the Maturity Date.

(b)   The "Maturity Date" shall be the earlier of:

i.    the date of the Company's Initial Public Offering;

ii.   the effective date of a Change of Control;

iii.  one hundred eighty (180) calendar days from the date of receipt by the Company of Investor's written demand for repayment of this Note pursuant to this Section 1(b)(iii), which demand may be made only if the Company does not meet the mutually agreed-upon success criteria for the Pilot set forth in Schedule F of the Agreement; or

iv.   the date that is ten years after the date of the Note .

(c)   Prepayment.  The Company shall not have the right to prepay any portion of principal or accrued interest under this Note except with the express written consent of Investor unless and only to the extent that the Company and/or the Investor have determined that the Pilot contemplated by the Agreement is unsuccessful.

2.      **Conversion.**

**Confidential Treatment Requested by Walgreen Co.**                          **WAG-TH-00000078**

(a)   Optional Conversion. At any time prior to repayment by the Company of the Note, if services are being offered in at least 1,000 Investor locations (as contemplated in the Agreement), Investor may elect to convert all or any party of the outstanding principal amount up to $20,000,000 of this Note into fully paid and non-assessable shares of the Company's Series C-1 Preferred Stock at the Conversion Price, provided, however, that upon conversion 50% of the converted amount must come from Tranche 1 and 50% from Tranche 2 until such time as Tranche 1 is exhausted. At any time prior to repayment by the Company of the Note, if services are being offered in at least 2,500 locations (as contemplated in the Agreement) Investor may elect to convert all or any part of the remaining outstanding principal amount of this Note into fully paid and non-assessable shares of the Company's Series C-1 Preferred Stock at the Conversion Price, provided, however, that upon conversion 50% of the converted amount must come from Tranche 1 and 50% from Tranche 2 until such time as Tranche 1 is exhausted.   Investor's election to convert shall be evidenced by Investor's delivery to the Company of written notice of Investor's intention to convert.  All accrued and unpaid interest on this Note shall be paid in full in cash and not in shares of capital stock upon the occurrence of a conversion pursuant to a Company Event. If Investor elects to convert the Note following receipt by Investor of notice of a Company event pursuant to Section 2(b) hereof and for any reason the Company Event described in any such notice does not occur, such election to convert by Investor shall be rescinded and shall be null and void.

(b)   Notice of Company Events.      The Company shall give written notice to Investor of the anticipated occurrence of any Company Event.  Such written notice of the anticipated occurrence of a Company Event shall be given not less than fifteen (15) days and not more than thirty (30) days prior to the actual occurrence of a Company Event

(c)        Conversion Procedure.

    i.   <u>Conversion Pursuant to Section 2(a)</u>.  Before Investor shall be entitled to convert this Note into shares of Series C-1 Preferred Stock, it shall surrender this Note (or a notice to the effect that the original Note has been lost, stolen or destroyed and an agreement acceptable to the Company whereby the holder agrees to indemnify the Company from any loss incurred by it in connection with this Note) and give written notice to the Company at its principal corporate office of the election to convert the same pursuant to Section 2(a).  Upon such conversion of this Note, the Company and the Investor hereby agree to execute and deliver to one another a purchase agreement and other ancillary agreements, with customary representations and warranties and transfer restrictions (including, without limitation, the Amended and Restated Investors' Rights Agreement, the Amended and Restated Co-Sale Agreement and the Amended and Restated Voting Agreement).  The Company shall, as soon as practicable thereafter, issue and deliver to such Investor a certificate or certificates for the number of shares to which Investor shall be entitled upon such conversion, including a check payable to Investor for any cash amounts payable as described in Section 2(c)(ii).  Any conversion of this Note pursuant to Section 2(a) shall be deemed to be effective upon the earlier to occur of (i) the tenth day following the Company's receipt of Investor's written notice of its intention to convert, and (ii) immediately prior to the occurrence of the Company Event, and on and after such date the Persons entitled to receive the shares issuable upon such conversion shall be treated for all purposes as the record holder of such shares.

    ii.   <u>Fractional Shares; Interest; Effect of Conversion</u>. No fractional shares shall be issued upon conversion of this Note.  In lieu of the Company issuing any fractional shares to the Investor upon the conversion of this Note, the Company shall pay to Investor an amount equal to the product obtained by multiplying the applicable conversion price by the fraction of a share not issued pursuant to the previous sentence.  The Company shall pay to Investor any interest accrued on the amount converted and on the amount to be paid to Company pursuant to the previous sentence in cash and not in shares of capital stock upon the conversion of this Note.  Upon conversion of this Note in full and the payment of the amounts specified in this paragraph, Company shall be forever released from all its obligations and liabilities under this Note and this Note shall be deemed of no further force or effect, whether or not the original of this Note has been delivered to the Company for cancellation.

