JOHN D. CLINE (CA State Bar No. 237759)
50 California Street, Suite 1500
San Francisco, CA 94111
Telephone: (415) 662-2260 │ Facsimile: (415) 662-2263
Email: cline@johndclinelaw.com

KEVIN M. DOWNEY (Admitted Pro Hac Vice)
LANCE A. WADE (Admitted Pro Hac Vice)
AMY MASON SAHARIA (Admitted Pro Hac Vice)
KATHERINE TREFZ (CA State Bar No. 262770)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
Washington, DC 20005
Telephone: (202) 434-5000 │ Facsimile: (202) 434-5029
Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

Attorneys for Defendant ELIZABETH A. HOLMES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR-18-00258-EJD |
| Plaintiff, | **MS. HOLMES' REPLY IN SUPPORT OF MOTION TO DISMISS AS DUPLICITOUS COUNTS ONE AND THREE THROUGH EIGHT OF THE SECOND AND THIRD SUPERSEDING INDICTMENTS** |
| v. | |
| ELIZABETH HOLMES and RAMESH "SUNNY" BALWANI, | |
| Defendants. | Date: October 6, 2020<br>Time: 10:00 a.m.<br>CTRM: 4, 5th Floor |
| | Hon. Edward J. Davila |

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO DISMISS AS DUPLICITOUS COUNTS ONE AND THREE
THROUGH EIGHT OF THE SECOND AND THIRD SUPERSEDING INDICTMENTS
CR-18-00258 EJD

# TABLE OF CONTENTS

**Page**

I.  To the Extent the Government Contends that Any Board Member Who Owned Stock Is an Investor, the Indictments Allege a Distinct Scheme to Defraud. ...........................................2

II. The Alleged Scheme to Defraud Business Partners Is Distinct from the Alleged Scheme to Defraud Investors. ...............................................................................................4

III. The Court Should Dismiss the Investor Counts or, in the Alternative, Order the Government to Elect the Basis on Which It Will Offer Proof at Trial. ...........................................7

CONCLUSION....................................................................................................................................8

# TABLE OF AUTHORITIES

## CASES

Page(s)

Bourjaily v. United States, 483 U.S. 171 (1987) .................................................................... 7

Russell v. United States, 369 U.S. 749 (1962) ....................................................................... 8

*United States v. Gordon*, 844 F.2d 1397 (9th Cir. 1988) ................................................. 1, 6

*United States v. Hinton*, 127 F. Supp. 2d 548 (D.N.J. 2000) ................................................ 8

*United States v. Morse*, 785 F.2d 771 (9th Cir. 1986). ......................................................... 1

*United States v. Pantoja-Valderama*, 1997 WL 856119 (S.D. Cal. Nov. 24, 1997) ............ 8

## RULES AND REGULATIONS

17 C.F.R. § 230.701 ............................................................................................................... 4

Fed. R. Evid. 403 ................................................................................................................... 7

Fed. R. Evid. 404 ................................................................................................................... 7

## OTHER AUTHORITIES

1 Charles Alan Wright, *Federal Practice and Procedure, Criminal* 125 (3d ed. 1999) ......... 8

For over two years the government litigated this case alleging that Ms. Holmes and Mr. Balwani engaged in a scheme to defraud "investors." Both the government and Ms. Holmes understood that term to mean individuals whom Ms. Holmes and Mr. Balwani solicited for money in exchange for shares of the company. The government now claims that the Second and Third Superseding Indictments ("Indictments"), which contain a new and expanded definition of "investors," simply clarify the "investors" that the government was referring to all along. That assertion does not withstand even minimal scrutiny.

By adding a new definition of "investors" and lengthening the time period of the charged conspiracy, the government has plainly expanded the charges. But, rather than expressly adding new charges (at least some of which would be time-barred), it wishes to pretend that it has not. The result is a duplicitous indictment that charges three different schemes as one: the first involving Theranos' equity investors, the second involving its Board of Directors, and the third involving its business partners Walgreens and Safeway. The Court should dismiss Counts One and Three through Eight as duplicitous, or at a minimum, order the government to elect which of the three conspiracies and schemes to defraud it wishes to prosecute.

