1  JOHN D. CLINE (CA State Bar No. 237759)
   50 California Street, Suite 1500
2  San Francisco, CA 94111
   Telephone: (415) 662-2260 │ Facsimile: (415) 662-2263
3  Email: cline@johndclinelaw.com

4  KEVIN M. DOWNEY (Admitted Pro Hac Vice)
   LANCE A. WADE (Admitted Pro Hac Vice)
5  AMY MASON SAHARIA (Admitted Pro Hac Vice)
   KATHERINE TREFZ (CA State Bar No. 262770)
6  WILLIAMS & CONNOLLY LLP
   725 Twelfth Street, NW
7  Washington, DC 20005
   Telephone: (202) 434-5000 │ Facsimile: (202) 434-5029
8  Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

9  Attorneys for Defendant ELIZABETH A. HOLMES

10

11                    UNITED STATES DISTRICT COURT

12                  NORTHERN DISTRICT OF CALIFORNIA

13                         SAN JOSE DIVISION

14
   UNITED STATES OF AMERICA,                )  Case No. CR-18-00258-EJD
15                                          )
              Plaintiff,                    )  **MS. HOLMES' MOTION TO EXCLUDE**
16                                          )  **EXPERT OPINION TESTIMONY OF**
       v.                                   )  **FACT/PERCIPIENT WITNESSES UNDER**
17                                          )  **RULES 401-403 AND 702**
   ELIZABETH HOLMES and                     )
18  RAMESH "SUNNY" BALWANI,                 )  Date:    January 22, 2021
                                            )  Time:    10:00 AM
19            Defendants.                   )  CTRM:  4, 5th Floor
                                            )
20                                          )  Hon. Edward J. Davila
                                            )
21  _____ )

22

23

24

25

26

27

28
   MS. HOLMES' MOTION TO EXCLUDE EXPERT OPINION TESTIMONY OF FACT/PERCIPIENT
   WITNESSES UNDER RULES 401-403 AND 702
   CR-18-00258 EJD

1

2

## MOTION TO EXCLUDE EXPERT OPINION
## TESTIMONY OF FACT/PERCIPIENT WITNESSES

3

PLEASE TAKE NOTICE that on January 22, 2021, or on such other date and time as the Court

4

may order, in Courtroom 4 of the above-captioned Court, 280 South 1st Street, San Jose, CA 95113,

5

before the Honorable Edward J. Davila, Defendant Elizabeth Holmes will and hereby does respectfully

6

move the Court pursuant to Rules 401-403 and 702 of the Federal Rules of Evidence for an Order

7

excluding certain testimony of certain of the government's experts.  The Motion is based on the below

8

Memorandum of Points and Authorities and Exhibits, the Declaration of Amy Mason Saharia, the record

9

in this case, and any other matters that the Court deems appropriate.  At a minimum, Ms. Holmes

10

respectfully requests a *Daubert* hearing to determine the admissibility of the experts' testimony.

11

12

DATED:  November 20, 2020

13

14

/s/ Amy Mason Saharia
KEVIN DOWNEY
15
LANCE WADE
AMY MASON SAHARIA
16
KATHERINE TREFZ
Attorneys for Elizabeth Holmes

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................ 1

BACKGROUND ........................................................................................................................ 2

ARGUMENT .............................................................................................................................. 7

    I.      The Government's Rule 16 Summaries Are Deficient .................................................. 10

    II.     The Government's Witnesses Cannot Offer Opinions about the Accuracy and Reliability of Theranos' Tests ....................................................................................... 12

           A.     The Witnesses Are Not Qualified to Opine on Accuracy and Reliability .......................................................................................... 13

           B.     The Witnesses Opinions Are Based on Anecdotes, Not Sufficient Data, and Therefore Are Unreliable .................................................. 14

           C.     The Witnesses' Opinions Based on Their Inability To Recall Errors at Other Labs Are Unreliable ................................................................. 16

    III.    The Witnesses' Opinions About Individual Patients Are Unreliable, Irrelevant, and Unhelpful ............................................................................................................... 18

             1.     Many of the Opinions about Specific Patients Are Unreliable ................ 18

             2.     Opinions about Specific Patients Are Irrelevant and Unhelpful ............... 19

    IV.    Testimony Regarding Ramifications of Inaccurate Test Results Is Irrelevant and Prejudicial. ......................................................................................................... 20

    V.    At a Minimum, the Court Should Hold a *Daubert* Hearing. ........................................ 23

CONCLUSION ......................................................................................................................... 24

MS HOLMES' MOTION TO EXCLUDE EXPERT OPINION TESTIMONY OF FACT/PERCIPIENT WITNESSES UNDER RULES 401-403 AND 702
CR-18-00258 EJD

i

# TABLE OF AUTHORITIES

## CASES

*Barber v. City of Santa Rosa*, 2010 WL 5069868 (N.D. Cal. Dec. 7, 2010) ............................................13

*Casey v. Home Depot*, 2016 WL 7479347 (C.D. Cal. Sept. 15, 2016) ......................................................14

*Casey v. Ohio Med. Prods*, 877 F. Supp. 1380 (N.D. Cal. 1995) ............................................................15

*City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036 (9th Cir. 2014) ....................................................9

*Claar v. Burlington N. R.R.*, 29 F.3d 499 (9th Cir. 1994) ........................................................................8

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ......................................................... *passim*

*Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311 (9th Cir. 1995) ............................................9, 19, 24

*Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.*, 823 F. Supp. 2d 995 (N.D. Cal. 2011) ...................................8

*FTC v. Wellness Support Network, Inc.*, 2013 WL 5513332 (N.D. Cal. Oct. 4, 2013) ......................22, 23

*Gebhardt v. Mentor Corp.*, 15 F. App'x 540 (9th Cir. 2001) ..................................................................13

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ......................................................................................16

*Jones v. United States*, 933 F. Supp. 894 (N.D. Cal. 1996) .....................................................................9

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ........................................................................8, 17

*Malletier v. Dooney & Bourke, Inc.,* 525 F. Supp. 2d 558 (S.D.N.Y. 2007) ...........................................13

*Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193 (9th Cir. 2014) ..........................................................9

*Morritt v. Stryker Corp.*, 973 F. Supp. 2d 177 (E.D.N.Y. 2013) .............................................................14

*Mullins v. Premier Nutrition Corp.*, 178 F. Supp. 3d 867 (N.D. Cal. 2016) ...........................................8

*Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521 (6th Cir. 2012) ............................................8

*Salinas v. Amteck of Ky, Inc.*, 682 F. Supp. 2d 1022 (N.D. Cal. 2010) ....................................................8

*Samuels v. Holland Am. Line-USA Inc.*, 656 F.3d 948 (9th Cir. 2011) ..................................................14

*United States v. Baras*, 2013 WL 6502846 (N.D. Cal. Dec. 11, 2013) ....................................................9

*United States v. Cerna*, 2010 WL 2347406 (N.D. Cal. June 8, 2010) ....................................................10

*United States v. Cervantes*, 2015 WL 7734281 (N.D. Cal. Dec. 1, 2015) ..............................................10

*United States v. Gibson*, 2018 WL 4903261 (E.D. Va. Oct. 9, 2018) ...............................................21, 22

*United States v. Hermanek*, 289 F.3d 1076 (9th Cir. 2002) ....................................................................8

MS HOLMES' MOTION TO EXCLUDE EXPERT OPINION TESTIMONY OF FACT/PERCIPIENT
WITNESSES UNDER RULES 401-403 AND 702
CR-18-00258 EJD

ii

1 | *United States v. Hitt*, 981 F.2d 422 (9th Cir. 1992) ...........................................................................20, 23

2 | *United States v. Redlightning*, 624 F.3d 1090 (9th Cir. 2010)............................................................8, 13

3 | *United States v. Rincon*, 28 F.3d 921 (9th Cir. 1994)............................................................................9

4 | *United States v. Valdez*, 2019 WL 539074 (N.D. Cal. Feb. 11, 2019) ......................................................12

5 | *United States v. Valencia-Lopez*, 971 F.3d 891 (9th Cir. 2020) .........................................................17, 19

6 | *Velazquez v. Costco Wholesale Corp.*, 2012 WL 13059928 (C.D. Cal. Oct. 12, 2012)...........................15

7 | *Vollrath Co. v. Sammi Corp.*, 9 F.3d 1455 (9th Cir. 1993)....................................................................15

8 | *Wessmann v. Gittens*, 160 F.3d 790 (1st Cir. 1998) ...............................................................................15

9 | **RULES**

10 | Fed. R. Crim. P. 16 ................................................................................................................ *passim*

11 | Fed. R. Evid. 401 .....................................................................................................1, 2, 9, 20

12 | Fed. R. Evid. 402 .....................................................................................................1, 2, 9, 20

