JOHN D. CLINE (CA State Bar No. 237759)
50 California Street, Suite 1500
San Francisco, CA 94111
Telephone: (415) 662-2260 │ Facsimile: (415) 662-2263
Email: cline@johndclinelaw.com

KEVIN M. DOWNEY (Admitted Pro Hac Vice)
LANCE A. WADE (Admitted Pro Hac Vice)
AMY MASON SAHARIA (Admitted Pro Hac Vice)
KATHERINE TREFZ (CA State Bar No. 262770)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
Washington, DC 20005
Telephone: (202) 434-5000 │ Facsimile: (202) 434-5029
Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

Attorneys for Defendant ELIZABETH A. HOLMES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   Plaintiff,<br><br>   v.<br><br>ELIZABETH HOLMES and<br>RAMESH "SUNNY" BALWANI,<br><br>   Defendants. | Case No. CR-18-00258-EJD<br><br>**MS. HOLMES' MOTION TO EXCLUDE EVIDENCE OF THERANOS' TRADE SECRETS PRACTICES UNDER FEDERAL RULES OF EVIDENCE 401-404**<br>Date:   January 22, 2021<br>Time:   10:00 AM<br>CTRM: 4, 5th Floor<br><br>Hon. Edward J. Davila |

MS. HOLMES' MOTION TO EXCLUDE EVIDENCE OF THERANOS' TRADE SECRETS
PRACTICES UNDER FEDERAL RULES OF EVIDENCE 401-404
CR-18-00258 EJD

# MOTION TO EXCLUDE EVIDENCE OF
# THERANOS' TRADE SECRETS PRACTICES

PLEASE TAKE NOTICE that on January 22, 2021, at 10:00 a.m., or on such other date and time as the Court may order, in Courtroom 4 of the above-captioned Court, 280 South 1st Street, San Jose, CA 95113, before the Honorable Edward J. Davila, Defendant Elizabeth Holmes will and hereby does respectfully move *in limine* to exclude evidence of Theranos' trade secrets practices.  Ms. Holmes makes this motion pursuant to Federal Rules of Evidence 401, 402, 403, and 404(b).  The Motion is based on the below Memorandum of Points and Authorities, the exhibits and declarations that accompany this motion, the record in this case, and any other matters that the Court deems appropriate.

DATED: November 20, 2020

/s/ Amy Mason Saharia
KEVIN DOWNEY
LANCE WADE
AMY MASON SAHARIA
KATHERINE TREFZ
Attorneys for Elizabeth Holmes

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ...............................................................................1

BACKGROUND ...................................................................................................................................1

ARGUMENT .........................................................................................................................................7

    I.    Evidence Concerning the Measures Theranos Took To Protect Trade Secrets Has No Probative Value and Will Confuse, Mislead, and Prejudice the Jury. ....................7

    II.    The Court Should Also Exclude This Evidence Pursuant to Rule 404(b). .........................9

CONCLUSION ....................................................................................................................................10

**MEMORANDUM OF POINTS AND AUTHORITIES**

Defendant Elizabeth Holmes moves, pursuant to Federal Rules of Evidence 401-403 and 404(b), to preclude the government from introducing evidence of Theranos' trade secrets practices to prove that Ms. Holmes intended to defraud investors or customers. Theranos, like other companies pursuing innovative technologies, implemented common policies to protect its confidential trade secrets. These measures—all of which California courts have endorsed, if not demanded—are in place at countless businesses that possess far less sensitive information than did Theranos. Absent the implementation of these measures, Theranos faced a serious risk that courts would find it had failed to "exercise eternal vigilance" in protecting its trade secrets. *HiRel Connectors, Inc. v. United States*, 2005 WL 4958547, at *4 (C.D. Cal. Jan. 4, 2005).

