# Exhibit 3



*United States Attorney*
*Northern District of California*

*1301 Clay Street, Suite 340S*     *(510) 637-3680*
*Oakland, California 94612*     *Fax  (510) 637-3724*

September 28, 2020

*By Email*

Lance Wade, Esq.
Kevin Downey, Esq.
Katie Trefz, Esq.
Amy Saharia, Esq.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, DC  20005

    Re:   *United States v. Holmes*, CR 18-258 EJD

Dear Counsel,

    On March 6, 2020, and April 3, 2020, and through our discovery letters, we notified you of evidence crimes, wrongs, or other acts the government may seek to introduce at trial.  We write to supplement those disclosures.  By providing this disclosure, the government is not conceding that the evidence described below (or previously) is properly considered Rule 404(b) evidence or is admissible only under the provisions of Rule 404(b).  The government may also assert that this evidence is admissible as direct evidence of the charged conduct, that it is inextricably intertwined with the events charged in the operative Indictment, that it shows a continuing course of conduct otherwise admissible under Rules 401 and 402, or that it simply is not subject to Rule 404(b).  We make these disclosures out of an abundance of caution and to avoid surprise about the government's intentions.  In addition to the evidence expressly cited below, the government reserves the right to admit alternative versions of the cited items, additional evidence needed to place the cited evidence in context, and other equivalent and similar evidence of the same acts.

    With that in mind, we notify you as follows:

/ /

1

I.      **False and misleading representations directed at insured patients.**

The government may offer evidence of the following:

███████████

Before October 2014, ████████████ received presentations from Theranos in the medical practice where she worked.  "Theranos's fingerstick blood draw was appealing to ████," and she saw Theranos testing as convenient and quicker than testing at a traditional laboratory.  US-REPORTS-0010790.  On or about October 4, 2014, █████ visited a Theranos Service Center in Phoenix, Arizona.  US-REPORTS-0011799.  After, she received an inaccurate hCG result from Theranos.  The results were faxed from Palo Alto to her physician in Arizona.  US-REPORTS-0011799.  Holmes and Balwani were made aware of the inaccurate result no later than October 15, 2014, and were advised █████ "was told she was miscarrying, which was not the case."  TS-1041959-961; TS-1078204-207; SEC-USAO-EPROD-000388965; SEC-USAO-EPROD-000402263-69.  Balwani claimed the inaccurate result was because of human error.  SEC-USAO-EPROD-000402263-69.  Theranos ultimately voided the result in or about March 2016.

The evidence is offered for the permitted purpose of intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy.  Such evidence tends to show Holmes and Balwani knew of problems with Theranos's hCG tests.  Such evidence tends to show Theranos was unable to provide accurate and reliable test results, that Holmes and Balwani knew Theranos was unable to provide accurate and reliable test results, as alleged in Paragraph 16, and statements to investors and patients were false and misleading.  Such evidence tends to show Holmes and Balwani's scheme contemplated the use of interstate wires.  Such evidence tends to show Holmes and Balwani understood the importance of accurate hCG tests and the consequences of inaccurate results, as well as the materiality of statements about accuracy to investors and patients.  Such evidence tends to show their knowledge and control over Theranos's operations.  Theranos's voiding of the test tends to show Theranos was unable to produce accurate and reliable test results.  Evidence that insured and other nonpaying patients were induced to use Theranos's services tends to show the existence of the scheme and the materiality of the statements.

███████████

████████████ worked at Walgreens and, by virtue of her work, received and was exposed to Theranos marketing.  █████ spent a week at Theranos's corporate office to train to become a Theranos technician.  Her Theranos trainers talked about their tests being more accurate and requiring less blood.  █████ said that Walgreens had a health testing month.  Before Theranos partnered with her store, if a patient came in seeking an HbA1c test, she would direct them to an over-the-counter device.  Once Theranos partnered with her store, she would recommend to patients that they use a Theranos test.  She would tell the patients, "It's accurate, less painful, there's less blood drawn, and Theranos is right here."  This message that she presented was borne out of a combination of her Theranos training she received as well as the brochures Theranos created that were left for patients.  US-REPORTS-0010783-785

On or about September 24, 2014, ▮▮▮▮▮ visited a Theranos Service Center in Apache Junction, Arizona.  CMS-DOJ-0208226.  After, she received an inaccurate hCG result from Theranos.  On or about October 1, 2014, she called to complain.  THPFM0004992928.  On or about October 1, 2014, Christian Holmes and Dan Edlin (who reported to Holmes) were advised of ▮▮▮▮ inaccurate result.  SEC-USAO-EPROD-004138573; SEC-USAO-EPROD-004142263.  Later, Balwani was advised ▮▮▮▮ was receiving suspect results.  SEC-USAO-EPROD-001298981; SEC-USAO-EPROD-001298982.  On or about August 28, 2015, ▮▮▮▮ wrote Theranos about her inaccurate result.  THPFM0005249329.  Holmes and Balwani were alerted to her complaints.  SEC-USAO-EPROD-000879453; US-REPORTS-0070786.  Theranos ultimately voided the result on or about March 28, 2016.  CMS-DOJ-0208226.

The evidence is offered for the permitted purpose of intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy.  Such evidence tends to show Holmes and Balwani knew of problems with Theranos's hCG tests.  Such evidence tends to show Theranos was unable to provide accurate and reliable test results, that Holmes and Balwani knew Theranos was unable to provide accurate and reliable test results, as alleged in Paragraph 16, and statements to investors and patients were false and misleading.  Such evidence tends to show Holmes and Balwani's scheme contemplated the use of interstate wires.  Such evidence tends to show Holmes and Balwani understood the importance of accurate hCG tests and the consequences of inaccurate results, as well as the materiality of statements about accuracy to investors and patients.  Such evidence tends to show their knowledge and control over Theranos's operations.  Theranos's voiding of the test tends to show Theranos was unable to produce accurate and reliable test results.  Evidence that insured and other nonpaying patients were induced to use Theranos's services tends to show the existence of the scheme and the materiality of the statements.

▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮ was a patient of IVF Phoenix.  US-FDA-0040578.  On September 5, 2014, she visited a Theranos Service Center in Phoenix, Arizona.  US-FDA-0040578.  After, she received an inaccurate hCG result measuring <7.82.  US-FDA-0040578.  The results were faxed from Palo Alto to her physician in Arizona.  US-FDA-0040578.  On September 19, 2014, she visited a Theranos Service Center in Phoenix, and received an hCG test result measuring 2150.01.  US-FDA-0040578.  No later than September 30, 2014, both Holmes and Balwani were notified by IVF Phoenix that, due to the inaccurate Theranos test result which indicated that ▮▮▮▮ was "negative" for pregnancy, ▮▮▮▮ fertility medications had been discontinued in order to prepare her for the next cycle.  THPFM0000832674.  They were also notified that, several weeks after the Theranos inaccurate test, ▮▮▮▮ was confirmed by IVF Phoenix to be carrying a baby with a heartbeat.  THPFM0000832674; THPFM0000288921.  Theranos ultimately voided the result on or about March 28, 2016.  CMS-DOJ-0208226.

The evidence is offered for the permitted purpose of intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy.  Such evidence tends to show Holmes and Balwani knew of problems with Theranos's hCG tests.  Such evidence tends to show Theranos was unable to provide accurate and reliable test

results, that Holmes and Balwani knew Theranos was unable to provide accurate and reliable test results, as alleged in Paragraph 16, and statements to investors and patients were false and misleading. Such evidence tends to show Holmes and Balwani's scheme contemplated the use of interstate wires. Such evidence tends to show Holmes and Balwani understood the importance of accurate hCG tests and the consequences of inaccurate results, as well as the materiality of statements about accuracy to investors and patients. Such evidence tends to show their knowledge and control over Theranos's operations. Theranos's voiding of the test tends to show Theranos was unable to produce accurate and reliable test results. Evidence that insured and other nonpaying patients were induced to use Theranos's services tends to show the existence of the scheme and the materiality of the statements.



███████████████ **(formerly** ███████████ **)**

███████████ (formerly ███████████) was hired by Theranos in 2013 as a phlebotomist. US-REPORTS-0017505. Balwani interviewed her prior to hiring her, and she received training from Theranos. US-REPORTS-0017505. Her understanding was that Theranos had an "innovative" new technology that could run many tests, 70 to 100 in the beginning, through a couple of drops of blood from the finger. US-REPORTS-0017505. During the training, Theranos taught ███████████ that Theranos was "better, and new, and so advanced." US-REPORTS-0017505. Theranos assigned ███████████ to Walgreens Store #3177 in Scottsdale, AZ. US-REPORTS-0017505.

███████████ received several inaccurate PT/INR results from Theranos in the month of August 2014. *See, e.g.*, SEC-USAO-EPROD-004699552; SEC-USAO-EPROD-003004453. Despite having health insurance through Theranos, ███████████ paid out of pocket for at least some of her Theranos tests. US-REPORTS-0017505. ███████████ had an email exchange with Tracy Masson, former Theranos vice president of operations, on August 25, 2014, notifying her of the inaccurate test results. *See, e.g.*, SEC-USAO-EPROD-004699552. After ███████████ notified Theranos of her inaccurate test results, Theranos put its PT/INR fingerstick test "on hold." US-REPORTS-0017505. No one from Theranos ever gave her an explanation as to why her Theranos test results were inaccurate. US-REPORTS-0017505. Holmes and Balwani were advised of ███████████ inaccurate test result. When a Theranos employee told Balwani "[a]s I mentioned, I had some concerns a few weeks back about sample stability for PT/INR only when patients are under Coumadin treatment" and was creating a study plan," Balwani stated to Holmes "[a]lways another study after the fact." *See, e.g.*, TS-1150122; THPFM0000057384.

The evidence is offered for the permitted purpose of intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy. Such evidence tends to show Holmes and Balwani knew of problems with Theranos's PT/INR tests. Such evidence tends to show Theranos was unable to provide accurate and reliable test results, that Holmes and Balwani knew Theranos was unable to provide accurate and reliable test results, as alleged in Paragraph 16, and statements to investors and patients were false and misleading. Such evidence tends to show Holmes and Balwani's scheme contemplated the use of interstate wires. Such evidence tends to show Holmes and Balwani understood the importance of accurate PT/INR tests and the consequences of inaccurate results, as well as the materiality of statements about accuracy to investors and patients. Such evidence tends to show

their knowledge and control over Theranos's operations. Theranos's voiding of the test tends to show Theranos was unable to produce accurate and reliable test results. Evidence that insured and other nonpaying patients were induced to use Theranos's services tends to show the existence of the scheme and the materiality of the statements.

Prior to about November 9, 2015, ████████████ was exposed to Theranos advertisements in a magazine advertising that they could "get patients in and out of their testing facility quickly and that the blood draws would be done via finger stick." US-REPORTS-0014778. She understood that Theranos's laboratory costs were much less than local laboratories, and she "absolutely has an expectation that a testing laboratory is giving accurate results and that it is of equal quality to other labs." US-REPORTS-0014778. On or about November 9, 2015, ████ visited a Theranos Service Center in Mesa, Arizona. After which, she received an inaccurate PT/INR test result from Theranos. ABRAMS-000008. Theranos learned of the inaccurate PT/INR test result on or around November 12, 2015, when it was requested that they rerun Ms. ████ PT/INR because "normally [████] PT/INR is a lot higher and now ████] is taking a new medication and they believe the results may be incorrect." *See, e.g.*, SEC-USAO-EPROD-003097628.

The evidence is offered for the permitted purpose of intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy. Such evidence tends to show Holmes and Balwani knew of problems with Theranos's PT/INR tests. Such evidence tends to show Theranos was unable to provide accurate and reliable test results, that Holmes and Balwani knew Theranos was unable to provide accurate and reliable test results, as alleged in Paragraph 16, and statements to investors and patients were false and misleading. Such evidence tends to show Holmes and Balwani's scheme contemplated the use of interstate wires. Such evidence tends to show Holmes and Balwani understood the importance of accurate PT/INR tests and the consequences of inaccurate results, as well as the materiality of statements about accuracy to investors and patients. Such evidence tends to show their knowledge and control over Theranos's operations. Theranos's voiding of the test tends to show Theranos was unable to produce accurate and reliable test results. Evidence that insured and other nonpaying patients were induced to use Theranos's services tends to show the existence of the scheme and the materiality of the statements.

Prior to about October 30, 2015, ████████ was exposed to Theranos advertisements that said, "One little prick and they could do all these tests." US-REPORTS-0010804. She thinks she saw the advertisements on a couple of billboards or on television. US-REPORTS-0010804. On or about October 30, 2015, ████ visited a Theranos Service Center inside of a Walgreens in Phoenix, Arizona. *See, e.g.*, SEC-USAO-EPROD-000715459; US-REPORTS-0010804. After, she received an inaccurate estradiol test, which she viewed through Theranos's on-line portal. US-REPORTS-0010804; ████-000003. Theranos learned of the inaccurate estradiol test as early as November 19, 2015, and again on November 23, 2015, in an email sent from ████ to customersupport@theranos.com. *See, e.g.*, SEC-USAO-EPROD-001283843;

SEC-USAO-EPROD-000877524; SEC-USAO-EPROD-000715459.  Balwani was informed of
the inaccurate estradiol test on or before November 24, 2015, saying "I assume this was run in
AZ so need the AZ team to followup (sic.) on this asap and see what happened here."  *See, e.g.*,
SEC-USAO-EPROD-000877519; SEC-USAO-EPROD-000772753.

     The evidence is offered for the permitted purpose of intent, preparation, plan, knowledge,
absence of mistake, and lack of accident, as well as the existence of the conspiracy.  Such
evidence tends to show Holmes and Balwani knew of problems with Theranos's estradiol
tests.  Such evidence tends to show Theranos was unable to provide accurate and reliable test
results, that Holmes and Balwani knew Theranos was unable to provide accurate and reliable test
results, as alleged in Paragraph 16, and statements to investors and patients were false and
misleading.  Such evidence tends to show Holmes and Balwani understood the importance of
accurate estradiol tests and the consequences of inaccurate results, as well as the materiality of
statements about accuracy to investors and patients.  Such evidence tends to show their
knowledge and control over Theranos's operations.  Evidence that insured and other nonpaying
patients were induced to use Theranos's services tends to show the existence of the scheme and
the materiality of the statements.

     Prior to about September 2015, ████████ saw Theranos advertisements on a billboard
and heard advertisements on the radio advertising Theranos's "futuristic" technology that only
needed a pin prick of blood and that did not require a requisition from the doctor.  US-
REPORTS-0008571.  On or around September 8, 2015, ███ visited a Theranos Service Center in
Gilbert, AZ.  KR-000008; SEC-USAO-EPROD-000716959.  After, he received an inaccurate
HIV Ab/Ag test, which he accessed through Theranos's on-line portal.  KR-000008; US-
REPORTS-0008571.  A day after ███ accessed the inaccurate test result, an employee from
Theranos contacted him to say "Oh, we made a mistake," and inform him that his HIV Ab/Ag
test was negative.  US-REPORTS-0008571.  Numerous employees reporting to Holmes and
Balwani became aware of ███ inaccurate HIV Ab/Ag test on or before September 16, 2015.
*See, e.g.*, SEC-USAO-EPROD-000716959; SEC-USAO-EPROD-001355975.

     The evidence is offered for the permitted purpose of intent, preparation, plan, knowledge,
absence of mistake, and lack of accident, as well as the existence of the conspiracy.  Such
evidence tends to show Holmes and Balwani knew of problems with Theranos's HIV tests.  Such
evidence tends to show Theranos was unable to provide accurate and reliable test results, that
Holmes and Balwani knew Theranos was unable to provide accurate and reliable test results, as
alleged in Paragraph 16, and statements to investors and patients were false and
misleading.  Such evidence tends to show Holmes and Balwani understood the importance of
accurate HIV tests and the consequences of inaccurate results, as well as the materiality of
statements about accuracy to investors and patients.  Such evidence tends to show their
knowledge and control over Theranos's operations.  Evidence that insured and other nonpaying
patients were induced to use Theranos's services tends to show the existence of the scheme and
the materiality of the statements.

## II.     **False and misleading representations directed at doctors.**

The government may offer evidence of the following:

*Defendants directed Theranos's marketing materials toward doctors along with other intended recipients.*

A September 9, 2013 press release by Theranos stated:  "Consumers can now complete any clinician-directed lab test with as little as a few drops of blood and results available in a matter of hours. . . .  For the first time, Theranos is introducing CLIA-certified laboratory services with the ability to run its tests on micro-samples.  Theranos's proprietary laboratory infrastructure minimizes human error through extensive automation to produce high quality results.  Test results are available to physicians in a matter of hours, enabling fast diagnoses to help informed treatment choices. . . .  For the past 10 years, Theranos has worked relentlessly to reach a point at which we could help make actionable information accessible to physicians and patients at the time it matters most."  The release also stated Theranos offered consumers access to "less invasive and more affordable clinician-directed lab testing, from blood samples as small as a few drops, or 1/1000 the size of a typical blood draw."  These statements presented Theranos's technology as mature and ready for use in the clinical setting, when Defendants knew that Theranos's tests were not ready for launch and suffered from accuracy and consistency problems that made them unreliable.  [NEED BATES CITE]

In a Theranos flyer apparently from 2015, the company invited patients to "[b]ring any lab order from your clinician to your nearest Theranos Wellness Center location" to obtain a Theranos test.  This statement suggested to patients that Theranos tests were sufficiently accurate and reliable for use in the clinical setting, when in fact Defendants knew that Theranos tests suffered from accuracy and consistency problems that rendered them unreliable and unsuitable for medical decision-making.  [See, e.g., US-FDA-0037983]

In one flyer, Theranos stated that it "offers affordable STI tests, so it's easier to know."  This statement suggested that Theranos's STI tests were sufficiently accurate for patients to rely on them to "know" whether they had a given infection, when in fact Defendants knew that Theranos tests—including the assays for HIV and gonorrhea—suffered from accuracy and consistency problems rendering them unreliable.  [See, e.g., US-FDA-0037996]

One Theranos flyer claimed that Theranos was "revolutionizing every aspect of laboratory testing" (or "reinventing every aspect of laboratory testing") and invited patients to get a lab order from their physician.  These statements falsely presented Theranos as an advanced laboratory offering superior testing services accurate and reliable enough for use by physicians in making medical treatment decisions.  In fact, Defendants knew that Theranos relied in part on conventional testing methods and that its tests suffered from accuracy and consistency problems. [See, e.g., US-FDA-0038001; THPFM0005547680]

In one piece of promotional material, Theranos stated, "We believe everyone has the right to information about their own health" and offered to provide such information through its lab tests, "[m]eaning now you can find out where you stand, and find out what's going on inside

your body," "get the information you need," and "detect potential problems early." All of these claims falsely suggested to patients that Theranos's test results could be relied upon to reflect the state of a patient's health and whether that patient was suffering from medical problems, when in fact Defendants knew that Theranos's tests suffered from accuracy and consistency problems that made them unreliable and unsuitable for use in the clinical setting. [See, e.g., US-FDA-0038006; THPFM0005547542]

Theranos advertised its hCG assay as a "Pregnancy Test" despite the fact that this assay suffered from accuracy and consistency problems that rendered it unsuitable for detecting pregnancy. Additionally, Theranos advised patients not to change their medical treatment before reviewing their test results with a physician, necessarily representing that physicians could rely on its tests for that purpose despite Defendants' knowledge of the prevalent accuracy problems with Theranos's tests. [See, e.g., US-FDA-0038011]

In a press release dated July 2, 2015, Theranos claimed that FDA had validated Theranos's approach for FDA review of its LDTs (Laboratory Developed Tests), and Holmes was quoted as saying that Theranos was committed to ensuring that its systems and LDTs "are of the highest quality, and that patients and their physicians have access to the most accurate information about their health." In fact, Defendants knew that FDA disagreed with Theranos's arguments regarding regulation of LDTs, and were aware that Theranos's tests suffered from accuracy and consistency problems that prevented them from offering patients "the most accurate information about their health." [See, e.g., THPFM0000021148-50]

In a press release dated July 16, 2015, Theranos claimed that a CLIA waiver for its HSV test meant that "FDA determined the Theranos test and technology is reliable and accurate and can be used in a broader set of locations outside of a traditional CLIA certified laboratory, including Theranos Wellness Centers." Holmes was quoted as saying that the company was continually innovating "to provide the best laboratory testing services in the world." In fact, Defendants knew that FDA prohibited Theranos from operating its analyzers outside of the lab setting, and were aware that their tests suffered from accuracy and reliability problems that made them inferior to conventional tests and unsuitable for use in the clinical context. [See, e.g., THPFM0005548113]

In a letter sent to a University in March 2016 pitching Theranos's immunity testing, Theranos's market access manager Jennifer Hanson wrote that Theranos was a diagnostic company with the goal of providing access to "accurate, affordable, real-time diagnostic information." In fact, Defendants knew that Theranos's tests were not sufficiently accurate and consistent to be relied upon in a medical setting. [See, e.g., THPFM0005548324]

In one print ad, Theranos recited its slogan, "one tiny drop changes everything" next to an image of a nanotainer, and claimed that "[n]ow it's easier to find out what's going on with your body." Defendants knew, however, that Theranos's tests suffered from accuracy and consistency problems that rendered them unreliable indicators of what was happening inside a patient's body. [See, e.g., THPFM0000314831]

In Theranos's Guide to Direct Testing for Arizona, the company touted patients' ability to obtain blood testing without a doctor's order, claiming that patients were now "free to engage with your physician and your health like never before." The guide also claimed that this would allow patients to "get a read on their health," "become more informed earlier," and work with doctors to "address potential problems sooner." A different version of the guide celebrated that it was now easier for patients to get "vital information about their health when it matters most," and specifically promoted Theranos's ability to help monitor thyroid, blood glucose, and sexual health. These statements suggested to patients that Theranos's tests were accurate reflections of their actual health status and that they were therefore suitable to be relied upon by doctors in diagnosing problems and making treatment decisions, when in fact Defendants knew that Theranos's tests—including assays targeting TSH, glucose, and certain STIs—suffered from accuracy and consistency problems that made them unreliable. [See, e.g., SEC-USAO-EPROD-000699159; SEC-USAO-EPROD-000037181-82]

In advertising used in connection with its partnership with Walgreens, Theranos claimed that it was "changing lab testing forever" with its ability to run all of its tests via micro-samples, and that its services made it "easy to know more about your own health," suggesting that Theranos tests provided accurate information about a patient's physical condition. Similarly, those same materials claimed that Theranos automated pre- and post-analytic process to minimize lab errors, and that the company "offer[ed] tests with the highest levels of accuracy." Defendants knew that Theranos's tests did not have the highest levels of accuracy but suffered from accuracy and consistency problems that made them inferior to conventional laboratory tests and unreliable for this purpose. [See, e.g., WAG-TH-DOJ-00069577-78]

*Defendants used Theranos's website to direct information to doctors as well as other intended recipients.*

Theranos's website claimed that the company was "enabling providers, physicians, patients, and consumers alike with better health information," and stated that the company's products "empower people to take control of their health and to extract better information from healthcare tests and information systems than is possible using today's conventional infrastructure," suggesting that Theranos's technology provided accurate results superior to conventional labs' testing services. In fact, Defendants knew that Theranos's technology had significant disadvantages relative to conventional labs and that it was not capable of producing consistently accurate results. [See, e.g., US-FBI-0000060; US-FBI-0000067; US-FBI-0000110; US-FBI-0000135-45]

Similarly, Theranos's website stated elsewhere that the company's products "empower providers, physicians, and consumers alike with better health information," suggesting that Theranos's tests offered superior accuracy and reliability compared to competing tests and that they were suitably reliable for use in the clinical setting. In fact, Defendants knew that Theranos's tests suffered from accuracy problems that rendered them unreliable. [See, e.g., US-FBI-0000112; US-FBI-0000118; US-FBI-0000153]

Theranos's website claimed that its tests "made it easier to get access to the tests [patients] need" so that they and their physicians "can better track small changes that emerge

over time" to "help provide insight into where your health is headed, and the early detection of disease." These statements suggested that Theranos's tests were accurate, precise, and consistent enough for doctors and patients to rely upon in tracking changes in their health and diagnosing medical conditions. In fact, Defendants knew that Theranos's tests were not accurate or reliable enough for these purposes. [See, e.g., US-FBI-0000347]

In approximately August 2015, Theranos's website stated that the company was "pioneering a new era where people can engage with their health, and their physician, like never before." The website also claimed that Theranos's ability to "run a full range of assays on a single micro-sample" allowed it to conduct auto-reflex testing to "properly diagnose conditions." The website claimed that Theranos's rapid processing allowed analysis of "key markers before their analyte decay rates materially affect result integrity," this providing "insight into subtle trends in important analytes." In fact, Defendants knew that Theranos's assays suffered from accuracy and consistency problems that rendered them unreliable for providing insight into health conditions, properly diagnosing conditions, and tracking subtle trends in analytes. [See, e.g., Theranos website as of August 14, 2015 – Bates number pending]

In approximately August 2015, Theranos's website included a bio for Holmes stating that she had led the company to "enable a new paradigm of consumer health and prevention," making real the mission "to make actionable health information accessible to people everywhere… enabling early detection and intervention of disease." The bio also claimed that Theranos's breakthrough advancements had made it possible "to quickly process the full range of laboratory tests from a few drops of blood." Defendants knew, however, that Theranos relied on third-party devices for many of its tests, and that its assays suffered from accuracy and consistency problems that prevented them from reliably yielding actionable health information suitable for clinical use. [See, e.g., Theranos website as of August 14, 2015 – Bates number pending]

*Defendants used Theranos's Twitter account to direct messages at doctors along with other intended recipients.*

On November 17, 2013, Theranos retweeted "@theranosinc can test for almost anything with the 1/1,000 the amount of blood than a reg. test #science" with an image of a Theranos nanotainer containing a microsample of blood. [See https://twitter.com/BradTonoff/status/402210940327702528, available at https://twitter.com/theranos; US-REPORTS-0008793 through US-REPORTS-0008801]

On November 20, 2013, Theranos tweeted: "Empowering patients and speeding accurate diagnosis." [See https://twitter.com/theranos/status/403284724623216640; US-REPORTS-0008793 through US-REPORTS-0008801]

On or about November 20, 2013, Theranos retweeted: "Walgreens/Theranos deal brings rapid, accurate, low-cost blood testing to the local pharmacy . . . with results in 4 hours." [See https://twitter.com/PosseList/status/403215950394433536; US-REPORTS-0008793 through US-REPORTS-0008801]

On December 4, 2013, Theranos tweeted: "The lab test. Reinvented." With an image of a nanotainer compared to three large vials of blood. [See https://twitter.com/theranos/status/408297103593447424; US-REPORTS-0008793 through US-REPORTS-0008801]

On December 4, 2013, Theranos tweeted: "One tiny drop changes everything." [See https://twitter.com/theranos/status/408327320823283712; US-REPORTS-0008793 through US-REPORTS-0008801]

On December 10, 2013, Theranos tweeted: "Say goodbye, big bad needle" with an image of a small child. [See https://twitter.com/theranos/status/410482810894290944; US-REPORTS-0008793 through US-REPORTS-0008801]

On January 28, 2014. Theranos tweeted: "Not a big fan of needles? Neither were we. So we got rid of them." Theranos included a series of images showing a single drop of blood being drawn from a fingertip using a tiny needle. [See https://twitter.com/theranos/status/428272143969701888; US-REPORTS-0008793 through US-REPORTS-0008801]

