# Exhibit 5



United States Attorney
Northern District of California

*150 Almaden Boulevard, Suite 900*  *(408) 535-5061*
*San Jose, California 95113*  *FAX (408) 535-5066*

September 28, 2020

VIA EMAIL

Lance Wade
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, DC 20005

Jeffrey B. Coopersmith
Orrick Herrington & Sutcliffe LLP
701 5th Avenue, Suite 5600
Seattle, WA 98104-7097

> Re:  *United States v. Elizabeth Holmes and Ramesh "Sunny" Balwani*
> CR-18-00258-EJD
> Supplemental Expert Notice

Dear Counsel:

Pursuant to Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure, the government hereby provides the following supplemental written summary of testimony that the government intends to use under Rules 702, 703, and/or 705 of the Federal Rules of Evidence during its case-in-chief at trial.  This disclosure is a supplement to the information contained in the government's previous disclosure dated March 6, 2020.  Pursuant to Rule 16(b)(1)(C) of the Federal Rules of Criminal Procedure, the government hereby requests from Defendants disclosure of testimony they intend to use under Rule(s) 702, 703, and/or 705 of the Federal Rules of Evidence as evidence at trial.  Please note that the backgrounds and qualifications of the following experts are summarized in the resumes and/or curricula vitae, which are attached hereto and incorporated by reference.

1. Bruce Pixley

Please see the attached report summarizing the testimony of Mr. Pixley.  His qualifications are summarized in the accompanying CV.

2. Dr. Steven Linnerson

Dr. Linnerson is a fact / percipient witness, whose testimony may also cover topics and/or opinions informed by his knowledge, skill, experience, training, and education. *See* Fed. R. Evid. 702.

Dr. Linnerson has practiced medicine for 37 years and has extensive experience as an OBGYN practitioner. He has experience training resident physicians as well, and occupies a training role at his current practice. Dr. Linnerson also discusses current developments in medical practice with the other members of his practice. As a group, they commonly get into didactic discussions at regular provider meetings and product committee meetings.

Dr. Linnerson may testify that the hCG test is standard for OBGYN patients. In addition to detecting pregnancy, it can be a tumor marker. hCG is a chemical that comes from a developing placenta, but it is also a marker for cells that make abnormal chemicals. It is used as a tumor marker very rarely; its primary use is in detecting pregnancies. That has been true throughout his entire career. There are two types of hCG tests: quantitative and qualitative. Qualitative is either positive or negative, and quantitative gives you a number. Typically, for qualitative testing, if a patient's hCG level was greater than 20, it was called positive, and if it was less than 20, it was called negative. Quantitative hCG has been available for approximately 20 years.

In medical school and then in his residency, Dr. Linnerson was educated on hCG, including the role of hCG in pregnancy and the role of different levels. Besides education in medical school and in residency, his continuing medical education has contributed to his knowledge of hCG. ACOG (the American College of OBGYNs) has technical bulletins and articles that he reads to stay current. Currently, OBGYNs must certify yearly, such that during active years of practice he engages in a lot of reading hCG quantitative levels as part of that certification process. He reads articles on hCG and has discussions with the partners in his practice. Additionally, years of treating patients has contributed to his knowledge base regarding hCG.

Dr. Linnerson has handled an estimated 200,000 office visits, and half of those visits were OB patients. Through the years, he has handled about 30 deliveries a month and treated a total of 14,000-15,000 pregnant women. Every one of those patients involved him looking at an hCG test. Dr. Linnerson estimates that every delivery was preceded by 13 office visits. In a normal pregnancy, a physician will want to know if hCG levels are going up. hCG levels also reveal whether a baby is okay, which is of heightened concern in patients who have a history of miscarriage or bleeding. Dr. Linnerson said he has easily personally examined tens of thousands of hCG tests. All the hCG test results that Dr. Linnerson examined were provided by outside labs. Those tests were generally conducted by vein draw.

Dr. Linnerson may testify that all pregnancies start in the fallopian tube. The sperm and the egg meet in the tube and then travels down the tube into the uterus. If the fertilized egg gets stuck in the tube it leads to an ectopic pregnancy that can rupture the tube causing the patient to bleed internally. If the pregnancy is stuck in the fallopian tube, the doctor generally must poison the embryo and cause it to dissolve in the tube to avoid danger to the mother. hCG values are expected to go up 2/3 every 48 hours and they double every 72 hours in a normal pregnancy. If

the pregnancy test goes 200, 400, 410, 550, the curve is flattening and that is a dangerous sign. The patient may lose the baby or require additional treatment.

