# Exhibit 16

LAW OFFICES
# HYMAN, PHELPS & MCNAMARA, P.C.

700 THIRTEENTH STREET, N.W.
SUITE 1200
WASHINGTON, D. C. 20005-5929
202 737-5600
FAX 202 737-9329
www.hpm.com

JEFFREY N. GIBBS

Direct Dial (202) 737-4288
JGibbs@hpm.com

November 26, 2013

## BY E-MAIL/CONFIRMATION COPY BY MAIL

Alberto Gutierrez, Ph.D.
Director
Office of In Vitro Diagnostics and Radiological Health
Center for Devices and Radiological Health
Food and Drug Administration
10903 New Hampshire Avenue
WO Bldg. 66, Rm. 5680
Silver Spring, Maryland 20993

Dear Dr. Gutierrez:

We appreciated meeting with you and your staff on November 4 and having an open discussion regarding the status of Theranos, Inc.'s (Theranos) laboratory services. As we discussed during the meeting, Theranos is fully committed to working with the Office of *In Vitro* Diagnostics and Radiological Health (OIR), as illustrated by the many steps the company has taken to make OIR aware of its plans and progress, and to work collaboratively with OIR in developing and refining those plans. Theranos has been working closely with OIR for the past four months to develop a plan for the submission and review of multiple 510(k) premarket notifications to cover hundreds of assays. Those discussions have been extremely productive due to the open communications.

We were therefore very surprised to hear OIR, for the first time, question whether, in the Phase I model, Theranos' laboratory testing complies with the Federal, Food, Drug, and Cosmetic Act (FDC Act) because, in OIR's view, the company is not offering laboratory developed tests (LDTs). Throughout the development process, Theranos has taken multiple steps to ensure that it was operating as a laboratory and that the test, as developed and used by Theranos in its laboratory, would qualify as an LDT. As discussed at our meeting and further explained in this letter, Theranos strongly believes that its test is an LDT and therefore its testing activities during Phase I are not subject to regulation as a device.

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

Alberto Gutierrez, Ph.D.                    HYMAN, PHELPS & McNAMARA, P.C.
November 26, 2013
Page 2

It appears that OIR's major concern relates to the instrument used in processing samples. To address that concern, the company is willing to submit a 510(k) premarket notification for all of the components of its test, including the processing unit, for use within Theranos' clinical laboratory for Phase I. Theranos is prepared to take this step even though it believes that it is not required to do so as a matter of law. This submission would be in addition to all the other filings Theranos has been preparing for in the plan shared with FDA. Theranos has already commenced discussions with the reviewing Division about submission of this 510(k), which it will submit as soon as possible on an agreed upon timeline.

I. Background

To make sure that there is no misunderstanding as to what Theranos is doing, we wish to describe the service Theranos is offering, particularly because we understand that OIR has previously received inaccurate information regarding the company. Specifically, we understand that some individuals at the Department of Defense had alleged that Theranos was distributing one or more products. That is not true. Theranos does not distribute and has not distributed the processing unit used at the Theranos laboratory. Nor has the company distributed any assay or reagent. The company has committed to OIR that it will not distribute any processing unit, assay, or reagent until it receives 510(k) clearance of the devices intended to be used in its patient service centers.

During Phase I, the testing is conducted only at the Theranos laboratory on patient samples that are shipped to the facility. The Theranos laboratory is licensed as a high complexity laboratory pursuant to the Clinical Laboratory Improvements Amendments (CLIA), and the test that the laboratory is conducting has been validated in full compliance with CLIA.

All of the major elements of the test are developed and made by Theranos. The primary elements are the processing unit, the software, and the assays. These elements are manufactured by the company under a Quality System. Of course, Theranos does not manufacture all of the components used to make these elements. For example, the company purchases certain components, such as motors and microprocessors, from outside vendors. Thus, while Theranos does manufacture elements of its test, including the processing unit that was the focus of the discussion, it procures certain key components utilized in its test from third parties. These activities are conducted in accordance with the company's Quality System.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER
THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                THER-0957501
Fed. R. Crim. P. 6(e) material

SEC-THERANOS-004782160

Alberto Gutierrez, Ph.D.                    HYMAN, PHELPS & MCNAMARA, P.C.
November 26, 2013
Page 3

In accordance with Theranos' philosophy of working closely with FDA, Theranos
has voluntarily provided a copy of its Quality System Manual to OIR.  As this document
shows, unlike the myriad other tests currently being conducted at other laboratories
which are not regulated by FDA because they are deemed to be LDTs, the company has
control over all parts of the testing material and process, and can assure the quality of all
the elements of the test.  Moreover, unlike the situation for virtually all of the other
innumerable laboratory tests that are now being offered by other companies, OIR has
received detailed information from Theranos demonstrating that a Quality System is in
place.  As Theranos stated at the meeting, it is willing to share additional information
regarding its Quality System if OIR so desires.

