# Exhibit 31

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA


SECURITIES AND EXCHANGE

COMMISSION,

        Plaintiff,

vs.                        CASE NO. 5:18-CV-01603-EJD

RAMESH "SUNNY" BALWANI,

        Defendant.

_____/


CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER


        The above-captioned video deposition of
SARAH BENNETT was held on Wednesday, January 29, 2020,
commencing at 8:35 a.m., at the Law Offices of DLA
Piper, 100 Light Street, Suite 1350, Baltimore,
Maryland, before Steven Poulakos, Notary Public.


REPORTED BY:  Steven Poulakos, RPR

Page 2

1    APPEARANCES:

2        ON BEHALF OF THE PLAINTIFF:

3        SHARANYA SAI MOHAN, ESQUIRE

4            U.S. Department of Justice

5            450 Golden Gate Avenue

6            9th Floor

7            San Francisco, California  94102

8            Telephone:  415.436.7198

9            Email:  sharanya.mohan@usdoj.gov

10

11       ON BEHALF OF THE PLAINTIFF:

12       MARC D. KATZ, ESQUIRE

13           U.S. Securities and Exchange Commission

14           Division of the Enforecement

15           44 Montgomery Street

16           Suite 2800

17           San Francisco, California  94104

18           Telephone:  415.705.8121

19           Email:  katzma@sec.gov

20

21

22

23

24

25

```
 1   APPEARANCES (Continued):

 2

 3        ON BEHALF OF THE PLAINTIFF:

 4        LINDSEY L. TURNER, ESQUIRE

 5        TAMARA CLARK, ESQUIRE (via telephone)

 6            U.S. Department of Health and Human Services

 7            330 Independence Avenue, S.W.

 8            Romm 5300

 9            Washington, D.C.  20201

10            Telephone:  202.205.5867

11            Email:  lindsay.turner@hhs.gov

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
                                                         Page  4
 1   APPEARANCES (Continued):

 2        ON BEHALF OF THE DEFENDANT:

 3        STEPHEN A. CAZARES, ESQUIRE

 4        AMANDA MARLAM McDOWELL, ESQUIRE

 5            Orrick, Herrington & Sutcliffe, LLP

 6            701 5th Avenue

 7            Suite 5600

 8            Seattle, Washington  98104

 9            Telephone:  206.839.4300

10            Email:  scazares@orrick.com

11                    amcdowell@orrick.com

12

13   ALSO PRESENT:  RAMESH "SUNNY" BALWANI

14                  IOANNIS ARSENIS, THE VIDEOGRAPHER

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                           INDEX

 2                  Deposition of SARAH BENNETT

 3                       January 28, 2020

 4    Examination by:                            Page

 5    Mr. Cazares                                   7

 6

 7    Exhibit No.                                Marked

 8    Exhibit 393   State operations manual         61

 9    Exhibit 394   Surveyor notes                  73

10    Exhibit 395   An email with an attachment    172

11    Exhibit 396   A letter                       187

12    Exhibit 397   Clawed back                    196

13

14              PREVIOUSLY MARKED EXHIBITS

15    Exhibit No.                                Marked

16    Exhibit 262   An email with an attachment    132

17

18

19

20

21

22

23

24

25
```

00:37:29  1            MR. CAZARES:  That's okay.  I understand

00:37:31  2    these aren't simple.  That's fine.

          3    BY MR. CAZARES:

00:37:33  4        Q      Under CLIA rules and regulations, are you

00:37:36  5    the surveyor required to have evidence that the lab

00:37:39  6    director knew of the deficiency you discovered prior to

00:37:43  7    your visit and survey?

00:37:45  8            MR. KATZ:  Same objections.

00:38:01  9            THE WITNESS:  I can't really answer that

00:38:04 10    because like I said, they are responsible for the

00:38:06 11    overall management and operation of the laboratory, so

00:38:09 12    they have to know what's going on in their laboratory,

00:38:12 13    but do we have something specific that says they must,

00:38:16 14    no.

         15    BY MR. CAZARES:

00:38:17 16        Q      So does what mean whether or not you have

00:38:20 17    evidence that a lab director knew of a deficiency that

00:38:23 18    you've discovered that supported a condition-level

00:38:26 19    finding the lab director would still be responsible?

00:38:29 20            MR. KATZ:  Objection, leading, compound and

00:38:31 21    vague and ambiguous and misstates her testimony.

00:38:50 22            THE WITNESS:  I need you to repeat it again

00:38:50 23    because I'm thinking.

