# Exhibit 40

```
1              UNITED STATES DISTRICT COURT

2      NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

3

4    ROBERT COLMAN and HILARY
     TAUBMAN-DYE, Individually and
5    on Behalf of All Others Similarly
     Situated,
6
                         Plaintiffs,
7
            vs.                        Case No. 5:16-cv-06822-
8                                                  NC

9    THERANOS, INC., Et Al.,

10
                         Defendants.
11

12

13                        CONFIDENTIAL

14
          VIDEOTAPED DEPOSITION OF ADAM ROSENDORFF, M.D.
15

16
                         January 16, 2018
17
                            9:38 a.m.
18

19
                  655 West Broadway, Suite 1900
20
                      San Diego, California
21

22

23
     REPORTED BY
24   Renee K. Papierniak
     CSR No. 7056
25
```

CONFIDENTIAL PER P.O.                                    BALWANI-SEC_000162
                                                         COLM-000849

```
 1    APPEARANCES:

 2

 3         For Plaintiffs:

 4             HAGENS, BERMAN, SOBOL, SHAPIRO, LLP
               REED R. KATHREIN & DANIELLE CHARLES
 5             715 Hearst Avenue, Suite 202
               Berkeley, California  94710
 6             510.725.3000
               reed@hbsslaw.com
 7
               ROBBINS, GELLER, RUDMAN & DOWD, LLP
 8             JASON A. FORGE
               655 West Broadway, Suite 1900
 9             San Diego, California  92101
               619.231.1058
10             jforge@rgrdlaw.com

11         For Witness Adam Rosendorff:

12             COBLENTZ PATCH DUFFY & BASS, LLP
               REES F. MORGAN & SEAN COYLE
13             One Montgomery Street, Suite 3000
               San Francisco, California  94104
14             415.772.5754
               rmorgan@coblentzlaw.com
15
           For Defendant Theranos, Inc.:
16
               WILMERHALE
17             MICHAEL MUGMON & SAHAR MAALI
               950 Page Mille Road
18             Palo Alto, California  94304
               650.858.6103
19             michael.mugmon@wilmerhale.com

20         For Defendant Elizabeth Holmes:

21             COOLEY, LLP
               SHANNON M. EAGAN
22             3175 Hanover Street
               Palo Alto, California  94304
23             650.843.5000
               seagan@cooley.com
24

25
```

CONFIDENTIAL PER P.O.                                    BALWANI-SEC_000163
                                                           COLM-000850

```
 1      APPEARANCES (Continued):

 2

 3          For Defendant Ramesh Balwani:

 4              DAVIS WRIGHT TREMAINE, LLP
                STEPHAN M. RUMMAGE & JEFFREY B. COOPERSMITH
 5              1201 Third Avenue, Suite 2200
                Seattle, Washington  92101-3045
 6              206.757.8136
                steverummage@dwt.com
 7
                DAVIS WRIGHT TREMAINE, LLP
 8              KELLY GORTON
                505 Montgomery Street, Suite 800
 9              San Francisco, California  94111-6533
                415.276.6566
10              kellygorton@dwt.com

11          Also Present:

12              Ryan LaFond, Videographer

13

14

15

16

17

18

19

20

21

22

23

24

25
```

CONFIDENTIAL PER P.O.                              BALWANI-SEC_000164
                                                    COLM-000851

```
 1              INDEX TO CONFIDENTIAL EXAMINATION

 2

 3         WITNESS:  ADAM ROSENDORFF, M.D.

 4    EXAMINATION                              PAGE

 5    By Mr. Kathrein                             9

 6    By Mr. Rummage                        205, 273

 7    By Mr. Forge                          253, 275

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

CONFIDENTIAL PER P.O.                    BALWANI-SEC_000165
                                          COLM-000852

