# Exhibit 42

In re Arizona Theranos, Inc. Litigation

Videotaped Deposition of

ADAM ROSENDORFF, M.D.

February 26, 2019

CONFIDENTIAL

UNDER PROTECTIVE ORDER



TRANSCRIPTS-004298

```
                                                Page 1
 1              IN THE UNITED STATES DISTRICT COURT
 2                   FOR THE DISTRICT OF ARIZONA
 3
 4   In re:                  )No. 2:16-cv-2138-HRH
                             )Consolidated with
 5   ARIZONA THERANOS, INC., )2:16-cv-2373-HRH
     Litigation              )2:16-cv-2660-HRH
 6                           )2:16-cv-2775-HRH
                             )-and-
 7                           )2:16-cv-3599-HRH
     _____)
 8
 9         CONFIDENTIAL UNDER THE PROTECTIVE ORDER
10         VIDEOTAPED CONFIDENTIAL DEPOSITION OF
11                    ADAM ROSENDORFF, M.D.
12                   San Francisco, California
13                      February 26, 2019
14
15
16
17
18
19
20
21
22   REPORTED BY:
23   JOHNNA PIPER
24   CSR 11268
25   Job No. 10051729
```

```
                                                Page 2
 1              IN THE UNITED STATES DISTRICT COURT
 2                   FOR THE DISTRICT OF ARIZONA
 3
 4   In re:                  )No. 2:16-cv-2138-HRH
                             )Consolidated with
 5   ARIZONA THERANOS, INC., )2:16-cv-2373-HRH
     Litigation              )2:16-cv-2660-HRH
 6                           )2:16-cv-2775-HRH
                             )-and-
 7                           )2:16-cv-3599-HRH
     _____)
 8
 9           Deposition of ADAM ROSENDORFF, M.D.,
10   Volume 1, taken on behalf of Plaintiffs, at Lieff,
11   Cabraser, Heimann & Bernstein, 275 Battery Street,
12   29th Floor, San Francisco, California, beginning at
13   9:11 a.m. and ending at 7:32 p.m. on Tuesday,
14   February 26, 2019, before JOHNNA PIPER, Certified
15   Shorthand Reporter No. 11268.
16
17
18
19
20
21
22
23
24
25
```

```
                                                Page 3
 1   APPEARANCES:
 2   For the Plaintiffs:
          Keller Rohrback LLP
 3        1201 Third Avenue, Suite 3200
          Seattle, Washington 98101-3052
 4        (206) 623-1900
          rmorowitz@kellerrohrback.com
 5     By:  Rachel E. Morowitz, Esq.
 6               --and--
 7        Lieff, Cabraser, Heimann & Bernstein
          275 Battery Street, 29th Floor
 8        San Francisco, California 94111
          (415) 956-1000
 9        tashur@lchb.com
          jleggett@lchb.com
10     By:  Tanya Ashur, Esq.
             James Leggett, Esq.
11
     For the witness:
12        Coblentz, Patch, Duffy & Bass LLP
          One Montgomery Street, Suite 3000
13        San Francisco, California 94104
          (415) 391-4800
14        rmorgan@cobletzlaw.com
       By:  Rees F. Morgan, Esq.
15
16   For Ramesh Sunny Balwani:
          Davis, Wright, Tremaine LLP
17        920 Fifth Avenue, Suite 3300
          Seattle, Washington 98104-1610
18        (206) 622-3150
          steverummage@dwt.com
19        jeffcoopersmith@dwt.com
       By:  Stephen M. Rummage, Esq.
20           Jeffrey B. Coopersmith, Esq.
21                -and-
22        Davis, Wright, Tremaine LLP
          505 Montgomery Street, Suite 800
23        San Francisco, California 94111
          (415) 276-6584
24        kellygorton@dwt.com
       By:  Kelly M. Gorton, Esq.
25
```

```
                                                Page 4
 1   For the Walgreens Defendants:
          Sidley Austin LLP
 2        One South Dearborn
          Chicago, Illinois 60603
 3        (312) 853-6892
          lawrence.fogel@sidley.com
 4        sstern@sidley.com
       BY:  Lawrence P. Fogel, Esq.
 5           Stephanie C. Stern, Esq.
 6   For Elizabeth Holmes (telephonically):
          Cooley
 7        1700 Seventh Avenue, Suite 1900
          Seattle, Washington 98101-1355
 8        (206) 452-8700
          jlombard@cooley.com
 9     By:  Jeff Lombard, Esq.
10
     Also Present:  Monti Majthoub, videographer.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 209

1    MR. MORGAN:  Same objection.
2    THE WITNESS:  Yes.
3  BY MR. RUMMAGE:
4    Q. And -- and you believed at the time that
5  you had the qualifications and capability to review
6  and approve the validation reports, correct?
7    A. Yes.
8    Q. And -- and to your knowledge, did
9  Mr. Balwani and Ms. Holmes have that view about you?
10   MR. MORGAN:  Same objection.
11   Answer if you can.
12   THE WITNESS:  Yes.
13   MS. MOROWITZ:  Join the objection.
14  BY MR. RUMMAGE:
15   Q. And I believe you said that when -- when
16  you signed a validation report you were satisfied
17  that the assay could produce accurate and repeatable
18  results, correct?
19   A. Correct.
20   Q. So before you reached that conclusion, I
21  think you said that there was a process that you
22  went through that included some software. CLSI; is
23  that right?
24   A. Correct.
25   Q. And -- and what does the CLSI software do?

Page 210

1  I know you said it crunches numbers, but -- but what
2  numbers is it crunching?
