# Exhibit 47

MEMORANDUM OF INTERVIEW

CASE NUMBER              :     2204323-MF

PERSON INTERVIEWED       :     Adam Rosendorff

PLACE OF INTERVIEW       :     United States Attorney's Office, San Francisco, CA

DATE OF INTERVIEW        :     January 12, 2018

TIME OF INTERVIEW        :     10:15 A.M.

On January 12, 2018, at the United States Attorney's Office in San Francisco, CA, Adam Rosendorff (ROSENDORFF) was interviewed regarding his knowledge of Theranos. Present for the interview were Assistant United States Attorney's John Bostic and Jeffrey Schenk, Securities and Exchange Commission Staff Attorney Mark Katz, Postal Inspector Matthew Norfleet and me. Participating by telephone were U.S. Food and Drug Administration-Office of Criminal Investigation Special Agent George Scavdis and government consultant Dr. Geoffrey Baird. Present as ROSENDORFF's counsel were Sean Coyle, Rees Morgan, and Skye Langs. ROSENDORFF was admonished prior to the start of the interview. The following is a summary of the statements made during the interview.

ROSENDORFF described Theranos technology in the CLIA [Clinical Laboratory Improvement Amendments] lab as the following: Blood was collected in a Theranos nanotainer using a fingerstick method. The blood was spun to obtain approximately 60 µL of serum. The serum was diluted and then analyzed using Siemens lab tests. ROSENDORFF thought Theranos used Siemens reagents for their lab tests, although they may have used reagents from other manufacturers, as well. A "t-cup" was used to measure small quantities of fluid.

The Edison device was added to the CLIA lab after a 2013 lab inspection. The device ran one assay at a time and consumed most of the sample by the time the assay was completed. The Edison device ran immunoassay tests only utilizing antibody coated tips. The devices suffered frequent quality assurance (QA) and quality control (QC) failures. ROSENDORFF estimated the Edison device could run approximately twenty different assays by the time he left Theranos.

ROSENDORFF defined a QC failure as two back-to-back observations which were two standard deviations outside of the expected mean value. Westgard rules were observed at Theranos. A device had to pass QC before any samples could be run. If a device failed QC, or if there was a Westgard violation, the device was recalibrated. ROSENDORFF speculated the reason for the frequent QC failures was non-standardized reagent production, specifically, reagent variation and stability. ROSENDORFF did not know of any QC data being altered retroactively, nor did he know if any instances where QC was made more lax.

ROSENDOFF was present for the delivery, installation, and setup of the Siemens devices. The devices were installed by Siemens technicians and then altered by Theranos. Siemens did not

know Theranos was altering their devices, but while this was a non-standard practice, the Siemens devices had open channels for laboratory developed tests (LDT's).

Siemens device modifications were revalidated using venous blood. For capillary blood, twenty fingerstick samples were analyzed and reference ranges were examined per CLSI [Clinical & Laboratory Standards Institute] guidelines. The validation would be redone if two or more samples resulted in values outside of the reference range.

Theranos first used published reference ranges but later changed to reference ranges calculated for use with the LDT's. ROSENDORFF did not have any discussion with BALWANI, HOLMES, or YOUNG about this.

Theranos' LDT's were comprehensively validated using venous blood. Precision and the lower limit of quantitation (LLOQ) values were calculated. ROSENDORFF stated the upper limit of quantitation (ULOQ) was not calculated. He raised this issue with Sunny Balwani (BALWANI) but felt BALWANI responded with "lip service." Due to intrinsic difficulties with collecting capillary blood, the coefficient of variation (CV) was not calculated using the fingerstick method. Capillary blood was, however, used to calculate reference ranges using a twenty sample process. Precision and recovery were not calculated using capillary blood.

ROSENDORFF knew of an algorithm used to calculate CV's, but he had no knowledge of the details.

