# Exhibit 50

**Chavez, Sergio**

| | |
|---|---|
| **From:** | Hole, Mary |
| **Sent:** | Wednesday, September 02, 2015 6:21 AM |
| **To:** | Walburger, Matthew; Anderson, Eric W; Lum, Lawton W; Chavez, Sergio |
| **Cc:** | Singh, Seema; Almogela, Darlene B |
| **Subject:** | FYI - Theranos Objections to Inspections |
| **Attachments:** | 2015 8 30 HKing to IPilcher re FDA Inspection.pdf; FDA vs CMS Oversight paper.pdf; Letter to M. Hamburg.pdf; CLIA Regulation.pdf |

Good Morning:

I just thought it might be helpful to SCSOs and Compliance Branch if I share with you some of the objection letters that we are receiving from Theranos concerning our jurisdiction and authority to inspect certain aspects of their QMS activities that are occurring in their CLIA Labs. Attached please find four documents that were given to me so far by the firm's lawyers (who are constantly in the conference room, voicing and documenting their objections to many of my requests or questions).

I hope that you will find these documents helpful with regards to the firm's strategy and thinking.

Best Regards,

Mary

Mary R. Hole, M.B.A.
Investigator / Consumer Safety Officer
U.S. Food and Drug Administration

*Duty Station:*
San Jose Resident Post
96 N. 3rd Street
San Jose, CA 95112
Ph: 408-291-7548 ext. 1119
Fax: 408-291-7228

*Tour of Duty:*
M-F 06:30 – 15:00 PST

ATTACHMENT 5

US-REPORTS-0007073



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

August 30, 2015

**VIA ELECTRONIC MAIL**

Ian A. Pilcher
Consumer Safety Officer
Division of Chemistry and Toxicology Devices
Office of In Vitro Diagnostics and Radiological Health
Center for Devices and Radiological Health
Food and Drug Administration
10903 New Hampshire Avenue
Building 66, Room 4666
Silver Spring, Maryland  20993

Dear Mr. Pilcher:

I write in follow up to our discussions during the on-site inspections at Theranos, Inc.'s (Theranos') Newark and Palo Alto facilities that were conducted from August 25-28, 2015. First, we appreciate the constructive conversations that we had with Agency representatives and that we believe significantly helped to clear up what evidently was confusion about the interpretation of some of the data that we had submitted to the Food and Drug Administration ("FDA" or "Agency").  After speaking with Agency representatives, it is also very clear to us that there is very significant room for improvement in how we communicate our data and study designs to the agency, and we are committed to making these improvements.

Moreover, although many aspects of the Agency's policies in this area remain unclear, it has become evident that we must revisit our previous understanding of the Agency's developing expectations as to the rate, extent and manner in which Quality Systems Regulation (QSR) requirements should be implemented by laboratories transitioning from laboratory developed tests (LDTs) to fully FDA-regulated devices, as well as the clarity of our prior communications with the Agency as to our QSR compliance status.  While we previously believed that we were appropriately implementing QSR requirements during this transitional period, based upon our discussions last week we now recognize that an expansion of those efforts prior to clearance of the collection tubes used as part of our LDTs is necessary based on FDA's current thinking. However, we note that we are not alone in our confusion: this is an area in which many other laboratory stakeholders stated serious concerns and asked for additional guidance in the course of FDA's prior public meetings on its framework for LDT regulation.[1]  We are hopeful that we

---

[1] Indeed, FDA's *Federal Register* notice for the January 2015 Public Workshop on the Agency's framework for expanding LDT regulation specifically called out these areas as needing further regulatory policy development and dialogue, posing the following questions for discussion:

"How can laboratories best leverage their current processes and procedures, implemented to meet CLIA accreditation requirements, to meet the FDA QS regulation requirements in the least burdensome manner?

1

**CONFIDENTIAL COMMERCIAL INFORMATION – EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT**

US-REPORTS-0007074



theranos

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

can continue this productive dialogue to answer these critical questions and eliminate any potential misunderstanding as to our QSR compliance status in the future.

As we have previously indicated, we are deeply committed to maintaining the highest standards for the quality and accuracy of all of our laboratory tests. We know that physicians and patients rely on information from laboratory tests as they make critically important medical decisions. To that end, we have committed to voluntarily submitting all of our LDTs to the FDA for review and, accordingly, as we hope the Agency representatives observed, we have greatly progressed in our efforts toward transitioning all of our operations related to LDTs regulated under the Clinical Laboratory Improvement Amendments (CLIA) to a comprehensive state of compliance applicable to regulated medical devices under the Federal Food, Drug, and Cosmetic Act (FDCA), including the QSRs. However, we now recognize that we must accelerate and expand those efforts based on FDA's current thinking.

We are extremely confident in the robustness of our data, and we look forward to working with you and others at the Agency on this very important transition. Indeed, as described in more detail in Section II below and in Exhibit A attached, studies assessing the performance of the Theranos sample collection devices (TSCDs)[2] for each of the four analytes we discussed with you conclusively demonstrate that the TSCDs meet applicable quality standards and can safely and effectively achieve clinical benefits in their intended clinical use, in support of the statements in the validation report we reviewed. Examination of the results of the prior studies that provide context for that report and the subsequent studies in 2014 and 2015 shows that the deviations in the validation studies in question were due to factors not attributable to the performance of the collection devices, and we have also provided additional validation studies performed in 2013 that demonstrated that the collection devices already met the criteria for performance with these assays, and that the factors that cause any deviation were already known and characterized.

Given the above, and, for the reasons discussed below, if there were to be any finding that Theranos is out of compliance with any medical device regulatory requirements during this transition, such findings would be unwarranted and would constitute a major change in FDA

---

Are there FDA QS requirements that differ from CLIA requirements that FDA should continue not to enforce for laboratories that make LDTs?

What additional resources will laboratories need in order to assist them with implementation of the QS regulation?

What is the appropriate timeframe for phase-in enforcement of QS regulation requirements in general and for design controls specifically?"

79 Fed. Reg. 69860, 69863 (November 24, 2014).

[2] The trade name for TSCDs used in Theranos regulatory submissions is "Capillary Tubes and Nanotainer™ Tubes" and some documents produced to FDA this past week refer to them as "CTNs".

2

CONFIDENTIAL COMMERCIAL INFORMATION – EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

US-REPORTS-0007075



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

policy and interpretation of current law. With all due respect, such a fundamental policy shift should not be implemented via inspections, particularly in the context of an inspection of Theranos, which – unlike the traditional laboratory industry – has embraced FDA's developing framework for the transition of LDTs to compliance with device requirements.

## I.    Background On the Recent Inspection of Theranos Facilities.

As you know, beginning on August 24, 2015, FDA Office of Regulatory Affairs (ORA) field investigators and headquarters employees from the Office of In Vitro Diagnostics and Radiological Health (OIR) in the Center for Devices and Radiological Health conducted an inspection at Theranos' locations in Newark, California, Palo Alto, California and Scottsdale, Arizona. Those locations engage in the following functions and activities:

- The Scottsdale facility is a CLIA-certified moderate-complexity laboratory that conducts no manufacturing. Nor does it run any LDTs. All of the tests run at this facility are FDA-cleared or approved. Theranos does not run its Theranos System Processing Unit at this or any facility (as was previously communicated and confirmed by Agency staff who visited the location and Theranos' other laboratory). Therefore, none of its activities are within the jurisdiction of FDA under the FDCA.

- The Palo Alto facility is Theranos' corporate headquarters. Among other things, this facility contains a laboratory for research and development purposes. It is not a clinical laboratory, nor does it manufacture any products on site. Rather, it houses the business offices and a research laboratory, and design activities are conducted there.

- The Newark location contains two separate facilities: 1) a CLIA-certified high-complexity lab that runs clinical samples, including LDTs and FDA-cleared or approved tests; and 2) a site that produces the TSCDs for use in Theranos' CLIA-certified lab in Newark and manufactures devices for research and development purposes.

As discussed more fully below, over the course of the four days that FDA employees were present at these facilities, Theranos repeatedly objected orally and in writing to the scope and premises underlying a number of aspects of FDA's inspection and related requests for documentation. Although we believe much of the inspection has gone beyond the scope of the Agency's authority under the FDCA and any appropriate interpretation of FDA requirements and policy currently applicable to Theranos, we cooperated fully and completely with the inspection, and at no time did Theranos refuse access or otherwise impede or obstruct the Agency's inspection of any of these facilities. Indeed, even though they relate to CLIA and CLIA certification, Theranos took FDA inspectors on a full tour of its CLIA-certified labs and voluntarily shared Theranos' CLIA laboratories' assay validation reports, lab SOPs and other data generated in the CLIA facility in order to demonstrate the high quality of our tests and the compliant management of our laboratory operations.

3

CONFIDENTIAL COMMERCIAL INFORMATION – EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

US-REPORTS-0007076



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

## II.   Substantive Issues Raised by FDA During the Recent Inspection.

In accordance with our discussion, we first want to address some of the substantive issues or questions raised by FDA during the inspection over the past few days.  We believe that this additional information will help FDA to understand that there is no cause for concern regarding these questions.

On August 28, 2015, you raised concerns about validation studies with results that warranted further investigation for four analytes (bicarbonate, glucose, calcium, and potassium) and asked us to provide prior and /or subsequent data from further studies that substantiate prior conclusions and show that the devices meet criteria for assay compatibility in accordance with the report you referenced.  We have attached Exhibit A, which, along with additional referenced Appendices, describes in detail studies performed in 2014 and 2015 assessing the performance of the TSCDs for each of these analytes.  These data conclusively demonstrate that the TSCDs meet applicable quality standards and can safely and effectively achieve clinical benefits in the intended clinical use with these assays, and that the deviations noted in that report were substantiated.

