STEPHANIE M. HINDS (CABN 154284)
Attorney for the United States,
Acting Under Authority Conferred By 28 U.S.C. § 515

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

JEFF SCHENK (CABN 234355)
JOHN C. BOSTIC (CABN 264367)
ROBERT S. LEACH (CABN 196191)
VANESSA BAEHR-JONES (CABN 281715)
Assistant United States Attorneys

    150 Almaden Boulevard, Suite 900
    San Jose, California 95113
    Telephone: (408) 535-5061
    Fax: (408) 535-5066
    Robert.Leach@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. 18-CR-00258 EJD |
| | ) |
|     Plaintiff, | ) UNITED STATES' MOTIONS *IN LIMINE* |
| | ) |
|   v. | ) Date:   January 22, 2021 |
| | ) Time:  10:00 a.m. |
| ELIZABETH HOLMES, | ) Court: Hon. Edward J. Davila |
| | ) |
|     Defendant. | ) |
| | ) |
| _____ | ) |

# NOTICE OF MOTIONS AND MOTIONS

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD IN THIS ACTION:**

PLEASE TAKE NOTICE that on January 22, 2021 at 10 a.m., or as soon thereafter as the matter may be heard, in Courtroom 4, 5th Floor, of the United States District Court for the Northern District of California, 280 South 1st Street, San Jose, CA 95113, the United States will and hereby does move *in limine* for the following evidentiary orders:

1. Precluding Defendant Elizabeth Holmes ("Defendant") from offering an improper defense blaming her victims;

2. Precluding the Defendant from referencing punishment in front of the jury;

3. Precluding an improper advice-of-counsel defense;

4. Precluding a defense argument that the government's charging decisions were influenced by coordination with journalists or competitors;

5. Precluding the Defendant from presenting an improper good faith defense;

6. Admitting the Centers for Medicare and Medicaid Services' ("CMS") January 26, 2016 Form CMS-2567, Statement of Deficiencies;

7. Admitting text messages between Defendant and Ramesh Balwani offered by the government;

8. Admitting statements by Theranos, Inc. ("Theranos") and Theranos employees and agents offered by the government;

9. Excluding self-serving hearsay statements made and offered by Defendant;

10. Admitting relevant testimony from "non-paying" patients; and

11. Ordering the Defendant to produce reverse *Jencks* including any *in camera* proffers.

These motions are based upon the instant notice, the attached memorandum of points and authorities, the records in this case, and upon such argument as may be made at the hearing on the motions.

1   DATED:  November 20, 2020

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

STEPHANIE M. HINDS
Attorney for the United States,
Acting Under Authority Conferred
By 28 U.S.C. § 515


_____/s/_____
JEFF SCHENK
JOHN C. BOSTIC
ROBERT S. LEACH
VANESSA BAEHR-JONES
Assistant United States Attorneys

1

## <u>TABLE OF CONTENTS</u>

2

I.      MOTION *IN LIMINE* NO. 1:  THE COURT SHOULD PRECLUDE DEFENDANT

3

FROM OFFERING AN IMPROPER DEFENSE OF BLAMING HER VICTIMS ...................................1

4

II.     MOTION *IN LIMINE* NO. 2:  THE COURT SHOULD PRECLUDE THE DEFENSE

FROM REFERENCING PUNISHMENT IN FRONT OF THE JURY.....................................................4

5

6

III.    MOTION *IN LIMINE* NO. 3:  THE COURT SHOULD PRECLUDE AN

IMPROPER ADVICE-OF-COUNSEL DEFENSE..........................................................................5

7

8

IV.     MOTION *IN LIMINE* NO. 4:  THE COURT SHOULD PRECLUDE A DEFENSE

ARGUMENT THAT THE GOVERNMENT'S CHARGING DECISIONS WERE

9

INFLUENCED BY COORDINATION WITH JOURNALISTS OR COMPETITORS ...........................6

10

V.      MOTION *IN LIMINE* NO. 5:  THE COURT SHOULD PRECLUDE DEFENDANT

11

FROM PRESENTING AN IMPROPER GOOD FAITH DEFENSE .........................................................7

12

VI.     MOTION *IN LIMINE* NO. 6:  THE COURT SHOULD ADMIT CMS' JANUARY

26, 2016 FORM CMS-2567, STATEMENT OF DEFICIENCIES............................................................8

13

14

      A.      Factual Background ...........................................................................8

15

      B.      Argument ...........................................................................................9

16

VII.    MOTION *IN LIMINE* NO. 7:  THE COURT SHOULD ADMIT TEXT MESSAGES

BETWEEN DEFENDANT AND BALWANI OFFERED BY THE GOVERNMENT..........................10

17

18

      A.      Factual Background .........................................................................10

19

      B.      Argument .........................................................................................14

20

VIII.   MOTION *IN LIMINE* NO. 8:  THE COURT SHOULD ADMIT STATEMENTS BY

21

THERANOS AND THERANOS EMPLOYEES AND AGENTS OFFERED BY THE

GOVERNMENT.....................................................................................................15

22

23

IX.     MOTION *IN LIMINE* NO. 9:  THE COURT SHOULD EXCLUDE SELF-SERVING

HEARSAY STATEMENTS MADE AND OFFERED BY DEFENDANT ............................................17

24

25

X.      MOTION *IN LIMINE* NO. 10:  THE COURT SHOULD ADMIT RELEVANT

TESTIMONY FROM "NON-PAYING" PATIENT WITNESSES........................................................20

26

27

XI.     MOTION *IN LIMINE* NO. 11:  THE COURT SHOULD ORDER DEFENDANT TO

PRODUCE REVERSE *JENCKS* INCLUDING ANY *IN CAMERA* PROFFERS.................................24

28

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Beech Aircraft Corp. v. Rainey*,
    488 U.S. 153 (1988) ............................................................................................ 19

*Hunt v. Blackburn*,
    128 U.S. 44 (1888) .............................................................................................. 5

*Neder v. United States*,
    527 U.S. 1 (1999) ........................................................................................... 2, 21

*SEC v. Jasper*,
    675 F.3d 1116 (9th Cir. 2012) ........................................................................... 10

*Shannon v. United States*,
    512 U.S. 573 (1994) ............................................................................................ 4

*Tome v. United States*,
    513 U.S. 150 (1995) .......................................................................................... 19

*United States v. Agne*,
    214 F.3d 47 (1st Cir. 2000) ............................................................................... 16

*United States v. Allen*,
    201 F.3d 163 (2d Cir. 2000) ................................................................................ 2

*United States v. Benny*,
    786 F.2d 1410 (9th Cir. 1986) ............................................................................. 7

*United States v. Biesiadecki*,
    933 F.2d 539 (7th Cir. 1991) ............................................................................... 2

*United States v. Blixt*,
    548 F.3d 882 (9th Cir. 2008) ............................................................................... 1

*United States v. Bush*,
    626 F.3d 527 (9th Cir. 2010) ........................................................................... 5, 6

*United States v. Castillo*,
    181 F.3d 1129 (9th Cir. 1999) ........................................................................... 23

*United States v. Chang Da Liu*,
    538 F.3d 1078 (9th Cir. 2008) ........................................................................... 19

*United States v. Ciccone*,
    219 F.3d 1078 (9th Cir. 2000) ............................................................................. 1

*United States v. Collicott*,
    92 F.3d 973 (9th Cir. 1996) ............................................................................... 19

*United States v. Colton*,
    231 F.3d 890 (4th Cir. 2000) ............................................................................... 1

*United States v. Coyle*,
    63 F.3d 1239 (3d Cir. 1995) ................................................................................ 2

*United States v. Daniel*,
    329 F.3d 480 (6th Cir. 2003) ............................................................................... 2

GOVT. MOTIONS *IN LIMINE*,
CASE NO. 18-258 EJD

*United States v. DiStefano*,
   129 F. Supp. 2d 342 (S.D.N.Y. 2001).................................................................................. 3

*United States v. Fernandez*,
   839 F.2d 639 (9th Cir. 1988) ............................................................................................. 19

*United States v. Frank*,
   956 F.2d 872 (9th Cir. 1992) ............................................................................................... 4

*United States v. Fryberg*,
   854 F.3d 1126 (9th Cir. 2017) ........................................................................................... 10

*United States v. Gibson*,
   690 F.2d 697 (9th Cir. 1982) ............................................................................................. 16

*United States v. Hickey*,
   580 F.3d 922 (9th Cir. 2009) ........................................................................................... 7, 9

*United States v. Ibarra-Alcarez*,
   830 F.2d 968 (9th Cir. 1987) ............................................................................................... 6

United *States v. Jones*,
   982 F.2d 380 (9th Cir. 1992) ............................................................................................. 23

*United States v. Kenny*,
   645 F.2d 1323 (9th Cir. 1982) ........................................................................................... 18

*United States v. Kirk*,
   844 F.2d 660 (9th Cir. 1988) ....................................................................................... 16, 18

*United States v. Kreimer*,
   609 F.2d 126 (5th Cir. 1980) ............................................................................................... 2

