# EXHIBIT H

Page 1

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:                )
                                 )   File No. SF-04030-A
THERANOS, INC.                   )   Amended: 8/31/2017

WITNESS:   Elizabeth Holmes
PAGES:     1 through 301
PLACE:     Securities and Exchange Commission
           44 Montgomery Street, Suite 2600
           San Francisco, CA   94104
DATE:      Tuesday, July 11, 2017

    The above entitled matter came on for hearing, pursuant to notice, at 9:00 a.m.

Diversified Reporting Services, Inc.
(202) 467 9200

Page 2

1  APPEARANCES:
2
3  On behalf of the Securities and Exchange Commission:
4      JESSICA CHAN, ESQ.
5      RAHUL KOLHATKAR, ESQ.
6      MONIQUE WINKLER, ESQ.
7      MICHAEL FOLEY, CPA
8      JASON HABERMEYER, ESQ.
9      MARC KATZ, ESQ.
10     Securities and Exchange Commission
11     Division of Enforcement
12     44 Montgomery Street, Suite 2600
13     San Francisco, CA  94104
14     (415) 705-2339
15
16 On behalf of the Witness:
17     STEPHEN NEAL, ESQ.
18     JOHN DWYER, ESQ.
19     ALEXANDRA LEEPER, ESQ.
20     Cooley LLP
21     3175 Hanover Street
22     Palo Alto, California 94304
23     (650) 843-5182
24
25

Page 3

1  APPEARANCES (CONT.):
2
3  On behalf of Theranos, Inc.:
4      DAVID TAYLOR, ESQ.
5      General Counsel, Theranos, Inc.
6      1701 Page Mill Road
7      Palo Alto, California 94304
8      (650) 838-9292
9      CHRIS DAVIES, ESQ.
10     WILLIAM MCLUCAS, ESQ.
11     WilmerHale LLP
12     1875 Pennsylvania Avenue, NW
13     Washington DC 20006
14     (202) 663-6187
15
16
17
18
19
20
21
22
23
24
25

Page 4

1              C O N T E N T S
2
3  WITNESS:                        EXAMINATION
4  Elizabeth Holmes                     10
5
6  EXHIBITS:    DESCRIPTION          IDENTIFIED
7  191      Subpoena                    15
8  192      Background Questionnaire    15
9           dated July 2, 2017
10 193      January 22, 2010, e-mail    28
11          with attachment from Danise
12          Yam to Elizabeth Holmes with
13          a subject line "For Tina."
14          (Starting Bates No.
15          THPFM0000690035)
16 194      Organizational Chart (Bates  40
17          No. TS0000001)
18 195      Document entitled "Theranos  70
19          Confidential Summary
20          Capitalization" (Starting
21          Bates No. TS-000603)
22 196      Spreadsheet titled "Detailed 77
23          2917" (Starting Bates No.
24          TS-0558077)
25

Page 5

1          C O N T E N T S (CONT.)
2
3  EXHIBITS:    DESCRIPTION          IDENTIFIED
4  197      June 11, 2013, e-mail from  124
5           Sunny Balwani to Elizabeth
6           Holmes, subject line
7           "Forward: Demo next Tuesday
8           6/11 at noon" (Starting
9           Bates No. TS-0902539)
10 198      January 23, 2014, e-mail    139
11          from Alberto Gutierrez to
12          Elizabeth Holmes with
13          various copy e-mails
14          (Starting Bates No.
15          TS-0469692)
16 199      Theranos, Inc.'s responses  142
17          and objections to
18          plaintiff's first set of
19          interrogatories filed in the
20          Court of Chancery in the
21          state of Delaware in Partner
22          Investments LP v. Theranos,
23          Inc. (Starting Bates No.
24          SEC-PRM-E-0003430)
25

Page 6

```
 1                  C O N T E N T S (CONT.)
 2
 3      EXHIBITS:      DESCRIPTION              IDENTIFIED
 4      200            Theranos, Inc.'s first        149
 5                     supplemental responses and
 6                     objections to plaintiff's
 7                     first set of interrogatories
 8                     filed in the Court of
 9                     Chancery in the state of
10                     Delaware in Partner
11                     Investments v. Theranos,
12                     Inc. (Starting Bates No.
13                     SEC-PRM-E-0005120)
14      201            Theranos, Inc., responses     155
15                     and objections to
16                     plaintiff's second set of
17                     interrogatories filed in the
18                     Court of Chancery of the
19                     state of Delaware in Partner
20                     Investments v. Theranos,
21                     Inc. (Starting Bates No.
22                     SEC-PRM-E-0003334)
23
24
25
```

Page 7

```
 1                  C O N T E N T S (CONT.)
 2
 3      EXHIBITS:      DESCRIPTION              IDENTIFIED
 4      202            August 13, 2013, e-mail       201
 5                     from Elizabeth Holmes to
 6                     Daniel Edlin with a copy to
 7                     Sunny Balwani, Daniel Young,
 8                     and Samartha Anekal, Subject
 9                     line "Re devices in the demo
10                     room for tomorrow's meeting"
11                     (Bates No. TS-0375316)
12      203            October 10, 2014, e-mail      206
13                     from Christian Holmes to
14                     Sunny Balwani and Elizabeth
15                     Holmes, subject line "Re BDT
16                     visitors to WAG Saturday."
17                     (Starting Bates No.
18                     TS-0830981)
19
20
21
22
23
24
25
```

Page 8

```
 1                  C O N T E N T S (CONT.)
 2
 3      EXHIBITS:      DESCRIPTION              IDENTIFIED
 4      204            October 13, 2014, e-mail      217
 5                     from Daniel Edlin to
 6                     Elizabeth Holmes with a copy
 7                     to Sunny Balwani and
 8                     Christian Holmes, subject
 9                     line "Re testing in Arizona
10                     for Rob Walton." (Starting
11                     Bates No. THPFM0001308054)
12      205            December 31, 2014, e-mail     227
13                     from Elizabeth Holmes to
14                     Daniel Young with a copy to
15                     Christian Holmes, Sunny
16                     Balwani, and Maximillion
17                     Fosque, subject line "Re VIP
18                     tomorrow-PT/PTT" (Starting
19                     Bates No. THPFM0000331112)
20
21
22
23
24
25
```

Page 9

```
 1                  C O N T E N T S (CONT.)
 2
 3      EXHIBITS:      DESCRIPTION              IDENTIFIED
 4      206            March 29, 2010, e-mail        264
 5                     with attached presentation
 6                     from Kermit Crawford to Mary
 7                     Beth Holcer, subject
 8                     "Forward: Follow-up to our
 9                     meeting today" (Starting
10                     Bates No. WAG-TH-00006784)
11      207            May 7, 2010, e-mail with      284
12                     attachment from Elizabeth
13                     Holmes to Jay Rosan with a
14                     copy to Sunny Balwani,
15                     subject "Regulatory Overview
16                     Summary" (Starting Bates
17                     No. THPFM0000416490)
18      208            E-mail with attachment from   292
19                     Elizabeth Holmes to Daniel
20                     Young with a copy to Sunny
21                     Balwani, subject "Forward:
22                     Hopkins" (Starting Bates No.
23                     THPFM0005620882)
24
25
```

