# Exhibit 5

MEMORANDUM OF INTERVIEW

| | | |
|---|---|---|
| CASE NUMBER | : | 2204323-MF |
| PERSON INTERVIEWED | : | David BOIES |
| PLACE OF INTERVIEW | : | USAO, N.D.Cal., San Francisco CA |
| DATE OF INTERVIEW | : | January 23, 2018 |
| TIME OF INTERVIEW | : | 10:05A |

On January 23, 2018, David Boies (BOIES) was interviewed at the United States Attorney's Office, Northern District of California, in San Francisco, CA. Participating in-person were AUSA's Jeffrey Schenk and John Bostic, SEC Attorneys Rahul Kolhatkar, Jessica Chan, and Monique Winkler, FBI Special Agents Mario Scussel and Cameron Purves, Postal Inspector Christopher McCollow, and myself. Present as attorneys for BOIES were Gregory J. Weingart and Tomas Renzo, of the law firm Munger, Tolles and Olson LLP. Present as counsel for Theranos were Christopher Davies and Thomas Strickland of the law firm WilmerHale.

Chan advised BOIES of the requirements of SEC Form 1662. Counsel for BOIES said he was familiar with it.

BOIES said he first became involved with Theranos in late 2010 or early 2011. John Phillips was an early Theranos investor and a friend of BOIES and his law partner Don Schiller. At that time, Phillips requested BOIES meet with Holmes in Palo Alto, which he did, but nothing immediately came of it. In the fall of 2011, BOIES and his firm represented Theranos in intellectual property claim against Fuisz that went to trial.

Following that case, BOIES had more general exposure to Theranos. Mike Underhill began reviewing Theranos's patent portfolio. At some point, BOIES began to attend Theranos Board meetings, probably three to four months after the Fuisz trial. After that trial, BOIES's firm represented Theranos in three to four small cases, including a trademark dispute with Becton Dickinson over the name "Nanotainer," and two to three other small cases.

In 2015, when the Wall Street Journal ("WSJ") began investigating, Theranos asked BOIES to work on that, and the work his firm did for Theranos increased considerably. In the summer (July, August, or September) of 2015, Theranos asked BOIES to be on the Board of Directors ("Board"). He agreed and joined the Board for the October 2015 meeting.

Prior to October, BOIES had "two hats" as a lawyer and investor in the company. Some of his investment came from an agreement by which his firm received half its fees in Theranos stock. They reached that agreement some time near the end of the Fuisz litigation, and it applied retroactively. From 2011 to 2016, BOIES's firm earned half its fees in cash and half in stock. The firm still holds stock in the company, but it no longer has the value it did at the time.

After starting as a Director in October 2015, BOIES continued to represent Theranos in a variety of legal matters, mostly related to the WSJ directly or indirectly, which continued until summer of 2016, when his involvement in the company somewhat lessened. BOIES stopped representing

1

US-REPORTS-0009314

Theranos in the beginning of September, during the U.S. Open Tennis tournament. BOIES stayed on the Board for some months after that, then left the Board.

BOIES had attended some Board meetings to report on the Fuisz trial, which was pretty important to the company. The Board then asked him to attend on a regular basis for general advice. Because it was a start-up company, it did not have a real general counsel's office. The Board was very distinguished, but did not have a lot of experience in technology. Company management thought it would be useful to have a lawyer attend Board meetings.

Prior to 2015, BOIES's firm billed Theranos for his time attending Board meetings as a lawyer, but not for his work as a member of the Board. BOIES received stock personally as compensation for his Board service.

Wilson Sonsini was the corporate lawyer for Theranos, but BOIES was usually the only lawyer at the Board meetings. BOIES represented the Theranos corporation, not Elizabeth Holmes (HOLMES) personally. There would have been an engagement letter between Theranos and his firm, BOIES is virtually certain there was because the firm requires them, but he was not one hundred percent certain, but the engagement letter may have been revised later.

It was "not usual" for BOIES's firm to be paid in stock. Usually, they do not get paid in stock, but when representing a start-up, it happens. For example, WebMD paid its fees that way. BOIES estimated his firm accepted stock in payment once or twice per year. In Theranos case, they were doing enough work they did not want to be paid entirely in stock, for cash flow reasons. BOIES could not remember how it came up. He believed Theranos had paid other vendors in stock, but not any lawyers that he was aware of. His firm started off billing Theranos normally, then later there was a question about applying the stock for fees agreement retroactively. BOIES himself did not care either way. When they first agreed to accept stock for fees, Theranos was issuing stock at $15 per share, if BOIES's recollection was correct. So they simply divided the fees owed by 15 and received that many shares. Later, when the stock price began to change, they took stock at whatever price it was at the time Theranos paid their legal bills. When stock was selling for less than $15 per share, during the period of the billing, they received stock at the lower price. They agreed to take the stock price at the time Theranos paid its bill, but Theranos was slow to pay its bills. When Theranos started selling stock at $17 per share, BOIES does not recall if his firm ever received stock at that price. There is still a multi-million dollar amount owed for fees which were supposed to have been paid in stock; but since the WSJ article came out, no-one has known the value of the stock. Theranos has paid for all the fees that were due in cash.

