STEPHANIE M. HINDS (CABN 154284)
Attorney for the United States,
Acting Under Authority Conferred By 28 U.S.C. § 515

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

JEFF SCHENK (CABN 234355)
JOHN C. BOSTIC (CABN 264367)
ROBERT S. LEACH (CABN 196191)
VANESSA BAEHR-JONES (CABN 281715)
Assistant United States Attorneys

150 Almaden Boulevard, Suite 900
San Jose, California 95113
Telephone: (408) 535-5589
Fax: (408) 535-5066
john.bostic@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ELIZABETH HOLMES and RAMESH "SUNNY" BALWANI,<br><br>Defendants. | Case No. 18-CR-00258 EJD<br><br>UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION IN LIMINE TO EXCLUDE EXPERT OPINION TESTIMONY OF FACT/PERCIPIENT WITNESSES [ECF No. 561]<br><br>Date: March 23, 2021<br>Time: 10:00 a.m.<br>Court: Hon. Edward J. Davila |

## INTRODUCTION & FACTUAL BACKGROUND

The Third Superseding Indictment alleges that Defendant engaged in a scheme to defraud patients who relied on Theranos's blood testing services. Defendant and her agents held out Theranos's tests as sufficiently accurate and reliable for use in the clinical setting. Defendant knew, however, that Theranos's tests suffered from a range of reliability problems that rendered them unsuitable for medical use. Patients became victims of Defendant's fraud when they paid her company for tests they believed to be accurate, but received something else. At trial, the government will present testimony from several of those patient victims. Along with patient testimony, the government plans to present testimony from treating physicians. Such testimony will be an essential part of the government's proof at trial because those physicians are qualified and equipped to deliver reliable opinions that certain Theranos test results were demonstrably incorrect.

Defendant seeks to exclude this testimony from Physicians, objecting to the admission of any accuracy evidence not based on a large statistical study. Defendant, however, fails to cite any authority for the proposition that testimony from individual victims is irrelevant or prejudicial. The opinions offered by the doctor witnesses identified by the government is reliable because it is based on their extensive education and experience, and guided by the application of the medical judgment based on the same standards they apply in their practices. The Court should exercise its significant discretion in this area and permit expert testimony that will be helpful to the jury as they consider whether Theranos's customers were defrauded.

Defendant also argues that the government has not yet disclosed certain facts forming the bases of these witnesses' opinions. The government has provided the defense with the information that it has received from the designated witnesses, but is working to collect the additional details requested by Defendant. The government intends to supplement its disclosure as soon as it obtains the necessary information from its witnesses, who are assisting the government voluntarily. The government believes this supplemental disclosure can be completed soon enough to avoid prejudicing the defense in connection with the July trial date.

/ /

## ARGUMENT

### I. The Test for Admissibility of Expert Opinions is Flexible

As the Ninth Circuit has noted, the Supreme Court's reliability test for expert testimony is "flexible." *United States v. Lopez-Martinez*, 543 F.3d 509, 514 (9th Cir. 2008). "[T]he law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* Notably, neither the Supreme Court nor the Ninth Circuit requires a formal *Daubert* hearing before admission of expert testimony. *Id.*

In this case, Defendant's complaint about the lack of a formal and detailed methodology underlying the experts' opinions is based on an overly rigid and formulaic approach to expert qualification. *See Adams v. Lab. Corp. of Am.*, 760 F.3d 1322, 1331 (11th Cir. 2014) (an expert's methodology can consist of "the application of [medical] knowledge," and "whether her approach is called a 'methodology' or simply 'application of professional judgment' does not matter" as long as there is an appropriate reliability inquiry).

