STEPHANIE M. HINDS (CABN 154284)
Attorney for the United States,
Acting Under Authority Conferred By 28 U.S.C. § 515

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

JEFF SCHENK (CABN 234355)
JOHN C. BOSTIC (CABN 264367)
ROBERT S. LEACH (CABN 196191)
VANESSA BAEHR-JONES (CABN 281715)
Assistant United States Attorneys

    150 Almaden Boulevard, Suite 900
    San Jose, California 95113
    Telephone: (408) 535-5589
    Fax: (408) 535-5066
    john.bostic@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. 18-CR-00258 EJD |
| Plaintiff, | ) <br> ) UNITED STATES' OPPOSITION TO <br> ) DEFENDANT'S MOTION IN LIMINE TO |
| v. | ) EXCLUDE CERTAIN RULE 404(B) EVIDENCE <br> ) FOR LACK OF EXPERT SUPPORT [ECF No. 564] |
| ELIZABETH HOLMES and RAMESH "SUNNY" BALWANI, | ) <br> ) Date: March 23, 2021 <br> ) Time: 10:00 a.m. |
| Defendants. | ) Court: Hon. Edward J. Davila <br> ) |

GOVT OPP TO MOT RE 404(B) EVIDENCE
18-CR-00258 EJD

# INTRODUCTION & FACTUAL BACKGROUND

The government opposes Defendant's motion to exclude evidence regarding Theranos's lab practices noticed under Rule 404(b). Throughout Defendant's motion, she seeks to characterize Theranos's laboratory procedures as a sideshow, unrelated to the allegations in this case. Not so. Just as Theranos's clinical lab was central to the operation of the company, certain laboratory procedures played a key role in enabling and furthering Defendant's fraud. By modifying its analyzers to run each test multiple times and report an average result, Theranos maximized the apparent reliability of its tests and masked any variability problems, consistent with Defendant's representations to potential investors that Theranos's tests had the highest levels of accuracy and exhibited remarkably low variation. When Defendant refused to provide patients with reference ranges specific to the method used on their sample, it was to keep secret Theranos's use of third-party analyzers and perpetuate the falsehood that Theranos's own device could run every test. Defendant's and Theranos's decisions to withhold certain pieces of information from patients and doctors is highly probative of Defendant's intent to defraud.

The government has provided Rule 404(b) notice of this evidence to Defendant out of an abundance of caution. In fact, as described above each of the topics discussed herein is inextricably intertwined with the core allegations in the Indictment. *See United States v. Loftis*, 843 F.3d 1173, 1177 (9th Cir. 2016) (The "inextricably intertwined" doctrine "applies when the acts in question are so interwoven with the charged offense that they should not be treated as other crimes or acts for purposes of Rule 404(b)").

Defendant complains that these topics require additional expert analysis, but many of the facts within these categories speak for themselves without input from an expert. Where needed, the government has already identified witnesses qualified to testify on these matters, and it has disclosed their opinions to the defense.

Because the lab practices discussed herein are further implementations of Defendant's fraud targeting investors and patients, the Court should deny Defendant's motion and allow the relevant evidence to be presented at trial.

//

# ARGUMENT

## I. Theranos's Methods Tended to Hide Variability in its Results, Consistent with Defendant's Scheme to Defraud

The evidence at trial will show that, for at least some of Theranos's tests, the company's analyzers were configured to run assays six times simultaneously and then report a single, combined result. When a patient's blood sample was inserted into the Theranos device, six pipette tips would simultaneously draw six portions of blood from the larger sample. Each of those six portions would then be tested for the target analyte, i.e., the substance that was being measured. Those six tests would then yield six results. Theranos's algorithm would then review the set of six numerical values and discard any that were outliers. The remaining values were then averaged and the combined average value was reported to the patient. Dr. Adam Rosendorff, Theranos's former CLIA laboratory director, may testify at trial that this six-tip analyzer approach used by Theranos would tend to increase the *appearance* of precision in lab test results beyond the true performance of a given method. In other words, Theranos's method of combining multiple test results tended to make its tests look more consistent and less variable than they actually were.

Defendant and others at Theranos knew that variability was a key marker of a tests accuracy, and they made a point of touting the supposedly low variability of results generated by Theranos's analyzers. For example, in a slide deck that Defendant distributed to a number of potential and actual investors, there is a slide titled "A New Standard in Quality," which claims that Theranos systematically controlled and standardized its processes to offer tests with "the highest levels of accuracy." See Ex. 52 to Declaration of Bob Leach. That slide prominently features the claim that Theranos's Vitamin D assay yielded a coefficient of variation of less than ten percent. *Id.* Accordingly, Theranos's use of a testing method that tended to artificially conceal variability in its test results furthered Defendant's fraud by making Theranos's tests appear to perform more reliably than they actually did.

