STEPHANIE M. HINDS (CABN 154284)
Attorney for the United States,
Acting Under Authority Conferred By 28 U.S.C. § 515

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

JEFF SCHENK (CABN 234355)
JOHN C. BOSTIC (CABN 264367)
ROBERT S. LEACH (CABN 196191)
VANESSA BAEHR-JONES (CABN 281715)
Assistant United States Attorneys

   150 Almaden Boulevard, Suite 900
   San Jose, California 95113
   Telephone: (408) 535-5589
   Fax: (408) 535-5066
   john.bostic@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> ELIZABETH HOLMES and RAMESH "SUNNY" BALWANI, <br><br> Defendants. | Case No. 18-CR-00258 EJD <br><br> UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION IN LIMINE TO EXCLUDE BAD ACTS AND FALSE OR MISLEADING STATEMENTS OF THERANOS AGENTS AND EMPLOYEES [ECF No. 565] <br><br> Date: March 23, 2021 <br> Time: 10:00 a.m. <br> Court: Hon. Edward J. Davila |

GOVT OPP TO MOT RE ACTS OF EMPLOYEES
18-CR-00258 EJD

**INTRODUCTION**

Despite the arguments raised in Defendant's pending motion, the evidence at trial will make it abundantly clear that Defendant is facing criminal charges as a result of her own conduct. That conduct, however, had the natural result of causing false information about Theranos to spread throughout her company and on to others. That false information was frequently conveyed by Theranos employees or agents, acting as witting or unwitting accomplices to Defendants' fraud. Defendant asks the Court to exclude all evidence of false statements by Theranos employees. But the risk of prejudice Defendant highlights is not present in this case given the strength of the evidence regarding her role as someone who devised the fraud and moved it forward. Moreover, Defendant's own false statements are what gave rise to subsequent false statements by her employees, which in turn reinforced Defendant's fraudulent scheme. False statements by employees are therefore admissible to show Defendant's intent and the effects of the fraud.

The Court should deny Defendant's motion.

**ARGUMENT**

**I.     Defendant Devised and Orchestrated the Charged Schemes to Defraud**

Consistent with the Indictment, the proof at trial will establish beyond a reasonable doubt that Defendant worked with her partner and coconspirator Ramesh Balwani to devise and carry out schemes to defraud Theranos's investors and customers. Based on the nature of the fraud, the identities of the victims, and the way the scheme was carried out, no one else was positioned to commit this crime, and it could not have happened without Defendant's dedicated, active participation.

Witnesses at trial will testify about Defendant's role in assembling and approving materials that went to potential and actual investors in the company. Those materials will feature prominently in the government's case because they contain numerous false and misleading statements about Theranos's technology, including the number of tests it could perform and the level of accuracy it could achieve. Former senior scientists at Theranos have confirmed the falsity of materials statements in those investor materials, and those former employees are expected to testify at trial.

In meetings with investors, Defendant was the primary spokesperson for Theranos. In those formal meetings and in subsequent communications with investors, Defendant controlled what

information they received and how they received it.  Defendant took those opportunities to exaggerate Theranos's accomplishments and the capabilities of its technology, leading victims to overestimate the value of an investment in the company.  At trial, multiple investors will testify about their conversations with Defendant and the ways she misled them about facts from the regulatory status of Theranos to the military's purported use of the company's analyzer.  Some of those conversations were recorded.

Defendant also granted interviews to members of the media and spoke at conferences and other events, discussing Theranos's achievements.  In those contexts, Defendant repeated versions of the same false statements she had delivered to potential investors, actively hiding the fact that Theranos's analyzer could not handle high-throughput testing, along with the related fact that Theranos depended on third-party devices for a large proportion of its testing.

Significantly, all of the eight or more categories of false statements identified in the Indictment can be traced back to statements that Defendant made or materials that she created or distributed to victims.  It makes sense that Defendant was so active in devising and executing the fraud because she had the most to gain from its success.  As discussed in the government's other filings, Defendant reaped substantial financial, tangible, and non-tangible benefits from her association with a company falsely buoyed by fraud.

These circumstances, and in particular Defendant's central role, easily distinguish this case from the authority Defendant cites in her motion.  Those cases deal with convictions and trials of defendants whose connections to the alleged crimes were tenuous or nonexistent.  In *United States v. Rank*, for example, the Sixth Circuit vacated the conviction of a defendant who was convicted along with a codefendant despite the fact that there was no evidence upon which a rational jury could have found that he participated in the fraud.  *United States v. Rank*, 805 F.2d 1037, *3 (6th Cir. 1986).  In fact, the evidence at trial established that that defendant had been in the Caribbean attending medical school during most of the time relating to the fraud counts against him.  *Id.*  Similarly, in *United States v. Fitzgerald*, a new trial was granted where the prosecution referenced pending criminal charges against an acquaintance of the defendant during the defendant's cross-examination.  *United Stated v. Fitzgerald*, 2007 WL 1704943, *1-2 (S.D. Cal. Jun. 11, 2007).  The Ninth Circuit affirmed, concluding that there was no direct link between the defendant's charges and the pending charges against the other individual.

