STEPHANIE M. HINDS (CABN 154284)
Attorney for the United States,
Acting Under Authority Conferred By 28 U.S.C. § 515

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

JEFF SCHENK (CABN 234355)
JOHN C. BOSTIC (CABN 264367)
ROBERT S. LEACH (CABN 196191)
VANESSA BAEHR-JONES (CABN 281715)
Assistant United States Attorneys

    150 Almaden Boulevard, Suite 900
    San Jose, California 95113
    Telephone: (408) 535-5589
    Fax: (408) 535-5066
    john.bostic@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 18-CR-00258 EJD |
| Plaintiff, | UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION IN LIMINE TO EXCLUDE EVIDENCE AND ARGUMENT REGARDING THIRD-PARTY TESTING PLATFORMS [ECF No. 576] |
| v. | |
| ELIZABETH HOLMES and RAMESH "SUNNY" BALWANI, | Date: March 23, 2021 |
| Defendants. | Time: 10:00 a.m. |
| | Court: Hon. Edward J. Davila |

# INTRODUCTION & FACTUAL BACKGROUND

Central to the alleged fraud in this case is the fact that Defendant led victims to believe that Theranos had developed a small proprietary analyzer device that could conduct the full range of blood tests using a drop of blood from a finger-stick. In reality, the majority of Theranos's clinical testing was conducted using analyzers that the company purchased from other manufacturers. Some of those analyzers were operated by Theranos in the same manner that other clinical labs used them. For tests run on those devices, Theranos drew larger blood samples from patient's veins and ran standard, FDA-approved assays to arrive at results.

For other third-party analyzers, though, Theranos made modifications to the devices' hardware and software in order to allow them to run tests on finger-stick blood samples that were smaller and more diluted than those machines were designed to handle. In particular, Theranos replaced internal hardware components in its Siemens ADVIA analyzers, adding a low-volume sample cup designed to work with the company's smaller, pre-diluted samples. Theranos named this component the 'T-cup," an apparent play on the ADVIA's own "J-cup," which was not optimized for samples as small as the ones Theranos wished to use. Theranos also modified the software running on the ADVIA machines to enable the analyzers to work with those samples. It is undisputed that these modifications were not common or standard in the clinical testing industry. Indeed, Defendant continues to argue that Theranos's practice of modifying third-party devices constituted a valuable trade secret that the company strove to conceal from competitors.

Nor were such modifications expected or accounted for by the companies who manufactured those commercial analyzers. Commercially available analyzers have some built-in functionality allowing a degree of customization when it comes to testing processes. The evidence at trial will show, however, that Theranos's changes to these devices went beyond the scope of what manufacturers like Siemens envisioned. For example, at least one former Theranos employee has informed the government that only authorized Siemens technicians had access to a certain level of internal programing on the analyzer, but that Theranos employees had reprogrammed an analyzer after outside technicians had left access open on the machine, apparently inadvertently. And as for Theranos's changes to analyzer

hardware, operating manuals for devices like the Siemens ADVIA 1800 make no mention of aftermarket hardware modifications or replacing components for the purpose of testing diluted microsamples. (*See* Defense Exh. 44).

Defendant's motion expresses concern that the government will argue that Theranos's modifications of third-party analyzers violated industry standards or manufacturer user agreements, or that those modifications were wrong or unethical in and of themselves. The government presently does not plan to introduce testimony or argument to that effect. As explained below, however, the jury is entitled to hear about the unusual nature of Theranos's modifications to commercial analyzers because those facts are relevant to a full understanding of Defendant's misrepresentations about Theranos's technology and the effect of those misrepresentations on the targets of the fraud. Details about the nature of those modifications also help explain why Theranos's tests suffered from problems with accuracy and reliability—issues which deprived patient victims of the benefit of their bargain. The Court should deny Defendant's motion seeking to exclude such evidence.

For similar reasons, the Court should reject Defendant's suggestion that the jury be blocked from hearing about steps Theranos took to conceal its reliance on modified third-party analyzers. Those steps perpetuated the fraud against investors and patients. Evidence showing those steps constitutes an important part of the government's proof at trial.

**ARGUMENT**

**I.     Theranos's Aftermarket Modifications of Third-Party Analyzers Are Central to Defendant's Fraud**

Theranos's modifications to third-party devices are relevant for several reasons and critical to the jury's understanding of the fraud. As an initial matter, the fact and nature of those modifications are part of the story surrounding one of Defendant's most persistent and repeated misrepresentations. As discussed above, Defendant regularly spoke about Theranos's technology in a way that caused investor and patient victims to believe that the company was conducting all of its clinical testing using its own proprietary analyzer. That claimed ability by Theranos was obviously material to potential investors attempting to predict the company's impact on the marketplace. Defendant withheld information from those investors that would have revealed Theranos's use of modified third-party devices. And because

modification of those analyzers to handle microsamples was an unknown and non-standard use, victims had no basis to suspect that Theranos was using third-party devices to compensate for the shortcomings of its own analyzer. Details about the nature of those modifications are therefore properly admissible to provide context for Defendant's fraudulent statements about the capabilities of Theranos's technology.

