STEPHANIE M. HINDS (CABN 154284)
Attorney for the United States,
Acting Under Authority Conferred By 28 U.S.C. § 515

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

JEFF SCHENK (CABN 234355)
JOHN C. BOSTIC (CABN 264367)
ROBERT S. LEACH (CABN 196191)
VANESSA BAEHR-JONES (CABN 281715)
Assistant United States Attorneys

    150 Almaden Boulevard, Suite 900
    San Jose, California 95113
    Telephone: (408) 535-5589
    Fax: (408) 535-5066
    john.bostic@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 18-CR-00258 EJD |
| Plaintiff, | UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION IN LIMINE TO EXCLUDE NEWS ARTICLES [ECF NO. 578] |
| v. | |
| ELIZABETH HOLMES and RAMESH "SUNNY" BALWANI, | Date:   March 23, 2021<br>Time:   10:00 a.m.<br>Court:  Hon. Edward J. Davila |
| Defendants. | |

## INTRODUCTION & FACTUAL BACKGROUND

This case involves a Defendant who devised and executed a scheme to defraud people who invested in her blood-testing company as well as patients who purchased the company's testing services. Contrary to Defendant's representations to investors, business partners, government agencies, customers, and journalists, Defendant's company Theranos had *not* developed technology that could reliably conduct the full range of clinical blood tests using a tiny blood sample from a finger-stick, and Defendant knew it. Defendant's fraud was exposed toward the end of 2015, when *The Wall Street Journal* began publishing a series of articles that exposed some of Defendant's misrepresentations about Theranos's achievements. Defendant's fraudulent schemes against investors and patients had been very successful up until that point. Theranos had attracted more than $700 million in investor funds, and thousands of patients were patronizing its testing locations to purchase blood tests. And while the publication of those negative articles in late 2015 marked the beginning of the end of Defendant's fraud, media coverage of Defendant and her company had previously played a significant role in her earlier success.

Beginning no later than 2013, when Defendant brought Theranos out of what she called "stealth mode," she engaged with the media, granting interviews to a number of journalists who subsequently wrote articles about Theranos's purported scientific, technological, and business achievements. These articles vary in area of focus and level of detail, but they all contributed to a wave of favorable coverage that brought much-needed attention to the startup. That positive attention caused wealthy individuals to reach out to Defendant and inquire about investing in her company. Positive news coverage and the attendant hype also affected how those potential investors pursued investment opportunities at Theranos, creating a sense of urgency that Defendant exploited to her benefit. Critically, Defendant made active use of positive news articles that contained misleading statements about Theranos, sending those articles to potential and actual investors and thus adopting the articles' content as her own statements. Under these circumstances, it is also relevant that Defendant had opportunities, both before and after articles were published, to weigh in on their content and correct any false information.

Defendant's motion to exclude news articles incorrectly assumes that the government seeks to use them as standalone proof that Holmes made certain statements. The government, however, is aware

of the hearsay issues raised by such use and has no plans to introduce newspaper articles for that purpose. If articles or other publications are introduced into evidence at trial, they will be for the following non-hearsay purposes: (1) to show the favorable press coverage of Defendant and Theranos during the height of the fraud and illustrate what information was publicly available about the company; (2) to show the effect on witnesses who read news articles about Theranos that influenced their thinking and decision-making; (3) to show how Defendant and her agents disseminated false information about Theranos by forwarding misleading articles to investors and others; and (4) to show that Defendant ratified information in certain news articles by approving or failing to correct that information before and after publication. These permissible uses show why a blanket order barring such evidence is inappropriate. The Court should deny Defendant's motion.

## ARGUMENT

**I.   Newspaper Articles Are Admissible to Show the Favorable Press Coverage of Theranos in the Public Realm Before the Fraud Was Discovered.**

Defendant cites case law holding that a news article generally cannot be introduced for the truth of its content. In general, the government agrees. Courts recognize, though, that there are other purposes for which an article may be admissible. It is well-established, for example, that a factfinder can rely on articles as evidence of what information was in the public realm during a relevant time period. The Ninth Circuit has taken judicial notice of publications for this non-hearsay purpose. In *Von Saher*, the Ninth Circuit heard a case involving a dispute over the ownership of works of art. *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954 (9th Cir. 2010). One of the parties in that case moved for judicial notice "of the fact that various newspapers, magazines, and books have published information about [the artwork]." *Id.* at 960. The Ninth Circuit granted that request, acknowledging that courts "may take judicial notice of publications introduced to 'indicate what was in the public realm at the time,'" although such materials are not admissible to show "'whether the contents of those articles were in fact true.'" *Id.* (quoting *Premier Growth Fund v. Alliance Capital Mgmt.*, 435 F.3d 396, 401 n. 15 (3d Cir.2006)). The Ninth Circuit thus held that the newspapers and other publications offered by the museum could serve "solely as an indication of what information was in the public realm at the time." *Id.* The Ninth Circuit issued a similar holding in *Heliotrope General*, a case

GOVT OPP TO MOT RE NEWS ARTICLES
18-CR-00258 EJD                                                    2

involving alleged securities violations and fraud.  *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971 (9th Cir. 1999).  In that case, the court cited a variety of published analyst reports and other news articles to show that the market was aware of relevant facts relating to the alleged fraud.  *Id.* at 977.

