STEPHANIE M. HINDS (CABN 154284)
Attorney for the United States,
Acting Under Authority Conferred By 28 U.S.C. § 515

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

JEFF SCHENK (CABN 234355)
JOHN C. BOSTIC (CABN 264367)
ROBERT S. LEACH (CABN 196191)
VANESSA BAEHR-JONES (CABN 281715)
Assistant United States Attorneys

    150 Almaden Boulevard, Suite 900
    San Jose, California 95113
    Telephone: (408) 535-5061
    Fax: (408) 535-5066
    Robert.Leach@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 18-CR-00258 EJD |
| Plaintiff, | UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE EXPERT OPINION TESTIMONY OF DR. STEPHEN MASTER UNDER RULES 401-403 AND 702 [ECF NO. 560] |
| v. | |
| ELIZABETH HOLMES, | |
| Defendant. | Date: March 23, 2021<br>Time: 10:00 a.m.<br>Court: Hon. Edward J. Davila |

The government respectfully submits its Opposition to Defendant's Motion *in Limine* to Exclude Expert Opinion Testimony of Dr. Stephen Master Under Rules 401-403 and 702.

**INTRODUCTION**

Dr. Stephen Master is Associate Professor of Pathology and Laboratory Medicine at the Perelman School of Medicine, University of Pennsylvania. He currently serves as Chief of the Division of Laboratory Medicine and Medical Director of the Michael Palmieri Laboratory for Metabolic and Advanced Diagnostics at Children's Hospital of Philadelphia. He is a Fellow of the College of American Pathologists ("CAP"). He is President-Elect of the Board of Directors of the American Association for Clinical Chemistry ("AACC"). Few, if any, are more qualified to assess whether Theranos's technology did what Defendant said it could do.

Based on his review of Theranos business records, testimony and statements of insiders (including Theranos's former lab director, Dr. Adam Rosendorff), and reports by the federal agencies that inspected Theranos, Dr. Master has opined (1) Theranos was not market-ready and capable of producing accurate and reliable fingerstick results for tests such as Vitamin D, chloride, potassium, bicarbonate, cholesterol, and sodium, and there are substantial questions about its ability to provide patient-appropriate results for calcium, HIV, HbA1c, and hCG, and (2) Theranos did not adhere to normal industry standards for clinical laboratory testing from 2013-2015, including by running patient samples when quality control checks were giving values out of the acceptable range, directly impacting the accuracy and reliability of the results that are returned to the patient or clinician. Dr. Master's opinions are fully consistent with observations by the Centers for Medicare & Medicaid Services ("CMS"), which observed in a survey of Theranos's laboratory deviations from conditions and standards so severe that they posed immediate jeopardy to patients. Dr. Master's opinions will aid the jury in assessing whether Defendant's representations to investors and patients about her analyzer and testing were as she claimed.

Because Dr. Master's opinions are relevant and reliable, they should be admitted. Defendant's motion should be denied.

# FACTUAL BACKGROUND

## I. Dr. Master's Qualifications

Dr. Master received an undergraduate degree in molecular biology from Princeton University. He holds both an MD and a PhD (in cell and molecular biology) from the University of Pennsylvania School of Medicine. He performed his residency at the Hospital of the University of Pennsylvania, where he served as Chief Resident in Clinical Pathology.

After joining the Penn faculty as an Assistant Professor of Pathology and Laboratory Medicine, he was appointed Medical Director of the Endocrinology Laboratory at the Hospital of the University of Pennsylvania. He also spent five years as director of the University of Pennsylvania translational core laboratory.

In 2015, Dr. Master moved to Cornell as a faculty member at Weill Cornell Medical Center in New York City, where he was director of the Central Laboratory and Chief of Clinical Chemistry Laboratory Services at Weill Cornell Medicine / New York Presbyterian Hospital.

In 2018, Dr. Master returned to Penn, where today he is Associate Professor of Pathology and Laboratory Medicine at the Perelman School of Medicine. He also is Chief of the Division of Laboratory Medicine and Medical Director of the Michael Palmieri Laboratory for Metabolic and Advanced Diagnostics at Children's Hospital of Philadelphia, one of the world's leading children's hospitals.

