STEPHANIE M. HINDS (CABN 154284)
Attorney for the United States,
Acting Under Authority Conferred By 28 U.S.C. § 515

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

JEFF SCHENK (CABN 234355)
JOHN C. BOSTIC (CABN 264367)
ROBERT S. LEACH (CABN 196191)
VANESSA BAEHR-JONES (CABN 281715)
Assistant United States Attorneys

     150 Almaden Boulevard, Suite 900
     San Jose, California 95113
     Telephone: (408) 535-5061
     Fax: (408) 535-5066
     Robert.Leach@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. 18-CR-00258 EJD |
|     Plaintiff, | ) |
| v. | ) UNITED STATES' OPPOSITION TO |
| | ) DEFENDANT'S MOTION IN LIMINE TO |
| | ) EXCLUDE FDA INSPECTION EVIDENCE |
| ELIZABETH HOLMES, | ) UNDER RULES 401-404 AND 801-803 |
| | ) [ECF NO. 573] |
|     Defendant. | ) |
| | ) Date:   March 23, 2021 |
| | ) Time:  10:00 a.m. |
| | ) Court:  Hon. Edward J. Davila |

## **TABLE OF CONTENTS**

INTRODUCTION……………………………………………………………………… 1

FACTUAL BACKGROUND………………………………………………………….. 1

ARGUMENT…………………………………………………………………………… 7

    I.     There Is No Basis for a Categorical Exclusion of Evidence of the FDA Inspection……….. 7

    II.    The FDA Forms 483 Are Not Excludable Hearsay…………………………………… 9

CONCLUSION………………………………………………………………………..  12

1

## **TABLE OF AUTHORITIES**

2

### **Cases**

3

4

*Curtis v. M&S Petroleum. Inc.*, 174 F.3d 661 (5th Cir. 1999) ................................................... 8

*Manocchio v. Moran*, 919 F.2d 770 (1st Cir. 1990) .................................................................. 10

5

*Smith v. I-Flow Corp.*, 2011 WL 12627557 (N.D. Ill. 2011) ..................................................... 8

6

7

*United States v. Ayers*, 924 F.2d 1468 (9th Cir.1991) ............................................................... 9

8

*United States v. Edelmann*, 458 F.3d 791 (8th Cir. 2006) ........................................................ 11

9

*United States v. Fryberg*, 854 F.3d 1126 (9th Cir. 2017) ........................................................... 9

10

*United States v. Grady*, 544 F.2d 598 (2d Cir. 1976) ............................................................... 11

11

*United States v. Hansen*, 583 F.2d 325 (7th Cir. 1978) ............................................................ 10

12

*United States v. Hernandez–Rojas*, 617 F.2d 533 (9th Cir.1980)............................................. 10

13

*United States v. Lopez*, 762 F.3d 852 (9th Cir. 2014)............................................................... 10

14

*United States v. Orellana-Blanco*, 294 F.3d 1143 (9th Cir. 2002) ........................................... 12

15

*United States v. Orozco*, 590 F.2d 789 (9th Cir. 1979) ............................................................ 11

16

*United States v. Rosa*, 11 F.3d 315 (2d Cir. 1993) .................................................................. 10

17

*United States v. Sims*, 617 F.2d 1371 (9th Cir. 1980)............................................................... 12

18

*United States v. Sine*, 493 F.3d 1021 (9th Cir. 2007) ................................................................ 8

19

*United States v. Stone*, 604 F.2d 922 (5th Cir. 1979) ............................................................... 10

20

### **Statutes**

21

22

28 U.S.C. § 515 ..................................................................................................................... 1, 12

23

### **Rules**

24

Fed R. Evid. 803(5) .................................................................................................................. 12

25

Fed R. Evid. 803(8) .................................................................................................................... 9

26

27

28

1    The government respectfully submits its Opposition to Defendant's Motion *in Limine* to Exclude

2    FDA Inspection Evidence Under Rules 401-404 and 801-803.

3                                    **INTRODUCTION**

4           Defendant seeks to exclude "any evidence, argument, or reference to the FDA's 2015

5    inspections."  ECF No. 573-1 at 2.  The Court should decline to do so.  Defendant's statements and

6    conduct during the FDA inspection are relevant to her state of mind, intent, and knowledge.  FDA's

7    observations – particularly that Theranos's own design validation plan for its "nanotainer" showed four

