STEPHANIE M. HINDS (CABN 154284)
Attorney for the United States,
Acting Under Authority Conferred By 28 U.S.C. § 515

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

JEFF SCHENK (CABN 234355)
JOHN C. BOSTIC (CABN 264367)
ROBERT S. LEACH (CABN 196191)
VANESSA BAEHR-JONES (CABN 281715)
Assistant United States Attorneys

    150 Almaden Boulevard, Suite 900
    San Jose, California 95113
    Telephone: (408) 535-5061
    Fax: (408) 535-5066
    Robert.Leach@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 18-CR-00258 EJD |
| Plaintiff, | |
| v. | UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE EVIDENCE OF CMS SURVEY FINDINGS AND SANCTIONS PURSUANT TO RULES 401-403 AND 801-803 [ECF NO. 574] |
| ELIZABETH HOLMES, | |
| Defendant. | |
| | Date: March 23, 2021 |
| | Time: 10:00 a.m. |
| | Court: Hon. Edward J. Davila |

# **TABLE OF CONTENTS**

INTRODUCTION………………………………………………………………………………… 1

FACTUAL BACKGROUND…………………………………………………………………….. 2

ARGUMENT……………………………………………………………………………………… 6

    I.     Evidence of the CMS Survey Is Relevant and Not Excludable Under Rule 403….……….. 6

    II.    The CMS Survey Observations Are Not Excludable Hearsay……………...……………… 9

CONCLUSION…………………………………………………………………………………… 13

# TABLE OF AUTHORITIES

## Cases

*Manocchio v. Moran*, 919 F.2d 770 (1st Cir. 1990) .................................................................. 10

*Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193 (9th Cir. 2014) .......................................... 6

*Novick v. Shipcom Wireless, Inc.*, 946 F.3d 735 (5th Cir. 2020) ............................................... 6

*United States v. Edelmann*, 458 F.3d 791 (8th Cir. 2006) ....................................................... 10

*United States v. Fryberg*, 854 F.3d 1126 (9th Cir. 2017) ........................................................ 10

*United States v. Grady*, 544 F.2d 598 (2d Cir. 1976) .............................................................. 11

*United States v. Hansen*, 583 F.2d 325 (7th Cir. 1978) ........................................................... 10

*United States v. Hernandez–Rojas*, 617 F.2d 533 (9th Cir. 1980) .......................................... 11

*United States v. Lopez*, 762 F.3d 852 (9th Cir. 2014) .............................................................. 11

*United States v. Orellana-Blanco*, 294 F.3d 1143 (9th Cir. 2002) .......................................... 11

*United States v. Orozco*, 590 F.2d 789 (9th Cir. 1979) ........................................................... 11

*United States v. Pacific Gas & Elec. Co.*, 178 F. Supp. 3d 927 (N.D. Cal. 2016) ..................... 9

*United States v. Rodriguez-Soler*, 773 F.3d 2389 ...................................................................... 6

*United States v. Rosa*, 11 F.3d 315 (2d Cir. 1993) .................................................................. 10

*United States v. Sims*, 617 F.2d 1371 (9th Cir. 1980) .............................................................. 12

*United States v. Stone*, 604 F.2d 922 (5th Cir. 1979) .............................................................. 11

## Statutes

28 U.S.C. § 515 ..................................................................................................................... 1, 12

42 U.S.C. § 263a(g) ...................................................................................................................... 2

## Rules

Fed. R. Evid. 401 ......................................................................................................................... 6

Fed. R. Evid. 403 ......................................................................................................................... 6

Fed R. Evid. 803(8) ...................................................................................................................... 9

Fed R. Evid. 803(8)(B) ............................................................................................................... 11

**<u>Regulations</u>**

42 C.F.R. § 493.1251(a) ............................................................................................................... 5

42 C.F.R. § 493.1773 .................................................................................................................... 2

42 CFR § 493.1256(a)(c) ............................................................................................................. 5

The government respectfully submits its Opposition to Defendant's Motion *in Limine* to Exclude Evidence of CMS Survey Findings and Sanctions Pursuant to Rules 401-403 and 801-803.

