# EXHIBIT 15

| **Establishment Inspection Report** | FEI: | **3006231732** |
|---|---|---|
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA 94560 | EI End: | 09/16/2015 |

## TABLE OF CONTENTS

Summary ........................................................................................................ 1

Administrative Data ..................................................................................... 2

History............................................................................................................ 5

Interstate Commerce .................................................................................... 6

Jurisdiction.................................................................................................... 9

Individual Responsibility and Persons Interviewed.......................... 10

Firm's Training Program ........................................................................... 12

Manufacturing/Design Operations......................................................... 12

Manufacturing Codes ................................................................................ 25

Complaints................................................................................................... 25

Recall Procedures....................................................................................... 26

Objectionable Conditions and Management's Response .................... 26

Refusals ........................................................................................................ 41

General Discussion with Management .................................................... 41

Additional Information ............................................................................. 41

Samples Collected...................................................................................... 41

Voluntary Corrections............................................................................... 42

Exhibits Collected...................................................................................... 42

Attachments ................................................................................................ 46

## SUMMARY

This For Cause, Level II QSIT inspection of Theranos, Inc., a manufacturer of Class II In Vitro Diagnostic medical devices that are used for clinical diagnosis purposes was requested through a CDRH Assignment dated 08/21/2015 (**Attachment 5**), FACTS Assignment #11558121, OC Control Number 105896, and ORA Concurrence Number MP2015082101. It was performed as part of the SAN-DO FY2015 Work Plan, and it was conducted in accordance with CP 7382.845, for PACs 82845G, 82012, 82845B, 81845R, and 81010.

This is the firm's first FDA inspection. Concurrent FDA inspections took place at the firm's Palo Alto Headquarters and the Scottsdale, AZ facility, in accordance with the same CDRH Assignment. The inspection in Arizona was terminated on the first day as there were no FDA-regulated products or activities at that site. The firm has never been inspected by the State of California Food and Drug Branch and does not possess a CAFDB Manufacturer License. During the current inspection, the firm questioned FDA's jurisdiction and raised several objections to the inspections, both in Newark and Palo Alto, on the grounds that its product was a Lab Developed Test (LDT) under the control of

US-FDA-0024046

| **Establishment Inspection Report** | FEI: | **3006231732** |
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA  94560 | EI End: | 09/16/2015 |

its CLIA Lab in Newark. The firm also objected numerous times verbally and in writing through its legal counsels that the FDA inspection was premature as the firm had not received the guidance it had requested from FDA for transitioning its product from an LDT to a medical device. Over the past few years CDRH had been in contact with Theranos, Inc. and had informed them several times that their product was not an LTD, but that it was a Class II medical device that required a 510(k) clearance. Despite this information, since November 13, 2013, the firm has been shipping its uncleared medical device between California, Arizona, and Pennsylvania.

The current inspection covered Management Controls, CAPA, Design Controls, and Production and Process Controls. A Form FDA-483, Inspectional Observations, was issued to Ramesh (NMI) Balwani ("Sunny"), Theranos, Inc. President and Chief Operations Officer, for not listing a device that requires listing and shipping it in interstate without a 510(k) clearance, inadequate complaint procedures, complaints of possible device failure not investigated, CAPA activities not documented, unvalidated software, not documenting evaluation of potential suppliers, not establishing records of acceptable suppliers, inadequately established DHR procedure, and quality audits not performed. Firm management chose to annotate all the observations except for the first one with "promised to correct within 7 days" and annotated the first observation with "under consideration". Firm Management said that they will respond in writing within 15 working days.

Throughout the inspection, Sunny Balwani kept expressing that all the information was confidential and he expressed that documents and information supplied to us during the inspection were exempt from Freedom of Information Act requests as they were confidential and would hurt the security of firm's operational and technological information. He also was concerned that the Form FDA-483 will be available to the public. The firm made several verbal and written attempts to prevent the issuing of inspectional observations on the Form FDA-483.

Interstate documentary samples were collected for shipments of uncleared medical devices between California, Arizona, and Pennsylvania. No refusals, apart for refusal to read and sign two Affidavits, were encountered. The firm made numerous verbal and written objections to the inspection with regards to jurisdiction as well as to requests for documents and records.

## ADMINISTRATIVE DATA

| Inspected firm: | Theranos, Inc. |
| Location: | 7333 Gateway Blvd.<br>Newark, CA  94560 |
| Phone: | 650-320-2777 |
| | |
| Mailing address: | 7333 Gateway Blvd.<br>Newark, CA  94560 |

US-FDA-0024047

| **Establishment Inspection Report** | FEI: | 3006231732 |
|---|---|---|
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA 94560 | EI End: | 09/16/2015 |

| | |
|---|---|
| Dates of inspection: | 8/25/2015, 8/26/2015, 8/27/2015, 8/28/2015, 9/1/2015, 9/2/2015, 9/4/2015, 9/8/2015, 9/10/2015, 9/16/2015 |
| Days in the facility: | 10 |
| Participants: | Mary R. Hole, Investigator |
| | Yung W. Chan, Chemistry Branch Chief |
| | Stayce E. Beck, Diabetic Diagnostic Devices Branch Chief |

This inspection was not preannounced. On 08/25/2015, Stayce E. Beck, Diabetes Diagnostic Devices Branch Chief, and I showed our credentials and issued a Form FDA-482, Notice of Inspection, to James E. Twitchell ("Jim"), Director of Quality, who identified himself to us as the most responsible person at the firm at that time. He told us that he is also the firm's Quality Management Representative. Ramesh (NMI) Balwani ("Sunny"), Theranos, Inc. President and Chief Operations Officer, arrived at the Newark facility in the afternoon of 08/25/2015 and he was present for the rest of the inspection. In the afternoon of 08/26/2015, Yung W. Chan, Chemistry Branch Chief, joined the inspection at the Newark facility after her participation in the inspection of the Theranos, Inc. facility in Scottsdale, Arizona. On 08/26/2015, we showed our credentials and issued a new Form FDA-482, Notice of Inspection, to Sunny R. Balwani*, Theranos, Inc. President and Chief Operations Officer. On 08/27/2015, we inspected the manufacturing areas and labs located at the Newark site, which included a building adjacent to 7333 Gateway Blvd. On 08/27/2015, we showed our credentials and issued another Form FDA-482, Notice of Inspection, to Sunny R. Balwani*, Theranos, Inc. President and Chief Operations Officer, to inspect the adjacent building located at 7373 Gateway Blvd, Newark, CA 94560. We also performed inspections of additional manufacturing areas on 08/25/2015 and 08/28/2015.

Stayce Beck and Yung Chan were present during the first week of the inspection. They were not present after 08/28/2015, and they were not present for the closing of the inspection. This report is written by Mary Hole with contributions from Stayce Beck and Yung Chan; sections written by Stayce Beck and Yung Chan are identified as such in the Assignment Questions section of this report. Exhibits collected by them are numbered 76 through 109. The words "we", "us", and "our" in this report refer to Stayce Beck, Yung Chan, and Mary Hole, and the words "I", "me", and "my" refer to Mary Hole.

Within an hour of issuing our Form FDA-482 to Jim Twitchell on 08/25/2015, Stayce Beck and I expressed that we wanted to walk through the Newark facility. Jim Twitchell walked us out of the conference room and was about to start escorting us through the facility when a security guard stopped him and told him that we needed to wait for permission. I asked Jim Twitchell whose permission we needed and he replied "Elizabeth Holmes and Sunny Balwani" (the firm's CEO and the firm's President). I asked him if this was a refusal and he replied "Not yet". We returned to the conference room and after some time Timothy E. Cooper ("Tim"), Vice President of Hardware Manufacturing, and Lisa Barclay, Counsel with the law firm of Boies, Schiller, and Flexner LLC, walked into the conference room. Lisa Barclay identified herself as a legal representative for the firm. She asked us the purpose of our presence at the firm and I explained that we were conducting a QSIT inspection of the firm's Quality Management System. She told us that the firm was officially

US-FDA-0024048

| **Establishment Inspection Report** | FEI: | **3006231732** |
| --- | --- | --- |
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA  94560 | EI End: | 09/16/2015 |

objecting to our inspection based on the fact that their product was a Lab Developed Test (LDT) under the control of their CLIA Lab. She also mentioned that she used to work at the US Food and Drug Administration, where until recently she was the Chief of Staff for FDA Commissioner Dr. Margret Hamburg. She added that despite the firm's objection, the firm was not refusing the inspection. I told her that in that case, Stayce Beck and I wanted to inspect the facility. She told us that since the facility contained the firm's CLIA Lab, they wanted some time to figure out which parts of the facility were the areas that we could inspect. A couple of hours later, Stayce Beck and I were escorted by Jim Twitchell, Tim Cooper, Lisa Barclay, and a couple of security guards to the Capillary Tube Nanotainer (CTN) Manufacturing, Quality Control Testing, MRB Cage, and incoming materials inspection areas.

Sunny Balwani told us that we did not have jurisdiction to inspect the CLIA Lab or CLIA Lab Records, but I pointed out that if QSR activities were happening in those areas, we had jurisdiction to inspect those QSR-related activities and documents wherever they were. I told him that I could not do a meaningful assessment of the firm's compliance with the QSR if I could not see all the information because it was happening in a CLIA Lab. I told him that in that case, I would have to report that the firm was making a refusal of my inspection and of my requests for records. I also told him that it could result in several Form FDA-483 observations. In the afternoon of 08/27/2015, Sunny Balwani told Stayce Beck, Yung Chan, and me that he wanted to show us the entire Newark facility (including the CLIA Labs) to demonstrate that the firm wanted to be transparent. Before we started our walk through the facility, Lisa Barclay handed us a letter of objection (**Exhibit 1**) and stated that the firm objected to our inspection but that it did not represent a refusal. We inspected the two buildings that contained shipping and receiving, manufacturing, labs, research and development, warehouse, and offices accompanied by Sunny Balwani, Tim Cooper, Jim Twitchell, Lisa Barclay, David L. Zifkin (Counsel, Boies, Schiller, and Flexner LLC), Shira R. Liu (Counsel, Boies, Schiller, and Flexner LLC), Diana S. Lee (Sunny's assistant), Samathra G. Anekal ("Sam") (Vice President of Theranos Systems), Brian (NMI) Kutner (Director of Consumables Manufacturing), and several security guards.

On 08/28/2015, I told Sunny Balwani that although they had told us that the firm manufactures every component in-house, I did not see an injection-molding operation during the facility inspection the day before. He said that it must have been an oversight and he said that we could go look at it if we wanted. We inspected the injection-molding manufacturing area accompanied by Sunny Balwani, Lisa Barclay, Tim Cooper, Jim Twitchell, Brian Kutner, David Zifkin, Diana Lee, and Meredith R. Dearborne (Counsel, Boies, Schiller, and Flexner LLC).

Starting 08/27/2015, the firm started the day by making a verbal objection to our inspection through their Boies, Schiller, and Flexner LLC counsel, David L. Zifkin. The records provided by the firm were supplied with a coversheet with statements that these records were exempt from FOIA requests, and several contained attached written objections that these records were "yet another example of FDA requesting information outside its jurisdiction". The firm's legal counsels and their paralegals were present in the conference room and walk-throughs of the facility for almost the

US-FDA-0024049

| Establishment Inspection Report | FEI: | 3006231732 |
| --- | --- | --- |
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA  94560 | EI End: | 09/16/2015 |

entire time of the inspection. The firm also kept a security guard outside the conference room at all times, and security guards accompanied us wherever we went in the facility.

On 09/16/2015, a Form FDA-483, Inspectional Observations was issued to Ramesh (NMI) Balwani, Theranos, Inc. President and Chief Operations Officer. He chose to annotate the observations and said that the firm will reply in writing to the San Francisco FDA District Director within 15 working days. During the inspection he mentioned that Theranos, Inc. plans to mount a legal challenge to our inspection (and the other inspections) as the firm feels it was premature in that the firm had asked FDA for guidance for transferring its product from an LDT to a medical device and instead of responding, the FDA launched inspections at the firm's facilities.

*On 08/25/2015, Ramesh (NMI) Balwani told me that his official name is "Sunny R. Balwani". On 09/08/2015, he told me that his official name is Ramesh (NMI) Balwani, but that he goes by the name "Sunny" and that everyone knows him by the name "Sunny".

## HISTORY

According to Sunny Balwani, Theranos, Inc. is a privately held corporation that was founded in 2003 by Elizabeth Holmes, the firm's current Chief Executive Officer. It was incorporated in the State of Delaware in 2003 and is comprised of two business units; Diagnostics and CLIA Labs. The firm has no partners or subsidiaries. The firm employs 700 employees and operates 24 hours a day, seven days a week. The firm has three main facilities as follows:

- 1701 Page Mill Road, Palo Alto, CA 94304-1111 (Headquarters)
- 7333 Gateway Blvd., Newark, CA 94560 (Research & Development, Manufacturing, and High Complexity CLIA Lab)
- 1365 N. Scottsdale Road, Suite 300, Scottsdale, AZ 85257 (Medium Complexity CLIA Lab)

The firm is also setting up another CLIA Lab at 1250 Camp Hill Bypass, Lemoyne, Pennsylvania. Sunny Balwani said that it is currently awaiting its certification inspection so it is not yet fully functional.

In 2013, the firm opened Theranos collection sites (Theranos Wellness Centers) located within select Walgreens stores and physician clinics in California, Arizona, and in Pennsylvania, where phlebotomists that are employed and trained by Theranos, collect patient samples for clinical analysis at the firm's CLIA Labs (**Exhibit 2**). The firm offers a menu of clinical assays (**Exhibit 3**) through the Theranos Wellness Centers.

Sunny Balwani and Jim Twitchell told me that the Newark facility has not ever been inspected by the California Food and Drug Branch and that they do not have a CAFDB Manufacturing License.

US-FDA-0024050

| Establishment Inspection Report | FEI: | 3006231732 |
|---|---|---|
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA 94560 | EI End: | 09/16/2015 |

They told me that the firm has not had any recalls or field actions. This is the first US FDA inspection at this facility.

FMD 145 correspondence should be sent to:

Sunny R. Balwani, President and Chief Operations Officer
Theranos, Inc.
1701 Page Mill Road,
Palo Alto, CA 94304-1111


**INTERSTATE COMMERCE**

Sunny Balwani told me that about 90% of their raw materials are sourced from outside California and that about 95% of their finished product (Capillary Tube Nanotainer or CTN) is shipped outside of California, mainly to Arizona. The firm also ships its product to Pennsylvania. Sunny Balwani told me that there have been 45 shipments to Arizona since November 13, 2013 (**Exhibit 4**). All CTNs (containing patient samples) are returned to the Newark facility for analysis in the CLIA Lab. Expired CTNs are destroyed on site in Arizona or Pennsylvania.

Sunny Balwani told me that the firm uses common carriers to ship CTNs from Newark to Arizona. The firm has its own courier to drop off CTN supplies and pick up CTN patient samples from Theranos collection sites such as the ones in the various Walgreens. All CTN patient samples are returned to Newark via common carriers for analysis by the Newark CLIA Lab.

