# EXHIBIT 22

| | |
|---|---|
| To: | Elizabeth Holmes[eholmes@theranos.com]; Sunny Balwani[sbalwani@theranos.com]; 'Mike Brille'[MBrille@BSFLLP.com]; DB[xboies@gmail.com]; Meredith Dearborn[mdearborn@bsfllp.com] |
| From: | Heather King |
| Sent: | Fri 7/3/2015 7:11:49 AM |
| Importance: | Normal |
| Subject: | FW: Theranos |
| Received: | Fri 7/3/2015 7:11:56 AM |

CLSI, Assessment of Laboratory Tests When Proficiency Testing Is Not Available (Aug. 2008).pdf
CLSI, Proposed Draft Guideline GP27 (Dec. 3, 2014).pdf
VitaminD_Graphical_API_PT_wrt_Centaur_20150623.pdf
Dr. Rezaie Statement.pdf
Dr. Beardsley Statement.pdf
2015 7 2 Theranos FDA Clearance FINAL.pdf

JC Email 4 sent

**From:** Heather King
**Sent:** Friday, July 03, 2015 12:11 AM
**To:** 'John.Carreyrou@dowjones.com'
**Subject:** Theranos

John,

Here are additional on the record statements responding to additional points raised. We are continuing to work to provide you with additional information. The bolded portions are those that particularly need to be included to provide a fair statement of our comments and the relevant factual context. In addition to the statements below, please see the attached press release as an on-the-record statement.

## Testing Accuracy

*If anyone were to assert that Theranos' tests are inaccurate or unreliable, that assertion would be false. Theranos' tests are accurate and reliable, and have been validated by numerous independent parties.*

*Theranos' laboratories are CLIA-certified and subject to ongoing review and regular inspections by regulators.* As stated by CMS, CLIA's purpose is to "ensure quality laboratory testing" and "ensure accurate and reliable test results." (Centers for Medicare & Medicaid Services, *Clinical Laboratory Improvements Amendments (CLIA)* (last accessed July 2, 2015), *available at* https://www.cms.gov/Regulations-and-Guidance/Legislation/CLIA/index.html; Centers for Medicare & Medicaid Services, *Clinical Laboratory Improvements Amendments (CLIA)* (July 2014), *available at* http://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/downloads/CLIABrochure.pdf.) Theranos maintains CLIA certification for its laboratories in Newark, California, and Scottsdale, Arizona. Information regarding Theranos' CLIA certification is publicly available through the CMS and CDC websites. *Theranos' laboratories have been CLIA-certified for the entirety of the time that they have been processing patient samples.* Theranos' Newark facility is certified as a high-complexity lab, meeting those requirements which by definition allow Theranos to run samples on its 510(k)-cleared analyzers and its laboratory-developed tests. (*See* 42 C.F.R. § 493.17; Centers for Disease Control & Prevention, *Test Complexities* (last accessed July 2, 2015), *available at* https://wwwn.cdc.gov/clia/Resources/TestComplexities.aspx.)

*To earn and maintain CLIA certification, and to ensure the accuracy and reliability of its tests, Theranos conducts extensive validation studies and proficiency testing. Theranos publishes data concerning those validation exercises and proficiency testing on its website, and Theranos makes this data available to federal and state regulators as well.* CMS makes available to physicians and the general public specific information used to evaluate the performance of laboratories, including lists of laboratories that have been sanctioned or whose accreditation have been withdrawn, and Theranos labs have of course never been listed in those reports. (Centers for Medicare & Medicaid Services, *Laboratory Registry* (last accessed July 2, 2015), *available at* http://www.cms.gov/Regulations-and-Guidance/Legislation/CLIA/Laboratory_Registry.html.)

