# EXHIBIT 29



# Food and Drug Administration
## OFFICE OF CRIMINAL INVESTIGATIONS
## MEMORANDUM OF INTERVIEW

| | |
|---|---|
| **CASE NUMBER:** | 2016-MWM-709-0576-J |
| **CASE TITLE:** | THERANOS, INC. |
| **DOCUMENT NUMBER:** | 284011 |
| **PERSON INTERVIEWED:** | Jerry Hurst, Laboratory Consulting Services |
| **PLACE OF INTERVIEW:** | WebEx |
| **DATE OF INTERVIEW:** | 08/03/2020 |
| **TIME OF INTERVIEW:** | 1300 EST |
| **INTERVIEWED BY:** | ASAIC George Scavdis |
| **OTHER PERSONS PRESENT:** | See below. |

On August 3, 2020, the case agent conducted an interview of Jerry Hurst, owner, Laboratory Consulting Services, via WebEx regarding consulting services he provided to Theranos. Also present during the interview were the following: Cynthia Hurst; Assistant United States Attorney Robert Leach, United States Attorney's Office, Northern District of California; Chris McCollow, Postal Inspector, United States Postal Inspection Service.

Mr. Hurst began the interview by saying that he had been contacted by Sunny Balwani's attorney and investigator in 2018. They flew out to Mr. Hurst's ranch to interview him for a couple of hours. The interview was not recorded. Subsequently, the attorney asked for Mr. Hurst's interview notes from the mock audits he conducted for Theranos; Mr. Hurst was uncomfortable with that and refused. After that interview, Mr. Hurst was contacted by an attorney for Mr. Balwani who again asked him for his notes. The attorney, named Amanda (LNU), called him on one or two occasions and emailed him on another. Mr. Hurst engaged an attorney, and the attorney advised him not to produce his notes. Mr. Hurst directed Amanda to contact him through his attorney, and he never heard from her again. Mr. Hurst said Mr. Balwani's attorneys were David Dee from Davis, Wright and Tremaine, and Rich Bartlett. Mr. Balwani's investigator was Rich Conti. Conti used to work for the United States Department of Justice (DOJ).

Mr. Hurst talked to his attorney prior to the WebEx with the case agent, and he said he was comfortable being interviewed. Mr. Hurst has been under contract with the DOJ in year's past.

Mr. Hurst has a master's degree in microbiology. He is licensed as a California clinical scientist, and he is certified as a California public health microbiologist. He worked for many years in the clinical lab arena. Mr. Hurst eventually specialized in microbiology and worked at Stanford for several years. Subsequently, he went to the California State Department of Health for several years. He then became an inspector for CLIA (Certified Laboratory Improvement Amendments) in California. He rose to manage the California and CLIA inspection program for the California Department of Public Health; he retired in that position. Upon retirement, he directed a couple of Kaiser hospital labs for a year, and then worked as a vice president of regulatory for Unilab, which no longer exists. He was getting many calls for consulting, so he started consulting in the early 2000s. He incorporated his consulting business in 2006 or 2008. He technically started consulting in 1998 while he was still working with the California State Department of Health. There was no conflict of interest because he was engaged in international consulting. His wife (Cynthia) joined his company in 2015 as a consultant. She has a background in bio technology.

Mr. Hurst explained his previous work with DOJ. DOJ was prosecuting a lab or a company and he helped review the documentation and advise on CLIA and compliance issues. He worked with them for several months, and he's not sure which year-maybe the mid-2000s. He recently contracted with the California Department of Public Health regarding audits of plasma centers. He's not sure if the DOJ case he consulted on was criminal or civil.

In 2011, Theranos contacted him because they wanted to get licensed in California as a clinical lab and get CLIA certified. He went and talked to them about what was needed. He helped them through the process of doing the paperwork and setting up their infrastructure. Several months later, they wanted him to be a technical supervisor (TS). Labs need a technical supervisor for each subspecialty, and Mr. Hurst qualified for all specialties. His job was to insure compliance with all the rules. Once the laboratory was set-up, his job was to help them monitor their laboratory from a quality perspective.

