# EXHIBIT 78

Message

| | |
|---|---|
| **From:** | Brad Arington ▮ |
| | ▮ ] |
| **Sent:** | 11/19/2013 6:22:25 PM |
| **To:** | 'Sally.Hojvat@▮ [Sally.Hojvat@▮ ]; 'JOHN.HOBSON@▮ ' [JOHN.HOBSON@▮ ] |
| **CC:** | Elizabeth Holmes ▮ ] |
| **Subject:** | Informational Meeting Minutes |
| **Attachments:** | Minutes from Informational Meeting Theranos DRAFT.docx |

**Importance:** High

Sally and Peyton:

Please find attached the draft of the minutes for the Informational Meeting on November 4. Per the previous emails from Elizabeth, these are draft minutes and we hope you will have the opportunity to comment, but we are prepared to submit to DMC directly today if needed.

Thanks, Brad

Brad Arington

Theranos, Inc.

Senior Regulatory Counsel

Direct: (650) 856-7304

Cell: (650) 683-0233

This email and any attachments thereto may contain private, confidential, and privileged material for the sole use of the intended recipient. Any review, copying, or distribution of this email (or any attachments thereto) by others is strictly prohibited. If you are not the intended recipient, please contact the sender immediately and permanently delete the original and any copies of this email and any attachments thereto.

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THERANOS CONFIDENTIAL

**DRAFT MEMO**

**Attendees**:
**CDRH:** Alberto Gutierrez, James Woods, Sally Hojvat, J. Peyton Hobson, Courtney Lias, Reena Philip, Marcy Busch, Ian Pilcher, Tamara Feldblyum, Uwe Scherf, James Woods, Pamela Bradley, Claudia Gaffey, Scott McFarland
**CMS:** Melissa Singer, Penny Keller
**Theranos** : Elizabeth Holmes, Sunny Balwani, Brad Arington, Jeffrey Gibbs (counsel from Hyman, Phelps & McNamara)

**Subject:** Face-to-Face meeting
**On Site meeting date:** November 4, 2013
**Company:** Theranos

The following information summarizes the topics discussed at the meeting between Theranos and the

FDA and CMS.

**Theranos:** Theranos, after expressing its appreciation for the opportunity to provide accurate

information to the agencies about its laboratory testing system, started with a high level description of

the company's background.  Ten years ago, Theranos began developing laboratory testing from small

samples to minimize the patient impact of traditional phlebotomy, improve patient experience, and

provide a better model for automation of pre-analytic processing of samples, while maintaining the

oversight of a high complexity CLIA-certified laboratory.  Sample processing steps are the source of

approximately 93% of errors in laboratory testing today.  The Theranos Sample Processing Unit (TSPU)

has been designed to automate these steps, while being subject to oversight under CLIA.  The Theranos

Laboratory Automated System (TLAS), located in the CLIA-certified lab, provides oversight and control of

the TSPU.  The TLAS software is capable of receiving signals from the TSPU and converting these raw

signals into images, concentrations, counts of cells, etc.  All test results are reviewed by a CLIA-qualified

pathologist at Theranos.  Theranos pointed out that processing steps are commonly performed today in

patient service centers by technicians, such as aliquoting, centrifugation, and other specimen

preparation steps and that adding reagents is similar to steps commonly taken by technicians who

[ PAGE  \* MERGEFORMAT ]

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0345670

**THERANOS CONFIDENTIAL**

prepare slides, such as staining, sectioning, affixing, etc., prior to shipping specimens to a lab for analysis.  Theranos then noted that, while the TPSU could operate in a patient service center, that is not occurring now.   Currently (Phase I) the TSPU is operated in the Theranos high complexity CLIA-certified laboratory and all samples are shipped to the Theranos laboratory, where pre-analytical and analytical steps are conducted.

Theranos noted that during a meeting in October 2012 to discuss the Theranos system, FDA had stated that it would be acceptable for Theranos to offer its test as an LDT.  (During the 2012 meeting, Theranos said it would perform clinical tests on patient samples shipped to its CLIA-certified Palo Alto laboratory where the test was designed, validated, and manufactured and used in the same CLIA-certified laboratory, with the results transmitted back to the ordering physician.)  Theranos established its current business model accordingly.  Theranos has communicated to FDA its intention to submit to FDA for clearance or approval of all of its assays, and has provided a monthly Pre-Submission plan for 510(k) clearances of Class II assays.  Theranos has currently begun the Pre-Submission process on the system and the first assays for influenza.  In addition, Theranos emphasized that it is not commercially distributing the TPSU, and all testing is currently run, including the pre-analytical processing steps, in its high-complexity CLIA-certified laboratory.  Theranos is pursuing clearance of a processing unit for the TSPU in the patient service center with traditional analyzer steps being performed by the TLAS in the laboratory.

