# EXHIBIT T

## MEMORANDUM OF INTERVIEW

| | | |
|---|---|---|
| CASE NUMBER | : | 2204323-MF |
| PERSON INTERVIEWED | : | Dr. Kingshuk Das |
| PLACE OF INTERVIEW | : | Videoconference Call |
| DATE OF INTERVIEW | : | February 1, 2021 |
| TIME OF INTERVIEW | : | 3:35 P.M. |

On February 1, 2021, Dr. Kingshuk Das (DAS) was interviewed by videoconference call regarding his knowledge of and employment with Theranos. Assistant United States Attorney Robert Leach, Food and Drug Administration-Office of Criminal Investigation Special Agent George Scavdis, and I participated in the interview. DAS was instructed during the interview that he should not reveal any communications he had with attorneys as they may be protected by attorney/client privilege. The following is a summary of the statements made during the interview.

DAS works remotely for Invitae and currently resides in Minnesota. He worked at UCLA before his employment with Theranos.

DAS first learned about Theranos from a job advertisement. He applied for the position of laboratory director and was interviewed by Elizabeth Holmes (HOLMES), Sunny Balwani (BALWANI), Daniel Young, (YOUNG), and possibly one other person. During the interview, DAS learned the position would be as lab director for Theranos' Newark facility. He was told to anticipate "a few weeks of paperwork," which he later learned was responding to the CMS Form 2567. HOLMES and BALWANI told to DAS CMS had conducted an audit, and that a few irregularities had been identified, but specifics were not discussed. DAS described the interview overall as pleasant, and HOLMES and BALWANI as charismatic. DAS started with Theranos as a contractor in December 2015, and commuted one day per week to the San Francisco Bay Area while continuing to work at UCLA. DAS became a full time Theranos employee in March 2016 and was employed with Theranos until he was laid off in June 2018. DAS worked for Theranos, and was paid a yearly salary by Theranos.

Theranos had a full legal team in place, and DAS interacted with that team often. This was unusual for him.

Theranos' lab as well equipped, and the staff was good but "needed seasoning." Some of the laboratory staff included Gurbir Sidhu, Hoda Alamdar, and Calvin Leung. Theranos' microbiology lab was in operation when DAS started at Theranos, and he believed the Arizona lab was fully operational. Theranos' proprietary testing had been shut down and DAS did not think any Edison or modified devices were operational. Edison devices were never used in the CLIA laboratory during DAS' tenure at Theranos. Some clinical samples were sent to either ARUP or Mayo for processing.

DAS identified Tina Lin as the person most familiar with the Edison data, and YOUNG as having the most knowledge of the Edison device overall. YOUNG, Chinmay Pangarkar

(PANGARKAR), and "Shelia" prepared a high-level PowerPoint document which analyzed Edison test accuracy and precision. This document was presented as part of the CMS audit investigation. DAS received a copy of this document and reviewed it. DAS conducted a Six Sigma analysis of the Edison data and concluded the Edison devices did not perform well, and the accuracy and precision did not meet the level needed for clinical testing. He said that even using a fairly low bar, none of the Edison tests passed an acceptable level. DAS thought YOUNG and PANGARKAR believed the Edison analysis demonstrated the device performed adequately.

DAS' Six Sigma analysis led to an uncomfortable meeting setup by Boies Shiller Flexner (BSF) attorneys with HOLMES, BALWANI, and YOUNG. He believed this meeting took place sometime after the first response to the CMS 2567, but before the second response. DAS presented at this meeting, which took place in the conference rooms where BSF was setup.

DAS said HOLMES was always with the BSF lawyers.

DAS concluded the Edison devices never performed at the level of accuracy and precision required, and could not have generated any results which had clinical value. DAS said there was some push back, but this conclusion was based on Six Sigma metrics. Theranos management suggested this was not a device issue, but rather a quality systems issue. DAS disagreed with that assessment and decided to void all Edison tests. DAS said it was his obligation as the director of record to conduct a patient impact assessment to determine if any harm came from a laboratory error.

