JOHN D. CLINE (CA State Bar No. 237759)
50 California Street, Suite 1500
San Francisco, CA 94111
Telephone: (415) 662-2260 │Facsimile: (415) 662-2263
Email: cline@johndclinelaw.com

KEVIN M. DOWNEY (Admitted Pro Hac Vice)
LANCE A. WADE (Admitted Pro Hac Vice)
AMY MASON SAHARIA (Admitted Pro Hac Vice)
KATHERINE TREFZ (CA State Bar No. 262770)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
Washington, DC 20005
Telephone: (202) 434-5000 │Facsimile: (202) 434-5029
Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

Attorneys for Defendant ELIZABETH A. HOLMES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. CR-18-00258-EJD |
| Plaintiff, | ) |
| | ) **MS. HOLMES' REPLY IN SUPPORT OF** |
| v. | ) **MOTION TO EXCLUDE EVIDENCE OF** |
| | ) **ANECDOTAL TEST RESULTS UNDER** |
| ELIZABETH HOLMES and | ) **FEDERAL RULES OF EVIDENCE 401-403** |
| RAMESH "SUNNY" BALWANI, | ) |
| | ) Date:    March 23, 2021 |
| Defendants. | ) Time:    9:00 AM |
| | ) CTRM:  4, 5th Floor |
| | ) |
| | ) Hon. Edward J. Davila |
| | ) |
| | ) |

# TABLE OF CONTENTS

**Page**

I.     Anecdotal Test Results Are Not Probative of Problems with Theranos Technology..........3

II.    Rule 403 Bars Admission of Evidence of Anecdotal Test Results....................................6

III.   The Government Lost the LIS Data, Not Ms. Holmes. ...................................................7

    A.     Summary ................................................................................................................7

    B.     Importance of the LIS ........................................................................................10

    C.     The Government's Failure to Access LIS Before the Indictment.........................12

    D.     The Government's Failure to Preserve the LIS ...................................................13

    E.     The Government's Attempts to Blame Others.....................................................16

CONCLUSION.......................................................................................................................20

1

**TABLE OF AUTHORITIES**

2

**CASES**

3

**Pages**

4

*Brady v. Maryland*, 373 U.S. 83 (1963) ..............................................................10

5

*Conde v. Henry*, 198 F.3d 734 (9th Cir. 2000) ....................................................20

6

*Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311 (9th Cir. 1995) ..................3

7

*In re Grand Jury Subpoena Duces Tecum Dated Jan. 2, 1985 (Simels)*, 767 F.2d 26 (2d Cir. 1985) ......16

8

*United States v. Boulware,* 384 F.3d 794 (9th Cir. 2004)......................................20

9

*United States v. Burns*, 790 F. App'x 93 (9th Cir. 2020) ....................................17

10

*United States v. Copple*, 24 F.3d 535 (3d Cir. 1994)..............................................5

11

*United States v. Dodd*, 391 F.3d 930 (8th Cir. 2004) .............................................1

12

*United States v. Solorio-Soto*, 300 F. App'x 487 (9th Cir. 2008)........................20

13

*United States v. Star*, 470 F.2d 1214 (9th Cir. 1972)...........................................16

14

*United States v. Whitman,* 771 F.2d 1348 (9th Cir. 1985)....................................20

15

*United States v. Zaragoza-Moreira*, 780 F.3d 971 (9th Cir. 2015) .......................9

16

*United States v. Zuniga-Garcia*, 472 F. App'x 498 (9th Cir. 2012)................9, 19

17

**CONSTITUTIONAL PROVISIONS**

18

U.S. Const., amend. VI ...........................................................................................20

19

**RULES**

20

Fed. R. Crim. P. 16 ..................................................................................3, 13, 18, 19

21

Fed. R. Evid. 401 .......................................................................................................1

22

Fed. R. Evid. 403 ...................................................................................................6, 7

23

24

25

26

27

28

REPLY IN SUPPORT OF MOTION TO EXCLUDE EVIDENCE OF ANECDOTAL TEST RESULTS
UNDER FEDERAL RULES OF EVIDENCE 401-403
CR-18-00258 EJD

A federal court would never let a civil plaintiff prove a product defect claim—for example, a claim that ingesting a drug causes heart attacks—by presenting evidence that a handful of individuals out of millions who took the drug experienced a heart attack.  That kind of anecdotal evidence has no probative value because it does not establish a scientifically reliable connection between the drug and the cardiac event.  As a matter of chance, some number of people undergo heart attacks.  The fact that some people who took the drug had a heart attack may well have resulted from chance.  For this reason, federal courts demand scientifically reliable evidence of causation, not mere anecdotes.

The government wants to prove the scientific proposition that Theranos was unable to produce consistently accurate and reliable test results with anecdotes.  It wants the jury to hear from eleven customers and eleven medical professionals about instances in which customers received test results that the government claims were erroneous—instances out of the 7 to 10 million total results generated by Theranos.[1]  The government does not dispute, however, that *all* blood tests produce occasional errors, for a variety of reasons.  Any given blood test may be erroneous, for reasons having nothing to do with a defect in Theranos' technology.  The government has not explained how it can prove that the at-issue blood tests resulted from a defect, as opposed to chance.  And, absent that proof, this evidence is simply irrelevant and prejudicial.

The government concedes that it lacks the evidence—*i.e.*, data from Theranos' Laboratory Information System (LIS) database—it needs to prove in a reliable way that Theranos was incapable of consistently producing accurate and reliable test results.  It spends most of its Opposition attempting to explain why it lacks this evidence.  But "evidence missing at trial is not transformed into evidence . . . by an explanation of its absence."  *United States v. Dodd*, 391 F.3d 930, 935 (8th Cir. 2004).  The government's excuses for its loss of the LIS data do not help the government overcome its lack of

---

[1] The government also intends to introduce hearsay-within-hearsay accounts of such anecdotes through Theranos' customer-service spreadsheets, which are the subject of a separate motion, and presumably intends to introduce similar hearsay accounts through the testimony of Theranos employees. Ms. Holmes' motion clearly covers all such anecdotal testimony, including the testimony of customers. *See* Def. Mot., Dkt. 563 at 1 ("The Court should exclude under Rules 401-403 all anecdotal evidence regarding incorrect test results, including testimony of customers, doctors, or Theranos employees."). The government's footnoted claim not to understand the scope of the motion is not credible.  *See* Gov't Opp'n, Dkt. 682 at 12 n.10.

REPLY IN SUPPORT OF MOTION TO EXCLUDE EVIDENCE OF ANECDOTAL TEST RESULTS UNDER FEDERAL RULES OF EVIDENCE 401-403
CR-18-00258 EJD

1    evidence.  The reason the government lacks this evidence is because the prosecutors sat on their hands

2    for years before attempting to acquire it, and then sat on their hands again after acquiring it.  They are

3    entirely to blame.

4          The government's failure to preserve the LIS data has deprived the government of the evidence it

5    needs to attempt to prove that Theranos was not consistently able to produce accurate and reliable

6    results.  That is why the government has sought to fill the gaps in its case with (1) anecdotes, *see* Dkt.

