# Exhibit 88



*United States Attorney*
*Northern District of California*

*1301 Clay Street, Suite 340S*                    *(510) 637-3680*
*Oakland, California 94612*              *Fax  (510) 637-3724*

October 29, 2020

*By Email*

Lance Wade, Esq.
Kevin Downey, Esq.
Amy Saharia, Esq.
Katie Trefz, Esq.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, DC  20005

　　　　Re:　　*United States v. Holmes*, CR 18-258 EJD

Dear Counsel:

　　　　Pursuant to your requests for discovery, we write to alert you to the following information, which you may view as potential *Brady*, *Giglio*, or *Jencks* information.  This supplements our letter to you dated July 9, 2019.  By making these disclosures, we do not necessarily agree that this information is responsive to Rule 16, *Brady*, *Giglio*, or *Jencks*, nor do we waive any applicable privilege or protection.

　　　　　　　　　　* * * * *

　　　　1.　　Government notes of a phone call with Pete Skinner on or about January 28, 2016, state in part:

　　　　　　　privately held
　　　　　　　few SHDs
　　　　　　　　　　sophisticated
　　　　　　　　　　employees
　　　　　　　no public offering

　　　　　　　tech
　　　　　　　　　　prop – h'ware, software, chem, protocol
　　　　　　. . . .
　　　　　　　software enables TSPU and larger h'ware to hook up w/ cloud so machine can be
　　　　　　　used remotely & results viewed remotely
　　　　　　　　　　big data anal.

1

> . . . .
> co has not described to press – protocols and custom could be used by competitors
>> 4 min mile
>> don't want other to reveal possibilities
> can't disclose for competitive reasons
> . . . .
> co. did not keep control systems

2.      On or about May 20, 2016, an AUSA, FBI agents, and a Postal Inspector met with attorneys from WilmerHale and Boies Schiller.  Notes of the meeting state in part:

> 2003-2013
>> --pharmaceutical companies
>> --small clinical lab
>>> --Safeway employees blood test
> R&D lab vs. clinical lab
> now – R&D and retail operation
>> 80 PhD employees
>
> Theranos tech {          -collection process
>>>> -chemical process
>>>> -device
>>>> -software
> . . . .
> -200 tests/80 operational
> -Arizona – moderately complex
>> -not using proprietary machines
> high throughput machine – runs many at [?]

Additional notes state in part:

> 2 clinical labs:  Newark, AZ
> 750 employees, 80 Phds
> 1000 patents
>
> private co.
>> 85 investors
> . . . .
> barcode w patient name & test info
> create shipping container
> chemicals keep
>
> automation to industry
> . . . .
> software
>> apps for intake
>> automate lab

> allows to do for less cost

> cloud software – can program the TSPUs remotely
> big data implication & treat in a productive way

The additional notes also reflect statements made by Theranos' counsel about efforts the company was taking in response to the CMS review and other government inquires.

      3.    Notes by a Postal Inspector of a call or meeting with Boies Schiller on or about June 30, 2016 state in part:

> 750 employees
> 85 shareholders
> . . . .
> software innovations – smaller needle & volume for venous draws
> -Theranos using Edison for ELISA [?] (15 tests)
> CLIA waiver for 35 machine for HSVI only

      4.    Notes by a Postal Inspector of a meeting with WilmerHale, the SEC, the FBI, and others state in part:

> Examined –   QC results,
>                patient distribution
>                proficiency testing
> 60,000 voided vs. 1.5 million total tests"

      5.    Government notes of a meeting among the government, the SEC, WilmerHale, and David Taylor dated November 16, 2016 state in part:

> SB loaned $$ to the co; EH never took out
> . . . .
> have resources at right team
>
> Walgreens unraveling blew all of this up
>
> clearly errors in the lab
>
> emphasis on Edison, TSPU, + minilab = distortion
> . . . .
> 2007-2010:  all resources into R&D
>         worked w/ #
>         established POC that the device worked
>         Testing more propel, more regularly would get better data
> . . . .
> fin record keeping not precise
> . . . .
> the CLIA lab misadventure

. . . .
8/2014 – Wag increases projections, 500-2500
3 stores in PHX
5/14 – 20
41 total by 9/2014
. . . .
DNK why roll out stalled
      CFO issues
      new management
      failed Express Scrips

6.      Notes by an SEC attorney dated December 16, 2016 of a "Call with Wilmer" state in part:

<u>Prosecution update</u>
. . . .
Spreadsheet w/ LIS – response 14 &15 first stop
. . . .
LIS spreadsheet (12/9)
2 diff [?]

7.      Notes by an SEC attorney dated December 2016 of a "Call with Wilmer Hale" state in part:

3.  Spreadsheet – LIS – proprietary / third party equipment
. . . .
LIS spreadsheet – this week's production
. . . .
4.  Investor meeting this week . . . shift in strategy, return to TSPU, focus on NICUS-development

8.      Notes by an SEC attorney dated March 13, 2017 of a "Call with Winston Chan" state in part:

2/27:  Anti Kohrhonen

9.      Notes by an SEC attorney dated March 16, 2017 of a "Call with Wilmer" state in part:

2 files for 2 lab [?]
Originally used LabDaq
At some point in early 2013; decision made to [?]
      --T LIS – Intell. Property
LabDaq continued in parallel of LIS from October 2013 thru middle June 2014
Past bridge from LabDaq to LIS
Only venous collections went into LabDaq
Any finger stick is in LIS

4

Data . . . out of LabDaq file is venous
After June 2014, LIS has every record – include . . . finger v. venous
No finger stick in LabDaq @ all
LabDaq had data from demos [?]
. . . .
Can't say @ what point every tech demo is recorded in LIS
. . . .
Can try provide data in native file

--compilation of test by device
. . . .
Device "unknown" on spreadsheet?

