# Exhibit 42

5/24/2021 Two FDA Inspection Reports Show Theranos' Blood-Collection 'Nanotainer' Was an Uncleared Class II Medical Device - Dark Daily

Case 5:18-cr-00258-EJD Document 807 Filed 05/27/21 Page 2 of 12





# Two FDA Inspection Reports Show Theranos' Blood-Collection 'Nanotainer' Was an Uncleared Class II Medical Device

Oct 28, 2015 | Coding, Billing, and Collections, Compliance, Legal, and Malpractice, Instruments & Equipment, Laboratory Instruments & Laboratory Equipment, Laboratory Management and Operations, Laboratory News, Laboratory Operations, Laboratory Pathology, Laboratory Testing, Management & Operations

*FDA details findings from visits by five federal inspectors at California clinical lab company over 10 days in late August and early September; heavily redacted reports outline 14 compliance deficiencies*

Two reports released Tuesday by the Food and Drug Administration (FDA) brought more bad news to Theranos, of Palo Alto, California. The clinical laboratory company has been the subject of much unwanted press coverage since October 15. In the FDA inspection reports, Theranos is required to explain or correct each of 14 "inspectional observations."

Pathologists, clinical laboratory scientists, and *in vitro* company executives who take the time to read both FDA reports about the federal agency's inspection of Theranos will find insights into how FDA assessors view the lab company's compliance with FDA regulations and requirements. There were 14 issues described in the two FDA reports.

**FDA Said Theranos Nanotainer Blood-Collection Container Is Class II Medical Device**

For example, in the first FDA report posted on the FDA's website Tuesday, the agency said the blood-collection container Theranos used when collecting finger-stick specimens from patients is a Class II Medical Device. For any Class II device, manufacturers must use special labels, meet performance standards, and conduct post-market surveillance.

However, in this first report, the FDA inspectors wrote that Theranos claimed the container, which the report called a "Capillary Tube Nanotainer," to be a Class I device, for which there are no such regulatory requirements. In other words, Theranos was using a Class II device without FDA clearance. "You are currently shipping this uncleared medical

5/24/2021 Two FDA Inspection Reports Show Theranos Blood Collection Nanotainer Was an Uncleared Class II Medical Device - Dark Daily

Case 5:18-cr-00258-EJD Document 807 Filed 05/27/21 Page 3 of 12

device in interstate commerce, between California, Arizona, and Pennsylvania," the first report stated.



**Above is an excerpt from the FDA inspection report of the Theranos facility in California. FDA inspectors wrote that the "Capillary Tube Nanotainer (CTN) … is a Class II Medical Device. You have not listed the [redacted] CTN as a Class II Medical Device." (Image excerpted from FDA report.)**

One lab administrator said using a Class II device without clearance could result in a warning letter and a potential fine. The FDA declined to comment, according to *The Wall Street Journal* (WSJ).

**Elizabeth Holmes States Nanotainer Now Only Used for FDA-Cleared HSV-1 Test**

On October 21, Theranos Founder and CEO Elizabeth Holmes told a conference in California that the company was no longer using the Nanotainer except for one FDA-cleared test, HSV-1, for which it earned FDA clearance in July. Theranos was doing venipunctures for more than 240 blood tests for consumers, she explained.

Theranos became the subject of national headlines on October 15 and 16, when the *WSJ* published front page exposés of Theranos on successive days. Among the many significant revelations made by journal reporter John Carryrou was that Theranos had ceased using its finger stick collection and Nanotainer for 239 of the 240 medical laboratory tests it offers to patients and consumers. Only specimens for the FDA-cleared HSV-1 test were being collected with a finger stick and Nanotainer.

The second FDA report appeared to address failures to comply with requirements for medical devices. Because both reports are heavily redacted, it is difficult to know what specific failures the second report addressed.

The FDA categorizes medical devices into one of three classes based on their risks and the regulatory controls needed to provide a reasonable assurance of safety and effectiveness, the FDA said. Class I devices generally pose the lowest risk to patients, and Class III devices pose the highest risks.

**FDA Receive FOIA Requests from Several News Organizations**

5/24/2021 Two FDA Inspection Reports Show Theranos Blood-Collection 'Nanotainer' Was an Uncleared Class II Medical Device - Dark Daily

Case 5:18-cr-00258-EJD Document 807 Filed 05/27/21 Page 4 of 12

According to *The Arizona Republic*, the FDA reports posted Tuesday are the result of requests the Republic and others filed under the Freedom of Information Act (FOIA).

