STEPHANIE M. HINDS (CABN 154284)
Acting United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

JEFF SCHENK (CABN 234355)
JOHN C. BOSTIC (CABN 264367)
ROBERT S. LEACH (CABN 196191)
KELLY I. VOLKAR (CABN 301377)
Assistant United States Attorneys

    150 Almaden Boulevard, Suite 900
    San Jose, California 95113
    Telephone: (408) 535-5061
    Fax: (408) 535-5066
    Robert.Leach@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 18-CR-00258 EJD |
| Plaintiff, | UNITED STATES' RESPONSE TO DEFENDANT'S REQUEST FOR EXPANDED SUMMONS AND JURY QUESTIONNAIRE, AS WELL AS INDIVIDUAL *VOIR DIRE* WITH COUNSEL |
| v. | |
| ELIZABETH HOLMES, | |
| Defendant. | Date: June 15, 2021<br>Time: 10:00 a.m.<br>Court: Hon. Edward J. Davila |

U.S.' RESPONSE TO REQUEST RE
EXPANDED JURY QUESTIONNAIRE,
CASE NO. 18-258 EJD

**TABLE OF CONTENTS**

INTRODUCTION………………………………………………………………………………. 1

LEGAL STANDARD……………………………………………………………………….… 3

ARGUMENT………………………………………………………………………………….. 4

I. DEFENDANT'S PROPOSED JURY QUESTIONNAIRE IS EXCESSIVE, INVASIVE, AND UNLIKELY TO AID THE COURT IN SECURING AN IMPARTIAL JURY………… 4

    A. Defendant's asserted rationales in her motion do not support the breadth and invasiveness of her proposed jury questionnaire……………………………………… 4

    B. Defendant fails to explain why prior questionnaires used in this District are inadequate to address COVID-related and background questions…… ………………… 6

    C. The pretrial publicity regarding Theranos and Defendant does not justify her requested expanded jury questionnaire…………………………………………….. 7

II. THE GOVERNMENT AGREES THAT SOME ADDITIONAL JURY SELECTION PROCEDURES ARE WARRANTED DUE TO THE COVID-19 PANDEMIC AND PUBLICITY SURROUNDING THIS CASE…………………………………………….. 11

# TABLE OF AUTHORITIES

Cases

*Irvin v. Dowd*, 366 U.S. 717 (1961) ........................................................................................... 3

*Mackey v. Asuncion*, No. 15-CV-03165-HSG, 2018 WL 4680190 (N.D. Cal. Sept. 28, 2018) ................ 8

*Mu'Min v. Virginia*, 500 U.S. 415 (1991) ............................................................................ 3, 7, 10

*Murray v. Schiro*, 882 F.3d 778 (9th Cir. 2018) ......................................................................... 3

*Seattle Times Co. v. U.S. Dist. Ct. for W. Dist. of Washington*, 845 F.2d 1513 (9th Cir. 1988) ............ 3, 7

*Skilling v. United States*, 561 U.S. 358 (2010) ................................................................... passim

*United States v. Affleck*, 776 F.2d 1451 (10th Cir. 1985) ............................................................ 9

*United States v. Bonds*, No. 07-CR-00732 SI, 2011 WL 902207 (N.D. Cal. Mar. 14, 2011)……..   3

*United States v. Helmsley*, 733 F. Supp. 600 (S.D.N.Y. 1989) ...................................................... 9

*United States v. Hougen*, 20-CR-00432-EJD (N.D. Cal. 2020) ………………………………….. 6

*United States v. Hussain*, 16-CR-00462-CRB, (N.D. Cal. 2018)………………….. ……………… 6

*United States v. Kail*, 18-CR-00172-BLF (N.D. Cal. 2021)…………………………………………6

*United States v. Pac. Gas & Elec. Co.*, No. 14-CR-00175-TEH (N.D. Cal. 2016)………………… 3, 12

