1   STEPHANIE M. HINDS (CABN 154284)
    Acting United States Attorney

2

    HALLIE HOFFMAN (CABN 210020)
3   Chief, Criminal Division

4   JEFF SCHENK (CABN 234355)
    JOHN C. BOSTIC (CABN 264367)
5   ROBERT S. LEACH (CABN 196191)
    KELLY I. VOLKAR (CABN 301377)
6   Assistant United States Attorneys

7       150 Almaden Boulevard, Suite 900
        San Jose, California 95113
8       Telephone: (408) 535-5061
        Fax: (408) 535-5066
9       john.bostic@usdoj.gov

10  Attorneys for United States of America

11              UNITED STATES DISTRICT COURT

12              NORTHERN DISTRICT OF CALIFORNIA

13                    SAN JOSE DIVISION

14
    UNITED STATES OF AMERICA,           )   Case No. 18-CR-00258 EJD
15                                        )
           Plaintiff,                     )   UNITED STATES' OPPOSITION TO
16                                        )   DEFENDANT'S MOTION TO SUPPRESS
        v.                                )   EVIDENCE OF CUSTOMER COMPLAINTS AND
17                                        )   TESTING RESULTS AS WELL AS FINDINGS IN
    ELIZABETH HOLMES,                     )   CMS REPORT
18                                        )
           Defendant.                     )   Date:  July 7, 2021
19                                        )   Time:  10:00 a.m.
                                          )   Court: Hon. Edward J. Davila
20  _____)

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................2

I.      The Data Contained in the Theranos Laboratory Information System.............................3

II.     The Government's Diligent Efforts to Obtain the LIS .....................................................5

III.    Theranos's Access to and Destruction of the LIS............................................................6

ARGUMENT .......................................................................................................................7

I.      The Legal Standard Is Unfavorable to Defendant's Argument .......................................7

II.     The Undisputed Facts Demonstrate that Suppression is Not Warranted.......................11

        A.      Defendant cannot show bad faith or connivance by the government. ................11

        B.      Defendant cannot show prejudice from the loss of exculpatory information....................12

        C.      Instructive case law warrants denial of Defendant's motion. ............................14

III.    An Evidentiary Hearing is Unnecessary. ......................................................................18

IV.     The Government Has Met and Exceeded its Discovery Obligations Relating to this
        Topic. ............................................................................................................................18

CONCLUSION....................................................................................................................19

1

# TABLE OF AUTHORITIES

2

Page(s)

3

Cases

4

*Arizona v. Youngblood*,
5
    488 U.S. 51 (1988)........................................................................................................... passim
6
*California v. Trombetta*,
    467 U.S. 479 (1984)............................................................................................................. 8, 10
7
*Cunningham v. City of Wenatchee*,
    345 F.3d 802 (9th Cir. 2003) ...................................................................................................... 17
8
*Miller v. Vasquez*,
9
    868 F.2d 1116 (9th Cir. 1989) ............................................................................................. 8, 9, 11
10
*Moore v. Illinois*,
    408 U.S. 786 (1972).................................................................................................................... 19
11
*State v. Krosch*,
    642 N.W.2d 713 (Minn. 2002)..................................................................................................... 9
12
*United States v. Agurs*,
13
    427 U.S. 97 (1976)................................................................................................................. 15, 19
14
*United States v. Booth*,
    309 F.3d 566 (9th Cir. 2002) ...................................................................................................... 14
15
*United States v. Drake*,
    543 F.3d 1080 (9th Cir. 2008) ...................................................................................................... 8
16
*United States v. Flyer*,
17
    633 F.3d 911 (9th Cir. 2011) ................................................................................................. 8, 10
18
*United States v. Garcia*,
    37 F.3d 1359 (9th Cir. 1994) .......................................................................................... 14, 15, 16
19
*United States v. Gibson*,
    Case No. CR 11-00734 WHA, 2012 WL 1123057 (N.D. Cal. Apr. 3, 2012) ......................... 17
20
*United States v. Hendrix*,
21
    Case No. CR19-0024JLR, 2019 WL 6683509 (W.D. Wash. Dec. 6, 2019) ..................... 13, 15, 17, 18
22
*United States v. Hinkson*,
    Case No. CR-04-127-S-RCT, 2004 WL 7333646 (D. Id. Dec. 22, 2004)............................. 8, 18
23
*United States v. Howell*,
    231 F.3d 615 (9th Cir. 2000) ...................................................................................................... 18
24
*United States v. Loud Hawk*,
    628 F.2d 1139 (9th Cir. 1979) .............................................................................................. passim
25
*United States v. Martinez-Martinez*,
26
    369 F.3d 1076 (9th Cir. 2004) .............................................................................................. passim
27
*United States v. Patrick*,
    Case No. 16-cr-20390, 2016 WL 6610983 (E.D. Mich. Nov. 9, 2016)..................................... 17

28

*United States v. Robertson*,
  895 F.3d 1206 (9th Cir. 2018) ................................................................................... 16, 17
*United States v. Sinek*,
  Case No. 8:12-cr-448-2 (GLS), 2016 WL 11687630 (N.D.N.Y. Aug. 18, 2016) .............................. 15
*United States v. Weld*,
  No. CR 08-0083 PJH, 2009 WL 901871 (N.D. Cal. Apr. 1, 2009) ...................................... 19
*United States v. Zaragoza-Moreira*,
  780 F.3d 971 (9th Cir. 2015) ................................................................................... 11, 17
*United States v. Zuniga-Garcia*,
  472 Fed. Appx. 498 (9th Cir. 2012) ................................................................................... 11

**INTRODUCTION**

Defendant's motion asks the Court to exclude from trial several categories of extremely probative evidence—including percipient witness testimony from victims of Defendant's fraud—all based on the destruction of secondary evidence carried out by her own company when she was Chair of the Board.  Defendant urges this Court to exclude relevant evidence because, in her view, the government did not act quickly enough or aggressively enough to seize from her company the complete database of Theranos's patient testing.  Granting Defendant this kind of windfall based on Theranos's failure to preserve its own Laboratory Information System would be a counterintuitive and unjust outcome, to say the least.[1]

