1   JOHN D. CLINE (CA State Bar No. 237759)
    50 California Street, Suite 1500
2   San Francisco, CA 94111
    Telephone: (415) 662-2260 │Facsimile: (415) 662-2263
3   Email: cline@johndclinelaw.com

4   KEVIN M. DOWNEY (Admitted Pro Hac Vice)
    LANCE A. WADE (Admitted Pro Hac Vice)
5   AMY MASON SAHARIA (Admitted Pro Hac Vice)
    KATHERINE TREFZ (CA State Bar No. 262770)
6   WILLIAMS & CONNOLLY LLP
    725 Twelfth Street, NW
7   Washington, DC 20005
    Telephone: (202) 434-5000 │Facsimile: (202) 434-5029
8   Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

9   Attorneys for Defendant ELIZABETH A. HOLMES

10

11                          UNITED STATES DISTRICT COURT

12                        NORTHERN DISTRICT OF CALIFORNIA

13                                SAN JOSE DIVISION

14

15  UNITED STATES OF AMERICA,           )   Case No. CR-18-00258-EJD
                                        )
16          Plaintiff,                  )   **MS. HOLMES' REPLY IN SUPPORT OF**
                                        )   **MOTION TO SUPPRESS EVIDENCE OF**
17      v.                              )   **CUSTOMER COMPLAINTS AND TESTING**
                                        )   **RESULTS AS WELL AS FINDINGS IN CMS**
18  ELIZABETH HOLMES and                )   **REPORT**
    RAMESH "SUNNY" BALWANI,             )
19                                      )   Date:    July 7, 2021
            Defendants.                 )   Time:    10:00 a.m.
20                                      )   CTRM:  4, 5th Floor
                                        )
21                                      )
                                        )   Hon. Edward J. Davila
22  _____)

23

24

25

26

27

28

1

## <u>TABLE OF CONTENTS</u>

2
Page

3
I. *Flyer* Does Not Require Bad Faith for Suppression. ...........................................................2

4
II. The Loss of Potentially Useful Evidence Can Constitute a Due Process
Violation Under *Youngblood*. ...............................................................................................5

5
    A. The Government Misstates the Legal Standard Under *Youngblood*........................5

6
    B. The Parties Dispute Whether the *Youngblood* Elements Have Been
Satisfied....................................................................................................................6

7
III. An Evidentiary Hearing Is Necessary to Resolve Specific Factual Disputes. .....................8

8
    A. The Pleadings Have Identified Specific Contested and Unresolved
Issues of Fact...........................................................................................................9

9

10
    B. Testimony Is Necessary to Resolve Contested or Open Issues of Fact. ................11

    C. The Government Has Conceded Specific Issues of Fact. ......................................13

11
IV. Ms. Holmes Is Entitled to Evidence Identified in the Government's *Brady*
Letter........................................................................................................................................14

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF AUTHORITIES**

## **CASES**

*Arizona v. Youngblood*, 488 U.S. 51 (1988)……………………………………………..*passim*

*Brady v. Maryland*, 373 U.S. 83 (1963) ...................................................................................14

*California v. Trombetta*, 467 U.S. 479 (1984)……………………………………………….4

*Cunningham v. City of Wenatchee*, 345 F.3d 802 (9th Cir. 2003)......................................4

*Giglio v. United States*, 405 U.S. 150 (1972) ............................................................................14

*Illinois v. Fisher*, 540 U.S. 544 (2004) .........................................................................................5

*Mellen v. Winn*, 900 F.3d 1085 (9th Cir. 2018) ...................................................................15

*United States v. Booth*, 309 F.3d 566 (9th Cir. 2002)...........................................................4

*United States v. Brown*, 2018 WL 451556 (D. Nev. Jan. 16, 2018)...............................3

*United States v. Drake*, 543 F.3d 1080 (9th Cir. 2008) ......................................................8

*United States v. Flyer*, 633 F.3d 911 (9th Cir. 2011)............................................... *passim*

*United States v. Garcia*, 37 F.3d 1359 (9th Cir. 1994) ........................................................4

*United States v. Hinkson*, 2004 WL 7333646 (D. Idaho Dec. 22, 2004).....................4

*United States v. Holman*, 2013 WL 12204324 (D. Nev. Sept. 20, 2013)....................3

*United States v. Howell*, 231 F.3d 615 (9th Cir. 2000)........................................................8

*United States v. Loud Hawk*, 628 F.2d 1139 (9th Cir. 1979)................................. *passim*

*United States v. Montes De Oca*, 656 F. App'x 831 (9th Cir. 2016).........................15

*United States v. Patrick*, 2016 WL 6610983 (E.D. Mich. Nov. 9, 2016).....................4

*United States v. Sinek*, 2016 WL 11687630 (N.D.N.Y. Aug. 18, 2016) ......................4

*United States v. Stevers*, 603 F.3d 747 (9th Cir. 2010)...................................................15

*United States v. White*, 850 F.3d 667 (4th Cir. 2017)......................................................15

*United States v. Zaragoza-Moreira*, 780 F.3d 971 (9th Cir. 2015) ...................... *passim*

1

**RULES**

2 | Fed. R. Crim. P. 12 ....................................................................................................15

3 | Fed. R. Crim. P. 16 .............................................................................................14, 15

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO SUPPRESS
CR-18-00258 EJD

This Court should hold an evidentiary hearing, and, after that hearing, suppress the categories of customer complaints, testing results, and CMS Report findings identified in Ms. Holmes' motion.

