UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>ELIZABETH A. HOLMES,<br>Defendant. | Case No. 5:18-cr-00258-EJD-1<br><br>**ORDER DENYING MOTION TO SUPPRESS**<br><br>Re: Dkt. No. 810 |

Defendant Elizabeth Holmes moves to suppress evidence of customer complaints and testing results, as well as findings in a January 25, 2016 report from the Centers for Medicare & Medicaid Studies ("the CMS Report"). Ms. Holmes' Mot. to Suppress Evid. of Customer Compls. and Testing Results as Well as Findings in CMS Report ("Mot."), Dkt. No. 810. Holmes requests (1) an evidentiary hearing, (2) suppression of evidence (including customer complaints, testing results, and the CMS Report findings), and (3) an order compelling additional production from the Government. *Id.* at 1–2, 5–7, 8. The Court heard oral argument on the motion on July 7, 2021. July 7, 2021 Tr. of Proceedings ("July 7 Tr."), Dkt. No. 866. Having considered the parties' moving papers, the record in this case, and the relevant legal authority, the Court DENIES the motion to suppress.

I.  **BACKGROUND**[1]

In 2003, Holmes founded Theranos, Inc. ("Theranos") a health care and life sciences

---

[1] Additional factual background is set forth in the Court's prior orders. *See, e.g.*, *United States v. Holmes*, No. 5:18-cr-00258-EJD, 2021 WL 2044470, at *1 (N.D. Cal. May 22, 2021).

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING MOT. TO SUPPRESS

1

company offering blood testing technology, and she served as the company's Chief Executive Officer from its inception until mid-June 2018. Third Super. Indict., Dkt. No. 469 ¶ 1; United States' Opp'n to Mot. to Suppress ("Opp'n"), Dkt. No. 846, at 7. Theranos used a bespoke database called the Laboratory Information System ("LIS") that housed, among other things, all patient test results and all quality control data at Theranos. Dkt. No. 798 at 56.

In the fall of 2015, federal government agencies began investigating Theranos. Opp'n at 5. Over the next few years, the Securities and Exchange Commission ("SEC") and the Department of Justice ("DOJ") expressed interest in Theranos's databases, issuing multiple subpoenas and document requests. Decl. of John Bostic in Supp. of United States' Opp'n to Def.'s Mot. to Suppress ("Bostic Decl."), Ex. C, Dkt. No. 846-4 (Oct. 19, 2015 document preservation letter from SEC to Theranos instructing the company to preserve certain categories of evidence, including documents and data relating to Theranos's lab testing results and the accuracy of Theranos technology, electronically stored in databases or otherwise); Decl. of Amy Mason Saharia in Supp. of Holmes's Reply in Supp. of Mot. to Exclude Anecdotal Test Results ("Saharia Decl."), Ex. 87, Dkt. No. 732-1 (producing data from LIS and Labdaq databases in response to Nov. 23, 2015 and Sept. 6, 2016 SEC subpoenas and DOJ requests made at a Nov. 16, 2016 meeting); Bostic Decl., Ex. F, Dkt. No. 846-7 at GJS-000016 (Feb. 13, 2018 grand jury subpoena seeking "[t]he entirety of all blood test lab reports . . . Theranos provided to its patients" from July 1, 2014 through Sept. 1, 2014). In April and June 2018, the DOJ served grand jury subpoenas on Theranos for information specifically from the LIS database and requested a copy of the database itself, along with the necessary software to access and search it. Bostic Decl., Ex. G, Dkt. No. 846-8 (Apr. 20, 2018 grand jury subpoena expanding records request to include "[t]he entirety of all blood test lab reports maintained in the L.I.S. database"); Decl. of AUSA Robert S. Leach in Supp. of United States' Opp'ns to Def.'s Mots. in Lim. ("Leach Decl."), Ex. 63, Dkt. No. 681-27 (June 4, 2018 grand jury subpoena requesting "the entirety of all blood test lab reports maintained in the L.I.S. database that Theranos provided to its patients" and "[a] softcopy or proxy of the L.I.S. database, along with any other proprietary software required to access and search the

database").

