# Exhibit D

D5403

Finding #2
**D5403 - July 7 Letter Statement 1. Finding #2.** *The laboratory failed to submit documentation of any quality control (QC) procedure prior to May 15, 2014. Rather, the laboratory's submission includes an attestation (Ex. FF, Tab 13) from an employee who, based on documentation and interview at the time of the onsite survey, only performed dilutions on the TECAN, but did not perform quality control or patient testing. Both the attestation and the laboratory's written submission state what the employee recalls as to the laboratory's QC procedure. Again, however, the laboratory did not provide any documented evidence that a QC procedure existed or was in use prior to May 15, 2014. We also note that the attestation states that the employee's duties included running QC, which is contrary to the information given to the surveyor at the time of the onsite survey, but did not indicate if he/she had responsibility for evaluating QC prior to releasing patient test results.*

**Comment [MC1]:** Q1

**Comment [MC2]:** Q2

**Comment [MC3]:** The testing dates and for the assay are before

**Comment [MC4]:** Q#

*The second submission states the following in Ex.AA, Tab 3:*

> *Upon review of that response, including the entirety of the prior analysis of TPS [Theranos Propriety System] 3.5 QC data and patient test results distribution for all analytes during the time period examined, the laboratory made note of poor QC performance throughout. Therefore, the laboratory conducted an expanded retrospective analysis for 2014 and 2015.*

This data is presented in Ex. FF, Tabs 1-12. The laboratory noted multiple and recurrent time periods (across all analytes tested) of abrupt shifts in QC target means, high rates of 1-2s QC rule failures, and QC CV's [Coefficients of Variation] far exceeding limits for a stable testing process. (See Investigation section)

Although the magnitude of QC deviations from target means does not necessarily reflect the exact nature and magnitude of bias on patient results because of differences in matrices, the QC failures identified by this comprehensive retrospective analysis reflect a global and long-term failure of the quality control program for this instrument, as well as failures of related quality assurance procedures that should have alerted the laboratory to correct such an unstable process. Therefore, the laboratory has concluded that there is a possible patient impact for every test reported from the laboratory's TPS 3.5 instruments. (See Patient Impact section)

The fraction of patient results truly impacted, and the nature and magnitude of any effect, are unknown. Out of an abundance of caution, the laboratory has voided all patient test results reported from the TPS 3.5 instruments. Many corrected reports have been transmitted. (See Corrective Action section)

**Theranos Response to Statement 1, Finding #2 in D5403.**
**The laboratory fully agrees with criticisms of the previously-submitted employee attestation to QC procedures prior to May 14, 2014. Not only does the attestation conflict with data gathered by surveyors, an attestation certainly does not constitute proper or formal documentation of a QC SOP. Upon further investigation, the laboratory has located a QC procedure prior to May 14, 2015 Ex XXX, which would have been applicable to TPS 3.5 testing. However, upon review of TPS 3.5 QC data (see analysis below), from start of testing October 11, 2013 through May 14, 2014, we find no evidence of this SOP being enacted for TPS 3.5 instrument. Therefore, we conclude that no formal QC SOP was implemented in practice by the laboratory for the TPS 3.5 instruments from October 11, 2013 through May 14, 2014.**

**D5403 - July 7 Letter Statement 2. Finding #2.** *Review of documents in Ex. FF, Tabs 1-12 revealed that only QC data was submitted. There was no documentation in Ex. FF, Tabs 1-12 related to a "comprehensive retrospective review." In addition, there was no documentation submitted related to "multiple and recurrent time periods (across all analytes tested) of abrupt shifts in QC target means, high rates of 1-2s QC rule failures, and QC CVs far exceeding limits for a stable testing process" that the laboratory noted. We also note that no documentation was submitted in Ex. AA, Tab 3 or Ex. FF, Tabs 1-12 that indicated what the investigation into QC issues found as the root cause for the QC failures.*

[Comment [MC5]: #1]
[Comment [MC6]: #2]

*Based on the laboratory's submission at Ex. AA, Tab 3, the expanded retrospective analysis*

for 2014 and 2015 centered on QC issues, but failed to include 2013 in the expanded analysis. Four tests (Vitamin D, TSH, Free T4, and Total PSA) were put into use for patient testing in 2013. It is unclear why the 2013 QC data was not included, especially since the laboratory concluded that "there is a possible patient impact for every test reported from the laboratory's TPS 3.5 instruments." We also note that the QC data submitted for the above four tests did not begin until various dates in March 2014. We are unclear as to whether QC was performed from November 2013 through various dates in March 2014.

