# Exhibit D



United States Attorney
Northern District of California

*150 Almaden Boulevard, Suite 900*  *(408) 535-5061*
*San Jose, California 95113*  *FAX (408) 535-5066*

July 30, 2021

VIA EMAIL

Lance Wade
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, DC 20005

      Re:    <u>United States v. Elizabeth Holmes</u>
               CR-18-00258-EJD
               Amended Expert Notice re Physician Witnesses

Dear Counsel:

Pursuant to Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure, the government hereby provides the following supplemental written summary of testimony that the government intends to use under Rules 702, 703, and/or 705 of the Federal Rules of Evidence during its case-in-chief at trial.[1]

The government previously disclosed summaries of anticipated testimony under the above rules on March 6, 2020, and on September 28, 2020. On May 22, 2021, the Court denied Defendant's motion in limine to exclude the expert testimony of physician witnesses, observing in its Order that the government would need to provide further Rule 16 disclosures regarding that testimony. The parties subsequently agreed that the government would serve interim updated disclosures today for previously identified physician witnesses who have provided additional information to the government since its previous disclosures, and that the government would serve an amended set of disclosures for all physician witnesses by July 30. The information below supersedes and amends previous disclosures for the below-listed physician witnesses.

---

[1] Please note that this disclosure contains personally identifiable information and private medical information of witnesses in this case. As such, it must be treated in accordance with the rules for "Private Documents" under the Court's July 2, 2018 Protective Order, ECF No. 28.

1

Pursuant to Rule 16(b)(1)(C) of the Federal Rules of Criminal Procedure, the government hereby requests from Defendants disclosure of testimony they intend to use under Rule(s) 702, 703, and/or 705 of the Federal Rules of Evidence as evidence at trial.

Please note that the backgrounds and qualifications of the following experts are summarized in the resumes and/or curricula vitae, which were attached the government's previous disclosures and are hereby incorporated by reference. The bases and reasons for the witnesses' opinions are contained below and in the medical records relating to the below-identified patients in the government's production.

1. Dr. Steven Linnerson

Dr. Linnerson is a fact / percipient witness, whose testimony may also cover topics and/or opinions informed by his knowledge, skill, experience, training, and education. *See* Fed. R. Evid. 702.

Dr. Linnerson has practiced medicine for 37 years and has extensive experience as an OBGYN practitioner. He has experience training resident physicians as well, and occupies a training role at his current practice. Dr. Linnerson also discusses current developments in medical practice with the other members of his practice. As a group, they commonly get into didactic discussions at regular provider meetings and product committee meetings.

Dr. Linnerson may testify that the hCG test is standard for OBGYN patients. In addition to detecting pregnancy, it can be a tumor marker. hCG is a chemical that comes from a developing placenta, but it is also a marker for cells that make abnormal chemicals. It is used as a tumor marker very rarely; its primary use is in detecting pregnancies. That has been true throughout his entire career. There are two types of hCG tests: quantitative and qualitative. Qualitative is either positive or negative, and quantitative gives you a number. Typically, for qualitative testing, if a patient's hCG level was greater than 20, it was called positive, and if it was less than 20, it was called negative. Quantitative hCG has been available for approximately 20 years.

In medical school and then in his residency, Dr. Linnerson was educated on hCG, including the role of hCG in pregnancy and the role of different levels. Besides education in medical school and in residency, his continuing medical education has contributed to his knowledge of hCG. ACOG (the American College of OBGYNs) has technical bulletins and articles that he reads to stay current. Currently, OBGYNs must certify yearly, such that during active years of practice he engages in a lot of reading hCG quantitative levels as part of that certification process. He reads articles on hCG and has discussions with the partners in his practice. Additionally, years of treating patients has contributed to his knowledge base regarding hCG.

