JEFFREY B. COOPERSMITH (SBN 252819)
WALTER F. BROWN (SBN 130248)
MELINDA HAAG (SBN 132612)
RANDALL S. LUSKEY (SBN 240915)
STEPHEN A. CAZARES (SBN 201864)

ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:   +1-415-773-5700
Facsimile:   +1-415-773-5759

Email: jcoopersmith@orrick.com; wbrown@orrick.com;
       mhaag@orrick.com; rluskey@orrick.com;
       scazares@orrick.com

Attorneys for Defendant
RAMESH "SUNNY" BALWANI

FILED

JAN 21 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                       Plaintiff,<br><br>              v.<br><br>HOLMES, et al.,<br><br>                       Defendants. | Case No. 18-CR-00258-EJD<br><br>**DEFENDANT RAMESH "SUNNY" BALWANI'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION TO SEVER AND ADMINISTRATIVE MOTION TO SEAL**<br><br>Date:   February 10, 2020<br>Time:   10:00 AM<br>Judge:  Honorable Edward J. Davila<br>Ctrm:   4, 5th Floor |

# **PROVISIONALLY FILED UNDER SEAL PURSUANT TO COURT ORDER OF JANUARY 13, 2020**

## I. INTRODUCTION AND STATEMENT OF FACTS

At a sealed conference on January 13, 2020, the Court invited Mr. Balwani to submit a supplemental memorandum in support of his motions to sever and to seal all filings relating to the topics of severance and Ms. Holmes' underlying "abuse" defense, in light of Ms. Holmes' severance motion and related argument at the January 13 conference.[1] This supplemental memorandum also takes account of information presented in Ms. Holmes' Notice of Submission in Response to January 13, 2020 Sealed Hearing, filed on January 17, 2020.

Ms. Holmes' filings and representations demonstrate that Mr. Balwani cannot receive the fair trial the Constitution guarantees him unless his case is severed, he proceeds to trial first, and all proceedings related to both severance and Ms. Holmes' "abuse" defense remain under seal until his trial is complete. When Mr. Balwani filed his severance motion, he knew that Ms. Holmes intended to introduce expert testimony at trial recounting, among other things, "intimate partner violence/abuse" she purportedly suffered, (2) Mr. Balwani's allegedly abusive tactics, and (3) the effect of this alleged abuse on Ms. Holmes in connection with the charged conspiracy. *See* Balwani Mot. to Sever at 2. We know far more now.



---

[1] The Court asked that the brief be submitted on January 20, 2020. Because January 20 is a federal holiday, the courthouse—in which sealed filings must be presented in hard copy form—is closed. Mr. Balwani therefore submits this supplemental memorandum on January 21, 2020. However, to avoid disturbing the current briefing schedule and February 10, 2020 hearing date, Mr. Balwani served copies of this supplemental memorandum on the parties on January 20.

The most recent sworn declaration from Ms. Holmes' expert noted that she interviewed Ms. Holmes for a total of 14 hours, and interviewed Ms. Holmes' family members, including her brother, Christian Holmes, who had a significant role at Theranos. *See* January 16, 2020 Mechanic Declaration at 3. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *See id.* at 13.

At the January 13 conference, Ms. Holmes' counsel conveyed, in no uncertain terms, Ms. Holmes' intention to present a defense of a mental condition bearing on guilt not just through her expert, but also through third-party fact witnesses who would support the abuse defense. Ms. Holmes' counsel has also gone as far as undersigned counsel for Mr. Balwani has seen in many decades of law practice to announce that Ms. Holmes intends to testify in her own defense on these topics. *See* Declaration of Jeffrey Coopersmith ¶ 2; Holmes Notice of Submission at 1 ("[C]ounsel can state, as officers of the court, that there is a significant likelihood that Ms. Holmes will (1) testify at trial that she suffered from intimate partner abuse and (2) explain the impact of the abuse on her state of mind during the relevant period.").

