1  JEFFREY B. COOPERSMITH (SBN 252819)
   WALTER F. BROWN (SBN 130248)
2  MELINDA HAAG (SBN 132612)
   RANDALL S. LUSKEY (SBN 240915)
3  STEPHEN A. CAZARES (SBN 201864)

4  ORRICK, HERRINGTON & SUTCLIFFE LLP
   The Orrick Building
5  405 Howard Street
   San Francisco, CA 94105-2669
6  Telephone:   +1-415-773-5700
   Facsimile:   +1-415-773-5759
7
   Email: jcoopersmith@orrick.com; wbrown@orrick.com;
8         mhaag@orrick.com; rluskey@orrick.com;
          scazares@orrick.com
9
10 Attorneys for Defendant
   RAMESH "SUNNY" BALWANI
11

FILED

FEB 07 2020

Susan Y. Soong
Clerk, U.S. District Court
Northern District of California
San Jose

ECF Dkt. No. 325

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>        v.<br><br>HOLMES, et al.,<br><br>                    Defendants. | Case No. 18-CR-00258-EJD<br><br>**DEFENDANT RAMESH "SUNNY" BALWANI'S REPLY IN SUPPORT OF MOTION TO SEVER**<br><br>Date:   February 10, 2020<br>Time:   10:00 AM<br>Judge:  Honorable Edward J. Davila<br>Ctrm:   4, 5th Floor |

## PROVISIONALLY FILED UNDER SEAL PURSUANT TO COURT ORDER OF JANUARY 13, 2020

## TABLE OF CONTENTS

|     |     | Page |
| --- | --- | --- |
| I.  | INTRODUCTION | 1 |
| II. | ARGUMENT | 2 |
|     | A. Ms. Holmes will likely elicit alleged evidence that Mr. Balwani abused her even if her expert does not testify. | 2 |
|     | B. Because Ms. Holmes will likely elicit alleged evidence that Mr. Balwani abused her, his trial must be severed. | 4 |
|     | C. Dual juries would not cure the prejudice to Mr. Balwani. | 9 |
|     | D. If the Court severs the cases, it should order that Mr. Balwani be tried first. | 12 |
|     | E. The Court must decide the issue of severance now. | 14 |
| III. | CONCLUSION | 14 |

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Beam v. Paskett*,
  3 F.3d 1301 (9th Cir. 1993), *overruled on other grounds by Lambright v. Stewart*, 191 F.3d 1181 (9th Cir. 1999) .................................................................................12

*Gannett Co. v. DePasquale*,
  443 U.S. 368 (1979) ..................................................................................................................13

*Hardwick v. Ind. Bell Tel. Co.*,
  No. 11:5-CV-01161-JMS-DML, 2018 WL 4620252 (S.D. Ind. Sept. 26, 2018) .......................13

*Lambright v. Stewart*,
  191 F.3d 1181 (9th Cir. 1999) ..................................................................................................12

*Reay v. Scribner*,
  369 F. App'x 847 (9th Cir. 2010) ................................................................................................7

*Todd v. Lovecruft*,
  No. 19-CV-01751-DMR, 2020 WL 60199 (N.D. Cal. Jan. 6, 2020) .........................................13

*United States v. Al Fawwaz*,
  67 F. Supp. 3d 581 (S.D.N.Y. 2014) .........................................................................................11

*United States v. Breinig*,
  70 F.3d 850 (6th Cir. 1995) ..............................................................................................5, 6, 7

*United States v. Delorme*,
  No. 07-20534-CR, 2010 WL 11507134 (S.D. Fla. Feb. 18, 2010) ............................................10

*United States v. Joetzki*,
  952 F.2d 1090 (9th Cir. 1991) .....................................................................................................7

*United States v. Lewis*,
  716 F.2d 16 (D.C. Cir. 1983) ....................................................................................................11

*United States v. Lopez*,
  915 F. Supp. 891 (E.D. Mich. 1996) ..................................................................................5, 6, 7

*United States v. Muhtorov*,
  No. 12-CR-33-JLK, 2016 WL 11612426 (D. Colo. Nov. 29, 2016) .........................................10

*United States v. Odom*,
  888 F.2d 1014 (4th Cir. 1989) ..................................................................................................12

*United States v. Pelletier*,
    490 F. Supp. 2d 17 (D. Me. 2007) .................................................................................. 9, 10

*United States v. Shields*,
    673 F. App'x 625 (9th Cir. 2016) ............................................................................................ 8

*United States v. Sidman*,
    470 F.2d 1158 (9th Cir. 1972) .............................................................................................. 12

*United States v. Swan*,
    No. 1:12-CR-00027-JAW, 2013 WL 3422022 (D. Me. July 8, 2013) ........................ 4, 5, 6, 7

