# Exhibit 2

## MEMORANDUM OF INTERVIEW

| | | |
|---|---|---|
| CASE NUMBER | : | 2204323-MF |
| PERSON INTERVIEWED | : | Daniel Edlin |
| PLACE OF INTERVIEW | : | Videoconference Call |
| DATE OF INTERVIEW | : | August 20, 2021 |
| TIME OF INTERVIEW | : | 1:03 P.M. |

On August 20, 2021, Daniel Edlin (EDLIN) was interviewed by videoconference call in preparation for possible trial testimony. Assistant United States Attorneys John Bostic, Robert Leach, and Jeffrey Schenk conducted the interview. Ismail Ramsey and Bob Sacks were present as EDLIN's counsel. The following is a summary of the statements made during the interview.

EDLIN graduated from Duke University with a degree in public policy and a markets and management certificate in 2009. In 2019, he obtained his MBA from UCLA. The whole of EDLIN's science-based learning in college consisted on an introductory chemistry course and an astronomy course. EDLIN has been employed by Genentech for the previous two years as a marketing manager.

EDLIN was employed by Telsey Advisory Group in New York City from 2009 to 2011. EDLIN first heard of Theranos from his friend Christian Holmes (CHRISTIAN) who recruited him for the company. EDLIN did not know much of Theranos at the time other than it was a blood testing company that took samples by fingerstick, and that there was a partnership with Walgreens. EDLIN viewed working for Theranos as an exciting opportunity to move into the start-up environment. EDLIN had initial job discussions with CHRISTIAN. He then travelled to Palo Alto, California for a group interview and individual interviews with Elizabeth Holmes (HOLMES) and Sunny Balwani (BALWANI). He did not have any specific recollection of the interview discussions other than both HOLMES and BALWANI told him Theranos held a lot of potential and opportunity for EDLIN to grow and develop. EDLIN started at Theranos in September 2011 as a senior product manager, one member of a team of product managers. EDLIN reported directly to CHRISTIAN initially. After approximately six months, he started working more closely with HOLMES on projects she lead. EDLIN helped manage some of Theranos' other relationships, including the Department of Defense (DOD), pharmaceutical companies, and research entities. EDLIN reported directly to HOLMES starting in 2014.

EDLIN's main job responsibility was to operationalize Theranos' business partnership with Walgreens. Theranos wanted to create a calm, soothing environment for customers and EDLIN's work focused on the customer experience of the lab test process, including the technology and software involved in that experience. EDLIN helped select pilot locations, determined space requirements for Theranos Wellness Centers, and set logistics, such as securing couriers. EDLIN was also involved with teaching WAG technicians how to use the Theranos service center software, how to store blood samples, and how to properly execute the fingerstick collection process, which had been developed internally by Theranos. EDLIN worked with Walgreens

US-REPORTS-0032859

retail pharmacy staff, including Kim Romanski, "Nimesh," "Reena," Jay Rosan, and Walgreens technicians. EDLIN worked with BALWANI more than HOLMES for the Walgreens project.

A portion of the Walgreens training also taught the technicians how to deal with patients, and specifically what Theranos' technology could do for a patient. Many of those technicians were excited for the potential of Theranos, namely the fingerstick draw, price, access to testing, and access to personal health information. Positive feedback was shared with EDLIN and he remembered quotes attributed to patients that had problems with conventional testing. The training for Walgreens technicians was important enough that HOLMES and BALWANI would have approved of the training plan, even though EDLIN had no specific recollection of either HOLMES or BALWANI specifically approving it. Daniel Young (YOUNG) may have been involved with the Walgreens training, too.

EDLIN was not responsible for taking customer calls or handling customer emails directly, however, he had access to Theranos' public email account. When he saw a customer complaint, he forwarded it to the responsible person. CHRISTIAN and the lab director handled customer complaints. There was a customer service group in Palo Alto. He did not know if there was a similar group in Arizona. He did not know where customer telephone calls were routed.

