# Exhibit 3




**FEDERAL BUREAU OF INVESTIGATION**

Date of entry 07/20/2021

DANISE YAM SPIVEY (SPIVEY), previously interviewed, was interviewed via WebEx video teleconference. Also present for the interview from the United States Attorney's Office - Northern District of California were Assistant United States Attorney (AUSA) Bob Leach, AUSA John Bostic, and AUSA Jeff Schenk, AUSA Kelly Volkar and Intern Shaymus Lynch. After being advised of the identity of the interviewing parties and the nature of the interview, SPIVEY provided the following information:

When SPIVEY worked as an Auditor at Deloitte she would go to a client's company, request their financial record, and review documents in order to ensure that the company's financial record and reporting was accurate.

When SPIVEY was approached by a recruiter for the position at Theranos, she was told that HOWARD BAILEY (BAILEY), Theranos' Chief Financial Officer (CFO), was looking for someone from one of the big four accounting firms to groom to be a financial officer in the future, so SPIVEY thought it seemed like a good opportunity. SPIVEY was surprised when BAILEY left Theranos a few months after she started. Theranos did bring in some candidates for CFO after BAILEY left, but did not end up hiring someone to fill this position.

Theranos engaged Ernst & Young to audit their financial statements until 2009 when they hired KPMG. DAN COLEMAN was Theranos' primary contact at Ernst & Young. SPIVEY did not know why Theranos's engagement with Ernst & Young stopped, it was not her choice and she was not involved in the decision. SPIVEY was Ernst & Young's primary contact when their team needed information from Theranos. If SPIVEY did not have the information they needed she would obtain the information from ELIZABETH HOLMES (HOLMES). When SPIVEY would get letters from the Ernst & Young audit team that needed to be signed, she would send them to HOLMES. HOLMES would then return the signed letter to SPIVEY who would in turn send it to Ernst & Young.

Investigation on 07/15/2021 at San Francisco, California, United States (Phone, Other (WebEx Video teleconference))

File # 318A-SF-7315857 Date drafted 07/15/2021

by Mario C. Scussel

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Theranos had audited financial statements from 2005 through 2008. The audited financial statement for 2005 would have been from before SPIVEY started working at Theranos.

It would have been HOLMES decision to hire KPMG to replace Ernst & Young. KPMG re-audited 2007 and 2008 and signed off on these audits, but they did not complete any further audits. These audits were not completed because there was a disagreement between Theranos and KPMG as to Theranos' valuation. KPMG said the value was too low in regards to the value Theranos assigned to the company in regards to their stock opition grants. Theranos wanted to continue using their valuation from when they were running out of money and subsequently had a low valuation. However, in 2010 Theranos received a substantial equity investment from investors. Accordingly, KPMG argued that Theranos' valuation was higher because investors were willing to invest in the company at a certain price so the strike price for options needed to increase as well and Theranos could not keep using the valuation from before they received the investment. The substantial equity investment referred to here was not the loan which SUNNY BALWANI (BALWANI) provided to the company. SPIVEY knew that stock options were being given to HOLMES and BALWANI, but she could not recall if there were additional stock option grants to other employees at this time.

From SPIVEY's experience it was unusual for a company to have audited financial statements for a period of time, then stop having audited financial statements. The main hold up regarding the audited financial statements was the company valuation issue as it related to equity stock option grants. Then after they had stopped having audited financial statements for a few years they did not decide to start doing them again.

HOLMES was involved in conversations regarding equity option grants. HOLMES' opinion was that Theranos should use the lower valuation from 2010, prior to receiving the equity investment. At some point BALWANI was also on the call with KPMG regarding valuation. OANH NGUYEN (NGUYEN) was the manager Theranos worked with at KPMG. SPIVEY was not sure how much Theranos was paying KPMG, but estimated that it was approximately $200,000 a year.

