STEPHANIE M. HINDS (CABN 154284)
Acting United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

JEFFREY B. SCHENK (CABN 234355)
JOHN C. BOSTIC (CABN 264367)
ROBERT S. LEACH (CABN 196191)
KELLY I. VOLKAR (CABN 301377)
Assistant United States Attorneys

    150 Almaden Boulevard, Suite 900
    San Jose, California 95113
    Telephone: (408) 535-5061
    Fax: (408) 535-5066
    Kelly.Volkar@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 18-CR-00258 EJD |
| Plaintiff, | UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE TESTIMONY OF TRIAL WEEK OF SEPTEMBER 6, 2021 WITNESSES |
| v. | |
| ELIZABETH HOLMES, | |
| Defendant. | Date: September 8, 2021<br>Time: 8:30 a.m.<br>Court: Hon. Edward J. Davila |

The government opposes Defendant Elizabeth Holmes's Motion to Exclude Certain Testimony of Erika Cheung, Daniel Edlin, and So Han Spivey (a.k.a. Danise Yam). ECF No. 1000 ("1000 Mot."). Defendant's 1000 Motion asks the Court to make speculative and prophylactic evidentiary rulings based on a federal agent's summary of the respective witness' unsworn statements during a voluntary interview (captured in what is informally called a "302" memorandum) as if the 302s contain sworn statements such as are given in depositions. Without hearing a single question posed by the government, Defendant's 1000 Motion seeks to exclude swaths of *potential* testimony from each of the substantive witnesses the government intends to call to testify during the first week of trial. The government is aware of and will abide by the Court's Order regarding the parties' motions *in limine* (ECF No. 798 ("MIL Order")), as well as the Federal Rules of Evidence. Defendant's 1000 Motion is premature, demonstrates the inefficiency of the Defendant's currently intended protocol, and is substantively incorrect that all of the potential testimony challenged should be excluded under the Federal Rules of Evidence. Thus, the government requests that the Court deny Defendant's 1000 Motion outright, or at least defer ruling on the individual topics unless and until they are presented at trial.

### I. Defendant's 1000 Motion is Inefficient and Premature

The Court acknowledged the Defendant's intent to "object[ ] to just about everything that the government [presents]" and attempt to do so on a lopsided timetable, but instead asked Defendant to file motions by noon on Saturday to give the government a "fair distribution" of time to respond. *See*, *e.g.*, 8/16/2021 Hearing Transcript (8/16 Tr.) at 21:6–28:24, 49:24–53:9;[1] ECF No. 958, 8/25/2021 Hearing Transcript (8/25 Tr.) at 54:9–60:23. But Defendant ignored the Court's request and sent the government an email "notice" Saturday after 10:00 p.m.—more than forty-eight hours after the government disclosed the four witnesses who would likely testify during the first week of trial. Volkar Decl., Exhs. 1 & 2. Defendant's "notice" informed the government of its intent to challenge multiple points identified in the agent's summary of a witness statement for three of the four disclosed witnesses. Volkar Decl., Exh. 2. On Monday morning shortly after 8:00 a.m. (September 6, 2021), Defendant filed

---

[1] The government does not see an ECF entry containing the transcript for the August 16, 2021, hearing before the Court, and thus, out of an abundance of caution, attaches that transcript for reference as Exhibit 3, along with all other exhibits referenced herein, to the Declaration of Kelly I. Volkar in support of the Government's Opposition to Defendant's ECF No. 1000 Motion ("Volkar Decl.").

the 1000 Motion seeking, in essence, to exclude testimony from each of the substantive witnesses the government anticipates presenting during the first week of trial without regard to whether the challenged statements are going to, in fact, be offered by the government into evidence at trial.  It is clear that this is the pattern Defendant intends to follow throughout trial.

