# EXHIBIT 12

## MEMORANDUM OF INTERVIEW

| | | |
|---|---|---|
| CASE NUMBER | : | 2204323-MF |
| PERSON INTERVIEWED | : | Surekha Gangakhedkar |
| PLACE OF INTERVIEW | : | United States Attorney's Office, San Jose, CA |
| DATE OF INTERVIEW | : | September 13, 2021 |
| TIME OF INTERVIEW | : | 10:10 A.M. |

On September 13, 2021, Surekha Gangakhedkar (GANGAKHEDKAR) was interviewed at the United States Attorney's Office, San Jose, in preparation for possible trial testimony. Assistant United States Attorneys Robert Leach, John Bostic, Jeffrey Schenk, and Kelly Volkar were conducted the interview. Elizabeth Pipkin and Tyler Atkinson were present as GANGAKHEDKAR's counsel. Before the interview started, AUSA Leach explained the trial testimony process and courtroom procedures. AUSA Leach also explained that while GANGAKHEDKAR's testimony in a trial was compelled, her interview, which was pursuant to a proffer agreement, was voluntary. An application for immunity had been filed with the court for GANGAKHEDKAR. AUSA Leach reviewed some areas of potential cross examination by the defense. The following is a summary of the statements made during the interview. It may not contain all statements made which have been documented in prior memoranda.

GANGAKHEDKAR reviewed her educational and professional background. She worked for Clara Bioscience from 1999 to 2005, a company that focused on enzyme assay development. When the company moved to South San Francisco, GANGAKHEDKAR was recruited by Ian Gibbons (GIBBONS) and started as a senior scientist at Theranos. GANGAKHEDKAR knew GIBBONS from her previous employment.

Theranos had only fifteen to twenty employees when she first started. In 2005, Theranos developed assays from scratch in a process that included the identification of a target protein, examination of reagents and antibodies, the development of a standard curve, and optimization. Samples were tested to look for concordance with standard assays.

GANGAKHEDKAR was promoted to assay developer team lead where she supported projects. She reported to Gary Frenzel (FRENZEL). In 2008, she was promoted to manager of assay specialization and managed a team that optimized assays for Theranos devices that were in development. GANGAKHEDKAR only developed immunoassays, which functioned via antibodies to measure target proteins. The other main categories of assays were clinical chemistry, molecular biology, and flow cytometry. GANGAKHEDKAR played only a minor role in the development of these types of assays, which was limited to ordering reagents.

FRENZEL developed health issues at which point GANGAKEHEDKAR reported directly to Elizabeth Holmes (HOLMES). GANGAKHEDKAR met with HOLMES a few times per week and kept her up to date on assay development and device integration. HOLMES did not like to take "no" for an answer and pushed to get things done. GANGAKHEDKAR's interaction with Sunny Balwani (BALWANI) was limited primarily to large group meetings. He often wanted

assay development projects to move more quickly but became more focused on other projects. An immunoassay might take, on average, six months to fully develop. Some immunoassays were easier, and others more difficult, taking a year and a half to develop. HOLMES knew assays could take months to develop and was involved with project planning for those on GANGAKHEDKAR's team. HOMLES wanted people working on multiple projects at any given time. GANGKEHEDKAR did not know how long it took to develop general chemistry or flow cytometry assays, but guessed it might have been longer since those at Theranos that developed those assays were starting from scratch.

The Theranos devices consisted of the 1.0 which was the size of a toaster, a slightly larger 2.0 device, and the Edison 3.0 and 3.5 devices. The 1.0 and 2.0 device development was challenging. This led to the development of the 3.0 and 3.5 devices. In 2013, GANGAKHEDKAR knew the next-gen devices consisted of the monobay, minilab, and 4s. Each was a slightly different configuration of the other.

Moving assays on to the next-gen devices usually did not require any redevelopment. Those assays had to be reoptimized for new hardware and software configurations.

GIBBONS was a technical lead for assay development. Tony Nugent led the device team.

