# EXHIBIT 13

MEMORANDUM OF INTERVIEW

| | | |
|---|---|---|
| CASE NUMBER | : | 2204323-MF |
| PERSON INTERVIEWED | : | Surekha Gangakhedkar |
| PLACE OF INTERVIEW | : | Videoconference Call |
| DATE OF INTERVIEW | : | May 27, 2021 |
| TIME OF INTERVIEW | : | 2:15 P.M. |

On May 27, 2021, Surekha Gangakhedkar (GANGAKHEDKAR) was interviewed by videoconference call. Assistant United States Attorneys Robert Leach, John Bostic, and Jeffrey Schenk participated in the interview. Elizabeth Pipkin was present as GANGAKHEDKAR's counsel. Prior to the start of the interview, GANGAKHEDKAR reviewed the proffer agreement with Pipkin and was admonished. GANGAKHEDKAR expressed general concern because she had never before testified in a trial. The following is a summary of the statements made during the interview.

GANGAKHEDKAR received her bachelor's degree in microbiology from a university in India in 1995, and a degree in chemistry from San Jose State in 1999. She attended University of North Carolina at Chapel Hill by distance learning from February 2016 to 2018 and received her Master of Business Administration degree. GANGAKHEDKAR immigrated to the United States in May 1995 and became a citizen in either 2008 or 2009.

GANGAKHEDKAR began her employment at Theranos in 2005 as a senior scientist. In 2009, she was promoted to Manager of Assay Systems where she led a team that developed immunoassays for Theranos' devices. She first reported to Ian Gibbons and then in to Gary Frenzel (FRENZEL) in 2011. At some point in time, she reported directly to Elizabeth Holmes (HOLMES). She resigned from Theranos in September 2013. After Theranos, GANGAKHEDKAR worked as a part-time consultant at OncoGenesis, and then Index Lifecare from 2014 to October 2015. She then worked at OncoGenesis again for only a few hours per week before hired by Abbott. GANGAKHEDKAR remained at Abbott until 2020 when she left for Cepheid. As of the date of the interview, GANGAKHEDKAR was Manager of Global Product Support at Cepheid.

GANGAKHEDKAR participated in two prior interviews with the government regarding Theranos, including one at a Starbucks in May 2016. During that interview, she provided agents with documents kept from her time at Theranos. GANGAKHEDKAR was familiar with Theranos' policies of protecting company documents. Theranos' approach and product development were "chaotic" at the time, and she kept printed versions of those documents because she felt the information would be useful to protect herself in the future. She did not tell anyone she kept the documents because she was concerned about Theranos coming after her. She provided the documents to the government to help with the investigation into what happened after Theranos launched their service with Walgreens.

GANGAKHEDKAR reviewed document SEC-DOJ-E-0000010 and believed it was one of the documents she had previously provided to the government. From her review, GANGAKHEDKAR believed the discussion was about using Edison 3.0 devices but could say

Page 1 of 7

with complete certainty. She understood the plan was validate assays on the Edison 3.0 and 3.5 devices, though limited information was shared with her on how this process would have worked. GANGAKHEDKAR was frustrated because of the lack of clarity as to why the launch plan had changed and confused because it was unclear how Theranos would be ready to launch. She decided to retain this document because it had some information about Theranos' launch plan. GANGAKHEDKAR agreed the Walgreens launch was rushed.

During her employment, GANGAKHEDKAR was aware of the different iterations of Edison devices. The 1.0 and 2.0 devices had consistency issues, as did the 3.0. GANGAKHEDKAR did not know what the specific differences between the 3.0 and 3.5 devices were, but guessed it was related to hardware and software updates. She understood a 4.0 device, under development at the time, faced challenges toward become operational.

GANGAKHEDKAR reviewed document SEC-DOJ-E-0000011 and identified Sharada Sivaraman (SIVARAMAN) as a technical lead in the assay development group, Ester Chan as a Theranos employee responsible for cartridge manufacturing and preparation, Tina Noyes as a counterpart of SIVARAMAN's, and Karen Shaw (SHAW) as a member of GANGAKHEDKAR's group. Daniel Young (YOUNG) was responsible for planning launch projects. She thought YOUNG was a company vice president who reported to HOLMES. GANGAKHEDKAR explained high priority assays were identified for the first phase of the Walgreens launch. Even though she was "out-of-the loop," GANGAKHEDKAR said validation exercises were planned to start around the time of her resignation.

GANGAKHEDKAR reviewed document SEC-DOJ-E-0000018 to SEC-DOJ-E-0000019 and recognized it as a document she had provided previously to the government. She believed the document showed both HOLMES and YOUNG were aware of the Edison's issues in 2011. GANGAKHEDKAR was on vacation leave in August 2013 and was surprised to learn about Theranos' launch plans upon her return. SIVARAMAN shared this email with her to remind her of the prior issues with the 3.0 devices.

