United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES,<br><br>        Plaintiff,<br><br>   v.<br><br>BARRY LAMAR BONDS,<br><br>        Defendant.<br>_____ / | No. C 07-00732 SI<br><br>**ORDER RE: ACCESS TO COMPLETED JUROR QUESTIONNAIRES** |

On March 8, 2011, the Court heard argument on the Non-Party Press Organizations' Motion for Immediate and Concurrent Access to Completed Juror Questionnaires. Having considered the arguments of counsel and the papers submitted, the Court hereby rules as follows.

**BACKGROUND**

On February 19, 2009, the Court issued a Pretrial Order in this case. Doc. 136. In the Order, the Court explained that it would provide a questionnaire to be completed by a full panel of time-qualified jurors, which would in turn be distributed to the attorneys prior to oral voir dire in the case. The Court concluded by stating: "All completed questionnaires will be filed and retained under seal." *Id.* at 2. The same day, the Court ruled on several motions in limine filed by defendant. Doc. 137. Among other things, the Court stated that certain evidence would not be admissible at trial if it were not authenticated by Greg Anderson, defendant's former trainer who was and still is refusing to testify in this case.

On February 26, 2009, and in response to the Court's Pretrial Order, The Associated Press, ESPN, Hearst Corporation, The New York Times Company, KNTV Television, Inc., NBC Subsidiary

(KNBC-TV), Inc., and Los Angeles Times Communications, LLC, filed an Ex Parte Application for Order Shortening Time to Hear Motion to Vacate Order Sealing Completed Juror Questionnaires and For Immediate Access to Completed Juror Questionnaires. Doc. 154. The next day, before either party or the Court had responded to the Press Organizations' filing, the government filed an interlocutory appeal of the Court's other February 19 Order. Doc. 155 (Notice of Appeal). The trial was postponed.

After the appeal was completed, trial was rescheduled for March 21, 2011. On February 10, 2011, the Press Organizations, joined now as well by Sports Illustrated and MediaNews Group, wrote a letter to the Court. Press Letter Re: Docket 154 ("Press Letter"). The Press Organizations requested "a hearing on the issue of their exclusion from the *voir dire* proceeding and sealing of completed juror questionnaires." *Id.* at 1. At a February 18, 2011 status hearing, the Court asked the parties to brief the Court with regard to the Press Organizations' motion. Doc. 252, TR 4:1–4:7. On March 1, after receiving briefing from both parties, the Court scheduled a hearing for March 8, 2011 and provided the parties and the Press Organizations one last opportunity to brief the Court by March 4. Doc. 257. The parties provided supplemental briefing, although the Press Organizations did not.

**LEGAL STANDARD**

The Supreme Court has made clear that "[t]he process of juror selection is itself a matter of importance, not simply to the adversaries but to the criminal justice system." *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 505 (1984) [*Press-Enterprise I*]. Historically, an open selection process has given "assurance to those not attending trials that others were able to observe the proceedings and enhanced public confidence." *Id.* at 507. There is a "presumption of openness" of the jury selection process, just as there is a presumption of openness for a criminal trial generally. *See id.* at 510.

The closing of a criminal trial to the public, including the closing of the jury selection process, is subject to strict scrutiny:

> The circumstances under which the press and public can be barred from a criminal trial are limited; the State's justification in denying access must be a weighty one. Where the State attempts to deny the right of access in order to inhibit the disclosure of sensitive information, it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest.
>
> The presumption of openness may be overcome only by an overriding interest based on

2

      findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

*Id.* at 509–10 (citations omitted).

## DISCUSSION

The Court finds it appropriate to begin by discussing the extent to which the trial in general — including oral voir dire — will be open to the public. The Court has agreed to reserve six seats for defendant throughout the trial. Doc. 258. During the trial, the courtroom will be open to members of the public, including members of the press. Additionally, although the Court expects that the courtroom will be nearly filled with prospective jurors during voir dire, the Court will reserve five seats for the public in general and an additional five seats for members of the press with special press passes. The proceedings will be broadcast live on a video and audio feed to the press room on the first floor of the courthouse.[1] If necessary, another overflow room will be opened, also with live video and audio feed. In accordance with Federal Rule of Criminal Procedure 53, the audio and video feed from the courtroom to overflow rooms will not be recorded, and no one will be permitted to record to the audio or video feed. *See United States v. Hastings*, 695 F.2d 1278, 1279 (11th Cir. 1983) (upholding Rule 53 as constitutional). Transcripts of the trial, including the oral portion of voir dire, will be available as they are in any criminal trial, and in accordance with General Order No. 59 (Electronic Availability of Transcripts of Court Proceedings). Additionally, the Court will permit quiet use of laptops in the courtroom and any overflow courtroom, as well as the use of BlackBerry or other similar personal devices for electronic transmission of email, including the filing of reporter's stories. Thus, the criminal trial, including oral voir dire, will be conducted in public to the extent that all criminal trials are conducted in public in the Northern District of California, with certain unusual accommodations made for the large expected attendance. The press and the public will be able to "attend, listen, and report on

---

[1] The Court intends that the video feed will display the following throughout the proceedings. One monitor will show a simulcast from one camera focused on the witness stand, one camera focused on the bench, and one camera focused on the attorney's podium. It is expected that defendant will be visible on the attorney's podium camera. A second monitor will display any document or photograph that is being published to the jury. There will also be an audio feed from the microphones in the courtroom.

