1  STEVEN D. ZANSBERG (SBN 177528)

2  Law Office of Steven D. Zansberg, LLC___
   100 Fillmore Street, Suite 500
3  Denver, Colorado 80206
   Phone Number (303) 385-8698
4  Fax Number: (720) 650-4763_____
   Email:  steve@zansberglaw.com
5
   Attorney for Proposed Intervenor Media Coalition
6

7

8                  UNITED STATES DISTRICT COURT

9               NORTHERN DISTRICT OF CALIFORNIA

10                      SAN JOSE DIVISION

11

12  | UNITED STATES OF AMERICA | Case No. 18-cr-00258-EJD |

13  Plaintiff,

**MEDIA COALITION'S REPLY IN
SUPPORT OF ITS OF MOTION TO
INTERVENE FOR LIMITED PURPOSE OF
SEEKING THE UNSEALING OF
COMPLETED QUESTIONNAIRES OF
SEATED JURORS AND ALTERNATES;
MOTION TO UNSEAL COMPLETED
QUESTIONNAIRES OF SEATED JURORS
AND ALTERNATES**

14  v.

15  ELIZABETH HOLMES and
16  RAMESH "SUNNY" BALWANI,

17  Defendants.

18

19  Date: September 30, 2021
    Time: 11:30 a.m.
20  Courtroom: 4, 5th Floor
    Hon. Edward J. Davila
21

22

23

24

25

26

27

28  MEDIA COALITION'S REPLY IN SUPPORT OF                    CASE NO. 18-CR-00258-EJD
    ITS MOTION SEEKING TO UNSEALCOMPLETED
    JUROR QUESTIONNAIRES

                              - 1 -

The Media Coalition, by and through its undersigned counsel, hereby replies to the Responses to its motion asking the Court to unseal the completed juror questionnaires of the seated jurors and alternates ("the Motion").

### INTRODUCTION

Neither party has contested the portion of the Motion for leave to intervene.  Defendant takes no position on the merits of the Motion.  The Government opposes the Motion and urges the Court not to unseal the completed juror questionnaires, if at all, until after the verdict has been rendered, and even then, only with the jurors' identities redacted.

As demonstrated below, the Government has not satisfied the applicable test, imposed by the First Amendment (and as prescribed by *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501 (1984)), to justify closure of the courtroom or the sealing of written voir dire questioning.  The Government has failed to demonstrate (through actual evidence) that unsealing, *now*, poses a "substantial probability" of harm to any compelling interest or that less restrictive alternative means to protect against purely hypothetical attempts to tamper with the jury are inadequate.  Accordingly, the Motion should be granted.

### REPLY ARGUMENT

**I.    THE *PRESS-ENTERPRISE* STANDARD FOR CLOSING THE COURTROOM DURING VOIR DIRE APPLIES HERE**

The Government declares that "there is no federal consensus [on] whether the presumption of [public] access extends to" juror questionnaires.  Resp. at 2: 1-3.  However, the Government has not cited a single authority, from *any* court, that contradicts the holdings of the ten state and federal courts cited in the Motion at 5 - 6, that "the use of the questionnaires is merely a part of the overall voir dire process, [and is therefore] subject to . . .  the same qualified limitations as applied to oral voir dire." *Stephens Media, LLC v. Eighth Judicial Dist. Ct.*, 221 P.3d 1240, 1245 (Nev. 2009).  Indeed, the word "questionnaire" appears 216 times in the transcripts of two days of voir direand of the parties' oral motions to strike individual jurors for cause, which the Court resolved on the basis

1   of those questionnaires.  *See* Tr. 8/31/21 and 9/1/21.[1]   Accordingly, in resolving the Motion, the

2   Court should apply the standard applicable to closing the courtroom during voir dire that is set forth

3   in *Press Enterprise Co. v. Superior Court*, 464 U.S. 501 (1984).

