JEAN-PAUL JASSY, Cal Bar No. 205513
    jpjassy@jassyvick.com
JEFFREY A. PAYNE, Cal Bar No. 279034
    jpayne@jassyvick.com
**JASSY VICK CAROLAN LLP**
355 South Grand Avenue, Suite 2450
Los Angeles, California 90071
Telephone:    310-870-7048
Facsimile:    310-870-7010

Attorneys for Non-Party Journalist
and Proposed Intervenor
JOHN CARREYROU

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>             Plaintiff,<br><br>    vs.<br><br>ELIZABETH HOLMES and RAMESH "SUNNY" BALWANI,<br><br>             Defendants. | Case No. 5:18-cr-00258-EJD<br><br>Honorable Edward J. Davila<br><br>**NOTICE OF MOTION AND MOTION TO INTERVENE FOR THE LIMITED PURPOSE OF MOVING TO EXEMPT JOHN CARREYROU FROM WITNESS EXCLUSION AND GAG ORDER [DKT. 824]**<br><br>Date:    October 18, 2021<br>Time:    1:30 p.m.<br>Crtrm:  4 |

TO THE HONORABLE COURT AND COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on October 18, 2021 at 1:30 p.m., or as soon thereafter as counsel may be heard in person or via videoconference or teleconference, as the Court may allow, in Courtroom 4 of the above-captioned Court, located at 280 South 1st Street, San Jose, CA 95113, non-party journalist and proposed intervenor John Carreyrou ("Carreyrou") will and does move the Court to: (1) permit Carreyrou to intervene for the limited purpose of moving the Court to exempt Carreyrou from the Court's orders affecting him directly; (2) exempt and relieve Carreyrou from the Court's order excluding and sequestering fact witnesses from attending trial; (3) exempt and relieve Carreyrou from the Court's order directing fact witnesses not to discuss their testimony with anyone except their counsel; and (4) direct any party wishing to call Carreyrou as a witness to first provide Carreyrou's counsel with: (a) a list of questions subpoenaing counsel intends to ask Carreyrou or a proffer of what testimony it hopes to elicit from Carreyrou; and (b) at least seventy-two (72) hours' notice to enable Carreyrou's counsel to bring an appropriate motion in response.

This Motion is based on this Notice, the attached Memorandum of Points and Authorities, the record in this action, and such other and further argument and evidence as the Court deems appropriate to consider.

This Motion follows an effort to confer with counsel for the parties, which conference did not result in a resolution of the matter.  Counsel for defendant Elizabeth Holmes rejected Carreyrou's counsel's request to remove Carreyrou from Holmes's witness list, or, in the alternative, to stipulate that Carreyrou should be exempt from the Court's exclusion order and gag order.  Counsel for the Government stated that it does not object to Carreyrou being present in the courtroom during testimony.

DATED:        September 30, 2021              **JASSY VICK CAROLAN LLP**


                                              _____/s/ Jean-Paul Jassy_____
                                              JEAN-PAUL JASSY
                                              Counsel for Non-Party Journalist and
                                              Proposed Intervenor
                                              JOHN CARREYROU

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION.................................................................................................1

II.   PERTINENT BACKGROUND INFORMATION ................................................2

III.  CARREYROU SHOULD BE PERMITTED TO INTERVENE FOR THE LIMITED
      PURPOSE OF CHALLENGING THE EXCLUSION ORDER AND GAG ORDER...........3

IV.   CARREYROU SHOULD BE EXEMPTED FROM THE EXCLUSION ORDER .............4

      A.   The Court May Exempt Carreyrou From the Exclusion Order...................4

      B.   Carreyrou Should Not Be Excluded From Attending Trial ........................4

           1.   Excluding Carreyrou From Attending the Trial Would Not Serve the
                Purpose of the Exclusion Order Because Carreyrou Is Not a Fact Witness ...4

           2.   Placing Carreyrou on the Witness List Was Done in Bad Faith and
                Was Designed to Harass Him, As Would Any Subpoena to Carreyrou .........5

           3.   Excluding Carreyrou Would Infringe His Rights and Privileges...................7

                a.   The Right to Attend and Report on the Trial ......................................8

                b.   The Journalist's Privilege Not to Testify ...........................................9

                     i.    The Ninth Circuit Recognizes a Qualified First Amendment
                           Reporter's Privilege...................................................................9

                     ii.   The First Amendment Privilege Applies to Carreyrou, and
                           Both His Confidential and Non-Confidential Materials ....... 11

                     iii.  Holmes Cannot Overcome the First Amendment Privilege.. 11

                     iv.   The Common Law Also Protects Carreyrou ........................ 13

                c.   Carreyrou Has the Right Not to be Discriminated Against as
                     Compared With Other Media ............................................................ 16

V.    CARREYROU SHOULD ALSO BE EXEMPTED FROM THE GAG ORDER............... 17

      A.   The Gag Order Is A Presumptively Unconstitutional Prior Restraint...................... 17

      B.   Carreyrou Should Be Exempted From the Court's Gag Order ................................ 19

           1.   Carreyrou's Speech About His Testimony Poses Neither a Clear and
                Present Danger Nor A Serious or Imminent Threat to Justice ..................... 19

2.      The Gag Order is Not Narrowly Drawn........................................................20

3.      There Are Less Restrictive Alternatives Than Gagging Carreyrou ..............20

VI.     CONCLUSION AND SUMMARY OF REQUESTED RELIEF .........................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Broad. Cos., Inc. v. Cuomo*,
 570 F.2d 1080 (2d Cir. 1977) ..................................................................................16

*Anderson v. Cryovac, Inc.*,
 805 F.3d 1 (1st Cir. 1986) ........................................................................................16

*Associated Press v. U.S. Dist. Ct.*,
 705 F.2d 1143 (9th Cir. 1983) ..................................................................................19

*Ayash v. Dana-Farber Cancer Institute*,
 822 N.E.2d 667 (Mass. 2005) ..................................................................................15

*Baker v. F&F Investment*,
 470 F.2d 778 (2d Cir. 1972) .....................................................................................14

*Belanger v. City and County of Honolulu*,
 Civ. No. 93-4047-10 (Haw. 1st Cir. Ct. May 4, 1994) ...........................................15

*Bowman Dairy Co. v. United States*,
 341 U.S. 214 (1951) ...............................................................................................7, 8

*Branzburg v. Hayes*,
 408 U.S. 665 (1972) ...........................................................................5, 9, 10, 13, 14

*Brown v. Virginia*,
 204 S.E.2d 429 (Va. 1974) .......................................................................................16

*Carroll v. President and Comm'rs of Princess Anne*,
 393 U.S. 175 (1968) ..................................................................................................20

*Clemente v. Clemente*,
 56 Va. Cir. 530 (2001) ..............................................................................................16

*Columbia Broad. Sys., Inc. v. U.S. Dist. Ct.*,
 729 F.2d 1174 (9th Cir. 1984) ..................................................................................20

*Courthouse News Serv. v. Planet*,
 947 F.3d 581 (9th Cir. 2020) ....................................................................................17

*Craig v. Harney*,
 331 U.S. 367 (1947) ..................................................................................................17

*In re Dan Farr Prods.*,
 874 F.3d 590 (9th Cir. 2017) ...............................................................................19, 20

*Eason v. Federal Broad. Co.*,
 697 So. 2d 435 (Miss. 1997) ....................................................................................15

*Elrod v. Burns*,
 427 U.S. 347 (1976) ..................................................................................................19

*Freedom Communications v. Superior Court*,
 167 Cal. App. 4th 150 (2008) ...................................................................................18

*Gannett Co. v. DePasquale,*
    443 U.S. 368 (1979) ...................................................................................................16

*Gilbert v. National Enquirer, Inc.,*
    43 Cal. App. 4th 1135 (1996)...................................................................................17

*Globe Newspaper Co. v. Superior Ct.,*
    457 U.S. 596 (1982) .................................................................................................3, 8

*Gonzales v. NBC,*
    194 F.3d 29 (2d Cir. 1999) ...........................................................................11, 14, 15

*Gore Newspapers Co. v. Reasbeck,*
    363 So.2d 609 (Fla. Ct. App. 1978) ........................................................................6, 7

*Gorenc v. Salt River Project Agric. Improvement & Power Dist.,*
    869 F.2d 503 (9th Cir. 1989).......................................................................................15

*In re Grand Jury Proceedings,*
    5 F.3d 397 (9th Cir. 1993) ...........................................................................................6

*In re Grand Jury Subpoena,*
    875 F.3d 1179 (9th Cir. 2017)...................................................................................5, 6

*In re Grand Jury Subpoena,*
    No. 38664 (Miss. 1st Cir. Ct. Oct. 4, 1989) .............................................................16

*Harbert v. Priebe,*
    466 F. Supp. 2d 1214 (N.D. Cal. 2006) ...................................................................11

*Hawkins v. Williams,*
    No. 29,054 (Miss. Cir. Ct. Hinds Co. Mar. 16, 1983)..............................................15

*Holland v. Centennial Homes, Inc.,*
    No. 92-CV-1533, 1993 WL 755590 (N.D. Tex. Dec. 21, 1993) ..............................12

*Hunt v Nat'l Broad. Co., Inc.,*
    872 F.2d 289 (9th Cir. 1998).................................................................................19, 20

*Hurvitz v. Hoefflin,*
    84 Cal. App. 4th 1232 (2000) ...................................................................................18

*Idaho v. Salsbury,*
    924 P.2d 208 (Idaho 1996) .......................................................................................15

*Jaffee v. Redmond,*
    518 U.S. 1 (1996) ................................................................................................13, 15

*In re John Doe Grand Jury Investigation,*
    574 N.E.2d 373 (Mass. 1991) ...................................................................................15

