# Exhibit 3

MEMORANDUM OF INTERVIEW

CASE NUMBER            :    2204323-MF

PERSON INTERVIEWED     :    Shane Weber

PLACE OF INTERVIEW     :    Videoconference Call

DATE OF INTERVIEW      :    August 24, 2021

TIME OF INTERVIEW      :    10:00 A.M.

On August 24, 2021, Shane Weber (WEBER) was interviewed by videoconference call in preparation for possible trial testimony. Assistant United States Attorneys Robert Leach, Jeffrey Schenk, and John Bostic conducted the interview. Lisa Tenorio-Kutzkey, Mandy Chan, and Andrew Galliard were present as WEBER's counsel. Prior to the start of the interview, AUSA Leach explained the trial testimony process. The following is a summary of the statements made during the interview. It may not necessarily contain all statements made during the interview that have been documented in previous memoranda.

WEBER attended Northwestern University and graduated with a degree in molecular biology in 1976. He conducted post-doctoral research in radiation biology at the University of Rochester, and then worked at Eastman Kodak for ten years where he researched protein engineering, protein tagging, and imaging. WEBER's employment at Johnson and Johnson focused on diagnostic assays. In 2008, WEBER was approached by a recruiter for Pfizer to work with Hakan Sakul (SAKUL) and others in diagnostics as part of the company's molecular medicine group. WEBER was hired as a Director of Diagnostics and worked at Pfizer for eight to ten years. He is currently retired and longer does any consulting work.

FDA regulated assays were used to measure proteins or other analytes for clinical decision making. A physician must have high confidence in the results. As part of Pfizer's molecular medicine group, WEBER had knowledge and awareness of new and existing technologies and assays in the field for possible use in clinical trials.

In November or December 2008, WEBER's colleague, Craig Lipset (LIPSET) approached WEBER with a request to examine, evaluate, and make a recommendation of Theranos' technology. LIPSET was one of four directors in Pfizer's molecular medicine group headed by Dr. Aidan Power (POWER). The group consisted of one hundred twenty employees.

WEBER reviewed document THER-2605305 to THER-2605331. He did not believe he had seen the document previously.

WEBER reviewed document THER-2608636 to THER-2608744. Gary Frenzel (FRENZEL) was a Theranos employee LIPSET introduced to WEBER to assist with the technology evaluation. WEBER remembered reviewing documents he received from LIPSET, and recalled seeing the report, informed consent, and slide deck attachments in the document. In an email to FRENZEL, WEBER apologized for "multiple Pfizer points of contact over the years for Theranos" (THER-2608636). Theranos had pushed to sell their technology and Pfizer was undergoing tremendous reorganization at the time. As of November 2008, it had been difficult to determine what

Page 1 of 4

US-REPORTS-0034798

Theranos had been done with Pfizer, so WEBER apologized to Theranos to smooth any frustrations. He also asked for any previously supplied documents, as part of his normal practice, to ensure he had everything for his review.

WEBER understood Theranos' devices had been used a part of an oncology study, but more, he wanted to know what Theranos wanted to do with their technology in the future. The documents Theranos provided were difficult to understand, but WEBER gleaned Theranos had been given access to clinical blood samples from a Sutent study to conduct a performance comparison of Theranos devices. WEBER wrote, "I am responsible for platforms for which Pfizer has a diagnostic interest and for which there is a clinical validation." He said his statement was a fair assessment of the situation at the time.

"IRB" stood for institutional review board, a process where protocols for a clinical study must be reviewed and approved before subject enrollment began.

WEBER reviewed Theranos' patent portfolio as part of his examination of the technology. Patents were publicly available documents that let him review additional information about a company to provide insight. A developed company had a developed patent portfolio. There was a rigor to filing patents and it was a felony to make misrepresentations on the applications. It was a normal part of WEBER's process to review a company's patents, as well as the patents of any of the company's competitors.

In the same document, WEBER posed a list of questions he wanted Theranos to answer (THER-2608637), including what other assays the devices could run. He wanted to learn about the device's capabilities, multiplexing, and what else Theranos could do. The more WEBER knew about a company, its technology, the process, and what actually worked, the more he could assist in advancing the technology through his process. WEBER was interested in the calibrators Theranos used because consistency was important. Instruments were calibrated based on device performance. Calibrators, or standards, needed to be done for each specific assay type.

After he posed his questions, the next step in WEBER's process was to review the answers provided and give the company an opportunity to sell him on the technology. This was the point in time where WEBER tried to develop an understanding of where Theranos' technology was and if it could have been used for diagnostics to report results to physicians for clinical decisions. Theranos' answers to WEBER's questions were the briefest he ever remembered receiving. Typically, a company responded to each of WEBER's questions with paragraphs to a whole page of information supporting the response.

WEBER reviewed document PFE0000043 to PFE0000049. He recognized the document as a summary of his position for LIPSET, SAKUL, and POWER. The summary was drafted at the conclusion of WEBER's technology review and was a part of his normal practice. This was his final report and his conclusions never changed. The summary contained the questions he asked Theranos, and the brief responses he received from the company. His overall review of the technology was "deep," but relatively quick and was completed in three to four months. As was his style, WEBER wrote his report in such a way to leave open the possibility for future reengagements of Pfizer by Theranos. WEBER said the "Overview" (PFE0000043) section of his report was a fair assessment, and the "Recommendations" were clear recommendations for review by directors and other company vice presidents.

