# EXHIBIT B

Pages 1 - 52

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Nathanael M. Cousins, Judge

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )
                               )
  VS.                          )   NO. CR 18-00258 EJD (NC)
                               )
ELIZABETH HOLMES and RAMESH    )
"SUNNY" BALWANI,               )
                               )
          Defendant.           )
_____)

                          San Jose, California
                          Thursday, October 14, 2021


**TRANSCRIPT OF OFFICIAL ELECTRONIC SOUND RECORDING**

**OF REMOTE ZOOM VIDEOCONFERENCE PROCEEDINGS**

**TIME: 1:32 P.M.  -  3:02 P.M.  = 90 MINUTES**


**APPEARANCES VIA ZOOM:**

For Plaintiff:
                     STEPHANIE M. HINDS
                     ACTING UNITED STATES ATTORNEY
                     450 Golden Gate Avenue, 11th Floor
                     San Francisco, California  94102
              **BY:  KELLY I. VOLKAR**
                     **ASSISTANT UNITED STATES ATTORNEY**


              **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


Transcribed By:  Ana M. Dub

```
 1    APPEARANCES VIA ZOOM:   (CONTINUED)

 2    For Plaintiff:
                          STEPHANIE M. HINDS
 3                        ACTING UNITED STATES ATTORNEY
                          150 Almaden Boulevard, Suite 900
 4                        San Jose, California  95113
                  BY:  JOHN C. BOSTIC
 5                      ASSISTANT UNITED STATES ATTORNEY

 6

 7    For Defendant Elizabeth Holmes:
                          LAW OFFICE OF JOHN D. CLINE
 8                        235 Montgomery Street, Suite 1070
                          San Francisco, California 94104
 9                BY:  JOHN D. CLINE, ATTORNEY AT LAW

10

11    For Non-Party Journalist:

12                        JASSY VICK CAROLAN LLP
                          355 South Grand Avenue, Suite 2450
13                        Los Angeles, California 90071-9500
                  BY:  JEAN-PAUL JASSY, ATTORNEY AT LAW
14

15    For Non-Party Witness Roger Parloff:
                          MILLER KORZENIK SOMMERS RAYMAN LLP
16                        The Paramount Building
                          1501 Broadway, Suite 2015
17                        New York, New York 10036
                  BY:  DAVID KORZENIK, ATTORNEY AT LAW
18                      TERENCE KEEGAN, ATTORNEY AT LAW

19

20

21

22

23

24

25
```

**Thursday, October 14, 2021**                                    **1:32 p.m.**

                    **P R O C E E D I N G S**

                        ---o0o---

                (Defendant not present.)

    **THE CLERK:**  Calling Criminal 18-0258, United States versus
Elizabeth Holmes.

    Counsel, please state your appearances, beginning with
the Government.

    **MS. VOLKAR:**  Good afternoon, Your Honor.  Kelly Volkar for
the Government, and with me is my colleague John Bostic.

    **THE COURT:**  Thank you.  Good afternoon.

    **MR. BOSTIC:**  Good afternoon, Your Honor.

    **MR. CLINE:**  Your Honor, for Ms. Holmes, John Cline.

    **THE COURT:**  Good afternoon.

    **MR. CLINE:**  Good afternoon.

    **MR. JASSY:**  Good afternoon, Your Honor.  Jean-Paul Jassy
for John Carreyrou.

    **THE COURT:**  Thank you.  Good afternoon.

    And you're the moving party on the motion to intervene at
Docket 1056, and that's one of the three motions before
the Court today.  We'll deal with it first.

    First, on a procedural question for me, I scheduled this
today with the objective of being -- doing this on a dark day
for the trial and to give every- -- the trial attorneys a
chance to participate from home in their comfortable clothes,

1   but that plan was thwarted by the trial taking place today.   So

2   I wanted to see if there's any time constraints that the trial

3   attorneys have, that we need to fit this in, to get back into

4   courtroom action.

5       **MR. BOSTIC:**   Your Honor, for myself, I'll just say I

6   currently don't have a witness on the stand.   I'm grateful that

7   gives me the opportunity to appear on this motion.   I don't

8   have a hard stop time.   Thank you.

9       **THE COURT:**   Okay.   Thank you.

10      And, Mr. Cline?

11      **MR. CLINE:**   Same goes for me, Your Honor.   The trial is

12  proceeding apace without any of the lawyers before you.

13      **THE COURT:**   All right.   Thank you.

14      And I apologize.   It was not my intention to order you to

15  be two places at once.   And we are doing this remotely because

16  of the pandemic and because Mr. Jassy is also out of town.   I

17  thought it'd be more efficient and still fair to do the

18  proceedings remotely in this format.   So, sorry for creating

19  any logistical hassle for you.

20      And we are making a recording.   This is a public

21  proceeding for those in the audience, a reminder that no

22  broadcast, transmission, or other use of the presentation is

23  allowed without court order.   And thank you for your

24  participation today.

25      And we'll deal with the motions involving Roger Parloff

1    second, and we'll start here with the motion to intervene.

2        So these motions have all been referred to me from

3    Judge Davila, of course.  They're -- both cases involve an

4    intersection between due process for the accused and the case

5    on trial.  First is the First Amendment and the rights of the

6    reporters and of the public to participate in those

7    proceedings, as well as assertions of reporter privileges and

8    things that flow from the First Amendment.  And there's a

9    particular rule of evidence, Rule 615, which is also in play as

10   part of that process in evaluating Judge Davila's prior order

11   excluding certain witnesses, including the reporter indicated

12   here, from the trial.  And so that's what we're talking about

13   and the motions before the Court.

14       I did -- just so you know what I looked at before our

15   hearing today, working backwards, I did get the reply filed by

16   Mr. Jassy.  So I read that, as well as the responses from

17   the Government and Ms. Holmes' counsel, and then working

18   backwards to the original motion to intervene.

19       There's no opposition to the intervention of the witness

20   to have this argument.  So the intervention is granted.

21       But the second part of the discussion is hotly debated,

22   and that's what -- whether there should be some exception to

23   Judge Davila's pretrial ruling excluding the witness.  And

24   there's kind of a further part to the discussion, which is,

25   should there be some limits set on conversations and questions

1   to the witness when he's called.  And that's a lesser point.

2       The more important point is, should I make some exception

3   to Rule 615 and to Judge Davila's pretrial exclusion order that

4   would allow Mr. Carreyrou to be in the courtroom during other

5   testimony.

6       And I'll stop talking in a moment and listen, but I did

7   have a pragmatic suggestion before the briefing was complete

8   and before I saw the reply brief, which was to suggest

9   pragmatically that Mr. Carreyrou be treated as an expert

10  witness, rather than a fact witness, for purposes of

11  Judge Davila's exclusion order.  And if I went ahead and made

12  that decision, that would allow him to be in the courtroom

13  during other witnesses' testimony and it would there- -- and,

14  also, as a second part, would not have a restriction on him

15  discussing his testimony with other people.

16      So that was my suggestion for a pragmatic solution.  But I

17  do note that Ms. Holmes did not agree to that pragmatic

18  solution and thought that would still aggrieve her rights, and

19  seeks enforcement strictly of Rule 615, which excludes

20  witnesses, and she argues there's no exception to that under

21  the rules.

22      So hopefully, I've not mischaracterized anyone's

23  arguments.  And I don't think that there's much skin in the

24  game for the prosecution.  I appreciated and I did read their

25  response.  Ms. Volkar, not to take anything away from you, but

```
 1    you didn't object to the intervention and would be fine with my
 2    solution.
 3         So the primary disagreement seems to be between the
 4    witness and Ms. Holmes' side.
 5         So, Mr. Jassy, I've got a few questions for you, if I can
 6    move into that phase here.  One is as to the -- kind of the
 7    timing of this.  Judge Davila made his witness exclusion order
 8    before trial.  Trial then began, and then your motion came
 9    after that.  The trial's been going on now for about a month.
10    And I've not been following Mr. Carreyrou's podcast, but as I
11    understand it, he's been able to report on what's going on and
12    comment on what's going on.
13         So what's the need for the -- for the request at this
14    moment?  If he's being able to do his First Amendment reporting
15    activities, what -- kind of what's the prejudice to continuing
16    things as they are and sort of just keep going status quo
17    rather than having the Court order something?
18    MR. JASSY:  Well, thank you, Your Honor.
19         It's important that Mr. Carreyrou have the ability to be
20    in court to see the testimony, just as the jury would, just as
21    other members of the public that are there, other members of
22    the press.
23         Mr. Carreyrou's being singled out, and we believe he's
24    being singled out because of his prior reporting and the animus
25    that Ms. Holmes has for him.
```

1        And it's important that he's able to be there to not just

2    hear things, but to actually see the dynamics of the courtroom,

3    see what the jurors are seeing, and to offer his insights and

4    his experience, which is really abundant here, with respect to

5    the issues and the facts and the underlying matters that are

6    being tried.

