# Exhibit 3



# FEDERAL BUREAU OF INVESTIGATION

Date of entry   09/10/2021

ROGER PARLOFF (PARLOFF), previously interviewed, was interviewed via WebEx video teleconference. Representing PARLOFF during the interview was David Korzenik from Miller, Korzenik, Sommers, Rayman LLP. Also present for the interview were Assistant United States Attorney (AUSA) John Bostic, AUSA Jeffrey Schenk, and United States Food and Drug Administration (FDA) Special Agent George Scavdis. After being advised of the identity of the interviewing parties and the nature of the interview, PARLOFF provided the following information:

PARLOFF graduated from Harvard University before obtaining his Juris Doctorate (J.D.) from Yale University. After law school, PARLOFF clerked for a federal judge in the Eastern District of Texas. PARLOFF then worked in the Manhattan District Attorney's Office before working as a criminal defense attorney for three years. PARLOFF then taught law at Hofstra University. After Hofstra, PARLOFF became a journalist and worked for American Lawyer Magazine for 12 years. PARLOFF then worked for Fortune magazine, from 2004 to 2016, as their main legal correspondent. PARLOFF has since worked as a freelance journalist.

PARLOFF taped approximately four to seven hours of conversations with ELIZABETH HOLMES (HOLMES) for a Fortune article, and there were more conversations with HOLMES that were not recorded over the years he spoke with her. For these recorded conversations, HOLMES agreed to being recorded. For conversations with HOLMES which were not recorded, PARLOFF would usually take notes during the conversation. There were occasions when PARLOFF did not take notes when he spoke with HOLMES, such as when the conversations were just logistical, during meals, or when HOLMES contacted him and he did not have a pen and paper handy. When taking notes PARLOFF would make an effort to try to capture the literal language said by HOLMES if possible. PARLOFF had been taught speed writing as a journalist which he used to take notes.

| | | | |
|---|---|---|---|
| Investigation on | 09/03/2021 at | San Francisco, California, United States (Phone, Other (WebEx video teleconference)) | |
| File # | 318A-SF-7315857 | | Date drafted 09/03/2021 |
| by | Mario C. Scussel, Adelaida Hernandez | | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

318A-SF-7315857

Continuation of FD-302 of (U) Interview of Roger Parloff , On 09/03/2021 , Page 2 of 7

PARLOFF's initial contact with Theranos was when he saw a patent lawsuit involving HOLMES which DAVID BOIES was litigating. PARLOFF found it interesting that BOIES, who was one of the premier litigators in the country, was representing a company which PARLOFF had never heard of. PARLOFF then had contact with BOIES' law firm about doing a story on Theranos, as the company was starting to do patient testing and, as a result, was coming out of stealth mode.

PARLOFF's first meeting with HOLMES was at Theranos' headquarters in Palo Alto on California Avenue, which had previously been the headquarters for HP and Facebook. During this four day visit to Palo Alto, PARLOFF went to Theranos' headquarters on at least three of the days. During his visit PARLOFF was given a tour of Theranos's facilities to include Theranos headquarters and their manufacturing facility. PARLOFF thinks HOLMES was present for the whole tour he was given of Theranos. However, PARLOFF did not see the lab in which testing was being done on patient samples. PARLOFF had asked HOLMES to see the patient testing lab, but she told him that he had basically already seen it, as it was just more analyzers. PARLOFF did see the research and development lab, and saw the Theranos analyzer. The Theranos analyzer was the size and shape of a desktop computer with smoothed edges and a black and silver diagonal design. Theranos' manufacturing facility was a huge warehouse in Newark, California. PARLOFF did not recall Theranos manufacturing their analyzers here, and there was not an active assembly line at this location. PARLOFF did not recall this location being very active.

PARLOFF also got a blood test at the Walgreens in Palo Alto, where his blood was drawn via fingerstick. PARLOFF was impressed with how painless the phlebotomist was able to make the fingerstick blood draw. This was a planned visit and HOLMES might have gone with him to get his blood tested. PARLOFF got his test results back a few hours later in a password protected email.

During his visit to Theranos HOLMES also provided PARLOFF with written materials that included a presentation marked PARLOFF-0000130, which was shown to PARLOFF. PARLOFF recognized this presentation, which he received around the first day of his visit. HOLMES was there when he was provided with a hard copy of these materials. Slide 4 and 5 of this presentation were showing the difference in the amount of blood drawn for a

Theranos blood test as compared to the amount taken for a conventional blood test. The procedure shown on PARLOFF-000142 was similar to PARLOFF's experience when he had his blood drawn at Walgreens. The next slide, PARLOFF-0000143, was titled "1/1000th the size of a typical blood draw" also stated "Theranos runs any test available in central laboratories, and processes all sample types.", "All tests match existing reimbursement codes." and "Theranos provides the highes level of oversight, automation, and standardization in our pre- and post-analytic processes, ensuring the highest levels of accuracy and precision.". None of this information was presented as something which Theranos hoped to do, it was presented as something they were already doing. PARLOFF was not told anything later to walk back any of these claims. The presentation included the tests on Theranos' test menu from PARLOFF-000145 to PARLOFF-000147. HOLMES never told PARLOFFF that there were tests on Theranos' test menu which had to be run on third party devices.

