JOHN D. CLINE (CA State Bar No. 237759)
50 California Street, Suite 1500
San Francisco, CA 94111
Telephone: (415) 662-2260 │ Facsimile: (415) 662-2263
Email: cline@johndclinelaw.com

Attorney for Defendant ELIZABETH A. HOLMES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>ELIZABETH HOLMES and<br>RAMESH "SUNNY" BALWANI,<br><br>　　　　Defendants. | Case No. CR-18-00258-EJD<br><br>**MS. HOLMES' SUPPLEMENTAL RESPONSE TO MOTION OF MEDIA COALITION TO INTERVENE FOR LIMITED PURPOSE OF SEEKING THE UNSEALING OF COMPLETED QUESTIONNAIRES OF SEATED JURORS AND ALTERNATES; MOTION TO UNSEAL COMPLETED QUESTIONNAIRES OF SEATED JURORS AND ALTERNATES** |

MS. HOLMES' SUPPLEMENTAL RESPONSE TO MOTION TO INTERVENE AND MOTION TO UNSEAL
CR-18-00258 EJD

Pursuant to the Court's October 14, 2021 Order, ECF 1088, Ms. Holmes respectfully submits this supplemental response to the media coalition's motion to unseal juror questionnaires. Following the juror colloquies on October 12-13, 2021, Ms. Holmes now opposes that motion. The juror colloquies made clear that disclosure of the questionnaires will compromise Ms. Holmes' fair trial rights under the Fifth and Sixth Amendments. Disclosure would distract the jurors and expose them to outside information and influence, and the prospect of post-verdict harassment would threaten to taint their decision-making as they deliberate in this case. District courts have broad authority to take prophylactic "remedial measures that will prevent [this] prejudice at its inception" in order to prevent jurors from being "thrust into the role of celebrities." *Sheppard v. Maxwell*, 384 U.S. 333, 353, 363 (1966). The Court should deny the media coalition's motion and inform the jurors of that decision as soon as possible.

**I.    Ms. Holmes' Right to a Fair Trial Outweighs Any First Amendment Rights in the Circumstances of this Case**

Even if the media possessed a First Amendment right to the questionnaires (*but see* Part II *infra*), that right must give way to Ms. Holmes' fair trial rights. In cases where a First Amendment right of access exists, "[t]he presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 510 (1984). "No right ranks higher than the right of the accused to a fair trial." *Id.* at 508; *see also Waller v. Georgia*, 467 U.S. 39, 45 (1984). Other interests overcoming a First Amendment right of access include "[t]he privacy interests" of jurors. *Press-Enterprise Co.*, 464 U.S. at 512. The Court should enter findings, based on its colloquies with the jurors and its knowledge of the intense media and public interest in this case,[1] that withholding of the juror questionnaires is necessary to preserve Ms. Holmes' right to a fair trial and the jurors' privacy interests for the following reasons.[2]

---

[1] Ms. Holmes has previously documented the extensive, inflammatory nature of media coverage of this case. *See* ECF 799-800, 817-18, 956, 987.

[2] The transcripts dated October 12 and October 13, 2021 are maintained under seal. Given the sealed nature of the colloquies, and out of an abundance of caution, Ms. Holmes has filed an unredacted version of this pleading under seal and a redacted version of this pleading on the public docket.

MS. HOLMES' SUPPLEMENTAL RESPONSE TO MOTION TO INTERVENE AND MOTION TO UNSEAL
CR-18-00258 EJD

*First*, there is a substantial risk that, if the jurors' identities are disclosed or deduced from their questionnaires before the verdict, the jurors will be exposed to information about this case by (a) the media; (b) family, friends, or acquaintances; or (c) random members of the public. That exposure will severely prejudice Ms. Holmes' constitutional right to be tried only on the evidence presented at trial.

