# EXHIBIT 5



| | 1701 Page Mill Road | P 650.838.9292 | theranos.com |
| | Palo Alto, CA 94304 | F 650.838.9165 | |

April 1, 2016

**BY MESSENGER**

Ms. Karen Fuller
State Oversight and CLIA Branch
Division of Survey and Certification
Centers for Medicare and Medicaid Services
90 Seventh Street, Suite 5-300 (5W)
San Francisco, CA 94103-6707

**Re:   Updated Response of Theranos, Inc. to the March 18, 2016 Letter From Karen
       Fuller To Dr. Sunil Dhawan, Elizabeth Holmes, and Sunny Balwani (CLIA Number
       05D2025714)**

Dear Ms. Fuller,

This letter provides Theranos, Inc.'s response to your letter of March 18, 2016.  We respond to
each of the reasons why CMS found that our response to a specific deficiency was insufficient by
providing additional information and supporting documentation, which we believe demonstrate
that our Newark, California laboratory has come into Condition-level compliance and abated the
immediate jeopardy.

Based on the productive discussions we have had with Sarah Bennett and Gary Yamamoto about
your March 18 letter, this response aims to ensure that there are not any miscommunications
about important issues that we have learned were unclear to CMS from our initial submission.  In
addition, this response reflects work that the laboratory, under the direction of its new leadership,
has done to address CMS's feedback, including, for example, performing thorough re-review of
data and further revising procedures.

As set forth in this detailed response and through the enclosed supporting documentation:

1.  The laboratory has put in place new leadership, including a new full-time lab director and
    a new full-time clinical consultant, who is a co-director under California's regulations.
    The new laboratory director, Dr. Kingshuk Das, has been on-site full-time as of March
    14, 2016.  He has extensive clinical laboratory experience, including as an Associate
    Medical Director of UCLA's Clinical Laboratories between August 2013 and March
    2016.  The new clinical consultant, Dr. Don Tschirhart, has been on-site full-time as of
    March 14, 2016.  He has over 15 years of experience as a hospital lab director.

2.  The laboratory's new leadership firmly believes that the laboratory will be able to ensure
    the deficient practices will not recur through its robust new quality systems and through
    the intense oversight being provided by the laboratory's new quality monitoring and
    improvement program and new audit procedures.  Indeed, the laboratory's new audit

1
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

procedures require both monthly tracer audits of pre-analytic, analytic and post-analytic processes and quarterly audits of the laboratory's quality systems.  The results of these audits are then scrutinized at the laboratory's monthly QMPI Program meetings.

3. Many of the issues raised in your March 18 letter appear to be premised on CMS's belief that the laboratory is running a number of tests that it actually stopped running either before or during the survey, and has not run since. We have clarified this issue below.

4. The laboratory has undertaken aggressive corrective actions.  For example, out of an extreme abundance of caution and based on its dissatisfaction with prior QA oversight, the laboratory voided all results reported for the assays run on the Theranos Proprietary System 3.5 (TPS) in 2014 and 2015 and all reported PT/INR tests run on the Siemens Advia BCS XP instrument that went into use in October 2014 through September of 2015.[1]

We believe that these considerable actions, when viewed together with the other information and documentation provided herein and in our initial submission, should leave no doubt that the Newark laboratory has come into Condition-level compliance and abated immediate jeopardy. For that reason, we submit that CMS should approve the laboratory's submission, and thereafter perform a revisit at which CMS will see that the laboratory's new leadership has implemented, enforced, and monitored the corrective actions.

We welcome further engagement with CMS on any of the information we have submitted to date, including the opportunity to address any questions or concerns CMS may have in real-time, in order to avoid any unnecessary delay or work for CMS and pursuant to our efforts to respond comprehensively to all issues raised by CMS.

Please note that these materials contain confidential commercial information and trade secrets that are statutorily exempt from disclosure under the Freedom of Information Act, 5 U.S.C. § 552(b)(4).  We are providing this highly sensitive information to CMS in order to fully respond to the agency's inquiries.  However, this is information that Theranos closely protects from public disclosure, and any disclosure by the agency of this information is likely to cause the company irreparable harm.  As a result, in providing this information, we respectfully request the opportunity to provide redactions should you decide to disclose any of the documents to any member of the public for any reason, under FOIA procedures or otherwise.  In addition, if the agency incorporates the substance of any of this information into correspondence or other agency-generated documents that may be publicly disclosed, we request the opportunity to redact the information from those documents as well.  We also ask that you take steps to protect these documents from unauthorized disclosure

---

[1] A list of all accessions for which corrected reports have been issued is enclosed herein in Exhibit MM.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

### D2094

**D2094 – March 18 Letter Statement 1:** *"Some documents pertaining to this deficiency referenced in the submission were not included. Specifically, the submission references 'Ex. A, Tab 4, § 7.1.2.2.d.2.' We found no such reference contained in the materials provided to CMS. In addition, Exhibit (Ex.) O, Tab 2 states: 'The QC data are presented here: <Exhibit D Tab 7, Tab 8>.' We found no 'Tab 7' or 'Tab 8' in Ex. D."*

    **Theranos Response to Statement 1 in D2094:** The citation reference to Ex. A, Tab 4, § 7.1.2.2.d.2 was an inadvertent transcription. The citation reference Ex. D, Tabs 7 and 8 were also inadvertent transcription errors, but the QC data were included in the initial submission in Exhibit O. We have enclosed another copy of that QC data for ALP with this letter at Ex. JJ, Tab 3B.

**D2094 – March 18 Letter Statement 2:** *"Although the laboratory's submitted protocol indicates that ungraded proficiency testing (PT) results will be evaluated, the submitted protocol does not explain how an investigation is performed and who must sign an investigation of ungraded PT samples."*

    **Theranos Response to Statement 2 in D2094:** The lab has revised its proficiency testing procedure (i) to indicate the protocol used to evaluate ungraded proficiency testing (PT); (ii) to explain how an investigation of ungraded PT is performed; and (iii) to explain who must sign an investigation of ungraded PT samples. (Ex. BB, Tab 3). The revised procedure requires the laboratory to use its Proficiency Testing Investigation and Corrective Action form to investigate ungraded PT, which must be approved by the lab director. (Ex. BB, Tab 3§ 9.4, F-1). Training on this revised SOP has occurred. (Ex. BB, Tabs 3B-3C).

**D2094 – March 18 Letter Statement 3:** *"In the submission, the laboratory concludes:*

-    *'Not enough patient data available for meaningful analysis'*
-    *'No evidence of systemic errors'*
-    *'No patient impact expected'*

*However, no information as to how the laboratory came to these conclusions related to patient outcomes was submitted. Documentation contained in in Ex. O, Tab 2 also compares the 'Range of Means' with no explanation as to what this refers to or how it correlates to the laboratory's ungraded results. The submission merely indicates that 'the lab has investigated this ungraded PT event for ALP [alkaline phosphatase] and has documented its investigation and conclusion."*

    **Theranos Response to Statement 3 in D2094:** Pursuant to its revised proficiency testing procedure, the lab has documented its investigation of the ungraded ALP event for the 3rd event of 2014 using the Proficiency Testing Investigation and Corrective Action form. (Ex. JJ, Tab 3A). That documentation explains how the laboratory came to its conclusions related

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

to patient outcomes. (Ex. JJ, Tab 3A). Additionally, the laboratory has revised and clarified its analysis, including by removing the phrase "Range of Means." (Ex. AA, Tab 13).

**D2094 – March 18 Letter Statement 4:** *"Furthermore, a Quality Monitoring and Processing Improvement (QMPI), Program Meeting Agenda, CL FRM-00045-F1, that was submitted as part of Ex. A, Tab 13 and only includes PT for Alternative Proficiency Assessment (APA). Based on information included in the submitted agenda, all PT issues were not addressed as required in CL QOP-00045, Revision A (Ex. A, Tab 12) in Section 7.2.2.6 and 7.2.2.7."*

    **Theranos Response to Statement 4 in D2094:** The lab has revised the QMPI Program procedures and meeting agenda to make clear that the agenda includes all PT issues as required in CL QOP-00045. (Ex. BB, Tab 7 § 7.5.2).[2]

**D2094 – March 18 Letter Statement 5:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In the submission, the laboratory indicates that a 'tracer audit* **may** *[emphasis added] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

    **Theranos Response to Statement 5 in D2094:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8 § 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7§ 7.5).[3] Training on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

---

[2] Note, the prior version of the QMPI QOP that was included with the submission stated that QMPI Meetings would include a review of the "schedule" and "results" for "Proficiency Tests". (Ex. A, Tab 12, § 7.2.2.5).

[3] Note, the prior version of the QMPI Meeting Agenda that was included with the submission required a review of audit "Findings." (Ex. A, Tab 12, § 9.)

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

## D2128

**D2128 – March 18 Letter Statement 1:**  *"The submission references 'Ex. A, Tab 4, § 7.1.2.2.d.2.'  We found no such reference contained in the materials provided to CMS."*

**Theranos Response to Statement 1 in D2128:**  The citation reference to Ex. A, Tab 4, § 7.1.2.2.d.2 was an inadvertent transcription error and should not have been included.

**D2128 – March 18 Letter Statement 2**  *"Although the laboratory's submitted protocol indicates that unsatisfactory PT results would be investigated using CL FRM-00006-F1, the laboratory provided no documentation showing that the required form was used to investigate the unsatisfactory PT result.  The laboratory also states that the 'lab has investigated the one unacceptable challenge and documented its investigation and conclusions'; however, CL FRM-00006-F1 documenting the investigation was not submitted per the laboratory's protocol."*

**Theranos Response to Statement 2 in D2128:**  We note that there was not an "unsatisfactory PT result" reported by the American Proficiency Institute for the "Blood Cell ID (Educational)" 2nd event of 2014, because this educational event was "Not Graded." (Ex. JJ, Tab 2).  Pursuant to its revised proficiency testing procedure, the laboratory has documented its investigation of this "Blood Cell ID (Educational)" 2nd event of 2014 that was "Not Graded" using the Proficiency Testing Investigation and Corrective Action form. (Ex. JJ, Tab 2).

Likewise, pursuant to its revised proficiency testing procedure, the laboratory has documented its investigation of the one unacceptable challenge for the "Blood Cell Identification" 2nd event of 2014 using the Proficiency Testing Investigation and Corrective Action form.  (Ex. JJ, Tab 2A).

**D2128 – March 18 Letter Statement 3:**  *"In the submission, the laboratory concludes:*

- *'Not enough patient data available for meaningful analysis'*
- *'No evidence of systemic errors'*
- *'No patient impact expected'*

*However, no information as to how the laboratory came to these conclusions related to patient outcomes was submitted.  Documentation contained in Ex O, Tab 3 shows that the laboratory received a passing score of 80% for blood cell identification."  While this is true, the CLIA regulations require that all unacceptable results have remedial action taken and that such remedial action be documented.  The submission does not contain evidence of remedial action."*

**Theranos Response to Statement 3 in D2128:**  Pursuant to its revised proficiency testing procedure, the laboratory has documented its investigation of the "Blood Cell ID (Educational)" 2nd event of 2014 that was "Not Graded" using the Proficiency Testing Investigation and Corrective Action form.  (Ex. JJ, Tab 2).  That documentation explains how the laboratory came to its conclusions related to patient outcomes.  (Ex. JJ, Tab 2).

5
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534704



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

Pursuant to its revised proficiency testing procedure, the laboratory has documented its investigation of the one unacceptable challenge for "Blood Cell Identification" 2nd event of 2014 using the Proficiency Testing Investigation and Corrective Action form. (Ex. JJ, Tab 2A). That documentation explains how the laboratory came to its conclusions related to patient outcomes. (Ex. JJ, Tab 2A).

**D2128 – March 18 Letter Statement 4:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In the submission, the laboratory indicates that a 'tracer audit may [emphasis added [in the letter]] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 4 in D2128:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8 § 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab 7B-7C).

<u>D5024</u>:

The March 18 Letter states: *"See our reviews of D5403, D5437, D5447, D5469, D5481, D5779, and D5801."*  Accordingly, we refer you to our responses to those reviews.

<u>D5217</u>

**D5217 – March 18 Letter Statement 1:**  *"Some documents pertaining to this deficiency referenced in the submission were not included. Specifically, the submission references 'Ex. A, Tab 4, § 7.1.2.2.d.2.' We found no such reference contained in the materials provided to CMS. In addition, Exhibit (Ex.) O, Tab 2 states: 'The QC data are presented here: <Exhibit D Tab 7, Tab 8>.' We found no 'Tab 7' or 'Tab 8' in Ex. D."*

**Theranos Response to Statement 1 – D5217:**  The citation reference to Ex. A, Tab 4, § 7.1.2.2.d.2 was an inadvertent transcription error and should not have been included. The citation reference Ex. D, Tabs 7 and 8 were also inadvertent transcription errors, but the QC data were included in the submission in Exhibit O. We have enclosed another copy of the QC data for Troponin with this letter at Ex. JJ, Tab 1B.

6
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534705



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

**D5217 – March 18 Letter Statement 2:**  *"In the submission, the laboratory concludes:*

- *'Not enough patient data available for meaningful analysis'*
- *'No evidence of systemic errors'*
- *'No patient impact expected'*

*However, no information as to how the laboratory came to these conclusions related to patient outcomes was submitted.*

**Theranos Response to Statement 2 – D5217:**  The lab has revised its conclusions for the ungraded Troponin 2nd event of 2014; those conclusions are consistent with CMS's review in response to D5217 Statement 3 below.  Pursuant to its revised proficiency testing procedure, the laboratory has documented its investigation and conclusion of the ungraded Troponin 2nd event of 2014 using the Proficiency Testing Investigation and Corrective Action form.  (Ex. JJ, Tab 1A).  That documentation explains how the laboratory came to its conclusions related to patient outcomes. (Ex. JJ, Tabs 1A-1B).

**D5217 – March 18 Letter Statement 3:**  *"The laboratory states in Ex. O, Tab 1 that no peer data was available for the Siemens Immulite 2000.  Based on lack of a peer group, the laboratory should compare its results to 'All Participants' values for troponin.  Review of the laboratory's values versus the 'All Participants' values shows that four of five of the laboratory's troponin values for the second proficiency testing event of 2014 were unacceptable when compared to the 'All Participants' acceptable ranges.  It appears the laboratory reviewed all of the mean values for all peer, instrument and method groups in order to determine an inappropriate acceptable range for its samples based on data not related to the 'All Participants' values."*

**Theranos Response to Statement 3 – D5217:**  Pursuant to its revised proficiency testing procedure, the laboratory has documented its investigation and conclusion of the ungraded Troponin 2nd event of 2014 using the Proficiency Testing Investigation and Corrective Action form.  (Ex. JJ, Tab 1A). That documentation reflects the laboratory's revised investigation, analysis, and conclusions.  (Ex. JJ, Tabs 1A-1B).  Based on this investigation, the laboratory has concluded that its values versus the "All Participants" values show that four of five of the laboratory's troponin values for the second proficiency testing event of 2014 did not constitute passing values for this PT event.  (Ex. JJ, Tabs 1A-1B).  The enclosed documentation describes the investigation and remedial action taken to address the unacceptable values.  (Ex. JJ, Tabs 1A-1B).  As explained in that documentation, the laboratory has, out of an abundance of caution, issued corrected reports voiding all affected Troponin results.  (Ex. JJ, Tab 1A).  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5217 – March 18 Letter Statement 4:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program.  However, the laboratory did not*

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

*establish the procedure by which these quarterly audits are to be conducted.  In the submission, the laboratory indicates that a 'tracer audit **may** [emphasis added [in the letter]] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 4 – D5217:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8). Training on these procedures has occurred.  (Ex. BB, Tabs 8B-C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB Tab 7§ 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tab7B-C).

## D5311

**D5311 – March 18 Letter Statement 1:**  *"The submission references 'Ex. A, Tab 4, 7.1.2.2.d.2.' We found no such reference contained in the materials provided to CMS."*

**Theranos Response to Statement 1 – D5311:**  The citation reference to Ex. A, Tab 4, § 7.1.2.2.d.2 was an inadvertent transcription error and should not have been included.

**D5311 – March 18 Letter Statement 2:**  *"The laboratory concluded that 'this issue is not likely to affect patients' because its mislabel error rate is comparable to published industry mislabel error rates.  No other information related to possible patient outcomes was provided.  Even though the laboratory's error rate may be comparable, the laboratory must still pursue any corrective action(s) for patients that may have been affected by this deficient practice."*

**Theranos Response to Statement 2 – D5311:**  The laboratory has revised its patient impact assessment analysis and conclusions to address CMS's review.  (Ex. AA, Tab 1).  Among other things, the revised assessment shows that laboratory took corrective action in 2014 and 2015 for patients that may have been affected by offering a redraw and retest at no charge. (Ex. AA, Tab 1; Ex. HH, Tab 10).

**D5311 – March 18 Letter Statement 3:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program.  However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted.  In the submission, the laboratory indicates that a 'tracer audit **may** [emphasis added [in the letter]] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would*

8
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 3 – D5311:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

## D5391

### Finding #1

**D5391 Finding #1 – March 18 Letter Statement 1:** *"The submission references 'Ex. A, Tab 4.' We found no such reference contained in the materials provided to CMS."*

**Theranos Response to Statement 1 – D5391 Finding #1:** The citation reference to Ex. A, Tab 4, § 7.1.2.2.d.2 was an inadvertent transcription error and should not have been included.

**D5391 Finding #1 – March 18 Letter Statement 2:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In the submission, the laboratory indicates that a 'tracer audit **may** [emphasis added [in the letter]] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5391 Finding #1:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on

9
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material                    THER-0534708



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

findings and analysis" during the QMPI Program meetings.  (Ex. BB Tab 7§ 7.5).  Training
on the revised QMPI procedures has occurred.  (Ex. BB, Tab7B-C).

<u>Finding #2</u>

**D5391 Finding #2 – March 18 Letter Statement 1:**  *"The submission references 'Ex. A, Tab
18, § 3.7.1,' and 'Ex. A, Tab 23, §§ 7.14, 7.15, 8.6.1, 8.6.4, 8.6.5.'  We found no such reference
contained in the materials provided to CMS."*

> **Theranos Response to Statement 1 –  D5391 Finding #2:**  The citation references to Ex. A,
> Tab 4, § 3.7.1 and Ex. A, Tab 23, §§ 7.14, 7.15, 8.6.1, 8.6.4, 8.6.5 were inadvertent
> transcription errors and should not have been included.

**D5391 Finding #2 – March 18 Letter Statement 2:**  *"At the time of the onsite survey, the
laboratory failed to establish a written protocol for the daily review of patient specimens
referred to other laboratories for testing to ensure timely receipt and reporting of test results
performed by other laboratories.  The laboratory did not provide such a protocol with its
submission."*

> **Theranos Response to Statement 2 – D5391 Finding #2:**  The lab has implemented revised
> written procedures for referral testing, which includes the protocol for daily review of patient
> specimens referred to other laboratories for testing to ensure timely receipt and reporting of
> test results performed by other laboratories.  (Ex. BB, Tab 10 § 8.7).  The revised procedure
> requires written documentation of this daily review.  Training on that SOP has occurred.
> (Ex. BB, Tabs 10B-10C).  The revised QMPI Program procedures require a review of
> referral testing and turnaround time.  (Ex. BB, Tab 7 §§ 7.5.3, 7.5.4).

**D5391 Finding #2 – March 18 Letter Statement 3:**  *"In addition, it is unclear how the
laboratory's QMPI Program would ensure the establishment of written protocols for all the
laboratory's processes."*

> **Theranos Response to Statement 3 – D5391 Finding #2:**  The laboratory's improved
> document control procedures, SOP on SOPs, audit procedures, and QMPI Program ensure
> the laboratory has written protocols for all of the laboratory's processes.  (Ex. BB, Tabs 1-2,
> 7-8). The document control procedures identify levels and categories of procedures (Ex. BB,
> Tab 1 §§ 3.11, 6.1); the SOP on SOPs includes procedures and templates to ensure that there
> are written protocols for all processes that should be covered by an SOP (Ex. BB, Tab 2); the
> revised audit procedures include monthly tracer audits that would identify any instance where
> a written protocol did not exist for a process (Ex. BB, Tab 8 § 8.1); and the QMPI Program
> requires review of tracer audit results and of written procedures that are new, revised or in
> process.  (Ex. BB, Tab 7§§ 7.1, 7.5).  Training on these procedures has occurred.  (Ex. BB,
> Tabs 1B-1C, 2B-2C, 7B-7C, 8B-8C).

