# EXHIBIT 3



# Food and Drug Administration
OFFICE OF CRIMINAL INVESTIGATIONS
MEMORANDUM OF INTERVIEW

| | |
|---|---|
| CASE NUMBER: | 2016-MWM-709-0576 |
| CASE TITLE: | THERANOS, INC. |
| DOCUMENT NUMBER: | 258754 |
| PERSON INTERVIEWED: | Sarah Bennett, CMS/Division of Laboratory Services |
| PLACE OF INTERVIEW: | CMS, 7500 Security Blvd., Woodlawn, MD |
| DATE OF INTERVIEW: | 09/12/2017 |
| TIME OF INTERVIEW: | 1000 EST |
| INTERVIEWED BY: | SA George Scavdis |
| OTHER PERSONS PRESENT: | See below |

On September 12, 2017, the case agent interviewed Sarah Bennett, Centers for Medicare and Medicaid Services (CMS), regarding a CLIA (Clinical Laboratory Improvement Amendments) survey she conducted of Theranos, Inc.'s (Theranos) high complexity laboratory in 2015. Bennett is a medical technologist in CMS's Division of Laboratory Services (DLS). Also present during the interview were the following: AUSA Jeffrey Schenk, United States Attorney's Office for the Northern District of California; Jessica Chan, Securities and Exchange Commission (SEC), Division of Enforcement (DOE); Rahul Kolhatkar, SEC, DOE; Monique Winkler, SEC, DOE; Gary Williams, HHS, Office of the General Counsel (OGC); and Kelsey Schaefer, FDA, Office of the Chief Counsel (telephonically).

Bennett has a Bachelor's of Science degree in medical technology, and she has worked in laboratories for over 28 years. In 2007, she went to work for the Maryland state agency that conducted CLIA surveys, and she was the supervisor of the Laboratory Licensing and Surveying Department. That department was responsible for the implementation of CLIA. In addition to being a supervisor, she conducted surveys.

Bennett explained that a CMS Form 2567 is called a Statement of Deficiencies and Plan of Correction. Bennett was responsible for drafting a portion of the one issued to Theranos, and Gary Yamamoto was responsible for drafting the other portion. Bennett said that she can speak to the parts of the Form 2567 that she wrote, and that she wouldn't have written a deficiency if she didn't have the expertise to write it. In order to be able to write a deficiency, one needs to know the CLIA regulations, the requirements that are applicable to the laboratory being surveyed, and whether what is observed during a survey rises to the level of a deficiency. Bennett works with the Form 2567 within the course of her employment at CMS.

Bennett explained that with regard to CLIA, some states have their own regulations, and a laboratory that is housed in that state must follow whichever set of regulations is more stringent — either the state's, or the CLIA regulations. She further explained that only some of the state regulations may be more stringent than the corresponding CLIA regulations; it's not all or nothing. The State of California has its own state regulations, but Bennett is unsure whether those regulations are considered more stringent than the CLIA ones. Normally, if a state agency is conducting a laboratory survey, it would be looking at both the federal and the state regulations that apply to a laboratory. When Bennett surveyed Theranos, she was only looking at the laboratory's compliance with the federal CLIA regulations, because she was conducting a federal survey. When Bennett was a surveyor for the State of Maryland, she looked at deficiencies under both the state and federal CLIA regulatory schemes, and she would generate two different Form 2567s to reflect that. It's up to

the individual states as to whether they want to combine the results of a survey on one form or do them separately. Theranos never stated to CMS during or after the survey that they were following California state regulations as opposed to CLIA regulations.

In order to become a CLIA certified laboratory, a laboratory first completes and submits a CMS Form 116 (CLIA Application for Certification). When the Form 116 gets filed and approved, the system generates a CLIA number. Within 3 to 12 months after the generation of the CLIA number, the state conducts a survey of the laboratory, which results in either a finding of compliance or in a finding of deficiency. CMS collects a laboratory's Form 116 each time it conducts a survey. If a laboratory makes certain changes, like replacing its laboratory director, then it must complete and submit a new Form 116. CMS typically doesn't get that first Form 116 generated by a laboratory, because the initial survey is conducted by the state. The first two surveys of Theranos were done by the State of California, and CMS did the third. The first state survey occurred in either 2011 or 2012, and the second one occurred in 2013. It would have been normal for the state to survey them in 2015, however, due to the media attention Theranos was receiving at the time and due to the complaints CMS had received about Theranos, it was determined that Bennett and the CMS regional office (Yamamoto) would conduct the survey instead.

