1

2                   UNITED STATES DISTRICT COURT

3                 NORTHERN DISTRICT OF CALIFORNIA

4                      SAN JOSE DIVISION

5

     UNITED STATES OF AMERICA,        )  CR-18-00258-EJD
6                                     )
                     PLAINTIFF,       )  SAN JOSE, CALIFORNIA
7                                     )
           VS.                        )  VOLUME 6
8                                     )
     ELIZABETH A. HOLMES,             )  SEPTEMBER 14, 2021
9                                     )
                     DEFENDANT.       )  PAGES 660 - 854
10    _____ )

11

12                 TRANSCRIPT OF TRIAL PROCEEDINGS
               BEFORE THE HONORABLE EDWARD J. DAVILA
13                 UNITED STATES DISTRICT JUDGE

     A P P E A R A N C E S:
14

15   FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                            BY:  JOHN C. BOSTIC
16                               JEFFREY B. SCHENK
                            150 ALMADEN BOULEVARD, SUITE 900
17                          SAN JOSE, CALIFORNIA 95113

18                          BY:  ROBERT S. LEACH
                                 KELLY VOLKAR
19                          1301 CLAY STREET, SUITE 340S
                            OAKLAND, CALIFORNIA 94612

20        (APPEARANCES CONTINUED ON THE NEXT PAGE.)

21

     OFFICIAL COURT REPORTERS:
22                            IRENE L. RODRIGUEZ, CSR, RMR, CRR
                              CERTIFICATE NUMBER 8074
23                            LEE-ANNE SHORTRIDGE, CSR, CRR
                              CERTIFICATE NUMBER 9595
24
        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25            TRANSCRIPT PRODUCED WITH COMPUTER

1      A P P E A R A N C E S: (CONT'D)

2

3      FOR DEFENDANT HOLMES:   WILLIAMS & CONNOLLY LLP
                               BY:  KEVIN M. DOWNEY
4                                   LANCE A. WADE
                                    KATHERINE TREFZ
5                                   JEAN RALPH FLEURMONT
                               725 TWELFTH STREET, N.W.
6                              WASHINGTON, D.C. 20005

7                              LAW OFFICE OF JOHN D. CLINE
                               BY:  JOHN D. CLINE
8                              ONE EMBARCADERO CENTER, SUITE 500
                               SAN FRANCISCO, CALIFORNIA 94111
9

10     ALSO PRESENT:           FEDERAL BUREAU OF INVESTIGATION
                               BY:  ADELAIDA HERNANDEZ
11
                               OFFICE OF THE U.S. ATTORNEY
12                             BY:  LAKISHA HOLLIMAN, PARALEGAL
                                    MADDI WACHS, PARALEGAL
13
                               WILLIAMS & CONNOLLY
14                             BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL

15                             TBC
                               BY:  BRIAN BENNETT, TECHNICIAN
16

17

18

19

20

21

22

23

24

25

1

<u>INDEX OF PROCEEDINGS</u>

2

GOVERNMENT'S:

3

4

**SO HAN SPIVEY (A.K.A. DANISE YAM)**
DIRECT EXAM BY MR. LEACH (RES.)          P. 685
5        CROSS-EXAM BY MR. WADE                    P. 740
REDIRECT EXAM BY MR. LEACH                P. 783

6

7        **ERIKA CHEUNG**
DIRECT EXAM BY MR. BOSTIC                 P. 789
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX OF EXHIBITS

2
                                        IDENT.      EVIDENCE
3        GOVERNMENT'S:

4        615                                        685
         792                                        689
5        1901                                       685
         5206                                       696
6        431                                        707
         5219                                       711
7        5172                                       717
         5085                                       724
8        5141                                       726
         3533                                       729
9        3527                                       730
         5190                                       731
10       2623                                       732
         4859, PROVISIONALLY                        735
11       3233                                       737
         1853                                       762
12       256                                        784
         5388                                       801
13       5389                                       807
         3741, BATES 15286-15292                    811
14       1287                                       845

15

16       DEFENDANT'S:

17       7753                                       749
         13711                                      760
18       7761                                       763
         13719                                      771
19       7091                                       776
         4176                                       780
20

21

22

23

24

25

```
 1        SAN JOSE, CALIFORNIA                    SEPTEMBER 14, 2021

 2                         P R O C E E D I N G S

 3             (COURT CONVENED AT 8:42 A.M.)

 4             (JURY OUT AT 8:42 A.M.)

 5                  THE COURT:  GOOD MORNING.  PLEASE BE SEATED.  THANK

 6        YOU AGAIN FOR YOUR COURTESY.

 7             LET'S GO ON THE RECORD IN OUR MATTER UNITED STATES VERSUS

 8        HOLMES.

 9             LET ME GET APPEARANCES OF THE PARTIES FOR TODAY, PLEASE.

10                  MR. LEACH:  GOOD MORNING, YOUR HONOR.

11             ROBERT LEACH, JEFF SCHENK, AND JOHN BOSTIC FOR THE

12        UNITED STATES.

13                  THE COURT:  THANK YOU.  GOOD MORNING EVERYONE.

14             MR. WADE.

15                  MR. DOWNEY:  GOOD MORNING, YOUR HONOR.

16                  THE COURT:  OR MR. DOWNEY.

17                  MR. DOWNEY:  I'M CLOSEST.

18                  THE COURT:  OKAY.

19                  MR. DOWNEY:  KEVIN DOWNEY FOR MS. HOLMES.

20             WITH ME ARE LANCE WADE, KATIE TREFZ, AND J.R. FLEURMONT,

21        AND OUR COCOUNSEL, JOHN CLINE, IS HERE, AND MS. HOLMES IS

22        PRESENT.

23                  THE COURT:  THANK YOU.  GOOD MORNING, EVERYONE.

24             WE ARE OUTSIDE OF THE PRESENCE OF OUR JURY, AND I WANTED

25        TO TAKE UP A COUPLE OF MATTERS.
```

08:43AM  1     INITIALLY LET ME TALK ABOUT WE WERE NOT IN SESSION LAST

08:43AM  2  FRIDAY, AND THAT WAS OWING TO SOME CONVERSATION WE HAD WITH ONE

08:43AM  3  OF OUR JURORS, JUROR NUMBER 9, WHO INFORMED US OF POTENTIAL

08:43AM  4  CONTACT WITH AN INDIVIDUAL WHO HAD CONTRACTED OR WAS POSITIVE

08:44AM  5  FOR COVID.

08:44AM  6     OVER THE WEEKEND, AND I THINK YESTERDAY, MS. KRATZMANN

08:44AM  7  RECEIVED EMAIL INFORMATION, AND I THINK I SHARED THAT, THAT WAS

08:44AM  8  SHARED WITH COUNSEL THAT OUR JUROR RECEIVED TWO NEGATIVE TESTS,

08:44AM  9  ONE ON SEPTEMBER 9TH AND ANOTHER TEST ON SEPTEMBER 11TH, AND

08:44AM  10 BOTH OF THOSE TESTS WERE NEGATIVE.  WE RECEIVED THAT, AND WE'RE

08:44AM  11 HAPPY FOR THAT JUROR, AND THAT'S WHY WE'RE IN SESSION TODAY.

08:44AM  12     I THINK COUNSEL RECEIVED THAT INFORMATION, DID YOU?

08:44AM  13          MR. DOWNEY:  YES, YOUR HONOR.

08:44AM  14          MR. SCHENK:  YES, YOUR HONOR.

08:44AM  15          THE COURT:  GREAT.

08:44AM  16     AND THEN WE DID RECEIVE SOME OTHER INFORMATION REGARDING

08:44AM  17 JUROR NUMBER 7 WHO YOU RECALL HAD SOME ISSUES WITH HER

08:44AM  18 EMPLOYMENT.  I HAD ASKED HER TO TALK WITH HER EMPLOYER TO SEE

08:44AM  19 IF IT WERE POSSIBLE TO RESCHEDULE HER EMPLOYMENT SUCH THAT SHE

08:44AM  20 COULD REMAIN ON THE JURY.

08:45AM  21     WE RECEIVED, MS. KRATZMANN DID, AN EMAIL FROM JUROR

08:45AM  22 NUMBER 7 INDICATING THAT THAT WAS NOT POSSIBLE.  SO I THINK WE

08:45AM  23 SHARED THAT INFORMATION WITH COUNSEL AS WELL.

08:45AM  24     IN LIGHT OF THAT, I'M INCLINED TO EXCUSE HER FOR FINANCIAL

08:45AM  25 HARDSHIP REASONS.

08:45AM 1          BUT LET ME ASK COUNSEL IF THEY WISH TO COMMENT.

08:45AM 2                MR. SCHENK:  YES WE AGREE.  NO OBJECTION.

08:45AM 3                MR. DOWNEY:  NO OBJECTION TO EXCUSAL FOR HARDSHIP.

08:45AM 4           THE COURT:  THANK YOU VERY MUCH.

08:45AM 5          THEN JUROR NUMBER 7, MS. HERNANDEZ-PEREZ, IS EXCUSED.  AND

08:45AM 6     WE'LL ADVANCE ALTERNATE NUMBER 1 TO SEAT 7, AND THAT ALTERNATE

08:45AM 7     JUROR WILL REPLACE MS. HERNANDEZ-PEREZ AS A SEATING JUROR.

08:45AM 8     THANK YOU FOR THAT.  WE'LL DO THAT WHEN THE JURY COMES OUT.

08:45AM 9          THERE WILL BE GREAT FORMALITY WHEN HE MOVES FROM HIS SEAT

08:46AM 10    TO SEAT NUMBER 7.

08:46AM 11         I NEXT WANT TO TALK ABOUT THE GOVERNMENT HAD FILED

08:46AM 12    DOCUMENT 1014, WHICH WAS AN EX PARTE APPLICATION FOR IMMUNITY

08:46AM 13    FOR A WITNESS.

08:46AM 14         MR. SCHENK, MR. LEACH, CAN YOU JUST SPEAK TO ME A LITTLE

08:46AM 15    BIT ABOUT THIS, PLEASE.

08:46AM 16          THE DEFENSE HAS RECEIVED THIS ALSO I ASSUME.

08:46AM 17               MR. WADE:  WE HAVE, YOUR HONOR.

08:46AM 18           THE COURT:  ALL RIGHT.  THANK YOU.

08:46AM 19              MR. LEACH:  YES, YOUR HONOR.

08:46AM 20         THE GOVERNMENT ANTICIPATES CALLING AFTER ERIKA CHEUNG

08:46AM 21    MS. SUREKHA GANGADKHEDKAR WHO IS A FORMER EMPLOYEE OF THERANOS.

08:46AM 22    HER COUNSEL INDICATED TO ME THAT IF CALLED TO TESTIFY SHE WOULD

08:46AM 23    INVOKE HER FIFTH AMENDMENT RIGHT AGAINST SELF-INCRIMINATION.

08:46AM 24         MY OFFICE HAS OBTAINED APPROVAL FROM DOJ TO IMMUNIZE HER

08:46AM 25    BECAUSE OF HER INVOCATION, AND THAT'S THE BASIS OF THE EX PARTE

08:46AM 1    APPLICATION.

08:46AM 2            THE COURT:  I SEE.  CAN YOU -- THANK YOU.  I HAVE

08:47AM 3    THAT BEFORE ME, AND I JUST HAVE A COUPLE OF QUESTIONS ABOUT

08:47AM 4    THIS.

08:47AM 5        SHOULD THE COURT BE CONCERNED THAT THIS POTENTIAL WITNESS

08:47AM 6    WHO IS IN ESSENCE GRANTED IMMUNITY, SHOULD I BE CONCERNED ABOUT

08:47AM 7    ANY COMPLICITY IN THE UNDERLYING CHARGES SUCH THAT I NEED TO

08:47AM 8    BALANCE THOSE INTERESTS WITH THE ORDER?

08:47AM 9            MR. LEACH:  I DON'T THINK THE COURT NEEDS TO DO

08:47AM 10   THAT.  I THINK THAT THE STATUTORY BASIS FOR IMMUNITY ARE LAID

08:47AM 11   OUT IN 18 U.S.C. SECTION 6002.  IT'S A DECISION FOR THE

08:47AM 12   EXECUTIVE BRANCH TO DECIDE IF IT'S IN THE PUBLIC INTEREST TO

08:47AM 13   CONFER IMMUNITY.

08:47AM 14       SO I THINK THE COURT'S ROLE IS TO ASSESS WHETHER THOSE

08:47AM 15   STATUTORY FACTORS ARE MET, AND I DON'T THINK THAT THE COURT

08:47AM 16   NEEDS TO DO ANY ANALYSIS BEYOND THAT.

08:47AM 17           THE COURT:  ALL RIGHT.  THANK YOU.

08:47AM 18       MR. DOWNEY, DO YOU WISH TO BE HEARD ON THIS?  MR. WADE?

08:48AM 19           MR. WADE:  I'M WALKING A LONG WAY, YOUR HONOR, TO

08:48AM 20   SAY THAT THE DEFENSE TAKES NO POSITION ON THIS MOTION.

08:48AM 21           THE COURT:  THANK YOU VERY MUCH.

08:48AM 22       I JUST WANTED TO MAKE THAT INITIAL INQUIRY, MR. LEACH.

08:48AM 23   I'M AWARE OF THE STATUTORY GROUNDS FOR THIS.  I HAVE THE

08:48AM 24   DOCUMENT IN FRONT OF ME, AND I WILL APPROVE THIS, AND I WILL

08:48AM 25   SIGN THIS, AND THIS WILL BE ON FILE TODAY.

08:48AM  1          MR. LEACH:  THANK YOU, YOUR HONOR.

08:48AM  2          THE COURT:  THANK YOU.

08:48AM  3     I WANT TO TURN NEXT TO AN ISSUE THAT WAS JUST RAISED THIS

08:48AM  4  MORNING TO ME.  I WAS SHARED AN EMAIL FROM THE COURT'S MEDIA

08:48AM  5  COORDINATOR AND THE COURT'S MEDIA COORDINATOR APPARENTLY

08:48AM  6  MONITORED ON SOMETHING CALLED "LAW 360," A TWITTER FEED FROM AN

08:49AM  7  INDIVIDUAL.

08:49AM  8     I'LL JUST READ THE QUOTE:  "THE WOMAN BEHIND ME WHO GREW

08:49AM  9  UP IN NJ IS A SPECTATOR," QUOTE, "'DON'T FORGET THE ME TOO

08:49AM  10  MOVEMENT,'" END QUOTE, "SHE SHOUTS AS JURORS WAIT TO GO THROUGH

08:49AM  11  SECURITY.

08:49AM  12     "A MAN IN A SUIT BEHIND HER TELLS HER TO BE QUIET BECAUSE

08:49AM  13  SHE COULD CAUSE A MISTRIAL.

08:49AM  14     "'THIS MAY BE HER ONLY DAY ATTENDING COURT,' SHE REPLIES."

08:49AM  15     THIS WAS FORWARDED FROM OUR MEDIA COORDINATOR, AND I

08:49AM  16  PRESUME YOU READ IT OFF OF THE TWITTER FEED.

08:49AM  17     LET ME JUST STATE THAT ANYONE WHO INTERFERES WITH A JUROR,

08:49AM  18  A SITTING JUROR IN A CASE RISKS INVESTIGATION FOR TAMPERING

08:49AM  19  WITH THE JURY AND THE COURT PROCESS, AND THAT COULD RESULT IN

08:49AM  20  AN INVESTIGATION BY THE COURT, AND THE COURT COULD ORDER AN

08:50AM  21  INVESTIGATION.

08:50AM  22     SO, COUNSEL, I JUST WANT TO TELL YOU, AND I THINK YOU'RE

08:50AM  23  AWARE OF THIS, IF ANYONE DOES INTERFERE OR ATTEMPT TO INTERFERE

08:50AM  24  WITH A JUROR, ANY OF THE JURORS, I'D LIKE IT TO BE BROUGHT TO

08:50AM  25  MY ATTENTION, PLEASE, AND I'LL TAKE WHATEVER ACTION I FEEL IS

08:50AM  1    APPROPRIATE.

08:50AM  2         SO THANK YOU FOR THAT.

08:50AM  3         ANYTHING FURTHER ON THAT?

08:50AM  4              MR. SCHENK:  NO.  THANK YOU, YOUR HONOR.

08:50AM  5              THE COURT:  MR. DOWNEY, ANYTHING?  MR. WADE?  SORRY.

08:50AM  6              MR. WADE:  NO, YOUR HONOR.

08:50AM  7              THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

08:50AM  8         NEXT I'D LIKE TO TAKE UP A QUESTION ABOUT JUROR NUMBER 12.

08:50AM  9    AND I BELIEVE MS. KRATZMANN SHARED SOME EMAILS THAT JUROR

08:50AM  10   NUMBER 12 SENT TO HER.  THERE'S A QUESTION ABOUT -- NOT A

08:50AM  11   QUESTION, BUT SHE HAD INDICATED THAT SHE HAD PREVIOUSLY WORKED

08:50AM  12   AT KPMG FROM MAY UNTIL OCTOBER IN 2012 AS AN ADMINISTRATIVE

08:51AM  13   ASSISTANT FOR A NUMBER OF PARTNERS.  SHE INDICATES SHE WAS

08:51AM  14   NEVER EXPOSED TO ANY INFORMATION OR MATERIAL REGARDING THE

08:51AM  15   CASE.  SHE FOLLOWED UP -- THIS WAS SEPTEMBER 8TH, I BELIEVE.

08:51AM  16        ON SEPTEMBER 12TH SHE FOLLOWED UP WITH AN EMAIL

08:51AM  17   INDICATING THAT SHE HAD A VERY GOOD FRIEND WHO WORKED AT KPMG

08:51AM  18   FOR 20-PLUS YEARS, HOWEVER, SHE WAS NOT IN A ROLE THAT WOULD

08:51AM  19   REVEAL ANY INFORMATION OR GAIN KNOWLEDGE OF ANY CASE OR

08:51AM  20   CLIENTS.  SHE APPARENTLY IS A SENIOR REPRESENTATIVE OFFICE

08:51AM  21   SERVICES.  THAT WAS RECEIVED.

08:51AM  22        THE OTHER EMAIL THAT WAS RECEIVED FROM THIS WITNESS, OR

08:51AM  23   EXCUSE ME, JUROR ON SEPTEMBER 7TH THE JUROR E-MAILED

08:51AM  24   MS. KRATZMANN ABOUT A QUESTION AND SHE HAD A QUESTION ABOUT

08:51AM  25   WHETHER OR NOT THE JURY WOULD BE RESPONSIBLE FOR POTENTIAL

08:52AM 1      SENTENCING PHASE IN THE CASE.

08:52AM 2          I THINK WE SHARED THAT WITH COUNSEL, THOSE EMAILS WITH

08:52AM 3      COUNSEL.

08:52AM 4          DO YOU HAVE THOSE?

08:52AM 5              MR. SCHENK:  YES.  YES, YOUR HONOR.

08:52AM 6              MR. DOWNEY:  YES, YOUR HONOR.

08:52AM 7              THE COURT:  THANK YOU.

08:52AM 8          MY THOUGHT WAS TO -- EXCUSE ME, IS TO BRING THIS JUROR OUT

08:52AM 9      THIS MORNING, OUTSIDE OF THE PRESENCE OF THE OTHER JURORS, AND

08:52AM 10     MAKE SOME INQUIRIES ABOUT THESE EMAILS.  I'LL ALLOW COUNSEL TO

08:52AM 11     ASK QUESTIONS IF YOU FEEL IT'S APPROPRIATE AS WELL.

08:52AM 12         ANY OBJECTION TO THAT PROCESS?

08:52AM 13             MR. SCHENK:  NO, YOUR HONOR.

08:52AM 14             MR. DOWNEY:  NO, YOUR HONOR.

08:52AM 15             THE COURT:  ALL RIGHT.  THANK YOU.

08:52AM 16         LET'S BRING JUROR NUMBER 12 OUT THEN.

08:52AM 17             COUNSEL, WHILE THAT IS HAPPENING, MY THOUGHT WAS I WOULD

08:52AM 18     READ, AFTER OUR DISCUSSION, I THINK I WILL READ TO THE JURY

08:52AM 19     ONCE THEY COME IN NINTH CIRCUIT MODEL INSTRUCTION 7.4, WHICH IS

08:52AM 20     THE JURY CONSIDERATION OF PUNISHMENT.

08:52AM 21         AS YOU RECALL IN MY VOIR DIRE, AND I BELIEVE ALSO IN MY

08:52AM 22     PRELIMINARY INSTRUCTIONS, I INSTRUCTED THE JURY THAT THEY ARE

08:52AM 23     NOT TO CONSIDER PUNISHMENT AT ALL, BUT I THOUGHT OUT OF AN

08:53AM 24     ABUNDANCE OF CAUTION I'LL READ THAT TO THEM.

08:53AM 25         AND LET ME INDICATE THAT I HAVE EDITED 7.4.  I HAVE LOOKED

08:53AM 1    AT THE SUBMISSION OF BOTH PARTIES IN YOUR JURY INSTRUCTIONS,

08:53AM 2    AND I'VE EDITED ACCORDING TO MS. HOLMES'S EDITS.  I'LL PASS YOU

08:53AM 3    DOWN THIS, AND YOU CAN LOOK AT IT.

08:53AM 4        KYLE, DO YOU WANT TO HAND THESE (HANDING).

08:53AM 5        THANK YOU.

08:53AM 6        GIVE ONE TO IRENE.

08:54AM 7        ANY COMMENT ON 7.4 AS I'VE EDITED IT?

08:54AM 8            MR. DOWNEY:  THAT INSTRUCTION IS FINE WITH THE

08:54AM 9    DEFENSE.

08:54AM 10            MR. LEACH:  YOUR HONOR, I DON'T HAVE THE BENEFIT OF

08:54AM 11   THE MODEL IN FRONT OF ME, BUT THIS INSTRUCTION IS FINE.

08:54AM 12       THE GOVERNMENT -- BEFORE THE FINAL INSTRUCTIONS IS GIVEN

08:54AM 13   WE WOULD LIKE TO LOOK AT IT ONE MORE TIME, BUT FOR PURPOSES OF

08:54AM 14   TODAY WE HAVE NO OBJECTION.

08:54AM 15            THE COURT:  ALL RIGHT.  THANK YOU.

08:54AM 16       (JUROR NUMBER 12 PRESENT.)

08:55AM 17            THE COURT:  GOOD MORNING.

08:55AM 18            JUROR:  GOOD MORNING.

08:55AM 19            THE COURT:  PLEASE BE SEATED, LADIES AND GENTLEMEN.

08:55AM 20       WE HAVE JUROR NUMBER 12 OUTSIDE OF THE PRESENCE OF THE

08:55AM 21   OTHER JURORS.

08:55AM 22       FIRST, BEFORE WE DO ANYTHING ELSE, I DO WANT TO ASK YOU

08:55AM 23   SOME QUESTIONS ABOUT SOME EMAILS THAT YOU SENT TO

08:55AM 24   MS. KRATZMANN.

08:55AM 25            BUT BEFORE I DO THAT, I DO WANT TO ASK YOU A QUESTION THAT

08:55AM 1   I'M GOING TO ASK YOUR COLLEAGUES IN JUST A MOMENT WHEN THEY

08:55AM 2   JOIN US, AND THAT IS THAT I'D LIKE TO KNOW WHETHER OR NOT,

08:55AM 3   SINCE OUR LAST IN-COURT APPEARANCE, SINCE YOUR LAST IN-COURT

08:55AM 4   APPEARANCE, WHETHER OR NOT YOU'VE SEEN, HEARD, READ, OR BEEN

08:55AM 5   SUBJECT TO ANY TYPE OF MEDIA OR CONVERSATION ABOUT THIS CASE OR

08:55AM 6   ANYTHING TO DO WITH IT?

08:55AM 7        HAVE ANY OF THOSE THINGS HAPPENED?

08:55AM 8             JUROR:  NO, NOT REALLY.

08:55AM 9             THE COURT:  SO I NEED TO INQUIRE.  WHEN YOU SAY "NOT

08:55AM 10  REALLY," TELL ME WHAT?

08:55AM 11            JUROR:  SO BEFORE I WAS SELECTED I HAD MENTIONED TO

08:55AM 12  A FRIEND THAT I WAS UP FOR JURY DUTY.  I NEVER MENTIONED WHAT

08:55AM 13  CASE IT WAS, BUT I GUESS THEY KIND OF FIGURED IT OUT, AND WHEN

08:56AM 14  THEY ASKED ME I DIDN'T CONFIRM OR DENY.

08:56AM 15       THURSDAY I GOT A TEXT FROM MY FRIEND'S WIFE ASKING ME IF I

08:56AM 16  WAS OKAY, AND I THOUGHT THAT WAS KIND OF WEIRD.  SO LATER HE

08:56AM 17  CALLED ME AND HE ASKED ME IF I WAS OKAY.  AND HE SAID THAT ON

08:56AM 18  THE NEWS THAT THERE WAS SOMETHING ABOUT -- I HAD MENTIONED, NO,

08:56AM 19  I DIDN'T HAVE COURT TODAY.

08:56AM 20       AND HE SAID, YEAH, I KNOW.

08:56AM 21       AND I SAID, WELL, HOW DO YOU KNOW?

08:56AM 22       AND HE SAID IT WAS ON THE NEWS.

08:56AM 23       I SAID DON'T TELL ME ANYTHING ABOUT IT, AND THEY DIDN'T

08:56AM 24  MENTION IT TO US SO THERE MUST BE SOME REASON WE DON'T KNOW.

08:56AM 25  SO THAT WAS IT.

08:56AM   1            THE COURT:  OH, I SEE.

08:56AM   2            JUROR:  BUT I DIDN'T SEE -- I DON'T WATCH THE LOCAL

08:56AM   3   NEWS BECAUSE OF THIS.

08:56AM   4            THE COURT:  OKAY.

08:56AM   5            JUROR:  AND THEY DON'T MENTION IT ON CABLE NEWS.

08:56AM   6            THE COURT:  OH, OKAY.  ALL RIGHT.

08:56AM   7         SO IN REGARDS TO WHETHER OR NOT YOU'VE SEEN, HEARD, OR

08:56AM   8   READ ANYTHING, COMMUNICATED YOURSELF OR ANYONE TO YOU ABOUT

08:56AM   9   THIS CASE, IS THAT ANSWER NO?

08:56AM  10            JUROR:  THE ANSWER IS NO.  YES.

08:56AM  11            THE COURT:  ALL RIGHT.  THANK YOU.

08:56AM  12         LET ME ASK COUNSEL IF THEY HAVE QUESTIONS FOR YOU ABOUT

08:57AM  13   THIS TOPIC?

08:57AM  14            MR. SCHENK:  NO, YOUR HONOR.  THANK YOU.

08:57AM  15            MR. DOWNEY:  NOTHING FROM US.

08:57AM  16            THE COURT:  ALL RIGHT.  THANK YOU.

08:57AM  17         I'D LIKE TO MOVE TO A COUPLE OF OTHER TOPICS AND THEY

08:57AM  18   INVOLVE KPMG.

08:57AM  19            JUROR:  UH-HUH.

08:57AM  20            THE COURT:  AND I THINK YOU SENT AN EMAIL TO

08:57AM  21   MS. KRATZMANN ABOUT YOUR CONNECTION WITH KPMG.

08:57AM  22            JUROR:  RIGHT.

08:57AM  23            THE COURT:  AND I HAVE THOSE IN FRONT OF ME HERE,

08:57AM  24   AND I KNOW YOU DON'T.  AND I'M AT A BIT OF AN ADVANTAGE.

08:57AM  25         I THINK YOU TOLD MS. KRATZMANN THAT IN MAY TO OCTOBER OF

08:57AM  1    2012 YOU WORKED AS AN ADMINISTRATIVE ASSISTANT THERE?

08:57AM  2              JUROR:  CORRECT.

08:57AM  3              THE COURT:  AND I THINK YOU TOLD MS. KRATZMANN THAT

08:57AM  4    YOU WERE NEVER EXPOSED TO ANY INFORMATION OR MATERIAL IN THIS

08:57AM  5    CASE?

08:57AM  6              JUROR:  CORRECT.

08:57AM  7              THE COURT:  AND WHAT WERE THE SCOPE OF YOUR DUTIES

08:57AM  8    THERE DURING YOUR EMPLOYMENT?

08:57AM  9              JUROR:  IT WAS, YOU KNOW, MAINLY DOING EXPENSES AND

08:57AM  10   CALENDAR MANAGING, AND JUST ADMINISTRATIVE SUPPORT, BASIC

08:57AM  11   SUPPORT.

08:57AM  12             THE COURT:  OKAY.  WERE YOU INVOLVED AT ALL IN ANY

08:57AM  13   OF THE WORK THAT ANY OF THE PARTNERS DID OR ANY OF THE

08:58AM  14   EMPLOYEES DID, THAT IS, ANY OF THE FINANCIAL WORK THAT THEY

08:58AM  15   DID?

08:58AM  16             JUROR:  OTHER THAN EXPENSES.

08:58AM  17             THE COURT:  OKAY.  AND TELL ME A LITTLE BIT ABOUT

08:58AM  18   THAT.  WERE YOU RECONCILING THE EXPENSES OR COORDINATING THOSE

08:58AM  19   IN SOME FASHION?

08:58AM  20             JUROR:  FOR THEIR REIMBURSEMENT, YES.

08:58AM  21             THE COURT:  I SEE.

08:58AM  22             JUROR:  OR PAYMENT OF THE CARD.

08:58AM  23             THE COURT:  I SEE.  SO IT WAS A COMPANY CREDIT CARD

08:58AM  24   THAT WAS USED?

08:58AM  25             JUROR:  CORRECT, IN MOST CASES.

08:58AM  1          THE COURT:  OKAY.  AND THEN WHAT WOULD YOU DO?  WHAT

08:58AM  2     WAS YOUR JOB IN THAT REGARD?  WHAT DID YOU DO?

08:58AM  3          JUROR:  SO BASICALLY IT WAS MANAGING THE CALENDARS.

08:58AM  4     AND, GOSH, IT'S BEEN A WHILE.  I DON'T REMEMBER MORE SPECIFICS,

08:58AM  5     BUT BASIC ADMINISTRATIVE SUPPORT, ANYTHING THAT THEY MAY HAVE

08:58AM  6     NEEDED AS FAR AS, YOU KNOW, COPIES OR EMAILS OR PHONE CALLS

08:58AM  7     OR --

08:58AM  8          THE COURT:  I SEE.  OKAY.

08:58AM  9          JUROR:  A LOT OF EXPENSING.

08:58AM 10          THE COURT:  OKAY.  AND YOU WERE -- WERE YOU JUST

08:58AM 11     MATCHING FIGURES?  I SAY JUST, PARDON ME.

08:59AM 12          JUROR:  YES.

08:59AM 13          THE COURT:  YOU WERE MATCHING THE REQUESTS WITH THE

08:59AM 14     RECEIPTS, THAT TYPE OF THING?

08:59AM 15          JUROR:  CORRECT.

08:59AM 16          THE COURT:  AND WERE YOU INVOLVED AT ALL IN ANY OF

08:59AM 17     THE AUDITING WORK OR ANYTHING THAT --

08:59AM 18          JUROR:  NO.  NO.  JUST PROCESSING ENGAGEMENT LETTERS

08:59AM 19     AND WHATEVER.  BUT NOTHING THAT I RECALL SPECIFICS AT ALL,

08:59AM 20     ESPECIALLY AT THIS POINT.

08:59AM 21          THE COURT:  SURE.

08:59AM 22      AND THEN YOU FOLLOWED UP INDICATING THAT YOU HAVE A GOOD

08:59AM 23     FRIEND WHO HAS WORKED THERE AT KPMG FOR 20 YEARS AND SHE'S NOT

08:59AM 24     IN A ROLE THAT WOULD REVEAL TO HER ANY INFORMATION?

08:59AM 25          JUROR:  CORRECT.

08:59AM   1                  THE COURT:  TELL US ABOUT THAT.

08:59AM   2                  JUROR:  SO SHE WORKED IN REPROGRAPHICS FOR MANY

08:59AM   3       BEING MANY, MANY YEARS AND JUST RECENTLY NOW SHE'S IN SOME SORT

08:59AM   4       OF SERVICE ROLE.

08:59AM   5                  THE COURT:  I THINK YOU SAID SENIOR REPRESENTATIVE

08:59AM   6       OFFICER.

08:59AM   7                  JUROR:  YES.

08:59AM   8                  THE COURT:  RIGHT.  AND DO YOU TALK TO HER ABOUT HER

08:59AM   9       WORK OR ANYTHING?

08:59AM   10                 JUROR:  NOT LIKE -- MORE OF A GOSSIPY KIND OF THING

09:00AM   11      RATHER THAN SPECIFICS ABOUT ANYTHING WORK RELATED.

09:00AM   12                 THE COURT:  DID ANY OF THE GOSSIP, AND PARDON ME,

09:00AM   13      BUT DID ANY OF THAT TOUCH ON THIS CASE?

09:00AM   14                 JUROR:  NO.  SHE DOESN'T EVEN KNOW I'M ON THIS JURY.

09:00AM   15                 THE COURT:  I SEE.

09:00AM   16                 JUROR:  SO I'VE TALKED TO NO ONE ELSE EXCEPT THIS

09:00AM   17      ONE PARTICULAR COUPLE BEFORE I GOT, YOU KNOW, PLACED ON JURY

09:00AM   18      DUTY.

09:00AM   19                 THE COURT:  RIGHT.

09:00AM   20                 JUROR:  AND JUST HAPPENED TO MENTION JURY DUTY

09:00AM   21      PERIOD AND NOT ANYTHING OTHER THAN THAT SPECIFICALLY.

09:00AM   22                 THE COURT:  OKAY.

09:00AM   23                 JUROR:  SO NO ONE ELSE REALLY KNOWS.

09:00AM   24                 THE COURT:  OKAY.  IS THERE ANYTHING ABOUT YOUR --

09:00AM   25      AND YOU RAISE THIS.  I THINK WE HEARD SOME TESTIMONY AND THAT

09:00AM 1     COMPANY'S NAME CAME UP LAST WEEK KPMG I THINK.

09:00AM 2              JUROR:  OH, YES, THAT'S WHY I BROUGHT IT TO HER

09:00AM 3     ATTENTION.

09:00AM 4              THE COURT:  RIGHT.  AND THANK YOU FOR DOING THAT.  I

09:00AM 5     APPRECIATE YOUR ATTENTION TO YOUR RESPONSIBILITIES.

09:00AM 6          IS THERE ANYTHING ABOUT YOUR FORMER EMPLOYMENT AND THE

09:00AM 7     FACT THAT YOU KNOW YOUR FRIEND WHO WORKS AT THIS KPMG, ANYTHING

09:01AM 8     ABOUT THAT WILL AFFECT YOUR ABILITY TO CONTINUE TO BE FAIR AND

09:01AM 9     IMPARTIAL AS YOU SIT AS A JUROR?

09:01AM 10             JUROR:  NO.  LIKE I SAY, SHE HAS NO IDEA THAT I'M

09:01AM 11    EVEN ON THE JURY.

09:01AM 12             THE COURT:  OKAY.

09:01AM 13             JUROR:  AND EVEN IF SHE DID, I THINK SHE HAS NO

09:01AM 14    INFORMATION WHATSOEVER.

09:01AM 15             THE COURT:  OKAY.

09:01AM 16             JUROR:  PLUS I DON'T TELL ANYBODY SO IT DOESN'T COME

09:01AM 17    UP SO I DON'T, YOU KNOW, FOR LACK OF A BETTER WAY OF DESCRIBING

09:01AM 18    IT, BECOME COMFORTABLE TALKING ABOUT IT.  SO I JUST DON'T EVEN

09:01AM 19    BRING IT UP TO ANYBODY.

09:01AM 20             THE COURT:  WELL, THANK YOU.  AND THANK YOU FOR

09:01AM 21    FOLLOWING MY ORDER IN THAT REGARD.  I APPRECIATE IT.  THANK

09:01AM 22    YOU.

09:01AM 23          I'M GOING TO TURN TO THESE LAWYERS AND SEE IF THEY HAVE

09:01AM 24    ANY QUESTIONS FOR YOU.

09:01AM 25             MR. SCHENK:  NOTHING FURTHER.

09:01AM  1          MR. DOWNEY:  NO, YOUR HONOR.  I APPRECIATE IT BEING

09:01AM  2     BROUGHT TO OUR ATTENTION, BUT I DON'T HAVE ANY QUESTIONS.

09:01AM  3          THE COURT:  ALL RIGHT.  THANK YOU.

09:01AM  4     I DO WANT TO ASK YOU ABOUT YOUR EMAIL, ONE OTHER ISSUE,

09:01AM  5     AND YOU INDICATED TO MS. KRATZMANN THAT YOU HAD A QUESTION THAT

09:01AM  6     YOU THOUGHT OF OVER THE WEEKEND.  EXCUSE ME.

09:01AM  7     AND YOUR QUESTION WAS, "I DON'T KNOW IF WE WILL HAVE

09:01AM  8     FURTHER OPPORTUNITIES TO TALK WITH YOU ONCE THE TRIAL BEGINS.

09:02AM  9     "MY QUESTION IS, WILL WE ALSO BE RESPONSIBLE FOR THE

09:02AM 10     (POTENTIAL) SENTENCING PHASE OF THIS TRIAL OR IS IT ALREADY

09:02AM 11     PREDETERMINED BASED ON THE CHARGES."

09:02AM 12     AND THEN YOU ENDED SAYING "YOU CAN BCC EVERYONE WITH YOUR

09:02AM 13     ANSWER IF APPROPRIATE."

09:02AM 14     SO LET ME ASK YOU ABOUT THAT QUESTION.

09:02AM 15          JUROR:  WELL, TRIALS THAT I'VE SEEN ON T.V.

09:02AM 16     SOMETIMES HAVE A SENTENCING PHASE THAT THE JURY IS RESPONSIBLE

09:02AM 17     FOR, SO I JUST WANTED TO KNOW BECAUSE YOU GAVE A TIMEFRAME AND

09:02AM 18     THEN THAT WAS FOR, YOU KNOW, THE ANTICIPATION OF THE JURY

09:02AM 19     TIMELINE, AND THEN, OF COURSE, WE WOULD HAVE THE DELIBERATION

09:02AM 20     PHASE, AND THEN ONCE THAT'S OVER, THEN THERE WOULD BE, I WOULD

09:02AM 21     GUESS, I WASN'T SURE IF THERE WOULD BE A SENTENCING PHASE SO I

09:02AM 22     WAS KIND OF TRYING TO TIME OUT IF THAT WAS THE CASE HOW MUCH

09:02AM 23     TIME THAT WOULD INVOLVE.

09:03AM 24          THE COURT:  I SEE.

09:03AM 25          JUROR:  IF THERE WAS GOING TO BE AN EXTENDED TIME

09:03AM 1    BEYOND THE 13, 14 WEEKS THAT IS ANTICIPATED FOR THE TRIAL.

09:03AM 2                THE COURT:  OKAY.  I SEE.  ALL RIGHT.

09:03AM 3        DO YOU RECALL ME TELLING YOU AND YOUR COLLEAGUE JURORS

09:03AM 4    THAT THE JURY IS NOT TO CONSIDER SENTENCING, THAT'S NOT

09:03AM 5    SOMETHING THAT THEY SHOULD CONSIDER?

09:03AM 6                JUROR:  I DON'T RECALL.

09:03AM 7                THE COURT:  OKAY.  ALL RIGHT.

09:03AM 8        AND LET ME ASK A FOLLOW-UP.  YOU SAID "YOU CAN BCC

09:03AM 9    EVERYONE."  I ASSUME THAT MEANS THAT THE EMAIL WAS SENT BY

09:03AM 10   MS. KRATZMANN TO THE ENTIRE JURY?

09:03AM 11               JUROR:  YEAH.  SHE WANTED TO -- IN CASE SOMEBODY

09:03AM 12   ELSE HAD THAT QUESTION IN THEIR MIND, IF SHE WANTED TO SHARE

09:03AM 13   THAT ANSWER WITH THE REST OF THE JURY, THEN I DIDN'T HAVE ANY

09:03AM 14   OBJECTION TO THAT.

09:03AM 15               THE COURT:  I SEE.

09:03AM 16               JUROR:  OF COURSE NOT IT BEING ADDRESSED FROM ME BUT

09:03AM 17   FROM HER.

09:03AM 18               THE COURT:  RIGHT.  RIGHT.

09:03AM 19       LET ME ASK YOU, HAVE YOU TALKED WITH ANY OF YOUR FELLOW

09:03AM 20   JURORS ABOUT THAT QUESTION?

09:03AM 21               JUROR:  NO.

09:03AM 22               THE COURT:  THAT DIDN'T COME UP?

09:03AM 23               JUROR:  NO.  I FIGURED SHE DIDN'T ADDRESS IT SO I

09:04AM 24   WASN'T GOING TO BRING IT UP MYSELF.

09:04AM 25               THE COURT:  OKAY.  ALL RIGHT.

09:04AM 1          SO IF I TOLD YOU THIS MORNING THAT IN ANSWER TO YOUR

09:04AM 2    QUESTION THAT THE JURY IS NOT TO BE INVOLVED AT ALL, WON'T BE

09:04AM 3    INVOLVED AT ALL IN SENTENCING, ASSUMING THERE IS A SENTENCING,

09:04AM 4    THAT IS SOLELY IN THE PROVINCE OF THE COURT, YOU WOULD RESPECT

09:04AM 5    THAT?

09:04AM 6          JUROR:  OH, OF COURSE.

09:04AM 7          THE COURT:  AND YOU WOULD NOT CONSIDER PUNISHMENT AT

09:04AM 8    ALL DURING YOUR DELIBERATIONS?

09:04AM 9          JUROR:  NO.

09:04AM 10          THE COURT:  OKAY.  AND I JUST WANT TO EMPHASIZE

09:04AM 11   SOMETHING.  I TALKED ABOUT -- DO YOU REMEMBER ME TALKING ABOUT

09:04AM 12   THE PRESUMPTION OF INNOCENCE?

09:04AM 13          JUROR:  OH, OF COURSE.

09:04AM 14          THE COURT:  AND YOU UNDERSTAND THAT CARRIES

09:04AM 15   THROUGHOUT THE TRIAL THROUGH YOUR DELIBERATIONS?

09:04AM 16          JUROR:  YES.

09:04AM 17          THE COURT:  AND THE PURPOSE OF THE DELIBERATIONS IS

09:04AM 18   TO DETERMINE WHETHER OR NOT THE GOVERNMENT HAS MET THEIR

09:04AM 19   BURDEN.

09:04AM 20          I DON'T WANT TO GO INTO IT WITH YOU WHAT WE TALKED ABOUT

09:04AM 21   LAST WEEK, BUT IT'S IMPORTANT.  YOU UNDERSTAND ALL OF THAT?

09:04AM 22          JUROR:  I DO.  THANK YOU FOR CLARIFYING.

09:04AM 23          THE COURT:  OF COURSE.

09:04AM 24          WHAT I'M GOING TO DO IS TO READ THE INSTRUCTION AGAIN TO

09:05AM 25   YOU AND YOUR COLLEAGUES AGAIN JUST TO MAKE SURE THAT THERE'S

09:05AM  1    CLARITY ON THAT.

09:05AM  2              JUROR:  OKAY.

09:05AM  3              THE COURT:  LET ME TURN IT OVER TO COUNSEL AND SEE

09:05AM  4    IF THEY HAVE SOME QUESTIONS FOR YOU.

09:05AM  5              MR. SCHENK:  NOTHING FURTHER.  THANK YOU.

09:05AM  6              MR. DOWNEY:  NOTHING FROM US, YOUR HONOR.

09:05AM  7              THE COURT:  ALL RIGHT.  THANK YOU.

09:05AM  8         THANK YOU VERY MUCH FOR SPENDING TIME WITH ME THIS

09:05AM  9    MORNING.  I APPRECIATE IT.

09:05AM  10              JUROR:  OF COURSE.

09:05AM  11              THE COURT:  SO WE'RE GOING TO -- WELL, LET'S SEE.

09:05AM  12    WHY DON'T WE HAVE YOU GO BACK.  COULD WE BRING EVERYONE OUT

09:05AM  13    NOW?  IS EVERYONE READY TO PROCEED?

09:05AM  14              MR. SCHENK:  YES, YOUR HONOR.

09:05AM  15              THE CLERK:  I'M MISSING JUROR NUMBER 2.  I DON'T

09:05AM  16    KNOW IF HE'S HERE.

09:05AM  17              THE COURT:  LET'S HAVE YOU GO BACK FOR A MOMENT, AND

09:05AM  18    MS. KRATZMANN WILL ESCORT YOU BACK TO THE JURY ROOM.

09:05AM  19              JUROR:  OF COURSE.

09:05AM  20              THE COURT:  THANK YOU FOR YOUR CANDOR THIS MORNING.

09:05AM  21    WE APPRECIATE.  THANK YOU.

09:05AM  22              JUROR:  OF COURSE.  YOU'RE WELCOME.

09:05AM  23         (PROCEEDINGS HELD OUT OF THE PRESENCE OF JUROR NUMBER 12.)

09:05AM  24              THE COURT:  ALL RIGHT.  PLEASE BE SEATED.

09:05AM  25         I'M INFORMED THAT JUROR NUMBER 2 HAD NOT ARRIVED YET SO

| 09:05AM | 1 | WE'LL GIVE THIS A MOMENT. |
| 09:07AM | 2 | (PAUSE IN PROCEEDINGS.) |
| 09:07AM | 3 | THE COURT:  I'M GOING TO STEP DOWN AND SEE WHAT IS |
| 09:07AM | 4 | GOING ON HERE.  HOPEFULLY WE CAN START IN JUST A MOMENT. |
| 09:07AM | 5 | THAT DID IT. |
| 09:10AM | 6 | (JURY IN AT 9:10 A.M.) |
| 09:10AM | 7 | THE COURT:  PLEASE BE SEATED.  THANK YOU. |
| 09:10AM | 8 | THE RECORD SHOULD REFLECT THAT OUR JURY AND ALTERNATES ARE |
| 09:10AM | 9 | NOW IN THE COURTROOM. |
| 09:10AM | 10 | GOOD MORNING EVERYONE.  BEFORE WE GO FURTHER, I SEE |
| 09:10AM | 11 | ALTERNATE JUROR NUMBER 1, MR. BEDNAR, SIR.  I'M GOING TO ASK |
| 09:10AM | 12 | YOU TO STAND UP, AND WE'RE GOING TO ASK YOU TO SIT IN JUROR |
| 09:10AM | 13 | NUMBER 7'S SEAT. |
| 09:10AM | 14 | WE EXCUSED A JUROR, AND SO ALTERNATE NUMBER 1, MR. BEDNAR, |
| 09:10AM | 15 | WILL NOW REPLACE JUROR NUMBER 7 AS A DELIBERATING JUROR. |
| 09:11AM | 16 | THANK YOU, SIR. |
| 09:11AM | 17 | AND OUR ALTERNATES CAN SCOOT OVER AND MAKE YOURSELF |
| 09:11AM | 18 | COMFORTABLE, AND WE'LL CONTINUE WITH OUR TRIAL. |
| 09:11AM | 19 | ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN. |
| 09:11AM | 20 | OUR JURY IS PRESENT. |
| 09:11AM | 21 | BEFORE I ASK THE GOVERNMENT IF THEY HAVE ADDITIONAL |
| 09:11AM | 22 | EXAMINATION OF A WITNESS, I DO WANT TO INQUIRE OF OUR JURY AND |
| 09:11AM | 23 | OUR ALTERNATES A QUESTION THAT I TOLD YOU I WOULD ASK EACH TIME |
| 09:11AM | 24 | WE WOULD START EACH DAY, AND THAT IS THAT IT'S IMPORTANT THAT |
| 09:11AM | 25 | YOU DECIDE THE CASE SOLELY, THIS CASE, SOLELY ON THE EVIDENCE |

09:11AM  1   AND THE LAW PRESENTED IN THE COURTROOM.  SO YOU MUST NOT LEARN

09:11AM  2   ANY INFORMATION ABOUT THIS CASE FROM SOURCES OUTSIDE OF THE

09:11AM  3   COURTROOM TO ENSURE FAIRNESS TO ALL PARTIES IN THE TRIAL.

09:11AM  4        I'LL NOW ASK YOU WHETHER OR NOT ANY OF YOU HAVE LEARNED

09:11AM  5   ABOUT OR SHARED INFORMATION ABOUT THIS CASE OUTSIDE OF THE

09:11AM  6   COURTROOM EVEN IF IT WAS ACCIDENTAL?

09:12AM  7        IF ANY OF YOU THINK YOU MAY HAVE DONE SO, WOULD YOU PLEASE

09:12AM  8   RAISE YOUR HAND AND LET US KNOW THAT.

09:12AM  9        I SEE NO HANDS.

09:12AM 10        THANK YOU VERY MUCH, LADIES AND GENTLEMEN.  I APPRECIATE

09:12AM 11   YOUR ATTENTION, CONTINUED ATTENTION TO THIS.

09:12AM 12        LET ME ALSO JUST FOR A MATTER OF COMFORT FOR A COUPLE OF

09:12AM 13   OUR JURORS, JUROR NUMBER 11 AND JUROR NUMBER 9, THOSE OF YOU

09:12AM 14   WHO ARE IN THE OUTSIDE SEATS, I THINK THOSE SEATS WILL RAISE IF

09:12AM 15   THAT'S HELPFUL TO YOU.  I DON'T KNOW IF YOU'VE FIGURED THAT

09:12AM 16   OUT, BUT IF YOU WOULD LIKE TO RAISE THE SEATING, I THINK

09:12AM 17   THERE'S A BUTTON ON IT THAT WOULD ALLOW YOU TO DO THAT IF YOU

09:12AM 18   WISH.

09:12AM 19        ALSO, IF ANY JUROR HAS ANY DIFFICULTY EITHER SEEING OR

09:12AM 20   HEARING ANY OF THE TESTIMONY, PLEASE RAISE YOUR HAND, LET ME

09:12AM 21   KNOW, AND WE'LL TRY TO CORRECT THAT.  SO THANK YOU VERY MUCH.

09:12AM 22        MR. LEACH, DO YOU HAVE A CONTINUING EXAMINATION?

09:12AM 23             MR. LEACH:  WE DO, YOUR HONOR.  THANK YOU.

09:12AM 24             THE COURT:  ALL RIGHT.  THANK YOU.

09:12AM 25        LET'S ASK THE WITNESS TO PLEASE COME IN.

09:13AM 1      ONE THING I DO WANT TO DO WHILE THAT'S HAPPENING, WE'LL

09:13AM 2   HAVE MS. SPIVEY TAKE THE SEAT AGAIN.  GOOD MORNING.

09:13AM 3           THE WITNESS:  GOOD MORNING.

09:13AM 4           THE COURT:  PLEASE HAVE A SEAT.  IN JUST A MOMENT

09:13AM 5   I'M GOING TO ASK YOU TO STATE YOUR NAME.

09:13AM 6       LADIES AND GENTLEMEN OF THE JURY, I DO WANT TO -- I AM

09:13AM 7   GOING TO READ YOU AN INSTRUCTION AGAIN.  I WANT TO READ THIS

09:13AM 8   INSTRUCTION NOW.  I'VE HAD SOME CONVERSATION WITH COUNSEL, AND

09:13AM 9   I THINK IT APPROPRIATE FOR ME TO READ TO YOU AN INSTRUCTION.

09:13AM 10  YOU WILL RECEIVE FINAL INSTRUCTIONS AT THE END OF THE CASE, BUT

09:13AM 11  FOR NOW I'D LIKE TO READ THIS INSTRUCTION TO YOU.

09:13AM 12      THE PUNISHMENT PROVIDED BY LAW FOR THIS CRIME IS FOR THE

09:13AM 13  COURT TO DECIDE.  YOU MAY NOT CONSIDER PUNISHMENT IN DECIDING

09:13AM 14  WHETHER THE GOVERNMENT HAS PROVED ITS CASE AGAINST MS. HOLMES

09:14AM 15  BEYOND A REASONABLE DOUBT.

09:14AM 16      SO THANK YOU VERY MUCH, LADIES AND GENTLEMEN.

09:14AM 17      COUNSEL, DO YOU HAVE QUESTIONS?

09:14AM 18      COULD YOU STATE YOUR NAME AGAIN, PLEASE, FOR THE RECORD.

09:14AM 19           THE WITNESS:  SO HAN SPIVEY.

09:14AM 20           THE COURT:  THANK YOU.

09:14AM 21      **(GOVERNMENT'S WITNESS, SO HAN SPIVEY, WAS PREVIOUSLY**

09:14AM 22  **SWORN.)**

09:14AM 23           THE COURT:  I JUST WANT TO REMIND THE WITNESS,

09:14AM 24  YOU'RE STILL UNDER OATH, MS. SPIVEY.

09:14AM 25      DO YOU UNDERSTAND THAT?

09:14AM  1              THE WITNESS:  YES.

09:14AM  2              MR. LEACH:  THANK YOU SO MUCH, YOUR HONOR.

09:14AM  3                   **DIRECT EXAMINATION (RESUMED)**

09:14AM  4       BY MR. LEACH:

09:14AM  5       Q.   MS. SPIVEY, WHEN WE WERE LAST HERE WE WERE DISCUSSING WHAT

09:14AM  6       HAD BEEN MARKED AS EXHIBIT 578 AND THERANOS'S BALANCE SHEET AND

09:14AM  7       INCOME STATEMENT FROM 2010 AND 2009.

09:14AM  8            DO YOU RECALL THAT TESTIMONY?

09:14AM  9       A.   YES.

09:14AM 10       Q.   I'D LIKE TO NOW DRAW YOUR ATTENTION TO WHAT HAS BEEN

09:14AM 11       MARKED AS EXHIBIT 615.

09:15AM 12            YOUR HONOR, I UNDERSTAND THE PARTIES STIPULATE TO THE

09:15AM 13       ADMISSION OF 615?

09:15AM 14              MR. WADE:  WE DO, YOUR HONOR.

09:15AM 15              THE COURT:  ALL RIGHT.  THANK YOU.

09:15AM 16          THIS IS EXHIBIT 615?

09:15AM 17              MR. LEACH:  YES, YOUR HONOR.

09:15AM 18              THE COURT:  ALL RIGHT.  THANK YOU.  SO THAT WILL BE

09:15AM 19       ADMITTED BY STIPULATION.  IT MAY BE PUBLISHED.

09:15AM 20            (GOVERNMENT'S EXHIBIT 615 WAS ADMITTED.)

09:15AM 21              MR. LEACH:  THANK YOU, YOUR HONOR.

09:15AM 22       Q.   IF I COULD PLEASE --

09:15AM 23            MS. HOLLIMAN, IF YOU WOULD ZOOM INTO THE TOP HALF OF THE

09:15AM 24       EMAIL.  WONDERFUL.

09:15AM 25            DO YOU SEE THIS EMAIL?

09:15AM   1    A.   YES.

09:15AM   2    Q.   AND TO REFRESH US, DANISE YAM WAS THE NAME YOU WERE USING

09:15AM   3    AT THE TIME THAT YOU WERE AT THERANOS AS THE CORPORATE

09:15AM   4    CONTROLLER?

09:15AM   5    A.   YES.

09:15AM   6    Q.   AND DO YOU SEE ELIZABETH HOLMES NAME IN THE TO LINE?

09:16AM   7    A.   YES.

09:16AM   8    Q.   THERE'S AN ATTACHMENT TO THIS EMAIL.  IT SAYS, FINANCIAL

09:16AM   9    STATEMENT ANALYSIS TEMPLATE-THERANOS.PDF; AND THEN FS 12/31/11.

09:16AM   10         DO YOU SEE THAT?

09:16AM   11   A.   YES.

09:16AM   12   Q.   AND WHAT DOES THAT 12/31/11 REFER TO?

09:16AM   13   A.   DECEMBER 31, 2011.

09:16AM   14   Q.   AND WHAT DOES FS REFER TO?

09:16AM   15   A.   FINANCIAL STATEMENTS.

09:16AM   16   Q.   AND ARE YOU PROVIDING FINANCIAL STATEMENTS FOR THE TIME

09:16AM   17   PERIOD 2011 TO MS. HOLMES DURING THIS EMAIL?

09:16AM   18   A.   YES.

09:16AM   19   Q.   IF WE COULD GO TO PAGE 4, MS. HOLLIMAN.  AND IF WE COULD

09:16AM   20   PLEASE ZOOM IN ON THE TOP PORTION OF THE DOCUMENT.

09:16AM   21         UP AT THE TOP, MS. SPIVEY, IT SAYS THERANOS INC. AND

09:16AM   22   SUBSIDIARY CONSOLIDATED STATEMENTS OF OPERATIONS.

09:17AM   23         DO YOU SEE THAT?

09:17AM   24   A.   YES.

09:17AM   25   Q.   AND WHAT IS THE CONSOLIDATED STATEMENTS OF OPERATIONS?

09:17AM  1    A.   THAT'S THE CONSOLIDATED STATEMENTS.

09:17AM  2    Q.   AND TO THE RIGHT THERE ARE TWO COLUMNS FOR 2011 AND 2012.

09:17AM  3         WHAT DO THOSE CONVEY.

09:17AM  4         I'M SORRY, 2011 AND 2010.  WHAT DO THOSE COLUMNS CONVEY?

09:17AM  5    A.   THAT'S THE INCOME FOR THE YEAR OF 2010 AND 2011.

09:17AM  6    Q.   OKAY.  AND DID YOU BELIEVE THAT YOU WERE PROVIDING

09:17AM  7    ACCURATE INFORMATION TO THE DEFENDANT ABOUT THERANOS'S 2011 AND

09:17AM  8    2010 FINANCIAL STATEMENTS?

09:17AM  9    A.   YES.

09:17AM  10   Q.   THERE'S A LINE FOR REVENUE.

09:17AM  11        DO YOU SEE THAT?

09:17AM  12   A.   YES.

09:17AM  13   Q.   WHAT IS REVENUE?

09:17AM  14   A.   THAT'S THE INCOME THAT THE COMPANY GETS FOR PROVIDING

09:17AM  15   SERVICES.

09:18AM  16   Q.   AND WHAT WAS THERANOS'S REVENUE FOR 2010?

09:18AM  17   A.   $1,401,305.

09:18AM  18   Q.   AND THE REVENUE FOR 2011, WHAT WAS THAT?

09:18AM  19   A.   $518,248.

09:18AM  20   Q.   FURTHER DOWN IN THE INCOME STATEMENT THERE'S A LINE FOR

09:18AM  21   NET LOSS.

09:18AM  22        DO YOU SEE THAT?

09:18AM  23   A.   YES.

09:18AM  24   Q.   AND WHAT IS THE NET LOSS?

09:18AM  25   A.   THAT IS THE COMPANY THAT -- THAT'S THE MONEY THAT THE

SPIVEY DIRECT EXAM BY MR. LEACH (RES.)

09:18AM   1    COMPANY LOST FOR THAT YEAR.

09:18AM   2    Q.   SO THE NET LOSS FOR 2011 IS APPROXIMATELY $27.66 MILLION?

09:18AM   3    A.   YES.

09:18AM   4    Q.   AND THE LOSS FOR 2010 WAS APPROXIMATELY $16.2 MILLION?

09:18AM   5    A.   YES.

09:19AM   6    Q.   IF WE COULD GO TO PAGE 3, PLEASE.

09:19AM   7         AND IF WE CAN ZOOM IN, PLEASE, MS. HOLLIMAN ON THE TEXT ON

09:19AM   8    PAGE 3 ALL OF THE WAY DOWN TO THE MIDDLE.  WONDERFUL.  THANK

09:19AM   9    YOU.

09:19AM  10         MS. SPIVEY, DO YOU SEE AT THE TOP WHERE IT SAYS

09:19AM  11    CONSOLIDATED BALANCE SHEETS DECEMBER 2011 AND 2010?

09:19AM  12    A.   YES.

09:19AM  13    Q.   AND I DRAW YOUR ATTENTION TO A LINE ROUGHLY FOUR FROM THE

09:19AM  14    BOTTOM CALLED THE ACCUMULATED DEFICIT.  DOWN A LITTLE.  RIGHT

09:19AM  15    THERE (INDICATING).

09:19AM  16         THANK YOU, MS. HOLLIMAN.

09:19AM  17         DO YOU SEE THAT LINE, MS. SPIVEY?

09:19AM  18    A.   YES.

09:19AM  19    Q.   AND WHAT IS MEANT BY ACCUMULATED DEFICIT?

09:19AM  20    A.   THAT'S THE ACCUMULATED LOSSES FOR THE COMPANY SINCE

09:19AM  21    INCEPTION.

09:19AM  22    Q.   SO WHAT WAS THE ACCUMULATED DEFICIT FOR THERANOS IN 2010?

09:20AM  23    A.   76.5 MILLION.

09:20AM  24    Q.   AND WHAT DOES THAT MEAN?

09:20AM  25    A.   THAT MEANS SINCE INCEPTION THE COMPANY LOST 76.5 MILLION.

09:20AM 1    Q.   WHEN YOU SAY "INCEPTION" THAT'S 2003, 2004?

09:20AM 2    A.   YES.

09:20AM 3    Q.   AND WHAT IS THE ACCUMULATED DEFICIT FOR THERANOS AS THE

09:20AM 4    YEAR ENDED 2011?

09:20AM 5    A.   ABOUT 104 MILLION.

09:20AM 6    Q.   IF I CAN NOW DRAW YOUR ATTENTION TO WHAT HAS BEEN MARKED

09:20AM 7    AS EXHIBIT 792.

09:20AM 8        I BELIEVE THE PARTIES STIPULATED TO THE ADMISSION OF THIS

09:20AM 9    EXHIBIT.

09:20AM 10            MR. WADE:  WE DO, YOUR HONOR.

09:20AM 11            THE COURT:  ALL RIGHT.  THANK YOU.

09:20AM 12       IT'S ADMITTED, AND IT MAY BE PUBLISHED.

09:20AM 13       (GOVERNMENT'S EXHIBIT 792 WAS RECEIVED IN EVIDENCE.)

09:21AM 14   BY MR. LEACH:

09:21AM 15   Q.   AND IF I COULD, LET'S START, MS. HOLLIMAN, WITH THE TOP

09:21AM 16   PORTION OF THE EMAIL IF WE COULD.  THANK YOU.

09:21AM 17       DO YOU SEE YOUR NAME IN THE FROM LINE, MS. SPIVEY?

09:21AM 18   A.   YES.

09:21AM 19   Q.   AND DO YOU SEE MS. HOLMES NAME IN THE TO LINE?

09:21AM 20   A.   YES.

09:21AM 21   Q.   AND DO YOU SEE THE DATE FEBRUARY 12TH, 2013?

09:21AM 22   A.   YES.

09:21AM 23   Q.   THERE ARE TWO ATTACHMENTS TO THIS EMAIL.  ONE IS TITLED

09:21AM 24   FS 2012.XLSX.

09:21AM 25       DO YOU SEE THAT?

09:21AM   1        A.    YES.

09:21AM   2        Q.    AND WHAT DOES FS STAND FOR?

09:21AM   3        A.    FINANCIAL STATEMENTS.

09:21AM   4        Q.    AND THE 2012, WHAT DOES THAT REFER TO?

09:21AM   5        A.    YEAR 2012.

09:21AM   6        Q.    IS THAT A DOCUMENT THAT YOU PREPARED?

09:21AM   7        A.    YES.

09:21AM   8        Q.    OKAY.  AND THE SUBJECT OF THIS EMAIL CHAIN IS STANFORD.

09:21AM   9              DO YOU SEE THAT?  OR IT INCLUDES THE NAME STANFORD.

09:21AM  10              DO YOU SEE THAT?

09:21AM  11        A.    YES.

09:21AM  12        Q.    AND WHAT RELATIONSHIP DID THERANOS HAVE WITH STANFORD?

09:22AM  13        A.    STANFORD IS A LANDLORD TO THERANOS.

09:22AM  14        Q.    AND IF I COULD NOW DRAW YOUR ATTENTION TO THE BOTTOM

09:22AM  15        PORTION OF PAGE 1, THE EMAIL THAT EXPANDS -- THAT GOES OVER

09:22AM  16        PAGE 1 TO PAGE 2.

09:22AM  17              MS. HOLLIMAN, I DON'T KNOW IF YOU CAN SHOW ALL OF THAT.

09:22AM  18              DO YOU SEE WHERE IT SAYS, "SOME TIME AGO WE MET WITH

09:22AM  19        STANFORD AND SHARED SOME FINANCIAL INFORMATION IN A TEMPLATE

09:22AM  20        THEY REQUESTED"?

09:22AM  21        A.    YES.

09:22AM  22        Q.    AND IN THIS EMAIL WERE YOU ATTEMPTING TO PROVIDE TRUE AND

09:22AM  23        ACCURATE INFORMATION ABOUT THERANOS'S FINANCIAL CONDITION TO

09:22AM  24        MS. HOLMES?

09:22AM  25        A.    YES.

09:22AM    1    Q.   LET ME PLEASE DRAW YOUR ATTENTION TO PAGE 6 OF THE

09:22AM    2    DOCUMENT OF THE EXHIBIT.  P.

09:22AM    3         AND I'D LIKE TO DISPLAY THE NATIVE FILE, IF WE COULD,

09:22AM    4    MS. HOLLIMAN.

09:23AM    5         MS. SPIVEY, DO YOU SEE THE TABS DOWN AT THE BOTTOM BS, IS,

09:23AM    6    CF, AND TB?

09:23AM    7    A.   YES.

09:23AM    8    Q.   AND WHAT DO THOSE REFER TO?

09:23AM    9    A.   BS IS BALANCE SHEETS, IS IS INCOME STATEMENT, AND CF IS

09:23AM   10    CASH FLOW STATEMENT, AND TB IS TRIAL BALANCE.

09:23AM   11    Q.   AND PLEASE, LET'S START WITH THE BALANCE SHEET.  WERE YOU

09:23AM   12    TRYING TO PROVIDE ACCURATE INFORMATION TO MS. HOLMES ABOUT THE

09:23AM   13    COMPANY'S ASSETS, LIABILITIES, AND STOCKHOLDERS EQUITY IN THIS

09:23AM   14    DOCUMENT?

09:23AM   15    A.   YES.

09:23AM   16    Q.   UP IN ROW 5 AND 6 THERE WILL DATES, AND THERE IS A LINE

09:24AM   17    WITH THREE ZEROS.  CAN YOU EXPLAIN WHAT THOSE THREE ZEROS MEANS

09:24AM   18    FOR US?

09:24AM   19    A.   THAT MEANS THAT THOSE NUMBERS PRESENTED IS IN THOUSANDS.

09:24AM   20    Q.   OKAY.  SO IF WE LOOK AT THE CASH FOR YEAR END

09:24AM   21    DECEMBER 31ST, 2012, THAT'S APPROXIMATELY $51 MILLION, NOT

09:24AM   22    $51,000?

09:24AM   23    A.   CORRECT.

09:24AM   24    Q.   AND IF WE COULD GO TO THE LINE FOR THE ACCUMULATED DEFICIT

09:24AM   25    DOWN BELOW LINE 32.

09:24AM   1          WHAT WAS THE ACCUMULATED DEFICIT FOR THERANOS AS OF

09:24AM   2     DECEMBER 2012?

09:24AM   3     A.   APPROXIMATELY 161 MILLION.

09:24AM   4     Q.   NOW IF WE COULD PLEASE GO TO THE TAB IS.

09:25AM   5          WERE YOU TRYING TO PROVIDE ACCURATE INFORMATION TO

09:25AM   6     MS. HOLMES IN THIS TAB?

09:25AM   7     A.   YES.

09:25AM   8     Q.   AND DOES THIS INCOME STATEMENT COVER THE TIME PERIOD 2002

09:25AM   9     AND THE FIRST MONTH OF 2013?

09:25AM   10    A.   YES.

09:25AM   11    Q.   THERE APPEAR TO BE FOUR ROWS TO THE LEFT:  OPERATING LOSS,

09:25AM   12    INTEREST AND OTHER INCOME, NET, INTEREST EXPENSE, AND NET LOSS.

09:25AM   13         DO YOU SEE THOSE?

09:25AM   14    A.   YES.

09:25AM   15    Q.   AND THERE'S NO LINE FOR REVENUE IN THIS SPREADSHEET.  WHY

09:25AM   16    IS THAT?

09:25AM   17    A.   BECAUSE THERE WAS NO REVENUE FOR THE COMPANY.

09:25AM   18    Q.   SO THERE WAS NO REVENUE FOR THE COMPANY AT ALL IN 2012?

09:25AM   19    A.   CORRECT.

09:25AM   20    Q.   AND FOR THE YEAR 2012 THERE'S THE NUMBER IN RED,

09:25AM   21    PARENTHESIS, 57,111.  WHAT DOES THAT SIGNIFY?

09:26AM   22    A.   THAT'S THE COMPANY, ALL OF THE EXPENSES FOR THE COMPANY

09:26AM   23    FOR THE YEAR.

09:26AM   24    Q.   AND IS THAT IN MILLIONS OR IN THOUSANDS OR SOME OTHER

09:26AM   25    NUMBER?

09:26AM  1    A.   THAT'S 57 MILLION.

09:26AM  2    Q.   THAT WAS THE NET LOSS FOR 2012?

09:26AM  3    A.   RIGHT.

09:26AM  4    Q.   OKAY.  THANK YOU.  WE CAN TAKE THAT DOWN, MS. HOLLIMAN.

09:26AM  5         MS. SPIVEY, YOU SHOULD HAVE A BINDER IN FRONT OF YOU, AND

09:26AM  6    I'D LIKE TO DRAW YOUR ATTENTION TO WHAT HAS BEEN MARKED AS

09:26AM  7    EXHIBIT 1901.

09:26AM  8         DO YOU HAVE THAT IN FRONT OF YOU?

09:26AM  9    A.   YES.

09:26AM  10   Q.   DOES THIS APPEAR TO BE AN EMAIL THAT YOU AUTHORED?

09:26AM  11   A.   YES.

09:26AM  12   Q.   AND THERE ARE TWO NAMES AT THE TOP, MARK KUCHARSKI AND

09:26AM  13   DENNIS ONDYAK.

09:26AM  14        WHO ARE THEY?

09:26AM  15   A.   THEY ARE THE ACCOUNTANTS FOR THE TAX FIRM THAT THERANOS

09:27AM  16   USED.

09:27AM  17   Q.   AND DID YOU WORK WITH THOSE ACCOUNTANTS AT THE TAX FIRM IN

09:27AM  18   ORDER TO PREPARE ACCURATE TAX RETURNS ON BEHALF OF THERANOS?

09:27AM  19   A.   YES.

09:27AM  20   Q.   THERE'S A NUMBER OF ATTACHMENTS TO THIS EMAIL.  GENERALLY

09:27AM  21   SPEAKING, WHAT ARE THESE?

09:27AM  22   A.   THESE ARE THE SCHEDULE AND FINANCIAL INFORMATION THAT

09:27AM  23   THERANOS PROVIDED TO ACCOUNTANTS SO THAT THEY CAN PREPARE THE

09:27AM  24   TAX RETURN.

09:27AM  25   Q.   WERE THESE EXCEL FILES MADE AT OR NEAR THE TIME IN ORDER

09:27AM   1    TO PREPARE ACCURATE TAX RETURNS?

09:27AM   2    A.   YES.

09:27AM   3    Q.   AND DID YOU KEEP THESE DOCUMENTS IN THE ORDINARY COURSE OF

09:27AM   4    BUSINESS?

09:27AM   5    A.   YES.

09:27AM   6    Q.   OKAY.  AND WAS IT YOUR REGULAR PRACTICE TO PREPARE THESE

09:27AM   7    DOCUMENTS SO THAT THERANOS COULD ACCURATELY REPORT ITS INCOME

09:27AM   8    AND EXPENSES TO THE I.R.S.?

09:28AM   9    A.   YES.

09:28AM   10   Q.   ONE OF THE EXCEL SPREADSHEETS IS -- OR ONE OF THE

09:28AM   11   ATTACHMENTS IS TITLED TB 12/31/13.  IT'S THE SECOND ONE FROM

09:28AM   12   THE BOTTOM.

09:28AM   13        DO YOU SEE THAT?

09:28AM   14   A.   YES.

09:28AM   15   Q.   AND WHAT DOES TB STAND FOR?

09:28AM   16   A.   TRIAL BALANCE.

09:28AM   17   Q.   AND WHAT IS THAT TRIAL BALANCE FOR?

09:28AM   18   A.   2013.

09:28AM   19   Q.   AND DID YOU PREPARE THAT TRIAL BALANCE AND MAINTAIN THAT

09:28AM   20   IN THE ORDINARY COURSE OF BUSINESS?

09:28AM   21   A.   YES.

09:28AM   22   Q.   AND DID YOU PREPARE IT BASED ON DATA FROM THE QAD SYSTEM?

09:28AM   23   A.   YES.

09:28AM   24        MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 1901 AND THE

09:28AM   25   ATTACHMENTS TB 12-31-13.

09:28AM   1                    THE COURT:  ANY OBJECTION?

09:28AM   2                    MR. WADE:  WE HAVE NO OBJECTION TO THE TRIAL

09:28AM   3     BALANCE.

09:28AM   4          WE OBJECT TO THE DOCUMENT ITSELF UNDER 401 AND 805.

09:29AM   5                    THE COURT:  DO YOU WISH TO RESPOND?

09:29AM   6                    MR. LEACH:  IT'S THE STATEMENT OF AN AGENT.

09:29AM   7                    THE COURT:  I THINK IT QUALIFIES UNDER 803, SO I'LL

09:29AM   8     ADMIT IT.

09:29AM   9          (GOVERNMENT'S EXHIBIT 1901 WAS RECEIVED IN EVIDENCE.)

09:29AM   10                   MR. LEACH:  IF YOU COULD PLEASE DISPLAY IT.

09:29AM   11         MS. KRATZMANN, IF I COULD USE THE ELMO?

09:29AM   12                   THE CLERK:  YES.

09:29AM   13    BY MR. LEACH:

09:30AM   14    Q.   MS. SPIVEY, WHILE MY LAPTOP IS REBOOTING LET ME ORIENT

09:30AM   15    HERE EVERYONE ON 1901.

09:30AM   16         DO YOU SEE YOUR NAME IN THE FROM LINE?

09:30AM   17    A.   YES.

09:30AM   18    Q.   DENNIS ONDYAK AND MARK KUCHARSKI, THEY'RE WITH THE TAX

09:30AM   19    PREPARATION FIRM?

09:30AM   20    A.   YES.

09:30AM   21    Q.   AND I WAS DRAWING YOUR ATTENTION TO TB 12/31/13.

09:30AM   22         DO YOU SEE THAT?

09:30AM   23    A.   YES.

09:30AM   24    Q.   LET ME PLEASE DRAW YOUR ATTENTION TO PAGE 59.

09:31AM   25         DO YOU SEE THE TITLE THERANOS INC. AND SUBSIDIARY AT THE

09:31AM  1      TOP?

09:31AM  2      A.   YES.

09:31AM  3      Q.   AND IS THIS THE INCOME STATEMENTS FOR YEAR ENDED

09:31AM  4      DECEMBER 31ST, 2013, 2012, 2011, AND 2010?

09:31AM  5      A.   YES.

09:31AM  6      Q.   WHAT WAS THE REVENUE FOR THERANOS FOR 2013?

09:31AM  7      A.   ZERO.

09:31AM  8      Q.   AND DOWN AT THE BOTTOM THERE'S A NET LOSS OF $92,367,725.

09:31AM  9           DO YOU SEE THAT?

09:31AM  10     A.   YES.

09:31AM  11     Q.   AND WHAT DOES THAT SIGNIFY?

09:31AM  12     A.   THAT'S ALL OF THE EXPENSES FOR THE YEAR.

09:31AM  13     Q.   FOR THE YEAR 2013?

09:31AM  14     A.   RIGHT.

09:32AM  15     Q.   THANK YOU, MS. SPIVEY.  WE CAN PUT THAT DOCUMENT TO THE

09:32AM  16     SIDE.

09:32AM  17          LET ME DRAW YOUR ATTENTION TO WHAT HAS BEEN MARKED AS

09:32AM  18     5206.  I BELIEVE WE STIPULATED TO THE ADMISSION OF 5206.

09:32AM  19               MR. WADE:  WE DO, YOUR HONOR.

09:32AM  20               THE COURT:  ALL RIGHT.  THANK YOU.  IT'S ADMITTED.

09:32AM  21     IT MAY BE PUBLISHED.

09:32AM  22          (GOVERNMENT'S EXHIBIT 5206 WAS RECEIVED IN EVIDENCE.)

09:32AM  23               MR. LEACH:  MAY I APPROACH THE WITNESS, YOUR HONOR?

09:32AM  24               THE COURT:  YES.

09:32AM  25     BY MR. LEACH:

09:32AM 1    Q.  (HANDING.)

09:33AM 2       MS. SPIVEY, I'M PLACING ON THE SCREEN THE FIRST PAGE OF

09:33AM 3    EXHIBIT 5206.

09:33AM 4       DO YOU SEE YOUR NAME IN THE FROM LINE?

09:33AM 5    A.  YES.

09:33AM 6    Q.  AND IS THIS TO MS. HOLMES AND MR. BALWANI?

09:33AM 7    A.  YES.

09:33AM 8    Q.  THE SUBJECT OF THIS EMAIL IS 409A -- OR 409A VALUATION

09:33AM 9    ANALYSIS.

09:33AM 10      WHAT IS A 409A VALUATION ANALYSIS?

09:34AM 11   A.  THAT'S THE I.R.S. TAX CODE FOR THE VALUATION FOR OPTIONS.

09:34AM 12   Q.  WHAT DO YOU MEAN BY OPTIONS?

09:34AM 13   A.  THAT'S THE OPTION THAT WE GIVE TO EMPLOYEES, DIRECTOR,

09:34AM 14   CONSULTANTS, AND THEY CAN BUY COMPANY STOCK AT A PREDETERMINED

09:34AM 15   PRICE.

09:34AM 16   Q.  AND WHY WAS IT NECESSARY FOR THERANOS TO VALUE THESE STOCK

09:34AM 17   OPTIONS?

09:34AM 18   A.  SO THE COMPANY KNOWS WHAT THE PREDETERMINED PRICE SHOULD

09:34AM 19   BE.

09:34AM 20   Q.  OKAY.  AND IN THIS EMAIL YOU ARE WRITING TO MS. HOLMES,

09:34AM 21   "ATTACHED PLEASE FIND THE LATEST 409A REPORT.  THE VALUE GOES

09:34AM 22   UP FROM $1.56 (FROM $1.44 IN DECEMBER) DUE TO THE LATEST

09:34AM 23   FUNDING IN FEB AND MARCH 2015."

09:35AM 24      DO YOU SEE THAT LANGUAGE?

09:35AM 25   A.  YES.

09:35AM 1    Q.   AND WHAT DID YOU MEAN BY "THE LATEST FUNDING IN FEB AND

09:35AM 2    MARCH OF 2015"?

09:35AM 3    A.   LOOKING AT THIS EMAIL I BELIEVE THERE WAS A ROUND OF

09:35AM 4    FINANCING TO RAISE MONEY IN FEBRUARY AND MARCH OF 2015.

09:35AM 5    Q.   RAISE MONEY FROM WHOM?

09:35AM 6    A.   INVESTORS.

09:35AM 7    Q.   AND DOES THE COMPANY RECORD ANY TYPE OF EXPENSE RELATED TO

09:35AM 8    ITS STOCK OPTIONS IN ITS FINANCIAL STATEMENTS?

09:35AM 9    A.   YES.

09:35AM 10   Q.   AND DOES THAT HAVE ANY CONNECTION TO THE 409A VALUATION

09:35AM 11   ANALYSIS THAT YOU'RE TALKING ABOUT HERE?

09:35AM 12   A.   YES.

09:35AM 13   Q.   CAN YOU EXPLAIN THAT FOR US, PLEASE?

09:35AM 14   A.   SO EACH OPTION -- SO THE COMPANY WILL -- WHEN THE COMPANY

09:35AM 15   GRANT AN OPTION, THIS PART IS CONSIDERED AN EXPENSE ON THE

09:35AM 16   FINANCIAL STATEMENTS.  SO IT'S BASED ON THE -- HOW MUCH EXPENSE

09:36AM 17   THE COMPANY RECOGNIZED IS BASED ON THE VALUE.

09:36AM 18   Q.   AND ARE YOU PROCURING THIS REPORT IN ORDER TO MAKE SURE

09:36AM 19   THAT YOU GET THAT VALUE RIGHT IN THE FINANCIAL STATEMENTS?

09:36AM 20   A.   YES.

09:36AM 21   Q.   LET ME PLEASE DRAW YOUR ATTENTION TO PAGE 14.

09:36AM 22       I UNDERSTAND FROM MS. HOLLIMAN THAT WE CAN HAVE IT

09:36AM 23   DISPLAYED WITHOUT THE ELMO.

09:36AM 24       WERE YOU ABLE TO SEE PAGE 14 ON THE SCREEN, MS. SPIVEY?

09:36AM 25   A.   YES.

09:36AM  1    Q.   THERE'S A NAME AT THE BOTTOM, ARANCA.  WHAT IS ARANCA?

09:36AM  2    A.   ARANCA IS THE INDEPENDENT FIRM THAT PROVIDE THE VALUATION

09:36AM  3    SERVICE TO THERANOS.

09:36AM  4    Q.   AND WHAT WAS ARANCA ENGAGED TO DO?

09:36AM  5    A.   LIKE THE ENGAGEMENT WOULD LET THERANOS KNOW WHAT THE FAIR

09:37AM  6    VALUE OF THE COMMON STOCK SHOULD BE.

09:37AM  7    Q.   OKAY.  DID YOU DO YOUR BEST TO PROVIDE ACCURATE

09:37AM  8    INFORMATION TO ARANCA?

09:37AM  9    A.   YES.

09:37AM  10   Q.   AND DID YOU CONSULT WITH MS. HOLMES ABOUT THE INFORMATION

09:37AM  11   YOU WERE PROVIDING TO ARANCA?

09:37AM  12   A.   YES.

09:37AM  13   Q.   AND WHY DID YOU DO THAT?

09:37AM  14   A.   BECAUSE SHE HAS THE BEST INFORMATION ON WHAT THE COMPANY

09:37AM  15   PROJECTION AND FORECAST IS.

09:37AM  16   Q.   AND WHAT TYPES OF INFORMATION DID YOU PROVIDE TO ARANCA?

09:37AM  17   A.   TYPICALLY IT WOULD BE THE HISTORICAL FINANCIAL

09:37AM  18   INFORMATION, AND THE PROJECTION FOR THE NEXT FIVE YEARS, AND

09:37AM  19   THE CAPITALIZATION RECORD FOR THE COMPANY.

09:37AM  20   Q.   WHEN YOU SAY "PROJECTION FOR THE NEXT FIVE YEARS," WHAT DO

09:37AM  21   YOU MEAN?

09:37AM  22   A.   THAT MEANS WHAT THE COMPANY FORECAST FOR THE FINANCIAL

09:37AM  23   INFORMATION FOR THE NEXT FIVE YEARS THAT -- LIKE THE REVENUE,

09:38AM  24   AND EXPENSES, AND CAPITAL EXPENDITURE, ET CETERA.

09:38AM  25   Q.   AND DID YOU HAVE DISCUSSIONS WITH MS. HOLMES ABOUT WHAT

09:38AM  1    FINANCIAL PROJECTIONS TO PROVIDE TO ARANCA?

09:38AM  2    A.   YES.

09:38AM  3    Q.   AND DID YOU HAVE MORE THAN ONE, MORE THAN ONE DISCUSSION?

09:38AM  4    A.   YES.

09:38AM  5    Q.   IF WE COULD ZOOM OUT, PLEASE, MS. HOLLIMAN.

09:38AM  6         I WANT TO DRAW YOUR ATTENTION TO THE MIDDLE OF THE PAGE

09:38AM  7    WHERE IT SAYS, "THERANOS INC., FMV OF COMMON STOCK AS OF

09:38AM  8    MARCH 25, 2015."

09:38AM  9         DO YOU SEE THAT?

09:38AM 10    A.   YES.

09:38AM 11    Q.   AND WHAT IS FMV?

09:38AM 12    A.   FAIR MARKET VALUE.

09:38AM 13    Q.   AND IF WE CAN PLEASE GO TO PAGE 17.  AND IF WE COULD

09:38AM 14    PLEASE ZOOM IN ON SECTION 1.1, THE BACKGROUND.

09:39AM 15         MS. SPIVEY, DO YOU SEE WHERE IT SAYS, "ARANCA, INC.,

09:39AM 16    ('ARANCA') HAS BEEN ENGAGED BY THERANOS'S INC., ('THERANOS' OR

09:39AM 17    "THE COMPANY') TO CONDUCT VALUATION ANALYSIS OF THE COMPANY AND

09:39AM 18    PREPARE A WRITTEN REPORT TO EXPRESS OUR OPINION ON THE FAIR

09:39AM 19    MARKET VALUE (FMV) OF ITS COMMON STOCK."

09:39AM 20         DO YOU SEE THAT LANGUAGE?

09:39AM 21    A.   YES.

09:39AM 22    Q.   AND IS THAT A FAIR SUMMARY OF WHAT ARANCA WAS ENGAGED TO

09:39AM 23    DO?

09:39AM 24    A.   YES.

09:39AM 25    Q.   NOW, IF WE COULD GO OUT, PLEASE, MS. HOLLIMAN, AND LOOK AT

09:39AM 1   SECTION 1.2, THE FIRST BULLET OR THE FIRST FOUR WOULD BE GREAT.

09:39AM 2   THANK YOU SO MUCH.

09:39AM 3       DO YOU SEE IN THE FIRST BULLET WHERE IT SAYS, "WE

09:39AM 4   UNDERSTAND THIS REPORT AND ITS CONCLUSIONS WOULD BE USED BY THE

09:39AM 5   COMPANY'S BOARD OF DIRECTORS SOLELY IN CONNECTION WITH

09:39AM 6   DETERMINING THE EXERCISE PRICE FOR GRANTING OPTIONS TO ITS

09:40AM 7   EMPLOYEES TO COMPLY WITH IRC SECTION 409A."

09:40AM 8       DO YOU SEE THAT LANGUAGE?

09:40AM 9   A.   YES.

09:40AM 10  Q.   AND WAS THAT YOUR UNDERSTANDING AT THE TIME WHEN ARANCA

09:40AM 11  WAS PREPARING THIS REPORT?

09:40AM 12  A.   YES.

09:40AM 13  Q.   IN THE FOURTH BULLET IT SAYS, "IN PREPARING OUR ANALYSIS,

09:40AM 14  DANISE YAM, CORPORATE CONTROLLER, PROVIDED INFORMATION

09:40AM 15  REGARDING THERANOS'S BUSINESS, PRODUCTS AND SERVICES,

09:40AM 16  OPERATIONS, PAST PERFORMANCE AND FINANCIAL RESULTS, FINANCIAL

09:40AM 17  CONDITION, DEVELOPMENT, AND BUDGET."

09:40AM 18      DO YOU SEE THAT LANGUAGE?

09:40AM 19  A.   YES.

09:40AM 20  Q.   IS THAT ACCURATE?

09:40AM 21  A.   YES.

09:40AM 22  Q.   AND IN THE COURSE OF DOING THAT, DID YOU CONSULT WITH

09:40AM 23  MS. HOLMES?

09:40AM 24  A.   YES.

09:40AM 25  Q.   THANK YOU.

SPIVEY DIRECT EXAM BY MR. LEACH (RES.)

09:40AM  1          MS. HOLLIMAN, IF WE COULD PLEASE GO TO PAGE 19.  AND IF WE

09:40AM  2     COULD ZOOM IN ON THE TOP PART.  GREAT.

09:41AM  3          MS. SPIVEY, DO YOU SEE WHERE IT SAYS, "DURING THE COURSE

09:41AM  4     OF OUR ANALYSIS WE HAVE CONDUCTED LIMITED REVIEWS, INQUIRIES,

09:41AM  5     AND INTERVIEWS."

09:41AM  6          DO YOU SEE THAT LANGUAGE?

09:41AM  7     A.   YES.

09:41AM  8     Q.   AND IN BULLET NUMBER 2 IT SAYS, "REVIEW OF FINANCIAL

09:41AM  9     STATEMENTS."

09:41AM  10          DO YOU SEE THAT LANGUAGE?

09:41AM  11    A.   YES.

09:41AM  12    Q.   IS THAT ACCURATE?

09:41AM  13    A.   YES.

09:41AM  14    Q.   AND HOW ABOUT NUMBER 3, "REVIEW OF FORECASTED FINANCIAL

09:41AM  15    STATEMENTS."

09:41AM  16          IS THAT ACCURATE?

09:41AM  17    A.   YES.

09:41AM  18    Q.   IF WE CAN ZOOM OUT, PLEASE, MS. HOLLIMAN, AND NOW GO TO

09:41AM  19    PAGE 2, THE NEXT PAGE.

09:41AM  20          AND IF WE CAN ZOOM IN ON THE SUMMARY OF FINDINGS DOWN AT

09:41AM  21    THE BOTTOM.  THANK YOU.

09:42AM  22          DO YOU SEE A SIGNATURE ON THIS, MS. SPIVEY?

09:42AM  23    A.   YES.

09:42AM  24    Q.   AND THE NAME IS HEMENDRA ARAN.  IS THAT THE PERSON FROM

09:42AM  25    ARANCA WHO YOU WORKED WITH IN PART TO PREPARE THIS VALUATION

09:42AM   1       ANALYSIS?

09:42AM   2       A.   YES.

09:42AM   3       Q.   HOW LONG DID THERANOS USE ARANCA FOR?

09:42AM   4       A.   THEY USED IT BEFORE I JOINED THE COMPANY.

09:42AM   5       Q.   AND YOU JOINED WHEN?  CAN YOU PLEASE REMIND US.

09:42AM   6       A.   2006.

09:42AM   7       Q.   OKAY.  IF WE COULD PLEASE GO TO PAGE 20.  I'M SORRY, PAGE

09:42AM   8       23, MS. HOLLIMAN.  WONDERFUL.

09:42AM   9            IF WE COULD PLEASE ZOOM IN ON THE TABLE AT THE TOP.

09:43AM  10            DO YOU HAVE THAT IN FRONT OF YOU, MS. SPIVEY?

09:43AM  11       A.   YES.

09:43AM  12       Q.   IN THIS TABLE THERE'S A LIST OF CLASS OF STOCK.

09:43AM  13            DO YOU SEE THAT?

09:43AM  14       A.   YES.

09:43AM  15       Q.   AND THERE'S SERIES A, B, C, C-1, C-1 WITH AN ASTERISK, AND

09:43AM  16       C-2.

09:43AM  17            WHAT DO THOSE REPRESENT?

09:43AM  18       A.   THOSE ARE THE DIFFERENT SERIES OF PREFERRED STOCK.

09:43AM  19       Q.   HOW DOES SERIES A DIFFER FROM SERIES B?

09:43AM  20       A.   THAT WAS DEPENDING ON THE TIME OF THE INVESTMENT.

09:43AM  21       Q.   OKAY.  IS IT FAIR TO ASSUME FROM THIS THAT THE C-2 SERIES

09:43AM  22       COMES LATER THAN THE SERIES A INVESTORS?

09:43AM  23       A.   YES.

09:43AM  24       Q.   OKAY.  I WANT TO FOCUS ON THE SERIES C-2.  THERE'S AN

09:43AM  25       ISSUE PRICE OF $17 IF YOU GO TO THE RIGHT.  WHAT DOES THAT $17

09:43AM   1    REPRESENT?

09:43AM   2    A.   THAT EACH SHARE OF THE PREFERRED STOCK C-2 COSTS $17.

09:44AM   3    Q.   IS THAT THE PRICE PER SHARE THAT INVESTORS WERE PAYING FOR

09:44AM   4    C-2 INVESTMENTS?

09:44AM   5    A.   YES.

09:44AM   6    Q.   AND TO THE RIGHT THERE'S A COLUMN FOR INVESTED CAPITAL,

09:44AM   7    $730,109,863.

09:44AM   8         WHAT DOES THAT REPRESENT?

09:44AM   9    A.   THAT REPRESENTS THE AMOUNT OF MONEY THAT THERANOS RECEIVED

09:44AM   10   FROM THE C-2 INVESTORS.

09:44AM   11   Q.   OKAY.  AND ROUGHLY WHAT TIME PERIOD WAS THE C-2 FINANCING

09:44AM   12   ROUND?

09:44AM   13   A.   PROBABLY 2014, 2015.

09:44AM   14   Q.   SO LATER ON IN THE COMPANY'S TENURE?

09:44AM   15   A.   RIGHT.

09:44AM   16   Q.   OKAY.  LET'S PLEASE GO NOUN TO PAGE 54.  ACTUALLY, I THINK

09:45AM   17   IT'S FURTHER DOWN, WHICH I'M LOOKING FOR SECTION 7.2,

09:45AM   18   MS. HOLLIMAN, WHICH I'LL GET YOU.

09:45AM   19        PAGE 67.  MY APOLOGIES.

09:45AM   20        IF WE COULD ZOOM IN, PLEASE, ON THE TOP HALF OF THIS WHERE

09:45AM   21   THERE'S HISTORICAL FINANCIALS INCOME STATEMENT.  THANK YOU.

09:45AM   22        DO YOU SEE WHERE IT SAYS 7.2.1 INCOME STATEMENT,

09:45AM   23   MS. SPIVEY?

09:45AM   24   A.   YES.

09:45AM   25   Q.   AND THERE'S A ROW SUMMARY INCOME STATEMENT IN 3 ZEROS,

09:46AM 1    DECEMBER 11TH, DECEMBER 12TH, AND THEN IT MOVES FORWARD.

09:46AM 2         ARE THOSE THE YEAR ENDS FOR THOSE INCOME STATEMENTS?

09:46AM 3    A.   YES.

09:46AM 4    Q.   AND BENEATH THAT IT SAYS F Y-A.  WHAT DOES FY-A MEAN?

09:46AM 5    A.   FINANCIAL YEAR ACTUAL.

09:46AM 6    Q.   SO THOSE ARE THE REAL RESULTS AS COMPARED TO PROJECTED

09:46AM 7    RESULTS?

09:46AM 8    A.   YES.

09:46AM 9    Q.   AND DID YOU DO YOUR BEST TO PROVIDE ACCURATE INFORMATION

09:46AM 10   TO ARANCA ON THESE POINTS?

09:46AM 11   A.   YES.

09:46AM 12   Q.   AND IN DECEMBER OF '14 THERE'S A NUMBER 150.

09:46AM 13        DO YOU SEE THAT?

09:46AM 14   A.   YES.

09:46AM 15   Q.   AND WHAT DOES THAT MEAN?

09:46AM 16   A.   THAT'S THE INCOME THAT THE COMPANY RECORDED FOR SERVICES

09:46AM 17   PROVIDED.

09:46AM 18   Q.   SO $150,000?

09:46AM 19   A.   YES.

09:46AM 20   Q.   AND TO THE RIGHT FOR THE PERIOD ENDING MARCH 15TH THERE'S

09:46AM 21   THE NUMBER 14.

09:46AM 22        DO YOU SEE THAT?

09:46AM 23   A.   YES.

09:46AM 24   Q.   AND WHAT DOES THAT MEAN?

09:47AM 25   A.   THAT'S THE REVENUE THAT THE COMPANY RECORDED FOR SERVICES

09:47AM   1      PROVIDED.

09:47AM   2      Q.   $14,000?

09:47AM   3      A.   $14,000, YES.

09:47AM   4      Q.   OKAY.  AND DO YOU RECALL THINGS GETTING MATERIALLY BETTER

09:47AM   5      FOR THE YEAR 2015?

09:47AM   6      A.   NO.

09:47AM   7      Q.   I'M SORRY?

09:47AM   8      A.   NO.

09:47AM   9      Q.   LET'S LOOK AT THE NEXT PAGE, PLEASE.  PAGE 68.  THERE'S A

09:47AM  10      BALANCE SHEET AT THE TOP.

09:47AM  11           ACTUALLY, IF WE COULD ZOOM IN ON THE ENTIRETY OF THE TEXT,

09:47AM  12      MS. HOLLIMAN.  PERFECT.  THANK YOU.

09:47AM  13           ALL RIGHT.  DID YOU PROVIDE THIS BALANCE SHEET, THE

09:47AM  14      INFORMATION IN THIS BALANCE SHEET TO ARANCA, MS. SPIVEY?

09:47AM  15      A.   YES.

09:47AM  16      Q.   AND DOWN TOWARDS THE BOTTOM THERE'S A LINE FOR SOMETHING

09:47AM  17      CALLED RETAINED EARNINGS.

09:48AM  18           DO YOU SEE THAT ROW, MS. SPIVEY?

09:48AM  19      A.   YES.

09:48AM  20      Q.   AND WHAT IS RETAINED EARNINGS?

09:48AM  21      A.   THAT'S THE ACCUMULATED INCOME AND LOSS FOR THE YEAR.

09:48AM  22      Q.   AND IS THAT SYNONYMOUS WITH ACCUMULATED DEFICIT?

09:48AM  23      A.   YES.

09:48AM  24      Q.   AND THE TERM THAT WE SAW IN PRIOR SPREADSHEETS?

09:48AM  25      A.   YES.

09:48AM   1    Q.   WHAT WAS THE ACCUMULATED DEFICIT OR RETAINED EARNINGS AS

09:48AM   2    OF DECEMBER 2014 --

09:48AM   3    A.   I --

09:48AM   4    Q.   IF WE COULD ZOOM OUT FOR THE WITNESS.

09:48AM   5    A.   APPROXIMATELY 376 MILLION.

09:48AM   6    Q.   AND THAT'S THE ACCUMULATED DEFICIT AS OF 2013?  OR 2014,

09:49AM   7    EXCUSE ME?

09:49AM   8    A.   YES.

09:49AM   9    Q.   OKAY.  THANK YOU.

09:49AM  10         WE CAN TAKE THIS DOWN, PLEASE, MS. HOLLIMAN.

09:49AM  11         I'D LIKE TO SHIFT FOCUS A LITTLE BIT FROM THERANOS'S

09:49AM  12    OVERALL FINANCIAL CONDITION AND TALK ABOUT SOME PARTICULAR

09:49AM  13    RELATIONSHIPS THAT THERANOS HAD, MS. SPIVEY.

09:49AM  14         I'D LIKE TO DRAW YOUR ATTENTION, PLEASE, TO EXHIBIT 431.

09:49AM  15    I BELIEVE WE HAVE STIPULATED TO THE ADMISSION OF 431.

09:49AM  16              MR. WADE:  WE HAVE, YOUR HONOR.

09:49AM  17              THE COURT:  THANK YOU.  IT'S ADMITTED, AND IT MAY BE

09:49AM  18    PUBLISHED.

09:49AM  19         (GOVERNMENT'S EXHIBIT 431 WAS RECEIVED IN EVIDENCE.)

09:49AM  20    BY MR. LEACH:

09:49AM  21    Q.   LET'S FOCUS ON THE TOP PORTION OF THIS EMAIL, MS. SPIVEY.

09:50AM  22         DO YOU SEE YOUR FORMER NAME IN THE TOP PART OF THE EMAIL?

09:50AM  23    A.   YES.

09:50AM  24    Q.   AND THIS IS TO AN INDIVIDUAL AT KPMG.  REMIND US, WE'VE

09:50AM  25    TALKED A LITTLE BIT ABOUT KPMG LAST WEEK, WHAT WAS KPMG DOING

| | | |
|--|--|--|
| 09:50AM | 1 | FOR THERANOS? |
| 09:50AM | 2 | A.   KPMG WAS THE AUDITOR TO THERANOS. |
| 09:50AM | 3 | Q.   OKAY.  AND THE SUBJECT IS FOR PFIZER REV REC. |
| 09:50AM | 4 | DO YOU SEE THAT? |
| 09:50AM | 5 | A.   YES. |
| 09:50AM | 6 | Q.   AND WHAT IS REV REC? |
| 09:50AM | 7 | A.   IT'S REVENUE RECOGNITION. |
| 09:50AM | 8 | Q.   AND WHAT DOES THAT MEAN? |
| 09:50AM | 9 | A.   THAT MEANS HOW MUCH MONEY THAT THE -- REVENUE THAT THE |
| 09:50AM | 10 | COMPANY CAN RECORD FOR THE YEAR. |
| 09:50AM | 11 | Q.   AND WHY WERE YOU FORWARDING THIS EMAIL TO KPMG IN OR |
| 09:50AM | 12 | AROUND 2011? |
| 09:50AM | 13 | A.   THIS IS TO BACK UP THE REVENUE THAT THE COMPANY RECORDED |
| 09:50AM | 14 | IN THE FINANCIAL BOOK. |
| 09:50AM | 15 | Q.   REVENUE RELATING TO WHICH CUSTOMER? |
| 09:50AM | 16 | A.   PFIZER. |
| 09:50AM | 17 | Q.   OKAY.  I'D LIKE TO DRAW YOUR ATTENTION TO THE FIRST EMAIL |
| 09:50AM | 18 | IN THIS CHAIN.  IF I CAN ZOOM OUT A LITTLE BIT, MS. HOLLIMAN. |
| 09:51AM | 19 | MAYBE THE TOP HALF OF THE DOCUMENT WOULD BE GOOD. |
| 09:51AM | 20 | DO YOU SEE THE EMAIL FROM ELIZABETH HOLMES TO AIDAN POWER |
| 09:51AM | 21 | AND CRAIG LIPSET ON OCTOBER 10TH, 2008? |
| 09:51AM | 22 | A.   YES. |
| 09:51AM | 23 | Q.   AND WHO DO YOU UNDERSTAND THOSE FOLKS TO BE? |
| 09:51AM | 24 | A.   YES. |
| 09:51AM | 25 | Q.   AND WHO DO YOU UNDERSTAND THOSE FOLKS TO BE? |

09:51AM   1    A.   I'M NOT SURE.

09:51AM   2    Q.   AND DO YOU BELIEVE THEM TO BE WITH PFIZER?

09:51AM   3    A.   I'M NOT SURE.

09:51AM   4    Q.   OKAY.  THERE'S A NAME IN THE CC LINE MARC THIBONNIER.  WHO

09:51AM   5    IS HE?

09:51AM   6    A.   HE'S THE CHIEF MEDICAL OFFICER AT THAT TIME.

09:51AM   7    Q.   BACK IN 2008?

09:51AM   8    A.   YES.

09:51AM   9    Q.   AND MS. HOLMES WROTE IN THE SECOND PARAGRAPH, "IN THE

09:51AM   10   INTEREST OF FINISHING AS QUICKLY AS POSSIBLE, WE VARIED THE

09:52AM   11   ENROLLMENT SCHEDULES OF SOME OF OUR EXISTING AND NEW PATIENTS,

09:52AM   12   AS YOU WILL SEE IN THE ATTACHED.

09:52AM   13        "THROUGHOUT THIS PROCESS, WE HAVE BEEN COMPILING THE DATA

09:52AM   14   FOR OUR FINAL REPORT.  I'M VERY PLEASED TO PRESENT YOU WITH THE

09:52AM   15   FINAL DATA -- SEE THE ATTACHED STUDY REPORT."

09:52AM   16        DO YOU SEE THAT LANGUAGE?

09:52AM   17   A.   YES.

09:52AM   18   Q.   AND MS. HOLMES FORWARDS THIS TO YOU SHORTLY AFTER SENDING

09:52AM   19   IT TO AIDAN POWER AND CRAIG LIPSET AND WRITES, "THE REPORT HAS

09:52AM   20   BEEN SUBMITTED.  WE CAN NOW INVOICE FOR THE REMAINING 400K."

09:52AM   21        DO YOU SEE THAT LANGUAGE?

09:52AM   22   A.   YES.

09:52AM   23   Q.   AND WHAT DID THAT MEAN?

09:52AM   24   A.   SO MY RECOLLECTION OF THIS CONSIDER IS THAT THERANOS WOULD

09:52AM   25   PROVIDE A STUDY REPORT TO PFIZER FOR A TOTAL OF $900,000 AND

09:52AM   1      PFIZER WOULD -- ALREADY PAID $500,000 BEFORE 2008, AND THE

09:52AM   2      REMAINING 400,000 WOULD BE PAID WHEN THERANOS PROVIDED THE

09:53AM   3      REPORTS.

09:53AM   4      Q.   IS THIS MS. HOLMES GIVING YOU DIRECTION TO RECOGNIZE

09:53AM   5      ADDITIONAL REVENUE ON THE PFIZER CONTRACT?

09:53AM   6      A.   TO INVOICE FOR THE REMAINING AMOUNT.

09:53AM   7      Q.   WHAT DO YOU MEAN BY "INVOICE"?

09:53AM   8      A.   TO SEND PFIZER THE INVOICE SO THEY WOULD PAY THE AMOUNT.

09:53AM   9      Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO PAGE 3 OF THIS

09:53AM   10     DOCUMENT.

09:53AM   11         IF WE COULD ZOOM IN ON THE TOP PORTION OF PAGE 3.  LET'S

09:53AM   12     INCLUDE ALL OF THE TEXT AT THE TOP, PLEASE.  THERE WE GO.

09:53AM   13     THANK YOU, MS. HOLLIMAN.

09:53AM   14         MS. SPIVEY, DO YOU -- THERE'S A LOGO AT THE TOP THAT SAYS,

09:54AM   15     "THERANOS REDEFINING HEALTHCARE."

09:54AM   16         DO YOU SEE THAT?

09:54AM   17     A.   YES.

09:54AM   18     Q.   AND IS THAT THERANOS'S OLD LOGO?

09:54AM   19     A.   YES.

09:54AM   20     Q.   AND DID THAT CHANGE AT SOME POINT IN TIME?

09:54AM   21     A.   YES.

09:54AM   22     Q.   OKAY.  AND THEN IT SAYS, THERANOS'S ANGIOGENESIS STUDY

09:54AM   23     REPORT PREPARED FOR DR. AIDAN POWER, PFIZER, INC."

09:54AM   24         DO YOU SEE THAT LANGUAGE?

09:54AM   25     A.   YES.

09:54AM   1    Q.   AND DO YOU BELIEVE THAT TO BE THE REPORT THAT MS. HOLMES

09:54AM   2    WAS REFERRING TO IN HER EMAIL THAT SHE WAS FORWARDING TO YOU?

09:54AM   3    A.   YES.

09:54AM   4    Q.   AND DO YOU BELIEVE THAT THIS WAS PROVIDED TO PFIZER AS

09:54AM   5    SUPPORT FOR THE INVOICE?

09:54AM   6    A.   YES.

09:54AM   7    Q.   LET ME PLEASE DRAW YOUR ATTENTION TO WHAT HAS BEEN MARKED

09:54AM   8    AS 5219.

09:54AM   9         AND I BELIEVE THE PARTIES HAVE AGREED TO THE ADMISSION OF

09:54AM   10   5219?

09:54AM   11              MR. WADE:  WE DO, YOUR HONOR.

09:54AM   12              THE COURT:  ALL RIGHT.  THANK YOU.  IT'S ADMITTED

09:54AM   13   AND MAY BE PUBLISHED.

09:54AM   14        (GOVERNMENT'S EXHIBIT 5219 WAS RECEIVED IN EVIDENCE.)

09:55AM   15              MR. LEACH:  MS. HOLLIMAN, IF WE CAN PLEASE ZOOM IN

09:55AM   16   ON THE TOP HALF OF THIS.

09:55AM   17   Q.   DO YOU SEE YOUR NAME IN THE FROM LINE, MS. SPIVEY?

09:55AM   18   A.   YES.

09:55AM   19   Q.   AND IS THIS AN EMAIL THAT YOU SENT TO FOLKS AT KPMG IN

09:55AM   20   CONNECTION WITH THEIR AUDIT WORK?

09:55AM   21   A.   YES.

09:55AM   22   Q.   AND DID KPMG EVER RENDER AN OPINION ON THERANOS'S

09:55AM   23   FINANCIAL STATEMENTS?

09:55AM   24   A.   NO.

09:55AM   25   Q.   THERE ARE TWO EXCEL -- OR FOUR EXCEL SPREADSHEETS ON THIS,

09:55AM 1    TWO TITLED CONTRACT SUMMARY.

09:55AM 2        DO YOU SEE THOSE?

09:55AM 3    A.   YES.

09:55AM 4    Q.   ARE THOSE DOCUMENTS THAT YOU PREPARED?

09:55AM 5    A.   YES.

09:55AM 6    Q.   OKAY.  IF WE COULD PLEASE DISPLAY PAGE 14, THE NATIVE

09:55AM 7    FILE.  IF WE COULD MOVE TO THE LEFT, PLEASE, MS. HOLLIMAN.

09:56AM 8        I THINK WE NEED TO MOVE THIS OVER TO THE LEFT.  THERE WE

09:56AM 9    GO.  AND IF WE COULD GO ALL OF THE WAY TO THE TOP, PLEASE.

09:56AM 10   WONDERFUL.  THANK YOU.

09:56AM 11       UP IN THE RIGHT-HAND CORNER IT SAYS, "THERANOS INC. SALES

09:56AM 12   CONTRACT SUMMARY YE 12/31/2009."

09:56AM 13       WHAT DOES YE STAND FOR?

09:56AM 14   A.   YEAR ENDED.

09:56AM 15   Q.   AND IN THE FIRST COLUMN THERE'S A CUSTOMER AND IT SAYS

09:56AM 16   ASTRAZENECA.

09:56AM 17       WHAT IS MEANT BY THAT?

09:56AM 18   A.   THE CUSTOMER IS ASTRAZENECA.

09:56AM 19   Q.   AND WAS ASTRAZENECA A PHARMACEUTICAL COMPANY THAT THERANOS

09:57AM 20   DID SOME BUSINESS WITH?

09:57AM 21   A.   YES.

09:57AM 22   Q.   AND TO THE RIGHT IN THE COLUMN UNDER D IT SAYS 1/31/2008.

09:57AM 23       DO YOU SEE THAT?

09:57AM 24   A.   YES.

09:57AM 25   Q.   AND WHAT DOES THAT REFER TO?

09:57AM  1    A.   THE CONTRACT WAS EFFECTIVE ON THAT DATE.

09:57AM  2    Q.   AND THEN THERE'S A LINE CONTRACT TOTAL, 25,000.

09:57AM  3         DO YOU SEE THAT?

09:57AM  4    A.   YES.

09:57AM  5    Q.   AND WHAT DOES THAT MEAN?

09:57AM  6    A.   THERANOS WOULD PROVIDE SERVICES OR PRODUCT FOR THAT

09:57AM  7    CONTRACT AMOUNT.

09:57AM  8    Q.   OKAY.  AND THERE ARE TWO CONTRACTS HERE FOR ASTRAZENECA

09:57AM  9    AND ONE TOTALLED 25,000 AND ONE TOTALLED 225,000.

09:57AM  10        IF WE CAN GO DOWN TO THE NEXT ROW.  OTHER THAN THOSE TWO

09:57AM  11   CONTRACTS, DID THERANOS HAVE ANY REVENUE GENERATING CONTRACTS

09:57AM  12   WITH ASTRAZENECA?

09:58AM  13   A.   NO.

09:58AM  14   Q.   AND IN ROW 2 THERE'S CELGENE CORPORATION.

09:58AM  15        DO YOU SEE THAT?

09:58AM  16   A.   YES.

09:58AM  17   Q.   AND THE AMOUNT OF THAT CONTRACT IS $106,000.

09:58AM  18        DO YOU SEE THAT?

09:58AM  19   A.   YES.

09:58AM  20   Q.   AND I'LL COME BACK TO CELGENE IN A MOMENT.  BUT LET ME

09:58AM  21   FIRST ASK ABOUT ROW 11, NOVARTIS.

09:58AM  22        DO YOU SEE THAT?

09:58AM  23   A.   YES.

09:58AM  24   Q.   AND WHAT IS THE DATE OF THE NOVARTIS CONTRACT?

09:58AM  25   A.   JUNE 24TH, 2008.

09:58AM  1      Q.   AND WHAT IS THE AMOUNT?

09:58AM  2      A.   65,000.

09:58AM  3      Q.   AND IF WE CAN SCROLL DOWN A LITTLE MORE.

09:58AM  4           OUTSIDE OF THAT 65,000 NOVARTIS CONTRACT, DID THERANOS

09:58AM  5      HAVE ANY REVENUE GENERATING CONTRACTS WITH NOVARTIS?

09:58AM  6      A.   NO.

09:58AM  7      Q.   IN ROW, IN ROW 12 THERE'S CENTOCOR, AND I'LL COME BACK TO

09:58AM  8      THAT IN A MOMENT, MS. SPIVEY.

09:58AM  9           I WANTED TO ASK ABOUT ROW 13, MERCK, FOR $12,000.  OUTSIDE

09:58AM  10     OF THAT AGREEMENT, DID THERANOS HAVE ANY REVENUE GENERATING

09:58AM  11     CONTRACTS WITH MERCK?

09:59AM  12     A.   NO.

09:59AM  13     Q.   AND FURTHER DOWN THE ROW THERE'S PFIZER.

09:59AM  14          DO YOU SEE THAT?

09:59AM  15     A.   YES.

09:59AM  16     Q.   AND DO YOU BELIEVE THAT TO BE A REFERENCE TO THE EXHIBIT

09:59AM  17     THAT WE JUST LOOKED AT?

09:59AM  18     A.   YES.

09:59AM  19     Q.   AND THAT WAS A $900,000 CONTRACT?

09:59AM  20     A.   YES.

09:59AM  21     Q.   OUTSIDE OF THIS $900,000 CONTRACT WITH PFIZER DATED

09:59AM  22     DECEMBER 15TH, 2006, DID THERANOS HAVE ANY REVENUE GENERATING

09:59AM  23     CONTRACTS WITH PFIZER?

09:59AM  24     A.   NO.

09:59AM  25     Q.   HOW ABOUT THE MAYO CLINIC IN ROW 15.  OUTSIDE OF THE

SPIVEY DIRECT EXAM BY MR. LEACH (RES.)                        715

09:59AM  1    $60,000 CONTRACT REFERENCED THERE, DID THERANOS HAVE ANY

09:59AM  2    REVENUE GENERATION CONTRACTS WITH THE MAYO CLINIC?

09:59AM  3    A.   NO.

09:59AM  4    Q.   IN ROW 18 THERE'S SCHERING-PLOUGH.

09:59AM  5         DO YOU SEE THAT?

09:59AM  6    A.   YES.

09:59AM  7    Q.   AND WHAT WAS THE VALUE OF THE SCHERING-PLOUGH AGREEMENT?

09:59AM  8    A.   279,000.

09:59AM  9    Q.   AND WHAT WAS THE DATE?

09:59AM  10   A.   APRIL 30TH, 2009.

10:00AM  11   Q.   OUTSIDE OF THIS AGREEMENT, DID THERANOS HAVE ANY REVENUE

10:00AM  12   GENERATING CONTRACTS WITH SCHERING-PLOUGH?

10:00AM  13   A.   NO.

10:00AM  14   Q.   AND LET ME PLEASE NOW DRAW YOUR -- I WANT TO GO BACK TO

10:00AM  15   CENTOCOR AND CELGENE IN THE CONTEXT OF PAGE 16 OF THIS EXHIBIT,

10:00AM  16   ANOTHER EXCEL FILE.  WONDERFUL.

10:00AM  17        WE'RE NOW LOOKING AT PAGE 6 OF THIS EXHIBIT, MS. SPIVEY.

10:00AM  18   UP AT THE TOP IT SAYS YE 12/31/2009.

10:01AM  19        DO YOU ACTUALLY BELIEVE THIS TO BE THE CONTRACTS REVENUE

10:01AM  20   ANALYSIS FOR 2010?

10:01AM  21   A.   I BELIEVE SO.

10:01AM  22   Q.   AND OUTSIDE OF THE CONTRACTS ON THIS SPREADSHEET FOR

10:01AM  23   CENTOCOR AND CELGENE, DID THERANOS HAVE ANY REVENUE GENERATING

10:01AM  24   CONTRACTS WITH THOSE TWO PHARMACEUTICAL COMPANIES?

10:01AM  25   A.   NO.

10:01AM  1    Q.   DOWN AT THE -- IN ROW 11 THERE'S A REFERENCE TO SOMETHING

10:01AM  2    CALLED THE AMERICAN BURN ASSOCIATION.

10:01AM  3         WHAT IS THAT?

10:01AM  4    A.   WHAT DO YOU MEAN?

10:01AM  5    Q.   WHAT WAS THAT CONTRACT?  WHAT WAS THAT ARRANGEMENT?

10:01AM  6    A.   OH.  SO THERANOS WOULD PROVIDE SOME -- THE CARTRIDGES AND

10:01AM  7    THE DEVICE TO AMERICAN BURN ASSOCIATION FOR THE AMOUNT OF THE

10:01AM  8    CONTRACT TOTAL OF 288,000.

10:02AM  9    Q.   OUTSIDE OF THE CONTRACT LISTED HERE, DID THERANOS HAVE ANY

10:02AM  10   REVENUE GENERATING CONTRACTS WITH THE AMERICAN BURN

10:02AM  11   ASSOCIATION?

10:02AM  12   A.   NO.

10:02AM  13   Q.   DID THERANOS HAVE ANY REVENUE GENERATING CONTRACTS WITH

10:02AM  14   THE DEPARTMENT OF DEFENSE?

10:02AM  15   A.   NO.

10:02AM  16   Q.   HOW ABOUT THE UNITED STATES MILITARY?

10:02AM  17   A.   NO.

10:02AM  18   Q.   HOW ABOUT ANY HOSPITAL CHAINS?

10:02AM  19   A.   NO.

10:02AM  20   Q.   THANK YOU, MS. HOLLIMAN.  YOU CAN TAKE THAT DOWN.

10:02AM  21        I'D LIKE TO NOW DRAW YOUR ATTENTION, MS. HOLMES, TO

10:02AM  22   EXHIBIT 5172.  I BELIEVE THAT THE PARTIES STIPULATE TO THE

10:02AM  23   ADMISSION OF 5172.

10:02AM  24             MR. WADE:  WE DO, YOUR HONOR.

10:02AM  25             THE COURT:  THANK YOU.  IT'S ADMITTED, AND IT MAY BE

10:02AM   1    PUBLISHED.

10:02AM   2        (GOVERNMENT'S EXHIBIT 5172 WAS RECEIVED IN EVIDENCE.)

10:02AM   3    BY MR. LEACH:

10:02AM   4    Q.   BEFORE WE GET TO THE EXHIBIT, MS. SPIVEY, I'D LIKE TO DRAW

10:03AM   5    YOUR ATTENTION THAT LAST WEEK WE TALKED ABOUT THE TIME PERIOD

10:03AM   6    OF 2009.  WAS THERANOS SHORT ON CASH AT THE BEGINNING OF 2009?

10:03AM   7    A.   YES.

10:03AM   8    Q.   AND HOW WOULD YOU DESCRIBE THE COMPANY'S CASH POSITION AT

10:03AM   9    THAT TIME PERIOD?

10:03AM  10    A.   THE CASH POSITION WAS VERY TIGHT IN 2009.

10:03AM  11    Q.   AND I'D LIKE TO NOW MOVE FORWARD IN TIME TO 2013.

10:03AM  12        DO YOU HAVE THAT TIMEFRAME IN MIND?

10:03AM  13    A.   YES.

10:03AM  14    Q.   OKAY.  IN 2013 WAS THERANOS ALSO EXPERIENCING SOME CASH

10:03AM  15    DIFFICULTIES?

10:03AM  16    A.   IT STARTED TO GET A BIT TIGHT, NOT TO THE EXTENT OF 2009,

10:03AM  17    BUT WE WERE WATCHING THE CASH POSITION VERY CLOSELY.

10:03AM  18    Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO 5172 IF WE COULD.

10:04AM  19        UP IN THE TOP LEFT-HAND CORNER OF THIS THERANOS

10:04AM  20    SPREADSHEET IT SAYS THERANOS CASH BALANCE.

10:04AM  21        DO YOU SEE THAT?

10:04AM  22    A.   YES.

10:04AM  23    Q.   AND IS THIS A DOCUMENT THAT YOU PREPARED?

10:04AM  24    A.   YES.

10:04AM  25    Q.   AND WHY DID YOU PREPARE THIS?

10:04AM  1    A.   TO SHOW ELIZABETH HOLMES AND SUNNY BALWANI OF THE CASH

10:04AM  2    POSITION IN EACH WEEK.

10:04AM  3    Q.   DID YOU DO THAT ON A REGULAR BASIS?

10:04AM  4    A.   YES.  WEEKLY.

10:04AM  5    Q.   USING DOCUMENTS SUCH AS EXHIBIT 5172?

10:04AM  6    A.   YES.

10:04AM  7    Q.   OKAY.  MS. HOLLIMAN, IF WE COULD MOVE TO THE LEFT TO

10:04AM  8    COLUMNS EL AND E9.  A LITTLE MORE TO THE LEFT.  THERE WE GO.

10:04AM  9    LET'S USE E9 IF WE COULD.

10:05AM  10        I'M SORRY, EN.  EXCUSE ME.

10:05AM  11        IN COLUMN EN, MS. SPIVEY, THERE'S TWO ROWS BEGINNING AND

10:05AM  12   ENDING.  WHAT DO THOSE ROWS SIGNIFY?

10:05AM  13   A.   THAT'S THE WEEK STARTING SEPTEMBER 23RD.

10:05AM  14   Q.   THERE WE GO.  LET'S LEAVE IT RIGHT THERE, MS. HOLLIMAN.

10:05AM  15   THANK YOU.

10:05AM  16        SO 9-23 TO 9-29, THAT'S THE LAST WEEK OF SEPTEMBER 2013?

10:05AM  17   A.   YES.

10:05AM  18   Q.   OKAY.  AND WHAT WAS THE TOTAL CASH BALANCE FOR THAT WEEK?

10:06AM  19   A.   AS OF 9-29 THE CASH BALANCE WAS ABOUT 14.5 MILLION.

10:06AM  20   Q.   OKAY.  AND IF WE COULD GO JUST A LITTLE BIT TO THE LEFT,

10:06AM  21   MS. HOLLIMAN, PLEASE.

10:06AM  22        AND THE WEEK BEFORE THAT WAS THE TOTAL CASH BALANCE

10:06AM  23   16.6 MILLION?

10:06AM  24   A.   YES.

10:06AM  25   Q.   AND THE WEEK BEFORE THAT IT WAS 18.82 MILLION?

10:06AM   1    A.   YES.

10:06AM   2    Q.   AND IS THIS WHAT YOU WERE REFERRING TO WHEN YOU WERE

10:06AM   3    SAYING THAT THINGS WERE GETTING TIGHT?

10:06AM   4    A.   YES.

10:06AM   5    Q.   IN ROW 14 THERE'S SOME AMOUNTS FOR TOTAL PAYMENTS.

10:06AM   6         DO YOU SEE THAT?   IN ROW 24.

10:06AM   7    A.   YES.

10:06AM   8    Q.   WHAT DOES TOTAL PAYMENTS REPRESENT?

10:06AM   9    A.   THAT'S THE AMOUNTS THAT THERANOS OR THE CASH THAT THERANOS

10:07AM  10    BURNED FOR THAT WEEK.

10:07AM  11    Q.   AND DID YOU SAY BURNED?

10:07AM  12    A.   SPENT.

10:07AM  13    Q.   OKAY.   ARE YOU FAMILIAR WITH THE TERM BURN RATE?

10:07AM  14    A.   YES.

10:07AM  15    Q.   AND WHAT DOES BURN RATE MEAN?

10:07AM  16    A.   THAT'S ALL OF THE EXPENSES AND OUTGOING PAYMENTS.

10:07AM  17    Q.   OKAY.   AND SO DOES THIS INDICATE THAT IN THE WEEK OF

10:07AM  18    SEPTEMBER 23RD, 2013, THERANOS WAS SPENDING $2.16 MILLION IN

10:07AM  19    CASH?

10:07AM  20    A.   YES.

10:07AM  21    Q.   AND THE WEEK BEFORE THAT IT WAS 2.217?

10:07AM  22    A.   YES.

10:07AM  23    Q.   AND THE WEEK BEFORE THAT IT WAS 1.194 MILLION?

10:07AM  24    A.   YES.

10:07AM  25    Q.   AND DOES THAT ROUGHLY APPROXIMATE THE WEEKLY BURN RATE OF

10:07AM  1     THERANOS DURING THIS TIME PERIOD?

10:07AM  2     A.   YES.

10:07AM  3     Q.   IF WE COULD DOWN FURTHER IN ROW 27 THERE'S A LINE FOR

10:08AM  4     OPTION STOCK PROCEEDS.

10:08AM  5          DO YOU SEE THAT?

10:08AM  6     A.   YES.

10:08AM  7     Q.   WHAT DOES THAT REFER TO?

10:08AM  8     A.   THAT'S THE MONEY THAT THERANOS RECEIVED EITHER FROM

10:08AM  9     EXERCISED OPTION OR FROM SELLING STOCK.

10:08AM 10     Q.   SO DOES THIS REFLECT THAT IN THE WEEK OF SEPTEMBER 30TH,

10:08AM 11     2013, THERANOS RECEIVED $21 MILLION THROUGH THE EXERCISE OF

10:08AM 12     OPTIONS OR THE SALE OF STOCK TO AN INVESTOR?

10:08AM 13     A.   YES.

10:08AM 14     Q.   AND IF WE COULD PLEASE MOVE TO THE RIGHT, MS. HOLLIMAN --

10:08AM 15     PERFECT.  FEBRUARY 3RD, 2014, THERE'S A LINE FOR $114,559,985.

10:09AM 16          MAYBE WE CAN MOVE UP A LITTLE BIT SO WE CAN SEE IT,

10:09AM 17     MS. HOLLIMAN.  THERE WE GO.  DOWN A LITTLE MORE, PLEASE.  RIGHT

10:09AM 18     HERE, THIS NUMBER (INDICATING).

10:09AM 19          DOES THAT -- DOES $114 MILLION REPRESENT MONEY RECEIVED

10:09AM 20     FROM THE EXERCISE OF STOCK OPTIONS OR INVESTMENTS FROM

10:09AM 21     INVESTORS?

10:09AM 22     A.   YES.

10:09AM 23     Q.   OKAY.  AS THE CORPORATE CONTROLLER --

10:09AM 24          WILL YOU TAKE THAT DOWN, MS. HOLLIMAN.  THANK YOU.

10:09AM 25          AS THE CORPORATE CONTROLLER OF THERANOS, WERE YOU

10:09AM  1    RESPONSIBLE FOR MONITORING THE COMPANY'S SPENDING ON PARTICULAR

10:09AM  2    EXPENSES?

10:09AM  3    A.    YES.

10:10AM  4    Q.    AND WERE YOU -- DO YOU KNOW WHETHER THE DEFENDANT EARNED A

10:10AM  5    SALARY DURING HER TIME AT THERANOS?

10:10AM  6    A.    YES.

10:10AM  7    Q.    AND FOR THE TIME PERIOD OF 2015, APPROXIMATELY WHAT AMOUNT

10:10AM  8    WAS THE DEFENDANT'S SALARY?

10:10AM  9    A.    400,000.

10:10AM  10   Q.    $400,000?

10:10AM  11   A.    YES.

10:10AM  12   Q.    BUT FOR THE TIME PERIOD 2010 THROUGH 2014, DO YOU KNOW

10:10AM  13   APPROXIMATELY WHAT THE DEFENDANT'S SALARY WAS?

10:10AM  14   A.    200,000.

10:10AM  15   Q.    $200,000?

10:10AM  16   A.    RIGHT.

10:10AM  17   Q.    ARE YOU FAMILIAR WITH A COMPANY CALLED FLIGHT

10:10AM  18   LOGISTICS INC.?

10:10AM  19   A.    YES.

10:10AM  20   Q.    AND WHAT IS FLIGHT LOGISTICS INC.?

10:10AM  21   A.    IT'S THE COMPANY THAT PROVIDE PRIVATE JET SERVICES TO

10:10AM  22   THERANOS.

10:10AM  23   Q.    AND WHEN YOU SAY IT'S THE COMPANY THAT PROVIDED PRIVATE

10:10AM  24   JET SERVICES TO THERANOS, WHAT DO YOU MEAN?

10:10AM  25   A.    THAT MEANS WHEN ELIZABETH HOLMES AND -- USED TO TRAVEL

10:11AM 1    THROUGH A PRIVATE JET, THAT WE WOULD PAY THROUGH THAT COMPANY

10:11AM 2    AND THEY WOULD ARRANGE THE FLIGHT FOR THERANOS.

10:11AM 3    Q.   AND DID YOU HAVE A ROLE IN ARRANGING FLIGHTS FOR

10:11AM 4    MS. HOLMES ON THIS PRIVATE JET?

10:11AM 5    A.   NO.

10:11AM 6    Q.   OKAY.  WHO HANDLED THAT?

10:11AM 7    A.   I'M NOT SURE.

10:11AM 8    Q.   WERE YOU REQUIRED TO APPROVE THE INVOICES FOR A PRIVATE

10:11AM 9    JET BY THE DEFENDANT?

10:11AM 10   A.   YES.

10:11AM 11   Q.   AND WHO ELSE USED THIS PRIVATE JET THAT THERANOS WAS

10:11AM 12   PAYING FOR?

10:11AM 13   A.   I CAN'T REMEMBER.

10:11AM 14   Q.   OKAY.  AND WHAT TYPES OF PURPOSES WAS THIS PRIVATE JET

10:11AM 15   USED FOR?  WHERE WAS THE DEFENDANT GOING?

10:11AM 16   A.   I'M NOT SURE.

10:11AM 17   Q.   OKAY.  DO YOU HAVE A BALLPARK OF HOW MUCH MONEY THERANOS

10:11AM 18   SPENT ON PRIVATE JETS FOR MS. HOLMES'S USE?

10:12AM 19   A.   I CAN'T RECALL.

10:12AM 20   Q.   MORE THAN 500,000?

10:12AM 21   A.   I CAN'T RECALL.

10:12AM 22   Q.   MORE THAN A MILLION?

10:12AM 23   A.   I DON'T KNOW.

10:12AM 24   Q.   OKAY.  ARE YOU FAMILIAR WITH A COMPANY CALLED SIEMENS?

10:12AM 25   A.   YES.

10:12AM  1    Q.   AND WHAT IS SIEMENS?

10:12AM  2    A.   WE -- THERANOS PURCHASED EQUIPMENT AND SOME LAB SUPPLIES

10:12AM  3    FROM THAT COMPANY.

10:12AM  4    Q.   OKAY.  AND WERE YOU RESPONSIBLE FOR APPROVING INVOICES

10:12AM  5    FROM SIEMENS?

10:12AM  6    A.   NO.

10:12AM  7    Q.   WHO WAS RESPONSIBLE FOR DOING THAT?

10:12AM  8    A.   SO THERANOS USED QAD AND A PURCHASING SYSTEM, WHICH I

10:12AM  9    CAN'T REMEMBER WHAT IT'S CALLED, BUT THERE'S AN APPROVAL SYSTEM

10:12AM 10    THAT THERANOS USED.

10:12AM 11         SO THE STAFF WILL SUBMIT A PURCHASE REQUISITION, AND IT

10:13AM 12    WOULD GO THROUGH THE APPROVAL PROCESS BASED ON THE AMOUNT, AND

10:13AM 13    SO AFTER IT'S APPROVED, THEN THE PURCHASING TEAM WILL PLACE THE

10:13AM 14    PURCHASE ORDER.

10:13AM 15         AND WHEN THE COMPANY RECEIVED WHAT WE PURCHASED, ACCORDING

10:13AM 16    TO THE PURCHASE ORDER, THEN THE STAFF WILL RECEIVE THAT INTO

10:13AM 17    QAD.

10:13AM 18         SO FROM AN ACCOUNTING PERSPECTIVE, I ONLY -- WE ONLY LOOK

10:13AM 19    AT WHAT HAS BEEN RECEIVED AND THEN AFTER WE MATCH UP WITH THE

10:13AM 20    INVOICE AND THEN WE CAN PROCESS PAYMENT.

10:13AM 21    Q.   OKAY.  SO YOU KNOW THE COMPANY SPENT MONEY ON SIEMENS FOR

10:13AM 22    SOME TYPE OF EQUIPMENT; IS THAT FAIR?

10:13AM 23    A.   YES.

10:13AM 24    Q.   BUT YOU WEREN'T RESPONSIBLE FOR APPROVING THAT?

10:13AM 25    A.   I WASN'T INVOLVED IN THAT APPROVAL PROCESS.

10:13AM   1    Q.   OKAY.  AND DID YOU HAVE ANY INSIGHT INTO WHAT THE SIEMENS

10:13AM   2    EQUIPMENT WAS BEING USED FOR?

10:13AM   3    A.   NO.

10:13AM   4    Q.   OKAY.  LET ME SHIFT TOPICS, MS. SPIVEY.  THE LAST TOPIC I

10:14AM   5    WANT TO GO BACK TO IS ARANCA.  YOU SHOULD HAVE IN BINDER

10:14AM   6    NUMBER 2 EXHIBIT 5085.

10:14AM   7         DOES THIS APPEAR TO BE AN EMAIL FROM YOU TO

10:14AM   8    ELIZABETH HOLMES DATED MAY 25TH, 2013?

10:14AM   9    A.   YES.

10:14AM  10    Q.   AND DOES THE SUBJECT APPEAR TO BE 409A?

10:14AM  11    A.   YES.

10:14AM  12    Q.   AND, AGAIN, WHAT IS 409A?

10:15AM  13    A.   IT'S THE I.R.S. TEST CODE FOR STOCK OPTION.

10:15AM  14    Q.   AND FROM TIME TO TIME DID YOU HAVE DISCUSSIONS WITH

10:15AM  15    MS. HOLMES ABOUT 409A ANALYSES?

10:15AM  16    A.   YES.

10:15AM  17              MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5085.

10:15AM  18              MR. WADE:  NO OBJECTION, YOUR HONOR.

10:15AM  19              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:15AM  20         (GOVERNMENT'S EXHIBIT 5085 WAS RECEIVED IN EVIDENCE.)

10:15AM  21    BY MR. LEACH:

10:15AM  22    Q.   AND, MS. HOLLIMAN, IF WE COULD PLEASE ZOOM IN ON THE TOP

10:15AM  23    PORTION WITH THE TEXT.

10:15AM  24         DO YOU SEE THE EMAIL AT THE BOTTOM WHERE MS. HOLMES

10:15AM  25    APPEARS TO WRITE, "CAN YOU FORWARD ME THE LATEST YOU HAVE ON

10:15AM   1    GETTING THIS DONE AGAIN -- I AM GOING TO GET WHATEVER WE NEED

10:15AM   2    DONE DONE THIS WEEKEND."

10:16AM   3         DO YOU SEE THAT LANGUAGE?

10:16AM   4    A.   YES.

10:16AM   5    Q.   AND YOU WRITE BACK, "HERE ARE THE THREE LATEST MODEL WE

10:16AM   6    HAVE."

10:16AM   7         THERE'S A LINE FOR 5/31/10, 7/01/10, 7/01/11.

10:16AM   8         WHAT DO THOSE DATES REFER TO?

10:16AM   9    A.   MAY 31ST, 2010, JULY 1ST, 2010, AND JULY 1ST, 2011.

10:16AM   10   Q.   AND ARE THOSE DATES OF MODELS THAT ARANCA WAS PREPARING?

10:16AM   11   A.   YES.

10:16AM   12   Q.   AND FOR THE MAY 31ST, 2010, YOU WROTE, "BASED ON THIS

10:16AM   13   MODEL, ARANCA CAME BACK WITH A VALUE OF $0.44."

10:16AM   14        IS THAT THE PRICE PER SHARE FOR COMMON STOCK?

10:16AM   15   A.   YES.

10:16AM   16   Q.   AND "THE IMPACT WAS THAT YOUR OPTION PLUS ALL OF THE OTHER

10:16AM   17   OPTIONS THAT WERE GRANTED IN JUNE WOULD BE GRANTED BELOW

10:16AM   18   VALUE."

10:16AM   19        WHAT DOES THAT MEAN?

10:16AM   20   A.   SO THE COMPANY GRANTED OPTIONS TO ELIZABETH HOLMES IN MAY

10:17AM   21   AND ALSO TO A LIST OF EMPLOYEES IN JUNE 2010 AT A LOWER VALUE.

10:17AM   22   Q.   AND WHAT DOES THAT MEAN?  WHAT CONSEQUENCE DOES THAT HAVE?

10:17AM   23   A.   IF THE COMPANY GRANTED OPTION BELOW FAIR MARKET VALUE,

10:17AM   24   THEN IT WOULD TRIGGER TAX CONSEQUENCE TO THE OPTIONEE.

10:17AM   25   Q.   AND THE OPTIONEE HERE WOULD BE THE DEFENDANT, MS. HOLMES?

10:17AM 1    A.   TO MS. HOLMES AND TO THE OTHER OPTIONEES THAT WE GRANTED

10:17AM 2    THE OPTION IN JUNE.

10:17AM 3    Q.   YOU TESTIFIED LAST WEEK THAT KPMG WAS ALSO RAISING

10:18AM 4    QUESTIONS WITH RESPECT TO THE VALUE OF THE OPTION GRANT IN

10:18AM 5    2010.

10:18AM 6         DO YOU UNDERSTAND THAT TESTIMONY?

10:18AM 7    A.   YES.

10:18AM 8    Q.   AND DID THAT ISSUE EVER GET RESOLVED WITH KPMG?

10:18AM 9    A.   NO.

10:18AM 10   Q.   AND IN THE DISCUSSION WITH KPMG, WERE THEY ADVOCATING FOR

10:18AM 11   A HIGHER PRICE FOR THE OPTIONS OR A LOWER PRICE FOR THE

10:18AM 12   OPTIONS?

10:18AM 13   A.   HIGHER.

10:18AM 14   Q.   THANK YOU.  WE CAN PUT THIS ASIDE, MS. HOLLIMAN.

10:18AM 15        LET ME DRAW YOUR ATTENTION TO WHAT HAS BEEN MARKED AS

10:18AM 16   EXHIBIT 5141.

10:18AM 17        I UNDERSTAND THAT WE ARE STIPULATING TO THE ADMISSION OF

10:18AM 18   5141?

10:18AM 19            MR. WADE:  THAT'S CORRECT, YOUR HONOR.

10:18AM 20            THE COURT:  THANK YOU.  IT'S ADMITTED.  IT MAY BE

10:18AM 21   PUBLISHED.

10:18AM 22        (GOVERNMENT'S EXHIBIT 5141 WAS RECEIVED IN EVIDENCE.)

10:18AM 23   BY MR. LEACH:

10:19AM 24   Q.   PERFECT, MS. HOLLIMAN.  THANK YOU.

10:19AM 25        DO YOU SEE YOUR NAME AT THE TOP OF THIS EMAIL, MS. SPIVEY?

SPIVEY DIRECT EXAM BY MR. LEACH (RES.)

10:19AM   1    A.   YES.

10:19AM   2    Q.   AND THE DATE IS DECEMBER 8TH, 2013?

10:19AM   3    A.   YES.

10:19AM   4    Q.   AND IT'S TO SOMEONE NAMED VALESKA HINTZ.

10:19AM   5         WHO IS THAT?

10:19AM   6    A.   SHE'S THE SENIOR ATTORNEY AT THERANOS.

10:19AM   7    Q.   AND YOU HAVE COPIED MS. HOLMES ON THIS EMAIL; IS THAT

10:19AM   8    RIGHT?

10:19AM   9    A.   YES.

10:19AM   10   Q.   THE SUBJECT IS 409A VALUATION REPORTS.

10:19AM   11        DO YOU SEE THAT?

10:19AM   12   A.   YES.

10:19AM   13   Q.   AND IS THAT A REFERENCE TO THESE 409A VALUATION REPORTS

10:19AM   14   THAT ARANCA WAS PREPARING?

10:19AM   15   A.   YES.

10:19AM   16   Q.   AND LET'S LOOK AT PAGE 2, PLEASE.

10:19AM   17        WE'RE LOOKING AT PAGE 2 OF THE EXHIBIT, THE ATTACHMENT TO

10:19AM   18   THE EMAIL.  IS THIS ARANCA REPORT VALUING THERANOS'S COMMON

10:19AM   19   STOCK AS OF SEPTEMBER 30TH, 2013?

10:19AM   20   A.   YES.

10:20AM   21   Q.   AND IF I COULD DRAW YOUR ATTENTION TO PAGE 38.

10:20AM   22        THANK YOU, MS. HOLLIMAN.  THERE WE GO.  AND IF WE COULD

10:20AM   23   ZOOM IN ON THE TOP PORTION, THE TABLE AT THE TOP.

10:20AM   24        MS. YAM, I DRAW YOUR ATTENTION TO THE EXISTING

10:20AM   25   SHAREHOLDERS AS OF SEPTEMBER 30TH, 2013, AND I DON'T SEE A

10:20AM  1    REFERENCE TO THE C-2 INVESTORS.

10:20AM  2         IS IT FAIR TO CONCLUDE FROM THIS THAT THE C-2 INVESTORS

10:20AM  3    COME THEREAFTER?

10:20AM  4    A.   YES.

10:20AM  5    Q.   AND IF WE COULD PLEASE GO TO PAGE 51.

10:21AM  6         MS. SPIVEY, THERE'S A SUMMARY INCOME STATEMENT AT THE TOP

10:21AM  7    WITH DIFFERENT YEARS GOING OUT TO 2017.

10:21AM  8         DO YOU SEE THAT?

10:21AM  9    A.   YES.

10:21AM 10    Q.   AND THERE'S A ROW WITH 3 MTH-F, FY-F.  DO YOU SEE THAT?

10:21AM 11    A.   YES.

10:21AM 12    Q.   AND HELP US TO UNDERSTAND WHAT THAT MEANS?

10:21AM 13    A.   SO THE FIRST COLUMN IS 3 MONTH FORECAST AND 2013, AND THE

10:21AM 14    NEXT ROW IS FOR THE YEAR 2013 FORECAST SO ON AND SO FORTH.

10:21AM 15    Q.   SO THE F IS FOR THE FORECAST?

10:21AM 16    A.   YES.

10:21AM 17    Q.   AND THESE FORECASTED REVENUE NUMBERS, WHERE DOES ARANCA

10:22AM 18    GET THOSE?

10:22AM 19    A.   THEY GOT THAT FROM ME.

10:22AM 20    Q.   AND WHERE DID YOU GET THEM FROM?

10:22AM 21    A.   FROM ELIZABETH HOLMES.

10:22AM 22    Q.   WHAT WAS THE REVENUE FORECAST THAT THERANOS PROVIDED FOR

10:22AM 23    YEAR ENDED 2013?

10:22AM 24    A.   50 MILLION.

10:22AM 25    Q.   HOW ABOUT 2015 OR 2014?

10:22AM   1    A.   ABOUT 90 MILLION.

10:22AM   2    Q.   AND 2015?

10:22AM   3    A.   112 MILLION.

10:22AM   4    Q.   AND YOU'VE HAD DISCUSSION WITH MS. HOLMES ABOUT THESE

10:22AM   5    NUMBERS?

10:22AM   6    A.   YES.

10:22AM   7    Q.   DID YOU EVER PROVIDE FINANCIAL PROJECTIONS TO INVESTORS?

10:22AM   8    A.   NO.

10:22AM   9    Q.   DID MS. HOLMES OR MR. BALWANI ASK YOU TO PREPARE REVENUE

10:22AM   10   PROJECTIONS FOR ANYBODY INTERESTED IN INVESTING IN THE COMPANY?

10:22AM   11   A.   NO.

10:22AM   12   Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO EXHIBIT 3533.

10:23AM   13        I BELIEVE WE HAVE STIPULATED TO THE ADMISSION OF 3533?

10:23AM   14             MR. WADE:  WE HAVE, YOUR HONOR.

10:23AM   15             THE COURT:  THANK YOU.  IT'S ADMITTED, AND IT MAY BE

10:23AM   16   PUBLISHED.

10:23AM   17        (GOVERNMENT'S EXHIBIT 3533 WAS RECEIVED IN EVIDENCE.)

10:23AM   18             MR. LEACH:  IF WE CAN PLEASE ZOOM IN, MS. HOLLIMAN,

10:23AM   19   ON JUST THE TEXT TO ABOUT RIGHT HERE (INDICATING).

10:23AM   20   Q.   DO YOU SEE YOUR NAME IN THE FROM LINE ON THIS EMAIL,

10:23AM   21   MS. SPIVEY?

10:23AM   22   A.   YES.

10:23AM   23   Q.   AND DO YOU SEE MS. HOLMES'S NAME IN THE TO LINE?

10:23AM   24   A.   YES.

10:23AM   25   Q.   AND THE SUBJECT IS 409A PREP.  IS THIS ANOTHER REFERENCE

10:23AM 1    TO DISCUSSIONS ABOUT 409A VALUATIONS?

10:24AM 2    A.   YES.

10:24AM 3    Q.   AND IS THIS AN EXAMPLE OF YOU CONSULTING WITH THE

10:24AM 4    DEFENDANT ABOUT WHAT REVENUE PROJECTIONS TO PROVIDE TO ARANCA?

10:24AM 5    A.   YES.

10:24AM 6    Q.   THANK YOU.  IF WE COULD NOW LOOK AT 3527.

10:24AM 7         I BELIEVE WE HAVE STIPULATED TO 3527.

10:24AM 8              MR. WADE:  WE HAVE, YOUR HONOR.

10:24AM 9              THE COURT:  THANK YOU.  IT'S ADMITTED, AND MAY BE

10:24AM 10   PUBLISHED.

10:24AM 11             (GOVERNMENT'S EXHIBIT 3527 WAS RECEIVED IN EVIDENCE.)

10:24AM 12             MR. LEACH:  THAT'S GOOD, MS. HOLLIMAN.  RIGHT THERE.

10:24AM 13   THANK YOU.

10:24AM 14        IS THERE SOME WAY TO DELETE MY WRITING?  THANK YOU.

10:24AM 15   Q.   MS. SPIVEY, IS THIS ANOTHER EXAMPLE OF YOU DISCUSSING 409A

10:25AM 16   VALUATIONS WITH THE DEFENDANT?

10:25AM 17   A.   YES.

10:25AM 18   Q.   OKAY.  IN THE MIDDLE ON DECEMBER 22ND, 2014, YOU WROTE "I

10:25AM 19   SENT OVER THE PROJECTION TO ARANCA LAST NIGHT.  THEY KNOW WE

10:25AM 20   HAVE A DEADLINE BEFORE THE END OF THE YEAR AND WILL WORK WITH

10:25AM 21   THAT.

10:25AM 22        "I USED THE SAME ASSUMPTIONS FOR REVENUE AS IN OCTOBER,

10:25AM 23   ROUGHLY $100M, $300M, $300M, AND $500M IN 2015 THRU 2018."

10:25AM 24        WHAT DID YOU MEAN BY THAT?

10:25AM 25   A.   THAT'S THE REVENUE PROJECTION THAT WE USE FOR THE

10:25AM   1    FORECAST.

10:25AM   2    Q.   THAT YOU WOULD USE FOR THE LAST FORECAST?

10:25AM   3    A.   RIGHT.

10:25AM   4    Q.   AND ARE YOU ASKING FOR PERMISSION TO USE THOSE SAME

10:25AM   5    FORECASTS FOR THE NEXT VALUATION?

10:25AM   6    A.   CORRECT.

10:25AM   7    Q.   AND MS. HOLMES WRITES BACK, "100M FOR 15 RIGHT."

10:26AM   8         YOU REPLY, "YES."

10:26AM   9         AND THEN SHE WRITES, "THX."

10:26AM  10         DO YOU SEE THAT?

10:26AM  11    A.   YES.

10:26AM  12    Q.   AND WHAT DID THAT MEAN?  WHAT ARE YOU TALKING ABOUT THERE?

10:26AM  13    A.   FROM HERE SHE WANTS TO CONFIRM THAT WE USE 100 MILLION FOR

10:26AM  14    2015, AND I RESPOND YES.

10:26AM  15    Q.   AND THAT'S 115 MILLION IN REVENUE FOR THE YEAR END 2015?

10:26AM  16    A.   100 MILLION, YES.

10:26AM  17    Q.   AND THE DATE OF THIS EMAIL EXCHANGE IS THE END OF 2014?

10:26AM  18    A.   YES.

10:26AM  19    Q.   LET ME DRAW YOUR ATTENTION TO EXHIBIT 5190.

10:26AM  20         I BELIEVE WE HAVE STIPULATED TO THE ADMISSION OF 5190?

10:27AM  21              MR. WADE:  WE HAVE, YOUR HONOR.

10:27AM  22              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:27AM  23         (GOVERNMENT'S EXHIBIT 5190 WAS RECEIVED IN EVIDENCE.)

10:27AM  24    BY MR. LEACH:

10:27AM  25    Q.   MS. SPIVEY, IS THIS AN EMAIL WITH YOU SENDING THE FINAL

10:27AM  1    DECEMBER 2014 ARANCA VALUATION REPORTS TO MS. HOLMES?

10:27AM  2    A.   YES.

10:27AM  3    Q.   OKAY.  AND IS THE REPORT ATTACHED IN THERANOS 409A REPORT,

10:27AM  4    DECEMBER 15TH, 2014?

10:27AM  5    A.   YES.

10:27AM  6    Q.   AND IS THIS ANOTHER EXAMPLE OF YOU DISCUSSING 409A

10:27AM  7    ANALYSES WITH MS. HOLMES?

10:27AM  8    A.   YES.

10:27AM  9    Q.   OKAY.  ONE MORE FOR ARANCA.  IF WE CAN PLEASE LOOK AT

10:27AM 10    EXHIBIT 2623.

10:27AM 11        I BELIEVE WE HAVE STIPULATED TO THE ADMISSION OF 2623?

10:28AM 12            MR. WADE:  THAT'S CORRECT, YOUR HONOR.

10:28AM 13            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:28AM 14        (GOVERNMENT'S EXHIBIT 2623 WAS RECEIVED IN EVIDENCE.)

10:28AM 15    BY MR. LEACH:

10:28AM 16    Q.   IF WE CAN PLEASE LOOK AT PAGE 2 OF THIS EMAIL THREAD.  AND

10:28AM 17    IF WE CAN HIGHLIGHT THE TOP PART OF THE PAGE DOWN TO THE TABLE.

10:28AM 18        THE SUBJECT OF THIS IS SUNIL DHAWAN.

10:28AM 19        DO YOU KNOW WHO SUNIL DHAWAN IS?

10:28AM 20    A.   HE WAS THE CONTRACT LAB DIRECTOR AT THERANOS.

10:28AM 21    Q.   THANK YOU.  AND DOES THIS EMAIL THREAD RELATE TO POSSIBLE

10:29AM 22    OPTION GRANTS FOR DR. DHAWAN?

10:29AM 23    A.   YES.

10:29AM 24    Q.   AND YOU WROTE TO ELIZABETH HOLMES AND SUNNY BALWANI ON

10:29AM 25    JUNE 27TH, 2015, "PLEASE SEE ATTACHED FOR THE FULL PROJECTION

10:29AM 1    MODEL.  THE QUICKEST TURNAROUND TIME IS TWO WEEKS, DEPENDING ON

10:29AM 2    HOW MUCH CHANGES TO THE ASSUMPTIONS WE ARE MAKING.  THE

10:29AM 3    ASSUMPTIONS WE HAD BEEN USING SINCE SEPTEMBER 2014 WERE AS

10:29AM 4    FOLLOWS."

10:29AM 5         AND THEN THERE'S A COLUMN WITH REVENUE NUMBERS FOR 2015 TO

10:29AM 6    2018.

10:29AM 7         DO YOU SEE THOSE?

10:29AM 8    A.   YES.

10:29AM 9    Q.   AND WHAT DID YOU MEAN "THE ASSUMPTIONS WE HAD BEEN USING

10:29AM 10   SINCE SEPTEMBER 2014 WERE AS FOLLOWS"?

10:29AM 11   A.   THESE ARE THE ASSUMPTIONS THAT THE COMPANY USED TO CREATE

10:29AM 12   AND PROJECT ALL OF THE FORECAST FINANCIAL STATEMENTS.

10:29AM 13   Q.   AND AM I RIGHT TO READ THIS AS YOU TELLING SINCE SEPTEMBER

10:30AM 14   OF 2014 THERANOS HAD BEEN TELLING ARANCA THAT ITS PROJECTED

10:30AM 15   REVENUE FOR 2015 WAS $113 MILLION?

10:30AM 16   A.   YES.

10:30AM 17   Q.   LET ME PLEASE DRAW YOUR ATTENTION TO EXHIBIT 4859.

10:30AM 18        DO YOU HAVE 4859 IN FRONT OF YOU, MS. SPIVEY?

10:30AM 19   A.   YES.

10:30AM 20   Q.   OKAY.  PRIOR TO 2015, HAD YOU EVER SEEN THIS DOCUMENT

10:31AM 21   BEFORE?

10:31AM 22   A.   NO.

10:31AM 23   Q.   DID YOU HAVE ANY ROLE IN PREPARING FINANCIAL PROJECTIONS

10:31AM 24   FOR INVESTORS?

10:31AM 25   A.   NO.

| | | |
|---|---|---|
| 10:31AM | 1 | Q.   AND DID YOU HAVE ANY IDEA WHERE THIS DOCUMENT CAME FROM? |
| 10:31AM | 2 | A.   NO. |
| 10:31AM | 3 | Q.   DO YOU HAVE ANY IDEA WHAT SUPPORT THERE WAS FOR THE |
| 10:31AM | 4 | PARTICULAR NUMBERS ON THE RIGHT SIDE OF THIS DOCUMENT? |
| 10:31AM | 5 | A.   NO. |
| 10:31AM | 6 | Q.   DID YOU PROVIDE ANY INFORMATION TO MS. HOLMES OR |
| 10:31AM | 7 | MR. BALWANI ABOUT THE INFORMATION IN THE RIGHT TWO COLUMNS OF |
| 10:31AM | 8 | THIS DOCUMENT? |
| 10:31AM | 9 | A.   NO. |
| 10:31AM | 10 | MR. LEACH:  YOUR HONOR, I'D LIKE TO OFFER 4859 RIGHT |
| 10:31AM | 11 | NOW.  I THINK THIS WILL COME IN THROUGH ANOTHER WITNESS, AND I |
| 10:31AM | 12 | THINK IT MAY AID TO GO THROUGH IT NOW. |
| 10:31AM | 13 | MR. WADE:  WE WOULD OBJECT UNDER 602 AND 802. |
| 10:32AM | 14 | THE COURT:  DO YOU HAVE A FOUNDATIONAL WITNESS THAT |
| 10:32AM | 15 | IS AVAILABLE? |
| 10:32AM | 16 | MR. LEACH:  YES, LATER IN THE TRIAL, YES. |
| 10:32AM | 17 | THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, I'M |
| 10:32AM | 18 | GOING TO ADMIT THIS NOW PROVISIONALLY, THAT IS TO SAY THAT I AM |
| 10:32AM | 19 | GOING TO ALLOW EXAMINATION BY BOTH SIDES ON THIS NOW SUBJECT TO |
| 10:32AM | 20 | THE FOUNDATION BEING LAID FOR ITS ADMITTANCE LATER. |
| 10:32AM | 21 | IF THAT DOESN'T HAPPEN, YOU'LL HEAR ME TELL YOU TO STRIKE |
| 10:32AM | 22 | ANY TESTIMONY AND THIS EXHIBIT. |
| 10:32AM | 23 | IF THE FOUNDATION IS LAID, I WILL TELL YOU THAT AND INFORM |
| 10:32AM | 24 | YOU OF THAT AS WELL THAT IT MAY BE CONSIDERED. |
| 10:32AM | 25 | SO FOR NOW IT'S ADMITTED PROVISIONALLY, SUBJECT TO THE |

10:32AM  1    FOUNDATION BEING LAID IN THE FUTURE.

10:32AM  2        (GOVERNMENT'S EXHIBIT 4859 WAS PROVISIONALLY RECEIVED IN

10:32AM  3    EVIDENCE.)

10:32AM  4            MR. LEACH:  THANK YOU, YOUR HONOR.  UNDERSTOOD.

10:32AM  5            THE COURT:  SO IT MAY BE PUBLISHED AT THIS TIME.

10:33AM  6    BY MR. LEACH:

10:33AM  7    Q.  MS. SPIVEY, COULD YOU SEE IN THE UPPER LEFT-HAND CORNER

10:33AM  8    WHERE IT SAYS PROJECTED STATEMENT OF INCOME?

10:33AM  9    A.  YES.

10:33AM 10    Q.  AND THERE'S SOME HANDWRITING ON THIS PAGE.  YOU DON'T KNOW

10:33AM 11    WHOSE HANDWRITING THAT IS?

10:33AM 12    A.  I DON'T KNOW.

10:33AM 13    Q.  AND THERE ARE TWO COLUMNS FOR 1231, 2014, AND 12/31/2015.

10:33AM 14        DO YOU SEE THOSE?

10:33AM 15    A.  YES.

10:33AM 16    Q.  AND THERE'S A REVENUE PROJECTION FOR DECEMBER 31ST, 2014,

10:33AM 17    OF $140 MILLION.

10:33AM 18        DO YOU SEE THAT?

10:33AM 19    A.  YES.

10:33AM 20    Q.  AND DID YOU PROVIDE THAT NUMBER TO ANYBODY?

10:33AM 21    A.  NO.

10:33AM 22    Q.  AND DO YOU HAVE ANY IDEA WHERE THAT NUMBER CAME FROM?

10:33AM 23    A.  NO.

10:33AM 24    Q.  TO THE RIGHT THERE'S A TOTAL REVENUE OF 990 MILLION FOR

10:33AM 25    DECEMBER 31ST, 2015.

10:33AM  1          DO YOU SEE THAT?

10:33AM  2     A.   YES.

10:33AM  3     Q.   AND DID YOU PROVIDE THAT NUMBER TO SOMEBODY?

10:33AM  4     A.   NO.

10:33AM  5     Q.   DO YOU HAVE ANY IDEA WHERE THAT NUMBER CAME FROM?

10:34AM  6     A.   NO.

10:34AM  7     Q.   DO YOU HAVE ANY EXPLANATION FOR WHY THAT NUMBER IS

10:34AM  8     DIFFERENT THAN THE NUMBERS THAT WERE PROVIDED TO ARANCA?

10:34AM  9     A.   NO.

10:34AM 10     Q.   AND CAN YOU THINK OF ANY REASON WHY THERANOS WOULD PROVIDE

10:34AM 11     ONE SET OF NUMBERS TO ARANCA AND A DIFFERENT SET OF NUMBERS TO

10:34AM 12     A DIFFERENT AUDIENCE?

10:34AM 13     A.   NO, I DON'T KNOW.

10:34AM 14     Q.   THANK YOU, MS. HOLLIMAN.  YOU CAN PLEASE TAKE THAT DOWN.

10:34AM 15          LET ME DRAW YOUR ATTENTION TO EXHIBIT 3233.

10:34AM 16          THE COURT:  I'M SORRY, WHAT EXHIBIT IS IT?

10:35AM 17          MR. LEACH:  3233, YOUR HONOR.

10:35AM 18          THE COURT:  THANK YOU.

10:35AM 19     BY MR. LEACH:

10:35AM 20     Q.   DOES THIS APPEAR TO BE A COPY OF THERANOS'S TAX RETURN FOR

10:35AM 21     THE YEAR ENDED DECEMBER 31ST, 2015, MS. SPIVEY?

10:35AM 22     A.   YES.

10:35AM 23     Q.   AND DID YOU HAVE A HAND IN PREPARING THIS OR GIVING

10:35AM 24     INFORMATION TO CONSULTANTS TO PREPARE THIS?

10:35AM 25     A.   YES.

10:35AM  1    Q.   AND DID THERANOS PREPARE TAX RETURNS IN THE ORDINARY

10:35AM  2    COURSE OF BUSINESS?

10:35AM  3    A.   YES.

10:35AM  4    Q.   WAS IT MADE AT OR NEAR THE TIME OF THE INFORMATION IN THE

10:35AM  5    QAD SYSTEM AND OTHER FINANCIAL RECORDS?

10:35AM  6    A.   YES.

10:35AM  7    Q.   AND WAS IT THERANOS'S PRACTICE TO KEEP ITS TAX RETURNS SO

10:35AM  8    THAT IT COULD DEMONSTRATE ITS INCOME AND EXPENSES TO THE

10:35AM  9    I.R.S.?

10:35AM  10   A.   YES.

10:35AM  11            MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 3233.

10:35AM  12            MR. WADE:  WE OBJECT UNDER 401, YOUR HONOR.

10:35AM  13            THE COURT:  THANK YOU.  THE OBJECTION IS OVERRULED.

10:36AM  14   IT MAY BE ADMITTED UNDER 803.  THE FOUNDATION HAS BEEN LAID.

10:36AM  15       IT MAY BE PUBLISHED.

10:36AM  16       (GOVERNMENT'S EXHIBIT 3233 WAS RECEIVED IN EVIDENCE.)

10:36AM  17            MR. LEACH:  LET'S ZOOM IN BRIEFLY, PLEASE,

10:36AM  18   MS. HOLLIMAN AT THE TOP OF THE TEXT.

10:36AM  19   Q.   DO YOU SEE THE DATE DECEMBER 31ST, 2015, MS. SPIVEY?

10:36AM  20   A.   YES.

10:36AM  21   Q.   AND THERE'S A REFERENCE TO MOSS ADAMS LLP.  IS THAT THE

10:36AM  22   TAX PREPARATION FIRM?

10:36AM  23   A.   YES.

10:36AM  24   Q.   AND LET ME PLEASE DRAW YOUR ATTENTION TO PAGE 4 THERE'S AN

10:36AM  25   ENTRY OF $429,210 FOR GROSS RECEIPTS OR SALES.

SPIVEY DIRECT EXAM BY MR. LEACH (RES.)                    738

10:37AM  1          DO YOU SEE THAT?

10:37AM  2      A.   YES.

10:37AM  3      Q.   AND DO YOU BELIEVE THAT TO BE THE REVENUE FOR THERANOS IN

10:37AM  4      2015?

10:37AM  5      A.   YES.

10:37AM  6      Q.   AND IF I COULD PLEASE DRAW YOUR ATTENTION TO PAGE 8

10:37AM  7      THERE'S A NUMBER NEGATIVE $585,079,242.

10:37AM  8          DO YOU SEE THAT IN RETAINED EARNINGS?

10:37AM  9      A.   YES.

10:37AM 10      Q.   IS THAT A REFERENCE TO THERANOS'S ACCUMULATED DEFICIT FROM

10:37AM 11      2003 UP THROUGH 2015?

10:37AM 12      A.   YES.

10:37AM 13      Q.   THANK YOU, MS. SPIVEY.

10:38AM 14          THANK YOU, YOUR HONOR.  I HAVE NOTHING FURTHER.

10:38AM 15              THE COURT:  THANK YOU.

10:38AM 16          CROSS-EXAMINATION?

10:38AM 17              MR. WADE:  YES, YOUR HONOR.

10:38AM 18          YOUR HONOR, MAYBE THE JURY WOULD LIKE TO STAND UP AS I'M

10:38AM 19      JUST TRANSITIONING MY MATERIALS?

10:38AM 20              THE COURT:  WELL, THANK YOU FOR THAT.

10:38AM 21          FOLKS, YOU MAY STAND IF YOU WOULD LIKE.

10:38AM 22          (STRETCHING.)

10:39AM 23              THE COURT:  LET ME ASK COUNSEL, WILL WE BE RECESSING

10:39AM 24      AT 11:00?

10:39AM 25              MR. DOWNEY:  I THINK SOME TIME BETWEEN 11:00 AND

10:39AM  1    11:15.  WHATEVER SEEMS SENSIBLE.

10:39AM  2              THE COURT:  THANK YOU.  THANK YOU FOR THAT.

10:39AM  3          (PAUSE IN PROCEEDINGS.)

10:39AM  4              THE COURT:  LADIES AND GENTLEMEN OF THE JURY, ONE

10:39AM  5    THING I'M GOING TO ASK YOU TO DO IS TO LOOK AT YOUR SCHEDULES

10:39AM  6    OVER THE NEXT DAY AND MAYBE TODAY.  IT MAY BE THAT I'M GOING TO

10:39AM  7    ASK YOU IF WE COULD -- I TOLD YOU THAT WE END AT 2:00 P.M.  I

10:39AM  8    MAY ASK IF WE CAN EXTEND THAT AN HOUR TO MAYBE GO UNTIL

10:39AM  9    3:00 O'CLOCK ON SOME DAYS JUST TO CAPTURE EXTRA TIME.

10:39AM 10        WE LOST FRIDAY'S TESTIMONY, AS YOU KNOW.  I'D LIKE TO GET

10:39AM 11    US ON SCHEDULE AND KEEP US ON SCHEDULE FOR YOUR CONVENIENCE.

10:39AM 12    BUT I JUST WANT TO LET YOU KNOW IN ADVANCE OF THAT FOR YOUR

10:40AM 13    PLANNING IF YOU MIGHT INVESTIGATE MAYBE ENDING AT 3:00 O'CLOCK.

10:40AM 14        CANDIDLY, THERE MAY BE SOME DAYS THAT I'M GOING TO ASK YOU

10:40AM 15    MAYBE WE'LL GO UNTIL 4:00 O'CLOCK.  I'M NOT GOING TO KEEP YOU

10:40AM 16    UNTIL 5:00, I PROMISE YOU THAT, ON ANY DAY.

10:40AM 17        I DO WANT TO POINT OUT ONE OTHER THING.  I THINK WE DO

10:40AM 18    HAVE THE HEPA FILTERS NOW IN THE COURTROOM, AND THEY SHOULD BE

10:40AM 19    BY COUNSEL TABLE.  I THINK THAT'S RIGHT.  I HAVEN'T HEARD THEM

10:40AM 20    KICK THEM OVER YET SO I ASSUME THAT THEY'RE WELL PLACED.

10:40AM 21        BUT I JUST WANT TO LET YOU KNOW THAT, LADIES AND

10:40AM 22    GENTLEMEN, WE DO HAVE SOME ADDITIONAL FILTRATION HERE IN THE

10:40AM 23    COURTROOM.

10:40AM 24    ///

10:40AM 25    ///

**CROSS-EXAMINATION**

10:40AM 2    BY MR. WADE:

10:40AM 3    Q.   GOOD MORNING, MS. SPIVEY.

10:40AM 4    A.   GOOD MORNING.

10:40AM 5    Q.   MY NAME IS LANCE WADE.  I REPRESENT MS. HOLMES.  I'D LIKE

10:40AM 6    TO ASK YOU A FEW QUESTIONS HERE THIS MORNING.

10:40AM 7    A.   OKAY.

10:40AM 8    Q.   WE'VE NEVER MET BEFORE; CORRECT?

10:41AM 9    A.   NO.

10:41AM 10   Q.   IT'S NICE TO MEET YOU.

10:41AM 11        MS. YAM, I'D LIKE TO START WITH GOVERNMENT EXHIBIT 5702.

10:41AM 12   IF WE COULD CALL THAT UP.

10:41AM 13           THE CLERK:  COUNSEL, THAT HAS NOT BEEN ADMITTED.

10:41AM 14           MR. WADE:  I'M SORRY.  I CALLED THE WRONG NUMBER.

10:41AM 15        5172.

10:42AM 16   Q.   DO YOU RECALL THIS DOCUMENT, MS. SPIVEY?

10:42AM 17   A.   YES.

10:42AM 18   Q.   AND THIS IS A DOCUMENT THAT RELATES TO THE CASH FLOW OF

10:42AM 19   THE COMPANY FROM THE PERIOD 2011 UNTIL THE END OF 2015?

10:42AM 20   A.   YES.

10:42AM 21   Q.   AND THIS WAS THE TYPE OF DOCUMENTS THAT YOU WOULD

10:42AM 22   REGULARLY PROVIDE MS. HOLMES?

10:42AM 23   A.   YES.

10:42AM 24   Q.   AND IT WAS FOCUSSED ON THE CASH?

10:42AM 25   A.   YES.

10:42AM  1    Q.   AND THAT WAS AN AREA OF THE FINANCES THAT MS. HOLMES WAS

10:42AM  2    MOST KEENLY FOCUSSED ON?

10:42AM  3    A.   I'M NOT SURE.  I PROVIDE THIS ON A WEEKLY BASIS.

10:42AM  4    Q.   THIS WAS THE REPORT THAT YOU PROVIDED TO HER MOST

10:42AM  5    FREQUENTLY?

10:42AM  6    A.   YES.

10:42AM  7    Q.   AND WE'VE TALKED ABOUT SOME DIFFERENT ACCOUNTING

10:42AM  8    PRINCIPLES HERE THIS MORNING.  I'D LIKE TO EXPLORE THE

10:43AM  9    DIFFERENCES BETWEEN CASH AND REVENUE.  OKAY?

10:43AM  10   A.   UH-HUH, YES.

10:43AM  11   Q.   THEY'RE NOT THE SAME; CORRECT?

10:43AM  12   A.   CORRECT.

10:43AM  13   Q.   AND WHEN CASH COMES IN THE DOOR FROM A CUSTOMER AND GOES

10:43AM  14   INTO THE THERANOS BANK ACCOUNT, THAT DOESN'T MEAN THAT IT'S

10:43AM  15   REVENUE; CORRECT?

10:43AM  16   A.   CORRECT.

10:43AM  17   Q.   SOMETIMES IT'S CONSIDERED DEFERRED REVENUE?

10:43AM  18   A.   YES.

10:43AM  19   Q.   AND IT WILL SIT ON THE BOOKS OF THE COMPANY AS DEFERRED

10:43AM  20   REVENUE UNTIL CERTAIN CONDITIONS ARE MET AND IT CAN BE

10:43AM  21   RECOGNIZED IN THE REVENUE; CORRECT?

10:43AM  22   A.   CORRECT.

10:43AM  23   Q.   BUT THE CASH IS IN THE BANK ACCOUNT; CORRECT?

10:43AM  24   A.   YES.

10:43AM  25   Q.   AND THE CASH CAN BE SPENT BY THE COMPANY; CORRECT?

10:43AM   1   A.   YES.

10:43AM   2   Q.   AND IN THIS CASE THE CASH WAS INVESTED BY THE COMPANY INTO

10:43AM   3   VARIOUS THINGS LIKE RESEARCH AND DEVELOPMENT?

10:43AM   4   A.   YES.

10:43AM   5   Q.   AND SO WHEN MR. LEACH WAS ASKING ABOUT REVENUE, HE WAS

10:44AM   6   FOCUSSED ON AN ACCOUNTING JUDGMENT THAT IS MADE; CORRECT?

10:44AM   7   A.   CAN YOU REPEAT THAT.

10:44AM   8   Q.   SURE.  LET ME TRY IT A DIFFERENT WAY.

10:44AM   9        THERE ARE MANY RULES THAT RELATE TO WHEN YOU CAN RECOGNIZE

10:44AM   10  CASH AS REVENUE; CORRECT?

10:44AM   11  A.   YES.

10:44AM   12  Q.   AND THERE ARE A LOT OF ACCOUNTING CONCEPTS RELATED TO

10:44AM   13  THAT?

10:44AM   14  A.   YES.

10:44AM   15  Q.   AND, IN FACT, IN THIS TIME PERIOD THERE WERE NUMEROUS

10:44AM   16  ACCOUNTING PRINCIPLES AND OPINIONS THAT RELATED TO REVENUE

10:44AM   17  RECOGNITION; CORRECT?

10:44AM   18  A.   YES.

10:44AM   19  Q.   AND THAT'S A PRETTY TECHNICAL ACCOUNTING JUDGMENT;

10:44AM   20  CORRECT?

10:44AM   21  A.   YES.

10:44AM   22  Q.   AND THAT WAS A JUDGMENT THAT YOU WERE INTERACTING WITH

10:44AM   23  FREQUENTLY WITH KPMG AND OTHERS; CORRECT?

10:44AM   24  A.   YES.

10:44AM   25  Q.   AND OFTENTIMES IT WOULD HINGE ON VERY PARTICULAR ELEMENTS

SPIVEY CROSS BY MR. WADE

10:44AM 1  OF FACTS AND CIRCUMSTANCES THAT RELATED TO A PARTICULAR

10:44AM 2  CONTRACT; CORRECT?

10:44AM 3  A.  YES.

10:44AM 4  Q.  AND SO YOU'D HAVE TO LOOK AT THE TERMS OF A CONTRACT, FOR

10:45AM 5  EXAMPLE, AND ASSESS WHETHER IT WOULD MEET THE TECHNICAL

10:45AM 6  PROVISION OF THE ACCOUNTING?

10:45AM 7  A.  YES.

10:45AM 8  Q.  AND THAT'S A VERY DETAILED ANALYSIS?

10:45AM 9  A.  YES.

10:45AM 10  Q.  THAT WAS DONE BY YOU AND OTHER ACCOUNTANTS WITHIN THE

10:45AM 11  COMPANY?

10:45AM 12  A.  YES.

10:45AM 13  Q.  AND IN CONJUNCTION WITH DISCUSSIONS ABOUT THOSE MATTERS

10:45AM 14  WITH YOUR OUTSIDE ACCOUNTANTS FROM TIME TO TIME; CORRECT?

10:45AM 15  A.  YES.

10:45AM 16  Q.  AND, IN FACT, WE SAW ONE EMAIL BY MR. LEACH WHERE SOME

10:45AM 17  INFORMATION WAS FORWARDED A FEW MONTHS AFTER IT WAS RECEIVED SO

10:45AM 18  THAT THE ACCOUNTANTS COULD GIVE THEIR VIEW FOR WHETHER A PFIZER

10:45AM 19  CONTRACT COULD BE RECOGNIZED AS REVENUE; CORRECT?

10:45AM 20  A.  YES.

10:45AM 21  Q.  BUT THAT MONEY HAD BEEN IN THE DOOR FOR A LONG TIME?

10:45AM 22  A.  YES.

10:45AM 23  Q.  AND THE COMPANY HAD BEEN USING THAT MONEY FOR A LONG TIME?

10:45AM 24  A.  YES.

10:45AM 25  Q.  I'LL COME BACK TO SOME DETAILS RELATING TO THAT IN A

SPIVEY CROSS BY MR. WADE

10:46AM 1    MINUTE, BUT LET ME SHIFT TO SOME OF YOUR TESTIMONY WITH RESPECT

10:46AM 2    TO CHALLENGES THAT THE COMPANY FACED IN 2009.

10:46AM 3        DO YOU RECALL THAT TESTIMONY?

10:46AM 4    A.   YES.

10:46AM 5    Q.   AND DO YOU RECALL IN LATE 2008 AND EARLY 2009 THE COUNTRY

10:46AM 6    WAS EXPERIENCING A FINANCIAL CRISIS?

10:46AM 7    A.   YES.

10:46AM 8    Q.   AND DO YOU RECALL THAT BEAR STEARNS COLLAPSED IN OCTOBER

10:46AM 9    OF 2008 AND IT PRECIPITATED A FINANCIAL CRISIS THAT BESET THE

10:46AM 10   COUNTRY FOR A NUMBER OF YEARS?

10:46AM 11   A.   YES.

10:46AM 12   Q.   AND AS A RESULT OF THAT A LOT OF COMPANIES WERE GOING

10:46AM 13   THROUGH HARD TIMES; CORRECT?

10:46AM 14   A.   I'M NOT SURE.

10:46AM 15   Q.   WELL, WERE YOU AWARE OF AT LEAST ONE COMPANY THAT WAS

10:46AM 16   GOING THROUGH HARD TIMES?

10:46AM 17   A.   THERANOS.

10:46AM 18       (LAUGHTER.)

10:46AM 19   BY MR. WADE:

10:46AM 20   Q.   OKAY.  AND THERE WERE A LOT OF WORKERS AT THAT TIME WHO

10:47AM 21   WERE GOING THROUGH HARD TIMES AS A RESULT OF A FINANCIAL

10:47AM 22   CRISIS; CORRECT?

10:47AM 23   A.   I'M NOT SURE.

10:47AM 24   Q.   YOU'RE NOT AWARE OF ANY OF THAT?

10:47AM 25   A.   NOPE.

SPIVEY CROSS BY MR. WADE

10:47AM 1    Q.   OKAY.  AND IN THIS TIME PERIOD MS. HOLMES WAS VERY

10:47AM 2    FOCUSSED ON THE CASH MANAGEMENT OF THE COMPANY; CORRECT?

10:47AM 3    A.   YES.

10:47AM 4    Q.   AND IT WAS SIMILAR TO THE TYPE OF ANALYSIS THAT WE WERE

10:47AM 5    DISCUSSING IN CONNECTION WITH THE EXHIBIT?

10:47AM 6    A.   YES.

10:47AM 7    Q.   SHE WOULD LOOK AT MONEY COMING IN AND MONEY GOING OUT?

10:47AM 8    A.   YES.

10:47AM 9    Q.   AND THERE WOULD BE A NEED AS A STRUGGLING BUSINESS TO

10:47AM 10   PRIORITIZE THOSE DEMANDS; CORRECT?

10:47AM 11   A.   YES.

10:47AM 12   Q.   AND YOU WORKED WITH HER HARD ON THAT TO TRY AND DO THAT

10:47AM 13   CORRECTLY?

10:47AM 14   A.   YES.

10:47AM 15   Q.   AND ENSURING THAT THERANOS EMPLOYEES WOULD GET PAID WAS A

10:47AM 16   PARTICULAR FOCUS FOR MS. HOLMES; CORRECT?

10:47AM 17   A.   I'M NOT -- I MEAN, I'M NOT SURE WHAT SHE PRIORITIZE OR HOW

10:48AM 18   SHE PRIORITIZE.

10:48AM 19   Q.   WELL, YOU RECALL YOUR TESTIMONY YESTERDAY ABOUT THE

10:48AM 20   PAYROLL -- I'M SORRY, NOT YESTERDAY.  IT FEELS LIKE YESTERDAY

10:48AM 21   MAYBE.

10:48AM 22       YOU RECALL YOUR TESTIMONY LAST WEEK WITH RESPECT TO THE

10:48AM 23   PAYROLL AND EFFORTS TO ENSURE THAT PAYROLL WAS MADE?

10:48AM 24   A.   YES.

10:48AM 25   Q.   AND THERE WERE SOME EXTRAORDINARY EFFORTS TO MAKE SURE

10:48AM  1    THAT A CHECK CLEARED THE BANK SO THAT THE PAYROLL WOULD CLEAR.

10:48AM  2        DO YOU RECALL THAT?

10:48AM  3    A.   YES.

10:48AM  4    Q.   AND THAT WAS SOMETHING THAT MS. HOLMES CARED A LOT ABOUT

10:48AM  5    IN THAT INSTANCE; CORRECT?

10:48AM  6    A.   IN THAT INSTANCE, YES.

10:48AM  7    Q.   AND, IN FACT, THE COMPANY ALWAYS MADE ITS PAYROLL, DID IT

10:48AM  8    NOT?

10:48AM  9    A.   YES.

10:48AM  10   Q.   THAT'S TRUE IN THE ENTIRE TIME PERIOD THAT YOU WORKED AT

10:48AM  11   THE COMPANY?

10:48AM  12   A.   YES.

10:48AM  13   Q.   NOW, WHEN YOU STARTED AT THE COMPANY IN 2006, THERANOS

10:48AM  14   ALREADY HAD SOME INVESTORS?

10:48AM  15   A.   YES.

10:48AM  16   Q.   AND THE COMPANY WAS INVESTING A LOT OF ITS CAPITAL IN

10:49AM  17   RESEARCH AND DEVELOPMENT?

10:49AM  18   A.   YES.

10:49AM  19   Q.   AND FROM THE TIME THAT YOU ARRIVED AT THERANOS THAT

10:49AM  20   CONTINUED INVESTMENT CONTINUED UNTIL 2015; CORRECT?

10:49AM  21   A.   YES.

10:49AM  22   Q.   AND THAT WAS TYPICALLY THE LARGEST EXPENDITURE THAT THE

10:49AM  23   COMPANY MADE?

10:49AM  24   A.   I'M NOT SURE.

10:49AM  25   Q.   WE CAN LOOK AT SOME DETAILED EXPENSE RECORDS IN A MOMENT

SPIVEY CROSS BY MR. WADE

10:49AM  1    THAT MIGHT HELP REFRESH YOUR RECOLLECTION ON THAT.

10:49AM  2         YOU TALKED A BIT ABOUT THE PHARMACEUTICAL COMPANIES THAT

10:49AM  3    THERANOS DID BUSINESS WITH.

10:49AM  4         DO YOU RECALL THAT TESTIMONY?

10:49AM  5    A.   YES.

10:49AM  6    Q.   AND THERANOS RECEIVED MILLIONS OF DOLLARS FROM CONTRACTS

10:50AM  7    THAT IT HAD AND WORK THAT IT DID WITH THOSE COMPANIES; CORRECT?

10:50AM  8    A.   YES.

10:50AM  9    Q.   AND INITIALLY THAT WAS CASH THAT CAME IN THE DOOR?

10:50AM  10   A.   YES.

10:50AM  11   Q.   AND CUSTOMER RECEIPTS?

10:50AM  12   A.   YES.

10:50AM  13   Q.   AND THEN AT DIFFERENT POINTS IN TIME IT WOULD BE

10:50AM  14   RECOGNIZED AS REVENUE?

10:50AM  15   A.   YES.

10:50AM  16   Q.   AFTER YOUR ACCOUNTING JUDGMENTS WERE MADE?

10:50AM  17   A.   YES.

10:50AM  18   Q.   AND THERE WERE SOMETIMES WHERE THE COMPANY WAS SUPPORTED

10:50AM  19   BY BANK LOANS?

10:50AM  20   A.   YES.

10:50AM  21   Q.   AND THERE WERE MANY TIMES WHEN THERANOS HAD LARGE AMOUNTS

10:50AM  22   OF CASH IN THE BANK BUT IT ACCEPTED ADDITIONAL INVESTMENTS

10:50AM  23   ANYWAY; CORRECT?

10:50AM  24   A.   YES.

10:50AM  25   Q.   IN FACT, LET'S LOOK AT 5172 AGAIN.  LET ME BRING YOU TO

10:50AM   1    COLUMN GR.  AND THIS IS FOR THE WEEK OF OCTOBER 2014; CORRECT?

10:51AM   2    A.   YES.

10:51AM   3    Q.   AND AT THIS TIME THE COMPANY HAD A HUNDRED MILLION DOLLARS

10:51AM   4    IN THE BANK?

10:51AM   5    A.   YES.

10:51AM   6    Q.   AND IF YOU LOOK IN COLUMN GS, NOTWITHSTANDING THE FACT

10:51AM   7    THAT IT HAD $113 MILLION IN THE BANK, IT TOOK AN ADDITIONAL

10:51AM   8    INVESTMENT OF $130 MILLION; CORRECT?

10:51AM   9    A.   YES.

10:51AM  10    Q.   AND THAT'S REFLECTED IN ROW 27?

10:51AM  11    A.   YES.

10:51AM  12    Q.   AND IN EARLY NOVEMBER 2014, IF WE CAN GO TO GT, YOU SEE

10:52AM  13    THE COMPANY HAD SIGNIFICANT CASH ON HAND.

10:52AM  14        DO YOU SEE THAT?

10:52AM  15    A.   YES.

10:52AM  16    Q.   I'M SORRY.  LET ME FOCUS YOU FIRST ON GS.  GS THEY HAVE

10:52AM  17    $233 MILLION ON HAND; CORRECT?

10:52AM  18    A.   YES.

10:52AM  19    Q.   AND THEN NOTWITHSTANDING THAT THEY TOOK IN THE NEXT WEEK

10:52AM  20    ANOTHER HUNDRED MILLION DOLLAR INVESTMENT?

10:52AM  21    A.   YES.

10:52AM  22    Q.   AND THIS PATTERN OCCURRED THROUGHOUT 2014 AND '15?

10:52AM  23    A.   YES.

10:52AM  24    Q.   THERANOS WASN'T JUST RECEIVING INVESTMENT BECAUSE IT

10:52AM  25    NEEDED IMMEDIATE CASH?

10:53AM   1    A.   CORRECT.

10:53AM   2    Q.   YOU TESTIFIED ON DIRECT ABOUT THAT TIME PERIOD IN 2009,

10:53AM   3    AND I'D LIKE TO FOCUS ON SOME PAYMENTS THAT WERE RECEIVED IN

10:53AM   4    2009.

10:53AM   5        AND I'LL DO THAT BY BRINGING UP EXHIBITS 7753, WHICH I

10:53AM   6    BELIEVE THAT THE GOVERNMENT HAS STIPULATED TO ADMITTING?

10:53AM   7            MR. LEACH:   THAT'S CORRECT, YOUR HONOR.

10:53AM   8            THE COURT:   ALL RIGHT.   THAT IS ADMITTED, AND IT MAY

10:53AM   9    BE PUBLISHED.

10:53AM   10        (DEFENDANT'S EXHIBIT 7753 WAS RECEIVED IN EVIDENCE.)

10:53AM   11   BY MR. WADE:

10:53AM   12   Q.   AND DO YOU SEE THIS IS AN EMAIL THAT YOU -- IF WE CAN BLOW

10:54AM   13   UP THE TOP.   I'M JUST FOCUSSED ON THE DATE, MS. SPIVEY.   THIS

10:54AM   14   IS A DOCUMENT THAT YOU PREPARED IN NOVEMBER 2016 AT THE REQUEST

10:54AM   15   OF SOME COMPANY EMPLOYEES AND AGENTS AND IT INCLUDED A LIST OF

10:54AM   16   RECEIPTS FROM PHARMA.

10:54AM   17        DO YOU SEE THAT?

10:54AM   18   A.   YES.

10:54AM   19   Q.   AND A CONTRACT SUMMARY?

10:54AM   20   A.   YES.

10:54AM   21   Q.   AND SOME OF THE RELATED CONTRACTS FOR THAT.

10:54AM   22        DO YOU RECALL COMPILING THIS?

10:54AM   23   A.   LOOKING AT THIS EMAIL, I DON'T RECALL IT OUTSIDE OF THIS

10:54AM   24   EMAIL.

10:54AM   25   Q.   OKAY.   BUT YOU RECALL THAT YOU KEPT SOME OF THESE RECORDS

10:54AM  1   DURING YOUR TIME AT THE COMPANY?

10:54AM  2   A.   YES.

10:54AM  3   Q.   AND I'D LIKE TO LOOK AT THE ATTACHMENT AND BRING UP BATES

10:54AM  4   ENDING 5721.

10:56AM  5       (PAUSE IN PROCEEDINGS.)

10:56AM  6           MR. WADE:  I WOULD ASK THE COURT'S INDULGENCE WHILE

10:56AM  7   WE IRON OUT A TECHNICAL DETAIL.

10:56AM  8           THE COURT:  YES, OF COURSE.

10:56AM  9       (PAUSE IN PROCEEDINGS.)

10:56AM  10  BY MR. WADE:

10:56AM  11  Q.   I'VE CALLED UP AN ATTACHMENT TO EXHIBIT 7753.  AND DO YOU

10:56AM  12  SEE THAT THIS IS A DOCUMENT THAT SHOWS WHEN DIFFERENT PAYMENTS

10:56AM  13  WERE RECEIVED FROM THE PHARMACEUTICAL COMPANIES THAT THERANOS

10:56AM  14  DID WORK FOR?

10:57AM  15  A.   YES.

10:57AM  16  Q.   AND CAN YOU SEE FROM THIS THAT THERANOS, FROM JANUARY TO

10:57AM  17  MARCH OF 2009, IF I CAN PULL THAT UP.

10:57AM  18      DO YOU SEE THAT?  DO YOU SEE IN THAT TIME PERIOD THERANOS

10:57AM  19  RECEIVED ABOUT $3.7 MILLION IN PAYMENTS FROM CELGENE, CENTOCOR,

10:57AM  20  AND THE MAYO CLINIC?

10:57AM  21  A.   YES.

10:57AM  22  Q.   AND IN THE APRIL THROUGH JUNE PERIOD OF 2009 THE COMPANY

10:57AM  23  RECEIVED $1.8 MILLION IN PAYMENTS FROM CENTOCOR AND

10:57AM  24  SCHERING-PLOUGH?

10:57AM  25  A.   YES.

10:57AM 1    Q.   AND THEN IN THE PERIODS THAT FOLLOW, IF WE SCROLL TO THE

10:58AM 2    RIGHT YOU SEE IN THE 2009 AND 2010 PERIOD THEY'RE APPROACHING

10:58AM 3    ANOTHER $2 MILLION IN PAYMENTS?

10:58AM 4    A.   HUH, WHERE AM I LOOKING AT?

10:58AM 5    Q.   WELL, YOU SEE CELGENE THERE'S 1.4 MILLION COMBINED IN

10:58AM 6    2010?

10:58AM 7         DO YOU SEE THAT?

10:58AM 8    A.   1.1 MILLION, RIGHT.

10:59AM 9              THE CLERK:  DO YOU WANT ME TO CLEAR IT?

10:59AM 10             MR. WADE:  PLEASE.

10:59AM 11   Q.   THE PAYMENT IS RIGHT NEAR THE PENCIL AND GOING TO THE

10:59AM 12   RIGHT.

10:59AM 13        DO YOU SEE THAT?

10:59AM 14   A.   YES.

10:59AM 15   Q.   AND FROM THE AMERICAN BURN ASSOCIATION THERE WAS A

10:59AM 16   $250,000 PAYMENT?

10:59AM 17   A.   YES.

10:59AM 18   Q.   ACTUALLY TWO PAYMENTS, ONE FOR 250,000 AND ONE FOR 38,000?

10:59AM 19   A.   YES.

10:59AM 20   Q.   AND THAT AMERICAN BURN ASSOCIATION, THAT WAS WORK THAT WAS

10:59AM 21   DONE IN CONNECTION WITH THE DEPARTMENT OF DEFENSE?

10:59AM 22   A.   YES.

11:00AM 23        (PAUSE IN PROCEEDINGS.)

11:00AM 24   BY MR. WADE:

11:00AM 25   Q.   I'D LIKE TO TALK QUICKLY ABOUT THE STOCK OPTIONS ISSUE

SPIVEY CROSS BY MR. WADE

11:00AM  1    THAT YOU'VE BEEN ASKED QUESTIONS ABOUT IN CONNECTIONS WITH THE

11:00AM  2    DEALING WITH KPMG.

11:00AM  3        DO YOU RECALL THAT TESTIMONY?

11:00AM  4    A.   YES.

11:00AM  5    Q.   AND THE ISSUE RELATED TO OPTIONS THAT WERE GRANTED ON MAY

11:00AM  6    31ST, 2010?

11:00AM  7    A.   YES.

11:00AM  8    Q.   AND THOSE WERE OPTIONS THAT WERE GRANTED AND APPROVED AT

11:00AM  9    THE MEETING OF THE THERANOS BOARD OF DIRECTORS?

11:00AM 10    A.   YES.

11:00AM 11    Q.   AND THE OPTION PRICE THAT IS REFLECTED HAS TO REFLECT THE

11:00AM 12    FAIR MARKET VALUE ON THE DATE THAT THEY'RE GRANTED; CORRECT?

11:01AM 13    A.   YES.

11:01AM 14    Q.   AND PART OF THAT IS THAT IF THE OPTION IS BELOW FAIR

11:01AM 15    MARKET VALUE, THERE'S AN EXPENSE THAT THE COMPANY TAKES?

11:01AM 16    A.   RIGHT.

11:01AM 17    Q.   BECAUSE THAT WOULD BE A NON-CASH COMPENSATION EXPENSE?

11:01AM 18    A.   RIGHT.

11:01AM 19    Q.   BUT THERE'S NO COMPENSATION EXPENSE IF THEY'RE DONE ON

11:01AM 20    FAIR MARKET VALUE ON DATE OF AGREEMENT?

11:01AM 21    A.   YES.

11:01AM 22    Q.   AND YOU ALSO AVOID CREATING VARIOUS TAX IMPLICATIONS IF

11:01AM 23    YOU DO THEM ON FAIR MARKET VALUE, AT FAIR MARKET VALUE ON THE

11:01AM 24    DAY OF THE GRANT?

11:01AM 25    A.   YES.

SPIVEY CROSS BY MR. WADE

11:01AM   1   Q.   AND SO THERE'S AN EFFORT THAT IS MADE IN GOOD FAITH BY THE

11:01AM   2   COMPANY TO TRY AND ASSESS THE FAIR MARKET VALUE SO THAT IT

11:01AM   3   COMPLIES WITH ALL OF THOSE REQUIREMENTS; CORRECT?

11:01AM   4   A.   YES.

11:01AM   5   Q.   AND THAT'S THE PROCESS THAT YOU WERE ENGAGED IN WITH

11:01AM   6   VARIOUS PROFESSIONAL FIRMS IN CONNECTION WITH THESE OPTIONS?

11:01AM   7   A.   YES.

11:01AM   8   Q.   DO YOU RECALL THAT IN THIS TIME PERIOD IT WAS ACTUALLY YOU

11:01AM   9   WHO REACHED OUT TO KPMG TO SEEK SPECIFIC ASSISTANCE FROM THEM

11:02AM  10   IN ANALYZING THESE OPTIONS?

11:02AM  11   A.   WHAT DOES THAT MEAN?

11:02AM  12   Q.   WELL, LET ME SEE IF I CAN REFRESH YOUR RECOLLECTION.

11:02AM  13        MAY I APPROACH, YOUR HONOR?

11:02AM  14           THE COURT:  YES.

11:02AM  15   BY MR. WADE:

11:02AM  16   Q.   (HANDING.)

11:02AM  17        MS. SPIVEY, I'M SHOWING YOU WHAT HAS BEEN MARKED FOR

11:03AM  18   IDENTIFICATION PURPOSES AT THIS POINT IS DX 13744.

11:03AM  19        DO YOU RECOGNIZE THIS EMAIL?

11:03AM  20   A.   YES.

11:03AM  21   Q.   AND DOES THIS REFRESH YOUR RECOLLECTION THAT YOU REACHED

11:03AM  22   OUT TO KPMG BECAUSE YOU WANTED TO GET ITS TAKE ON THESE STOCK

11:03AM  23   OPTIONS MATTERS?

11:03AM  24   A.   YES.

11:03AM  25   Q.   IT WASN'T KPMG RAISING AN ISSUE.  YOU, ON BEHALF OF THE

11:03AM 1    COMPANY, ACTUALLY REACHED OUT AND SOLICITED THEIR ADVICE?

11:03AM 2    A.   I BELIEVE MY RECOLLECTION OF THIS IS THAT THEY PERFORMED

11:03AM 3    THE AUDIT OF THE FINANCIAL STATEMENT FOR THE COMPANY, AND THIS

11:04AM 4    WAS PART OF THE ISSUE THAT THEY RAISED AND THE COMPANY AND KPMG

11:04AM 5    WAS TRYING TO WORK TOGETHER TO RESOLVE THAT.

11:04AM 6    Q.   DIDN'T YOU TELL KPMG IN APRIL OF 2011 THAT WITH RESPECT TO

11:04AM 7    THE 409A ISSUE WE WOULD LIKE TO GET THEIR TAKE ON THIS MATTER?

11:04AM 8    A.   YES.

11:04AM 9    Q.   AND DIDN'T YOU ADVISE KPMG THAT YOU HAD DISCUSSED THESE

11:04AM 10   ISSUES WITH LEGAL AND VALUATION FIRMS?

11:04AM 11   A.   YES.

11:04AM 12   Q.   AND THAT THOSE PROFESSIONALS SUGGESTED THAT YOU REACH OUT

11:04AM 13   TO KPMG?

11:04AM 14          MR. LEACH:  YOUR HONOR, CAN HE BE CLEAR IF THIS IS

11:04AM 15   REFRESHING THE RECOLLECTION OR READING FROM THE DOCUMENT.

11:05AM 16          THE COURT:  WELL, THE DOCUMENT IS NOT IN EVIDENCE.

11:05AM 17          MR. LEACH:  RIGHT.

11:05AM 18          THE COURT:  I DON'T KNOW IF YOU'RE READING FROM THE

11:05AM 19   DOCUMENT.

11:05AM 20       IF YOU'RE SEEKING TO REFRESH THE RECOLLECTION OF THIS

11:05AM 21   WITNESS, PLEASE DO SO BY THE QUESTION.

11:05AM 22          MR. WADE:  I'M SEEKING TO REFRESH HER RECOLLECTION

11:05AM 23   IF SHE RECALLS TELLING KPMG WHETHER THEY WERE REFERRED TO THE

11:05AM 24   ACCOUNTANTS BY THEIR LEGAL AND VALUATION ADVISORS.

11:05AM 25          THE COURT:  DO YOU UNDERSTAND THE QUESTION?

11:05AM  1          MS. SPIVEY, DO YOU UNDERSTAND HIS QUESTION?

11:05AM  2               THE WITNESS:  CAN YOU REPEAT.

11:05AM  3     BY MR. WADE:

11:05AM  4     Q.   DOES LOOKING AT THIS DOCUMENT REFRESH YOUR RECOLLECTION

11:05AM  5     THAT YOU WERE CONSULTING WITH LEGAL AND VALUATION ADVISORS ON

11:05AM  6     THESE OPTION ISSUES?

11:05AM  7     A.   YES.

11:05AM  8     Q.   AND DOES IT REFRESH YOUR RECOLLECTION THAT AS A RESULT OF

11:05AM  9     THOSE CONSULTATIONS YOU WANTED TO REACH OUT TO KPMG?

11:05AM 10     A.   I CAN'T RECALL WHETHER THEY RAISED THE ISSUE AND WE

11:06AM 11     RESPOND OR WE REACHED OUT TO THEM.  I CAN'T RECALL THAT.

11:06AM 12     Q.   AND 13744 DOES NOT REFRESH YOUR RECOLLECTION ON THAT

11:06AM 13     POINT?

11:06AM 14     A.   NO.

11:06AM 15     Q.   OKAY.  DO YOU RECALL WHETHER THERE WAS A REQUEST

11:06AM 16     IMMEDIATELY FOLLOWING THIS OR IN THE WEEK THAT FOLLOWED THIS TO

11:06AM 17     HAVE KPMG PERFORM SOME SPECIAL PROCEDURES RELATING TO LOOKING

11:06AM 18     AT THESE OPTIONS?

11:06AM 19     A.   I DON'T REMEMBER.

11:06AM 20     Q.   LET ME SEE IF I CAN REFRESH YOUR RECOLLECTION.

11:07AM 21          MAY I APPROACH?

11:07AM 22               THE COURT:  YES.

11:07AM 23     BY MR. WADE:

11:07AM 24     Q.   (HANDING.)

11:07AM 25               THE COURT:  SO, MR. WADE, YOUR QUESTION IS, DO YOU

11:07AM 1      RECALL THAT THERE WAS A REQUEST IMMEDIATELY FOLLOWING THIS OR

11:07AM 2      IN THE WEEK FOLLOWING THIS TO HAVE KPMG PERFORM SOME SPECIAL

11:07AM 3      PROCEDURES RELATING TO THE OPTIONS?

11:07AM 4              MR. WADE:  CORRECT.

11:07AM 5              THE COURT:  ALL RIGHT.  SO THAT'S THE QUESTION,

11:07AM 6      MS. SPIVEY.

11:07AM 7          LOOK AT THIS DOCUMENT AND SEE IF THIS DOCUMENT REFRESHES

11:07AM 8      YOUR RECOLLECTION AS TO THAT QUESTION.

11:07AM 9          (PAUSE IN PROCEEDINGS.)

11:07AM 10             THE COURT:  HAVE YOU FINISHED LOOKING AT THAT

11:07AM 11     DOCUMENT?

11:07AM 12             THE WITNESS:  YES.

11:08AM 13     BY MR. WADE:

11:08AM 14     Q.   DOES THAT REFRESH YOUR RECOLLECTION ON THAT?

11:08AM 15     A.   I DON'T REMEMBER THIS DOCUMENT.

11:08AM 16     Q.   OKAY.  AND YOU DON'T RECALL KPMG LOOKING AT THAT ISSUE IN

11:08AM 17     THAT TIME PERIOD?

11:08AM 18     A.   I REMEMBER THEY -- THERANOS AND KPMG DISCUSSED THIS ISSUE,

11:08AM 19     BUT I DID NOT REMEMBER THIS PARTICULAR DOCUMENT THAT THEY

11:08AM 20     PERFORMED.

11:08AM 21     Q.   DO YOU RECALL THAT KPMG CONCLUDED BASED ON THEIR TEST WORK

11:08AM 22     THAT THE SHARE BASED PAYMENT EXPENSE APPEARS TO BE COMPLETE AND

11:08AM 23     ACCURATE, EXIST, AND BE PROPERLY VALUED AND PRESENTED?

11:08AM 24         DO YOU RECALL THAT?

11:08AM 25     A.   NO.

| | | |
|---|---|---|
| 11:08AM | 1 | MR. LEACH:  OBJECTION.  HEARSAY. |
| 11:08AM | 2 | THE COURT:  I'LL LET THE ANSWER REMAIN. |
| 11:08AM | 3 | YOU CAN ASK ANOTHER QUESTION. |
| 11:08AM | 4 | THE WITNESS:  ARE YOU STILL LOOKING AT THIS DOCUMENT |
| 11:08AM | 5 | THAT -- |
| 11:08AM | 6 | BY MR. WADE: |
| 11:08AM | 7 | Q.  I'M JUST ASKING IF YOU RECALL THAT KPMG CAME TO THE |
| 11:08AM | 8 | CONCLUSION THAT THERANOS'S VIEWS WITH RESPECT TO THE PRICING OF |
| 11:09AM | 9 | THOSE OPTIONS WAS ACCURATE? |
| 11:09AM | 10 | A.  NO. |
| 11:09AM | 11 | Q.  AND THIS DOCUMENT DOESN'T REFRESH YOUR RECOLLECTION AS TO |
| 11:09AM | 12 | THAT? |
| 11:09AM | 13 | A.  NO. |
| 11:09AM | 14 | MR. WADE:  YOUR HONOR, MAYBE NOW WOULD BE A GOOD |
| 11:09AM | 15 | TIME FOR A BREAK. |
| 11:09AM | 16 | THE COURT:  FOLKS, LET'S TAKE OUR RECESS NOW.  LET'S |
| 11:09AM | 17 | TAKE ABOUT 30 MINUTES, IT PROBABLY WILL BE 35 MINUTES BY THE |
| 11:09AM | 18 | TIME WE GET YOU BACK IN HERE. |
| 11:09AM | 19 | SO PLEASE RECALL MY ADMONITION.  YOU'RE NOT TO DISCUSS THE |
| 11:09AM | 20 | CASE WITH ANYONE, INCLUDING YOURSELVES.  DON'T REACH ANY |
| 11:09AM | 21 | CONCLUSIONS ABOUT ANYTHING UNTIL THE CASE HAS BEEN PRESENTED TO |
| 11:09AM | 22 | YOU FOR YOUR DELIBERATIONS. |
| 11:09AM | 23 | HAVE A GOOD BREAK.  THANK YOU. |
| 11:09AM | 24 | MS. SPIVEY, YOU CAN STAND DOWN AS WELL.  THANK YOU. |
| 11:09AM | 25 | THE WITNESS:  THANK YOU. |

```
11:14AM   1              (RECESS FROM 11:14 A.M. UNTIL 11:49 A.M.)

11:49AM   2                  THE COURT:  PLEASE BE SEATED.  THANK YOU.  WE'RE

11:49AM   3      BACK ON THE RECORD.  OUR JURY IS PRESENT, AND ALTERNATES ARE

11:49AM   4      PRESENT, AND COUNSEL AND THE DEFENDANT ARE PRESENT.

11:49AM   5          IF WE CAN GET OUR WITNESS BACK.

11:50AM   6          GOOD AFTERNOON, MS. SPIVEY.

11:50AM   7          MR. WADE, WOULD YOU LIKE TO CONTINUE?

11:50AM   8                  MR. WADE:  I WOULD, YOUR HONOR.  THANK YOU.

11:50AM   9      Q.  GOOD AFTERNOON, MS. SPIVEY.

11:50AM  10          I'D LIKE TO TALK BRIEFLY ABOUT MR. BALWANI.

11:50AM  11      A.  YES.

11:50AM  12      Q.  HE JOINED THE COMPANY IN 2009; IS THAT CORRECT?

11:50AM  13      A.  YES.  YES.

11:50AM  14      Q.  AND WHEN HE JOINED THE COMPANY, HE REPORTED DIRECTLY TO --

11:50AM  15      YOU REPORTED DIRECTLY TO HIM AS WELL; CORRECT?

11:50AM  16      A.  REPORTED?  I REPORTED DIRECTLY TO ELIZABETH HOLMES.

11:50AM  17      Q.  YOU DIDN'T ALSO DIRECTLY REPORT TO MR. BALWANI?

11:51AM  18      A.  I WOULD KEEP HIM INVOLVED.

11:51AM  19      Q.  YOU KEPT HIM INVOLVED IN THE FINANCIAL AFFAIRS OF THE

11:51AM  20      COMPANY?

11:51AM  21      A.  CORRECT.

11:51AM  22      Q.  AND YOU PROVIDED HIM INFORMATION I THINK WE TALKED ABOUT

11:51AM  23      EARLIER TODAY?

11:51AM  24      A.  YES.

11:51AM  25      Q.  AND WITH RESPECT TO THESE 409A ISSUES AND THE ARANCA
```

11:51AM 1    ISSUES, HE WAS SOMETIMES INVOLVED IN REVIEWING THE MATERIALS

11:51AM 2    THAT WENT TO THE VALUATION FIRM AS WELL; CORRECT?

11:51AM 3    A.   YES.

11:51AM 4    Q.   AND DO YOU RECALL THAT MR. BALWANI WAS PARTICULARLY

11:51AM 5    INVOLVED IN DEVELOPING SOME MODELS WITHIN THE COMPANY?

11:52AM 6    A.   I'M NOT SURE.

11:52AM 7    Q.   YOU DON'T RECALL HIM BEING INVOLVED IN ANY FINANCIAL

11:52AM 8    MODELS?

11:52AM 9    A.   NO.

11:52AM 10   Q.   DO YOU RECALL HIM BEING INVOLVED IN FINANCIAL PROJECTIONS?

11:52AM 11   A.   AS FAR AS I CAN REMEMBER FROM MY POINT IT'S ONLY FOR THE

11:52AM 12   409A.

11:52AM 13   Q.   409A PURPOSE?

11:52AM 14   A.   RIGHT.

11:52AM 15   Q.   LET ME PUT UP DTX 13710, WHICH I BELIEVE THE GOVERNMENT

11:52AM 16   HAS STIPULATED TO.

11:52AM 17          THE CLERK:  CAN YOU SAY THAT NUMBER AGAIN, PLEASE,

11:52AM 18   COUNSEL.

11:52AM 19          MR. WADE:  13710.

11:53AM 20          MR. LEACH:  I DON'T BELIEVE I HAVE THAT.

11:53AM 21          MR. WADE:  SORRY, BOB.  I'LL SKIP TO THE NEXT ONE.

11:53AM 22   Q.   LET ME SHOW YOU EXHIBIT 13711.

11:53AM 23          MR. LEACH:  NO OBJECTION, YOUR HONOR.

11:53AM 24          THE COURT:  THAT'S RECEIVED.

11:53AM 25          YOU'RE ASKING THAT THAT BE ADMITTED?

SPIVEY CROSS BY MR. WADE                                                  760

11:53AM   1              MR. WADE:  YES, YOUR HONOR.

11:53AM   2              THE COURT:  IT'S RECEIVED WITHOUT OBJECTION, AND IT

11:53AM   3      MAY BE PUBLISHED.

11:53AM   4          (DEFENDANT'S EXHIBIT 13711 WAS RECEIVED IN EVIDENCE.)

11:53AM   5      BY MR. WADE:

11:53AM   6      Q.  MS. YAM, WE WERE TALKING ABOUT YOUR 409A PROJECTIONS WITH

11:53AM   7      MR. BALWANI; CORRECT?

11:53AM   8      A.  YES.

11:53AM   9      Q.  AND ON THIS MS. HOLMES IS ASKING WHAT DROVE THE

11:54AM  10      $50 MILLION IN REVENUE PROJECTION.

11:54AM  11          DO YOU SEE THAT?

11:54AM  12      A.  YES.

11:54AM  13      Q.  AND WHAT WAS YOUR RESPONSE?

11:54AM  14      A.  SUNNY'S ESTIMATE.

11:54AM  15      Q.  SO THAT WAS INFORMATION THAT YOU RECEIVED FROM

11:54AM  16      MR. BALWANI?

11:54AM  17      A.  YES.

11:54AM  18      Q.  AND MR. BALWANI WORKED WITH YOU ON THE PREPARATION OF

11:54AM  19      FINANCIAL INFORMATION IN ADVANCE OF BOARD MEETINGS; CORRECT?

11:54AM  20      A.  USUALLY I GOT THE DATA FROM THE QAD SYSTEM.

11:54AM  21      Q.  AND YOU PREPARED BALANCE SHEETS FOR THOSE QUARTERLY BOARD

11:54AM  22      MEETINGS?

11:54AM  23      A.  RIGHT.

11:54AM  24      Q.  AND YOU PROVIDED THOSE TO MR. BALWANI?

11:54AM  25      A.  YES.

11:54AM  1      Q.   I'D LIKE TO PUBLISH DOCUMENT EXHIBIT 4859, PLEASE.

11:55AM  2           THIS IS ALREADY IN EVIDENCE, YOUR HONOR.

11:55AM  3              THE COURT:  ALL RIGHT.

11:55AM  4      BY MR. WADE:

11:55AM  5      Q.   DO YOU RECALL THE GOVERNMENT SHOWING YOU THIS DOCUMENT?

11:55AM  6      A.   YES.

11:55AM  7      Q.   AND YOU DIDN'T HAVE ANY FAMILIARITY WITH THIS DOCUMENT?

11:55AM  8      A.   CORRECT.

11:55AM  9      Q.   DO YOU KNOW THE PURPOSE FOR WHICH IT WAS PREPARED?

11:55AM  10     A.   NO.

11:55AM  11     Q.   DO YOU KNOW WHETHER IT WAS PROVIDED TO INVESTORS?

11:55AM  12     A.   NO.

11:55AM  13     Q.   DO YOU KNOW WHAT DISCUSSIONS OCCURRED IN CONNECTION WITH

11:55AM  14     THE HANDWRITING THAT IS ASSOCIATED?

11:55AM  15     A.   NO.

11:55AM  16     Q.   DO YOU SEE UP IN THE UPPER LEFT-HAND CORNER WHERE IT SAYS

11:56AM  17     "PROJECTED STATEMENT OF INCOME"?

11:56AM  18     A.   YES.

11:56AM  19     Q.   AND DO YOU KNOW WHAT "INCOME" MEANS IN THE CONTEXT OF THIS

11:56AM  20     DOCUMENT?

11:56AM  21     A.   THE REVENUE THAT THE COMPANY PROJECTED.

11:56AM  22     Q.   WELL, IT SAYS TOTAL REVENUE DOWN BELOW; CORRECT?

11:56AM  23     A.   RIGHT.

11:56AM  24     Q.   AND DO YOU KNOW WHAT ACCOUNTING PRINCIPLES WERE USED IN

11:56AM  25     CONNECTION WITH THE PREPARATION OF THIS?

SPIVEY CROSS BY MR. WADE                                                762

11:56AM   1    A.   NO.

11:56AM   2    Q.   NO.  DO YOU KNOW WHO PREPARED THIS DOCUMENT?

11:56AM   3    A.   NO.

11:56AM   4    Q.   DO YOU KNOW WHEN THIS DOCUMENT WAS PREPARED?

11:56AM   5    A.   NO.

11:56AM   6    Q.   I'D LIKE TO SHOW YOU DOCUMENT NUMBER 1853, WHICH I BELIEVE

11:57AM   7    THE GOVERNMENT HAS STIPULATED TO.

11:57AM   8         MR. LEACH:  NO OBJECTION, YOUR HONOR.

11:57AM   9         THE COURT:  IT MAY BE ADMITTED.

11:57AM   10   (GOVERNMENT'S EXHIBIT 1853 WAS RECEIVED IN EVIDENCE.)

11:57AM   11   BY MR. WADE:

11:57AM   12   Q.   DO YOU SEE I HAVE ON THE SCREEN 1853, MS. YAM?

11:57AM   13   A.   YES.

11:57AM   14   Q.   AND DOES THAT DOCUMENT LOOK FAMILIAR TO EXHIBIT 4859 WHICH

11:57AM   15   WE WERE JUST LOOKING AT?

11:57AM   16   A.   YES.

11:57AM   17   Q.   OKAY.  AND THIS VERSION HAS TWO PAGES.  I'D LIKE TO TURN

11:57AM   18   YOUR ATTENTION TO THE SECOND PAGE OF THIS DOCUMENT.

11:57AM   19        DO YOU SEE THIS DOCUMENT?

11:57AM   20   A.   YES.

11:57AM   21   Q.   AND IS THIS A DOCUMENT THAT YOU'RE FAMILIAR WITH?

11:58AM   22   A.   YES.

11:58AM   23   Q.   AND IS THIS A DOCUMENT THAT YOU BELIEVE YOU PREPARED?

11:58AM   24   A.   YES.

11:58AM   25   Q.   AND THIS DOCUMENT IS DATED AS OF JULY 14TH, 2014; CORRECT?

11:58AM   1    A.   YES.

11:58AM   2    Q.   AND DO YOU SEE ABOUT MAYBE TWO-THIRDS OF THE WAY DOWN THE

11:58AM   3    PAGE THERE'S AN INDICATION OF DEFERRED REVENUE AND CUSTOMER

11:58AM   4    DEPOSITS?

11:58AM   5         DO YOU SEE THAT?

11:58AM   6    A.   YES.

11:58AM   7    Q.   AND THE AMOUNT THERE IS HOW MUCH?

11:58AM   8    A.   ABOUT 169 MILLION.

11:58AM   9    Q.   ABOUT $169 MILLION?

11:58AM  10    A.   YES.

11:58AM  11    Q.   AND THAT WAS INFORMATION THAT MR. BALWANI -- YOU PROVIDED

11:58AM  12    TO -- STRIKE THAT.

11:58AM  13         THAT WAS INFORMATION THAT YOU PROVIDED IN CONNECTION WITH

11:58AM  14    THIS EXHIBIT?

11:58AM  15    A.   YES.

11:58AM  16    Q.   AND IF I COULD PUT UP DOCUMENT 7761, AND WITH THE

11:59AM  17    GOVERNMENT'S STIPULATION MOVE THAT INTO EVIDENCE, YOUR HONOR.

11:59AM  18              MR. LEACH:  NO OBJECTION, YOUR HONOR.

11:59AM  19              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:59AM  20         (DEFENDANT'S EXHIBIT 7761 WAS RECEIVED IN EVIDENCE.)

11:59AM  21    BY MR. WADE:

11:59AM  22    Q.   AND IF WE CAN BLOW UP THE TOP, PLEASE.

11:59AM  23         MS. YAM, DO YOU SEE THIS IS AN EMAIL BETWEEN YOU AND

11:59AM  24    MR. BALWANI ON JULY 15TH, 2014?

11:59AM  25    A.   YES.

11:59AM  1    Q.   AND THE SUBJECT MATTER IS BS AT 063014?

11:59AM  2    A.   YES.

11:59AM  3    Q.   AND DO YOU KNOW WHAT THAT REFERS TO?

11:59AM  4    A.   BALANCE SHEET AS OF JUNE 30TH, 2014.

11:59AM  5    Q.   AND IF WE CAN LOOK AT THE ATTACHMENT TO THIS EMAIL.

12:00PM  6         DOES THIS APPEAR TO BE -- I'LL DRAW YOUR ATTENTION TO THE

12:00PM  7    DEFERRED REVENUE AND CUSTOMER DEPOSITS ON LINE 25 OF THIS

12:00PM  8    BALANCE SHEET.

12:00PM  9         DO YOU SEE THAT?

12:00PM  10   A.   YES.

12:00PM  11   Q.   AND THAT'S ALMOST 169 MILLION THERE?

12:00PM  12   A.   YES.

12:00PM  13   Q.   AND SO YOU BELIEVE THAT THIS IS THE INFORMATION THAT MADE

12:00PM  14   IT INTO EXHIBIT 1853?

12:00PM  15   A.   YES.

12:00PM  16   Q.   IT APPEARS TO MATCH?

12:00PM  17   A.   YES.

12:00PM  18   Q.   SO THE FINANCIAL INFORMATION THAT YOU PROVIDED TO

12:00PM  19   MR. BALWANI MADE IT INTO THIS DOCUMENT, THE EXHIBIT 1853;

12:01PM  20   CORRECT?

12:01PM  21   A.   YES.

12:01PM  22   Q.   IF I COULD BRING UP 1853 AGAIN.

12:01PM  23        FOCUSSING ON PAGE 1 OF THIS EXHIBIT, DO YOU RECALL WHETHER

12:01PM  24   YOU EVER SAW A LIVE SPREADSHEET, A NATIVE FILE THAT DEPICTED

12:01PM  25   THIS INFORMATION?

SPIVEY CROSS BY MR. WADE

12:01PM 1    A.   NO.

12:01PM 2    Q.   NO, YOU DON'T BELIEVE THAT YOU DID SEE THAT?

12:01PM 3    A.   I DON'T THINK SO.

12:01PM 4    Q.   SO YOU DON'T KNOW IF THIS IS A SPREADSHEET, YOU DON'T KNOW

12:01PM 5    WHETHER THERE'S OTHER INFORMATION THAT FED INTO IT; CORRECT?

12:01PM 6    A.   CORRECT.

12:01PM 7    Q.   I'D LIKE TO ASK YOU A COUPLE OF QUESTIONS ABOUT INVESTORS,

12:02PM 8    AND I CAN TAKE THIS DOCUMENT DOWN.

12:02PM 9        YOU DIDN'T ATTEND MEETINGS WITH POTENTIAL INVESTORS, DID

12:02PM 10   YOU?

12:02PM 11   A.   NO.

12:02PM 12   Q.   YOU WERE THE CONTROLLER AT THE COMPANY?

12:02PM 13   A.   CORRECT.

12:02PM 14   Q.   AND YOUR PRINCIPAL JOB WAS THE ACCOUNTING OF THE COMPANY?

12:02PM 15   A.   YES.

12:02PM 16   Q.   AND DEALING WITH INVESTORS WAS NOT ONE OF YOUR JOB

12:02PM 17   RESPONSIBILITIES?

12:02PM 18   A.   RIGHT.

12:02PM 19   Q.   AND ARE YOU AWARE THAT THE COMPANY SOMETIMES WOULD HAVE

12:02PM 20   MEETINGS WITH POTENTIAL INVESTORS WHERE THEY WOULD PROVIDE

12:02PM 21   INFORMATION ABOUT THE COMPANY?

12:02PM 22   A.   I HAVE NO PERSONAL KNOWLEDGE OF THAT.

12:02PM 23   Q.   DID YOU KNOW WHETHER THAT WAS HAPPENING OR NOT?

12:02PM 24   A.   I DON'T KNOW.

12:02PM 25   Q.   BUT YOU KNOW THE COMPANY RECEIVED MONEY FROM INVESTORS?

SPIVEY CROSS BY MR. WADE                                          766

12:03PM   1     A.   YES.

12:03PM   2     Q.   SO IT MUST HAVE COME FROM SOMEWHERE?

12:03PM   3     A.   YES.

12:03PM   4     Q.   WHEN YOU WERE ASKED OR IF YOU WERE ASKED TO PROVIDE

12:03PM   5     INFORMATION TO INVESTORS, DID YOU ALWAYS PROVIDE ACCURATE

12:03PM   6     INFORMATION?

12:03PM   7     A.   YES.

12:03PM   8     Q.   AND, IN FACT, WHENEVER YOU WERE REQUESTED TO PROVIDE

12:03PM   9     INFORMATION TO ANYONE, DID YOU ALWAYS TRY TO PROVIDE ACCURATE

12:03PM  10     INFORMATION?

12:03PM  11     A.   YES.

12:03PM  12     Q.   YOU'RE A CPA; CORRECT?

12:03PM  13     A.   YES.

12:03PM  14     Q.   AND YOU'RE A LICENSED PROFESSIONAL?

12:03PM  15     A.   YES.

12:03PM  16     Q.   AND YOU ALWAYS TRIED TO PROVIDE THE MOST ACCURATE

12:03PM  17     FINANCIAL INFORMATION THAT YOU COULD?

12:03PM  18     A.   YES.

12:03PM  19     Q.   SOMETIMES ACCOUNTING RECORDS ARE NOT STATIC; CORRECT?

12:03PM  20     A.   I'M NOT SURE WHAT THAT MEANS.

12:03PM  21     Q.   LET ME SEE IF I CAN UNPACK THAT.

12:03PM  22          YOU SOMETIMES MAKE ENTRIES INTO THE BOOKS AND RECORDS OF

12:03PM  23     THE COMPANY AND HAVE TO CHANGE THOSE IN THE FUTURE AFTER

12:03PM  24     ADDITIONAL ACCOUNTING JUDGMENTS ARE MADE WITH RESPECT TO A

12:04PM  25     PARTICULAR ENTRY; IS THAT RIGHT?

SPIVEY CROSS BY MR. WADE

12:04PM 1    A.   YES.

12:04PM 2    Q.   ONE EXAMPLE OF THAT WOULD BE DEFERRED REVENUE THAT WE

12:04PM 3    TALKED ABOUT EARLIER; CORRECT?

12:04PM 4    A.   YES.

12:04PM 5    Q.   AND YOU MIGHT BOOK THE REVENUE, BUT THEN DECIDE THAT SOME

12:04PM 6    OF IT WOULD NEED TO BE DEFERRED?

12:04PM 7    A.   YES.

12:04PM 8    Q.   OR YOU MIGHT DEFER REVENUE AND THEN DECIDE THAT SOME OF IT

12:04PM 9    MIGHT NEED TO BE RECOGNIZED?

12:04PM 10   A.   RIGHT.

12:04PM 11   Q.   AND IN CONNECTION WITH THE FINANCIAL ACTIVITY OF THE

12:04PM 12   COMPANY, THERE ARE A VARIETY OF DIFFERENT REPORTS THAT YOU

12:04PM 13   PREPARE?

12:04PM 14   A.   YES.

12:04PM 15   Q.   WE'VE SEEN MANY OF THEM TODAY AND THEY PROVIDE DIFFERENT

12:04PM 16   VANTAGE POINTS INTO THE FINANCIAL PERFORMANCE OF THE COMPANY?

12:04PM 17   A.   YES.

12:04PM 18   Q.   AND WE SAW INCOME STATEMENTS THAT PROVIDE ONE VIEWPOINT;

12:04PM 19   CORRECT?

12:04PM 20   A.   YES.

12:05PM 21   Q.   AND THOSE USUALLY INVOLVE GAAP ACCOUNTING; CORRECT?

12:05PM 22   A.   YES.

12:05PM 23   Q.   AND WE SAW A BALANCE SHEET?

12:05PM 24   A.   YES.

12:05PM 25   Q.   AND THAT USUALLY DISPLAYS THE COMPANY'S ASSETS,

12:05PM  1    LIABILITIES, AND SHAREHOLDER'S EQUITY?

12:05PM  2    A.   YES.

12:05PM  3    Q.   AND THEN WE SAW THE CASH FLOW STATEMENT WHICH JUST TRACKS

12:05PM  4    THE CASH IN AND OUT?

12:05PM  5    A.   RIGHT.

12:05PM  6    Q.   AND WITH RESPECT TO ARANCA, WE SAW SOME VALUATION REPORTS;

12:05PM  7    CORRECT?

12:05PM  8    A.   YES.

12:05PM  9    Q.   AND WE FOCUSSED ON A COUPLE OF PARAGRAPHS WITHIN THOSE

12:05PM  10   REPORTS.

12:05PM  11        DO YOU RECALL THAT?

12:05PM  12   A.   YES.

12:05PM  13   Q.   BUT THOSE DOCUMENTS ARE EXTREMELY LENGTHY; CORRECT?

12:05PM  14   A.   YES.

12:05PM  15   Q.   MAYBE 150 PAGES?

12:05PM  16   A.   SOMETHING LIKE THAT.

12:05PM  17   Q.   AND THEY PROVIDE VERY DETAILED ANALYSES?

12:05PM  18   A.   YES.

12:05PM  19   Q.   AND THEY PROVIDE MANY DIFFERENT VALUATION APPROACHES?

12:06PM  20   A.   YES.

12:06PM  21   Q.   AND OFTENTIMES THAT COME UP WITH DIFFERENT ANSWERS?

12:06PM  22   A.   YES.

12:06PM  23   Q.   SOMETIMES THOSE ANSWERS AS TO VALUATION CAN RANGE

12:06PM  24   SIGNIFICANTLY?

12:06PM  25   A.   I'M NOT SURE.

12:06PM 1    Q.   THEY CAN -- THERE CAN BE SIGNIFICANT DIFFERENCES BETWEEN

12:06PM 2    THE VALUATIONS BASED UPON DIFFERENT VALUATION METHODS?

12:06PM 3    A.   THERE ARE USUALLY DIFFERENCES.

12:06PM 4    Q.   WELL, LET ME PULL UP ONE OF THEM AND WE CAN ASK RELATED TO

12:06PM 5    THAT EXHIBIT 5206, WHICH IS ALREADY IN EVIDENCE.

12:06PM 6         I'D LIKE TO TURN TO PAGE 52 AT THE BOTTOM.

12:07PM 7         SORRY, 52.

12:07PM 8             MR. BENNETT:  BATES NUMBER?

12:07PM 9             MR. WADE:  1078552.

12:08PM 10   Q.   AND THIS IS THE EMAIL CHAIN IN EXHIBIT 5206, IN WHICH THE

12:08PM 11   ARANCA REPORT WAS ULTIMATELY TRANSMITTED TO THE COMPANY.

12:08PM 12        DO YOU RECALL THAT EMAIL CHAIN?

12:08PM 13   A.   YES.

12:08PM 14   Q.   AND WITHIN THIS CHAIN DO YOU SEE THAT YOU ARE BEING

12:08PM 15   PROVIDED SOME INFORMATION BY ARUN MONTENA AT ARANCA?

12:08PM 16   A.   YES.

12:08PM 17   Q.   AND HE'S TALKING ABOUT SOME DIFFERENT VALUATION APPROACHES

12:08PM 18   WITHIN THIS EMAIL?

12:08PM 19   A.   YES.

12:08PM 20   Q.   AND HOW ONE OF THOSE VALUATION APPROACHES VALUED THE

12:08PM 21   COMPANY AT $1.96 BILLION?

12:08PM 22   A.   YES.

12:08PM 23   Q.   AND HOW ONE OF THE VALUATION APPROACHES VALUED THE COMPANY

12:08PM 24   AT $9.5 BILLION?

12:08PM 25   A.   YES.

| | | |
|---|---|---|
| 12:09PM | 1 | Q.   THAT WAS THE POST MONEY VALUATION? |
| 12:09PM | 2 | A.   YES. |
| 12:09PM | 3 | Q.   AND SO IS IT FAIR TO SAY BASED ON DIFFERENT METHODOLOGIES, |
| 12:09PM | 4 | THERE CAN BE A PRETTY FAIR RANGE IN THE VALUATIONS OF A |
| 12:09PM | 5 | COMPANY? |
| 12:09PM | 6 | A.   YES. |
| 12:09PM | 7 | (PAUSE IN PROCEEDINGS.) |
| 12:10PM | 8 | BY MR. WADE: |
| 12:10PM | 9 | Q.   WE TALKED ABOUT, BEFORE THE BREAK, HOW SOMETIMES CASH HAD |
| 12:10PM | 10 | TO BE REFERRED TO AS DEFERRED REVENUE. |
| 12:10PM | 11 | DO YOU RECALL THAT? |
| 12:10PM | 12 | A.   YES. |
| 12:10PM | 13 | Q.   AND THAT WAS THE RESULT OF THE APPLICATION OF ACCOUNTING |
| 12:10PM | 14 | PRINCIPLES? |
| 12:10PM | 15 | A.   YES. |
| 12:10PM | 16 | Q.   AND SOMETIMES WHEN YOU COULD RECOGNIZE THE REVENUE WOULD |
| 12:10PM | 17 | BE SUBJECT TO DEBATE? |
| 12:10PM | 18 | A.   YES. |
| 12:10PM | 19 | Q.   I'D LIKE TO SHOW YOU AND MOVE INTO EVIDENCE DTX 13719, |
| 12:10PM | 20 | WHICH I BELIEVE THE GOVERNMENT HAS STIPULATED TO. |
| 12:10PM | 21 | MR. LEACH:  THAT'S CORRECT, YOUR HONOR.  NO |
| 12:10PM | 22 | OBJECTION. |
| 12:10PM | 23 | THE COURT:  ALL RIGHT.  IT'S ADMITTED, AND IT MAY BE |
| 12:10PM | 24 | PUBLISHED. |
| 12:10PM | 25 | (DEFENDANT'S EXHIBIT 13719 WAS RECEIVED IN EVIDENCE.) |

12:11PM  1    BY MR. WADE:

12:11PM  2    Q.   I'D LIKE TO START AT THE BOTTOM OF THIS EMAIL CHAIN IN

12:11PM  3    WHICH YOU SENT DECEMBER 12TH, 2014.

12:11PM  4         DO YOU SEE THAT?

12:11PM  5    A.   YES.

12:11PM  6    Q.   AND THIS SAYS IN HERE, YOU WRITE, "AFTER ADDING BACK 50

12:11PM  7    MILLION, THE DEFERRED REVENUE IS 168 MILLION."

12:11PM  8         DO YOU SEE THAT?

12:11PM  9    A.   YES.

12:11PM  10   Q.   AND IT TALKS WHAT THAT INCLUDES; RIGHT?

12:11PM  11   A.   YES.

12:11PM  12   Q.   AND THAT INCLUDES MONEY THAT YOU RECEIVED FROM CUSTOMERS

12:11PM  13   OVER A PERIOD OF TIME?

12:11PM  14   A.   YES.

12:11PM  15   Q.   AND IF I CAN MOVE TO THE NEXT EMAIL IN THE CHAIN.  THAT'S

12:11PM  16   AN EMAIL IN RESPONSE FROM MR. BALWANI TO YOU AND MS. HOLMES.

12:12PM  17        DO YOU SEE THAT?

12:12PM  18   A.   YES.

12:12PM  19   Q.   AND THAT'S DECEMBER 12TH, 2014?

12:12PM  20   A.   YES.

12:12PM  21   Q.   AND HE'S SUGGESTING THAT CELGENE SHOULD BE RECOGNIZED IN

12:12PM  22   2013.

12:12PM  23        DO YOU SEE THAT?

12:12PM  24   A.   YES.

12:12PM  25   Q.   AND HE THEN SAYS KEEP 165 AS DEFERRED AND -- FOR 2013.

12:12PM   1          DO YOU SEE THAT?

12:12PM   2     A.   YES.

12:12PM   3     Q.   AND HE'S SUGGESTING THAT THE 165 MILLION COULD BE

12:12PM   4     RECOGNIZED -- COULD BE CATEGORIZED AS DEFERRED REVENUE?

12:12PM   5     A.   YES.

12:12PM   6     Q.   THAT'S FOR THE 2013 PERIOD?

12:12PM   7     A.   YES.

12:12PM   8     Q.   HE THEN SAYS, "BUT IN 2014, WE WILL RECOGNIZE AT LEAST 100

12:12PM   9     MILLION OF IT."

12:12PM   10         DO YOU SEE THAT?

12:12PM   11    A.   YES.

12:12PM   12    Q.   AND THIS EMAIL IS SENT ON DECEMBER 12TH, 2014; CORRECT?

12:12PM   13    A.   YES.

12:12PM   14    Q.   AND JUST SO WE'RE CLEAR, IT'S NOT AS THOUGH 100 MILLION IS

12:13PM   15    JUST GOING TO FALL OUT OF THE SKY IN DECEMBER OF 2014; CORRECT?

12:13PM   16    A.   RIGHT.

12:13PM   17    Q.   THAT 100 MILLION HAD BEEN BOOKED INTO THE COMPANY AS CASH;

12:13PM   18    CORRECT?

12:13PM   19    A.   YES.

12:13PM   20    Q.   AND MR. BALWANI IS EXPRESSING THE VIEW THAT 100 MILLION OF

12:13PM   21    THAT COULD BE RECOGNIZED IN 2014?

12:13PM   22    A.   YES.

12:13PM   23    Q.   NOW, DO YOU RECALL AT THE END OF 2013 OR THE BEGINNING OF

12:13PM   24    2014 THE COMPANY RECEIVED A $75 MILLION PAYMENT FROM WALGREENS?

12:14PM   25    A.   YES.

12:14PM   1    Q.   AND THAT WAS BOOKED AS REVENUE IN -- ON DECEMBER 31ST,

12:14PM   2    2013?

12:14PM   3    A.   NO.

12:14PM   4    Q.   IT WAS BOOKED ON -- IT WAS ADDED TO THE BOOKS AS CASH ON

12:14PM   5    DECEMBER 31ST OF 2013?

12:14PM   6    A.   YES.

12:14PM   7    Q.   AND IT WAS DEFERRED REVENUE AT THAT POINT?

12:14PM   8    A.   YES.

12:14PM   9    Q.   AND THAT WAS AMONG THIS MONEY THAT THERE WAS DISCUSSION AS

12:14PM   10   TO WHEN IT COULD BE RECOGNIZED; CORRECT?

12:14PM   11   A.   YES.

12:14PM   12   Q.   IF WE CAN GO TO DTX 5172, WHICH IS ALREADY IN EVIDENCE,

12:15PM   13   AND I'D LIKE TO GO TO ROW 26 WHERE IT SAYS "CUSTOMER RECEIPTS."

12:15PM   14        DO YOU SEE THAT?

12:15PM   15   A.   YES.

12:15PM   16   Q.   AND WE'VE BEEN TALKING A LITTLE BIT ABOUT WHEN MONEY WAS

12:15PM   17   RECEIVED FROM CUSTOMERS.

12:15PM   18        DO YOU RECALL THAT TESTIMONY?

12:15PM   19   A.   YES.

12:15PM   20   Q.   AND THIS IS WHERE IT WOULD SHOW UP; CORRECT?

12:15PM   21   A.   YES.

12:15PM   22   Q.   AND SO, FOR EXAMPLE, COLUMN DC IN THE FIRST WEEK OF 2013

12:15PM   23   SHOWS $25 MILLION IN CUSTOMER RECEIPTS; CORRECT?

12:15PM   24   A.   YES.

12:15PM   25   Q.   AND DO YOU KNOW WHERE THAT PAYMENT WAS FROM?

| | | |
|---|---|---|
| 12:15PM | 1 | A.   I DON'T REMEMBER. |
| 12:15PM | 2 | Q.   OKAY.  WELL, LET ME START BACK.  LET ME GO TO COLUMN D AND |
| 12:16PM | 3 | WE'LL RUN THROUGH AND JUST GET A SENSE OF THE CUSTOMER |
| 12:16PM | 4 | RECEIPTS. |
| 12:16PM | 5 | IN COLUMN D, WE START SMALL, ROW 26.  I'LL STAY IN ROW 26 |
| 12:16PM | 6 | THROUGHOUT. |
| 12:16PM | 7 | DO YOU SEE THERE'S $462 THERE? |
| 12:16PM | 8 | A.   YES. |
| 12:16PM | 9 | Q.   AND AS YOU WORK YOUR WAY ACROSS COLUMN H, THERE'S 60,000? |
| 12:16PM | 10 | A.   YES. |
| 12:16PM | 11 | Q.   AND COLUMN J, THERE'S 201,000? |
| 12:16PM | 12 | A.   YES. |
| 12:16PM | 13 | Q.   AND IN COLUMN N4, 358? |
| 12:16PM | 14 | A.   YES. |
| 12:16PM | 15 | Q.   AND LET ME JUMP TO COLUMN AC. |
| 12:16PM | 16 | DO YOU SEE THERE THAT'S $5 MILLION? |
| 12:16PM | 17 | A.   YES. |
| 12:16PM | 18 | Q.   AND COLUMN AH IS $30 MILLION? |
| 12:16PM | 19 | A.   YES. |
| 12:16PM | 20 | Q.   COLUMN AO, ANOTHER 5 MILLION COMES IN? |
| 12:17PM | 21 | A.   YES. |
| 12:17PM | 22 | Q.   COLUMN AU, THERE'S $15 MILLION? |
| 12:17PM | 23 | A.   YES. |
| 12:17PM | 24 | Q.   COLUMN AZ, DO YOU SEE 18 MILLION -- 18.5 MILLION? |
| 12:17PM | 25 | A.   YES. |

12:17PM  1    Q.   COLUMN BY, DO YOU SEE 40 MILLION?

12:17PM  2    A.   YES.

12:17PM  3    Q.   DC, DO YOU SEE 25 MILLION?

12:17PM  4    A.   YES.

12:17PM  5    Q.   DD IS 4 MILLION?

12:17PM  6    A.   YES.

12:17PM  7    Q.   AND IF I GO TO FC, THAT WAS -- THOSE WERE CUSTOMER

12:17PM  8    RECEIPTS FOR $75 MILLION FROM WALGREENS THAT WE MENTIONED A

12:17PM  9    MINUTE AGO.

12:18PM  10        DO YOU SEE THAT?

12:18PM  11   A.   YES.

12:18PM  12   Q.   AND IN ALL, THE COMPANY RECEIVED FROM CUSTOMERS HUNDREDS

12:18PM  13   OF MILLIONS OF DOLLARS; CORRECT?

12:18PM  14   A.   YES.

12:18PM  15   Q.   AND IT RECEIVED THESE PAYMENTS FROM CAPITAL BLUE CROSS?

12:18PM  16   A.   YES.

12:18PM  17   Q.   AND SAFEWAY?

12:18PM  18   A.   YES.

12:18PM  19   Q.   AND WALGREENS?

12:18PM  20   A.   YES.

12:18PM  21   Q.   AND BLUE CROSS BLUE SHIELD OF WYOMING?

12:18PM  22   A.   YES.

12:18PM  23   Q.   AND BLUE CROSS BLUE SHIELD OF MASSACHUSETTS?

12:18PM  24   A.   YES.

12:18PM  25   Q.   AND BLUE CROSS BLUE SHIELD OF NORTH CAROLINA?

12:18PM    1    A.   YES.

12:18PM    2    Q.   AND A LOT OF THIS MONEY WAS CASH THAT WAS RECEIVED AND

12:18PM    3    USED, BUT IT WAS BOOKED AS DEFERRED REVENUE; CORRECT?

12:18PM    4    A.   YES.

12:18PM    5    Q.   I'D LIKE TO RETURN BRIEFLY TO THE BURN STUDY WE HEARD

12:19PM    6    ABOUT AND SHOW YOU DOCUMENT 7091, WHICH I BELIEVE THE

12:19PM    7    GOVERNMENT STIPULATED TO ADMIT.

12:19PM    8         WE MOVE THE ADMISSION, YOUR HONOR.

12:19PM    9              MR. LEACH:   THAT'S CORRECT, YOUR HONOR, NO

12:19PM   10    OBJECTION.

12:19PM   11              THE COURT:   IT'S ADMITTED.   IT MAY BE PUBLISHED.

12:19PM   12         (DEFENDANT'S EXHIBIT 7091 WAS RECEIVED IN EVIDENCE.)

12:19PM   13    BY MR. WADE:

12:19PM   14    Q.   LET ME BLOW UP THE TOP SO WE CAN ORIENT YOU.

12:19PM   15         THIS IS AN EMAIL THAT YOU RECEIVED IN DECEMBER OF 2009.

12:19PM   16         DO YOU SEE THAT?

12:19PM   17    A.   YES.

12:19PM   18    Q.   AND THIS MAKES YOU AWARE OF INFORMATION RELATING TO

12:20PM   19    PAYMENTS THAT WERE TO BE PROVIDED BY THE BURN CENTER?

12:20PM   20    A.   YES.

12:20PM   21    Q.   FOR THE BURN STUDY?   I'M SORRY.

12:20PM   22    A.   YES.

12:20PM   23    Q.   AND IF WE CAN TURN TO -- AS ONE OF YOUR ROLES IN

12:20PM   24    DETERMINING REVENUE RECOGNITION AND BOOKING ITEMS ON THE BOOKS

12:20PM   25    OF THE COMPANY, WOULD YOU OFTENTIMES GET CONTRACT DOCUMENTATION

12:20PM   1    AND INFORMATION TO KEEP IN YOUR FILES?

12:20PM   2    A.   YES.

12:20PM   3    Q.   OKAY.  I'D LIKE TO LOOK AT THE DOCUMENT THAT FOLLOWS THE

12:20PM   4    ATTACHMENT.

12:20PM   5    A.   YES.

12:20PM   6    Q.   AND THIS PARTICULAR DOCUMENT WAS A GRANT THAT WAS

12:20PM   7    PROVIDED; CORRECT?

12:20PM   8    A.   YES.

12:20PM   9    Q.   AND SO IN THIS PARTICULAR CASE WITH THE BURN STUDY, THIS

12:21PM  10    IS -- THIS WAS EFFECTIVELY THE CONTRACT; IS THAT RIGHT?

12:21PM  11    A.   I DON'T RECALL THIS DOCUMENT.

12:21PM  12    Q.   OKAY.  BUT YOU RECALL -- YOU SAW THAT YOU RECEIVED THIS

12:21PM  13    DOCUMENT AS PART OF THAT EMAIL?

12:21PM  14    A.   YES.

12:21PM  15    Q.   AND THIS WOULD HAVE BEEN A DOCUMENT THAT MIGHT HAVE GIVEN

12:21PM  16    YOU INFORMATION THAT YOU WOULD USE TO DETERMINE REVENUE

12:21PM  17    RECOGNITION; IS THAT FAIR?  MAYBE IF WE LOOK AT THE FULL

12:21PM  18    DOCUMENT YOU CAN TAKE A LOOK.

12:21PM  19         (PAUSE IN PROCEEDINGS.)

12:21PM  20            THE WITNESS:  I AM NOT SURE.  I DON'T RECALL THIS

12:21PM  21    DOCUMENT.

12:21PM  22    BY MR. WADE:

12:21PM  23    Q.   YOU DON'T RECALL THE DOCUMENT?

12:21PM  24    A.   NO.

12:21PM  25    Q.   OKAY.  THANK YOU.

SPIVEY CROSS BY MR. WADE

12:22PM  1          AS THE CONTROLLER OF THE COMPANY, DID YOU HAVE A SENSE FOR

12:22PM  2     HOW THE COMPANY WAS SPENDING ITS MONEY?

12:22PM  3     A.   YES.

12:22PM  4     Q.   AND ONE OF THE THINGS THAT YOU WOULD DO WAS BOOK,

12:22PM  5     CATEGORIZE DIFFERENT EXPENSES ACCORDING TO DIFFERENT PARTS OF

12:22PM  6     THE BUSINESS; CORRECT?

12:22PM  7     A.   YES.

12:22PM  8     Q.   AND THAT INCLUDES, FOR EXAMPLE, FOR RESEARCH AND

12:22PM  9     DEVELOPMENT?

12:22PM  10    A.   YES.

12:22PM  11    Q.   OR ADMINISTRATIVE EXPENSES?

12:22PM  12    A.   YES.

12:22PM  13    Q.   AND SO AS EXPENSES WOULD COME IN, YOU WOULD CATEGORIZE HOW

12:22PM  14    IT WAS DEPICTED IN THE FINANCIAL STATEMENTS?

12:22PM  15    A.   YES.

12:22PM  16    Q.   I'D LIKE TO SHOW YOU DX 578, WHICH I BELIEVE IS -- WHICH

12:23PM  17    IS ALREADY IN EVIDENCE.

12:23PM  18          DO YOU RECALL THIS DOCUMENT?  THESE WERE SOME FINANCIAL

12:23PM  19    STATEMENTS THAT WERE EMAILED TO KPMG?

12:23PM  20    A.   YES.

12:23PM  21    Q.   AND I'D LIKE TO LOOK AT THE ATTACHMENT THAT INCLUDES THE

12:23PM  22    TRIAL BALANCE.

12:24PM  23          WHILE WE'RE PULLING THAT UP, WHAT IS THE TRIAL BALANCE?

12:24PM  24    A.   IT'S THE FINANCIAL ACCOUNTS, ALL OF THE FINANCIAL ACCOUNTS

12:24PM  25    OF THE COMPANY THAT HAS ALL OF THE ASSETS, LIABILITY,

SPIVEY CROSS BY MR. WADE

12:24PM  1    SHAREHOLDER'S EQUITY, EXPENSES, INCOME.

12:24PM  2    Q.   OKAY.  AND IF I CAN GO TO THE BS TAB.  THIS IS THE

12:24PM  3    CONSOLIDATED BALANCE SHEET THAT WE LOOKED AT EARLIER.

12:24PM  4         DO YOU RECALL THAT?

12:24PM  5    A.   YES.

12:24PM  6    Q.   AND IF WE CAN SCROLL DOWN.

12:25PM  7         DO YOU SEE IN COLUMN B THERE THE DEFERRED REVENUE?

12:25PM  8    A.   YES.

12:25PM  9    Q.   AND THAT'S $77 MILLION IN DEFERRED REVENUE?

12:25PM  10   A.   YES.

12:25PM  11   Q.   IF WE CAN GO TO THE PL BY GROUP.  THIS SHOWS THE

12:25PM  12   CATEGORIZATION OF SOME OF THE EXPENSES; IS THAT CORRECT?

12:25PM  13   A.   YES.

12:25PM  14   Q.   AND IF WE CAN -- YOU SEE IN COLUMN I IT SAYS R&D?

12:25PM  15   A.   YES.

12:25PM  16   Q.   AND THAT IN COLUMN K IT SAYS GRAND TOTAL?

12:25PM  17   A.   YES.

12:25PM  18   Q.   AND IF WE CAN GO TO THE BOTTOM.

12:26PM  19        DO YOU SEE IN COLUMN I IT SHOWS $21.9 MILLION IN R&D

12:26PM  20   EXPENSES?

12:26PM  21   A.   YES.

12:26PM  22   Q.   AND THAT'S OUT OF 26.2 MILLION IN TOTAL?

12:26PM  23   A.   YES.

12:26PM  24   Q.   AND DO YOU RECALL THE YEAR THIS IS FOR?

12:26PM  25   A.   WAS IT 2010?

12:26PM  1    Q.   WE CAN GO TO THE TOP.  LET'S GO TO THE BALANCE SHEET.

12:26PM  2    THAT WILL SHOW THE DATE CLEARLY.

12:26PM  3         THAT WAS FOR 2011?

12:26PM  4    A.   IT COULD BE.  I DON'T KNOW.  I HAVEN'T LOOKED AT THE DATA.

12:27PM  5    Q.   LET ME PULL UP DTX 4176, WHICH I BELIEVE IS IN EVIDENCE.

12:27PM  6         THE CLERK:  CAN YOU SAY THAT NUMBER AGAIN, PLEASE,

12:27PM  7    COUNSEL.

12:27PM  8         COUNSEL, WHAT IS THE NUMBER?

12:27PM  9         MR. WADE:  4176, WHICH I WILL MOVE INTO EVIDENCE

12:27PM  10   ACTUALLY, YOUR HONOR.  I APOLOGIZE.  WITH STIPULATION.

12:27PM  11        MR. LEACH:  NO OBJECTION.  THANK YOU, YOUR HONOR.

12:27PM  12        THE COURT:  IT'S ADMITTED.  IT CAN BE PUBLISHED.

12:27PM  13        (DEFENDANT'S EXHIBIT 4176 WAS RECEIVED IN EVIDENCE.)

12:27PM  14   BY MR. WADE:

12:27PM  15   Q.   AND DO YOU SEE HERE -- DO YOU RECOGNIZE THIS DOCUMENT?

12:28PM  16   A.   YES.

12:28PM  17   Q.   AND WHAT IS THIS DOCUMENT?

12:28PM  18   A.   THAT'S THE CONSOLIDATED INCOME STATEMENTS FOR THE COMPANY.

12:28PM  19   Q.   AND DOES IT SHOW THE OPERATING EXPENSES?

12:28PM  20   A.   YES.

12:28PM  21   Q.   AND FOR 2013, WHAT WERE THE TOTAL OPERATING EXPENSES?

12:28PM  22   A.   92 MILLION.

12:28PM  23   Q.   AND THE AMOUNT THAT WAS SPENT ON RESEARCH AND DEVELOPMENT?

12:28PM  24   A.   ABOUT 68 MILLION.

12:28PM  25   Q.   AND FOR 2012, WHAT WERE THE TOTAL OPERATING EXPENSES?

SPIVEY CROSS BY MR. WADE

| | | |
|---|---|---|
| 12:28PM | 1 | A.   ABOUT 67 MILLION. |
| 12:28PM | 2 | Q.   AND THE TOTAL AMOUNT SPENT ON RESEARCH AND DEVELOPMENT? |
| 12:28PM | 3 | A.   ABOUT 53 MILLION. |
| 12:28PM | 4 | Q.   AND FOR 2011, YOU SEE THAT THERE WAS 28.2 MILLION IN TOTAL |
| 12:28PM | 5 | OPERATING EXPENSES? |
| 12:28PM | 6 | A.   YES. |
| 12:28PM | 7 | Q.   AND 22 MILLION IN RESEARCH AND DEVELOPMENT? |
| 12:29PM | 8 | A.   YES. |
| 12:29PM | 9 | Q.   AND SO YOU SEE THERE THAT THERE ARE OPERATING LOSSES? |
| 12:29PM | 10 | A.   YES. |
| 12:29PM | 11 | Q.   AND THE GOVERNMENT PREVIOUSLY REFERRED TO ACCUMULATED |
| 12:29PM | 12 | DEFICIT. |
| 12:29PM | 13 | DO YOU RECALL THAT? |
| 12:29PM | 14 | A.   YES. |
| 12:29PM | 15 | Q.   AND A BIG REASON FOR THESE OPERATING LOSSES WAS BECAUSE OF |
| 12:29PM | 16 | THE SIGNIFICANT INVESTMENT AND THE RESEARCH AND DEVELOPMENT; IS |
| 12:29PM | 17 | THAT RIGHT? |
| 12:29PM | 18 | A.   YES. |
| 12:29PM | 19 | Q.   DID YOU MAINTAIN THE CAPITALIZATION TABLE FOR THE COMPANY |
| 12:29PM | 20 | AS WELL? |
| 12:29PM | 21 | A.   YES. |
| 12:29PM | 22 | Q.   AND THAT IS A LISTING THAT IDENTIFIES THE VARIOUS |
| 12:29PM | 23 | SHAREHOLDERS? |
| 12:29PM | 24 | A.   YES. |
| 12:29PM | 25 | Q.   AND YOU WOULD TRACK THAT AS NEW SHAREHOLDERS WOULD BE |

12:30PM   1      ADDED?

12:30PM   2      A.   YES.

12:30PM   3      Q.   AND WHO WAS THE LARGEST SHAREHOLDER?

12:30PM   4      A.   I'M NOT SURE.

12:30PM   5      Q.   WAS MS. HOLMES THE LARGEST SHAREHOLDER?

12:30PM   6      A.   I WOULD THINK SO, BUT I, I DON'T, I DON'T REMEMBER.

12:30PM   7      Q.   WELL, MS. HOLMES OWNED ABOUT HALF OF THE COMPANY; CORRECT?

12:30PM   8      A.   I DON'T REMEMBER AT THIS TIME.

12:30PM   9      Q.   THAT WASN'T SOMETHING YOU FOCUSSED ON?

12:30PM   10     A.   I WOULD HAVE TO LOOK AT THE DATA.

12:30PM   11     Q.   DO YOU RECALL PROCESSING ANY STOCK SALES FOR MS. HOLMES?

12:30PM   12     A.   I'M SORRY?

12:30PM   13     Q.   DID YOU EVER PROCESS ANY STOCK SALES FOR MS. HOLMES?

12:30PM   14     A.   NO.

12:30PM   15     Q.   SHE NEVER SOLD ANY STOCK, DID SHE?

12:30PM   16     A.   NO.

12:31PM   17          MR. WADE:  THE COURT'S INDULGENCE.

12:31PM   18       (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

12:31PM   19          MR. WADE:  WE HAVE NO FURTHER QUESTIONS, YOUR HONOR.

12:31PM   20          THE COURT:  RECROSS?  EXCUSE ME.  REDIRECT?

12:31PM   21          MR. LEACH:  VERY BRIEFLY, YOUR HONOR.  THANK YOU.

12:31PM   22     ///

12:31PM   23     ///

12:31PM   24     ///

12:31PM   25     ///

**REDIRECT EXAMINATION**

BY MR. LEACH:

Q.   GOOD MORNING AGAIN, MS. SPIVEY.

     MR. WADE ASKED YOU A LOT OF QUESTIONS ABOUT DEFERRED

REVENUE.

     DO YOU RECALL THAT TESTIMONY?

A.   YES.

Q.   WHAT IS DEFERRED REVENUE?

A.   IT'S MONEY THAT THE COMPANY RECEIVED BUT WE HAVE NOT

PROVIDES SERVICES OR PRODUCT.

Q.   HAVE YOU EARNED THE REVENUE AT THAT POINT?

A.   NO.

Q.   AND IF YOU DON'T PERFORM UNDER THE CONTRACT, IF YOU DON'T

EARN THE REVENUE, DO YOU GET TO KEEP THE MONEY?

A.   DEPENDING ON THE CONTRACTS.  THERE COULD BE A CLAUSE FOR A

REFUND.

Q.   SO THE REASON THAT YOU DON'T MOVE DEFERRED REVENUE INTO

REVENUE IS BECAUSE THE COMPANY HASN'T DONE WHAT IT NEEDS TO IN

ORDER TO EARN THAT MONEY; IS THAT FAIR?

A.   YES.

Q.   AND IS THERE SOME POSSIBILITY THAT YOU HAVE TO GIVE THAT

MONEY BACK?

A.   YES.

Q.   MR. WADE ALSO ASKED YOU ABOUT THE COMPANY'S FINANCIAL

CONDITION IN 2009.  I'D LIKE TO BRING YOUR ATTENTION TO

12:32PM   1    EXHIBIT 256, WHICH I THINK WE STIPULATE TO THE ADMISSION OF.

12:33PM   2              MR. WADE:  YES, YOUR HONOR.

12:33PM   3              THE COURT:  THANK YOU.  IT IS ADMITTED, AND IT MAY

12:33PM   4    BE PUBLISHED.

12:33PM   5        (GOVERNMENT'S EXHIBIT 256 WAS RECEIVED IN EVIDENCE.)

12:33PM   6    BY MR. LEACH:

12:33PM   7    Q.   AND IF WE CAN PLEASE LOOK AT THE -- DO YOU SEE YOUR EMAIL

12:33PM   8    IN THE TOP, MS. SPIVEY?  DO YOU SEE YOUR NAME AT THE TOP OF THE

12:33PM   9    EMAIL?

12:33PM   10   A.   YES.

12:33PM   11   Q.   AND DO YOU SEE THAT THIS IS AN EMAIL TO ELIZABETH HOLMES?

12:33PM   12   A.   YES.

12:33PM   13   Q.   AND DO YOU ATTACH FINANCIAL STATEMENTS FOR THE PERIOD

12:33PM   14   ENDING DECEMBER 2009?

12:33PM   15   A.   YES.

12:33PM   16   Q.   LET ME DRAW YOUR ATTENTION TO THE NATIVE FILE, WHICH I

12:33PM   17   BELIEVE IS PAGE 5.

12:34PM   18        IF I COULD DRAW YOUR ATTENTION, PLEASE, TO THE TAB MONTHLY

12:34PM   19   PL.  IF WE CAN MOVE A LITTLE BIT TO THE LEFT, PLEASE,

12:34PM   20   MS. HOLLIMAN.  PERFECT.  THANK YOU.

12:34PM   21        THERE'S A LINE THERE FOR TOTAL OPERATING EXPENSES.

12:34PM   22        DO YOU SEE THAT, MS. SPIVEY?

12:34PM   23   A.   YES.

12:34PM   24   Q.   AND IN JANUARY IT'S 936,000?

12:34PM   25   A.   YES.

12:34PM  1    Q.   AND FEBRUARY $1 MILLION?

12:34PM  2    A.   YES.

12:34PM  3    Q.   THOSE ARE THE MONTHLY EXPENSES THAT THE COMPANY IS

12:34PM  4    INCURRING DURING THAT TIME PERIOD?

12:34PM  5    A.   YES.

12:34PM  6    Q.   AND WOULD THOSE AMOUNTS HAVE TO BE OFFSET BY ANY CASH FROM

12:34PM  7    THE PHARMACEUTICAL CONTRACTS THAT MIGHT BE COMING IN AT ANY

12:35PM  8    PARTICULAR TIME?

12:35PM  9    A.   CAN YOU REPEAT?

12:35PM  10   Q.   LET ME ASK YOU A BETTER QUESTION.

12:35PM  11        MR. WADE SHOWED YOU SOME RECEIPTS FROM PHARMACEUTICAL

12:35PM  12   CONTRACTS DURING YOUR CROSS-EXAMINATION.

12:35PM  13        DO YOU RECALL THAT TESTIMONY?

12:35PM  14   A.   YES.

12:35PM  15   Q.   AND WOULD THOSE CASH RECEIPTS BE OFFSET BY EXPENSES THAT

12:35PM  16   THE COMPANY IS INCURRING DURING THAT SAME TIME PERIOD?

12:35PM  17   A.   YES.

12:35PM  18   Q.   THANK YOU.  WE CAN TAKE THAT DOWN, MS. HOLLIMAN.

12:35PM  19        AND IF WE CAN PLEASE GO BACK TO MR. WADE ASKED YOU A

12:35PM  20   COUPLE OF QUESTIONS ABOUT DIFFERENT VALUATION METHODS FOR THE

12:35PM  21   409 ANALYSIS, AND HE DREW YOUR ATTENTION TO EXHIBIT 5206,

12:35PM  22   PAGE 4.

12:36PM  23        DO YOU RECALL THIS EMAIL WHERE YOU WERE BEING ASKED

12:36PM  24   QUESTIONS ABOUT THE DIFFERENT VALUATION METHODS THAT WENT INTO

12:36PM  25   ARANCA'S ANALYSIS?

SPIVEY REDIRECT BY MR. LEACH

12:36PM  1     A.   YES.

12:36PM  2     Q.   AND DO YOU RECALL ATTENTION BEING DRAWN -- WHOOPS.

12:36PM  3          IF WE CAN ZOOM OUT, PLEASE, MS. HOLLIMAN.  THANK YOU.

12:36PM  4          I THINK YOU WERE ASKED ABOUT THIS THING CALLED A POST

12:36PM  5     MONEY VALUATION OF 9.5 BILLION?

12:36PM  6     A.   YES.

12:36PM  7     Q.   DO YOU RECALL BEING ASKED ABOUT THAT?

12:36PM  8     A.   YES.

12:36PM  9     Q.   AND THAT'S BASED ON THE RECENT SERIES C-2 FUNDING.

12:36PM  10         DO YOU SEE THAT LANGUAGE?

12:36PM  11    A.   YES.

12:36PM  12    Q.   AND IS THAT ESSENTIALLY THE VALUE ASSIGNED TO THE SHARE

12:36PM  13    PRICE FOR THE C-2 FINANCING?

12:36PM  14    A.   THE SHARE PRICE.

12:36PM  15    Q.   WELL, I THINK WE TALKED EARLIER ABOUT THE C-2 SHARE PRICE

12:36PM  16    BEING $17 A SHARE.  IF YOU MULTIPLY THAT BY THE NUMBER OF

12:37PM  17    SHARES, YOU GET SOMETHING IN THE NEIGHBORHOOD OF $9.5 BILLION?

12:37PM  18              MR. WADE:  OBJECTION, YOUR HONOR.  602 AND 701, 702.

12:37PM  19              THE COURT:  OVERRULED.  I DON'T THINK THIS CALLS FOR

12:37PM  20    EXPERT TESTIMONY.  IT'S MULTIPLICATION OF THE FIGURES, SO --

12:37PM  21         DO YOU WANT TO REPEAT THE QUESTION?

12:37PM  22    BY MR. LEACH:

12:37PM  23    Q.   SURE.  DO YOU UNDERSTAND THE POST MONEY VALUATION REFERRED

12:37PM  24    HERE TO BE BASED ON THE C-2 SHARE PRICE?

12:37PM  25    A.   YES.

12:37PM 1    Q.   OKAY.  AND THEN AT THE BOTTOM OF THIS PARAGRAPH IT SAYS,

12:37PM 2    "WE HAVE NOT ASSIGNED ANY WEIGHT TO THIS APPROACH."

12:37PM 3         DO YOU SEE THAT LANGUAGE?

12:37PM 4    A.   YES.

12:37PM 5    Q.   AND DO YOU UNDERSTAND THAT TO BE ARANCA TELLING YOU THAT

12:37PM 6    EVEN THOUGH THE C-2 FINANCING IS AT THIS PRICE, WE'RE NOT

12:37PM 7    ASSIGNING THAT ANY WEIGHT IN HOW WE VALUE THESE STOCK OPTIONS?

12:37PM 8    A.   YES.

12:37PM 9    Q.   OKAY.  THANK YOU, MS. SPIVEY.

12:38PM 10        THANK YOU, YOUR HONOR.  I HAVE NOTHING FURTHER.

12:38PM 11             MR. WADE:  NOTHING FURTHER, YOUR HONOR.

12:38PM 12             THE COURT:  MAY THIS WITNESS BE EXCUSED?

12:38PM 13             MR. LEACH:  YES, YOUR HONOR.

12:38PM 14             MR. WADE:  YES, YOUR HONOR.

12:38PM 15             THE COURT:  THANK YOU.  YOU'RE EXCUSED.  THANK YOU.

12:38PM 16             THE WITNESS:  THANK YOU.

12:38PM 17             THE COURT:  DOES THE GOVERNMENT HAVE ANOTHER

12:38PM 18   WITNESS?

12:38PM 19             MR. BOSTIC:  YES, YOUR HONOR.

12:38PM 20        THE UNITED STATES CALLS ERIKA CHEUNG.

12:39PM 21        MAY I APPROACH THE STAND, YOUR HONOR?

12:39PM 22             THE COURT:  YES.

12:39PM 23        IF YOU COULD COME FORWARD, PLEASE, AND I'LL HAVE YOU STAND

12:39PM 24   BY THE WITNESS STAND THERE.  OUR COURTROOM DEPUTY WILL PLACE

12:39PM 25   YOU OATH.  AND IF YOU'LL RAISE YOUR RIGHT HAND, SHE HAS A

12:39PM  1   QUESTION FOR YOU.

12:39PM  2          **(GOVERNMENT'S WITNESS, ERIKA CHEUNG, WAS SWORN.)**

12:39PM  3              THE WITNESS:  YES.

12:39PM  4              THE CLERK:  THANK YOU.

12:39PM  5              THE COURT:  THANK YOU.  PLEASE HAVE A SEAT HERE.

12:39PM  6   MAKE YOURSELF COMFORTABLE.  FEEL FREE TO ADJUST THE CHAIR AND

12:39PM  7   MICROPHONE AS YOU NEED.

12:39PM  8       I'LL ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE MICROPHONE.

12:40PM  9          WHEN YOU ARE COMFORTABLE, COULD YOU PLEASE STATE YOUR NAME

12:40PM  10  AND THEN SPELL IT, PLEASE.

12:40PM  11             THE WITNESS:  MY NAME IS ERIKA CHEUNG.  AND THAT'S

12:40PM  12  SPELLED E-R-I-K-A, AND LAST NAME CHEUNG, C-H-E-U-N-G.

12:40PM  13             THE COURT:  THANK YOU.  COUNSEL.

12:40PM  14             MR. BOSTIC:  THANK YOU, YOUR HONOR.  AND,

12:40PM  15  YOUR HONOR, PLEASE CORRECT ME IF I'M WRONG, MY UNDERSTANDING IS

12:40PM  16  THAT IF WITNESSES ARE VACCINATED, THE COURT IS AMENABLE TO THEM

12:40PM  17  TESTIFYING WITHOUT A MASK?

12:40PM  18             THE COURT:  YES.

12:40PM  19             MR. BOSTIC:  MS. CHEUNG, MAY I ASK IF YOU'RE

12:40PM  20  COMFORTABLE DISCLOSING AND IF YOU'RE VACCINATED, IF THAT IS

12:40PM  21  TRUE WOULD YOU LIKE TO REMOVE YOUR MASK?

12:40PM  22             THE WITNESS:  I'M VACCINATED AND I AM COMFORTABLE

12:40PM  23  TAKING OFF MY MASK.

12:40PM  24             THE COURT:  ALL RIGHT.  THANK YOU.  YOU MAY DO SO.

12:40PM  25             MR. BOSTIC:  AND, YOUR HONOR, DOES THE SAME GO FOR

12:40PM  1    QUESTIONING COUNSEL?

12:40PM  2              THE COURT:  IT DOES.  AND I THINK WE ESTABLISHED

12:40PM  3    THAT ALL PARTIES ON ALL TEAMS ARE ALL VACCINATED.

12:40PM  4              MR. BOSTIC:  YES, YOUR HONOR.

12:40PM  5              THE COURT:  AND, MS. CHEUNG, JUST TO LET YOU KNOW,

12:40PM  6    WE HAVE AN AIR FILTER SYSTEM JUST BELOW YOU AND I THINK IT'S

12:40PM  7    OPERATIONAL NOW.

12:40PM  8              THE WITNESS:  YEAH, IT IS.

12:40PM  9              THE COURT:  GREAT.  THANK YOU.

12:40PM  10        COUNSEL.

12:40PM  11                          **DIRECT EXAMINATION**

12:40PM  12   BY MR. BOSTIC:

12:40PM  13   Q.   GOOD AFTERNOON, MS. CHEUNG.

12:41PM  14   A.   GOOD AFTERNOON.

12:41PM  15   Q.   WAS THERE A TIME WHEN YOU WERE EMPLOYED BY A COMPANY

12:41PM  16   CALLED THERANOS?

12:41PM  17   A.   YES.

12:41PM  18   Q.   AND WHEN YOU WERE AT THERANOS, WHAT WAS YOUR JOB TITLE AND

12:41PM  19   DESCRIPTION?

12:41PM  20   A.   SO MY JOB TITLE AND DESCRIPTION WAS LAB ASSOCIATE, AND I

12:41PM  21   CAME INTO THE COMPANY WORKING IN THE RESEARCH AND DEVELOPMENT

12:41PM  22   LAB WHEN I FIRST STARTED WORKING FOR THE COMPANY.

12:41PM  23   Q.   OKAY.  DID YOU REMAIN IN THE RESEARCH AND DEVELOPMENT LAB

12:41PM  24   FOR YOUR ENTIRE TIME AT THE COMPANY?

12:41PM  25   A.   NO.  I WAS FIRST IN THE RESEARCH AND DEVELOPMENT LAB AS A

12:41PM 1    LAB ASSOCIATE, AND THEN WAS INTEGRATED INTO THE CLINICAL LAB AS

12:41PM 2    A LAB ASSOCIATE WHERE THE CLINICAL LAB IS EFFECTIVELY WHERE THE

12:41PM 3    PATIENT PROCESSING OCCURRED OR OCCURS AT THERANOS.

12:41PM 4    Q.   WHAT WERE YOUR DATES OF EMPLOYMENT AT THERANOS?

12:41PM 5    A.   I WORKED AT THERANOS OCTOBER 2013 TO ABOUT APRIL OF 2014.

12:41PM 6    Q.   OKAY.  APPROXIMATELY SIX MONTHS GIVE OR TAKE?

12:41PM 7    A.   YES.

12:41PM 8    Q.   HOW DID YOUR EMPLOYMENT AT THERANOS END?  WERE YOU

12:41PM 9    TERMINATED?  LAID OFF?  DID YOU RESIGN?

12:42PM 10   A.   I RESIGNED.

12:42PM 11   Q.   AND IN GENERAL TERMS, WHAT WAS THE REASON FOR RESIGNING

12:42PM 12   FROM YOUR JOB AT THERANOS?

12:42PM 13   A.   I LEFT THERANOS BECAUSE I WAS UNCOMFORTABLE PROCESSING

12:42PM 14   PATIENT SAMPLES AND I DID NOT FEEL THAT THE TECHNOLOGY THAT WE

12:42PM 15   WERE USING IN ORDER TO PROCESS PATIENT SAMPLES WAS ADEQUATE

12:42PM 16   ENOUGH TO BE ENGAGING IN THAT BEHAVIOR OF PROCESSING PATIENT

12:42PM 17   SAMPLES.

12:42PM 18       AFTER LOTS OF CONVERSATIONS WITH VARIOUS EXECUTIVES AND

12:42PM 19   PEOPLE WITHIN THE ORGANIZATION, I HAD MADE THE DECISION TO

12:42PM 20   LEAVE THE ORGANIZATION.

12:42PM 21   Q.   OKAY.  LET'S GO BACK IN TIME A LITTLE BIT.

12:42PM 22       CAN YOU SUMMARIZE YOUR EDUCATION FOR ME BEGINNING POST

12:42PM 23   HIGH SCHOOL?

12:42PM 24   A.   POST HIGH SCHOOL EDUCATION, I GRADUATED FROM

12:42PM 25   U.C. BERKELEY, UNIVERSITY OF CALIFORNIA BERKELEY, AND I

12:42PM   1    RECEIVED A DEGREE IN MOLECULAR AND CELLULAR BIOLOGY AND A

12:43PM   2    BACHELOR'S IN LINGUISTICS, SO A DUAL DEGREE.

12:43PM   3    Q.   WAS THERANOS YOUR FIRST EMPLOYMENT OUT OF COLLEGE?

12:43PM   4    A.   YES.

12:43PM   5    Q.   AND HOW DID YOU FIRST HEAR ABOUT THE COMPANY THERANOS?

12:43PM   6    A.   I FIRST HEARD ABOUT THERANOS AT A STUDENT CAREER FAIR AT

12:43PM   7    THE U.C. BERKELEY CAMPUS, AND ESSENTIALLY THEY'RE BOOTHS SET UP

12:43PM   8    WITH DIFFERENT COMPANIES, AND THERANOS HAD PROBABLY THE MOST

12:43PM   9    POPULAR BOOTH.  IT HAD KIND OF A LINE OUT THE DOOR OF PEOPLE

12:43PM   10   WAITING TO TALK TO THE RECRUITER THERE, AND SO I WAITED IN LINE

12:43PM   11   TO TALK TO ONE OF THE RECRUITERS TO BE A PART OF THE COMPANY.

12:43PM   12   Q.   AND AT THAT TIME DID YOU KNOW MUCH ABOUT THE BUSINESS OF

12:43PM   13   THE COMPANY, WHAT IT WAS DOING?

12:43PM   14   A.   NO.

12:43PM   15   Q.   DID YOU THEN GO THROUGH THE JOB INTERVIEW PROCESS FOR A

12:43PM   16   POSITION AT THERANOS?

12:43PM   17   A.   YES.  SO ESSENTIALLY AFTER WAITING IN LINE, I HANDED OVER

12:43PM   18   MY RESUME TO THE RECRUITER, AND SHE SAID WE'RE HIRING A WHOLE

12:44PM   19   BUNCH OF PEOPLE FOR MANY DIFFERENT POSITIONS, LET ME SUBMIT

12:44PM   20   YOUR RESUME AND GIVE YOU A CALL TO SEE WHAT OPENING POSITIONS

12:44PM   21   YOU'LL HAVE.

12:44PM   22        SO AFTER I SUBMITTED MY RESUME I HAD GOTTEN A CALL BACK

12:44PM   23   AND THEY HAD TOLD ME THAT I HAD A PHONE INTERVIEW WITH THE

12:44PM   24   COMPANY FOR A POTENTIAL POSITION, AN ENTRY LEVEL POSITION.

12:44PM   25        AND THEN I PROCEEDED TO GO THROUGH THEIR INTERVIEW PROCESS

12:44PM  1    FROM THAT POINT FORWARD.

12:44PM  2    Q.   AND DID THE INTERVIEW PROCESS INCLUDE INTERVIEWS WITH

12:44PM  3    EITHER ELIZABETH HOLMES OR RAMESH "SUNNY" BALWANI?

12:44PM  4    A.   YES, WITH BOTH RAMESH BALWANI AND ELIZABETH HOLMES.

12:44PM  5    Q.   OKAY.  AND WAS THAT THE ORDER THAT THEY OCCURRED IN FIRST

12:44PM  6    MR. BALWANI AND THEN MS. HOLMES IF YOU RECALL?

12:44PM  7    A.   YES.

12:44PM  8    Q.   DURING THOSE INTERVIEWS -- WELL, LET'S START WITH THE

12:44PM  9    INTERVIEW WITH MR. BALWANI FIRST.

12:44PM  10       DO YOU RECALL LEARNING ANYTHING ABOUT THE COMPANY DURING

12:44PM  11   YOUR CONVERSATION WITH HIM?

12:44PM  12   A.   I DIDN'T LEARN TOO MUCH.  I UNDERSTOOD THAT IT WAS A

12:44PM  13   MEDICAL DIAGNOSTIC COMPANY, THAT THERE WERE SORT OF GRAND

12:45PM  14   ENVISIONS OF WHAT THEY WERE GOING TO ACCOMPLISH, BUT IN TERMS

12:45PM  15   OF THE QUESTIONS THAT I ASKED DURING THE INTERVIEW IT WAS TOLD

12:45PM  16   TO ME THAT THEY, YOU KNOW, HAD CONFIDENTIALITY AROUND THE

12:45PM  17   TECHNOLOGY THAT THEY WERE BUILDING AND I WOULD FIND OUT ONCE I

12:45PM  18   STARTED WORKING FOR THE COMPANY AND MORE SPECIFICS ABOUT WHAT

12:45PM  19   IT WAS THAT WE WERE WORKING ON AND THE TECHNOLOGY THAT WE WERE

12:45PM  20   DEALING WITH.

12:45PM  21   Q.   HOW ABOUT YOUR INTERVIEW WITH MS. HOLMES, HOW DID THAT

12:45PM  22   COMPARE IN THAT REGARD?

12:45PM  23   A.   I ALSO -- IN MY INTERVIEW WITH MS. HOLMES I THINK I WAS

12:45PM  24   MORE KIND OF STAR STRUCK BECAUSE OF WHAT I HAD READ ON THE

12:45PM  25   INTERNET WITH HER.  I ASKED A COUPLE OF QUESTIONS, AND SHE SAID

12:45PM  1    YOU'LL FIND OUT ONCE YOU START WORKING FOR THE COMPANY AS WELL

12:45PM  2    ABOUT THE TECHNOLOGY WE'RE WORKING WITH AND SEE WHAT IT IS THAT

12:45PM  3    WE'RE ALL ABOUT AND WHAT THE PROSPECTS BASICALLY OF THE COMPANY

12:45PM  4    ARE GOING TO BE RIGHT NOW AND IN THE FUTURE.

12:45PM  5    Q.   AND YOU WERE IN THE MIDST OF THE JOB APPLICATION PROCESS,

12:45PM  6    SO I TAKE IT YOU WERE INTERESTED IN THE POSITION; IS THAT

12:46PM  7    CORRECT?

12:46PM  8    A.   YES.

12:46PM  9    Q.   SEPARATE FROM THAT, WERE YOU EXCITED ABOUT THE PROSPECT OF

12:46PM  10   WORKING AT THERANOS?

12:46PM  11   A.   I WAS VERY EXCITED ABOUT THE PROSPECT OF WORKING FOR

12:46PM  12   THERANOS BASED ON THE VERY LITTLE INFORMATION THAT WAS ABOUT

12:46PM  13   THE COMPANY, IT HAD WHAT WOULD APPEAR TO BE A REALLY EXCITING

12:46PM  14   TECHNOLOGY WHERE THEY WERE ESSENTIALLY GOING TO PREVENT PEOPLE

12:46PM  15   FROM GETTING LAB DIAGNOSTICS THAT WERE PAINFUL BY DOING VENOUS

12:46PM  16   DRAWS BY A FINGERSTICK, THAT IT WOULD BE AFFORDABLE, THAT THERE

12:46PM  17   WAS COMPLETE PRICE TRANSPARENCY, WHICH IS SOMETHING THAT I WAS

12:46PM  18   EXCITED ABOUT, SOMETHING THAT WAS GOING TO BE MORE ACCESSIBLE.

12:46PM  19   SO ESSENTIALLY INSTEAD OF JUST GETTING YOUR BLOOD TESTS DONE

12:46PM  20   ONCE OR TWICE, YOU COULD GET IT MULTIPLE TIMES.

12:46PM  21        SO BETWEEN THE TECHNOLOGY, BETWEEN WHAT I HAD HEARD ABOUT

12:46PM  22   MS. HOLMES, AND THE FACT THAT WE WERE IN THE SILICON VALLEY AND

12:46PM  23   IT HAD SORT OF THIS HYPE ABOUT BEING THIS KIND OF A STARTUP, I

12:46PM  24   WAS REALLY EXCITED TO WORK WITH THERANOS AND HAD ACTUALLY

12:46PM  25   TURNED DOWN OTHER JOB OPPORTUNITIES TO WORK WITH THEM.



12:47PM 1   Q.   WHAT WAS ABOUT IT MS. HOLMES IN PARTICULAR THAT INCREASED

12:47PM 2   THE APPEAL OF THE COMPANY TO YOU?

12:47PM 3   A.   I THINK IN THE INTERVIEW THAT I HAD SEEN WITH THE STANFORD

12:47PM 4   TECHNOLOGY VENTURE PROGRAM SHE HAD TALKED ABOUT ESSENTIALLY

12:47PM 5   WHAT THE TECHNOLOGY COULD DO, WHAT POINT OF CARE DIAGNOSTICS

12:47PM 6   COULD DO.

12:47PM 7        SO INSTEAD OF JUST HAVING A ONE TIME STAMP OF YOUR BLOOD

12:47PM 8   DIAGNOSTICS YOU COULD HAVE MULTIPLE BECAUSE IT WAS EASIER, LESS

12:47PM 9   PAINFUL, CHEAPER, AND IT WOULD HAVE A SORT OF DYNAMIC STORY

12:47PM 10  LINE OF WHAT YOUR HEALTH WAS, WHICH COULD REALLY CHANGE THE WAY

12:47PM 11  IN WHICH WE TREAT PATIENTS.

12:47PM 12       AND SHE HAD A CHARISMA TO HER, RIGHT?  SHE WAS VERY

12:47PM 13  ARTICULATE.  SHE HAD A STRONG SENSE OF CONVICTION ABOUT HER

12:47PM 14  MISSION.

12:47PM 15       AND ALSO AT THAT TIME SHE WAS ONE OF THE FEW, YOU KNOW,

12:47PM 16  FEMALE ENTREPRENEURS WHO MANAGED TO GET THIS SORT OF UNICORN

12:47PM 17  STATUS OF A COMPANY, WHICH MEANS THAT IT HAD A VALUATION OF

12:47PM 18  OVER A BILLION DOLLARS, AND TO HELP SUPPORT SOMEONE WHO HAD

12:48PM 19  WHAT APPEARED TO BE STRONG LEADERSHIP, A STRONG MISSION, AND

12:48PM 20  WHO COULD POTENTIALLY SET AN EXAMPLE FOR OTHER WOMEN TO GET

12:48PM 21  EXCITED ABOUT SCIENCE AND ENGINEERING.

12:48PM 22       IT SEEMED LIKE A COMPANY THAT I WANTED TO BE APART OF AND

12:48PM 23  TO HELP BUILD AND GROW.

12:48PM 24  Q.   AT THE CONCLUSION OF THE APPLICATION PROCESS, WERE YOU

12:48PM 25  OFFERED A POSITION AT THERANOS?

12:48PM  1    A.    YES.

12:48PM  2    Q.    AND DID YOU ACCEPT?

12:48PM  3    A.    YES.

12:48PM  4    Q.    AND FOR THE REASONS THAT WE JUST DISCUSSED?

12:48PM  5    A.    YES.

12:48PM  6    Q.    WHEN YOU STARTED AT THE COMPANY, DID YOU SIGN A

12:48PM  7    NONDISCLOSURE AGREEMENT?

12:48PM  8    A.    YES.

12:48PM  9    Q.    DURING THE EARLY DAYS OF YOUR EMPLOYMENT WITH THE COMPANY,

12:48PM  10   DID YOU GET A SENSE OF WHETHER INFORMATION WAS RESTRICTED AT

12:48PM  11   THE COMPANY?  IN OTHER WORDS, WHETHER THERE WAS INFORMATION

12:48PM  12   THAT YOU WERE LEARNING THAT COULD NOT BE SHARED OUTSIDE OF THE

12:48PM  13   COMPANY?

12:48PM  14   A.    YES.

12:48PM  15   Q.    AND HOW DID YOU GET THAT SENSE?

12:48PM  16   A.    WHEN WE DID OUR ENTRY INTERVIEW INTO THE COMPANY, WE SAT

12:48PM  17   DOWN WITH CHRISTIAN HOLMES, WHO WAS ONE OF THE PROJECT MANAGERS

12:49PM  18   OF THE COMPANY, AND HE ESSENTIALLY TOLD US THAT SECRECY WAS

12:49PM  19   VERY IMPORTANT BECAUSE WE NEEDED TO GUARD INFORMATION TO ENSURE

12:49PM  20   THAT COMPETITORS WOULD NOT FIGURE OUT WHAT WE WERE DOING WITHIN

12:49PM  21   THE COMPANY AND THAT WE COULDN'T PUT -- SAY THAT WE WORKED AT

12:49PM  22   THERANOS ON OUR LINKEDIN PROFILES OR HAVE VERY DESCRIPTIVE

12:49PM  23   INDICATIONS ABOUT WHAT OUR ROLES AND RESPONSIBILITIES WERE, AND

12:49PM  24   IT WAS VERY IMPORTANT FOR US TO KEEP INFORMATION ABOUT WHAT WE

12:49PM  25   WERE DOING IN THE COMPANY INTERNAL.

12:49PM  1      SO IT WAS VERY CLEAR FROM THE VERY BEGINNING WORKING THERE

12:49PM  2   THE FIRST DAY ON THE JOB THAT WE NEEDED TO KEEP INFORMATION

12:49PM  3   CONFIDENTIAL AND SECRET AND THAT IT WAS MEANT FOR SORT OF

12:49PM  4   INTERNAL VIEWING.

12:49PM  5   Q.   REMIND ME OR REPEAT, WHAT WAS CHRISTIAN HOLMES'S TITLE AT

12:49PM  6   THE COMPANY AGAIN?

12:49PM  7   A.   CHRISTIAN HOLMES'S TITLE, HE WAS ONE OF THE LEAD PROJECT

12:49PM  8   MANAGERS.

12:49PM  9   Q.   IN ADDITION TO THAT WAS HE ALSO ELIZABETH HOLMES'S

12:50PM 10   BROTHER?

12:50PM 11   A.   YES.

12:50PM 12   Q.   NOW THAT YOU WERE EMPLOYED AT THE COMPANY, DID YOU DEVELOP

12:50PM 13   A SENSE OF WHAT BUSINESS THE COMPANY WAS IN?  WHAT THE COMPANY

12:50PM 14   DID?

12:50PM 15   A.   YES.

12:50PM 16   Q.   AND HOW WOULD YOU DESCRIBE THAT AT A HIGH LEVEL?

12:50PM 17   A.   SO AT A HIGH LEVEL THERANOS WAS CREATING A NEW TYPE OF

12:50PM 18   MEDICAL DEVICE WHERE ESSENTIALLY INSTEAD OF RUNNING VENOUS DRAW

12:50PM 19   BLOOD SAMPLES THEY WERE RUNNING A FINGERSTICK.

12:50PM 20      YOU WOULD TAKE THIS FINGERSTICK SAMPLE AND PUT IT INTO A

12:50PM 21   TESTING KIT, AND STICK IT INTO A MACHINE, AND THEN IT WOULD

12:50PM 22   GIVE YOU ALL OF THE RESULTS THAT YOU WOULD NEED FOR YOUR LAB

12:50PM 23   DIAGNOSTICS THAT AT THAT POINT A DOCTOR WOULD TYPICALLY ORDER.

12:50PM 24      SO IT WAS A PATIENT PROCESSING COMPANY IN ADDITION TO AN

12:50PM 25   INNOVATIVE MEDICAL DEVICE COMPANY.

12:50PM   1    Q.   BASED ON YOUR UNDERSTANDING AT THE TIME, DID THERANOS HAVE

12:50PM   2    ANY COMPETITORS IN THE BLOOD TESTING FIELD?

12:50PM   3    A.   THEY DID, YES.

12:51PM   4    Q.   WHO WERE THE CHIEF COMPETITORS IF YOU HAVE A SENSE?

12:51PM   5    A.   THE CHIEF COMPETITORS WERE LAB CORP. AND

12:51PM   6    QUEST DIAGNOSTICS.

12:51PM   7    Q.   AND WAS THERE ANYTHING ABOUT THERANOS THAT SET THAT

12:51PM   8    COMPANY APART FROM THOSE TWO COMPETITORS THAT YOU MENTIONED?

12:51PM   9    A.   YES.

12:51PM   10   Q.   AND WHAT WAS THAT?

12:51PM   11   A.   SO THE BIGGEST THING THAT SET THERANOS APART WAS

12:51PM   12   EVENTUALLY THE GOAL OF THERANOS WAS THE FACT THAT THESE DEVICES

12:51PM   13   WOULD BE SET UP IN PHARMACIES ACROSS THE U.S., SO IN WALGREENS.

12:51PM   14   SO INSTEAD OF HAVING YOUR BLOOD TUBES SORT OF SENT TO A

12:51PM   15   CENTRALIZED LABORATORY FACILITY LIKE LAB CORP.,

12:51PM   16   QUEST DIAGNOSTICS, IT COULD BE RUN ONSITE.  SO IT COULD BE RUN

12:51PM   17   AT THE WALGREENS LOCATION AND HAVING A MORE SORT OF

12:51PM   18   DECENTRALIZED WAY OF TESTING PEOPLE WAS SOMETHING THAT YOU

12:51PM   19   HADN'T QUITE SEEN YET.

12:51PM   20   Q.   YOU MENTIONED A MINUTE AGO THE METHOD OF DRAWING BLOOD

12:51PM   21   FROM A FINGERSTICK AS WELL?

12:51PM   22   A.   YES.

12:51PM   23   Q.   AND WAS THAT SOMETHING THAT WAS RELATIVELY UNIQUE TO

12:52PM   24   THERANOS AS COMPARED TO THE COMPETITOR COMPANIES THAT YOU

12:52PM   25   MENTIONED?

12:52PM  1    A.   YES.

12:52PM  2    Q.   YOU SAID THAT YOUR INITIAL PLACEMENT AT THE COMPANY WAS IN

12:52PM  3    THE RESEARCH AND DEVELOPMENT LAB; IS THAT CORRECT?

12:52PM  4    A.   THAT IS CORRECT.

12:52PM  5    Q.   AND JUST ONE MORE TIME, WHAT WAS YOUR JOB TITLE THERE?

12:52PM  6    A.   I WAS A LAB ASSOCIATE.

12:52PM  7    Q.   WHEN YOU JOINED THE COMPANY, WAS THERANOS ALREADY OFFERING

12:52PM  8    BLOOD TESTING SERVICES TO THE PUBLIC?

12:52PM  9    A.   YES.

12:52PM  10   Q.   AND THIS WOULD HAVE BEEN IN OCTOBER 2013 YOU SAID?

12:52PM  11   A.   YES.

12:52PM  12   Q.   AND WHAT DEPARTMENT OR GROUP IN THERANOS HANDLED PATIENT

12:52PM  13   BLOOD TESTING?

12:52PM  14   A.   IN OCTOBER OF 2013 IT WAS THE RESEARCH AND DEVELOPMENT

12:52PM  15   DEPARTMENT FOR FINGERSTICK SAMPLES.

12:52PM  16   Q.   WAS THERE ALSO A CLINICAL LAB OPERATING AT THAT TIME?

12:52PM  17   A.   YES.

12:52PM  18   Q.   AND DID THE CLINICAL LAB ALSO HAVE A ROLE IN CONDUCTING

12:52PM  19   PATIENT TESTING?

12:52PM  20   A.   YES.

12:52PM  21   Q.   CAN YOU EXPLAIN AGAIN IN GENERAL TERMS THE DIFFERENCE

12:52PM  22   BETWEEN THE RESEARCH AND DEVELOPMENT DEPARTMENT VERSUS THE

12:53PM  23   CLINICAL LABORATORY DEPARTMENT AT THERANOS?

12:53PM  24   A.   JUST TO MAKE SURE I UNDERSTAND THE QUESTION.  EXPLAIN THE

12:53PM  25   DIFFERENCES BETWEEN THE RESEARCH AND DEVELOPMENT LAB AND THE

12:53PM  1      CLINICAL LAB?

12:53PM  2      Q.   EXACTLY.

12:53PM  3      A.   SO IN THE RESEARCH AND DEVELOPMENT LAB, THAT WAS THE

12:53PM  4      CREATION OF ALL OF THE DIFFERENT BLOOD TESTS.

12:53PM  5           SO THE RESEARCH AND DEVELOPMENT LAB WAS THE LABORATORY

12:53PM  6      WHERE WE WERE DEVELOPING ALL OF THE TESTS THAT WE WERE GOING TO

12:53PM  7      RUN ON FINGERSTICK SAMPLES.  AND SO THE DEVELOPMENT HAPPENED

12:53PM  8      THERE IN ADDITION TO THE VALIDATION TO MAKE SURE ARE THESE

12:53PM  9      ACCURATE TESTS?  DO THEY OPERATE RELIABLY?  AND, YOU KNOW, THIS

12:53PM  10     WAS THE PLACE WHERE ALL OF THE NEW TESTS THAT WE HADN'T

12:53PM  11     DEVELOPED YET WERE ONGOING AND WORKING.

12:53PM  12          AND THEN IN THE CLINICAL LAB, THE CLINICAL LAB IS WHERE

12:53PM  13     YOU ACTIVELY PROCESS PATIENT SAMPLES.  SO WHEN A DOCTOR HAS A

12:54PM  14     REQUEST, IT GETS SENT TO THE CLINICAL LAB, AND WE FIGURE OUT IN

12:54PM  15     THE CLINICAL LAB HOW TO RUN THAT PATIENT SAMPLE.

12:54PM  16          SO THAT'S THE DIFFERENCE.

12:54PM  17     Q.   SO A GIVEN TEST WOULD BEGIN IN THE RESEARCH AND

12:54PM  18     DEVELOPMENT SECTION OR LAB, AND THEN ONCE IT WAS READY IT WOULD

12:54PM  19     BE MOVED INTO THE CLINICAL LAB FOR PATIENT TESTING?

12:54PM  20     A.   YES.

12:54PM  21     Q.   AND YOU WORKED IN BOTH OF THESE LABS AT THERANOS; CORRECT?

12:54PM  22     A.   YES.

12:54PM  23     Q.   AND DURING YOUR TIME AT THE COMPANY, DID YOU BECOME

12:54PM  24     GENERALLY FAMILIAR WITH WHAT KINDS OF TESTS THERANOS WAS

12:54PM  25     CONDUCTING?

12:54PM   1    A.   YES.

12:54PM   2    Q.   HOW ABOUT THE DEVICES USED BY THE COMPANY.  AS PART OF

12:54PM   3    YOUR ROLE DID YOU BECOME FAMILIAR WITH THE KINDS OF ANALYZERS

12:54PM   4    THAT THERANOS WAS USING TO TEST PATIENT BLOOD SAMPLES?

12:54PM   5    A.   YES.

12:54PM   6    Q.   AND DID THERANOS MANUFACTURE SOME BLOOD ANALYZERS?

12:54PM   7    A.   YES, THEY DID.

12:54PM   8    Q.   WHAT WERE THOSE?

12:55PM   9    A.   THE DEVICES THAT THERANOS MANUFACTURED WERE THE EDISON,

12:55PM  10    THE EDISON DEVICES.

12:55PM  11    Q.   AND WERE THERE DIFFERENT VERSIONS OF THE EDISON DEVICES?

12:55PM  12    A.   YES.  SO THERE WAS THE EDISON 3.0'S AND THE EDISON 3.5'S.

12:55PM  13    Q.   AND WERE THOSE TWO DIFFERENT VERSIONS OF THE SAME BASIC

12:55PM  14    DEVICE?

12:55PM  15    A.   YES.

12:55PM  16    Q.   AND THERE'S A BINDER ON THE DESK IN FRONT OF YOU.  IF I

12:55PM  17    COULD ASK YOU TO OPEN THAT AND TURN TO A TAB LABELLED

12:55PM  18    EXHIBIT 5388.

12:55PM  19         LET ME KNOW WHEN YOU'RE THERE.

12:55PM  20    A.   IS IT IN THE FRONT OF 5388 OR THE BACK?

12:55PM  21    Q.   IT SHOULD BE IN THE BACK.  I THINK IT'S THE SECOND TO THE

12:55PM  22    LAST TAB IN THE BINDER.

12:55PM  23    A.   YES.

12:55PM  24    Q.   AND YOU SHOULD BE LOOKING AT AN IMAGE.

12:55PM  25    A.   YES.

12:55PM  1    Q.   AND DO YOU RECOGNIZE WHAT IS DEPICTED IN THAT IMAGE?

12:55PM  2    A.   YES.

12:56PM  3    Q.   AND WHAT IS IT?

12:56PM  4    A.   THAT'S THE EDISON DEVICE.

12:56PM  5    Q.   AND IS THIS A TRUE AND CORRECT IMAGE OF THE EDISON DEVICE?

12:56PM  6    A.   YES.

12:56PM  7            MR. BOSTIC:  YOUR HONOR, I WOULD MOVE EXHIBIT 5388

12:56PM  8    INTO EVIDENCE AT THIS TIME.

12:56PM  9            MR. WADE:  NO OBJECTION.

12:56PM  10           THE COURT:  IT'S RECEIVED AND MAY BE PUBLISHED.

12:56PM  11       (GOVERNMENT'S EXHIBIT 5388 WAS RECEIVED IN EVIDENCE.)

12:56PM  12           MR. BOSTIC:  LET'S GET THAT UP ON THE SCREEN,

12:56PM  13   MS. HOLLIMAN.

12:56PM  14       OKAY.

12:56PM  15   Q.   MS. CHEUNG, DO YOU NOW SEE ON THE SCREEN IN FRONT OF YOU

12:56PM  16   THE IMAGE THAT WE WERE TALKING ABOUT?

12:56PM  17   A.   YES.

12:56PM  18   Q.   AND YOU SAID THIS WAS THE EDISON.  WHAT DOES THIS LOOK

12:56PM  19   LIKE IN PERSON?  CAN YOU EXPLAIN, FOR EXAMPLE, HOW BIG IT WAS?

12:56PM  20   A.    IT WAS ABOUT THE SIZE OF A, LIKE, DESKTOP COMPUTER, MAYBE

12:56PM  21   SLIGHTLY BIGGER.

12:56PM  22   Q.   AND THE SCREEN IN FRONT, IS THAT A TOUCH SCREEN?

12:56PM  23   A.   YES.

12:56PM  24   Q.   DURING YOUR TIME AT THE COMPANY, DID YOU BECOME FAMILIAR

12:56PM  25   WITH THE USE OF THE EDISON ANALYZER?

12:56PM  1    A.   YES.

12:56PM  2    Q.   AND CAN YOU DESCRIBE WHAT THE STEPS WERE INVOLVED IN

12:57PM  3    RUNNING A SAMPLE ON THE EDISON?

12:57PM  4    A.   YES.  SO WHEN A PATIENT WOULD GET THEIR BLOOD COLLECTED,

12:57PM  5    IT WOULD BE IN A CONTAINER CALLED A NANOTAINER.

12:57PM  6         THAT NANOTAINER WOULD BE TAKEN TO THE LABORATORY WHERE WE

12:57PM  7    WOULD BASICALLY SORT WHO GOT ACCESS TO THE BLOOD SAMPLE FIRST.

12:57PM  8         AND THEN ONCE WE WOULD GET THE BLOOD SAMPLE, WE WOULD RUN

12:57PM  9    IT THROUGH SOMETHING CALLED A TECAN, AND THEN PUT THIS BLOOD

12:57PM 10    SAMPLE INTO A CARTRIDGE.

12:57PM 11         AND THAT CARTRIDGE WOULD THEN BE PUT INTO THIS DEVICE.

12:57PM 12    AND WE WOULD SCAN A BAR CODE, AND WE WOULD HIT START IF IT WAS

12:57PM 13    THE ACCURATE TEST, MAKING SURE YOU CHECK.

12:57PM 14         AND THEN ONCE WE CONFIRMED IT WAS THE ACCURATE TEST, WE

12:57PM 15    WOULD START IT, AND IT WOULD RUN.

12:57PM 16         AND EVENTUALLY THE RESULTS WOULD COME THROUGH A BACK-END

12:57PM 17    SYSTEM CALLED ALCHEMIST, IT'S A-L-C-H-E-M-I-S-T.

12:58PM 18         AND FROM THERE WE WOULD GET THE PATIENT RESULTS.

12:58PM 19         AND THAT'S HOW WE USE THE EDISON DEVICES.

12:58PM 20    Q.   I JUST WANT TO FOLLOW UP ON ONE STEP YOU MENTIONED.  YOU

12:58PM 21    MENTIONED I THINK A DEVICE CALLED THE TECAN; IS THAT CORRECT?

12:58PM 22    A.   YES.

12:58PM 23    Q.   AND IS THAT T-E-C-A-N?

12:58PM 24    A.   YES.

12:58PM 25    Q.   AND WHAT DID THE TECAN DO IN THIS PROCESS?

12:58PM  1    A.   SO THE TECAN WAS A LIQUID HANDLING DEVICE.  ESSENTIALLY

12:58PM  2    WHAT IT DOES IS THAT IT'S ABLE TO DISPENSE AND DISPENSE VERY

12:58PM  3    SMALL QUANTITIES OF LIQUID INTO VERY SPECIFIC LOCATIONS.  SO

12:58PM  4    IT'S A ROBOTIC SYSTEM.

12:58PM  5         YEAH, IT'S ROBOTICS LIQUID HANDLING DEVICE.

12:58PM  6    Q.   AND DID THE TECAN ADD TO OR TAKE ANYTHING AWAY FROM THE

12:58PM  7    BLOOD SAMPLE?

12:58PM  8    A.   IT WOULD DILUTE THE BLOOD SAMPLE.

12:58PM  9    Q.   SO, IN OTHER WORDS, IT WOULD ADD A LIQUID TO THE BLOOD

12:59PM 10    SAMPLE?

12:59PM 11    A.   YES.

12:59PM 12    Q.   AND WHAT LIQUID WAS USED TO DILUTE THE BLOOD SAMPLES?

12:59PM 13    A.   TYPICALLY IT WOULD BE SOME SORT OF REAGENT.  IT WOULD BE

12:59PM 14    SOMETHING LIKE PBS OR PSA, DEPENDING ON WHAT TYPE OF TEST IT

12:59PM 15    WAS.  THERE WERE DIFFERENT DILUTION BUFFERS THAT WOULD BE USED.

12:59PM 16    Q.   AND WAS THE TECAN DEVICE, THE TECAN MACHINE MANUFACTURED

12:59PM 17    BY THERANOS?

12:59PM 18    A.   NO.

12:59PM 19    Q.   WAS IT SOMETHING THAT HAD BEEN INVENTED BY OR DEVELOPED BY

12:59PM 20    THERANOS?

12:59PM 21    A.   NO.

12:59PM 22    Q.   AND WHAT DID IT LOOK LIKE, THE TECAN DEVICE?

12:59PM 23    A.   IT'S A VERY LARGE DEVICE.  IT'S PROBABLY, IF YOU FLIPPED A

12:59PM 24    REFRIGERATOR ON ITS SIDE IT WOULD BE ABOUT THAT SIZE, AND IT

12:59PM 25    HAS KIND OF LIKE A TABLETOP WHERE YOU CAN SORT OF SET UP

12:59PM 1    DIFFERENT SETUPS IN ORDER TO TELL THE ROBOTIC SYSTEM WHERE TO

12:59PM 2    PLACE THE LIQUID OR WHERE TO TAKE LIQUID FROM, OR WHAT TO PUT

12:59PM 3    IT INTO.

12:59PM 4        SO IT'S A PRETTY LARGE TABLETOP ROBOTICS DEVICE, YEAH.

01:00PM 5    Q.   THE EDISON ANALYZER, COULD IT RUN DIFFERENT TYPES OF

01:00PM 6    TESTS -- WELL, LET ME ASK A DIFFERENT QUESTION.

01:00PM 7        IN YOUR EXPERIENCE USING THE EDISON ANALYZER, WAS IT USED

01:00PM 8    TO RUN MULTIPLE TYPES OF TESTS ON THE SAME SAMPLE AT ONE TIME?

01:00PM 9    A.   THE EDISON DEVICE COULD ONLY RUN ONE TYPE OF TEST FOR ONE

01:00PM 10   PATIENT AT A GIVEN TIME.

01:00PM 11   Q.   IN OTHER WORDS, ONE DEVICE COULD ONLY RUN ONE TYPE OF

01:00PM 12   SAMPLE ON ONE DEVICE AT ONE TIME?

01:00PM 13   A.   YES.

01:00PM 14   Q.   WERE THERE OTHER BLOOD ANALYZERS THAT THERANOS

01:00PM 15   MANUFACTURED IN HOUSE?

01:00PM 16   A.   THERE WAS ONE OTHER THAT THERANOS DEVELOPED, YEAH.

01:00PM 17   Q.   SO LET ME ASK A BETTER QUESTION, WHICH IS DURING YOUR TIME

01:01PM 18   AT THE COMPANY, WERE THERE ANY OTHER THERANOS MANUFACTURED

01:01PM 19   DEVICES THAT WERE USED FOR PATIENT SAMPLE TESTING?

01:01PM 20   A.   NO.

01:01PM 21   Q.   WERE THERE OTHER THERANOS ANALYZERS THAT WERE BEING USED

01:01PM 22   BUT NOT FOR PATIENT TESTING?

01:01PM 23   A.   YES.

01:01PM 24   Q.   AND CAN YOU DESCRIBE WHICH OF THOSE YOU BECAME FAMILIAR

01:01PM 25   WITH?

01:01PM  1    A.   SO THERE WAS ANOTHER DEVICE CALLED THE 4.0'S WHICH WAS

01:01PM  2    ESSENTIALLY A DEVICE THAT WAS MEANT TO BE ABLE TO PROCESS ALL

01:01PM  3    OF THE DIFFERENT TYPES OF TESTS THAT WE RUN WITH DIFFERENT

01:01PM  4    TYPES OF METHODOLOGY.

01:01PM  5         YOU KNOW, ONE WOULD BE A CHEMISTRY METHODOLOGY, AND AN

01:01PM  6    IMMUNOCHEMISTRY METHODOLOGY, MICROBIOLOGY.  SO IT WAS SUPPOSED

01:01PM  7    TO BE THIS AGGREGATIVE DEVICE, AND THAT WAS THE 4.0.

01:01PM  8    Q.   AND YOU SAID "SUPPOSED TO BE."  WHY ARE YOU USING THAT

01:01PM  9    TERM INSTEAD OF JUST SAYING WHAT THE DEVICE COULD DO?

01:01PM  10   A.   IT WAS STILL IN DEVELOPMENT WHILE I WAS THERE.  IT DIDN'T

01:01PM  11   HAVE THAT CAPACITY WHILE I WAS WORKING FOR THE COMPANY.

01:01PM  12   Q.   YOU SAID THAT THAT DEVICE -- AND DID YOU CALL IT THE 4.0?

01:02PM  13   A.   YES.

01:02PM  14   Q.   AND YOU SAID THAT THAT DEVICE WAS SUPPOSED TO BE ABLE TO

01:02PM  15   DO ALL OF THE KINDS OF TESTS THAT THERANOS OFFERED; IS THAT

01:02PM  16   CORRECT?

01:02PM  17   A.   YES.

01:02PM  18   Q.   WOULD THAT MAKE IT DIFFERENT FROM THE EDISON DEVICE?

01:02PM  19   A.   YES.

01:02PM  20   Q.   AND HOW SO?

01:02PM  21   A.   THE EDISON DEVICES COULD ONLY RUN ABOUT 12 DIFFERENT TYPES

01:02PM  22   OF TESTS, AND THEY WERE IMMUNO ASSAYS, SO THEY WERE

01:02PM  23   IMMUNOCHEMISTRY TESTS.  ANOTHER TERM FOR THEM IS AN ELISA, SO

01:02PM  24   IT'S E-L-I-S-A.

01:02PM  25   Q.   AND THAT WAS JUST A SUBSET OF THE TOTAL SET OF TESTS THAT

01:02PM 1    THERANOS WAS OFFERING AT THE TIME?

01:02PM 2    A.   YES.

01:02PM 3    Q.   I THINK YOU JUST ANSWERED THIS QUESTION AS WELL, BUT JUST

01:02PM 4    TO BE CLEAR, DURING YOUR TIME AT THERANOS, DID THERANOS RUN

01:02PM 5    PATIENT BLOOD TESTS ONLY ON THE EDISON, THE THERANOS BUILT

01:03PM 6    ANALYZER?

01:03PM 7    A.   NO.

01:03PM 8    Q.   DID IT USE OTHER TYPES OF DEVICES FOR PATIENT BLOOD SAMPLE

01:03PM 9    TESTING?

01:03PM 10   A.   YES.

01:03PM 11   Q.   WHAT WERE THE OTHER TYPES OF DEVICES THAT THERANOS USED

01:03PM 12   FOR PATIENT SAMPLE TESTING?

01:03PM 13   A.   SO THERANOS HAD UTILIZED OTHER FDA APPROVED MACHINES THAT

01:03PM 14   THEY HAD MODIFIED IN ORDER TO BE ABLE TO HANDLE THE SMALL BLOOD

01:03PM 15   SAMPLES THAT WE HAD.

01:03PM 16        SO ONE OF THEM FOR CHEMISTRY SAMPLES WAS CALLED THE

01:03PM 17   SIEMENS ADVIA, AND THAT'S A NORMAL FDA APPROVED MACHINE THAT

01:03PM 18   YOU WOULD FIND IN HOSPITALS AND YOU CAN BUY OFF THE SHELF.

01:03PM 19        ANOTHER ONE FOR ALL OF THE HEMATOLOGY SAMPLES WE WOULD USE

01:03PM 20   A MACHINE CALLED THE BSD FORTESSA, IT'S A FLOW CYTOMETER, AND

01:03PM 21   THAT WAS ANOTHER DEVICE THAT WE USED IN ORDER TO RUN ALL OF THE

01:04PM 22   CYTOLOGY OR HEMATOLOGY SAMPLES.

01:04PM 23   Q.   THE DEVICES THAT YOU'RE TALKING ABOUT RIGHT NOW, WERE

01:04PM 24   THOSE DEVICES MANUFACTURED OR DEVELOPED BY THERANOS?

01:04PM 25   A.   NO.

01:04PM   1    Q.   WERE THEY INSTEAD DEVELOPED AND SOLD BY THIRD PARTY

01:04PM   2    COMPANIES?

01:04PM   3    A.   YES.

01:04PM   4    Q.   IN THE BINDER IN FRONT OF YOU, CAN I ASK YOU TO TURN TO

01:04PM   5    EXHIBIT 5389.  THAT SHOULD BE JUST THE NEXT ONE IN ORDER.

01:04PM   6         YOU SHOULD SEE AN IMAGE THERE.

01:04PM   7    A.   YES.

01:04PM   8    Q.   AND DO YOU RECOGNIZE WHAT IS DEPICTED IN THAT IMAGE?

01:04PM   9    A.   YES.  THIS IS THE SIEMENS ADVIA.

01:04PM   10   Q.   IS THE IMAGE MARKED AS EXHIBIT 5389 A TRUE AND CORRECT

01:04PM   11   DEPICTION OF THAT DEVICE BASED ON YOUR EXPERIENCE?

01:04PM   12   A.   YES.

01:04PM   13            MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT WOULD MOVE

01:04PM   14   TO ADMIT EXHIBIT 5389 AT THIS TIME.

01:04PM   15            MR. WADE:  NO OBJECTION, YOUR HONOR.

01:04PM   16            THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

01:04PM   17        (GOVERNMENT'S EXHIBIT 5389 WAS RECEIVED IN EVIDENCE.)

01:04PM   18   BY MR. BOSTIC:

01:04PM   19   Q.   MS. CHEUNG, ARE WE NOW LOOKING AT THE SIEMENS ADVIA

01:05PM   20   ANALYZER?

01:05PM   21   A.   YES.

01:05PM   22   Q.   AND WHAT DID THIS LOOK LIKE IN PERSON?

01:05PM   23   A.   THIS DEVICE, IT'S LARGER.  IT'S ABOUT THE SIZE OF -- IT

01:05PM   24   WOULD BE LIKE THE SIZE OF A WASHER AND DRYER IF YOU PUT IT

01:05PM   25   TOGETHER, SO IT WAS QUITE LARGE.  YOU COULD FIT PROBABLY TWO TO

01:05PM 1     THREE PEOPLE IN FRONT OF IT.

01:05PM 2         AND YOU OPEN THIS CASING AND ESSENTIALLY IT WILL HAVE A

01:05PM 3     PLACE WHERE YOU CAN PUT ALL OF THE VENOUS TUBES, THE BLOOD

01:05PM 4     TUBES FOR VENOUS DRAWS IN THERE WITH DIFFERENT BAR CODES SO YOU

01:05PM 5     CAN SCAN IT AND ACTUALLY PROCESS THE PATIENT SAMPLES.

01:05PM 6     Q.   THIS DEVICE WAS MANY TIMES LARGER THAN THE EDISON

01:05PM 7     ANALYZER; CORRECT?

01:05PM 8     A.   YES.

01:05PM 9     Q.   YOU SAID THAT THE EDISON ANALYZER COULD ONLY RUN ONE TYPE

01:05PM 10    OF ASSAY OR ONE TYPE OF TEST ON ONE PATIENT SAMPLE AT A TIME;

01:05PM 11    IS THAT RIGHT?

01:05PM 12    A.   CAN YOU REPEAT THAT.

01:05PM 13    Q.   I THINK YOU SAID THAT THE EDISON ANALYZER COULD ONLY RUN

01:06PM 14    ONE TYPE OF TEST ON ONE PATIENT SAMPLE AT A TIME; IS THAT

01:06PM 15    CORRECT?

01:06PM 16    A.   YES.

01:06PM 17    Q.   AND WAS THAT TRUE FOR THE SIEMENS ADVIA AS WELL?

01:06PM 18    A.   NO.

01:06PM 19    Q.   AND HOW WAS IT DIFFERENT?

01:06PM 20    A.   SO THE SIEMENS ADVIA WAS DIFFERENT BECAUSE YOU COULD

01:06PM 21    ESSENTIALLY PLACE THE VENOUS TUBE IN THERE AND SCAN THE BAR

01:06PM 22    CODE, AND IT WOULD BE ABLE TO DETERMINE, YOU KNOW, MAYBE A

01:06PM 23    BLOOD SAMPLE HAS NUMEROUS TYPES OF CHEMISTRY TESTS THAT IT

01:06PM 24    NEEDS TO RUN, AND IT WOULD RUN THEM IN CONJUNCTION WITH ONE

01:06PM 25    ANOTHER.  AND IT WOULD RUN BASICALLY MULTIPLE TESTS, MULTIPLE

01:06PM 1    DIFFERENT TYPES OF TESTS ON MULTIPLE DIFFERENT SAMPLES.

01:06PM 2         THERE WOULD BE SOME SORT OF CAP, LIKE MAY BE 30 PATIENTS,

01:06PM 3    LET'S SAY 30 TO 40 PATIENTS.

01:06PM 4         YEAH, YOU COULD RUN MULTIPLE PATIENTS, MULTIPLE DIFFERENT

01:06PM 5    TYPES OF TESTS WITHIN A GIVEN, WHAT WE WOULD CALL A RUN.

01:06PM 6         SO ONCE YOU FILL UP ALL OF THE SLOTS FOR ALL OF THE VENOUS

01:06PM 7    TUBES AND ALL OF THE SLOTS FOR ALL OF THE TESTING, THEN YOU

01:07PM 8    COULD START IT AND HAVE IT GO TO COMPLETION TO RUN ALL OF THE

01:07PM 9    PATIENTS IN DIFFERENT TYPES OF TESTS.

01:07PM 10   Q.   THE SIEMENS ADVIA ANALYZER, THE WAY IT COMES FROM THE

01:07PM 11   FACTORY, IS IT CAPABLE OF PROCESSING A SMALL FINGERSTICK BLOOD

01:07PM 12   SAMPLES AS FAR AS YOU KNOW?

01:07PM 13   A.   NO.

01:07PM 14   Q.   DID THERANOS MAKE CHANGES TO ITS SIEMENS ADVIA TO ALLOW

01:07PM 15   THEM TO RUN SMALL FINGERSTICK SAMPLES?

01:07PM 16   A.   YES.

01:07PM 17   Q.   AND WHAT WERE THOSE CHANGES GENERALLY SPEAKING?

01:07PM 18   A.   SO INSTEAD OF -- WHERE THE PATIENT PROCESSING HAPPENS ARE

01:07PM 19   IN THESE LITTLE CUPS, AND THEY'RE CALLED J-CUPS, AND THAT'S

01:07PM 20   WHAT SIEMENS ENDS UP SELLING TO YOU IN ORDER TO DO THE

01:07PM 21   PROCESSING.

01:07PM 22        BUT THERANOS HAD 3D PRINTED THESE THINGS CALLED T-CUPS, SO

01:07PM 23   THEY WERE SHORTER, AND WOULD PLACE THE T-CUPS BASICALLY INSIDE

01:07PM 24   OF THE SIEMENS ADVIA IN ORDER TO RUN THE FINGERSTICK SAMPLES

01:08PM 25   THAT HAD THESE SMALLER VOLUMES OF BLOOD.



01:08PM   1    Q.   AND WHY WAS THE DIFFERENT CUP NECESSARY?

01:08PM   2    A.   BECAUSE IT WAS -- THE MACHINE WASN'T BUILT TO BE ABLE TO

01:08PM   3    DO THE PROCESSING ON THAT SMALL OF A VOLUME THAT WE HAD

01:08PM   4    COLLECTED UTILIZING THE SORT OF NANOTAINERS AND FINGERSTICK

01:08PM   5    COLLECTION.

01:08PM   6    Q.   FOR A SAMPLE TO BE RUN -- LET ME START AGAIN.

01:08PM   7         FOR A FINGERSTICK SAMPLE TO BE RUN ON THE SIEMENS ADVIA,

01:08PM   8    DOES IT NEED TO FIRST BE DILUTED ON THE TECAN DEVICE AS WELL?

01:08PM   9    A.   YES.

01:08PM  10    Q.   FOR A FINGERSTICK SAMPLE TO BE RUN ON A SIEMENS ADVIA, DID

01:08PM  11    IT FIRST HAVE TO BE DILUTED USING THE TECAN DEVICE, T-E-C-A-N?

01:08PM  12    A.   YES.

01:08PM  13    Q.   AND SIMILAR TO RUNNING A SAMPLE ON THE EDISON ANALYZER?

01:09PM  14    A.   YES.

01:09PM  15    Q.   AND CAN I ASK YOU TO TURN IN YOUR BINDER TO EXHIBIT 3741.

01:09PM  16    I'LL ASK YOU TO LOOK AT THE FIRST SEVEN PAGES OF THIS EXHIBIT,

01:09PM  17    PLEASE.

01:09PM  18         HAVE YOU PREVIOUSLY HAD A CHANCE TO REVIEW THIS DOCUMENT

01:09PM  19    IN DETAIL?

01:09PM  20    A.   YES.

01:09PM  21    Q.   AND DO YOU RECOGNIZE THIS DOCUMENT?

01:09PM  22    A.   YES.

01:09PM  23    Q.   WHAT IS IT?

01:09PM  24    A.   THIS IS THERANOS'S TESTING MENU.

01:09PM  25    Q.   AND IS THIS REPRESENTATIVE OF THE TESTING MENU

01:09PM   1      APPROXIMATELY DURING THE TIME THAT YOU WORKED AT THE COMPANY?

01:09PM   2      A.   YES.

01:09PM   3              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT MOVES TO

01:09PM   4      ADMIT EXHIBIT 3741 AT THIS TIME -- OR SORRY.  THE GOVERNMENT

01:09PM   5      MOVES TO ADMIT PAGES 1 THROUGH 7 OF EXHIBIT 3741, AND WE'LL

01:09PM   6      MARK THAT AS EXHIBIT 3741A IF WE CAN.

01:10PM   7              MR. WADE:  YOUR HONOR, MAY I INQUIRE OF THE BATES

01:10PM   8      RANGE SO I'M CLEAR ON WHAT IS COMING IN.

01:10PM   9              MR. BOSTIC:  SO THIS WILL BE BATES 15286 THROUGH

01:10PM   10     15292.

01:10PM   11             MR. WADE:  NO OBJECTION, YOUR HONOR.

01:10PM   12             THE COURT:  THESE PAGES ARE ADMITTED, AND THEY MAY

01:10PM   13     BE PUBLISHED.

01:10PM   14         (GOVERNMENT'S EXHIBIT 3741, BATES PAGES 15286 THROUGH

01:10PM   15     15292, WAS RECEIVED IN EVIDENCE.)

01:10PM   16             MR. BOSTIC:  MS. HOLLIMAN, IF WE COULD PUT UP PAGE 6

01:10PM   17     OF EXHIBIT 3741.

01:10PM   18     Q.   MS. CHEUNG, ARE YOU SEEING IN FRONT OF YOU ONE OF THE

01:10PM   19     PAGES FROM WHAT YOU SAID WAS THE TEST MENU?

01:10PM   20     A.   YES.

01:10PM   21     Q.   AND I WON'T ASK YOU TO PROVIDE AN EXHAUSTIVE LIST, BUT

01:10PM   22     LOOKING AT THESE TESTS, CAN YOU GIVE US SOME EXAMPLES OF SOME

01:10PM   23     TESTS THAT THE EDISON ANALYZER COULD DO?

01:10PM   24     A.   SOME EXAMPLES OF THE TESTS THAT THE EDISON COULD DO.

01:10PM   25     Q.   YES, PLEASE.  EITHER REFERENCING THIS OR FROM YOUR MEMORY?

01:10PM  1    A.    SO THE EDISON COULD DO -- WHILE I WAS WORKING THERE?

01:11PM  2    Q.    YES, PLEASE.

01:11PM  3    A.    THE EDISON COULD DO ABOUT MAYBE THREE TESTS ON THE

01:11PM  4    THYROID, THYROID SECTION.

01:11PM  5        WE COULD DO ABOUT TWO ON THE REPRODUCTIVE HEALTH SECTION.

01:11PM  6        AND MAYBE ONE ON THE -- YES, ONE ON THE ALPHABETICAL TEST

01:11PM  7    SECTION.

01:11PM  8    Q.    AND YOU SAID IN TOTAL THE NUMBER OF TESTS THAT THE EDISON

01:11PM  9    COULD RUN IN YOUR EXPERIENCE WAS APPROXIMATELY HOW MANY?

01:11PM  10   A.    IT WAS LIKE, DEPENDING ON THE TIME, IT WAS BETWEEN 4 TO

01:11PM  11   MAX 12.

01:11PM  12   Q.    WE HAVE ALSO BEEN TALKING ABOUT THERANOS'S USE OF MODIFIED

01:12PM  13   THIRD PARTY DEVICES.

01:12PM  14       DO YOU SEE ANY TESTS ON THIS PANEL THAT THERANOS RELIED ON

01:12PM  15   MODIFIED THIRD PARTY DEVICES TO RUN?

01:12PM  16   A.    YES.

01:12PM  17   Q.    AND WHICH ONES OF THOSE THAT STAND OUT TO YOU?

01:12PM  18   A.    THE COMMON PANELS, SO THINGS LIKE CBC, CBC WITH

01:12PM  19   DIFFERENTIAL, THE LIPID PANEL, THERE'S THE ELECTROLYTES PANEL,

01:12PM  20   THE COMPREHENSIVE METABOLIC PANEL, AND WE COULD ALSO DO -- ON

01:12PM  21   THE MODIFIED, AGAIN, JUST FOR CLARIFICATION?

01:12PM  22   Q.    JUST ON THE MODIFIED FOR NOW, UH-HUH.

01:12PM  23   A.    WE COULD DO SOME OF THE ALPHABETICAL TESTS AS WELL, THINGS

01:12PM  24   LIKE THE -- LIKE MAGNESIUM, I BELIEVE, IRON.

01:13PM  25   Q.    FAIR TO SAY THAT THE THIRD PARTY MODIFIED DEVICES COULD DO

01:13PM 1    SIGNIFICANTLY MORE TYPES OF ASSAYS THAN THE THERANOS-BUILT

01:13PM 2    EDISON?

01:13PM 3    A.   YES.

01:13PM 4    Q.   AND WERE THERE SOME -- LET ME FIRST ASK, THE TEST THAT

01:13PM 5    COULD NOT BE RUN ON THE EDISON, FOR EXAMPLE, YOU LISTED SEVERAL

01:13PM 6    OF THE COMMON PANELS IN THAT LIST; IS THAT RIGHT?

01:13PM 7    A.   YES.

01:13PM 8    Q.   AND ARE THEY CALLED COMMON PANELS BECAUSE THEY'RE COMMON

01:13PM 9    AND FREQUENTLY ORDERED?

01:13PM 10   A.   YES.

01:13PM 11   Q.   LOOKING AT THE TEST MENU, WERE THERE SOME THAT COULD NOT

01:13PM 12   BE RUN ON THE EDISON OR THE THIRD PARTY MODIFIED?

01:13PM 13   A.   YES.

01:13PM 14   Q.   AND WHAT DID THERANOS DO TO RUN THOSE TESTS?

01:14PM 15   A.   SO THERANOS ARE SOME OF THESE FDA APPROVED MACHINES, SORT

01:14PM 16   OF PREDICATED MACHINES IN AN UPSTAIRS LABORATORY WHERE THEY

01:14PM 17   COULD RUN SOME VENOUS SAMPLES, SO THEY WOULD COLLECT A VENOUS

01:14PM 18   TUBE AND RUN THEM IN THE UPSTAIRS LABORATORY.

01:14PM 19        AND IF IT WAS SOMETHING THAT WE DIDN'T POSSESS IN HOUSE IN

01:14PM 20   ORDER TO PROCESS, IT WOULD BE SENT TO AN ORGANIZATION CALLED

01:14PM 21   ARUP, IT'S A-R-U-P, LABORATORIES, ALL CAPS FOR A-R-U-P, IN

01:14PM 22   ORDER TO DO THE ONES THAT WE DIDN'T HAVE IN-HOUSE CAPABILITIES

01:14PM 23   TO RUN.

01:14PM 24   Q.   SO NOW WE'RE TALKING ABOUT DEVICES THAT WERE NOT INVENTED

01:14PM 25   OR MANUFACTURED BY THERANOS; IS THAT CORRECT?

01:14PM  1    A.   YES.

01:14PM  2    Q.   AND DEVICES THAT HAVE NOT BEEN CHANGED OR ALTERED BY

01:14PM  3    THERANOS IN ANY WAY?

01:14PM  4    A.   YES.

01:14PM  5    Q.   ARE THESE DEVICES THAT ANY BLOOD LAB TO YOUR KNOWLEDGE

01:14PM  6    COULD PURCHASE AND OPERATE THE SAME WAY THAT THERANOS DID?

01:15PM  7    A.   YES.

01:15PM  8    Q.   AM I UNDERSTANDING CORRECTLY THAT EVEN THOSE CATEGORIES

01:15PM  9    THAT WE'VE TALKED ABOUT, THE THERANOS'S BUILT EDISON, THE

01:15PM  10   MODIFIED THIRD PARTY DEVICES, AND THE UNMODIFIED STORE BOUGHT

01:15PM  11   THIRD PARTY DEVICES, THOSE THREE CATEGORIES WERE STILL NOT

01:15PM  12   SUFFICIENT FOR THERANOS TO BE ABLE TO CONDUCT ALL OF THE

01:15PM  13   TESTING THAT IT OFFERED?

01:15PM  14   A.   YES.

01:15PM  15   Q.   AND HOW DID IT HANDLE THE KINDS OF TESTS THAT IT COULD NOT

01:15PM  16   PERFORM IN HOUSE?

01:15PM  17   A.   IT WOULD SEND THEM OFF TO A THIRD PARTY ESSENTIALLY TO RUN

01:15PM  18   THOSE SAMPLES.

01:15PM  19   Q.   AND THAT WAS AN INDEPENDENT THIRD PARTY NOT AFFILIATED

01:15PM  20   WITH THERANOS?

01:15PM  21   A.   YES.

01:15PM  22   Q.   I'D LIKE TO TALK A LITTLE BIT ABOUT YOUR WORK IN THE

01:15PM  23   RESEARCH AND DEVELOPMENT LAB?

01:15PM  24   A.   OKAY.

01:15PM  25   Q.   WHEN YOU WERE WORKING IN R&D, DID YOU COME TO UNDERSTAND

01:15PM 1      WHAT VALIDATION MEANT, THE PROCESS OF VALIDATION AT THERANOS?

01:15PM 2      A.   YES.

01:15PM 3      Q.   AND WHAT WAS VALIDATION?

01:15PM 4      A.   SO VALIDATIONS, VALIDATION IS ESSENTIALLY A SERIES OF

01:16PM 5      EXPERIMENTS THAT YOU RUN WHEN YOU DEVELOP A TYPE OF LABORATORY

01:16PM 6      TEST OR DIAGNOSTIC TEST.

01:16PM 7           SO IT WILL CHECK THINGS LIKE IS THE TEST ACCURATE?  IS IT

01:16PM 8      PRECISE?

01:16PM 9           BECAUSE WE WERE DOING FINGERSTICKS VERSUS VENOUS DRAWS, IS

01:16PM 10     THERE A DIFFERENCE BETWEEN THOSE AND HOW DO WE ACCOMMODATE FOR

01:16PM 11     THOSE DIFFERENCES?

01:16PM 12          IT WOULD CHECK THINGS LIKE THE STABILITY OF, YOU KNOW, DO

01:16PM 13     YOU RUN IT IN A DIFFERENT TYPE OF COLLECTION UNIT?  YOU KNOW,

01:16PM 14     DO YOU HAVE TO HAVE A CERTAIN TYPE OF CODING?

01:16PM 15          SO ESSENTIALLY IT'S A VERY COMPREHENSIVE SET OF

01:16PM 16     EXPERIMENTS THAT YOU RUN IN ORDER TO MAKE SURE THAT THE NEW

01:16PM 17     TEST THAT YOU'RE DEVELOPING IS, IS UP TO A QUALITY THAT IS

01:16PM 18     APPROPRIATE TO TEST ON PATIENTS.

01:16PM 19     Q.   AND IN YOUR EXPERIENCE IS THAT PROCESS SUPPOSED TO HAPPEN

01:16PM 20     BEFORE, DURING, OR AFTER THE ACTUAL USE OF THAT ASSAY FOR A

01:16PM 21     PATIENT TESTING?

01:16PM 22     A.   IT'S SUPPOSED TO HAPPEN BEFORE.

01:17PM 23     Q.   AND DOES A GIVEN TEST OR ASSAY NEED TO PASS VALIDATION

01:17PM 24     BEFORE IT CAN BE USED FOR CLINICAL PATIENT TESTING?

01:17PM 25     A.   YES.

01:17PM 1    Q.   YOU MENTIONED BEFORE THAT WHEN YOU JOINED THE COMPANY IN

01:17PM 2    OCTOBER OF 2013, THE COMPANY WAS ALREADY CONDUCTING PATIENT

01:17PM 3    TESTING; IS THAT RIGHT?

01:17PM 4    A.   YES.

01:17PM 5    Q.   AND DOES THAT MEAN THAT ALL OF THE VALIDATION WORK WAS

01:17PM 6    DONE AND THERE WAS NOTHING TO DO IN THE R&D LAB?

01:17PM 7    A.   NO.

01:17PM 8    Q.   AND WHAT WAS STILL HAPPENING IN THE R&D LAB?

01:17PM 9    A.   THE RESEARCH AND DEVELOPMENT LAB WAS STILL VALIDATING SOME

01:17PM 10   OF THE DIFFERENT ASSAYS AND TESTS FOR THE EDISON DEVICES WHEN I

01:17PM 11   CAME TO THE COMPANY.

01:17PM 12   Q.   WAS THAT PART OF AN EFFORT TO TRY TO GET MORE TESTS RUN ON

01:17PM 13   THE THERANOS DEVICE?

01:17PM 14   A.   YES.

01:17PM 15   Q.   DID YOU WORK ON VALIDATION WHEN YOU WERE AT THERANOS?

01:17PM 16   A.   YES.

01:17PM 17   Q.   WHEN YOU LEFT THE COMPANY IN APRIL OF 2014, WAS VALIDATION

01:17PM 18   WORK COMPLETE AT THAT POINT OR WAS IT STILL ONGOING IN R&D?

01:18PM 19   A.   IT WAS STILL ONGOING IN R&D.

01:18PM 20   Q.   DID THE VALIDATION WORK INVOLVE TESTING THE ANALYZER BY

01:18PM 21   HAVING IT RUN BLOOD SAMPLES?

01:18PM 22   A.   YES.

01:18PM 23   Q.   AND WHERE DID THE BLOOD SAMPLES COME FROM IN THE THERANOS

01:18PM 24   R&D LAB?

01:18PM 25   A.   THE BLOOD SAMPLES CAME FROM -- SOMETIMES THEY WERE

01:18PM   1    PURCHASED AND OTHER TIMES THEY WERE COLLECTED FROM EMPLOYEES.

01:18PM   2    SO EMPLOYEES WOULD ESSENTIALLY DONATE THEIR BLOOD TO THERANOS

01:18PM   3    IN EXCHANGE FOR, LIKE, CASH FOR BOTH FINGERSTICK AND VENOUS

01:18PM   4    DRAWS IN ORDER TO CONDUCT THE RESEARCH STUDIES.

01:18PM   5    Q.   DID YOU PERSONALLY EVER DONATE BLOOD TO THE RESEARCH

01:18PM   6    PROCESS?

01:18PM   7    A.   YES.

01:18PM   8    Q.   ON MULTIPLE OCCASIONS?

01:18PM   9    A.   YES.

01:18PM   10   Q.   AND WHEN YOU DID THAT, DID YOU GET RESULTS BACK FROM THE

01:18PM   11   TESTS THAT WERE RUN ON YOUR BLOOD?

01:18PM   12   A.   YES.

01:18PM   13   Q.   AND DID ANYTHING STAND OUT TO YOU ABOUT THE SPECIFIC TEST

01:18PM   14   RESULTS THAT YOU GOT BACK ON YOUR SAMPLES?

01:18PM   15   A.   WHAT WE WERE -- WHAT I NOTICED WHEN I HAD -- ESSENTIALLY

01:19PM   16   WHAT WE WOULD DO IS WE WOULD MEMORIZE THE KIND OF NUMBER THAT

01:19PM   17   WAS CREATED ONCE THEY TOOK OUR BLOOD SAMPLES.  AND SO WE WOULD

01:19PM   18   RUN IT.

01:19PM   19        IN MY CASE I WAS IN CHARGE OF RUNNING VITAMIN D SAMPLES,

01:19PM   20   AND SO WHEN I WOULD RUN MY VITAMIN D, IT WOULD ALWAYS COME OUT

01:19PM   21   THAT I HAD A VITAMIN D DEFICIENCY, WHICH REALLY WOULDN'T MATCH

01:19PM   22   UP WITH WHAT WE WOULD RUN ON THE PREDICATE DEVICES.

01:19PM   23        SO I STARTED TO NOTICE THAT THERE WAS A SLIGHT DISCREPANCY

01:19PM   24   BETWEEN WHAT WAS DONE ON THE EDISON DEVICES VERSUS WHAT WAS

01:19PM   25   DONE ON THE UPSTAIRS CLINICAL LAB FOR THE VENOUS DRAWS.

01:19PM   1    Q.   AND JUST TO BE CLEAR, AROUND THE TIME THAT YOU WERE HAVING

01:19PM   2    YOUR BLOOD SAMPLE TESTED AS PART OF THE R&D PROCESS ON THE

01:19PM   3    THERANOS ANALYZER --

01:19PM   4    A.   RIGHT.

01:19PM   5    Q.   -- WERE YOU ALSO ABLE TO SEE RESULTS FROM YOUR BLOOD

01:20PM   6    ANALYSIS RUN ON A THIRD PARTY DEVICE?

01:20PM   7    A.   YES, BECAUSE WE WERE FREQUENTLY RUNNING SORT OF THE

01:20PM   8    COMPARATIVE STUDIES.

01:20PM   9    Q.   I SEE.  AND THAT'S THE BASIS FOR YOU SAYING THAT YOU SAW

01:20PM   10   SOME DISAGREEMENT BETWEEN THE TWO?

01:20PM   11   A.   YES.

01:20PM   12   Q.   DID THERANOS EVER RUN DEMONSTRATIONS OF ITS TECHNOLOGY FOR

01:20PM   13   VIP GUESTS OR POTENTIAL INVESTORS WHO CAME TO THE COMPANY?

01:20PM   14   A.   YES.

01:20PM   15   Q.   AND DID YOU HAVE AN UNDERSTANDING AT THE TIME OF WHO THOSE

01:20PM   16   GUESTS WERE GENERALLY SPEAKING?

01:20PM   17   A.   WE UNDERSTOOD THEM TO BE VERY IMPORTANT PEOPLE.  SO THEY

01:20PM   18   WOULD BE CALLED DEMO PATIENTS OR VIP PATIENTS ESSENTIALLY THAT

01:20PM   19   WOULD COME IN.

01:20PM   20   Q.   WERE YOU EVER INVOLVED IN HELPING WITH THOSE DEMOS OR

01:20PM   21   RUNNING THOSE DEMOS?

01:20PM   22   A.   YES.

01:20PM   23   Q.   AND WHAT WAS YOUR ROLE?

01:20PM   24   A.   I WAS IN CHARGE OF ANY DEMOS THAT CAME IN THAT REQUIRED

01:21PM   25   EDISON TESTING.

01:21PM   1        SO ANY OF THE EDISON TESTS THAT CAME IN, I WOULD BE IN

01:21PM   2   CHARGE OF RUNNING THOSE DEMO SAMPLES.

01:21PM   3   Q.   WHEN THESE DEMOS WERE HAPPENING -- WE'VE TALKED ABOUT THE

01:21PM   4   RESEARCH AND DEVELOPMENT LAB, THAT WAS OPERATIONAL; CORRECT?

01:21PM   5   A.   YES.

01:21PM   6   Q.   AND THERE WAS ALSO A CLINICAL LAB WHERE PATIENT TESTING

01:21PM   7   WAS HAPPENING; IS THAT RIGHT?

01:21PM   8   A.   YES.

01:21PM   9   Q.   AND BETWEEN THOSE TWO WHERE WERE THE DEMO SAMPLES RUN OR

01:21PM  10   WERE THEY SOMETIMES IN BOTH?

01:21PM  11   A.   SO IN THE BEGINNING OF STARTING TO WORK THERE THEY WERE

01:21PM  12   RAN IN THE RESEARCH AND DEVELOPMENT LAB, BUT THEN EVENTUALLY --

01:21PM  13   AND THIS IS FOR THE EDISONS, THEY WERE RUN IN THE CLINICAL LAB.

01:21PM  14   Q.   I'LL ASK YOU TO TURN IN YOUR BINDER TO EXHIBIT 1227,

01:21PM  15   PLEASE.

01:22PM  16        DO YOU RECOGNIZE EXHIBIT 1227?

01:22PM  17   A.   YES.

01:22PM  18   Q.   AND IS THIS AN EMAIL THAT YOU RECEIVED DURING YOUR TIME AS

01:22PM  19   AN EMPLOYEE AT THERANOS?

01:22PM  20   A.   YES.

01:22PM  21   Q.   IS THIS A TRUE AND ACCURATE COPY OF THAT EMAIL?

01:22PM  22   A.   YES.

01:22PM  23        MR. BOSTIC:  YOUR HONOR, I'LL MOVE EXHIBIT 1227 INTO

01:22PM  24   EVIDENCE AT THIS TIME.

01:22PM  25        MR. WADE:  YOUR HONOR, MAY WE APPROACH ON THESE

01:22PM  1    DOCUMENTS?  I THINK THERE ARE A NUMBER OF SIMILAR DOCUMENTS

01:22PM  2    COMING UP.

01:22PM  3            THE COURT:  DO YOU HAVE OTHER DOCUMENTS SIMILAR TO

01:22PM  4    THIS CLASS THAT YOU'LL BE EXAMINING THIS WITNESS ON?

01:22PM  5            MR. BOSTIC:  THERE ARE OTHER EMAILS IF THAT'S WHAT

01:22PM  6    DEFENSE COUNSEL IS REFERRING TO, YES, YOUR HONOR.

01:22PM  7            THE COURT:  OKAY.  ALL RIGHT.  LET'S HAVE A

01:22PM  8    SIDE-BAR.  FOLKS, I'M GOING TO MEET WITH COUNSEL IN THE BACK IN

01:22PM  9    THE JURY ROOM NOW.  WE'LL HAVE OUR COURT REPORTER GO BACK AS

01:23PM  10   WELL.

01:23PM  11       LADIES AND GENTLEMEN, WE'RE GOING TO LEAVE THE COURTROOM.

01:23PM  12   YOU'RE NOT TO DISCUSS THE CASE AT ALL AMONGST YOURSELVES.

01:23PM  13       COUNSEL, DO YOU HAVE AN IDEA OF HOW LONG THIS WILL BE?

01:23PM  14           MR. WADE:  HOPEFULLY NOT LONG.  FIVE OR TEN MINUTES.

01:23PM  15           THE COURT:  WHY DON'T WE DO THIS.  RATHER THAN DO

01:23PM  16   THAT, WHY DON'T WE EXCUSE OUR JURY FOR JUST A SECOND.  LET'S DO

01:23PM  17   THAT.

01:23PM  18       LADIES AND GENTLEMEN, WHY DON'T YOU GO BACK TO THE JURY

01:23PM  19   ROOM, PLEASE.  I'LL REMAIN HERE.

01:23PM  20       MS. CHEUNG, YOU CAN STEP DOWN.  IF YOU WOULD GO OUTSIDE OF

01:23PM  21   THE COURTROOM, PLEASE.

01:24PM  22       (JURY OUT AT 1:24 P.M.)

01:24PM  23           THE COURT:  PLEASE BE SEATED.  THE RECORD SHOULD

01:24PM  24   REFLECT THAT OUR JURY AND ALTERNATES HAVE LEFT THE ROOM.

01:24PM  25       MS. CHEUNG IS OUTSIDE.  YES.  SHE'S OUTSIDE.

CHEUNG DIRECT BY MR. BOSTIC                                        821

01:24PM 1      ALL COUNSEL AND THE DEFENDANT REMAIN.

01:24PM 2          MR. WADE:  THANK YOU, YOUR HONOR.

01:24PM 3      THERE ARE A NUMBER OF EXHIBITS THAT ARE ABOUT TO BE

01:24PM 4  INTRODUCED, I BELIEVE, BASED ON COUNSEL'S COURTESY DISCLOSURE

01:24PM 5  OF THESE DOCUMENTS IN ADVANCE OF THE TESTIMONY THAT ARE

01:24PM 6  BUSINESS RECORDS, AND CONTAIN -- THAT ARE NOT BUSINESS RECORDS

01:24PM 7  AND THAT CONTAIN HEARSAY WITHIN THEM.

01:24PM 8      IN ADDITION, WE WOULD SUGGEST TO THE COURT VIRTUALLY ALL

01:24PM 9  OF THE DOCUMENTS THAT ARE ABOUT TO BE OFFERED, AND I BELIEVE A

01:24PM 10  LOT OF THE TESTIMONY BASED ON THE 302, DOESN'T INVOLVE OUR

01:24PM 11  CLIENT IN ANY WAY SO IT WOULD NOT BE RELEVANT UNDER 401.

01:25PM 12      IT CERTAINLY IS NOT RELEVANT TO HER STATE OF MIND IF SHE'S

01:25PM 13  NOT AWARE OF IT.  AND SOME OF THESE ISSUES THAT ARE ABOUT TO

01:25PM 14  COME UP MAY HAVE -- I ASSUME THE GOVERNMENT IS GOING TO CONTEND

01:25PM 15  THAT THEY REFLECT LAB DEFICIENCIES OF SOME KIND, BUT, YOU KNOW,

01:25PM 16  THIS PERSON IS NOT AN EXPERT, AND NOT -- IS NOT IN A POSITION

01:25PM 17  TO OPINE ON THOSE.

01:25PM 18      MS. HOLMES WASN'T AWARE OF MANY OF THESE THINGS.

01:25PM 19      SO I WANTED TO FLAG THIS ISSUE.  AND IN PARTICULAR THE

01:25PM 20  DOCUMENTS THAT THEY SEEK TO BE ADMITTED, I THINK THE

01:25PM 21  NINTH CIRCUIT LAW IS CLEAR ON THESE EMAILS THAT DON'T GO TO OUR

01:25PM 22  CLIENT, YOU KNOW, BEING HEARSAY AND IN SOME CASES LAYERED

01:25PM 23  HEARSAY AND SHOULD NOT BE ADMISSIBLE.

01:25PM 24          THE COURT:  MR. BOSTIC?

01:25PM 25          MR. BOSTIC:  YOUR HONOR, I DISAGREE.  I THINK THE

01:25PM 1    RECORDS THAT THE GOVERNMENT IS GOING TO OFFER ARE BUSINESS

01:25PM 2    RECORDS.  I'D ASK FOR AN OPPORTUNITY TO LAY A FOUNDATION FOR

01:25PM 3    THAT WITH THIS WITNESS.  I THINK WE CAN DO THAT.

01:26PM 4        SEPARATELY, I THINK SEVERAL OF THESE DOCUMENTS ARE COMING

01:26PM 5    IN FOR A NONHEARSAY PURPOSE.  NOT ON ALL OF THEM BUT ON SOME

01:26PM 6    THE COURT WILL SEE THAT ISSUES WERE ULTIMATELY RAISED TO

01:26PM 7    MR. BALWANI, WHO IS THE CHARGED COCONSPIRATOR IN THIS CASE, HIS

01:26PM 8    KNOWLEDGE OF ISSUES AT THERANOS IS RELEVANT AND ADMISSIBLE

01:26PM 9    HERE.

01:26PM 10       SEPARATELY, I THINK THAT TO THE EXTENT THAT THESE

01:26PM 11   DOCUMENTS AND MS. CHEUNG'S TESTIMONY WILL SHOW THAT ISSUES WERE

01:26PM 12   FREQUENT IN THE THERANOS LAB, THAT THEY WERE SERIOUS, THAT THEY

01:26PM 13   WERE FREQUENTLY ELEVATED, THAT THEY WERE GENERALLY KNOWN.

01:26PM 14       THE JURY COULD INFER FROM THAT AND FROM OTHER EVIDENCE

01:26PM 15   THAT THE DEFENDANT AND THE COCONSPIRATOR WERE AWARE OF THESE

01:26PM 16   ISSUES.

01:26PM 17       FINALLY, AT THE CONCLUSION OF THE WITNESS'S TESTIMONY I

01:26PM 18   EXPECT THAT SHE WILL TESTIFY ABOUT ISSUES THAT SHE DID RAISE

01:26PM 19   DIRECTLY TO MR. BALWANI BEFORE SHE LEFT AND THE REASONS WHY SHE

01:27PM 20   DID NOT RAISE ISSUES TO MS. HOLMES, SPECIFICALLY THAT SHE WAS

01:27PM 21   SHOWN AN EMAIL BY ANOTHER EMPLOYEE SENT DIRECTLY TO MS. HOLMES

01:27PM 22   RAISING SOME OF THESE ISSUES.

01:27PM 23       SO ULTIMATELY THESE ISSUES DO PERCOLATE UP TO THE

01:27PM 24   DEFENDANTS IN THE CASE.  THE WITNESS SHOULD BE ABLE TO DESCRIBE

01:27PM 25   WHAT SHE ACTUALLY WITNESSED AT THE GROUND LEVEL IN THE LAB TO

01:27PM   1    EXPLAIN HOW THOSE CONCERNS DEVELOPED AND WHY THEY EVENTUALLY

01:27PM   2    PROMPTED HER TO TAKE THAT ACTION.

01:27PM   3             THE COURT:  SO I THINK SHE CAN, AS YOU SUGGEST, SHE

01:27PM   4    CAN TESTIFY ABOUT HER PERCIPIENT OBSERVATIONS, THOSE THINGS

01:27PM   5    THAT SHE EXPERIENCED, AND IF THERE ARE SPECIFIC COMMENTS FROM

01:27PM   6    EITHER THIS DEFENDANT TO HER, SHE CAN CERTAINLY TALK ABOUT

01:27PM   7    THAT.

01:27PM   8        BUT WHAT ABOUT, MR. WADE SUGGESTS, THESE AREN'T BUSINESS

01:27PM   9    RECORDS AND THERE MAY NOT BE AN OPPORTUNITY TO PROVE THOSE UP?

01:28PM  10             MR. BOSTIC:  I THINK, YOUR HONOR, THEY SHOULD BE

01:28PM  11    CONSIDERED BUSINESS RECORDS.  THE WITNESS'S ROLE AT THE COMPANY

01:28PM  12    WORKING IN THE LAB, I EXPECT THAT SHE WILL EXPLAIN, IF GIVEN A

01:28PM  13    CHANCE, THAT THAT EMAIL WAS THE PRINCIPAL MEANS OF

01:28PM  14    COMMUNICATION AND THE MEANS BY WHICH EMPLOYEES IN THE LAB

01:28PM  15    TRANSMITTED IMPORTANT INFORMATION TO EACH OTHER ABOUT THE

01:28PM  16    OPERATIONS OF THE COMPANY AND THE BUSINESS AFFAIRS OF THE

01:28PM  17    COMPANY AT THAT TIME.

01:28PM  18        I THINK THAT DOES MAKE THEM ADMISSIBLE UNDER 803(6).  THAT

01:28PM  19    RULE AND THE COMMENTARY TALKS ABOUT THE IMPORTANCE OF

01:28PM  20    SITUATIONS WHERE THERE'S A DUTY TO BE ACCURATE IN REPORTING AND

01:28PM  21    WHERE THAT IS IMPORTANT, AND THAT WAS CERTAINLY THE CASE HERE.

01:28PM  22        I THINK THAT IF GIVEN THE CHANCE, THE WITNESS WILL

01:28PM  23    EXPLAIN THAT BOTH ON THE R&D SIDE, AND, OF COURSE, ON THE

01:28PM  24    CLINICAL SIDE WHEN DEALING WITH PATIENT TESTING IT WAS VERY

01:28PM  25    IMPORTANT THAT INFORMATION BE TRANSMITTED CONTEMPORANEOUSLY,

01:28PM   1    ACCURATELY REFLECTING THE TRUE EVENTS, AND THAT THE PURPOSE OF

01:29PM   2    THESE EMAILS WAS TO TRANSMIT THAT INFORMATION, TO PRESERVE AND

01:29PM   3    MAINTAIN THAT INFORMATION, AND TO FACILITATE THE OPERATION OF

01:29PM   4    THE BUSINESS.

01:29PM   5         I THINK THAT PUTS THEM SQUARELY WITHIN THE COVERAGE OF THE

01:29PM   6    RULE.

01:29PM   7              THE COURT:  YOU THINK HER TESTIMONY WILL ALLOW THESE

01:29PM   8    TO COME IN UNDER 803(6)?

01:29PM   9              MR. BOSTIC:  I DO, YOUR HONOR.

01:29PM  10              MR. WADE:  YOUR HONOR, WE WELCOME THE OPPORTUNITY TO

01:29PM  11    BRIEF THIS.  IT'S 1:30.  WE'RE APPROACHING 2:00 O'CLOCK.  MAYBE

01:29PM  12    WE CAN GO -- WE HAVE A BENCH MEMORANDUM I CAN HAND UP.

01:29PM  13    UNFORTUNATELY, I ONLY HAVE ONE COPY.

01:29PM  14              THE COURT:  WELL, WHO GETS IT, HE DOES OR ME?

01:29PM  15              MR. WADE:  YOU KNOW THE ANSWER TO THAT, YOUR HONOR.

01:29PM  16         (LAUGHTER.)

01:29PM  17              MR. WADE:  AND WE WILL FILE THIS ON ECF SO EVERYONE

01:29PM  18    HAS NOTICE OF IT, BUT THE LAW IN THE NINTH CIRCUIT IS CLEAR ON

01:29PM  19    THIS.  THEY ARE CONSIDERED BUSINESS RECORDS THAT ARE EMAILS AND

01:29PM  20    WHETHER THEY'RE ADMISSIBLE, AND THEY'RE NOT.  AND IN MANY CASES

01:29PM  21    THESE DOCUMENTS ARE LAYERED HEARSAY.

01:29PM  22         SO --

01:29PM  23              THE COURT:  WELL, EMAILS CAN BE BUSINESS RECORDS.

01:29PM  24    IT'S NOT A WHOLESALE PRECLUSION.

01:30PM  25              MR. WADE:  YOUR HONOR IS ABSOLUTELY RIGHT, ALTHOUGH

01:30PM  1    THE LIMITATIONS UNDER THE LAW ARE PRETTY LIMITED.

01:30PM  2        FOR EXAMPLE, THE PHILLIPS CASE COUNSEL SUGGESTED THAT THE

01:30PM  3    STATE OF MIND OF THE COCONSPIRATOR WOULD BE A NONHEARSAY

01:30PM  4    PURPOSE.  UNDER THE PHILLIPS CASE IN THE NINTH CIRCUIT THAT'S

01:30PM  5    NOT THE CASE.  ONLY ACTS IN FURTHERANCE OF THE CONSPIRACY.

01:30PM  6        THE MENTAL STATE OF THE COCONSPIRATOR IS NOT A BASIS TO

01:30PM  7    OFFER A DOCUMENT FOR A NONHEARSAY PURPOSE.

01:30PM  8            THE COURT:  SO I THINK I KNOW WHERE YOU'RE -- I

01:30PM  9    THINK I TRACK WHERE YOU'RE GOING WITH THIS, BUT I WAS CURIOUS

01:30PM  10   WHETHER OR NOT YOU WERE GOING TO TRY, THE GOVERNMENT IS GOING

01:30PM  11   TO OFFER ANY OF THIS EVIDENCE OR THIS -- THESE DIALOGUES UNDER

01:30PM  12   AN E EXCEPTION, THAT IS, A CONSPIRACY.

01:30PM  13       IS THAT SOMETHING THAT YOU'RE GOING TO TRY TO DO, A

01:30PM  14   STATEMENT IN FURTHERANCE OF?  I HAVEN'T HEARD IT YET, LET ME

01:30PM  15   JUST SAY THAT.

01:31PM  16       AND YOUR QUESTIONING DON'T SEEM TO BE DESIGNED TO CREATE

01:31PM  17   THAT YET.  I'M JUST ASKING IF THAT IS SOMETHING THAT WE'RE

01:31PM  18   GOING TO SEE AS WELL.

01:31PM  19            MR. BOSTIC:  I THINK, YOUR HONOR, FOR SOME OF THE

01:31PM  20   EXHIBITS THAT I'M CONTEMPLATING INTRODUCING, YES, THAT

01:31PM  21   PROVISION WILL APPLY.

01:31PM  22       I THINK THAT FOR OTHERS 801(D)(2)(D) STATEMENT OF AN AGENT

01:31PM  23   WILL APPLY.

01:31PM  24       I THINK THIS NEEDS TO BE ANALYZED ON A CASE-BY-CASE BASIS

01:31PM  25   FOR THESE EMAILS, BUT I DO THINK THAT GENERALLY THEY'RE

01:31PM   1    ADMISSIBLE AS A BUSINESS RECORD IN THIS CASE.

01:31PM   2              THE COURT:  OKAY.  SO UNDER THE (2)(D)(2) ANALYSIS,

01:31PM   3    I WAS LOOKING AT THAT, TOO, AND WONDERING CAN THIS WITNESS LAY

01:31PM   4    A FOUNDATION FOR THAT?

01:31PM   5              MR. BOSTIC:  I BELIEVE SO, YOUR HONOR.

01:31PM   6         I BELIEVE THIS WITNESS COULD TESTIFY ABOUT THE REPORTING

01:31PM   7    RELATIONSHIP THAT SHE HAD TO OTHERS IN THE COMPANY AND HOW THAT

01:31PM   8    ULTIMATELY LED TO MS. HOLMES.

01:31PM   9         I THINK SHE WILL BE ABLE TO IDENTIFY THE PARTICIPANTS ON

01:31PM  10    THE EMAILS IN PARTICULAR, IDENTIFYING THEM ALSO AS EMPLOYEES OF

01:32PM  11    THE COMPANY AND AGENTS OF MS. HOLMES, AND EXPLAIN HOW THEY FIT

01:32PM  12    INTO THAT GENERAL ORG CHART AND REPORTING STRUCTURE.

01:32PM  13              THE COURT:  SO HOW DOES THAT RELATE TO THIS WITNESS

01:32PM  14    IF SHE WAS NOT A DIRECT REPORT?  I DON'T KNOW IF SHE WAS OR

01:32PM  15    NOT.

01:32PM  16         IF SHE'S A DIRECT REPORT, IT MAKES IT EASY -- OR EASIER.

01:32PM  17    BUT IF SHE'S NOT A DIRECT REPORT, WE'LL PROBABLY HAVE -- I'M

01:32PM  18    JUST ANTICIPATING THAT MR. WADE WILL OBJECT TO THAT LINEUP.

01:32PM  19              MR. BOSTIC:  SO I'M NOT AWARE OF THE CASE LAW,

01:32PM  20    YOUR HONOR, THAT SAYS THAT AN AGENT CANNOT BE REPORTING TO THE

01:32PM  21    PRINCIPAL THROUGH A LAYER, INCLUDING SOMEONE ELSE.  I HAVEN'T

01:32PM  22    SEEN THAT.  I'M HAPPY TO REVIEW IT, OF COURSE, IF DEFENSE

01:32PM  23    COUNSEL IS AWARE.

01:32PM  24              THE COURT:  WELL, WE'LL LET'S SEE IF HE RAISES IT.

01:32PM  25              MR. WADE:  YOUR HONOR, KNOWS FROM THE MOTION IN

01:32PM 1    LIMINE BRIEFING THAT THERE HAS TO BE SOME TIE HERE TO OUR

01:32PM 2    CLIENT.  THE CEO IS NOT RESPONSIBLE FOR EVERY COMMUNICATION

01:33PM 3    THAT OCCURS WITHIN THE COMPANY.  THEY HAVE TO PROFFER SOME

01:33PM 4    BASIS AND SHOW SOME EVIDENCE THAT GOES FORWARD APART FROM JUST

01:33PM 5    A REPORTING RELATIONSHIP.

01:33PM 6        TO THE BEST OF OUR KNOWLEDGE BASED ON THE STATEMENTS OF

01:33PM 7    THE WITNESS WHO WE HAVE NEVER SPOKEN WITH BEFORE, THE INTERVIEW

01:33PM 8    THAT YOU JUST HEARD IS THE LONGEST CONVERSATION THAT SHE EVER

01:33PM 9    HAD WITH OUR CLIENT, AND SO SHE WAS NOT INTERACTING WITH HER ON

01:33PM 10   A DAILY BASIS.

01:33PM 11       THE EVIDENCE IS PRETTY CLEAR THAT MR. BALWANI WAS THE

01:33PM 12   MANAGER FROM A NON-LAB STANDPOINT, WAS THE MANAGER OVERSEEING

01:33PM 13   THE LAB.

01:33PM 14       SO I DON'T THINK THAT THE GOVERNMENT CAN ADMIT IT ON THAT

01:33PM 15   BASIS, AND I DON'T THINK THAT THEY -- MANY OF THESE STATEMENTS

01:33PM 16   ARE NOT, ARE NOT DOCUMENTS THAT ARE STATEMENTS IN FURTHERANCE

01:33PM 17   OF THE CONSPIRACY EVEN IF, YOU KNOW, EVEN IF WE GET TO THAT

01:33PM 18   LEVEL AS THE COURT WAS REFERRING TO THAT EXCEPTION.

01:33PM 19       SO, YOU KNOW, WHAT I'M -- I KNOW THE COURT DENIED OUR 1000

01:34PM 20   MOTION ON THIS, AND IN PART THERE WAS A TIMING ISSUE ON THIS.

01:34PM 21   THIS IS WHERE WE ARE NOW BECAUSE I THINK EVERY DOCUMENT, YOU

01:34PM 22   KNOW, IS GOING TO PRESENT THE NEED TO, THE NEED TO COME TO

01:34PM 23   SIDE-BAR AND TO RAISE THESE ISSUES BECAUSE THEY'RE CLEARLY

01:34PM 24   HEARSAY.

01:34PM 25       YOU HEARD THE GOVERNMENT SUGGESTING THAT THEY CAN OFFER A

01:34PM  1    HEARSAY STATEMENT OF ANOTHER WITNESS TO OUR CLIENT THAT THIS

01:34PM  2    WITNESS OBTAINED KNOWLEDGE OF, YOU KNOW, INTO THE CASE, WHICH

01:34PM  3    THAT IS A NEW ONE FOR ME, YOUR HONOR.

01:34PM  4         SO I JUST WANT TO FIND AN ORDERLY WAY TO TRY TO DEAL WITH

01:34PM  5    THIS WITHOUT DERAILING THE TRIAL.

01:34PM  6              THE COURT:  ALL RIGHT.

01:34PM  7              MR. BOSTIC:  YOUR HONOR, ON THAT, I WOULD JUST

01:34PM  8    BRIEFLY COMMENT THAT I THINK WE NEED TO RESIST THE RULE THAT A

01:34PM  9    DOCUMENT IS NOT RELEVANT UNLESS MS. HOLMES'S NAME IS ON IT, AN

01:34PM 10    EVENT DOESN'T EXIST UNLESS SHE WAS PRESENT FOR IT.  THAT'S NOT

01:34PM 11    HOW IT WORKS.

01:34PM 12         THERE WILL BE SUBSTANTIAL EVIDENCE THROUGHOUT THE TRIAL

01:34PM 13    SHOWING AND ESTABLISHING MS. HOLMES'S INVOLVEMENT IN THE

01:35PM 14    AFFAIRS OF THE COMPANY GENERALLY.  THE TYPES OF INFLUENCE,

01:35PM 15    INTERACTION, AND DIRECTION THAT SHE APPLIED WHEN SHE WAS AT THE

01:35PM 16    COMPANY, IN PARTICULAR THE LEVEL OF COMMUNICATION AND THE

01:35PM 17    PERVASIVE NATURE OF THE COMMUNICATION BETWEEN MR. BALWANI AND

01:35PM 18    MS. HOLMES, THAT IS ALL SUITABLE EVIDENCE FOR THE JURY TO INFER

01:35PM 19    THAT MS. HOLMES WAS AWARE OF THE HAPPENINGS AT THERANOS.

01:35PM 20         THE GOVERNMENT SHOULD BE ALLOWED TO SHOW WHAT WAS

01:35PM 21    HAPPENING AT THE COMPANY, MS. HOLMES'S KNOWLEDGE OF WHAT WAS

01:35PM 22    HAPPENING AT THE COMPANY.  THOSE TWO THINGS DON'T NECESSARILY

01:35PM 23    NEED TO HAPPEN SIMULTANEOUSLY.  OF COURSE, ONLY ONE PERSON CAN

01:35PM 24    FIT ON THE WITNESS STAND AT A TIME SO WE WOULD ASK FOR SOME

01:35PM 25    LATITUDE TO DEVELOP IT.

01:35PM  1          THE COURT:  WELL, I APPRECIATE THAT.  YOU'RE

01:35PM  2     CREATING THE LADDER, IF YOU WILL, THAT MOVES UPWARDS.

01:35PM  3          BUT I THINK TO MR. WADE'S POINT, THERE MIGHT BE SOME

01:35PM  4     FOUNDATIONAL ISSUES THAT WE SHOULD CLEAR UP FIRST.

01:35PM  5          LET ME ASK YOU THIS, AND HE HAS SOME LAW THAT HE WOULD

01:36PM  6     LIKE TO GIVE TO THE COURT AND HE'S, OF COURSE, GOING TO GIVE IT

01:36PM  7     TO YOU.  I THINK COUNSEL SHOULD HAVE AN OPPORTUNITY TO LOOK AT

01:36PM  8     THIS AND RESPOND.

01:36PM  9          IS THERE ANY -- ARE THERE ANY OTHER QUESTIONS THAT YOU CAN

01:36PM 10     POSE TO THIS WITNESS BEYOND THESE ISSUES?

01:36PM 11          AND WHAT I'D LIKE TO DO IN THE INTERIM ALSO IS I'M CURIOUS

01:36PM 12     TO KNOW WHICH EXHIBITS THAT YOU THINK MIGHT FALL UNTO

01:36PM 13     MR. WADE'S OBJECTION SO I COULD REVIEW THAT AS WELL, IF THEY'RE

01:36PM 14     ALL THE SAME CATEGORY OF DOCUMENTS, IT'S THE EMAILS IT SOUNDS

01:36PM 15     LIKE.

01:36PM 16          MR. BOSTIC:  YOUR HONOR, I WANT TO BE HELPFUL TO THE

01:36PM 17     COURT'S ANALYSIS HERE.  I'M NOT SURE I'M IN THE BEST POSITION

01:36PM 18     TO PREDICT WHAT THE OBJECTION IS GOING TO BE.  THE GOVERNMENT

01:36PM 19     PROVIDED THE DEFENSE NOTICE LAST WEEK OF THE SPECIFIC EXHIBITS

01:36PM 20     THAT IT INTENDED TO INTRODUCE THROUGH MS. CHEUNG.

01:36PM 21          IF THE DEFENSE'S POSITION IS THAT THESE OBJECTIONS APPLY

01:36PM 22     IT TO EACH AND EVERY SINGLE EMAIL THAT THE GOVERNMENT INTENDS

01:37PM 23     TO INTRODUCE, THEN I THINK WE HAVE OUR ANSWERS, BUT I'M NOT

01:37PM 24     SURE.

01:37PM 25          MR. WADE:  I THINK THEY DO, YOUR HONOR.

01:37PM 1          THE COURT:  OKAY.

01:37PM 2          MR. WADE:  WITH POSSIBLY ONE EXCEPTION, WHICH MAY

01:37PM 3  NOT BE ADMISSIBLE FOR A DIFFERENT PURPOSE.

01:37PM 4      BUT THAT'S WHY WE DIDN'T STIPULATE.

01:37PM 5      AS THE COURT SAW WITH MS. SPIVEY, WE STIPULATED ON ALMOST

01:37PM 6  EVERY DOCUMENT.

01:37PM 7      WE DID NOT STIPULATE TO THESE BECAUSE OF THE HEARSAY

01:37PM 8  ISSUES.  SO I WOULD SUGGEST IF THE COURT HAS A BINDER, IT'S

01:37PM 9  VIRTUALLY EVERY DOCUMENT IN THE BINDER.

01:37PM 10     AND THE COURT WILL NOTE, I THINK THERE'S ONE EXCEPTION,

01:37PM 11 MAYBE THERE'S TWO WITHIN THE BINDER THAT ACTUALLY GO TO OUR

01:37PM 12 CLIENT.  MANY OF THEM ARE LOWER LEVEL ISSUES THAT HAPPEN WITHIN

01:37PM 13 THE LAB.

01:37PM 14     MS. CHEUNG, AS SHE TESTIFIED, WAS AN ENTRY LEVEL EMPLOYEE.

01:37PM 15 THERE WERE SEVERAL LEVELS, YOU KNOW, BETWEEN HER AND EVEN THE

01:37PM 16 LAB DIRECTOR, BUT SHE'S INTERACTING, YOU KNOW, WITH PEOPLE

01:37PM 17 WITHIN THE LAB.  THERE'S NOT AN INDICATION FROM THESE DOCUMENTS

01:38PM 18 THAT THEY GO TO OUR CLIENT.

01:38PM 19     IF THE ISSUE DOES GO TO OUR CLIENT, THEY CAN CALL THE

01:38PM 20 WITNESS WHO BROUGHT IT TO OUR CLIENT OR OFFER THE EVIDENCE

01:38PM 21 THROUGH A COCONSPIRATOR EXCEPTION THAT BRINGS IT TO OUR CLIENT.

01:38PM 22     BUT THEY CAN'T JUST DUMP EVERY ISSUE IN THE LAB AND

01:38PM 23 SUGGEST THAT'S IMPUTABLE TO OUR CLIENT.  THE COURT NOTED THE

01:38PM 24 RISK IN THE MOTION IN LIMINE ORDER WHERE THERE'S A RISK THAT

01:38PM 25 OUR CLIENT COULD BE FOUND GUILTY BECAUSE OF NEGLIGENT PRACTICES

01:38PM   1      WITHIN THE LAB.

01:38PM   2              THE COURT:  THAT WAS GOING TO -- WHAT I WAS TALKING

01:38PM   3      ABOUT IS THAT WAS GOING TO A VIOLATION OF A REGULATORY THAT

01:38PM   4      CAN'T BE CONSIDERED.

01:38PM   5              MR. WADE:  SURE.

01:38PM   6              THE COURT:  AND I UNDERSTAND THAT.

01:38PM   7          MR. BOSTIC, ARE THERE -- I WANT TO GIVE YOU -- I'M GOING

01:38PM   8      TO LOOK AT THIS.  HE'S OFFERED ME SOME LAW THAT I NEED TO LOOK

01:38PM   9      AT, AND I WANT YOU TO LOOK AT IT ALSO.

01:38PM  10          IS THERE ANOTHER LINE OF QUESTIONING THAT YOU CAN CONDUCT

01:38PM  11      FOR 20 MINUTES WITH THIS WITNESS?  WILL THAT BREAK IT UP?  IF

01:38PM  12      NOT, WE CAN TAKE A RECESS NOW AND YOU'LL HAVE 20 EXTRA MINUTES

01:39PM  13      TO GO OVER THIS DOCUMENT.

01:39PM  14              MR. BOSTIC:  YOUR HONOR, I WONDER IF THE ONE

01:39PM  15      EXCEPTION -- WELL, I DON'T WANT TO GUESS.  IF COUNSEL WILL TELL

01:39PM  16      ME WHAT THE ONE EXCEPTION IS TO THE OBJECTION, WE MIGHT BE ABLE

01:39PM  17      TO EXPLORE THAT WITH THE WITNESS.

01:39PM  18              MR. WADE:  WELL, I DIDN'T STIPULATE TO ANY OF THEM.

01:39PM  19              THE COURT:  I THOUGHT YOU SAID THERE MIGHT BE ONE.

01:39PM  20              MR. WADE:  THERE MIGHT BE ONE DEPENDING ON HOW THEY

01:39PM  21      OFFER THE DOCUMENT.

01:39PM  22          I BELIEVE 1287 OUR CLIENT RECEIVES, BUT THE ISSUES ON

01:39PM  23      WHICH MS. CHEUNG IS COMMUNICATING ARE NOT, ARE NOT -- SHE'S NOT

01:39PM  24      ON THE EMAIL CHAIN WITH OUR CLIENT.

01:39PM  25              DOES THE COURT HAVE THAT DOCUMENT?  I APOLOGIZE.

01:39PM   1                    THE COURT:  I HAVE 1287, YES.

01:39PM   2                    MR. BOSTIC:  YOUR HONOR, I WOULD ALSO DRAW THE

01:39PM   3     COURT'S ATTENTION TO 1289, WHICH IS THAT SAME EMAIL CHAIN.

01:39PM   4         I'D SUBMIT THAT WE SHOULD BE ABLE TO AT LEAST EXPLORE

01:40PM   5     THESE WITH THIS WITNESS PENDING RESOLUTION OF THE DEFENSE'S

01:40PM   6     OBJECTIONS.

01:40PM   7                    THE COURT:  DO YOU SEE 1289, MR. WADE?

01:40PM   8                    MR. WADE:  I'M SORRY, YOUR HONOR?

01:40PM   9                    THE COURT:  1289?  MR. BOSTIC IS SUGGESTING THAT AT

01:40PM  10     A MINIMUM WE GO FORWARD WITH 1289.  MS. CHEUNG'S NAME IS ON

01:40PM  11     THESE EMAILS.

01:40PM  12                    MR. BOSTIC:  AND THE CHAIN IS FORWARDED TO

01:40PM  13     MS. HOLMES AT THE TOP OF 1287.

01:40PM  14                    THE COURT:  SO IT SEEMS FOUNDATIONALLY WE CAN GO

01:40PM  15     THROUGH THIS ONE.

01:40PM  16                    MR. WADE:  I THINK WE CAN GO THROUGH 1287,

01:41PM  17     YOUR HONOR.  I HAVEN'T -- MY ONLY HESITATION IS THAT I

01:41PM  18     HAVEN'T -- I NOW WANT TO JUST LOOK TO MAKE SURE THERE'S NO

01:41PM  19     LAYERED HEARSAY WITHIN HERE, BUT IT DID GO TO OUR CLIENT.  SO

01:41PM  20     AS LONG AS IT'S NOT OFFERED FOR THE TRUTH.

01:41PM  21                    THE COURT:  AND THIS IS -- 1287, IT LOOKS LIKE

01:41PM  22     FOUNDATIONALLY 1289 CONNECTS WITH THIS.

01:41PM  23                    MR. BOSTIC:  CORRECT, YOUR HONOR.

01:41PM  24                    THE COURT:  LET'S -- WHY DON'T WE DO THIS, WE HAVE

01:41PM  25     15 MINUTES LEFT IN THE DAY.  WHY DON'T I LET YOU START WITH

01:41PM   1      THESE THEN, MR. BOSTIC.  I'M SORRY TO INTERRUPT YOUR

01:41PM   2      PRESENTATION HERE, BUT DO YOU HAVE A COPY OF THE -- WHAT YOU

01:41PM   3      WANT TO GIVE ME, YOUR BRIEF?

01:41PM   4               MR. WADE:  I WILL HAND THIS UP.  AND MY APOLOGIES

01:41PM   5      FOR NOT BRINGING TWO COPIES.  WE'LL SEND ONE TO THE GOVERNMENT,

01:41PM   6      AND WE CAN FILE IT ON PACER.

01:41PM   7               THE COURT:  KYLE, CAN YOU MAKE A COPY?

01:41PM   8               MR. DOWNEY:  I HAVE ONE, YOUR HONOR, AND I'LL GIVE

01:41PM   9      IT.

01:41PM  10               THE COURT:  THANK YOU.

01:41PM  11               MR. BOSTIC:  VERY BRIEFLY, YOUR HONOR, A PROCESS

01:41PM  12      POINT, IF I COULD.

01:41PM  13          WE HAVE HAD A COUPLE OF DISCUSSIONS, THE PARTIES AND THE

01:42PM  14      COURT, ABOUT THE MOST EFFICIENT WAY OF RAISING DEFENSE

01:42PM  15      OBJECTIONS TO GOVERNMENT EVIDENCE.  THERE WAS SOME DISCUSSION

01:42PM  16      ABOUT FILING WEEKLY MOTIONS ON MONDAY MORNINGS.  I UNDERSTAND

01:42PM  17      THAT THE COURT EXPRESSED A PREFERENCE THAT THOSE ISSUES BE

01:42PM  18      RAISED SOONER.  I THINK THE COURT PROPOSED SATURDAY AS A

01:42PM  19      DEADLINE FOR THAT.  THE GOVERNMENT WAS IN AGREEMENT WITH THE

01:42PM  20      COURT THERE.

01:42PM  21          THIS SEEMS TO BE A STEP IN THE OPPOSITE DIRECTION RAISING

01:42PM  22      AN ISSUE THAT IS ALREADY BRIEFED BUT NOT TO THE GOVERNMENT'S

01:42PM  23      KNOWLEDGE WHILE A WITNESS IS ON THE STAND.

01:42PM  24          I'M HOPEFUL THAT WE CAN FIND A MORE EFFICIENT WAY TO DEAL

01:42PM  25      WITH THESE DISPUTES IN THE FUTURE.

01:42PM 1        MR. WADE:  WE RAISED -- WE FILED MOTION 1000 AND THE

01:42PM 2   GOVERNMENT DIDN'T LIKE THAT, SO WE UNDERSTOOD IT WAS OUR

01:42PM 3   PREFERENCE TO DEFER ON MS. CHEUNG PER THE COURT'S ORDER.

01:42PM 4        SO WE'RE HERE TO DO THAT.

01:42PM 5        WE'LL RAISE ISSUES AS PROMPTLY AS WE CAN.

01:42PM 6        THE COURT:  I THOUGHT YOU SAID YOU HAD THIS LAST

01:42PM 7   WEEK?  I THOUGHT YOU SAID YOU HAD THIS LAST WEEK OR LOOKED AT

01:43PM 8   THIS LAST WEEK?

01:43PM 9        MR. WADE:  WE FILED THE MOTION LAST WEEK.  THE

01:43PM 10  1000 MOTION, AS THE COURT KNOWS, WAS RULED ON LAST WEEK.

01:43PM 11       THE COURT:  RIGHT.  RIGHT.

01:43PM 12       MR. WADE:  THE GOVERNMENT EXHIBITS WITH RESPECT TO

01:43PM 13  MS. CHEUNG, YOU KNOW, WE HAVE HAD TO PULL THEM AND SORT OF GO

01:43PM 14  THROUGH A PROCESS, BUT IF THE COURT PREFERS US TO RAISE THEM IN

01:43PM 15  THE MORNING, I WOULD HAVE BEEN HAPPY TO RAISE THIS.

01:43PM 16       THE REASON I WAITED UNTIL NOW IS BECAUSE I THOUGHT IT WAS

01:43PM 17  THE COURT'S PREFERENCE TO COME FORWARD AFTER WE SAW HOW THE

01:43PM 18  EVIDENCE WAS GOING TO COME IN.

01:43PM 19       THE COURT:  WELL, THAT'S HOW -- THAT'S WHAT THE

01:43PM 20  ORDER SUGGESTS IT WAS PREMATURE TO MAKE OBJECTIONS AT THAT

01:43PM 21  POINT.

01:43PM 22       BUT IF YOU KNOW IN ADVANCE WHAT THE OBJECTIONS ARE GOING

01:43PM 23  TO BE BASED ON THE DOCUMENTATION THAT YOU RECEIVE, THAT'S

01:43PM 24  HELPFUL TO -- SO WE DON'T HAVE TO WASTE THE JURY'S TIME

01:43PM 25  OBVIOUSLY, AND I WOULD PREFER TO DO IT WHEN WE -- TO DO THESE

01:43PM  1    DISCUSSIONS OUTSIDE, OF COURSE, THE PRESENCE OF THE JURY, BUT

01:43PM  2    ALSO BEFORE THE JURY COMES INTO THE COURTROOM, THAT'S HELPFUL

01:43PM  3    TO THEM.

01:44PM  4        YOU'VE HEARD ME TELL THEM TODAY I MIGHT ASK THEM TO STAY A

01:44PM  5    LITTLE LATER ON SOME DAYS SO WE CAN CAPTURE TIME AND STAY ON

01:44PM  6    SEQUENCE.  THIS IS COUNTER TO THAT.

01:44PM  7        BUT LET'S DEVELOP A PROTOCOL WHERE WE CAN MEET IN THE

01:44PM  8    MORNING, AND I'LL GET HERE AS EARLY AS YOU WOULD LIKE SO WE CAN

01:44PM  9    DISCUSS THESE ISSUES.

01:44PM  10       BUT FOR NOW WHY DON'T WE -- LET'S CALL THE JURY BACK,

01:44PM  11   WE'LL PROCEED WITH -- MR. BOSTIC, YOU CAN LAY SOME FOUNDATION

01:44PM  12   AND START ON THESE EXHIBITS 1287 AND 1289 AND SEE WHAT KIND OF

01:44PM  13   FOUNDATION YOU CAN LAY.

01:44PM  14       I'LL LOOK AT THESE DOCUMENTS TOMORROW.  WE'RE IN SESSION

01:44PM  15   TOMORROW.  I MIGHT TELL THE JURY THAT WE WON'T HAVE THEM OUT

01:44PM  16   UNTIL 9:30 JUST TO GIVE US A FULL OPPORTUNITY TO DISCUSS THESE

01:44PM  17   TOMORROW.  MAYBE WE WILL MEET AT 8:00.  WE'LL TALK ABOUT THAT

01:44PM  18   AFTER THE JURY LEAVES TODAY.  ALL RIGHT.

01:44PM  19           MR. WADE:  THANK YOU, YOUR HONOR.

01:45PM  20           MR. BOSTIC:  THANK YOU, YOUR HONOR.

01:45PM  21       (PAUSE IN PROCEEDINGS.)

01:45PM  22       (JURY IN AT 1:45 P.M.)

01:46PM  23           THE COURT:  THANK YOU.  PLEASE BE SEATED.  WE'RE

01:46PM  24   BACK ON THE RECORD.  OUR JURY AND ALTERNATES ARE PRESENT.

01:47PM  25       THE WITNESS IS ON THE STAND, AND ALL PARTIES PREVIOUSLY

01:47PM  1    PRESENT ARE PRESENT ONCE AGAIN.

01:47PM  2         I'M SORRY FOR THE INTERRUPTION, LADIES AND GENTLEMEN.

01:47PM  3         MR. BOSTIC.

01:47PM  4             MR. BOSTIC:  THANK YOU, YOUR HONOR.

01:47PM  5    Q.   WELCOME BACK, MS. CHEUNG.

01:47PM  6         CAN I DIRECT YOUR ATTENTION, PLEASE, TO EXHIBIT 1289 IN

01:47PM  7    THE BINDER IN FRONT OF YOU?

01:47PM  8    A.   YES.

01:47PM  9    Q.   LET ME KNOW ONCE YOU'RE THERE?

01:47PM  10   A.   I'M AT 1289.

01:47PM  11   Q.   OKAY.  IF YOU WOULD LOOK AT PAGE 2 OF 1289, DO YOU SEE AN

01:47PM  12   EMAIL THAT BEGINS THIS CHAIN?

01:47PM  13        IT SHOULD JUST BE ON THE BACK OF THAT FIRST PAGE.

01:47PM  14   A.   OH, YES.

01:47PM  15   Q.   ARE YOU LOOKING AT AN EMAIL FROM YOU TO OTHER EMPLOYEES AT

01:47PM  16   THERANOS?

01:47PM  17   A.   YES.

01:47PM  18   Q.   AND LOOKING AT THIS EMAIL CHAIN, DO YOU HAVE A

01:47PM  19   RECOLLECTION OF THE EVENTS THAT IT COVERS?

01:48PM  20   A.   YES.

01:48PM  21   Q.   AND CAN YOU EXPLAIN -- WE'LL GO THROUGH THIS IN SOME MORE

01:48PM  22   DETAIL, BUT CAN YOU EXPLAIN GENERALLY WHAT WAS HAPPENING?

01:48PM  23   A.   A PATIENT SAMPLE CAME INTO THE WALGREENS LOCATION IN

01:48PM  24   PALO ALTO TO HAVE THEIR VITAMIN D TESTED, AND ESSENTIALLY I WAS

01:48PM  25   PREPPING TO RUN THIS VITAMIN D SAMPLE.  AND BEFORE YOU RUN A

01:48PM   1    VITAMIN D SAMPLE YOU HAVE TO RUN SOMETHING CALLED QUALITY

01:48PM   2    CONTROLS, AND THEY HAVE TO PASS IN ORDER TO RUN THE PATIENT

01:48PM   3    SAMPLE.

01:48PM   4         SO IN THIS EMAIL I'M NOTIFYING DIFFERENT PEOPLE WITHIN THE

01:48PM   5    CLINICAL LAB AND THE RESEARCH AND DEVELOPMENT LAB AND THE HELP

01:48PM   6    LINE CALLED NORMANDY 911 THAT THE QC'S AREN'T PASSING AND

01:48PM   7    TRYING TO FIGURE OUT WHAT I'M SUPPOSED TO DO.

01:48PM   8    Q.   AND DO YOU REMEMBER THESE EVENTS?

01:48PM   9    A.   YES.

01:48PM   10   Q.   LET ME ASK YOU A FEW QUESTIONS ABOUT HOW YOU USED EMAIL AT

01:49PM   11   THERANOS IF THAT'S OKAY.

01:49PM   12   A.   OKAY.

01:49PM   13   Q.   FIRST, DID YOU REGULARLY SEND EMAILS AS PART OF YOUR WORK

01:49PM   14   AT THERANOS?

01:49PM   15   A.   YES.

01:49PM   16   Q.   AND WAS IT YOUR PRACTICE TO SEND EMAILS LIKE THESE AT OR

01:49PM   17   NEAR THE TIME OF THE EVENTS THAT YOU WERE DESCRIBING IN THE

01:49PM   18   EMAILS?

01:49PM   19   A.   YES.

01:49PM   20   Q.   IN RESEARCH AND DEVELOPMENT AND IN THE CLINICAL LAB, DID

01:49PM   21   YOU AND OTHER EMPLOYEES AT THERANOS USE INFORMATION TO CONVEY

01:49PM   22   INFORMATION IN THE COURSE OF REGULARLY CONDUCTED ACTIVITIES OF

01:49PM   23   THE COMPANY?

01:49PM   24   A.   YES.

01:49PM   25   Q.   IN THE WORK THAT YOU DID AND THE WORK THAT OTHERS DID AT

01:49PM  1    THERANOS IN R&D AND IN THE CLINICAL LAB, WAS IT IMPORTANT TO

01:49PM  2    CONVEY INFORMATION IN EMAILS ACCURATELY?

01:49PM  3    A.   YES.

01:49PM  4    Q.   AND WERE THESE KINDS OF EMAILS RELIED UPON BY INDIVIDUALS

01:49PM  5    AT THERANOS SUCH THAT IT WAS ESSENTIAL TO REPORT INFORMATION

01:49PM  6    ACCURATELY IN THE EMAILS?

01:50PM  7    A.   YES.

01:50PM  8    Q.   DID YOU ALSO, WHEN YOU WERE AT THERANOS, USE EMAILS TO

01:50PM  9    MEMORIALIZE OR PRESERVE INFORMATION SO IT COULD BE REFERRED

01:50PM  10   BACK TO LATER?

01:50PM  11   A.   YES.

01:50PM  12   Q.   DID THERANOS SET UP ANY SPECIFIC EMAIL GROUPS OR EMAIL

01:50PM  13   ALIASES OR ADDRESSES TO BE USED TO FACILITATE THE FUNCTIONS

01:50PM  14   THAT WE'VE BEEN TALKING ABOUT?

01:50PM  15   A.   YES.

01:50PM  16   Q.   AND WHAT WERE SOME OF THEM IF YOU REMEMBER?

01:50PM  17   A.   SO WE CREATED DIFFERENT GROUPS FOR DIFFERENT DEPARTMENTS,

01:50PM  18   SO DIFFERENT RESEARCH AND DEVELOPMENT LABS WOULD HAVE THEIR OWN

01:50PM  19   SORT OF GROUP, EMAIL GROUP.

01:50PM  20       AND WE ALSO HAD THEM IN THIS CASE FOR A HELP LINE.  SO IF

01:50PM  21   WE HAD ANY ISSUES IN THE LABORATORY, WE HAD NORMANDY 911, WHICH

01:50PM  22   WAS TO ESSENTIALLY CONTACT A GROUP OF PEOPLE WHO COULD HELP

01:50PM  23   TROUBLESHOOT ANY PROBLEMS THAT MAY HAVE AROSE WHILE WE WERE

01:51PM  24   WORKING.

01:51PM  25   Q.   AND HOW DID YOU CONTACT THE NORMANDY 911 GROUP?  WHAT WAS

01:51PM  1    THE MECHANISM AT THERANOS?

01:51PM  2    A.   YOU JUST CC'D THAT GROUP TAG.

01:51PM  3    Q.   AND SO YOU WOULD SEND AN EMAIL TO AN EMAIL ADDRESS

01:51PM  4    NORMANDY 911?

01:51PM  5    A.   YES.

01:51PM  6    Q.   AT THERANOS.COM OR SOMETHING LIKE THAT?

01:51PM  7    A.   YES.

01:51PM  8    Q.   AND THAT EMAIL ADDRESS WAS CREATED BY THE COMPANY ITSELF?

01:51PM  9    A.   YES.

01:51PM  10   Q.   GOING BACK TO EXHIBIT 1289.  WE TALKED ABOUT THE BASIC

01:51PM  11   SITUATION INVOLVING HERE I THINK YOU SAID A QC FAILURE; IS THAT

01:51PM  12   CORRECT?

01:51PM  13   A.   YES.

01:51PM  14   Q.   AND I'LL POINT YOUR ATTENTION TO PAGE 1 OF THAT EXHIBIT.

01:51PM  15   YOU WILL SEE AT THE TOP THE EMAIL CHAIN ENDS WITH AN EMAIL FROM

01:51PM  16   MR. BALWANI; IS THAT CORRECT?

01:51PM  17   A.   YES.

01:51PM  18   Q.   AND CAN YOU FLIP BACK ONE EXHIBIT TO EXHIBIT 1287, PLEASE.

01:52PM  19        DO YOU SEE EXHIBIT 1287?

01:52PM  20   A.   YES.

01:52PM  21   Q.   IS THAT ANOTHER VERSION OR A DIFFERENT PORTION OF THIS

01:52PM  22   SAME EMAIL CHAIN?

01:52PM  23   A.   YES.

01:52PM  24   Q.   AT THE TOP OF EXHIBIT 1287 DO YOU SEE A COUPLE OF

01:52PM  25   EXCHANGES WHERE MS. HOLMES IS EITHER THE SENDER OR RECIPIENT OF

01:52PM  1    EMAILS?

01:52PM  2    A.   YES.

01:52PM  3              MR. BOSTIC:  YOUR HONOR, AT THIS TIME THE GOVERNMENT

01:52PM  4    WOULD MOVE TO ADMIT EXHIBIT 1289.

01:52PM  5              MR. WADE:  YOUR HONOR, I HAVE NO OBJECTION TO EVERY

01:52PM  6    EMAIL IN 1289 WITH THE EXCEPTION OF THE TOP EMAIL, WHICH IS NOT

01:52PM  7    INCLUDED IN 1287.

01:52PM  8              THE COURT:  THE EMAIL AT THE TOP OF THE PAGE ON THE

01:52PM  9    FIRST PAGE OF 3069?

01:53PM  10             MR. WADE:  I'M SORRY, 1289 I BELIEVE IS WHAT THE

01:53PM  11   GOVERNMENT IS MOVING; IS THAT CORRECT?

01:53PM  12             MR. BOSTIC:  BATES ENDING IN 3069.

01:53PM  13             MR. WADE:  BATES, CORRECT.  YES, YOUR HONOR, THE TOP

01:53PM  14   EMAIL OF THAT CHAIN.

01:53PM  15             THE COURT:  MR. BOSTIC?

01:53PM  16             MR. BOSTIC:  I BELIEVE THAT EMAIL SHOULD BE

01:53PM  17   ADMITTED, YOUR HONOR.  IT PROVIDES THE REACTION OF THE

01:53PM  18   COCONSPIRATOR IN THIS CASE, AND I THINK THAT'S RELEVANT.

01:53PM  19             MR. WADE:  SHOULD WE APPROACH, YOUR HONOR?

01:53PM  20             THE COURT:  I SEE THE COCONSPIRATOR'S NAME HERE.

01:53PM  21        WHAT IS THE -- IS HE A RECIPIENT?

01:53PM  22             MR. BOSTIC:  HE'S A SENDER IN THE EMAIL MESSAGE THAT

01:53PM  23   WE'RE REFERENCING, YOUR HONOR.

01:53PM  24             THE COURT:  I SEE.  IT'S A THREE HOLE PUNCH, AND

01:53PM  25   IT'S PUNCHED OUT IN THE TITLE OF THE COPY THAT I HAVE.

01:53PM 1          MR. BOSTIC:  YOUR HONOR, FOR EXPEDIENCY, WE CAN

01:54PM 2    DEFER ON 1289 FOR NOW.  I CAN ASK THE WITNESS ABOUT THE EVENTS

01:54PM 3    INDEPENDENT OF THE EMAIL.

01:54PM 4          THE COURT:  SURE.  ALL RIGHT.  LET'S DO THAT.  WE'LL

01:54PM 5    TALK ABOUT THIS TOMORROW.

01:54PM 6    BY MR. BOSTIC:

01:54PM 7    Q.   MS. CHEUNG, YOU MENTIONED A CONCEPT CALLED QC OR QUALITY

01:54PM 8    CONTROL?

01:54PM 9    A.   YES.

01:54PM 10   Q.   AND WHAT IS QC AND HOW DID IT WORK AT THERANOS?

01:54PM 11   A.   SO QC STANDS FOR QUALITY CONTROLS, AND ESSENTIALLY QUALITY

01:54PM 12   CONTROL IS A SYSTEM THAT YOU SET UP BEFORE YOU RUN PATIENT

01:54PM 13   SAMPLES.

01:54PM 14        SO A QUALITY CONTROL ITSELF IS A SAMPLE WHERE YOU HAVE A

01:54PM 15   KNOWN CONCENTRATION OF WHATEVER YOU'RE TRYING TO TEST.  SO, FOR

01:54PM 16   EXAMPLE, IF YOU'RE TRYING TO TEST VITAMIN D, YOU KNOW THAT THE

01:54PM 17   QUALITY CONTROL SAMPLE IS 12 MICROGRAMS PER MIL.

01:54PM 18        SO WHAT YOU'LL DO IS RUN THESE QUALITY CONTROL SAMPLES

01:55PM 19   PRIOR TO RUNNING A PATIENT SAMPLE TO MAKE SURE EVERYTHING IN

01:55PM 20   YOUR SYSTEM IS WORKING ACCURATELY.

01:55PM 21        BECAUSE THERE ARE SO MANY DIFFERENT MOVING PARTS, YOU WANT

01:55PM 22   TO MAKE SURE THAT THE DEVICE, THE CHEMICALS THAT YOU USE, THE

01:55PM 23   CHEMISTRY, EVERYTHING, THE TECHNICIAN IS TRAINED PROPERLY, IS

01:55PM 24   WORKING EFFECTIVELY SO YOU RUN THIS QUALITY CONTROL SAMPLE TO

01:55PM 25   SEE IF IT PASSES OR FAILS IN ORDER TO ALLOW YOU THEN TO PROCESS

CHEUNG DIRECT BY MR. BOSTIC

01:55PM  1   A PATIENT SAMPLE.

01:55PM  2       SO IT'S KIND OF LIKE AN ASSURANCE SYSTEM BEFORE RUNNING A

01:55PM  3   PATIENT SAMPLE.

01:55PM  4   Q.   SO A BLOOD TEST, THE GOAL IS TO TEST THE CONCENTRATION OF

01:55PM  5   A CERTAIN SUBSTANCE IN THE BLOOD GENERALLY SPEAKING?

01:55PM  6   A.   YES.

01:55PM  7   Q.   AND SO FOR THIS QUALITY CONTROL STEP, IF I'M UNDERSTANDING

01:55PM  8   CORRECTLY, YOU TAKE A SAMPLE THAT HAS A KNOWN CONCENTRATION?

01:55PM  9   A.   RIGHT.

01:55PM  10   Q.   AND THE GOAL IS TO SEE IF THE DEVICE CAN RETURN THE RESULT

01:55PM  11   THAT MATCHES WITH THAT KNOWN CONCENTRATION?

01:56PM  12   A.   YEAH.  SO IT WILL EITHER BE A TYPE OF CONCENTRATION, SO

01:56PM  13   YOU WANT THE SAME CONCENTRATION, OR SOMETIMES IT WILL BE A

01:56PM  14   POSITIVE OR A NEGATIVE VALUE OR YOU WILL KNOW YOU HAVE A

01:56PM  15   POSITIVE VALUE OR A NEGATIVE VALUE.  SO IT COULD BE EITHER OF

01:56PM  16   THOSE TYPES OF SETUPS.

01:56PM  17   Q.   AND HOW OFTEN WAS -- HOW OFTEN DID QUALITY CONTROL HAVE TO

01:56PM  18   BE PERFORMED AT THERANOS WHEN YOU WERE WORKING THERE?

01:56PM  19   A.   AT THERANOS WE PERFORMED QUALITY CONTROLS TYPICALLY AT THE

01:56PM  20   BEGINNING OF THE DAY BEFORE WE WERE GOING TO RUN ALL OF OUR

01:56PM  21   PATIENT SAMPLES.

01:56PM  22   Q.   DID QUALITY CONTROL HAVE TO BE PERFORMED JUST ON ONE

01:56PM  23   REPRESENTATIVE DEVICE OR DID IT HAVE TO BE PERFORMED ON EACH

01:56PM  24   DEVICE THAT WAS GOING TO BE USED FOR PATIENT TESTING?

01:56PM  25   A.   IT HAS TO BE RUN ON EACH DEVICE THAT IS GOING TO BE USED

01:56PM 1    FOR PATIENT TESTING.

01:56PM 2    Q.   AND DOES IT HAVE TO BE RUN FOR EACH KIND OF TEST FOR EACH

01:56PM 3    ASSAY THAT IS GOING TO BE USED THAT DAY OR JUST FOR CERTAIN

01:56PM 4    EXAMPLE ASSAYS?

01:56PM 5    A.   IT HAS TO BE RUN FOR EACH ASSAY.  SO EACH TEST THAT YOU

01:57PM 6    RUN YOU HAVE TO RUN QC'S FOR.

01:57PM 7    Q.   AND WHAT HAPPENS IF A DEVICE FAILS QC ON A CERTAIN DAY FOR

01:57PM 8    A CERTAIN ASSAY?

01:57PM 9    A.   SO TYPICALLY IF A QC FAILS, YOU HAVE TO INVESTIGATE WHY

01:57PM 10   DID IT FAIL, AND YOU HAVE TO COME UP WITH SOME SORT OF

01:57PM 11   CORRECTIVE ACTION IN ORDER TO MAKE SURE THAT THEY PASS AND THAT

01:57PM 12   THE SYSTEM IS WORKING.

01:57PM 13       SO, FOR EXAMPLE, IF IT FAILS, YOU WILL LOOK AND SEE, OKAY,

01:57PM 14   LET'S LOOK AT THE SOLUTIONS I'M USING, YOU KNOW, IS ANYTHING

01:57PM 15   EXPIRED?

01:57PM 16       OR MAYBE I MADE SOME SORT OF A MISTAKE, AND YOU'LL TRY AND

01:57PM 17   BASICALLY RE-CORRECT FOR ANY POTENTIAL ERROR THAT YOU MIGHT

01:57PM 18   HAVE.

01:57PM 19       IT KIND OF WORKS LIKE A FLAG SYSTEM TO LET YOU KNOW THAT

01:57PM 20   SOMETHING IS OFF OR SOMETHING IS WRONG AND SO YOU HAVE TO

01:57PM 21   INVESTIGATE WHAT THAT IS.

01:57PM 22   Q.   AND IN THAT CASE IF A DEVICE FAILS QC FOR A CERTAIN ASSAY

01:57PM 23   ON A CERTAIN DAY, CAN IT CONTINUE TO BE USED FOR PATIENT

01:57PM 24   TESTING WHILE THE PROBLEM IS INVESTIGATED?

01:57PM 25   A.   NO.

01:57PM  1      Q.   CAN THE MACHINE BE USED AGAIN BEFORE IT PASSES -- SORRY.

01:58PM  2           WHEN A MACHINE FAILS QC, CAN IT BE USED AGAIN FOR PATIENT

01:58PM  3      TESTING BEFORE IT PASSES QC?

01:58PM  4      A.   CAN YOU REPEAT THAT QUESTION.

01:58PM  5      Q.   SURE.  IF A DEVICE FAILS QC, ARE YOU ALLOWED TO USE IT FOR

01:58PM  6      PATIENT TESTING AGAIN BEFORE IT PASSES QC?

01:58PM  7      A.   NO, YOU CAN'T USE IT FOR PATIENT TESTING.

01:58PM  8      Q.   SO GOING BACK TO THE EMAIL THAT YOU SEE IN FRONT OF YOU.

01:58PM  9           WHAT WAS THE DATE WHEN THIS SITUATION OCCURRED WITH THE QC

01:58PM  10     RESULT YOU REFERENCED EARLIER?

01:58PM  11     A.   THE DATE WAS NOVEMBER 30TH, 2013.

01:58PM  12     Q.   OKAY.  AND ON THAT DATE DO YOU REMEMBER SENDING AN EMAIL

01:58PM  13     TO THE NORMANDY 911 EMAIL ADDRESS?

01:58PM  14     A.   YES.

01:58PM  15     Q.   AND WHAT WAS THE REASON FOR SENDING THAT EMAIL?

01:58PM  16     A.   THE REASON FOR SENDING THAT IS BECAUSE THE QC'S DIDN'T

01:58PM  17     PASS, AND I WAS TRYING TO TROUBLESHOOT DIFFERENT SOLUTIONS AND

01:58PM  18     NOTHING WAS WORKING BECAUSE THEY KEPT REPEATEDLY FAILING.

01:59PM  19     Q.   AND BECAUSE THE QC'S FAILED, YOU WEREN'T ALLOWED TO RUN

01:59PM  20     THE PATIENT SAMPLE THAT YOU NEEDED TO RUN; IS THAT CORRECT?

01:59PM  21     A.   THAT IS CORRECT.

01:59PM  22     Q.   AND WHAT WAS THE ASSAY INVOLVED HERE?

01:59PM  23     A.   THE ASSAY WAS VITAMIN D.

01:59PM  24     Q.   DO YOU HAVE AN UNDERSTANDING FROM YOUR TIME AT THERANOS OF

01:59PM  25     WHAT THE VITAMIN D TEST IS AND WHY IT'S IMPORTANT?

01:59PM 1  A.   THE VITAMIN D TEST IS TO CHECK FOR THE MINERAL VITAMIN D,

01:59PM 2  AND SO IT WILL INDICATE TO A PATIENT WHETHER THEY HAVE A

01:59PM 3  DEFICIENCY, WHETHER THEY'RE OVERDOSING, IF THEY'RE TAKING

01:59PM 4  SUPPLEMENTS OR WHETHER THEY'RE IN THE NORMAL RANGE.

01:59PM 5  Q.   I'LL ASK YOU TO TURN BACK TO EXHIBIT 1287.

01:59PM 6          MR. WADE:  YOUR HONOR, ARE WE REFRESHING

01:59PM 7  RECOLLECTION NOW?

01:59PM 8          THE COURT:  HE HASN'T ASKED A QUESTION YET.

01:59PM 9          MR. WADE:  OKAY.  I JUST -- WE'RE GOING -- I'M JUST

01:59PM 10 SEEKING CLARIFICATION.

02:00PM 11         MR. BOSTIC:  MY NEXT STEP IS TO SEEK TO MOVE

02:00PM 12 EXHIBIT 1287 INTO EVIDENCE.

02:00PM 13         MR. WADE:  WITHOUT OBJECTION.

02:00PM 14         THE COURT:  IT MAY BE PUBLISHED.  THANK YOU.

02:00PM 15     (GOVERNMENT'S EXHIBIT 1287 WAS RECEIVED IN EVIDENCE.)

02:00PM 16 BY MR. BOSTIC:

02:00PM 17 Q.   DO YOU SEE A VERSION OF THIS EMAIL CHAIN ON THE SCREEN IN

02:00PM 18 FRONT OF YOU, MS. CHEUNG?

02:00PM 19 A.   YES.

02:00PM 20 Q.   I'LL DIRECT YOUR ATTENTION TO THE BOTTOM OF PAGE 1.  IF WE

02:00PM 21 CAN ZOOM DOWN TO -- YES, TO THE BOTTOM THERE, MS. HOLLIMAN.

02:00PM 22 THANK YOU.

02:00PM 23     THERE'S A MESSAGE FROM MR. BALWANI IN THE MIDDLE OF THE

02:00PM 24 TEXT THERE ON NOVEMBER 30TH, 2013, AT 7:10 A.M.

02:01PM 25         DO YOU SEE THAT?

02:01PM  1    A.   YES.

02:01PM  2    Q.   AND MR. BALWANI REMARKS, "THIS IS BEYOND UNACCEPTABLE

02:01PM  3    PERFORMANCE."

02:01PM  4         DO YOU SEE THAT?

02:01PM  5    A.   YES.

02:01PM  6    Q.   AND FROM YOUR STANDPOINT AS AN EMPLOYEE OF THE COMPANY,

02:01PM  7    DID YOU AGREE THAT THIS WAS BEYOND UNACCEPTABLE PERFORMANCE FOR

02:01PM  8    THE THERANOS ASSAY AT THIS TIME?

02:01PM  9    A.   YES, THAT THE QC FAILED.

02:01PM  10   Q.   MS. HOLMES THEN RESPONDS TO THAT MESSAGE AND ASKS "DO WE

02:01PM  11   HAVE ENOUGH SAMPLE TO RUN THIS ONE ON TRADITIONAL METHODS?"

02:01PM  12        DO YOU SEE THAT?

02:01PM  13   A.   YES.

02:01PM  14   Q.   AND WHAT WAS YOUR UNDERSTANDING WHAT SHE MEANT WHEN SHE

02:01PM  15   SAID "TRADITIONAL METHODS"?  WHAT DOES THAT MEAN?

02:01PM  16   A.   TRADITIONAL METHODS MEANS IS THE PREDICATE METHOD, SO IT'S

02:01PM  17   THE MACHINES THAT WE HAD IN THAT UPSTAIRS LABORATORY, THE SORT

02:01PM  18   OF OFF-THE-SHELF MACHINES.  SO THIS WOULD HAVE LIKELY BEEN THE

02:02PM  19   DIASORIN, WHICH IS UTILIZED FOR VITAMIN D SAMPLES.

02:02PM  20   Q.   AND YOU SAID DIASORIN.  IS THAT ANOTHER MANUFACTURER

02:02PM  21   BESIDES THERANOS?

02:02PM  22   A.   YEAH, IT'S LIKE THE DIASORIN LIAISON.  IT'S THE MACHINE

02:02PM  23   USED TO PROCESS VITAMIN D SAMPLES.

02:02PM  24   Q.   SO, IN OTHER WORDS, MS. HOLMES IS ASKING HERE WHETHER THE

02:02PM  25   SAMPLE IS LARGE ENOUGH TO FORGET ABOUT USING THE THERANOS

CHEUNG DIRECT BY MR. BOSTIC

02:02PM  1    TECHNOLOGY ALTOGETHER AND SIMPLY RELY ON GENERAL STORE BOUGHT

02:02PM  2    ANALYZERS; IS THAT CORRECT?

02:02PM  3    A.   YES.

02:02PM  4    Q.   THANK YOU, MS. HOLLIMAN.  LET'S ZOOM OUT AND ZOOM IN ON

02:02PM  5    THE NEXT -- KIND OF THE NEXT MIDDLE THIRD OF THE DOCUMENT,

02:02PM  6    PLEASE.

02:02PM  7         LET'S SAY FROM THE LINE ABOUT ONE-THIRD DOWN, FROM ABOUT

02:02PM  8    THERE (INDICATING).

02:02PM  9         SORRY.  LET'S GO BACK.  AND FROM WHERE I MARKED NEAR THE

02:03PM  10   TOP, STARTING FROM THERE GOING DOWN.  CORRECT.  PERFECT.  THANK

02:03PM  11   YOU.

02:03PM  12        NISHIT DOSHI RESPONDS TO MS. HOLMES'S QUESTION; CORRECT?

02:03PM  13   A.   YES.

02:03PM  14   Q.   AND WHAT IS THE ANSWER TO HER QUESTION AND WHETHER IT IS

02:03PM  15   POSSIBLE TO JUST USE THIRD PARTY DEVICES AND NOT THERANOS

02:03PM  16   DEVICES FOR THIS?

02:03PM  17   A.   HE'S EFFECTIVELY SAYING THAT WE NEED A LARGER SAMPLE, SO

02:03PM  18   WE NEED 150 MICROLITERS OF SERUM, WHICH SERUM IS A DIFFERENT

02:03PM  19   TYPE OF TUBE AND NOT EDTA PLASMA.

02:03PM  20        SO SOMETIMES YOU HAVE DIFFERENT COATINGS ON DIFFERENT

02:03PM  21   TYPES OF TUBES.  SO WE DON'T HAVE ENOUGH SAMPLE AND THE RIGHT

02:03PM  22   TYPE OF SAMPLE IN ORDER TO RUN IT ON THE LIAISON, WHICH IS THIS

02:03PM  23   PREDICATE METHOD MACHINE, THE VENOUS OFF-THE-SHELF FDA-APPROVED

02:03PM  24   MACHINE THAT YOU WOULD RUN VITAMIN D SAMPLES ALTERNATIVELY ON.

02:03PM  25   Q.   MS. HOLMES THEN RESPONDS AND ASKING HOW FAST WE CAN

02:04PM  1    RESOLVE THIS ISSUE.

02:04PM  2        DO YOU SEE THAT?

02:04PM  3    A.   YES.

02:04PM  4    Q.   AND DANIEL YOUNG RESPONDS.  WHO WAS DANIEL YOUNG AT THE

02:04PM  5    COMPANY?

02:04PM  6    A.   DANIEL YOUNG WAS THE VICE PRESIDENT OF THE COMPANY.

02:04PM  7    Q.   WHAT WAS HIS FUNCTION AT THE COMPANY, IF YOU HAVE AN

02:04PM  8    UNDERSTANDING OF WHAT HIS JOB ENTAILED?

02:04PM  9    A.   SO DANIEL YOUNG WAS THE VICE PRESIDENT, AND HE TENDED TO

02:04PM  10   HAVE OVERSIGHT OVER ALL OF THE RESEARCH AND DEVELOPMENT

02:04PM  11   ACTIVITIES.

02:04PM  12       AND THEN SPECIFICALLY WHEN IT CAME TO SORT OF THIS

02:04PM  13   INTEGRATION, HELPING TO BASICALLY MAKE IT POSSIBLE SO THAT

02:04PM  14   THERANOS COULD PROCESS EVEN MORE SAMPLES THAN WE CURRENTLY HAD

02:04PM  15   CAPACITY OF.  SO THAT WAS MY UNDERSTANDING OF WHAT HIS ROLE

02:04PM  16   WAS.

02:04PM  17       HE KIND OF OVERSAW A LOT OF THE R&D AND A LOT OF THE

02:04PM  18   SCIENTISTS AND ALSO THIS INTEGRATION OF GETTING THESE NEW TYPES

02:04PM  19   OF TESTS THAT WE WERE DEALING WITH INTO THE CLINICAL SETTING.

02:04PM  20       HE WAS KIND OF A LEAD PERSON THAT WE WOULD CONTACT TO

02:04PM  21   DISCUSS WHAT WE WERE WORKING ON OR ANY ISSUES THAT WE HAD IN

02:04PM  22   THAT REGARD.

02:05PM  23   Q.   HIS ANSWER TO MS. HOLMES IS "THIS HAS BEEN RESOLVED.

02:05PM  24   SAMPLE IS BEING RUN ON THE EDISON."

02:05PM  25       IS THAT CORRECT?

CHEUNG DIRECT BY MR. BOSTIC

02:05PM 1    A.    YES.

02:05PM 2    Q.    AND MS. HOLMES ASKS "WHAT IS THE RESOLUTION?"

02:05PM 3          LET'S ZOOM OUT AND GO TO THE TOP EMAIL ON THE CHAIN,

02:05PM 4    PLEASE, THE TOP PORTION.  THANK YOU.  THERE'S AN EMAIL FROM

02:05PM 5    SURAJ SAKSENA.  WHO WAS SURAJ SAKSENA AT THERANOS?

02:05PM 6    A.    SURAJ SAKSENA WAS A TEAM LEAD.  HE WAS A SCIENTIST ON THE

02:05PM 7    BINDERS TEAM AND HE ALSO WORKED ON THE ELISA AND ALSO ON

02:05PM 8    PRODUCTION.

02:05PM 9    Q.    AND HIS RESPONSE SAYS, "HI ELIZABETH.  2 OUTLIERS HAD TO

02:05PM 10   BE MANUALLY REMOVED TO PASS QC.  FOR FUTURE, WE WILL

02:06PM 11   INCORPORATE AUTOMATIC OUTLIER DETECTION AND REMOVAL FROM

02:06PM 12   ANALYSIS."

02:06PM 13         CAN YOU EXPLAIN WHAT THAT MEANS, "2 OUTLIERS HAD TO BE

02:06PM 14   MANUALLY REMOVED TO PASS QC"?

02:06PM 15   A.    SO ESSENTIALLY THE PATIENT RESULTS AND THE QC RESULTS WERE

02:06PM 16   ALL DERIVED FROM AN AGGREGATION OF SIX DATA POINTS.  AND SURAJ

02:06PM 17   IS TALKING ABOUT THIS, LIKE, PROCESS AT THERANOS WHERE THEY

02:06PM 18   WOULD DELETE TWO DATA POINTS IF A QC FAILED OR IF A THERE WAS

02:06PM 19   SOME INSTANCE WHERE WE WEREN'T GETTING LIKE THE QC TO PASS OR

02:06PM 20   INVALIDATION STUDIES, THIS WAS ALSO CONDUCTED LIKE THIS SORT OF

02:06PM 21   OUTLIER REMOVAL.

02:06PM 22         SO LET'S TAKE TWO DATA POINTS OUT OF THE SIX DATA POINTS

02:06PM 23   THAT WE HAVE TO SEE IF THAT CHANGES THE RESULTS THAT WE'RE

02:06PM 24   GETTING.

02:06PM 25   Q.    AND IS THIS A PROCESS THAT YOU BECAME FAMILIAR WITH DURING

02:06PM  1    YOUR TIME AT THERANOS?

02:06PM  2    A.   YES.

02:06PM  3    Q.   AND IS THIS A PROCESS THAT YOU AGREED WITH OR DISAGREED

02:06PM  4    WITH?

02:06PM  5    A.   I DISAGREED WITH.

02:06PM  6    Q.   BY SAYING OUTLIERS WERE REMOVED, DOES THAT MEAN THAT THOSE

02:07PM  7    RESULTS NEVER EXISTED IN THE FIRST PLACE OR JUST THAT THEY WERE

02:07PM  8    IGNORED OR DISREGARDED FOR PURPOSES OF QUALITY CONTROL?

02:07PM  9    A.   THEY WERE IGNORED AND DISREGARDED FOR THE PURPOSES OF

02:07PM  10   QUALITY CONTROL.

02:07PM  11          MR. BOSTIC:  YOUR HONOR, THERE'S MORE TO TALK ABOUT

02:07PM  12   ON THIS TOPIC, BUT THIS MIGHT BE A GOOD TIME TO BREAK FOR THE

02:07PM  13   DAY.

02:07PM  14          THE COURT:  LET'S DO THAT.

02:07PM  15      LADIES AND GENTLEMEN, WE'LL TAKE OUR RECESS AT THIS TIME.

02:07PM  16   I WANT TO TELL YOU TOMORROW I'M HOPEFUL THAT WE CAN BEGIN AT

02:07PM  17   9:00 O'CLOCK TOMORROW.  IT MAY BE -- I'M PROBABLY GOING TO WANT

02:07PM  18   TO TALK TO THE LAWYERS IN ADVANCE, BUT I'M QUITE CONFIDENT THAT

02:07PM  19   WE WILL BE ABLE TO BEGIN AT THE LATEST AT 9:30, BUT I'M

02:07PM  20   SHOOTING FOR 9:00 O'CLOCK.  I JUST WANT TO GIVE YOU A HEADS UP

02:07PM  21   ON THAT.

02:07PM  22      WE'LL TAKE OUR RECESS TODAY.  I DO, ONCE AGAIN, WANT TO

02:07PM  23   ADMONISH YOU ABOUT THE NEED TO DECIDE THIS CASE SOLELY ON THE

02:07PM  24   EVIDENCE PRESENTED IN THE COURTROOM.  AGAIN, THIS MEANS THAT

02:07PM  25   YOU'RE NOT TO DO ANY RESEARCH ABOUT THE CASE, ANYTHING TO DO

02:08PM 1    WITH THE CASE, INCLUDING ANY INDEPENDENT RESEARCH.  YOU SHOULD

02:08PM 2    LIMIT YOUR EXPOSURE TO TRADITIONAL FORMS OF MEDIA INFORMATION,

02:08PM 3    AND YOU MUST NOT COMMUNICATE WITH ANYONE IN ANY WAY ABOUT THIS

02:08PM 4    CASE, AND YOU MUST IGNORE ANY INFORMATION ABOUT THE CASE THAT

02:08PM 5    YOU MIGHT SEE WHILE BROWSING THE INTERNET OR ON YOUR SOCIAL

02:08PM 6    MEDIA FEEDS.

02:08PM 7         AGAIN, TOMORROW MORNING I'M GOING TO ASK YOU THE OTHER

02:08PM 8    QUESTION, WHETHER OR NOT ANY OF YOU HAVE BEEN EXPOSED TO

02:08PM 9    INFORMATION.  I HOPE YOU APPRECIATE THE SOMEWHAT REDUNDANCY OF

02:08PM 10   THIS, BUT I HOPE YOU ALSO APPRECIATE HOW IMPORTANT IT IS FOR

02:08PM 11   THIS CASE AND FOR YOUR DELIBERATIONS TO BE DECIDED ONLY ON THE

02:08PM 12   EVIDENCE HERE.

02:08PM 13        WITH THAT, WE'LL SEE YOU TOMORROW MORNING.

02:08PM 14        MS. KRATZMANN WILL TELL YOU WHERE TO COLLECT YOURSELVES

02:08PM 15   AND HOW THAT IS GOING TO BE ENGAGED.

02:08PM 16        I UNDERSTAND THERE'S ANOTHER JURY TRIAL GOING ON IN OUR

02:08PM 17   COURTHOUSE, AND IT MIGHT CREATE SOME CHALLENGES AS FAR AS

02:08PM 18   ELEVATORS AND THINGS.  ALTHOUGH I BELIEVE WE HAVE WORKED THE

02:08PM 19   TIMING OUT ON THAT.

02:08PM 20        BUT IN ANY EVENT, HAVE A GOOD EVENING.  PLEASE REMEMBER

02:09PM 21   THE ADMONITION.  I HOPE WE CAN START AT 9:00 O'CLOCK.

02:09PM 22   REALISTICALLY IT'S PROBABLY GOING TO BE A LITTLE BIT AFTER

02:09PM 23   THAT, JUST TO BE CANDID, BUT WE'LL DO THE BEST THAT WE CAN.

02:09PM 24        TOMORROW WE MIGHT GO LATER.  I ASKED YOU TO CHECK ON THAT,

02:09PM 25   BUT WE'LL FOLLOW UP ON THAT TOMORROW.  THANK YOU.

02:09PM  1          MS. CHEUNG, YOU CAN STEP DOWN AS WELL.  IF YOU COULD BE

02:09PM  2     AVAILABLE TOMORROW AT 9:00 O'CLOCK, PLEASE.

02:10PM  3          (JURY OUT AT 2:10 P.M.)

02:10PM  4          THE COURT:  ALL RIGHT.  PLEASE BE SEATED.  THANK

02:10PM  5     YOU.

02:10PM  6          THE RECORD SHOULD REFLECT OUR JURY HAS LEFT FOR THE DAY.

02:10PM  7          MS. CHEUNG, OUR WITNESS, HAS LEFT THE COURTROOM.

02:10PM  8          COUNSEL, I THINK THE PROSECUTION -- YOU HAVE A COPY OF

02:10PM  9     THIS, OF THE BRIEF?

02:10PM 10          MR. BOSTIC:  WE DO, YOUR HONOR.

02:10PM 11          THE COURT:  YOU CAN LOOK THAT OVER TONIGHT.  IF YOU

02:10PM 12     HAVE ANYTHING YOU WANT TO PREPARE IN WRITING AND YOU FINISH IT

02:10PM 13     THIS EVENING, I APPRECIATE YOU SENDING IT OVER SO I CAN LOOK AT

02:10PM 14     IT BEFORE TOMORROW MORNING, AND THEN WE'LL HAVE A FULLER

02:10PM 15     DISCUSSION ABOUT THIS TOMORROW.

02:10PM 16          MR. WADE?

02:10PM 17          MR. WADE:  YOUR HONOR, IN LIGHT OF SOME OF THE

02:10PM 18     ISSUES THAT CAME UP, IF THERE'S ANYTHING THAT -- ANY CASE LAW

02:10PM 19     THAT WE THINK WOULD SHED ANY FURTHER LIGHT ON THIS, WE'LL FILE

02:11PM 20     IT AS WELL.  THIS WAS NOT A SUBMISSION THAT WAS SPECIFIC TO

02:11PM 21     THESE EMAILS.  IT WAS JUST A BENCH MEMO THAT WE HAD ON BUSINESS

02:11PM 22     RECORDS.

02:11PM 23          IF IN LIGHT OF SOME OF THE ISSUES THAT THE GOVERNMENT HAS

02:11PM 24     RAISED THERE ARE PARTICULAR ITEMS THAT COME UP, WE'LL FILE THEM

02:11PM 25     WITH THE COURT AND GIVE THEM TO THE GOVERNMENT AS QUICKLY AS WE

02:11PM 1    CAN.

02:11PM 2            THE COURT:  YOU'RE SAYING IN RESPONSE TO WHAT THEY

02:11PM 3    FILE?

02:11PM 4            MR. WADE:  THEY RAISED, FOR EXAMPLE, THE AGENCY

02:11PM 5    ISSUE WHICH IS SUGGESTING THAT A WHOLE SLEW OF DOCUMENTS CAN

02:11PM 6    COME IN.  IF WE THINK THERE'S SOME CASE LAW ON POINT, WE MAY

02:11PM 7    SUBMIT A ONE PAGER OR A VERY SHORT SUBMISSION JUST IN THE

02:11PM 8    SPIRIT OF GIVING EVERYONE NOTICE AS QUICKLY AS POSSIBLE.

02:11PM 9            THE COURT:  WELL, LET'S -- I DON'T KNOW WHAT THE --

02:11PM 10   WE'VE TALKED ABOUT A BUSINESS RECORD EXCEPTION, WE'VE TALKED

02:11PM 11   ABOUT VICARIOUS ADMISSIONS, WE'VE TALKED ABOUT, I THINK, AN

02:11PM 12   AGENCY TYPE OF THEORY FOR ADMISSION UNDER 801(D)(2) AND PERHAPS

02:11PM 13   (E) AND PERHAPS (D), PERHAPS (C), IF YOU WANT TO LOOK AT THOSE.

02:12PM 14   I THINK THIS IS WHAT WE TALKED ABOUT IN OUR DISCUSSION.  THERE

02:12PM 15   MIGHT BE ALTERNATIVE WAYS THAT THIS COULD BE AT LEAST ARGUABLY

02:12PM 16   ADMITTED.  SO IF THERE'S GOING TO BE DISCUSSION ABOUT THAT, I'M

02:12PM 17   HAPPY TO RECEIVE YOUR COMMENTS.

02:12PM 18           MR. WADE:  AND I'M NOT SUGGESTING -- WE WOULDN'T

02:12PM 19   FILE A MOTION THAT WOULD REQUIRE A RULING OR ANYTHING TO THAT

02:12PM 20   EFFECT.  IT'S JUST THAT IF WE NOTE SOME AUTHORITY, WE'LL BRING

02:12PM 21   IT TO EVERYONE'S ATTENTION SO THEY HAVE AS MUCH NOTICE AS

02:12PM 22   POSSIBLE.

02:12PM 23           THE COURT:  OKAY.  ANYTHING FURTHER?

02:12PM 24           MR. BOSTIC:  NOT ON THIS ISSUE.

02:12PM 25           THE COURT:  ANYTHING FROM YOUR SIDE?

02:12PM  1                    MR. WADE:  NO, YOUR HONOR.

02:12PM  2                    THE COURT:  ALL RIGHT.  HAVE A GOOD EVENING.

02:12PM  3       THANKS.

02:12PM  4            (COURT ADJOURNED AT 2:12 P.M.)

         5

         6

         7

         8

         9

        10

        11

        12

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

1

2

3                     CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8     UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9     CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10    HEREBY CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16         _____
           IRENE RODRIGUEZ, CSR, CRR
           CERTIFICATE NUMBER 8076
17

18

19         _____
           LEE-ANNE SHORTRIDGE, CSR, CRR
           CERTIFICATE NUMBER 9595
20

21         DATED:  SEPTEMBER 14, 2021

22

23

24

25