Confidential Treatment Requested by Walgreen Co.                                                                    WAG-TH-00000079

3.      **Definitions.** As used in this Note, the following capitalized terms have the following meanings:

"Amended and Restated Co-Sale Agreement" shall mean that certain Amended and Restated Co-Sale Agreement by and among the Company and the other signatories thereto dated as of July 1, 2010. as such agreement may be amended from time to time.

"Amended and Restated Investors' Rights Agreement" shall mean that certain Amended and Restated Investors' Rights Agreement by and among the Company and the other signatories thereto dated as of July 1, 2010. as such agreement may be amended from time to time.

"Amended and Restated Voting Agreement" shall mean that certain Amended and Restated Voting Agreement by and among the Company and the other signatories thereto dated as of July 1, 2010. as such agreement may be amended from time to time.

"Change of Control" shall mean (i)  any reorganization, merger or consolidation of the Company (excluding  any  sale  of  stock  for  capital  raising  purposes),  other  than  a  transaction  or  series  of  related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction  or  series  of  related  transactions  retain,  immediately  after  such  transaction  or  series  of  related transactions,  as  a  result  of  shares  in  the  Company  held  by  such  holders  prior  to  such  transaction  or  series  of related transactions,  at least a majority of the total voting power represented by the outstanding voting securities of  the  Company  or  such  other  surviving  or  resulting  entity;  (ii) a  sale,  lease  or  other  disposition  of  all  or substantially all of the assets of the Company

"Company Event" shall mean the Company's Initial Public Offering, a Change of Control, a dissolution of the Company, other event of liquidation, declaration of a Series C-1 Dividend or other events agreed upon in writing by the Company.

"Conversion Price" shall mean $15.00 per share, as may be adjusted from time to time for stock splits, stock dividends or similar events with respect to the Series C-1 Preferred Stock.

"Initial Public Offering" shall mean the closing of the Company's first firm commitment underwritten initial public offering of the Company's Common Stock pursuant to a registration statement filed under the Securities Act.

"Investor" shall mean the Person specified in the introductory paragraph of this Note or any Person who shall at the time be the registered holder of this Note.

"Person" shall mean and include an individual, a partnership, a corporation (including a business trust), a joint stock company, a limited liability company, an unincorporated association, a joint venture or other entity or a governmental authority.

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Series C-1 Dividend" shall mean any dividend, whether in the form of cash, property or securities, payable or paid to the holders of the Company's Series C-1 Preferred Stock. For the avoidance of doubt, C-1 Dividends do not include any stock re-purchases.

"Tranche 1" shall mean $10,000,000 of the principal amount of this Note.

"Tranche 2" shall mean $30,000,000 of the principal amount of this Note.

"Tranche 1 Conversion Price" shall mean $15.00 per share, as may be adjusted from time to time for stock splits, stock dividends or similar events with respect to the Series C-1 Preferred Stock.

"Tranche 2 Conversion Price" shall mean $75.00 per share, as may be adjusted from time to time for stock splits, stock dividends or similar events with respect to the Series C-1 Preferred Stock.

**Confidential Treatment Requested by Walgreen Co.**                                                         **WAG-TH-00000080**

4. **Investor Representations.** Investor represents and warrant to the Company as follows:

(a) Binding Obligation.  Investor has full legal capacity, power and authority to execute and deliver this Note and to perform its obligations hereunder. This Note constitutes a valid and binding obligation of Investor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b) Securities Law Compliance.  Investor has been advised that the Note and the underlying securities have not been registered under the Securities Act, or any state securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. Investor is aware that the Company is under no obligation to effect any such registration with respect to the Note or the underlying securities or to file for or comply with any exemption from registration, except as may be provided in the Amended and Restated Investors' Rights Agreement. Investor has not been formed solely for the purpose of making this investment and is purchasing the Note for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. Investor has such knowledge and experience in financial and business matters that Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing Investor's financial condition and is able to bear the economic risk of such investment for an indefinite period of time. Investor is an "accredited investor" as such term is defined in Rule 501 of Regulation D under the Securities Act and shall submit to the Company such further assurances of such status as may be reasonably requested by the Company. The principal place of business of Investor is correctly set forth beneath Investor's name on the signature page hereto.