As an initial matter, the government devotes half of its argument quibbling with a straw man. The government repeatedly argues that there is "no requirement that all victims of the scheme be the same or substantially similar." ECF No. 517 at 6-7 ("Opp'n"). To be clear, that is not Ms. Holmes' argument. Instead, Ms. Holmes' position is that the identities of the victims bear directly on the nature of the charged schemes, a factor courts must consider in determining if a conspiracy is duplicitous. *See United States v. Gordon*, 844 F.2d 1397, 1401 (9th Cir. 1988) (listing factors). The question for the Court, and the issue presented by Ms. Holmes' motion, is whether the Indictments charge multiple schemes to defraud "investors" and thereby allege multiple conspiracies and schemes in a single count. *United States v. Morse*, 785 F.2d 771, 774 (9th Cir. 1986).

To answer that question courts consider the following factors: (1) the nature of the scheme; (2) the identity of the participants; (3) the quality, frequency, and duration of each conspirator's transactions; and (4) the commonality of times and goals. *Gordon*, 844 F.2d at 1401. Applying these

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO DISMISS AS DUPLICITOUS COUNTS ONE AND THREE THROUGH EIGHT OF THE SECOND AND THIRD SUPERSEDING INDICTMENTS
CR-18-00258 EJD                                                          1

factors, the Court should dismiss Counts One and Three through Eight because they necessarily allege and rely on three distinct schemes to defraud.

### I. To the Extent the Government Contends that Any Board Member Who Owned Stock Is an Investor, the Indictments Allege a Distinct Scheme to Defraud.

The scope of the government's allegations regarding Theranos' Board members remains unclear. In its opposition to this motion, the government argues that "some Theranos board members paid millions to acquire securities, which [] is entirely consistent with the allegation that they are investors." Opp'n at 2. Applying that definition, the government identifies the following Board members as investors: R.B. (who bought shares with S.B.) and H.K (who bought shares via a trust). *Id.* The government alleges that these individuals paid between three to five million dollars in exchange for Theranos stock. *Id.* at 5. Ms. Holmes does not dispute that these directors' multi-million dollar stock purchases are comparable in nature to the other stock transactions described in the Indictments. In opposing Ms. Holmes' motion to dismiss the Indictments as duplicitous, the government appropriately appears to limit the at-issue Board members to these two who "paid millions to acquire securities" in transactions that were unrelated to their service on the Board. *Id.* at 2.

In its opposition to Ms. Holmes' separate motion to dismiss the Indictments as vague, however, the government appears to embrace a broader definition of the at-issue Board members. There, the government points to a "Stock Certificate Ledger" that it states "appears to contain a complete list of investors" who directly purchased shares from Theranos in exchange for money. ECF No. 522 at 9. The government argues that cross-referencing a list of Board members against the document would "indicate which Board members were also investors." *Id.* That list, however, identifies shares that certain Board members received from the company as compensation. It also identifies stock that Board members obtained when they exercised stock options that they received as compensation for Board service. R.B. for example, received a stock option grant of 500,000 shares as part of his service on the Board, as did all Board members that served during the same time period. In *addition* to this equity compensation, R.B. invested $5,100,000 to purchase the Company's Series C-2 Preferred Stock, an investment that was considered and approved by the full Board.

1    If the government intends to sweep Board members who received shares by virtue of their
2 service on the Board, the Indictments are duplicitous.  The conduct alleged in Counts One and Three
3 through Eight is the making of false statements to *solicit* investments from investors.  ECF No. 469 ¶ 20.
4 Although the Indictments do not allege the particular false statements alleged to have been made to
5 investors, at least the context of the statements is known:  statements made to induce investments.  For
6 the Board members that owned stock as compensation, however, the Indictments do not suggest that Ms.
7 Holmes or her co-defendants made statements to Board members for the purpose of inducing them to
8 invest.  Of course, Ms. Holmes and Mr. Balwani made countless statements to Board members in the
9 course of running the company.  And Board members had access to far more information than a typical
10 arm's-length investor.  If the government intends to allege that Ms. Holmes' every-day interactions with
11 Board members were part of a scheme to induce them to make still-unidentified investments, that would
12 be a distinct scheme.