13 | Fed. R. Evid. 403 ..................................................................................................... *passim*

14 | Fed. R. Evid. 702 ..................................................................................................... *passim*

15 | Fed. R. Evid. 703 ...............................................................................................................10

MS HOLMES' MOTION TO EXCLUDE EXPERT OPINION TESTIMONY OF FACT/PERCIPIENT
WITNESSES UNDER RULES 401-403 AND 702
CR-18-00258 EJD

iii

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2    This wire-fraud case centers in large part on the government's allegation that Ms. Holmes falsely

3    represented to customers that Theranos' blood testing technology was accurate and reliable.  The

4    government has not conducted the data-driven analysis that would be needed to determine whether

5    Theranos' blood tests were accurate and reliable.  Notably, its hematology expert, Dr. Master, did not

6    conduct the scientific analysis that he identifies as the accepted method in the blood-testing field for

7    assessing the accuracy and reliability of tests.  In an attempt to plug the holes in its case, the government

8    has disclosed as experts nine fact witnesses—medical professionals whose patients received Theranos

9    tests during the period of the charged conspiracy.  These nine medical professionals are among the

10   *thousands* of medical professionals whose patients used Theranos.  The government intends to use these

11   professionals' individualized experiences with Theranos tests—sometimes limited to just one patient—

12   to elicit opinions, or to urge the jury to draw conclusions, about the accuracy and reliability of Theranos'

13   tests writ large.

14   As an initial matter, the government failed to provide an adequate disclosure of these doctors'

15   opinions and the bases and reasons for the opinions.  Even putting that defect aside, their expected

16   testimony offering those opinions should be excluded under Rules 702 and 401-403.  None of the

17   witnesses even purports to have the expertise to determine whether a Theranos assay is "accurate and

18   reliable," nor did they review any information that would allow them to draw such opinions.  Any

19   opinions about the general accuracy or reliability of Theranos' assays, or comparing the general

20   accuracy or reliability of Theranos' tests to those of other laboratories, by these witnesses are unreliable.

21   They primarily opine that, in a limited number of cases, they believe that a particular patient or patients'

22   test results were in error.  That more limited opinion does not fit this case and is unhelpful to the jury:

23   because all blood tests sometimes return erroneous results, and test results vary across any lab to

24   another, whether particular patients received erroneous test results says nothing about whether Theranos

25   was able consistently to produce accurate and reliable results.

26   Finally, the government's disclosures make plain one purpose of these witnesses' testimony:  to

27

28   MOTION TO EXCLUDE EXPERT OPINION TESTIMONY OF FACT/PERCIPIENT WITNESSES
UNDER RULES 401-403 AND 702
CR-18-00258 EJD

1

1  offer inflammatory, emotional accounts about injuries that could have resulted from erroneous blood test

2  results—even though those injuries did not occur in this case.  That testimony is irrelevant and highly

3  prejudicial and should be excluded under Rules 401-403.

4        The Court should perform its gate-keeping function and exclude these witnesses' testimony on

5  these topics.  At a minimum, it should hold a *Daubert* hearing before deciding whether their testimony is

6  admissible.

7  **BACKGROUND**

8        The government has disclosed as experts nine medical professionals from whom the government

9  intends to elicit opinions regarding various Theranos test results received by their patients.  *See*

10  *generally* Ex. 4 (Mar. 6, 2020 Gov't Rule 16 Disclosure); Ex. 5 (Sept. 28, 2020 Gov't Supp. Rule 16

11  Disclosure).  Each had one or more patients who received Theranos tests during the period of the

12  charged conspiracy.  The government states that these witnesses may provide expert opinions regarding

13  Theranos' tests based on the "knowledge, skill, experience, training and education" of their respective

14  fields.  Ex. 4 at 1.

15        For four of the government's fact witnesses—Drs. Steven Linnerson, Audra Zachman, Edward

16  Szmuc, and John Couvaras—the government intends to elicit opinions on hCG (pregnancy) tests.  For

17  these witnesses, the government disclosed the following:

18  **Dr. Steven Linnerson.**  Dr. Linnerson is an OB-GYN.  His proffered testimony relates to hCG

19  test values and how a physician interprets those values.  Ex. 4 at 1-2.  The government's summary states

20  that Dr. Linnerson will testify that "his practice has never had problems with its hCG tests with other

21  established laboratories before it started using Theranos [and that his] practice has been doing business

22  with Sonora Quest and LabCorp for fifteen years and never had a problem."  *Id.* at 2.  Dr. Linnerson will

23  also testify about a comparative study of hCG values his office conducted involving Theranos and other

24  laboratories.  *Id.*

25        The government supplemented Dr. Linnerson's summary to explain that hCG tests can be used

26  as a tumor marker.  Ex. 5 at 2.  Dr. Linnerson also intends to explain the risks of ectopic pregnancies

27

28  MOTION TO EXCLUDE EXPERT OPINION TESTIMONY OF FACT/PERCIPIENT WITNESSES
UNDER RULES 401-403 AND 702
CR-18-00258 EJD

1   (which occur when the fertilized egg is stuck in the fallopian tube), which include potential rupture of

2   the fallopian tube, causing internal bleeding.  According to Dr. Linnerson, if the egg is stuck in the

3   fallopian tube, a doctor must "poison the embryo and cause it to dissolve in the rube to avoid danger to

4   the mother." *Id.* at 2.  The reason for this testimony is unclear; the government does not disclose that he

5   conducted such a procedure on a Theranos customer.

6         According to the government's supplemental disclosure, Dr. Linnerson intends to testify that his

7   interpretation of certain Theranos tests results "prov[ed] that the test results must have been inaccurate

8   and that "lab error is the only explanation for the numbers he saw from Theranos." *Id.* at 3.  The

9   government does not identify in its disclosure any specific patient of Dr. Linnerson whom he believes

10  obtained inaccurate test results from Theranos.

11        **Dr. Audra Zachman.**  Dr. Zachman is a women's health nurse practitioner.  Her proffered

12  testimony relates to hCG tests generally and to the results of *one* identified patient. Ex. 4 at 2.  Dr.

13  Zachman will testify that "the hCG test is a reliable test which laboratories get right" and that it "is

14  normal to send a patient who has suffered from [previous] miscarriages for hCG testing every 48 hours."

15  *Id.* Specifically, she will testify that "Theranos's explanation as to the discrepancy in hCG test values for

16  her patient . . . was 'not plausible.'" *Id.*  Lastly, like Dr. Linnerson, Dr. Zachman will testify that she

17  "has never had any other problems with hCG tests aside from the experience she had with her patient

18  who was tested by Theranos." *Id.*[1]

19        **Dr. Edward Szmuc.**  Dr. Szmuc's proffered testimony relates to how hCG tests are used to

20  identify early pregnancies.  *Id.* at 3.  Dr. Szmuc intends to testify that "he relies on [hCG] tests, that the

21  hCG test is the most important lab work he orders as an OBGYN, and that a doctor must have full

22  confidence in the results from hCG tests."  *Id.* Dr. Szmuc will testify about how an hCG test informs his

23  decision as to whether a pregnancy is life threatening.  *Id.*  Lastly, Dr. Szmuc will testify that "[i]n 30

24  years of using Sonora Quest, he never questioned their results."  *Id.*

25

26        ───────────────────
        [1] The government supplemented Dr. Zachman's testimony to include information similar to her

27  originally noticed testimony.  Ex. 5 at 3-4.

28  MOTION TO EXCLUDE EXPERT OPINION TESTIMONY OF FACT/PERCIPIENT WITNESSES
    UNDER RULES 401-403 AND 702
    CR-18-00258 EJD

                                        3

1      The government supplemented Dr. Szmuc's disclosure to describe his experience with *one*

2 Theranos customer who received a second hCG test result that had decreased.  Ex. 5 at 7.  According to

3 the disclosure, he was not confident in the test result and thus sent the patient to another lab to repeat the

4 test.  *Id.*  He intends to testify that when an hCG test result decreases, a doctor will be concerned about

5 an ectopic pregnancy, and that ectopic pregnancies can lead to "rupture, significant hemorrhage, or the

6 worst-case scenario of patient death."  *Id.*  It does not appear that any of these catastrophic consequences

7 happened to any of his patients who received Theranos test results.

8     **Dr. John Couvaras.**  The government's summary states that Dr. Couvaras' proffered testimony

9 will focus on *one* patient he treated in 2014.  Ex. 4 at 5.  Specifically, Dr. Couvaras will testify about his

10 patient's first hCG test performed by Sonara Quest and two subsequent tests performed by Theranos.  *Id.*

11 He intends to testify about his treatment protocol based on the patient's second hCG test,

12 communications he had with his patient, and the details surrounding the patient's last visit to his office.