The government, however, intends to offer at trial evidence of Theranos' trade secrets practices solely to mislead the jury into believing that Ms. Holmes created an ominous culture of secrecy at Theranos and placed suspicious restrictions on individuals' access to Theranos' labs because she knew criminal conduct was occurring and sought to conceal it. *See* Ex. 1 at 4 (Mar. 6, 2020 Gov't Rule 404(b) Notice) (Categories 7, 8, 12). If implementing measures to protect trade secrets required by California law were evidence of fraud, every CEO who properly seeks to protect proprietary technology would face potential criminal liability. The government's proposed evidence is probative of nothing. The government's intended, inflammatory narrative—that legally required trade-secrets protection measures are evidence of fraud—will unfairly prejudice Ms. Holmes and will risk conviction based on improper propensity reasoning. The government's evidence will also confuse the jury and spawn mini-trials about the reasons why Theranos implemented such measures—an endeavor that is complicated by the significant involvement of attorneys in this aspect of Theranos' business. The Court should exclude this evidence under Rules 401-403 and 404(b).

**BACKGROUND**

For many years, Theranos researched and designed novel medical testing technologies. The company hoped that its proprietary research and medical devices would facilitate mass testing for

infectious diseases and common health problems. Because of the potential commercial value of such research and technology, it attracted significant attention from many individuals and entities, including its competitors and former employees. Even in the years before Theranos' work attracted widespread public interest, Theranos warded off multiple attempted thefts of its proprietary information and trade secrets.

Theranos adopted common measures that California companies often take to protect their trade secrets. California law defines a "trade secret" as information that is subject to "efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d)(2); *see generally* 1 Melvin F. Jager, Trade Secrets Law §§ 5:16, 5:20-5:22, 5:24-5:26, 7:3 (Oct. 2020 Update). A company's failure to take "reasonable" efforts to protect information's secrecy will result in loss of trade secret protection. Accordingly, "the time-tested advice is to implement as many protective measures as reasonably possible" "[g]iven the uncertainty surrounding what constitutes reasonable measures" in the trade secrets context. David S. Almeling et. al., *A Statistical Analysis of Trade Secret Litigation in Federal Courts*, 45 Gonz. L. Rev. 291, 322 (2009). Theranos obtained advice from attorneys concerning trade secret security and preservation and, indeed, implemented many protective measures.

The government has noticed its intent to introduce evidence of Theranos' trade secrets protection measures in order to prove that Ms. Holmes intended to defraud others. Category 7 of the government's Rule 404(b) notice provides as follows:

> **7. Fostering culture of secrecy and forcing employees and others to sign non-disclosure agreements.** In order to prevent the spread of information regarding problems at Theranos, Defendants required employees to sign strict non-disclosure agreements. Similar agreements were prerequisites to board members, potential investors, and other visitors obtaining information about the company, its technology, and its business. Similarly, in their roles controlling the day-to-day operations of Theranos and overseeing the company's employees, Defendants took steps to silo information within Theranos, discouraging employees from sharing information about their work with other employees in the company and fostering a culture of internal secrecy. These actions minimized the number of Theranos employees who were aware of problems relating to the company's research and development practices, technological capabilities, clinical laboratory practices, and business relationships. In particular, Defendants discouraged employees

from sharing information regarding Theranos's use of third-party analyzers for its tests, taking specific steps to conceal this fact from employees who did not already know. Those steps included renaming third-party devices in Theranos's information management systems and assigning them code names so that employees who accessed these systems could not determine that those devices had in fact been manufactured by third-party companies. Defendants were so restrictive in controlling employees' statements about Theranos that they required some employees to remove references to Theranos from the employees' LinkedIn profiles. Defendants were similarly secretive with investors, refusing to disclose to representatives like Lisa Peterson the identities of other investors in the company. The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees and investors as well as potential and actual strategic partners of Theranos.