On March 11, 2014, Theranos retweeted: "Elizabeth Holmes built technology that can perform hundreds of tests on only one drop of blood." [See https://twitter.com/socialcitizen/status/443397183791181824; US-REPORTS-0008793 through US-REPORTS-0008801]

On February 3, 2015, Theranos retweeted an image of a hand holding a nanotainer containing a tiny sample of blood, along with text reading: "At Theranos, we're working to shape the future of lab testing. Now, for the first time, our high-complexity CLIA-certified laboratory can perform your tests quickly and accurately on samples as small as a single drop." [See https://twitter.com/brandchannel/status/562665880115744768; US-REPORTS-0008793 through US-REPORTS-0008801]

On April 20, 2015, Theranos retweeted an image of a person holding what appears to be a Theranos brochure or mailer displaying an image of a nanotainer and the text "the blood tests that need just a tiny sample." [See https://twitter.com/tbutani/status/590280397692358656; US-REPORTS-0008793 through US-REPORTS-0008801]

On May 14, 2015, Theranos tweeted: "Find out how we're making actionable health information more accessible." [See https://twitter.com/theranos/status/599001739220529152; US-REPORTS-0008793 through US-REPORTS-0008801]

On June 2, 2015, Theranos tweeted: "Know the facts when it comes to your health. We offer glucose tests for as low as $2.70." Theranos included an image of a soda can with text stating that approximately 24% of Americans have pre-diabetes and don't know it. [See https://twitter.com/theranos/status/605769761885032450; US-REPORTS-0008793 through US-REPORTS-0008801]

On June 6, 2015, Theranos tweeted: "A glucose test can help diagnose & monitor high/low blood glucose, diabetes, and pre-diabetes." Theranos included an image advertising Theranos's glucose test at a rate of $2.70 compared to $5.39 as the Medicare Rate. [See https://twitter.com/theranos/status/607222726286114816; US-REPORTS-0008793 through US-REPORTS-0008801]

On June 27, 2015, Theranos tweeted: "Now it's easy and affordable to get tested, know for sure, and #ownyourhealth." Theranos included an image of a red ribbon and text reading "National HIV Testing Day." [See https://twitter.com/theranos/status/614826256480104448; US-REPORTS-0008793 through US-REPORTS-0008801]

On July 13, 2015, Theranos tweeted: "The lab tests you need at prices you'll love." Theranos included an image listing relatively low prices for glucose, lipid panel, vitamin 25-OH, and HbA1c assays, as well as the text "the same low prices, for everyone." [See https://twitter.com/theranos/status/620710104061493248; US-REPORTS-0008793 through US-REPORTS-0008801]

On September 4, 2015, Theranos posted to Twitter a short film by Errol Morris "about the fear of a typical blood draw" and stated, "We're changing the whole experience." The video ended with the words: "small samples, less blood. Theranos. The lab test. Reinvented. hundreds of tests." [See https://twitter.com/theranos/status/639845415307743232; US-REPORTS-0008793 through US-REPORTS-0008801]

*Defendants and their agents made statements directly to doctors in connection with Theranos's tests and specific results.*

A Theranos representative told Dr. Jessica Bramstedt that Theranos would conduct micro-testing on blood samples drawn from the fingertip; that Theranos was equivalent to other major labs like LabCorp and Sonora Quest, and that when Theranos lost its lab license, it was merely a "slap on the wrist" that would have a temporary effect on the company. In fact, Defendants knew that Theranos depended on venous blood for many of its tests; that Theranos used different and unapproved methods for many of its tests that were not the equivalent of conventional laboratory tests; and that regulatory penalties imposed on Theranos were significant punitive measures. [See, e.g., Jessica Bramstedt 302 Report, US-REPORTS-0015111]

Theranos representative Kimberly Alfonzo told Dr. Gerald Asin that Theranos could do all blood tests with a fingerstick draw, although Defendants knew that Theranos relied on venous blood for many of its tests. [See, e.g., Gerald Asin 302 Report, US-REPORTS-0015043]

A Theranos sales representative told Dr. Nathan Matthews that Theranos's testing was accurate, although Defendants knew that Theranos's tests were plagued by accuracy and consistency problems. On a conference call with Theranos representatives, those representatives told Dr. Matthews that Theranos went through all the necessary steps in their testing to make sure that it was done accurately, although Defendants knew that Theranos had inadequate proficiency testing and quality control protocols and that its tests suffered from accuracy problems. [See, e.g., Nathan Matthews MOI dated 2/28/18, US-REPORTS-0008530]

Theranos representatives told Dr. Steve Linnerson that the company's device was FDA-approved and that it had met all the national laboratory standards.  In fact, Defendants knew that Theranos had not obtained the required FDA approvals and that the company's laboratory practices did not meet applicable standards.  In response to inaccurate test results, Theranos representatives told Dr. Linnerson that the company was having some equipment problems.  Defendants knew, however, that problems with Theranos's tests stemmed from fundamental deficiencies in the test methodology rather than isolated mechanical problems.  [See, e.g., Steven Linnerson MOI dated 3/1/18, US-REPORTS-0008577]

Theranos representatives told nurse practitioner Audra Zachman that the company's testing was valid and that all Theranos's testing could be done via fingerstick.  In fact, Defendants knew that Theranos tests suffered from accuracy problems and had not been properly validated, and that many of the company's tests could not be performed by fingerstick.  In discussing an inaccurate blood test, Theranos representatives falsely told Ms. Zachman that the problem had resulted from a misplaced decimal point although that was not a plausible result for the test results in question.  [See, e.g., Audra Zachman MOI dated 6/14/19, US-REPORTS-0011789]

A Theranos representative pitching the company's testing services told Dr. Edward Szmuc that the company had quality control and that its tests would be accurate, although Defendants knew that Theranos's tests had accuracy problems.  [See, e.g., Edward Szmuc MOI dated 3/3/20, US-REPORTS-0014799]

Theranos representatives told JoEllen Embry and Raymond Embry that its fingerstick technology had been validated, and emphasized its fingerstick testing method.  In fact, Defendants knew that Theranos's validation processes were insufficient, that its tests had accuracy problems, and that many of its tests could not be performed on fingerstick samples.  [See, e.g., JoEllen Embry and Raymond Embry MOI dated 3/3/20, US-REPORTS-0014802]

In a meeting with Erin Edgar, Holmes talked about microvolume testing and mentioned that Theranos was able to run every laboratory test, although Theranos relied on venous draws for many of its tests and was not capable of running every laboratory test on its proprietary devices.  [See, e.g., Erin Edgar MOI dated 3/9/20, US-REPORTS-0014994]

In May 2013 Elizabeth Holmes gave a presentation to Dr. Melissa Pessin and others at Memorial Sloan Kettering Cancer Center about Theranos's "new" laboratory testing technology.  Ms. Holmes brought the Theranos device to the presentation and gave a PowerPoint presentation that included a picture of the Theranos device, a picture of the "mini-tainer," and some graphs comparing the Theranos technology to some sort of standard technology.  The graphs showed the results correlated.  Ms. Holmes said the Theranos device would do thousands of tests, though it could not do them all at once.  She said the device could run tests in about 40 minutes, and that tests would cost half of what Medicare rates.  Ms. Holmes never told Ms. Pessin that Theranos was using third party devices to test blood samples or that they were diluting samples to run them.  [US-REPORTS-0017494]

After experiencing problems with its hCG test, Allison Hsieh informed Balwani that Theranos had removed the "pregnancy test" description from its hCG blood quant assay description because the company's test was not able to confirm a pregnancy. However, Theranos continued to offer the hCG blood test knowing that doctors and patients would rely on the assay to determine pregnancy status. [See, e.g., THPFM0004228061]

After experiencing problems with its hCG test, Theranos switched the assay from fingerstick to venous draw. Rather than inform doctors and patients that the switch was necessitated by a problem with the assay, Christian Holmes directed that doctors and patients be told that it was a "temporary" "routine quality check" related to Theranos's expanding patient population. [See, e.g., THPFM0000555315, THPFM0000958955]

After experiencing problems with its PT/INR test, Theranos switched the assay from fingerstick to venous draw, telling doctors and patients only that it was a temporary switch. Christian Holmes directed Theranos customer service representatives to adhere to a script that deceptively omitted information about problems with the assay's accuracy. [See, e.g., THPFM0000018472]

After experiencing problems with its complete metabolic panel assays, Theranos switched CMP from fingerstick to venous draw. Christian Holmes suggested to Balwani that Theranos tell doctors and patients that the switch was related to an ongoing sample stability study. When Balwani rejected that proposal, Christian Holmes reported that he had previously used language consistent with Holmes's direction stating that Theranos required larger samples because it was running each test in more than triplicate. This explanation deceptively masked the true reason for the switch to venous draws. [See, e.g., THPFM0000147443]

When Theranos switched PT/INR from fingerstick to venous after experiencing problems with the assay, Theranos representatives including Kimberly Alfonso explained the change by telling doctors and/or patients that Theranos had confidence in its testing and the switch to venous draws was intended simply to give the doctor the experience he or she was more accustomed to. This explanation deceptively masked the true reason for the switch. [See, e.g., THPFM0000204033]

Theranos ran HbA1c tests using two different methods: venous blood on an Advia device and fingerstick on a DCA Vantage device. Theranos's Lab Director, Dr. Adam Rosendorff, informed staff that this approach made "no sense whatsoever" and that it "goes against every recommendation." Results from each of these types of HbA1c tests were provided to doctors without explanation as to the types of analyzers used to conduct the assays, creating a situation where doctors did not have the information they needed to place the results in context. This was especially problematic in situations where a single patient had Theranos multiple Theranos assays conducted using different methods, yielding different results that falsely suggested to the doctor that the patient's analyte values had changed. This was the case with a patient treated by Dr. Phelan, who was the subject of internal emails at Theranos. [See, e.g., THPFM0000003941; Rosendorff MOI, US-REPORTS-0007227]

In November 2014, a doctor contacted Theranos to report discrepant results for HDL and LDL for a particular patient.  Specifically, the Theranos-provided values for HDL and LDL were not adding up to the total cholesterol measurement the way they should have.  Rosendorff stated in response that the issue seemed "like a technical problem" as there were "no patient factors that would explain this."  Other at Theranos attempted to explain away the results and persuade Rosendorff to defend them to the physician, and he refused, citing his obligation to focus on the accuracy and reliability of Theranos's results and the fact that honesty and transparency with the patient were essential.  Holmes and Balwani were aware of this incident and sided against Rosendorff in the disagreement.  [See, e.g., THPFM0005008026; THPFM0003759624; TS-1124314]

**** 

The evidence described above is offered for the permitted purpose of motive, opportunity, intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy.

Evidence that Holmes and Balwani made false and misleading statements to doctors tends to show their intent to defraud patients by conveying misleading information to their victims indirectly through patients' doctor representatives.

Evidence that Holmes and Balwani made false and misleading statements to doctors tends to show their plan to generate referrals to Theranos by deceiving patients through their doctors.

Evidence that Holmes and Balwani along with other Theranos staff made false and misleading statements to doctors tends to show their intent to defraud and the existence of the conspiracy.

Evidence that Holmes and Balwani made false and misleading statements to doctors about the capabilities of Theranos's technology tends to show Defendants' intent to defraud victims by causing them to believe Theranos's tests were accurate and reliable.

Evidence that Holmes and Balwani misled doctors regarding ongoing problems with Theranos's tests tends to show their intent to defraud and the absence of mistake.

Evidence that Holmes and Balwani misled doctors as to the quality control measures and safeguards Theranos put in place to ensure the accuracy of its tests tends to show Defendants' intent to defraud.

Evidence that Holmes and Balwani misled doctors about Theranos's reliance on venous draws and their use of third-party devices tends to show their intent to defraud by exaggerating the maturity and revolutionary nature of their technology.

Evidence that Holmes and Balwani directed false statements toward doctors tends to show their motive to capture market share by defrauding associated patients.

### III.    False and misleading representations made to Theranos' Board.

The government may offer evidence of the following:

On or about March 2, 2010, Theranos' board met.  Holmes provided detailed updates on the company.  *See, e.g.*, THER-0335871.

On or about May 31, 2010, Theranos' board met.  Holmes provided detailed updates on commercial matters, convertible notes, and corporate and real estate matters, as well as valuations of the company's stock under Section 409A of the Internal Revenue Code.  Holmes was awarded additional shares.  *See, e.g.*, THER-0335796.

On or about January 14, 2013, Theranos' board met.  Holmes and Balwani attended.  Four board members were given a stock option grant for 100,000 shares in exchange for their services and were to be paid $150,000 annually.  *See, e.g.*, THER-0335524.

In or about 2013 or early 2014, Holmes and Balwani provided Confidential Briefing Materials to board members stating, among other things, "Theranos' proprietary, patented technology runs comprehensive blood tests from a finger-stick and tests from micro-samples of other matrices outside of traditional lab settings and generates significantly higher integrity data than currently possible," "replac[e] old infrastructure with new," "real-time finger stick-based tests without need to drive to third-party sites," "the <5% CV yielded in Theranos' analysis results from elimination of pre-analytic errors, and provides for precise and actionable information that was previously inaccessible," "Theranos has quicker test run times and communicates results within 20-30 minutes after the sample arrives at the lab," "all 2000+ currently run tests/CPT codes are available through Theranos," "Theranos runs any test available in central laboratories," "Theranos can process any sample type," "Theranos Systems . . . [comprise] Minilab Devices," and "Theranos has been comprehensively validated over the course of the last seven years by ten of the fifteen largest pharmaceutical companies," as well as suggesting Theranos could accurately and reliably perform the most common blood tests and standard general chemistry panels.  *See, e.g.*, PFM-DEPO-00010787.

On or about July 15 and July 16, 2013, Theranos' board met.  Holmes and Balwani attended.  Holmes led a tour of the company's production facilities and gave detailed briefings on all aspects to Theranos's business, including product plans and historical and projected financial statements.  James Mattis and Richard Kovacevich joined the board and were given a stock option grant for 100,000 shares in exchange for their services and were to be paid $150,000 annually.  *See, e.g.*, THER-0335524; TS-0022451.  Holmes prepared a detailed 250+ page PowerPoint with misrepresentations similar to those detailed above and provided to investors.  *See, e.g.*, THER-0337130.

On or about October 8, 2013, Theranos' board met.  Holmes and Balwani attended.  Holmes gave detailed briefings on numerous aspects relating to Theranos's business, including product plans and historical and projected financial statements.  *See, e.g.*, THER-0335524; TS-0022465; SEC-USAO-EPROD-002629438.  The board discussed 409A valuations.  *Id.*

For the October 8, 2013 meeting, Holmes prepared a PowerPoint, stating, among other things:

- The actionable information you need, 1/1,000 the size of a typical blood draw.
- Theranos runs any test available in central laboratories, and processes all sample types. All tests match existing reimbursement codes. Theranos provides the highest level of oversight, automation, and standardization in our pre- and post-analytic processes, ensuring the highest levels of accuracy and precision.
- The highest levels of accuracy. By systematically controlling and standardizing our processes, Theranos offers tests with the highest levels of accuracy. Theranos automates pre- and post-analytic processes, drastically minimizing human processing – the cause of the majority of lab test errors.
- Theranos has been comprehensively validated over the course of the last seven years by ten of the fifteen largest pharmaceutical companies.

*See, e.g.*, TS-0023403; SEC-USAO-EPROD-000050361. Such statements were provided to outside investors as well. The PowerPoint also included news articles Holmes had procured and provided to investors.

On or about March 18, 2014, Theranos' board met. Holmes and Balwani attended. Holmes gave detailed briefings on numerous aspects relating to Theranos's business, including product plans and historical and projected financial statements. Riley Bechtel joined the board and was given a stock option grant for 500,000 shares in exchange for his services and was to be paid $150,000 annually. The Board discussed 409A valuations. *See, e.g.*, THER-0335524; TS-0022592.

On or about April 17, 2014, a board member told Holmes he told Roger Parloff (a reporter) that Theranos "will effect a revolutionary change in health care, providing significantly lower cost, greater efficiency, and higher quality." *See, e.g.*, SEC-USAO-EPROD-000128843. Holmes said that was wonderful to hear. *See, e.g.*, SEC-USAO-EPROD-000128929.

On or about May 9, 2014, Theranos' board met. Holmes and Balwani attended. Holmes gave detailed briefings on numerous aspects relating to Theranos's business, including product plans and historical and projected financial statements. William Frist joined the board and was given a stock option grant for 500,000 shares in exchange for his services and was to be paid $150,000 annually. *See, e.g.*, THER-0335524; TS-0022607. Holmes provided a PowerPoint stating: "Patented technology can analyze samples as small as 1/1,000 the size of the typical blood draw. Proprietary infrastructure allows test analyses to be completed within hours. Value . . . highest levels of quality . . . full range of laboratory tests, from common panels to specialized tests." The PowerPoint displayed Theranos Systems as comprising "collection samples, TPSU 4s and Cartridges, and TLAS & Mobile/Web Apps" – not third party devices. *See, e.g.*, SEC-USAO-EPROD-002055775.

On or about May 24, 2014, Holmes provided talking points to a board member for an interview with Parloff. *See, e.g.*, SEC-USAO-EPROD-000129052.

Some time before May 29, 2014, Holmes told a board member that Theranos had audited financial statements and that Balwani was her former boyfriend. *See, e.g.*, SEC-USAO-EPROD-000029312.

On or about July 15, 2014, Theranos' board met.  Holmes and Balwani attended.  Holmes gave detailed briefings on numerous aspects relating to Theranos' business, including product plans and historical and projected financial statements. *See, e.g.*, THER-0335524; TS-0022625. Holmes prepared a 312-page PowerPoint for the board. *See, e.g.*, TS-0023854 (SEC-USAO-EPROD-000050812).  Holmes described Theranos Systems as consisting of collection supplies, a TPSU 4s and cartridge, and "TLAS and Mobile/Web Apps" – omitting that Theranos was using third party devices to perform the majority of its testing.  As she did with outside investors, she wrote:  "Theranos' proprietary, patented technology runs comprehensive blood tests from a finger-stick and tests from micro-samples of other matrices, and generates significantly higher integrity data than currently possible"; "Theranos' micro-sample analysis is performed at amazing speeds, so we can report results faster than previously possible in less than 4 hours"; "[d]ata reported in high quality and in real-time becomes actionable information for improved decision making"; "A New Standard in Quality"; "The highest levels of accuracy"; "By systematically controlling and standardizing our process, Theranos tests with the highest levels of accuracy.  Theranos automates pre-and post-analytic processes, drastically minimizing human processing"; "Theranos has been comprehensively validated over the course of the last seven years by ten of the fifteen largest pharmaceutical companies"; "The full range of tests.  A fraction of the costs."  She also included slides purporting to show "Theranos Infectious Disease Work and Select Clinical Correlations" and stated "Theranos' technology infrastructure is able to perform any laboratory test.  The following . . . demonstrate performance of tests when validated next to traditional laboratories and reference methods."

On or about July 23, 2014, Holmes told a Theranos board member:  "Theranos has grown from cash from its contracts for some time."  Holmes intended the board member to relay the message to a potential investor. *See, e.g.*, SEC-USAO-EPROD-000009206.  Holmes made similar statements to other investors.

In or about August 2014, Theranos employees tested a board member's blood using a Siemens device, not a Theranos-manufactured analyzer. *See, e.g.*, SEC-USAO-EPROD-000429472; SEC-USAO-EPROD-006000464.  Holmes was aware. *See, e.g.*, SEC-USAO-EPROD-006021872.

On or about September 14, 2014, Holmes provided talking points to a board member for an interview with a *New Yorker* reporter. *See, e.g.*, SEC-USAO-EPROD-000130080.

On or about October 21, 2014, Theranos' board met.  Holmes and Balwani attended. Holmes gave detailed briefings on numerous aspects of Theranos's business, including product plans. *See, e.g.*, THER-0335524; TS-00226667.  On or about October 21, 2014, Holmes prepared a 358-page PowerPoint for the board. *See, e.g.*, TS-0024166 (SEC-USAO-EPROD-000051124).  Although Theranos was using its analyzer for less than 15 tests in its CLIA lab and was years away from FDA approval (if ever), Holmes stated that "Theranos' system will enable

18

healthcare workers to rapidly detect, treat, and monitor the Ebola virus in a decentralized manner so as to effectively facilitate containment." Although Walgreens told Balwani as early as August 2014 that Walgreens would not expand past 200 new stores in FY 2015, Holmes stated that 900 stores were planned. She described Theranos Systems as consisting of collection supplies, a TPSU 4s and cartridge, and "TLAS and Mobile/Web Apps" – omitting that Theranos was using third-party devices to perform the majority of its testing. Although Theranos was repeatedly reporting false hCG results, Holmes displayed a Theranos website image bragging that "Theranos takes the guesswork out of planning your pregnancy" and promising "Theranos accuracy" in 24 hours. She also included slides purporting to show "Theranos Infectious Disease Work and Select Clinical Correlations" and stated "Theranos' technology infrastructure is able to perform any laboratory test. The following . . . demonstrate performance of tests when validated next to traditional laboratories and reference methods."

On or about January 20, 2015, Theranos' board met. Holmes and Balwani attended. Holmes gave detailed briefings on numerous aspects of Theranos's business, including product plans and finances. *See, e.g.*, THER-0335524; TS-0022679.

On or about January 20, 2015, Holmes provided a PowerPoint to a board member stating "not disclosing . . . device capabilities" and describing "Theranos Systems" as consisting of "Collection Supplies, Device & Cartridges [with an image of a Theranos-manufactured analyzer], and Analytics System & Applications" – omitting use of third party devices. *See, e.g.*, SEC-USAO-EPROD-000027998; SEC-USAO-EPROD-000048468.

Prior to February 12, 2015, Holmes and Balwani provided a 409A valuation report to board members with financial projections inconsistent with those provided to outside investors. *See, e.g.*, SEC-USAO-EPROD-000017769.

In or about March 2015, Holmes told a board member "we redeveloped the lab infrastructure to make it possible to run any combination of lab tests from a tiny fingerstick." *See, e.g.*, PFM-DEPO-00014186-87.

On or about April 14, 2015, a Theranos board member told a magazine: "Elizabeth Holmes is a story that could happen only in America. After her sophomore year she left Stanford to devote herself to a vision of healthcare available as a basic human right. . . . [S]he is on the verge of achieving her vision – through a new method of blood testing that significantly reduces costs, tests for a whole range of infections, is mobile, and can therefore be easily transported . . . ." *See, e.g.*, SEC-USAO2-EPROD-000009919.

On or about April 15, 2015, Holmes met with board members. The PowerPoint states "not disclosing . . . device capabilities." *See, e.g.*, SEC-USAO-EPROD-000048795.

On or about July 14, 2015, Holmes met with board members. The PowerPoint states "not disclosing . . . device capabilities." *See, e.g.*, SEC-USAO-EPROD-000027830; SEC-USAO-EPROD-000049227.

Admiral Gary Roughead, a Theranos board member, testified:  "it was not until some of the press reporting that I became aware that there was extensive commercial analyzers in use."  PFM-DEPO-00010632.

Admiral Roughead testified he was not aware Theranos was using venous blood for purposes of running blood tests.  PFM-DEPO-00010733.

George Shultz, a Theranos board member, understood that all of the tests that Theranos ran were done on blood that was taken by fingerstick and put into the nanotainer.  PFM-DEPO-00014176.

George Shultz was under the assumption from discussions with Holmes that all the blood tests that Theranos ran were being run on Theranos-manufactured devices.  PFM-DEPO-00014178, 181, 183-184; PFM-DEPO-00014196; PFM-DEPO-00014199.

George Shultz would have wanted to know that Theranos was running blood tests not on the device that Holmes invented but on commercially available blood analyzers.  PFM-DEPO-00014183, 84, 97.

Holmes told George Shultz:  "we've redeveloped the lab infrastructure to make it possible to run any combination of lab tests from tiny droplets of blood.  People can come in and do full service laboratory testing with a fingerstick as opposed to having tubs taken from your arm.  We do that not just for basic tests, but for any test."  PFM-DEPO-00014186-87.

Holmes did not tell George Shultz that some of the blood tests that Theranos was running on patient blood were being run on commercially available blood analyzers made by third-party companies like Siemens.  PFM-DEPO-00014196-97.

According to Henry Kissinger, when he and the board members first saw the report that Theranos was using third party machines nobody thought of this possibility.  Holmes said the machines were used to test the standard to which the Theranos machines were calibrated.  Eventually, there was an implied retreat from this position by Holmes when she said the number of tests had gotten too large and they needed additional machines.  Theranos never took steps to get parallel tests.  US-REPORTS-0005021.

According to Kissinger, Holmes never said other machines were used for income from the wellness centers.  Holmes continued to say the machines were used for calibration and made vague references to people in the company misled her, including Balwani.  Holmes said she may have shown too much confidence in Balwani.  *Id.*

In or around October 2015, George Shultz wrote Holmes encouraging her to make a statement that "all of the tests are performed on Theranos-developed and produced machinery."  Holmes never told him, after he sent the letter, that the statement was false.  PFM-DEPO-00014220-21.

On October 17, 2015, Holmes told board members:  "During the time we are transitioning the nanotainers operations, we are still able to use all our proprietary technology, including our devices, which were approved for use this summer based on studies with +900 patient samples.  Note the name Edison was the name of the company's very first device (not our current systems) - this is one of many incorrect statements by the former employee who communicated this information to the WSJ reporter.  We do not have a good % number right now of how many tests will be done on our equipment during this temporary period, in addition to our first FDA-cleared test, as we are literally in the middle of having just completed this transition and mapping that out now, and this will likely continually evolve, including as we get additional clearances."  PFM-DEPO-00011002.

On or about October 26, 2015, Holmes and Balwani requested the board approve a false statement that Theranos board members were "familiar with the technology," which two board members characterized as "a stretch."  PFM-DEPO-00011015; PFM-DEPO-00011017.

On or about October 27, 2015, an assistant to a board member told Theranos's General Counsel a proposed statement was "the furthest" he would go and in its current form would "spark more controversy than it settles."  Theranos's General Counsel said she would provide it to Holmes.  *See, e.g.*, SEC-USAO2-EPROD-000009911; SEC-USAO2-EPROD-000012225 (10/29/2015 email by another board member to Holmes and Balwani echoing a similar sentiment).

On or about October 28, 2015, after being advised a proposed public statement by the board did "not really address the most critical issue; namely the allegations that Theranos' machine, Edison, might be giving faulty readings," Holmes and Balwani assured or suggested to the board that Theranos would publish meaningful comparative studies of Theranos devices and data in collaboration with independent third parties like the Cleveland Clinic.  Holmes and Balwani also misleadingly stated "'Edison' was the code name of one of our older devices; we had explained this to the reporter from the journal but he ignored this along with many other facts."  *See, e.g.*, PFM-DEPO-00011080.

On or about October 28, 2015, a board member advised Holmes to engage former Senator George Mitchell of DLA Piper to perform an independent review.  *See, e.g.*, THER-0325204.  Holmes was advised "the primary need for Theranos is to restore credibility by going through the painful but necessary process of identifying and addressing deficiencies and being willing to expose that process to sufficient transparency and scrutiny."  *Id.*; *see also* SEC-USAO-EPROD-000009214 (undated notes by board member emphasizing "urgent that persuasive, ind. 3rd party").  No such review was conducted.