Dr. Linnerson will testify that Theranos provided hCG test results to doctors in his practice that indicated clearly that pregnancies were not going to make it because the hCG levels were not doubling as they should have been. Despite those results, those patients were later determined to be carrying viable pregnancies. Dr. Linnerson may testify that hCG results can be plus or minus 10 percent, so doctors are careful to examine trends in test results. There are biological differences in the rates at which pregnancies grow. Despite there being a range of normal results, the values returned by Theranos to more than one of Dr. Linnerson's practice's patients indicated unambiguously that pregnancies would not be viable. Dr. Linnerson will testify that, in the cases he observed at his practice, the Theranos test values were too low to have a biological explanation in light of the fact that the patients in question did not lose their pregnancies. It is not possible to obtain a viable pregnancy from the low hCG values some Theranos tests showed, proving that the test results must have been inaccurate. Dr. Linnerson will testify that lab error is the only explanation for the numbers he saw from Theranos.

   3.  Dr. Audra Zachman

Dr. Zachman is a fact / percipient witness, whose testimony may also cover topics and/or opinions informed by her knowledge, skill, experience, training, and education. *See* Fed. R. Evid. 702.

Dr. Zachman is a nurse practitioner with extensive experience treating pregnant patients and interpreting hCG results. Since she began practicing, Dr. Zachman has renewed her license every two years, and attends a conference every year. Although those tasks entail additional education, hCG values are so fundamental a part of obstetric practice that extensive additional education on the topic has been unnecessary. Dr. Zachman may testify that hCG is a standard tool used with obstetrics (OB) patients to confirm the presence and health of a pregnancy. The hCG hormone can be excreted in "pregnancy like" situations, such as in a molar pregnancy, where hCG levels are used to track the progress of a dangerous growth in the uterus that does not include a fetus. Dr. Zachman may testify that it is very clear when you are looking at qualitative hCG, that hCG is either present in the body or it's not. When you are looking at quantitative hCG, a treating doctor knows based on the patient's condition where that number should be. For example, if a test is yielding numbers in the hundreds of thousands and the patient is early on in her pregnancy, you would know that wasn't possible.

Dr. Zachman received training on hCG while earning her doctorate in school. She continued to have extensive experience with hCG tests and interpreting test results while working at her practice. During times of active practice, Dr. Zachman averaged 20 patients a day, 5 days a week for four years, and three days a week for two years. During an average week. Dr. Zachman probably reviewed 25 hCG tests. She has therefore reviewed approximately 1,000 hCG tests or more over a full year during her years of practice. Over the course of her career, she has reviewed an estimated 5,000 quantitative hCG tests. In each of these cases, the hCG data comes from the outside lab conducting the test.

Dr. Zachman may testify that an hCG result tells her whether a patient is pregnant or not. If Dr. Zachman already knows the patient is pregnant, it tells her how far along the pregnancy might be. If she already knows how far along a pregnancy is based on other data, then the hCG value can give her additional important information, such as whether the pregnancy is likely to be viable or threatened. hCG values may also indicate whether a pregnancy includes twins or triplets, or if it looks like a molar pregnancy. With hCG results, it is important to look at the trend then looking at a specific value; the normal range can vary somewhat from person to person. Thus, practitioners pay attention to how the patient's hCG values are trending over a period. Dr. Zachman may testify that one would anticipate in a healthy pregnancy to see a doubling of hCG every 48 hours in the first couple of weeks of pregnancy, and then a plateau after that. If the hCG numbers did not double according to this rule, it would give Dr. Zachman suspicion of a threatened viability.

Dr. Zachman may testify that, in a normal healthy pregnancy, it is not biologically possible for an hCG value to double, then level out and start to drop, but then resume its climb as normal. In the case of a particular patient, ███████████, Dr. Zachman received hCG results from Theranos indicating that her hCG level was 12,500 one day, then 125 two days later. Dr. Zachman may testify that, if accurate, those results would indicate a nonviable pregnancy. Such a substantial drop, in fact, would indicate that the body had already begun to miscarry the pregnancy. Results like that would be inconsistent with a viable pregnancy. Following the 125 value, ███ received another Theranos test result two days later indicating an hCG value of 9,500. Dr. Zachman may testify that that sequence of three test results should not be biologically possible. Were Dr. Zachman to ignore the lowest value of 125, a drop from 12,500 to 9,500 over four days would still be indicative of a potential serious problem with the pregnancy. In a normal healthy pregnancy, one would expect that number to rise from 12,500 to approximately 48,000 over that four-day period. Based on this, it is clear that at least one of the Theranos test results was not accurate.