Currently, Theranos' patient services centers are located at three Walgreens and
also at the company's Palo Alto location.  Patient samples are collected at these centers
and then are sent to the Theranos laboratory.  As disclosed to FDA prior to the meeting
earlier this month, Theranos is offering a small number of immunoassays run through the
processing unit within its CLIA-licensed laboratory, with plans to add more assays in the
coming months.[1]  All of these assays are validated in accordance with, and meet the
requirements of, CLIA.  In addition, these are routine clinical tests offered by many
laboratories, such as TSH and Vitamin D.  Thus, they are unlike tests offered by
companies like 23andMe – a company referenced by OIR at the meeting – which
markets its testing services directly to consumers without a physician's order or
transmission of all information back to a physician directly, counsels patients about their
increased risks for certain diseases like breast cancer, and does not even perform the
testing in its own CLIA-certified laboratory.  Theranos' testing is offered only on the
order of a physician, the review of the test results is conducted at the Theranos laboratory
by the Theranos CLIA laboratory director, and the test results are then transmitted
directly to the physician.

From a risk-based perspective, it is self-evident that the tests being conducted by
Theranos are of much lower concern than are many other tests offered by other
laboratories that have not been cleared by the Food and Drug Administration (FDA).  In
addition, drawing micro-blood samples for testing has many potential benefits to patients
for whom multiple vials of venous blood pose potential complications, such as infections,
collapsed veins, etc.  And Theranos has further addressed risks by having a CLIA
compliant infrastructure, validated assay methodologies, on-board controls with every

---

[1]     As previously communicated, other laboratory tests offered through the patient service centers are
run on commercially available analyzers in Theranos' CLIA-licensed laboratory.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER
THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                    THER-0957502
Fed. R. Crim. P. 6(e) material

SEC-THERANOS-004782160

Alberto Gutierrez, Ph.D.                     HYMAN, PHELPS & MCNAMARA, P.C.
November 26, 2013
Page 4

test, and production of key elements used in its test in accordance with its Quality System.  Given this, identifying Theranos' test as a potential target for enforcement action is not congruent with OIR's model of risk-based regulations.

At the November 4 meeting, OIR stated that, in its view, LDTs are more typically analyte specific reagents and/or general reagents on an open system and not "reagent cartridges."  Theranos explained that the consumables cartridge used in the processing unit is not a reagent cartridge, and that it is not substantially different from a standard reagent tray or microtiter plate.  In addition, the processing unit is not like a point-of-care device with an onboard fluidics circuit.  Basically, the processing unit architecture mimics what is done with a traditional laboratory's ability to have reagents loaded through an open architecture.

Given this background, OIR's expression of concerns about whether the Theranos' Phase I laboratory test is an LDT was completely unexpected and is different from the understanding communicated by OIR at the October 15 meeting last year.  The minutes of the meeting (copy attached), which were prepared by FDA, indicate that the agency would not regulate a test developed in-house by Theranos.  The minutes state as follows:

> An LDT was described as a test that is developed, validated, and used in the same CLIA certified laboratory.  As Theranos has established a CLIA certified laboratory in Palo Alto, California, under enforcement discretion, use of a test developed and validated by the laboratory and which meets the definition of an LDT can be performed on clinical samples which are shipped to the CLIA certified Palo Alto laboratory, and results can then be transmitted back to the ordering physician.