00:38:51 24            MR. CAZARES:  Can you read the question,

00:39:26 25    please?

             1         (Reporter read back the record as requested.)

00:39:40   2              THE WITNESS:  Again, the lab director is

00:39:41   3   responsible for the overall management and operation of

00:39:45   4   that laboratory.  And if there are any actions taken

00:39:50   5   against a laboratory such as revocation, the laboratory

00:39:56   6   director then would be prohibited if a certificate is

00:40:01   7   revoked.

             8   BY MR. CAZARES:

00:40:03   9      Q     Again, I appreciate that information, but

00:40:05  10   it's not really responsive to the question.  The

00:40:08  11   question is --

00:40:08  12              MR. KATZ:  Object to the commentary.

            13   BY MR. CAZARES:

00:40:11  14      Q     -- in your determination that the lab

00:40:14  15   director -- let me back up.  In your finding of a

00:40:18  16   condition-level deficiency for a laboratory, are you

00:40:22  17   required to have evidence that the lab director was

00:40:25  18   aware of the deficiency that supported the

00:40:28  19   condition-level finding?

00:40:30  20              MR. KATZ:  Again, calls for a legal

00:40:31  21   conclusion, vague and ambiguous.

00:40:40  22              THE WITNESS:  Whether or not the laboratory

00:40:41  23   director knew about the deficient practice does not

00:40:45  24   enter into the determination of whether condition-level

00:40:48  25   noncompliance exists.

Page  37

```
            1    BY MR. CAZARES:
00:40:51    2       Q      Does the same go for the owners of the
00:40:54    3    laboratory?
00:40:55    4               MR. KATZ:  Objection, vague.
00:41:05    5               THE WITNESS:  I would say in my opinion,
00:41:10    6    yes, the same applies.  But, again, they're
00:41:15    7    responsible.  Regardless of whether they knew what was
00:41:20    8    occurring, they are responsible.
            9    BY MR. CAZARES:
00:41:25   10       Q      Thank you.  I appreciate that.
00:41:26   11       A      Okay.
00:41:37   12       Q      If we can back up now.  I didn't get into
00:41:43   13    your background unfortunately, so let's go back to
00:41:48   14    that.
00:41:48   15               Can you describe for me your educational
00:41:50   16    background?
00:41:53   17       A      I have a degree in medical technology from
00:41:54   18    the Medical College of Virginia, Virginia Commonwealth
00:41:57   19    University.
00:42:12   20       Q      And -- and did you do any postgraduate
00:42:16   21    studies?
00:42:17   22       A      I did not.
00:42:20   23       Q      And have you obtained any state or federal
00:42:23   24    licensing or licenses?
00:42:26   25       A      I'm certified by the American Board of
```

Page 97

02:08:06  1    regulations.  They were found to not be in compliance.

         2    BY MR. CAZARES:

02:08:12  3        Q      And did you discuss this issue with any of

02:08:15  4    the lab personnel?

02:08:25  5        A      I don't recall specifically, but I would

02:08:28  6    presume that when I found it, I would have asked them

02:08:32  7    about the five-day expiration as opposed to the two day

02:08:37  8    and the manufacturer's package insert.

02:08:39  9        Q      Were the lab personnel at Theranos aware of

02:08:41 10    the fact that they were using the Innovin beyond the

02:08:46 11    manufacturer indicated two days of stability?

02:08:49 12               MR. KATZ:  Objection, calls for

02:08:50 13    speculation.

02:08:52 14               THE WITNESS:  I don't know what they

02:08:53 15    were -- what they knew and what they didn't know.

         16   BY MR. CAZARES:

02:08:56 17        Q      Is that not part of your survey process?

02:08:57 18               MR. KATZ:  Objection, vague.

02:09:17 19               THE WITNESS:  Certainly that would have

02:09:18 20    been something that I would have looked into and I

02:09:26 21    don't -- I can't -- I don't know from my notes if I

02:09:37 22    interviewed anyone specifically, but in situations like

02:09:43 23    this, it's not necessarily require -- it's not

02:09:49 24    necessarily something that I might interview because I

02:09:52 25    had, you know, I had the documents that showed me that,

02:09:55  1  in fact, they were not meeting the regulatory

02:09:57  2  requirements.

3  BY MR. CAZARES:

02:09:59  4  Q      So it was a compliance violation regardless

02:10:02  5  of whether or not the lab personnel were aware of the

02:10:04  6  fact that they were using expired or otherwise Innovin

02:10:10  7  beyond the stability date indicated by the

02:10:14  8  manufacturer?