```
1              MR. RUMMAGE:  Object to the form of the
2     question.
3              THE WITNESS:  Venous blood was used to compare
4     diluted and undiluted samples.
5     BY MR. KATHREIN:
6         Q.  But not -- but you never did a test to compare
7     capillary blood on the Siemens machine to whether or not
8     it correlated with the -- with a diluted or undiluted
9     Siemens draw?
10             MR. RUMMAGE:  Object to the form of the
11    question.
12             THE WITNESS:  That's correct.
13    BY MR. KATHREIN:
14        Q.  Did Daniel Young know this?
15        A.  Yes.
16        Q.  Did Elizabeth Holmes know this?
17             MS. EAGAN:  Object to form.
18             THE WITNESS:  I don't know if she knew it.  I
19    would be speculating if she understood the subtlety of
20    that.
21    BY MR. KATHREIN:
22        Q.  Did Mr. Balwani know this?
23             MR. RUMMAGE:  Object to form.
24             THE WITNESS:  I don't know.  I think he just
25    wanted the validation report signed.
```

CONFIDENTIAL PER P.O.                    BALWANI-SEC_000240
COLM-000927

1    BY MR. KATHREIN:

2         Q.   And why do you say that?

3         A.   He was putting a lot of pressure on people.

4         Q.   And what kind of pressure did he put on you to

5    sign the validation reports?

6         A.   I signed the validation reports because I

7    believed that they were valid, not because of any

8    pressure that was put upon me.

9         Q.   Are you aware of any testing that was done at

10   Theranos to compare capillary draws and correlate them to

11   the results on the same blood or the same person using a

12   venous draw?

13             MR. RUMMAGE:   Object to the form of the

14   question.

15             THE WITNESS:   There were quality assurance

16   exercises done by Daniel comparing capillary to venous --

17   capillary diluted to venous diluted to venous

18   undiluted.

19   BY MR. KATHREIN:

20        Q.   And when did he do that?

21        A.   I don't recall.  Sometime in 2014.

22        Q.   But not 2013?

23        A.   No.  Not to my knowledge.

24        Q.   Uh-huh.  Do you know whether those results were

25   written down somewhere?

CONFIDENTIAL PER P.O.                                    BALWANI-SEC_000241
                                                        COLM-000928

1          A.   They must have been.

2          Q.   Okay.  Do you know what they are called?

3          A.   No.

4          Q.   When you did the validation comparing the venous

5     draws on the diluted samples to the venous draws on the

6     undiluted samples, how did you determine whether or not

7     there was a correlation or a comparison that indicated

8     that the -- that the results were the same?

9               MS. EAGAN:  Object to the form.

10              THE WITNESS:  You use a least-squares

11    regression.

12              THE REPORTER:  I'm sorry?

13              THE WITNESS:  Least-squares regression.

14    BY MR. KATHREIN:

15         Q.   Is there a --

16         A.   You plot the one set of -- you plot the set of

17    values on an X and Y axis, and you make sure that the

18    R-squared value is close to 1.

19         Q.   So you'd want the R-squared close to 1?

20         A.   Yes.

21         Q.   What does "close to" mean?

22         A.   Greater than .95.

23         Q.   And is there a number that you would come up

24    with for that that would say --

25         A.   I don't recall the exact cutoff that we used.

CONFIDENTIAL PER P.O.                                    BALWANI-SEC_000242
                                                         COLM-000929

1    Theranos, were, as I understand it, for the lab-developed

2    tests.  Is that right?

3         A.   Sorry, can you repeat the question?

4         Q.   Yeah, it was long.  Let's put it this way.  You

5    don't need to do a validation study for an assay that is

6    being run on a off-the-shelf commercial device and is

7    using all of the protocols and reagents that that

8    commercial device --

9         A.   What CLIA --

10             THE REPORTER:  "That commercial device"?

11             MR. MORGAN:  Let him finish his question.

12   BY MR. RUMMAGE:

13        Q.   -- that comes with that commercial device.  Is

14   that right?

15        A.   CLIA says you have to verify the performance of

16   the device.

17        Q.   All right.  Do you do a validation report on

18   something other than a lab-developed test?

19        A.   No.  You do the validation on the lab-developed

20   tests.  Usually the person installing the instrument does

21   the verification part.

22        Q.   And that's for something other than a

23   lab-developed test.  Is that right?

24        A.   That's for a test ran as a predicate test.

25        Q.   Okay.  And so when we talk about validation

CONFIDENTIAL PER P.O.

BALWANI-SEC_000372
COLM-001059

1    reports in the context of this deposition, we're

2    typically talking about lab-developed tests.  Right?

3         A.   That's correct.

4         Q.   Okay.  And what was your role in the validation

5    reports for the lab-developed tests?

6         A.   We used a software called EP Evaluator, and I --

7    I put the data in so that we had nice graphs for our

8    method comparison, for linearity.  We had nice boxes with

9    accuracy, precision.  Basically help make the documents

10   read -- read nicely and have the right figures in it and

11   the right footnotes, et cetera.

12        Q.   Okay.  And then at the end of the day, you had

13   to approve it.  Correct?

14        A.   Correct.

15        Q.   And I believe you testified that you did not

16   sign off on any validation report that you were not

17   comfortable signing?

18        A.   Correct.

19        Q.   And all of the assays -- all of the

20   lab-developed tests that Theranos developed and had on

21   line, at some point, were signed off on by you.

22   Correct?

23        A.   Correct.

24        Q.   And we're going to look at a couple of those

25   specific examples so that you can help us understand what

CONFIDENTIAL PER P.O.                                BALWANI-SEC_000373
                                                                       COLM-001060

1    goes --

2         A.   Okay.

3         Q.   -- into those.

4              You also said, when you were describing your

5    responsibilities, that you interact with regulatory

6    agencies during their inspections.  Was that one of your

7    responsibilities?

8         A.   Yes.

9         Q.   And how about outside the inspection context,

10   did you ever interact with the regulatory agencies?

11        A.   No.  With the exception of a short phone call

12   with the inspector.  And I don't recall what the content

13   of the phone call was.  But the CMS inspector called me

14   to clarify something.

15        Q.   Okay.  And you also mentioned you drafted

16   policies for the labs.  And I was unclear a little bit on

17   what the difference is between the policies in the labs

18   and the SOPs were.  Is there a difference there?

19        A.   Well, after -- I don't think we had distinct

20   policy documents.  That's more of what I'm -- what I did

21   in my second job.  So maybe I misspoke when I said

22   policy.

23        Q.   Okay.  All right.  And during the time that you

24   were lab director -- let's do this kind of in temporal

25   stages.  When you started as lab director, how many folks

CONFIDENTIAL PER P.O.

BALWANI-SEC_000374
COLM-001061