3    A. It's telling you how many samples you need,
4  for instance, to establish a reference range, which
5  is 120, and you input the results for 120 samples
6  into CLSI and it spits out a reference range with a
7  -- an error.
8    Q. All right.
9    A. With a P value and an error.
10   Q. And -- and is that software -- let's back
11  up for a second. If you had been at University of
12  Pittsburgh and had developed an LDT, would you have
13  used the same software?
14   A. We didn't have any LDTs at the University
15  of Pittsburgh.
16   Q. All right. Let me ask the question a
17  different way. To your understanding, is the CLSI
18  software sort of industry standard for this process?
19   A. It's used by a lot of labs.
20   Q. Okay. And -- and what again does CLSI
21  stand for?
22   A. Clinical Laboratory Standards Institute.
23   Q. And so -- is that a regulatory body of some
24  sort?
25   A. It's a standards body. It's a --

Page 211

1    Q. Okay. That's a better way of putting it.
2  So it's a standards body, and it generates software
3  to assist labs in creating these validation reports,
4  right?
5    A. Yes.
6    Q. Okay. And so when -- when Theranos was
7  taking the results of its tests, putting them into
8  the CLSI software and generating results, it was
9  doing the same thing that other labs do?
10   A. Yes.
11   Q. It was just doing it with different
12  technology, right?
13   A. Yes.
14   Q. Okay. I want to talk a little bit about
15  the IMMULITE T protocols. So those were run on --
16  actually, strike that.
17   Let -- let's talk first about the T
18  protocols that were run on the assay -- on the
19  ADVIAs. The ADVIAs were not designed to run small
20  samples, correct?
21   A. Correct.
22   Q. And did that pose an issue in terms of
23  figuring how to run -- fingerstick capillary blood
24  on ADVIAs?
25   A. Yeah, the -- the samples had to be diluted

Page 212

1  in a special cup called the T-cup. It was
2  manufactured so that the probe could reach down to
3  the very bottom of the T-cup and no sample was
4  wasted.
5    Q. All right. And -- and then I think you
6  said that after the T-cup was manufactured and --
7  and it was put into the ADVIA or used in the ADVIA,
8  that the ADVIA had to -- had to be reprogrammed in
9  some ways to accommodate the -- the T protocol; is
10  that right?
11   A. Yes. Correct.
12   Q. And -- and were you responsible for the
13  programming?
14   A. No.
15   Q. Who took care of that?
16   A. This guy, Xinwei Gong, Sam Gong.
17   Q. Sam Gong, okay.
18   And was that something, to your knowledge,
19  that other blood testing companies were doing?
20   A. No.
21   Q. Did you regard that as a novel or
22  innovative solution to allow the ADVIAs to do
23  fingerstick processing?
24   A. I didn't think there was anything illegal
25  about it. I thought it was disappointing that

Page 213

1 Theranos wasn't using its own technology to --
2   Q. That wasn't my question. My question was:
3 Did you think it was a novel solution to allow the
4 ADVIA to run fingerstick samples?
5   A. It was novel. I mean, there -- there are
6 other labs that do dilutions. If you get a very
7 high number that's above the reportable range, you
8 can do a dilution to get it back into the reportable
9 range.
10   Q. Right.
11   A. Other labs had -- had done dilution, so the
12 idea of doing a dilution wasn't novel in and of
13 itself, but the T-cup was a novel concept. I think
14 there were some aspects of it that were novel.
15   Q. Who came up with that idea, the T-cup?
16   A. I don't know.
17   Q. And by the way, since you mentioned about
18 dilution, dilution is not uncommon in the
19 blood-testing industry, is it?
20   A. No.
21   Q. And, in fact, you talked about dilution in
22 a situation where you had an extremely high result
23 and you dilute to bring it down within reportable
24 results, right?
25   A. Correct.

Page 214

1   Q. And that does happen, especially on certain
2 assays, correct?
3   A. Correct.
4   Q. But there's also dilution that actually
5 happens inside these analytical machines, like the
6 ADVIA, correct?
7   A. Yes.
8   Q. So dilution is not an uncommon phenomenon
9 in blood testing, right?
10   A. No.
11   Q. Okay. And then the IMMULITE, did the
12 IMMULITE had to be modified -- have to be modified
13 in order to accommodate the ELISA assays that were
14 run on it?
15   A. I don't know. I don't recall.
16   Q. All right. Fair to say that Mr. Balwani
17 never directed you to sign a validation report,
18 correct?
19   A. No.
20   Q. And -- and Ms. Holmes never directed you to
21 sign a validation report, correct?
22   A. No.
23   Q. Okay. And by the way, just so that we're
24 clear, getting back a moment ago to our discussion
25 about dilution, Mr. Balwani didn't specify exactly

Page 215

1 what the dilution protocols were, did he?
2   A. No.
3   Q. And Ms. Holmes didn't do that either,
4 right?
5   A. No, they didn't come up with them.
6   Q. All right. And they didn't decide where in