In an effort to improve precision, Theranos moved from a three-tip device to a six-tip device. The idea, formulated by Daniel Young (YOUNG), removed the high and low values of an assay and averaged the remaining four values to determine a result. ROSENDORFF remembered discussing this with Elizabeth Holmes (HOLMES) in early 2014. ROSENDORFF told HOLMES accuracy and CV's would improve. He thought HOLMES understood the idea, although the math behind the process was not discussed. HOLMES supported the switch and the process was implemented over the course of one month. The process improved precision.

The process six-tip process was revalidated in Theranos' R&D lab first and then again in Theranos' CLIA lab. The chem-7 was the most frequently ordered assay so it was revalidated first. The TSH, PSA, T3, prolactin and other assays were also revalidated for the six-tip device.

ROSENDORFF did not discuss the six-tip process with anyone outside of Theranos.

During the interview, ROSENDORFF expressed worry about moving to a six-tip method based on his contemplation after leaving Theranos. He stated the process, which in effect took averages of averages, could make precision look better than it is. YOUNG never explained the algorithm used to complete the six-tip calculations to ROSENDORFF.

YOUNG was responsible for assay validation. Samples for validation studies were obtained from Theranos employees. Patient samples were not used. ROSENDORFF had discussions with Paul Patel regarding IRB [Institutional Review Board] approval, but ROSENDORFF had no knowledge if the approval was ever obtained.

US-REPORTS-0007376

Validation reports used the calculated CV of the particular assay. ROSENDORFF did not know if CV's were discussed with Theranos VIP's.

Potassium results which were outside of the reference range were reported as, "hemolyzed/recollect." ROSENDORFF discussed critical values and potassium issues with HOLMES and stated she was visibly upset about the topic. She remarked to ROSENDORFF that Theranos could resort to collecting venous blood to resolve the issue. YOUNG ultimately fixed the potassium issue, which ROSENDORFF believed was the result of technician collection issues and freeze/thaw issues.

Hemolysis was an outlier issue fixed by YOUNG through an ISE [ion selective electrode] calibration. ROSENDORFF was not sure if YOUNG made any other changes in Theranos' CLIA lab.

ROSENDORFF was told about Theranos' minilab device. He understood it had a flow cytometer and ran PCR [polymerase chain reaction] assays with a spectrophotometer.

There were three types of nanotainers. One type was lined with EDTA for use with serum to run immunoassays. There were also heparin lined nanotainers and a gel-separated nanotainers with no coagulant.

ROSENDORFF stated YOUNG understood clinical laboratory issues, but may have lacked the years of experience to run a CLIA moderate complexity lab. ROSENDORFF never had any discussion with anyone regarding YOUNG's qualifications.

ROSENDORFF thought all demo samples were run in Theranos' lab, not in the conference room. His conclusion is based on his observation of samples being brought into the lab and that the Edison device was the only in-house device in use during his tenure at Theranos. The samples needed pre-processing, including centrifugation. The Edison devices did not have a centrifuge.

Theranos used reference lab ARUP for some tests. ROSENDORFF was not sure of the menu used with ARUP. ROSENDORFF remembered tubes of venous blood sent to ARUP.

ROSENDORFF stated Theranos' test menu showed all tests available at Theranos and did not indicate whether a test was run on an Edison device or on a Siemens device. ROSENDORFF thought the test menu was misleading.

Test send outs were reported to patients on the backend. There was a time when LDT use was not reported on the backend.

ROSENDORFF resigned from Theranos because he felt that the issues he raised were not taken seriously. Specifically, Theranos did not have a proficiency testing (PT) protocol in place for over one year on the Theranos devices and modified third party devices. While QC was done, it was not done in a challenging way. Finally, an alternative assessment of proficiency (AAP) process was planned but not implemented.