Specifically:

- The results of the subsequent testing for **bicarbonate** met and exceeded the acceptance criteria, and further examination concluded that the prior deviations resulted from delays caused by availability of the sample processing equipment, as also previously observed during the development process.

- The results of the subsequent testing with fasting study subjects for **glucose** met and exceeded the acceptance criteria, and further examination concluded that the prior deviations resulted from the collection of samples from non-fasting subjects, as well known in clinical laboratory science and previously observed during the development process.

- For **calcium**, the subsequent testing included characterization of hemolysis and draw volumes and excluded samples exhibiting unsatisfactory characteristics to overcome variability that are associated with samples of poor analytical quality.  These met and exceeded the acceptance criteria for performance with calcium assays, and further examination concluded that variables associated with poor sample quality had attributed to the deviations shown in the previous validation study for calcium, as well known in clinical laboratory science and previously observed during the development process.

- The observation of higher **potassium** bias in several samples in the previous validation study was the same as that for calcium. The subsequent studies performed by the clinical laboratory team for potassium characterized hemolysis and draw volume and excluded samples exhibiting unsatisfactory characteristics, as well known in clinical laboratory

4

CONFIDENTIAL COMMERCIAL INFORMATION – EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

US-REPORTS-0007077



1701 Page Mill Road     P 650.838.9292     theranos.com
Palo Alto, CA 94304     F 650.838.9165

science and previously observed during the development process, and the performance in the subsequent studies again met and exceeded the acceptance criteria.

Therefore, in each case, an examination of the results of the subsequent studies demonstrates that the deviations in the validation studies in question were due to factors not attributable to the performance of the collection devices. Furthermore, we have provided additional validation studies performed in 2013 that demonstrated that the collection devices met the criteria for performance with these assays, as described in Exhibit B and the accompanying Appendices 11–15, and that the deviations were not due to the collection device.

In addition, FDA staff have raised some questions as to whether Theranos has met all of the requirements under the FDCA with regard to quality systems, including the handling of complaints and MDR compliance. As noted in Exhibit C, Theranos recently registered for the eMDR system as part of its transition into full compliance with the FDCA which was planned for the time of TSCD submission before the end of September. And Theranos currently uses the TSCDs internally only as part of LDTs in its high complexity CLIA-certified lab in Newark— and it has not received any formal customer complaints about its products. At the same time, Theranos remains in compliance with the CLIA complaints system and has numerous mechanisms for informal feedback and discussion to facilitate constant improvements to its tests and processes.

### III.   This Inspection.

Over the course of the inspection, FDA at times suggested that Theranos might not be fully compliant with all of the medical device provisions of the FDCA, including the provisions related to design controls, medical device reporting and other quality systems requirements. Such suggestions do not take into account the fact that Theranos has, to date, been fully compliant with the relevant regulations issued by the Centers for Medicare and Medicaid Services (CMS) under CLIA, which require, among other things, that labs that are conducting LDTs must establish maintenance protocols and meet instrument and test performance requirements and performance specifications. Theranos always has been fully compliant with these CLIA requirements. Moreover, as your team in Newark observed, Theranos has gone above and beyond those stated CLIA requirements by, in addition to all routine daily QC, performing weekly internal quality monitoring by testing paired capillary and venous samples from donors to ensure testing quality (which otherwise would be required only twice a year), as well as proactively initiating the New York state application process and requirement compliance even though Theranos has no presence in New York.

**While we fully understand that in the course of articulating its new framework for LDTs the Agency has suggested that current CLIA requirements are inadequate, that framework -- which is non-binding at this time -- also recognizes that the further regulation of LDTs under FDCA authorities will require an orderly and risk-based transition. Specifically, FDA has acknowledged in the LDT guidance that even for Class III high-risk devices there will need to be a grace period for companies to come into compliance. Theranos has always anticipated that it would transition to being fully compliant with the FDCA requirements**

5

CONFIDENTIAL COMMERCIAL INFORMATION – EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

US-REPORTS-0007078



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

applicable to medical device manufacturers. **As noted, we remain committed to this goal, and we had planned to ensure all documentation was in place in full compliance with QSR at the time of submission for the TSCDs next month, and of course before any decision on such a submission was issued by FDA.**

Working toward that end, since 2013 we have taken numerous actions to come into compliance with QSR. An extensive list of these actions is included as Exhibit C. However, such steps should not be considered a waiver of the orderly processes that we anticipated would be applied as part of the transition to a fully FDCA-regulated environment. **Under no scenario did we believe that the Agency would attempt to impose a broad-ranging change in policy and legal interpretation in the course of inspecting a single manufacturer – particularly a manufacturer that has committed to a data-driven transition to full device regulation for all of its tests, which no other laboratory company has done.**

We believe that our approach to date has met, and in many respects exceeded, government requirements applicable at this juncture, and we have ensured that we are not creating any risk to patients. Our goal remains to maintain the highest standards for quality and accuracy of our laboratory tests throughout this transition. We are hopeful that the Agency will work with Theranos and allow us to fully transition to device status – including all relevant QSR requirements – in an orderly manner. The immediate and full application of QSR and other requirements to Theranos in an inspectional setting, including a retrospective expectation as to QSR-level design history compliance, would be contrary to law and all articulated Agency policy. While we would welcome further guidance and clarity as to FDA's expectations in this transition period, such information should be developed and implemented in accordance with applicable law, including the due process protections afforded under the Administrative Procedure Act and Good Guidance Practices regulations, as applicable, so as to ensure proper notice, fairness, and consistency.

## IV.    Regulatory Status of TSCDs.

At all times that the TSCDs have been used, it has been in the context of LDTs, in a Theranos CLIA-certified laboratory regulated by CMS under CLIA. Specifically, 42 C.F.R. §§ 493.1253(b)(2) and 493.1253(b)(3) provide that laboratory-developed tests must be conducted in accordance with certain requirements for performance requirements and specifications for the tests and test systems and maintenance protocols. Theranos has fully complied with these CLIA requirements including by following its Standard Operating Procedure (CL QOP-00022) reflecting the CLIA regulatory requirements.

In September 2013, Theranos voluntarily listed the TSCD as a Class I device as an early step in the transition from the CLIA-certified environment and as a matter of transparency with the Agency. Notably, the predicate for Theranos' 510(k) for the TSCD, the RAM Scientific Safe-T-Fill Capillary Blood Collection System, has been listed as a Class I device under the same regulatory classifications.

6

CONFIDENTIAL COMMERCIAL INFORMATION – EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

US-REPORTS-0007079



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304     F 650.838.9165

However, in written feedback to a Pre-Submission (Q131199), dated October 21, 2013, Theranos was instructed by FDA officials in OIR that it should file a 510(k) application for the TSCD because FDA had determined that it was actually a Class II device that required a pre-market clearance. At that time, Theranos raised an objection to the classification of the TSCD as a Class II device. However, in the spirit of cooperation, Theranos agreed to file a 510(k) for this product.

As part of Theranos' transition to having the TSCD 510(k) application cleared, it has been working since 2013 to come into compliance with all relevant medical device requirements under the FDCA, many of which are detailed in Exhibit C, including updated SOPs, improved training, standardization of nomenclature, filing for eMDR, and hiring of key professionals.

This path has not been easy. Even as FDA has indicated in draft guidance that it intends to change its position regarding the exercise of enforcement discretion over LDTs (a change Theranos publicly supported), there has been an outcry from members of the laboratory industry other than Theranos about how this transition will work. Indeed, at its public meeting on the LDT guidance in early January, many companies and other presenters raised questions about how FDA intends to allow companies to transition from the status quo. Theranos has also struggled with the lack of clear information and direction from FDA to date regarding LDTs, yet we have chosen to take a path that is protective of patients and patient safety. That is why Theranos submitted its original 510(k) for TSCDs and has been transitioning to be ready for full compliance with all applicable requirements under the FDCA. With respect to design history, while such a history is a retrospective requirement if now imposed with respect to TSCDs used in the CLIA-regulated setting, Theranos has already been expediting the development of SOPs in that area, and further documenting the design history for TSCDs in accordance with FDA regulations and guidance.

In the next few weeks, Theranos intends to re-submit its 510(k) for the TSCDs to FDA for review. We plan to follow up on the discussions that we had with FDA personnel who were in Newark last week to definitively resolve the issue of which data FDA would like to see in this submission. As we have noted in discussions with FDA staff, both in recent phone calls and during the inspection of the Theranos facilities, Theranos feels very strongly that its data on the TSCDs is extremely robust. Moreover, Theranos received very productive feedback from FDA staff during the inspection that will assist it in better communicating with the review division about its data and the comparison of its data to that of the predicate device. We are confident that once we can better communicate with FDA about this issue, the Agency will appreciate the strength of Theranos' data. Theranos welcomes this opportunity to work with the Agency on this submission.

That said, **FDA should allow Theranos to transition to FDCA regulatory compliance in an orderly and fair manner, rather than implementing new policy by inspection and empowering those that oppose the Agency's developing policies in this area.**

In its draft guidance document outlining a framework for the oversight of LDTs, FDA envisioned a phased-in approach under which entities that use LDTs would have a period of time

7

CONFIDENTIAL COMMERCIAL INFORMATION – EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

to come into compliance with applicable requirements. Indeed, the Agency has noted that it is considering whether Class III LDTs (which would require submission of PMAs within 12 months of publication of a final LDT guidance) should remain under enforcement discretion for the design control requirements (21 C.F.R. § 820.30(a) – (h) and (j)) of the QSR) for up to 24 months after publication of the final guidance. Therefore, principles of basic fairness dictate that FDA should not hold Theranos to a standard that it is not currently applying to any other labs developing LDTs. We are simply asking that FDA understand that moving from an entity that makes TSCDs solely for use with LDTs in a CLIA-certified lab (that is subject to and fully compliant with CMS regulations under CLIA) to one that is fully compliant with all FDA requirements under the FDCA will take some time and will raise certain complexities along the way.