*United States v. Lew*,
   875 F.2d 219 (9th Cir. 1989) ............................................................................................. 20

*United States v. Lillard*,
   354 F.3d 850 (9th Cir. 2003) ............................................................................................. 24

*United States v. Lindsey*,
   850 F.3d 1009 (9th Cir. 2017) ......................................................................................... 1, 2

*United States v. Loftis*,
   843 F.3d 1173 (9th Cir. 2016) ........................................................................................... 23

*United States v. Lopez*,
   762 F.3d 852 (9th Cir. 2014) ............................................................................................. 10

*United States v. Matlock*,
   415 U.S. 164 (1974)........................................................................................................... 18

*United States v. Mitchell*,
   502 F.3d 931 (9th Cir. 2007) ............................................................................................. 18

*United States v. Olano*,
   62 F.3d 1180 (9th Cir. 1995) ............................................................................................... 4

*United States v. Ortega*,
   203 F.3d 675 (9th Cir. 2000) ............................................................................................. 19

*United States v. Pelisamen*,
   641 F.3d 399 (9th Cir. 2011) ............................................................................................. 18

*United States v. Pinson*,
    584 F.3d 972 (10th Cir. 2009) ................................................................. 5
*United States v. Ramsey*,
    785 F.2d 184 (7th Cir. 1986) ................................................................. 16
*United States v. Reed*,
    641 F.3d 992 (8th Cir. 2011) ................................................................. 7
*United States v. Svete*,
    556 F.3d 1157 (11th Cir. 2009) ............................................................ 2
*United States v. Thomas*,
    377 F.3d 232 (2d Cir. 2004) ............................................................ 3, 14
*United States v. Utz*,
    886 F.2d 1148 (9th Cir. 1989) .............................................................. 24
*United States v. Warren*,
    25 F.3d 890 (9th Cir. 1994) ................................................................. 24
*United States v. Williams*,
    989 F.2d 1061 (9th Cir. 1993) .............................................................. 24
*United States v. Winkle*,
    477 F.3d 407 (6th Cir. 2003) ................................................................. 2
*United States v. Workman*,
    138 F.3d 1261 (8th Cir. 1998) ............................................................... 5
*United States v. Yeager*,
    331 F.3d 1216 (11th Cir. 2003) ............................................................. 2
*Wayte v. United States*,
    470 U.S. 598 (1985) .............................................................................. 7
*Zal v. Steppe*,
    968 F.2d 924 (9th Cir. 1992) ................................................................. 4

**Statutes**

28 U.S.C. § 515 ....................................................................................... 1, 2, 26
42 U.S.C. 263(a) .......................................................................................... 8

**Rules**

FED. R. CRIM. P. 26.2(a) ............................................................................ 24
FED. R. CRIM. P. 26.2(e) ............................................................................ 25
FED. R. EVID. 402 ........................................................................................ 7
FED. R. EVID. 403 ........................................................................................ 7
FED. R. EVID. 801(d)(2)(A) ................................................................... 14, 18
FED. R. EVID. 801(d)(2)(B) ......................................................................... 17
Fed. R. Evid. 801(d)(2)(D) ......................................................................... 16, 17
FED. R. EVID. 803(6) .................................................................................... 10

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.     MOTION *IN LIMINE* NO. 1:  THE COURT SHOULD PRECLUDE DEFENDANT FROM OFFERING AN IMPROPER DEFENSE OF BLAMING HER VICTIMS**

At trial, the government anticipates that Defendant may attempt to justify her conduct by arguing or presenting evidence that the victims in this case – in particular, relatively sophisticated investor victims – could have or should have exercised more diligence or skepticism in their dealings with Theranos.  Defendant also may attempt to argue that the victims did not in fact rely on the materially false and misleading statements made by her and her co-conspirators.  Defendant should be precluded from pursuing this strategy, which would distract the jury from the central issues in this case: Defendant's intent to defraud and the falsity and materiality of her statements.

The Third Superseding Indictment ("TSI") in this case charges Defendant with multiple counts of wire fraud as well as conspiracy to commit wire fraud under two distinct schemes to defraud. Because reliance and damages are not elements of these crimes, it is no defense that the victim of the fraud was negligent or gullible.  *See, e.g.*, *United States v. Blixt*, 548 F.3d 882, 889 (9th Cir. 2008) (In a mail fraud case, "[w]hat is important is the intent of the person making the statement that it be in furtherance of some fraudulent purpose.") (citation omitted); *United States v. Ciccone*, 219 F.3d 1078, 1083 (9th Cir. 2000) ("It is immaterial whether only the most gullible would have been deceived by the defendants' scheme…. [T]he wire fraud statute protects the naive as well as the worldly-wise.") (quotation and citation omitted).

Consistent with these principles, the Ninth Circuit has held in a wire fraud case that the defendant could not rely on a bank's negligence in verifying loan application information, and affirmed the district court's preclusion of evidence and argument on that topic.  *United States v. Lindsey*, 850 F.3d 1009, 1015 (9th Cir. 2017).  In *Lindsey*, the defendant, a mortgage loan officer, attempted to argue that mortgage lending in 2006-2007 functioned like the "Wild West," with banks not really caring about the quality of their mortgage lending.  *Id*. at 1012-13.  The district court ordered the defendant to "stay away" from such arguments.  *Id*.  The Ninth Circuit affirmed the district court's ruling, noting:

> Several of our sister circuits have held that a fraud victim's negligence is not a defense to criminal charges under the federal fraud statutes.  *See United States v. Colton*, 231 F.3d 890, 903 (4th Cir. 2000) ("The susceptibility of the victim of the fraud, in this case a

financial institution, is irrelevant to the analysis:  If a scheme to defraud has been or is intended to be devised, it makes no difference whether the persons the schemers intended to defraud are gullible or skeptical, dull or bright." (internal quotation marks omitted)); *see also United States v. Svete*, 556 F.3d 1157, 1165 (11th Cir. 2009) (en banc) ("A perpetrator of fraud is no less guilty of fraud because his victim is also guilty of negligence."); *United States v. Allen*, 201 F.3d 163, 167 (2d Cir. 2000) (per curiam) ("The victim's negligence in permitting a crime to take place does not excuse the defendant from culpability for [the] substantive offense . . . ."); *United States v. Coyle*, 63 F.3d 1239, 1244 (3d Cir. 1995) ("The negligence of the victim in failing to discover a fraudulent scheme is not a defense to criminal conduct."); *United States v. Kreimer*, 609 F.2d 126, 132 (5th Cir. 1980) ("The victim's negligence is not a defense to criminal conduct.").

*Id.* at 1014–15.

Similarly, the Supreme Court has confirmed that, while materiality is an element of the wire fraud offense, "the government does not have to prove actual reliance upon the defendant's misrepresentations."  *Neder v. United States*, 527 U.S. 1, 25 (1999).[1]  In this regard, the proof required to establish criminal fraud is entirely different from that required in a civil case.  *See id.* at 24-25.  Since *Neder*, Courts of Appeal have routinely affirmed district court rulings precluding testimony relating to the question of whether a defendant's fraudulent statements actually misled the intended victim.  *See United States v. Biesiadecki*, 933 F.2d 539, 544 (7th Cir. 1991) (affirming district court's decision precluding testimony from customers who were not misled by defendant's statements; holding that the "excluded testimony of the other . . . customers would have improperly shifted the jury's attention away from the knowledge and intent of [the defendant] and focused instead on the beliefs of the victims of the alleged scheme to defraud."); *see also United States v. Yeager*, 331 F.3d 1216, 1221 (11th Cir. 2003); *United States v. Daniel*, 329 F.3d 480, 486-87 (6th Cir. 2003).

This reasoning is consistent with similar rulings by other courts in cases involving fraudulent schemes.  For example, it would be irrelevant if some bank or lender employee had overlooked a "red flag" associated with a fraudulent loan application.  *United States v. Winkle*, 477 F.3d 407, 414 n.3 (6th Cir. 2003) ("[T]he victim of a bank fraud is the bank, not the CEO of the bank, and approval of a bank

---

[1]     *Lindsey* also holds that "[a] false statement is material if it *objectively* had a tendency to influence, or was capable of influencing, a lender to approve a loan.  This standard is not concerned with a statement's subjective effect on the victim, but only the intrinsic capabilities of the false statement itself."  850 F.3d at 1015 (emphasis in original; citation and internal quotations omitted).

officer does not relieve a defendant of liability for bank fraud.") (citations omitted).  Similarly, in a scheme to induce travel for a fraudulent purpose, the Second Circuit rejected the defendant's argument that the "foolishness of the [victim] in [the defendant's] scheme somehow vitiates [the defendant's] fraudulent intent."  *United States v. Thomas*, 377 F.3d 232, 243 (2d Cir. 2004) (collecting cases and upholding district court's exclusion of evidence and testimony relating to gullibility of victim).  Under the case law above, the Court should preclude the defense from arguing that the victims were negligent, were not actually misled, or were otherwise at fault in this case.