SEC-TX-000005258

Page 10

1  PROCEEDINGS
2  THE VIDEOGRAPHER: We are on the record at the
3  beginning of Media No. 1, Volume I. My name is
4  Patrick Murray, contracted by Hahn & Bowersock.
5  Please begin.
6  MS. CHAN: This is the testimony of Elizabeth
7  Holmes. Going on the record in San Francisco,
8  California, at 9 o'clock a.m. on July 11th, 2017.
9  Ms. Holmes, please raise your right hand. Do
10 you swear to tell the truth, the whole truth, and nothing
11 but the truth?
12 MS. HOLMES: I do.
13 MS. CHAN: Thank you.
14 Whereupon,
15 ELIZABETH HOLMES
16 was called as a witness and, having been first duly
17 sworn, was examined and testified as follows:
18 EXAMINATION
19 BY MS. CHAN:
20 Q   My name is Jessica Chan, and with me are Rahul
21 Kolhatkar, Monique Winkler, Michael Foley, Marc Katz in
22 the back, and Jason Habermeyer. I and Rahul Kolhatkar
23 are staff attorneys in this office. Mr. Foley is a staff
24 accountant. Ms. Winkler is an assistant director in this
25 office, and Mr. Habermeyer and Mr. Katz are trial counsel

Page 11

1  in the San Francisco regional office of the United States
2  Securities and Exchange Commission. We are officers of
3  the Commission for the purposes of this proceeding.
4  This is an investigation by the Securities and
5  Exchange Commission in the matter of Theranos, Inc., SF
6  4030 to determine whether there have been violations of
7  certain provisions of the federal securities laws.
8  However, the facts developed in this investigation might
9  constitute violations of other federal or state, civil or
10 criminal laws.
11 Prior to the opening of the record, you were
12 provided with a copy of the formal order of investigation
13 in this matter. The formal order will be available for
14 your examination during the course of this proceeding.
15 Have you had an opportunity to review the
16 formal order?
17 A   I'm not sure if I have reviewed it, but I know
18 our team has it.
19 Q   Do you have any questions about it?
20 A   I don't.
21 Q   Prior to the opening of the record, you were
22 also provided with a copy of the Commission Supplement
23 Information Form 1662, which has been marked as Theranos
24 Exhibit 1.
25 Have you had an opportunity to review Exhibit

Page 12

1  1?
2  A   I have.
3  Q   You also received this Form 1662 with your
4  subpoena for testimony, correct?
5  A   Yes.
6  Q   Do you have any questions about Exhibit 1?
7  A   I don't.
8  Q   Ms. Holmes, are you represented by counsel
9  today?
10 A   I am.
11 MS. CHAN: Would counsel please identify
12 themselves and if you wouldn't mind providing your firm
13 name, address, and phone number as well.
14 MR. NEAL: I'm Stephen Neal with Cooley. My
15 phone number is (650) 843-5182, and I'm one of the
16 attorneys representing Ms. Holmes.
17 MR. DWYER: John Dwyer also with Cooley at
18 (650) 843-5000.
19 MR. TAYLOR: I'm David Taylor, the general
20 counsel of Theranos.
21 MR. DAVIES: Chris Davies of Wilmer. (202)
22 663-6187.
23 MR. MCLUCAS: Bill McLucas, Wilmer. (202)
24 663-6622.
25 MS. LEEPER: Ali Leeper with Cooley. I'll need

Page 13

1  a minute for my phone number. (650) 843-5376.
2  MS. CHAN: And would you also provide your
3  office addresses as well?
4  MR. NEAL: For all three Cooley people our
5  office address is 3175 Hanover Street, Palo Alto, 94304.
6  MR. TAYLOR: For Theranos? 1701 Page Mill
7  Road, Palo Alto 94304.
8  MR. DAVIES: And Bill and I are at 1875
9  Pennsylvania Avenue, Washington, D.C. 20006.
10 MS. CHAN: Do you represent Ms. Holmes in her
11 personal capacity?
12 MR. NEAL: I represent Ms. Holmes in all
13 capacities.
14 MS. CHAN: Okay. And what about Mr. Taylor and
15 the attorneys from Wilmer?
16 MR. TAYLOR: I represent the company Theranos.
17 MR. DAVIES: I represent the company and Ms.
18 Holmes as CEO.
19 MR. MCLUCAS: Same. Company and Ms. Holmes.
20 BY MS. CHAN:
21 Q   Before we start today, I want to go over some
22 ground rules with you. The court reporter will be
23 recording and transcribing what we say, so it's important
24 for us to talk only one at a time. So if you could
25 please wait until I finish my question before you answer

SEC-TX-000005259

Page 166

1  clinical lab and Phase 2 would be deploying the Theranos
2  devices to stores?
3       A    So a large part of it came out of our
4  discussions with Walgreens.  There had been a lot of back
5  and forth about the business model and the timelines and
6  the regulatory framework.  We also worked very closely
7  with FDA and regulatory counsel to try to figure out how
8  to do this right because we wanted to bring up a large
9  number, relatively speaking, of tests on small sample
10 analysis.  And so it was in partnership with Walgreens
11 and some guidance from both of our counsels that we
12 decided to first become a clinical lab while we worked to
13 take the technology through the FDA.
14      Q    And when you say "we" at the company, who --
15 who made that decision on behalf of the company?
16      A    I don't -- I don't know that it was sort of a
17 single decision that was made.  It was months of
18 engagement with Walgreens, feedback from counsel, and
19 ultimately a business decision that we -- I mean, I guess
20 you could say it was consummated with the amendment to
21 the Walgreens contract at a later point in time.  I don't
22 think it was sort of a single meeting where we said,
23 okay, let's make the decision.  It was sort of an
24 evolution over time.
25      Q    Okay.  But were you the decision maker on

Page 167

1  behalf of Theranos?  And did you sign the Walgreens
2  contract or the amendment?
3       A    I did.  I signed many of the Walgreens
4  agreements.  I don't know if I signed all of them.  And
5  yes.  I mean, I'm the CEO.  I'm the ultimate decision
6  maker for the company.
7            I don't think this was a case where we sort of
8  sat down and had a meeting and said let's do this.  I
9  think it was, after a lot of iterative feedback, a mutual
10 decision with Walgreens initially.
11           BY MR. KOLHATKAR:
12      Q    I just want to circle back to a couple
13 questions.  You mentioned sort of the Phase 1/Phase 2
14 model being sort of the genesis of the nanotainer
15 development?
16      A    Yeah.
17      Q    When did -- what time period did that take
18 place?
19      A    So I don't know when the initial sort of idea
20 invention happened.  I remember, as we worked with
21 Walgreens on how to solve the business model questions
22 that we were contemplating, bringing to them the
23 nanotainer and trying to convey that you could still do
24 small sample testing even in the centralized setting
25 while we were working to get the TSPU through the FDA.