With respect to acquiring stock personally, he agreed to take monetary compensation for Board service in stock, and he received a stock option which he thinks he exercised for going to Board meetings prior to becoming a member. To encourage participation, the same option of a future interest in shares was given to Board members.

There were three periods of BOIES participation with the Board. One was reporting on the Fuisz litigation. The second was as a lawyer for Theranos who attended Board meetings. The third was as a member of the Board after mid-2015.

Board meetings were held four times per year. Board meetings were always held in California. After Theranos moved into the new offices, the Board meetings were always held there. Before that, meetings were held in different places. There was typically a Board dinner the night before a meeting. The following day, the Board would meet in the morning through early afternoon.

US-REPORTS-0009315

Board member attendance was "pretty good." Henry Kissinger attended by phone more than the others. BOIES attended some meetings by telephone. An agenda was prepared in advance. When they came to a meeting, Board members received a Board book containing the agenda and tabs. In general, Powerpoints presented at meetings were printed in the Board book, but sometimes the meeting included Powerpoints not printed in the book. BOIES did not get the Board books in advance, but sometimes he prepared to talk to the Board about a piece of litigation. He talked to HOLMES about the changes in corporate governance in advance of a Board meeting.

Because of the WSJ article, there was much more intense interest from the Board than before. The WSJ articles "consumed" company management, and also the Board. The response to the WSJ articles started slowly, as "undesirable, but not company-threatening," but eventually became "company-threatening."

Keeping minutes of Board meetings changed when the company brought in a general counsel. BOIES was "not one hundred percent sure" whether they were kept before. Heather King became the first general counsel before BOIES was on the Board, some time in the second or third quarter of 2015. BOIES did not go onto the Board until October 2015. Until that time, he was still doing legal work for the company, but his firm was doing much more than he was himself.

BOIES did not know HOLMES before John Phillips introduced them. They first met for the purpose of becoming a lawyer for Theranos (WilmerHale asserted Attorney Client Privilege to any further questions about the BOIES first meeting with HOLMES.) Their first meeting would have been months before he began representing Theranos in the Fuisz case in 2011.

Prior to the meeting, Phillips had conversation with BOIES and Flexner in which he said he was an early investor in a company with "very disruptive technology" that would disrupt incumbent companies who would "go after" Theranos, and Theranos would need "very good lawyers." BOIES went out to talk to HOLMES and nothing came of it.

BOIES had to understand the technology to litigate it. He also found out more about the technology at Board meetings through discussion. He learned the most through the Fuisz litigation and responding to the WSJ. In the middle period, he learned some about the technology, but did not add a lot to his understanding.

BOIES went on tours of the new Theranos facility and the Newark manufacturing facility where he could see "stuff work" but did not understand what it actually was.

BOIES spoke to HOLMES about the technology almost exclusively, but after the WSJ matter came up, BOIES talked to HOLMES and Sunny Balwani (BALWANI), and the Director of the Arizona lab. A young man came to a Board dinner to discuss the technology, but BOIES did not remember his name. BOIES continued to go to HOLMES to discuss technology because BALWANI did not seem to be as knowledgeable.

Between the time of the Fuisz patent litigation, and the WSJ investigation, BOIES believed the company was consistent about the underlying technology, but had shifted its implementation strategy. At first, the technology was intended to be machines placed in Safeways and doctor's offices, which would take Nanotainers and perhaps transfer information somehow. Then the strategy shifted into going into the laboratory business like Quest and LabCorp. Theranos would take the samples to their lab and process them, but using different technology than their

US-REPORTS-0009316

competitors. The plan to collect samples for a central lab site preceded the WSJ article, but shifted over time. The two approaches may have been parallel for some time, but shifted towards running a "discrete" lab.