Even in the medical context, courts should not place excessive weight on demanding a detailed and rigorous methodology where the situation does not call for it. In *Davis v. United States*, for example, the Eighth Circuit approved of expert testimony by a public health officer investigator regarding the probability of transmitting gonorrhea. *Davis v. United States*, 865 F.2d 164, 168 (8th Cir.1988). While that expert lacked any formal medical training, the Eight Circuit noted, he had practical experience, having investigated and managed cases involving sexually-transmitted diseases for more than eight years. *Id.* Additionally, he had received specialized training through the Centers for Disease Control and testified that he reads current information in his field as time permits. *Id.* That expert's approach to answering the question was "based on his practical experience and was corroborated by literature on the subject," according to his testimony. *Id.* at 167. He admitted that he "had not made any systematic study," but the court noted that his testimony was based on "personal observation of hundreds of cases" and was "substantiated by his reading of a recognized medical treatise." *Id.*

The cases cited in Defendant's motion are inapposite because they involve expert opinions that

are inherently more complex or esoteric than those at issue here. For example, in *Vollrath*, the Ninth Circuit considered expert testimony in an anti-trust case addressing whether a certain steamer qualified as its own market distinct from other products. *Vollrath Co. v. Sammi Corp.*, 9 F.3d 1455, 1462 (9th Cir. 1993). The court in that case criticized the expert's conclusion that the products could be considered a market of their on "in a sense," where that conclusion was "hardly firm" and was based on limited anecdotal evidence rather than a "detailed examination of market data." *Id.* *Velazquez* involved a labor dispute and a study seeking to determine work conditions at the time of the plaintiffs' employment. *Velazquez v. Costco Wholesale Corp.*, 2012 WL 13059928, *2 (C.D. Cal. Oct. 12, 2012). *Casey v. Ohio Medical Products*, cited by Defendant, involves the medical field, but deals with testimony addressing causation in a product liability case where the expert's opinion was based solely on a case study that did not clearly support his position. *Casey v. Ohio Med. Prod.*, 877 F. Supp. 1380, 1384 (N.D. Cal. 1995). None of these cases is instructive here, where qualified physicians are prepared to render straightforward opinions that their patients' test results could not have been accurate.

## II. Evidence Showing that Patients Received Inaccurate Test Results from Theranos is Relevant and Admissible

Much of Defendant's motion is devoted to arguing that the experts noticed by the government lack a sufficient basis to offer opinions on the general accuracy and reliability of Theranos tests. Similarly, Defendant contends that those experts' experience interpreting laboratory results does not qualify them to opine on how a laboratory conducts its tests, how lab technology performed, what a laboratory should have known or done, or the cause of any incorrect test result. (Mot. at 13-14). These arguments by Defendant miss the thrust of the government's disclosure. The government does not intend to introduce opinions from its listed experts regarding the overall accuracy of Theranos tests or the explanations for incorrect results. Instead, the doctors on the government's expert list will be called primarily as fact witnesses to testify about their experiences reviewing certain results from Theranos in connection with patients under their care. Their testimony—factual and opinion—will be limited to the specific results their patients received from Theranos. To the extent their testimony has an expert component, it will generally address two goals: (1) to provide the jury with the background information it needs to understand the use and significance of the assays being discussed, and (2) to explain why the

witnesses believe that certain test results their patients received from Theranos could not be accurate.

The fraud charges in this case stem from two related but independent schemes to defraud devised and carried out by Defendants. The first scheme targeted investors in Theranos, who were tricked into believing that the company had perfected a novel technology that could conduct the full range of clinical blood tests and produce reliable results from a finger-stick sample. Among numerous other deceptions, Defendants concealed from those investors the accuracy and reliability problems that plagued Theranos's proprietary tests. When these deceived investors gave Theranos large sums of money in exchange for equity in the company, they became victims of Defendants' fraud. In Defendant's second scheme to defraud, they targeted medical patients as customers of Theranos, misleading those individuals into believing that Theranos's tests were accurate and reliable enough to be relied upon in clinical treatment. When those individuals were induced to pay for Theranos tests they had been led to believe were accurate and reliable, but received results that were unreliable—and in many cases demonstrably incorrect—they were defrauded.