Defendant argues that Dr. Rosendorff's position regarding multiplexing test results must be expounded upon by an expert following a review of data according to scientific methodology. But the effect of Theranos's six-tip analyzer method is straightforward enough not to require those steps, rendering Defendant's demand unreasonable. Though the government has noticed this point as an

expert opinion out of an abundance of caution, it is an undisputable truth that Theranos's method of combining results would tend to mask any inconsistency in the company's testing.

A simple hypothetical proves this fact.  Imagine a blood test that measures a certain substance in a patient's blood and reports levels between 0 and 10 based on the concentration of that substance.  Imagine that a patient's blood contains that substance at concentration level 5.  If a blood test is run on that patient six times in a row, and that test is perfectly accurate and reliable, the result will be 5 each time, matching the concentration in the patient's blood.  In the case of the accurate and reliable test, averaging multiple identical results would be pointless.  On the other hand, if that test has *poor* reliability, the test is likely to produce inaccurate and inconsistent results—for example, a scattering of values throughout the 0-10 range that do not consistently match the true concentration of the substance in the patient's blood.  In the case of the unreliable and inconsistent test, averaging multiple results will yield a single combined result that will tend to be in the middle of the measured range.  For example, imagine that unreliable test is repeated six times on that same patient's blood and yields results of 2, 9, 4, 1, 8, and 6.  The extreme variability in those results inspires little confidence in the usefulness and accuracy of the test.  But if those six results are averaged, they will yield a combined result of 5.  This example illustrates how multiplexing test results in this manner can conceal variability and cause a testing method to look more accurate than it actually is.

The concept can also be illustrated using a dartboard as an analogy.  In the image below, the upper left dartboard represents a blood test that is accurate and reliable, consistently delivering "bullseye" results that match the true values of the analytes being measured.  The upper right dartboard represents a test that is consistent but inaccurate, repeatedly delivering the incorrect result.  The boards at the lower left and lower right represent inconsistent tests with reliability issues.  For the dartboards representing inconsistent tests, Theranos's multiplexing method did the equivalent of only counting the average position of all of darts combined, rather than counting each dart individually.  The dartboards on the bottom row of the image have darts in a variety of position, but for each of those boards the average position of the darts is somewhere near the bullseye.  Reporting the average position of the darts rather than each individual strike would hide variability and increase the appearance of accuracy.  This effect

would be compounded if one ignored outliers (the worst misses) when generating the average.



Applying the dartboard analogy to Theranos, the company's six-tip multiplexing method had the tendency to make results like the problematic ones on the bottom dartboards look like the ideal results in the upper left.  By increasing the *apparent* consistency and reliability of Theranos's tests, this method contributed to the fraudulent schemes by concealing the actual inconsistencies and inaccuracies in the test results.  Critically, Defendant does not contest that Theranos's multiplexing approach would tend to mask test result variability.  Nor has Defendant noticed an expert to render a contrary opinion on this point.  Instead, Defendant quibbles with the language used by agents documenting interviews of Dr. Rosendorff on this topic.  Those complaints are not a sufficient basis to exclude testimony on this topic.

To the extent the above information qualifies as expert testimony, Dr. Rosendorff is qualified to serve in that role.  The government has disclosed to the defense that Dr. Rosendorff is a medical doctor with extensive experience as a laboratory director.  Having served as lab director in a variety of corporate and clinical settings, he is a suitable expert in clinical lab operations and best practices.  Over the course of his career in a series of lab director roles, the labs he has overseen have run hundreds of thousands of assays, and Dr. Rosendorff has personally reviewed thousands of lab test results covering a

wide range of analytes, including some of the most common tests run in clinical chemistry, toxicology, genetics, and immunology.

Because this anticipated testimony is reliable and based on the sound methodology of a qualified expert applying his experience and professional judgment to the facts, it is admissible. *See Adams v. Lab. Corp. of Am.*, 760 F.3d 1322, 1331 (11th Cir. 2014) (an expert's methodology can consist of "the application of [medical] knowledge," and "whether her approach is called a 'methodology' or simply 'application of professional judgment' does not matter" as long as there is an appropriate reliability inquiry). The Court should deny Defendant's request to exclude this evidence.

## II. Theranos's Manipulation of Reference Ranges

Defendant's fraud targeting patients also impacted the company's approach to reference ranges. When a clinical laboratory reports the results of certain tests to a patient, it provides a reference range along with the patient's specific value. Comparison of the patient's test value against the reference range indicates whether a patient's value for that analyte is within normal ranges. Accordingly, accurate reference ranges are critical to the utility of a blood test result. As laid out in the government's disclosures to the defense, Dr. Adam Rosendorff may testify at trial that he was involved in setting reference ranges for Theranos tests. (*See* ECF No. 580-2 at 71-72). Dr. Rosendorff may testify that Theranos launched its clinical testing services in 2013 without conducting a formal reference range study to determine the appropriate reference range values because Theranos was "in a hurry" to launch, and that it would have been preferable to establish reference ranges before the launch. This testimony will be based on Dr. Rosendorff's percipient observations at Theranos as well as his judgment and experience as a certified laboratory director.