*United States v. Fitzgerald*, 279 Fed. Appx. 444 (9th Cir. 2008).  Finally, in *United States v. Wassner*, the district court ruled that the prosecution could not introduce evidence of crimes by the defendants' associates where there was "no direct proof" to sustain a conviction against the defendants themselves. *United States v. Wassner*, 141 F.R.D. 399, 404-05 (S.D.N.Y. 1992).  Here, in contrast, there is no lack of evidence that Defendant herself not only participated in the fraud at Theranos, but created it and carried it off.  During the relevant time period, Defendant was not just at Theranos, she was controlling the company and directing its employees.  Nor is this a case where the government would seek to incriminate Defendant by associating her with someone more involved, more active, or more culpable.  In this fraud, there is no such person.

As the originator of the fraudulent scheme and the author of the falsehoods used to deceive and cheat victims, Defendant cannot credibly argue that she is in danger of being convicted for a crime unrelated to her.  The Ninth Circuit has affirmed convictions for knowing participation in fraudulent schemes for defendants who were far less integral to their frauds than Defendant is to the fraud in this case.  *See, e.g.*, *United States v. Blitz*, 151 F.3d 1002, 1006 (9th Cir. 1998) (evidence of personal contact with prospective victims was sufficient to sustain conviction for knowing participation in fraudulent scheme); *United States v. Lothian*, 976 F.2d 1257, 1267-68 (evidence was sufficient to prove fraud where defendant made misrepresentations to customers about company); *United States v. Peters*, 962 F.2d 1410, 1414 (9th Cir.1992) (upholding conviction for fraud because appellant knew of complaints from victims about money they were promised, continued to do administrative tasks, and deposited fraudulently acquired checks).

**II.     It Is No Surprise that Theranos's Employees and Agents Passed Along Defendant's Misrepresentations and Furthered Her Fraudulent Schemes**

**A.     Defendant's Role as Founder and CEO Gave Her Influence Over All Facets of the Company's Operation**

Defendant's motion relies on conclusory assertions that Defendant was not involved in some of the activities of the company and that some key employees did not report to a chain of command that included her.  These arguments are unavailing given that the evidence shows Defendant's involvement in virtually every aspect of the company and her authority to make final decisions on virtually any issue facing the company.

Defendant's reach within the company made it easy for her to direct Theranos employees to pass along misleading statements to, or withhold details from, the victims of her fraud. In particular, the evidence shows that Defendant had the ability to direct communications between Theranos representatives and customers who contacted the company to report issues with tests. For example, in August 2014, when Theranos routinely obtained invalid bicarbonate results due to sample stability issues or other problems, it would withhold the result from doctors and patients with no explanation. It was Defendant who directed that, if customers called to inquire about such withheld results, Theranos representatives should respond that "CO2 results were not reported due to temporary unavailability of this test for this sample" and note that the company was growing as fast as it could. The email correspondence on that subject reveals that Balwani asked the relevant Theranos employees to consult with Defendant on the issue. (See, e.g., TS-1078095, TS-1076614-16).

In February 2015, after experiencing problems with its Complete Metabolic Panel (CMP) tests, Theranos decided to move that assay from fingerstick to venous collection. In connection with that change, Christian Holmes sent Balwani a proposed script for Theranos representatives to use when explaining the change to customers. That script stated that the switch to vein draws was to allow Theranos to conduct additional sample stability studies on its fingerstick samples. When Balwani indicated he did not like that explanation, Christian responded that he had other language based on an earlier conversation he had with Defendant, and stated that he would work with Defendant on the matter going forward. (See THPFM0000147443).

It is worth noting that Defendant evidently had the final say regarding Theranos's communications to its customers in these instances. These examples—and their references to other similar conversations—are indicative of the influence Defendant exerted over Theranos's communications with the victims of the fraud. Circumstances like these fall squarely within the holding of *United States v. Ciccone*. In that case, a defendant carried out a telemarketing scheme where his employees contacted and made misrepresentations to victims. *United States v. Ciccone*, 219 F.3d 1078, 1083-85 (9th Cir. 2000). Ciccone argued on appeal that he could not be convicted of fraud because he did not personally lie to the victims. *Id.* at 1083. The Ninth Circuit rejected that argument and concluded that he had been a knowing participant in the fraudulent scheme by virtue of his role

authoring many of the lies delivered to victims. *Id.* at 1084.