Additionally, the jury should be allowed to consider whether Theranos's unusual and non-standard use of third-party analyzers contributed to the accuracy problems experienced by the company's customers. The evidence at trial will show that Theranos's modifications were aimed at allowing the third-party analyzers to measure blood samples that were smaller and more diluted than the machines would be able to handle in their non-modified state. By operating the analyzers under these conditions, however, Theranos increased the likelihood of inaccurate and unreliable results.

Dr. Adam Rosendorff, Theranos's laboratory director during the first year of clinical testing, is expected to testify that the company's practice of diluting microsamples to run on the third-party devices was disadvantageous. According to Dr. Rosendorff, the company's approach diluted samples below the lower level of quantitation (or "LLOQ")—the minimum concentration that would allow the device to reliably measure the amount of analyte present in the sample. Dr. Rosendorff may testify based on his extensive experience as a laboratory director that manufacturers of analyzers calculate a device's LLOQ by using samples of known concentrations, which are then diluted and run on those devices so that results can be measured and errors calculated. *See* Defense Exh. 44 at 23-27 (describing dilution mechanisms present in Siemens ADVIA). These manufacturer tests established the capabilities of an integrated system including the chemistries and hardware used by the analyzer. When Theranos altered the process created by the device manufacturer and introduced additional dilution, they "broke the system," in Dr. Rosendorff's words, by forcing the analyzers to attempt measurements that might be below their LLOQ. Dr. Rosendorff can explain to the jury that this method increased the risk of error in Theranos's tests, since error increases at low analyte concentrations. In addition, to the extent an analyzer has an undesirable bias—a tendency to under-report or over-report the value of an analyte—sample dilution can exacerbate the harmful effect of that bias on the accuracy of test results.[1]

---

[1] The government has given the defense notice of this expected testimony from Dr. Rosendorff,

GOVT OPP TO MOT RE THIRD-PARTY TESTING
PLATFORMS
18-CR-00258 EJD                          3

In an effort to paint Theranos's modifications as something benign and even expected or condoned by the manufacturers of these devices, Defendant cherry picks and misconstrues language from an operating manual and a summary of a witness interview. In her motion, Defendant points out that the Siemens ADVIA software allows users a certain level of customization, and that the devices are set up to run proprietary tests if needed. (Mot. at 2). As discussed above, though, the manual makes no mention of the kind of modification Theranos performed on the ADVIA machines, and it appears that Theranos was only able to make some of its software modifications using access that a Siemens technician had mistakenly left open on one of the company's devices. Facts like these, combined with information about the harmful impact of Theranos's modifications on test sensitivity and accuracy, show how Theranos's modifications to commercial analyzers fit into and enabled Defendant's fraud. Defendant's disagreement with the government regarding the significance of these facts is no reason to exclude evidence. As always, the defense will be free to present its view of the facts at trial through witness examination and attorney argument. For now, Defendant's self-serving description of Theranos's modifications only highlights the need for the jury to have the full picture. Indeed, without context regarding the kinds of changes Theranos made to these third-party analyzers, the jury might be confused as to who is responsible for their inaccurate test results. Such confusion benefits Defendant but would unnecessarily hinder the jury in its role as fact-finder.

## II. The Court Should Not Exclude Evidence of Defendant's Attempts to Conceal Her Fraud

For the same reasons, the Court should allow the jury to hear about Defendant's attempts to conceal Theranos's modifications from outside technicians sent to Theranos to service third-party analyzers. At the core of Defendant's fraudulent schemes was the representation that Theranos's technology was ready to replace conventional labs and supply the full range of clinical blood tests using finger-stick samples. That representation was false in several respects. In particular, Defendant knew that Theranos's proprietary analyzer could run only a small number of tests, that its analyzer could not handle high-throughput testing, that the company relied on third-party analyzers for many of its tests, and that Theranos's microsample-based approach suffered from accuracy and reliability problems.

---

and the defense is not seeking to exclude it.

Viewed in the context of Defendant's fraudulent scheme, Theranos's use of modified commercial analyzers is revealed for what it is: a measure Defendant's company put in place to hide the truth about what its proprietary analyzer could not do. Revealing the company's dependence on commercial analyzers would have demonstrated the limits of Theranos's own analyzer and exposed Defendant's misrepresentations to victims. Keeping that information secret concealed Defendant's scheme and made it possible for numerous victims to be defrauded. Defendant's strategy to hide her fraud should not be withheld from the jury simply because Defendant now characterizes it as trade secret protection.[2] Questions about Defendant's intent are for the jury to answer based on a complete record.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's motion.

DATED: January 8, 2021

Respectfully submitted,

STEPHANIE M. HINDS
Attorney for the United States,
Acting Under Authority Conferred
By 28 U.S.C. § 515

*/s/ John C. Bostic*
JOHN C. BOSTIC
JEFF SCHENK
ROBERT S. LEACH
VANESSA BAEHR-JONES
Assistant United States Attorneys

---

[2] This issue is discussed in greater detail in the government's Opposition to Defendant's Motion to Exclude Evidence of Theranos's Trade Secrets Practices.