Here, news articles from the relevant time period will give the jury a sense of what information was generally available about Theranos when investors and customers were making decisions about whether to get involved with the company.  In particular, those articles will show the jury how much excitement built up around Theranos based on the potential of the company's purported scientific breakthroughs, and the speed with which Theranos's national profile grew.  For example, in September 2013, *The Wall Street Journal* published an article titled "Elizabeth Holmes:  The Breakthrough of Instant Diagnosis."  That article included the promising report that Theranos's processes were "faster, cheaper, and more accurate than conventional methods and require only microscopic blood volumes, not vial after vial of the stuff."  *Id.*  In November of that year, *Wired Magazine* published additional favorable coverage of Theranos under the title "What Health Care Needs Is a Real-Time Snapshot of You," touting the potential benefits of the company's technology.  That same month, *Singularity Hub* released a positive article calling Theranos "the poster child of med tech."  The existence of these articles and the reporting they contained painted a favorable image of Theranos and contributed to excitement about the startup in Silicon Valley and beyond.  Theranos's public profile and reputation form the backdrop for many of the key events in the arc of Defendant's fraud.  Accordingly, certain articles are relevant and admissible simply because their existence and publication demonstrates what information was publicly available about Theranos at a given time.  The importance of articles admitted for this purpose has nothing to do with the truth of their content or whether any of that content is attributable to Defendant herself.

This type of evidence is also valuable to the jury in understanding Defendant's motive for devising and carrying out the fraudulent schemes alleged in the operative Indictment.  During the time when Defendant was actively publicizing Theranos's purported achievements, Defendant was the recipient and beneficiary of a great deal of favorable media attention.  She graced the covers of national publications and met dignitaries including former President Bill Clinton and then-Vice President Joe Biden, and those meetings were in turn covered by the press, increasing Defendant's fame and influence

in the business community.  The jury may reasonably conclude that acquiring and maintaining that level of prominence motivated Defendant to engage in the alleged fraud.  Similarly, negative media coverage following the exposure of the fraud at Theranos is relevant because it proves that the favorable attention Defendant had received until then was contingent on those truths remaining hidden.  Withholding this kind of news coverage from the jury will leave it with an incomplete picture of Defendant's motivations in a case where her mental state is a key element for their consideration.  It is the publication and circulation of these articles—not their content—that constitutes the relevant fact to which the jury is entitled.  Introduction of news articles for that purpose does not violate the hearsay rules or any of the case law cited by Defendant.

## II.     Articles Are Admissible for their Effect on the Reader

A related but independent use of newspaper coverage is to explain a decision made or action taken by a witness.  Based on the government's investigation, it understands that many of Theranos's investors, potential business partners, and customers were exposed to media reports at various times during their dealings with the company.  Trial witnesses may reference certain articles during their testimony to answer questions about their thought processes or actions in connection with Theranos.  Under those circumstances, relevant news articles and the statements within them are admissible for this recognized non-hearsay purpose.  *See, e.g.*, *United States v. Churn*, 800 F.3d 768, 776 (6th Cir. 2015) ("A statement that is not offered to prove the truth of the matter asserted but to show its effect on the listener is not hearsay.  Such a statement may be admitted to show why the listener acted as she did.") (quotation and citation omitted); *United States v. Inglese*, 282 F.3d 528, 538 (7th Cir. 2002) (out-of-court statement is not hearsay when offered for the effect it had on the listener and to explain actions).  When a media report is used only for its effect on the reader, the jury is not asked to make any conclusions about the truth or falsity of the statements in that report, and the hearsay rules are not violated.

For instance, the government anticipates based on its investigation that some Theranos investors may testify that the positive coverage of Theranos in the news media contributed to their desire to invest in the company.  Indeed, the level of excitement and hype attached to Theranos had an unavoidable effect on potential investors, creating a sense of urgency that caused them to fear missing out on an

opportunity to invest in a company that was poised to become very successful.  The evidence at trial will show that Defendant exploited this atmosphere, sometimes setting deadlines that forced investors to make decisions on relatively short timetables without thorough due diligence.  Any news articles that contributed to an investor's eagerness to invest in Theranos—or their lack of skepticism and willingness to invest without additional fact-checking—is admissible for its effect on that witness.  Barring such witnesses from referencing publications that affected their decision-making would prevent them from fully explaining their actions to the jury, and risks leaving those victims open to unfair cross-examination by the defense.