Dr. Master is board certified by the American Board of Pathology ("ABP") in Clinical Pathology. He holds an active medical license in Pennsylvania. He is a Fellow of CAP. He serves on the Board of Editors of the journal *Clinical Chemistry* and other journals. He has over 75 publications, including original research articles, reviews, and book chapters, and has lectured extensively at a national and international level on a variety of subjects related to clinical chemistry, including new paradigms for quality control. In addition, he is President-Elect of the Board of Directors of AACC.

Like many in the blood testing community, Dr. Master was familiar with Theranos well before the indictment in this matter. In addition, in the summer of 2016, after questions from *The Wall Street Journal* surfaced about the accuracy and reliability of Theranos's technology, Dr. Master, with Defendant's blessing, moderated a panel at AACC's annual meeting, where Defendant publicly

presented performance data on the most recent iteration of the blood analyzer Theranos had been developing. Defendant's presentation, which had been billed as Defendant's chance to silence critics, disappointed many. Defendant showed performance data for a small number of assays (not the hundreds that had been claimed previously), and provided no clear data on the robustness of the machines in an operational setting. Defendant, moreover, acknowledged that the technology Theranos showed was not ready for patient testing. ECF No. 580-5 at p.2 & 17.[1]

## II.     Dr. Master's Work and Opinions

Around February 3, 2020, the government first contacted Dr. Master about serving as an expert in this matter. On February 18, 2020, he was formally engaged. Dr. Master was provided thousands of pages of discovery from this matter, including Theranos business records, internal emails, testimony and witness statements from Theranos insiders, and reports from federal regulators. ECF No. 580-5 at Appendix B. Chief among them was a Form CMS-2567, Statement of Deficiencies issued by CMS in January 2016 outlining substantial deviations from conditions and standards for laboratories. The report included significant data about how Theranos's analyzer actually performed in operation with patients, for example:

- One device had 15 consecutive days that the results for Vitamin D[2] were at least two standard deviations above the mean from June 30 through July 25, 2014 (ECF No. 581-1 at 45), and records from other devices and other assays show this was not an outlier (*id.* at 42-46) (describing similar issues with Vitamin B12, TTD, TT3, and SHBG in January, February July, and October of 2014 and January and March 2015);

---

[1] The fact that Defendant was chosen to moderate this panel demonstrates both his independence and experience. Nothing bars his testimony of percipient events and statements by Defendant. Nor is it unreasonable or unreliable, in forming an opinion, to consider public statements by a defendant about her technology, particularly statements made in his presence. Moreover, it is not unreasonable or unreliable for an expert, or any witness, to infer that Defendant's presentation, under the circumstances, represented an authoritative description of Theranos's present abilities.

[2] Theranos told CMS that Vitamin D was the first assay it used with its analyzer in the CLIA lab, and it appears to be the assay that was tested for the longest period in the CLIA lab. *See* January 8, 2021 Declaration of AUSA Robert S. Leach in Support of United States' Opposition to Defendant's Motions *in Limine* ("1/8/2021 Leach Decl."), Ex. 6.

GOVT. OPP'N TO MOT. TO EXCLUDE DR. MASTER
TESTIMONY, CASE NO. 18-258 EJD              3

- Quality control results for Theranos's analyzer showed high coefficients of variation on multiple devices at times from June 2014 through February 2015 for not just Vitamin D but VB12 and SHBG (*id.* at 55-56);
- Monthly QC reports went unsigned by the lab director (*id.* at 56);
- July 2014 data showed the following tests showed percentage of QC samples with more than 15% of values greater than two standard deviations:  TST (28%), TT4 (21%), Vitamin D (28%).  Overall 16% of QC samples on all tests on all devices had values greater than two standard deviations (*id.* at 57);
- October 2014 data showed similar values for even more assays, and overall 29% of QC samples on all tests on all devices had values greater than two standard deviations (*id.*);
- February 2015 data showed a similar pattern (*id.*);
- March 2015 data showed a similar pattern, and by then Theranos had ceased using its analyzer for Vitamin D (*id.*; 1/8/2021 Leach Decl. Ex. 6);
- May 2015 data showed a similar pattern (ECF No. 581-1 at 58); and
- June 2015 data showed a similar pattern (*id.*).