8    assays failed the plan's accuracy criteria – have a tendency to show that Theranos could not provide

9    accurate, fast, reliable, and cheap blood test results, as the operative indictment alleges.  Rule 403 is no

10   basis for exclusion.  The fact that Defendant's statements and conduct were in the context of a

11   regulatory inspection increases their relevance; to the extent Defendant fears FDA observations will be

12   deemed "authoritative," she may cross-examine them.  Finally, FDA's observations – communicated to

13   Defendant in Forms 483, Inspectional Observations – are not excludable hearsay, but are public records,

14   and thus are admissible for their truth.  In any event, the forms are admissible for non-hearsay purposes,

15   testimony about the inspection is not excludable hearsay, and Defendant's responses to the Forms 483

16   are not hearsay.  Defendant's motion should be denied.

17                                **FACTUAL BACKGROUND**

18          The operative indictment alleges Defendant and Ramesh Balwani "represent[ed] . . . that

19   Theranos could provide accurate, fast, reliable and cheap blood test and test results . . . [despite

20   knowing] Theranos's technology was, in fact, not capable of consistently producing accurate and

21   reliable results."  ECF No. 469 ¶ 16.  Evidence at trial will show Defendant was aware that persistent

22   problems with Theranos's blood collection tubes – variously referred to as Theranos Sample Collection

23   Devices ("TSCDs"), Capillary Tubes and Nanotainers ("CTNs"), or just "nanotainers" – were affecting

24   test results.  For example, on November 7, 2013, Defendant's brother stated he would bring up with her

25   concerns by employees who "look[ed] through each nanotainer that came back from [Walgreens]

26   training and [saw] with our own eyes the poor quality of specimens that are being collected."  *See*

27   January 8, 2021 Declaration of AUSA Robert S. Leach in Support of United States' Opposition to

28

Defendant's Motions *in Limine* ("1/8/2021 Leach Decl."), Ex. 9 at THPFM0001526357.  On May 10, 2014, Defendant's vice president advised her:  "I do have concerns about sample quality in the CTN impacting ISE [e.g., sodium, chloride, potassium, and bicarbonate] results."  *Id.* Ex. 10 at TS-1137753. On May 15, 2014, Balwani alerted Defendant to an "[a]stonishing number of ctn failures" and discouraged her from widely sharing such information.  *Id.* Ex. 11 at TS-0812982; Ex. 12 at TS-0813437.  On November 19, 2014, Balwani confided in Defendant:  "Need ctn fixed.  Our root cause of issues."  ECF No. 594 at THER-2566600 (Ex. M to 11/20/2020 Declaration of AUSA Robert S. Leach (ECF No. 588-1)).  Nanotainer issues were so pervasive that, by January 2016, a Theranos employee advised Defendant that Theranos should extract samples manually until it could get to the root cause of the issue.  1/08/2021 Leach Decl. Ex. 13.

On August 25, 2015, the FDA commenced a regulatory inspection of Theranos.  As the defense notes, a focus of the inspection was on nanotainers.  ECF No. 573 at 3; 1/8/2021 Leach Decl. Ex. 14 at US-FDA-0035542.

Throughout the inspection, Defendant and Balwani texted repeatedly, reflecting deep coordination, an obsession over secrecy, an effort to manage and influence the FDA inspectors, anxiety over what the FDA might find, acknowledgment that statements Theranos was making were misleading, a plan to run "circles" around the regulator, and plans both to abandon the nanotainer and to devote more resources to making it work.  For example, between August 25 and September 2, 2015, they stated:

| | |
|---|---|
| Defendant: | All documents need to be labeled with foia exemption language |
| . . . | |
| Defendant: | On text |
| Balwani: | Yep.  I am on email. |
| Defendant: | Text if need me.  Still haven't started here. |
| . . . | |
| Defendant: | They are back here.  Will be on text. |
| Defendant: | Text better than email as I'll see it when I'm talking |
| Balwani: | Ok |