## INTRODUCTION

Defendant lured Theranos investors through claims about the accuracy and reliability of her blood analyzer and testing. In one investor PowerPoint, Defendant bragged:

- "Theranos' proprietary, patented technology runs comprehensive blood tests from a finger-stick and . . . generates significantly higher integrity data than currently possible. Theranos is the world's first and only CLIA-certified laboratory running its tests on micro-samples." ECF No. 588-2 at RDV012675.

- "Theranos is certified as a High Complexity CLIA Laboratory . . . requir[ing] the highest level of training, technique and result interpretation; most stringent standards; labs are surveyed routinely and randomly" *Id.* at RDV012677.

- "Theranos runs any test available in central laboratories, and processes all sample types . . . . Theranos provides the highest level of oversight, automation, and standardization in our pre- and post-analytic processes, ensuring the highest levels of accuracy and precision." *Id.* at RDV012700.

- "A New Standard in Quality. The highest levels of accuracy. Theranos Vitamin D <10% Coefficient of Variation. By systematically controlling and standardizing our processes, Theranos offers tests with the highest levels of accuracy." *Id.* at RDV012702.

- New Possibilities in Lab. . . . Comprehensive laboratory test menu available through Theranos. Theranos runs any test available in central labs. Theranos can process any sample type. . . . With CLIA certification, Theranos is a nationally accredited provider. Higher quality data. . . . The unprecedented lack of variation . . . ." *Id.* at RDV012704.

To prove Theranos's bona fides, Defendant even included an image of the Certificate of Compliance issued by Centers for Medicare & Medicaid Services ("CMS") in her investor PowerPoint. *Id.* at RDV012678.

Beginning in September 2015, CMS conducted an in-person survey of Theranos's Newark laboratory, examining documents provided by Theranos and interviewing Theranos personnel, including Defendant. The surveyors observed that Theranos's blood analyzer repeatedly failed quality control checks (yet Theranos continued to report patient results). They noted that Theranos's blood analyzer repeatedly produced values outside of ranges *Theranos* deemed acceptable (yet they continued to report patient results). With respect to Vitamin D, they noted quality control results for analyzers were showing coefficients of variation between 18.7% and 63.6% during certain periods in 2014 (yet they

continued to report patient results). The deficiencies noted by the surveyors were so severe CMS determined they posed immediate jeopardy to patient health and safety.

The CMS survey results, embodied in its Form 2567, put the lie to Defendant's grandiose claims about Theranos's technology. The form is highly probative of the falsity of Defendant's statements to investors and patients – indeed, its probative value could hardly be higher. There is no prejudice – let alone undue prejudice – from admission of the form or CMS testimony about the form: Defendant remains free to attack the basis of CMS's observations, to disclaim her knowledge of the operation of Theranos technology in its clinical laboratory, and to insist that she lacked intent to defraud. To the extent the Form 2567 is hearsay, it falls within the public records exception. Its primary authors, CMS surveyors Sarah Bennett and Gary Yamamoto, are expected to testify to its content and will be subject to cross-examination. Defendant's written responses to the Form 2567 – which largely admitted the deficiencies observed by CMS – are not hearsay. There simply is no basis to keep such highly relevant evidence from the jury.

Because the Form 2567 is highly relevant and not excludable under Rule 403, and because it falls within exceptions to the hearsay rule, it should be admitted. CMS witnesses should be permitted to testify to what they observed and concluded. Defendant's admissions should be admitted. The Court should deny the motion.

## FACTUAL BACKGROUND

CMS regulates all laboratory testing (except research) performed on humans in the United States through the Clinical Laboratory Improvement Amendments ("CLIA"). The objective of the CLIA program is to ensure quality laboratory testing. *See* https://www.cms.gov/Regulations-and-Guidance/Legislation/ CLIA.