During the inspection, I collected manufacturing and interstate shipment records to document two examples of the firm's interstate shipping of an uncleared medical device as follows:

A. Shipment of CTNs from Newark, CA to Scottsdale, AZ with a return shipment from Scottsdale, AZ to Newark, CA

- Nonconformity report for NCR-01926 (**Exhibit 5**)
- Traveler for the manufacturing of a quantity of 4, 920 Surfacil-Coated Body P/N 52-00134, Lot No. 03022015-3736 with Unibody P/N 51-00348, Lot No. M141203002 (**Exhibit 6**) that is the subject of NCR-01926
- Travelers for the manufacturing of three lots of Li-Hep Capillary Tube Nanotainer (CTN) P/N 52-00121, with Surfacil-Coated Body P/N 52-00134, Lot No. 03022015-3736; these are a quantity of 132 Lot. No. 29122014-3690 (**Exhibit 7**), a quantity of 134 Lot No. 30122014-3749 (**Exhibit 8**), and a quantity of 78 Lot No. 02012015-3751 (**Exhibit 9**)

US-FDA-0024051

| Establishment Inspection Report | FEI: | **3006231732** |
|---|---|---|
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA  94560 | EI End: | 09/16/2015 |

- Example of the primary product label that was applied to the package of 10 CTNs per plastic bag of the finished CTNs (**Exhibit 10**). Please note that the firm could not provide a copy of the actual label that they applied because it was firm's practice not to retain a copy of it in their DHR (see Observation 8 in the Objectionable Conditions and Management's Response Section).

- Shipping Department Spreadsheet (**Exhibit 11**) showing the three lots (Lot Nos. 29122014-3690, 30122014-3749, and 02012015-3751) of Li-Hep CTNs shipping on 02/27/2015

- Fed-Ex Request Form dated 02/27/2015 with notation "CTN Shipment" (**Exhibit 12**) to 1365 N. Scottsdale Road, Suite 300, Scottsdale, AZ 85257. Brian Kutner affirmed that the "CTN Shipment" refers to the three lots (Lot Nos. 29122014-3690, 30122014-3749, and 02012015-3751) of Li-Hep CTNs.

- FedEx Label, Tracking No. 773016880780 (**Exhibit 13**), dated 02/27/2015 for shipment from Newark, CA to Scottsdale, AZ. Brian Kutner affirmed that this FedEx shipment label was used to ship CTNs Lot Nos. 29122014-3690, 30122014-3749, and 02012015-3751.

- FedEx Delivery Confirmation (**Exhibit 14**) for Tracking No. 773016880780 showing delivery to Scottsdale, AZ on 03/02/2015

- Spreadsheet (**Exhibit 15**) showing the barcode ranges for CTNs within each of the three lots of Li-Hep CTNs (Lot Nos. 29122014-3690, 30122014-3749, and 02012015-3751)

- Lab Sample Tracking Sheet (**Exhibit 16**) showing which barcodes were returned on which American Airlines flight and on which day. The Lab Sample Tracking Sheet also shows which assays were ordered for each barcoded Li-Hep (green) CTN

- AACargo Air WayBill No. 67567080 (**Exhibit 17**) dated 04/22/2015 for "Biological Specimens" on American Airlines Flight AA601 from Phoenix Airport to San Jose Airport

- AACargo Air Waybill No. 67567113 (**Exhibit 18**) dated 04/24/2015 for "Human Samples" on American Airline Flight AA831 from Phoenix Airport to San Jose Airport

- AACargo Air Waybill No. 67567194 (**Exhibit 19**) dated 04/29/2015 for "Biological Subst. Cat. B" on American Airline Flight AA601 from Phoenix Airport to San Jose Airport

B. Shipment of CTNs from Newark, CA to Lemoyne, PA via Scottsdale, AZ with a return shipment from Lemoyne, PA to Newark, CA

- Traveler (**Exhibit 20**) for the manufacturing of Li-Hep CTNs P/N 52-00121, Lot No. 20052015-4736 (Quantity 110) made on 06/08/2015

- An example of the label (**Exhibit 21**) that was used to label bags of packaged CTNs (10 CTNs per bag). Please note that the firm could not provide a copy of the actual label that

US-FDA-0024052

| Establishment Inspection Report | FEI: | 3006231732 |
| --- | --- | --- |
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA  94560 | EI End: | 09/16/2015 |

they applied because it was firm's practice not to retain a copy of it in their DHR (see Observation X in the Objectionable Conditions and Management's Response Section).

- Shipping Department Spreadsheet (**Exhibit 22**) showing 110 Li-Hep CTNs  Lot No. 20052015-4736 shipping to Arizona on 07/21/2015

- Fed-Ex Shipment Receipt for Tracking No. 774103293749 (**Exhibit 23**) dated 07/21/2015 for a shipment from Newark, CA to 1365 N. Scottsdale Road, Suite 300, Scottsdale, AZ 85257. Brian Kutner affirmed that this FedEx Shipment Receipt is for the 110 Li-Hep CTNs  Lot No. 20052015-4736 referenced in the Shipping Department Spreadsheet (**Exhibit 22**)

- FedEx Receipt Confirmation for Tracking No. 774103293749 (**Exhibit 24**) showing pick-up from Newark, CA and delivery to Scottsdale, AZ on 07/23/2015

- CTN Inventory Tracking Log (**Exhibit 25**) for Li-Hep CTNs (Green) dated 07/30/2015 showing transfer of 50 CTNs Lot No. 20052015-4736 to Pennsylvania. Brian Kutner affirmed that these 50 CTNs were from the 110 Li-Hep CTNs Lot No. 20052015-4736 that were received in Scottsdale, AZ via Fed-Ex Shipment Tracking No. 774103293749 (**Exhibit 23**) on 07/23/2015.

- Theranos Shipping Manifest (**Exhibit 26**) dated 09/02/2015 listing 2 nanotainers sent via UPS Next Day Service, Tracking Numbers 1ZYF46800198835251, 1ZYF46800195072876, and 1ZYF46800195457862.  Brian Kutner affirmed that these nanotainers are from the 50 Li-Hep CTNs Lot No. 20052015-4736 that were received in Scottsdale, AZ via Fed-Ex Shipment Tracking No. 774103293749 (**Exhibit 23**) on 07/23/2015.

- UPS Delivery Confirmations (**Exhibit 27**) for delivery from PA to Newark, CA on 09/03/2015 for Tracking Numbers 1ZYF46800198835251, 1ZYF46800195072876, and 1ZYF46800195457862.

- Spreadsheet (**Exhibit 28**) showing bar code range for Li-Hep CTN P/N 52-00121, Lot No. 20052015-4736 that were manufactured in Newark on 06/08/2015, and subsequently shipped to AZ on 07/21/2015, and then 50 of those Li-Hep CTNs were shipped to PA on 08/05/2015.

- Lab Sample Tracking Sheet (**Exhibit 29**) showing the two CTN barcodes that were returned from PA via UPS Tracking Numbers1ZYF46800198835251, 1ZYF46800195072876, and 1ZYF46800195457862. The Lab Sample Tracking Sheet also shows which assays were ordered for each barcoded Li-Hep (green) CTN. The Li-Hep CTNs that were returned to Newark from PA are as follows:

1. CTN Barcode No. 0360000000228296 was used to collect a sample for Potassium, Sodium, and Chloride blood assays

2. CTN Barcode No. 0360000000228318 was used to collect a sample for Glucose, Creatinine, Urea Nitrogen, Carbon Dioxide Blood, Calcium, Cholesterol, Lipoprotein (HDL), Triglycerides, and Lipoprotein Blood (LDL) assays

US-FDA-0024053

| Establishment Inspection Report | FEI: | 3006231732 |
|---|---|---|
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA  94560 | EI End: | 09/16/2015 |

Two affidavits (**Attachments 6 and 7**) document the firm's information regarding these interstate shipments. The affiant, Brian Kutner refused to sign the affidavits upon the advice of firm's counsels Meredith R. Dearborne, Heather King, and Daniel Kracov.

Jim Twitchell told me that there are no promotional materials; however later on in the inspection David Zifkin provided me with a copy of promotional material aimed at patients that is available at Walgreens (**Exhibit 30**)

## JURISDICTION

Theranos, Inc. manufactures Capillary Tube Nanotainers (CTN) that are intended to draw up a drop of blood from a puncture in the skin of a patient's finger, and then store it for transportation to a lab where various clinical assays are performed on that drop of blood using FDA-cleared in vitro diagnostic instruments that are manufactured by other manufacturers such as Siemens or BD. The CTN is also known by other names such as Theranos Capillary Tube, Theranos Sample Collection Device (TSCD), Nanotainer Tube, or Nanotainer. Theranos manufactures two types of anti-coagulant-containing CTNs; EDTA CTN and Li-Hp CTN. The CTNs contain serum separating gel to separate plasma from non-plasma blood components during transportation to the lab. As such they are Class II medical devices as per 21CFR 862.1675. Brian Kutner supplied me with examples of the primary product labels that are applied to CTNs that are packaged 10 CTNs per plastic bag. The labels are color-coded to identify the two types of CTNs; purple color for EDTA CTNs (**Exhibit 31**) and green color for Li-Hep CTNs (**Exhibit 32**)

The firm has a clearance for its Theranos Herpes Simplex Virus-1 IgG Assay (K143236) that Sunny Balwani told us the firm is not currently using. The firm also manufactures reagents and calibrators for Research and Development purposes.

The firm developed the Theranos Laboratory Automation System (TLAS) that they are not currently using as they are already developing the next generation of this instrument. Sunny Balwani told us that, apart from the purpose of conducting a clinical trial for their HPV-1 submission, Theranos has not shipped any instruments, reagents, or calibrators.

Much time during the inspection was spent with the firm challenging the FDA's jurisdiction to inspect Theranos. According to Sunny Balwani, Lisa Barclay, and David Zifkin, the firm's position is that their CTN is not a Class II medical device, but a Lab Developed Test (LDT) within the control of its Newark CLIA Lab. They told us that as such the FDA does not have jurisdiction to inspect at this time. Sunny Balwani told me that the firm had sought FDA guidance for transitioning the CTN from an LDT to a medical device, but that the FDA had not provided that guidance. He said that the FDA had not given them enough time to set up their Quality Management System before inspecting them without any warning. He further stated that the predicate device for the CTN is a Class I exempt device, not a Class II. He told me several times that at no time did the FDA tell

9 of 48

| Establishment Inspection Report | FEI: | 3006231732 |
|---|---|---|
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA  94560 | EI End: | 09/16/2015 |

Theranos that the CTN was a Class II medical device or that they needed a 510(k) to ship it in interstate. He also stated that Theranos had offered to stop using the CTN, but FDA did not reply to that offer. Throughout the inspection, Theranos kept objecting verbally and in writing to the inspection; **Exhibit 1** and **Exhibits 33 – 35** are copies of written objections that were given to me during the inspection. On September 3rd, 2015, the firm's outside counsel, Daniel Kracov, sent a letter of objection to Melinda Plaisir, FDA Associate Commissioner for Regulatory Affairs, and Alberto Gutierrez, FDA Director of the Office of In Vitro Diagnostics and Radiological Health, (**Attachment 8**) with the same objections.

For FDA's part, CDRH has been telling Theranos since 2013, that the CTN was a Class II device and that they required a 510(k) clearance to ship it in interstate. On September 14, 2015, Alberto Gutierrez wrote back to Theranos counsels Heather King and Daniel Kracov to point out that contrary to their assertion that they had not been told that FDA had jurisdiction, the firm had been told several times of the FDA's determination that the CTN was a Class II medical device (see **Attachment 9**). The firm's interstate shipment of its uncleared medical device resulted in an inspectional observation (see Observation 1 in the Objectionable Conditions and Management's Response section)

## INDIVIDUAL RESPONSIBILITY AND PERSONS INTERVIEWED

On 08/25/2015, Stayce Beck and I showed our credentials and issued a Form FDA-483, Notice of Inspection, to James E. Twitchell ("Jim"), Director of Quality, who identified himself to us as the most responsible person at the firm at that time. Ramesh (NMI) Balwani ("Sunny"), Theranos, Inc. President and Chief Operations Officer, arrived at the Newark facility in the afternoon of 08/25/2015 and he was present for the rest of the inspection, and accompanied us on inspections of the facility and manufacturing areas on 08/27/2015 and 08/28/2015. A Form FDA-483 was issued to Ramesh (NMI) Balwani ("Sunny") on 09/16/2015. Sunny Balwani provided me with the current organizational chart for Theranos, Inc. (**Exhibit 36**).

**Ramesh (NMI) Balwani ("Sunny")**, *President and Chief Operations Officer.* Sunny Balwani told me that he reports to Elizabeth Holmes, Founder and Chief Executive Officer of Theranos, Inc. He said that he has been with Theranos since 2009 and that he has over 20 direct reports. He told me that he has capital expenditure powers and that he also has hiring and firing powers. He explained that he has ultimate recall authority with the concurrence of Elizabeth Holmes. He told me that he is responsible for running all operations, sales, marketing, and daily running of the company. On 08/25/2015 he told me that his official name was "Sunny R. Balwani"; however on 09/08/2015 he told me that his actual official name was "Ramesh (NMI) Balwani", but explained this discrepancy by saying that everyone knew him as Sunny Balwani. He exhibited his authority by giving and withholding permission for inspection of facility premises, and the providing of documents, and records. He directed employees to supply documents and to answer my questions.

US-FDA-0024055

| Establishment Inspection Report | FEI: | **3006231732** |
|---|---|---|
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA 94560 | EI End: | 09/16/2015 |

**Timothy E. Cooper ("Tim")**, *Vice President of Hardware Manufacturing*. Tim Cooper told me that he has been at the firm since February 2014 and that he reports to Elizabeth Holmes. He said that he has about 15 direct reports. He told me that he has capital expenditure power, and hiring and firing powers. He told me that he has input into recall decisions. He told me that he is responsible for overseeing the manufacturing operations for devices and associated processes.

**James E. Twitchell ("Jim")**, *Director of Quality*. Jim Twitchell told me that he has been at the firm for a year and that he reports to Tim Cooper. He said that he has 4 direct reports. He told me that he has hiring and firing power, capital expenditure power, and input into recall decisions. He told me that he is the firm's Quality Management Representative, and that he is responsible for implementing the quality management system at Theranos, Inc.

**Brian (NMI) Kutner**, *Director of Consumables Manufacturing*. Brian Kutner told me that he has been at the firm since March 2014 and that he reports to Samathra Anekal ("Sam"), Vice President of Theranos Systems. He said that he has 35 direct reports. He told me that he has hiring and firing power, capital expenditure power, and input into recall decisions. He told me that he is responsible for directing the manufacturing of consumables and for manufacturing engineering.

Other Theranos, Inc. employees joined the inspection for short periods of time to answer questions regarding various topics. They are as follows:

**Samathra G. Anekal ("Sam")**, *Vice President of Theranos Systems*
**Diana S. Lee**, *Personal Assistant to Sunny Balwani*
**Daniel L. Young**, *Vice President of Theranos Systems (Lab Director of the Phoenix Theranos Lab)*
**Chin May H. Pangarkar**, *Vice President of Assay Systems*
**Tina Y. Lin**, *Product Manager*
**Godfrey L. Maside**, *Technical Supervisor*
**Babak (NMI) Haghiri**, *Director of Reagent Production*
**Gregory C. Bosick**, *QC Inspector*
**Heather King**, *Counsel* (by phone)

Boies, Schiller & Flexner LLC legal staff:
**Lisa Barclay**, *Counsel* (ex-FDA, ex-Chief-of-Staff for FDA Commissioner Margaret Hamburg)
**David L. Zifkin**, *Counsel*
**Shira R. Liu**, *Counsel*
**Meredith R. Dearborne**, *Counsel*
**Joshua M. Stein**, *Counsel*
**Fiona Y. Tang**, *Associate*
**Nicole M. Sands**, *Paralegal*
**Lisa M. Cajigas**, *Paralegal*

US-FDA-0024056

| **Establishment Inspection Report** | FEI: | **3006231732** |
|---|---|---|
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA  94560 | EI End: | 09/16/2015 |

**Jenel L. Day**, *Case Manager*

Arnold & Porter LLP legal staff:
**Daniel Kracov**, *Counsel* (by phone)


## FIRM'S TRAINING PROGRAM

I reviewed the firm's written training procedure "Competence Awareness and Training, Document Number SOP-00151, Revision A, Effective Date 02/10/14" and the training records for five employees. I did not note any objectionable conditions for the firm's training program.