*Theranos is the first laboratory to commit to proactively submitting all of its laboratory-developed tests ("LDTs") to FDA, voluntarily accepting even more scrutiny and providing further evidence of Theranos' accuracy and reliability.*

Confidential                                                                                                                                    THPFM0000875055

**To this end, Theranos has received its first FDA clearance and has already submitted information on over 120 tests to the FDA.** On March 1, 2015, Theranos provided comment to FDA draft guidance in support of the position that laboratory-developed tests should be subject to the requirements of the Federal Food, Drug, and Cosmetic Act, and noted that it had "made the decision to submit all of our laboratory developed tests to FDA for review or approval, although we have not been required to do so." (*See* Letter from E. Holmes to M. Hamburg (Mar. 1, 2015), *available at* https://www.theranos.com/content/pdf/theranos_comment_ldt_guidance.pdf.)

**On July 2, 2015, Theranos received its first clearance from the FDA, for its assay for the HSV-1 virus and the associated test system**. Attached is a copy of the press release. **This is a major milestone, because the FDA's decision involved extensive review and independent validation of the Theranos system upon which this and other Theranos tests are run. The HSV-1 assay clearance process involved studies to determine whether Theranos' assay is substantially equivalent to a reference commercially available assay for herpes, including matrix comparison studies using samples from seventy donors, using sixty-nine devices; sensitivity and specificity clinical studies with hundreds of human samples, and a bridging clinical study with samples from 178 subjects. It also included CDC panel testing, which demonstrated 100% agreement with the results provided by CDC; low-prevalence population tests; a comparison of venous serum and venous plasma versus finger stick samples from 20 adult subjects; matrix equivalency studies; precision studies, and much more. Theranos is in the process of submitting each and every one of its tests for review at this rigorous standard.**

Theranos' validation data has been reviewed by other third parties, including **medical professionals like David Helfet, the chief of orthopedic trauma at the Hospital for Special Surgery in Manhattan, who said "It's real data… It's not their interpretation."** (Roger Parloff, *This CEO Is Out for Blood*, FORTUNE (June 12, 2014), *available at* http://fortune.com/2014/06/12/theranos-blood-holmes/).

**Theranos has also been generating actual results for patients on a large scale through its Wellness Centers in Arizona (and one in Palo Alto). As of June 16, 2015, it had processed millions of tests ordered by thousands of physicians**.

<u>Assay Validation</u>

***Theranos' methods, including how it calculates coefficients of variation and equivocal zones, are consistent with industry practice, known to regulators, and provide an honest view of the performance and accuracy of Theranos' tests.*** The theories espoused regarding the calculation of the coefficient of variation by the Journal's source—likely a former junior employee with no degree in or experience with computational biostatistics—are simply wrong. If applied, the methods proposed by that individual would lead to nonsensical results. It makes no sense whatsoever to evaluate a coefficient of variation based on anything other the final result given to the patient. Theranos sets its equivocal zones carefully and consistently with industry practice, and each of these methods has been repeatedly disclosed to regulators and fully explained to FDA. In particular, the HSV-1 assay clearance by FDA today involved those very methods for determinations of CV and establishment of an equivocal zone, as explicitly reviewed and cleared by FDA.

<u>Published Data and FDA</u>

***Theranos considers FDA review to be the gold standard for clinical laboratory test performance. For this reason, Theranos is submitting each of its laboratory-developed tests to FDA for clearance and approval, even though such clearance is not required. To Theranos' knowledge, no other laboratory has submitted all of its laboratory-developed tests to either peer review or FDA.***

The Journal's focus on the 2014 *Hematology Reports* paper is misplaced. The purpose of that study was not to compare Theranos analyzers to predicate analyzers; in fact, it explicitly noted that an additional study would be required to do this analysis. Theranos has conducted additional studies on the assays that run in its clinical laboratories, as documented through detailed validation reports, has made those reports available to state and federal regulators, and published information regarding those reports on its website. Moreover, the data in the paper is seven years old. It was collected in 2008. The Theranos platform used in connection with this paper was in operation more than three years before Theranos started processing patient samples, and was never used in a Theranos CLIA-certified laboratory.