Mr. Hurst doesn't recall who from Theranos first contacted him. His initial meetings were with Elizabeth Holmes and Mr. Balwani. Theranos told him they wanted to set up a clinical laboratory in Palo Alto. His early conversations would have been about the following: The process for applying for a license and certificate; personnel requirements; required infrastructure; and laboratory procedures that needed to be created and implemented. Theranos never told Mr. Hurst about any proprietary or LDT (laboratory developed test) or "home brewed" testing they wanted to do. The lab he helped them set up was a small but fairly well-rounded set of analyzers and test systems. During the time he was in that laboratory, he thought it was going to be just a traditional little laboratory. He had no idea at that time they were going to be performing LDTs. Years later during meetings with them, they did talk about validating new test systems including LDTs, but the discussion was mostly about microbiology. This occurred a year or two or three after he was engaged to help them start up their lab. When Mr. Hurst was in the Theranos lab he was looking at their procedures and personnel files. He also provided their lab director for them. He has several laboratory directors that are licensed sub-contractors for his company. Spencer Herocki was provided to Theranos as a laboratory director through his company. Spencer has since passed away. Mr. Hurst doesn't know if he itemized the Theranos analyzers they were using in his notes. He doesn't think he has an inventory of their analyzers, but he knows they covered chemistry, hematology, urinalysis, and immunology test systems. Of the analyzers, he said, "These were all FDA approved test systems they were using." As a result, he wanted to make sure they were following the instructions the manufacturer required to operate those test systems. He explains to the companies he deals with that if they deviate from those instructions, then they've lost the FDA clearance or approval and it becomes an LDT.

In 2013, Mr. Hurst's contract with Theranos changed from a retainer contract to an hourly consulting contract. Post 2013 if they had questions, then they would contact him. Theranos was a "very controlling environment." He and Spencer were required to sign in to get into the front door and to get into the Theranos lab. A TS and lab director need unimpeded access to the lab, and he had to convince Theranos to give him access, which they eventually did. The lab director and TS need to be available 24/7 to deal with any issues that may come up. Most of Mr. Hurst's contact was with Mr. Balwani. Early on, he had several meetings with both Mr. Balwani and Ms. Holmes. Most of the nuts and bolts stuff with the lab had him meeting with Mr. Balwani. Mr. Hurst would also interact with lab staff after the lab was set up. He interacted with "Arnie" Gelb once Mr. Gelb was hired as Theranos's lab director. Mr. Gelb was a board-certified pathologist. Mr. Hurst said of the Palo Alto offices, "We weren't allowed to go upstairs ever." He explained that he couldn't go up there without an escort. Theranos's administrative offices were housed upstairs and the lab was downstairs. The downstairs had a little reception area and a small lab adjacent to it.

Lynette Sawyer was a contract lab director that Mr. Hurst placed with Theranos after Spencer and Mr. Gelb left Theranos. She functioned as their laboratory director for a while. Mr. Hurst couldn't name all Theranos's lab directors that were in place during his engagement with them because it had been a long time ago. The names he did provide were Mr. Gelb, Spencer, Ms. Sawyer, Adam Rosendorff, and a guy named "Brad." When Mr. Hurst conducted a mock audit of Theranos in 2015, he hadn't met their lab director until Mr. Hurst came on site to conduct the audit.

Mr. Hurst was a TS for Theranos until 2013. He explained that the TS gets his delegation of authority and responsibility directly from the lab director. The lab director tells the TS what he's allowed to do, and that delegation must be in writing. For the time period of 2011 through 2013, his understanding hadn't changed- Theranos was doing routine testing on 3rd party analyzers. At some point, Theranos moved their lab to a bigger facility in Palo Alto, but he doesn't remember the year that happened. He can't recall if he was still the TS then. He visited that lab several times. Mr. Hurst can't recall the volume of testing that Theranos was doing, but he explained that the fee for a CLIA certificate and state license are pro-rated based on test volume, so the case agent could figure out the testing volume by finding out what Theranos paid for their certificates. They also must disclose on the application forms their test volumes. Those forms are the CMS 116 and the CA 144.

After 2013, Mr. Hurst was used by Theranos as a consultant to help-out when issues came up. Mr. Balwani would email him with a question, and he would answer it. At one point, he advised them on proficiency testing (PT) issues. All the issues he recalled were routine. He doesn't remember Theranos talking to him about anything unique or proprietary. They said nothing about proprietary test systems or testing off-label by taking an analyzer and changing the specimen type. They did talk about that during his last mock audit in 2015, specifically about changing the testing specimen matrix-and that was the first time that had ever come up. Theranos enrolled in CAP (College of American Pathologists) for PT. He can't remember if Theranos had any in-house PT system set up. When a laboratory does have a proprietary home brewed test, there is no available commercial PT testing, so that is when they are forced to come up with an in-house test system, and he doesn't recall ever talking to them about an in-house test system. So, his assumption at that time was either they weren't doing LDTs, or they didn't tell him they were. He clarified that the time period he was referring to was 2013 through 2015, and his final mock audit was in 2015.