**FDA:**  FDA stated that it did not remember that FDA had concluded that the Theranos system with the processing unit is used in the lab is an LDT, and stated that it would review the minutes from the October 2012 meeting.  FDA stated that there are LDTs where it exercises enforcement discretion, but there are laboratory tests where it would not, for example, where a laboratory manufactures its own equipment and, in particular, where a laboratory is manufacturing the whole system within the same company.  FDA said that a test may not qualify as an LDT if the laboratory makes the instrument,

[ PAGE  \* MERGEFORMAT ]

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0345671

THERANOS CONFIDENTIAL

software and reagent.  FDA further stated that it feels that CLIA does not have the controls in its

regulations for production and manufacturing, and that CLIA does not address FDA issues.  FDA added

that Theranos was doing something "very different" from where FDA had exercised enforcement

discretion, and that this was not contemplated by FDA when it started exercising enforcement

discretion.

**Theranos:**  Theranos stated its belief that the current use of the Theranos system in the CLIA-certified

laboratory is compliant with the law, as supported in the legal memos by outside counsel, recently

provided to FDA.  In particular, the CLIA regulations contemplate the use of FDA-uncleared or

unapproved equipment and have specific requirements for the establishment and verification of

performance standards for such equipment.   Many FDA-unapproved or uncleared equipment are used

in labs today, such as liquid handling robots and spectrometers, as well as products labeled "research

use only."   These products, unlike Theranos' equipment, are not manufactured in accordance with GMP

principles.  In addition, Theranos has developed and manufactured its equipment under a GMP-based

quality system.

**FDA:**  FDA stated that there may be some laboratories manufacturing their own equipment.  FDA also

stated that that there may be disagreement within industry as to the manner in which it exercises

enforcement discretion regarding LDTs, pointing to the Laboratory Corporation's OvaSure test warning

letter as an example.  FDA reiterated its position that it has regulatory authority over laboratory tests

including LDTs.  FDA stated that, in its view, most LDTs are more typically analyte specific reagents

and/or general purpose reagents on an open system and not reagent cartridges.  Historically, traditional

LDTs were reasonably well-controlled and therefore, enforcement discretion was appropriate.  FDA

compared Theranos to 23andMe as a company that did not fit into the scope of FDA's enforcement

discretion for LDTs.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF
INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THERANOS CONFIDENTIAL

**Theranos:** Theranos explained that the consumables cartridge is not much different from a standard reagent tray or microtiter plate and that the TSPU architecture basically mimics what is done with a traditional analyzer's ability to load reagents through an open architecture. Theranos also pointed out that it is very different from a company like 23andMe, which markets its testing services directly to consumers, does not require a physician's order and tells patients, based on genetic testing, that they may have an increased risk for specific diseases, like breast cancer, and does not conduct tests in its own CLIA certified laboratory. Furthermore, Theranos has proactively sought to work in cooperation with FDA. Theranos is providing standard laboratory tests, such as CBC or calcium levels, the results of which are reviewed by its high-complexity CLIA lab director and then sent to and interpreted by physicians.

**FDA:** FDA reiterated its concern about the manufacturing aspect of Theranos' system, specifically that, in its view, the CLIA regulations do not provide appropriate controls for the development and manufacture of equipment and software; that a CLIA-qualified Lab Director doesn't have the experience and skills to oversee those; and that it did not agree with the memoranda from the law firms. FDA stated that since it believes tests on the Theranos test system are not LDTs, to use it in a CLIA lab for Phase I would be a "regulatory risk" taken by the company. However, FDA stated that if it chose enforcement action on Phase I, this issue was not entirely clear-cut and that there could be different perspectives on Phase I. FDA also stated that, in its view, a defense to enforcement against Phase II – where the TSPU would be sent to other facilities – based on being an LDT would be difficult. FDA also stated that in the last three years, it has been fairly silent on the issue of LDTs and that it is in the process of drafting specific guidance for LDTs. FDA further stated it believed Theranos had listed the processing unit wrongly under the Class I analyzer classification. At the same time, FDA reassured Theranos that it did see its testing devices as an advance; the issue is that this is not what other laboratories do.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

**THERANOS CONFIDENTIAL**

**CMS:**  CMS stated that there had been an inspection of Theranos's clinical laboratory and the inspection had determined that Theranos's laboratory and the tests performed by the laboratory are in compliance with CLIA.  CMS stated that there are CLIA regulations that require establishment and verification of performance specifications for unmodified, FDA-cleared or approved tests, and more requirements for modified or FDA-uncleared or approved tests.  CMS explained that these regulations provide a framework so that prior to performing clinical testing, whether on FDA-cleared/approved tests or those developed by the lab, the laboratory has to establish that the test works properly in accordance with the CLIA regulations.  Under CLIA, LDTs are just one kind of unapproved system.  CMS also stated that it was in attendance to gather information about Theranos and, at this time, was not prepared to provide guidance.