PT/INR results were also voided because the assay, which used a BCS-XP device, was run improperly. The calculations associated with the test were done incorrectly, and quality control was poor. DAS said there was no way to salvage any of the test results. DAS believed he documented his work at this information should be contained in the contents of his Theranos computer hard drive. He also communicated these results to counsel, and to Brian Lipszin (LIPSZIN), a contractor who helped craft Theranos' final response to CMS. DAS did not know who hired LIPSZIN.

Theranos did not provide much Edison accuracy or precision data to CMS when responding to the Form 2567, and instead focused on laboratory remediation instead of directly responding to the issues. DAS said it was not his responsibility to consider business implications.

DAS knew Sunil Dhawan, [Adam] Rosendorff, and [Arnold] Gelb were former Theranos laboratory directors. He never spoke to them.

DAS had private meeting with HOLMES he described as general meetings where they would check-in with each other. DAS mentioned his finding to HOLMES, and said these conversations did not go well. HOLMES was not a laboratorian, and he needed to discuss certain topics at her level. He specifically remembered telling HOLMES that approximately one dozen female patients had PSA [prostate-specific antigen] results reported. He said HOLMES seemed perplexed by the issue, and to prove her point, identified an abstract which said females could have PSA in their blood. DAS said that while it was in the realm of possibility that a woman could have PSA in her blood, it was unlikely that twelve women had a reportable result.

There was an effort to rebuild the Theranos CLIA lab by bringing up one test at a time. DAS believed the first test they worked on was the CBC [complete blood count] run on an Advia 2120

with blood drawn by venipuncture.  DAS did not think this process concluded due to the settlement with CMS.

After the CLIA lab closed, DAS continued his internal investigations until those were shut down by Theranos' general counsel in late 2017 or early 2018.  DAS said addressing the deficiencies identified in the CMS 2567 was just the "tip of the iceberg," and his investigations continued to "follow the thread" into other areas.  DAS believed he finished his investigation of Theranos' proprietary testing by the time he was shut down.  DAS provided periodic updates to David Taylor, and WilmerHale attorneys Mugmon and Davies.

During his last six months, DAS worked on a non-clinical Zika assay that was going to be submitted to the U.S. Food and Drug Administration (FDA).

DAS did not work on the minilab device, but saw some data that was going to be used for HOLMES' AACC [American Association for Clinical Chemistry] presentation.  He and Phoenix lab director Don Tschirhart (TSCHIRHART) were initially going to attend the AACC conference and participate in a roundtable discussion, but were politely uninvited by Daniel Edlin.  DAS was told they were not needed and their spots would be used for someone else.

DAS believed he only had two direct interactions with BALWANI before he left Theranos because his mother fell ill.  DAS heard gossip about BALWANI's role in the company similar to what was published in John Carreyrou's (CARREYROU) book and in other new articles.

DAS has not been deposed in relation to any Theranos litigation.  He provided Zika information on the condition of anonymity to CARREYROU for an upcoming podcast.  He did not speak with any other journalists.

DAS reviewed document THER-0534700 to THER-0534792 and said that he drafted, reviewed, and signed the document.  Most of the content, however, was the work of Theranos attorneys.  He did not know what role HOLMES played in drafting this document, but would have been surprised if she had not reviewed it.  Most of his CMS interactions were with local inspector Gary Yamamoto
(YAMAMOTO) with whom he exchanged periodic emails regarding sending data.  DAS, HOLMES, TSCHIRHART, and Heather King attended a meeting in Washington, D.C. at CMS with Karen Fuller's supervisor.  YAMAMOTO and Sarah Bennett attended by telephone.

DAS' Edison review data was stored on Theranos' share drives and labelled with D-tag numbers corresponding to the CMS 2567.  There were also LIS [laboratory information system] data dumps on his computer.

The interview ended at 4:35 P.M.

*Christopher McCollow*

| | |
|---|---|
| Christopher McCollow | February 15, 2021 |
| U.S. Postal Inspector | Date |

Attachments:

- THER-0534700 to THER-0534792