7    560, 561, 563; (2) expert speculation based on anecdotes, *see* Dkt. 560, 561; (3) regulatory findings that

8    did not determine whether Theranos was capable of consistently producing accurate and reliable test

9    results, *see* Dkt. 573, 574, 575; (4) remedial measures taken by Theranos in an abundance of caution, *see*

10   Dkt. 572; (5) hearsay-within-hearsay anecdotes in Theranos spreadsheets, *see* Dkt. 570; and (6)

11   inflammatory hypotheticals of patient harm that never occurred, *see* Dkt. 561, 562.  None of this

12   evidence is relevant to the issues in this case.  The reason that the government has built its case on this

13   teetering card house of irrelevant evidence is that it lost—or, worse, did not want to analyze pre-

14   indictment—the actual evidence of testing results in this case.

15         The government's loss of the LIS data has another profound consequence for this case:  it has

16   deprived Ms. Holmes of evidence she needs to rebut the government's misguided allegations.  The LIS

17   data very well might have shown that the eleven customers the government wishes to introduce to the

18   jury were in fact aberrations—*i.e.*, that Theranos was consistently able to produce reliable and accurate

19   test results, and that the examples from the government are therefore statistically insignificant.  Or the

20   LIS might have revealed additional data raising doubt about the government's assertions with respect to

21   some or all of the anecdotes.  The government's presentation of unreliable anecdotes to the jury after

22   having failed to preserve the evidence that would rebut those anecdotes would raise grave due process

23   concerns.  For now, the question before the Court is whether the government's failure to preserve this

24   evidence renders the government's irrelevant, unreliable patient anecdotes relevant.  Of course it does

25   not.  The Court should exclude evidence of anecdotal test results.

26

27

28   REPLY IN SUPPORT OF MOTION TO EXCLUDE EVIDENCE OF ANECDOTAL TEST RESULTS
     UNDER FEDERAL RULES OF EVIDENCE 401-403
     CR-18-00258 EJD

1    **I.      Anecdotal Test Results Are Not Probative of Problems with Theranos Technology.**

2            The government's proffered evidence related to specific patients' test results is entirely

3    anecdotal.  *See Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1321 (9th Cir. 1995) ("*Daubert*

4    *II*") (opinion was inadmissible because expert "offer[ed] no tested or testable theory" to establish

5    causation from the "limited information" contained in plaintiffs' medical records).  One example proves

6    the point.  The government intends to call Dr. Audra Zachman to testify about pregnancy (hCG) test

7    results for *one* identified patient, B.G.  Def. Ex. 5, Dkt. 580-4 at 4.  The government has also identified

8    her patient, B.G., as a witness.  *See* Def. Ex. 72 at 2 (filed under seal).  After Ms. Holmes filed her

9    motions *in limine*, the government apparently asked Dr. Zachman to comb her files for additional

10   examples of Theranos customers who received an incorrect hCG test result.  After a "thorough review,"

11   she informed the government that there were none.  Def. Ex. 76, Dkt. 722-2 at 2.  According to Dr.

12   Zachman, "[t]he case with B.G. and her interaction with me is the only circumstance that had quant

13   values that were overtly abnormal and made a difference to her care.  Sorry I do not have more to

14   report."  *Id.*[2]

15           Just as the fact of a heart attack does not prove what caused the heart attack, the fact of an

16   incorrect blood test does not prove what caused the error.  As Ms. Holmes pointed out in her motion,

17   there is a certain amount of expected error in all laboratory blood testing (which the government's

18   proffered expert Dr. Master concedes).  *See* Def. Ex. 6, Dkt. 580-5 at 6-7 (hereinafter Master Report).

19   One study concluded that "the total [lab] testing process error rate ranges widely from 0.1% to 3.0%."

20   *See* J. Hammerling, *A Review of Medical Errors in Laboratory Diagnostics and Where We Are Today*,

21   43 LabMedicine 41 (2012).  Accordingly, any given laboratory will necessarily produce some number of

22   incorrect test results.  Additionally, there are a number of factors other than defective technology that

23   can produce inaccurate or unexpected test results in any given case, including improper specimen

24   _____

25           [2] Another document suggests that the government cherry-picked negative anecdotes.  The
     government apparently approached numerous providers who used Theranos' services, but its follow up
     was selective.  One individual wrote to the government: "We received your letter regarding [T]heranos.
26   We have only good things to say about them.  They were close by, friendly, easy to get in promptly, and
     did our labs at a very reasonable cost."  Def. Ex. 86 at 2 (FDA-CORR-000548).  The government's Rule
27   16 production reflects no follow up with this medical professional after it received this email.

28   REPLY IN SUPPORT OF MOTION TO EXCLUDE EVIDENCE OF ANECDOTAL TEST RESULTS
     UNDER FEDERAL RULES OF EVIDENCE 401-403
     CR-18-00258 EJD

1  handling, human processing error, reagent defects, and patient-specific considerations such as diet or

2  medications that may interfere with an assay.

3      ***The government does not dispute any of these facts.*** It just ignores them in its Opposition.

4  Closing its eyes to the fundamental problem in its case will not make it go away. The government does

5  not know whether B.G.'s apparently incorrect hCG result resulted from chance, a Theranos defect, or

6  some other factor. The same is true for the other anecdotal test results that it wishes to put before the

7  jury. Absent a reliable causal connection, and there is none, none of this evidence has any relevance.

8      The government likewise does not dispute that the Federal Judicial Center, federal courts around

9  the country, and expert regulatory agencies such as the FDA caution against drawing scientific

10  conclusions from anecdotes. *See* Def. Mot., Dkt. 563 at 3-6. As the Federal Judicial Center's *Reference*

11  *Manual on Scientific Evidence* explains, anecdotal reports like the government's examples "are not even

12  sufficient to show association, because there is no comparison group." Fed. Judicial Ctr., *Reference*

13  *Manual on Scientific Evidence* 217-18 (3d ed.). That is exactly the problem here: the government has

14  no comparison group. For example, it has not attempted to determine the error rate for Theranos' hCG

15  test or to compare that rate to the rate that occurs by chance across other clinical laboratories. Without

16  that information, any individual incorrect test is simply irrelevant.

17      The government resists any comparison to the standards for admitting expert evidence in civil

18  cases. Gov't Opp'n, Dkt. 682 at 12. According to the government, even if an expert cannot rely on

19  anecdotes to prove causation, the government can put "victim" anecdotes before the jury and ask the

20  jury to draw its own scientific conclusion that a defect in Theranos' technology caused the incorrect

21  result. *Id*. at 12-13. As an initial matter, the government has not even established that many of its

22  proposed customer witnesses are "victims" because there is no evidence that many of them paid for their

23  tests. To the extent the government is claiming that testimony by "victims" that they received an

24  inaccurate tests proves that they were "defrauded," *id*. at 9, 12-13, that argument could only support the

25  testimony of customers who paid for their blood tests.