10.     Notes by an SEC attorney dated March 16, 2017 of a "Call with Wilmer Hale"
state in part:

4.  Do they have spreadsheets showing unique tests by device?

8.  Request 13 and 14 spreadsheet
Originally used commercially available LABDAQ available system
Early 2013 – decision made to develop proprietary system
LIS, which would house data
October 2013-June 2014 – developers created abridge all data in LABDAQ in LIS
Only venous collections went into LABDAQ
All fingerstick collection in LIS
LABDAQ included pre-commercial lab data prior to Walgreens launch.
There are results that signify was conducted for demo and not lab patient
Produced only commercial testing data

*will check that can put data in excel
*will check on fingersticks prior to bridge being created

11.     Government notes of a meeting with Wilmer Hale on or about May 18, 2017 state
in part:

voided 10% of the tests – QA wasn't in place
. . . .
AZ AG
        reimb -- $ to patients, mostly going to Walgreens
        we reimbursed everyone
        AZ published a complaint
. . . .
thought it could take 1 month to get assays into box(?)
        thought a mere step from R&D to clinical lab
        PFM knew that 20 samples not suff.

12.     Undated notes of a government call with WilmerHale attorneys state in part: "data re tests – more refined, next week, 13-15."

13.     Notes by an SEC attorney dated April 16, 2017 of a "Call with Wilmer Hale" state in part:

> "Live cycle documents – when will be produced?"
> . . . .
> Tender offer on hold.  . . .

> Notes by an SEC attorney dated May 1, 2017 of a "Call with Wilmer Hale" state in part:

> $43.5 payment made today
> . . . .
> •     Don't know about company's cash position
> Company will continue with tender offer and clock starts ticking once TRO has been lifted
> . . . .
> Unproduced texts . . . will review and produce only business related texts

14.     Notes by an SEC attorney dated May 17, 2017 of a "Meeting with Wilmer Hale" state in part:

> 2       Future plans
> Tender offer – Wilson Sonsini – fundraising method has changed
> . . . .
> $60mm cash in hand left as of April
> $10mm burn rate per month
>         --over half of burn rate is legal
> Trying to get advancement of legal fees $10-15mm
>         $30mm total
>
> Walgreens – want to settle
>
> Make submissions on 5.0 through 2018
>         --Need $100m to survive until 2018
> Existing investors – not sure if existing investors will put in more $
>
> --new investors
>         Banks
>         One-off investors –wealthy families
> --monetizing the IP
> . . . .
> IP Is valuable, not a lot of prior art
>         --exploring loans secured by IP
> . . . .

6

$550mm have accepted tender offer from C-1 and C-2

15.     Notes by an SEC attorney dated November 29, 2017 of a "Call with Rob Khuzami" state in part:

███ :  Fortress wants to make sure no misunderstanding regarding the financing of Theranos
         --explain what the financing looks like
         Don't want any surprises
. . . .
Not looking to get any blessing from the SEC

███ :  We cannot give blessing
We cannot disclose parts of investigation or where is headed
███ :  we can answer any questions about use of proceeds

███ :  Don't want clients to be shocked if we say nothing
Don't want to be position where Fortress asks why we didn't warn about the transaction

███ :  Fully understand that we will not get blessing.  Encourage us to ask questions – they want to be helpful.  Believe that ████████ will attend with Fortress.

███     Feel free to reach out to Justice and we can coordinate
Noon looks fine for a meeting

16.     Notes by an SEC attorney dated June 23, 2017 of a "Call with Wilmer Hale" state in part:

(1)     Fundraising – whether secured by assets, underwriters assisting, what timing, who leading communications, term sheet, list of poss. Investors
. . . .
(6) Search terms – narrow date range
. . . .
(9)  Theranos considering a debt raise
Putting together term sheet
         --seek funds from current investors, before going out
         Need bridge capital
         Convertible notes, not secured
. . . .
Offered to C-2 investors who participated in settlement.
. . . .
Holmes texts . . . did not include intensely personal nature may exclude personally embarrassing
There is a concern that she is a public figure
         --included other private things – excluded

7

17.     Notes by an SEC attorney dated July 5, 2017 of a "Call with ███████ (Wilmer)" state in part:

> Elizabeth Holmes and David Taylor are interacting with investors.
> Company is at a critical juncture at now – will have a chilling impact on the company's survival

18.     Notes by an SEC attorney dated July 20, 2017 of a "Call with Wilmer Hale" state in part:

> (6) Fundraising . . . hoping to finalize Walgreens deal this week.

19.     Notes by an SEC attorney dated July 28, 2017 of a "Call with Wilmer Hale" state in part:

> Theranos has not received a commitment to invest
>         --has not provided term sheet to others aside from list
> Have provided the term sheet to bank
>         Applied Capital – TCP Advisory
> Provided IP to Perkins Coie – no update
>
> Company projected $43mm cash on hand
>         --had heard burn rate of $10mm per month
>
> Walgreens settlement . . . . .
> Plaintiffs injunction to stop Theranos from paying out class certification.