Called Form FDA-483, the two reports do not represent a final determination regarding compliance and are not an exhaustive list of objectionable conditions, the FDA stated. "Under the law, your firm is responsible for conducting internal self-audits to identify and correct any and all violations of the quality system requirements," the reports said.

**FDA Inspectors Showed Up at Two Different Theranos Facilities in California**

One fact that most reporters seem to have missed is that FDA inspectors spent considerable time on multiple visits at two different Theranos facilities. Both reports are dated September 16, 2015, and show the dates of inspection as August 25 to September 16. The first report shows that three inspectors visited the Theranos laboratory at 7333 Gateway Blvd., in Newark, California, on four consecutive days, August 25 through August 28, and that the three inspectors returned on September 1, 2, 4, 8, 10, and 16. The second report shows two inspectors visited the Theranos lab at 1701 Page Mill Road in Palo Alto over 12 days: August 25, 26, 27, and 28, and September 1, 2, 3, 4, 9, 10, 11, and 16.

It is notable that the FDA apparently did not visit the Theranos medical lab facility in Scottsdale, Arizona. Given the facts that have been published and Theranos' statements about how it is using conventional lab analyzers to perform tests for clinical care, the absence of FDA inspections at the Scottsdale lab may be a sign that Theranos is operating a conventional clinical lab at that location. If this facility was not manufacturing or using the proprietary test devices Theranos is developing, FDA inspectors probably did not have a reason to visit this lab.

**FDA Inspectors Identified 14 Issues in Their Inspections of Two Theranos Facilities**

Among the five FDA inspectors who signed the reports, three signed the first report and two signed the second report. The first report contains nine observations, only one of which addresses the medical device issue, and the second report contains five observations, all of which seem to address the medical device issue. Heavy redactions make the reports difficult to follow.

In the reports, the FDA included brief descriptions of Theranos' response to the observations. In the first report, for Observation One, the FDA said Theranos had taken the observation "Under consideration." For Observations Two through Nine, the FDA said Theranos, "Promised to correct within seven days."

For each of the observations listed in the second report, the FDA stated Theranos, "Report corrected, not verified."

**Theranos' Legal Counsel Said Company 'Addressed and Corrected' All Observations**

5/24/2021 Two FDA Inspection Reports Show Theranos Blood Collection Nanotainer Was an Uncleared Class II Medical Device - Dark Daily

Case 5:18-cr-00258-EJD Document 807 Filed 05/27/21 Page 5 of 12

The *WSJ* reported Tuesday afternoon that Theranos' General Counsel Heather King, said via e-mail that the lab company "addressed and corrected" all the observations "at the time of, or within a week of, the inspection and have submitted documents to FDA that say so, including extensive documentation."

Theranos has issued multiple statements in response to the coverage of the *WSJ* and other news outlets. On October 15, following the first story published by the *WSJ*, Theranos stated, in part, "Today's *Wall Street Journal* story about Theranos is factually and scientifically erroneous and grounded in baseless assertions by inexperienced and disgruntled former employees and industry incumbents. Theranos presented the facts to this reporter to prove the accuracy and reliability of its tests and to directly refute these false allegations, including more than 1,000 pages of statements and documents."

For Observation Two in the first report, the FDA said, "Procedures for receiving, reviewing, and evaluating complaints by a formally designated unit have not been adequately established." Theranos has two written procedures for handling complaints, the report said, and they "do not accurately describe the entire complaint handling procedure."

**Record-Keeping and Procedures for Responding to Complaints**

Regarding the other observations in the first report, the FDA said, "Complaints involving possible failure of a device to meet any of its specifications were not reviewed, evaluated, and investigated where necessary; corrective and preventive action activities and/or results have not been documented; software **validation** for computers, automated data processing systems used as part of the quality system have not been documented; the evaluation of potential suppliers was not documented; records of acceptable suppliers have not been adequately established; procedures for device history records have not been adequately established, quality audits have not been performed."

When it listed the observations in the second report, the FDA referred to a device that is not identified in the un-redacted sections of the report but may be the Capillary Tube Nanotainer. The FDA said, "Design **validation** did not ensure the device conforms to defined user needs and intended uses … The device was not validated under actual or simulated conditions, design input requirements were not adequately documented, results of the design risk analysis were not adequately documented, documents were not reviewed and not approved by designated individual(s) prior to issuance."