*United States v. Rocha*, 19-CR-00382-EJD (N.D. Cal. 2021)…………………………………….6

*United States v. Tsarnaev*, 968 F.3d 24 (1st Cir. 2020) ............................................................... 9

*United States v. Wittig*, 2005 WL 758605 (D. Kan. 2005) ............................................................ 9

# INTRODUCTION

To select a jury in this wire fraud case, which involves misrepresentations by a private Silicon Valley company and its executives, Defendant Elizabeth Holmes urges four deviations from the typical jury selection process, citing "pervasive" and "pervasively negative" pretrial publicity in this case and COVID-19 as justification. ECF No. 799 (Defendant's Request for Expanded Summons and Jury Questionnaire, as well as Individual *Voir Dire* with Counsel ("Mot.")) at 1–6. Specifically, Defendant asks the Court to employ a 45-page jury questionnaire comprising more than 112 questions (with dozens of subparts), which, as best the government can discern, is unprecedented in this District and in other similar fraud cases. *See* ECF No. 808.

While the government agrees that the Court should, through the entire *voir dire* process, ensure pretrial publicity does not result in a biased jury and adequately screen for any unique COVID-19 complications, Defendant's proposed questionnaire goes far beyond that and, if accepted, will promote gamesmanship in and protraction of the jury selection process in this case. The questionnaire Defendant proposes is far too long, deeply intrusive of potential jurors' privacy in unnecessary ways, argumentative and repetitive, and does more to potentially bias the jury in her favor than to aid in selecting a fair and impartial jury representing a cross-section of the local public. Through questions untethered to pretrial publicity and COVID-19 (*e.g.*, "41. Do you have investments? . . . If yes, [which type] Savings Accounts; Stocks . . . "; "42. Do you have health insurance?" and who provides it; 51(e). "Do you belong to any groups on social media . . . ?"; 51(f). "[D]escribe the websites or social media platforms that you have used; the types of things you have posted or blogged . . . ."; 54. "[How frequently d]o you watch or listen to . . . Hulu [and] Netflix . . . [?]") (ECF No. 808 at 19, 22, 26), Defendant's questionnaire appears designed—not to obtain a fair and impartial venire—but to isolate jurors that fit a certain profile she considers favorable. Tellingly, the two main rationales Defendant asserts for justifying such an excessive questionnaire—pretrial publicity and COVID-19—relate to approximately 14 out of 112 questions she proposes. Those concerns are adequately addressed by the government's proposed questionnaire—and certainly do not require the wholesale revision of the standard questionnaire that Defendant seeks.

1    The government respectfully requests the Court use the 10-page, 51-question jury questionnaire that the government submitted (ECF No. 802), which aligns with the typical practice in this District and was drawn largely from recently used questionnaires in this District that address COVID-19 concerns.[1] The government submits this questionnaire with limited additional measures will aid the Court in selecting an impartial jury for trial.

In addition to her unduly excessive and burdensome jury questionnaire, Defendant requests an expanded distribution of summons, meet-and-confer by the parties prior to *voir dire*, and individual *voir dire* by the Court and counsel. Mot. at 1–2. The government agrees expanded distribution of summons may be appropriate and, of course, will meet and confer in good faith prior to *voir dire* to avoid unnecessary disputes for the Court's resolution and to facilitate the jury selection process. The government also agrees in principle that individualized *voir dire* is an additional tool the Court may wish to use with a limited subset of prospective jurors as necessary to ensure an impartial jury is selected for trial. But the government respectfully submits this issue is not ripe for resolution and the Court should await responses from the questionnaire before issuing a blanket order that individualized *voir dire* is necessary for the entire venire under all circumstances. The government submits much, if not all, of the panel can be fairly, effectively, and efficiently examined as a group without exposing individual prospective jurors to information that will irrevocably disqualify them from service.