Unsurprisingly, the case law of the Supreme Court and Ninth Circuit offers no support for Defendant's bold request.  Although the government has a duty to retain and preserve clearly exculpatory evidence in its possession, the law does not impose a general obligation on the government to collect potentially exculpatory evidence in the hands of third parties.  The Ninth Circuit has held that a defendant's due process rights may be violated where the government fails to collect exculpatory evidence *in bad faith*.  It is Defendant's burden, however, to show bad faith surpassing mere negligence or recklessness, and she makes no attempt to do so here.  Nor could she; the grand jury *subpoenaed* the very information she claims the government has made unavailable.  Rather than allege a due process violation, Defendant seeks suppression based on the factors discussed in *United States v. Loud Hawk*, 628 F.2d 1139 (9th Cir. 1979).  Importantly, Defendant cannot cite a single case applying those factors to suppress evidence in a case where the government never actually possessed the evidence in question and was therefore under no duty to preserve it.  "A failure to collect potentially useful evidence is distinctly different than a destruction of evidence that is already extant."  *United States v. Martinez-Martinez*, 369 F.3d 1076, 1087 (9th Cir. 2004).

/ /

---

[1]  While the government opposes Defendant's motion on substantive grounds, it also notes that the motion is untimely.  Defendant claims that the instant motion was ripened by the Court's rulings on her motions in limine, but there is no reason her motion could not have been filed along with other Rule 12 motions or at an earlier date.  The timing of Defendant's motion suggests it is primarily a renewed attempt to avoid evidence that the Court has already deemed admissible.

1  Even under the *Loud Hawk* factors, Defendant's motion necessarily fails.  The Ninth Circuit
2  requires a defendant to show "bad faith or connivance" on the part of the government before suppression
3  is warranted—even in cases where the government is responsible for the loss of the evidence.  *Loud*
4  *Hawk*, 628 F.2d at 1146.  Defendant cannot make that showing here, where the government had no hand
5  in destroying the missing evidence.  Indeed, the facts of this case are the opposite of what might warrant
6  suppression:  it was Defendant's own company, Theranos, that destroyed the LIS evidence despite the
7  government's affirmative efforts to obtain that evidence via grand jury subpoenas.  Under these
8  circumstances, balancing the quality of the government's conduct weighs strongly against suppression
9  and is fatal to Defendant's motion.

10  Defendant's motion also fails because she cannot show that she is prejudiced by the
11  unavailability of the evidence Theranos destroyed.  Defendant's arguments about the importance and
12  possible exculpatory value of the LIS database are purely speculative—based on what an analysis of
13  such data *might* show.  Such speculation, though, fails to meet the legal standard for suppression or other
14  sanctions.  In contrast, and as discussed below, the evidence in this case strongly suggests that the LIS
15  data would be highly *inculpatory*, bolstering the government's allegations that Theranos's analyzers
16  were plagued by accuracy and reliability problems.  Unable to show prejudice from the absence of the
17  LIS, Defendant would not be entitled to relief even if the government were responsible for its loss.

18  Because Defendant utterly fails to make the required showing needed to justify suppression of
19  evidence, and because the key facts are already established, the Court should decline to hold an
20  evidentiary hearing and deny Defendant's motion in full.

21  **BACKGROUND**

22  The parties' previous filings have discussed some of the relevant facts surrounding the nature
23  and destruction of Theranos's Laboratory Information System ("LIS").  There is no need to repeat facts
24  already presented to the Court, but the government incorporates by reference its earlier submissions,
25  including ECF No. 682.  Most of the parties' briefing has focused on the extent to which Defendant and
26  Theranos violated their legal obligations in connection with the destruction of the LIS.  The factual
27  dispute over Defendant's culpability is ongoing.  In connection with Defendant's pending motion,
28  however, there are a handful of critical and undisputed facts that should guide the Court's analysis.

I.      **The Data Contained in the Theranos Laboratory Information System**

Although the government was never in possession of the full LIS, its investigation has yielded substantial information regarding the database's contents.  Based on reports generated from the LIS, subsets of LIS data extracted for various purposes during the company's operation, and interviews of former Theranos employees, the government understands that the LIS contained information regarding each clinical test performed by Theranos, including patient identity, date, treating physician, equipment used, and the assay results themselves.  The LIS was capable of running reports in response to user queries, sorting and isolating individual test results by patient, assay type, time period, and so on.

It is important to note, however, that the LIS would *not* have provided a direct mechanism for determining the accuracy of a given test result.  As explained in the government's filings regarding the anticipated testimony of its patient and physician witnesses, individual test results are revealed to be inaccurate based on inconsistencies with patient presentation and contemporaneous test results from conventional labs—details not necessarily contained within the LIS.  Accordingly, the LIS, while valuable to identify additional victims and track Theranos's use of various assays over time, would not have allowed the parties to sort accurate from inaccurate results or determine an overall failure rate for Theranos's tests.

The LIS, however, did reportedly contain data regarding the quality control ("QC") testing of Theranos's analyzers.  Clinical labs are required to conduct daily QC testing of their analyzers on known standard samples to confirm that they can accurately and reliably return results during patient tests.  The performance of Theranos analyzers during these periodic evaluations is probative of their ability to deliver accurate test results.  A significant amount of QC data survived the destruction of the LIS, and employees familiar with that data have provided valuable input regarding Theranos's performance during that testing.  The information obtained by the government shows that this QC data signaled serious problems with Theranos's accuracy and reliability, undercutting any claim that the LIS contents would exculpate Defendant.

For example, Dr. Adam Rosendorff—Theranos's laboratory director at the time of its clinical launch and for several months thereafter—has informed the government that Theranos's analyzers failed QC testing at a high rate of up to 20%, raising concerns in his mind about their accuracy relative to

1   conventional analyzers with which he was also familiar.  Dr. Kingshuk Das—who served as Theranos

2   laboratory director in 2016—told government investigators that Theranos's QC data was "never good,"

3   and that its Edison devices exhibited poor performance on this metric.  See Declaration of John Bostic,

4   Exh. A (Interview report of Kingshuk Das).  Reviewing samples of Theranos QC data, Dr. Das recalled

5   his impression that most laboratory directors would be uncomfortable relying on Theranos's devices

6   given their poor sigma metric performance and high total allowable error.  When Dr. Das was at

7   Theranos, his thorough review of the QC data in the LIS enabled him to prepare a draft response to

8   CMS's report acknowledging significant shortfalls in Theranos's lab performance.  Bostic Decl., Exh. B

9   (Draft response to CMS).  In that document, Dr. Das responded to a CMS finding of QC deficiencies by

10  conceding the following:

11      Upon review of that response, including the entirety of the prior analysis of TPS

12      (Theranos Proprietary System) 3.5 QC data and patient test results distribution for all

13      analytes during the time period examined, the laboratory made note of poor QC

14      performance throughout.  Therefore, the laboratory conducted an expanded retrospective

15      analysis for 2014 and 2015.