Ms. Holmes is entitled to relief under the governing legal standards.  First, and contrary to the government's assertion, suppression does not require a finding of bad faith.  *See United States v. Flyer*, 633 F.3d 911 (9th Cir. 2011).  Instead, the Ninth Circuit requires consideration and balancing of multiple factors.  *See id.* at 916 (citing *United States v. Loud Hawk*, 628 F.2d 1139, 1152 (9th Cir. 1979) (Kennedy, J., concurring)).  Under this doctrine, suppression may be appropriate even when bad faith is absent.

Second, the Ninth Circuit has held that the loss of "potentially useful" evidence—evidence that *might* have been exculpatory—constitutes a due process violation when the government acts in bad faith.  *See United States v. Zaragoza-Moreira*, 780 F.3d 971, 978 (9th Cir. 2015) (applying *Arizona v. Youngblood*, 488 U.S. 51 (1988)).  The government suggests that the loss of such evidence cannot form the basis of a due process violation.  That is incorrect, and there is no question that the evidence residing in the LIS was potentially useful to Ms. Holmes' defense.

The government's opposition makes clear that a suppression hearing is required.  The government does not contest that this Court's Order on the motions *in limine* endorsed the relevance of its anecdotal evidence.  Dkt. 798 at 48-49.  That Order ripened Ms. Holmes' due process concern.  The government also agrees that a suppression hearing is necessary when the movant identifies contested issues of fact.  And while the government has conceded important factual issues, such as the involvement of members of the prosecution team in the events at issue, numerous factual disputes remain.  *See infra* pp. 11-13.

Ms. Holmes is also entitled to the identities of the government personnel discussed in the government's October 29, 2020 *Brady* letter, as well as the documents on which that letter relies.  Dkt. 732-2.  This evidence is necessary for both this motion and the preparation of her defense as a whole.

A final point before turning to the merits.  The government continues to insinuate vaguely that Ms. Holmes had a role in the loss of the LIS.  *See* Opp'n, Dkt. 846 at 1-2, 7; *see also* Dkt. 682 at 1, 9-10; Dkt. 580, 580-1, 580-2; 7/20/2020 H'rg Tr. 56:15-18; 5/4/2021 Hr'g Tr. 82:14-17, 83:17-21.  That is

1  false.  In an "independent" grand jury investigation relating to the LIS, members of the prosecution team

2  have collected dozens of witness statements and proffers and hundreds of thousands of pages of

3  documents.  They have not found one scintilla of evidence connecting Ms. Holmes to the loss of this

4  database—because there is none.  Counsel's persistence in insinuating without evidence that Ms.

5  Holmes is responsible for the loss of this evidence needs to stop, particularly in light of this Court's

6  ruling foreclosing such argument because of the government's lack of evidence.  Dkt. 798 at 57.

7  **I.**     ***Flyer* Does Not Require Bad Faith for Suppression.**

8  Bad faith on the part of the government is required to dismiss an indictment under the Due

9  Process Clause, but not for lesser sanctions such as suppression.  In *Flyer*, the Ninth Circuit explained

10  that "[t]he government's failure to preserve potentially exculpatory evidence rises to the level of a due

11  process violation if a defendant can show that the government acted in bad faith."  633 F.3d at 916.

12  "Bad faith," the Ninth Circuit continued, "requires more than mere negligence or recklessness."  *Id*.

13  However, "[i]f the government destroys evidence under circumstances that do not violate a defendant's

14  constitutional rights," *e.g*., which do not involve bad faith, "the court may still impose sanctions

15  including suppression of secondary evidence."  *Id*. (citing *Loud Hawk,* 628 F.2d at 1152 (Kennedy, J.,

16  concurring)).  In determining whether such sanctions are appropriate, "the court must balance 'the

17  quality of the Government's conduct and the degree of prejudice to the accused.'"  *Id*. (quoting *Loud*

18  *Hawk,* 628 F.2d at 1152 (Kennedy, J., concurring)).  Although the defendant bears the burden of

19  showing the government's bad faith to establish a constitutional violation, the government has the

20  burden of justifying its conduct under *Flyer*, where lesser sanctions are at stake.  633 F.3d at 916.

21  The government's assertion that the Ninth Circuit inflexibly requires bad faith for the

22  suppression of evidence, Dkt. 846 at 9, 11-12, is wrong.  The government bases this assertion on Judge

23  Trask's opinion in *Loud Hawk*, Dkt. 846 at 1-2, 9-10, but in *Flyer* the Ninth Circuit adopted then-Judge

24  Kennedy's controlling opinion in that case, not Judge Trask's.  Judge Kennedy's opinion is

25  unmistakably clear: "[i]n cases of severe prejudice, suppression or other sanctions would be appropriate

26  without regard to the good faith or culpability of the Government."  628 F.2d at 1152.

27  The Ninth Circuit's opinion in *United States v. Zuniga-Garcia* illustrates the showing required

28

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO SUPPRESS
CR-18-00258 EJD

1  for sanctions under *Flyer*.  472 F. App'x 498, 499 (9th Cir. 2012).  In a prosecution for importing

2  narcotics, the defendant claimed that he was unaware of the marijuana found in his car's gas tank.  At

3  trial, the government sought to establish *mens rea* by pointing to the facts that the defendant had a bolt

4  in his pocket when arrested, and that the bolt fit the retaining clip connecting the gas tank to the vehicle.

5  *See id*. at 500 (Callahan, J., dissenting).

6         For his part, the defendant argued that the bolt "was for one of the many construction-related

7  tools in his truck." *Id*. at 499.  At some point before trial, however, the government lost all those

8  construction tools, preventing the defendant from showing that the bolt matched one of the tools.  *Id*.