During this period, outside counsel from Wilmer Cutler Pickering Hale and Dorr, LLP ("WilmerHale") represented Theranos in responding to government subpoenas and communicating with government attorneys. Decl. of Lance Wade in Supp. of Ms. Holmes' Mot. to Suppress ("Wade Decl."), Ex. 10, Dkt. No. 855-1 at 3–4, 5. According to David Taylor, Theranos's General Counsel who replaced Holmes as CEO following her indictment, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* at 3–4, 5, 6. On June 5, 2018—one day after the grand jury subpoena seeking a copy of the LIS database issued—counsel from WilmerHale emailed Taylor "to touch base on LIS" and suggested that "we should just give DOJ the database and let them figure it out. . . . [T]hey won't know what to do with it and . . . the people who do are in India. Our experts are the only ones who understand it, and we don't want to make them percipient witnesses. Is there anyone left at the Company who could assist us in actually getting the database to the government?" Saharia Decl., Ex. 90, Dkt. No. 732-4 at WH000002107; *see also* Wade Decl., Ex. 10, Dkt. No. 855-1 at 3, 5–6. Subsequent emails between WilmerHale attorneys and Theranos in-house counsel discussed what was necessary to produce a copy of the LIS database to the Government. Saharia Decl., Ex. 112, Dkt. No. 736-7 (June 13, 2018 email from Xan White to two WilmerHale attorneys, discussing obligations regarding document preservation and the "ongoing litigation hold," in addition to the need to "potentially transfer the preserved material to counsel for the individual defendants whose actions may be unresolved at the moment the company ceases to exist"); Leach Decl., Ex. 64, Dkt. No. 681-28 (June 27, 2018 email from a WilmerHale attorney to an unknown recipient stating that "we think it is a better strategy to just dump the entire bespoke database on the Government"). Internal emails between Theranos employees revealed that the LIS database copy would be encrypted and require not only a password but also a private key to access the information in the database. Leach Decl., Ex. 70, Dkt. No. 681-34, at TheranosABC00042262; *see also* Saharia Decl., Ex. 101, Dkt. No. 735-2 at 2; Leach Decl., Ex. 72, Dkt. No. 681-36 at 3 (Sept. 28, 2020 expert witness report of Bruce W. Pixley stating that "[i]n

order to decrypt the [LIS database copy], a person would need to know the password and have a copy of the 'key' file" and that he has "not been able to access the contents of the encrypted . . . database backups" without the key).

On June 14, 2018, the federal grand jury returned the first indictment against Holmes. Dkt. No. 1. Holmes resigned from her position as Theranos CEO but remained the Chair of the Board of Directors. Opp'n at 7.

On July 25, 2018, the Government requested WilmerHale attorneys produce the LIS database and any software necessary to access or query it by August 10, 2018. Saharia Decl., Ex. 88 ("*Brady* Ltr."), Dkt. No. 732-2 at 14–16; Bostic Decl., Ex. H, Dkt. No. 846-9 at USAO-008587–88. WilmerHale responded on July 30, 2018, describing the proprietary third-party software necessary to utilize the LIS database. *Brady* Ltr. at 16–17; Leach Decl., Ex. 65, Dkt. No. 681-29 at 3. WilmerHale's response did not mention the fact that the database copy would be encrypted and require an additional key to access. That same day, a Theranos employee working on procuring the database copy emailed Theranos in-house counsel, stating: "[T]he other thing to understand is that it's not just a database. It's a whole system with layers of applications and data. I'm not sure what functionality it is expected to have but if we are just handing over a database I'm not sure it will meet the needs[.]" Leach Decl., Ex. 66, Dkt. No. 681-30 at TheranosABC00042201. Theranos in-house counsel replied, "[I]t's ultimately not Theranos'[s] problem if our system of storing and accessing data is inconvenient for outsiders." *Id.* at TheranosABC00042200. In-house counsel informed WilmerHale that "[t]here might be one password" to the LIS database copy that only one person at Theranos knew, and that "IT is still working on that." Leach Decl., Ex. 70, Dkt. No. 681-34, at TheranosABC00042260; *see also* Leach Decl., Exs. 68, 69, 73, Dkt. Nos. 681-32, 681-33, 681-37 (emails between Theranos's IT consultant and Theranos employees/agents regarding the password for the private key). Theranos employees/agents were ultimately unable to obtain the private key. Wade Decl., Ex. 13, Dkt. No. 855-3 at US-REPORTS-0019713 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

████████████████████████████████████████

████████████████████████████████████████).

On August 27, 2018, WilmerHale produced a copy of the LIS database to the Government. Leach Decl., Ex. 71, Dkt. No. 681-35; *see also Brady* Ltr. at 18–19; July 7 Tr. at 12:7-11, 19:1-2, 45:15-17. WilmerHale's email to the Government attaching the transmittal letter included the password, but failed to mention that a private key would also be necessary to access the LIS database. Leach Decl., Ex. 71, Dkt. No. 681-35. In subsequent communications with the Government, WilmerHale confirmed that it was unaware of any additional information or software that would facilitate government access to the LIS database information. Saharia Decl., Ex. 101, Dkt. No. 735-2 at 2; *Brady* Ltr. at 23.