**Comment [MC7]:** #3

**Comment [MC8]:** #4

**Theranos Response to Statement 2, Finding #2 in D5403.**

**Comment [MC9]:** Dr DAS

The laboratory agrees fully with the above criticisms and certainly failed to provide supporting documentation for its claims. It is correct that clinical testing on TPS 3.5 instruments began in 2013. In fact, clinical testing for Vitamin D (vitD), Thyroid Stimulating Hormone (TSH), Free Thyroxine (fT4), and Total Prostate Specific Antigen (tPSA) on the TPS 3.5 started in October, 2013 (10/11/2013 for vitD, 10/17/2013 for TSH, 10/22/2013 for fT4, and 10/25/2013 for tPSA). In review of this discrepancy noted by CMS, it was uncovered that the laboratory limited its review to 2014-2015, citing the scope of the current CMS audit versus previous. However, the laboratory failed to recognize that proper investigation of patients affected or having the potential to be affected by a deficient practice has no such limitations on scope. Therefore a proper investigation of deficiencies related to TPS 3.5 clinical testing should have included 2013, as noted by CMS. In addition, the laboratory failed to include any documentation of its analysis of 2014-2015 TPS 3.5 QC data previously submitted, in addition to failing to provide or analyze the 2013 data. The 2013 data has now been included and analyzed alongside the 2014-2015 data (Ex. XX). This updated analysis includes retrospective evaluation of QC data according to SOP's that should have been implemented during the respective time periods (Ex. XX, QC SOP 00013 for October 2013 through May 14, 2014; and Ex. XX QC SOP 15026 and related TPS assay-specific SOPs for May 14, 2014 through June 25, 2015, the result upload date for the final "live" TPS 3.5 assay: i.e., PSA). As the surveyors noted, when QC rules were applied (1-2s trigger, followed by 1-3s, 2-2s, R-4s, 4-1s, and 10x as necessary, prior to May 14, 2014; and 1-2s and 10x rules from May 14, 2014 onward), the findings indicated an unexpectedly high QC failure rate of 20.8% overall (15.7% overall were 1-2s rule violations) for all QC's performed across all time periods for all 12 analytes assayed on the TPS 3.5 (Ex. XX). Overall QC failure rates varied by assay from 14.7 to 33.3% (11.1 to 22% for 1-2s violations, Ex. XX). Although it is obvious by visual discrimination that such rates are inconsistent with adequate analytical performance, the laboratory has supported this assertion by analyzing observed versus expected 1-2s QC failure rates via Chi-squared statistical analysis (Ex. XX). As expected, this analysis returned very large Chi-squared values, 5678 for 1-2s failures overall, and varied from 67 to 1636 depending on the assay. Each of those values equated to P values less than 0.0001 (any value <0.05 would be alarming), meaning there is less than a 0.01% chance that such large discrepancies would be observed between the expected and observed QC failure rates of the

TPS 3.5. With such obviously poor quality control metrics, the laboratory initiated a root cause analysis. First, the analytical performance of the methods was examined by using the available method validation data sets (Ex. XX). These findings were then corroborated using the available "live" testing data, in the form of patient test result distributions (Ex. XX) and proficiency testing results (Ex. XX).