Dr. Linnerson has handled an estimated 200,000 office visits, and half of those visits were OB patients. Through the years, he has handled about 30 deliveries a month and treated a total of 14,000-15,000 pregnant women. Every one of those patients involved him looking at an hCG test. Dr. Linnerson estimates that every delivery was preceded by 13 office visits. In a normal pregnancy, a physician will want to know if hCG levels are going up. hCG levels also reveal whether a baby is okay, which is of heightened concern in patients who have a history of

miscarriage or bleeding. Dr. Linnerson said he has easily personally examined tens of thousands of hCG tests. All the hCG test results that Dr. Linnerson examined were provided by outside labs. Those tests were generally conducted by vein draw.

Dr. Linnerson may testify that all pregnancies start in the fallopian tube. The sperm and the egg meet in the tube and then travel down the tube into the uterus. If the fertilized egg gets stuck in the tube it leads to an ectopic pregnancy that can be dangerous to the mother. hCG values are expected to go up 2/3 every 48 hours and they double every 72 hours in a normal pregnancy. If the pregnancy test goes 200, 400, 410, 550, the curve is flattening and that is a dangerous sign. The patient may lose the baby or require additional treatment.

Dr. Linnerson will testify that Theranos provided hCG test results in connection with a patient at his practice named ▇▇▇▇▇▇. Those Theranos test results, if accurate, would have clearly indicated that ▇▇▇▇▇▇ pregnancy was not going to survive because the hCG level was not doubling as it should have been. Despite those results, that patient was later determined to be carrying a viable pregnancy. Dr. Linnerson may testify that hCG results can be plus or minus 10 percent, so doctors are careful to examine trends in test results. There are biological differences in the rates at which pregnancies grow. Despite there being a range of normal results, the values returned by Theranos in the case of ▇▇▇▇▇▇ indicated unambiguously that the pregnancy would not be viable. Dr. Linnerson will testify that, in that case, Theranos produced hCG values that were too low to have a biological explanation in light of the fact that the patient subsequently carried a healthy pregnancy to term. It is not possible to obtain a viable pregnancy from the low hCG values ▇▇▇▇▇▇ Theranos tests showed, proving that the test results must have been inaccurate.

   2. Dr. Audra Zachman

Dr. Zachman is a fact / percipient witness, whose testimony may also cover topics and/or opinions informed by her knowledge, skill, experience, training, and education. *See* Fed. R. Evid. 702.

Dr. Zachman is a nurse practitioner with extensive experience treating pregnant patients and interpreting hCG results. Since she began practicing, Dr. Zachman has renewed her license every two years, and attends a conference every year. Although those tasks entail additional education, hCG values are so fundamental a part of obstetric practice that extensive additional education on the topic has been unnecessary. Dr. Zachman may testify that hCG is a standard tool used with obstetrics (OB) patients to confirm the presence and health of a pregnancy. The hCG hormone can be excreted in "pregnancy like" situations, such as in a molar pregnancy, where hCG levels are used to track the progress of a dangerous growth in the uterus that does not include a fetus. Dr. Zachman may testify that it is very clear when you are looking at qualitative hCG, that hCG is either present in the body or it's not. When you are looking at quantitative hCG, a treating doctor knows based on the patient's condition where that number should be. For example, if a test is yielding numbers in the hundreds of thousands and the patient is early on in her pregnancy, you would know that wasn't possible.

3

Dr. Zachman received training on hCG while earning her doctorate in school. She continued to have extensive experience with hCG tests and interpreting test results while working at her practice. During times of active practice, Dr. Zachman averaged 20 patients a day, 5 days a week for four years, and three days a week for two years. During an average week. Dr. Zachman probably reviewed 25 hCG tests. She has therefore reviewed approximately 1,000 hCG tests or more over a full year during her years of practice. Over the course of her career, she has reviewed an estimated 5,000 quantitative hCG tests. In each of these cases, the hCG data comes from the outside lab conducting the test.