Although Mr. Balwani categorically denies Ms. Holmes' allegations, their existence guarantees that, without a severance, Mr. Balwani will be irreparably prejudiced at trial. That is why courts that have examined similar issues have either severed the defendants before them or else been reversed for failing to do so. *See* Balwani Mot. to Sever at 4–7 (citing cases). Nor would the prejudice be significantly lessened if the Court were to exclude Ms. Holmes' expert. As Ms. Holmes' submissions confirm, her defense is not solely dependent upon expert testimony. Third-party fact witnesses—apparently including her brother, who worked at Theranos—will allegedly support her claims as well. There is, moreover, a "significant likelihood" that Ms. Holmes will take the stand to do the same. Holmes Notice of Submission at 2.

Ms. Holmes' updated allegations, spanning a decade of alleged abuse, would force Mr. Balwani to defend against a second, new set of accusations, presenting insurmountable challenges

for the preparation and execution of his defense. A joint trial that included those allegations would require Mr. Balwani to conduct an even broader investigation than the one he contemplated when he filed his severance motion. Indeed, it is no exaggeration to say that he would need to interview virtually every person who saw him interact with Ms. Holmes throughout their relationship. Worse, Mr. Balwani will likely have to incorporate the fruits of this investigation into his cross-examinations of many witnesses during the government's case-in chief—both those who observed Ms. Holmes in the presence of Mr. Balwani and those who did not—in anticipation of Ms. Holmes' defense case, focusing the jury onto these prejudicial issues.[2]

Much of the damage will therefore be done before Ms. Holmes must make a final decision to testify. And when she does make that decision, it will be too late, not only in view of the significantly different opening statement and cross-examination Mr. Balwani would have had to undertake, but also because after spending months at trial he could not simply be jettisoned from the trial during the defense case without causing massive prejudice to him as well as potential double jeopardy issues. Moreover, even if Ms. Holmes ultimately decides after months of trial not to testify, her expert witness's presentation risks creating a Confrontation Clause violation that would also require an unacceptable and unconstitutional severance in the middle of the defense case. *See United States v. Mayfield*, 189 F.3d 895, 901 (9th Cir. 1999). The only way to guarantee Mr. Balwani a fair trial is to try him alone and try him first, before Holmes' "abuse" defense creates a firestorm of press coverage that incurably poisons the jury pool.

For the same reasons, the papers discussing Ms. Holmes' "abuse" defense must be sealed until after Mr. Balwani's trial concludes. This case is not just a local sensation: It is one of the most closely watched criminal cases in the country. Adding allegations of sexual abuse that have nothing to do with the fraud case—especially in the current era of #MeToo—will only fan the flames of the already relentless, highly prejudicial coverage of Mr. Balwani and Ms. Holmes. Social science research indicates that such negative pretrial publicity can influence juror decision-making in ways not curable through traditional methods, such as questionnaires and voir dire.

---

[2] We would expect Ms. Holmes to do the same—that is, to lay the foundation for her "abuse" defense through cross examination of government witnesses who interacted with her and Mr. Balwani.

Under these circumstances, the Court must do all it can to shield Mr. Balwani from a jury pool tainted by these inflammatory accusations.

### A. Severance Is the Only Way to Protect Mr. Balwani's Right to A Fair Trial.

The defense Ms. Holmes plans to advance at trial would unquestionably undermine Mr. Balwani's constitutional rights by allowing the jury to hear the type of character evidence that would never be admissible against Mr. Balwani alone. This prejudice cannot be cured. As the Supreme Court has recognized, "[t]he naive assumption that prejudicial effects can be overcome by instructions to the jury … all practicing lawyers know to be unmitigated fiction." *Bruton v. United States*, 391 U.S. 123, 129 (1968) (ellipsis in original) (quoting *Krulewitch v. United States*, 336 U.S. 440, 453 (1949) (Jackson, J., concurring)). Accusations of lurid conduct and years of psychological and sexual abuse are precisely the sort of bell that could not be un-rung. The federal courts that have addressed this issue have reached the same conclusion.