*United States v. Yizar*,
    956 F.2d 230 (11th Cir. 1992) .............................................................................................. 12

**Other Authorities**

Sixth Amendment ................................................................................................................... 1, 9

## I.  INTRODUCTION

In his initial motion, and again at the sealed hearing on January 13, 2020, Mr. Balwani explained that there must be a severance of defendants here because the evidence Ms. Holmes intends to offer is irrelevant to Mr. Balwani's case, and will severely, unfairly, and irreparably prejudice him. Mr. Balwani's motion also noted that her defense likely will be irreconcilably antagonistic to his own, and if she elects not to testify, the testimony she elicits from other witnesses will likely violate his confrontation rights under the Sixth Amendment. *See* Balwani Motion to Sever (Def. Mot.) at 4-10.

Recognizing that severance is all but required under these circumstances, the government hardly engages with Mr. Balwani's arguments. *See* United States' Opposition to Motion to Sever (Gov. Opp.) at 19-25. It ignores his primary argument that evidence of Ms. Holmes' allegations, if admitted, will cause severe and unfair prejudice to his case. The government also misconstrues the law relating to antagonistic defenses, and completely ignores the potential Confrontation Clause issues inherent in the testimony of witnesses other than Ms. Holmes. Instead, the government baselessly accuses Mr. Balwani of "coordinat[ing]" with Ms. Holmes to cook up "a joint strategy to obtain severance," Gov. Opp. at 2 n.1,[1] before going on to insist that, in any case, there is nothing to worry about because this inflammatory and explosive evidence will never be admitted in the first place, *see id.* at 6-17. The government's position largely fails to address, and does not rebut, Mr. Balwani's showing that a joint trial will result in extreme and unfair prejudice to his case, and that putting off a ruling on Mr. Balwani's severance motion would be highly prejudicial to his ability to prepare for trial.

Nothing but a severance can adequately cure the unfair prejudice to Mr. Balwani.

---

[1] The government claims that the parties "coordinat[ed]" because Ms. Holmes' September 18 letter to Mr. Balwani (notifying him of her intended defense) and Mr. Balwani's Motion to Sever both recognized that Ms. Holmes "abuse" evidence would prejudice Mr. Balwani. Gov. Opp. at 2-3 & n.1. In other words, the government's evidence that the parties coordinated is that both sets of experienced criminal defense counsel accurately recounted the same obviously applicable law. This is illogical, baseless, and improper. There is no world in which Mr. Balwani's counsel would gin up accusations of sexual abuse that, if admitted at trial, would be catastrophic for Mr. Balwani's case and reputation. The government's allegations of "coordination" are based on nothing.

DEFENDANT BALWANI'S RELY
IN SUPPORT OF MOTION TO SEVER,
CASE NO. 18-CR-00258-EJD

4128-4869-5842.9

Certainly not dual juries. Courts use dual juries in simple cases with discrete issues. Here, dual juries would be unworkable. The "Balwani jury" would need to be dismissed dozens of times to prevent contamination from Ms. Holmes' "abuse" evidence and any effort to undermine it. And if Ms. Holmes puts on evidence and testifies about the purported abuse—as her counsel has repeatedly said is likely—it will transform what is already one of the country's most watched criminal proceedings into required (and unavoidable) viewing for anyone with a television or smartphone, making it necessary to sequester the "Balwani jury." If the Court severs to avoid poisoning the jury with unfairly prejudicial information, then it should sequence the trials to avoid poisoning the jury pool with that same information.[2]

Finally, the Court should decide Mr. Balwani's severance motion now. To prepare for an exceedingly complex fraud trial, Mr. Balwani must know what sorts of allegations he faces. Waiting months to decide whether to sever will irreparably harm his efforts to defend himself and further jeopardize the trial date. Even if, as the government says, he is not the "lead defendant" and the "face of Theranos," that is no justification to shunt him and his ability to prepare for trial to the sidelines while the government and Ms. Holmes battle it out on the playing field.

## II.   ARGUMENT

### A.   Ms. Holmes will likely elicit alleged evidence that Mr. Balwani abused her even if her expert does not testify.

The government spends most of its brief arguing that Ms. Holmes' expert will not be permitted to testify that Ms. Holmes suffered from a "mental disease or defect" that prevented her from forming the *mens rea* required for wire fraud. *See* Gov. Opp. at 6-17. But the government misses the point. Mr. Balwani will be prejudiced, not just by the expert's opinion of Ms. Holmes' mental state, but by the factual allegations underlying it and her counsel's argument that she is innocent because of the mental trauma she suffered at the hands of Mr. Balwani. And contrary to the government's assertions, Ms. Holmes may not need an expert to elicit those facts. As the

---

[2] The government's ill-conceived dual jury suggestion is fully addressed later in this reply brief, but for now it is worth noting that for these same reasons a jury empaneled to hear Mr. Balwani's case in a dual jury trial would have to be sequestered for many months.