From conversations with HOLMES and BALWANI, EDLIN knew he could not say anything about Theranos to any external party, even his family, without prior approval. Information was siloed internally at Theranos, too. HOLMES and BALWANI told him Theranos' work was highly confidential and was sought after by competitors. He was instructed to be secretive. EDLIN specifically remembered ongoing discussions before the Walgreens launch between the product management group, HOLMES, and BALWANI. He was directly told to not share their strategy discussions with anyone internally. EDLIN believed he was told to keep this information as, "need to know."

EDLIN resigned from Theranos because he wanted to attend business school and because he saw no future for himself at the company. His decision to leave was not easy. EDLIN had spent a significant amount of time working at Theranos, sometimes working early mornings and late evenings. It became his entire life. He tried his best to help, but as he learned more about the company, EDLIN became disillusioned. He hoped for Theranos' success, but that never came true. EDLIN said it was hard to see the truth while on the inside.

EDLIN did not know what devices Theranos used to test patient blood when the service launched with Walgreens. In 2016, he met with Theranos' scientific and technical boards where a variety of topics were discussed. He learned at that time about Theranos' use of LDT's [laboratory developed tests] and third-party devices.

In or around 2012, EDLIN was asked to support a research project with the ABA [American Burn Association]. This was the first time EDLIN learned about Theranos' Edison 3.0 devices which had been sent to the study's research sites. EDLIN participated in conversations and meetings with DOD officials as part of this study.

In 2013, Edison 3.0 and 3.5 devices were black and white in color, and were smaller and weighed less than Theranos' next-gen devices. The Edison devices could only run immunoassays. The process to run an assay on an Edison stated when blood was collected into a capillary tube, which was then put into a cartridge. Each cartridge could run from one to four tests. Theranos' next-gen devices were those devices that were being developed at Theranos. Edison devices were not

US-REPORTS-0032860

next-gen devices. The next-gen devices came in three iterations: A tower version that could run multiple cartridges at once, a monobay which ran one cartridge at a time, and the 4s which was a smaller version of the monobay. The next-gen devices could run any type of tests, including immunoassays. EDLIN learned about Theranos' devices and their capabilities from HOLMES.

As the DOD projects developed, EDLIN said some of his contacts believed they were going to receive devices like the Edison. HOLMES told EDLIN the DOD was going to get different devices.

EDLIN did not know what devices were being used for clinical testing in 2013 but he learned t their use for patient testing in 2016. EDLIN knew venous blood samples were run on third-party devices but could not remember when he learned that. EDLIN did not seek out information he did not need to know.

EDLIN was the main person at Theranos that coordinated tours for VIP's. He gave tours of Theranos' headquarters, manufacturing, and the research and development labs. He never gave a tour of Theranos' CLIA lab. HOLMES told EDLIN where he could and could not take VIP's.

In 2013, around the time of the Walgreens launch, HOLMES asked EDLIN to work with Daniel YOUNG and other Theranos engineers to setup a room with minilab devices in preparation for a tour by Walgreens executives. The room was near Theranos' CLIA lab. HOLMES wanted ten to fifteen minilab devices in the room with their user interfaces turned on. She also wanted the devices to be able to accept a cartridge. The room was setup per HOLMES' instructions and remained that way for a few days after the tour. EDLIN did not participate in the tour and did not know if the Walgreens executives ever saw the room. A few days after the tour, EDLIN asked HOLMES if the room should remain setup and she told him to move the devices out. EDLIN did not know what the room looked like before he and YOUNG placed the minilab devices in it, and he also did not remember if anyone could have seen any third-party devices while in room.

The CLIA lab was closed to outsider access.

From 2012 on, EDLIN was responsible for preparing rooms with Theranos devices as frequently as once per week, and sometimes only once every few weeks. He was sometimes present for these meetings.

The "null protocol" was an application on a Theranos device that did not show an error if a cartridge was inserted into a machine and an error occurred.