In 2009 Theranos' financial situation was pretty bad, and they did not have sufficient funds to pay their vendors. Accordingly SPIVEY had to

manage which vendors would get paid when they had enough to pay them. SPIVEY recalled one time when they were waiting for a pharmaceutical company to pay Theranos so that they could make their payroll. When this happened, Comerica Bank wanted to wait a few days for the check to clear, so SPIVEY put Comerica Bank in touch with the bank for the pharmaceutical company so the check could clear faster and Theranos could make their payroll. HOLMES was with SPIVEY when dealing with this issue with their payroll and getting the check to clear at Comerica Bank. Theranos' vendors included companies they purchased research and development supplies or computer equipment from, among others.

SPIVEY was shown THPFM0000690035, an email exchange she had with HOLMES on January 22, 2010 in which she attached a document titled "Monthly Financial statement Dec 2009_USCIS.xls". SPIVEY did not recall the exact meaning of USCIS but advised that it was the Immigration service. CAROLYN BALKENHOL (BALKENHOL), who SPIVEY identified BALKENHOL as one of HOLMES' assistants, was also on this email chain at one point. ATA Ventures was one of Theranos' investors. Row 10 of the attachment, THPFM0000690039, contained Theranos' cash balance at the time, which was approximately $1.25 million at the beginning of 2009. This was reflected the assets of the company, but some of this might have been restructured. The Accounts Payable row would have been the amount Theranos owed to their vendors, which in January 2009 was $666,298. From July 2009 to August 2009 the cash & Investments row increased from $1.8 million to $8.7 million. At this same time an entry for "LOC - loan" in the amount of $8,000,015 was added to the spreadsheet. SPIVEY did not recall the amount of BALWANI's loan to Theranos, but this amount would be consistent. This loan allowed Theranos to meet payroll and other obligations at that time.

SPIVEY was not responsible for raising money for Theranos, HOLMES would have been the person primarily responsible for fund raising. SPIVEY would learn of new investments from HOLMES when HOLMES would send her an email telling her to look for money coming in from a new investment.

Theranos switched banks from Silicon Valley Bank to Comerica Bank shortly after SPIVEY joined Theranos.

In 2009 Theranos' source of revenue was from pharmaceutical companies. The payments from pharmaceutical companies were not regular as they were

paid on a project by project basis. SPIVEY did not have any contact with Theranos' customers.

From 2010 to 2013 SPIVEY did not think Theranos had any substantial sources of revenue, until they started receiving money for their blood testing services. Throughout this time Theranos was operating off investments and prepayments from Safeway and Walgreens. SPIVEY did not have any interactions with anyone from Safeway or Walgreens.

SPIVEY was shown THER-4481663 an email exchange between SPIVEY and BONGUMUSA MDLETSHE (MDLETSHE) with an attachment, THER-448164. This spreadsheet had multiple tabs which used the following abbreviations, TB for Trial Balance, BS - Balance Sheet, IS for Income Statement, PNL by Group for Profit and Loss by Group, and QAD which was the accounting system which Theranos used. This was a document SPIVEY would prepare in the normal course of business as part of her job at Theranos. On the Income Statement tab, row 9 contained Theranos' revenue for 2009 through 2011. SPIVEY was surprised that there was any revenue in 2010 and 2011, and advised the amounts would not have been larger than the ones reported in this sheet. Operating expenses were greater than revenue for every year Theranos was in existence.

SPIVEY updated HOLMES in regards to Theranos' financials before Board of Director's meetings until 2016. Then after 2016, SPIVEY started updating HOLMES on Theranos' financials more regularly, on a monthly basis. When Theranos was low on funds SPIVEY would update HOLMES more often and would provide HOLMES with the cash balance every week.

SPIVEY was shown THPFM0000691796, an email between SPIVEY and HOLMES with an attachments titled "Financial Statement Analysis Template-Theranos.pdf" and "FS 123111.pdf". These documents were prepared by SPIVEY in the normal course of business. The numbers SPIVEY was reporting to HOLMES showed income of $1.4 million in 2010 and $518,000 in 2011 and net losses of approximately $16 million in 2010 and $27 million in 2011.