The current protocol that Defendant intends to follow creates an inefficient process that relieves defense counsel of objecting in real-time as witnesses are testifying and burdens the Court with reviewing motions about potential testimony that may never be elicited during the actual trial. Defendant's 1000 Motion asserts basic evidentiary challenges that fall squarely within the Court's discretion, such as hearsay, relevance, 403, 404(b), personal knowledge—challenges which defense counsel acknowledged are typically brought up in real-time before the jury.  8/25 Tr. at 56:18–22. Indeed, expecting to file these types of evidentiary-based motions, defense counsel insisted that the Court need not rule on them in advance.  8/25 Tr. at 57:1–2.  Rather, Defendant made her intentions clear that she would like to raise every conceivable objection, but outside the presence of the jury so as to avoid any negative feelings by the jury as defense counsel assert what they see as their duty to object. 8/16 Tr. at 53:3–8; *see also id.* at 49:24–53:2.  But it is a hallmark of habeas jurisprudence with respect to ineffective assistance of counsel claims that defense lawyers are *not* required to object at every conceivable moment and should instead be strategic about which objections to raise and when.  *See*, *e.g.*, *Strickland v. Washington*, 466 U.S. 668, 690–91 (1984) ("[s]trategic choices"—including the decision to lodge or withhold objections—are entitled to "a heavy measure of deference to [defense] counsel's judgments"); *Gresser v. Franke*, 628 F. App'x 960, 962–63 (9th Cir. 2015) (determining "whether to object to damaging testimony at the risk of drawing the jury's attention to it is a tactical decision" that can render failure to object "a valid strategic decision").  The Court can—and often does—rule on the types of evidentiary challenges Defendant is raising as the topics arise during trial.

The topics of Defendant's 1000 Motion demonstrates the inefficiency that the present protocol will involve and the premature nature of the substance of her motion.  Defendant challenges multiple aspects from the respective agent's summary of a witness statement in 302s connected with the government's disclosed three substantive witnesses for the first week of trial.  1000 Mot. at 3–6.  But voluntary witness interviews can serve many purposes, including, among others:  to learn the underlying

1  facts of a case when initially investigating, to understand a witnesses' current memory of specific topics
2  that may have occurred years ago, or to clarify the meaning or origin of documents produced in the case.
3  The government regularly provides 302 summaries to criminal defendants pursuant to discovery
4  obligations, however, those summaries are not scripts for the witnesses' trial testimony.  So too here.
5  The government is not required to raise all topics covered in the witness interview at trial, nor is the
6  government bound by the topics discussed in those interviews.  The merit of Defendant's evidentiary
7  challenges will ultimately depend on the questions posed by the government and the witnesses'
8  responses, not on what an agent recalls when summarizing an interview in a 302.  Furthermore, unlike
9  witness interviews, the evidence at trial does not come before the jury in a vacuum but is combined with
10 all other evidence presented before and afterwards at trial, often providing context and foundation for
11 topics that may not be immediately apparent when one witness' testimony is isolated.  Thus, the
12 government asks the Court to deny or defer Defendant's challenges in her 1000 Motion to hypothetical
13 testimony that may occur, until and unless the government actually seeks to elicit such testimony.
14        The government submits that Defendant's 1000 Motion is simply the first—and likely not the
15 last—example of what Defendant intends to be a weekly ritual, and thus the government hereby requests
16 the Court order Defendant to comply with the Saturday at 12:00 p.m. deadline for Defendant's weekly
17 motions as discussed on August 25. 8/25 Tr. at 54:14–15.  The imposition of such a deadline would not
18 prejudice Defendant because, of course, her counsel has the opportunity—as they acknowledged that
19 lawyers typically utilize—to object in the moment before witness testimony is elicited in front of the
20 jury or to ask the Court to strike objectionable testimony if the objection is sustained after the testimony
21 is elicited.

**II.    The Court Should Deny Defendant's September 6 Motion to Exclude**

23        The topics Defendant seeks to exclude in her 1000 Motion demonstrate that these are the types of
24 issues best dealt with in the moment, once the Court has had the benefit of hearing the questions posed
25 and the respective witness' answer, particularly in light of the Court's MIL Order (ECF No. 798).