Before the commercial launch, Theranos devices were used in collaboration with pharmaceutical partners. Theranos developed assay panels for Celgene, Centocor, and GSK. The panel for GSK was a diabetes specific panel and included GLP-1. GANGAKHEDKAR did not know if GSK paid Theranos for the services, but guessed they might have from conversation with Nelson Rhodes (RHODES), GSK lab coordinator. He said other companies wanted to be involved, and this led GANGAKHEDKAR to assume Theranos was paid. The entirety of the GSK project took place over the course of several months.

GANGAKHEDKAR reviewed document THER-2632558 and identified Susan DiGiaimo (DIGIAIMO) as a commercial sales lead. She and GANGAKHEDKAR travelled to GSK's lab with four Theranos devices (2.0's or above) and ran a comparison of Theranos' assays versus another standard assay over the course of two days. The samples were run in GSK's lab. They reported their daily results and observations to HOLMES, FRENZEL, and Tina Noyes (NOYES) by conference call. They also discussed issues and logistics. The data generated was uploaded directly to Theranos servers for analysis by GIBBONS. The comments contained in the attachment to this document were GSK's. RHODES was present for the analysis and happy with the overall results. The reference assay took over twenty hours to run and required refrigeration. The Theranos assay ran faster and did not require refrigeration.

GANGAKHEDKAR did not know if Theranos worked with GSK after this, or if there was a clinical trial, but said she was not involved with any additional work. The two-day study was not a clinical trial, and she said it would have been "hard to say" this was a comprehensive validation because more tests needed to be run. GANGAKHEDKAR described the work with GSK as a feasibility study.

HOLMES and BALWANI announced Theranos was expanding into the retail market with Walgreens and Safeway in 2009. BALWANI was in Thailand during the H1N1 outbreak and saw the potential of a retail market. GANGAKHEDKAR's supported the retail rollout through the development of immunoassays. In 2013, Theranos had developed the next-gen devices (4.0 and 4s). GANGAKHEDKAR and her team continued assay development for the Edison 3.0

devices, with the goal of transferring those assays to the 4.0. Many assays were ready for transfer to the new devices and GANGAKHEDKAR helped plan assay validation protocols. However, the devices did not work well and were not ready to be deployed.

In 2013, GANGAKHEDKAR knew from conversations with HOLMES and Theranos engineers that the Edison 3.0 suffered from continued issues. There was a lack of resources available to fix the issues as they were focused on the next-gen devices.

GANGAKHEDKAR was not in Theranos' CLIA lab and had no knowledge of the assays run in the CLIA lab.

NOYES was a technical lead in GANGAKHEDKAR's assay group and resigned from Theranos the same day as GANGAKHEDKAR. NOYES shared the same concerns about Theranos' launch as GANGAKHEDKAR, namely the use of Edison 3.0 and 3.5 as a stopgap measure until the 4.0 devices were ready. She was also concerned about Theranos' approach to the launch. NOYES told her about her resignation while GANGAKHEDKAR was cleaning out her desk. They had no prior discussion of their own plans. GANGAKHEDKAR knew NOYES spoke to HOLMES that day because they had an open office floor plan that let her see NOYES in HOLMES' office, and HOLMES' assistants called for them to meet. GANGAKHEDKAR had multiple meetings with HOLMES that day, leaving only to meet with HOLMES again. GANGAKHEDKAR believed HOLMES spoke to BALWANI after she had left the first time.

GANGAKHEDKAR reviewed document PFM-DEPO-00008825 and said she recalled the project outlined in this document. She was instructed by HOLMES that she and her team should not share any information about assay development or the 4.0 devices with anyone outside the team. Information was often kept as "need to know" at Theranos. This surprised GANGAKHEDKAR who said HOLMES and BALWANI were paranoid about leaks. This also frustrated GANGAKHEDKAR because she needed information from other teams but could not share with them. The only two people who knew everything were HOLMES and BALWANI. As of March 2013, Theranos worked to bring assays onto the 4.0 devices. The document represented a shift in priorities, but priorities constantly shifted at Theranos. People were often pulled from one project to another. The content of the document was HOLMES' priorities relayed to the team by GANGAKHEDKAR.