GANGAKHEDKAR reviewed document SEC-DOJ-E-0000012. She believed this was one of her documents she provided to the government. Rose Edmonds (EDMONDS) worked for Paul Patel on the clinical chemistry team.

GANGAKHEDKAR reviewed document SEC-DOJ-E-0000013 and said the purpose of the email was to keep HOLMES and YOUNG informed about the issues with the device. In the email, YOUNG stated, "We will note in the study report that x number of failed runs (due to the wrong cartridges being used) were rerun." GANGAKHEDKAR did not agree with YOUNG's assessment and said that while she did not know the exact cause of the failed runs, it was not due to the use of wrong cartridges. GANGAKHEDKAR did not think that she followed-up past this email with either YOUNG or HOLMES because she was unsure if they would have listened or changed.

GANGAKHEDKAR reviewed document SEC-DOJ-E-0000014 to SEC-DOJ-E-0000017. She recognized the document as something she had previously provided to the government. Theranos was aggressive towards former employees, and they told GANGAKHEDKAR her LinkedIn profile revealed too much information about her work at the company. She believed they were being too restrictive of what former employees said. Mona Ramamurthy suggested GANGAKHEDKAR change the content or face legal action. GANGAKHEDKAR had used the same scientific techniques at previous employers, and Theranos' actions caused her to believe she was singled out. The handwriting on the document is GANGAKHEDKAR's.

GANGAKHEDKAR was familiar with some of Theranos' work with pharmaceutical companies, and said certain projects developed assays for these companies, including Centocor, Celgene, and Novartis. One of the assays GANGAKHEDKAR and her team were specifically involved with was the development of a GLP-1 assay. At a high level, Theranos developed assay for pharmaceutical companies, collected data, and then shared the results with HOLMES and GIBBONS. Information sharing with GANGAKHEDKAR and her team was limited, and any decisions or concerns were not shared with her. GANGAKHEDKAR described the work as moving from an old project to a new one, without hearing anything beyond very limited feedback. Work with pharmaceutical companies stopped because of reliability issues, as evidenced by the previous email to HOLMES and YOUNG (SEC-DOJ-E-0000018).

GANGAKHEDKAR ran a metabolic panel with GSK. She was not aware of the details of any contracts or payments. She was also asked to work with Pfizer but was not sure what happened with that project. The work with Schering-Plough focused on GLP-1, but GANGAKHEDKAR was unsure of how that project ended. GANGAKHEDKAR believed YOUNG was the best person to ask about pharma contracts, and FRENZEL was the person with the most overall knowledge of Theranos' work with pharma companies. She reconnected with FRENZEL every few years. GANGAKHEDKAR reiterated that while she was not part of the overall project conversations, she observed reliability issues and then observed the pharma work cease.

GANGAKHEDKAR did not have much interaction with Sunny Balwani (BALWANI) becuase he was focused on the hardware and software.

GANGAKHEDKAR reviewed document THER-2632558 to THER-2632560. Susan DiGiaimo (DIGIAIMO) was responsible for commercial sales at Theranos, and Nelson Rhodes (RHODES) was a GSK representative and collaborator. GANGAKHEDKAR said she had no direct interaction with RHODES, and while this document was from long ago, they may have planned and prepared for the project. GANGAKHEDKAR thought metabolic panels were run on Edison devices at GSK's site and that she and DIGIAIMO were physically present at GSK. This project was not a clinical trial. GANGAKHEDKAR did not know if Theranos ran any clinical trials with GSK and could not remember any other work Theranos completed with GSK.

GANGAKHEDKAR reviewed document THER-2632966 to THER-2932971 and said the document would have been prepared from data collected by her and GIBBONS. She described their drafting process as collaborative, where she shared data with GIBBONS and he drafted sections of the report. GANGAKHEDKAR believed she may have also drafted sections of these types of reports. GANGAKHEDKAR did not download pharmaceutical company logos and had no role in putting together report packages. She did not draft any marketing material for investors.

Theranos shifted its focus to retail operations after BALWANI returned from a trip to Thailand.

GANGAKHEDKAR had no role with obtaining FDA approvals. She suggested either HOLMES or YOUNG would have knowledge of the topic.