**United States District Court**
For the Northern District of California

the proceedings." *Hastings*, 695 F.2d at 1280.

The Press Organizations' motion, then, raises four narrow questions. First, to what extent does the public right of access to the jury selection process extend to the content of written jury questionnaires filled out before oral voir dire begins? Second, to what extent does the public right of access to the jury selection process extend to the names or other identifiers of prospective and empaneled jurors? Third, are there any compelling governmental interests in restricting either of these rights of access? And finally, what narrow means might the Court use to serve those interests?

Neither the Supreme Court nor the Ninth Circuit has examined whether, and to what extent, jury questionnaires are part of the "jury selection process."[2] The California state courts have considered the question in more detail, concluding that the public right of access to the jury selection process extends only to the jury questionnaires filled out by venirepersons who actually are "called to the jury box for oral voir dire." *See Copley Press, Inc. v. Superior Court*, 228 Cal. App. 3d 77, 80 (1991) (distinguishing *Lesher Communications, Inc. v. Superior Court*, 224 Cal. App. 3d 774 (1990)).

The California courts have based their conclusion on federal constitutional law and the following persuasive rationale:

> [V]enirepersons who are never called to the jury box do not play any part in the voir dire or the trial. They fill out the questionnaire only as a prelude to their participation in voir dire. The questionnaire serves no function in the selection of the jury unless the person filling it out is actually called to be orally questioned.

*Lesher*, 224 Cal. App. 3d at 779. Based on this reasoning, the California courts "see no legitimate public interest in disclosure of these questionnaires." *Id.*

The Court agrees. Written jury questionnaires are meant to help facilitate the jury selection process by assisting the attorneys and the Court during oral voir dire and the actual selection of the jury. Written jury questionnaires are only part of the jury selection process to the extent that they are used to select jurors. In this case, it is the Court's intention to begin oral voir dire on the morning of March 21 with the questioning of 50 individuals. At that time, the written questionnaires of those individuals

---

[2] In *United States v. King*, 140 F.3d 76 (2d Cir. 1998), the Second Circuit appears to have assumed, though it never stated so explicitly, that jury questionnaires are part of the jury selection process. In reviewing and ultimately permitting a variety of restrictions on public access to voir dire, including delayed access to completed juror questionnaires, the Court did not address the delayed access question specifically. *See id.* at 80, 84.

4

will become part of the jury selection process. If it thereafter becomes necessary to question more individuals, more written questionnaires will become part of the jury selection process. Although other individuals will have filled out questionnaires in preparation for possible participation in the voir dire process, they will not actually have participated in the criminal trial, and their questionnaires will have served "no function in the selection of the jury." *Lesher*, 224 Cal. App. 3d at 779.

The question then becomes what it means for these jury questionnaires to be open to the public. The questionnaires are a proxy for an extended oral voir dire, and should be treated as such. Just as it is important for the press and the public to be able to "attend, listen, and report on" voir dire generally, *Hastings*, 695 F.2d at 1280, it is important for the press and public to be able to have access to, see, and report on the jury questionnaires that are actually part of the jury selection process. With the exception of the names of jurors, which the Court discusses separately below, the Court finds it appropriate to do the following with regard to the questionnaire. First, the most recent draft of the blank questionnaires is currently posted to the public docket in this case, and a finished copy will be as soon as the content is finalized. Second, the Court will ask prospective jurors general demographic questions aloud during oral voir dire, as per the Court's normal voir dire process. Third, to the extent that, during oral voir dire, the Court or the attorneys refer to specific answers written on questionnaires, the Court will display those written answers on a video monitor in the courtroom, the media room, and any additional overflow viewing area. In this way, members of the public and press who are watching oral voir dire will be able to follow the proceedings as easily as they would had the Court not utilized written questionnaires.