4   **II.    THE GOVERNMENT HAS NOT DEMONSTRATED THAT UNSEALING THE**
5   **JUROR QUESTIONNAIRES WOULD CREATE A *SUBSTANTIAL PROBABILITY***
    **OF *INJURY* TO COMPELLING STATE INTEREST**
6
7           No one disputes that (a) avoiding jury tampering and (b) protecting jurors' legitimate rights

8   to personal privacy are compelling state interests. But merely reciting that such interests are *at stake*

9   does not satisfy the Government's burden to justify closing voir dire (in the form of continued

10  sealing of the juror questionnaires).  Instead, the case law is clear that "[p]resumptively open court

11  records can be closed *only if*: (1) closing them serves a compelling interest; (2) *there is **a***

12  ***substantial probability** that, in the absence of closing them, this compelling interest would be*

13  *harmed*; <u>and</u> (3) there are no alternatives to closing them that would adequately protect the

14  compelling interest." *U.S. v. McClatchy Newspapers, Inc.,* 2 F. App'x 745, 747 (9th Cir. 2001)

15  (emphasis added) (citations omitted); *Phoenix Newspapers, Inc. v. U.S. Dist. Ct.*, 156 F.3d 940, 949

16  (9th Cir. 1998) (same); *Oregonian Pub. v. U.S. Dist. Ct.,* 920 F.2d 1462, 1466 (9th Cir. 1990)

17  (same).  The Government's "showing" falls woefully short of satisfying either prong (2) or (3).

---

22  [1] In light of the numerous references to the completed questionnaires in the publicly released
23  transcripts, maintaining the seal on the questionnaires raises the specter of a "two-tier" records
    system that the Ninth Circuit has expressly decried.  *See Phoenix Newspapers, Inc. v. U.S. Dist.*
24  *Court*, 156 F.3d 940, 948 (9th Cir. 1998) ("If the right of access is to be meaningful, a court has the
    duty to ensure that its records are accurate. . . . If public records cannot be compared with the sealed
25  ones, all of the former are put in doubt.") (quoting *CBS, Inc. v. United States Dist. Ct.*, 765 F.2d
    823, 826 (9th Cir. 1985).

28  MEDIA COALITION'S REPLY IN SUPPORT OF                               CASE NO. 18-CR-00258-EJD
    ITS MOTION SEEKING TO UNSEALCOMPLETED
    JUROR QUESTIONNAIRES

                                              - 3 -

1

2

### A.   The Government's Expressed Concern Of *Potential* Juror Tampering Is Completely Speculative And Conjectural

3

Under the First Amendment, *"*[i]t is the burden of the party seeking closure . . . *to present*

4

*facts* supporting closure," i.e., actual evidence, not mere arguments of counsel, demonstrating that

5

"there is *a substantial probability* that, in the absence of clos[ure, a] compelling interest *would be*

6

harmed." *Oregonian Pub.,* 920 F.2d at 1466-67 (emphasis added) (citation omitted).  This

7

evidentiary burden is not mere semantics; the Supreme Court has held that denying the public's

8

right of access under any lower evidentiary standard violates the Constitution of the United States.

9

*See Press-Enterprise Co. v. Superior Court,* 478 U.S. 1, 2 (1986) (holding that order closing a

10

preliminary hearing to the public at defendant's request was unconstitutional because "the

11

'reasonable likelihood' test applied by the California Supreme Court placed a lesser burden on the

12

defendant than the 'substantial probability' test *required by the First Amendment*") (emphasis

13

added).

14

Here, the Government attempts to meet that burden by pointing solely to two discreet and

15

rather unextraordinary events: one in which a member of the public shouted something *outside the*

16

*courthouse* during voir dire that "none of the jurors heard," Gov. Resp. at 3, and one in which Juror

17

12 notified the Court that she had been contacted by the husband of one her friends whom she had

18

told, directly, she had jury duty, and her friend's husband had apparently deduced that she was one

19

of the seated jurors.  *Id.* (citing 9/1 Tr. 671 – 683).  Notably, (but unmentioned by the Government),

20

when Juror 12 proactively and promptly brought this incident to the Court's attention, it was

21

quickly determined, after questioning in chambers, that Juror 12 had not been exposed to any

22

information, whatsoever, about this case:

23

 THE COURT:  OH, OKAY.  ALL RIGHT. SO IN REGARDS TO WHETHER

24

        OR NOT YOU'VE SEEN, HEARD, OR READ ANYTHING,

25

        COMMUNICATED YOURSELF OR ANYONE TO YOU

26

        ABOUT THIS CASE, IS THAT ANSWER NO?