*Krase v. Graco Children Prod., Inc.,*
    79 F.3d 346 (2d Cir. 1996) .......................................................................................12

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League,*
    89 F.R.D. 489 (C.D. Cal. 1981) ..........................................................................14, 16

*Lenhart v. Thomas,*
    944 F. Supp. 525 (S.D. Tex. 1996) ..........................................................................12

*Levine v. U.S. Dist. Ct.*,
  764 F.2d 590 (9th Cir. 1985) ................................................................17, 18, 19

*Mississippi v. Hand*,
  No. CR89-49-C(T-2) (Miss. 2d Cir. Ct. July 31, 1990) ................................15, 16

*Missouri ex rel. Classic III, Inc.*,
  954 S.W.2d 650 (Mo. Ct. App. 1997) ....................................................16

*N.Y. Times Co. v. United States*,
  403 U.S. 713 (1971) ....................................................................14

*Nebraska Press Ass'n v. Stuart*,
  427 U.S. 539 (1976) ....................................................17, 18, 19, 20

*New Hampshire v. Siel*,
  444 A.2d 499 (N.H. 1982) ................................................................16

*New York v. Troiano*,
  486 N.Y.S.2d 991 (N.Y. Sup. Ct. 1985) ....................................................12

*Opinion of Justices*,
  373 A.2d 644 (N.H. 1977) ................................................................16

*Oregonian Publ'g Co. v. U.S. Dist. Ct.*,
  920 F.2d 1462 (9th Cir. 1990) ..............................................................3

*Philip Morris Co. v. ABC, Inc.*,
  36 Va. Cir. 1 (1995) ......................................................................16

*Pope v. Village Apartments, Ltd.*,
  No. 92-71-436 CV (Miss. 1st Cir. Ct. Jan. 23, 1995) ....................................15

*Richmond Newspapers, Inc. v. Virginia*,
  448 U.S. 555 (1980) ......................................................................8

*Riley v. Chester*,
  612 F.2d 708 (3d Cir. 1979) ................................................................13

*Sacramento Bee v. U.S. Dist. Ct.*,
  656 F.2d 477 (9th Cir. 1981) ................................................................4

*Shoen v. Shoen*,
  5 F.3d 1289 (9th Cir. 1993) (*Shoen I*) ................................10, 11, 12, 14, 15

*Shoen v. Shoen*,
  48 F.3d 412 (9th Cir. 1995) *(Shoen II)* ................................11, 12, 13, 14

*Siam v. Potter*,
  No. C 04-00129 MHP, 2006 WL 1530155 (N.D. Cal. June 5, 2006) ....................4

*Silkwood v. Kerr-McGee Corp.*,
  563 F.2d 433 (10th Cir. 1977) ..............................................................14

*Sinnott v. Boston Retirement Board*,
  524 N.E.2d 100 (Mass. 1988) ..............................................................15

*Tennenbaum v. Deloitte & Touche*,
  77 F.3d 337 (9th Cir. 1996) ................................................................16

*Tory v. Cochran,*
    544 U.S. 734 (2005) ............................................................................................20

*Turner Broad. Sys., Inc. v. FCC,*
    512 U.S. 622 (1994) ............................................................................................17

*U.S. v. Ahn,*
    231 F.3d 26 (D.C. Cir. 2000) .............................................................................10

*U.S. v. Bertoli,*
    854 F. Supp. 975 (D.N.J. 1994) .......................................................................4, 5

*U.S.  v. Burke,*
    700 F.2d 70 (2nd Cir 1983) ...........................................................................10, 13

*U.S.  v. Capers,*
    708 F.3d 1286 (11th Cir. 2013) .........................................................................10

*U.S. v. Carporale,*
    806 F.2d 1487 (11th Cir. 1986) ....................................................................10, 12

*U.S. v. Connolly,*
    204 F. Supp. 2d 138 (D. Mass. 2002) ...............................................................6, 7

*U.S v. Cozzetti,*
    441 F.2d 344 (9th Cir. 1971) ...........................................................................4, 5

*U.S. v. Criden,*
    633 F.2d 346 (3d Cir. 1980) ..........................................................................10, 14

*U.S. v. Cuthbertson,*
    630 F.2d 139 (3d Cir. 1980) ...............................................................10, 11, 14, 15

*U.S. v. Hobbs,*
    31 F.3d 918 (9th Cir. 1994) ...................................................................................4

*U.S. v. LaBrake,*
    No. 02-cr-319-RAL-TGW, Dkt No. 189 (M.D. Fla. Nov. 2, 2004) ...................6, 7

*U.S. v. La Rouche Campaign,*
    841 F.2d 1176 (1st Cir. 1988) ........................................................................10, 14

*U.S. v. Oropeza,*
    564 F.2d 316 (9th Cir. 1977) .................................................................................4

*U.S. v. Pretzinger,*
    542 F.2d 517 (9th Cir. 1976) ...............................................................................10

*U.S. v. Scrushy,*
    Case No. 2:03-cr-00530-KOB-TMP, Dkt. 398 (N.D. Ala. Feb. 15, 2005) ...........18

*U.S. v. Straus,*
    473 F.2d 1262 (3d Cir. 1973) ...............................................................................5

*United States v. Collins,*
    No. 11-cr-00471, 2013 WL 1089908 (N.D. Cal. Mar. 15, 2013) .........................7

*United States v. Cuthbertson,*
    651 F.2d 189 (3d Cir. 1981) ...........................................................................8, 12

*United States v. Eden*,
    659 F.2d 1376 (9th Cir. 1981) ................................................................................8

*United States v. Fields*,
    663 F.2d 880 (9th Cir. 1981) ..................................................................................8

*United States vs. Long*,
    978 F.2d 850 (4th Cir. 1992) ..................................................................................6

*United States v. Nixon*,
    418 U.S. 683 (1974) ................................................................................................8

*United States v. Sleugh*,
    896 F.3d 1007 (9th Cir. 2018) ................................................................................8

*Vermont v. St. Peter*,
    315 A.2d 254 (Vt. 1974) .......................................................................................16

*Wilson v. Superior Court*,
    13 Cal. 3d 652 (1975) ...........................................................................................17

*Winegard v. Oxberger*,
    258 N.W.2d 847 (Iowa 1977) ...............................................................................15

*In re Wright*,
    700 P.2d 40 (Idaho 1985) ......................................................................................15

*Zerilli v. Smith*,
    656 F.2d 705 (D.C. Cir. 1981) ....................................................................11, 12, 14


**U.S. Constitution**

    Article VI ..................................................................................................................8
    First Amendment .............................................1, 2, 5, 6, 7, 8, 9, 10, 11, 12, 16, 17, 19, 20, 21

**California Constitution**

    Article 1, § 2(a) .....................................................................................................17
    Article 1, § 2(b) ...............................................................................................15, 16

**Federal Rules**

    Fed. R. Criminal Procedure 17(c) ......................................................................7, 8
    Fed. R. Evid. 501 .............................................................................................13, 16
    Fed. R. Evid. 501, Adv. Comm. Note, H.R. No. 93-650 (1974) ...........................13
    Fed. R. Evid. 615 .................................................................................................1, 5
    Fed. R. Evid. 615(d) ................................................................................................8

**California State Statutes**

    Cal. Evid. Code § 1070 .........................................................................................15
    Cal. Evid. Code § 1070(a) .....................................................................................16

        MOTION TO EXEMPT J. CARREYROU FROM
WITNESS EXCLUSION AND GAG ORDER

**Other State Statutes**

16 Me. Rev. Stat. Ann. § 61 .................................................................................15

42 Pa. Cons. Stat. Ann. § 5942 ............................................................................15

735 Ill. Comp. Stat. 5/8-901, *et seq.*..................................................................15

Ala. Code § 12-21-142 .........................................................................................15

Alaska Stat. §§ 09.25.300, *et seq.* .....................................................................15

Ariz. Rev. Stat. Ann. §§ 12-2214, 12-2237 ........................................................15

Ark. Code Ann. § 16-85-510 ................................................................................15

Colo. Rev. Stat. §§ 13-90-119, 24-72.5-101, *et seq.* .........................................15

Conn. Gen. Stat. Ann. § 52-146t .........................................................................15

Del. Code. Ann. tit. 10, §§ 4320, *et seq.* ...........................................................15

D.C. Code Ann. §§ 16-4702-4704. ......................................................................15

Fla. Stat. Ann. § 90.5015......................................................................................15

Ga. Code Ann. § 24-5-508 ...................................................................................15

Ind. Code § 34-46-4-1, 34-46-4-2 .......................................................................15

Kan. Stat. Ann. §§ 60-480, *et seq.*.....................................................................15

Ky. Rev. Stat. Ann. § 421.100 .............................................................................15

La. Rev. Stat. Ann. §§ 45:1451-59 ......................................................................15

Md. Code Ann. Cts. & Jud. Proc. § 9-112 ...........................................................15

Mich. Comp. Laws § 767.5a ................................................................................15

Minn. Stat. §§ 595.021, *et seq.*..........................................................................15

Mont. Code Ann. §§ 26-1-901, *et seq.* ..............................................................15

Neb. Rev. Stat. §§ 20-144, *et seq.*.....................................................................15

Nev. Rev. Stat. Ann. § 49.275, 49.385 ................................................................15

N.C. Gen. Stat. § 8-53.11 .....................................................................................15

N.J. Stat. Ann. §§ 2A:84A21, *et seq.* ................................................................15

N.M. Stat. Ann. § 38-6-7......................................................................................15

N.Y. Civ. Rights Law § 79-h ...............................................................................15

N.D. Cent. Code § 31-01-06.2 .............................................................................15

Ohio Rev. Code. Ann. §§ 2739.04, 2739.12 ........................................................15

Okla. Stat. Ann. tit. 12, § 2506 ...........................................................................15