US-REPORTS-0034799

- WEBER wrote, "1) Theranos does not at this time have any diagnostic or clinical interest to Pfizer." This was WEBER's assessment made after discussion with other departments within Pfizer.
- WEBER wrote, "2) It is recommended that no further financial investment or clinical sample resources be extended to Theranos." This was his recommendation.
- Regarding recommendation 3, Theranos had been excessively pushy with Pfizer and this was his summary of those interactions. When running into roadblocks, Theranos sought out, "who else should we talk to?" Theranos had many points-of-contact within Pfizer and were very assertive, deflective, and evasive with WEBER. He wanted to minimize financial and clinical sample waste. Clinical samples should not have been used to help a company validate an unproven technology. He left door open for future dialog.
- WEBER inserted a footer which stated, "Subject to Ongoing Management Review." This was a statement he wrote to affirm he was willing to reevaluate the technology again if further development had been made.
- PFE0000044 referenced "The Introduction to Theranos slide deck." This was the introductory PowerPoint presentation WEBER had previously reviewed.
- PFE0000044 stated, "Theranos has provided a poorly prepared summary document of their platform…" WEBER believed this referenced summary documents sent to POWER.
- PFE0000044 stated, "The nine conclusions in their summary document are not believable based on the information provided." This was WEBER's opinion based on the information Theranos had provided.
- "Theranos unconvincingly argues the case for having accomplished tasks of interest to Pfizer." WEBER said Theranos made statements that lead him to conclude what Theranos wanted to do, but those statements were not supported by fact.
- Theranos' responses to WEBER's questions were "non-informative." WEBER included these questions and answers in his summary report so anyone reviewing the report could review Theranos' responses and not have to rely solely on WEBER's interpretation of those answers.
- PFE0000045 referenced a November 13th teleconference call. WEBER participated in this call with HOLMES and six to eight other Theranos employees, although she was the only person from Theranos who spoke. The call lasted approximately sixty minutes and WEBER left the call with the same impression he took away from Theranos' written responses to his questions.

WEBER was not looking to learn proprietary information. He wanted to learn about the technology so he could merge Pfizer and Theranos' roadmaps. There were brief internal discussions of WEBER's report with LIPSET, SAKUL, and POWER. He did not remember any disagreement over the final product. He did not know if anyone within Pfizer had overruled his recommendations and did not know if there was any discussion of Theranos at levels above POWER.

WEBER's point-of-contact at Theranos was the person LIPSET introduced to him. He did not know if he ever emailed Elizabeth Holmes (HOLMES) directly.

WEBER reviewed a document marked PFE0000051 by the government and said he recognized it. He wrote the email contained in this document as part of his normal practice to document he had communicated to Theranos Pfizer's position. He was polite during the conversation and "left the

door open" for future reengagement.  WEBER normally kept email communications and other documents in digital format for future review.  Any documents would have stayed with Pfizer.  WEBER confirmed he spoke with HOLMES and relayed Pfizer's position as written in the first paragraph of this email.  The information in the second paragraph was also true, and HOLMES told WEBER that "Pfizer was missing a huge opportunity" and that she wanted additional points-of-contact withing the company.  WEBER referenced "alliance contract" and said he confirmed Theranos had been paid for their work on the Sutent project.  Pfizer's budget at the time was tight and WEBER wanted to make sure Theranos had been paid to avoid any underbilling or overbilling situations.  WEBER was not aware of any contract with Theranos past 2009 and believed Pfizer and Theranos had fully separated.

WEBER reviewed document MFH00000391 to MFH00000424.  WEBER did not remember ever reviewing this version of Theranos' report and did not give Theranos permission to use Pfizer's logo.  WEBER stated he was not allowed to use Pfizer's logo.  He reviewed Theranos' conclusions on MFH00000416 and said Theranos' technology did not perform with, "superior performance to reference assays," did not enable, "on-demand home installation an patient training," did not show, "inter-system accuracy [was] excellent," and did not show, "good correlations …to various commercially available gold-standards."  WEBER would have been disappointed if he had learned Theranos' conclusions were passed off as those of Pfizer.

WEBER saw news articles and other media about Theranos after December 2008.  He has a vague recollection of those articles and did not actively track Theranos.

WEBER was upset Theranos had sent unsolicited confidential information from competitor pharma companies to him on CD.  He described the situation as "horrifying."  WEBER never reviewed the CD and took it to a local Post Office to return.  Theranos sending him confidential information was outside of normal boundaries and WEBER worried they may have had leverage over him had he reviewed the contents of the CD.

The interview ended at 11:35 A.M.

*Christopher McCollow*

| | |
|---|---|
| Christopher McCollow | September 2, 2021 |
| U.S. Postal Inspector | Date |

Attachments:

THER-2605305 to THER-2605331
THER-2608636 to THER-2608744
PFE0000043 to PFE0000049
PFE0000051
MFH00000391 to MFH00000424