7        And to exclude him and really, from the witness list point

8    of view offered by the defense, only him from the courtroom as

9    a reporter is taking away his ability to see the trial and

10   absorb the trial and interpret the trial and comment upon it.

11   It's true his podcast is going, and that's all the more reason

12   why he should be allowed in the courtroom because he's doing

13   ongoing reporting about the case.

14       **THE COURT:**  All right.  And turning to kind of the rule

15   interpretation -- and I'm looking at my other screen here at

16   Rule 615 -- there's no real discussion or dispute that the

17   first three exceptions to Rule 615 don't apply.  We're not

18   talking about a party who is a natural person, or a party's

19   representative, or a person whose presence is essential to a

20   claim or defense in the case.  So it seems like the exception

21   by the rule we're talking about is 615(d), a person authorized

22   by statute to be present.

23       And if we're looking at that exception to Rule 615, what

24   statute would you say authorizes Mr. Carreyrou to be present in

25   the courtroom?

1      **MR. JASSY:**  Well, the answer to that question is,

2  Your Honor, the First Amendment.  But I do acknowledge that

3  that's not the only thing that we are relying upon here.  It's

4  not just 615(d).  There are other reasons why the rule really

5  shouldn't even apply in this circumstance and/or the order

6  shouldn't apply to Mr. Carreyrou.  Because of the way the order

7  is worded and defined, it should not apply to him, and we just

8  want to make sure that that's clear.

9      But I'm happy to expand on that a little bit more,

10  Your Honor.  But the Rule 615(d) question, that's the answer as

11  we have it.  But there are other dynamics, of course, going on

12  that we believe make it so that he should be -- Mr. Carreyrou

13  should be exempt from the -- from the order.

14      **THE COURT:**  All right.  And I'll give you a chance to

15  expand on that.

16      So if -- if I'm not just strictly construing Rule 615 and

17  applying that, what would be the basis to go outside of that

18  and to make an exception for Mr. Carreyrou?

19      **MR. JASSY:**  Right.  Understood, Your Honor.

20      Well, I think a good starting point here is to recognize

21  that other courts have come to the conclusion that we're asking

22  this Court to come to, in the federal context, even under

23  Rule 615 where that was used as a basis to exclude witnesses.

24      There are two federal cases which we noted in the

25  briefing, and I know Your Honor has read -- *U.S. v. Connolly*

1    and *U.S. v. LaBrake* -- where courts have recognized that

2    reporters should not be subjected to an exclusion order

3    basically just because they were doing their job of being

4    reporters; that they're not going to be considered witnesses

5    that would be excluded under Rule 615.

6           So we're not asking for something that's truly

7    extraordinary at all.

8           There's another state case.  Of course, state rules can

9    differ from Rule 615.  But it's got nice and persuasive value,

10   I think.  That's the *Gore Newspapers v. Reasbeck* case out of

11   the Florida Appellate Court.  But I think in contrast, it's

12   interesting to note that the defense has not cited a single

13   case where a court has approved excluding or gagging a reporter

14   under Rule 615.

15          So that's just kind of the starting point, Your Honor.

16   But there really are three ways that the Court could rule in

17   our favor on the exclusion order.

18          The first is finding that listing Carreyrou as a witness

19   or the possible issuance of a subpoena to him would be in bad

20   faith or would be harassing.

21          The second is finding that Mr. Carreyrou -- the second way

22   that the Court could find in our favor is finding that

23   Mr. Carreyrou is not a fact witness.

24          And the third is, even if he were considered a fact

25   witness, even if the Court were to say that the subpoena --

1  possible subpoena were issued in good faith, which we don't

2  agree is the case, that Mr. Carreyrou still should not be

3  exempted because he would not ultimately be called to testify

4  as to anything that he could be required to testify or

5  compelled to testify about.

6       So just, I think it's important to focus on the first two

7  because I think that they do get to Your Honor's question, the

8  fundamental question about how to reconcile Rule 615 with what

9  we're asking for.

10      So the first point is that any subpoena that would be

11  issued to Mr. Carreyrou would be in bad faith or be harassing.

12  And there's a lot to demonstrate this.

13      And, by the way, the two cases I mentioned earlier, the

14  two federal cases, *U.S. v. Connolly* and *U.S. v. LaBrake*, there

15  was no real indication that there was any bad faith or

16  harassing intent, but here there is.

17      And one thing -- there's a couple of things that the

18  parties have agreed upon in the briefing, and one of those

19  things that we've agreed upon is that bad faith or harassing

20  subpoenas are not to be issued to reporters; that that's not a

21  legitimate thing for any party to do to a non-party reporter.

22      So here, there are several examples of why there's bad

23  faith, some of them go completely unrebutted.

24      The first is, there's many examples of animus toward

25  Mr. Carreyrou that were detailed by our briefing and then,

1    also, by the briefing presented by the Government which

2    expanded on it even more, to explain the background and why it

3    is that Ms. Holmes might have bad feelings toward

4    Mr. Carreyrou, as he is the one who broke the story and has

5    really, for the last several years, been dogged in pursuing it,

6    in trying to understand exactly what happened with Theranos.

7        The second reason is Mr. Carreyrou, as I mentioned, is the

8    only reporter on Ms. Holmes' witness list.  Ms. Holmes points

9    out that Roger Parloff is on the Government's witness list and

10   another witness is on the Government's witness list.  Those

11   people -- I know Mr. Parloff is cooperating with

12   the Government.  Mr. Carreyrou's not cooperating with

13   the Government.  He would oppose any subpoena from anybody.

14   And here, he's the only reporter, out of the dozens, maybe

15   hundreds, of reporters covering this case, that is being -- was

16   put on the witness list and, therefore, may be excluded from

17   attending the trial.

18       The third is --

19   **THE COURT:**  What if that's because he knows more than

20   anybody else?  What if he has information that might be

21   probative of the claims and defenses in the case so he sort of

22   deserves to be in a special status?

23   **MR. JASSY:**  Well, I think that gets to the second reason

24   why there shouldn't be any exclusion.

25       I think he definitely knows a lot about this case.

1   There's no question about it.  But the second question and the

2   second reason why Mr. Carreyrou should be exempted is that he

3   is not a fact witness.  Yes, it's true he knows a lot about

4   this matter; he knows a lot about what happened.  But he is not

5   a fact witness.  And the order, the parties agree -- as they

6   must -- that the order only applies to fact witnesses, and

7   that's by its own terms.

8        So it's important to recall, though, that there's no --

9   there are no examples of Mr. Carreyrou having any personal or

10  percipient knowledge of any underlying facts.

11       The purported examples that are offered by Ms. Holmes fall

12  into two categories.  The first is the Government's Rule 404(b)

13  disclosures, and they note several different spots where, in

14  that long document, Mr. Carreyrou's name appears.  But as noted

15  in the reply brief, if you look at those examples, none of them

16  reveal that Mr. Carreyrou had any personal knowledge of what

17  was going on.

18       They're things like Ms. Holmes leading a chant of her

19  employees that says, "FU, Carreyrou!"  I'm obviously

20  abbreviating that.

21       And there's examples where she's texting back and forth

22  with Mr. Balwani, and they're trying to figure out how they're

23  going to thwart or somehow compromise Mr. Carreyrou's

24  reporting.

25       Mr. Carreyrou doesn't have any personal knowledge of any

1   of that.  He doesn't have any personal knowledge of anything

2   that was happening.  He is gathering information; he is

3   processing that information; he's doing interviews; he's

4   talking to people and then reporting on it.  And that's exactly

5   what reporters do.