For the recordings PARLOFF made of his conversations with HOLMES, he used a digital recorder which had a USB port so the files could be uploaded to a computer. PARLOFF placed these files on a USB and provided them to the government pursuant to a federal grand jury subpoena.

PARLOFF was played the following clip from a recording of an interview he did with HOLMES on May 12, 2014.

"ROGER PARLOFF: Now, with that -- that said, when I -- you know, when I looked at Quest, you know, obviously, they have many different kinds of chemistry going on. They do about 600 tests in this -- in this regional hub lab -- ELIZABETH HOLMES: Uh-huh. ROGER PARLOFF: -- many different kinds of samples, you know, including tissue samples, biopsies. So -- so they're preparing slides for examination under microscope, you know, among other things. ELIZABETH HOLMES: Uh-huh. ROGER PARLOFF: Now, do you -- does your platform replace all of those? ELIZABETH HOLMES: Our platform can yield -- let me see the best way to say this. We can do all of those tests. ROGER PARLOFF: Uh-huh. ELIZABETH HOLMES: So we can provide data back to clinicians for -- for all the same tests. ROGER PARLOFF: Okay. And you're -- you're hesitant about saying "replace"? ELIZABETH HOLMES: Well, I -- I think -- ROGER PARLOFF: Does it sub- -- I mean, could it substitute for those or are there advantages to some -- for some reasons and to others for other reasons? ELIZABETH HOLMES: The reason I didn't say "replace" was just

because of the esteem of -- ROGER PARLOFF: Oh, a dip- -- a diplomatic matter? ELIZABETH HOLMES: Well, you know, we're -- we're processing the samples a different way. Let's put it that way. But we believe very strongly that we're able to yield data at the highest levels and with the highest levels of quality and -- and data integrity. So this is a -- another framework through which to -- to run the same types of tests, basically."

In this clip PARLOFF asked HOLMES if Theranos could do all these 600 tests, and HOLMES responds that they could. Accordingly PARLOFF understood that Theranos could do all of these tests.

PARLOFF was played the following clip from a recording of an interview with HOLMES on May 21, 2014:

"ROGER PARLOFF: The -- the difference between -- there -- there are now close to 200 -- or at least the last I looked, there were close to 200 tests now on your website. The difference between the ones that are on the website and the ones that aren't -- ELIZABETH HOLMES: Yeah. ROGER PARLOFF: -- because you said -- you said you -- you have -- you -- you -- you feel comfortable about more than one thousand CPTs? ELIZABETH HOLMES: Yes, yes. ROGER PARLOFF: Okay. ELIZABETH HOLMES: Yes. ROGER PARLOFF: And is a thousand the right -- or 1,200? Is that a better number, or maybe a thousand? ELIZABETH HOLMES: Yeah, I think -- I think if you say "more than a thousand," that's -- ROGER PARLOFF: Yeah. ELIZABETH HOLMES: -- that's a good reference point for it. ROGER PARLOFF: Okay. And what is the difference, then, the -- the 200 that are listed and the -- a thousand you feel comfortable you can do? ELIZABETH HOLMES: Yeah, absolutely. So this gets into some of what we were talking about before in terms of, you know, when we do venipunctures and those types of things. ROGER PARLOFF: Oh, uh-huh. ELIZABETH HOLMES: And so it's more that we have operationalized a certain set of tests, expecting a certain set of ordering patterns with certain sets of inventories and workflows, for those tests that are most commonly done. ROGER PARLOFF: Uh-huh. ELIZABETH HOLMES: And so those ones on the website are the ones that are most commonly done. ROGER PARLOFF: I see. Okay. ELIZABETH HOLMES: And so those are the ones that -- that we brought up first. ROGER PARLOFF: I see. ELIZABETH HOLMES: But we are adding to it. And, in fact, before the article comes out, we may have a new batch that is going on the website -- and I'm going to add this to my list here -- which is a whole set of the infectious disease test which are relevant -- ROGER