Although the coalition's counsel represented that his ten clients will not contact the jurors during their service, he could not make that representation for other members of the media, nor could he promise that his clients would refrain from publishing the information. 9/30/21 Hr'g Tr. 12-14, 24. In this age of blogging and social media, anyone with access to the internet can call themselves the "media." Internet sleuthing—including discovery of the identities of persons in the public eye—is a popular pastime. If *any* information from the questionnaires is made public, even if identity information is redacted, less scrupulous media outlets and/or internet sleuths following this case will likely deduce and publicize the jurors' identities. Even if the ten coalition members promise to behave responsibly, this Court cannot realistically protect the jurors from becoming "media prey" if their identities are publicly revealed or deduced from partial disclosure of their questionnaires. *United States v. Blagojevich*, 614 F.3d 287, 292 (7th Cir. 2010) (Posner, J., dissenting from denial of reh'g en banc).³

Additionally, once the jurors' identities become public, their identities will spread rapidly across social media and other media outlets. Family members, friends, and acquaintances will learn about the jurors' roles in this case. Jurors expressed significant concern that if such individuals learn they are jurors in this case, the jurors will be unable to shield themselves from commentary about the case by such individuals. *See* 10/12/21 Tr. 3231-38, 3271.

Finally on this point, the risk of unsolicited contact from the public is severe. The government has represented that "counsel for the government have received several unsolicited emails from

---

³ In the *Blagojevich* case, the Seventh Circuit panel required the district judge to make findings justifying withholding juror names from the public before the verdict. 612 F.3d 558, 564-65 (7th Cir. 2010). Judge Posner would have held that the existing record already sufficed to justify such action. On remand, Judge Zagel made such findings and kept the juror names confidential until after the verdict, and again followed that course during the second trial. *See* 2011 WL 812116, at *4 (N.D. Ill. Feb. 28, 2011). The government's prior assertion that the Seventh Circuit panel "required the district court to release the names of seated jurors" is incorrect. ECF 1033 at 4.

MS. HOLMES' SUPPLEMENTAL RESPONSE TO MOTION TO INTERVENE AND MOTION TO UNSEAL
CR-18-00258 EJD

2

1   members of the public expressing views on the merits and underlying facts of the case." ECF 1033, at 6.
2   Undersigned counsel represents that defense counsel have received *many* such unsolicited emails, phone
3   calls, and letters from members of the public. And, as the Court has observed, a member of the public
4   harassed jurors as they entered the courthouse. 9/30/21 Hr'g Tr. 18-19. These are concrete facts—not
5   "baseless conjecture," as the media previously posited. ECF 1036, at 5. These facts distinguish this
6   case from many others and allow the Court to make a factual finding that the substantial risk of exposure
7   to outside information warrants withholding the juror questionnaires. If the jurors' identities are
8   revealed before the verdict, members of the public who follow this case almost certainly will contact
9   jurors. It will be impossible to shield the jurors from such unsolicited contact.

10   This risk of exposure to "expressions of opinion from both cranks and friends" led the Supreme
11   Court to warn in *Sheppard* that prophylactic remedial measures are required to "prevent the prejudice at
12   its inception." 384 U.S. at 353, 363. In high-profile cases generating significant media attention like
13   this one, courts have frequently found that shielding juror information from the public is necessary to
14   protect the defendant's right to be tried only upon the evidence presented in the courtroom. *See, e.g.*,
15   *United States v. Blagojevich*, 743 F. Supp. 2d 794, 802 (N.D. Ill. 2010) (finding "evidence that if jurors'
16   names are made public, they will be subjected to improper outside contact" based in part on unsolicited
17   communications received by judge from members of the public); *United States v. Black*, 483 F. Supp. 2d
18   618, 630 (N.D. Ill. 2007) ("to disclose the jurors' names in a high-profile trial such as this would create
19   the unnecessary risk that, during the course of the trial, jurors will be subjected to improper and
20   presumptive prejudicial contact").