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material                                                                    THER-0534709



1701 Page Mill Road    P 650.838.9292   theranos.com
Palo Alto, CA 94304    F 650.838.9165

## D5393

**D5393 – March 18 Letter Statement 1:** *"The submission references 'Ex. A, Tab 23, §§ 7.14, 7.15, 8.6.1, 8.6.4, 8.6.5.'  We found no such reference contained in the materials provided to CMS."*

> **Theranos Response to Statement 1 – D5393:** The citation references to Ex. A, Tab 23, §§ 7.14, 7.15, 8.6.1, 8.6.4, 8.6.5 was an inadvertent transcription error and should not have been included.

**D5393 – March 18 Letter Statement 2:** *"At the time of the onsite survey, the laboratory failed to establish a written protocol for the daily review of patient specimens referred to other laboratories for testing to ensure timely receipt and reporting of test results performed by other laboratories.  The laboratory did not provide such a protocol with its submission."*

> **Theranos Response to Statement 2 – D5393** The lab has implemented revised written procedures for referral testing, which includes the protocol for daily review of patient specimens referred to other laboratories for testing to ensure timely receipt and reporting of test results performed by other laboratories.  (Ex. BB, Tab 10 § 8.7).  The revised procedure requires written documentation of this daily review.  (Ex. BB, Tab 10 § 8.7, F-1).  Training on that SOP has occurred.  (Ex. BB, Tabs 10B-10C).  The revised QMPI Program procedures require a review of referral testing and turnaround time.  (Ex. BB, Tab 7 §§ 7.5.3, 7.5.4).

**D5393 – March 18 Letter Statement 3:** *"In addition, it is unclear how the laboratory's QMPI Program would ensure the establishment of written protocols for all of the laboratory's processes."*

> **Theranos Response to Statement 3 – D5393:** The laboratory's improved document control procedures, SOP on SOPs, audit procedures, and QMPI Program ensure the laboratory has written protocols for all of the laboratory's processes.  (Ex. BB, Tabs 1-2, 7-8). The document control procedures identify levels and categories of procedures (Ex. BB, Tab 1 §§ 3.11; 6.1); the SOP on SOPs includes procedures and templates to ensure that there are written protocols for all processes that should be covered by an SOP (Ex. BB, Tab 2); the revised audit procedures include monthly tracer audits that would identify any instance where a written protocol did not exist for a process (Ex. BB, Tab 8 § 8.1); and the QMPI Program requires review of tracer audit results and of written procedures that are new, revised or in process.  (Ex. BB, Tab 7§§ 7.1, 7.5).  Training on these procedures has occurred.  (Ex. BB, Tabs 1B-1C, 2B-2C, 7B-7C, 8B-8C).

**D5393 – March 18 Letter Statement 4:** *"In addition, without daily written documentation, it is unclear as to how the laboratory's QMPI Program would ensure this quality assessment activity has been completed."*

> **Theranos Response to Statement 4 – D5393:** The laboratory's revised written procedures for referral testing require written documentation of the daily review of referral testing.  (Ex. BB, Tab 10 § 8.7, F-1).  Training on the revised referral testing procedures has occurred.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304     F 650.838.9165

(Ex. BB, Tabs 10B-10C). The revised QMPI procedures require a review of referral testing and turnaround time. (Ex. BB, Tab 7 §§ 7.5.3, 7.5.4). Training on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

## D5400

The March 18 Letter states "*See our reviews of D5403, D5407, D5413, D5421, D5423, D5429, D5437, D5447, D5449, D5469, D5477, D5481, D5775, D5779, D5787, D5791, and D5793.*" Accordingly, we refer you to our responses to those reviews.

## D5403

Finding #1

**D5403 Finding #1 – March 18 Letter Statement 1:** *"Although the laboratory addressed the inclusion in its procedure manual of corrective actions to be taken when calibration or quality control (QC) results failed to meet the laboratory's criteria for acceptability when using the Siemens Advia 2120i instrument, in its submission the laboratory failed to address how it will ensure its procedure manuals include applicable components as required by 42 C.F.R. 493.1251(b)."*

    **Theranos Response to Statement 1 – D5403 Finding #1:** The lab's revised SOP on SOPs includes written protocols and SOP templates, which sets forth protocols for preparing procedure manuals that are consistent with 42 C.F.R. § 493.1251(b). (Ex. BB, Tab 2). The laboratory's revised document control policies further ensure that procedure manuals are consistent with 42 C.F.R. § 493.1251(b). (Ex. BB, Tab 1 §§ 6.1, 6.2, 6.3). The lab will monitor compliance with these procedures and 42 C.F.R. § 493.1251(b) through its monthly QMPI meetings, which include a review of written procedure manuals that are new, revised or in process. (Ex. BB Tab 7, §§ 7.1, 7.5.6). The lab will also ensure compliance through its revised audit procedures of pre-analytic, analytic, and post-analytic practices. (Ex. BB, Tab 8, §§ 8.1, 8.2). Training on these revised procedures has occurred. (Ex. BB, Tabs 1B-1C; 2B-2C; 7B-7C; 8B-8C).

**D5403 Finding #1 – March 18 Letter Statement 2:** *"To ensure appropriate and required calibration or QC corrective actions were taken, the laboratory indicated that quarterly audits will be performed and suggested that the audit results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In the submission, the laboratory indicates that a 'tracer audit* **may** *[emphasis added] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

    **Theranos Response to Statement 2 – D5403 Finding #1:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex BB,

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Trial Exh. 5471 Page 00012

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534711



Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

Finding #2:

**D5403 Finding #2 – March 18 Letter Statement 1:**  *"The laboratory was cited for not having a QC procedure for the 'Edison 3.5 Theranos System' prior to 5/15/14.  The laboratory's submission states that it performed QC before and after 5/15/14; however, it did not address the citation.  While the data submitted did show that QC was run prior to 5/15/14, the laboratory provided no information regarding any investigation as what procedure the laboratory was using to determine number, type, frequency, and acceptability criteria."*

    **Theranos Response to Statement 1 – D5403 Finding #2:**  D5403 Finding #2 relates to the Theranos Proprietary System 3.5 ("TPS") The laboratory has performed a review to determine number, type, frequency, and acceptability criteria for QC on the TPS 3.5 prior to May 15, 2014.  Prior to May 15, 2014, the laboratory (i) used the same type of QC material as used after May 15, 2014; (ii) the laboratory ran at least two levels of QC prior to May 15, 2014; (iii) the laboratory was required to pass at least two levels of QC at least 24 hours before reporting a patient result; and (iv) the laboratory used the Westgard rules for the acceptance criteria.  (Ex. FF, Tab 13).

**D5403 Finding #2 – March 18 Letter Statement 2:**  *"The laboratory indicated that systemic errors using QC and patient test distribution over time as well as random errors were used to evaluate patient impact.  Specifically, the laboratory indicated that 'QC data was reviewed to identify >2SD failure and periods of elevated CV.  Namely, batches of 10 consecutive QC data points were analyzed and the CV was calculated for each QC level during this period.  If the CV was >30%, then all patient results run during that time period will be voided.'  Ex. E, Tab 1. That laboratory did not indicate how 'periods of elevated CV' were identified or what time periods were reviewed."*

    **Theranos Response to Statement 2 – D5403 Finding #2:**  This deficiency concerns the TPS 3.5, which was one of the Theranos proprietary technologies in use in 2014 and 2015.  The laboratory began phasing out the TPS 3.5 in December 2014, and it was **fully retired** in early-August 2015.

The laboratory values CMS's feedback, and takes it very seriously.  The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was fully retired in early-August 2015.  As explained further in the

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road     P 650.838.9292     theranos.com
Palo Alto, CA 94304     F 650.838.9165

attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5. (Ex. AA, Tab 3). The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures. Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015. As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015. (Ex. AA, Tab 3). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5403 Finding #2 – March 18 Letter Statement 3:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In the submission, the laboratory indicates that a 'tracer audit **may** [emphasis added [in the letter]] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

    **Theranos Response to Statement 3 – D5403 Finding #2:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits are documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

<u>**D5407**</u>

**D5407 – March 18 Letter Statement 1:** *"Although the laboratory's submitted protocol (provided at Ex. A, Tab 1 § 4.13) indicates that the laboratory director must sign all procedures prior to use, the response does not include an explanation as to why the cited procedures were not signed by the laboratory director prior to use as required by the laboratory's protocol available at the time of the onsite."*

    **Theranos Response to Statement 1 – D5407:** D5407 states that the following procedures showed an effective date in December 2014, but were signed by the lab director on

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

September 19, 2015: CL SOP-09102 (ALP),[4] CL SOP-09161, Revision A (APO), CL SOP-09118 (Glucose),[5] CL SOP-09111 (CO2), CL SOP-10001, Revision B (Measuring Prothrombin Time-Innovin (PT)), and CL SOP-15036, Revision A (Edison 3.5 Theranos System Daily QC Procedure).

D5407 also states that CL SOP-06060, Revision A (SensoScientific Monitor) showed an effective date of June 23, 2015, but was not signed by the lab director until September 22, 2015.

Lastly, D5407 states that CL PLN-14003, Revision A (Master Validation Plan for Routine Chemistry Assays on Theranos Devices) showed an effective date of November 4, 2011, but was not signed by the lab director under September 19, 2015.  To ensure that the record is correct with respect to this document, we note that CL PLN-14003, Revision A (Master Validation Plan for Routine Chemistry Assays on Theranos Devices), was authored and signed by the laboratory's then-lab director, Dr. Arnold Gelb, on November 4, 2011.  (Ex. HH, Tab 12).  Dr. Gelb remained the Lab Director until January 27, 2013.  (Ex. HH, Tab 4C).  Although Dr. Gelb signed CL PLN-14003, the subsequent lab directors did not sign and date CL PLN-14003 until Dr. Sunil Dhawan signed it on September 19, 2015.  We recognize that those prior lab directors should have reviewed, dated and signed CL PLN-14003 before that date.

As reflected by the Lab Director deficiencies identified by CMS, the prior lab directors did not provide sufficient oversight over the documents cited in D5407.  This appears to be one of the reasons why these documents were not timely reviewed and signed by the prior lab directors.  In addition, the laboratory has found that its quality assurance oversight over these documents, including document control oversight, was not sufficient.  The laboratory has hired a new lab director, who has approved enhanced document control policies and procedures to address this issue.  (Ex. BB, Tab 1 §§ 5.1, 5.2, 5.3, 6.1, 6.2, 6.3).  Training on those procedures has occurred.  (Ex. BB, Tabs 1B-1C).  The laboratory has also hired a Document Control Manager whose responsibilities include tracking new and revised policies and procedures to ensure that they are reviewed and approved by the lab director before they become effective.  (Ex. HH, Tab 7C).  In addition, the laboratory's revised QMPI Program procedures and agenda require review of procedures that are new, revised, or in process at monthly QMPI Program meetings.  (Ex. BB, Tab 7 §§ 7.1, 7.5.6).

---

[4] D5407, Paragraph h, states that the Alkaline Phosphatase SOP that was made effective in December 2014 was "CL SOP-81102."  This reference appears to be a typographical error because the Alkaline Phosphatase (ALP) SOP that was made effective in December 2014 was "CL SOP-09102."

[5] As another point of clarification only, we note that D5407, Paragraph h, states that the glucose procedure (CL SOP-09118) was not signed by the LD.  That procedure was signed by the lab director, but not until September 19, 2015.  We recognize that this signature date is still deficient under D5407, and provide this information only to clarify the record.

15
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534714



1701 Page Mill Road     P 650.838.9292     theranos.com
Palo Alto, CA 94304     F 650.838.9165

**D5407 – March 18 Letter Statement 2:** *"In Ex. L, Tab 26 the submission states: "The lab's overarching review of its systems and primary instruments has identified the patients affected or having the potential to be affected by this issue." The laboratory did not define the criteria used to make this determination or provide documentation as to how they came to this conclusion."*

**Theranos Response to Statement 2 – D5407:** D5407 cites certain documents that were not timely signed and approved by the former lab director.

D5407 cites the follows SOPs for certain assays run on the Siemens Advia XPT because they had an effective date in December 2014, but were not signed by the former lab director until September 2015: (i) CL SOP-09161, Revision A (Apoliprotein); (ii) CL SOP-09118 (Glucose); [6] (iii) CL SOP-09111 (CO2); and (iv) CL SOP-09102 (Alkaline Phophatase).[7] The laboratory and its new leadership do not approve of the fact these SOPs were given an effective date before Dr. Dhawan signed them. However, there is no potential for these untimely signatures by Dr. Dhawan to have affected patients because Dr. Dhawan ultimately approved the SOPs without making any modifications or revisions to them. To address other deficiencies identified by CMS, the laboratory's initial submission included a broader analysis of QC, proficiency testing results, and patient population distribution data for APO, Glucose, CO2, and ALP tests run on the Siemens Advia XPT for the entire period during which these SOPs were effective. In response to CMS's review of D5793 Finding #8, the laboratory has extended this analysis to evaluate global quality control indicators. (Ex. AA, Tab 11). Based on these analyses, the laboratory has issued corrected reports. (Ex. AA, Tab 11). The laboratory **stopped** using the Siemens Advia XPT instrument on November 17, 2015, and **has not used it since then**.

D5407 also cites CL SOP-10001, Revision B (Measuring Prothrombin Time-Innovin (PT)), because it was made effective in December 2014, but was not signed by the former lab director until September 2015. This SOP concerns PT/INR tests on the BCS XP. Again, the laboratory and its new leadership do not approve of the fact this SOP was given an effective date before Dr. Dhawan signed the SOP. However, there is no potential for this untimely

---

[6] As a point of clarification only, we note that D5407, Paragraph h, states that the glucose procedure (CL SOP-09118) was not signed by the LD. That procedure was signed by the lab director, but not until September 19, 2015. We recognize that this signature date is still deficient under D5407, and provide this information only to clarify the record.

[7] D5407, Paragraph h, states that the Alkaline Phosphatase SOP that was made effective in December 2014 was "CL SOP-81102." This reference appears to be a typographical error because the Alkaline Phosphatase (ALP) SOP that was made effective in December 2014 was "CL SOP-09102."

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material                                                      THER-0534715



1701 Page Mill Road     P 650.838.9292     theranos.com
Palo Alto, CA 94304     F 650.838.9165

signature to have affected patients because Dr. Dhawan ultimately approved the SOP without making any modifications or revisions to it.  To address other deficiencies identified by CMS, the laboratory has performed a broader analysis of all PT/INR tests run on this BCS XP instrument, which was **first put into use in October 2014.**  Based on this analysis, which included a review of INR calculations, QC data, proficiency testing, and patient population distribution data, the laboratory issued corrected reports voiding PT/INR test results reported for the period October 2014 through September 2015.  (Ex. AA, Tab 7).  The laboratory **stopped** using the BCS XP instrument on September 17, 2015, and **has not used it since then**.

D5407 also cites CL SOP-15036, Revision A (Edison 3.5 Theranos System Daily QC Procedure), because it was made effective in December 2014, but was not signed by the former lab director until September 2015.  This SOP concerns the Theranos Proprietary System (TPS), which was being phased-out beginning in December 2014 and was fully **retired** in mid-August 2015.  Again, the laboratory and its new leadership do not approve of the fact this SOP was given an effective date before Dr. Dhawan signed the SOP to indicate his approval of it.  However, there is no potential for this untimely signature to have affected patients because Dr. Dhawan ultimately approved the SOP without making any modifications or revisions to it.  To address other deficiencies identified by CMS, the laboratory has performed a broad re-analysis of all QC related to tests run on the TPS 3.5 in 2014 and 2015.  That analysis is discussed below and is enclosed with this letter at Tab AA, Ex. 3.  Based on that analysis, the laboratory has, out of an extreme abundance of caution, voided all tests run on the TPS 3.5 in 2014 and 2015.  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

D5407 also cites CL SOP-06060, Revision A (SensoScientific Monitor) because it was made effective on June 23, 2015, but was not signed by the former lab director until September 2015.  Again, the laboratory and its new leadership do not approve of the fact this SOP was given an effective date before Dr. Dhawan signed the SOP to indicate his approval of it.  However, there is no potential for this untimely signature to have affected patients because Dr. Dhawan ultimately approved the SOP without making any modifications or revisions to it.

Finally, D5407 cites CL PLN-14003, Revision A (Master Validation Plan for Chemistry Assays on Theranos Devices).  The plan is consistent with 42 C.F.R. § 493.1253(b).  CL PLN-14003 was authored, approved, signed and dated by Dr. Arnold Gelb.  Dr. Gelb was the

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material



Laboratory Director when he approved CL PLN-14003.[8]  (Ex. HH, Tabs 4B, 4C, & 12).
Although Dr. Dhawan should have reviewed the plan sooner, he ultimately approved of it.
Because Dr. Dhawan approved of the plan without making any changes to it, no patients
have the potential to have been affected by the finding in D5407, Paragraph g.

## D5413

Finding #1

**D5413 Finding #1 – March 18 Letter Statement 1:**  *"Although the laboratory's submitted
protocol indicates that the allowable temperature should be posted on the unit (see Ex. A, Tab
29), the response does not address the incorrect labeling for acceptable temperatures on the
freezer doors. Documentation contained in Ex. A. Tab 29, § 4.5 indicated that the laboratory
supervisor or designee was responsible for monitoring and recording temperatures. However,
we could not determine if the new procedure had been effectuated as no documentation was
submitted to show that the freezer units had been labeled appropriately."*

> **Theranos Response to Statement 1 – D5413 Finding #1:**  The new procedure has been
> effectuated as reflected in the enclosed documentation showing that the freezer units have
> been labeled appropriately.  (Ex. II, Tab 2).

**D5413 Finding #1 – March 18 Letter Statement 2:**  *"In addition, the laboratory states that
training had occurred subsequent to the survey, but it is not clear who should be trained as
'laboratory supervisor or designee' was not defined."*

> **Theranos Response to Statement 2 – D5413 Finding #1:**  The laboratory has revised this
> procedure to define who should be trained.  The revised procedure is enclosed at Ex. BB, Tab
> 13.

**D5413 Finding #1 – March 18 Letter Statement 3:**  *"Training records provided in Ex. A, Tab
30 included only training documents for one general supervisor."*

> **Theranos Response to Statement 3 – D5413:**  The laboratory has enclosed with this letter a
> complete set of training records on this SOP, which shows that the relevant laboratory
> personnel have been trained.  (Ex. BB, Tabs 13B-13C).

**D5413 Finding #1 – March 18 Letter Statement 4:**  *"Several freezers were identified as "not
used in patient testing" (see Ex. N, Tab A); however, based on interviews during the onsite visit,*

---

[8] At the time that Dr. Gelb authored this plan, his qualifications included, among other things, a
Master of Science in Materials Science and Engineering (Biomedical); a Fellowship in MIT's
Medical Engineering Graduate Program; a Doctor of Medicine from Stanford University; an
internship in Internal Medicine at the University of Chicago Hospitals; a Fellowship in
Immunodiagnosis and Surgical Pathology at Stanford University; and a Fellowship in
Hematopathology at the University of California San Francisco.  (Ex. HH, Tab 4A).

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534717



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*these freezers were identified as being used for CLIA activities.  The submission did not include a response or data related to the freezers identified as 'not used in patient testing.'"*

**Theranos Response to Statement 4 – D5413 Finding #1:**  D5413 identifies six -20C freezers and four -80C freezers.  In the lab's submission, we explain that five of those freezers did not contain materials that would be used in the future for clinical patient testing.  Rather, they only contained material that might be used in the future for research and development.

Based on CMS's March 18 letter, it appears that there was a miscommunication when the CMS surveyors were onsite.  D5413, Paragraph f, states that CMS had a discussion about these freezers with the "Director of Assay Systems and technical supervisor at 11/19/15 at approximately 11 am."  The Director of Assay Systems did not have any regular involvement with those freezers at that time and did not have knowledge of their contents.  The "technical supervisor" in attendance on November 19, 2015 joined the company on October 26, 2015; he also did not have regular involvement with those freezers at the time and did not have knowledge of their contents.  (Ex. HH, Tab 8).  To the extent CMS understood either of these individuals to be confirming the contents of these freezers or whether these freezers were used in clinical patient testing, there was a miscommunication.

The laboratory has looked into this issue further, and has reconfirmed that the statements in the laboratory's submission are accurate.  As reflected in the enclosed documentation:

- On November 19, 2015, there were four -20 C freezers in the microbiology or BUGS laboratory.  7061 BUGS -20 C Freezer 4 did **not** contain any materials for future use in clinical patient testing.  (Ex. II, Tab 3B).

- On November 19, 2015, there was one -20 C freezer in the Normandy laboratory.  Clinical patient testing in the Normandy laboratory **stopped** on September 20, 2015, and there has **not** been any clinical patient testing in the Normandy laboratory since then.  The 1 Normandy -20 C freezer did **not** contain any materials for future use in patient testing.  (Ex. II, Tab 3C).