In 2014, Theranos came to CMS to explain their device and their business model. Bennett said that it's unusual for a company to do that. She believes that Elizabeth Holmes (Theranos's CEO) wanted to convince CMS that Theranos didn't need a CLIA certificate for their business model. Theranos gave them a flow chart of a business model which showed that the Theranos black boxes would be at sites in Walgreens, that they would be used to collect blood, and that they would send a signal back to Theranos's headquarters in Palo Alto, CA. CMS told them in that meeting that Theranos had to go to the FDA with their device. CMS also told Theranos at that meeting that Theranos did indeed need a CLIA certificate. Penny Keller and Judy Yost from CMS were involved in that meeting. Yost has since retired. Bennett has some e-mails relating to that meeting that she promised to provide at a later date through OGC.

CMS is responsible for the implementation of the CLIA regulations, which are designed to ensure the accuracy and reliability of laboratory testing. FDA interacts with the manufacturers of devices and test systems. CLIA interacts with the laboratory to make sure the laboratory is using those devices and test systems in the manner in which they are supposed to be used. In other words, the manufacturing of tests is FDA, and the running of laboratory tests is CLIA. A laboratory can run either FDA approved tests or tests that are unapproved which are called laboratory developed tests (LDTs). If a laboratory tweaks an FDA approved test, then there are other requirements under CLIA with regard to additional testing that the laboratory must perform to validate that test.

During the 2015 survey, Theranos didn't talk with Bennett about significant modifications that it was making to FDA cleared or approved tests that it was using in its CLIA laboratory. While there, Bennett looked at the Edison device, which Theranos had discontinued using by the time of the survey. Most of her review was "paper" review; she focused her review on their validation studies, which had to include accuracy, precision, reportable range, reference range, analytic specificity, and analytic sensitivity. She focused on quality control (QC) as well as on quality assessment (QA) issues that Theranos had identified in their QA monitoring program. Bennet explained that QA monitoring involves investigating problems with equipment, finding and implementing corrections, and monitoring those corrections. Yamamoto focused on Theranos's pre-analytic data.

Bennett does not use a CLIA "checklist" when she conducts laboratory surveys. While conducting a survey, the areas Bennett focuses on are QC, QA, and proficiency testing. She picks those areas because those are areas where she can usually discover if there's a problem. Problems in those areas show there is some kind of breakdown in a company's overall quality system, because it demonstrates that the laboratory can't identify issues that arise. Bennett also looks at personnel qualifications very closely while she's on a survey.

The 2015 Theranos survey was both a recertification survey and a complaint survey; it's not unusual for CMS to combine surveys in this manner. The complaints regarding Theranos were received by Yamamoto in CMS's Region Nine. Bennett has copies of the complaints that she will gather together and give to OGC.

Bennett said that Yamamoto received a complaint from a former Theranos employee. Additionally, the State of New York received a complaint, which they said they sent to CMS; however, CMS said they never received that complaint, so nobody within CMS could track that down. CMS started its on-site survey of Theranos in September 2015, and it came back to finish the survey in November 2015. The survey was announced to Theranos ahead of time. During the survey, CMS found that Theranos had a lot of procedures that had been signed by their new laboratory director just a day or two before the start of the September survey.

CMS conducts biannual CLIA surveys of a laboratory; so, in 2015, Theranos was due to be surveyed. If a laboratory submits a new Form 116 because it has hired a new laboratory director or for some other reason, that fact would not trigger a CLIA survey. Typically, a recertification survey is conducted approximately six months before the expiration of a laboratory's CLIA certificate. If there's some extenuating circumstance, like with Hurricane Irma or Hurricane Harvey, surveys of affected laboratories won't be completed within the two-year time frame. If the state agency tries to schedule a survey and the laboratory gives them the run around, normally the state agency will notify the CMS regional office. The CMS regional office can take enforcement action, whereas the state cannot. They can continue to try and reschedule, and if the laboratory continues to refuse, CMS can cite them for refusing an inspection, which allows CMS to take certain enforcement actions. Bennett doesn't know if any of this happened with Theranos. The state agencies are agents of CMS; they are not CMS employees.