5. **Miscellaneous.**

(a) Successors and Assigns; Transfer of this Note or Securities Issuable on Conversion Hereof.

   i. Subject to the restrictions on transfer described in this Section 5(a), the rights and obligations of the Company and Investor shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties.

   ii. Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, in whole or in part, by the Investor to any legal entity or person, other than a wholly-owned direct or indirect subsidiary of Investor.  In the event Investor intends to assign any rights, interests or obligations under this Note to a wholly-owned direct or indirect subsidiary, Investor shall give Company no less than thirty (30) calendar days' prior written notice.

   iii. Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, by operation of law or otherwise, in whole or in part, by the Company without the prior written consent of the Investor.

(b) Waiver and Amendment.  Any provision of this Note may be amended, waived or modified upon the written consent of the Company and the Investor.

(c) Notices.  All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing and faxed, mailed or delivered to each party at the respective addresses of the parties as set forth in the signature page to this Note.  All such notices and communications will be deemed effectively given the earlier of (i) when received, (ii) when delivered personally, (iii) one business day after being delivered by facsimile (with receipt of appropriate confirmation), (iv) one business day after being deposited with an overnight courier service of recognized standing or (v) four days after being deposited in the U.S. mail, first class with postage prepaid.

(d) Payment.  Unless converted into the Company's equity securities pursuant to the terms hereof, payment shall be made in lawful tender of the United States.

Theranos and Walgreens Confidential and Proprietary

**Confidential Treatment Requested by Walgreen Co.**                    **WAG-TH-00000081**

(e)    Governing Law.  This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law provisions of the State of Delaware, or of any other state.

(f)    Counterparts.  This Note may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Note.

The Company has caused this Note to be issued as of the date first written above.

THERANOS, INC.,
a Delaware corporation

By: _____
Name: _____
                    Elizabeth Holmes
Its: _____
                    CEO

Acknowledged and accepted by Investor:
WVC INVESTMENTS, LLC

By: _____
Name: _____
Its: _____

Confidential Treatment Requested by Walgreen Co.                                    WAG-TH-00000082

(e)   Governing Law.  This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law provisions of the State of Delaware, or of any other state.

(f)   Counterparts.  This Note may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Note.

The Company has caused this Note to be issued as of the date first written above.

THERANOS, INC.,
a Delaware corporation

By:_____
Name:_____
Its:_____

Acknowledged and accepted by Investor:
WVC INVESTMENTS, LLC

By:_____
Name:_____
Its:_____

Confidential Treatment Requested by Walgreen Co.                                    WAG-TH-00000083

**SCHEDULE H-2**
**CERTIFICATE EVIDENCING RIGHT TO PURCHASE CONVERTIBLE PROMISSORY NOTE**

[ June 5 ], 2012

     PURSUANT to Section 21of that certain Amended and Restated Theranos Master Services Agreement of even date herewith (the "**Agreement**"), by and between Walgreen Co. ("**Walgreens**") and Theranos, Inc. ("**Theranos**"), this Certificate evidences the right granted to Walgreens under the Agreement to purchase a convertible promissory note in the principal amount of $40 million in substantially the form set forth in Schedules H-1 of the Agreement (the "**Convertible Note**").

     From the Effective Date (as defined in the Agreement) to fourteen (14) days after the Effective Date with respect to Schedule H-1, Walgreens shall have the right to purchase the Convertible Note, subject to the terms of the Agreement, by countersigning this Certificate, for the applicable Convertible Note, below.

THERANOS, INC.