13    The *Gordon* factors support this conclusion.  First, the nature of the schemes are different.  The
14 scheme actually alleged in Counts One and Three through Eight is the making of false statements to
15 *solicit* money in exchange for corporate shares.  Any scheme involving Board members that goes
16 beyond the two investments identified above is distinctly different in nature, as most Board members did
17 not make such investments.  At most, Board members simply received shares or exercised options that
18 they received as compensation, and nothing in the Indictments suggests that Ms. Holmes made
19 statements to Board members specifically to induce them to do so.

20    Second, the quality, frequency, and duration of each conspirator's transactions as between the
21 Board members and investors are dissimilar.  On the one hand, Theranos automatically granted stock
22 options to all Board members, as well as to dozens of employees.  And Ms. Holmes would have
23 conversed with such individuals about Theranos business in the course of her day-to-day activities.  By
24 contrast, independent purchases of shares often involved discussions between Theranos and the potential
25 investor and the execution of purchaser agreements.  In other words, both the transactions themselves
26 and the nature of the parties' interactions were distinct.

Lastly, the commonality of times and goals were necessarily different between the two schemes. The traditional purpose for awarding stock options and other equity compensation is to incentivize employment/Board service and to motivate good performance since the employee/director has a stake in the company's success.[1]  In contrast, the goal of attracting actual investments into the company was to generate capital for the company.

To the extent the government seeks to include all directors that owned stock in the company, as it has implied in its other filings, the Court should dismiss the Investor Counts as duplicitous.

## II. The Alleged Scheme to Defraud Business Partners Is Distinct from the Alleged Scheme to Defraud Investors.

The government now claims that it always intended for Walgreens and Safeway to be among the "investors" included in the prior indictment.  For the reasons set forth in Ms. Holmes' reply in support of her motion to dismiss the Indictments as vague, that claim is just not credible.  Notably, although the government rests this claim on the fact that Walgreens and Safeway held convertible notes, those companies obtained those notes in 2011 and 2012, *see* Opp'n at 3-4, before the conspiracy period charged in the prior indictment.[2]  The government's amendments to the Indictments—including the lengthening of the conspiracy period—were obviously designed to *add* Walgreens and Safeway to the Indictments, not to clarify that they were already included.

The government argues that Walgreens and Safeway are "investors" because they held convertible notes and because Theranos sometimes called them "investors."  *Id.* at 7.  But the relevant question is not whether, as a factual matter, someone might call lending money to a counterparty an "investment."  The legal question presented by this motion is whether the alleged scheme to defraud Theranos' equity investors is sufficiently similar to a scheme to defraud Walgreens and Safeway that the two schemes may properly be charged as one.  The answer to that question is no.

---

[1] Notably, equity compensation is treated differently under securities laws regarding reporting requirements and is directly contrasted with securities issued for raising capital.  *See* 17 C.F.R. § 230.701 (providing "an exemption from the registration requirements of the Act for securities issued in compensatory circumstances").

[2] The government also points to a 2013 contract with Walgreens that provided Walgreens the "right to convert $50 million of a $75 million payment Walgreens was making at the time into Theranos equity," Opp'n at 4, but Walgreens never exercised that right.

1       First, the natures of the alleged schemes are different. As the government concedes, Walgreens
2  and Safeway never held Theranos equity shares and were not included on a list of Theranos
3  shareholders. *See* ECF No. 522 at 9. Although the terms of their lending agreements with Theranos
4  permitted for conversion of notes into equity, conversion was contingent on certain conditions that
5  demonstrate that the nature of the parties' relationships was a business *partnership*. For example,
6  Safeway's 2011 convertible notes were only convertible, at Safeway's option, if Safeway made a "Third
7  Inventory Payment," which in turn could occur only upon Safeway's notifying Theranos that it
8  determined, "in its sole discretion," that its Pilot Program with Theranos had been a success. Leach
9  Decl., ECF No 517-1 at 8, 15. Additionally, Safeway could terminate the agreement and demand
10 payment if Safeway determined "in its sole discretion that the pilot of the Program has been
11 unsuccessful" or if any of a number of events occurred, including if the FDA asserted jurisdiction over
12 Theranos and Theranos failed to obtain FDA clearance. *Id.* at 22. If any of these conditions occurred,
13 Theranos was obligated to repurchase the note. *Id.* at 23. In other words, the goal of the convertible
14 note was to create shared incentives for Theranos and Safeway as they conducted a joint Pilot Program.
15 For its part, Walgreens could only convert the June 5, 2012 note identified by the government into
16 shares if Theranos services were offered in at least 1,000 Walgreens locations. *Id.* at 109. Conversely,
17 Walgreens could have called the note if Theranos did not meet "mutually agreed-upon success criteria"
18 for a Pilot program. *Id.* at 108. As with the Safeway note, the note with Walgreens was part and parcel
19 of its business partnership with Theranos.