13 *Id.* Dr. Couvaras also will testify that one of the medications he prescribed to the patient was

14 contraindicated for pregnant patients.  *Id.*  The government supplemented Dr. Couvaras' disclosure to

15 include his opinion that the Theranos test results he reviewed for this one patient "made no sense

16 biologically."  Ex. 5 at 9-10.

17     The government has disclosed five other witnesses—JoEllen Embry, Dr. Gerald Asin, Dr. Curtis

18 Page, Dr. Govind Acharya, and Dr. Mark Burnes—who intend to offer testimony about various

19 Theranos tests.  For these witnesses the government disclosed the following:

20     **JoEllen Embry.**  Ms. Embry is a nurse practitioner specializing in obstetrics and gynecology,

21 and her proffered testimony relates to testosterone tests.  Ex. 4 at 3.  She intends to testify about levels of

22 testosterone in patients experiencing Poly Cystic Ovarian Syndrome (PCOS), a condition that affects a

23 woman's testosterone levels.  *Id.*  She will testify that some of her patients who typically have very high

24 abnormal testosterone levels received Theranos testosterone results that were lower than expected and

25 that she has never had patients with results that low.  *Id.*  She intends to testify that "errors with regard to

26 testosterone values and Theranos's test were blatant and obvious."  *Id.* Ms. Embry will also testify that

27

28 MOTION TO EXCLUDE EXPERT OPINION TESTIMONY OF FACT/PERCIPIENT WITNESSES
UNDER RULES 401-403 AND 702
CR-18-00258 EJD

1   she "adjusts patients' medication based on lab results, and an incorrect adjustment could result in patient

2   harm." *Id.*  Last, Ms. Embry will testify that "in 20 plus years of using Sonora Quest and LabCorp, she

3   has never experienced any clinical errors with their lab results." *Id.*

4          According to the government's supplemental disclosure, Ms. Embry also intends to testify that

5   PCOS leads to inflammation that "can in turn lead to diabetes, heart disease, and fertility issues [as well

6   as] uterine cancer if the patient goes months and months without a menstrual cycle." Ex. 5 at 5. Ms.

7   Embry will also testify that there was "no biological explanation" for the Theranos results that her

8   patients received, "leading to the conclusion that Theranos's test results were inaccurate." *Id.* The

9   government does not identify the at-issue patients or even the number of such patients.

10         **Dr. Gerald Asin.**  Dr. Asin is an internist.  According to the government's original summary,

11   Dr. Asin will testify about prostate-specific antigen (PSA) and HIV tests.  Ex. 4 at 4. Specifically, Dr.

12   Asin intends to testify that if a PSA test comes back high, a patient may need to undergo an unpleasant

13   biopsy procedure to determine if that patient has prostate cancer.  *Id.*  If the PSA test is incorrect, the

14   patient "could have to go through this unpleasant test unnecessarily."  *Id.*  With respect to HIV, Dr. Asin

15   intends to testify that "an HIV test result showing that it was reactive for HIV 1+2 antibodies, but non-

16   reactive for HIV 1 antibody and HIV 2 antibody, separately, did not make any sense [and that it] was not

17   possible for the blood to have a combination of HIV 1 and 2, but not have either HIV 1 or 2

18   individually."  *Id.*

19         The government's supplemental disclosure says nothing about Dr. Asin's HIV opinion; it is

20   unclear if he is continuing to offer an HIV opinion.  With respect to PSA, the supplemental disclosure

21   states that "some of his patients had uncharacteristically high results from Theranos." Ex. 5 at 8.  The

22   disclosure did not identify the names or even number of such patients.  It then provides more detail

23   regarding the potential complications of a prostate biopsy, including the potential for "fecal material [to]

24   make its way into the blood . . . result[ing] in fevers and chills."  *Id.*  According to the disclosure, it is

25   "possible the needle could hit a blood vessel, leading to hemorrhaging that would require surgery."  *Id.*

26   The reason for this information is unclear; he does *not* state that any of his Theranos patients underwent

27

28   MOTION TO EXCLUDE EXPERT OPINION TESTIMONY OF FACT/PERCIPIENT WITNESSES
     UNDER RULES 401-403 AND 702
     CR-18-00258 EJD

                                                        5

1   this procedure.

2       According to the supplement, Dr. Asin also will testify that he found "abnormalities with

3   Theranos protein and calcium tests." *Id.*  Whereas he saw calcium too high from other laboratories once

4   to twice a month, he saw calcium too high from Theranos every week.  *Id.*  He does not identify the

5   names or number of such patients.

6       Finally, Dr. Asin intends to testify about HbA1c tests, which test for "the percentage of sugar

7   attached to the red blood cells."  According to the supplemental disclosure, "Theranos A1C tests were

8   either too high or too low; the Theranos tests were not accurate."  The disclosure does not identify the

9   names or number of patients with supposedly inaccurate results.  According to the disclosure, if the test

10  is inaccurate, "the patients' medicine (such as insulin) could be incorrectly changed, leading to an

11  overdose or underdose" and potentially resulting in "a coma from the brain shutting down."  *Id.* at 7.  He

12  does not state that he changed any medication for any of his Theranos patients, let alone that any patient

13  suffered a coma or other injury.

14      **Dr. Curtis Page.**  Dr. Page is a physician who practices advanced lipid testing and

15  cardiovascular prevention programs.  Ex. 4 at 6.  He intends to testify regarding HbA1C tests (which test

16  for blood sugar) and complete blood count (CBC) tests.  *Id.*  He will testify that he "experienced a high

17  quantity of abnormal A1C tests with Theranos testing."  *Id.*  He will further testify "that he did not

18  understand how Theranos could not have known they had a problem with A1Cs for a couple of months

19  [and] that he did not think it would require a doctor to point out this kind of issue."  *Id.*  The government

20  did not disclose any proffered testimony concerning CBC tests.[2]  *Id.*

21      In its supplemental disclosure, the government explains that Dr. Page will opine that the

22  "discrepancy" between Theranos HbA1C test results and those of another laboratory "called into

23  question the integrity of the Theranos testing system, specifically whether it was giving accurate

24  results."  Ex. 5 at 10.  Dr. Page will testify that 70-100 test results were affected and that Theranos

25

---

26      [2] The government inexplicably noticed Dr. Page as an expert on CBC tests despite the fact that he told the government that Theranos CBC tests "seemed fine"  Ex. 18 at 2 ( US-REPORTS-0015101). It appeared to have jettisoned a CBC opinion in its supplemental disclosure.

27

28  MOTION TO EXCLUDE EXPERT OPINION TESTIMONY OF FACT/PERCIPIENT WITNESSES UNDER RULES 401-403 AND 702
CR-18-00258 EJD

1   refunded all affected tests.  *Id.* at 11.

2   **Dr. Govind Acharya.**  Dr. Acharya is plastic surgeon who intends to testify about "blood

3   metabolic panel (BMP) tests, and among other things, the electrolyte analysis and potassium analysis in

4   these tests."  Ex. 4 at 4.  He will testify that BMP is not a complicated test, and is typically used as a pre-

5   surgical screening.  *Id.*  He intends to testify that "if abnormal results came back a surgery could be

6   called off [and that] abnormal result[s] for a potassium test could indicate a heart issue that would not

7   allow surgery."  *Id.*

8   The government's supplemental disclosure explains that Dr. Acharya intends to testify that "[i]f

9   [a] potassium [test result] was off, it was possible that the patient could die on the table."  Ex. 5 at 9.