Ex. 1 at 4-5. Category 8 further provides:

**8. Restricting access to laboratory areas within Theranos.** Defendants set policies at Theranos that severely restricted access to the laboratory areas where Theranos tested patient samples. Employees who did not work in the clinical laboratory generally were not able to access the areas, and visitors generally were not allowed to view those areas. These policies and practices prevented the dissemination of knowledge regarding problems with Theranos's proprietary analyzers as well as Theranos's use of third-party devices for many of its tests. Similarly, while withholding access to the actual clinical lab, Defendants misled visitors to Theranos by intentionally giving them the impression that the clinical lab consisted of multiple Theranos TSPUs and did not include other conventional devices. For example, when Vice President Biden visited Theranos in July 2015, Theranos did not show visitors the CLIA lab where patient sample testing was performed, but set up a room containing a large number of Theranos TSPU boxes on shelves, intending that visitors believe they were viewing the machines that ran Theranos's clinical tests. Within Theranos's Normandy laboratory, Balwani ordered that wall dividers be installed to hide the Tecan devices Theranos used to dilute its samples. When Holmes was interviewed by Roger Parloff following his visit to Theranos's facilities, she responded to his request to see the lab by indicating that he had essentially already seen the lab because he had seen a room with multiple TSPU devices. The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees, potential and actual strategic partners of Theranos, journalists, and others who visited Theranos.

*Id.* at 5.

And Category 12 states in relevant part:

**12. Threatening or intimidating employees or former employees.** Defendants and their agents directed threats and intimidating language at current and former Theranos employees in an effort to discourage employees from disseminating facts about the problems facing the company's technology and business. On multiple occasions, when

MS. HOLMES' MOTION TO EXCLUDE EVIDENCE OF THERANOS' TRADE SECRETS
PRACTICES UNDER FEDERAL RULES OF EVIDENCE 401-404
CR-18-00258 EJD

3

    employees left the company voluntarily or were terminated, Defendants corresponded or met with those employees to deliver stern reminders of the employee's obligations under nondisclosure agreements and threatened employees with consequences should they reveal any nonpublic information about Theranos's technology or business practices. . . .

*Id*. at 6. In a supplemental disclosure, the government claimed that evidence of these allegations "tends to show consciousness of guilt and tends to show a belief that transparency would expose the falsity of what [Defendants] claimed to investors, patients, and others." Ex. 3 at 55 (Sept. 28, 2020 Gov't Supp. Rule 404(b) Notice); *see also id.* at 57, 63.

    The foregoing allegations, however, reflect common measures that California law requires, that trade secrets scholars recommend, and that California companies implement all the time to attempt to protect their trade secrets. In particular:

    <u>Confidentiality policy</u>: Like many companies, Theranos had a confidentiality policy that governed what matters its employees could discuss and with whom employees could discuss those matters. *See, e.g.*, *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 521 (9th Cir. 1993); *see* Jager, *supra*, § 5.21 ("A uniform policy on the protection of confidential information should be established and communicated to all employees who will have access to the data.").

    <u>Restricting access to information and facilities</u>: Like many companies, Theranos protected its trade secrets by sharing information on a need-to-know basis (which the government characterizes as "siloing" in its Rule 404(b) notice), and by controlling which employees had access to different parts of its facilities, including its laboratories where confidential technology was being used. *See, e.g.*, *Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1454 (Cal. Ct. App. 2002) ("[R]easonable efforts . . . include advising employees of the existence of a trade secret, limiting access to a trade secret on [a] need to know basis, and controlling plant access.").[1] Such measures are recommended, normal steps to protect trade secrets. *See* Jager, *supra*, §5.20 ("Highly sensitive information should be disclosed to employees

---

[1] "Siloing" of employees—*i.e.*, limiting employees' access to information concerning parts of a company's work in which they are not engaged—also protects against trade secrets appropriation claims by competitors. *See, e.g.*, *Calendar Research LLC v. StubHub, Inc.*, 2018 WL 4846797, at *10 (CD. Cal. Aug. 7, 2018).