On or about October 28, 2015, Holmes told board members:  "For rest of groups [sic] reference, I have been emailing with Bill on the clinical correlations we have, as well as independent blinded sample scores from our auditors that we have reviewed with the board every meeting.  Please let me know if anyone has questions on any aspect of this.  As I announced with Toby Cosgrove at Cleveland clinic on Monday, we are also preparing to publish our data including with independent third parties."  *See, e.g.*, PFM-DEPO-00011080; PFM-DEPO-00011053; SEC-USAO-EPROD-000066325.

On or about October 30, 2015, Holmes and Balwani were advised "[t]he sooner we can get real data like this to the public, the sooner we can put to rest the negative reports about Theranos.  The release of these comparative data would be much more significant than the general comments we have been making."  *See, e.g.*, SEC-USAO-EPROD-000066358.  They were further advised that earlier comments by Balwani "still do[] not address the request I made several weeks ago, which is for [Theranos] to contract with an independent lab to do an authoritative independent test on a significant number of subjects comparing the results of our system and a conventional blood testing system.  If those tests show the kind of results that you are reporting, that should end any serious controversy.  I think it is imperative that [Theranos] proceed immediately to contract for such tests, with the testing lab (or labs) reporting their results to the company and, independently, to the board."  *See, e.g.*, SEC-USAO-EPROD-000066368.

On or about November 1, 2015, Holmes falsely stated:  "the press around the FDA inspection . . . had nothing to do with our tests, devices, software, or the accuracy of our test methods.  The inspection reports focused only on the operations of one of our Nanotainer Tubes, and its transition from the lab framework policies to the FDA framework policies as part of Theranos' ongoing, voluntary commitment to transition its tests to FDA oversight."  *See, e.g.*, PFM-GJ-00000926.

On or about November 2, 2015, a board member advised Holmes and Balwani "we need to do even more. . . . [I]ndependent tests to prove our system's accuracy and reliability are the highest priority.  Perhaps the Cleveland Clinic tests will do that . . . The issues here involve no less than the company's reputation for integrity . . . ."  *See, e.g.*, PFM-DEPO-00011088.

On or before November 4, 2015, a board member was told tests were already underway at Cleveland Clinic.  *See, e.g.*, PFM-DEPO-00011098; *see also* PFM-DEPO-00011088.

On or about November 5, 2015, after being advised that "Theranos should immediately contract with one or two independent companies to . . . conduct comparative tests," Holmes and Balwani stated to board members "we are well aware of the importance of publishing independent comparative tests; that is in fact the heart of our strategy for disproving these falsehoods.  We have initiated these efforts, and are highly focused on the fact that time is of the essence here."  *See, e.g.*, PFM-DEPO-00011098; SEC-USAO-EPROD-000012357; SEC-USAO-EPROD-000066488; SEC-USAO-EPROD-000070661.

On or about November 12, 2015, when asked "[w]hat I take from the public debate is our proprietary equipment doesn't produce consistent results with itself or consistent results with other existing equipment.  Why wouldn't a comparative test be able to prove that our proprietary equipment is consistent in both of these cases.  Aren't those the allegations we need to prove wrong," Holmes told board members "that's data we already have – it's in our FDA applications."  When asked "why can't we ask an independent lab to run a series of samples on the box and compare them with first, the box itself, and second, other equipment, in order to answer the fundamental question:  whether our proprietary equipment is valid," Holmes said:  "We're doing that with Cleveland Clinic. . . . [T]hat's what we're doing."  Holmes also made

statements blaming Carreyrou stating he was on a "jihad." Holmes further suggested its analyzer [i.e., the "TSPU"] was already approved for all tests. Holmes said "[w]e've invited hospitals in and said, okay, you review this stuff." When asked whether Holmes was implying that all Theranos's testing was conducted on the TSPU, Holmes stated: "Unfortunately, that claim came from some of the original sources of the WSJ. The fact of the matter is that if we collect a venipuncture sample, we don't use our equipment even though we could. When we collect a finger prick, which is the proprietary stuff, we obviously use our equipment." Holmes said *The Wall Street Journal* "refused our offer to send our technology to their office and demonstrate how it works. . . . Besides the *WSJ*, no one has ever cared when we use which devices in our labs. We tell people in advance." Holmes suggested because of the *Journal* article Theranos would not meet its revenue goal. Holmes said Quest orchestrated this. Holmes said Theranos did not need to make inflammatory statements anymore. Holmes said Cleveland Clinic was "collecting hundreds of samples from their patients and they're going to run them in their labs while we run them in ours." *See, e.g.*, SEC-USAO-EPROD-000070593.

On or about November 16, 2015, Holmes was advised by a board member that he strongly supports "an independent laboratory verify Theranos' pronouncements." The board member also asked a second set of questions "concern[ing] the operation of Theranos' Wellness Centers. Do they use Theranos or traditional equipment, and in what proportion? And if they use largely traditional equipment, how does Theranos differentiate itself and achieve its stated objectives?" *See, e.g.*, SEC-USAO2-EPROD-000009903; SEC-USAO2-EPROD-000009928.

On or about December 14, 2015, Holmes told board members the Cleveland Clinic had "already collected between 200-300 samples from their patients, which will be sent to the Theranos lab and the Cleveland Clinic lab" and tested for 30 tests. *See, e.g.*, SEC-USAO-EPROD-000070623.

On or about January 20, 2016, Holmes told a board member the Cleveland Clinic had "vetted the data" and asked to form a partnership, and that the vetting included both blood samples and the machines. She said the clinic had come to Palo Alto for a day and analyzed our technology, "which was successful." She said: "What we're doing now is comparing our lab to their lab by testing the same blood samples." *See, e.g.*, SEC-USAO-EPROD-000070646.

**** 

The evidence described above is offered for the permitted purpose of motive, opportunity, intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy. Evidence that Holmes and Balwani made false and misleading statements to board members identical or substantially similar to those provided to outside investors tends to show Holmes and Balwani made such statements intentionally, with intent to defraud, and not by mistake. Such evidence tends to show the materiality of the statements and the existence of the scheme.

Evidence that Holmes presented to board members about all aspects of Theranos's operations tends to show her control over Theranos and knowledge of its operations and tends to show Holmes did not defer to Balwani or was able to form intent to defraud.

Evidence that Holmes and Balwani presented to board members about 409A valuations tends to show a motive, knowledge of Theranos's finances, and knowledge that statements to investors regarding Theranos's historical and projected revenue were false.

Evidence that Holmes and Balwani made statements to board members about pharmaceutical clients identical or substantially similar to those provided to outside investors tends to show Holmes and Balwani made such statements intentionally, with intent, and not by mistake.  Such evidence tends to show the materiality of the statements and the existence of the scheme.

Evidence that Holmes and Balwani did not disclose to board members Theranos's use of third party devices tends to show intent to defraud.

Evidence that Holmes said Carreyrou was on a "jihad" tends to show intent to defraud and consciousness of guilty and disproves Holmes was unable to form intent to defraud because of a mental disease or defect.

Evidence that Holmes and Balwani provided false exculpatory statements to board members after negative press coverage tends to show consciousness of guilt and intent to defraud.

Evidence that Holmes and Balwani promised but failed to complete comparative studies of Theranos's device against competitors tends to show Theranos was unable to produce accurate and reliable results and Holmes's and Balwani's knowledge and consciousness of guilt.

## IV.    **False and misleading representations made to Walgreens.**

The government may offer evidence of the following:

On or about January 21, 2010, Holmes and Balwani authorized Carolyn Balkenhol to state to Walgreens:  "We have developed small point of care devices that, for the first time, can run any blood test in real-time for less than half the cost of central lab tests."  *See, e.g.*, WAG-TH-00010171-172; WAG-TH-DOJ-00025328.

On or about March 15, 2010, Holmes emailed Dr. Jay Rosan of Walgreens two documents titled "Theranos Systems at Walgreens_Overview" and "Theranos Systems at Walgreens_Partnership" that misrepresented Theranos's technology.  *See, e.g.*, THER-2436909-45.  Balwani was copied on the email.  Among other things, the documents falsely stated:  "Theranos Systems have been comprehensively validated over the course of the last seven years by ten of the fifteen largest pharmaceutical companies"; "Theranos Systems at Walgreens allow for . . . Significant reductions in the cost of care by . . . enabling earlier, more accurate, more frequent and preventative screening"; "Theranos . . . has developed small point-of-care devices that, for the first time, can run any blood test in real-time for less than half the cost of central lab tests.  The systems run standard chemistry tests and proprietary tests that detect the earliest appearance of cancers and other diseases," and "Theranos cartridges contain . . . tests performing

identical assays with superior performance to those ordered by physicians across the country today."

On or about March 23, 2020, Holmes emailed Wade Miquelon (Walgreens CFO) and Rosan a PowerPoint titled "Theranos Systems at Walgreens." *See, e.g.*, WAG-TH-00006784-823; WAG-TH-DOJ-00021950-988.  Balwani was copied on the email.  Among other things, the document falsely stated that "Theranos' proprietary, patented technology runs comprehensive blood tests from a finger-stick in real-time at the point of care, outside of traditional lab settings" and that "Theranos Systems have been comprehensively validated over the course of the last seven years by ten of the fifteen largest pharmaceutical companies," as well as suggesting Theranos could accurately and reliably perform the most common blood tests and standard general chemistry panels.

On or before March 25, 2010, Holmes and Balwani stated to Rosan in substance:  "50-70% cheaper than tests done at lab . . . cuts entire infrastructure of clinical lab . . . no couriers, no expensive testing equipment, no teams of trained lab techs, no big buildings . . . 96% of tests done at big labs will be able to be done on these devices which will be CLIA approved and FDA approved . . . Consumer benefit – Finger stick versus blood draw – Results in 30 minutes instead of tomorrow." *See, e.g.*, WAG-TH-DOJ-00021948; WAG-TH-00006827 (4/26/2010 email); WAG-TH-00012066 (4/26/2010 email).  Holmes made similar claims to Walgreens on or about April 30, 2010.  *See, e.g.*, WAG-TH-DOJ-00021993; WAG-TH-DOJ-00024863; SEC-TX-000001925-1926.

On or about April 6, 2010, Holmes met with Rosan in Palo Alto.  WAG-TH-00010182 (SEC-USAO2-EPROD-000238292); SEC-TX-000002033.

On or about April 14, 2010, Holmes emailed Rosan and Alex Jung and attached three documents she falsely described as "independent due diligence reports on Theranos Systems" "from GlaxoSmithKline, Pfizer, and Schering Plough after their own technical validation." *See, e.g.*, TS-0906360-414.  In truth, the documents were prepared by Theranos and doctored to appear as the work product and conclusions of the pharmaceutical companies themselves.  Holmes provided the same doctored reports to potential investors through at least 2014.

Prior to on or about May 3, 2010, Holmes and Balwani falsely stated to Miquelon in substance that three pharmaceutical companies had vetted Theranos.  *See, e.g.*, WAG-TH-00009707-13 (SEC-USAO2-EPROD-000237823); SEC-TX-000002041.

On or about May 7, 2010, Holmes, with a copy to Balwani, emailed Rosan with a Regulatory Overview Summary stating "[a]fter receiving endorsement from FDA, Theranos Systems are the sole means for collecting all clinical data, including drug concentrations, and CRFs in registrational studies across a broad range of therapeutic areas." *See, e.g.*, WAG-TH-DOJ-00024877.

On or about July 30, 2010, Holmes signed a Theranos Master Purchase Agreement with Walgreens.  *See, e.g.*, WAG-TH-DOJ-00000005-47.  Balwani was aware of the agreement.  Among other things, Holmes falsely stated that "Theranos has developed, and is developing,

generations of 'mini-lab- devices that can run any blood test in real-time for less than the traditional cost of central lab tests" and attached a "Theranos Base Assay Library" falsely suggesting Theranos devices could accurately and reliably run all of the listed tests.

On or about November 8, 2010, Holmes and Balwani participated in a meeting with Walgreens executives. *See, e.g.*, WAG-TH-DOJ-00001745-63. Among other things, Holmes and Balwani falsely stated "full menu of tests comparable to current central labs will be available through Theranos" and "within ~30 minutes at Walgreens locations a minimum of the top 95% of all routine blood and urine tests will be available."

On or about December 15, 2010, Holmes and Balwani provided to Walgreens a document titled "Theranos Regulatory and Business Model Approach" stating that the company was undergoing CLIA certification as a high complexity laboratory. *See, e.g.*, SEC-TX-000002059; WAG-TH-DOJ-00026801.

On or about March 10, 2011, Holmes emailed Rosan and counsel for Walgreens responses to how the proposed Walgreens relationship implicated certain federal laws. *See, e.g.*, WAG-TH-DOJ-00025180.

On or about June 2011, Holmes sent equity offering documents to Walgreens. *See, e.g.*, WAG-TH-00011857.

Around June 25, 2011, Holmes and Balwani met with Miquelon and another Walgreens representative. Walgreens told Homes it "didn't think it was a good idea . . . to enter into the market with Theranos without having a confirmatory conversation with the FDA" and "didn't think it is a good idea to do the 'Theranos based pilot' aka rented space model, as that may also in a sense just be a way of getting around the FDA . . . ." *See, e.g.*, SEC-TX-000002076; WAG-TH-00006863.

On or about January 16, 2012, Holmes and Balwani presented to Walgreens a "Project Normandy Briefing." *See, e.g.*, WAG-TH-DOJ-00000181-210. Among other things, Holmes and Balwani stated or suggested Theranos offered "the world's first finger-stick based CLIA-certified lab through retail RX" with "99.9% less blood"; "[s]tate of the art result turnaround: 4-24 hours"; and "[n]ation's lowest cost and highest quality laboratory provider." They also described their "CLIA Lab" would process samples "on Theranos devices" and claimed "[n]o regulatory risk."

In or around January 31, 2012, Holmes and Balwani told Rosan that Theranos "hopes to have an article published in JAMA within the next six months and an additional article by the end of the calendar year to add credibility to the offering." They said Theranos was working with the military in the hopes that the lifesaving application of their device would aid the military's efforts. She said she believed the Walgreens pilot could begin in May. *See, e.g.*, WAG-TH-DOJ-00000213.

In or around June 5, 2012, Theranos and Walgreens amended the Master Services Agreement. Among other things, Holmes and Balwani referred to the Theranos System as

comprising Devices, i.e. Theranos's analyzer, not third party analyzers.  *See, e.g.*, WAG-TH-DOJ-00000048.

In or around June 22, 2012, Holmes and Balwani met with Rosan and another Walgreens representative.  *See, e.g.*, WAG-TH-DOJ-000002825.  Holmes and Balwani provided a test menu, and performed a demo with a new collection tool.  They also provided a CLIA certificate and alleged "validation from an outside agency."

In or around January 2013, Walgreens sought information from Balwani supporting the value of the convertible promissory note Walgreens had purchased.  *See, e.g.*, WAG-TH-DOJ-000002089.

In or around January 2013, Balwani made proposals to Walgreens "defeat[ing] the whole purpose of our soft pilot launch and timeline.  We are only weeks away from launching and he wants to change the construct of the pilot . . . ."  *See, e.g.*, SEC-TX-000002078.

In or around March 2013, Christian Holmes proposed telling Walgreens customers that "Theranos is conducting a clinical trial and testing a new patient management system."  *See, e.g.*, WAG-TH-DOJ-00035752; WAG-TH-DOJ-00035894; WAG-TH-DOJ-00036023.

In or around July 2013, Rosan met with Holmes and Balwani and stated "I also hope that you were not too upset with the topics I brought up."  *See, e.g.*, SEC-TX-000002086.

In or around August 2013, Holmes and Balwani met with Walgreens executives to discuss the upcoming launch.  *See, e.g.*, SEC-TX-000002088; 2091.

Prior to October 18, 2013, Holmes and Balwani told Walgreens Theranos's device differs from competitors because its device is not "a point of care device with a small number of tests (about 30)" and "it can do 95% of all blood tests (in the thousands) and can actually be a replacement to any certified lab."  Theranos was also different because it could do more than chemistry tests, including blood counts, cultures, etc.  Holmes and Balwani also told or suggested that its results are dramatically more accurate.  *See, e.g.*, WAG-TH-DOJ-000001065.

In or around December 2013, Holmes and Balwani agreed to amendments to the Master Services Agreement.  *See, e.g.*, WAG-TH-00002204 (SEC-USAO-EPROD-000065246).

In or around April 2014, Balwani ascribed the high percentage of venous draws to doctors ordering many tests.  *See, e.g.*, THPFM0001312680.

In or around May 2014, Theranos was still doing venous draws at Walgreens 40% of the time, which was "not good at all" and delivering a "poor patient experience."  *See, e.g.*, WAG-TH-DOJ-00050954.

In or around August 2014, Nimesh Jhaveri of Walgreens told Balwani without a documented detailed plan it would be difficult for him to convince others of expansion beyond Arizona.  *See, e.g.*, WAG-TH-00035711; WAG-TH-00035814; WAG-TH-00035811.

On or about October 17, 2015, Balwani requested Jhaveri remove signage at Walgreens that said "the blood tests that need just a tiny sample." *See, e.g.*, WAG-TH-00003683 (SEC-USAO-EPROD-000325241).

At some point in or after October 2015, Holmes falsely denied Walgreens had communicated to Theranos that no further Wellness centers were opening. *See, e.g.*, WAG-TH-00003870 (SEC-USAO-EPROD-000325426).

According to Wade Miquelon, Holmes and Balwani, in each other's company, said in 2010 that Theranos' Nanotainer and Edison device were capable of running most conventional blood tests using a small amount of blood drawn by a fingerstick. Holmes and Balwani said the Edison could run around 600 different types of blood tests pending further reagent development. Holmes and Balwani told Miquelon that Theranos's hurdles at the time were scaling the devices, not technological boundaries. Holmes and Balwani told Miquelon that Theranos had worked with pharmaceutical companies on clinical trials and had also performed real-time localized testing with the U.S. military. Specifically, Balwani told Miquelon that Theranos had conducted work with the military and that the Edison device was in the field on military helicopters in Afghanistan before 2012. Balwani even specifically identified a device and stated, "This is the one on the helicopter." Balwani also told Miquelon that Theranos blood collection devices resulted in instantaneous separation of blood, negating the need for a centrifuge. US-REPORTS-0014079.

Holmes told Miquelon that Theranos's board included technology people because Theranos was a technology company. Holmes said that medical professionals on the board would have only added bureaucracy. US-REPORTS-0014079.

After the Walgreens launch, Miquelon asked Holmes and Balwani about the number of blood draws that were being done via venipuncture. Holmes told Miquelon that Theranos's competitors were sending people into Walgreens stores to order esoteric blood tests in order to throw off the blood draw percentages. Holmes reassured Miquelon that the percent of fingerstick blood draws would quickly increase to 90%. US-REPORTS-0014079.

Walgreens was restricted from contacting Pfizer due to the non-disclosure agreement that Walgreens signed with Theranos. Miquelon is also expected to testify about how he learned several facts about Theranos's actual testing and dilution procedures after September 2015.

According to Dr. Jay Rosan, on or about and between 2010 and 2016, Holmes and Balwani each made certain statements to or in front of Rosan. Those include when Holmes and Balwani, in each other's company, said in 2010 that Theranos was working with major pharmaceutical companies. In a different meeting, Holmes and Balwani also showed Rosan a ruggedized version of the device that would be evaluated for use on a military helicopter. Holmes and Balwani told Rosan that Theranos would cost less than traditional labs, because Theranos had eliminated many of the costs associated with blood testing, such as couriers. Holmes told Rosan that major pharmaceutical companies had conducted independent due diligence. US-REPORTS-0012950.

Balwani told him that Theranos kept everything confidential, because Balwani feared others would copy Theranos's idea before it was introduced to the market. Also, even though Rosan requested financial statements from Theranos, and Holmes and Balwani said they would provide financial statements, Rosan never received them. US-REPORTS-0012950; US-REPORTS-0012961 to 13557.

According to Dan Doyle, for several years starting in 2010, Holmes and Balwani each made certain statements to or in front of Doyle. Those include when Holmes and Balwani, in each other's company, described in 2010 how Theranos technology worked, how much volume of testing Theranos could handle, and how quickly Theranos could scale. Holmes told Doyle that Theranos could move quickly and be open in thousands of Walgreens stores quickly. Holmes and Balwani told Doyle that Theranos devices were in use at multiple major pharmaceutical companies in clinical trials. In or around March 2010, Doyle recalls that Holmes and Balwani represented that Theranos could do 95% of all blood tests that were available. Doyle will testify that he understood this comment to mean that Theranos was able to perform these days presently (that day) and that 95% referred to volume of tests (that is 95% of ordered tests). Holmes and Balwani both represented that the U.S. military was using their device in the field and that the device was producing timely results. Holmes and Balwani both told Doyle that Theranos systems had been comprehensively validated, meaning that pharmaceutical companies validated Theranos technology and were using it themselves. Holmes and Balwani represented to Doyle that Theranos could perform general chemistry testing. Holmes and Balwani represented to Doyle that Theranos had outside auditors and audited financial statements. Holmes and Balwani criticized Walgreens' regulatory counsel as being too conservative. US-REPORTS-0012436.

Holmes told Doyle that Theranos could move quickly and be open in thousands of Walgreens stores quickly. Holmes and Balwani told Doyle that Theranos devices were in use at multiple major pharmaceutical companies in clinical trials. In or around March 2010, Doyle recalls that Holmes and Balwani represented that Theranos could do 95% of all blood tests that were available. Doyle is expected to testify that he understood this comment to mean that Theranos was able to perform these days presently (that day) and that 95% referred to volume of tests (that is 95% of ordered tests). Holmes and Balwani both represented that the U.S. military was using their device in the field and that the device was producing timely results. Holmes and Balwani both told Doyle that Theranos systems had been comprehensively validated, meaning that pharmaceutical companies validated Theranos technology and were using it themselves. Holmes and Balwani represented to Doyle that Theranos could perform general chemistry testing. Holmes and Balwani represented to Doyle that Theranos had outside auditors and audited financial statements. Holmes and Balwani criticized Walgreens' regulatory counsel as being too conservative.

According to Nimesh Jhaveri, on or about and between 2010 and 2016, Holmes and Balwani each made certain statements to or in front of Jhaveri. Those include after the Walgreens launch, when Balwani and Jhaveri discussed how Walgreens was not happy with the number of vein draws Theranos was conducting at Walgreens stores. Balwani told Jhaveri that the reason for the high number of vein draws was that cartridges were not ready for certain blood

tests that were ordered, that LabCorp and Quest were sending people in to Walgreens to order tests that required venous blood draws, and because doctors were ordering esoteric tests to test the Theranos system.  Aside the from Walgreens launch, Balwani also made representations to Jhaveri about Theranos, including that Theranos was doing work in with the military and pharmaceutical companies and that Theranos technology was being used "in the field."  Jhaveri received complaints from a nurse practitioner about the accuracy of Theranos test results, and elevated those concerns to Balwani.  Finally, after *The Wall Street Journal* article came out in October 2015, questioning Theranos technology, Balwani told Jhaveri that the article contained lies.  US-REPORTS-0012220.  In prior testimony, Jhaveri also stated he was unaware his blood had been tested by Theranos using a third party device just before the Walgreens launch was announced.  PFM-DEPO-00018619-20.

****

The evidence described above is offered for the permitted purpose of motive, opportunity, intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy.

Evidence that Holmes and Balwani provided doctored reports purportedly from pharmaceutical companies to Walgreens (and falsely characterized them as independent reports from pharmaceutical companies) tends to show they made the false and misleading statements alleged in the indictment intentionally, with intent to defraud, and not by mistake, including those described in Paragraph 12(h).  Claims to Walgreens that Theranos's tests were faster, cheaper, and comprehensive tend to show Holmes and Balwani similarly misled investors.

Evidence that Holmes and Balwani provided false and misleading PowerPoints and oral statements to Walgreens identical or substantially similar to those provided to outside investors tends to show Holmes and Balwani made such statements intentionally, with intent to defraud, and not by mistake.  Such evidence tends to show the materiality of the statements and the existence of the scheme.

Evidence that Holmes and Balwani failed to disclose to Walgreens it was using commercially available equipment to run patient blood tests tends to show an intent to deceive and corroborate that Theranos's device did not work.

Evidence that Walgreens, not Holmes and Balwani, did not to go forward without a conversation with the FDA tends to show Holmes and Balwani had a disregard for regulatory requirements.

Evidence that Holmes and Balwani made false and misleading statements to Walgreens about the military's use of Theranos's technology tends to show they made the false and misleading statements alleged in the indictment intentionally, with intent to defraud, and not by mistake, including those in Paragraph 12(E).

Evidence related to Walgreens is relevant to allegations in the Third Superseding Indictment that Theranos pursued a relationship with Walgreens.  Evidence related to Walgreens

30

is relevant to proving the truth or falsity of statements to investors about Walgreens, including those alleged in Paragraph 12(D).

Evidence Jhaveri's blood was tested on a third party device is relevant to the allegations in Paragraph 10 and 12(C), among others.

The evidence described above also shows Holmes's and Balwani's control and knowledge of Theranos's operations, including the Walgreens relationship, and its projects with pharmaceutical companies; their knowledge of problems with Theranos's technology; and Theranos's business plan. Evidence regarding the Walgreens relationship tends to show Holmes and Balwani's financial projections to investors – which were based on an expanding relationship with Walgreens – were false and lacked basis.

**V.     False and misleading representations made to Safeway.**

The government may offer evidence of the following:

On or about April 16, 2010, Holmes emailed Safeway attaching three documents she falsely suggested were independent due diligence reports on Theranos Systems from GlaxoSmithKline, Pfizer, and Schering Plough after their own technical validation. Balwani was copied. In truth, the documents were prepared by Theranos and doctored to appear as the work product and conclusions of pharmaceutical companies. Holmes provided the same doctored reports to Walgreens and potential investors through at least 2014, which she characterized as exemplary reports from pharmaceutical companies. *See, e.g.*, THPFM0005638605-662; SEC-USAO2-EPROD-000036484. It gave Safeway's CEO comfort that Theranos worked with many pharmaceutical companies. *See, e.g.*, US-REPORTS-0000001.

On or about May 14, 2010, Holmes stated to Safeway: "Theranos started out of Stanford University in 2003. We have built a 'mini-lab' system that automates the process of running a broad range of assays on accelerated timelines with much smaller volumes of sample. Our system has been used as a replacement for central laboratories in pharmaceutical clinical trials over the past six years to measure drugs, proteins, enzymes, cellular markers, and viral loads. Our assays are validated under FDA / ICH guidelines." *See, e.g.*, SEC-USAO-EPROD-000016617.

Prior to May 19, 2010, Holmes falsely told Safeway, among other things, that Theranos could provide "full diagnostic blood, saliva and urine lab in a box" from "blood test samples result[ing] from a finger stick" "in 20 minutes" at a cost 40-70% less than competitors. Holmes also falsely stated that Theranos was "[c]urrently cash flow neutral." *See, e.g.*, PFM-DEPO-00017722; SEC-USAO-EPROD-000122138 (same); *see also* PFM-DEPO-00017746 (8/24/2010 Safeway Board presentation material); SEC-USAO-EPROD-000016615 (3/31/2020 letter from Steve Burd to Holmes stating "I enjoyed our meeting last week and was impressed with the capabilities of the Theranos blood analyzer" and expressing interest in verifying "that the blood analyzer can perform at least 85% of the blood work done by a standard retail lab today"); PFM-DEPO-00017581 at 30-34 (PFM deposition testimony of Robert Gordon).

On or about July 2, 2010, Holmes solicited an investment in Theranos from Safeway's CEO.  *See, e.g.*, SEC-USAO-EPROD-000016850.