   4. Dr. JoEllen B. Embry

Nurse Practitioner JoEllen Embry is a fact / percipient witness, whose testimony may also cover topics and/or opinions informed by her knowledge, skill, experience, training, and education. *See* Fed. R. Evid. 702.

Dr. Embry's medical practice focuses on women's health issues. Specifically, her current practice focuses on Polycystic Ovarian Syndrome (PCOS). PCOS is a pre-diabetic, pre-heart disease condition. When Ms. Embry became a nurse practitioner, she went to endocrine conferences and sought out expert advice, she started really learning about PCOS. In addition to PCOS, her practice also focuses on other endocrine problems. This has been the case for at least 20 years. Dr. Embry formerly would attend three to four large out of town conferences every year along with dozens of dinners throughout the year, all of which would feature speakers addressing topics relevant to her practice. Since 1995 Dr. Embry has regularly attended conferences where endocrine issues and PCOS were discussed. These have included conferences specifically focusing on PCOS from 2000 on.

Dr. Embry may testify that PCOS can be a complicated condition.  Women with PCOS do not ovulate regularly and many times they are overweight.  PCOS is the number one endocrine problem affecting women.  In some women, it shows up right from the moment they start their menstrual cycle.  In others, it shows up after their first pregnancy or after a hugely stressful event in their life that triggers hormone changes. Many women were probably born with it.  Most patients with PCOS have a family history of diabetes.  These women present with menstrual irregularities, excessive facial and/or body hair, acne, obesity (especially mid-section obesity), hair thinning, and/or velvety patches behind their neck.  The underlying problem is insulin resistance, which results in hormonal changes, including the production of excessive estrogen and testosterone.  A patient with PCOS may have elevated lipid levels.  Some women will have a period every month, but that doesn't mean they are ovulating.  Many have multiple follicles in their ovaries and around their ovaries. The condition leads to a problem of inflammation that can in turn lead to diabetes, heart disease, and fertility issues.  It can also lead to uterine cancer if the patient goes months and months without a menstrual cycle.

As a nurse practitioner focusing on women's health issues, Ms. Embry has treated between 65,000-75,000 individual patients.  Of those patients, 1,500 to 2,000 each year were treated for PCOS.  Thus, in her career she has treated approximately 30,000 PCOS patients.  Each of those PCOS patients had multiple testosterone lab tests ordered and reviewed by Dr. Embry.  In total, Dr. Embry has reviewed in excess of 100,000 testosterone lab results over her career.

Dr. Embry may testify that a healthy female patient's testosterone levels may typically be around 30 for total testosterone, with a level of 3 or 4 for free testosterone.  A patient with PCOS may have a testosterone level as high as 130 with a free testosterone level at 30.

Monitoring testosterone levels gives Dr. Embry an idea on how to treat PCOS.  Some women's testosterone levels are s a little elevated and they have a lot of symptoms, some have high levels but few symptoms.  By measuring their levels, Dr. Embry can prescribe the correct dose of Spironolactone, for example, which will help lower testosterone levels.  It is important that she have accurate test results to be able to manage the treatment and the dosage amount of Spironolactone.  Using this method, Dr. Embry has seen patients who presented with testosterone levels of 90 that were reduced over time to 40 or 50 in a year, which will bring improvements in their health.

In her experience with Theranos, Dr. Embry received testosterone results for patients she knew to be suffering from PCOS with levels so low as to indicate that the patient had no hint of PCOS.  Some of those suspect results were less than 1—lower than would be expected and healthy in a similarly aged patient with no endocrine disorder.  Dr. Embry may testify that menopausal women sometimes have testosterone levels that low, but that she was seeing these results in twenty-five year old patients known to have PCOS—patients who normally presented with testosterone levels of 30 or 40 but who were suddenly getting Theranos results indicating levels of less than 5.  Dr. Embry may testify that there could be no biological explanation for a drop of that nature given the history of the patients and their stable medication dosage, leading to the conclusion that Theranos's test results were inaccurate.

5. Dr. Mark Burnes

Dr. Burnes is a fact / percipient witness, whose testimony may also cover topics and/or opinions informed by his knowledge, skill, experience, training, and education. *See* Fed. R. Evid. 702.