The test that was described at the October 2012 meeting and characterized as an LDT in the meeting minutes is the same that was discussed at the meeting on November 4.  In 2012 OIR characterized the test as an LDT.  Since then, the test has not changed.  Thus, the information that led OIR to conclude last year that Theranos was offering an LDT is unchanged.  Theranos relied on OIR's statements at last year's meeting, and has devoted a great deal of time and money to getting its service up and running in accordance with that guidance.  There have been no policy statements by OIR on LDTs that explain why what was considered an LDT last year is not deemed an LDT this year.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER
THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                   THER-0957503
Fed. R. Crim. P. 6(e) material

SEC-THERANOS-004782160

Alberto Gutierrez, Ph.D.  HYMAN, PHELPS & McNAMARA, P.C.
November 26, 2013
Page 5

## II. Theranos' Test in Phase I Should Not Be Regulated as a Device

As discussed at the November 4 meeting, the regulation of Theranos' test as a device derives directly from OIR's application of its LDT policy. OIR deems LDTs to be devices, over which it is exercising enforcement discretion. That is, OIR's position is that LDTs are devices that would be regulated under the FDC Act but for enforcement discretion. This perspective was reiterated at the meeting. Thus, OIR's position on Theranos' status is inextricably bound to its views on the regulation of LDTs. As you are well aware, the position that LDTs are devices is one that has been strongly questioned by many stakeholders. In lieu of presenting a detailed response to the position asserted at the meeting that LDTs are devices, we refer you to the recent citizen petition filed by the American Clinical Laboratory Association and related documents in the docket. FDA's regulatory assertion that it can regulate LDTs as devices is disputed by many other observers as well, on similar or complementary grounds. For similar reasons, we also believe that LDTs are not subject to FDA regulation as a matter of law.

A key element of LDT regulation is defining what is an LDT. As various stakeholders have noted, any attempt by FDA to regulate LDTs without adhering to the Administrative Procedure Act (APA) would raise serious legal issues.[2] Defining what constitutes an LDT is an integral aspect of regulating LDTs. Thus, the present situation raises a core regulatory element: establishing a novel delineation of when a laboratory test is not an LDT. OIR has made this change without complying with the APA.[3] OIR's assertion that a laboratory test does not qualify as an LDT because it was a test designed and developed, with elements of such test manufactured, by a laboratory represents an unprecedented, never-before articulated restriction on the scope of what constitutes an LDT. Thus, OIR's assertion of authority over Theranos' laboratory implicates broad policy and legal issues, under the FDC Act, the APA, and CLIA.

As we understand OIR's position, you question whether the Theranos test qualifies as an LDT because the company makes the assay, processing unit, and software. We have previously sent to OIR opinions from three different leading law firms, each of

---

[2]    In addition, OIR's hypothesis conflicts with Congress' intent in enacting the Food and Drug Administration Safety and Innovation Act's requirement that FDA notify Congress at least 60 days prior to issuing a draft or final guidance on the regulation of LDTs. Narrowing the scope of the definition of an LDT does result in greater regulation of laboratories. Creating and invoking a new policy – even if unwritten – that circumscribes the definition of LDTs arguably triggers the congressional reporting requirement.

[3]    The change is also inconsistent with FDA's Good Guidance Practice regulation.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER
THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos          THER-0957504
Fed. R. Crim. P. 6(e) material

SEC-THERANOS-004782160

Alberto Gutierrez, Ph.D.                    HYMAN, PHELPS & MCNAMARA, P.C.
November 26, 2013
Page 6

which concluded that what Theranos is doing is completely consistent with CLIA and
constitutes laboratory activity. OIR's statement that CLIA does not apply is at odds with
these analyses and the law, and also creates a conflict between the provisions of CLIA
and FDA's interpretation of the FDC Act. While these are two separate statutes, FDA's
view that laboratory conduct which is explicitly lawful under CLIA is implicitly unlawful
under the FDC Act gives rise to inconsistent regulatory regimes.

OIR's position apparently is that Theranos' test is not an LDT because certain
elements, including the instrument, were manufactured by Theranos. To the best of our
knowledge, that position has never been publicly advanced by OIR. We are unaware of
any statement by FDA saying that a test loses its status as an LDT because development
excludes manufacturing by the laboratory. In fact, in convening a public meeting to
discuss LDTs, FDA described them as a class of IVDs manufactured by a laboratory:

> Since the implementation of the 1976 Medical Device Amendments, the FDA has
> generally exercised enforcement discretion and not enforced applicable regulations
> with respect to LDTs, a class of in vitro diagnostics (IVDs) that are manufactured,
> including being developed and validated, and offered, within a single laboratory.
> Thus, the FDA has not actively regulated most LDTs. (emphasis added)[4]

During the meeting itself, FDA reiterated that "[l]ab developed tests we are defining as
tests that are designed, manufactured, and used within a single laboratory."[5] Theranos'
test falls squarely within this definition. Significantly, the definition does not say
"developed by a laboratory but not manufactured by that laboratory."[6] Thus, the
narrowed definition articulated at the meeting is squarely at odds with FDA's own
statements about LDTs.