02:10:25  9  A      It is a regulatory noncompliance issue if

02:10:35  10  the laboratory has modified a test and not performed

02:10:40  11  the applicable requirements before testing patient

02:10:46  12  results.

02:10:48  13  Q      And in your survey work on this issue, did

02:10:51  14  you find or identify evidence that the laboratory

02:10:55  15  personnel were aware of the fact that they had modified

02:10:59  16  the manufacturer specified use of the Innovin?

02:11:06  17  A      To the best of my recollection, they were

02:11:10  18  surprised by what I found.

02:11:19  19  Q      Is -- stepping back from Theranos.  This

02:11:23  20  issue of expired reagent or in using reagent beyond the

02:11:28  21  stability date indicated by the manufacturer, is that

02:11:31  22  something in your experience that you have identified

02:11:33  23  in other laboratories you surveyed?

02:11:35  24  A      Yes.

02:11:47  25  Q      If you could turn to the next page or I

03:35:51  1            THE WITNESS:  Once there's a determination

03:35:53  2   of noncompliance, you have to use your professional

03:35:58  3   surveyor judgment to determine what evidence you need

03:36:01  4   to support that noncompliance and there's no standard

03:36:05  5   set.  It all depends on the -- it's very situational.

          6   BY MR. CAZARES:

03:36:16  7       Q     In your own practice, is it your practice

03:36:18  8   to cite or refer to the most significant evidence or

03:36:23  9   most important evidence supporting your findings?

03:36:31 10       A     When I'm writing deficiencies, I am going

03:36:35 11   to include whatever findings support my deficient

03:36:39 12   practice statement which is the based on statement.

03:37:01 13       Q     So just so I understand the difference.  So

03:37:04 14   under for DTAG D2128 that we're looking at hematology.

03:37:08 15       A     Um-hmm.

03:37:09 16       Q     Sticking with that same page.  There's --

03:37:12 17   under hematology, there's 1 and 2 which is what?

03:37:18 18       A     Under 2128?

03:37:19 19       Q     Yeah.

03:37:20 20       A     That's the regulatory language.

03:37:21 21       Q     Okay.  So there's a 1 and 2 is the

03:37:23 22   regulatory language?

03:37:24 23       A     Which is pre-populated.

03:37:27 24       Q     And then there's -- this standard is not

03:37:29 25   met as evidenced by and then there's a based on review.

Page 166

03:49:53  1    guess, the risk relating to the condition or

03:49:55  2    noncompliance is more important than the number of

03:49:59  3    deficiencies?

03:50:01  4              MR. KATZ:  Objection, misstates the

03:50:01  5    witness's testimony and leading.

03:50:09  6              THE WITNESS:  What I'm saying is the number

03:50:11  7    of standards -- there's no requirement to have a

03:50:15  8    certain number of standards out of compliance in order

03:50:18  9    to call a condition.  It all is situation dependent and

03:50:21 10    what you find on the survey as to how serious the

03:50:26 11    particular noncompliance is.

         12    BY MR. CAZARES:

03:50:43 13        Q     In your experience, can -- or have you --

03:50:48 14    have you observed or known -- well, let me back up.  In

03:50:53 15    your experience, can two qualified experienced

03:50:55 16    surveyors come to different conclusions relating to

03:51:01 17    similar findings, similar laboratory records, and/or

03:51:05 18    personnel actions or failures to act?

03:51:08 19              MR. KATZ:  Objection, vague and calls for

03:51:13 20    speculation.

03:51:16 21              THE WITNESS:  I would say in my experience

03:51:18 22    when you're on a survey team, sometimes there are

03:51:24 23    discussions about citations between the surveyors, but

03:51:35 24    ultimately what is cited on the 2567 is the

03:51:40 25    determination that is made.

1    BY MR. CAZARES:

03:51:44  2    Q    Okay.  I appreciate that and that kind of

03:51:46  3    gets to what I'm getting at.

03:51:47  4    A    Right.

03:51:48  5    Q    But my point is, I mean, in your

03:51:49  6    experience, can two surveyors look at a lab and look at

03:51:52  7    the same evidence and come to different conclusions

03:51:55  8    regarding how serious the deficiencies are?

03:51:57  9              MR. KATZ:  Objection, vague, calls for

03:51:59 10    speculation.

03:52:09 11              THE WITNESS:  In my experience generally

03:52:15 12    when you're on a team, there is agreement as to the

03:52:23 13    level of the noncompliance.  However, you can have

03:52:31 14    differences of opinion about the citations or what

03:52:35 15    perhaps whether it should be cited as a standard or a

03:52:37 16    condition.