```
 1    did you have reporting up to you?

 2         A.   Maybe 12 people.

 3         Q.   And by the time you left, how many folks were

 4    reporting up to you?

 5         A.   About the same.  About 10 people.

 6         Q.   All right.  And what was the background of the

 7    folks that reported up to you?

 8         A.   Some had bachelor's degrees.  Some had master's

 9    degrees.  Some had CLS certification.  They'd gone to

10    school to study laboratory science.  At least a

11    bachelor's degree.  That was our minimum standard.

12         Q.   All right.  And then you -- I had gathered there

13    was also an R&D group.  Right?

14         A.   Correct.

15         Q.   And what was your interaction with the folks in

16    the R&D group?

17         A.   They would -- they would ask me

18    medically-directed questions.  What should the reportable

19    range for a specific assay be.  And I would look up what

20    reference ranges typically applied and how wide did we

21    have to be in our reportable range to include the

22    reference range.  The reportable range is this big.  The

23    reference range is -- has to be smaller than the

24    reportable range.  Just asked me medical questions about

25    the significance of different levels of analytes and that
```

CONFIDENTIAL PER P.O.

BALWANI-SEC_000375
COLM-001062

```
1              DECLARATION UNDER PENALTY OF PERJURY

2

3              I do hereby certify under penalty of perjury

4      that I have read the foregoing transcript of my

5      deposition taken on January 16, 2018; that I have made

6      such corrections as appear noted on the Deposition Errata

7      Page, attached hereto, signed by me; that my testimony as

8      contained herein, as corrected, is true and correct.

9

10

11              Dated this _____ day of _____,

12      2018, at _____,

13      California.

14

15

16

17

18                          _____

19                          Adam Rosendorff, M.D.

20

21

22

23

24

25
```

CONFIDENTIAL PER P.O.

BALWANI-SEC_000439
COLM-001126

```
 1                    DEPOSITION ERRATA SHEET

 2
       Page No. _____  Line No. _____
 3
       Change: _____
 4
       Reason for Change: _____
 5
       Page No. _____  Line No. _____
 6
       Change: _____
 7
       Reason for Change: _____
 8
       Page No. _____  Line No. _____
 9
       Change: _____
10
       Reason for Change: _____
11
       Page No. _____  Line No. _____
12
       Change: _____
13
       Reason for Change: _____
14
       Page No. _____  Line No. _____
15
       Change: _____
16
       Reason for Change: _____
17
       Page No. _____  Line No. _____
18
       Change: _____
19
       Reason for Change: _____
20
       Page No. _____  Line No. _____
21
       Change: _____
22
       Reason for Change: _____
23

24
       _____      _____
25     Adam Rosendorff, M.D.             Dated
```

CONFIDENTIAL PER P.O.                          BALWANI-SEC_000440
                                               COLM-001127

```
 1                    REPORTER'S CERTIFICATE

 2

 3            I, RENEE K. PAPIERNIAK, a Certified Shorthand

 4   Reporter, do hereby certify:

 5            That the foregoing proceedings were taken

 6   before me at the time and place therein set forth,

 7   At which time the witness was put under oath by me;

 8            That the testimony of the witness, the

 9   questions propounded, and all objections and statements

10   made at the time of the examination were recorded

11   stenographically by me and were thereafter transcribed;

12            That a review of the transcript by the deponent

13   was requested:

14            That the foregoing is a true and correct

15   transcript of my shorthand notes so taken.

16            I further certify that I am not a relative or

17   employee of any attorney of the parties, nor financially

18   interested in the action.

19            I declare under penalty of perjury under the

20   laws of California that the foregoing is true and

21   correct.

22            Dated this 25th day of January, 2018.

23        Renee K. Papierniak

24

25            RENEE K. PAPIERNIAK, CSR NO. 7056
```

CONFIDENTIAL PER P.O.                              BALWANI-SEC_000441
                                                   COLM-001128