7 the process dilution would be done, correct?
8   A. Correct.
9   Q. They were relying on the scientists to come
10 up with that information?
11   A. Correct.
12       MR. MORGAN: Objection. Lacks foundation.
13 BY MR. RUMMAGE:
14   Q. And you mentioned a moment ago that, from
15 your perspective, you know, Mr. Balwani had a degree
16 in computer science, correct?
17   A. Yes.
18   Q. And so he wasn't capable of making these
19 scientific judgments as to exactly how these assays
20 should be run and what was necessary to come up with
21 verifiable results, was he?
22   A. Yes, not -- not qualified.
23   Q. Another concept that I've seen come up in
24 some of these documents is bias correction. Can you
25 tell me what bias correction is?

Page 216

1   A. Well, if a test's -- test A gives you
2 results of 100 consistently and test B gives you
3 results of 120 for the same sample, then you can
4 take that 120 and multiply it by .9 and -- and get
5 back to the 100 and then -- that's what bias
6 correction is. It's if there's a consistent bias
7 when comparing two tests, you apply a multiplier to
8 get it back to make the results equivalent.
9   Q. And is there anything wrong with that?
10   A. I hadn't seen other labs doing that, so I
11 wonder about that. But I didn't think there was
12 anything inherently wrong about that.
13   Q. And was that something that Dr. Young,
14 Daniel Young --
15   A. He came up with it.
16   Q. And -- and that was implemented on some
17 tests in the lab; is that right?
18   A. Yes.
19   Q. And you approved that, correct?
20   A. Yes.
21   Q. Okay. Let's look at a couple sample
22 validations.
23       (Deposition Exhibit 64 was marked
24       for identification.)
25       (Off record discussion.)

Page 361

1 right, at one point you said, "I shouldn't have
2 signed this document." Do you remember saying that?
3   A. Yes.
4   Q. And I believe that counsel cleared up that
5 issue, but I want to again just make sure it's
6 crystal clear for the record. Today, is this
7 roughly the first time you've seen this document
8 since you signed it?
9   A. Correct.
10  Q. And as counsel for Mr. Balwani pointed out,
11 if you look at page 5 of 6, there is a series of
12 attachments listed there.
13  A. Yes.
14  Q. And we don't have the attachments with us
15 today; is that right?
16  A. Correct.
17  Q. And -- do you remember what any of those
18 attachments said?
19  A. No, I don't -- don't recall.
20  Q. Is it at least possible that those
21 attachments made you feel comfortable in executing
22 this standard operating procedure?
23  A. Yes, it's possible.
24  Q. Dr. Rosendorff, have you ever signed off on
25 and SOP that you weren't comfortable with?

Page 362

1   A. No, never.
2     MR. MORGAN: That's all I have.
3     MR. RUMMAGE: Thank you.
4     MR. MORGAN: Thank you.
5     MS. MOROWITZ: Plaintiffs have no further
6 questions.
7     Thank you for your time, Mr. --
8 Dr. Rosendorff.
9     THE WITNESS: Thank you.
10    THE VIDEOGRAPHER: Okay. This concludes
11 today's proceedings. We are now going off the video
12 record. The time is 7:31 p.m.
13    COURT REPORTER: Stephen, do you want a
14 copy of the transcript?
15    MR. RUMMAGE: Yes, please. Thank you.
16    COURT REPORTER: Lawrence, do you want a
17 copy of the transcript today?
18    MR. FOGEL: Yeah. Can we do electronic
19 only?
20    (TIME NOTED 7:32 p.m.)

Page 363

1           CERTIFICATE OF REPORTER
2       I, JOHNNA PIPER, a Certified Shorthand
3 Reporter, hereby certify that the witness in the
4 foregoing deposition was by me duly sworn to tell
5 the truth, the whole truth and nothing but the truth
6 in the within-entitled cause;
7       That said deposition was taken down in
8 shorthand by me, a disinterested person, at the time
9 and place therein stated, and that the testimony of
10 the said witness was thereafter reduced to
11 typewriting, by computer, under my direction and
12 supervision;
13      I further certify that I am not of counsel
14 or attorney for either or any of the parties to the
15 said deposition nor in any way interested in the
16 event of this cause and that I am not related to any
17 of the parties thereto.
18
19 DATED: March 13, 2019
20
21      [signature]
22      _____
23      JOHNNA PIPER, CSR 11268

Page 364

1        DECLARATION UNDER PENALTY OF PERJURY
2 Case Name: In re Arizona Theranos, Inc. Litigation
3 Date of Deposition: 02/26/2019
4 Job No.: 10051729
5
6       I, ADAM ROSENDORFF, M.D., hereby certify
7 under penalty of perjury under the laws of the State of
8 _____ that the foregoing is true and correct.
9       Executed this _____ day of
10 _____, 2019, at _____.
11
12
13              _____
14                    ADAM ROSENDORFF, M.D.
15
16 NOTARIZATION (If Required)
17 State of _____
18 County of _____
19 Subscribed and sworn to (or affirmed) before me on
20 this _____ day of _____, 20__,
21 by_____, proved to me on the
22 basis of satisfactory evidence to be the person
23 who appeared before me.
24 Signature: _____ (Seal)

Page 365