ROSENDORFF stated BALWANI was very involved with many aspects of Theranos' business and was always in HOLMES' office. Specifically, ROSENDORFF discussed the ASR rule with

US-REPORTS-0007377

BALWANI. ROSENDORFF wanted to report reagent use to the patient as required, but BALWANI did not. Research-use reagents were used for testing patient samples and BALWANI did not want any qualifying remarks on patient reports. ROSENDORFF speculated BALWANI wanted the Theranos device to do everything and that the public might lose confidence in the technology if there were qualifying remarks. BALWANI yelled at ROSENDORFF about this issue and HOLMES had to apologize for him.

ROSENDORFF reviewed document ROSEN-0000154 to ROSEN-0000160. This content of this document, consisting of an email chain, took place before a meeting ROSENDORFF had regarding PT. YOUNG believed PT testing material could only be used on specific devices. Due to matrix effects, where everything beside the analyte may be different, the matrix of a sample may not have been compatible with a Theranos test which could have produced a different result. ROSENDORFF stated it was better to run PT on a range of samples. Per the document, the plan was to run PT samples using a Theranos test and a predicate test. Theranos had no similar peer group, so AAP had to be implemented.

- On page ROSEN-0000156, BALWANI stated, "And our validation against immulite has been excellent in the past. It is these PT samples that are off." ROSENDORFF did not know why BALWANI stated that.

In 2014, while ROSENDORFF was still employed with Theranos, the Edison device did not undergo any PT testing. ROSENDORFF agreed with YOUNG's assessment of AAP and for using PT samples. PT samples are synthetic and there is no chance of hemolysis. PT samples may also have provided a greater range of results. PT must be run on everything Theranos used with a preferred method of running PT of a predicate device to determine a result, and then following that result with a Theranos test.

ROSENDORFF reviewed document ROSEN-0000125 to ROSEN-0000131. ROSENDORFF was concerned because he felt PT should be run on the primary method of collection on a Theranos device, namely fingerstick collection. ROSENDORFF thought Theranos did not have to use a company's PT material. Theranos could use patient samples and AAP for their PT.

ROSENDORFF conducted a cursory review of document PFM-GJ-00001976 to PFM-GJ-00001979 and THER-2541918 to THER-2542065. ROSENDORFF stated that high QC failure rates for the Edison assays and failure to conduct PT for Edison assays as identified in the January 2016 CMS audit report were issues that were present when ROSENDORFF was lab director. ROSENDORFF also identified a validation issue that was present when he was Theranos lab director. He stated multiple operations were required over multiple days, but that was properly determined by guidelines set by the lab director.

Potassium testing continued to be an issue which ROSENDORFF raised with BALWANI. Fingerstick blood has a higher rate of hemolysis. ROSENDORFF did not think the hemolysis issue was ever truly resolved.

US-REPORTS-0007378

ROSENDORFF raised issues to HOLMES and BALWANI. Often, he was referred to YOUNG. He said HOLMES and BALWANI were receptive to his issues sometimes and hostile other times.

Theranos ran coagulant tests using LDT's. This process did not last long.

Theranos used a Beckton-Dickinson device to run CBC assays. Theranos also used the Immulite device.

Blood culture assay were not conducted when ROSENDORFF was at Theranos.

ROSENDORFF stated that unqualified lab technicians should not be handling any patient samples. He was not sure if this was discussed with BALWANI and HOLMES.

ROSENDORFF stated the liquid handler used had good precision and accuracy.

During the course of the interview, we took breaks at the following times to rest and to allow for ROSENDORFF to confer with his counsel.

BREAK 11:30 A.M. to 11:35 A.M.

BREAK 12:20 P.M. to 12:22 P.M.


The interview ended at 12:35 P.M.

*[signature]*

Christopher McCollow                                           March 8, 2018
U.S. Postal Inspector                                          Date

ATTACHMENTS

- ROSEN-0000154 to ROSEN-0000160
- ROSEN-0000125 to ROSEN-0000131
- PFM-GJ-00001976 to PFM-GJ-00001979 and THER-2541918 to THER-2542065