We therefore submit that FDA should refrain from any findings that Theranos is out of compliance with the FDCA while it continues to make a good faith effort to come into full compliance with the FDCA in this transitional period. As stated above, because Theranos is already meeting and far exceeding all of its requirements under CLIA, we believe there is no public health risk, and as your teams observed first hand, are working diligently to voluntarily expedite our timeline in any areas of possible concern to the FDA.

**Theranos has been transparent with FDA and, unlike the industry as a whole, has publicly committed to working with the Agency to achieve the goals of its new framework for transitioning LDTs to full device regulatory status.** Surely such efforts should not be rewarded with premature and unwarranted inspectional observations based on developing Agency policy thinking that has not been clearly articulated to the industry as a whole or been the subject of stakeholder input. Such an approach would only strengthen the hand of those who oppose even small steps in FDA's developing LDT regulatory framework and would unfairly prejudice Theranos in achieving its public health and business objectives.

Theranos welcomes the opportunity to discuss these matters further with the Agency. We remain ready to discuss any questions or concerns that the Agency may have regarding any aspect of Theranos' operations or tests.

Sincerely,

*/s/ Heather King*

Heather King
General Counsel

8

CONFIDENTIAL COMMERCIAL INFORMATION – EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

US-REPORTS-0007081

## FDA vs. CMS Oversight

- The Theranos Sample Collection Devices (TSCDs) were developed in-house at Theranos as an LDT. LDTs are diagnostic tests that are developed internally by a laboratory for use in its clinical testing.

- Equipment developed by a laboratory for use with laboratory developed tests (LDTs) is considered part of the LDT system, which is subject to oversight by the Centers for Medicare and Medicaid Services (CMS) under the Clinical Laboratory Improvement Amendments (CLIA) program. CLIA regulates laboratories that perform testing on patient specimens in order to ensure accurate and reliable test results.

  o The CLIA regulations establish quality system requirements for laboratory systems. They state: "Each laboratory that…introduces a test system not subject to FDA clearance and approval (including methods developed in-house…must establish for each test system the performance specifications for the [applicable] performance characteristics."[1]

  o Further, for quality system requirements relating to maintenance and function checks, CLIA regulations state that for "equipment, instruments, or test systems developed in-house," the laboratory must establish a certain maintenance and function check protocol.

- In contrast, the FDA regulates manufacturers and devices under the Federal Food, Drug, and Cosmetic Act (FFDCA) to ensure that devices, including those intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, are reasonably safe and effective.

- Copies of the regulations cited above are attached.

---

[1] 42 C.F.R. § 493.1253(b)(2) (emphasis added).

CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT



reporting. The criteria must be consistent with the manufacturer's instructions, if provided. These conditions must be monitored and documented and, if applicable, include the following:

(1) Water quality.

(2) Temperature.

(3) Humidity.

(4) Protection of equipment and instruments from fluctuations and interruptions in electrical current that adversely affect patient test results and test reports.

(c) Reagents, solutions, culture media, control materials, calibration materials, and other supplies, as appropriate, must be labeled to indicate the following:

(1) Identity and when significant, titer, strength or concentration.

(2) Storage requirements.

(3) Preparation and expiration dates.

(4) Other pertinent information required for proper use.

(d) Reagents, solutions, culture media, control materials, calibration materials, and other supplies must not be used when they have exceeded their expiration date, have deteriorated, or are of substandard quality.

(e) Components of reagent kits of different lot numbers must not be interchanged unless otherwise specified by the manufacturer.

### § 493.1253 Standard: Establishment and verification of performance specifications.

(a) *Applicability.* Laboratories are not required to verify or establish performance specifications for any test system used by the laboratory before April 24, 2003.

(b)(1) *Verification of performance specifications.* Each laboratory that introduces an unmodified, FDA-cleared or approved test system must do the following before reporting patient test results:

(i) Demonstrate that it can obtain performance specifications comparable to those established by the manufacturer for the following performance characteristics:

(A) Accuracy.

(B) Precision.

(C) Reportable range of test results for the test system.

(ii) Verify that the manufacturer's reference intervals (normal values) are appropriate for the laboratory's patient population.

(2) *Establishment of performance specifications.* Each laboratory that modifies an FDA-cleared or approved test system, or introduces a test system not subject to FDA clearance or approval (including methods developed in-house and standardized methods such as text book procedures), or uses a test system in which performance specifications are not provided by the manufacturer must, before reporting patient test results, establish for each test system the performance specifications for the following performance characteristics, as applicable:

(i) Accuracy.

(ii) Precision.

(iii) Analytical sensitivity.

(iv) Analytical specificity to include interfering substances.

(v) Reportable range of test results for the test system.

(vi) Reference intervals (normal values).

(vii) Any other performance characteristic required for test performance.

(3) *Determination of calibration and control procedures.* The laboratory must determine the test system's calibration procedures and control procedures based upon the performance specifications verified or established under paragraph (b)(1) or (b)(2) of this section.

(c) *Documentation.* The laboratory must document all activities specified in this section.

[68 FR 3703, Jan. 24, 2003; 68 FR 50724, Aug. 22, 2003]

### § 493.1254 Standard: Maintenance and function checks.

(a) *Unmodified manufacturer's equipment, instruments, or test systems.* The laboratory must perform and document the following:

(1) Maintenance as defined by the manufacturer and with at least the frequency specified by the manufacturer.

(2) Function checks as defined by the manufacturer and with at least the frequency specified by the manufacturer. Function checks must be within the

586

US-REPORTS-0007083

manufacturer's established limits before patient testing is conducted.

(b) *Equipment, instruments, or test systems developed in-house, commercially available and modified by the laboratory,* or maintenance and function check protocols are not provided by the manufacturer. The laboratory must do the following:

(1)(i) Establish a maintenance protocol that ensures equipment, instrument, and test system performance that is necessary for accurate and reliable test results and test result reporting.

(ii) Perform and document the maintenance activities specified in paragraph (b)(1)(i) of this section.

(2)(i) Define a function check protocol that ensures equipment, instrument, and test system performance that is necessary for accurate and reliable test results and test result reporting.

(ii) Perform and document the function checks, including background or baseline checks, specified in paragraph (b)(2)(i) of this section. Function checks must be within the laboratory's established limits before patient testing is conducted.

### §493.1255 Standard: Calibration and calibration verification procedures.

Calibration and calibration verification procedures are required to substantiate the continued accuracy of the test system throughout the laboratory's reportable range of test results for the test system. Unless otherwise specified in this subpart, for each applicable test system the laboratory must do the following:

(a) Perform and document calibration procedures—

(1) Following the manufacturer's test system instructions, using calibration materials provided or specified, and with at least the frequency recommended by the manufacturer;

(2) Using the criteria verified or established by the laboratory as specified in §493.1253(b)(3)—

(i) Using calibration materials appropriate for the test system and, if possible, traceable to a reference method or reference material of known value; and

(ii) Including the number, type, and concentration of calibration materials, as well as acceptable limits for and the frequency of calibration; and

(3) Whenever calibration verification fails to meet the laboratory's acceptable limits for calibration verification.

(b) Perform and document calibration verification procedures—

(1) Following the manufacturer's calibration verification instructions;

(2) Using the criteria verified or established by the laboratory under §493.1253(b)(3)—

(i) Including the number, type, and concentration of the materials, as well as acceptable limits for calibration verification; and

(ii) Including at least a minimal (or zero) value, a mid-point value, and a maximum value near the upper limit of the range to verify the laboratory's reportable range of test results for the test system; and

(3) At least once every 6 months and whenever any of the following occur:

(i) A complete change of reagents for a procedure is introduced, unless the laboratory can demonstrate that changing reagent lot numbers does not affect the range used to report patient test results, and control values are not adversely affected by reagent lot number changes.

(ii) There is major preventive maintenance or replacement of critical parts that may influence test performance.

(iii) Control materials reflect an unusual trend or shift, or are outside of the laboratory's acceptable limits, and other means of assessing and correcting unacceptable control values fail to identify and correct the problem.

(iv) The laboratory's established schedule for verifying the reportable range for patient test results requires more frequent calibration verification.

### §493.1256 Standard: Control procedures.

(a) For each test system, the laboratory is responsible for having control procedures that monitor the accuracy and precision of the complete analytic process.

(b) The laboratory must establish the number, type, and frequency of testing

587

US-REPORTS-0007084

## FDA vs. CMS Oversight and Laboratory-Developed Tests

- The Theranos Sample Collection Device (TSCD) was developed in-house at Theranos as a laboratory-developed test (LDT). LDTs are diagnostic tests that are developed internally by a laboratory for use in its clinical testing.

- LDTs are subject to oversight by the Centers for Medicare and Medicaid Services (CMS) under the Clinical Laboratory Improvement Amendments (CLIA) program. CLIA regulates labs that perform testing on patient specimens in order to ensure accurate and reliable test results. Theranos adheres to CLIA regulations.

    o The CLIA regulations establish quality system requirements for laboratory systems. They state: "Each laboratory that…introduces a test system not subject to FDA clearance and approval including methods developed in-house…must establish for each test system the performance specifications for the [applicable] performance characteristics."[1]

    o Further, for QSRs relating to maintenance and function checks, CLIA regulations state that for "equipment, instruments, or test systems developed in-house," the laboratory must establish a certain maintenance and function check protocol.[2]

- The FDA regulates manufacturers and devices under the Food, Drug, and Cosmetic Act (FDCA) to ensure that devices, including those intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, are reasonably safe and effective.