Defendant also might attempt to introduce a related improper defense focusing on the culture of Silicon Valley startups, arguing that founders in this area frequently use exaggeration and dramatic promises to generate needed attention for their companies and attract capital.  This defense is simply a region-specific version of "other people committed the same crime."  To be sure, Defendant was not the first person to commit fraud in connection with investments into a Bay Area startup.  At trial, the defense may attempt to minimize Defendant's conduct by eliciting testimony regarding other instances of similar fraudulent schemes, perhaps highlighting cases where no criminal charges were brought.  Such testimony would be improper, as there is no "other people did it too" defense to wire fraud or conspiracy.  Thus, reference to any wrongdoing committed by individuals other than the defendants or co-conspirators during voir dire or trial would be irrelevant and prejudicial, and should therefore be excluded pursuant to Federal Rules of Evidence 401-403.  *See United States v. King*, No. CR-08-002-E-BLW, 2009 U.S. Dist. LEXIS 32935, at *7-8 (D. Idaho Apr. 17, 2009) ("Evidence of selective prosecution . . . would be irrelevant and unfairly prejudicial to present to the jury."); *see also United States v. DiStefano*, 129 F. Supp. 2d 342, 348 (S.D.N.Y. 2001) (rejecting defendant's selective enforcement claim regarding the existence of other uncharged co-workers engaging in the same conduct).  The sole question for this trial is whether Defendant engaged in the charged conduct.  The Court should not allow any argument or evidence from Defendant suggesting that she should be acquitted because others have committed those offenses as well.

For these reasons, the Court should preclude Defendant from offering an improper defense of blaming her victims.

/ /

## II. MOTION *IN LIMINE* NO. 2: THE COURT SHOULD PRECLUDE THE DEFENSE FROM REFERENCING PUNISHMENT IN FRONT OF THE JURY.

The government moves to preclude, as irrelevant and prejudicial, any reference by the defense to the Defendant's alleged suffering or potential punishment during any phase of the trial, including jury selection, opening statements, examination of witnesses (including the Defendant, if she elects to testify), and summation. Impermissible references to punishment could be overt; for example, "The defendant is facing a prison term if convicted." But such references could also be subtler; for example, that "the Defendant is facing a lot of time," "the case has serious consequences for the Defendant," "the Defendant's liberty is at stake in this trial," or "your decision will have consequences for a long time to come." Once the jury hears anything about punishment or other consequences, the bell simply cannot be unrung or the damage neutralized by a curative instruction.

"It has long been the law that it is inappropriate for a jury to consider or be informed of the consequences of their verdict." *United States v. Frank*, 956 F.2d 872, 879 (9th Cir. 1992). "The jury's function is to find facts and to decide whether, on those facts, defendant is guilty of the crime charged." *Shannon v. United States*, 512 U.S. 573, 579 (1994). Information about penalty and punishment "draw[s] the attention of the jury away from their chief function as the sole judges of the facts, opens the door to compromise verdicts, and confuses the issues to be decided." *United States v. Olano*, 62 F.3d 1180, 1202 (9th Cir. 1995); *see also Shannon*, 512 U.S. at 579 ("[P]roviding jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion."). Accordingly, the defense should be precluded from making any reference to the Defendant's alleged suffering or potential punishment in the presence of the jury, whether in statements, questions, or argument.

Other attempts at jury nullification are likewise improper. "[N]either a defendant nor his attorney has a right to present to a jury evidence that is irrelevant to a legal defense to, or an element of, the crime charged. Verdicts must be based on the law and the evidence, not on jury nullification as urged by either litigant." *Zal v. Steppe*, 968 F.2d 924, 930 (9th Cir. 1992) (Trott, J., concurring). Whether the types of comments cited above evoke punishment, encourage jury nullification, or both,

they are irrelevant and improper.  The Court should preclude the defense from making any such statements at trial.

### III.   MOTION *IN LIMINE* NO. 3:  THE COURT SHOULD PRECLUDE AN IMPROPER ADVICE-OF-COUNSEL DEFENSE

The defense should be precluded from soliciting testimony or making arguments suggesting that Defendant relied upon advice given to her by attorneys as a defense to the charged offenses.  This Court should preclude both (1) defense solicitation of testimony suggesting that attorneys made statements to Defendant or that Defendant relied upon such statements in an attempt to negate intent; and also (2) a formal advice-of-counsel defense and the associated jury instruction.  First, while falling short of presenting a full advice-of-counsel defense, and thus avoiding the affirmative obligations such a defense places upon its proponent, Defendant still may try to elicit testimony from attorney-witnesses suggesting that they made certain statements to her.  Additionally, Defendant may attempt to elicit testimony from former Theranos employees concerning statements attorneys may have made.  The Court should rule *in limine* that this type of testimony is prohibited.  First, while Defendant has put at least one of Theranos's attorneys, David Taylor, on her witness list, she has not waived any applicable privileges related to her relationships with counsel.  When defendants invoke an advice-of-counsel defense, they waive any attorney-client privilege they previously enjoyed.  *See, e.g., Hunt v. Blackburn*, 128 U.S. 44, 407-71 (1888) (when defendant entered into a defense which relied upon what her lawyer told her, she waived her right to object to him giving his own account); *United States v. Bush*, 626 F.3d 527, 539 (9th Cir. 2010) (an advice-of-counsel instruction requires the defendant to show he made a full disclosure of all material facts to his attorney); *United States v. Pinson*, 584 F.3d 972, 977 (10th Cir. 2009) (when defendant invoked an advice of counsel defense, he waived his attorney-client privilege as to all advice received concerning the same subject matter); *United States v. Workman*, 138 F.3d 1261, 1263 (8th Cir. 1998) (attorney-client privilege can be implicitly waived by raising an advice of counsel defense)  Since Defendant continues to assert the existence of an attorney-client privilege between herself and Boies Schiller Flexner LLP, she must therefore be precluded from eliciting statements made between Defendant and her attorneys.

Second, this Court should preclude Defendant from asserting a formal advice-of-counsel defense.  While the government concedes that ordinarily the Court may wait until hearing the evidence presented at trial to rule on the appropriate jury instructions (such as an affirmative advice-of-counsel defense), the defense has given the government no notice of an intent to offer an advice-of-counsel defense.  Moreover, the defense has continued to assert applicable privileges between herself and her attorneys.  Therefore, she fails to meet the waiver prerequisite to asserting an advice-of-counsel defense, and should be precluded from asserting a formal advice-of-counsel defense.  The Ninth Circuit has held that such a defense requires a showing by the Defendant that (1) she fully disclosed all material facts to her attorney and (2) she relied in good faith on the specific course of conduct recommended by her attorney.  *See, e.g.*, *United States v. Ibarra-Alcarez*, 830 F.2d 968, 973 (9th Cir. 1987).  Under Ninth Circuit law, the defendant is required to have affirmatively sought out advice from an attorney or other professional.  *See United States v. Bush*, 626 F.3d 527, 539 (9th Cir. 2010) (defendant not entitled to an "advice of counsel" instruction because of failure to present evidence that he fully advised his attorney of his plan, received advice regarding that plan from the attorney, and followed that exact advice in good faith).

## IV.  MOTION *IN LIMINE* NO. 4:  THE COURT SHOULD PRECLUDE A DEFENSE ARGUMENT THAT THE GOVERNMENT'S CHARGING DECISIONS WERE INFLUENCED BY COORDINATION WITH JOURNALISTS OR COMPETITORS

The defense should be precluded from making baseless assertions regarding coordination between the government's criminal investigation and third parties such as journalists or other lab testing companies.  While third-party testimony may be relevant when the journalist or lab company employee was a percipient witness to relevant events, the defense should be precluded from arguing to the jury that the government's investigation or charging decisions were unduly influenced by the input of lab companies, such as Quest or LabCorp, or journalists, such as John Carreyrou.  First, such a defense argument would be contrary to the evidence; the government did not coordinate with lab testing companies or journalists.  Indeed, no attorney or agent on the prosecution team has ever had a substantive conversation with Mr. Carreyrou, Quest, or Labcorp in connection with this case.  Second, by alleging such coordination happened, the defense would not only be arguing something untrue to the

jury, it would also be implying that such coordination is relevant for some determination the jury must make.  In other words, a defense argument suggesting coordination between the government and certain third parties fails the relevance test under Federal Rule of Evidence 401.

The Supreme Court has recognized that "[i]n our criminal justice system, the Government retains 'broad discretion' as to whom to prosecute."  *Wayte v. United States*, 470 U.S. 598, 607 (1985) (quotation omitted).  Inquiries into the government's charging decisions have no tendency to make the existence of any fact that is of consequence to the action more probable or less probable and are thus irrelevant.  FED. R. EVID. 402.  And even if the inquiries into the government's charging decisions had any marginal probative value, they are substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury.  FED. R. EVID. 403; *see also United States v. Reed*, 641 F.3d 992, 993-94 (8th Cir. 2011) (many factors unrelated to guilt may influence charging decisions and therefore their admission risks misleading the jury and confusing the issues).  Thus, Defendant should not be allowed to suggest that the jury consider the government's charging decisions, including baseless arguments that those decisions were unduly influenced by journalists or other outside sources.