Page 168

1  I can't remember exactly what year that was,
2  but I know it was certainly before 2013.
3           BY MS. CHAN:
4       Q    Let me just ask a clarification question on
5  that.
6       A    Yeah.
7       Q    So what do you mean by "centralized lab
8  setting"?
9       A    So the way I think about it is either you have
10 the TSPU intended use case, which is you're with the box
11 outside of a lab in a place where people don't
12 necessarily traditionally do lab testing, like a pharmacy
13 or a home or somewhere where a person is; you're just
14 going to want to do one sample at a time.
15           Or you're in a clinical lab, and you have
16 samples from other locations being sent in at the same
17 time.  So 1,000 samples may show up or 10,000 samples may
18 show up, and you need to be able to process all of those
19 as fast as possible.  That's a completely different use
20 case than when you're with one patient at a time.
21      Q    So you were saying that the model changed.  So
22 previously was the model that Theranos would be placing
23 these devices in Walgreens stores?
24      A    Yes.  When we signed the contract.
25      Q    Right.  And so how was Theranos envisioning

Page 169

1  processing all of these samples if they were going to
2  be -- you know, all of these people coming into Walgreens
3  stores to have their blood tested?
4       A    So it's a different use case where you're doing
5  one patient at a time.  So one person would come in,
6  their cartridge would be placed into the device right
7  there, the results would be reported, and then you'd do
8  the next one.
9            As opposed to at a lab you're collecting
10 samples all day.  Then you ship them.  And so a large
11 number of samples come in at the same time.
12           BY MR. KOLHATKAR:
13      Q    I also want to follow up on another answer you
14 gave about being open about Theranos' use of
15 venipuncture.
16      A    Yeah.
17      Q    I think the question involved disclosing the
18 use of third-party analyzers.
19           I guess, in your mind, what was the
20 relationship between the use of venipuncture and the use
21 of third-party analyzers?
22      A    So, in general, we associate and sort of talked
23 about venipuncture as being synonymous with the use of
24 third-party analyzers.  I want to qualify that by saying
25 that we did take smaller samples and did sometimes run

43 (Pages 166 to 169)

SEC-TX-000005298

Page 238

1  then you should not include it.
2     Q  Okay. But I guess I'm just wondering, why
3  wouldn't you just include it but say this is too high; we
4  can't rely on it; let's do a re-draw?
5     A  I mean, I'm not a laboratory professional. But
6  my understanding is if you believe it's wrong, you can't
7  report it.
8     Q  Okay. And so do you know if the person who was
9  tested here was told that this result wasn't reported on
10 his lab report?
11    A  I don't.
12    Q  Did you make decisions like this for lab
13 reports routinely?
14    A  No.
15    Q  Okay. Why were -- why were you making that
16 decision this time?
17    A  Again, I can't remember this particular
18 exchange. If it was someone who I was communicating
19 with, then I would have been in the loop on these. And
20 in general my philosophy on all of this has been if
21 there's a question about a result, don't report it.
22    Q  Okay. And you also mention that the -- you
23 know, the lab director would know what the practice was.
24        Who was the lab director at this time? Was it
25 still Adam Rosendorff?

Page 239

1     A  I think so, but I'm not sure.
2     Q  So why wasn't he included on this e-mail
3  exchange?
4     A  I don't know. It looks like this was done as
5  what's being referred to as a technology demonstration.
6     Q  Was the lab director not involved in technology
7  demonstrations?
8     A  I don't know.
9     Q  Who would know whether that was the case?
10    A  Again, I would -- I would talk to Sunny.
11    Q  Do you know if the same kind of review -- which
12 is, you know, certain tests results are coming back too
13 high. Should we remove it, or should we keep it on? --
14 do you know if those types of conversations were taking
15 place within Theranos with respect to regular patient
16 testing?
17    A  They should have been, but I now know that we
18 had not effectively implemented our quality system.
19    Q  And who would have been managing that process,
20 reviewing patient results?
21    A  It was the job of the lab director and the
22 director of quality for the clinical lab.
23    Q  Okay. And who did they report to?
24    A  Functionally up to Sunny.
25    Q  Okay. Did you have any supervision, or did you

Page 240

1  have any responsibility for overseeing that part of the
2  business?
3     A  To the extent I'm the CEO of the company, I'm
4  responsible for the company. But, no, I was not engaged
5  in it.
6         MR. NEAL: Why don't we take a short break.
7  We've been going a little over an hour.
8         MS. CHAN: Sure.
9         THE VIDEOGRAPHER: This concludes Media No. 3
10 of Elizabeth Holmes. We're off the record at 3:46.
11        (A brief recess was taken.)
12        THE VIDEOGRAPHER: We are back on the record at
13 the beginning of Media No. 4 of Elizabeth Holmes. The
14 time is 4:03.
15        BY MS. CHAN:
16    Q  Ms. Holmes, did we have any substantive
17 conversations off the record during the break?
18    A  No.
19    Q  So I want to turn gears a little bit -- and you
20 can put that exhibit aside. And I want to change gears a
21 little bit and now focus on Theranos' relationship with
22 Walgreens.
23        So, you know, why don't you tell us from the
24 beginning sort of why Theranos was interested in engaging
25 with Walgreens and, conversely, what your understanding

Page 241

1  was of why Walgreens was interested in partnering with
2  Theranos.
3     A  Well, it evolved over a long period of time. We
4  were interested in partnering with Walgreens because of
5  the retail footprint. And we understood that they were
6  interested in partnering with us to bring lab services to
7  retail.
8     Q  Okay. So when did you first start discussions
9  with Walgreens?
10    A  I don't know specifically. I believe it was in
11 2010.
12    Q  Who were your contacts at Walgreens at that
13 time?
14    A  So it evolved over a period of time. Amongst
15 others, Jay Rosan and Wade Miquelon.
16    Q  And did it -- you said it evolved over time.
17 Were there others that entered the mix after 2010?
18    A  Yes.
19    Q  Who else were you in conversations with at
20 Walgreens after that date?
21    A  I know there was a team at Walgreens that was
22 dedicated to working with us, and we tried to put a team
23 in place on our side too.
24    Q  Who was the main Theranos contact at Walgreens
25 that you were working with? I'm talking about besides

SEC-TX-000005316

Page 302

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:          )
                           )  File No. SF-04030-A
THERANOS, INC.             )  Amended: 8/31/2017

WITNESS:   Elizabeth Holmes
PAGES:     302 through 578
PLACE:     Securities and Exchange Commission
           44 Montgomery Street, Suite 2600
           San Francisco, CA  94104
DATE:      Thursday, July 13, 2017

    The above entitled matter came on for hearing, pursuant to notice, at 9:04 a.m.