Initially, the plan had been for the "box" or machine to do the testing and transmit data from within the machine, without the blood ever leaving the box. What tests could be done in the machine became a focus in 2015 before the WSJ article came out. Everybody on the Board knew that the very, very large number of blood tests that could be done on conventional machines would be "shifting" to Theranos technology over time. The Board was not focused on how many tests the Theranos technology could do. BOIES knew, the Board members knew, and everyone knew that some tests could be done on Theranos technology, some tests may never be. Some reagents and software had to be developed for other tests. The Board probably did not understand the science, but it did understand that tests had to be adapted to Theranos technology.

BOIES does not remember HOLMES ever saying some tests were not worth transferring to Theranos technology. The Board did not get into the nuts and bolts of the technology. Some Board materials listed tests and panels of tests Theranos technology could perform. The Company went back and forth a little on working on tests of particular interest in hospitals, because of the focus on putting machines into hospitals.

BOIES reviewed Exhibit 1, Bates THPFM0004657007.

BOIES would not be able to tell you how many tests run on the Edison versus commercial machines. While you could count the number of tests being done commercially, the number of tests being done in the laboratory would be harder to say because some tests are in different stages in R&D.

BOIES did discuss the number of tests performed in the CLIA lab with HOLMES because the number sometimes changed. The number never went down, theoretically it could have gone down, but BOIES is not aware of any time that happened. The WSJ article raised questions about whether some of the Theranos tests were working. BOIES would have learned more about test availability from his work on the WSJ article than from Board meetings. At the Board meetings, there were Powerpoints that listed tests and said "these are the tests they were able to do commercially" in a CLIA lab or for a hospital.

There were possible discussions of taking over the lab, and responsibility for doing lab work, for Cedars Sinai in Los Angeles, a major hospital. The discussions were very close to complete, but were derailed by the WSJ article. BALWANI was primarily responsible for the negotiation. BOIES strong recollection was the negotiations started before and continued after the WSJ article came out.

BOIES reviewed Exhibit 2, Bates TS-0024289-0024292.

This exhibit shows the kind of charts BOIES saw on Powerpoints at Board meetings listing various tests and panels of tests Theranos could do. Hospital-acquired infections were of particular interest. Exhibit 2 is something that might have been in a Board book for a meeting. The Board books always had more information than Powerpoints, but sometimes there were Powerpoints they viewed that were not in the Board books. BOIES usually left his Board books there. Sometimes he had them sent back to his office. Board members were always offered the option of having their Board books shipped to them.

4

US-REPORTS-0009317

BOIES reviewed Exhibit 2, Bates TS0024172

Ebola was discussed at more than one Board meeting. The Board thought the Theranos system could do what the slide says because that's what they were told. HOLMES said they could do it. BOIES certainly thought Theranos could. BOIES knows that the FDA did not give Theranos approval for its Ebola test. He does not personally know if Theranos can detect Ebola.

With respect to offering Ebola testing to governments, BOIES believed Theranos intended to offer the service to the government and other countries' governments, but it was not imminent. There was optimism that the FDA would approve the Ebola test. HOLMES always took the lead in discussions of Theranos technology, but BALWANI participated in discussion of the Ebola contracts.

BOIES talked to HOLMES and BALWANI about FDA submissions, although the company had separate FDA counsel. BOIES participated in calls with the FDA counsel regarding FDA jurisdiction, including possible jurisdiction over the nanotainer, but BOIES never contacted the FDA himself on behalf of Theranos.

BOIES reviewed Exhibit 2, Bates TS0024192

BOIES remembered discussion of precision of Theranos testing at Board meetings. He did not recall discussion of specific elements. The WSJ and another study raised issues later regarding sodium and perhaps potassium. The Company told the Board it did not believe the WSJ was accurate, basically saying they "can't see that" and "our data doesn't support that." HOLMES told the Board "We don't see what they're reporting" and speculated as to why the WSJ would have reported that.

BOIES reviewed Exhibit 2, Bates TS0024222

BOIES recalled the concept that Theranos Technology was cheaper and faster. He has also heard Theranos make claims regarding accuracy. The reference to "sensitivity" in the exhibit may mean accuracy. BOIES understood the greater "sensitivity" of Theranos tests may have come from the ability to do more frequent, multiple testing. Because Theranos test did not require as large a blood draw as conventional testing, patients may be more willing to get tested frequently. The advantage for any given test would be that the series of data points may give you better predictability. For example, on a PSA (prostate) test, an individual number does not tell you much, but a trend over time would be more diagnostic. Because Theranos tests were supposed to be faster, easier, and use less blood, it would be more practical to do finger pricks more often than venous draws, so patients would be more able to have a series of tests over time to see their progress. That is certainly something which HOLMES would have said during a Board meeting.