Defendants have already tried to invalidate the government's theory of fraud against patients, arguing that Indictment did not alleged that any patient received an inaccurate test result. See ECF No. 206 at 6. Those attempts failed. Defendant has now pivoted to an attempt to block the jury from hearing about victims of Defendant's fraud who received provably inaccurate results. Defendant's lawyers previously admitted that testimony from doctor witnesses could play an important and legitimate role at trial. As the Court knows, Defendants have made multiple attempts to remove from the Indictment allegations about Theranos's interactions with doctors. At the February 10, 2020 hearing on Defendant's first round of motions to dismiss, counsel for Holmes clarified that their complaints about the Indictment were "not about why [doctors] are relevant to the case." (Feb. 10, 2020 Transcript at 104:23-24). Defense counsel then conceded that, if Holmes "were moving in limine to exclude all reference to doctors, we would, of course, lose that motion." (*Id*. at 104:24-105:1). In August of 2020, Defendant moved again to remove references to doctors from the Indictment in this case. In opposing that motion, the government predicted that the defense seemed to be positioning itself for a motion to curtail or exclude evidence of doctors' experiences with Theranos tests. (ECF No. 520 at 10).

Defendant's pending motion, if granted, will have just that effect—excising from doctors' testimony critical proof that Theranos delivered inaccurate tests to patient victims.  The Court should deny Defendant's request.

Defendant argues that the expert opinions at issue are based on too small a dataset—sometimes limited to a single patient.  Defendant repeatedly uses the term "anecdotal" in a pejorative sense, insisting that the government's witnesses cannot rely on their experiences to render "opinions about the general accuracy and reliability of Theranos's tests."  (Mot. at 9).  This argument mischaracterizes the nature and scope of the witnesses' opinions.  The government does not anticipate that any of the medical professionals will opine that Theranos's tests were inaccurate across the board or suffered from widespread problems.  Instead, each doctor is expected to testify only about his or her individual experience with Theranos test results.  If a doctor's testimony focuses on the experience of a single patient who was tested by Theranos, that doctor will not render opinions about the accuracy of Theranos's tests beyond that one patient's results.

For example, Dr. Mark Burnes is prepared to testify about a patient of his who received a prostate specific antigen (PSA) test result from Theranos that would be strongly indicative of an aggressive form of prostate cancer.  See Def.'s Ex. 5 at 6.  That patient had previously tested at a level 2 for PSA, but one year later received a PSA result of 26 from Theranos.  Dr. Burnes will testify based on his education and extensive experience with PSA tests and related medical conditions, that such a large jump in PSA value could not be explained by prostatitis or another biological event.  Dr. Burnes will also testify that the same patient received a second Theranos test shortly thereafter, which returned a value of 1.71, then a third Theranos test soon after that which yielded a PSA level of 22.8.  Dr. Burnes will explain to the jury that, based on his education and medical experience, there is no biological explanation for such large jumps in PSA values.  Nor is there a medical explanation for a drop from 26 to 1.71 over such a short time period.  Because Dr. Burnes is confident that the PSA values reported by Theranos could not have reflected his patient's true PSA levels, and because he is qualified to make that assessment, his testimony will constitute probative evidence of inaccurate test results—in this case, multiple inaccurate results going to the same customer.  Although Dr. Burnes's conclusions are not the

result of a formalized study, they are grounded in his specialized training and the application of his medical judgment, rendering them reliable. *See Davis v. United States*, 865 F.2d 164, 168 (8th Cir.1988).

Defendant maintains that individual patient experiences are not relevant, but cites no authority establishing such a rule in this kind of fraud case. Indeed, accounts like Dr. Burnes' are relevant and admissible to show that Theranos's tests produced inaccurate results which were then reported back to the company. Defendant suggests that accuracy-related evidence is reliable only if based on a large survey of a large dataset of Theranos tests that could determine the overall error rate in the company's testing and compare it with competitors in the industry. But this wire fraud case turns on Defendant's intent and the falsity of her representations, not industry standards. The jury must determine whether Defendant had the intent to deceive and cheat patients when she held out Theranos's tests as accurate and reliable despite knowing about problems with their accuracy and reliability. Inaccurate results are probative of that determination.[1]

**III. Medical Practitioners Should Be Permitted to Testify About the Purpose and Significance of the Tests in Question**

In the course of testifying about their patients' experiences with certain Theranos blood tests, medical professionals will define those tests and state in general terms what those tests measure. They will likewise provide the jury with background information regarding their own experience with the relevant tests, explaining how they use those tests in their treatment of patients. Finally, they will explain the meaning of test results, differentiating between healthy results and concerning results and describing the significance of results that raise red flags. Defendant is quick to characterize such topics as unhelpful and inflammatory, but this testimony is important for at least two reasons.