Separately, Dr. Rosendorff may testify that Defendant and Balwani were resistant to the idea of establishing and disclosing reference ranges that were specific to the sample type and method Theranos used to analyze a given patient sample. This fact is documented in an email exchange Dr. Rosendorff had with Defendant and Balwani in November of 2014. This would have meant establishing reference ranges for Theranos's capillary blood tests that were distinct from the venous sample tests that Theranos ran on third-party devices. *Id.* Holmes and Balwani were unsupportive of this proposal, likely because it might have alerted doctors to the fact that Theranos was using multiple methods and analyzers—

including commercially available devices—to conduct its testing.

The government continues to investigate Theranos's practices with respect to reference ranges, and will update its 404(b) notice and expert disclosures if necessary. For now, the Court should decline to issue a blanket order excluding facts about the ways Theranos set and altered reference ranges. The government does not intend to present evidence like the above in support of an argument that Theranos violated industry standards. Nonetheless, these facts are admissible because they are relevant to the jury's determination of Defendant's intent to defraud. As the above examples show, Defendant made decisions that prioritized maximizing the company's commercial advancement and reputation over delivering the most accurate and useful information to patients.

### III. Theranos Withheld Key Information from Doctors and Patients as a Necessary Step in Defendant's Scheme

The government also intends to introduce evidence regarding information that Theranos regularly withheld from the doctors and patients who were its customers. The following examples, among others, have been disclosed to the defense as potential 404(b) evidence, citing the relevant documents by bates number:

- When Theranos obtained invalid bicarbonate results due to sample stability issues or other problems, it would withhold the result from doctors and patients with no explanation. Holmes directed that, if customers called to inquire about such withheld results, Theranos representatives should respond that "CO2 results were not reported due to temporary unavailability of this test for this sample" and note that the company was growing as fast as it could. This statement was misleading because it deceptively concealed problems with Theranos's tests.

- After experiencing problems with its hCG test, a Theranos employee informed Balwani that Theranos had removed the "pregnancy test" description from its hCG blood quant assay description because the company's test was not able to confirm a pregnancy. However, Theranos continued to offer the hCG blood test knowing that doctors and patients would rely on the assay to determine pregnancy status.

- In response to problems with the hCG test, Theranos switched the assay from fingerstick to

      venous draw. Rather than inform doctors and patients that the switch was necessitated by a problem with the assay, Christian Holmes directed that doctors and patients be told that it was a "temporary" "routine quality check" related to Theranos's expanding patient population.

- Although Theranos used a variety of methods to conduct its blood tests, its lab reports sent to doctors and patients did not disclose method and sample type—important information that would allow recipients to put the results in context. In November of 2014, Dr. Rosendorff emailed Holmes and Balwani to advise that reference ranges should be specific to sample type and method. In that same message, he stated his preference that physicians should "be aware if a test was performed on fingerstick versus venous blood," explaining that that information "should be made clear in the laboratory report." Dr. Rosendorff explained that this information "would make the physician more understanding of discrepant results that might arise due to matrix/sample type effects."

      Defendant argues that facts like these should be excluded from evidence because the government has not proffered any expert opinion addressing what information should be included in laboratory reports. This argument misses the mark. The above examples are relevant in this case, not because they show violations of industry standards, but because Theranos's actions as described above were in furtherance of Defendant's fraud. In instances like these, Theranos responded to problems with its tests by covering them up. Patients were not alerted to reliability issues plaguing Theranos's tests, nor were patients ever informed that their tests might be run on third-party analyzers. Each of these decisions by Theranos had the effect of protecting and concealing Defendant's misrepresentations to investors and patients about what the company's technology could do. This evidence is admissible to show Defendant's intent to maintain and further her fraudulent schemes, and to demonstrate the degree to which others in the company adopted Defendant's approach based on her direction or influence. The Court should decline to issue a blanket order excluding these facts.

//

# CONCLUSION

For the foregoing reasons, the Court should deny Defendant's motion.

DATED: January 8, 2021

Respectfully submitted,

STEPHANIE M. HINDS
Attorney for the United States,
Acting Under Authority Conferred
By 28 U.S.C. § 515

 */s/ John C. Bostic*
JOHN C. BOSTIC
JEFF SCHENK
ROBERT S. LEACH
VANESSA BAEHR-JONES
Assistant United States Attorneys