As CEO, Defendant was also the primary contact for the company's lawyers, including David Boies, who represented Theranos and sat on its Board of Directors. In 2015, Boies was working on Theranos's behalf to quash a piece of negative journalism being prepared by a reporter at *The Wall Street Journal*. To that end, Boies had a number of conversations with individuals at the publication during which he alleged that the representations in the planned article were false and that Theranos's technology was as capable as claimed. In Defendant's motion, she seeks to disclaim any responsibility for those communications. (Mot. at 5). It is implausible that Defendant did not play a significant role in influencing Boies's actions during that time period. Although Boies first learned about Theranos's technology in his capacity as a litigator for the company, he told the government that Defendant was essentially his exclusive source for that information until the *Wall Street Journal* matter, when he began receiving information from Balwani too. (See US-REPORTS-0009318). As a Board member, Boies obtained his information from Defendant, so it is to be expected that his understanding of the facts was biased in Theranos's favor, including the false understanding that Theranos's devices could perform "any test" and were more accurate than conventional counterparts. *Id.* Notably, before the *Wall Street Journal*'s investigation, Boies did not know about the company's use of third-party analyzers. *Id.* His knowledge about Theranos was controlled by Defendant, and that knowledge shaped his interactions with a publication he believed was about to release an inaccurate and unfair article. Because Boies was working for Defendant's company, it is reasonable to infer that he took strategic direction from her as well. In sum, Defendant's attempts to distance herself from Boies's actions are unconvincing.

As the government continues to meet with witnesses in preparation for trial, it is likely that former Theranos employees will have additional information about the control Defendant had over employee's knowledge of key facts and their responses to questions others posed about the company.

Defendant's partnership with Balwani increased her capacity to monitor and control Theranos's activities. If there were any components of Theranos that Defendant did not directly supervise, the evidence shows that they were entrusted to her partner Balwani. Based on interviews of former employees and a review of Defendant's emails and text messages, it is clear that Defendants worked very closely together when they were both at the company. Their tendency to share information and

make decisions jointly was further heightened during the time when they were in a romantic relationship and living together. They were also partners in the charged fraudulent schemes. Between them, there was little happening at the company that they did not direct. They were well positioned to ensure that the actions of Theranos's employees and agents furthered Defendants' schemes whenever possible.

### B. Defendant Made Witting and Unwitting Accomplices of Theranos's Employees and Agents

As a result of Defendant's leadership position, her words and actions had a significant effect on the way Theranos employees viewed the company. Because Defendant consistently made the same false statements about Theranos during the years it was active, it is unavoidable that her employees would start to echo those statements and repeat them to others outside the company.

Certainly, some at Theranos knew enough to recognize Defendant's false statements for what they were. Whether those employees viewed Defendant's actions as criminal or not, the evidence shows that several individuals routinely helped Defendant spread false information about the company and conceal the truth about Theranos's limitations. The evidence further shows that some individuals in the group of employees who interfaced with doctors and patients became accustomed to passing off phony explanations for failures of Theranos technology. Those employees frequently received guidance from Defendants on how to spin voided and inaccurate results.

On the other hand, it is also likely that some Theranos employees and agents were deceived by misinformation from Defendant, just like the victims of the fraudulent schemes. Former Theranos employees who have spoken to the government have discussed the company's practice of creating silos around working groups to separate them and limit access to information within the company. One result of this approach would be that some employees would not realize that Defendant was misleading people when she talked about the capabilities of the Theranos analyzer or the relationship with Walgreens. For example, a former Theranos chemist may testify about being alarmed to learn after she had been working there for some time that the company was modifying Siemens machines and altering chemistries—actions that directly affected her work. Before that discovery, she might have unknowingly spread false information about the machines Theranos used. As discussed above, lawyer David Boies spent much of 2015 advocating for a technology he believed could do what Defendant said

it could.  A Walgreens employee in Arizona told the government that she told customers that Theranos tests were accurate because that was what Theranos staff had told her.  The causal chains of such false statements lead back to Defendant.

Accordingly, evidence that an employee or agent repeated a version of one of Defendant's falsehoods does not represent 404(b) material or an independent scheme to defraud.  Instead, it is simply additional evidence of Defendant's scheme to defraud, and a component of Defendant's plan to maintain the false image of Theranos for as long as possible.  This kind of evidence is therefore relevant and admissible to show Defendant's intent and the effects of her misrepresentations.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's motion.

DATED:  January 8, 2021                                  Respectfully submitted,

STEPHANIE M. HINDS
Attorney for the United States,
Acting Under Authority Conferred
By 28 U.S.C. § 515


 */s/ John C. Bostic*
JOHN C. BOSTIC
JEFF SCHENK
ROBERT S. LEACH
VANESSA BAEHR-JONES
Assistant United States Attorneys