### III.   Articles Are Admissible to the Extent Holmes or Her Agents Sent Them to Investors and Other Victims

While reliance on news articles alone to prove Defendant's statements during interviews might raise hearsay issues, the jury is entitled to know about Defendant's active use of misleading articles to defraud victims.  As referenced above, there was no shortage of favorable press coverage for Theranos from 2013 through most of 2015.  During that time period, Defendant and her agents regularly circulated certain of those articles to potential investors, members of the Theranos Board of Directors, and other influential individuals.  For instance, several potential investors received a binder from Theranos containing promotional materials as well as press clippings.  Theranos employees will likely testify at trial that Defendant was involved in selecting and approving the contents of information packages sent to investors. Dan Mosley was one Theranos investor who received such a binder, which included a copy of a September 8, 2013 article in the *Wall Street Journal* that reported several pieces of misinformation following an interview with Defendant.  That article stated that hundreds of Theranos employees were secretly working on "devices that automate and miniaturize more than 1,000 laboratory tests, from routine blood work to advanced genetic analysis," and reported that Theranos's processes were "more accurate than conventional methods" of testing.  *Id*.  The evidence will show that, when Defendant caused this article to be sent to investors like Mosley, she knew that Theranos's technology could not perform more than 1,000 laboratory tests, and that Theranos's tests were not more accurate than conventional methods.

In June 2014, Defendant personally emailed copies of an article in *Fortune* titled "This CEO Is

Out for Blood" to several influential individuals associated with Theranos, including Riley Bechtel, who subsequently purchased several million dollars of Theranos stock.

That article contained several misleading statements, including that Theranos "currently offers more than 200—and is ramping up to offer more than 1,000—of the most commonly ordered blood diagnostic tests, all without the need for a syringe," and touted the small footprint of the unique machines Theranos used for its tests.  *Id.*  When Defendant distributed that article to victims like Bechtel, she knew that those statements were false; Theranos depended on large, third-party analyzers for most of its tests, and relied on vein draws for a large proportion of its testing.  By distributing these materials to potential investors, Holmes implicitly but unmistakably endorsed their content, inviting recipients to rely on the statements in those publications.  The articles themselves and the fact that Holmes sent them to victims are admissible to show an important element of Defendant's fraudulent scheme.

Theranos employees operating under Defendant's supervision also promoted and redistributed articles with misleading content using Theranos's website along with social media platforms like Twitter.  Theranos's website displayed an extensive collection of favorable and misleading press, and Defendant was actively involved in monitoring and directing that content.  See Exh. 55 to Bob Leach Declaration.  Similarly, Defendant relied on Theranos's Twitter account to increase circulation of misleading articles.  In November 2013, for example, Theranos retweeted a *Singularity Hub* article claiming that Theranos's tests had improved precision because "all of the diagnostic technology is integrated," and touted Theranos's advantages over labs that used multiple devices.  In fact, Defendant knew that Theranos relied on other brands of analyzers for its tests, and even performed some manually rather than using integrated analyzers.  In June 2015, Theranos tweeted a link to an *Economist* article reporting that, while the company was in stealth mode, Defendant "perfected a way of doing hundreds of tests cheaply and quickly on a drop of blood."  As Defendant knew, Theranos never perfected methods for conducting hundreds of tests using a finger-stick sample.  The evidence at trial will show that Defendant was personally involved in monitoring and approving content tweeted by Theranos.  See Exh. 56 to Leach Decl.  It is important that the jury hear about this method of disseminating misleading information.

Withholding this kind of evidence from the jury would open an unintended loophole in the laws criminalizing fraud.  Defendant cites no authority for the proposition that a fraudster is responsible only for the misrepresentations she makes *directly* to a victim.  Indeed, the case law shows otherwise.  For example, in *United States v. Ciccone*, a defendant who carried out a telemarketing scheme argued on appeal that his fraud conviction should be overturned because he did not personally lie to the victims. *United States v. Ciccone*, 219 F.3d 1078, 1083-85 (9th Cir. 2000).  The Ninth Circuit rejected that argument and declined to impose a requirement that a fraud defendant make misrepresentations directly to the victim.  *Id.* at 1084.  Although that case involved false statements made by agents and co-conspirators of the defendant, its reasoning is instructive here.  It would be far too easy for a fraudster to avoid accountability by passing false statements through an intermediary, and there are myriad ways that a fraudster can transmit misleading information to a victim.  In this case, Defendant used a variety of methods to deceive and cheat Theranos's investors and customers—including by causing those victims to read news articles containing falsely favorable information about Theranos and its technology.  At trial, the jury should be allowed to hear evidence of all of the methods Defendant employed in furtherance of the fraud.