Based on the above, CMS observed Theranos did not meet the standards or conditions for Analytic Systems Quality Assessment.  *Id.* at 52-53, 56-59.

On March 6, 2020, the government provided notice to Defendant under Rule 16(a)(1)(G) that it intended to call Dr. Master, and provided Defendant with a 20-page report detailing Dr. Master's opinions, the bases for his opinions, and the witness's qualifications.  Dr. Master's 20-page report sets forth two primary opinions:

*First*, Dr. Master opines:  "Theranos was not market ready and able to produce accurate and reliable fingerstick results for tests such as Vitamin D, chloride, potassium, bicarbonate, cholesterol, and sodium.  He opines further "there are substantial questions about the ability of their laboratory to provide patient-appropriate results for calcium, HIV, HbA1c, and hCG."  ECF No. 580-5 at p.12.

Second, Dr. Master opines "Theranos did not adhere to normal industry standards for clinical laboratory testing from 2013-2015."  He stated:  "Running patient samples when QC is giving values out of the acceptable range [as the CMS report described] directly impacts the accuracy and reliability of the

results that are returned to the patient or clinician." He opined further: "Theranos did not appropriately engage in proficiency testing," and that this had the potential to adversely affect the accuracy of its results. *Id.* at p.17 & 18.

On November 20, 2020, this motion followed. Defendant noticed no rebuttal expert to Dr. Master, nor has she identified anyone who will opine with respect to Theranos's technology.

**ARGUMENT**

**I.  LEGAL STANDARD**

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)  the testimony is based on sufficient facts or data;

(c)  the testimony is the product of reliable principles and methods; and

(d)  the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Court exercises a gatekeeping function to ensure an expert's proffered testimony is relevant and reliable. *United States v. Valencia-Lopez*, 971 F.3d 891, 897-98 (9th Cir. 2020).

"Relevancy simply requires that the evidence logically advance a material aspect of the party's case." *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1188 (9th Cir. 2019) (internal quotations omitted).

The reliability element is satisfied if the expert's testimony has "'a reliable basis in the knowledge and experience of the relevant discipline." *Id.* at 1188-89 (quoting *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014)). The Court is to "assess whether 'the reasoning or methodology underlying the testimony is scientifically valid' and 'properly can be applied to the facts in issue,' with the goal of ensuring that the expert 'employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Id.* at 1189 (quoting *Daubert*, 509 U.S. at 592-93 & *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). The "reliability inquiry is a flexible one, and the district court has broad latitude to determine what factors in

*Daubert*, if any, are relevant to the reliability determination." *Valencia-Lopez*, 971 F.3d at 898 (internal quotations omitted); *Lukov v. Schindler Elevator Corp.*, 2012 WL 248251, at *2 (N.D. Cal. Jun. 26, 2012) (Davila, J.) ("This role is a flexible one, however, such that 'the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable'" (quoting *Kumho Tire*, 526 U.S. at 152)).

As the notes to Rule 702 demonstrate, "rejection of expert testimony is the exception rather than the rule. *Daubert* did not work a 'seachange over federal evidence law,' and 'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.'" FED. R. EVID. 702 advisory comm. notes (quoting *United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi*, 80 F.3d 1074, 1078 (5th Cir. 1996)).

## II. DR. MASTER'S OPINIONS ARE ADMISSIBLE

Applying these principles, Dr. Master's opinions are relevant and reliable and should not be excluded. Nor is any *Daubert* hearing necessary.

### A. Dr. Master's Opinion About Theranos's Market Readiness and Ability to Produce Accurate Results Is Relevant and Reliable

Defendant dissects, reorders, and isolates portions of Dr. Master's report, but at bottom her complaints go entirely to the weight of Dr. Master's opinion and the judgment of an expert to rely on certain materials.