| | | |
|---|---|---|
| 1 | Defendant: | All three sites today got an inspector and one of Courtney's deputies |
| 2 | Balwani: | Yep |
| 3 | . . . | |
| 4 | Defendant: | They said they are trying to show that there are no quality issues and ctn performs as intended.  OK whether it's under the CLIA lab or FDA system so we can pull CLIA systems if needed. |
| 5 | | |
| 6 | . . . | |
| 7 | Defendant: | We are preparing for Dan to call someone he knows at very top of Fda because he knows him.  May ruffle feathers but we think he will get that 483 will be bad for Fda are also drafting email to Alberto [Gutierrez, a senior FDA official] to let him know we're following up with counsel on this (leave door open for Dan) |
| 8 | | |
| 9 | . . . | |
| 10 | | |
| 11 | Defendant: | Do you have comments on my email to Alberto |
| 12 | . . . | |
| 13 | Defendant: | Sole purpose is to mitigate surprise when he hears top Fda officials are now involved because our counsel called them. |
| 14 | Balwani: | I actually don't think it matters or that we should give a fuck. |
| 15 | Balwani: | It's time to get in high gear against him. |
| 16 | Balwani: | He should have called this off this morning. |
| 17 | . . . | |
| 18 | Defendant: | So far do u have any indication of 483 likelihood there |
| 19 | . . . | |
| 20 | Balwani: | We need to change .com provider section.  It talks about micro samples and reflect testing on micro samples. |
| 21 | Defendant: | Is that from audit? |
| 22 | Balwani: | No |
| 23 | Balwani: | Just saying it is a disaster. |
| 24 | Balwani: | Will talk later. |
| 25 | Balwani: | It is partially from audit.  See my email in 2 minutes |
| 26 | . . . | |
| 27 | Balwani: | We should discuss tonite turning CTN off. |
| 28 | Defendant: | Been thinking about it. |

GOV'T OPP'N TO MOT. TO EXCLUDE FDA INSPECTION  3
CASE NO. 18-258 EJD

| | | |
|---|---|---|
| 1 | Balwani: | We don't want them to say we are marketing LDTs.  At least we can stop CTN |
| 2 | | for direct access. |
| 3 | . . . | |
| 4 | Balwani: | We can build this business . . . and run circles around others and fda by |
| | | manipulating their game. |
| 5 | Balwani: | We just need a fresh start and a giant step back.  Like we discussed lay [sic] night. |
| 6 | | Do CTN PMA on our terms and then go intelligent on marketing.  intelligent. |
| 7 | Defendant: | We can definitely run circles. |
| 8 | Defendant: | This isn't even a game.  It's straight out harassment. |
| 9 | Balwani: | Yes |
| 10 | Defendant: | With pma you can market whatever you want |
| 11 | Balwani: | Not LdTs |
| 12 | Defendant: | But all our marketing now is for our lab. |
| 13 | Balwani: | Yes |
| 14 | Defendant | (Agree) |
| 15 | Balwani: | That's the intelligent part. |
| 16 | Balwani: | We can market our lab and everything and people will talk about our fingerstick. |
| 17 | | Without us talking about it. |
| 18 | Defendant: | Yea |
| | Balwani: | Once we have 70% fs |
| 19 | . . . | |
| 20 | Balwani: | We also need to put ALL resources on CTN submission and potassium |
| 21 | | submission. |
| 22 | Defendant: | Agree |

ECF No. 595 at THER-2566752-760 (Ex. M to 11/20/2020 Declaration of AUSA Robert S. Leach (ECF No. 588)).

During the inspection, Defendant made numerous admissions to the FDA.  She stated that she was the most responsible individual at the firm; that she was responsible for overall Theranos operations; and that she oversaw the quality system.  1/8/2021 Leach Decl. Ex. 14 at US-FDA-0035543 & US-FDA-0035550.  She sought to de-emphasize the use of the nanotainer by stating that only 12% of

all samples collected involved the nanotainer.  *Id.* at US-FDA-0035554.  She provided documents

showing that by August 2015 Theranos had completely stopped using its analyzer (generally called the

TSPU or Edison 3.5) in its CLIA laboratory.  *Id.* at US-FDA-0035545-46, US-FDA-0035616-17, US-

FDA-0035623-27, US-FDA-0035633-34; *see also id.* at US-FDA-0035544 (noting that Theranos

"stopped using [its TSPU] in July 2015 because they are in the process of building an upgraded version

and no longer support the older version").  FDA inspectors observed:  "She was present and actively

participated in the inspection process and provided the majority of relevant documents."  *Id.* at US-

FDA-0035550.

Defendant and her agents repeatedly questioned the FDA's authority.  In the words of

Theranos's General Counsel, Theranos "repeatedly objected orally and in writing to the scope and

premises underlying a number of aspects of FDA's inspection and related requests for documentation."