A CLIA-certified laboratory like Theranos must permit CMS to conduct an inspection to assess the laboratory's compliance with CLIA. *See* 42 U.S.C. § 263a(g); 42 C.F.R. § 493.1773. Theranos had a laboratory in Palo Alto, which moved to Newark in 2014 and was "high-complexity." January 8, 2021 Declaration of AUSA Robert S. Leach in Support of United States' Opposition to Defendant's Motions

//

CASE NO. 18-258 EJD

*in Limine* ("1/8/2021 Leach Decl."), Ex. 15 at US-FDA-0024050.  It also had a laboratory in Arizona which was "moderate complexity," which limited the types of tests it could perform.  *See id*.

The focus of a CMS survey "is to assess how the laboratory monitors its operations and ensures the quality of its testing."  ECF No. 584-4 at 4 (Def. Ex. 35) (Interpretive Guidelines for Laboratories and Laboratory Services).  Procedures and interpretive guidelines issued by CMS underscore the connection between CMS regulations and test accuracy and reliability.  For example, they state: "The principal focus of the outcome-oriented survey is *the effect* (outcome) of the laboratory's practices *on patient test results and/or patient care*.  The outcome-oriented survey process is intended to direct the surveyor to those requirements that will most effectively and efficiently *assess the laboratory's ability to provide accurate, reliable, and timely test results*."  ECF No. 584-4 at 4 (emphasis added).  They provide further:  "It is the surveyor's objective, using professional judgment, to determine, based on observation of the laboratory's (past and current) practices, interviews with the laboratory's personnel, and review of the laboratory's relevant documented records, *whether it is producing quality test results (i.e., accurate, reliable, and timely)*."  *Id.* (emphasis added).

Defendant herself repeatedly drew a connection between CMS's regulations and supervision and the accuracy and reliability of Theranos's blood tests.  For example, Defendant told one of her Board members "CMS CLIA Accreditation . . . Ensures accurate, reliable testing regardless of location":

**CMS CLIA Accreditation**

Theranos is certified as a High Complexity CLIA Laboratory

Clinical Laboratory Improvement Amendment of 1988

- CLIA regulates all testing on humans for health purposes using quality standards
    - The more complex the test, the more stringent the standards

- Ensures accurate, reliable testing regardless of location

- Administered by , , & 

//

//

1/8/2021 Leach Decl. Ex. 21 at ROUGHEAD_THERANOS_ 0000396. To rebut questions by a journalist about Theranos's "Testing Accuracy," Defendant pointed to CMS's CLIA certification, emphasizing that "Theranos' laboratories are CLIA-certified and subject to ongoing review and regular inspections by regulators." *Id.* Ex. 22 at THPFM0000875055. And, on Theranos's website and in communications with investors, under the heading "Accuracy and Reliability," Defendant wrote: "CMS and CLIA: To earn and maintain CLIA certification, Theranos must ensure the accuracy and reliability of our tests. CLIA's purpose is to ensure quality laboratory testing and ensure accurate and reliable test results." *Id.* Ex. 23 at KOVACEVICH_THERANOS_ 0000451.

Beginning in September 2015, CMS conducted an in-person survey of Theranos's Newark laboratory. Defendant attended portions of the survey. ECF No. 584-3 at 3 (Def. Ex. 34).

One of the CMS surveyors, Sarah Bennett, is expected to testify that "CMS is responsible for the implementation of the CLIA regulations, which are *designed to ensure the accuracy and reliability of laboratory testing*." ECF No. 584-3 at 3 (Def. Ex. 34) (emphasis added). In explaining the dividing line between FDA regulation and CMS regulation, Bennett is expected to testify "the manufacturing of tests is FDA, and the running of laboratory tests is CLIA." *Id.* Bennett is expected to testify that, before conducting the survey, CMS received a complaint that "QC [quality control] on the Edison devices was not acceptable and Theranos was still reporting patient results. That part of the complaint was substantiated during the survey." *Id.* at 5.