## MANUFACTURING/DESIGN OPERATIONS

This For Cause, Level II QSIT inspection of Theranos, Inc., a manufacturer of Class II In Vitro Diagnostic medical devices that are used for clinical diagnosis purposes was requested through a CDRH Assignment dated 08/21/2015 (**Attachment 5**), FACTS Assignment #11558121, OC Control Number 105896, and ORA Concurrence Number MP2015082101. I covered Management Controls, Corrective and Preventive Actions (CAPA), Design Controls, and Production and Process Controls. Additionally I inspected MDR reporting and Field Actions. Sterilization and Tracking requirements were not covered as they do not apply to this firm's products.

Theranos, Inc.'s Newark facility consists of two adjacent building (totaling approximately 300,000ft$^2$) that house administrative staff, manufacturing, quality assurance and regulatory assurance, research and development, warehouses, and laboratories. The buildings are connected but are physically separated into discrete areas that are accessed through biometric and card key locks. Only personnel with specific permissions may enter different areas of the buildings. For example, manufacturing personnel do not have access to CLIA Laboratory areas, or vice-versa. Sunny Balwani gave me a map of the Newark facility (**Exhibit 37**) and a process flow chart for the manufacturing of CTNs (**Exhibit 38**). The firm does not use any contract manufacturers.

### Management Controls

For management controls I covered the quality plan, quality policy, quality objectives, management reviews, quality audit procedures and quality audits, implementation of a management representative, the organizational structure, and the quality system procedures. Jim Twitchell identified himself as the firm's Quality Management representative and gave me a copy of the firm's Quality Manual (**Exhibit 39**). I asked for the Quality Objectives and Jim Twitchell told me that they are contained within the Quality Policy. I noted that the firm has not performed any internal audits to date and that it had no planned internal audits scheduled for this year. Please refer to Observation 9 in the Objectionable Conditions and Management's Response section for further details.

US-FDA-0024057

| Establishment Inspection Report | FEI: | 3006231732 |
| --- | --- | --- |
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA  94560 | EI End: | 09/16/2015 |

**Corrective Action and Preventive Action (CAPA)**

I reviewed the firm's written CAPA procedure "Corrective and Preventive Actions, Document Number SOP-00157, Revision B, Effective Date 04/07/2015" and the firm's only CAPA. CAPA-00025 was opened on 04/21/2015 for an outdated patient consent form that was used in clinical study Theranos 001-2014, which was identified as "non-product related". The firm corrected the issue by distributing the latest approved patient consent form to the clinical site. There is no documented effectiveness check plan and this CAPA is still open. I asked Jim Twitchell why this CAPA was still open and he said that it was held up because the firm was busy establishing other quality system procedures that took precedence. I also noted that during the inspection the firm performed corrections as I pointed out deficiencies; however the firm did not follow their CAPA procedure for undertaking corrections to their Quality Management System. Please see Observation 4 in the Objectionable Conditions and Management Response section for further details.

I also reviewed the firm's written nonconformities procedure "Control of Non-Conforming Product, Document Number SOP-00154, Revision A, Effective Date 12/11/2013" (**Exhibit 40**) and ten NCRs. During my review of NCR-01926 (**Exhibit 5**) I noted that this was a complaint that had been incorrectly handled as an NCR. Please refer to Observation 3 in the Objectionable Conditions and Management Response section for further details.

**Design Controls**

Sunny Balwani told me that design is handled at the Palo Alto facility. Stayce Beck and Yung Chan reviewed the firm's validation data for select assays and other related documents during our inspection; their analysis is included in this report under the section titled Assignment Questions.  I reviewed the written design procedures and I reviewed portions of the Design History File for the Theranos Sample Processing Unit (another name for the CTN). Since design controls are the responsibility of the Palo Alto facility and since Investigator Seema Singh was conducting a concurrent FDA inspection at that facility, I did not do a detailed examination of the firm's level of compliance with the design regulations. Please refer to Investigator Seema Singh's Form FDA-483 and EIR for further details regarding the firm's design controls.

**Production and Process Controls**

Theranos' CTN manufacturing and distribution takes place at the Newark facility. We inspected the shipping and receiving area, manufacturing areas, labs, research and development, and warehouse areas in the facility on 08/25/2015, 08/27/2015, and 08/28/2015 accompanied by Sunny Balwani*, and various Theranos employees (including security guards) and legal representatives. Yung Chan was not yet present on 08/25/2015; however she was able to inspect the CTN Manufacturing area and QC Testing Lab on 08/27/2015. On 08/25/2015 Stayce Beck and I observed CTN lot numbers 25082015-5530 and 25082015-5531 in the drying ovens in the CTN manufacturing area.

US-FDA-0024058

| **Establishment Inspection Report** | FEI: | **3006231732** |
|---|---|---|
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA 94560 | EI End: | 09/16/2015 |

I reviewed the firm's written procedures and records for employee training, equipment IQ/OQ/PQ, maintenance and calibration, process validation, incoming materials acceptance, and finished product release. I also reviewed the DHRs for EDTA CTN lot numbers 24072015-5548 and 24072015-5549, and the DHRs for Li-Hep CTN lot numbers 29122014-3690 (**Exhibit 7**), 30122014-3749 (**Exhibit 8**), 02012015-3751 (**Exhibit 9**), and 22072015-5584. I noted deviations with the firm's software validation and DHR process; please see Observations 5 and 8 in the Objectionable Conditions and Management Response section for further details.

I also reviewed the firm's written purchasing procedures, approved supplier list, and supplier qualification records. I noted deviations with the firm's purchasing controls. Please refer to Observations 6 and 7 in the Objectionable Conditions and Management's Response section of this report for further details.

*Sunny Balwani did not accompany us on 08/25/2015

**Medical Device Reports (MDRs)**

At the start of the inspection, the firm did not have a stand-alone MDR-procedure; however, Section 6.5 in the firm's complaint handling procedure, "Customer Complaints, Document Number SOP-00174, Revision A, Effective Date 07/02/2014" (**Exhibit 41**) provided instructions for filing MDRs for reportable complaints. On 09/01/2015, Jim Twitchell, provided me with a copy of a new stand-alone MDR procedure "Medical Device Reporting Procedure, Document Number SOP-00159, Revision A, Effective Date 08/30/2015" (**Exhibit 42**) that he told me will be used by the firm moving on.

Sunny Balwani and Jim Twitchell told me that the firm has not filed any MDRs to date.

**Field Actions**

Theranos has a written recall procedure. It is "Device Recall and Advisory Notices, SOP-00160, Revision A, Effective Date 12/11/2013" (**Exhibit 43**). Sunny Balwani and Jim Twitchell told me that the firm has not ever had any recalls or field actions.

**Assignment Questions**

*1. Determine what devices the firm has distributed. Collect shipping records to document the names and types of devices that the firm has distributed. Specifically, determine if the firm has shipped any sample collection, processing or transport devices, clinical instruments, reagents, calibrators, or controls either to outside firms or to other Theranos locations. Collect a list of all customers a in which products have been shipped by Theranos and the products received by those customers if*

US-FDA-0024059

| Establishment Inspection Report | FEI: | 3006231732 |
|---|---|---|
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA  94560 | EI End: | 09/16/2015 |

*possible.*

The firm currently only distributes CTNs. Sunny Balwani told me that apart from shipments made for the clinical trial for the HSV-1 submission Theranos has not shipped any of its instruments, reagents, or calibrators. Theranos has not shipped any product to customers. The firm has shipped, and is still shipping, EDTA and LiHep CTNs to 1365 N. Scottsdale Road, Suite 300, Scottsdale, Arizona, and to 1250 Camp Hill Bypass, Lemoyne, Pennsylvania. All CTNs containing patient samples are shipped back to the High Complexity CLIA Lab in Newark for lab analysis. Sunny Balwani told me that CTNs are shipped to offices that are located in the same buildings as their CLIA Labs in AZ and PA (he said the CTNs are never received or stored in the labs; rather these activities happen in an office that is separate from the lab). The CTNs are assembled into a kit with other supplies such as gloves, gauze, etc. for the phlebotomists' convenience, by the office personnel. The CTNs are then distributed to the various collection sites by a Theranos courier, who also picks up CTN patient samples from the collection sites and transports them back to the office for shipment to the Newark Lab for assay.

**Analysis for Question 1 by Stayce E. Beck and Yung W. Chan:**

The firm distributes nanotainers (Theranos Collection Device (TCSD)) to other Theranos facilities in Arizona, California, and Pennsylvania. They ship the nanotainers to the Phoenix Theranos facility (CLIA moderate complexity lab), who then distributes them to the Theranos wellness centers. The nanotainers are then used to collect capillary samples (from the fingerstick) and then are shipped back to the Newark High Complexity CLIA lab for processing and testing and patient results are reported back to the physician or person who ordered the tests. The firm also collects venous blood using vacutainers and processes these at either the CLIA Moderate complexity lab in Phoenix or the CLIA Moderate complexity lab in Newark, CA.  There are two different configurations of the Theranos nanotainer tubes (TSCD), one contains anticoagulant called K2EDTA to preserve the blood for downstream hematology analytes measurement.  The other contains anticoagulant called Lithium heparin to preserve the blood and separate the plasma portion for downstream chemistry analytes measurement.  Theranos is currently manufacturing these two specific types of nanotainer tubes (TSCD) for their customers.

**Exhibit 76** is a list of the Theranos Wellness Centers that was printed out from the website and handed to Stayce Beck at 2:54 PM PST on August 25, 2015 from James Twitchell
**Exhibit 77** is a copy of the labels placed on the nanotainers for shipping to the collection sites given to Stayce Beck by Sunny Balwani on August 26, 2015 at 1:40 PM PST.
**Exhibit 78** is a copy of records for August 18, 2015- August 24, 2015 showing the nanotainers shipped from 7373 Gateway Blvd in Newark, CA to 1365 N. Scottsdale Rd # 300 in Scottsdale, AZ. These were given to Stayce Beck from Sunny Balwani on August 26, 2015 at 11:03 AM.
**Exhibit 79** is a document stating that the first nanotainer was shipped from Arizona to California on November 13, 2013 which indicates that this is when the nanotainers were first used to evaluate patient samples. This was given to Stayce Beck on August 28, 2015 at 2:15 PM by Sunny Balwani.
**Exhibit 80** is a patient report for a patient who visited a Theranos Service Center located at 9050 W. Union Hills Dr. Peoria, AZ 85382, and shows it was processed at Theranos Laboratories at 7373

US-FDA-0024060

| Establishment Inspection Report | FEI: | **3006231732** |
|---|---|---|
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA  94560 | EI End: | 09/16/2015 |

Gateway Boulevard Newark, CA 94560.  Sunny Balwani provided this to Stayce Beck and stated that this was a report for samples that were collected in a nanotainer and run in their High Complexity CLIA lab in Newark, CA. This was given to Stayce Beck by Sunny Balwani at 11:05 AM PST on August 28, 2015.

**Exhibit 81** is a patient report for a patient who visited a Theranos Service Center located at 4500 Marketplace Way, Enola, PA 17025, and shows it was processed at Theranos Laboratories at 7373 Gateway Boulevard Newark, CA 94560.  Sunny Balwani provided this to Stayce Beck and stated that this was a report for samples that were collected in a nanotainer and run in their High Complexity CLIA lab in Newark, CA. This was given to Stayce Beck by Sunny Balwani at 11:05 AM PST on August 28, 2015.

**Exhibit 82** is a patient report for a patient who visited a Theranos Service Center located at 7011 E Shea Blvd. Scottssdale, AZ 85254, and shows it was processed at Theranos Laboratories at 7373 Gateway Boulevard Newark, CA 94560.  Sunny Balwani provided this to Stayce Beck and stated that this was a report for samples that were collected in a nanotainer and run in their High Complexity CLIA lab in Newark, CA. This was given to Stayce Beck by Sunny Balwani at 11:05 AM PST on August 28, 2015.

**Exhibit 83** is a patient report for a patient who visited a Theranos Service Center located at 300University Avenue Palo Alto, CA 94305, and shows it was processed at Theranos Laboratories at 7373 Gateway Boulevard Newark, CA 94560.  Sunny Balwani provided this to Stayce Beck and stated that this was a report for samples that were collected in a vacutainer (not with nanotainer containing capillary sample) and run in their CLIA lab in Newark, CA. This was given to Stayce Beck by Sunny Balwani at 11:05 AM PST on August 28, 2015.

*(Yung's comment: Sunny Balwani gave us 4 patient results reports from 4 different dates: 8/13/15 (**Exhibit 83**), 8/21/15 (**Exhibit 82**), 8/25/15 (**Exhibit 80**), and 8/26/15 (**Exhibit 81**).  At the firm, after I've reviewed them and they looked very similar to me, I asked Sunny Balwani how could I tell which report comes from the venous unmodified assay and which comes from the capillary nanotainers LDT assay.  He said he doesn't know and will find out for us.  Afterwards he came back and pointed to us that the 8/13/15 (**Exhibit 83**) report was from non-capillary testing, and the other 3 reports were from capillary testing.  As far as I could tell, the reports from the capillary nanotainers LDT assay did not have any disclaimers on it.

**Exhibit 84** is a list of tests that are run as LDT's using the nanotainer tubes at the Theranos High Complexity Lab in Newark, CA. Some tests are general chemistry tests (27 tests) performed on Lithium heparin nanotainer tube and some tests are hematology tests performed on K2EDTA nanotainer tube (6 tests). This was given to Stayce Beck at 10:15 AM PST on August 26, 2015 by Sunny Balwani.

**Exhibit 85** is a list of tests that are run at the CLIA Moderate Complexity lab in Phoenix, AZ using venous samples. This was given to Stayce Beck at 1:40 AM PST on August 26, 2015 by Sunny Balwani.

The firm stated that they had never shipped the Theranos Sample Processing Unit (TSPU). However, they did previously run some tests using the TSPU in the CLIA High Complexity Clinical

US-FDA-0024061

| **Establishment Inspection Report** | FEI: | **3006231732** |
|---|---|---|
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA 94560 | EI End: | 09/16/2015 |

Laboratory in Newark, CA. They stated that they started running samples using the TSPU in October of 2013 and stopped in early 2015 and that these information has been previously provided to Alberto Gutierrez (Office Director of OIR in FDA). They stated that they never distributed the TSPU for use with the HSV-1 assay that was 510k cleared (k143236) and they did not have plans to distribute it. Sunny Balwani also stated that TSPU's are destroyed at the end of their life.

**Exhibit 86** is a list of tests that were previously run on the TSPU in the CLIA High Complexity Lab in Newark, CA. This was given to Stayce Beck on August 26, 2015 at 10:35 AM EST by Sunny Balwani. An updated version was given at 9:21 AM PST on August 28, 2015 to Stayce Beck form Sunny Balwani which added TSH.
**Exhibit 87** is an example end of life disassembly record for the TSPU provided to Stayce Beck by Sunny Balwani on August 28, 2015 at 2:15 PM PST.
**Exhibit 88** is a copy of the HSV-1 package insert for use with the TSPU that was never distributed. This was given to Stayce Beck by Sunny Balwani on August 26, 2015 at 11:40 AM PST.
**Exhibit 89** is a document from Sunny Balwani regarding the TSPU unit and use of lasers in which they state that they do not have any TSPU's distributed for clinical diagnostic testing. This was given to Stayce Beck on August 26, 2015 at 10 AM PST by Sunny Balwani.