<u>Contact from Regulators</u>

Theranos has not been contacted by the New York State Department of Health, CMS or any other regulatory body regarding any complaint by any current or former employee, or any concerns whatsoever related to its methods, despite

Confidential THPFM0000875056

being in frequent communication with those agencies. Theranos has not been contacted by the California Department of Public Health's Laboratory Field Services, or by CMS, other than routine and positive interactions with those regulators, in 2015 or prior.

**Proficiency Testing**

*Theranos always has been upfront and transparent with regulators and proficiency testing providers about its proficiency-testing process, and any statement or insinuation to the contrary would be false. Theranos abides by all applicable CLIA regulations and industry guidelines, including by testing proficiency testing samples in the same manner as patient specimens.*

Theranos has reason to believe that you have misrepresented Theranos' position regarding CAP's CEO's visit to Theranos in February 2014, based on information provided to you during the June 23, 2015 discussion on background that you also explicitly agreed was for use only on background. Theranos had a positive and forthright discussion about AAP with a CAP representative, as it has always been transparent about this process with providers and regulators, but Theranos never represented to you or anyone else that the CAP representative had officially certified Theranos' procedures, and any suggestion to the contrary would be false.

It is sound laboratory science to perform proficiency testing through alternative assessment procedures for laboratory-developed tests that have no peer group, according to industry guidance. *Theranos confirms, repeatedly and frequently, that patient samples run on its proprietary platform return comparable results as previously validated FDA-cleared analyzers, and makes that data, as well as the methodology and processes by which that data are collected, available to regulators. Patients and physicians can have the best confidence, based on this procedure, that Theranos' tests are accurate and reliable.*

*Theranos has never failed proficiency testing and any statement or insinuation suggesting otherwise would be false.* Consistent with industry practice, Theranos has occasionally used left-over proficiency testing samples to conduct additional experiments and verify best practices with respect to alternative assessment procedures. It would be improper for Theranos to report the results of any such experiments to regulators. *No experiment conducted by Theranos using left-over proficiency testing samples has ever demonstrated any inaccuracy or unreliability with any Theranos tests or Theranos hardware. It would be false to characterize any experiment using left-over proficiency testing samples, a common industry practice, as a proficiency testing failure.* The results of the experiment in February 2014 were neither intended to be, nor were, submitted to any proficiency-testing provider; in fact, if someone had submitted them that would have been an error. Nor was that experiment a proper method of comparing the performance of Theranos' proprietary platform to that of FDA-cleared analyzers. Indeed, Theranos closely analyzed the results of that experiment and confirmed that there were no issues with Theranos' proprietary platform.

We recommend that you review the following sources, among other industry guidance:

- John R. Astles *et al.*, *CLIA Requirements for Proficiency Testing: The Basics for Laboratory Professionals*, 45 MEDICAL LABORATORY OBSERVER 8 (Sept. 2013), *available at* http://www.mlo-online.com/articles/201309/clia-requirements-for-proficiency-testing-the-basics-for-laboratory-professionals.php ("Peer grouping was determined to be necessary for many analytes because the modified constituents of PT samples can sometimes affect test results (matrix effects), and these inaccuracies cannot be corrected.").

- Rex Astles, *CLIA Proficiency Testing – Criteria for Acceptable Performance* at 16–17 (Sept. 1, 2010), *available at* https://wwwn.cdc.gov/cliac/pdf/Addenda/cliac0910/Addendum%20K_Astles.pdf ("'Matrix effect,' refers to an analytical effect, inherent to the interaction between the PT material and the test system, which results in an analytical bias in PT results. Affected PT results tend to agree with PT results obtained using the same test system, but they will not agree with results from other, unaffected test systems. … Biases are not necessarily predictable or correctable, and the PT test results cannot be compared with results from a reference method or all-methods mean.").