Mr. Hurst can't remember why Theranos stopped using him as a TS in 2013. Theranos was hiring people so perhaps it was more cost effective. Mr. Balwani wanted Mr. Hurst to conduct an audit of Theranos in November 2013; they brought him in to audit prior to a CLIA inspection. In December 2013, Mr. Hurst still thought Theranos was using FDA approved analyzers to do their lab tests. When he did the Theranos audit in 2013, all they showed him were traditional FDA approved analyzers. They didn't tell him they modified devices to run diluted samples. Most times with other labs during audits, he's allowed to "do his thing" and walk around and do what he needs to do. With Theranos, he was always under escort and told where to go. He was not free to open doors and closets and stick his nose in things. He said, "I never even heard of that little desktop analyzer in all my conversations with them." He never saw it, and they never talked to him about it. It surprises him because he was their compliance expert, and he was hired to make sure things were validated properly, etc. After 2015, he never talked to Theranos after CMS sanctioned them. Theranos was always secretive. When he was their TS, Mr. Hurst received a call from Theranos's attorney demanding he remove Theranos's name from his website and his CV (curriculum vitae). They said he was violating their contract with him. He told the attorney he'd take Theranos's name off his website but not his CV. This call with the Theranos attorney occurred around the time he was a TS near the end of 2013. Mr. Hurst thinks the attorney that called him was Brad Arrington. He was also in contact with a Theranos attorney named David Doyle at that time.

Mr. Hurst described the Theranos lab in Palo Alto as one large room. It was a traditional lab that had chemistry, hematology, and immunology analyzers. He's not sure if they were doing microbiology there. Theranos's final laboratory was in Newark—there were two in Palo Alto, then they moved to Newark. The Newark facility was a big two-story facility. Mr. Hurst did his three audits of Theranos at the Newark facility. There was one clinical laboratory in Newark that covered two floors. Chemistry and hematology were located downstairs. They did full blown microbiology in Newark, and they were doing immunology testing as well. During his last audit of Theranos, they mentioned something about whole blood use on one of their chemistry analyzers, which were FDA approved for serum/plasma. Mr. Hurst asked to see the validation documentation because that would have been a change—it would have been off-label. He looked at the validation documentation and told them he didn't think it was an adequate validation. This conversation took place in a large conference room in September 2015. Present from Theranos were Langley (LNU), the microbiology supervisor, Gurbir Sidhu, Daniel Young, Hoda (LNU), Godfrey (LNU), and Siraj Saksanaea (sp.). Mr. Hurst did an audit in August 2015 and came back and did another one in September 2015.

The case agent asked Mr. Hurst to describe the August 2015 Theranos audit. Mr. Hurst asked his wife, "Was that the one where they kicked us out early?" He said, "We were going through the lab and they told us we had to leave." He went through each department looking at their machines, looking at their QC (quality control), PT, and personnel. He described the August 2015 audit as a generic audit to assess compliance. It was the August or September audit when, halfway through when they were in the lab, Theranos said something came up and Mr. Hurst had to leave. He described Theranos as very controlling. He said he had to have an escort to go to the bathroom. He described the records they did show him for their traditional lab work as "pretty good," except there were issues with QC. Overall the issues he saw didn't surprise him; nothing jumped out. He remembers having a discussion with them on complaint procedures. They were comparing procedures with actual practice. Their complaint procedures were inadequate and didn't reflect what they were supposed to do. Their critical value reporting procedures needed more detail. There was a disconnect between what the company was saying they had to do and what they were doing—this was relative to a particular analyzer. Mr. Hurst specified that there was a disconnect between what the manufacturer said the control value should be and what Theranos had programmed into their software. The thing that was surprising was, normally after an audit, he is asked to write a report. On both the audits in 2015, Theranos did not want a report, which Mr. Hurst found surprising. Mr. Hurst asked them if they wanted a written report, and Mr. Balwani said it wasn't necessary. All Theranos people there were taking notes during the audits. Mr. Hurst said that Mr. Balwani was listed on their personnel CA form as a lab assistant, which Mr. Hurst found strange.