**Theranos:**  Theranos emphasized that it has never wanted to operate under FDA "regulatory risk" and that it has been very careful to proceed upon the guidance of legal counsel for many years and in cooperation with FDA.  In particular, following the meeting in October 2012, Theranos moved forward with a business model where samples are shipped back to be fully processed and tested within its high complexity CLIA-certified lab, with the understanding that this model was within the bounds of FDA's enforcement discretion for LDTs.   Theranos also pointed out that it has submitted a Pre-Submission for its first 510(k) and has provided to FDA a plan for further Pre-Submissions for nearly 400 of its Class II assays in the coming months, being the first clinical laboratory to do so.  Theranos is committed to pursuing these submissions and working collaboratively with FDA.  Also, Theranos has committed substantial resources to developing a quality system for the development and manufacturing of its system.  Theranos reiterated that Theranos has proceeded in good faith based on FDA's historical enforcement discretion, and that there has been no guidance from FDA stating that a test was not an LDT because it had been made by the laboratory.  Theranos also emphasized that it is not commercially shipping any products.  (FDA responded by saying this was a "nicety.")  Theranos referenced that there

[ PAGE  \* MERGEFORMAT ]

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THERANOS CONFIDENTIAL

have been many changes that have occurred in the development of LDTs since 1992. Theranos said it should and is working very hard to be seen as the model for working with FDA and added that it was not appropriate to insist on such a novel definition of LDT as FDA was now setting forth.

After further discussion, Theranos stated that in light of the unexpected comments made by FDA at this meeting, it would consult with counsel and determine how to respond.  FDA stated that it would be open to a follow-up discussion.

****

**Theranos:**  The discussion then turned to Phase II, in which Theranos would be supplying equipment to service centers to conduct processing steps on the sample.  Theranos emphasized the importance of the appropriate FDA-cleared intended use for the TSPU as a sample processing unit in the Theranos patient service centers.

**FDA:**  FDA suggested that Theranos meet separately with CMS about any CLIA compliance issues for Phase II.  FDA also stated that the TSPU may be a Point-of-Care (POC) device because, in FDA's view, the TSPU performs testing and analyzes and displays results.  FDA further said the processing unit might work well as a high complexity test but that when launched at Walgreens there could be an issue.

**Theranos:**  Theranos reiterated the importance of establishing the proper intended use as a processing unit and that tests be CLIA-certified under its business model.  It also disagreed with the characterization of the TSPU as a POC device, explaining that it does not perform any analysis or testing, i.e., does not produce any results, let alone display results, in the patient service center.  Theranos also commented that there cannot be disjointed steps between FDA and CMS, and that coordination between the two agencies is important.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0345675

THERANOS CONFIDENTIAL

**CMS:**  CMS described what, in its view, is typically done in service centers, e.g., aliquoting, centrifugation, etc.  CMS stated that pathology has some specific regulations that allow for specimen preparations steps previously described by Theranos.  CMS expressed concern that the cartridges contain reagents and that this could result, in its view, in testing being performed in the patient service centers.  CMS stated that its legal team has determined that the agency can interpret the applicable provisions of the regulations broadly.  If CMS determines that the analysis occurs in a patient service center, that center would need a CLIA certificate and properly qualified personnel.  CMS reiterated that it was attending the meeting to gather information and not to make any final recommendations.  CMS said the company could contact the team and the Regional Director for follow-up discussions.

**Theranos:**  Theranos pointed out that the TSPU performs automated processing steps that do not include any analysis or examination as provided in the CLIA definition of laboratory; specifically, the TSPU does not determine, measure or otherwise describe the presence or absence of any substances or organisms in the body.  In addition, the TSPU only carries out specimen collection, preparation and processing functions similar to those non-laboratory facilities currently perform.  The TSPU only generates signals that have to be relayed to the TLAS for analysis in order to perform any analysis or examination.  Theranos also pointed out that after collecting the patient sample and placing it into the cartridge, the Phase II operator of the TSPU does nothing more than load the cartridge into the TSPU and press the start button.  Theranos provided photos of an operator placing the cartridge into the TSPU and of the user interface on the unit, demonstrating the simple steps performed by the operator.  Theranos also pointed out that these steps are less complicated and require less skill than the specimen collection, processing and preparation steps required of operators in many standard non-laboratory facilities today.

****

[ PAGE  \* MERGEFORMAT ]

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

**THERANOS CONFIDENTIAL**

The final topic was a discussion about Theranos' plan to proceed with Pre-Submissions covering nearly 400 assays in the coming months.

**FDA:** FDA had previously stated that the proposed Pre-Submission plan is ambitious and expressed concern as to whether all of the assays to be submitted actually need formal Pre-Submission Meetings. FDA suggested that Theranos research the relevant decision summaries and where appropriate, break out those with questions rather than full Pre-Submissions for all of the assays. FDA also expressed some concern with collecting samples for certain assays, specifically troponin, in the context of the patient service centers, since a troponin test is usually ordered in a medical emergency and not at a pharmacy.

**Theranos:** Theranos agreed to look further into FDA's suggested alternative to full Pre-Submissions for all the proposed assays, but also pointed out that troponin testing is currently ordered in non-emergency situations as well. In addition, Theranos expressed concerns about the advice not to file Pre-Submissions given that the some published decision summaries may be outdated and FDA's views may have shifted since the document was generated.

[ PAGE  \* MERGEFORMAT ]

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0345677