26      In any event, the government's proposition is completely backwards. If an expert cannot draw a

27

28  REPLY IN SUPPORT OF MOTION TO EXCLUDE EVIDENCE OF ANECDOTAL TEST RESULTS
UNDER FEDERAL RULES OF EVIDENCE 401-403
CR-18-00258 EJD

reliable conclusion about causation from anecdotes, neither can a lay jury.  The government cites no case permitting the party with the burden of proof, whether in a criminal or civil case, to prove a scientific proposition in this slapdash fashion.[3]  And, lest there be any doubt, that is exactly what the government intends to do with these anecdotes.  According to the government, the mere fact that a customer received an incorrect test proves that she was "defrauded."  *Id*.  That is wrong, for all the reasons just stated.

The government also claims that these anecdotes are relevant to materiality and Ms. Holmes' intent.  *Id*. at 12-13.  Ms. Holmes has addressed the government's materiality argument in her Reply in Support of Motion To Exclude Customer Impact Evidence ("Customer Impact Evidence Reply"), Dkt. 706 at 3-4.  The fact of any particular test result does not prove the materiality of representations about the accuracy and reliability of test results as a general matter.  And the government offers no explanation whatsoever related to Ms. Holmes' intent, other than to gesture to its Opposition to Ms. Holmes' Mot. To Exclude Customer Impact Evidence, Dkt. 676.  For the reasons explained in Ms. Holmes' Customer Impact Evidence Reply, Dkt. 706, customers' accounts (or doctors' speculation) of collateral effects are irrelevant to Ms. Holmes' supposed intent to commit wire fraud.

Finally, the government claims that it will prove its case that Theranos was not consistently capable of producing accurate and reliable test results in other ways—namely, through reports by CMS and FDA inspectors who conducted inspections of Theranos that did not determine whether Theranos' test results were accurate or reliable.  Ms. Holmes has responded to the government's arguments regarding those inspections in other reply briefs; neither proves that Theranos' blood tests were inaccurate and unreliable.  *See* Dkts. 716, 717.  For purposes of the present motion, the government does not explain how evidence related to the CMS and FDA inspections renders these irrelevant anecdotes admissible.  None of the evidence cited by the government solves the evidentiary flaw with the government's anecdotes:  the government lacks scientifically reliable evidence establishing that these tests results resulted from a defect in Theranos' technology as opposed to the accepted variability,

---

[3] *United States v. Copple*, 24 F.3d 535 (3d Cir. 1994), which involved victim testimony as to financial loss, is irrelevant to whether isolated anecdotes can support broad extrapolations.

REPLY IN SUPPORT OF MOTION TO EXCLUDE EVIDENCE OF ANECDOTAL TEST RESULTS UNDER FEDERAL RULES OF EVIDENCE 401-403
CR-18-00258 EJD

chance, or human error.

The only other evidence the government cites is a March 2014 email concerning quality control (QC) data for several assays (none of which correlates to the exemplar patients the government discusses in its Opposition).  Dkt. 682, at 1 (citing Gov't Ex. 58, Dkt. 681-22).  The government appears to misunderstand the point of QC.  QC failures do not indicate that "it was essentially a coin toss whether the patient was getting the right result."  *Id*.  Theranos ran daily QC as part of its standard procedure for determining *whether* a given device *could* be used to report patient samples.  And under Theranos' protocols, any device that did not pass QC was *not to be used* until it had passed QC. Nothing in Government Exhibit 58 suggests that Theranos reported patient samples from devices that had abnormal QC results.

The government conspicuously does not assert in its Opposition that the testimony of its retained expert, Dr. Master, supplies the missing scientific link.  That is presumably because it recognizes, as it must, that his opinions are unreliable.  Notably, Dr. Master does not even offer opinions on all of the tests at issue in this anecdotal testimony.  For example, the government highlights a patient who received an estrogen test in its Opposition, *see* Dkt. 682, at 9, but Dr. Master does not offer any opinion on the estrogen test.  Many of the government's anecdotal examples concern the hCG (pregnancy) test, but Dr. Master conceded that he lacked sufficient data to opine that Theranos was unable consistently to produce accurate and reliable hCG results.  *See* Master Report at 15-16.  At a minimum, the government cannot permissibly put patient anecdotes before the jury when its own expert was unable to reach an opinion that Theranos was not consistently capable of producing accurate and reliable results.

**II.    Rule 403 Bars Admission of Evidence of Anecdotal Test Results.**

Even if these anecdotes had some minimal probative value with respect to the issues proffered in the government's Opposition, the Rule 403 considerations far outweigh that minimal probative value for all the reasons set forth in Ms. Holmes' motion.  *See* Def. Mot., Dkt. 563, at 5-6.  The government offered no response whatsoever under Rule 403 and thus does not dispute the unfairly prejudicial and misleading nature of the evidence.  First, the evidence will confuse and mislead the jury about what is at

REPLY IN SUPPORT OF MOTION TO EXCLUDE EVIDENCE OF ANECDOTAL TEST RESULTS
UNDER FEDERAL RULES OF EVIDENCE 401-403
CR-18-00258 EJD

6

1   issue in this case—a deprivation of property.  As noted above, the government wants to present these

2   anecdotes to the jury as proof that "victims" were "defrauded," but many of the at-issue customers

3   apparently are not "victims" under the wire-fraud statute.  Second, the jury will be confused about the

4   scientific relevance of this evidence.  Indeed, the government makes clear in its Opposition that it wants

5   the jury to draw scientific inferences from this evidence (even though its own expert could not).  Finally,

6   for the reasons detailed at length in Ms. Holmes' Motion To Exclude Customer Impact Evidence, this

7   evidence will be highly prejudicial, even if the Court excludes (as it should) inflammatory testimony

8   about the emotional impact on customers and about hypothetical ramifications that never happened.

9   *See, e.g.*, Ms. Holmes' Motion To Exclude Customer Impact Evidence, Dkt. 562 at 2 ("coma from the

10  brain shutting down"; "hemorrhaging"; "patient could die on the table").

11  **III.    The Government Lost the LIS Data, Not Ms. Holmes.**

12          Despite their obvious evidentiary weakness, the government continues to rely on the anecdotes

13  described above for a simple reason.  The government failed to gather and preserve the body of evidence

14  necessary to prove its sweeping accuracy-and-reliability allegations: Theranos' LIS database.  Rather

15  than accept responsibility for that investigative failure, and the resulting evidentiary holes in its case, the

16  government has chosen a different path.  In an attempt to shift blame elsewhere, it has presented a one-

17  sided narrative that ignores its own role in losing the LIS data and that casts aspersions on Theranos'

18  outside counsel.  The government has insinuated that the loss of the LIS data reflects on Ms. Holmes'

19  supposed guilt even though she had nothing to do with it.  It has even asked that Ms. Holmes be barred

20  from presenting argument addressing this hole in the government's case.  Ms. Holmes is compelled to

21  set the record straight.

22          **A.      Summary**

23          From the grand jury's first indictment of Ms. Holmes, the government has asserted that

24  "Theranos' technology was, in fact, not capable of consistently producing accurate and reliable results."