20.     Notes by an SEC attorney dated August 12, 2017 of a "Call with Wilmer Hale" state in part:

> (7) Still hoping to raise more capital survive longer
> Involved in a study at UCSF regarding efficacy of assays on the TSPU
>         --hoping they are on the right track
>         "whatever you think of Elizabeth and company," technology is promising
> . . . .
> Trying to do what they can with $ they have

21.     Notes by an SEC attorney dated August 7, 2017 of a "Call with Wilmer Hale" state in part:

> (2)     $43.6mm cash position
> Plan is to raise money, IP investors – no commitments

22.     Notes by an SEC attorney dated November 17, 2017 of a "Wilmer Hale Mtg" state in part:

> TS . . . believe a resolution around 17(a)(3) fits the facts
> . . . .
> 10b-5 would be devastating even if EH [?] than company
> . . . .
> Cooley & DWT are in a better position
>        --they believed they were saying when said it
>        --case is largely circumstantial
> . . . .
> Sophisticated investors . . . w/o . . . diligence
>        --inexperienced management is relevant to the state of mind
> . . . .
> Reality is the charges will be death . . . of the company
> . . . .
> DT . . . Fortress 100m debt facility
>        Targets Thanksgiving; end of month
>        Need to get certain shareholders [consent?]

23.     Undated SEC notes state in part:

> $100M debt facility with Fortress
>        --up to date on what is going on with SEC
> Targeting Thanksgiving for close – end of month
> Most of largest shareholders have been told and are supportive
> Madrone, Devos, PEER – largest shareholders will need to vote
> Against the whole IP
>        --SPV that holds IP, Fortress owns it
> Debt covenants are strong
>        --terms of loan for 3-5 years

24.     Notes by an SEC attorney dated November 29, 2017 of a "Meeting w/ John Dwyer & Steve Neal" state in part:

> If Fortress goes through; carries through end of 2018
> . . . .
> Current view is it makes company [secure?]

25.     On numerous occasions, including on December 18, 2017, government attorneys had phone calls with lawyers at WilmerHale representing Theranos. During these conversations, the parties discussed Wilmer's rolling document productions made in response to outstanding grand jury subpoenas. The conversations addressed a variety of topics, including Wilmer's set of search terms, and the government's request to Wilmer to supplement its search terms.

26.     Notes by an SEC attorney dated December 19, 2017 of a "Meeting with John and Steve" state in part:

> SN . . . If meet Fortress plan requirements, company would be ready for an IPO in ? years

JD . . . Board thinks EH should be at the helm today.  Whether she should stay on after IPO is a question, but don't want to take that off the table.
. . . .
If she cannot be the CEO of Theranos after IPO, that would be taking away the option – some value to shareholders
. . . .
The loan that company gave her to purchase the stock
      --no money changed hands
       No ill-gotten gain
The stock is going to be a significant issue

Believe the fraud, if any, would have started 2013 with the C-2 round
Believe that the investors were playing with play money and did not conduct adequate due diligence
November 2013-2015 during C2 round
. . . .
Her ability to pay is based on her salary – contingent on company going forward
She doesn't have a million dollars to give us now

    ▮ Need a multiple of her salary – millions

    27.    Notes by an SEC attorney dated February 14, 2018 of a "Call with Wilmer and Cooley" state in part:

    ▮. The language is important to EH
. . . .
The staff isn't required to plead fraud or deceit
Haven't seen anything to support that
Written and oral communications
      --gap between what was said and what was heard
Inventors were talking about potential of invention, rather than current state
Risky and ambitious plan but investors understood risks.
What happened with FDA – not relevant

    ▮ . . . communications with FDA don't have anything to do with investors.

    ▮:  client was young and inexperienced
She relied on others for their experience and put in place knowledgeable advisors
There is a stumbling on execution of business plan
 and a lack of procedures in place for a company moving forward quickly.
      -EH can live with this
SEC can typically show self-dealing
      -no self-dealing
      Acknowledgment would go a long way
Process and procedures are getting better
      --would be helpful to see in a complaint

█ :  We have the challenge of reconciling complaint with complaint against Balwani.

. . . .

█ :  This is a unique case
Have not seen misstatements that can tie to particular individual.
Citing specific misstatements will be easier to get sign-off on

. . . .

█ : . . . What is important is this be described in a manner that reflects recklessness and not a scheme intended to defraud
This is not a case where principals are keeping separate set of books.
Ample evidence of lack of maturity, rather than desire to mislead people
There are explanations for what was said

. . . .

█     is finalizing a privilege log
        Trying to work with document certification to modify.

█ :  In the process of getting tax returns and bank statements.