**Theranos May Have Dual Regulatory Burden, Involving Both FDA and CLIA Compliance**

Sifting through the FDA reports, the issues identified by FDA inspectors, and the large number of news stories and business commentaries, some knowledgeable lab industry experts say that Theranos must work through some unique challenges. In fact, the FDA report shows that Theranos faces an unusual dilemma in the clinical lab industry. On one

5/24/2021 Two FDA Inspection Reports Show Theranos Blood-Collection Nanotainer Was an Uncleared Class II Medical Device - Dark Daily

Case 5:18-cr-00258-EJD Document 807 Filed 05/27/21 Page 6 of 12

hand, Theranos is a device manufacturer producing devices for clinical use. On the other hand, it is a clinical laboratory providing diagnostic testing services for clinical use.

Thus, because it is developing, manufacturing, and using medical devices of its own invention for clinical laboratory testing, it needs to meet FDA requirements. This requires Theranos to comply with the FDA's current quality management system requirements, known as current good manufacturing practices (CGMPs).



**One October 6, Theranos CEO Elizabeth Holmes (right) appeared with former President Bill Clinton in New York City at the Clinton Global Initiative Conference. (Photo from Holmes' Twitter account.)**

Holmes referred to the effort by Theranos to comply with the FDA CGMP in a public appearance. At the WSJDLive conference in Laguna Beach, California on October 21, Holmes stated, "We have to move, as a company, from the [clinical] lab framework and quality systems to the FDA framework and quality systems."

### All Medical Labs Performing Non-Waived Testing Must Meet CLIA Requirements

However, at the same time, there is another regulatory burden for the company. Since Theranos is performing laboratory tests for clinical purposes and has acknowledged that it is using conventional medical laboratory testing equipment for some proportion of these tests, the lab facilities performing this testing must meet Clinical Laboratory Improvement Amendments (CLIA) requirements. Laboratory-developed tests (LDTs), which Theranos has stated it uses for clinical lab testing, have aspects that must meet certain regulations of both the FDA and CLIA. This is a complex issue, as there is overlap between the two sets of regulations.

To date, most reporting in the nation's press about compliance at Theranos has not made this point clear because most reporters don't understand the complexities, similarities, and differences of FDA or CLIA.

### Comparing Lab Test Results from Theranos and Stanford University Medical Center

5/24/2021 Two FDA Inspection Reports Show Theranos Blood-Collection Nanotainer Was an Uncleared Class II Medical Device - Dark Daily

Case 5:18-cr-00258-EJD Document 807 Filed 05/27/21 Page 7 of 12

There is another issue that may have caught the attention of federal regulators. Some consumers have complained about results they received from testing by Theranos and then compared with lab test results they obtained from other labs. One example getting wide play involves [Jean-Louis Gassée](#), a former executive at Apple Computer and a well-respected expert in technology.

Gassée has the condition known as [polycythemia vera](#) (PCV) and thus undergoes testing regularly to monitor this condition. On October 18, following the news coverage published by the *WSJ*, he [posted a blog about lab test results](#) he received from testing by Theranos that he compared to lab tests done by [Stanford University Medical Center](#). Gassée saw a discrepancy in the lab test results and notified Theranos. He says that he was never contacted by a representative from the company.

At the *WSJ* conference on October 21, Holmes responded to a question about Gassée's blog and experience. [She answered](#) by saying, "He wrote me a letter and unfortunately I personally did not receive this letter. I wish he had called our call center … We absolutely are going to follow-up with him now that we're aware of this and we've done over 3.5 million tests so to take five of them out of context is just misleading."

In Phoenix, the [*Arizona Republic* published a story](#) on October 26 about Theranos. [Reporter Ken Alltucker](#) interviewed [Keith Ginsberg, MD](#), a family-practice doctor in Gilbert, Arizona. Alltucker wrote, "[Ginsberg] said he began referring patients to Theranos centers about seven months ago … Ginsberg said he has closely monitored the accuracy of lab results coming from Theranos. He believes most lab results were accurate, but he said he has referred patients to other labs if the results seem off. 'For the most part, they came back dead on,' Ginsberg said. 'We did get a few discrepancies,' and in those cases he ordered patients to get retested at another lab."