//

//

//

//

---

[1] On May 5, 2021, while counsel for the parties participated in the hearing on the motions *in limine*, Defendant sent a proposed jury questionnaire. On May 11, 2021, the government asked why Defendant's proposed questionnaire did not include any questions related to Defendant's Rule 12.2 defense. On May 12, 2021, the government objected to Defendant's questionnaire, provided exemplars of questionnaires recently used in this District, and expressed a willingness to review any revision that aligned more closely with the exemplars. On May 20, 2021, Defendant responded to the government's email but never referenced the exemplars or the government's stated objections. ECF No. 807-9. A few days later, the government sent a draft of its proposed questionnaire, ultimately filed with the Court (ECF No. 802), which tracked the exemplars from this District along with additional questions to address the pretrial publicity this case has received.

## LEGAL STANDARD

Criminal defendants have the right to a trial by an impartial jury under the Sixth Amendment. *Skilling v. United States*, 561 U.S. 358, 377–78 (2010). But "juror *impartiality* . . . does not require *ignorance*." *Id.* at 381 (original emphasis) (citing *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)). Indeed, the Ninth Circuit has clearly held that "pervasive publicity, without more, does not automatically result in an unfair trial." *Seattle Times Co. v. U.S. Dist. Ct. for W. Dist. of Washington*, 845 F.2d 1513, 1517 (9th Cir. 1988). Rather, courts must look to a number of factors, including the publicity's "capacity to inflame and prejudice the entire community" such as in "cases involving lurid subject matter, particularly violent crimes[.]" *Id.* at 1517–18; *see also Murray v. Schiro*, 882 F.3d 778, 802 (9th Cir. 2018). Other factors include "the size and characteristics of the community in which the crime occurred[,]" whether news stories contain a "confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight[,]" and the amount of time that has elapsed between the newsworthy events and jury selection. *Skilling*, 561 U.S. at 382–83; *Seattle Times*, 845 F.2d at 1517–18. In sum, "pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial." *Skilling*, 561 U.S. at 384 (quotation omitted).

Appellate courts ultimately place "primary reliance on the judgment of the trial court" when pretrial publicity is at issue because the judge "sits in the locale where the publicity is said to have had its effect" and may base his evaluation on his "own perception of the depth and extent of news stories that might influence a juror" to determine "how detailed an inquiry to make of the members of the jury venire." *Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991). For example, courts in this District have acknowledged that jury questionnaires can be helpful tools during the jury selection process. *See, e.g.*, *United States v. Bonds*, No. 07-CR-00732 SI, 2011 WL 902207, at *3 (N.D. Cal. Mar. 14, 2011) ("Written jury questionnaires are meant to help facilitate the jury selection process" but they "are only part of the jury selection process to the extent that they are used to select jurors"). But questionnaires are not required. *See, e.g.*, *United States v. Pac. Gas & Elec. Co. ("PG&E")*, No. 14-CR-00175-TEH, Dkts. 297, 641, 658, 667 (N.D. Cal. 2016) (orally denying defendant's request for expanded jury questionnaire because the parties could ask additional questions during *voir dire*).

# ARGUMENT

I. **DEFENDANT'S PROPOSED JURY QUESTIONNAIRE IS EXCESSIVE, INVASIVE, AND UNLIKELY TO AID THE COURT IN SECURING AN IMPARTIAL JURY**

Defendant requests "that the standard jury questionnaire [ ] be expanded in three ways" to address: (i) "exposure to prejudicial pretrial coverage of Ms. Holmes, Theranos, and this case"; (ii) "prospective juror[s'] experience with the COVID-19 pandemic"; and (iii) "questions ordinarily reserved for in-person *voir dire* in order to streamline that process." Mot. at 8. While Defendant does not explicitly identify the additional questions she asserts satisfy these three justifications for expansion, her proposed jury questionnaire has headings entitled "Preliminary Matters," "Background," "Life Experience," and "Media Habits and Exposure" that include 58 questions out of the total 112 questions. ECF No. 808.