16  *Id.*  That same document referenced "QC CVs (Coefficients of Variation) far exceeding limits

17  for a stable testing process."  *Id.*  Dr. Das's conclusion based on all the data available to him then

18  was that:

19      [T]he QC failures identified by this comprehensive retrospective analysis reflect a global

20      and long-term failure of the quality control program for this instrument, as well as

21      failures of related quality assurance procedures that should have alerted the laboratory to

22      correct such an unstable process.

23  *Id.*

24      Quality control data from the LIS also was reviewed by regulators at Centers for Medicare and

25  Medicaid Services ("CMS") during their inspection of Theranos's lab in late September 2016.  CMS

26  inspectors' review of a sample subset of QC records caused them to note in their report of deficiencies

27  that Theranos was not in compliance with the requirement to conduct thorough daily QC for the assay in

28  question.  *See* October 14, 2016 CMS Report, ECF No. 584-2, pp.24-25.

II.     **The Government's Diligent Efforts to Obtain the LIS**

The investigation of Theranos by government agencies began in fall 2015.  As early as October 2015, Theranos was put on notice that it would be required to produce its laboratory testing data to the government in connection with that investigation.  Specifically, on October 19, 2015, the Securities and Exchange Commission's Division of Enforcement sent Theranos a document preservation letter, instructing the company to preserve certain categories of relevant records.  See Bostic Decl., Exh. C (October 19, 2015 SEC notice letter).  That letter expressly defined the term "documents" to include electronically-stored information, data compilations, and databases, and called for the retention of any document created after January 1, 2010 that was created, modified, or accessed by lab personnel tasked with reviewing and analyzing testing results from the Edison device, as well as any document from that time period that related or referred to "Theranos's lab testing, including, but not limited to, methodology, equipment used, and results." *Id.*  Those categories unmistakably encompassed Theranos's LIS database.  The letter advised Theranos that it might need to act affirmatively to prevent the destruction of the evidence defined in the notice.  *Id.*

The SEC followed up with specific document requests that implicated the data in the LIS.  For example, on November 23, 2015, the SEC sent Theranos a request for several categories of records, including "documents sufficient to show the number of tests performed by Theranos's proprietary technology and the number of tests performed by equipment developed by third parties" and "documents sufficient to show the number of types of diagnostic tests that Theranos's proprietary technology was capable of performing" as of certain dates.  Bostic Decl. Exh. D (November 23, 2015 SEC document request).  On September 6, 2016, the SEC sent another document subpoena requiring Theranos to produce "documents sufficient to identify which machines manufactured by Theranos were used for patient testing and the time frames during which these machines were used for patient testing."  Bostic Decl. Exh. E (September 6, 2016 SEC document request).

On February 13, 2018, the Department of Justice served a grand jury subpoena on Theranos, requiring the company to produce several categories of evidence.  Bostic Decl. Exh. F (February 13, 2018 Grand Jury subpoena).  Specifically, the subpoena required production of "[t]he entirety of all blood test lab reports" provided to Theranos patients during a representative time period of July 1, 2014

through September 1, 2014.  *Id.*

The government served another grand jury subpoena on April 20, 2018.  Bostic Decl. Exh. G (April 20, 2018 Grand Jury subpoena).  That subpoena expanded the grand jury's records request to include [t]he entirety of all blood test lab reports maintained in the L.I.S. database," except for test results Theranos was legally prohibited from producing.  *Id.*  On June 4, 2018, the government served an additional grand jury subpoena on Theranos, requesting the entirety of all reports in the LIS along with a softcopy or proxy of the LIS database, along with any proprietary software required to access and search the database.  *See* ECF No. 681-27.  The attachments to all three grand jury subpoenas advised Theranos that any person who destroys documents—"including electronic documents"—demanded by the subpoena may be subject to criminal prosecution.  *Id.*

Subsequently, the government stayed in touch with counsel for Theranos to encourage compliance with the subpoena and facilitate transfer of the LIS data.  *See, e.g.*, Bostic Decl. Exh. H (July 25, 2018 email to Theranos counsel).

On August 27, 2018, counsel for Theranos sent the government a transmittal letter representing that Theranos was producing an encrypted hard drive containing a copy of Theranos's LIS database in native format.  *See* ECF No. 681-35.  Theranos's counsel provided a password for the enclosed hard drive itself, but did not disclose to the government that the database could not be accessed without a separate password for the "key file" needed to restore the database.  The government's efforts to access that copy of the LIS database or obtain a functioning copy have failed, meaning the government has never had access to a working version of the LIS.

## III.   Theranos's Access to and Destruction of the LIS

The government understands that, although Theranos had discontinued patient testing, the company maintained its LIS as a functional database for most of 2018—including past the date criminal charges were filed in this case.  Throughout that time period, employees at Theranos had access to the LIS and were able to run queries throughout Theranos's testing data and generate reports from that data.

On August 28, 2018, three days before Theranos was set to vacate the facility where it maintained the LIS database hardware, Theranos executives and attorneys convened a call to discuss the upcoming shutdown of the LIS system.  *See* ECF No. 681-37.  Theranos (but not the government) was

1   aware that, once the LIS was put into storage, it might become "very difficult to resuscitate." *Id.* On

2   August 30, 2018, the Theranos personnel began to disassemble the hardware running the LIS database at

3   its Newark facility. *See* ECF No. 681-38. The following day—and only four days after the government

4   had received what it still believed to be an accessible copy of the LIS—the Theranos database had been

5   completely shut down. *Id.* On or about September 14, 2018, Theranos assigned its assets to an assignee

6   (essentially a bankruptcy trustee). The government understands that, at the time, it had approximately

7   $5 million in cash. Theranos successfully migrated other IT records to the assignee.