9  Applying *Flyer*, the Ninth Circuit did not ask the defendant to prove that the bolt, in fact, fit those

10 construction tools, nor did the court assess whether the government acted in bad faith.  In reversing the

11 conviction and instructing the district court to provide the requested sanction, the Court's reasoning was

12 simple enough: "The destruction of this evidence left the defendant without any means of refuting an

13 important part of the prosecution's case." *Id*.

14        The government's principal response is to suggest that it tried, but failed, to obtain a working

15 copy of the LIS.  Dkt. 846 at 9-10, 14.  Under *Flyer*, whether the government had custody of evidence is

16 just one factor to consider—it is not dispositive.  *See Loud Hawk*, 628 F.2d at 1152 (Kennedy, J.,

17 concurring).[1]  The adequacy of the government's efforts to gather, access, and preserve a working copy

18 remains in dispute.  The government received a copy of the LIS on August 27, 2018, Dkt. 732-2 ¶ 34

19 (Oct. 29, 2020 Letter from R. Leach to L. Wade ("*Brady* Letter")); Dkt. 681-35, but its efforts to access

20 that copy were lackluster at best, *see, e.g., Brady* Letter ¶¶ 46-49; Dkt. 730 at 13-16.  The government

21 also claims that the LIS was "inaccessible" from late August 2018 onward, Dkt. 846 at 7, but that

22

23         [1] In *United States v. Brown*, 2018 WL 451556, *4 (D. Nev. Jan. 16, 2018), the district court
   summarily declined to apply *Flyer* balancing because the government's failure to collect evidence was

24 negligent, rather than in bad faith.  That holding is irreconcilable with Judge Kennedy's controlling
   opinion in *Loud Hawk*, which makes clear that government custody is just one factor to consider, and

25 that the loss of evidence may require suppression "without regard to the good faith or culpability of the
   government" in cases of severe prejudice.  628 F.2d at 1152.  And in *United States v. Holman*, 2013 WL

26 12204324 (D. Nev. Sept. 20, 2013), after holding an evidentiary hearing, the court declined to give a
   loss of evidence instruction because, by the time the government began its investigation, the email

27 "server contained no emails to collect or preserve" due to the company's document-destruction policy,
   and there was no question that the government had acted diligently in initiating the investigation.  *Id*. at

28 *2-*4.

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO SUPPRESS
CR-18-00258 EJD

1   assertion conflicts with the statements of multiple witnesses who understood that the LIS could be

2   reconstituted on hardware in the possession of the Theranos Assignee.  *See infra* p. 8.  And that is to say

3   nothing of the government's inexplicable delay in taking possession of the database from which it had

4   been receiving productions for years, as the company was closing.  *See* Dkt. 730 at 12-14.

5          The government cites a flurry of cases, but most involve constitutional claims and thus apply a

6   legal standard more onerous than the *Flyer* standard.[2]  The government cites only three opinions that

7   balance the quality of the government's conduct against the prejudice to the defense.  Those are readily

8   distinguishable.   In *United States v. Robertson,* the court declined to impose sanctions when a separate

9   government agency "not involved in the case" automatically recorded over a videotape because, *inter*

10  *alia*, prosecutors were not involved in the loss of evidence; it was unclear whether the video had an

11  unobstructed view of the events in question (or even could confirm the identity of the individuals

12  involved); the video was "not central to the case" because it concerned only a small subset of the

13  allegations; and the jury was informed of the government's loss of the videotape.  895 F.3d 1206, 1213-

14  14 (9th Cir. 2018).  In *United States v. Gibson*, the Court did not impose sanctions because the officer

15  who failed to collect evidence followed crime-scene protocol; had no reason to believe the uncollected

16  evidence was exculpatory; was not negligent; and the lost evidence would not have exculpated the

17  defendant.  2012 WL 1123057, at *4 (N.D. Cal. 2012).  In *United States v. Hendrix*, the court was

18  "somewhat troubled" by the quality of the government's conduct, but ultimately declined to impose

19  sanctions because no prosecutors were involved in the loss of evidence; the loss was not deliberate; the

20  government conformed to standard practices; and the lost evidence was not "crucial or exculpatory."

21  2019 WL 6683509, at *6 (W.D. Wash. Dec. 6, 2019).

22         By contrast, here, members of the prosecution team were involved in the loss of evidence, acted

23  in disregard of Ms. Holmes' rights by failing to preserve the LIS, bucked the advice of federal personnel

24

25         [2] *See Cunningham v. City of Wenatchee*, 345 F.3d 802, 812 (9th Cir. 2003) (applying
    *Youngblood* and *Trombetta*); *United States v. Booth*, 309 F.3d 566, 574 (9th Cir. 2002) (applying
26  *Trombetta*); *United States v. Garcia*, 37 F.3d 1359, 1366 (9th Cir. 1994) (applying *Youngblood*); *United
    States v. Sinek*, 2016 WL 11687630, at *3-*4 (N.D.N.Y. Aug. 18, 2016) (applying *Youngblood* and
27  *Trombetta*); *United States v. Patrick*, 2016 WL 6610983, at *1 (E.D. Mich. Nov. 9, 2016) (applying
    *Trombetta*); *United States v. Hinkson*, 2004 WL 7333646, at *13-*14 (D. Idaho Dec. 22, 2004)
28  (applying *Youngblood* and *Trombetta*).