Immediately after production of the LIS database copy, Theranos began moving to decommission the original LIS database at its Newark facility. Leach Decl., Ex. 73, Dkt. No. 681-37 (Aug. 28, 2018 emails between WilmerHale, Theranos's IT consultant, Theranos employees, and Shekar Chandrasekaran from IncRev Corporation regarding phone conference "to hash out what we still need from LIS and what we need to do to get it, given that the system will be put into storage this Friday [(Aug. 31, 2018)] and may thereafter be very difficult to resuscitate?"). Theranos began to dismantle the physical server hardware housing the LIS database on August 29, 2018, with the "all clear to shutdown" arriving on August 30, 2018. Leach Decl., Ex. 74, Dkt. No. 681-38 (Aug. 29–30, 2018 email exchange between Theranos employees, Theranos IT consultant, and Chandrasekaran). On August 31, 2018, Theranos vacated the Newark facility. Leach Decl., Exs. 73-75, Dkt. No. 681-37, 681-38, 681-39. At that time, Theranos employees/agents knew that once the system was put into storage, it might be "very difficult to resuscitate." Leach Decl., Ex. 73, Dkt. No. 681-37 at 2; *see also* Saharia Decl., Ex. 106, Dkt. No 736-1, at USAO-008626 (email stating that Taylor had reported "on several occasions that the LIS was decommissioned and that prior to ABC, Theranos, Inc. had been told it could no longer be reconstructed with the existing resources."); Wade Decl., Ex. 11, Dkt. No. 855-2 at US-REPORTS-0024257–59 (████

████████████████████████████████████████

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING MOT. TO SUPPRESS

5

1

2  ).

3  Eric Caddenhead, a former Theranos IT employee who previously worked as the infrastructure

4  architect for the LIS server informed Theranos's IT consultant in August 2018 that "if they took

5  the LIS apart they would not be able to access it again because then the encryption key would be

6  lost. The encryption key was located on a disk array which had a lot of pieces and when they took

7  the disk array apart it would have destroyed the encryption key." Saharia Decl., Ex. 111, Dkt. No.

8  736-6 at US-REPORTS-0016253. The disk array was dismantled when the LIS server equipment

9  was removed. *Id.*

10  On or around September 12, 2018, WilmerHale informed the Government that Theranos

11  "was probably dissolving that day." *Brady* Ltr. at 19.

12  In September and October 2018, the Government tried repeatedly and unsuccessfully to

13  access the information from the copy of the LIS database. *Brady* Ltr. at 19–22. DOJ attorneys

14  were aware of difficulties accessing the copy at least as early as October 2018. *Id.* at 22, 23. In

15  March 2019, the Government reached out to the assignee of Theranos's assets, Sherwood Partners

16  ("Sherwood"), and its counsel, Dorsey & Whitney LLP ("Dorsey"), with follow-up inquiries about

17  how the LIS database came to be encrypted and decommissioned. *Brady* Ltr. at 23. On March 21,

18  2019, Dorsey informed the Government that Sherwood's understanding was that the encrypted

19  LIS database had since "been decommissioned, and before the company formally closed we were

20  advised that it be a herculean undertaking to get it up and running again." Saharia Decl., Ex. 106,

21  Dkt. No. 736-1 at USAO-008626. A follow-up email from Dorsey stated that Taylor had

22  informed Sherwood "on several occasions 'that the LIS was decommissioned and that prior to

23  ABC, Theranos, Inc. had been told that it could no longer be reconstructed with the existing

24  resources.'" *Brady* Ltr. at 23. The Government communicated with Dorsey again in October and

25  November of 2020, with Dorsey ultimately informing the Government that the LIS database was

26  encrypted, that Sherwood lacked the means to decrypt it, and that it had been unable to locate an

27  alternative version of the LIS database. *Id.* at 22.

28  Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING MOT. TO SUPPRESS

6

The parties agree that, for all intents and purposes, the LIS database copy produced to the Government cannot be accessed without the private key, and the information on the LIS database is lost—perhaps irretrievably. July 7 Tr. at 65:7-14.

## II.     LEGAL STANDARD

Motions to suppress evidence must be made prior to trial "if the basis for the motion is then reasonably available." Fed. R. Crim. P. 12(b)(3)(C).

Holmes's motion is based on the Government's duty to preserve potentially exculpatory evidence. *United States v. Flyer*, 633 F.3d 911, 916 (9th Cir. 2011). The Government's loss or destruction of such evidence may "rise[] to the level of a due process violation if a defendant can show that the Government acted in bad faith," which "requires more than mere negligence or recklessness." *Id*. (citing *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)).