Analysis of the validation data for the TPS 3.5 assays revealed that all 12 demonstrated analytical performance characteristics were unsuitable for clinical purposes (Ex. XX, with summary attached). It is immediately apparent that the bias and imprecision of these assays could not support quality clinical testing results. When the laboratory performed the method validations, it referenced very lenient total allowable error (TEa) criteria, often citing proficiency testing acceptance criteria which are liberal enough to allow assessment of specific methods operating in many different laboratories under many different conditions and operators, which result in large ranges in analytical performance. Nonetheless, these TEa criteria were used to judge the analytical performance of the 12 TPS 3.5 methods by calculating sigma metrics at each level evaluated. The average sigma metric calculated across all levels of all 12 methods was 1.00, ranging from -0.84 (negative due to hCG mean bias exceeding TEa for 2 levels) to 3.5. We note that using a very lenient sigma metric cut-off of 1.65 allows 5% of test results to exceed the TEa. Assuming stable method performance, 86.1% (31/36) of calculated sigma metrics failed to meet these criteria, with 0 out of 12 methods meeting criteria at all 3 levels. Not being able to meet such lenient analytical performance criteria, while also assuming continued stable method performance, is certainly unacceptable for clinical assays. The attached summary document (Ex. XX) details other gross and notable failures in all 12 method validations. It was also discovered that only a fraction of the total number of TPS instruments employed clinically had documented method validations. Based on a comparison of instrument identifiers for those that were used clinically for each method versus the number of identifiers of those validated for each method, it appears that only a maximum of 12 of 249 (4.8%) instruments used for clinical purposes were fully validated (Ex. XX). In addition, although TPS instruments were calibrated versus predicate devices, if bias between TPS instruments for any given method was investigated, as required by CLIA (cite rule for q6 month method comparison for same analyte multiple methods, same analyte multiple instruments/same method), no documentation was made of these studies.

To assess the impact of inadequate TPS 3.5 performance, including the impact of those instruments whose analytical performance was not documented properly by method validations, patient test result distributions were examined from all 12 TPS 3.5 methods. Calculations of the observed test result distribution means and SDs were made for each month of testing, for each analyte. Standard errors of those observed means were calculated (referencing the number of patients tested per month) to obtain a gross estimate of the 95% confidence interval of those means. These observed intervals were

compared to the respective expected patient test result means (calculated from >1000 patients, per mean), generated from predicate devices operating in Theranos Arizona clinical laboratory during the same time period, to best approximate the reference population distribution. Under these circumstances, because 95% intervals were calculated, it is highly unlikely that an expected result mean would lie outside the observed TPS 3.5 interval by chance, whereas it would be very likely that finding represents gross bias affecting the TPS 3.5 for the respective time intervals. Note that only gross, long-term biases are likely to be detected by this analysis since a large (95%) interval is used for comparison to expected results, and the data is compiled into monthly intervals. Nonetheless, the analysis revealed that 58% (ranging from 35 to 88%, per assay, Ex. XX) of monthly intervals across all 12 assays demonstrate such evidence of gross bias. Of those, 63% (ranging from 0 to 100%, per assay) of monthly interval biases identified correlated with the direction (i.e., negative vs. positive) of mean biases detected during the respective method validations, which further supports validity of the mean analytical biases detected via method comparison studies. However, the lack of 100% correlation in this case suggests additional presence of gross preanalytical biases and/or method instability. Further controlled studies would be necessary to investigate these possibilities; however, from this crude initial evaluation it is certain that significant gross biases affected patient testing across the majority of monthly testing periods for all 12 analytes tested on the TPS 3.5.

The last set of analytical performance data evaluated was the Alternative Assessment Procedures (AAP) for the TPS 3.5. If implemented properly, such quality assessments, whether external or alternative, can detect changes in method performance at prescribed points in time, when present. Unfortunately, in the case of the TPS 3.5, the AAP program was not implemented or monitored in a manner conducive to prompt error detection, investigation, and correction. A total of 18 assessments were performed from August 2014 through March 2015, covering all 12 analytes tested on these instruments (Ex XX, including summary Excel sheet). Of the 18 surveys, 12 (67%) were performed in a timely manner (on the q6 month schedule). Since no limits had been set by the laboratory for timeliness, we have chosen one month to represent a reasonable time limit, since all assessments are performed and analyzed within Theranos Laboratories. Notably, 0 of the 18 surveys were actually evaluated within these time limits: data analysis was delayed until August 2015 (signed by the then-current Laboratory Director on 9/19/2015) for some surveys and November 2015 (signed by the then-current Laboratory Director on 11/15/2015) for others. This delay in analysis would not have allowed timely identification of method error, if present. When examining the survey analyses, it was also noted that acceptance criteria were uniformly set at ± 20% TEa, citing CLIA criteria; however, these criteria were found to be true for only one analyte (Total T4). For the remaining 11 analytes, we applied TEa acceptance criteria quoted from the respective method validations, which allowed more consistent evaluation of these methods in this review. Also of note, the range of analyte examined via AAP for these 12 methods was very limited for 10 of the methods, but acceptable for the remaining 2 (fT4 and Testosterone). Limiting the analyte ranges tested even further hinders error detection via AAP because error modes