Dr. Zachman may testify that an hCG result tells her whether a patient is pregnant or not. If Dr. Zachman already knows the patient is pregnant, it tells her how far along the pregnancy might be. If she already knows how far along a pregnancy is based on other data, then the hCG value can give her additional important information, such as whether the pregnancy is likely to be viable or threatened. hCG values may also indicate whether a pregnancy includes twins or triplets, or if it looks like a molar pregnancy. With hCG results, it is important to look at the trend then looking at a specific value; the normal range can vary somewhat from person to person. Thus, practitioners pay attention to how the patient's hCG values are trending over a period. Dr. Zachman may testify that one would anticipate in a healthy pregnancy to see a doubling of hCG every 48 hours in the first couple of weeks of pregnancy, and then a plateau after that. If the hCG numbers did not double according to this rule, it would give Dr. Zachman suspicion of a threatened viability.

Dr. Zachman may testify that, in a normal healthy pregnancy, it is not biologically possible for an hCG value to double, then level out and start to drop, but then resume its climb as normal. In the case of a particular patient, ███████████ Dr. Zachman received hCG results from Theranos indicating that her hCG level was 12,500 one day, then 125 two days later. Dr. Zachman may testify that, if accurate, those results would indicate a nonviable pregnancy. Such a substantial drop, in fact, would indicate that the body had already begun to miscarry the pregnancy. Results like that would be inconsistent with a viable pregnancy. Following the 125 value, ███ received another Theranos test result two days later indicating an hCG value of 9,500. Dr. Zachman may testify that that sequence of three test results should not be biologically possible. Were Dr. Zachman to ignore the lowest value of 125, a drop from 12,500 to 9,500 over four days would still be indicative of a potential serious problem with the pregnancy. In a normal healthy pregnancy, one would expect that number to rise from 12,500 to approximately 48,000 over that four-day period. Based on this, it is clear that one or more of the Theranos test results was not accurate.

   3. Dr. JoEllen B. Embry

Nurse Practitioner JoEllen Embry is a fact / percipient witness, whose testimony may also cover topics and/or opinions informed by her knowledge, skill, experience, training, and education. *See* Fed. R. Evid. 702.

Ms. Embry's medical practice focuses on women's health issues. Specifically, her current practice focuses on Polycystic Ovarian Syndrome (PCOS). PCOS is a pre-diabetic, pre-heart disease condition. When Ms. Embry became a nurse practitioner, she went to endocrine

4

conferences and sought out expert advice, she started really learning about PCOS. In addition to PCOS, her practice also focuses on other endocrine problems. This has been the case for at least 20 years. Dr. Embry formerly would attend three to four large out of town conferences every year along with dozens of dinners throughout the year, all of which would feature speakers addressing topics relevant to her practice. Since 1995 Dr. Embry has regularly attended conferences where endocrine issues and PCOS were discussed. These have included conferences specifically focusing on PCOS from 2000 on.

Ms. Embry may testify that PCOS can be a complicated condition. Women with PCOS do not ovulate regularly and many times they are overweight. PCOS is the number one endocrine problem affecting women. In some women, it shows up right from the moment they start their menstrual cycle. In others, it shows up after their first pregnancy or after a hugely stressful event in their life that triggers hormone changes. Many women were probably born with it. Most patients with PCOS have a family history of diabetes. These women present with menstrual irregularities, excessive facial and/or body hair, acne, obesity (especially mid-section obesity), hair thinning, and/or velvety patches behind their neck. The underlying problem is insulin resistance, which results in hormonal changes, including the production of excessive estrogen and testosterone. A patient with PCOS may have elevated lipid levels. Some women will have a period every month, but that doesn't mean they are ovulating. Many have multiple follicles in their ovaries and around their ovaries. The condition leads to a problem of inflammation that can in turn lead to diabetes, heart disease, and fertility issues. It can also lead to uterine cancer if the patient goes months and months without a menstrual cycle.