*United States v. Breinig*, 70 F.3d 850 (6th Cir. 1995), reversed the district court for failing to sever the trial of former spouses where the ex-wife alleged dominating and controlling behavior throughout a twenty-four-year marriage. *Id.* at 852. But while the defendant raising the abuse defense in *Breinig* presented her defense "based largely on the testimony of a psychiatrist and a psychologist" who, "[o]ver Breinig's objections, … testified to Moore's mental instability; … extreme insecurities; … suicidal tendencies; and … low self-esteem," Ms. Holmes will also rely on third-party witnesses to advance her explosive claims, apparently including her brother, who worked at Theranos throughout most of Mr. Balwani's tenure with the company. *Id.* And the substance of Ms. Holmes' evidence goes beyond what the Sixth Circuit reversed for in *Breinig*. ▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊ Ms. Holmes also plans to rely on the type of expert testimony that *Breinig* found unacceptable in a joint trial.

The same analysis led to severance in trial courts. *See, e.g., United States v. Lopez*, 915 F. Supp. 891, 894–95, 900–01 (E.D. Mich. 1996) (severing trial where one co-defendant intended to offer evidence that the other had beat her and coerced her into committing crimes); *United States v. Swan*, No. 1:12-CR-00027-JAW, 2013 WL 3422022, at *4 (D. Me. July 8, 2013) (severing trial where defendant's wife intended to offer evidence that defendant "emotionally and physically abused her").

As the record now shows, Ms. Holmes' defense will not come from a single expert, but also from third-party fact witnesses, apparently including her brother who worked at Theranos with Ms. Holmes throughout most of Mr. Balwani's tenure and beyond. And there is a "significant likelihood" that Ms. Holmes will testify herself on these topics. The unfair prejudice flowing from such evidence is precisely why the *Swan* court severed the trials of a married couple—where one spouse argued that she lacked the necessary *mens rea* because the other was controlling and physically abusive—even though she did not give notice of an expert witness to support her claims. 2013 WL 3422022, at *2–3. In other words, Ms. Holmes' expert alone is not the source of the prejudice, her "abuse" defense is.

A joint trial under these circumstances sets up an unmanageable trial scenario in which the Court and the parties face a gauntlet of unique and crucial decisions implicating the constitutional rights of both Mr. Balwani and Ms. Holmes at every step. For example, to what extent would Ms. Holmes be permitted to address domestic abuse, emotional abuse, ▮▮▮▮ and related topics in voir dire? Will she be allowed to raise the "abuse" defense in her opening statement? How could Mr. Balwani prepare his own voir dire and opening statement without knowing the answers ahead of time? Any answer to these questions will potentially impinge one (or both) defendants' right to a fair trial. Under these circumstances, piecemeal solutions are inadequate. For instance, forcing Ms. Holmes to disclose her opening statement to Mr. Balwani could prejudice her; however, the failure to do so would undoubtedly prejudice him.

Similarly, how would or could the Court and the parties manage cross-examination of witnesses during the government's case-in-chief with the specter of Ms. Holmes "abuse" defense—including expert, third-party, and possibly her own testimony—lingering in the

background? Ms. Holmes would likely seek to cross-examine those government's witnesses who observed Mr. Balwani and Ms. Holmes interact—including former Theranos employees and investors—to support her claims of abuse. Would Ms. Holmes be permitted to extract testimony demonstrating character traits of Mr. Balwani that may support her defense? If she is not, her right to put on a defense may be implicated. If she is, Mr. Balwani's right to a fair trial would be impinged and he would be forced to cross-examine the government's witnesses to rebut this otherwise inadmissible character evidence. This "second" trial would expose the jury to inflammatory character evidence before the defense case had even begun, and before Mr. Balwani even knew the extent of evidence supporting the "abuse" defense Ms. Holmes ultimately presented against him. Much of the damage would therefore be done before the Court could definitively address the other legal harms to Mr. Balwani: Whether his defense and Ms. Holmes' are irreconcilably antagonistic, and whether testimony from Ms. Holmes' expert and third-party fact witnesses violate Mr. Balwani's Confrontation Clause rights by introducing testimonial statements of non-testifying declarants.

A joint trial including one or all of the three prongs of "abuse" evidence Ms. Holmes has proffered—expert, third-party, and direct testimony—would also inevitably lengthen an already complex, months-long trial. Whether the evidence comes in through the expert or otherwise, Mr. Balwani will be forced to put on a defense case to answer the "abuse" allegations—a defense case that would be wholly unnecessary in a separate trial. This would diminish the efficiency and resource benefits a joint trial might offer.