1    Court suggested several times at the January 13 hearing, *see* Transcript of Jan. 13, 2020 hearing
2    (Tr.) at 10-11, 13-14, 25, 34, 36, 66, at trial Ms. Holmes may call third-party witnesses to the
3    alleged abuse or simply take the stand herself. In fact, this is exactly what Ms. Holmes says she
4    will do in her sealed reply filed on February 6, 2020. Whether she does is "vital to the Court's
5    decision about ... severance," Tr. at 10, precisely because the prejudice Mr. Balwani will suffer
6    from lay testimony will be at least as severe, and indeed more severe, than it would be if it came
7    in through an expert alone.

8    There can be little doubt, at this point, about what Ms. Holmes intends to do. At the
9    January 13 hearing, her counsel plainly stated that their team "would not have filed the motion if
10   [they] did not anticipate" that nonexpert testimony about these prejudicial facts "was likely" to be
11   part of Ms. Holmes' defense. Tr. at 22. Counsel repeated this point a half-dozen times. *See, e.g.*,
12   Tr. at 22 ("[T]he court should consider ... [the issue of prejudice to Mr. Balwani] with the
13   assumption that there is ... a likelihood that at least nonexpert testimony will come in. ...We have
14   made some judgment in that regard."); 29 ("I expect that there will be [fact and expert]
15   testimony."); 30 ("I'm just commenting that I anticipate that [fact testimony] will be admitted.");
16   49 ("Ms. Holmes, if she chooses, has a right to present evidence related to this defense, and as I
17   have indicated to the Court, such a presentation is likely and substantial."); 68 ("The question is
18   the Court obviously has to make a decision as to likelihood [of prejudicial fact testimony coming
19   into evidence], and we think based on what is in front of the Court it's in a position to do so.").

20   In case these representations were not a clear enough indication of Ms. Homes' plan, her
21   attorneys included even stronger language in their January 17 filing: "[C]ounsel can state, as
22   officers of the court, that there is a significant likelihood that Ms. Holmes will (1) testify at trial
23   that she suffered from intimate partner abuse and (2) explain the impact of the abuse on her state
24   of mind during the relevant period." Notice of Submission at 1 (Dkt. 288). Counsel also stressed
25   the "significant likelihood that Ms. Holmes will call other [nonexpert] witnesses and offer other
26   evidence on these issues," citing a December 16, 2019, *in camera* proffer. *Id.* at 2.

27   Ms. Holmes made this even more explicit in her February 6, 2020 reply filing. There she
28   described the "abuse" claim as "a significant portion of [her] likely defense, including important

aspects of her own likely testimony." Holmes Reply at 1. That submission repeatedly suggests that this evidence cannot be "limited in meaningful ways," that "expert testimony likely will play an important role" in her defense, and that evidence on this issue is "highly likely" to come in at trial "in the form of both fact and expert testimony." *Id.* at 1-2.

But while the "vital" question "driv[ing]" the severance issue is whether Ms. Holmes will present prejudicial nonexpert testimony, Tr. at 10, the government's 25-page response brief includes just *two pages* addressing it. *See* Gov. Opp. at 17-18. Worse, its argument—that any nonexpert testimony about facts that could affect Ms. Holmes' mental state are "entirely irrelevant" unless an expert can diagnose her as part of a 12.2(b) defense, Gov. Opp. at 17—fails to acknowledge that defendants frequently testify about traumatic events that affect their mental states. Indeed, in *United States v. Swan*—an analogous case Mr. Balwani discussed in his opening brief, Def. Mot. at 6-7, but the government ignored—the court severed a husband from his wife after she alleged that his long-term abuse and control would "establish her lack of intent to defraud" at trial because of the way it affected her "state of mind, including her motivations, beliefs, knowledge, and understanding." No. 1:12-CR-00027-JAW, 2013 WL 3422022, at *2 (D. Me. July 8, 2013). Ms. Swan not only "failed to provide notice of an expert witness," but also "failed to produce any documents confirming that she [was even] a victim of domestic abuse." *Id.* at *3. But the court severed anyway. Even without an expert, the jury's "ability to judge [Mr. Swan] fairly on the merits would be compromised," the court found, in light of "[Mrs.] Swan's allegations." *Id.* at *4.