EDLIN reviewed document THPFM0002270863 to THPFM0002270864 and said the people included on this email were the heads of the science and software teams. The document referenced the null protocol and the "demo app." EDLIN believed the demo app ran the null protocol and other protocols, and that the demo app and null protocol could be run together or independently from each other. At the time, if a nanotainer loaded with a sample was put into a cartridge it had to be put in very tightly for the device to work properly. To an outside observer, the process could look like a "struggle." Under the null protocol, if a sample was not tested and there was no blood in the cartridge, the nanotainer did not have to be placed into the cartridge as tightly. The null protocol was part of the process to avoid seeing the "struggle." If running the null protocol, the outside observer would see the device interface, the device door open, the cartridge placed into the device, the cartridge retracted inside of the device, and then the device interface display "processing." This loading and initialization process looked identical to the

US-REPORTS-0032861

process when an actual sample was run. EDLIN noted the null protocol did not terminate on its own and the device would continually say either, "initializing" or "processing." He did not know what happened if no cartridge was placed into the device under the null protocol. Overall, the null protocol helped show the observer what the device looked like while operating and prevented any errors from being displayed to that observer.

The demo app was similar to the null protocol in that it would not display any errors on the device's screen. The demo app, whether run with an actual sample or not, returned no errors. When run with a sample, the demo app ran an analysis and returned results. The demo app had a good customer design which matched the smartphone app and the app of the 3.0 devices. Prior application's interface looked similar to a Windows desktop. The goals of the demo app and null protocol were the same and were used when someone important was watching.

In 2013, EDLIN did not know if any next-gen devices were used for clinical testing. As of the date of the interview, EDLIN said the tower-version of the minilab had not been used for clinical testing. He did not know if the other versions had been, however. EDLIN said it was not part of his job to know about Theranos' CLIA lab.

For some time, device availability was an issue. As time progressed, more supplies and resources became available.

Edison devices were placed into a room for a demo to run a blood sample, and next-gen devices still in the R&D phase were also present. During a meeting with Walgreens officials before the launch, devices were present in the room, but the samples taken were placed into a container and brought to one of Theranos' labs.

EDLIN reviewed document TS-0375316 and confirmed the demo app used in combination with the null protocol would prevent an observer from seeing any error messages.

EDLIN reviewed document THPFM0001578878 and stated BALWANI expressed his opinion of device preferences for a demo. BALWANI had experience with software and while EDLIN did not know the breadth of BALWANI's scientific knowledge, he believed BALWANI had no scientific training. EDLIN had no first-hand knowledge of BALWANI's role with R&D nor with the CLIA lab, but he understood both HOLMES and BALWANI managed those areas. Both BALWANI and HOLMES had the right to control technical decisions within the company. EDLIN copied Samartha Anekal (ANEKAL) to keep him informed of technical issues regarding the analyzers' use during demonstrations.

EDLIN reviewed document THPFM0000028301 to THPFM0000028303. He coordinated demos, ensured the correct devices had been setup, and had people stand-by to speed up the process. EDLIN sometimes took blood samples by fingerstick, but this process eventually transitioned to phlebotomists. The collected blood sample was placed into a cartridge and then into a device for analysis. He described Theranos devices as fully functioning computers and said he sometimes saw them connected to laptop computers. Software errors did not happen often while the devices were running and would have represented the worst-case scenario. The null protocol gave Theranos flexibility when running a demo in case an error happened.

EDLIN reviewed document THPFM0000028223 to THPFM0000028237. EDLIN wrote, "It's already been running for 1 hr 15 mins and has been stuck on 99% for about 8 minutes." EDLIN had a recollection of this statement and thought either Sharada Sivaraman (SIVARAMAN) or

US-REPORTS-0032862

Surekha Gangakhedkar (GANGAKHEDKAR) told him the assay run time was shorter than what it turned out to be. His understanding was later corrected. Further on in the document, EDLIN wrote, "It looks like there is some discrepancy between the two Infectious Panel runs…" Both panels were run on a 3.0 device, and he expected the same result from both runs. EDLIN raised the issue with HOLMES and BALWANI because of the discrepant results. At various points in the document, YOUNG suggested reference range changes. EDLIN recalled other instances where YOUNG updated reference ranges, but he did not know why those changes were made and said he had no reason to know. YOUNG was responsible for data analysis, and EDLIN's role at this point in the process was to draft a demo report for YOUNG's and HOLMES' for review and approval. EDLIN wrote, "Elizabeth--please advise on how to report the infectious panel results." HOLMES was aware of this particular demo. EDLIN asked her how to report the results because she gave final approval for all communication with outside parties. HOLMES wrote, "Agree on the PA [Palo Alto} measles Alto." We'll only include that one from PA." HOLMES chose to not report the conflicting results.