SPIVEY was shown 02_SEC-USAO-EPROD-000369344/SEC-MOSSADAMS-E-0000018, a letter from DENNIS ONDYAK, a partner at the tax firm Theranos engaged to complete their tax filings. SPIVEY would provide ONDYAK and his firm with the most accurate and up to date information to insure Theranos' taxes were

filed properly. HOMES was aware that SPIVEY was working with ONDYAK in regards to Theranos' tax returns. SPIVEY recognized the signature on the document as HOLMES' signature. Theranos' total income listed on this document was $2.3 million which was higher than reported in previous documents for 2011. This number was different because income is calculated differently for tax income purposes due to factors such as deferred revenue. SPIVEY advised that there would be documents as to how they arrived at this number.

SPIVEY did not recall any pharmaceutical revenue in 2012 or 2013 and if there was any in 2011 it would have been minimal. Theranos did not have any contracts with the military, but they did have a shipment to the American Burn Association for $200,000.

SPIVEY was shown SEC-USAO-EPROD-000785234/THPFM0000402344, an email from August 29, 2015 between SPIVEY and KPMG with four attachments two of which were titled "Contract summary 123109.xlsx" and "Contract summary 123110.xlsx". These were summaries of contracts Theranos had with pharmaceutical companies. Row 7 for Customer Centocor Research showed a $1.9 million dollar contract with a $580,000 optional contact for the 2008-2009 time period. SPIVEY did not recall of any engagements with Centocor after this time period. The contract summary found in SEC-USAO-EPROD-000785247 was for year-end 2009. This document was SPIVEY's best effort to capture all the relationships Theranos had with pharmaceutical companies to produce to KPMG.

At Theranos each department leader could approve expenditures up to a certain amount, as the amount increased the approval would go to the next level manager. If the amount went beyond what could be approved by the next level manager, it then went to BALWANI and then to HOLMES.

HOLMES would charge travel to Theranos to include flights on a private jet, and SPIVEY would have to ask HOLMES for approval to pay the private jet company. Theranos also paid for HOLMES hotel bills. There was no budget at Theranos for HOLMES' travel expenses, in fact there was no budgeting at Theranos. Instead spending was done on an ad hoc basis for everything. They tried to put together a budget, but nobody did anything with it. SPIVEY also recalled asking HOLMES about a $2,000 purchase from a jewelry store and why Theranos should pay for it.

SPIVEY was responsible for maintaining Theranos' capitalization table. From 2013-2015 HOLMES was the most significant owner of Theranos stock. The last capital raise Theranos did was around approximately 2015.

A 409a report was a company valuation which would be used for tax purposes. This report was done to assess the value of options being given to employees because employees would need to know this information to pay their own taxes properly. SPIVEY also needed to know this information to determine the attributable expense to put on Theranos' income statements for options granted. SPIVEY worked with Aranca on the 409a reports. If Aranca needed any information that SPIVEY did not have, SPIVEY would ask HOLMES for the information.

SPIVEY was not involved in providing information to CMS inspectors or to the FDA.

After SPIVEY left Theranos, her responsibilities were split up over two companies, one of which handled the day to day accounting, bills and payrolls while the other responsibilities were handled by the interim CFO.

SPIVEY never dealt with investors directly. If the auditors for an investor would request Theranos' audited financials, instead of providing them with the latest financial statement Theranos would instead provide their most recent fundraising numbers. SPIVEY was told to do this by HOLMES.

Theranos also had an issue with having a low cash balance in 2013 right before the Walgreens launch. This was solved either through equity investments or by payments from Walgreens.

SPIVEY was shown SEC-USAO2-EPROD-000204407, an excel spreadsheet containing the cash balance for Theranos from 2011 through 2016. SPIVEY prepared this document, which was a summary of Theranos' cash position. SPIVEY updated this document weekly and provided it to HOLMES and BALWANI every week.