    **A.    Erika Cheung**

27        Erika Cheung joined Theranos when she was just a few years older than the Defendant when
28 Holmes founded Theranos, and Cheung worked in the research and development lab, testing Theranos's

proprietary device, during the charged period. ECF No. 1000-2 at 2. Cheung personally witnessed issues in her work on validation studies and precision testing in the lab and repeatedly raised these issues to her superiors and to Defendant's co-conspirator, Ramesh "Sunny" Balwani. *Id.* at 3–8. Cheung became so disillusioned that she quit her job at Theranos and, after some time, she reported what she had seen during her time at Theranos to regulatory authorities (CMS) as a whistleblower. *Id.* at 7–10.

Defendant's 1000 Motion challenges as hearsay or lacking personal knowledge several aspects described in the 302 summary of Cheung's voluntary unsworn statements during her interview with the government. 1000 Mot. at 3–4. As an initial matter, as discussed above, Defendant's arguments are premature because the government does not intend to elicit every fact that Cheung provided during her voluntary interview at trial. More importantly, several statements Defendant has highlighted are not hearsay. ECF No. 1000-2. For example, the fact that Tyler Shultz had a meeting with Holmes and Balwani and quit the next day is not hearsay and Cheung likely does have first-hand knowledge of another employee working in a similar capacity resigning from his job. *Cf. id.* at 7. The fact that the meeting occurred also explains why Cheung and Tyler Shultz met with George Shultz and how seriously she understood the issues at Theranos to be in deciding to escalate her concerns to a member of the Board of Directors. Similarly, the fact that "there was pressure from Holmes and Balwani to get validation studies and reports done" is not hearsay on its face, nor does Cheung lack personal knowledge to testify to that fact. *Id.* at 5, 7. Even if Cheung was told of this pressure by other Theranos employees, the Court's MIL Order permits such adopted admissions so long as there is a sufficient tie to Holmes, which is self-evident here. MIL Order at 94–97. As yet another example, the fact that Balwani gave one reason for problems with Theranos' blood testing device (e.g., software), but the person in charge of software for the device said that that was not the root cause of the issues helps explain why Cheung ultimately felt compelled to report the problems at Theranos to regulatory authorities. ECF No. 1000-2 at 4, 8. In sum, to the extent Cheung testifies at trial to any of these topics, the Defendant has not shown they constitute excludable hearsay or that they lack sufficient personal knowledge to exclude such statements blanketly at this time.

U.S.' OPP'N RE: DEF.'S 9/6 MOT. TO EXCLUDE TESTIMONY,
CASE NO. 18-CR-258 EJD 4

Furthermore, the Court should reject Defendant's attempt to exclude Cheung's reactions to learning that Theranos could not deliver on its promise to patients. 1000 Mot. at 3. Several 302 statements identified by Defendant may be admissible and are certainly relevant to demonstrate how seriously Cheung understood the issues at Theranos to be, and why the facts she learned and observed at Theranos propelled Cheung from her initial excitement to join Theranos, to her dismay and ultimate resignation from Theranos, to becoming a whistleblower. ECF No. 1000-2. Cheung's realization that Holmes and Balwani did not care about the issues with Theranos's blood testing device that "could have an effect on people's health" is part of what compelled her to report the issues to CMS rather than using channels within the company to voice her concerns. *Id.* at 7, 9–10. Cheung's motivation is also relevant to demonstrate a lack of bias, even if she received subsequent personal gains, such as in connection with the TED Talk identified in the jury questionnaire. *See id.* at 10; ECF No. 928 at 13. Thus, these topics identified in Defendant's 1000 Motion are indeed relevant and not unduly prejudicial.

Defendant's final challenge to Cheung's testimony that might purportedly violate the Court's MIL Order also lacks merit. 1000 Mot. at 3–4. First, Defendant challenges the practice within the Theranos lab of removing outliers to improve the quality control data and Cheung's observation of it. *Id.* at 4. But the Court already rejected similar challenges to Dr. Adam Rosendorff's expected testimony and held it did not require expert opinions to describe this practice. MIL Order 75–77. Second, the Court deferred ruling in its MIL Order on the government's ability to introduce certain evidence—such as actions by the Boies Schiller Flexner LLP law firm on behalf of Theranos—until the government sufficiently tied such actions to Defendant (outside the presence of the jury). MIL Order at 62–64.