GANGAKHEDKAR reviewed document THPFM0000068864 and identified Chinmay Pangarkar (PANGARKAR) as the flow cytometry lead, Paul Patel (PATEL) as the clinical chemistry lead, Samartha Anekal (ANEKAL) and the 4.0 development lead, and Michael Chen (CHEN) as responsible for cartridges and consumables. Daniel Young (YOUNG) was a de facto chief technology officer and oversaw the development of the technology. He was involved with strategy and updates and shared HOLMES' strategy with others. Cartridges were single use items that held the reagents, tips, and sample to run an assay. The cartridges were inserted into the device which ran a test and reported a result.

In the above document, GANGAKHEDKAR called attention to issues she identified with the nanotainers. While the volume of blood looked sufficient, air bubbles were observed when the cartridge was run. This could have been due to low volume or a tip issue. The issues with the nanotainers were not resolved by the time GANGAKHEDKAR resigned from Theranos. Daily nanotainer testing was conducted, and each team received a subset of daily collected samples. HOLMES was aware of the issues with the nanotainer. Theranos' devices and nanotainers were

troubling issues, but GANGAKHEDKAR believed the nanotainer issue was worse because there was no consistency of the issue.

GANGAKHEDKAR reviewed document THPFM0000253456 and said Sharada Sivaraman (SIVARAMAN) was the other technical lead in her group and took over after GANGAKEDKAR resigned. They met one time after GANGAKHEDKAR's resignation. The document contained ELISA/4.0 daily testing data. GANGAKHEDKAR wrote, "Vit D – Very noisy, Calibration curve cannot be generated" and said this was bad news for the 4.0 devices. At the time of this document, she believed the 4.0 devices were going to be used for the Walgreens launch. This document kept HOLMES appraised of 4.0 development progress.

GANGAKHEDKAR reviewed document THPFM0004672258 and said she recalled the email contained within. GIBBONS was focused on general chemistry assays and working with PATEL at the time of his death. GANGAKHEDKAR did not have much interaction with him at the time, but felt he had been pushed aside. When Theranos first started, he had HOLMES' ear. GANGAKHEDKAR was not aware of issues with patents, and could not say what impact his death had on Theranos.

GANGAKHEDKAR reviewed document THPFM0001389628 and said she was familiar with the content. "Karen" and "Nahal" were assay developers and ferritin was a protein biomarker. This email discussed the transfer of assays onto the next-gen devices, specifically ferritin. HOLMES instructed GANGAKHEDKAR that Karen should continue working on the current project related to LDT's (laboratory developed tests).

When GANGAKHEDKAR left for a trip to India in August 2013, the Walgreens launch was not imminent, and the plan was to use the 4.0 devices. When she returned, she was surprised to learn from SIVARAMAN and NOYES that the launch was now imminent and that Theranos was moving forward with testing on the Edison 3.0 and 3.5 devices. GANGAKHEDKAR did not think these devices were ready to support the launch because of reliability issues, general errors, and data loss issues. She told HOLMES this was not the system to use for a commercial launch. While GANGAKHEDKAR was out, SIVARAMAN acted in her role as team lead and sent some emails to HOLMES highlighting the issues with the Edison devices. When GANGAKHEDKAR returned, she asked SIVARAMAN to resend those emails, containing data from a previous study, to HOLMES and YOUNG.

GANGAKHEDKAR reviewed document THPFM0000253352 and said this was part of the validation plan to move the assays onto the 3.0 devices. Ran Hu (HU) was a principal scientist in GANGAKEDKAR's group. There were only three Edison devices available at the time for the validation study which was a limiting factor of the work that could be completed. In the document, Karen Shaw (SHAW) wrote, "Yikes good to know!" This was a common feeling at that time. There were always unrealistic expectations and pressure to do in days what should have took weeks or months. There was a rush to validate the assays.