GANGAKHEDKAR reviewed document THER-0606926 to THER-0606928. Marc Thibonnier (THIBONNIER) was Theranos' Chief Medical Officer and GANGAKHEDKAR had limited interaction with him. GANGAKHEDKAR was not familiar with the term "510(k)." She heard Theranos was going to have a CLIA [Clinical Laboratory Improvement Amendments] laboratory, saw it built, and heard that it had received the necessary certifications. Otherwise,

GANGAKHEDKAR had limited involvement with the CLIA lab, and was not aware of what tests were run in the lab. Arnold Gelb was lab director after THIBONNIER. She had limited interaction with him, too.

GANGAKHEDKAR reviewed document THPFM0000063141 to THPFM0000063142. "LDT" was shorthand for laboratory developed tests, an assay run in a CLIA lab. GANGAKHEDKAR did not know why she was copied on the email comprised in this document but thought there was a desire to move assays into the CLIA lab. She was not involved in communications about FDA and CLIA guidelines.

GANGAKHEDKAR developed assays for use by the American Burn Association (ABA) which were put onto Theranos cartridges and shipped for testing. Daniel Edlin (EDLIN) coordinated ABA cartridge shipments.

GANGAKHEDKAR was not familiar with any work with the Department of Defense or any Safeway testing.

Theranos operated in a siloed manner, but this did not have much impact on GANGAKHEDKAR's work. Assay development was workflow independent, a there were a few engineers assigned to work with her group that aided with intra-group coordination.

Theranos' Walgreens launch was announced at an in-house meeting.

GANGAKHEDKAR reviewed document PFM-DEPO-00008825 to PFM-DEPO-00008826. She remembered this email and said HOLMES wanted to start the project. GANGAKHEDKAR's email contained in this document want meant to aid team planning. They did not have much success with the 4.0 device and the data was not submitted.

GANGAKHEDKAR reviewed document THPFM0004672258. GIBBONS hired GANGAKHEDKAR, and she reported to him for some time. Even after the reporting structure changed, GIBBONS was still present as a scientific advisor. She and GIBBONS worked together less often in 2013. GANGAKHEDKAR was not sure if GIBBONS had a role with the Edison or the Walgreens launch. While she had heard about the Fuisz litigation, she was not involved. GANGAKHEDKAR never talked to HOLMES about GIBBONS, and HOLMES never expressed any frustration in GIBBONS. Additionally, GIBBONS never expressed any frustration with HOLMES to GANGAKHEDKAR.

GANGAKHEDKAR reviewed document THPFM0000253425 to THPFM0000253427. The assays listed in this document were immunoassays. As assays were developed, GANGAKHEDKAR's group moved to the next priority group. At the time of this document, the 4.0 device was in development. GANGAKHEDKAR took steps to prepare for assay development on the 4.0 device for when it becmae operational.

GANGAKHEDKAR reviewed document THPFM0001389628. Samartha Anekal (ANEKAL) led 4.0 development. "Karen" was SHAW, and "Nahal" was an assay developer. The minilab and 4s were iterations of the 4.0 device. GANGAKHEDKAR thought HOLMES wanted to make sure assays were being tested on the other devices, too. In her response contained in this document, GANGAKHEDKAR wrote, "Karen has been pulled into the Ferritin LDT planning." She did not remember what she meant by that statement. GANGAKHEDKAR said HOLMES responded that SHAW should focus on the LDT and should Nahal focus on assay validation for the 4.0.

GANGAKHEDKAR reviewed document PFM-DEPO-00008832 to PFM-DEPO-00008836 and said that she was not completely sure of what the Walgreens launch plan was, but that it involved the use of Theranos' 4.0 device. GANGAKHEDKAR had not known about modified third-party devices and was surprised to learn about their use in an email from EDMONDS (SEC-DOJ-E-0000012). GANGAKHEDKAR also learned about the use of the 3.0 and 3.5 devices for the Walgreens launch at the same time as the modified third-party devices.

GANGAKHEDKAR reviewed document PFM-DEPO-00008837 and believed she was on vacation leave at the time this email was sent. Ran Hu was an assay developer. GANGAKHEDKAR stated again that when she left, she understood Theranos would launch with Walgreens using the 4.0 device. When she returned from her leave, she was surprised to learn of the changes. She did not remember what was meant by, "1. The LDT validation will be the top priority for the group now."

GANGAKHEDKAR reviewed document THPFM0000806667 to THPFM0000806668. The email contained in this document was consistent with what GANGAKHEDKAR learned about the use of third-party devices after returning from her leave.

GANGAKHEDKAR reviewed document PFM-DEPO-00008847 to PFM-DEPO-00008853 and stated she recognized it. After returning from her leave, GANGAKHEDKAR examined the plans put in place to make ready the 3.0 and 3.5 devices. She had no role in validating the third-party devices, but some of her group members worked with the lab director to complete this task. GANGAKHEDKAR could not gauge her confidence of Theranos' plan to use the 4.0 device with Walgreens, but recognized the plan changed with the inclusion of the previous generation Edison devices. GANGAKHEDKAR agreed that Theranos wanted to get the validation done as quickly as possible.