Finally, copies of the jury questionnaires filled out by individuals who actually are "called to the jury box for oral voir dire," *Copley Press*, 228 Cal. App. 3d at 80, will be made available for public and press review during oral voir dire, and they will be part of the record open to the public after the conclusion of the trial. Ten binders of numbered, completed questionnaires for the first 50 prospective jurors will be made available in the media room on the first floor of the courthouse at approximately 8:30 am on Monday, March 21, 2011. Eight of the binders will be reserved for any press organization with court issued media credentials for the case, and two of the binders will be available to all members of the public. Members of the public and members of the press may view, take notes from, and report on the written questionnaires; however, as with voir dire in general, they may not photograph, record,

or broadcast a facsimile of the completed questionnaires. *See* Fed. R. Crim. Pro. 53. Nor will they be permitted to remove any questionnaire or any part of any questionnaire from the binders. If it becomes necessary for additional prospective jurors to be "called to the jury box," the Court will make their completed questionnaires available at that time, in the same manner.

In this way, the public and the media will have open and meaningful access to the completed questionnaires of prospective jurors, just as they would have had access to the questions and answers if the Court had conducted an extended oral voir dire instead of allowing the attorneys to use written questionnaires to facilitate jury selection.

The next question for the Court is to what extent the public right of access to the jury selection process extends to the names or other identifiers of prospective and empaneled jurors. Neither the Supreme Court nor the Ninth Circuit has examined whether, and to what extent, the presumption of public access applies to the names of jurors. The Court assumes that the presumption applies, just as it applies to other aspects of the jury selection process. As the Seventh Circuit has recently explained, "The right question is not *whether* names may be kept secret, or disclosure deferred, but *what justifies* such a decision." *United States v. Blagojevich*, 612 F.3d 558, 561 (7th Cir. 2010) (emphasis in original). "[A] judge must find some unusual risk to justify keeping jurors' names confidential; it is not enough to point to possibilities that are present in every criminal prosecution." *Id.* at 565.

This approach is in accord not only with the general presumption of openness in *Press-Enterprise I*, but also with the rules of the Northern District of California. In the Northern District of California, General Order 6 provides that

> The names drawn from the qualified jury wheel shall be disclosed to the parties and to the public upon request of any party or member of the public; provided, however, that the chief judge or any judge before whom a case is pending in which any of the prospective jurors concerned are expected to serve, may *by special order* require that the clerk keep these names confidential *where the interest of justice so requires*.

N.D. Cal. Gen'l Order 6, at XIII (emphasis added); *see also* 28 U.S.C. § 1863 (requiring each district court to "devise and place into operation a written plan for random selection of . . . petit jurors," which includes fixing "the time when the names drawn from the qualified jury wheel shall be disclosed to parties and to the public").

This does not end the Court's inquiry. Here, the Court is faced with two compelling

6

governmental interests that militate in favor of non-disclosure of the names of empaneled jurors: juror privacy and defendant's right to a fair trial. Unlike in *United States v. Presley*, 130 S. Ct. 721 (2010), defendant here has requested that public access to the voir dire be limited to a certain extent. Specifically, defendant requests the following:

> that the Court defer disclosure of the names of jurors and alternates until after the jury has been discharged. Defendant also requests that, at a minimum, all identifying information for jurors and alternates (e.g., names, addresses, place of birth, name of employer, names of relatives, etc.) be redacted from any juror questionnaires should any portion thereof be made public prior to the jury's discharge, with such redaction to remain in effect until the time of the discharge.

Def. Suppl. Statement Re: Confidentiality of Juror Questionnaires, Doc 272. As defendant clarified during the hearing on this matter, this would amount to deferred disclosure and thus would differ from an "anonymous jury" case where the names of the jurors are never disclosed.

The Court notes first that this is a very high profile case. Defendant is a local celebrity who played for the San Francisco Giants from 1993 until 2007, during which time he was very successful on the field. Fifty-seven news organizations, domestic and international, have requested press credentials for the trial.[3] The question of steroid use in professional sports is of such interest that Congress has held multiple hearings on the subject, and former Senate Majority Leader George Mitchell released a report on steroids and Major League Baseball. *See* George J. Mitchell, *Report to the Commissioner of Baseball of an Independent Investigation into the Illegal Use of Steroids and Other Performance Enhancing Substances by Players in Major League Baseball* (Dec. 13, 2007). Defendants' name is in the subtitle of a book entitled *Game of Shadows: Barry Bonds, BALCO, and the Steroids Scandal that Rocked Professional Sports*, written by two local journalists who have written extensively about the BALCO case and these proceedings.

The parties and the Court are concerned about the possibility that any members of the public, press or non-press, will interact with jurors during the trial in ways that might invade the privacy of the jurors and ultimately negatively impact the fairness of the proceedings. As with any high profile case, there is a risk that jurors will themselves receive attention during the trial, which might distract them

---

[3] These are all requests that were either made or renewed after the trial was rescheduled for March 2011.

from the case. The jurors could be approached or even harassed or offered money to provide information about themselves or the case. The jurors could see their names or photographs in print. Even if they are completely successful in sequestering themselves from media coverage, people they know may inform them about it. The jurors will be instructed that they may not read or watch press coverage of the case, which will already be a difficult task. Disclosing their names before the trial is concluded will make that task more difficult still.