27

28

MEDIA COALITION'S REPLY IN SUPPORT OF
ITS MOTION SEEKING TO UNSEALCOMPLETED
JUROR QUESTIONNAIRES

CASE NO. 18-CR-00258-EJD

- 4 -

1   JUROR:         THE ANSWER IS NO.  YES.

2   9/14 Tr. at 673:6 - 10.

3       The Government surmises that these two practical non-events "'are concrete enough to

4   warrant' certain limitations on the public's right of access." Gov. Resp. at 3: 27 -28.  In other words,

5   the Government asks the Court to enter a *finding of fact* that unsealing the portion of the voir dire

6   conducted in writing poses a "substantial probability" that some member of the press (or the public)

7   will attempt to commit the federal crime of jury tampering,[2] and further, that such person(s) will

8   succeed in that effort.

9       If such baseless conjecture of counsel were found to provide a sufficient factual basis to

10  overcome the public's presumptive right of access to criminal proceedings and judicial records,

11  there would be nothing left to that constitutional right.  Thankfully, that is not the law.  *See, e.g.,*

12  *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 15 (1986) ("The First Amendment right of

13  access cannot be overcome by the *conclusory assertion* that publicity *might* deprive the defendant

14  of [a fair trial]. ") (emphasis added); *see also Valley Broad. Co. v. United States Dist. Ct.,* 798 F.2d

15  1289, 1293 (9th Cir. 1986) (holding, under the less stringent standard of the common law, that the

16  presumption of public access can "be overcome only on the basis of articulable facts known to the

17  court, not on the basis of unsupported hypothesis or conjecture") (internal quotation marks and

18  citations omitted); *Rockdale Citizen Publishing Co. v. State,* 266 Ga. 579, 580 (Ga. 1996)

19  ("Assumptions and speculation can never justify the infringement on First Amendment rights which

20  the closure of criminal proceedings creates.").

21      Of course, in any high-profile criminal case like this one – which is of tremendous public

22  interest and has justifiably attracted a great deal of press attention – there is the *possibility* that

23  members of the jury may, even inadvertently, be exposed to information outside the courtroom

24

25  [2] *See* 18 U.S.C. §§ 1504(b), 1503(b)(3) (imposing maximum penalties of either six months or ten
26  years imprisonment for interfering with a federal juror's duties).

27

28  MEDIA COALITION'S REPLY IN SUPPORT OF                    CASE NO. 18-CR-00258-EJD
    ITS MOTION SEEKING TO UNSEALCOMPLETED
    JUROR QUESTIONNAIRES

1  concerning the case at issue.  Accordingly, this Court instructed all potential jurors consciously to

2  avoid all press reports, not to conduct any independent research, Doc. 928 at 21 (Question 63), and

3  has queried the venire at the start of each day of trial whether any such event has occurred.  *See,*

4  *e.g.,* 9/14 Tr. 684: 4 -9. With the exception of the one instance discussed above (involving Juror 12),

5  no juror has notified the Court of any such occurrence – notwithstanding the fact that all of the

6  seated jurors and alternates were called to the jury box by their last names in open court.  9/2 Tr. at

7  479:18 -482:24.[3]

8         For the Court to accept as actual evidence the Government's bald prognostication that

9  disclosure of the juror's written questionnaires "*could* increase the chances of jury tampering in this

10  case," Gov. Resp. at 6: 2 -3, would fly in the face of this Circuit's precedent that forbids such

11  speculative assumptions, *without proof*, from denying the public's right of access:

12        [T]he district court did consider whether disclosure of the plea agreement
and related documents would pose a risk of harm to Wolsky and his family.

13  The court concluded that, in the absence of closure, the safety of Wolsky
and his family would be placed in jeopardy. This conclusion, however, was

14  not supported by any factual finding. It was based upon the district court's
stated belief that because the agreement contemplated Wolsky's cooperation

15  with the government, Wolsky would be in danger if the court disclosed the
terms of the plea agreement. There was *no evidentiary support for this.*

16  

17  *Oregonian Pub. v. U.S. Dist. Ct.,* 920 F.2d at 1467 (emphasis added).