Or. Rev. Stat. §§ 44.510, *et seq.* .......................................................................15

R.I. Gen. Laws §§ 9-19.1-1, *et seq.* ...................................................................15

S.C. Code Ann. § 19-11-100 ................................................................................15

S.D. HB 1074 (signed Mar. 5, 2019) ...................................................................15

Tenn. Code Ann. § 24-1-208.................................................................................15

Tex. Civ. Proc. & Rem. Code §§ 22.021 *et seq.* ...............................................15

Tex. Code of Crim. Proc. Act 38.11 & 38.111 ....................................................15

Utah Rule of Evid. 509 .........................................................................................15

Wash. Rev. Code § 5.68.010 ................................................................................15

W. Va. Code § 57-3-10 .........................................................................................15

Wis. Stat. Ann. § 885.14 ......................................................................................15

**Other Authorities**

Carreyrou, John, *Bad Blood: Secrets and Lies in a Silicon Valley Startup* (Knopf 2018) .................3

Carreyrou, John, *Bad Blood: The Final Chapter* (Aug. 26, 2021),
   https://podcasts.apple.com/us/podcast/bad-blood-the-final-chapter/id1575738174) ..............3

Carreyrou, John, *Hot Startup Theranos Has Struggled With its Blood-Test Technology*, Wall St. J.,
   Oct. 16, 2015, https://www.wsj.com/articles/theranos-has-struggled-with-blood-tests-
   1444881901 ............................................................................................................................2

Carreyrou, John, Latest Articles, Wall St. J. (last visited Sept. 28, 2021),
   https://www.wsj.com/news/author/john-carreyrou ...............................................................2

Carreyrou, John, *Theranos Dials Back Lab Tests at FDA's Behest*, Wall St. J., Oct. 16, 2015,
   https://www.wsj.com/articles/hot-startup-theranos-dials-back-lab-tests-at-fdas-behest-
   1444961864 ...........................................................................................................................2

Congressional Record, Volume 120, H12253-54 (daily ed. Dec. 18, 1974) ....................................13

# I.     INTRODUCTION

John Carreyrou – a Pulitzer Prize-winning reporter, best-selling book author and podcast host – brings this motion to protect his First Amendment rights.

The Court entered an order stating, in pertinent part: "Fact witnesses shall be excluded from the courtroom during testimony.  Fact witnesses shall not discuss their testimony with anyone [except their counsel]."  Dkt. 824 at 2.  Defendant Elizabeth Holmes named Carreyrou to her witness list.  Dkt. 1003.  Taken together, the Court's order and Holmes's witness list arguably exclude Carreyrou from the courtroom during the testimony of any witnesses (the "Exclusion Order"), and preclude Carreyrou from discussing his testimony with anyone except his counsel (the "Gag Order").  Counsel for Holmes would not stipulate that Carreyrou is exempt from the Exclusion Order and the Gag Order.  Neither the Exclusion Order nor the Gag Order are constitutional as applied to Carreyrou.

The focus of Carreyrou's work over the last several years has been reporting on the activities of Theranos and its founder and former CEO Elizabeth Holmes.  He is currently hosting a popular podcast, *Bad Blood: The Final Chapter*, discussing the background of the Theranos matter (based on his extensive newsgathering and reporting) and the proceedings in the ongoing Holmes trial.  As part of that work – which is an extension of his prior work on the Theranos affair in *The Wall Street Journal* and his book, *Bad Blood* – Carreyrou intends to attend trial, hear witness testimony and analyze that testimony (including possibly his own testimony if compelled over objections) for his podcast listeners and others.  The Exclusion Order and Gag Order would prevent Carreyrou from doing that.

Federal Rule of Evidence 615 provides that witnesses may be excluded from hearing the testimony of other witnesses.  But the Court has discretion to permit exemptions from exclusion where, as here, the purpose of the rule is not met.  Carreyrou is not a percipient fact witness.  He is a reporter who has gathered and summarized information about Theranos for the public, and continues to do so.  In the course of doing his job, he drew the animus of Holmes and her co-defendant Sunny Balwani, Theranos's former President and COO.  One manifestation of that animus is that Carreyrou is the *only* reporter on Holmes's witness list, even though dozens of

1   reporters are actively covering the matter.  Holmes has not subpoenaed Carreyrou for trial, but she

2   will not stipulate to exempting him from the Exclusion Order or the Gag Order.  Other courts, when

3   faced with such a cynical ruse, have rightly rejected it in favor of reporters' First Amendment

4   interests.

5         The Exclusion Order violates Carreyrou's First Amendment rights and privileges in several

6   ways.  First, it violates his general right to attend and therefore report firsthand on the trial.  Second,

7   assuming Carreyrou is eventually subpoenaed, a subpoena would infringe on his qualified First

8   Amendment and common law privileges not to testify as to both confidential and non-confidential

9   unpublished information.  Third, it violates his right not to be discriminated against as compared to

10   other media outlets, whose reporters are not excluded from the courtroom.

11         The Gag Order is a prior restraint that violates the First Amendment.  Even if he is called to

12   testify, and does testify, Carreyrou should be able to freely discuss his testimony on the podcast he

13   hosts or anywhere else.  The Gag Order cannot survive the requisite strict scrutiny required for such

14   prior restraints on speech.

15         For these reasons, and those detailed further below, Carreyrou respectfully requests that the

16   Court exempt Carreyrou from the Exclusion Order and Gag Order and grant this Motion in full.

17   **II.       PERTINENT BACKGROUND INFORMATION**

18         In October 2015, Dow Jones published in *The Wall Street Journal* the first of many articles

19   by Carreyrou exposing potential concerns with Theranos's then-famed blood-test technology, based

20   on his own independent investigation of anonymous tips he had received.[1]  In the three years that

21   followed, Carreyrou continued to report on Theranos, authoring and co-authoring more than 40

22   articles in *The Wall Street Journal* from October 2015 to September 2018.[2]

23   _____

24   [1] *See* John Carreyrou, *Theranos Dials Back Lab Tests at FDA's Behest*, Wall St. J., Oct. 16, 2015, available at https://www.wsj.com/articles/hot-startup-theranos-dials-back-lab-tests-at-fdas-behest-

25   1444961864; John Carreyrou, *Hot Startup Theranos Has Struggled With its Blood-Test Technology*, Wall St. J., Oct. 16, 2015, available at https://www.wsj.com/articles/theranos-has-struggled-with-

26   blood-tests-1444881901.

27   [2] *See* John Carreyrou Latest Articles, Wall St. J. (last visited Sept. 28, 2021), https://www.wsj.com/news/author/john-carreyrou.

28

1    In May 2018, Alfred A. Knopf, a division of Penguin Random House LLC, published

2  Carreyrou's book-length treatment of his coverage of Theranos titled *Bad Blood: Secrets and Lies*

3  *in a Silicon Valley Startup*, based on his reporting and hundreds of interviews with more than 150

4  people, including more than sixty former Theranos employees.[3]  And just last month, in August

5  2021, Carreyrou began airing his new podcast, *Bad Blood: The Final Chapter* through Three

6  Uncanny Four LLC about Theranos, and its culmination in the criminal trials of Elizabeth Holmes

7  and Sunny Balwani.[4]  The podcast is ongoing and airs new episodes weekly, along with weekly

8  "This Week in Court" segments that report on the trial itself.[5]

9    The evidence available in this case plainly demonstrates Holmes's (and Balwani's) disdain

10  for Carreyrou.  For example, in text messages between them in April 2015 (before Carreyrou

11  published his initial articles), Holmes and Balwani discussed that "Wsj guy might show up

12  tomorrow" and schemed ways to manipulate any blood testing he might order.  Tr. Ex. 5387 B, at

13  PRH_0000175-76.  In June 2015, they discussed ways to "knock[] the legs off" Carreyrou's

14  reporting.  Dkt. 1005-4, at 3 ("so that's another leg chopped off carryrou [sic]").  Holmes later made

15  statements to her board of directors attacking Carreyrou, stating that he was on a "jihad." Dkt. 580-

16  2, at 23-24.  And Holmes and Balwani led Theranos employees in chants of, "Fuck you Carreyrou."

17  *Id.* at 60.

18  **III.    CARREYROU SHOULD BE PERMITTED TO INTERVENE FOR THE LIMITED**

19  **PURPOSE OF CHALLENGING THE EXCLUSION ORDER AND GAG ORDER.**

20    The Supreme Court and Ninth Circuit have repeatedly recognized the press's right to be

21  heard on any order that restricts access to criminal proceedings.  *See, e.g.*, *Globe Newspaper Co. v.*

22  *Superior Ct.*, 457 U.S. 596, 609 n. 25 (1982) ("representatives of the press and general public must

23  be given an opportunity to be heard on the question of their exclusion") (quotation marks omitted);

24  *Oregonian Publ'g Co. v. U.S. Dist. Ct.*, 920 F.2d 1462, 1466 (9th Cir. 1990) ("those excluded from

---

25  [3] *See* John Carreyrou, *Bad Blood: Secrets and Lies in a Silicon Valley Startup* (Knopf 2018).

26  [4] *Bad Blood: The Final Chapter* (Aug. 26, 2021), *available at*
    https://podcasts.apple.com/us/podcast/bad-blood-the-final-chapter/id1575738174.

27  [5] *See id.*

28

1   the proceeding must be afforded a reasonable opportunity to state their objections"); *Sacramento*

2   *Bee v. U.S. Dist. Ct.*, 656 F.2d 477, 480 (9th Cir. 1981) (concluding newspaper had standing

3   "because it was excluded from a criminal trial and was inhibited from reporting news"); *see also*

4   Dkt. 965 (order permitting Dow Jones to intervene to access records).  Carreyrou therefore has

5   standing to intervene and be heard with respect to the Court's order excluding him from the

6   courtroom and limiting his reporting on this case.