6        So the second category -- and Ms. Holmes' brief tries to

7   tease it out into four different things, but really, the

8   second, third, and fourth from Ms. Holmes' brief all collapse

9   into one concept, which is that there are instances where

10  Mr. Carreyrou interviewed people or interacted with people that

11  are percipient witnesses.

12       Well, yes, he did, because that's exactly what

13  investigative journalists do.  They talk to people who were

14  there; they try to find out information; they try to make sure

15  they understand what they're getting; and then they report on

16  it.

17       There's nothing that he -- he was -- he didn't work at

18  Theranos.  He didn't invest in Theranos.  He wasn't on the

19  board of directors.  He wasn't there.  He didn't watch any of

20  the lab work being done personally.  He's taking the

21  information in, absorbing it, and then summarizing it for other

22  people to digest.

23       So that's -- that is the second reason why he should not

24  be -- fall under this exclusion order.  And I think -- I think

25  that gets back to the -- going back to the first reason where

1    we were talking about how he's been singled out.

2        But there's also been no subpoena issued to Mr. Carreyrou.

3    And he was there for two weeks at the beginning of the trial,

4    for jury selection and for opening statements.  They knew he

5    was there because the Government's brief reveals that they

6    were -- they were talking about trying to exclude him from the

7    courtroom.  And they didn't subpoena him.

8        Now, counsel for Ms. Holmes says there's nothing that

9    requires a subpoena.  Okay.  That's not really what the *LaBrake*

10   case says.  For example, they noted that there was no subpoena

11   that had been issued, the Court did there.  But it does speak

12   to whether or not there's really a good faith intent to call

13   him as a witness, because if you don't even bother to subpoena

14   somebody but you just put him on your witness list and then

15   seek to exclude him from the courtroom, it definitely raises a

16   question as to whether or not you're actually interested in

17   having him come and testify.

18       And to that last point, the briefing that's offered by

19   Ms. Holmes doesn't actually say that they're planning on

20   calling him to testify.

21       So we are going through this entire exercise, and it could

22   be that Mr. Carreyrou is not allowed in the courtroom and is

23   gagged, and they don't have any real intention to call him as a

24   witness, haven't subpoenaed him, and they -- they don't say

25   that they actually plan to call him as a witness.

1          So those are some of the reasons why there's bad faith,

2     there's harassment, that Mr. Carreyrou has been singled out

3     here.

4          And I'll tell you, Your Honor, I've done a lot of these

5     kinds of cases.  I've never actually argued a case of bad faith

6     or harassment.  We're usually arguing over the mechanics of the

7     reporter's privilege.  This is a stark example, and it really

8     stands out.  And it really stands out that there's been no

9     rebuttal from Ms. Holmes about all of the instances of animus

10    that's directed specifically toward Mr. Carreyrou through

11    the years that would help to establish there's been bad faith

12    here.  So --

13         **THE COURT:**  All right.  Thank you.  I'm going to give

14    Mr. Cline a chance.

15         And, Mr. Cline, I'm going to give it to you straight right

16    at the beginning here, kind of a two-part question.  Are you

17    intending to call Mr. Carreyrou as a witness?  And if so, why?

18    Why would you want to call him as a witness?

19         **MR. CLINE:**  Let me answer your first question.

20         I can't tell you at this point who we're going to call as

21    witnesses.  We may.  That's all that I can say.  We may not put

22    on a case.  We may call Ms. Holmes; we may not.

23         We're halfway through the Government's case in this trial.

24    And to ask us to tell you definitively that we're going to call

25    any particular witness, we just can't do it.  But I can

1   certainly tell you that we may call him, which takes me to the

2   second part of your question.

3        Let me give you a couple of examples of where

4   Mr. Carreyrou could be a fact witness.  And, again, I'm not

5   saying for sure that we're going to call him, but -- and I

6   should back up and say that he -- his name is -- is woven

7   through this case.  Just this morning, there were -- his name

8   came up repeatedly in the -- in the testimony.

9        But let me give you a couple of concrete examples.

10  The Government -- Judge Davila has -- over our objection, will

11  permit the Government to introduce, at least in part, a CMS

12  inspection report from January 2016 which is quite critical of

13  Theranos.

14       That inspection began as a routine -- as I understand it,

15  as a routine state inspection in, let's say, mid-2015,

16  somewhere in there.  Around that time, Mr. Carreyrou began

17  contacting CMS, which is the federal regulator.

18       Following those contacts, CMS became involved.  It

19  appears, from what we've seen so far, that Mr. Carreyrou was

20  peppering them with requests and suggestions, and he forwarded

21  a complaint, and he asked about the qualifications of the lab

22  director.  And I expect that we will contend that the CMS

23  decision to become involved and the harshness of the -- of the

24  ultimate report may have been, in part, because of pressure

25  that Mr. Carreyrou was exerting.

1       Now, the Government's going to call CMS inspectors in its

2  case, and we will get to cross-examine them.  Perhaps we can

3  make the showing we need to make to present that argument

4  through the cross-examination, but perhaps not.  It may be that

5  those people will say that -- either deny contacting

6  Mr. Carreyrou or say that his inquiry had no impact whatsoever.

7       If that happens, we may decide we need to call

8  Mr. Carreyrou to detail his interactions with CMS during the

9  relevant period.  He would be a fact witness, not an expert,

10  not a summary witness.  He would be a fact witness to those

11  interactions.  That is one example.

12       Here's a second example.  The Government has listed as a

13  trial exhibit -- I think it's 2857, if I'm remembering right --

14  a Mad Money segment from the day -- I think the morning that --

15  or the day that the first *Wall Street Journal* article by

16  Mr. Carreyrou appeared.  It might have been the day after.  I

17  can't recall.  And on the Mad Money segment -- I don't know if

18  you've ever watched Mad Money, but it features a fellow named

19  Jim Cramer.  And on Mad Money, Mr. Cramer questioned Ms. Holmes

20  about *The Wall Street Journal* article.

21       In response, Ms. Holmes was quite critical of

22  *The Wall Street Journal* reporting.  She said, for example --

23  and I'm paraphrasing here -- that Theranos had provided a

24  thousand pages of material -- maybe it was thousands of pages

25  of material -- showing that the allegations in the article were

1  untrue.  I believe she said that Theranos had heard from people

2  that *The Wall Street Journal*, meaning Mr. Carreyrou, had talked

3  to that their statements had been misrepresented.

4      Now, the Government has that exhibit on its witness list.

5  In its 404(b) notice at page -- this is Document 580,

6  page 46 -- it lists Ms. Holmes' statement about providing

7  thousands of material -- pages of material to *The Wall Street*

8  *Journal* showing the allegations were false as a false

9  statement.

10      It may well contend -- "it" being the Government here --

11  may well contend, either in its case-in-chief or on cross of

12  Ms. Holmes if she testifies, that her further statement was

13  false as well, about sources denying that they said what

14  *The Wall Street Journal* -- again, meaning Mr. Carreyrou -- said

15  they said.

16      If we get into that battle -- and, of course, at this

17  point, we don't know what the Government's going to do.  It

18  hasn't played that segment yet, but it's on its exhibit list --

19  Mr. Carreyrou could easily become a witness, a fact witness,

20  again, to the interactions between Theranos and him, on the one

21  hand, and between himself and his sources as well.

22      I can't tell you how that's going to play out.  But I can

23  tell you that if we end up in that battle, Mr. Carreyrou could

24  very easily find himself on the witness stand as a defense

25  witness.

1          I should add that the Government has also included among

2     its trial exhibits a number of transcripts and other

3     interactions between Theranos and *The Wall Street Journal*

4     during the period leading up to the October 15th -- I'm

5     sorry -- October 2015 publication of the article.

6     Mr. Carreyrou was present for many of those interactions.  I'm

7     not sure what the Government has in mind with those, but

8     he's -- he is -- I assume there's going to be some sort of a

9     claim that Ms. Holmes and/or Theranos were somehow

10    representing -- making false statements.