PARLOFF: Oh, wow. ELIZABETH HOLMES: -- in the context of the Helfet conversation. ROGER PARLOFF: Yes, yeah. ELIZABETH HOLMES: So as we sort of operationalize more areas like that, then that's when we add them to the website. ROGER PARLOFF: Okay. ELIZABETH HOLMES: And the -- I should clarify the word "operationalize." Effectively, what we mean by that is if someone sends a test to the lab, we can run it even if the test is not on the website. ROGER PARLOFF: Uh-huh. ELIZABETH HOLMES: However, we are not actively publishing that we have that test because we have focused on the core set that are on the website for how we have operationalized the laboratory today. But we do have the ability to -- to do tests that are not on the website, and we do do that. I mean, there's patients who come into our collection centers and they have orders for tests that are not on the website, and we do handle it. ROGER PARLOFF: Okay. And -- and not to -- not to belabor this too much, but I guess I -- I -- how -- how -- how does it help to not have -- you know, to have a small Vacutainer as opposed to a nanotainer for the ones that aren't operationalized? How would that help you? I don't understand. ELIZABETH HOLMES: So off the record -- ROGER PARLOFF: Uh-huh. ELIZABETH HOLMES: -- the way it helps is that, if you remember those devices that you saw in the lab -- ROGER PARLOFF: Uh-huh. ELIZABETH HOLMES: -- they all have those cartridges that go into them. ROGER PARLOFF: Uh-huh. ELIZABETH HOLMES: And we pre-configure those cartridges based on the ordering patterns that we see. So if, for example, someone orders one of those specialty tests and we've not built out all the inventory of cartridges, because, ultimately, we're going to have thousands of cartridge types that we use -- ROGER PARLOFF: Mm. ELIZABETH HOLMES: -- then we would need to get a second cartridge which is dedicated just for that specialty type. ROGER PARLOFF: Mm. ELIZABETH HOLMES: And so it's a little bit more blood. ROGER PARLOFF: I see. ELIZABETH HOLMES: It's not a lot of blood, but it's a little bit more that we can use for a second cartridge. Now, that gets into sort of the whole thing about how the devices work, which we don't really want to get into which is why -- ROGER PARLOFF: I see. ELIZABETH HOLMES: -- when you asked me that question the first time, I -- ROGER PARLOFF: Okay. ELIZABETH HOLMES: -- sort of answered it by saying, you know, the -- there's a core test that we've, quote/unquote, operationalized the lab around; we have the ability to do other tests. ROGER PARLOFF: Uh-huh. ELIZABETH HOLMES: But they're more specialty tests, and so we don't list them on our website even though we can do them if they're sent in because our main focus and our volume right now is on those other tests."

PARLOFF understood HOLMES statements in this clip to mean that Theranos analyzers could run more tests beyond the tests which were listed on their website. HOLMES never told PARLOFF that Theranos was running these tests on third party devices or sending samples to other labs to run tests.

PARLOFF was played the following clip from a recording of an interview with HOLMES on April 7, 2014:

"ROGER PARLOFF: Foods that absorb. Obviously, you -- you have a number of military people on your board. What sorts of things are they seeing in -- in what you're doing? ELIZABETH HOLMES: And you're also welcome to talk to them if you would like to, any of these guys. ROGER PARLOFF: Yeah -- ELIZABETH HOLMES: I'm going to talk to Henry Kissinger also, and I might have him meet with you when you're back in New York and to talk to you about this. ROGER PARLOFF: Oh, that would be -- oh, that would be fantastic. (Inaudible). ELIZABETH HOLMES: He -- you know, it -- it's a very similar application to the hospital application, both in terms of the emergency room and trauma -- ROGER PARLOFF: Hm. ELIZABETH HOLMES: -- as well as just the cost of health care. I mean, if you talk to these senior military leaders, they will tell you that the cost of health care is a major problem for them and -- in terms of their own budgets. And -- and the way that we can facilitate savings both on a direct out-of-pocket basis as well as a fully loaded basis in terms of what, quote/unquote, real-time data means with respect to being able to make better decisions around how you triage someone, and then around the time it takes to triage them, the time they're in a bed, whether you give them the right intervention the first time or whether you have to go through this back-and-forth process, it adds up really fast. And so -- so that's an element of it. And then there's -- there's military-specific applications, too, that are -- that are quite promising when you think about what it means to be on a mission or in the middle of nowhere and need, you know, access to technology. ROGER PARLOFF: Hm. ELIZABETH HOLMES: And that -- that's something that, you know, I'm personally very passionate about because I see it as our way to serve, you know, in whatever small way we can. ROGER PARLOFF: What would it -- like, beyond what -- whatever you have in your centralized location in Phoenix, say, when all the -- ELIZABETH HOLMES: (Inaudible). ROGER PARLOFF: -- is that something that you can put out in the field, you know, when we're

fighting in Iraq, or is that too -- ELIZABETH HOLMES: Yeah. ROGER PARLOFF: -- too large? ELIZABETH HOLMES: No, we can."

In conjunction with this clip PARLOFF was also shown PARLOFF-0000077 which contained typed notes from a conversation with HOLMES on April 22, 2014, which was not recorded. PARLOFF would type up his handwritten notes. In these notes, notes in brackets would be for when PARLOFF was not capturing the exact words said, but instead the basic substance of what was said. The notes contained the following "{discussion of General Mattis ... can't discuss actual use in Afghanistan but can discuss potential for military care ... hospital systems and combat care as general matter ...}". This conversation left PARLOFF with the impression that Theranos' device was being used in Afghanistan since he was told not to ask GENERAL (JAMES) MATTIS (MATTIS) about its actual use in Afghanistan, which made it appear to be classified information which MATTIS could not talk about. PARLOFF was also being told this off the record so he could not use it in the article.