21   *Second*, it is evident that the fear of the onslaught of media and public attention that would
22   follow a verdict in this case if the jurors' identities are revealed poses a significant risk to the jurors'
23   decision-making process. As Judge Posner put it, "[a] degree of anonymity . . . allows jurors to focus on
24   the facts rather than on how the public might receive their verdict." *Blagojevich*, 614 F.3d at 293.
25   Following acquittals in other high-profile cases, members of the public threatened jurors' safety, made
26   death threats, and otherwise harassed jurors. *See* Scott Ritter, Note, *Beyond the Verdict: Why Courts*
27   *Must Protect Jurors from the Public Before, During, and After High-Profile Cases*, 89 Ind. L.J. 911,
28   MS. HOLMES' SUPPLEMENTAL RESPONSE TO MOTION TO INTERVENE AND MOTION TO UNSEAL
CR-18-00258 EJD

3

1   911-12 (2014); *see also United States v. Blagojevich*, 2011 WL 812116, at *1-2 (N.D. Ill. Feb. 28, 2011)
2   (describing a threatening phone call to a juror following the split verdict in the first *Blagojevich* trial,
3   which prompted a federal investigation, and describing "abusive" conduct by the media, which included
4   flying a helicopter over a juror's house and knocking on a juror's door every fifteen minutes until almost
5   midnight); *United States v. Brown*, 250 F.3d 907, 921-22 (5th Cir. 2004) (stating that "[t]hreats of
6   intimidation and harassment do not necessarily end with the conclusion of trial" and affirming order
7   denying access to juror questionnaires and names).

8   From their pre-trial exposure to the overwhelmingly negative media coverage of Ms. Holmes and
9   Theranos, the jurors almost certainly intuit that an acquittal in this case will generate intense media and
10  public scrutiny.  The colloquies made clear that jurors are acutely aware of the extreme degree of media
11  attention to this case; indeed, they experience the attention every day as they pass a throng of cameras to
12  enter the courthouse, observe the long line of observers waiting to enter the courtroom every day, and
13  watch journalists reporting in real time from their laptops in the courtroom.  It is clear from the
14  colloquies that the likely invasion of their privacy *after* a verdict in this case, should disclosure occur, is
15  weighing on some jurors.  *See, e.g.*, 10/12/21 Tr. 3213; 10/13/21 Tr. 3297-99, 3308-09, 3333.  As long
16  as jurors fear media contact and public harassment following a verdict, Ms. Holmes' constitutional right
17  to an impartial jury cannot be guaranteed.

18  *Third*, if the jurors' names and questionnaires are released during trial, the resulting invasion of
19  privacy, concern about their personal safety and security, and concern about family members' privacy
20  will distract the jurors from their duties as jurors.  "[J]urors may well feel a sense of invasion that
21  accompanies a personal investigation, and knowledge that the media is conducting such an investigation
22  carries a significant risk that jurors will not be able to function effectively." *Blagojevich*, 743 F. Supp.
23  2d at 805; *see also Black*, 483 F. Supp. 2d at 630-31 ("to transform jurors' personal lives into public
24  news—especially where several jurors have already indicated sensitivity to this issue—could
25  unnecessarily interfere with the jurors' ability of willingness to perform their sworn duties").  Even the
26  fear of such disclosure after trial will distract jurors from their duties.  Numerous jurors expressed
27  significant concern about the effect of disclosure on their personal privacy and/or security and that of

MS. HOLMES' SUPPLEMENTAL RESPONSE TO MOTION TO INTERVENE AND MOTION TO
UNSEAL
CR-18-00258 EJD

4

their families.[4]  *See* 10/12/21 Tr. at 3212-13, 3241-44, 3248, 3252-67, 3270; 10/13/21 Tr. at 3294-98, 3303-10, 3313-14, 3319-22, 3327-29.  Significantly, jurors expressed concern that the media attention has already distracted or would distract the jurors from their duty to provide a fair trial, 10/12/21 Tr. at 3230-31; 10/13/21 Tr. at 3320-22, and two jurors initially expressed hesitation about their ability to remain fair and impartial before agreeing that they could, 10/12/21 Tr. at 3231-38; 10/13/21 Tr. at 3298-99.