- On November 19, 2015, there were four -80 C freezers.  7098 -80 C Freezer 1 Nuair, 7111 -80 C Freezer 2 Thermo, and 7113 -80 2 CLIA Lab did not contain any materials for future use in clinical patient testing.  While named 7113 -80 2 CLIA Lab, it was only used to store old specimens that were not for use in clinical patient testing.  (Ex. II, Tab 3A).

**D5413 Finding #1 – March 18 Letter Statement 5:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program.  However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted.  In the submission, the laboratory indicates that a 'tracer audit may [emphasis added [in the letter]] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a*

19

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534718



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 5 – D5413 Finding #1:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

<u>Finding #2</u>

**D5413 Finding #2 – March 18 Letter Statement 1:** *"The submission references 'Ex. I, Tabs 2-6.' We located these tabs, but found no documentation in Tabs 2, 5, and 6."*

**Theranos Response to Statement 1 – D5413 Finding #2:** There was an inadvertent copying error for Exhibit I to the initial submission. The laboratory has enclosed the applicable documents with this letter, as well as additional documents related to the laboratory's broader analysis of the PT/INR test over the entire time it was run on this Siemens BCS XP instrument. (Ex. GG).

**D5413 Finding #2 – March 18 Letter Statement 2:** *"Although the laboratory's submitted protocol indicates that the laboratory was required to check manufacturer package inserts prior to use (see Ex. A, Tab 31, §8.1.2), which was also stated in the laboratory's written procedure available prior to the onsite survey, the laboratory provided no documentation showing that this protocol has been effectuated and no indication that package inserts for new lot numbers have been checked."*

**Theranos Response to Statement 2 – D5413 Finding #2:** D5413 concerns the laboratory's failure to follow the manufacturer's instructions for the expiration date of one lot of Innovin (thromboplastin) used for Prothrombin Time/International Normalized Ratio (PT/INR) testing on the Siemens BCS XP. The laboratory **stopped** running tests on Siemens BCS XP on September 17, 2015, and has **not** run any tests on the Siemens BCS XP since then.

Although the laboratory is not running PT/INR tests on the Siemens BCS XP, we have enclosed documentation related to a different test that is in use, which shows that the laboratory has effectuated its protocol to check manufacturer's instructions for the expiration date. This documentation includes a photograph of the manufacturer's package insert for IRISpec and a photograph of the bottles showing a handwritten open date and expiration date that is consistent with the 15-day "open stability" specification contained in the package

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534719



1701 Page Mill Road      P 650.838.9292      theranos.com
Palo Alto, CA 94304      F 650.838.9165

insert . (Ex. HH, Tabs 11A-11B).  As these photographs show, the laboratory effectuated its protocol by reviewing the manufacturer's instructions, initialed the material, and wrote the correct expiration date on the bottle.  (Ex. HH, Tab 11A).

**D5413 Finding #2 – March 18 Letter Statement 3**: *"In addition, the submission states that "the lab has conducted training on those procedures;" however, the training documents submitted in Ex. A, Tab 32 do not include any training specific to the cited deficiency. We were unable to verify that training occurred as stated."*

**Theranos Response to Statement 3 – D5413 Finding #2:**  D5413 Finding #2 states that the laboratory "failed to follow the manufacturer instructions for expiration date of Innovin (thromboplastin) used for Prothrombin Time/International Normalized Mean Ratio (PT/INR) testing."  The laboratory's submission included records for training on the revised reagent qualification and management procedures.  (Ex. BB, Tab 14B).  The training addressed review of manufacturer specification and package inserts.  (Ex. BB, Tab 14).  The laboratory has performed supplemental training that specifically focuses on reviewing and following manufacturer instructions for expiration dates.  (Ex. BB, Tab 14D).  That training used this deficiency about Innovin (thromboplastin) as a case study.  (Ex. BB, Tab 14D).

**D5413 Finding #2 – March 18 Letter Statement 4**: *"In Ex. I, Tab 1, the laboratory provided lists of patient specimen accession numbers for which the laboratory issued corrected reports; however, the laboratory did not provide copies of the corrected reports."*

**Theranos Response to Statement 4 – D5413 Finding #2:**  To address this and other deficiencies related to PT/INR, the laboratory conducted a further patient assessment analysis that covers the entire period during which this Siemens BCS XP instrument was in use in the lab. (Ex. AA, Tab 7).  As a result of that analysis, the laboratory has voided all results for PT/INR from October 2014 through September 2015. (Ex. AA, Tab 7).  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK; Ex. GG, Tab 7).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

## D5421

### Finding #1

**D5421 Finding #1– March 18 Letter Statement 1**: *The submission references "Ex. A, Tab 9, §7.2.4.4 and Ex. B, Tabs 46-50, 52-56, 57-61."  We found no such references contained in the materials provided to CMS."*

**Theranos Response to Statement 1 – D5421 Finding #1:**  There was an inadvertent copying error for Exhibit I to the initial submission.  The laboratory has enclosed the applicable documents with this letter, as well as additional documents related to the

21

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534720



1701 Page Mill Road     P 650.838.9292     theranos.com
Palo Alto, CA 94304     F 650.838.9165

laboratory's broader analysis of the PT/INR test over the entire time it was run on this Siemens BCS XP instrument.  (Ex. GG).

**D5421 Finding #1– March 18 Letter Statement 2**:  *"The laboratory's submitted protocol (Ex. A, Tab 9, § 4.2) states: 'If the verification is performed by the vendor, the laboratory is involved in all aspects of the verification and the final verification documentation is reviewed and signed off by the Laboratory Director.' We were unable to determine what specific aspects of the method verification the laboratory would be performing or if vendors would continue to perform method verifications."*

> **Theranos Response to Statement 2 – D5421 Finding #1:**  The laboratory has further revised its method verification SOP to clarify that the procedure requires the laboratory to perform method verifications.  To be clear, the vendor will not continue to perform method verifications. (Ex. BB, Tab 5 § 4.1.2).

**D5421 Finding #1– March 18 Letter Statement 2:**  *"The submitted protocol included form CL FRM-00022-F1, Verification Results (Ex. A, Tab 9), which appears to be pre-signed by the laboratory director. We were unable to determine if the laboratory director will "review and sign off' on each method verification."*

> **Theranos Response to Statement 2 – D5421 Finding #1:**  The copy of CL FRM-00022-F1 included with the submission was not a pre-signed form.  Rather, the laboratory director signed the version of the form attached to the revised method verification SOP simply to indicate that he approved of it as a new form that could be used. To eliminate any confusion or potential confusion caused by this way of approving forms, we have revised the lab's document control policy to make clear that forms attached to an SOP are part of the SOP, and therefore are approved when the lab director approves the SOP.  (Ex. BB, Tab 1). Consistent with this revision, the enclosed copy of CL FRM-00022-F1 no longer has any signatures on it.  (Ex. BB, Tab 5 F1).

**D5421 Finding #1– March 18 Letter Statement 3:**  *"We note that in the laboratory's submission related to test performance specifications for the Advia XPT instrument, it was the laboratory's policy to accept %CV values that were up to 1.5 times the %CV values stated by the instrument manufacturer for any given chemistry analyte.  In the submission, we found no explanation as to why 1.5 times the manufacturer's %CV was acceptable to the laboratory. We also note that the submitted re-verification of test performance specifications did not follow the submitted protocol for test verification; therefore, we could not determine if the re-verifications were adequate or how the laboratory determined if patients were affected or potentially affected."*

> **Theranos Response to Statement 3 – D5421 Finding #1:**  Prior to the survey, the laboratory did not employ a policy to accept %CV values that were up to 1.5 times the %CV values stated by the manufacturer, and the verification reports that CMS reviewed did not use 1.5 times the %CV stated by the manufacturer.  Likewise, the laboratory's revised method

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road     P 650.838.9292     theranos.com
Palo Alto, CA 94304     F 650.838.9165

verification procedure does not include a 1.5 times %CV policy.  (Ex. BB, Tab 5).[9]  Rather, it requires that the laboratory verify the manufacturer's imprecision claim. (Ex. BB, Tab 5 § 8.2).  Training on the revised procedure has occurred.  (Ex. BB, Tabs 5B-5C).  Additionally, there appears to have been a miscommunication because the laboratory **stopped** running tests on the Siemens Advia XPT on November 17, 2015, and has **not** run any tests on the instrument since then.  Accordingly, the laboratory has not re-verified any assay on the Siemens Advia XPT.  References to method verification data in documents enclosed with the submission are to verification reports prepared **before** the survey began and before the laboratory's revised procedures were made effective (those reports were either reviewed by CMS or available to CMS during the survey), which were referenced for context.

Finding #2

**D5421 Finding #2– March 18 Letter Statement 1:**  *"Although the laboratory's submitted protocol (Ex. A, Tab 9) included a method verification procedure which addressed verification of accuracy, precision, and reportable range, the laboratory provided no documentation showing that this protocol had been followed to re-verify performance specifications.  The submission also stated: Before the lab resumes any test on the Advia XPT, the lab will ensure that the test has been re-verified pursuant to the lab's improved method verification procedures that have been approved by the laboratory director." The completion date for the correction of this deficiency was indicated on the submitted Allegation of Compliance as February 12, 2016, which, in order to determine correction, should include the re-verification documentation for the Advia XPT. However, the laboratory provided no documentation that the re-verification had been performed.  We note that in the laboratory's submission related to test performance specifications for the Advia XPT instrument it was the laboratory's policy to accept %CV values that were up to 1.5 times the %CV values stated by the instrument manufacturer for any given chemistry analyte. In the submission, we found no explanation as to why 1.5 times the manufacturer's %CV was acceptable to the laboratory.*

    **Theranos Response to Statement 1 – D5421 Finding #2:**  Prior to the survey, the laboratory did not employ a policy to accept %CV values that were up to 1.5 times the %CV values stated by the manufacturer, and the verification reports that CMS reviewed did not use 1.5 times the %CV stated by the manufacturer.  Likewise, the laboratory's revised method verification procedure does not include a 1.5 times %CV policy.  (Ex. BB, Tab 5).[10]  Rather, it requires that the laboratory verify the manufacturer's imprecision claim. (Ex. BB, Tab 5 §

---

[9] The laboratory referred to a 1.5 times %CV in its response based upon Bio-Rad's coefficient of variation rate.  (http://www.qcnet.com/Portals/50/PDFs/QCWorkbook2008_Jun08.pdf). Upon further review, the laboratory does not believe that Bio-Rad's coefficient of variation rate is applicable here.

[10] The laboratory referred to a 1.5 times %CV in its response based upon Bio-Rad's coefficient of variation rate.  (http://www.qcnet.com/Portals/50/PDFs/QCWorkbook2008_Jun08.pdf). Upon further review, the laboratory does not believe that Bio-Rad's coefficient of variation rate is applicable here.

23
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534722



1701 Page Mill Road      P 650.838.9292      theranos.com
Palo Alto, CA 94304      F 650.838.9165

8.2).  Training on the revised procedure has occurred.  (Ex. BB, Tabs 5B-5C).  Additionally, there appears to have been a miscommunication because the laboratory **stopped** running tests on the Siemens Advia XPT on November 17, 2015, and has **not** run any tests on the instrument since then.  Accordingly, the laboratory has not re-verified any assay on the Siemens Advia XPT.  References to method verification data in documents enclosed with the submission are to verification reports prepared **before** the survey began and before the laboratory's revised procedures were made effective (those reports were either reviewed by CMS or available to CMS during the survey), which were referenced for context.

**D5421 Finding #2– March 18 Letter Statement 2:**  *"We also found no explanation as how "normal patient distribution" related to determining if patients were affected or potentially affected."*

> **Theranos Response to Statement 2 – D5421 Finding #2:**  The laboratory has enclosed a revised analysis to clarify its examination of these patient test result distributions, which should eliminate the confusion created by the phrase "normal patient distribution."  (Ex. AA, Tab 5).

**D5421 Finding #2– March 18 Letter Statement 3:**  *"In addition, the laboratory's submission (Ex. B, various analyte tabs) states: "Matrix comparisons done by the manufacturer between serum and plasma showed correlation." No documentation was submitted supporting this statement."*

> **Theranos Response to Statement 3 – D5421 Finding #2:**  The laboratory has enclosed with this letter documentation supporting that matrix comparisons done by the manufacturer between serum and plasma showed correlation.  (Ex. HH, Tab 13).

**D5421 Finding #2– March 18 Letter Statement 4:**  *"The submission also states that "the lab has conducted training on these procedures to ensure that the practice is consistent with them," but the laboratory did not include complete training documentation to support this assertion."*

> **Theranos Response to Statement 4 – D5421 Finding #2:**  The laboratory's submission included training documentation for seven laboratory personnel. The laboratory has enclosed with this letter additional training documentation for the lab's method verification procedures. (Ex. BB, Tabs 5B-5C).

**D5421 Finding #2– March 18 Letter Statement 5:**  *"Because the laboratory has not shown whether it can follow its own validation protocols, it was uncertain whether the laboratory's quality assessment mechanisms could monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

> **Theranos Response to Statement 5 – D5421 Finding #2:**  As stated above, there appears to have been a miscommunication because the laboratory **stopped** running tests on the Siemens

24
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road     P 650.838.9292     theranos.com
Palo Alto, CA 94304      F 650.838.9165

Advia XPT on November 17, 2015, and has **not** run any tests on the instrument since then. Accordingly, the laboratory has not re-verified any assay on the Siemens Advia XPT.

The laboratory is capable of ensuring that the deficient practice in D5421 does not recur. Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures. The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016. Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory. In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant. Dr. Tschirhart has over fifteen years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team. The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

## D5423

**D5423 – March 18 Letter Statement 1:** *"Although the laboratory's submitted protocol (Ex. A, Tab 9) included a method verification procedure which addressed verification of accuracy, precision, and reportable range, the laboratory provided no documentation showing that this protocol had been followed to re-verify performance specifications. The submission also stated: Before the lab resumes any test on the Advia XPT, the lab will ensure that the test has been re-verified pursuant to the lab's improved method verification procedures that have been approved by the laboratory director." The completion date for the correction of this deficiency was indicated on the submitted Allegation of Compliance as February 12, 2016, which, in order to determine correction, should include the re-verification documentation for the Advia XPT. However, the laboratory provided no documentation that the re-verification had been performed. We note that in the laboratory's submission related to test performance specifications for the Advia XPT instrument, it was the laboratory's policy to accept %CV values that were up to 1.5 times the %CV values stated by the instrument manufacturer for any given chemistry analyte. In the submission, we found no explanation as to why 1.5 times the manufacturer's %CV was acceptable to the laboratory."*

**Theranos Response to Statement 1 – D5423:** Prior to the survey, the laboratory did not employ a policy to accept %CV values that were up to 1.5 times the %CV values stated by the manufacturer, and the verification reports that CMS reviewed did not use 1.5 times the %CV stated by the manufacturer. Likewise, the laboratory's revised method verification procedure does not include a 1.5 times %CV policy. (Ex. BB, Tab 5).[11] Rather, it requires

---

[11] The laboratory referred to a 1.5 times %CV in its response based upon Bio-Rad's coefficient of variation rate. (http://www.qcnet.com/Portals/50/PDFs/QCWorkbook2008_Jun08.pdf). Upon

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material
THER-0534724



1701 Page Mill Road     P 650.838.9292    theranos.com
Palo Alto, CA 94304      F 650.838.9165

that the laboratory verify the manufacturer's imprecision claim. (Ex. BB, Tab 5 § 8.2). Training on the revised procedure has occurred.  (Ex. BB, Tabs 5B-5C).  Additionally, there appears to have been a miscommunication because the laboratory **stopped** running tests on the Siemens Advia XPT on November 17, 2015, and has **not** run any tests on the instrument since then.  Accordingly, the laboratory has not re-verified any assay on the Siemens Advia XPT.  References to method verification data in documents enclosed with the submission are to verification reports prepared **before** the survey began and before the laboratory's revised procedures were made effective (those reports were either reviewed by CMS or available to CMS during the survey), which were referenced for context.

**D5423 – March 18 Letter Statement 2:**  *"We also found no explanation as how "normal patient distribution" relates to determining if patients were affected or potentially affected."*

**Theranos Response to Statement 2 – D5423:**  The laboratory has enclosed a revised analysis to clarify its examination of these patient test result distributions, which should eliminate the confusion created by the phrase "normal patient distribution."  (Ex. AA, Tab 5).

**D5423 – March 18 Letter Statement 3:**  *"The laboratory's procedure as well as the method verification for alkaline phosphatase was reviewed at the onsite survey and the reportable range was documented as 0 - 1100 IU/L thus modifying the test. At the time of survey, the laboratory stated that the reportable range was 10 - 1100 IU/L per the manufacturer, and that the reportable range of 0 - 1100 IU/L was an error. The laboratory confirmed that the lowest reportable value established by the manufacturer was 10 IU/L. The Patient Impact Analysis submitted by the laboratory at Ex. B, Tab 6 now indicates that the reportable range should be 5 - 1100 IU/L which is still lower than the range established by the manufacturer; however, the laboratory did not submit any documentation to support this new reportable range."*

**Theranos Response to Statement 2 – D5423:**  The "Patient Impact Analysis" submitted by the laboratory at Ex. B, Tab 6 of its submission included a typographical error.  As reflected in the revised patient assessment enclosed with this letter, the reportable range should be 12 – 909 U/L.  (Ex. AA, Tab 6).

**D5423 – March 18 Letter Statement 4:**  *"The Patient Impact Analysis also indicates that review of the PT showed a negative bias for PT samples CAP C-A 2015 and CAP-B 2015, but the laboratory determined that no corrected were needed. The submission also states: "There were no significant trends or bias in patient population data." The laboratory provided no explanations for these assertions."*

---

further review, the laboratory does not believe that Bio-Rad's coefficient of variation rate is applicable here.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

**Theranos Response to Statement 4 – D5423:** The laboratory's patient assessment analysis appears to have included an inadvertent copy and paste mistake.  The laboratory has enclosed its revised analysis.  (Ex. AA, Tab 2).

**D5423 – March 18 Letter Statement 5:**  *"In addition, the laboratory's submission states at Ex. B, Tab 6: "Matrix comparisons done by the manufacturer between serum and plasma showed correlation." The laboratory submitted no documentation supporting this statement."*

**Theranos Response to Statement 5 – D5423:** The laboratory has enclosed with this letter documentation supporting that matrix comparisons done by the manufacturer between serum and plasma showed correlation.  (Ex. HH, Tab 13).

**D5423 – March 18 Letter Statement 6:**  *"The submission also states that "the lab has conducted training on these procedures to ensure that the practice is consistent with them," but did not include complete training documentation."*

**Theranos Response to Statement 6 – D5423:** The laboratory's submission included training documentation on the method verification procedures for seven laboratory personnel.  The laboratory has enclosed with this letter additional training documentation for the lab's method verification procedures. (Ex. BB, Tabs 5B-5C).

**D5423 – March 18 Letter Statement 7:**  *"Because the laboratory has not shown whether it can follow its own validation protocols, it is uncertain whether the laboratory's quality assessment mechanisms could monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

**Theranos Response to Statement 7 – D5423:** As stated above, there appears to have been a miscommunication because the laboratory **stopped** running tests on the Siemens Advia XPT on November 17, 2015, and has **not** run any tests on the instrument since then.  Accordingly, the laboratory has not re-verified any assay on the Siemens Advia XPT.

The laboratory is capable of ensuring that the deficient practice in D5423 does not recur.  Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures.  The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016.  Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory.  In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant.  Dr. Tschirhart has over fifteen years of experience as a clinical laboratory director, and is a valuable part of the

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Trial Exh. 5471 Page 00027

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534726



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

laboratory's new leadership and oversight team.  The laboratory's new leadership team
has installed an entirely redesigned QMPI Program, as well as robust audit procedures
that required monthly and quarterly audits.

## D5429

**D5429 – March 18 Letter Statement:**  *"To ensure the deficient practice does not recur, the
laboratory indicated that quarterly audits will be performed and suggested that the audits results
would be reviewed within the laboratory's QMPI Program.  However, the laboratory did not
establish the procedure by which these quarterly audits are to be conducted.  In the submission,
the laboratory indicates that a 'tracer audit* **may** [emphasis added [in the letter]] be used, but
did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would
be documented, and whether the results of a 'tracer audit' would be the information reviewed by
the QMPI Program."*

**Theranos Response to Statement – D5429:**  The laboratory has revised its audit procedures
to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training
on these procedures has occurred.  (Ex. BB, Tabs 8B-C).  The revised procedures establish
that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that
tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8
§ 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality
management systems; provide the protocol for quarterly audits; and require that quarterly
audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 §
8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and
quarterly audits are reviewed, analyzed and presented based on findings and analysis" during
the QMPI Program meetings.  (Ex. BB Tab 7§ 7.5).  Training on the revised QMPI
procedures has occurred.  (Ex. BB, Tab7B-C).