Bennett explained that it is unusual that CMS sent central office personnel (Bennett) out on the Theranos survey. With that being said, Bennett had experience as a surveyor and she was asked to go by her supervisor, Karen Dyer, the director of DLS. Bennett said that DLS is also known as the CLIA program. Bennett has conducted CLIA surveys for CMS on two other occasions.  Normally, re-certification surveys are conducted by the state agency, but because of the media attention associated with Theranos, the decision was made to send Yamamoto and Bennett. John Carreyoru (a reporter for the Wall Street Journal) had been in contact with CMS about an article he was writing on Theranos. Carreyoru talked to Dyer about the article. He has never spoken with Bennett. The CMS regional office conducts federal jurisdictional surveys. For instance, the National Institute of Health would be surveyed by CMS's Philadelphia Regional Office. Also, federal surveyors would be responsible for surveying the Maryland state laboratory, for example. Bennett was a natural to ask to do the survey because she has survey experience, and she had done it twice before. Most of the people within DLS are not surveyors. CMS knew the day that FDA went in to inspect Theranos (in August 2015). Bennett thinks FDA notified Dyer, and that Dyer told Bennett. The FDA inspection played no role in CMS deciding to involve its central office in the Theranos survey. Surveys are not coordinated between FDA and CMS; the two agencies have different authorities and they look at different things. They have different regulations, standards, and requirements that they're looking at. For instance, FDA would have been looking at the manufacturing, and CMS would have been looking at the testing. Typically, a laboratory is not both a manufacturer and a laboratory conducting tests.

Bennett said that going on site at Theranos was "very interesting."  Everything there is kept behind locked doors. She'd never been on a survey before where there was so much security, which she described as men wearing black suits and ear buds. There was never a time when Bennett and Yamamoto were not in view of a security guard; they even had to be escorted to the bathroom. Bennett's been on dozens of surveys and has never seen that before.  Theranos had both in-house attorneys and outside counsel at the survey, which is not something you'd typically see. It's also not typical to have stickers put on everything saying that it's exempt from release under FOIA. Bennett noted that it was unusual to ask a company for a document, for it to take the company a long time to produce it, and then for the document to be non-responsive; that is what happened with Theranos. CMS told them when they came back in November that practice was not acceptable, and that CMS would assume that if Theranos couldn't produce a document when CMS asked for it, then Theranos didn't have it.

Bennett didn't talk to any previous Theranos surveyors prior to the 2015 Theranos survey. She expected there to be some security because of the mystery surrounding the Edison device, which was proprietary, but she didn't expect that level of security in the non-proprietary laboratory. She had never surveyed a laboratory that developed a device before. The non-proprietary side of the Theranos laboratory was the portion of the laboratory where Theranos was using traditional FDA approved devices. Bennett didn't

inspect the portion of the laboratory that tested blood obtained from finger stick testing; she only inspected the portion where Theranos was using samples obtained from venous blood draws. During the survey, Bennett and Yamamoto went into one laboratory that was portioned off, with Theranos telling them that the side portioned off was their research and development (R&D) area, and that they were not permitted to go in there. It's typical for a company to tell CMS that they can't go into an R&D area.

Bennett explained that when CMS initiates a complaint survey, the survey is typically focused on the subject of the complaint; however, if during that survey other issues are found that are not related to the complaint, then the scope of the survey can be expanded. Since the Theranos survey was both a recertification survey and a complaint survey, there wasn't a separate "portion" of the survey done to address the complaint; they just incorporated what the complaint issues were into the recertification survey.  In the case of the Theranos survey, the complaint that CMS received was about proficiency testing. More specifically, the complaint alleged that they were testing patients on their proprietary device, but doing their proficiency testing on the FDA approved devices. Proficiency testing is a CLIA requirement, and there are regulated analytes and unregulated analytes.  Proficiency testing normally consists of three events a year with five samples being tested for regulated analytes. The proficiency testing provider sends the blind samples to the laboratory, the laboratory runs the samples and sends the results back to the provider, who then grades the laboratory. The proficiency testing provider sends schedules to the laboratory, so the laboratory knows when the blind samples are coming. During the survey, CMS could not find any evidence to substantiate that part of the complaint about Theranos's proficiency testing. Bennett noted that it would have been very difficult to substantiate that, because Theranos could have hidden that easily and there would have been no way for CMS to find that unless CMS was given specific information about where to find it. The other part of the complaint that CMS received was that the QC on the Edison devices was not acceptable and Theranos was still reporting patient results. That part of the complaint was substantiated during the survey.