By: _____

Name: ____Elizabeth Holmes_____

Title: _____CEO_____

*THE FOLLOWING IS TO BE EXECUTED ONLY UPON EXERCISE OF RIGHT TO PURCHASE NOTE:*

     On this _____ day of _____, 201__, Walgreens hereby elects to purchase the Convertible Note pursuant to the terms of the Agreement, and tenders herewith the full purchase price of the Convertible Note.

WALGREEN CO.

By: _____

Name: _____

Title: _____

**Confidential Treatment Requested by Walgreen Co.**                    **WAG-TH-00000084**

**SCHEDULE I**
**THERANOS PHARMACEUTICAL CLINICAL TRIALS INFRASTRUCTURE**

Final terms for extending Theranos' clinical trials infrastructure to Walgreens' stores shall be agreed upon following execution of this Agreement.  At that time, this Schedule will be completed accordingly, and this Agreement amended, if warranted.

**Confidential Treatment Requested by Walgreen Co.**                                                **WAG-TH-00000085**

**SCHEDULE J**
**TEST MENU**

**TO COME**

Theranos and Walgreens Confidential and Proprietary

-35-

**Confidential Treatment Requested by Walgreen Co.**

# Exhibit E

December 31, 2013


Theranos, Inc.
Attn: Elizabeth Holmes
1601 S. California Avenue
Palo Alto, CA 94304

Re:    Amended and Restated Theranos Master Services Agreement

Dear Ms. Holmes:

In reference to that certain Amended and Restated Theranos Master Services Agreement dated June 5, 2012, as amended by that letter agreement dated January 7, 2013 (collectively "Agreement"), by and between Theranos, Inc. ("Theranos"), and Walgreen Co. ("Walgreens"), the parties agree that it is necessary to revisit certain terms contained within the Agreement as the intentions of the parties regarding their business relationship have evolved since the Agreement was first executed.

It is the intention of the parties to develop a mutually beneficial strategic relationship that facilitates the successful deployment of Theranos nationally, establishes Walgreens as the national partner for laboratory services that Theranos is able to provide (the "Theranos Services"), and Theranos as Walgreens national partner for such Theranos Services, and protects the long-term strategic and competitive positioning of Theranos and Walgreens with respect to competitive technologies and services.  Assuming appropriate coverage, quality and performance by Walgreens, it is the expectation that Walgreens will be Theranos' exclusive retail pharmacy and clinic partner.    Assuming the ability to scale, acceptable quality and performance by Theranos, it is the expectation that Theranos will be Walgreens exclusive partner for the Services.   The parties understand that this relationship may evolve, and their business relationship may change over time as a result of industry developments, competitive dynamics, regulations, technological advances, consumer acceptance, Theranos' desired store and patient experience, and other factors.  The parties also understand that their economic relationship will similarly evolve, and as the market roll-out advances the capital investments, costs of healthcare professionals, marketing expense and Walgreens service fees related to new markets will be adjusted based on requirements existing at the time.   The parties intend that this Agreement be structured in a manner that provides flexibility but also commits both parties to each other as "anchor" partners and provides adequate protections to justify the significant investment that both are expecting to make in reliance on their strategic relationship.

To that end, the parties agree to the following:

1

**Confidential Treatment Requested by Walgreen Co.**                                             **WAG-TH-00000099**

1. **National Roll-out; New Market Entry**. The parties shall work together to develop a forecast that details the anticipated roll-out dates for Theranos Services in individual U.S. States/territories (each, a "State"). The parties are committed to taking all steps reasonably necessary to ensure a successful national roll-out of the Theranos Services, and agree that a quality store and patient experience is an important component of this success as patient adoption and acceptance of Theranos' laboratory services will be highly impacted by the patient experience. To that end, the parties agree that, within sixty (60) days prior to entering a new State, they will develop a plan (the "New Market Entry Plan") that sets forth the material terms that will govern the parties' expectations as it relates to that new State. The New Market Entry Plan will describe the required coverage for Theranos within that State (i.e., how many outlets are required to serve patients within that market), the expectations regarding how to provide that coverage, including expected Geo-access and Branding Acceptability (and, whether the market will be exclusive [as further described below], specifically which Walgreens locations will be utilized and any non-Walgreens locations), expected mix of Walgreens store formats (i.e., Gold, Silver, Bronze) and associated capital investments, required health care professionals, marketing expenses, and similar items. The New Market Entry Plan will also include the expected allocation of costs among the parties, and the economic relationship that will exist between them as it relates to that new State (i.e., Walgreens' service fee).