20      These details, which are readily discernible from the contracts on which the government relies,
21 inform the first *Gordon* factor: the nature of the scheme. The scheme to defraud outside equity
22 investors, as articulated in the Indictments, involved soliciting investments in Theranos for the purpose
23 of raising capital. Each of the wire transfers identified in the Indictments fits that pattern. The alleged
24 scheme to defraud Walgreens and Safeway, by contrast, involved the creation and maintenance of
25 business *partnerships* whereby the companies used a convertible note in order to ensure their interests
26 were aligned. Walgreens and Safeway had access to far more information and conducted far more due
27 diligence than a normal investor; Walgreens, for example, received one of Theranos' proprietary
28

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO DISMISS AS DUPLICITOUS COUNTS ONE AND THREE
THROUGH EIGHT OF THE SECOND AND THIRD SUPERSEDING INDICTMENTS
CR-18-00258 EJD                                5

devices. (Walgreens and Safeway, after all, were Fortune 100 companies.). Because any alleged scheme involving the business partners would be entirely different in nature, the government's expansion of the term "investor" to include Walgreens and Safeway alleges a scheme of a different nature.[3]

Similarly, the commonality of time and goals also points to multiple conspiracies. As stated above, the goal of the transactions with Walgreens and Safeway was to form mutually beneficial *partnerships* whereby Theranos services would be offered in Walgreens and Safeway stores, generating income for both companies. Even the government calls these entities "business partners." *See generally* ECF No. 469, *see also* ECF No. 497-3 at 3-4 (government's Rule 404(b) notice alleging that misrepresentations were made to Walgreens and Safeway "[in] pursuing and maintaining" partnerships with the two entities). As for timing, the Indictments allege wires from investors ranging from 2013 to 2014, and the government's opposition alleges investments made by Board members in 2014. The contracts the government cites that governs the convertible notes obtained by the business partners, by contrast, were executed in either 2011 or 2012. The alleged scheme to defraud the business partners would have ended in 2012, the year of the last relevant transaction, while all of the transactions cited by the government in the Indictments in Counts Three through Eight occurred in 2013. Indeed, each of the indictments filed in this case treats the 2010-2013 time period as distinct from the 2013-2016 period. *See, e.g.*, ECF No. 469 ¶¶ 5-6.

Additionally, many of the alleged misrepresentations that form the basis of the Investor Counts concerned conduct that post-dated any alleged scheme to defraud the business partners. *Id.* ¶ 12. For example, Paragraph 12B alleges representations about the financial stability of the company in 2014 and 2015, and Paragraph 12F explicitly recognizes that any alleged misrepresentations about FDA approval were made no earlier than "late 2013"— years after the agreements were executed. This factor points to multiple conspiracies. *Gordon*, 844 F.2d at 1401 (multiple conspiracies alleged in single count when

---

[3] Relatedly, the quality, frequency, and duration of each conspirator's transactions supports multiple conspiracies. Unlike either of the other two conspiracies alleged in the Investor Counts, the alleged business partnership scheme required ongoing negotiations, different access to information, likely numerous iterations of contracts, and due diligence. The transactions attendant to this ongoing business relationship were different in kind from that of a company soliciting an investor.

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO DISMISS AS DUPLICITOUS COUNTS ONE AND THREE THROUGH EIGHT OF THE SECOND AND THIRD SUPERSEDING INDICTMENTS
CR-18-00258 EJD                                6

1  conduct underlying first conspiracy ended in "September 1983 while the [conduct underlying the first
2  conspiracy] did not begin until . . . March of 1984.").

3      Accordingly, the Court should dismiss Counts One and Three through Eight in so far as they
4  allege a scheme to defraud business partners.