10  His supplement also explains that "[f]or the two patients Dr. Acharya remembered having an issue with

11  the Theranos BMP, their potassium" was higher than what he expected.  *Id.*

12  **Dr. Mark Burnes.**  Dr. Burnes, an internist, is a newly identified expert in the government's

13  supplement.  He intends to testify about his experience treating *one* specific Theranos customer who

14  received Theranos PSA tests results.  Ex. 5 at 6.  He intends to testify that there was no biological

15  explanation for the "large jumps" in the patient's PSA results, and that one of the results "would be

16  strongly indicative of a very aggressive form of prostate cancer."  *Id.*  He also intends to testify that

17  when "prostate cancer shows up at a relatively young age like 45 it can be very aggressive and take the

18  patient's life in five years."  *Id.*

19  **ARGUMENT**

20  Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,

21  509 U.S. 579 (1993), govern the admissibility of expert testimony.  Rule 702 requires that the witness be

22  qualified by "knowledge, skill, experience, training, or education."  Fed R. Evid. 702.  Even if a witness

23  is qualified as an expert in a particular field, scientific, technical, or specialized testimony is admissible

24  only if it (a) "will help the trier of fact to understand the evidence or to determine a fact in issue," (b) "is

25  based upon sufficient facts or data," (c) "is the product of reliable principles and methods," and (d) "the

26  expert has reliably applied the principles and methods to the facts of the case."  *Id.*

27

28  MOTION TO EXCLUDE EXPERT OPINION TESTIMONY OF FACT/PERCIPIENT WITNESSES
UNDER RULES 401-403 AND 702
CR-18-00258 EJD

7

"Even the most qualified expert may not offer any opinion on any subject; the expert's opinion must be grounded in his or her personal 'knowledge, skill, experience, training, or education.'" *Mullins v. Premier Nutrition Corp.*, 178 F. Supp. 3d 867, 900 (N.D. Cal. 2016) (quoting Fed. R. Evid. 702). "The key inquiry is whether the witness has sufficient skill or knowledge related to the pertinent field so that his inference will probably be of some assistance to the untrained layman." *Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.*, 823 F. Supp. 2d 995, 1001 (N.D. Cal. 2011). "To be able to testify . . . expert witnesses must describe their relevant background and explain how that background informed the opinions they offer." *Mullins*, 178 F. Supp. 3d at 900. Opinions that fall outside a witness's expertise are inadmissible. *See, e.g.*, *United States v. Redlightning*, 624 F.3d 1090, 1115 (9th Cir. 2010) (holding witness with expertise in psychological effects of a disorder was not qualified to offer opinions related to physical or medical symptoms of that disorder); *Salinas v. Amteck of Ky., Inc.*, 682 F. Supp. 2d 1022, 1030 (N.D. Cal. 2010) (holding expert's opinions related to warning labels were inadmissible because, although the witness was qualified as a workplace safety expert, there was no indication that expert had training on the formulation or design of safety labels).

In addition to drawing from the witness's expertise, the expert's testimony must be both reliable and relevant. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). Expert testimony is reliable when "the reasoning or methodology underlying the testimony is scientifically valid and . . . that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 600. "As a prerequisite to making the Rule 702 determination" of reliability, "the court must assure that the methods are adequately explained." *United States v. Hermanek*, 289 F.3d 1076, 1093-94 (9th Cir. 2002); *Claar v. Burlington N. R.R.*, 29 F.3d 499, 502 (9th Cir. 1994). "[A]n expert, whether basing testimony upon professional studies or personal experience, [must] employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. An expert's "reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity" are all "[re]d flags" cautioning against the admission of expert testimony. *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th

Cir. 2012).

"Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043 (9th Cir. 2014). In other words, the expert testimony must "fit" the question the jury must answer, *Daubert v. Merrell Dow Pharms., Inc. (Daubert II)*, 43 F.3d 1311, 1321 n.17 (9th Cir. 1995), and "logically advance[] a material aspect of the proposing party's case," *Messick v. Novartis Pharm Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014) (citation omitted). In assessing "fit," courts "must look to the governing substantive standard." *Daubert II*, 43 F.3d at 1320. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 600. The "fit" requirement is more stringent than the relevancy requirement of Rule 402, reflecting "the special dangers inherent in scientific expert testimony." *Jones v. United States*, 933 F. Supp. 894, 900 (N.D. Cal. 1996).

Even if expert testimony satisfies Rule 702, a court may nonetheless exclude such testimony under Rule 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *United States v. Rincon*, 28 F.3d 921, 925 (9th Cir. 1994). "Since scientific expert testimony can be both powerful and quite misleading due to the difficulty in evaluating it, federal judges must 'exclude proffered scientific evidence under Rules 702 and 403 unless they are convinced that it speaks clearly and directly to an issue in dispute in the case, and that it will not mislead the jury.'" *United States v. Baras*, 2013 WL 6502846, at *8 (N.D. Cal. Dec. 11, 2013).

As an initial matter, the government's summaries fail to identify the bases and reasons for these witnesses' opinion and are thus deficient under Federal Rule of Criminal Procedure 16. Given the ample opportunities the government had to provide the required information, the appropriate remedy at this juncture is to exclude the opinions. In any event, these witnesses' testimony is inadmissible under Rules 401-403 and 702 because (1) they are not qualified to draw opinions about the general accuracy and reliability of Theranos's tests, and any such opinions are unreliable and misleading; (2) their opinions about individual patients' test results do not fit the case and are unhelpful; and (3) their testimony

MOTION TO EXCLUDE EXPERT OPINION TESTIMONY OF FACT/PERCIPIENT WITNESSES
UNDER RULES 401-403 AND 702
CR-18-00258 EJD

describing the medical consequences of inaccurate test results are irrelevant, misleading,  and unfairly prejudicial.

## I.     The Government's Rule 16 Summaries Are Deficient

Rule 16 requires the government to provide a "written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial."  The "summary provided . . .  must describe the witness's opinions [and] the bases and reasons for those opinions."  Fed. R. Crim. P. 16(a)(1)(G).  This requirement "is intended to minimize surprise that often results from unexpected expert testimony, [to] reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination."  Fed. R. Crim. P. 16 advisory committee's note to 1993 amendment.

"Rule 16 requires that the government summarize each specific opinion to be offered along with the basis for it."  *United States v. Cervantes*, 2015 WL 7734281, at *2 (N.D. Cal. Dec. 1, 2015).  The disclosed "bases and reasons must be sufficient to allow counsel to frame a *Daubert* motion (or other motion *in limine*), to prepare for cross-examination, and to allow a possible counter-expert to meet the purport of the case-in-chief testimony."  *United States v. Cerna*, 2010 WL 2347406, at *1 (N.D. Cal. June 8, 2010).

After the government served its summaries on March 6, 2020, Ms. Holmes repeatedly requested that the government disclose the bases and reasons for these witnesses' testimony.  *See* Ex. 17 (Mar. 12, 2020 Letter from K. Trefz to government); Ex. 19 (April 8, 2020 E-mail from K. Trefz to government); Ex. 59 (May 6, 2020 Letter from K. Trefz to government).  After two months of such requests, the government finally responded on May 14 that its disclosures "are more than sufficient" and refused to provide any additional information.  Ex. 20 (May 14, 2020 E-mail from R. Leach to defense counsel).

In July 2020, Ms. Holmes moved to compel adequate summaries.  ECF No. 435.  In her motion, Ms. Holmes asserted that the government had failed to identify the foundation for these experts' opinions.  For example, and critically, the government did not disclose the specific patients or test

MOTION TO EXCLUDE EXPERT OPINION TESTIMONY OF FACT/PERCIPIENT WITNESSES UNDER RULES 401-403 AND 702
CR-18-00258 EJD

10

results on which the opinions are based.  In many cases, it did not disclose how many patients were at issue or what was abnormal about the test results.  It did not disclose what methodology these witnesses applied to arrive at their opinions:  Did they conduct a retrospective review of their patients' records?  Did they systematically compare results across laboratories?  How do they know whether they received inaccurate results from other laboratories?

At the hearing on the motion, the Court stated that "it may be necessary to have the government offer additional information in regards to some of the witness's testimony and the basis and reasons if that testimony is going to leave and move from treatment into other opinions that they wish to speak about."  7/20/20 Hr'g Tr. at 59:12-18; *see also id.* at 59:26-60:3 ("I do think that the government is going to be required to produce some additional foundational information and background on some of this testimony.").  The Court, however, did not rule on the motion, apparently because the government's decision to supersede would require revised disclosures in any event.  *See id.* at 60:4-9.

The government ultimately supplemented its disclosure on September 28, 2020.  The supplemental disclosure, however, contains many of the same deficiencies as the first one.  It does not identify the patient names or test results on which these experts are basing their opinions; with a few exceptions, it does not identify the number of patients at issue (in some cases, just one patient is at issue); and it does not identify what methodology these experts applied to arrive at their opinions.

Ms. Holmes promptly (again) requested adequate disclosures from the government.  Ex. 21 (Oct. 8, 2020 Ltr to Gov't).  Nearly one month later, *and seven months after Ms. Holmes' original request for adequate disclosures*, the government responded that it was working with the experts to collect additional information but that the "pandemic and other factors are affecting some doctors' availability and [the government's] access to that information."  Ex. 22 (Nov. 4, 2020 Email from Gov't to Def. Counsel).

That vague explanation cannot justify the government's seven-month delay.  The government had ample opportunity to collect the information necessary to provide adequate disclosures:  in March 2020, when it first disclosed these opinions; in April and May 2020, when Ms. Holmes first requested

MOTION TO EXCLUDE EXPERT OPINION TESTIMONY OF FACT/PERCIPIENT WITNESSES
UNDER RULES 401-403 AND 702
CR-18-00258 EJD

1   this information; in July 2020, when Ms. Holmes moved to compel this information; in September 2020,

2   when the government supplemented its disclosures; and in October 2020, when Ms. Holmes again

3   requested this information.