MS. HOLMES' MOTION TO EXCLUDE EVIDENCE OF THERANOS' TRADE SECRETS PRACTICES UNDER FEDERAL RULES OF EVIDENCE 401-404
CR-18-00258 EJD

4

on a need-to-know basis.  Depending on the circumstances, it may be desirable to make some areas of the premises off-limits to employees who do not have the required clearance or need-to-know. Visitors should be kept out of sensitive areas. . . . Established procedures should prevent confidential documents, drawings, and equipment or the like, from being visible to the visitor."); 1 Roger M. Milgrim & Eric E. Benson, *Milgrim on Trade Secrets* § 1.04 (2020) (stating that one technique for protecting trade secrets on which courts often focus is "[m]aintaining internal secrecy by dividing the process into steps and separating the various departments working on the several steps").  In addition, regulations promulgated by the Centers for Medicare & Medicaid Services (CMS) provide that each "laboratory must ensure confidentiality of patient information throughout all phases of the total testing process that are under the laboratory's control." 42 C.F.R. § 493.1231.  This federal requirement is another reason to control access to all spaces "within the laboratory's control." *Id*.

Security systems:  Like many companies, Theranos had physical and electronic security systems in place to make sure that confidential information was not leaving the facility. *See, e.g.*, *United States v. Nosal*, 2013 WL 4504652, at *17 (N.D. Cal. Aug. 15, 2013) (finding reasonable efforts taken where company monitored employees' download activity); *PQ Labs, Inc. v. Yang Qi*, 2014 WL 334453, at *3 (N.D. Cal. Jan. 29, 2014) (approving the use of "fingerprint scanners and security personnel" and "passwords and firewalls to protect its electronic information").

Use and enforcement of nondisclosure agreements:  Like many companies, Theranos asked its employees, board members, investors, or visitors—all of whom learned about Theranos' practices and technology—to sign "strict non-disclosure agreements," non-cooperation clauses, and affidavits affirming their confidentiality obligations.  Ex. 1 at 4; *see, e.g.*, *Kema, Inc. v. Koperwhats*, 2010 WL 726640, at *4 (N.D. Cal. Mar. 1, 2010) ("[T]he failure to secure non-disclosure agreements from others in possession of any remaining portions is fatal to a trade secret claim."); *see also* 1 *Milgrim*, *supra*, § 1.04 ("Confidentiality agreements are typically a central focus of a reasonable efforts analysis.").  With respect to employees in particular, there is nothing unusual about requiring employees to adhere to nondisclosure agreements; as one treatise explains, "Surveys show that a confidentiality agreement or

MS. HOLMES' MOTION TO EXCLUDE EVIDENCE OF THERANOS' TRADE SECRETS PRACTICES UNDER FEDERAL RULES OF EVIDENCE 401-404
CR-18-00258 EJD

5

clause is included in virtually all employment agreements used by major corporations." Jager, *supra*, § 13.3. Commentators specifically recommend conducting exit interviews with departing employees and requiring them to acknowledge their ongoing confidentiality obligations. *See id* § 5.26. And, of course, there is nothing unusual about threatening litigation against former employees who violate such agreements. In fact, the failure to pursue litigation in that situation may terminate trade secret status. *See* 1 Milgrim, *supra*, § 1.04 ("A failure to take legal action against one who has misappropriated a trade secret may be viewed as a failure to employ reasonable measures to protect secrecy.").

<u>Social media posting</u>: Like many companies, Theranos limited what its employees could say about their work at Theranos in public fora such as LinkedIn. *See, e.g.*, *Cellular Accessories for Less, Inc. v. Trinitas LLC*, 2014 WL 4627090, at *4 (C.D. Cal. Sept. 16, 2014) (information available to the public on LinkedIn may not be a trade secret).

<u>Return of company property</u>. Like many companies, Theranos also expected its employees to return all company property when they departed Theranos. *See, e.g.*, *IPC Sys., Inc. v. Garrigan*, 2012 WL 12872028, at *5 (N.D. Ga. May 21, 2012) (finding reasonable steps to protect trade secrets where policy required return of all company work product upon termination of employment); *see also* Jager, *supra*, § 5.26.