On or about July 30, 2010, Holmes and Balwani provided to Safeway "Theranos Financial Projections."  Holmes and Balwani stated, among other things, Theranos would achieve $192 million in non-Safeway revenue in 2011 and a positive gross margin.  *See, e.g.*, SEC-USAO-EPROD-000016667.  Balwani was reluctant to provide the projections.  *See, e.g.*, US-REPORTS-0000001.

On or about September 20, 2010, Holmes signed a Theranos Master Purchase Agreement with Safeway.  *See, e.g.*, SEC-USAO-EPROD-000016526; SEC-USAO-EPROD-000122157 (10/19/2010 Safeway Board presentation); SEC-USAO-EPROD-000122718 (7/29/2010 email with draft agreement).  Balwani was aware of the agreement, and both he and Holmes were involved in its negotiation.  Among other things, Holmes and Balwani falsely stated or suggested that "Theranos has developed, and is developing, generations of 'mini-lab' devices that can run any blood test in real-time for less than the traditional cost of central lab tests" and "the ability to run blood tests from a finger-stick in 30 minutes or less in Safeway stores creates a new workflow, and a new diagnostic paradigm for healthcare," and attached a pricing schedule falsely suggesting Theranos devices could accurately and reliably run all of the listed tests.

In or about early 2011, Holmes provided a presentation to the Safeway board.  Balwani attended.  She drew blood from the finger of one of the board members.  She had a device set up in the corner and put the blood sample into that device.  She said no results could be provided because the device was not connected to the Palo Alto lab.  *See, e.g.*, PFM-DEPO-00017581 (Gordon Deposition) at 28-29; FBI-FD 302 of 9/23/2020 Interview of Larree Renda (forthcoming).  According to Safeway's CEO, Holmes said the machine could do 30 or more tests in one machine and had multiple cartridges.  These tests could be done in 30 minutes or less at a fraction of the cost.  *See, e.g.*, US-REPORTS-0000001.

In or around March 2011, Holmes provided an Executive Briefing to Safeway falsely stating, among other things, "Theranos' proprietary, patented technology runs comprehensive blood tests from a finger-stick and tests from micro-samples of other matrices in real-time outside of traditional lab settings and generates significantly higher integrity data than currently possible"; "Theranos Systems have been comprehensively validated over the course of the last seven years by ten of the fifteen largest pharmaceutical companies, with hundreds of thousands of assays processed"; and Theranos's service was more "cost-effective" than other labs.  *See, e.g.*, PFM-DEPO-00017807.

In or about June 2011, Holmes provided an Executive Briefing to Safeway falsely stating, among other things that "Theranos' proprietary, patented technology runs comprehensive blood tests from a finger-stick and tests from micro-samples of other matrices in real-time outside of traditional lab settings and generates significantly higher integrity data than currently possible" and "Theranos tests have been comprehensively validated over the course of the last seven years by ten of the fifteen largest pharmaceutical companies, with hundreds of thousands of assays processed."  The PowerPoint also falsely suggested "Theranos Systems" comprised minilab

devices that had been validated and were being used in a CLIA certified laboratory.  *See, e.g.*, SEC-USAO-EPROD-000122498.

Holmes left a meeting with Safeway and UCSF stating "Theranos would provide UCSF with a box."  By the time of Burd's government interview, Holmes had not done so.  *See, e.g.*, US-REPORTS-0000001.

Holmes suggested Theranos was missing launch deadlines because she was working with the Department of Defense.  Safeway's CEO was led to believe the boxes were already deployed and the military was actively deploying the boxes on helicopters, among other places all over the world.  *See, e.g.*, US-REPORTS-0000001.

Theranos lost samples and had to have customers go back for additional testing.  Safeway was surprised how long the tests would take at times.  Holmes resisted Safeway's efforts to see how their process worked.  *See, e.g.*, US-REPORTS-0000001.

In or about May 2012, Theranos tested Gordon's blood.  The results took more than a week and generated an elevated PSA result that was proved wrong by subsequent tests.  *See, e.g.*, PFM-DEPO-00017581(Gordon Deposition) at 72-74.

In or about July 2012, Holmes caused Safeway to think that Theranos had the ability to perform an in-house blood nicotine test when it truth Theranos was "sending them out."  *See* SEC-USAO-EPROD-000403646.

In or around August 2012, Holmes and Safeway discussed "[c]reat[ing] PR buzz to facilitate adoption" of Theranos's blood testing services.  Among other things, the two contemplated "[a] WSJ article will be released the day of our launch" – as Theranos ultimately did by having Joe Rago author a false and misleading article about Theranos around the time of the Walgreens launch.  *See, e.g.*, PFM-DEPO-00017821; SEC-USAO-EPROD-000122331.

On or about September 12, 2012, Holmes emailed Safeway's CEO, who advised Holmes: "I am genuinely concerned that Safeway's lab reputation gets worse by the day. . . . The sooner we get to 'finger stick' the better we will be."  Holmes replied:  "As you also know, we do not have all tests run in our lab onsite. . . . We have an average of 1-5 calls a week right now to the lab and all are on the same topic – when will the results be delivered to the doctor. . . . We have been struggling with the fact that SWY employees have been telling patients they will get their results in less than 24 hours without conferring with us . . . . [I]t does not make sense for us to invest in a full service dinosaur lab."  *See, e.g.*, SEC-USAO-EPROD-000016743.

On or about September 17, 2012, Holmes and Burd emailed about a "Hostage Exchange" – a proposal whereby Burd proposed exchanging a sales pitch for a contract.  *See, e.g.*, SEC-USAO-EPROD-000016746.

On or about September 17, 2012, Burd emailed Holmes "Key Milestones for Bay Area Launch" "[b]ased on our Friday conversation."  Among the milestones was a "Six store soft launch" that Theranos was not capable of achieving.  *See, e.g.*, SEC-USAO-EPROD-000016745.

On or about September 25, 2012, Burd advised Holmes:  "I thought I would share with you what your team has communicated to Brian Hille (see attached).  If the soft launch is likely to be as late as October 29, I need to know that now so I can slow down the hiring effort.  I have always understood that something could get in our way, but this schedule has two weeks of finger stick and courier followed by two weeks of finger stick and on site processing.  It also looks like your lab work is all being sent to Utah, not UCSF and not being done on site.  It is the only way it could possibly take 3 to 5 days.  I realize this is a temporary process but we should be doing everything possible to simulate the future in store process.  As currently described, with 3 to 5 days before results, this is a very bad patient experience.  In hindsight, we should have created a wholly owned subsidiary with a different name to avoid tarnishing the Theranos brand.  We will overcome this, because this is a completely controlled workforce whose CEO is prepared to dictate the lab they can use.  I firmly believe there are things we should be doing differently even in the short run.  I am sure I don't have all the information you have, but given the small number of patients we could create a much better short term experience with little or no additional effort.  It pains me not to do so.  I don't want to take your time to reinvent this temporary process, but I am more than willing to work with Christian and Nick.  If you want me to engage, I will, if you want me to back off, I will.  I just know we can do better.  Process is something we are very good at.  Sorry to burden you with this.  What would you like to do?"  *See, e.g.*, SEC-USAO-EPROD-000016756.

On or about October 25, 2012, Burd advised Holmes:  "Where are we on the schedule?  We have hired 26 phlebotomists and have screened, interviewed and have identified 181 others that we are prepared to hire.  We are also well down the path on selecting supervisors who will need either limited or class one training.  I know we still have some uncertainty, but only you know how much.  I am available all day to discuss the schedule or other issues.  I should have a final point of view on the sales effort this morning.  It has taken longer than I thought it would."  *See, e.g.*, SEC-USAO-EPROD-000016776; SEC-USAO-EPROD-000016774.

On or about November 9, 2012, Burd told Holmes:  "If we don't pick a launch date soon, we can forget about launching even six stores in 2012.  If you have already decided it is not going to happen until next year, I would like to know.  While it would be very unfortunate to not launch in Q4, based on the information I have, it looks pretty remote.  I feel like a jogger running in place waiting for the stop light to turn green."  *See, e.g.*, SEC-USAO-EPROD-000016779.

On or about November 12, 2012, in an email titled "Becoming Discouraged," Burd advised Holmes:  "As I am sure you know, I am not easily discouraged.  In fact, I can only recall having been discouraged once is the last 62 years.  That said, I am getting close to my second event.  It is not the delays and the uncertainty, it is not knowing all the obstacles....and believing that I could help remove many of them.  I think all of this is compounded by the fact that I personally have so much at risk.  I feel as strongly as you do about not going forward until we are ready.  I also feel I could be so much more helpful if given the chance.  In addition to setting a timetable for the 29 tasks, I would like to know all the remaining obstacles, if any."  *See, e.g.*, SEC-USAO-EPROD-000016783.

On or about December 7, 2012, Burd told Holmes, among other things: "the on campus lab has operated for almost a year with a poor patient experience. ( this has nothing to do with the fact that we are doing vein draw). " *See, e.g.*, SEC-USAO-EPROD-000016790.

On or about December 18, 2012, Burd told Holmes: "Without recounting all the missed deadlines, it is crystal clear that either the most recently committed dates (September 24[th] and later December 6[th]) were far too ambitious, or there have been some overwhelming surprises along the way). I also worry that the demands or your core business or the newly acquired DOD business are consuming resources that would otherwise be committed to launch. . . . when I try to envision the Theranos 'to do' list, the work that remains to be done appears nothing short of daunting. I am not sure when or how it gets done." *See, e.g.*, SEC-USAO-EPROD-000016792; *see also* SEC-USAO-EPROD-000122217 (Holmes email with draft contract amendment).

On or about December 31, 2012, Burd wrote Holmes: "Thanks for your time today. We did not bridge the gap but I think we both learned enough from each other that we can reach an agreement on a revised contract. I think this session was much more valuable than slogging through the contract. We will not sit idle while waiting for your ideas. I will go to work on this tomorrow and try to find a path that works for both us. It may seem like we accomplished nothing, but I believe we accomplished a great deal. Let's hope our next conversation proves me right." *See, e.g.*, SEC-USAO-EPROD-000122934.

At some point in 2012 or 2013, Holmes caused Theranos to cease providing services on an on-campus facility at Safeway. *See, e.g.*, PFM-DEPO-00017581 (Gordon Deposition) at 69-71.

On or about January 2, 2013, in an email titled "Theranos-Safeway Proposal," Holmes wrote: "Today has turned in to dealing with the announcement. Our board is already raising fundamental issues with the 2010 deal in the context of the announcement today. The terms in the attachment were much worse terms for Theranos than our 2010 contract, which is now already under great scrutiny with today's announcement. It does not make sense for us to modify it along the lines of the attachment. I will be talking more with our board about the announcement and our contract (in the context of the announcement) in the coming days; we can follow up accordingly." *See, e.g.*, SEC-USAO-EPROD-000016803; *see also* SEC-USAO-EPROD-000122930 (1/2/2013 Burd email re same).

On or about January 3, 2013, Burd told Holmes: "We have now invested $367 million, completed 963 facilities and 511 facilities now have two rooms." *See, e.g.*, SEC-USAO-EPROD-000016804; SEC-USAO-EPROD-000122823.

On or about January 14, 2013, Burd asked whether it was possible that our launch date will occur after he retires from Safeway on May 14. Holmes said no. *See, e.g.*, SEC-USAO-EPROD-000016806.

On or about January 19, 2013, Burd wrote Holmes: "I cannot begin to tell you how disappointed I am that you redesigned the wordmark without ever telling us you were doing it. With all the work we did, we should have been informed. I realize it is your brand, but it will be

35

executed in our stores.  It sounds like you are locked in on this, so I am going to avoid giving you my opinion.  Barbara and I would not make a final decision without testing all form factors. My suggested form factors are as follows:  letter head, business cards, devices, website retail POS (point of sale) outdoor store signs, in store bulkhead with Wellness Center lockup, overhead Wellness Center signs, and brochures.  When we did this last time it changed some of our thinking.  Many of these need to be photo shopped.

"You of course have complete control over your brand.  When it comes to the Wellness Center you have no choice...we must both agree.  I would suggest you have Chiat work with Barbara.  They should not do this by themselves.

"In two and one half years we have invested $400 million and more than 50,000 man hours.  I would like to know now how much of our effort you intend to replace without our participation.  I don't mind passing the baton to either Theranos or someone else.  What I mind is having it ripped from my hands.  I do not like wasting time.  This does not feel like a partnership. We are still doing a lot of marketing work on your behalf.  If you are going to redo our efforts, we will stop working.  If you want to do all the work, we will stand down.  When you think you are ready to launch, we will review your marketing plan.  If it isn't good enough, we will spend time improving it before we launch.

"I have been asking for a more collaborative effort for more than a year.  You seem willing to collaborate with others, including holding weekly scheduled meetings, but not with us.

"I believe in you.  I believe in your company.  And I share your vision.  I want so much to help you change the world.  We are so good together when we collaborate.  But I have never been more frustrated.  I want to help, but you are making it difficult.  I have been completely transparent to you for two and one half years.  My transparency does not stem from naïveté, it is because I believe all great partnerships are transparent.

"If this feels like you are drinking out of a fire hydrant, I am sorry.  This is not about the wordmark; this about dozens of things.  I needed to get this off my chest.  I would have preferred to have this discussion in person, but I am not at all certain when that would happen.  My entire schedule revolves around yours.  In the interest of the broader objective and sensitive to your time, I have always been willing to accommodate you.  If you think I am overreacting, I am confident I could convince you otherwise in a face to face meeting.  Let me know how you would like to proceed."

*See, e.g.*, SEC-USAO-EPROD-000016810.

On or about January 30, 2013, Burd emailed Holmes regarding Contract Discussions:  "I have been putting a fair amount of energy into how best to conclude our contract discussions. Up until late today, I was focused on the 'CEO' issue, trying to create a 'virtual' Steve Burd.  It occurred to me this is also about 'control' and about 'money'.  If I am correct about control and money, it would be helpful if you could rank these three issues from most important to least important.  If I am leaving something out, let me know."  *See, e.g.*, SEC-USAO-EPROD-000122929.

36

On or about February 18, 2013, Holmes provided Burd a letter of credit and an invoice demanding payment under the master services agreement.  *See, e.g.*, SEC-USAO-EPROD-000035825.

On or about February 26, 2013, Burd emailed Holmes a "Summary of Key Proposals for revised Contract."  *See, e.g.*, SEC-USAO-EPROD-000122928.

On or about March 24, 2013, Holmes proposed amending the Master Purchase Agreement.  Holmes stated that Gordon "was on all the shareholder calls with you in which you've discussed this publicly."  *See, e.g.*, SEC-USAO-EPROD-000122112.

On or about March 19, 2013, Gordon wrote Holmes requesting an explanation why Safeway's $25 million pre-purchase commitment was payable.  "Could you please explain your reasons for believing that the payment is now due?  Safeway does not wish to be in default of any obligation under the contract, and if you believe we are in default or in danger of being in default, we would appreciate your pointing to the provisions of the contract or other facts that give rise to this situation.  We are at a loss to understand why Theranos believes this payment is due now."  *See, e.g.*, SEC-USAO-EPROD-000122116; *see also* SEC-USAO-EPROD-000122204 (3/19/2013 Holmes response); SEC-USAO-EPROD-000122203 (3/22/2013 Burd/Holmes email discussing "Trigger Point for the $25 million").

On or about April 25, 2013, Burd emailed Holmes a draft amendment stating:  "I hope we can find a way to clear the impasse."  *See, e.g.*, SEC-USAO-EPROD-000122912.

On or about June 26, 2013, Holmes and Balwani met with two Safeway executives.  Among other things, Safeway questioned why had Theranos decided to use a central lab and courier service as opposed to its device (TSPU) in all stores, whether this central lab model gave Theranos a meaningful competitive advantage over Quest and LabCorp, and whether the costs of the business model impacted the profitability of Theranos or Safeway.  *See, e.g.*, PFM-DEPO-00017852.

Holmes and Balwani falsely stated, among other things, "there is no technological problem with the devices and no plan to go without the devices in the stores"; "[t]he central lab contains the device; in fact, the device is the only way of obtaining results from the nanotainers"; and "[t]he device is currently capable of performing the routine blood tests (90% or more of the demand).  In order for Theranos to offer a full array of lab tests, it needs to offer the esoteric tests (the other 10% or so) that would require courier pickup to a central lab even if there were a device in the store.  So the courier service does not create an additional cost or change in the model."  *See, e.g.*, PFM-DEPO-00017853; PFM-DEPO-00017581 at 83-93.

In December 2013, Gordon emailed Balwani seeking to discuss, among other things, "status of devices and any plans to deploy them in stores."  *See, e.g.*, SEC-USAO-EPROD-000382479.

On or about February 14, 2014, Balwani provided Gordon a document estimating the value of Safeway's convertible notes to be $73m / 1% of co." *See, e.g.*, SEC-USAO-EPROD-000382442.

On or about February 17, 2014, Gordon told Balwani Safeway's auditors required additional financial information to prevent impairment of the notes. *See, e.g.*, SEC-USAO-EPROD-000124996; SEC-USAO-EPROD-000125159.

As of April 2014, there was no concrete plan to open 300 stores opened in California. *See, e.g.*, PFM-DEPO-00017581(Gordon Deposition) at 114.

On May 10, 2014, Gordon emailed Balwani stating that the two parties were not making progress on a rent model. He said "9 months ago, Elizabeth estimated that device availability for all stores was two-plus quarters away. If this capability is still not available, we would be interested in understanding what it is not. Are the issues related to technology, manufacturing cost, or something else?" *See, e.g.*, SEC-USAO-EPROD-000382548.

On or about May 21, 2014, Holmes emailed Safeway a document titled "Theranos Deal Economics and Recap of discussions with SWY thru May 21, 2014." *See, e.g.*, SEC-USAO-EPROD-000036124.

On or about May 29, 2014, Holmes stated to Safeway, with Balwani's knowledge, that there had been no progress on the Safeway launch in over a year. *See, e.g.*, SEC-USAO-EPROD-000382525; SEC-USAO-EPROD-000382551.

Prior to October 16, 2015, Gordon was unaware that Theranos was using commercially available equipment to run patient blood tests. *See, e.g.*, PFM-DEPO-00017581(Gordon Deposition) at 120.

After a negative *Wall Street Journal* article in or around October 16, 2015, Heather King, Theranos's General Counsel, who reported to Holmes, proposed joint Theranos/Safeway responses with inaccurate information. *See, e.g.*, PFM-DEPO-00017581(Gordon Deposition) at 123.

****

The evidence described above is offered for the permitted purpose of motive, opportunity, intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy.

Evidence that Holmes and Balwani provided doctored reports purportedly from pharmaceutical companies to Safeway (and falsely characterized them as independent reports from pharmaceutical companies) tends to show they made the false and misleading statements alleged in the indictment intentionally, with intent to defraud, and not by mistake, including those described in Paragraph 12(h). Claims to Safeway that Theranos's tests were faster, cheaper, and comprehensive tend to show Holmes and Balwani similarly misled investors.

Claims to Safeway that Theranos was "cash neutral" tend to corroborate similar claims to investors.  False and misleading projections to Safeway tend to show that projections to investors were made knowingly; Holmes and Balwani's repeated failure to achieve anything close to projections to Safeway tends to show they knew projections to investors were false and misleading.  Balwani's reluctance to provide projections to Safeway tends to show he knew they were unreliable.

Evidence that Holmes provided Executive Briefings to Safeway similar to those provided to investors tends to show statements to investors were made knowingly, with intent to defraud, and not by mistake.  Evidence that Holmes refused to provide Theranos's technology to Safeway and UCSF tends to show she was aware the technology did not work.  Evidence that Holmes suggested Theranos was missing launch deadlines because she was working with the Department of Defense tends to show she knew Theranos's technology was not working and disproves the claim she could not form intent to defraud because of a mental disease or defect.  Evidence she told Safeway's CEO the boxes were already deployed and on helicopters corroborates misrepresentations to investors and evidences intent to defraud.

Evidence that Theranos lost samples and had to have customers go back for additional testing tends to show Theranos's technology did not work, despite representations to investors.  Evidence of Gordon's blood test tends to tends to show Theranos's technology did not work, and corroborates evidence Holmes and Balwani used misleading demonstrations to attract investors.

Evidence that Burd told Holmes Theranos was unable to "get to finger stick" with Safeway or timely provide results to Safeway tends to show Holmes was aware of Theranos's technological challenges.  Evidence that Holmes missed projected launch dates in 2012 with Safeway tends to show Holmes was aware projections to investors lacked basis.

Evidence that Holmes and Balwani demanded payments from Safeway in 2013 tends to show Theranos needed cash and a motive to defraud.

Evidence that Holmes and Balwani falsely stated to Safeway "there is no technological problem with the devices and no plan to go without the devices in the stores" tends to show an intent to defraud and to conceal issues with Theranos's technology.

Evidence that there was no concrete plan to open 300 stores opened in California tends to show Holmes and Balwani's claims to investors were false and that its projections to investors lacked basis.

Evidence that Holmes failed to disclose to Safeway it was using commercially available equipment to run patient blood tests tends to show an intent to deceive and corroborate that Theranos's device did not work.

Evidence that Holmes's General Counsel proposed issuing false information following a negative *Wall Street Journal* article shows Holmes's consciousness of guilt and disproves the claim that, because of a mental disease or defect, she did not act with intent to defraud.

The evidence described above also shows Holmes's and Balwani's control and knowledge of Theranos's operations, including the Safeway relationship, and its projects with pharmaceutical companies; their knowledge of problems with Theranos's technology; and Theranos's business plan.  Evidence regarding the Safeway relationship tends to show Holmes and Balwani's financial projections to investors were false and lacked basis.

## VI.    False and misleading representations made to journalists.

The government may offer evidence of the following:

In a September 8, 2013 article in the Wall Street Journal titled "Elizabeth Holmes: The Breakthrough of Instant Diagnosis," a journalist wrote, based on information supplied by Holmes and other Theranos representatives:  "Theranos's processes are faster, cheaper, and more accurate than conventional methods and require only microscopic blood volumes, not vial after vial of the stuff."  The article also stated that Theranos's technology could "run any combination of tests, including sets of follow-on tests, at once, very quickly, all from a single microsample." According to the article, Theranos's technology could achieve much lower variance ranges for a given test, with Holmes claiming that the company's tests have margins of "allowable error" targets less than 10%.  These statements suggested that Theranos's tests were advanced and accurate, although Defendants knew that Theranos's assays experienced frequent accuracy and reliability problems.  [MEDIA-000191]

In a November 6, 2013 video published by Wired, Holmes stated:  "We built the first laboratory capable of processing any of our laboratory tests from a tiny droplet of blood, or what we call a microsample.  So that, for the first time, people can get any of the laboratory tests that we do from a fingerstick, instead of having to do phlebotomy."  Holmes similarly claimed:  "And because we've made it possible to do testing  on any analyte from the same microsample, unlike today where you have to draw a dedicated tube for each type of test you need to run, here we don't."  Describing Theranos's purported automation aimed at removing lab error, Holmes said: "Then it becomes  a question of how much we can minimize the variability that traditionally contributes to error in the laboratory process. 93% of error in the laboratory process is associated with what's called pre-analytic processing. So this is generally where humans do things - and it could be manually centrifuging a sample, it could be transport, temperature, all these different variances that can affect the analyte."  "And we have invested over the course of the last ten years in automating these processes so we could minimize variability and standardize the framework."  Holmes claimed that Theranos can do a "very large number of tests" ordered by physicians including some of the specialty and esoteric tests, noting that Theranos's first job was "figuring out how to do that from what we call the microsample, or the tiny sample.  So we spent years investing in a lot of infrastructure to be able to automate that process, and we also developed new tests, to be able to run the exact same analytes but from a tiny sample.  And we did this many times, in the context of being able to offer comprehensive laboratory services to physicians."  [MEDIA-000392]

In an interview for a November 18, 2013 article in Medscape titled, "Creative Disruption? She's 29 and Set to Reboot Lab Medicine - Elizabeth Holmes Plans to revolutionize testing by using tiny blood draws and offering near-instantaneous results," Holmes stated that

after "redeveloping every test that is recognized by Medicare in the form of a CPT (Current Procedural Terminology) code to be able to run it on a tiny sample," Theranos "focused a great deal on these tests and validated and verified them over the years, building an infrastructure that was highly automated and standardized such that the quality of the data that we generate could be used in an actionable manner by clinicians," minimizing variability.  Holmes also stated that Theranos was capable of automatically rerunning samples in response to out-of-range tests to provide additional information to doctors and patients.  These statements suggested that Theranos's tests were highly accurate and reliable, when Defendants knew that Theranos had not properly validated its assays and that its assays suffered from accuracy and consistency problems that made them unreliable for clinical use.  [MEDIA-000089]

In a November 27, 2013 video published by Fox Business, Holmes stated:  "By being able to make it possible to do any of our laboratory tests from a tiny droplet of blood, we've now changed the experience for people everywhere."  [MEDIA-000071]

In an interview for a February 18, 2014 article in Wired titled "This Woman Invented a Way to Run 30 Lab Tests on Only One Drop of Blood," Holmes touted Theranos's ability to provide test results quickly allowing for adaptive clinical trials where pharmaceutical companies could "change the dosing for a patient in real time or in a premeditated way, as opposed to waiting a long period and then deciding to change a dose."  These statements suggested that Theranos's tests were accurate and reliable enough to support real-time dosing adjustments in clinical trials, although Defendants knew that Theranos's assays suffered from serious accuracy and consistency problems.  [MEDIA-0000365]

In an interview for a March 1, 2014 article in Wired titled "One Drop, Infinite Data: How Elizabeth Holmes Built a Better Blood Test," Holmes stated:  "We built the first laboratory capable of processing any of our laboratory tests from a tiny droplet of blood, or what we call a microsample.  So that, for the first time, people can get any of the laboratory tests that we do from a fingerstick, instead of having to do phlebotomy."  Holmes also discussed minimizing variability, and claimed:  "93% of error in the laboratory process is associated with what's called pre-analytic processing.  So this is generally where humans do things - and it could be manually centrifuging a sample, it could be transport, temperature, all these different variances that can affect the analyte… And we have invested over the course of the last ten years in automating these processes so we could minimize variability and standardize the framework."  These statements suggested that Theranos's tests were accurate and consistent, with low variability.  Defendants knew that Theranos relied on venous draws for many of its tests, that it did not use a high level of automation, and that the company's assays experienced repeated accuracy and consistency problems.

In a June 14, 2014 article in Fortune titled "This CEO is Out for Blood," based on interviews with Holmes, a journalist wrote that Theranos offered more than 200—and was ramping up to offer more than 1000—of the "most commonly ordered blood diagnostic tests, all without the need for a syringe."  The article also discussed the small size of Theranos's proprietary analyzers and claimed that Theranos did not buy analyzers from third parties.  The article attributed to Holmes a claim that Theranos was submitting all of its tests for FDA approval though it was not obligated to do so.  These claims, which Holmes originated and

approved prior to the article's publication, presented Theranos's technology as mature and advanced, and therefore reliable.  In fact, Defendants knew that Theranos relied on venous draws and large, third-party analyzers for many of its tests, and experienced frequent accuracy problems.  [MEDIA-000012]

In an interview in connection with a July 8, 2014 article in USA Today titled "Change Agents:  Elizabeth Holmes Wants your Blood," Holmes stated:  "Over the last 10 years, Theranos has worked to redevelop all the tests run in a traditional laboratory to be able to take a tiny sample, a few droplets of blood, instead of the big tubes, that are traditionally drawn from an arm."  This statement suggested that Theranos's technology was advanced and as reliable as traditional laboratory tests, but Defendants knew that Theranos's assays suffered from regular accuracy and consistency problems.