Dr. Burnes is an experienced physician practicing in internal medicine. He may testify about the blood test for PSA or Prostate Specific Antigen. Pieces of the prostate organ get deposited in the bloodstream as debris and the PSA blood test is designed to measure the quantity of that. As the prostate gets bigger with age, it produces more discarded tissue and PSA levels are expected to rise. Any PSA level above 10 will get a physician's attention. When monitoring PSA levels, however, it is important for doctors to be aware of trends. A patient can have prostate cancer with a PSA level of 2.5 if their healthy baseline level would be five times lower at 0.5. Conversely, a patient may experience PSA levels rising from 8 to 12 to 14 to 18 while still having negative biopsies for prostate cancer.

Dr. Burnes received training on interpreting PSA results in medical school, and has had additional experience since then. Dr. Burnes has treated approximately 28 patients with prostate cancer over the course of his career. He estimates that he has reviewed more than 5000 PSA results during his career as a practicing doctor.

Dr. Burnes may testify about his experience treating a patient who received Theranos test results for the PSA analyte. That patient had previously tested at a level 2 for PSA, but one year later received a PSA result of 26 from Theranos. Such a jump would be strongly indicative of a very aggressive form of prostate cancer. A large jump in values like that could not be explained by prostatitis. When prostate cancer shows up at a relatively young age like 45 it can be very aggressive and take the patient's life in five years. An additional Theranos test returned a value of 1.71, then a third Theranos test yielded a PSA level of 22.8. Dr. Burnes may testify that there is no biological explanation for such large jumps in PSA values. There is no medical explanation for a drop from 26 to 1.71 over such a short time period. Lab error / inaccurate testing is the only possibility. Similarly, there is no medical explanation for the jump from 1.71 to 22.8 except for physical trauma to the prostate. Even with severe prostatitis, a doctor would expect the level to rise from a 2 to a 6 or 8.

6. Dr. Edward Szmuc

Dr. Szmuc is a fact / percipient witness, whose testimony may also cover topics and/or opinions informed by his knowledge, skill, experience, training, and education. *See* Fed. R. Evid. 702.

Dr. Szmuc will testify that hCG is produced by placental tissue that is growing in an early pregnancy. Once a patient has a positive hCG test, which is anywhere from a value of 3 to 5, it indicates a pregnancy. Typically, the hCG number doubles every two to three days. Once a number gets up to about 100,000, it levels off and goes down; this occurs somewhere after six weeks. By that time, the physician should have confirmed an intrauterine pregnancy by ultrasound. After that, it's no longer necessary to follow the hCG numbers. Dr. Szmuc will testify about treating a patient who wanted to become pregnant and who was feeling well with no symptoms of pain, shoulder pain, or bleeding. That patient's first Theranos hCG test result was

positive, but Dr. Szmuc recalled the second Theranos hCG test result decreased. He will explain that when that happens, a doctor is concerned with the possibility of an ectopic pregnancy or an abnormal growing intrauterine pregnancy. Dr. Szmuc will testify that the second result did not make sense because the patient was not experiencing any other symptoms. Because Dr. Szmuc was not confident in the Theranos hCG result, he sent the patient out to another lab for her subsequent hCG test.

Dr. Szmuc will testify that with an ectopic pregnancy the hCG numbers usually either level out, go up slowly, or fall slowly. With an ectopic pregnancy, the hCG numbers do not double every two or three days. He will explain that if you look at a falling hCG number, that is usually associated with an abnormal intrauterine pregnancy, which is when the embryo stops growing. hCG numbers with an abnormal intrauterine pregnancy usually fall faster than they would in an ectopic pregnancy. Dr. Szmuc will explain that physicians are always trying to rule out an ectopic pregnancy. With an ectopic pregnancy, the growth of a placenta occurs in the tube, and the fetus cannot grow normally. If the pregnancy is in the end of the tube, there is more room to grow, the pregnancy can grow further long, and you can see the hCG numbers get much higher. If a pregnancy is ectopic, it qualifies as high risk. With an ectopic pregnancy, physicians are worried about rupture, significant hemorrhage, or the worst-case scenario of patient death. He will explain that if he treats a patient where he suspects an ectopic pregnancy, he would talk to that patient on a regular basis and get hCG numbers every two days or so. A physician would also need to get an ultrasound and make sure there is no blood in the patient's abdomen. The physician must work quickly to act before a rupture occurs. Sometimes it takes a week, sometimes it takes two weeks to determine definitively if a patient has an ectopic pregnancy. Dr. Szmuc said 2.7% of all maternal deaths in the United States result from ectopic pregnancies.