---

[4]    Announcement of FDA/CDRH Public Meeting: Oversight of Laboratory
       Developed Tests (LDTs), Date July 19-20, 2010;
       http://www.fda.gov/medicaldevices/newsevents/workshopsconferences/ucm212830.htm
       (emphasis added).

[5]    Public Meeting on Oversight of Laboratory Developed Tests, July 19, 2010, Transcript at 18
       (emphasis added).

[6]    In addition, FDA's product code for LDTs defines this product as "[a] clinical
       diagnostic test for use in the diagnosis of disease or other conditions that was developed by clia
       [sic] certified clinical laboratory for use in that laboratory." Again, this definition does not
       explicitly exclude manufacturing of elements of the test by the laboratory.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER
THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                    THER-0957505
Fed. R. Crim. P. 6(e) material

SEC-THERANOS-004782160

Alberto Gutierrez, Ph.D.                          HYMAN, PHELPS & MCNAMARA, P.C.
November 26, 2013
Page 7

        In addition, OIR's position conflicts with the definition of LDTs utilized by the
Centers for Medicare & Medicaid Services (CMS) in its document entitled "Laboratory
Developed Tests (LDTs) Frequently Asked Questions". The first question posed is
"What is a Laboratory Developed Test." CMS' answer is as follows:

        The FDA defines a Laboratory Developed Test (LDT) as an *in vitro*
        diagnostic test that is underlined manufactured by and used within a single laboratory
        (i.e. a laboratory with a single CLIA certificate). LDT's are also referred to
        as in-house developed tests or "home brew" tests.[7]

Thus, CMS itself states that FDA's definition of an LDT includes tests that are
"manufactured by" the laboratory. Indeed, CMS appears to be relying on the definition
of LDT as provided by FDA. The restriction OIR is seeking to impose cannot be
reconciled either with CMS' public explication of FDA's definition or with FDA's 2010
statements. It would be wholly indefensible for OIR to take any action adverse to
Theranos based on its manufacturing of elements of its test when FDA's and CMS'
statements expressly contemplate the manufacture of LDTs by a clinical laboratory.
Simply put, there is no legal or regulatory basis for saying that a test loses its LDT status
because it has been fully developed by a laboratory and the laboratory manufactures
some elements comprising that test.

        In addition to raising significant legal issues, this kind of limitation on LDTs
appears squarely inconsistent with policy objectives that OIR has publicly advanced.
OIR has repeatedly expressed its concerns that LDTs are not properly quality controlled
and may not be of suitable quality because the components frequently come from a third
party, which has not established a Quality System. For example, OIR has criticized the
use by laboratories of RUO instruments or assays because they are not made under the
Quality System Regulation, and the laboratory cannot be sure of the product's quality or
consistency. Indeed, the new RUO Guidance Document, on pages 4-5, raises this precise
concern regarding RUO products. The document references "manufacturer controls that
are inadequate to ensure consistent manufacturing of the finished product." In contrast,
Theranos has complete control over all parts of the test and has developed them under a
Quality System.

---

[7]     http://www.cms.gov/Regulations-and-Guidance/Legislation/CLIA/index.html?redirect=/clia/
        (emphasis added).

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER
THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                    THER-0957506
Fed. R. Crim. P. 6(e) material

                                                                    SEC-THERANOS-004782160

Alberto Gutierrez, Ph.D.              HYMAN, PHELPS & MCNAMARA, P.C.
November 26, 2013
Page 8

OIR's approach also results in a peculiar outcome. Theranos' processing unit is not in "commercial distribution" and therefore, even if it were a device, no registration or premarket submission would be needed.[8] Yet if Theranos had purchased the processing unit from some vendor, then the tests run at the Theranos laboratory would qualify as LDTs, even though the processing unit would have been in commercial distribution. Thus, a test which is wholly developed by a laboratory is subject to device regulation, whereas a test run by a laboratory that incorporates devices developed by a third party is not.