17    BY MR. CAZARES:

03:52:42 18    Q    Thank you.

03:52:43 19              If we could continue on.  We're going to

03:52:46 20    skip several more pages and I think I'm on CMS10926 in

03:52:53 21    the right-hand corner.

03:52:54 22              Do you see that?

03:52:56 23    A    Let me get there.  Okay.

03:52:59 24    Q    Okay.  I'm looking at the top of the page

03:53:05 25    D6168 testing personnel.

Page  178

04:08:58  1    running the PTs on and the ISI value which is a value

04:09:03  2    that is determined by the manufacturer for each

04:09:06  3    thromboplastin lot number was also -- the number that

04:09:11  4    was on the manufacturer's package insert was also in

04:09:13  5    the instrument.

04:09:16  6        Q     So was -- does that mean that the lab by

04:09:20  7    9/23/15 was correctly calculating and utilizing the

04:09:24  8    MNPT in relation to the ISI?

04:09:27  9             MR. KATZ:  Objection, vague and misstates

04:09:30  10   her testimony.

04:09:31  11            THE WITNESS:  All I can say is that when I

04:09:33  12   checked the device, the MNPT reflected the value from

04:09:39  13   9/18/15 and the ISI reflected the value of the

04:09:42  14   manufacturer's package insert.

          15   BY MR. CAZARES:

04:09:43  16       Q     So does this mean the findings relating to

04:09:46  17   the PT/INR deficiency is historical, I guess, prior to

04:09:53  18   9/23/15?

04:09:54  19            MR. KATZ:  Objection, vague.

04:10:02  20            THE WITNESS:  Can you --

          21   BY MR. CAZARES:

04:10:03  22       Q     I guess what I'm getting at is by 9/23/15

04:10:06  23   as indicated in point 3 under laboratory findings, did

04:10:09  24   it appear that the laboratory was correctly utilizing

04:10:13  25   or using the correct MNPT in its PT/INR testing?

04:10:18  1          A       And what I can say is that the numbers from

04:10:24  2   the MNPT data from September 18th and ISI value on the

04:10:31  3   manufacturer's package insert were in the device on

04:10:35  4   9/23/15.

04:10:35  5          Q       And is that what you would expect to find?

04:10:39  6          A       Yes.

04:10:39  7          Q       Now, under point 4, the document indicates

04:10:43  8   81 patients had PT/INR reported from April 1, 2015,

04:10:48  9   through September 19, 2015.  Is that an indication of

04:10:50 10   the number of patients affected by this deficiency or

04:10:52 11   noncompliance?

04:10:54 12          A       That is an indication of the number of

04:11:07 13   patients that Theranos reported to me that they had run

04:11:14 14   between those dates.

04:11:17 15          Q       And the fact that those 81 patients had

04:11:20 16   reported results are under -- for PT/INR from April 1,

04:11:24 17   2015, to September 19, 2015, does that necessarily mean

04:11:28 18   that those 81 patients were affected by the

04:11:30 19   noncompliance in that time period?

04:11:32 20                  MR. KATZ:  Objection, vague, compound.

04:11:42 21                  THE WITNESS:  What I can say about those 81

04:11:43 22   patients in my opinion is that there was the potential

04:11:50 23   because of the noncompliance to have issues with the

04:11:59 24   results.

             25   BY MR. CAZARES:

04:18:07  1   were shifting downward, their response was to simply

04:18:11  2   shift their acceptable control values to match their

04:18:16  3   data.

04:18:16  4        Q     In your -- in your survey and inquiry into

04:18:20  5   this issue, were you able to identify who within

04:18:24  6   Theranos's lab made the decision to shift the control

04:18:29  7   values without the investigation you cited?

04:18:32  8                MR. KATZ:  Objection, vague and

04:18:35  9   argumentative, assumes facts not in evidence.

04:18:43 10                THE WITNESS:  My understanding was that it

04:18:45 11   was Mr. Gee who was in charge of quality control and

04:18:48 12   quality assurance as the QAQC manager.

         13   BY MR. CAZARES:

04:18:54 14        Q     I think there's a second page here, but

04:18:56 15   it's only a little bit.

04:18:58 16        A     There is.

04:18:59 17        Q     So if we could continue on to point 9 under

04:19:01 18   the laboratory findings portion of the presentation.