```
 1  DEPOSITION ERRATA SHEET
 2  Case Name: In re Arizona Theranos, Inc. Litigation
    Name of Witness: Adam Rosendorff, M.D.
 3  Date of Deposition: 02/26/2019
    Job No.: 10051729
 4  Reason Codes:  1. To clarify the record.
                   2. To conform to the facts.
 5                 3. To correct transcription errors.
 6  Page _____ Line _____ Reason _____
 7  From _____ to _____
 8  Page _____ Line _____ Reason _____
 9  From _____ to _____
10  Page _____ Line _____ Reason _____
11  From _____ to _____
12  Page _____ Line _____ Reason _____
13  From _____ to _____
14  Page _____ Line _____ Reason _____
15  From _____ to _____
16  Page _____ Line _____ Reason _____
17  From _____ to _____
18  Page _____ Line _____ Reason _____
19  From _____ to _____
20  Page _____ Line _____ Reason _____
21  From _____ to _____
22  Page _____ Line _____ Reason _____
23  From _____ to _____
24  Page _____ Line _____ Reason _____
25  From _____ to _____
```

Page 366

```
 1  DEPOSITION ERRATA SHEET
 2  Page _____ Line _____ Reason _____
 3  From _____ to _____
 4  Page _____ Line _____ Reason _____
 5  From _____ to _____
 6  Page _____ Line _____ Reason _____
 7  From _____ to _____
 8  Page _____ Line _____ Reason _____
 9  From _____ to _____
10  Page _____ Line _____ Reason _____
11  From _____ to _____
12  Page _____ Line _____ Reason _____
13  From _____ to _____
14  Page _____ Line _____ Reason _____
15  From _____ to _____
16  Page _____ Line _____ Reason _____
17  From _____ to _____
18  Page _____ Line _____ Reason _____
19  From _____ to _____
20  Page _____ Line _____ Reason _____
21  From _____ to _____
22  _____ Subject to the above changes, I certify that the
            transcript is true and correct
23  _____ No changes have been made. I certify that the
            transcript is true and correct.
24
            _____
25               ADAM ROSENDORFF, M.D.
```