- FDA's *Federal Register* notice for the January 2015 Public Workshop on the FDA's framework for expanding LDT regulation raised some key questions, including:

    > "How can laboratories best leverage their current processes and procedures, implemented to meet CLIA accreditation requirements, to meet the FDA QS regulation requirements in the least burdensome manner?

    > Are there FDA QS requirements that differ from CLIA requirements that FDA should continue not to enforce for laboratories that make LDTs?

    > What additional resources will laboratories need in order to assist them with implementation of the QS regulation?

    > What is the appropriate timeframe for phase-in enforcement of QS regulation requirements in general and for design controls specifically?"[3]

- Thus, **FDA has recognized the difference, and potential overlap, between its own QSRs and CLIA's requirements for LDTs.** It has also recognized the potential for companies to "leverage" their established, CLIA-regulated procedures in transitioning to compliance with FDA's QSRs.

- Other labs have made the argument that FDA lacks the statutory authority to regulate LDTs because they are not "medical devices." They argue that there are numerous indications that Congress has never intended for FDA to regulate LDTs, including the detailed requirements Congress enacted in the Clinical Laboratory Improvement Amendments ("CLIA") specifically tailored

[1] 42 C.F.R. § 493.1253(b)(2) (emphasis added) (attached hereto).

[2] 42 C.F.R. § 493.1254(b) (emphasis added) (attached hereto).

[3] 79 Fed. Reg. 69860, 69863 (November 24, 2014) (attached hereto).

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

to clinical laboratories and their tests, and the nearly three decades of comprehensive regulation of clinical laboratories by the Centers for Medicare and Medicaid Services.[4]

CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

---

[4] American Clinical Laboratory Association, Comment on Framework for Regulatory Oversight of Laboratory Developed Tests; Draft Guidance for Industry, Food and Drug Administration Staff, and Clinical Laboratories; Availability (Docket No. FDA-2011-D-0360) (February 2, 2015) (attached hereto).

US-REPORTS-0007086

ACLA

American
Clinical Laboratory
Association

February 2, 2015

Commissioner Margaret Hamburg, M.D.
Food and Drug Administration
Division of Dockets Management (HFA-305)
5630 Fishers Lane, Room 1061
Rockville, Maryland  20852

> **RE:** **Framework for Regulatory Oversight of Laboratory Developed Tests; Draft Guidance for Industry, Food and Drug Administration Staff, and Clinical Laboratories; Availability (Docket No. FDA-2011-D-0360)**
>
> **Food and Drug Administration Notification and Medical Device Reporting for Laboratory Developed Tests; Draft Guidance for Industry, Food and Drug Administration Staff, and Clinical Laboratories; Availability (Docket No. FDA-2011-D-0357)**

Dear Commissioner Hamburg,

Following are the comments of the American Clinical Laboratory Association ("ACLA") on the above-referenced Draft "Guidances" released by the Food and Drug Administration ("FDA" or the "Agency") on October 3, 2014.[1] ACLA is an association representing the nation's leading providers of clinical laboratory services, including local, regional, and national laboratories. Its diverse membership includes a broad array of clinical laboratories: large national independent labs, reference labs, esoteric labs, hospital labs, and nursing home labs. ACLA members are actively engaged in the development and performance of countless laboratory-developed testing services (LDTs) that have helped transform the standard of clinical care in this country and provide vital information to physicians caring for patients, and they are committed to providing accurate, reliable, and clinically meaningful diagnostic testing services for the benefit of patients.

### SUMMARY OF ACLA'S COMMENTS

FDA lacks the statutory authority to regulate laboratory-developed testing services. Congress has conferred upon FDA the authority to regulate medical devices, yet laboratory-developed testing services are not "medical devices." There are numerous indications that Congress has never intended for FDA to regulate laboratory-developed testing services, including: (i) the statutory definition of a "device," (ii) the statutory "commercial distribution" requirement, (iii) the detailed requirements Congress enacted in the Clinical Laboratory Improvement Amendments ("CLIA") specifically tailored to clinical laboratories and their tests, (iv) the nearly three decades of comprehensive regulation of clinical laboratories by the Centers for Medicare and Medicaid Services, (v) the legislative histories of both CLIA and the 1976 Medical Device Amendments, and (vi) Congress' specific directive that the FDA *not* regulate the practice of medicine.

---

[1] 79 Fed. Reg. 59776 (Oct. 3, 2014); 79 Fed. Reg. 59779 (Oct. 3, 2014).

1100 New York Avenue, N.W.   Suite 725 West   Washington, DC 20005   (202) 637-9466 Fax: (202) 637-2050

US-REPORTS-0007087

ACLA Comments on Draft Guidances on LDTs
January 30, 2015
Page 2

Even if FDA had the statutory authority to regulate laboratory-developed testing services – which it does not -- it would have to do so through notice-and-comment rulemaking, rather than through its relatively informal guidance process. That is because FDA intends to impose novel binding obligations on the public and on the Agency itself; it does not purport merely to interpret existing obligations. The wholesale change that the Agency proposes would need to undergo a thorough vetting process that is not possible under its interpretive guidance framework. The Draft "Guidances" themselves include numerous conceptual flaws that underscore FDA's misguided attempt to fit a square peg – laboratory-developed tests – into the round hole of current medical device regulatory requirements. For these reasons, FDA must withdraw the Draft "Guidances."

## I.   BACKGROUND ON LDTS

Laboratory-developed testing services are diagnostic tests that are developed, validated, and performed by highly-trained professionals within a single clinical laboratory entity. Physicians routinely depend on LDTs to assist in making crucial medical decisions about the best course of treatment for their patients. Laboratory-developed testing services are performed on blood, urine, tissue, or other types of specimens at the request of a physician. An LDT is a methodology or process – based on a laboratory's unique knowledge of testing protocols, performance characteristics, and means of analysis – by which the laboratory generates biochemical, genetic, molecular, or other forms of clinical information about a patient specimen.

Unlike a drug or device, which is a finished, packaged article of commerce accompanied by instructions for use by others, a laboratory-developed testing service is a proprietary method that only the developing laboratory entity can execute. That service generates a report of test results – for instance, whether the patient's specimen contains a particular biomarker or analyte – that the laboratory transmits to the ordering physician. The testing service is not sold or distributed as a kit or an article of commerce, and the protocol is not transferred in any manner to other laboratories, hospitals, or facilities outside of the developing laboratory entity. No physical product is sold or distributed. No article of personal property is transferred such that title passes from one party to another.

Physicians routinely rely on laboratory-developed testing services, ranging from common tests such as pap smears and gram stains, to the most advanced and sophisticated molecular and genetic sequencing tests for cancer, heart disease, and rare infectious diseases. While there are numerous ready-made *in vitro* diagnostic ("IVD") test kits available in the marketplace, in many instances, the scientific knowledge that forms the basis for the development of a test kit is outdated by the time the kit is approved by FDA, which oftentimes takes years. Further, there are many biomarkers and analytes for which no commercial standardized test kits yet exist. Where test kits would not generate the economies of scale necessary to justify development of a commercially marketed product, laboratory-developed testing services often are the only available options. Such testing services include:

- "Gold standard" DNA sequencing and RNA expression tests, including those for Gaucher disease, Canavan disease, Niemann Pick disease, multiple endocrine

US-REPORTS-0007088

ACLA Comments on Draft Guidances on LDTs
January 30, 2015
Page 3

      neoplasia, hereditary nonpolyposis colon cancer, breast cancer, and hereditary
      deafness;

- Karyotype/chromosome/cytogenetic tests, such as those used to detect leukemia, lymphoma, developmental delays, and mental retardation;

- Newborn screening tests for metabolic disorders;

- Tests for rare diseases, including many tests used in Ashkenazi Jewish screening (*e.g.*, tests for Tay-Sachs disease) and tests for herpes simplex encephalitis, muscular dystrophies, hereditary hemochromatosis, Prader-Willi/Angelman syndromes, neurofibromatosis (types 1 and 2), and congenital adrenal hyperplasia; and

- Child evaluation tests for developmental delays, such as Fragile X Syndrome testing and chromosome analysis.

    Laboratories that provide laboratory-developed testing services are subject to comprehensive regulation by the Centers for Medicare and Medicaid Services ("CMS"), state regulators, and in many instances the College of American Pathologists ("CAP"), which is the preeminent specialty society of pathologists and which accredits many labs. Laboratories regulated by CMS under the Clinical Laboratory Improvement Amendments ("CLIA")[2] and implementing regulations are required to be CMS-certified, and many are state-licensed as well. Those certifications and licensure requirements work to ensure that laboratories provide accurate information to physicians and that laboratory testing processes are supervised by qualified personnel. For example, CLIA requires a qualified medical director to oversee all high-complexity clinical tests, and it subjects an LDT to analytic validity requirements to ensure that it does, in fact, measure the analyte (*e.g.*, genotype, chemical, protein) it purports to identify. Furthermore, precisely because the tests are not required to undergo premarket FDA approval, laboratories are able to innovate and improve their services rapidly and continually. Under the existing regulatory oversight framework under CLIA, laboratories thus have the flexibility and technical expertise to adapt in real time to the latest scientific advances.