## V.     MOTION *IN LIMINE* NO. 5:  THE COURT SHOULD PRECLUDE DEFENDANT FROM PRESENTING AN IMPROPER GOOD FAITH DEFENSE

Defendant might attempt to present evidence or argument that she should be acquitted because she acted in good faith.  Defendant might claim, despite her deception of investors, that she always intended to make those victims' investments profitable, such that the victims would suffer no loss when all was said and done.  That argument—and any argument along those lines—should be barred, as they do not constitute recognized legal defenses to the charges and are therefore improper and irrelevant.

The Ninth Circuit has recognized "[w]hile an honest, good-faith belief in the truth of the misrepresentations may negate intent to defraud, a good-faith belief that the victim will be repaid and will sustain no loss is no defense at all."  *United States v. Benny*, 786 F.2d 1410, 1417 (9th Cir. 1986) (actual loss is not an element of securities fraud).  In other words, even if Defendant genuinely intended that her victims' investments would return a profit for them once Theranos became successful, Defendant would still be guilty of the charged offenses if her actions otherwise met the elements.  *See United States v. Hickey*, 580 F.3d 922, 931 (9th Cir. 2009) (finding that the trial court properly excluded

1   expert testimony on good faith).  In light of the above, this Court should exclude evidence and

2   arguments that Defendant believed in good faith that her victims would be repaid and would sustain no

3   loss.

4   **VI.**     **MOTION *IN LIMINE* NO. 6:  THE COURT SHOULD ADMIT CMS' JANUARY 26, 2016 FORM CMS-2567, STATEMENT OF DEFICIENCIES**

5

6       **A.**    **Factual Background**

7       Defendant raised hundreds of millions of dollars based on claims that Theranos operated the

8   world's first and only high-complexity, CLIA-certified laboratory running its tests on micro-samples.[2]

9   She claimed to investors that Theranos generated significantly higher integrity data than currently

10  possible and met "[a] new standard in quality" with "[t]he highest levels of accuracy."  *See* Declaration

11  of AUSA Robert S. Leach in Support of United States' Motions *in Limine* ("Leach Decl."), Ex. A

12  (RDV012673 at pp.3 & 30).

13       Beginning in September 2015, CMS conducted a CLIA recertification and complaint survey of

14  Theranos's Newark laboratory.  Sarah Bennett and Gary Yamamoto were among the CMS surveyors;

15  the government currently intends to call one or both of them in its case-in-chief.  Based on the survey,

16  CMS found Theranos failed to comply with five conditions required for CLIA certification, as well as

17  numerous CLIA standards.  On January 26, 2016, CMS wrote Theranos regarding "CONDITION

18  LEVEL DEFICIENCIES – IMMEDIATE JEOPARDY."  Leach Decl. Ex. B (THER-0534383).  Based

19  on its survey, CMS determined that Theranos was not in compliance with all of the conditions required

20  for certification in the CLIA program.  CMS provided Theranos with a listing of all deficiencies

21  identified during the survey on a Form CMS-2567, Statement of Deficiencies.  The letter also stated

22  that, because Theranos failed to meet a condition-level requirement relating to hematology, "the

23  deficient practices of the laboratory pose immediate jeopardy to health and safety."  Among other

24  things, in the Form CMS-2567, CMS found Theranos failed to ensure that quality control ("QC") was

25

26  [2]     "CLIA" is an acronym for Clinical Laboratory Improvement Amendments.  *See* 42 U.S.C. 263a(a) *et seq.*  CLIA regulates laboratory testing and requires clinical laboratories to be certified by

27  CMS before they can accept human samples for diagnostic testing.  CMS is also charged with implementing CLIA, including laboratory registration and surveys.  *See, e.g.,*

28  https://www.cms.gov/Regulations-and-Guidance/ Legislation/ CLIA/ Program_Descriptions_Projects.

acceptable for the Theranos Proprietary System (TPS/Edison 3.5) prior to the reporting of patient test results, failed to ensure that quality control for PT/INR was acceptable prior to reporting patient test results, failed to verify accuracy, precision, and/or reportable reference range for numerous assays, and failed to verify the performance specifications and conduct of a third-party device it was using. *Id.* at THER-0534389-90, 394-95, 397, 403, 423-429, 435-440.

By letter dated April 1, 2016, after additional communications between Theranos and CMS, Theranos's lab director advised CMS that Theranos had "actually stopped running [a number of tests] either before or during the survey, and has not run them since."  The letter stated that "based on its dissatisfaction with prior QA oversight, the laboratory voided all results reported for the assays run on the Theranos Proprietary System 3.5 (TPS) in 2014 and 2015 and all reported PT/INR tests run on the Siemens Advia BCS XP instrument that went into use in October 2014 through September of 2015." *See, e.g.*, Leach Decl. Ex. C at p.2 (THER-0534701).

On April 18, 2016, Holmes stated publicly and to Theranos shareholders:  "I'm the founder and CEO of this company.  Anything that happens in this company is my responsibility, at the end of the day.  We stopped testing [in Newark], and have taken the approach of saying, let's rebuild this entire laboratory from scratch."  She said further "I know what we've built. . . ." *See, e.g.*, Leach Decl. Ex. D.

On October 24, 2016, Holmes caused Theranos to relinquish its CLIA certificate, close the Newark laboratory, and cease laboratory operations. *See, e.g.*, Leach Decl. Ex. E.

### B.    Argument

The Court should admit the Form CMS-2567, Statement of Deficiencies.  It is clearly relevant evidence that Theranos, despite its representations to investors, was not capable of consistently producing accurate and reliable blood test results and that its proprietary analyzer had accuracy and reliability problems, as the TSI alleges.  It also demonstrates that Theranos had not met "[a] new standard in quality" with "[t]he highest levels of accuracy."

To the extent the Form CMS-2567, Statement of Deficiencies is arguably hearsay, it falls within the exception for public records.  *See* FED. R. EVID. 803(8).  The exception applies to "[a] record or statement of a public office if: (A) it sets out: (i) the office's activities; [or] (ii) a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement

personnel . . . and (B) neither the source of information nor other circumstances indicate a lack of trustworthiness." The Form CMS-2567 is a statement of a public office (i.e., CMS) setting out matters observed while under a legal duty to report. *See, e.g.*, *United States v. Fryberg*, 854 F.3d 1126, 1131 (9th Cir. 2017) (affirming that a legal duty to report may exist in the absence of a statute or regulation expressly imposing duties to observe, report, and keep records and that the pertinent question is whether the creation and maintenance of the record at issue is appropriate to the function of the relevant government office given the nature of the responsibilities assigned to that office); *United States v. Lopez*, 762 F.3d 852, 862 (9th Cir. 2014). CMS surveyors like Bennett and Yamamoto, who through testimony may describe the survey and the Form CMS-2567, are not "law-enforcement personnel." Finally, there is nothing about the source of the information for the CMS form nor the circumstances under which it was prepared that indicate a lack of trustworthiness.[3]

To the extent the defense may suggest the Form CMS-2567 evidence is excludable under Rules 403 or 404(b), such arguments are mistaken. The evidence is direct evidence of the falsity of Defendant's statements. Its probative value is extremely high. Likewise, it is not improper "propensity" evidence but evidence of falsity, knowledge, intent, plan, and preparation – all permissible purposes under Rule 404(b). Finally, the CMS form is not unduly prejudicial.

For these reasons, the Court should admit CMS' January 26, 2016 Form CMS-2567, Statement of Deficiencies. The Court should also admit Theranos's statements in response to the Form CMS-2567 – which are not hearsay under Rule 801(d)(2)(A) through (D).

## VII.   MOTION *IN LIMINE* NO. 7:  THE COURT SHOULD ADMIT TEXT MESSAGES BETWEEN DEFENDANT AND BALWANI OFFERED BY THE GOVERNMENT

### A.   Factual Background

On September 6, 2016, the staff of the SEC issued a subpoena to Theranos requesting production of communications between Defendant and Balwani since the period January 1, 2010. Leach Decl. Ex. F. On July 7, 2017, an attorney with Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale"), who

---

[3]      The form also falls within the hearsay exception for records of regularly conducted activity. *See* Fed. R. Evid. 803(6); *SEC v. Jasper*, 675 F.3d 1116, 1122-1124 (9th Cir. 2012) (holding restated financial statements filed with the SEC fell within the hearsay exception for business records).

represented both Theranos and Defendant, produced to the SEC a document Bates-numbered TS-1036239 through TS-1036827 (the "SEC Spreadsheet"), which he represented to be "a spreadsheet containing business-related text messages, iMessages, and Skype exchanges between Elizabeth Holmes and Sunny Balwani." *Id.* Ex. G.  On July 11 and 13 and August 23, 2017, Defendant testified under oath before the SEC.  During testimony, the SEC Spreadsheet was shown to Defendant and marked as an exhibit.  Defendant testified she had no reason to believe the document is not a true collection of text messages between her and Balwani on her work cell phone.  *Id.* Ex. H (Holmes SEC Testimony p. 375-76).  Subsequently, a second attorney with WilmerHale submitted to the SEC a declaration under penalty of perjury certifying records of regularly conducted activity, which stated:  "I certify that the document produced at TS-1036239 through TS-1036827 is a spreadsheet containing Theranos business-related text messages, iMessages, and Skype exchanges between Ms. Holmes and Mr. Balwani.  These messages and exchanges were sourced from images taken of Ms. Holmes' business phones, as well as messaging applications on Ms. Holmes' computer."  *Id.* Ex. I.