Diversified Reporting Services, Inc.
(202) 467 9200

|  | Page 303 |
|---|---|
| 1 | APPEARANCES: |
| 2 | |
| 3 | On behalf of the Securities and Exchange Commission: |
| 4 | JESSICA CHAN, ESQ. |
| 5 | RAHUL KOLHATKAR, ESQ. |
| 6 | MONIQUE WINKLER, ESQ. |
| 7 | MICHAEL FOLEY, CPA |
| 8 | JASON HABERMEYER, ESQ. |
| 9 | MARC KATZ, ESQ. |
| 10 | Securities and Exchange Commission |
| 11 | Division of Enforcement |
| 12 | 44 Montgomery Street, Suite 2600 |
| 13 | San Francisco, CA  94104 |
| 14 | (415) 705-2339 |
| 15 | |
| 16 | On behalf of the Witness: |
| 17 | STEPHEN NEAL, ESQ. |
| 18 | JOHN DWYER, ESQ. |
| 19 | ALEXANDRA LEEPER, ESQ. |
| 20 | Cooley LLP |
| 21 | 3175 Hanover Street |
| 22 | Palo Alto, California 94304 |
| 23 | (650) 843-5182 |
| 24 | |
| 25 | |

|  | Page 304 |
|---|---|
| 1 | APPEARANCES (CONT.): |
| 2 | |
| 3 | On behalf of Theranos, Inc.: |
| 4 | DAVID TAYLOR, ESQ. |
| 5 | General Counsel, Theranos, Inc. |
| 6 | 1701 Page Mill Road |
| 7 | Palo Alto, California 94304 |
| 8 | (650) 838-9292 |
| 9 | CHRIS DAVIES, ESQ. |
| 10 | WILLIAM MCLUCAS, ESQ. |
| 11 | WilmerHale LLP |
| 12 | 1875 Pennsylvania Avenue, NW |
| 13 | Washington DC 20006 |
| 14 | (202) 663-6187 |

|  | Page 305 |
|---|---|
| 1 | C O N T E N T S |
| 2 | |
| 3 | WITNESS:                      EXAMINATION |
| 4 | Elizabeth Holmes                   314 |
| 5 | |
| 6 | EXHIBITS:    DESCRIPTION          IDENTIFIED |
| 7 | 209    Subpoena                    316 |
| 8 |        (previously marked as 191) |
| 9 | 210    Background Questionnaire    316 |
| 10 |        dated July 2, 2017 |
| 11 |        (previously marked as 192) |
| 12 | 211    January 22, 2010, e-mail    316 |
| 13 |        with attachment from Danise |
| 14 |        Yam to Elizabeth Holmes with |
| 15 |        a subject line "For Tina." |
| 16 |        (Starting Bates No. |
| 17 |        THPFM0000690035) |
| 18 |        (previously marked as 193) |
| 19 | 212    Organizational Chart (Bates  316 |
| 20 |        No. TS0000001) |
| 21 |        (previously marked as 194) |

|  | Page 306 |
|---|---|
| 1 | C O N T E N T S (CONT.) |
| 2 | |
| 3 | EXHIBITS:    DESCRIPTION          IDENTIFIED |
| 4 | 213    Document entitled "Theranos  316 |
| 5 |        Confidential Summary |
| 6 |        Capitalization" (Starting |
| 7 |        Bates No. TS-000603) |
| 8 |        (previously marked as 195) |
| 9 | 214    Spreadsheet titled "Detailed  316 |
| 10 |        2917" (Starting Bates No. |
| 11 |        TS-0558077) |
| 12 |        (previously marked as 196) |
| 13 | 215    June 11, 2013, e-mail from    316 |
| 14 |        Sunny Balwani to Elizabeth |
| 15 |        Holmes, subject line |
| 16 |        "Forward: Demo next Tuesday |
| 17 |        6/11 at noon" (Starting |
| 18 |        Bates No. TS-0902539) |
| 19 |        (previously marked as 197) |

2 (Pages 303 to 306)

Page 307

| | C O N T E N T S (CONT.) | |
|---|---|---|
| EXHIBITS: | DESCRIPTION | IDENTIFIED |
| 216 | January 23, 2014, e-mail from Alberto Gutierrez to Elizabeth Holmes with various copy e-mails (Starting Bates No. TS-0469692) (previously marked as 198) | 316 |
| 217 | Theranos, Inc.'s responses and objections to plaintiff's first set of interrogatories filed in the Court of Chancery in the state of Delaware in Partner Investments LP v. Theranos, Inc. (Starting Bates No. SEC-PRM-E-0003430) (previously marked as 199) | 316 |

Page 308

| | C O N T E N T S (CONT.) | |
|---|---|---|
| EXHIBITS: | DESCRIPTION | IDENTIFIED |
| 218 | Theranos, Inc.'s first supplemental responses and objections to plaintiff's first set of interrogatories filed in the Court of Chancery in the state of Delaware in Partner Investments v. Theranos, Inc. (Starting Bates No. SEC-PRM-E-0005120) (previously marked as 200) | 316 |
| 219 | July 12, 2013, e-mail with attachments from Daniel Edlin to Daniel Young with a copy to Elizabeth Holmes. The subject line is "Re demo results for 7/11" (Starting Bates No. THPFM0000064613) | 342 |

Page 309

| | C O N T E N T S (CONT.) | |
|---|---|---|
| EXHIBITS: | DESCRIPTION | IDENTIFIED |
| 220 | May 6, 2014, e-mail with attachment from Sunny Balwani to Elizabeth Holmes, Subject "Forward: Final Deck" (Starting Bates No. THPFM0001558583) | 366 |
| 221 | Excel file of text messages (Starting Bates No. TS-1036239) | 376 |
| 222 | Handwritten notes dated December 10, 2014 (Starting Bates No. TS-0480486) | 383 |
| 223 | June 28, 2013, e-mail with attachment from Bob Gordon to Elizabeth Holmes and Sunny Balwani, Subject line "Safeway/Theranos Meeting 6/26/13" (Bates No. TS-0034026) | 394 |

Page 310

| | C O N T E N T S (CONT.) | |
|---|---|---|
| EXHIBITS: | DESCRIPTION | IDENTIFIED |
| 224 | May 1, 2014, e-mail from Sunny Balwani to Elizabeth Holmes, Subject line "Re Safeway/Theranos" (Starting Bates No. THPFM0001558606) | 404 |
| 225 | August 1, 2014, e-mail from Bob Gordon to Elizabeth Holmes, Subject line "Safeway/Theranos" (Bates No. TS-0046261) | 412 |
| 226 | Document titled "Theranos, Inc., FMV as common stock as of March 25, 2015"; Report date April 6th, 2015. (Starting Bates No. TS-0021981) | 451 |
| 227 | Document titled "Pro Forma Projected Statement of Income" (Starting Bates No. TS-0021911) | 464 |