BOIES reviewed Exhibit 2, Bates TS0024238

BOIES did not recall any specific discussion of H1N1 at a Board meeting. He did remember discussing the concept that Theranos tests had greater accuracy than conventional tests, but he did not recall the specific tests described. He did not recall HOLMES ever saying that any specific test was less accurate than a commercially available test of the same type. HOLMES never said Quest was better than Theranos on any test.

5

US-REPORTS-0009318

BOIES reviewed Exhibit 2, Bates TS0024255

BOIES did recall HOLMES discussing FDA filings with the Board. BOIES knew that Theranos was making filings with the FDA to have tests approved. BOIES knew the Theranos Herpes test was approved by the FDA, and the plan was to have a series of tests approved. Once the Theranos system was approved for Herpes, it would be easier to get more Theranos tests approved by the FDA. BOIES did not recall discussions of which tests were submitted to the FDA. He remembered Herpes because it was approved. He remembered Ebola because there was a lot of discussion of it. BOIES's understanding was that FDA approval was the gold standard for testing. If Theranos had FDA approval and other labs did not, Theranos would be more competitive. BOIES did not recall if HOLMES ever used the word "voluntary" to describe FDA approval for Theranos test, but it was implicit in the claim that other companies did not have FDA approval.

BOIES recalled that the way FDA classified the Nanotainer determined how it had to be approved by the FDA. His understanding was that the FDA had accepted Theranos using the Nanotainer without requiring a certain approval previously, but then asserted Theranos needed that approval. BOIES did not think the type of Nanotainer used (indicated by different colored tops) was the reason FDA approval changed.

BOIES reviewed Exhibit 2, Bates TS0024256

BOIES definitely recalled discussion of proficiency testing (PT) with the Board. He did not recall what HOLMES said the PT scores were. BOIES learned from the WSJ article that there was a question about using split samples.

BOIES reviewed Exhibit 2, Bates TS0024267

BOIES did not think the Board understood the technology of the Theranos device well enough to distinguish device capabilities from Theranos trade secrets. BOIES can say HOLMES had an intense focus on confidentiality, almost paranoia that Quest and Labcorp would find out Theranos technology. HOLMES told the Board to keep everything as protected and confidential as possible. HOLMES certainly made the point to the Board of not discussing Theranos technology outside of the Board meetings.

HOLMES asked BOIES to speak to potential investors. The Company was raising money from wealthy investors around 2014, maybe into 2015. BOIES spoke to the representative of the investors, a lawyer, and another investor. BOIES's conversation with investors may have taken place in February 2015. BOIES also had conversations with his former partner Dan Mosely who was representing investors. BOIES had more than one conversation with Mosely, including after the WSJ article was published. Mosely ended up investing. Prior to the conversation, Mosely reached out to BOIES; BOIES asked HOLMES if he could talk to Mosely. Mosely represented Henry Kissinger. BOIES and Mosely discussed in general what Theranos did. BOIES told Mosley that he did not completely understand what the technology was, but that it seemed to be great technology. BOIES said he did not know if Theranos technology would be scalable, nobody knew that, but everybody who looked at the technology said it was great, and it would change healthcare if it does what Theranos says it does. BOIES told Mosely "If it works, it's great," but he did not want Mosely to invest based on BOIES saying it was great technology. BOIES did not try to say he had tested the technology.

6

US-REPORTS-0009319

BOIES was on a panel discussing dyslexia at Yale with Toby Cosgrove of the Cleveland Clinic. Cosgrove started talking about how great Theranos technology could be. Theranos would bring people out to their facility and sign them up to be on the science advisory committee. People who knew more about science than BOIES seemed to think the technology was impressive. BOIES told Mosely more generally if the technology works and is scalable, it is going to be a "game changer," and would change not just blood testing but how patients interact with medicine. This was especially true in the "third world" where they don't have hospitals. BOIES knew the company had talked to hospitals, he had seen a Powerpoint listing a whole series of hospitals they had talked to and wanted a contract. He was thinking of the potential hospital business when he talked to Mosely. HOLMES and BALWANI had told BOIES that hospitals had looked at the technology and approved of it. BOIES discussed scalability, not revenue, with Mosley. Mosely represented the Waltons.

BOIES also talked to a representative of a family investment group, possibly DeVos, probably not the Waltons, and not Oppenheimer, which did end up investing. HOLMES asked BOIES to talk to the investors, telling him, "they would like to talk to you." BOIES's conversation with that investor would have been less discursive than his conversation with Mosley, including how long he had been involved with Theranos and what he had learned about technology companies' plans. Based on prior experience, BOIES was especially concerned about scalability, meaning the company's ability to develop a new test that worked well in a lab, but could then be put in a machine and run by people who were not PhD's. BOIES's concern about scalability was not discussed at Board meetings, but came from his prior experience from litigating problems that arose from taking tests out of laboratories and having them executed by nurses and clinics.