First, this testimony will demonstrate that a medical professional is familiar with a given assay, and therefore qualified to speak about the significance and reliability of specific test results. As discussed above, Defendant's substantive complaints go not to the admissibility of the challenged

[1] Moreover, Defendant's complaints regarding the admissibility of individual doctor and patient experiences—as opposed to large-scale data analyses—ring hollow in light of Theranos's role in the destruction of the data that might have enabled such an analysis. That issue is discussed in greater detail in the government's opposition to Defendant's motion to preclude anecdotal evidence, filed herewith.

testimony but to the weight it should be accorded by the jury. Accordingly, it is important for the jury to hear about each witness's qualifications and experience working with a given assay and the underlying health conditions implicated by it.

Second, testimony about the purpose of a particular blood test and the significance of test results is essential to the jury's understanding of witness testimony. Without background information addressing how a given assay fits into a patient's medical care, the witnesses' accounts will be scrubbed of all meaningful context, risking juror confusion. Testimony about individual assay types will be probative also to show why a given blood test result could not have been accurate. For example, doctors like Audra Zachman will testify that a low hCG result like the one her pregnant patient received from Theranos would, if accurate, indicate a terminating pregnancy. The fact that the patient who received that test result maintained a healthy and viable pregnancy shows that the hCG result could not have been correct.

Finally, testimony concerning the possible effects of inaccurate blood tests is also important. Besides providing further insight into how medical professionals use blood tests, these details add weight to a doctor's representation that he or she has not encountered similar errors in test results from other labs. If incorrect lab test results had no significance, it would be harder to believe that a doctor could reliably remember incorrect results after a years-long or decades-long career. That is not the case, though. Demonstrably false results like the ones Theranos delivered to the government's witnesses make an impact precisely because of the possible health implications were those results viewed as accurate and used to inform treatment decisions.

As for Defendant's objection to statements that a doctor had never had similar accuracy problems with the relevant assay conducted by a conventional lab, that is not expert testimony but simple recollection. To the extent a doctor used a conventional lab for much longer than Theranos, the contrast in reliability becomes all the more significant.

**IV. The Witnesses at Issue Are Qualified to Testify Regarding these Topics**

An expert witness must offer opinions that are tied to his or her "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Here, the medical professionals on the government's witness

list are clearly qualified to speak on the topics addressed above. Defendant admits that these witnesses "may be qualified to offer opinions that any given test result seemed erroneous when viewed in the context of a patient's medical history." (Mot. at 13). Each of these practitioners has received formal education and training in their respective medical fields, and each has extensive experience reviewing and interpreting the results of the assays they will address. The following are abbreviated summaries of representative experts from the government's list. These experts' full qualifications can be viewed at ECF No. 580-5, Def. Exh. 5).

Dr. Steven Linnerson: Dr. Linnerson has practiced medicine for 37 years and has extensive experience as an OBGYN practitioner and as a trainer of resident physicians. In medical school and then in his residency, Dr. Linnerson was educated on hCG, including the role of hCG in pregnancy and the significance of results. Besides education in medical school and in residency, his continuing medical education has contributed to his knowledge of hCG. Dr. Linnerson has handled an estimated 200,000 office visits, and half of those visits were OB patients. Through the years, he has handled about 30 deliveries a month and treated a total of 14,000-15,000 pregnant women. Dr. Linnerson has personally examined tens of thousands of hCG tests.

Dr. Audra Zachman: Dr. Zachman is a nurse practitioner with extensive experience treating pregnant patients and interpreting hCG results. Dr. Zachman received training on hCG while earning her doctorate in school. She continued to have extensive experience with hCG tests and interpreting test results while working at her practice. During times of active practice, Dr. Zachman averaged 20 patients a day, 5 days a week for four years, and three days a week for two years. She estimates that she has reviewed approximately 1,000 hCG tests or more over a full year during her years of practice. Over the course of her career, she has reviewed an estimated 5,000 quantitative hCG tests.