## IV.     Articles Are Admissible to the Extent Holmes Ratified their Contents Before or After Publication

Defendant also ratified the contents of certain news articles during conversations with journalists and Theranos employees before and after articles were published.  In a case where Defendant used the media as a vehicle to spread misleading information in furtherance of her fraud, the jury is entitled to consider evidence showing that she reviewed and approved deceptive statements in news articles.

For example, in Summer of 2013, Defendant was interviewed by the journalist who wrote the September 8, 2013 *Wall Street Journal* referenced in Section III above.  Days before that article was published, the journalist sent drafts of the article—including language attributed to her—so that she could have time to review and correct the facts reported in the article.  See Exh 57 to Leach Decl.  The draft article contained the same misleading statements discussed above, including the representations that Theranos was refining devices that automate and miniaturize thousands of tests, and that Theranos's processes were faster and more accurate than conventional methods.  *Id.*  Such evidence shows that

Defendant had a significant degree of control over the content of certain articles. Where those articles contain false information supplied and approved by Defendant herself, it is fair for the jury to hear about her role in disseminating that misleading information.

In another incident, an in-house attorney at Theranos noticed misleading information in a newspaper article in *Fortune* magazine resulting from an interview of Defendant. In particular, that newspaper article reported that Theranos "does not buy any analyzers from third parties." *Id.* This Theranos attorney knew better, and was aware that the company had purchased analyzers from third parties. The in-house lawyer, who is on the government's witness list, noticed at least two other pieces of inaccurate information in that same *Fortune* article, and was moved to raise the issue with Defendant directly. The government is still investigating the precise content of this witness's conversation with Defendant, but it has already confirmed that Defendant never reached out to *Fortune* or to the journalist who wrote that article in order to correct the misleading statements.

**V.     Articles Admitted for the Above Purposes are Not Unfairly Prejudicial**

Finally, Defendant argues that, regardless of the purpose for which news articles are introduced, they are all inadmissible under Rule 403 of the Federal Rules of Evidence. (Mot. at 4). Defendant's motion seeks to exclude dozens of unidentified articles on this basis, but this argument applies only to articles that were critical of Theranos. In contrast, the articles discussed above are generally favorable to Defendant and Theranos. Such articles are not unduly prejudicial to Defendant, partly because they carry high probative value in terms of context for relevant events and witnesses' actions, as well as a fuller understanding of the methods Defendant used to carry out her fraud. As for articles in the 2015-2016 time frame that portray Theranos negatively, the government intends to use these articles sparingly and only as necessary to provide context for subsequent events. In particular, the jury will need access to the content of the October 2015 article in *The Wall Street Journal* that exposed Theranos's deception. Some review of that article is necessary in order to understand Defendant's response to that reporting in the months that followed—a time period that saw Defendant double down on her fraud and make additional misleading statements about recent press coverage.

Defendant's arguments under Rule 403 fail to meet the required standard in light of the high probative value explained above. *See United States v. Mende*, 43 F.3d 1298, 1302 (9th Cir.1995)

("Under the terms of the rule, the danger of prejudice must not merely outweigh the probative value of the evidence, but substantially outweigh it."); *United States v. Patterson*, 819 F.2d 1495, 1505 (9th Cir.1987) (stating that Rule 403 is "an extraordinary remedy to be used sparingly"). Defendant's cited case law is not persuasive on this point, and the Court should not substitute those fact-specific holdings for its own judgment—informed by a review of specific exhibits during trial if necessary. "The Ninth Circuit recognizes that trial courts are in a much better position to sense the dynamics of a trial and to examine surrounding facts and circumstances than are courts of appeals." *Go-Video, Inc. v. Motion Picture Ass'n of Am.*, 977 F.2d 588 (9th Cir. 1992) (citing *R.B. Matthews v. Transamerica Transp. Servs.*, 945 F.2d 269 (9th Cir.1991)). Accordingly, the Court should decline to exclude any news articles under Rule 403 at this time.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's motion.

DATED: January 8, 2021

Respectfully submitted,

STEPHANIE M. HINDS
Attorney for the United States,
Acting Under Authority Conferred
By 28 U.S.C. § 515

 */s/ John C. Bostic*
JOHN C. BOSTIC
JEFF SCHENK
ROBERT S. LEACH
VANESSA BAEHR-JONES
Assistant United States Attorneys