First, Defendant notes that Dr. Master defined accuracy and precision and discussed their role in determining the suitability of an assay for clinical use. She then accuses him of not "conduct[ing] that analysis for any of Theranos' tests." ECF No. 560 at 1:10-11. Defendant appears to fundamentally misunderstand the significance of Dr. Master's assessment of data in the CMS report. The precision of an assay is measured by repeatedly running the same material or sample over time to determine how reproducible the result is. At a number of points in the CMS report, the inspectors analyzed the behavior of quality control data from Theranos assays. Notably, quality control procedures repeatedly run the same material/sample over time to ensure that the performance of the instrument does not significantly change. Thus, the reported imprecision (expressed as %CV) from the quality control records *is* effectively data from a precision experiment in actual clinical practice, as implemented by Theranos

employees within the Theranos lab.  Thus, it simply is wrong to say Dr. Master does "not engage in any data analysis at all." *Id.* at 4:14.  Quite the contrary, Dr. Master assessed data derived from an inspection by a neutral, third party observer that explicitly reported the precision of Defendant's clinical assays in practice.  Defendant questions whether this is enough data to render a judgment, but this goes to the weight of Dr. Master's opinion.  The persistent problems with multiple assays and multiple devices over an extended period support Dr. Master's conclusion that Theranos was not market-ready[3] and able to produce accurate and reliable fingerstick results for tests such as Vitamin D.

Second, with respect to accuracy and cholesterol in particular, Defendant faults Dr. Master's reliance on specific experimental results designed to assess accuracy as reported in the peer-reviewed scientific paper (the "Icahn report") published in the *Journal of Clinical Investigation*.  This goes to the weight of Dr. Master's opinion.  Defendant points to nothing beyond disagreement that it is unreasonable or unreliable for a lab director to rely on journals in his field.  Further, Defendant misconstrues the nature of the paper's results when she argues "the Icahn study concluded that further investigation was needed before a firm conclusion on the accuracy of Theranos' cholesterol tests could be reached." ECF No. 560 at 13:19.  She simply omits any reference to statements in the paper such as the following: "In an effort to minimize systematic bias between the methods, most clinical laboratory assays in use today are standardized against reference materials.  The Theranos technology is unknown and, based on our data, does not fit the current regulatory guidelines as highlighted by the systemic biases in tests of total cholesterol, HDL-C, and LDL-C." (Kidd et al, p. 1740).  The paper goes on in the next sentence to recommend further investigation, but, the reason is not to determine if Theranos's cholesterol testing might be accurate after all; rather, it recommends "additional assessments" to determine how to account for this reported inaccuracy in terms of changing medical interpretation.

Third, for certain assays, Defendant faults Dr. Master for relying on customer complaints when assessing a laboratory test.  She argues: "Conspicuously, he does not opine that an expert in his field would rely on 'consumer complaints' to determine accuracy and reliability of a laboratory test." ECF

---

[3] In a footnote, Defendant quibbles with the word "market ready."  The lack of a scientific definition for ready for commercial use does not render Dr. Master's opinion irrelevant or unreliable.  Having run many labs and used many devices Dr. Master is fully capable to opine on whether a product and test is market ready.

GOVT. OPP'N TO MOT. TO EXCLUDE DR. MASTER
TESTIMONY, CASE NO. 18-258 EJD                              7

No. 560 at 12:3. This narrow reading of the notice ignores that it is implicit in his opinion. The government fully expects Dr. Master to testify that an expert in the field of laboratory medicine would consider customer complaints in assessing the accuracy and reliability of a test. He is likely to describe multiple instances in his career where customer feedback (whether the customer is an ordering physician or a patient) has directly led to uncovering systematic or patient-specific issues with a laboratory test, and that he regularly teaches trainees about the importance of paying attention to customer feedback as a way of identifying unresolved issues with assays. In fact, one of the lab directors *in this case* resigned from Theranos in part because increasing customer complaints led him to doubt the accuracy of Theranos tests. 1/8/2021 Leach Decl. Ex. 38 at 177-179.[4]

Fourth, with respect to potassium, Defendant: (1) ignores the fact Dr. Rosendorff after long clinical experience too came to the conclusion that Theranos had a "potassium problem" (*id.* Ex. 38 at 178), (2) ignores the conclusion of the FDA that Theranos was not even following its own validation plan (*id.* Ex. 14 at US-FDA-0035522), and (3) undervalues repeatedly Theranos business records questioning its potassium results. Her complaints go entirely to the weight of Dr. Master's opinion.