ECF No. 586-4 at 5 (Def. Ex. 50).  One inspector observed "the firm's lawyers . . . are constantly in the

conference room, voicing and documenting their objections to many of my requests or questions."  *Id.* at

2 (Def. Ex. 50).  The same inspector reported running "into resistance regarding customer complaints. . .

. I kept pushing Sunny to show me an example of the Customer Service complaint log. . . . He, and Lisa

Barclay (the ex-Chief of Staff for [FDA Commissioner] Margaret Hamburg) initially told me I had no

jurisdiction to see this log, but . . . they relented and said that they will give me 'a sample'.  When I

pushed to see the entire log, they told me that it is thousands of complaints . . . ."  ECF No. 586-3 at 3-4

(Def. Ex. 49).  At one point, Balwani suggested to an inspector that Theranos was "going to make a

legal challenge to our inspections."  ECF No. 586-6 at 4 (Def. Ex. 52).  The inspector "suspected as

much with all the lawyers and paralegals involved" but noted "that was the first time he actually came

out and said it to me."  Another added:  "they are challenging my observation 'big time' that the

Nanotainers have to be validated with *every* assay they offer."  *Id.* at 3-4 (Def. Ex. 52); *see also*

1/8/2021 Leach Decl. Ex. 15 at US-FDA-0024046-47, 49.

On September 16, 2015, the inspectors issued two Forms FDA 483, Inspectional Observations,

which typically are issued at the conclusion of an inspection when an investigator has observed any

conditions that may constitute violations of the Food Drug and Cosmetic Act and related acts.  *See*

1   https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-

2   references/fda-form-483-frequently-asked-questions.

3     One Form 483, for the Palo Alto facility, observed Theranos's "[d]esign validation did not

4   ensure the device conforms to defined user needs and intended uses." 1/8/2021 Leach Decl. Ex. 14 at

5   US-FDA-0035522. It observed Theranos's design validation plan excluded a number of assays, yet

6   Theranos performed thousands of tests for such assays using the nanotainer. *Id.* It observed that four

7   assays (bicarbonate, calcium, glucose, and potassium) failed acceptance criteria in the validation plan

8   and required further investigation – yet Theranos continued to use the nanotainer for such assays. *Id.*;

9   *see also* ECF No. 586-3 at 5 (Def. Ex. 49) ("[an inspector] was going over design validation and found

10  that several assays failed acceptance criteria but the validation still passed. The firm says they have an

11  explanation but there is no documentation in the validation report that explains the deviations. Elizabeth

12  says they are going to compile documents that explain the failures. The protocol is also deficient.").

13  When confronted with this, Defendant had Theranos employees prepare an appendix after the fact –

14  relying in part on studies conducted in June/August 2015 – purporting to demonstrate the four assays

15  could safely be used with the nanotainer. 1/8/2021 Leach Decl. Ex. 14 at US-FDA-0035555-56. In the

16  Form 483, the FDA observed the appendix was not reviewed and approved by designated individuals

17  prior to issuance. *Id.* Ex. US-FDA-0035522.

18    The second Form 483, for the Newark facility, observed, among other things, that (1) Theranos

19  was shipping an uncleared medical device – *i.e.*, the nanotainer – in interstate commerce, and

20  (2) procedures for receiving, reviewing, and evaluating complaints had not been adequately established.

21  *Id.* Ex. 16 at THPFM0002376499.

22    On October 7, 2015, Defendant provided formal responses to the Forms 483 for Palo Alto and

23  Newark. *Id.* Exs. 17 & Ex. 18.

24              **ARGUMENT**

25  **I. There Is No Basis for a Categorical Exclusion of Evidence of the FDA Inspection.**

26    Defendant seeks an order excluding "any evidence, argument, or reference to the FDA's 2015

27  inspections." 573-1 at 2. There is no basis for such an order.