Bennett is expected to testify further: "Theranos was not following its own QC procedures, and they were still reporting patient results." *Id.* And, "[i]f the QC is problematic, there is no way to assess whether the patient data is accurate and reliable. If the laboratory runs the controls and they are unacceptable, then they should not be running patients after that." *Id.* at 6. "Another issue that CMS found was that QC results on their device had been out of range multiple times, yet Theranos was still reporting patient results during that time. Theranos's solution was to simply adjust the mean." *Id.* at 7. "Theranos continued to report patient values despite having these QC problems." *Id.* The government anticipates she will testify: "There is a systemic issue of quality. Across the board, not just with the Edison but also their other testing." 1/18/2021 Leach Decl. Ex. 24 at 7.

On January 25, 2016, following the survey, CMS notified Theranos that it was "not in compliance with all of the Conditions required for certification in the CLIA program." ECF No. 581-1 at 2 (Def. Ex. 12). CMS advised Theranos that "the deficient practices of the laboratory pose[d] immediate jeopardy to patient health and safety," meaning that "immediate corrective action is necessary because the laboratory's non-compliance with one or more Condition-level requirement has already caused, is causing, or is likely to cause, at any time, serious injury or harm, or death, to individuals served by the laboratory or to the health and safety of the general public." *Id.* In its letter, CMS listed five specific conditions that were not met (including Hematology and Analytic Systems) and its attached Form CMS-2567, Statement of Deficiencies described numerous conditions and standards that were not met and observations CMS made. *Id.* Among other things, CMS observed:

- the laboratory failed the condition for analytic systems for, among many reasons, failing to ensure QC test results met acceptance criteria (ECF No. 581-1 at 14-15);[1]

- "the laboratory failed to have a procedure for [quality control] for the Edison 3.5 Theranos System[2] prior to 5/15/2014" even though the initial use dates for eight of the 12 analytes run on the system ranged from 11/6/2013 through 5/9/2014" (*id.* at 16);

- "the laboratory failed to ensure that QC for PT/INR was acceptable prior to reporting patient results from April 2015 through September 2015 (*id.* at 41-42);

- "the laboratory failed to ensure that . . . QC was acceptable for the Theranos Proprietary System (TPS) prior to reporting patient test results" (*id.* at 42-46);

- "the laboratory failed to have a quality assessment (QA) procedure to identify and correct problems with the QC values for the Theranos Proprietary System when precision did not meet the laboratory's requirement for precision" (*id.* at 54 & 56); and

- "Based on a review of validation documents on the Theranos Proprietary System (TPS), the laboratory director failed to ensure . . . the quality of results on the TPS; failed to ensure the establishment of performance specifications followed the laboratory's procedures to establish accuracy, precision, reportable range, and/or reference range" (*id.* at 80).

---

[1] CLIA regulations require a laboratory to have quality control (QC) procedures to monitor the accuracy and precision of the complete testing process. *See, e.g.*, 42 C.F.R. § 493.1251(a), (b)(7-8); 42 CFR § 493.1256(a)(c).

[2] Evidence will show Theranos's analyzer is variously referred to as Edison 3.5, Theranos Proprietary System 3.5 ("TPS"), and TSPU ("Theranos Sample Processing Unit"). This was the only Theranos analyzer ever used in its clinical laboratory to process blood tests, and it was only used for 12 assays. Despite its grandiose claims to investors, Theranos had stopped using its analyzer in its laboratory altogether by the time CMS inspectors arrived in September 2015. *See* 1/8/2021 Leach Decl. Ex. 6.