The firm stated that they did not produce or distribute any other devices. They were asked if they manufactured any other devices. They did state that they manufacture sample cups which are specifically used as sample processing containers for some of their LDT assays, but they did not provide any information about those. Sunny Balwani also mentioned that they can manufacture and make anything in house and majority of the materials they needed are manufactured in this manufacturing facility. They also stated that they made some of the buffers for use with their LDT assays, but did not provide any information about those. They stated that they did not manufacture centrifuges for separating the nanotainer capillary samples, but they did purchase centrifuges for this purpose along with an adapter for the Theranos nanotainer tubes. Theranos stated that the specific sample cups are used for the Lithium heparin coated nanotainer tubes for the chemistry analytes measurements only because the K2EDTA nanotainer tubes does not need a pre-dilution step before testing for the hematology analytes. In addition, the centrifugation step also pertains to the lithium heparin nanotainer tubes only because the K2EDTA nanotainer uses whole blood for the hematology analytes measurements.

**Exhibit 90** is a procurement and supplier management SOP for the centrifuge adapter for the nanotainer. This was given to Stayce Beck by Sunny Balwani on August 28, 2015 at 10:30 AM PST.
**Exhibit 91** is a picture of the centrifuge that can be found in their CLIA lab for the nanotainers, which Sunny Balwani stated was also used in the Theranos Wellness Centers. This was given to Stayce Beck by Sunny Balwani on August 28, 2015 at 10:30 AM PST.

*2. Obtain design requirements for the Capillary Tubes and Nanotainers, TSUP, and TLAS, as well as representative assays, to determine design inputs are appropriate, unambiguous, and address the intended use of the devices.*

US-FDA-0024062

| Establishment Inspection Report | FEI: | **3006231732** |
|---|---|---|
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA  94560 | EI End: | 09/16/2015 |

Investigator Seema Singh covered design in her inspection of the Theranos Palo Alto facility. Please see EIR written by Investigator Seema Singh.

*3. Determine whether the firm has written plans to ensure that there is an adequate evaluation of conformance to design inputs, including acceptance criteria.*

Investigator Seema Singh covered design in her inspection of the Theranos Palo Alto facility. Please see EIR written by Investigator Seema Singh.

**Analysis for Question 3 by Stayce E. Beck and Yung W. Chan:**

The firm has a nonconformance procedure for the nanotainers as well as a document for the requirements for the nanotainer (TSCD).

**Exhibit 92** is the nonconformance procedure for the nanotainer (TCSD) given to Stayce Beck by Sunny Balwani on August 26, 2015 at 1:40 PM PST.
**Exhibit 93** is the nanotainer (TCSD) collection device requirements from Sunny Balwani to Stayce Beck at 11:38 AM PST on August 26, 2015.

*4. Determine whether the firm has written procedures for validating device design.*

Investigator Seema Singh covered design in her inspection of the Theranos Palo Alto facility. Please see EIR written by Investigator Seema Singh.

*5. Collect and review verification and validation records for the firms nanotainers and instruments, potassium assay, sodium assay, chloride assay, calcium assay, troponin assay, glucose assay, and any other assays that appear to have inaccurate or imprecise results based on other information collected during this inspection.*

Investigator Seema Singh covered design in her inspection of the Theranos Palo Alto facility. Please see EIR written by Investigator Seema Singh.

**Analysis for Question 5 by Stayce E. Beck and Yung W. Chan:**

Theranos provided us with several documents that they stated validated their LDT assays using the nanotainers.

US-FDA-0024063

| Establishment Inspection Report | FEI: | 3006231732 |
|---|---|---|
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA  94560 | EI End: | 09/16/2015 |

**Exhibit 94** is the data comparing venous blood on unmodified ADVIA 1800 assays (x-axis) versus capillary blood in a nanotainer (y-axis) on unmodified ADVIA 1800 assays for albumin, alkaline phosphatase, alanine aminotransferase, aspartate aminotransferase, calcium, cholesterol, chloride, HDL cholesterol, LDL cholesterol, creatinine, glucose, potassium, sodium, bilirubin, total protein, triglycerides, and urea nitrogen. This was given to Stayce Beck by Sunny Balwani at 9:30 AM PST on August 28, 2015.

**Exhibit 95** is the CLIA lab LDT validation data for the CBC panel (hematology analytes).  Here the precision, linearity, limit of blank, limit of detection, limit of quantitation, and interference  studies for all analytes were performed by aliquoting venous samples from vacutainers to nanotainers and then were run on the modified LDT assays. The method comparison compared venous samples run on unmodified predicate assays to venous samples ran on modified LDT assays. The Verification of Pre-analytical methods (in section 5)- transference and verification of reference intervals for fingerstick samples for each analyte is the only study using nanotainer capillary blood on the modified assays in the CLIA lab (y-axis)  compared to the venous sample on the unmodified assay (x-axis). This was given to Stayce Beck by Sunny Balwani at 11 AM PST on August 28, 2015.

**Exhibit 96** is the CLIA lab LDT validation data for the potassium assay. Here the precision, linearity, limit of blank, limit of detection, limit of quantitation, and interference studies for all analytes were performed by testing venous samples from vacutainers on the modified LDT assays. The method comparison compared venous samples run on unmodified predicate assays to venous samples ran on modified LDT assays.  The Verification of Pre-analytical methods (in section 5)- transference and verification of reference intervals for fingerstick samples for each analyte is the only study using nanotainer capillary blood on the modified assays in the CLIA lab (y-axis) compared to the venous sample on the unmodified assay (x-axis). This was given to Stayce Beck by Sunny Balwani at 11 AM PST on August 28, 2015.

**Exhibit 97** is the CLIA lab LDT validation data for the glucose assay. Here the precision, linearity, limit of blank, limit of detection, limit of quantitation, and interference studies for all analytes were performed by testing venous samples from vacutainers on the modified LDT assays. The method comparison compared venous samples run on unmodified predicate assays to venous samples ran on modified LDT assays. The Verification of Pre-analytical methods (in section 5)- transference and verification of reference intervals for fingerstick samples for each analyte is the only study using nanotainer capillary blood on the modified assays in the CLIA lab (y-axis)  compared to the venous sample on the unmodified assay (x-axis). This was given to Stayce Beck by Sunny Balwani at 11 AM PST on August 28, 2015.

**Exhibit 98** is the CLIA lab LDT validation data for the sodium assay. Here the precision, linearity, limit of blank, limit of detection, limit of quantitation, and interference studies for all analytes were performed by testing venous samples from vacutainers on the modified LDT assays. The method comparison compared venous samples run on unmodified predicate assays to venous samples ran on modified LDT assays.  The Verification of Pre-analytical methods (in section 5)- transference and verification of reference intervals for fingerstick samples for each analyte is the only study using nanotainer capillary blood on the modified assays in the CLIA lab (y-axis)  compared to the venous sample on the unmodified assay (x-axis). This was given to Stayce Beck by Sunny Balwani at 11 AM PST on August 28, 2015.

**Exhibit 99** is the CLIA lab LDT validation data for the chloride assay. Here the precision, linearity,

US-FDA-0024064

| | | |
|---|---|---|
| **Establishment Inspection Report** | FEI: | **3006231732** |
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA  94560 | EI End: | 09/16/2015 |

limit of blank, limit of detection, limit of quantitation, and interference studies for all analytes were performed by testing venous samples from vacutainers on the modified LDT assays. The method comparison compared venous samples run on unmodified predicate assays to venous samples ran on modified LDT assays. The Verification of Pre-analytical methods (in section 5)- transference and verification of reference intervals for fingerstick samples for each analyte is the only study using nanotainer capillary blood on the modified assays in the CLIA lab (y-axis)  compared to the venous sample on the unmodified assay (x-axis). This was given to Stayce Beck by Sunny Balwani at 11 AM PST on August 28, 2015. **Exhibit 100** is a copy of routine quality assessment data that Theranos performs in their CLIA laboratory using paired fingerstick capillary data in nanotainers with venous samples using BD vacutainers from the same subject (from company volunteer). This data is for chloride, potassium, sodium, and glucose spanning the time period between June 2, 2015 to August 21, 2015. This was given to Stayce Beck by Sunny Balwani at 9:56 AM PST on August 28, 2015.

* (Yung's comment: Theranos stated that weekly they will draw paired fingerstick TSCD and venous BD vacutainer from the same subject, about 6 to 7 normal subjects from their company and run the modified assays to see if there are any performance shifts.

**\*Please see attachment 11 for Yung's review and evaluation of Theranos validation study protocols**

*6. Determine whether the firm has written recall procedures for submitting written reports to FDA of any correction or removal actions required to be reported to FDA per 21 CFR 806.*

Theranos has a written recall procedure. It is "Device Recall and Advisory Notices, SOP-00160, Revision A, Effective Date 12/11/2013" (**Exhibit 43**). Sunny Balwani and Jim Twitchell told me that the firm has not ever had any recalls or field actions.

*7. Determine whether the firm has written MDR procedures in accordance with 21 CFR 803.17 and whether the firm has established and maintains MDR event files in accordance with 21 CFR 803.18. Please obtain a copy of the firm's MDR procedures.  Failure to have written MDR records should be listed on the FDA 483.*

At the start of the inspection, the firm did not have a stand-alone MDR-procedure; however, Section 6.5 in the firm's complaint handling procedure, "Customer Complaints, Document Number SOP-00174, Revision A, Effective Date 07/02/2014" (**Exhibit 41**) provided instructions for filing MDRs for reportable complaints. On 09/01/2015, Jim Twitchell, provided me with a copy of a new stand-alone MDR procedure "Medical Device Reporting Procedure, Document Number SOP-00159, Revision A, Effective Date 08/30/2015" (**Exhibit 42**) that he told me will be used by the firm moving on.

US-FDA-0024065

| Establishment Inspection Report | FEI: | 3006231732 |
|---|---|---|
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA 94560 | EI End: | 09/16/2015 |

*8. Determine whether the firm has adequate written procedures for receiving, reviewing, and evaluating complaints. Verify the process for complaints received and distributed from the corporate level or complaints that were sent directly to Walgreens. Please obtain a copy of the firm's complaint handling procedures. Determine whether the procedure(s) addresses how to handle complaints for which it is unknown if the device problem is due to a Capillary Tube or a Nanotainer issue or due to an issue with the reagents or analyzers Theranos is using. Determine what criteria the firm uses to identify a Capillary Tube or Nanotainer issue versus a reagent or analyzer issue.*

The firm insisted that the CTNs fall under the definition of Lab Developed Tests (LDTs), and that customer complaints are received and investigated by their CLIA lab, and as such, FDA does not have the appropriate jurisdiction to review those complaints. The complaint handling process was verbally described to me by Sunny Balwani and Jim Twitchell as follows:

1. Customer calls in a complaint to the Theranos Customer Service Center
2. Theranos Customer Service logs the complaint and forwards it to the Theranos CLIA Lab
3. Theranos CLIA Lab investigates and if it is determined to be a device issue, CLIA Lab forwards the complaint to Client Solutions (a liaison group between Theranos CLIA Lab and Theranos Quality Assurance)
4. Client Solutions forwards the complaint to Theranos QA
5. Theranos QA performs a product investigation, and if warranted files an MDR

Theranos QA has a procedure, ""Customer Complaints, Document Number SOP-00174, Revision A, Effective Date 07/02/2014" (**Exhibit 41**) that Jim Twitchell told me describes how QA would handle customer complaints that are forwarded on to them by Client Solutions. Also, the firm provided me with "Guest Calls, Document Number CS SOP-05071, Revision A, Effective Date 03/27/2015" (**Exhibit 44**), an SOP for the Theranos Call Center, that describes the initial intake and routing of customer complaints. Neither of these written procedures describes the same complaint-handling scenario that was verbally explained to me during the inspection. Sunny Balwani told me that it is the "highly trained CLIA Lab personnel" that determine if a complaint is a device issue complaint, and if they determine that a complaint was a device issue complaint, they would forward it to Client Solutions. Theranos QA does not see all the incoming complaints; they only see the ones that are forwarded to them by Client Solutions. I asked how many device issue complaints had been forwarded to Theranos QA by Client Solutions, and Jim Twitchell said that there were none up to date.

Also during the inspection I discovered a complaint that was handled as an NCR (non-conformance report) even though it met the definition of a complaint.

Observations 2 and 3 on the Form FDA-483 were issued for complaint-handling deficiencies.

*9. If the review of the firm's complaint files identifies complaints that were not reported under MDR but appear to be reportable, please collect a copy of the complaint record(s). If the complaints*

US-FDA-0024066

| **Establishment Inspection Report** | FEI: | 3006231732 |
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA  94560 | EI End: | 09/16/2015 |

*include unreported malfunctions that would likely cause or contribute to a death or serious injury, include an explanation of the malfunction and its effect on the patient in the EIR.  Obtain the firm's rationale for considering the event to be not reportable.  If a large number of complaints are identified, obtain a copy of the complaint record for a representative sample of the unreported complaints for MDR reportability review.*

Please refer to the answer for question 8. Although Sunny Balwani told me that the CLIA Lab had received several customer complaints, Theranos QA had no reports of customer complaints forwarded to them by Client Solutions.

When I reviewed the firm's nonconforming material handling records, I discovered an NCR for opaque-walled CTNs making it hard for lab personnel to detect blood clotting. This met the definition of a complaint; however Theranos QA handled it as an NCR. I pointed this out to Jim Twitchell and  asked him if they had checked with the lab to see if there were any adverse events that resulted from the "opaque wall issue" (such as incorrect lab results due to undetected blood clotting in the CTN). He said that they did not ask that question when they investigated it as a non-conformity. I pointed out that not only was this "NCR" a complaint, but this should have been investigated for possible MDR reportability.

*10. Determine whether the firm has adequate written procedures for identification, documentation, evaluation, segregation, and disposition of nonconforming product.  Review the firm's nonconforming product files to determine whether it includes assessment of the Capillary Tubes and Nanotainers with the reagents and instruments being used or the Capillary Tubes and Nanotainers only.  Determine what criteria and decision making process are followed to make decisions on nonconforming product investigations for issues involving the Capillary Tubes and Nanotainers.*

The firm has a written procedure, "Control of Non-Conforming Product, Document Number SOP-00154, Revision A, Effective Date 12/11/13" (**Exhibit 40**) that provides instructions for the identification, documentation, evaluation, segregation, and disposition of nonconforming product.  I also reviewed the firm's NCR log and picked 10 NCRs for review. I did not note any observations for the firm's handling of nonconformities.

*11. Determine if the firm has contract manufacturing or distribution agreements with any other firms. Collect the names of these firms and any contracts that describe the regulatory responsibilities of the firms involved.*

Sunny Balwani told me that Theranos does not use any manufacturing or distribution contractors. Theranos conducts all activities in-house, from injection-molding of its own polymer parts to distributing the finished products to its collection sites.

*12. Collect examples of product labeling and promotional material.*

US-FDA-0024067

| Establishment Inspection Report | FEI: | 3006231732 |
|---|---|---|
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA  94560 | EI End: | 09/16/2015 |

During the inspection, I collected examples of product identification labels that are applied to CTNs that are packages 10 CTNs to a bag. The firm does not include any inserts or instructions for use with the packaged product. The firm utilizes color-coding as follows to identify its two types of CTNs; purple for EDTA CTNs and green for Li-Hep CTNs. (Please refer to **Exhibits 31 and 32**). Investigator Seema Singh collected promotional materials from the Palo Alto site that is responsible for promoting and marketing activities. Please refer to her EIR for further information.