- Daniel C. Edson *et al.*, *Proficiency Testing: A Guide to Maintaining Successful Performance*, 38 LAB MEDICINE 184, 185 (Mar. 2007), *available at* http://labmed.ascpjournals.org/content/38/3/184.full.pdf ("Assignment to the wrong peer group can result in unsatisfactory performance because of matrix effects (bias

introduced by artificial constituents added to a material). Because matrix effects impact all users of the same instrument/reagent group similarly, peer group grading mitigates this influence.").

- Clinical & Laboratory Standards Institute, *Using Proficiency Testing and Alternative Assessment to Improve Medical Laboratory Quality; Third Edition—Draft Guideline* at 32 (Dec. 3, 2014) (attached) ("It is important to note that most PT samples are made with a different matrix than normal body fluids; hence, the results may not be commutable. This limits the ability to use PT material for assessing the trueness of a new analyzer and is the reason that most PT material are graded based on the peer group."); 27 ("In the absence of a comparable peer group to use for evaluation, the participant should consider the options listed for an AAP."). This source also explains peer groups, AAP, and references the use of leftover proficiency testing samples for internal experimentation.

- American Academy of Family Physicians, *2015 Handbook – A Proficiency Testing Program for Office Laboratories* at 13 (2015), *available at* http://www.aafp.org/dam/AAFP/documents/practice_management/office_lab_pt/AAFP-PTHandbook.pdf ("Occasionally, an instrument or method may display a matrix effect with the PT specimens. This occurs when a positive or negative bias is noted with PT specimen testing but there is no actual bias when testing patients. This is most likely due to a constituent or artifact in the manufactured specimen.").

- 42 C.F.R. § 493.1236(c)(2) (providing that a laboratory must verify the accuracy of tests "for which *compatible* proficiency testing samples are not offered by a CMS-approved proficiency testing program" at least twice annually) (emphasis added).

- Centers for Medicare & Medicaid Services, *State Operations Manual Appendix C – Survey Procedures and Interpretive Guidelines for Laboratories and Laboratory Services* at D5219 (May 29, 2015), *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/som107ap_c_lab.pdf ("Laboratory tests or procedures that are not compatible [under 42 C.F.R. § 493.1236(c)(2)] may include *new or emerging technologies* for which PT is not yet available.") (emphasis added).

- College of American Pathologists, *Proficiency Testing Manual* at 14 (2015), *available at* http://www.cap.org/apps/docs/proficiency_testing/surveys-excel-manual.pdf (emphasizing that "participants' results are combined into *comparable* method/instrument groups") (emphasis added).

- American Proficiency Institute, *Frequently Asked Questions* (last accessed June 10, 2015), *available at* https://www.api-pt.com/PersonalAssistant.aspx?r=Default.aspx ("We need a method for most tests that you are submitting results for. Choosing a method ensures that your results are compared to those of your individual peer group.").

- Clinical & Laboratory Standards Institute, *Assessment of Laboratory Tests When Proficiency Testing Is Not Available; Approved Guideline, Second Edition* at 5 (Aug. 2008) (attached) ("Participation in a PT program enables a laboratory to compare its performance against other laboratories using *similar* methods/reagents/instruments. … AAP may often use patient samples, which have certain advantages over the manufactured materials frequently used in PT.") (emphasis added).

In addition, we draw your attention to data on API's website, for example the data for Vitamin D proficiency testing that is available here: https://www.api-pt.com/pdsselect.aspx?te=2015CHEA. The attached graph is drawn from these data, showing the differences between the mean from a peer group for a randomly picked analyzer against another FDA-cleared analyzer. You will note that there is a more than 75% difference—and in one case, it appears, more than 100% difference—in PT values between peer groups, demonstrating matrix effects.

Confidential
THPFM0000875058

## Doctors and Patients

***We are disappointed and dismayed that a journalist from the Wall Street Journal would make such patently false and defamatory statements about clinician practitioners and patients, as documented in the attached.*** Please see the attached signed statements from two of the sources you contacted, Drs. Beardsley and Rezaie. We are still in the process of scheduling meetings with other individuals you have identified.