On September 1, 2015, Mr. Hurst got an email from Mr. Balwani confirming an audit. Mr. Balwani asked them to come back in September. The August audit was more of a discussion of what needed to be done. The main objective of the second audit in September was to go into detail on the whole laboratory operation. It was in that audit when Mr. Hurst was asked to leave abruptly. At the time of September audit, Theranos mentioned that they were scheduled for a CLIA inspection, however they didn't know the date or who the examiner was going to be. He was never made aware of their desktop analyzer, the Edison. The only time they talked about a modification was briefly during the September audit when they talked about this whole blood specimen change on their chemistry analyzer. He looked at the validation and said it was inadequate. He thinks the validation was for one analyte. Normally, Mr. Hurst looks at the performance specifications and asks, "Are they adequate?" He looks at what metrics they set for performance and then looks at the available data to see how it was analyzed--did they appropriately conclude and describe accuracy or performance? Mr. Balwani was not at this meeting when Mr. Hurst told Theranos that their validation for the analyzer was inadequate. Mr. Balwani wasn't at the August or September audit.

Mr. Hurst's impressions of Mr. Balwani were that he was very polite. He was receptive to Mr. Hurst's recommendations. Mr. Hurst was never treated rudely by Mr. Balwani. Mr. Hurst met with Ms. Holmes four or five times. He described her as very polite, probing, and direct. She would ask very specific questions. She wanted to learn about various compliance issues.

Mr. Hurst explained that a competency assessment of personnel is a CLIA requirement. A laboratory must assess competency of all personnel at least once a year. The must do it twice the first year and annually thereafter. It is up to the lab director to decide how competency should be assessed. The test systems they're using are part of that assessment.

Mr. Hurst talked to Mr. Rosendorff on several occasions. Mr. Rosendorff left Theranos to work for Invitae, and Mr. Hurst was a TS there, so he dealt with him there. Mr. Gelb left. Mr. Rosendorff left. Ms. Sawyer wanted to leave and so did Spencer. Ms. Sawyer and Spencer did not like working for Theranos. The overall working environment was very restrictive. Ms. Sawyer, as the lab director, had a fiduciary duty and Theranos wouldn't even give her a list of their employees. She couldn't get the information she needed to do her job as a lab director. Ms. Sawyer is still a subcontractor for Hurst.

As a TS, Mr. Hurst charged Theranos $3,500 per month. When their contract switched to hourly consulting, he charged them $200-$250 per hour. His guess is he didn't exceed 100 hours working as a TS for Theranos in 2013. He'd have to look up invoices to see how many hours he expended doing consulting for

Theranos at the end of 2013. Mr. Hurst said "We can only assess compliance with the things that are shown to us. My job is not to challenge them and call them liars and say you're not telling me everything. We can only advise them on the things they disclose to us whether it's records, procedures, or analyzers." He said, "If I ask to see analyzers and they show me one and hide another, I'd have no idea that the other one was there. I never saw the Edison. I never, ever knew anything about specimens being diluted or used inappropriately with an analyzer. Never came up."

Mr. Hurst read the book "Bad Blood." He said the allegations in the book regarding Theranos "blew me away." He knows most of the players in the book. He'd been in Theranos's laboratories "man, many times" and he didn't see any of that going on. No one brought it to his attention. He knows Diane Dupuy personally and she never contacted him and said anything to him about any of this.

No one at Theranos told Mr. Hurst they were diluting blood samples to run on Siemens machines. He explained that with venipuncture you'd have plenty of sample to run on an analyzer. With a fingerstick draw to get that up to volume, you'd have to dilute it, and no one told him anything about Theranos diluting specimens from fingerstick blood draws.

AUSA Leach asked Mr. Hurst "Would it surprise you to learn that Theranos used a proprietary analyzer in its CLIA lab?" He responded, "Absolutely. Absolutely. I never saw it." When he did his audit in 2015, he didn't look back retrospectively per say. When he does an audit, he goes through each department and as part of that evaluation he'll look back at records. If he's looking at a glucose test, he'll look at the machine they're doing it on and then look at historic records for that machine to see how they're doing things.