25  Dkt. No. 1 ¶ 16; Dkt. No. 469 ¶ 16.  This claim underpins a central theory of the prosecution—that Ms.

26  Holmes represented that Theranos' technology was accurate and reliable but knew that it was not.

27

28  REPLY IN SUPPORT OF MOTION TO EXCLUDE EVIDENCE OF ANECDOTAL TEST RESULTS
    UNDER FEDERAL RULES OF EVIDENCE 401-403
    CR-18-00258 EJD

1    Any assessment of the accuracy and reliability of a given test necessarily would require data for

2    a representative sample of the total applications of that test.  *See generally* Def. Mot., Dkt. 563.  As the

3    government concedes, such specific and comprehensive data existed in a Theranos database called the

4    Laboratory Information System, or LIS.  *See* Gov't Opp'n, Dkt. 682 at 1.  That database contained

5    *millions* of Theranos test results, and could have substantiated or debunked the government's accuracy

6    and reliability allegations.  Despite knowing about the database and its contents, the government never

7    consulted the database for the purpose of verifying those claims before asking the grand jury to return an

8    indictment against Ms. Holmes.  The government now admits that the information stored on the LIS can

9    no longer be retrieved.  *Id*.

10    The government's failure to collect and preserve this critical evidence reveals a troubling pattern

11    of shooting first and aiming later.  The government learned of the LIS and its contents no later than

12    December 2016.  Def. Ex. 87 (Theranos-DOJ TL0000004).  But, as mentioned above, the government

13    never accessed the LIS to confirm the accuracy and reliability of Theranos testing before the grand jury

14    returned its indictment in June 2018.  After the indictment, the government did not take adequate steps

15    to preserve the data in the LIS system—despite knowing that (1) the company would close imminently,

16    *see, e.g.,* Ex. 88 ¶ 21 (R. Leach Letter to L. Wade (Oct. 29, 2020) [hereinafter Gov't *Brady* Letter]), and

17    (2)  there could be complications in accessing the data stored on the LIS, *see* Def. Ex. 89

18    (WH000003121); Ex. 90 (WH000002107); Ex. 113 (filed under seal) (GJ-TRANSCRIPTS000862-63).

19    And after receiving a copy of the LIS, government lawyers did not act on the advice of government IT

20    and litigation support professionals on possible ways to access and preserve the data.  *See* Def. Ex. 88

21    ¶ 46 (Gov't *Brady* Letter).  Instead, the copy of the LIS sat undisturbed with a paralegal for over a year,

22    until "around the spring of 2020."  *Id*. ¶ 47.

23    In March 2020, just as the government produced its expert report on laboratory testing (in which

24    the government's expert concedes he lacks sufficient data to reach certain opinions), the government

25    appears to have finally grasped the importance of the LIS.  At that point, rather than accept

26    responsibility for the loss of this critical evidence, the government made broad accusations of

27

28    REPLY IN SUPPORT OF MOTION TO EXCLUDE EVIDENCE OF ANECDOTAL TEST RESULTS
UNDER FEDERAL RULES OF EVIDENCE 401-403
CR-18-00258 EJD

wrongdoing in its Rule 404(b) disclosure.  *See* Def. Ex. 1, Dkt. 580 at 9.  And in another example of shooting first, and aiming later, the government appears to have embarked on a purportedly "independent" grand jury investigation relating to the disassembly of the LIS only *after* having faulted others for the loss of the database in its initial Rule 404(b) notice.  Over nearly a year, in correspondence with defense counsel and in representations to this Court, the government has repeatedly sought to cast blame elsewhere for its own investigative failings.

In the end, the government's attempt to pin the loss of this evidence elsewhere cannot change the glaring fact that, in light of the charges it sought to pursue, the government should have obtained and preserved this evidence years ago and did not.  That failure not only prevents the government from attempting to prove that Theranos' technology was not capable of producing accurate and reliable results, but it also denies Ms. Holmes the opportunity to use a comprehensive database reflecting millions of lab results to rebut the government's scattered and anecdotal claims.  The government's failure to collect and preserve potentially exculpatory evidence, while making claims that cannot be substantiated without the very evidence that it failed to gather, raises grave constitutional questions.  If the government is allowed to proceed with its claims of inaccuracy and unreliability based on anecdotal evidence, without affording Ms. Holmes the opportunity to rebut those claims by reference to the vast data residing on the LIS database, Ms. Holmes' ability to present a complete defense and receive due process will be seriously imperiled.  *See United States v. Zaragoza-Moreira*, 780 F.3d 971, 978-82 (9th Cir. 2015) (government's knowing failure to preserve potentially exculpatory evidence violated due process and required dismissal of indictment); *United States v. Zuniga-Garcia*, 472 F. App'x 498, 499 (9th Cir. 2012) (sanctions may be appropriate even when loss of evidence does not constitute constitutional violation, depending on "the quality of the government's conduct and the degree of prejudice to the accused").[4]

---

[4] Having put the loss of the LIS at the center of the case through its Rule 404(b) notices, in-court representations, and its Opposition to this Motion, the government is now refusing to produce evidence suggesting that the government and others—and not Ms. Holmes—are responsible for the loss of the data residing on the LIS.  *See* Def. Ex. 91 (L. Wade Email to R. Leach (Feb. 4, 2021)).  Ms. Holmes intends to seek those materials in a forthcoming motion to compel.  *See Brady v. Maryland*, 373 U.S. 83 (1963).

REPLY IN SUPPORT OF MOTION TO EXCLUDE EVIDENCE OF ANECDOTAL TEST RESULTS
UNDER FEDERAL RULES OF EVIDENCE 401-403
CR-18-00258 EJD

B.       **Importance of the LIS**

In its Opposition, the government has correctly described the importance of the evidence contained in the LIS.  The LIS "was the most comprehensive company repository of clinical information."  Gov't Opp'n, Dkt. 682 at 2 (quoting Gov't Ex. 62, Dkt. 681-26).  The database contained data from tests administered during "the three years that Theranos tested patients' blood."  *Id*. at 1.  That data reflected "millions of patient tests," *id*. at 1, and included "patient contact info, doctor contact info, test data and results," *id*. at 2 (quoting Gov't Ex. 62, Dkt. 681-26), and "all QC data," *id*. at 1.  What is more, as the government recounts, the database provided "immense functionality."  *Id*. at 3.  Users "could query the database," sorting and sifting through vast troves of data "by test result," "type of analyzer," and other metrics.  *Id*.  As a result, with no more than "a few clicks on the keyboard," users could have ascertained "how many errors were flagged" for specific Theranos tests.  *Id*.  Users could determine whether a proprietary Theranos analyzer or other technology produced any given test result.  Searches of the kind the government describes could have addressed the very question the government seeks to put to the jury—whether Theranos' technology was systematically inaccurate and unreliable.