17.     Notes by an SEC attorney dated March 12, 2018 of a "Call with Wilmer and Cooley" state in part:

Have proposed final edits to board
Overreaching thematic point – complaint makes it seem like this was a Ponzi scheme
. . . .
Haven't tried to soften the language
. . . .
Draft of document at Wilmer's or Cooley's office
. . . .
Fraudulent scheme is stricken from the summary
Read like no intent to develop a technology that was viable

Theranos and Holmes were reckless in making these statements, often being unclear about status of technology nor did their descriptions of tech reflected current status of technology given developments to date
. . . .
Fortress warrant is not included in the 625 number

18.     Notes by an SEC attorney dated March 13, 2018 of a "Call with Cooley and Wilmer" state in part:

(2) Para 3 – "virtually every aspect" "many" fine
. . . .
Knew there was substantial cash coming in    <u>no</u>
Even if not revenue

(7) Para 93 – delete 'defrauded' in front of investors.  <u>No</u>

19.     In advance of Wilmer's March 14, 2018 production to the government that was labeled THER-2609026 through THER-2627934, and included blood test lab reports generated via Theranos' LIS and LABDAQ systems, the government and attorneys at Wilmer discussed the fact that Wilmer would be withholding from its production certain test results, such as those that reference CD4+T-Cell test results.  These telephone conversations, between Wilmer and the government, occurred over the course of several dates, on dates unknown, but likely in or around February and March 2018.

20.     Notes by an SEC attorney dated March 22, 2018 of a "Call with Jeff and John" state in part:

> (2) Theranos has funding runway through the summer.  IEEE evaluated IP
> portfolio and one of the top 3 companies – ½ billion dollars
> Will start laying off people soon

21.     On or about April 8, 2018, the government hosted an in-person meeting at the USAO in San Jose with one or more lawyers from WilmerHale regarding Theranos.  ███████ ███████ is believed to have been present for this meeting.  The government understands that WilmerHale asked for the meeting to update the government on developments at Theranos, including the purchase of some of its intellectual property by Fortress.  David Taylor was present for this meeting.  At this meeting, someone, believed to be David Taylor, stated in substance that Theranos's "runway" would last until July 2018.

22.     In or about April 2018, attorneys at WilmerHale asked to meet with government supervisors in the event the line prosecutors recommended charging the corporation.

23.     On or about April 26, 2018, ███████████████ of WilmerHale stated to the government:  "the Company will be producing all lab reports held in LIS from the commencement of retail patient testing to about September 19, 2015 (when the CTNs ceased being used), including unredacted HIV test results.  We will reproduce the lab reports from the period covered by the prior production to include these HIV test results."

24.     On or about May 4, 2018, counsel for Mr. Balwani wrote the government:

Thank you again for meeting with us last Friday with your team.  We hope that you will agree with us that Sunny's liability for Theranos-related matters, if any, will and should be fully addressed by the civil actions, including the pending SEC enforcement case in San Jose, the Attorney General's action and pending class action lawsuit in Arizona, and the pending class action lawsuit in San Jose.  As we discussed, the burden of those cases is very substantial and will fall almost entirely on Sunny's shoulders.

"If any event, I wanted to let you know that we had a discovery conference with SEC counsel yesterday, and agreed that we would receive the Commission's

initial disclosures on May 17, with the documents they obtained from third parties
to follow within a reasonable time after that, subject, we are told, to the workload
of their document processing department.  We expect to receive this material and
additional material we have requested within the next two months, or perhaps
sooner.  Although of course we understand that your office has conducted its own
investigation, we assume that the Commission's case at least overlaps with the
evidence relevant to the criminal investigation.

Whether we agree on the proper course of action in this matter, there is no
question that the case is highly complex, involving a great many documents and
witnesses, and thus if indicted would consume substantial time and resources on
both sides.  Before the government commits to that process -- which regardless of
outcome would dramatically alter not only Sunny's life but also the lives of his
family members who look to him for support and leadership -- we think that the
government as well as Sunny would benefit from a discussion of more of the
specific evidence that we will receive from the SEC, and perhaps from your office
if you are willing to provide any pre-charge discovery in the form of a reverse
proffer or otherwise.  As we discussed last Friday, we believe that even the
limited number of SEC transcripts we received only a week before our meeting
cast substantial doubt on the investor fraud allegations in the Commission's case,
particularly regarding Sunny's intent.  For this reason, we believe that the
government could only benefit from further dialogue that takes into
account  additional evidence and such of the government's charging theories that
you may be willing to share.

    25.    On or about May 10, 2108, counsel for Ms. Holmes wrote the Attorney for the
Government stating, in substance, there were two factors why no prosecution was warranted:
"virtually no evidence . . . to support a jury finding that Ms. Holmes acted with an intent to
deceive" . . . and "your office has, to date, given insufficient weight to Ms. Holmes' settlement
with the [SEC]."

    26.    On or about May 16, 2018, counsel for the government wrote WilmerHale as
follows:

    Hi Wilmer folks,

    Can we have a call today or tomorrow to talk about a few outstanding items on
    the to-do list?  So you can have the right people on the call, here are the topics
    we'd like to discuss:

    •    Timing of production of 2016 and 2017 documents, and Theranos's
    proposed privilege filter
    •    Production of additional items requested in subpoena served on April 20,
    i.e., lab data, exemplar devices, and materials re advertising / marketing
    •    Updates regarding Brad Arington's knowledge of a false statement made
    by Holmes to the FDA / CMS

Jeff and I are available toward the end of the day today and generally available tomorrow, so please let me know what times might work for you.

27.    On or about May 30, 2018, attorneys from WilmerHale stated to attorneys for the government:  "Would you guys have time for a brief conversation today with ███ and me (and perhaps David Taylor as well).  We'd like to catch up with you on the status of the Company's sales efforts."