**Pathologists in CLIA-Licensed Medical Labs**

Clinical pathologists who serve as medical directors of CLIA-licensed medical laboratories will recognize the issues raised by both these anecdotes of inaccurate or discrepant lab test results produced by Theranos. The fact that a physician recognizes this discordance on several occasions and simply refers those patients to a second medical laboratory for retesting would generally trigger concerns if brought to the attention of that lab's medical director, since there is the potential for patient harm. The question is whether the Laboratory Field Services at the [California Department of Public Health](#) (which regulates clinical laboratories in California) or the CLIA officials in Arizona, have picked up on these news stories and have followed up with their own investigation into these issues.

In fact, these public disclosures of discrepant lab test results brings up another point that the national media has yet to address. The *WSJ* reported on October 15 that "The New York State Department of Health confirms that it got a formal complaint in April 2014 'in regard

5/24/2021 Two FDA Inspection Reports Show Theranos Blood-Collection Nanotainer Was an Uncleared Class II Medical Device - Dark Daily

Case 5:18-cr-00258-EJD Document 807 Filed 05/27/21 Page 8 of 12

to testing practices at Theranos and forwarded it to the Centers for Medicare and Medicaid Services."

Theranos published a statement in answer to this issue. It said, in part, "What about the complaint? The [*WSJ*] reporter referred to a purported complaint filed by a former employee with the New York State Department of Health in March 2014. This anecdote is irresponsibly reported." There is more detail in the answer, which can be read at the Theranos website.

**Audits by Federal Lab Regulators**

In its next story about Theranos on October 16 the *WSJ* wrote, "Theranos has also been audited by the Centers for Medicare and Medicaid Services, the main regulatory overseer of clinical labs, according to people familiar with the matter. A CMS spokeswoman declined to comment."

*Dark Daily* is unable to find a statement by Theranos that specially addresses visits by CLIA inspectors to its facilities as described by the *WSJ*.

The *WSJ* states that CLIA inspectors have been to Theranos. However, the CMS typically will not publish their records of inspections, the deficiencies identified during such inspections, nor the corrective actions taken by the lab. The lack of transparency in CLIA inspections, and the surprising number of times that CLIA inspectors fail to catch serious deficiencies of CLIA requirements that have the potential to cause patient harm, was the theme of an investigative report filed by Ellen Gabler of the *Milwaukee Journal Sentinel* (MJS) last May.

***Milwaukee Journal Sentinel* Investigates System of CLIA Lab Inspection**

Titled, "Weak Oversight Allows Lab Failures to Put Patients at Risk," the *MJS* article explains why the CMS doesn't make public the information about the results of CLIA inspections of labs. However, given the current interest in Theranos, it would not be surprising if national news organizations pursued FOIA requests with vigor to learn what CLIA inspectors found during their visits to Theranos.

To this point, the "inspectional observations" contained in the two FDA inspection reports would be hints that CLIA inspectors may have identified similar issues in problem resolution and in QA/QC activities that are required by CLIA. That's speculation. However, what has been mentioned in news coverage about Theranos is the serious issue of possible non-compliance with proficiency testing.

**Proficiency Testing Discussed by *The Wall Street Journal***

For example, on October 15, the *WSJ* wrote that, "In early 2014, Theranos split some of the proficiency-testing samples it got into two pieces, according to internal e-mails reviewed by the *Journal*. One was tested with Edison machines and the other with instruments from other companies. The two types of equipment gave different results when testing for

5/24/2021 Two FDA Inspection Reports Show Theranos Blood-Collection Nanotainer Was an Uncleared Class II Medical Device - Dark Daily

Case 5:18-cr-00258-EJD Document 807 Filed 05/27/21 Page 9 of 12

vitamin D, two thyroid hormones, and prostate cancer. The gap suggested to some employees that the Edison results were off, according to the internal e-mails and people familiar with the findings."

As described by the *WSJ*, these individuals recognized a proficiency testing problem that has tripped up many clinical labs. The *Journal* wrote, "The former employees say they did what they were told but were concerned that the instructions violated federal rules, which state that a lab must handle 'proficiency testing samples … in the same manner as it tests patient specimens' and by 'using the laboratory's routine methods.'"

**Theranos Issues Statement about Proficiency Testing**

Theranos issued a statement to answer the proficiency testing comments published by the *WSJ*. In part, Theranos said, "February 2014 experiment: The reporter questions the accuracy of Theranos' tests based on a February 2014 experiment using leftover proficiency-testing samples. This is wrong and misleading: the reporter does not explain that the experiment was not designed to assess the accuracy of any Theranos tests, nor was it proficiency testing. Theranos has shared its proficiency testing methods with our regulators, and our proficiency testing methods meet the regulatory requirements." There is more to this statement, which can be accessed in full on the Theranos website.