## A. Defendant's asserted rationales in her motion do not support the breadth and invasiveness of her proposed jury questionnaire

As a threshold matter, the reasons Defendant submits to the Court purportedly justifying the expansive 112-question jury questionnaire account for only half of the questions proposed. The majority of Defendant's motion focuses on the publicity that she and Theranos received as justifying additional measures to protect against a biased jury. Mot. at 1, 3–11. But her proposed questionnaire only seeks to include 10 out of 112 questions under the "Media Habits and Exposure" topic—and even those are overly broad as discussed in Section I.C. *See* ECF No. 808 at 21–28. Defendant's second asserted rationale for an expanded jury questionnaire is to address concerns related to the COVID-19 pandemic. Mot. at 11–12. But her proposed questionnaire only includes 4 out of 112 questions on this topic. ECF No. 808 at 7. Defendant's final asserted rationale for an expanded jury questionnaire is to streamline in-person *voir dire*. Mot. at 11. While Defendant does not identify which specific questions fall within this category, her motion references "a greater number of questions about jurors' life experiences and perspectives," which seems to correlate to the section of her proposed questionnaire entitled "Life Experience" and perhaps "Background." ECF No. 808 at 8–20. These two sections include 37 questions (*id.*), many of which overlap with those proposed by the government, as described

in the next section. Even if the Court were inclined to agree with Defendant that any of her asserted rationales supported expanding the jury questionnaire, she does not even attempt to justify roughly half of the questions she proposed in her submitted questionnaire.[2]

Moreover, Defendant's proposed questions, in all categories, are vastly overbroad and invasive, and will not aid the Court in distilling from the responses any potentially biased prospective jurors. For example, Defendant does not—and cannot—support the breadth of her proposed questions which ask prospective jurors whether and how much they use social media, whether they read or listen to blog posts, podcasts, or social media posts connected with more than 15 journalists, and whether and how frequently they read 46 different newspapers (including *The New York Times* and *The Wall Street Journal*) or magazines (including *People* and *Fortune*) or watch or listen to 19 networks (including Netflix, Hulu, and NPR). ECF No. 808 at 21–28. The questionnaire also asks prospective jurors their views on the fairness or accuracy of the media as a whole. *Id.* at 28. These questions serve no purpose beyond providing details about prospective jurors' media use and consumption habits without any connection to Defendant, Theranos, or the facts of this particular case. Some of Defendant's proposed questions are even more invasive into prospective jurors' private lives—without any connection to this case—such as: whether or not they have health insurance and who provides it, which groups on social media prospective jurors belong to, if any, what the jurors have posted or blogged about on social media, topics published or unpublished authors have written on, how jurors make decisions within a group setting, and whether they have investment funds and which type. *Id.* at 16, 19, 22. Finally, yet another category of questions seems aimed solely at creating a jury profile from responses and should be rejected as irrelevant gamesmanship, such as whether the prospective juror: has a general opinion about startup businesses, has ever written a letter to the editor or called into a radio show, considers the news media to be fair and accurate, or thinks companies that oppose a government regulation and seek to overturn it are more likely to commit fraud. *Id.* at 19, 27, 28, 29.

---

[2] For example, Defendant proposes almost as many questions improperly inviting potential jurors to pre-judge guilt as she does about media exposure. *See, e.g.*, ECF No. 808 at 36–39. One of her proposed questions does not even list "not guilty" as an option for the potential juror to select. *Id.* at 36–37.

U.S.' RESPONSE TO REQUEST RE
EXPANDED JURY QUESTIONNAIRE,
CASE NO. 18-258 EJD                     5

The Court should reject Defendant's proposed questionnaire as overly broad, invasive, and argumentative.