8       It is worth noting that Defendant was still the CEO of Theranos when the company received the

9   grand jury's subpoenas calling for LIS data in February and April of 2018. As such, it is all but certain

10  she was aware of the pending request for that evidence. Defendant continued to run Theranos as its top

11  executive for months after the April subpoena, eventually resigning from that position at the time of the

12  Indictment in mid-June 2018. Defendant remained the Chair of Theranos's Board of Directors

13  following her resignation, and held that position during the time Theranos was producing a nonviable

14  copy of the LIS to the government and permanently disassembling the only working version of the

15  database.

16                                    **ARGUMENT**

17  **I.    The Legal Standard Is Unfavorable to Defendant's Argument**

18      Defendant's description of the applicable legal standard fails to acknowledge the heavy burden a

19  defendant must carry to obtain the kind of relief she seeks. While the government acknowledges its duty

20  to retain and produce evidence in a criminal case, Defendant's request for suppression under these

21  circumstances finds no support in the case law. Courts analyzing the loss of evidence do not impose

22  sanctions on the government where the evidence is destroyed by a third party without the government's

23  involvement or knowledge, where the evidence in question could have incriminated rather than

24  exonerated the defendant, and where there was is no evidence suggesting bad faith on the government's

25  part.

26      The Due Process Clause requires the government to retain and preserve evidence that is

27  material—that is, evidence that "possesses an exculpatory value that was apparent before the evidence

28  was destroyed." *United States v. Martinez-Martinez*, 369 F.3d 1076, 1087 (9th Cir. 2004) (quoting

1    *California v. Trombetta*, 467 U.S. 479, 488-89 (1984)).  "[T]he fact that the evidence *may* have proven

2    exculpatory… does not render it per se material."  *Id.* at 1087 (emphasis in original); *see also United*

3    *States v. Drake*, 543 F.3d 1080, 1090 (9th Cir. 2008) ("The exculpatory value of an item of evidence is

4    not 'apparent' when the evidence merely 'could have' exculpated the defendant.").  Thus, evidence is

5    not material—even if there is no question that it "*might* have been exculpatory"—if it very well may

6    have inculpated the defendant further.  *See Martinez-Martinez*, 369 F.3d at 1087 (emphasis added).

7           Independent of the government's evidence retention obligations, the government has no general

8    duty to collect evidence that a defendant might view as exculpatory.  *See United States v. Hinkson*, Case

9    No. CR-04-127-S-RCT, 2004 WL 7333646, *13 (D. Id. Dec. 22, 2004) ("The Government does not

10   have a general obligation to collect and preserve evidence that is potentially exculpatory.") (citing

11   *United States v. Martinez-Martinez*, 369 F.3d 1076, 1086-87 (9th Cir. 2004)).  The Supreme Court's

12   holding in *California v. Trombetta*, 467 U.S. 479 (1984), does not task law enforcement officers with

13   obtaining evidence.  *Miller v. Vasquez*, 868 F.2d 1116, 1119 (9th Cir. 1989).  The Ninth Circuit has

14   held, however, that "a *bad faith* failure to collect potentially exculpatory evidence" can violate a

15   defendant's due process rights.  *Id.* at 1120 (emphasis added).

16          Whether the evidence was lost due to the government's bad faith is a key question.  Indeed,

17   "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially

18   useful evidence does not constitute a denial of due process of law."  *Arizona v. Youngblood*, 488 U.S.

19   51, 58 (1988).  Importantly, bad faith "requires more than mere negligence or recklessness."  *United*

20   *States v. Flyer*, 633 F.3d 911, 916 (9th Cir. 2011).  Instead, the government must display "official

21   animus" or "a conscious effort to suppress exculpatory evidence."  *Trombetta*, 467 U.S. at 488.  "The

22   presence or absence of bad faith" turns on "the police's knowledge of the exculpatory value of the

23   evidence at the time it was lost or destroyed."  *Youngblood*, 488 U.S. at 56.  The operation of the bad

24   faith requirement in the context of a failure to collect exculpatory evidence is demonstrated by *Miller v.*

25   *Vasquez*, an assault case that analyzed a police officer's failure to collect the victim's bloodstained

26   jacket and photograph the defendant's scratched arms.  868 F.2d at 1119.  The defendant claimed that

27   such evidence would have had exculpatory value, and Ninth Circuit remanded that case for further

28   consideration of the defendant's due process arguments.  *Id.* at 1121.  Critical to the Ninth Circuit's

decision in that case was evidence in the record showing the officer's inconsistent explanations regarding the failure to collect the jacket and his apparent animus directed toward the defendant.  *Id.* at 1121.

Requiring a showing of government bad faith is consistent with Supreme Court precedent in that it avoids placing on law enforcement "an undifferentiated and absolute duty" to collect "all material that might be of conceivable evidentiary significance in a particular prosecution." *Youngblood*, 488 U.S. at 58 (discussing the government's duty to retain evidence).  Instead, the government's obligations are limited to "reasonable bounds," and violations are found only in cases where the government's conduct itself indicates "that the evidence could form a basis for exonerating the defendant." *Id.*  The case law is clear that, where such bad faith is required, the burden of proving it falls on the defendant. *Id.* at 56.

In situations not implicating constitutional due process, the Ninth Circuit has suggested that evidentiary sanctions may be warranted "[w]hen the government loses or destroys tangible evidence prior to trial." *United States v. Loud Hawk*, 628 F.2d 1139, 1146 (9th Cir. 1979).  In such cases, the defendant may obtain suppression of secondary evidence "if the defendant can show (1) bad faith or connivance on the part of the government, and (2) that [the defendant] was prejudiced by the loss or destruction of the evidence." *Id.*  Determining the appropriate sanction requires a court to balance "the quality of the Government's conduct" against "the degree of prejudice to the accused." *Id.* at 1152 (Kennedy, J., concurring).  In adjudicating such issues, the degree of government fault is important. Even in cases where the government *is responsible* for the loss of the evidence, ordering suppression automatically would fail to "give proper recognition to the responsibility of the Government to prosecute criminal cases." *Id.* at 1151 (Kennedy, J., concurring).