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO SUPPRESS
CR-18-00258 EJD

4

regarding the handling of the LIS, and then (years later) sought to cast the blame on others for the loss of this evidence.  *See* Dkt. 810 at 5-6; Dkt. 730 at 10-20.  In addition, Ms. Holmes is severely prejudiced by the loss of the LIS, for the reasons previously explained to the Court.  *See* Dkt. 810 at 6-7; Dkt. 730 at 10-12; *see also* 5/4/2021 Hr'g Tr. 46:15-49:3.

The government also suggests that the case law forecloses relief when the exculpatory potential of the evidence is "purely speculative."  Dkt. 846 at 2.  But lost evidence need only be "potentially useful" to warrant sanctions.  *See infra* pp. 5-6.  There is no question that the LIS contained significant exculpatory evidence, *see infra* pp. 9-10 n. 8, 9, or that the government appreciated the significance of the database before its loss, Dkt. 846 at 5-6 (describing government subpoenas for data contained in LIS).

## II.    The Loss of Potentially Useful Evidence Can Constitute a Due Process Violation Under *Youngblood*.

### A.    The Government Misstates the Legal Standard Under *Youngblood*.

The government maintains that the loss of evidence that could have either exculpated or inculpated a defendant cannot form the basis of a due process violation.  Dkt. 846 at 7-8, 12-13.  That is an incorrect statement of the law.  *Youngblood* makes clear that the loss of even "potentially exculpatory evidence" can violate the Due Process Clause.  488 U.S. at 57-58.  In assessing whether the government has acted in bad faith, the key question is whether the government had "knowledge of the *potential* usefulness of the evidence" at the time that evidence was lost or destroyed.  *Zaragoza-Moreira*, 780 F.3d at 977 (emphasis added).[3]

The Ninth Circuit's opinion in *Zaragoza-Moreira* is on point.  *Id.*  In that case, the Ninth Circuit found a due process violation when the government destroyed a videotape that could have "corroborated or disproved" the defendant's statements supporting her duress defense.  *Id.* at 980.  The defendant was

---

[3] The Supreme Court does not require a finding of bad faith "when the [government] suppresses or fails to disclose material exculpatory evidence."  *Illinois v. Fisher*, 540 U.S. 544, 547 (2004).  In that circumstance, "the good or bad faith of the prosecution is irrelevant: a due process violation occurs whenever such evidence is withheld."  *Id.*  The bad-faith requirement applies only when the government has failed "to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant."  *Id.* (quoting *Youngblood*, 488 U.S. at 57).

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO SUPPRESS
CR-18-00258 EJD

5

1   apprehended at a port of entry with narcotics.  *Id*. at 975.  At an interview, the defendant informed a

2   government agent of facts supporting a duress defense—namely, that she had tried to get the attention of

3   authorities while in the port-of-entry line, and that she had been accompanied in line by a woman named

4   "Karen" who had pressured her to transport the drugs.  *Id*.  The agent was independently aware that a

5   videotape existed that might have substantiated those statements, but "made no attempt to view or

6   preserve the . . . video before it was destroyed."  *Id*. at 980.  The Ninth Circuit held that the government

7   agent was aware of the videotape's "apparent value," despite the fact that no one had actually viewed the

8   videotape.  *Id*.  That knowledge, coupled with the agent's knowledge that "Karen" had passed through

9   that port-of-entry (which partially corroborated the defendant's account), and the agent's omission of

10  statements of the defendant from some (but not all) post-interview documents, established bad faith and

11  required dismissal of the indictment.[4]  *Id*. at 980-81.

12       **B.**    **The Parties Dispute Whether the *Youngblood* Elements Have Been Satisfied.**

13       *Youngblood* and its progeny set out three elements for a due process violation resulting from the

14  loss of evidence.  As applied to this motion, those are:

15      •  Whether the evidence residing on the LIS was potentially useful to Ms. Holmes' defense;

16      •  Whether the government failed to access and preserve the LIS while knowing that evidence

17             was potentially useful to Ms. Holmes, and its conduct is sufficient to show "a conscious

18             effort to suppress exculpatory evidence," i.e., bad faith;

19      •  Whether Ms. Holmes can obtain comparable evidence by other reasonably available means.

20  *Zaragoza*, 780 F.3d at 977, 980.

21       The parties agree on some facts relevant to the three-part test and dispute others.  As to the first

22  element, the government does not contest that the LIS contained some exculpatory evidence.  For

23  example, the government accepts that the LIS contained substantial data concerning millions of testing

24  results (including potentially millions of accurate test results), contained vast quantities of QC data, and

25

26         [4] The government notes that, in *Zarogoza-Moreira*, the prosecutor "failed to notify the agency of

27  the defendant's explicit request to preserve the video evidence."  Dkt. 846 at 11.  But the Ninth Circuit made clear that it was not relying on the conduct of the prosecutor for its finding of bad faith—the

28  conduct of the federal agent was sufficient.  *See* 780 F.3d at 981.

could be used to query and access those results and data.  Dkt. 846 at 3-4.  Ms. Holmes has described the

ways in which this information could be used to assess accuracy of particular testing results.  *See* Dkt.

730 at 10-11; 5/4/2021 Hr'g Tr. 46:15-49:3.  Nor does the government dispute that, under this Court's

ruling, accurate results in the LIS would be exculpatory.  Dkt. 810 at 6 (quoting Dkt. 798 at 48-49).  The

parties dispute the degree of prejudice associated with the loss of the LIS.  *Compare* Dkt. 846 at 12-13,

*with* Dkt. 810 at 4, 6-7.  For example, the government now describes the LIS as "secondary evidence."