If, however, the Government's conduct does not rise to the level of a constitutional violation, "the court may still impose sanctions including suppression of secondary evidence." *Id*. (citing *United States v. Loud Hawk*, 628 F.2d 1139, 1152 (9th Cir. 1979) (en banc) (Kennedy, J., concurring)). In so doing, the court must balance "the quality of the Government's conduct and the degree of prejudice to the accused." *Id.* (internal quotation marks omitted). The Government bears the burden of justifying its actions, and the defendant bears the burden of demonstrating prejudice. *Id.* (quoting *Loud Hawk*, 628 F.2d at 1152). In evaluating the Government's conduct,

> the court should inquire whether the evidence was lost or destroyed while in [Government] custody, whether the Government acted in disregard for the interests of the accused, whether it was negligent in failing to adhere to established and reasonable standards of care for police and prosecutorial functions, and, if the acts were deliberate, whether they were taken in good faith or with reasonable justification.

*Loud Hawk*, 628 F.2d at 1152. Also relevant to the analysis is "the nature and degree of federal participation" and "whether the government attorneys prosecuting the case have participated in the events leading to loss or destruction of the evidence." *Id.* In evaluating prejudice against the defendant, the court must consider, among other things,

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING MOT. TO SUPPRESS

7

the centrality of the evidence to the case and its importance in establishing the elements of the crime or the motive or intent of the defendant; the probative value and reliability of the secondary or substitute evidence; the nature and probable weight of factual inferences or other demonstrations and kinds of proof allegedly lost to the accused; the probable effect on the jury from absence of the evidence, including dangers of unfounded speculation and bias that might result to the defendant if adequate presentation of the case requires explanation about the missing evidence.

*Id.*

### III.   DISCUSSION

The Court considers each of Holmes's requests for relief in turn.

#### A.   Suppression of Evidence

First, Holmes seeks to suppress evidence of customer complaints, testing results, and the CMS Report based on the balancing test described in *Flyer* and *Loud Hawk*.[2] Mot. at 5–6. She contends that allowing the Government to use that evidence as "evidence of fraud" after it failed to gather and preserve the LIS database would violate her rights to present a complete defense and to receive due process, because the entirety of the LIS database was necessary to refute that evidence. Mot. at 1; July 7 Tr. at 36:2–38:9.

##### 1.   Exculpatory value

The threshold question for the Court is whether the LIS database is potentially exculpatory. Holmes does not contend that the LIS database is materially exculpatory, but rather argues that it is potentially useful evidence. Reply at 1. "Potentially useful evidence, as defined in *Youngblood*, is 'evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.'" *United States v. Zaragoza-Moreira*, 780 F.3d 971, 978 (9th Cir. 2015).

The Government has, throughout this case, maintained its belief that the LIS was either

---

[2] Holmes's opening brief relies solely on the *Loud Hawk* balancing test, and at no point does she expressly assert that the government acted in bad faith in delaying examining the LIS database copy. *See* Mot. at 5–7. On reply, Holmes argues that bad faith is not necessary for suppression under *Flyer* and suggests her right to due process has been violated under *Youngblood*. Ms. Holmes' Reply in Supp. of Mot. to Suppress ("Reply") at 7–8.

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING MOT. TO SUPPRESS

8

highly inculpatory and could bolster its case against Holmes (as it would "corroborat[e] the information that the Government intends to present from witnesses"), or that it was useless to both sides because there is no indication it contained data reflecting the accuracy of Theranos test results. Opp'n at 2–3; July 7 Tr. at 61:6-19; May 4, 2021 Tr. of Proceedings, Dkt. No. 792 at 79:13-25, 80:14-21. At the hearing on this motion, defense counsel stated that "Ms. Holmes has always believed the database would be exculpatory in this case." July 7 Tr. at 25:5-6. However, there is no indication in the record that Holmes ever informed the Government of the database's purported exculpatory value either prior to filing the present motion or prior to the decommissioning of the original LIS database. *United States v. Robertson*, 895 F.3d 1206, 1212–13 (9th Cir. 2018) (distinguishing *Zaragoza-Moreira* in finding that the potential usefulness of the lost/unobtained evidence was "completely speculative," and neither Robertson nor the union "made any affirmative assertion that would have put [law enforcement] on notice of the relevance of the [evidence] to [establishing a] defense"). Nor is there any indication that Holmes attempted to rush the Government along in its efforts to access the database copy, despite now criticizing the Government for its "delay." July 7 Tr. at 48:8-21, 65:7-14.