affecting only certain intervals of the AMR may not be detected. In fact, the initial AAP SOP (Ex. XX, CL SOP-0020 Rev A) required testing of specimens across the AMR (with contrived specimens, as necessary) per 12-month AAP cycle; however, this requirement was eliminated in both subsequent revisions (CL SOP-0020 Rev B and C, Ex. XX) for unknown reasons. Regardless, while acknowledging these limitations, a retrospective grading of all 18 surveys yielded passing grades for 17 of 18, with only the Testosterone survey failing 3 of 5 specimens (acceptance criteria allow one specimen failure out of 5, or 20%, see Ex. XX for SOP's). Since the criteria applied by the laboratory at the time of analysis deemed this a passing event, no investigation was performed or documented; however, these results clearly violate the required analytical method performance metrics as set forth in the validation study (See Ex. XX). This method continued in clinical use from the date of this failed survey on 10/20/2014 through the last recorded result upload date of 3/10/2015, presumably operating at increased risk of error.

After root cause analysis of QC failures on the TPS 3.5 identified that the analytical performance was unsuitable for clinical use, including inadequate method validation metrics for all 12 methods and further substantiated by biases in patient testing results across the majority of testing periods for all methods, all results reported by these methods were voided. Note that the voided results were updated to include those reported in 2013 (vitamin D, TSH, fT4, and PSA), which were inadvertently not included in the initial analysis. Voided reports and receipt confirmations are available in Ex. XX. It is evident that the laboratory failed to properly execute and analyze method evaluations and validations for the TPS 3.5. Even a cursory evaluation of accuracy and precision should have noted unsatisfactory metrics and prompted remedial action by the research and development team. It appears the laboratory lacked the proper procedures and oversight to execute these critical studies. To avoid such issues with LDT's in the future, the organization has determined to pursue the more prudent route of developing these technologies through the FDA QSR framework, ultimately targeting LDT offerings in the clinical laboratory under FDA regulation and, eventually, IVD's through 510k/PMA routes [need clarity here, vs. revising method validation SOPs and checklists]. In addition to the failure to properly vet and establish analytical performance characteristics of LDT's prior to launch, the laboratory lacked the trained and licensed testing personnel and laboratory director oversight to perform these necessary quality control and quality assessment procedures. This is underscored by satisfactory QC SOP's with completely unsatisfactory QC performance and corrective actions. However, quality assessment procedures did not appear to be instituted effectively, evidenced by lack of patient test result documentation and monitoring over time and an inadequate AAP. QC and QA systems have been revised and updated, including monthly QC and QMPI meetings (Ex. XX). [This entire last paragraph is likely addressed by Bryan's document + other Dtag write-ups]

**D5403 - July 7 Letter Statement 3. Finding #2.** *Based on documentation supplied by the laboratory at the time of the survey, the TPS was not used for patient testing after June 25, 2015. However, the laboratory's submission states that the TPS 3.5 was "fully retired in early-August 2015." Patient testing was "retired" later than when the laboratory previously indicated. We note that no explanation was submitted regarding the*

Comment [MC10]: #2

*disparity between the end dates provided at the time of the survey and the portion of the second submission dated April 1, 2016.*      **Comment [MC11]:** #2

**Theranos Response to Statement 3, Finding #2 in D5403.**     **Comment [MC12]:**

The laboratory has reviewed the history of clinical test results from the 12 TPS 3.5 assays, which confirms the initial information provided to surveyors. The final result upload from the last assay being performed clinically on the TPS 3.5 (PSA) was dated 6/25/2015. No clinical results were released from TPS 3.5 instruments after this date, therefore the mention of "early-August 2015" either references non-clinical activity on the TPS 3.5 or was referenced erroneously.