As a nurse practitioner focusing on women's health issues, Ms. Embry has treated between 65,000-75,000 individual patients. Of those patients, 1,500 to 2,000 each year were treated for PCOS. Thus, in her career she has treated approximately 30,000 PCOS patients. Each of those PCOS patients had multiple testosterone lab tests ordered and reviewed by Dr. Embry. In total, Dr. Embry has reviewed in excess of 100,000 testosterone lab results over her career.

Ms. Embry may testify that a healthy female patient's testosterone levels may typically be around 30 for total testosterone, with a level of 3 or 4 for free testosterone. A patient with PCOS may have a testosterone level as high as 130 with a free testosterone level at 30.

Monitoring testosterone levels gives Ms. Embry an idea on how to treat PCOS. Some women's testosterone levels are s a little elevated and they have a lot of symptoms, some have high levels but few symptoms. By measuring their levels, Ms. Embry can prescribe the correct dose of Spironolactone, for example, which will help lower testosterone levels. It is important that she have accurate test results to be able to manage the treatment and the dosage amount of Spironolactone. Using this method, Ms. Embry has seen patients who presented with testosterone levels of 90 that were reduced over time to 40 or 50 in a year, which will bring improvements in their health.

In her experience with Theranos, Ms. Embry received testosterone results for patients she knew to be suffering from PCOS with levels so low as to indicate that the patient had no hint of PCOS. Some of those suspect results were less than 1—lower than would be expected and healthy in a similarly aged patient with no endocrine disorder. Ms. Embry may testify that menopausal

women sometimes have testosterone levels that low, but that she was seeing these results in younger patients known to have PCOS—patients who normally presented with testosterone levels of 30 or 40 but who were suddenly getting Theranos results indicating levels of less than 5 and free testosterone levels of less than 1.  Ms. Embry may testify that there could be no biological explanation for a drop of that nature given the history of the patients and their stable medication dosage, leading to the conclusion that Theranos's test results were inaccurate.  Ms. Embry may further testify that she did not experience problems like this with other labs used in her practice.

Specifically, Ms. Embry may testify about a patient named ██████████ who received a series of testosterone / free testosterone tests from Theranos and conventional labs in connection with her treatment for PCOS.  Ms. Embry may testify that this patient's Theranos test result (28 for testosterone / 0.38 for free testosterone) were impossibly low given her treatment, medical condition and presentation of symptoms.  Ms. Embry may also testify that all of the test results obtained from conventional labs for this patient showed dramatically higher levels of testosterone and free testosterone, consistent with the patient's medical condition and treatment for PCOS.

Ms. Embry may further testify about a patient named ██████████████████ who similarly received a series of testosterone / free testosterone tests from Theranos and conventional labs in connection with her treatment for PCOS.  Ms. Embry may testify that this patient's Theranos results (<10 for testosterone / <0.08 for free testosterone) were impossibly low given the patient's presentation, treatment, and diagnosis, and that the Theranos result represented an outlier among her results for these same analytes from tests run by conventional labs, which returned free testosterone results between 1.7 and 4.13.  In particular, Ms. Embry may testify that such a low result for testosterone was incredibly low in her experience and would only be expected in a patient with an endocrine disorder that affected their production of testosterone.

Ms. Embry may testify about an additional patient named ██████████ who was diagnosed with PCOS and treated by Ms. Embry's practice.  This patient received a series of testosterone / free testosterone tests from Theranos and conventional labs, with Theranos returning unexpectedly low results inconsistent with the patient's diagnosis, treatment, and presentation.  Ms. Embry may testify that this patient's free testosterone result of <0.47 was impossible in light of her medical condition, treatment history, and her test results from conventional labs, which were dramatically higher and consistent with the patient's overall medical history and presentation.

Finally, Ms. Embry may testify about a patient named ██████████  As described above, this patient had a series of testosterone / free testosterone tests from Theranos and conventional labs, with Theranos returning unexpectedly low results inconsistent with the patient's diagnosis, treatment, and presentation.  In particular, this patient's free testosterone Theranos result of <0.57 was medically impossible given the patient's PCOS diagnosis, treatment history, and overall presentation of symptoms.  This patient's results from conventional lab testing returned significantly higher values consistent with the patient's medical status.