Further, as Mr. Balwani's severance motion points out—and Ms. Holmes' new details only underscore—the prejudice does not start at trial. *See* Balwani Mot. to Sever at 8. If the Court were to refuse to sever, Mr. Balwani would already be months behind in the massive investigation he would need to conduct to rebut Ms. Holmes' claims. In light of the new allegations, that investigation is even larger than Mr. Balwani understood when he filed his severance motion. *See id.* Such an investigation would not just be expensive; it would also detract from Mr. Balwani's efforts to confront a massively complex fraud allegation at precisely the time when his focus should be undivided.

Failing to sever now would also force Mr. Balwani to wait until after the government's case to learn whether Ms. Holmes' defense would threaten his Confrontation Clause rights. If Ms. Holmes does not testify (or, indeed, if any of her family members interviewed by her expert do not testify), statements from her expert (or even third-party fact witnesses) that include testimonial statements from non-testifying declarants will violate Mr. Balwani's Sixth Amendment rights, requiring severance mid-trial. *See Mayfield*, 189 F.3d at 901 ("Confrontation Clause violations can require a court to sever trials."). Even if Ms. Holmes does not testify, it is highly likely that Ms. Holmes would seek to have her expert provide factual detail to demonstrate the alleged validity of her expert's diagnosis. And, of course, in the likely event that Ms. Holmes' does testify the unfair prejudice that is unrelated to the government's case against Mr. Balwani would come directly from Ms. Holmes.

### B. Good Cause and Compelling Reasons Justify Sealing.

As Mr. Balwani explained in his administrative motion to seal and in his reply in support of that motion, the good-cause standard governs sealing questions. *See, e.g., United States v. Schipke*, 515 F. App'x 662, 664 n.1 (9th Cir. 2013); *United States v. Mahoney*, No. CR18-0090-JCC, 2019 WL 1040402, at *2 (W.D. Wash. Mar. 5, 2019). But even if it were otherwise, compelling reasons exist to seal all filings discussing Ms. Holmes' "abuse" defense until after Mr. Balwani's trial, and no measure less restrictive than sealing would protect Mr. Balwani's rights.

Nothing in the government's opposition papers, Ms. Holmes' motion to sever, or the parties' comments at the January 13, 2020 status conference change that. Instead, those developments strengthen the case. Ms. Holmes' ███████ ███████ as part of the alleged abuse stands out as an example of how the prejudice of public disclosure would be even greater than Mr. Balwani's administrative motion anticipated. Disclosure of Ms. Holmes' allegations in the circumstances of this case is simply incompatible with Mr. Balwani's right to a fair trial.

Indeed, one is hard-pressed to think of circumstances that more strongly call for a court to fulfill its "affirmative constitutional duty to minimize the effects of prejudicial pretrial publicity." *Gannett Co. v. DePasquale*, 443 U.S. 368, 378 (1979). As Mr. Balwani's severance motion

explained, this case has already been the subject of hundreds of news stories, plus high-profile documentaries, podcasts, and a forthcoming Hollywood film and tv series. *See* Balwani Mot. to Sever at 11. That is without inflammatory accusations of sexual abuse, the salacious nature of which are certain to intensify negative pretrial publicity. *See id.* at 11–12. Declining to seal filings and hearings discussing these charges would not just add fuel to an already substantial fire—it will inject uniquely prejudicial allegations into the public discourse. No longer will this case be against a tech-COO; in the minds of nearly any potential juror this Court finds, this case will be against a sexual predator. That is not just unfair; it is unconstitutional.