To be clear, Mr. Balwani is not arguing that "evidence" of the false and inflammatory allegations Ms. Holmes' intends to elicit is admissible. But the government's thin arguments give Mr. Balwani no confidence that it will not surface in a joint trial. Unless the Court is certain that it can and will exclude *all* the "evidence" Ms. Holmes intends to elicit, a severance is the only remedy that could protect Mr. Balwani's Constitutional rights.

**B. Because Ms. Holmes will likely elicit alleged evidence that Mr. Balwani abused her, his trial must be severed.**

The government spends the final few pages of its brief alternatively ignoring and

mischaracterizing Mr. Balwani's arguments for severance.

*First*, it simply overlooks Mr. Balwani's primary argument for severance—that "[a] joint trial would expose the jury to tremendously prejudicial evidence that is otherwise inadmissible against Mr. Balwani." Def. Mot. § A.1. As Mr. Balwani explained, the evidence Ms. Holmes will attempt to elicit is wholly irrelevant to his guilt or innocence; would never be admitted in a case against him alone; will place him in the profoundly unfair position of having to defend against the government's case and Ms. Holmes' case at the same time; and presents a grave risk that the jury will convict him, not because he committed the charged crimes, but because they believe he committed uncharged crimes of partner abuse. Def. Mot. at 4, 7. Mr. Balwani also offered three federal cases directly addressing the unusual circumstances presented here: *United States v. Breinig*, 70 F.3d 850 (6th Cir. 1995); *United States v. Lopez*, 915 F. Supp. 891 (E.D. Mich. 1996); and *United States v. Swan*, No. 1:12-CR-00027-JAW, 2013 WL 3422022 (D. Me. July 8, 2013). Def. Mot. at 4-7.

In *Breinig*, the Sixth Circuit reversed Breinig's conviction and sentence because the trial court denied severance. The court found that the evidence his former wife elicited to show that he "controlled" and "'manipulated' her throughout the course of a twenty-four-year marriage" was "manifestly prejudicial," "would have been inadmissible against him under any theory of the Federal Rules of Evidence on a trial for tax evasion," and "provided the government with an unfair windfall that the rules of evidence and elemental notions of fairness would otherwise not allow." 70 F.3d at 852, 853; *see* Def. Mot. at 4-5 (providing additional details).

*Lopez* and *Swan*—both district court cases—reach the same conclusion as *Breinig*. In *Lopez*, Sandra Lopez's defense to drug conspiracy charges was that her co-defendant, Rene Cardona, "beat and/or coerced her." 915 F. Supp. at 900. The court severed because "the testimony which Lopez intends to introduce will expose Cardona to the same degree of prejudice which justified the reversal in *Breinig*," and "would be inadmissible against Cardona if he were tried independently." *Id.* at 901; *see* Def. Mot. at 6. *Swan*, mentioned above, presented the same issue, and the court reached the same conclusion: Because "[i]f his case were tried separately, his

wife's allegations of spousal abuse would be inadmissible," and because, if tried together, "Marshall Swan will ... be compelled to defend himself not only against the prosecutor's case against him but also his wife's case against him," the court was compelled to sever to preserve the "basic fairness of the trial." 2013 WL 3422022 at *4-5; *see* OB6-7 (providing additional details).

Remarkably, the government ignores this entire argument: It does not so much as mention *Lopez* or *Swan*, and it misunderstands the import of *Breinig*. It claims that *Breinig* "is distinguishable" from this case because, there, "the defendants had met their initial burden of showing actually antagonistic defenses," whereas here "it is not clear that Balwani's defense would be antagonistic to Holmes's." Gov. Opp. at 20. That is simply wrong. As the Sixth Circuit explained, "the unfairness in Breinig's trial resulted *not* from a mutually antagonistic defense"— which, contrary to what the government says, Breinig never met his initial burden of showing— "but from evidence the jury was permitted to hear and evaluate and which was, as to Breinig, impermissible and highly inflammatory evidence of his bad character." 70 F.3d at 853 (emphasis added). In other words, the *Breinig* court did not reverse because the defenses were antagonistic; it reversed, as Mr. Balwani explained in his opening brief, because the co-defendant's claims were so prejudicial that a severance was the only option.[3]

Given the government's silence on prejudice, the Court must assume that it does not contest Mr. Balwani's central claims—namely, that evidence of Ms. Holmes' allegations is wholly irrelevant to his guilt or innocence; that it would never be admitted were he tried alone; that her defense will place him in the deeply unfair position of having to defend against the government's case and her case at the same time; and that her defense presents a grave risk that