EDLIN reviewed document TS-0902539 to TS-0902540. He wrote, "Just caught up with Sunny. He definitely wants to have a minilab, and then either a 4s or monobay (whichever is working better)." BALWANI instructed EDLIN which devices he wanted prepared. Theranos' devices that "worked better" changed over time. The device development was an on-going process and each of these instruments were at various stages of readiness. Further in this document YOUNG wrote, "Right now, we are not planning on running anything on the ML, unfortunately. The general chemistry and ELISA assays are not performing adequately for a demo at the moment." EDLIN said this statement from YOUNG was an example of periodic problems at Theranos.

EDLIN reviewed document THPFM0000068395 to THPFM0000068401. This document consisted of an email chain around the time of a Walgreens executive visit and discussed removing results from certain demo reports. At the time, Theranos' thyroid panel was not performing well, and either HOLMES or YOUNG would have decided to remove results. Other edits were made to the demo reports, and with the exception of typographical errors, EDLIN had no insight as to why the changes were made. EDLIN understood an assay returned a range of results for a healthy person, and anything "out-of-range" could indicate someone was unhealthy. Out-of-range results were important if they were accurate, and looking back, EDLIN was concerned if those results were removed without good reason. EDLIN emailed demo reports until the process was moved into the LIS database. He was never instructed to provide any explanation for missing results.

EDLIN reviewed document THPFM0000191037 to THPFM0000191041 and said he recalled a second visit to Theranos by Walgreens executives. The Advia was a third-party device, not a Theranos device. He did not know if the Advia was used often for demos and did not remember if he knew what an Advia was at the time of this document. EDLIN did not know if the chart contained in this document identified device was used for any given situation.

EDLIN reviewed document THPFM0002698493 to THPFM0002698497. The August 22, 2013 demo discussed in the document was for a *Wall Street Journal* reporter. EDLIN wrote, "For this demo we will need to turn around results faster than ever before- **ideally in 1 hour and no longer than 2 hours.**" The typical goal for returning demo results was one day and this demo was supposed to be run faster than ever previously done. EDLIN wrote further, "Unfortunately by the looks of the Thyroid panel results below it appears to have had major issues again." This was not

US-REPORTS-0032863

the first time EDLIN was aware of issues with the thyroid panel, and he understood BALWANI was frustrated by this.

EDLIN reviewed document THPFM0001474818 to THPFM0001474823 and said he did not understand what was meant by "Neat" or "1:1" referenced in the document. "Siemens protocol" referenced Siemens, a device manufacturer separate from Theranos. EDLIN was not aware at the time of this document Siemens devices were used for demonstrations and had no insight into the process after the sample was passed to laboratory staff. He had no recollection of third-party devices used after the Walgreens launch. Initially, demo samples were run in Theranos' lab. It was uncommon in 2013 to run an analysis in the room. At some point in time, those samples were run on a device inside the room where the demo took place. Samples were collected, placed into a cartridge, put into a device, and then analyzed. EDLIN remembered that sometime after 2013, and certainly in 2015 and 2016, lab results were provided while the meeting was still happening.

EDLIN reviewed document THPFM0000344512 to THPFM0000344514 and said he remembered the demo referenced. "Tina" could be either Tina Lin (LIN) and Tina Noyes (NOYES). This demo took place after the *Wall Street Journal* article critical of Theranos was published. EDLIN was unsure of the relationship Dr. Ethan Weiss had with Theranos but knew HOLMES met him at a Forbes conference. The goal of the demo was to compare Theranos' fingerstick assays to venous drawn assays at Theranos, ARUP, and UCSF. The ideal outcome was all results would match; however, the calcium and total protein results did not match and were not reported. EDLIN wrote, "Root cause (from Tina) – The contamination of the CTN is not due to any human error." This was Tina's technical opinion. However, HOLMES later wrote, "You can say we do run those assays ,but were not able to run them on this sample, apparently due to a human error in sample handling." HOLMES' instructions were to report the error as human error. He did not remember receiving the specific email from HOLMES but thought there was additional communication beyond what is contained in this document. He did not recall BALWANI ever suggesting that Theranos should, "do the right thing."