The government can meet that burden with respect to Cheung's testimony and hereby submits to the Court that there is sufficient foundation and connection to Holmes to permit Cheung to testify regarding the retaliation she faced after resigning from Theranos. Specifically, in May 2015, after learning that *Wall Street Journal* reporter John Carreyrou was investigating Theranos's claims regarding its proprietary blood analyzer device, co-conspirator Balwani sends text messages to Defendant Holmes that he is "narrowing [ ] down" who may be the source of Carreyrou's information, and ultimately says "It is Tyler Erika and Adam" (referring to Tyler Shultz, Erika Cheung, and Dr. Adam Rosendorff).

Volkar Decl., Exh. 4 at 2–4.[2] Defendant Holmes responds: "I know." *Id.* at 3; *see also id.* at 4 (PRH_0000221) (Balwani referring to Carreyrou). Balwani and Holmes then discuss a legal strategy to respond to the Theranos insiders who are providing information to Carreyrou and Holmes says: "You and I will put our heads together" and "put all our thoughts together into it[.]" *Id.* at 3–5. One month later, on June 26, 2015, Balwani texts Holmes: "I am ok sending letter to Erika as in heathers email" (referring to Heather King, then Theranos' general counsel and former partner at Boies Schiller Flexner LLP). *Id.* at 6. The letter from Boies Schiller Flexner LLP that Cheung receives is dated the same day as Balwani's text message—June 26, 2015. Volkar Decl., Exh. 5. Within twenty-four hours of co-defendant Balwani's text message, he approves payment to "Interfor," which is a "global investigative and security consulting firm." Volkar Decl., Exhs. 6 & 7; *see* https://www.interforinternational.com/. And an internal spreadsheet tracking payments to vendors from March 2015 to February 2016 reflects the payments to Interfor as well as payments over $100,000 to David B. Fechheimer, a San Francisco-based private investigator, under the category labeled "E. Cheung & T. Shultz project." Volkar Decl., Exh. 8. Thus, the government asserts that the evidence proffered sufficiently ties Defendant Holmes along with her co-defendant and co-conspirator Balwani to the actions of Boies Schiller Flexner LLP and its agents as they relate to Erika Cheung. The Court should thus deny Defendant's 1000 Motion as it relates to Cheung's expected testimony regarding Theranos's retaliation against her after she resigned.

### B. Daniel Edlin

Daniel Edlin began working for Theranos as a senior product manager in 2011 and mostly reported directly to Defendant. ECF No. 1000-3 at 2. From Edlin's perspective, both Holmes and Balwani controlled technical decisions and shared authority within the company, but Defendant made the ultimate decisions. *Id.* at 5, 9–10. Edlin was responsible for arranging demos to demonstrate the capabilities of Theranos's blood testing device and managing Theranos's business partnership with

---

[2] Exhibit 4 contains excerpts of text messages exchanged between Holmes and Balwani, as contained in government trial exhibit 5387 at PRH_0000219–22 and PRH_0000254–55, which was provided by a custodian of PricewaterhouseCoopers LLP; the text messages are also government exhibit 3481. *See* ECF No. 1001 (government's redacted exhibit list). The Court's MIL Order states the government must authenticate these text messages and the government intends to do so through Justin Offen, a principal with PricewaterhouseCoopers LLP. MIL Order at 90–94 ("The Court notes, however, that the burden on the Government to produce such evidence is slight.").