GANGAKHEDKAR reviewed document THPFM0000254600. Ester Chan (CHAN) developed reagent formulations for cartridge manufacturing. GANGAKHEDKAR believed she was on leave at the time of this document and that SIVARAMAN probably participated in meetings with HOLMES.

- LDT validation for use in the CLIA lab was the most important action item. This was not the development of new assays.

- New projects were delayed.
- GANGAKHEDKAR's group received three new Edison devices. The devices were upgraded for the validation studies.
- There were references to "6 assays." GANGAKHEDKAR believed these assays needed to be validated and multiplexed to run all on the system.

GANGAKHEDKAR reviewed document TS-1135782 and said she thought a 3.5 device protocol was run and that data was provided to the group. The document referenced "newly cut capture layers and wicking pads." She thought these may have been cartridge components.

GANGAKHEDKAR reviewed document THPFM0001608804 and said YOUNG spearheaded the validation. SIVARAMAN wrote, "Per our plan we are estimating at least 200 cartridges per assay for the complete validation." Cartridge manufacturing took time as the reagents had to be formulated and qualified. Antibody conjugation involved the attachment of a marker and binder to an antibody. New products had to be acceptable when compared to a gold standard, and then manufactured in large quantities. This process was rushed, but not unusual. They approached the work with an "all hands-on deck attitude."

GANGAKHEDKAR reviewed document THPFM0001616123 and said YOUNG communicated the assays that had to be validated for the 3.0 and 3.5 devices. The document referenced an "Advia," which was a commercial assay system used in the CLIA lab that Theranos planned to use for validation. "MFG and Formulations" was the group that manufactured the reagents. TPSA, Vitamin D, TSH, were among the first assays GANGAKHEDKAR's group focused on. The validation work had not yet started when GANGAKHEDKAR resigned.

GANGAKHEDKAR reviewed document TS-0297862 and identified Suraj Saksena (SAKSENA) as the in-house reagents team lead. SIVARAMAN described the ELISA team's main project at the time, and GANGAKHEDKAR said it was an accurate statement. Daniel Edlin (EDLIN) was a project manager that conveyed information and deadlines.

GANGAKHEDKAR reviewed document THPFM0005295890 and said those emailed in the chain were GANGAKHEDKAR's team and the formulation and manufacturing teams. GANGAKHEDKAR had returned from her leave at this time. The table included as an attachment to this document identified assays that had to be validated, and the Theranos employee responsible for each particular item. The "3.0 20 uL Protocol name" column heading referred to the specific Edison protocol software used to run the assay.

There was a plan to use the Edison devices for clinical chemistry. Immunoassays needed a light detector to operate, and clinical chemistry assays used a different color-based detector. The idea worked in principle, but there were challenges to be faced. The other assay types (flow cytometry) faced even greater challenges for transferring to an Edison. Theranos' original concept was more easily captured by immunoassays. GANGAKHEDKAR said there was no "breakthrough" made when Theranos considered running clinical chemistry on an Edison.

GANGAKHEDKAR reviewed THER-4718700 and said she recognized it. GANGAKHEDKAR recommended SIVARAMAN resend it so Theranos knew of the 3.0 device failures.

GANGAKHEDKAR reviewed document THER-2060224 and said YOUNG and Adam Rosendorff (ROSENDORFF) asked GANGAKHEDKAR to send the assay development reports to see if the data could be used for the validation.

GANGAKHEDKAR reviewed document FBI-SG-0000004 and said she recognized it as a document she took from Theranos that summarized 3.5 device run data for HOLMES and YOUNG. There were issues with the Vitamin D assay and with some of the devices. YOUNG suggested they report the wrong cartridges were used; GANGAKHEDKAR was adamant they were not. GANGAKHEDKAR did not know if she reported this to HOLMES.