GANGAKHEDKAR reviewed document THER-2060224 to THER-2060241. Adam Rosendorff (ROSENDORFF) was CLIA laboratory director. She had limited interaction with him, and her opinion was that he lacked control of what he was responsible for. YOUNG played a large role in planning and review. "TSH" was short for thyroid stimulating hormone, and "TPSA" was a protein related to the prostate. ROSENDORFF and YOUNG wanted to review previous assay development plans and protocols. GANGAKHEDKAR said development reports contained the data used during the assay development process, while plans summarized the experiments used to conduct an assay's validation. GANGAKHEDKAR did not see this as "redoing work," rather a retrospective look at what had been needed previously.

GANGAKHEDKAR reviewed document THPFM0003795701 and said she recognized the document. She believed the content of this email was a fair summary of the current state of Theranos' validation at the time. GANGAKHEDKAR said there was an overall pressure to "get things done."

GANGAKHEDKAR reviewed document THPFM0000254553 to THPFM0000254573. SIVARAMAN was very unhappy with BALWANI's assessment of the team, and GANGAKHEDKAR agreed with her. GANGAKHEDKAR did not follow-up with BALWANI nor HOLMES about this document. This was an example of the pressure put on the employees.

GANGAKHEDKAR lost contact with SIVARAMAN due mainly to the passage of time. Theranos wanted former employees to break all ties with those who remained.

US-REPORTS-0028317

GANGAKHEDKAR reviewed document THPFM0003650233 to THPFM0003650238 and said she recognized it as a document HOLMES asked her to draft explaining the immunoassay development process.

GANGAKHEDKAR told HOLMES in-person on September 5, 2013 that she was resigning. She gave a one-week notice, a length of time she believed was more than sufficient. HOLMES was surprised and asked GANGAKHEDKAR if she needed to take some time away from Theranos. GANGAKHEDKAR initially stated she and HOLMES did not discuss specific details, nor did they discuss GANGAKHEDKAR's concerns about the validation process, but after a short break and discussion with her counsel, GANGAKHEDKAR said she told HOLMES about problems at Theranos. There were unaddressed problems at the company that HOLMES either ignored or could not fix. GANGAKHEDKAR said it had been a long time since her conversation with HOLMES, but she told GANGAKHEDKAR she, "had to deliver to [the] customers." GANGAKHEDKAR also told HOLMES about her concerns with the Theranos devices and with venous blood draws. Again, HOLMES stated she had customers she needed to deliver for.

It was difficult for GANGAKHEDKAR to leave Theranos, as she enjoyed the work, was surrounded by a good team of coworkers, and had the opportunity to work with technologically new assays and devices. GANGAKHEDKAR also did not have another job to go to. However, she was so concerned with what was happening at Theranos, and filled with a desire to protect herself since she did not think the situation was going to end well, that she resigned. ==GANGAKHEDKAR also believed one day she would be talking to government officials like she was during the interview==.

During the interview, we took breaks from 3:30 P.M. to 3:40 P.M. and from 4:26 P.M. to 4:29 P.M.

Prior to the conclusion of the interview, GANGAKHEDKAR expressed a need for some lead time if she were to testify. AUSA Leach stated we would work through her counsel if any additional information was needed.

The interview ended at 4:38 P.M.

*Christopher McCollow*

| | |
|---|---|
| Christopher McCollow | July 21, 2021 |
| U.S. Postal Inspector | Date |

Attachments:

- Signed proffer agreement
- SEC-DOJ-E-0000010
- SEC-DOJ-E-0000011
- SEC-DOJ-E-0000018 to SEC-DOJ-E-0000019
- SEC-DOJ-E-0000012
- SEC-DOJ-E-0000013
- SEC-DOJ-E-0000014 to SEC-DOJ-E-0000017
- THER-2632558 to THER-2632560
- THER-2632966 to THER-2932971

- THER-0606926 to THER-0606928
- THPFM0000063141 to THPFM0000063142
- PFM-DEPO-00008825 to PFM-DEPO-00008826
- THPFM0004672258
- THPFM0000253425 to THPFM0000253427
- THPFM0001389628
- PFM-DEPO-00008832 to PFM-DEPO-00008836
- PFM-DEPO-00008837
- THPFM0000806667 to THPFM0000806668
- PFM-DEPO-00008847 to PFM-DEPO-00008853
- THER-2060224 to THER-2060241
- THPFM0003795701
- THPFM0000254553 to THPFM0000254573
- THPFM0003650233 to THPFM0003650238

US-REPORTS-0028319