Additionally, there is a risk that members of the public, press or non-press, could approach the jurors and attempt to influence the verdict in the case. In a more typical case, that might involve approaching a juror to express one's thoughts about a criminal defendant's guilt or innocence. This is undesirable, but the Court would expect that a juror would and could follow the Court's admonitions, refuse to engage with that person, and put the person's comments aside when deliberating. However, the specific risk in this case is higher and somewhat unique. Not only does the case have a high news profile, but the Court has excluded various documents and areas of testimony, absent authenticating testimony by Greg Anderson, who is expected to refuse to testify at trial. *See* Order Re: Defendant's Motions in Limine (Doc. 137). This ruling in particular has been subject to a large amount of publicity. The risk here is that someone might approach a juror specifically to tell that juror about the inadmissible evidence, either in person or by, for example, posting a short message on the juror's Facebook page. There is a risk that information about inadmissible evidence could be communicated before the juror would be able to disengage. It would be more difficult for a juror to ignore specific information about excluded evidence than it is to ignore general opinions.

Defendant has a compelling interest in being tried by an impartial jury based on the evidence and testimony presented at trial. "Actions which have a significant potential of intimidating jurors or disturbing their tranquility to the point that they lose the ability to rationally consider the evidence or follow instructions are . . . to be discouraged." *United States v. Blagojevich*, --- F. Supp. 2d ----, 2010 WL 2934476 (N.D. Ill. July 26, 2010). Additionally, "jurors summoned from the community to serve as participants in our democratic system of justice are entitled to safety, privacy and protection against harassment." *In re Globe Newspaper*, 920 F.2d 88, 95 (1st Cir. 1990); *see also id.* ("As the Supreme Court has recognized, protecting jurors' privacy interests also implicates the integrity and reputation of

8

the judicial process" (citing *Press-Enterprise I*, 464 U.S. at 515 (Blackmun, J., concurring))). The potential transformation of "jurors' personal lives into public news . . . could unnecessarily interfere with the jurors' ability or willingness to perform their sworn duties." *United States v. Black*, 483 F. Supp. 2d 618, 630 (N.D. Ill. 2007).

The Court finds it necessary and appropriate to withhold from the public the names of jurors during the trial.[4] This restriction is intended to lessen the risk that jurors will be approached during the trial, either for the purpose of obtaining information from the jurors or for the purpose of influencing the verdict in the case. By releasing the names of the jurors only after they have been dismissed, any risk to the integrity of the process is considerably minimized.

The Court has considered more burdensome alternatives: sequestering the jury; having an anonymous jury; closing voir dire access in general; and restricting access to the jury questionnaires. The Court does not find these to be narrowly tailored to the facts of this case. The Court also notes that the single restriction of deferred disclosure is narrower that the restrictions upheld in *United States v. King*, 140 F.3d 76 (2d Cir. 1998), and significantly narrower than those overruled in *Presley* and *Stephens Media LLC v. Eighth Judicial District of Nevada*, 221 P.3d 1240 (Nev. 2009).

Defendant has argued for deferred disclosure not only of jurors' names, but also of "addresses, place[s] of birth, name[s] of employer, [and] names of relatives." The risk of improper contact with jurors is considerably lessened by the simple restriction on the publication of jurors' names, and the Court does not find it necessary to defer disclosure of anything other than the actual names of the jurors. (The Court notes that the home address of jurors is never disclosed. Rather, the jurors are asked for the name of the city or community in which they live.)

The Court does find it necessary to edit one question on the draft questionnaire. As written, question 14 requests specific names of any "relatives or close personal friends who are judges or attorneys or court personnel," as well as the prospective juror's relationship to the person or persons. *See* Proposed Juror Questionnaire (Doc. 125). The Court will ask instead for the prospective juror to

---

[4] No one has suggested deferring release of the names of the jurors to the parties themselves. This is a remedy reserved for situations where there is some concern about that one party or another might attempt wrongfully to influence the jury verdict. This is not such a case.

9

1  "identify the type of judge or attorney or court personnel, and the their relationship to you."

2  To the extent the parties remain concerned about any questions on the questionnaire, they may
3  propose further edits before submitting a final copy to the Court.

4  The Court also notes that deferring disclosure of the identity of the jurors will necessitate that
5  the voir dire process be conducted by number. Thus the questionnaires shown to the public during voir
6  dire will be numbered and will not include the name of the individuals who filled them out.

7  The Court's 2009 Order sealing the jury questionnaire is rescinded.

9  **IT IS SO ORDERED.**

11  Dated: March 14, 2011

SUSAN ILLSTON
United States District Judge