18

19

20

---

21  [3] Not only have none of the jurors or alternates been so much as *approached* by any member of the
press, the Media Coalition is not aware of *anyone* having published their last names, including those

22  whose unique spellings render them fully identifiable via a simple Google search.  Of course,
because those names have already been publicly disclosed, they can no longer be subject to sealing.

23  *See, e.g., In re Copley Press, Inc.,* 518 F.3d 1022, 1024 (9th Cir. 2008) ("Once information is
published, it cannot be made secret again."); *Gambale v. Deutsche Bank Ag*, 377 F.3d 133, 144 (2d

24  Cir. 2004) ("We simply do not have the power . . . to make what has thus become public private
again.") (citations omitted); *SmithKline Beecham Corp. v. Pentech Pharms., Inc.,* 261 F. Supp. 2d

25  1002, 1008 (N.D. Ill. 2003) (refusing to redact information that had previously been disclosed in a

26  court opinion because "the cat is out of the bag").

27

28

1    In sum, the Government has not presented any "evidentiary support" for its speculative

2    claim[4] that disclosure of the questionnaires creates a "substantial probability" that jury tampering

3    will occur.[5]

4    **B.    Jurors' Right to Privacy Is Extremely Limited and Can Be Accommodated By**
         **Allowing Them to "Affirmatively Request" Confidentiality Only of "Deeply**

5    **Personal Matters"**

6    The second compelling interest the Government advances to support continued and

7    complete sealing of the juror questionnaires (and the redaction of their names therefrom) is the

8    juror's right to personal privacy. Gov. Resp. at 6 - 8. Of course, the Motion acknowledged that

9    jurors' personal privacy interests, properly confined to sensitive and intimate information, is a

10    compelling interest. *See* Mot. at 6: 22 – 25 (noting that the Supreme Court has expressly limited

11    such right to "when interrogation touches *on deeply personal matters* that person has legitimate

12    reasons for keeping out of the public domain") (emphasis added). The Government quotes Justice

13    Blackmun's concurrence in *Press-Enterprise*, suggesting that jurors should "not be required to

14

15

16    [4] Equally unfounded is the Government's assertion that "the *Bond* case occurred more than a decade
      ago and before social media platforms became ubiquitous." Gov. Resp. at 8: 23 – 24. The trial of
17    Barry Bonds occurred in 2011. *But see* Faith Merino, *Global Population Reaches 7 Billion, 1/70
      Has An Iphone,* Vator News, Oct. 31, 2011 ("With 800 million users (and some saying that number
18    is quickly approaching one billion), Facebook now has nearly one-seventh of the global population
      on its site."), https://vator.tv/n/20e5; Leena Rao, *Twitter Added 30 Million Users In The Past Two*
19    *Months*, TechCrunch, Oct. 30, 2010 ("Twitter now has 175 million registered users, which is up
      from 145 million users in September."), https://techcrunch.com/2010/10/31/twitter-users/; Jessie
20    Hempel, *How Facebook is Taking Over Our Lives*, CNN, Feb. 17, 2009 ("growing at the
      astounding rate of about five million new users a week . . . It even edges out the U.S. television
21    audience for Super Bowl XLIII"),
22    https://money.cnn.com/2009/02/16/technology/hempel_facebook.fortune/index.htm?postversion=20
      09021910.
23
      [5] Curiously, the Government cites and summarizes eight cases in which a seated juror was
24    contacted, at some point in the trial court proceeding, including post-verdict. Gov. Resp. at 4 -5.
      But the word "questionnaire" appears in only one of those decisions, and then only once, in the
25    recitation of the trial court's *Allen* charge. *See U.S. v. Ruggiero*, 928 F.2d 1289, 1293 (2d Cir.
      1991).
26

27

28    MEDIA COALITION'S REPLY IN SUPPORT OF                     CASE NO. 18-CR-00258-EJD
      ITS MOTION SEEKING TO UNSEALCOMPLETED
      JUROR QUESTIONNAIRES