7   **IV.     CARREYROU SHOULD BE EXEMPTED FROM THE EXCLUSION ORDER.**

8   **A.  The Court May Exempt Carreyrou From the Exclusion Order.**

9   This Court has discretion in ordering the sequestration or exclusion of witnesses from trial.

10  *U.S. v. Oropeza*, 564 F.2d 316, 326 (9th Cir. 1977).  For example, "[t]he decision to exempt

11  particular witnesses from an exclusion order … is within the discretion of the court."  *Siam v.*

12  *Potter*, No. C 04-00129 MHP, 2006 WL 1530155, at *5 (N.D. Cal. June 5, 2006).

13  **B.  Carreyrou Should Not Be Excluded From Attending Trial.**

14  Holmes identified Carreyrou as a potential witness, Dkt. 1003, but has not served Carreyrou

15  with a trial subpoena.  There is no basis for Holmes to seek to exclude Carreyrou from trial if she

16  has no real intention of calling him as a witness at trial.  And there is no reason to exclude

17  Carreyrou if he will not actually testify.  However, even if Carreyrou were subpoenaed and called to

18  testify, there are several reasons the Court still should exempt Carreyrou from the Exclusion Order.

19  **1.  Excluding Carreyrou From Attending the Trial Would Not Serve the**

20  **Purpose of the Exclusion Order Because Carreyrou Is Not a Fact Witness.**

21  The purpose of exclusion or sequestration of witnesses is "to prevent the shaping of

22  testimony by witnesses to match that given by other witnesses."  *U.S v. Cozzetti*, 441 F.2d 344, 350

23  (9th Cir. 1971).  "This process serves both to reduce the danger that a witness's testimony will be

24  influenced by hearing the testimony of other witnesses, and to increase the likelihood that the

25  witness's testimony will be based on her own recollections."  *U.S. v. Hobbs*, 31 F.3d 918, 921 (9th

26  Cir. 1994).  However, witnesses who offer testimony summarizing records "need *not* be

27  sequestered."  *U.S. v. Bertoli*, 854 F. Supp. 975, 1038 (D.N.J. 1994) (emphasis in original), *aff'd in*

28  *part, vacated in part on other grounds,* 40 F.3d 1384 (3d Cir. 1994).  "Like experts, summary

witnesses do not testify to the facts of the case, but rather testify 'based on the testimony of others.'"  *Id*.  And where a witness's "testimony relate[s] only the summary of records and [does] not depend upon any prior testimony, even the rationale for sequestration [is] absent[.]"  *U.S. v. Straus*, 473 F.2d 1262, 1263 (3d Cir. 1973) (cleaned up; citing Ninth Circuit's for purpose of sequestration in *Cozzetti*).

Carreyrou's is that of a journalist – investigating, interviewing, gathering information, and reporting.  He accumulates information and provides it to the public in a summarized, comprehensible way.  John Carreyrou is not a percipient fact witness, and the Exclusion Order only applies to "[f]act witnesses."  Dkt. 824 at 2.  He did not work at, invest in, or serve on the Board of Theranos; nor was he a government agent tasked with investigating Theranos.  Aside from being harassed and threatened for his journalistic efforts, he is not an alleged victim of Theranos, Holmes or Balwani.  He would only ever testify as to published information so there is no risk that he will shape his testimony to that of other witnesses.  He is, at most, akin to a witness who summarizes the experiences and records of others.  The rationale for excluding Carreyrou is entirely absent, and Rule 615's purpose is not vindicated by Carreyrou's exclusion.

## 2.   Placing Carreyrou on the Witness List Was Done in Bad Faith and Was Designed to Harass Him, As Would Any Subpoena to Carreyrou.

Bearing in mind the animus Holmes harbors toward Carreyrou and the important role Carreyrou played in exposing Theranos, Holmes and Balwani, it is not surprising that Holmes would put Carreyrou on her witness list in an effort to exclude him from attending trial and stymie his ongoing reporting.  Any future subpoena to Carreyrou would further elevate the harassment, and would also infringe on Carreyrou's First Amendment rights and privileges as discussed in greater detail below.

The Supreme Court and Ninth Circuit recognize that subpoenas issued to reporters in bad faith or for purposes of harassment are not to be tolerated.  *See, e.g.*, *Branzburg v. Hayes*, 408 U.S. 665, 707-08 (1972) ("Official harassment of the press … would have no justification."); *id.* at 709-10 (Powell, J., concurring) ("[N]o harassment of newsmen will be tolerated."); *In re Grand Jury*

1   *Subpoena*, 875 F.3d 1179, 1189-92 (9th Cir. 2017) (same); *In re Grand Jury Proceedings*, 5 F.3d

2   397, 400 (9th Cir. 1993) (same).

3       An appellate court rejected a similar tactic to Holmes's in *Gore Newspapers Co. v.*

4   *Reasbeck*, 363 So.2d 609 (Fla. Ct. App. 1978), calling it a "charade [that] was simply a ruse by

5   counsel for the defendant to exclude the press." *Id.* at 610.  The appellate court held that the trial

6   court abused its discretion when it refused to exempt reporters from an exclusion order after defense

7   counsel asked that the reporters be sequestered. *Id.*  The court further cautioned that, "[u]nless the

8   tactics used here to close the courtroom to the public and the press are condemned, they could fall

9   into common usage by counsel who wish their case to be tried in a non-public setting." *Id.*[6]

10      More to the point of using subpoenas to exclude particular members of the press, Judge

11  Wilkinson of the Fourth Circuit recognized the special dangers posed by listing reporters as

12  witnesses: "[U]sing the power of a subpoena to remove reporters with a special background on a

13  story is a troubling matter.  It will not enhance the public's understanding of events, and it may

14  restrain the flow of information in a way that ordinary subpoenas do not." *United States vs. Long*,

15  978 F.2d 850, 854-55 (4th Cir. 1992) (Wilkinson, J., concurring).

16      The concern does not diminish where a court determines that reporters are "not adversarial

17  witnesses," but are nonetheless singled out for exclusion. *U.S. v. Connolly*, 204 F. Supp. 2d 138,

18  138 (D. Mass. 2002).  In *Connolly*, the district court granted a motion to excuse and exempt two

19  reporters from a witness sequestration order. *Id.*  The court recognized the "salutary effect of

20  permitting them to meet their important First Amendment responsibility of keeping the public

21  informed as to the events taking place in open court." *Id.*  The court "adopt[ed]" the briefing from

22  counsel, which explained that: the reporters intended to report on the trial; the reporters had

23  experience reporting on the underlying "subject matter of the case;" the reporters intended to move

24  to quash trial subpoenas "on the grounds that neither party can satisfy the constitutional burdens

25

---

26  [6] Similarly, a federal court in Florida granted a motion to exempt reporters from an exclusion order
    where, like here, the reporters had been named on the defense's witness list, but had not been
27  subpoenaed. *U.S. v. LaBrake*, No. 02-cr-319-RAL-TGW, Dkt No. 189 (M.D. Fla. Nov. 2, 2004);
    *see also id.*, Dkt. 186 (motion providing more context).

28

imposed on those who seek to compel the testimony of newspersons;" it was unlikely the reporters would be called at trial, and, even if they testified for some limited purpose, they still should be relieved from the sequestration order because neither of the reporters "was a party or witness to any criminal activity" and their "qualifications as witnesses apparently arise from accurately reporting news to the public;" and the "combined effect of the subpoenas (the enforceability of which [had] not yet been ruled upon by the Court) and the sequestration order would violate the reporters' First Amendment rights if applied to them." *Id.* at 138-39.  As such, "the public interest in these reporters being able to cover [the] proceeding far outweighs any conceivable interest in excluding them from the trial of this case." *Id.* at 140.  The court permitted the reporters to remain at trial, and ordered subpoenaing counsel to give the court 48 hours' notice before calling the reporters to testify so that the court could consider the reporters' previously filed motions to quash, or for a protective order, as to the subpoenas. *Id.* at 138.

Holmes's placement of Carreyrou on her witness list is a ruse, akin to that rejected in *Reasbeck*, *LaBrake* and *Connolly*.  Carreyrou has not been subpoenaed, and it remains entirely unclear whether or why Holmes would actually want to call Carreyrou to the stand.  There is a public interest in Carreyrou's reporting on his podcast, which is very popular, and it should not be stymied because of any maneuvers by Holmes.   Holmes's tactic is an extension of a bad faith desire to harass Carreyrou and infringe on his First Amendment rights and privileges.

### 3.  Excluding Carreyrou Would Infringe His Rights and Privileges.

Because Carreyrou has not been subpoenaed, there is, perforce, zero basis to exclude him from the courtroom during trial.  Being placed on a witness list does not a witness make.  But even if Carreyrou were subpoenaed, such a subpoena should not serve as a basis to exclude him from the courtroom.[7]  Carreyrou has First Amendment rights to be present and report on the trial.  And, as a

---

[7] If Carreyrou is subpoenaed and/or called to testify, he reserves all objections, and reserves the right to move to quash the subpoena, or, in the alternative, for a protective order.  Additionally, if the subpoena includes document demands, Carreyrou reserves the right to object pursuant to Federal Rule of Criminal Procedure 17(c).  Rule 17(c) "is narrow in scope."  *United States v. Collins*, No. 11-cr-00471, 2013 WL 1089908 at *1 (N.D. Cal. Mar. 15, 2013).  The rule was designed "'to expedite trial' by giving a defendant the right to inspect items possessed by the government, including items provided to the government by third parties."  *Id.* (quoting *Bowman*

1    journalist, Carreyrou enjoys First Amendment and common law privileges not to testify that should

2    be considered before he is excluded from the courtroom as a potential witness.  If he cannot be

3    compelled to testify, or at least have his testimony limited to published information, then there is no

4    need or basis to exclude him.  Finally, Carreyrou has a First Amendment right not to be treated

5    differently than so many other reporters who are currently allowed to stay in the courtroom and

6    report on the trial.