11         Again, Mr. Carreyrou is right at the heart of some pretty

12    significant events in this case.  He could easily end up as a

13    witness.  He is not being singled out.  He is being treated

14    like every other potential fact witness in the case, which is,

15    he's excluded from the courtroom and he can't talk about his

16    testimony except with his lawyer.

17         **THE COURT:**  All right.  Thank you.

18         Let me give Ms. Volkar a chance, if she wants to weigh in

19    on any of the things that she's heard from the Government's

20    perspective, give you a chance to contribute to the making of

21    justice here.

22         **MS. VOLKAR:**  Thank you, Your Honor.

23         As you know, the Government does not oppose

24    Mr. Carreyrou's motion or the Court's suggestion.

25         We merely would like to make sure the record is clear and

provide facts that may be known only to the parties, and
perhaps not even to the Court in many instances, so that the
Court can make an informed ruling.

In that regard, the first thing I actually want to correct
is what could be a little bit misleading in Ms. Holmes'
briefing.  She may not have meant to do so.  But she did say
that Carreyrou was added to the witness list in the August 2021
version because the Government had supplemented its list.  But
all of the witnesses that she claims Carreyrou could be a
response to or would be called to were on the Government's
June 2020 list and, therefore, had been on the list and
knowledgeable to her for the better part of a year and a half.
I do think that's a key point that I want the Court to know.

Other than that, the other part that I think is worth
mentioning is she also discusses -- her brief discusses
Ms. Cheung's testimony from earlier.  And I know transcripts
are likely available, but one thing, for the benefit of
everyone on this call, is that Ms. Cheung was testifying about
the retaliation against her by Ms. Holmes through the use of
her attorneys, then David Boies and his firm, because they
believed Ms. Cheung was talking to Mr. Carreyrou.

And I just wanted to note that that was the testimony that
they cited as something that Mr. Carreyrou could talk about;
but of course, he wouldn't have any personal knowledge of the
retaliation by Ms. Holmes against Ms. Cheung because they

believed Ms. Cheung was talking to Mr. Carreyrou.  So I did
want to set the record straight on that point.

     As to the statements said here, I think I'll leave a lot
of the argument to Mr. Jassy; but I think that the exhibits
provided show the -- Mr. Carreyrou's interactions with CMS.  As
far as we know -- and, again, we don't have any involvement
with Mr. Carreyrou so I can't -- I'll let his lawyer speak for
him.  But what we have seen does not show any coordination.

     We brought a motion in limine before Judge Davila to block
any argument along these lines, that there was coordination
between Mr. Carreyrou and the Government, because we expected
Ms. Holmes may go there, even though in our position, our view,
the evidence doesn't support that.  And Judge Davila agreed
with us, said there wasn't evidence to show actual
coordination, and he did indeed grant our motion in limine to
block any such arguments.

     So I do -- I'm sure Your Honor is well aware of that
portion of the order.  We, of course, mentioned it in our
brief.  But I do want to state that we have had -- heard
similar arguments before.

     Mr. Cline's point about Mad Money, that's the first time
I'm hearing that.  I did not see that in his brief.  But,
again, I think it falls into the category of there are other --
I'm not entirely clear what portion of that Carreyrou would be
involved with, if he would be the fact witness to say whether

1    or not he did receive thousands of pages or -- I guess I might

2    have misunderstood exactly what part of testimony he could

3    bring to the table that would shed any additional light on

4    that, whether or not he would prove if that statement was

5    false, which, if that's the case, I'm not entirely sure why the

6    defense might want to call him.

7          But without getting into too much speculation here,

8    Your Honor, I really just want to state the facts as

9    the Government sees them for the benefit of the Court.  And

10   ultimately, we don't oppose the motion, and that's our view of

11   the facts as we know them.

12         Thank you for the opportunity.

13         **THE COURT:**  Thank you.

14         Mr. Jassy, anything further in support of your motion?

15         **MR. JASSY:**  Yes, Your Honor.  I'd like to respond to some

16   of the points that were made by Mr. Cline.

17         First, he's talking about the CMS interactions.  And,

18   again, what he's talking about is communications that

19   Mr. Carreyrou had with CMS in the course of doing his job.  And

20   I think what he's referring to most prominently are some of the

21   exhibits to his declaration, to Mr. Cline's declaration.

22         And the four exhibits that even reference CMS are 3, 4, 5,

23   and 6.  And if you look at -- well, I guess 2 might as well,

24   but it doesn't -- it doesn't mention Mr. Carreyrou directly.

25         In Number 3, Mr. Carreyrou asks a question of a public

1   relations person at CMS and then says:  I want to give you a

2   heads-up in case CMS wants to comment on any of this.

3        That's what reporters do.  That's what we encourage them

4   to do.

5        And then in Exhibit 4, he's saying:  We may run a story

6   tonight.  Can I paraphrase a CMS spokesman?  And says:  Is this

7   an accurate statement?  And then:  Can you give me some

8   guidance because I want to understand something?

9        Again, this is what reporters do.  They say:  Here's an

10  opportunity to comment.  Does this match what your position is?

11  And can you help me understand what your agency, this

12  Government agency, is meant to do?  Can you help me understand

13  if I've got it right?

14       Same with Number 5.  Similar situation where Mr. Carreyrou

15  is asking questions.  He's trying to understand the situation.

16  This is a Government agency.  As a member of the press, this is

17  exactly what members of the press do.  They go and they ask

18  the Government agencies questions.  And they say:  Is this --

19  do I have it right?  Am I understanding this correctly?

20       And the same thing comes up with -- with Exhibit 6,

21  questions that are being posed.

22       He does not know -- Mr. Carreyrou did not lodge any

23  complaints with anybody.  He's talking about complaints that

24  third parties -- I don't even know who the third parties are --

25  have lodged and whether or not CMS has them, what they have to

1    say about them, if they have anything that they want to comment

2    on.

3         Mr. Carreyrou was not there.  He didn't see what was

4    happening.  He didn't see -- he's not the one filling out a

5    complaint form and saying something went wrong.  He's just

6    saying:  This is what I understand is going on.  Can you help

7    me understand it so that I can be accurate in my reporting?

8         That's what professional journalists do.  That's what

9    ethical journalists do.  That's what Mr. Carreyrou did here.

10        So the CMS point, it's really -- it's really not something

11   that establishes him as a fact witness.  It establishes him as

12   a reporter, but we all knew that.

13        The second, the Mad Money point, like Ms. Volkar, I didn't

14   understand exactly what it was -- the point of that was, but it

15   sounds like it was an interview between the host of Mad Money,

16   Mr. Cramer, and Ms. Holmes -- Mr. Carreyrou was not there for

17   that -- where apparently she says something about having given

18   material to *The Wall Street Journal*.  Okay.  She can testify to

19   that if she wants to.  Or others at -- from Theranos can

20   testify to that.  They had a whole army of people that were

21   coming and telling *The Wall Street Journal* they had things

22   wrong.  But that does not mean that Mr. Carreyrou is someone

23   that needs to be there to confirm what she said on a different

24   television show that he wasn't even involved in.

25        The communications with *The Wall Street Journal* generally,

1    they interacted because that was -- again, part of the job was

2    to ask questions, get comments.  There was a meeting at one

3    point that's been discussed.  There were lots of people in that

4    meeting that were on the Theranos side.  All of them could be

5    exhausted as alternative sources in the first place.

6        So basically, what I hear Ms. Holmes' counsel saying is

7    "Well, the Government might argue this" -- and the Government

8    doesn't sound like they're planning on arguing it, from what

9    I'm gathering from Ms. Volkar, but -- "The Government might

10   argue this, the defense might argue that, and Mr. Carreyrou

11   might be called as a witness."

12       And all of that stands in the face of Mr. Carreyrou and

13   his rights.  And that does not make him a fact witness.  He's

14   not a fact witness just because they put him on a list.

15       And to say he wasn't being singled out, that's not really

16   right, because he is being singled out.  He's the only reporter

17   that is not -- that is even having to bring a motion like this

18   and that there's any question about whether he can be in

19   the courtroom.