Given these considerations and the inevitable "drumbeat of publicity" that would accompany disclosure of the questionnaires, *Brown*, 250 F.3d at 919-20, the court sensibly told jurors in advance that their responses would remain confidential.  In that situation, other courts have recognized that disclosure would interfere with jurors' exercise of their duties.  As Judge Zagel explained, jurors' "ang[er] at having been induced by false pretenses to agree to take months out of their life to perform jury service" is "likely to interfere with the jurors' ability to perform their duties."  *Blagojevich*, 743 F. Supp. 2d at 805-06 (internal quotation marks omitted); *see also Brown*, 250 F.3d at 919-20 (noting that the district court's denial of post-verdict access to juror names "rest[ed] on an earlier promise of anonymity" made in a case involving a "drumbeat of publicity"); *Copley Press, Inc. v. Superior Court*, 228 Cal. App. 3d 77, 89-90 (1991) (concluding that it would be "unfair" "to not honor the trial court's assurance of confidentiality" to the venire members notwithstanding subsequent determination that media had First Amendment right to questionnaires); 10/12/21 Tr. at 3252; 10/13/21 Tr. at 3327, 3351.

For all these reasons, any disclosure of the questionnaires threatens Ms. Holmes' fair trial rights.  The Court should enter factual findings to that effect based on the juror colloquies, the other information conveyed above, and the Court's own awareness of the extent and nature of media and public interest in this case.  Although Ms. Holmes submits that any disclosure of the questionnaires presents a substantial risk of revealing the jurors' identities and compromising her fair trial rights, Ms. Holmes notes that narrower alternatives to permanent withholding of the questionnaires exist.  First, the Court could

---

[4] Redacting family information from the questionnaires will not suffice.  As the Court indicated in the colloquies, in today's world, the media and public can quickly discover the identities of relatives. 10/12/21 Tr. at 3219.

MS. HOLMES' SUPPLEMENTAL RESPONSE TO MOTION TO INTERVENE AND MOTION TO UNSEAL
CR-18-00258 EJD

release the questionnaires, with heavy redactions to conceal any information from which juror identities might be deduced, only *after* the verdict. *See, e.g.*, *Gannett Co. v. DePasquale*, 443 U.S. 368, 390-93 (1979) (holding that post-judgment access to transcript of sealed pre-trial hearing satisfied the media's First Amendment rights). And, if the Court releases the questionnaires after the verdict (it should not), it should redact the jurors' names and all other information that could be used to identify the jurors, such as residence, employment, and family information, to protect against the substantial risks to Ms. Holmes' fair trial rights discussed above.

## II. The First Amendment Does Not Provide a Qualified Right of Access to Juror Identities

The Court can deny the media coalition's motion on the basis of the balancing test discussed above without resolving the threshold question whether the media has a First Amendment right of access in the first place. But the Court should also hold that there is no First Amendment right at all to juror identities. This analysis asks whether (1) "the place and process have historically been open to the press and general public" (the "experience" test) and (2) "public access plays a significant positive role in the functioning of the particular process in question" (the "logic" test). *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8 (1986).

Numerous courts have rejected media arguments that the First Amendment confers a right to access juror identities. *See, e.g.*, *Brown*, 250 F.3d at 914, 921 (5th Cir. 2004) (holding, in high-profile case, that "a trial court may refuse to allow the media to inspect documents not a matter of public record, including jurors' names and addresses," affirming order denying request for post-verdict release of juror identities and questionnaires, and observing that jurors "need not become unwilling pawns in the frenzied media battle"); *Black*, 483 F. Supp. 2d at 623-30; *Gannett Co. v. State*, 571 A.2d 735, 743-51 (Del. 1990); *Morgan v. Dickerson*, --- P.3d ----, 2021 WL 3046844, at *4-6 (Ariz. Ct. App. 2021). Other courts, including the Ninth Circuit, have accepted as given the premise that courts can withhold juror identities. *See Phoenix Newspapers, Inc. v. U.S. District Court*, 156 F.3d 940, 951 (9th Cir. 1998); *ABC, Inc. v. Stewart*, 360 F.3d 90, 104-05 (2d Cir. 2004); Order, *United States v. Bonds*, Case No. 07-732, ECF 284, at 9 (N.D. Cal. Mar. 14, 2011).