## D5437

Findings #1 & #2

**D5437 Findings #1 & #2 – March 18 Letter Statement 1:** *"At the time of the onsite survey, the
laboratory failed to maintain calibration documentation for the complete blood count (CBC)
instruments. In the submission, we found no evidence the laboratory has re-established its
calibration documentation for the CBC instruments."*

**Theranos Response to Statement 1 – D5437 Findings #1 & #2:**  There appears to have
been a miscommunication.  The laboratory **stopped** using its Siemens Advia 2120i
instruments for clinical patient testing on November 17, 2015, and has **not** used them since
then.  The two Drew-3 instruments were retired before the survey began on September 22,
2015 and before the laboratory's revised procedures were made effective.  Because the

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Trial Exh. 5471 Page 00028

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534727



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

laboratory's "CBC instruments" are not in use, the laboratory has not "re-established" calibration documentation for those instruments.

**D5437 Findings #1 & #2 – March 18 Letter Statement 2:**  *"In Ex. F, the laboratory provided lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports; however, the laboratory provided no documentation to indicate corrected reports were generated and issued."*

>**Theranos Response to Statement 2 – D5437 Findings #1 & #2:**  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5437 Findings #1 & #2 – March 18 Letter Statement 3:**  *"To ensure appropriate and required calibration or QC corrective actions were taken, the laboratory indicated that quarterly audits will be performed and suggested that the audit results would be reviewed within the laboratory's QMPI Program.  However, the laboratory did not establish the procedure by which these quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program.  However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted.  In the submission, the laboratory indicates that a 'tracer audit **may** [emphasis added] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

>**Theranos Response to Statement 3 – D5437 Finding #1 & #2:**

The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits are documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB Tab 7§ 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tab7B-C).

**D5437 Findings #1 & #2 – March 18 Letter Statement 4:**  *"In addition, we note that in the laboratory's re-verification of test performance specifications for the CBC instruments, it was the laboratory's policy to accept %CV values that were up to 1.5 times the %CV values stated by*

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534728



1701 Page Mill Road     P 650.838.9292    theranos.com
Palo Alto, CA 94304     F 650.838.9165

*the instrument manufacturer for any given CBC analyte. In the submission, we find no*
*explanation as to why 1.5 times the manufacturer's %CV is acceptable to the laboratory."*

**Theranos Response to Statement 4 – D5437 Finding #1 & #2:** Prior to the survey, the
laboratory did not employ a policy to accept %CV values that were up to 1.5 times the %CV
values stated by the manufacturer, and the verification reports that CMS reviewed did not use
1.5 times the %CV stated by the manufacturer.  Likewise, the laboratory's revised method
verification procedure does not include a 1.5 times %CV policy.  (Ex. BB, Tab 5).[12]  Rather,
it requires that the laboratory verify the manufacturer's imprecision claim.  (Ex. BB, Tab 5 §
8.2).  Training on the revised procedure has occurred.  (Ex. BB, Tabs 5B-5C).  Additionally,
there appears to have been a miscommunication because the laboratory stopped running tests
on the Siemens Advia 2120i instruments on November 17, 2015, and has not run any tests on
the instruments since then.  The laboratory has retired its two Drew-3 instruments.
Accordingly, the laboratory has not re-verified any assay on "the CBC instruments."
References to method verification data in documents enclosed with the submission are to
verification reports prepared **before** the survey began and before the laboratory's revised
procedures were made effective (those reports were either reviewed by CMS or available to
CMS during the survey), which were referenced for context.

## D5447

**D5447 – March 18 Letter Statement 1:**  *"Although the laboratory's submitted protocol*
*indicates that a two-level QC slide review is now required every day of patient testing when*
*using the Cellavision, the laboratory provided no documentation of or information about the QC*
*materials used, how the statistical parameters of the QC materials would be determined, how*
*QC test results will be documented, and whether laboratory staff has been trained on this new*
*protocol."*

**Theranos Response to Statement 1 – D5447:**  The laboratory has revised the Cellavision
SOP to include information about the QC materials used, how the statistical parameters of
the QC materials would be determined, and how QC test results will be documented.  (Ex.
BB, Tab 15 ).  However, this SOP is not presently in use, because the laboratory stopped
using the Cellavision on November 17, 2015, and has not used the Cellavision since then.
Because the Cellavision is not in use, the laboratory has not conducted a training on this
revised (but inactive) SOP.

---

[12] The laboratory referred to a 1.5 times %CV in its response based upon Bio-Rad's coefficient
of variation rate.  (http://www.qcnet.com/Portals/50/PDFs/QCWorkbook2008_Jun08.pdf).  Upon
further review, the laboratory does not believe that Bio-Rad's coefficient of variation rate is
applicable here.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534729



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

**D5447 – March 18 Letter Statement 2:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program.  However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted.  In the submission, the laboratory indicates that a 'tracer audit may [emphasis added [in the letter]] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

> **Theranos Response to Statement 2 – D5447:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2)  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB Tab 7§ 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tab7B-C).

### D5449

**D5449 – March 18 Letter Statement 1:**  *"Although the laboratory's submitted protocol indicates that an external positive QC material would be included in each run of patient Chlamydia trachomatis/Neisseria gonorrhoeae (CT /NG) testing, the laboratory provided no documentation of the positive QC material used, how the statistical parameters of the positive QC material would be determined, how the positive QC test result will be documented, and whether laboratory staff has been trained on this new protocol."*

> **Theranos Response to Statement 1 – D5449:**  The laboratory has revised the CT/NG SOP to include information about the positive QC materials used, how the statistical parameters of the QC materials would be determined, and how QC test results will be documented.  (Ex. BB, Tab 16 § 9.1.5).  The relevant laboratory personnel have been trained on this protocol. (Ex. BB, Tabs 16B-16C).

**D5449 – March 18 Letter Statement 2:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program.  However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted.  In the submission, the laboratory indicates that a 'tracer audit may [emphasis added [in the letter]] be used, but*

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534730



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5449:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

## D5469

## Finding #1

**D5469 Finding #1 – March 18 Letter Statement 1:** *"Although the laboratory's submitted protocol indicates that the stated values of new commercially assayed CBC QC materials were to be verified through parallel testing against QC materials in use, the laboratory provided no documentation indicating that this protocol had been effectuated, no information as to how the results of the parallel testing will be documented, and no information as to whether laboratory staff has been trained on this new protocol."*

**Theranos Response to Statement 2 – D5469 Finding #1:** D5469 Finding #1 relates to the laboratory's "two Drew 3 instruments." The laboratory's two Drew-3 instruments were retired before the survey began on September 22, 2015. Since the survey, there has not yet been a need to perform parallel testing against QC materials in use because the laboratory has not approached a QC lot change for the tests that are in use. To ensure that there will not be an issue with documentation of such parallel testing in the future, the laboratory has further revised its procedures as to how the results of the parallel testing against QC materials in use must be documented. (Ex. BB, Tab 14 § 9). The laboratory staff has been trained on this documentation procedure. (Ex. BB, Tabs 14B-C).

To ensure that there is not any confusion, we note that the Advia 2120i CBC SOP is inactive (and is not in use) because the laboratory stopped using those instruments on November 17, 2015, and has not used them since then.

32
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road     P 650.838.9292     theranos.com
Palo Alto, CA 94304     F 650.838.9165

**D5469 Finding #1 – March 18 Letter Statement 2:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5469 Finding #1:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB Tab 7§ 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tab7B-C).

Finding #2

**D5469 Finding #2 – March 18 Letter Statement 1:** *"Although the laboratory's submitted protocol indicates that the stated values of new commercially assayed chemistry QC materials were to be verified through parallel testing against QC materials in use, the laboratory provided no documentation indicating that this protocol had been effectuated, no information as to how the results of the parallel testing will be documented, and no information as to whether laboratory staff has been trained on this new protocol."*

**Theranos Response to Statement 1 – D5469 Finding #2:** D5469 Finding #2 relates to the chemistry assays on the Siemens Advia 1800 and Siemens Advia XPT instruments.  The laboratory stopped using the Siemens Advia 1800 instruments before the survey began on September 22, 2015, and has not used them since then.  The laboratory stopped using the Siemens Advia XPT instrument on November 17, 2015, and has not used it since then.  Since the survey, there has not yet been a need to perform parallel testing against QC materials in use because the laboratory has not approached a QC lot change for the tests that are in use.  To ensure that there will not be an issue with documentation of such parallel testing in the future, the laboratory has further revised its procedures as to how the results of the parallel

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534732



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

testing against QC materials in use must be documented.  (Ex. BB, Tab 14).  The current procedures include worksheets for how to document parallel testing. (Ex. BB, Tab 14 F1-F4). The laboratory staff has been trained on this documentation procedure.  (Ex. BB, Tabs 14B-14C).

**D5469 Finding #2 – March 18 Letter Statement 2:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5469 Finding #1:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB Tab 7§ 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tab7B-C).

## D5477

**D5477 – March 18 Letter Statement 1:**  *"The laboratory submitted no written procedure for the bacteriology media QC protocol, and no information as to whether laboratory staff has been trained on this new protocol."*

**Theranos Response to Statement 1 – D5477:**  The laboratory has enclosed with this letter its written procedure for the bacteriology media QC protocol and documentation showing that the relevant personnel have been trained on it.  (Ex. BB, Tabs 4-4C).

**D5477 – March 18 Letter Statement 2:**  *"In Ex. L, Tab 8, the submission included a completed form titled 'Blood Agar 5% Quality Control Log sheet.'  We note that the entry for the media received on 1/18/16 indicates that QC testing of this bacteriology media was completed on 1/14/16, which is before the date the media was received by the laboratory. Yet, as documented*

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road     P 650.838.9292     theranos.com
Palo Alto, CA 94304     F 650.838.9165

*on the form, the completed form was reviewed on 2/11/16 without any indication this entry had been reviewed. We question the accuracy of this entry as well as the effectiveness of the laboratory's oversight mechanism."*

**Theranos Response to Statement 2 – D5477:**  CMS appears to have had difficulty reading the handwriting on the Blood Agar 5% Quality Control Log Sheet, confusing a handwritten "3" with an "8".  The "Blood Agar 5% Quality Control Log Sheet" states that the media was received on 1/13/16.  ((Ex. HH, Tabs 5A-5B). Therefore, there is no reason to question that accuracy of this entry because the log shows that the media was received the day before QC testing of this bacteriology media was completed.  For the same reason, the February 11, 2016 review of the completed form was performed correctly, and there is no reason to question the effectiveness of the laboratory's oversight mechanism.

**D5469 Finding #2 – March 18 Letter Statement 3:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 3 – D5469 Finding #2:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB Tab 7§ 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tab7B-C).

<u>**D5481**</u>

<u>Finding #1</u>

**D5481 Finding #1 – March 18 Letter Statement 1:**  *"The submission references 'Ex. I, Tabs 2-6.' We located these tabs, but found no documentation in Tabs 2, 5, and 6."*

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534734



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

**Theranos Response to Statement 1 – D5481 Finding #2:** There was an inadvertent copying error for Exhibit I to the initial submission. The laboratory has enclosed the applicable documents with this letter, as well as additional documents related to the laboratory's broader analysis of the PT/INR test over the entire time it was run on this Siemens BCS XP instrument. (Ex. GG).

**D5481 Finding #1 – March 18 Letter Statement 2:** *"Although the laboratory's submitted protocol requires that QC values be acceptable prior to reporting patient results, the submission states: 'Theranos reviewed all quality control (QC) data for PT/INR [Prothombin Time/International Normalized Ratio] for the time period that this lot of Dade Innovin was in use.' The laboratory provided no documentation of this review other than stating it was performed.*

**Theranos Response to Statement 2 – D5481 Finding #1:** The laboratory has revised its patient assessment analysis for PT/INR, which is enclosed with this letter at Ex. AA, Tab 7. The revised assessment references supporting documentation identifying the time period that this lot of Dade Innovin was in use, as well as the QC data for that period. (Ex. AA, Tab 7; Ex. GG). That supporting documentation is also enclosed with this letter. (Ex. GG).

**D5481 Finding #1 – March 18 Letter Statement 3:** *We also found no documentation to indicate that the revised standard operating procedures (SOPS) have been effectuated. That is, we found no documentation of PT/INR QC failure investigations and corrective actions taken based on the revised SOPS."*

**Theranos Response to Statement 3 – D5481 Finding #1:** There appears to have been a miscommunication because the laboratory stopped running tests on the Siemens BCS XP, including PT/INR, on September 17, 2015, and has not run any tests on the instrument since then. Therefore, there have been no new QC failures for PT/INR to investigate or address through corrective action. The revised SOPs were implemented only after CMS identified the QC failures for PT/INR. The "review" discussed in the submission was simply intended to refer to the analysis conducted to address the deficiency identified by CMS. The issue addressed by the "review" — i.e., failing to document corrective action for QC fails for PT/INR — is the same issue identified by CMS in its deficiency, and thus did not constitute a new issue or occurrence.

**D5481 Finding #1 – March 18 Letter Statement 4:** *"In Ex. I, the laboratory provided lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were issued. We also note that the Patient Impact Assessment (Ex. I, Tab 1) states that "remedial action was taken on 9/25/15," but "corrected reports were issued beginning on 11/10/15 and completed on*

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Trial Exh. 5471 Page 00036

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534735



1701 Page Mill Road    P 650.838.9292   theranos.com
Palo Alto, CA 94304    F 650.838.9165

*11/12/15." There was no explanation as to why there was such a long period of time between the remedial action and issuing corrected reports.*

**Theranos Response to Statement 4 – D5481 Finding #1:** All of these corrected reports for PT/INR, along with documentation confirming that they were sent, are enclosed with this letter. (Ex. GG, Tab 7). On September 22 or 23, CMS identified a number of issues related to PT/INR tests during the period April to September 2015. The laboratory undertook a thorough investigation. Given the number of issues to review, the investigation took time to complete properly. Timeliness for proper completion of the investigation and associated corrective actions were also affected by the absence of a full-time, on-site laboratory director. The laboratory subsequently hired its new lab director, Dr. Kingshuk Das, who is highly qualified and has extensive clinical laboratory experience. As of March 14, 2016, Dr. Das joined Theranos on-site full-time at the Newark, California laboratory. Additionally, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant. Dr. Tschirhart has over fifteen years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team.

**D5481 Finding #1 – March 18 Letter Statement 5:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 5 – D5481 Finding #1:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7 § 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material                                                    THER-0534736



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

<u>Finding #2</u>

**D5481 Finding #2 – March 18 Letter Statement 1:** *"Although the laboratory submitted a QC protocol (Ex. A, Tab 9), the laboratory's submission did not include an updated protocol for QC specific to the Theranos Proprietary Devices."*

> **Theranos Response to Statement 1 – D5481 Finding #2:** This aspect of the review appears to be based on a miscommunication because Theranos **retired** the TPS 3.5 in early-August 2015.

**D5481 Finding #2 – March 18 Letter Statement 2:** *"The reference protocol states at §§ 8.1.9-8.1.10:*

> *'No instrument or test method can be used for the purpose of performing a test to report a result to a patient prior to having passed all required QC procedures at least once for the day on which the test is to be performed. It is the responsibility of all testing personnel to ensure this does not occur. Testing personnel must immediately take the appropriate action for all failed QC runs, refer to section 8.4.'*

*In addition, the laboratory's submission states:*

> *'To perform this analysis, systematic error was investigated using quality control (QC) data and patient distribution over time. The QC data was reviewed in Levey-Jennings plots and evaluated for bias trends. The patient data was summarized by plotting monthly means, monthly medians and monthly means ("average of normal" or AON) calculated from central 95% of values. In addition, random errors were evaluated by analysis of QC data. Namely, QC data was reviewed to identify >2SD failures and period of elevated CV. Namely, batches of 10 consecutive QC data points were analyzed and the CV was calculated for each QC level during this period. If the CV was >30%, then all patient results run during that time period will be voided. (Ex. E, Tab 1).'*

*The laboratory's response does not include an evaluation of unacceptable QC results or patients affected or potentially affected by the cited QC failures. It is not clear how evaluating aggregate patient (i.e., monthly means and medians) and QC (i.e., bias trends, >2SD, CV) data addressed specific days that the QC was unacceptable and patient results were reported.*

*The summary (Ex. E, Tab 1) included analytes tested on the Theranos Proprietary Device. We note that general statements such as, but not limited to, were included:*

- *'Monthly patient distribution variance were noted, but they could not be further substantiated by QC trends'*
- *'Patient results following a QC failure and during periods of high CV are being voided'*

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

- *'Patient distribution and QC trends did not reveal significant trends.'*
- *'Potential biases observed in patient distributions were found to be insignificant relative to the normal reference intervals'*

*The laboratory's submission did not provide any explanation or documentation to support these statements."*

**Theranos Response to Statement 2 – D5481 Finding #2:**  This deficiency concerns the TPS 3.5, which was one of the Theranos proprietary technologies in use in 2014 and 2015.  The laboratory began phasing out the TPS 3.5 in December 2014, and it was **fully retired** in early-August 2015.

The laboratory values CMS's feedback, and takes it very seriously.  The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was fully retired in early-August 2015.  As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5.  (Ex. AA, Tab 3).  The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures.  Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015.  As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015.  (Ex. AA, Tab 3).  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5481 Finding #2 – March 18 Letter Statement 3:**  *"The submission (Ex. E) includes a list of patient specimen accession numbers for which the laboratory "identified reports," but does not specify or include documentation to indicate whether corrected reports were generated and issued."*

**Theranos Response to Statement 3 – D5481 Finding #2:**  As indicated above, the laboratory has revised and broadened its analysis of this deficiency.  Based on that analysis, which is described above and in the attached documentation, the laboratory has, out of an extreme abundance of caution, voided all results reported for assays run on the TPS 3.5 in 2014 and 2015.  (Ex. AA, Tab 3).  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

## D5775

Finding #1

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

**D5775 Finding #1 – March 18 Letter Statement 1:**   *"In the submitted protocol, the laboratory states: 'To ensure all manual differentials performed are comparable, ... manual differentials will be compared annually amongst the competent staff....' The laboratory provided no written procedure as to how "manual differentials will be compared annually.' In addition, the regulation requires the laboratory to conduct such evaluations twice a year, not annually."*

**Theranos Response to Statement 1 – D5775:** The laboratory has revised the Cellavision SOP to include procedures for how manual differential will be compared and to require that the laboratory perform such evaluations twice a year.  (Ex. BB, Tab 15 § 9.1.4.2).  Please note, however, that this SOP is inactive because the laboratory stopped using the Cellavision on November 17, 2015, and has not used it since then.

**D5775 Finding #1 – March 18 Letter Statement 2:**   *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5775 Finding #1:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB Tab 7§ 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tab7B-C).

<u>Finding #2</u>

**D5775 Finding #2 – March 18 Letter Statement 1:**   *"Although the laboratory submitted a method/instrument comparison protocol (Ex. A, Tab 28), we were unable to determine if the protocol was effectuated. In its submission, the laboratory states: 'The lab's technical supervisors and the quality system director will be responsible for ensuring that these*

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534739



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*procedures are followed.' However, the laboratory's submission did not include any documentation to indicate that the technical supervisors or the quality systems director had been trained on the method/instrumentation comparison protocols."*

**Theranos Response to Statement 1 – D5775 Finding #2:** This deficiency concerns method comparison for the TPS 3.5. As indicated above, the TPS 3.5 was fully **retired** in early-August 2015. Before the survey began, the laboratory had **stopped** running the same test using different methodologies or instruments, and the laboratory has **not** run the same test using different methodologies or instruments since then. As a result, the laboratory has had no reason to use the method verification protocol that it included with the submission. Although the laboratory does not have a need to use the revised method comparison protocol at this time, it has trained its technical supervisors and quality director on it. (Ex. BB, Tabs 12-12C).