CMS requires that a laboratory run two levels of QC for each day of patient testing, and that the laboratory follow the manufacturer's ranges for those tests. A laboratory must verify those ranges before doing a new lot of QC. If a laboratory has its own device, it has to come up with its own QC procedures. Theranos was not following its own QC procedures, and they were still reporting patient results. Bennett explained that there are assayed controls and there are unassayed controls, where a laboratory has to determine what ranges are acceptable. Theranos was using commercial controls, which means they were purchasing control material to use on the Edison. On any system, a laboratory has to do QC. Most control material is purchased commercially; it's not developed by the laboratory or the device manufacturer. So, when Theranos tests the control material that they're using to do QC, they have to be within the ranges of what the manufacturer sets for that control. Theranos can't change those ranges. The package insert will list the devices that are cleared to be used with that control material, and it will give acceptable range limits for those devices. For the Edison, that device would not have been on any package insert for commercial control materials, so Theranos would have had to come up with their own way to determine QC values. With regard to QC testing, CMS is looking to see that Theranos is following its QC ranges. CMS is not assessing the validity of the ranges they've come up with, they're just looking to see if Theranos is following them. CMS is also checking to make sure that Theranos is not conducting patient tests when its device is out of range.

Bennett found many instances where Theranos ignored their own procedures for acceptability of controls. CMS would comment on it if they weren't following their own procedures, or if they were using assayed controls and they weren't following those ranges. CMS looked to see if Theranos developed their own ranges and whether their QC testing results were within their own definition of what was acceptable. During the survey of Theranos, Bennett asked for QC records for a particular date range in order to check this. She explained that what she normally gets back from a laboratory in response to this request is something called a Levy-Jennings Graph. This is generated by a computer, and it is used for QC only. She explained that the graph has a range of controls and a line that represents the mean. If a laboratory gets a value that is outside the range of controls, they have to react to that. For Theranos, those graphs were created by a computer (an LIS, or laboratory information system) that takes the controls and puts in the testing values. Theranos was using Westguard as a basis, but they were cherry picking what part of Westguard they wanted to use.

CMS looks at a laboratory's procedures and it looks to see that they are running them when they say they

are supposed to be running them. CMS doesn't look to the patient data. If the QC is problematic, there is no way to assess whether the patient data is accurate and reliable. If the laboratory runs the controls in the morning and they are unacceptable, then they should not be running patients after that. The standard deviation is used for controls, not for patients; patients have a normal reference range. Patients are either going to be abnormally low or abnormally high. There is also a reportable range. CMS doesn't require that a laboratory track patient test results, but they do require a laboratory to address patients who were tested during a period when the laboratory was not functioning as it should have been.

Bennett will look at patient testing when she's on a survey if there's a problem with proficiency testing or QC. She wants to see if the laboratory has identified whether there was a QC problem, and if they continued to report patient results when there was one. There's no value to the raw data if you're not using it in context with something else. One place you might look at patient results is when you're looking at the final report with regard to what the LIS said, but Bennett didn't look at that on the Theranos survey. QC results have to be reviewed by an appropriate person at the laboratory. When Bennett asked for Levy-Jennings reports from Theranos, they went to their computer, put the dates in, and printed them out for her. Her understanding was that the information went right from their device into the LIS; it was not manually entered. The LIS system is populated with patient and QC data. The one device that Bennett saw at Theranos fed its results directly into the LIS.