2. **Exclusivity**. As detailed below, Walgreens is willing to commit to a higher level of build out with respect to its stores in order to provide Services to Theranos. The parties' expectation is that the majority of Theranos spaces will be gold or silver spaces with no more than 20% bronze spaces and minimum 40% gold spaces. As such, the parties agree that increased exclusivity represents a fair market value exchange for such commitment. While the parties acknowledge the need to further document specifics concerning each party's performance, Branding Acceptability and Geo-access of Walgreens stores in respective markets, the parties agree to the following:

   a. In addition to the exclusivity provisions, and subject to the carve-outs related to pharmaceutical companies and United States and foreign government agencies, in Schedule B, Section 3(b) of the Agreement, with respect to California, Arizona and New York, the parties agree to the following exclusivity framework: For each state listed above, a period of eighteen (18) months commencing on the date on which 20 Walgreens stores (or other number the parties may agree) located such state  are actively collecting samples for commercial patients, Theranos shall not provide testing services or have samples collected on its behalf through or at any of the following entities:     Wal-Mart Stores, Inc., CVS Caremark Corporation, Rite Aid Corporation, and Target Corporation.    Provided that Walgreens satisfies mutually agreed upon requirements regarding Geo-access, Branding Acceptability, and Walgreens performance, the parties will conduct an annual exclusivity extension review, with the presumption being that if Walgreens has satisfied the Geo-access, Branding Acceptability, and performance

2

**Confidential Treatment Requested by Walgreen Co.**                                      **WAG-TH-00000100**

requirements, the parties will negotiate to extend the above exclusivity framework for an additional twelve (12) month period.

b. In connection with developing the New Market Entry Plan and at least sixty (60) days prior to the planned launch date for such State, the parties shall discuss and agree on Walgreens's proposed Geo-access and Branding Acceptability for such State and Walgreens's performance to date. Should Walgreens (a) elect to move forward with such State, (b) satisfy the Geo-access and Branding Acceptability negotiations for such State and (c) satisfy Theranos' reasonable expectations as to Walgreens's performance to date (consistent with the intention of the parties described above), the parties agree that the following exclusivity (subject to the carve-outs related to pharmaceutical companies and United States and foreign government agencies in Schedule B, Section 3(b) of the Agreement) shall apply with respect to each State: for a period of twelve (12) months commencing on the date on which the first Walgreens location in such State actively collects samples for commercial patients, Theranos shall not launch testing services or have samples collected on its behalf through or at locations owned or operated by CVS Caremark Corporation, Rite Aid Corporation or Target Corporation.

c. Theranos further agrees that it shall not launch testing services or have samples collected on its behalf through or at locations owned or operated by Wal-Mart at any time during 2014, except with Walgreens approval if needed to fill gaps in Walgreens coverage. After 2014, Theranos will have discretion to launch testing services or have samples collected on its behalf through or at locations owned or operated by Wal-Mart if, after good faith discussions with Walgreens, Theranos believes it is necessary to do so to advance Theranos' business or strategic objectives. For the avoidance of doubt, after 2014, such decision will be made in Theranos' sole discretion.

d. Notwithstanding anything to the contrary, Theranos agrees that it shall not, without Walgreens prior written consent, offer services or collect samples through CVS Caremark Corporation's Minute Clinics, or their equivalent in exclusive Walgreens markets. In the event Theranos desires to utilize such clinics in non-exclusive Walgreens markets it will inform Walgreens in advance and review their rationale for doing so, and consider reasonable alternatives that Walgreens may advance. Theranos further agrees to discuss with Walgreens the inclusion of Walgreens in-store and employer worksite clinics in the national roll-out, as may be appropriate.

e. Definitions.
  i. "Geo-access" shall include, but not be limited to, access to a store location within an acceptable mileage from every person in the relevant State (e.g., for urban markets, 5 miles from every household) and ability for individual stores and at a market level to handle the volume of patients. Further the parties shall work together in order to determine what other factors need to be considered in order to

3

determine what saturation level of sample collection locations are necessary to satisfy a market's particular needs.

ii. "Branding Acceptability" shall include, but not be limited to, (i) the in-store patient experience and percentage of Gold, Silver and Bronze locations (with such designations being generally consistent with the parties discussions to date, and final commitments to be agreed upon in writing as part of the New Market Entry Plan) built out by Walgreens in the relevant State, (ii) prominent display of the Theranos wordmark, and the Theranos space within Walgreens locations. The parties shall take reasonable steps to work together in order to come to agreement in writing on these details/terms.