**III.  The Court Should Dismiss the Investor Counts or, in the Alternative, Order the Government to Elect the Basis on Which It Will Offer Proof at Trial.**

    The duplicitous nature of Counts One and Three through Eight requires dismissal.  Each of the concerns that duplicity raises is present here.  First, there is a substantial risk of a non-unanimous jury verdict.  Although the government argues that a unanimity instruction can mitigate this risk, that argument only highlights why duplicitous indictments are so prejudicial.  The duplicity doctrine requires the government to commit in advance to one scheme.  The government's argument would mean that the government can try to prove different schemes at trial and hope that the jury will unanimously agree on one of them.  That is not how criminal trials are supposed to work.

    Second, the duplicitous nature of the indictment risks prejudicial evidentiary rulings because, as the government previously conceded, the Indictments attempt to take evidence that was otherwise subject to Rule 404(b) and make it evidence of charged conduct.  July 20, 2020 Hr'g Tr. 23:16-24 (stating new definition of investors to include Board members "makes certain evidence no longer 404(b) evidence and evidence of the conspiracy that is alleged in the [] indictment").  The government faults Ms. Holmes for not explaining why such evidence would be inadmissible under Rule 404(b).  Of course, it is the government's burden to show why evidence of other acts is admissible under Rule 404(b), not Ms. Holmes' burden to disprove its admissibility.  *See Bourjaily v. United States*, 483 U.S. 171, 176 (1987).  But, in any event, it is not difficult to see why Rules 403 and 404(b) would exclude, or at a minimum limit, evidence related to representations to third parties such as Walgreens and Safeway that would encourage the jury to convict based on improper propensity reasoning and threaten innumerable mini-trials regarding the circumstances of such representations.

    Finally, the government's duplicitous definition of "investors" is an improper end-run around the statute of limitations.  Contrary to the government's arguments, *see* Opp'n at 8-9, the application of the

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO DISMISS AS DUPLICITOUS COUNTS ONE AND THREE THROUGH EIGHT OF THE SECOND AND THIRD SUPERSEDING INDICTMENTS
CR-18-00258 EJD                                          7

statute of limitations to Walgreens and Safeway is not the subject of speculation. The Indictments themselves state that the relationship between Walgreens and Theranos stalled in 2014—more than five years before the Indictments were returned, and the last purported "investment" by Walgreens occurred in 2013. Moreover, the government's opposition shows that the most recent "investment" made by Safeway was completed in 2011, seven years before the government sought *any* Indictment in this case. The government could not have charged a new count alleging that Ms. Holmes had engaged in a scheme to defraud Walgreens and Safeway because that count would have been time-barred. So the government instead created a new definition of "investors" and lumped them in there.

At a minimum, if the Court concludes that the Investor Counts are duplicitous it should direct the government to elect the basis on which it will offer proof at trial. *United States v. Pantoja-Valderama*, 1997 WL 856119, at *5 (S.D. Cal. Nov. 24, 1997). A duplicitous indictment cannot be cured by a bill of particulars. *United States v. Hinton*, 127 F. Supp. 2d 548, 554 (D.N.J. 2000) (citing *Russell v. United States*, 369 U.S. 749, 770 (1962)) and 1 Charles Alan Wright, Federal Practice and Procedure, Criminal §§ 125, 129 (3d ed. 1999)). The Court should require the government either to proceed with its prior definition of the term investor or to choose which (timely indicted) scheme it will pursue at trial. In addition, the government must strike any factual allegations that do not apply to its elected scheme.

## CONCLUSION

For these reasons, this Court should grant Ms. Holmes' motion.

DATED: October 2, 2020                                     Respectfully submitted,

/s/Amy Mason Saharia
KEVIN DOWNEY
LANCE WADE
AMY MASON SAHARIA
KATHERINE TREFZ
Attorneys for Elizabeth Holmes

**CERTIFICATE OF SERVICE**

I hereby certify that on October 2, 2020 a copy of this filing was delivered via ECF on all counsel of record.

/s/ Amy Mason Saharia
AMY MASON SAHARIA
Attorney for Elizabeth Holmes

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO DISMISS AS DUPLICITOUS COUNTS ONE AND THREE THROUGH EIGHT OF THE SECOND AND THIRD SUPERSEDING INDICTMENTS
CR-18-00258 EJD