4        Ms. Holmes cannot prepare for the upcoming trial without adequate disclosures.  How can she

5   prepare to cross-examine these witnesses about their opinions about the accuracy or reliability of

6   Theranos tests, for example, if she does not know how many results they relied on to reach that opinion

7   or what the allegedly inaccurate results are or when they occurred?  The Court thus should exclude their

8   testimony.  *See* Fed. R. Crim. P. 16(d)(2)(C).  "The plain purpose of Rule 16 is to prevent exactly the

9   situation threatened here -- a defendant facing imminent trial without an adequate opportunity to prepare

10  for evidence that the government intends to use against [her]."  *United States. v. Valdez*, 2019 WL

11  539074, at *3 (N.D. Cal. Feb. 11, 2019).  And at this point in time, it would be too late for Ms. Holmes

12  effectively to make use of adequate disclosures without significantly delaying the trial date.  Given the

13  government's extended delay in providing this necessary information, the experts should be excluded.

14  **II.   The Government's Witnesses Cannot Offer Opinions about the Accuracy and Reliability of
         Theranos' Tests.**

15

16       Independent of the Rule 16 deficiency, the witnesses' testimony and opinions are unreliable and

17  irrelevant.  To the extent these witnesses venture opinions about the accuracy and/or reliability of

18  Theranos tests, those opinions must be excluded.  *See, e.g.*, Ex. 5 at 6 (Burnes:  "Lab error / inaccurate

19  testing is the only possibility."); *id.* at 8 (Couvaras:  "Dr. Couvaras may testify that the Theranos results

20  are explainable only through lab error or inaccurate testing methods."); *id.* at 10 (Page:  "The

21  discrepancy called into question the integrity of the Theranos testing system, specifically whether it was

22  giving accurate results.").

23       Any such opinion should be excluded because (1) the witnesses are not qualified to provide

24  expert testimony on the subject, (2) the witness's opinions based on anecdotal data are unreliable; and

25  (3) the witnesses opinions based on lab comparisons are similarly unreliable.

26

27

28  MOTION TO EXCLUDE EXPERT OPINION TESTIMONY OF FACT/PERCIPIENT WITNESSES
    UNDER RULES 401-403 AND 702
    CR-18-00258 EJD

## A.      The Witnesses Are Not Qualified to Opine on Accuracy and Reliability.

These witnesses are not qualified to offer opinions about the accuracy and reliability of Theranos' tests.  To be sure, these witnesses may be qualified to offer opinions that any given test *result* seemed erroneous when viewed in the context of a patient's medical history—although, as discussed in the next Part, such opinions do not fit this case.  But the government has not disclosed any experience that would qualify these witnesses to opine about the scientific accuracy or reliability of Theranos' tests or the cause of erroneous test results.  Notably, the government has disclosed a hematology expert, Dr. Stephen Master, who discusses in his disclosure the methodology that professionals in his field use to measure the accuracy and reliability of blood assays.  *See* Ex. 6 (Master Rpt.).  (Significantly, Dr. Master is unable to offer an opinion that certain blood tests (including hCG and HbA1C, among others) were inaccurate or unreliable.  *See* Mot.to Exclude Expert Opinion Testimony of Dr. Stephen Master. These witnesses possess no relevant experience applying that methodology, or otherwise assessing the accuracy or reliability of a laboratory's blood assays.  In fact, they disclose no relevant medical device, technology, or laboratory experience at all.

As a result, these witnesses are utterly unqualified to opine about the general accuracy or reliability of Theranos' assays.  *See Redlightning*, 624 F.3d at 1115 (holding witness who was an expert in psychology could not testify about defendant's physical symptoms); *Gebhardt v. Mentor Corp.*, 15 F. App'x 540, 542 (9th Cir. 2001) (expert could not opine as to how a warning label would have affected a surgeon's decision when expert did not have "a medical degree, medical training, or more specifically, experience as a surgeon"); *Barber v. City of Santa Rosa*, 2010 WL 5069868, at *7 (N.D. Cal. Dec. 7, 2010) (police officer expert in deploying Taser not qualified as an expert on the physiological effect of Taser on plaintiff); *see also Malletier v. Dooney & Bourke, Inc.,* 525 F. Supp. 2d 558, 642 (S.D.N.Y. 2007) ("Testimony on subject matters unrelated to the witness's area of expertise is prohibited by Rule 702.").  Experience interpreting laboratory results does not qualify a witness to opine on how a laboratory conducts those tests, how laboratory technology performed, or what a laboratory should have known or done.

1   *Samuels v. Holland Am. Line-USA Inc.*, 656 F.3d 948 (9th Cir. 2011), is instructive.  In *Samuels*,

2   the plaintiffs' proposed expert witness "ha[d] worked in the travel industry for over 30 years," and on

3   that basis plaintiffs sought to have the expert testify on the standard of care for cruise lines.  *Id.* at 953.

4   Notwithstanding the witness's experience in the travel industry, the district court held that she failed to

5   provide a basis for her testimony on the specific subject of cruise lines.  *Id.*  The Ninth Circuit affirmed,

6   noting that the expert had never worked on a cruise line, and "more importantly [the expert] failed to

7   specify in her declaration what information she relied on in reaching her conclusions."  *Id.*; *see also*

8   *Morritt v. Stryker Corp.*, 973 F. Supp. 2d 177, 188 (E.D.N.Y. 2013) (excluding expert who failed to

9   show how expertise in "orthopedic medicine and surgical principles and concepts qualified him to testify

10  as to the mechanical functioning" of an orthopedic medical device).

11      The same holds true here.  The government does not point to any scientific, technical, or other

12  specialized knowledge that the witnesses possess that would qualify them to offer opinions assessing the

13  accuracy or reliability of Theranos' tests or to opine about the cause of any incorrect test results.

14      **B.    The Witnesses Opinions Are Based on Anecdotes, Not Sufficient Data, and
               Therefore Are Unreliable.**

15

16      Even if these witnesses were qualified to offer such opinions, the opinions are completely

17  unreliable.  None of these witnesses attempted to review results across a representative sample of

18  Theranos patients.  Instead, their opinions are based on nothing more than personal recollections of

19  individual patient experiences—which may or may not be representative of broader problems with

20  Theranos tests.  Most of them do not reference specific test results on specific days for specific patients

21  that could be objectively quantified and evaluated.  As a result, any opinions about the accuracy or

22  reliability of Theranos tests they draw from these anecdotes are unreliable.

23      Anecdotal evidence about individual patients' experiences with Theranos tests is not a reliable

24  indicator of whether an assay, let alone Theranos' technology more generally, was inaccurate or

25  unreliable.  *See Casey v. Home Depot*, 2016 WL 7479347, at *23 (C.D. Cal. Sept. 15, 2016) (denying

26  motion for class certification because "the declarations submitted by Plaintiff only provide anecdotal

27

28  MOTION TO EXCLUDE EXPERT OPINION TESTIMONY OF FACT/PERCIPIENT WITNESSES
    UNDER RULES 401-403 AND 702
    CR-18-00258 EJD

                                                    14

evidence that may not necessarily be representative of the Proposed Class").  Part and parcel of the reliability requirement is the principle that experts must ground their analysis in "sound data," rather than "limited anecdotal evidence."  *Vollrath Co. v. Sammi Corp.*, 9 F.3d 1455, 1462 (9th Cir. 1993); *see Velazquez v. Costco Wholesale Corp.*, 2012 WL 13059928, at *2 (C.D. Cal. Oct. 12, 2012) ("A collection of 25 anecdotal experiences is not a sufficient basis to express an opinion.").  Anecdotal evidence is suspect because it "does not tend to show that a problem is pervasive" or that the evidence is "representative" of the expert's opinions.  *Wessmann v. Gittens*, 160 F.3d 790, 805 (1st Cir. 1998).  For this reason, courts have repeatedly expressed skepticism about medical opinions drawn from nothing more than case reports or adverse event reports.  *See, e.g., Casey v. Ohio Med. Prods*, 877 F. Supp. 1380, 1385 (N.D. Cal. 1995) ("Courts have repeatedly held . . . that "[c]ase reports are not reliable scientific evidence of causation, because they simply described reported phenomena without comparison to the base rate at which the phenomena occur in the general population or in a defined control group; do not isolate and exclude potentially alternative causes; and do not investigate or explain mechanism of causation.").  That is because some amount of illness occurs in the general population by chance, and one cannot draw any reliable conclusions from the fact of illness without reliable scientific analysis.