<u>Litigation</u>: Like many companies, Theranos was willing to litigate to protect its trade secrets in accordance with its agreements, including by enforcing non-disclosure agreements. *See, e.g.*, *HiRel*, 2005 WL 4958547, at *3–5 (summarizing cases regarding the need for prompt legal demands or suits when a trade secret risks public disclosure).

In sum, the government's Rule 404(b) notice reflects nothing more than Theranos' reasonable efforts to "exercise eternal vigilance" and thereby protect its trade secrets under California law. *Id.* at *4.

1 **ARGUMENT**

2 **I.    Evidence Concerning the Measures Theranos Took To Protect Trade Secrets Has No Probative Value and Will Confuse, Mislead, and Prejudice the Jury.**

3

4       A court must exclude evidence that is of no consequence to the charges in a case, Fed. R. Evid.

5 401, 402, or evidence whose limited probative value "is substantially outweighed by a danger of one or

6 more of the following:  unfair prejudice, confusing the issues, misleading the jury, . . . [or] wasting

7 time[,]" Fed. R. Evid. 403.  Cumulatively, these Rules require excluding the government's proposed

8 evidence concerning Theranos' "culture of secrecy" (Category 7), restrictions on access to its

9 laboratories (Category 8), and efforts to hold employees and former employees to the terms of their

10 contractual confidentiality obligations (Category 12).

11      The government's proposed evidence regarding Theranos' trade secrets practices has no

12 probative value; at best, its probative value is "very slight."  *United States v. Hitt*, 981 F.2d 422, 424

13 (9th Cir. 1992).  The documents and testimony that the government noticed in its Rule 404(b) notice

14 depict a company protecting its trade secrets through commonplace methods.  *See supra* pp. 2-4.

15 Evidence that Theranos took measures to safeguard its trade secrets is far from remarkable.  To the

16 contrary, the absence of such measures would have been unusual, given that the lack of such practices

17 could have invalidated Theranos' claim to hold trade secrets under California law.  No diligent officer

18 or director of Theranos would have failed to implement these kinds of measures; Ms. Holmes would have

19 been derelict in her duties to the company if she had failed to do so.  *See Leykin v. AT & T Corp.*, 423 F.

20 Supp. 2d 229, 243 (S.D.N.Y. 2006) (acknowledging the potential for derivative securities fraud actions

21 if a competitor "had gained access to, copied and used" the defending company's "proprietary

22 technology").  Moreover, a failure to "ensure confidentiality of patient information throughout all phases

23 of the total testing process that are under the laboratory's control" would have put Theranos in violation

24 of federal regulations.  42 C.F.R. § 493.1231.

25      The irrelevance of Theranos' trade secrets practices becomes even more apparent given that no

26 witness can permissibly testify that Theranos' practices were "unusual" or "excessive."  A qualified

27
28  MS. HOLMES' MOTION TO EXCLUDE EVIDENCE OF THERANOS' TRADE SECRETS
   PRACTICES UNDER FEDERAL RULES OF EVIDENCE 401-404
   CR-18-00258 EJD

7

expert could perhaps offer such testimony if he had the knowledge and ability to draw meaningful comparisons between the trade secrets practices of Theranos and its peers, assuming the opinion could otherwise satisfy Rule 702.  But no lay witness could hope to offer an admissible opinion along these lines, *see* Fed. R. Evid. 701(c), and the government has not disclosed an expert witness who will offer such testimony.  In other words, the admissible evidence at trial will reveal nothing more than that Theranos implemented and maintained safeguards for its trade secrets, all of which California law allows and even requires.  Because that fact tells the jury nothing about the alleged fraud, evidence of that fact is irrelevant and inadmissible.