In a July 8, 2014 video published by USA Today, Holmes stated:  "Over the last 10 years, Theranos has worked to redevelop all the tests run in a traditional laboratory to be able to take a tiny sample, a few droplets of blood, instead of the big tubes, that are traditionally drawn from an arm. And we've made the tests from these few droplets of blood available at prices that are unprecedented for Medicaid members, Medicare members, and everybody else, to be able to access the test they need."  [MEDIA-000449]

In a July 10, 2014 video published by Fox Business, Holmes stated that Theranos was beginning to work with hospital systems including InterMountain Health in Utah and Dignity in California.  Holmes also claimed that Theranos was working with UCSF to be able to bring its testing capabilities into the hospital setting along with the outpatient setting.  [MEDIA-000069]

In a September 8, 2014 video published by TechCrunch, Holmes stated that Theranos had developed a process" to replace the traditional phlebotomist, or the process of getting big tubes of blood from the arm," with "tiny nanocontainers, which you'll see just collect a few drops."  In that video, the host had his blood drawn by finger-stick as a demonstration.  Holmes also stated that Theranos had been generating cash from operations for some time, first through its work for pharmaceutical companies a year or two after the company was started.  Holmes claimed that that was the platform on which they had built the business.  Holmes claimed that, once nanotainer samples arrived at Theranos's lab:  "what we've done is re-develop all the chemistry associated with running these tests on traditional platforms to make it possible to run any laboratory test from a tiny droplet a blood."  Holmes went on to claim:  "And we've also built out novel analytical systems on which to run the chemistries, because traditional instrumentation requires much larger tubes of blood.  And then that data will be electronically sent to the ordering physician and integrated into their EMER systems, for example."  [MEDIA-000447]

In a video published on approximately October 8, 2014 by Fortune, Holmes touted the company's ability to run "every laboratory test" "on a tiny droplet of blood," and claimed that the company's tests were "highly automated to ensure the integrity of the process and integrity of the data."  Holmes went on to explain:  "We went through redeveloping every test that is run in a traditional laboratory to be able to operate on these tiny volumes of blood or other fluids - we do urine testing, feces testing, swaps and all sorts of other fluids.  And went test by test to be able to do that. And then we had to redevelop the analytical system to run those tests because

traditionally very large tubes of blood are required in order to run these tests, in traditional labs, and different tubes of blood are required - you need the green top, and the purple top, and the rainbow top, and all these other tops. And then we invested very heavily in software in the context of automating the traditional analytical process - and importantly what's called the pre-analytical and post-analytical processes wherein humans are traditionally involved in doing things like manually handling samples, centrifuging them, leaving them on counters.  And that's where 93% of the error and variability is introduced.  So we worked to design a process that is highly automated to help to minimize that variability and error."  These statements presented Theranos's tests as accurate and reliable due to their advanced nature and use of automation, but Defendants knew that Theranos did not heavily automate its testing procedures and that its assays suffered from regular accuracy and variability problems.  [MEDIA-000433]

During a video of a media appearance dated approximately October 16, 2014, Holmes claimed that Theranos was doing all R&D around their own platform, and had spent the last ten years redeveloping chemistry on a test-by-test basis.  [MEDIA-000070]

During a TEDMED speech in approximately November 2014, Holmes stated that Theranos had "made it possible to run comprehensive laboratory tests from a tiny sample, or a few drops of blood, that could be taken from a finger."  In fact, Defendants knew that Theranos could not run all laboratory tests from a fingerstick sample, and were aware that Theranos's assays suffered from accuracy and consistency problems that rendered them unreliable as clinical laboratory tests.  [MEDIA-000448]

During an appearance in connection with a December 5, 2014 article in The New Yorker titled "Blood, Simpler," Holmes stated that Theranos's blood tests "can help detect dozens of medical conditions, from high cholesterol to cancer, based on a drop or two of blood drawn with a pinprick from your finger."  Balwani is quoted in that article as saying, "Our platform is all about automation… we have automated the process from start to finish."  Holmes also claimed that Theranos had data showing "a perfect correlation between a fingerstick and a venipuncture for every test that we run," and that there had been "tens" of audits and "external third-party comparisons" of Theranos's tests.  Holmes also claimed not to have any government contracts but stated that Theranos earned revenue from the military, with Holmes stating that it was an important area in terms of potential for saving lives.  In fact, Defendants knew that Theranos had not significantly automated its testing protocols, that there were important differences between capillary and vein blood in the context of several of its assays, that third parties had not conducted comprehensive comparisons of Theranos's tests, and that the company's tests suffered from accuracy problems that made them unreliable for medical diagnoses.  [MEDIA-000173]

In a December 8, 2014 video published by Fortune, Holmes stated:  "We've done that by making it possible to do any lab test from a tiny drop of blood from a finger instead of having big needles stuck in your arm and tubes and tubes of blood taken out."  In that same video, Holmes claimed that Theranos could conduct all sorts of tests on a single drop of blood 1/100th to 1/1000th the amount that would normally need to be drawn.  Speaking to the accuracy of Theranos tests, Holmes stated:  "We defined our mission as access to actionable information at the time it matters.  And the information is only actionable if it is of the highest level of integrity, highest level of quality.  Which means we've done a huge number of studies over the last 11 and

43

half years to get to the point in which the data could be of that quality.  And so we have been, for example, proactively submitting every single one of our tests to FDA because we believe it's so important in terms of a quality stamp.  I think about it as my mom goes and gets a test at one of these locations, I want to know, every single time, that the data is flawless no matter what. So our approach has been to embrace regulation, because we see it as critical to realizing our mission."  [MEDIA-000433]

In a March 1, 2015 article published by Wired, Holmes stated that Theranos can "get results, on average, in less than four hours," which she claimed was very helpful for doctors and patients.  Holmes also stated that Theranos was "able to do all the testing using just a single microsample, rather than having to draw a dedicated tube for each type of test."  [MEDIA-000045]

In a March 9, 2015 video published by Fox Business, Holmes stated:  "We have spent the last, now almost 12 years, redeveloping every laboratory test to make it possible to run on tiny samples."  [MEDIA-000043]

During an April 16, 2015 appearance on CBS This Morning with a segment title "Blood Sweat and No Fear," Holmes stated:  "First we've created these little tiny tubes, which we call the nanotainers.  Which are designed to replace the big traditional tubes that come from your arm. And instead allow for all the testing to be done from a tiny drop from a finger."  This statement presented Theranos's technology as novel, advanced, and reliable.  Defendants knew that Theranos's assays suffered from repeated accuracy problems that rendered them unreliable.

In a video published by CNBC on approximately April 27, 2015, Holmes held up a nanotainer and stated that it was "designed to replace the big vials that you take out of your arm when you draw blood traditionally, with a tiny drop that can come from a finger."  [MEDIA-000424]

During a June 3, 2015 appearance on PBS / Charlie Rose, Holmes stated that Theranos didn't talk about its work for a long time because "we wanted to do it and then talk about it." Holmes also stated that Theranos produces the same results from its fingerstick tests that one would get if he or she went to a doctor and had them draw a vial of venous blood, claiming "effectively equivalent or identical results."  Holmes also addressed the purported chemistry, hardware, and software advances that allowed Theranos to work with small samples, and stated that Theranos was going through the FDA approval process because FDA was the "gold standard" and that was "the way to do this for lab testing because the data is so important." Holmes also claimed that the FDA approval process would present an opportunity for Theranos to show "our performance, and the accuracy of our tests."  These statements presented Theranos's tests as advanced, valid, and accurate.  Defendants knew, however, that FDA was requiring Theranos to seek approval, and that Theranos's assays experienced frequent accuracy and consistency problems.  [MEDIA-000443]

In connection with a June 27, 2015 article in the Economist, Holmes claimed that she spent ten years with the company in stealth mode without press releases or a company website.

Holmes claimed that, during that time, she perfected a way of doing hundreds of tests cheaply and quickly on a drop of blood, using lab-on-a-chip technology.  [MEDIA-000024]

During a September 10, 2015 interview at the Commonwealth Club, Holmes stated that Theranos's job was "to ensure that we provide the highest quality service, for every person, person by person," noting that the stakes in the industry were high:  "… you can't compromise on quality here. It's not a website, where if you know, oops, we didn't QA that thing, that's just not going to fly, right."  Holmes also claimed:  "Once you're in there, we can do many of our tests with very, very small samples of blood that can be taken from a finger.  As opposed to with big tubes of blood from the arm.  And so that means, you could get a finger stick, and with a few drops of blood, have your test done. And we've built  a backend infrastructure that allows for those tests to be run very quickly, so you'll get results in as close to real time as possible."  These statements suggest that Theranos was committed to providing the highest quality test results, but Defendants knew that Theranos's tests suffered from regular accuracy and consistency problems that rendered them unreliable.  [MEDIA-000430]

In a September 29, 2015 video published by CNBC, Holmes stated:  "Theranos has committed to an unprecedented level of transparency in our work."  "…We're the only lab to publish our proficiency testing score (which are our audit  scores as a lab).  We're the only lab to publish our data now through FDA decision summaries by being the first lab to submit all of our tests to FDA.  And we're the only lab to advocate for FDA regulation of lab developed tests, because we believe so strongly, that in order to realize a world in which prevention is a reality you have to hit that quality standard."  [MEDIA-000458]

During the October 8, 2015 Forbes 30 Under 30 Summit, Holmes claimed that Theranos relied on venous draws for "specialty tests" (like the Russell Viper venom assay) to give patients an alternative to more expensive labs that would charge them thousands of dollars.  Holmes also stated during that appearance that there are many technology companies that had grown too fast. Holmes claimed that Theranos was working in an area that was mission critical where you can't go too fast because what matters is the quality and integrity of what Theranos does and the people it serves.  [MEDIA-000432]

In an October 8, 2015 video published by Vanity Fair, Holmes stated:  "I think about it all the time in the context of my mom, and the information that we're generating, she does all of her tests through us, knowing that we're right every single time, and knowing that we're not compromising on quality, and knowing that we're, in every action that we take, approaching this with the seriousness that it deserves"…. "because it's not just building a glucose meter or cholesterol test, it's redeveloping 3,000 tests. And that is, that's a very long-term project. So we knew what we were getting into, but this is a space in which there aren't shortcuts."  Holmes also claimed that Theranos had invested a lot in being able to redevelop every test or every assay that's run in a traditional laboratory to be able to run on tiny drops of blood.  These statements represented that Theranos's tests were 100% accurate and that the company had taken the time it needed to perfect its technology.  Defendants knew, however, that Theranos had failed to conduct proper validation studies, and that its tests experienced regular accuracy and consistency problems.  [MEDIA-000450]

During an October 15, 2015 appearance on Mad Money, Holmes claimed that Theranos had sent the Wall Street Journal "over a thousand pages of documentation demonstrating that the statements in their piece were false," and that partners like Cleveland Clinic and Walgreens had "seen our technology, worked with us, they've used our systems, and they understand what we're doing." Holmes also pushed back against claims that Theranos did the majority of its tests with commercially available machines, claiming that those devices were needed as a result of Theranos's decision to expand its test menu to include "all the specialty and esoteric tests that are traditionally run only very infrequently but cost a huge amount of money." Holmes claimed that Theranos had already done extensive testing, including a 900-patient study demonstrating the correlation between venous and finger-stick test results. Holmes claimed that such testing had been done "over and over again, for every single test." These statements suggested that the facts in that day's Wall Street Journal story were inaccurate and that Theranos could prove through documentation and qualified third-party confirmation that its technology was valid. Defendants knew, however, that the facts in the WSJ article were true, that Theranos's tests had regular accuracy and consistency problems, and that third parties had not used and validated Theranos's technology. In this same appearance, Holmes also repeated the false statement that Theranos relied on venous draws primarily for specialty tests. [MEDIA-000423]

On or about October 15, 2015, Holmes caused Theranos to issue a Statement from Theranos falsely denying the allegations in the Wall Street Journal article that same date. [THER-0592390]

In an October 21, 2015 video published by Wall Street Journal Live, Holmes claimed that Theranos had "never used commercially available lab equipment for fingerstick-based tests." Holmes further stated that Theranos's decision to collect fingerstick samples only for HSV had nothing to do with the tests, methodology, or accuracy of performance of Theranos's technology. Holmes further claimed that Theranos had voluntarily decided not to use its nanotainer tubes as part of its switch to the FDA system. During that same video, Holmes claimed that the company's rate of venous tests had increased due to the company's decision to offer rarer "esoteric" tests, and that these "specialty" tests were the cause of decreased fingerstick use at Theranos. Holmes also stated that those specialty tests used commercially available analyzers because they hadn't yet been transitioned to Theranos's proprietary instruments. These statements suggested that Theranos's technology was mature and capable of producing accurate and reliable results, but Defendants knew that problems with Theranos's tests required reliance on third-party devices for fingerstick and venous samples and that Theranos's assays were not sufficiently reliable for clinical use. [MEDIA-000452]

As reported in an October 22, 2015 article in the New York Times, Theranos claimed that it could do many different medical tests sing only a tiny amount of blood taken with a finger prick. The article also repeated Theranos's claim that it used proprietary lab equipment to deliver results much faster and more cheaply than traditional blood tests, which in some cases require several vials of blood to be drawn from the arm and several days to get a result. [MEDIA-000009]

In a November 2, 2015 video published by Fortune in connection with its Global Forum, Holmes stated that Theranos had "developed hundreds of tests over the course of the last 12

years that can run a tiny sample using proprietary Theranos technology." Holmes also claimed that Theranos was temporarily not using its proprietary sample collection device because it was transitioning to the "FDA quality system." When question about whether Theranos would still be able to achieve its goal of doing "comprehensive tests" from a finger stick, Holmes replied, "Absolutely, and we've done it in the past and we're going to continue to do it in the future." In that same video, Holmes claimed that Walgreens had not told them that they were stopping expansion to new stores, and stated that the two companies were looking at what the next steps would be in the relationship. [MEDIA-000042]

In a video published by CNN on approximately August 1, 2016, Holmes claimed that the company's black box / minilab was designed to allow the same operations that a technologist could do in a laboratory, with the video further claiming that the minilab could run up to 40 different tests on a tiny sample of blood. [MEDIA-000427]

*False statements made to Fortune's Roger Parloff*

In a series of interviews and meetings with journalist Roger Parloff, Holmes and Balwani made a number of false and misleading statements. Those statements ended up underlying articles that Parloff wrote about Theranos.

In a December 3, 2014 conversation with Parloff, Holmes stated that Theranos was making it possible to do any lab test from a tiny drop of blood from the finger instead of tubes of blood, and that Theranos could do all kinds of tests from a single drop of blood. She also claimed that Theranos's future was about scalability and replicability as they expanded across the country. She stated that test information is actionable only if it's of the highest level of integrity and quality, and claimed that Theranos had done a huge number of studies over the last 11 years to get to that point. [PARLOFF-0000183

In an April 7, 2014 conversation, Holmes stated that Theranos's tests did not exhaust the sample, and that that achievement is what took the company ten years and required the creation of infrastructure that could handle those microsamples. [PARLOFF-0000184]

In another April 7, 2014 conversation, Holmes claimed that there were many breakthroughs underlying Theranos's capabilities. She also stated her purported philosophy that it is important to execute first before talking about achievements. She further claimed that pharmaceutical work was an important part of Theranos's business. Holmes denied having anyone special in her life and stated that Theranos takes all her attention. [PARLOFF-0000185]

In an April 8, 2014 conversation, Holmes stated that she considered Theranos's progress to be revolutionary—especially the speed of Theranos's tests, with the company able to get information to doctors at the time they are seeing the patient. Holmes again claimed that Theranos's methods preserved enough of samples to conduct retests. Holmes claimed that Theranos had a revolutionary level of quality and a very low CV. She stated that Theranos does all sorts of different tests from microsamples such as CBC and others. She claimed that Theranos had done more than seventy from a single microsample. [PARLOFF-0000186]

During another April 8, 2014 conversation, Holmes stated that there was a high probability that Theranos would implement with UCSF and others.  She stated that Theranos was not exclusive with Walgreens but could open with other partners too.  She stated that the company had done so much work but never published, and said that those studies would proceed soon.  [PARLOFF-0000187]

That same day, Holmes stated that Theranos offered the same tests as a traditional lab but with a smaller sample size, claiming that the only difference was the sample size.  She touted Theranos's built-in capabilities for automatic follow-on tests and reflex testing.  [PARLOFF-0000188]

On April 9, 2014, Balwani told Parloff that Holmes was the most important inventor of their time.  He claimed that they had been patient with Theranos, taking a decade to get where they were.  He stated that they were seeing Moore's Law in action, with Theranos being able to do a lot more every eighteen months.  [PARLOFF-0000199]

On April 10, 2014, Holmes told Parloff that the major change with Theranos was the sample volume, and that Theranos had proprietary technology, and asked Parloff not to refer to the technology as "devices," but rather proprietary tests and systems to handle tiny samples.  She told Parloff that she did not want to get into how many devices Theranos had, but went on to refer to a single analytical system and piece of hardware that takes up a lot less space than a traditional device.  Holmes added that the Theranos machine is manageable for the military unlike competing technologies, and that the military was one application of Theranos's tech. [PARLOFF-0000189]

On May 12, 2014, Holmes told Parloff that they had comparative studies and validation data on Theranos's website and that no other labs do that.  She stated that Theranos did proficiency testing more than required and did QC weekly.  She stated that there was no need to publish their data before launch because their contracts were with pharma companies.  She claimed that Theranos had correlations for every test and that they were seeking FDA clearance or approval for every test, and that the analyzer was approved as part of test approval. [PARLOFF-0000190]

On that same day, Holmes told Parloff that Theranos's platform can do all of the hundreds of tests that Quest can do on many different types of samples.  Holmes said that Theranos processes the samples in a different way.  She stated that Theranos would not sell its technology because they were trying to build a wonderful experience for individuals and physicians and make health info accessible and actionable.  Holmes said that they had oversight and QC in place to assure integrity of data, recognizing the importance of information used for decision-making.  Holmes said that criticism of fingerstick testing was absolutely false and that Theranos had demonstrated that with data.  Holmes said that Theranos still conducts venipuncture because they were scaling as they built inventory and capacity, using vein draws to handle high volume of samples.  Holmes stressed that Theranos's whole business was about eliminating venipuncture.  Holmes added that Theranos could process all sample types. Explaining her sensitivity around the word "device," Holmes stated that it was due to trade

secrecy concerns because the fact that Theranos had a single device that could perform any test was a big deal.  [PARLOFF-0000191]

On May 21, 2014, Holmes stated that Theranos had deployed its systems to pharma and military over the years.  Now that the company had a test menu, infrastructure, and ability to serve, it could enter the core clinical care space.  When asked to explain the discrepancy between the 200 tests listed on Theranos's website and the claim that Theranos could handle 1000 CPT codes, Holmes stated that the number of tests on the website was expanding and that Theranos could conduct more tests (that were operationalized) even if they weren't listed on the website.  Holmes also claimed that Theranos could match a long list of Quest capabilities.  Holmes reminded Parloff again not to reveal that Theranos had one device that could do all testing, promising to get him approved language on that issue.  Holmes said that Theranos averages four-hour turnaround time in California and hours as opposed to days in Arizona.  [PARLOFF-0000192]

On May 28, 2014, Holmes distinguished between their website's claim of tests being validated under FDA and other guidelines but not yet approved.  Holmes claimed to have much more data regarding clinical validation that was not on the Theranos website.  Holmes also explained CAP accreditation claims and stressed that Theranos didn't want to be audited by someone from a competing company.  Holmes talked about proficiency testing and claimed that Theranos scored 100%.  Holmes stated that labs don't submit LDTs for peer-reviewed journals.  When confronted about Dignity and Intermountain's status with Theranos, Holmes claimed not to know and said she would get back to Parloff.  Holmes promised to send Parloff pharma reports going into the device in detail.  [PARLOFF-0000193]

On June 2, 2014, Holmes told Parloff that Dignity had actually assessed Theranos's technology.  She also stated that Theranos was not changing test methods, just optimizing chemistry to be able to run small tests.  Holmes said that she was ok with Parloff saying Theranos had "devices" but stressed that she didn't want the article to say Theranos had one device that could do everything and that that would be the follow-on story.  In the meantime, she requested that the article talk about "analyzers" to keep it ambiguous.  When asked to describe the size of the device, Holmes said it was bigger than a CPU.  Holmes stated that Theranos was still involved in pharma clinical studies and had been continuously since 2005.  Holmes claimed that Theranos could perform as many as 70 different tests from a single drop.  She also mentioned that she had met Balwani before 2004 but omitted the fact that they were dating.  [PARLOFF-0000194]

On November 17, 2014, Holmes said that UCSF wanted to send samples to Theranos but that Theranos was too busy, though they worked with UCSF when they did their test validation.  Holmes discussed a purportedly novel method of DNA amplification that was specific to Theranos.  Holmes said that Theranos's machines would become public when they went out, and would look the same as what Parloff had already seen.  [PARLOFF-0000195]

On February 2, 2015, Holmes told Parloff that Theranos had been making sure its locations realize excellent patient service and meet a high quality standard.  She also claimed to be working with FDA to create a model for regulation of LDTs.  [PARLOFF-0000196]

On July 1, 2015, Holmes told Parloff that FDA was the highest bar for performance of Theranos's systems and that Theranos's interactions with FDA constituted a milestone.  Holmes promised that Theranos would receive a waiver allowing them to go into retail.  Holmes said that Theranos had 140 submissions to FDA with the goal of getting 140 clearances.  She told Parloff that Theranos had published all of its PT data.  She said that, of the 140 tests under submission, they would all be able to be run on finger-stick samples, but in some cases would run on other matrices partly to demonstrate that Theranos could return the same results for the two sample types.  Holmes explained that Theranos had its high complexity lab in Newark, its moderate complexity in Scottsdale, and said that all LDTs were run at the high complexity location, where Theranos's QC showed the integrity of the tests.  Holmes then stated that that year, Theranos had gone live with a reference lab service offering low cost.  Theranos would do traditional venipuncture, sometimes on traditional equipment, as part of that service, but that Theranos was working to get more tests running on capillary samples.  Holmes again steered Parloff away from stating that Theranos had one system capable of running clinical chemistry, DNA, and immunoassays because she did not want people to know it was the same machine.  Holmes also stated that all of Theranos's machines were registered proactively with FDA.  Holmes further explained the distinction between Theranos's lab locations, claiming that Theranos conducted its reference lab testing in Phoenix, after previously telling Parloff that the reference lab focused on esoteric tests.  [PARLOFF-0000198]

****

The evidence described above is offered for the permitted purpose of motive, opportunity, intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy.

Evidence that Holmes and Balwani made false and misleading statements to journalists tends to show Defendants' plan, preparation, and intent to defraud victims by transmitting misleading information to them indirectly through the press.

Evidence that Holmes and Balwani repeatedly made the same false and misleading statements to journalists tends to show their intent to defraud and absence of mistake.

Evidence that Holmes and Balwani repeatedly made the same false and misleading statements to journalists tends to show the existence of the conspiracy.

Evidence that Holmes deceived journalists regarding the capabilities of Theranos's analyzer tends to show Defendants' intent to defraud victims and the existence of the conspiracy.

Evidence that Holmes deceived journalists regarding the nature of Theranos's relationships with partner companies and government agencies tends to show Defendants' intent to defraud and their plan to associate themselves with well-regarded organizations that would boost their credibility.

Evidence that Holmes deceived journalists regarding the extent to which Theranos's technology had been validated by independent reviewers tends to show Defendants' intent to defraud by discouraging skepticism regarding Theranos's tests.

Evidence that Holmes deceived journalists regarding Theranos's reliance on third party devices tends to show Defendants' intent to defraud and consciousness of guilt.

Evidence that Holmes deceived journalists regarding Theranos's regulatory status tends to shoe Defendants intent to defraud by convincing victims that Theranos's technology had the government's stamp of approval.

Evidence that Holmes and Balwani deceived journalists regarding Theranos's achievements tends to show Defendants' motive to elevate their own status and that of Theranos by burnishing the company's reputation with the public.

## VII.   Fostering culture of secrecy and forcing employees and others to sign non-disclosure agreements.

The government may offer evidence of the following:

- Statements by David Boies to the effect that Holmes had an intense focus on confidentiality, almost paranoia that Quest and Labcorp would find out Theranos technology.  Holmes told the board to keep everything as protected and confidential as possible.  Holmes certainly made the point to the board of not discussing Theranos technology outside of the board meetings.  In general, Holmes was "obsessive" about confidentiality and did not want board members talking about the company at all.  US-REPORTS-0009314.

- Statements by Steve Burd to the effect:  "Holmes was very secretive.  He thought it was a highly secretive company, like other technology companies."  US-REPORTS-0000001.

- Statements by Sarah Cabayan to the effect that Theranos kept teams partitioned and did not allow them to communicate with each other.  US-REPORTS-0000399.

- Statements by Dr. William Clarke to the effect that "[h]e did not like the amount of secrecy at THERANOS."  US-REPORTS-0000575.

- Statements by Erica Cheung to the effect "I was nervous to make the complaint because the whole company really sort of made me uncomfortable . . . . The way that they were sort of handling secrecy and the fact that vendors would come in, we would have to hide things from people, we were constantly hiding things from all sorts of people, whether it was regulators or whether it was outside vendors . . . At this time when I left this job I also [saw] just how aggressive that Sunny was in talking to him . . . ."  PFM-DEPO-00004985.

51

- Statements by Michael Craig to the effect that Holmes and Balwani fostered a culture of secrecy and forced employees to sign non-disclosure agreements.  US-REPORTS-0009787; US-REPORTS-0009794 to 0009845; THPFM0000979564 to 571.

- Statements by Andrea Cuppoletti to the effect that "CUPPOLETTI thought THERANOS was very secretive.  CUPPOLETTI would receive emails with lists of words he could not tell people."  US-REPORTS-0000613.

- Statements by Diana Dupuy to the effect that Theranos was a toxic place that had a "screw you" mentality.  US-REPORTS-0015604.

- Statements by Daniel Edlin to the effect that "EDLIN did not ask questions about testing because he did not have a need to know.  Information was siloed at THERANOS, meaning there was no encouragement to talk to other people from other groups.  There was some level of secrecy as to what people were working on.  EDLIN was told he could not tell people outside THERANOS what he was working on.  EDLIN was told not to discuss certain things discussed at meetings with other people at THERANOS.  It eventually became a part of EDLIN's understanding as to what he could discuss with others inside and outside THERANOS.  EDLIN was also told to not discuss the DOD discussions with others."  US-REPORTS-0004548.

- Statements by Kerry Denise Elenatinoba-Johnson to the effect that "THERANOS was very secretive.  A woman fainted and they would not let the emergency crews into the office area."  US-REPORTS-0000807.

- Statements by Surekha Gangakhedkar to the effect that Theranos had a strong non-disclosure agreement.  She was not supposed to talk to anybody about the work she did, not even her spouse.  At one point, she was asked to remove information from her Linkedin.com profile.  Much of the data generated at Theranos was kept confidential and the individual groups within Theranos had access to only their particular subset.  US-REPORTS-0000813.

- Statements by Robert Gordon to the effect that "Theranos seemed extremely concerned that having the box in a place where it might be viewed would be damaging to its business."  PFM-DEPO-00017581 at 71-72.