Dr. Szmuc first started using hCG tests during his residency, which was between the years of 1979-1983. To be specific, he started using hCG tests in 1982; before then, hCG numbers were not ascertainable, so physicians had to use other methods. He has been in practice for 37 years, and he probably utilizes hCG tests several times a week, every week. He estimates that he has reviewed over 10,000 hCG tests. Dr. Szmuc will testiy that in his career, he has never observed a positive hCG test, followed by a lower hCG test 48 hours later, followed by a higher hCG test 48 hours after that. Dr. Szmuc will also testify that he has never had any issues with hCG tests and other laboratories in his career, other than the issues he had with Theranos.

   7. Dr. Gerald S. Asin

Dr. Asin is a fact / percipient witness, whose testimony may also cover topics and/or opinions informed by his knowledge, skill, experience, training, and education.  *See* Fed. R. Evid. 702.

Dr. Asin will testify about A1c tests. Hemoglobin A1c (A1c) test is a diabetic test. A1c tests for the percentage of sugar attached to the red blood cell. Theranos A1c tests were either too high or too low; the Theranos results were not accurate. If the A1c test is not accurate the patients' medicine (such as insulin) could be incorrectly changed, leading to an overdose or underdose in the patient. Normal A1c is less than 5.6% for a healthy patient, and less than 7% if diabetic (8%-11% would be high for a diabetic patient). Low hemoglobin, less than 5%, could result in a coma from the brain shutting down.

Dr. Asin will also testify about protein and calcium tests. Protein tests are ordered as part of a Comprehensive Metabolic Panel (CMP). Dr. Asin will testify that he found abnormalities with Theranos protein and calcium tests. He contacted the lab because he was getting erroneous results. Dr. Asin will further testify that too much protein, if not linked to another sickness, could indicate an issue with bone marrow or cancer. Low protein could indicate malnourishment. Overuse of antacids could impact protein. Although it would depend on the particular lab used, generally a normal range was 5-7 or 6-8 g/dL. Calcium tends to correlate with protein. Normal calcium is about 8.8 -10.4 mg/dL.

Doctors also adjust the calculation of calcium when they review CMP results, because if the protein is off it could be masking the actual calcium number. The equation was 1 protein to .8 calcium. If the protein reported on the CMP was off, the doctor would wrongly apply this ratio, which could either hide an actual issue with calcium or indicate there was an issue with calcium when one did not exist.

High or low calcium is very dangerous and could implicate the heart. When using Theranos tests, Dr. Asin saw calcium too high every week, as opposed to when he used other labs, when he only saw high calcium once to twice a month.

Dr. Asin will also testify about PSA tests. Dr. Asin will testify that some of his patients had uncharacteristically high PSA results from Theranos. The prostate-specific antigen (PSA) tests for the specific prostate antigen. The prostate secretes this antigen, and it tends to correlate with the increase in prostate size and risk of cancer. It is a test to look for cancer before symptoms might show.

For most men under 60 years old, normal PSA is below 4. As men get older, the prostate naturally grows larger, so the normal range is adjusted. For men over 70 years old, normal is below 5. For men over 80, normal is below 6. A physician's review of the results also looks at the change from year to year, not only if the number is technically in the normal range. Also, some men can have larger prostates without having cancer.

If PSA results are reported low incorrectly, cancer could be missed. If PSA results are reported high incorrectly, a man would have to have an additional, more invasive test. Specifically, a biopsy of the prostate would need to be done. In order to do a biopsy, a needle would be used, piercing through the colon to the prostate. In addition to conducting this test unnecessarily, the prostate biopsy could also have complications. Since the needle is pushed through the colon, fecal material could make its way into the blood. This would result in fevers and chills. For instance, Dr. Asin recently treated a patient who experienced this and spent one week hospitalized. It was also possible the needle could hit a blood vessel, leading to hemorrhaging that would require surgery.

Dr. Asin monitored his own PSA, and would expect his number to be lower at 54 than at 59. Hopefully his number was between 1 – 2, and generally less than 4. Dr. Asin will testify that his own PSA seemed higher than was accurate in a Theranos test. Dr. Asin had a prostate biopsy done on himself.

Dr. Asin ordered A1c, CMP, and PSA tests for all 33 years of his medical practice. For A1c, protein, and PSA, Dr. Asin ordered the tests every day, multiple times a day.

8. Dr. Govind Acharya

Dr. Acharya is a fact / percipient witness, whose testimony may also cover topics and/or opinions informed by his knowledge, skill, experience, training, and education. *See* Fed. R. Evid. 702.

Dr. Acharya will testify that BMP is a basic metabolic panel. BMP is a basic test ordered prior to operating, which Dr. Acharya has done for forty years. BMP was ordered before all surgeries, inpatient or outpatient, done by Dr. Acharya. BMP tested electrolytes: sodium, potassium, and fluoride.