OIR's new policy results in another oddity: it encourages Theranos' use of third party equipment even though Theranos would no longer have complete control over the quality system governing the elements of the tests it would run. Such a view that a test based on uncontrolled materials from outside vendors is an LDT while a laboratory that takes on responsibility for manufacturing elements of its test – thereby having greater control – loses its status as an LDT would have perverse consequences. It would deter laboratories from taking full control over test quality in favor of using outside vendors which may not have quality systems to enable the laboratory to run tests on an "open system".[9] Given OIR's publicly-stated concerns regarding the use by laboratories of RUO instruments manufactured outside QSR, one would have expected OIR to be supportive of Theranos' approach, which promotes test quality.

During the November 4 meeting, OIR mentioned the warning letter it sent to Laboratory Corporation of America. That letter is inapposite. In that letter, OIR articulated the view that a laboratory needed to make at least a minimum contribution to developing the assay for the assay to be an LDT. OIR has not, however, articulated a corresponding restriction of the opposite type – that there is a maximum permissible level of laboratory involvement in making elements of the test. OIR has never said that a laboratory test, the elements of which are made by the laboratory – thus exceeding some undefined threshold – is no longer considered an LDT. The lack of clear criteria – and the sudden application of this unprecedented limit on Theranos without prior notice – cannot be reconciled with the APA or the FDC Act.

---

[8] See 21 C.F.R. §§807.31(b), 807.20(g), and 807.81(a).

[9] Laboratories that develop tests using vendors who do not have quality systems are not subject to FDA regulation based on the quality of their vendors.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                    THER-0957507
Fed. R. Crim. P. 6(e) material

SEC-THERANOS-004782160

Alberto Gutierrez, Ph.D.                    HYMAN, PHELPS & MCNAMARA, P.C.
November 26, 2013
Page 9

The limitations suggested at the meeting are also inconsistent with ongoing industry practice. Other laboratories have developed tests incorporating materials manufactured within the same corporation. As far as we know, OIR has not taken action against them, or told these laboratories that they need to forego manufacturing their reagents, software, or instruments. Singling out Theranos for an ad hoc action based on non-public criteria would violate the APA. While it may be that FDA cannot take action against all companies it believes have acted unlawfully, it cannot invoke a novel, previously unarticulated redefinition of an LDT and then apply it only to Theranos.

There is yet another point to consider: Theranos is a model company that has sought to work closely with OIR. The company has held multiple meetings and phone calls with OIR to discuss its regulatory strategy, which is designed to result in the clearance of over 500 assays ultimately. OIR has asked that laboratories work with them and just this week highlighted its longstanding cooperative approach to help laboratories come into compliance.[10] Theranos is an exemplar of that cooperative approach.[11] If OIR were to penalize Theranos, it would send a signal that working with the agency is not rewarded.   Instead of being an example of industry-agency collaboration that might encourage other laboratories to approach FDA, Theranos would likely be perceived as a cautionary tale as to why laboratories should avoid interactions with FDA.

In summary, Theranos strongly believes that it is acting legally, and that its test is an LDT which is not subject to FDA regulation. Nevertheless, Theranos is willing to submit a 510(k) to obtain clearance for all elements of its test, including the processing unit, for use only within its CLIA-certified laboratory. This would be in addition to the 510(k) submission plan previously provided to OIR. The company has already had initial discussions with the Division regarding such a submission, and expects to submit this 510(k) as soon as possible on a mutually agreed upon date. The company is clearly acting diligently and in good faith. Given the lack of any prior guidance from FDA that a test is not exempt because it has been developed, with elements manufactured, by the laboratory; OIR's prior recognition at the October 2012 meeting that the test described by Theranos would not require a 510(k); the significant statutory and APA issues that any enforcement action would trigger; the lack of any safety issue; that OIR's narrowed definition of an LDT conflicts with the definition, provided by FDA in 2010 and which was recently posted by CMS; and the company's actions to promptly resolve the newly

---

[10]     Warning Letter to Ann Wojcicki, 23andMe, Inc. (Nov. 22, 2013), p. 2.

[11]     Theranos' interactions stand in sharp contrast to 23andMe's conduct described in the November 22, 2013 warning letter.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER
THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                              THER-0957508
Fed. R. Crim. P. 6(e) material

                                                                     SEC-THERANOS-004782160

Alberto Gutierrez, Ph.D.              HYMAN, PHELPS & MCNAMARA, P.C.
November 26, 2013
Page 10

expressed concerns by submission of a 510(k) to cover Phase I, no enforcement action is warranted. Conversely, any action would give rise to legal and policy issues that would implicate not only Theranos' own assays but much broader issues relating to FDA's regulation of laboratories and would discourage laboratories from seeking to put quality systems in place or work with FDA.