04:19:05 19   So 9 says:  "A study done by the surveyor comparing the

04:19:08 20   81 reported patient values versus the values

04:19:12 21   calculated -- the values -- calculated values using the

04:19:15 22   correct MNPT and ISI numbers show that 81 of 81 patient

04:19:19 23   values did not match.  INR value differences ranged

04:19:27 24   from .1 to .4."

04:19:30 25                So what is it you're reporting there?

04:19:33  1      A      What I'm showing there is the fact that I

04:19:38  2  took the values, the PT values, the prothrombin time

04:19:48  3  values.  I put in the MNPT value that -- and the ISI

04:19:53  4  numbers that Theranos was using and the calculation

04:19:57  5  that I got did not match the reported result.  So, in

04:20:08  6  other words, the values that I got for the INR were

04:20:11  7  different than what was reported by Theranos.

04:20:15  8      Q      And does that mean those results reported

04:20:17  9  by Theranos were inaccurate or incorrect?

04:20:21  10     A      It means that they were different.

04:20:24  11     Q      And for someone who is not in the lab, what

04:20:26  12  does that mean to be different?

04:20:29  13     A      That means the value that should have been

04:20:31  14  reported was different than the value that was

04:20:34  15  reported.

04:20:35  16     Q      And saying it's different, is that

04:20:38  17  different -- saying that the values were different than

04:20:42  18  what was reported is not the same as the reported

04:20:47  19  results being inaccurate?

04:20:49  20          MR. KATZ:  Objection, vague.

04:20:53  21          THE WITNESS:  It's not my job to determine

04:20:54  22  whether a result is accurate.

          23  BY MR. CAZARES:

04:20:59  24     Q      We can continue on for number 10.  At

04:21:04  25  number 10, the last of the points, it says:  "The

04:22:53 1    44 had values greater than or equal to 2 and that

04:22:57 2    includes the greater than or equal to 3.  And then of

04:23:01 3    those 44 patients, 16 of the 44 had values reported

04:23:06 4    that had were greater than or equal to 3.

04:23:18 5        Q      So what does that mean from a therapeutic

04:23:22 6    perspective?

04:23:23 7        A      That actually falls into the practice of

04:23:24 8    medicine how a physician or a medical professional is

04:23:28 9    going to react to those numbers.  But in order for a

04:23:31 10   medical professional to make an appropriate decision

04:23:35 11   about Coumadin or Warfarin therapy, they need to have

04:23:39 12   an accurate and reliable result.

04:23:44 13       Q      You can set that aside.

04:23:53 14              MS. MOHAN:  Can we go off the record?

04:23:59 15              MR. CAZARES:  Sure.

04:24:00 16              THE VIDEOGRAPHER:  We're going off the

04:24:05 17   record.  The time is 2:27 p.m.

         18              (Deposition recessed at 2:27 p.m.)

         19              (Deposition resumed at 2:29 p.m.)

04:24:09 20              THE VIDEOGRAPHER:  We are back on the

04:24:10 21   record.  The time is 2:29 p.m.

         22              (Bennett Exhibit 396 was marked for

         23   purposes of identification.)

         24   BY MR. CAZARES:

04:25:19 25       Q      Ms. Bennett, you've been handed a document

Page 188

04:25:21  1    marked 396.  It appears to be a letter dated

04:25:28  2    November 29, 2016, from CMS to Daniel Young, Elizabeth

04:25:32  3    Holmes, Ramesh Balwani.  Important notice.  Please read

04:25:37  4    carefully.

04:25:39  5              Do you have that in hand?

04:25:40  6        A    I do.

04:25:40  7        Q    Are you familiar with the document?

04:25:45  8        A    I've seen it.

04:25:46  9        Q    What is it?

04:25:52  10       A    It is a proposed sanction letter that

04:25:55  11   conditions were not met and there was immediate

04:26:00  12   jeopardy.

04:26:00  13       Q    And this is of the Theranos Arizona

04:26:04  14   laboratory?

04:26:05  15       A    Yes.  That's the address in the letter.

04:26:08  16       Q    And did you participate in the survey of

04:26:09  17   the Theranos's Arizona lab?

04:26:11  18       A    I did.

04:26:12  19       Q    And did you have a partner in that survey?

04:26:15  20       A    Mr. Yamamoto.

04:26:19  21       Q    Okay.  In the course of your survey of the

04:26:21  22   Arizona lab, did you take handwritten notes in the same

04:26:25  23   way as the notes that we saw earlier today relating to

04:26:28  24   your survey for the California lab for Theranos?

04:26:31  25       A    I believe so.