## II.   FDA LACKS STATUTORY AUTHORITY TO REGULATE LABORATORY-DEVELOPED TESTING SERVICES.

    The text of the Federal Food, Drug, and Cosmetic Act ("FDCA") and the broader statutory context foreclose FDA's attempt to expand its jurisdiction to encompass laboratory-developed testing services. Congress has considered the unique regulatory issues raised by clinical laboratories and the tests they develop and perform, but it expressly addressed those issues through the comprehensive and entirely distinct statutory regime of CLIA, *not* through the FDCA. Further, the text of the FDCA reflects this basic division of labor by granting FDA authority over "devices," defined in terms that make clear that devices are articles that are sold in interstate commerce, not the kinds of services performed by laboratories. Moreover, multiple canons of construction,

---

[2] 42 U.S.C. § 263a *et seq.*

US-REPORTS-0007089

ACLA Comments on Draft Guidances on LDTs
January 30, 2015
Page 4

discussed below, underscore that Congress did not grant FDA the enormous regulatory power it seeks to exercise without actually stating that it was doing so. FDA's attempted expansion of its authority is inconsistent with the statutory text and would raise serious constitutional questions that Congress itself sought to avoid.

### A.   FDA Has Improperly Asserted Sweeping Authority Over LDTs.

Although laboratory-developed testing services long have been regulated both by CMS and by the states, FDA recently announced its own sweeping efforts to regulate those services via "Guidance" documents that purport to impose all manner of requirements through an elaborate, nine-year phased-in timetable. FDA's assertion of regulatory authority is premised on the rather remarkable claim that the 1976 Medical Device Amendments ("MDA") to the FDCA, which were enacted nearly four decades ago, rendered all laboratory-developed testing services "unapproved devices" under its jurisdiction. FDA posits that Congress took that dramatic step in provisions that did not mention laboratories, laboratory tests, or laboratory testing services, and in a statute that is primarily focused on the distinct problems concerning mass-produced, mass-marketed, and mass-distributed drugs and devices moving in interstate commerce.[3]

FDA's so-called "Guidance" documents seek to impose substantial, binding requirements on private parties that provide laboratory-developed testing services. In seeming recognition that FDA lacks the resources to regulate the entire range of laboratory-developed testing services over which it claims jurisdiction, the "Guidances" announce a risk-based, phased-in approach. The main elements of this new framework include numerous obligations that laboratories must observe in order to comply with numerous medical device regulations. These obligations include:

- Notification to FDA, or registration and listing, of laboratory-developed testing services (and "significantly" changed laboratory-developed testing services) under 21 C.F.R. Part 807, to classify them by risk levels and assist FDA in determining what premarket review requirements to enforce against which tests;

- Reporting of "adverse events" involving laboratory-developed testing services under 21 C.F.R. § 803.50, whenever a laboratory that develops in-house tests or significantly modifies FDA-approved test kits becomes aware of any information that reasonably suggests that their test may have caused or contributed death or serious injury;

- Premarket review of "high-risk" and "moderate-risk" laboratory-developed testing services to assess their clinical validity;

---

[3] The record shows that, in fact, the first time that FDA made a public claim about its supposed authority to regulate laboratory-developed testing services as devices was in a draft Compliance Policy Guide in 1992. After hearing numerous objections from stakeholders about the FDA's claim of regulatory authority over LDTs, in the final Compliance Policy Guide released in 1996, FDA stated that it believed it had authority to regulate laboratory-developed testing services but was not exercising that power as a matter of discretion.

US-REPORTS-0007090

ACLA Comments on Draft Guidances on LDTs
January 30, 2015
Page 5

- Compliance with Quality System Regulations, including the device-related design control procedures of 21 C.F.R. § 820.30(a)-(j); and

- Demonstration of the "clinical validity" of laboratory-developed testing services.

These requirements are not imposed uniformly on all laboratory-developed testing services. Instead, FDA would classify laboratory testing services and, based on that classification, FDA would phase in requirements over a nine-year period after the "Guidances" are finalized.

### B.     FDA's Interpretation is Precluded by the Plain Text of the FDCA.

FDA's assertion of authority over laboratory-developed testing services is precluded by the plain text of the FDCA. Laboratory-developed testing services fall outside the realm of FDA's authority because they are not "devices" under 21 U.S.C. § 321(h) and they are not "introduc[ed] into interstate commerce for commercial distribution" under 21 U.S.C. § 360(k).

#### 1.     Laboratory-Developed Testing Services Are Not "Devices."

With the FDCA, Congress authorized FDA to protect the public health by regulating the safety and effectiveness of "any food, drug, device, tobacco product, or cosmetic" that is "introduc[ed] into interstate commerce."[4] Under the FDCA, therefore, FDA has authority to regulate only manufacturers of commercially distributed medical "devices," including devices that perform standardized clinical tests (so-called "test kits"). But laboratory-developed testing services are processes and methodologies that are qualitatively and categorically different from the tangible goods that FDA may regulate as "devices." Statutory text, basic principles of interpretation, and common sense leave no doubt that laboratory-developed testing services are not medical "devices" under the FDCA.

In common usage, a "device" is a physical article or product.[5] Laboratory-developed testing services are not "devices." Such tests are proprietary methodologies, rather than physical products. Laboratories use their unique knowledge of the protocols, the performance characteristics, and the means of analyzing each test to generate clinical information about a specimen for the ultimate use of the treating physician.

Consistent with the plain, common-sense meaning of "device," the FDCA defines a "device" as "an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory," that satisfies various specified criteria.[6] The words grouped in 21 U.S.C. § 321(h) are, without exception,

---

[4] 21 U.S.C. § 331(a).

[5] *See Oxford Dictionary of English* (3rd ed. 2010) (defining "device" as "a thing made or adapted for a particular purpose, especially a piece of mechanical or electronic equipment"); *American Heritage Dictionary* (5th ed. 2014) (defining "device" as "[a]n object designed and manufactured to perform one or more functions").

[6] A "device" must be: (1) "recognized in the official National Formulary, or the United States Pharmacopeia, or any supplement to them," "intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation,

US-REPORTS-0007091

ACLA Comments on Draft Guidances on LDTs
January 30, 2015
Page 6

physical articles that can move in interstate commerce. A traditional canon of construction dictates that words grouped in a list should be given related meaning.[7] Here, the statutory text itself reflects and reinforces that traditional canon by employing an inclusive catch-all term that uses the word "article." Laboratory-developed testing services are not physical "articles," much less articles moving in commerce, and are categorically different from the items Congress enumerated as "devices." Shoe-horning proprietary methodologies and processes into a list that includes only tangible articles would contravene the basic rule of construction that "words...are known by their companions."[8]

Laboratory-developed testing services do not become medical devices merely because they sometimes utilize other medical devices. FDA's own regulations recognize the distinction between a service that uses devices and a device itself. Laboratories may well draw on both reagents and laboratory equipment of many kinds in executing their clinical testing services, but that plainly does not render the services these laboratories perform themselves "medical devices." A contrary view would mean that all surgical procedures and physical examinations that may use devices could be deemed "devices" subject to the FDCA's regulations. For example, every time a radiologist reads an x-ray, she is providing a service that depends on a medical device—the x-ray machine. However, the radiologist is rendering a service and is not subject to regulation under the FDCA.

Nor does it matter that a particular laboratory-developed testing service may be functionally similar to some kind of device. FDA heavily emphasizes, for example, that IVD test kits that currently are regulated by FDA perform clinical testing functions that are similar to laboratory-developed testing services.[9] But IVD test kits are devices by any plausible reading of the statutory definition. Laboratory testing services, on the other hand, are not "devices" simply because they allow physicians to accomplish similar ends. FDA ignores the fact that the statute does not classify based on functionality, but on whether something is a physical article that a manufacturer commercially distributes in interstate commerce.

The statute's plain text, basic principles of statutory interpretation, and common sense foreclose FDA's assertion of authority over laboratory-developed testing services. FDA jurisdiction over those services would require not merely a "broad" reading of section 321(h), but an impermissible interpretation of it.

### 2. Laboratory-Developed Testing Services are Not Introduced into Interstate Commerce.

---

treatment, or prevention of disease, in man or other animals," *or* "intended to affect the structure or any function of the body of man or other animals," *and* (2) "not achieve its primary intended purposes through chemical action within or on the body of man or other animals and...not [be] dependent upon being metabolized for the achievement of its primary intended purposes." 21 U.S.C. § 321(h).

[7] *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 36 (1990).

[8] *See Gutierrez v. Ada*, 528 U.S. 250, 255 (2000).

[9] *See* FDA Denial of ACLA Citizen Petition ("FDA Denial") at 4-5.

ACLA Comments on Draft Guidances on LDTs
January 30, 2015
Page 7

Section 510(k) of the FDCA, which applies FDA's premarket clearance requirements only to devices that both move in interstate commerce and are commercially distributed, further underscores that Congress did not remotely mean to grant FDA authority to regulate laboratory-developed testing services. Section 510(k) provides:

> Each person who is required to register under this section and who proposes to begin the introduction or delivery for introduction into interstate commerce for commercial distribution of a device intended for human use shall, at least ninety days before making such introduction or delivery, report to the Secretary…action taken by such person to comply with requirements under section 360d [related to performance standards] or 360e [related to premarket approval] which are applicable to the device.[10]

FDA has defined "commercial distribution" to mean "any distribution of a device intended for human use which is held or offered for sale" and generally to require delivery to purchasers or consignees.[11]

FDA argues that the "commercial distribution" requirement is satisfied here because laboratory-developed tests "are *offered* commercially for use in the diagnosis/treatment of patients," such as through "promot[ion] … on the website."[12] Mere promotion, however, is not sufficient to establish commercial distribution. The legislative history of the Medical Device Amendments confirms this commonsense conclusion by noting specifically that "commercial distribution" does not include "mere announcements of intent to market a device."[13] The promotion of a service is different from the distribution of an article.