On September 6, 2017, the Grand Jury issued a subpoena to Theranos for "[a]ll text or SMS messages sent or received by cellular phones owned or paid for by Theranos, and used by either Elizabeth Holmes or Sunny Balwani."  *Id.* Ex. J (Theranos-DOJ TL000093).  On October 3, 2017, WilmerHale represented to the government:  "With respect to Ms. Holmes's phones, we will produce all text message exchanges between Ms. Holmes and Mr. Balwani redacting only those that are sexual in nature."  *Id.*  On November 7, 2017, WilmerHale produced to the FBI a document Bates-numbered THER-2566547 through THER-2567135 (the "DOJ Spreadsheet"), which WilmerHale represented to be "a spreadsheet reflecting text messages sent to and from Elizabeth Holmes and Ramesh Balwani as collected from Elizabeth Holmes's Company-issued devices.  These text messages were originally produced at TS-1036239 through TS-1036827, and are being reproduced today with revised redactions pursuant to the guidelines discussed on our October 2, 2017 call with Mr. Schenk and Mr. Bostic."  *Id.* Ex. K.  The DOJ Spreadsheet generally has fewer redactions from the SEC Spreadsheet.

The Spreadsheets are replete with admissions by Defendant and Balwani that demonstrate their knowledge that their statements to investors were false and misleading and that Theranos's testing was beset with problems.  For example, on November 28, 2013, Balwani wrote:  "We are at $15m as of

today"—an apparent reference to Theranos's dwindling cash position.  Holmes replied:  "I saw that."

Leach Decl. Exs. L & M at 32.

On November 19, 2014, the Spreadsheets show the following texts:

| Date Time | Content | From Name | To Name |
|---|---|---|---|
| 11/19/2014 4:56:32 | Customer service seems to be terrible.  Everyone complaining. | sunnybalwani@mac.com | Elizabeth Holmes |
| 11/19/2014 4:56:32 | Need to focus on ops.  Getting hurt in market. | sunnybalwani@mac.com | Elizabeth Holmes |
| 11/19/2014 4:58:07 | Yes. | Elizabeth Holmes | sunnybalwani@mac.com |
| 11/19/2014 4:58:15 | We have to own this. | Elizabeth Holmes | sunnybalwani@mac.com |
| 11/19/2014 4:58:40 | Lab, customer service, tat, all need director level people | sunnybalwani@mac.com | Elizabeth Holmes |
| 11/19/2014 4:58:40 | No.  She is still great.  She is just trying to manage a lot m | sunnybalwani@mac.com | Elizabeth Holmes |
| 11/19/2014 4:58:40 | She is doing all of this. | sunnybalwani@mac.com | Elizabeth Holmes |
| 11/19/2014 4:58:40 | Tracy seemed burnt out | sunnybalwani@mac.com | Elizabeth Holmes |
| 11/19/2014 4:59:18 | Exactly | Elizabeth Holmes | sunnybalwani@mac.com |
| 11/19/2014 4:59:49 | Hmm | Elizabeth Holmes | sunnybalwani@mac.com |
| 11/19/2014 4:59:58 | Burnt out like problem? | Elizabeth Holmes | sunnybalwani@mac.com |
| 11/19/2014 5:00:32 | We will help her | Elizabeth Holmes | sunnybalwani@mac.com |
| 11/19/2014 5:00:40 | By doing this | Elizabeth Holmes | sunnybalwani@mac.com |
| 11/19/2014 5:00:48 | Imo | sunnybalwani@mac.com | Elizabeth Holmes |
| 11/19/2014 5:00:48 | Need professionals across the board.  Need PMs and Allison out ASAP. | sunnybalwani@mac.com | Elizabeth Holmes |
| 11/19/2014 5:00:48 | Waste of time imp | sunnybalwani@mac.com | Elizabeth Holmes |
| 11/19/2014 5:00:48 | We need.  The lab and call center fixed.. | sunnybalwani@mac.com | Elizabeth Holmes |
| 11/19/2014 5:00:57 | Exactly | Elizabeth Holmes | sunnybalwani@mac.com |
| 11/19/2014 5:01:21 | Yes | Elizabeth Holmes | sunnybalwani@mac.com |
| 11/19/2014 5:01:33 | Met w all PMs here on new roles today | Elizabeth Holmes | sunnybalwani@mac.com |
| 11/19/2014 5:01:45 | Getting on pagers pre thx giving | Elizabeth Holmes | sunnybalwani@mac.com |
| 11/19/2014 5:02:50 | We need call center manager, new call center team, get recurrent crew out of docs facing communications | sunnybalwani@mac.com | Elizabeth Holmes |
| 11/19/2014 | Current crew out | sunnybalwani@mac.com | Elizabeth Holmes |

| 5:02:56 | | | |
|---|---|---|---|
| 11/19/2014 5:02:56 | Fundamentally we need to stop fighting fires by not creating them | sunnybalwani@mac.com | Elizabeth Holmes |
| 11/19/2014 5:03:19 | Yes | Elizabeth Holmes | sunnybalwani@mac.com |
| 11/19/2014 5:05:04 | 18C, ctn, tip coating | sunnybalwani@mac.com | Elizabeth Holmes |
| 11/19/2014 5:05:04 | Call center,tech support, everything | sunnybalwani@mac.com | Elizabeth Holmes |
| 11/19/2014 5:05:04 | It will be ideal to put all ops in Az so they are managed professionally and away from hq | sunnybalwani@mac.com | Elizabeth Holmes |
| 11/19/2014 5:05:04 | New lab dirs, lab manager like Tracy | sunnybalwani@mac.com | Elizabeth Holmes |
| 11/19/2014 5:05:04 | Rebuild | sunnybalwani@mac.com | Elizabeth Holmes |
| 11/19/2014 5:05:52 | Fundamentally we need to stop fighting fires by not creating them | Elizabeth Holmes | sunnybalwani@mac.com |
| 11/19/2014 5:06:06 | Need to fix root cause here | Elizabeth Holmes | sunnybalwani@mac.com |
| 11/19/2014 5:07:09 | Yes | Elizabeth Holmes | sunnybalwani@mac.com |
| 11/19/2014 5:07:12 | Exactly | Elizabeth Holmes | sunnybalwani@mac.com |
| 11/19/2014 5:07:50 | Call center manager and new doc facing call center in 1701. | sunnybalwani@mac.com | Elizabeth Holmes |
| 11/19/2014 5:08:56 | We can't scale with wag. | sunnybalwani@mac.com | Elizabeth Holmes |
| 11/19/2014 5:09:09 | They are terrible and we need swy and cvs | sunnybalwani@mac.com | Elizabeth Holmes |
| 11/19/2014 5:09:33 | It's time | Elizabeth Holmes | sunnybalwani@mac.com |

*See* Leach Decl. Exs. L & M at 53-54.

On November 28, 2014, the Spreadsheets show the following texts:

| **Date Time** | **Content** | **From Name** | **To Name** |
|---|---|---|---|
| 11/28/2014 23:12:42 | Normandy lab is a fucking disaster zone.  Glad I came here. Will work on fixing this. | Sunny Balwani | Elizabeth Holmes |
| 11/28/2014 23:13:51 | Meant to be that your there apparently . . What happened | Elizabeth Holmes | Sunny Balwani |
| 11/28/2014 23:30:01 | Just called you to checkin.  Call anytime / when convenient | Elizabeth Holmes | Sunny Balwani |
| 11/28/2014 23:30:08 | In Normandy.  Will call when I leave. | Sunny Balwani | Elizabeth Holmes |
| 11/28/2014 23:31:24 | No rush.  Just checking in. | Elizabeth Holmes | Sunny Balwani |
| 11/28/2014 23:32:16 | I will get Tina out.  We need software person ruining [sic] this. Between Tina and Max we have a mess. | Sunny Balwani | Elizabeth Holmes |

| 11/28/2014 23:33:23 | I could not agree more. | Elizabeth Holmes | Sunny Balwani |

*See* Leach Decl. Exs. L & M at 59.