SEC-TX-000005381

Page 311

| | | C O N T E N T S (CONT.) | |
|---|---|---|---|
| | EXHIBITS: | DESCRIPTION | IDENTIFIED |
| | 228 | Excel spreadsheet titled "Theranos Confidential Market Assumptions" (Starting Bates No. THER-2550987) | 511 |
| | 229 | Letter with Hyman, Phelps & McNamara letterhead dated November 26, 2013 addressed to Alberto Gutierrez (Starting Bates No. TS-0995690) | 527 |
| | 230 | Letter from the Department of Health and Human Services FDA to Brad Arington dated June 13, 2014 (Starting Bates No. TS-0992588) | 545 |
| | 231 | Teleconference meeting minutes between Theranos and FDA on June 19, 2014. It's a teleconference meeting (Starting Bates No. THER-0353763) | 553 |

Page 312

| | | C O N T E N T S (CONT.) | |
|---|---|---|---|
| | EXHIBITS: | DESCRIPTION | IDENTIFIED |
| | 232 | Letter from FDA to Brad Arington at Theranos dated October 28, 2014 (Starting Bates No. THER-0360329) | 566 |

Page 313

PROCEEDINGS

THE VIDEOGRAPHER: We are on the record at the beginning of Media No. 1, Volume II. My name is Patrick Murray contracted, by Hahn and Bowersock. Please begin.

MS. CHAN: We're on the record at 9:04 a.m. on July 13th, 2017. I'm Jessica Chan, and with me are Rahul Kolhatkar, Monique Winkler, Michael Foley, Jason Habermeyer, and not yet with us is Marc Katz. But we are officers of the Commission for the purposes of this proceeding.

We are today resuming the examination of Elizabeth Holmes, which was adjourned on July 11th, 2017. Would counsel please identify themselves?

MR. NEAL: Stephen Neal Cooley, LLP, on behalf of Elizabeth Holmes.

MR. DWYER: John Dwyer also for Cooley.

MR. TAYLOR: David Taylor of Theranos on behalf of Theranos.

MR. DAVIES: Chris Davies from Wilmer.

MR. MCLUCAS: Bill McLucas, Wilmer.

MS. LEEPER: Ali Leeper, Cooley.

MS. CHAN: Testimony today is pursuant to a commission subpoena which has previously been marked as Exhibit 191.

Page 314

Ms. Holmes, do you understand that you remain under oath?

MS. HOLMES: I do.

MS. CHAN: Let the record reflect that a copy of the formal order of investigation in this matter as supplemented will be available for examination during the course of this proceeding.

Whereupon,

ELIZABETH HOLMES

was recalled as a witness and, having been previously duly sworn, was examined and testified further as follows:

EXAMINATION

BY MS. CHAN:

Q   So before we get started, I wanted to give to you what was previously marked as Theranos Exhibits 191 to 200. I'll give these all to you. If you could just take a quick look, and just let me know if you recall that we went through these exhibits earlier in your testimony on Tuesday.

MR. KOLHATKAR: Just for the record, Counsel, we just have to remark because of a numbering error.

MR. DWYER: Okay. Thank you.

THE WITNESS: Yeah.

BY MS. CHAN:

Page 347

1  Q  Background in statistics and data analysis?
2  A  Yeah.
3  Q  And you hired him for this position, correct?
4  A  No. We hired him many years before as a
5  scientist and promoted him up within our organization
6  over time.
7  Q  So you promoted him to this position?
8  A  We promoted him into product development, and
9  ultimately Sunny decided to make him a lab director.
10 Q  But here as we're looking, July 2013, he was in
11 the role to make this decision because of you, correct?
12 A  I mean, again, I was the CEO of the company, so
13 I take responsibility for this company. I did not place
14 Daniel in this role. I did not directly oversee the
15 labs, but I tried to pick people who I trusted to do this
16 right. And --
17 Q  So who was overseeing Mr. Young at this time?
18 A  To the extent that he was engaged in anything
19 in the clinical lab operations, Adam Rosendorff was the
20 ultimate decision maker at the time he became clinical
21 lab director. I don't know when that was. And Sunny was
22 overseeing anything associated with operations in the
23 laboratory.
24 Q  But I don't see Sunny or Mr. Rosendorff on this
25 e-mail.

Page 348

1  A  I don't know.
2     BY MS. CHAN:
3  Q  Why didn't you include them on the e-mail?
4  A  Again, I -- I -- it's July of 2013. I read
5  this as a technology demo that was done in an R & D
6  setting prior to the lab going live.
7     BY MR. KOLHATKAR:
8  Q  And, I guess, what's the -- what was the
9  difference in your mind between the importance of results
10 in an R & D setting versus the importance of the results
11 in a CLIA setting?
12 A  I understand the results to be important across
13 the board. I believe there was a different process in
14 place once the lab went live for how decisions like this
15 were made based on the authority and discretion of the
16 lab director.
17 Q  I -- did you communicate a distinction for --
18 to the Walgreens folks receiving these demonstrations
19 that, that Theranos didn't have those SOPs in place at
20 this time?
21 A  I don't know.
22 Q  Did you tell anyone at Theranos to communicate
23 that to these folks at Walgreens?
24 A  I believe that Walgreens understood the lab
25 wasn't ready to go live yet because we hadn't gone live,

Page 349

1  and they were pushing us really hard to go live as soon
2  as possible. So they certainly knew we weren't
3  operational at that time. I don't know what else was
4  discussed or what the circumstance of this demo or, I
5  mean, frankly, I don't even know if this was for
6  Walgreens. I defer to you if you're saying it was.
7     BY MS. CHAN:
8  Q  Well, why don't you take a look at the
9  attachments. So the attachments include lab reports for
10 Mia Scholz and Alan Nielsen.
11    Does that ring a bell to you? Do those two
12 names sound familiar to you?
13 A  I generally recognize Nielsen's name. I don't
14 recognize Scholz.
15 Q  Who is Alan Nielsen?
16 A  I don't know.
17 Q  You don't know whether he's a Walgreens
18 executive or not?
19 A  I'm -- I'm not sure. I think so, but I'm not
20 sure.
21 Q  So instead of removing the results entirely,
22 why didn't you just instruct Daniel Young and Daniel
23 Edlin to just include the results but maybe either
24 indicate that it's out of range or just indicate that
25 they needed to re-draw for those results? Why not go