BOIES did not tell the investors anything that was not already said about Theranos generally; their technology would be smaller, faster, and less intrusive than existing technology. Everyone talked about how impressive HOLMES was. People invest in start-ups because of who is there. BOIES did not recall HOLMES ever telling him what he could talk to the investors about. In general, HOLMES was "obsessive" about confidentiality and did not want Board members talking about the company at all. A lot of companies are like that. Press inquiries would be referred to the company. The general instruction he received on the Board was not to talk about the company. He would be surprised if any other members of the Board talked to investors.

BOIES "probably" gave some advice to Theranos about protecting trade secrets in the context of the Fuisz litigation and the intellectual property portfolio. Trade secrets came up regarding "George's Grandson's" conversations with the WSJ.

One potential investor wanted a commitment about exit strategy, an IPO or repurchase at formulaic prices, and did not invest. BOIES reviewed the materials shared with investors only at a later time. At the time he talked to potential investors, he did not generally understand what information had been shared with investors.

BOIES did not talk to potential investors about venous draws in February 2015, but it would not surprise him if he talked to Mosley about it because publication of the WSJ overlapped with their conversation. It was unlikely BOIES talked about Theranos using venous blood draws before the WSJ article was published. BOIES was virtually certain he did not discuss Theranos's use of third-party testing devices with potential investors in February 2015. Prior to the investigation by the WSJ, he would not have had any reason to discuss the use of other companies' testing equipment.

US-REPORTS-0009320

BOIES could not be certain, but thought he knew prior to February 2015 the Theranos lab in Arizona was drawing venous blood to run some tests on conventional testing machines. BOIES knew that the Arizona lab testing menu included tests which could not be performed on Theranos testing devices.

BOIES was not sure if he was aware of the Arizona lab or the WSJ investigation first. He did not think he would have known Theranos relied on other companies' testing equipment before the WSJ investigation. But he did know the lab in Arizona offered tests that Theranos technology was not ready to do, which required venous blood draws. He therefore understood the Arizona lab was using commercially available testing machines.

Theranos had two labs, one in California and one in Arizona. There was a time when patient samples were shipped to California from Walgreens stores in Arizona. BOIES knew that venous draws in Arizona were run on commercially available machines. Until the WSJ investigation, BOIES is certain he did not know Theranos used modified tests on commercially available equipment. BOIES could not remember for sure when Walgreens opened or when he was told what was happening in Arizona. There could have been a time when BOIES thought all the testing in Arizona was done on Theranos devices.

In the Palo Alto Walgreens, BOIES assumed all the testing was done on Theranos machines.

BOIES thought he believed that a fingerstick test always meant the test was run on Theranos devices. He did not know about the modified tests, but the fact of Theranos using venous draws was not sensitive information because "anybody who walked into Walgreens knew what they were doing."

BOIES's conversations with investors always focused not on business but on technology. Nobody asked about revenue. They only cared about the technology and the potential.

BOIES reviewed Exhibit 2, Bates TS0024288

BOIES did not recall this chart. He recalled each subject on the chart being discussed. He recalled discussing Wellness Centers with HOLMES but was not sure when. BOIES discussed venous blood draws with HOLMES with reference to the Arizona lab.

BOIES did not know what the exhibit meant regarding sensors. Going back many years, the first products Theranos had were sensors.

BOIES heard the term "Edison" for the first time in conjunction with the WSJ. He believed the Edison is now called the "Microlab, or something." The Theranos machine was originally the product the company intended to produce. It was going to go into doctors' offices and connect to Theranos over a network. BOIES did not know why the Board did not discuss the modified commercial machines Theranos used in the CLIA labs. The modified commercial machines may have been intended as an interim step to completing the Theranos machine. The modified commercial machine could have only been used in the CLIA lab. The Theranos machines were distributed devices like personal computers, as compared to a mainframe. BOIES speculated knowing how obsessive the company was about confidentiality, they may not have wanted anyone to know that commercially available machines could do what Theranos used them for. What Theranos had was the ability to use a small blood draw. Its competitors would "crush" it if they could catch up using commercially available machines.

8

US-REPORTS-0009321

"Why did Theranos go commercial with its lab service when it did?", was a good, obvious question for the Board. The Board did not discuss the decision to begin providing commercial service. "If Theranos had a box that was unique and innovative, why open up a commercial lab?", is a question everyone now wishes they had asked.