Dr. JoEllen B. Embry: Dr. Embry's medical practice focuses on women's health issues, specifically Polycystic Ovarian Syndrome (PCOS) and other endocrine problems. This has been the case for at least 20 years. Since 1995 Dr. Embry has regularly attended conferences where endocrine issues and PCOS were discussed. These have included conferences specifically focusing on PCOS from 2000 on. As a nurse practitioner focusing on women's health issues, Ms. Embry has treated between

65,000-75,000 individual patients.  Of those patients, 1,500 to 2,000 each year were treated for PCOS.  Thus, in her career she has treated approximately 30,000 PCOS patients.  Each of those PCOS patients had multiple testosterone lab tests ordered and reviewed by Dr. Embry.  In total, Dr. Embry has reviewed in excess of 100,000 testosterone lab results over her career.

Dr. Mark Burnes:  Dr. Burnes is an experienced physician practicing in internal medicine.  He may testify about blood test for PSA or Prostate Specific Antigen.  Dr. Burnes received training on interpreting PSA results in medical school, and has had additional experience since then.  Dr. Burnes has treated approximately 28 patients with prostate cancer over the course of his career.  He estimates that he has reviewed more than 5000 PSA results during his career as a practicing doctor.

Dr. Edward Szmuc:  Dr. Szmuc first started using hCG tests during his residency, which was between the years of 1979-1983. To be specific, he started using hCG tests in 1982; before then, hCG numbers were not ascertainable, so physicians had to use other methods. He has been in practice for 37 years, and he probably utilizes hCG tests several times a week, every week. He estimates that he has reviewed over 10,000 hCG tests.

Dr. John Couvaras:  Dr. Couvaras is an experienced physician practicing in obstetrics and reproductive endocrinology.  Over the course of his career as a treating physician, he has seen 10,000 or 11,000 patients who have had hCG tests, meaning that he has personally reviewed well over 10,000 hCG test results.

## V.    The Government Has Disclosed All Information in its Possession Regarding these Experts' Anticipated Testimony, and Will Supplement that Disclosure

Defendant argues that the government has not yet provided sufficient written summaries of the anticipated testimony for many or all of the witnesses named in its motion.  The government has, however, provided the defense with all of the information available to it, including the memoranda summarizing each interview of one of these witnesses, and any medical records obtained from their offices.

It is also worth noting, that while there is still information outstanding from several of these providers regarding the specific patients who received inaccurate Theranos tests, Defendant does have that information for others on the government's list.  For example, Defendant is aware of the identities

of the patients discussed by Dr. Zachman, Dr. Burnes, Dr. Couvaras, as well as one patient of Dr. Asin's.

The government has expended significant time and resources in an effort to obtain the additional information Defendant is requesting—in particular, patient names and relevant records underlying the witnesses' conclusions that their patients received inaccurate test results from Theranos. For one doctor located in Arizona, an FBI agent took two driving trips from the Bay Area to that doctor's office late last year with the goal of locating responsive documents to produce to the defense. Generally speaking, the government's efforts to retrieve this information have not yet been successful. The government understands that the ongoing COVID-19 pandemic has been a contributing factor. Many medical professionals are under extraordinary demands right now. For example, the government understands from conversations with Dr. Embry that her office was recently administering thousands of COVID-19 tests per day. She and her staff are now working in warehouses to prepare for the distribution of the recently released vaccine. Unlike retained experts whose job it is to provide information to parties in litigation, the witnesses covered by Defendant's motion are working medical practitioners who are assisting the government voluntarily.

The government will redouble its efforts to obtain the additional information requested by the defense. As a next step, the government plans to serve Rule 17 subpoenas on the medical service providers immediately. The government will contact defense counsel regarding whether they will agree to an early return date in light of the case schedule.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's motion. In the alternative, the Court should reserve ruling on the motion to allow the government's witnesses to produce the requested information and associated records. The government believes that disclosure can still be made far enough in advance of the July trial date to avoid any prejudice to Defendant.

DATED: January 8, 2021

Respectfully submitted,

STEPHANIE M. HINDS
Attorney for the United States,
Acting Under Authority Conferred
By 28 U.S.C. § 515

*/s/ John C. Bostic*
JOHN C. BOSTIC
JEFF SCHENK
ROBERT S. LEACH
VANESSA BAEHR-JONES
Assistant United States Attorneys