Finally, Defendant suggests Dr. Master lacks competence to assess fingerstick testing technology ECF No. 560 at 24. Defendant points to nothing to support this. And it is not supportable. Dr. Master's postgraduate medical training in Clinical Pathology is a formal credential that allows him to oversee laboratory testing, including fingerstick blood testing. He is board certified in Clinical Pathology by the American Board of Pathology – fingerstick blood testing falls within the discipline of Clinical Pathology. At various points, he has served as Director of Point of Care testing (which includes significant fingerstick blood testing) or has exercised similar oversight, both at Weill Cornell Medicine and Children's Hospital of Philadelphia. The Division of Laboratory Medicine at the Children's Hospital of Philadelphia includes fingerstick blood testing as part of Point of Care, and as Chief of that Division the technology comes under his professional purview.

---

[4] Defendant also faults Dr. Master for opining "there are substantial questions" with some assays, but that does not mean he has no opinion or that his opinion is irrelevant and unreliable. Given the certitude and breadth with which Defendant spoke – the highest levels of accuracy for virtually every test – Dr. Master's opinion will assist the jury in assessing if that was true, for example, with hCG.

GOVT. OPP'N TO MOT. TO EXCLUDE DR. MASTER
TESTIMONY, CASE NO. 18-258 EJD           8

Laced with terms like "anecdotal" (ECF No. 560 11:1), "snippets" (*id.* at 14:22), "patently insufficient" (*id.* at 14:25-26), "woefully inadequate" (*id.* at 15:2-4), and "paltry" (*id.* at 16:1), Defendant's complaints amount to an argument about the weight of evidence. Dr. Master's first opinion is reliable and relevant and should not be excluded.

### B. Dr. Master's Opinion That Theranos Did Not Adhere to Normal Industry Standards for Clinical Laboratory Testing from 2013-2015 Is Not an Impermissible Legal Opinion and Would Not Mislead the Jury

Based in part on the CMS report and other evidence, Dr. Master is expected to testify that Theranos did not adhere to normal industry standards by failing to have a quality control system for Edison devices and not appropriately engaging in proficiency testing. ECF No. 580-5 at p.17-19. His opinion is relevant and reliable.

Defendant suggests that Dr. Master is improperly offering legal opinions. Not so. The Ninth Circuit has permitted experts to testify about industry standards even where the testimony "relie[s] in part on [the expert's] understanding of the requirements of . . . law." *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004) ("'[A] witness may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible. Indeed, a witness may properly be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms.'" (quoting *Specht v. Jensen*, 853 F.2d 805, 809 (10th Cir. 1988)); *King v. GEICO Indem. Co.*, 712 Fed. Appx. 649 (9th Cir. 2017) (unpublished) ("Although it is well established that experts may not give opinions as to legal conclusions, experts may testify about industry standards . . . .").

Numerous lower courts have held that an expert is not prohibited from testifying about the standard of care in his industry merely because federal regulations form part of those standards. *Martinez v. Continental Tire the Americas, LLC*, No. 17-CV-922-KWR, 2020 WL 5943691, at *5 (D.N.M. Oct. 7, 2020); *see Sands v. Integon Nat'l Ins. Co.*, 2020 WL 7027442, at *4 (D. Colo. Nov. 30, 2020) ("[The expert] may not opine whether defendants met their duties under applicable caselaw or violated various statutes, but may testify whether, in his opinion, defendants' conduct conformed with specific insurance industry standards, including ones identified in those statutes.") *Rutstein v. Cindy's*

*Trucking of Illinois Inc.*, No. 11-CV-320-F, 2012 WL 8813611, at *4 (D. Wyo. Aug. 8, 2012) (expert testimony based in part on legal standards obtained from Federal Motor Carrier Regulations generally did not invade the province of the court or jury; expert is "[u]tilizing industry standards and practices, of which [federal] [r]egulations play[] an integral part, and comparing those industry standards to Defendants['] actual conduct" "does not state a legal conclusion"); *Valyou v. Vannest*, No. 15-CV-0191-S, 2016 WL 7664288, at *3 (D. Wyo. Sept. 19, 2016) (expert basing his opinions on experience, training, federal motor carrier regulations did not give impermissible legal conclusions); *SEC v. BankAtlantic Bancorp, Inc.*, No. 12-60082-CIV-SCOLA/OTAZO-REYES, 2013 WL 12009694, at *10-11 (S.D. Fla. Nov. 14, 2013) ("[E]xpert testimony on regulatory requirements and industry practices is permissible and does not, without more, constitute improper legal conclusions.").[5]