28

1    Evidence of conduct and statements by Defendant, Balwani, and their agents during the FDA

2    inspection is relevant and has a tendency to reflect Defendant's state of mind and intent, as well as her

3    agreement to a common plan with Balwani.  Defendant and Balwani's communications during the

4    inspection reveal deep coordination (reflecting the existence of a conspiratorial agreement), an obsession

5    over secrecy (reflecting a belief that scrutiny of Theranos technology would expose its flaws and

6    knowledge of falsity), an effort to manage and influence the FDA inspectors (reflecting anxiety over

7    what the FDA might find), a desire to change the Theranos website (reflecting knowledge their

8    statements were false and misleading), a plan to run "circles" around the regulator (reflecting a disdain

9    for regulation and a belief they could avoid scrutiny of their technology), plans to abandon the

10   nanotainer (reflecting knowledge it was not working), and plans to devote more resources to the

11   nanotainer (reflecting knowledge it was not working).  Indeed, it is difficult to imagine evidence more

12   probative of intent than Defendant's private communications with Balwani during government

13   inspection.

14   Defendant argues:  "The inspections postdate any statements made by Ms. Holmes to induce

15   investments during the conspiracy period, as Theranos' final investment round during the charged

16   conspiracy period had closed four months earlier."  ECF No. 573 at 1:4-6.  This is both wrong and

17   irrelevant.  It is wrong because there is evidence Defendant solicited investments through at least

18   November 2015, well after the FDA inspection.  1/8/2021 Leach Decl. Exs. 19 & 20.  It is irrelevant

19   because statements and conduct in August and September 2015 have a tendency to show knowledge of

20   issues with the nanotainer and failings in Theranos's technology.

21   The observations of FDA inspectors, memorialized in the Forms 483, also have a tendency to

22   show Defendant's statements about Theranos's technology were false and misleading.  For example, the

23   fact that FDA observed that four assays (bicarbonate, calcium, glucose, and potassium) failed

24   acceptance criteria in the validation plan and required further investigation tends to show Theranos's

25   nanotainer was not working as designed and Theranos was not capable of consistently producing

26   accurate and reliable results.  Evidence of the FDA inspection easily clears the low bar for relevance.

27   Rule 403 does not bar evidence of the FDA inspection.  Defendant argues jurors may "perceive

28   FDA's decision to conduct unannounced inspections of Theranos as indicative of Ms. Holmes' guilt."

GOV'T OPP'N TO MOT. TO EXCLUDE FDA INSPECTION  7
CASE NO. 18-258 EJD

1    ECF No. 573 at 6:20-22.  This is speculation supported by none of the cases cited by Defendant.  Her

2    best case, *United States v. Sine*, 493 F.3d 1021, 1033 (9th Cir. 2007), involved the admission of

3    "adverse, derogatory factual findings and comments" by a *judge*.  Indeed, when observing "jurors are

4    likely to defer to findings and determinations relevant to credibility made by an authoritative,

5    professional factfinder," the court cited Federal Rule of Evidence 605 ("The presiding judge may not

6    testify as a witness at the trial") and authorities touching on the judge as witness.  But evidence does not

7    become unduly prejudicial just because it comes from a regulator.[1]  The mere fact that a regulator

8    elected to do an inspection in a highly regulated environment is not unduly prejudicial.  Defendant's

9    argument could be used to exclude any interaction with a government agent.

10          Defendant also argues she will need to challenge "the accuracy and legal basis for the inspectors'

11   observations."  ECF No. 573 at 7:11-14.  But their observations go directly to whether tests resulting

12   from use of the nanotainer were accurate and reliable, one of the allegations in the indictment.  The fact

13   that Defendant may wish to cross-examine or undercut evidence is not a basis to exclude evidence

14   altogether.  She also suggests a need to litigate "the accuracy of the investigators' claims that Theranos

15   employees (not Ms. Holmes) took certain actions."  *Id.* at 7:14-16.  But as demonstrated by the text

16   messages and evidence described above, there is every reason to think Defendant was in command of

17   and responsible for Theranos's responses to the FDA inspection.

18          Finally, Defendant's claim that her resistance to the FDA inspection is excludable under Rule

19   404(b) is misplaced.  The evidence is not offered to prove propensity, but to prove state of mind, intent,

20   knowledge, and consciousness of guilt.  *See United States v. Ayers,* 924 F.2d 1468, 1472–73 (9th

21   Cir.1991) (stating evidence of other crimes is admissible "except where it tends to prove *only* criminal

22   disposition").  To the extent evidence of Defendant's statements to and demeanor before regulators can

23   even be considered an other act, wrong, or crime, it satisfies the standards for Rule 404(b).  The

24   evidence is relevant to a material issue in the case (i.e. intent); her acts were *during* the conspiracy and

25

26   [1]     *Curtis v. M&S Petroleum. Inc.*, 174 F.3d 661, 673 (5th Cir. 1999), is inapt and unpersuasive; the
     court in a toxic tort case relied primarily on the cumulative nature of the evidence.  The unpublished
27   decision in *Smith v. I-Flow Corp.*, 2011 WL 12627557, at *2 (N.D. Ill. 2011), is even less helpful.  The
     case involves no meaningful analysis and appears to exclude evidence of an FDA warning *after* the
28   tortious event at issue.