In its Form 2687, CMS documented numerous instances where (1) Theranos ran patient tests after failing QC (ECF No. 581-1 at 43-46); (2) QC results for multiple assays, for weeks on end, were at least two standard deviations from the mean (*id.* at 45-46); (3) QC results for multiple assays had coefficients of variation as high as 63.8% (*id.* at 55-56); (4) the overall percentage of QC samples on all tests on all devices was at or in excess of 20% (*id.* at 57-58); and (5) accuracy, precision, reportable range, and allowable bias for multiple assays did not meet even Theranos's criteria (*id.* at 80-81).

Theranos provided multiples responses to the Form CMS-2567, including submissions on February 12, 2016, and April 1, 2016. *See, e.g.*, ECF No. 588-4. Theranos did not dispute many of CMS's observations, emphasized that the TSPU was phased out beginning December 2014 and fully retired by early 2015, conceded it was "dissatisf[ied] with prior QA oversight" and its ability to address "QC imprecision, QC failures, and QC trends," and admitted that "its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015." *Id.* at 3, 14-15, 16, 40-43.

## ARGUMENT

### I. Evidence of the CMS Survey Is Relevant and Not Excludable Under Rule 403.

Evidence is relevant if it has "any tendency" to make a fact of consequence more or less probable than it would be without the evidence. FED. R. EVID. 401. The relevancy requirement is "a very low bar" that "is not very hard to meet." *United States v. Rodriguez-Soler*, 773 F.3d 2389, 293-294 (1st Cir. 2014); *see Novick v. Shipcom Wireless, Inc.*, 946 F.3d 735, 741 (5th Cir. 2020); *Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014). Relevant evidence may not be excluded under Rule 403 unless its probative value is "substantially outweighed" by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. FED. R. EVID. 403.

Evidence regarding CMS's survey and its observations easily meets the low bar for relevance. The fact that Theranos was deviating from conditions and standards designed to ensure accuracy and reliability of blood tests has a tendency to show Theranos did not prioritize testing accuracy and was not

GOV'T OPP'N TO MOT. TO EXCLUDE CMS SURVEY      6
CASE NO. 18-258 EJD

capable of consistently producing accurate and reliable results, as the operative indictment alleges. Specific CMS observations, moreover, have a tendency to show Theranos was not capable of consistently producing accurate and reliable results. For example, CMS observed:

- Theranos repeatedly ran patient tests after failing quality control (ECF No. 581-1 at 43-46);
- QC results for multiple assays, for weeks on end, were at least two standard deviations from the mean (*id.* at 45-46);
- QC results for multiple assays had coefficients of variation as high as 63.8% (*id.* at 55-56);
- the overall percentage of QC samples on all tests on all devices was at or in excess of 20% (*id.* at 57-58); and
- accuracy, precision, reportable range, and allowable bias for multiple assays did not meet even Theranos's criteria (*id.* at 80-81).

Each of these observations alone and collectively has a tendency to show Theranos was not capable of consistently producing accurate and reliable results.

CMS's observations with respect to quality control results for Vitamin D have a tendency to show that Defendant's statements in her investor PowerPoint were false and misleading. For example, to investors, Defendant bragged: "A New Standard in Quality. The highest levels of accuracy. Theranos Vitamin D <10% Coefficient of Variation. By systematically controlling and standardizing our processes, Theranos offers tests with the highest levels of accuracy." Yet CMS observed coefficients between 18.7% and 63.8% for certain Theranos devices between June and August 2014.

Defendant argues, with emphasis, that "*the CMS survey findings, critically, do not assess accuracy and reliability of Theranos technology*." ECF No. 574 at 4:24-25. This distorts the surveyors' role and the import of their findings. CMS regulations of laboratories do not exist for their own sake; they are designed to ensure accuracy and reliability of blood tests. Indeed, when it suited her, Defendant touted this connection to her constituents. 1/8/2021 Leach Decl. Ex. 21 at ROUGHEAD_THERANOS_0000396 ("CMS CLIA Accreditation . . . ensures accurate, reliable testing").