*13. Collect shipping documentation for instruments, sample tubes, and the assays offered by the firm and listed in Section 2 above.*

During the inspection, I collected examples of interstate shipments for:
A. CTNs shipped from Newark, CA to Scottsdale, AZ, and then back to Newark, CA
B. CTNs shipped from Newark, CA to Lemoyne, PA (via Scottsdale, AZ), and then back to Newark, CA

(Please refer to **Exhibits 11 – 19** and **Exhibits 22 – 27**)

*14. Collect examples of lot release criteria for instruments, sample tubes, and the assays offered by the firm and listed in Section 2 above.*

I collected the lot release criteria for the two types of Theranos CTNs (EDTA and Li-Hep). They are identified as "QCP, ASSY, TSCD, DUAL-EDTA, LIQ, Document Number QCP-00063, Revision C, Effective Date 08/26/2015" (**Exhibit 45**), and "QCP, ASSY, TSCD, DUAL-Li-HEP, LIQ, Document Number QDP-00064, Revision C, Effective Date 08/26/2015" (**Exhibit 46**)

**Other Questions (Analysis provided by Stayce E. Beck and Yung W. Chan):**

*15. If the firm is currently reporting out patients results from their nanotainer tubes (TSCD), which assays/tests did they use the nanotainer tubes on?*

Currently, Theranos are reporting patient results from the clinical laboratories in Newark, CA. Theranos has two main clinical laboratories located inside 7373 Gateway Blvd, Newark, which is adjacent to their manufacturing facility, located at 7333 Gateway Blvd, Newark.  One of the main clinical laboratories is a CLIA moderate complexity lab, which they claimed only use FDA cleared or approved assays or device.  The other main laboratory is a CLIA High complexity lab, which they stated that they had to modify some of the cleared/approved assays or devices so they can use the reduced volume sample from the blood collected from the nanotainer tubes (TSCD) to run the tests. Theranos provided us a list of tests that are run on the nanotainer tubes in their CLIA High complexity lab (see **Exhibit 84**).  Specifically, we observed their operations on 8/27/15 in their CLIA High complexity lab with the lithium heparin nanotainer tubes for the Siemens ADVIA 1800 chemistry analyzer testing.  After the barcoded nanotainer tubes had been processed (in a different

US-FDA-0024068

| **Establishment Inspection Report** | FEI: | **3006231732** |
|---|---|---|
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA  94560 | EI End: | 09/16/2015 |

room, with a quick centrifugation and a quality and quantitative check using an automatic instrument) and passed the quality assessment evaluation in their processing room, all lithium heparin nanotainer tubes  were placed on the TECAN Freedom eov instrument for further pre-diluted by buffer (either saline or water), depending on the appropriate diluent needed for the specific chemistry assay/analyte. The nanotainer tubes were first put on a sample rack, and the instrument's pipet came over the nanotainer tubes and pipet up some sample from the nanotainer tubes and placed them over into a small sample cup (i.e. T-cup, hold maximum of 200uL of fluid) in a different sample rack (with adapter).  The instrument pipet went to pick up the dilution buffer and placed them into the same sample cup that has the sample already in it, followed by several washing steps to clean the instrument's pipet.

Once complete, we observed one technician physically took the sample rack with the T-cup, into the Siemens ADVIA 1800 analyzer and loaded into the sample loading area and then hit the "Start" button on the instrument to start the testing.   The ADVIA analyzer has a screen monitor showing the adapter ID number but the technician did not know what tests are ordered or being run at that time. As soon as the testing completed, the patient results will be released to the LIS (Laboratory Information System) and then sent to the customer or physician who ordered the tests.

16.  *Did the firm use cleared assays/devices for their testing to obtain the patient results, or did they used modified assays/devices, and how did they modified the cleared assays/devices?  Collect evidence to document that the firm is reporting patient's results using their nanotainer tubes (TSCD).*

Theranos is currently using a mixture of both for reporting patient results out to the customer.  They either used the venous BD vacutainer tubes tested on the cleared assays/devices (unmodified) from the moderate complexity lab or used the capillary Theranos nanotainer tubes (TSCD) tested on the modified assays or otherwise called LDT (Laboratory Developed Test) in the high complexity lab. Please see ==Exhibits 80, 81, and 82== for evidence that firm is reporting patient results from the capillary nanotainer tubes tested with the modified assay (LDT).

In addition to the pre-dilution step described in response to #15 above, the firm also altered the ADVIA chemistry assay's parameters such as sample volume and reagent volume in order to adapt to the reduced sample volume obtained from the nanotainer tubes (TSCD).  Because the Siemens ADVIA 1800 analyzer is an open system, therefore, it would allow the customer to change or add new assay parameters and run test that they want to establish in their clinical lab.  Theranos did not provide any specific information about the changes made to the assay parameters.

17.  *Collect evidence on how the firm validates their nanotainer tubes with the modified assays/devices.*

See ==Exhibits 95, 96, 97, 98, 99==, and ==Attachment 11== on how the firm validated their nanotainer tubes with the modified assays/devices.

US-FDA-0024069

| Establishment Inspection Report | FEI: | 3006231732 |
| --- | --- | --- |
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA  94560 | EI End: | 09/16/2015 |

## MANUFACTURING CODES

The Theranos manufacturing code scheme is as follows:

$$XXYYZZZZ\text{-}ABCD$$

Where  XX = day of manufacture

YY = month of the manufacture

ZZZZ = year of manufacture

ABCD = four digit sequentially assigned increasing number

Therefore, a CTN with the manufacturing code 20022015-4576 would mean that this is the 4,576[th] CTN lot made by Theranos and that it was manufactured on February 20th 2015.

## COMPLAINTS

I reviewed the firm's written procedures "Customer Complaints, Document Number SOP-00174, Revision A, Effective Date 07/02/2014" (**Exhibit 41**) and "Guest Calls, Document Number CS SOP-05071, Revision A, Effective Date 03/27/2015" (**Exhibit 44**). I also requested to review the complaint log and Jim Twitchell gave me a blank complaint log (**Exhibit 51**). I told him that I found it hard to believe that there have been no customer complaints since November 2013 when the firm started offering their lab analysis service that utilizes the CTN.

Sunny Balwani told me there had been "thousands of complaints" but that those were handled by the CLIA Lab and as such I had no jurisdiction to review them. I told him that if a customer had a complaint that involved a CTN, a Class II medical device, I did have jurisdiction to see that complaint. He told me that the vast majority of the complaints were general complaints such as billing, shipping, or quantity issues. He said that the rest were CLIA Lab complaints such as the results were high or low because the patient had not fasted before giving the blood sample. He then drew a diagram of the complaint handling process on the conference room whiteboard (**Exhibit 47**). He said that customers call a phone number that is provided to them with the lab result and that the Customer Service Center would pass on the customer complaint to the CLIA Lab for investigation. He told me that they have lab SOPs and highly trained people in the CLIA Lab to investigate the complaints and if the lab personnel determined that the complaint was a device issue, they would pass it on to the Client Solutions group (a liaison group between the CLIA Lab and the Quality group). He told me that Client Solutions forwards the complaint to the QA group for investigation and if the QA group determines that an MDR needed to be filed, they would do so.

I told Sunny Balwani that without inspecting customer complaints I could not verify that device issues complaints are being correctly detected by the CLIA Lab. I asked him if I could see the complaint log and complaints that were handled by the CLIA Lab since those were complaints for a

US-FDA-0024070

| Establishment Inspection Report | FEI: | 3006231732 |
| --- | --- | --- |
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA  94560 | EI End: | 09/16/2015 |

Class II medical device that fall under the Part 820 regulation. After many objections by Sunny Balwani and the firm's legal staff, Sunny Balwani provided me with a redacted facsimile of the complaint log (patient identification information was redacted). He also provided me two examples of lab investigations but one of them had nothing to do with a CTN complaint. I also told him that I was concerned that the QA group did not have access to the incoming complaints until after a complaint "emerges from the fog" after making its way through three other layers of the organization, which may delay the QA group's timeliness in investigating and reporting MDR issues. I told Sunny Balwani that since the CTN was a Class II medical device, the QA group needs to have access to all CTN complaints and to be able to reach their own conclusions whether the complaint is or is not a device issue.

I also asked Sunny Balwani if Walgreen employees are trained in complaint handling so that they would be able to identify a complaint and forward it to Theranos for investigation. Sunny said that Walgreens are not trained by Theranos on complaint handling; he presumed that they would refer customers to the Theranos Wellness center in the store.

The complaint handling written procedures I reviewed does not match the complaint handling procedure that firm representatives explained to me. Additionally I found that the firm had received a complaint from the CLIA Lab but had handled it as a nonconformity rather than as a complaint. Please refer to Observations 2 and 3 in the Objectionable Conditions and Management's response section for further details.

## RECALL PROCEDURES

I reviewed the firm's written recall procedure "Device Recall and Advisory Notices, SOP-00160, Revision A, Effective Date 12/11/2013" (**Exhibit 43**). Sunny Balwani and Jim Twitchell told me that the firm has not ever had any recalls or field actions.

## OBJECTIONABLE CONDITIONS AND MANAGEMENT'S RESPONSE

### Observations listed on form FDA 483

### OBSERVATION 1

Devices for which listing is required have not been listed.

Specifically, your Li-Hep Capillary Tube Nanotainer (CTN) is a blood specimen collection device containing a separating gel, which is intended to separate plasma from nonplasma blood components prior to further testing, and as such the Li-Hep CTN is a Class II medical device. You have not listed the Li-Hep CTN as a Class II medical device, and you are currently identifying it as a Class I exempt medical device. You are currently shipping this uncleared medical device in interstate commerce, between California, Arizona, and Pennsylvania.

US-FDA-0024071

| Establishment Inspection Report | FEI: | 3006231732 |
|---|---|---|
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA  94560 | EI End: | 09/16/2015 |

*Annotation: Under consideration.*

Reference: 21 CFR 807.20(a)

Supporting Evidence and Relevance:

Blood collection devices that contain serum separating gel that is intended to separate plasma from non-plasma blood components prior to further testing are classified as Class II medical devices according to 21CFR 862.1675

    A.  Theranos, Inc. purchases Poyton gel, which is a serum separating gel. This is evidenced by Theranos Purchase Order Number 67911 (**Exhibit 48**) dated 06/19/2015 for an order of Poyton gel, and the receiving documents (**Exhibit 49**) dated 07/16/2015 that show that the firm received 50 kilograms of "Serum Separating Gel" for Purchase Order Number 67911 designated for Brian Kutner, who is in charge of CTN manufacturing.

    B.  The firm's CTN manufacturing travelers for Li-Hep CTN lot numbers 29122014-3690 (**Exhibit 7**), 30122014-3749 (**Exhibit 8**), and 02012015-3751 (**Exhibit 9**) show that they contain Poyton gel.

    C.  The firm's shipping records (**Exhibits 11 – 19** and **Exhibits 22 – 27**) show that CTNs are shipped out of Newark, CA and that patient sample Li-Hep CTNs are returned to the Newark lab for further testing (**Exhibits 16 and 19**).

Points A - C show that Theranos' Capillary Tube Nanotainers contain serum separating gel, and that they are intended to store plasma and non-plasma components prior to further testing. This matches the definition in 21CFR 862.1675, and therefore the CTNs are Class II medical devices.

Lab Developed Tests (LDTs) are assays that are developed and used *within one lab*. Theranos Inc. holds three CLIA lab certificates for three separate labs in Newark, CA, Scottsdale, AZ, and Lemoyne, PA. Sunny Balwani gave me the CLIA certificate numbers for the Arizona and California labs (**Exhibit 50**). I looked up the firm's CLIA certificate numbers on the CDC website and located three CLIA certificate numbers for Theranos labs (**Attachment 10**) (Please note that the CLIA certificate number for the Newark Lab is different on the document supplied by Sunny Balwani than the one that appears on the CDC website). CLIA certificates cover a *single lab in only one location* and do not cover satellite locations (unless they are temporary locations as in mobile labs, or unless they are not-for-profit or government labs performing limited public health work, or unless they are labs located in contiguous buildings of one hospital) Theranos ships CTNs from Newark, CA to Scottsdale, AZ, as well as to Lemoyne, PA (**Exhibits 11 – 19** and **Exhibits 22 – 27**). When CTNs leave one lab and are shipped across state lines to another location, they are no longer under the control of that lab. Once they leave the control of the CLIA Lab, they are no longer LDTs but Class II medical devices requiring a 510(k) clearance before being marketed and distributed.

US-FDA-0024072

| **Establishment Inspection Report** | FEI: | 3006231732 |
|---|---|---|
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA 94560 | EI End: | 09/16/2015 |

Sunny Balwani told me that the FDA had never told Theranos that the CTNs were Class II medical devices and that the FDA had never told the firm that they require a 510(k) clearance. In her objection letter addressed to Ian Pilcher, FDA CDRH Consumer Safety Officer, dated 08/30/2015, Theranos General Counsel Heather King states, "However, in written feedback to a Pre-Submission (Q131199), dated October 21, 2013, Theranos was instructed by FDA officials in OIR that it should file a 510(k) application for the TSCD because FDA had determined that it was actually a Class II device that required a pre-market clearance. At that time, Theranos raised an objection to the classification of the TSCD as a Class II device. However, in a spirit of cooperation, Theranos agreed to file a 510(k) for this product" (**Exhibit 35, Page 7**). Furthermore, in his response letter (**Attachment 9**) Alberto Gutierrez, FDA Director of the Office of In Vitro Diagnostics and Radiological Health, informed Theranos counsels Heather King and Daniel Kracov that contrary to their assertion that they had not been told that FDA had jurisdiction, the firm had been told several times of the FDA's determination that the CTN was a Class II medical device and that it required a 510(k) clearance.

Discussion with Management:

Sunny Balwani stated "Theranos disagrees with FDA based on prior communication with the Agency where the Agency had acknowledged that the CTN was an LDT. However, Theranos has filed a 510(k) but still has a fundamental disagreement and plans to address this with CDRH and OIR"

---

**OBSERVATION 2**

Procedures for receiving, reviewing, and evaluating complaints by a formally designated unit have not been adequately established.

Specifically, your two written procedures, "Customer Complaints, Document Number SOP-00174, Revision A, Effective Date 07/02/2014", and "Guest Calls, Document Number CS SOP-05071, Revision A, Effective Date 03/27/2015" do not accurately describe the entire complaint handling procedure that you currently employ to receive, review, and evaluate customer complaints. The procedure that you verbally described during the current inspection is as follows:

1. Customer calls in a complaint to the Theranos Customer Service Center
2. Theranos Customer Service logs the complaint and forwards it to the Theranos CLIA Lab
3. Theranos CLIA Lab investigates and if it is determined to be a device issue, CLIA Lab forwards the complaint to Client Solutions (a liaison group between Theranos CLIA Lab and Theranos Quality Assurance)
4. Client Solutions forwards the complaint to Theranos QA
5. Theranos QA performs a product investigation, and if warranted files an MDR

In written procedure "Customer Complaints, Document Number SOP-00174, Revision A, Effective Date 07/02/2014", Section 6.1.1 states that "all customer communication after a device is released for distribution, whether written or oral, is forwarded to the Client Solutions group" where they are recorded in the Customer Complaint Log maintained by Client Solutions. Section 6.3.1 of this written procedure also states that "All Device Complaints are evaluated by Client Solutions and, when appropriate, are formally investigated by Quality Assurance".

US-FDA-0024073

| Establishment Inspection Report | FEI: | 3006231732 |
|---|---|---|
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA  94560 | EI End: | 09/16/2015 |

"Guest Calls, Document Number CS SOP-05071, Revision A, Effective Date 03/27/2015", Section 8.1.1 states the "All calls, regardless of their nature, shall be documented in the Call Log". Section 7.1 of the same written procedure contains a flow diagram that shows that complaints that require escalation are documented in an Escalation Call Log and escalated to the appropriate Product Manager, who follows up with the Guest, and then documents the call in the Call Log. This procedure does not provide instructions for forwarding complaints to the CLIA Lab, or Client Solutions, or Theranos QA for product investigation and assessment of MDR reportability.