Theranos has sought but not yet received HIPAA waivers for all of the individuals that you identified by name. On June 30 and July 1, Theranos received HIPAA waivers from Tammy Bell, Maureen Glunz, and Nicole Sundene, but Theranos has not yet had any opportunity to meet with these individuals to discuss their test results, despite our best efforts to schedule those meetings. As explained below, based on the information currently available to Theranos, any assertion that the test results for the individuals you identified reflect some inaccuracy or unreliability in connection with one or more Theranos tests would be false. ***Theranos has conducted extensive quality control testing in connection with each and every one of these tests, and Theranos has confirmed the accuracy and reliability of these tests. There is no basis to assert that Theranos has any "accuracy and reliability problem" based on these anecdotal test results.***

In the case of Ms. Bell, the Journal asked about one D-dimer test result from a sample obtained on September 24, 2014. The Journal, however, left out the fact that less than one week earlier, Ms. Bell had dozens of tests run. Of those results, Ms. Bell's D-dimer test result was high. That test was re-run on September 24, 2014, and again showed a high D-dimer result. The Theranos test results identify Ms. Bell's physician as Dr. Adrienne Stewart, a naturopath with Integrative Health. (http://www.integrativehealthcare.com/doctors/dr-adrienne-stewart/.) Additional details may follow on any conditions that may have impacted Ms. Bell's test results. It is well known that many clinical factors affect D-dimer test results, including arthritis, recent surgery or trauma, mobility, and estrogen therapy. (*See* Christopher Kabrhel *et al.*, *Factors Associated with Positive D-dimer Results in Patients Evaluated for Pulmonary Embolism*, 17 ACAD. EMERG. MED. 589 (June 2010), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3538031/pdf/nihms427912.pdf.) We understand that Ms. Bell suffers from a number of chronic medical conditions that could impact her test results and has a complex medical history. The Journal asserts that, upon receiving the D-dimer test results, Dr. Stewart "immediately grew concerned that Tammy might have developed deep-vein thrombosis," which led to Dr. Stewart asking Ms. Bell to postpone a vacation. Research has shown, however, that only 12 percent of people with high D-dimer have deep-vein thrombosis (*see* Giuseppe Lippi *et al.*, *Causes of Elevated D-dimer in Patients Admitted to a Large Urban Emergency Department*, 25 EURO. J. INTERNAL MED. 45 (2014), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3538031), therefore it is not at all surprising that Ms. Bell's ultrasound came back with no evidence of deep-vein thrombosis. The Journal stated that Ms. Bell was later tested at Sonora Quest, but did not provide any documentation regarding those test results. In any case, it appears that any Sonora Quest tests were conducted at a later date, and there are many reasons why test results can vary at different times. Ms. Bell's D-dimer test was run on a venous draw sample - not a finger stick - and on a FDA-cleared predicate analyzer. Theranos conducted extensive quality control testing for the D-dimer test during the period in which Ms. Bell's test occurred, and that testing confirmed that Theranos' D-dimer test was both accurate and reliable. Theranos has performed hundreds of D-dimer tests without any incident, and Ms. Bell's test results in no way establish or reflect any inaccuracy or unreliability with any Theranos tests.

In the case of Ms. Glunz, the Journal asked about certain Theranos test results from November 2014. Ms. Glunz's tests were only mildly elevated. Her glucose level was 103 mg/dL, just slightly above the high range of 100 mg/dL; her calcium was 11.8 mg/dL, only slightly above the upper end of 10.6 mg/dL; her total protein was 8.4 g.dL, just above the reference range end of 8.3 g/dL; and her ALP, ALT, and AST only showed mild elevations as wells. Many factors can cause transient and mild elevations in the results for those tests, including medications or herbal remedies, dehydration, and more. (*See* Edoardo G. Giannini *et al.*, *Liver Enzyme Alteration: A Guide for Clinicians*, 172 CAN. MED. ASS'N J. 367 (Feb. 2005), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC545762/pdf/20050201s00028p367.pdf.) ***Ms. Glunz's naturopath, Dr. Sundene, states on her website that her "area of expertise involves the combination of herbs, nutrition and bioidentical hormones for balancing hormones in Women's Health conditions."*** (http://www.fhnaturopathic.com/.) Theranos may provide additional details on what herbs, supplements, or medication Ms. Glunz may have been taking or what if any conditions may have impacted her test results. Notably, none of Ms. Glunz's results were close to the "critical range." When Ms. Glunz's labs were re-drawn two days later they showed normal results. It is not uncommon that results showing mildly elevated levels would show normal levels two days later, and a number of factors can affects these test results. Ms. Glunz's Theranos tests were based on a sample drawn at 7:16 a.m., when she had been fasting. Ms. Glunz's labs at the hospital were based on a sample drawn at 5:40 p.m. two days