Mr. Hurst was not aware Theranos was using LDTs in it's CLIA lab. He cited three reasons for that. First, it never came up in a discussion. Second, when he did his audits, every analyzer shown to him was an FDA cleared analyzer. Third, LDTs also must have an internal accuracy assessment program, and he doesn't recall ever seeing that at Theranos. If a laboratory was being sneaky and not doing an internal accuracy assessment program, he wouldn't know that.

Theranos never described any interactions to him they had with FDA or CMS. Mr. Hurst doesn't know Ilene Norkin. He can't recall if he and Theranos talked about a 2013 CMS audit.

Mr. Hurst's last contact with Theranos was September 2015, excluding the time that Mr. Balwani's attorneys contacted him. Ms. Holmes's attorneys haven't reached out to him. Mr. Hurst has a copy of the CMS 2015 Statement of Deficiencies issued to Theranos. Someone sent him a public link to it. He'd have to read it again because it's been a long time since he read it. He generally reads these to see if the examiner's citations are well founded and he reads the plan of correction to see how the company plans to fix the deficiencies. He couldn't say if anything surprised him here because he can't remember from when he read the statement of deficiencies and plan of correction several years ago.

Mr. Hurst doesn't know Sunil Dhawan. He never met him, but he heard the name. In terms of meeting the legal CLIA standard, it's not a problem to have a dermatologist as a lab director. From the experience perspective, one must ask what type of experience a dermatologist has running a laboratory--especially a high complexity laboratory like Theranos's. So, Hurst was surprised Theranos would hire a dermatologist to run their laboratory. Normally, a pathologist would direct these types of laboratories.

Theranos didn't seek any services from Mr. Hurst after their September 2015 CMS inspection.

AUSA Leach asked Mr. Hurst, "Do you think Theranos was fully candid with you during the audit?" He said that based on what he learned in the news and in the book, "No. Apparently, they were not forthcoming. I didn't see dilution. I didn't see Edison desktop testing. So, I'd have to say no they weren't forthcoming."

Mr. Hurst explained his invoice charges to Theranos for laboratory director services: The lab director he

provided to Theranos billed Mr. Hurst, and Mr. Hurst invoiced Theranos. Mr. Hurst then paid the lab director, like Ms. Sawyer or Spencer. When the laboratory changes directors, all of that must be disclosed to the State and to the Feds. When Ms. Sawyer terminated her employment with Theranos, they had to make a notification. The State of California allows co-directors, and with CLIA you can only have one lab director. Mr. Hurst doesn't know who Theranos had as lab director in between Mr. Rosendorff and the dermatologist (Dhawan). In March 2015, Ms. Sawyer was till co-directing the Theranos laboratory. Ms. Sawyer resigned as co-director in June 2015. Mr. Hurst explained that contract laboratory directors are not on site in the lab. They must be available by email or phone 24/7, but there's no requirement they be on site. Ms. Sawyer had "a heck of a time" trying to get information from Theranos. She was unhappy with the overall work environment and in dealing with Mr. Balwani and the personnel in the lab. She didn't think she was getting the cooperation she needed to do her job.

Immediately following the interview, the case agent telephonically contacted Mr. Hurst for follow-up. The case agent asked Mr. Hurst if Mr. Balwani's attorneys covered anything with him that the case agent didn't. Hurst said they went through emails with him. They talked about the two mock audits and how they wanted Mr. Hurst's notes from the audits. The time period they questioned him about was January 2011 through September 2015 regarding the emails they showed him. They talked about his contract, the CLIA inspection, and venous versus fingerstick blood draws. Regarding fingerstick blood draws, they showed him an email discussing fingerstick draws from December 2013. Mr. Hurst said it was an email internal to Theranos. He was on the first part of the email, but not the part where fingerstick was discussed.

Mr. Hurst emailed the case agent and attached an updated version of his CV. (Attachment one)

**SUBMITTED:** Electronically submitted by GEORGE SCAVDIS

GEORGE SCAVDIS, ASSISTANT SPECIAL AGENT IN CHARGE       DATE:   08/05/2020

**APPROVED:** Electronically approved by MARK MCCORMACK

MARK MCCORMACK, SPECIAL AGENT IN CHARGE       DATE:   08/05/2020

**DISTRIBUTION:**   Orig:   MWFO w/attachments
                    cc:     Prosecution w/attachments

**ATTACHMENTS:**  1 - Curriculum Vitae