The LIS evidence could shed light on, and provide needed context for, specific pieces of anecdotal evidence on which the government now relies.  For example, Dr. Master's expert report is replete with conclusions that rest solely on anecdotal evidence.  *See* Master Report at 14-16.  Take his assessment of Theranos' Potassium test, which Dr. Master deemed "not . . . accurate" on the basis of a single email reporting that 17% of fingerstick measurements for the month of April 2014 were "abnormally high."  *Id*. at 14-15.  With the LIS data, Ms. Holmes could verify the accuracy of the statement in that email by consulting the actual data from the time in question.  In addition, Ms. Holmes could assess basic facts surrounding the application of the Potassium test during the period at issue.  Ms. Holmes could identify how many Potassium results were generated in April 2014 to determine whether the 17% rate was accurate or based on a meaningful amount of data.  She could review the data for all Potassium test results over the three-year period, to assess whether the 17% number was a representative

REPLY IN SUPPORT OF MOTION TO EXCLUDE EVIDENCE OF ANECDOTAL TEST RESULTS
UNDER FEDERAL RULES OF EVIDENCE 401-403
CR-18-00258 EJD

1  sample.  She could review the refined data associated with each test[5] to try to ascertain the root cause of

2  the issue, and the effect of any corrective steps taken.  This type of data analysis is essential to

3  determining whether any errors fell within the expected or allowable error rate, and whether any errors

4  were in fact were attributable to Theranos technology.  Such evidence would have been highly probative

5  not only as to the accuracy and reliability of Theranos technology, but also to Ms. Holmes' state of mind

6  in describing that technology.  If errors fell within an allowable error rate—or were attributable to

7  factors other than Theranos' technology—Ms. Holmes can hardly be said to have known "that

8  Theranos' technology was, in fact, not capable of consistently producing accurate and reliable results."

9  Dkt. 469 ¶ 16.

10     The same goes for the government's allegations relating to quality control (QC) testing in

11  connection with the Vitamin D test.  Master Report at 12-13; *see* Def. Reply, Dkt. 704.  Armed with the

12  now-lost evidence from the LIS, Ms. Holmes could have consulted "all of the QC data" for Vitamin D—

13  rather than the isolated hearsay snippets quoted from the CMS Report.  Gov't Opp'n, Dkt. 682.  And

14  critically, Ms. Holmes could have determined whether patient test results were actually delivered using

15  devices that had failed Theranos' daily quality control protocol (and where the quality issue had not yet

16  been addressed).

17     The LIS data also would have been indispensable in responding to the government's proffered

18  anecdotal evidence based on the testimony of doctors.  For example, the government has noticed the

19  testimony of JoEllen Embry, through whom the government apparently intends to introduce evidence of

20  anecdotal issues with testosterone.  *See* Def. Ex. 4, Dkt. 580-3 at 3; Def. Ex. 5, Dkt. 580-4 at 5.  The

21  government has yet to identify the specific patient results to which she will apply her opinions (which is

22  grounds to exclude her opinions).  But a recently produced interview memorandum appears to capture

23  Ms. Embry's questions about why certain of her patients received particular testosterone results.  *See*

24

---

25     [5] Tracked data included, among other things, detailed patient information, the identity of the
       physician who ordered the test, that physician's practice, the provider's office location, the testing
26     location, the draw type (finger stick or venipuncture), details regarding the labs that were ordered, the
       laboratory at which the tests were run, the performed test, the collection container, the blood-container
27     barcode used to track results, and the reference range for each test.

28  REPLY IN SUPPORT OF MOTION TO EXCLUDE EVIDENCE OF ANECDOTAL TEST RESULTS
    UNDER FEDERAL RULES OF EVIDENCE 401-403
    CR-18-00258 EJD

1    Def. Ex. 92 (US-REPORTS-0023800).  It is not clear which of these she raised with Theranos.  Without

2    access to LIS, there is no way to investigate her questions.  Were these tests run on Theranos technology

3    or on FDA-approved devices?  Are there any indications that the device(s) on which they were run were

4    running high or low, based on a comparison to other data?  Are there commonalities between the

5    questionable results, including regarding the location, draw, timing, method, or technician, which would

6    suggest that some factor unrelated to Theranos' technology caused the abnormal results?  And upon

7    investigation, how many of the results appear questionable?  Is it a statistically significant number?  The

8    same is true for the other doctors' anecdotal cases of unexpected laboratory results.

9        **C.    The Government's Failure to Access LIS Before the Indictment.**

10        The record reveals a troubling failure on the part of the government to take steps necessary to

11    consult the LIS before seeking an indictment from the grand jury.  The government learned about the

12    LIS and its contents no later than December 2016—eighteen months before the indictment.  Def. Ex. 87

13    (Theranos-DOJ TL0000004).  Specifically, Theranos' outside counsel, WilmerHale, informed the

14    government that a production derived from the LIS contained the following information regarding each

15    result:

16    - "Year and month of the patient visit;

17    - The accession number associated with the patient visit;

18    - A description of each test and result;

19    - Identification of whether the result was direct or calculated;

20    - Identification of the lab that produced the result;

21    - Identification of whether the result was produced using a proprietary calculation or method; and

22    - Identification of the device that produced the result."

23    *Id*. at 2.  The SEC also investigated the LIS in 2016 and 2017.  Def. Ex. 88 ¶¶ 6-7, 9-10 (Gov't *Brady*

24    Letter).  As the investigation continued, the government held "several" calls with WilmerHale relating to

25    the production of lab blood test reports from the LIS, and received at least one such production from the

26    database.  *Id*. at 12, ¶ 19.

27

28    REPLY IN SUPPORT OF MOTION TO EXCLUDE EVIDENCE OF ANECDOTAL TEST RESULTS
     UNDER FEDERAL RULES OF EVIDENCE 401-403
     CR-18-00258 EJD
                                                    12

1    While the government requested discrete information from the LIS, *see* Def. Ex. 93

2  (TheranosABC00042459); Ex. 89 (WH000003121), there is no indication in the government's Rule 16

3  production that the government had any intention to use the LIS database to assess inaccuracy or

4  unreliability.  For example, in its communications with WilmerHale, the government never expressed an

5  interest in gathering comprehensive data for all of the tests it now claims were unreliable—or even

6  comprehensive data for all tests delivered to the particular doctors who are now making claims about

7  supposed inaccuracies.

8    **D.    The Government's Failure to Preserve the LIS**

9    The government did not subpoena the LIS until June 4, 2018, when Theranos was on its last legs,

10  with limited cash and a skeleton crew of employees.  Ex. 94.[6]  The government carefully monitored

11  Theranos' financial condition in 2017 and 2018.  Ex. 88 at 8-10, ¶¶ 17-24 (Gov't *Brady* Letter), 26; *id.*

12  at 12, ¶ 21.  By spring 2018, a senior Theranos employee had informed the government that the

13  company's financial "runway" would end by July of that year.  *Id.* at 12, ¶ 21.  According to a press

14  report in the government's possession, once the company's cash reserves dipped below a certain

15  threshold (expected to occur in summer 2018), under the terms of the company's loan agreement with a

16  private equity firm, that firm could "seize the company's assets and [] liquidate them."  Def. Ex. 95 at 2

17  (USAO-007265).