28.    Shortly before on or about June 1, 2018, the government had a call with several attorneys at Wilmer (representing the company) and the Theranos GC.  It was said that Theranos was in the process of looking for a buyer for its assets (mainly IP).  There were several upcoming dates that were allegedly important to the sale process.  Those dates were June 15, July 15, and August 15.  It was requested that the government not indict anything or anyone, but if it did, it was requested that the government delay indictment until after August 15.  If that was not doable, it was requested that the government consider delaying until after July 15, or even June 15.  It was said that each "fifteenth" that passed without additional negative publicity would make a sale more likely.  It was also claimed that a sale was the only way investors would see ROI.

29.    Notes by an SEC attorney dated June 18, 2018 of a "Call with ███████████" state in part:

> Joint defense agreements
> PFM depo videos
> Colman depo transcripts/videos
> Website captures
> QAD preservation
>
> Extremely low on cash and people
> QAD has been preserved / website preserved

30.    On or about July 23, 2018, an attorney of a law firm representing individuals interviewed by the government stated that the attorney "wanted . . . make sure you [i.e., the government] were aware of the . . . sales of Theranos assets."  The attorney noted "[w]e have heard rumors that this was done in a manner specifically to avoid the use of the Theranos name."  The attorney referred the government to the following website:

https://www.bidspotter.com/en-gb/auction-catalogues/bschilc/catalogue-id-bschilc10084

31.    On or about July 25, 2018, an AUSA wrote several attorneys at WilmerHale as follows:

> Wilmer team,
>
> Thanks again for taking the time to speak to me the other day.  I wanted to follow up on the topics we discussed to make sure we're on track to wrap everything up

14

in the next couple weeks.  In particular, I thought it would be helpful to set some compliance deadlines as laid out below.

**Production of Devices**

Thanks for providing the description of the devices in Theranos's possession.  If you'd like us to consider postponing our request for a given model on the grounds that the company only has one copy and needs access to it in the short term, please identify which models that applies to and briefly explain the need for the company to retain possession.  Please provide this information by Monday, July 30.  As to any unique devices we don't get in this round, the government would expect Theranos to maintain them in the company's possession without altering them or relinquishing custody to any other parties.  Speaking of which, I've looked into your question regarding the anticipated request from Holmes and Balwani for those same devices.  I've found no support for the proposition that a party is excused from complying with a grand jury subpoena on the basis of a competing request from a defendant—especially where the grand jury subpoena was served first and the Rule 17 subpoena has not been issued.  It's routine, of course, for the government to take possession of unique evidence items relevant to a criminal prosecution.  Defendants have a right to inspect such evidence seized by the government, but they don't have the power to deprive the government of that evidence by making competing requests.  Please let me know if you have any authority to the contrary.  Based on our understanding of the law, we don't think it would be appropriate for Theranos to delay production to the government based on a conversation it had with defense counsel.

The deadline for compliance with the request for devices is <u>August 8, 2018</u>.  Please deliver the requested devices to the FBI or have them ready for pickup by that date.  As a reminder, that subpoena request also included samples of other proprietary devices including the sample collection device and nanotainer.

**Remaining Documents & Privilege Filter Issues**

On the topic of 2016-2017 docs, we've received one production and understand you are preparing an additional production.  The additional production will include, among other things, communications with non-lawyer third parties that were withheld based on your initial privilege filter.  Please also include in that production any non-privileged documents to, from, or mentioning Heather King.  Given her expansive role at the company and her involvement in relevant events, we can't accept a production that simply excludes anything with her name on it.  We are fine, however, with Theranos keeping ███████████ name on the privilege filter, based on your representations that his role was mainly limited to contracts and IP and the fact that any communications between him and non-lawyers outside of Theranos will be captured and produced as discussed above.

15

The deadline for compliance with this document request is <u>August 20, 2018</u>.  Please let us know by August 8 if Theranos won't comply so that we can determine next steps.

**LIS Database + Software**

I understand from our conversation that you've received the LIS database from Theranos and are preparing it for production to us next week.  To comply with the subpoena, please complete that production—including any software necessary to access and query the database—by <u>August 10, 2018</u>.

Please feel free to reach out by email or phone if you'd like to discuss any of the above.

32.   On or about July 30, 2018, an attorney with WilmerHale wrote the government:

Thank you for speaking with us, we very much appreciate your time.  Pursuant to our conversation last week, we wanted to circle back on the open items discussed on our call and in your email below.

**Production of Devices**

At this time, Theranos would appreciate postponing the requests for certain devices identified below.  Currently, only a single copy of each of these device versions exists, and the Company hopes to retain these unique devices so that it can demonstrate the evolution of its technologies to potential buyers or other potential partners.

- Theranos Bench Prototype
- Theranos Monolab
- Theranos Minilab 4.1-TC

Additionally, it appears that two miniLab 4.1 devices were incorrectly identified as the previous miniLab 4S versions.  As such, the Company will not be able to provide a version of the miniLab 4S, as most of these devices were disassembled and reused to build the miniLab 4.1 in 2015 and early 2016.  The Company is working to prepare its devices for transport and is happy to have these devices ready for pickup before August 8th (if possible, we believe scheduling a pickup for Monday, August 6th would work well on our end).  As we have discussed, we would appreciate it if this pickup could be handled with discretion.  We will provide you with a list of the devices we will have ready for pickup, and are of course happy to work with you and/or the FBI to arrange for the pickup of these devices.  Please don't hesitate to let us know if you have any other questions on this front.