Pathologists know that CLIA inspectors pay close attention to violations of proficiency testing requirements. For example, in 2012, no less than the Ohio State University Wexner Medical Center (OSUWMC) in Columbus, Ohio, acknowledged that it faced enforcement actions including possible revocation of the lab's CLIA license because of the inadvertent referral of proficiency testing specimens by the OSUWMC lab. (See *Dark Daily*, "CLIA Officials Propose Major Sanctions against Prominent Academic Center Clinical Laboratory Due to Inadvertent Referral of Proficiency Test Referrals," August 13, 2012.

Theranos has been swift, forceful, and emphatic in its responses to the large number of news stories discussing these and other issues. But one development may be welcomed by clinical laboratory professionals and could, over time, help Theranos build the bridges it needs with pathologists, clinical chemists, and other medical laboratory scientists.

At a conference sponsored by the Cleveland Clinic on Tuesday, Elizabeth Holmes stated that Theranos was prepared to publish data about its lab tests. *The New York Times* wrote how Holmes "suggested that presenting the data would be more effective than trying to rebut articles in the news media that she said unfairly attacked the company. 'Data is a powerful thing because it speaks for itself,' she said."

The *Times* further reported that a "Theranos spokeswoman said the company would publish data comparing its technology to reference testing methods and comparing the results of tests using finger prick samples to those using conventional blood draws. She did not say when or where data would be published."

5/24/2021  Two FDA Inspection Reports Show Theranos Blood Collection 'Nanotainer' Was an Uncleared Class II Medical Device - Dark Daily

Case 5:18-cr-00258-EJD Document 807 Filed 05/27/21 Page 10 of 12

Sorting the truth from the news accounts and from the statements provided by Theranos will occupy journalists and Wall Street investors for months to come. What is true is that this latest wave of news coverage seems to be giving Theranos a reason to be more transparent about the performance of its proprietary diagnostic technology. Patients, in particular, will welcome this development, as they want to know that they can trust the test results produced by their medical laboratory provider.

*—Joseph Burns and Robert L. Michel*

**Related Information**

FDA Says Theranos Shipping Unapproved Medical Device

FDA Cites Theranos Over Unapproved Medical Device, Complaint Handling

Theranos Facts (from Theranos website)

Crisis of the Week: Theranos Reacts to Blood Test Stories

Hot Startup Theranos Has Struggled With Its Blood-Test Technology

Theranos CEO: Company Is in a 'Pause Period'

Walgreens Scrutinizes Theranos Testing

Theranos' Finger-Stick Blood Testing Gets FDA Approval

Theranos Receives CLIA Waiver, Paving the Way for Greater Accessibility of Health Information at the Time and Place it Matters

[Subscribe to E-Briefings]

# E-Briefings Categories

Coding, Billing, and Collections

Compliance, Legal, and Malpractice

dark daily home page

darkdaily.com

5/24/2021 Two FDA Inspection Reports Show Theranos Blood Collection 'Nanotainer' Was an Uncleared Class II Medical Device - Dark Daily

Case 5:18-cr-00258-EJD Document 807 Filed 05/27/21 Page 11 of 12

Digital Pathology

Instruments & Equipment

Laboratory Hiring & Human Resources

Laboratory Instruments & Laboratory Equipment

Laboratory Management and Operations

Laboratory News

Laboratory Operations

Laboratory Pathology

Laboratory Sales and Marketing

Laboratory Testing

Managed Care Contracts & Payer Reimbursement

Management & Operations

News From Dark Daily

## Dark Daily Information

**Contact:** Email us or call 512.264.7103

**Services & Products:** Webinars | White Papers | Lead Gen Programs | Special Reports | Events | E-Briefings

**Company Information:** About Us | Privacy Policy

**Related Sites:** The Dark Report | Executive War College | Lab Quality Confab

## Connect With Us



## Editorial Excellence Award Winner



HOME   DARK REPORT   LAB RESOURCES   SPECIAL REPORTS   EBRIEFINGS
WEBINARS   WHITE PAPERS   LEAD GENERATION   COVID-19   PRESS

© 2020 · The Dark Intelligence Group, Inc. All rights reserved.

;