### B. Defendant fails to explain why prior questionnaires used in this District are inadequate to address COVID-related and background questions

The government agrees some COVID-related questions and background (or "life experiences") questions should be included in the jury questionnaire. *See* Mot. at 11–12. However, Defendant has not presented any justification for this Court to deviate from the type of questions routinely used in jury questionnaires in this District to address these types of questions. Indeed, Defendant cites some recent questionnaires used by this Court (Mot. at 11)—which the government provided to Defendant as exemplars—but does not explain why her far more expansive proposal should be selected over the government's, which is based on these very exemplars.

For example, Defendant acknowledges that this Court has addressed COVID-related concerns in jury questionnaires circulated before recent trials, including *United States v. Rocha*, 19-CR-00382-EJD (Mot. at 11), and yet she does not explain why her proposed questions are superior to those already employed by the Court in *Rocha*. *Compare* ECF No. 808 at 7 (Defendant's proposal varying from the *Rocha* questions), *with* ECF No. 802 at 9 (government's proposed COVID-related questions mimicking those used in *Rocha*). The government agrees some COVID-related questions should be included in the jury questionnaire and proposed questions used by this Court in a recent jury questionnaire, in *United States v. Rocha*, 19-CR-382-EJD. ECF No. 802 at 9.

Similarly, Defendant acknowledges that this Court has sought background and "life experiences" information in jury questionnaires circulated in recent trials—*Rocha* and *United States v. Hougen*, 20-CR-00432-EJD—but contests that the "complexity" of her case requires additional questions. However, she fails to acknowledge that another recent trial in this District, *United States v. Kail*, 18-CR-00172-BLF (exemplar also provided by the government to Defendant's counsel), which involved similarly complex charges (wire fraud, mail fraud, and money laundering connected to bribes and kickback schemes), used a *shorter* jury questionnaire (7 pages and 46 questions) than *Rocha* or *Hougen* that she cited. *See also United States v. Hussain*, 16-CR-00462-CRB, ECF No. 201-1 (N.D. Cal. 2018)

(jury questionnaire from equally complex fraud case that the government also provided to Defendant as an exemplar). Furthermore, Defendant does not justify why the complexity of her case entitles her to ask more invasive and irrelevant questions of potential jurors, including whether or not they have health insurance. *See* ECF No. 808 at 19. This Court should not deviate from the types of questions routinely employed in this District to aid in selecting an unbiased and impartial venire of potential jurors, as proposed in the government's submitted jury questionnaire.

Finally, the government notes that—despite Defendant's assertion that she proposes additional questions "to minimize the amount of time required for in-person *voir dire*" (Mot. at 11)— Defendant's proposed questionnaire does not contain a single question related to her Rule 12.2 defense. Given the breadth in number and coverage of questions that Defendant proposes, the government submits this is a glaring omission.

### C. The pretrial publicity regarding Theranos and Defendant does not justify her requested expanded jury questionnaire

As described above, the Supreme Court and the Ninth Circuit look to a number of factors to ensure criminal defendants receive a fair trial by an impartial jury as required by the Sixth Amendment. *Skilling*, 561 U.S. at 382–83; *Seattle Times*, 845 F.2d at 1517–18. None of those factors applied in this case justifies the expansive and invasive questions that Defendant seeks to ask.

First, courts look to the size and diversity of the community where the crime occurred and is being tried. *Skilling*, 561 U.S. at 382–83 ("Given this large, diverse pool of potential jurors [in Houston], the suggestion that 12 impartial individuals could not be empaneled is hard to sustain."); *Mu'Min*, 500 U.S. at 429 (potential for prejudice mitigated by the size of county and number of similar crimes therein as well as because the county "is a part of the metropolitan Washington [D.C.] statistical area"); *Seattle Times*, 845 F.2d at 1517–18 ("[P]rejudicial publicity is less likely to endanger the defendant's right to a fair trial in a large metropolitan area such as Seattle."). This aligns with courts' observations that a certain percentage of the venire pool in a larger metropolitan area will likely never have heard of the case—even if widely publicized—or may not have been interested in following the news stories about that particular case even if they were aware of it at a general level. *See*, *e.g.*, *Skilling*,

561 U.S. at 389–91 (quoting juror responses to questionnaire and *voir dire* with varying degrees of prior knowledge about Enron); *Mackey v. Asuncion*, No. 15-CV-03165-HSG, 2018 WL 4680190, at *25–26 (N.D. Cal. Sept. 28, 2018) (court and counsel discussing jury responses to *voir dire* where approximately 24% had never heard of widely publicized case and up to 78% "either had no knowledge of, or, despite knowledge, had formed no opinion about, the case").