Defendant cites no case applying the *Loud Hawk* test to order suppression where the missing evidence was never in the possession of the government.  This is no surprise.  Courts interpreting *Youngblood* and its progeny recognize that "[a] failure to collect potentially useful evidence is distinctly different than a destruction of evidence that is already extant." *Martinez-Martinez*, 369 F.3d at 1087. Indeed, "[t]here is a fundamental distinction between those case in which the state loses, destroys, or otherwise fails to preserve evidence it has collected and those in which the state fails to collect evidence in the first place." *State v. Krosch*, 642 N.W.2d 713, 718 (Minn. 2002), *cited approvingly by United*

1   *States v. Brown*, No. 2:17-CR-58 JCM (VCF), 2018 WL 451556, *3 (D. Nev. Jan. 16, 2018).  After all,

2   the government's duty to preserve evidence "exists only with respect to evidence it collects during the

3   investigation of a crime," and "it would be illogical to impose an obligation on [the government] to

4   preserve evidence that it does not possess."  *Id.*  At least one district court has held that, in the absence

5   of case law imposing court sanctions in response to a negligent failure to collect evidence, a balancing

6   analysis weighing government conduct and prejudice to defendant is unnecessary in such cases.  *See*

7   *Brown*, 2018 WL 451556, *4.

8          Although Defendant cites a number of court opinions dealing with the loss of evidence in the

9   government's possession, she glosses over the fact that the majority of the binding authority on this

10  issue disfavors her position.  Courts routinely decline to find constitutional violations or impose

11  sanctions based on missing evidence—even in situations where the government was directly responsible

12  for the loss of evidence actually in its possession.  In *Trombetta*, the Supreme Court found no due

13  process violation in the failure to preserve Intoxilyzer breath samples in criminal cases, holding that the

14  relevant officers were not acting in bad faith and that the preserved samples were unlikely to have been

15  exculpatory.  467 U.S. at 488-89.  In *Youngblood*, a child abduction case, the authorities failed to

16  refrigerate clothing taken into evidence and perform a type of testing on semen samples.  488 U.S. at 58.

17  The Supreme Court in that case found this failure to be negligent at worst, finding no bad faith on the

18  part of the police and concluding there had been no due process violation.  *Id.*

19         In *United States v. Loud Hawk*, the Ninth Circuit *reversed* a suppression order after local police

20  officers destroyed evidence consisting of explosive material, causing arguable prejudice to the

21  defendants.  *Loud Hawk*, 628 F.2d at 1155-56.  The Ninth Circuit found that the prejudice to those

22  defendants was minimal in light of the reliability of secondary evidence, and that the police who

23  destroyed the evidence acted independent of federal involvement and without bad faith.  *Id.* at 1154-56.

24  The Ninth Circuit's decision in *Flyer* applied the *Loud Hawk* standard, affirming the trial court's

25  decision not to suppress evidence where the government had unintentionally corrupted data on a laptop

26  in evidence due to mishandling rather than bad faith.  *Flyer*, 633 F.3d at 915-16.

27         Defendant's other cited authority is easily distinguished.  *United States v. Zuniga-Garcia* is an

28  unpublished case involving evidence that was lost or destroyed while in the custody of the government

1  itself, warranting a missing evidence instruction.  *United States v. Zuniga-Garcia*, 472 Fed. Appx. 498,

2  499 (9th Cir. 2012).  The dissimilar facts of that case—combined with the panel's failure to analyze the

3  bad faith requirement—limits the usefulness of that non-binding opinion.  In *United States v. Zaragoza-*

4  *Moreira*, the government failed to preserve video evidence in its possession that could have supported

5  the defendant's duress defense.  *United States v. Zaragoza-Moreira*, 780 F.3d 971, 980 (9th Cir. 2015).

6  The court in that case found bad faith on the part of the case agent, who was aware of the exculpatory

7  value of that video based on statements by the defendant, and had failed to report the defendant's

8  claimed defense in several reports.  *Id.*  The prosecutor in that case also failed to notify the agency of the

9  defendant's explicit request to preserve the video evidence.  *Id.* at 980-81.  No similar facts are present

10  here.  And in contrast to *Miller*, this case involves no allegations of animus or dishonesty by the

11  government.  *See Miller*, 868 F.2d at 1121.

12      Critically, Defendant does not cite a single case where a court imposed sanctions on the

13  government for failing to collect evidence that the government *actually attempted to obtain*.  Even if

14  Defendant's proposed standard applied to this case, the facts would defeat her request for suppression

15  without the need for further inquiry.

16  **II.  The Undisputed Facts Demonstrate that Suppression is Not Warranted**

17      Unlike the cases discussed above, Defendant cannot show that the LIS evidence was ever

18  possessed or controlled by the government.  Defendant is unable to establish that the government had

19  any involvement in the LIS's destruction—much less that the government acted in bad faith in doing so.

20  Nor can Defendant show that the LIS data had any apparent exculpatory value such that she is

21  prejudiced by its absence.

22      **A.  Defendant cannot show bad faith or connivance by the government.**

23      Defendant's claim must fail also because she cannot show that the government's bad faith caused

24  the loss of the LIS.  As discussed above, the government had *no role whatsoever* in Theranos's

25  destruction of the LIS.  In fact, three days after purportedly providing a copy of the LIS to the

26  government, and while under several subpoenas and litigation holds, Defendant's company destroyed

27  the evidence itself.  The government was unaware that Theranos planned to disassemble the LIS, and

28  Theranos never stated to the government that limited resources would cause it to destroy electronically

1    stored information.  To the contrary, the government understands that the company successfully

2    migrated its general IT network to the Assignee.

3        Where law enforcement *causes* evidence to be lost, knowing that it is likely exculpatory, a

4    defendant may succeed in showing bad faith.  Indeed, such actions by law enforcement could suggest a

5    desire to avoid evidence to the prosecution.  *See Youngblood*, 488 U.S. at 58.  Here, the opposite is true,

6    as evidenced by the significant efforts the government devoted to obtaining the LIS for use as evidence

7    at trial.  No court could find on these facts that the government was responsible for the loss of the LIS

8    evidence—much less that it intended that loss in order to dispose of evidence unfavorable to its case.