Dkt. 846 at 13.  That is incorrect, as Theranos' specific lab testing results and QC data were stored in the

LIS, as the government has elsewhere acknowledged, *see* Dkt. 846 at 4-5, Dkt. 682 at 1-3.  The

government's second- and third-hand anecdotes about testing results and QC data all trace to the LIS.

As to the second element (whether the government acted in bad faith), the government refuses to

accept that it bears any responsibility for the loss of the LIS evidence, arguing instead that Theranos

"destroyed the [LIS] evidence."  Dkt. 846 at 11-12; 5/4/2021 Hr'g Tr. 81:17-18.  This position conflicts

with the statements of witnesses who understood that, even after the closure of Theranos' facility in

August 2018, the LIS could be reconstituted on its original hardware.  *See* Dkt. 736-7 (filed under seal);

Ex. 10 (US-REPORTS-0025513); *cf.* Dkt. 735-4 (describing November 2018 attempt by former

Theranos contractor to access LIS that "suggest[ed] that the database servers _may_ still be running").

Other witnesses with IT expertise have stated that it would have been technically possible to reconstitute

the LIS on its original hardware.  Ex. 11 (US-REPORTS-0024258) (IT expert "did not think it would be

difficult to reconstruct the servers to make them work because they had given them instruction on how

to rebuild them and it was a standard Microsoft procedure on how to rebuild it."); Ex. 13 (US-

REPORTS-0019711) (although "very difficult," LIS could be reconstructed if the hard drives were

placed in the proper order).

In addition, unanswered questions remain (due to the government's inadequate disclosures) as to

why government attorneys refused to follow the advice of government personnel regarding ways to

access the LIS following the assignment.  *See Brady* Letter ¶¶ 46-49.  The government's course of

conduct after taking possession of the LIS copy (including its massive, years-later expenditure of

resources to pin the fault elsewhere) bears directly on the question of bad faith, as does the decision to

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO SUPPRESS
CR-18-00258 EJD

seek the return of an indictment before consulting the company's comprehensive database to assess

accuracy and reliability.  *See* Dkt. 730 at 8; *Zaragoza-Moreira*, 780 F.3d at 980.

As to the third element, the government's opposition does not contest that Ms. Holmes is unable

"to obtain comparable evidence by other reasonably available means." *Zaragoza-Moreira*, 780 F.3d at

977, 981 (rejecting cross-examination as a comparable substitute).  The government has acknowledged

that the LIS was a unique repository of critical evidence in this case.  *See* Dkt. 682 at 1-3, 9-10.

The government's principal response to all this is to suggest that it never had a working copy of

the LIS.  Dkt. 846 at 9-10.  But, as the government concedes, the government's failure even to collect

potentially exculpatory evidence violates due process if done in bad faith, *id*. at 8.  And, as already

discussed, the facts surrounding this issue are very much in dispute.  *See supra* pp. 3-4.  An evidentiary

hearing is required to resolve the parties' factual dispute concerning the government's conduct.  *See*

*Zaragoza-Moreira* 780 F.3d at 977, 980.[5]

### III.    An Evidentiary Hearing Is Necessary to Resolve Specific Factual Disputes.

Both parties agree that an evidentiary hearing is necessary "when the moving papers allege facts

with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested

issues of fact exist." *United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000); *see* Dkt. 846 at 18.

The government has already recognized a factual dispute relating to its handling of this evidence.

5/4/2021 Hr'g Tr. 81:17-18 (Government: "When it comes to blame for the loss of the LIS. As the Court

can tell, this is a very hotly debated factual dispute."); *see also id*. at 82:5-7, 83:17-23.  In addition, the

parties dispute specific facts associated with the question of prejudice, including whether the LIS data

---

[5] The government's cases do not warrant a different result.  In *United States v. Martinez-Martinez*, the Ninth Circuit acknowledged that the loss of potentially exculpatory evidence may violate due process, but concluded that "it was not readily apparent that [the evidence at issue] might have proven exculpatory."  369 F.3d 1076, 1087 (9th Cir. 2004).  By contrast, in this case, the government "undoubtedly appreciated the significance" of the LIS database.  *Zaragoza-Moreira*, 780 F.3d at 979. The government also relies on *United States v. Drake*, 543 F.3d 1080, 1090 (9th Cir. 2008), which misstates the *Youngblood* standard.  To the extent that *Drake* stands for the idea that the loss of potentially exculpatory evidence cannot violate due process, even when bad faith is present, it is inconsistent with *Youngblood* and has been abrogated by subsequent Ninth Circuit case law.  *See* *Zaragoza-Moreira*, 780 F.3d at 977.

could "corroborate[] or disprove[]" the government's assertions about accuracy and reliability.

*Zaragoza-Moreira*, 780 F.3d at 980.

A.    **The Pleadings Have Identified Specific Contested and Unresolved Issues of Fact.**

Among others, the following contested and/or unresolved issues of fact exist:

***The quality of the government's conduct***

- Whether the government could have accessed the LIS through legacy Theranos servers after the closure of Theranos' facility (before their return to the lessor), as multiple witnesses have indicated;[6]

- Whether, had the government followed the advice of its litigation support professionals, it could have accessed and preserved the copy of the LIS in its possession;[7]

- Whether the government could have obtained the password to access the produced copy of the LIS if it had timely sought the password, *see supra* p. 9 n. 6;

- The extent of government notice about the existence of accurate testing results in the LIS;[8]