Holmes argues that the LIS database could have been used to assess the accuracy of Theranos test results, which she asserts is central to the Government's wire fraud case against her.[3] *Id.* at 30:16-22. The Government contends that additional information outside the LIS database would be necessary to draw any firm conclusions about the accuracy of the test results and that, at

---

[3] The government disputes Holmes's contention that the LIS database information is central to its case against her. July 7 Tr. at 59:15–60:4 ("Certainly the government did not view this as the most critical evidence in the case at the time of indictment. If that had been the case, of course the government would have collected and examined that evidence prior to charging the case."). As the Court previously observed, the government has repeatedly asserted that large-scale statistical analysis of Theranos's test results is not necessary to prove the elements of wire fraud here. Dkt. No. 798 at 57; May 5, 2021 Hr'g Tr., Dkt. No. 793, at 82:15-16 (government counsel stating that "the LIS was not critical to the charging in this case nor is it critical to the proof at trial"); *id.* at 79:10–80:9 (government explaining that while the LIS database would have been a "powerful tool" to identify patient victims and identify which assays Theranos was running and when, "the Government has been able to capture that information in various other ways"); *id.* at 80:14–81:2 (stating that "this case is not about overall failure rate" nor about "determining what percentage of Theranos'[s] tests were inaccurate").

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING MOT. TO SUPPRESS

9

any rate, other evidence indicates that Theranos's test results were questionable.[4] Opp'n at 3–4; July 7 Tr. at 72:1-10. Holmes does not dispute the need for non-LIS information to draw such conclusions, focusing instead on what proportion of tests were accurate and suggesting that the LIS might contain information that would suggest reasons why a particular result was inaccurate. July 7 Tr. at 72:1-17. At the hearing, she acknowledged that "[p]erhaps it's true" that no conclusions can be drawn about the accuracy of any particular individual test result but argued instead that statistical analyses could be performed that would show that a far vaster number of results were accurate. *Id.* at 34:4-17. For example, Holmes suggested that one could "identify the spread of test results that occurred over various references ranges and determine how many of them fell within the expected range" and whether there were "an extreme number of outliers," *id.*, but it is not clear how one would know what an "expected range" would be or what would constitute "an outlier" without additional contemporaneous information about the patient and their condition to serve as touchpoints or control data—information that the parties do not dispute would not be in the LIS database.

The LIS database information alone would not provide a conclusive determination of whether the Theranos blood tests were accurate, and it could just as likely contain incriminating evidence to the contrary. Any exculpatory value is therefore speculative in nature. *Robertson*, 895 F.3d at 1211–12 (affirming finding of no bad faith where although law enforcement officer was aware of contested video's existence, the record did not show he had knowledge of its exculpatory value or that he knew of the 30-day deletion process, and the exculpatory value was

---

[4] This other evidence is, of course, the very evidence Holmes now seeks to suppress. *Compare* Mot. at 5 n.5 (seeking to suppress "testimony and exhibits offered by customers relating to their specific testing results; testimony and exhibits offered by doctors relating to customers' specific testing results; any aspect of Dr. Master's opinions that relates to specific testing results or quality control results; the CMS report's discussion of quality control results and other data that was maintained in the LIS; customer feedback spreadsheets; any other customer complaints or testing results offered by fact witnesses (by testimony or exhibit) other than doctors and customers; and *any other testimony or exhibits relating to quality control data or any other data residing in the LIS offered by fact witnesses*") (emphasis added) *and* July 7 Tr. at 36:2–38:9 (discussing evidence and testimony based on LIS data) *with* Opp'n at 3–4 (describing evidence concerning quality control issues).

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING MOT. TO SUPPRESS
10

speculative because it only provided a partial view and could not have provided conclusive identification of the perpetrator); *see also United States v. Sivilla*, 714 F.3d 1168, 1172 (9th Cir. 2013) (government did not act in bad faith in failing to preserve evidence when the exculpatory value of the evidence "was not obvious"); *Cunningham v. City of Wenatchee*, 345 F.3d 802, 812 (9th Cir. 2003) (detective's failure to gather potentially exculpatory evidence was not in bad faith because the value of the untested evidence was "speculative" in that it could have exonerated defendant but also could have incriminated him); *United States v. Drake*, 543 F.3d 1080, 1090 (9th Cir. 2008) ("The exculpatory value of an item of evidence is not 'apparent' when the evidence merely '*could have*' exculpated the defendant.") (citing *Youngblood*, 488 U.S. at 56, emphasis original).

### 2. The Government's conduct

"The presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed, because without knowledge of the potential usefulness of the evidence, the evidence could not have been destroyed in bad faith." *Zaragoza-Moreira*, 780 F.3d at 977. The exculpatory value of the LIS database was not apparent to the Government on August 31, 2018 for multiple reasons.

First, as explained above, the potential usefulness of the LIS data is speculative, and the Ninth Circuit has not found bad faith in situations involving speculative exculpatory value. *Robertson*, 895 F.3d at 1211–12; *Sivilla*, 714 F.3d at 1172; *Cunningham*, 345 F.3d at 812.