Ms. Embry may testify that she has not encountered such unexpectedly low testosterone results like the above from conventional labs. Ms. Embry may testify that Theranos sent her corrected results for patients who had testosterone assays approximately two years after the patients' original tests, which caused her to question how that was possible given that she would not expect blood samples to remain viable for that length of time.

4. Dr. Mark Burnes

Dr. Burnes is a fact / percipient witness, whose testimony may also cover topics and/or opinions informed by his knowledge, skill, experience, training, and education. *See* Fed. R. Evid. 702.

Dr. Burnes is an experienced physician practicing in internal medicine. He may testify about the blood test for PSA or Prostate Specific Antigen. Pieces of the prostate organ get deposited in the bloodstream as debris and the PSA blood test is designed to measure the quantity of that. As the prostate gets bigger with age, it produces more discarded tissue and PSA levels are expected to rise. Any PSA level above 10 will get a physician's attention. When monitoring PSA levels, however, it is important for doctors to be aware of trends. A patient can have prostate cancer with a PSA level of 2.5 if their healthy baseline level would be five times lower at 0.5. Conversely, a patient may experience PSA levels rising from 8 to 12 to 14 to 18 while still having negative biopsies for prostate cancer.

Dr. Burnes received training on interpreting PSA results in medical school, and has had additional experience since then. Dr. Burnes has treated approximately 28 patients with prostate cancer over the course of his career. He estimates that he has reviewed more than 5000 PSA results during his career as a practicing doctor.

Dr. Burnes may testify about his experience treating a patient, ▬▬▬▬▬ who received Theranos test results for the PSA analyte. That patient had previously tested at a level 2 for PSA, but one year later received a PSA result of 26 from Theranos. Such a jump would be strongly indicative of a very aggressive form of prostate cancer. A large jump in values like that could not be explained by prostatitis. When prostate cancer shows up at a relatively young age like 45 it can be very aggressive. An additional Theranos test returned a value of 1.71, then a third Theranos test yielded a PSA level of 22.8. Dr. Burnes may testify that there is no biological explanation for such large jumps in PSA values. Specifically, he may opine that there is no medical explanation for a drop from 26 to 1.71 over such a short time period. Similarly, there is no medical explanation for the jump from 1.71 to 22.8 except for physical trauma to the prostate. Even with severe prostatitis, a doctor would expect the level to rise from a 2 to a 6 or 8. Thus, Dr. Burnes may opine that inaccurate test results are the only explanation for the PSA values discussed above.

5. Dr. Edward Szmuc

Dr. Szmuc is a fact / percipient witness, whose testimony may also cover topics and/or opinions informed by his knowledge, skill, experience, training, and education. *See* Fed. R. Evid. 702.

Dr. Szmuc will testify that hCG is produced by placental tissue that is growing in an early pregnancy. Once a patient has a positive hCG test, which is anywhere from a value of 3 to 5, it indicates a pregnancy. Typically, the hCG number doubles every two to three days. Once a number gets up to about 100,000, it levels off and goes down; this occurs somewhere after six weeks. By that time, the physician should have confirmed an intrauterine pregnancy by ultrasound. After that, it's no longer necessary to follow the hCG numbers.

Dr. Szmuc will testify that with an ectopic pregnancy the hCG numbers usually either level out, go up slowly, or fall slowly. With an ectopic pregnancy, the hCG numbers do not double every two or three days. He will explain that if you look at a falling hCG number, that is usually associated with an abnormal intrauterine pregnancy, which is when the embryo stops growing. hCG numbers with an abnormal intrauterine pregnancy usually fall faster than they would in an ectopic pregnancy. Dr. Szmuc will explain that physicians are always trying to rule out an ectopic pregnancy. With an ectopic pregnancy, the growth of a placenta occurs in the tube, and the fetus cannot grow normally. If the pregnancy is in the end of the tube, there is more room to grow, the pregnancy can grow further long, and you can see the hCG numbers get much higher. If a pregnancy is ectopic, it qualifies as high risk. He will explain that if he treats a patient where he suspects an ectopic pregnancy, he would talk to that patient on a regular basis and get hCG numbers every two days or so. A physician would also need to get an ultrasound and make sure there is no blood in the patient's abdomen.