Filings relating to the "abuse" defense and severance must remain under seal because traditional methods used to mitigate pretrial publicity are insufficient under these unique circumstances. Change of venue is "appropriate if the publicity surrounding a trial is centered on a specific geographical location." *Levine v. U.S. Dist. Court*, 764 F.2d 590, 600 (9th Cir. 1985). But that is of little comfort when the case is featured in the *Wall Street Journal*, a *New York Times* best-selling book, countless national publications, on HBO, on hit podcasts, and a coming film apparently starring an Academy Award winning actress. *See* Balwani Mot. to Sever at 11. Change of venue would likely do little to mitigate the jury pool taint and resulting prejudice. Similarly, voir dire of the jury pool is a traditional method that may be sufficient in typical cases; but not here. Recent social science research suggests that negative pretrial publicity has a "cumulative effect … on jurors' attitudes and decisions." Christine L. Ruva, *From the Headlines to the Jury Room: An Examination of the Impact of Pretrial Publicity on Jurors and Juries*, in 3 *Advances in Psychology and Law* 5 (M. Miller ed. 2018). "[F]or jurors exposed to anti-defendant articles, those receiving high amounts of [pretrial publicity] were more likely to vote guilty than those receiving low amounts." *Id.*

Worse, studies show that jurors cannot detect the bias pretrial publicity causes in their own views. Multiple surveys of jury-eligible adults have found that, while "potential jurors' knowledge about a case was not related to their self-reported ability to be impartial," as their knowledge of the case increased, "so did [their] bias against the defendant." *Id.* (citing studies). It is unsurprising, then, that social science research suggests voir dire does little if anything to

help courts detect jurors who have been biased by pretrial publicity. *Id.* at 24 (summarizing findings that jurors exposed to pretrial publicity were more likely to vote "guilty" than jurors who were not, despite attesting that they could "judge the defendant in a fair and unbiased manner"). And, unavoidably, some potential jurors may conceal their true feelings in voir dire to obtain a seat on the jury of this high-profile case. So-called "stealth jurors" are surprisingly common. *See, e.g.*, Malia Wollan, *How to Be Selected for a Jury*, N.Y. Times, July 28, 2017 ("Philip Anthony, chief executive of DecisionQuest, a trial consulting firm whose work includes assisting in jury selection … [e]stimates that some 17 percent [of jurors] are ''stealth jurors,'' people seeking a seat to further a hidden personal agenda.").[3]

For these reasons, unsealing portions of the filings relating to the "abuse" defense and severance may do irreparable damage to Mr. Balwani's right to a fair trial. Moreover, the public will have access to Ms. Holmes' "abuse" defense in the context of her trial, which is wholly consistent with the public's right of access to court proceedings.

The government's arguments to the contrary ring particularly hollow in the context of this case. The irony should not be lost on the Court that the same government that here claims to champion public access is the entity most responsible for curtailing it, especially in criminal cases. From serving Stored Communications Act warrants with non-disclosure orders,[4] and asking for search warrant affidavits to be placed under seal, to fighting Freedom of Information Act requests tooth and nail,[5] and engaging in wholesale efforts to block witnesses and evidence in connection with the ongoing presidential impeachment proceedings, the government routinely offers full-throated defenses of efforts to thwart access to information of similar or greater public concern than Ms. Holmes' defense. At times the government may do so for good reason—to protect the integrity of its own investigations. The same logic applies even more strongly here, where it is necessary to protect a criminal defendant entitled to a presumption of innocence from

---

[3] https://www.nytimes.com/2017/07/28/magazine/how-to-be-selected-for-a-jury.html
[4] *See* 18 U.S.C. § 2705(b).
[5] *See* 5 U.S.C. § 552.

the massively unfair taint of prejudicial pretrial publicity that would flow from airing accusations that have no bearing on his guilt.

Here, the public will not be forever precluded from learning of Ms. Holmes' allegations. That information will be made public at Ms. Holmes' trial. This will vindicate all of the purposes of public access: disclosing information of public concern and giving the public the ability to assess the evidence in a criminal case and assure itself of the fairness of the proceedings. All Mr. Balwani asks is that this access be temporarily curtailed so that he can receive a fair trial. Disclosure before his trial would serve no purpose but to taint the jury pool.

## IV.   CONCLUSION

Mr. Balwani asks the Court to sever his case from Ms. Holmes', order that he proceed to trial first, and keep all papers and hearings that discuss the abuse defense and severance for that reason under seal.

Dated: January 21, 2020

Respectfully submitted,
ORRICK, HERRINGTON & SUTCLIFFE LLP

_____
JEFFREY B. COOPERSMITH

Attorney for Defendant
RAMESH "SUNNY" BALWANI