---

[3] The government's footnote, Gov. Opp. at 20 n.7, is more perplexing than its in-text discussion. After stating—again, incorrectly—that *Breinig* "reversed ... because the defenses were antagonistic," it goes on to suggest that *Breinig* is "of limited value" because the Sixth Circuit "did not examine the content of the expert testimony in support of the wife's defense and therefore never considered how these facts were relevant and admissible as part of her defense." *Id.* But this simply shows how profoundly the government has misunderstood the problem Mr. Balwani's arguments address. The prejudice he will suffer derives not from the expert's opinion, but from the facts Ms. Holmes will elicit—from experts *or nonexperts*—to support her defense. That the *Breinig* court could reverse without considering "the content of the expert testimony" only underscores that it's the underlying facts, not the expert testimony, that creates reversible prejudice.

the jury will convict him, not because he committed the charged crimes, but because they believe he committed uncharged crimes of partner abuse. Def. Mot. at 4, 7. In short, the government does not contest that, if admitted, Ms. Holmes' evidence would cause severe, unfair, and irreparable prejudice for precisely the reasons the *Breinig*, *Lopez*, and *Swan* courts identified.[4] This prejudice alone, with or without the presence of antagonistic defenses, requires severance under the law.

*Second*, the government argues that Mr. Balwani's defense is not irreconcilably antagonistic to Ms. Holmes' because (1) Ms. Holmes' defense "does not require a jury to find Balwani guilty"; (2) Mr. Balwani "has not yet articulated his defense and how this defense would be antagonistic to Holmes's"; and (3) this case is distinguishable from *Breinig*. Gov. Opp. at 19-21.

None of these arguments hold water. As explained above, the defendants in *Breinig* did not have irreconcilably antagonistic defenses, and Mr. Balwani never claimed they did. In fact, Mr. Balwani did not mention *Breinig* at all when discussing antagonistic defenses. *See* Def. Mot. at 9. So it is not clear what the government is "distinguish[ing]." Gov. Opp. at 20. Antagonistic defenses need not be present when severance is based on unfairly prejudicial evidence presented by a co-defendant that could never be admitted against the defendant otherwise.

---

[4] Nor could the court cure the prejudice with a limiting instruction, as the government suggests. *See* Gov. Opp. at 21. Both *Lopez* and *Swan* considered and rejected that option. *See Lopez*, 915 F. Supp. at 901; *Swan*, 2013 WL 3422022, at *5. Instead of addressing those cases—again, the government does not even mention them—it cites two others: *Reay v. Scribner*, 369 F. App'x 847, 848-49 (9th Cir. 2010) and *United States v. Joetzki*, 952 F.2d 1090, 1094 (9th Cir. 1991). *Reay* is an unpublished decision in which the Ninth Circuit affirmed a murder conviction under deferential AEDPA review. It held that the affirmance by the California Court of Appeal of a state court's admission of evidence of domestic violence was "neither contrary to nor an unreasonabl[e] application of federal law" in part because "there was *other properly admitted* evidence of domestic violence" at the trial. 369 F. App'x at 849 (emphasis added). Thus, even setting aside the obvious difference in standards of review, *Reay* presents a completely different question: whether it is reversable error to admit prejudicial evidence that merely bolsters already admissible evidence. And *Joetzki*, which has nothing to do with domestic abuse, is not relevant at all. There, the Ninth Circuit affirmed a district court's decision to admit "evidence concerning a bizarre method of refining gold" that "had relevance in establishing that the [defendants'] enterprise was a sham" and was, for that reason, "probative of fraudulent intent." 952 F.2d at 1093, 1094. Ms. Holmes' explosive allegations, which are wholly irrelevant to Mr. Balwani's case, are nothing like the relevant, probative evidence in *Joetzki*, and a jury instruction would come nowhere close to curing their admission.

But in any event, it is highly likely that the defenses will be antagonistic. As Mr. Balwani explained in his opening brief, "Ms. Holmes apparently intends to argue that she is not guilty of fraud or conspiracy because Mr. Balwani's alleged abusive conduct let him 'exert control over her,'" Def. Mot. at 9 (citing Holmes Letter), negating her *mens rea*. Plausibly, then, she intends to argue that, regardless of whether the statements she and Mr. Balwani made to investors were deceptive, Mr. Balwani's treatment of her, including the control he exercised over her day-to-day affairs, prevented her from forming an intent to deceive. Ms. Holmes' subsequent filings and statements at the January 13 hearing—which show that much of the alleged abuse occurred contemporaneously with the events at issue in the indictment—only reinforce Mr. Balwani's initial understanding of her intention. *See* Amended Declaration of Mindy Mechanic at 13 (alleging that Mr. Balwani's control included monitoring her calls, text messages, and emails; physical violence, such as throwing hard, sharp objects at her; restricting her sleep; monitoring her movements; and insisting that any success she achieved was because of him). Ms. Holmes' February 6, 2020 brief goes further still. It goes as far as her defense counsel possibly could to say that Ms. Holmes will use her abuse claims to blame Mr. Balwani for huge swaths of the government's case, including his alleged responsibility for the financial models presented to investors and the Walgreens' relationship. *See* Holmes Reply at 1-2. Mr. Balwani's defense, by contrast, "is simply that he did not commit the fraud alleged in the indictment and did not conspire with or direct Ms. Holmes to do so." Def. Mot. at 9.