EDLIN remembered one incident where HOLMES and BALWANI disagreed on what should be reported (THPFM0000028223 to THPFM0000028237). He did not recall any other occasions when they disagreed.

HOLMES was intimately involved with the DOD projects and introduced EDLIN to DOD contacts by email. EDLIN's role was to oversee and manage the relationships. When EDLIN received a request for information from someone within DOD, he either forwarded it to HOLMES for review or they discussed it in-person. EDLIN than drafted a response, using parameters and talking points she gave him, and sent it to HOLMES for her approval. HOLMES did not participate in every telephone call. The DOD wanted to evaluate Theranos' technology against existing equipment to see if it would operate effectively in-theater. Some of the testing focused on different environments, ambient temperatures, and ability to withstand movement and vibration. The goal was to use Theranos technology in the field. EDLIN knew Theranos devices needed to pass certain tests before it was adopted by the DOD, and HOLMES knew this too because they had many conversations about it.

A Theranos device was sent to Africa for evaluation by AFRICOM. The device was setup but did not run any samples. EDLIN understood this testing process was part of the device's evaluation. Devices were also deployed for use with the ABA research, but not used to make any

US-REPORTS-0032864

clinical decisions. Theranos devices were never deployed to treat soldiers and never used to make clinical decisions within the DOD.

HOLMES told EDLIN Theranos' relationship with the DOD did not develop further because it would have required additional resources to execute those projects. Theranos would have had to allocate people to develop assays, prepare devices, support the studies, and manage shipping, inventory, and other logistics. Instead, Theranos focused their finite resources on commercial projects. HOLMES never said technology limitations stalled the DOD work.

EDLIN reviewed document TS-0324734 to TS-0324739 and said he recalled communication with USASOC [USA Special Operations Command]. Part of the document referenced, "Device function on board evacuation platforms." The intent was to see if Theranos' device could operate on-board a medevac helicopter, but that never happened. DOD was eager to move forward with the project and proposed a twelve-month evaluation period where Theranos sent examples for evaluation. This was not clinical testing. EDLIN reviewed the document contained within titled, "USASOC & Theranos, Inc." and said he prepared the document using content from other PowerPoint presentations or internal Theranos documents. HOLMES reviewed and approved it for transmission to DOD. HOLMES did not "rubberstamp" the approval and was intimately involved with the project and cared about the details.

EDLIN took the information contained in the paragraph titled "Background" at face value. TS-0324738 stated, "Each Theranos device can run every test currently available through the traditional centralized or hospital laboratory infrastructure." EDLIN again took this statement at face value. He did not know what assays the Theranos device could run, but said it was designed to run every test. If there was a business need, Theranos scientists could have developed assays when the decision had been made and resources were dedicated to implement. Edison devices only ran immunoassays, so any reference to running all tests referred to next-gen devices such as the minilab or 4s. EDLIN did not know if those devices were ever used to make clinical decisions. TS-0324738 also stated, "Theranos manufactures all of its technologies and systems within the United States." He did not know why this was important but said the statement did not apply to Siemens manufactured devices.

EDLIN reviewed document TS-0325082 to TS-0325161. Lieutenant Colonel Kevin Chung was lead investigator of the ABA research project. This was the most developed DOD project, which may have been completed and published. Clinical decisions were not made using Theranos devices as part of this project. EDLIN was familiar with the PowerPoint presentation included within this document and said he and others on the project management team prepared it. HOLMES reviewed and approved the presentation.

- TS-0325088 stated, "Theranos' proprietary, patented technology runs comprehensive blood tests from a finger-stick and tests from micro-samples of other matrices in real-time outside of traditional lab settings and generates significantly higher integrity data than currently possible." EDLIN did not remember the exact source of this statement, but said it existed in some presentation before he started at Theranos. He did not know if the statement was true but trusted it was.
- TS-0325091 described a high complexity laboratory under CMS regulation. EDLIN did not know at the time of this document which devices were used in Theranos' CLIA lab. As of the date of the interview, he did not know which devices were used in Theranos' CLIA lab.