1    Walgreens, and any relationships between Theranos and the Department of Defense (DoD),
2    pharmaceutical companies, and research entities. *Id.* at 2–6.  While working for Theranos, Edlin
3    observed issues with the tests run during demos and noted that other employees sometimes removed
4    outliers, which in hindsight concerns him. *Id.* at 6–7.  In managing Theranos's limited relationship with
5    the DoD, Edlin knew that Theranos's goal was to provide blood testing devices that the military could
6    use in the field, but both Edlin and Holmes knew that Theranos's devices would need to pass certain
7    tests before it was adopted for use by the DoD. *Id.* at 7–9.  Edlin's 302 states: "Theranos devices were
8    never deployed to treat soldiers and never used to make clinical decisions within the DOD." *Id.* at 8.
9         Defendant's 1000 Motion objects to a PowerPoint presentation that Edlin prepared for the DoD,
10   which Defendant Holmes reviewed and approved. *Id.* at 8–9; 1000 Mot. at 4–5.  The Defendant's main
11   basis for her objection is that the PowerPoint contains misrepresentations that were sent *to* DoD rather
12   than directly providing proof of Defendant's lies *about* Theranos's relationship with the DoD, which she
13   asserts is impermissible character evidence, in violation of Rule 404(a), or a prior bad act in violation of
14   Rule 404(b) for which the government did not sufficiently provide notice.  1000 Mot. at 4–5.  Defendant
15   accurately states that the government is not alleging the DoD is a victim of either scheme to defraud. *Id.*
16   But this contested evidence does not merely show Defendant's propensity for lying; instead, this
17   evidence shows Defendant Holmes executing her plan and scheme to defraud the victims in the case,
18   and her knowledge and intent in defrauding potential investors in Theranos.  The agent's summary of
19   Edlin's witness interview noted that Edlin obtained several of the statements in the PowerPoint sent to
20   the DoD from other PowerPoints created at Theranos.  ECF No. 1000-3 at 8–9.  Holmes reviewed and
21   approved the material in the PowerPoint that was sent to the DoD, which contained overlapping
22   statements with those sent to victim investors in the case, thus showing Defendant's knowledge and
23   intent with respect to statements Theranos was making in the overall scheme to defraud.
24        Furthermore, Defendant's misrepresentations *to* the DoD are inextricably intertwined—and thus
25   not Rule 404(b) evidence—with Defendant's lies *about* the relationship with the DoD because the lies to
26   DoD facilitated Defendant's ability to conceal the truth from investors.  Evidence that is inextricably
27   intertwined with the charged offense is not Rule 404(b) evidence, and it is inextricably intertwined if the
28   acts are "part of a single criminal transaction" or necessary "to permit the prosecutor to offer a coherent

1  and comprehensible story regarding the commission of the crime." *United States v. Beckman*, 298 F.3d
2  788, 793–94 (9th Cir. 2002); *see also* MIL Order at 23–24, 29–30, 65–66 (finding other claimed 404(b)
3  evidence to be inextricably intertwined, including when it demonstrated "whether [Holmes] intended to
4  mislead investors regarding the accuracy and reliability of Theranos' technology"). Defendant's lies to
5  the DoD are the quintessential example of inextricably intertwined evidence because Defendant knew
6  the device was not working at the level DoD required but she needed some possibility of a relationship
7  with the DoD in order to be able to sell the same lies to potential investors. Simply put, Defendant lied
8  to the DoD and strung them along with false promises of a machine that never worked the way she
9  promised, and by having some contact with the DoD, she was able to severely exaggerate Theranos's
10 involvement and relationship with the military when making a pitch to investors for money. Lies *about*
11 Theranos's relationship with the military have always been a core aspect of this case, and Theranos's
12 representations to the military demonstrate why that relationship could never have advanced to the level
13 that Holmes claimed. Indeed, to the extent Defendant intends at trial to place the blame on the DoD for
14 not moving further, Edlin noted in his interview that "a recurring theme was the DOD was eager and
15 ready to move forward while Theranos was slow" and unable to fulfill its promises. ECF No. 1000-3 at
16 9. These lies to the DoD are both part of the Defendant's scheme to defraud investors and necessary for
17 the government to provide a coherent and comprehensible story about Defendant's scheme to defraud.
18 Thus, the Court should deny Defendant's 1000 Motion.