GANGAKHEDKAR reviewed document THPFM0005301735 and said the Advia devices were modified to run small samples. GANGAKHEDKAR asked with SIVARAMAN or SHAW about precision testing, which had been run on the Advia. At the time of this document, no assays had been validated on the Edison device.

GANGAKHEDKAR reviewed document THPFM0004299073. BALWANI thought GANGAKHEDKAR's team was not working hard enough, but he did not understand assay development. GANGAKHEDKAR said she agreed with NOYES' comments. The issues discussed in this specific document were logistical, not device issues.

GANGAKHEDKAR reviewed document THPFM0004299056 and said her statements in the most recent email were a fair description of her feeling at the time.

GANGAKHEDKAR reviewed document THPFM0001616121. The retrofit effort was a push to increase the reliability of the 3.0 device through hardware and software updates. This process was rushed and there were not enough systems.

GANGAKHEDKAR reviewed document THPFM0003795701 and said this was an Advia validation update.

GANGAKHEDKAR reviewed document THPFM0003650233 and said the attachment was a true copy of her resignation letter. GANGAKHEDKAR resigned from Theranos because she was not comfortable with the plans for patient testing and because the 3.0 and 3.5 devices were not reliable as shared with HOLMES, BALWANI, YOUNG, and other team leads. This was discussed during multiple conversations with HOLMES. GANGAKHEDKAR loved the research but did not like how Theranos worked around the Advia device. They did not listen, and the launch was going to happen, "no matter what." ==GANGAKHEDKAR thought it was misleading to have people believe they were going to have their blood drawn by fingerstick,== but HOLMES said Theranos could draw two venous samples. During her exit interview, HOLMES and GANGAKHEDKAR discussed the device issues. HOLMES also said Theranos had to launch because she had promised customers and "did not have much of a choice." GANGAKHEDKAR was shocked to learn about venous draws during her exit interview.

GANGAKHEDKAR said she worked every day and night to do something good and hoped the Theranos product worked. Even though there were challenges, she believed the problems would be solved. However, GANGAKHEDKAR said Theranos manipulated commercial assays and devices and this devalued her work. There was no value to what Theranos did. GANGAKHEDKAR noted the CV's were high, and those issues were not going to be solved over the course of a few days.

YOUNG and ROSENDORFF had conversations with GANGAKHEDKAR about using systems for patient samples. These were not raised the issue with HOLMES. The services should not have been used for patient testing.

GANGAKHEDKAR reviewed document SEC-DOJ-E-0000010 and said these were the documents she took from Theranos and gave to the FBI during a voluntary interview. She signed an NDA and heard stories of former employees subject to lawsuits for violating those NDA's. ==GANGAKHEDKAR took the documents because she was concerned about the Walgreens launch, to avoid any personal blame, and to show HOLMES was made aware of the issues. She willfully violated her NDA to protect herself.==

GANGAKHEDKAR said that when HOLMES had an opportunity to talk to her team members, she sometimes acted as if she was hearing certain information for the first time. GANGAKHEDKAR did not want her to do this again and was another reason why she took documents with her.

Mona Ramamurthy contacted GANGAKHEDKAR to remover certain statements from her LinkedIn account.

GANGAKHEDKAR was contacted and offered counsel to support her during litigation. She did not want to be involved.

We took a rest break from 11:41 A.M. to 11:55 A.M.

The interview ended at 1:20 P.M.


*Christopher McCollow*

Christopher McCollow                                        September 14, 2021

U.S. Postal Inspector                                        Date


Attachments:

THER-2632558
PFM-DEPO-00008825
THPFM0000068864
THPFM0000253456
THPFM0004672258
THPFM0001389628
THPFM0000253352
THPFM0000254600
TS-1135782
THPFM0001608804
THPFM0001616123
TS-0297862
THPFM0005295890
THER-4718700
THER-2060224
FBI-SG-0000004
THPFM0005301735
THPFM0004299073
THPFM0004299056

THPFM0001616121
THPFM0003795701
THPFM0003650233
SEC-DOJ-E-0000010