1  disclose to all the world highly personal and embarrassing information," and that "privacy interests

2  of the jurors may be accounted for by delaying disclosure . . . and may sometimes warrant

3  permanent sealing."  Gov. Resp. at 6: 17 – 22.[6]

4          Only three of the 68 questions in the Juror Questionnaire (numbers 32, 50, and 66) call for

5  responses that could *potentially* "touch on deeply personal matters."  *Press-Enterprise Co*., 464

6  U.S. at 511. [7] If any of the other 65 questions were put to potential jurors during oral voir dire, there

7  would not be even a colorable basis to exclude the public from the courtroom.  That the voir dire

8  here was conducted in writing makes no difference.  *See* Mot. at 5 - 6.  Indeed, even with respect to

9  a potentially sensitive and personal topic – the jurors' personal experience(s) with domestic

10

11  _____

12  [6] The Government's Response cites several law review articles that discuss the use of anonymous
    juries, which, in certain circumstances, may be appropriate (e.g., in cases involving organized crime
    figures, gang members, or drug cartel kingpins). *See, e.g., United States v. Gotti*, 777 F. Supp. 224

13  (E.D.N.Y. 1991); *United States v. Gambino*, 819 F. Supp. 536 (E.D.N.Y. 1993); *United States v.
    Bellomo*, 263 F. Supp.2d 557 (E.D.N.Y. 2003).  However, it is long-settled that in ordinary criminal

14  cases, like securities fraud, jurors' identities are not secret. Indeed, dating back to colonial times,
    jurors were identified in high-profile criminal cases.  *See, e.g., In re Baltimore Sun Co.,* 841 F.2d

15  74, 75 (4th Cir. 1988) ("When the jury system grew up with juries of the vicinage, everybody knew
    everybody on the jury and we may take judicial notice that this is yet so in many rural communities

16  throughout the country."); *see also* Marcus M. Wilson, Jr., *Juror Identities in High-Profile Trials:
    The Case for a First Amendment Right of Access*, 3 First Amend. L. Rev. 437, 457 (2005) ("In

17  1670, the names of jurors were publicly announced at William Penn's trial for inciting unlawful
    assembly. Jurors' identities were also made public at John Peter Zenger's trial in 1735.") (citations

18  omitted); *id.* at 458 ("the considerable body of evidence available suggests [that] jurors' identities
    were presumptively public both under English and American law"); Steven Zansberg, *The Public's

19  Right of Access to Juror Information Loses More Ground*, 17 Comm. L. 11 (ABA 2000) ("So
    common was the practice of disclosing the identity of jurors that in the conspiracy trial of Aaron

20  Burr, over which Chief Justice Marshall presided, the names of the twelve chosen jurors were

21  printed in the reported decision.") (citations omitted), https://corporate.findlaw.com/law-library/the-
    public-s-right-of-access-to-juror-information-loses-more.html.  In any event, the last names of the

22  seated jurors and alternates in this case are already a matter of public record. *See supra n.* 3.

23

24  [7] *See Press-Enterprise Co.,* 464 U.S. at 513 ("Assuming that some jurors had protectible privacy

25  interests in *some* of their answers, the trial judge provided no explanation as to why his broad order
    denying access to information at the voir dire was not *limited to information that was actually

26  sensitive and deserving of privacy protection*.") (emphasis added).

27

28  MEDIA COALITION'S REPLY IN SUPPORT OF                              CASE NO. 18-CR-00258-EJD
    ITS MOTION SEEKING TO UNSEALCOMPLETED
    JUROR QUESTIONNAIRES

violence or "intimate partner" abuse – several of the potential jurors (and one selected alternate, *see* 9/1 Tr. 401:22 – 402:21) willingly discussed those experiences in open court.  8/31 Tr. 134:5 – 136:15; 137:8 – 142:3; 9/1 Tr. 396:11 – 407:4.  And they did so notwithstanding the Court's repeated declaration that anyone wishing to discuss such matters "privately" (outside of a public courtroom) were invited to so indicate and the Court would accommodate that request.  8/31 Tr. 41:4 – 43:23; 138: 20 - 23; 9/1 Tr. 310: 4 - 20. 396: 11 – 15.  Only a few of the potential jurors accepted the Court's invitation.  *See, e.g.,* 8/31 Tr. 199: 2 - 10; 199:18 – 203:11.