7                                **a.   The Right to Attend and Report on the Trial.**

8            The Supreme Court has long recognized that the press and public enjoy a First Amendment

9    "right of access to criminal trials."  *Globe Newspaper Co.*, 457 U.S. at 604-05 (emphasis removed).

10   Steeped in Anglo-American jurisprudence is the principle that "throughout its evolution, the trial

11   has been open to all who cared to observe," as criminal trials are "presumptively open."  *Richmond*

12   *Newspapers, Inc. v. Virginia*, 448 U.S. 555, 564, 575 (1980).  Indeed, a trial courtroom is "a public

13   place where the people generally – and representatives of the media – have a right to be present."

14   *Id.* at 578.[8]

15          Carreyrou does not suggest that the Court has entirely shut down or closed the trial in this

16   action.  Far from it; the Court has made efforts to ensure general access.  But, unless he is

17   exempted, Carreyrou will be the ***only member of the news media*** especially barred from attending

18   the trial and reporting firsthand on its proceedings, and all because the defense put him on a witness

19

20   *Dairy Co. v. United States*, 341 U.S. 214 (1951)).  Given Rule 17(c)'s limited purpose, "[t]he
     Supreme Court has made it clear that a party seeking production of materials under a Rule 17(c)

21   subpoena must demonstrate to the court '(1) relevancy; (2) admissibility; [and] (3) specificity.'"
     *United States v. Sleugh*, 896 F.3d 1007, 1012 (9th Cir. 2018) (quoting *United States v. Nixon*, 418

22   U.S. 683, 700 (1974)).  If a subpoena is overly broad or has the indicia of a "wild goose chase" it
     should be stricken.  *United States v. Cuthbertson*, 651 F.2d 189, 192 (3d Cir. 1981).  Moreover, the

23   issuing party cannot rely on "mere conclusory statements" to meet his burden.  *United States v.*
     *Eden*, 659 F.2d 1376, 1381 (9th Cir. 1981).  And a subpoena may not be used to gather evidence

24   simply for possible impeachment.  *United States v. Fields*, 663 F.2d 880, 881 (9th Cir. 1981).

25   [8] Moreover, Federal Rule of Evidence 615(d) grants an exception for persons "authorized by statute
     to be present."  As discussed throughout, Carreyrou has a First Amendment right under the U.S.

26   Constitution to attend this trial. Because the Constitution carries greater force than any statute, *see,*
     *e.g.*, U.S. Const. art. VI ("This Constitution … shall be the supreme law of the land"), the Court

27   would also be justified in exercising its discretion to conclude that Carreyrou fits within this section.

28

1  list.  Carreyrou's right to attend the trial and report on its proceedings will be infringed if he is not

2  exempted from the Exclusion Order.

### b.  The Journalist's Privilege Not to Testify.

4          Carreyrou should only be subject to the Exclusion Order if he will actually be a witness.

5  Thus far, however, he has not been subpoenaed.  Even if he were subpoenaed, Carreyrou would

6  seek to quash such subpoena, or at least secure a protective order limiting his testimony, based on

7  the First Amendment and common law reporter's privileges.  Carreyrou should not be excluded

8  from attending the trial just because Holmes listed him as a witness, particularly because there is

9  little chance he will actually serve as a witness – even if subpoenaed – given the protections

10  afforded him under the First Amendment and common law.

### i.  The Ninth Circuit Recognizes a Qualified First Amendment Reporter's Privilege.

13          Nearly a half century ago, the Supreme Court in *Branzburg* expressly recognized that

14  newsgathering activities qualify for First Amendment protection: "Without some protection for

15  seeking out the news, freedom of the press could be eviscerated."  408 U.S. at 681.[9]  Justice Powell,

16  whose concurring opinion made him the majority's fifth member in *Branzburg*, explained the

17  limitations of the majority's holding: "The Court does not hold that newsmen, subpoenaed to testify

18  before a grand jury, are without constitutional rights with respect to the gathering of news or in

19  safeguarding their sources."  *Id.* at 709 (Powell, J., concurring).  Justice Powell further stated "if a

20  newsman is called upon to give information bearing only a remote and tenuous relationship to the

21  subject of the investigation, or if he has some other reason to believe that his testimony implicates

22  confidential source relationship without a legitimate need of law enforcement, he will have access

23  to the court."  *Id.* at 710.

---

[9] In the specific context of the grand jury subpoenas before it, a five-to-four majority of the Court held that reporters who observe a crime or who were aware of criminal conduct on the part of a source were compelled to respond to grand jury subpoenas and answer relevant questions.  *Id.* at 708.  The majority carefully circumscribed its holding: "[g]rand juries are subject to judicial control and subpoenas to motions to quash.  We do not expect courts will forget that grand juries must operate within the limits of the First Amendment."  *Id.*

---

MOTION TO EXEMPT J. CARREYROU FROM
                                        WITNESS EXCLUSION AND GAG ORDER

1    The Ninth Circuit has held that *Branzburg* established a constitutionally based qualified

2  privilege for journalists to resist the disclosure of information gathered or obtained during the course

3  of newsgathering activities: "Rooted in the First Amendment, the privilege is a recognition that

4  society's interest in protecting the integrity of the newsgathering process, and in ensuring the free

5  flow of information to the public, is an interest 'of sufficient social importance to justify some

6  incidental sacrifice of sources of facts needed in the administration of justice." *Shoen v. Shoen*

7  ("*Shoen I*"), 5 F.3d 1289, 1292 (9th Cir. 1993) (internal citations omitted); *see also U.S. v.*

8  *Pretzinger*, 542 F.2d 517, 520-21 (9th Cir. 1976) (affirming decision not to compel reporter to

9  disclose source in criminal case, holding that, a "district judge must balance the interest of

10  confidentiality of news sources against the needs of the criminal justice system to know the identity

11  of the source").[10]

12    In holding that the qualified privilege attached to subpoenaed, unpublished, non-confidential

13  information obtained by a book author, the Ninth Circuit stated: "the journalist's privilege

14  recognized in *Branzburg* [is] a partial First Amendment shield that protects journalists against

15  compelled disclosure in all judicial proceedings, civil and criminal alike." *Shoen I*, 5 F.3d at 1292.[11]

16

17  ─────────────────

18  [10] Most federal circuit courts considering the issue interpret *Branzburg* to confer a qualified privilege for journalists to resist compelled disclosure in criminal cases not involving testimony before grand juries. *See U.S. v. La Rouche Campaign*, 841 F.2d 1176, 1182 (1st Cir. 1988); *U.S. v. Burke*, 700 F.2d 70, 77 (2nd Cir 1983); *U.S. v. Cuthbertson*, 630 F.2d 139, 147 (3d Cir. 1980); *U.S. v. Ahn*, 231 F.3d 26, 37 (D.C. Cir. 2000); *U.S. v. Criden*, 633 F.2d 346 (3d Cir. 1980); *Shoen I*, 5 F.3d at 1292; *U.S. v. Capers*, 708 F.3d 1286, 1303 (11th Cir. 2013); *U.S. v. Caporale*, 806 F.2d 1487 (11th Cir. 1986).

22  [11] As the Third Circuit held:

23    [T]he interests of the press that form the foundation for the privilege are not diminished because of the nature of the underlying proceedings out of which the request for the information arises is a criminal trial. [The journalist's] interest in protecting confidential sources, preventing the intrusion into the editorial process, and avoiding the possibility of self-censorship created by compelled disclosure of sources and unpublished notes does not change because a case is civil or criminal.

26  *Cuthbertson*, 630 F.2d at 147; *see also Burke*, 700 F.2d at 77 ("We see no legally-principled reason for drawing a distinction between civil and criminal cases when considering whether the reporter's interest in confidentiality should yield to the moving party's need for probative evidence").

28

─────────────────
MOTION TO EXEMPT J. CARREYROU FROM
                                                                   WITNESS EXCLUSION AND GAG ORDER

1   This privilege reflects "the preferred position of the First Amendment and the importance of a

2   vigorous press." *Zerilli v. Smith*, 656 F.2d 705, 712 (D.C. Cir. 1981).

3                    **ii.   The First Amendment Privilege Applies to Carreyrou, and**

4                          **Both His Confidential and Non-Confidential Materials.**

5          The Ninth Circuit explained that the privilege "is designed to protect investigative reporting,

6   regardless of the medium used to report the news to the public … What makes journalism is not its

7   format but its content." *Shoen I*, 5 F.3d at 1293.  Consequently, the journalist's privilege may be

8   invoked whenever material is being gathered for dissemination to the public.  *Id.*  "The test … is

9   whether the person seeking to invoke the privilege had 'the intent to use material – sought, gathered

10  or received – to disseminate information to the public and [whether] such intent existed at the

11  inception of the newsgathering process." *Id.*  Moreover, the Ninth Circuit, like most federal courts

12  that have addressed the issue, also holds that the privilege protects both confidential *and* non-

13  confidential material.  *Shoen I*, 5 F.3d at 1295; *Shoen v. Shoen* ("*Shoen II*"), 48 F.3d 412, 414 (9th

14  Cir. 1995); *Cuthbertson*, 630 F.2d at 147; *Gonzales v. NBC*, 194 F.3d 29, 35 (2d Cir. 1999).

15         Carreyrou has reported on the Theranos matter in many capacities – as a newspaper reporter,

16  book author and now a podcast host.  In each capacity, Carreyrou was gathering information for

17  dissemination to the public.  As such, he qualifies for protection from disclosing unpublished

18  confidential *and* non-confidential information under the Ninth Circuit's qualified First Amendment

19  privilege.  *Shoen I*, 5 F.3d at 1293.