20       I do have another argument, but it's in the papers, that I

21   would expand on a little bit if the Court would like about why,

22   even if this was in good faith and even if he were a fact

23   witness, he would not be -- he should not be excluded from the

24   courtroom.  But --

25       **THE COURT:**  I'm going to pause you there and say you've

1  given me enough argument to work with.  So I need to get on to

2  my ruling as we have other business to get to.

3       Mr. Cline, you've been waiting, though.  Did you have

4  anything further to contribute before I reach my conclusion?

5       **MR. CLINE:**  I would just say this, Your Honor.  I

6  understand this is a hardship for Mr. Carreyrou.  He's not the

7  only one suffering a hardship.  Ms. Holmes' father would like

8  to be here.  We may call him as a witness.  I don't know if we

9  will, but we might.  And because we might, he's having to miss

10  the trial of his daughter.  So the hardship here is felt by all

11  the witnesses for different reasons.

12       Mr. Carreyrou is a potential fact witness in this case.

13  Rule 615 requires his exclusion.  It's that simple.

14       **THE COURT:**  All right.  Thank you.

15       This will be the ruling of the Court.  And it's upon

16  referral from Judge Davila; that any party, including the

17  movant, could appeal my decision, it would go back to

18  Judge Davila for further evaluation.

19       My conclusion in balancing these interests between due

20  process and the defendant's rights versus the rights of

21  Mr. Carreyrou, the witness, to participate in the trial and

22  cover the trial as a reporter are that I'm going to grant his

23  motion and find that there should be an exclusion to Rule 615,

24  an exclusion made for him to Judge Davila's pretrial ruling

25  that would otherwise exclude him from the courtroom to cover

1    the trial.

2         And that's with particular facts of this case, which are

3    not -- perhaps not unique, but unusual, in the centrality that

4    Mr. Carreyrou has played in investigating this story, covering

5    the story, not just in the past, but including now, including

6    through trial.  He's still covering the story now.  And he's

7    not merely a member of the public who's interested in what's

8    going on.  He's been providing an important public service in

9    providing information about what's happened here.

10        So as far as the First Amendment needs balancing here,

11   they're very high in his circumstance.  And he is the only

12   person in his circumstance requested to testify potentially by

13   the defense; so he is being singled out.  And I'm only

14   evaluating this as to him.

15        So underlying my analysis, there's no doubt that

16   Mr. Carreyrou knows things.  He knows relevant information.  So

17   it's not a question of does he have something to testify about.

18   I imagine if he were called to testify, he could talk about

19   lots of things.

20        But the reality, just putting this into pragmatic

21   analysis, he's testifying as to secondary things, not things

22   that he saw or heard firsthand.  He's reporting and would

23   testify about something that someone else said or did and that

24   he covered.  And he really is akin to an expert witness who has

25   collected information from many sources.  And if he testified

1   in this case, he would be testifying akin to an expert who has

2   collected information from many sources, has cobbled them all

3   together, and is testifying to all those different things.

4        So I think just evaluating what the defense says that they

5   would ask Mr. Carreyrou about and the things that are in the

6   record as far as exhibits and other witnesses, it's fair to

7   treat Mr. Carreyrou as an expert because that is what he would

8   be if he were actually called.  He's not someone who has

9   firsthand independent knowledge that only he has.  He would be

10  repeating or contradicting or presenting information that

11  someone else in the trial also can testify about; probably more

12  than one person can testify about.

13       So I think just, pragmatically, it's fair to treat him as

14  an expert because that's really the role he would play if he

15  did testify, is testifying about what someone else did or said.

16       And I'm not sure he's going to be called.  There's reason

17  to be skeptical, based on the timing of his addition to the

18  witness list and to the many other witnesses who are going to

19  be called in the case.  I don't conclude -- I don't think

20  there's enough evidence for me to conclude that it's in bad

21  faith; so I'm not reaching that conclusion.  But I do reach the

22  conclusion that it will be fair to treat him as an expert

23  witness for purposes of Judge Davila's pretrial exclusion

24  order.  And if we treat him as an expert witness, well, then

25  he's not excluded from the courtroom and is not limited by

 1    Judge Davila's pretrial ruling.

 2         There were some other suggestions in the brief about there

 3    should be restrictions on the questions asked to Mr. Carreyrou

 4    or some advanced warning of what those questions are.  I'm not

 5    going to rule on those now because those are very theoretical.

 6    I don't know if Mr. Carreyrou will actually be called as a

 7    witness.  I don't know what the actual questions will be and

 8    what topics might be posed.  And there's going to be more water

 9    under the trial bridge before you get there.  There's going to

10    be more evidence that's going to come in.  It could end up

11    being cumulative.

12         And it's really the trial judge who's going to be in the

13    best position to make rulings on particular questions and field

14    the particular objections.  So I'm not going to impose any

15    advanced limits on potential questions to Mr. Carreyrou.  I'm

16    just passing those along to the possibility that he's actually

17    called and there's an actual question and answer that arises.

18         So as to the reporter's privilege and other assertions of

19    privilege that might be asserted at trial, I find that right

20    now, that's premature and speculative to rule upon.

21         But the immediate relief requested in the motion was the

22    participation of Mr. Carreyrou to cover the trial and to get

23    him out from underneath the pretrial exclusion order, and I'm

24    granting that request.

25         All right.  Thank you for listening and participating in

1   the hearing.  I'll report that to Judge Davila.

2        And we'll take a couple minutes' recess before we call on

3   the Parloff matter.

4        **MR. JASSY:**  Thank you, Your Honor.

5        **THE COURT:**  Thank you.

6                              (Recess taken.)

7        **THE CLERK:**  Counsel for the Parloff matter, could you

8   please raise your hand?

9        **THE COURT:**  All right.  I think we're ready for Round 2.

10       **THE CLERK:**  Yes, Your Honor.

11       Counsel, could you please restate your appearances?

12       **MR. KORZENIK:**  Yes.

13       **MR. BOSTIC:**  Yes, Your Honor.

14       **MR. KORZENIK:**  John, go right ahead.

15       **MR. BOSTIC:**  Sorry.

16       Good afternoon, Your Honor.  John Bostic for the

17   United States, joined by Kelly Volkar.

18       **THE COURT:**  Thank you.

19       **MR. CLINE:**  And, Your Honor, John Cline for Ms. Holmes,

20   back again.

21       **THE COURT:**  Welcome back.

22       **MR. KORZENIK:**  And, Your Honor, David Korzenik, Miller

23   Korzenik Sommers Rayman, with my partner, Terence Keegan.

24       **THE COURT:**  Good afternoon to you both.  And which of you

25   is going to take it, or are you dividing it by issues?

1        **MR. KORZENIK:**  I'll be taking it, but I may resort to

2   Terence (audio disruption) thoughts.

3        **THE COURT:**  Very good.  All right.  Thanks for being with

4   us.

5        And we've got competing motions.  First filed was the

6   Holmes motion to compel enforcement of the Rule 17 subpoena;

7   and then, responding to that, going the opposite direction, was

8   a motion for protective order or to quash that same subpoena.

9        And I've reviewed those materials, and they're all

10  referred from Judge Davila, and any appeal of my decision would

11  go back to him.

12       On this one, because the defense moved first, and for no

13  other reason than a coin flip, Mr. Cline, I'll start with you,

14  to kind of have you summarize:  What is it you need from this

15  witness?  What do you need from Mr. Parloff for the defense?

16       The test, of course, under Rule 17 is from *Nixon*, and

17  there's also issues of reporter's privilege brought up in the

18  opposition.  But kind of start me out with the basics of what

19  do you need here and why.

20       **MR. CLINE:**  And I will, Your Honor, but I want to correct

21  something from my initial brief in the Parloff matter.

22       I talked about the *Schneider* case, Judge Illston's

23  decision in *Schneider*, which is, I think, very important on the

24  reporter's privilege issue.  For some reason that I cannot

25  explain, I said that Judge Illston denied the press motion to

1    quash.  In fact, she granted it, not on First Amendment or

2    reporter's privilege grounds, but on Rule 17 grounds.  I just

3    got that wrong, and I wanted to make sure I clarified that.

4         So --

5         **THE COURT:**  Thank you, Mr. Cline, for clarifying that.  Go

6    ahead.

7         **MR. CLINE:**  To your question --

8         **THE COURT:**  Yes.