MS. HOLMES' SUPPLEMENTAL RESPONSE TO MOTION TO INTERVENE AND MOTION TO UNSEAL
CR-18-00258 EJD

6

1    Neither the experience test nor the logic test points to a First Amendment right to jurors'
2 identities.  There is no historical right of access to juror names:  notably, when Congress enacted the
3 Jury Selection and Service Act in 1968, the Act's drafters commented on "the present diversity of
4 practice" around the nation on whether to disclose juror names, noting that some courts "keep juror
5 names confidential for fear of jury tampering." H.R. Rep. 90-1076, at 11 (1968).  Nor does disclosure of
6 juror identities logically play a positive role in the functioning of criminal trials.  To the contrary, as the
7 Supreme Court has observed, mid-trial disclosure of juror identities threatens to expose jurors to outside
8 information that corrupts the trial process.  *See Sheppard*, 384 U.S. at 353.  The Court commented that
9 reversals of convictions in such circumstances "are but palliatives; the cure lies in those remedial
10 measures that will prevent the prejudice at its inception." *Id.* at 363.

11                            *        *        *

12    Ms. Holmes is concerned that this issue has cast a cloud over these proceedings.  As long the
13 jurors fear that "they [will] become unwilling pawns in the frenzied media battle" following a verdict in
14 this case, *Brown*, 250 F.3d at 921, they may not be able to fairly judge Ms. Holmes' innocence or guilt.
15 As long as they fear the onslaught of media attention that will accompany release of their names and
16 questionnaires, they will be distracted from their duties in this trial.  And if their identities are disclosed
17 during trial, it is inevitable that multiple jurors will be exposed to prejudicial publicity about this case,
18 requiring a mistrial.  It is unclear if the prejudicial consequences of the events related to this motion can
19 be reversed, and Ms. Holmes reserves the right to move for a mistrial as future events develop.  At a
20 minimum, to attempt to mitigate the prejudice to Ms. Holmes, the Court should deny the motion and
21 inform the jurors of that decision as soon as possible.

28 MS. HOLMES' SUPPLEMENTAL RESPONSE TO MOTION TO INTERVENE AND MOTION TO UNSEAL
CR-18-00258 EJD

7

1  DATED: October 25, 2021

3                                              /s/ John D. Cline
                                               JOHN D. CLINE
4                                              Attorney for Elizabeth Holmes

28 MS. HOLMES' SUPPLEMENTAL RESPONSE TO MOTION TO INTERVENE AND MOTION TO UNSEAL
CR-18-00258 EJD

8

# CERTIFICATE OF SERVICE

I hereby certify that on October 25, 2021 a copy of this filing was delivered via email on the following counsel of record.

Jeffrey Benjamin Schenk
John Curtis Bostic
Robert S. Leach
Kelly I. Volkar
Amani S. Floyd
UNITED STATES ATTORNEY'S OFFICE
NORTHERN DISTRICT OF CALIFORNIA

jeffrey.b.schenk@usdoj.gov
john.bostic@usdoj.gov
robert.leach@usdoj.gov
kelly.volkar@usdoj.gov
amani.floyd@usdoj.gov

*Attorneys for United States*

Steven D. Zansberg
LAW OFFICE OF STEVEN D. ZANSBERG, LLC
steve@zansberglaw.com

*Attorney for Media Coalition*

                                            /s/ John D. Cline
                                            JOHN D. CLINE
                                            Attorney for Elizabeth Holmes

MS. HOLMES' SUPPLEMENTAL RESPONSE TO MOTION TO INTERVENE AND MOTION TO UNSEAL
CR-18-00258 EJD