**D5775 Finding #2 – March 18 Letter Statement 2:** *"The laboratory's submission also includes the following statement:*

> *Because TPS's [Theranos Proprietary Devices] were factory calibrated by Theranos, the laboratory did not perform additional method correlation studies. As part of this investigation, Theranos examined the correlation of different TPS to evaluate their concordance. Namely, for SHGB, TT3, Vitamin B12 and Vitamin D, patient distributions were compared across representative TPS's in use during the same period (Exhibit E Tab 12-A; Tab 24-A, Tab 33-A). These data showed similar patient distributions across the different devices. In addition, comparison of assay results across different assay levels and different TPS's demonstrates that the instruments were well correlated to each other (Exhibit E, Tab 12-A; Tab 24-A, Tab 33-A). Namely, the median result for each TPS was within the total allowable error thereby demonstrating that the same assay reference ranges were appropriate for TPS.*

*The laboratory's response indicates that not all TPS would be included in the correlation studies rather 'across representative TPS in use during the same period.' The laboratory submitted correlation studies for Sex Hormone Binding Globulin (SHBG) and Vitamin D (VitD) only (Ex E, Tabs 12-A, 24-A and 33-A, respectively). However, these studies did not include a date on either the summary or raw data, so we were unable to determine when the correlation studies occurred. The submission for SHBG also included information on one document with box plots that included three devices and another document that included box plots of six devices, so we were unable to determine what devices were actually used for SHBG testing.*

*The laboratory's submission offered no response to correlation studies for Vitamin B12 and no explanation for the disparity between the devices used for QC and the devices used for patient*

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

*testing. We also noted that there was no explanation as to where the total allowable error (TAE) of 24% on the raw data documentation came from or if any TAE was calculated for the submitted data. The laboratory used the median result for each proprietary device to determine if TAE was acceptable, but did not provide an explanation why the median results were used."*

**Theranos Response to Statement 2 – D5775 Finding #2:**  This portion of CMS's March 18 letter concerns aspects of the patient assessment analysis for tests run on the TPS 3.5.  The laboratory began phasing out the TPS 3.5 in December 2014, and it was **fully retired** in early-August 2015.

As reflected in its submission, the laboratory believes oversight, implementation and structure of its prior method comparison procedures were not satisfactory, which is why it has developed the improved method comparison procedures that were included with the submission.  The laboratory has further revised those procedures in response to other feedback contained in CMS's March 18 letter.  (Ex. BB, Tab 12).  Training on these procedures has occurred. (Ex. BB, Tabs 12B-12C).

The laboratory values CMS's feedback, and takes it very seriously.  The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was **fully retired** in early-August 2015.  As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5.  (Ex. AA, Tab 3).  The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures.  Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015.  As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015.  (Ex. AA, Tab 3).  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5775 Finding #2 – March 18 Letter Statement 3:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would*

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534741



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

*be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5775 Finding #1:** audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

**D5779**

**D5779 – March 18 Letter Statement 1***: "In Ex. F, the laboratory provided lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were issued."*

**Theranos Response to Statement 1 – D5779:** Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5779 – March 18 Letter Statement 2:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5779:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material
THER-0534742



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB Tab 7§ 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tab7B-C).

## D5787

**D5787 – March 18 Letter Statement 1:**  *"The laboratory submitted no written procedure for the documentation of the lot of bacteriology media used to test any given patient specimen, and no information as to whether laboratory staff has been trained on this new protocol."*

> **Theranos Response to Statement 1 – D5787:**  The laboratory has enclosed with this letter its written procedure for the documentation of bacteriology media QC protocol.  (Ex. BB, Tab 4 § 8.2).  The relevant laboratory personnel have been trained on that procedure, as reflected in the documentation enclosed at Ex. BB, Tabs 4B-4C.

**D5787 – March 18 Letter Statement 2:**  *"In its submission, the laboratory references Ex. L, Tab 6 which states: "When [media quality control] testing is completed the results are logged into an excel sheet with lot number and expiration date for each patient (see attached report)." We find no "attached report" in the submission and, therefore, no documentation indicating the laboratory's corrective action has been effectuated."*

> **Theranos Response to Statement 2 – D5787:**  The laboratory has effectuated its written bacteriology media QC protocol by logging each patient result into a separate excel worksheet that includes the lot number and expiration date for the bacteriology media lot used for that patient test.  We have enclosed examples of these excel spreadsheets, which show that the laboratory's corrective action has been effectuated.  (Ex. HH, Tab 6).

**D5787 – March 18 Letter Statement 3:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

> **Theranos Response to Statement 3 – D5787:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

Training on these procedures has occurred.  (Ex. BB, Tabs 8B-C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB Tab 7§ 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tab7B-C).

## D5791

### Finding #1

**D5791 Finding #1 – March 18 Letter Statement 1:**  *"The laboratory submitted a protocol for the SensoScientific Monitoring in Ex. A, Tab 24. The response does not specifically address the days that the freezers did not meet acceptable temperatures as documented in the SensoScientific Monitoring Audit Node Log. We could not determine if the new procedure has been effectuated as no documentation was submitted to show that the unacceptable freezer temperatures were addressed.*

**Theranos Response to Statement 1 – D5791 Finding #1:**  The laboratory has effectuated its revised procedures for the SensoScientific Monitoring that were included with our initial submission.  Two examples of the current system monitoring are enclosed with this letter.  (Ex. II, Tabs 1A-1B).  First, on March 18, 2016, at about 11:00 a.m., the laboratory's Wi-Fi became temporarily inoperable.  All monitors went into failure mode and a down-time paper recording was initiated.  The Wi-Fi was brought back up and the system was restored by 6:00 p.m.  Data was reclaimed from the monitors for the period in question, and this failure was documented in the enclosed Alarm History and Corrective Action (Ex. II, Tab 1A) and the enclosed Occurrence Report Form.  (Ex. II, Tab 1B).  Second, on March 19, 2016, freezer 7063 failed a temperature check.  The low magnitude and brevity of the failure was below the alarm threshold.  (Ex. II, Tab 4).  The failure was detected and evaluated on a weekly review.  (Ex. II, Tab 4).  As it had corrected itself less than 30 minutes after it occurred, there was no need for further action.  (Ex. II, Tab 4).  This demonstrates that the procedure is being followed and temperatures are being adequately monitored.  In addition, as stated in above regarding D5413, the laboratory has also posted signs on the freezers pursuant to the new procedures, as reflected in the attached documentation.  (Ex. II, Tab 2).

45
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

**D5791 Finding #1 – March 18 Letter Statement 2:**  *In addition, the laboratory states that training has occurred, but it was not clear who should be trained as 'laboratory supervisor or designee' was not defined."*

> **Theranos Response to Statement 2 – D5791 Finding #1:**  The laboratory has revised this procedure to clarify that "[i]t is the daily responsibility of the laboratory supervisor to monitor and record the temperatures of refrigerators and freezers and the temperature and humidity of each lab room and ambient storage space." (Ex. BB, Tab 13 § 4.5).  The revised procedure is enclosed at Ex. BB, Tab. 13.

**D5791 Finding #1 – March 18 Letter Statement 3:**  *"Training records provided in Ex. A, Tab 30 included only training documents for one general supervisor."*

> **Theranos Response to Statement 3 – D5791 Finding #1:**  The laboratory has enclosed with this letter a complete set of training records on this SOP, which show that the relevant laboratory personnel have been trained.  (Ex. BB, Tabs 13B-13C).

**D5791 Finding #1 – March 18 Letter Statement 4:**  *"Several freezers were identified as 'not used in patient testing' (see Ex. N, Tab A); however, based on interviews during the onsite visit, these freezers were identified as being used for CLIA activities.  The submission did not include a response or data related to the freezers identified as 'not used in patient testing.'"*

> **Theranos Response to Statement 4 – D5791 Finding #1:**  D5791 #1 identifies the same six -20 C freezers and four -80 freezers as D5413.  In the laboratory's submission, we explain that five of those freezers did not contain materials that would be used in the future for clinical patient testing.  Rather, they only contained material that might be used in the future for research and development.

Based on CMS's March 18 letter, it appears that there was a miscommunication when the CMS surveyors were onsite.  D5413, Paragraph f, states that CMS had a discussion about these freezers with the "Director of Assay Systems and technical supervisor at 11/19/15 at approximately 11 am."  The Director of Assay Systems did not have any regular involvement with those freezers at that time and did not have knowledge of their contents.  The "technical supervisor" in attendance on November 19, 2015 joined the company on October 26, 2015 (Ex. HH, Tab 8); he also did not have regular involvement with those freezers at the time and did not have knowledge of their contents.  To the extent CMS understood either of these individuals to be confirming the contents of these freezers or whether these freezers were used in clinical patient testing, there was a miscommunication.

The laboratory has looked into this issue further, and has reconfirmed that the statements in the laboratory's submission are accurate.  As reflected in the enclosed documentation:

- On November 19, 2015, there were four -20 C freezers in the microbiology or BUGS laboratory.  7061 BUGS -20 C Freezer 4 did **not** contain any materials for future use in clinical patient testing.  (Ex. II, Tab 3B).

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Trial Exh. 5471 Page 00046

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534745



1701 Page Mill Road     P 650.838.9292   theranos.com
Palo Alto, CA 94304     F 650.838.9165

- On November 19, 2015, there was one -20 C freezer in the capillary laboratory. Clinical patient testing in the Normandy laboratory **stopped** on September 20, 2015, and there has **not** been any clinical patient testing in the Normandy laboratory since then. The 1 Normandy -20 C freezer 7066 did **not** contain any materials for future use in patient testing. (Ex. II, Tab 3C).

- On November 19, 2015, there were four -80 C freezers. 7098 -80 C Freezer 1 Nuair, 7111 -80 C Freezer 2 Thermo, and 7113 -80 2 CLIA Lab did not contain any materials for future use in clinical patient testing. While the last of those three freezers was named 7113 -80 2 CLIA Lab, it was only used to store old specimens that were not for future use in clinical patient testing. (Ex. II, Tab 3A)

**D5791 Finding #1 – March 18 Letter Statement 5:** *"The laboratory submitted an article for the use of Mean Kinetic Temperatures (MKT) (Ex. N, Tab 1). This article relates to the handling, storage, and distribution of temperature sensitive pharmaceuticals, not clinical laboratory specimens, reagents, reference materials, etc. We are unclear as to how this article applies to this deficient practice, and note that the written procedure submitted by the laboratory at Ex. A, Tab 24 does not incorporate monitoring temperature by MKT."*

> **Theranos Response to Statement 5 – D5791 Finding #1:** Although the article is not critical to our analysis, it is relevant because it provides a specific rationale for understanding the chemical effects of brief increases (or decreases) in temperature on pharmaceuticals, and by extrapolation, on chemical controls. The conclusion of the article is that brief periods of temperature elevation have little effect on the rate of chemical degradation on the product being stored. While we do not recommend storing chemical control material in an unstable environment, the article gives reassurance that chemical control materials subjected to a short period of increased temperature by mistake are unlikely to be chemically degraded.

**D5791 Finding #1 – March 18 Letter Statement 6:** *"The laboratory also submitted an article related to the storage of bacterial samples for optimal viability (Ex. N, Tab 22). We note that the submitted written procedure relates to determining acceptable temperature viability of bacterial samples does not include any references to this article. We are unclear as to how this article applied to this deficient practice."*

> **Theranos Response to Statement 6 – D5791 Finding #1:** This article is cited in the laboratory's revised patient assessment for this deficiency, which is enclosed with this letter. (Ex. AA, Tab 4). This article is relevant because it shows that bacterial samples will remain viable for 10 years at -80C and for 1-3 years at -20C.

**D5791 Finding #1 – March 18 Letter Statement 7:** *"The laboratory submitted no evidence to support the following conclusion for the Sanyo JP Lab 7059 -20 freezer: '[The laboratory]*

47

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534746



1701 Page Mill Road     P 650.838.9292     theranos.com
Palo Alto, CA 94304     F 650.838.9165

*determined that higher storage temperature had no effect on the calibrators or controls stored in this freezer. There is no patient impact from the change in temperature during the time period.'"*

**Theranos Response to Statement 7 – D5791 Finding #1:**  The laboratory has revised its patient assessment analysis to provide more detail and documentation about its review of the effect this issue may have had on the Immulite controls stored in this freezer.  (Ex. AA, Tab 4).  Based on that review, the laboratory has voided certain test results.  (Ex. AA, Tab 4).  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5791 Finding #1 – March 18 Letter Statement 8:**  *In addition, the laboratory stated for another freezer (1 BUGS 7120 -80 freezer) that the 'MKT remained between -70 and -86 C for the entire date range.' However, the laboratory indicated that "a small number of bacterial cultures ... labeled to be stored at -80C or colder" were stored in this freezer. It was unclear as to why it was appropriate to store 'bacterial cultures ... labeled to be stored at -80C or colder' to be stored at temperatures of -70C to -79C."*

**Theranos Response to Statement 8 – D5791 Finding #1:**  The temperature at which these bacterial cultures are stored is not determined by a manufacturer.  While the laboratory recognizes that it should have followed its procedures for maintaining the temperature of this freezer at -80C or colder, storage of these bacterial cultures at temperatures of -70C to -79C did not have the potential to affect patients receiving tests in 2014 and 2015.  Most importantly, these bacterial cultures can only be used in patient testing after there is growth, which occurs **after** the bacterial culture is removed from the freezer.  If there is no growth after the bacterial culture is removed from the freezer, then the culture is not viable and cannot be used in patient testing.  Therefore, the higher temperature of this freezer did not have any potential to affect patients, even if even it had caused a bacterial culture to be unviable.

It is also worth noting that the temperature of -70C to -79C should not have had an impact on the viability of these bacterial cultures, which were put in these freezers after the laboratory moved to the Newark facility in October 2014.  The laboratory labels bacterial cultures for storage at -80C or colder only because that allows for the longest period of viability, which is 10 years.  (Ex. II, Tab 26). However, bacterial cultures remain viable for 1-3 years when stored at -20C.  (Ex. II, Tab 26).

**D5791 Finding #1 – March 18 Letter Statement 9:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the*

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

*laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 9 – D5791 Finding #1:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits are documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

Finding #2

**D5791 Finding #2 – March 18 Letter Statement 1:**  *"The laboratory submitted a protocol for a Master Validation Plan (Ex. E, Tab 30B) which required the %CV of replicates to be not more than 20% (25% at the lower and upper limits of detection). The submitted protocol was different than the protocol presented to the surveyor at the time of the onsite survey which required the %CV of replicates to be not more than 15% (20% at the lower and upper limits of detection). The %CV in the protocol presented to the surveyor at the time of the onsite survey matched the %CV of the predicate devices. It is unclear as to why the TPS, which is covered by the Master Validation Plan, can now have %CV's for replicates greater than the predicate devices; no explanation was submitted. In addition, we note that the %CV's (18.7% - 63.8%) included in the submission does not appear to have been evaluated using this new protocol nor was it addressed in the laboratory's response provided at Ex. E, Tab 1."*

**Theranos Response to Statement 1 – D5791 Finding #2:**  This deficiency concerns the TPS 3.5.  As noted above, the TPS 3.5 was **fully retired** in early-August 2015.

With respect to these validation plans, there appears to have been a miscommunication. During the September 22-23, 2015 on-site visit, the laboratory understood that CMS had requested the validation plan for proprietary chemistry assays run on other Theranos technologies.  The laboratory did not realize that CMS believed this plan was also the

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Trial Exh. 5471 Page 00049

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534748



1701 Page Mill Road      P 650.838.9292    theranos.com
Palo Alto, CA 94304      F 650.838.9165

validation plan that applied to ELISA assays run on the TPS 3.5. After reviewing the Form 2567, we realized that there had been a miscommunication, which is why our submission included the ELISA Master Validation Plan.

As detailed above, the laboratory values CMS's feedback, and takes it very seriously. [13] The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was **fully retired** in early-August 2015. As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5. (Ex. AA, Tab 3). The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures. Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015. As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015. (Ex. AA, Tab 3). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5791 Finding #2 – March 18 Letter Statement 2:** *"The submission (Ex. E) includes a list of patient specimen accession numbers for which the laboratory "identified reports," but does not specify or include documentation to indicate whether corrected reports were generated and issued."*

**Theranos Response to Statement 2 – D5791 Finding #2:** As indicated above, the laboratory has revised and broadened its analysis of this deficiency and associated corrective actions. Based on that analysis, which is described above and in the attached documentation, the laboratory has, out of an extreme abundance of caution, voided all results reported for assays run on the TPS 3.5 in 2014 and 2015. (Ex. AA, Tab 3). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be

---

[13] In discussing establishment of precision for an LDT, the March 18 letter references a comparison of %CVs between an LDT and "predicate devices." We note, however, that CLIA regulations do not contain any regulation requiring that there be any correlation or equivalence of %CV between LDTs and predicate devices. Rather, the regulations require only that the precision for the test must be established for the LDT itself. 42 C.F.R. § 493.1253(b)(2). It also is generally accepted that accuracy is the only required performance specification that typically requires a correlation study. 42 C.F.R. § 493.1253(b)(2).

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534749



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

Finding #3

**D5791 Finding #3 – March 18 Letter Statement 1:**  *"The laboratory's review of the QC found in Ex. E, Tab 1 did not specify what period of QC the laboratory reviewed."*

> **Theranos Response to Statement 1 – D5791 Finding #3:**  As indicated above, the laboratory's analysis covers the entire period in which each assay run on the TPS 3.5 was in use in 2014 and 2015.  (Ex. AA, Tab 3).

**D5791 Finding #3 – March 18 Letter Statement 2:**  *"The quality assessment (QA) documentation related to QC data from the survey in July 2014, October 2014, and February through June 2015. The laboratory's investigation did not indicate that the review had identified the cited issues related to QC."*

> **Theranos Response to Statement 2 – D5791 Finding #3:**  The revised analysis enclosed with this letter makes clear that the laboratory identified the cited issues related to QC.  (Ex. AA, Tab 3).  The laboratory's review of QC in connection with the submission, as well as the re-review reflected in the enclosed revised analysis, included a review of imprecision, QC trends, and QC failures, including failures occurring where one of the two levels of control had a value of 2SD or greater.

**D5791 Finding #3 – March 18 Letter Statement 3:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

> **Theranos Response to Statement 3 – D5791 Finding #3:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on

51

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534750



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

<u>Finding #4</u>

**D5791 Finding #4 – March 18 Letter Statement 1:**  *"Although the laboratory's submitted protocol included information about quarterly audits and agenda items for the laboratory's QMPI Program, the submission does not provide specific actions to take when problems are identified, specifically related to clotted specimens. The laboratory states in Ex. L, Tab 35 that "[p]atient specimens that did not meet the lab's acceptance criteria were rejected ... " However, the issue was not that the clotted specimens were rejected, rather that the laboratory's QA program did not identify the high number of clotted specimens over a period of three quarters. The submission does not include any documentation showing that the issue was identified and corrected. We note that Ex. A, Tab 12, §7.2.1.6 indicates that the QMPI Program agenda included specimen rejection rate partitioned by rejection criteria, but does not require that any action be taken based on this agenda item. In addition, we note that in Ex. A, Tab 12, §7.1, the laboratory provided the frequency of the QMPI Program meetings, but does not indicate any action should be taken in the event it is determined that the quality metrics were not met."*

**Theranos Response to Statement 1 – D5791 Finding #4:**  The laboratory has further revised its QMPI Program procedures to ensure that the QMPI Program identifies specimen rejection issues promptly.  (Ex. BB, Tab 7 § 7.2.3.1). The procedure requires that when analyzing specimen rejection and redraws, the QMPI team will "[i]dentify any corrective action to take based on data such as retraining or a procedure change." (Ex. BB, Tab 7 § 7.2.3.1.e)

**D5791 Finding #4 – March 18 Letter Statement 2:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5791 Finding #4:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tab 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a

<div align="center">52</div>
<div align="center">TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION</div>
<div align="center">EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT</div>

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

## D5793

### Finding #1

The March 18 Letter states:  *"See our reviews of D5403, D5437, D5469, and D5779."*  Accordingly, we refer you to our responses to those reviews.

### Finding #2

**D5793 Finding #2 – March 18 Letter Statement 1:**  *In the submission, the laboratory states:*

> *Based on comprehensive review, multiple examples of failed QC without the appropriate documentation with no investigation or corrective action was identified which is now addressed with revised SOPS and training. Additional competency is on-going to ensure CLS demonstrate the required proficiency with quality control and the appropriate investigation, corrective action and notification.*

*We find no documentation to indicate that the 'revised SOPS' have been effectuated. That is, we find no documentation of cytometry QC failure investigations and corrective actions taken based on the 'revised SOPS' as discovered while conducting the 'comprehensive review.'"*

**Theranos Response to Statement 1 – D5793 Finding #2:**  There appears to have been a miscommunication here because the laboratory **stopped** running tests on the flow cytometer before the survey began on September 22, 2015, and **has** not run any tests on the instrument since then.  Because the flow cytometer is not in use, and has not been in use since the survey began, there has not been any new QC failures that required investigation or corrective action under the laboratory's new procedures.  The "review" discussed in the submission was simply intended to refer to the analysis conducted to address the deficiency identified by CMS.  The issue addressed by the "review" — i.e., failing to document corrective action for QC fails for the Fortessa and Canto — is the same issue identified by CMS in its deficiency, and thus did not constitute a new issue or occurrence.