Surveyors are the ones that decide what deficiencies to cite. Before CMS concludes the survey, they tell the laboratory what deficiencies they've found. With Theranos, Bennett sat with them at the end of every single day and told them what she and Yamamoto found. Sunny Balwani was there every day.  Holmes was not present during the September survey, but she came in November and followed Bennett around for two days. Bennett thinks CMS was at Theranos for three days in September and for four days in November. In November, Balwani went with Yamamoto, and Holmes went with Bennett. Theranos wanted details every day on what CMS had found, and at the end of the survey, CMS went over everything again with them. Bennett has a computer program that she writes the deficiencies in, and the program creates the Form 2567. The "Findings" section is the specific evidence that supports the "Deficiency" that is cited. Bennett has her handwritten notes from the survey, and she said that not everything in her notes is transferred into the Form 2567. Karen Fuller, Yamamoto's supervisor, was at the survey to observe, but she didn't take notes. During the survey, CMS received documents from Theranos that they took with them. Holmes was not happy and expressed her displeasure at the end of each day in November at what CMS had found. Heather King was very assertive in trying to convince CMS that what they were seeing wasn't really an issue.  Bennett's survey notes are geared toward what CMS was looking at with regard to CLIA compliance. If someone from Theranos made a comment that was a confirmation of something CMS saw that was a deficiency, then Bennett would have put that in the notes.

CMS started to create the Form 2567 after the September part of the survey, and it was completed after the November portion. CMS normally creates that form at the end of the survey. Bennett was looking at proficiency testing first and she found issues there, so she would have known on the first day of the survey that she would be issuing a Form 2567.

Bennet explained that within each condition there are multiple standards. If there is non-compliance, the surveyor has to make a determination if it is just a "standard level" deficiency or if it rises to a "condition level" deficiency. If a laboratory sends a patient test report out and later finds out that it is wrong, the laboratory is required to do a certain report and send it to certain people in response. Within each of these component areas you have to react to it, fix it, and monitor it.  Title 42 CFR 493 lays out all of the CLIA regulations.

CMS knew when they left in September that Theranos was likely to get "condition level" deficiencies, and that they were IJ (In Jeopardy). IJ is a "condition level" deficiency that has the potential to cause patient harm. CMS hadn't made a final determination at the time of the survey. It's not unusual for CMS to make a determination of IJ. They talked about it with Theranos, but hadn't made a final decision. They were waiting for Theranos to produce a document related to PT/INR. PT/INR stands for Prothrombin International Normalized Ratio, which is a test to see if Coumadin is working. This test is measured in seconds. Bennett had discovered several issues with Theranos's INR, and one was that they had entered a mean normal

prothrombin time. She explained that a laboratory has to run something like 20 samples and come up with an average. In order to calculate the INR, you need that number. Theranos had a number in the computer and a document that showed that their INR had been calculated three days before CMS got there. Despite calculating that number three days prior to the survey, the reagents had been in use for six months prior to that, and Theranos couldn't produce a document showing that the INR had been arrived at for testing during that period. Doctors need to know that INR number because it speaks to how prone a patient is to getting clots or to bleeding out. CMS discovered this issue in September, and they went over this with Balwani and King at the end of the day. Bennett remembers that the conversation took place at the Theranos instrument. Bennett said she needed that document and they couldn't produce it. Another issue that CMS found was that QC test results on their device had been out of range multiple times, and yet Theranos was still reporting patient results during that time. Theranos's solution was to simply adjust the mean. Langley G., who was the Theranos laboratory director at the time, was the individual who was said to implement that solution. Another issue that CMS found had to do with sample stability. Theranos missed that the manufacturer of the Thromboplastin that they were using changed the stability on their package insert. The package insert changed the stability from ten days to two days, and for six months Theranos was using that product with a five-day stability protocol. At the time of the survey, Sunil Dhawan was the Theranos lab director, and Bennett saw him once for a total of 30 minutes, and he talked to no one. During a survey, the laboratory director is not required to be present.

The PT/INR was one of the reasons that CMS called IJ. They couldn't tell if that six-month period whether the patient testing was done correctly. Theranos wasn't even calculating their own reported values correctly. The other part of Theranos that Bennett looked at during the survey that was problematic was all of the validation and QC data for the Edison device. Theranos continued to report patient values despite having these QC problems. Bennett noted that Theranos had stopped using the Edison device by the time of this survey. Regardless, CMS can still look at any records from the previous two years of the date of inspection. CMS also cited Theranos for having a procedure that was not signed by the laboratory director. Before a laboratory director signs off on a procedure, it's not really usable in the laboratory. CMS sees this often. They also see unqualified personnel as a common issue in laboratories.