3. **Innovation Fee**. As detailed in Section 6 of Schedule B of the Agreement, Walgreens is to make an Innovation Fee payment of up to $100 million to Theranos. The parties acknowledge that in order to be better prepared for national roll-out of Theranos laboratory testing, there is a need to accelerate the Innovation Fee payment schedule. To that end (and subject to Section 7 below), the parties have agreed that Walgreens shall accelerate payment of the Innovation Fee so that $75M of the pre-purchase will become immediately due and payable at the close of business on 12/31/2013, and Walgreens commits to wire immediately available funds in such amount within five (5) business days after the date hereof to an account designated by Theranos.

3. **Service Levels/Training**. The parties agree that it is necessary to document their respective responsibilities and expectations with respect to performance and to training, among other items. In a separate document, the parties shall reduce to writing tangible performance levels with respect to all activities addressed under the Agreement as it relates to providing laboratory services to patients.

5. **Pricing**. Schedule B, Section 11 of the Agreement provides that the Pricing for Walgreens Services shall, on average, fall within a range of $10.00-$16.00/patient/visit. Walgreens has conducted a fair market value assessment of the Walgreens Services and the parties agree that the Pricing shall be $10.00/patient/visit during the Pilot. The parties shall further discuss and agree upon Pricing beyond the Pilot as part of the New Market Entry Plan.

6. With respect to Schedule F of the Agreement, the parties agree to the following terms with respect to the Pilot:

i. The "Pilot Stores" mean the stores mutually agreed upon by the parties as pilot locations.

ii. The parties soft launched the Pilot by first offering Tests at three (3) stores, with two in the Phoenix market and one in Palo Alto. The Pilot will run for a period of ninety (90) days after the last of the 20 Walgreens stores is actively collecting samples for commercial patients.

4

iii.     Notwithstanding anything to the contrary, should the parties agree that the Pilot is successful prior to the end of the ninety (90) day period, the parties may move onto the national roll-out launch planning phase as detailed in Schedule F and end the Pilot early.

7.     **Additional Equity Rights**. The parties agree that $50M of the $75M payment made by Walgreens pursuant to Section 3 above may be converted, at Walgreens option, into equity on such terms as are made available to investors in Theranos' planned equity financing in the first quarter of 2014. The parties also agree that upon signing this Agreement, Walgreens will receive an option to purchase up to $50M in Theranos equity on the terms made available to investors who invested in the prior equity financing (e.g., $15/share). Paperwork associated with these additional equity rights will be drafted by Theranos and delivered to Walgreens within 30 days of the date of this Agreement.

8.     **Good Faith Efforts**. The parties shall use good faith efforts to ensure that the intentions stated above are realized. In order to enable the parties to open new markets as efficiently as possible, the parties agree that their teams will, within 90 days of the date of this Agreement, develop a short-form agreement that will include all terms required to convert a New Market Entry Plan into a binding agreement between the parties, and the terms governing exclusivity within the relevant State. For the same reasons, as well as to provide as much certainty to the parties as possible regarding their expectations, these teams will define in writing what constitutes acceptable Geo-access and Branding Acceptability and Walgreens performance objectives before December 31, 2014.

9.     All other provisions of said Agreement shall remain in full force and effect.

5

Please indicate your agreement with the above by signing and returning one fully executed counterpart of this letter agreement to Greg Kunstman. If you have any questions, Mr. Kunstman may be reached at 847.315.4118.

Very truly yours,

Agreed to and accepted this 31 day of December, 2013 by:

WALGREEN CO.

THERANOS, INC.

By: _Mark Vainisi_
Name: _Mark E. Vainisi_
Title: _Group Vice President, MJA_

By: _____
Name: _Elizabth Holmes_
Title: _CEO_

6

Confidential Treatment Requested by Walgreen Co.                    WAG-TH-00000104