This problem is especially acute when it comes to blood testing.  As the government's own hematology expert acknowledges, there is a certain amount of expected error in laboratory blood testing.  Ex. 6 at 6-7.  Accordingly, some number of incorrect or unexpected results is to be expected.  Because the government's fact experts saw only a limited amount of data related to their own patient(s), they lack the data required to opine on whether this "normal and expected feature" of all laboratory tests—*i.e.*, error— represented a pervasive problem.  *Wessmann*, 160 F.3d at 805.  They simply cannot draw reliable opinions about the accuracy or reliability of Theranos' tests from the fact that one or more patients received tests results that they believed to be wrong.  A patient's result very well may have fallen within the expected error rate for the test at issue.  Without access to data relating to all individuals who received the test or some other scientifically reliable mechanism for distinguishing chance from causation (such as a statistically significant sample), there is "simply too great an analytical

MOTION TO EXCLUDE EXPERT OPINION TESTIMONY OF FACT/PERCIPIENT WITNESSES
UNDER RULES 401-403 AND 702
CR-18-00258 EJD

15

1    gap between the data and the opinion proffered."  *General Electric Co. v. Joiner*, 522 U.S. 136, 146

2    (1997).

3           **C.     The Witnesses' Opinions Based on Their Inability To Recall Errors at Other Labs
     Are Unreliable.**

4

5           Several witnesses point to their lack of memory of errors with other labs as a basis for their

6    expert testimony regarding Theranos tests.  For example, Dr. Linnerson will testify that "his practice has

7    never had problems with its hCG tests with other established laboratories before it started using

8    Theranos" and that his "practice has been doing business with Sonora Quest and LabCorp for fifteen

9    years and never had a problem."  Ex 4 at 2.  Dr. Zachman will testify that she "has never had any other

10   problems with hCG tests aside from the experience she had with her patient who was tested by

11   Theranos."  *Id.*  Ms. Embry intends to testify that "that in 20 plus years of using Sonora Quest and

12   LabCorp she has never experienced any clinical errors with their lab results."  *Id.* at 3.  Dr. Acharya will

13   testify that "that he did not recall ever seeing potassium levels as high as those [two] Theranos test

14   results."  Ex. 5 at 9.  Lastly, Dr. Szmuc will testify that "[i]n 30 years of using Sonora Quest, he never

15   questioned their results."  Ex. 4 at 3.  These witnesses cannot reliably draw comparisons between

16   Theranos test results and results from competing laboratories such as LabCorp or Sonora Quest.

17          This testimony is inadmissible under Rule 702 because it is unreliable.  There is no evidence

18   suggesting that their limited exposure to Theranos test results allows them to draw a statistically

19   significant comparison between Theranos and other laboratories.  The witnesses did not attempt to

20   conduct a statistical comparison.  They have not disclosed any principles or methods they used to arrive

21   at their opinions about lack of problems with other laboratories.  It does not appear, for example, that

22   they reviewed patient data for indicia of problems.  They do not define what they mean by "problems"

23   or disclose methodologies by which experts in their fields ascertain whether latent "problems" existed in

24   test results.  Further still, they have not provided any basis for their opinions that allegedly erroneous

25   test results were caused by Theranos technology, as opposed to an issue with the method of blood draw,

26   sample handling, or myriad other issues that may affect a test result.  Absent any methodology, scientific

27

28   MOTION TO EXCLUDE EXPERT OPINION TESTIMONY OF FACT/PERCIPIENT WITNESSES
     UNDER RULES 401-403 AND 702
     CR-18-00258 EJD

1   principles, or substantiating data, these witnesses' recollections of vast periods of time are too unreliable

2   to be admitted at trial.

3        The Ninth Circuit recently warned about the dangers of this type of "experience-based" expert

4   testimony. *United States v. Valencia-Lopez*, 971 F.3d 891, 897 (9th Cir. 2020). In *Valencia-Lopez*, the

5   Ninth Circuit reversed a conviction due to the district court's failure properly to vet an expert who

6   testified that in his experience the probability of the defendant's explanation of the circumstances

7   surrounding his duress defense were "[a]lmost nil, almost none." *Id.* at 895. In so doing, the court

8   admonished that although "*Daubert* and *Kumho Tire* may be harder to apply when the expert testimony

9   is 'experience-based' rather than 'science-based' . . . reliability becomes more, not less, important when

10  the 'experience-based' expert opinion is perhaps not subject to routine testing, error rate, or peer review

11  type analysis, like science-based expert testimony." *Id.* The court reversed the conviction because the

12  "record contain[ed] no evidence as to why that experience, by itself, equals reliability for his [expert]

13  testimony." *Id.* at 899. Because the expert "failed to link his general expertise with his . . . conclusion,

14  and . . . never explain[ed] how his expertise lent itself to that conclusion, [the court could not] sort out

15  what 'reliable principles and methods underlie the particular conclusions offered.'" *Id.* at 900.

16       The same holds true in this case. These witnesses offer no more than their "experiences" (their

17  memories of their experiences to be precise) with other laboratories and their limited exposure with

18  Theranos tests. Like the inadmissible expert testimony in *Valencia-Lopez*, the government offers "no

19  *evidence* as to why that experience, by itself equals reliability for [their] testimony" regarding the ability

20  of Theranos technology to produce consistently accurate and reliable test results. *Id.* at 899. As

21  discussed above, a certain amount of error is expected for all laboratory tests, *see* Ex. 6 at 6, and that the

22  witnesses believe they did not experience issues with other laboratories tells the jury nothing about

23  whether any errors with Theranos tests were so pervasive that it rendered those tests inaccurate and

24  unreliable. That testimony also tells the jury nothing about the actual error rates of other laboratories,

25  because these witnesses' experiences were informed by limited data based on their own patients. For all

26  these reasons, any comparative "experience-based" opinions by these experts are unreliable.

27

28  MOTION TO EXCLUDE EXPERT OPINION TESTIMONY OF FACT/PERCIPIENT WITNESSES
    UNDER RULES 401-403 AND 702
    CR-18-00258 EJD
                                        17

1    **III.    The Witnesses' Opinions About Individual Patients Are Unreliable, Irrelevant, and**
2           **Unhelpful.**

3           In many cases, the government intends to offer testimony from these witnesses that they believed

4    that specific Theranos test results received by their patients were in error.  To provide a few illustrative

5    examples:

6       •   Dr. Couvaras will testify about one specific patient, G.M., who received two hCG

7           (pregnancy) blood tests from Theranos.  Ex. 4 at 5.  He will testify that, based on the first of

8           those tests, he concluded that his patient was not pregnant and put her on medication that is

9           contraindicated for pregnant patients.  *Id.*  He will also testify that her second Theranos test

10          led him to conclude that she might have an ectopic pregnancy.  *Id.*

11      •   Dr. Govind Acharya will testify that "[for] the two patients Dr. Acharya remembered having

12          an issue with the Theranos BMP, their potassium" levels were higher than he expected.  Ex.

13          5 at 9.  He intends to testify that "[i]f potassium was off, it was possible that the patient could

14          die on the table."  *Id.*

15      •   Dr. Zachman will testify about one specific patient, B.G., who appears to have received two

16          hCG tests from Theranos.  Ex. 4 at 2.  She intends to testify that Theranos' explanations

17          about the discrepancies between tests for her specific patient were not "plausible."  *Id.*

18   Ms. Holmes does not dispute that these doctors are qualified to opine that specific tests results were

19   inconsistent with a patient's medical history.  An inconsistent test result, however, is not synonymous

20   with an erroneous result absent additional data not disclosed in most cases here by the government in

21   support of these opinions.  For these reasons, many of these opinions are unreliable and do not fit this

22   case.

23                   **1.       Many of the Opinions about Specific Patients Are Unreliable.**

24          As already discussed, although a number of these witnesses offer opinions about test results

25   received by their patients, they fail to identify the patients or the test results at issue, nor do they explain

26   what methodology they applied to arrive at their opinions.  Dr. Linnerson, for example, plans to testify

27

28   MOTION TO EXCLUDE EXPERT OPINION TESTIMONY OF FACT/PERCIPIENT WITNESSES
     UNDER RULES 401-403 AND 702
     CR-18-00258 EJD

                                                    18

that, from the "cases he observed at his practice," "the low hCG values *some* Theranos tests showed, prove[s] that the tests results must have been inaccurate." Ex. 5 at 3. (emphasis added). He notes that this happened to "more than one" of his patients. *Id.* Linnerson fails to articulate the number of cases, the patients, or the test results. He does not state whether he is basing his opinion on a review of actual patient or lab data, or whether he is simply providing an opinion based on his memory. Similarly, Dr. Asin plans to testify that "Theranos A1C tests were either too high or too low; the Theranos tests were not accurate," *id.* at 7, and that Theranos protein tests were "too high," *id.* at 8. He identifies no data for this conclusion, nor does his explain his methodology.[3]

For many of these experts the government's summaries focus primarily on the witness's educational background and work experience. However, as the Ninth Circuit has stated, "qualifications and experience are relevant, and indeed necessary. But they cannot establish the reliability and thus the admissibility of the expert testimony." *Valencia-Lopez*, 971 F.3d at 900. Rule 702 demands more. Under Rule 702, an expert's opinion must be "based on sufficient facts or data . . . [and] the product of reliable principles and methods." The government has not even identified the facts or data on which most of these experts' opinions about their patients are based, nor has it identified the methodology (if any) they applied to arrive at those opinions. As a result, the opinions must be excluded.