Even if this evidence had minimal probative value, it would constitute "an abuse of discretion to admit it if there's even a modest likelihood of unfair prejudice or a small risk of misleading the jury." *Hitt*, 981 F.2d, at 424.  That risk is undoubtedly present here.  The government is attempting to "connect[] seemingly innocent conduct"—a company's legitimate efforts to protect its trade secrets— "to a vast [fraud] empire" allegedly orchestrated by Ms. Holmes.  *United States v. Vallejo*, 237 F.3d 1008, 1017 (9th Cir. 2001) (drug trafficking context); *see also United States v. Lim*, 984 F.2d 331, 334-35 (9th Cir. 1993) (noting that it "is inherently prejudicial to the defendant" to "suggest that innocuous events indicate criminal activity").  The government makes no secret of this intention.  It intends to offer evidence of Theranos' legitimate trade secrets practices to show that Ms. Holmes fostered a "culture of secrecy" to "prevent the spread of information regarding problems at Theranos."  Ex. 1 at 4; *see id.* at 5 (stating that Theranos' lab restrictions were designed for a similar purpose); Ex. 3 at 55 (claiming this evidence is relevant to consciousness of guilt).

There also exists a meaningful risk that the jury might interpret Theranos' legal need to withhold some information from employees, *see Whyte*, 101 Cal. App. 4th at 1454, as an intent by Ms. Holmes to deceive Theranos' employees.  Thus, not only would this evidence run the risk of confusing the jury, it would suggest "that the individual who was indicted for [wire] fraud has a character for fraud," which is of course "unduly prejudicial."  *United States v. Shayota*, 2016 WL 6093237, *5 (N.D. Cal. Oct. 19,

MS. HOLMES' MOTION TO EXCLUDE EVIDENCE OF THERANOS' TRADE SECRETS
PRACTICES UNDER FEDERAL RULES OF EVIDENCE 401-404
CR-18-00258 EJD

8

2016); *accord United States v. Martin*, 796 F.3d 1101, 1107 (9th Cir. 2015) (finding such reasoning unfairly prejudicial in the tax fraud context).

Last but not least, if the government is allowed to present evidence of Theranos' trade secrets practices, the parties will be required to engage in a string of mini-trials. Ms. Holmes will have no choice but to present evidence regarding why Theranos took such actions, which will include the history of trade secrets theft discussed above. In short, the parties will spend precious time debating why Theranos took certain measures, as opposed to focusing the jury's valuable time on the core issues implicated by the Indictment. And Ms. Holmes will be handicapped in these mini-trials by the fact that Theranos attorneys were heavily involved in this aspect of Theranos' operations, meaning that much of the relevant evidence is privileged. In short, this evidence will "result[] in a 'mini-trial'" on the question of Theranos' trade secrets, as Ms. Holmes disputes "much of [it]." *Tennison v. Circus Circus Enters.*, 244 F.3d 684, 690 (9th Cir. 2001).

In sum, there is no (or at best slight) probative value in the evidence of Theranos' trade secrets measures, and there is a serious risk of prejudicing Ms. Holmes, confusing the issues, and misleading the jury. This Court should therefore exclude this evidence.

**II.    The Court Should Also Exclude This Evidence Pursuant to Rule 404(b).**

Even if this evidence could clear Rules 401, 402, and 403, it violates Rule 404(b). Evidence of a prior act is admissible under Rule 404(b) to prove a non-propensity point only if "(1) the evidence tends to prove a material point; (2) the prior act is not too remote in time; (3) the evidence is sufficient to support a finding that the defendant committed the other act; and (4) (in cases where knowledge and intent are at issue) the act is similar to the offense charged." *United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1013 (9th Cir. 1995) (quoting *United States v. Mayans*, 17 F.3d 1174, 1181 (9th Cir. 1994)). The government has the burden of establishing all four criteria. *See United States v. Bailey*, 696 F.3d 794, 799 (9th Cir. 2012). Even when the government meets that burden, the district court must conduct a Rule 403 balancing. *United States v. Hodges*, 770 F.2d 1475, 1479 (9th Cir. 1985).