- Statements by Christian Holmes to the effect that "BALWANI fostered the siloed culture at THERANOS which resulted in not having open lines of communication.  At first, CHRISTIAN did not think THERANOS was siloed, but started to notice it more as the company grew and around the time of the WALGREENS launch.  BALWANI said THERANOS was set up this way because he did not want miscommunication between people, however, CHRISTIAN did not agree with this management style at the time.  ELIZABETH

was aware of this siloed culture, but she deferred to BALWANI. . . . CHRISTIAN thought BALWANI reacted irrationally when people gave negative opinions.  He would remove people from projects unnecessarily."  US-REPORTS-0006904.

- Statements by Stefan Hristu to the effect that everyone in the company operated in a silo and this was made worse after Balwani started.  US-REPORTS-0013672.

- Statements by Henry Kissinger to the effect that "[t]here was a large amount of secrecy around THERANOS technology because HOLMES' machine was so unique.  HOLMES was willing to show the machine, but she was not willing to show how it operated. The machine was not only the core of the business, but it was the business."  US-REPORTS-0005021.

- Statements by Chris Lucas to the effect that "[b]etween 2006 and the investment in 2013 HOLMES was very secretive about THERANOS.  LUCAS typically knew much more information about other companies in which he invested but for THERANOS he had almost no information provided to him in written form HOLMES would give presentations and bring the device to show to the group of investors."  US-REPORTS-0009029.

- Statements by Seth Michelson to the effect that "MICHELSON described the culture of Theranos as secretive and a Stalinist silo."  US-REPORTS-0013835.

- Statements by Tony Nugent to the effect that "NUGENT thought THERANOS had a culture which was siloed."  US-REPORTS-0004562; US-REPORTS-0004571 to 0004608.

- Statements by Channing Robertson to the effect that "[h]e understood Theranos employees did not widely share what they were working on.  It was part of Theranos culture HOLMES never said anything specific regarding this and ROBERTSON never received any instructions regarding secrecy."  US-REPORTS-0009716.

- Statements by Kim Romanski to the effect that "Theranos had a culture of secrecy no transparency they were constantly changing their minds and everything had to go through HOLMES who made all decisions."  US-REPORTS-0012779.

- Statements by Callie Raquel Rosendin to the effect that "[t]he culture at THERANOS was very intense and secretive. . . . ROSENDIN's concerns with THERANOS as a company were in regards to the culture which she described as oppressive and strange.  ROSENDIN further advised people were fired often at THERANOS."  US-REPORTS-0002366.

- Statements by Adam Rosendorff to the effect that "[h]e further described the Normandy lab as secretive.  Dividers were installed in vendors were present." US-REPORTS-0007227.

- Statements by Tyler Shultz to the effect that he formed the impression that Theranos had secretive culture.  PFM-DEPO-00004761-62.

- Statements by Rebecca Walker to the effect that "WALKER knew within the first week that she did not want to continue working at Theranos because she did not like the culture or the way they treated people.  The company was very secretive and private.  Accordingly Theranos employees were not allowed to talk to each other despite being in an open office space.  WALKER made a friend while she was working there but in order to talk to her she would text her friend to meet her in the bathroom so they could talk.  There was a list of words which employees were not allowed to use in emails which included screw and lamp."  US-REPORTS-0014774.

- Statements by Daniel Young to the effect that "Theranos teams operated in silos with secrecy between teams.  YOUNG deduced this was to prevent secrets from leaving Theranos."  US-REPORTS-0007694.

- Statements by David Nathan Zalatan to the effect that "THERANOS was a very secretive company."  US-REPORTS-0002523.

- Statements by Lisa Zuckerman to the effect that "Theranos had a bizarre culture and they seemed paranoid and secretive."  US-REPORTS-0002526.  In addition, at or around the time of Dignity's investment, "[d]ue diligence on Theranos was extremely limited given the secrecy and lack of transparency in which Theranos operates."  SEC-USAO-EPROD-000067767.

On or about June 22, 2013, Holmes instructed her assistant, when making dinner reservations at a Michelin-rated restaurant for meetings with Walgreens, that they wanted "the most private, enclosed dinner / meeting area."  SEC-USAO-EPROD-001191535.

At or around the time of his interview (in which he met with Holmes and Balwani), Dr. Rosendorff was not permitted to tour the CLIA lab.  *See, e.g.*, Rosendorff Deposition/I*n re Arizona Theranos Inc. Litig.* at p.31.

In or around December 2014, Balwani's and Theranos's HR director had Dr. Rosendorff delete emails he had forwarded to himself before resigning from Theranos.  "Sunny was exhibiting – trying to strong-arm me into deleting emails that I'd e-mailed to myself and threatening legal action and being intimidating, and I just wanted to meet with Elizabeth to sort of protect me from Sunny, I guess. . . . [H]e said that the HR director, Mona Ramamurthy, was going to sit down with me in front of my Gmail and make sure I deleted anything with reference to Theranos, then she was going to go through my Gmails. . . .  He was just being really aggressive."  *Id.* at 180-182; TS-0042709; TS-0042716; BALWANI-SEC_000340 to 344

(Rosendorff testimony in *Colman* case that "Sunny was harassing me" to delete his emails and forcing him to sign affidavit after termination).

In May 2015, Askon Niroomand advised Holmes and Balwani's head of HR: "the division between labs and strict secrecy procedures further increases these compliance and workflow issues. . . . Suppressed communication between employees, even within the same department, makes collaboration harder, increases the chance of errors and redundancies, prevents trust, and hurts employee motivation." THPFM0005579073.

On or about September 25, 2015, Erika Cheung told CMS: "Theranos takes confidentially and secrecy to an extreme level that has always made me scared to say anything. I really hope you do all you can to protect my identity from Theranos." PFM-DEPO-00005081.

****

The evidence described above is offered for the permitted purpose of motive, opportunity, intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy. Holmes and Balwani's fostering of a culture of secrecy tends to show consciousness of guilt and tends to show a belief that transparency would expose the falsity of what they claimed to investors, patients, and others. The evidence tends to show an agreement between Holmes and Balwani. Evidence that Holmes and Balwani forced employees and others to sign non-disclosure agreements tends to show consciousness of guilt and tends to show a belief that transparency would expose the falsity of what they claimed to investors, patients, and others.

## VIII.   Restricting access to laboratory areas within Theranos.

The government may offer evidence of the following:

Dr. Rosendorff, Theranos's former lab director, stated that he viewed Theranos's Normandy laboratory as secretive. He noted that dividers were installed in the lab when vendors were present in order to hide the devices that were being used. Rosendorff also stated that Balwani had dividers installed in Theranos's Normandy lab in order to hide the Tecan devices Theranos used in conducting tests using diluted samples. Rosendorff stated that he believes Balwani intended to hide the fact that Theranos was using sample dilution for its "proprietary" tests. In connection with the presence of the dividers during an upcoming inspection of the Normandy lab, Balwani instructed that, if the inspector asked, staff should say that "this area is for future growth and is being organized" but is "restricted to the CLIA lab and authorized team." [See, e.g., Rosendorff MOI, US-REPORTS-0007227; THPFM0005762828; THPFM5761698]

Rosendorff also stated that, when CMS audited Theranos in 2013, Rosendorff was instructed not to show the Normandy lab to the CMS inspector because it would be more "simple" to show only the lab containing the predicate devices as opposed to Theranos's

proprietary TSPUs.  To Rosendorff's knowledge, the inspector never saw the Normandy lab or asked to see the TSPU machines.  Rosendorff believed the instructions came from Holmes and Balwani through Daniel Young.  [US-REPORTS-0002388]

Jim Twitchell was employed at Theranos as the Quality Director, where his role was to provide management representation to leadership and make sure FDA regulations and standards were met.  He was involved in design control, quality acceptance, validation testing, and inspection procedures as well as regulatory compliance.  [US-REPORTS-0008515]  Twitchell worked in development of the Theranos box analyzer, working with R&D and the manufacturing side and assisting with validations in that capacity.  At Theranos, Twitchell put together a small quality group.  Even as Director of Quality for Manufacturing, Twitchell had no access to Theranos's CLIA lab.  Twitchell observed that Theranos used access-coded badges for employees, and that everything at the company was very compartmentalized and siloed.  This was in stark contrast to other similar positions he had held at other companies.  [US-REPORTS-0017560]

Godfred Masinde began working for Theranos in May 2014 and worked in the microbiology lab.  Masinde stated that the two sections of the lab—chemistry and microbiology—were divided and were never mixed.  He explained that there was a hallway in the middle that divided the lab into the two sides.  Employees' access badges only opened what they had access to.  Masinde could not enter the chemistry section of the laboratory in Newark despite his position as technical supervisor of the microbiology lab.  [US-REPORTS-0017553]

Elle Goldberg was a Theranos phlebotomist who worked at a Walgreens store in Arizona.  She received training from Theranos in the form of written materials and presentations, including several meetings.  At some point during her employment, she visited Theranos headquarters in Palo Alto and met Holmes.  Goldberg observed that the laboratory at Theranos was "very off-limits" and was not part of the tour that she received.  She had no knowledge of how blood was being tested at Theranos despite the fact that she was a phlebotomist who appeared in Theranos promotional materials.  [US-REPORTS-0017505]

Jerry Hurst is a clinical scientist and microbiologist hired by Theranos in 2011 because Theranos wanted to get licensed in California as a clinical lab and get CLIA certified.  Hurst helped Theranos through the process of setting up their infrastructure and navigating the paperwork.  During that time period, Theranos never told Mr. Hurst about any proprietary or LDT (laboratory developed test) or in-house proprietary testing they wanted to do.  The lab he helped them set up consisted of a small set of analyzers and test systems. During the time he was in that laboratory, he thought it was going to be just a traditional little laboratory. He had no idea at that time they were going to be performing LDTs.  As far as Hurst knew, Theranos was exclusively using FDA-approved test systems.  From 2013 onward, Hurst continued as an hourly consultant with Theranos.  He remembers Theranos being a "very controlling environment," with restricted access to areas of the facility.  Although he was a technical supervisor for Theranos for a period of time—a position that must come with unimpeded access to the lab—Hurst had to convince Theranos to allow him greater access.  From 2013 on, Hurst worked as a consultant for Theranos, advising on issues including proficiency testing.  The issues Theranos presented him with were routine, and Theranos never spoke to him about anything unique or proprietary in the

company's testing.  In 2013, Hurst conducted an audit of Theranos to advise them on compliance issues around their testing.  All they showed him were traditional FDA approved analyzers. They didn't tell him they modified devices to run diluted samples.  At Theranos, he was always under escort and told where to go, contrary to his experiences working for other labs.  Hurst never saw Theranos's proprietary analyzer, and they never talked to him about it.  Between 2013 and 2015, Theranos never informed Hurst the company was performing LDTs.  Hurst recalls that, at Theranos's Palo Alto offices, he was never allowed to go upstairs, and understood that the lab was downstairs.  Hurst had additional contact with Balwani and Theranos regarding an audit in 2015.  Again, Theranos never made Hurst aware of its proprietary analyzer.  Even during the 2015 audit, Theranos kept Hurst from discovering that the company was using LDTs and proprietary analyzers in its CLIA lab.  Every analyzer shown to him was an FDA cleared third-party device.  Based on the above, it is clear that Theranos took efforts to exclude Hurst from the sections of Theranos's offices and lab that contained its proprietary TSPU analyzers.  [See, e.g., 8/3/20 Report of Interview of Hurst, US-REPORTS-0017529]

Dr. Rosendorff stated that he recalls Balwani not wanting Hurst to learn about Theranos's methods—especially before the Walgreens launch.  [See, e.g., Rosendorff MOI, US-REPORTS-0007227]

**** 

The evidence described above is offered for the permitted purpose of motive, opportunity, intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy.

Evidence that Holmes and Balwani restricted access to Theranos's laboratory tends to show their intent to defraud victims by concealing the methods they used to conduct patient tests and hide their reliance on commercially available devices.

Evidence that Holmes and Balwani restricted access to Theranos's laboratory tends to show their knowledge that victims were unaware of their use of commercially available devices and their absence of mistake in misleading victims into believing that Theranos only used its own proprietary devices.

Evidence that Holmes and Balwani restricted access to Theranos's laboratory even as to consultants conducting audits tends to show Defendants' intent to defraud and the absence of mistake in misleading victims.

Evidence that Holmes and Balwani took steps to conceal portions of Theranos's laboratory from government inspectors tends to show their intent to defraud, consciousness of guilt, and absence of mistake.

/ /

IX.     **Harassing, threatening, or otherwise influencing doctors or patients who had negative experiences with Theranos.**

The government may offer evidence of the following:

- Statements by Dr. Adrienne Stewart to the effect that:

    *The Wall Street Journal* reporter, John Carreyrou, found Dr. Stewart's practice when he was in Scottsdale, Arizona.  She remembers telling him there were some pros and some cons to Theranos, and that she had some test results from them she was questioning; Theranos didn't like that.  Theranos was like "Oh, you're wrong."  Then they tried to discredit everything. When she spoke to Mr. Carreyrou, she wasn't expecting to be contacted by Theranos; the whole thing escalated quickly.  . . . [S]he's pretty sure the Theranos sales representative came in and Dr. Stewart told him that they were recently interviewed by *The Wall Street Journal*, which escalated things.  What Dr. Stewart is describing occurred in the Summer of 2015. . . . She thinks Theranos called her office and were persistent about meeting. They went ahead and met with some of the other doctors in the practice when she was out of town.  They showed up when she came back and at a time when she was seeing patients. Theranos had a bunch of people in the lobby, and she told them to come back a couple of days later.  They did, and she took the meeting.  In general, it was an intimidation tactic.  They presented her with a letter to sign retracting anything she said to the *Wall Street Journal* reporter.  There were three or four people from Theranos present at the meeting, including Ms. King and Mr. Balwani.  She described herself as "pretty sure" that Ms. King and Mr. Balwani were there.  Dr. Stewart felt intimidated.  They tried to discredit her as a doctor. . . . She did not sign the prewritten letter Theranos presented to her.  She felt like she did nothing wrong, and she was there to protect and serve her patients, and they didn't like that she didn't sign the letter.  She was the only doctor from her practice present in that meeting.  After she heard what Theranos had to say about her claims regarding Ms. ███, it didn't cause her to doubt her previous clinical opinion. At the time, she was newly in her practice and she didn't want her name or practice drug into the ground." US-REPORTS-0016096.

- Statements by Dr. Nicole Sundene to the effect that:  When John Carreyrou of *The Wall Street Journal* called Theranos and asked them for their rebuttal to Dr. Sundene's Theranos test results, Theranos started sending "crazy" people in to her office as patients.  Theranos called her office multiple times and flew out to her office on multiple occasions.  At the time, Amanda Miranda was her secretary. Sunny Balwani and two other top employees of Theranos flew out to her practice on two occasions and threatened to sue Dr. Sundene.  He made those threats to Miranda, who kept the trio up at the receptionist desk and wouldn't let them back

to speak directly to Dr. Sundene.  Miranda was literally scared of Balwani and the other Theranos employees.  US-REPORTS-0008532.



- Statements by █████████ to the effect that:  When Theranos contacted her, she could tell they had her on speaker phone.  ███ believes that Theranos had one or two lawyers on the call, as well as the Theranos founder.  There was one person on the phone from Theranos asking all the questions, and that person was trying to make ███ feel "really stupid."  ███ would explain something to that person and then that person would challenge her on everything that she said.  ███████ doesn't think that the person doing the challenging had a medical background.  The person speaking on behalf of Theranos was a male, and ████ thinks he was one of the attorneys.  After that call with Theranos, ███ didn't take any more of their phone calls.  The first call lasted 5 or 10 minutes before ████ hung up.  Theranos tried to call her back that same day after that first call, but ████ wouldn't pick up.  US-REPORTS-0008527; *see, e.g.*, SEC-USAO-EPROD-003068293 (evidencing Holmes and Balwani were aware of outreach to ███).

****

The evidence described above is offered for the permitted purpose of motive, opportunity, intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy.  Among other things, Holmes and Balwani's harassing of doctors and patients tends to show consciousness of guilt and a belief that transparency would expose the falsity of what they claimed to investors, patients, and others. ████████████████████████████████████████████████████████████████████████████████████████████████  Such evidence tends to show knowledge of issues with Theranos's testing and control over Theranos's operations.  Such evidence tends to show an agreement between Holmes and Balwani.

## X.    Threatening, influencing, or vilifying journalists in response to negative coverage of Theranos.

The government intends to offer evidence of the following:

In or about 2015, during a celebration after achieving a CLIA waiver for a single assay, Balwani stood up and got a cheer going: "Fuck quest."  COLM-001372.

According to Serena Stewart, Holmes and Balwani lead the group in chants of "Fuck you Sonora Quest" and "Fuck you Carreyrou."  They chanted "Fuck you Sonora Quest" because it was implied that the big laboratories, like Sonora Quest, were behind the questioning of Theranos.  Stewart was also in California at Theranos's office a month before when Holmes chanted "Fuck you Carreyrou" there.  No one really asked questions during these meetings, as they were generally scared of Balwani.  US-REPORTS-0015130.

On or about July 7, 2015, after Rupert Murdoch wrote that he had spoken to *The Wall Street Journal* editor and a lawyer and "certainly nothing now" was to be published, Holmes stated: "As promised during our meeting, I've attached the Op Ed draft I've written on prevention and laboratory testing.  I had been thinking about sending it over to Joe Rago at WSJ, with whom we did the very first piece on Theranos, introducing our work to the world and into the public domain in 2013 after working for so many years in stealth mode. (As an FYI, Joe actually toured our laboratories, saw our technologies running, and was briefed on our technology in detail in 2013)."  SEC-USAO-EPROD-000536645.

On or about September 8, 2015, David Boies, at Theranos's direction, wrote the Editor-in-Chief of Dow Jones in an attempt to quash Carreyrou's pending story.  SEC-USAO-EPROD-002487614.

On or about September 8, 2015, Holmes emailed Murdoch and wrote:  "For the purpose of keeping you in the loop, I wanted to share the attached documents with you, including a briefing document that was sent from David to Gerard at WSJ today in the hopes that Gerard might meet with our team. I have also attached the material Theranos has shared with WSJ (responsive to questions from John Carreyrou) since the materials I gave you in July.  As I've reflected on this, I thought that were I in your shoes I would want to know/be in the loop on this one, and since you had the prior materials from July, wanted to give you the complete set.  We are very much hoping that Gerard will meet with our team.  If you have thoughts on that please do let me know."  SEC-USAO-EPROD-003493166.

On or about September 9, 2015, Murdoch stated he was checking internally about the meeting.  TS-110529.

On or about October 8, 2015, Boies and Heather King (Theranos's General Counsel) spoke to the Dow Jones' Editor-in-Chief and others in an attempt to quash Carreyrou's pending story.  THER-2507775

On or about October 16, 2015, Holmes wrote Murdoch stating "[i]t was disappointing to see the WSJ article, especially after all the comments they had relayed to you about it.  As we'd feared, this reporter chose to write a false and defamatory piece, despite over 1,000 pages of documents and reference documents, in total, that we'd given to him disproving the very points he put in the piece.  It has been evident he had an end in mind before this piece was ever written. In addition to the publication of many inaccurate and misleading statements we had refuted, it was frustrating to see the repeated reliance on anonymous sources. . . . It was also frustrating that they imply the Theranos technology does not produce accurate results, but never mentioned that David had offered to bring our device to the Journal's office and demonstrate it first hand by testing the Journal's own people.  You know that we had been trying to meet with Gerry for some time (and that I was reluctant to meet just with the reporter who in his first contact with us accused me in an email of causing someone's death and asked totally inappropriate questions about my personal life)."  SEC-USAO-EPROD-000034937.

On or about October 17, 2015, Holmes wrote Murdoch stating "[t]wo thoughts I want to briefly connect on / run by you – let me know if there's a convenient moment to give you a call." SEC-USAO-EPROD-000034936.

According to Nimesh Jhaveri, after the Carreyrou article was published, Theranos told Walgreens it was a lie. Walgreens called Balwani and asked him questions about information published in the article and Balwani told them everything was a lie and that the author did not talk to Theranos. US-REPORTS-0012220.

According to Roger Parloff, after he published an article to the effect that Holmes mislead him, Holmes contacted him and asked him to delete the part of the article about her/Theranos misleading him, and stated she would never intentionally mislead him. However, Holmes did not provide any rebuttal or evidence to show that she did not mislead Parloff. When Parloff refused Holmes advised that if he was not going to change it then they would have to take other action. Theranos then provided *Fortune* with a letter from Brooke Buchanan, which Parloff thought read more like it had been written by Heather King. In the first draft of this letter, Theranos claimed they thought Parloff was doing an article with a limited narrow focus on Intellectual Property (IP), because he was a legal journalist. This statement was removed before it was published because an editor at *Fortune* contacted Buchanan and said she might want to reconsider claiming that they did not know it was going to be a feature article, and that she should think about her own reputation. Buchanan then submitted a second draft of the letter, which did not include this statement, and was subsequently published. US-REPORTS-0008842 & 8872.

****

The evidence described above is offered for the permitted purpose of motive, opportunity, intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy. Among other things, Holmes and Balwani's threatening and influencing journalists in response to negative coverage tends to show consciousness of guilt and a belief that transparency would expose the falsity of what they claimed to investors, patients, and others. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Such evidence tends to show knowledge of issues with Theranos's testing and control over Theranos's operations. Such evidence tends to show an agreement between Holmes and Balwani.

## XI.   Blaming and vilifying competing companies.

The government may offer evidence of the following:

- Statements from Wade Miquelon to the effect: HOLMES said Theranos' competitors were sending people into Walgreens to order esoteric blood tests in order to throw off the blood draw percentages. US-REPORTS-0014079.

- Statements from Nimesh Jhaveri to the effect: BALWANI advised Walgreens that the reasons for the high number of venous blood draws included the

cartridges not being ready for tests that were being ordered, LabCorp and Quest sending people in to order tests which required venous blood draws, and doctors ordering esoteric tests.  US-REPORTS-0012220.

- Statements from Suraj Saksena to the effect:  SAKSENA learned about John Carreyrou's (CARREYROU) Wall Street Journal (WSJ) article right before it was published.  He attended an all-hands meeting where he learned of the impending article.  During the meeting, the attendees were told the article made several allegations that were false, and that this story was being pushed by LabCorp and Quest.  In addition, Theranos had engaged with CARREYROU for months prior to publishing the article.

****

The evidence described above is offered for the permitted purpose of motive, opportunity, intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy.  Among other things, Holmes and Balwani's blaming or vilifying competitors tends to show consciousness of guilt. ███████████████████████ ██████████████████████████████.  Such evidence tends to show knowledge Theranos's technology not capable of consistently producing accurate and reliable results, as alleged in the indictment.

## XII.   Threatening or intimidating employees and former employees.

The government may offer evidence of the following:

- Statements by Tyler Shultz to the effect that he formed the impression that Theranos had a culture of intimidation and that people were afraid to speak up; that Theranos management made it known within the company that they are willing to sue ex-employees; and that there was a culture of fear.  PFM-DEPO-00004763-64.

- Statements by Tony Nugent to the effect that he witnessed conduct by Holmes or Balwani after Balwani joined the company that he would characterize as intimidation towards Theranos employees.  PFM-DEPO-00005990-59999; US-REPORTS-0004562.

On the day Rosendin (Holmes's former personal assistant) resigned, she was forced to sign various documents and then abruptly escorted out of the building.  US-REPORTS-0002373

On or about August 11, 2012, Balwani threatened Rosendin with legal action when he suspected she was disclosing Holmes and Balwani's personal relationship.  US-REPORTS-0002384 US-REPORTS-0002373.

In or around December 2014, Balwani and Theranos's HR director had Dr. Rosendorff delete emails he had forwarded to himself before resigning from Theranos. "Sunny was exhibiting – trying to strong-arm me into deleting emails that I'd e-mailed to myself and threatening legal action and being intimidating, and I just wanted to meet with Elizabeth to sort of protect me from Sunny, I guess. . . . [H]e said that the HR director, Mona Ramamurthy, was going to sit down with me in front of my Gmail and make sure I deleted anything with reference to Theranos, then she was going to go through my Gmails. . . . He was just being really aggressive. *Id.* at 180-182; TS-0042709; TS-0042716; BALWANI-SEC_000340 to 344 (Rosendorff testimony in Colman case that "Sunny was harassing me" to delete his emails and forcing him to sign affidavit after termination).

On or about May 15, 2015, Theranos's attorneys ambushed Tyler Shultz at the home of his grandfather and threatened to sue him.  US-REPORTS-0008460.

On or about June 26, 2015, Theranos threatened to sue Erika Cheung.  PFM-DEPO-00004949, 4985; PFM-DEPO-00005078.

****

The evidence described above is offered for the permitted purpose of motive, opportunity, intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy.  Among other things, such evidence tends to show Holmes and Balwani's consciousness of guilt and tends to show they believed that transparency would expose the falsity of what they claimed to investors, patients, and others. ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ The evidence tends to show an agreement between Holmes and Balwani.  Such evidence tends to show Holmes and Balwani knew that at Theranos, they had to hide or conceal the difference between the public picture they painted of Theranos and the true reality of Theranos.

## XIII.   <u>False and misleading representations made to FDA, CMS, CDPH, and other regulatory organizations.</u>

The government may offer evidence of the following:

On or about October 23, 2013, Holmes provided the FDA a list of tests run in Theranos's CLIA laboratory from samples collected in Theranos Wellness Centers.  The list provided a column for test, chemistry, and device, and purported to show that, in certain circumstances, Theranos was using an "FDA cleared/approved" device but failed to disclose that Theranos was modifying third-party devices to perform certain tests.  *See, e.g.*, THPFM0000154254.

According to Kerry Denise Elenatinoba-Johnson, on an unspecified date, Johnson needed to ask BALWANI how to walk the Laboratory Director and a consultant through the CLIA laboratory.  BALWANI told her she needed to walk them around the outside of the building into a separate entrance.  *See, e.g.*, US-REPORTS-0000807.

63

On or about December 3, 2013, following directions from Balwani, Young wrote to Dr. Rosendorff regarding Normandy Lab:  "Let's not remind her [a CLIA inspector] about the downstairs lab unless she asks again.  Just simple if we can just show her the lab upstairs."  *See, e.g.*, SEC- USAO2-EPROD-000070971.  Holmes was made aware of Young's instruction no later than June 2015.  *See, e.g.*, TS-1133080.

In or about November 2014, Balwani approached his dermatologist, Dr. Sunil Dhawan, about serving as the Bay Area Lab Director in place of Dr. Rosendorff, who was raising concerns about Theranos's lab practices.  Balwani assured Dr. Dhawan the "time commitment is minimal."  *See, e.g.*, US-REPORTS-0008350.

Between November 2014 and August 2015, Dr. Dhawan did no work for Theranos and instead negotiated the amount of Theranos equity he would be paid.  US- REPORTS-0008361-68.

On or about September 9, 2015, Balwani wrote Dr. Dhawan to finalize issues relating to Dr. Dhawan's compensation, and stated:  "I also need your help on an additional matter.  We have a lab audit coming up on 9/22 at 9am . . . and wanted to see if you can be present for at least part of it."  Balwani also provided directions to the lab Dr. Dhawan was purportedly supervising.  *See, e.g.*, US-REPORTS-0008371-72.

On September 15, 2015, Balwani thanked Dr. Dhawan for dropping by and advised he "need[ed] a couple of hours from you this coming weekend, unfortunately I have close to 300 SOP's that need signing."  *See, e.g.*, US-REPORTS-0008373 (CTRL-DHAWAN-00009861).