An abnormality in BMP results would cause an issue with administering anesthesia. The most sensitive result was potassium, which had an effect on the heart and so was significant to the anesthesiologist. If potassium was off, it was possible that the patient could die on the table.

Dr. Acharya will testify that he ordered and evaluated thousands of BMP tests. Potassium numbers above 5 and below 3 were abnormal. For plastic surgery, this resulted in the surgery being cancelled. For the two patients Dr. Acharya remembered having an issue with the Theranos BMP, their potassium was over 5. This was very unusual for healthy patients, which these two patients were. That number would be expected in patients with kidney failure or cardiac issues, not healthy patients.

Dr. Acharya had not seen BMP test results that high since the first ten years of practice, because during that time he was doing emergency and trauma cases. Once Dr. Acharya moved to plastic surgery, which had been the last thirty years of practice, he will testify that he did not recall ever seeing potassium levels as high as those Theranos test results.

9. Dr. John Couvaras

Dr. Couvaras is a fact / percipient witness, whose testimony may also cover topics and/or opinions informed by his knowledge, skill, experience, training, and education. *See* Fed. R. Evid. 702.

Dr. Couvaras is an experienced physician practicing in obstetrics and reproductive endocrinology. Over the course of his career as a treating physician, he has seen 10,000 or 11,000 patients who have had hCG tests, meaning that he has personally reviewed well over 10,000 hCG test results. Dr. Couvaras may testify that hCG is a hormone used to indicate the presence and health of a pregnancy, and that hCG levels are expected to double or increase by a factor of 1.6 every 48 hours during a normal, healthy pregnancy.

Dr. Couvaras may further testify about his experience treating a pregnant patient who received an hCG test result showing a level of 160, indicating the presence of a pregnancy. That patient

then received a Theranos hCG test three days later returning a value of less than 5, indicating the absence of a pregnancy. That same patient was tested a third time more than two weeks later and the Theranos test indicated an hCG level of 2150, again showing an established pregnancy.

Dr. Couvaras may testify that these values made no sense biologically. There is no medical explanation for an hCG value dropping that quickly. Even if the patient miscarried and there was still a sack in the uterus, the placenta would still be pumping out hCG such that higher levels would linger for weeks. On that basis, Dr. Couvaras may testify that the Theranos results are explainable only through lab error or inaccurate testing methods.

Dr. Couvaras may also testify that lovastatin is contraindicated for pregnant women.

    10. Dr. Curtis Page

Dr. Page is a fact / percipient witness, whose testimony may also cover topics and/or opinions informed by his knowledge, skill, experience, training, and education. *See* Fed. R. Evid. 702.

Dr. Page will explain that the A1C test provides a look back on the previous three months of the average blood sugar of a patient. It tells the physician how well the patient's diabetes is being managed. It allows the physician to make clinical decisions based on the value it returns. Dr. Page will testify there is not a whole lot of evidence that an A1C that is too high or too low can affect clinical outcomes; it does not represent a critical value like a low potassium would, unless the results are either extremely high or extremely low.

Dr. Page will explain that what his practice found was that the A1C results their patients were getting from Theranos did not correlate with those patients' previous results. Nothing had changed dramatically in the patients as far as their condition, but their A1C results were changing. The patients were getting results from Theranos that were one to two orders of magnitude different than their previous results, and Dr. Page sent them to another lab for testing. The discrepancy called into question the integrity of the Theranos testing system, specifically whether it was giving accurate results.

Dr. Page will testify that the average person, when including babies and infants, has an A1C value of 4.2. The A1C value represents the percentage of red blood cells irreversibly tagged to a blood sugar molecule. Most adults have an A1C value of 5.0 to 5.6. If a person is diabetic, that person's A1C is at least 6.5. A person with diabetes that is well controlled will have an A1C value between 6.5 and 7.2. As a person gets older, their A1C number rises. Dr. Page will testify that an A1C between 6 and 9 is considered acceptable in some circumstances. In a younger person, an A1C around 6.5 to 7 is preferable. Once a patient's A1C gets higher than 9, that is indicative of very poor care, although it does not represent an acute emergency. If a patient's A1C is 14, that would be an immediate problem.

With Theranos's A1C test, a patient of Dr. Page's would have a value of 6.5 for years, and then all of a sudden, the Theranos value would be 8.0. That did not make sense to Dr. Page and his practice. It made him question the integrity of the test. There was a period of two to three months when Dr. Page's practice was getting inaccurate A1C results from Theranos. Some of the A1C

results from Theranos seemed normal, but some of them were not. Dr. Page will testify approximately 70 to 100 of his patients were affected. Theranos said the problem was with the machine. Theranos went back and refunded all the patients that were affected. There was a long delay after his practice notified Theranos of the problem and Theranos did an investigation.