We believe that a prompt 510(k) submission for the Phase I model should provide a reasonable basis for resolving all of your concerns. In order to ensure that you have no outstanding issues and concerns, Theranos will reach out to you to discuss this further after you have had the opportunity to review this letter.

Sincerely,

Jeffrey N. Gibbs

Attachment

cc:    James Woods, Deputy Director, Patient Safety and Product Quality
       Courtney Lias, Ph.D., Director, Division of Chemistry and Toxicology Devices
       Sally Hojvat, Ph.D., Director, Division of Microbiology Devices
       Elizabeth Holmes, CEO, Theranos, Inc.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER
THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                THER-0957509
Fed. R. Crim. P. 6(e) material

SEC-THERANOS-004782160

*Meeting Minutes*

Department of Health and Human Services
Public Health Service
Food and Drug Administration

Memo Date: November 16, 2012

**Attendees:**
**CDRH:** Alberto Gutierrez, James Woods, Sally Hojvat, Peyton Hobson, Kristian Roth, Carmen Maher, Heather McDowell

**Theranos :** Elizabeth Holmes, Sunny Balwani

**Subject:  Face-to-Face meeting**
**On Site meeting date: October 15, 2012**
**Company: Theranos**
**Meeting attachment:**  Theranos Briefing

The following information is meant to summarize the issues raised at the meeting between Theranos and the FDA.

**FDA:** Information was received from multiple individuals within the DoD stating concerns over the Theranos business model for commercialization of their device, and as to whether this approach was within FDA regulations.  Clarification of the Theranos business model for operations with regards to Laboratory Developed Tests (LDTs) and Analyte Specific Reagents (ASRs) was discussed.  It was stated very early in the meeting that the FDA does not consider the assays to be ASRs and distribution of the Theranos system (analyzer+reagents) in the US as an LDT is not appropriate.  Theranos was also informed that many of the potential assays that could be used on their analyzer are nucleic acid based or are classified as Class II or Class III, therefore classification of the instrument as a Class I device is incorrect and requires pre-market clearance or approval for marketing in the United States.

Clarification regarding what an LDT actually is and how, under specific circumstances, the FDA exercises enforcement discretion was also provided.  An LDT was described as a test that is developed, validated, and used in the same CLIA certified laboratory.  As Theranos has established a CLIA certified laboratory in Palo Alto, California, under enforcement discretion, use of a test developed and validated by the laboratory and which meets the definition of an LDT can be performed on clinical samples which are shipped to the CLIA certified Palo Alto laboratory, and results can then be transmitted back to the ordering physician.  Any distribution of reagents or analyzers for clinical testing outside of the CLIA certified laboratory is not covered under enforcement discretion.  However, it was pointed out that the deployment of Theranos systems for "Research" or "Investigational" use at U.S. Military facilities in Afghanistan for evaluation purposes is

Theranos face-to-face meeting October 15, 2012                                             1 of 3

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

acceptable and does not violate any regulations as long as the results obtained during the evaluation are strictly not used for patient diagnosis and management and Theranos follows the required labeling regulations stated in CFR 21 809.10.

FDA indicated that they wanted to facilitate innovation and new ways of doing business if the technology involved is demonstrated to be safe and effective and, for this reason, wanted to further understand the Theranos device and proposed intended uses of the technology.   It was also important to note that it may be necessary to engage with other Agencies to discuss the proposed Theranos U.S. model as Agencies, such as the Centers for Medicare and Medicaid Services (CMS), the College of American Pathologists (CAP), or the Joint Commission Accrediting Hospital Organization (JCAHO) have jurisdiction over the procedures and practices within laboratories.

To move forward with the regulatory process the Agency recommended that for their first submission, Theranos should pick an analyte or a panel of analytes that may be of interest to DOD and proceed to work interactively with the Agency to develop a regulatory pathway to achieve pre-market clearance /approval status. It was discussed that Theranos's influenza assay reagents together with the appropriate analyzer and software information may be the first devices to be submitted as 510(k)s for FDA review.

Knowledge and understanding gained from the first submission will pave the way for subsequent submissions.  Timelines are dynamic and usually become shorter once the Agency has evaluated a new analyzer. In addition, a well written submission always helps to reduce the time needed to achieve a successful regulatory decision.  The Pre-Submission Program designed to help developers reach this goal was discussed and Theranos was given a copy of the newly published draft Guidance for this type of submission.