04:26:32  1        Q     Did you provide those to requesters who

04:26:35  2   requested documents of you?

04:26:37  3        A     I believe so.

04:26:40  4        Q     Any -- can you give me some sense of how

04:26:42  5   voluminous your notes may be from the Arizona survey?

04:26:50  6        A     Not unless I would see them.

04:26:53  7        Q     But you're confident that you did take

04:26:54  8   handwritten notes and provided them to the requesters

04:26:56  9   who requested documentation from you relating to

04:27:01 10   Theranos?

04:27:02 11        A     Yes.

04:27:02 12        Q     I'm not suggesting otherwise.  I'm just

04:27:03 13   trying to confirm because --

04:27:04 14        A     Anything I was asked for, I turned over.

04:27:10 15        Q     Okay.  Did yourself and Mr. -- did yourself

04:27:13 16   and Mr. Yamamoto kind of use a division of labor in

04:27:20 17   dividing up responsibilities for the survey of the

04:27:23 18   Arizona lab?

04:27:24 19              MR. KATZ:  Objection, vague.

04:27:28 20              THE WITNESS:  We handled the division of

04:27:29 21   labor the same way that we did in California.  We

04:27:32 22   divided up the different areas we were looking at.

         23   BY MR. CAZARES:

04:27:36 24        Q     And can you give me some sense or describe

04:27:39 25   for me what happened on the first day of the survey of

Page 199

04:41:09 1   record.  I meant I have no further questions.  If you

04:41:13 2   have anything.

04:41:15 3              MR. KATZ:  No.

04:41:15 4              MS. MOHAN:  Yeah, just housekeeping.

04:41:16 5              MR. CAZARES:  Go ahead.

04:41:17 6              MS. MOHAN:  We'd like to designate the

04:41:19 7   transcript as confidential pursuant to the protective

04:41:22 8   orders in this case and the witness would like the

04:41:24 9   opportunity to review and sign the transcript as well.

04:41:27 10  And I also intended to designate the video as

04:41:30 11  confidential pursuant to the protective order.

04:41:34 12             MR. KATZ:  And the SEC's request for the

04:41:38 13  transcript is consistent with our national order and

04:41:43 14  what we did with the one yesterday.  Thank you very

04:41:45 15  much.

04:41:48 16             MS. McDOWELL:  We are also ordering a video

04:41:55 17  and transcript.

04:41:57 18             MS. MOHAN:  We're not ordering the video,

04:41:58 19  but we are ordering a copy of the transcript and

04:42:00 20  exhibits.

04:42:03 21             THE VIDEOGRAPHER:  Thank you very much.

04:42:03 22  This -- we're going off the record.  The time is

04:42:07 23  2:53 p.m. and this marks also the end of DVD number 3

04:42:12 24  and today's deposition of Ms. Sarah Bennett.

        25             (Deposition was concluded at 2:53 p.m.)

Page 200

1                    CERTIFICATE OF DEPONENT

2             I hereby certify that I have read and

3    examined the foregoing transcript, and the same is a

4    true and accurate record of the testimony given by me.

5

6             Any additions or corrections that I feel

7    are necessary will be made on the Errata Sheet.

8

9

10                    _____

11                         Sarah Bennett

12

13

14

15                    _____

16                            Date

17

18   (If needed, make additional copies of the Errata Sheet

19   on the next page or use a blank piece of paper.)

20

21

22

23

24

25

Page 201

```
 1                    ERRATA SHEET

 2   Case: SEC V Ramesh "Sunny" Balwani

 3   Witness: Sarah Bennett          Date: 01/29/2020

 4   PAGE/LINE          SHOULD READ          REASON FOR CHANGE

 5   _____

 6   _____

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____
```

Page  202

1      CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2              I, Steven Poulakos, registered Professional

3      Reporter, the officer before whom the foregoing

4      proceedings were taken, do hereby certify that the

5      foregoing transcript is a true and correct record of

6      the proceedings; that said proceedings were taken by me

7      stenographically and thereafter reduced to typewriting

8      under my supervision; and that I am neither counsel

9      for, related to, nor employed by any of the parties to

10     this case and have no interest, financial or otherwise,

11     in its outcome.

12             IN WITNESS WHEREOF, I have hereunto set my

13     hand and affixed my notarial seal this 4th day of

14     February 2020.

15     My commission expires:

16     August 20, 2023

17

18

19

20     --------------------------

21     NOTARY PUBLIC IN AND FOR

22     THE STATE OF MARYLAND

23

24

25