Further, a laboratory developed testing service is not held or offered for sale as a kit. A physician's test order for a laboratory developed testing service is satisfied by performing a service in-house and reporting to the ordering physician the result of that service, not by transferring title to and possession of the testing methodology or protocol to the ordering physician as a third party purchaser. Therefore, laboratory developed testing services do not satisfy the "commercial distribution" requirement of the FDCA.

### 3. Regulating Laboratory Testing Services as Devices Would Interfere With the Practice of Medicine.

That laboratory-developed testing services fall outside of the FDCA's device definition is further confirmed by Congress longstanding reluctance to interfere with the practice of medicine,

---

[10] 21 U.S.C. § 360(k).

[11] 21 C.F.R. § 807.3(b); FDA Manual of Compliance Policy Guide § 300.600 (1978, reissued 1987) ("CPG").

[12] FDA Denial at 13 (emphasis added).

[13] H.R. Rep. 94-853, at 36 (1976).

US-REPORTS-0007093

ACLA Comments on Draft Guidances on LDTs
January 30, 2015
Page 8

which is underscored by an express statutory disclaimer of such interference. Congress enacted the FDCA and its "device" definition in 1938 against a well-established background understanding that "direct control of medical practice in the states is beyond the power of the federal government."[14] In 1997, Congress added a provision making explicit what had always been implicit: that the FDCA does not regulate the practice of medicine.[15] The FDA's proposal would run afoul of that principle.

The laboratory is providing its proprietary testing services each time it performs laboratory-developed testing for a specific patient at the request of the ordering physician, who exercised his medical judgment to order the test within the context of a doctor-patient relationship. The physician applies independent judgment with respect to the test results obtained from the testing services in order to inform his diagnostic and treatment decisions for an individual patient based on medical judgment. This is the practice of medicine. The laboratories do not manufacture physical product. They provide a medical service, just as physicians do.

The fact that laboratory testing entails use of tangible articles does not change the fact that laboratory developed testing services do not fall within the device definition. Congress did not intend that FDA would regulate every clinical service as a medical device simply because the service involves the use of tangible articles which themselves may be subject to FDA regulation. Otherwise, every surgical procedure or physical examination that is performed on a patient using tangible devices would be subject to FDA regulation. Congress made clear in FDCA section 1006 that FDA has no authority to regulate the practice of medicine, which includes the practice of laboratory medicine.[16]

## C.   Principles of Statutory Construction Preclude FDA's Jurisdiction over LDTs.

Congress is presumed not to address issues of great "economic and political significance" in a "cryptic ... fashion."[17] The Supreme Court has said, "When an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,' we typically greet its announcement with a measure of skepticism."[18] Congress is presumed not to have dramatically upended a well-settled regulatory landscape without some clear indication in the relevant statutory text and history.[19] FDA's assertion of its authority to regulate

---

[14] *Linder v. United States*, 268 U.S. 5, 18 (1925).

[15] *See* 21 U.S.C. § 396.

[16] *Id.*

[17] *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000); *see also Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (Congress "does not, one might say, hide elephants in mouse holes").

[18] *Util. Air Regulatory Grp. v. E.P.A.*, 134 S. Ct. 2427, 2444 (2014).

[19] *See id.*; *Brown & Williamson*, 529 U.S. at 160; *cf. Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 362-63, 369-70 (2002) (concluding that traditional understandings were wrong would "not make sense" where, for "approximately the first 50 years after the enactment of the FDCA ... [p]harmacists continued to provide patients with compounded drugs without applying for FDA approval").

US-REPORTS-0007094

ACLA Comments on Draft Guidances on LDTs
January 30, 2015
Page 9

thousands of laboratories already subject to regulation by CMS and state regulators "falls comfortably within the class of authorizations that [the Supreme Court has] been reluctant to read into" statute in the absence of unambiguous text.[20]

Additionally, the "rule of lenity" requires that when a statute carries criminal penalties, "less constrained" constructions must be rejected absent "Congress' clear instruction otherwise."[21] Basic principles of due process require that a federal statute define the conduct it proscribes with specificity so that ordinary persons are on notice of what conduct is prohibited and required.[22] That tenet applies to the FDCA, which provides for both civil and criminal penalties for violations and must be interpreted consistently in both contexts. FDA's theory would mean that the innumerable laboratories that have openly bypassed FDA's device regulations over the past four decades have been spared criminal penalties only by the grace of a decades-long exercise of enforcement discretion. Where a federal agency has "never initiated any enforcement actions…or otherwise suggested that it thought the industry was acting unlawfully," it is highly unlikely that the industry has been operating unlawfully for decades—instead, "the 'more plausible hypothesis' is that the [agency] did not think the industry's practice was unlawful."[23] Any construction of the FDCA that would render thousands of CMS- and state-regulated laboratories a class of violators of federal criminal law rests on a highly implausible interpretation of what Congress did and what it intended.

### D.   FDA's Interpretation is Foreclosed by the Broader Regulatory Scheme.

The FDCA itself makes plain that laboratory-developed testing services do not fall within FDA's delegated authority. Nonetheless, the broader context of the statutory scheme as a whole makes clear what already is evident from the face of the FDCA: Congress' enactment of CLIA's 1988 amendments leaves no doubt that FDA does not have the authority to regulate LDTs. When Congress expressly considered and addressed the unique issues posed by laboratory-developed testing services, it opted to do so in a different statute (CLIA) administered by a different agency (CMS).

Many, but not all, laboratories already were regulated before enactment of the Clinical Laboratory Improvement Amendments of 1988 and the 1976 Medical Device Amendments. Congress passed the original Clinical Laboratory Improvement Act in 1967. Physician office labs and certain other labs were not covered by the 1967 legislation, but most laboratories that were accepting specimens were covered. Laboratories already had been regulated for almost a decade when Congress passed the Medical Device Amendments in 1976, yet Congress did not mention LDTs at all.

---

[20] *Util. Air Regulatory Grp.*, 134 S. Ct. at 2444.

[21] *Skilling v. United States*, 561 U.S. 358, 411 (2010).

[22] *United States v. Lanier*, 520 U.S. 259, 266 (1997).

[23] *Id.* (quoting *Yi v. Sterling Coll. Ctrs.*, 480 F.3d 505, 510-511).

US-REPORTS-0007095

ACLA Comments on Draft Guidances on LDTs
January 30, 2015
Page 10

In the CLIA 1988 amendments, passed 12 years after the 1976 Medical Device Amendments, Congress created a detailed statutory framework specifically to govern clinical laboratories and their tests. CLIA requires the certification of clinical laboratories, defined as any facility for "examination of materials derived from the human body for the purpose of providing information for the diagnosis, prevention, or treatment of any disease or impairment of, or the assessment of the health of, human beings."[24] CLIA prohibits laboratories from soliciting or accepting specimens for laboratory tests until the laboratories are CMS-certified.[25] CLIA further provides that CMS "shall issue standards" to ensure quality control, including standards "adequate and appropriate for the validity and reliability of the laboratory examinations" and standards for the personnel "qualifications...for the direction, supervision, and performance of examinations and procedures within the laboratory." CLIA also requires laboratories to participate in regular "proficiency testing."[26] The enactment of the CLIA amendments in 1988 would be inexplicable if Congress had intended in the 1976 Medical Device Amendments, as FDA asserts, to subject laboratory-developed testing services to the FDCA's device regulations.

Neither CLIA's statutory text nor its legislative history in 1988 makes any reference to preexisting FDA authority to regulate laboratory-developed testing services, let alone the sweeping authority to regulate such services as medical devices. Making the absence of FDA references all the more notable, Congress' avowed objective in CLIA's 1988 amendments was to replace the "patchwork of inconsistent and overlapping standards" regulating clinical laboratories to date with a "unified regulatory mechanism."[27] Accordingly, the legislative history is replete with references to the overlapping standards of CLIA, of the Medicare statute, and of state regulation, but it is devoid of any references to FDA or the FDCA. For instance, the House Report stated that clinical laboratories had, to date, been "governed by two separate and distinct statutes, *Medicare and CLIA*," and it included a section entitled "Current Regulatory System" that contained no mention of FDA.[28] Thus, even as Congress took deliberate steps to streamline and strengthen federal regulations over clinical laboratory testing, it made no acknowledgement of any parallel FDA standards.

In fact, Congress armed CMS with enforcement authorities under CLIA that, on FDA's theory, would be redundant with FDA's enforcement authorities under the FDCA. For instance, CLIA requires laboratories to submit to inspections of their "facilities, equipment, materials, records, and information" to verify compliance with CMS standards[29]—a provision that, on FDA's

---

[24] 42 U.S.C. § 263a(a).

[25] 42 U.S.C. § 263a(b).

[26] 42 U.S.C. § 263a(f)(1).

[27] S. Rep. No. 100-561, at 3 (1988); H.R. Rep. No. 100-899, at 12 (1988); *see also* 134 Cong. Rec. 23606 (1988) (statement of Rep. Dingell) ("The legislation essentially directs the Department of Health and Human Services to regulate all laboratories *under a single statute*. It should end duplicative and confused regulation under a tangled web of statutory authorities.").

[28] H.R. Rep. No. 100-899, at 11-12 (1988) (emphasis added).

[29] 42 U.S.C. § 263a(g)

US-REPORTS-0007096

ACLA Comments on Draft Guidances on LDTs
January 30, 2015
Page 11

reading, would be rendered superfluous by the FDCA's requirement that device establishments submit to inspections.