On April 20, 2015, the Spreadsheets show:

| Date Time | Content | From Name | To Name |
| --- | --- | --- | --- |
| 4/20/2015 19:41:10 | Can we take FS [live] tomorrow | Elizabeth Holmes | Sunny Balwani |
| 4/20/2015 19:41:43 | ? | Sunny Balwani | Elizabeth Holmes |
| 4/20/2015 19:41:52 | U mean Gc? | Sunny Balwani | Elizabeth Holmes |
| 4/20/2015 19:41:52 | Very risky. We need more software testing. | Sunny Balwani | Elizabeth Holmes |
| 4/20/2015 19:43:05 | Yes. | Elizabeth Holmes | Sunny Balwani |
| 4/20/2015 19:44:00 | Checking but very risky | Sunny Balwani | Elizabeth Holmes |

*See* Leach Decl. Exs. L & M at 127.

In addition, as CMS was performing its survey (described above), Balwani wrote: "Our validation reports are terrible. Really painful going thru this process. Same issues fda point out . . . . Going bad so far. Pray. Daniel has nothing ready. Told me everything is in the binder. Not there." Holmes replied shortly after: "Praying . . . . Praying continually." *See* Leach Decl. Exs. L & M at 222-223. On October 21, 2015, the same day Defendant falsely told *The Wall Street Journal* that Theranos "never used commercially available lab equipment for finger-stick based tests," Balwani confessed to her: "Worried about your 'all fingersticks on our technology' comment." *Id.* at 240.

B.     **Argument**

The Court should admit the foregoing excerpts of the Spreadsheets, and any similar ones offered by the government. The Spreadsheets are authentic and relevant. Defendant's text messages to Balwani (and others) are not hearsay when offered by the government as an opposing party's statement. *See* FED. R. EVID. 801(d)(2)(A) (providing a statement is not hearsay if "offered against an opposing party and was made by the party in an individual or representative capacity"). Balwani was Defendant's subordinate at Theranos, and thus his text messages to her are admissible for their truth (when offered by the government) because they are adopted admissions, authorized admissions, statements by a party's agent or employee on a matter within the scope of that relationship while it existed, or statements by a

co-conspirator during and in furtherance of the conspiracy.  *See id.* Rule 801(d)(2)(B)-(E).  And to the extent they are not, they are admissible to demonstrate Defendant's knowledge and intent and the effect on the hearer.  There are no other bases for exclusion.

For these reasons, the Court should admit the above-referenced texts from the Spreadsheets, and any similar ones offered by the government.

## VIII.  MOTION *IN LIMINE* NO. 8:  THE COURT SHOULD ADMIT STATEMENTS BY THERANOS AND THERANOS EMPLOYEES AND AGENTS OFFERED BY THE GOVERNMENT

Defendant was the founder, majority owner, chairman, president, and chief executive officer of Theranos.  In her words, she was "the ultimate decision maker for the company."  Leach Decl. Ex. H (Holmes SEC Testimony at p.167).  She has conceded:  "I was the CEO of the company, so I take responsibility for this company."  *Id.* at p.347; *see also id.* at p.240 ("I'm responsible for the company.") & p.488 (Q:  So what were your responsible for?  I was CEO of the company.").  She has conceded that she and Balwani were managing the company together and making decisions for the company together. *Id.* at p.856.  She controlled more than 51% of Theranos's outstanding shares.  Leach Decl. Ex. N (PFM-ROGS-00000046).  She had majority control of the voting power.  *Id.* Ex. O (THPFM0003051405). She was "involved in Theranos's vision, strategy, inventions, and creative pursuits . . . generally attended initial meetings with prospective investors . . . [and was] involved in communications with . . . Walgreens, Safeway, and potential partners."  *Id* Ex. N at pp.10, 23-24.  Because Defendant exercised total control over Theranos, statements by her company, its employees, and its agents are fairly attributed to her at trial.

Rule 801(d)(2) excludes from the hearsay definition (and thus the rule against hearsay) statements offered against an opposing party and

(A)  . . . made by the party in an individual or representative capacity;

(B)  . . . one the party manifested that it adopted or believed to be true;

(C)  . . . made by a person whom the party authorized to make a statement on the subject;

(D)  . . . made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or

(E)  . . . made by the party's coconspirator during and in furtherance of the conspiracy.

1   FED R. EVID. 801(d)(2) & 802.  "The rule specifies five categories of statements for which the

2   responsibility of a party is considered sufficient to justify reception in evidence against [her]."  *Id.*

3   advisory comm. note.

4        Applying these rules, the Ninth Circuit has repeatedly affirmed admission of statements by

5   employees of private companies owned, controlled, and managed by an individual defendant.  For

6   example, in *United States v. Kirk*, 844 F.2d 660 (9th Cir. 1988), the government charged the founder of

7   a time share venture with conspiracy, wire fraud, and other offenses.  Kirk "ran the day-to-day

8   operations" and exercised "control over the time share scheme."  *Id.* at 661.  The Ninth Circuit affirmed

9   the conviction and admission of testimony from "Paradise Palms salespeople[] and co-defendants,"

10  holding that the statements "were admissible as nonhearsay statements of agents or employees under

11  Fed. R. Evid. 801(d)(2)(D)."  *Id.* at 663.  The Ninth Circuit further stated:  "Many of the statements cited

12  by Kirk as instances of hearsay were made by agents or employees of Paradise Palms.  The statements

13  primarily described the nature and quality of the time share units, and the nature and extent of

14  contractual obligations to prospective time share customers, therefore clearly falling within the scope of

15  agency or employment."  *Id.*

16       Similarly, in *United States v. Gibson*, 690 F.2d 697, 699 (9th Cir. 1982), the government brought

17  mail fraud, wire fraud, and other charges against Gibson, the founder, sole shareholder, chairman, and

18  president of Gibson Marketing International, Inc. ("GMI"), which sold franchises and franchise

19  distributorship rights.  *Id.* at 697.  At trial, the government introduced evidence of statements by GMI

20  employees and salesmen against Gibson.  The Ninth Circuit found no error in admitting the statements.

21  The Ninth Circuit held that testimony by investors as to statements made by GMI employees were not

22  hearsay but evidence of existence of the scheme.  *Id.* at 700-701.  The court added that "even if the

23  testimony did fall within the hearsay definition, it would be admissible under either Rule 801(d)(2)(D)

24  (statements by an agent) or Rule 801(d)(2)(E) (statements by a co-conspirator)."  *Id.* at 701.

25       Precedent from other circuits amply supports the common sense notion that the owner and

26  president of a closely held company is responsible for the statements of the company's employees.

27  *United States v. Agne*, 214 F.3d 47, 54-55 (1st Cir. 2000) (citing cases); *United States v. Ramsey*, 785

28  F.2d 184, 191 (7th Cir. 1986) ("The victims testified to many statements of the four defendants . . . . The

1   defendants say that this was improper because the conspiracy was not established by sufficient non-

2   hearsay evidence.  Marshall [the President of S.U.R.E., Inc.] cannot make this argument because the

3   other three defendants were his employees at SURE, and a 'statement by his agent or servant concerning

4   a matter within the scope of his agency or employment' is admissible without regard to the existence of

5   a conspiracy." (quoting FED. R. EVID. 801(d)(2)(D)).

6        Accordingly, the Court should admit against Defendant relevant statements by Theranos agents

7   and employees on matters within the scope of that relationship and while it existed.

8        The Court should also admit against Defendant statements by Theranos that she authorized or

9   manifested that she adopted or believed to be true.  FED. R. EVID. 801(d)(2)(B) & (C).  For example, in

10  prior litigation, Theranos, with Defendant's knowledge and approval, made sworn admissions under

11  penalty of perjury.  Leach Decl. Exs. P, Q, & R.  Among other things, Theranos conceded that it earned

12  less than $500,000 from blood testing revenue from 2013 to 2015; that its contracts with the Department

13  of Defense were limited to three agreements producing de minimus revenue; that it modified third-party

14  analyzers in order to process blood tests; that only 12 tests were ever run on a Theranos-manufactured

15  device in its clinical lab; and that Theranos ceased all testing on Theranos-manufactured devices by June

16  2015.  Leach Decl. Ex. P at 35-38, Ex. Q at 22-24, 36-39, at Ex. R 22-23.  Holmes was a co-defendant in

17  the lawsuit at the time the statements were made and her own interrogatory responses made reference to

18  Theranos's statements (*see, e.g.*, Leach Decl. Ex. N at 16-18) – compelling the inference that she

19  authorized her company's statements and manifested that she adopted or believed them to be true.

20       Accordingly, the Court should admit the discovery responses referenced above and any other

21  statements by Theranos that Defendant authorized or manifested that she adopted or believed to be true,

22  to the extent such responses are offered by the government.

23  **IX.   MOTION *IN LIMINE* NO. 9:  THE COURT SHOULD EXCLUDE SELF-SERVING
24        HEARSAY STATEMENTS MADE AND OFFERED BY DEFENDANT**

25       As founder of Theranos, Defendant represented the company in conversations with investors, in

26  interviews with journalists, and in many other settings.  During the course of its investigation, the

27  government has collected extensive evidence of previous statements by Defendant regarding Theranos's

28  technology, business relationships, financial health, regulatory status, and other key topics.  The

government will seek to introduce Defendant's previous statements in its case-in-chief as proof that she engaged in schemes to defraud investors and patients. The Court, however, should reject any attempt by Defendant to improperly admit her own prior statements. Although Defendant may wish to introduce witness testimony or direct evidence of self-serving statements she has made to the press, to victims, or in her testimony to the SEC, such statements are inadmissible hearsay and must be excluded.