Page 350

1  that route?
2  A  Again, I'm not a laboratory. And we thought
3  the right thing to do, I believe, if there was a result
4  that was incorrect was not share the value. We thought
5  that was -- that was not proper.
6  Q  But you -- you must have known that Walgreens
7  would want to know that all of the tests that they
8  were -- that were being performed would be performed
9  correctly.
10    So why wouldn't you want to be as transparent
11 as possible and let them know, actually, there were some
12 issues with, it looks like, at least six results? So
13 what's your answer to that?
14 A  Again, the lab was not even live at this point
15 in time. I don't think they even came in with specific
16 test orders. I think that the team was picking tests to
17 do and made the decision that if test results were wrong,
18 they shouldn't be reported. I don't know anything
19 further than that.
20 Q  But isn't another reason why you wouldn't want
21 to include any indication that there were questions about
22 the results that had you put something like an
23 out-of-range result or, you know, needs re-draw, that
24 that would raise questions with Walgreens?
25 A  I mean, I'm speculating, but my guess is that

13 (Pages 347 to 350)

Page 375

1  with your understanding of the Walgreens contracts?
2      A   I don't know if we had worked out exactly.  As
3  we were collecting funds from people at retail, I think
4  Walgreens was collecting them, we hadn't yet created a
5  system where they were reimbursing Theranos for the
6  monies that they had collected.  We figured we'd work
7  that out over time.
8          I -- I don't know if we were following exactly
9  the labor and staffing model in the agreement.  We were
10 doing different things.  I think there was some instances
11 in which Theranos was actually doing the labor for
12 check-in even though we contemplated that that would
13 be Walgreens generally.  I'm sure there's probably
14 others.
15         BY MS. CHAN:
16     Q   I'm going to hand to you what's been marked
17 Theranos Exhibit 221, and unfortunately they are all
18 loose-leaf and not clipped.  Maybe we can clip this one.
19 It's not possible but --
20     A   No worries.
21     Q   -- if you can try to keep this together.
22         I'm handing to you what's been marked as
23 Theranos Exhibit 221.
24         MS. CHAN:  Here are copies for the two of you.
25         MR. DWYER:  Thank you.

Page 376

1          (SEC Exhibit No. 221 was marked for
2           identification.)
3          BY MS. CHAN:
4      Q   Exhibit 221 purports to be an Excel file that
5  includes a number of rows of font.  The starting Bates
6  number is TS-1036239.
7          Have you seen Exhibit 221 before?
8      A   I think I've seen some of the content in it.
9  I've never seen it like this.
10     Q   Does this -- I'll represent to you that these
11 are -- this is the file that Theranos provided to the SEC
12 pursuant to subpoena which is supposed to reflect the
13 text messages between you and Mr. Balwani on your
14 Theranos-issued cell phone.
15     A   Yep.
16     Q   Do you have any reason to believe that this
17 isn't a true collection of those text messages from your
18 work cell phone?
19     A   No.
20     Q   So if you turn to the page with Bates No.
21 1036292.
22         MR. NEAL:  62 what?
23         MS. CHAN:  6292.
24         BY MS. CHAN:
25     Q   Are you there?

Page 377

1      A   I am.
2      Q   Yours looks a little different from mine.
3      A   Maybe I'm --
4      Q   Are you on 6292?
5      A   Oh, I'm sorry.  I was on the wrong page.  Yeah,
6  got it.
7      Q   Okay.  So you'll see about five messages down
8  from the top, there's an SMS message on November 19th,
9  2014, and it appears to be from Sunny Balwani to
10 yourself.
11         Is this Sunny Balwani's e-mail address?  Do you
12 recognize it?  SunnyBalwani@mac.com?
13     A   I think so.
14     Q   And he says, "We can't scale with WAG."
15         And WAG you understand is Walgreens?
16     A   Yes.
17     Q   Okay.  And then in his next text message he
18 says, "They are terrible, and we need SWY and CVS."
19         Do you understand SWY to be Safeway?
20     A   Yes.
21     Q   And then you respond, "It is time.  Let's get
22 SWY done this week.  We can do it."
23         And then Mr. Balwani responds, "They told our
24 team in WAG meeting that they don't intend to open more
25 PSCs until July because we missed their IT integration

Page 378

1  deadline."
2          Do you see that?
3      A   I do.
4      Q   And PSC again is patient service centers?
5      A   Yes.
6      Q   So you were aware in November 2014 that
7  Walgreens wasn't looking to expand Theranos services to
8  any other stores; isn't that right?
9      A   Sitting here now reading this exchange, I don't
10 think I would have taken that as definitive that we
11 wouldn't be expanding.  If we thought there was an issue,
12 I would have called their CEO or president and said we
13 need to expand.
14     Q   So you didn't think, reading this, that there
15 was an issue?
16     A   Clearly I thought there was an issue because
17 we're talking about Safeway and CVS, but I wouldn't take
18 a comment made in a WAG meeting as indicative that we
19 wouldn't be expanding with Walgreens.
20     Q   Okay.  Did you do anything to contact anyone at
21 Walgreens about this issue, the fact that they raised in
22 a meeting that they wouldn't be looking to roll out
23 Theranos services in any additional stores?
24     A   I don't know.  I don't know.
25         BY MR. KOLHATKAR:

20 (Pages 375 to 378)

Page 487

1  certainly prior to '14, and I don't know what year it
2  was.
3       Q  Would 2011 sound right to you?
4       A  I wouldn't be surprised if it's wrong.
5       Q  You wouldn't be surprised if it's wrong?
6       A  Yeah.  I don't know.
7       Q  Okay.  So you don't know at all when you might
8  have received payments from the pharmaceutical companies?
9       A  When the last payments were?  I don't.  Again,
10 if you said 2011, I wouldn't doubt it.
11      Q  Who was responsible for those pharmaceutical
12 company relationships in this time frame, if there was
13 anyone?
14      A  So I don't know what this specifically is
15 referring to here.  If it was an assumption around the
16 pharmaceutical relationships that Walgreens had been
17 working to foster, then it would have been Walgreens'
18 relationships with pharma companies.
19         Otherwise, we had originally had a sales force
20 that had relationship with the pharma companies.  We then
21 get rid of that sales force and built a new one that was
22 retail-focused.  And had we reinstated those
23 relationships, we -- I don't know who we would have used.
24 Sunny would have made that suggestion because Kimberly
25 reported to him.