The shift from developing a box to opening a lab was explained to the board as a step that had to be taken to get Theranos technology into the field. Selling a box would have required FDA approval. Opening a CLIA lab did not. Theranos could open a lab quickly. Theranos management told the Board they were opening CLIA labs to begin using Theranos technology before it could sell the devices because Theranos could use the devices in the lab, but it could not put the devices in Walgreens for others to use. BOIES did not think the Board "really analyzed" the shift away from developing Theranos devices.

As soon as the Board focused on the nature of the operation in Arizona, the Board knew Theranos would not do everything there on proprietary Theranos devices, because they knew the Arizona lab was using venous blood draws. The Board did not focus on the Arizona operations because the labs were supposed to be a bridge or a waystation to getting Theranos technology "out there."

The Board was not composed of individuals who were likely to question the decision to open the CLIA labs. The Board had "enormous" confidence in HOLMES. The Board did not understand the Theranos technology. The Board thought HOLMES did understand the Theranos technology. HOLMES was a charismatic, intelligent, hard-working individual who owned the company. HOLMES did not try to discourage the Board from questioning management. The balance of the Board led to deferring to her naturally. Prior to 2015, nobody on the Board challenged or criticized HOLMES. The Board was eminent, but not necessarily activist. BOIES "sort of" gave advice regarding the Board's duties.

The Board got presentations that said Theranos technology worked, they saw the machine turned on and things put in it. People came to Theranos and got tested (BOIES did not get tested by Theranos himself). When members of the Board got tested, Theranos employees narrated what happened, employees from the lab portion of the HQ building explained the machine was taking the nanotainer, taking blood out, spinning the blood around. BOIES did not recall the name of the employee who described the operation of the Theranos device. HOLMES did not describe the device herself. BOIES saw the box in the conference room of the Theranos building. He never saw one outside the Theranos building. Governor Brown came to the Theranos building, pricked his finger, and put it in the nanotainer; they were not able to test his blood right there with the machine, BOIES was not sure why. Other Board members told BOIES they had been tested on the Theranos machine, but he did not observe the testing. BOIES himself encouraged reporters to come get tested on the Theranos machine.

BOIES toured the Theranos production facility and received a demonstration of how the engineering worked. At that time, there were two kinds of machines, the box, and a high throughput machine that did several tests at the same time. There were banks of machines at the HQ building, a number of them lined up together. On one of the tours for the Board, HOLMES walked the Board room to room, and introduced an employee in each room, for example, the reagent room, who explained what went on there.

BOIES reviewed Exhibit 2, Bates TS0024293

US-REPORTS-0009322

TPSU was a fingerstick test in this time frame, and BOIES would not have thought of Theranos systems as involving third party equipment or venous blood draws.

BOIES reviewed Exhibit 2, Bates TS0024340

Theranos technology was described as able and capable, not as theoretically capable but not there yet. BOIES did not think anybody on the Board thought in 2014 that Theranos technology was able to perform "any" test. The Board did not ask whether it made sense to go into Walgreens now, a year from now, or two years from now. HOLMES clearly discussed and conveyed that Theranos technology was capable of being used to perform "any" lab test. She did not say they were not doing it yet or would not be able to do it for five years. Prior to the Arizona lab, BOIES was not sure the Board knew how many tests were run on Theranos technology, and he is not sure the Board asked.

BOIES reviewed Exhibit 2, Bates TS0024343-344

BOIES was not sure he had seen this specific chart, but had "certainly" seen charts which he believed represented tests which could be performed on Theranos technology. BOIES believed the chart he saw was found at Bates 289-290.

BOIES reviewed Exhibit 3, Bates TS0024478

This may be a document received from Aranca. There were sometimes Aranca documents in Board books. BOIES did not think he had seen this exhibit before. Theranos retained Arance because, like a lot of companies, Theranos gave people stock options. There is a tax advantage if a stock option is given at then-current market price. The directors are supposed to make a determination under 409(a) safe harbor if an evaluator does a forecast. BOIES gave advice to Theranos concerning the use of Aranca forecast for 409 purposes.

BOIES reviewed Exhibit 4

This exhibit is an example of the kind of thing that would have been on a Powerpoint presented at a Board meeting.

BOIES reviewed Exhibit 4, Bates THER0336847

Theranos DoD strategy meant the DoD use of Theranos technology in remote locations. Theranos technology was very well-suited for military locations where they did not have hospitals. Certainly HOLMES would have been the person discussing military strategy with the Board, and there were 2, 3, or 4 military people on the Board who could also discuss it. BOIES understood that bureaucratic issues were holding up the use of Theranos technology in the military, but that it would be "great."