Here, the mere fact that industry standards are codified in federal regulation does not prevent Dr. Master from testifying to the substance of the standards. In other words, Dr. Master can testify that Theranos deviated from the substantive industry standards without testifying that Theranos violated a federal regulation. For example, according to the CMS report, 42 C.F.R. § 493.1289 provides "[t]he laboratory must establish and follow written policies and procedures for an ongoing mechanism to monitor, assess, and when indicated, correct problems identified in the analytic systems." ECF No. 581-1 at 52. CMS observed the standard was not met, in part, because "[b]ased on review of the quality control (QC) data and Monthly QC reports, the laboratory failed to have a quality assessment procedure to identify and correct problem[]s with QC values for the Theranos Proprietary System (TPS) when precision did not meet the laboratory's requirement for precision." *Id.* at 54. Testimony that such conduct failed to adhere to industry standards – without reference to violation of 42 C.F.R. § 493.1289 – is well within the expert's purview and does not constitute an impermissible legal opinion. This is particularly so because, as Dr. Master is expected to explain, federal regulations are less demanding than standards imposed by organizations such as CAP.

---

[5] Defendants' cases are not to the contrary. *See* United States' Opposition to Defendant's Motion *in Limine* to Exclude Evidence of Alleged Violations of Industry Standards and Government Regulations Under Rules 401-403 at 5.

Defendant also suggests that because Dr. Master is a lab director and not a lawyer, he cannot properly testify about the conditions and standards imbedded in CLIA or otherwise observed by the laboratory medical community. This is deeply misguided. CLIA standards and conditions fall on *lab directors*. It is the lab director, not the lawyer, who is subject to punishment when conditions and standards are not met. (Indeed, Dr. Sunil Dhawan, who was Defendant's lab director at the time of the CMS survey, was sanctioned for failing to meet his responsibilities.) Dr. Rosendorff will corroborate Dr. Master that lab directors must be familiar with the standards and conditions in CLIA. Dr. Master and his laboratory are required to follow federal regulations and other professional standards as part of his daily professional practice. Regulatory requirements of the laboratory are part of his professional training, and he gives formal, annual lectures to trainees on precisely this subject. There can be no question that opinions about these issues reflect prevailing understandings within the laboratory medicine community, and thus are an accurate reflection of what are considered industry standards.

Finally, Defendant argues Dr. Master's opinion is misleading because he does not tie it to accuracy and reliability. Not so. With respect to Theranos's quality control failures, Dr. Master's report states: "Running patient samples when QC is giving values out of the acceptable range [as the CMS report described] directly impacts the accuracy and reliability of the results that are returned to the patient or clinician." With respect to proficiency testing, Defendant herself makes the connection to accuracy. For example, she touted Theranos's purported 100% proficiency testing score in investor PowerPoints as a measure of Theranos's accuracy. ECF No. 588-2 at RDV012679. This case is wholly distinguishable for *Daubert v. Merrell Dow Pharm. (Daubert II)*, 43 F.3d 1311 (9th Cir.1995), where the plaintiff was required to prove causation. Here, in the context of this fraud case, Dr. Master's opinion will aid the jury in assessing whether Defendant had a basis to make the definitive statements she made about accuracy. His opinion will also aid the jury in understanding and assessing Dr. Rosendorff's complaints about proficiency testing in 2014.

## CONCLUSION

The Court should deny the motion to exclude Dr. Master's testimony. Because there is no genuine dispute that his opinions are relevant and reliable, the Court need not hold a *Daubert* hearing.

To the extent the Court has questions about admissibility, the Court should order a *Daubert* hearing prior to granting the motion.

DATED: January 8, 2021                                         Respectfully submitted,

STEPHANIE M. HINDS
Attorney for the United States,
Acting Under Authority Conferred
By 28 U.S.C. § 515

*/s Robert S. Leach*
_____
JEFF SCHENK
JOHN C. BOSTIC
ROBERT S. LEACH
VANESSA BAEHR-JONES
Assistant United States Attorneys