GOV'T OPP'N TO MOT. TO EXCLUDE FDA INSPECTION  8
CASE NO. 18-258 EJD

1   in furtherance of it; there is more than sufficient evidence connecting Defendant to the act; and her acts

2   are similar to the offenses charged and consistent with a long pattern of resisting scrutiny of her

3   technology.

4   **II.      The FDA Forms 483 Are Not Excludable Hearsay.**

5          Under Federal Rule of Evidence 803(8), the rule against hearsay does not apply to:

6   A record or statement of a public office if:

7          **(A)** it sets out:

8                  **(i)** the office's activities;

9                  **(ii)** a matter observed while under a legal duty to report, but not including, in a
                   criminal case, a matter observed by law-enforcement personnel; or

10                 **(iii)** in a civil case or against the government in a criminal case, factual findings
                   from a legally authorized investigation; and

11

12         (B)     the opponent does not show that the sources of information or other circumstances
                   indicate a lack of trustworthiness.

13   FED R. EVID. 803(8).  Rule 803(8)(A)(ii) thus permits admission of out-of-court statements of public

14   offices setting out a matter observed while under a legal duty to report, except, in criminal cases such as

15   this, a matter observed by "law-enforcement personnel."

16         The Ninth Circuit has adopted a "narrow understanding of the law enforcement exception."

17   *United States v. Fryberg*, 854 F.3d 1126, 1132 (9th Cir. 2017).  Consistent with this, courts have found

18   that civil government employees such as city building inspectors, medical examiners, and prison case

19   managers are not "law-enforcement personnel" within the meaning of the rule.  *See United States v.*

20   *Hansen*, 583 F.2d 325, 333 (7th Cir. 1978) ("It was argued . . . that the enforcement of the building code

21   was a 'quasi-criminal' procedure.  It appears that failure to comply with the building code may result in

22   a fine, but not in a criminal conviction.  We do not believe we are justified in broadening the

23   interpretation of . . . 'police officers and other law enforcement personnel' to include city building

24   inspectors."); *United States v. Rosa*, 11 F.3d 315 (2d Cir. 1993) (medical examiner); *Manocchio v.*

25   *Moran*, 919 F.2d 770, 777 (1st Cir. 1990) (medical examiner); *United States v. Edelmann*, 458 F.3d 791,

26   813-14 (8th Cir. 2006) ("Wilson is not a police officer or a member of law enforcement; instead, she is

27   an Inmate Systems Manager who produced the memorandum in the normal course of her duties.  The

28   memorandum does not contain any opinions, findings, or conclusions; it is a record of events

communicated to Wilson and recorded contemporaneously with the events. . . . Because Wilson does not qualify as a police officer or other law enforcement personnel, Rule 803(8)(B) does not apply to the memorandum Wilson created.").

Further, even when the statement sets out a matter observed by law enforcement, the Ninth Circuit has "looked to the purpose of the law enforcement exception in determining the admissibility of a public record." *United States v. Hernandez–Rojas,* 617 F.2d 533, 535 (9th Cir.1980) (holding a warrant of deportation signed by a US immigration officer was not excludable hearsay). The rule, thus, "does not bar the admission of all law enforcement agency records." *Edelmann*, 458 F.3d at 813. The Ninth Circuit has "noted that the *purpose* of the law enforcement exception is to 'exclude observations made by officials at the scene of the crime or apprehension, because observations made in an adversarial setting are less reliable than observations made by public officials in other situations.'" *United States v. Lopez*, 762 F.3d 852, 861 (9th Cir. 2014) (affirming admission of an ICE Form I-296 verification of removal) (quoting *United States v. Hernandez–Rojas,* 617 F.2d 533, 535 (9th Cir.1980)).[2] The Ninth Circuit also has underscored "'(i)n adopting this exception, Congress was concerned about prosecutors attempting to prove their cases in chief simply by putting into evidence police officers' reports of their contemporaneous observations of crime.'" *United States v. Orozco*, 590 F.2d 789, 793–94 (9th Cir. 1979) (quoting *United States v. Grady*, 544 F.2d 598, 604 (2d Cir. 1976)) (alteration in original) (upholding admission of computer data cards generated by law enforcement personnel).[3] Thus, even when observations of law-enforcement personnel are involved, the Ninth Circuit distinguishes "observations made in an adversarial setting" and "routine, nonadversarial matters." *Hernandez-Rojas*, 617 F.2d at 535; *Orozco*, 590 F.2d at 793; *United States v. Orellana-Blanco*, 294 F.3d 1143, 1150 (9th Cir. 2002) (holding Rule 803(8)(A)(ii) does not apply to a law-enforcement memorandum of interview and observing "the government should have called [the memorandum's author] as a witness").