//

//

Defendant also seizes on a single line from testimony by Sarah Bennett in the parallel SEC action, but again, her statement does nothing to undercut the relevance of the CMS survey and its observations.  The survey is designed to assess whether Theranos was meeting the conditions and standards embodied in CLIA, which are designed to ensure accuracy and reliability.  The fact that Theranos was not meeting CLIA conditions and standards has a tendency to show their tests were not accurate and reliable, and their specific observations support the same conclusion with respect to individual assays.  Indeed, to understand the link between the CLIA regulations and accuracy and reliability, one need to look no further than CMS's statement in its cover letter:  "the deficient practices of the laboratory pose immediate jeopardy to patient health . . . [i.e.,] the laboratory's non-compliance . . . has already caused, or likely to cause, at any time, serious injury or harm, or death, to individuals served by the laboratory or to the health and safety of the general public."  ECF No. 588-3 at 2.  To suggest, as Defendant does, that the CMS survey has no bearing on the accuracy and reliability of Theranos's tests strains any understanding of relevance.[3]

Defendant's Rule 403 arguments fair no better.  The relevance of the CMS survey is high and the alleged prejudice Defendant identifies are really disagreements with the inferences that should be drawn from the evidence.  Defendant argues the jury might give "special weight" to the assertions of a federal regulator as "authoritative" – but that is true any time a government agent testifies.  Defendant remains free to cross-examine CMS witnesses and attempt to undercut their observations.  She argues that some of CMS's observations were "subjective" and that other surveyors may have thought differently.  This simply does not hold for many of CMS's observations – *e.g.*, the high CVs for Vitamin D and other assays in quality control data, the reporting of patient results after failing quality control, high percentages of quality control samples for numerous assays exceeding two standard deviations.  It is also evident from Theranos's responses to the CMS survey that Defendant *agreed* with many of the observations.  More fundamentally, evidence is not excludable because it is "subjective"; the remedy is

---

[3] For the reasons discussed in the government's Opposition to Defendant's Motion *In Limine* to Exclude Evidence Relating to Theranos' Interactions With Government Regulatory Agencies Under Rules of Evidence 401-404 and 408, Defendants statements and conduct during the survey are highly probative of her state of mind, intent, and knowledge.

GOV'T OPP'N TO MOT. TO EXCLUDE CMS SURVEY      8
CASE NO. 18-258 EJD

cross-examination. Defendant argues the jury will "equate CMS's findings" with the ultimate conclusion that Defendant's tests were inaccurate and unreliable. That too is an attack on the weight of the evidence. Defendant further argues the CMS survey results do not, standing alone, demonstrate her knowledge of the deficiencies. But they do have a tendency to show the falsity of Defendant's statements, and highly relevant evidence does not become excludable under Rule 403 because it tends to prove only one element. The government is proving Defendant's knowledge through the totality of its evidence.

Finally, Defendant cites *United States v. Pacific Gas & Elec. Co.*, 178 F. Supp. 3d 927 (N.D. Cal. 2016), but that case is not binding, persuasive, or to the contrary. PG&E was charged with obstructing an investigation of a gas line explosion in San Bruno that killed 11 people, as well as violations of the Pipeline Safety Act. PG&E sought exclusion of a report by the National Transportation Safety Board ("NTSB"), which found PG&E's integrity management program was the probable cause of the explosion. 947-948. The court observed the report had limited probative value because the cause of the explosion was not at issue in the case. Here, by contrast, the observations made by CMS – particularly its observations that Theranos repeatedly ran patient tests after failing quality control; that QC results for multiple assays, for weeks on end, were at least two standard deviations from the mean; that QC results for multiple assays had coefficients of variation as high as 63.8%; and that the overall percentage of QC samples on all tests on all devices was at or in excess of 20% at times – directly shows the failings of the TSPU in practice and the inaccuracy and unreliability of Theranos's tests. The Court was also concerned the jury would punish PG&E for causing an explosion that was not at issue, but here the accuracy and reliability of Theranos's tests is very much at issue.