Your written procedures do not describe your complaint handling as you verbally described it during the inspection. The Theranos QA complaint log that you provided contained no logged complaints; however, the CLIA Lab complaint log that you also subsequently provided contained CTN-related complaints.

_____

*Annotation: Promised to correct within 7 days.*

Reference: 21 CFR 820.198(a)

Supporting Evidence and Relevance:

During my inspection of the firm's complaint handling procedure, I reviewed two written procedures; "Customer Complaints, Document Number SOP-00174, Revision A, Effective Date 07/02/2014" (**Exhibit 41**) and "Guest Calls, Document Number CS SOP-05071, Revision A, Effective Date 03/27/2015" (**Exhibit 44**). I also asked Jim Twitchell to provide me with a complaint log and he gave me a blank log (**Exhibit 51**). When I told him that I found it hard to believe that there have been no customer complaints since November 2013, Sunny Balwani told me that there have been "thousands" of complaints but these were handled by the CLIA Lab and that I had no jurisdiction to see them. I told him that if a customer had a complaint that was related to a CTN, a Class II medical device, I did have jurisdiction to see that complaint. He drew a diagram on the conference room whiteboard (**Exhibit 47**) and told me that the firm's complaint handling procedure is as follows:

1. Customer calls in a complaint to the Theranos Customer Service Center
2. Theranos Customer Service logs the complaint and forwards it to the Theranos CLIA Lab
3. Theranos CLIA Lab investigates and if it is determined to be a device issue, CLIA Lab forwards the complaint to Client Solutions (a liaison group between Theranos CLIA Lab and Theranos Quality Assurance)
4. Client Solutions forwards the complaint to Theranos QA
5. Theranos QA performs a product investigation, and if warranted files an MDR

US-FDA-0024074

| Establishment Inspection Report | FEI: | **3006231732** |
|---|---|---|
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA  94560 | EI End: | 09/16/2015 |

This disagreed with the written procedures as follows:

| Item | Verbal Procedure | SOP-00174 | SOP-05071 |
|---|---|---|---|
| Intake of Complaint | Customer calls customer service center | All customer complaints are forwarded to Client Solutions (6.1.1) | Document call in Call Log and if needed in Escalation Log (7.1 – Flow chart) |
| Logging of Complaint | Customer Service forwards complaint to CLIA Lab where it is logged into CLIA complaint log | All customer complaints are recorded in the Client Solutions Customer Complaint Log (6.1.2) | Document call in Call Log and if needed in Escalation Log (7.1 – Flow chart) |
| Classification of complaint | CLIA Lab determines if it is a device issue and if so forwards to Client Solutions | Client Solutions reviews and classifies customer complaints (6.2.1) | Customer Service escalates complaint to appropriate Product Manager(7.1 – Flow chart) |
| Evaluation | CLIA Lab investigates and forwards only device issues to Client Solutions | Client Solutions evaluates all device complaints (6.3.1) | ? |
| Complaint Record Retention | CLIA Lab retains complaint records | Complaint Investigation records are kept by Client Solutions (6.4)(6.8.3) | ? |

The CLIA Lab and its role in complaint handling are not referenced in either of the SOPs. I told Sunny Balwani that without inspecting customer complaints I could not verify that device issue complaints are being correctly detected by the CLIA Lab. I asked him if I could see the complaint log and CTN complaints that were handled by the CLIA Lab since CTN sample complaints involved a Class II medical device that falls under the Part 820 regulation. After many objections by Sunny Balwani and the firm's legal staff, Sunny Balwani provided me with a redacted facsimile of the complaint log (patient identification information was redacted) starting on 03/04/2014 for 46 complaints that were for patient samples collected with CTNs (**Exhibit 52**). None of these 46 CTN-related complaints appeared on the Complaint Log maintained by Theranos QA (**Exhibit 51**).

Discussion with Management:

Sunny Balwani said that observations 2 through 9 have already been corrected and he wanted them annotated as corrected and verified. I told him that I disagreed that they were corrected and that I could not verify something that was not yet corrected.

US-FDA-0024075

| **Establishment Inspection Report** | FEI: | **3006231732** |
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA  94560 | EI End: | 09/16/2015 |

He also objected to my using the term "CTN-related complaints" in Observation 2. He told me that this implied that these complaints were device issues. I told him that what I meant was that these complaints were for patient samples that were collected using CTNs. I told him that Theranos QA needs to have immediate access to any such complaints because they are obligated to investigate all complaints that are associated with the Class II medical device and that there are time-frames to which they will be held if the complaint is an MDR-reportable complaint.

Sunny Balwani told me that he wished to annotate this observation with "Promised to correct within 7 days" subject to the statement he made for Observation 1.

---

**OBSERVATION 3**

Complaints involving the possible failure of a device to meet any of its specifications were not reviewed, evaluated, and investigated where necessary.

Specifically, a complaint that was reported to you via NCR-01926 on 01/30/2015 was not handled as a complaint in compliance with your written procedure "Customer Complaints, Document Number SOP-00174, Revision A, Effective Date 07/02/2014". NCR-01926 was a report of a complaint from your CLIA Lab (identified in the NCR as Normandy) that there were "difficulties in inspecting CTN specimen quality. Reports were that walls of 51-00348 parts were too opaque to be able to see clotting clearly". You did not identify this as a complaint and you did not investigate it as a complaint, nor did you investigate if this complaint required the filing of MDRs. This complaint was not documented in your complaint log.

*Annotation: Promised to correct within 7 days.*

Reference: 21 CFR 820.198(c)

Supporting Evidence and Relevance:

I asked Jim Twitchell to show me the firm's Complaint Log that is maintained by Theranos QA and he gave me a blank complaint log (**Exhibit 51**). I asked him if there were any complaints since the firm started using the CTN and he said that none were reported to Theranos QA; Sunny Balwani told me that customer complaints are handled by the CLIA Lab, and if the CLIA Lab determines that the complaint is a device issue, then it would be forwarded to the QA group for further processing. This procedure is not described in either of the firm's written procedures; "Customer Complaints, Document Number SOP-00174, Revision A, Effective Date 07/02/2014" (**Exhibit 41**) and "Guest Calls, Document Number CS SOP-05071, Revision A, Effective Date 03/27/2015" (**Exhibit 44**). Additionally Jim Twitchell and Sunny Balwani told me that the word "customer" in the written procedure "Customer Complaints, Document Number SOP-00174, Revision A, Effective Date 07/02/2014" (**Exhibit 41**) referred to the CLIA Lab; the word "customer" is not defined in this procedure nor does the procedure refer to the CLIA Lab. Section 3.4 of this procedure defines

US-FDA-0024076

| Establishment Inspection Report | FEI: | 3006231732 |
|---|---|---|
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA  94560 | EI End: | 09/16/2015 |

"Customer Complaint" as "Any written, electronic, or oral communication from a customer against a product released for distribution. Customer complaints are inclusive of Device complaints and General complaints." (**Exhibit 41, Page 3**)

During my review of NCR-01926 (**Exhibit 5**) I noted that this was a complaint that had been incorrectly handled as an NCR. The NCR, dated 01/30/2015, describes the nonconformity as "Parts quarantined due to complaints from Normandy about difficulties in inspecting CTN specimen quality. Reports were that walls of 51-00348 parts were too opaque to be able to see clotting clearly." I asked Jim Twitchell to identify what "Normandy" was, and he told me that it was a code word for the CLIA Lab. I also asked what part was referenced by "51-00348 parts", and Brian Kutner told me that it was a component of the CTN called a "unibody". I pointed out to Jim Twitchell that this met the definition of a complaint and in fact the firm had used the word "complaints" in describing the issue. Jim Twitchell said that this was an internal issue and that is why it was handled as an NCR, but I told him that it was not internal if the CTNs contained patient specimens that the CLIA Lab was having a hard time assessing for clotting due to the opaqueness of the unibody wall. I also pointed out that according to Jim Twitchell, the CLIA Lab was the "customer" referenced in the firm's written procedure, and that since the CTN had been released for distribution, this met the firm's own definition of a "customer complaint"; but, the firm had not handled this complaint according to their complaint procedure. I also pointed out that the firm needed to investigate the complaint to find out if there were any MDR-reportable events that resulted from the CLIA Lab's difficulty in detecting blood clotting in any of the specimens in the opaque CTNs. In response to my MDR concern, Sunny Balwani gave me a sheet of paper (**Exhibit 53**) showing reports of two re-draws of blood samples for two patients but upon closer examination these two examples bore no reference to opaque-walled CTNs and did not provide enough information to prove that there were no MDR-reportable events associated with the opaque-walled complaints from the CLIA Lab.

Discussion with Management:

On 09/08/2015, Jim Twitchell told me that in response to my concerns with their written procedure, the firm had updated the written complaint procedure, and he gave me a copy of "Customer Complaint, Document Number SOP-00174, Revision C, Effective Date 09/01/2015" (**Exhibit 54**) and a newly created complaint form, "Complaint Investigation Form, Document Number SOP-00174-F2, Revision A, Effective Date 08/30/2015" (**Exhibit 55**). Jim Twitchell told me that among other updates to the procedure, the "customer" is now defined as the Newark CLIA Lab (**Exhibit 54, Page 4, Section 3.8**)

Sunny Balwani said that observations 2 through 9 have already been corrected and he wanted them annotated as corrected and verified. I told him that I disagreed that they were corrected and that I could not verify something that was not yet corrected.

US-FDA-0024077

| Establishment Inspection Report | FEI: | 3006231732 |
|---|---|---|
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA  94560 | EI End: | 09/16/2015 |

Sunny Balwani told me that he wished to annotate this observation with "Promised to correct within 7 days" subject to the statement he made for Observation 1.

---

**OBSERVATION 4**

Corrective and preventive action activities and/or results have not been documented.

Specifically, you undertook several corrections of your Quality Management System procedures and records without documenting the investigations of causes of the nonconformities, the actions needed to correct or prevent recurrence of similar quality problems, the verification or validation of corrective actions, and the dissemination of information about the quality problems to responsible parties. During this inspection you undertook to correct procedures and records for your Complaint Handling, supplier qualifications, DHRs, and internal audits without opening CAPAs to document your investigation into the causes of these deficiencies and their impact on your Quality Management System, an analysis and plan of what corrections were required, whether the corrections impacted other areas of your Quality Management System, and the dissemination of the information about these issues to your firm's employees.

For example, during this inspection you were unable to produce documented supplier qualifications, and you corrected the deficiency by assembling the required supplier qualification documents for your suppliers. You did this without opening a CAPA that investigated the probable cause for not having supplier qualification documentation, or to investigate if these suppliers had met your quality requirements the entire time in the past when you had purchased materials from them with which you had manufactured your finished products, or if your purchasing department personnel required training to ensure future compliance with this required quality activity, and training that may be required by other employees making purchases so that they understand the probable quality impact on products made with materials sourced from unapproved suppliers. This correction of your lack of documented supplier qualification was not documented in a CAPA that contained an effectiveness plan to ensure that the correction you undertook would reduce or eliminate any future recurrence of this situation.

*Annotation: Promised to correct within 7 days.*

Reference: 21 CFR 820.100(b)

Supporting Evidence and Relevance:

During my inspection I expressed several concerns with the firm's complaint handling, purchasing controls, DRH records, and lack of internal audits (see Observations 2, 3, 6, 7, 8, and 9). On 09/08/2015, Jim Twitchell and Brian Kutner told me that in an effort to respond to my concerns, they had already made corrections to those issues.

In response to my concerns regarding the deficiencies in the firm's complaint handling / MDR investigation processes, the firm updated the written complaint handling procedure and created a new complaint form. Jim Twitchell gave me a copy of the new version of the complaint handling procedure, "Customer Complaint, Document Number SOP-00174, Revision C, Effective Date

US-FDA-0024078

| Establishment Inspection Report | FEI: | **3006231732** |
|---|---|---|
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA  94560 | EI End: | 09/16/2015 |

09/01/2015" (**Exhibit 54**) and a copy of the newly created complaint form, "Complaint Investigation Form, Document Number SOP-00174-F2, Revision A, Effective Date 08/30/2015" (**Exhibit 55**).

In response to my concerns with the firm's purchasing controls, on 09/01/2015, Jim Twitchell gave me newly created supplier qualification documents for three suppliers (**Exhibits 56, 57 and 58**)that were on the Approved Supplier List (**Exhibit 59**) but had no documented supplier qualification, and then on 09/08/2015 he gave me a copy of the firm's updated Approved Supplier List (**Exhibit 60**).

During the inspection I had also pointed out that the firm needed to keep a copy of their primary identification label for the CTNs in their DHRs, and on 09/08/2015 Brian Kutner gave me a copy of the new revision of CTN Traveler Manufacturing Operating Procedure, MOP-00606 (**Exhibit 61**) that was updated to include instructions to retain a copy of the primary identification label in the CTN travelers.

Additionally, in response to my concern with the firm's lack of internal audits, Jim Twitchell gave me an updated internal audit procedure (**Exhibit 62**), a newly created internal audit questionnaire (**Exhibit 63**), a 2015 Internal Audit Schedule (**Exhibit 64**), and a 2016 Internal Audit Schedule (**Exhibit 65**).

No CAPAs were opened to document these corrections. The firm did not investigate the extent of the firm's non-compliance of the various subsystems with the QSR, of which my observations were examples. They did not analyze the impact of their quality system deficiencies on their product, or investigate the causes and extent of these deficiencies, or assess all the corrections that may be necessary, or determine which employees needed to be informed or trained, or establish a plan and criteria to measure the effectiveness of their corrections.

Discussion with Management:

Sunny Balwani said that observations 2 through 9 have already been corrected and he wanted them annotated as corrected and verified. I told him that I disagreed that they were corrected and that I could not verify something that was not yet corrected.

I explained that although I appreciated that they wanted to quickly fix the issues that I was pointing out in the inspection, these types of corrections required a more analytical and thoughtful approach than just a quick update to a written procedure or the creation of a new record. I explained that the instances I had pointed out were examples and that there may be other systematic problems that would only be uncovered if the firm performed a deeper investigation and analysis of the issues that I had pointed out. Such an approach would typically involve opening a CAPA. I explained that this was exactly the reason why I did not agree that these observations had been corrected, and why I could not verify that they were corrected.

US-FDA-0024079

| Establishment Inspection Report | FEI: | 3006231732 |
|---|---|---|
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA 94560 | EI End: | 09/16/2015 |

Sunny Balwani told me that he wished to annotate this observation with "Promised to correct within 7 days" subject to the statement he made for Observation 1.

---

### OBSERVATION 5

Software validation activities and results for computers or automated data processing systems used as part of production and the quality system have not been documented.

Specifically, you use an unvalidated Excel spreadsheet to document the results of the needle length dimensional testing during the Needle Inspection step for your Li-Hep CTN and EDTA CTN manufacturing. For example, you record the needle length range in the travelers for CTN Lot Numbers 24072015-5549, 24072015-5548, and 22072015-5584; however, you recorded the individual raw data in an unvalidated Excel spreadsheet that calculates the average and standard deviation. This unvalidated spreadsheet does not specify what dimension is being recorded, or the units of measure, or the identity of the person making the individual measurements. This unvalidated Excel spreadsheet does not document a QA review of the data. The spreadsheet is not included with the traveler as part of the Device History File.