later and a day when Ms. Glunz had not planned to have tests re-drawn, and thus was likely not fasting. All of these Theranos tests performed for Ms. Glunz have been subject to extensive quality control testing, and Ms. Glunz's test results in no way establish or reflect any inaccuracy or unreliability with any Theranos tests. This is further evidenced by the fact that after Ms. Sundene allegedly had this issue with Theranos labs on November 24, 2014, she continued to meet with and refer more patients to Theranos for laboratory services than ever before, and ordered the same tests that she is now alleging yielded incorrect results in the November 24, 2014 incident you cite above.

In the case of Dr. Sundene, the Journal asked about certain test results that Dr. Sundene ordered for herself in April 2014. The Journal incorrectly states that Theranos "never acknowledged or responded to" a letter from Dr. Sundene. In fact, Theranos has had four meetings with Dr. Sundene or her staff after she sent the letter, and one meeting with Dr. Sundene's staff less than a week before Dr. Sundene sent the letter. Dr. Sundene refused to provide information to Theranos during those meetings or to elaborate on any purported concerns. Dr. Sundene also never contacted Theranos to report any issue with regards to any discrepancies in her own lab results. Dr. Sundene has now refused to meet with Theranos since her interaction with the Journal, and Theranos is therefore unable to obtain information necessary to understand what conditions may have impacted Dr. Sundene's test results or concerning Ms. Glunz. At a minimum, it appears that Dr. Sundene's LabCorp test results may not have been run until two days after the labs were actually drawn, noting "Testing not performed due to the age of this specimen." Any delay in processing a sample can impact the results. The Journal describes Dr. Sundene's cortisol results as "critical" but the Mayo Clinic does not consider any cortisol results to be "critical." As in the case of Ms. Bell, the sample for Dr. Sundene was collected via a venous draw, not a finger stick, and the test was run on a FDA-cleared predicate analyzer. Theranos conducted quality control testing for TSH and cortisol tests during the period before and after Dr. Sundene's test, and that testing confirmed that Theranos' tests were both accurate and reliable. Theranos has performed millions of tests, amongst which TSH is routinely ordered, and Dr. Sundene's test results in no way establish or reflect any inaccuracy or unreliability with any Theranos tests.

**Secrecy and Staff Turnover**

Any assertion that Theranos has a "culture of secrecy" is patently false. **Theranos takes great pride in having created a culture of innovation, collegiality, and collaboration. Theranos' policy around employee confidentiality and trade secrets is typical of a technology company, and Theranos' turnover statistics are in fact comparable, or lower, than its peers.**

Theranos' current laboratory directors, along with its R&D staff, are all highly qualified.

*The Theranos Board of Directors is fully apprised of critical business decisions, and Theranos' employees and regulators, with whom Theranos proactively establishes unprecedented levels of transparency, carefully review Theranos' processes to ensure that test results are accurate and reliable.* Theranos' Board of Directors includes not only Ms. Holmes and Mr. Balwani but also, among others, an epidemiologist and the former director of the U.S. Center for Disease Control and Prevention (CDC), a nationally recognized physician, a renowned engineer, and experienced leaders in business and public policy. Theranos has also built medical advisory boards and task forces.