18    The government was also on notice by late spring 2018 that there could be complications

19  associated with accessing the LIS.  On a May 23, 2018 call, WilmerHale told the government that "it

20  was not feasible to simply provide a copy of the LIS database, because they would not have the

21  experience with the system to understand how to compile the data they wanted."  Def. Ex. 89

22  (WH000003121 at 3123).  As a WilmerHale attorney relayed in an email the day after the LIS subpoena

23  issued, "I've told ██████████████ that they won't know what to do with it [*i.e.*, the LIS]."  Def.

24  Ex. 90 (WH000002107).  ████████████████████████████████████████

25  ████████████████████████████████████████████

26  ───────────────────

27    [6] The return date of the subpoena was June 14, 2018—the date the grand jury returned an
indictment against Ms. Holmes.  Dkt. 1.

28  REPLY IN SUPPORT OF MOTION TO EXCLUDE EVIDENCE OF ANECDOTAL TEST RESULTS
UNDER FEDERAL RULES OF EVIDENCE 401-403
CR-18-00258 EJD

1 ████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████

4 ███████████████████████

5      The company's imminent closure and the potential impediments to securing the data located on

6 the LIS did not, however, spur the government to take readily available steps to secure the contents of

7 the LIS in summer 2018.  For example, the government did not acquire the third-party, publicly

8 available software necessary to access the database.  *See* Def. Ex. 96 (USAO-008868); Def. Ex. 97

9 (WH000005242 at 5246-47).  (A government litigation support professional later complained that the

10 government lacked the software to access a database of the LIS' size.  Def. Ex. 88 ¶ 46 (Gov't *Brady*

11 Letter).)  Nor did the government attempt to take physical possession of the database—despite sending a

12 truck to Theranos to collect various other devices.  *See* Def. Ex. 98 (WH000000552).  The government

13 also considered and decided not to "go the search warrant route" to take control of the database before it

14 would be dismantled.  Def. Ex. 97 (WH000005242).

15      When the government finally obtained a hard drive containing a copy of the LIS, it did precious

16 little with it for nearly two years.[7]  Following receipt of the hard drive, and notwithstanding the

17 imminent closure of Theranos facilities, the government took *three weeks* to enter the password to the

18 database copy (a task that takes minutes, not weeks).[8]  Def. Ex. 88 ¶¶ 36, 43 (Gov't *Brady* Letter).  It

19 then took another two and a half weeks for U.S. Attorney's Office (USAO) support personnel to

20 recognize that the data were complicated (a fact that had been conveyed to government counsel months

21

22     [7] Theranos transmitted a copy of the LIS to the government on August 27, 2018.  Gov't Ex. 71,
Dkt. 681-35; Def. Ex. 99 (USAO-008988).  Shortly thereafter, Theranos disassembled the servers

23 hosting the LIS and moved them to storage, as Theranos discontinued the lease for the Newark facility
where the LIS was located.  This was one of the company's final acts; the Theranos assignee went "live"

24 approximately two weeks later.  Def. Ex. 100 (USAO-008660).

25     [8] The file was produced in native format on an encrypted hard drive, with a password to the hard
drive provided by separate cover on the same date.  Def. Ex. 99 (USAO-008988).  It appears that the

26 LIS files contained on the hard drive remained encrypted and were accessible via a separate encryption
key that had been maintained at Theranos, though there is no evidence that the government even

27 attempted to open these files at the time they were produced.

28 REPLY IN SUPPORT OF MOTION TO EXCLUDE EVIDENCE OF ANECDOTAL TEST RESULTS
UNDER FEDERAL RULES OF EVIDENCE 401-403
CR-18-00258 EJD

1  earlier, *see supra* p. 14) and that due to the size and complexity of the produced copy, the government

2  would not be able to load the data on software it possessed. *Id*. ¶ 46.[9]

3      Out of their depth and unable to access and process the LIS, USAO support personnel repeatedly

4  advised government counsel on various steps they might take to access the data. *Id*. ¶¶ 46-47, 49.

5  Contrary to the advice of its own professionals, the government did not acquire the Microsoft SQL

6  software needed to access the data; did not investigate ways to access or decrypt the data; did not seek to

7  obtain the servers on which the LIS database resided; and did not hire any experts to advise it on these

8  technical issues—or bring in FBI forensic specialists—to advise it on ways in which the LIS database

9  could be restored. All it did was make a general inquiry of the Theranos Assignee (who was only weeks

10  into its work and knew almost nothing about the company).[10] *Id*. ¶ 48. And after the Assignee informed

11  the government that it did not know how to locate an alternate copy of the LIS (and that the copy of the

12  LIS was encrypted), the government did nothing further to seek or investigate the availability of the

13  evidence or whether the encrypted files might be decrypted,[11] and instead left the LIS copy sitting with

14  a USAO paralegal for more than a year. *Id*. ¶¶ 47-48.

15      Critically, the backup copy of the LIS furnished by WilmerHale to the government may not have

16

17      [9] The government has represented to the defense that "[s]hortly after receiving the hard drive, [it]
18  corresponded with Theranos counsel by telephone in an effort to gain access to the data." Def. Ex. 101
   at 2 (R. Leach Letter to L. Wade (July 23, 2020)). The government has never substantiated this
19  representation, either through documents or by identifying the participants in the call, despite defense
   counsel's repeated requests. *See* Def. Ex. 102 (Gov't Email to L. Wade (Feb. 19, 2021)); Def. Ex. 91 at
20  3-4 (L. Wade Email to R. Leach (Feb. 2, 2021)). Subsequent *Brady* correspondence reflects no inquiries
   of Theranos' counsel at WilmerHale to seek assistance accessing LIS database files until "March or
21  April" 2020. Def. Ex. 88 ¶ 52 (Gov't *Brady* Letter).

22      [10] The Assignee, Sherwood Partners, assumed Theranos' assets upon closure of the company in
   September 2018. As a result, the Assignee took control of Theranos' legacy servers and data. For this
23  reason, government counsel "was in contact with counsel for the assignee" in fall 2018 "on a variety of
   topics." Def. Ex. 88 ¶ 48 (Gov't *Brady* Letter).

24      [11] In March and April 2019, the government had a phone call and exchanged emails with
   Assignee's counsel relating to the encryption and closure of the LIS. In that correspondence, Assignee's
25  counsel provided a number of names of individuals familiar with the disassembly of the LIS. Def. Ex.
   88 ¶¶ 50-51 (Gov't *Brady* Letter). The government acknowledged the need to "speak to [David Taylor,
26  former general counsel and CEO of Theranos] briefly about this issue to try and get some more detail—
   and maybe find someone who can tell us more about how that happened." Def. Ex. 106 (USAO-
27  008626). The government has produced no evidence that it sought to interview Mr. Taylor or any other
   LIS-related witnesses at that time.