**Remaining Documents & Privilege Filter Issues**

We are continuing to discuss this issue with our client and hope to get back to you shortly.  We will circle back by August 8th to let you know our preferred option(s) on this front and to discuss next steps.

**LIS Database + Software**

We are working with the Company to prepare the LIS database for production.  We have also been in touch regarding your request for additional information on any proprietary software necessary to query the LIS database, and are working with the Company to better understand this issue.  Thus far, we have determined that the following software/operating system(s) will be necessary to restore and query the database:

- Microsoft SQL Server Enterprise License on Windows Server 2012R2
- SQL Server Management Studio 2014 Management Studio or any other standard software to query SQL Server database

Because the above software/operating system(s) are technically the property of third parties, we feel it is appropriate for you to obtain access via the relevant third parties.  We are of course happy to work with you and provide any other information to assist you in this regard.

Thank you again for your time, and please don't hesitate to let us know if you have any questions or would like to discuss any of the above.  We will of course circle back on these open items per your email below.

33.     On or about August 7, 2018, an attorney for WilmerHale wrote the government:

We are prepared to turn over the devices listed below.  As we've discussed previously, these are the devices for which Theranos has more than one copy.  I also included packaging dimensions and item weights so you can coordinate appropriate sized vehicle and resources for loading.  There will be total of six (6) packages for pickup.

Please let us know when the agent or agents will be available to pick up the devices.  We have a preference for 2pm on Wednesday, August 8th, but if that time does not work on your end we can find another time that works.

**Testing Devices**
- Edison 3.5 (only THE-manufactured device used in clinical lab) -> ***Edison35_40-01006_06AUG2018.jpg (14"-W x 20"-L x 20"-H, Weight ~40lbs)***
- miniLab Tower -> ***miniLab-Tower_40-01000_06AUG2018.jpg (Pallet 28"-W x 67"-L x 28"-H, Weight ~300lbs)***
- miniLab 4.1-Full -> ***CASE_T41-C010_miniLab41-FULL_40-01016_06AUG2018.jpg (Case 28"-W x 32"-L x 26"-H, Weight ~130lbs)***

17

- miniLab 4.1-Lite (version used for UCSF study) -> **CASE_T41-C033_miniLab41-LITE_40-01019_06AUG2018.***jpg* **(Case 28"-W x 32"-L x 26"-H, Weight ~110lbs)**
- miniLab 4.1-TC V2 (current version, used in R&D for Zika) -> **CASE_T41-C023_miniLab41-TCv2_40-01024_06AUG2018.***jpg* **(Case 28"-W x 32"-L x 26"-H, Weight ~120lbs)**

**Collection Devices & Cartridges ->**
*Packed_TSCD&Cartridges_06AUG2018.jpg (small box, content pictures included for reference as described below)*
- TSCD -2 (LiHep) -> *TSCD2_50-00120_LiHEP_06AUG2018.jpg*
- TSCD -2 (EDTA)  -> *TSCD2_50-00121_EDTA_06AUG2018.jpg*
- Zika, fully assembled, with reagents (recent R&D use) -> *Cartridge_60-00186_06AUG2018.jpg*
- Training cartridges, fully assembled -> *Cartridge_60-00187_06AUG2018.jpg*

At this time, Theranos will not be providing the devices listed below because it only possesses one copy of each.  You will note the addition of two cartridges to this list.

- Theranos Bench Prototype
- Theranos Monolab
- Theranos Minilab 4.1-TC
- HSV-2 IgG Assay Cartridge
- Custom Potassium Cartridge

Please let me know if you would like to discuss or if there is a particular agent or agents with whom we should be coordinating.

The attorney attached photos of the referenced devices.

34.     On or about August 27, 2018, ███████ wrote government attorneys: "Attached please find the transmittal letter accompanying today's production of Theranos' LIS database.  The media will be delivered via courier today.  The encryption key is 7Dh$fsB!dgs&6Fes!."  On August 29, 2018, a government attorney replied:  "We've received that production—thank you.  Please provide a status update on Theranos's plans regarding the outstanding 2016-2017 documents at your earliest opportunity.  In order for us to determine appropriate next steps, it would be helpful for us to have a clear statement of the company's intentions with respect to complying with the subpoena.  Separately, we discussed obtaining the deposition transcripts from the Colman litigation.  I understand that under the protective order you needed to provide notice to certain parties.  Has that issue been resolved such that you can send us the transcripts today?"  On or about September 4, 2018, ███████████ wrote attorneys for the government: "I understand that ████ has been in touch with you to advise you that Theranos intends to make a fully responsive production next week, upon consideration of John's email below. Am I correct that you nonetheless intend to file a motion to compel (which I assume would make clear that DOJ is seeking, among other things, non-privileged

communications from lawyer custodians), notwithstanding that (1) you will shortly be getting everything you asked for (and more); and (2) John's email made quite clear that we were to contact you before COB today if we wanted to avoid motion practice (which we do)? I'm not sure what would be the relief seek in your motion, if you do intend to file one. And I'd personally find it disappointing if you do intend to file a motion where we were given time to and did consider your position — and are giving you what you've requested. I assume that you would not be using this motion to cast the Company in a negative light to support your indictments.   I am taking time away from my vacation out of the country to respond to this, and I would hope that we could have your professional courtesy."