Here, Defendant's proposed jury questionnaire is overbroad and unnecessarily invasive given the size and diversity of Silicon Valley and the greater San Francisco Bay Area.[3]  As courts have found previously, there is likely a certain percentage of the local population and potential jurors who have never heard of Theranos or Elizabeth Holmes.  Indeed, expanding the jury summons will aim to increase the percentage of people who fall into this category.  But Defendant's proposed questions go far beyond the inquiry that would determine whether jurors have had pretrial exposure to *this case* and have potentially prejudged the facts, and instead seek to ask how often potential jurors read or consume news through a variety of mediums, including how often potential jurors use social media.  ECF No. 808 at 21–28.  The questions also include judgment regarding the fairness or accuracy of the media as a whole without any connection to Defendant or the facts of this particular case.  *Id.* at 28.  These questions will not aid the Court in determining who among the potential venire may have formed opinions that would inhibit them from impartially hearing the evidence at trial.[4]  By contrast, the government's proposed questions go right to the heart of the pretrial publicity issue by asking:  whether the potential juror has previously heard or read anything about the case, if any prior information would affect how that person would judge the case or Defendant, if the person has—or knows someone who has—strong feelings about either defendant or Theranos, whether the prospective juror could abide by an instruction to decide

---

[3] For example, Santa Clara County, alone, has a population of approximately 1.928 million people, and Alameda County (where the Newark lab was located) has a population of approximately 1.671 million people.  By comparison, the city of Seattle has an estimated population of 754,000 and the county in which it sits has an estimated 2.253 million people.  *See* U.S. Census Bureau, *available at* https://www.census.gov/quickfacts/fact/table/seattlecitywashington,kingcountywashington,alamedacountycalifornia,santaclaracountycalifornia/PST045219.

[4] Indeed, Defendant's proposed questionnaire seems designed in part to isolate members of the public who do not consume the news regularly, and/or those who are educated with a high degree of reading comprehension (*see* ECF No. 808 at 44 (asking if the prospective juror had difficulty understanding the questionnaire))—neither of which is aimed at identifying a true cross-section of the public.

the case based solely on the evidence presented in the courtroom and not any information the juror may have heard or read about the case previously, and if the person has ever had a personal connection to Theranos.  ECF No. 802 at 12–13.

Second, courts consider the nature of the publicity, including whether it contains lurid or particularly violent subject matter, or contains a "confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Skilling*, 561 U.S. at 382–83.  For example, Defendant repeatedly references in her motion the Boston Marathon Bomber case, where the government sought the death penalty after the defendant "detonated two homemade bombs at the 2013 Boston Marathon, thus committing one of the worst domestic terrorist attacks since the 9/11 atrocities."  *United States v. Tsarnaev*, 968 F.3d 24, 34 (1st Cir. 2020), *cert. granted*, No. 20-443, 2021 WL 1072279 (U.S. Mar. 22, 2021).  Defendant also cites cases that "carr[y] racial overtones," "bias towards gangs," and other cases involving violent crime, such as using a weapon of mass destruction and murder.  Mot. at 7–8 & n.5.[5]

This factor also does not support the breadth of questions that Defendant proposes.  Tellingly, the sole case Defendant cites in her motion that used a 100-question questionnaire akin to her proposed 112-question questionnaire is the Boston Marathon Bomber case.  *See id.*  In contrast to *Tsarnaev* (Boston Marathon Bomber case) and the other cases Defendant cites, this case does not involve the death penalty, murder, a weapon of mass destruction, domestic terrorism, or other heinous violent acts.  The defendant in *Tsarnaev* quite literally terrorized an entire city—through acts so jarring it spurred a response of "Boston Strong" to convey courage and resilience.  968 F.3d at 39.  Defendant, by contrast, is accused of defrauding investors and patients of a private technology company.