9        These facts are dispositive when it comes to assessing "the quality of the Government's conduct"

10   under *Loud Hawk*.  *Id.* at 1152.  Under the factors discussed by the Ninth Circuit in that case, it is clear

11   that the LIS evidence was not "lost or destroyed while in [the government's] custody."  *Id.*  Indeed, the

12   evidence was never in the government's custody or control.  The destruction of the LIS was not the

13   result of any "deliberate" act by the government.  *See id.*  There is zero evidence that the government

14   "acted in disregard for the interests of the accused."  *Id.*  Instead, the government took the same

15   investigative steps any prosecutor would:  serving a grand jury subpoena for relevant evidence on a

16   company under investigation and working in good faith with the company to obtain compliance with the

17   requests in the subpoena.  *See id.*  The blame for the loss of the LIS rests squarely with Defendant's

18   company, Theranos.

19       Because Defendant cannot show "bad faith or connivance on the part of the government," her

20   motion to suppress must fail.  *See id.* at 1146.

21       **B.    Defendant cannot show prejudice from the loss of exculpatory information.**

22       Defendant is not entitled to court-ordered sanctions because she has not been prejudiced by the

23   loss of the LIS.  On the contrary, she is likely benefitted from it.  Defendant's argument overstates the

24   "centrality of the [LIS] evidence to the case and its importance in establishing the elements of the crime"

25   or her "motive and intent."  *See Loud Hawk*, 628 F.3d at 1152.  Defendant emphasizes the government's

26   recognition that the LIS data would have provided important evidence in this case, but as discussed

27   above, the LIS was incapable of identifying individual test results as accurate or inaccurate, and could

28   not have been used to calculate an overall failure rate for Theranos's assays.  Moreover, an

1    acknowledgement that evidence is important is not the same thing as a concession that the data would be

2    *exculpatory*. "[T]hat the lost or destroyed evidence is *relevant* is not the question *Trombetta* and its

3    progeny ask. Rather, the question is whether the evidence had apparent exculpatory value." *United*

4    *States v. Hendrix*, Case No. CR19-0024JLR, 2019 WL 6683509, *4 (W.D. Wash. Dec. 6, 2019)

5    (emphasis added). And "[m]ere speculation regarding the exculpatory value of evidence is not sufficient

6    to establish that the evidence is exculpatory." *Id.*

7         Defendant's motion is premised on the assumption that the LIS data would have allowed her to

8    rebut the allegation that Theranos's technology suffered from accuracy problems. But the case law does

9    not allow defendants to base requests for sanctions on mere speculation, and Defendant provides no

10   concrete support for the claim that the LIS evidence would be of any help to her. In fact, the available

11   information strongly suggests that, were the LIS still in existence, its contents would dramatically

12   bolster the government's allegations. As discussed above, Theranos employees familiar with the LIS

13   have reported that it contained quality control data for Theranos's analyzers that revealed significant

14   consistency problems with the machines' performance. Based on a detailed analysis of Theranos QC

15   data stored in the LIS, former Theranos lab director Dr. Das concluded that Theranos's Edison 3.5

16   analyzer suffered from a global and long-term quality control failure. See Bostic Decl. Exhs. A, B.

17   Because the LIS data was far more likely to inculpate Defendant than exculpate her, she is not entitled to

18   any relief based on its loss. *See Martinez-Martinez*, 369 F.3d at 1087.

19        Defendant's attempt to show prejudice also fails because the secondary evidence of Theranos's

20   accuracy and reliability problems is strong. *See Loud Hawk*, 628 F.2d at 1155-56. Defendant clearly

21   contests this point, having filed several motions in limine to exclude from trial evidence of individual

22   inaccurate patient test results, physician assessments of test accuracy, laboratory director opinions, and

23   government regulatory findings of deficiencies at Theranos. See ECF Nos. 561, 563, 564, 569, 573,

24   574, 575. The Court has generally rejected Defendant's attempts to block this evidence, concluding that

25   the evidence is sufficiently relevant and reliable to be considered by the jury. See ECF No. 798.

26        The Court should deny Defendant's motion to suppress because, even applying the *Loud Hawk*

27   standard for which she advocates, she is unable to show prejudice from the destruction of the LIS

28   database by her own company, Theranos.

GOVT. OPP. TO DEF.'S MOT. TO SUPPRESS
CASE NO. 18-CR-258 EJD                    13

1       **C.**     **Instructive case law warrants denial of Defendant's motion.**

2       Defendant has not cited a single case where a court imposed sanctions on the government for the

3 loss of evidence where (1) the government actively sought to obtain the evidence; (2) the government

4 was unable to obtain that evidence; and (3) the evidence was subsequently destroyed by a third party

5 without the government's consent or involvement. In situations bearing some similarity to this one,

6 courts have easily found in the government's favor. For example, in *United States v. Booth*, the

7 defendant appealed his convictions for wire fraud and money laundering arising from a scheme to

8 defraud clients of his business, which purported to operate as a broker for businesses seeking to lease

9 equipment. *United States v. Booth*, 309 F.3d 566, 570 (9th Cir. 2002). On appeal, the defendant argued

10 that the government had improperly failed to collect and preserve hard drives from his computer. *Id.* at

11 574. Following that defendant's arrest, his computers were repossessed by a private, third-party vendor,

12 who had erased hard drives of those devices after confirming that the government did not need copies of

13 the information they contained. *Id.* The defendant claimed that those hard drives contained exculpatory

14 information showing that he had in fact sought funding for his client's leases. *Id.* The Ninth Circuit,

15 however, rejected that argument, acknowledging that the "prosecution's duty to preserve evidence

16 applies only to material evidence, i.e., evidence whose exculpatory value was apparent before its

17 destruction." *Id.* (quotation and citation omitted). In that case, "[t]here was nothing about the hard

18 drives… that would have made their allegedly exculpatory nature apparent to the government." *Id.* The

19 court also stressed that there was "no evidence that the government ever possessed the computers," and

20 noted that the hard drives "were as accessible to [the defendant] as to the government." *Id.* Moreover,

21 the defendant could not prevail on a claim of failure to preserve potentially useful evidence because he

22 could not show bad faith by the government. *Id.*

23       *Booth* was not the first time the Ninth Circuit rejected an attempt by a defendant to blame the

24 government for the loss of materials it never possessed. In *United States v. Garcia*, a defendant

25 convicted of narcotics conspiracy, money laundering, and other offenses argued on appeal that

26 government had acted in bad faith by failing to collect the business records from the defendant's alleged

27 business partner. *United States v. Garcia*, 37 F.3d 1359, 1366 (9th Cir. 1994). The Ninth Circuit found