---

[6] According to evidence generated by the government's "independent" grand jury investigation, there were at least two possible ways to access the LIS following the closure of Theranos' facility in late August 2018.  First, the government might have accessed the copy of the LIS produced to it on August 27, 2018.  The government states that this copy was "inaccessible" because the government lacked the appropriate password (although the government did not timely request the password).  Dkt. at 846 at 6, 18.  But a number of witnesses have stated that there was a *second* possible way to access the LIS: the LIS could have been reconstituted on the sophisticated hardware retained by Theranos and subsequently by the Assignee.  The government has repeatedly ignored the availability of this second possible pathway for accessing and preserving the LIS.  *Compare, e.g.,* Dkt. 846 at 5, 18 (asserting that the copy of the LIS that it received was "inaccessible"); 5/4/2021 Hr'g Tr. 83:17-21 (government argument: describing copy of LIS in government's possession as "inaccessible"), *id.* at 83:6-16 (government argument: stating that government attempts to access LIS after closure of Theranos facility "may have been doomed from the start"), *id.* at 83:3-5 (government argument: it was "likely impossible" to access the LIS); *with supra* p. 8 (witness statements that it was understood that LIS could be reconstituted after the closure of Theranos facility).

[7] *Compare* Dkt. 846 at 5; 5/4/2021 Hr'g Tr. 83:17-21, *with Brady* Letter ¶¶ 46-49.

[8] Before August 2018, the government knew that accurate test results resided in the LIS.  *See, e.g.,* Ex. 14 (US-REPORTS-0008569) (February 28, 2018 interview with member of prosecution team and doctor, who stated that "Theranos was his favorite laboratory" and "all his clients' test results from Theranos were clinically relevant"); Ex. 15 (US-REPORTS-0007225) (February 2, 2018 interview in which doctor said that out of "40 or 50" patients sent to Theranos only "[a] couple of those results were 'weird'" but "[w]eird laboratory results aren't out of the ordinary"); Ex. 16 (US-REPORTS-0008710) (February 27, 2018 interview including member of prosecution team in which doctor, when shown test result, stated that he "did not have a concern about the accuracy of the test" and, when shown another, "did not find anything concerning in the lab results"); Ex. 17 (US-REPORTS-0002771) (investor's Theranos blood test results "seemed consistent with other tests he has received").

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO SUPPRESS
CR-18-00258 EJD

- The extent to which the LIS contained exculpatory evidence in the form of accurate test results;[9]

- The extent of government notice about the technical complications associated with accessing and preserving the LIS, Dkt. 732-3, 732-4, 736-7 (under seal);

- The reason why government attorneys did not take steps recommended by government personnel to gather and/or access and preserve the LIS, *Brady* Letter ¶¶ 46-49;

- The reason why the government did not acquire the software needed to access the LIS, as recommended by Theranos counsel, *Brady* Letter ¶ 32; Dkt. 734, 734-1;

- The reason why the government did not "go the search warrant route," Dkt. 734-1, or seek to take possession of the physical servers (as it did for specific devices), Dkt. 734-2; *Brady* Letter ¶ 33;

- The extent of involvement of members of the prosecution team in these events, Dkt. 732-3, 732-4, 734, 734-1, 734-2, 736-7 (under seal); *cf., e.g., Brady* letter ¶¶ 46-49 (describing actions of unnamed government attorneys).

***Degree of prejudice to the accused***

- Whether the data in the LIS could have been used to rebut the government's assertions of accuracy and reliability;[10]

- Whether (as Dr. Master states in his supplemental report) an individual test result tends to prove or disprove accuracy and reliability of the underlying technology, Dkt. 842-1 at 2;

- Whether the rich array of data in the LIS (both patient testing data and QC data) could been used to verify or rebut anecdotal assertions, including from Kingshuk Das, Adam Rosendorff, and doctors and customers;[11]

---

[9] *Compare* Dkt. 846 at 2 ("purely speculative" that LIS possessed actual exculpatory evidence), *with supra* p. 9 n. 8 (detailing exculpatory evidence in LIS).

[10] *Compare* Dkt. 846 at 3; 5/4/2021 Hr'g Tr. 79:10-15, *with* Dkt. 730 at 2, 9-12; Dkt. 810 at 6-7; 5/4/2021 Hr'g Tr. 46:15-49:3.

[11] *Compare* Dkt. 846 at 3; 5/4/2021 Hr'g Tr. 79:10-15, *with* Dkt. 730 at 2, 9-12; Dkt. 810 at 6-7; 5/4/2021 Hr'g Tr. 46:15-49:3.

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO SUPPRESS
CR-18-00258 EJD

- The "probative value and reliability of the secondary or substitute evidence" intended to be used by the government at trial;[12]

- The "nature and probable weight of factual inferences or other demonstrations and kinds of proof lost" to Ms. Holmes as a result of the loss of the LIS data.[13]

These factual issues are directly relevant to the question whether to suppress the evidence identified in Ms. Holmes' motion.[14]

### B. Testimony Is Necessary to Resolve Contested or Open Issues of Fact.

Resolving these factual disputes requires testimony from the individuals involved, and the production and review of relevant documents.  For example, the parties will need to elicit testimony from the following individuals on the following subjects.

- USAO Automated Litigation Support (ALS) Staff
    - What options for accessing the LIS the ALS Unit, government paralegal(s), and government attorneys discussed in fall 2018, *Brady* Letter ¶¶ 39-43, 45-47;
    - The reasons for the ALS Unit's recommendations for accessing the LIS, *id*. ¶ 46;
    - How the ALS ordinarily accesses and preserves sensitive data, *cf. id*. ¶¶ 37-54.
- USAO Paralegal(s)
    - Whether the paralegal received any instructions from government attorneys upon receipt of the hard drive containing the LIS copy;[15]
    - Why the paralegal delayed approximately two weeks before sending the hard drive to the Automated Litigation Support supervisor, *Brady* Letter ¶¶ 36, 39;
    - Whether anyone contacted the paralegal between October 30, 2018 and May 2020 regarding the LIS copy in her possession, *id*. ¶¶ 47, 49, 53;

---

[12] *Compare* Dkt. 846 at 13, *with* Dkt. 810 at 6.