Second, the Ninth Circuit cases both parties cite appear to suggest that the Government must be the party ultimately responsible (whether through affirmative action or inaction) for the destruction or loss of the potentially exculpatory evidence. *See, e.g.*, *Flyer*, 663 F.3d at 916 ("The government's failure to preserve potentially exculpatory evidence rises to the level of a due process violation if a defendant can show that *the government acted* in bad faith. . . . *If the government destroys* evidence under circumstances that do not violate a defendant's constitutional rights, the court may still impose sanctions including suppression of secondary evidence.") (internal citations omitted; emphases added); *Zaragoza-Moreira*, 780 F.3d at 979 ("[W]hen

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING MOT. TO SUPPRESS
11

potentially useful evidence has been destroyed *by the government*, the bad faith inquiry initially turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed.") (internal quotation marks omitted; emphasis added).  Here, the Government did not lose or destroy evidence in its possession.  The Government sought the LIS database from third parties Theranos and WilmerHale.  Through WilmerHale, Theranos produced an encrypted copy of the LIS database in response to government subpoenas, but it did not inform the Government that the additional key was necessary to access the database, nor did it provide the key.  It is undisputed that the copy of the LIS database Theranos provided was not accessible; and the only entity in possession of the sole working version of the LIS database was Theranos—up until it dismantled the database hardware, destroying the key and rendering the original database unusable as well.  The Government thus never had true possession of the LIS database in the first instance, and there is no dispute that the Government played no role in the decommissioning and dismantling of the original LIS database.  July 7 Tr. at 18:2-5 ("THE COURT: . . . [C]an we agree that the Government did not decommission the database?  MS. SAHARIA: Of course, Your Honor.  The Government was not there at the time d[is]connecting the wires.").  Holmes has not cited to any cases suggesting that the Government can be held responsible for not acting before a third party destroys the potentially exculpatory evidence, when the Government has no knowledge of the destruction and has no control or influence over the third party.

        Third, the essence of Holmes's argument is that the Government should have looked at the LIS database copy immediately upon receipt, and that if it had, it would have realized that there was a problem.  The Government could then have raised the issue with Theranos or WilmerHale, and then either of those two parties would have informed the Government that an additional key was necessary and provided it.  July 7 Tr. at 20:12-24, 23:14–24:1. The Court does not find it reasonable to expect all of these measures to be accomplished within the four days before Theranos decommissioned the LIS database.  There are no facts suggesting that the Government was aware that Theranos planned to decommission the LIS database and dismantle its hardware on August 30, 2018.  *See Brady* Ltr. at 19 (Sept. 12, 2018 email from WilmerHale informing the

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING MOT. TO SUPPRESS

12

1   Government that Theranos "was probably dissolving that day").  There is no evidence the

2   Government knew at the time of decommission that (1) a separate encryption key was necessary to

3   access its LIS database copy, (2) dismantling the LIS database hardware would result in the

4   permanent loss of the key, or (3) reconstituting the LIS database would be a very difficult

5   undertaking—if not impossible.  July 7 Tr. at 19:21-25 ("THE COURT: Did WilmerHale ever

6   provide information to the Government that they would need the key, the missing key?  Was that

7   ever given to the Government?  MS. SAHARIA: I have not seen that evidence in the record . . .

8   .").  Holmes does not cite any case law to support the proposition that failure to look at a

9   production within four days of receipt is per se unreasonable.  The Ninth Circuit has rejected the

10  argument that a failure to immediately obtain potentially exculpatory video evidence as soon as

11  the law enforcement agent was put on notice of its existence is sufficient to compel a finding of

12  bad faith.  *Robertson*, 895 F.3d at 1212 ("At most, [the agent] was slow to obtain evidence of

13  speculative value of which he had been indirectly put on notice.  This is insufficient to establish

14  that [the agent] made 'a conscious effort to suppress exculpatory evidence' such that bad faith can

15  be inferred from his conduct alone.").  A brief delay of four days hardly approaches even

16  negligence, much less bad faith or a due process violation.

17      Holmes contends that there were other steps the Government could and should have taken,

18  even after Theranos decommissioned the LIS database.  She argues that the Government could

19  have reconstructed the LIS database.  *See, e.g.*, July 7 Tr. at 16:9-24 (citing Wade Decl., Ex. 10,

20  11, 13); Reply at 7 (same).  But the evidence she cites either contradicts her proposition or is of

21  low persuasive value.  Wade Decl., Ex. 11, Dkt. No. 855-2 at US-REPORTS-0024256–58

22  (█████████████████████████████████████████████████████████

23  █████████████████████████████████████████████████████████

24  █████████████████████████████████████████████████████████

25  ████████████████████████████); Wade Decl., Ex. 13, Dkt. No. 855-3 at US-

26  REPORTS-0019713 (███████████████████████████████████████

27  ██████████████████████████████████████████); Wade Decl.,

28  Case No.:   5:18-cr-00258-EJD-1
    ORDER DENYING MOT. TO SUPPRESS
    13

1   Ex. 10, Dkt. No. 855-1 at US-REPORTS-0025515 (

2

3

4   ); *see also* Saharia Decl., Ex. 106, Dkt. No 736-1, at USAO-008626 (Taylor

5   stating that the LIS database "could no longer be reconstructed with the existing resources").