Dr. Szmuc will testify about treating a patient named ▓▓▓▓▓▓▓▓ and ordering an hCG assay to rule out an ectopic pregnancy based on her ultrasound results and reports of right lower quadrant pain. ▓▓▓▓▓ had her blood tested by Theranos, and the first blood draw occurred on approximately July 7, 2014. The July 14 Theranos HCG Quant test returned a value of 4941, which was a result consistent with a six-week pregnancy. Dr. Szmuc may testify that, if the hCG value is 4,000, you can almost always see an intrauterine pregnancy on the ultrasound. Because the pregnancy was not visible on ▓▓▓▓▓ ultrasound, Dr. Szmuc needed more testing. ▓▓▓▓▓ visited Theranos again on July 10, 2014, and Theranos reported an hCG value of 4722. Dr. Szmuc may explain that these two results indicated to a physician that the patient had an ectopic pregnancy or that she was miscarrying / about to miscarry. Dr. Szmuc may testify that hCG Quant values in women can continue to rise in an ectopic pregnancy, but it rises in a slow manner. They can also decrease, again, in a slow manner. Miscarriages can present in the same way where the hCG Quant value stays flat or goes down over a period. Based on ▓▓▓▓▓ results, Dr. Szmuc sent her to get hCG testing at Sonora Quest less than a week later. That hCG test returned a value of 98,868—consistent with ▓▓▓▓▓ actual condition and viable intrauterine pregnancy. Dr. Szmuc may testify regarding his conclusion that the second hCG test result that ▓▓▓▓▓ received from Theranos could not have been. Specifically, he may opine that that test result was inconsistent with a normal, healthy pregnancy that ▓▓▓▓▓ was later shown to have less than one week later. Dr. Szmuc may testify that, in 40 years of medical practice, he cannot recall another instance where he had a patient that had her hCG quant value drop when she ultimately had a healthy pregnancy. These facts caused him to conclude that the Theranos test result was inaccurate.

Dr. Szmuc may also testify about a patient named ▓▓▓▓▓▓▓▓ This patient came into the office after a positive pregnancy urine test, and Dr. Szmuc requested hCG quant tests because the



8

patient had had a previous miscarriage. On approximately May 21, 2014, Theranos returned an hCG quant value of 811 for this patient. A follow-up test conducted by Theranos on May 23, 2014 returned an hCG value less than 9. Theranos acknowledged that this result could not have been accurate, and a redraw shortly thereafter returned an hCG value of 2367. Dr. Szmuc may testify that there could be no biological explanation for the extremely low value returned by the second Theranos test, especially in the context of the other contemporaneous hCG results and the patient's overall presentation, causing him to conclude that the Theranos test was not accurate.

Dr. Szmuc first started using hCG tests during his residency, which was between the years of 1979-1983. To be specific, he started using hCG tests in 1982; before then, hCG numbers were not ascertainable, so physicians had to use other methods. He has been in practice for 37 years, and he probably utilizes hCG tests several times a week, every week. He estimates that he has reviewed over 10,000 hCG tests. Dr. Szmuc will testify that in his career, he has never observed a positive hCG test, followed by a lower hCG test 48 hours later, followed by a higher hCG test 48 hours after that. Dr. Szmuc will also testify that he has never had any issues with hCG tests and other laboratories in his career, other than the issues he had with Theranos.