The government claims that these defenses are not antagonistic because "both defendants may argue that there was no scheme to defraud and the statements made to investors and patients were entirely truthful," or that "any false or deceptive statements were immaterial." Gov. Opp. at 19. But that completely fails to contend with the likely permutations of Ms. Holmes' proposed defense. Ms. Holmes plans to advance a defense that may be irreconcilably antagonistic with Mr. Balwani's. And Mr. Balwani must know now, just months from an already immensely complex fraud trial, what the case against him will look like and how he can prepare to meet it.[5]

---

[5] The government's citation to *United States v. Shields*, 673 F. App'x 625 (9th Cir. 2016), another unpublished decision from the Ninth Circuit, is not to the contrary. While the

*Third*, the government states in its introduction that Mr. Balwani "has not shown ... that his confrontation rights will be compromised." Gov. Opp. at 2. But it never says why. Indeed, aside from this conclusory sentence, the government never mentions Mr. Balwani's Sixth Amendment argument at all. For the uncontested reasons Mr. Balwani gave in his opening brief, *see* Def. Mot. at 9-10, the Court should sever to avoid the grave risk that Ms. Holmes' defense would violate his constitutional rights if she chooses not to testify.

### C. Dual juries would not cure the prejudice to Mr. Balwani.

As Mr. Balwani's authorities make plain, severance is necessary to protect his right to a fair trial. That right cannot be adequately vindicated by empaneling dual juries. This procedure is designed for short, simple trials where prejudicial evidence is easily cabined. Mr. Balwani has found no examples—and the government cites none—of dual juries used for a lengthy, complex fraud trial. The government's authorities stand only for the proposition that empaneling dual juries in a criminal case is not per se unconstitutional. They say nothing about whether the procedure would be a practical solution here, or would cure the prejudice to Mr. Balwani.

It would accomplish neither. Instead, it would require endless interruptions as the "Balwani jury" shuffled in and out of the courtroom to avoid problematic testimony, exacting care by the Court and all counsel to ensure that the "Balwani jury" is not exposed to any evidence or argument about the "abuse" allegations, and months-long sequestration of the "Balwani jury" to prevent its otherwise inevitable exposure to press coverage of Ms. Holmes' accusations. This will not do.

Courts confronted with trials dramatically less complex than this one have rejected dual juries. For instance, *United States v. Pelletier* dealt with a *Bruton* issue—the typical context for

---

memorandum provides almost no information about the defenses in that case, the court indicates that one defendant advanced a defense that he was "innocent" of the conspiracy charge, and then, separately, accused the other defendant of "committing fraud." *Id.* at 626-27. However, nothing about the first defendant's defense turned on the accusation against the second defendant. Our case is exactly the opposite. Mr. Holmes' is arguing that she lacked the required *mens rea because* Mr. Balwani controlled and abused her. The claims are necessarily connected. If the jury believes her, then they will believe that Mr. Balwani controlled her during the fraud, which is inconsistent with Mr. Balwani's defense that he never committed fraud.

dual juries—in which law enforcement would testify that several non-testifying codefendants had made statements incriminating Pelletier, compromising his Sixth Amendment rights. *See* 490 F. Supp. 2d 17, 20 (D. Me. 2007). The court chose separate trials rather than one trial with two juries, concluding that "the risk of inadvertent disclosure of evidence admissible against one, but inadmissible against other defendants exceeds the efficiency benefits of a joint trial." *Id.* at 21.

So too in *United States v. Muhtorov*, No. 12-CR-33-JLK, 2016 WL 11612426 (D. Colo. Nov. 29, 2016), where the court severed over a *Bruton* issue, rejecting the government's request to empanel two juries. *See id.* at *2-3. It did so in part because "the complexity of the evidence to be adduced, the number of witnesses to be called and the likelihood that one or the other jury would have to leave the courtroom on numerous occasions [would make] management and presentation of the case unnecessarily difficult." *Id.* at *3. The court was also mindful of the public controversy surrounding the issues in the case (terrorism) in concluding that the circumstances made the case "too fragile . . . to justify a joint trial." *Id.* The joint trial in *Muhtorov* was set for five weeks, rather than the three months that will be needed for this case. *See id.* at *1. Yet even there, the complexity was too great for dual juries to be a practicable solution.