US-REPORTS-0032865

- TS-0325096 depicted an Edison device in the upper left corner of the slide, and a minilab tower directly next to it. The minilab tower was four to five feet tall.
- TS-0325097 stated, "…Theranos analyzers run any test available in central laboratories." EDLIN trusted this statement was true.
- TS-0325106 stated, "Theranos Systems have been comprehensively validated over the course of the last seven years by ten of the fifteen largest pharmaceutical companies, with hundreds of thousands of assays processed." EDLIN did not know if Theranos' systems had been comprehensively validated. This statement already existed in some form when he started at Theranos. He did not believe the statement was true at the time of the interview. While gathering documents for the Roger Parloff interview, EDLIN did not remember seeing documents from ten different pharmaceutical companies, but he was unsure of his recollection.

EDLIN reviewed document TS-0328135. Colonel Erin Edgar was part of CENTCOM and probably the first person HOLMES introduced to EDLIN. CENTCOM planned a technology evaluation and was eager to review Theranos technology. EDLIN said a recurring theme was the DOD was eager and ready to move forward while Theranos was slow. Some DOD contacts were frustrated with Theranos' pace and wanted the projects to move more quickly.

EDLIN reviewed document TS-0297864 to TS-0297869. EDLIN believed the limited objective experiment (LOE) discussed in this document was for a technical evaluation of Theranos' device and not for any intended medical use. EDLIN remembered discussions about funding for fiscal year 2014 and said the window for Theranos to deliver was closing. This put increased pressure on the company to meet a specific date since FY 2013 had been written off. HOLMES, with input from YOUNG, proposed an August 1, 2014 delivery date and relayed the information to EDLIN. Theranos did not meet the deadline.

EDLIN recalled three Theranos devices were shipped to a military base in Kentucky to meet a contractual delivery deadline with SOCOM to avoid default. Per SOCOM, the devices needed to be reviewed. The devices were shipped for technical evaluation, not for making medical decisions. EDLIN and ANEKAL prepared the devices for shipment. EDLIN said that even though three devices were shipped, device development continued at Theranos and they may have had to ship new, updated devices when the evaluation started. Theranos personnel were to travel to Kentucky to train SOCOM personnel and to run the devices. The second group of devices were never sent and there was no further follow-up. No one from Theranos ever travelled to Kentucky and the evaluation did not happen.

EDLIN reviewed document THPFM0000610205. HOLMES instructed EDLIN and others to not mention DOD work with a policy reporter. EDLIN said there was no internal tension regarding publicity of Theranos' work with DOD, rather it was simply instruction to not say anything to anyone outside of Theranos. EDLIN believed the document was created around the time James Mattis (MATTIS) joined the Board of Directors, and there was some confusion about not discussing work with the DOD, while MATTIS' appointment suggested otherwise.

EDLIN learned his senior year of college that HOLMES and BALWANI were in a romantic relationship.

EDLIN's desk was outside of HOLMES' and BALWANI's offices, and he worked directly with both. HOLMES took more responsibility over the areas of science, technology, marketing, communications, and the vision of the company. She was also the face of Theranos. BALWANI

US-REPORTS-0032866

took more responsibility for software and operations.  While they may have shared authority and deferred to one another, HOLMES was the CEO and EDLIN believed she was the ultimate authority at the company.

We took a break from 3:06 P.M. to 3:14 P.M.

The interview ended at 4:32 P.M.

*Christopher McCollow*

Christopher McCollow                                          August 26, 2021

U.S. Postal Inspector                                                Date

Attachments:

THPFM0002270863 to THPFM0002270864
TS-0375316
THPFM0001578878
THPFM0000028301 to THPFM0000028303
THPFM0000028223 to THPFM0000028237
TS-0902539 to TS-0902540
THPFM0000068395 to THPFM0000068401
THPFM0000191037 to THPFM0000191041
THPFM0002698493 to THPFM0002698497
THPFM0001474818 to THPFM0001474823
THPFM0000344512 to THPFM0000344514
TS-0324734 to TS-0324739
TS-0325082 to TS-0325161
TS-0328135
TS-0297864 to TS-0297869
THPFM0000610205

US-REPORTS-0032867