19    **C.**    **So Han Spivey (a.k.a. Danise Yam)**

20    So Han Spivey, known as Danise Yam when she worked at Theranos, was Theranos's top
21 financial officer for more than a decade and tracked financial statements for the company, coordinated
22 external audits (when they occurred), and monitored Theranos's cash flow. ECF No. 1000-4 at 2–5.
23 Yam worked closely with Defendant Holmes. *Id.* at 4–7. Yam is aware of the time periods when
24 Theranos was low on funds and also that, if Theranos was asked to provide financial information to
25 investors, the company would not provide the latest financial statement but would instead provide the
26 most recent fundraising numbers. *Id.* at 5, 7. Yam was trained as a financial auditor, but she provided
27 requested information to an outside company that prepared Theranos's tax returns. *Id.* at 2, 5–6. Yam
28 recognized Defendant's signature on Theranos's tax returns. *Id.* at 6. The agent's 302 summary of

1 Yam's voluntary interview also discussed how numbers may be slightly different between financial
2 statements and tax returns because "income is calculated differently for tax income purposes due to
3 factors such as deferred revenue." *Id.* Yam also worked with a company called Aranca to prepare a
4 company valuation, which was needed for tax purposes and for stock options granted. *Id.* at 7.

5     The assertions in Defendant's 1000 Motion relating to Yam's testimony show the fundamental
6 flaw in Defendant's approach. 1000 Mot. at 5–6. The government does not intend to elicit the
7 difference in numbers between Theranos's financial statements, which Yam largely prepared, and
8 Theranos's tax returns, which Yam did not prepare or approve. *See* ECF No. 1000-4 at 2, 5–6. This is
9 exactly the type of information that one would ask a potential witness in an interview to understand
10 differences—such as in two documents that provide slightly different accounts of the company's
11 finances—that may never be elicited at trial. Nor does the government intend to present testimony that
12 Theranos's failure to have audited financial statements violated some law or regulation. Indeed, the
13 agent summary of Yam's witness interview only states that such a practice was "unusual." *Id.* at 3.
14 Defendant's 1000 Motion is premature and inefficient by objecting to evidence or potential testimony
15 that may never be brought out at trial.

16     Moreover, Defendant asserts that an expert must be called to discuss the differences between
17 financial statements. No expert is needed to discuss the financial statements Yam prepared within her
18 role as top financial officer for Theranos and for which she has personal knowledge—that is percipient,
19 not expert testimony. And no expert is needed to explain why the financial projections given to
20 investors were one-hundred-fold higher than the valuation of stock options prepared in a manner that
21 would benefit Defendant, as directed by Defendant. Those are simply facts and facts to which Yam can
22 testify as a percipient witness. The relevance is apparent from the stark contrast between the two
23 numbers and the discrepancy is listed as one of Defendant's misrepresentations to investors as alleged in
24 the indictment. TSI ¶ 12(B).

25     Finally, Defendant challenges the agent's summary of Yam's statements related to Defendant
26 Holmes's spending as Theranos's CEO, and a specific purchase of jewelry. 1000 Mot. at 5–6. To the
27 extent the government intends to elicit any such testimony at trial, it will comply with the Court's
28 MIL Order. Specifically, the Court held that "[t]he Government may introduce evidence that Holmes

enjoyed a lifestyle as Theranos CEO that is comparable to those of other tech company CEOs[, including] salary, travel, celebrity, and other perks and benefits commensurate with the position. However, references to specific purchases or details reflecting branding of clothing, hotels, or other personal items" is not permitted.  MIL Order at 9.  The government has read and understands the Court's MIL Order and fully intends to abide by it.  There is no need for the Court to enter an additional order instructing the government to follow the Court's prior MIL Order.

### III.    Conclusion

Therefore, the government respectfully requests that the Court deny outright, or at most defer, Defendant's 1000 Motion.

DATED:  September 7, 2021

Respectfully submitted,

STEPHANIE M. HINDS
Acting United States Attorney

_/s/ Kelly I. Volkar_
JEFFREY B. SCHENK
JOHN C. BOSTIC
ROBERT S. LEACH
KELLY I. VOLKAR
Assistant United States Attorneys