Thus, consistent with the holding of *Press Enterprise* (which the Government's Response ignores), the appropriate and *constitutionally-required* course of action is to ask each of the jurors, prior to unsealing, whether they have any concerns about any portion of their answers to Question Numbers 32, 50 and 66 being publicly disclosed (thereby "requiring the prospective juror to make an affirmative request"); the Court cannot simply assume that is the case. *See* Mot. at 6:25 – 7:10. Arguably, Questions 50 and 66 have already provided the jurors with that opportunity.

## III.   EVEN *IF* THE GOVERNMENT HAD DEMONSTRATED A REAL AND SUBSTANTIAL RISK OF JUROR TAMPERING, LESS RESTRICTIVE ALTERNATIVES TO CONTINUED BLANKET SEALING ARE READILY AVAILABLE

As indicated above, the Government has failed to meet its evidentiary burden to demonstrate that disclosure of the completed juror questionnaires creates a "substantial probability" that juror tampering or other interference with the jurors' conduct will occur.  But even *if* the Government *had* satisfied its burden of proof, continued sealing cannot be authorized by the Court because the Government has also failed to satisfy its other necessary burden, "to demonstrate that available alternatives will not protect [against such harm]." *Oregonian Pub.,* 920 F.2d at 1467.

As previously mentioned, intentional interference with a member of the petite venire, through oral or written communications, constitutes a federal crime. *See supra* n. 2.  In addition, any reporter who violates court orders prohibiting such contacts (with knowledge of such orders)

1  faces a possible contempt sanction for doing so.  *See, e.g., In re Stone*, 703 P.2d 1319, 1322 (Colo.

2  App. 1985) (affirming contempt sanction on reporters who contacted potential jurors during voir

3  dire: "once the trial process had begun, respondents' First Amendment rights did not extend to

4  permit communication with prospective jurors who had been admonished not to discuss the pending

5  case").  Because these less restrictive alternative means prospectively to prevent any such

6  sanctionable conduct are available, and have not been shown to be "inadequate," the Government

7  has not met its burden of "demonstrat[ing] that alternatives will not protect" against the remote

8  possibility of juror tampering.[8]

9  **CONCLUSION**

10  For the reasons set forth in the Motion, and above, the Court should grant the Media

11  Coalition's motion and order the unsealing of the completed juror questionnaires for the 12 original

12  jurors and five alternates, forthwith.

13

14  DATED: September 27, 2021

15  */s/ Steven D. Zansberg*

16  STEVEN D. ZANSBERG
   Attorney for The Media Coalition

17  (American Broadcasting Companies, Inc. d/b/a ABC
18  News, the Associated Press, Bloomberg L.P., The Daily
   Mail, Dow Jones and Company, Inc., NBCUniversal
19  Media, LLC,  The New York Times Company, Portfolio
   Media, Inc. –  publisher of Law360, Three Uncanny
20  Four LLC, and the Washington Post Company)

21

22

23
   _____

24  [8] Similarly, the Government's expressed concern that unsealing the questionnaires *in this case* may
25  "discourage juror candor" *in future cases*, is easily addressed by not including any promise of
   confidentiality in *future* written questionnaires, or, alternatively, dispensing with written
26  questionnaires altogether, despite the inefficiency of doing so.

27

28  MEDIA COALITION'S REPLY IN SUPPORT OF                    CASE NO. 18-CR-00258-EJD
   ITS MOTION SEEKING TO UNSEALCOMPLETED
   JUROR QUESTIONNAIRES

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on September 27, 2021, a copy of this filing was delivered via ECF to all

3

counsel of record.

4

*/s/ Steven D. Zansberg*
STEVEN D. ZANSBERG

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEDIA COALITION'S REPLY IN SUPPORT OF          CASE NO. 18-CR-00258-EJD
ITS MOTION SEEKING TO UNSEALCOMPLETED
JUROR QUESTIONNAIRES