20                    **iii.   Holmes Cannot Overcome the First Amendment Privilege.**

21         In the Ninth Circuit, disclosure of confidential information or non-confidential unpublished

22  information may be compelled "only upon a showing that the requested material is: (1) unavailable

23  despite exhaustion of all reasonable alternative sources; (2) non-cumulative; and (3) clearly relevant

24  to an important issue in the case." *Shoen II*, 48 F.3d at 416.  *Shoen II* also requires that the party

25  seeking to overcome the privilege "must [make] a showing of actual relevance; a showing of

26  potential relevance will not suffice." *Id.*  The three-part constitutional test under *Shoen II* is

27  necessarily a "high hurdle against compelled disclosure from third party journalists." *Harbert v.*

28  *Priebe*, 466 F. Supp. 2d 1214 (N.D. Cal. 2006).

1        Here, Holmes would not be able to satisfy any of the requirements established by the Ninth

2   Circuit in *Shoen II*, let alone all three.  First, Carreyrou was not a direct, percipient fact witness to

3   any of the happenings at Theranos or its labs, board meetings, investor pitches, etc.  Thus, there

4   would be *nothing but* alternative sources of information – all of which would need to be fully

5   exhausted before Carreyrou could be called to testify.[12]  Second, Holmes could not demonstrate that

6   Carreyrou's testimony is not cumulative.  Cumulative information cannot reach the level of

7   significance required to overcome the privilege.  *Shoen II*, 48 F.3d at 416; *Burke*, 700 F.2d at 78

8   (subpoena quashed because information sought by criminal defendant "would be merely cumulative

9   and would not defeat [the] First Amendment privilege").  Third, Holmes will not be able to show

10  that the information sought is "*clearly relevant* to an important issue" in her case.  *Shoen II*, 48 F.3d

11  at 416 (emphasis added); *Burke*, 700 F.2d at 77 (holding that First Amendment-privileged materials

12  are not subject to disclosure because criminal defendant failed to make a "clear and specific

13  showing that [subpoenaed] documents were necessary or critical to the maintenance of his

14  defense").[13]  As explained in *Shoen II*, the party seeking to overcome the privilege "must [make] a

15  showing of actual relevance; a showing of potential relevance will not suffice."  48 F.3d at 416.  It

16  is not sufficient that the information sought would be "useful."  *Krase v. Graco Children Prod.,*

17  *Inc.*, 79 F.3d 346, 351 (2d Cir. 1996).  Instead, "there must be a finding that the claim for which the

18  information is to be used "virtually rises or falls" on the admission of the materials.  *Id.*[14]  Any

---

[12] The exhaustion requirement applies despite fear that "the investigation may be time consuming, costly, and unproductive."  *Lenhart v. Thomas*, 944 F. Supp. 525, 530 (S.D. Tex. 1996); *see also Shoen I*, 5 F.3d at 1296; *Zerilli*, 656 F.2d at 713.

[13] *See also Caporale*, 806 F.2d at 1504 (holding in criminal case that party issuing subpoena for privileged information must show that material is "highly relevant" and "necessary to the proper presentation of the case"); *Cuthbertson*, 651 F.2d at 196 (holding that criminal defendant must prove that information is "crucial to the claim"); *Zerilli*, 656 F.2d at 713 (holding that material sought must "go to the 'heart of the matter'" and be "crucial to the case").

[14] For example, courts reject subpoenas to journalists designed to elicit impeachment evidence.  *See Holland v. Centennial Homes, Inc.*, No. 92-CV-1533, 1993 WL 755590, at *6 (N.D. Tex. Dec. 21, 1993) ("Discovery of the private work product of a reporter should not be compelled upon the mere speculation of possible impeaching material alone, especially in a civil case where the reporter is neither a party nor a witness to the facts upon which the lawsuit is based"); *New York v. Troiano*, 486 N.Y.S.2d 991, 996 (N.Y. Sup. Ct. 1985) (asserted need for cross-examination material

---

1    subpoena to Holmes would be indefensible under the Ninth Circuit's test in *Shoen II*.  Thus,

2    Carreyrou is not justifiably on the witness list, should not be compelled to testify, and should not be

3    excluded from attending trial.

4                   **iv.   The Common Law Also Protects Carreyrou.**

5          While the Ninth Circuit has recognized the qualified privilege as constitutionally based,

6    federal common law independently supports a journalist's privilege.  This privilege arises under

7    Federal Rule of Evidence Rule 501, which was adopted after *Branzburg* and provides in relevant

8    part that "privilege(s) … shall be governed by the principles of the common law as they may be

9    interpreted by the courts of the United States in the light of reason and experience."  Fed. R. Evid.

10   501.  The House Report accompanying the 1975 adoption of Rule 501 explained that the federal

11   common law of privileges is "to be developed by the courts of the United States under a uniform

12   standard applicable both in civil and criminal cases."  Fed. R. Evid. 501, Adv. Comm. Note, H.R.

13   No. 93-650 (1974).

14         In *Jaffee v. Redmond,* 518 U.S. 1 (1996), the United States Supreme Court established the

15   framework for evaluating privileges under the federal common law.  As a guide to interpreting

16   Rule 501, the Court referred to the "oft-repeated observation that 'the common law is not

17   immutable but flexible, and by its own principles adapts itself to varying conditions.'"  *Id.* at 8.[15]

18   The Second Circuit held that, "[a]bsent a federal statute to provide specific instructions, courts

19

20   inadequate to overcome privilege because not critical; applying federal and state journalist's
     privilege).  Even in criminal cases, and even when the information is non-confidential, the need for
21   privileged newsgathering information for purposes of impeachment generally is not sufficient to
     overcome the qualified privilege.  *See, e.g., Burke,* 700 F.2d at 78.

22   [15] The legislative history of Rule 501 – dating back more than 45 years – anticipated that the law of
23   privilege would evolve to recognize a journalist's privilege.  For example, Representative Hungate,
     Chair of the House Judiciary Subcommittee on Criminal Justice and principal draftsman of
24   Rule 501, believed that the rule "permits the courts to develop a privilege for newspaperpeople on a
     case-by-case basis," and made clear that "[t]he language cannot be interpreted as a congressional
25   expression in favor of having no such privilege, nor can the conference action be interpreted as
     denying to newspaperpeople any protection they may have from State newsperson's privilege laws."
26   120 Cong. Rec. H12253-54 (daily ed. Dec. 18, 1974).  *See also Riley v. Chester,* 612 F.2d 708, 714
     (3d Cir. 1979) (legislative history of Rule 501 "manifests that its flexible language was designed to
27   encompass, *inter alia,* a reporter's privilege not to disclose a source").

28

---

1   which must attempt to devine the contours of non-statutory federal law governing the compelled

2   disclosure of confidential journalistic sources must rely on both judicial precedent and well

3   informed judgment as to the proper federal public policy to be followed in each case." *Baker v.*

4   *F&F Investment*, 470 F.2d 778, 781 (2d Cir. 1972).

5          Most circuit courts to address the issue post-*Branzburg* recognize some form of a qualified

6   journalist's privilege in criminal proceedings. *See* Sec. IV.B.3.b.i, *supra*. Moreover, several circuit

7   courts and district courts since *Branzburg* have expressly recognized an independently based,

8   federal common law qualified journalist's privilege. *See, e.g.*, *Baker*, 470 F.2d at 783; *Cuthbertson*,

9   630 F.2d at 147; *Criden*, 633 F.2d at 356; *Silkwood v. Kerr-McGee Corp.*, 563 F.2d 433, 437 (10th

10  Cir. 1977); *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 89 F.R.D. 489, 492-493 (C.D.

11  Cal. 1981).

12         The public interest is unquestionably advanced by recognition of such a common law

13  privilege. Courts repeatedly have recognized that subpoenas to non-party journalists pose a

14  pernicious threat to freedom of the press. Indeed, "news gathering is ***essential*** to a free press":

15  
16                 'The press was protected so that it could bare the secrets of
                    government and inform the people.' Without an unfettered press,
17                 citizens would be far less able to make informed political, social,
                    and economic choices. But the press' function as a vital source of
18                 information is weakened ***whenever the ability of journalists to
                    gather news is impaired***.

19  *Zerilli*, 656 F.2d at 711 (emphasis added) (quoting *N.Y. Times Co. v. United States*, 403 U.S. 713,

20  717 (1971) (Black, J., concurring)).

21         These public policy concerns apply to the compelled disclosure of underlying resource

22  materials. *Shoen II*, 48 F.3d at 416; *Shoen I*, 5 F.3d at 1294-95 (identifying a number of harms,

23  including the risk of appearing as a "research tool" of litigating parties); *La Rouche*, 841 F.2d at

24  1182 ("We discern a lurking and subtle threat to journalists and their employers if disclosure of

25  outtakes, notes, and other unused information, even if nonconfidential, becomes routine and

26  casually, if not cavalierly, compelled"). This is due in part to the fact that "court-enforced access to

27  journalistic resources would risk the symbolic harm of making journalists appear to be an

28  investigative arm of the judicial system, the government, or private parties." *Gonzales*, 194 F.3d at

35.  The Ninth Circuit has also recognized the substantial burden that compliance with subpoenas can impose on reporters, noting that "frequency of subpoenas would not only preempt the otherwise productive time of journalist and other employees but measurably increase expenditures for legal fees." *Shoen I*, 5 F.3d at 1295 (citation omitted); *see also Cuthbertson*, 630 F.2d at 147 ("the compelled production of a reporter's resource materials can constitute a significant intrusion into the newsgathering and editorial processes").