9         **MR. CLINE:**  -- Mr. Parloff will be called as a Government

10   witness.

11        It seems pretty certain that he's going to be called.  And

12   the Government will introduce through him a series of

13   interviews that he conducted with Ms. Holmes starting in 2014

14   and running into 2015.  And, again, the Government has

15   designated as trial exhibits a number of such interviews.

16   The Government will then call Mr. Parloff presumably to

17   authenticate the tapes, although I don't think there's any real

18   dispute about that.

19        But then I gather -- and I'm gathering this really from

20   his -- Mr. Parloff's counsel's account of what he expects

21   Mr. Parloff to testify about.  Apparently, Mr. Parloff will

22   then testify about what he understood Ms. Holmes to be saying

23   in context and how he ultimately came to conclude that

24   Ms. Holmes had not been -- had tried to mislead him.

25        We want to be able to rebut those assertions by

1    Mr. Parloff.  And for that, we'd like to be able to show the

2    information that he gathered from others, both information that

3    is consistent with what Ms. Holmes was telling him and

4    information that was pointing him toward potential issues with

5    Theranos.

6        And, for example, it's clear from his article that

7    Mr. Parloff talked with at least one of Theranos's competitors.

8    I suspect he talked with both.  They had all kinds of

9    criticisms and critiques of Theranos.  Those are important to

10   show that Mr. Parloff was alerted to these potential issues on

11   which he claims Ms. Holmes -- or we expect him to claim at

12   trial he thinks Ms. Holmes misled him.

13       In addition to that, Ms. Holmes and Theranos pointed him

14   to a number of other people he could talk to, and I gather that

15   he did talk to a number of those people.  Many of them are

16   named in his article.  He talked to heads of hospitals, of

17   these three hospital chains.  He talked to, I think, the CEO of

18   Walmart, with whom Theranos had a partnership.  He talked to a

19   Dr. David Helfet, who is a medical expert and who had reviewed

20   information concerning the Theranos tests.

21       So he had a variety of sources, and some of whom

22   Ms. Holmes pointed him to.  And we want to be able to explore

23   with him, with the benefit of his interview notes, the

24   information that he gathered from them.  And we want that to

25   show (a) that he was not misled by Ms. Holmes; that he had all

1   kinds of sources of information that both alerted him to the

2   issues and responded to the issues from people other than

3   Ms. Holmes; (b) we want to be able to show that Ms. Holmes,

4   just in pointing him to all of these other people, was

5   demonstrating her good faith and lack of any intent to mislead;

6   and (c) we want to -- we may argue that Mr. Parloff's ultimate

7   conclusions here are colored by bias.  And by that, I mean by

8   desire to blame any errors that he made in his initial article

9   on Ms. Holmes rather than on his own failure to understand what

10  he was told.

11        So that's why we want what we want.  We've explained it in

12  somewhat more detail in the brief.  But, in essence, what we're

13  looking for is the materials that Mr. Parloff has -- had

14  available to him during the relevant period, which is

15  essentially from March or April of 2014, somewhere in there,

16  through roughly the end of 2015 and early 2016.

17        **THE COURT:**  All right.  Thank you.

18        And starting with kind of the Rule 17 issues, before

19  getting into any privilege assertions on Mr. Parloff's side,

20  tell me your argument as to why that -- I should just reject

21  the subpoena right there at the Rule 17 stage.

22        **MR. CLINE:**  And, Your Honor, I will say, I think Rule 17

23  is really the issue here for reasons we can discuss.  I don't

24  think the reporter's privilege really figures into this at all.

25  I believe it is a Rule 17(c) issue.

1    **THE COURT:** And that's -- and that's why I'm -- that's why

2    I'm starting and may finish with that issue, is my focus.

3    **MR. CLINE:** Understood.

4    I think I've explained the relevance of the material.  The

5    question is maybe admissibility.

6    If we were seeking this material for its truth, I would

7    understand the admissibility argument.  There'd be a hearsay

8    issue, and the materials would be inadmissible, but we're not.

9    We're seeking these materials to show the information that

10    Mr. Parloff had available.  During this period, as he will

11    testify, we're told, that he was concluding that Ms. Holmes had

12    misled him, he had a range of information available to him.

13    We want to show the information that Ms. Holmes pointed

14    him to.  Doesn't matter whether the information turned out to

15    be correct or incorrect.  The fact that she pointed him to

16    these sources and that he obtained information from them is

17    important, irrespective of whether the information he obtained

18    was true or not.  And so the admissibility issue really comes

19    down to a hearsay question, and we're not offering it for its

20    truth.

21    As for specificity, I don't think we could be much more

22    specific than we were.  We asked for notes of specific meetings

23    on specific dates with specific people.  And then there are a

24    few slightly broader categories, but I don't think Mr. Parloff

25    would have any difficulty identifying the material that

1  we're -- that we're seeking.

2      **THE COURT:**  All right.

3      **MR. CLINE:**  So --

4      **THE COURT:**  I'm going to --

5      **MR. CLINE:**  -- those are really the --

6      **THE COURT:**  Sorry to interrupt.  I cut you off.

7      Mr. Parloff, I'm going to give his counsel a chance.  I've

8  got to take a break for just a piece of business here.  I'll be

9  right back.  So, Mr. Parloff's counsel, you'll be coming up

10 next.  One second.

11                      (Recess taken.)

12     **THE COURT:**  All right.  Let's pick up on the witness side.

13 Go ahead.

14     **MR. KORZENIK:**  Good.  Thank you, Your Honor.  David

15 Korzenik again.

16     I think that John Cline seriously overstates what it is

17 that Roger Parloff can testify to, what he will testify to, and

18 what's admissible about anything that he either knows or has in

19 his records.

20     The truth of the matter is, Roger Parloff can only testify

21 in this case as to what Ms. Holmes told him.  There's also a

22 brief, a limited interview as to -- with Mr. Balwani.  So that

23 too is a matter about which Mr. Parloff is an eyewitness.  He

24 is not an eyewitness as to anything else in this case.

25     My understanding is that the reason that he's being called

1  is because Holmes told him X, Y, Z; he printed X, Y, Z in the

2  article; and apparently -- we can't prove this but

3  the Government will -- that article was given to investors and

4  they relied on it to their detriment.  We can't prove that.  We

5  don't know that as an eyewitness.  That's another part of the

6  case.

7      But we are not, as John suggests, here to testify that

8  she -- that those statements were false.  We do not know.

9  Not as -- we know that as a reporter, as any reporter would,

10  just as Carreyrou knows that to be false or believes it to be

11  false.

12      But the trial is not about Mr. Parloff's state of mind.

13  The trial is not a libel case against his subsequent article in

14  which he corrected his first.  If it were, this trial would

15  probably go on until Easter, if not Tisha B'av.  It would be --

16  and it would cover things that just had nothing to do with

17  this.

18      What I hear from what John is suggesting is that he wants

19  to go into Roger Parloff's bias.  That's just -- it can't

20  possibly be the subject of this trial because it's not about

21  his state of mind; it's about the defendant's state of mind.

22  And it's not about whether he coulda, woulda, shoulda reported

23  it differently; coulda, woulda, shoulda stood by his first

24  article.  None of this thing is something that he can testify

25  or should.  So the only thing that he is here for is to what he

1    was an eyewitness for.

2        Now, I want to point out one thing that's actually rather

3    significant, too, in terms of the law.  All of the different

4    people that they list as to the interviewees, well, it's

5    obvious there's a limited universe of people to whom a reporter

6    speaks.  And you can list them all.  And they may know some of

7    this from the -- reading the article.

8        They can ask Roger Parloff if -- to validate his -- to

9    authenticate the article and to say, "Those are the two

10   articles I wrote."

11       And did Mr. So-and-so in the article say that to you?

12       That, too, is something that he can testify to, as to

13   whether they said it or whether they didn't.  But I don't even

14   see how that's relevant.  I don't even see how that's

15   admissible.  I don't see how that is anything that's needed,

16   because all of these people, every single one of the people

17   listed in their subpoena, they are all available to the

18   defendant.  They could subpoena any one of them, and they have

19   done so.