**D5793 Finding #2 – March 18 Letter Statement 2:**  *In Ex. J, the laboratory provided lists of patient specimen accession numbers for which the laboratory intended to issue corrected test*

53
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

*reports. The laboratory provided no documentation to indicate corrected reports were generated and issued.*

**Theranos Response to Statement 2 – D5793 Finding #2:**  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5793 Finding #2 – March 18 Letter Statement 3:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 3 – D5793 Finding #2:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits are documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

<u>Finding #3</u>

**D5793 Finding #3 – March 18 Letter Statement 1:**  *"In the submission, the laboratory states:*

- *'07/16/2015: Level 3 QC outside manufacturer's recommended range, and not repeated, therefore level 3 QC was out of control for the day'*
- *'09/01/2015 to 09/13/2015: all level 3 control results are outside the manufacturer's recommended range (negative bias)'*
- *'10/01/2015 - 10/31/2015: all level 3 control results are outside the manufacturer's recommended range (negative bias)'*
- *'All 3 levels of QC were not run on 11/04/2015, 11/05/2015, 11/07/2015, 11/08/2015, 11/09/2015, 11/10/2015, 11/12/2015, 11/14/2015, and 11/15/2015' [The laboratory*

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

*provided no information as to whether patient HCG specimens were tested on the November dates listed.]*

*Yet, the laboratory concluded: 'Results for urine HCG are quantitative with a cut off of 30 mUI/ml. Because of the nature of this assay no correct reports are required.'*

*Since QC failures may indicate possible test system problems and it is unknown as to how the HCG (human chronic gonadotropin) test results were used and interpreted, we question the laboratory's conclusion and the accuracy and reliability of any patient HCG test results reported on the July, September, October, and November dates listed."*

**Theranos Response to Statement 1 – D5793 Finding #3:** The laboratory has conducted a further review of this data and has revised its patient assessment analysis, as reflected in the enclosed documentation. (Ex. AA, Tab 8).

**D5793 Finding #3 – March 18 Letter Statement 2:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5793 Finding #3:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

Finding #4

**D5793 Finding #4 – March 18 Letter Statement 1:** *"In the submission, the laboratory states:*

- *'Anti-HBs is a qualitative assay with a positive cutoff of 11 so no corrected reports are*

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road    P 650.838.9292   theranos.com
Palo Alto, CA 94304    F 650.838.9165

*required.'*
- *'Qualitative assay will not require corrected reports to be issued'*

*We are unclear as to how the laboratory came to these conclusions and the submission does not contain any documentation to support these statements."*

**Theranos Response to Statement 1 – D5793 Finding #4:**  The laboratory has conducted a further review of this data and has revised its patient assessment analysis, as reflected in the enclosed documentation.  (Ex. AA, Ex. 9).

**D5793 Finding #4 – March 18 Letter Statement 2:**   *"Nevertheless, to ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5793 Finding #4:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

Finding #5

**D5793 Finding #5 – March 18 Letter Statement 1:**   *"In the submission, the laboratory states: 'Corrected [LH] reports to be sent for patient samples analyzed for the following time period: 7/1/2015-7/8/2015; all patient samples analyzed in 8/2015 and 9/2015.' However, later in the submission, the laboratory concluded that '[b]ased on this review, 0 corrected reports are being issued.' From these conflicting statements, it is unclear whether the laboratory addressed patient outcomes. The laboratory provided no documentation to indicate that corrected LH (luteinizing hormone) patient reports were issued."*

56
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534755



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

**Theranos Response to Statement 1 – D5793 Finding #5:**  The laboratory's patient assessment analysis for this finding appears to have included an inadvertent copy and paste mistake.  The laboratory has enclosed its revised analysis, which explains why it has issued corrected reports for certain patients having the potential to be affected.  (Ex. AA, Tab 10).  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5793 Finding #5 – March 18 Letter Statement 2:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5793 Finding #5:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

Finding #6

**D5793 Finding #6 – March 18 Letter Statement 1:**  *"In the submission, the laboratory states:*

- *"All patient results reported> 472 U/ml will need corrected reports."*
- *"Based on this review, 122 corrected [CA-125] reports are being issued to reflect the verified reportable range."*

*The laboratory provided no documentation to indicate corrected reports were generated and issued.*

57
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534756



1701 Page Mill Road     P 650.838.9292     theranos.com
Palo Alto, CA 94304      F 650.838.9165

**Theranos Response to Statement 1 – D5793 Finding #6:**  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5793 Finding #6 – March 18 Letter Statement 2:**   *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5793 Finding #6:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

Finding #7

**D5793 Finding #7 – March 18 Letter Statement 1:**  *"The submission references "Ex. H, Tabs 1, 2 - 5, 16, 17 - 20, 21, 22 - 25, 26, 27 - 30, 36, 37 - 40,46, 47 - 50, 56, and 57 - 60." We found no such references in the materials provided to CMS."*

**Theranos Response to Statement 1 – D5793 Finding #7:**  The citation references to Ex. H, Tabs 1, 2 - 5, 16, 17 - 20, 21, 22 - 25, 26, 27 - 30, 36, 37 - 40,46, 47 - 50, 56, and 57 – 60 were inadvertent transcription errors, and the inclusion of these blank tabs in the materials was an inadvertent copying error.

**D5793 Finding #7 – March 18 Letter Statement 2:**  *"Throughout Ex. H, the submission includes lists of patient specimen accession numbers for which the laboratory intended to issue*

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road     P 650.838.9292     theranos.com
Palo Alto, CA 94304     F 650.838.9165

*corrected test reports. The laboratory provided no documentation to indicate corrected reports were generated and issued."*

**Theranos Response to Statement 2 – D5793 Finding #7:**  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5793 Finding #7 – March 18 Letter Statement 3:**  *"We found no information addressing how the laboratory will ensure the timely review of the effectiveness of any actions taken. Although the laboratory indicated that quarterly audits will be performed to ensure compliance with this deficient practice, it is unclear how quarterly audits will timely address the issues cited under this deficiency.  Nevertheless, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 3 – D5793 Finding #7:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

<u>Finding #8</u>

**D5793 Finding #8 – March 18 Letter Statement 1:**  *"The submission references 'Ex. B, Tabs 51 and 53-55, and Ex. H, Tabs 1,2 - 5, 17 - 20, 26, 27 -30, 36, 37 - 40, 46, 47 - 50, 56, and 57 - 60.' We found no such references in the materials provided to CMS."*

**Theranos Response to Statement 1 – D5793 Finding #8:**  The citation references to Ex. B, Tabs 51 and 53-55, and Ex. H, Tabs 1,2 - 5, 17 - 20, 26, 27 -30, 36, 37 - 40, 46, 47 - 50, 56, and 57 - 60 were inadvertent transcription errors, and the inclusion of these blank tabs in the materials was an inadvertent copying error.

<div align="center">59</div>

<div align="center">TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT</div>

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material                                                      THER-0534758



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

**D5793 Finding #8 – March 18 Letter Statement 2:**   *"The laboratory submitted a new QC procedure (Ex. A, Tab 1) which requires QC Pass/Fail Criteria. Specifically, Section 8.2.1.1.a - c. provides that QC must meet certain criteria as well as '... the required Westgard rule pass criteria.' Westgard rules included a "10x" rule for rejecting QC when 10 consecutive control measurements fall on one side of the mean. We note that on page 17 of 19 (Ex. A, Tab 6) in the updated protocol that the "10x" rule was included as part of the Westgard rules which the lab must follow. The lab provided no documentation indicating that the "10x" rule was evaluated as part of its review ... Because the laboratory has not shown whether it can follow its own QC protocols, it is unclear whether the laboratory's quality assessment mechanisms can monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

**Theranos Response to Statement 2 – D5793 Finding #8:**  The laboratory has extended this analysis to evaluate global quality control indicators, as reflected in the attached documentation.  (Ex. AA, Tab 11).  As a result of that analysis, the laboratory has voided additional results for certain chemistry assays.  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

The laboratory is capable of ensuring that the deficient practice in D5793 Finding #8 does not recur. Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures.  The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016.  Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory.  In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant.  Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team.  The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

**D5793 Finding #8 – March 18 Letter Statement 3:**   *"In Ex. B and Ex. H, the submission includes lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were generated and issued."*

**Theranos Response to Statement 3 – D5793 Finding #8:**  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road
Palo Alto, CA 94304
P 650.838.9292
F 650.838.9165
theranos.com

Finding #9

**D5793 Finding #9 – March 18 Letter Statement 1:** *"The laboratory did not submit any documentation in the referenced exhibits related to an updated protocol for Alternative Assessment Procedures (AAP); therefore, we have concluded that the current protocol applies. The laboratory's submission did not include any documentation to explain why the laboratory did not follow its AAP protocol for the Theranos Proprietary System. Because the laboratory has not shown whether it can follow its own AAP protocols, it is unclear whether the laboratory's quality assessment mechanisms can monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

**Theranos Response to Statement 1 – D5793 Finding #9:** There appears to have been a miscommunication. The TPS 3.5 was **fully retired** in early-August 2015. In addition, the laboratory **stopped** using its other LDTs, and does not have plans to resume using them as it transitions to compliance with FDA quality systems requirements for its LDTs and introduces next generation technologies. Accordingly, the AAP protocol that was used for tests run on these instruments in 2014 and 2015 is not in use.

Furthermore, although alternative proficiency testing is not required for any test that is in use in the lab, the laboratory's revised proficiency testing procedure includes new procedures for alternative proficiency assessment. (Ex. BB, Tab 3 § 9.2.4). These alternative proficiency assessment procedures were in the version of the proficiency testing procedure included with our submission, and are also in the revised proficiency testing procedure enclosed with this letter. (Ex. BB, Tab 3). Training on the revised proficiency testing procedure has occurred. (Ex. BB, Tabs 3B-3C). The QMPI procedures state that the "meeting standing agenda" includes a discussion of analytical quality metrics including proficiency testing results and overall performance. (Ex. BB, Tab 7 § 7.5.2.5).

The laboratory is capable of ensuring that the deficient practice in D5793 Finding #9 does not recur. Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures. The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016. Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory. In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant. Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team. The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.


TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT



FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

<u>Finding #10</u>

**D5793 Finding #10 – March 18 Letter Statement 1:** *Ex. A, Tab 9 of the submission contains the protocol "Method Validation." Section 8.4 of this protocol, "Reference Intervals," states:*

> *The reference intervals are established from a selected reference population. Typically, when both decreased and increased levels are clinically significant, it is defined as the interval between and including the lower and upper reference limits of the studies population. This is calculated as the central 95 percentile of the population distribution where the lower and upper reference limits are demarcated as the 2.5th and 97.5th percentiles of the underlying distribution of values ... The reference intervals are used to establish expected level in health "normal" individuals. Values outside the reference range are considered "abnormal" or "high" or "low."*

*In Ex. E, Tab 1, the laboratory states:*

> *[The] laboratory director decided to use medical decision limits based on national consensus. Accordingly, the following decision limits were displayed on all lab reports for Vitamin D. As noted in CLSI EP28-A3, "when decision limits determined by national or worldwide consensus exist, these limits, rather than reference intervals should be reported.*

*In Ex. E of the submission, the laboratory provided the following "medical decision limits:"*

| | |
|---|---|
| *Deficiency:* | *<20.0 ng/mL* |
| *Insufficiency:* | *20.0 - 29.0 ng/mL* |
| *Sufficiency:* | *30.0 - 100.0 ng/mL* |
| *Possible Toxicity:* | *>100.0 ng/mL* |

*We were unclear as to the laboratory's definition of "medical decision limits." No definition of this phrase was found in Section 3 - Definitions of the "Method Validation" protocol. In addition, no reference to CLSI EP28-A3 was found in the submitted protocol. We also note that the submitted protocol does not include a reference to "medical decision limits" as a criterion for determining reference range.*

**Theranos Response to Statement 1 – D5793 Finding #10:**  D5793 Finding #10 relates to the TPS 3.5.  The TPS 3.5 was **fully retired** in early-August 2015.  The laboratory's revised method verification procedure references a "medical decision level," which is defined in the procedure as "[t]he concentration of analyte in blood or bodily fluid sample being analyzed at which some medical action is indicated for proper patient care. There may be several medical decision limits for a given analyte." (Ex. BB, Tab 5 § 3.9).  In addition, this revised

62
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534761



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

procedure references CLSI EP28-A3 (Ex. BB, Tab 5 § 10.6), which states: "for some analytes, reference intervals have been replaced by ***decision limits [emphasis in original]***, established by national (or international) consensus. As examples, consider cholesterol and glycated hemoglobin." Training on the laboratory's revised method verification procedure has occurred. (Ex. BB, Tabs 5B-5C).

**D5793 Finding #10 – March 18 Letter Statement 2:** *Since the laboratory provided no definition of "critical medical decision level," no information regarding the laboratory's disparity between the reference range (9.3 - 47.9 ng/mL) in the validation documentation and raw data reports, and no explanation as to how a Vitamin D level could be both normal and deficient or insufficient, it is unclear as to whether the laboratory has followed its own "Method Validation" protocol set forth at Section 8.4…. Because the laboratory has not shown whether it could follow its own validation protocols, it is unclear whether the laboratory's quality assessment mechanisms can monitor the laboratory's corrective actions and ensure this deficient practice does not recur.*

**Theranos Response to Statement 2 – D5793 Finding #10:** D5793 Finding #10 concerns the TPS 3.5. There appears to have been a miscommunication because the TPS 3.5 was **fully retired** in early-August 2015. Accordingly, the laboratory has not re-validated any assay on the TPS 3.5. References to validation data in documents enclosed with the submission are to validation reports prepared **before** the survey began and **before** the laboratory's revised procedures were made effective (those reports were either reviewed by CMS or available to CMS during the survey).

Because there is a national consensus for the decision levels for Vitamin D, the laboratory was correct in using the national consensus instead of a reference interval established through a validation study. CLSI EP28-A3 states: "for some analytes, reference intervals have been replaced by ***decision limits [emphasis in original]***, established by national (or international) consensus. As examples, consider cholesterol and glycated hemoglobin."

The laboratory's revised method verification procedure references a "medical decision level," which is defined in the procedure as "[t]he concentration of analyte in blood or bodily fluid sample being analyzed at which some medical action is indicated for proper patient care. There may be several medical decision limits for a given analyte." (Ex. BB, Tab 5 § 3.9). In addition, this revised procedure references CLSI EP28-A3. (Ex. BB, Tab 5 § 10.6). Training on the laboratory's revised method verification procedure has occurred. (Ex. BB, Tabs 5B-5C).

Additionally, the laboratory is capable of ensuring that the deficient practice in D5793#10 does not recur. Significantly, the laboratory has brought in an entirely new leadership team

63

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534762



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

that is directly involved with implementing and monitoring the laboratory's new procedures. The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016. Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory. In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant. Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team. The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

**D5793 Finding #10 – March 18 Letter Statement 3:** *"Throughout Ex. E, the laboratory provided a list of patient specimen accession numbers for which the laboratory 'identified reports,' but did not specify or submit documentation to indicate whether corrected reports were generated and issued."*

**Theranos Response to Statement 2 – D5793 Finding #10:** This deficiency concerns the TPS 3.5, which was one of the Theranos proprietary technologies in use in 2014 and 2015. The laboratory began phasing out the TPS 3.5 in December 2014, and it was **fully retired** in early-August 2015.

The laboratory values CMS's feedback, and takes it very seriously. The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was fully retired in early-August 2015. As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5. (Ex. AA, Tab 3). The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures. Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015. As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015. (Ex. AA, Tab 3). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

## D5801

**D5801 – March 18 Letter Statement 1:** *"The submission references "Ex. I, Tabs 2-6." We located these tabs, but found no documentation in Tabs 2, 5 and 6."*

64
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534763



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

**Theranos Response to Statement 1 – D5801:** There was an inadvertent copying error for Exhibit I to the initial submission. The laboratory has enclosed the applicable documents with this letter, as well as additional documents related to the laboratory's broader analysis of the PT/INR test over the entire time it was run on this Siemens BCS XP instrument. (Ex. GG).

**D5801 – March 18 Letter Statement 2:** *"In the submission, the laboratory states:*

> *Before PT/INR testing resumes, the lab will also prepare a revised assay-specific procedure for PT/INR to reinforce that the International Normalized Ratio (INR) must be calculated accurately prior to reporting patient test results. The relevant testing personnel will be required to demonstrate competency to ensure the practice is consistent with these procedures.*

*We note that the laboratory provided no documentation to indicate that the inaccurate calculations were reviewed or that INR calculation using different lot numbers of Dade Innovin were reviewed for accuracy. In addition, we found that the laboratory did not provide documentation to ensure that PT/INR results reported from calculations were, and would continue to be, accurate."*

**Theranos Response to Statement 2 – D5801:** As noted above, the laboratory **stopped** running PT/INR tests on the Siemens BCS XP on September 17, 2015, and has **not** run any PT/INR tests since then. The laboratory has reviewed the inaccurate calculation and has reviewed the INR calculations for different lot numbers of Dade Innovin that were used with this Siemens BCS XP instrument from the time it was put in use in October 2014. As a result of this review, the laboratory has determined that certain INR calculations for prior lots were not accurate because the laboratory did not use the correct MNPT and ISI figures for those calculations. Based on this finding and other findings in the revised PT/INR patient assessment that is enclosed with this letter, the laboratory has voided all PT/INR results reported from October 2014 through September 2015. (Ex. AA, Tab 7). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

The laboratory is capable of ensuring that the deficient practice in D5801 does not recur. Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures. The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016. Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory. In addition, the laboratory has hired

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534764



1701 Page Mill Road      P 650.838.9292    theranos.com
Palo Alto, CA 94304      F 650.838.9165

Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant.  Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team.  The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

**D5801 – March 18 Letter Statement 2:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5801:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

<u>**D5805**</u>

**D5805 – March 18 Letter Statement 1:**  *"The submission references "Ex. I, Tabs 2-6." We located these tabs, but found no documentation in Tabs 2, 5 and 6."*

**Theranos Response to Statement 1 – D5805:**  There was an inadvertent copying error for Exhibit I to the initial submission.  The laboratory has enclosed the applicable documents with this letter, as well as additional documents related to the laboratory's broader analysis of the PT/INR test over the entire time it was run on this Siemens BCS XP instrument.  (Ex. GG).

**D5805 – March 18 Letter Statement 2:**  *In its submission, the laboratory states: 'The lab revised its patient reports during the survey so that the interpretive note appears only under the*

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material
THER-0534765



1701 Page Mill Road      P 650.838.9292      theranos.com
Palo Alto, CA 94304      F 650.838.9165

*heading for patients with therapy.' However, no updated forms were shown to the surveyor during the survey and the laboratory's submission does not include documentation of the updated reports.*

**D5805 – March 18 Letter Statement 2:**  As indicated above, the laboratory performed a patient assessment for PT/INR tests run on this BCS XP instrument with reagent lots that were used prior to the reagent lot identified in CMS's Form 2567.  Based on that review, the laboratory has voided all PT/INR results from the time this BCS XP instrument was put in use in October 2014.  (Ex. AA, Tab 7).  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5805 – March 18 Letter Statement 3:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 3 – D5805:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

## D5821

**D5821 – March 18 Letter Statement 1:**  *"The submission references "Ex. I, Tabs 2-6." We located these tabs, but found no documentation in Tabs 2, 5 and 6."*

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road     P 650.838.9292     theranos.com
Palo Alto, CA 94304     F 650.838.9165

**Theranos Response to Statement 1 – D5821:**  There was an inadvertent copying error for Exhibit I to the initial submission.  The laboratory has enclosed the applicable documents with this letter, as well as additional documents related to the laboratory's broader analysis of the PT/INR test over the entire time it was run on this Siemens BCS XP instrument.  (Ex. GG).

**D5821 – March 18 Letter Statement 2:**  *"In Ex. I, the laboratory provided lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were issued. "We also note that the Patient Impact Assessment (Ex. I, Tab 1) states that 'remedial action was taken on 9/25/15,' but 'corrected reports were issued beginning on 11/10/15 and completed on 11/12/15.' There was no explanation as to why there was such a long period of time between the remedial action and issuing corrected reports."*

**Theranos Response to Statement 2 – D5821:**  All of these corrected reports for PT/INR, along with documentation confirming that they were sent, are enclosed with this letter.  (Ex. GG, Tab 7).  On September 22 or 23, CMS identified a number of issues related to PT/INR tests during the period April to September 2015.  The laboratory undertook a thorough investigation.  Given the number of issues to review, the investigation took time to complete. Completion of the investigation was also hindered by the absence of a highly qualified, full-time laboratory director.  The laboratory subsequently hired its new lab director, Dr. Kingshuk Das, who is highly qualified and has extensive clinical laboratory experience.  As of March 14, 2016, Dr. Das joined Theranos full-time at the Newark, California laboratory.

**D5821 – March 18 Letter Statement 3:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5821:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8). Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

### D6076

The March 18 Letter states: *"See our reviews of D6083, D6085, D6086, D6093, D6094, D6098, and D6102."*  Accordingly, we refer you to our responses to those reviews.

### D6079

The March 18 Letter states that "[b]ased on the laboratory's submission, this requirement is met."