One deficiency can lead to a determination of IJ, or it can be a mix of things. If CMS makes an initial determination of IJ, the company must work relatively quickly in order to abate that. In this case with regard to the timelines for enforcement, Theranos was given much longer than any other laboratory would have been given. In Bennett's opinion, this was due to the number of high profile people that were involved. The letter CMS sent to Theranos on January 25, 2016, is the IJ notification. Normally, CMS doesn't put exactly why something is IJ in its notification, other than that the determination is IJ. The allegation of compliance that a company sends in response must show that they've corrected the deficiency at the time of the submission. In Theranos's case, the evidence did not support a credible allegation of compliance. The letter that CMS sent Theranos in March tells them exactly why their response was not credible.

CMS cited Theranos for five "condition level" deficiencies. CMS was able to remove the testing personnel "condition level" deficiency, because Theranos removed the person in question from his position. At the time that CMS sent its July 2016 letter to Theranos, four "condition level" deficiencies remained. The main reason CMS called IJ was because of all the issues they found in hematology, not just the PT/INR issue.

The letter CMS sent to Theranos in July 2016 was the "Impose Notice," which told Theranos that the proposed sanctions would be imposed as of the date of the letter unless Theranos appealed. Theranos approached CMS about a settlement. Because CMS called IJ, they could limit Theranos's CLIA certificate by saying they couldn't test hematology after a certain time without waiting for a decision from an administrative law judge (ALJ). In Theranos's written responses to CMS in which they attempted to show they had corrected the cited deficiencies, Theranos would send CMS a copy of a faxed sheet saying something was corrected along with a corrected report, but CMS could never marry the two together; so, CMS never knew if Theranos actually notified all of their affected patients. Bennett said that over 50,000 patient test results were implicated. To date, CMS doesn't know if all of the affected patients have been notified. Theranos made the decision to void the test results; CMS didn't tell them to do that. CMS tells the laboratory they must fix a deficiency and the laboratory decides how they're going to fix it. Theranos came to CMS

sometime after the IJ determination to tell CMS how hard they worked and how they were in compliance, all in an effort to keep their CLIA license.

In this case, Theranos appealed after they received the July Impose Notice. Bennett explained that after CMS sends an Impose Notice, CMS can't talk to the company until the company appeals. This appeal goes to the Civil Remedies Division. Theranos both appealed and approached CMS about a settlement. When the laboratory files an appeal, it gets assigned to an ALJ, and the ALJ tells the company that they have to send in all of the documents that they're going to be using prior to the date of the hearing. CMS doesn't create any new documents on their side, but Bennett doesn't know if Theranos created new documents to submit as their evidence. In this case, there was no decision by the ALJ because a settlement was reached resulting in Theranos withdrawing their appeal. Bennett was not involved in the settlement at all. She assumes it was Kate Goodrich and maybe David Wright, but she has no idea who was involved in the settlement. Bennett suggested that the case agent ask Dyer to find out who was involved. Bennett said that anytime CMS revokes a laboratory's CLIA certificate, the owner/operator and the laboratory director are barred from running a laboratory for 2 years.

Bennett explained that it's CMS's ten regional offices that propose and impose sanctions. In this case, the letters sent from CMS to Theranos came from the regional office. All of the letters that went to Theranos after the first January 2016 letter went all the way up through CMS to at least Goodrich's level. This is not the normal process; it's usually handled by the region.

If CMS calls IJ, it gives CMS the ability to limit or suspend the CLIA certificate prior to a decision of the ALJ. That occurred in this case. CMS limited Theranos's CLIA certificate three days after Theranos received the letter. The "barring" of the laboratory director and the owner/operator from running a laboratory for two years occurs only when the revocation is imposed and final. There are only certain things a laboratory can appeal, and those things are called "initial determinations." In this case, revocation was never imposed. Bennett doesn't know the terms of the settlement other than hearing that Theranos's Arizona and California laboratories were all in one settlement, that Theranos voluntarily ceased testing at both laboratories, and that the laboratory directors wouldn't run another lab for a certain period of time. She heard that revocation was not a part of the settlement. The survey of the Arizona laboratory was in August or September of 2016, and Bennett and Yamamoto did that survey as well. When they were in the Arizona laboratory, they discovered significant issues and a Form 2567 was issued. The survey of the Arizona laboratory led to a determination of IJ as well for some of the same issues that CMS saw at the California laboratory. Theranos's Allegation of Compliance essentially said, "We were planning on closing before you came in, and we're closing." The laboratory director, Daniel Young, was present during the entirety of the survey. He was especially difficult to deal with, and talked in circles. He was there for the California laboratory survey as well, and spent most of his time with Yamamoto.