## 2. Opinions about Specific Patients Are Irrelevant and Unhelpful.

An anecdote about one test result or even a number of test results out of the millions of results generated by Theranos says nothing about whether any given assay was consistently accurate or reliable. *See Daubert II*, 43 F.3d at 1315 (expert testimony must "logically advance [ ] a material aspect of the proposing party's case" to be relevant). The government has alleged that Ms. Holmes represented to customers "that Theranos could provide accurate, fast, reliable and cheap blood tests and test results"

---

[3] Dr. Asin plans to testify that incorrectly reported A1C results can lead to "a coma from the brain shutting down." Ex. 5 at 7. Dr. Page by contrast plans to testify that "there is not a whole lot of evidence that an A1C that is too high or too low can affect clinical outcomes." *Id.* at 10. These conflicting opinions are emblematic of the lack of standard methodology that pervades the government's disclosure and the unreliability of the opinions that is a byproduct of the failure to apply reliable principles and methods.

MOTION TO EXCLUDE EXPERT OPINION TESTIMONY OF FACT/PERCIPIENT WITNESSES
UNDER RULES 401-403 AND 702
CR-18-00258 EJD

19

when she knew "that Theranos's technology was not *capable of consistently producing accurate and reliable results.*"  ECF No. 469 ¶ 16.  Just like these experts cannot reliably offer opinions on this question from the limited set of data available to them, so too the jury cannot reliably reach a conclusion on that question based on individual anecdotes.  For example, what conclusions could the jury reliably draw from the fact that Dr. Zachman had one patient who received test results that she believed were incorrect?  None.  The jury will have no way of ascertaining whether these results fall within the expected error rate for such tests or whether they are representative of some statistically significant problem.  As a result, the anecdotes are irrelevant under Rules 401-402.

Even if the Court finds that these anecdotes have some probative value, that minimal value would be "substantially outweighed by the danger of unfair prejudice," Fed. R. Evid. 403, and therefore the evidence must be excluded.  *See United States v. Hitt*, 981 F.2d 422, 424 (9th Cir. 1992) ("Where the evidence is of very slight (if any) probative value, it's an abuse of discretion to admit it if there's even a modest likelihood of unfair prejudice or a small risk of misleading the jury.").  The emotional anecdotes previewed by the government's disclosure present the serious risk of the jury's rendering a "decision on an improper basis [*i.e.*] an emotional one."  *See* Fed. R. Evid. 403 advisory committee's notes.  As discussed in more detail below, the effect of these anecdotes will be to inflame the jury with stories of supposed or hypothetical patient harm; therefore the Court should exclude the witnesses' anecdotal testimony.

## IV.    Testimony Regarding Ramifications of Inaccurate Test Results Is Irrelevant and Prejudicial.

Finally, it is clear from the government's summaries that it intends to use these witnesses to make blatant, irrelevant appeals to the jury's emotions by hypothesizing about the potentially catastrophic medical consequences that could follow from inaccurate blood tests that were not flagged as inaccurate—even though those hypothetical consequences did not occur in this case and would require several additional causal steps and even though the relevant harm in this wire-fraud case is deprivation of money or property.  Testimony about the medical consequences of inaccurate blood tests—whether in

MOTION TO EXCLUDE EXPERT OPINION TESTIMONY OF FACT/PERCIPIENT WITNESSES
UNDER RULES 401-403 AND 702
CR-18-00258 EJD

20

1    specific cases or in the abstract—is irrelevant and will prejudice the jury.[4]

2          The government has disclosed its intent to elicit testimony explaining the medical ramifications

3    of an incorrect test.  For example, Ms. Embry intends to testify that she "adjusts patients' medication

4    based on lab results, and an incorrect adjustment could result in patient harm," *id.*, as well as about

5    fertility issues and uterine cancer in patients with PCOS. Ex. 5 at 5.  Dr. Couvaras intends to testify that

6    after receiving the results of a Theranos test he altered a patient's treatment plan.  *Id.* at 5.  Similarly, Dr.

7    Asin intends to testify about a painful biopsy procedure a doctor may order if an initial PSA test comes

8    back high, as well as a host of hypothetical issues that may arise during that hypothetical procedure.  Ex.

9    *Id.* at 8.

10         Similarly, the government intends to elicit testimony about highly prejudicial medical issues that

11   never occurred as a result of Theranos test results.  For example, Dr. Szmuc intends to provide testimony

12   concerning the potential consequences of ectopic pregnancies, including rupturing, significant

13   hemorrhaging "or the worst-case scenario of patient death."  *Id.* at 7.  Dr. Linnerson, for his part, will

14   add that, in cases of ectopic pregnancy, a doctor "must poison the embryo and cause it to dissolve in the

15   tube to avoid danger to the mother."  *Id.* at 2.  The only connection this testimony has to hCG tests is

16   that the test can indicate if a woman may be at risk for such a pregnancy.  The same issue arises with Dr.

17   Linnerson's testimony that an hCG test can be used as a tumor marker.

18         This testimony is irrelevant and prejudicial:  the ramifications of incorrect test results (whether

19   actual or hypothetical) have no bearing on the charges in this case.  *See United States v. Gibson*, 2018

20   WL 4903261, at *6-7 (E.D. Va. Oct. 9, 2018) ("[E]vidence at trial of collateral emotional and personal

21   hardships endured by the victims would only serve to elicit additional sympathy for those victims and

22   risk unfairly prejudicing the Defendant.").  This is a wire-fraud case:  the relevant harm is intended loss

23   of money or property, not medical harm.  *See* Mem Op., ECF No. 330 at 28-35 (dismissing indictment

24   as to doctors and insured or nonpaying patients).  The government did not charge Ms. Holmes with

25

26   ───────────────

27   [4] Ms. Holmes has separately moved to exclude evidence concerning the actual or hypothetical
consequences of purportedly inaccurate tests, as they are irrelevant and unfairly prejudicial.

28   MOTION TO EXCLUDE EXPERT OPINION TESTIMONY OF FACT/PERCIPIENT WITNESSES
UNDER RULES 401-403 AND 702
CR-18-00258 EJD

1    offenses that pose a risk of medical harm.  To prove a scheme to defraud patients, the government must

2    show that Ms. Holmes made material falsehoods about the accuracy and reliability of Theranos' tests.

3    *See* Mem Op., ECF No. 330 at 24 (citing Superseding Indictment, ECF No. 39 ¶ 16.).  The medical

4    consequences of an incorrect test are irrelevant to that question.  *See Gibson*, 2018 WL 4903261, at *6.

5    ("Unlike actual loss, evidence of collateral financial and emotional harms sustained by the victims

6    should be excluded.").  Rather, the effect of this testimony will be to elicit sympathy for Theranos

7    customers by focusing the jury's attention on the potential negative medical ramifications of a

8    purportedly inaccurate test.

9        *United States v. Gibson* is on point.  2018 WL 4903261, at *6-7.  In *Gibson*, a mail- and wire-

10   fraud case, the government sought to elicit testimony regarding the personal hardships the victims

11   suffered as a result of the fraud and how the defendant's scheme to defraud exhausted the victims'

12   resources.  *Id.*  The court excluded the evidence, explaining, "[o]ther courts have repeatedly held that

13   evidence of collateral loss sustained by victims of fraud should be excluded at trial as unfairly

14   prejudicial."  *Id.* at *6.  According to the court, "evidence at trial of collateral emotional and personal

15   hardships endured by the victims would only serve to elicit additional sympathy for those victims and

16   risk unfairly prejudicing the Defendant."  *Id.*  The same holds true here:  if evidence of collateral

17   consequences of financial loss are prejudicial in a wire-fraud case, evidence of alleged hypothetical

18   physical and psychological patient harm (a loss not contemplated by the statute) is even more so.  *See id.*

19   at *7 (stating that in fraud cases evidence that "shows the broader impact of the fraud on the victims'

20   lives, rather than just the actual loss suffered" should be excluded under Rule 403).