MS. HOLMES' MOTION TO EXCLUDE EVIDENCE OF THERANOS' TRADE SECRETS PRACTICES UNDER FEDERAL RULES OF EVIDENCE 401-404
CR-18-00258 EJD

9

Another act is admissible evidence of intent under Rule 404(b) only if the other act "is similar to the offense charged." *Mayans*, 17 F.3d at 1181. The government must "articulate precisely the evidential hypothesis by which a fact of consequence may be inferred from the other acts evidence." *Id.* No such hypothesis is viable here. The Indictment charges Ms. Holmes with allegedly scheming to defraud:

- investors and paying patients (not Theranos employees);
- of property (not internal transparency at Theranos);
- through deliberate misrepresentations (not through necessary trade secrets precautions); and
- through interstate wires (not through Theranos' labs).

The trade secrets "evidence" that the government intends to introduce is far different and not admissible under Rule 404(b). It is merely an attempt to backdoor into this case the suggestion that Ms. Holmes has previously "engaged in some sort of fraud" and thus "ha[s] [a] tendency to commit fraud." *Shayota*, 2016 WL 6093237, at *4. That is not a permissible purpose for the introduction of this evidence.

## CONCLUSION

For the foregoing reasons, Ms. Holmes respectfully requests an order precluding the government from introducing at trial evidence of Theranos' trade secrets practices for the purpose of proving intent to defraud.

DATED: November 20, 2020                    Respectfully submitted,

/s/ Amy Mason Saharia
KEVIN DOWNEY
LANCE WADE
AMY MASON SAHARIA
KATHERINE TREFZ
Attorneys for Elizabeth Holmes

# CERTIFICATE OF SERVICE

I hereby certify that on November 20, 2020 a copy of this filing was delivered via ECF on all counsel of record.

/s/ Amy Mason Saharia
AMY MASON SAHARIA
Attorney for Elizabeth Holmes

JOHN D. CLINE (CA State Bar No. 237759)
50 California Street, Suite 1500
San Francisco, CA 94111
Telephone: (415) 662-2260 │ Facsimile: (415) 662-2263
Email: cline@johndclinelaw.com

KEVIN M. DOWNEY (Admitted Pro Hac Vice)
LANCE A. WADE (Admitted Pro Hac Vice)
AMY MASON SAHARIA (Admitted Pro Hac Vice)
KATHERINE TREFZ (CA State Bar No. 262770)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
Washington, DC 20005
Telephone: (202) 434-5000 │ Facsimile: (202) 434-5029
Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

Attorneys for Defendant ELIZABETH A. HOLMES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR-18-00258-EJD |
| Plaintiff, | **[PROPOSED] ORDER GRANTING MS. HOLMES' MOTION TO EXCLUDE EVIDENCE OF THERANOS' TRADE SECRETS PRACTICES** |
| v. | |
| ELIZABETH HOLMES and RAMESH "SUNNY" BALWANI, | Hon. Edward J. Davila |
| Defendants. | |

[PROPOSED] ORDER GRANTING MOTION TO EXCLUDE EVIDENCE OF THERANOS' TRADE SECRETS PRACTICES
CR-18-00258-EJD

1  This Cause having come before the Court upon Defendant Elizabeth A. Holmes' Motion to
2  Exclude Evidence of Theranos' Trade Secret Practices. After due consideration of the filings, the
3  governing law and the argument of the parties:
4  IT IS HEREBY ORDERED that Ms. Holmes' motion is GRANTED.
5  IT IS FURTHER ORDERED that the government shall not introduce at trial any
6  evidence, argument, or reference to Theranos' trade secrets practices for the purpose of proving intent to
7  defraud.

9  IT IS SO ORDERED.

11  Dated: _____

     _____
     Hon. Edward J. Davila
     United States District Judge

28  [PROPOSED] ORDER MOTION TO EXCLUDE EVIDENCE OF THERANOS' TRADE SECRETS
     PRACTICES
     CR-18-00258 EJD