On or about September 21, 2015, Holmes congratulated Dr. Dhawan on "joining a team defined by the excellence with which every objective is pursued."  *See, e.g.*, US-REPORTS-0008387.  Despite the fact that Dr. Dhawan had done next to no work and had minimal familiarity with the Bay Area CLIA lab, Holmes and Balwani held him out to CMS inspectors as knowledgeable of Theranos's technology and practices.

On or about September 23, 2015, Theranos representatives attending a CMS inspection, with Holmes and Balwani's knowledge, told CMS inspectors "Theranos changes the platforms on which it runs tests from time to time.  The decision to move testing off of TSPUs and onto other platforms in this case was a business decision to transition to the manufacturing quality systems to QSR compliance under FDA guidelines and does not reflect on the reliability or accuracy of any platform."  *See, e.g.*, SEC-USAO-EPROD-005968690.

****

The evidence described above is offered for the permitted purpose of motive, opportunity, intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy.

Among other things, evidence that Holmes failed to fully explain what tests, chemistries, and devices it was using tends to show consciousness that full regulatory scrutiny would expose

that Theranos was unable to provide accurate and reliable test results.  It tends to show Holmes's knowledge and control over Theranos's operation and dealings with regulators.

Evidence that Balwani directed Theranos employees to not show portions of the CLIA laboratory to a consultant and/or an inspector tends to show consciousness that full regulatory scrutiny would expose that Theranos was unable to provide accurate and reliable test results.

Evidence that Holmes and Balwani hired Balwani's dermatologist to serve as the CLIA laboratory director tends to show their control over Theranos's operations, their willingness to turn a blind eye to issues in the CLIA laboratory and patient safety, and that the laboratory was not the revolution in blood testing Theranos claimed it to be, and evidence that Holmes and Balwani held him out as serving from November 2014 to September 2015 and knowledgeable of Theranos's technology and practices tends to show consciousness that Theranos was unable to provide accurate and reliable test results.

Evidence that Theranos representatives, working at Holmes and Balwani's direction, falsely told CMS the decision to stop using the TSPU in the CLIA laboratory "does not reflect on the reliability or accuracy of any platform" tends to show intent to defraud and consciousness that full regulatory scrutiny would expose that Theranos's TSPU was unable to provide accurate and reliable test results.

## XIV.   **Violations of industry standards and government regulations or rules regarding research and development procedures, medical devices and clinical laboratory practices.**

The government may offer evidence of the following:

On or about November 10, 2013, Dr. Rosendorff emailed Balwani about "areas in which we are currently not compliant in terms of CLIA law."  *See, e.g.*, THPFM0000266077.

On or about December 10, 2013, the California Department of Public Health issued an IMPORTANT NOTICE-ACTION NECESSARY, advising Theranos of a number of deficiencies.  *See, e.g.*, THPFM0001203524.  Holmes and Balwani were provided a copy.  *See, e.g.*, SEC-USAO-EPROD-003713433 THPFM0005279630.

In or about February 2014, Dr. Rosendorff told Balwani "we need to migrate our proficiency testing to Theranos methods ASAP. . . . CLIA requires PT to be performed the same way we test patient samples.  Currently this is not 100% the case.  PT is a complex issue that needs to [be] vetted, but is essential[] in maintaining licensure and quality."  *See, e.g.*, TS-0231083.

On or about February 21, 2014, Holmes and Balwani were advised by Dr. Rosendorff:  "I do not feel that reporting this HDL in light of the spate of low HDLs we have been having is good medical practice."  *See, e.g.*, THPFM0001407063.

On or about October 28, 2014, Dr. Rosendorff advised Theranos employees, and ultimately Holmes and Balwani, it was "running HbA1c using 2 different methods – venous blood on ADVIA and FS on DCA Vantage. . . . it makes no sense whatsoever, it goes against every recommendation." Dr. Rosendorff stated further:  "If my authority as laboratory director is counteracted again in this way, there will be serious consequences." *See, e.g.*, THPFM0000003941; TS-1081376.

In or around September 2015, CMS conducted a CLIA recertification and complaint survey, which concluded on or about November 20, 2015.  Based on the survey, CMS found Theranos to be out of compliance with five CLIA Condition level requirements, in addition to numerous CLIA Standard-level requirements.  *See, e.g.*, THER-0495513.  Balwani urged Holmes to pray during the survey and admitted that "[o]ur validation reports are terrible.  Really painful going thru this process."  Holmes said she was "[p]raying literally non stop."  THER-2566547.

On or about January 26, 2016, CMS wrote Theranos regarding "CONDITION LEVEL DEFICIENCIES – IMMEDIATE JEOPARDY."  CMS wrote that as a result of its survey, it was determined that Theranos was not in compliance with all of the Conditions required for certification in the CLIA program.  CMS provided Theranos with a listing of all deficiencies identified during the survey on Form CMS-2567, Statement of Deficiencies.  The letter also notified the laboratory that the seriousness of the deficiencies resulted in a finding of immediate jeopardy of patient health and safety.  *See, e.g.*, THER-0534383; THER-0495513.  The letter listed the conditions not being met as 42 C.F.R. § 493.1215 (Hematology), 42 C.F.R. § 493.1250 (Analytic systems), 42 C.F.R. § 493.1441 (laboratory director), 42 C.F.R. § 493.1447 (technical supervisor), and 42 C.F.R. § 493.1487 (testing personnel), as well as other standards.  Among other things, CMS found Theranos failed to ensure that quality control was acceptable for the Theranos Proprietary System (TPS/Edison 3.5) prior to the reporting of patient tests, failed to have a quality assessment procedure to identify and correct problems with the QC values for the TPS when precision did not meet the lab's requirement for precision, failed to ensure that the validation procedures performed on the TPS established performance specifications for accuracy, precision, reportable range, and/or reference range, and failed to ensure establishment of the performance specifications followed the laboratory's procedures.

On or about February 12, 2016, Theranos's General Counsel, with Holmes's knowledge, provided CMS with an "allegation of compliance and evidence of correction" in response to the Form 2567.  *See, e.g.*, THER-0593739; THER-0495513.

By letter dated March 18, 2016, CMS notified Holmes and Balwani of its determination related to the laboratory's submission; provided the laboratory with its review of the submission; and proposed sanctions against the laboratory's CLIA certificate based on the finding of immediate jeopardy, the laboratory's failure to meet all CLIA Condition-level requirements, and the failure by the owners and director of the laboratory to comply with certificate requirements and performance standards as evidenced by the deficiencies cited during the CLIA recertification and complaint survey.  *See, e.g.*, THER-0534655.  Among other things, CMS determined that the laboratory's submission did not constitute a credible allegation of compliance and acceptable evidence of correction for the deficiencies cited during the CLIA recertification and complaint

survey, and did not demonstrate that the laboratory had come into Condition-level compliance and abated the immediate jeopardy.

On or about March 28, 2016, Theranos provided a written response, stating among other things it had ceased running all tests at issue in the Form 2567. *See, e.g.*, SEC-USAO-EPROD-005969471.

On or about April 1, 2016, Theranos's lab director wrote in response to CMS' March 18, 2016 letter setting forth reasons "we believe demonstrate that our Newark California laboratory has come into Condition-level compliance and abated the immediate jeopardy." The letter notes that Theranos has put in new leadership, that "deficient practices will not recur through its robust new quality systems and through intense oversight being provided by the laboratory's new quality monitoring and improvement program and audit procedures." The letter notes Theranos had "stopped running [a number of tests] either before or during the survey, and has not run them since." The letter notes Theranos "based on its dissatisfaction with prior QA oversight . . . had voided all results reported for the assays run on the Theranos Proprietary System 3.5 (TPS) in 2014 and 2015 and all reported PT/INR test run on the Siemens Advia BCS XP instrument that went into use in October 2014 through September of 2015." *See, e.g.*, THPFM0003765147; THER-0534700.

On or about April 17, 2016, Theranos provided supplemental information to CMS. *See, e.g.*, THER-0534793; THER-0534801 (email to CMS copying Holmes); SEC-USAO-EPROD-006024676 (emailed to CMS dated 4/25/2020 with attachments); SEC-USAO-EPROD-006024677; SEC-USAO-EPROD-006024824.

On or about April 18, 2016, Holmes stated publicly and to shareholders:  "I'm the founder and CEO of this company. Anything that happens in this company is my responsibility, at the end of the day. We stopped testing [in Newark], and have taken the approach of saying, let's rebuild this entire laboratory from scratch." She said further "I know what we've built. . . ." *See, e.g.*, SEC-USAO-EPROD-000382615.

On or about July 7, 2016, CMS advised Holmes and Balwani that CMS had determined the Newark lab was not in compliance with the CLIA Condition-level requirements, that it had not removed the finding of immediate jeopardy, and of the consequent imposition of sanctions. *See, e.g.*, THER-0495513.

On or about October 24, 2016, Holmes directed Theranos to relinquish its CLIA license and ceased lab operations. *See, e.g.*, THPFM0005754133.

****

The evidence described above is offered for the permitted purpose of motive, opportunity, intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy. Among other things, evidence that Theranos violated CLIA regulations and industry standards tends to show that Theranos's technology was, in fact, not capable of consistently producing accurate and reliable results, as alleged in Paragraph 16,

and that its proprietary analyzer had accuracy and reliability problems, as alleged in Paragraph 12.  Such evidence tends to show statements to investors, patients, and others were false and the materiality of such statements.  Such evidence tends to show Holmes and Balwani's control over Theranos and knowledge of its operations.  Evidence Theranos voided tests is an admission its prior statements were false.  Theranos's statement it was "dissatisf[ied] with prior QA oversight" is an admission its prior statements were false.  Theranos's statements to CMS are admissions it was not CLIA-complaint.  Evidence of CLIA violations demonstrates the falsity of claims to investors that Theranos's "technological advances" and "laboratory infrastructure" were superior to conventional labs, as alleged in Paragraphs 6-10.  Evidence of CLIA violations demonstrates the falsity of claims to investors that Theranos was an attractive investment because it operated a licensed, high complexity laboratory.

## XV.   **Altering or tampering with third-party medical devices.**

The government may offer evidence of the following:

Holmes admitted that, in 2013, before the clinical lab went live, Theranos made modifications to FDA approved machines to process tests on smaller samples.  *See, e.g.*, SEC-TX-000005284.  For example, Holmes testified "[s]peaking about the ADVIA specifically, we had taken our protocol, which is essentially our formula for how to make the chemistry work with the small volume, and, as I understand it, overtaken essentially the software in the instrument to implement our protocol.  And then we modified the physical hardware.  There's little cups that are used to contain the sample . . . we changed the geometry so that you didn't have . . . loss."  SEC-TX-000005284 & 85; *id.* at 84 ("We purchased the machines, and then we modified the hardware."); *id.* at 5300 ("I was aware that we were doing it [i.e. using commercially available machines and modified protocols for patient testing]."); SEC-USAO-EPROD-000666750 (2/19/2014 email to Balwani, copied to Holmes, describing use of Advias in CLIA lab).

Holmes authorized Theranos's admission in prior litigation that the company used non-proprietary or commercially available machines or equipment to perform blood tests for commercial testing center patients, including Abbot, Beckman Coulter, and Siemens AG.  *See, e.g.*, TS-0958390 (xx453); TS-0959027.

Holmes also authorized Theranos's admission in prior litigation that, from October 2013 to September 2015, the company modified the Siemens ADVIA 1800 analyzer, the BD Biosciences LSR Fortessa and FACSCanto II flow cytometers, and the Drew Scientific Drew-3 Hematology System to process General Chemistry, ELISA, and Cytometry blood tests on capillary samples or micro-samples.  *See, e.g.*, TS-0959090, TS-0959114-123.  Holmes was aware Theranos had done so.  SEC-TX-00005295.

Additional emails demonstrate Holmes and Balwani's knowledge of modification of third-party devices.  *See, e.g.*, TS-0546225 (8/2/2013 email re "throughput and latency estimates").  THPFM0003106027 (8/29/2013 email from Balwani to Holmes re Rosendorff "concerns about the launch discussing proposed use of ADVIA in CLIA lab"); THPFM0000269370.

On or about August 3, 2013, with Balwani's knowledge, Holmes directed Dr. Rosendorff: "You'll obviously need to make sure our micro-cups and protocols / modifications are not are not in any way visible to any Siemens rep." Dr. Rosendorff later reported to the two: "All 100 Siemens assays on the new ADVIA, the technical rep shouldn't need to login to the old instrument." *See, e.g.*, THPFM0000273433.

On or about August 21, 2013, Holmes ordered that the ELISA launch and validating Theranos's LDTs was the only priority of the ELISA team going forward, and that the team had 27 assays to validate on the Siemens Advia. *See, e.g.*, TS-0297862.

On or about August 23, 2013, Rose Edmonds, a development scientist under Holmes and Balwani's supervision, noted to Dr. Rosendorff, Surehka Gangakhedkar, and others "there is a small chance that Siemens techs will be around this weekend and if so, we must be discreet and not let them know that we are altering the chemistries and protocols on the ADVIA." *See, e.g.*, FBI-SG-0000001.

Surekha Gangakhedkar learned about devices being modified and was alarmed that chemistries were altered. She resigned from Theranos because she was not comfortable with the validation plan or with the use of multiple devices to complete validation. Gangakhedkar was also concerned about Theranos altering device chemistries and felt that the 4.0 device and nanotainers were not working properly. *See, e.g.*, US-REPORTS-0000813.

On or about November 3, 2013, Balwani directed, with Holmes's knowledge, that the two Advias on Normandy be 100% dedicated to CLIA micro samples starting that week and be "ready for primetime." Balwani and Holmes were advised Theranos employees were working with engineering to optimize T-cup dead volume so that the ISE assays could be properly executed on one of the ADVIAs. They were also advised about concerns with the feasibility of making Balwani's directive happen, including the need for properly trained personnel and updated validation reports. *See, e.g.*, TS-0795030.

Holmes and Balwani were aware in February 2014 that CLIA personnel were not reviewing QC data on a regular basis, despite the deficiency having arisen in a prior audit. *See, e.g.*, SEC-USAO-EPROD-000666750.

On or about May 3, 2014, Balwani admitted, and Holmes was told, "ISE on Advia is our sore point resulting in overwhelming majority of the redraws . . . so we need to solve this problem in a structured way." *See, e.g.*, TS-0550583.

In or around November 2014, Balwani acknowledged, and Holmes was advised, "to reduce our redraws and reruns, we need to focus first and foremost on Advias"; that "our problem around the 3 problem assays got worse when we made changes to Advia"; "and problems [were] coming from Normandy process." The two were advised "[s]ince we have moved to Newark, we have had to call the Siemens rep multiple times for both Advias. There were reagent probe sensor issues, probe alignment issues, etc. . . . Troubleshooting with an unstable system has been challenging." They were advised further: "Imprecision for our assays

is higher compared to neat Siemens protocol.  Different aspects of our process contribute to imprecision: Sample integrity, Tecan dilution, Advia processing and detection, use of P-protocols (dilution) and all need to be tightened."  *See, e.g.*, THER-0303315.

**** 

The evidence described above is offered for the permitted purpose of motive, opportunity, intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy.  Among other things, evidence that Theranos altered or tampered with third party devices and concealed the changes tends to show that Theranos's proprietary analyzer was, in fact, not capable of consistently producing accurate and reliable results, as alleged in Paragraph 16, and that its proprietary analyzer had accuracy and reliability problems, as alleged in Paragraph 12.  Such evidence tends to show statements to investors, patients, and others were false and the materiality of such statements.  Such evidence tends to show Holmes and Balwani's control over Theranos and knowledge of its operations, as well as the existence of the scheme.

## XVI.  Multiplexing test results and disregarding outliers to mask inconsistency

In order to improve the apparent precision of its tests, Theranos changed its devices from a three-tip design to a six-tip design, such that each assay would be run six times on a given sample in parallel.  Theranos would then take the six results yielded by that approach, remove the high and low values of an assay, and average the remaining four values to determine a final result.  Dr. Adam Rosendorff stated that Daniel Young formulated the idea and Rosendorff remembers discussing the proposal with Holmes in early 2014 and getting her approval.  After implementing the change over the course of a month, the apparent precision of Theranos's tests improved.  In retrospect, Rosendorff stated that he has some concerns about the change to a six-tip method.  He believes that the process, which in effect too averages of averages, could make precision look better than it is.  [US-REPORTS-0007375]

Theranos employees emailed about setting up the six-tip method of sample processing in late January 2014.  [THPFM0004221367]  In March of that year, employees emailed again about the six-tip method, which had already been rolled out for patient testing.  In that email chain, employees discussed the fact that, at that time, they could not generate patient results using the six-tip method without sending the data for a script to be run.  The goal was to automate that process eventually so that the separate step of running a script was no longer needed.  [THPFM0000170882]  In July 2014, Rosendorff, Young, and other Theranos employees discussed the CV values being yielded by the six-tip method, citing values more favorable than earlier methods.  [THPFM0000109479]

Rosendorff also stated that running an assay multiple times for a given sample then reporting the average of the results is not good laboratory practice.  Dr. Rosendorff also specifically stated that Theranos's practice of running an assay on a sample multiple times in parallel and statistically combining the results while disregarding outliers was "not ideal."  Instead, he explained that it would be better to run the assay a single time using a highly accurate and reliable method, and report that result.  [Interview report pending production]

70

****

The evidence described above is offered for the permitted purpose of motive, opportunity, intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy.

Evidence that Theranos used a six-tip method to run assays multiple times in parallel before multiplexing the results and reporting the average tends to show Defendants' plan to conceal the accuracy and precision problems with Theranos's technology as well as their intent to defraud patients by offering and providing blood tests that were not as precise as they appeared to be.

Evidence that Theranos used a six-tip method to run assays multiple times in parallel before disregarding outliers tends to shoe Defendants' intent to defraud victims by concealing consistency and precision problems inherent in Theranos's approach to blood testing.

Evidence that Theranos's multiplexing method disregarded high and low values tends to show Defendants' knowledge of the flaws and precision problems in Theranos's technology.

## XVII. Improperly setting and altering reference ranges

The government may offer evidence of the following:

Dr. Rosendorff stated that as lab director at Theranos, he set reference ranges for Theranos assays, including assays run by Theranos's "t-protocol" and on Theranos's Edison devices. Theranos also used published reference ranges specific to other devices and specific populations. Rosendorff stated that Theranos was "in a hurry" to proceed with the Walgreens launch. If that had not been the case, he would have preferred to set reference ranges before the launch of clinical testing services. Instead, Theranos launched its clinical testing services with Walgreens without conducting a formal reference range study. The reference ranges for the tests Theranos conducted were under constant review after the launch. Rosendorff also disagreed with others at Theranos as to whether there should be specific reference ranges for fingerstick samples distinct from the ranges for venous samples, with Rosendorff arguing for independent reference ranges. [See, e.g., Rosendorff MOI, US-REPORTS-0007227; THPFM0001608214; THPFM0002747643]

Rosendorff also stated that reference ranges for finger-stick samples were set using a twenty-sample process. He also stated that Theranos did not calculate the coefficient of variation, precision, or recovery with the finger-stick method. [US-REPORTS-0007375]

In early June 2013, Holmes, Balwani, and others at Theranos emailed about setting and adjusting reference ranges in response to a particular demo result for a female patient. In that email chain, Daniel Young examines the specific results and requests that certain changes be made to the reference ranges for multiple results. One such adjustment causes a "low" value in

the patient's tests to become "normal."  Another adjustment keeps the patient's result for that assay outside the reference range, but brings it closer to that range.  [THPFM0000028250]

In November 2014, Dr. Rosendorff emailed Holmes and Balwani to advise them that Theranos tests should show references ranges "specific to the sample type and method being used," further advocating for information regarding sample type and method to be included on lab reports themselves.  Holmes and Balwani apparently rejected Rosendorff's proposal, with Balwani insisting that there was no difference between venous blood and capillary blood.  [See, e.g., THPFM0002747643]

****

The evidence described above is offered for the permitted purpose of motive, opportunity, intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy.

Evidence that Holmes and Balwani did not conduct sufficient studies to establish and support valid reference ranges for Theranos's tests tends to show their motive to launch Theranos's testing services as soon as possible to generate profits and capture market share at the expense of patient safety.

Evidence that Holmes and Balwani did not establish proper reference ranges based on sufficient evidence tends to show Defendants' intent to defraud victims by offering and providing blood testing services that produced unreliable results.

Evidence that Holmes and Balwani were in a hurry to launch testing services, requiring Theranos to set reference ranges during and after the launch, tends to show Defendants' intent to defraud victims before their previous false statements were exposed.

Evidence that Holmes and Balwani caused Theranos to adjust reference ranges based on patient results tends to show Defendants' intent to defraud patients by bringing abnormal results within normal ranges to avoid scrutiny of Theranos's tests.

Evidence that Theranos needed to adjust reference ranges based on patient results tends to show Defendants' knowledge that Theranos's tests were not sufficiently developed and suffered from calibration, accuracy, or reliability problems.

Evidence that Holmes and Balwani rejected their laboratory director's admonishments about the need for customized reference ranges for finger-stick versus venous samples tends to show their knowledge of those differences and their absence of mistake in treating those sample types as equivalents.

/ /

XVIII. **Withholding critical test results and other important information from doctors and patients.**

The government may offer evidence of the following:

When Theranos obtained invalid bicarbonate results due to sample stability issues or other problems, it would withhold the result from doctors and patients with no explanation. Holmes directed that, if customers called to inquire about such withheld results, Theranos representatives should respond that "CO2 results were not reported due to temporary unavailability of this test for this sample" and note that the company was growing as fast as it could. This statement was misleading because it deceptively concealed problems with Theranos's tests. [See, e.g., TS-1078095, TS-1076614-16]

When Theranos obtained critical test values for chloride, it conducted a redraw and/or rerun rather than reporting the critical value. This approach misled doctors and patients by masking potential accuracy problems with Theranos's tests. [See, e.g., TS-1078326]

After experiencing problems with its hCG test, Allison Hsieh informed Balwani that Theranos had removed the "pregnancy test" description from its hCG blood quant assay description because the company's test was not able to confirm a pregnancy. However, Theranos continued to offer the hCG blood test knowing that doctors and patients would rely on the assay to determine pregnancy status. [See, e.g., THPFM0004228061]

After experiencing problems with its hCG test, Theranos switched the assay from fingerstick to venous draw. Rather than inform doctors and patients that the switch was necessitated by a problem with the assay, Christian Holmes directed that doctors and patients be told that it was a "temporary" "routine quality check" related to Theranos's expanding patient population. [See, e.g., THPFM0000555315, THPFM0000958955]

After experiencing problems with its PT/INR test, Theranos switched the assay from fingerstick to venous draw, telling doctors and patients only that it was a temporary switch. Christian Holmes directed Theranos customer service representatives to adhere to a script that deceptively omitted information about problems with the assay's accuracy. [See, e.g., THPFM0000018472]

After experiencing problems with its complete metabolic panel assays, Theranos switched CMP from fingerstick to venous draw. Christian Holmes suggested to Balwani that Theranos tell doctors and patients that the switch was related to an ongoing sample stability study. When Balwani rejected that proposal, Christian Holmes reported that he had previously used language consistent with Holmes's direction stating that Theranos required larger samples because it was running each test in more than triplicate. This explanation deceptively masked the true reason for the switch to venous draws. [See, e.g., THPFM0000147443]

When Theranos switched PT/INR from fingerstick to venous after experiencing problems with the assay, Theranos representatives including Kimberly Alfonso explained the change by telling doctors and/or patients that Theranos had confidence in its testing and the switch to

venous draws was intended simply to give the doctor the experience he or she was more accustomed to.  This explanation deceptively masked the true reason for the switch.  [See, e.g., THPFM0000204033]

Theranos ran HbA1c tests using two different methods:  venous blood on an Advia device and fingerstick on a DCA Vantage device.  Theranos's Lab Director, Dr. Adam Rosendorff, informed staff that this approach made "no sense whatsoever" and that it "goes against every recommendation."  Results from each of these types of HbA1c tests were provided to doctors without explanation as to the types of analyzers used to conduct the assays, creating a situation where doctors did not have the information they needed to place the results in context. This was especially problematic in situations where a single patient had Theranos multiple Theranos assays conducted using different methods, yielding different results that falsely suggested to the doctor that the patient's analyte values had changed.  This was the case with a patient treated by Dr. Phelan, who was the subject of internal emails at Theranos.  [See, e.g., THPFM0000003941; Rosendorff MOI, US-REPORTS-0007227]

Although Theranos used a variety of methods to conduct its blood tests, its lab reports sent to doctors and patients did not disclose method and sample type—important information that would allow recipients to put the results themselves in context.  In November of 2014, Dr. Rosendorff emailed Holmes and Balwani to advise that reference ranges should be specific to sample type and method.  In that same message, he stated his preference that physicians should "be aware if a test was performed on fingerstick versus venous blood," explaining that that information "should be made clear in the laboratory report."  According to Dr. Rosendorff, this information "would make the physician more understanding of discrepant results that might arise due to matrix/sample type effects."  During that same month, Dr. Rosendorff corresponded with Holmes, Balwani, and others regarding a physician who had inquired about a discrepancy in patient test results obtained from Theranos.  Dr. Rosendorff then explained that the difference in the patients' results from two tests ten days apart might have been due to the fact that Theranos tests the analyte on capillary blood while the other lab tests for that analyte using venous blood. In connection with that example, Rosendorff suggested that Theranos's lab reports should report "exactly what method and sample type is being used for testing on every lab report," and noted that he had made that proposal to Balwani the previous week.  Despite the above input, Theranos never disclosed that type of information on its reports sent to doctors and patients.  In particular, Balwani was resistant to Rosendorff's suggestion because he refused to acknowledge that there might be differences between venous and capillary blood.  [See, e.g., THPFM0005008031; THPFM0002747643]

****

The evidence described above is offered for the permitted purpose of motive, opportunity, intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy.

Evidence that Holmes and Balwani withheld critical results from doctors and patients— redrawing samples or voiding the results themselves—tends to show Defendants' intent to

defraud patients by depriving them of the information they believed they would receive when patronizing Theranos's services.

Evidence that Holmes and Balwani withheld critical results from doctors and patients tends to show Defendants' knowledge of the accuracy and reliability problems with Theranos's tests, to the extent that decision shows a lack of confidence in Theranos's test results.

Evidence that Holmes and Balwani withheld critical results from doctors and patients tends to show Defendants' intent to deceive victims by holding back information that might cause victims to suspect or discover the accuracy and reliability problems with Theranos's test results.

Evidence that Holmes and Balwani withheld critical results from doctors and patients tends to show Defendants' motive to preserve and enhance the company's reputation and market share at all costs.

Evidence that Defendants and other Theranos representatives made excuses for ongoing problems with Theranos's tests and withheld the true reasons for missing results tends to show the existence of the conspiracy.

Evidence that Defendants and their agents gave vague reasons for test failures rather than disclosing the underlying problems with the tests tends to show Defendants' intent to defraud.

Evidence that Defendants and their agents needed to generate excuses and vague explanations for missing test results tends to show Defendants' knowledge of the accuracy and reliability problems in Theranos's tests.

Evidence that Defendants and their agents did not disclose to doctors and patients the methods by which their tests were being conducted—or the nature of the devices used—tends to show Defendants' intent to defraud victims by concealing their reliance on third party devices.