Dr. Page first started interpreting A1C results when he was in medical school, and he has been interpreting them ever since, which is at least 20 years. He looks at A1C tests every day.

    11. Dr. Adam Rosendorff

Dr. Rosendorff is a fact / percipient witness, whose testimony may also cover topics and/or opinions informed by his knowledge, skill, experience, training, and education. *See* Fed. R. Evid. 702. Dr. Rosendorff's opinions are further summarized in the reports of his interviews and his documented statements, all of which have been produced by the government.

Dr. Rosendorff is a medical doctor with years of experience as laboratory director at a number of clinical labs and companies. He is currently Medical Director and CLIA [Clinical Laboratory Improvement Amendments] Laboratory Director of record at Millennium—a clinical toxicology laboratory that also conducts genetic analyses. In that position, Rosendorff is responsible for ensuring testing is accurate and precise, reviewing quality control (QC) and quality assurance (QA), conducting proficiency testing through the College of American Pathologists (CAP), examining test result trends to determine if QC is meeting specifications, and interpreting urine and drug testing reports as necessary. Previously, Dr. Rosendorff was Laboratory Director for Invitae, a CAP accredited clinical laboratory that conducted genetic analyses for cancers and other hereditary conditions. Rosendorff's responsibilities at Invitae were the same as with Millennium, with the exception that he also was signatory on patient reports. Invitae was a CAP deemed organization meaning that CAP reported its lab findings to CLIA. CAP had higher standards than CLIA and had an area checklist that laboratories had to abide by. While at Invitae, Rosendorff was also part time lab director for Precision Diagnostics. Before Theranos, Dr. Rosendorff was Laboratory Director for Children's Hospital-University of Pittsburgh. As lab director for Children's Hospital, Dr. Rosendorff was responsible for reviewing and approving validation reports for assays. Dr. Rosendorff treated patients as part of his medical residency, and while at Children's Hospital, he often interacted with clinical physicians allowing him to gain a deeper understanding of the use of patient clinical lab testing.

Doctor Rosendorff is board certified in laboratory medicine/clinical pathology. He has taken continuing education courses to maintain his medical license, and regularly reviews articles in the New England Journal of Medicine and other toxicology based publications. Under his supervision as lab director, the labs Dr. Rosendorff has overseen have run hundreds of thousands of assays. He has personally reviewed thousands of lab tests covering a wide variety of analytes, including some of the most common tests run in clinical chemistry, toxicology, genetics, and immunology.

Dr. Rosendorff may testify about the responsibilities of a lab director. Laboratory directors must be familiar with the laws that govern laboratory operations which are outlined in CLIA regulations and Code of Federal Regulations. Some states have state-specific laws. For

example, New York State requires labs to meet specific regulations in order to run samples from patients that reside in New York. The lab director may delegate responsibility for maintaining compliance with state regulation to a QA manager. Lab directors oversee lab staff, but may delegate staffing duties and other logistic responsibilities to a lab manager and operations vice president. A lab director's ultimate goal is to run the lab smoothly, generate results that were of clinical use, ensure device calibrations were set, ensure QC was in range, review critical values to ensure no pre-analytic issues caused the result, and ensure that results are accurate and precise. A lab director cannot review every result and must trust that the other lab personnel are make decisions based on their best judgement and that the systems are working. A lab director can trust lower level employees because the director must also make sure lab personnel are qualified for their positions.

Ultimately, the laboratory director has the highest authority in the lab. The lab director's authority or decisions, regarding medical issues, cannot be overruled, especially by a superior that lacks a medical background. Thus, it would be inappropriate for a "business person," such as a CEO, to overrule a lab director's decision. Authority is derived from CLIA regulation. A laboratory director's decisions are made based on his or her medical education and training, and their experience running a clinical lab.

Dr. Rosendorff may testify that, under CLIA and as a matter of good laboratory practice, any assay that is going to be used for patient care needs to be validated to CLIA performance standards of accuracy, precision, linearity, upper limit of detection, lower limit of detection, and sensitivity. A validation report must be approved and signed before the assay can be used clinically. Proficiency testing post-validation continues to ensure the assay is meeting performance specifications, while quality control is used on a daily or shift-basis to determine if a device is "drifting." QC standards are determined by CAP checklist and the Clinical & Laboratory Standards Institute (CLSI) for any lab operating under good lab practices.