**Theranos:** Theranos claims it has two business models, neither of which includes providing ASR's to non-Theranos laboratories.  It is the intent of Theranos to provide pre-market submissions for 510(k) clearance for all of their devices before marketing.

1) **US model:** provide testing services in a CLIA laboratory setting.  Clinical specimens sent to Theranos's CLIA lab for testing and the results transmitted back to the ordering physician.  Using this model the Company will compete with other commercial clinical labs (e.g. Quest and LabCorp.).

2) **"International" model or DoD model:** Instruments are sent into a foreign field of operations for IVD testing of US military personnel.  In this model the field lab would be CLIA certified and the Company could operate without FDA regulation under the current enforcement discretion policy.

Theranos is not currently shipping instruments or reagents for use at external sites.  All testing is performed at the Theranos CLIA lab in Palo Alto.  Theranos is aware of and wants to begin the process of obtaining regulatory approval or clearance for all assays offered by Theranos.

Theranos face-to-face meeting October 15, 2012

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

Theranos presented a large number of slides with performance data for a wide range of IVD assays run on the Theranos platform and indicated that most, if not all, of the assays will have a predicate device as these assays are already being performed routinely in clinical labs. The company indicated that they thought that most of their assays would be classified as Class II devices. Theranos plans to offer a menu of hematology, clinical chemistry, and infectious disease tests and potentially all three types of assays would be on one consumable.

**FDA:** During the meeting FDA expressed concerns with claims it had seen attributed to Theranos's devices as LDTs or ASRs. FDA stated that the description of Theranos reagents as being ASRs is inappropriate. During the meeting Ms. Holmes claimed Theranos had never claimed that their reagents were ASRs even when told that the FDA had seen documentation (see attached) with just such a claim. FDA also reiterated and clarified that the Theranos platform would not be classified as a Class I device as many of the assays that are being proposed are nucleic acid based and therefore fall into Class II or potentially Class III for certain analytes such as those for the diagnosis of HIV, HPV, Hepatitis B, and Hepatitis C infections. These Class III devices would require pre-market approval submissions (PMA's).

In addition, the "international" model Theranos is proposing would not fall under the current LDT model as previously defined.

Finally, the information regarding analyzer deployment should only be considered for DoD demonstration/evaluation purposes. The position of FDA is that the deployment of the Theranos platform and provision of assay kits or reagents within the U.S. (outside of Theranos's CLIA certified laboratory model) and "internationally", will absolutely require pre-market clearance or approval of the devices as the current Theranos model does not fit the definition of either a laboratory developed test (LDT) or distribution of analyte specific reagents (ASRs).

The meeting ended with a mutual verbal agreement between FDA and Theranos to work interactively to bring the current Theranos business models for commercialization of their device into regulatory compliance.

FOIA Confidential Treatment Requested by Theranos                                     THER-0957512
Fed. R. Crim. P. 6(e) material

SEC-THERANOS-004782160



## Confidential Briefing: Theranos

**Background.**

Theranos is a high-complexity CLIA-certified laboratory headquartered in Palo Alto, California.
Theranos manufactures proprietary clinical analyzers, assay reagents, and laboratory developed
tests for the complete range of tests reimbursed by the Centers for Medicare and Medicaid
Services.

Theranos tests are all validated with micro-liter sample volumes of the relevant biological
matrices. For blood based assays, the assays are validated on micro-liter samples of serum,
plasma, venous and finger-stick blood.

All Theranos tests are validated under FDA and ICH guidelines and where applicable, under/to
WHO guidelines and standards.

**Overview:**

**Theranos Clinical Analyzers.**

Theranos' clinical analyzers are capable of running the full spectrum of laboratory tests ranging
from hematology to clinical chemistry, immunoassays, microscopy, and molecular based
diagnostic tests.

There are two models of Theranos clinical analyzers: the Theranos 4.0™ and Theranos
minilab™. The Theranos 4.0™ is a small, compact and portable analyzer that processes a single
sample at one time. The Theranos minilab™ has a proprietary modular structure in which
multiple analytical "blades" are stacked within one device. This allows for total redundancy at
the system level – if any blade malfunctions the other blades remain unaffected. It also allows for
multiple samples to be processed simultaneously. The Theranos minilab™ processes six samples
at a time in its standard configuration. For high throughput testing, multiple minilab™s are
deployed to a given laboratory location.