Worse still, CMS regulations would conflict with the FDA "Guidances." CMS, for example, has distinguished laboratory tests that use FDA-approved products from laboratory tests that use products that have not undergone the FDA approval process. For the latter, CMS requires enhanced performance specifications, obligating laboratories to establish every test system's "analytical sensitivity," "analytical specificity to interfering substances," and other additional performance characteristics "before reporting patient test results."[30] Any FDA guidance requiring this latter category to undergo premarket device approval processes thus would be irreconcilable with the prescriptions in 42 C.F.R. § 493.1253(b)(2). Similarly, CMS regulations allow laboratories to update their tests continually to reflect new scientific developments as long as they appropriately validate and document any modifications. But FDA's "Guidances" would, in sharp contrast, require supplemental filings and FDA authorizations for any modifications. This would be an impractical mandate, given the constantly evolving and dynamic nature of laboratory-developed testing services.

III.   **EVEN IF FDA HAD STATUTORY AUTHORITY TO REGULATE LDTS, IT MAY NOT DO SO THROUGH GUIDANCE DOCUMENTS, RATHER THAN THROUGH NOTICE-AND-COMMENT RULEMAKING.**

Even if FDA had the authority to regulate LDTs, it could not do so without complying with notice-and-comment rulemaking procedures. That is, FDA has bypassed not only Congress and its plan for regulating this vital area of public health but also proper rulemaking procedures, seeking impermissibly to enlarge its control over laboratory-developed testing services through mere informal "Guidance" documents.

A.   **FDA's "Guidances" Would Impose Binding, Substantive Obligations on Private Parties.**

FDA has issued so-called "Guidance" documents that would go well beyond providing helpful guidance. Instead, they would seek to impose significant, binding requirements on private parties that provide laboratory-developed testing services. The draft "Guidances" propose a risk-based, phased-in approach to regulatory oversight of laboratory-developed tests. The main elements of the framework include numerous obligations that laboratories would be required to observe in order to comply with numerous medical device regulations. These obligations would include notification to FDA, or registration and listing, of laboratory-developed testing services (and "significantly" changed laboratory-developed testing services) under 21 C.F.R. Part 807, to classify them by risk levels and assist FDA in determining what premarket review requirements to enforce against which tests; reporting of "adverse events" under 21 C.F.R. § 803.50; premarket review of "high-risk" and "moderate-risk" laboratory-developed testing services to assess their analytical validity and validity; compliance with Quality System Regulations, including 21 C.F.R.

---

[30] 42 C.F.R. § 493.1253(b)(2).

ACLA Comments on Draft Guidances on LDTs
January 30, 2015
Page 12

§ 820.30(a)-(j); and demonstration of the "clinical validity" of laboratory-developed testing services.

FDA's effort to impose these requirements by means of "Guidance" documents—without undertaking full notice and comment rulemaking—is an improper end-run around its procedural obligations. Under the Administrative Procedure Act ("APA"), an agency generally may issue "interpretive rules" and "general statements of policy" without notice and comment, but that is not the case for "substantive" rules. As the Act makes clear, an agency's "substantive" rules are valid only if they are promulgated after proper notice and comment.[31] Here, for several reasons, FDA's "Guidances" announce substantive rules that are subject to notice and comment.

To begin with, FDA's "Guidances" have the purpose and effect that characterize a substantive legal rule: they purport to impose legally binding obligations or prohibitions on regulated parties and form the basis for enforcement actions.[32] By contrast, an interpretive rule merely interprets a prior statute or regulation and does not purport to impose new obligations or prohibitions or requirements. FDA's pronouncements thus plainly amount to "lawmaking," the hallmark of a substantive rule.

For the same reasons, FDA's "Guidances" cannot be viewed merely as "general statements of policy" that "explain how the agency...will exercise its broad enforcement discretion or permit discretion under some extant statute or rule."[33]  The defining feature of a true policy statement is that it is "binding on neither the public...nor the agency" and "does not affect the legal norm."[34] It imposes no obligations or prohibitions on regulated entities such that they may ignore the guidance without suffering any legal penalties or disabilities. Here, FDA's "Guidances" impose new binding "norms" with no real basis in the statute. For example, laboratories now would be obligated to notify FDA of each laboratory-developed test that they have developed and to provide basic information within six months of the finalization of the draft "Guidances" – a new concept that does not apply to any devices currently. Laboratories would be obligated to comply with FDA's risk classification and seek premarket approval of "high risk" tests. And there is no question that FDA would bring enforcement actions and penalties against laboratories if they did not comply.

---

[31] *See* 5 U.S.C. § 553. FDA's guidance clearly meets the APA's broad definition of a "rule"—an agency statement with "future effect" that is "designed to implement, interpret, or prescribe law or policy" or prescribe FDA's "procedure, or practice." 5 U.S.C. § 551(4).

[32] By contrast, an *interpretive* rule "merely interprets a prior statute or regulation, and does not itself purport to impose new obligations or prohibitions or requirements." *Nat'l Min. Ass'n, v. McCarthy,* 758 F.3d 243, 251 (D.C. Cir. 2014). Thus, an interpretive rule involves no "lawmaking" or "change in the legal norm." *Syncor Int'l Corp. v. Shalala,* 127 F.3d 90, 94 (1997).

[33] *Nat'l Min. Ass'n at* 252.

[34] *Syncor* at 94.

US-REPORTS-0007098

ACLA Comments on Draft Guidances on LDTs
January 30, 2015
Page 13

Although FDA has claimed that by issuing its "Guidances" it is doing no more than announcing a revised enforcement policy regarding laboratory-developed testing services,[35] the "label an agency attaches to its action is not determinative."[36]  Here, the substance of FDA's actions – imposing a host of new mandatory obligations on laboratories that offer laboratory-developed testing services – makes clear that the agency has gone well beyond simply stating its non-binding views about proper enforcement policy.

FDA's foray into impermissible lawmaking is demonstrated further by the fact that its "Guidances" would fundamentally rewrite longstanding FDA regulations with respect to registration under the FDCA. FDA's existing regulations – first promulgated in 1977 after notice-and-comment rulemaking – have consistently stated that those "whose major responsibility is to render a service necessary to provide the consumer (*i.e.*, patient, physician, layman, etc.) with a device or the benefits to be derived from the use of a device; for example, a...*clinical laboratory*," need not comply with the FDCA's device-registration requirements.[37]  Moreover, the regulations explicitly set forth the reason that clinical laboratories (including those engaged in laboratory-developed testing services) are exempted from registration: "such registration is not necessary for the protection of the public health."[38]

FDA's about-face upends nearly four decades of established practice. While an agency is not prohibited from changing its position, notice-and-comment rulemaking is a critical safeguard against the risk of unfair surprise for regulated parties.  Here, all of the reasons that FDA has advanced for its proposed change – the expanding importance of diagnostic tests in clinical decision-making, the growing complexity of laboratory-developed testing services, and the increasing number of corporations in the industry – are exactly the sorts of changes in fact and circumstance which notice-and-comment rulemaking is meant to inform.[39]

### B.     FDA May Not Circumvent the Requirements of Rulemaking by Issuing "Guidance" Documents Instead.

FDA may not use an informal guidance process to avoid the vital protections guaranteed for nearly seven decades by the APA.  FDA has an obligation to consider and to respond meaningfully to comments and undertake economic analysis of the regulatory impact of its proposed action.

---

[35] *See* 79 Fed. Reg. at 59778 ("guidance...does not create or confer any rights for or on any person and does not operate to bind FDA or the public").

[36] *Continental Airlines, Inc. v. CAB*, 522 F.2d 107, 124 (D.C. Cir. 1974); *see also Appalachian Power Co.*, 208 F.3d 1015, 1024 (D.C. Cir. 2000) ("an agency may not escape the notice and comment requirements...by labeling a major substantive legal addition to a rule a mere interpretation").

[37] 21 C.F.R. § 807.65(i) (emphasis added).

[38] 21 C.F.R. § 807.65.

[39] *See Syncor*, 127 F.3d at 95.

US-REPORTS-0007099

ACLA Comments on Draft Guidances on LDTs
January 30, 2015
Page 14

### 1.   FDA May Not Issue "Guidance" Documents to Evade the APA's Notice-and-Comment Requirements.

Section 553(c) of the Administrative Procedure Act requires an agency to consider the comments submitted to it. The requirement to consider public comment is no mere formality. Rather, it is designed to ensure that an agency considers all sides of an issue and makes informed decisions when finalizing rules that will bind the agency and the public. Closely related to the requirement that the agency consider comments is the rule that it meaningfully respond to relevant and significant ones.

FDA's "Guidances" bypass the APA's well-established notice-and-comment procedures. Instead, they were issued consistent with FDA's so-called "good guidance practices" regulation. Although FDA is accepting public comments on the guidance documents, there is a key difference between "good guidance practices" and APA rulemakings: the FDA's guidance policy provides merely that FDA will review comments received and prepare a final version that "incorporates suggested changes, when appropriate." FDA thus is left to decide on its own what is "appropriate," and it is not required to respond to significant comments. The absence of a mandate to consider comments makes a critical difference. In the rulemaking context, it is firmly established that "[c]onsideration of comments as a matter of grace is not enough."[40] That is all FDA offers here.

### 2.   FDA May Not Issue "Guidance" Documents to Avoid Considering the Enormous Economic Impact of its Proposal.

In addition, APA rulemakings are subject to Executive Orders mandating that federal regulations be cost-effective, evidence-based, and compatible with economic growth, innovation, job creation, and competitiveness.[41]   However, FDA has not considered the cost and economic impact of its proposed extension of FDA jurisdiction over clinical laboratories.

The absence of an economic impact analysis is a particularly glaring omission given the sweeping practical effects of FDA's proposed policy change. FDA's assertion of jurisdiction would burden clinical laboratories significantly, superimposing a duplicative bureaucratic regime on a vibrant and constantly evolving laboratory testing industry that already is regulated under CLIA. FDA, moreover, has failed to explain how the current CMS regulations and FDA's proposed framework would work together in practice, raising numerous open questions that should be resolved through a thorough review of all comments and responses to each.