It is well settled that under Rule 801(d)(2)(A) of the Federal Rules of Evidence, only the government can offer into evidence a defendant's prior statement. The Rules of Evidence allow admission of out-of-court statements if (1) made by the defendant and (2) offered against the defendant. FED. R. EVID. 801(d)(2)(A); *see also United States v. Pelisamen*, 641 F.3d 399, 410 (9th Cir. 2011) (defendant's own statements made during television interview admissible over hearsay objection). The admissibility of a defendant's statements under this rule does not depend on the substance of the defendant's testimony at trial—or whether the defendant testifies at all. *See United States v. Kenny*, 645 F.2d 1323, 1339-40 (9th Cir. 1982). Indeed, a defendant's own out-of-court admissions "surmount all objections based on the hearsay rule" and are "admissible for whatever inferences the [factfinder] could reasonably draw." *United States v. Matlock*, 415 U.S. 164, 172 (1974).[4]

While the Rules of Evidence allow the government to introduce out-of-court statements of defendants and their agents, those rules preclude defendants from doing the same. A plain reading of Federal Rule of Evidence 801(d)(2)(A) exempts from hearsay only those party-opponent admissions that are "offered against an opposing party." FED. R. EVID. 801(d)(2) (emphasis added). To the extent that Defendant seeks admission at trial of her own out-of-court statements or those of agents acting on her behalf, those statements constitute inadmissible hearsay unless they otherwise fall under an established exception. This is true even as to statements by Defendant that are arguably exculpatory, and even if such exculpatory statements were not elicited on direct examination. *See e.g.*, *United States v. Mitchell*, 502 F.3d 931, 964 (9th Cir. 2007) (defendant's attempt to elicit exculpatory statements he made during

---

[4]     Alternatively, certain statements made by Defendant—in particular, misrepresentations—are admissible not for their truth but for the fact they were made. *See, e.g.*, *United States v. Kirk*, 844 F.2d 660, 663 (9th Cir. 1988) (upholding admission of statements that constituted misrepresentations in a fraudulent scheme).

1    interviews with agents was improper because "[t]hese statements were inadmissible hearsay; as

2    [defendant] was attempting to introduce them himself, they were not party-opponent admissions");

3    *United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000) ("[T]he district court did not abuse its

4    discretion when it limited Ortega's ability to elicit his exculpatory hearsay statements on cross-

5    examination" because otherwise "Ortega would have been able to place his exculpatory statements

6    before the jury without subjecting himself to cross-examination, precisely what the hearsay rule

7    forbids.") (quotation omitted); *United States v. Fernandez*, 839 F.2d 639, 640 (9th Cir. 1988) (district

8    court properly precluded defense counsel from eliciting, on cross-examination, defendant's post-arrest

9    statement denying participation in robbery).

10          The rule of completeness, codified in Rule 106 of the Federal Rules of Evidence, does not

11   support a different result.  As an initial matter, Rule 106 applies only to writings or recorded statements,

12   not to oral conversations.  *Ortega*, 203 F.3d at 682 ("the rule of completeness . . . applies to written and

13   recorded statements.").  Nor does the rule of completeness compel the admission of all statements made

14   during the same event, e.g., the same interview.  *Id.*  ("[Defendant's] non-self-inculpatory statements are

15   inadmissible even if they were made contemporaneously with other self-inculpatory statements.").

16   Critically, the rule "does not compel admission of otherwise inadmissible hearsay evidence."  *United*

17   *States v. Collicott*, 92 F.3d 973, 983 (9th Cir. 1996) (quotation omitted).  At trial, the Court should

18   construe Rule 106 narrowly, applying it only where "misunderstanding or distortion can be averted only

19   through presentation of another portion" or an excerpted document or recorded statement.  *Id.* (quoting

20   *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 172 (1988)).

21          Finally, Defendant cannot avoid the above restrictions simply by labelling her previous

22   statements as prior consistent statements under Rule 801(d)(1)(B).  A party seeking to admit statements

23   under that rule must satisfy four elements: (1) the declarant-defendant must testify at trial and be subject

24   to cross-examination; (2) there must be an express or implied charge of recent fabrication or improper

25   influence or motive of the declarant-defendant's testimony; (3) the proponent must offer a prior

26   consistent statement that is consistent with the challenged in-court testimony; and (4) the prior

27   consistent statement must be made prior to the time that the supposed motive to falsify arose.  *United States v.*

28   *Chang Da Liu*, 538 F.3d 1078, 1086 (9th Cir. 2008); *see also Tome v. United States*, 513 U.S. 150, 157-

58 (1995).  The Court should reject any attempt by Defendant to exploit this rule without satisfying each of the above elements.

## X.   MOTION *IN LIMINE* NO. 10:  THE COURT SHOULD ADMIT RELEVANT TESTIMONY FROM "NON-PAYING" PATIENT WITNESSES

The evidence at trial will show that Defendant devised and carried out two schemes to defraud: one targeting investors who purchased Theranos securities based on misleading information from Holmes, and the other targeting patients who purchased Theranos's testing services after being defrauded into believing that the company's tests were accurate and reliable.  While non-paying patients do not qualify as victims of the charged scheme under the Court's prior rulings, some of those patients have important knowledge that goes directly to key issues in this case, including the misrepresentations and misleading information Defendant targeted at all patients, the materiality of that deceptive information, the accuracy (or lack thereof) of Theranos's blood tests, Defendant's knowledge of the accuracy problems with Theranos's tests, and Defendant's overall intent to defraud patient customers.  In light of the Court's rulings, the government will not argue to the jury that they may convict based on a theory that treats non-paying patients as fraud victims.  However, patient customers with relevant information should be permitted to testify at trial regardless of whether they paid out of pocket for Theranos tests and became victims.

Ruling on a motion to dismiss filed by Defendants at the end of last year, the Court held that patients whose insurance paid for the blood testing services they received from Theranos are not victims of the charged fraud.  (ECF No. 330 at 28-33).  The Court's decision was based on *United States v. Lew*, 875 F.2d 219 (9th Cir. 1989).  Under *Lew*, in order to convict a defendant of mail fraud, the defendant must have intended "to obtain money or property from the one who is deceived."  *Id.* at 221.  Here, the Indictment alleges that Defendants sought to obtain money from patients—the "victim[s] of the deceit" under *Lew*.  *Id.* at 222.  Where individual wire fraud counts in the operative Indictment are based on wire transfers involving Theranos patients, those patients paid out of pocket for the blood testing services they received from Defendant's company.  Thus, the Indictment is in compliance with the Court's Order, and there is no risk of conviction based on a theory inconsistent with the Court's reading of *Lew*.

The Court's ruling on Defendant's motion to dismiss concerned the allegations in the Indictment, not the type of evidence the government may advance to prove those allegations. The government anticipates, however, that the defense may attempt to misconstrue the Court's earlier ruling to limit or exclude testimony from Theranos customers who did not pay Theranos out of pocket. But that testimony is admissible and consistent with the Court's order as long as non-paying patients are not described as victims of the fraud. Anticipated testimony from certain non-paying patients is also highly probative, as described below.

It is worth remembering that, although the Court partially granted Defendants' motion to dismiss as to non-paying patients, it rejected Defendants' argument that the Indictment failed to allege that any patients were defrauded. (ECF No. 330 at 35-38). The Court ruled that a patient is defrauded when he or she pays for a blood test that is held out as accurate and reliable when it is not. The Indictment alleges that Defendants knew about the problems with their technology but still misrepresented Theranos's ability to provide accurate and reliable results. When Defendants allegedly sent out inaccurate or unreliable test results, patients did not receive the benefit of the bargain. (*Id*. at 38). Thus, the Indictment presents a cognizable scheme to defraud patients. Defendant pursued that scheme by, among other things, (1) distributing marketing materials for Theranos touting the company's technology, (2) holding out Theranos's blood tests as suitable for clinical use; (3) directing Theranos employees to give misleading answers to patients who received inaccurate results from Theranos; and (4) continuing to offer blood testing services despite knowing that Theranos tests were not sufficiently accurate and reliable. Testimony from Theranos's customers will help establish that conduct and show its significance.

The patients on the government's witness list—both paying and insured—will testify as to facts that will greatly assist the jury in making their findings about the falsity of Defendant's statements, her knowledge of their falsity, and her intent to defraud patients in general. For example:

- One patient who may not have paid (initials "BG") received presentations from Theranos in the medical practice where she worked. She was impressed by Theranos based on what she heard, and later visited a Theranos Service Center in Arizona for a blood test. She later received a demonstrably inaccurate hCG result from Theranos, which caused her to believe

that she was in the process of losing a pregnancy.  Holmes and Balwani were made aware of the inaccurate result no later than October 15, 2014.  Balwani claimed the inaccurate result was due to human error, and the company subsequently voided the result in approximately March 2016.