Page 488

1       Q  So you think that Sunny Balwani would have
2  known about the status of the pharmaceutical
3  relationships that Theranos had at this time?
4       A  I believe so.
5       Q  So it sounds like Sunny Balwani would have
6  known about the physicians' office contracts that
7  Theranos might have had, hospital system contracts, and
8  the pharmaceutical service contracts, and Sunny was also
9  involved in the Walgreens relationship and responsible
10 for that as well and that after a certain period of time,
11 he was also responsible for the Safeway relationship.
12         So what were you responsible for?
13      A  I was CEO of the company.  I, from a technology
14 perspective, was focused on inventions and named on a
15 large number of our patents.  I tried to contribute
16 creatively to technical issues when we were dealing with
17 technical issues that would require invention.
18         I was very focused on the restructure to become
19 a private company.  I was focused on our vision and our
20 strategy.  And I ultimately became very focused on
21 policy-related initiatives, like the law change in
22 Arizona and the work to try to build Medicare at lower
23 prices and the work to try to advocate for regulation of
24 LDTs.
25      Q  What was the last patent that you appeared on

Page 489

1  for Theranos?
2       A  I don't know.  I'm still writing memoranda of
3  invention right now.
4       Q  So if you turn back to the macro market
5  assumptions, which is the first page of the attachment,
6  you'll see there's a list of, it looks like, device cost.
7  So for 2014 the device cost is 40,000; for 2015, the
8  device cost is 35,000.
9          Do you see that?
10      A  I do.
11      Q  What do these costs depict?  What device are
12 these costs for?
13      A  I don't know.  Again, I didn't prepare this
14 document.  I'm not sure what these are referring to.
15      Q  Was this consistent with the cost for a TSPU or
16 a miniLab?
17      A  I don't know.
18         BY MR. KOLHATKAR:
19      Q  How much did it cost to manufacture a miniLab
20 in 2014?
21      A  I could -- I don't know.  I can tell you what
22 it is right now.  I don't know what it was then.
23      Q  How much did it cost to purchase a Siemens
24 ADVIA 1800 in 2014?
25      A  I don't know.  I would assume it was more than

Page 490

1  $40,000, but I don't know.
2       Q  Why do you make that assumption?
3       A  I just have general understanding that the
4  Siemens equipment was expensive.
5          BY MS. WINKLER:
6       Q  How did you gain that understanding?
7       A  Because we're trying to liquidate a lot of it
8  right now.  And I have generally been in touch with our
9  operations teams on how much money we can get from it.
10      Q  Did you know how expensive Siemens equipment
11 was back in 2014?
12      A  I probably didn't know the exact amount, no.
13      Q  Did you know that they were more expensive than
14 the cost to manufacture a TSPU in 2014?
15      A  Yes.
16      Q  And how did you know that back in 2014?
17      A  Because I was generally aware of the cost of
18 traditional lab equipment.
19         BY MR. KOLHATKAR:
20      Q  Can you think of any reason why the -- why the
21 cost for a TSPU would be relevant to Theranos'
22 projections for -- at the end of 2014?
23      A  I was -- I was just trying to look at that in
24 here.  I don't know if that was an assumption that we
25 were building a certain number of devices for R & D.  I

48 (Pages 487 to 490)

Page 579

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:           )
                            )  File No. SF-04030-A
THERANOS, INC.              )

WITNESS:  Elizabeth Holmes
PAGES:    579 through 869
PLACE:    Securities and Exchange Commission
          44 Montgomery Street, Suite 2600
          San Francisco, CA  94104
DATE:     Wednesday, August 23, 2017

   The above entitled matter came on for hearing, pursuant to notice, at 9:13 a.m.

Diversified Reporting Services, Inc.
(202) 467 9200

SEC-TX-000005499

Page 580

1  APPEARANCES:
2
3  On behalf of the Securities and Exchange Commission:
4      JESSICA CHAN, ESQ.
5      RAHUL KOLHATKAR, ESQ.
6      MONIQUE WINKLER, ESQ.
7      MICHAEL FOLEY, CPA
8      JASON HABERMEYER, ESQ.
9      Securities and Exchange Commission
10     Division of Enforcement
11     44 Montgomery Street, Suite 2600
12     San Francisco, CA 94104
13
14 On behalf of the Witness:
15     STEPHEN NEAL, ESQ.
16     JOHN DWYER, ESQ.
17     ALEXANDRA LEEPER, ESQ.
18     Cooley LLP
19     3175 Hanover Street
20     Palo Alto, California 94304
21     (650) 843-5182
22
23
24
25

Page 581

1  APPEARANCES (CONT.):
2
3  On behalf of Theranos, Inc.:
4      DAVID TAYLOR, ESQ.
5      General Counsel, Theranos, Inc.
6      1701 Page Mill Road
7      Palo Alto, California 94304
8      (650) 838-9292
9
10     CHRIS DAVIES, ESQ.
11     WILLIAM MCLUCAS, ESQ.
12     WilmerHale LLP
13     1875 Pennsylvania Avenue, NW
14     Washington DC 20006
15     (202) 663-6187
16
17
18
19
20
21
22
23
24
25

Page 582

1                C O N T E N T S
2
3  WITNESS:                        EXAMINATION
4  Elizabeth Holmes                    586
5
6  EXHIBITS:    DESCRIPTION           IDENTIFIED
7  261      Subpoena                      586
8  262      December 24, 2014, E-mail from   593
9           Brad Arington to Elizabeth
10          Holmes, copy to Sunny Balwani,
11          subject line "Re FYI" (Starting
12          Bates No. TS-099-7054)
13 263      Handwritten notes dated 12/23/14  595
14          and 12/24/14, entitled "Alberto
15          TC" (Starting Bates No.
16          THPFM0005528637)
17 264      September 23, 2014, E-mail from   628
18          Elizabeth Holmes to Sunny
19          Balwani with subject line "Re:
20          innovation payment letter"
21          (Starting Bates No.
22          THPFM0000696484)
23
24
25

Page 583

1             C O N T E N T S (CONT.)
2
3  EXHIBITS:    DESCRIPTION           IDENTIFIED
4  265      February 25, 2015, E-mail from    635
5           Sunny Balwani to Elizabeth
6           Holmes, Subject line "Forward:
7           Theranos, Walgreens, Boots
8           Alliance draft contract,"
9           (Starting Bates No.
10          THER-0982058), with two
11          attachments (Starting Bates Nos.
12          THER-0982059 and THER-0982095)
13 266      December 19, 2014, E-mail from    776
14          Elizabeth Holmes to Sunny
15          Balwani, Subject line "Forward
16          project test company overview
17          memo, version 025.PDF" (Starting
18          Bates No. THPFM0003891168), with
19          attachment (Starting Bates No.
20          THPFM0003891169)
21
22
23
24
25

2 (Pages 580 to 583)

Page 584

1            C O N T E N T S (CONT.)
2
3   EXHIBITS:    DESCRIPTION              IDENTIFIED
4   267         December 23, 2014, E-mail from      780
5               Byron Trott to Elizabeth Holmes,
6               with copy to Rob Verigan,
7               Genevieve Hovde, and John Dills,
8               Subject line "Re: follow-up to
9               our call" (Starting Bates No.
10              BDTSEC_PST0005074)

Page 585

1              P R O C E E D I N G S
2           THE VIDEOGRAPHER:  We are on the record,
3   Media 1, Volume III.
4           My name is Phillip Knowles.  I'm with
5   Veritext.
6           Please begin.
7           MS. CHAN:  We're on the record at 9:13 a.m. on
8   August 23rd, 2017.
9           I am Jessica Chan.
10          And with me are Rahul Kolhatkar, Michael
11  Foley, Jason Habermeyer, and Monique Winkler.
12          We are officers of the Commission for the
13  purposes of this proceeding.
14          We are today resuming the examination of
15  Elizabeth Holmes, which was adjourned on July 13th,
16  2017.
17          Would counsel please identify themselves.
18          MR. NEAL:  Stephen Neal, representing
19  Elizabeth Holmes.
20          MR. DWYER:  John Dwyer, also for Elizabeth
21  Holmes.
22          MR. TAYLOR:  David Taylor, Theranos.
23          MR. DAVIES:  Chris Davies from Wilmer.
24          MR. McLUCAS:  Bill McLucas from Wilmer.
25          MS. LEEPER:  Ali Leeper from Cooley.