BOIES reviewed Exhibit 4, Bates THER0336848

The high throughput machine BOIES saw was about six times as big as the regular Theranos device.

10

US-REPORTS-0009323

BOIES reviewed Exhibit 4, Bates THER0336849

BOIES is not sure if this exhibit represents the cartridge used by the Theranos device, or something Theranos would have put the Nanotainer into. BOIES did not remember any reference to urine testing. BOIES was not sure, but thought 75 tests was more than the Theranos technology could perform. He believed the number was somewhere in the fifties, not the seventies.

BOIES reviewed Exhibit 4, Bates THER0336852

BOIES did not recall seeing this specific chart. It looked like the kind of thing he had seen, but was not sure if he had seen this one. The Board saw a number of charts that listed tests that could be performed. He did not recall if he had seen this one.

BOIES reviewed Exhibit 4, Bates THER0336856

BOIES recalled 2013 goals, he did not recall 2012 goals. BOIES did not recall if Theranos needed money to fund its business at that time. It probably did, but he could not recall. Theranos did want money to swap out the shareholder base, they wanted a smaller number of larger investors, and they wanted to give early investors an out but they also wanted to stay private. There was a lot of discussion of bringing in new capital to buy out the early investors. BOIES had the impression the company was cash flow positive based on the discussion of working with pharmaceutical companies. Later, BOIES believed the company had revenue from the lab in Arizona, which Theranos opened to establish market share to occupy the field of lab testing.

BOIES's firm did not have an exit strategy for the shares it owned. BOIES believed in the company and thought it had a chance to be a long term success. BOIES put his shares in a trust for his children.

BOIES never saw financial statements. The projections he did see were more ambiguous than he expected. He thought the company had more continuous revenues, and he expected to see revenue from Walgreens and Safeway probably in 2015. BOIES was surprised when he discovered the lab in Arizona had not developed more revenue for the company.

BOIES reviewed Exhibit 5, Bates SEC-FRISTW-E-0000656

BOIES recalled being asked if he was comfortable with this statement going out. The statement dropped the words "accurate" and "reliable" because Theranos had to get out the word that there were substantial tests showing Theranos technology was accurate. Third party tests showed variances with Quest, LabCorp, and reference labs. You can't be sure every test is accurate. Quest and Labcorp are not accurate every time, they invalidate many tests every year. But Theranos management did not want to disclose results of tests. Theranos testing was not transparent.

BOIES reviewed Exhibit 5, Bates SEC-FRISTW-E-0000652

As part of a presentation to a conference in August 2016, and only to a limited extent, Theranos published some test results. BOIES was not satisfied because he thought four party testing (testing the same samples with Theranos technology, Quest, LabCorp, and reference labs) was the only way to resolve the doubts about the reliability of Theranos technology. Theranos

US-REPORTS-0009324

management said they were going to do that in 2015, but one thing after another prevented them from releasing the results. Management said the four party testing had started, but was held up by a confidentiality agreement or something. According to WSJ reporter John Carreyrou, Theranos still says to this date that they are planning to release four party test results.

BOIES reviewed Exhibit 5, Bates SEC-FRISTW-E-0000650

Theranos Board member former Secretary of Defense William Perry's problem was that things were not moving fast enough to counter the media reports questioning the reliability of Theranos technology. Perry wanted independent tests, or to ship the Theranos box out to an independent lab to confirm its capabilities. BOIES did not advocate for independent testing of Theranos technology because Quest and LabCorp will all return different results. With four party testing, the public would be able to see that Theranos was as reliable as the incumbent lab service providers.

BOIES did not receive any information in his capacity as a Board member that led him to conclude that Theranos tests were unreliable – except for the fact that he could never get any proof of their reliability.

Perry favored shipping the Theranos machine off for testing. BOIES favored four party testing. Neither approach was done while BOIES was affiliated with Theranos, which lasted until February 2017.

BOIES reviewed Exhibit 6

Theranos management told the Board that in addition to "stuff" they had already been presented, there was deeper data of the reliability of the Theranos technology tests done commercially. Theranos had to get out that the tests they were selling to the public were accurate.

On the exhibit, where HOLMES says testing was "reviewed with the Board at every meeting," BOIES believed she was referring to Proficiency Testing. BOIES thought Theranos technology proficiency testing would be published in a peer reviewed journal.

BOIES reviewed Exhibit 7

BOIES recommended caution in making the proposed statement to the public because nobody is perfect, but if Theranos staked out ground it could not sustain, it would cost the organization credibility when they had very little credibility left. The WSJ article was not very balanced, but they had facts and sources the Theranos board was not aware of.