---

[2]     In *Hernandez-Rojas*, the Ninth Circuit affirmed admission of a warrant of deportation and cited with approval the Fifth Circuit's observation: "Rule 803(8) is designed to allow admission of official records prepared for purposes independent of litigation." 617 F.2d at 535 (citing *United States v. Stone*, 604 F.2d 922 (5th Cir. 1979)).

[3]     The law-enforcement personnel exception thus avoids potential issues under the Confrontation Clause if the defendant is unable to cross-examine the author of the report. *See* U.S. Const. Amend. VI.

The FDA Forms 483 issued to Defendant meet the elements of Rule 803(8)(A)(ii).  They are records of statements of a public office setting out matters observed while under a duty to report.  The exception does not extend in criminal cases to matters observed by "law enforcement-personnel," but the FDA inspectors are not "law-enforcement personnel" within the meaning of the rule.  They are not the police.  They have no criminal law enforcement power.  They did not prepare the Forms 483 with a view to a criminal prosecution.  They are more akin to the city building inspector in *Hansen*, the medical examiners in *Rosa* and *Manocchio*, and the prison official in *Edelmann*.

Even if the FDA inspectors are properly considered "law-enforcement personnel," the law-enforcement exception does not apply.  The inspectors observations were not made in an adversarial setting, in the same way a police report of a suspect interview at the scene of the crime is.  To the contrary, the FDA inspectors were trying to ensure the safety, accuracy, and reliability of Theranos's technology.  Put simply, the FDA inspectors are not the police; the FDA Forms 483 are not police reports; and the Defendant's broad interpretation of the law-enforcement exception is at odds with Ninth Circuit authority and render inadmissible large swaths of government documents that may be appropriately relied on.

None of the Ninth Circuit cases cited by Defendant is to the contrary.  In *Orozco*, it was not disputed the government agent was "law-enforcement personnel" and the court ultimately affirmed admission of the evidence.  *Orellana-Blanco* too involved conceded "law-enforcement personnel" and involved a government memorandum of interview that was certain to be used for litigation.  *United States v. Sims,* 617 F.2d 1371, 1377 (9th Cir. 1980) likewise involved an FBI memorandum of interview.  Both were adversarial settings in anticipation of criminal charges.

Finally, the Forms 483 may be properly admitted for non-hearsay purposes – including to show notice to Defendant and to undercut the veracity of statements she made to investors that Theranos ceased using the nanotainer voluntarily.  And, in no circumstances should FDA inspectors (or Theranos

employees) be precluded from testifying about their first-hand observations and conclusions during the inspection.  Finally, Defendant's responses to the Forms 483 are not excludable as hearsay.[4]

## CONCLUSION

For these reasons, the Court should deny the motion.

DATED:  January 8, 2021

Respectfully submitted,

STEPHANIE M. HINDS
Attorney for the United States,
Acting Under Authority Conferred
By 28 U.S.C. § 515

*/s Robert S. Leach*
_____
JEFF SCHENK
JOHN C. BOSTIC
ROBERT S. LEACH
VANESSA BAEHR-JONES
Assistant United States Attorneys

---

[4]      Defendant identifies a number of internal FDA emails.  The Court should decline to exclude them now.  They may be used to refresh recollection and may fall under other exceptions to the hearsay rule, such as the exception for recorded recollection.  *See* Fed. R. Evid. 803(5).

GOV'T OPP'N TO MOT. TO EXCLUDE FDA INSPECTION   12
CASE NO. 18-258 EJD