## II. The CMS Survey Observations Are Not Excludable Hearsay.

Under Federal Rule of Evidence 803(8), the rule against hearsay does not apply to:

A record or statement of a public office if:

    **(A)** it sets out:

        **(i)** the office's activities;

        **(ii)** a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or

          **(iii)** in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and

    (B)    the opponent does not show that the sources of information or other circumstances indicate a lack of trustworthiness.

FED R. EVID. 803(8). Rule 803(8)(A)(ii) thus permits admission of out-of-court statements of public offices setting out a matter observed while under a legal duty to report, except, in criminal cases such as this, a matter observed by "law-enforcement personnel."

        The Ninth Circuit has adopted a "narrow understanding of the law enforcement exception." *United States v. Fryberg*, 854 F.3d 1126, 1132 (9th Cir. 2017). Consistent with this, courts have found that civil government employees such as city building inspectors, medical examiners, and prison case managers are not "law-enforcement personnel" within the meaning of the rule. *See United States v. Hansen*, 583 F.2d 325, 333 (7th Cir. 1978) ("It was argued . . . that the enforcement of the building code was a 'quasi-criminal' procedure. It appears that failure to comply with the building code may result in a fine, but not in a criminal conviction. We do not believe we are justified in broadening the interpretation of . . . 'police officers and other law enforcement personnel' to include city building inspectors."); *United States v. Rosa*, 11 F.3d 315 (2d Cir. 1993) (medical examiner); *Manocchio v. Moran*, 919 F.2d 770, 777 (1st Cir. 1990) (medical examiner); *United States v. Edelmann*, 458 F.3d 791, 813-14 (8th Cir. 2006) ("Wilson is not a police officer or a member of law enforcement; instead, she is an Inmate Systems Manager who produced the memorandum in the normal course of her duties. The memorandum does not contain any opinions, findings, or conclusions; it is a record of events communicated to Wilson and recorded contemporaneously with the events. . . . Because Wilson does not qualify as a police officer or other law enforcement personnel, Rule 803(8)(B) does not apply to the memorandum Wilson created.").

        Further, even when the statement sets out a matter observed by law enforcement, the Ninth Circuit has **"**looked to the purpose of the law enforcement exception in determining the admissibility of a public record." *United States v. Hernandez–Rojas,* 617 F.2d 533, 535 (9th Cir. 1980) (holding a warrant of deportation signed by a US immigration officer was not excludable hearsay). The rule, thus, "does not bar the admission of all law enforcement agency records." *Edelmann*, 458 F.3d at 813. The

Ninth Circuit has "noted that the *purpose* of the law enforcement exception is to 'exclude observations made by officials at the scene of the crime or apprehension, because observations made in an adversarial setting are less reliable than observations made by public officials in other situations.'" *United States v. Lopez*, 762 F.3d 852, 861 (9th Cir. 2014) (affirming admission of an ICE Form I-296 verification of removal) (quoting *United States v. Hernandez–Rojas,* 617 F.2d 533, 535 (9th Cir.1980)).[4] The Ninth Circuit also has underscored "'(i)n adopting this exception, Congress was concerned about prosecutors attempting to prove their cases in chief simply by putting into evidence police officers' reports of their contemporaneous observations of crime.'" *United States v. Orozco*, 590 F.2d 789, 793–94 (9th Cir. 1979) (quoting *United States v. Grady*, 544 F.2d 598, 604 (2d Cir. 1976)) (alteration in original) (upholding admission of computer data cards generated by law-enforcement personnel).[5] Thus, even when observations of law-enforcement personnel are involved, the Ninth Circuit distinguishes "observations made in an adversarial setting" and "routine, nonadversarial matters." *Hernandez-Rojas*, 617 F.2d at 535; *Orozco*, 590 F.2d at 793; *United States v. Orellana-Blanco*, 294 F.3d 1143, 1150 (9th Cir. 2002) (holding Rule 803(8)(A)(ii) does not apply to a law enforcement memorandum of interview and observing "the government should have called [the memorandum's author] as a witness").