----

*Annotation: Promised to correct within 7 days.*

Reference: 21 CFR 820.70(i)

Supporting Evidence and Relevance:

During my review of the firm's DHRs, namely the travelers for CTN Lot Numbers 24072015-5549 (**Exhibit 66**), 24072015-5548 (**Exhibit 67**), and 22072015-5584 (**Exhibit 68**), I noted that although a sample size of 20 needles were measured, the needle lengths (step 7.5.5 of the DHR) was recorded as a range rather than individual lengths. I asked Brian Kutner why the process operator taking the individual measurements did not record them in the DHR. He told me that these individual measurements are entered into a separate Excel spreadsheet and he gave me a sheet of paper (**Exhibit 69**) showing the individual measurements copied from the Excel Spreadsheet for the three lots I had reviewed.

The spreadsheet calculates the average and standard deviation; however it does not show which attribute is being measured, the units of measure, or the identity of the process operator performing the measurements. The spreadsheet also lacks a QA review and it is not included as part of the DHR. I asked Brian Kutner if this Excel Spreadsheet was validated and he replied that it was not a validated spreadsheet.

US-FDA-0024080

| Establishment Inspection Report | FEI: | 3006231732 |
| --- | --- | --- |
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA  94560 | EI End: | 09/16/2015 |

Discussion with Management:

Sunny Balwani said that observations 2 through 9 have already been corrected and he wanted them annotated as corrected and verified. I told him that I disagreed that they were corrected and that I could not verify something that was not yet corrected.

Sunny Balwani told me that he wished to annotate this observation with "Promised to correct within 7 days" subject to the statement he made for Observation 1.

---

**OBSERVATION 6**

---

The evaluation of potential suppliers was not documented.

Specifically, your written procedure, "Supplier Management, Document Number SOP-00171, Revision B, Effective Date 07/08/2015" lays out the procedure for qualifying suppliers of goods and services "for released products, or those materials and services supporting a regulatory submission"; however, you did not have documented approved supplier qualifications for at least three of the suppliers on your Approved Supplier List until after the start of the current inspection.

For example, your supplier of Poyton Gel had no documented approved supplier qualification until after the start of this inspection, yet you purchased a serum separating gel that you use in the manufacture of your Li-Hep CTNs from this supplier. On 06/19/2015 you issued Purchase Order Number 67911 to your supplier of Poyton Gel and on 07/16/2015 you received 50 kilograms of Serum Separating Gel from this vendor; however, you had no documented approved supplier qualification for this supplier of Poyton Gel until 09/07/2015.

_____

*Annotation:  Promised to correct within 7 days.*

Reference: 21 CFR 820.50(a)(1)

Supporting Evidence and Relevance:

During my inspection of the Theranos Inc. purchasing controls subsystem, I reviewed written procedure, "Supplier Management, Document Number SOP-00171, Revision B, Effective Date 07/08/2015" and noted that its scope is for qualifying suppliers of goods and services "for released products, or those materials and services supporting a regulatory submission" (**Exhibit 70, Page 3, Section 2**). I asked Jim Twitchell to give me a copy of the firm's approved supplier list (ASL) and on 09/01/2015 he gave me a copy of the firm's ASL (**Exhibit 59**). I asked him to confirm that all the suppliers on this list were suppliers of CTN materials or services and Brian Kutner told me that only some of them are; he used a pen and marked the CTN materials suppliers with a dot next to their name. I picked out two of the marked suppliers; Interstate Speciality [sic] Products and McMaster-Carr Supply Company. I asked Jim Twitchell to provide me with the supplier qualification for these two suppliers that appeared on the ASL, and he gave me the three supplier qualifications (**Exhibits**

US-FDA-0024081

| Establishment Inspection Report | FEI: | 3006231732 |
| --- | --- | --- |
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA  94560 | EI End: | 09/16/2015 |

56 and 57). I noted that these supplier qualifications were dated 08/31/2015, five days after the start of the current inspection. I asked Jim Twitchell if they had documented supplier qualifications that predated these documents and he said that they did not have any previous to these documents.

Similarly, when on 09/10/2015, I asked to see the supplier qualification documentation for Shanghai Poyton Industry Co. Ltd. (supplier of Poyton gel), Jim Twitchell gave me the supplier qualification for that supplier (Exhibit 58) and I noted that it was created on 09/07/2015. The firm had issued Purchase Order Number 67911 (Exhibit 48) on 06/19/2015 to Shanghai Poyton Industry Co. Ltd. and on 07/16/2015 they received 50 kilograms of the serum-separating gel from this vendor (Exhibit 49). Contrary to the requirements set forth in the firm's written procedure "Supplier Management, Document Number SOP-00171, Revision B, Effective Date 07/08/2015" (Exhibit 70), the firm had not qualified suppliers "for released products, or those materials and services supporting a regulatory submission" (Exhibit 70, Page 3, Section 2) until after the start of this inspection.

Discussion with Management:

Sunny Balwani said that observations 2 through 9 have already been corrected and he wanted them annotated as corrected and verified. I told him that I disagreed that they were corrected and that I could not verify something that was not yet corrected.

Sunny Balwani told me that he wished to annotate this observation with "Promised to correct within 7 days" subject to the statement he made for Observation 1.

---

**OBSERVATION 7**

Records of acceptable suppliers have not been adequately established.

Specifically, not all the suppliers of your goods and services are included on your Approved Supplier List. Section 6.1.1 of your written procedure, "Procurement, Document Number SOP-00170, Revision B, Effective Date 07/08/2015" states "Purchases for items and/or services that will be used to produce devices to meet both design control and/or commercial sale requirements must be made from approved suppliers. The requisitioner is responsible for ensuring that the supplier he or she wishes to procure goods or services from is on Theranos' ASL"; however, on 08/14/2015 you purchased polypropylene homopolymer that is used in the manufacturing of your CTNs via Purchase Order Number 70115 from a supplier that is not listed on your ASL.

――――

*Annotation:  Promised to correct within 7 days.*

Reference: 21 CFR 820.50(a)(3)

US-FDA-0024082

| Establishment Inspection Report | FEI: | **3006231732** |
|---|---|---|
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA  94560 | EI End: | 09/16/2015 |

Supporting Evidence and Relevance:

During my review of the "opaque unibody wall" issue described in NCR-01926 (**Exhibit 5**), I asked Brian Kutner what was the material used for the manufacturing of the unibody, and he told me that it was polypropylene homopolymer.

I reviewed the firm's written procedure "Procurement, Document Number SOP-00170, Revision B, Effective Date 07/08/2015" (**Exhibit 71**) and I noted that according to Section 6.1.1, "Purchases for items and/or services that will be used to produce devices to meet both design control and/or commercial sale requirements must be made from approved suppliers. The requisitioner is responsible for ensuring that the supplier he or she wishes to procure goods or services from is on Theranos' ASL" (**Exhibit 71, Page 4**). I asked Brian Kutner to name the supplier of the polypropylene homopolymer that was used to make the unibody described in NCR-01926 (**Exhibit 5**), and he told me that the manufacturer is Flint Hills Resources, LP, in Witchita, KS but that they buy it from a distributor, Polyone. I searched the firm's ASL (**Exhibit 59**) for Flint Hills and Polyone but they were not listed there. I asked Jim Twitchell why they were not on the ASL, and he told me that they do not list "raw material suppliers" on their ASL. I asked him if he did not think it was important to establish if suppliers of raw materials met Theranos' requirements and list them on the ASL. Jim Twitchell told me that the components and finished materials are tested down the line so it did not much matter because problems with raw materials would be detected at that point. I told him that according to what I saw from NCR-01926 (**Exhibit 5**), that was not necessarily so; the problem with the opaque polymer was not detected until the finished device was used to collect patient samples and presented a problem to the lab analysts because the opaque polymer material made it had to detect clotting in the CTNs.

I asked to see an example of a purchase of polypropylene homopolymer and Brian Kutner gave me Purchase Order 70115 (**Exhibit 72**) made out to Polyone in Palatine, IL dated 08/14/2015 for an order of 4,500lbs of "Polypropylene, Flint". On 09/08/2015, Jim Twitchell gave me a revised ASL (**Exhibit 60**); however, although the distributor Polyone was listed on it, the manufacturer of the raw material, Flint Hills, was still not listed on the revised ASL (**Exhibit 60**).

Discussion with Management:

Sunny Balwani said that observations 2 through 9 have already been corrected and he wanted them annotated as corrected and verified. I told him that I disagreed that they were corrected and that I could not verify something that was not yet corrected.

Sunny Balwani told me that he wished to annotate this observation with "Promised to correct within 7 days" subject to the statement he made for Observation 1.

US-FDA-0024083

| **Establishment Inspection Report** | FEI: | 3006231732 |
|---|---|---|
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA  94560 | EI End: | 09/16/2015 |

## OBSERVATION 8

Procedures for device history records have not been adequately established.

Specifically, Sections 6.1 and 6.1.5 of your written procedure "Device History Record (DHR), Document Number SOP-00151, Revision A, Effective Date 01/28/2014" state "Records for inclusion in the DHR must specify the following: The primary identification label and labeling used for each production unit"; however, your travelers documenting the manufacture of your Capillary Tube Nanotainers (CTNs) do not include a copy of the primary identification label that was applied to the finished product. For example, your travelers for the manufacturing of Li-Hep CTN Lot numbers, 29122014-3690, 30122014-3749, and 02012015-3751 do not include copies of the primary identification label that was applied to the bags of finished Li-Hep CTNs manufactured with those lot numbers.

*Annotation:  Promised to correct within 7 days.*

Reference: 21 CFR 820.184

Supporting Evidence and Relevance:

When I reviewed the firm's written procedure " Device History Record (DHR), Document Number SOP-00151, Revision A, Effective Date 01/28/14" (**Exhibit 73**), I noted that Sections 6.1 and 6.1.5 state "Records for inclusion in the DHR must specify the following: The primary identification label and labeling used for each production unit" (**Exhibit 73, Page 4**) My review of the firm's DHRs, for example the DHRs for CTN Lot Numbers 24072015-5549, 24072015-5548, and 22072015-5584 (**Exhibits 66 -68**), revealed that the firm does not comply with their written procedure in that they do not retain a copy of the primary identification label in their DHRs. This became more apparent when I requested copies of the primary identification labels for the two interstate shipment documentary samples that I collected during the inspection. The firm had not retained copies of the primary identification labels and therefore had to give me examples of the labels. Brian Kutner acknowledged that they needed to retain a copy of the primary identification label in their DHRs, and on 09/08/2015, he gave me a copy of "MOP, TSCD Packaging, Document Number MOP-00606, Revision D, Effective Date 09/01/15" (**Exhibit 61**). He pointed out Section 9.3 (**Exhibit 61, Page 13**) that gives instructions to apply a copy of the label to the traveler.

Discussion with Management:

Sunny Balwani said that observations 2 through 9 have already been corrected and he wanted them annotated as corrected and verified. I told him that I disagreed that they were corrected and that I could not verify something that was not yet corrected.

Sunny Balwani told me that he wished to annotate this observation with "Promised to correct within 7 days" subject to the statement he made for Observation 1.

US-FDA-0024084

| Establishment Inspection Report | FEI: | **3006231732** |
| --- | --- | --- |
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA 94560 | EI End: | 09/16/2015 |

**OBSERVATION 9**

Quality audits have not been performed.

Specifically, you have not monitored your Quality Management System through internal quality audits; you had no documented internal quality audit schedule to monitor your Quality Management System until after the start of this inspection. Section 6.1.1 of your written procedure, "Internal Quality Audit, Document Number SOP-00177, Effective Date 07/02/2014" states "Each quality system process is audited at least annually"; no internal audits were performed in 2014, and none have been performed so far in 2015. Section 6.1.1.1 of the same written procedure states "Internal audit schedules are documented and maintained by Quality Assurance with the Internal Audit Matrix, reference 7.1" [7.1 = TMP-00032, Internal Audit Matrix]; at the start of this inspection, your TMP-00032 Audit Matrix was blank..

_____

*Annotation:  Promised to correct within 7 days.*

Reference: 21 CFR 820.22

Supporting Evidence and Relevance:

I reviewed the firm's written procedure "Internal Quality Audit, Document Number SOP-00177, Revision A, Effective Date 07/02/2014" (**Exhibit 74**) and I noted that Section 6.1.1 states, "Each quality system process is audited at least annually" (**Exhibit 74, Page 3**) and that Section 6.1.1.1 states "Internal audit schedules are documented and maintained by Quality Assurance with the Internal Audit Matrix, reference 7.1" (**Exhibit 74, Page 4**) I asked Jim Twitchell to show me evidence that internal quality audits were performed for 2014 and to show me the schedule (referred to in the written procedure as reference 7.1 or TMP-00032, Internal Audit Matrix) for this year. Jim Twitchell gave me a blank Internal Audit Matrix (**Exhibit 75**) and told me that no internal quality audits had been performed in 2014, and that none had been scheduled for this year. On 09/08/2015, Jim Twitchell gave me an updated internal audit procedure (**Exhibit 62**), a newly created internal audit questionnaire (**Exhibit 63**), a 2015 Internal Audit Schedule (**Exhibit 64**), and a 2016 Internal Audit Schedule (**Exhibit 65**). He did not open a CAPA for these corrections to the deficiencies in the firm's Quality Management subsystem.

Discussion with Management:

Sunny Balwani said that observations 2 through 9 have already been corrected and he wanted them annotated as corrected and verified. I told him that I disagreed that they were corrected and that I could not verify something that was not yet corrected.

Sunny Balwani told me that he wished to annotate this observation with "Promised to correct within 7 days" subject to the statement he made for Observation 1.

US-FDA-0024085

| Establishment Inspection Report | FEI: | 3006231732 |
|---|---|---|
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA  94560 | EI End: | 09/16/2015 |

## REFUSALS

Apart from a refusal to sign two affidavits the firm did not make any overt refusal to the inspection or to requests for documents. However, there were numerous verbal and written objections made to the inspection and requests for documents. Please refer to the Administrative Data and Jurisdiction sections of this report, as well as to **Exhibit 1** and **Exhibits 33 – 35,** for further details.

## GENERAL DISCUSSION WITH MANAGEMENT

On 09/16/2015, I concluded my inspection with a closing meeting with Sunny Balwani, Tim Cooper, Jim Twitchell, Brian Kutner, Meredith Dearborne, and Jenel Day.

I issued the Form FDA-483 Inspectional Observations to Ramesh (NMI) Balwani ("Sunny"), Theranos, Inc. President and Chief Operations Officer. When I asked if the firm wanted to annotate the Form FDA-483, Sunny Balwani said that he wanted me to annotate that observations 2 – 9 were corrected and verified. I told him that I do not agree that the observations were corrected; the firm had updated some documents that I had mentioned but I did not feel that the firm had corrected the underlying deficiencies with their Quality Management System. Sunny Balwani told me that in that case he wanted to annotate the Observations 2 through 9 as "Promised to Correct within 7 days" and to annotate Observation 1 as "Under consideration". He told me that he wished to state the following in regards to Observation 1: "Theranos disagrees with FDA based on prior communication with the Agency where the Agency had acknowledged that the CTN was an LDT. However, Theranos has filed a 510(k) but still has a fundamental disagreement and plans to address this with CDRH and OIR". He added that he wanted me to note that for the rest of the observations the "Promised to correct within 7 days" was subject to that statement. He told me that they will respond in writing to the San Francisco FDA District Director within 15 working days.

I explained that FDA has other legal sanctions such as seizures, injunctions, civil money penalties, etc. to which it can resort for firms that do not comply with the Food, Cosmetic, and Drug Act.

## ADDITIONAL INFORMATION

The firm sources materials from various suppliers (**Exhibit 60**). The firm does not use any manufacturing contractors or distribution contractors.

## SAMPLES COLLECTED

Interstate shipment documents were collected to document the interstate shipment of an uncleared Class II medical device between California, Arizona, and Pennsylvania. Please refer to the Interstate Commerce section of this report for further details.