28  REPLY IN SUPPORT OF MOTION TO EXCLUDE EVIDENCE OF ANECDOTAL TEST RESULTS
   UNDER FEDERAL RULES OF EVIDENCE 401-403
   CR-18-00258 EJD

been the only way to access this evidence.  It was understood that the LIS could be restored from the

servers even *after* the system was put in storage.  ███████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████.  But the government never took any action to secure or preserve those

servers.  There is also evidence to suggest that the data on the LIS may have been available as late as

November 2018.  Def. Ex. 103 (TheranosABC00001770).  As time passed, the Assignee made plans to

return some servers to the lessor, *see, e.g.*, Def. Ex. 104 (TheranosABC00000268), while the others fell

into a state of disrepair, *see, e.g.*, Def. Ex. 105 (NEETEK_0000013).  The government's failure to act

meant that the servers on which the database resided were gone or unusable—as was any possibility of

gaining access to the LIS database by reconnecting the hardware.

It was not until summer 2020 that the government hired an outside expert to try to access the LIS

files, and discovered that it could not do so.  *See* Gov't Ex. 72, Dkt. 681-36.  By this time, the company

had long since ceased operations, and what remained of Theranos' sophisticated hardware was "well

past its usable life."  Def. Ex. 105 (NEETEK_000013).  According to materials produced by the

government, it appears that the LIS database is now inaccessible.

### E.    The Government's Attempts to Blame Others

Rather than accepting responsibility for an indictment lacking in evidence and its failure to

preserve critical evidence, the government has embarked on a grand-jury investigation with the goal of

blaming anyone but itself for the loss of LIS data.[12]

On the same day the government provided its expert disclosure (in which, as noted above, Dr.

Master conceded that he lacked sufficient data), the government noticed its intent to introduce a category

---

[12] The government's use of the grand jury to gather evidence for use in this case raises problems of its own.  It is well established that "the government should not use the grand jury for the sole purpose of pretrial discovery in cases in which an indictment has already been returned."  *United States* v. *Star*, 470 F.2d 1214, 1217 (9th Cir. 1972); *In re Grand Jury Subpoena Duces Tecum Dated Jan. 2, 1985 (Simels)*, 767 F.2d 26, 29 (2d Cir. 1985) ("The law is settled in this circuit and elsewhere that it is improper to utilize a Grand Jury for the sole or dominating purpose of preparing an already pending indictment for trial.").

REPLY IN SUPPORT OF MOTION TO EXCLUDE EVIDENCE OF ANECDOTAL TEST RESULTS
UNDER FEDERAL RULES OF EVIDENCE 401-403
CR-18-00258 EJD

of Rule 404(b) evidence against Ms. Holmes relating to the closure of the LIS.  In that 404(b) notice, the government claimed that the disassembly of the LIS "had the effect of obscuring or destroying detailed information regarding the specific tests Theranos conducted during the years of its clinical testing operation, *hindering the government's investigation of Defendants*."  Def. Ex. 1, Dkt. 580 at 9 (404(b) Notice of Intent to Introduce Certain Evidence (Mar. 6, 2020)); *see also* Def. Ex. 2, Dkt. 580-1 at 16 (404(b) Notice of Intent to Introduce Evidence (Apr. 3, 2020) (listing potential witnesses)).  But given the government's utter disinterest in securing and preserving the contents of the LIS, there is no evidence that (at that time) the loss of the LIS had "hindered" the government's investigation at all.[13] Based on the government disclosures, the government does not appear to have investigated the accessibility of the LIS between its March and April 2019 communications with Assignee counsel and its June 2020 retention of an outside expert to try to open the database copy it received in August 2018. *See supra* p. 16 & n. 11.  And at the time the government tendered its initial Rule 404(b) notice, the government had no evidence that Ms. Holmes had any knowledge of, or played any role in, the events surrounding  the disassembly of the LIS—and it still doesn't.[14]

When defense counsel noted that the government's March 6, 2020 Rule 404(b) notice had expanded the scope of this case, and asked the government to produce "documentary evidence or witness statements" to support the Rule 404(b) notice, Def. Ex. 107 at 1 (L. Wade Email to J. Bostic (Mar. 11, 2020) (quoting L.R. 16-1)), the government claimed that "the topics discussed in the notice have always been part of the government's investigation," *id*. at 2 (J. Bostic Email to L. Wade (Mar. 11,

---

[13] Just weeks before the government went on the offense with unsubstantiated allegations about missing evidence relating to LIS (an issue raised in March 2020 for the first time), the government had a conviction reversed by the Ninth Circuit in part because an adverse inference instruction was not given at trial.  *United States v. Burns*, 790 F. App'x 93, 95 (9th Cir. 2020).

[14] Nor did it later identify any such evidence in the hundreds of thousands of pages it obtained pursuant to numerous grand jury subpoenas.  And for good reason: Ms. Holmes played no role in those events whatsoever.  Ms. Holmes resigned from her role as CEO on June 15, immediately after she was indicted.  *See* Theranos Announces Management Transition, PR Newswire (June 15, 2018), *available at* https://www.prnewswire.com/news-releases/theranos-announces-management-transition-300667225.html (last accessed Feb. 20, 2021).  And she had no role managing or overseeing evidence preservation while she was CEO or after.  Those responsibilities fell to others in the company, with oversight and advice from inside and outside counsel.  *See, e.g.*, Def. Ex. 112 (WH000003133).

REPLY IN SUPPORT OF MOTION TO EXCLUDE EVIDENCE OF ANECDOTAL TEST RESULTS
UNDER FEDERAL RULES OF EVIDENCE 401-403
CR-18-00258 EJD

2020)).  When defense counsel again informed the government that it had received no evidence

supporting the government's Rule 404(b) contentions about the disassembly of the LIS, Def. Ex. 108 at

2 (L. Wade Letter to J. Bostic Mar. 13, 2020)), the government simply promised to "produce to you any

memoranda of interview we *subsequently prepare* in this matter," Def. Ex. 109 at 1 (J. Bostic Letter to

L. Wade (Mar. 19, 2020)) (emphasis added).

By the time of the government's supplemental 404(b) notice on April 3, 2020, it still had failed

to produce evidence relating to the closure of the LIS.  Def. Ex. 110 (L. Wade Letter to J. Bostic (Mar.