35.     On or about September 4, 2018, ██████████ wrote to attorneys for the government: "I now understand that it is Mr. Balwani's counsel that intends to file a motion to quash the subpoena. If that is not correct, please let us know. If, however, the below is right, we would like to continue meeting and conferring."  An attorney for the government replied: "Thanks for reaching out.  I think your first email was based on a misunderstanding and that you have things straight now.  The sole purpose of a motion to compel would be to obtain the documents covered by the subpoena.  If Theranos is going to produce those documents pursuant to the subpoena and without the need for further court order, there's no need for any such motion.  I understand from speaking to ████ a few minutes ago that Theranos is processing the production now and that we'll get it as soon as it is ready next week.  I also understand that Theranos intends to produce those documents regardless of any motion that Mr. Balwani's lawyers might file in the criminal case.  If that's correct, I expect that the issue I raised in my September 1 email will be resolved with that production.  Please let me know if I'm misinformed about the company's plans.  Thanks again for taking the time to write.  I appreciate your attention to the matter and hope you enjoy the rest of your vacation."

36.     Shortly after receiving an encrypted hard drive with what was purported to be "a copy of Theranos' LIS database" on or about August 27, 2018, FBI Agent Scussel, at the direction of an attorney for the government, sent the encrypted drive by Federal Express to a paralegal in the USAO.

37.     On or about September 5, 2018, a USPIS representative not connected to the investigation forwarded to Chris McCollow a newspaper article to the effect that Theranos was shutting down.

38.     On or about September 12, 2018, ██████████ from WilmerHale stated to the government that the company was probably dissolving that day and that WilmerHale would not be able to act for the company after that. ████ indicated WilmerHale was still planning to produce a final batch of documents to the government at the end of the week.  She also provided the name of the assignee and the law firm representing the assignee.

39.     On or about September 12, 2018, a paralegal in the USAO reported to an Automated Litigation Support (ALS) supervisor with the USAO that she had two hard drives in her possession.  The paralegal indicated she had wanted to send one of the hard drives to the ALS supervisor, that is was a 1 TB drive but that she was not sure what the data size was; her computer was not detecting the data size.  The paralegal planned on sending the hard drive to the IT department of the USAO to take a look.  If the IT department was able to fix it, the paralegal

planned to have the IT department give it to the ALS supervisor.  The paralegal indicated if the IT department was able to fix it, she would execute routine ALS forms to provide details on what the paralegal wanted done.

40.     Later on or about September 12, 2018, the ALS supervisor agreed to the paralegal's plan and offered to look at the drive as well, noting ALS had its little tricks to try and coax drives to play nice.  The paralegal advised that after a call with an IT department representative the paralegal decided to send the drive directly to ALS for processing.

41.     On or about September 14, 2018, the ALS supervisor advised the paralegal, an IT department representative, and a USAO employee in the ALS unit that she had received the drive that afternoon but it was not playing nice for her either.  She reported receiving the following message on both her workstation and a standalone computer:



The ALS supervisor initially guessed that that the drive might be formatted for a Mac or simply corrupted.  She discussed the matter with an IT department supervisor and the USAO employee in the ALS unit, who wondered whether the entire drive might be encrypted as a VeraCrypt (or TrueCrypt) volume.  The ALS supervisor noted that if that were the case, the ALS unit would need a password to unlock it.  She asked whether the originator of the drive provided any documentation as to the contents and/or a password?  She provided a scan of the drive label to assist in tracking down a password.

42.     On or about September 15, 2018, the paralegal reported to the ALS supervisor, the IT department representative, and the USAO employee in the ALS unit that she had found the hard drive is password protected and provided the following password: 7Dh$fsB!dgs&6Fes!

43.     On or about September 18, 2018, the ALS supervisor advised the paralegal and the USAO employee in the ALS unit as follows:

> It looks like [the USAO employee in the ALS unit's] diagnosis was correct; we couldn't see the contents of the drive because it's a VeraCrypt volume (a drive which has been encrypted using VeraCrypt).

> Using the password you provided I was able to open it on the standalone, but now I just have further questions!

> The contents of the drive *do not* appear to be load ready files, or natives, or any kind of forensic viewer. Rather, It looks like a set of backup copies of something, probably a database (the format is .bak).

Without knowing what sort of database these are from (or if they indeed are database backups) it's very hard to figure out how we might extract the data (or even if it's possible for us to do so).

It also raised the question that perhaps these are simply backup copies of material that has already been provided to our office.

Was there any documentation provided when the drive was delivered?

If you could send along any additional info you have about this drive that would be great; I'm also happy to speak with an agent if you have a point of contact for this material.

The ALS supervisor also provided the following screenshot:



44. On or about September 20, 2018, the government spoke with attorneys from Dorsey representing the Assignee. The call participants discussed state law governing assignments for the benefit of creditors, the contract governing the assignment, board and shareholder approval, Fortress, and the Assignee's approach to privilege.

45. On or about October 4, 2018, the government paralegal advised the ALS supervisor (and attorneys for the government) of an upcoming vacation through October 19, 2018, and inquired whether she was able to find the program that would enable the government to view the hard drive (described above).