---

[5] Defendant also cites three cases that involve fraud or tax evasion charges, one of which involved a fraud against members of the Mormon Church in Salt Lake City with a high percentage of Mormons in the population, *United States v. Affleck*, 776 F.2d 1451 (10th Cir. 1985), and another that found the case "does not involve heinous facts," *United States v. Wittig*, 2005 WL 758605, at *5 (D. Kan. 2005).  Mot. at 8 n.5.  The third involved a family connected to the hotel business and the questions asked of potential jurors targeted "their exposure to *this case* through the media; their exposure to the [defendant's] Hotels advertisement campaign . . . ;" whether they had any personal connection to the hotel chain and what television programs they generally watch, among others.  *United States v. Helmsley*, 733 F. Supp. 600, 609–10 & n.8 (S.D.N.Y. 1989).  These cases do not support the overly broad questions Defendant seeks to ask here regarding how frequently potential jurors consume various types of news or social media.

And while Defendant is correct that there is publicity surrounding Theranos and Defendant herself, she ignores that roughly two-thirds of that media attention is *positive press* rather than negative. ECF No. 800 ¶ 2(b) (declaration in support of Defendant's motion noting that roughly one-third of news hits were negative on LexisAdvance). Indeed, before September 2015, the press regarding Theranos and Defendant was overwhelmingly positive and Defendant herself often sought out media attention or participated as a speaker at events. ECF Nos. 681-19, 681-20, 681-21. Defendant's motion assumes—without support—that the amount that a potential juror consumes news through television, radio, newspapers, or social media will aid the Court in excluding potentially biased jurors because she assumes that means that potential juror must have seen *negative* publicity regarding Theranos or Defendant, when the opposite could be true. But the Supreme Court has noted that "[p]rominence does not necessarily produce prejudice, and juror *impartiality* . . . does not require *ignorance*." *Skilling*, 561 U.S. at 381 (original emphasis).

The government submits this case is more akin to—and less widely publicized than—*Skilling*, which involved allegations of a wide-ranging scheme to defraud investors regarding the financial status of Enron, then the seventh highest-revenue-grossing company in America, before it crashed into bankruptcy in 2001. *Id.* at 367–69. In *Skilling*, the court used a "77-question, 14-page [questionnaire] that asked prospective jurors about, *inter alia*, their sources of news and exposure to Enron-related publicity, beliefs concerning Enron and what caused its collapse, opinions regarding the defendants and their possible guilt or innocence, and relationships to the company and to anyone affected by its demise." *Id.* at 371 & n.4; *see also Mu'Min*, 500 U.S. at 417 (jurors were asked whether they "had read or heard something about the case" or if they "had formed an opinion based on the outside information" or if "it would affect their ability to determine [defendant's] guilt or innocence based solely on the evidence presented at trial"). The government's proposed questionnaire sufficiently covers these topics. ECF No. 802.

Finally, courts look to the length of time that has elapsed between a "widely reported crime," and jury selection or the beginning of trial. *Skilling*, 561 U.S. at 383 (four years elapsed between Enron filing bankruptcy and trial and the media attention dwindled during that time period). Similarly, here,

nearly six years have passed since news first broke regarding the accuracy and reliability problems with Theranos' tests and media attention has generally decreased over time since then.  *See* John Carreyrou, *Hot Startup Theranos Has Struggled With Its Blood-Test Technology*, Wall Street Journal, *available at* https://www.wsj.com/articles/theranos-has-struggled-with-blood-tests-1444881901.