28 no constitutional violation because there was "no evidence that the government intentionally neglected

GOVT. OPP. TO DEF.'S MOT. TO SUPPRESS
CASE NO. 18-CR-258 EJD           14

1    to obtain evidence" regarding the defendant's involvement with his partner.  *Id.*  On the contrary, the

2    record in that case showed that the government had attempted "numerous times" to obtain the records

3    from the business, defeating any accusation of bad faith and rendering a missing-evidence jury

4    instruction inappropriate.  *Id.*

5          District courts have applied similar reasoning in other cases where the government tried but

6    failed to obtain evidence.  In *United States v. Holman*, a wire fraud defendant argued that the

7    government had put insufficient effort into recovering encrypted materials from a laptop belonging to

8    his coconspirator.  *United States v. Holman*, Case No. 2:11-cr-00457-JCM-CWH, 2013 WL 12204324

9    (D. Nev. Sep. 20, 2013).  The FBI seized the laptop in question, but was unable to review all of its

10   contents because the supplied encryption key did not unlock all the files.  *Id.* at *1.  Aware that

11   additional documents might be accessible from the servers of defendant's company, the government

12   considered serving a subpoena for those materials but ultimately decided not to.  *Id.*  When FBI

13   eventually visited the company's headquarters in an attempt to retrieve decrypted copies of the files it

14   could not access, it found that the laptop contained no emails and that emails stored on company servers

15   would have been deleted pursuant to a sixty- or ninety-day retention policy.  *Id.* at *2.  The defendant

16   claimed that the missing emails would have shown "legitimate work communication and no fraudulent

17   invoices," but presented no evidence to demonstrate that the emails had an exculpatory value.  *Id.* at *3.

18   Noting this, the court admonished the defendant that "the 'mere possibility' that the lost or destroyed

19   evidence is exculpatory does not meet the materiality standard."  *Id* at *3 (quoting *United States v.*

20   *Agurs*, 427 U.S. 97, 110-11 (1976)).  The court found no bad faith by the government in connection with

21   the loss of the emails, acknowledging that bad faith "requires more than mere negligence or

22   recklessness."  *Id.* at *3.  In particular, the court found it relevant that the government had never actually

23   been in possession of the allegedly exculpatory emails, and declined to find that the government had a

24   duty to collect email evidence stored elsewhere.  *Id.* at *3-4.  Moreover, because the government had

25   neither lost nor destroyed evidence, the court declined impose the sanction of a remedial jury

26   instruction.  *Id.* at *4; *see also United States v. Sinek*, Case No. 8:12-cr-448-2 (GLS), 2016 WL

27   11687630 (N.D.N.Y. Aug. 18, 2016) (denying suppression and evidentiary hearing where hard drive

28

1  seized by government suffered from technical fault that resulted in the loss of some data because

2  government bad faith was not the cause of the loss and materiality was not shown).

3         Here, as in *Booth* and *Holman*, Defendant makes conclusory representations about the

4  exculpatory value of the data in Theranos's LIS.  As discussed above, the Court should view those

5  claims with skepticism, as it is far more likely that the information in the LIS would have been

6  *inculpatory*, bolstering the allegations in the Indictment regarding the accuracy problems in Theranos's

7  blood tests.  Defendant is unable to show that the LIS data had any exculpatory potential, much less that

8  the exculpatory nature of the LIS would have been apparent years ago when Theranos disassembled the

9  database.  As was the case in *Booth* and *Garcia*, this case involves evidence that was never actually in

10  the government's possession—distinguishing it from a bulk of cases analyzing this question.  Consistent

11  with the Ninth Circuit's analysis in *Garcia*, there is no evidence here that the government deliberately

12  avoided collecting the LIS.  Indeed, the opposite is true, and the government's repeated efforts to obtain

13  the LIS in 2018 roundly defeat any post-hoc claim of bad faith.  *See Garcia*, 37 F.3d at 1366.

14         The case law is replete with other examples of cases where defendants failed to obtain relief

15  based on missing evidence—even where the government's involvement in the loss of evidence was

16  more deliberate and direct than in this case.  For example, in *Robertson*, a postal employee was

17  convicted of stealing mail, and later argued that the government had improperly allowed potentially

18  exculpatory security camera footage of the employee parking lot at her workplace to be deleted as a

19  result of the Postal Inspection Service's thirty-day retention period for such footage.  *United States v.*

20  *Robertson*, 895 F.3d 1206, 1211 (9th Cir. 2018).  The government case agent in *Robertson* had been

21  aware of the possible existence of the parking lot video, but the evidence did not show that the video's

22  exculpatory value was apparent or that it would be deleted after thirty days.  *Id.*  On that record, the

23  Ninth Circuit affirmed the district court's decision to decline to dismiss the case or impose other

24  sanctions.  As to the exculpatory nature of the missing evidence, the Ninth Circuit noted that, while the

25  defendant claimed that the video would show who had access to her car on the day of her arrest, it was

26  "completely speculative whether the parking lot video was potentially useful" to the defense.  *Id.* at

27  1211-12.

28

1    Though the case agent in *Robertson* might have been slow to collect evidence "of speculative

2    value," that was insufficient to establish that he had made "a conscious effort to suppress exculpatory

3    evidence" supporting a finding of bad faith. *Id.* (quoting *United States v. Zaragoza-Moreira*, 780 F.3d

4    971, 980 (9th Cir. 2015)).  Applying the *Loud Hawk* standard to the defendant's request for sanctions,

5    the Ninth Circuit ruled in the government's favor, finding its conduct "not entirely blameless," but

6    "within a general range of reasonableness." *Id.* at 1213.  *See also United States v. Gibson*, Case No. CR

7    11-00734 WHA, 2012 WL 1123057 (N.D. Cal. Apr. 3, 2012) (holding that felon-in-possession

8    defendant was not entitled to dismissal or trial sanctions where investigating officer had failed to take

9    into evidence the laundry bag containing the charged firearm because exculpatory value was not

10   apparent and there was no evidence of bad faith); *Cunningham v. City of Wenatchee*, 345 F.3d 802, 812

11   (9th Cir. 2003) (in Section 1983 action stemming from sexual abuse investigation, rejecting argument

12   that investigating officer acted in bad faith by deciding not collect physical evidence like bed sheets and

13   clothing, where the value of that untested evidence was speculative and might have incriminated the

14   defendant further); *United States v. Patrick*, Case No. 16-cr-20390, 2016 WL 6610983, *1-2 (E.D.