[13] *Compare* Dkt. 810 at 6-7; Dkt. 730 at 10-11; 5/4/2021 Hr'g Tr. 46:15-49:3, *with* Dkt. 846 at 13.

[14] To be clear, Ms. Holmes does not concede that the LIS at the Theranos facility was the "only accessible version of the database," or that the LIS was inaccessible after the closure of that facility. Dkt. 846 at 18.  Ms. Holmes also does not concede that the government lacked "notice" of Theranos' closure and, with it, the movement of the LIS servers from the Theranos facility.  *Id.*

[15] *See id.* ¶ 36; *see* Exs. 18 (USAO-8511), 19 (USAO-8512).

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO SUPPRESS
CR-18-00258 EJD

- o Why the paralegal re-initiated contact twice in January 2019 with government attorneys to remind them of potential ways to access the LIS, *id*. ¶ 49;

- o Whether the government attorneys responded to this January 2019 outreach, *id*.

- Government attorneys

  - o Why the government sought productions of data from the LIS from 2015 to 2018.[16]

  - o Whether government attorneys were informed that there would be technical difficulties associated with accessing the LIS database, Dkt. 732-3, 732-4, 736-7 (under seal);

  - o How government attorneys responded to notice of those technical difficulties, *id*.;

  - o Why the government did not acquire the software identified in the July 2018 email from Theranos counsel to the prosecution team as necessary to restore and run the LIS, *Brady* Letter ¶ 32; Dkt. 734, 734-1;

  - o Whether the fact that the LIS copy was intended for a SQL database was communicated to the paralegal and the ALS unit, *Brady* Letter ¶ 46;

  - o Why the government waited until June 4, 2018 to subpoena the LIS, Dkt. 733;

  - o The identities of the unnamed government attorneys described in the *Brady* letter, and why did they not follow the advice of ALS staff and the USAO paralegal outlined in the *Brady* letter, *Brady* Letter ¶¶ 46, 49;

  - o Whether the government asked the FBI or any other agency with appropriate expertise to try to access the LIS database, *id*. ¶¶ 46-47;

  - o Whether government attorneys responded to the paralegal's proposals for accessing the LIS in January 2019, *id*. ¶ 49;

  - o Whether the government took steps to contact any Theranos IT personnel for assistance with accessing the LIS in fall 2018, *cf. id*. ¶ 18;

---

[16] Dkt. 846 at 5-6; Dkt. 846-7, 846-8; *cf. Zaragoza*, 780 F.3d at 979 (questions about duress defense showed government notice of potentially exculpatory nature of evidence).

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO SUPPRESS
CR-18-00258 EJD

- o Whether government counsel (as they have previously represented) spoke with Theranos counsel over the phone regarding access to the LIS database shortly after receiving the copy of the LIS, Dkt. 730 at 15 n. 9; Dkt. 735-2.
- o Whether government counsel contacted a particular former Theranos executive, as a member of the prosecution team indicated they might, Dkt. 736-1;

- Theranos counsel
  - o What specifically Theranos counsel told government attorneys regarding technical difficulties associated with accessing the LIS database, Dkt. 732-3, 732-4, 736-7 (under seal);
  - o When Theranos counsel did so, *id*.;
  - o Whether Theranos counsel informed the government of the closing of the Theranos facility and/or the disassembly of the LIS.[17]

At the requested evidentiary hearing, Ms. Holmes also would call one or more witnesses to establish the capabilities and functionality of the LIS, and how it included vast amounts of information that are directly relevant to the government's allegations.[18]

### C.    The Government Has Conceded Specific Issues of Fact.

The government has conceded certain factual issues relevant under *Flyer*.

***Quality of government conduct***

- The government was on notice as early as 2015 of the LIS and its contents, Dkt. 846 at 5-6, Dkt. 732-1;
- The government sought and received productions of data derived from the LIS between 2015 and 2018, *id*.; Dkt. 732-1; *Brady* Letter p. 12, ¶ 19;
- Theranos counsel produced what they represented to be a copy of the LIS to the government, *Brady* Letter ¶ 36; Dkt. 681-35;

---

[17] Dkt. 846 at 11, 18.

[18] *See* Dkt. 682 at 1-3; Dkt. 810 at 6-7; Dkt. 730 at 10-11; 5/4/2021 Hr'g Tr. 46:15-49:3.

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO SUPPRESS
CR-18-00258 EJD

13

- The government took custody of that copy, *Brady* Letter ¶ 36; Exs. 18 (USAO-8511), 19 (USAO-8512);

- Government attorneys did not follow the advice of litigation support professionals after receipt of that copy, *Brady* Letter ¶¶ 46-49;

- Members of the prosecution team were involved in the events at issue, Dkt. 732-3, 732-4, 734, 734-1, 734-2, 736-7 (under seal).

***Prejudice to Ms. Holmes***

- The data the LIS contained (including data relating to each testing result and all the QC data) and the specific functionality of the database (including the ability to query and sort data);[19]

- That the LIS contained potentially millions of accurate test results;[20]

- The probable effect on the jury of loss of evidence, *i.e.*, faulting Ms. Holmes for the loss of the evidence, *see supra* pp. 1-2, and shifting the burden to her to disprove the government's accuracy-and-reliability allegations, *cf*. Dkt. 846 at 3-4.