6   Even if the Government had been able to resurrect the physical database hardware, it still would

7   have lacked the encryption key, which the uncontroverted evidence suggests has been lost for all

8   time.  Wade Decl., Ex. 11, Dkt. No. 855-2 at US-REPORTS-0024256–58; Wade Decl., Ex. 13,

9   Dkt. No. 855-3 at US-REPORTS-0019713; Saharia Decl., Ex. 111, Dkt. No. 736-6 at US-

10  REPORTS-0016253 (describing destruction of disk array causing the loss of the encryption key).

11  For this reason, the Government's conduct after August 31, 2018 is irrelevant.

12           Finally, to the extent Holmes contends that the Government failed to preserve evidence,

13  that argument is also unpersuasive.  The Government's duty to preserve already-collected

14  evidence is well-established.  *California v. Trombetta*, 467 U.S. 579, 481 (1984) ("[T]he question

15  presented is whether the Due Process Clause requires law enforcement agencies to preserve breath

16  samples of suspected drunken drivers"); *Youngblood*, 488 U.S. at 52 (due process challenge of

17  police's failure to preserve biological samples); *Zaragoza-Moreira*, 780 F.3d at 974 (due process

18  challenge of police's failure to preserve video footage).  But "failure to preserve potentially useful

19  evidence does not constitute a denial of due process of law" absent bad faith.  *Youngblood*, 488

20  U.S. at 58; *see also Miller v. Vasquez*, 868 F.2d 1116, 1120 (9th Cir. 1989) ("[I]n the absence of

21  bad faith, . . . failure to *preserve* evidence that is only potentially exculpatory does not violate due

22  process, then a fortiori neither does the good faith failure to *collect* such evidence violate due

23  process.") (emphases original).  As discussed above, it is not clear the LIS database is potentially

24  exculpatory.  Here, the Government sought production of a (presumably) functioning LIS

25  database, but Theranos knowingly and without comment produced an inaccessible copy.  It

26  appears the Government believed in good faith that Theranos had provided a working copy of the

27  LIS database, with all necessary passwords and information on the additional software required to

28  Case No.:  5:18-cr-00258-EJD-1
    ORDER DENYING MOT. TO SUPPRESS

access it.  Thus, the Government has not failed to preserve evidence so much as it has preserved the unusable evidence Theranos produced.  The Government still has the nonfunctioning copy of the LIS, and it provided Holmes with a copy as well.  Holmes presumably has also been unsuccessful in accessing her copy of the LIS database.  July 7 Tr. at 48:8-21.

In sum, the potential usefulness of the LIS database is speculative, and no exculpatory value was apparent at the time Theranos decommissioned the LIS database, therefore the Court finds no bad faith on the part of the Government and no due process violation.  Because the Government never actually possessed a working accessible copy of the LIS database, and because the Government did not cause the destruction or loss of the database, the Court need not engage in the *Youngblood* three-factor analysis or reach the question of whether other sanctions are warranted under the *Loud Hawk* balancing test.  *See Flyer*, 633 F.3d at 916 ("*If the government destroys evidence* under circumstances that do not violate a defendant's constitutional rights, the court may still impose sanctions including suppression of secondary evidence.") (emphasis added).

Accordingly, the Court DENIES Holmes's request to suppress evidence of customer complaints, testing results, and the CMS Report.

### B.     Evidentiary Hearing

An evidentiary hearing on a motion to suppress is necessary "when the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist."  *United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000).

Holmes asserts that two factual disputes exist that necessitate an evidentiary hearing.  First, she argues that a factual dispute exists as to who bears responsibility for the loss of the LIS database.  Mot. at 7.  However, a review of the timeline of the events in this case does not support the existence of such a dispute.  The Government issued at least three subpoenas to Theranos seeking information relating to data stored in the LIS database in Theranos's possession, custody, and control.  The Government also repeatedly sought clarification from Theranos's counsel and third parties on whether any additional information was necessary to operate the LIS database

copy. It appears that Theranos and WilmerHale's actions frustrated the Government's efforts. Internal Theranos emails and email exchanges with WilmerHale demonstrate that neither Theranos nor WilmerHale were concerned about the actual functionality of the LIS database copy. Furthermore, Theranos knowingly produced an encrypted copy of the LIS database and did not inform the Government that an additional key was necessary to access it. Four days later, Theranos decommissioned and dismantled the original functioning LIS database. It was the deliberate actions of these third parties that resulted in the loss of the LIS database and its contents, not the Government's actions. It is undisputed that the Government never possessed a functional copy of the LIS database in the first place. As discussed above, resurrection of the LIS database would be impossible without the lost key, rendering the Government's conduct after the decommissioning a moot issue.