   6. Dr. Gerald S. Asin

Dr. Asin is a fact / percipient witness, whose testimony may also cover topics and/or opinions informed by his knowledge, skill, experience, training, and education. *See* Fed. R. Evid. 702.

Dr. Asin may testify regarding patient ███████████. This patient received a positive HIV antibody test from Theranos despite the fact that she did not have HIV. Dr. Asin may testify that the Theranos HIV test result could not have been accurate.

Dr. Asin may further testify that HIV AB tests search for antibodies that the immune system produces in response to an HIV 1 or HIV 2 infection. Dr. Asin may testify that HIV 1 and HIV 2 are two strains of the HIV virus. He may further testify that the AB 1+2 test searches for a type of antibody that is produced by individuals infected with HIV regardless of which of the two strains they are infected by. In contrast, the HIV 1 and HIV 2 antibody tests search for antibodies that are only produced in response to one strain of HIV or the other, respectively. Meanwhile, the HIV 1 RNA test searches for the genome of the virus itself, directly measuring the presence of the virus. Dr. Asin may testify that HIV RNA tests are run in response to positive antibody tests.

Dr. Asin may testify that a patient may have a positive HIV RNA test combined with a negative antibody test in cases of recent exposure, for example, where the body's immune system has not yet reacted and created the responsive antibodies. Conversely, a patient may have a positive antibody test but a negative HIV RNA test in a case involving a long-term HIV infection that has been under treatment with anti-HIV drugs such that the viral load has diminished below the detection threshold of the assay. Outside of that scenario, it would not be expected for a patient to have a positive antibody test and a negative HIV RNA test. Such a combination of results would indicate that one of those two results was false. In the case of a patient who subsequently tested negative for HIV following the receipt of that combination of results, it could be concluded that the positive HIV antibody result was an inaccurate one, i.e., a false positive.

In Dr. Asin's 33 years of practice, he has reviewed results from approximately 5,000 HIV tests. During that time period, he estimates that he has observed approximately 50-100 positive HIV results—each of which was later confirmed, with the exception of the positive HIV antibody test result received by Erin Tompkins. Dr. Asin will testify that the above-referenced HIV result is the only known false positive result he has encountered in his practice.

7.  Dr. John Couvaras

Dr. Couvaras is a fact / percipient witness, whose testimony may also cover topics and/or opinions informed by his knowledge, skill, experience, training, and education. *See* Fed. R. Evid. 702.

Dr. Couvaras is an experienced physician practicing in obstetrics and reproductive endocrinology. Over the course of his career as a treating physician, he has seen 10,000 or 11,000 patients who have had hCG tests, meaning that he has personally reviewed well over 10,000 hCG test results. Dr. Couvaras may testify that hCG is a hormone used to indicate the presence and health of a pregnancy, and that hCG levels are expected to double or increase by a factor of 1.6 every 48 hours during a normal, healthy pregnancy.

Dr. Couvaras may further testify about his experience treating a pregnant patient named ▓▓▓▓▓▓▓ who received an hCG test result showing a level of 160, indicating the presence of a pregnancy. That patient then received a Theranos hCG test three days later returning a value of less than 5, indicating the absence of a pregnancy. That same patient was tested a third time more than two weeks later and the Theranos test indicated an hCG level of 2150, again showing an established pregnancy.

Dr. Couvaras may testify that these values made no sense biologically. There is no medical explanation for an hCG value dropping that quickly. Even if the patient miscarried and there was still a sack in the uterus, the placenta would still be pumping out hCG such that higher levels would linger for weeks. On that basis, Dr. Couvaras may testify that the Theranos results were necessarily inaccurate.

\* \* \*

The government reserves the right to supplement this disclosure of expert testimony to the extent additional facts are learned or disclosed by the above witnesses.

                                                         Very truly yours,

                                                         STEPHANIE M. HINDS
                                                         Acting United States Attorney

                                                         */s/ John C. Bostic*

                                                         JOHN C. BOSTIC
                                                         Assistant United States Attorney