The Southern District of Florida also severed to avoid a *Bruton* issue in *United States v. Delorme*, No. 07-20534-CR, 2010 WL 11507134, at *1 (S.D. Fla. Feb. 18, 2010). Despite the fact that the issue was simple—one defendant's post-arrest statements repeatedly implicated the other defendant—the court rejected the government's dual-jury proposal, holding that a procedure in which one jury would need to be excused before any mention of the co-defendant's post-arrest statements could, "rather than promote judicial economy, ... simply lead to increased delays and potential error." *Id.* at *1-2.

Here, if the case were tried before two juries, Ms. Holmes could be expected to cross-examine the government's witnesses who observed her interactions with Mr. Balwani—including investors, former Theranos employees, and regulators—about the dynamics they observed in ways that may prejudice a jury against Mr. Balwani. The "Balwani jury" would need to be excused for all these crosses, interrupting the flow of trial. The government's breezy suggestion

4128-4869-5842.9

that similar departures for the openings, closings, and large swaths of the defense case—during which Ms. Holmes herself would likely offer damaging testimony on issues wholly unrelated to the fraud charges—would be "much less disruptive" than two trials is unpersuasive. *See* Gov. Opp. at 22-23. Rather, the government's proposed dual juries would substantially lengthen an already months-long trial, thereby undermining any claimed efficiency gained from a joint trial. Its proposed procedure is not practicable, and any misstep would risk a mistrial.

Worse, neither these cases nor those the government cites dealt with the kind of national media frenzy—complete with a Hollywood movie adaptation and hit podcast—that already plagues this case. In a digital age where even conscientious jurors receive unavoidable news alerts through pre-installed smartphone applications, nothing short of (or even including) sequestration of the Balwani jury could prevent the jurors from learning of Ms. Holmes' abuse claims at precisely the time they are made public.

Indeed, even courts that have used dual juries or rejected severance altogether have emphasized that dual juries should be used for simple cases where the prejudicial evidence is discrete and easily contained. That is not this case. As one example, the D.C. Circuit affirmed the use of dual juries for a trial that lasted only eight days, where the only issue was one defendant's statement implicating his co-defendants. *See United States v. Lewis*, 716 F.2d 16, 18-19 (D.C. Cir. 1983). But the court stressed that dual juries should be used, if at all, only in "relatively uncomplicated situations" because the procedure can involve "substantial risks of prejudice to a defendant's right to a fair trial." *Id.* at 19 (internal quotation marks omitted) (citing cases). The Southern District of New York also has described the two-jury process as "fraught with complications" that may create confusion and interrupt the flow of trial. *United States v. Al Fawwaz*, 67 F. Supp. 3d 581, 588 (S.D.N.Y. 2014) (rejecting severance and defendants' request for dual juries). As these opinions highlight, dual juries should be limited to uncomplicated situations that "will not require the excessive moving of juries in and out of the courtroom," *id.* (internal quotation marks omitted), and will avoid the "substantial risks of prejudice" to a defendant, *Lewis*, 716 F.2d at 19 (internal quotation marks omitted).

But of course, Mr. Balwani is not facing an eight-day trial in which only a single witness's

testimony on a discrete subject is prejudicial, as in *Lewis*. Instead, the parties have estimated that this trial will take three months. Dkt. 80 at 2. And *Fawwaz* involved no statement by one defendant implicating the other in unrelated criminal conduct or creating prejudice to the other, and no defendant was offering a defense that would supercharge already nationwide negative press coverage. Not so here.

The government's authorities do not suggest otherwise. All the cases to which the government turns dealt with violent crimes. *See* Gov. Opp. at 22-23. The trial in *United States v. Sidman*—to which the government points as a model—lasted only *four* days. 470 F.2d 1158, 1170 (9th Cir. 1972). And that case stated that its holding was "not to be read as an endorsement of the 'experiment' that was carried out." *Id.*

Even later cases like *Lambright v. Stewart* emphasized that a key consideration in severance is "whether the evidence as it relates to the individual defendants is easily compartmentalized." 191 F.3d 1181, 1186 (9th Cir. 1999) (en banc). *Beam v. Paskett* observed that some courts had "expressed serious reservations regarding the use of dual juries in any but the simplest of trials ...." 3 F.3d 1301, 1303 (9th Cir. 1993), *overruled on other grounds by Lambright*, 191 F.3d 1181. *Beam* recognized that the "dual jury procedure introduces additional complexity and likelihood of error into the trial and thereby impairs a defendant's ability to conduct his defense." *Id.* at 1304.