The Ninth Circuit also has recognized that federal courts should look to state law for guidance when a state has directly addressed the issue.  *Gorenc v. Salt River Project Agric. Improvement & Power Dist.*, 869 F.2d 503, 505 (9th Cir. 1989); *see also Jaffee*, 518 U.S. at 12-13 (same).  There is widespread consensus among the States regarding the existence and value of a journalist's privilege.  Forty states (including California), as well as the District of Columbia, have codified the reporter's privilege.[16]  Courts in nine additional states have recognized the journalist's privilege in at least some context in case law.[17]  Wyoming is the only State that has not weighed in.

---

[16] *See* Ala. Code § 12-21-142; Alaska Stat. §§ 09.25.300, *et seq.*; Ariz. Rev. Stat. Ann. §§ 12-2214, 12-2237; Ark. Code Ann. § 16-85-510; Cal. Const. art. I, § 2(b); Cal. Evid. Code § 1070; Colo. Rev. Stat. §§ 13-90-119, 24-72.5-101, *et seq.*; Conn. Gen. Stat. Ann. § 52-146t; Del. Code. Ann. tit. 10, §§ 4320, *et seq.*; D.C. Code Ann. §§ 16-4702-4704; Fla. Stat. Ann. § 90.5015; Ga. Code Ann. § 24-5-508; 735 Ill. Comp. Stat. 5/8-901, *et seq.*; Ind. Code § 34-46-4-1, 34-46-4-2; Kan. Stat. Ann. §§ 60-480, *et seq.*; Ky. Rev. Stat. Ann. § 421.100; La. Rev. Stat. Ann. §§ 45:1451-59; 16 Me. Rev. Stat. Ann. § 61; Md. Code Ann. Cts. & Jud. Proc. § 9-112; Mich. Comp. Laws § 767.5a; Minn. Stat. §§ 595.021, *et seq.*; Mont. Code Ann. §§ 26-1-901, *et seq.*; Neb. Rev. Stat. §§ 20-144, *et seq.*; Nev. Rev. Stat. Ann. § 49.275, 49.385; N.J. Stat. Ann. §§ 2A:84A21, *et seq.*; N.M. Stat. Ann. § 38-6-7; N.Y. Civ. Rights Law § 79-h; N.C. Gen. Stat. § 8-53.11; N.D. Cent. Code § 31-01-06.2; Ohio Rev. Code. Ann. §§ 2739.04, 2739.12; Okla. Stat. Ann. tit. 12, § 2506; Or. Rev. Stat. §§ 44.510, *et seq.*; 42 Pa. Cons. Stat. Ann. § 5942; R.I. Gen. Laws §§ 9-19.1-1, *et seq.*; S.C. Code Ann. § 19-11-100; S.D. HB 1074 (signed Mar. 5, 2019); Tenn. Code Ann. § 24-1-208; Tex. Civ. Proc. & Rem. Code §§ 22.021 *et seq.*; Tex. Code of Crim. Proc. Act 38.11 & 38.111; Utah Rule of Evid. 509; Wash. Rev. Code § 5.68.010; W. Va. Code § 57-3-10; Wis. Stat. Ann. § 885.14.

[17] *See Belanger v.  City and County of Honolulu*, Civ. No. 93-4047-10 (Haw. 1st Cir. Ct. May 4, 1994) (unpublished) (civil); *Idaho v. Salsbury*, 924 P.2d 208 (Idaho 1996) (criminal); *In re Wright*, 700 P.2d 40 (Idaho 1985) (criminal); *Winegard v. Oxberger*, 258 N.W.2d 847 (Iowa 1977) (civil); *In re John Doe Grand Jury Investigation*, 574 N.E.2d 373 (Mass. 1991) (grand jury); *Sinnott v. Boston Retirement Board*, 524 N.E.2d 100 (Mass. 1988) (civil); *Ayash v. Dana-Farber Cancer Institute*, 822 N.E.2d 667 (Mass. 2005) (civil); *Eason v. Federal Broad. Co.*, 697 So. 2d 435, 437 (Miss. 1997); *Hawkins v. Williams*, No. 29,054 (Miss. Cir. Ct. Hinds Co. Mar. 16, 1983) (unpublished opinion) (based on Miss. Const.); *Pope v. Village Apartments, Ltd.*, No. 92-71-436 CV (Miss. 1st Cir. Ct. Jan. 23, 1995) (unpublished opinion) (Gibbs, J.) (civil); *Mississippi v. Hand*,

---

-15-                     MOTION TO EXEMPT J. CARREYROU FROM
                                                                    WITNESS EXCLUSION AND GAG ORDER

1       The federal common law, as well as an examination of state law, makes clear that the

2   reporter's privilege is in the public interest, it is robust, and any contemplated subpoena from

3   Holmes cannot overcome that privilege.[18]

4                                    *        *        *

5       The qualified First Amendment reporters privilege and the common law will be significant –

6   and insurmountable – hurdles to Holmes's ability to subpoena Carreyrou to testify in her trial even

7   if she wanted to.  As a result, Carreyrou is not an appropriate fact witness in this trial and should not

8   be excluded from the courtroom.

9                   **c.   Carreyrou Has the Right Not to be Discriminated Against as**

10                          **Compared With Other Media.**

11      Once the "government has opened its doors," members of the press must have "equal

12  access."  *Gannett Co. v. DePasquale*, 443 U.S. 368, 405 (1979) (Rehnquist, J., concurring) (cleaned

13  up); *see also Anderson v. Cryovac, Inc.*, 805 F.3d 1, 9 (1st Cir. 1986) ("A court may not selectively

14  exclude news media from access to information otherwise made available for public dissemination

15  … Such a practice is unquestionably at odds with the First Amendment"); *American Broad. Cos.,

16  Inc. v. Cuomo*, 570 F.2d 1080, 1083 (2d Cir. 1977) ("once there is a public function, public

17  

18  No. CR89-49-C(T-2) (Miss. 2d Cir. Ct. July 31, 1990) (unpublished opinion) (criminal); *In re
    Grand Jury Subpoena,* No. 38664 (Miss. 1st Cir. Ct. Oct. 4, 1989) (unpublished opinion) (grand

19  jury); *Missouri ex rel. Classic III, Inc.*, 954 S.W.2d 650 (Mo. Ct. App. 1997) (civil); *New
    Hampshire v. Siel*, 444 A.2d 499 (N.H. 1982) (criminal); *Opinion of Justices*, 373 A.2d 644 (N.H.

20  1977 (civil statutory proceeding); *Vermont v. St. Peter*, 315 A.2d 254 (Vt. 1974) (criminal); *Brown
    v. Virginia*, 204 S.E.2d 429 (Va. 1974) (criminal); *Clemente v. Clemente*, 56 Va. Cir. 530 (2001)

21  (civil); *Philip Morris Co. v. ABC, Inc.*, 36 Va. Cir. 1 (1995) (civil).

22  [18] This Court may also look to California law in analyzing the privilege claim.  *See Tennenbaum v.

23  Deloitte & Touche*, 77 F.3d 337, 340 (9th Cir. 1996) (holding, in federal question case involving
    attorney-client privilege, that court would look first to federal common law, but that "we may also

24  look to state privilege law … if it is enlightening"); *see also L.A. Mem'l Coliseum Comm'n*, 89
    F.R.D. at 492 ("in 'molding federal privileges under the common law development approach of

25  Rule 501,' [federal courts] have traditionally sought guidance from existing state law").  The
    immunity from contempt provided journalists who refuse to disclose confidential sources and

26  unpublished, non-confidential information under the California Constitution, Art. 1, § 2(b), and

27  Evidence Code § 1070(a) reflects "a paramount interest in maintenance of a vigorous, aggressive
    and independent press … ."  *L.A. Mem'l Coliseum Comm'n*, 89 F.R.D. at 495.

28  

---

comment, and participation by some of the media, the First Amendment requires equal access to all of the media or the rights of the First Amendment would no longer be tenable").  Last year, the Ninth Circuit stated: "Favoring one media organization over another would 'present serious First Amendment concerns.'"  *Courthouse News Serv. v. Planet*, 947 F.3d 581, 596 n.8 (9th Cir. 2020) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 659 (1994)).  The defense put Carreyrou (and no other reporters) on its witness list in the hope that the Court would rubber-stamp his exclusion.  The Court should not countenance that tactic.

## V.      CARREYROU SHOULD ALSO BE EXEMPTED FROM THE GAG ORDER.

### A.   The Gag Order Is A Presumptively Unconstitutional Prior Restraint.

"What transpires in the courtroom is public property."  *Craig v. Harney*, 331 U.S. 367, 374 (1947).  An order that limits Carreyrou's right to discuss his testimony, like the order here, is a gag order, and it is a prior restraint on future speech.  *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 556 (1976).  Gag orders, like all prior restraints, bear a "heavy presumption against … constitutional validity."  *Id.* at 545.  Prior restraints, including gag orders, are "the most serious and least tolerable infringement on First Amendment rights."  *Id.* at 559.[19]

The Ninth Circuit holds that a gag order on trial participants is "properly characterized as a prior restraint," and that gag orders are "are subject to strict scrutiny because of the peculiar dangers presented by such restraints."  *Levine v. U.S. Dist. Ct.*, 764 F.2d 590, 595 (9th Cir. 1985).  A gag order can survive strict scrutiny only if: "(1) the activity restrained poses either a clear and present danger or a serious and imminent threat to a protected competing interest; (2) the order is narrowly

---

[19] Prior restraints are also presumptively invalid under the California Constitution, Article I, § 2(a), which provides: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right.  A law may not restrain or abridge liberty of speech or press."  The California Supreme Court has stated that the free speech provision of the California Constitution provides even greater protection than its federal counterpart. *Wilson v. Superior Court*, 13 Cal. 3d 652, 658 (1975) ("[a] protective provision more definitive and inclusive than the First Amendment is contained in our state constitutional guarantee of the right of free speech and press"); *see also Gilbert v. National Enquirer, Inc.*, 43 Cal. App. 4th 1135, 1144 (1996) ("the California Constitution provides an even broader guarantee of the right of free speech and the press than does the First Amendment").