20       So it does seem to me that they don't meet a single one of

21   the Rule 17 tests.  None of this stuff is admissible that they

22   imagine they can question him on.

23       The specificity also is sort of a faux specificity.  They

24   know that we interviewed different people, but that doesn't

25   mean -- and they may know that we interviewed them on

1    particular dates.  But they haven't the slightest idea what's

2    in those notes.  They don't even know if they exist.  In fact,

3    some of the notes that they've subpoenaed that they called

4    "notes" don't exist.  Some of the tapes that they say exist

5    don't exist.

6         So what we're dealing with is, their specificity is

7    nothing more than a blind shot at Roger's file.  And the one

8    thing that is very clear is the specificity requirement is

9    something that is mandated by both Rule 17 and by the

10   reporter's privilege.

11        I do want an opportunity to address the claim that John

12   has made that somehow the reporter's privilege doesn't apply in

13   the Ninth Circuit where criminal cases are involved.  That's

14   just simply not true, and it is -- it's a disservice to -- to

15   this Court if that's the argument being made.

16        The truth of the matter is, ever since -- you know, what

17   John would like is to be able to say that *McKevitt* is the

18   reading that the -- of the Seventh Circuit, is the reading that

19   the Ninth Circuit and the Second Circuit and all the others

20   follow.  It is not.

21        And the first thing that proves that I think John's legal

22   point is wrong is that the Seventh Circuit criticizes the

23   Ninth Circuit and criticizes the Second Circuit and the First

24   and the Third precisely because they follow the reading of the

25   reporter's privilege that we have advocated here.  And that

1    tells you a lot.  If Judge Posner disputes the Ninth Circuit,

2    he's disputing the reading that we advocate here.

3        The other thing that is significant is in *U.S. v. Smith*,

4    another case that John cites and relies on, it says (reading):

5            "Although some courts have taken" --

6        And this is the Fifth Circuit, one of the only other ones

7    that disputes the Second Circuit and the Ninth Circuit on the

8    reporter's privilege.  It says (reading):

9            "Although some courts have taken from

10           Justice Powell's concurrence a mandate to construct a

11           broad, qualified newsreporters' privilege in criminal

12           cases . . . ."

13       And there, he cites the First Circuit and the Third.

14       He says:  The Fifth Circuit says we decline to do so.

15       But the truth of the matter is, the Ninth Circuit was the

16   first circuit to adopt the interpretation in criminal cases

17   that we advocate here.  The two cases were *Farr* and *Pretzinger*.

18   And what's interesting is those are the first two cases after

19   *Branzburg* to actually interpret *Branzburg* and apply it to

20   criminal cases.  They do that.

21       And what's interesting is, then the Second Circuit and the

22   Third Circuit in *Cuthbertson* -- Second Circuit in *Cutler*,

23   Third Circuit in *Cuthbertson*, they all adopt *Farr* and follow

24   the Ninth Circuit.

25       And then what's interesting is it all feeds back to the

1    Ninth Circuit again in *Shoen*, where *Shoen* says:  Yep, they

2    followed us, and that's what they're doing; and we follow -- we

3    continue to follow our approach.

4        The interpretation that we call for here is precisely the

5    interpretation that John -- that Ms. Holmes' advocate advances,

6    and it's not to be followed.

7        The *Schneider* case in many ways is really just a

8    standalone.  I don't think it's to be followed.  But it's

9    instructive that *Schneider* also winds up going the other way,

10   against the defendant in the -- on the Rule 17 level.

11       The two tests overlap.  To some degree, they are

12   different; so it's possible to have different outcomes with

13   each of them.  But I think that it's pretty clear where the

14   Ninth Circuit stands here, and that's the interpretation that

15   we're advancing.

16       The thing that I find troublesome here about what Holmes

17   contemplates is that the whole -- these theories of possible

18   use of Roger Parloff as a witness are extremely attenuated and

19   hypothetical.  They have no idea what the interviews of -- that

20   they list, the Perry or some of the others, contain.  Some of

21   it could be good for them.  Some of it could be bad for them.

22       But I want to make this one thing very clear.  We provided

23   what we were eyewitness to as to this defendant or the two

24   defendants, nothing more.  And when Roger Parloff met with the

25   AUSA, they were following the Justice Department guidelines

1   that defer to the reporter's privilege, and they would not and

2   did not ask him for anything that Roger said:   I feel

3   uncomfortable providing that.

4        Some of these people are confidential witnesses.   And in

5   the defendant's papers, they say that none of them are

6   confidential.   They have no way of knowing any of these things.

7   A lot of this stuff is speculative and wishful.

8        But, again, the only thing that Roger Parloff can testify

9   to is what Ms. Holmes said to him and what -- and he can

10  authenticate his articles and confirm that those things said to

11  him that the articles include were indeed said to him.   And

12  that's the end of his mission and role here.

13       It's possible that they could ask him some questions, this

14  one sentence that everyone seems to be interested in, that John

15  is interested in, about whether he's changed his view.   I don't

16  think that that's -- if he's changed his view, it can only be

17  relevant in the way that he knows is relevant because of

18  something that she told him.

19       But he can't say it's true or false based on other

20  reporting that he did.   He can't say it's true or false because

21  Carreyrou wrote that it was false.   Nobody -- he does not know

22  what's in the black box or the testing machinery that they were

23  using, and he can't testify to that.

24       So to make this a trial about what Roger Parloff woulda,

25  coulda, shoulda reported is really the wrong thing.   It's not

1   admissible.  It's not relevant.

2        And if someone wants to bring this type of irrelevancy

3   into the trial, they can do it through all the other witnesses

4   who are all within reach.

5        **THE COURT:**  Thank you very much.

6        Let me get Ms. Volkar's input, if anything, on behalf of

7   the Government, or Mr. Bostic, whoever's handling it.

8        **MS. VOLKAR:**  Thank you, Your Honor.  I'm actually going to

9   hand it over to my colleague, Mr. Bostic, who has already, I

10  think, met with Mr. Parloff before.

11       **THE COURT:**  Very good.

12       And I note for the record, Mr. Parloff is an attendee at

13  the hearing, listening in.

14       Go ahead, Mr. Bostic.

15       **MR. BOSTIC:**  Thank you, Your Honor.

16       I don't have much to add.  Let me just confirm a few

17  points made by counsel previously.

18       When we met with Mr. Parloff and collected evidence from

19  him, Mr. Korzenik is correct that we did not request any

20  recordings or notes relating to conversations that Mr. Parloff

21  had with anyone besides the two charged defendants in this

22  case.  That was not just because of Mr. Parloff's status as a

23  reporter.  It was also because of what we view as the lack of

24  relevance of that information in this case.

25       Statements made by other people who were interviewed by

1    Mr. Parloff on these topics would certainly be hearsay, and

2    I -- I wonder about whether there really are non-hearsay uses

3    at trial for these statements.

4        To the extent they are consistent with what Ms. Holmes

5    said, that would not be exculpatory; and it wouldn't be

6    surprising either because many of these individuals got their

7    information from Ms. Holmes.

8        To the extent they're inconsistent with what Ms. Holmes

9    said, that wouldn't be exculpatory either.  The fact that

10   someone provides accurate information doesn't excuse someone

11   else who has provided deceptive or inaccurate information.  So

12   that's why we didn't seek that information.

13       If Mr. Parloff is called as a witness at trial, the

14   defense has the benefit of a memoranda summarizing our

15   conversations with him to date.  And as the defense knows,

16   those conversations have focused on the evidence that we

17   actually collected from him; namely, the statements actually

18   made by Ms. Holmes to him.

19       To the extent those statements will be proven to be true

20   or false at trial, that proof needs to come from other

21   witnesses and other pieces of evidence besides Mr. Parloff, to

22   the extent that other witnesses and evidence will show what the

23   technology was actually capable of, what was happening at

24   Theranos, and what was not happening.  So I provide those

25   details in case they're helpful to the Court.

1        **THE COURT:**  Thank you, Mr. Bostic.

2        Mr. Cline, back to you for the last word.

3        **MR. CLINE:**  Yes, Your Honor.