### D6083

The March 18 Letter states: *"See our reviews of D5413 and D5791."*  Accordingly, we refer you to our responses to those reviews.

### D6085

The March 18 Letter states: *"See our review of D6115."*  Accordingly, we refer you to our responses to your review of D6115.

### D6086

**D6086 Finding #1—March 18 Letter Statement 1:** *"The submission references 'Ex. A, Tab 9, F-l" and "Ex. A, Tab 10, F-1.' We found no such references in the materials provided to CMS."*

**Theranos Response to Statement 1 in D6086 Finding #1:** The citation references to Ex. A, Tab 9, F-1 and Ex. A, Tab 10, F-1 were inadvertent transcription errors and should not have been included.

**D6086 Finding #1 – March 18 Letter Statement 2:** *"Throughout Ex. E, Tab 1, the laboratory provided lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were generated and issued."*

**Theranos Response to Statement 2 in D6086 Finding #1:** This deficiency concerns the TPS 3.5, which was one of the Theranos proprietary technologies in use in 2014 and 2015.  The laboratory began phasing out the TPS 3.5 in December 2014, and it was **fully retired** in early-August 2015.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

The laboratory values CMS's feedback, and takes it very seriously.  The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was fully retired in early-August 2015.  As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5.  (Ex. AA, Tab 3).  The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures.  Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015.  As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015.  (Ex. AA, Tab 3).  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D6086 Finding #1 – March 18 Letter Statement 3:** *We found no information addressing how the laboratory will ensure the accurate review of test method validation documentation, the issue cited in the deficiency.*

    **Theranos Response to Statement 3 in D6086 Finding #1:** The TPS 3.5 was **fully retired** early-August 2015, and the laboratory is **not** using any LDTs.

    The laboratory has revised its method verification procedure to show how it will ensure the accurate review of test method verification documentation.  (Ex. BB, Tab 5).  As set forth in the revised procedures, the laboratory director is responsible for reviewing both the verification plan and the verification report.  (Ex. BB, Tab 5 § 4.1).  "The method verification procedure requires multiple reviews to include Quality to ensure protocols are followed." (Ex. BB, Tab 7 § 7.1.3.3).

<u>Finding #2</u>

**D6086 Finding #2—March 18 Letter Statement 1:** *"The submission references 'Ex. H, Tabs 1, 2-5, 16, 17 - 20, 21, 22 - 25, 26, 27 - 30, 36, 37 - 40, 46, 47 - 50, 56, and 57 - 60.' We found no such references in the materials provided to CMS."*

    **Theranos Response to Statement 1 in D6086 Finding #2:**  The citation references to Ex. H, Tabs 1, 2-5, 16, 17 - 20, 21, 22 - 25, 26, 27 - 30, 36, 37 - 40, 46, 47 - 50, 56, and 57-60 were inadvertent.

<center>70</center>

<center>TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT</center>

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534769



1701 Page Mill Road     P 650.838.9292   theranos.com
Palo Alto, CA 94304     F 650.838.9165

**D6086 Finding #2—March 18 Letter Statement 2:** *"Ex. H contains lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were generated and issued."*

**Theranos Response to Statement 2 in D6086 Finding #2:** Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D6086 Finding #2—March 18 Letter Statement 3:** *"At the time of the onsite survey, the laboratory's protocol 'Master Validation Plan for Routine Chemistry Assays on Theranos Devices,' stated: '... for establishing the trueness or comparability to two procedures. . .at least 50% of samples should be outside the reference interval.' For five validation documents (ALT, BUN, calcium, glucose, and sodium testing using the Advia 1800), a review of the test results used by the laboratory to establish 'the trueness or comparability of two procedures' showed that the laboratory did not follow its established protocol and use "at least 50% of samples ... outside the reference interval. The submission includes the protocol 'Method Validation,' at Ex. A, Tab 9, Section 8.1.1.1 ('A method comparison and bias estimation design'), which states: 'If the analyte has a critical medical decision level, at least 50% of the specimens must have analyte levels below this value and the remaining 50% above.' We are unclear as to the laboratory's definition of 'critical medical decision level.' No definition of this phrase was found in Section 3 - Definitions of the "Method Validation" protocol or in Ex. H.""*

**Theranos Response to Statement 3 in D6086 Finding #2:** D6086 Finding #2 relates to the chemistry assays on the Siemens Advia 1800 instruments. The laboratory **stopped** using the Siemens Advia 1800 instruments before the survey began on September 22, 2015, and has **not** used them since then.

The laboratory's revised method verification procedure references a "medical decision level," which is defined in the procedure as "[t]he concentration of analyte in blood or bodily fluid sample being analyzed at which some medical action is indicated for proper patient care. There may be several medical decision limits for a given analyte." (Ex. BB, Tab 5 § 3.9). In addition, this revised procedure references CLSI EP28-A3 (Ex. BB, Tab 5 § 10.6), which states: "for some analytes, reference intervals have been replaced by *decision limits [emphasis in original]*, established by national (or international) consensus. As examples, consider cholesterol and glycated hemoglobin." Training on the laboratory's revised method verification procedure has occurred. (Ex. BB, Tabs 5B-5C).

**D6086 Finding #2—March 18 Letter Statement 4:** *"In Ex. H of the submission, the laboratory provided the following 'assay validation' summary:*

71
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534770



<div style="text-align:right">

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

</div>

| *Analyte* | *Number of Specimens Used* | *Specimen Value Range* |
|---|---|---|
| *ALT* | *128* | *12-62* |
| *BUN* | *128* | *9-21* |
| *Calcium* | *128* | *9.2 -10.2* |
| *Glucose* | *128* | *65 - 142* |
| *Sodium* | *128* | *134 -142* |

*Since the laboratory provided no definition of 'critical medical decision level' and no information regarding the laboratory's panic or alert values for ALT, BUN, calcium, glucose, and sodium testing, it is unclear as to whether the laboratory has followed its own "Method Validation" protocol at Section 8.1.1.1.  Because the laboratory has not shown whether it can follow its own validation protocols, it is unclear whether the laboratory's quality assessment mechanisms can monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

**Theranos Response to Statement 4 in D6086 Finding #2:** There appears to have been a miscommunication. The laboratory **stopped** using its Siemens Advia 1800 instruments for clinical patient testing before the survey began on September 22, 2015 and before the revised method verification procedures were effective, and has **not** used them since then. Accordingly, the laboratory has not re-validated any assay on the Siemens Advia 1800.

The laboratory's revised method verification procedure references a "medical decision level," which is defined in the procedure as "[t]he concentration of analyte in blood or bodily fluid sample being analyzed at which some medical action is indicated for proper patient care. There may be several medical decision limits for a given analyte."  (Ex. BB, Tab 5 § 3.9).  In addition, this revised procedure references CLSI EP28-A3 (Ex. BB, Tab 5 § 10.6), which states:  "for some analytes, reference intervals have been replaced by *decision limits [emphasis in original]*, established by national (or international) consensus.  As examples, consider cholesterol and glycated hemoglobin."  Training on the laboratory's revised method verification procedure has occurred.  (Ex. BB, Tabs 5B-5C).

The laboratory is capable of ensuring that the deficient practice in D6086 Finding #2 does not recur. Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures.  The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016.  Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory.  In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant.  Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team.  The laboratory's new leadership team has installed an entirely redesigned QMPI

<div style="text-align:center">

72

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

</div>

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534771



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

Program, as well as robust audit procedures that required monthly and quarterly audits. With respect to method verification, the procedure now includes appropriate criteria for accuracy, precision, and other pertinent performance characteristics, and requires the lab director to review both the verification plan and verification report to ensure adherence to the criteria in the procedure. (Ex. BB, Tab 5 §§ 7.7, 8).

<u>Finding #3</u>

**D6086 Finding #3—March 18 Letter Statement 1:** *"Ex. H contains lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were generated and issued."*

> **Theranos Response to Statement 1 in D6086 Finding #3:** Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D6086 Finding #3—March 18 Letter Statement 2:** *"At the time of the onsite survey, for five validation documents reviewed (ALT, BUN, calcium, glucose, and sodium testing using the Advia 1800), laboratory summary information indicated that the laboratory obtained coefficient of variation (CV) results greater than CV's established by the instrument manufacturer. That is, ALT, BUN, calcium, glucose, and sodium test results obtained by the laboratory were statistically less precise than what would be expected using the Advia 1800. The laboratory provided no explanation for and no information pertaining to any investigation as to why the laboratory's test results were less precise. These validation documents were approved by the laboratory director as evidenced by his signature. In Ex. H of the submission, the laboratory provided summary data for ALT, BUN, calcium, glucose, and sodium similar to the CV data reviewed at the time of the onsite survey. Again, the laboratory provided no explanation for and/or information pertaining to any investigation as to why the laboratory's test results were less precise. Because the laboratory has not shown whether its assay verification procedures are adequate to determine assay precision characteristics, we question whether the laboratory's quality assessment mechanisms can monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

> **Theranos Response to Statement 2 in D6086 Finding #3:** D6086 Finding #3 concerns the laboratory's method for using capillary specimens to test for ALT, BUN, calcium, glucose and sodium using Advia 1800 instruments that the laboratory modified. There appears to have been a miscommunication. The laboratory **stopped** using its Siemens Advia 1800 instruments for clinical patient testing before the survey began on September 22, 2015 and before the revised method verification procedures were effective, and has **not** used them

73

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534772



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

since then.  Accordingly, the laboratory has not re-validated any assay on the Siemens Advia 1800.

Additionally, the CV figures from the manufacturer's package insert are **not** relevant.  Under 42 C.F.R. § 1253(b)(1), a laboratory that "modifies an FDA-cleared or approved test system … must, before reporting patient results, establish for each test system the performance specifications for the following performance characteristics: (i) Accuracy, (ii) Precision, (iii) Analytical sensitivity, (iv) Analytical specificity to include interfering substances, (v) Reportable range of test results for the test system, (vi) Reference intervals (normal values), (vii) Any other performance characteristic required for test performance."  Under this regulation, the precision of an LDT is established solely by the laboratory.  These regulations do **not** require a laboratory to compare the CV it establishes for an LDT — including an LDT that is based on a modification to an FDA-cleared or approved test system — with the %CV of "the predicate device."  Likewise, there is nothing in 42 C.F.R. §1253(b)(1) that requires a laboratory to document why the CV that it has established for an LDT is different from the CV for "a predicate device."

<u>Finding #4</u>

**D6086 Finding #4—March 18 Letter Statement 1:** *"Ex. H contains lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were generated and issued."*

**Theranos Response to Statement 1 in D6086 Finding #4:** Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D6086 Finding #4—March 18 Letter Statement 2:** *"At the time of the onsite survey, for four validation documents reviewed (ALT, BUN, calcium, and glucose testing using the Advia 1800), laboratory summary information indicated that the reference range determined by the laboratory's testing differed from the reference range on the laboratory's test reports. The following was noted:*

| *Analyte* | *Validation Document Reference Range* | *Test Report Reference Range* |
|---|---|---|
| *ALT* | *0- 52 UIL* | *8-41 U/L* |
| *BUN* | *5.3 - 22.5 mg/dL* | *6 - 24 mg/dL* |
| *Calcium* | *8.18 -10.3 mg/dL* | *8.3 - 10.6 mg/dL* |
| *Glucose* | *64.0 - 112.3 mg/dL* | *73 - 99 mg/dL* |

74
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*In Ex. H of the submission, the laboratory provided the following reference ranges, some of which were still different than what appeared on the laboratory's test reports:*

| Analyte | Reference Range |
|---------|-----------------|
| ALT | 8-41 U/L |
| BUN | 6.2 - 22 mg/dL |
| Calcium | 8.2 - 10.3 mg/dL |
| Glucose | 64 - 112 mg/dL |

*Since the laboratory did not provide copies of any updated test reports in its submission, we are unable to determine whether the laboratory has corrected this deficient practice. Because the laboratory has not shown whether it had corrected this deficient practice, we are also unable to determine whether the laboratory's quality assessment mechanisms can monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

**Theranos Response to Statement 2 in D6086 Finding #4:**  As CMS observed in the Form 2567, the validation reports for these assays were dated in April 2015.  These validated assays went live on April 22, 2015.  The laboratory has issued corrected reports updating the reference ranges for ALT, Calcium, and BUN tests run on the Siemens Advia 1800 on or after April 2015.  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.  As noted above, the laboratory **stopped** running these tests on the Siemens Advia 1800 before the survey began on September, and has **not** run them since then.

The laboratory has not issued corrected reports for Glucose because the reference range used in patient reports was consistent with the national consensus, which was the correct range to use.  As noted above, the revised method verification procedures enclosed with this letter references CLSI EP28-A3, which provides that when decision limits determined by national or worldwide consensus exist, these limits, rather than reference intervals should be reported. (Ex. BB, Tab 5 § 10.6).

The laboratory is capable of ensuring that the deficient practice in D6086 Finding #4 does not recur. Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures.  The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016.  Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory.  In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant.  Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight

75

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534774



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

team.  The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

<u>Finding #5</u>

**D6086 Finding #5 – March 18 Letter Statement 1**:  *"The submission references 'Ex. G, Tabs 31, 34, 36, 39, 41, 44, 46, 49, 51, 54, 56, 61, 64, 66, and 69.' We found no documents within these tabs."*

   **Theranos Response to Statement 1 in D6086 Finding #5:**  The citation reference to Ex. G, Tabs 31, 34, 36, 39, 41, 44, 46, 49, 51, 54, 56, 61, 64, 66, and 69 was an inadvertent transcription error, and the inclusion of these blank tabs in the materials was an inadvertent copying error.

**D6086 Finding #5 – March 18 Letter Statement 2:**  *"At the time of the onsite survey, the laboratory maintained no documentation showing that the validation documents for two Siemens Advia 2120i instruments had been reviewed and approved by the laboratory director.  In Ex. G of the submission, we again found no information to indicate the Siemens Advia 2120i validation documents have been reviewed and approved by the director. Because the laboratory has not shown whether it has corrected this deficient practice, we are also unable to determine whether the laboratory's QA mechanisms can monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

   **Theranos Response to Statement 2 in D6086 Finding #5:**  There appears to be a miscommunication.  The laboratory **stopped** using its Siemens Advia 2120i instruments for clinical patient testing on November 17, 2015, and has **not** used them since then.  The laboratory does not intend to rely on those verifications to perform any tests on the Siemens Advia 2120i instruments in the future.  As described above, the laboratory has put in place mechanisms that will effectively monitor its corrective action and ensure that deficient practices do not recur.  With respect to method verification, the current procedures require the lab director to approve both the verification plan prior to the verification and the verification report.   (Ex. BB, Tab 5 § 7.7). "The method verification procedure requires multiple reviews to include Quality to ensure protocols are followed."  (Ex. BB, Tab 7 § 7.1.3.3).

The laboratory is capable of ensuring that the deficient practice in D6086 Finding #5 does not recur. Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures.  The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016.  Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory.  In addition, the laboratory has hired

<div align="center">76</div>

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant.  Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team.  The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

Finding #6

**D6086 Finding #6 – March 18 Letter Statement 1:**  *"The submission references 'Ex. I, Tabs 2-6.' We located these tabs, but found no documentation in Tabs 2, 5, and 6."*

**Theranos Response to Statement 1 – D6086 Finding #6:**  There was an inadvertent copying error for Exhibit I to the initial submission.  The laboratory has enclosed the applicable documents with this letter, as well as additional documents related to the laboratory's broader analysis of the PT/INR test over the entire time it was run on this Siemens BCS XP instrument.  (Ex. GG).

**D6086 Finding #6 – March 18 Letter Statement 2:**  *"See our review of D5413."*

**Theranos Response to Statement 2 – D6086 Finding #6:**  See the laboratory's response to your review of D5413.

**D6086 Finding #6 – March 18 Letter Statement 3:**  *"Although the submitted protocol (Ex. A, Tab 31, § 8.1.2) included the requirement to review all new manufacturer package inserts and vendor notifications, the laboratory did not provide a response to the citation other than to state: 'Theranos did not have the documentation for the MNPT calculation done for lot #539280 in 3/2015 before it was put in use for patient testing.' It is unclear what investigation was performed to determine how the Mean Normal Prothrombin Time (MNPT) for Dade Innovin lot number 539280 was defined and entered into the Siemens BCS-XP."*

**Theranos Response to Statement 3 – D6086 Finding #6:**  The lab personnel responsible for MNPT for PT/INR tests run on the Siemens BCS XP at the time that this Dade Innovin lot was put in use are no longer with the laboratory, which has limited the laboratory's ability to determine precisely what occurred.  Based on the laboratory's investigation, it appears that the laboratory would determine the MNPT with the assistance of Siemens.  Siemens would then send the laboratory a letter containing both the MNPT and the ISI for the lot.  The laboratory would then be responsible for entering the MNPT and ISI numbers for the lot into the BCS XP.  The laboratory appears to have not properly entered the MNPT and ISI numbers for this lot and the laboratory failed to have sufficient oversight to identify the problem when it occurred.

77
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304     F 650.838.9165

As noted above, the laboratory **stopped** running PT/INR tests on September 17, 2015, and has **not** run any PT/INR tests since then. The laboratory is capable of ensuring that the deficient practice in D6086 Finding #6 does not recur. Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures. The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016. Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory. In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant. Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team. The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

**D6086 Finding #6 – March 18 Letter Statement 4:**  *"In its submission the laboratory states "training has occurred," however, training documentation provided in Ex. A Tab 32 did not include all testing personnel listed on the CMS-209 (Ex. L, Tab 1 )."*

   **Theranos Response to Statement 4 – D6086 Finding #6:**  The training records for this SOP provided with the submission included all testing personnel listed on the CMS-209 who run tests in the laboratory. Please note that Chi Nguyen is no longer a member of the CLIA laboratory (we will update our Form 209 accordingly), which is why she does not appear on any of the training documentation. The enclosed training records reflect that all testing personnel listed on the CMS-209 have been trained on the laboratory's enhanced protocol requiring review of all new manufacturer package inserts and vendor notifications. (Ex. BB, Tabs 14B-14D).

**D6086 Finding #6 – March 18 Letter Statement 5:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

   **Theranos Response to Statement 5 – D6086 Finding #6:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Trial Exh. 5471 Page 00078
FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material
THER-0534777



1701 Page Mill Road        P 650.838.9292    theranos.com
Palo Alto, CA 94304        F 650.838.9165

audit; and require that tracer audits be documented using the tracer audit form, CL FRM
00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a
quarterly audit to cover the quality management systems; provide the protocol for quarterly
audits; and require that quarterly audits are documented using the audit record form, CL QOP
00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear
that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on
findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training
on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

**D6093**

Finding #1

The March 18 Letter states:  *"See our reviews of D5447, D5449, D5461, D5481, and D5779."*
Accordingly, we refer you to our responses to those reviews.

Finding #2

**D6093 Finding #2 – March 18 Letter Statement 1:**  The March 18 Letter states: *"See our
reviews of D5481."*

    **Theranos Response to Statement 1 – D6093 Finding #2:**  We refer you to our response to
your review of D5481.

**D6093 Finding #2 – March 18 Letter Statement 2:**  *"The submission references 'Ex. I, Tabs 2-
6.' We located these tabs, but found no documentation in Tabs 2, 5, and 6."*

    **Theranos Response to Statement 2 – D6093 Finding #2:**  There was an inadvertent
copying error for Exhibit I to the initial submission.  The laboratory has enclosed the
applicable documents with this letter, as well as additional documents related to the
laboratory's broader analysis of the PT/INR test over the entire time it was run on this
Siemens BCS XP instrument.  (Ex. GG).

**D6093 Finding #2 – March 18 Letter Statement 3:**  *"The laboratory's submission did not
include an explanation or documentation of an investigation regarding the adjustment of QC
ranges."*

    **Theranos Response to Statement 3 – D6093 Finding #2:**  D6093#2, Paragraph k, states
that "[o]n approximately 9/16/15, the laboratory adjusted the acceptable range for Citrol 3 to
match the data" and that the "change was implemented without any investigation as to the
reason for the shift in control values."  The laboratory **stopped** running PT/INR tests on
September 17, 2015.  The laboratory's review of this issue has come to the same ultimate
conclusion.  Under the laboratory's prior leadership and its old QA Program, the laboratory

79
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road      P 650.838.9292     theranos.com
Palo Alto, CA 94304        F 650.838.9165

changed the control values for PT/INR on September 16, 2015 without documenting a proper investigation, and in contrast to what is required by the laboratory's new procedures. The laboratory's new leadership and new QMPI Program do **not** ascribe to this type of practice, as changes to QC values should not occur unless a full and documented investigation shows that the change is warranted. The laboratory **stopped** PT/INR testing on September 17, 2015, thus limiting the potential effect that this change to control values could have. The laboratory has not performed any PT/INR tests since September 17, 2015. As indicated above, the laboratory has broadened its investigation of PT/INR tests to encompass the entire period during which this BCS XP instrument was in use, which was October 2014 through September 2015. Based on that investigation, the laboratory has voided all PT/INR results reported during that period. (Ex. AA, Tab 7). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D6093 Finding #2 – March 18 Letter Statement 4:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 4 – D6093 Finding #2:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

<u>**D6094**</u>

<u>Finding #1</u>

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Trial Exh. 5471 Page 00080

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534779



1701 Page Mill Road     P 650.838.9292     theranos.com
Palo Alto, CA 94304      F 650.838.9165

The March 18 Letter states: *"See our reviews of D5391, D5393, D5791, and D5793."* Accordingly, we refer you to our responses to those reviews.

Finding #2

The March 18 Letter states: *"See our reviews of D5413, D5481, D5801, D5805, and 5821."* Accordingly, we refer you to our responses to those reviews.

**D6098**

The March 18 Letter states: *"See our review of D5805."*  Accordingly, we refer you to our response to your review of D5805.

**D6102**

**D6102 – March 18 Letter Statement 1:**  *"The laboratory submitted protocols relating to testing personnel training (Ex. A, Tab 16, §§ 4.5.3 and 6.4) which state the following:*

- *§ 4.5.3 'Testing personnel/trainee are responsible to ensure that training is properly documented using CL-FRM-03016-F4, Training Attendance Form, approved by the designated trainer and stored in the relevant binder.'*
- *§ 6.4 '... It is the responsibility of the trainee and trainer to ensure the SOP is accurate.'*

*However, the regulations require that the laboratory director, not the testing personnel, is responsible for ensuring that prior to testing patient specimens, all personnel have the appropriate training and have demonstrated that they can perform all testing operations to provide and report accurate results."*

**Theranos Response to Statement 1 in D6102:**  The laboratory has revised its training and competency procedures to clarify that the laboratory director has the responsibility to ensure adherence to the Quality Management System, including the training and competency procedures.  (Ex. BB, Tab 9 §§ 4.1, 4.7.6, 6.9.9.1).  Training on these procedures has occurred.  (Ex. BB, Tabs 9B-9C).

**D6102 – March 18 Letter Statement 2:**  *"Training documentation submitted in Ex. A, Tab 11 only includes training on protocols related to testing personnel qualification requirements and delegation of responsibilities, as well as job descriptions. The laboratory provided no documentation or plan to train or retrain testing personnel on the Theranos Proprietary Device."*

**Theranos Response to Statement 2 in D6102:**  There appears to have been a miscommunication because the TPS 3.5 was **fully retired** before the survey began on September 22, 2015.  Because the TPS 3.5 is not being used, and will not be used in the

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Trial Exh. 5471 Page 00081

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534780

 theranos

1701 Page Mill Road     P 650.838.9292     theranos.com
Palo Alto, CA 94304     F 650.838.9165

future, the laboratory is not required to train or re-train personnel on tests that used to be run on that retired instrument.

**D6102 – March 18 Letter Statement 3:** "*Training documents submitted in Ex. A, Tab 17 only addressed review of the document control and training and competency protocols, but did not include training or retraining documentation for personnel performing testing in the venipuncture lab nor did it include an investigation if patient were affected or potentially affected when untrained or partially trained testing personnel were performing patent testing.*"

**Theranos Response to Statement 3 in D6102:**  The laboratory previously submitted training and competency documentation for all testing personnel as part of its response to D6124.  The laboratory has updated that documentation.  A list showing which testing personnel operate each instrument currently in use is enclosed.  (Ex. HH, Tab 9A).[14]  Current training and competency documentation for those testing personnel and those instruments is also enclosed.  (Ex. HH, Tab 9B).

D6102, paragraph a, concerns the personnel training documentation for the TPS 3.5.  The TPS 3.5 was **fully retired** in early-August 2015.  The laboratory values CMS's feedback, and takes it very seriously.  The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was fully retired in early-August 2015.  As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5.  (Ex. AA, Tab 3).  The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures.  Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015.  As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015.  (Ex. AA, Tab 3).  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

---

[14] Please note that Chi Nguyen, who is listed on the Form 209, is no longer a member of the CLIA laboratory (we will update our Form 209 accordingly), which is why she does not appear on any of the training documentation.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

As set forth in the attached analysis, the laboratory has enclosed training documentation for Testing Person #6 (TP6); Testing Person #11 (TP11); and Testing Person #31 (TP31). (Ex. HH, Tabs 14, 15, 16). The analysis of these training records is set forth in Ex. AA, Tab 12.

**D6102 – March 18 Letter Statement 4:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit **may** [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 4 – D6102:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

## D6108

The March 18 Letter states: *"See our review of D6115."* Accordingly, we refer you to our response to your review of D6115.

## D6111

The March 18 Letter states: "Based on the laboratory's submission, this requirement is met."

## D6115

**D6115 – March 18 Letter Statement 1:** *"The laboratory submitted a protocol for a Master Validation Plan at Ex. E, Tab 30B which was a different protocol than presented to the surveyor. In Ex. E, Tab 1, under the Accuracy section, the submission indicates that 'some of the immunoassays on the TSP [Theranos Proprietary System] were 'calibrated' or 'corrected' to*

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534782



1701 Page Mill Road      P 650.838.9292    theranos.com
Palo Alto, CA 94304      F 650.838.9165

*remove systemic bias between the two methods.' It is not clear what specific biases were used for each analyte which used a corrected results or if the corrected or uncorrected results was reported.*

**Theranos Response to Statement 1 – D6115:**  This deficiency concerns the TPS 3.5, which was one of the Theranos proprietary technologies in use in 2014 and 2015.  The laboratory began phasing out the TPS 3.5 in December 2014, and it was **fully retired** in early-August 2015.

The laboratory values CMS's feedback, and takes it very seriously.  The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was fully retired in early-August 2015.  As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5.  (Ex. AA, Tab 3).  The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures.  Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015.  As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015.  (Ex. AA, Tab 3).  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D6115 – March 18 Letter Statement 2:**  *In addition, the Accuracy section described that the "samples spanned the medical decision levels (MDL)". We are unclear as to the laboratory's definition of "medical decision limits." No definition of this phrase was found in Section 3 - Definitions of the "Method Validation" protocol or in Ex. E. We also note that the submitted protocol does not include a reference to "medical decision limits" as a criterion for determining accuracy.*

**Theranos Response to Statement 2 – D6115:**  D6115 concerns the TPS 3.5.  The TPS 3.5 was **fully retired** before in early-August 2015.  References to method validation data in documents enclosed with the submission are to validation reports prepared **before** the survey began and before the laboratory's revised procedures were made effective (those reports were either reviewed by CMS or available to CMS during the survey), which were referenced for context.  In addition, the laboratory has further revised its method verification procedure, which now has no reference to "critical medical decision limits."  (Ex. BB, Tab 5).

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Trial Exh. 5471 Page 00084

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534783



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

The laboratory's revised method verification procedure references a "medical decision level," which is defined in the procedure as "[t]he concentration of analyte in blood or bodily fluid sample being analyzed at which some medical action is indicated for proper patient care. There may be several medical decision limits for a given analyte." (Ex. BB, Tab 5 § 3.9). In addition, this revised procedure references CLSI EP28-A3 (Ex. BB, Tab 5 § 10.6), which states: "for some analytes, reference intervals have been replaced by *decision limits [emphasis in original]*, established by national (or international) consensus. As examples, consider cholesterol and glycated hemoglobin." Training on the laboratory's revised method verification procedure has occurred. (Ex. BB, Tabs 5B-5C).

**D6115 – March 18 Letter Statement 3:** *"We also note that the laboratory's submission provided no indication why the validation report for SHBG had an effective date of 7/14/14, but was not approved by the laboratory director until 9/19/15, even though patient testing began 7/28/14."*

**Theranos Response to Statement 3 – D6115:** This issue is similar to the issue addressed in the discussion above regarding D5407. As reflected by the Lab Director deficiencies identified by CMS, the prior lab directors did not provide sufficient oversight over the documents cited in D5407 and D6115. This appears to be one of the reasons why these documents were not timely reviewed and signed by the prior lab directors. In addition, the laboratory has found that its quality assurance oversight over these documents, including document control oversight, was not sufficient. The laboratory has hired a new lab director, who has approved enhanced document control policies and procedures to address this issue. (Ex. BB, Tab 1 §§ 5.1, 5.2, 5.3, 6.1, 6.2, 6.3). Training on those procedures has occurred. (Ex. BB, Tabs 1B-1C). The laboratory has also hired a Document Control Manager whose responsibilities include tracking new and revised policies and procedures to ensure that they are reviewed and approved by the lab director before they become effective. (Ex. HH, Tab 7C). In addition, the laboratory's revised QMPI Program procedures and agenda require review of procedures that are new, revised, or in process at monthly QMPI Program meetings. (Ex. BB, Tab 7 §§ 7.1, 7.5.6).

**D6115 – March 18 Letter Statement 4:** *The laboratory's submission in Ex. E, Tab 1 states:*

*The procedure and acceptance criteria outlined in the "Guidance for Industry: Bioanalytical Method Validation, 2001" document from FDA was followed to establish the analytical measurement range (AMR) (reportable range) for these immunoassays run on the TPS. Theranos did not follow the validation plan for immunoassays (ELISAs) as outlined in Master Validation Plan for ELISA Assays on Theranos Devices.*

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material                                                    THER-0534784



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*The laboratory's response does not include a copy of the FDA protocol, and does not state in the submitted master validation protocol, CL PLN-14002, Rev. A, that the FDA protocol should be used to determine AMR.*

*The laboratory submitted a protocol for a Master Validation Plan at Ex. E, Tab 30B which requires the %CV of replicates to be not more than 20% (25% at the lower and upper limits of detection). The submitted protocol was different than the protocol presented to the surveyor at the time of the onsite survey which required the %CV of replicates to be not more than 15% (20% at the lower and upper limits of detection). The %CV in the protocol presented to the surveyor at the time of the onsite survey matched the %CV of the predicate devices. Based on the protocol submitted in the submission, it is unclear as to why the TPS, which is covered by the Master Validation Plan, can now have %CV's for replicates greater than the predicate devices. No explanation for the change in %CV was submitted. In addition, we noted that the information submitted in Ex. E, Tab 1 did not include a 20-day precision study as required by the submitted protocol.*

*The laboratory's submitted protocol requires that 120 samples be used to determine Reference Intervals (see Ex. E, Tab 30B), Ex. E, Tab 1 states:*

> *However, the validation plan noted that the reference range would be established with 120 samples per partition. However, the study followed CLSI procedure for transferring a reference range - the process by which one adapts a previously established reference range to a new analytical method. Furthermore, the transferred reference range was verified following CLSI guidelines - namely "the process by which one ensures, with reasonable confidence, using a relative small number of reference individuals (eg, $n=20$), that a reference interval established elsewhere, or transferred from another study, can be used locally.*

*We question the laboratory's procedure for "transferring a reference range" since the laboratory provided no reference document to support "transferring a reference range." We note that the submitted protocol does not state in Section 18, Reference Range, that the laboratory can "transfer" a reference range. It is unclear as to how the laboratory determined that the predicate method's reference range could be adapted or "transferred" to the Theranos Proprietary Devices, which used different methodology than the predicate method.*

**Theranos Response to Statement 4 – D6115:** D6115 concerns the TPS 3.5. The TPS 3.5 was **fully retired** in early-August 2015. In addition, the laboratory **stopped** using its other LDTs, and does not have plans to resume using them as it transitions to compliance with FDA quality systems requirements for its LDTs and introduces next generation technologies. Accordingly, neither the master validation plan for ELISA assays nor "*Guidance for*

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Trial Exh. 5471 Page 00086

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534785



1701 Page Mill Road
Palo Alto, CA 94304
P 650.838.9292
F 650.838.9165
theranos.com

*Industry: Bioanalytical Method Validation, 2001"* are being used by the laboratory. The laboratory does not plan to use either of those documents, plans or procedures in the future.

The laboratory will ensure that all future validation plans are documented and supported in accordance with the laboratory's new quality systems and procedures. Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures. The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016. Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory. In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant. Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team. The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

The laboratory values CMS's feedback, and takes it very seriously. The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was **fully retired** in early-August 2015. As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5. (Ex. AA, Tab 3). The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures. Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015. As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015. (Ex. AA, Tab 3). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.[15]

[15] In discussing establishment of precision for an LDT, the March 18 letter references a comparison of %CVs between an LDT and "predicate devices." We note, however, that CLIA regulations do not contain any regulation requiring that there be any correlation or equivalence of %CV between LDTs and predicate devices. Rather, the regulations require only that the precision for the test must be established for the LDT itself. 42 C.F.R. § 493.1253(b)(2). It also is generally accepted that accuracy is the only required performance specification that typically requires a correlation study. 42 C.F.R. § 493.1253(b)(2).



TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT



FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material
THER-0534786



1701 Page Mill Road        P 650.838.9292    theranos.com
Palo Alto, CA 94304         F 650.838.9165

**D6115 – March 18 Letter Statement 5:** *"The laboratory's submission does not indicate that the % Recovery and Allowable Bias citations had been addressed…. Because the laboratory has not shown that it can follow its own validation protocols, it is unclear whether the laboratory's quality assessment mechanisms could monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

**Theranos Response to Statement 5 – D6115:**  D6115 concerns the TPS 3.5.  The TPS 3.5 was **fully retired** in early-August 2015.  In addition, neither the master validation plan for ELISA assays nor the master validation plan for chemistry assays are being used by the laboratory.  The laboratory does not plan to use either of those documents, plans or procedures in connection with clinical testing in the future.

The laboratory values CMS's feedback, and takes it very seriously.  The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was fully retired in early-August 2015.  As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5.  (Ex. AA, Tab 3).  The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures.  Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015.  As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015.  (Ex. AA, Tab 3).  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

The laboratory is capable of ensuring that the deficient practice in D6115 does not recur.  Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures.  The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016.  Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory.  In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant.  Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team.  The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.  For

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534787



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

example, § 8.1.1.3 of the method verification procedure lays out the requirements for a recovery design as part of an IVD verification.  (Ex. BB, Tab 5 § 8.1.1.3).

**D6115 – March 18 Letter Statement 6:**  *"Ex. E contains a list of patient specimen accession numbers for which the laboratory 'identified reports', but did not specify, or submit documentation to show that corrected reports were generated and issued."*

> **Theranos Response to Statement 6 – D6115:**  As described above, the laboratory has revised its patient assessment analysis based upon a thorough re-review of QC data for the TPS 3.5.  Based on that analysis, the laboratory has, out of an extreme abundance of caution, voided all results reported for assays run on the TPS 3.5 in 2014 and 2015.  (Ex. AA, Tab 3). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

<u>**D6124**</u>

**D6124 – March 18 Letter Statement 1:**  *"Ex. A, Tab 16, § 7.3 of the submission contains a competency assessment protocol, Annual Competency. However, the protocol does not address the cited deficiency that direct observation was required for instrument maintenance and function checks. The protocol at § 1.1.7 (page 12) allows for a choice of validation method of which direct observation is one choice. The submitted laboratory protocol also requires the use of CL FRM 03016-F3 for annual competency. This form also allows the assessor to choose the validation method for competency assessment. Neither the submitted protocol nor the form to document competency assessment indicate that the six required procedures for CLIA competency assessment are required."*

> **Theranos Response to Statement 1 in D6124:**  The laboratory has revised its training and competency procedures to clarify that the performance of maintenance and function checks <u>must</u> be directly observed (Ex. BB, Tab 9 §§ 6.9.4.4, 9.1), and to expressly require each of the procedures required by 42 CFR § 493.1451(b)(8)(iv).  (Ex. BB, Tab 9 §§ 6.9.4).  Training on these procedures has occurred.  (Ex. BB, Tabs 9B-9C).

**D6124 – March 18 Letter Statement 2:**  *"Ex. L, Tab 4 of the submission states: 'All testing personnel currently performing tests have completed competency testing with direct observation of, among other things, maintenance and function checks for the tests they are performing.' We are unable to determine if the documentation is complete as there is no information submitted about which testing personnel were performing testing on which instrument(s). Because the laboratory has not shown that it has corrected this deficient practice, we are also unable to determine whether the laboratory's quality assessment mechanisms can monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

89
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road    P 650.838.9292   theranos.com
Palo Alto, CA 94304    F 650.838.9165

**Theranos Response to Statement 2 in D6124:** The laboratory's submission included training and competency documentation for all testing personnel on the instruments they were operating at that time. The laboratory subsequently made some minor staffing changes. A list showing which testing personnel operate each instrument currently in use is enclosed. (Ex. HH, Tab 9A). Current training and competency documentation for those testing personnel and those instruments is also enclosed. (Ex. HH, Tab 9B). That documentation shows that all testing personnel have completed competency testing for the tests they are performing. (Ex. HH, Tabs 9A-9B).

The laboratory is capable of ensuring that the deficient practice in D6124 does not recur. Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures. The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016. Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory. In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant. Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team. The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

## D6170

**D6170 – March 18 Letter Statement 1:** *"Ex. J, Tab 46 contains lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were generated and issued."*

> **Theranos Response to Statement 1 in D6170:** Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D6170 – March 18 Letter Statement 2:** *"The submission further states:*

-   *"Based on comprehensive review, multiple examples of failed QC [quality control] without the appropriate documentation with no investigation or corrective action was identified which is now addressed with revised SOPS and training."*
-   *" ... the review identified multiple examples where technical service provided PM and that service was not documented in addition to failed QC run as part of the service which is now addressed with revised SOPs and training."*

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road     P 650.838.9292     theranos.com
Palo Alto, CA 94304     F 650.838.9165

*The laboratory provided no documentation of investigation or corrective action for these QC failures and lack of maintenance documentation."*

**Theranos Response to Statement 2 in D6170:** There appears to have been a miscommunication here because the laboratory **stopped** running tests on the Fortessa and Canto before the survey began on September 22, 2015, and has **not** run any tests on the instruments since then. Because the Fortessa and Canto instruments are not in use, and have not been in use since the survey began, there have not been any new QC failures or maintenance issues that required investigation or corrective action under the laboratory's new procedures. The "review" discussed in the submission was simply intended to refer to the analysis conducted to address the deficiency identified by CMS. The issue addressed by the "review" — i.e., failing to document corrective action for QC fails for the Fortessa and Canto — is the same issue identified by CMS in its deficiency, and thus did not constitute a new issue or occurrence.

**D6170 – March 18 Letter Statement 3:** *"Ex. A, Tab 10, § 5.10 states: 'Unlicensed laboratory personnel are responsible for performing the activities listed below, under direct and constant supervision by licensed test personnel, with strict adherence to regulatory requirements ...' California. The laboratory relied on its written policies and procedures to ensure that appropriately licensed testing personnel were performing and reporting patient test results. However, if the laboratory's policies and procedures are inconsistent with state requirements, we question whether this mechanism would prevent the deficient practice from recurring, and question the laboratory's document control system to ensure accurately written policies and procedures."*

**Theranos Response to Statement 3 in D6170:** The laboratory's policy does not permit unlicensed personnel to run patient tests, and the laboratory did not intend to imply otherwise. To eliminate any confusion or potential for confusion, however, the laboratory has revised this procedure to remove the language identified by CMS. (Ex. BB, Tab 6 § 5.10).

### D6171

**D6170 – March 18 Letter Statement 1:** *"Ex. L, Tab 3 of the submission states: 'TP14 has been retrained to ensure that TP14 only performs activities within the scope of TP14's job description as a clinical laboratory associate, under the supervision of testing personnel. Because TP 14 is not testing personnel, the high complexity personnel educational requirements do not apply.' The CLIA job responsibilities in the job description provided at Ex. L, Tab 3 does include CLIA regulatory responsibilities for testing personnel, and as such TP14 was required to meet the educational requirements. The laboratory's submission does not provide any additional*

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534790



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*documentation that establishes that TP14 was qualified to perform high complexity testing. TP14 remains unqualified to perform high complexity testing.*

**Theranos Response to Statement 1 in D6170:** The job description for TP14 has been revised to be consistent with the job description of a Clinical Laboratory Associate in the laboratory's revised personnel procedures. (Ex. HH, Tab 7B). The laboratory has confirmed that TP14 has not performed any test analyses between November 2015 and his execution of this revised job description. (Ex. HH, Tab 7A).

## D6178

**D6178 – March 18 Letter Statement 1:** *"Ex. F contains lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were generated and issued."*

**Theranos Response to Statement 1 in D6178:** Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D6178 – March 18 Letter Statement 2:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit **may** [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D6178:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534791



1701 Page Mill Road     P 650.838.9292     theranos.com
Palo Alto, CA 94304     F 650.838.9165

Sincerely,

Dr. Kingshuk Das
Laboratory Director
Theranos, Newark California Laboratory

93
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534792