A revocation means that the CLIA number can no longer produce laboratory results. The difference between a revocation and a settlement is there's no black mark on the laboratory's record in the case of a settlement--they don't have a revocation on their CLIA history.

There's no separate form surveyors create to memorialize interviews they've conducted during a survey. They just have the information in their notes.

Bennett explained that CMS hadn't looked at the Edison device at the start of the Theranos survey in September and hadn't addressed all of the issues in the complaint, so that's why they had to go back in November. She said that, as far as she's concerned, if you don't have the right INR result there is a potential for patient harm based on that because you can't have any confidence in the patient results. She looked at patient data and saw three or more different lot numbers of Thrombin, and she couldn't even tell where the patient result came from when she looked at the data. It's the laboratory's responsibility to look at that and decide if any patients have been affected; it's not CMS's job.

The CLIA regulations have nothing to do with payment and billing. All Bennett can tell someone is whether a laboratory has met the CLIA regulations. She said there is a provision in their CLIA regulations with regard to

criminal violations, but it's not for CMS to determine whether something constitutes a criminal violation. During the interview, Bennett cited the provision as being section 493.1806(E)

In January 2014, Theranos came to CMS to have a meeting, and Holmes attended. Bennett doesn't know if there were any minutes taken and kept for that meeting, but she took a few notes. During the meeting, Theranos gave CMS some documents, including a flow chart. Dyer, Penny Keller, and Bennett were there. She doesn't know if Balwani attended. Theranos requested the meeting in order to show CMS their new technology, and because they thought they didn't need a CLIA waiver to put their black boxes in Walgreens. CMS told them they needed to go to FDA to get the CLIA waiver. Theranos didn't bring their Edison device to the meeting, and Bennett doesn't recall who from Theranos presented. They talked more about their business model—that they had a proprietary device to do a finger stick that would go into the Edison device, and that the Edison device would send an electronic signal to Palo Alto, CA, where the results would be interpreted. CMS considers a test system from the beginning to the end. In CMS's view, the device was receiving a specimen and doing the testing and that's where the results were generated, even though they were in electronic form. Theranos made some statements about what their hopes were with regard to tests they would run on the Edison. Bennett didn't have the impression that they were using the Edison at that time. The meeting was probably an hour long. They told Theranos if they wanted to get their device approved they had to go to FDA. They also told Theranos that if they wanted their device waived they had to go to FDA. Bennett was not involved with any CMS follow-up to that meeting.

There are three levels of testing: "waived," "moderate," and "high" level complexity. If a laboratory is only performing waived testing, they only need a certificate of waiver. Waived tests are tests where, in most cases, an inaccurate result won't cause patient harm (i.e. a urine pregnancy test or a blood glucose test). Any time you have a waived test and don't follow the manufacturer's instructions, it becomes a high complexity test. With moderate complexity testing, the personnel requirements are not as stringent as they are for high complexity. Performance specifications are the same for both moderate and high complexity. According to Bennett, performance specifications is CLIA speak for validation. FDA is responsible for the classifications of waived, moderate, or high. The finger stick samples Theranos was diluting and putting on traditional devices were high complexity because they had modified the manufacturers' instructions. The Edison device was high complexity because it was considered a laboratory developed test. All of the tests run on the Edison device were high complexity. A lab developed test is never CLIA waived.

Bennett said her understanding was that the state surveyor who performed the 2013 Theranos survey was unaware that Theranos was using the Edison device at the time and that the surveyor only inspected the traditional side of their laboratory.

Bennett said that pre-diluting samples on a regular basis is unusual, but that there is nothing in the CLIA regulations that prohibits Theranos from doing that. If they are diluting samples, they have to perform the validation.

At some point, Bennett was told by her management to stop communicating with Theranos, be it over e-mail or telephonically.

SUBMITTED: Electronically submitted by GEORGE SCAVDIS

GEORGE SCAVDIS, SPECIAL AGENT                          DATE:   10/02/2017

APPROVED: Electronically approved by MARK MCCORMACK

MARK MCCORMACK, SPECIAL AGENT IN CHARGE                DATE:   10/03/2017

DISTRIBUTION:   Orig:  MWFO
                cc:    Prosecution

ATTACHMENTS:  None