21       *FTC v. Wellness Support Network, Inc.*, 2013 WL 5513332, at *9 (N.D. Cal. Oct. 4, 2013), is

22   also instructive.  There, the court excluded an expert's opinion for failure to meet the "fit" requirement

23   in an action against a company alleging that the company made deceptive claims in advertising.  *Id.* at

24   *9.  The claim at issue was that two of the companies' medical products were an effective treatment for

25   diabetes.  *Id.*  The defendant proffered an expert to opine that its products "[could] be used to improve

26   prediabetes and diabetes" because each ingredient had been "shown to have some merit or potential

27

28   MOTION TO EXCLUDE EXPERT OPINION TESTIMONY OF FACT/PERCIPIENT WITNESSES
     UNDER RULES 401-403 AND 702
     CR-18-00258 EJD
                                                     22

1  usefulness."  *Id.*  The court held that the testimony was irrelevant, because the question was "whether

2  the *particular claims* that [the company] is alleged to have made about its products are false or lack

3  substantiation," and the expert's report did not "speak clearly and directly to that issue."  *Id.*  Because

4  the expert's testimony was not directly relevant to whether the company's particular statement was false,

5  the Court held the expert failed the fit requirement.  *Id.*

6          Like the expert testimony in *Wellness Support Network*, the testimony at issue here does not

7  speak clearly and directly to the government's allegations.  *Id.*  This is not a case about patient harm.

8  Anecdotes about the ramifications of allegedly faulty Theranos tests bear no relation to whether Ms.

9  Holmes' alleged representations about certain Theranos' tests were false, and therefore do not fit the

10  charges in this case.  Accordingly, they are irrelevant and should be excluded.

11         The testimony is also misleading and prejudicial.  The doctors' emotional anecdotes about

12  hypothetical injuries would mislead the jury into thinking that these events actually occurred because of

13  Theranos tests.  Dr. Acharya for example will testify that a faulty potassium test could lead to "the

14  patient d[ying] on the table," despite never having this issue with a Theranos test.  As the Ninth Circuit

15  has explained, "[i]t's bad enough for the jury to be unduly swayed by something a defendant did; it's

16  totally unacceptable for it to be prejudiced by something he seems to have done but in fact did not."

17  *Hitt*, 981 F.2d at 424-25.  Furthermore, any probative value of this testimony is substantially outweighed

18  by the danger that its admission would mislead the jury into convicting Ms. Holmes for something that

19  the government did not charge—alleged physical and emotional harm to patients based on a handful of

20  allegedly inaccurate tests.  This testimony must be excluded.

21  **V.      At a Minimum, the Court Should Hold a *Daubert* Hearing.**

22         Although the Court can and should exclude these witnesses' testimony on the basis of the

23  government's disclosure, at a minimum a *Daubert* hearing is required to determine the admissibility of

24  their testimony.  "Where the opposing party . . . raises a material dispute as to the admissibility of expert

25  scientific evidence, the district court must hold an *in limine* hearing (a so-called *Daubert* hearing) to

26  consider the conflicting evidence and make findings about the soundness and reliability of the

27

28  MOTION TO EXCLUDE EXPERT OPINION TESTIMONY OF FACT/PERCIPIENT WITNESSES
UNDER RULES 401-403 AND 702
CR-18-00258 EJD

1  methodology employed by the scientific experts." *Daubert II*, 43 F.3d 1311, 1319 n.10 (9th Cir. 1995)

2  (citing Fed. R. Evid. 104(a)).  Ms. Holmes has put in dispute the admissibility and reliability of the

3  disclosed testimony of these experts.  Accordingly, Ms. Holmes respectfully requests that the Court

4  conduct a *Daubert* hearing.

5  **CONCLUSION**

6  For the foregoing reasons, the Court should exclude the witness's expert testimony for failure to

7  comply with Rule 16.  Alternatively, the Court should exclude the testimony regarding (1) testimony or

8  opinions about laboratory practices, laboratory testing, technology, or the accuracy and reliability of

9  Theranos' tests, or testimony or opinions comparing Theranos to other laboratories and, (2) testimony or

10  opinions based on anecdotal evidence about patient test results; (3) testimony or opinions about

11  ramifications of inaccurate tests.  And, at a bare minimum, the Court should conduct a *Daubert* hearing

12  before deciding whether these witnesses' testimony is admissible.

13

14  DATED:  November 20, 2020                    Respectfully submitted,

15

16                    /s/ Amy Mason Saharia
                       KEVIN DOWNEY

17                    LANCE WADE
                       AMY MASON SAHARIA

18                    KATHERINE TREFZ
                       Attorneys for Elizabeth Holmes

19

20

21

22

23

24

25

26

27

28  MOTION TO EXCLUDE EXPERT OPINION TESTIMONY OF FACT/PERCIPIENT WITNESSES
UNDER RULES 401-403 AND 702
CR-18-00258 EJD

1

### **CERTIFICATE OF SERVICE**

2       I hereby certify that on November 20, 2020, a copy of this filing was delivered via ECF on all

3    counsel of record.

4

5                                        /s/ Amy Mason Saharia

6                                        AMY MASON SAHARIA
                                         Attorney for Elizabeth Holmes
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28    MOTION TO EXCLUDE EXPERT OPINION TESTIMONY OF FACT/PERCIPIENT WITNESSES
      UNDER RULES 401-403 AND 702
      CR-18-00258 EJD

1  JOHN D. CLINE (CA State Bar No. 237759)
   50 California Street, Suite 1500
2  San Francisco, CA 94111
   Telephone: (415) 662-2260 │Facsimile: (415) 662-2263
3  Email: cline@johndclinelaw.com

4  KEVIN M. DOWNEY (Admitted Pro Hac Vice)
   LANCE A. WADE (Admitted Pro Hac Vice)
5  AMY MASON SAHARIA (Admitted Pro Hac Vice)
   KATHERINE TREFZ (CA State Bar No. 262770)
6  WILLIAMS & CONNOLLY LLP
   725 Twelfth Street, NW
7  Washington, DC 20005
   Telephone: (202) 434-5000 │Facsimile: (202) 434-5029
8  Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

9  Attorneys for Defendant ELIZABETH A. HOLMES

10

11                    UNITED STATES DISTRICT COURT

12                  NORTHERN DISTRICT OF CALIFORNIA

13                        SAN JOSE DIVISION

14

15  UNITED STATES OF AMERICA,          )  Case No. CR-18-00258-EJD
                                       )
16            Plaintiff,               )  **[PROPOSED] ORDER GRANTING MS.**
                                       )  **HOLMES' MOTION TO EXCLUDE EXPERT**
17      v.                             )  **OPINION TESTIMONY OF**
                                       )  **FACT/PERCIPIENT WITNESSES UNDER**
18  ELIZABETH HOLMES and               )  **RULES 401-403 AND 702**
    RAMESH "SUNNY" BALWANI,            )
19                                     )
              Defendants.              )  Hon. Edward J. Davila
20                                     )
                                       )
21  _____   )

22

23

24

25

26

27

28

   [PROPOSED] ORDER GRANTING MS. HOLMES' MOTION TO EXCLUDE EXPERT OPINION
   TESTIMONY OF FACT/PERCIPIENT WITNESSES UNDER RULES 401-403 AND 702
   CR-18-00258-EJD

1    This Cause having come before the Court upon Defendant Elizabeth A. Holmes' Motion to

2    Exclude Expert Opinion Testimony of Fact/Percipient Witnesses Under Rules 401-403 and 702.  After

3    due consideration of the filings, the governing law and the argument of the parties:

4              IT IS HEREBY ORDERED that Ms. Holmes' motion is GRANTED.

5              IT IS FURTHER ORDERED that the government shall not elicit any expert opinions

6    from the nine medical professionals disclosed as experts.

7              IN THE ALTERNATIVE, IT IS FURTHER ORDERED that the government shall not

8    elicit testimony or opinions from its witnesses regarding laboratory practices, laboratory testing,

9    technology, or the accuracy or reliability of Theranos' tests.

10              IT IS FURTHER ORDERED that the government shall not elicit testimony or opinions

11    from its witnesses regarding comparisons of Theranos to other laboratories.

12              IT IS FURTHER ORDERED that the government shall not elicit testimony or opinions

13    from its witnesses regarding individual test results believed to be erroneous.

14              IT IS FURTHER ORDERED that the government shall not elicit testimony or opinions

15    from its witnesses about ramifications of inaccurate tests.

16

17              IT IS SO ORDERED.

18

19    Dated: _____

20

21                                                          _____

22                                                          Hon. Edward J. Davila
                                                          United States District Judge

23

24

25

26

27

28    [PROPOSED] ORDER GRANTING MS. HOLMES' MOTION TO EXCLUDE EXPERT OPINION
      TESTIMONY OF FACT/PERCIPIENT WITNESSES UNDER RULES 401-403 AND 702
      CR-18-00258 EJD