## XIX.   Declining to conduct or agree to meaningful comparative tests.

The government may offer evidence of the following:

Toby Cosgrove is the former CEO of the Cleveland Clinic and heard about Theranos in mid-2014 through Bill Frist who was on Theranos's Board.  [US-REPORTS-0014814; SEC-FRISTW-E-0000065]  Cosgrove was excited about the prospect of Theranos based on what he heard the company could do, and believed Cleveland Clinic was well positioned to test the capabilities of the Theranos machine.  If the device performed well, Cleveland Clinic would have been interested in being among the early implementers of the technology.  Cosgrove met with Holmes six to eight times including during a visit by him to Theranos and a visit by Holmes to the Cleveland Clinic.  Though Cleveland Clinic overall was interested in testing the Theranos technology, some at the Clinic appeared to be skeptical of Theranos's claims.  On September 18, 2014, Theranos hosted Cosgrove and a larger group from Cleveland Clinic for a series of meetings discussing potential collaboration.  [THPFM0001777415]  Cosgrove recalls that

Theranos also came to the Cleveland Clinic to meet with him, and he did not see any equipment or testing devices that they had with them during that visit.  [US-REPORTS-0014814]

On December 19, 2014, Cleveland Clinic entered into a collaboration agreement with Theranos intended to establish a framework in which the parties would work together in furtherance of a long-term strategic alliance to further patient health.  The "current opportunities" for collaboration identified in the agreement included:  the Clinic assisting Theranos in studies of Theranos testing and new Theranos test development; on-site pilot studies involving placement of a Theranos test platform onsite at the Clinic; Theranos setting up and running a CLIA laboratory onsite at the Clinic; use of Theranos testing services for Clinic patients; and cooperation in clinical trials, with the Clinic working with Theranos on prospective studies to demonstrate the performance and impact of the Theranos infrastructure.  [CCF000000003]

From the time the parties entered into the above agreement and the eventual release of the Wall Street Journal article in October 2015, the Clinic's position was that it wanted to receive examples of Theranos technology to test it in their laboratory.  Cosgrove had email discussions regarding specific proposals contingent on the receipt of Theranos's devices.  [CCF000001002; CCF000000257]  If the technology performed well, the Clinic would report it as good.  The Clinic, however, never received a device from Theranos and Cosgrove never received an explanation as to why not.  [US-REPORTS-0014814]

Following the release of the Wall Street Journal article in October 2015, staff at the Cleveland Clinic discussed the need to understand how Theranos was using and testing its technology and get on the same page with Theranos on messaging about their relationship.  [CCF000000950]  Cosgrove remembers reaching out to Holmes and offering to help, and that he mentioned to her at that time that the Clinic was still ready to test Theranos's technology.  [US-REPORTS-0014814]  In response, he received an email from Theranos's in-house attorney providing him with Theranos's "core themes" in responding to the WSJ article.  [CCF000000750]

Cosgrove continued to press Holmes to send the Clinic a Theranos device they could evaluate, but Theranos never sent the device.  After the visit to Theranos in 2016, Cosgrove remembers a rapid decline in communication between the company and the Clinic, and the relationship petered out.  [US-REPORTS-0014814]

Byron Trott runs BDT Capital, and considered investing in Theranos following his introduction to Holmes in September 2014.  [US-REPORTS-0008637]  BDT met with Theranos and began its due diligence work leading up to an investment.  [BDTSEC_SD0001200]  BDT was impressed with the information it received from Theranos about the purported capabilities of its analyzers, but was especially focused on the representation that Theranos would be sending its box device to Cleveland Clinic for evaluation.  Trott wanted this testing to occur before BDT invested so that the Clinic could sign off on the device.  Trott became aware that the Clinic and Theranos announced a joint venture at some point, but that Theranos never sent the Clinic a device.  During the discussions, BDT sent Theranos a document summarizing its view of the company and for potential use with co-investors.  [BDTSEC_PST0005413]  Ultimately, BDT

declined to invest in Theranos largely due to Theranos's failure to send any devices to Cleveland Clinic for evaluation.  [US-REPORTS-0008637]

David Boies, as a member of Theranos's Board of Directors, also urged Holmes to conduct independent testing of Theranos's analyzers to prove the efficacy of the devices and to answer criticisms.  For example, in August 2016, Theranos published some test results to a limited extent.  Boies was not satisfied by this level of transparency because he believed that four-party testing—comparing Theranos to Quest, LabCorp, and reference labs—was the only way to resolve the doubts about the reliability of Theranos technology.  Theranos management said they were going to conduct that testing in 2015, but they never released the results as far as Boies knows.  At some point, management told Boies that the testing had started but had been held up by a confidentiality agreement.  Boies reported that fellow Board member William Perry also wanted independent testing of Theranos analyzers, i.e., he wanted Theranos to ship the Theranos box out to an independent lab who could confirm its capabilities.  Boies preferred the idea of multi-party testing because he believed it would show equivalent discrepancies between all participants.  When Boies met with representatives from the Wall Street Journal leading up to the publication of the Carreyrou article in October 2015, Boies offered to bring a device to the Wall Street Journal for testing.  He had not discussed this proposal with Theranos management beforehand or obtained approval from Holmes to make the offer.  He urged Theranos management to follow through on his offer and received messages that it would be done, but Theranos subsequently delayed and never ended up sending a device to the WSJ for evaluation.  Theranos never completed any approach for outside evaluation of its analyzers during Boies's time with the company, which stretched until February 2017.  [See, e.g., US-REPORTS-0009314; SEC-FRISTW-E-0000652; SEC-FRISTW-E-0000850; SEC-USAO-EPROD-004843969]

Dr. Melissa Pessin is the Chair of the department of laboratory medicine at Memorial Sloan Kettering Cancer Center (MSKCC).  Pessin learned of Theranos in 2013 and subsequently engaged in discussions with Theranos about potential collaboration.  MSKCC asked Theranos multiple times if they could place a Theranos analyzer onsite to conduct testing and evaluate its performance.  Theranos responded that it was not willing to take that step.  Later, Theranos offered to place a device at MSKCC with a Theranos employee running it, but that would have required a local, New York doctor.  [US-REPORTS-0017494]

Erin Edgar is a retired U.S. Army Colonel and had dealings with Theranos in connection with a potential collaboration with the military.  [US-REPORTS-0014994]  Edgar served as the command surgeon working for General Mattis and oversaw how CENTCOM would take care of casualties.  Edgar learned about Theranos in 2011 when Mattis sent him an email about the company and Holmes.  Edgar eventually met with Holmes at Theranos and was impressed by Holmes's claims about the technology.  [TS-0324480; TS-0326862; TS-0326863]  Edgar and Mattis were in agreement that the military should move forward with a pilot of the Theranos technology.  From that point forward, however, Edgar felt like Theranos was stalling for the following year and a half.  Edgar was trying to get one of Theranos's machines to conduct testing and Holmes would respond with promises that he was the company's top priority.  Still, he was kept waiting for the device.  [US-REPORTS-0014994]  Even when Edgar left to go to Fort Detrick, the Theranos project still was not moving forward, and Mattis expressed regret when he

retired in the first part of 2013 that the Theranos project had not gotten off the ground.  Edgar had some further discussions with Theranos about working with the military's Institute of Surgical Research, but Edgar does not believe Theranos ever sent a machine to the ISR or to Fort Bragg.  [US-REPORTS-0014994; TS-0324567]  After an additional visit to Theranos where Edgar had a finger-stick blood draw done but never received the results, he began to lose hope that Theranos would follow through and send an analyzer for testing.  Though CENTCOM was always ready to accept Theranos devices for evaluation, Theranos never sent a device to go to the field.  Edgar's last contact with Holmes was in early 2013.  At that time, he was still asking her when he would receive the Theranos device.  She told him "next week," and kept assuring him that CENTCOM was their top priority.  [US-REPORTS-0014994]

Dee Anna Smith is CEO of Sarah Cannon Cancer Center and first heard of Theranos and Holmes in 2007 or 2008.  She knew Holmes as a "wonder" in the business and understood that Holmes had developed technology that would ease the burden of blood testing for patients.  [US-REPORTS-0013566]  After Smith met Holmes in 2014 during an event hosted by Bill Frist, Sarah Cannon Research Institute (SCRI) pursued a consulting relationship with Theranos.  [SCRI_001324]  Smith toured the Theranos facilities and was shown a Theranos blood testing device.  [SCRI_001484]  SCRI was willing to help Theranos, but felt pressure from Theranos to release a statement to the media that the parties were working together.  [SCRI_001272; SCRI_001794]  Such a statement ultimately was not issued due to the negative Wall Street Journal article in October 2015.  Following the release of that article, Smith believed Theranos needed to counter that narrative by publishing their data, and believed that SCRI had the platform to assist Theranos in that way.  [SCRI_001864; SCRI_001290; SCRI_002214; US-REPORTS-0013566]  Ultimately, Theranos did not enlist SCRI's help and work with SCRI on generating and publishing data, and Smith did not understand Theranos's reason.  SCRI never received the data it requested from Theranos.

In a September 29, 2015 video published by CNBC, Holmes responded to a question about Theranos's lack of peer-reviewed bona fides by stating:  "We do it [answer our critics] by submitting to FDA.  I mean you look at a peer review journal, someone spends 5 minutes on it, and you release a publication."  "And in lab testing there is no higher standard than the FDA.  And especially with the work we've done to advocate for individual right to get engaged in the testing process, you can't compromise on that."  [MEDIA-000458]

\*\*\*\*

The evidence described above is offered for the permitted purpose of motive, opportunity, intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy.

Evidence that Holmes and Balwani were reluctant or unwilling to provide their devices to independent parties who would test the devices' capabilities tends to show Defendants' knowledge of the problems and weaknesses in Theranos's technology and their related knowledge of the falseness of their representations regarding the capabilities of Theranos's analyzers.

Evidence that Defendants repeatedly promised to deliver devices to third parties for independent testing tends to show their intent to defraud by concealing the weaknesses in Theranos's technology.

Evidence that Holmes and Balwani were reluctant to let third parties evaluate their technology but still pursued relationships with third parties tends to show Defendants' motive to associate with other prominent individuals and entities.

Evidence that Holmes and Balwani pursued relationships with prominent third parties with no intention of following through and delivering devices tends to show Defendants' preparation and intent to defraud victims by associating themselves with reputable organizations in an effort to bolster their own credibility.

Evidence that Holmes and Balwani attempted to distract from their failure to allow sufficient independent testing by pointing to possible FDA approval tends to show Defendants' plan and intent to defraud victims by touting FDA approval they knew they had not obtained.

## XX.    **Destruction of the L.I.S. Database.**

The government may offer evidence of the following:

On June 4, 2018, a Grand Jury subpoena was issued as part of a criminal investigation into violations of 18 U.S.C. § 1343, wire fraud, and 18 U.S.C. § 1349, conspiracy to commit wire fraud, to the custodian of records for Theranos, Inc.  (Subpoena produced in discovery on July 23, 2020.)  The subpoena sought:  "The entirety of all blood test lab reports maintained in the L.I.S. [Laboratory Information Systems] database that Theranos provided to its patients."  The subpoena further clarified that the reports should be in the same format as they were originally provided to the patients, and the production of the database should include, a "softcopy or proxy of the L.I.S. database, along with any other proprietary software required to access and search the database."

The L.I.S. database contained patient test result from the time of the company's commercial launch in October 13, 2013, up to July 30, 2016.  (Theranos-DOJ TL000005.)  The L.I.S. database was Theranos's *only* method of storing and maintaining patient data and test results.  (Bates US-REPORTS-0018716–00018717.)  The searchable test result data in L.I.S. could include, among other items, time, doctor, assay type, the specific performing lab, and the type of device used to perform the test.  (*Id.*; Bates Theranos-DOJ TL000005.)  The L.I.S. database was used during quality control checks to compare Theranos patient test results and respond to audits.  (Bates US-REPORTS-0018716–00018717.)  The database also generated reports, and software and lab managers used L.I.S. to generate reports of test results.  (*Id.*)

On June 14, 2018, the government charged Elizabeth Holmes and Ramesh Balwani with wire fraud and conspiracy to commit wire fraud in an eleven-count indictment.  CR 18-258-EJD.

On or about August 28, 2018, lawyers for Wilmer Hale provided a hard drive to the U.S. Attorney's Office, which they represented in a transmittal letter contained a copy of the L.I.S.

database.  (Bates US-REPORTS-0010268 – US-REPORTS-0010273.)  Wilmer Hale attorney
Katie Moran provided the password to the encrypted hard drive in an email.  (*See id.*)  All
subsequent efforts by the government to access the information on this hard drive have failed.  A
computer forensic expert retained by the U.S. Attorney's Office to assist in retrieving this data,
Bruce Pixley, found that the "key" file on the hard drive, which would enable the sequel database
to be reconfigured, is itself encrypted by a distinct password (not the one provided with the
transmittal letter), and cannot be opened.  (*See* Sept. 28, 2020, Pixley Report ("In order to
decrypt the backup, a person would need to know the password and have a copy of the 'key'
file.")  Without the key file, the data files contained on the hard drive cannot be reconfigured into
a sequel server and remain inaccessible.  (*See id.*)

On or about August 28–31, 2018, high-level managers within Theranos, Inc., including
David Taylor, authorized the disassembly of the hardware that comprised the L.I.S. database as
part of the closing of the company's Newark facility.  For example, in an August 28, 2018,
email, Taylor wrote "the system [containing the L.I.S. database] will be put into storage this
Friday and may thereafter be very difficult to resuscitate."  (Bates Neetek_000596.)  On or about
August 31, 2018, Theranos employees and hired consultants took apart the hardware comprising
the L.I.S. database.  This resulted in the permanent destruction of the database.  (*See id.*; Bates
Neetek_000578; Bates US-REPORTS-0016253.)

High-level members of the company had communicated about this process over emails
leading up to the date of the destruction, indicating that they knew that once the hardware was
taken apart, the database would no longer be accessible.  (*See generally* Bates Neetek_000001–
001100; *see also* Neetek_000596.)  High-level managers were also aware that the IT support
staff who had copied the database onto the hard drives provided to the government in response to
the subpoena did *not* have the password needed to decrypt the information contained on the hard
drives.  (*See, e.g.*, Bates Neetek_000746, Neetek_000815–000817, Neetek_000855.)  For
example, in emails dated July 18, 2018, and July 24, 2018, Theranos counsel Xan White
informed senior leaders in Theranos—including David Taylor—that the copied database
produced in response to the litigation request, "appears to require passwords that Antti alone may
have."  (Bates Neetek_000817, Neetek_000855.)  According to emails, on or about August 8,
2018, Eric Caddenhead contacted former Theranos IT employee Antti Korhonen in an attempt to
obtain the additional password.  (Neetek_000811; Neetek_000746.)

In an interview, Korhonen recalled being contacted by Caddenhead on behalf of
Theranos in early August 2018.  Caddenhead asked him for the password that would access the
master key file of the L.I.S. database, but Korhonen was unable to provide one that worked.
(Bates US-REPORTS-0017922.)  Caddenhead recalled during an interview that he told Michael
Chung (who was an IT consultant hired to manage the Newark shutdown) in approximately
August 2018 that if they took the L.I.S. database apart they would not be able to access it again
because the encryption key would be lost.  (Bates US-REPORTS-0016253.)  In an interview,
Chung recalled that he had meetings with John McChesney and others at Theranos to explain
that once the servers were turned off, then a forensic team would be needed to recover the data
on the LIS, but nobody on their team knew how to do this or if it would even be possible.  (Bates
US-REPORTS-0016262–US-REPORT-0016265.)

In other words, senior managers within Theranos were aware that the hard drive provided to the government in response to the June 4, 2018, Grand Jury subpoena was inaccessible and useless when they authorized the destruction of the L.I.S. hardware in August 2018.

In addition to being inextricably intertwined with the offense, the above evidence is admissible under Rule 404(b) to show knowledge, intent, absence of mistake, and lack of accident. Specifically, destruction of the one database that stored all of Theranos's patient test records demonstrates consciousness of guilt. It tends to show that Theranos's highest managers participated in the destruction of a critical piece of evidence after a Grand Jury subpoena had been issued for this evidence and after the criminal case had been charged. The evidence demonstrating the destruction of the database also puts into context the patient test results that the government does have and tends to show that these inaccurate results were not one-off accidents or mistakes. Indeed, the destruction of the database places the government's evidence in context as part of a larger fraud scheme, one which Theranos was attempting to hide and conceal even after the indictment in this case.

## XXI. **Obtaining personal benefit from position at Theranos.**

The government may offer evidence of the following:

Between 2010 and 2016, Holmes was paid hundreds of thousands of dollars and held Theranos securities valued in the billions of dollars. *See, e.g.*, PFM-ROGS-00000040. The evidence is offered for the permitted purpose of motive, intent, preparation, plan, knowledge, absence of mistake, and lack of accident. Holmes's financial stake and receipt of benefits from Theranos tend to show she had a financial incentive to commit the offenses, exercised control over Theranos, and was aware of its activities. It disproves Holmes's pubic suggestion and investor pitch that she was not motivated by money and acted for altruistic purposes. *See, e.g.*, SEC-USAO-EPROD-002625245. ████████████████████████████████████████
████████████████████████████████████████████████████████████

Balwani's compensation is likewise offered to prove motive and intent.

In 2014, Holmes had her Theranos-paid assistants run personal errands, perform personal tasks, and purchase luxury goods, in communications often mingled with Theranos business. *See, e.g.*, SEC-USAO-EPROD-001175694; SEC-USAO-EPROD-001175665 (6/2014 emails from assistant Lisa Durkin to Holmes regarding Yellowstone Weekend, picking up Apple adapter, checking for Donna Karan thigh highs, picking up sheets, and purchasing Chanel pearl necklace); SEC-USAO-EPROD-001176349 (6/2014 email from Durkin to Holmes regarding purchase of pillow cases, lipstick, jewelry, fine wine, and Hermes and Birkin bags, as well as ELISA and HSV meeting and Parloff interview); SEC-USAO-EPROD-001204153 (10/28/2014 email from Durkin to Holmes regarding Theranos business and purchase of Mason Pearson brushes, Tom Ford shoes, fine wine, trips to Neiman Marcus, and research of bungalows in Hawaii); SEC-USAO-EPROD-001204223 (10/24/2014 email from Durkin to Holmes regarding meetings regarding CLIA and HSV2 and trips to Hermes and Neiman Marcus, modifications for a private shower in her bathroom, *Fortune* article reprints, wine purchases, Jimmy Choo shoes, Gucci items, and Tom Ford boots); SEC-USAO-EPROD-001204256 (10/22/2014 email from Durkin to Holmes regarding same, plus flights on corporate jet); SEC-USAO-EPROD-

001205188 (9/4/2014 email from Durkin to Holmes reporting she will go to Armani, Gucci, Chanel, Hermes and Bloomingdales – and reporting on investor presentations); SEC-USAO-EPROD-001205215 (8/30/2014 Durkin/Holmes email discussing food delivery to house, Hermes belts, new wallet, certain stylists, manicures at the Four Seasons, and meeting Cleveland Clinic CEO Delos Cosgrove); SEC-USAO-EPROD-001205225 (similar 8/29/2014 email); SEC-USAO-EPROD-001205336 (similar 8/25/2014 email); SEC-USAO-EPROD-001205348 (8/23/2014 email from Durkin to Holmes regarding Gucci, Hermes, Neiman's, and work items); SEC-USAO-EPROD-001206267 (6/28/2014 email reflecting scheduling of meeting with investment bankers, TV and media interviews, TedMed speech, Intermountain business, CLIA lab update, calls with investor, estimates for jet to Nashville); SEC-USAO-EPROD-001314378 (Durkin to-do list on or about 1/15/2014 regarding food delivery from Four Seasons and calling Neiman Marcus); SEC-USAO-EPROD-001043591 (10/2/2014 email from Durkin describing support for Holmes).

The evidence is offered for the permitted purpose of motive, intent, preparation, plan, knowledge, absence of mistake, and lack of accident.  Holmes's receipt of benefits from Theranos tends to show she had a financial incentive to commit the offenses.  It tends to show she coveted fame and luxury goods and disproves Holmes's pubic suggestion and investor pitch that she was not motivated by money and acted for altruistic purposes.  The evidence tends to show she exercised control over Theranos, and was aware of its activities. ███████████████████████████████████████████████████████████████

Throughout the time period of the conspiracy, Holmes closely monitored daily news to cultivate her image and coveted fame and media attention.  *See, e.g.*, SEC-USAO-EPROD-001198532 (10/25/2014 17-page "media grid"); SEC-USAO-EPROD-001212249; SEC-USAO-EPROD-002625245; SEC-USAO-EPROD-002787868; SEC-USAO-EPROD-003188132; SEC-USAO-EPROD-005053153; SEC-USAO-EPROD-000723875; SEC-USAO-EPROD-001198532; US-FDA-0038921.  The evidence is offered for the permitted purpose of motive, intent, preparation, plan, knowledge, absence of mistake, and lack of accident.  Evidence Holmes achieved fame and media attention tends to show motive and disproves Holmes's pubic suggestion and investor pitch that she was not motivated by money or acted for altruistic purposes.  The evidence tends to show she exercised control over Theranos, and was aware of its activities. █████████████████████████████████████████████████████████████████

Throughout the time period of the conspiracy, Holmes ingratiated herself with board members and others who might benefit her with gifts.  *See, e.g.*, SEC-USAO-EPROD-001202724 (1/21/2015 Durkin/Holmes email re gifts).  She also closely monitored details of board dinners to create the appearance of success and patriotism and to manage the information they received and followed.  *See, e.g.*, SEC-USAO-EPROD-001203150 (1/13/2015 email regarding specific details of board meeting); SEC-USAO-EPROD-001204258 (10/22/2014 Durkin/Holmes email monitoring board binders and notes).  The evidence is offered for the permitted purpose of motive, intent, preparation, plan, knowledge, absence of mistake, and lack of accident.  The evidence tends to show she exercised control over Theranos, and was aware of

its activities. ████████████████

During the fraud, Holmes traveled on corporate jets and in luxury vehicles and stayed in luxury hotels. *See, e.g.*, SEC-USAO-EPROD-001314171 (1/27/2015 travel on Flite logistics aircraft and landmark limousine); SEC-USAO-EPROD-002150649 (discussing search for best five star hotels, whether another suite needs to be reserved for Balwani, invite to Clinton Foundation, and internal Theranos meetings); SEC-USAO-EPROD-003730862; SEC-USAO-EPROD-003730866. The evidence is offered for the permitted purpose of motive, intent, preparation, plan, knowledge, absence of mistake, and lack of accident. Holmes's receipt of benefits from Theranos tends to show she had a financial incentive to commit the offenses, exercised control over Theranos, and was aware of its activities. It disproves Holmes's pubic suggestion and investor pitch that she was not motivated by money or acted for altruistic purposes. ████████████████

In or around September 2014, Holmes suggested at a TedMed conference her uncle's death was the inspiration for Theranos and that he died suddenly. *See, e.g.*, SEC-USAO-EPROD-000705421 (2/28/2016 email from E. Holmes to D. Edlin/E. Holmes stating that uncle's death was not sudden); SEC-USAO-EPROD-001205162. The evidence is offered for the permitted purpose of motive, intent, preparation, plan, knowledge, absence of mistake, and lack of accident. Such evidence disproves Holmes's pubic suggestion and investor pitch that she was not motivated by money and acted for altruistic purposes. ████████████████

Balwani's Lamborghini or Porsche bore the license plate DASKAPITAL. US-REPORTS-0013672. The evidence is offered for the permitted purpose of motive and intent.

## XXII. Concealing the romantic relationship between Holmes and Balwani from investors and others.

The government may offer evidence of the following:

- Testimony by Holmes that she never told investors that she and Balwani had a romantic relationship. SEC-TX-000005499.

- Statements by Callie Rosendin that, sometime between March 2011 and July 2012, despite discouraging interpersonal relationships amongst Theranos employees, Holmes and Balwani were involved in a romantic relationship. Approximately three to four months into Rosendin's employment at Theranos, Balwani went to her and told her to keep his relationship with Holmes quiet. US-REPORTS-0002366.

- Statements by Jeff Blickman that he knew Balwani and Holmes were dating before Blickman started at Theranos. Blickman was under the impression their

relationship was not to be talked about with others at Theranos.  Blickman got this direction from Christian Holmes.  US-REPORTS-0009349.

- Statements by Surekha Gangakhedkar that it was well known that Sunny Balwani and Elizabeth Holmes were in a relationship and that they were boyfriend and girlfriend.  Balwani was known to be running the company. The relationship between Holmes and Balwani was not disclosed.  US-REPORTS-0000813.

- Statements by Alex Taylor that he was not aware of any personal relationship between Holmes and Balwani.  Had he been advised of such a relationship, he would have taken it under advisement.  US-REPORTS-0002610.

- Statements by Scott Earthy that he was not aware of a personal relationship between Holmes and Balwani.  Earthy would have liked to have known if Holmes and Balwani had a personal relationship because there could have been a downside if the relationship did not work out.  US-REPORTS-0006026.

- Statements by Jerry Tubergen that he was not aware of a personal relationship between Balwani and Holmes before the investment was made.  Tubergen said he would have wanted to know because the disclosure might have mattered.  US-REPORTS-0008136.

- Statements by Don Lucas that he learned about Holmes and Balwani's relationship through media reports.  He was surprised and said it was material information to know.  Lucas did not invest in husband wife start ups because there is too much drama.  US-REPORTS-0011835.

- Statements by Christian Holmes that, at some point in the 2014/2015 time period, Holmes told him that she was disclosing the relationship to the board.  PFM-DEPO-00015017.

- Statements by Craig Hall to the effect that throughout Hall's interactions with Holmes beginning in or about 2006 and lasting through in or about 2013, Holmes concealed her romantic relationship with Balwani.  US-REPORTS-0007005; US-REPORTS-0007010 to 0007017.

- Statements by Dan Mosley to the effect that throughout Mosley's interactions with Holmes beginning in or about 2014 and lasting through in or about 2016, Holmes concealed her romantic relationship with Balwani.  US-REPORTS-0002767; US-REPORTS-0002776 to 0004299.

Holmes caused the distribution of a *New Yorker* article to members of the board and investors stating:  "Her home is a two-bedroom condo in Palo Alto, and she lives an austere life. Although she can quote Jane Austen by heart, she no longer devotes time to novels or friends, doesn't date, doesn't own a television, and hasn't taken a vacation in ten years."  SEC-USAO-

EPROD-000068053; SEC-USAO-EPROD-000068054; SEC-USAO2-EPROD-000041814; SEC-USAO2-EPROD-000041815; SEC-USAO-EPROD-001224372.

\*\*\*

The evidence is offered for the permitted purpose of motive, intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy. Among other things, evidence that Holmes and Balwani did not disclose the relationship tends to show the agreement and joint plan.  Such evidence tends to show intent – Holmes and Balwani feared that if investors knew it would raise questions about Balwani's role and qualifications. Such evidence is relevant to consciousness of guilt – public knowledge would undermine Holmes's public image that she lived an austere life devoted only to Theranos.  Such evidence is relevant to the materiality of statements made to investors.  Such evidence is also related to claims that Holmes and/or Balwani relied on the other and/or claims that because of a mental disease or defect she was unable to form intent to defraud.

\*\*\*

The government reserves the right to introduce additional evidence covered by its previous disclosures, and further reserves the right to amend this notice in advance of trial based on its continuing investigation and trial preparation.

Very truly yours,

ADAM A. REEVES
Attorney for the United States,
Acting Under Authority Conferred
By 28 U.S.C. § 515

/s/

_____
ROBERT S. LEACH
JEFFREY SCHENK
JOHN C. BOSTIC
VANESSA BAEHR-JONES
Assistant United States Attorneys

Cc      Jeffrey Coopersmith, Esq. (by email)