Dr. Rosendorff may explain that proficiency testing is a method to measure the ability of a lab to return an accurate result. The process relies on peers running the same analyte on the same type of analyzers. Success is measured by returning a measurement that was within two standard deviations from the results of the lab's peer group. Proficiency testing samples, such as CAP samples, are artificial samples containing a certain concentration of the analyte to be measured. The concentration is known to CAP, but unknown to the lab that is supposed to conduct the analysis. These samples are shipped to a lab and its peer group at the same time and are supposed to be measured in the same manner as a regular patient sample. In particular, CLIA dictates proficiency testing should be done using the most common method performed at the lab, which for Theranos, was finger-stick blood samples. CAP samples are designed to be stable. They are reliable and consistent when run on FDA devices in the manner they were designed to be run. During Dr. Rosendorff's tenue at Theranos, Balwani blamed unfavorable PT results at Theranos on bad PT samples. That was most likely not the explanation for Theranos's PT failure.

Dr. Rosendorff may testify about the differences between venous blood and capillary blood drawn from a finger-stick. For example, capillary blood may have more glucose, whereas glucose in venous blood tends to be metabolized. Cell lysis also presents problems for blood

collected by finger-stick. Cell lysis compromises a sample and there is no way to compensate for a sample contaminated with excess potassium due to cell lysis. LDL levels can also be affected by cell lysis as there is more LDL in red blood cells than serum. Edema or excess interstitial fluid on a person's fingertips can also affect the results derived from finger-stick blood. Capillary samples and venous samples should not be assumed to be the same in clinical lab testing. In particular, the different samples types should each have their own reference ranges.

Dr. Rosendorff may testify that assays like CMP, CBC, Vitamin D, HbA1c, TSH, PSA, and bicarbonate are assays that are commonly run as part of normal metabolic panels. These are not esoteric tests.

Dr. Rosendorff also may testify that Theranos's practice of diluting microsamples was disadvantageous because the Theranos process diluted samples below the Siemens device's lower level of quantitation (LLOQ). LLOQ was the value where the device could reliably measure while limit of detection (LOD) was the value at which the device produced a signal. These measurements are different. ROSENDORFF explained the Siemens instrument was qualified to measure values per the manufacturer. The manufacturer calculated the device's LLOQ by using samples of known concentrations that were diluted and run in an assay. Results were measured and error was calculated. Chemistry, hardware, and reagents were all integrated into the process of producing a result. Theranos processes were "breaking the system" to measure values lower than the LLOQ. ROSENDORFF said it was well known in the clinical lab community that, "the lower the value, the greater the error." Moreover, dilution issues can exacerbate the effect of device bias.

Dr. Rosendorff also may testify that Theranos's six-tip analyzer design ran assays in parallel and returned the average result, using Theranos-developed rules to address outliers for tip specific results. This process was not ideal because it may have tended to increase the appearance of precision beyond a lab test's true performance. It would have been better to run a given assay only once using a method with maximum accuracy and precision.

Dr. Rosendorff may testify that a clinical lab must be transparent about their testing, to include what devices are used. This information can be important for a physician to understand a result and place it in context. A lack of transparency can create problems in particular for patients who are tracking their historical test results. HbA1c is notorious for returning different results based on what device is used to conduct the assay.

Dr. Rosendorff may testify that critical results are supposed to be reported by the laboratory director or a trained clinical laboratory scientist (CLS). The individuals in these positions meet the legal requirements and have the necessary lab training to perform that function. Moreover, critical results should not be voided as potential erroneous results because that process may hide truly critical values. At Theranos, voiding results, such as for abnormal bicarbonate results, could have masked actual abnormal patient test values. For bicarbonate assays at Theranos in particular, the problems with sample stability rendered the assay not useful.

\* \* \*

Please contact me if you believe that the notice that you have received provides inadequate notice under Rule 16(a)(1)(G). The government reserves the right to supplement this disclosure of expert testimony. To the extent the government determines that it intends to call any other expert witness to testify at trial based on its ongoing investigation, the identity and qualifications of any such additional witness(es), as well as the nature of the expert testimony and any related reports, will be disclosed immediately upon such a determination.

Please let us know if you have any questions, or would like to further discuss the matter raised above.

Very truly yours,

ADAM A. REEVES
Attorney for the United States,
Acting Under Authority Conferred
By 28 U.S.C. § 515

*/s/ John C. Bostic*

JOHN C. BOSTIC
Assistant United States Attorney