Theranos clinical analyzers are capable of performing comprehensive pre-analytical and sample
preparation procedures as well as analysis. In the context of placement of an analyzer in a
Theranos CLIA laboratory, the device can automatically perform the pre-analytic and analytic
procedures. The analyzers can also be used for sample preparation procedures only and transfer
data remotely for analysis. Automation of many of the manual pre-analytic procedures

THERANOS CONFIDENTIAL AND PROPRIETARY

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0957513

SEC-THERANOS-004782160



contributes to acceleration of the total turnaround time of test results from the time of sample collection to analysis. Pre-analytic processing automation and integration also contributes to low coefficients of variation in system wide performance data.

Theranos clinical analyzers have integrated connectivity modes ranging from cellular connectivity to wired connectivity to radio for the purpose of transmitting comprehensive performance, quality, sample prep, and analytical information to a secure analytical infrastructure or into an EMR system.

Theranos clinical analyzers include touch screens with applications for clinical data entry. Test results are displayed as each assay is processed either on the touch screen and/or in an EMR as specified. The touch screen can also run training, support, and other applications to assist in ease of use and in data interpretation.

Theranos clinical analyzers are factory calibrated. Standardization of analyzers across Theranos locations has contributed to higher integrity data generation in past deployments. The ability to rapidly process fresh whole blood samples has further contributed to the integrity of Theranos test results.

Unlike waived devices, Theranos analyzers and the associated Theranos laboratory analytical software was designed to operate in a CLIA-certified laboratory framework with minimal human intervention. The level of integrated controls and oversight was introduced with the intent of operating in remote, scantily staffed, and/or rural environments.

**Theranos Tests.**

Theranos reagents are Analyte Specific Reagents. Theranos reagents are enclosed in the disposable reagent tray or cartridge into which the sample is deposited for analysis. While multiple reagents are contained in a single tray, all reactions are discrete. Reagent trays contain reagents for a range of assay types. The largest number of assays run simultaneously on a single tray to date is 72. Reagent trays are customizable. Each reagent tray can process a finger-stick sample of blood to perform any given set of tests. Reagent trays are also customized for the full range of clinical sample matrices. The reagent tray is traced throughout its lifecycle through a unique bar code which is used for quality control purposes and monitoring reagent interactions.

Total test time of Theranos assays ranges from <1 minute for tests like PTT to <30 minutes depending on the analytes measured. Theranos has customized assay run times for prior deployments based on field requirements. Sample volume requirements range from <1 uL for a given assay to <50 uL for a given panel.

Theranos cartridges contain controls and calibrators for each assay. Assays are generally run in triplicates. All assays are validated under CLIA guidelines. Novel assays have been rapidly developed and validated on the Theranos platform for prior deployments. Representative data is attached.

**Regulatory and Infrastructure.**

THERANOS CONFIDENTIAL AND PROPRIETARY

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material



Theranos' CLIA laboratory received its Certificate of Compliance with no deficiencies during inspection. Internationally, Theranos' model of operation is ISO certification of all CLIA laboratory facilities.

In all deployments, Theranos trains and certifies technicians operating in its sample collection sites and laboratory locations. Staff for Theranos laboratories can be assigned or contracted via existing (hospital) laboratory personnel. Theranos has been building a large distribution and support infrastructure which includes logistical hubs through which devices are replaced and serviced. Deployments always include additional back up devices for further modularity and redundancy; replaced devices are generally serviced offsite by Theranos personnel. As a CLIA lab, Theranos has not sold devices for deployments but rather provides a reference laboratory service. Theranos manages just in time inventory of reagent trays in its locations. Reagents are designed with minimum twelve month stability targets under the most robust conditions possible for a given assay. Theranos clinical analyzers are Class I medical devices classified under FDA 21 CFR Part 862.2160. In addition to its CLIA lab quality system standards, Theranos is QSR compliant.

While Theranos analyzers can be used for sample processing in the field, Theranos has also developed proprietary nanotainer™ (tiny vaccutainer that collects blood through a small capillary) which allow for micro volumes of sample to be stabilized in the appropriate anticoagulant and shipped to or processed in a clinical laboratory. Theranos nanotainer™s are classified as Capillary Blood Collection Tubes under 21 CFR Part 864.6150.

THERANOS CONFIDENTIAL AND PROPRIETARY

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0957515

SEC-THERANOS-004782160