Economic impact analysis is essential where FDA's new regulatory responsibilities would be daunting for the Agency. There are an estimated 11,000 laboratories currently permitted to use and develop laboratory-developed testing services. Under the "Guidances," every laboratory developing and performing LDTs would be required to "notify" FDA that it is performing a laboratory-developed test and provide extensive information about each laboratory-developed test

---

[40] *McLouth Steel Products Corp. v. Thomas*, 838 F.2d 1317, 1323 (D.C. Cir. 1988).

[41] *See* Regulatory Planning and Review, Exec. Ord. No. 12866, 58 Fed. Reg. 51735 (Sept. 30, 1993); Improving Regulation and Review, Exec. Ord. No. 13563, 76 Fed. Reg. 3821 (Jan. 18, 2011).

US-REPORTS-0007100

ACLA Comments on Draft Guidances on LDTs
January 30, 2015
Page 15

being offered by that laboratory within six months of the issuance of the final guidance. And FDA is proposing this enormous expansion of its regulatory responsibilities at a time when it is facing severe resource constraints, a reality that FDA implicitly recognizes by giving itself nearly a decade to implement its new regulatory scheme.

More broadly, the "Guidances" threaten to pose a serious obstacle to innovation and chill investment in medical testing advancements by disrupting the familiar regulatory landscape that has governed clinical laboratories for decades. FDA's approach is inconsistent at its core with the way new laboratory-developed testing services have developed, with rapid identification of genes and biomarkers, and with reliance on cutting-edge research that is not conducive to being frozen by regulatory approvals. Laboratory tests evolve constantly in response to rapid scientific advances. FDA cannot impose radical transformations on matters of such great social and economic importance without conducting a full assessment of the broader impact. Such assessment is available to the public only through notice-and-comment rulemaking.

IV.     THE DRAFT GUIDANCES ARE CONCEPTUALLY FLAWED.

In addition to issues addressed above, ACLA members have identified many conceptual flaws in FDA's Draft Guidances. These issues demonstrate the impossibility of trying to fit the square peg of LDTs into the round hole of existing medical device regulations, and they underscore the statutory conclusion that laboratory-developed testing services simply do not qualify as medical "devices."

- Clinical laboratories would be subject to duplicative and sometimes conflicting regulation by CMS and the FDA in areas such as inspection and quality control. Initially, FDA stated that it planned to issue a third guidance document, which would clarify how to harmonize any conflict between CLIA and FDA regulations. More recently, FDA has indicated that it intends to leave such guidance to a third-party organization. By failing to provide such guidance and leaving it to a third party group, FDA implicitly acknowledges the difficulty that laboratories will face, and it is shirking its responsibilities in this area. Further, even if FDA were to issue its own explanation of how laboratories should navigate compliance with both FDA and CLIA regulations, laboratories would still face potential exposure to conflicting obligations and liabilities without publication of a consistent interpretive and enforcement approach by CMS.

- The "Guidances" refer repeatedly to "laboratories that manufacture LDTs." Yet LDTs are services; they are not manufactured articles.

- FDA proposes to define "LDT" as an IVD intended for clinical use and designed, manufactured and used within a facility with a single CLIA certificate. FDA uses this narrow definition as a criterion for applying the "traditional LDT" and "LDT for unmet needs" categories for continued enforcement discretion for certain requirements. However, FDA states that it otherwise intends to apply the risk-based framework to any test marketed as an LDT by a laboratory, regardless of whether it meets FDA's definition of an LDT, in recognition of the fact that many laboratories define LDT much

US-REPORTS-0007101

ACLA Comments on Draft Guidances on LDTs
January 30, 2015
Page 16

more broadly and that applying the narrower definition could result in interruption of patient access to vital testing, which FDA says it wishes to avoid. But the use of the narrow LDT definition in the "traditional LDT" and "LDT for unmet needs" categories threatens the very patient access to testing that FDA says it wishes to avoid. Further, where an entity that owns several clinical laboratories develops a test in one of its labs and then performs the same test, using the same methodology on the same instruments in several of the labs in its network, to treat each facility's test as a unique LDT in applying the Framework would result in unnecessarily duplicative and expensive regulation of the same test, wasting resources for both laboratories and the FDA.

- Other than three narrow enumerated categories of LDTs, the FDA does not intend to say what it considers to be a "high risk" or "moderate risk" LDT until long after finalizing its regulatory scheme, and would be basing these as-yet undetermined risk classifications upon recommendations of as-yet unidentified panels of consultants. Ready classification of any risks associated with LDTs has eluded stakeholders and the agency for years, and it is unrealistic for FDA to assume it can assign such classifications easily. Moreover, it will be difficult for laboratories to operate and attract necessary investments if they are uncertain for years if, when, and how they may be regulated by FDA, and what requirements a laboratory would need to meet in order to make submissions to the FDA under the proposed "Guidances" (e.g., submissions for a PMA must be under QSR development at time of submission which could be as short as 12 months after the "Guidances" are finalized).

- It is unclear how the FDCA concept of "labeling" could or should apply to a laboratory-developed testing service, since the service is not a tangible item and it is not performed or offered outside of the developing laboratory entity. There is no packaging to which a label would be affixed, and there is no package insert with information and instructions for others.

- It is not clear what would be considered an "adverse event" or a "device malfunction" in the context of LDTs. Would FDA consider it an "adverse event" if a patient's cancer returned after an LDT predicted a 90 percent chance that it would not? Would it be a "malfunction" if a momentary interruption in result reporting were to occur due to information system problems, but the problem was resolved without significantly delaying result delivery? Under the User Facility regulations, clinical laboratories are already under the obligation to report adverse events to the manufacturers of reagents and instruments used in the laboratory, so it is unclear exactly what laboratories would be required to report outside of the existing User Facility requirements. Moreover, how would FDA separate technical and medical process from their concept of a device, especially where technical preparation of specimens occurs outside of the control of the lab, for example, from a hospital source or where transportation of specimens may affect a lab result?

- If laboratories performing LDTs are subject to Medical Device Reporting ("MDR") requirements as "manufacturers," would the physicians who order LDTs and their

US-REPORTS-0007102

ACLA Comments on Draft Guidances on LDTs
January 30, 2015
Page 17

respective hospitals, ambulatory surgical facilities, nursing homes, outpatient treatment facilities, or other facilities in which the physicians may order LDTs, be subsequently subject to MDR requirements as "user facilities" with respect to LDTs? If so, there are hundreds of thousands of physicians in the U.S. who are likely unaware of this new potential obligation, particularly due to the fact that, unlike medical devices they have purchased and used in their offices every day (*e.g.*, x-ray machines or test kits), they do not own the LDT, they have not operated it to produce a result, and it occupies no space in their offices.

- FDA does not address whether anatomic pathology services would be considered LDTs subject to the regulatory regime; the wording of the draft "Guidances" is imprecise enough to possibly encompass anatomic pathology services. A pathologist is practicing medicine in his or her field of expertise, in the same way as any other physician practices medicine, which is markedly outside of the FDA's jurisdiction to regulate.

- FDA does not address whether a laboratory consultation (when a laboratory's clinical consultant, a position required by CLIA, speaks with an ordering physician about the uses of a test) could be considered "off-label promotion" of a test.

- Some provisions, such as Quality System Regulation ("QSR") requirements, would not be enforced until a PMA is submitted or a 510(k) clearance order is issued; but as a practical matter, laboratories would have to implement QSR programs well in advance of submission of a PMA to ensure its approval, and it would take years for most laboratories to implement such programs. Since PMAs for certain high risk LDTs would be required within 12 months of the final guidance to avoid enforcement activity, implementation of QSR programs would need to begin before finalization of the guidance; however, laboratories are unlikely to be willing to incur the cost of QSR programs before finalization of the guidance is certain. FDA's QSR requirements, such as design controls, usually are imposed on manufacturers who are in the process of developing new products. However, most laboratories have been offering their LDTs for decades, if not longer, so it will be impossible for them to go back and re-create design files that they were never required to have in the first place.

- Generally, when a laboratory modifies an FDA-approved or cleared test kit, that new test is considered an LDT. Indeed, the CLIA regulations specifically address and authorize this laboratory practice. Laboratories make such modifications routinely, usually because they have determined more efficient ways to run a test or because they have determined some other ways to use a kit, such as with a different type of specimen or with other variations not encompassed in the manufacturer's instructions (such as instrumentation models that may differ from those discussed in the manufacturer's labeling). FDA appears to intend to treat most if not all of these modifications as new LDTs that would be subject to risk-based premarket review, which would tax FDA's limited resources, freeze out future test improvements and even curtail laboratories from purchasing new analytical instruments because such a purchase may require them to do a new submission to the FDA.

US-REPORTS-0007103

ACLA Comments on Draft Guidances on LDTs
January 30, 2015
Page 18

- FDA has committed to refraining from imposing user fees on laboratories or LDTs during the MDUFA III period, but FDA's fee waiver authority is limited to 2% of user fee revenue annually (the equivalent of user fees for approximately 10 PMAs annually) and the draft guidance imposes no limits on the number of PMAs that may be required for LDTs. How would FDA keep its commitment?

## V.   CONCLUSION

In summary, FDA must withdraw the Draft "Guidances" in their entirety. The Agency lacks the statutory authority to regulate laboratory-developed testing services. If it did have such authority, it would need to issue its proposals through notice-and-comment rulemaking. Thank you for your consideration of ACLA's comments.

Sincerely,

Alan Mertz, President
American Clinical Laboratory Association

US-REPORTS-0007104