- Another patient who may not have paid (initials "AM") worked at Walgreens in connection with Theranos's blood testing service centers at the pharmacy chain.  In that capacity, she was exposed to Theranos marketing information provided by employees of the company.  Based on that information, she then promoted Theranos's blood testing services to Walgreens customers, informing them that "it's accurate, less painful, there's less blood drawn, and Theranos is right here [in the Phoenix area]."  In September 2014, AM received an inaccurate hCG test from Theranos that failed to reveal the presence of an ectopic pregnancy.  She subsequently contacted Theranos to complain.  That same day, Christian Holmes (Defendant's brother) and Dan Edlin (who reported to Holmes) were advised of AM's inaccurate result.  She followed up with Theranos in August of 2015, at which time Defendant and Balwani were alerted to her complaints.  Theranos ultimately voided the result in March of 2016.

- Another similarly situated patient (initials "AT") recalls seeing Theranos advertisements in a magazine claiming that they could "get patients in and out of their testing facility quickly and that the blood draws would be done via finger stick."  Expecting Theranos to give accurate results, AT visited a Theranos service center in November 2015, receiving an inaccurate PT-INR test result from the company.  Theranos was alerted to the inaccurate test when the company received a request that the test be rerun because it was inconsistent with AT's normal results for that assay.

- Yet another patient (initials "SA") was exposed to Theranos advertisements that touted the company's ability to conduct a large number of blood tests from a fingerstick blood draw.  In October 2015, SA visited a Theranos location in Arizona, subsequently receiving an inaccurate estradiol test result.  Theranos was aware of the inaccurate result in November 2015 after SA reached out to the company.  Balwani was informed of the problem with the

test that same month.

- Finally, a patient who may not have paid for Theranos blood testing (initials "RG") was exposed to Theranos marketing on a billboard and on the radio, and understood from those representations that Theranos had "futuristic" technology capable of conducting blood tests from a fingerstick. RG visited Theranos in September 2015 and subsequently received a result inaccurately indicating that he was HIV positive. Numerous employees reporting to Holmes and Balwani became aware of RG's inaccurate HIV test by September 2015.

Testimony along the lines described above is relevant to the questions facing the jury, and it is well-settled that the scope of admissible trial evidence is not strictly limited to the charged conduct. For example, Rule 404(b) of the Federal Rules of Evidence allows evidence of uncharged acts to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. "Rule 404(b) is a rule of inclusion." *United States v. Castillo*, 181 F.3d 1129, 1134 (9th Cir. 1999) (internal citation omitted). "[U]nless the evidence of other acts only tends to prove propensity, it is admissible." *Id.* Prior acts are admissible "so long as the acts tended to make the existence of [the defendant's] knowledge or intent more probable than it would be without the evidence." United *States v. Jones*, 982 F.2d 380, 382 (9th Cir. 1992).

Here, the facts offered by Theranos's customers—paying or non-paying—are probative of Defendant's knowledge and intent. Those facts demonstrate that Defendant knew about the accuracy problems plaguing Theranos's tests but continued to hold them out as accurate and reliable, thus helping to prove Defendant's intent to defraud patients. The facts offered by non-paying patients also show Defendant's plan and preparation to the extent they were exposed to the same set of marketing materials and misleading representations as the patients who ended up giving money to Theranos. Because such evidence is useful for an approved purpose and does not bear on propensity, it should be allowed at trial.

Facts like the ones summarized above also are admissible without resort to Rule 404(b) because they are inextricably intertwined with the charged conduct. *See United States v. Loftis*, 843 F.3d 1173, 1177-78 (9th Cir. 2016) ("other act" evidence is inextricably intertwined with the charged crime when it is: (1) "part of the transaction that serves as the basis for the criminal charge," and (2) necessary "in order to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of

the crime"). This standard is satisfied when the evidence at issue and the crime charged are "part of a single course of action." *United States v. Warren*, 25 F.3d 890, 895 (9th Cir. 1994). As the Ninth Circuit recognizes, "the policies underlying rule 404(b) are inapplicable when offenses committed as part of a single criminal episode become other acts simply because the defendant is indicted for less than all of his actions." *United States v. Lillard*, 354 F.3d 850, 854 (9th Cir. 2003) (quoting *United States v. Williams*, 989 F.2d 1061, 1070 (9th Cir. 1993)).

In this case, Theranos's contacts with non-paying patient customers were part of the same course of action charged in the Indictment, even if those patients did not end up as victims. A wire fraud charge requires proof "either that the victim was actually deprived of money or property *or* that the defendant intended to defraud the victim of the same." *United States v. Utz*, 886 F.2d 1148, 1151 (9th Cir. 1989) (emphasis in original). "A scheme to defraud, whether successful or not, remains within the purview of section 1341." *Id.* Here, Defendant scheme was to defraud patients and obtain their money. Her conduct in furtherance of the scheme was directed at all potential customers of Theranos—the intended targets of the fraud. A subset of those intended targets actually became customers, and a subset of that group paid Theranos for testing, becoming victims of the fraud. Consistent with the above case law, the jury's verdict will not turn on the success of Defendant's plans but on her intent and the nature of the overall scheme. Patient testimony is relevant and admissible if it bears on those issues.

For the foregoing reasons, the Court should permit testimony from patients who had relevant dealings with Theranos regardless of whether they paid Theranos for blood testing services.

## XI. MOTION *IN LIMINE* NO. 11: THE COURT SHOULD ORDER DEFENDANT TO PRODUCE REVERSE *JENCKS* INCLUDING ANY *IN CAMERA* PROFFERS

Defendant has failed to comply with the Court's deadline for production of witness statements under Rule 26.2(a) of the Federal Rules of Criminal Procedure. The Court should order Defendant to comply with its previous order immediately, and should exclude the testimony of any defense witness for whom Defendant fails to timely disclose 26.2 material.

Rule 26.2 of the Federal Rules of Criminal Procedure, derived from the *Jencks* Act, requires a party to produce to the opposing party "any statement of [a testifying witness] that is in [that party's] possession and that relates to the subject matter of the witness's testimony." FED. R. CRIM. P. 26.2(a).

1    Although the language of the rule contemplates production of this information during trial, courts

2    frequently order early disclosure.  On April 15, 2020, the Court set a number of deadlines aimed at

3    readying the matter for trial.  *See* ECF No. 374.  In particular, the Court's Order set a deadline of July

4    24, 2020 for Defendant to complete her production of witness statements pursuant to Rule 26.2.  The

5    government has produced Rule 26.2 material to the defense on a rolling basis throughout the pendency

6    of the case.  Defendant, however, has not complied with the Court's Order to produce 26.2 material—

7    neither on the July 24 deadline nor in the four months that have followed.

8           Accordingly, on November 13, 2020, the government sent a letter to Defendant's counsel

9    referencing the July 24, 2020 deadline and requesting that she immediately produce all Rule 26.2

10   witness statements for all defense witnesses.  On November 19, 2020, counsel for Defendant responded

11   to the government's letter.  Regarding the government's request for disclosures required by Rule 26.2,

12   Holmes's counsel stated:  "We are aware of our obligations under the current scheduling order and will

13   produce any Rule 26.2 material according to that schedule."  *See* Leach Decl. ¶ 20.  The government

14   assumes that Defendant's letter refers to the pretrial schedule set by the Court on August 11, 2020.  *See*

15   ECF No. 484.  That schedule, however, does not include a renewed deadline for Defendant to comply

16   with Rule 26.2, as that deadline had already passed when the Court issued its Order.  Accordingly,

17   Defendant appears to have disregarded the deadline set by the Court in April of this year, and it is

18   unclear whether or when Defendant intends to comply with Rule 26.2.

19          Rule 26.2 itself provides the appropriate remedy in cases where a party ignores its obligations

20   under the Rule.  Subsection (e) of the rule states that "[i]f the party who called the witness disobeys an

21   order to produce or deliver a statement, the court must strike the witness's testimony from the record."

22   FED. R. CRIM. P. 26.2(e).

23          Accordingly, the Court should order Defendant to produce all 26.2 material in her possession

24   within ten days of the hearing on this motion.  This material should include any proffers made by

25   Defendant to the Court and not disclosed to the government.  To the extent maintaining such statements

26   ex parte was warranted at the time, the government understands those concerns no longer apply.  Should

27   Defendant fail to produce such material for any of her witnesses by that date, the Court should exclude

28   those witnesses' testimony at trial.

1    DATED:  November 20, 2020                        Respectfully submitted,

2                                                     STEPHANIE M. HINDS
                                                      Attorney for the United States,
3                                                     Acting Under Authority Conferred
                                                      By 28 U.S.C. § 515
4

5                                                            _/s/_____

6                                                     JEFF SCHENK
                                                      JOHN C. BOSTIC
7                                                     ROBERT S. LEACH
                                                      VANESSA BAEHR-JONES
8                                                     Assistant United States Attorneys

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28