Page 586

1           MS. CHAN:  Testimony today is pursuant to a
2   Commission subpoena, which has been marked as Exhibit
3   261.
4           (SEC Exhibit No. 261 was marked for
5           identification.)
6           MS. CHAN:  And I am handing a copy of Exhibit
7   261 to you now.
8           Ms. Holmes, are you appearing here today
9   pursuant to Exhibit 261?
10          MS. HOLMES:  Yes.
11          MS. CHAN:  You can put that aside.
12          Ms. Holmes, do you understand that you remain
13  under oath?
14          MS. HOLMES:  I do.
15          MS. CHAN:  Let the record reflect that a copy
16  of the formal order of investigation in this matter, as
17  supplemented, will be available for examination during
18  the course of this proceeding.
19  Whereupon,
20              ELIZABETH HOLMES
21  was recalled as a witness and, having been previously
22  duly sworn, was examined and testified further as
23  follows:
24              EXAMINATION
25  BY MS. CHAN:

Page 587

1    Q   Ms. Holmes, when was your last contact with
2   Sunny Balwani?
3    A   I think early this year, 2017.
4    Q   And how did you meet with him?
5    A   It wasn't a meeting.  I think I was running
6   the dish, and he was running it at the same time, and we
7   passed each other and said, "Hello."
8    Q   Was there any other substance to your
9   conversation with him?
10   A   I was walking with one of our investors, and I
11  just introduced him and said, "This is Mike Chang," who
12  was the investor.
13          And he said "Hello," and that was it.
14   Q   Who was Mike Chang?
15   A   One of our Series A investors.
16   Q   In Theranos?
17   A   Yes.
18   Q   Why were you meeting with Mr. Chang?
19   A   He's a close friend.  And we were taking a
20  walk on the dish.
21   Q   Did you talk with Mr. Chang about Theranos?
22   A   During that dish walk?
23   Q   Yes.
24   A   I'm trying to remember.
25          I think so.  Yes, I'm sure I did.

Page 856

1  Q   And then you write back and you say -- there
2  are question marks, and you say, "I was just think" -- I
3  think you meant "thinking" -- "about texting you in that
4  minute.  By the way, it's just hard to transition."
5       Do you see that?
6  A   Yeah.
7  Q   Do you recall why he was writing you about the
8  fact that he'd worked pretty hard for the company?
9  A   No.  I mean -- I don't.
10 Q   And then he writes back to you at 4:46 p.m.
11      He says, "I am responsible for everything at
12 Theranos.  All have been my decisions, too."
13      Do you see that?
14 A   I do.
15 Q   Did you agree that you and Mr. Balwani were
16 managing the company together and making decisions for
17 the company together?
18 A   Yeah.  I mean, we made him president of the
19 company.  And he wanted to run the company and run
20 operations.  And I let him do that.
21 Q   And then if you look down a few more text
22 messages, there's one that's sent by Mr. Balwani at 4:49
23 p.m.
24      And he says, "I'm not leaving until we break
25 even.  We will do this together, and I will be by

Page 857

1  yourself until then.  Can't leave like this."
2       What did you understand him to mean by that?
3       MR. NEAL:  Well, first of all, do you
4  remember?
5       THE WITNESS:  I don't.  I don't remember this
6  text exchange.
7       I'm just trying to read the text above it to
8  get context.
9       I mean, he's clearly talking about getting the
10 company to a point in which it's at break even.
11      I -- I don't know what else he means by that.
12      BY MS. CHAN:
13 Q   Okay.
14      And then at 4:51, he writes again.
15      He says, "And, yes, I do dislike the direction
16 you've taken with all this PR and all legal work and a
17 lot of other things."
18      Do you see that?
19 A   Yes.
20 Q   Were you aware that he disagreed with the PR
21 strategy that the company had taken at this time?
22 A   I'm -- I'm not sure that that's what that's
23 referring to.  I think that he had specific strong
24 disagreements with certain people on our team who were
25 advising us to do certain things on both the PR and

Page 858

1  legal side.
2  Q   Who -- who was he disagreeing with?
3  A   I mean, you'd need to talk to him about this.
4  Because I'll be guessing what he's referring to
5  specifically.  But -- but I -- I think you'd be able to
6  talk about it, you know.
7  Q   Okay.
8       You just said that you -- you thought that
9  this was referring to him disagreeing with others.
10      Who were you thinking of when you said that?
11 A   He -- he had disagreements with the general
12 counsel that I'd brought in, Heather.
13 Q   Anyone else?
14 A   Some of the teams that she'd put in place on
15 the PR and legal side.
16      (Reporter clarification.)
17      BY MS. CHAN:
18 Q   Then at 4:53 p.m., a few more text messages
19 down, he writes to you.
20      He says, "Things are different now.  We need
21 to get the business to break even.  And then I will
22 leave. We are different when it comes to business."
23      Did you agree that you and he had different
24 mindsets when it came to business strategy?
25 A   I don't know if it's business strategy.  We

Page 859

1  had different mindsets on how to run the company.
2  Q   Okay.
3       And what were those differences?
4  A   Just very different leadership styles,
5  management styles.
6  Q   Was there anything else that was different
7  about how you and he wanted to run the business?
8  A   I mean, we -- I'm sure many things.  I -- I
9  would need to sit here and try to come up with a list.
10      But we were just very different in how we
11 approach it.  And I -- I'm running the company very
12 differently now.
13      BY MR. KOLHATKAR:
14 Q   I think this was something you mentioned last
15 time, that you had a very different leadership style
16 than Mr. Balwani.
17      How would you describe Mr. Balwani's
18 leadership style?
19 A   He comes out of a pure tech sort of software
20 company environment, where there's very aggressive
21 schedules, very aggressive goals and, you know,
22 companies that have had a different sort of work
23 environment than the -- the kind of culture that -- that
24 I resonate with and I'm trying to build in the company
25 now.

71 (Pages 856 to 859)

SEC-TX-000005569