BOIES firm recorded and transcribed Theranos interactions with WSJ reporters. Before the first article came out in the WSJ, the relationship between the paper and Theranos was extremely adversarial. The WSJ reporter started out asking extremely personal questions about whether Holmes was raped in college. BOIES did not think the article was an objective piece, and he wanted to be sure his firm's statements to the paper were not misconstrued. BOIES told a WSJ reporter the Theranos device was accurate, and offered to bring a device for testing. BOIES believed the device was accurate, and he was arguing the case to the WSJ. BOIES was vouching for Theranos. If he did not think the device was accurate, he would not have suggested the reporter test it, or have taken half his fees in company stock. BOIES's belief that

US-REPORTS-0009325

Theranos technology was accurate was based on what he heard in Board meetings, seeing reports and data provided by the company, the fact of 3 million tests performed in Arizona and doctors and other health professionals sending patients back to Theranos for testing.

Nobody told BOIES in advance that he could offer the WSJ reporter a chance to test the device, He thought the best way of defending the reliability of the device would be independent testing. He wanted it to happen. He urged Theranos management to do that. The message he received from Theranos management was that it would happen. But it took too long.

Theranos management asked somebody from the company to come to a Board dinner to talk about the status of third party testing. That representative told the Board that there were problems releasing the results because some party was not given the right confidentiality documents, something about testing protocols, or that Non-Disclosure Agreements were needed.

BOIES talked to HOLMES about lawyers coming to George Shultz's house.

BOIES had never been present when HOLMES talked to investors or potential investors. At a conference in Aspen in September 2015, HOLMES was on a panel, and BOIES was present. The conference may have been the Forstmann Little Conference or the Charlie Rose Weekend on the subject of politics, economics, technology and national security. HOLMES said Theranos used a "tiny sample" of blood, was cheaper, faster, and more reliable than existing technology. HOLMES's presentation was not anything new. HOLMES is a "very effective" presenter, her story was that this technology is going to change medical technology. HOLMES did not talk about third party testing equipment, and BOIES is "virtually certain" she did not mention using venous blood draws.

BOIES and HOLMES were both at Henry Kissinger's 90th Birthday Party in New York. They were also both at a conference in September 2014 with George Schultz.

BOIES never heard HOLMES say Theranos had audited financials at a board meeting. Maybe she said Theranos previously had audited financials in the past, but she was clear that the current financials were not audited after the WSJ article came out in 2016.

BOIES never heard BALWANI speak outside a Board dinner or meeting.

BOIES did not explicitly hear HOLMES say Johns Hopkins validated Theranos technology. He has seen references to Johns Hopkins in some materials, which also referred to Walgreens, Safeway, and a hospital chain, which may have been Cedars Sinai, having examined Theranos technology before partnering with the company.

BOIES encouraged reporters to try Theranos technology after the WSJ article came out. He participated in an interview on CBS Morning News in which he invited the camera to come out and get tested. Prior to the WSJ article, all press, except for one piece in the New Yorker, about Theranos had been favorable. The first Fortune piece started out being about the Fuisz litigation, and interviewed BOIES. He later told HOLMES the author of the Fortune article was a good reporter, and she should cooperate with the story. After the first Fortune story, BOIES talked to Holmes about the danger of overexposure at this stage of the company's growth. "Why did Holmes embrace the press?" Probably driven more by the press than the company. When the press is saying nice things, it is hard to shut them out. There was more press pursuing Theranos than Theranos pursuing press.

13

US-REPORTS-0009326

HOLMES gave the Board regular reports about cash they had beginning in 2016. Previously, nobody thought they had a problem. At the end of 2013, BOIES was not aware Theranos was running out of cash. What he knew is that Theranos was restructuring shareholders.

Regarding the Board resolution that gave HOLMES supermajority voting rights, BOIES did not know whose idea that was. The Delaware office of Wilson Sonsini worked on it. BOIES did not participate in that legal work.

BOIES's firm represented Theranos in addressing the people mentioned in the WSJ article, including doctors and patients with complaints about Theranos services. The firm got affidavits from both doctors and patients, people who had blood tested and their health care professionals, named in the WSJ article.

Regarding the Arizona Attorney General investigation, BOIES did not know who contacted the individuals. BOIES did not think his firm ever used investigators in that case. Theranos may have contacted them directly, but they probably left the decision to the firm about the best way to contact them.

Matthew Norfleet
Postal Inspector
U.S. Postal Inspection Service

Date prepared: March 29, 2018

14

US-REPORTS-0009327