The CMS Form 2567 meets the elements of Rule 803(8)(A)(ii).[6] It is a record or statement of CMS setting out matters observed while under a duty to report. The exception does not extend in criminal cases to matters observed by "law-enforcement personnel," but the CMS surveyors are not "law-enforcement personnel" within the meaning of the rule. They are not the police. They have no criminal law enforcement power. They did not prepare the statement of deficiencies with a view to a

---

[4] In *Hernandez-Rojas*, the Ninth Circuit affirmed admission of a warrant of deportation and cited with approval the Fifth Circuit's observation: "Rule 803(8) is designed to allow admission of official records prepared for purposes independent of litigation." 617 F.2d at 535 (citing *United States v. Stone*, 604 F.2d 922 (5th Cir. 1979)).

[5] The law-enforcement personnel exception thus avoids potential issues under the Confrontation Clause if the defendant is unable to cross-examine the author of the report. *See* U.S. CONST. Amend. VI.

[6] Defendant cannot show that the sources of information or other circumstances indicate a lack of trustworthiness. *See* Fed R. Evid. 803(8)(B).

GOV'T OPP'N TO MOT. TO EXCLUDE CMS SURVEY    11
CASE NO. 18-258 EJD

criminal prosecution. They are more akin to the city building inspector in *Hansen*, the medical examiners in *Rosa* and *Manocchio*, and the prison official in *Edelmann*.

Even if CMS surveyors are properly considered "law-enforcement personnel," the law-enforcement exception does not apply. The surveyors' observations were not made in an adversarial setting, in the same way a police report of a suspect interview at the scene of the crime is. Defendant characterizes some of their observations as subjective, but most are descriptions of documents provided by Theranos and notation of statements made by Defendant's agents. The form is a routine part of any CMS or state survey, prepared in the ordinary course of business of a civil agency, whose goal is to promote laboratory safety.[7]

Defendant notes that the Form 2567 includes out-of-court statements by Theranos personnel, but those are not hearsay because they are authorized admissions and statements of an agent or employee within the meaning of Federal Rule of Evidence 802(d)(2). *See generally* ECF No. 588 at 15-17.

Theranos's responses to the Form 2567, which largely concede CMS's observations, but argue that the deficiencies had been cured, are not hearsay and should not be excluded. Indeed, Defendant's concession regarding her QC programs are highly probative.

Finally, whether the Form 2567 is admitted or not, CMS surveyors (or Theranos employees) should not be precluded from testifying to their observations during the survey, their conclusions, and their interactions with Theranos and Defendant.

//
//
//
//
//

---

[7] None of the Ninth Circuit cases cited by Defendant is to the contrary. In *Orozco*, it was not disputed the government agent was "law-enforcement personnel" and the court ultimately affirmed admission of the evidence. *Orellana-Blanco* too involved conceded "law-enforcement personnel" and involved a government memorandum of interview that was certain to be used for litigation. *United States v. Sims,* 617 F.2d 1371, 1377 (9th Cir. 1980) likewise involved an FBI memorandum of interview.

**CONCLUSION**

For these reasons, the Court should deny the motion.

DATED: January 8, 2021                               Respectfully submitted,

STEPHANIE M. HINDS
Attorney for the United States,
Acting Under Authority Conferred
By 28 U.S.C. § 515

*/s Robert S. Leach*
_____
JEFF SCHENK
JOHN C. BOSTIC
ROBERT S. LEACH
VANESSA BAEHR-JONES
Assistant United States Attorneys

GOV'T OPP'N TO MOT. TO EXCLUDE CMS SURVEY     13
CASE NO. 18-258 EJD