US-FDA-0024086

| **Establishment Inspection Report** | FEI: | **3006231732** |
|---|---|---|
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA  94560 | EI End: | 09/16/2015 |

## VOLUNTARY CORRECTIONS

Although the firm undertook some corrections such as updating and creating documents, the firm did not do so through a CAPA process, therefore it is difficult to verify that the firm corrected the underlying deficiencies exemplified by the inspectional observations.

## EXHIBITS COLLECTED

*Please note*: The exhibits below are copies of original documents that were stamped with "exempt from disclosure under the Freedom of Information Act" and for the most part supplied with coversheets stating the same. Any pencil, pen, or highlighter marks on the exhibits were made by firm representatives.

1. Letter of Objection from Heather King dated 08/27/2015 and hand-delivered by Lisa Barclay prior to facility walk-through on 08/27/2015 (1 page)
2. List of Theranos Wellness Centers (3 pages)
3. Promotional brochure available at Walgreens Theranos Wellness Centers that was provided by David Zifkin (19 pages)
4. Information regarding CTN shipments to Arizona provided by Sunny Balwani (1 page)
5. NCR-01926 (3 pages)
6. Traveler for the manufacturing of Unibody P/N 52-00134 Lot No. 03022015-3736 (1 page)
7. Traveler for the manufacturing of Li-Hep CTN P/N 52-00121 Lot No. 29122014-3690 (1 page)
8. Traveler for the manufacturing of Li-Hep CTN P/N 52-00121 Lot No. 30122014-3749 (1 page)
9. Traveler for the manufacturing of Li-Hep CTN P/N 52-00121 Lot No. 02012015-3751 (1 page)
10. Example of Li-Hep CTN primary identification label (2 pages)
11. Shipping Department Spreadsheet showing Li-Hep CTN Lot Nos. 29122014-3690, 30122014-3749, and 02012015-3751 shipping on 02/27/2015 (1 page)
12. Fed-Ex Request Form dated 02/27/2015 with notation "CTN Shipment" on 02/27/2015 (1 page)
13. FedEx Label, Tracking No. 773016880780 (1 page)
14. FedEx Delivery Confirmation for Tracking No. 773016880780 (1 page)
15. Tracking showing the barcode ranges for CTNs within Lot Nos. 29122014-3690, 30122014-3749, and 02012015-3751 (2 pages)
16. Lab Sample Tracking Sheet showing barcodes, American Airlines flight numbers and lab assays (3 pages)
17. American Airlines Cargo Air WayBill No. 67567080 (1 page)
18. American Airlines Cargo Air Waybill No. 67567113 (1 page)
19. American Airlines Cargo Air Waybill No. 67567194 (1 page)

US-FDA-0024087

| Establishment Inspection Report | FEI: | 3006231732 |
|---|---|---|
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA 94560 | EI End: | 09/16/2015 |

20. Traveler for the manufacturing of Li-Hep CTNs P/N 52-00121, Lot No. 20052015-4736 (4 pages)

21. Example of Li-Hep CTN primary identification label (2 pages)

22. Shipping Department Spreadsheet showing Li-Hep CTN Lot No. 20052015-4736 shipping to Arizona on 07/21/2015 (1 page)

23. Fed-Ex Shipment Receipt for Tracking No. 774103293749 (1 page)

24. FedEx Receipt Confirmation for Tracking No. 774103293749 (2 pages)

25. CTN Inventory Tracking Log for Li-Hep CTN Lot No. 20052015-4736 (2 pages)

26. Theranos Shipping Manifest (2 pages)

27. UPS Delivery Confirmations for Tracking Numbers 1ZYF46800198835251, 1ZYF46800195072876, and 1ZYF46800195457862 (3 pages)

28. Spreadsheet showing bar code range for Li-Hep CTN P/N 52-00121, Lot No. 20052015-4736 (1 page)

29. Lab Sample Tracking Sheet (1 page)

30. Theranos promotional material (3 pages)

31. EDTA CTN primary identification label (2 pages)

32. Li-Hep CTN primary identification label (2 pages)

33. Objection Argument and Regulations given to Investigator Mary Hole by Sunny Balwani (3 pages)

34. Objection Argument and American Clinical Laboratory Association Letter to Margaret Hamburg dated 02/02/2015 (20 pages)

35. Objection Letter to Ian Pilcher dated 08/30/2015 (8 pages)

36. Theranos Organizational Chart (2 pages)

37. Theranos Facility Map for Newark facility (2 pages)

38. CTN Process Flow Chart (2 pages)

39. Theranos Quality Manual (15 pages)

40. Control of Non-Conforming Product, Document Number SOP-00154, Revision A, Effective Date 12/11/13 (7 pages)

41. Customer Complaints, Document Number SOP-00174, Revision A, Effective Date 07/02/14 (10 pages)

42. Medical Device Reporting Procedure, Document Number SOP-00159, Revision A, Effective Date 08/30/15 (9 pages)

43. Device Recall and Advisory Notices, Document Number SOP-00160, Revision A, Effective Date 12/11/13 (6 pages)

44. Guest Calls, Document Number CS SOP-05071, Revision A, Effective Date 03/27/2015 with a more legible Word copy of same procedure (15 pages)

45. QCP, ASSY, TSCD, DUAL-EDTA, LIQ, Document Number QCP-00063, Revision C, Effective Date 08/26/2015 (11 pages)

US-FDA-0024088

| Establishment Inspection Report | FEI: | 3006231732 |
|---|---|---|
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA  94560 | EI End: | 09/16/2015 |

46. QCP, ASSY, TSCD, DUAL-Li-HEP, LIQ, Document Number QDP-00064, Revision C, Effective Date 08/26/2015 (11 pages)

47. Photograph of Sunny Balwani's complaint handling diagram on the conference room whiteboard (1 page)

48. Theranos Purchase Order Number 67911 (2 pages)

49. Theranos receiving documents (4 pages)

50. Theranos CLIA Certificate Number information supplied by Sunny Balwani (1 page)

51. Theranos Customer Complaint Log (4 pages)

52. Theranos Complaint Spreadsheet (19 pages)

53. Information sheet for two re-draws of blood samples for two patients supplied by Sunny Balwani (2 pages)

54. Customer Complaints, Document Number SOP-00174, Revision C, Effective Date 09/01/15 (8 pages)

55. Complaint Investigation Form, Document Number SOP-00174-F2, revision a, 08/30/15 (7 pages)

56. Supplier Qualification for Interstate Speciality Products (13 pages)

57. Supplier Qualification for McMaster-Carr Supply Co. (10 pages)

58. Supplier Qualification for Shanghai Poyton Industry Co. (13 pages)

59. Theranos Approved Supplier List provided on 09/01/2015 (2 pages)

60. Theranos Approved Supplier List provided on 09/08/2015 (2 pages)

61. MOP, TSCD Packaging, Document Number MOP-00606, Revision D, Effective Date 09/01/15 (26 pages)

62. Internal Quality Audit, Document Number SOP-00177, Revision B, Effective Date 09/06/15 (8 pages)

63. Internal Audit Assessment and Report Form, Document Number SOP-00177-F3, Revision A, Effective Date 09/06/15 (26 pages)

64. 2015 Internal Audit Schedule (3 pages)

65. 2016 Internal Audit Schedule (3 pages)

66. Traveler for CTN Lot Number 24072015-5549 (2 pages)

67. Traveler for CTN Lot Number 24072015-5548 (2 pages)

68. Traveler for CTN Lot Number 22072015-5584 (2 pages)

69. Excel Spreadsheet data for CTN Lot Numbers 24072015-5549, 24072015-5548, and 22072015-5584 (2 pages)

70. Supplier Management, Document Number SOP-00171, Revision B, Effective Date 07/08/15 (7 pages)

71. Procurement, Document Number SOP-00170, Revision B, Effective Date 07/08/2015 (7 pages)

72. Theranos Purchase Order 70115 (2 pages)

US-FDA-0024089

| Establishment Inspection Report | FEI: | **3006231732** |
|---|---|---|
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA  94560 | EI End: | 09/16/2015 |

73. Device History Record (DHR), Document Number SOP-00151, Revision A, Effective Date 01/28/14 (6 pages)
74. Internal Quality Audit, Document Number SOP-00177, Revision A, Effective Date 07/02/14 (8 pages)
75. Theranos blank Internal Audit Matrix (1 page)

## Exhibits collected by Stayce E. Beck and Yung W. Chan (All original copies given by the firm during the inspection):

76. List of the Theranos Wellness Centers (4 pages)
77. Labels placed on the nanotainers for shipping to the collection sites (6 pages)
78. Records for August 18, 2015- Augsut 24, 2015 showing the nanotainers shipped from 7373 Gateway Blvd in Newark, CA to 1365 N. Scottsdale Rd # 300 in Scottsdale, AZ. (35 pages)
79. Document stating that the first nanotainer was shipped from Arizona to California on November 13, 2013 (1 page)
80. Patient report for a patient who visited a Theranos Service Center located at 9050 W. Union Hills Dr. Peoria, AZ 85382, and shows it was processed at Theranos Laboratories at 7373 Gateway Boulevard Newark, CA 94560. (3 pages)
81. Patient report for a patient who visited a Theranos Service Center located at 4500 Marketplace Way, Enola, PA 17025, and shows it was processed at Theranos Laboratories at 7373 Gateway Boulevard Newark, CA 94560. (6 pages)
82. Patient report for a patient who visited a Theranos Service Center located at 7011 E Shea Blvd. SAcottssdale, AZ 85254, and shows it was processed at Theranos Laboratories at 7373 Gateway Boulevard Newark, CA 94560. (4 pages)
83. Patient report for a patient who visited a Theranos Service Center located at 300University Avenue Palo Alto, CA 94305, and shows it was processed at Theranos Laboratories at 7373 Gateway Boulevard Newark, CA 94560. (3 pages)
84. List of tests that are run as LDT's using the nanotainer tubes at the Theranos High Complexity Lab in Newark, CA. (2 pages)
85. List of tests that are run at the CLIA Moderate Complexity lab in Phoenix, AZ using venous samples. (4 pages)
86. List of tests that were previously run on the TSPU in the CLIA High Complexity Lab in Newark, CA. (2 pages)
87. An example of end of life disassembly record for the TSPU (7 pages)
88. Copy of the HSV-1 package insert for use with the TSPU that was never distributed. (33 pages)
89. Document from Sunny Balwani regarding the TSPU unit (1 page)
90. Procurement and supplier management SOP for the centrifuge adapter for the nanotainer. (13 pages)
91. Picture of the centrifuge that can be found in their CLIA lab for the nanotainers (1 page)
92. The nonconformance procedure for the nanotainer (TSCD) (7 pages)
93. The nanotainer (TSCD) collection device requirements (10 pages)

US-FDA-0024090

| **Establishment Inspection Report** | FEI: | **3006231732** |
|---|---|---|
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA  94560 | EI End: | 09/16/2015 |

94. The data comparing venous blood on unmodified ADVIA 1800 assays (x-axis) versus capillary blood in a nanotainer (y-axis) on unmodified ADVIA 1800 assays (17 pages)

95. The CLIA lab LDT validation data for the CBC panel.  (84 pages)

96. The CLIA lab LDT validation data for the potassium assay. (15 pages)

97. The CLIA lab LDT validation data for the glucose assay. (16 pages)

98. The CLIA lab LDT validation data for the sodium assay. (16 pages).

99. The CLIA lab LDT validation data for the chloride assay. (16 pages)

100. Copy of  routine quality assessment data that Theranos performs in their CLIA laboratory (5 pages)

101. Copy of the method comparison study protocol for the general chemistry assays for their 510k submission. (7 pages)

102. Copy of the Q submission meeting requet for k143099 (13 pages)

103. Copy of the method comparison study sample processing protocol for the ELISA assays (13 pages)

104. Study Plan for 510k response for the general chemistry tests for method comparison study (6 pages)

105. Copy of the method comparison results of chloride (5 pages)

106. Letter of Objection from Heather King dated 08/27/2015 and hand-delivered by Lisa Barclay prior to facility walk-through on 08/27/2015 (1 page)

107. Document pertaining to the Q submission with regards to the acceptance criteria of the method comparison study, provided by Sunny on 8/26/15 (4 pages)

108. Document pertaining to the Q submission with regards to the acceptance criteria of the reproducibility study, provided by Sunny on 8/26/15  (3 pages)

109. Officially Sealed CD containing all the statistical data that was submitted to FDA in the Q submission.

## ATTACHMENTS

1. FDA Form 482, Notice of Inspection, issued by Investigator Mary R. Hole and Branch Chief Stayce E. Beck to James E. Twitchell, Director of Quality, Theranos, Inc., on 08/25/2015 for 7333 Gatway Blvd., Newark, CA 94560

2. FDA Form 482, Notice of Inspection, issued by Investigator Mary R. Hole, Branch Chief Stayce E. Beck, and Branch Chief Yung W. Chan to Sunny R. Balwani, President and Chief Operations Officer, Theranos, Inc., on 08/26/2015 for 7333 Gatway Blvd., Newark, CA 94560

US-FDA-0024091

| Establishment Inspection Report | FEI: | 3006231732 |
|---|---|---|
| Theranos, Inc. | EI Start: | 08/25/2015 |
| Newark, CA 94560 | EI End: | 09/16/2015 |

3. FDA Form 482, Notice of Inspection, issued by Investigator Mary R. Hole, Branch Chief Stayce E. Beck, and Branch Chief Yung W. Chan to Sunny R. Balwani, President and Chief Operations Officer, Theranos, Inc., on 08/27/2015 for 7373 Gatway Blvd., Newark, CA 94560

4. FDA Form 483, Inspectional Observations, issued by Investigator Mary R. Hole, Branch Chief Stayce E. Beck, and Branch Chief Yung W. Chan to Ramesh (NMI) Balwani, President and Chief Operations Officer, Theranos, Inc., on 09/16/2015

5. CDRH Assignment, OC Control Number 105896, FACTS ID Number 11558121, ORA Concurrence Number MP2015082101, dated 08/21/2015 (11 pages)

6. Unsigned Form FDA-463a, Affidavit (4 pages)

7. Unsigned Form FDA-463a, Affidavit (3 pages)

8. Letter of objection dated 09/03/2015 from Theranos Counsel Daniel A. Kracov to Melinda Plaisir, FDA Associate Commissioner for Regulatory Affairs, and Alberto Gutierrez, FDA Director of the Office of In Vitro Diagnostics and Radiological Health (3 pages)

9. Letter dated 09/14/2015 from Alberto Gutierrez to Theranos counsels Heather King and Daniel Kracov (2 pages)

10. Copy of Centers for Disease Control and Prevention database results for Theranos, Inc. CLIA certificate numbers (1 page)

11. Yung W. Chan's analysis of Theranos, Inc. validation protocols for supporting the use of Nanotainers for reporting patient results (2 pages)

US-FDA-0024092

**Establishment Inspection Report**
Theranos, Inc.
Newark, CA  94560

| | |
|---|---|
| FEI: | **3006231732** |
| EI Start: | 08/25/2015 |
| EI End: | 09/16/2015 |

# Mary Hole -S

Digitally signed by Mary Hole -S
DN: c=US, o=U.S. Government, ou=HHS, ou=FDA, ou=People,
cn=Mary Hole -S, 0.9.2342.19200300.100.1.1=2000553488
Date: 2015.10.30 08:22:15 -07'00'

Mary R. Hole, Investigator

# Yung W. Chan -S

Yung W. Chan, Chemistry Branch Chief

# Stayce Beck -S

Stayce E. Beck, Diabetes Diagnostic Devices
Branch Chief

US-FDA-0024093