23, 2020)).  As of that date, it appears that the government had not interviewed even one witness about

the decommissioning of the LIS database.  *Id.*  In its supplemental Rule 404(b) notice, the government

wrote only that it "may call David Taylor, Eric Caddenhead, and/or a custodian of records from the

Theranos assignee" on this topic.  Def. Ex. 2, Dkt. 580-1 at 16 (Gov't Supp. 404(b) Notice (Apr. 3,

2020)).  But the government had *not interviewed any* of those individuals.  Def. Ex. 106 (USAO-

008626).  The government appears to have begun investigating the disassembly of the LIS only *after* it

accused unidentified individuals of wrongdoing in its Rule 404(b) notices.  *See* Def. Ex. 111 (US-

REPORTS-0016251 (May 7, 2021 Caddenhead 302)).[15]

Since April, the government has doubled down on its claims of wrongdoing in the disassembly

of the LIS.  Government counsel alleged in open court that "Theranos, the company, destroyed [the LIS]

data set and destroyed the ability of the government to access that data set."  7/20/2020 H'rg Tr. 56:15-

18.  In a September 2020 supplemental Rule 404(b) notice, the government argued that the "destruction

of the one database that stored all of Theranos's patient test records demonstrates consciousness of

guilt," even though it identified no evidence tying the disassembly of the database to Ms. Holmes and

could not do so.  Def. Ex. 3 at 81 (Gov't Supp. 404(b) Notice 81 (Sept. 28, 2020)).  In that same letter,

the government maintained that "the destruction of the database places the government's evidence in

context as part of a larger fraud scheme, one which Theranos was attempting to hide and conceal even

---

[15] The government did not produce a copy of the LIS to the defense until June 26, 2020, despite having possessed a copy of the database since 2018, and, among other things, having stated that it had produced all Rule 16 material in its possession as of September 16, 2019.

REPLY IN SUPPORT OF MOTION TO EXCLUDE EVIDENCE OF ANECDOTAL TEST RESULTS
UNDER FEDERAL RULES OF EVIDENCE 401-403
CR-18-00258 EJD

1   after the indictment in this case." *Id*.

2   Against this backdrop of years of failing to gather, preserve, and develop this evidence, the

3   government now seeks to deflect attention to others. *See* Gov't Opp'n, Dkt. 682 at 3-7.  The

4   government's current theory appears to be that certain Theranos personnel and the company's outside

5   counsel are responsible for the loss of the LIS data.  Even if that theory were persuasive (it is not), the

6   actions of third parties with respect to the data are irrelevant.  The government has no evidence that Ms.

7   Holmes was involved in any way in the dismantlement of the LIS—because there is none.  *Supra* p. 18

8   n. 14.[16]  The government thus cannot admit evidence that third parties caused the loss of the LIS data in

9   this case, whether under Rule 404(b) or otherwise.  *See also* Def.'s Mot. in Limine To Exclude Bad Acts

10  and False or Misleading Statements of Theranos Agents and Employees, Dkt. 565, at 4.  To be clear, the

11  lack of data is highly relevant to this case because Ms. Holmes must be permitted to point out the lack of

12  data substantiating the government's claims.  But evidence of third parties' purported roles in causing

13  the loss of that data is irrelevant because it does not bear on Ms. Holmes' guilt in any way, shape, or

14  form.

15  In any event, the government's attempt to fault Theranos' counsel for the loss of the LIS is also

16  unpersuasive, in light of the course of conduct and relative motives at play.  Whereas the government

17  has a clear motive to rehabilitate "the quality of [its] conduct" for purposes of this case, *see Zinega-*

18  *Garcia*, 472 F. App'x at 499, the company's attorneys had no motive to do anything improper in the

19  summer of 2018, as suggested by the Opposition.  Those attorneys had cooperated throughout SEC and

20  DOJ investigations, were about to move on from the Theranos matter due to the insolvency of their

21  client, and had sterling reputations from long and distinguished careers—which they had no incentive to

22  risk.  Indeed, Theranos' team of lawyers for these investigations came from one of the most prominent

23  law firms in the world, included a former United States Attorney, a former Director of Enforcement at

24  

25  [16] The government even tried to imply that Ms. Holmes' counsel may have played a part in the dismantling of LIS database in late August 2018.  Gov't Opp'n, Dkt. 682 at 9-10.  To be clear, they had no role in these events.  The government's reference to a few documents on a privilege log relating to

26  joint defense communications in this general timeframe, *id*, reflects confusion on its part regarding the subject matter of the communications.  The cited privileged documents relate to different topics and

27  have absolutely nothing to do with LIS.

28  REPLY IN SUPPORT OF MOTION TO EXCLUDE EVIDENCE OF ANECDOTAL TEST RESULTS
    UNDER FEDERAL RULES OF EVIDENCE 401-403
    CR-18-00258 EJD

1    the SEC, and many other experienced counsel who in aggregate have nearly a century of distinguished

2    legal service.  In other words, these lawyers had no motive whatsoever to destroy data to protect

3    someone who was not even their client.

4         Finally, the government maintains that Ms. Holmes "should not be permitted" to "argue at trial

5    that the government's case is 'anecdotal'" or to point out the government's failure to identify a single

6    instance of patient harm.  Gov't Opp'n, Dkt. 682, at 10.  The Court should reject those unconstitutional

7    requests out of hand.  The loss of this critical evidence—and the prosecutors' own role in that loss—is

8    highly relevant to Ms. Holmes' defense, because it goes directly to the government's failure of proof and

9    Ms. Holmes' ability to verify and rebut the government's claims.  Precluding Ms. Holmes from

10   commenting on the government's failure of proof would violate her due process right to present a

11   complete defense and her Sixth Amendment rights to counsel and to confront witnesses.[17]

12                                          **CONCLUSION**

13        For the foregoing reasons, the Court should exclude evidence of anecdotal test results received

14   by Theranos customers.

15

16   DATED:  February 23, 2021                  Respectfully submitted,

17

18                                             /s/ Amy Mason Saharia
                                               KEVIN DOWNEY
19                                             LANCE WADE
                                               AMY MASON SAHARIA
20                                             KATHERINE TREFZ
                                               Attorneys for Elizabeth Holmes
21

22

23        [17] *See, e.g., Conde v. Henry*, 198 F.3d 734, 739 (9th Cir. 2000) ("precluding [defendant's]
     attorney from arguing his theory of the defense in closing arguments" "violated [defendant's] right to
24   counsel"); *United States v. Boulware,* 384 F.3d 794, 808 (9th Cir. 2004) (reversible error when court
     excluded evidence that "directly contradicted" the government's case); *United States v. Whitman,* 771
25   F.2d 1348, 1351 (9th Cir. 1985) (reversible error when court excluded evidence that contradicted
     prosecution's theory of motive, because "once the government produced evidence from which the jury
26   could reasonably infer [] motive, appellant had the right to rebut this evidence"); *United States v.
     Solorio-Soto*, 300 F. App'x 487, 488–90 (9th Cir. 2008) (limitation on cross-examination "prevented
27   [defendant] from arguing" that government's Rule 404(b) evidence did not establish element of the
     offense and violated his right to present a complete defense).

28   REPLY IN SUPPORT OF MOTION TO EXCLUDE EVIDENCE OF ANECDOTAL TEST RESULTS
     UNDER FEDERAL RULES OF EVIDENCE 401-403
     CR-18-00258 EJD
                                             20

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 23, 2021, a copy of this filing was delivered via ECF on all counsel of record.


/s/ Amy Mason Saharia
AMY MASON SAHARIA
Attorney for Elizabeth Holmes

REPLY IN SUPPORT OF MOTION TO EXCLUDE EVIDENCE OF ANECDOTAL TEST RESULTS
UNDER FEDERAL RULES OF EVIDENCE 401-403
CR-18-00258 EJD