46.     On or about October 5, 2018, the ALS supervisor advised attorneys for the government and the government paralegal about issues surrounding the hard drive.  She noted she had discussions with her unit, the IT department, and the LTSC.  She said the drive does not contain material which could be processed in house or by the LTSC.  She said the drive contains 12 BAK files totaling about 830 gigabytes.  She said the .bak extension indicates that the files were most likely backup files for a Microsoft SQL database.  She said if that was correct such files would be used to restore database backups on a Microsoft SQL Server.  She said .bak is a common extension and without documentation of what the drive was meant to contain she could only make an educated guess that these were database backups.  She said because they were archive files the size of the data could increase when restored.  She said the material was not provided to the USAO in a format that can be extracted, viewed, or processed by available software.  She said the LTSC's EDD [electronic data discovery] software can only digest SQL.bak files if they are under 300 mb.  She suggested a possible route forward of pushing the producing party to see if the party could be persuaded to produce in a manner that can be viewed and processed in a standard way rather than an unspecified archive format the government could not access.  She suggested encouraging the producing party to consider handing over its physical SQL server and setting it up in a workroom.  She suggested checking with the FBI or other agencies to see if they have resources that can process large SQL database archives.  She suggested identifying a vendor who could process the material and noted the data size and labor cost could be staggering.  She offered to set up a call or meeting to discuss the issues further.

47.     On or about October 30, 2018, the government paralegal advised the ALS supervisor she had met with attorneys for the government and the group decided to pursue the options of pushing the producing party to see if it could be persuaded to produce in a manner that can be viewed and processed in a standard way rather than an unspecified archive format the government could not access and checking with the FBI or other agencies to see if they have resources that can process large SQL database archives.  The government paralegal also advised the ALS supervisor to return the hard drive when she had a chance.  Around that time, the ALS supervisor did so.  The hard drive remained in the possession of the government paralegal until around the spring of 2020.

48.     In approximately October and November of 2020, counsel for the government was in contact with counsel for the assignee at the Dorsey law firm on a variety of topics.  During those discussions, government counsel noted that the government had been unable to access the copy of the LIS database produced by Theranos.  Assignee counsel expressed a lack of surprise that the government was having difficulty accessing the database, and offered to investigate whether the assignee had the database in a different form that would facilitate the government's access.  During a subsequent conversation, assignee counsel reported back to the government that it had been unable to locate an alternative version of the LIS database that would allow access.  Assignee counsel also informed government counsel that the LIS database was encrypted and that the assignee lacked the means to decrypt it.  Assignee counsel opined that Sunny Balwani would likely be able to decrypt the database, but could not identify anyone else who they thought could accomplish the task.

49.     On or about January 14, 2019, the government paralegal advised attorneys for the government that ALS had tried to process the hard drive but does not have the software to process the discovery and proposed possible options of producing a native version, involving the

FBI computer forensics team, involving a third party, and/or reaching out to the source.  On or about January 29, 2019, the government paralegal provided a similar update.

50.     In March of 2019, government counsel contacted assignee counsel to ask some follow-up questions about how the LIS database came to be encrypted and decommissioned.  On March 21, 2019, assignee counsel emailed an attorney for the government and conveyed the assignee's understanding that Sunny Balwani and Shekar Chandrasekaran encrypted the LIS database.  In that email, assignee counsel also quoted David Taylor, former Theranos president, as stating that the LIS database was "the most comprehensive (though still not fully comprehensive) company repository of clinical information -- patient contact info, doctor contact info, test dates and results, etc.  It has, however, been decommissioned, and before the company formally closed we were advised that it be a herculean undertaking to get it up and running again."  Assignee counsel promised to speak to the assignee to determine whether they had any additional information.

51.     On March 25, 2019, assignee counsel followed up with an attorney for the government and passed along information from Jarod Wada at the assignee entity.  Wada confirmed that the assignee did not know who decommissioned the LIS database.  Wada also conveyed that Eric Caddenhead, former IT manager of Theranos heard that Shakar Chandrasekaran had been involved with the LIS database, and that Caddenhead had stated that the LIS database was maintained by a group outside of Theranos, Inc.  That email also conveyed that David Taylor had told Wada on several occasions "that the LIS was decommissioned and that prior to ABC, Theranos, Inc. had been told that it could no longer be reconstructed with the existing resources."  The assignee also reported that a company called FTI Consulting had done some work via WilmerHale on behalf of Theranos, and relayed from a representative of that company that FTI had not decommissioned the database.

52.     In or about March or April of 2020, an attorney for the government called WilmerHale attorney ████████████ and/or ████████████.  The purpose of that call was to inquire as to whether WilmerHale was in possession of additional passwords or other information that would allow the government to access the purported copy of the LIS database that had previously been produced by WilmerHale when it represented Theranos.  During that call or a follow-on call, the attorney(s) from WilmerHale confirmed that they did not have any such additional information beyond what they had provided earlier.

53.     In or about May 2020, Special Agent Scussel retrieved an encrypted hard drive from the USAO and took it to the FBI's RCFL.

54.     In or about June 2020, Special Agent Scussel retrieved an encrypted hard drive from the RCFL, returned it the grand jury file, and provided four copies to the USAO.

Very truly yours,

STEPHANIE M. HINDS
Attorney for the United States,
Acting Under Authority Conferred
By 28 U.S.C. § 515

*/s Robert S. Leach*

ROBERT S. LEACH
JEFFREY SCHENK
JOHN C. BOSTIC
VANESSA BAEHR-JONES
Assistant United States Attorneys

cc      Jeff Coopersmith, Esq. (by email)