Thus, the government submits that the additional questions it proposed in conjunction with other questions routinely used in questionnaires in this District will aid the Court and the parties in narrowing the venire pool effectively and efficiently to ensure that ultimately an impartial jury is selected.  *See* ECF No. 802.  The Court should deny Defendant's motion to the extent it seeks the expanded jury questionnaire she proposes.

## II. THE GOVERNMENT AGREES THAT SOME ADDITIONAL JURY SELECTION PROCEDURES ARE WARRANTED DUE TO THE COVID-19 PANDEMIC AND PUBLICITY SURROUNDING THIS CASE

The government submits that district courts regularly use additional tools as necessary to ensure that an impartial jury is empaneled before trial.  The government agrees that some of those tools may be useful here, as Defendant suggests (Mot. at 1–2, 8, 12), but that they should be limited in a manner to avoid overly burdening prospective jurors and to conserve the Court's resources.

First, the government agrees, given the continuing uncertainty surrounding the COVID-19 pandemic, the duration of the trial, and the amount of publicity Theranos and Defendant have received over the past decade (positive and negative, as discussed above), that an expanded distribution of summons with an appropriate jury questionnaire will aid the parties and the Court in narrowing to an unbiased venire pool for the potential jury.  Defendant's proposed order simply seeks an expanded distribution and leaves the exact number for a later date to decide.  ECF No. 799-1.  The government reserves its right to comment on whatever number Defendant ultimately proposes if it is excessive for the needs of this case.  *See*, *e.g.*, *Skilling*, 561 U.S. at 372 (questionnaire sent to 400 prospective jurors).

Second, the government agrees that reasonable meet and confer in good faith between the parties prior to *voir dire* will reduce the need for Court involvement in identifying obvious for cause excusals.  While the parties may disagree as to what amount of exposure to media outlets or social media constitutes excusal for cause, the parties can first attempt to reach agreement during the meet-and-confer

process before involving the Court.

Third and finally, the government agrees that the selective use of individual *voir dire* by the Court and counsel may be warranted for a limited subset of prospective jurors in this case to aid in selecting an impartial and unbiased jury—but it is premature to determine whether and for whom such individualized *voir dire* is required at this point in time.  It is possible that certain prospective jurors may require additional, individualized questioning to determine the extent of their exposure to media reports regarding Theranos or to address sensitive topics that may surround answers connected to Defendant's Rule 12.2 defense.  For example, in *Skilling*, the trial court questioned the venire as a group and then used individual *voir dire* to further reduce possibility of any bias of the ultimate jury. *Skilling*, 561 U.S. at 373–74, 389.[6]  In *PG&E*, another case in this District that drew substantial media attention, the Court conducted individual *voir dire* for select jurors, after asking questions of the entire venire and allowing time for attorney-conducted *voir dire*. *See* No. 14-CR-00175-TEH, Dkts. 658-1, 659-1, 664-1 (N.D. Cal. 2016).  If necessary, individual *voir dire* of a limited subset of potential jurors may be used as a tool to further limit any potential taint by one venireperson affecting the remainder of the venire panel.

All three of the above measures are intended to unearth any biases of potential jurors and can be used to aid in ensuring both parties appear before an impartial jury for trial.  Thus, the government agrees in principle that these are additional tools the Court may use to ensure such a jury is selected for trial, but requests guardrails to avoid gamesmanship by the parties during the jury selection process.

DATED:  June 3, 2021

Respectfully submitted,

STEPHANIE M. HINDS
Acting United States Attorney


  */s/ Kelly I. Volkar*
JEFF SCHENK
JOHN C. BOSTIC
ROBERT S. LEACH
KELLY I. VOLKAR
Assistant United States Attorneys

---

[6] Notably, jury selection in *Skilling* lasted approximately five hours, demonstrating the effectiveness of the streamlined procedures the district court used in that case. *Id.* at 387.