15   Mich. Nov. 9, 2016) (where defendant was charged with a criminal violation of the Clean Water Act,

16   court declined to dismiss or suppress evidence based on government's decision not to collect samples

17   from the relevant body of water because there was no bad faith and evidence may have been

18   inculpatory); *United States v. Hendrix*, Case No. CR19-0024JLR, 2019 WL 6683509, *4 (W.D. Wash.

19   Dec. 6, 2019) (applying *Loud Hawk* standard to deny request for evidentiary hearing, dismissal, and

20   alternative sanctions where case agent failed to collect bag that had contained the firearm and narcotics

21   underlying the charges along with other items of the defendant's property, which property was

22   subsequently destroyed by local law enforcement)[2]; *United States v. Brown*, Case No. 2:17-CR-58 JCM

23   (VCF), 2018 WL 451556, *2-3 (D. Nev. Jan. 16, 2018) (declining to impose any sanctions where

24   officers "failed to collect evidence"—negligently, but not in bad faith—by turning off their body-worn

25

26   [2] The court in *Hendrix* was "somewhat troubled" by the government's conduct in connection
     with lost evidence. *Id.* at *6.  The evidence was destroyed by a local law enforcement agency, though
27   the federal authorities had chosen to collect only a portion of the evidence held by that agency,
     foregoing an opportunity to obtain the rest. *Id.*  Despite this arguable negligence, however, there was no
28   evidence that law enforcement was acting in disregard of the defendant's interests, and the government's
     conduct fell "well short of egregious," leading that court to decline to suppress evidence. *Id.*

GOVT. OPP. TO DEF.'S MOT. TO SUPPRESS
CASE NO. 18-CR-258 EJD                    17

1  cameras during portions of their investigation); *United States v. Hinkson*, Case No. CR-04-127-S-RCT,

2  2004 WL 7333646, *13-14 (D. Id. Dec. 22, 2004) (finding no bad faith or apparent exculpatory value

3  where officer turned off defendant's tape recorder during pat down, where recording of conversation

4  could have been incriminating).

5  **III.    An Evidentiary Hearing is Unnecessary.**

6      Because the undisputed facts of this case show that Defendant cannot establish that the

7  government failed to obtain or preserve material evidence in bad faith, an evidentiary hearing is

8  unnecessary to resolve Defendant's motion.  Evidentiary hearings are necessary "only when the moving

9  papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to

10  conclude that contested issues of fact exist."  *United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000).

11  Defendant has failed to meet that burden in this case.  Specifically, Defendant has failed to show that

12  resolving this issue requires the determination of any additional, disputed facts.  The parties may dispute

13  Defendants' level of culpability in connection with the loss of the LIS.  The key facts relevant to the

14  government's actions, however, are not in dispute.  Defendant does not dispute that the government

15  subpoenaed the LIS from Theranos in 2018 and was informed that same year that it was receiving an

16  electronic copy of that database.  The defense does not dispute that the copy of the LIS obtained from

17  Theranos in 2018 cannot be accessed.  Nor does the defense dispute that the LIS itself—apparently the

18  only accessible version of the database—was "decommissioned" by Theranos just days after the

19  company produced the inaccessible copy and without notice to the government.  These facts defeat

20  Defendant's motion under the legal standard discussed above.  Unless Defendant can offer "evidence or

21  contrary testimony" to suggest that the above account of relevant events is not credible, her blanket

22  desire to test the government's credibility in an evidentiary hearing is "little more than a fishing

23  expedition," which is "not sufficient to create a contested issue of fact that warrants an evidentiary

24  hearing."  *Hendrix*, 2019 WL 6683509 at *3.

25  **IV.    The Government Has Met and Exceeded its Discovery Obligations Relating to this Topic.**

26      Although Defendant's filing is styled as a motion to suppress, Defendant includes an ancillary

27  and undeveloped request that the Court compel production of certain documents relating to the

28  government's October 2020 discovery letter disclosing information to the defense regarding its efforts to

1    obtain and access the Theranos LIS.  (Mot. at 8).  The Court should deny this request, and resist

2    Defendant's attempt to use *Brady* as leverage to gain general access to the government's non-

3    discoverable internal records.  Indeed, as acknowledged in *Youngblood*, the Supreme Court has "rejected

4    the notion that a 'prosecutor has a constitutional duty routinely to deliver his entire file to defense

5    counsel.'"  *Youngblood*, 488 U.S. at 55 (quoting *United States v. Agurs*, 427 U.S. 97, 111 (1976)); *see*

6    *also Moore v. Illinois*, 408 U.S. 786, 795 (1972) ("We know of no constitutional requirement that the

7    prosecution make a complete and detailed accounting to the defense of all police investigatory work on a

8    case.").

9         By providing Defendant with the information in its October 2020 letter and related disclosures,

10   the government has more than satisfied its obligations under *Brady* and its progeny.  Defendant requests

11   access to government files to search for information that may help her argue the pending issue, but has

12   made no showing that any such additional information exists.  As courts in this District have recognized,

13   "defendants cannot use *Brady* simply to search for *Brady* materials.  Brady is not a pretrial discovery

14   tool."  *United States v. Weld*, No. CR 08-0083 PJH, 2009 WL 901871, *2 (N.D. Cal. Apr. 1, 2009).  The

15   Court should deny Defendant's request for production.

16                                        **CONCLUSION**

17        For the foregoing reasons, the Court should decline to hold an evidentiary hearing and should

18   deny Defendant's motion in its entirety.

19

20

21   DATED:  June 21, 2021                          Respectfully submitted,

22                                                   STEPHANIE M. HINDS
23                                                   Acting United States Attorney

24                                                   ___*/s/ John C. Bostic*_____
25                                                   JEFF SCHENK
                                                     JOHN C. BOSTIC
26                                                   ROBERT S. LEACH
                                                     KELLY I. VOLKAR
27                                                   Assistant United States Attorneys

28

GOVT. OPP. TO DEF.'S MOT. TO SUPPRESS
CASE NO. 18-CR-258 EJD          19