The government also concedes the legal proposition that, under this Court's motion *in limine* ruling, an accurate test result is exculpatory.  Dkt. 810 at 6.

### IV.   Ms. Holmes Is Entitled to Evidence Identified in the Government's *Brady* Letter.

Contrary to the government's assertion, *see* Dkt. 846 at 19, Ms. Holmes is not attempting to "search for information" within government files—she requests the particular evidence relied on or contained in the government's October 29, 2020 *Brady* letter.  This evidence is essential for the Court to make an informed decision under *Youngblood* and *Flyer*, and Ms. Holmes is entitled to it under *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and Rule 16.  The *Brady* letter plainly quotes from documents not yet produced to Ms. Holmes,[21] and describes conduct of unnamed government personnel that is squarely at issue in this motion.  *See, e.g., Brady* Letter ¶¶ 37-52;

---

[19] *See* Dkt. 846 at 4-5; Dkt. 682 at 1-3.

[20] The government does not contest this assertion in its opposition.  *See* Dkt. 810 at 6.

[21] *See, e.g., Brady* Letter ¶¶ 3-4 (quoting "Notes by a postal inspector"); ¶¶ 5, 11 (quoting "Government notes"); ¶ 6 (quoting "Notes by an SEC attorney"); ¶ 7 (quoting "Notes by an SEC attorney"); ¶¶ 8-10, 13-22, 29 (quoting "Notes by an SEC attorney"); ¶ 41 (screenshot of computer message); ¶ 43 (apparent block quote and screenshot of computer message).

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO SUPPRESS
CR-18-00258 EJD

*Mellen v. Winn*, 900 F.3d 1085, 1097-98 (9th Cir. 2018) ("[T]he government cannot satisfy its *Brady* obligation to disclose exculpatory evidence by making some evidence available and claiming the rest would be cumulative."). The government's refusal to produce this evidence is troubling, as the government bears the burden of justifying its conduct under *Flyer*. *See supra* p. 2.

This evidence also is material to Ms. Holmes' defense at trial. The government has noticed numerous LIS-related witnesses. In light of this Court's ruling on the motions *in limine*, some of those witnesses appear unlikely to testify, although Ms. Holmes notes that the government added many of these witnesses to its list *after* that ruling. Dkt. 798 at 57-58. If the Court revisits its ruling, Ms. Holmes will need to know who the individuals identified are, and what documents the *Brady* letter cites, quotes, and relies upon, in order to examine the noticed government witnesses and develop her own witness list.[22] *See* Fed. R. Crim. P. 16(a)(1)(E)(i) (requiring government to disclose all "documents . . . within the government's possession, custody, or control [that are] material to preparing the defense"); *see also United States v. Stevers*, 603 F.3d 747, 753-54 (9th Cir. 2010) (finding Rule 16 violation when government withheld relevant evidence).

## CONCLUSION

For the foregoing reasons, and those stated in Ms. Holmes' motion, this Court should order an evidentiary hearing and, thereafter, grant Ms. Holmes' motion.

---

[22] Ms. Holmes' motion is timely. For two reasons, the motion was not "reasonably available" before this Court's August 2020 deadline for Rule 12 motions, and Ms. Holmes has "good cause" to bring this motion now. Fed. R. Crim. P. 12(b)(3), (c)(3). First, the government did not provide its *Brady* disclosures relating to the loss of the LIS evidence until after the Court's Rule 12 deadline. The government has made key productions on this issue well after the Court's motion *in limine* deadlines. As relevant here, the government produced audio recordings, FD-302s, agent notes, and other documents relating to the LIS weeks after Ms. Holmes filed her February 23, 2021 Reply in Support of Motion to Exclude Anecdotal Test Results, Dkt. 730, despite having had much of this evidence in its possession for months. The government continues to resist disclosure of evidence relevant to this motion. *See supra* pp. 14-15. Courts routinely deem Rule 12(b) motions timely in such circumstances. *See United States v. White*, 850 F.3d 667, 673 (4th Cir. 2017) (mid-trial motion for a *Franks* hearing timely because it was based on trial testimony); *United States v. Montes De Oca*, 656 F. App'x 831, 833 n. 1 (9th Cir. 2016) (post-trial motion to dismiss timely because government had disclosed relevant evidence after trial); *see also* Fed. R. Crim. P. 12 Advisory Committee Notes – 2012 Amendments ("The 'then reasonably available' language is intended to ensure that a claim a party could not have raised on time [due to lack of information] is not subject to the [good cause] limitation on review imposed by Rule 12(c)(3)."). Second, this Court had not endorsed the relevance of the government's anecdotal evidence until its motion *in limine* rulings. *See* Dkt. 810 at 1; Dkt. 798 at 49-50.

1    DATED:  June 28, 2021                    Respectfully submitted,

2

3

4                                             KEVIN DOWNEY

5                                             LANCE WADE
                                              AMY MASON SAHARIA
6                                             KATHERINE TREFZ
                                              Attorneys for Elizabeth Holmes

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO SUPPRESS
CR-18-00258 EJD

1

## **<u>CERTIFICATE OF SERVICE</u>**

2

I hereby certify that on June 28, 2021 a copy of this filing was delivered via ECF on all counsel

3

of record.

4

5

6

_____

LANCE WADE

7

Attorney for Elizabeth Holmes

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO SUPPRESS
CR-18-00258 EJD