Holmes suggests someone might be able to reassemble the original LIS database, and argues that the Court should therefore hold an evidentiary hearing to explore whether that is a viable course of action. However, according to Theranos's former IT employee, once the hardware was dismantled, the key was destroyed, and the LIS database became unrevivable. Saharia Decl., Ex. 111.

Second, Holmes alleges a factual dispute exists regarding "the degree of prejudice associated with the government's failure to collect and preserve the LIS," including "whether the LIS data could 'corroborate[] or disprove[]' the government's assertions about accuracy and reliability." Mot. at 7; Reply at 8–9 (quoting *Zaragoza-Moreira*, 780 F.3d at 980). Beyond the Court's conclusion that the Government did not, in fact, fail to collect and preserve the LIS database, there is no indication in the record that the LIS database contains accuracy data for all tests run. As discussed above, no conclusions regarding accuracy could be drawn from the LIS data alone, suggesting that the database would not provide a fulsome record with which accuracy could be definitively determined. The defense conceded as much at the hearing on this motion. *See* July 7 Tr. at 34:4–35:9.

The Court finds that no material factual disputes exist concerning responsibility for the

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING MOT. TO SUPPRESS
16

1  decommissioning and dismantling of the original LIS database or whether the LIS database
2  contains all requisite information from which the accuracy of Theranos test results could be
3  determined.  An evidentiary hearing therefore would be fruitless, and accordingly, the Court
4  DENIES the request for one.

### C. Further Production

Finally, Holmes requests the Court compel further production from the Government—specifically, the identities and documents relied upon in the Government's October 29, 2020 discovery letter provided as potential disclosures under *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972).  Reply at 1, 14–15; *Brady* Ltr. at 1.  To the extent Holmes seeks the identities of government employees and documents cited for the purpose of delving into the Government's actions with respect to the LIS database after August 31, 2018, that information is not relevant for the reasons described above.  Furthermore, "defendants cannot use *Brady* simply to search for *Brady* materials.  *Brady* is not a pretrial discovery tool." *United States v. Weld*, No. CR 08-0083 PJH, 2009 WL 901871, *2 (N.D. Cal. Apr. 1, 2009); *see also United States v. Grace*, 401 F. Supp. 2d 1069, 1077 (D. Mont. 2005) (noting that "*Brady* violations are generally raised and adjudicated post-trial, upon the revelation by the government or discovery by the defense of information favorable to the accused that should have been disclosed before trial, [and that it is] [o]nly after trial has concluded and a complete trial record exists may a court analyze whether information the government has not produced constitutes a *Brady* violation").

Additionally, Holmes has not indicated why any of the information or evidence she seeks is relevant, helpful in establishing her defense, not cumulative, or not exempt from disclosure due to deliberative privilege and/or work product protection.  She asserts that the evidence is material to her defense at trial because "[t]he government has noticed numerous LIS-related witnesses." Reply at 15.  But Holmes does not identify any of those individuals, and it is not clear that those individuals would be called specifically to testify about the LIS database as opposed to some other topic.  The Court has already granted Holmes's related motion in limine to preclude evidence of

1  Theranos's involvement in the destruction of the LIS database, unless and until the Government
2  lays a proper foundation at trial or Holmes puts the factual dispute in issue. Dkt. No. 798 at 56–
3  59. Holmes has provided no reason to deviate from that approach at this time, therefore the Court
4  defers ruling on whether the Government must provide additional related documents unless and
5  until the Government elicits testimony concerning the LIS database from those witnesses. The
6  Court expects the Government to comply with its *Brady* and Federal Rule of Criminal Procedure
7  16 obligations by providing sufficient advance notice of whether it plans to elicit testimony
8  regarding the LIS database from its witnesses or to introduce documents referenced or relied upon
9  in its *Brady* letter, and to supplement its production accordingly and promptly.

10  Accordingly, the Court DENIES the request to compel further production.

**IV.  CONCLUSION**

For the foregoing reasons, the Court DENIES Holmes's motion to suppress. Pursuant to the Court's June 28, 2021 order granting Holmes's administrative motion to file certain exhibits under seal (Dkt. No. 853), an unredacted version of this order shall be filed under seal and a redacted version filed on the public docket.

**IT IS SO ORDERED.**

Dated: August 3, 2021

EDWARD J. DAVILA
United States District Judge

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING MOT. TO SUPPRESS
18