None of these decisions suggests that dual juries would be an adequate cure for the prejudice facing Mr. Balwani. Only severance can do that.

**D.    If the Court severs the cases, it should order that Mr. Balwani be tried first.**

The government's suggestion that the Court should order that Ms. Holmes proceed to trial first risks profound prejudice to Mr. Balwani. As Mr. Balwani's severance motion and supplemental memorandum show, the Court has discretion to order the sequence of trials after severance. *United States v. Yizar*, 956 F.2d 230, 233 n.17 (11th Cir. 1992). In exercising that discretion, it is appropriate to "consider the possible impact upon public opinion" of the Court's decision. *United States v. Odom*, 888 F.2d 1014, 1018 (4th Cir. 1989). There is no conceivable justification for severing Mr. Balwani's case to avoid the prejudice of Ms. Holmes' abuse

allegations but not to sequence the trials to prevent that same prejudice from infecting the jury pool. *See Yizar*, 956 F.2d at 233 (recognizing a trial court's ability, after granting severance of co-defendants, to sequence the trials to avoid the unfairness severance was designed to prevent).

The government's arguments to the contrary are inapposite and misapprehend the record. None of the government's cited authorities undermine the Court's "affirmative constitutional duty to minimize the effects of prejudicial pretrial publicity." *Gannett Co. v. DePasquale*, 443 U.S. 368, 378 (1979). And none speak to the sequencing of severed trials. As for the extent of the prejudice, the government erroneously refers to 150 press stories about Theranos since October 2015. That figure includes only stories from Bay Area publications. *See* Declaration of Jeffrey B. Coopersmith in Support of Motion to Sever ¶ 4 (Dkt. 190). A national search returned about *600* Theranos stories since October 2015 as of Mr. Balwani's severance motion. *Id.* Just since Mr. Balwani filed his motion to sever, more than a dozen new stories discussing Theranos have run in newspapers and wire services across the country, with dozens more in foreign publications and domestic blog posts. *See* Supplemental Declaration of Jeffrey B. Coopersmith ¶ 2. And Mr. Balwani can only assume that the government's reference to "additional national media attention," Gov. Opp. at 24, is a euphemism for the bestselling book, HBO documentary, podcast, and forthcoming theatrical film and television series centered on Theranos. The government cannot contend with a straight face that this is not already one of the country's most watched criminal prosecutions.

Nor can it deny that adding accusations of sexual abuse will dramatically increase this attention. The #MeToo movement has become "an internet phenomenon" since allegations of sexual misconduct by Harvey Weinstein were made public in 2017. *Hardwick v. Ind. Bell Tel. Co.*, No. 11:5-CV-01161-JMS-DML, 2018 WL 4620252, at *15 (S.D. Ind. Sept. 26, 2018). ▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ The same logic applies even more so when both the accuser and the accused are already in the public eye.

The government's sole proffered justification to try Ms. Holmes first—that she is the

"face of Theranos" and that the public has an interest in adjudicating her guilt—only underscores the publicity surrounding this case. Given that the government began its investigation years ago, their complaints about further delays ring hollow.

The Court should sever these cases, and order that Mr. Balwani be tried first.

### E. The Court must decide the issue of severance now.

Finally, as the motion to sever makes plain, a ruling on severance is needed now to allow Mr. Balwani to prepare his defense. *See* Def. Mot. at 8. The massive investigation that Mr. Balwani would need to undertake in a joint trial with this evidence is not, as the government suggests, *see* Gov. Opp. at 21, Mr. Balwani's argument for severance, but rather the reason why the Court cannot wait to rule. Nor is it simply a matter of time and expense in subpoenaing records, interviewing witnesses, and retaining experts. To prepare for an exceedingly complex fraud trial, Mr. Balwani must know what sort of trial he faces. If it is properly restricted to the government's allegations of fraud, that is one thing. But it is a different proposition entirely if Mr. Balwani must craft his defense strategy around rebutting Ms. Holmes' explosive claims, while at the same time defending against the government's fraud allegations. Waiting months to decide admissibility will make this impossible, irreparably harm Mr. Balwani's efforts to defend himself, and further jeopardize the trial date Mr. Balwani has been preparing for.

## III. CONCLUSION

For these reasons, Mr. Balwani asks the Court to protect his right to a fair trial and give the public confidence that the jury's verdict—whatever it may be—is rooted in the evidence about the crimes he is accused of and not salacious and irrelevant allegations of sexual misconduct. He asks for a severance.

Dated: February 7, 2020

Respectfully submitted,
ORRICK, HERRINGTON & SUTCLIFFE LLP

_____
JEFFREY B. COOPERSMITH

Attorney for Defendant
RAMESH "SUNNY" BALWANI