---

1   drawn; and (3) less restrictive alternatives are not available." *Id.* (citations omitted).[20]  Under this

2   standard, the gag order, as applied to Carreyrou, cannot survive strict scrutiny.

3        Similar cases are illustrative.  In *Freedom Communications v. Superior Court*, 167 Cal. App.

4   4th 150, 155 (2008), a California appellate court overturned a witness gag order forbidding a

5   newspaper from reporting on a case where the newspaper itself was a party at trial.  Similar to the

6   order at issue here, the gag order was "contained within a broader order that barred all nonexpert

7   witnesses from the courtroom except during their own testimony, forbade witnesses from discussing

8   their testimony with other witnesses, and forbade the parties and witnesses from disclosing 'to a

9   [nonexpert] witness the testimony of another witness.'"  *Id.* at 152.  The court, citing *Nebraska*

10  *Press*, struck the gag order as an unconstitutional prior restraint even though the newspaper itself

11  was a party to the litigation.  *Id.* at 153-54.  The court held that there were other "less restrictive

12  alternatives" than a gag order, including "admonish[ing] witnesses not to read press accounts of the

13  trial."  *Id.* at 154.  Such an admonishment would, the court noted, "go farther in preventing the

14  tainting of witness testimony because the gag order applies only to [the newspaper party] and not to

15  other newspapers that cover the trial."  *Id.*  If a gag order on journalists employed by a *party* could

16  not survive strict scrutiny, then, *a fortiori*, a third-party journalist like Carreyrou should not be

17  gagged.

18        In another matter, a federal district court granted an emergency motion relieving noted

19  reporter Mike Wallace, who was listed as a potential witness, from an order gagging the ability of

20  potential witnesses to discuss the underlying case, noting that the gag order was not "intended to

21  restrain the speech" of journalists.  *U.S. v. Scrushy*, Case No. 2:03-cr-00530-KOB-TMP, Dkt. 398

22  (N.D. Ala. Feb. 15, 2005).  Likewise, the gag order here should be clarified to exempt Carreyrou.

23  ///

24

25

26

27  [20] *Accord Hurvitz v. Hoefflin*, 84 Cal. App. 4th 1232, 1241 (2000) (applying same standard under
    California law).

28

**B.  Carreyrou Should Be Exempted From the Court's Gag Order.**

    **1.  Carreyrou's Speech About His Testimony Poses Neither a Clear and Present Danger Nor A Serious or Imminent Threat to Justice.**

Carreyrou's reporting about his own testimony at trial poses neither "a clear and present danger [n]or a serious and imminent threat to" the defense's fair trial rights or any other protected interest.  *Levine*, 764 F.2d at 595.  "A prior restraint to ensure a fair trial is permissible 'only if its absence would prevent securing twelve jurors who could, with proper judicial protection, render a verdict based only on the evidence admitted during trial.'"  *In re Dan Farr Prods.,* 874 F.3d 590, 593 (9th Cir. 2017)*; see also Nebraska Press*, 427 U.S. at 569 (same); *Hunt v Nat'l Broad. Co., Inc.*, 872 F.2d 289, 293-94 (9th Cir. 1998) (same).

Carreyrou is actively reporting on the Holmes trial.  And he is hardly the only journalist covering the case.  The matter has received massive media attention for the better part of a decade.  Even if Carreyrou were to testify, there is no plausible way that Carreyrou's discussion of his own testimony would pose a unique and unmanageable threat to Holmes's or anyone else's interests.

The reporting concerning Carreyrou's testimony by other media outlets would, by itself, obviate any risk associated with Carreyrou's reporting on the same subject.  The *Nebraska Press* court held that even "pervasive and concentrated" publicity "cannot be regarded as leading automatically and in every kind of criminal case to an unfair trial."  427 U.S. at 565.  And here the issue is only the marginal additional publicity Carreyrou might impart by discussing his own testimony.  In another high-profile criminal case, the Ninth Circuit held that, "[g]iven the extensive publicity that is occurring even while the orders [limiting the disclosure of documents] are outstanding, we doubt that the limitation on publicity accomplished by the closure orders would have any significant effect on [the defendant's] right to a fair trial." *Associated Press v. U.S. Dist. Ct.*, 705 F.2d 1143, 1146 (9th Cir. 1983) (concerning the drug trial of John DeLorean).  Likewise here, there is no threat posed by Carreyrou at all, let alone one that justifies an infringement of his First Amendment rights.  *Elrod v. Burns*, 427 U.S. 347, 373-374 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

1

### 2.  The Gag Order is Not Narrowly Drawn.

2      "An order issued in the area of First Amendment rights must be precise and narrowly

3 tailored to achieve the pin-pointed objective of the needs of the case."  *Tory v. Cochran*, 544 U.S.

4 734, 738 (2005) (cleaned up; quoting *Carroll v. President and Comm'rs of Princess Anne*, 393 U.S.

5 175, 183-184 (1968)).   The Gag Order does not limit any particular part of Carreyrou's discussion

6 about his potential testimony; instead, it restricts all of it.  Considering Carreyrou is likely the most

7 prolific journalist focused on the Theranos matter, any testimony he may give – if he were ever to

8 give testimony at all – could cover a great many topics, and those topics have already been exposed

9 to intense discussion by Carreyrou and many other fine journalists.  And he is not a fact witness so

10 his testimony would neither affect nor be affected by other witnesses.  To categorically prevent

11 Carreyrou – and, when it comes to journalists, *only* Carreyrou – from reporting on his own

12 testimony is the antithesis of a narrowly drawn order.

13

### 3.  There Are Less Restrictive Alternatives Than Gagging Carreyrou.

14      The Ninth Circuit makes clear that "any imposition of a prior restraint must be based on

15 *case-specific justifications* for why less extreme measures are not viable alternatives."  *In re Dan*

16 *Farr*, 874 F.3d at 596 (emphasis in original).  The Supreme Court identifies several potential less

17 restrictive alternatives, including the "use of emphatic and clear" jury instructions, jury

18 sequestration, "postponement of the trial," and change of trial venue.  *Nebraska Press*, 427 U.S. at

19 563-564; *accord Columbia Broad. Sys., Inc. v. U.S. Dist. Ct.*, 729 F.2d 1174, 1182-83 (9th Cir.

20 1984) (same).[21]  The Ninth Circuit holds that all of these are "appropriate alternatives preferable to

21 censorship."  *In re Dan Farr*, 874 F.2d at 595.  And it is the proponent of a gag order that bears the

22 burden of proving that the alternatives are insufficient to protect his or her rights.  *Hunt*, 872 F.2d at

23 295-96.

24      Any of the alternatives to censorship would be preferable here – particularly clear and

25 emphatic instructions to the jury not to read, listen to, or watch any media coverage of the case

26 pending the trial.

27

---

[21] *Nebraska Press* also suggests searching voir dire, but here the jury is already empaneled.  *Id.*

28

VI.     **CONCLUSION AND SUMMARY OF REQUESTED RELIEF.**

John Carreyrou should be exempted and excused from the Exclusion Order and the Gag Order.  Excluding Carreyrou, a non-percipient witness who has not been subpoenaed, from trial does not serve the purposes of the exclusion rule.  It is a cynical tactic employed to harass Carreyrou and no other reporters on the Theranos affair.  Even if he were subpoenaed, excluding Carreyrou infringes on Carreyrou's First Amendment rights and privileges in myriad ways.

The Gag Order, restricting Carreyrou's right to report on the trial, is presumptively unconstitutional and cannot survive the requisite strict scrutiny.  Carreyrou's reporting on his own potential or actual testimony poses no danger to Holmes's fair trial rights, the order is not narrowly drawn and less restrictive alternatives have not been exhausted.

For the foregoing reasons, Carreyrou respectfully requests that the Court enter an order:

1.  Permitting Carreyrou to intervene for the limited purpose of moving the Court to exempt Carreyrou from the Court's orders affecting him directly;

2.  Exempting and relieving Carreyrou from the Court's order excluding and sequestering fact witnesses from attending trial;

3.  Exempting and relieving Carreyrou from the Court's order directing fact witnesses not to discuss their testimony with anyone except their counsel; and

4.  Directing any party wishing to call Carreyrou as a witness to provide Carreyrou's counsel with:

    a.  a list of questions subpoenaing counsel intends to ask Carreyrou or a proffer of what testimony it hopes to elicit from Carreyrou; and

    b.  at least seventy-two (72) hours' notice to enable Carreyrou's counsel to bring an appropriate motion in response.

DATED:  September 30, 2021                        JASSY VICK CAROLAN LLP


                                                    ___/s/  Jean-Paul Jassy_____
                                                    JEAN-PAUL JASSY
                                                    Counsel for Non-Party Journalist
                                                    and Proposed Intervenor
                                                    JOHN CARREYROU

**CERTIFICATE OF SERVICE**

I hereby certify that on September 30, 2021, a copy of this filing was delivered via email to all counsel of record at the email addresses listed on the CM/ECF for this case:

kdowney@wc.com,

asaharia@wc.com,

alemens@wc.com,

jfleurmont@wc.com,

cline@johndclinelaw.com,

ktrefz@wc.com,

lwade@wc.com,

plooby@wc.com,

rcleary@wc.com,

SMRoper@wc.com,

jeffrey.b.schenk@usdoj.gov,

john.bostic@usdoj.gov,

kelly.volkar@usdoj.gov, and

robert.leach@usdoj.gov

 If any counsel states that they wish to receive a paper copy of this filing, I further certify that my office will send a copy of this filing to such counsel to be delivered the next business day.

_____/s/  Jean-Paul Jassy_
JEAN-PAUL JASSY