4        Quoting from Mr. Parloff's pleading -- and I haven't heard

5   Mr. Bostic contradict this -- he's not just going to come in

6   and authenticate his tapes of Ms. Holmes' comments.  He's going

7   to talk about what he took her statements to mean in the

8   setting of the question that -- questions that he asked of her.

9   I'm quoting now from Mr. Parloff's pleading.  And possibly

10  whether inconsistencies in Ms. Holmes' various statements over

11  time led Mr. Parloff to such a belief; namely, that she was not

12  honest with him.

13        The Government has noticed as a trial exhibit not just the

14  2014 article that was laudatory of Theranos, but also the late

15  2015, early 2016 article attached to our pleading that is --

16  where Mr. Parloff says:  I was misled.

17        So Mr. Parloff's state of mind is going to be at issue

18  here.  And, in particular, it's going to be issue as he

19  describes his view of Ms. Holmes' forthrightness with him.

20        His other sources of information, what information he had

21  available to him at the time that he was forming those

22  conclusions is clearly relevant here.  It is -- and it's

23  relevant for a non-hearsay purpose.  Not for the truth, but to

24  show the information that he had available to him.

25        It's also relevant to show Ms. Holmes' good faith in

1    sending him to people.

2        And the speculation that the people got information --

3    other information from Ms. Holmes is just that.  I mean,

4    Dr. Helfet would probably be surprised to hear that he was

5    essentially being described as a puppet of Ms. Holmes.  I'm

6    sure the CEO of Walgreens would feel the same way, and so on.

7        The point is, this is not just going to be testimony:

8    Yes, those are my recordings.  I talked to Ms. Holmes on a

9    certain date.  Good-bye.

10       He is going to offer his view of the meaning of what she

11   said and the -- his conclusions about the veracity of what she

12   said.  That's what it sounds like to me.  And --

13       **MR. KORZENIK:**  Your Honor, can I address that when he's

14   done?

15       **MR. CLINE:**  Sorry, Your Honor.

16       To not be able to challenge that, both through a probing,

17   vigorous cross-examination and through a compulsory process of

18   relevant materials, would deprive Ms. Holmes of her Fifth and

19   Sixth Amendment rights.

20       **THE COURT:**  All right.  Thank you.

21       Go ahead.

22       **MR. KORZENIK:**  There's the suggestion that Roger Parloff

23   is going to testify as to what he thought she meant generally,

24   we said, in the context of the questions that were asked.

25       One of the things that we were careful to do was to

provide the entire transcript and the entire set of notes of
the interview so that both sides would have the full -- the
statements she made in full context.  So the only thing that
Roger would be saying as to what he understood it to mean was
to explain it in the context of the questions that he asked her
and the answers that she gave him.

So it's not in the context of some other extrinsic matter
that he was relying on.  It's to make it clear that we've given
full context and that they have that.

The other thing, as to whether he felt that she had misled
him, he does feel that she did, but he is not going to be
testifying as to that in terms of anything other than what she
told him.  And it has -- and I think this is fully known.  We
didn't raise this as something that we're going to testify to.
It's a statement that Holmes' counsel put in his papers.  It's
where, I think, Roger says at one point:  I don't think that
she lied to me directly, but she deliberately misled me.
Something to that effect.

And I think they kind of like that, even though I think
that's still straight fraud in a -- in a legal sense.  But it
may be helpful to confuse the jury a little.  So they like
that.  And I think they say that they want to put that in.

The answer is, is that that's what he wrote.  And if they
put that in, then Roger can simply explain what later on, when
he revisited his notes about what she told him -- not when he

1  revisited his notes about Carreyrou, not when he revisited his

2  notes about anybody else, but when he revisited his notes about

3  what she told him, he saw that she did state those things that

4  were -- that were challenged.

5      So he is not going to be testifying about anything

6  extrinsic to his conversation with her.  He can't, and he

7  shouldn't, and he won't.  And it's neither admissible; it's not

8  competent; it's not material; it isn't needed; and I don't --

9  again, I think it's all largely imagined and hypothetical.  We

10  have a limited role here, and we did what we thought was the

11  right thing.

12      I should also point out that the material that we

13  ultimate- -- that Roger Parloff agreed to provide is exactly

14  the kind of thing that a grand jury test would require; in

15  other words, he was eyewitness to those statements.

16      But when it comes to anything beyond that, the law doesn't

17  compel that.  And he didn't waive anything by having given what

18  he reasonably believed the law would require him to provide and

19  what he felt ethically he ought to do.

20      But he did not go beyond that, and none of them -- and

21  there's no cause -- and this is my closing point.  There's no

22  cause to make him provide notes and tapes of confidential, and

23  even non-confidential, interviews that he took of third

24  parties.  They're not admissible; they're not relevant; they're

25  available from other people; and they have no specific

1  knowledge of what they contain.

2      They fail Rule 17, one, two, three, right down the line.

3  And they fail the reporter's privilege on similar bases.

4      **THE COURT:**  All right.  Thank you all very much.

5      This will be my ruling on the motion to compel and the

6  motion to quash, Dockets 1028 and 1063.

7      The motion to compel will be denied.

8      The motion to quash will be granted and on these bases:

9  The test I'm applying here is Rule 17 and *U.S. v. Nixon* and its

10 progeny, well established in this circuit, assessing relevance,

11 admissibility, materiality, need, and the specificity of the

12 materials being requested.

13     I'm not reaching the discussions about different circuits

14 and their assessment of the reporter's privilege because I

15 don't need to reach that issue.  The threshold test is whether

16 I should compel the production of these materials or quash the

17 production of these materials under Rule 17.

18     And my conclusion, assessing these issues of law, is that

19 the defense has not established the relevance, admissibility,

20 materiality, need, or specificity of what they're seeking.  For

21 sure they have identified certain things.  They've listed

22 different categories and different people that they would like

23 to get, but I do -- to adjoin your phrase, I do think it's faux

24 specificity.  They're guessing.  It's a fishing expedition as

25 to whether there might be material out there that could be

 1    helpful to the defense.  They don't know that there actually

 2    is.  They're guessing that there might be, and that's not

 3    sufficient under Rule 17 for the Court to compel the

 4    production.

 5         The state of mind of Roger Parloff or any other witness

 6    who might be hearing from another witness is just not relevant

 7    to the proceedings.  And it's secondary, and that's why it's

 8    not needed either.

 9         If the defense, or the prosecution, for that matter, wants

10    to call a witness who is a -- who has some percipient knowledge

11    of what occurred, well, they can do that.  And both sides, in

12    fact, have very long witness lists, and they appear to be

13    intending to call lots of firsthand witnesses.

14         So going to Roger Parloff's notes and who he talked to

15    beyond Ms. Holmes and Mr. Balwani is just a -- it's far afield

16    from what's at issue in the case and what's being tried.  And

17    if I were to allow this expedition and search, the trial very

18    well could be going on for many years as both sides pursue

19    secondary and tertiary pieces of information, witnesses who

20    would not be as useful as getting the firsthand witnesses who

21    might have something to say about what occurred and has been

22    charged in the case.

23         So I don't think it's a close call as far as the Rule 17

24    showing and, therefore, don't need to reach kind of closer and

25    somewhat more convoluted discussions about the reporter's

1    privilege, because if I get into a circuit split discussion,

2    well, different circuits have looked at that in different ways.

3    And someday, if the Ninth Circuit looks at this case, they

4    could -- could reach a different conclusion.

5        But I think Rule 17 is more established as far as

6    the Court's analysis goes.  And here, my conclusion is that the

7    defense has not established the necessity of this information.

8        So that's my assessment and the reasons for denying the

9    motion to compel and granting the motion to quash the subpoena.

10       So I thank you for your presentations.

11       That concludes our special setting this afternoon.

12       Have a good afternoon.

13    **MR. KORZENIK:**  Okay.  Thank you, Your Honor.

14    **THE COURT:**  We're in recess.

15    **MS. VOLKAR:**  Thank you, Your Honor.

16          (Proceedings adjourned at 3:02 p.m.)

17              ---o0o---

18

19

20

21

22

23

24

25

## CERTIFICATE OF TRANSCRIBER

I, ANA DUB, CSR NO. 7445, RDR, RMR, CRR, CCRR, CRG, CCG, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

DATE:  Friday, October 15, 2021


_____

Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG