1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                        SAN JOSE DIVISION

5

    UNITED STATES OF AMERICA,          )   CR-18-00258-EJD
6                                       )
                     PLAINTIFF,         )   SAN JOSE, CALIFORNIA
7                                       )
              VS.                       )   VOLUME 10
8                                       )
    ELIZABETH A. HOLMES,                )   SEPTEMBER 22, 2021
9                                       )
                     DEFENDANT.         )   PAGES 1450 - 1685
10   _____    )

11
                     TRANSCRIPT OF TRIAL PROCEEDINGS
12              BEFORE THE HONORABLE EDWARD J. DAVILA
                   UNITED STATES DISTRICT JUDGE
13
    A P P E A R A N C E S:
14
    FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
15                         BY:  JOHN C. BOSTIC
                                JEFFREY B. SCHENK
16                         150 ALMADEN BOULEVARD, SUITE 900
                           SAN JOSE, CALIFORNIA 95113
17
                           BY:  ROBERT S. LEACH
18                              KELLY VOLKAR
                           1301 CLAY STREET, SUITE 340S
19                         OAKLAND, CALIFORNIA 94612

20        (APPEARANCES CONTINUED ON THE NEXT PAGE.)

21
    OFFICIAL COURT REPORTERS:
22                              IRENE L. RODRIGUEZ, CSR, RMR, CRR
                                CERTIFICATE NUMBER 8074
23                              LEE-ANNE SHORTRIDGE, CSR, CRR
                                CERTIFICATE NUMBER 9595
24
         PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25            TRANSCRIPT PRODUCED WITH COMPUTER

```
 1      A P P E A R A N C E S: (CONT'D)

 2

 3      FOR DEFENDANT HOLMES:   WILLIAMS & CONNOLLY LLP
                                BY:  KEVIN M. DOWNEY
 4                                   LANCE A. WADE
                                     KATHERINE TREFZ
 5                                   J.R. FLEURMONT
                                     RICHARD CLEARY
 6                              725 TWELFTH STREET, N.W.
                                WASHINGTON, D.C. 20005
 7
                                LAW OFFICE OF JOHN D. CLINE
 8                              BY:  JOHN D. CLINE
                                ONE EMBARCADERO CENTER, SUITE 500
 9                              SAN FRANCISCO, CALIFORNIA 94111

10
        ALSO PRESENT:          FEDERAL BUREAU OF INVESTIGATION
11                             BY:  ADELAIDA HERNANDEZ

12                             OFFICE OF THE U.S. ATTORNEY
                               BY:  LAKISHA HOLLIMAN, PARALEGAL
13                                  MADDI WACHS, PARALEGAL

14                             WILLIAMS & CONNOLLY
                               BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL
15
                               TBC
16                             BY:  BRIAN BENNETT, TECHNICIAN

17

18

19

20

21

22

23

24

25
```

1452

INDEX OF PROCEEDINGS

GOVERNMENT'S:

**JUSTIN OFFEN**
DIRECT EXAM BY MR. LEACH              P. 1473
DIRECT EXAM BY MR. LEACH (RES.)      P. 1664
CROSS-EXAM BY MS. TREFZ              P. 1676

**JAMES MATTIS**
DIRECT EXAM BY MR. BOSTIC            P. 1522
CROSS-EXAM BY MR. DOWNEY             P. 1600
REDIRECT EXAM BY MR. BOSTIC          P. 1656

<pre>
 1                        INDEX OF EXHIBITS

 2
                                  IDENT.       EVIDENCE
 3        GOVERNMENT'S:

 4        5387B, PAGE 1                          1499
          5387B, PAGE 2                          1500
 5        5387B, PAGE 3                          1501
          5387B, PAGE 4                          1502
 6        5387B, PAGE 5                          1503
          5387B, PAGE 6                          1505
 7        5387B, PAGE 7                          1506
          5387B, PAGE 8                          1507
 8        5387B, PAGE 10                         1510
          5387B, PAGE 11                         1512
 9        5387B, PAGE 12                         1513
          5404                                   1527
10        5409                                   1536
          5407                                   1547
11        1106                                   1549
          1172A                                  1554
12        1776                                   1570
          4196                                   1575
13        5408                                   1580
          2611                                   1581
14        4553                                   1584
          2932                                   1592
15        5387B, PAGE 13                         1664
          5387B, PAGES 14 - 17                   1666
16        5387B, PAGE 18                         1668
          5387B, PAGE 19                         1669
17        5387B, PAGES 20 - 21                   1669
          5387B, PAGES 22 - 30                   1671
18        5387B (REDACTED)                       1675
          5387A                                  1677
19
          DEFENDANT'S:
20

21        10507                                  1604
          10520A & B                             1608
22        10516                                  1618
          10509                                  1622
23        10510                                  1624
          10506                                  1637
24        10523                                  1640
          10512                                  1649
25        7653                                   1652
          10524                                  1656
</pre>

|          |    |                                                                          |
|----------|----|--------------------------------------------------------------------------|
|          | 1  | SAN JOSE, CALIFORNIA                    SEPTEMBER 22, 2021                |
|          | 2  | P R O C E E D I N G S                                                    |
| 08:41AM  | 3  | (COURT CONVENED AT 8:41 A.M.)                                            |
| 08:41AM  | 4  | (JURY OUT AT 8:41 A.M.)                                                  |
| 08:41AM  | 5  | THE COURT:  WE ARE BACK ON THE RECORD.  ALL COUNSEL                      |
| 08:41AM  | 6  | ARE PRESENT.  MS. HOLMES IS PRESENT.                                     |
| 08:41AM  | 7  | WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.                               |
| 08:41AM  | 8  | I UNDERSTAND COUNSEL WANTED TO SPEAK ABOUT SOME MATTERS                  |
| 08:41AM  | 9  | BEFORE WE BRING THE JURY IN?                                             |
| 08:41AM  | 10 | MS. TREFZ:  YES, YOUR HONOR, THE TEXT MESSAGES THAT                      |
| 08:41AM  | 11 | WE WERE TALKING ABOUT YESTERDAY.                                         |
| 08:41AM  | 12 | THE COURT:  YES.                                                         |
| 08:41AM  | 13 | MS. TREFZ:  GOOD MORNING, YOUR HONOR.                                    |
| 08:41AM  | 14 | KATIE TREFZ FOR MS. HOLMES.                                              |
| 08:42AM  | 15 | WE HAD A DISCUSSION THAT I'M SURE YOUR HONOR REMEMBERS                   |
| 08:42AM  | 16 | FROM YESTERDAY ABOUT THE TEXT MESSAGES THAT THE GOVERNMENT              |
| 08:42AM  | 17 | SEEKS TO INTRODUCE TODAY THROUGH JUSTIN OFFEN WHO IS THE FIRST          |
| 08:42AM  | 18 | WITNESS THIS MORNING.                                                    |
| 08:42AM  | 19 | THE GOVERNMENT PROVIDED US YESTERDAY EARLY EVENING WITH                 |
| 08:42AM  | 20 | THE ADDITIONAL OR KIND OF THE UPDATED LIST OF TEXT MESSAGES             |
| 08:42AM  | 21 | THAT THEY ANTICIPATE SEEKING TO INTRODUCE.                               |
| 08:42AM  | 22 | LATE IN THE -- LATE AT NIGHT WE PROVIDED OUR OBJECTIONS TO              |
| 08:42AM  | 23 | THEM AND SUGGESTED DESIGNATIONS FOR COMPLETENESS.  THERE ARE A          |
| 08:42AM  | 24 | NUMBER OF TEXT MESSAGES WHERE THERE ARE NO OBJECTIONS AND NO            |
| 08:42AM  | 25 | COMPLETENESS DESIGNATION.  I THINK, YOU KNOW, THOSE WE WOULD            |

08:42AM 1   HAVE NO OBJECTION TO THE GOVERNMENT INTRODUCING TODAY.

08:42AM 2        THERE ARE A NUMBER WHERE THERE ARE SUGGESTIONS FOR

08:43AM 3   COMPLETENESS OR REQUESTS THAT WE WOULD MAKE FOR ADDITIONAL

08:43AM 4   MESSAGES TO BE INCLUDED FOR COMPLETENESS, AND THEN THERE ARE A

08:43AM 5   NUMBER WHERE WE HAVE 401, 403, 404(B), AND ONE WHERE WE HAVE AN

08:43AM 6   805 ARGUMENT.

08:43AM 7        ADDITIONALLY -- AND SO FOR THOSE, WE WOULD SUGGEST THAT --

08:43AM 8   AGAIN, THIS WITNESS IS NOT SOMEBODY WHO CAN RESOLVE THOSE

08:43AM 9   BECAUSE HE'S NOT A FACT WITNESS.  HE'S A WITNESS WHO, YOU KNOW,

08:43AM 10  PUT THESE MESSAGES TOGETHER AND COLLECTED THEM AND PUT THEM

08:43AM 11  TOGETHER IN A DATABASE OR IN A SPREADSHEET.

08:43AM 12       SO WE DON'T THINK IT'S REALLY AN EFFICIENT WAY TO DEAL

08:43AM 13  WITH THOSE ON THE FLY.  WE WOULD SUGGEST THAT FOR THOSE -- I'M

08:43AM 14  HAPPY TO TALK THROUGH THEM NOW, BUT, FRANKLY, WE THOUGHT IT

08:43AM 15  WOULD BE MORE EFFICIENT FOR THE GOVERNMENT TO SIMPLY PUT ON THE

08:43AM 16  ONES WHERE THERE'S NO OBJECTION AND THE WITNESS PRESUMABLY WILL

08:44AM 17  LAY THE FOUNDATION FOR AUTHENTICATION, WHICH I BELIEVE IS THE

08:44AM 18  REAL REASON WHY THIS WITNESS IS HERE.  THAT'S WHAT WE WOULD

08:44AM 19  SUGGEST.

08:44AM 20       I'M HAPPY TO PROVIDE TO THE COURT WHAT WE HAVE PROVIDED TO

08:44AM 21  THE GOVERNMENT LAST NIGHT WITH RESPECT TO THE INDIVIDUAL

08:44AM 22  OBJECTIONS SO THE COURT HAS A SENSE.  BUT THAT'S WHERE WE ARE

08:44AM 23  THIS MORNING.

08:44AM 24       THE COURT:  OKAY.  THANK YOU.

08:44AM 25       I THINK YESTERDAY WE TALKED ABOUT AUTHENTICITY, AND I WAS

08:44AM 1    LED TO BELIEVE THERE WON'T BE ANY DISCUSSION ABOUT OR

08:44AM 2    OBJECTIONS ABOUT AUTHENTICITY.  AUTHENTICATION, THAT'S NOT AN

08:44AM 3    ISSUE AS TO THESE, OR IS IT?

08:44AM 4            MS. TREFZ:  IT'S NOT AN ISSUE AS TO THE INDIVIDUAL

08:44AM 5    MESSAGES.  WE WILL HAVE A QUESTION FOR THE WITNESS ABOUT WHAT

08:44AM 6    DIFFERENT COLUMNS MEAN IF THEY'RE NOT ADDRESSED BY THE

08:44AM 7    GOVERNMENT.

08:44AM 8        BUT, YES, THERE WILL BE NO ISSUE WITH RESPECT TO

08:44AM 9    AUTHENTICATION.

08:44AM 10           THE COURT:  OKAY.  OKAY.

08:44AM 11       MR. LEACH?

08:45AM 12           MR. LEACH:  YOUR HONOR, WE WANT TO DISPLAY ALL OF

08:45AM 13   THE TEXT MESSAGES THAT WE PROPOSE TO THE DEFENSE TODAY.  WE

08:45AM 14   THINK THE FOUNDATION HAS BEEN LAID FOR ALL OF THE TEXTS THAT

08:45AM 15   WE'VE TALKED ABOUT.  THIS WITNESS DOESN'T KNOW THE SUBSTANCE,

08:45AM 16   BUT HE CAN TALK ABOUT THE DATE, AND I THINK IT'S IMPORTANT TO

08:45AM 17   DISPLAY TO THE JURY AS THEY'RE COMING IN AT LEAST FOR THESE.

08:45AM 18       I UNDERSTAND THE OBJECTION -- WITH RESPECT TO THE RULE OF

08:45AM 19   COMPLETENESS, I THINK THERE ARE SEVEN STRINGS WHERE THERE'S A

08:45AM 20   DISPUTE ABOUT WHETHER THOSE TEXTS ARE NECESSARY FOR

08:45AM 21   COMPLETENESS BETWEEN US.

08:45AM 22       I'M HAPPY TO GO THROUGH THOSE NOW OR USE THE DEFENSE

08:45AM 23   PROPOSED EXHIBIT AND YOUR HONOR CAN DECIDE IN THE MOMENT.

08:45AM 24       I ALSO URGE THE COURT TO TAKE UP THE 401 AND 403

08:45AM 25   OBJECTIONS NOW BECAUSE, EITHER OUTSIDE OF THE PRESENCE OF THE

08:45AM 1    JURY OR AS THEY'RE DISPLAYED WITH MR. OFFEN, BECAUSE OUR TRIAL

08:45AM 2    TIME IS PRECIOUS.

08:46AM 3              THE COURT:  RIGHT.

08:46AM 4              MR. LEACH:  WE'VE PLANNED ON PUTTING THESE IN

08:46AM 5    THROUGH MR. OFFEN, AND THERE'S BEEN A LOT OF MOTION PRACTICE

08:46AM 6    AROUND THIS AND I THINK THE TIME HAS COME, THEY'RE EITHER

08:46AM 7    RELEVANT OR THEY ARE NOT.

08:46AM 8        SO WE WOULD URGE THE COURT TO HEAR AND RESOLVE THE

08:46AM 9    OBJECTIONS AS HE'S TESTIFYING.

08:46AM 10       IF WE WANT TO TAKE IT UP NOW, WE'RE PREPARED TO DO THAT,

08:46AM 11   TOO.  I THINK MOST OF THESE OBJECTIONS CAN BE RESOLVED

08:46AM 12   EFFICIENTLY EITHER NOW OR IN THE MOMENT AS HE'S TESTIFYING.

08:46AM 13             THE COURT:  WELL, THANK YOU.  IT'S TEN TO 9:00 NOW.

08:46AM 14   I WAS TOLD THIS WOULDN'T TAKE LONG AND THAT'S WHY WE WOULD COME

08:46AM 15   OUT AT 8:45 OR 8:30 OR 7:00 A.M. TO RESOLVE THIS.

08:46AM 16       WHAT IS THE UNIVERSE OF DOCUMENTS THAT ARE IN DISPUTE?  IS

08:46AM 17   THIS SOMETHING THAT WE CAN REALISTICALLY DO IN TEN MINUTES?

08:46AM 18             MR. LEACH:  I DON'T KNOW IF WE CAN GET THROUGH --

08:46AM 19   IT'S THE DEFENSE OBJECTION SO I'M NOT SURE.  I THINK HOPE

08:46AM 20   SPRINGS ETERNAL, AND WE MIGHT BE ABLE TO BAT SOME OF THEM OUT.

08:46AM 21             THE COURT:  WELL, SHOULD I RECEIVE A LIST OF THESE

08:47AM 22   TO LOOK AT OR HOW WOULD YOU LIKE ME TO --

08:47AM 23             MS. TREFZ:  I'M HAPPY TO PROVIDE WHAT WE PROVIDED TO

08:47AM 24   THE GOVERNMENT AS WELL AS OUR PROPOSAL FOR, YOU KNOW, TO THE

08:47AM 25   EXTENT THAT THE COURT OVERRULES OUR OBJECTIONS.  SO I'M HANDING

```
08:47AM   1        UP NOW --

08:47AM   2                    THE COURT:  OKAY.  THANK YOU.

08:47AM   3            IS THIS YOUR NEXT WITNESS?

08:47AM   4                    MR. LEACH:  THIS IS OUR NEXT WITNESS, YOUR HONOR.

08:47AM   5                    MS. TREFZ:  AND, YOUR HONOR, I WOULD JUST NOTE THAT

08:47AM   6        ALTHOUGH THESE ISSUES HAVE BEEN PENDING FOR A LONG TIME, AS I

08:47AM   7        NOTED THE OTHER DAY, THE GOVERNMENT HAD, OR YESTERDAY, THE

08:48AM   8        GOVERNMENT ONLY PROVIDED US WITH THE IDENTIFICATION OF THE

08:48AM   9        MESSAGES THAT THEY WANTED TO ACTUALLY INTRODUCE ON MONDAY NIGHT

08:48AM  10        OR ON MONDAY AFTERNOON.

08:48AM  11            AND, YOU KNOW, WE HAD ASKED FOR THAT, YOU KNOW, AS

08:48AM  12        EARLY -- YOU KNOW, MANY WEEKS AGO.

08:48AM  13                    THE COURT:  THAT'S OKAY.  WE DON'T HAVE TO DO THAT.

08:48AM  14                    MS. TREFZ:  OKAY.

08:48AM  15                    THE COURT:  THAT'S OKAY.

08:48AM  16            (PAUSE IN PROCEEDINGS.)

08:48AM  17                    THE COURT:  I SEE -- IF YOU CAN JUST HELP ME,

08:48AM  18        MS. TREFZ, IN THE DESIGNATIONS FOR COMPLETIONS THERE ARE

08:48AM  19        NUMBERS THERE.  WHAT DO THOSE INDICATE?

08:48AM  20                    MS. TREFZ:  THOSE MATCH WITH THE FIRST COLUMN,

08:49AM  21        YOUR HONOR, THE RECORD NUMBER, AND THE ENDING NUMBER ON --

08:49AM  22                    THE COURT:  ARE THOSE ADDITIONAL TEXTS THAT YOU

08:49AM  23        WOULD LIKE TO ADD?

08:49AM  24                    MS. TREFZ:  CORRECT, YOUR HONOR.

08:49AM  25            SO IN THE RECORD -- THE WAY THAT THIS SHEET IS LAID OUT IS
```

08:49AM  1      THAT YOU HAVE PAGE, DATE, RECORD COLUMN BEGIN, RECORD COLUMN

08:49AM  2      END, THOSE ARE DESIGNATIONS PROVIDED BY THE GOVERNMENT.

08:49AM  3           THEN WE HAVE IDENTIFIED OUR ADDITIONAL DESIGNATIONS FOR

08:49AM  4      COMPLETENESS, WHICH ARE INCLUDED IN THE PACKET SO YOU CAN SEE

08:49AM  5      THE FULL SET.

08:49AM  6                THE COURT:  IN THIS PACKET (INDICATING)?

08:49AM  7                MS. TREFZ:  CORRECT.

08:49AM  8           TO THE EXTENT THAT THE GOVERNMENT HAS NO OBJECTION TO OUR

08:49AM  9      COMPLETENESS DESIGNATIONS, I THINK THERE ARE A LIMITED

08:49AM 10      NUMBER -- 1, 2, 3, 4 -- THERE ARE MAYBE 14 TEXT MESSAGES WHERE

08:49AM 11      WE HAVE A 401, 403, ET CETERA, OBJECTION.

08:49AM 12                THE COURT:  OKAY.  SO DO I -- SHOULD I KNOW THEN

08:50AM 13      YOUR STANDING AS TO THE COMPLETENESS DESIGNATIONS, MR. LEACH?

08:50AM 14                MR. LEACH:  YES, YOUR HONOR.

08:50AM 15           ON ROWS 67 THROUGH 69 THE GOVERNMENT OBJECTS TO THE

08:50AM 16      INCLUSION OF TEXT 19895 IN THE SECOND ROW THROUGH 19914.  THE

08:50AM 17      REMAINDER IN THAT BOX ARE FINE.

08:50AM 18           IN ROWS 185 --

08:50AM 19                MS. TREFZ:  SORRY, MR. LEACH.  DO YOU MIND SAYING

08:50AM 20      THAT ONE MORE TIME?

08:50AM 21                MR. LEACH:  SURE.  THROUGH ROWS 67 THROUGH 69, THE

08:50AM 22      GOVERNMENT OBJECTS TO 19895 THROUGH 19914.

08:50AM 23           IN ROWS 185, THE GOVERNMENT OBJECTS TO THE ADDITION OF ALL

08:51AM 24      OF THE MESSAGES WITH THE EXCEPTION OF 31764, 31765, 31760, AND

08:51AM 25      31762.

08:51AM  1          IN ROWS 220, THE GOVERNMENT OBJECTS TO THE TWO DESIGNATED

08:51AM  2     TEXTS 34230 AND 34231.

08:51AM  3          IN ROW 221, THE GOVERNMENT OBJECTS TO THE ADDITION OF ALL

08:51AM  4     OF THE PROPOSED TEXTS.

08:51AM  5          IN ROW 301, THE GOVERNMENT OBJECTS TO THE TWO TEXTS

08:51AM  6     PROPOSED 41902 AND 41903.

08:52AM  7          AND IN ROW 315, THE GOVERNMENT -- STRIKE THAT.  THE

08:52AM  8     GOVERNMENT HAS NO OBJECTION THERE.

08:52AM  9          AND WE DON'T OBJECT TO THE ADDITION OF THE REMAINING TEXTS

08:52AM 10     IN THE FAR RIGHT COLUMN THAT MS. HOLMES HAS DESIGNATED.

08:52AM 11               THE COURT:  OKAY.  THANK YOU.

08:52AM 12          AND THE GOVERNMENT'S OBJECTIONS RELATED TO YOUR FEELING

08:52AM 13     THAT THESE DON'T APPLY TO 106?

08:52AM 14               MR. LEACH:  CORRECT, I DON'T THINK THEY'RE NECESSARY

08:52AM 15     FOR THE RULE OF COMPLETENESS.

08:52AM 16               THE COURT:  OKAY.

08:52AM 17               MR. LEACH:  AND THEY'RE HEARSAY.

08:52AM 18               THE COURT:  OKAY.  AND THESE ARE IDENTIFIED IN THE

08:52AM 19     PACKET THAT YOU GAVE ME?

08:52AM 20               MS. TREFZ:  YES, YOUR HONOR.

08:52AM 21               THE COURT:  IT'S FIVE MINUTES TO 9:00.  WHAT WOULD

08:53AM 22     YOU LIKE ME TO DO?  SHOULD WE KEEP OUR JURY WAITING WHILE WE GO

08:53AM 23     THROUGH THIS?

08:53AM 24               MS. TREFZ:  WE WOULD OBVIOUSLY DEFER TO THE COURT,

08:53AM 25     YOUR HONOR, BUT I THINK THE -- I BELIEVE THAT THE COMPLETENESS

08:53AM 1     ISSUE IS, YOU KNOW, I BELIEVE THAT WE ARE ON SOLID GROUND ON

08:53AM 2     ALL OF THOSE.

08:53AM 3             THE COURT:  OKAY.

08:53AM 4             MS. TREFZ:  IF YOU WOULD LIKE TO --

08:53AM 5             THE COURT:  MS. KRATZMANN, WOULD YOU INFORM OUR JURY

08:53AM 6     THAT WE'RE GOING TO BE DELAYED THIS MORNING?

08:53AM 7             THE CLERK:  YES, YOUR HONOR, I WILL.

08:53AM 8             THE COURT:  THEN I'LL LOOK AT THESE.  DO I HAVE ALL

08:53AM 9     OF THE INFORMATION THAT I NEED FOR THIS DECISION DO YOU THINK?

08:53AM 10           MR. LEACH:  I BELIEVE SO, YOUR HONOR.

08:53AM 11           MS. TREFZ:  I BELIEVE SO, YOUR HONOR.

08:53AM 12           THE COURT:  OKAY.

08:53AM 13           MS. TREFZ:  ON MANY OF THE 401 AND 403 OBJECTIONS,

08:53AM 14     WE JUST DON'T KNOW WHAT THE GOVERNMENT BELIEVES IT'S RELEVANT

08:53AM 15     TO.

08:53AM 16           THE COURT:  SURE.  I'M LOOKING AT THE COMPLETENESS

08:53AM 17     ISSUES NOW AND THAT'S WHAT I'M GOING TO HAVE TO SPEND SOME TIME

08:53AM 18     LOOKING AT.  AND THAT'S ALL IN THIS PACKET?

08:53AM 19           MS. TREFZ:  CORRECT, YOUR HONOR.

08:53AM 20           THE COURT:  GREAT.  OKAY.  THANK YOU.

08:53AM 21     (RECESS FROM 8:53 A.M. UNTIL 9:47 A.M.)

09:47AM 22           THE COURT:  ALL RIGHT.  THANK YOU.  WE'RE BACK ON

09:47AM 23     THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE

09:47AM 24     AGAIN.

09:47AM 25     WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.

09:48AM  1          THANK YOU.  WE TOOK A BREAK AND WENT THROUGH THE PROPOSED

09:48AM  2     SUBMISSIONS THROUGH THE LENS OF 106.  LET ME JUST SAY THAT I

09:48AM  3     KNOW THAT I THINK MS. TREFZ, YOU HAD INDICATED IN ONE OF THESE

09:48AM  4     COLUMNS, OTHER OBJECTIONS, 401, 403, POSSIBLE 404(B).  I DID

09:48AM  5     NOT DO ANY TYPE OF ANALYSIS ON THAT.  I JUST LOOKED AT THE 106

09:48AM  6     CONVERSATION THAT WE HAD.

09:48AM  7          LET'S SEE IF I CAN GUIDE YOU ACCORDINGLY.  ON PAGE 68, I

09:48AM  8     THINK IT MIGHT BE EASIER FOR ME TO TELL YOU I THINK WHAT DOES

09:49AM  9     NOT DEPORT WITH 106, DOES NOT COMPORT, AND, THEREFORE, WOULD

09:49AM 10     NOT BE ADMISSIBLE.

09:49AM 11          ON PAGE 2 -- EXCUSE ME, PAGE 68, THE BOTTOM OF THE PAGE

09:49AM 12     ENDING IN 898 AND 901, THOSE WILL NOT BE PERMITTED.

09:49AM 13          WHEN I INDICATE THIS, EVERYTHING ELSE WOULD.  I'M TELLING

09:49AM 14     YOU WHAT IS NOT GOING TO BE ADMITTED.

09:49AM 15          PAGE 69, 908, 910, 907, 909, 912, 911, AND 914 ARE NOT --

09:49AM 16     WON'T BE ADMITTED UNDER 106.  IT APPEARS TO BE A LACK OF

09:49AM 17     FOUNDATION FOR THOSE, AND THEY'RE NOT TO COME IN UNDER A 106

09:49AM 18     ANALYSIS.

09:49AM 19          NEXT IS PAGE 220.  ON 220 LET ME SAY THAT I WILL ALLOW 230

09:50AM 20     AND 231 FOR 106 PURPOSES.

09:50AM 21          PAGE 221, I WILL ALLOW 271, 273, 275, 272, 270, 269, AND

09:50AM 22     274 UNDER 106.

09:50AM 23          NEXT I BELIEVE IS PAGE 301, PAGE 301.  902 AND 903 WILL BE

09:51AM 24     PERMITTED UNDER 106.

09:51AM 25          I BELIEVE THAT COMPLETES THAT ANALYSIS.

1463

09:51AM  1      AS I SAID, I'M NOT MAKING ANY ANTICIPATORY RULING UNDER

09:51AM  2   401, 403, OR 404(B).  I TRIED TO LOOK AT THE 404(B) AND I

09:51AM  3   COULDN'T SEE IT.  MAYBE YOU WANT TO TELL ME IN ADVANCE,

09:51AM  4   MS. TREFZ, WHAT THAT IS.

09:51AM  5           MS. TREFZ:  I CAN, YOUR HONOR, IF IT'S USEFUL.

09:51AM  6           THE COURT:  LET'S DO THAT.  LET'S KEEP OUR JURY

09:51AM  7   WAITING FOR ONE HOUR.  IT'S NOW FIVE TO 10:00, SO LET'S FINISH

09:51AM  8   THIS CONVERSATION IN FIVE MINUTES.

09:51AM  9           MS. TREFZ:  I CAN DO THAT.

09:52AM 10      YOUR HONOR, THE FIRST 404(B) IS ON 175 TO 176.  LET ME

09:52AM 11   TURN TO THAT.

09:52AM 12           THE COURT:  WHAT PAGE IS THAT ON?

09:52AM 13           MS. TREFZ:  175 TO 176.

09:52AM 14           THE COURT:  OKAY.

09:52AM 15           MS. TREFZ:  WE BELIEVE THIS IS PART OF THE SAME

09:52AM 16   EXCHANGE, AND OUR 404(B) ISSUE HERE, YOUR HONOR, IS THAT THIS

09:52AM 17   SEEMS TO REFER TO "THE WALL STREET JOURNAL" REPORTER, AND

09:52AM 18   ALTHOUGH THERE ARE 404(B) DISCLOSURES ABOUT JOURNALISTS --

09:52AM 19   STATEMENTS TO JOURNALISTS IN CATEGORY 6 OF THE GOVERNMENT'S

09:52AM 20   404(B) DISCLOSURES, THERE IS NO DISCLOSURE ABOUT ANY INTENT TO

09:52AM 21   DECEIVE "THE WALL STREET JOURNAL" REPORTER.  SO THAT'S THE

09:52AM 22   404(B) ISSUE THERE.

09:53AM 23           MR. LEACH:  THE INDICTMENT ALLEGES DECEIT OF

09:53AM 24   REPORTERS, YOUR HONOR.

09:53AM 25      THIS IS INEXTRICABLY INTERTWINED WITH THE SCHEME TO

1464

09:53AM 1    DEFRAUD.  IT APPEARS THAT THE DEFENDANT AND MR. BALWANI ARE

09:53AM 2    TALKING ABOUT MAKING MODIFICATIONS TO A PARTICULAR STORE IN

09:53AM 3    ORDER TO DECEIVE THE REPORTER WHO IS COMING IN.

09:53AM 4        IT'S INEXTRICABLY INTERTWINED AND THIS GOES TO THEIR

09:53AM 5    NOTICE AND KNOWLEDGE AND IT'S PART OF THE SCHEME TO DEFRAUD.

09:53AM 6            THE COURT:  MS. TREFZ, AS TO THE NOTICE ISSUE, IT

09:53AM 7    WOULD SEEM, JUST LOOKING AT IT, IT WOULD SEEM TO BE RELEVANT

09:53AM 8    FOR THAT ISSUE AND NOT NECESSARILY 404(B) IF IT ONLY GOES AS TO

09:53AM 9    THE KNOWLEDGE.

09:53AM 10       AND IT COULD BE CONDITIONALLY ADMITTED FOR THAT PURPOSE AS

09:53AM 11   I'VE DONE IN ANOTHER PIECE OF EVIDENCE.  THAT IS, IT GOES TO

09:54AM 12   THE ISSUE OF NOTICE AND KNOWLEDGE OF THE PARTIES.

09:54AM 13           MS. TREFZ:  NOTICE AND KNOWLEDGE AS TO WHAT,

09:54AM 14   YOUR HONOR?

09:54AM 15           THE COURT:  WELL, AS TO THE CONTENTS OF THIS

09:54AM 16   CONVERSATION.

09:54AM 17       AS YOU SAID, THERE'S A SUGGESTION THAT THERE IS SOMETHING

09:54AM 18   NEGATIVE BY THE PARTIES.  IS THIS CHARACTER EVIDENCE AS TO THEM

09:54AM 19   AND THEIR RELATIONSHIP WITH "THE WALL STREET JOURNAL"?

09:54AM 20           MS. TREFZ:  THAT'S HOW WE READ THE POTENTIAL

09:54AM 21   INFERENCE, YOUR HONOR.

09:54AM 22           THE COURT:  AND WHAT IS YOUR COMMENT AS TO WHETHER

09:54AM 23   OR NOT THIS IS INEXTRICABLY INTERTWINED WITH THE SCHEME, THE

09:54AM 24   CONTINUING SCHEME TO DEFRAUD, WHICH WOULD INCLUDE MISLEADING

09:54AM 25   JOURNALISTS OR OTHER INFORMATION GATHERING SOURCES?

09:54AM  1      MS. TREFZ:  WELL, YOUR HONOR, THE GOVERNMENT

09:54AM  2  IDENTIFIED IN CATEGORY 6 OF ITS 404(B) DISCLOSURES THE ALLEGED

09:55AM  3  ISSUES WITH RESPECT TO JOURNALISTS.

09:55AM  4      SO OUR POSITION IS THAT THEY'VE, YOU KNOW, THEY'VE CHOSEN

09:55AM  5  WHAT THEY WANT TO PUT IN WITH THAT, AND THEY DID NOT IDENTIFY

09:55AM  6  ANYTHING WITH RESPECT TO "THE WALL STREET JOURNAL" REPORTER.

09:55AM  7      THE COURT:  OKAY.

09:55AM  8      MR. LEACH:  I GO BACK TO, YOUR HONOR, THE INDICTMENT

09:55AM  9  ALLEGES DECEIT OF JOURNALISTS.  THIS IS DECEIT OF A JOURNALIST

09:55AM  10  DURING THE SCHEME TO DEFRAUD.

09:55AM  11      NO NOTICE WAS REQUIRED.  I THINK THE DEFENDANT HAS KNOWN

09:55AM  12  AND SEEN THIS COMING FOR A LONG PERIOD OF TIME, SO THERE

09:55AM  13  COULDN'T POSSIBLY BE PREJUDICE.

09:55AM  14      THIS SHOWS THE DEFENDANT'S KNOWLEDGE OF THE CONDITIONS IN

09:55AM  15  THE ARIZONA MARKET, IT SHOWS HER AGREEING AND COORDINATING WITH

09:55AM  16  HER COCONSPIRATOR, SO IT'S EVIDENCE OF THE CONSPIRATORIAL

09:56AM  17  AGREEMENT.

09:56AM  18      THIS IS INEXPLICABLY INTERTWINED WITH EVERYTHING THAT THE

09:56AM  19  GOVERNMENT ALLEGES.  I DON'T SEE HOW 404(B) APPLIES, AND EVEN

09:56AM  20  IF IT DID, IT'S MORE THAN SATISFIED.

09:56AM  21      THE COURT:  SO I DON'T KNOW IF -- I CAN'T SEE YET,

09:56AM  22  BUT MAYBE YOU WANT TO COMMENT ON THIS, MR. LEACH, AS TO WHETHER

09:56AM  23  OR NOT A PRIMA FACIE CASE HAS BEEN SHOWN YET, AND I'M HAPPY TO

09:56AM  24  HEAR FROM YOU ABOUT THAT, AND I'M ALSO CURIOUS AS TO WHETHER OR

09:56AM  25  NOT A PRIMA FACIE CASE CAN BE SHOWN JUST THROUGH THE TEXT

09:56AM 1    MESSAGES AND WHETHER OR NOT YOU'RE SUGGESTING THAT THIS

09:56AM 2    COLLOQUY HERE SUFFICES FOR THAT FOUNDATION.

09:56AM 3          MR. LEACH:  I'M SUGGESTING THAT THE ENTIRETY OF THE

09:56AM 4    TEXTS, YOUR HONOR, SHOW THE CLOSENESS OF THE RELATIONSHIP, THE

09:56AM 5    CONSTANT COMMUNICATION THAT INCLUDES WORK AND INCLUDES NON-WORK

09:56AM 6    MATTERS.

09:56AM 7       SO IT CERTAINLY SHOWS THE CLOSE RELATIONSHIP.

09:56AM 8       I DO THINK THE GOVERNMENT HAS MADE A PRIMA FACIE SHOWING

09:56AM 9    OF THE CONSPIRACY AT THIS POINT THROUGH MS. CHEUNG AND

09:57AM 10   MS. GANGAKHEDKAR.

09:57AM 11      I THINK THE EMAILS SUGGEST THERE IS COORDINATION BETWEEN

09:57AM 12   MR. BALWANI AND MS. HOLMES.  MS. CHEUNG TESTIFIED HOW SHE WENT

09:57AM 13   DIRECTLY TO MR. BALWANI AND DID NOT GO BECAUSE SHE KNEW

09:57AM 14   TYLER SHULTZ WAS GOING TO MS. HOLMES.

09:57AM 15      SO I THINK THERE IS A PRIMA FACIE SHOWING OF A CONSPIRACY.

09:57AM 16      EVEN IN THE ABSENCE OF A CONSPIRATORIAL AGREEMENT,

09:57AM 17   YOUR HONOR, THIS GOES TO HER KNOWLEDGE.  THIS GOES TO HER

09:57AM 18   KNOWLEDGE OF WHAT IS GOING ON IN THE ARIZONA LAB.  IT SHOWS HER

09:57AM 19   ABILITY TO CONTROL ALL OF THAT.  IT SHOWS HER KNOWLEDGE THAT

09:57AM 20   THEY MIGHT NOT BE ABLE TO RUN ALL OF THE TESTS IN A PARTICULAR

09:57AM 21   SERVICE CENTER AND THAT MIGHT BE DISAPPOINTING TO SOMEBODY FROM

09:57AM 22   THE PUBLIC COMING IN.

09:57AM 23      SO EVEN OUTSIDE OF THE CONSPIRACY, I DON'T THINK THAT'S

09:57AM 24   NECESSARY FOR A FINDING HERE.

09:57AM 25      I'D ALSO ADD, BALWANI IS HER COO.  HE'S AN AGENT.  YOU

09:57AM 1    KNOW, HIS STATEMENTS ARE BOTH STATEMENTS OF A COCONSPIRATOR IN

09:58AM 2    FURTHERANCE OF THE CONSPIRACY, AND STATEMENTS OF HER AGENT.  SO

09:58AM 3    THERE'S NO HEARSAY ISSUE.  AND THIS ALL GOES TO NOTICE.

09:58AM 4         MS. TREFZ:  WITH RESPECT TO THE PRIMA FACIE SHOWING,

09:58AM 5    YOUR HONOR, THESE TEXTS ARE SUBSTANTIALLY AFTER, MORE THAN A

09:58AM 6    YEAR AFTER THE ISSUES THAT MS. CHEUNG TESTIFIED TO AND MORE

09:58AM 7    THAN A YEAR AND A HALF AFTER MS. GANGAKHEDKAR LEFT THERANOS.

09:58AM 8    SO I'M NOT SURE THAT YOU CAN JUMP THAT FAR AHEAD.

09:58AM 9         THE COURT:  WELL, ARE THEY IN THE TIMEFRAME OF THE

09:58AM 10   CONSPIRACY AS ALLEGED IN THE INDICTMENT?

09:58AM 11        MS. TREFZ:  YES.

09:58AM 12        THE COURT:  OKAY.  WELL, THAT WOULD SEEM TO -- IF

09:58AM 13   THEY'RE RELEVANT AND THEY'RE ADMISSIBLE FOR THAT PURPOSE, IT

09:58AM 14   WOULD SEEM THAT THE STATEMENTS WOULD COME DURING THE TIME

09:58AM 15   PERIOD OF THE CONSPIRACY, THE EXISTENCE OF THE CONSPIRACY, AND

09:58AM 16   MR. LEACH ARGUES THEY'RE IN FURTHERANCE OF.

09:58AM 17        MS. TREFZ:  I UNDERSTAND HE ARGUES THAT, YOUR HONOR.

09:58AM 18   WE WOULD DISAGREE THAT JUST BECAUSE THEY'RE IN THE TIME

09:58AM 19   PERIOD OF THE CONSPIRACY THEY'RE -- THE ALLEGED CONSPIRACY,

09:59AM 20   THAT YOU CAN EASILY CONNECT 2013 TO 2015.

09:59AM 21   2013, THE LAB HAD NOT EVEN BEEN OPENED.

09:59AM 22        THE COURT:  I THINK THE KEY WORD THERE IS "EASILY."

09:59AM 23   THAT'S THE KEY WORD, CAN IT EASILY BE PROVED?

09:59AM 24   SO LET ME -- I DO THINK THAT THE -- I DON'T SEE THE

09:59AM 25   404(B).  I RESPECT THE ANALYSIS, BUT I THINK THESE WOULD BE

09:59AM 1   ADMISSIBLE FOR A DIFFERENT REASON, TO SHOW NOTICE OF AT LEAST

09:59AM 2   THE LAB PROCEEDINGS HERE.  IT SEEMS THAT THAT'S WHAT THIS

09:59AM 3   COLLOQUY IS ABOUT, AND I'LL SO INSTRUCT THE JURY WITH A

09:59AM 4   LIMITING INSTRUCTION AT THIS POINT, AT THE ADMISSIBILITY POINT.

09:59AM 5        THIS MAY, THERE MAY BE A TIME, IF IT IS CONNECTED UP

09:59AM 6   CONSPIRATORIALLY, THE PARTIES CAN TELL ME YOUR THOUGHTS ON THAT

09:59AM 7   AS WHETHER, AT THE TIME OF FINAL INSTRUCTIONS, THE COURT NEEDS

09:59AM 8   TO ADD A FINAL INSTRUCTION THAT TOUCHES ON THIS OR ANY OTHER

09:59AM 9   INFORMATION, COLLOQUIES, OR CONVERSATIONS THAT MIGHT ALLOW IT

10:00AM 10  TO BE CONSIDERED BY THE JURY FOR SOME OTHER PURPOSE.

10:00AM 11            MS. TREFZ:  UNDERSTOOD, YOUR HONOR.

10:00AM 12            THE COURT:  AND DID YOU -- THERE WAS ANOTHER 404(B),

10:00AM 13  I THINK.

10:00AM 14            MS. TREFZ:  YEAH.  THERE ARE TWO MORE, AND THEY

10:00AM 15  RAISE THE SAME ISSUE.  THOSE ARE AT 220 AND 221.

10:00AM 16       SO JUST DRAWING YOUR ATTENTION TO 220, THERE IS MESSAGE

10:00AM 17  34235.  THERE IS A REFERENCE THERE TO ROCHELLE, AND WE BELIEVE

10:00AM 18  THAT THE GOVERNMENT WOULD CONTEND THAT THAT'S A REFERENCE TO

10:00AM 19  ROCHELLE GIBBONS AND THERE'S BEEN NO 404(B) NOTICE WITH RESPECT

10:00AM 20  TO MS. GIBBONS.

10:01AM 21            MR. LEACH:  YOUR HONOR, THIS TEXT RELATES TO

10:01AM 22  MR. BALWANI AND MS. HOLMES LEARNING THAT A

10:01AM 23  "WALL STREET JOURNAL" REPORTER IS GOING TO WRITE A STORY.

10:01AM 24       THEY'RE SURMISING THAT TYLER SHULTZ AND ADAM ROSENDORFF

10:01AM 25  ARE TWO OF THE SOURCES FOR THE ARTICLE.

1469

10:01AM 1       THEY ARE PLOTTING -- FURTHER DOWN IN 242, IT IS TYLER,

10:01AM 2  ERIKA, AND ADAM -- WE BELIEVE THAT TO BE REFERENCE TO

10:01AM 3  TYLER SHULTZ, ERIKA CHEUNG AND ADAM ROSENDORFF -- AND THIS IS

10:01AM 4  EVIDENCE OF THEIR RETALIATION AGAINST THOSE TWO.

10:01AM 5       I DON'T HAVE THE BENEFIT OF THE 404(B) NOTICE AT HAND, BUT

10:01AM 6  I THINK IT WAS RETALIATION AGAINST EMPLOYEES.

10:01AM 7       I THINK THIS MINOR REFERENCE TO ROCHELLE GIBBONS IS JUST A

10:01AM 8  RED HERRING IN A SEA OF INFORMATION AND DOESN'T WARRANT

10:01AM 9  REDACTION AND FALLS WITHIN THE SCOPE OF THE RETALIATION THAT

10:01AM 10  THE TWO ARE PLOTTING.

10:02AM 11            THE COURT:  THIS IS MR. BALWANI'S EMAIL, OR TEXT,

10:02AM 12  RATHER, EXCUSE ME, TEXT I THINK.

10:02AM 13            MS. TREFZ:  YES.  AND THERE'S A SIMILAR MESSAGE FROM

10:02AM 14  MR. BALWANI ON THE FOLLOWING PAGE AT 34256.

10:02AM 15            THE COURT:  ANY COMMENT ON THAT?

10:02AM 16            MR. LEACH:  YOUR HONOR, IT'S INEXTRICABLY

10:02AM 17  INTERTWINED WITH THE PLOT RELATING TO MR. SHULTZ, MS. CHEUNG,

10:02AM 18  AND MR. ROSENDORFF.  I'M NOT SURE HOW THE ADDITION OF ANOTHER

10:02AM 19  EMPLOYEE REALLY ADDS TO THE ANALYSIS, AND THESE ARE STATEMENTS

10:02AM 20  BY MR. BALWANI.

10:02AM 21       IT GOES TO HER KNOWLEDGE, IT GOES TO HER INTENT, IT GOES

10:02AM 22  TO THE CONSPIRATORIAL AGREEMENT.

10:02AM 23       I FAIL TO SEE ANY PREJUDICE FROM THE INCLUSION OF ANOTHER

10:02AM 24  PERSON THAT THE JURY REALLY HAS NOT EVEN HEARD ABOUT HERE.

10:02AM 25            MS. TREFZ:  JUST TO BE CLEAR, YOUR HONOR,

10:02AM  1      ROCHELLE GIBBONS WAS NOT AN EMPLOYEE OF THERANOS.

10:03AM  2                THE COURT:  OKAY.

10:03AM  3                MS. TREFZ:  OUR REQUEST ON THOSE WOULD BE TO REDACT

10:03AM  4      THE INFORMATION ABOUT ROCHELLE.

10:03AM  5                THE COURT:  JUST THE NAME ITSELF ROCHELLE?

10:03AM  6                MS. TREFZ:  CORRECT.  ON THE SECOND ONE, WE WOULD

10:03AM  7      SUGGEST THE SECOND SENTENCE SHOULD BE REDACTED.

10:03AM  8                THE COURT:  MR. LEACH, ANY OBJECTION TO REDACTING

10:03AM  9      THE SENTENCE?

10:03AM  10               MR. LEACH:  I DON'T OBJECT.  I JUST THINK IT'S

10:03AM  11     UNNECESSARY.  IT'S DIFFICULT TO UNDERSTAND THESE COMMUNICATIONS

10:03AM  12     WITHOUT THE WHOLE CONTEXT, AND THE FACT THAT THEY'RE INCLUDING

10:03AM  13     A THIRD OR FOURTH PERSON IN THEIR RETALIATION SCHEME IS REALLY

10:03AM  14     GETTING TO A LEVEL WHERE I JUST DON'T THINK IT'S NECESSARY.

10:03AM  15               THE COURT:  WELL, I AGREE.  I HAVE TO AGREE WITH

10:03AM  16     YOU.  I DON'T SEE THE ADDITION OF ROCHELLE BEING NECESSARILY

10:03AM  17     PREJUDICIAL, AND I'M STRAINED TO SEE THE 404(B) ANALYSIS HERE.

10:04AM  18          BUT WE'LL JUST REDACT THE NAME ROCHELLE.

10:04AM  19               MS. TREFZ:  THANK YOU.

10:04AM  20               THE COURT:  THAT SHOULD TAKE CARE OF THE ISSUE.

10:04AM  21               MS. TREFZ:  AND THEN I WOULD JUST FLAG, YOUR HONOR,

10:04AM  22     THAT I DON'T BELIEVE THAT THE INFORMATION ABOUT TYLER SHULTZ

10:04AM  23     GOING TO "THE WALL STREET JOURNAL" IS IN THE RECORD YET, AND SO

10:04AM  24     I WOULD SUGGEST THAT SOME OF THIS INFORMATION SHOULD BE -- AND

10:04AM  25     DR. ROSENDORFF HASN'T TESTIFIED EITHER YET.

10:04AM   1        SO I WOULD SUGGEST THAT SOME OF THESE REFERENCES WOULD BE

10:04AM   2   MORE APPROPRIATE TO WAIT ON.

10:04AM   3             THE COURT:  OKAY.  I APPRECIATE THE HEADS UP.

10:04AM   4        SHOULD WE BRING THE JURY IN?

10:04AM   5             MR. LEACH:  YES, YOUR HONOR.

10:04AM   6             THE COURT:  LET'S DO THAT.

10:04AM   7        DO WE NEED TO BREAK AT 11:00?

10:04AM   8             MR. DOWNEY:  I THINK MR. LEACH SAID HE WOULD BE AN

10:05AM   9   HOUR OR AN HOUR AND A QUARTER, AND SO I THINK IF HE COULD GET

10:05AM  10   THROUGH THE DIRECT JUST TO KEEP THINGS MOVING.

10:05AM  11             THE COURT:  OKAY.  THANK YOU.

10:07AM  12        (JURY IN AT 10:07 A.M.)

10:07AM  13             THE COURT:  THANK YOU.  PLEASE BE SEATED.

10:07AM  14        WE ARE BACK ON THE RECORD IN THE UNITED STATES VERSUS

10:07AM  15   ELIZABETH HOLMES CASE.  ALL COUNSEL, MS. HOLMES IS PRESENT.

10:07AM  16   OUR JURY AND ALTERNATES ARE PRESENT.

10:07AM  17        GOOD MORNING, LADIES AND GENTLEMEN.  LET ME APOLOGIZE FOR

10:07AM  18   THE DELAY.  I NEEDED SOME TIME TO TALK TO THESE LAWYERS ABOUT

10:07AM  19   SOME MATTERS THAT CONCERN THE COURT AND THE EVIDENCE IN THE

10:07AM  20   CASE.  I APOLOGIZE THAT I DIDN'T START THAT EARLIER.

10:07AM  21        LET ME ASK YOU THAT QUESTION THAT I PROMISED YOU I WOULD

10:08AM  22   ASK YOU EVERY DAY, AND YOU'RE FAMILIAR WITH IT NOW.

10:08AM  23        I NEED TO KNOW WHETHER ANYONE HERE HAS BEEN EXPOSED TO ANY

10:08AM  24   OUTSIDE MATERIAL, INFORMATION VIA NEWSPAPERS, RADIO, BLOGS OR

10:08AM  25   ANY SOCIAL MEDIA THAT MAY HAVE TOUCHED ON THIS CASE OR ANYTHING

```
10:08AM    1    TO DO WITH IT, INCLUDING CONVERSATIONS WITH OTHER INDIVIDUALS.

10:08AM    2         IF ANYONE HAS BEEN EXPOSED TO THAT, PLEASE RAISE YOUR

10:08AM    3    HAND.  LET ME KNOW.

10:08AM    4         AGAIN, IF YOU WOULD LIKE TO SPEAK PRIVATELY ABOUT THAT, WE

10:08AM    5    CAN DO THAT.

10:08AM    6         THANK YOU.  I SEE NO HANDS.

10:08AM    7         THANK YOU FOR YOUR CONTINUED FIDELITY TO THAT ADMONITION.

10:08AM    8    I APPRECIATE THAT AND THE LAWYERS APPRECIATE THAT.  THANK YOU.

10:08AM    9         LET ME TURN TO THE GOVERNMENT AND ASK YOU IF YOU HAVE

10:08AM   10    ANOTHER WITNESS.

10:08AM   11              MR. LEACH:  WE DO, YOUR HONOR.

10:08AM   12         THE UNITED STATES CALLS JUSTIN OFFEN.

10:09AM   13              THE COURT:  GOOD MORNING.  IF YOU WOULD COME FORTH

10:09AM   14    HERE AND FACE OUR COURTROOM DEPUTY AND RAISE YOUR RIGHT HAND,

10:09AM   15    SHE HAS A QUESTION FOR YOU.

10:09AM   16              THE CLERK:  GOOD MORNING.

10:09AM   17         (GOVERNMENT'S WITNESS, JUSTIN OFFEN, WAS SWORN.)

10:09AM   18              THE WITNESS:  YES.

10:09AM   19              THE COURT:  THANK YOU.  LET ME INVITE YOU TO HAVE A

10:09AM   20    SEAT HERE, SIR.  MAKE YOURSELF COMFORTABLE.  FEEL FREE TO

10:09AM   21    ADJUST THAT CHAIR AND MICROPHONE AS YOU NEED.  I'LL ENCOURAGE

10:09AM   22    YOU TO SPEAK DIRECTLY INTO THE MICROPHONE.

10:09AM   23         WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

10:09AM   24    AND SPELL IT, PLEASE.

10:09AM   25              THE WITNESS:  MAY I TAKE MY MASK OFF?
```

10:09AM   1              THE COURT:  YOUR LAWYER -- EXCUSE ME -- MR. LEACH IS

10:09AM   2    GOING TO ASK YOU QUESTIONS ABOUT THAT.

10:09AM   3              THE WITNESS:  SURE.  MY NAME IS JUSTIN OFFEN.

10:09AM   4              THE COURT:  SPELL IT PLEASE.

10:09AM   5              THE WITNESS:  J-U-S-T-I-N, LAST NAME OFFEN,

10:09AM   6    O-F-F-E-N.

10:09AM   7              THE COURT:  THANK YOU.  COUNSEL.

10:09AM   8                          **DIRECT EXAMINATION**

10:10AM   9    BY MR. LEACH:

10:10AM  10    Q.   MR. OFFEN, IF YOU'RE VACCINATED AND FEEL COMFORTABLE, IT'S

10:10AM  11    OKAY TO TAKE OFF YOUR MASK, AND I CAN DO THE SAME.

10:10AM  12    A.   I AM.

10:10AM  13    Q.   AND WHERE DO YOU WORK?

10:10AM  14    A.   I WORK AT PWC, PRICEWATERHOUSECOOPERS.

10:10AM  15    Q.   AND WHAT IS PRICEWATERHOUSECOOPERS?

10:10AM  16    A.   WE'RE A PROFESSION SERVICES FIRM.  WE HELP COMPANIES --

10:10AM  17    APOLOGIES.

10:10AM  18         WE ARE A PROFESSIONAL SERVICES FIRM.  WE HELP COMPANIES

10:10AM  19    PREPARE FINANCIAL STATEMENTS.  WE HELP THEM WITH AUDIT

10:10AM  20    SERVICES, TAX SERVICES, AND CONSULTING SERVICES.

10:10AM  21    Q.   DO YOU WORK WITHIN A PARTICULAR UNIT OF

10:10AM  22    PRICEWATERHOUSECOOPERS?

10:10AM  23    A.   YES.  MY PRACTICE TEAM IS CALLED INVESTIGATIONS AND

10:10AM  24    FORENSICS.

10:10AM  25    Q.   INVESTIGATION AND FORENSICS.  LET'S TAKE THAT FIRST WORD.

OFFEN DIRECT BY MR. LEACH

10:10AM 1       WHAT IS THE INVESTIGATION PART OF THE INVESTIGATION AND

10:10AM 2 FORENSIC SERVICES UNIT?

10:10AM 3 A.   WE, AGAIN, PROVIDE A MULTITUDE OF SERVICES.  WE ARE WITHIN

10:10AM 4 THE CONSULTING GROUP THAT I OUTLINED EARLIER.  WE TYPICALLY

10:11AM 5 HELP COMPANIES WHO ARE GOING THROUGH INVESTIGATIONS, INTERNAL

10:11AM 6 OR EXTERNAL, TYPICALLY IN RESPONSE TO SOME TYPE OF EVENT THAT

10:11AM 7 HAS OCCURRED.

10:11AM 8       ADDITIONALLY, AS PART OF THE FORENSICS PART OF THAT, WE

10:11AM 9 ALSO HELP COMPANIES PREPARE, MANAGE, STORE, AND ANALYZE LARGE

10:11AM 10 VOLUMES OF DATA.

10:11AM 11 Q.   WHEN YOU SAY YOU HELP COMPANIES RESPOND TO AN EVENT, WHAT

10:11AM 12 TYPE OF EVENTS DO YOU HAVE IN MIND?

10:11AM 13 A.   THE EVENTS VARY.  SOMETIMES IT'S FRAUD RELATED.  SOMETIMES

10:11AM 14 IT'S REGULATORY INQUIRY RELATED.  SOMETIMES IT'S RELATED TO A

10:11AM 15 DEAL, SOME TYPE OF M&A ACTIVITY.

10:11AM 16       IT REALLY VARIES DEPENDING UPON THE COMPANY AND THE TYPE

10:11AM 17 OF ENGAGEMENT THAT WE'RE HIRED FOR.

10:11AM 18 Q.   AND WHEN A CLIENT HIRES YOU TO PERFORM FORENSIC SERVICES,

10:11AM 19 WHAT TYPES OF SERVICES DO YOU PROVIDE FOR CLIENTS?

10:11AM 20 A.   AGAIN, IT'S A COMBINATION OF ACCOUNTING, FINANCIAL

10:11AM 21 SERVICES, AND THEN TECHNOLOGY SERVICES.

10:11AM 22       I WORK IN THE TECHNOLOGY SPACE TYPICALLY RELATED TO

10:11AM 23 PRESERVATION, ANALYSIS, AND PRODUCTION OF SOME TYPE OF DATA AND

10:12AM 24 ANALYTICS EXERCISE.

10:12AM 25 Q.   AND WHAT TYPES OF DATA DO YOU GATHER ON BEHALF OF CLIENTS?

10:12AM  1    DESCRIBE THAT FOR US.

10:12AM  2    A.   IT VARIES DEPENDING ON THE MATTER.  BUT TYPICALLY

10:12AM  3    SPEAKING, THERE ARE TWO LARGE BUCKETS OF DATA THAT WE HELP

10:12AM  4    CLIENTS WITH.

10:12AM  5         THE FIRST IS WHAT I'LL CALL STRUCTURED DATA.  THAT'S

10:12AM  6    THINGS THAT PICTURE WOULD GO INTO A MICROSOFT EXCEL OR SOME

10:12AM  7    TYPE OF SPREADSHEET ROWS AND COLUMNS.  THAT WOULD BE FINANCIAL

10:12AM  8    RECORDS, ACCOUNTS PAYABLE INFORMATION, ACCOUNTS RECEIVABLE

10:12AM  9    INFORMATION, GENERAL LEDGER, THAT TYPE OF DATA.

10:12AM  10        AND THEN THE OTHER LARGE BUCKET THAT WE WORK WITH IS WHAT

10:12AM  11   IS CALLED UNSTRUCTURED DATA, SO THAT WOULD BE WORD DOCUMENTS,

10:12AM  12   WRITTEN PROS, YOU KNOW, LONGER KIND OF VERBAL MESSAGES, THOSE

10:12AM  13   TYPES OF THINGS.

10:12AM  14   Q.   ARE YOU SOMETIMES CALLED UPON TO GATHER EMAIL ON BEHALF OF

10:12AM  15   A CLIENT?

10:12AM  16   A.   YES.

10:12AM  17   Q.   AND DOES THAT FALL IN THE STRUCTURED OR THE UNSTRUCTURED

10:12AM  18   DATA CATEGORY?

10:12AM  19   A.   MOSTLY UNSTRUCTURED.  THERE ARE SOME METADATA RELATED TO

10:13AM  20   EMAIL THAT COULD ALSO BE STRUCTURED.  BUT GENERALLY SPEAKING,

10:13AM  21   EMAIL WOULD BE CONSIDERED UNSTRUCTURED DATA.

10:13AM  22   Q.   AND ARE YOU ALSO ASKED BY CLIENTS TO GATHER, IN CONNECTION

10:13AM  23   WITH GOVERNMENT INVESTIGATIONS, CELL PHONE DATA?

10:13AM  24   A.   YES.

10:13AM  25   Q.   AND DOES THAT FALL IN THE STRUCTURED OR UNSTRUCTURED

10:13AM 1    CATEGORY?

10:13AM 2    A.   SIMILAR TO EMAIL, MOSTLY UNSTRUCTURED.  BUT THERE'S A LOT

10:13AM 3    OF METADATA AGAIN AFFILIATED WITH MESSAGES THAT IS ALSO

10:13AM 4    CONSIDERED SOMETIMES STRUCTURED, OR ACTUALLY SEMI UNSTRUCTURED,

10:13AM 5    WHICH IS A COMBINATION OF THE TWO.

10:13AM 6    Q.   AND WHAT DO YOU MEAN BY "METADATA"?

10:13AM 7    A.   METADATA IS IDENTIFIABLE INFORMATION RELATED TO ELECTRONIC

10:13AM 8    RECORDS.  SO THINKING OF EMAIL OR TEXT MESSAGES, THE TO, FROM,

10:13AM 9    DATES SENT, THOSE KINDS OF THINGS WOULD BE CONSIDERED THE

10:13AM 10   METADATA.

10:13AM 11   Q.   ARE YOU A MEMBER OF ANY PROFESSIONAL ASSOCIATIONS?

10:13AM 12   A.   YES.  I'M A MEMBER OF THE CERTIFIED FRAUD EXAMINERS

10:13AM 13   ASSOCIATION, AND I'M ALSO AN ORACLE CERTIFIED ASSOCIATE.

10:13AM 14   Q.   ARE YOU FAMILIAR WITH A COMPANY CALLED THERANOS?

10:13AM 15   A.   YES.

10:13AM 16   Q.   HOW DID YOU BECOME FAMILIAR WITH THERANOS?

10:14AM 17   A.   IN THE FALL OF 2016 WE WERE RETAINED BY WILMER HALE AND

10:14AM 18   THERANOS.  WE WERE RETAINED BY WILMER HALE LAW FIRM TO ASSIST

10:14AM 19   THEM IN SOME LEGAL PROCEEDINGS THAT THEY WERE WORKING ON WITH

10:14AM 20   THEIR CLIENT, THERANOS.

10:14AM 21   Q.   THE WILMER HALE LAW FIRM, WAS THAT A LAW FIRM THAT YOU

10:14AM 22   WERE FAMILIAR WITH?

10:14AM 23   A.   YES.

10:14AM 24   Q.   AND HOW WERE YOU FAMILIAR WITH THEM?

10:14AM 25   A.   WE WORKED WITH THEM SEVERAL TIMES.

10:14AM  1    Q.   OKAY.  ARE THEY A BIG FIRM?  A SMALL FIRM?  HOW WOULD YOU

10:14AM  2    DESCRIBE THEM?

10:14AM  3    A.   A LARGE FIRM.

10:14AM  4    Q.   OKAY.  AND THERANOS HIRED WILMER HALE, WHO HIRED PWC; IS

10:14AM  5    THAT RIGHT?

10:14AM  6    A.   CORRECT.

10:14AM  7    Q.   AND WHAT WERE YOU HIRED TO DO?

10:14AM  8    A.   THE SCOPE OF SERVICES OUR ENGAGEMENT LETTER WAS TO ASSIST

10:14AM  9    WILMER HALE WITH LITIGATION AND OTHER LEGAL SERVICES FOR THEIR

10:14AM  10   CLIENT, THERANOS.

10:14AM  11   Q.   AND CAN YOU TALK ABOUT THE DIFFERENT TYPES OF -- AND HOW

10:14AM  12   LONG DID YOUR ENGAGEMENT WITH WILMER HALE LAST?

10:14AM  13   A.   WE BEGAN WORK, I BELIEVE, SEPTEMBER OF 2016, AND WE WERE

10:14AM  14   WORKING IN SOME CAPACITY THROUGH TO THE SPRING OF 2019.  BUT

10:15AM  15   THE MAJORITY OF THE WORK WAS IN 2017 AND EARLY 2018.

10:15AM  16   Q.   OKAY.  BETWEEN THAT 2016 AND 2019 TIME PERIOD, DESCRIBE

10:15AM  17   FOR US SOME OF YOUR ASSIGNMENTS.

10:15AM  18   A.   YEAH.  WE DID A COUPLE OF DIFFERENT THINGS.

10:15AM  19        FIRST, WE HELPED THEM DEDUPE AND SCRUB SOME EXISTING DATA

10:15AM  20   THAT THEY WERE USING FROM ANOTHER E-DISCOVERY PROVIDER; AND

10:15AM  21   THEN WE ASSISTED WILMER AND THERANOS WITH SOME REDUCTIONS IN

10:15AM  22   FORCE THAT THERANOS WAS EXECUTING ON; AND THEN WE ALSO ASSISTED

10:15AM  23   THEM WITH ELECTRONIC DISCOVERY SERVICES, WHAT I WOULD CALL THE

10:15AM  24   PRESERVATION OF ELECTRONIC DEVICES OR ASSETS, LAPTOPS,

10:15AM  25   DESKTOPS, AND MOBILE PHONES; AND ULTIMATELY WE HELPED WILMER

10:15AM  1   WITH THE PRODUCTION OF CERTAIN OF THOSE DOCUMENTS FOR WILMER IN

10:15AM  2   RESPONSE TO VARIOUS LEGAL PROCEEDINGS AND REGULATORY INQUIRIES.

10:16AM  3   Q.   WHEN YOU SAY "THE PRODUCTION," WHAT DO YOU MEAN BY THAT?

10:16AM  4   A.   THROUGH THE COURSE OF E-DISCOVERY ENGAGEMENT, IT BEGINS

10:16AM  5   WITH THE IDENTIFICATION AND PRESERVATION OF ELECTRONIC DEVICES,

10:16AM  6   AND THEN WE DO WHAT WE CALL PROCESSING, WHICH HELPS PREPARE

10:16AM  7   THAT INFORMATION IN A WAY IN WHICH HUMANS CAN EASILY REVIEW IT.

10:16AM  8       AND THEN WE GO THROUGH THE REVIEW PROCESS.  ULTIMATELY

10:16AM  9   CERTAIN DOCUMENTS OR MESSAGES ARE IDENTIFIED THAT ARE

10:16AM  10  RESPONSIVE OR ARE RELEVANT TO THE LEGAL INQUIRIES OR LEGAL

10:16AM  11  MATTERS.

10:16AM  12      AND THEN THOSE, AT THE DIRECTION OF COUNSEL, ARE WHAT WE

10:16AM  13  CALL PRODUCED TO WHOMEVER THEY'RE PRODUCING IT TO, WHETHER IN

10:16AM  14  THIS CASE IT WAS THE S.E.C. OR THE DOJ OR SOME OTHER LEGAL

10:16AM  15  MATTERS.

10:16AM  16  Q.   AND DID YOU HAVE A SENSE OF WHO WILMER HALE, ON BEHALF OF

10:16AM  17  THERANOS, WAS PRODUCING DOCUMENTS TO?

10:16AM  18  A.   APOLOGIES.  ONLY TO THE EXTENT IN WHICH THEY SHARED WITH

10:16AM  19  US KIND OF THE NAME OF THE MATTER.  SO, FOR EXAMPLE, WE

10:16AM  20  PRODUCED DOCUMENTS WE KNEW THAT WERE RELATED TO AN S.E.C.

10:17AM  21  INQUIRY.  WE PRODUCED DOCUMENTS THAT WERE IN RESPONSE TO A DOJ

10:17AM  22  INQUIRY.  BUT THAT WAS THE EXTENT OF OUR KNOWLEDGE OF WHAT IT

10:17AM  23  WAS.

10:17AM  24  Q.   OKAY.  DID YOU DO ALL OF THIS WORK YOURSELF?

10:17AM  25  A.   NO.

10:17AM  1     Q.   DID YOU HAVE A TEAM?

10:17AM  2     A.   YES.

10:17AM  3     Q.   AND HOW BIG WAS YOUR TEAM?

10:17AM  4     A.   IT VARIED THROUGHOUT THE TWO AND A HALF OR SO YEARS THAT

10:17AM  5     WE WERE WORKING.  I WOULD SAY WE HAD A CORE TEAM OF ABOUT 15 TO

10:17AM  6     20 THAT WERE INVOLVED FOR THE MOST PART.

10:17AM  7          AND THEN WE ENGAGED, FOR EXAMPLE, IN THE REDUCTION IN

10:17AM  8     FORCE ACTIVITIES, WE BROUGHT IN ADDITIONAL TEAM MEMBERS.  I

10:17AM  9     THINK THE LARGEST WE EVER HAD WAS ABOUT 40 AT ONE TIME, BUT

10:17AM  10    THAT WAS FOR THE SAKE OF A WEEK'S EXERCISE.

10:17AM  11         IT WAS PRETTY MUCH THE 15 TO 20.

10:17AM  12    Q.   AND DO YOU HAVE AN APPROXIMATION OF HOW MANY HOURS PWC

10:17AM  13    SPENT ON THIS ENGAGEMENT?

10:17AM  14    A.   OVER 10,000 HOURS.

10:17AM  15    Q.   AND DO YOU HAVE A SENSE OF HOW MUCH PWC BILLED FOR THIS

10:17AM  16    ENGAGEMENT?

10:17AM  17    A.   YES.

10:17AM  18    Q.   AND IS IT MORE THAN A MILLION DOLLARS?

10:17AM  19    A.   YES.

10:17AM  20         MS. TREFZ:  OBJECTION, YOUR HONOR.  RELEVANCE.

10:17AM  21         THE COURT:  OVERRULED.

10:17AM  22    BY MR. LEACH:

10:17AM  23    Q.   IS IT MORE THAN A MILLION DOLLARS?

10:18AM  24    A.   YES.

10:18AM  25    Q.   AND IS IT MORE THAN 5 MILLION?

10:18AM 1    A.    YES.

10:18AM 2    Q.    PRIOR TO AUGUST OF 2018, WHO WAS PAYING PWC'S FEES?

10:18AM 3    A.    THERANOS.

10:18AM 4    Q.    AND AFTER THE AUGUST TIME PERIOD, WERE YOU RETAINED BY

10:18AM 5    ANOTHER COMPANY CALLED SHERWOOD PARTNERS?

10:18AM 6    A.    YES, ALTHOUGH WE WERE RETAINED IN DECEMBER OF 2018 BY

10:18AM 7    THEM.

10:18AM 8    Q.    AND WHAT WAS SHERWOOD PARTNERS?

10:18AM 9    A.    THEY WERE THE ORGANIZATION WHICH TOOK OVER THE INSOLVENCY

10:18AM 10   OF THERANOS AS I UNDERSTAND IT.

10:18AM 11   Q.    I WANT TO FOCUS ON YOUR WORK PRIOR TO AUGUST OF 2018 IF WE

10:18AM 12   COULD, PARTICULARLY AS IT RELATES TO YOUR COLLECTION,

10:18AM 13   PRESERVATION AND COLLECTION OF EVIDENCE.

10:18AM 14        DO YOU HAVE THAT TIME PERIOD AND SUBJECT IN MIND?

10:18AM 15   A.    SURE.

10:18AM 16   Q.    OKAY.  IN CONNECTION WITH YOUR ASSIGNMENT ON BEHALF OF

10:18AM 17   WILMER HALE AND THERANOS, DID PWC GATHER THERANOS DIGITAL

10:18AM 18   DEVICES THAT WERE ASSIGNED TO ELIZABETH HOLMES?

10:18AM 19   A.    YES.

10:18AM 20   Q.    AND WHAT DID PWC DO?

10:19AM 21   A.    WE IMAGED, AGAIN, TOOK FORENSIC COPIES OF SIX OF HER

10:19AM 22   ASSETS.

10:19AM 23   Q.    AND WHEN YOU SAY "ASSETS," WHAT DO YOU MEAN?

10:19AM 24   A.    THERE WERE TWO DESKTOPS, THREE LAPTOPS, AND ONE MOBILE

10:19AM 25   PHONE.

10:19AM 1    Q.   AND WHERE DID PWC DO THIS?

10:19AM 2    A.   VARYING PLACES.   THESE DID NOT ALL OCCUR AT ONE TIME.

10:19AM 3    THIS TOOK PLACE OVER ABOUT A YEAR AND A HALF-ISH TIMELINE FROM,

10:19AM 4    AGAIN, LATE 2016 INTO EARLY 2018.

10:19AM 5        BUT THE INITIAL ONES THAT WE IMAGED WERE DONE AT

10:19AM 6    WILMER HALE'S OFFICES IN PALO ALTO, WHICH WAS RIGHT DOWN THE

10:19AM 7    STREET FROM THERANOS'S OFFICES IN PALO ALTO.

10:19AM 8    Q.   AND WERE YOU PRESENT FOR SOME OF THE IMAGING?

10:19AM 9    A.   YES.

10:19AM 10   Q.   AND FOR THOSE OF US NOT IN THE E-DISCOVERY BUSINESS, WHAT

10:19AM 11   IS IMAGING?

10:19AM 12   A.   SO IT'S THE USE OF FORENSIC SOFTWARE TO TAKE WHAT WE CALL

10:19AM 13   FORENSIC COPIES OF THE ELECTRONIC ASSETS, AND THE KEY PIECE

10:19AM 14   BEING THERE IS THAT THE SOFTWARE OR THE TECHNOLOGY USED TO

10:20AM 15   COMPLETE THE IMAGE, IT PREVENTS ANY OF THE UNDERLYING DATA FROM

10:20AM 16   BEING MANIPULATED OR ALTERED IN ANY CAPACITY.

10:20AM 17       SO WE TAKE WHAT WE CALL A CLEAN FORENSIC COPY, MEANING FOR

10:20AM 18   THE LAPTOPS, A DIRECT BYTE FOR BYTE COPY OF EVERY ELEMENT OF

10:20AM 19   THE HARD DRIVE; AND THEN FOR THE MOBILE DEVICES, A LOGICAL COPY

10:20AM 20   OF THE CONTENTS OF THE MOBILE DEVICE.

10:20AM 21   Q.   AND WHAT DID YOU MEAN BY "LOGICAL COPY"?

10:20AM 22   A.   LOGICAL COPY, RATHER THAN TAKING THE UNDERLYING DISK, THE

10:20AM 23   ACTUAL ONES AND ZEROS STORED ON THE DISK, BECAUSE OF THE

10:20AM 24   VARIOUS ENCRYPTION TECHNOLOGY ON THE MOBILE DEVICES, TAKING

10:20AM 25   THAT PURE FORENSIC COPY ISN'T REALLY HELPFUL BECAUSE YOU NEED

OFFEN DIRECT BY MR. LEACH

10:20AM 1    TO THEN HAVE EACH UNDERLYING PASSWORD AND EACH UNDERLYING

10:20AM 2    TECHNOLOGY EVERY TIME TO INTERPRET THAT OR READ THAT, SO YOU

10:20AM 3    TAKE A LOGICAL COPY WHERE THE PASSWORD IS ENTERED INTO THE

10:20AM 4    MOBILE DEVICE AND IT COPIES OFF -- AGAIN, FORENSIC SO THERE'S

10:20AM 5    NO MANIPULATION, NO CHANGING OF METADATA -- EVERY SINGLE FILE

10:21AM 6    AND RECORD THAT IS ON THAT PHONE.

10:21AM 7    Q.   WERE THERE ANY HICCUPS IN THE IMAGING OF THE DEVICES

10:21AM 8    ASSIGNED TO MS. HOLMES?

10:21AM 9    A.   NO, NOT TO MY RECOLLECTION.

10:21AM 10   Q.   OKAY.  AND DID YOU PERSONALLY RETURN ANY OF THE DEVICES

10:21AM 11   THAT PWC GATHERED FROM MS. HOLMES TO HER OR HER ASSISTANT?

10:21AM 12   A.   YES.  WE -- THE INITIAL IMAGE WE TOOK OF HER MOBILE DEVICE

10:21AM 13   IN JANUARY OF 2017 I RETURNED TO HER ASSISTANT.  I RETURNED TO

10:21AM 14   LISA DURKIN, WHO I BELIEVE IS HER ASSISTANT.

10:21AM 15   Q.   SO AFTER PWC COLLECTED AND IMAGED THESE DEVICES, WHAT DID

10:21AM 16   IT DO?

10:21AM 17   A.   SO WE THEN LEVERAGED THAT I REFERENCED EARLIER WHERE ONCE

10:21AM 18   WE DID THE COLLECTION AND PRESERVATION, WE THEN DO THE

10:21AM 19   PROCESSING AND ANY ANALYSIS OR REVIEW THAT IS NEEDED FOR THE

10:21AM 20   PURPOSES OF THIS DEVICE.  WE WERE ASKED BY WILMER TO CREATE A

10:22AM 21   FILE OF ALL OF THE MESSAGES OR CHATS FROM MS. HOLMES'S DIGITAL

10:22AM 22   ASSETS BETWEEN HERSELF AND SUNNY BALWANI.

10:22AM 23       SO THIS WAS ONE OF THE SPREADSHEETS OR OUTPUTS THAT WE

10:22AM 24   CREATED.

10:22AM 25   Q.   DID YOU USE ANY TYPE OF SOFTWARE PRODUCTS TO DO THIS?

10:22AM  1    A.   YES.  SO FOR THE MOBILE DEVICE WE USED A SOFTWARE CALLED

10:22AM  2    AXIOM, AN INDUSTRY RECOGNIZED SOFTWARE WHICH ENABLES YOU TO

10:22AM  3    EFFECTIVELY PARSE OUT CONTENTS OF MOBILE DEVICES OR LAPTOPS

10:22AM  4    WHERE IT CONTAINS CHAT MESSAGES OR THINGS OF THAT NATURE.

10:22AM  5    Q.   AND THE SOFTWARE PRODUCTS THAT YOU USED TO DO THIS, ARE

10:22AM  6    THOSE COMMERCIALLY AVAILABLE?

10:22AM  7    A.   CORRECT.

10:22AM  8    Q.   AND DO YOU FIND THEM TO BE RELIABLE?

10:22AM  9    A.   VERY.

10:22AM 10    Q.   AND ARE THEY PRODUCTS THAT YOU HAVE USED FOR OTHER

10:22AM 11    CLIENTS?

10:22AM 12    A.   YES.

10:22AM 13    Q.   AFTER THE DEVICES WERE IMAGED AND PROCESSED, CAN YOU

10:23AM 14    DESCRIBE WHAT PWC DID WITH THE DATA?

10:23AM 15    A.   YES.  SO WHEN AXIOM, AS I SAID, PARSES OUT THE UNDERLYING

10:23AM 16    CHAT MESSAGES, IT CREATES A FILE, A CSV FILE, COMMA SEPARATED

10:23AM 17    VALUE FILE, THAT HAS THE CONTENTS OF EVERYTHING THAT IT

10:23AM 18    IDENTIFIED ON THOSE DEVICES AS BEING CHATS OR MESSAGES.  IT

10:23AM 19    LOOKS AT DIFFERENT TYPES OF CHAT OR MESSAGING SOFTWARE AND IT

10:23AM 20    CREATES A FILE FOR EACH OF THOSE.

10:23AM 21         SO FOR HER MOBILE DEVICE, IT ONLY CONTAINED WHAT WAS

10:23AM 22    DEFINED AS COMMUNICATIONS OR IMESSAGES, SMS'S OR TEXT MESSAGES.

10:23AM 23    SO IT CREATED ONE VERY LARGE FILE OFF OF HER MOBILE DEVICE OF

10:23AM 24    THOSE.

10:23AM 25         AND THEN WE ALSO LOOKED AT HER OTHER ASSETS TO IDENTIFY

10:23AM  1    OTHER POTENTIAL CHATS OR MESSAGES THAT WERE CONTAINED ON THEM.

10:23AM  2        FOR EXAMPLE, ONE OF HER LAPTOPS HAD SOME IMESSAGES AND

10:24AM  3    SOME SKYPE MESSAGES, ET CETERA, SO WE COMPILED ALL OF THAT INTO

10:24AM  4    A MASTER FILE WHICH WE THEN ANALYZED IN ANOTHER SOFTWARE CALLED

10:24AM  5    ALTERYX.

10:24AM  6    Q.   WHAT IS ALTERYX?

10:24AM  7    A.   ALTERYX IS A DATA ANALYTICAL TOOL, VERY COMMON FOR DOING

10:24AM  8    VARIOUS ANALYSIS FOR STRUCTURED DATA.

10:24AM  9        ONCE THE TOOL AXIOM PARSED THIS OUT, IT WAS THEN ABLE TO

10:24AM  10   BE INGESTED AS STRUCTURED DATA FOR THE PURPOSES OF THE ANALYSIS

10:24AM  11   THAT WE THEN CONTINUED TO DO.

10:24AM  12   Q.   FROM TIME TO TIME, DID PWC PROVIDE EXCEL FILES TO

10:24AM  13   WILMER HALE TO REVIEW THE CONTENT OF TEXT MESSAGES?

10:24AM  14   A.   YES.

10:24AM  15   Q.   AND YOU SHOULD HAVE TWO BINDERS IN FRONT OF YOU,

10:24AM  16   MR. OFFEN.  I WOULD DRAW YOUR ATTENTION TO THE FIRST BINDER,

10:24AM  17   AND THERE SHOULD BE AN EXHIBIT IN THERE THAT WE HAVE MARKED AS

10:24AM  18   EXHIBIT 3481.

10:24AM  19   A.   YES.

10:24AM  20   Q.   DO YOU RECOGNIZE THIS DOCUMENT?

10:24AM  21   A.   YES.

10:25AM  22   Q.   WHAT IS THIS?

10:25AM  23   A.   BASED UPON THE FORMAT AND THE CODING, AND THE BATES

10:25AM  24   NUMBERING MOST NOTABLY IN THE BOTTOM RIGHT CORNER, I BELIEVE

10:25AM  25   THIS TO BE THE EXCEL FILE THAT WE CREATED THAT WILMER THEN

10:25AM   1    PRODUCED TO THE DOJ.

10:25AM   2    Q.   AND THERE'S A BATES -- HOW LONG IS THIS DOCUMENT?

10:25AM   3    A.   589 PAGES.

10:25AM   4    Q.   OKAY.  AND THERE'S A BATES NUMBER IN THE BOTTOM RIGHT

10:25AM   5    CORNER.  DO YOU RECOGNIZE THAT BATES NUMBERING SCHEME?

10:25AM   6    A.   CORRECT.

10:25AM   7    Q.   AND HOW DO YOU RECOGNIZE THAT?

10:25AM   8    A.   SORRY.  THAT APPEARS TO BE THE BATES NUMBERING -- WELL,

10:25AM   9    BOTH THE CODING, SO THE T-H-E-R WAS THE BEGINNING CODE FOR THE

10:25AM   10   RESPONSE WILMER PUT TOGETHER FOR THE DOJ; AND THEN THE

10:25AM   11   SUBSEQUENT NUMBERS ARE RELATED TO THE PAGES THAT WERE PRODUCED,

10:25AM   12   AND THIS NUMBER REMINDS ME OF THE -- OR IT IS THE NUMBER OF THE

10:25AM   13   FILE OF THE TEXT MESSAGES BETWEEN ELIZABETH AND SUNNY THAT WE

10:25AM   14   PROVIDED TO WILMER WHICH WAS ULTIMATELY PRODUCED TO THE DOJ.

10:26AM   15   Q.   SO YOU BELIEVE PWC HAD A HAND IN PREPARING THIS IN THE

10:26AM   16   FIRST INSTANCE?

10:26AM   17   A.   YES.

10:26AM   18   Q.   AND DID YOU DO THAT FROM DATA THAT YOU HAD GATHERED IN THE

10:26AM   19   COURSE OF YOUR WORK ON BEHALF OF WILMER HALE AND THERANOS?

10:26AM   20   A.   YES.

10:26AM   21   Q.   OKAY.  I WOULD DRAW YOUR ATTENTION TO THE FIRST BATES

10:26AM   22   NUMBER.  DO YOU SEE THE NUMBER 2566547?

10:26AM   23   A.   YES.

10:26AM   24   Q.   AND ON THE LAST PAGE DO YOU SEE THE NUMBER 2567135?

10:26AM   25   A.   YES.

10:26AM  1    Q.   YOU CAN PUT THAT BINDER TO THE SIDE, PLEASE.

10:26AM  2         IN ADVANCE OF THE TRIAL IN THIS MATTER, MR. OFFEN, DID PWC

10:26AM  3    RECEIVE A SUBPOENA TO PRODUCE CERTAIN RECORDS?

10:26AM  4    A.   YES.

10:26AM  5    Q.   AND DID THAT SUBPOENA CALL FOR THE PRODUCTION OF TEXT, SMS

10:26AM  6    OR SKYPE MESSAGES AND/OR IMESSAGES INVOLVING ELIZABETH HOLMES

10:27AM  7    AND RAMESH BALWANI REFLECTED ON THE BATES NUMBERS THAT WE

10:27AM  8    OBSERVED IN EXHIBIT 3481?

10:27AM  9    A.   YES.

10:27AM 10    Q.   AND DID YOU OVERSEE PWC'S PROCESS IN RESPONDING TO THAT

10:27AM 11    SUBPOENA?

10:27AM 12    A.   YES.

10:27AM 13    Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO WHAT WE HAVE MARKED

10:27AM 14    AS A DEMONSTRATIVE IN EXHIBIT 5386.

10:27AM 15         DO YOU RECOGNIZE THIS?

10:27AM 16    A.   YES.

10:27AM 17    Q.   AND IS THIS A DEMONSTRATIVE THAT PWC PREPARED IN ORDER TO

10:27AM 18    EXPLAIN ITS PROCESS FOR RESPONDING TO THE SUBPOENA?

10:27AM 19    A.   YES.

10:27AM 20    Q.   AND DO YOU FIND THIS HELPFUL IN EXPLAINING WHAT YOU DID IN

10:27AM 21    ORDER TO RESPOND TO THAT?

10:27AM 22    A.   YES.

10:27AM 23         MR. LEACH:  YOUR HONOR, I'D LIKE TO DISPLAY

10:27AM 24    EXHIBIT 5386.

10:27AM 25         MS. TREFZ:  NO OBJECTION.

10:27AM   1          THE COURT:  IT MAY BE DISPLAYED TO THE JURY.

10:28AM   2     BY MR. LEACH:

10:28AM   3     Q.    MR. OFFEN, DO YOU SEE TO THE RIGHT THERE'S A HEADING

10:28AM   4     PROCESS, AND THEN BENEATH THAT FOUR BOXES?

10:28AM   5     A.    YES.

10:28AM   6     Q.    OKAY.  AND WHAT IS CONVEYED IN THOSE FOUR BOXES?

10:28AM   7     A.    ON THE FAR LEFT?

10:28AM   8     Q.    YES, ON THE FAR LEFT.  EXCUSE ME.

10:28AM   9     A.    SO WHAT THOSE ARE, THOSE ARE THE BEGINNING SOURCES FROM

10:28AM   10    THE DIGITAL ASSETS THAT WE PROCEEDED TO COMPLETE THE OUTPUT OF

10:28AM   11    THE SPREADSHEET FROM.

10:28AM   12         THE TOP ONE REPRESENTS THE SOFTWARE USED TO DO THE INITIAL

10:28AM   13    IMAGING AND ACQUISITION OF THOSE DEVICES IN 2016 AND IN 2017

10:28AM   14    RESPECTIVELY.

10:28AM   15    Q.    SO IN ONE OF THE GREY BOXES THERE'S AN IPHONE 6S.

10:28AM   16         DO YOU SEE THAT?

10:28AM   17    A.    YES.

10:28AM   18    Q.    AND IS THAT THE SERIAL NUMBER BENEATH THAT?

10:28AM   19    A.    YES.

10:28AM   20    Q.    AND WAS THAT A DEVICE THAT YOU UNDERSTOOD BELONGED TO

10:28AM   21    MS. HOLMES?

10:28AM   22    A.    YES.

10:28AM   23    Q.    AND THEN THERE'S TWO BOXES FOR MAC PRO AND MAC AIR.

10:29AM   24         ARE THOSE THE SERIAL NUMBERS FOR THOSE DEVICES?

10:29AM   25    A.    I BELIEVE SO, YES.  I DON'T HAVE THEM EXACTLY MEMORIZED,

10:29AM  1    BUT I BELIEVE THOSE ARE THE EXACT ONES, YES.

10:29AM  2    Q.   THAT WOULD BE VERY IMPRESSIVE.

10:29AM  3    A.   YEAH.

10:29AM  4    Q.   AND WERE THOSE DEVICES THAT YOU UNDERSTOOD WERE ASSIGNED

10:29AM  5    TO MS. HOLMES?

10:29AM  6    A.   YES.

10:29AM  7    Q.   AND THESE WERE DEVICES THAT PWC CONTINUED TO HAVE IMAGES

10:29AM  8    OF IN ITS POSSESSION?

10:29AM  9    A.   CORRECT.  WE RETAINED THE EVIDENCE FILES THROUGHOUT THE

10:29AM  10   DURATION OF THE ENGAGEMENT; AND THEN FROM AICPA STANDARDS, YOU

10:29AM  11   RETAIN DATA FOR SEVEN YEARS AFTER THE CLOSE OF THE ENGAGEMENT.

10:29AM  12   Q.   AT THEN IN THAT BOX AT THE TOP, THERE'S CELLBRITE 5.4,

10:29AM  13   EWFACQUIRE, MACQUISITION.

10:29AM  14       WHAT ARE THOSE?

10:29AM  15   A.   SO THOSE ARE THE VARIOUS SOFTWARE TOOLS THAT WE USED TO

10:29AM  16   COMPLETE THE INITIAL FORENSIC IMAGES THAT I WAS REFERENCING

10:29AM  17   EARLIER.

10:29AM  18       THEY ARE IN SEQUENCE.  SO CELLBRITE WAS USED FOR THE

10:29AM  19   IPHONE; EWFACQUIRE WAS USED FOR THE MACBOOK PRO; AND

10:29AM  20   MACQUISITION WAS USED FOR THE MACBOOK AIR.

10:30AM  21   Q.   AS WE MOVE TO THE RIGHT THERE'S A BOX THAT HAS THE NUMBER

10:30AM  22   80,948.  WHAT DOES THAT REFER TO?

10:30AM  23   A.   THAT IS THE TOTAL NUMBER OF MESSAGES WHICH WERE EXTRACTED

10:30AM  24   OUT FROM THE PARSING PROCESS THAT I REFERENCED EARLIER FROM

10:30AM  25   AXIOM FROM THOSE THREE DEVICES.

10:30AM 1    Q.   AND BENEATH THAT THERE'S A BOX THAT SAYS AXIOM EXPORTS.

10:30AM 2         DO YOU SEE THAT?

10:30AM 3    A.   YES.

10:30AM 4    Q.   AND THERE'S SOME ROWS WITH THE WORD "HOUSE."  WHAT DOES

10:30AM 5    HOUSE REFER TO?

10:30AM 6    A.   HOUSE WAS THE INTERNAL PROJECT NAME THAT WE USED FOR THIS

10:30AM 7    WORK.  OUR WORK WAS BEING DONE UNDER PRIVILEGE FROM WILMER, AND

10:30AM 8    ANY TIME WE COMPLETE ANY PRIVILEGE ENGAGEMENT, WE ASSIGN A

10:30AM 9    PROJECT NAME SO THAT YOU DO NOT DISCUSS OPENLY THE CLIENT NAME

10:30AM 10   IN CONFERENCES AND WORK PAPERS, ET CETERA.

10:30AM 11   Q.   IN THAT FIRST ROW TO THE RIGHT IT SAYS HOLMES PO1.  WHAT

10:30AM 12   DOES PO1 REFER?

10:30AM 13   A.   THAT REPRESENTS HER MOBILE DEVICE.  THIS FILE, THE CSV,

10:31AM 14   REPRESENTS THE PARSED OUT CONTENTS OF ALL MESSAGES OF ALL OF

10:31AM 15   THE IMESSAGES AND SMS MESSAGES THAT WERE ON HER MOBILE DEVICE.

10:31AM 16   Q.   AND AS WE GO TO THE RIGHT, THIS IS AN CSV FILE?

10:31AM 17   A.   CORRECT.

10:31AM 18   Q.   AND IS THAT LIKE AN EXCEL FILE?

10:31AM 19   A.   IT'S THE DATA THAT AN EXCEL FILE WOULD OPEN.  IF YOU

10:31AM 20   LOOKED AT THIS IN ITS BASE FORM, TEXT FORM, YOU JUST SEE THE

10:31AM 21   VALUE, COMMA, VALUE, COMMA, VALUE, AND THEN EXCEL KNOWS TO

10:31AM 22   INTERPRET THAT INTO ROWS AND COLUMNS.

10:31AM 23   Q.   AND TO THE RIGHT THERE'S A NUMBER, 80,089.  AM I RIGHT TO

10:31AM 24   INFER THAT THE VAST MAJORITY OF THE MESSAGES THAT WERE

10:31AM 25   EXTRACTED FROM THE PHONES OR FROM THE DEVICES CAME FROM THIS

10:31AM   1   ONE PHONE?

10:31AM   2   A.   CORRECT.   EACH OF THE NUMBERS IN PARENTHESIS REPRESENTS

10:31AM   3   HOW MANY RECORDS WERE IN EACH OF THESE FILES.

10:31AM   4       SO OF THE 80,949 TOTAL, 80,089 TOTAL CAME FROM HER MOBILE

10:32AM   5   DEVICE.

10:32AM   6   Q.   TO THE RIGHT THERE'S A BOX FILTER, AND ABOVE THAT THERE'S

10:32AM   7   A BOX WITH A NUMBER OF NAMES.

10:32AM   8       WHAT IS CONVEYED THERE?

10:32AM   9   A.   SO THE SUBPOENA THAT WE WERE RESPONDING TO HAD REQUESTED

10:32AM   10  THAT WE PROVIDE THE TEXT AND CHAT MESSAGES BETWEEN MS. HOLMES

10:32AM   11  AND MR. BALWANI.

10:32AM   12      SO THE 80,948 REPRESENTS ALL OF THE MESSAGES THAT WERE ON

10:32AM   13  MS. HOLMES'S DEVICES TO MR. BALWANI AND WHOMEVER ELSE SHE WAS

10:32AM   14  COMMUNICATING WITH.

10:32AM   15      SO WE FILTERED THAT POPULATION DOWN TO ONES WE BELIEVED

10:32AM   16  THAT WOULD BE MESSAGES TO OR FROM MR. BALWANI.   SO WE

10:32AM   17  LEVERAGED, AGAIN, BASED UPON OTHER WORK WE WERE DOING WITH THE

10:32AM   18  COMPANY, HIS VARIOUS HANDLES, PHONE NUMBERS, EMAILS, ET CETERA,

10:32AM   19  THAT WOULD BE WHAT WE BELIEVED TO BE THE MESSAGES BETWEEN

10:32AM   20  HERSELF AND HIM.

10:32AM   21  Q.   OKAY.   AND BASED ON THAT FILTERING PROCESS, HOW MANY

10:32AM   22  MESSAGES DID PWC IDENTIFY?

10:32AM   23  A.   SO THAT WAS THE NEXT RIGHT BOX, IF YOU KEEP GOING OVER,

10:33AM   24  THE 12,132.

10:33AM   25  Q.   AND ABOVE THAT IT SAYS RELATIVITY FOR REDACTION.   WHAT IS

10:33AM 1    RELATIVITY?

10:33AM 2    A.    RELATIVITY IS AN E-DISCOVERY SOFTWARE WHICH TYPICALLY

10:33AM 3    ATTORNEYS OR LEGAL PROFESSIONALS USE TO REVIEW DOCUMENTS AND

10:33AM 4    MESSAGES.

10:33AM 5        IT ENABLES THEM TO FOLDER, SEARCH FOR KEY WORDS, PROVIDE

10:33AM 6    INDEXES, CODING, ET CETERA.

10:33AM 7    Q.    AND BENEATH THE 12,132 THERE'S A BOX, REPLACED IN ALTERYX.

10:33AM 8    WHAT DOES THAT REFER TO?

10:33AM 9    A.    SO THE FILES THAT WERE GENERATED BY AXIOM, IT PLACED THESE

10:33AM 10   TAGS IN SOME PLACES FOR MS. HOLMES'S NAME OR PHONE NUMBER.

10:33AM 11       SO WHERE IT SAYS THE PHONE BACKUP.TAR, FOR EXAMPLE, IPHONE

10:33AM 12   BACKUP.TAR, THAT WAS THE WHERE THE CONTENTS IN THE FROM OR SENT

10:33AM 13   OF RECEIVED NAME WAS, AND SO WE PLACED THAT WITH

10:33AM 14   ELIZABETH HOLMES TO BE EASIER TO REVIEW.

10:34AM 15   Q.    CAN YOU PLEASE EXPLAIN THE BOXES AND PENTAGON ON THE RIGHT

10:34AM 16   WHERE IT SAYS MATCH RECORDS NOT IN S.E.C. FILE, AND THEN THE

10:34AM 17   NUMBERS TO THE RIGHT GOING DOWN.  EXPLAIN WHAT YOU'RE CONVEYING

10:34AM 18   THERE.

10:34AM 19   A.    YEAH, WHAT WE WERE CALLING THE S.E.C. FILE WAS ACTUALLY

10:34AM 20   THE FIRST EXHIBIT THAT YOU HAD ME LOOK AT WHICH WAS ACTUALLY

10:34AM 21   THE DOJ FILE.

10:34AM 22       TO BE CLEAR, THEY'RE THE EXACT SAME CONTENTS, THEY JUST

10:34AM 23   HAD DIFFERENT REDACTIONS BY WILMER HALE, AND THAT'S WHY WE

10:34AM 24   REFERRED TO IT AS THE S.E.C. FILE, WHICH WAS THE INITIAL ONE WE

10:34AM 25   CREATED AND THEN IT WAS PRODUCED TWO DIFFERENT WAYS WITH

10:34AM  1    DIFFERENT REDACTIONS.

10:34AM  2        SO THE TOP NUMBER, THE 53, WE IDENTIFIED, WHEN WE

10:34AM  3    RECREATED THIS SPREADSHEET LAST MONTH, THERE WAS AN ADDITIONAL

10:34AM  4    53 RECORDS WE RAN, OR CREATED THE SPREADSHEET THIS TIME, WHICH

10:34AM  5    WERE NOT IN THE INITIAL FILE THAT WAS PRODUCED TO THE DOJ OR

10:34AM  6    THE S.E.C. BACK IN 2017.

10:34AM  7        WE ATTRIBUTED THOSE 53 RECORDS TO THE THREE DIFFERENT

10:35AM  8    ITEMS THAT ARE LISTED ABOVE IT.  THE FIRST ONE BEING THERE WERE

10:35AM  9    25 MESSAGES PRIOR TO JUNE 7TH IN THE RECREATION OF THE

10:35AM 10    SPREADSHEET, WHICH NEVER EXISTED IN THE ORIGINAL ONE; THERE

10:35AM 11    WERE 16 MESSAGES RELATED TO THE EMAIL SUNNY@DARWIN20.COM; AND

10:35AM 12    THEN THERE WERE 12 JUST IMAGINES THAT HAD NO CONTENT IN THE

10:35AM 13    SEARCHES, IN THE MESSAGE.

10:35AM 14    Q.   THERE ARE SOME BOXES --

10:35AM 15    A.   SORRY, APOLOGIES.  YOU ASKED ME TO GO THROUGH ALL OF THEM.

10:35AM 16        TO THE RIGHT, TO DO THE MATCH PROCESS, WE TRIED TO MATCH

10:35AM 17    THE TWO FILES, THE ONES THAT WE NOW CREATED, WHICH ARE THE

10:35AM 18    12,132 MESSAGES TO WHAT WE WERE REFERRING TO AS THE ORIGINAL

10:35AM 19    FILE, THE 12,120.

10:35AM 20        WE WENT THROUGH A SERIES OF PROGRAMMATIC MATCHES, VERY

10:35AM 21    STRAIGHTFORWARD.  WE SEARCHED FOR THE CONTENTS OF THE MESSAGE

10:35AM 22    AND THE DATE THAT THE MESSAGE WAS SENT.

10:35AM 23        WE DID DO SOME VARIATION IN THAT, LEADING AND TRAILING

10:35AM 24    SPACES, THERE WAS SOME DIFFERENT INTERPRETATIONS OF TIME ZONES

10:36AM 25    ON THE PHONE OR THE DATA THAT CAME THROUGH, SO WE DID A COUPLE

10:36AM 1    VARIATIONS.

10:36AM 2         BUT THE PROGRAMMATIC MATCHES WHERE WE DID THOSE SEARCHES

10:36AM 3    THAT I JUST REFERENCED YIELDED 12,081.  SO, AGAIN, THE VAST

10:36AM 4    MAJORITY OF THEM WERE MATCHED.

10:36AM 5         WE THEN PROCEEDED TO SEARCH THROUGH SOME OF THE ONES THAT

10:36AM 6    HAD NOT MATCHED, AND THEN IN THE REMAINING BALANCE WE FOUND 21

10:36AM 7    MATCHES MANUALLY.  THESE WERE MOSTLY DUE TO DIFFERENT

10:36AM 8    INTERPRETATIONS IN EXCEL.

10:36AM 9         FOR ANYONE WHO HAS WORKED WITH EXCEL, IF YOU START TYPING

10:36AM 10   WITH A MINUS SIGN OR A PLUS SIGN, FOR EXAMPLE, EXCEL THINKS

10:36AM 11   YOU'RE DOING A MATHEMATICAL EQUATION.

10:36AM 12        SO ON THE ORIGINAL FILE, THOSE WERE COMING THROUGH AS N/A.

10:36AM 13   AGAIN, IF ANY OF YOU HAVE SEEN EXCEL, IT'S PRETTY COMMON WHEN

10:36AM 14   EXCEL DOESN'T KNOW WHAT IT'S DOING, IT PUTS THE N/A WHERE WE

10:36AM 15   SAW THAT IT WAS ACTUALLY DUE TO THIS EQUATION.

10:36AM 16        THE OTHER REASON IT WAS CAUSING THAT WAS 100 PERCENT, WHEN

10:36AM 17   THE MESSAGE CONTENT WAS 100 PERCENT, THE ORIGINAL FILE

10:37AM 18   INTERPRETED 100 PERCENT TO BE JUST 1.  SO YOU LOST THE 00 AND

10:37AM 19   THE PERCENT SIGN.

10:37AM 20        SO THESE WERE SOME OF THE THINGS THAT FIT INTO THESE 21

10:37AM 21   MANUAL MATCHES.

10:37AM 22   Q.   AND THE BOX FOR NO MATCH, CAN YOU EXPLAIN WHAT THAT IS?

10:37AM 23   A.   YEAH.  OF THE OVERALL, THE ORIGINAL -- APOLOGIES -- OF THE

10:37AM 24   ORIGINAL 12,120 FILE, WE DID NOT IDENTIFY 18 OF THOSE MATCHES.

10:37AM 25   THEY WERE ALL OF THE SKYPE TYPE MESSAGES, NOT IMESSAGES OR TEXT

10:37AM  1    MESSAGES.

10:37AM  2    Q.   AND ARE THERE SOME POSSIBILITIES WHY YOU WERE UNABLE TO

10:37AM  3    MATCH THOSE 18 DOCUMENTS, OR 18 FILES?

10:37AM  4    A.   YES.  I THINK, AS I SAID AT THE VERY BEGINNING, WHEN WE

10:37AM  5    INITIALLY COMPLETED THIS MATTER, WE HAD PRESERVED OR IMAGED SIX

10:37AM  6    OF MS. HOLMES'S DEVICES.  FOR THE PURPOSE OF THIS ANALYSIS, WE

10:37AM  7    ONLY RAN IT ON THREE OF THEM.

10:37AM  8        SO IT WAS NOT SURPRISING TO ME THAT THERE WERE SOME THAT

10:37AM  9    DIDN'T MATCH.  QUITE CANDIDLY, I EXPECTED IT TO BE A LARGER

10:37AM  10   NUMBER.

10:37AM  11       BUT WHEN WE ONLY IDENTIFIED 18 THAT HAD NOT MATCHED, I WAS

10:38AM  12   CONFIDENT THAT OUR RECREATION OF THE SPREADSHEET WAS

10:38AM  13   SUFFICIENTLY ACCURATE AND DID NOT ASK MY TEAM TO DO ANY

10:38AM  14   ADDITIONAL WORK.

10:38AM  15   Q.   LET ME DRAW YOUR ATTENTION TO WHAT WE HAVE MARKED AS

10:38AM  16   EXHIBIT 5387.  THAT SHOULD BE IN YOUR SECOND BINDER.

10:38AM  17   A.   YES, I'VE GOT IT.

10:38AM  18   Q.   DO YOU RECOGNIZE THIS?

10:38AM  19   A.   YES.

10:38AM  20   Q.   WHAT IS THIS?

10:38AM  21   A.   THIS IS THE RECREATED SPREADSHEET THAT WE JUST WALKED

10:38AM  22   THROUGH THE PROCESS OF FROM THAT FLOW CHART.

10:38AM  23   Q.   THIS IS PWC'S RESPONSE TO THE SUBPOENA THAT WAS ISSUED TO

10:38AM  24   PWC?

10:38AM  25   A.   CORRECT.

10:38AM   1    Q.   AT THE TOP OF THIS DOCUMENT, THERE IS A ROW TITLED RECORD.

10:38AM   2         DO YOU SEE THAT?

10:38AM   3    A.   YES.

10:38AM   4    Q.   AND WHAT DOES RECORD REFER TO?

10:38AM   5    A.   SO IT IS THE CONCATENATION OF THE SOURCE DEVICE AND THE

10:38AM   6    AXIOM FILE NAME THAT WE JUST WALKED THROUGH.  SO ON THE FLOW

10:39AM   7    CHART, THE FIVE LINE ITEMS ON DIFFERENT FILES, AND THEN THE

10:39AM   8    SYSTEMATICALLY GENERATED SEQUENCE NUMBER.

10:39AM   9         THIS PURPOSE IS SIMPLY TO CREATE A UNIQUE IDENTIFIER FOR

10:39AM  10    EVERY RECORD IN THIS FILE BECAUSE, AGAIN, IT CAME FROM FIVE

10:39AM  11    SEPARATE UNDERLYING SOURCES.  WE WANTED TO HAVE ONE UNIQUE

10:39AM  12    NUMBER ACROSS ALL OF THEM.

10:39AM  13    Q.   FIVE SEPARATE OR THREE SEPARATE?

10:39AM  14    A.   THREE SEPARATE DIGITAL ASSETS, BUT WE CREATED FIVE FILES

10:39AM  15    THROUGH THE AXIOM WORK PROCESS.

10:39AM  16    Q.   AND THIS IS ASSIGNING A UNIQUE NUMBER SO YOU CAN IDENTIFY

10:39AM  17    THE MESSAGE AND THE SOURCE?

10:39AM  18    A.   CORRECT.

10:39AM  19         SO VERY QUICKLY, THE FIVE FILES, THREE OF THEM CAME FROM

10:39AM  20    ONE SOURCE BECAUSE THERE WERE THREE DIFFERENT TYPES OF MESSAGES

10:39AM  21    ON THAT SOURCE.  SO THERE WAS SOME IMESSAGES, THERE WAS SOME

10:39AM  22    SKYPE, AND THERE WAS SOME SKYPE SYNC.  THAT WAS IN THE FLOW

10:39AM  23    CHART THAT WE JUST WALKED THROUGH.

10:39AM  24    Q.   TO THE RIGHT THERE'S A ROW CALLED TYPE.  WHAT IS CONVEYED

10:39AM  25    THERE?

10:39AM   1    A.   THAT IS THE TYPE OF MESSAGE AS STORED ON THE ORIGINAL

10:39AM   2    DEVICE.

10:39AM   3    Q.   TO THE RIGHT THERE'S A COLUMN MESSAGE SENT, DATE/TIME.

10:40AM   4         DO YOU SEE THAT?

10:40AM   5    A.   YES.

10:40AM   6    Q.   AND WHAT DOES THAT CONVEY?

10:40AM   7    A.   THAT ALSO CONVEYS THE SENT TIME FROM THE VARIOUS FILES

10:40AM   8    THAT AXIOM CREATED.

10:40AM   9         SO FOR THE SMS OR IMESSAGE, IT'S THE TIME THE TEXT WAS

10:40AM  10    SENT; FOR THE SKYPE ONES, IT'S THE TIME THAT THE SKYPE CHAT WAS

10:40AM  11    SENT.

10:40AM  12    Q.   AND THERE'S A -- TO THE RIGHT THERE'S A COLUMN FOR

10:40AM  13    MESSAGE.  IS THAT THE SUBSTANCE OF THE MESSAGE?

10:40AM  14    A.   YES, THE CONTENTS OF THE MESSAGE.

10:40AM  15    Q.   OKAY.  AND THEN THERE ARE COLUMNS FOR SENDER/AUTHOR AND

10:40AM  16    RECIPIENT.

10:40AM  17         WHAT IS CONVEYED THERE?

10:40AM  18    A.   THE SENDER/AUTHOR IS THE PERSON WHO GENERATED THE MESSAGE,

10:40AM  19    AND THEN THE RECIPIENT IS THE INDIVIDUAL OR PHONE NUMBER THAT

10:40AM  20    RECEIVED IT.

10:40AM  21    Q.   TO THE RIGHT THERE'S SOMETHING CALLED CHAT I.D.  WHAT IS

10:40AM  22    THAT?

10:40AM  23    A.   SO WITHIN MOBILE DEVICES, AND ALSO THE SKYPE BUT MOSTLY

10:40AM  24    FOR MOBILE DEVICES, YOUR PHONE, IPHONE RATHER, AN IPHONE

10:41AM  25    CREATES A UNIQUE CHAT I.D., WHICH IS HOW, FOR THOSE OF YOU WHO

10:41AM 1    HAVE AN IPHONE, WHEN YOU SEE YOUR CHAT OR YOUR MESSAGES LISTED,

10:41AM 2    YOU KNOW, YOU ALWAYS SEE THEM GROUPED TOGETHER AND THEY COME

10:41AM 3    WITH NEW ONES ACCORDINGLY, THE PHONE IS DISPLAYING THAT UNIQUE

10:41AM 4    CHAT I.D. FOR EACH OF THOSE.

10:41AM 5    Q.   AND HOW LONG IS THIS DOCUMENT?

10:41AM 6    A.   449 PAGES.

10:41AM 7    Q.   AND DO YOU RECOGNIZE THE BATES NUMBERS TO THE RIGHT?

10:41AM 8    A.   YES.  BECAUSE THIS WAS A NEW MATTER, WE USED A NEW CODING

10:41AM 9    AND WE STARTED ON NUMBER 1 FOR THE FIRST PAGE, AND I'M ASSUMING

10:41AM 10   IT GOES THROUGH TO 449, BUT LET ME CONFIRM THAT.

10:41AM 11        YES, IT GOES TO 449.

10:41AM 12   Q.   BASED ON PWC'S PROCESS, BASED ON THE BATES NUMBER, BASED

10:42AM 13   ON THE FORMAT OF THIS DOCUMENT, IS THIS A TRUE DEPICTION OF

10:42AM 14   DATA FROM THE THREE DEVICES THAT PWC -- OF THREE DEVICES THAT

10:42AM 15   PWC COLLECTED FROM MS. HOLMES?

10:42AM 16   A.   YES, I BELIEVE SO.

10:42AM 17   Q.   OKAY.

10:42AM 18        MAY I APPROACH, YOUR HONOR?

10:42AM 19             THE COURT:  YES.

10:42AM 20             MR. LEACH:  (HANDING.)

10:42AM 21   Q.   I'VE PLACED BEFORE YOU, MR. OFFEN, A DOCUMENT THAT WE HAVE

10:42AM 22   LABELLED EXHIBIT 5387B.

10:43AM 23        DO YOU SEE THAT AT THE BOTTOM?

10:43AM 24   A.   YES.

10:43AM 25   Q.   OKAY.  DOES THIS APPEAR TO BE A SUBSET OF THE MESSAGES

10:43AM  1    REFLECTED IN 537, OR 5387?

10:43AM  2    A.   FROM A FORMATTING PERSPECTIVE, YES.

10:43AM  3         I CLEARLY DO NOT HAVE EVERY RECORD MEMORIZED, SO LET ME

10:43AM  4    FLIP TO THIS PAGE.

10:43AM  5    Q.   OKAY.

10:43AM  6    A.   YES.

10:43AM  7    Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO THE BOTTOM PART OF

10:43AM  8    5387B, AND DO YOU SEE THE BATES NUMBER 31 TO THE RIGHT?

10:43AM  9    A.   YES.

10:43AM 10    Q.   AND IS THAT A BATES NUMBER FROM THE -- THAT IS ALSO USED

10:43AM 11    IN 5387?

10:43AM 12    A.   YES.

10:43AM 13    Q.   OKAY.  AND DO YOU SEE TWO MESSAGES DOWN AT THE BOTTOM 7344

10:44AM 14    AND 7349?

10:44AM 15    A.   YES.

10:44AM 16    Q.   AND BASED ON PWC'S PROCESS, THE BATES NUMBERING SCHEME,

10:44AM 17    AND THE LOOK OF THIS DOCUMENT, DO YOU BELIEVE THIS TO BE DATA

10:44AM 18    DRAWN FROM ONE OF MS. HOLMES'S DEVICES?

10:44AM 19    A.   YES.

10:44AM 20         MR. LEACH:  YOUR HONOR, I OFFER PAGE 1 OF 5387B.

10:44AM 21         MS. TREFZ:  403 TO THE LAST MESSAGE, YOUR HONOR,

10:44AM 22    WHICH IS NOT IN THE SAME CHAIN.

10:44AM 23         THE COURT:  WHICH IS -- I'M SORRY?

10:44AM 24         MS. TREFZ:  NOT IN THE SAME CHAIN.  IT'S A RESPONSE

10:44AM 25    TO SOMETHING ABOVE.

10:44AM 1          OTHERWISE --

10:44AM 2               THE COURT:  OVERRULED.  IT CAN BE ADMITTED.  AND IT

10:44AM 3     MAY BE PUBLISHED.

10:44AM 4          (GOVERNMENT'S EXHIBIT 5387B, PAGE 1 WAS RECEIVED IN

10:44AM 5     EVIDENCE.)

10:44AM 6               MR. LEACH:  THANK YOU.

10:45AM 7          MS. HOLLIMAN, IF WE CAN ZOOM IN ON THE BOTTOM PORTION.

10:45AM 8     WELL, BEFORE WE DO THAT, MS. HOLLIMAN.

10:45AM 9     Q.   MR. OFFEN, LET ME DRAW YOUR ATTENTION TO THE TOP OF THE

10:45AM 10    DOCUMENT.  DO YOU SEE WHERE IT SAYS RECORD?

10:45AM 11    A.   YES.

10:45AM 12    Q.   AND ARE THESE THE COLUMNS THAT WE WERE TALKING ABOUT

10:45AM 13    PREVIOUSLY THAT YOU COULD FILTER WITH AXIOM?

10:45AM 14    A.   YES.

10:45AM 15    Q.   NOW, IF WE CAN ALSO HIGHLIGHT THE BOTTOM PORTION OF THE

10:45AM 16    DOCUMENT, MS. HOLLIMAN.

10:45AM 17         IN THE LEFT, MR. OFFEN, THERE'S SOME WRITING, HOLMES,

10:45AM 18    IPHONE, IMESSAGE, MMS, SMS, 007344.

10:45AM 19         CAN YOU EXPLAIN WHAT THAT IS?

10:45AM 20    A.   SO THAT IS THE RECORD I.D. THAT WE DISCUSSED EARLIER.

10:45AM 21    THIS IS THE CONCATENATION OF THE SOURCE FILE, SO AGAIN, ONE OF

10:45AM 22    THOSE FIVE FILES WE REFERENCED.  THIS ONE RELATES TO THE

10:45AM 23    RECORDS THAT WERE COMING FROM HER IPHONE, AND THEN THE

10:46AM 24    SYSTEMATICALLY CREATED SEQUENCE I.D. THAT AXIOM ASSIGNS TO THE

10:46AM 25    FILE AS A UNIQUE IDENTIFIER.

10:46AM 1    Q.   AND IN THE THIRD COLUMN TO THE RIGHT, DO YOU INTERPRET

10:46AM 2    THAT AS THE DATE THAT THE MESSAGE WAS SENT OR RECEIVED?

10:46AM 3    A.   YES.

10:46AM 4    Q.   WOULD YOU PLEASE READ THE SUBSTANCE OF THE FIRST MESSAGE

10:46AM 5    FOR US?

10:46AM 6    A.   "PISSING ME OFF WE DON'T HAVE ANYONE MANAGING PSC, CTN

10:46AM 7    PRODUCTION, CART PRODUCTION, ELISA ASSAYS, TSH.."

10:46AM 8    Q.   AND TO THE RIGHT IT SAYS SUNNY BALWANI.

10:46AM 9         DOES THAT INDICATE THE SENDER OF THE MESSAGE WAS

10:46AM 10   MR. BALWANI?

10:46AM 11   A.   YES.

10:46AM 12   Q.   AND TO THE RIGHT, THERE'S A NAME ELIZABETH HOLMES.

10:46AM 13        DOES THAT INDICATE THAT SHE WAS THE RECIPIENT?

10:46AM 14   A.   YES.

10:46AM 15   Q.   OKAY.  YOUR HONOR --

10:47AM 16        I'LL DRAW YOUR ATTENTION TO THE NEXT PAGE, MR. OFFEN.

10:47AM 17        I WOULD OFFER PAGE 2 OF EXHIBIT 5387B, BATES NUMBER 32.

10:47AM 18             MS. TREFZ:  NO OBJECTION.

10:47AM 19             THE COURT:  IT'S ADMITTED AND IT MAY BE PUBLISHED.

10:47AM 20        (GOVERNMENT'S EXHIBIT 5387B, PAGE 2 WAS RECEIVED IN

10:47AM 21   EVIDENCE.)

10:47AM 22             MR. LEACH:  IF WE CAN PLEASE HIGHLIGHT THE TOP

10:47AM 23   PORTION OF THE DOCUMENT, MS. HOLLIMAN.

10:47AM 24   Q.   DRAWING YOUR ATTENTION TO THE LEFT PORTION OF THIS

10:47AM 25   DOCUMENT, MR. OFFEN.  ARE THESE FURTHER MESSAGES FROM

10:47AM   1    MS. HOLMES'S DEVICE?

10:47AM   2    A.   YES, AGAIN, BASED UPON THE FORMAT AND THE BATES NUMBERING,

10:47AM   3    AND I'M COMPARING THEM TO THE BROADER FILE, YES.

10:47AM   4    Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO THE NEXT PAGE,

10:48AM   5    PAGE 3.  IT'S THE THIRD PAGE OF THE DOCUMENT.  THERE'S A BATES

10:48AM   6    NUMBER 42 IN THE BOTTOM.

10:48AM   7         DO YOU SEE THAT?

10:48AM   8    A.   YES.

10:48AM   9              MR. LEACH:  YOUR HONOR, THE GOVERNMENT MOVES THIS

10:48AM   10   PAGE INTO EVIDENCE.

10:48AM   11             MS. TREFZ:  NO OBJECTION.

10:48AM   12             THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

10:48AM   13        (GOVERNMENT'S EXHIBIT 5387B, PAGE 3 WAS RECEIVED IN

10:48AM   14   EVIDENCE.)

10:48AM   15             MR. LEACH:  MS. HOLLIMAN, IF WE CAN PLEASE HIGHLIGHT

10:48AM   16   THE TOP PORTION.

10:48AM   17   Q.   MR. OFFEN, WHAT ARE THE DATES OF THESE MESSAGES?

10:48AM   18   A.   THE DATES?

10:48AM   19   Q.   YES.

10:48AM   20   A.   NOVEMBER 28TH, 2013.

10:48AM   21   Q.   OKAY.  AND ARE THE FIRST TWO -- DOES IT INDICATE THAT THE

10:48AM   22   FIRST TWO ARE FROM MR. BALWANI AND THE SECOND TWO ARE FROM

10:48AM   23   MS. HOLMES?

10:48AM   24   A.   YES.

10:48AM   25   Q.   COULD YOU PLEASE READ THE SUBSTANCE OF THE MESSAGES?

10:48AM  1    A.   ALL FOUR?

10:48AM  2    Q.   YES, PLEASE.

10:48AM  3    A.   "WE ARE AT 15 MILLION AS OF TODAY.

10:49AM  4         "FREE CASH.

10:49AM  5         "I SAW THAT.

10:49AM  6         "DROP BY TO DISCUSS WHEN U CAN."

10:49AM  7    Q.   LET'S GO TO THE NEXT PAGE, MS. HOLLIMAN.

10:49AM  8         DO YOU SEE THE EXHIBIT NUMBER 5387, BATES NUMBER 67?

10:49AM  9    A.   YES.

10:49AM  10        MR. LEACH:  I OFFER THAT INTO EVIDENCE.

10:49AM  11        THE COURT:  IT'S ADMITTED AND IT MAY BE PUBLISHED.

10:49AM  12        (GOVERNMENT'S EXHIBIT 5387B, PAGE 4 WAS RECEIVED IN

10:49AM  13   EVIDENCE.)

10:49AM  14        MR. LEACH:  IF WE CAN HIGHLIGHT ALL OF THE WAY DOWN,

10:49AM  15   MS. HOLLIMAN, TO MESSAGE 872.

10:49AM  16   Q.   DOES THIS APPEAR TO BE A STRING OF MESSAGES ON

10:49AM  17   NOVEMBER 19TH, 2014, MR. OFFEN?

10:50AM  18   A.   YES.

10:50AM  19   Q.   AND DO THE FIRST TWO MESSAGES APPEAR TO BE FROM

10:50AM  20   MR. BALWANI TO MS. HOLMES?

10:50AM  21   A.   YES.

10:50AM  22   Q.   OKAY.  AND COULD I ASK YOU TO PLEASE READ THE SUBSTANCE OF

10:50AM  23   THE FIRST TWO MESSAGES?

10:50AM  24   A.   "NEED TO FOCUS ON OPS.  GETTING HURT IN MARKET.

10:50AM  25        "CUSTOMER SERVICE SEEMS TO BE TERRIBLE.  EVERYONE

10:50AM  1    COMPLAINING."

10:50AM  2    Q.   I DRAW YOUR ATTENTION TO THE FOURTH MESSAGE.  DO YOU SEE

10:50AM  3    WHERE IT SAYS, "LAB, CUSTOMER SERVICE, TAT, ALL NEED DIRECTOR

10:50AM  4    LEVEL PEOPLE"?

10:50AM  5    A.   YES.

10:50AM  6    Q.   AND DOES THAT APPEAR TO BE A MESSAGE FROM MR. BALWANI TO

10:50AM  7    MS. HOLMES?

10:50AM  8    A.   YES.

10:50AM  9    Q.   FURTHER DOWN BELOW, FOR MESSAGE 866, DO YOU SEE WHERE IT

10:50AM  10   SAYS, "WE NEED.  THE LAB AND CALL CENTER FIXED:

10:50AM  11        "NEED PROFESSIONALS ACROSS THE BOARD.  NEED PM'S AND

10:50AM  12   ALLISON OUT ASAP"?

10:50AM  13   A.   YES.

10:50AM  14   Q.   AND DO THOSE SEEM TO BE ADDITIONAL MESSAGES FROM

10:51AM  15   MR. BALWANI TO MS. HOLMES ON NOVEMBER 19TH?

10:51AM  16   A.   YES.

10:51AM  17   Q.   AND LET ME DRAW YOUR ATTENTION TO THE NEXT PAGE, PLEASE.

10:51AM  18        YOUR HONOR, I OFFER PAGE 68 OF EXHIBIT 5387B IN, WITH THE

10:51AM  19   EXCEPTION OF MESSAGES ENDING IN 898 AND 901.

10:51AM  20            MS. TREFZ:  ONLY OUR PRIOR OBJECTIONS, YOUR HONOR.

10:51AM  21            THE COURT:  THANK YOU.  IT'S ADMITTED, AND IT MAY BE

10:51AM  22   PUBLISHED.

10:51AM  23        (GOVERNMENT'S EXHIBIT 5387B, PAGE 5 WAS RECEIVED IN

10:51AM  24   EVIDENCE.)

10:51AM  25            MR. LEACH:  IF WE COULD HIGHLIGHT EVERYTHING,

10:51AM  1     MS. HOLLIMAN, DOWN TO MESSAGE 899, OR EXCUSE ME, 897.

10:52AM  2     Q.   DOES THIS APPEAR TO BE A STRING OF MESSAGES ON

10:52AM  3     NOVEMBER 19TH, 2014, MR. OFFEN?

10:52AM  4     A.   YES.

10:52AM  5     Q.   AND THESE, AGAIN -- LET ME DRAW YOUR ATTENTION TO MESSAGE

10:52AM  6     881, THE FIFTH OR SIXTH ONE DOWN.

10:52AM  7          DO THERE APPEAR TO BE FOUR MESSAGES FROM MR. BALWANI FROM

10:52AM  8     881 TO 886?

10:52AM  9     A.   YES.

10:52AM  10    Q.   AND COULD I ASK YOU TO PLEASE READ THOSE FOR US?

10:52AM  11    A.   "CALL CENTER, TECH SUPPORT, EVERYTHING.

10:52AM  12         "REBUILD.

10:52AM  13         "NEW LDTS, LAB MANAGER LIKE TRACY.

10:52AM  14         "18C, CTN, TIP COATING."

10:52AM  15    Q.   AND THEN THERE APPEAR TO BE FOUR MESSAGES FROM MS. HOLMES.

10:52AM  16         DO YOU SEE THAT?

10:52AM  17    A.   THE NEXT FOUR IN THE FILE?

10:52AM  18    Q.   YES.

10:52AM  19    A.   YES.

10:52AM  20    Q.   COULD YOU PLEASE READ THOSE FOR US?

10:52AM  21    A.   "FUNDAMENTALLY, WE NEED TO STOP FIGHTING FIRES BY NOT

10:53AM  22    CREATING THEM.

10:53AM  23         "NEED TO FIX ROOT CAUSE HERE.

10:53AM  24         "YES.

10:53AM  25         "EXACTLY."

10:53AM   1    Q.   AND IF WE SKIP OVER THE NEXT MESSAGE, THERE'S A MESSAGE

10:53AM   2    THAT SAYS "WE CAN'T SCALE WITH WAG."

10:53AM   3         DO YOU SEE THAT?

10:53AM   4    A.   YES.

10:53AM   5    Q.   AND "THEY ARE TERRIBLE AND WE NEED SWY AND CVS."

10:53AM   6         DO YOU SEE THAT?

10:53AM   7    A.   YES.

10:53AM   8    Q.   AND DO THOSE APPEAR TO BE FROM MS. HOLMES TO MR. BALWANI

10:53AM   9    ON NOVEMBER 19TH?

10:53AM  10    A.   YES.

10:53AM  11    Q.   AND YOU HAVE NO PERSONAL KNOWLEDGE ABOUT THE SUBSTANCE OF

10:53AM  12    THESE MESSAGES.  THIS IS DATA THAT YOU COLLECTED FROM

10:53AM  13    MS. HOLMES'S DEVICES; IS THAT FAIR?

10:53AM  14    A.   CORRECT.  I NEVER REVIEWED THE INDIVIDUAL CONTENTS BEFORE.

10:53AM  15    Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO THE NEXT PAGE,

10:53AM  16    PLEASE, ENDING IN 69.

10:53AM  17         YOUR HONOR, I OFFER THE FIRST THREE MESSAGES ON 6 --

10:53AM  18    PRH 69 ON TRIAL EXHIBIT 5387B.

10:53AM  19              MS. TREFZ:  NO OBJECTION BEYOND OUR PRIOR.

10:54AM  20              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:54AM  21         (GOVERNMENT'S EXHIBIT 5387B, PAGE 6 WAS RECEIVED IN

10:54AM  22    EVIDENCE.)

10:54AM  23    BY MR. LEACH:

10:54AM  24    Q.   DO THESE APPEAR TO BE ADDITIONAL MESSAGES FROM

10:54AM  25    NOVEMBER 19TH, 2014, MR. OFFEN?

10:54AM  1      A.   YES.

10:54AM  2      Q.   AND WOULD YOU PLEASE READ THE SUBSTANCE OF THE MESSAGES?

10:54AM  3      A.   ALL THREE?

10:54AM  4      Q.   YES, PLEASE.

10:54AM  5      A.   "NEED CTN FIXED.  OUR ROOT CAUSE OF ISSUES.

10:54AM  6           "I KNOW.  SEEMS LIKE THEY R A MESS.

10:54AM  7           "YES."

10:54AM  8      Q.   LET ME DRAW YOUR ATTENTION TO PAGE 76.

10:54AM  9           I OFFER PAGE 76 INTO EVIDENCE, YOUR HONOR.

10:54AM  10               MS. TREFZ:  NO OBJECTION.

10:54AM  11               THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:54AM  12          (GOVERNMENT'S EXHIBIT 5387B, PAGE 7 WAS RECEIVED IN

10:55AM  13     EVIDENCE.)

10:55AM  14     BY MR. LEACH:

10:55AM  15     Q.   DO YOU SEE THE TOP MESSAGE, MR. OFFEN, THE ONE ON

10:55AM  16     NOVEMBER 28TH, 2014, AT 11:12 P.M.?

10:55AM  17     A.   YES.

10:55AM  18     Q.   OKAY.  WITHOUT USING THE EXPLETIVE, WOULD YOU PLEASE READ

10:55AM  19     THE SUBSTANCE OF THAT MESSAGE?

10:55AM  20     A.   "NORMANDY LAB IS A DISASTER ZONE.  GLAD I CAME HERE.  WILL

10:55AM  21     WORK ON FIXING THIS."

10:55AM  22     Q.   AND DOES THAT APPEAR TO BE A MESSAGE FROM MR. BALWANI TO

10:55AM  23     MS. HOLMES?

10:55AM  24     A.   YES.

10:55AM  25     Q.   WOULD YOU PLEASE READ FOR US THE SUBSTANCE OF THE SECOND

10:55AM   1    MESSAGE FROM THE TOP -- FROM THE BOTTOM BEGINNING "WE BUILT

10:55AM   2    SOFTWARE."

10:55AM   3    A.   "WE BUILT SOFTWARE TO REMOVE HUMAN ERROR AND HUMAN

10:55AM   4    JUDGMENT.  ALL DAY I SAW THESE PEOPLE USE THEIR JUDGMENTS TO

10:55AM   5    WORK AROUND OUR PROCESSES."

10:55AM   6    Q.   IS THAT ANOTHER MESSAGE FROM NOVEMBER 28TH, 2014?

10:55AM   7    A.   YES.

10:55AM   8    Q.   LET ME DRAW YOUR ATTENTION TO PAGE 87.

10:56AM   9         I OFFER PAGE 87 OF EXHIBIT 5387B, YOUR HONOR.

10:56AM  10             MS. TREFZ:  NO OBJECTION.

10:56AM  11             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:56AM  12         (GOVERNMENT'S EXHIBIT 5387B, PAGE 8 WAS RECEIVED IN

10:56AM  13    EVIDENCE.)

10:56AM  14    BY MR. LEACH:

10:56AM  15    Q.   WHAT IS THE DATE OF THIS MESSAGE, MR. OFFEN?

10:56AM  16    A.   DECEMBER 16TH, 2014.

10:56AM  17    Q.   AND DOES THE MESSAGE READ:  "ARE THERE ANY MATERIALS IN

10:56AM  18    THE BINDERS YOU THINK SHOULD BE REMOVED FOR MURDOCH/NEWS CORP"?

10:56AM  19    A.   YES.

10:56AM  20    Q.   AND WHO IS THE SENDER OF THIS MESSAGE?

10:56AM  21    A.   ELIZABETH HOLMES.

10:56AM  22    Q.   LET ME DRAW YOUR ATTENTION TO PAGE 175.

10:56AM  23         YOUR HONOR, I OFFER PAGE 175 INTO EVIDENCE.

10:57AM  24             MS. TREFZ:  401 AND 403, AND 404(B).

10:57AM  25             THE COURT:  AS TO THE ENTIRETY OF THIS COLLOQUY?

10:57AM 1          MS. TREFZ:  404(B) AND -- YEAH, 401, 403 AND 404(B)

10:57AM 2    AS TO THE ENTIRETY.

10:57AM 3          THE COURT:  THANK YOU.

10:57AM 4       DO YOU WISH TO RESPOND?

10:57AM 5          MR. LEACH:  I THINK THIS IS THE MATTER WE DISCUSSED

10:57AM 6    EARLIER.

10:57AM 7          THE COURT:  YES, WE DID.  ANYTHING FURTHER ON OUR

10:57AM 8    DISCUSSIONS?

10:57AM 9          MR. LEACH:  NO.

10:57AM 10          THE COURT:  LADIES AND GENTLEMEN, THIS WILL -- THE

10:57AM 11    OBJECTION IS OVERRULED.

10:57AM 12       THIS WILL BE ADMITTED.  THE COURT FINDS THAT THIS IS MORE

10:57AM 13    PROBATIVE THAN PREJUDICIAL, AND THE COURT WILL INDICATE THAT

10:57AM 14    THIS IS BEING ADMITTED AS TO THE ISSUE OF KNOWLEDGE AND NOTICE

10:57AM 15    FOR MS. HOLMES, AND YOU'LL RECEIVE AN INSTRUCTION LATER AS TO

10:57AM 16    HOW -- IN THE FINAL INSTRUCTIONS AS TO HOW YOU MAY TREAT THIS

10:57AM 17    EVIDENCE.

10:57AM 18       SO PLEASE NOTE THAT.

10:57AM 19       MR. LEACH.

10:57AM 20          MR. LEACH:  MAY I DISPLAY THAT PAGE, YOUR HONOR?

10:58AM 21          THE COURT:  YES.

10:58AM 22    BY MR. LEACH:

10:58AM 23    Q.  MR. OFFEN, I DRAW YOUR ATTENTION TO THE SECOND MESSAGE

10:58AM 24    FROM THE TOP, THE MESSAGE ENDING 254.

10:58AM 25          WHAT IS THE DATE OF THIS MESSAGE?

10:58AM  1    A.   APRIL 21ST, 2015.

10:58AM  2    Q.   OKAY.  AND IS THE MESSAGE FROM MS. HOLMES TO MR. BALWANI?

10:58AM  3    A.   YES.

10:58AM  4    Q.   AND DOES THE FIRST MESSAGE READ, "WSJ GUY MIGHT SHOW UP

10:58AM  5    TOMORROW"?

10:58AM  6    A.   YES.

10:58AM  7    Q.   FURTHER DOWN MESSAGE 256, DOES THIS APPEAR TO BE A

10:58AM  8    RESPONSE FROM MR. BALWANI TO MS. HOLMES?

10:58AM  9    A.   YES, IT'S A MESSAGE FROM MR. BALWANI TO MS. HOLMES.

10:58AM  10   Q.   OKAY.  AND WOULD YOU PLEASE READ THE SUBSTANCE OF THAT

10:59AM  11   MESSAGE FOR US?

10:59AM  12   A.   "WE NEED TOMORROW TO TEST AND THEN THE TEAM CAN PUSH IT IN

10:59AM  13   PRODUCTION TOMORROW NIGHT."

10:59AM  14   Q.   OKAY.  AND DOES, DOES IT APPEAR THAT MS. HOLMES WRITES

10:59AM  15   AFTER THAT, "OKAY.

10:59AM  16        "COULD JUST DO FOR HIM ONLY IF HE SHOWS UP..."

10:59AM  17   A.   YES, THOSE ARE THE NEXT TWO MESSAGES.

10:59AM  18   Q.   OKAY.  WOULD YOU PLEASE READ THE SUBSTANCE OF THE NEXT

10:59AM  19   THREE MESSAGES?

10:59AM  20   A.   THE NEXT THREE?

10:59AM  21   Q.   YES.

10:59AM  22   A.   "HARD TO KNOW WHO HE IS AND WHAT ORDER HE BRINGS.

10:59AM  23        "BETTER A PERFECT VEIN PUNCTURE THAN BAD FINGERSTICK.

10:59AM  24        "OR MISS A TEST."

10:59AM  25   Q.   AND THEN ARE THERE -- IS THERE A MESSAGE FROM MS. HOLMES,

10:59AM 1  "IT'S POSSIBLE HE TALKS TO DOCS FIRST DAY AND THEN DRAW SECOND

10:59AM 2  DAY."

10:59AM 3       AND RESPONSE FROM MR. BALWANI, "SEEMS LIKE THIS GUY IS

10:59AM 4  LOOKING TO WRITE SOMETHING NEGATIVE"?

10:59AM 5  A.   YES.

10:59AM 6  Q.   LET ME DRAW YOUR ATTENTION --

11:00AM 7       I DON'T HAVE QUESTIONS FOR MR. OFFEN ON THIS, BUT I MOVE

11:00AM 8  INTO EVIDENCE PAGE 176.

11:00AM 9            MS. TREFZ:  SAME OBJECTIONS AS BEFORE, YOUR HONOR.

11:00AM 10            THE COURT:  ALL RIGHT.  THANK YOU.

11:00AM 11       OVERRULED.  THIS MAY BE ADMITTED.

11:00AM 12       (GOVERNMENT'S EXHIBIT 5387B, PAGE 10 WAS RECEIVED IN

11:00AM 13  EVIDENCE.)

11:00AM 14            THE COURT:  DO YOU WANT THIS PUBLISHED NOW?

11:00AM 15            MR. LEACH:  I DON'T NEED THIS PUBLISHED NOW,

11:00AM 16  YOUR HONOR.  THANK YOU.

11:00AM 17            THE COURT:  ALL RIGHT.

11:00AM 18  BY MR. LEACH:

11:00AM 19  Q.   LET ME DRAW YOUR ATTENTION TO PAGE 185, MR. OFFEN.

11:00AM 20       I OFFER PAGE 185, YOUR HONOR.

11:00AM 21            MS. TREFZ:  401, 403, AND 805, YOUR HONOR.  805 AS

11:00AM 22  TO 31758.

11:01AM 23            THE COURT:  IS THAT COMMENT BEING OFFERED FOR ANY

11:01AM 24  TRUTH?

11:01AM 25            MR. LEACH:  NO, THE FIRST LINE IS NOT OFFERED FOR

11:01AM   1    THE TRUTH.  IT'S OFFERED FOR NOTICE.

11:01AM   2        THE SECOND LINE IS A STATEMENT BY AN AGENT UNDER

11:01AM   3    801(D)(2)(E), AND IT IS OFFERED FOR THE TRUTH.

11:01AM   4            MS. TREFZ:  I DON'T BELIEVE THIS MESSAGE HAS BEEN

11:01AM   5    IDENTIFIED UNDER THE LOCAL RULES AS AN 801(D)(2) STATEMENT.

11:01AM   6            THE COURT:  IS THERE ANY FOUNDATION FOR THE

11:01AM   7    INDIVIDUAL THAT IS LISTED HERE?  BECAUSE I'M NOT SURE I HAVE

11:01AM   8    THAT.

11:01AM   9            MR. LEACH:  IN THE FIRST SENTENCE, YOUR HONOR?

11:01AM  10            THE COURT:  YES.  FOR AGENCY PURPOSES, I'M NOT

11:01AM  11    CERTAIN THERE'S A FOUNDATION FOR THAT.

11:01AM  12            MR. LEACH:  I'M OFFERING THAT FIRST LINE FOR NOTICE,

11:01AM  13    NOT -- FOR A NONHEARSAY PURPOSE.

11:01AM  14        THE SECOND LINE IS NOT CONNECTED TO THAT FIRST PERSON.

11:02AM  15            THE COURT:  I THINK THE 805 GOES TO THE SECOND, THE

11:02AM  16    SECOND LINE, THE COMMENT THAT THERE IS --

11:02AM  17            MR. LEACH:  I THINK THAT'S A COMMENT BY THE SENDER

11:02AM  18    OF THE MESSAGE, YOUR HONOR.

11:02AM  19        (PAUSE IN PROCEEDINGS.)

11:02AM  20            THE COURT:  ALL RIGHT.  THE FIRST LINE YOU'RE ASKING

11:02AM  21    TO BE ADMITTED PURELY FOR NOTICE AS TO MS. HOLMES ONLY?

11:02AM  22            MR. LEACH:  YES.

11:02AM  23            THE COURT:  AND NOTICE OF WHAT SPECIFIC ISSUE?

11:03AM  24            MR. LEACH:  KNOWLEDGE OF THE MEDIA, PERCEPTION OF

11:03AM  25    THE COMPANY, HOW CERTAIN MESSAGES ARE GETTING ACROSS.

11:03AM   1           THE COURT:  I THINK I SEE THE END OF THIS COLLOQUY,

11:03AM   2    THE END OF THE NEXT SENTENCE IS WHAT YOU'RE TALKING ABOUT PULLS

11:03AM   3    THAT TOGETHER FOR ME.

11:03AM   4           SO, LADIES AND GENTLEMEN, I WILL ADMIT THIS FOR KNOWLEDGE

11:03AM   5    AND NOTICE, AGAIN, OF MS. HOLMES AS TO THE ISSUES AS YOU HEARD

11:03AM   6    MR. LEACH DESCRIBE THEM, NOTICE OF MEDIA EXPOSURE, AND IT WILL

11:03AM   7    BE ADMITTED FOR THAT LIMITED PURPOSE ONLY.

11:03AM   8           (GOVERNMENT'S EXHIBIT 5387B, PAGE 11 WAS RECEIVED IN

11:03AM   9    EVIDENCE.)

11:03AM   10              MR. LEACH:  MAY WE DISPLAY, YOUR HONOR?

11:03AM   11              THE COURT:  YES.

11:03AM   12              MR. LEACH:  THANK YOU, MS. HOLLIMAN.

11:03AM   13   Q.   MR. OFFEN, LET ME DRAW YOUR ATTENTION TO THE FIFTH LINE,

11:04AM   14   MESSAGE 31758.

11:04AM   15        DO YOU SEE THAT?

11:04AM   16   A.   YES.

11:04AM   17   Q.   AND IS THAT ANOTHER MESSAGE THAT WAS PULLED FROM

11:04AM   18   MS. HOLMES'S PHONE?

11:04AM   19   A.   YES.

11:04AM   20   Q.   OKAY.  WOULD YOU PLEASE READ THE SUBSTANCE OF THAT MESSAGE

11:04AM   21   FOR US?

11:04AM   22   A.   "PETER (ONE OF THESE 2 GUYS) MET WITH RON CONWAY TODAY FOR

11:04AM   23   BREAKFAST AND RON COMMENTED THAT THERE IS TOO MUCH HYPE AROUND

11:04AM   24   THERANOS AND YOU.  FYI, I AM WORRIED ABOUT OVEREXPOSURE WITHOUT

11:04AM   25   SOLID SUBSTANCE WHICH IS LACKING RIGHT NOW.  WE CAN TALK

11:04AM  1      TOMORROW ABOUT OVEREXPOSURE."

11:04AM  2      Q.   AND THAT APPEARS TO BE A MESSAGE FROM MR. BALWANI TO

11:04AM  3      MS. HOLMES?

11:04AM  4      A.   YES.

11:04AM  5      Q.   LET ME DRAW YOUR ATTENTION TO THE LAST MESSAGE IN THIS

11:04AM  6      CHAIN.  DO YOU SEE WHERE IT SAYS, "WE NEED FDA CLEARANCE AND

11:04AM  7      CTN CLEARANCE B"?

11:05AM  8      A.   YES.

11:05AM  9      Q.   AND DOES THAT APPEAR TO BE ANOTHER MESSAGE FROM

11:05AM  10     MR. BALWANI TO MS. HOLMES ON OR ABOUT APRIL 25TH, 2015?

11:05AM  11     A.   YES.

11:05AM  12     Q.   LET ME DRAW YOUR ATTENTION TO PAGE 190.

11:05AM  13          I OFFER PAGE 190, YOUR HONOR.

11:05AM  14              MS. TREFZ:  NO OBJECTION.

11:05AM  15              THE COURT:  IT'S ADMITTED.  WOULD YOU LIKE TO

11:05AM  16     PUBLISH THAT NOW?

11:05AM  17              MR. LEACH:  YES, PLEASE.

11:05AM  18              THE COURT:  IT MAY BE PUBLISHED.

11:05AM  19          (GOVERNMENT'S EXHIBIT 5387B, PAGE 12 WAS RECEIVED IN

11:05AM  20     EVIDENCE.)

11:05AM  21              MR. LEACH:  COULD WE HIGHLIGHT THE BOTTOM PORTION,

11:05AM  22     PLEASE, MS. HOLLIMAN.

11:05AM  23          WONDERFUL.

11:05AM  24     Q.   WHAT IS THE DATE OF THESE MESSAGES, MR. OFFEN?

11:05AM  25     A.   APRIL 28TH, 2015.

11:05AM 1    Q.   OKAY.  AND DO YOU SEE IN THE FIRST ROW WHERE IT SAYS, "IT

11:05AM 2    IS MOST MADDENING THERE IS NO FOCUS IN ANY CHEM TEAMS AND NO

11:05AM 3    PRODUCT COMING OUT."

11:05AM 4    A.   YES.

11:05AM 5    Q.   AND DOES THAT APPEAR TO BE A MESSAGE FROM MR. BALWANI TO

11:05AM 6    MS. HOLMES?

11:05AM 7    A.   YES.

11:05AM 8    Q.   AND WOULD YOU PLEASE READ FOR US THE SUBSTANCE OF THE LAST

11:06AM 9    MESSAGE IN THIS THREAD?

11:06AM 10   A.   "MOST DISAPPOINTING HOW BAD THESE PEOPLE ARE."

11:06AM 11            MR. LEACH:  YOUR HONOR, I OFFER PAGE 191 -- I NOTE

11:06AM 12   THE TIME, YOUR HONOR.  IS THIS --

11:06AM 13            THE COURT:  CAN WE CONTINUE OR --

11:06AM 14            MR. DOWNEY:  HOW MUCH LONGER?

11:06AM 15            MR. LEACH:  A LITTLE.

11:06AM 16            MR. DOWNEY:  MAYBE WE SHOULD BREAK, YOUR HONOR.

11:06AM 17            THE COURT:  OKAY.  LET'S TAKE OUR BREAK NOW, LADIES

11:06AM 18   AND GENTLEMEN.  I APOLOGIZE FOR THE ABBREVIATED SCHEDULE.

11:06AM 19       BUT SHOULD THIS BE OUR 45 MINUTE BREAK, COUNSEL?

11:06AM 20            MS. TREFZ:  YES, PLEASE.

11:06AM 21            MR. LEACH:  THAT'S FINE, YOUR HONOR.

11:06AM 22            THE COURT:  LET'S DO THAT.  WE'LL TAKE 45 MINUTES,

11:06AM 23   LADIES AND GENTLEMEN, AND THEN WE'LL COME BACK.

11:06AM 24       WE'RE GOING TO 3:00 TODAY.  WE MAY TAKE ANOTHER SMALL

11:06AM 25   BREAK, TEN MINUTE BREAK IN BETWEEN.  BUT LET'S TAKE OUR RECESS

11:06AM  1    NOW.

11:06AM  2         PLEASE REMEMBER THE ADMONITION THAT IS IN PLACE.  WE'LL

11:07AM  3    SEE YOU IN 45 MINUTES.  THANK YOU.

11:07AM  4         SIR, YOU CAN STAND DOWN.  WE'LL SEE YOU BACK IN

11:07AM  5    45 MINUTES.

11:07AM  6         (JURY OUT AT 11:07 A.M.)

11:07AM  7              THE COURT:  YOU CAN STAND DOWN, SIR.

11:07AM  8              THE WITNESS:  THANK YOU.

11:07AM  9              THE COURT:  THE RECORD SHOULD REFLECT THAT OUR JURY

11:08AM  10   HAS LEFT FOR THE MORNING BREAK.  THE WITNESS HAS LEFT THE

11:08AM  11   COURTROOM NOW.

11:08AM  12        I JUST WANT TO SAY, COUNSEL, TO THE BEST OF YOUR

11:08AM  13   ABILITIES, IF WE COULD, IF WE'RE GOING TO HAVE SOME DISCUSSION,

11:08AM  14   LET'S DO THAT IN THE MORNING PRIOR TO THE JURY CALL.

11:08AM  15        AND I HATE -- WE LOST ABOUT AN HOUR, MAYBE A LITTLE MORE

11:08AM  16   TODAY.  AND IT'S HARD TO PREDICT THESE THINGS, I KNOW.  BUT

11:08AM  17   YOU'RE SKILLED COUNSEL, YOU ALL ARE, AND I WOULD ASK YOU TO USE

11:08AM  18   YOUR BEST JUDGMENT.

11:08AM  19        I'LL GET HERE AS EARLY AS YOU WANT TO HAVE THESE

11:08AM  20   CONVERSATIONS.  AND I SHOULD TELL YOU, I'M NOT REVEALING

11:08AM  21   ANYTHING UNTOWARD, OUR COURT REPORTER IS UP AT 5:00 A.M. EVERY

11:08AM  22   DAY, SO SHE'S HAPPY TO COME HERE.  SHE DOES NOT LIVE IN THE

11:08AM  23   COURTHOUSE, LET ME SAY THAT, BUT SHE'S UP AND WE CAN DO THAT IF

11:08AM  24   WE NEED TO.  SO I APPRECIATE YOU BEARING THAT IN MIND, PLEASE.

11:08AM  25        ALL RIGHT.  THANKS.  HAVE A GOOD BREAK.

11:08AM  1                    THE CLERK:  COURT IS IN RECESS.

11:08AM  2               (LUNCH RECESS TAKEN AT 11:08 A.M.)

         3

         4

         5

         6

         7

         8

         9

        10

        11

        12

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

|         |    |                                                                  |
|---------|----|------------------------------------------------------------------|
| 11:08AM | 1  | **AFTERNOON SESSION**                                            |
| 11:53AM | 2  |                                                                  |
| 11:53AM | 3  | (COURT CONVENED AT 11:53 A.M.)                                   |
| 11:53AM | 4  | (JURY OUT AT 11:53 A.M.)                                         |
| 11:53AM | 5  | THE COURT:  WE'RE ON THE RECORD OUTSIDE OF THE                   |
| 11:53AM | 6  | PRESENCE OF THE JURY.  MS. HOLMES AND COUNSEL ARE PRESENT.       |
| 11:53AM | 7  | WHAT IS THE STATUS OF OUR WITNESS LINEUP FOR TODAY?              |
| 11:53AM | 8  | MR. BOSTIC:  SO, YOUR HONOR, THE GOVERNMENT'S NEXT               |
| 11:53AM | 9  | WITNESS IS PREPARED TO TESTIFY.  THE WITNESS HAS ALERTED US      |
| 11:54AM | 10 | THAT HE HAS SOME DEMANDS ON HIS SCHEDULE ON FRIDAY, INCLUDING    |
| 11:54AM | 11 | SOME INTERNATIONAL VISITORS THAT HE'S HOSTING OR MEETING WITH.   |
| 11:54AM | 12 | THE GOVERNMENT AND DEFENSE COUNSEL HAVE CONFERRED AND IT'S       |
| 11:54AM | 13 | OUR MUTUAL INTENTION TO PROCEED AS EFFICIENTLY AS POSSIBLE WITH  |
| 11:54AM | 14 | HIS TESTIMONY IN THE HOPES OF FINISHING IT TODAY.               |
| 11:54AM | 15 | WE WANTED TO ALERT THE COURT TO THE SITUATION IN CASE            |
| 11:54AM | 16 | THERE IS ANY ROOM ON THE BACK END OF TODAY'S SCHEDULE TO EXTEND  |
| 11:54AM | 17 | THE TIME SOMEWHAT.                                               |
| 11:54AM | 18 | THE COURT:  WHY DON'T WE -- THANK YOU.                           |
| 11:54AM | 19 | WHY DON'T WE INTERRUPT THIS CURRENT WITNESS'S TESTIMONY          |
| 11:54AM | 20 | AND TAKE THAT WITNESS OUT OF ORDER AND CONCLUDE AND FOLLOW UP    |
| 11:54AM | 21 | WITH THE OTHER WITNESS?                                          |
| 11:54AM | 22 | CAN WE DO THAT?                                                  |
| 11:54AM | 23 | MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT DEFERS TO                |
| 11:54AM | 24 | THE COURT.  CAN I HAVE A MOMENT TO CONFER WITH MY COLLEAGUES?    |
| 11:54AM | 25 | THE COURT:  SURE.                                                |

11:54AM  1              WILL THAT WORK FOR THE DEFENSE?

11:54AM  2              (DISCUSSION OFF THE RECORD.)

11:54AM  3              MR. LEACH:  YOUR HONOR, SORRY, WITH MULTIPLE

11:54AM  4      LAWYERS.

11:54AM  5         MR. OFFEN IS FROM OUT OF TOWN AND HE FLEW IN FROM ATLANTA

11:55AM  6      AND HE HAS ADDITIONAL COMMITMENTS LATER THIS WEEK, AND SO IT'S

11:55AM  7      IMPORTANT WE FINISH WITH THE WITNESS.

11:55AM  8              THE COURT:  WE CAN HAVE THE WITNESSES ARM WRESTLE?

11:55AM  9      THE VICTOR WILL COME IN --

11:55AM 10              (LAUGHTER.)

11:55AM 11              THE COURT:  I THINK WE CAN -- WHAT I'M TOLD IS THAT

11:55AM 12      WE CAN FINISH BOTH OF THESE WITNESSES TODAY.  WE MAY NEED TO GO

11:55AM 13      UNTIL 5:00, OR LATER THAN 3:00.  I TOLD THE JURY WE'RE GOING TO

11:55AM 14      3:00 TODAY, EXTENDING THEIR DAY.

11:55AM 15         I SUGGEST WE CALL THE NEXT WITNESS -- BREAK THIS WITNESS'S

11:55AM 16      TESTIMONY AND CALL YOUR NEXT WITNESS, START WITH THAT WITNESS.

11:55AM 17         MY SENSE IS -- WHAT I'VE HEARD IS THAT AT LEAST

11:55AM 18      MS. KRATZMANN INFORMED ME THAT SHE'S DISCUSSED IT WITH COUNSEL

11:55AM 19      AND YOU THINK YOU CAN GET THIS WITNESS'S TESTIMONY DONE IN TWO

11:55AM 20      HOURS.  DOES THAT SOUND RIGHT?

11:55AM 21              MR. DOWNEY:  THAT'S MR. BOSTIC'S ESTIMATE.  BETWEEN

11:55AM 22      US WAS ABOUT THREE.

11:55AM 23              THE COURT:  THREE.  OKAY.

11:55AM 24              MR. BOSTIC:  SO I DON'T THINK GOING UNTIL 5:00 WOULD

11:56AM 25      BE NECESSARY.

11:56AM   1              THE COURT:  RIGHT.  FOR THIS WITNESS, THIS NEXT

11:56AM   2    WITNESS.

11:56AM   3              MR. BOSTIC:  CORRECT, YOUR HONOR.

11:56AM   4         I WOULD HOPE ALSO, EVEN WITHOUT DISTURBING THE ORDER, IT

11:56AM   5    MIGHT BE POSSIBLE TO FINISH BOTH IN THE SAME DAY.

11:56AM   6              THE COURT:  IT COULD.  WE COULD DO THAT.  IT SOUNDS

11:56AM   7    LIKE THAT'S POSSIBLE.  I WONDER IF WE COULD -- AND IF NOT --

11:56AM   8    THIS WITNESS IS FROM ATLANTA DID YOU SAY?

11:56AM   9              MR. LEACH:  YES, YOUR HONOR.

11:56AM  10              THE COURT:  WELL, HE SHOULD ENJOY THE WEST COAST AND

11:56AM  11    SOAK UP AS MUCH AS HE CAN WHILE HE'S HERE.

11:56AM  12         SO WHY DON'T WE BREAK THIS WITNESS'S TESTIMONY, GET THE

11:56AM  13    NEXT WITNESS ON, AND THEN WE CAN RESUME.

11:56AM  14         MY SENSE IS THAT IT PROBABLY WILL -- THE CURRENT WITNESS

11:56AM  15    THAT IS ON NOW, IT SOUNDS LIKE YOU'RE ABOUT HALFWAY, IF NOT

11:56AM  16    MORE, DONE WITH THESE.

11:56AM  17              MR. LEACH:  YES.

11:56AM  18              THE COURT:  AND THEN OF COURSE THERE'S

11:56AM  19    CROSS-EXAMINATION, AND THEN I EXPECT THERE MIGHT BE SOME, I

11:56AM  20    DON'T KNOW, BUT THERE MIGHT BE SOME REQUEST TO READ ADDITIONAL

11:56AM  21    INFORMATION IN THE RECORD.  I DON'T KNOW.

11:56AM  22         BUT IF WE CALL THE NEXT WITNESS, THEN, MR. LEACH, YOU AND

11:57AM  23    MS. TREFZ, AS RESPECTIVE LAWYERS FOR THIS WITNESS, CURRENT

11:57AM  24    WITNESS, CAN MAYBE DECIDE HOW BEST TO PROCEED.

11:57AM  25              MR. LEACH:  UNDERSTOOD, YOUR HONOR.  THANK YOU.

| | | |
|---|---|---|
| 11:57AM | 1 | THE COURT:  SO LET'S DO THAT. |
| 11:57AM | 2 | CAN WE BRING THE JURY IN?  ANYTHING FURTHER BEFORE WE |
| 11:57AM | 3 | BRING OUR JURY IN? |
| 11:57AM | 4 | MR. DOWNEY:  NOT FROM US. |
| 11:57AM | 5 | THE COURT:  IS THAT ALL RIGHT WITH YOU, MS. TREFZ, |
| 11:57AM | 6 | IF WE BREAK UP YOUR WITNESS? |
| 11:57AM | 7 | MS. TREFZ:  SURE, YOUR HONOR.  I EXPECT |
| 11:57AM | 8 | CROSS-EXAMINATION TO BE VERY SHORT OF THAT WITNESS, JUST FYI. |
| 11:57AM | 9 | THE COURT:  SAY AGAIN. |
| 11:57AM | 10 | MS. TREFZ:  I EXPECT CROSS-EXAMINATION OF MR. OFFEN |
| 11:57AM | 11 | TO BE SHORT, AND SO I FULLY EXPECT WE WILL BE ABLE TO FINISH |
| 11:57AM | 12 | HIM SHORTLY. |
| 11:57AM | 13 | THE COURT:  GREAT.  ALL RIGHT.  THANK YOU. |
| 11:57AM | 14 | MR. LEACH:  MAY I RETRIEVE THE BINDERS, YOUR HONOR? |
| 11:57AM | 15 | THE COURT:  YES.  THANKS. |
| 11:58AM | 16 | (PAUSE IN PROCEEDINGS.) |
| 12:00PM | 17 | (JURY IN AT 12:00 P.M.) |
| 12:00PM | 18 | THE COURT:  THANK YOU.  PLEASE BE SEATED. |
| 12:00PM | 19 | WE'RE BACK ON THE RECORD.  ALL COUNSEL AND MS. HOLMES IS |
| 12:00PM | 20 | PRESENT.  OUR JURY AND ALTERNATES ARE PRESENT. |
| 12:00PM | 21 | GOOD AFTERNOON, LADIES AND GENTLEMEN. |
| 12:00PM | 22 | I JUST WANT TO TELL YOU ABOUT OUR SCHEDULE.  WE'RE GOING |
| 12:00PM | 23 | TO -- I'M GOING TO INTERRUPT THE TESTIMONY OF THE CURRENT |
| 12:00PM | 24 | WITNESS AND INTERRUPT THE EXAMINATION AND I'LL ALLOW THE |
| 12:00PM | 25 | GOVERNMENT TO CALL A WITNESS OUT OF ORDER.  WE DO THIS |

12:00PM 1    SOMETIMES, AND THIS HAPPENS REGULARLY IN CASES, PARTICULARLY

12:00PM 2    LENGTHY CASES WHERE WITNESSES AND OTHER SCHEDULES MIGHT

12:00PM 3    INTERFERE.

12:00PM 4        I'M INTERRUPTING THE TESTIMONY OF THE CURRENT WITNESS IN

12:00PM 5    FAVOR OF THE NEXT WITNESS BECAUSE OF SCHEDULING CONFLICTS.

12:00PM 6        I'M TOLD BY THE LAWYERS THIS NEXT WITNESS SHOULD BE -- MAY

12:00PM 7    REQUIRE ABOUT THREE HOURS OF TESTIMONY, BOTH DIRECT AND

12:00PM 8    CROSS-EXAMINATION, RECROSS, REDIRECT.

12:01PM 9        IF WE HAVE TIME LEFT, I'M ALSO INFORMED BY THE PARTIES

12:01PM 10   THAT THE CURRENT WITNESS WHO'S TESTIFYING ABOUT THE TEXT

12:01PM 11   MESSAGES, I THINK THERE'S REMAINING MAYBE AN HOUR OF TESTIMONY.

12:01PM 12       IS THAT ACCURATE, MR. LEACH?

12:01PM 13           MR. LEACH:  I THINK LESS THAN THAT, YOUR HONOR.

12:01PM 14           MS. TREFZ:  SUBSTANTIALLY LESS THAN THAT.

12:01PM 15           THE COURT:  RIGHT.  SO I TOLD YOU 3:00 O'CLOCK.

12:01PM 16   LET'S SEE WHERE THE DAY TAKES US AND WE CAN REVISIT.

12:01PM 17       WE'LL PROBABLY TAKE A BREAK IN ANY EVENT AND WE CAN

12:01PM 18   REASSESS THINGS.

12:01PM 19       SO I JUST WANT TO LET YOU KNOW I'M INTERRUPTING THE

12:01PM 20   CURRENT WITNESS'S TESTIMONY WITH CONSENT OF COUNSEL.

12:01PM 21       THE GOVERNMENT HAS ANOTHER WITNESS TO CALL AT THIS TIME?

12:01PM 22           MR. BOSTIC:  YES, YOUR HONOR.  THANK YOU.

12:01PM 23       THE UNITED STATES CALLS GENERAL JAMES MATTIS.

12:01PM 24           THE COURT:  THANK YOU.

12:01PM 25           MR. BOSTIC:  YOUR HONOR, I UNDERSTAND THE WITNESS IS

12:01PM   1    MAKE HIS WAY TO THE COURTROOM.

12:01PM   2              THE COURT:  ALL RIGHT.  THANK YOU.

12:01PM   3              MR. BOSTIC:  MAY I APPROACH THE WITNESS STAND,

12:01PM   4    YOUR HONOR?

12:01PM   5              THE COURT:  YES.

12:02PM   6         SIR, IF YOU WOULD COME FORWARD, PLEASE.  I'LL INVITE YOU

12:02PM   7    TO STAND FACING OUR COURTROOM DEPUTY.

12:02PM   8         IF YOU WOULD RAISE YOUR RIGHT HAND, SHE HAS A QUESTION FOR

12:02PM   9    YOU.

12:02PM   10             THE CLERK:  GOOD AFTERNOON.

12:02PM   11        **(GOVERNMENT'S WITNESS, JAMES MATTIS, WAS SWORN.)**

12:02PM   12             THE WITNESS:  I DO.

12:02PM   13             THE COURT:  PLEASE HAVE A SEAT HERE, SIR.  I'LL

12:02PM   14    INVITE YOU TO MAKE YOURSELF TO FEEL COMFORTABLE.  ADJUST THE

12:02PM   15    CHAIR AND MICROPHONE AS YOU NEED.

12:02PM   16        I'LL ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE MICROPHONE.

12:02PM   17        WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

12:02PM   18    AND THEN SPELL IT, PLEASE.

12:02PM   19             THE WITNESS:  MASK?

12:02PM   20             THE COURT:  MR. BOSTIC IS GOING TO ASK YOU A

12:03PM   21    QUESTION ABOUT THAT.

12:03PM   22             THE WITNESS:  OKAY.

12:03PM   23    ///

12:03PM   24    ///

12:03PM   25    ///

|   |   |   |
|---|---|---|
| 12:03PM | 1 | **DIRECT EXAMINATION** |
| 12:03PM | 2 | BY MR. BOSTIC: |
| 12:03PM | 3 | Q.   FOR NOW, IF YOU COULD STATE AND SPELL YOUR NAME FOR THE |
| 12:03PM | 4 | RECORD. |
| 12:03PM | 5 | A.   JAMES MATTIS, M-A-T-T-I-S. |
| 12:03PM | 6 | Q.   THANK YOU. |
| 12:03PM | 7 |     GENERAL MATTIS, IF YOU ARE VACCINATED AND COMFORTABLE |
| 12:03PM | 8 | REMOVING YOUR MASK, I UNDERSTAND FROM THE COURT THAT YOU'RE |
| 12:03PM | 9 | WELCOME TO DO SO. |
| 12:03PM | 10 |     THE COURT:  PLEASE DO. |
| 12:03PM | 11 |     THE WITNESS:  THANK YOU. |
| 12:03PM | 12 |     THE COURT:  YOU'RE WELCOME. |
| 12:03PM | 13 | BY MR. BOSTIC: |
| 12:03PM | 14 | Q.   GOOD AFTERNOON AGAIN. |
| 12:03PM | 15 |     LET ME START BY ASKING, WAS THERE A TIME WHEN YOU WERE ON |
| 12:03PM | 16 | THE BOARD OF DIRECTORS OF A COMPANY CALLED THERANOS? |
| 12:03PM | 17 | A.   YES. |
| 12:03PM | 18 | Q.   WHAT WERE THE APPROXIMATE DATES OR YEARS WHEN YOU WERE ON |
| 12:03PM | 19 | THE THERANOS BOARD? |
| 12:03PM | 20 | A.   PROBABLY AUGUST, SEPTEMBER TIMEFRAME OF 2013 UNTIL |
| 12:03PM | 21 | DECEMBER, I BELIEVE, OF 2016. |
| 12:03PM | 22 | Q.   AND PRIOR TO JOINING THE THERANOS BOARD OF DIRECTORS, DID |
| 12:03PM | 23 | YOU PREVIOUSLY HAVE ANY CONTACT WITH THE COMPANY THERANOS? |
| 12:03PM | 24 | A.   YES, I DID. |
| 12:03PM | 25 | Q.   AT A HIGH LEVEL, WHAT WAS THE NATURE OF THAT CONDUCT, OR |

12:03PM   1      THAT CONTACT?

12:04PM   2      A.   I WAS THE COMMANDER OF U.S. CENTRAL COMMAND, THE COMMAND

12:04PM   3      COVERING THE MIDDLE EAST.   I WAS IN SAN FRANCISCO TO GIVE A

12:04PM   4      SPEECH, AND I MET MS. HOLMES AT THAT EVENT.

12:04PM   5      Q.   DID YOU CONTINUE TO HAVE CONVERSATIONS WITH MS. HOLMES

12:04PM   6      FOLLOWING THAT INITIAL MEETING?

12:04PM   7      A.   I DID.

12:04PM   8      Q.   WERE THOSE CONVERSATIONS ABOUT THE POSSIBILITY OF THERANOS

12:04PM   9      USING -- OR EXCUSE ME.   LET ME START AGAIN.

12:04PM   10         WERE THOSE CONVERSATIONS ABOUT THE POSSIBILITY OF THE

12:04PM   11     MILITARY USING THERANOS BLOOD TESTING TECHNOLOGY?

12:04PM   12     A.   YES.   I WAS BACKSTAGE FOR A SPEECH I WAS GOING TO GIVE IN

12:04PM   13     SAN FRANCISCO.

12:04PM   14         SHE PRICKED MY FINGER TO GIVE ME AN IDEA OF WHAT THE

12:04PM   15     MACHINE BLOOD DRAW WAS SHE POINTED TO, I BELIEVE THAT'S WHEN I

12:04PM   16     FIRST SAW THE MACHINE, A BOX-LIKE A DEVICE SITTING ON A BENCH

12:04PM   17     RIGHT THERE, AND EXPLAINED ABOUT THE SPEED AND WHAT IT COULD

12:05PM   18     DO.

12:05PM   19     Q.   APPROXIMATELY WHAT YEAR DID THAT FIRST CONTACT TAKE PLACE?

12:05PM   20     A.   I BELIEVE 2000 -- I'M NOT SURE.   EITHER 2011 OR 2012.   I

12:05PM   21     BELIEVE I CAN FIND IT FOR YOU IF YOU NEEDED IT.

12:05PM   22     Q.   THAT'S FINE FOR NOW.   AND WE'LL CIRCLE BACK MORE TO THAT

12:05PM   23     INITIAL MEETING AND WHAT YOU LEARNED.

12:05PM   24         CAN YOU TELL US FIRST, THOUGH, ABOUT YOUR CAREER LEADING

12:05PM   25     UP TO THAT TIME?   GIVE US AN OVERVIEW OF YOUR CAREER LEADING UP

12:05PM 1    TO THE 2011 TIMEFRAME.

12:05PM 2    A.   I WAS IN COLLEGE IN 1969.  THE DRAFT WAS ON.  I JOINED THE

12:05PM 3    MARINE RESERVES IN 1971 AFTER THREE YEARS AT WASHINGTON STATE

12:05PM 4    COLLEGE.  I WAS COMMISSIONED A SECOND LIEUTENANT IN THE

12:05PM 5    MARINE CORPS.  I WAS AN INFANTRY OFFICER FOR A LITTLE OVER

12:05PM 6    40 YEARS IN ACTIVE DUTY.

12:05PM 7    Q.   AND WHAT WAS YOUR POSITION OR TITLE IN 2011?  LET'S START

12:06PM 8    WITH YOUR RANK IN THE MILITARY.  WHAT WAS YOUR RANK AT THAT

12:06PM 9    TIME?

12:06PM 10   A.   I WAS A GENERAL, FOUR STAR GENERAL IN 2010.  I TOOK OVER

12:06PM 11   U.S. CENTRAL COMMAND IN I BELIEVE AUGUST OF 2000 -- EXCUSE ME,

12:06PM 12   2010, AUGUST OF 2010.

12:06PM 13        AND I WAS IN CHARGE OF MILITARY OPERATIONS IN THE MIDDLE

12:06PM 14   EAST FROM EGYPT TO PAKISTAN FROM THE SAUDI ARABIA PENINSULA UP

12:06PM 15   INTO SIBERIA.

12:06PM 16   Q.   AND YOU SAID IT'S CALLED CENTRAL COMMAND, THAT REGION?

12:06PM 17   A.   YES.

12:06PM 18   Q.   AND IS THAT ALSO SHORTENED TO CENTCOM SOMETIMES?

12:06PM 19   A.   IT IS, YES.

12:06PM 20   Q.   AND THAT GEOGRAPHICAL AREA THAT YOU JUST DESCRIBED, IS IT

12:06PM 21   FAIR TO SAY THAT IT'S ONE OF THE MOST BUSY AREAS FOR MILITARY

12:06PM 22   ACTIVITY?

12:06PM 23   A.   YES.  WE HAD ABOUT 200,000 U.S. TROOPS, ABOUT 50,000

12:06PM 24   ALLIED TROOPS, AND WE HAD ACTIVE OPERATIONS IN IRAQ,

12:07PM 25   AFGHANISTAN, YEMEN, AND ELSEWHERE.

12:07PM   1    Q.   AND AS COMMANDER OF CENTCOM AT THAT TIME, WERE YOU

12:07PM   2    OVERSEEING ALL OF THOSE SERVICE MEMBERS?

12:07PM   3    A.   YES, SIR.

12:07PM   4    Q.   AND IN THAT POSITION, WERE YOU OVER MULTIPLE BRANCHES OF

12:07PM   5    THE U.S. ARMED SERVICES?

12:07PM   6    A.   YES, ARMY, NAVY, AIR FORCE, COAST GUARD, MARINE CORPS,

12:07PM   7    PLUS THE ALLIED FORCES.

12:07PM   8    Q.   YOU TESTIFIED THAT YOU JOINED THE THERANOS BOARD IN 2013

12:07PM   9    AND WERE ON IT UNTIL 2016; IS THAT CORRECT?

12:07PM   10   A.   YES.

12:07PM   11   Q.   CAN YOU BRIEFLY SUMMARIZE, AGAIN AT A HIGH LEVEL, YOUR

12:07PM   12   CAREER POST THERANOS?

12:07PM   13   A.   POST THERANOS?

12:07PM   14   Q.   YES, PLEASE.

12:07PM   15   A.   YES.   I WENT BACK INTO GOVERNMENT SERVICE FOR TWO YEARS AS

12:07PM   16   THE SECRETARY OF DEFENSE.

12:07PM   17   Q.   LET'S GO BACK TO THAT ORIGINAL CONTACT WITH THERANOS AND

12:07PM   18   YOUR MEETING WITH MS. HOLMES.

12:08PM   19        IF I COULD DIRECT YOUR ATTENTION TO THE BINDER IN FRONT OF

12:08PM   20   YOU, THERE'S A TAB LABELLED 5404.   IF I COULD ASK YOU TO TURN

12:08PM   21   TO THAT TAB, PLEASE.

12:08PM   22        LET ME KNOW ONCE YOU'RE THERE.   TAKE YOUR TIME.

12:08PM   23   A.   5404?

12:08PM   24   Q.   YES, 5404.   TAKE YOUR TIME.

12:08PM   25   A.   UH-HUH.

12:08PM    1    Q.    AND DO YOU RECOGNIZE THE DOCUMENT AT 5404?

12:08PM    2    A.    YES.

12:08PM    3    Q.    AND WHAT IS THE DOCUMENT?

12:08PM    4    A.    IT'S AN EMAIL EXCHANGE BETWEEN MS. HOLMES AND MYSELF IN

12:08PM    5    OCTOBER, NOVEMBER, OF 2011.  THIS WAS WHILE I WAS COMMANDER OF

12:08PM    6    U.S. CENTRAL COMMAND.

12:09PM    7              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

12:09PM    8    EXHIBIT 5404 INTO EVIDENCE.

12:09PM    9              MR. DOWNEY:  NO OBJECTION.

12:09PM   10              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:09PM   11         (GOVERNMENT'S EXHIBIT 5404 WAS RECEIVED IN EVIDENCE.)

12:09PM   12              MR. BOSTIC:  THANK YOU.

12:09PM   13         MS. HOLLIMAN, IF WE COULD DISPLAY THAT EXHIBIT AND GO TO

12:09PM   14    PAGE 5, PLEASE.  LET'S START BY ZOOMING IN ON THE BOTTOM

12:09PM   15    MESSAGE, PLEASE.

12:09PM   16         THANK YOU.

12:09PM   17    Q.    GENERAL MATTIS, DO YOU SEE ON YOUR SCREEN AN EMAIL FROM

12:09PM   18    MS. HOLMES TO YOU ON AUGUST 26TH, 2011?

12:09PM   19    A.    NO.  IT'S FROM MS. HOLMES TO ADMIRAL SWEENEY.

12:09PM   20    Q.    THANK YOU.  THANK YOU FOR CORRECTING ME.

12:09PM   21         DOES THAT MESSAGE CONTAIN A NOTE ADDRESSED TO YOU,

12:09PM   22    GENERAL MATTIS?

12:09PM   23    A.    OH, YEAH, I SEE IT DOWN BELOW, YEAH.

12:09PM   24    Q.    AND DO YOU RECALL WHEN THIS HAPPENED IN RELATION TO WHEN

12:09PM   25    YOUR FIRST MEETING WAS WITH MS. HOLMES?  WOULD THIS HAVE BEEN

12:10PM  1    AROUND THAT TIME OR A FEW WEEKS AFTER?

12:10PM  2    A.   I BELIEVE IT WAS AROUND THAT TIME JUST FROM READING WHAT

12:10PM  3    THE MESSAGE SAYS AND THE DATE ON IT.

12:10PM  4    Q.   LET'S ZOOM OUT, MS. HOLLIMAN, AND THEN GO TO THE MESSAGE

12:10PM  5    AT THE TOP HALF OF THE PAGE.  WE CAN JUST CAPTURE THE TEXT

12:10PM  6    THERE.

12:10PM  7         GENERAL MATTIS, DO YOU RECOGNIZE WHAT IS ON THE SCREEN NOW

12:10PM  8    AS A MESSAGE THAT YOU SENT IN RESPONSE TO MS. HOLMES AROUND

12:10PM  9    THAT TIME?

12:10PM  10   A.   YES.  THAT'S A NOTE FROM ME TO MS. HOLMES.

12:10PM  11   Q.   LET'S GO TO PAGE 3 OF THIS EXHIBIT IF WE CAN.  LET'S ZOOM

12:11PM  12   IN ON THE SECOND MESSAGE FROM THE BOTTOM.  YES, FROM THERE

12:11PM  13   DOWN.

12:11PM  14        THANK YOU.

12:11PM  15        GENERAL MATTIS, ARE YOU LOOKING NOW AT ANOTHER EMAIL

12:11PM  16   MESSAGE FROM YOU TO MS. HOLMES?

12:11PM  17   A.   YES, ON OCTOBER 8TH, 2011.

12:11PM  18   Q.   THE SECOND SENTENCE OF YOUR EMAIL THERE SAYS, "I'M TRYING

12:11PM  19   TO FIND A WAY TO EMPLOY YOUR DEVICE ON A SWIFT 'PILOT PROJECT'

12:11PM  20   OR 'PROOF OF PRINCIPLE' TO EXPEDITE ITS ENTRY TO OUR FORCES."

12:11PM  21        CAN YOU EXPLAIN WHAT YOU MEANT BY THAT?

12:11PM  22   A.   YEAH.  I WAS TAKEN WITH THE IDEA THAT WITH ONE DROP OF

12:11PM  23   BLOOD AND WITH REMOTE CAPABILITY, YOU COULD BASICALLY TEST FOR

12:11PM  24   A BROAD ARRAY OF PROBLEMS.

12:11PM  25        AND IN TRIAGE WHERE YOU HAVE CAUSALITIES GOING IN, THIS

12:12PM  1    COULD BE VERY, VERY HELPFUL FOR MEDICAL PERSONNEL IF IT COULD

12:12PM  2    DO WHAT SHE SAID IT COULD DO.

12:12PM  3        AND SO I WANTED TO PUT IT ALONGSIDE WHAT WE WERE USING

12:12PM  4    THEN, NOT TO DIAGNOSE, BUT TO PUT IT ALONGSIDE AND SEE IF IT

12:12PM  5    PERFORMED AS STATED.

12:12PM  6    Q.   SO LET ME FOLLOW UP ON A COUPLE OF THINGS THERE.

12:12PM  7        AT THIS POINT YOU HAD SOME LEVEL OF UNDERSTANDING ABOUT

12:12PM  8    WHAT THE THERANOS TECHNOLOGY COULD SUPPOSEDLY DO; IS THAT

12:12PM  9    CORRECT?

12:12PM  10   A.   UH-HUH.

12:12PM  11   Q.   AND WHERE DID THAT KNOWLEDGE COME FROM?

12:12PM  12   A.   THE DISCUSSION I HAD WITH MS. HOLMES, IT WAS VERY

12:12PM  13   RUDIMENTARY IN TERMS OF HOW MUCH BLOOD IT WOULD TAKE AND THAT

12:12PM  14   IT COULD DO THE SAME TESTS AS WE WOULD BE DOING WITH ALL OF THE

12:12PM  15   TUBES OF BLOOD THAT WE HAVE ALL GIVEN MANY TIMES.

12:12PM  16   Q.   BESIDES THE TYPE OF SAMPLE AND THE SIZE OF THE SAMPLE, DID

12:12PM  17   YOU KNOW ANYTHING AT THIS POINT ABOUT THE SIZE OF THE DEVICE

12:12PM  18   THAT WAS USED, OR THAT WOULD BE USED TO PERFORM THOSE TESTS?

12:13PM  19   A.   YES, THERE WAS A -- I DON'T KNOW IF IT WAS THE REAL DEVICE

12:13PM  20   OR A FACSIMILE OF IT, BUT SHE POINTED TO THE SIZE OF THE

12:13PM  21   MACHINE.  I BELIEVE THE MACHINE WAS THERE.  IT MIGHT HAVE BEEN

12:13PM  22   A PICTURE, BUT I'M PRETTY SURE THE MACHINE WAS THERE.

12:13PM  23        IT WAS -- AGAIN, THIS WAS BACKSTAGE I THINK JUST BEFORE

12:13PM  24   I'M GOING TO GIVE A SPEECH OR JUST AFTERWARDS BEFORE A DINNER.

12:13PM  25        BUT IT WAS -- THAT'S ABOUT -- I'VE TOLD YOU JUST ABOUT AS

12:13PM 1    MUCH AS I KNEW.  VERY RUDIMENTARY WHAT I KNEW ABOUT AT THAT

12:13PM 2    POINT, OTHER THAN IT GOT MY INTEREST.

12:13PM 3    Q.   AND BASED ON THE EITHER THE EXAMPLE YOU SAW OR

12:13PM 4    MS. HOLMES'S DESCRIPTION, WHAT DID YOU UNDERSTAND THE SIZE OF

12:13PM 5    THE DEVICE TO BE?  HOW BIG WAS IT?

12:13PM 6    A.   OH, PROBABLY -- I CAN'T REALLY -- I DON'T KNOW.  MAYBE A

12:13PM 7    FOOT AND A HALF -- 2 FEET WIDE, 2 FEET DEEP AND 18 INCHES HIGH

12:13PM 8    IF I RECALL RIGHT, ABOUT SOMETHING LIKE THAT.

12:14PM 9    Q.   APPROXIMATELY?

12:14PM 10   A.   APPROXIMATELY.  SOMETHING THAT COULD BE PUT INTO

12:14PM 11   CONSTRAINED SPACES.

12:14PM 12   Q.   BASED ON THAT KNOWLEDGE, YOU WERE INTERESTED IN POSSIBLE

12:14PM 13   MILITARY APPLICATIONS FOR THE DEVICE?

12:14PM 14   A.   YES.

12:14PM 15   Q.   AND YOU JUST TESTIFIED ABOUT THE NATURE OF THIS PILOT

12:14PM 16   PROJECT OR PROOF OF PRINCIPLE.  CAN YOU SAY MORE ABOUT THAT?

12:14PM 17   HOW WOULD IT BE THE SAME AS OR DIFFERENT FROM ACTUALLY USING

12:14PM 18   THE DEVICE FOR DIAGNOSTIC PURPOSES?

12:14PM 19   A.   WELL, BY DOING IT THIS WAY, WE COULD DO A SIDE-BY-SIDE

12:14PM 20   COMPARISON, WHAT ARE WE DOING RIGHT NOW IN THEATRE?  WE WERE

12:14PM 21   TAKING CASUALTIES -- IT WAS TOUGH FIGHTING AT THAT POINT -- AND

12:14PM 22   PUT IT RIGHT ALONGSIDE IT.

12:14PM 23       AND DON'T USE IT FOR DIAGNOSIS, BUT THEN COMPARE THE

12:14PM 24   RESULT AND PUT THE BLOOD THROUGH USING THAT PROCESS AND SEE

12:14PM 25   WHAT HAPPENED.  WAS IT MORE ACCURATE?  WAS IT FASTER?  YOU

12:15PM  1     KNOW, THESE KIND OF ASPECTS TO IT.

12:15PM  2          AND THEN WE WOULD KNOW IF WE WERE REALLY INTERESTED IN

12:15PM  3     BRINGING IT IN THEATRE.

12:15PM  4     Q.   YOU SAID THIS WOULD BE A COMPARISON.  DO YOU MEAN A

12:15PM  5     COMPARISON BETWEEN THE THERANOS TECHNOLOGY AND CONVENTIONAL

12:15PM  6     BLOOD ANALYZERS?

12:15PM  7     A.   EXACTLY.

12:15PM  8     Q.   WHY NOT JUST MOVE RIGHT TO USING IT FOR DIAGNOSTIC

12:15PM  9     PURPOSES?  WHY WAS IT NECESSARY TO GO THROUGH THIS TESTING

12:15PM  10    PROCESS FIRST?

12:15PM  11    A.   WELL, IN BOTH THE CIVILIAN WORLD AND THE MILITARY WORLD --

12:15PM  12    I CAN SPEAK MOST AUTHORITATIVELY IN THE MILITARY WORLD --

12:15PM  13    ALTHOUGH THEY BOTH USE SOME OF THE SAME CERTIFICATIONS, IT'S A

12:15PM  14    VERY REGULATED INDUSTRY.

12:15PM  15         AND CONSIDERING THAT WE DEAL WITH A LOT OF VIOLENCE AND WE

12:15PM  16    WERE TAKING A LOT OF CASUALTIES, YOU DON'T TAKE CHANCES ON

12:15PM  17    SOMETHING LIKE THAT.  IT NEEDS TO PROVE ITSELF BEFORE IT'S

12:15PM  18    BROUGHT IN, AND THERE'S A CERTIFICATION PROCESS IT HAS TO GO

12:15PM  19    THROUGH, BUT I WANTED TO GET IT STARTED.

12:15PM  20    Q.   LET'S LEAVE PAGE 3 AND GO TO PAGE 1 OF THIS EXHIBIT,

12:16PM  21    PLEASE.  ONCE WE'RE AT PAGE 1, LET'S ZOOM IN ON THE TOP EMAIL

12:16PM  22    MESSAGE, PLEASE.

12:16PM  23         GENERAL MATTIS, DO YOU SEE ANOTHER EMAIL FROM MS. HOLMES

12:16PM  24    TO YOU, THIS ONE DATED NOVEMBER 20TH, 2011?

12:16PM  25    A.   YES.

12:16PM    1    Q.   AND IN THAT MESSAGE, MS. HOLMES SAYS, "IT IS ON US TO

12:16PM    2    DRIVE FORWARD AND GET A PILOT."

12:16PM    3         DO YOU SEE THAT?

12:16PM    4    A.   YES, I DO.

12:16PM    5    Q.   AND IS THAT PILOT REFERRING TO THE TESTING PROCESS THAT

12:16PM    6    YOU WERE REFERENCING?

12:16PM    7    A.   YES.  THAT'S HOW I INTERPRET IT, BUT I'M CERTAIN THAT IT

12:16PM    8    IS.

12:16PM    9    Q.   THE LINE BELOW THAT SAYS, "WE WILL DO ALL IT TAKES TO MAKE

12:16PM   10    THIS HAPPEN AND WORK THROUGH THIS PROCESS."

12:16PM   11         DO YOU SEE THAT?

12:16PM   12    A.   YES.

12:16PM   13    Q.   AND IS THAT CONSISTENT WITH WHAT MS. HOLMES WAS SIGNALLING

12:16PM   14    TO YOU ABOUT THERANOS'S INTEREST IN THIS PARTNERSHIP?

12:17PM   15    A.   SHE SUMS IT UP RIGHT THERE, YES.

12:17PM   16    Q.   WE TALKED A LITTLE BIT ABOUT YOUR UNDERSTANDING AT THAT

12:17PM   17    TIME OF WHAT THE THERANOS TECHNOLOGY WAS.  WE TALKED ABOUT THE

12:17PM   18    DEVICE, THE METHOD OF FINGERSTICK SAMPLE DRAW.

12:17PM   19         AROUND THAT TIME, DID YOU UNDERSTAND THAT THE THERANOS

12:17PM   20    DEVICE -- SORRY, THAT THE THERANOS TECHNOLOGY INCLUDED A SINGLE

12:17PM   21    DEVICE THAT COULD DO ALL OF THE TESTS OR MULTIPLE DEVICES?

12:17PM   22    A.   WELL, IT WAS A SINGLE DEVICE.  THAT'S WHY I WAS INTERESTED

12:17PM   23    IN IT.

12:17PM   24    Q.   AND WHY WAS THAT YOUR UNDERSTANDING, THAT IT WAS A SINGLE

12:17PM   25    DEVICE?

12:17PM   1   A.   WELL, ON THE SMALLER SHIPS, MY SHIPS OUT AT SEA, THEY

12:17PM   2   DON'T HAVE A DOCTOR.   THEY HAVE WHAT YOU WOULD CALL A MEDIC IN

12:17PM   3   THE ARMY OR AIR FORCE, THEY HAVE A CHIEF HOSPITAL CORPSMAN.

12:17PM   4        AT REMOTE OUTPOSTS YOU HAVE MEDICS, YOU DON'T HAVE DOCTORS

12:17PM   5   IN THE SMALL OUTPOSTS, FOR EXAMPLE, IN THE HINDU KUSH.

12:18PM   6        AND SO IF YOU CAN PUT ONE OF THESE IN AND HAVE SOMEONE

12:18PM   7   WITH LIMITED MEDICAL KNOWLEDGE TRAINED TO USE IT, IT COULD MAKE

12:18PM   8   A BIG DIFFERENCE.   RIGHT THERE AT THE POINT WHERE THE CASUALTY

12:18PM   9   OR THE ILLNESS IS TAKING PLACE, YOU CAN DETERMINE, DO YOU NEED

12:18PM  10   TO DO A MEDEVAC IN THE MIDDLE OF THE NIGHT, IN THE MIDDLE OF A

12:18PM  11   STORM OR SOMETHING LIKE THAT IF THEY HAD SOMETHING LIKE THIS,

12:18PM  12   IF IT COULD DO THIS.

12:18PM  13        IT WOULD ALSO HELP US IN TRIAGE IF YOU HAD A NUMBER OF

12:18PM  14   CASUALTIES AT ONE TIME.

12:18PM  15        AND WHAT SHE ALLUDED TO ME ABOUT THE SPEED OF THIS, IT

12:18PM  16   COULD HELP DOCTORS MAKE DECISIONS IN TRIAGE OF WHO GETS TREATED

12:18PM  17   FIRST AND WHO IS MOST IN NEED OF CARE.

12:18PM  18   Q.   IF IT WERE THE CASE THAT ONE DEVICE COULD NOT PERFORM ALL

12:18PM  19   OF THE TESTS AND MULTIPLE DEVICES WERE NEEDED, WOULD THAT HAVE

12:19PM  20   DECREASED OR AFFECTED YOUR INTEREST IN THIS TECHNOLOGY?

12:19PM  21   A.   I WOULDN'T BE TALKING ABOUT IT FROM THIS POSITION HERE.

12:19PM  22        THE REASON I WAS INTERESTED IS BECAUSE IT WAS ONE DEVICE

12:19PM  23   THAT COULD DO THIS.   THAT WAS WHY I WAS INTERESTED.

12:19PM  24        YEAH, I PROBABLY WOULD NOT HAVE BEEN INTERESTED IF IT WAS

12:19PM  25   GOING TO BE SOMETHING THAT WE HAVE TO BRING IN A LOT OF OTHER

12:19PM  1    STUFF FOR.

12:19PM  2    Q.    HOW ABOUT THE SIZE OF THE DEVICE?  WAS THE RELATIVELY

12:19PM  3    SMALL SIZE OF THE ANALYZER AN IMPORTANT FACTOR IN YOUR

12:19PM  4    INTEREST?

12:19PM  5    A.    ABSOLUTELY.  YOU HAVE LIMITED ROOM IN A SICK BAY ON A

12:19PM  6    SHIP, AND IT'S A RUGGED ENVIRONMENT WHEN YOU'RE OUT IN THE

12:19PM  7    FIELD AT SOME OF THE OUTPOSTS.  SO ONE DEVICE IS EASIER TO

12:19PM  8    INCORPORATE.  ONE DEVICE IS EASIER TO KEEP CLEAN, OR AT LEAST

12:19PM  9    TRYING TO KEEP FROM BEING IN A PLACE WHERE IT'S GOING TO GET

12:19PM  10   BEAT UP BY THE ENVIRONMENT.

12:19PM  11   Q.    IF INSTEAD YOUR UNDERSTANDING AT THE TIME WAS THAT

12:20PM  12   ADDITIONAL DEVICES, INCLUDING SOME DEVICES UP TO THE SIZE OF,

12:20PM  13   SAY, A REFRIGERATOR OR A LARGE COPIER WOULD BE NEEDED, WOULD

12:20PM  14   YOU STILL HAVE BEEN JUST AS INTERESTED IN THE THERANOS

12:20PM  15   TECHNOLOGY?

12:20PM  16   A.    NO.

12:20PM  17   Q.    IN SELECTING OR EVALUATING THIS KIND OF DEVICE OR

12:20PM  18   TECHNOLOGY FOR MILITARY USE, WOULD ACCURACY OF THE TESTING ALSO

12:20PM  19   BE IMPORTANT?

12:20PM  20   A.    WELL, WE -- WE TAKE CAUSALITIES IN OUR LINE OF WORK.

12:20PM  21   ACCURACY IS CRITICAL BECAUSE A LOT OF OUR CASUALTIES ARE

12:20PM  22   EMERGENCY.  WHAT I WAS CONCERNED WITH IN THEATRE WAS NOT THE

12:20PM  23   KIND OF MEDICAL CARE OF A COMMUNITY HOSPITAL.

12:20PM  24        IT WAS PEOPLE WHO WERE INJURED USUALLY WITH FRAGMENTATION

12:20PM  25   OR CONCUSSION INJURIES, THAT SORT OF THING THAT NEEDED

12:20PM  1    IMMEDIATE LIFE SAVING CARE, OR CERTAINLY THE KIND OF CARE THAT

12:20PM  2    WOULD KEEP THEM FROM LOSING A LIMB OR SOMETHING LIKE THAT.

12:21PM  3    Q.   SO, IN OTHER WORDS, THE STAKES ARE VERY HIGH?

12:21PM  4    A.   YES, THE STAKES ARE VERY HIGH.

12:21PM  5    Q.   WHAT ABOUT RELIABILITY OF THE DEVICE?  THE ABILITY OF THE

12:21PM  6    DEVICE TO KEEP FUNCTIONING, NOT TO BREAK DOWN AND TO RETURN

12:21PM  7    CONSISTENT RESULTS, WOULD THOSE THINGS BE IMPORTANT?

12:21PM  8    A.   THEY WOULD BE, BUT THAT WOULD BE DETERMINED IN THE

12:21PM  9    SIDE-BY-SIDE TEST.  I WASN'T MAKING AN ASSUMPTION THAT IT WOULD

12:21PM  10   OR WOULD NOT.  I JUST WANTED TO GET IT OUT THERE SO THE

12:21PM  11   MILITARY DOCTORS -- THERE'S NOTHING LIKE SEEING SOMETHING IN

12:21PM  12   ACTION TO SAY LET'S GET IT AND BUILD THE SUPPORT FOR SOMETHING

12:21PM  13   LIKE THIS THAT WAS SO NEW.

12:21PM  14        I MEAN, I WAS, FRANKLY, AMAZED AT WHAT WAS POSSIBLE.

12:21PM  15   Q.   AND, AGAIN, THAT WAS BASED ON WHAT MS. HOLMES WAS TELLING

12:21PM  16   YOU AT THE TIME?

12:21PM  17   A.   TOTALLY, YES.  I HAD NO OTHER SOURCE OF INFORMATION ON IT.

12:22PM  18   Q.   THE TEST THAT WE HAVE BEEN TALKING ABOUT, EXCUSE ME, WAS

12:22PM  19   IT YOUR UNDERSTANDING THAT A SUCCESSFUL OUTCOME ON THAT TEST

12:22PM  20   WOULD BE A PREREQUISITE TO THE MILITARY ACTUALLY USING THE

12:22PM  21   DEVICE FOR TREATING SOLDIERS?

12:22PM  22   A.   IT WAS CERTAINLY A PREREQUISITE FOR ME SUPPORTING TO MOVE

12:22PM  23   FORWARD AND SAY WE OUGHT TO DO THIS.

12:22PM  24   Q.   WE'VE TALKED SO FAR ABOUT YOUR UNDERSTANDING AND

12:22PM  25   IMPRESSION OF THE TECHNOLOGY AT THAT TIME.

12:22PM  1        HOW ABOUT MS. HOLMES HERSELF?  WHAT WAS YOUR IMPRESSION OF

12:22PM  2   HER?  HOW DID SHE STRIKE YOU?

12:22PM  3   A.   SHARP, ARTICULATE, COMMITTED.

12:22PM  4   Q.   WERE YOU IMPRESSED BY HER PERSONALLY?

12:22PM  5   A.   I WAS.  THAT DIDN'T TAKE THE PLACE FOR HAVING THE DEVICE

12:22PM  6   PROVE ITSELF.

12:23PM  7   Q.   IF I COULD ASK YOU TO TURN IN YOUR BINDER TO EXHIBIT 5409.

12:23PM  8   A.   UH-HUH.  OKAY.

12:23PM  9   Q.   OKAY.  AND ONCE YOU'RE THERE, LET ME KNOW IF YOU RECOGNIZE

12:23PM 10   THAT EXHIBIT.

12:23PM 11   A.   YES.  IT'S AN EMAIL CHAIN BETWEEN MS. HOLMES AND I -- ME.

12:23PM 12   IT LOOKS LIKE MARCH OF 2013.  I THINK THIS IS IMMEDIATELY

12:23PM 13   FOLLOWING MY LEAVING U.S. CENTRAL COMMAND.  I'M NOT SURE OF THE

12:23PM 14   DATE, BUT IT'S CERTAINLY AROUND THE DATE I LEFT U.S. CENTRAL

12:23PM 15   COMMAND AS COMMANDER.

12:23PM 16   Q.   UNDERSTOOD.

12:23PM 17        YOUR HONOR, WE MOVE IN EXHIBIT 5409.

12:24PM 18             MR. DOWNEY:  NO OBJECTION.

12:24PM 19             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:24PM 20        (GOVERNMENT'S EXHIBIT 5409 WAS RECEIVED IN EVIDENCE.)

12:24PM 21             MR. BOSTIC:  MS. HOLLIMAN, IF WE CAN ZOOM IN ON THE

12:24PM 22   TWO BOTTOM EMAILS.

12:24PM 23        THANK YOU.

12:24PM 24   Q.   GENERAL MATTIS, ARE THESE THE EMAILS THAT WE HAVE BEEN

12:24PM 25   LOOKING AT BETWEEN YOU AND MS. HOLMES IN MARCH 2013?

MATTIS DIRECT BY MR. BOSTIC

12:24PM  1    A.   YES.

12:24PM  2    Q.   AND IN THE BOTTOM MESSAGE, MS. HOLMES WRITES TO YOU, "WE

12:24PM  3    ARE MAKING SURE THAT OUR DEPLOYMENT IS DONE RIGHT AND ARE VERY

12:24PM  4    CLOSE TO ACTIVATING OUR PROGRAM.  I WISH YOU COULD HAVE BEEN

12:24PM  5    HERE WHEN WE GO LIVE.  I VERY MUCH LOOK FORWARD TO HAVING THE

12:24PM  6    OPPORTUNITY TO BRIEF YOU ON IT WHEN WE DO."

12:24PM  7         DO YOU SEE THAT?

12:24PM  8    A.   I DO.

12:24PM  9    Q.   AND AT THIS POINT IN TIME, WOULD THIS HAVE BEEN REFERRING

12:24PM  10   TO A DEPLOYMENT WITH THE U.S. MILITARY?

12:24PM  11   A.   ABSOLUTELY.  I THINK THAT'S WHY SHE WOULD HAVE BEEN

12:24PM  12   CONTACTING ME ABOUT IT.  I'M SURE THAT'S WHAT IT IS.

12:24PM  13   Q.   LET ME DIRECT YOUR ATTENTION TO THE EMAIL ABOVE THAT,

12:25PM  14   WHICH IS A MESSAGE FROM YOU TO MS. HOLMES.

12:25PM  15        DO YOU SEE THAT?

12:25PM  16   A.   YES.

12:25PM  17   Q.   AND IN THAT EMAIL YOU SAY, "I'M A STRONG BELIEVER IN WHAT

12:25PM  18   YOU HAVE DESIGNED/BUILT AND HOPE THAT WE CAN GET IT IN THEATRE

12:25PM  19   SOON TO TEST IT."

12:25PM  20        DO YOU SEE THAT?

12:25PM  21   A.   YES, ABSOLUTELY.

12:25PM  22   Q.   AROUND THIS TIME -- WE HAVE BEEN TALKING ABOUT THE TESTING

12:25PM  23   PROCESS THAT THE MILITARY WOULD HAVE TO GO THROUGH BEFORE IT

12:25PM  24   USE THE DEVICE.

12:25PM  25   A.   UH-HUH.

12:25PM  1    Q.   AND AT THIS POINT IN MARCH OF 2013, HAD THAT TESTING

12:25PM  2    PROCESS COMPLETED?

12:25PM  3    A.   NO, IT HAD NOT.  WE HAD BEEN UNSUCCESSFUL AT GETTING IT

12:25PM  4    INTO THEATRE.

12:25PM  5    Q.   AND HAD THAT TESTING PROCESS IN THEATRE EVEN STARTED AS

12:25PM  6    FAR AS YOU KNOW IN MARCH OF 2013?

12:25PM  7    A.   NO, NO, IT HAD NOT.

12:25PM  8    Q.   AT THIS POINT WERE YOU STILL INTERESTED, THOUGH, IN THE

12:25PM  9    THERANOS TECHNOLOGY AND HOPING THAT TEST COULD HAPPEN?

12:26PM  10   A.   THE CAUSALITIES HAD NOT RELENTED.  I WAS INTERESTED IN

12:26PM  11   ANYTHING THAT COULD PROMISE SOME IMPROVEMENT IN THE CARE OF THE

12:26PM  12   CAUSALITIES.

12:26PM  13   Q.   SO FAR WE'VE GONE FROM NOVEMBER OF 2011 UP TO MARCH OF

12:26PM  14   2013; CORRECT?

12:26PM  15   A.   RIGHT.

12:26PM  16   Q.   WHAT WAS YOUR UNDERSTANDING AT THE TIME OF WHY THIS TEST

12:26PM  17   HAD NOT YET BEGUN, THE MILITARY TEST OF THERANOS TECHNOLOGY?

12:26PM  18   A.   WELL, I CAN'T GIVE YOU A DETAILED BLOW BY BLOW, BUT WHEN I

12:26PM  19   WOULD COME BACK, I WOULD TURN IT OVER TO MY CHIEF OF STAFF WHO

12:26PM  20   RUNS THE STAFF WHEN I'M OUT TRAVELLING TO THEATRE AND ALL, AND

12:26PM  21   HE WAS WORKING IT.  I THINK THAT MY SURGEON AND MY JUDGE

12:26PM  22   ADVOCATE WERE WORKING IT AS WELL.

12:26PM  23        MY GOAL WAS TO GET IT IN FOR THE SIDE-BY-SIDE FOLLOWING

12:26PM  24   ALL LEGAL AND ETHICAL -- AND I HIGHLIGHTED THIS IN MY VERBAL

12:26PM  25   TALKS, WHICH I THINK YOU'LL FIND IN SOME OF THE EMAILS AS

12:27PM  1    WELL -- AND I WAS A STRONG BELIEVER IN GETTING THIS IN THEATRE

12:27PM  2    SO IT COULD EITHER STAND AND DELIVER, OR IT WOULDN'T.

12:27PM  3         BUT I DID NOT WANT TO MISS AN OPPORTUNITY IF THIS WAS

12:27PM  4    GOING TO DELIVER THIS AND SAY WE SAT ON OUR HANDS AT A TIME

12:27PM  5    WHEN SOMETHING COULD HAVE HELPED.

12:27PM  6    Q.   LET'S ZOOM OUT AND ZOOM BACK IN ON THE MIDDLE MESSAGE IN

12:27PM  7    THIS PAGE FROM MS. HOLMES.

12:27PM  8         GENERAL MATTIS, DO YOU SEE ON THE SCREEN A MESSAGE FROM

12:27PM  9    MS. HOLMES TO YOU, EXCUSE ME, ON MARCH 26TH, 2013?

12:27PM 10    A.   YES.

12:27PM 11    Q.   AND IN THAT MESSAGE, DOES SHE WRITE:  "THIS INITIATIVE IS

12:27PM 12    OUR SMALL WAY OF BEING ABLE TO SERVE AND WE WILL DO WHATEVER IT

12:27PM 13    TAKES TO MAKE IT SUCCESSFUL"?

12:28PM 14    A.   UH-HUH.

12:28PM 15    Q.   AROUND THIS TIME, WAS MS. HOLMES CONTINUING TO EXPRESS

12:28PM 16    INTEREST ON BEHALF OF THERANOS AND MOVING FORWARD WITH THIS

12:28PM 17    PARTNERSHIP?

12:28PM 18    A.   YES.  MY CONCERN -- I TOOK HER AT HER WORD.  SHE, SHE

12:28PM 19    MOVED WHAT I THOUGHT WAS FORWARD ON IT, AND I WAS JUST TRYING

12:28PM 20    TO GET THE MILITARY SIDE TO OPEN THE DOOR TO THE SIDE-BY-SIDE

12:28PM 21    TEST SO LONG AS THERE WAS NO RULE BARRING IT, AND I LEFT THAT

12:28PM 22    IN THE HANDS OF MY CHIEF OF STAFF.

12:28PM 23         THIS WAS NOT A SIGNIFICANT ISSUE CONSIDERING EVERYTHING

12:28PM 24    THAT WE WERE DEALING WITH IN THE CENTRAL COMMAND REGION, THE

12:28PM 25    MIDDLE EAST REGION AT THIS POINT.

12:28PM 1        BUT IT WAS SOMETHING THAT I DIDN'T WANT TO HAVE SIMPLY

12:28PM 2    PEOPLE GO TO SLEEP ON AND NOT TAKE ADVANTAGE OF IT IF IT WOULD

12:28PM 3    HELP.

12:28PM 4    Q.   AND AT THIS POINT WERE YOU AWARE OF ANY HOLDUPS ON THE

12:28PM 5    THERANOS SIDE OF THINGS?  IN OTHER WORDS, WAS THE COMPANY READY

12:28PM 6    TO MOVE FORWARD WITH THIS TEST BASED ON YOUR UNDERSTANDING?

12:28PM 7    A.   THESE EMAILS ARE PROBABLY ALL I HAD, BUT IT WAS

12:28PM 8    ELIZABETH'S REASSURANCE THAT SHE WAS READY TO MOVE FORWARD.

12:29PM 9        SO MY FRUSTRATION WAS MOSTLY DIRECTED TO MY CHIEF OF STAFF

12:29PM 10   ABOUT SAYING YES OR NO, IT CAN BE BROUGHT IN FOR A PILOT

12:29PM 11   PROJECT, A SIDE-BY-SIDE COMPARISON, OR IT CANNOT.

12:29PM 12   Q.   DO YOU RECALL AT ANY POINT MS. HOLMES TELLING YOU THERANOS

12:29PM 13   DID NOT HAVE THE RESOURCES TO MOVE FORWARD WITH THE MILITARY

12:29PM 14   TESTS OR PARTNERSHIP?

12:29PM 15   A.   NO.  SHE APPEARED VERY AGGRESSIVE IN WANTING TO GET IT IN.

12:29PM 16   Q.   AT ANY POINT DO YOU RECALL MS. HOLMES TELLING YOU THAT THE

12:29PM 17   COMPANY WOULD NEED TO PRIORITIZE THE COMMERCIAL LAUNCH OVER THE

12:29PM 18   PARTNERSHIP WITH THE MILITARY?

12:29PM 19   A.   SHE NEVER MENTIONED COMMERCIAL LAUNCH IN ANY CONTEXT TO

12:29PM 20   ME.  I MEAN, I ASSUMED IT WAS GOING ON, BUT IT WAS NOT THE

12:29PM 21   SUBJECT OF OUR EMAILS AT ANY POINT THAT I RECALL.

12:29PM 22   Q.   WE'RE NOW IN MARCH OF 2013 WITH THIS CORRESPONDENCE.

12:29PM 23       DID YOU STILL HAVE THE SAME UNDERSTANDING AT THAT TIME

12:29PM 24   WHAT THE THERANOS TECHNOLOGY WAS AND WHAT IT COULD DO?

12:29PM 25   A.   YES, I WAS STILL IN THE VERY RUDIMENTARY STAGE AND I

12:30PM   1       JUST -- IT WAS, IT WAS PROMISING TO ME, BUT WE, WE WOULD HAVE

12:30PM   2       TO SEE IF IT COULD DELIVER, AND SO THAT'S ABOUT AS MUCH AS I

12:30PM   3       KNEW ABOUT IT.

12:30PM   4       Q.   AND BASED ON YOUR CONVERSATIONS WITH MS. HOLMES, DID YOU

12:30PM   5       STILL UNDERSTAND THAT THE THERANOS TECHNOLOGY WAS EMBODIED IN

12:30PM   6       ONE DEVICE THAT COULD PERFORM ALL OF THE TESTS?

12:30PM   7       A.   YES.   I WOULD NOT HAVE BEEN INTERESTED IN IT WERE IT NOT.

12:30PM   8       Q.   AT ANY POINT DURING THIS TIME PERIOD THAT WE'VE BEEN

12:30PM   9       TALKING ABOUT, DID MS. HOLMES TELL YOU THAT, FOR EXAMPLE, THE

12:30PM  10       COMPANY NEEDED MORE TIME TO WORK ON DEVELOPING THE DEVICE

12:30PM  11       BEFORE IT WOULD BE READY FOR USE BY THE MILITARY?

12:30PM  12       A.   WELL, I THINK MY IMPRESSION AT THE TIME WAS THAT IT WAS A

12:30PM  13       STARTUP, MOVING OUT OF STARTUP TERRITORY AND BRINGING IT

12:30PM  14       FORWARD.

12:30PM  15           I ASSUMED, AS NEW AS IT WAS, I MEAN, IT WOULD PROBABLY BE

12:30PM  16       MORE WORK GOING ON WITH IT, BUT, NO, IT WAS -- I MEAN, SHE WAS

12:31PM  17       VERY CONFIDENT THAT IF WE GOT IT IN THERE, IT WOULD PROVE

12:31PM  18       ITSELF.

12:31PM  19       Q.   BECAUSE IT WAS A STARTUP, DID THAT FACTOR INTO THE NEED

12:31PM  20       FOR THE TECHNOLOGY TO PROVE ITSELF IN YOUR MIND?

12:31PM  21       A.   I WOULD HAVE REQUIRED THE SAME THING IF IT WAS AN

12:31PM  22       ESTABLISHED COMPANY.

12:31PM  23           AND IT WASN'T THAT MUCH OF A STARTUP.   SHE HAD BEEN

12:31PM  24       WORKING ON THIS FOR A WHILE.   SHE TOLD ME WHEN SHE LEFT COLLEGE

12:31PM  25       WHEN WE WERE HAVING A SHORT TALK THERE BEHIND THE CURTAIN, SO

12:31PM  1    TO SPEAK, AND SO I KNEW SHE HAD BEEN WORKING ON THIS AND

12:31PM  2    PUTTING A LOT OF EFFORT INTO IT FOR YEARS.

12:31PM  3    Q.   AND MOVING FORWARD IN TIME -- WELL, LET ME JUST ASK YOU,

12:31PM  4    SITTING HERE TODAY, ARE YOU AWARE OF THE THERANOS TECHNOLOGY

12:31PM  5    EVER BEING USED BY CENTRAL COMMAND TO TREAT SOLDIERS?

12:31PM  6    A.   IT HAD NOT BEEN USED PRIOR TO MY DEPARTURE, AND I'M NOT

12:31PM  7    AWARE OF IT BEING USED SINCE I LEFT, BUT I'M NOT IN THE CHAIN

12:32PM  8    OF COMMAND ANYMORE EITHER.

12:32PM  9    Q.   AND WHEN YOU SAY PRIOR TO YOUR DEPARTURE, DO YOU MEAN YOUR

12:32PM  10   DEPARTURE FROM THE MILITARY?

12:32PM  11   A.   NO, FROM U.S. CENTRAL COMMAND IN MARCH OF 2013.

12:32PM  12   Q.   OKAY.  HOW ABOUT DURING YOUR TIME AT THERANOS?  I'D LIKE

12:32PM  13   TO CONSIDER THAT TIME, TOO.  WHEN YOU WERE ON THE BOARD OF

12:32PM  14   DIRECTORS FROM 2013 TO 2016, DID YOU BECOME AWARE DURING THAT

12:32PM  15   TIME OF THERANOS TECHNOLOGY BEING USED BY CENTRAL COMMAND TO

12:32PM  16   TEST SOLDIERS?

12:32PM  17   A.   NO.

12:32PM  18   Q.   TO YOUR KNOWLEDGE, INCLUDING THAT TIME PERIOD WHEN YOU

12:32PM  19   WERE WITH CENTRAL COMMAND AND THE TIME WHEN YOU WERE WITH

12:32PM  20   THERANOS, WAS THE THERANOS ANALYZER EVER ACTUALLY DEPLOYED AND

12:32PM  21   PUT INTO THE FIELD BY THE MILITARY?

12:32PM  22   A.   I'M NOT AWARE OF IT.

12:32PM  23   Q.   AND SAME QUESTION.  BASED ON YOUR KNOWLEDGE, WAS THE

12:32PM  24   THERANOS ANALYZER EVER USED BY THE MILITARY IN THE TREATMENT OF

12:32PM  25   SERVICE MEMBERS?

12:32PM  1    A.   I'M NOT AWARE OF IT.

12:32PM  2    Q.   TO YOUR KNOWLEDGE, WAS THE THERANOS ANALYZER EVER EQUIPPED

12:33PM  3    OR INSTALLED ON A MILITARY HELICOPTER FOR THAT PURPOSE?

12:33PM  4    A.   AGAIN, I'M NOT AWARE OF IT.

12:33PM  5    Q.   AND FINALLY, ARE YOU AWARE OF THE THERANOS ANALYZER EVER

12:33PM  6    BEING USED TO PROVIDE MEDICAL SERVICES FOR SOLDIERS DURING

12:33PM  7    CLANDESTINE OPERATIONS?

12:33PM  8    A.   NO, I AM NOT.

12:33PM  9    Q.   DO YOU RECALL AT SOME POINT VISITING THE THERANOS

12:33PM  10   HEADQUARTERS?

12:33PM  11   A.   WHILE ON ACTIVE DUTY OR -- NO.

12:33PM  12   Q.   WELL, LET ME ASK -- DO YOU RECALL THE FIRST TIME THAT YOU

12:33PM  13   VISITED THERANOS'S HEADQUARTERS?

12:33PM  14   A.   YES.  WELL, I'M NOT QUITE CERTAIN OF THE DATE, BUT IT WAS

12:33PM  15   LATER IN 2013 AFTER I HAD RETIRED FROM THE MILITARY.

12:33PM  16   Q.   DO YOU RECALL TAKING A TOUR OF THE FACILITY AT THAT POINT?

12:33PM  17   A.   YES.  I WAS WITH MS. HOLMES, AND WE WALKED IN AND AROUND

12:34PM  18   THE FACILITY, YES.

12:34PM  19   Q.   AND DO YOU RECALL EITHER WAY WHETHER ON THAT OCCASION YOU

12:34PM  20   HAD A CHANCE TO LOOK AT THE SMALL THERANOS ANALYZER THAT WE

12:34PM  21   DISCUSSED EARLIER?

12:34PM  22   A.   YES.  YES, I RECALL IT.

12:34PM  23   Q.   AND DID YOU HAVE A CHANCE TO SEE THAT SMALL ANALYZER IN

12:34PM  24   PLACE?

12:34PM  25   A.   I DID SEE IT.  I DON'T RECALL THE EXACT DATE, BUT IT WAS I

12:34PM  1    THINK LATER IN 2013.

12:34PM  2    Q.   ON THAT SAME VISIT, DO YOU RECALL SEEING ANY LARGER

12:34PM  3    COMMERCIAL BLOOD ANALYZERS MADE BY OTHER COMPANIES?

12:34PM  4    A.   NO.

12:34PM  5    Q.   DID THERE COME A TIME WHEN MS. HOLMES INVITED YOU TO JOIN

12:34PM  6    THE THERANOS BOARD OF DIRECTORS?

12:34PM  7    A.   YES.

12:34PM  8    Q.   AND DID YOU ACCEPT THAT INVITATION?

12:34PM  9    A.   I DID, AFTER ASKING HER WHY.  I WAS NOT A MEDICAL PERSON.

12:34PM  10   Q.   WHAT WAS HER ANSWER TO THE QUESTION OF WHY SHE WANTED YOU

12:34PM  11   ON THE BOARD?

12:34PM  12   A.   TO HELP BUILD -- HELP HER BUILD A CORPORATE CULTURE, HOW

12:35PM  13   TO BUILD ELITE TEAMS, HOW TO GET COMMITMENT OUT OF PEOPLE.  IT

12:35PM  14   WAS ABOUT MANAGEMENT, ABOUT PERSONNEL, THOSE AREAS.

12:35PM  15   Q.   SORRY IF I ASKED ALREADY, BUT DID YOU ACCEPT THAT

12:35PM  16   INVITATION TO JOIN THE BOARD?

12:35PM  17   A.   I DID, YES.

12:35PM  18   Q.   AND WHY DID YOU WANT TO BE ON THE THERANOS BOARD AT THAT

12:35PM  19   TIME?

12:35PM  20   A.   WELL, IT WAS PRETTY BREATHTAKING, NUMBER ONE, WHAT SHE WAS

12:35PM  21   TALKING ABOUT DOING.

12:35PM  22        AND I THOUGHT IT WAS A VERY WORTHY PROJECT IF, IN FACT, IT

12:35PM  23   WAS GOING TO REDUCE THE COST OF HEALTH CARE FOR THE FIRST TIME

12:35PM  24   EVER, WHICH WAS ONE OF THE THINGS SHE MENTIONED TO ME.  IT WAS

12:35PM  25   NOT SOMETHING I HAD BEEN INTERESTED IN IN THE MILITARY BECAUSE

12:35PM   1   WE DON'T CHARGE FOR HEALTH CARE FOR OUR TROOPS OBVIOUSLY.

12:35PM   2       BUT ALSO THE ACCURACY AND THE -- JUST THE SPEED THAT -- I

12:35PM   3   MEAN, JUST FROM MY BACKGROUND, I COULD UNDERSTAND HOW THIS

12:36PM   4   WOULD BE VERY HELPFUL IN EVERY SETTING, EVERY MEDICAL SETTING.

12:36PM   5   Q.   SO EVEN THOUGH YOU HAD LEFT CENTRAL COMMAND AT THIS TIME,

12:36PM   6   WERE THE POTENTIAL MILITARY APPLICATIONS PART OF WHAT MADE YOU

12:36PM   7   EXCITED ABOUT THE COMPANY?

12:36PM   8   A.   THE POTENTIAL MILITARY APPLICATIONS WERE OBVIOUSLY WHAT

12:36PM   9   HELPED FORM MY OPINIONS ON THIS BECAUSE THERE'S NOTHING LIKE

12:36PM  10   TAKING CAUSALITIES TO WANT TO IMPROVE HEALTH CARE.

12:36PM  11       BUT AT THE SAME TIME, HAVING LEFT THE MILITARY, I HAD TO

12:36PM  12   GET A COUNSEL TO THE COMMANDANT APPROVAL THAT THIS WAS NOT

12:36PM  13   VIOLATING ANY ETHICAL REGULATIONS, AND I KNEW I WAS GOING TO

12:36PM  14   STAY WELL APART FROM ANY KIND OF MILITARY APPLICATION SO THERE

12:36PM  15   COULD NOT BE ANY MISCONSTRUING THAT I WAS BRINGING MY PAST RANK

12:36PM  16   TO BEAR ON THAT.

12:36PM  17   Q.   AND DID YOU OBTAIN THAT APPROVAL SO THAT YOU WERE CLEARED

12:36PM  18   TO JOIN THE BOARD?

12:36PM  19   A.   I DID.

12:36PM  20   Q.   AT THE TIME, WHAT WAS YOUR UNDERSTANDING OF WHAT THE ROLE

12:37PM  21   OF THE BOARD OF DIRECTORS WOULD BE AT THE COMPANY?

12:37PM  22   A.   ADVISORY DUTIES.  SHE TALKED TO ME WHEN SHE MADE THE OFFER

12:37PM  23   AND I CAUTIONED HER THAT I WAS NOT A MEDICAL PERSON, AND SHE

12:37PM  24   SAID SHE WAS LOOKING AT DOCTORS AND PEOPLE WITH MEDICAL

12:37PM  25   BACKGROUNDS AND BUSINESS BACKGROUNDS TO COVER CERTAIN ASPECTS

12:37PM  1    OF BUILDING OUT A BOARD.

12:37PM  2    Q.   SPEAKING OF THAT BOARD, YOU SAID THAT YOU WERE ON THE

12:37PM  3    BOARD FROM 2013 TO 2016; IS THAT CORRECT?

12:37PM  4    A.   THAT'S CORRECT.

12:37PM  5    Q.   AND DURING THAT TIME PERIOD, COULD YOU GIVE US AN IDEA OF

12:37PM  6    WHO ELSE WAS ON THE THERANOS BOARD?  I WON'T ASK YOU TO GIVE US

12:37PM  7    AN EXCLUSIVE LIST, BUT IF YOU COULD GIVE US SOME EXAMPLES AND

12:37PM  8    DESCRIBE THEIR BACKGROUND A LITTLE BIT.

12:37PM  9    A.   THERE WAS DAVID BOIES, HE WAS A LAWYER WITH A LOT OF LEGAL

12:37PM  10   BACKGROUND SHE BROUGHT ON.

12:37PM  11        AND SHE TALKED TO US ABOUT SOME OF THESE EFFORTS TO BRING

12:38PM  12   PEOPLE ON BEFORE SHE GOT THEM THERE, SO WE WERE AWARE OF IT.

12:38PM  13        A FORMER HEAD OF WELLS FARGO WITH A STRONG FINANCIAL

12:38PM  14   BACKGROUND; THE FORMER HEAD OF THE CDC, CENTER OF DISEASE

12:38PM  15   CONTROL; M.D. DOCTORS, THIS SORT OF THING; BUSINESS, LEGAL,

12:38PM  16   MEDICAL EXPERTS.

12:38PM  17   Q.   AROUND THAT TIME PERIOD, DID YOU ALSO MAKE THE DECISION TO

12:38PM  18   INVEST IN THERANOS PERSONALLY?

12:38PM  19   A.   YES.

12:38PM  20   Q.   AND WHAT WAS THE APPROXIMATE AMOUNT OF YOUR INVESTMENT?

12:38PM  21   A.   I BELIEVE IT WAS $85,000.  IT'S SOMEWHERE CLOSE TO THAT.

12:38PM  22   I'M NOT POSITIVE.

12:38PM  23   Q.   AND WAS THAT A SIGNIFICANT INVESTMENT FOR YOU AT THE TIME?

12:38PM  24   A.   FOR SOMEONE WHO HAD BEEN IN GOVERNMENT SERVICE FOR

12:38PM  25   40 YEARS, YES.

12:38PM  1    Q.   AND WHY DID YOU MAKE THAT DECISION TO INVEST IN THE

12:38PM  2    COMPANY?

12:38PM  3    A.   YOU KNOW, TO HAVE WHAT WE CALL SKIN IN THE GAME IN SOME

12:39PM  4    PLACES, MAKE CERTAIN THAT YOU BELIEVED IN IT AND THAT YOU'RE

12:39PM  5    WILLING TO CONTRIBUTE.

12:39PM  6    Q.   AT THIS TIME WHAT WERE YOUR SOURCES FOR INFORMATION ABOUT

12:39PM  7    THE COMPANY AND ITS TECHNOLOGY?

12:39PM  8    A.   MS. HOLMES.

12:39PM  9    Q.   WAS SHE THE PRIMARY SOURCE OF INFORMATION FOR YOU TO RELY

12:39PM 10    ON AT THAT TIME?

12:39PM 11    A.   THE SOLE SOURCE.

12:39PM 12    Q.   I'LL ASK YOU TO TURN TO EXHIBIT 5407 IN YOUR BINDER, AND

12:39PM 13    ONCE YOU'RE THERE, LET ME KNOW IF YOU RECOGNIZE EXHIBIT 5407.

12:39PM 14    A.   YES.

12:39PM 15    Q.   AND WHAT IS THAT DOCUMENT?

12:39PM 16    A.   IT'S AN EMAIL CHAIN FROM MS. HOLMES AND MYSELF FROM

12:39PM 17    SEPTEMBER OF 2013.

12:40PM 18           MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

12:40PM 19    EXHIBIT 5407 INTO EVIDENCE.

12:40PM 20           MR. DOWNEY:  NO OBJECTION.

12:40PM 21           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:40PM 22      (GOVERNMENT'S EXHIBIT 5407 WAS RECEIVED IN EVIDENCE.)

12:40PM 23           MR. BOSTIC:  MS. HOLLIMAN, LET'S ZOOM IN ON THE

12:40PM 24    BOTTOM HALF OF THE PAGE.  LET'S START -- YES, THAT'S GOOD.

12:40PM 25    Q.   GENERAL MATTIS, DO YOU SEE AT THE BOTTOM OF THE SCREEN

12:40PM  1      THERE AN EMAIL FROM MS. HOLMES TO YOU ON SEPTEMBER 7TH, 2013?

12:40PM  2      A.   UH-HUH.

12:40PM  3      Q.   AND THAT EMAIL READS:

12:40PM  4           "GENERAL MATTIS:

12:40PM  5           "FYI.  THE BELOW WILL GO OUT TO OUR SHAREHOLDERS TONIGHT.

12:40PM  6      WE HAVE BEGUN THE LAUNCH."

12:40PM  7           DO YOU SEE THAT?

12:40PM  8      A.   YES.

12:40PM  9      Q.   AND WHAT DO YOU BELIEVE THE LAUNCH TO REFER TO?

12:40PM 10      A.   I BELIEVE IT WAS THE LAUNCH OF THERANOS.

12:40PM 11      Q.   LET'S LOOK AT THE MESSAGE BELOW THIS.  PERFECT.  THANK

12:41PM 12      YOU.

12:41PM 13           IF WE CAN CAPTURE THE BOTTOM OF THIS PAGE AND THE TOP OF

12:41PM 14      THE SECOND PAGE.  WE CAN WORK WITH THIS.

12:41PM 15           GENERAL MATTIS, COULD YOU SEE ON THE SCREEN PART OF THAT

12:41PM 16      MESSAGE THAT WAS GOING TO BE SENT TO THERANOS SHAREHOLDERS?

12:41PM 17      A.   YES.

12:41PM 18      Q.   AND DO YOU SEE THAT IT INCLUDES A LINK TO THE NEW THERANOS

12:41PM 19      WEBSITE?

12:41PM 20      A.   YES.

12:41PM 21      Q.   AND DO YOU SEE ALSO THAT IT INCLUDES A LINK TO A

12:41PM 22      "WALL STREET JOURNAL" ARTICLE?

12:41PM 23      A.   RIGHT.  YES.

12:41PM 24      Q.   THE COMMERCIAL LAUNCH OF THE COMPANY AT THIS TIME, AS A

12:41PM 25      BOARD MEMBER, AS AN INVESTOR, WAS THIS AN IMPORTANT STEP IN

12:41PM   1    YOUR MIND?

12:41PM   2    A.   YES.

12:41PM   3    Q.   AND HOW SO?

12:41PM   4    A.   IT SHOWED THE MATURATION OF THE TECHNOLOGY THAT WAS GOING

12:41PM   5    OUT TO BE USED, THE VERY THING I TRIED TO DO AT CENTCOM TO GET

12:41PM   6    IT IN USE, OR AT LEAST A PILOT PROJECT TO START THAT PROCESS.

12:42PM   7    Q.   I'LL ASK YOU TO TURN TO EXHIBIT 1106 IN YOUR BINDER BACK

12:42PM   8    AT THE BEGINNING.

12:42PM   9         YOUR HONOR, THE GOVERNMENT IS MOVING TO MOVE IN 1106, AND

12:42PM  10    I BELIEVE THIS IS SUBJECT TO STIPULATION.

12:42PM  11              THE WITNESS:  UH-HUH.

12:42PM  12              MR. DOWNEY:  IT IS, YOUR HONOR, YES.

12:42PM  13              THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

12:42PM  14         (GOVERNMENT'S EXHIBIT 1106 WAS RECEIVED IN EVIDENCE.)

12:42PM  15    BY MR. BOSTIC:

12:42PM  16    Q.   GENERAL MATTIS, DO YOU SEE IN FRONT OF YOU A

12:42PM  17    "WALL STREET JOURNAL" FROM SEPTEMBER 8TH, 2013?

12:42PM  18    A.   YES.

12:42PM  19    Q.   AND THE TITLE IS ELIZABETH HOLMES:  THE BREAKTHROUGH OF

12:42PM  20    INSTANT DIAGNOSIS?

12:42PM  21    A.   YES.

12:42PM  22    Q.   AND DO YOU RECALL READING THIS ARTICLE IN 2013?

12:42PM  23    A.   I DO RECALL THAT.

12:42PM  24    Q.   AND I'D LIKE TO DRAW YOU TO A FEW CLAIMS IN THE ARTICLE.

12:42PM  25         FIRST ON PAGE 1, IF WE CAN ZOOM IN, MS. HOLLIMAN, ON THE

12:43PM  1    FIRST INDENTED PARAGRAPH.

12:43PM  2        GENERAL MATTIS, THERE'S LANGUAGE HERE THAT SAYS, "THE

12:43PM  3    SECRET THAT HUNDREDS OF EMPLOYEES ARE NOW REFINING INVOLVES

12:43PM  4    DEVICES THAT AUTOMATE AND MINIATURIZE MORE THAN 1,000

12:43PM  5    LABORATORY TESTS."

12:43PM  6        DO YOU SEE THAT?

12:43PM  7    A.   I DO.

12:43PM  8    Q.   AND HOW DID THIS RELATE TO INFORMATION THAT YOU WERE

12:43PM  9    GETTING FROM MS. HOLMES AT THE TIME?

12:43PM  10   A.   WELL, I HAD MOVED FROM A VERY RUDIMENTARY UNDERSTANDING OF

12:43PM  11   IT TO TALKING WITH HER AGAIN, AND THIS IS I BELIEVE BEFORE,

12:43PM  12   ALTHOUGH IT'S BEEN A FEW YEARS, I BELIEVE IT'S BEFORE I HAD MY

12:43PM  13   FIRST BOARD MEETING WITH MS. HOLMES AND HER TEAM.

12:43PM  14       I THOUGHT IT WAS 2,000 LABORATORY TESTS, BUT I'M SURE I

12:43PM  15   READ IT HERE AS 1,000.  SO MAYBE I WAS MISTAKEN.  I THOUGHT IT

12:44PM  16   WAS 2,000.

12:44PM  17   Q.   WELL, 2,000 IS MORE THAN 1,000, AND THAT'S WHAT THE

12:44PM  18   ARTICLE SAYS, SO --

12:44PM  19   A.   IT COULD BE.

12:44PM  20   Q.   YEAH.  DO YOU RECALL AROUND THIS TIME MS. HOLMES WAS

12:44PM  21   PROVIDING YOU WITH INFORMATION ABOUT THE NUMBER OF TESTS THAT

12:44PM  22   THERANOS TECHNOLOGY COULD DO?

12:44PM  23   A.   I CAN'T RECALL THE EXACT TIME.

12:44PM  24   Q.   LET ME -- WELL, LET ME ASK, DO YOU RECALL AT SOME POINT

12:44PM  25   MS. HOLMES GIVING YOU INFORMATION ABOUT THE NUMBER OF TESTS

12:44PM  1    THAT THERANOS TECHNOLOGY COULD DO?

12:44PM  2    A.   YES.  AT MY FIRST BOARD MEETING, I BELIEVE IT WAS OCTOBER,

12:44PM  3    ABOUT A MONTH AFTER THIS, TWO MONTHS AFTERWARDS, AND THEN I WAS

12:44PM  4    IN FOR A FULL BOARD BRIEF, OF COURSE, AND NOW I WAS GETTING A

12:44PM  5    LOT MORE DETAIL.

12:44PM  6    Q.   IN THAT SAME PARAGRAPH THAT IS ON THE SCREEN, THERE'S A

12:44PM  7    LINE THAT SAYS, "THERANOS'S PROCESSES ARE FASTER, CHEAPER, AND

12:44PM  8    MORE ACCURATE THAN THE CONVENTIONAL METHODS AND REQUIRE ONLY

12:44PM  9    MICROSCOPIC BLOOD VOLUMES, NOT VIAL AFTER VIAL OF THE STUFF."

12:44PM  10        DO YOU SEE THAT?

12:44PM  11   A.   RIGHT.

12:45PM  12   Q.   AND DO YOU RECALL MS. HOLMES PROVIDING YOU WITH ANY

12:45PM  13   INFORMATION OR CLAIMS ABOUT THERANOS'S PROCESSES BEING FASTER

12:45PM  14   THAN CONVENTIONAL METHODS?

12:45PM  15   A.   YES.

12:45PM  16   Q.   AND IS THAT WHAT SHE SAID?

12:45PM  17   A.   I BELIEVE I HAD ALREADY HEARD THAT YEARS BEFORE.  I

12:45PM  18   BELIEVE IT WAS FOUR OR FIVE HOURS START TO FINISH.  SO, YEAH,

12:45PM  19   FASTER FOR CERTAIN.

12:45PM  20        THAT WAS ONE OF THE REASONS THAT I HAD BEEN SO INTERESTED

12:45PM  21   IN IT WHEN YOU'RE DOING COMBAT CARE.

12:45PM  22   Q.   AND HOW ABOUT THAT CLAIM IN THE ARTICLE THAT THERANOS'S

12:45PM  23   PROCESS IS WERE MORE ACCURATE THAN CONVENTIONAL METHODS?

12:45PM  24        HAD MS. HOLMES SAID ANYTHING TO YOU ABOUT THE ACCURACY OF

12:45PM  25   THE TESTS?

12:45PM  1   A.   SHE EXPLAINED THAT BECAUSE YOU DIDN'T HAVE HUMAN BEINGS

12:45PM  2   HANDLING THESE AND CENTRIFUGING THEM AND ALL, YOU DIDN'T HAVE

12:45PM  3   AS MUCH POTENTIAL FOR THE ERROR THAT WAS, FRANKLY, QUITE

12:45PM  4   STARTLING TO HEAR WHAT THE ERROR RATES WERE ON SOME BLOOD

12:45PM  5   SAMPLES.  SO, YES, I RECALL THAT TO ME WAS ONE OF THE SELLING

12:46PM  6   POINTS FROM THE VERY BEGINNING ACTUALLY WHEN I HAD FIRST BEEN

12:46PM  7   INTERESTED.

12:46PM  8   Q.   I'LL ASK YOU TO LOOK AT SOME OF THE CONTENT ON PAGE 2 OF

12:46PM  9   THE ARTICLE.

12:46PM  10       IF WE CAN GO TO PAGE 2 OF THE EXHIBIT, MS. HOLLIMAN.

12:46PM  11       ABOUT HALFWAY DOWN THE PAGE, THERE'S A PARAGRAPH THAT

12:46PM  12  BEGINS, "THERANOS'S TECHNOLOGY ELIMINATES"?

12:46PM  13  A.   UH-HUH.

12:46PM  14  Q.   IS LET'S ZOOM IN ON THAT.

12:46PM  15       AND, GENERAL MATTIS, DO YOU SEE LANGUAGE IN THE ARTICLE

12:46PM  16  THAT SAYS, "THERANOS'S TECHNOLOGY ELIMINATES MULTIPLE LAB TRIPS

12:46PM  17  BECAUSE IT CAN RUN ANY COMBINATION OF TESTS, INCLUDING SETS OF

12:46PM  18  FOLLOW-ON TESTS, AT ONCE, VERY QUICKLY, ALL FROM A SINGLE

12:46PM  19  MICROSAMPLE"?

12:46PM  20       DO YOU SEE THAT LANGUAGE?

12:46PM  21  A.   YES.

12:46PM  22  Q.   AND WAS THAT CONSISTENT WITH WHAT MS. HOLMES WAS TELLING

12:46PM  23  YOU ABOUT THE TECHNOLOGY?

12:46PM  24  A.   YES, IT'S CONSISTENT.

12:46PM  25  Q.   LET'S GO TO THE BOTTOM OF THIS PAGE, THE VERY LAST LINE.

12:47PM 1    AND IF WE CAN LOOK AT THE BOTTOM OF THIS PAGE AND THE TOP OF

12:47PM 2    THE NEXT.

12:47PM 3         WE CAN JUST START HERE.

12:47PM 4         GENERAL MATTIS, DO YOU SEE A SENTENCE THAT BEGINS

12:47PM 5    "THERANOS'S TECHNOLOGY IS AUTOMATED, STANDARDIZED, AND ATTEMPTS

12:47PM 6    TO SUBTRACT HUMAN" -- IF WE CAN GO TO THE NEXT PAGE --

12:47PM 7    A.   YES.

12:47PM 8    Q.   AND ZOOM IN ON THE TOP.

12:47PM 9         -- "ATTEMPTS TO SUBTRACT HUMAN ERROR FROM THE PROCESS.  IT

12:47PM 10   CAN THUS ACHIEVE MUCH LOWER VARIANCE RANGES FROM A GIVEN TEST.

12:47PM 11   MS. HOLMES SAYS ITS TESTS HAVE MARGINS OF ALLOWABLE ERROR

12:47PM 12   TARGETS LESS THAN 10 PERCENT."

12:47PM 13   A.   UH-HUH.

12:47PM 14   Q.   WAS THAT CONSISTENT WITH WHAT MS. HOLMES WAS TELLING YOU

12:47PM 15   WHEN SHE WAS DESCRIBING THE TECHNOLOGY?

12:47PM 16   A.   YES.

12:47PM 17   Q.   YOU MENTIONED A BOARD MEETING A LITTLE WHILE AGO.  I'LL

12:47PM 18   ASK YOU TO TURN TO EXHIBIT 1172 IN YOUR BINDER, PLEASE.

12:48PM 19        YOUR HONOR, THE GOVERNMENT MOVES TO ADMIT 1172, AND I

12:48PM 20   BELIEVE IT'S ALSO SUBJECT TO STIPULATION.

12:48PM 21        MR. DOWNEY:  IT IS, YOUR HONOR.  I THINK WE'LL -- I

12:48PM 22   THINK THERE'S A THICKER VERSION OF THIS EXHIBIT AS WELL, BUT WE

12:48PM 23   CERTAINLY DON'T OBJECT TO THE ADMISSION OF 1172.

12:48PM 24        MR. BOSTIC:  SO IF THE GOVERNMENT CAN MARK THIS AS

12:48PM 25   1172A, IT'S AN EXCERPT, THE FIRST 89 PAGES OF WHAT IS 1172 ON

12:48PM   1    THE EXHIBIT LIST.

12:48PM   2              THE COURT:  WE'LL MARK IT A AND IT'S ADMITTED, AND

12:48PM   3    IT MAY BE PUBLISHED.

12:48PM   4        (GOVERNMENT'S EXHIBIT 1172A WAS RECEIVED IN EVIDENCE.)

12:48PM   5    BY MR. BOSTIC:

12:48PM   6    Q.   GENERAL MATTIS, DO YOU RECOGNIZE THE DOCUMENT MARKED AS

12:48PM   7    EXHIBIT 1172?

12:48PM   8    A.   I'M FAMILIAR WITH IT, YES.

12:48PM   9    Q.   AND WHAT IS IT?

12:48PM  10    A.   IT'S THE SLIDE SHOW FOR A BOARD OF DIRECTORS MEETING.

12:48PM  11    Q.   AND WHAT WAS THE DATE OF THAT MEETING?

12:48PM  12    A.   OCTOBER 8TH.

12:48PM  13    Q.   AND WERE YOU PRESENT FOR THE BOARD OF DIRECTORS MEETING ON

12:49PM  14    OCTOBER 8TH, 2013?

12:49PM  15    A.   I'M ALMOST CERTAIN I WAS.

12:49PM  16    Q.   AND YOU WOULD HAVE SEEN THIS PRESENTATION AT THE TIME?

12:49PM  17    A.   I KNOW I'VE SEEN IT.  I DON'T KNOW IF IT WAS FORWARDED TO

12:49PM  18    ME AFTERWARDS IF I MISSED THE BOARD MEETING.  I BELIEVE I WAS

12:49PM  19    THERE.

12:49PM  20    Q.   WHO PRESENTED INFORMATION LIKE THIS TO THE THERANOS BOARD

12:49PM  21    OF DIRECTORS?

12:49PM  22    A.   MS. HOLMES.

12:49PM  23    Q.   WAS SHE THE PRIMARY PRESENTER AT BOARD OF DIRECTORS

12:49PM  24    MEETINGS IN YOUR EXPERIENCE?

12:49PM  25    A.   YES.

12:49PM 1    Q.   AND WHO ELSE PRESENTED AT THOSE MEETINGS, IF ANYONE?

12:49PM 2    A.   MR. BALWANI WOULD SOMETIMES GIVE -- NOT AT THIS ONE, AT

12:49PM 3    LATER ONES I RECALL HIM GIVING FINANCIAL FORECASTS.

12:49PM 4         MS. HOLMES WOULD KIND OF INTRODUCE THE STRATEGIC VIEW OF

12:49PM 5    WHERE WE WERE GOING, AND THEN WE WOULD GET FINANCIAL FORECASTS

12:49PM 6    FROM MR. BALWANI.

12:49PM 7         I MEAN, THEY WERE BOTH TALKING BACK AND FORTH.  IT WAS A

12:49PM 8    TEAM PRESENTATION.

12:49PM 9    Q.   AND WHAT WAS THE PROPORTION BETWEEN THE TWO OF THEM AS FAR

12:49PM 10   AS HOW MUCH THEY PRESENTED TO THE BOARD?  WAS IT EQUAL?  HALF

12:50PM 11   AND HALF?

12:50PM 12   A.   MS. HOLMES WAS IN CHARGE PROBABLY I WOULD SAY -- I THINK

12:50PM 13   FOR THIS MEETING AND MANY OF THE INITIAL MEETINGS I WENT TO

12:50PM 14   PROBABLY 100 PERCENT.

12:50PM 15        IF HE WAS THERE, HE WOULD TALK ABOUT THE FINANCIALS.  SO

12:50PM 16   IT WAS PROBABLY 90 PERCENT MS. HOLMES, CEO.

12:50PM 17   Q.   AND DO YOU RECALL BOARD MEETINGS WHERE MR. BALWANI MIGHT

12:50PM 18   NOT HAVE EVEN BEEN PRESENT?

12:50PM 19   A.   YES.

12:50PM 20   Q.   LET'S LOOK AT PAGE 7 OF EXHIBIT 1172.

12:50PM 21        IS THIS IMAGE FAMILIAR TO YOU?

12:50PM 22   A.   YES, IT IS.

12:50PM 23   Q.   AND WHAT IS DEPICTED IN THE IMAGE ON PAGE 7?

12:50PM 24   A.   WELL, IT'S THE COMPARISON.  THERE YOU SEE THE PHYSICAL

12:50PM 25   COMPARISON ABOUT THE AMOUNTS OF BLOOD USED, THERANOS ON THE

12:50PM  1   RIGHT AND THEN THE SMALL CONTAINER.  AND I ASSUME THE

12:50PM  2   TRADITIONAL AMOUNT OF BLOOD TAKEN FOR A SIMILAR SERIES OF

12:51PM  3   TESTS.

12:51PM  4   Q.   LET'S LOOK AT PAGE 9 OF THIS EXHIBIT.

12:51PM  5        GENERAL MATTIS, ON PAGE 9 DO YOU SEE THAT THIS BOARD

12:51PM  6   PRESENTATION ALSO INCLUDED A CLIP OR AN IMAGE OF THE

12:51PM  7   "WALL STREET JOURNAL" ARTICLE THAT WE WERE JUST TALKING ABOUT?

12:51PM  8   A.   RIGHT, YES.

12:51PM  9   Q.   LET'S LOOK NEXT AT PAGE 19.

12:51PM 10        AND, GENERAL MATTIS, YOU'RE WELCOME TO FOLLOW ALONG JUST

12:51PM 11   ON THE SCREEN OR IN YOUR BINDER, WHATEVER IS EASIEST.

12:51PM 12   A.   UH-HUH.

12:51PM 13   Q.   LOOKING AT PAGE 19, DO YOU SEE A SERIES OF IMAGES ON THAT

12:51PM 14   PAGE?

12:51PM 15   A.   UH-HUH.

12:51PM 16   Q.   AND WHAT WAS YOUR UNDERSTANDING OF WHAT THOSE IMAGES

12:51PM 17   DEPICTED?

12:51PM 18   A.   WELL, HAVING MS. HOLMES HAVING PRICKED MY FINGER AND TAKEN

12:51PM 19   THE ONE DROP OF BLOOD FOR THE SMALL CONTAINER ON THE RIGHT, THE

12:52PM 20   IMAGES ARE OF THE AMOUNT OF BLOOD NECESSARY FOR THERANOS TO DO

12:52PM 21   ITS JOB.

12:52PM 22   Q.   AND SO THIS IS DEPICTING THE FINGERSTICK DRAW PROCESS AND

12:52PM 23   THE SIZE OF THE SAMPLE?

12:52PM 24   A.   YES, SIR.

12:52PM 25   Q.   AND THERE'S LANGUAGE ON THIS SLIDE PRESENTED TO THE BOARD

MATTIS DIRECT BY MR. BOSTIC

12:52PM 1  THAT SAYS, "THERANOS RUNS ANY TEST AVAILABLE IN CENTRAL

12:52PM 2  LABORATORIES AND PROCESSES ALL SAMPLE TYPES."

12:52PM 3      DO YOU SEE THAT?

12:52PM 4  A.   YES.

12:52PM 5  Q.   THERE'S ALSO LANGUAGE AT THE BOTTOM OF THE PAGE THAT SAYS

12:52PM 6  "THERANOS PROVIDES THE HIGHEST LEVEL OF OVERSIGHT, AUTOMATION,

12:52PM 7  STANDARDIZATION, AND IN OUR PRE- AND POST-ANALYTIC PROCESSES,

12:52PM 8  ENSURING THE HIGHEST LEVELS OF ACCURACY AND PRECISION."

12:52PM 9      DO YOU SEE THAT?

12:52PM 10 A.   YES.

12:52PM 11 Q.   AND WAS -- LET ME ASK A BETTER QUESTION.

12:52PM 12     DO YOU RECALL MS. HOLMES TELLING THE BOARD ABOUT

12:52PM 13 THERANOS'S HIGH LEVEL OF ACCURACY AND PRECISION?

12:52PM 14 A.   YES, THAT WAS ONE OF THE SELLING POINTS.  I MEAN, THAT WAS

12:52PM 15 ONE OF THE COMPELLING ASPECTS OF IT.

12:53PM 16 Q.   LET'S TURN TO PAGE 20 AND ZOOM IN ON THE IMAGE ON THE

12:53PM 17 RIGHT WHERE IT SAYS GERIATRICS.

12:53PM 18 A.   YEAH.

12:53PM 19 Q.   AND INCLUDE THE IMAGE BELOW THAT, PLEASE.

12:53PM 20     GENERAL MATTIS, DO YOU SEE HERE LANGUAGE IN THIS

12:53PM 21 PRESENTATION TO THE BOARD THAT SAYS, "WITH THERANOS, YOU CAN

12:53PM 22 PROCESS SAMPLES FROM PATIENTS WITH COLLAPSED VEINS WITHOUT THE

12:53PM 23 DISCOMFORT THEY GO THROUGH NOW.  NO MORE SEARCHING FOR VEINS.

12:53PM 24 NO MORE PAINFUL DRAWS FROM THE KNUCKLE OR THE BACK OF THE

12:53PM 25 HAND."

12:53PM   1          DO YOU SEE THAT?

12:53PM   2   A.   RIGHT.

12:53PM   3   Q.   AND WHAT WAS THIS REFERRING TO IF YOU HAD AN UNDERSTANDING

12:53PM   4   AT THE TIME?

12:53PM   5   A.   I'M SORRY?

12:53PM   6   Q.   WHAT WAS THIS REFERRING TO IF YOU HAD AN UNDERSTANDING AT

12:53PM   7   THE TIME?

12:53PM   8   A.   BASICALLY WHAT HAD BEEN DEMONSTRATED TO ME, YOU TAKE JUST

12:53PM   9   ONE DROP OF BLOOD FROM THE END OF YOUR FINGER, AND YOU DON'T

12:54PM  10   HAVE TO GO THROUGH THE REST OF THE BLOOD DRAWS OUT OF YOUR VEIN

12:54PM  11   AND YOUR ARM AND YOUR HAND.

12:54PM  12   Q.   AT THIS TIME DID YOU HAVE AN UNDERSTANDING AS TO WHETHER

12:54PM  13   THERANOS WAS USING FINGERSTICK VERSUS VEIN DRAWS FOR THE

12:54PM  14   PATIENT SAMPLES THAT IT WAS RUNNING?

12:54PM  15   A.   THE WHOLE IDEA I THOUGHT WITH THERANOS WAS TO USE THE

12:54PM  16   FINGERSTICK.  I BECAME AWARE LATER, BUT NOT AT THIS TIME, THAT

12:54PM  17   WE WERE DOING VENOUS DRAWS.

12:54PM  18   Q.   LET'S TURN TO PAGE 21 IN THE SAME PRESENTATION.

12:54PM  19          DO YOU SEE A SLIDE IN FRONT OF YOU TITLED FASTER RESULTS.

12:54PM  20   FASTER ANSWERS?

12:54PM  21   A.   YES.

12:54PM  22   Q.   AND THE TEXT ON THIS SLIDE SAYS, "THERANOS'S MICRO SAMPLE

12:54PM  23   ANALYSIS IS PERFORMED AT AMAZING SPEED SO WE CAN REPORT RESULTS

12:55PM  24   FASTER THAN PREVIOUSLY POSSIBLE."

12:55PM  25          DO YOU SEE THAT?

12:55PM 1    A.   YES.

12:55PM 2    Q.   AND DO YOU RECALL MS. HOLMES TELLING THE BOARD ABOUT THE

12:55PM 3    SPEED AT WHICH THERANOS TESTS COULD BE RUN?

12:55PM 4    A.   YES.  IT WAS A GIVEN.  SHE TALKED ABOUT IT AS ONE OF THE

12:55PM 5    CHARACTERISTICS OF THE THERANOS.

12:55PM 6    Q.   LET'S LOOK AT PAGE 23, PLEASE, THE SAME SLIDE

12:55PM 7    PRESENTATION.

12:55PM 8         THIS SLIDE IS TITLED A NEW STANDARD IN QUALITY; CORRECT?

12:55PM 9    A.   UH-HUH, YES.

12:55PM 10   Q.   AND BELOW THAT THERE'S LANGUAGE STATING THE HIGHEST LEVELS

12:55PM 11   OF ACCURACY AND THE LANGUAGE BELOW THAT SAYS, "BY

12:55PM 12   SYSTEMATICALLY CONTROLLING AND STANDARDIZING OUR PROCESSES,

12:55PM 13   THERANOS OFFERS TESTS WITH THE HIGHEST LEVELS OF ACCURACY."

12:55PM 14        DID I READ THAT CORRECTLY?

12:55PM 15   A.   RIGHT.

12:55PM 16   Q.   AND WAS THIS CONSISTENT WITH WHAT MS. HOLMES WAS TELLING

12:55PM 17   THE BOARD ABOUT THE ACCURACY OF THERANOS TESTS?

12:55PM 18   A.   YES.

12:56PM 19   Q.   AND THERE'S ALSO A GRAPHIC OR AN IMAGE IN THE MIDDLE OF

12:56PM 20   THE PAGE INDICATING A COEFFICIENT VARIATION OF LESS THAN

12:56PM 21   10 PERCENT FOR ONE OF THE ASSAYS; CORRECT?

12:56PM 22   A.   RIGHT.

12:56PM 23   Q.   LET'S MOVE TO PAGE 56 OF THIS EXHIBIT.

12:56PM 24        IS THIS ANOTHER SLIDE THAT WAS PRESENTED TO THE BOARD ON

12:56PM 25   THE DATE OF THAT BOARD MEETING THAT WE'VE BEEN DISCUSSING?

12:56PM 1    A.   YES.

12:56PM 2    Q.   ON THE LEFT SIDE THERE'S A TITLE WITH SOME BULLET POINTS.

12:56PM 3    THE TITLE SAYS ROUTINE, SPECIALTY AND ESOTERIC TEST.

12:56PM 4         AND THE FIRST BULLET SAYS, "ALL 2,000 PLUS CURRENTLY RUN

12:56PM 5    TESTS/CPT CODES ARE AVAILABLE THROUGH THERANOS."

12:56PM 6         DO YOU SEE THAT?

12:56PM 7    A.   YES.

12:56PM 8    Q.   AND THE NEXT BULLET POINT THERANOS RUNS ANY TEST AVAILABLE

12:56PM 9    IN CENTRAL LABORATORIES."

12:56PM 10        DO YOU SEE THAT?

12:56PM 11   A.   YES.

12:56PM 12   Q.   AND DO YOU REMEMBER WHAT MS. HOLMES GENERALLY WAS TELLING

12:56PM 13   THE BOARD AT THIS TIME ABOUT THE RANGE OF TESTS THAT THERANOS

12:57PM 14   WAS OFFERING OR THAT THE TECHNOLOGY COULD DO?

12:57PM 15   A.   NO.

12:57PM 16   Q.   DO YOU RECALL HEARING FROM MS. HOLMES THAT THE THERANOS

12:57PM 17   TECHNOLOGY COULD RUN ANY TEST AVAILABLE IN CENTRAL LABS?

12:57PM 18   A.   WHAT YOU SEE ON THE SLIDE ABOUT 2,000 TESTS AND RUN ANY

12:57PM 19   TEST AVAILABLE ON A CENTRAL LAB.  I KNOW THAT THIS IS WHERE I'M

12:57PM 20   STARTING TO LEARN MORE ABOUT HOW THIS MACHINE ACTUALLY WORKS,

12:57PM 21   AND THIS IS MY FIRST BOARD MEETING, AND I RECALL THIS VERY

12:57PM 22   CLEARLY.

12:57PM 23   Q.   ON THE RIGHT-HAND SIDE OF THE PAGE THERE'S A TABLE

12:57PM 24   ENTITLED HIGHER QUALITY DATA WITH SOME OTHER BULLET POINTS.

12:57PM 25        DO YOU SEE THAT?

12:57PM  1    A.  YES.

12:57PM  2    Q.  AND THE FIRST BULLET POINT REFERENCES "VARIABILITY AMONG

12:57PM  3    TRADITIONAL LABS," AND THE BULLET POINT A COUPLE DOWN FROM

12:57PM  4    THERE TALKS ABOUT "AN UNPRECEDENTED LACK OF VARIATION WITH

12:57PM  5    THERANOS YIELDS."

12:57PM  6        DO YOU SEE THAT?

12:57PM  7    A.  YES.

12:58PM  8    Q.  AND DO YOU RECALL MS. HOLMES SAYING ANYTHING ABOUT

12:58PM  9    THERANOS'S ACCURACY VERSUS THE ACCURACY OF CONVENTIONAL LABS?

12:58PM 10    A.  YES.

12:58PM 11    Q.  WHAT DID SHE SAY?

12:58PM 12    A.  THAT IT WAS MUCH MORE ACCURATE AND GAVE THE REASONS FOR

12:58PM 13    IT, THAT YOU DIDN'T HAVE AS MANY HUMAN HANDS HANDLING IT AND SO

12:58PM 14    THE POTENTIAL FOR HUMAN ERROR WAS MUCH REDUCED.

12:58PM 15    Q.  LET'S LOOK AT PAGE 76.  WE'RE STILL IN THE SAME

12:58PM 16    PRESENTATION; IS THAT CORRECT?

12:58PM 17    A.  UH-HUH.

12:58PM 18    Q.  DO YOU RECALL HOW LONG THIS PRESENTATION TOOK TO GIVE TO

12:58PM 19    THE BOARD ON THAT DATE?

12:58PM 20    A.  HOW LONG THE PRESENTATION TOOK?

12:58PM 21    Q.  UH-HUH.

12:58PM 22    A.  I THINK IT WAS -- IT GUIDED OUR DISCUSSION THAT DAY.

12:58PM 23    YOU'RE GOING FASTER THROUGH IT THAN WE DID.  WE STOPPED AND

12:58PM 24    TALKED ON EACH PAGE, AND -- BUT I WOULD SAY AT LEAST AN HOUR OR

12:59PM 25    TWO.  IT WAS NOT A QUICK ONE SLIDE AFTER ANOTHER, MR. BOSTIC.

12:59PM  1    WE STOPPED AND HAD A DISCUSSION ABOUT IT.

12:59PM  2    Q.   UNDERSTOOD.   LOOKING AT PAGE 76, DO YOU SEE A SLIDE TITLED

12:59PM  3    VALIDATION OF THERANOS?

12:59PM  4    A.   YES.

12:59PM  5    Q.   AND THE FIRST PARAGRAPH THERE SAYS, "THERANOS HAS BEEN

12:59PM  6    COMPREHENSIVELY VALIDATED OVER THE COURSE OF THE LAST SEVEN

12:59PM  7    YEARS BY TEN OF THE FIFTEEN LARGEST PHARMACEUTICAL COMPANIES."

12:59PM  8        DO YOU SEE THAT?

12:59PM  9    A.   YES.

12:59PM  10   Q.   AND DO YOU RECALL A DISCUSSION ABOUT PHARMACEUTICAL

12:59PM  11   COMPANIES VALIDATING THERANOS?

12:59PM  12   A.   I DON'T RECALL THE PHARMACEUTICAL COMPANIES.   I'M SURE IT

12:59PM  13   WAS ADDRESSED, JUST LIKE IT IS ON THE SLIDE, I JUST DON'T

12:59PM  14   RECALL THAT PART OF IT.   THERE ARE OTHER PARTS OF THE SLIDE

12:59PM  15   THAT I RECALL VERY WELL, THOUGH.

12:59PM  16   Q.   AND WHAT STOOD OUT IN YOUR MIND ABOUT THE SLIDE?

12:59PM  17   A.   ON THIS SLIDE IT WAS THERANOS INFRASTRUCTURE ELIMINATES

12:59PM  18   THE NEED FOR THE LAB, AND IT CAUGHT MY ATTENTION FOR MILITARY

01:00PM  19   USE.

01:00PM  20       BUT AS I WAS LEARNING ABOUT THIS, I HAD BEEN OBVIOUSLY

01:00PM  21   READING ON THE INTERNET ABOUT THERANOS AFTER I AGREED IN AUGUST

01:00PM  22   TO JOIN THE BOARD, BUT NOW I'M SEEING THERE'S A VALIDATION OF

01:00PM  23   ITS LAB INFRASTRUCTURE BY FDA, BY THE WORLD HEALTH

01:00PM  24   ORGANIZATION, AND THEN, OF COURSE, THE NOVEL BUT SOUND IT CAN

01:00PM  25   ACCURATELY WORK FROM JOHNS HOPKINS.

01:00PM  1          SO SEEING THIRD PARTY VALIDATION LIKE THIS OF WHAT I

01:00PM  2   THOUGHT WAS THE THERANOS -- OR WHAT ELIZABETH HAD BEEN TALKING

01:00PM  3   ABOUT, SO IT WASN'T JUST ELIZABETH TALKING ABOUT IT, IT WAS

01:00PM  4   THIRD PARTIES, RESPECTED THIRD PARTIES.

01:00PM  5   Q.   AND DID THAT INCREASE YOUR CONFIDENCE IN THE THERANOS

01:00PM  6   TECHNOLOGY?

01:00PM  7   A.   IT DID VERY MUCH.

01:00PM  8   Q.   LET'S LOOK AT SLIDE 78, PAGE 78 OF EXHIBIT 1172.

01:01PM  9          DO YOU SEE A TITLE HERE OVERVIEW:  THERANOS SYSTEMS?

01:01PM  10  A.   YES.

01:01PM  11  Q.   AND WHAT IS YOUR UNDERSTANDING OF WHAT WAS DEPICTED IN

01:01PM  12  THIS SLIDE AND IN PARTICULAR IN THE UPPER LEFT CORNER?

01:01PM  13  A.   THESE ARE THE PHYSICAL PARTS OF THE SYSTEM, AND IT SHOWS

01:01PM  14  HOW THERANOS WORKS.

01:01PM  15  Q.   AND IN THE UPPER LEFT DO YOU SEE TWO BOXES OR TWO DEVICES;

01:01PM  16  IS THAT CORRECT?

01:01PM  17  A.   UH-HUH.

01:01PM  18  Q.   AND WHAT WERE THOSE AS YOU UNDERSTOOD IT?

01:01PM  19  A.   THE ANALYZERS.

01:01PM  20  Q.   THE ANALYZERS MANUFACTURED BY THERANOS?

01:01PM  21  A.   PARDON?

01:01PM  22  Q.   THE ANALYZERS MANUFACTURED BY THERANOS?

01:01PM  23  A.   OH, YEAH.  ABSOLUTELY, YES.

01:01PM  24  Q.   FINALLY, LET'S LOOK AT EXHIBIT -- OR SORRY, EXHIBIT 1172,

01:01PM  25  PAGE 81 OF THIS SAME PRESENTATION.

01:01PM  1        THIS IS IN THE SAME BOARD PRESENTATION.  THERE'S A SLIDE

01:01PM  2   ENTITLED EXCERPTS FROM THERANOS'S TEST MENU; CORRECT?

01:02PM  3   A.   YES.

01:02PM  4   Q.   AND WE TALKED EARLIER ABOUT THE RANGE OF TESTS THAT

01:02PM  5   THERANOS COULD OFFER.

01:02PM  6        LOOKING AT THESE SLIDES WITH THE TEST MENU EXCERPTS, WHAT

01:02PM  7   WAS YOUR UNDERSTANDING ABOUT WHICH OF THESE WERE BEING

01:02PM  8   CONDUCTED ON THERANOS-MANUFACTURED ANALYZERS?

01:02PM  9   A.   EARLY ON AT THIS POINT I WAS REGRETTING AGAIN.  WE HADN'T

01:02PM 10   BEEN ABLE TO DO THE TEST IN THEATRE IN CENTCOM BECAUSE I

01:02PM 11   THOUGHT THEY COULD DO THEM ALL ON THE THERANOS ANALYZERS.

01:02PM 12   Q.   AND WAS THERE ANY DISCUSSION OR DISCLOSURE TO THE BOARD

01:02PM 13   AROUND THIS TIME ABOUT THE USE OF THIRD PARTY ANALYZERS TO RUN

01:02PM 14   A SIGNIFICANT PORTION OF THE TESTS ON THIS MENU?

01:02PM 15   A.   I DON'T RECALL THAT.  OUR POINT WAS THAT WE WERE BETTER

01:02PM 16   THAN THEM.  WE WERE FASTER, WE WERE CHEAPER, WE WERE MORE

01:02PM 17   ACCURATE THAN OTHERS.  SO I DON'T RECALL THAT EVER COMING UP.

01:03PM 18   Q.   WOULD THAT HAVE STOOD OUT IN YOUR MIND, FOR EXAMPLE, IF A

01:03PM 19   MAJORITY OF THE TESTS RUN WERE RUN ON THIRD PARTY DEVICES?

01:03PM 20   A.   AT THIS POINT IT WOULD HAVE LEAPED OUT AT ME BECAUSE MY

01:03PM 21   WHOLE EFFORT AT CENTCOM HAD BEEN TO TRY TO GET IT INTO THEATRE

01:03PM 22   BECAUSE IT WAS DIFFERENT AND IT COULD DO THIS OFF OF THIS ONE

01:03PM 23   SMALL MACHINE.

01:03PM 24        BUT I DID NOT KNOW IT WAS 2,000 WHEN I WAS AT CENTCOM.  I

01:03PM 25   MEAN, THAT KNOWLEDGE CAME IN LATER.

01:03PM   1    Q.   AROUND THIS TIME, SO WE'RE STILL IN LATE 2013, WERE YOU

01:03PM   2    EVER AWARE OR WERE YOU EVER TOLD THAT THE THERANOS ANALYZER

01:03PM   3    COULD RUN NO MORE THAN 12 TESTS?

01:03PM   4    A.   THAT -- I BECAME AWARE OF THAT.  I CAN'T TELL YOU WHEN.

01:03PM   5    YEARS HAVE GONE BY, BUT IT WAS SIGNIFICANTLY LATER THAN THIS.

01:03PM   6    Q.   YOU DID NOT KNOW THAT FACT AT THIS TIME IN 2013?

01:03PM   7    A.   NO.

01:03PM   8    Q.   WERE YOU EVER TOLD AROUND THIS TIME IN 2013 THAT THE

01:04PM   9    THERANOS ANALYZER COULD ONLY PERFORM A TYPE OF TEST CALLED AN

01:04PM   10   IMMUNOASSAY?

01:04PM   11   A.   I THINK I -- I KNEW IT COULD PERFORM IMMUNOASSAY.  I WAS

01:04PM   12   NOT AWARE THAT THAT WAS THE ONLY TEST.

01:04PM   13   Q.   IF YOU HAD KNOWN THOSE FACTS AT THE TIME, WOULD THOSE

01:04PM   14   FACTS HAVE BEEN IMPORTANT TO YOU?

01:04PM   15   A.   ABSOLUTELY.

01:04PM   16   Q.   AND WOULD THEY HAVE BEEN IMPORTANT WHEN IT CAME TO YOUR

01:04PM   17   INTEREST IN THE DEVICE FOR MILITARY USE?

01:04PM   18   A.   NO.  IT WOULD HAVE TEMPERED MY ENTHUSIASM SIGNIFICANTLY,

01:04PM   19   THAT'S MY ENTHUSIASM FOR A PILOT PROJECT.  AGAIN, IT HAD TO GO

01:04PM   20   IN AND DELIVER.  I WASN'T TAKING THAT, YOU KNOW -- I WAS

01:04PM   21   OPERATING IN GOOD FAITH THAT IT COULD DELIVER A LOT OF

01:04PM   22   CAPABILITY, BUT I WANTED TO SEE IT IN ACTION.

01:04PM   23   Q.   UNDERSTOOD.  WE CAN TAKE DOWN THIS EXHIBIT.  THANK YOU,

01:05PM   24   MS. HOLLIMAN.

01:05PM   25        BESIDES THE BOARD OF DIRECTORS MEETING THAT WE'VE BEEN

01:05PM   1    TALKING ABOUT, DID YOU CONTINUE TO ATTEND OTHER BOARD OF

01:05PM   2    DIRECTOR MEETINGS AT THERANOS?

01:05PM   3    A.   I DID.

01:05PM   4    Q.   AND DO YOU RECALL HOW FREQUENTLY THEY OCCURRED?

01:05PM   5    A.   NO, I DO NOT.  I THINK I MIGHT HAVE MISSED ONE WHEN I WAS

01:05PM   6    OVERSEAS, BUT I THINK I MADE IT TO ALL OF THEM.

01:05PM   7    Q.   AND BESIDES ATTENDING BOARD OF DIRECTORS MEETINGS, DID YOU

01:05PM   8    HAVE OTHER CONTACT WITH MS. HOLMES DURING YOUR TIME PERIOD AS A

01:05PM   9    BOARD MEMBER?

01:05PM   10   A.   I DID.  IN ACCORDANCE WITH OUR FIRST DISCUSSION WHEN SHE

01:05PM   11   ASKED ME TO JOIN THE BOARD WHEN I WAS AT STANFORD, WE WOULD SET

01:05PM   12   UP TIMES WHEN SHE AND I COULD MEET, AND I WOULD GO OVER AND

01:05PM   13   TALK, AND IT WAS BASICALLY ABOUT PERSONNEL PROCESSES, TEAM

01:05PM   14   BUILDING.

01:05PM   15       IT USUALLY STARTED WITH ME ASKING HER WHAT WERE THE BIG

01:06PM   16   ISSUES SHE WAS DEALING WITH AND HOW COULD I HELP.

01:06PM   17   Q.   HOW FREQUENTLY WOULD YOU HAVE THOSE -- WERE THOSE

01:06PM   18   ONE-ON-ONE CONVERSATIONS WITH MS. HOLMES?

01:06PM   19   A.   I WOULD SAY FOR EVERY BOARD MEETING THERE WAS AT LEAST ONE

01:06PM   20   OF THOSE OTHER EVENTS WHERE WE GOT TOGETHER ONE ON ONE.  IT

01:06PM   21   WOULD ONLY BE THE TWO OF US IN THE ROOM.  THERE MIGHT HAVE BEEN

01:06PM   22   SOMETIMES MAYBE TWICE IN BETWEEN BOARD MEETINGS.

01:06PM   23   Q.   AND YOU JUST TOLD US ABOUT SOME OF THE TOPICS THAT WERE

01:06PM   24   DISCUSSED.  DID YOU EVER DISCUSS DURING THOSE ONE-ON-ONE

01:06PM   25   MEETINGS HOW TO MANAGE INFORMATION FLOW IN THE COMPANY?

01:06PM   1    A.    YES.

01:06PM   2    Q.    AND WHAT DO YOU RECALL ADVISING HER ON THAT TOPIC?

01:06PM   3    A.    JUST THAT PROBABLY SOMEWHERE IN HER COMPANY WAS EVERY BIT

01:06PM   4    OF INFORMATION SHE NEEDED TO GUIDE IT, LEAD IT, MAKE DECISIONS.

01:06PM   5    AND HOW DO YOU OPEN UP THE INFORMATION FLOW?  HOW DO YOU

01:06PM   6    DISPLAY THE DATA SO EVERYBODY IS ON ONE SHEET OF MUSIC AND

01:06PM   7    YOU'RE NOT CAUGHT FLAT FOOTED, THAT SORT OF THING.

01:06PM   8         THE USE OF TOWN HALLS.  YOU KNOW, THE NORMAL THINGS THAT

01:07PM   9    PEOPLE DO WHO HAVE RESPONSIBILITY FOR LEADING ANY ORGANIZATION.

01:07PM   10   Q.    AND DID THAT ADVICE INCLUDE OR ENCOMPASS HOW TO DEAL WITH

01:07PM   11   NEGATIVE INFORMATION OR UNFAVORABLE INFORMATION?

01:07PM   12   A.    I DON'T RECALL IT IN PARTICULAR, BUT IT PROBABLY DID.  I'M

01:07PM   13   NOT SURE.

01:07PM   14   Q.    THINKING ABOUT YOUR FIRST YEAR ON THE THERANOS BOARD OF

01:07PM   15   DIRECTORS, SO THE FIRST HALF OF 2013 TO THE SECOND HALF OF

01:07PM   16   2014, WAS ANY ADDITIONAL PROGRESS MADE ON THE MILITARY FRONT?

01:07PM   17   DID THE TESTING EVER OCCUR TO YOUR KNOWLEDGE?

01:07PM   18   A.    I'M NOT AWARE OF ANY PROGRESS ON THE MILITARY FRONT.

01:07PM   19   Q.    DO YOU RECALL DURING THAT TIME PERIOD ANY CONVERSATIONS

01:08PM   20   THAT YOU HAD WITH MS. HOLMES ABOUT THE STATUS OF THINGS AND WHY

01:08PM   21   THINGS WEREN'T MOVING FORWARD?

01:08PM   22   A.    SAY AGAIN, PLEASE.

01:08PM   23   Q.    SURE.  DURING THAT TIME PERIOD WHEN YOU WERE ON THE BOARD,

01:08PM   24   DID YOU EVER DISCUSS WITH MS. HOLMES THE MILITARY PILOT PROJECT

01:08PM   25   AND WHY IT WASN'T MOVING FORWARD?

01:08PM  1    A.   NO.  I TALKED TO MS. HOLMES WHEN I CAME ON AND EXPLAINED

01:08PM  2    THAT I WOULD NOT DO THAT WHILE I HAD WHAT IS CALLED A SAFE

01:08PM  3    HARBOR LETTER, THAT I WOULD NOT VIOLATE ETHICAL RULES BY

01:08PM  4    ENGAGING WITH THERANOS MEMBERS OF THE BOARD, AND IT WAS MY

01:08PM  5    PERSONAL PREFERENCE NOT EVEN TO GET CLOSE TO THAT AND POSSIBLY

01:08PM  6    GIVE THE APPEARANCE OF USING MY FORMER POSITION.

01:08PM  7         AND SHE RESPECTED THAT AND NEVER ASKED ME ABOUT MILITARY

01:08PM  8    THINGS.

01:08PM  9    Q.   THAT ETHICAL RULE OR THE ETHICAL APPROACH YOU TOOK, WOULD

01:08PM  10   THAT HAVE PREVENTED YOU FROM HEARING INFORMATION OR JUST FROM

01:08PM  11   HAVING AN ACTIVE ROLE IN THE MILITARY INVOLVEMENT?

01:09PM  12   A.   YEAH IT WOULD PREVENT ME FROM DEALING WITH ANYONE IN

01:09PM  13   THERANOS, MS. HOLMES OR ANY OF HER TEAM ON IT, BUT IT WOULD NOT

01:09PM  14   PREVENT ME FROM HEARING FROM MY OLD BUDDIES IN THEATRE OR

01:09PM  15   PEOPLE LIKE THAT IF IT WAS OUT THERE AND WORKING.

01:09PM  16   Q.   AND WOULD IT HAVE PREVENTED MS. HOLMES FROM TELLING YOU

01:09PM  17   OUR DEVICE IS NOW BEING USED BY THE MILITARY?

01:09PM  18   A.   YOU WOULD HAVE TO ASK HER BECAUSE I HAD EXPLAINED TO HER

01:09PM  19   THAT I DID NOT WANT TO BE INVOLVED IN THE MILITARY ASPECT AT

01:09PM  20   ALL, AND SO THAT MAY HAVE HAD A COOLING EFFECT ON HER

01:09PM  21   WILLINGNESS TO COMMUNICATE IT.  BUT I CAN'T ANSWER THAT.

01:09PM  22   Q.   LET ME ASK, WERE THERE EVER ANY OCCASIONS DURING BOARD

01:09PM  23   MEETINGS WHERE, FOR EXAMPLE, YOU WERE ASKED TO LEAVE SO THAT

01:09PM  24   THE MILITARY PROJECT COULD BE DISCUSSED WITH THE REST OF THE

01:09PM  25   BOARD?

01:09PM 1   A.   NO.  I DO RECALL ON ONE OCCASION THE BAGRAM, I THINK,

01:09PM 2   PROJECT OR SOMETHING COMING UP, BAGRAM BEING THE AIRFIELD, OUR

01:10PM 3   PRIMARY MEDEVAC, MEDICAL EVACUATION AIRFIELD FROM THE AFGHAN

01:10PM 4   THEATRE FOR CAUSALITIES, BUT I DIDN'T KNOW ANYTHING ABOUT IT,

01:10PM 5   AND I DIDN'T ASK ANY QUESTIONS ABOUT IT.

01:10PM 6        AND IT WASN'T AN EXTENDED.  IT WAS MORE NOTED IN PASSING.

01:10PM 7   SO I DIDN'T HAVE TO GET UP AND LEAVE THE ROOM IN ORDER TO AVOID

01:10PM 8   IT.  THERE WAS NO SUBSTANCE TO THAT DISCUSSION THAT I RECALL.

01:10PM 9   Q.   YOU WERE NO LONGER IN ACTIVE MILITARY SERVICE AT THAT

01:10PM 10  TIME; IS THAT CORRECT?

01:10PM 11  A.   ON THE BOARD, YES.

01:10PM 12  Q.   HAD YOU PREVIOUSLY HELD A SECURITY CLEARANCE WITH THE

01:10PM 13  U.S. GOVERNMENT?

01:10PM 14  A.   YES.

01:10PM 15  Q.   AND WHAT LEVEL SECURITY CLEARANCE DID YOU HAVE?

01:10PM 16  A.   TOP SECRET SCI.

01:10PM 17  Q.   IS THAT THE TOP LEVEL CLEARANCE?

01:11PM 18  A.   YES, THAT IS A TOP LEVEL CLEARANCE.

01:11PM 19  Q.   AND DID YOU STILL HAVE THAT CLEARANCE LEVEL WHEN YOU WERE

01:11PM 20  SERVING ON THE THERANOS BOARD?

01:11PM 21  A.   I DID.

01:11PM 22  Q.   DOES THAT MEAN THERE WOULDN'T HAVE BEEN ANY REASONS

01:11PM 23  RELATED TO CLASSIFIED INFORMATION THAT YOU COULDN'T HAVE KNOWN

01:11PM 24  ABOUT MILITARY USE OF THE THERANOS DEVICE?

01:11PM 25  A.   NO.

01:11PM  1    Q.   IN OTHER WORDS, LET ME ASK, WOULD THERE HAVE BEEN ANY

01:11PM  2    REASONS THAT YOU COULDN'T HAVE KNOWN OF CLASSIFIED USE OF A

01:11PM  3    THERANOS DEVICE?

01:11PM  4    A.   NO.   THERE IS NO CLASSIFICATION REASON.   THERE IS THE

01:11PM  5    OTHER HALF OF IT, AND THAT'S THE NEED TO KNOW.   I PROBABLY

01:11PM  6    WOULDN'T HAVE HAD A NEED TO KNOW.

01:11PM  7    Q.   WHEN YOU WERE SERVING ON THE THERANOS BOARD, DID YOU EVER

01:11PM  8    HAVE OCCASION TO SPEAK TO JOURNALISTS ABOUT THE COMPANY?

01:11PM  9    A.   YES.

01:11PM  10   Q.   DO YOU RECALL AN OCCASION WHEN YOU SPOKE TO A JOURNALIST

01:11PM  11   FROM "FORTUNE" MAGAZINE NAMED ROGER PARLOFF?

01:12PM  12   A.   YES.

01:12PM  13   Q.   AND DO YOU REMEMBER APPROXIMATELY WHEN THAT WAS?

01:12PM  14   A.   I BELIEVE IT WAS JUNE, JULY, AUGUST, I BELIEVE IT WOULD

01:12PM  15   HAVE BEEN 2014.

01:12PM  16   Q.   I'LL ASK YOU TO LOOK AT EXHIBIT 1776.

01:12PM  17        YOUR HONOR, THE GOVERNMENT OFFERS THIS INTO EVIDENCE.

01:12PM  18   IT'S SUBJECT TO STIPULATION BETWEEN THE PARTIES.

01:12PM  19             MR. DOWNEY:   NO OBJECTION, YOUR HONOR.   IT MAY BE

01:12PM  20   ADMITTED.

01:12PM  21             THE COURT:   IT'S ADMITTED.   IT MAY BE PUBLISHED.

01:12PM  22        (GOVERNMENT'S EXHIBIT 1776 WAS RECEIVED IN EVIDENCE.)

01:12PM  23   BY MR. BOSTIC:

01:12PM  24   Q.   GENERAL MATTIS, DO YOU SEE IN FRONT OF YOU AN ARTICLE

01:12PM  25   ENTITLED AT THE TOP "THIS CEO'S OUT FOR BLOOD" FROM "FORTUNE"

01:12PM 1    MAGAZINE?

01:12PM 2    A.   YES.

01:12PM 3    Q.   AND IS THIS THAT ARTICLE BY THAT JOURNALIST ROGER PARLOFF

01:13PM 4    THAT WE'VE BEEN DISCUSSING?

01:13PM 5    A.   I ASSUME IT'S THE ARTICLE THAT I PROBABLY CONTRIBUTED TO,

01:13PM 6    YES.

01:13PM 7    Q.   AND DID YOU SPEAK TO MR. PARLOFF IN CONNECTION WITH THIS

01:13PM 8    ARTICLE?

01:13PM 9    A.   YES, HE CALLED ME.

01:13PM 10   Q.   AND DID MS. HOLMES KNOW THAT YOU WERE SPEAKING TO

01:13PM 11   MR. PARLOFF IN CONNECTION WITH THIS ARTICLE?

01:13PM 12   A.   YES.  I BELIEVE I KNEW HE WAS GOING TO CALL, AND SO I WENT

01:13PM 13   TO MS. HOLMES TO ASK HER FOR GUIDANCE ON WHAT I COULD SPEAK

01:13PM 14   ABOUT.  I DID NOT WANT TO REVEAL INTELLECTUAL PROPERTY OR TRADE

01:13PM 15   SECRETS, AND SO I WANTED A LITTLE GUIDANCE.  I DIDN'T WANT TO

01:13PM 16   LEARN ABOUT WHAT I WOULD SPEAK ABOUT IN THE BOARD MEETING.

01:13PM 17   THERE'S A DUTY OF CONFIDENTIALITY AS A MEMBER OF THE BOARD.

01:13PM 18   Q.   AND DID MS. HOLMES PROVIDE YOU WITH THAT GUIDANCE ON --

01:13PM 19   A.   SHE DID.

01:13PM 20   Q.   -- ON WHAT YOU COULD SAY AND WHAT YOU COULDN'T SAY?

01:13PM 21   A.   RIGHT.

01:13PM 22   Q.   I'D LIKE TO LOOK AT A COUPLE OF PORTIONS OF THIS ARTICLE.

01:13PM 23        FIRST, I'LL DRAW YOUR ATTENTION TO THE TOP LINE BELOW THE

01:13PM 24   BY LINE THERE'S A SECTION THAT SAYS AUTHOR'S NOTE IN BRACKETS.

01:14PM 25        DO YOU SEE THAT?

01:14PM   1     A.   YES.

01:14PM   2     Q.   AND THAT READS, "ON DECEMBER 17TH, 2015, I PUBLISHED A

01:14PM   3     PROTRACTED CORRECTION TO THIS ARTICLE."

01:14PM   4          DO YOU SEE THAT?

01:14PM   5     A.   I DON'T THINK I -- I'M SEEING IT NOW.  I'M NOT SURE I SAW

01:14PM   6     THAT ON THE VERSION I READ.  I DID READ THE ARTICLE, BUT IT DID

01:14PM   7     NOT HAVE THAT.

01:14PM   8     Q.   AND THAT'S MY POINT.

01:14PM   9          DO YOU THINK YOU WOULD HAVE READ THIS ARTICLE AT THE TIME

01:14PM   10    IT CAME OUT IN JUNE OF 2014?

01:14PM   11    A.   OH, RIGHT.

01:14PM   12    Q.   AND SO THAT LINE WOULD NOT HAVE BEEN THERE AT THE TIME

01:14PM   13    THAT YOU READ IT; CORRECT?

01:14PM   14    A.   I WOULD NOT HAVE SEEN THAT, NO.

01:14PM   15    Q.   LET'S TURN TO PAGE 4 OF THIS EXHIBIT.

01:14PM   16         AND DO YOU SEE AN IMAGE DISPLAYED AS PART OF THAT ARTICLE?

01:14PM   17    A.   YES.

01:14PM   18    Q.   AND WHAT DOES THAT IMAGE DEPICT, IF YOU HAVE AN

01:14PM   19    UNDERSTANDING?

01:14PM   20    A.   I'M SORRY, MR. BOSTIC?

01:14PM   21    Q.   AND WHAT DOES THAT IMAGE DEPICT?

01:14PM   22    A.   THIS IS THE THAN NO -- THIS IS THE BLOOD SAMPLE SIZE.

01:15PM   23    Q.   AND THE CAPTION TO THAT IMAGE SAYS, "THERANOS CAN RUN AS

01:15PM   24    MANY AS 7 TESTS --" I'M SORRY, "70 TESTS ON A SAMPLE THIS

01:15PM   25    SIZE."

01:15PM   1          IS THAT CORRECT?

01:15PM   2     A.   RIGHT.

01:15PM   3     Q.   LET'S TURN TO PAGE 11 OF THIS ARTICLE.

01:15PM   4          THERE'S A LINE IN A PARAGRAPH BEGINNING, "THERANOS, WHICH

01:15PM   5     DOES NOT."

01:15PM   6          IF WE ZOOM IN THERE.

01:15PM   7          DO YOU SEE LANGUAGE READING, "THERANOS, WHICH DOES NOT BUY

01:15PM   8     ANY ANALYZERS FROM THIRD PARTIES, IS THEREFORE IN A UNIQUE

01:15PM   9     POSITION"?

01:15PM  10     A.   YES.

01:15PM  11     Q.   AND WAS THAT CONSISTENT WITH YOUR UNDERSTANDING AT THE

01:15PM  12     TIME?

01:15PM  13     A.   ABSOLUTELY.  I WAS ASSUMING WE WERE SHOWING THE OTHERS NOT

01:16PM  14     TO BE AS GOOD AS US, SO OF COURSE WE WERE USING OURS.

01:16PM  15     Q.   LET'S TURN BACK TO PAGE 6, PLEASE, IN THIS EXHIBIT.  LET'S

01:16PM  16     ZOOM IN ON THE TOP PARAGRAPH, PLEASE.

01:16PM  17          THERE'S LANGUAGE THERE THAT SAYS, "THERANOS'S TESTS CAN BE

01:16PM  18     PERFORMED ON JUST A FEW DROPS OF BLOOD, OR ABOUT 1/100TH TO

01:16PM  19     1/1,000TH OF THE AMOUNT THAT WOULD ORDINARILY BE REQUIRED."

01:16PM  20          DO YOU SEE THAT LANGUAGE?

01:16PM  21     A.   YES.

01:16PM  22     Q.   AND LET'S TURN THE PAGE TO PAGE 7.

01:16PM  23          LET'S ZOOM IN ON THE PARAGRAPH BEGINNING, "PRECISELY"

01:16PM  24     TOWARDS THE BOTTOM.

01:16PM  25          THE ARTICLE SAYS, "PRECISELY HOW THERANOS ACCOMPLISHES ALL

01:16PM  1    OF THESE AMAZING FEATS IS A TRADE SECRET."

01:17PM  2        DO YOU SEE THAT?

01:17PM  3    A.   YES.

01:17PM  4    Q.   AND AS A MEMBER OF THE BOARD, DID YOU HAVE ANY OBLIGATIONS

01:17PM  5    TO PROTECT SECRET INFORMATION WITHIN THERANOS?

01:17PM  6    A.   THERE'S A DUTY OF CONFIDENTIALITY, YES.

01:17PM  7    Q.   AND DID YOU UNDERSTAND THAT AT THE TIME?

01:17PM  8    A.   ABSOLUTELY.

01:17PM  9    Q.   WHEN YOU WERE A MEMBER OF THE BOARD, WERE YOU EVER TOLD BY

01:17PM  10   MS. HOLMES THAT THERE WERE SOME FACTS THAT YOU WERE NOT ALLOWED

01:17PM  11   TO KNOW BECAUSE THEY WERE TRADE SECRETS?

01:17PM  12   A.   NO.

01:17PM  13   Q.   WOULD YOU HAVE BEEN SURPRISED TO HEAR THAT AT THE TIME?

01:17PM  14   A.   OH, I WOULD CERTAINLY WANT TO KNOW IF SHE SAID IT, BUT I

01:17PM  15   DON'T RECALL HER EVER SAYING IT SO.

01:17PM  16   Q.   AND IN YOUR VIEW WOULD CONFIDENTIAL INFORMATION HAVE BEEN

01:17PM  17   SAFE WITH YOU?

01:17PM  18   A.   I'VE MAINTAINED CONFIDENTIALITY OF A LOT OF SECRETS IN MY

01:17PM  19   CAREER.

01:17PM  20   Q.   AND DURING YOUR MILITARY CAREER, DID YOU HAVE THE

01:17PM  21   OPPORTUNITY TO BE PRIVY TO HIGHLY SENSITIVE INFORMATION, FOR

01:17PM  22   EXAMPLE?

01:17PM  23   A.   YES.

01:17PM  24   Q.   WOULD YOU HAVE TAKEN SERIOUSLY OR DID YOU TAKE SERIOUSLY

01:18PM  25   THE OBLIGATION AT THERANOS TO MAINTAIN THAT CONFIDENTIALITY?

01:18PM 1    A.   OF COURSE.  WHEN I WENT ONTO THE BOARD, I WENT OUT AND

01:18PM 2    BOUGHT BOOKS ABOUT WHAT YOU DO AS A MEMBER OF A BOARD AND

01:18PM 3    STUDIED THEM.  IT'S HIGHLIGHTED IN EVERY BOOK ABOUT BOARD

01:18PM 4    MEMBER DUTIES.

01:18PM 5         FURTHER, WHEN I GOT THE CALL FROM THE PERSON WHO WANTED TO

01:18PM 6    TALK WITH ME, THE JOURNALIST, I WENT TO HER AND SAID NOW WHAT

01:18PM 7    CAN I SAY?  I WANTED TO MAKE CERTAIN HAVING RECEIVED A LOT OF

01:18PM 8    INFORMATION AT THE BOARD MEETING THAT I DIDN'T SPEAK ABOUT

01:18PM 9    THINGS WE NEEDED TO KEEP CONFIDENTIAL TO MAINTAIN OUR

01:18PM 10   COMPETITIVE EDGE.

01:18PM 11   Q.   I'D ASK YOU TO TURN IN YOUR BINDER TO PAGE 4196, PLEASE.

01:18PM 12        ONCE YOU'RE THERE, LET ME KNOW IF YOU RECOGNIZE IT.

01:19PM 13   A.   YES.

01:19PM 14   Q.   AND WHAT IS EXHIBIT 4196?

01:19PM 15   A.   IT'S A NOTE FROM MS. HOLMES TO ME FOR TALKING POINTS FOR A

01:19PM 16   CALL FROM A NEW YORKER CORRESPON -- OR REPORTER.

01:19PM 17   Q.   IS THIS AN EMAIL THAT YOU RECEIVED IN SEPTEMBER OF 2014?

01:19PM 18   A.   OH, YES.

01:19PM 19        MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT MOVES TO

01:19PM 20   ADMIT EXHIBIT 4196.

01:19PM 21        MR. DOWNEY:  NO OBJECTION.

01:19PM 22        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:19PM 23        (GOVERNMENT'S EXHIBIT 4196 WAS RECEIVED IN EVIDENCE.)

01:19PM 24   BY MR. BOSTIC:

01:19PM 25   Q.   GENERAL MATTIS, DO YOU SEE THE EMAIL THAT WE'VE BEEN

01:19PM   1     TALKING ABOUT?

01:19PM   2     A.   RIGHT.

01:19PM   3     Q.   AND CAN YOU DESCRIBE FOR US THE PURPOSE OF THIS EMAIL AS

01:19PM   4     YOU UNDERSTOOD IT?

01:19PM   5     A.   YEAH.  I DON'T RECALL TALKING TO THIS REPORTER, BUT I MAY

01:19PM   6     HAVE.  I JUST DON'T REMEMBER.

01:19PM   7          AND THIS, AGAIN, IS MAKING CERTAIN THAT I KNOW WHAT I CAN

01:19PM   8     TALK ABOUT AND WHAT I CANNOT.

01:19PM   9          WE'RE GOING COMMERCIAL, WE'RE ROLLING IT OUT.  I DON'T

01:20PM  10     WANT TO INADVERTENTLY RELEASE INFORMATION THAT SHOULDN'T BE.

01:20PM  11     Q.   AND THIS EMAIL FROM MS. HOLMES SHE SAYS THAT FOR THAT

01:20PM  12     CONVERSATION, ANY QUESTIONS THAT HE ASKS YOU ABOUT, AND THEN

01:20PM  13     SHE LISTS THREE BULLET POINTS.  SHE SAYS YOU CAN LET HIM KNOW

01:20PM  14     WE DON'T TALK ABOUT THESE ON THE RECORD; IS THAT CORRECT?

01:20PM  15     A.   YES.

01:20PM  16     Q.   ONE OF THE THINGS THAT YOU WERE INSTRUCTED NOT TO TALK

01:20PM  17     ABOUT ON THE RECORD IS IN THE FIRST BULLET POINT WHERE IT SAYS

01:20PM  18     SPECIFIC DOD PROGRAMS?

01:20PM  19     A.   RIGHT.

01:20PM  20     Q.   IS DOD DEPARTMENT OF DEFENSE?

01:20PM  21     A.   YES.

01:20PM  22     Q.   AND AT THIS TIME IN SEPTEMBER OF 2014 WERE YOU AWARE OF

01:20PM  23     ANY SPECIFIC DOD PROGRAMS THAT YOU NEEDED TO KEEP OUT OF THIS

01:20PM  24     CONVERSATION?

01:20PM  25     A.   NO, BUT I WOULD NOT HAVE SPOKEN ABOUT THEM, EITHER.  BUT,

01:20PM  1    NO, I WAS NOT AWARE OF ANY.

01:20PM  2    Q.   BUT YOU'RE SAYING THAT YOU DIDN'T NEED TO BE TOLD TO KEEP

01:20PM  3    IT OUT OF THE CONVERSATION ANYHOW?

01:20PM  4    A.   WELL, SHE MAY HAVE BEEN CONTINUING WHAT I STARTED, THOUGH,

01:20PM  5    WITH THAT EFFORT AT THE PILOT PROJECT, BUT I DID NOT WANT TO

01:21PM  6    EVEN BE KEPT UP TO DATE ON THAT IN ORDER TO KEEP A FIREWALL

01:21PM  7    BETWEEN ME AND ANYTHING GOING ON WITH DOD.

01:21PM  8         SO I HAD NO PROBLEM WITH THIS GUIDANCE AT ALL.

01:21PM  9    Q.   OKAY.  THE SECOND BULLET POINT THERE SAYS ANOTHER THING

01:21PM  10   NOT TO BE TALKED ABOUT ON THE RECORD IS QUOTE, "HOW OUR

01:21PM  11   TECHNOLOGY WORKS."

01:21PM  12        DO YOU SEE THAT?

01:21PM  13   A.   YES.

01:21PM  14   Q.   AND IN PARENTHESIS IT SAYS, "IE THAT THERE IS A SINGLE

01:21PM  15   DEVICE THAT DOES ALL TESTS."

01:21PM  16        DO YOU SEE THAT?

01:21PM  17   A.   YES.

01:21PM  18   Q.   AND SO NOW WE'RE IN SEPTEMBER OF 2014.  WAS IT STILL YOUR

01:21PM  19   UNDERSTANDING AT THIS TIME THAT THERANOS HAD A SINGLE DEVICE

01:21PM  20   THAT PERFORMED ALL OF ITS TESTS?

01:21PM  21   A.   YEAH, I WAS -- I THOUGHT IT WAS RATHER STRANGE BECAUSE I

01:21PM  22   THOUGHT WE HAD BEEN KIND OF OUT FRONT THAT THERE'S A SINGLE

01:21PM  23   DEVICE AND WHY WOULD WE WANT TO HIDE THAT.

01:21PM  24        I WAS THINKING MAYBE WE'RE NOW TRYING TO PULL -- AND WE'VE

01:21PM  25   DONE THIS BEFORE IN THE MILITARY WHERE WE INADVERTENTLY

01:21PM  1    RELEASED SOMETHING AND WE SAY DON'T TALK ABOUT IT ANYMORE, WE

01:22PM  2    SHOULDN'T HAVE TALKED ABOUT THAT.

01:22PM  3         SO I THOUGHT IT DIDN'T BOTHER ME BECAUSE I DIDN'T CONSIDER

01:22PM  4    MYSELF A TECHNOLOGICAL EXPERT, AND I WASN'T GOING TO TALK ABOUT

01:22PM  5    SOMETHING I WASN'T AN EXPERT IN ANYWAY.

01:22PM  6    Q.   BUT AM I UNDERSTANDING YOU CORRECTLY THAT YOU WERE

01:22PM  7    SURPRISED THAT THIS WOULD EVEN BE A SECRET BECAUSE YOU THOUGHT

01:22PM  8    IT WAS KNOWN?

01:22PM  9    A.   WELL, YOU KNOW, IT'S -- WHEN YOU'RE IN A COMPETITIVE

01:22PM  10   MARKETPLACE, COMPETITIVE BALL GAME, COMPETITIVE BATTLE GROUND,

01:22PM  11   YOU HAVE TO ADAPT.  AND MAYBE THERE'S SOME REASON SHE DIDN'T

01:22PM  12   WANT TO REVEAL WE WERE DOING IT ON ONE DEVICE WAS THE WAY I

01:22PM  13   INTERPRETED IT AT THE TIME.

01:22PM  14   Q.   SO AT THIS TIME IN SEPTEMBER OF 2014 YOU HAD NOT BEEN TOLD

01:22PM  15   THAT THE COMPANY WAS USING THIRD PARTY ANALYZERS FOR MANY OF

01:22PM  16   ITS TESTS?

01:22PM  17   A.   I CANNOT RECALL WHEN I BECAME AWARE OF THAT.

01:22PM  18        AND WHEN I BECAME AWARE OF IT, I THOUGHT IT WAS VERY

01:22PM  19   LIMITED USE FOR INDIVIDUAL TESTS THAT PERHAPS WE HADN'T GOTTEN

01:23PM  20   CERTIFIED, WE WEREN'T AUTHORIZED YET TO RUN.

01:23PM  21        IN OTHER WORDS, IT WAS JUST -- THERE MIGHT HAVE BEEN SOME,

01:23PM  22   BUT I WAS STILL GOING BACK IN MY MIND TO THE 2,000 TESTS I

01:23PM  23   THOUGHT WE COULD RUN ON THE THERANOS ANALYZERS.

01:23PM  24   Q.   OKAY.  I WANT TO MAKE SURE WE'RE CLEAR ON THIS.

01:23PM  25        AT SOME POINT YOU DID LEARN THAT THERANOS WAS USING THIRD

01:23PM  1    PARTY ANALYZERS FOR SOME OF ITS TESTS; IS THAT CORRECT?

01:23PM  2    A.   THAT'S CORRECT.

01:23PM  3    Q.   AND WHAT WAS YOUR UNDERSTANDING AT THAT TIME ABOUT THE

01:23PM  4    PROPORTION OF THERANOS'S TESTS THAT NEEDED TO BE RUN ON THIRD

01:23PM  5    PARTY DEVICES?

01:23PM  6    A.   THAT IT WAS A VERY LIMITED NUMBER THAT WERE NOT -- THE

01:23PM  7    ASSAYS WERE NOT YET ACCEPTED BY THE REGULATORY AGENCIES.

01:23PM  8    Q.   WHEN YOU SAY THAT THERE WAS A LIMITED NUMBER THAT WERE NOT

01:23PM  9    YET ACCEPTED BY THE REGULATORY AGENCIES, DOES THAT MEAN YOU

01:24PM 10    UNDERSTOOD THAT THE ONLY HURDLE TO USING THOSE TESTS WOULD BE

01:24PM 11    REGULATORY APPROVAL?

01:24PM 12    A.   YES, THAT WAS MY IMPRESSION AT THE TIME.

01:24PM 13    Q.   AND AS YOU UNDERSTOOD IT BASED ON INFORMATION FROM

01:24PM 14    MS. HOLMES, WAS THE THERANOS DEVICE CAPABLE OF RUNNING THOSE

01:24PM 15    ADDITIONAL TESTS?

01:24PM 16    A.   YEAH.  I ASSUMED IT WAS FOR 2,000 TESTS.  BUT HAVING RUN

01:24PM 17    INTO REGULATORY ISSUES TRYING TO DO A PILOT PROJECT, I WAS

01:24PM 18    UNDERSTANDING IT MIGHT TAKE A WHILE TO GET EVERY ONE OF THEM

01:24PM 19    THROUGH, AND THIS IS A VERY REGULATED INDUSTRY, AND IT MAY TAKE

01:24PM 20    A WHILE TO GET EVERY ONE OF THEM THROUGH THE APPROVAL PROCESS.

01:24PM 21    Q.   I'LL ASK YOU TO LOOK AT EXHIBIT 5408, PLEASE.

01:25PM 22         DO YOU HAVE IT IN FRONT OF YOU?

01:25PM 23    A.   YES.

01:25PM 24    Q.   AND DO YOU RECOGNIZE IT?

01:25PM 25    A.   YES.

01:25PM   1       Q.   AND WHAT IS EXHIBIT 5408?

01:25PM   2       A.   THIS IS A NOTE FROM HEATHER KING, WHO MS. HOLMES HAD

01:25PM   3       HIRED, TO ALL OF US ON THE BOARD ABOUT "THE

01:25PM   4       WALL STREET JOURNAL" REPORTER JOHN CARREYROU.

01:25PM   5       Q.   AND WAS HEATHER KING AN ATTORNEY?

01:25PM   6       A.   I'M SORRY?

01:25PM   7       Q.   DO YOU KNOW WHETHER HEATHER KING WAS AN ATTORNEY FOR

01:25PM   8       THERANOS?

01:25PM   9       A.   I BELIEVE SO.

01:25PM  10            MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT MOVES TO

01:25PM  11       ADMIT EXHIBIT 5408.

01:25PM  12            MR. DOWNEY:  NO OBJECTION.

01:25PM  13            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:25PM  14       (GOVERNMENT'S EXHIBIT 5408 WAS RECEIVED IN EVIDENCE.)

01:25PM  15            MR. BOSTIC:  IF WE CAN ZOOM IN, MS. HOLLIMAN, ON THE

01:25PM  16       TEXT OF THE EMAIL, PLEASE.

01:25PM  17       Q.   GENERAL MATTIS, DO YOU SEE THAT THIS IS AN EMAIL SENT TO

01:26PM  18       THE BOARD -- ACTUALLY, SORRY, MS. HOLLIMAN.

01:26PM  19            IF WE CAN CAPTURE THE DATE OF THIS EMAIL AS WELL.

01:26PM  20            GENERAL MATTIS, IS THIS AN EMAIL THAT YOU AND OTHER

01:26PM  21       MEMBERS OF THE BOARD RECEIVED ON AUGUST 1ST, 2015, FROM

01:26PM  22       HEATHER KING?

01:26PM  23       A.   YES.

01:26PM  24       Q.   AND CAN YOU DESCRIBE THE SUBSTANCE OF THE EMAIL FOR US,

01:26PM  25       PLEASE?

01:26PM  1    A.   BASICALLY THERE WAS A REPORTER WHO WAS DEFAMING THE

01:26PM  2    COMPANY AND WAS EXPOSING TRADE SECRETS.

01:26PM  3         I HAD NOT TALKED WITH HIM.  I'M NOT AWARE THAT HE TRIED TO

01:26PM  4    GET AHOLD OF ME.  HE MAY HAVE.

01:26PM  5         BUT I DID NOT TAKE THE PHONE CALL.  I JUST DON'T RECALL

01:26PM  6    HIM EVER TRYING TO TALK TO ME.

01:26PM  7    Q.   AND IN THIS EMAIL THE BOARD IS BEING INSTRUCTED NOT TO

01:26PM  8    SPEAK TO THAT JOURNALIST; CORRECT?

01:26PM  9    A.   UH-HUH.  THAT'S CORRECT.

01:26PM  10   Q.   AND WAS THIS DIFFERENT FROM THERANOS'S APPROACH TO OTHER

01:27PM  11   JOURNALISTS IN THE PAST AS WE'VE BEEN DISCUSSING?

01:27PM  12   A.   OH, YES.  I MEAN, HE APPEARED TO BE GOING AFTER THE

01:27PM  13   COMPANY, AND SO SHE DIDN'T WANT US TALKING WITH HIM.

01:27PM  14   Q.   AND I'LL ASK YOU TO LOOK AT EXHIBIT 2611, PLEASE.

01:27PM  15        YOUR HONOR, THE GOVERNMENT MOVES TO ADMIT THIS EXHIBIT.  I

01:27PM  16   UNDERSTAND IT'S BEEN STIPULATED TO.

01:27PM  17             MR. DOWNEY:  YES, YOUR HONOR.  NO OBJECTION.

01:27PM  18             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:27PM  19        (GOVERNMENT'S EXHIBIT 2611 WAS RECEIVED IN EVIDENCE.)

01:27PM  20   BY MR. BOSTIC:

01:27PM  21   Q.   SO WE'VE GONE BACK IN TIME TO A COUPLE EMAILS, AND WE'RE

01:27PM  22   NOW AT JULY 14TH, 2015; CORRECT?

01:27PM  23   A.   YES.

01:27PM  24   Q.   AND DO YOU KNOW WHETHER YOU WERE PRESENT AT THE JULY 2015

01:27PM  25   BOARD MEETING AT THERANOS?

01:27PM  1      A.   I'M NOT SURE I WAS.  I THINK I WAS.

01:28PM  2      Q.   I'LL ASK YOU --

01:28PM  3      A.   I THINK I ONLY MISSED ONE MEETING DURING MY TIME ON THE

01:28PM  4      BOARD BECAUSE I WAS -- I HAD -- I WAS OVERSEAS, AND I COULDN'T

01:28PM  5      GET BACK.

01:28PM  6      Q.   ALL RIGHT.  I'LL DIRECT YOUR ATTENTION TO PAGE 5 OF THIS

01:28PM  7      EXHIBIT, AND THERE'S A TITLE CHARTERING THE BOARD OF

01:28PM  8      COUNSELORS.

01:28PM  9           DO YOU SEE THAT?

01:28PM 10      A.   UH-HUH.

01:28PM 11      Q.   AND DO YOU KNOW WHAT THE BOARD OF COUNSELORS WERE AT

01:28PM 12      THERANOS?

01:28PM 13      A.   WELL, WE WERE LOOKING AT NOW THAT THE COMPANY WAS MATURING

01:28PM 14      AND IT WAS NO LONGER A STARTUP, WE WERE STARTING TO PUT IN

01:28PM 15      PLACE INTERNAL CONTROLS, INTERNAL SOP'S, THAT SORT OF THING.

01:28PM 16           AND MS. HOLMES IS ADJUSTING THE OVERSIGHT AND CORPORATE

01:28PM 17      BOARD TO ADAPT TO THE EXPANDING ROLE OF THE COMPANY IS HOW I

01:28PM 18      LOOKED AT IT AT THE TIME.

01:28PM 19      Q.   THE FIRST BULLET POINT UNDER CHARTERING THE BOARD OF

01:29PM 20      COUNSELORS READS DUTY OF LOYALTY.

01:29PM 21           DO YOU SEE THAT?

01:29PM 22      A.   YES.

01:29PM 23      Q.   AND IF WE TURN THE PAGE AND WE CAN LOOK AT PAGE 6 OF THIS

01:29PM 24      EXHIBIT THERE'S A SLIDE TITLED DUTY OF LOYALTY.

01:29PM 25           DO YOU SEE THAT?

01:29PM   1      A.   YES.

01:29PM   2      Q.   AND THE CONTENT IS REDACTED.

01:29PM   3           BUT MY QUESTION FOR YOU IS DO YOU RECALL A DISCUSSION,

01:29PM   4      INCLUDING THE THERANOS BOARD, ABOUT THE DUTY OF LOYALTY?

01:29PM   5      A.   VAGUELY.  I DO RECALL IT.  I DON'T RECALL THE DETAILS

01:29PM   6      RIGHT NOW, AND I DON'T KNOW WHY IT'S REDACTED, BUT I REALLY

01:29PM   7      CAN'T FILL IN THAT -- WHAT IS MISSING.

01:29PM   8      Q.   THAT'S OKAY.

01:29PM   9           DO YOU REMEMBER YOUR REACTION AT THE TIME TO THIS

01:29PM  10      PRESENTATION ABOUT THE DUTY OF LOYALTY?

01:29PM  11      A.   WELL, MAYBE A QUESTION IN MY MIND IS THIS NEEDED WAS I

01:29PM  12      LOOKED AROUND THE ROOM AND WHO WAS IN THE ROOM BESIDE ME.

01:29PM  13           BUT, YOU KNOW, WHEN YOU'RE ON A BOARD LIKE THIS, YOU'RE

01:30PM  14      THERE TO HELP THE CEO.  YOU'RE TRYING TO ASSIST AS BEST YOU

01:30PM  15      CAN.

01:30PM  16           AND IF SHE FELT THAT WAS NECESSARY TO BRING UP, THEN YOU

01:30PM  17      SHOULD AT LEAST GIVE IT SOME ATTENTION.

01:30PM  18      Q.   OKAY.  WE CAN TAKE THAT DOWN.  THANK YOU, MS. HOLLIMAN.

01:30PM  19           DO YOU RECALL LATER IN 2015 THE JOURNALIST THAT WAS

01:30PM  20      REFERENCED IN THAT EMAIL DID PUBLISH AN ARTICLE ABOUT THERANOS?

01:30PM  21      A.   YES.  YES.

01:30PM  22      Q.   AND DID YOU READ THAT ARTICLE?

01:30PM  23      A.   I DID.

01:30PM  24      Q.   AND DID YOU READ IT AS SOON AS IT CAME OUT?

01:30PM  25      A.   I'M SORRY?

01:30PM   1    Q.   DID YOU READ IT AS SOON AS IT CAME OUT?

01:30PM   2    A.   PROBABLY WITHIN 24 HOURS, YES.

01:30PM   3    Q.   AND IT INCLUDED SOME FACTS OR CLAIMS ABOUT THE COMPANY; IS

01:30PM   4    THAT CORRECT?

01:30PM   5    A.   RIGHT.

01:30PM   6    Q.   WOULD YOU DESCRIBE THAT ARTICLE AS FAVORABLE TO THE

01:30PM   7    COMPANY OR UNFAVORABLE?

01:30PM   8    A.   UNFAVORABLE.

01:31PM   9    Q.   I'LL ASK YOU TO LOOK AT EXHIBIT 4553, PLEASE.

01:31PM  10    A.   4553?

01:31PM  11    Q.   4553.

01:31PM  12         DO YOU RECOGNIZE THAT DOCUMENT?

01:31PM  13    A.   YES.

01:31PM  14    Q.   AND WHAT IS EXHIBIT 4553?

01:31PM  15    A.   IT'S WITH MS. HOLMES, AND MR. BALWANI, AND HEATHER KING,

01:31PM  16    AND ALL OF THE MEMBERS OF THE BOARD TALKING ABOUT WHAT WE'RE

01:31PM  17    DOING IN RESPONSE TO THE ARTICLE AND THE ALLEGATIONS HERE.

01:31PM  18    Q.   I'LL ASK YOU TO LOOK AT PAGE 2 OF THIS EXHIBIT.

01:31PM  19         ACTUALLY, YOUR HONOR, THE GOVERNMENT MOVES TO ADMIT

01:31PM  20    EXHIBIT 4553.

01:32PM  21              MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

01:32PM  22              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:32PM  23         (GOVERNMENT'S EXHIBIT 4553 WAS RECEIVED IN EVIDENCE.)

01:32PM  24              MR. BOSTIC:  MS. HOLLIMAN, LET'S PROJECT PAGE 2 OF

01:32PM  25    THIS EXHIBIT, PLEASE.

01:32PM   1    Q.   GENERAL MATTIS, GENERALLY SPEAKING IS THIS AN EMAIL

01:32PM   2    DISCUSSION INCLUDING THE BOARD ABOUT THE CONTENT OF "THE

01:32PM   3    WALL STREET JOURNAL" ARTICLE AND THE COMPANY'S RESPONSE?

01:32PM   4    A.   WELL, LET ME READ THROUGH IT HERE AND SEE IF THAT'S THE

01:32PM   5    ONLY --

01:32PM   6    Q.   PLEASE.   TAKE YOUR TIME.

01:32PM   7         (PAUSE IN PROCEEDINGS.)

01:32PM   8              THE WITNESS:   WELL, IT'S A LOT OF THE STANDARD, WHAT

01:32PM   9    THERANOS IS ABOUT, WHAT WE DO, BUT IT IS IN RESPONSE TO "THE

01:32PM  10    WALL STREET JOURNAL."

01:32PM  11    BY MR. BOSTIC:

01:32PM  12    Q.   IF I COULD DIRECT YOUR ATTENTION TO PAGE 2 OF THE EXHIBIT

01:32PM  13    AND TOWARDS THE BOTTOM.

01:32PM  14         LET'S HIGHLIGHT A MESSAGE FROM MR. KOVACEVICH.

01:33PM  15    A.   RIGHT.

01:33PM  16    Q.   AND LET'S START ONE ABOVE THAT, MS. HOLLIMAN.

01:33PM  17         THANK YOU.   THAT'S GOOD?

01:33PM  18         DO YOU SEE HERE AN EMAIL THAT WAS SENT FROM

01:33PM  19    MR. KOVACEVICH?

01:33PM  20    A.   OKAY.

01:33PM  21    Q.   AND WAS HE A MEMBER OF THE THERANOS BOARD?

01:33PM  22    A.   YES.

01:33PM  23    Q.   AND WHO WERE THE OTHER INDIVIDUALS THAT THIS EMAIL WAS

01:33PM  24    SENT TO JUST GENERALLY SPEAKING?

01:33PM  25    A.   YES.

01:33PM   1    Q.  AND WHO WERE THE INDIVIDUALS WHO RECEIVED THIS EMAIL IF

01:33PM   2    YOU CAN TELL?

01:33PM   3    A.  WILLIAM FOEGE, FORMER DIRECTOR OF THE CENTER OF DISEASE

01:33PM   4    CONTROL, DR. PERRY.

01:33PM   5        I'M NOT SURE ON THE K. MATTHEWS.

01:33PM   6    Q.  GENERALLY SPEAKING, WERE THESE OTHER MEMBERS OF THE

01:34PM   7    THERANOS BOARD OF DIRECTORS?

01:34PM   8    A.  YES.  FOR CERTAIN ON DR. PERRY AND DR. FOEGE.

01:34PM   9    Q.  AND SOME EMAIL ADDRESSES ARE REDACTED HERE SO IT WILL BE

01:34PM  10    DIFFICULT FOR YOU TO SEE ALL OF THEM.

01:34PM  11    A.  I SEE.

01:34PM  12    Q.  AND THE TEXT OF THIS EMAIL SAYS, "SO WHEN BLOOD IS

01:34PM  13    WITHDRAWN IN VENOUS TUBES DO I UNDERSTAND CORRECTLY THAT THE

01:34PM  14    TESTS ARE THEN DONE ON LAB LIKE EQUIPMENT AND NOT EDISON AND

01:34PM  15    THOSE ARE SENT TO CLIA FOR TESTING WHILE EDISON IS ONLY BEING

01:34PM  16    USED FOR THE FDA TESTS"?

01:34PM  17        DO YOU SEE THAT?

01:34PM  18    A.  YES.

01:34PM  19    Q.  AND, FIRST OF ALL, THERE'S A MENTION OF EDISON.  WHAT WAS

01:34PM  20    YOUR UNDERSTANDING OF WHAT EDISON MEANT?

01:34PM  21    A.  THE THERANOS ANALYZER.

01:34PM  22    Q.  THAT WAS THE THERANOS MANUFACTURED ANALYZER?

01:34PM  23    A.  OH, THE THERANOS MANUFACTURED ANALYZER, YES.

01:34PM  24    Q.  MR. KOVACEVICH HERE APPEARS TO BE ASKING ABOUT HOW

01:34PM  25    THERANOS USES VENOUS SAMPLES AND WHAT EQUIPMENT VENOUS SAMPLES

01:35PM  1    ARE PROCESSED ON; RIGHT?

01:35PM  2    A.   YES.

01:35PM  3    Q.   AND WAS THAT SOMETHING THAT YOU ALSO HAD QUESTIONS ABOUT

01:35PM  4    FOLLOWING THE PUBLICATION OF THIS "WALL STREET JOURNAL"

01:35PM  5    ARTICLE?

01:35PM  6    A.   YES.  I HADN'T GOTTEN THIS EMAIL, AND WHEN I GOT TO IT I

01:35PM  7    WENT UP AND FOUND HIS AND WAS VERY FOCUSSED ON HIS QUESTION.

01:35PM  8    HE ASKED THE QUESTION THAT HAD COME TO MY MIND AS WELL.

01:35PM  9    Q.   WAS THIS AN IMPORTANT QUESTION IN YOUR MIND?

01:35PM  10   A.   ABSOLUTELY.

01:35PM  11   Q.   WHY?

01:35PM  12   A.   BECAUSE UP UNTIL THIS TIME I ASSUMED THAT WHEN WE TALKED

01:35PM  13   ABOUT THERANOS WE WERE NOT TALKING ABOUT THERANOS ANALYZER AND

01:35PM  14   OTHER THIRD PARTY ANALYZERS, IT WAS ABOUT THE THERANOS ANALYZER

01:35PM  15   STANDING ALONE.  THAT HAD BEEN MY UNDERSTANDING FROM MY FIRST

01:35PM  16   INTRODUCTION TO THE THERANOS TECHNOLOGY, AND IT WAS THE REASON

01:35PM  17   IN THE FIRST BOARD MEETING I WENT TO THAT WE COULD SAY THAT WE

01:35PM  18   ARE FASTER, WE ARE MORE ACCURATE.  SO WE WERE PUTTING OUR

01:35PM  19   REPUTATION AT RISK.  AND REPUTATIONAL RISK IS SOMETHING THAT I

01:36PM  20   PAY A LOT OF ATTENTION TO COMING FROM MY FORMATIVE BACKGROUND.

01:36PM  21   Q.   I'LL ASK YOU TO LOOK AT PAGE 1 OF THIS SAME EXHIBIT.

01:36PM  22        MS. HOLLIMAN, LET'S ZOOM IN ON THE BOTTOM MESSAGE, PLEASE.

01:36PM  23        DO YOU SEE ANOTHER EMAIL FROM MR. KOVACEVICH IN THIS SAME

01:36PM  24   EMAIL THREAD?

01:36PM  25   A.   YES.

01:36PM   1    Q.   AND HE FOLLOWS UP ON HIS PREVIOUS QUESTION.  THE SECOND

01:36PM   2    SENTENCE SAYS, "I AM STILL CONFUSED, HOWEVER, REGARDING MY

01:36PM   3    PREVIOUS EMAIL.  AT THIS MOMENT HOW MANY OF OUR CUSTOMER

01:36PM   4    SUBMISSIONS ARE BEING TESTED ON LAB EQUIPMENT VERSUS EDISON?"

01:36PM   5         DO YOU SEE THAT?

01:36PM   6    A.   YES.

01:36PM   7    Q.   AND WAS THIS A QUESTION THAT YOU HAD AT THIS TIME?

01:36PM   8    A.   EXACTLY.

01:36PM   9    Q.   AND WAS THIS AN IMPORTANT QUESTION TO YOU?

01:37PM  10    A.   ABSOLUTELY.

01:37PM  11    Q.   AT THIS TIME IN OCTOBER OF 2015, IS THIS SOMETHING THAT

01:37PM  12    YOU AND THE BOARD HAD NOT HAD A CLEAR UNDERSTANDING OF?

01:37PM  13    A.   I CAN'T SPEAK FOR THE BOARD, BUT I CERTAINLY HAD NOT.

01:37PM  14    Q.   AND YOU SAID THAT YOU HAD BEEN PRESENT AT ALL OF THE BOARD

01:37PM  15    MEETINGS SAVE FOR MAYBE ONE; IS THAT CORRECT?

01:37PM  16    A.   RIGHT.

01:37PM  17    Q.   AND LET'S ZOOM OUT AND THEN ZOOM IN ON THE TEXT OF

01:37PM  18    MS. HOLMES'S RESPONSE, PLEASE.  SO THE TOP TWO-THIRDS OF THIS

01:37PM  19    PAGE.

01:37PM  20         GENERAL MATTIS, IS THIS MS. HOLMES'S RESPONSE TO THE

01:37PM  21    QUESTIONS THAT WE'VE JUST LOOKED AT?

01:37PM  22    A.   RIGHT, YES, IT IS.

01:37PM  23    Q.   AND I'LL DRAW YOUR ATTENTION TO A FEW PORTIONS OF THIS

01:37PM  24    RESPONSE, PLEASE.

01:37PM  25         IN THE TOP PARAGRAPH MS. HOLMES SAYS, "THAT'S CORRECT --

01:38PM    1    WE ARE AT AN EXACT MOMENT IN TIME RIGHT NOW WHERE WE'VE JUST

01:38PM    2    TRANSITIONED FROM OPERATING UNDER THE TRADITIONAL LABORATORY

01:38PM    3    FRAMEWORK TO THE FDA FRAMEWORK.  THIS IS WHAT THE LABORATORIES

01:38PM    4    HAVE BEEN THREATENING TO SUE FDA ABOUT TO PREVENT SUCH A

01:38PM    5    TRANSITION FROM BEING REQUIRED FOR THEM.  WE ARE THE FIRST LAB

01:38PM    6    TO DO THIS."

01:38PM    7        DO YOU SEE THAT LANGUAGE?

01:38PM    8    A.   YES.

01:38PM    9    Q.   AND SHE GOES ON TO SAY, "PART OF THIS TRANSITION MEANS

01:38PM   10    MOVING ALL OPERATIONS FROM THE CLIA QUALITY SYSTEMS TO THE FDA

01:38PM   11    QUALITY SYSTEMS."

01:38PM   12        DO YOU SEE THAT?

01:38PM   13    A.   YES.

01:38PM   14    Q.   SHE SAYS, "BY DEFINITION, IT IS NOT POSSIBLE TO OPERATE

01:38PM   15    UNDER BOTH POLICIES AT THE SAME TIME."

01:38PM   16    A.   YES.

01:38PM   17    Q.   AND WHAT WAS YOUR UNDERSTANDING FROM MS. HOLMES'S RESPONSE

01:38PM   18    TO THESE QUESTIONS?

01:38PM   19    A.   I WAS STILL CONFUSED, BUT I WAS AWARE AT THIS POINT THAT

01:38PM   20    IT IS PROBABLY MORE THAN A COUPLE OF TESTS, A COUPLE OF ASSAYS.

01:39PM   21    IT WAS MORE THAN THAT.

01:39PM   22        AND SO MY IMPRESSION WAS THAT WE HAD AT A MINIMUM A

01:39PM   23    PROBLEM WITH WHAT WE HAD BEEN SAYING, AND SO IT WAS TIME TO GO

01:39PM   24    HELP THE CEO.

01:39PM   25    Q.   YOU FELT THAT WAS YOUR ROLE AS A BOARD MEMBER?

01:39PM   1    A.   I'M SORRY?

01:39PM   2    Q.   YOU FELT THAT WAS YOUR ROLE AS A BOARD MEMBER?

01:39PM   3    A.   ABSOLUTELY.

01:39PM   4    Q.   AND MS. HOLMES'S RESPONSE SAYS WE ARE AT AN EXACT MOMENT

01:39PM   5    IN TIME RIGHT NOW WHERE WE'VE JUST TRANSITIONED FROM ONE

01:39PM   6    FRAMEWORK TO ANOTHER; CORRECT?

01:39PM   7    A.   UH-HUH.

01:39PM   8    Q.   AND WHAT DID THAT CAUSE YOU TO THINK, IF ANYTHING, ABOUT

01:39PM   9    WHETHER THIS SITUATION WAS TEMPORARY OR NOT?

01:39PM  10    A.   WHAT WAS THE LAST PART OF YOUR QUESTION?

01:39PM  11    Q.   SURE.  WHAT DID THAT LANGUAGE CAUSE YOU TO THINK ABOUT

01:39PM  12    WHETHER THIS SITUATION WAS TEMPORARY OR NOT, THERANOS'S USE OF

01:39PM  13    VEIN DRAWS?

01:39PM  14    A.   WELL, THE LANGUAGE WAS THAT WE HAD APPARENTLY BEEN USING

01:40PM  15    VENOUS, AND I THOUGHT BECAUSE WE WERE UNDER CLIA AND WE WERE

01:40PM  16    TRANSITIONING NOW WHOLLY OVER TO THERANOS AND KIND OF GOT

01:40PM  17    CAUGHT IN MID STRIDE AT THIS POINT AND PROBABLY CONFUSED THE

01:40PM  18    REPORTER IS WHAT I WAS THINKING.

01:40PM  19    Q.   FROM MS. HOLMES'S -- EXCUSE ME.

01:40PM  20         FROM MS. HOLMES'S EMAIL RESPONSE DID YOU HAVE ANY SENSE

01:40PM  21    THAT THE COMPANY'S USE OF VEIN DRAWS MIGHT BE BECAUSE OF

01:40PM  22    LIMITATIONS IN THE THERANOS TECHNOLOGY?

01:40PM  23    A.   I THINK AT THAT TIME I WAS THINKING IT WAS PROBABLY A

01:40PM  24    REGULATORY PERMISSION, THAT OUR GEAR WAS WORKING BUT YOU WERE

01:40PM  25    STILL WORKING TO GET THINGS APPROVED AND TRYING TO GET THERANOS

01:40PM  1   APPROVED FOR EACH OF THE DIFFERENT TESTS.

01:40PM  2       BUT I STILL THOUGHT WE HAD A REPUTATION PROBLEM HERE, AN

01:40PM  3   INTEGRITY PROBLEM, MANAGERIAL INTEGRITY THAT WE WERE GOING TO

01:41PM  4   BE EXPOSED.  I THOUGHT ALL ALONG THAT WE WERE DOING IT ON

01:41PM  5   THERANOS GEAR.  I MEAN, I WAS A MEMBER OF THE BOARD AND I

01:41PM  6   THOUGHT THAT.

01:41PM  7   Q.   AND LET ME JUST ASK MORE DIRECTLY.  AT THIS TIME DID

01:41PM  8   MS. HOLMES EVER TELL THE BOARD WE USE THIRD PARTY DEVICES

01:41PM  9   BECAUSE THE EDISON CAN'T RUN MANY OF THE DEVICES THAT WE OFFER?

01:41PM 10   A.   NO, IT WAS NEVER PRESENTED LIKE THAT.

01:41PM 11       AS YOU CAN SEE SHE'S SAYING WE'RE TRANSITIONING.  THERE IS

01:41PM 12   STILL A SENSE OF CONFIDENCE.  OBVIOUSLY WE WOULDN'T TRANSITION

01:41PM 13   TO SOMETHING THAT IS NOT WORKING.

01:41PM 14   Q.   I'LL ASK YOU TO LOOK AT EXHIBIT 2932, PLEASE, 2932.  LET

01:42PM 15   ME KNOW ONCE YOU'RE THERE.

01:42PM 16       DO YOU HAVE EXHIBIT 2932 IN FRONT OF YOU?

01:42PM 17   A.   YES.

01:42PM 18   Q.   AND DO YOU RECOGNIZE IT?

01:42PM 19   A.   YES.

01:42PM 20   Q.   AND IS THIS ANOTHER EMAIL OR ANOTHER EMAIL CHAIN INCLUDING

01:42PM 21   MEMBERS OF THE BOARD AND MS. HOLMES FOLLOWING THE PUBLICATION

01:42PM 22   OF THIS ARTICLE?

01:42PM 23   A.   RIGHT.

01:42PM 24       MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT MOVES TO

01:42PM 25   ADMIT EXHIBIT 2932.

01:42PM  1         MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

01:42PM  2         THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

01:42PM  3         (GOVERNMENT'S EXHIBIT 2932 WAS RECEIVED IN EVIDENCE.)

01:42PM  4         MR. BOSTIC:  MS. HOLLIMAN, IF WE COULD START WITH

01:42PM  5    PAGE 3, PLEASE.

01:42PM  6         IF WE CAN ZOOM IN ON THE MESSAGE ON THE TOP HALF OF THE

01:43PM  7    PAGE WHERE IT SAYS "THIS IS A VERY NICE STATEMENT."

01:43PM  8         THE WITNESS:  YES.

01:43PM  9    BY MR. BOSTIC:

01:43PM 10    Q.   FIRST OF ALL, THIS IS FROM WILLIAM PERRY.

01:43PM 11         DO YOU SEE THAT?

01:43PM 12    A.   YES.

01:43PM 13    Q.   AND HE WRITES TO MS. HOLMES AND THE BOARD, "THIS IS A VERY

01:43PM 14    NICE STATEMENT, BUT DOES NOT REALLY ADDRESS THE MOST CRITICAL

01:43PM 15    ISSUE; NAMELY THE ALLEGATIONS THAT THERANOS'S MACHINE, EDISON,

01:43PM 16    MIGHT BE GIVING FAULTY READINGS."

01:43PM 17         DO YOU SEE THAT?

01:43PM 18    A.   YES.

01:43PM 19    Q.   AND DO YOU RECALL DISCUSSIONS ABOUT ACCURACY PROBLEMS WITH

01:43PM 20    THE EDISON AT THAT TIME?

01:43PM 21    A.   THAT WAS A CONCERN WITH SEVERAL OF US ON THE BOARD.

01:43PM 22    Q.   AND WILLIAM PERRY SAYS THIS IS THE MOST CRITICAL ISSUE.

01:43PM 23         DID YOU AGREE WITH HIM AT THE TIME THAT ACCURACY OF THE

01:43PM 24    EDISON WAS THE MOST CRITICAL ISSUE?

01:43PM 25    A.   ABSOLUTELY.  MEDICAL ISSUES, YOU'RE DEALING WITH PEOPLE'S

01:43PM  1    LIVES.  ABSOLUTELY CRITICAL.

01:43PM  2    Q.   AND WILLIAM PERRY GOES ON TO SAY, "THERANOS NEEDS TO

01:44PM  3    URGENTLY ADDRESS THAT ISSUE AND PUT IT TO REST WITH OBJECTIVE

01:44PM  4    DATA."

01:44PM  5         DO YOU SEE THAT?

01:44PM  6    A.   YES.

01:44PM  7    Q.   AND HE RECOMMENDS THAT THE COMPANY USE AN INDEPENDENT

01:44PM  8    AGENCY TO CONDUCT BLIND TESTS.

01:44PM  9         DO YOU SEE THAT?

01:44PM  10   A.   YES.

01:44PM  11   Q.   AND DID YOU AGREE WITH THAT RECOMMENDATION?

01:44PM  12   A.   100 PERCENT.  FROM MY FIRST DAYS ON THE BOARD IT HAD BEEN

01:44PM  13   INDEPENDENT AGENCIES, FDA, YOU KNOW, JOHNS HOPKINS, OTHERS,

01:44PM  14   THAT WE WERE ABLE TO POINT TO SAY THAT IT DOES WORK.  AND SO WE

01:44PM  15   NEEDED TO GET SOME THIRD PARTIES IN THERE, CREDIBLE THIRD

01:44PM  16   PARTIES TO GIVE US CREDENCE AGAIN.

01:44PM  17   Q.   OKAY.  WE CAN TAKE THAT DOWN.  THANK YOU, MS. HOLLIMAN.

01:44PM  18        THAT INDEPENDENT THIRD PARTY VERIFICATION -- FAST

01:44PM  19   FORWARDING AHEAD A LITTLE BIT.  TO YOUR KNOWLEDGE DID THAT WORK

01:44PM  20   EVER ACTUALLY TAKE PLACE?  WAS THERANOS'S ACCURACY EVER

01:45PM  21   CONFIRMED SUFFICIENTLY BY A THIRD PARTY AFTER THIS TIME?

01:45PM  22   A.   I DON'T BELIEVE SO.  FROM MY KNOWLEDGE, NO.

01:45PM  23        BUT THERE WAS THE THIRD PARTY VALIDATION FROM THE

01:45PM  24   OCTOBER 2013 BOARD MEETING THAT WAS CITED THAT I STILL TOOK IN

01:45PM  25   GOOD FAITH THAT THOSE EXCERPTS WERE ACCURATE STATEMENTS FROM

01:45PM  1    JOHNS HOPKINS AND W.H.O. THAT THEY VALIDATED THERANOS.  AND

01:45PM  2    WHEN THERANOS WAS USED, I ASSUMED THAT WAS THE THERANOS

01:45PM  3    ANALYZER THAT WAS BEING VALIDATED.

01:45PM  4    Q.   OKAY.  SO YOU STILL CREDITED THE EARLIER CLAIMS AT THIS

01:45PM  5    TIME AT LEAST?

01:45PM  6    A.   NO.  NOW I'M IN THE QUESTIONING MODE, BUT THAT'S WHERE I

01:45PM  7    HAD THIRD PARTY VALIDATED FROM, IT WAS FROM TWO YEARS BEFORE.

01:45PM  8    IT WAS NOT AT THIS POINT OR AFTER THIS.

01:45PM  9    Q.   AND CAN YOU TELL US MORE ABOUT THIS.  HAD YOUR THINKING

01:46PM  10   ABOUT THE TRUTH OF THOSE CLAIMS CHANGED AT THIS POINT?  YOU

01:46PM  11   SAID YOU WERE IN QUESTIONING MODE.

01:46PM  12       WHAT DOES THAT MEAN?

01:46PM  13   A.   WELL, INITIALLY I JUST THOUGHT WE HAD A PROBLEM WHERE WE

01:46PM  14   PRESENTED THINGS WRONG.  WE HAD A REPORTER, AGGRESSIVE, DOING

01:46PM  15   HIS JOB, BUT HE MISSED WHAT WE WERE REALLY TRYING TO DO.

01:46PM  16       AND SO LET'S ROLL UP OUR SLEEVES AND HELP ELIZABETH,

01:46PM  17   MS. HOLMES, LET'S GET THE COMPANY GOING, REGAIN THE MORALE HIGH

01:46PM  18   GROUND AND MAKE CERTAIN THAT WE CAN GIVE THESE THIRD PARTY

01:46PM  19   VERIFICATION VALIDATIONS OF WHAT THERANOS CAN DO.

01:46PM  20   Q.   AND YOU STAYED ON THE BOARD FOR SEVERAL MONTHS AFTER THIS;

01:46PM  21   CORRECT?

01:46PM  22   A.   YES.

01:46PM  23   Q.   AND THE PATH THAT YOU JUST OUTLINED, IN YOUR VIEW IS THAT

01:46PM  24   THE PATH THAT THE COMPANY TOOK?

01:46PM  25   A.   NO.  I WOULD THINK THAT WE WERE UNABLE TO DO THAT AND

01:46PM   1    PRETTY SOON YOU REALIZE -- I MEAN, I HAD TAKEN ON GOOD FAITH

01:46PM   2    WHAT WE HAD HEARD AND -- BUT THERE HAD BEEN SOME SURPRISES,

01:47PM   3    SOME DISAPPOINTING SURPRISES, AND NOW I WAS QUESTIONING WHETHER

01:47PM   4    OR NOT EDISON WORKED.

01:47PM   5         I CAN'T TELL YOU WHEN I ACTUALLY CAME TO THAT.  INITIALLY

01:47PM   6    I THOUGHT IT'S SOMETHING THAT WE CAN FIX BY GETTING THE TRUTH

01:47PM   7    OUT THERE.

01:47PM   8    Q.   HELP ME APPRECIATE THE TIMING IF YOU CAN, AND I KNOW THIS

01:47PM   9    WAS SEVERAL YEARS AGO.

01:47PM  10         IT SOUNDS LIKE AT FIRST YOU BELIEVED THIS WAS SOMETHING

01:47PM  11    THAT COULD BE FIXED.

01:47PM  12         DO YOU RECALL WHEN YOU STARTED TO FEEL OTHERWISE?

01:47PM  13    A.   WELL, I WAS TRYING TO DEFINE WHAT THE PROBLEM WAS AND

01:47PM  14    THAT'S WHY I WAS VERY ATTENTIVE TO THE EMAILS BY BILL PERRY, BY

01:47PM  15    DR. PERRY, AND BY DICK KOVACEVICH, AND FOLLOWING THAT

01:47PM  16    PROBABLY -- I JUST, I REALLY HESITATE TO SAY WHEN.

01:47PM  17         I WOULD SAY BY SOME TIME EARLY IN 2016 I WAS CONCERNED

01:48PM  18    WITH IT, BUT I'M NOT SURE THAT I DECIDED THAT I COULDN'T TRY

01:48PM  19    AND HELP MS. HOLMES TO GET THE COMPANY ON THE RIGHT TRACK.  I

01:48PM  20    WAS STILL GOING WITH THE IDEA THAT SOMEHOW THIS TECHNOLOGY WAS

01:48PM  21    SO RADICALLY DIFFERENT THAT PERHAPS CONVENTIONAL WAYS OF

01:48PM  22    EVALUATING IT FROM THE OUTSIDE COULD NOT SHOW THE PROMISE THAT

01:48PM  23    IT REALLY HAD.

01:48PM  24    Q.   I WON'T ASK YOU ABOUT SPECIFIC TIMING.

01:48PM  25         BUT DID THERE COME A TIME WHEN YOU ESSENTIALLY LOST HOPE

01:48PM  1    THAT THE COMPANY WOULD BE ABLE TO VINDICATE ITSELF WHEN IT CAME

01:48PM  2    TO ACCURACY?

01:48PM  3    A.   YES.  I DON'T RECALL THE EXACT TIME.  THERE JUST CAME A

01:48PM  4    POINT WHEN I DIDN'T KNOW WHAT TO BELIEVE ABOUT THERANOS

01:48PM  5    ANYMORE.

01:48PM  6    Q.   AND DID THERE COME A TIME WHEN YOU SEPARATED FROM THERANOS

01:48PM  7    AND WERE NO LONGER ON THE BOARD?

01:48PM  8    A.   WELL, I THINK WE STOPPED HAVING BOARD MEETINGS AT SOME

01:48PM  9    POINT.  AND IN NOVEMBER I GOT THE UNANTICIPATED CALL TO BE

01:49PM  10   INTERVIEWED FOR SECRETARY OF DEFENSE, AND AT THAT POINT I BROKE

01:49PM  11   ALL CONTACT WITH STANFORD, HOOVER INSTITUTION, STANFORD

01:49PM  12   UNIVERSITY, WITH OTHER BOARDS, FOOD BANK BOARDS AND EVERYTHING.

01:49PM  13   AND SO IT ALL CAME OFF AT THAT POINT, AND THAT WAS PART OF IT.

01:49PM  14   Q.   AND YOU TALKED EARLIER ABOUT YOUR VIEW OF THE ROLE OF THE

01:49PM  15   BOARD OF DIRECTORS.

01:49PM  16       DO YOU RECALL THAT?

01:49PM  17   A.   YES.

01:49PM  18   Q.   AT THERANOS DO YOU BELIEVE YOU AND THE BOARD WERE GIVEN

01:49PM  19   THE INFORMATION THAT YOU NEEDED TO EFFECTIVELY PERFORM THAT

01:49PM  20   ROLE?

01:49PM  21   A.   INITIALLY I THOUGHT SO.  THE BRIEFS WERE DETAILED.  MANY

01:49PM  22   OF THEM WERE DATA DRIVEN, BOTH THE FINANCIALS AND WHAT WE WERE

01:49PM  23   GETTING AS FAR AS MEDICAL RESULTS AND WHERE THAT COULD TAKE US

01:49PM  24   IN TERMS OF RETURNING ON THE PROMISE, FOR EXAMPLE, PREDICTIVE

01:49PM  25   CAPABILITY.

MATTIS DIRECT BY MR. BOSTIC

01:49PM 1      LOOKING BACK NOW I'M DISAPPOINTED IN THE LEVEL OF

01:50PM 2   TRANSPARENCY.  BY SEEING MS. HOLMES IN BETWEEN BOARD MEETINGS,

01:50PM 3   AND I WOULD COME RIGHT OUT AND ASK HER WHAT ARE YOUR

01:50PM 4   FUNDAMENTAL ISSUES AND WHAT CAN I DO TO HELP YOU.

01:50PM 5      SO I LOOKED BACK TO SEE IF I HAD BEEN MAYBE UNAVAILABLE OR

01:50PM 6   SOMETHING, AND I COULDN'T SEE WHY WE WERE BEING SURPRISED ON

01:50PM 7   SUCH FUNDAMENTAL ISSUES.

01:50PM 8   Q.   IF MS. HOLMES HAD TOLD YOU THAT THE THERANOS ANALYZER, THE

01:50PM 9   EDISON, COULD ONLY PERFORM 12 TESTS, WOULD THAT HAVE AFFECTED

01:50PM 10  YOUR DECISION TO JOIN THE THERANOS BOARD?

01:50PM 11  A.   PROBABLY.  IF HER GOAL WAS STILL 2,000, AND SHE WAS GOING

01:50PM 12  THROUGH THE STEPS AND UNDERSTOOD THE CHALLENGES, TECHNICAL AND

01:50PM 13  REGULATORY, IT MIGHT NOT HAVE CAUSED ME TO STOP -- YOU KNOW, TO

01:51PM 14  NOT JOIN OR TO LEAVE THE BOARD WHEN I HEARD IT.

01:51PM 15  Q.   YOU WERE ON THE THERANOS BOARD OF DIRECTORS AROUND THE

01:51PM 16  TIME OF THE COMMERCIAL LAUNCH; CORRECT?

01:51PM 17  A.   IN 2013?

01:51PM 18  Q.   UH-HUH.

01:51PM 19  A.   YES.

01:51PM 20  Q.   AND THAT'S WHEN THERANOS STARTED OFFERING ITS TESTS TO THE

01:51PM 21  PUBLIC; IS THAT RIGHT?

01:51PM 22  A.   RIGHT.

01:51PM 23  Q.   AND IF MS. HOLMES HAD COME TO THE BOARD AT THAT TIME AND

01:51PM 24  SAID THE DEVICE ISN'T READY YET, WE NEED SOME MORE TIME TO GET

01:51PM 25  MORE TESTS ON IT AND TO WORK ON ACCURACY ISSUES, HOW WOULD YOU

01:51PM   1    HAVE RESPONDED?

01:51PM   2    A.   ABSOLUTELY.  LET'S GO OUT AND HELP RAISE MORE CASH TO KEEP

01:51PM   3    THE COMPANY GOING AND GET IT RIGHT.

01:51PM   4        THERE ARE SOME THINGS THAT YOU DON'T WANT TO ROLL OUT AS A

01:51PM   5    PROTOTYPE THAT ISN'T PROVEN AND DEALING WITH PEOPLE'S LIVES,

01:51PM   6    HEALTH CARE, THAT WOULD BE ONE OF THEM.

01:51PM   7        MR. BOSTIC:  MAY I HAVE A MOMENT, YOUR HONOR?

01:51PM   8        THE COURT:  YES.

01:51PM   9    (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

01:52PM  10    BY MR. BOSTIC:

01:52PM  11    Q.   ONE MORE QUESTION.

01:52PM  12        GENERAL MATTIS, GOING BACK TO THE RESPONSE TO "THE

01:52PM  13    WALL STREET JOURNAL" ARTICLE AND THE ADDITIONAL TESTING THAT

01:52PM  14    THE BOARD WAS RECOMMENDING, DO YOU RECALL THAT?

01:52PM  15    A.   THE ADDITIONAL TESTING FOR THIRD PARTY TESTING?

01:52PM  16    Q.   CORRECT.

01:52PM  17    A.   YES.

01:52PM  18    Q.   AND WOULD THAT HAVE BEEN THE KIND OF COMPARISON TESTING

01:52PM  19    THAT THE MILITARY WOULD HAVE DONE, THE SAME KIND OF COMPARING

01:52PM  20    THERANOS RESULTS TO CONVENTIONAL ANALYZER RESULTS IN YOUR MIND?

01:52PM  21    A.   THAT PROBABLY WOULD HAVE BEEN INCLUDED.  I WOULD IMAGINE

01:52PM  22    IT WOULD START WITH JUST THERANOS, THE INTEGRITY OF THE MACHINE

01:53PM  23    ITSELF AND IT'S ABILITY TO DELIVER ACCURACY, AND I GUESS THAT

01:53PM  24    WOULD TAKE, YOU KNOW, SOME KIND OF THIRD PARTY TESTING

01:53PM  25    EQUIPMENT TO RUN IT AGAINST.

MATTIS DIRECT BY MR. BOSTIC

01:53PM 1          BUT I'M NOT AN EXPERT IN THIS AREA, AND I WOULD JUST SAY

01:53PM 2    WE WOULD HAVE TO PROVE THAT IT WAS ACCURATE.

01:53PM 3    Q.   AND AGAIN, BASED ON YOUR UNDERSTANDING AND YOUR

01:53PM 4    RECOLLECTION, WAS THAT EVER PROVEN TO THE BOARD'S SATISFACTION

01:53PM 5    FOLLOWING "THE WALL STREET JOURNAL" ARTICLE?

01:53PM 6    A.   NOT DURING MY TENURE ON THE BOARD.

01:53PM 7          MR. BOSTIC:  THANK YOU, YOUR HONOR.  NO FURTHER

01:53PM 8    QUESTIONS.

01:53PM 9          THE COURT:  WILL YOU HAVE CROSS-EXAMINATION?

01:53PM 10          MR. DOWNEY:  YES, YOUR HONOR.

01:53PM 11          THE COURT:  LET'S TAKE TEN MINUTES.  LET'S TAKE A

01:53PM 12    TEN MINUTE BREAK.  WE'LL TAKE A TEN MINUTE BREAK, AND THEN

01:53PM 13    WE'LL RESUME WITH CROSS-EXAMINATION.

01:53PM 14          THE CLERK:  COURT IS IN RECESS.

01:53PM 15      (RECESS FROM 1:53 P.M. UNTIL 2:07 P.M.)

02:07PM 16          THE COURT:  THANK YOU.  PLEASE BE SEATED.  THANK YOU

02:08PM 17    FOR YOUR COURTESY.

02:08PM 18      WE'RE BACK ON THE RECORD.  ALL COUNSEL ARE PRESENT, AND

02:08PM 19    MS. HOLMES IS PRESENT.  OUR JURY AND ALTERNATES ARE PRESENT.

02:08PM 20      THE WITNESS IS ON THE STAND.

02:08PM 21      YOU HAVE CROSS-EXAMINATION.

02:08PM 22      MR. DOWNEY, COME FORWARD.  LET ME SAY SOMETHING TO THE

02:08PM 23    AUDIENCE PLEASE.  IT'S COME TO MY ATTENTION THAT SOMEONE OR

02:08PM 24    SOME FOLKS MIGHT HAVE A DEVICE THAT THEY ARE TYPING WITH.

02:08PM 25    PLEASE -- AND THAT THE NOISE FROM THE TYPING, THE KEYS ARE

02:08PM  1    BEING HEARD UP HERE IN THIS AREA.

02:08PM  2         WE ARE ASKING THAT INDIVIDUALS WHO ARE USING DEVICES

02:08PM  3    PLEASE HAVE SOUNDLESS, WHATEVER THAT DESCRIPTION IS, NOISELESS

02:08PM  4    KEYPADS, PLEASE.

02:08PM  5         IF YOU DON'T HAVE THAT, THEN YOU SHOULD TYPE SOFTLY,

02:08PM  6    PLEASE, SUCH THAT IT DOESN'T INTERRUPT THESE PROCEEDINGS.

02:08PM  7         THANK YOU VERY MUCH.  THANK YOU.  SORRY FOR INTERRUPTING

02:08PM  8    YOUR EXAMINATION.

02:08PM  9              MR. DOWNEY:  YOUR HONOR, I'VE PASSED OUT A COPY OF

02:08PM 10    THESE EXHIBITS FOR THIS WITNESS.

02:08PM 11         AND MAY I APPROACH THE WITNESS?

02:09PM 12              THE COURT:  YES.  THANK YOU.

02:09PM 13              MR. DOWNEY:  (HANDING.)

02:09PM 14                       **CROSS-EXAMINATION**

02:09PM 15    BY MR. DOWNEY:

02:09PM 16    Q.   GOOD AFTERNOON, SECRETARY MATTIS.

02:09PM 17         DO YOU HAVE IN FRONT OF YOU A BINDER OF EXHIBITS, A BLACK

02:09PM 18    BINDER?

02:09PM 19    A.   YES.

02:09PM 20    Q.   AND I WANT TO ASK YOU ABOUT YOUR CAREER FOR A FEW MINUTES.

02:09PM 21    YOU WERE 40 YEARS IN THE U.S. MARINE CORPS?

02:09PM 22    A.   A LITTLE OVER THAT, YES, SIR.

02:09PM 23    Q.   AND THEN YOU SPENT ABOUT THREE AND A HALF YEARS IN PRIVATE

02:09PM 24    LIFE?

02:09PM 25    A.   I DID.

02:09PM 1    Q.   AND THEN YOU RETURNED TO PUBLIC SERVICE FOR A FEW YEARS?

02:09PM 2    A.   YES, SIR.

02:09PM 3    Q.   YOU DON'T HAVE ANY EXPERIENCE IN CLINICAL LAB SERVICES

02:09PM 4    OTHER THAN YOUR SERVICE ON THE THERANOS BOARD; IS THAT RIGHT?

02:09PM 5    A.   THAT'S CORRECT.

02:09PM 6    Q.   AND YOU'RE NOT A SCIENTIST; CORRECT?

02:09PM 7    A.   NO.

02:09PM 8    Q.   YOU'RE NOT AN ENGINEER?

02:09PM 9    A.   NO.

02:09PM 10   Q.   AND YOU'RE DEPENDING ON OTHERS TO EVALUATE THE VALIDITY OF

02:09PM 11   THERANOS'S TECHNOLOGY; CORRECT?

02:09PM 12   A.   THAT'S CORRECT.

02:09PM 13   Q.   AND YOU WEREN'T IN A POSITION TO EVALUATE ITS VALIDITY

02:10PM 14   WHEN YOU FIRST MET WITH MS. HOLMES IN 2011; CORRECT?

02:10PM 15   A.   NO.

02:10PM 16   Q.   AND YOU WEREN'T IN A POSITION TO EVALUATE IT WHEN YOU

02:10PM 17   JOINED THE BOARD IN 2013; CORRECT?

02:10PM 18   A.   NO.

02:10PM 19   Q.   AND YOU WEREN'T IN A POSITION TO EVALUATE IT IN 2015 WHEN

02:10PM 20   QUESTIONS WERE RAISED ABOUT IT; CORRECT?

02:10PM 21   A.   CORRECT.

02:10PM 22   Q.   AND THAT'S STILL TRUE TODAY; CORRECT?

02:10PM 23   A.   CORRECT.

02:10PM 24   Q.   THERE WERE MEMBERS OF THE THERANOS BOARD WHEN YOU WERE A

02:10PM 25   MEMBER OF THE BOARD WHO DID HAVE SOME SCIENTIFIC EXPERTISE;

02:10PM  1    CORRECT?

02:10PM  2    A.   YES.

02:10PM  3    Q.   AND ONE OF THEM WAS DR. BILL FRIST; CORRECT?

02:10PM  4    A.   IT WAS, YES.

02:10PM  5    Q.   AND HE'S A RESPECTED SURGEON; CORRECT?

02:10PM  6    A.   YES.

02:10PM  7    Q.   AND A FORMER U.S. SENATOR?

02:10PM  8    A.   UH-HUH, YES.

02:10PM  9    Q.   AND HE'S SOMEONE WHOSE OPINION YOU RESPECT?

02:10PM  10   A.   YES.

02:10PM  11   Q.   AND ALSO DR. FOEGE WHO YOU MENTIONED WAS ALSO A MEMBER OF

02:10PM  12   THE BOARD; CORRECT?

02:10PM  13   A.   YES.

02:10PM  14   Q.   AND HE WAS A FORMER DIRECTOR OF THE CENTER OF DISEASE

02:10PM  15   CONTROL; CORRECT?

02:10PM  16   A.   CORRECT.

02:10PM  17   Q.   AND WOULD THEY PARTICIPATE IN DISCUSSIONS AT THE BOARD

02:11PM  18   MEETING RELATED TO ANY OF THE SCIENTIFIC ISSUES THAT WERE

02:11PM  19   RAISED?

02:11PM  20   A.   YES.

02:11PM  21   Q.   AND WAS THAT AN AREA WHERE YOU REFRAINED MORE AND JUST

02:11PM  22   LISTENED OR DID YOU PARTICIPATE IN CONVERSATIONS ABOUT THE

02:11PM  23   SCIENTIFIC DATA AND OTHER ISSUES RELATED TO THE SCIENCE OF LAB

02:11PM  24   TESTING?

02:11PM  25   A.   ON THOSE AREAS I DID A LOT OF LISTENING, NOT MUCH TALKING.

02:11PM    1    Q.   OKAY.  WHEN YOU JOINED THE BOARD OF DIRECTORS, I THINK YOU

02:11PM    2    TESTIFIED THAT IT WAS SHORTLY AFTER YOU RESIGNED FROM THE

02:11PM    3    MILITARY IN 2013; CORRECT?

02:11PM    4    A.   RIGHT.

02:11PM    5    Q.   AND TO JOIN THE BOARD OF DIRECTORS, YOU HAD TO GO TO THE

02:11PM    6    DEPARTMENT OF THE NAVY AND ASK FOR WHAT IS CALLED A SAFE HARBOR

02:11PM    7    LETTER; CORRECT?

02:11PM    8    A.   THAT'S CORRECT.

02:11PM    9    Q.   AND A SAFE HARBOR LETTER IS SOMETHING THAT IS COMMON FOR

02:11PM   10    FORMER GOVERNMENT OFFICIALS AND MILITARY OFFICIALS TO REQUEST

02:11PM   11    WHEN THEY ENTER THE PRIVATE SECTOR; CORRECT?

02:11PM   12    A.   THAT'S CORRECT.

02:11PM   13    Q.   AND LET ME ASK YOU TO LOOK AT EXHIBIT 10507.

02:12PM   14    A.   YES.

02:12PM   15    Q.   DO YOU HAVE THAT IN FRONT OF YOU?

02:12PM   16    A.   I DO.

02:12PM   17    Q.   AND DO YOU SEE -- DO YOU RECOGNIZE THE FIRST PAGE OF THAT

02:12PM   18    EXHIBIT AS AN EMAIL FROM YOU TO MS. HOLMES?

02:12PM   19    A.   YES.

02:12PM   20    Q.   AND DO YOU RECOGNIZE THE ATTACHED PAGES AS YOUR REQUEST

02:12PM   21    FOR A SAFE HARBOR LETTER AND THEN THE SAFE HARBOR LETTER?

02:12PM   22    A.   YES.

02:12PM   23         MR. DOWNEY:  YOUR HONOR, I BELIEVE 10507 WAS

02:12PM   24    PREVIOUSLY ADMITTED, BUT IF NOT, I MOVE FOR ITS ADMISSION, AND

02:12PM   25    I THINK IT'S ON STIPULATION.

02:12PM 1          MR. BOSTIC:  IT'S NOT ADMITTED AND NOT STIPULATED

02:12PM 2    BUT NO OBJECTION.

02:12PM 3          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:12PM 4        (DEFENDANT'S EXHIBIT 10507 WAS RECEIVED IN EVIDENCE.)

02:12PM 5          MR. DOWNEY:  MAY I ASK YOU TO PUBLISH, MR. BENNETT,

02:12PM 6    THE LAST PAGE OF THE EXHIBIT.  THE PAGE BEFORE THAT.

02:13PM 7       IF YOU COULD HIGHLIGHT THE EMAIL FROM JIM TO ROBERT HOGUE.

02:13PM 8    Q.   DO YOU SEE THIS EMAIL FROM JULY 19TH, 2013, FROM YOU TO

02:13PM 9    ROBERT HOGUE?

02:13PM 10   A.   YES.

02:13PM 11   Q.   AND WHO IS ROBERT HOGUE?

02:13PM 12   A.   HE'S THE COUNSEL TO THE COMMANDANT, THE LEGAL COUNSEL TO

02:13PM 13   THE COMMANDANT OF THE MARINE CORPS.

02:13PM 14   Q.   AND HE'S THE INDIVIDUAL THAT YOU NEED TO CONTACT ABOUT

02:13PM 15   RECEIVING A SAFE HARBOR LETTER; IS THAT RIGHT?

02:13PM 16   A.   HE'S THE ONE WHO WOULD EVALUATE IT, YES.

02:13PM 17   Q.   AND IN YOUR EMAIL TO HIM YOU WRITE, "BOBBY, I NEED

02:13PM 18   (ANOTHER) SAFE HARBOR LETTER IF YOU DETERMINE IT IS

02:13PM 19   PERMISSIBLE.  THIS ONE IS FOR THERANOS, INC. AND THE OFFER

02:13PM 20   BELOW TO SERVE ON THEIR BOARD.  IT'S A MEDICAL LAB COMPANY, A

02:14PM 21   SILICON VALLEY STARTUP ATTEMPTING TO FIELD AN AUTOMATED MEDICAL

02:14PM 22   LAB."

02:14PM 23   A.   UH-HUH.

02:14PM 24   Q.   WAS THAT YOUR UNDERSTANDING OF THE COMPANY'S BUSINESS

02:14PM 25   MISSION AT THAT TIME?

02:14PM  1    A.   YES.

02:14PM  2    Q.   AND A FEW SENTENCES LATER YOU WRITE, "THERANOS IS FOCUSSED

02:14PM  3    ON THE U.S. MEDICAL LAB MARKET HERE IN THE STATES," AND THEN

02:14PM  4    YOU SAY "U.S. MILITARY MAY EVENTUALLY BE A CUSTOMER BUT LIKELY

02:14PM  5    NOT IMMEDIATELY OR IN A BIG WAY."

02:14PM  6    A.   UH-HUH.

02:14PM  7    Q.   WAS THAT YOUR UNDERSTANDING OF THERANOS'S RELATIONSHIP

02:14PM  8    WITH THE MILITARY WHEN YOU JOINED THE BOARD?

02:14PM  9    A.   YES, ABSOLUTELY.

02:14PM  10   Q.   AND WAS THAT INFORMATION THAT MS. HOLMES -- YOU HAD GAINED

02:14PM  11   FROM MS. HOLMES?

02:14PM  12   A.   NO.  THAT WAS FROM MY OWN EXPERIENCE THAT WE HAD BEEN

02:14PM  13   UNABLE TO EVEN GET A PILOT PROJECT STARTED.

02:14PM  14   Q.   OKAY.  WELL, DID YOU KNOW WHAT OTHER EFFORTS THE COMPANY

02:14PM  15   WAS MAKING IN THE MILITARY SPACE?

02:14PM  16   A.   NO.

02:14PM  17   Q.   OKAY.  DID YOU TALK TO MS. HOLMES AT ALL ABOUT THEIR PLANS

02:14PM  18   FOR THE MILITARY MARKET BEFORE YOU SENT THIS EMAIL?

02:14PM  19   A.   NO, I DID NOT.

02:14PM  20   Q.   OKAY.  THE ONLY DISCUSSION YOU HAD WITH HER WAS THAT YOU

02:15PM  21   WOULD NOT BE PART OF THE EFFORT TO OBTAIN DOD CONTRACTS; IS

02:15PM  22   THAT RIGHT?

02:15PM  23   A.   THERE'S 300 MILLION AMERICANS AND LESS THAN A MILLION

02:15PM  24   MILITARY, I COULD SURMISE THAT WE PROBABLY WOULD NOT BE A BIG

02:15PM  25   PART OF THEIR MARKET.

02:15PM  1     Q.   FAIR ENOUGH.  AND YOU WERE ABLE TO OBTAIN THE SAFE HARBOR

02:15PM  2     LETTER; CORRECT?

02:15PM  3     A.   YES.  I JUST SENT ANOTHER ONE PREVIOUSLY TO WORK AT

02:15PM  4     STANFORD, AND THIS WAS A SECOND ONE IN A RATHER SHORT ORDER.

02:15PM  5     Q.   OKAY.  AND SOME RESTRICTIONS WERE IMPOSED ON YOU IN

02:15PM  6     CONNECTION WITH THE SAFE HARBOR LETTER; CORRECT?

02:15PM  7     A.   YES.

02:15PM  8     Q.   AND ONE OF THOSE WAS THAT YOU COULDN'T PARTICIPATE IN ANY

02:15PM  9     DISCUSSIONS ABOUT DOD CONTRACTS WITH EITHER DOD OR WITHIN THE

02:15PM 10     COMPANY; RIGHT?

02:15PM 11     A.   RIGHT.  BUT I TOOK IT FURTHER TO THE BACK OFFICE KIND OF

02:15PM 12     TALK.  I WOULDN'T EVEN GIVE ADVICE ON BROADER ASPECTS.

02:15PM 13     Q.   AND YOU ABIDED BY THAT YOUR ENTIRE TIME AT THE COMPANY;

02:16PM 14     CORRECT?

02:16PM 15     A.   YES.  AND MS. HOLMES NEVER BROACHED IT.  SHE LIVED BY IT

02:16PM 16     WHEN WE FIRST TALKED ABOUT.

02:16PM 17     Q.   AND DO YOU KNOW ANYTHING ABOUT THERANOS'S EFFORTS WITH

02:16PM 18     ELEMENTS OF DOD OTHER THAN CENTCOM?

02:16PM 19     A.   I'VE HEARD SECOND OR THIRD HAND OCCASIONALLY ABOUT IT, BUT

02:16PM 20     I GOT NOTHING AUTHORITATIVE AND IT CAME TO NOTHING THAT I WAS

02:16PM 21     AWARE OF.

02:16PM 22     Q.   WELL, ARE YOU FAMILIAR WITH THE U.S. INSTITUTE -- U.S.

02:16PM 23     ARMY INSTITUTE OF SURGICAL RESEARCH IN HOUSTON,

02:16PM 24     FORT SAM HOUSTON?

02:16PM 25     A.   I'M AWARE IT EXISTS, BUT I'M NOT AWARE OF ANYTHING THAT

02:16PM  1        THERANOS DID WITH THEM.

02:16PM  2        Q.   AND DO YOU KNOW OF ANYTHING THAT THERANOS DID IN

02:16PM  3        CONNECTION WITH AFRICOM?

02:16PM  4        A.   NO.  THAT WAS ONE OF THE ONES I HEARD ABOUT, BUT NEVER

02:16PM  5        FROM ANYONE IN AUTHORITY.

02:16PM  6        Q.   ARE YOU AWARE THAT THERANOS DEVICES WERE SENT TO AFRICA

02:16PM  7        AND TRAVELLED WITH THE CHIEF SURGEON OF AFRICOM?

02:16PM  8        A.   NO.

02:16PM  9        Q.   AND DO YOU KNOW ANYTHING ABOUT ANY OTHER EFFORTS THAT

02:17PM  10       THERANOS UNDERTOOK WITH RESPECT TO DOD?

02:17PM  11       A.   NO.  I HEARD IN ONE OF THE BOARD MEETINGS ABOUT THE BAGRAM

02:17PM  12       EFFORT, BUT I HAVE NO -- I JUST TOLD YOU ALL I KNEW ABOUT THAT

02:17PM  13       ONE RIGHT THERE.

02:17PM  14       Q.   WHEN YOU JOINED THE BOARD, YOU WERE GRANTED STOCKING

02:17PM  15       OPTIONS; CORRECT?

02:17PM  16       A.   I BELIEVE SO.

02:17PM  17       Q.   AND CAN YOU EXPLAIN WHAT A STOCK OPTION IS?

02:17PM  18       A.   I NEVER RECEIVED ANY PAPERWORK SO I CANNOT IN THIS CASE.

02:17PM  19       Q.   LET ME ASK YOU TO LOOK FIRST IN YOUR NOTEBOOK AT

02:17PM  20       EXHIBIT 10520.

02:17PM  21       A.   OKAY.

02:17PM  22       Q.   AND THERE'S AN EMAIL ATTACHING SOME DOCUMENTS.  AND FOR

02:18PM  23       PURPOSES OF OUR DISCUSSION, I'M ONLY INTERESTED IN THE

02:18PM  24       ATTACHMENTS, NOT THE EMAIL.

02:18PM  25       A.   RIGHT.

02:18PM   1       Q.   SO I WOULD DIRECT YOUR ATTENTION TO EXHIBIT A, PAGE 4 OF

02:18PM   2    EXHIBIT A.

02:18PM   3            IS THAT YOUR SIGNATURE?

02:18PM   4       A.   IT IS.

02:18PM   5       Q.   AND IT IS DATED JANUARY 17TH, 2014; CORRECT?

02:18PM   6       A.   THAT'S CORRECT.

02:18PM   7       Q.   AND IF YOU LOOK AT EXHIBIT B, THAT'S ALSO YOUR SIGNATURE

02:18PM   8    ON THE SECOND PAGE?

02:18PM   9       A.   THE SAME DATE, YES.

02:18PM   10           MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT 10520, ONLY

02:18PM   11   EXHIBITS A AND B.

02:18PM   12           MR. BOSTIC:  NO OBJECTION.

02:18PM   13           THE COURT:  THEY'RE ADMITTED, AND THEY MAY BE

02:18PM   14   PUBLISHED.

02:18PM   15       (DEFENDANT'S EXHIBIT 10520A AND 10520B WERE RECEIVED IN

02:18PM   16   EVIDENCE.)

02:18PM   17           MR. DOWNEY:  IF I COULD ASK YOU TO PUBLISH THE

02:18PM   18   PARAGRAPH 1 OF EXHIBIT A.

02:18PM   19       Q.   FIRST OF ALL, DO YOU SEE ABOVE PARAGRAPH A THERE'S WRITING

02:19PM   20   AND IT SAYS ELIZABETH HOLMES.  IS THAT YOUR WRITING?

02:19PM   21       A.   NO, IT IS NOT.

02:19PM   22       Q.   PARAGRAPH 1 SAYS, EXERCISE OF OPTION," AND THEN IT READS,

02:19PM   23   "EFFECTIVE AS OF TODAY JANUARY 17TH, 2014, THE UNDERSIGNED

02:19PM   24   HEREBY ELECTS TO EXERCISE OPTIONEE'S OPTION TO PURCHASE 500,000

02:19PM   25   SHARES OF COMMON STOCK OF THERANOS INC."

02:19PM  1         DO YOU SEE THAT?

02:19PM  2    A.   YES.

02:19PM  3    Q.   AND IF WE LOOK AGAIN AT PAGE 4 OF THIS DOCUMENT, THAT'S

02:19PM  4    YOUR SIGNATURE; CORRECT?

02:19PM  5    A.   THAT'S CORRECT.

02:19PM  6    Q.   DOES THAT REFRESH YOUR RECOLLECTION THAT YOU WERE GRANTED

02:19PM  7    OPTIONS WHILE AT THERANOS?

02:19PM  8    A.   IT DOES.  I NEVER HAD A COPY OF THIS.  I SIGNED IT THERE

02:19PM  9    THAT DAY AND THERE WAS NO -- I MEAN, I DON'T RECALL RECEIVING

02:19PM 10    ANY PAPERWORK AT ANY TIME.

02:19PM 11    Q.   IF YOU LOOK AT EXHIBIT B AND IF YOU LOOK AT THE TOP

02:20PM 12    SEGMENT UNDER THE INVESTMENT REPRESENTATION STATEMENT, YOU SEE

02:20PM 13    YOUR NAME NEXT TO OPTIONEE, AND THEN IT SAYS COMMON STOCK AND

02:20PM 14    IT REFLECTS AN AMOUNT OF $85,000; CORRECT?

02:20PM 15    A.   UH-HUH.

02:20PM 16    Q.   IS THAT THE AMOUNT YOU PAID TO EXERCISE THESE OPTIONS

02:20PM 17    WHICH WERE GRANTED TO YOU BY THERANOS?

02:20PM 18    A.   I BELIEVE SO.  I'D HAVE TO CHECK, BUT I THINK IT IS.

02:20PM 19    Q.   OKAY.  IN ADDITION TO ANY OPTIONS THAT YOU MAY HAVE

02:20PM 20    GOTTEN, DID YOU ALSO RECEIVE A SALARY AS A DIRECTOR OF

02:20PM 21    THERANOS?

02:20PM 22    A.   YES.

02:20PM 23    Q.   AND HOW MUCH WERE YOU PAID TO SERVE AS A DIRECTOR OF

02:20PM 24    THERANOS?

02:20PM 25    A.   WELL, FIRST I'D LIKE TO POINT OUT THAT WHEN MS. HOLMES

02:20PM    1    MADE THE OFFER, I SAID I'LL DO THIS, YOU DON'T HAVE TO PAY ME,

02:20PM    2    I BELIEVE IN WHAT YOU'RE DOING.

02:20PM    3         AND SHE SAID, NO, IT'S -- I BELIEVE IT WAS $50,000 A YEAR.

02:20PM    4    Q.   OKAY.  WE'RE GOING TO TALK MORE ABOUT THAT CONVERSATION IN

02:20PM    5    A MINUTE.  BUT JUST TO GET THE FACTS OUT ABOUT THE SALARY, CAN

02:20PM    6    I ASK YOU TO LOOK AT, IN YOUR NOTEBOOK, AT EXHIBIT 13807.

02:21PM    7         I'M ASKING YOU TO LOOK AT THE TOP OF THE SECOND PAGE UNDER

02:21PM    8    NEW DIRECTORS.

02:21PM    9    A.   UH-HUH.

02:21PM   10    Q.   AND THERE'S A DISCUSSION THERE RELATED TO YOURSELF AND

02:21PM   11    MR. KOVACEVICH.

02:21PM   12         DOES REVIEWING THIS REFRESH YOUR RECOLLECTION THAT YOUR

02:21PM   13    ANNUAL COMPENSATION WAS $150,000 TO SERVE AS A DIRECTOR?

02:21PM   14    A.   I GUESS IT DOES, YES.

02:21PM   15    Q.   AND WERE YOU PAID THAT IN 2013?

02:21PM   16    A.   I BELIEVE I WAS.  I'M NOT -- I'D HAVE TO CHECK THE

02:21PM   17    RECORDS.

02:21PM   18    Q.   DO YOU RECALL THAT MS. HOLMES PAID YOU FOR THE ENTIRE --

02:22PM   19    OR THE COMPANY PAID YOU FOR THE ENTIRE YEAR, EVEN THOUGH YOU

02:22PM   20    BEGAN SERVICE A LITTLE BIT LATER INTO THE YEAR?

02:22PM   21    A.   I ASSUME IT WAS FOR 12 MONTHS, THE SUCCEEDING 12 MONTHS.

02:22PM   22    Q.   AND WERE YOU PAID FOR EACH OF YEARS THAT YOU WERE ON THE

02:22PM   23    BOARD, TO THE BEST OF YOUR RECOLLECTION?

02:22PM   24    A.   I DON'T BELIEVE SO.

02:22PM   25    Q.   AND I'D LIKE TO ASK YOU ABOUT WHEN YOU JOINED THE BOARD.

02:22PM   1          YOU MENTIONED AT SOME POINT IN YOUR DIALOGUE WITH

02:22PM   2     MR. BOSTIC THAT YOU REVIEWED SOME BOOKS ABOUT SERVING AS A

02:22PM   3     DIRECTOR; CORRECT?

02:22PM   4     A.   UH-HUH.

02:22PM   5     Q.   DO YOU REMEMBER WHAT BOOKS THOSE WERE THAT YOU REVIEWED?

02:22PM   6     A.   THERE WERE TWO -- I WAS LECTURING AT VARIOUS COLLEGES,

02:22PM   7     WENT TO BUSINESS SCHOOL LIBRARIES OR BOOK STORES AND PICKED UP

02:22PM   8     TWO -- TWO WERE BOOKS AND TWO WERE PAMPHLETS.  I DON'T RECALL

02:23PM   9     THE TITLES OF THEM RIGHT NOW.  AND THE PAMPHLETS TURNED OUT, I

02:23PM  10     THINK TO BE THE MOST -- THE BOOKS WERE GOOD BACKGROUND, BUT THE

02:23PM  11     PAMPHLETS ACTUALLY GOT INTO THE NITTY GRITTY.

02:23PM  12     Q.   AND WHEN YOU JOINED THE BOARD, WERE THERE SEVERAL

02:23PM  13     DIRECTORS WHO HAD HAD A LOT OF EXPERIENCE AS DIRECTORS OF

02:23PM  14     COMPANIES; CORRECT?

02:23PM  15     A.   YES.

02:23PM  16     Q.   AND MR. NUNN, FOR EXAMPLE, MR. SAM NUNN WAS A DIRECTOR OF

02:23PM  17     THE COMPANY; CORRECT?

02:23PM  18     A.   YES, SENATOR NUNN, YES.

02:23PM  19     Q.   AND SENATOR NUNN HAD BEEN A DIRECTOR OF SEVERAL BLUE CHIP

02:23PM  20     AMERICAN COMPANIES, COCA-COLA, GENERAL ELECTRIC, ET CETERA?

02:23PM  21     A.   YES.

02:23PM  22     Q.   AND DID YOU TALK TO HIM ABOUT YOUR DUTIES AS A BOARD

02:23PM  23     MEMBER?

02:23PM  24     A.   I LEARNED FROM WATCHING HIM, DAVID BOIES, AND THE OTHERS,

02:23PM  25     YES, AND WE TALKED ABOUT IT, ABOUT WHAT YOU DO.

02:23PM  1    Q.   AND WHAT -- DID MR. BOIES GIVE YOU AN INTRODUCTION TO YOUR

02:23PM  2    LEGAL DUTIES ACTING AS A DIRECTOR?

02:23PM  3    A.   DURING BREAKS -- WE ACTUALLY SAT NEXT TO EACH OTHER DURING

02:23PM  4    THE BOARD MEETINGS AND, YES, WE WOULD TALK ABOUT THAT MOSTLY

02:24PM  5    DURING THE BREAKS WHEN HE AND I TALKED ALONE.

02:24PM  6    Q.   AND WERE THOSE HELPFUL TO YOU TO LEARN YOUR OBLIGATIONS

02:24PM  7    AND RESPONSIBILITIES?

02:24PM  8    A.   I'M LEARNING ALL OF THE TIME FROM PEOPLE WITH THAT

02:24PM  9    EXPERIENCE.

02:24PM  10   Q.   YOU TESTIFIED THAT YOU'RE FAIRLY CONFIDENT YOU WERE AT THE

02:24PM  11   OCTOBER 2013 BOARD MEETING; CORRECT?

02:24PM  12   A.   YES.

02:24PM  13   Q.   AND IT LOOKS LIKE THAT HAD BEEN -- YOU HAD BEEN IN

02:24PM  14   NEW HAMPSHIRE THE PRIOR DAY AND THEN CAME BACK OVERNIGHT.  DOES

02:24PM  15   THAT HELP YOU REFRESH YOUR RECOLLECTION THAT YOU WERE THERE?

02:24PM  16   A.   RIGHT.  I'M ALMOST CERTAIN I WAS THERE.

02:24PM  17   Q.   I WANT TO ASK YOU A LITTLE ABOUT THAT BOARD MEETING AND

02:24PM  18   THEN SOME OF THE SUBSEQUENT BOARD MEETINGS.

02:24PM  19        IN CONNECTION WITH THAT, I'M GOING TO ASK YOU TO LOOK AT

02:24PM  20   WHAT MR. BOSTIC SHOWED TO YOU AS EXHIBIT 1172.  THIS WAS

02:24PM  21   ADMITTED DURING YOUR DIRECT EXAMINATION.

02:24PM  22        I'M GOING TO ASK YOU TO LOOK AT THE THIRD PAGE OF THIS

02:25PM  23   EXHIBIT, THE PAGE THAT IS LABELLED AGENDA.

02:25PM  24        AND IT'S ON YOUR SCREEN AS WELL IF THAT MAKES IT EASIER TO

02:25PM  25   LOCATE.

MATTIS CROSS BY MR. DOWNEY

02:25PM 1          DO YOU SEE THAT?

02:25PM 2     A.   YES.

02:25PM 3     Q.   AND WAS THAT IN FACT THE MORNING AGENDA FOR THIS MEETING?

02:25PM 4     A.   I CANNOT RECALL.  I ASSUME THAT THIS IS ACCURATE, BUT I

02:25PM 5     CAN'T VERIFY THAT.

02:25PM 6     Q.   OKAY.  LET ME SHOW YOU AS WELL THE NEXT SLIDE, WHICH IS

02:25PM 7     LABELLED BRIEFING AND STRATEGIC PLAN.

02:25PM 8          DO YOU SEE THAT?

02:25PM 9     A.   YES.

02:25PM 10    Q.   AND DO YOU REMEMBER THE CONTENT OF THE BRIEFING AND

02:25PM 11    STRATEGIC PLAN AT YOUR FIRST BOARD MEETING?

02:25PM 12    A.   NO.

02:25PM 13    Q.   WHEN YOU HAD MET WITH MS. HOLMES IN 2011, YOU CAME TO

02:25PM 14    UNDERSTAND THAT SHE WAS DEVELOPING THIS TECHNOLOGY WHICH HAD AS

02:26PM 15    ONE COMPONENT A DEVICE THAT COULD RUN BLOOD TESTS; CORRECT?

02:26PM 16    A.   THAT'S CORRECT.

02:26PM 17    Q.   AND YOU LEARNED, AT SOME POINT SHORTLY BEFORE YOU BECAME A

02:26PM 18    DIRECTOR, THAT THERANOS WOULD BE OFFERING BLOOD TESTS TO THE

02:26PM 19    PUBLIC; CORRECT?

02:26PM 20    A.   GOING -- COMMERCIALIZING IT, YES.

02:26PM 21    Q.   AND YOU REFERRED TO IT AS COMMERCIALIZING.

02:26PM 22         IS THAT HOW IT WAS REFERRED TO WITHIN --

02:26PM 23    A.   I BELIEVE SO.

02:26PM 24    Q.   -- THERANOS?

02:26PM 25         AND DO YOU KNOW WHERE THE BLOOD TESTS WERE BEING PERFORMED

MATTIS CROSS BY MR. DOWNEY

02:26PM   1    IN CONNECTION WITH THAT VENTURE?

02:26PM   2    A.   I BELIEVE ONE OF THE PLACES WAS WALGREENS IN DOWNTOWN

02:26PM   3    PALO ALTO BECAUSE I WALKED BY IT GOING TO THE BARBER SHOP.

02:26PM   4    Q.   AND YOU COULD HAVE YOUR BLOOD DRAWN IN A WALGREENS;

02:26PM   5    CORRECT?

02:26PM   6    A.   YES, SIR.

02:26PM   7    Q.   AND THEN WHERE WAS THE BLOOD ANALYZED?

02:26PM   8    A.   WELL, I ASSUMED IF IT WAS A THERANOS DRAW, IT WAS A

02:26PM   9    THERANOS EDISON MACHINE.

02:26PM   10   Q.   AND WERE YOU AWARE WHEN YOU JOINED THE BOARD THAT THE

02:26PM   11   BLOOD WAS BEING SENT BACK TO A CENTRAL THERANOS LAB?

02:27PM   12   A.   I ASSUMED THE CENTRAL THERANOS LAB WAS THE THERANOS

02:27PM   13   MACHINE, YES.

02:27PM   14   Q.   OKAY.  DID YOU KNOW THAT THERANOS HAD BUILT A LABORATORY

02:27PM   15   TO RUN SO-CALLED CLIA TESTS?

02:27PM   16   A.   YES.

02:27PM   17   Q.   AND YOU TOURED THAT LABORATORY, DIDN'T YOU?

02:27PM   18   A.   I HAVE BEEN TO THE NEWARK FACILITY.  I DON'T BELIEVE -- I

02:27PM   19   DON'T RECALL.  CAN YOU REFRESH ME ON WHAT I WOULD HAVE SEEN

02:27PM   20   THERE?

02:27PM   21   Q.   IN ANY EVENT, YOU WERE AWARE THAT THERE WAS A LABORATORY

02:27PM   22   THAT WAS PERFORMING PATIENT TESTING?

02:27PM   23   A.   ABSOLUTELY, YES.  I SEE.

02:27PM   24   Q.   AND YOU UNDERSTOOD THAT THE TESTS WERE BEING -- NOT BEING

02:27PM   25   PERFORMED WITHIN WALGREENS STORES; CORRECT?

02:27PM  1     A.   ABSOLUTELY.

02:27PM  2     Q.   DID YOU, DID YOU EVER HAVE A DISCUSSION IN THE CONTEXT OF

02:27PM  3     A BOARD MEETING ABOUT HIGH THROUGHPUT MACHINES?

02:27PM  4     A.   HIGH THROUGHPUT?  I DON'T RECALL THAT.

02:28PM  5     Q.   OKAY.  AND DID -- WAS THERE EVER ANY DISCUSSION ABOUT

02:28PM  6     WHETHER IT MADE SENSE TO RUN A BUSINESS WHICH CONSISTED OF

02:28PM  7     TRANSPORTING BLOOD SAMPLES BACK TO A CENTRAL LAB TO PERFORM

02:28PM  8     THEM ONE AT A TIME ON SINGLE ANALYZERS?

02:28PM  9     A.   I THINK WE TALKED AT LENGTH OVER THOSE YEARS ABOUT HOW THE

02:28PM  10    THERANOS -- WHAT ITS FOOTPRINT WOULD LOOK LIKE, WHERE IT WOULD

02:28PM  11    BE OPERATING, WHERE THE THERANOS -- WHERE THE EDISON MACHINES

02:28PM  12    WOULD BE USED.

02:28PM  13         IT WAS PART OF THE ROLLOUT.  MS. HOLMES WOULD LEAD THE

02:28PM  14    DISCUSSION.

02:28PM  15    Q.   AND YOU UNDERSTOOD THAT THE HOPE WAS THAT THE DEVICES

02:28PM  16    WOULD ULTIMATELY BE PLACED IN THE WALGREENS STORES; CORRECT?

02:28PM  17    A.   I THOUGHT THAT WAS GOING TO HAPPEN AT SOME POINT, YES.

02:28PM  18    Q.   AND DID YOU UNDERSTAND THAT A BARRIER IN THE RELATIONSHIP

02:28PM  19    BETWEEN WALGREENS AND THERANOS TO THAT HAPPENING WAS THAT

02:29PM  20    WALGREENS WANTED THERANOS TO GET FDA APPROVAL FOR THE USE OF

02:29PM  21    THE DEVICES IN THAT WAY?

02:29PM  22    A.   WELL, I THOUGHT FDA APPROVAL WAS GOING TO BE NECESSARY IF

02:29PM  23    WE WERE GOING TO MOVE THIS COMMERCIALLY ACROSS THE COUNTRY.

02:29PM  24    Q.   OKAY.  AND SO, SO YOU UNDERSTOOD THAT YOU WOULD HAVE TO

02:29PM  25    HAVE FDA APPROVAL IN ORDER TO ROLL THE DEVICES OUT INTO THE

02:29PM   1     STORES; CORRECT?

02:29PM   2     A.   YES.

02:29PM   3     Q.   I'M NOT GOING TO GO THROUGH ALL OF THE DIRECTORS.  YOU HAD

02:29PM   4     SOME DISCUSSION WITH MR. BOSTIC ABOUT WHO THEY WERE.

02:29PM   5          BUT IS IT FAIR TO SAY THAT THEY WERE A VERY STRONG GROUP

02:29PM   6     OF INDIVIDUALS?

02:29PM   7     A.   IT WAS AN ECLECTIC GROUP THAT HAD VARIED BACKGROUNDS.

02:29PM   8     THEY WERE PROVEN IN THEIR FIELD, YES, THEY WERE STRONG.

02:29PM   9     Q.   AND THEY WERE CAPABLE OF EXPRESSING THEIR OPINIONS;

02:29PM  10     CORRECT?

02:29PM  11     A.   YES.

02:29PM  12     Q.   AND THEY WERE CAPABLE OF ASKING QUESTIONS IF THEY HAD

02:29PM  13     UNCERTAINTY; CORRECT?

02:30PM  14     A.   ABSOLUTELY.

02:30PM  15     Q.   AND ALSO THEY WERE WILLING TO BE CANDID WITH EACH OTHER

02:30PM  16     AND WITH MS. HOLMES; CORRECT?

02:30PM  17     A.   YES, I BELIEVE SO.  I DON'T WANT TO SPEAK FOR THEM BUT,

02:30PM  18     YES, THAT'S MY OBSERVATION.

02:30PM  19     Q.   I WANT TO ASK YOU ABOUT DISCUSSIONS OF INTELLECTUAL

02:30PM  20     PROPERTY AT BOARD MEETINGS.

02:30PM  21          DO YOU RECALL SUCH DISCUSSIONS?

02:30PM  22     A.   YES.

02:30PM  23     Q.   OKAY.  LET ME ASK YOU TO LOOK AT DEFENDANT'S

02:30PM  24     EXHIBIT 10508.

02:30PM  25     A.   YES.

02:31PM 1     Q.   I'M SORRY.  I BEG YOUR PARDON.

02:31PM 2          LET ME DIRECT YOUR ATTENTION TO EXHIBIT 13792.

02:31PM 3     A.   OKAY.

02:31PM 4     Q.   IF YOU LOOK AT PAGE 5 OF PAGE 13792, YOU SEE A SECTION

02:31PM 5     THERE CALLED INTELLECTUAL PROPERTY DISCUSSION?

02:31PM 6     A.   YES.

02:31PM 7     Q.   IS IT ACCURATE THAT MS. HOLMES WOULD REVIEW, DURING BOARD

02:31PM 8     MEETINGS, THE COMPANY'S PATENT PORTFOLIO?

02:31PM 9     A.   YES, IT WAS COMMONLY DISCUSSED, YES.

02:31PM 10    Q.   AND WERE THERE SOME INSTANCES WHEN MR. BOIES WOULD DISCUSS

02:31PM 11    THE LEGAL ASPECTS --

02:31PM 12    A.   YES.

02:31PM 13    Q.   -- OF INTELLECTUAL PROPERTY?

02:31PM 14    A.   UH-HUH, YES.

02:31PM 15    Q.   AND YOU RECOGNIZED THAT THERE WAS A SENSITIVITY WITHIN THE

02:31PM 16    COMPANY TO PROTECTING ITS INTELLECTUAL PROPERTY RIGHTS?

02:31PM 17    A.   ABSOLUTELY.

02:31PM 18    Q.   AND YOU RECOGNIZE THAT THEY HAD ALREADY HAD LITIGATION

02:32PM 19    ABOUT PROTECTING THEIR INTELLECTUAL PROPERTY RIGHTS; CORRECT?

02:32PM 20    A.   I DIDN'T KNOW THAT IN DETAIL.  I KNOW THAT IT OCCURRED AND

02:32PM 21    IN THE READING THAT I HAD DONE AND IN THE BOARDROOM BOOKS AND

02:32PM 22    ALL OF THE BOARD BOOKS AND ALL, THIS WAS AN AREA THAT WAS

02:32PM 23    HIGHLIGHTED.

02:32PM 24    Q.   OKAY.  LET ME ASK YOU TO LOOK AT 10516 IN YOUR NOTEBOOK.

02:32PM 25         DO YOU SEE THAT?

02:32PM  1     A.   YEAH, UH-HUH.

02:32PM  2     Q.   IS THIS A DOCUMENT THAT WAS DISTRIBUTED AT A BOARD OF

02:32PM  3     DIRECTORS MEETING?

02:32PM  4     A.   IT LOOKS LIKE IT.  I COULDN'T BE CERTAIN.  IT APPEARS TO

02:32PM  5     BE SIMILAR TO SOME OF THOSE PASSED OUT.

02:32PM  6              MR. DOWNEY:  YOUR HONOR, I MOVE FOR THE ADMISSION OF

02:32PM  7     10516.

02:32PM  8              MR. BOSTIC:  YOUR HONOR, I'M NOT SURE THIS HAS BEEN

02:32PM  9     AUTHENTICATED PROPERLY, YOUR HONOR.

02:32PM  10             THE COURT:  DOES THIS REQUIRE ANY AUTHENTICATION OR

02:33PM  11    ANY REDACTIONS?  IS THERE PROPRIETARY INFORMATION IN THIS?

02:33PM  12             MR. DOWNEY:  THERE'S NOT PROPRIETARY INFORMATION.

02:33PM  13    THERE'S JUST A LIST OF PATENTS OR PATENT APPLICATIONS THAT WAS

02:33PM  14    ATTACHED AND REMOVED FROM THE BOARD EXHIBIT, WHICH MR. BOSTIC

02:33PM  15    PREVIOUSLY SUBMITTED.

02:33PM  16             THE COURT:  IS IT IN THAT PACKET, THE LARGER PACKET?

02:33PM  17             MR. DOWNEY:  IT'S NOT AS HE PUT IT TOGETHER, BUT

02:33PM  18    IT'S PART OF THE ORIGINAL PACKET, YES.

02:33PM  19             THE COURT:  ALL RIGHT.  I'LL ADMIT IT.

02:33PM  20        (DEFENDANT'S EXHIBIT 10516 WAS RECEIVED IN EVIDENCE.)

02:33PM  21             THE COURT:  IT MAY BE PUBLISHED.

02:33PM  22    BY MR. DOWNEY:

02:33PM  23    Q.   SO YOU SEE THIS LABELLED AS AN INTELLECTUAL PROPERTY

02:33PM  24    PORTFOLIO STATUS REPORT?

02:33PM  25    A.   YES.

MATTIS CROSS BY MR. DOWNEY

02:33PM 1    Q.   AND IS IT CORRECT THAT THIS IS THE TYPE OF DOCUMENT THAT

02:33PM 2    WOULD BE SHARED WITH THE BOARD TO LIST THE PATENTS THAT WERE

02:33PM 3    IMPORTANT TO THE COMPANY?

02:33PM 4    A.   YEAH, IT LOOKS FAMILIAR.

02:33PM 5    Q.   AND WOULD SOMETIMES, DURING BOARD MEETINGS, PARTICULAR

02:33PM 6    PATENTS AND INVENTIONS BE DISCUSSED AND REVIEWED BY MS. HOLMES?

02:34PM 7    A.   YES.

02:34PM 8    Q.   AND WOULD MR. BOIES ALSO DISCUSS CERTAIN PATENTS OR TRADE

02:34PM 9    SECRETS DURING THE COURSE OF THESE MEETINGS?

02:34PM 10   A.   I BELIEVE SO.  I COULDN'T CITE ANY IN PARTICULAR OR MUCH

02:34PM 11   OF THE CONVERSATION THIS MANY YEARS LATER.

02:34PM 12   Q.   BUT GENERALLY YOU REMEMBER THERE WAS A DISCUSSION ABOUT

02:34PM 13   INTELLECTUAL PROPERTY ISSUES; CORRECT?

02:34PM 14   A.   YES.

02:34PM 15   Q.   AND WERE YOU AWARE WHEN YOU WERE SERVING AS A DIRECTOR

02:34PM 16   THAT THERANOS HAD FILED AND OBTAINED HUNDREDS OF PATENTS;

02:34PM 17   CORRECT?

02:34PM 18   A.   YES.

02:34PM 19   Q.   OKAY.  ALL RIGHT.  THAT'S ALL I HAVE ON THAT SUBJECT.

02:34PM 20   A.   UH-HUH.

02:34PM 21   Q.   YOU MENTIONED THAT THERE WOULD BE PRESENTATIONS OF

02:34PM 22   FINANCIAL INFORMATION AND THAT MS. HOLMES MIGHT PROVIDE SOME

02:34PM 23   INFORMATION ABOUT FINANCES AND MR. BALWANI WOULD PROVIDE SOME

02:34PM 24   INFORMATION ABOUT FINANCES; CORRECT?

02:34PM 25   A.   THAT'S CORRECT.  SHE WOULD MORE INTRODUCE A STRATEGY AND

02:34PM  1    WHAT WE WERE DOING, AND MR. BALWANI WOULD GIVE FINANCIAL

02:34PM  2    DETAILS.

02:35PM  3    Q.   OKAY.  AND WOULD HE COMMENT ON HISTORICAL FINANCIAL

02:35PM  4    INFORMATION OF THE COMPANY?

02:35PM  5    A.   I THINK HE WOULD GENERALLY -- I CAN'T RECALL.  I REMEMBER

02:35PM  6    HE TALKED ABOUT FORECASTS.  I DON'T RECALL HOW MUCH HISTORIC

02:35PM  7    FINANCIAL DATA.

02:35PM  8    Q.   OKAY.  DID HE PROVIDE FORECASTS FOR DIFFERENT SCENARIOS?

02:35PM  9    A.   YES.

02:35PM  10   Q.   AND THOSE WOULD, OF COURSE, POTENTIALLY REFLECT DIFFERENT

02:35PM  11   EARNING AMOUNTS; CORRECT?

02:35PM  12   A.   RIGHT.  THEY WERE LOOKING DIFFERENT -- WHERE THEY WANTED

02:35PM  13   TO DEPLOY THE THERANOS CAPABILITY AND IF WE WENT WITH

02:35PM  14   PENNSYLVANIA HERE OR INTERMOUNTAIN OR CERTAIN HOSPITAL CHAINS,

02:35PM  15   THAT SORT OF THING, THAT WAS LAID OUT WHAT IT WOULD MEAN.  WE

02:35PM  16   WERE TRYING TO CREATE A PROFITABLE COMPANY SO IT WOULD STAY IN

02:35PM  17   EXISTENCE.

02:35PM  18   Q.   AND THERE WOULD BE BOARD DISCUSSION ABOUT THOSE SCENARIOS?

02:36PM  19   A.   THERE WOULD, YES.

02:36PM  20   Q.   I WANT TO SWITCH TOPICS TO THE SUBJECT OF MS. HOLMES'S

02:36PM  21   PERSONAL SECURITY.

02:36PM  22       DID THERE COME A TIME WHEN MEMBERS OF THE BOARD BEGAN TO

02:36PM  23   DISCUSS THE NEED FOR MS. HOLMES TO OBTAIN PERSONAL SECURITY?

02:36PM  24   A.   YES.

02:36PM  25   Q.   AND WERE YOU INVOLVED IN THOSE DISCUSSIONS?

02:36PM 1    A.   SECRETARY SHULTZ CALLED ME IN WITH A CONCERN THAT HER

02:36PM 2    PUBLIC PROFILE WAS GOING TO CREATE DANGER FOR HER.

02:36PM 3    Q.   AND DID YOU THEN GET INVOLVED IN HELPING HER TO LOCATE

02:36PM 4    PERSONAL SECURITY?

02:36PM 5    A.   I DID.

02:36PM 6    Q.   TELL ME WHAT YOU DID.

02:36PM 7    A.   MY FORMER CHIEF BODYGUARD, WHO HAD BEEN IN CHARGE OF MY

02:36PM 8    SECURITY FOR ABOUT FIVE YEARS WHEN I WAS A NATO SUPREME ALLIED

02:36PM 9    COMMANDER AND THE COMMANDER OF U.S. CENTRAL COMMAND, WAS

02:36PM 10   RETIRING FROM THE NAVAL CRIMINAL INVESTIGATIVE SERVICE, FULL

02:36PM 11   CAREER, HE HAD COMPLETED SOME -- A COUPLE OF -- I THINK

02:36PM 12   20 YEARS WITH THEM.

02:36PM 13       HE WAS GOING INTO, YOU KNOW, SOME OTHER JOB THAT HE COULD

02:36PM 14   DO, AND I SAID, THIS IS A GUY I WOULD TRUST.

02:37PM 15   Q.   AND YOU THOUGHT THAT PROVIDING THAT KIND OF SECURITY FOR

02:37PM 16   HER WAS NECESSARY; CORRECT?

02:37PM 17   A.   I, I DEFERRED TO HER.  I THOUGHT SHE HAD GOOD JUDGMENT.

02:37PM 18       AND SECRETARY SHULTZ PROBABLY KNEW MORE ABOUT THE CIVILIAN

02:37PM 19   WORLD AND WHAT THE THREATS WERE FOR PEOPLE WHO END UP WITH

02:37PM 20   THEIR PICTURE ON THE FRONT PAGE OF A MAGAZINE, SOMETHING LIKE

02:37PM 21   THAT.

02:37PM 22       I REALLY WASN'T PRIVY TO WHAT KIND OF THREATS SHE MIGHT

02:37PM 23   FACE.

02:37PM 24   Q.   ALL RIGHT.  LET ME ASK YOU TO LOOK IN YOUR NOTEBOOK AT

02:37PM 25   EXHIBIT 10509.

02:37PM   1    A.   YES.

02:37PM   2    Q.   THIS IS AN EMAIL EXCHANGE BETWEEN YOURSELF AND MS. HOLMES;

02:37PM   3    CORRECT?

02:37PM   4    A.   YES.

02:37PM   5            MR. DOWNEY:  YOUR HONOR, I WILL MOVE FOR THE

02:37PM   6    ADMISSION OF 10509.

02:38PM   7            MR. BOSTIC:  NO OBJECTION.

02:38PM   8            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:38PM   9            (DEFENDANT'S EXHIBIT 10509 WAS RECEIVED IN EVIDENCE.)

02:38PM  10    BY MR. DOWNEY:

02:38PM  11    Q.   IF YOU LOOK AT THE BOTTOM EMAIL, WHICH IS AN EMAIL FROM

02:38PM  12    YOU TO MS. HOLMES IN JULY OF 2014, I WILL DIRECT YOUR ATTENTION

02:38PM  13    TO THE THIRD PARAGRAPH OF THAT EMAIL.

02:38PM  14         IT REFERENCES GEORGE'S GROWING CONCERN ABOUT YOUR SECURITY

02:38PM  15    WITH THERANOS'S ROLE BECOMING MORE VISIBLE.

02:38PM  16         IS GEORGE IN THAT SENTENCE A REFERENCE TO MR. SHULTZ?

02:38PM  17    A.   YES, THAT'S SECRETARY SHULTZ.

02:38PM  18    Q.   AND SECRETARY SHULTZ IS THE INDIVIDUAL WHO HAD INTRODUCED

02:38PM  19    YOU TO THERANOS; CORRECT?

02:38PM  20    A.   TO ELIZABETH, YES.

02:38PM  21    Q.   AND HE EXPRESSED A CONCERN FOR HER SECURITY TO YOU;

02:38PM  22    CORRECT?

02:38PM  23    A.   HE DID.  HE AND I WOULD MEET MOST MORNINGS AT STANFORD,

02:38PM  24    AND ON ONE OF THOSE MORNINGS -- ON SEVERAL OF THOSE MORNINGS HE

02:38PM  25    BROUGHT UP THE CONCERN.

02:38PM  1    Q.   AND THEN WAS AN AUTHORIZATION DISCUSSED AT THE BOARD FOR

02:39PM  2    AN EXPENDITURE TO BE MADE FOR PERSONAL SECURITY FOR MS. HOLMES?

02:39PM  3    A.   IF IT WAS NOT, THEN I RECALL IT WAS IN THE OCTOBER BOARD,

02:39PM  4    AND THAT WOULD HAVE BEEN THE FIRST BOARD I WAS ON.  AND SO IF

02:39PM  5    IT HAD BEEN BROUGHT UP BY MR. SHULTZ IN THE WAY HE BROUGHT IT

02:39PM  6    UP TO ME IN THE SUMMER, I WOULDN'T HAVE KNOWN.

02:39PM  7    Q.   AND DO YOU KNOW IF IT WAS DISCUSSED ANY TIME AFTER OCTOBER

02:39PM  8    OF 2013 AT THE BOARD?

02:39PM  9    A.   I DON'T RECALL.  I DON'T WANT TO SAY IT WAS NOT BROUGHT UP

02:39PM  10   EITHER, BUT I JUST DON'T RECALL IT.

02:39PM  11   Q.   OKAY.  AND DID YOU JOIN ANY COMMITTEES OF THE BOARD WHEN

02:39PM  12   YOU JOINED?

02:39PM  13   A.   NO.

02:39PM  14   Q.   AND DO YOU RECALL THAT YOU HAD SOME INVOLVEMENT WITH THE

02:39PM  15   COMPENSATION COMMITTEE OF THE BOARD?

02:39PM  16   A.   I REMEMBER COMPENSATION BEING DISCUSSED BY THE BOARD

02:40PM  17   ITSELF, YES.

02:40PM  18   Q.   OKAY.  LET ME SHOW YOU AN EXHIBIT IN THE NOTEBOOK THAT IS

02:40PM  19   IN FRONT OF YOU.

02:40PM  20       I BEG YOUR PARDON, YOUR HONOR.  MAY I JUST CONFER FOR A

02:40PM  21   MOMENT?

02:40PM  22       (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

02:40PM  23   BY MR. DOWNEY:

02:40PM  24   Q.   IF YOU COULD LOOK AT 10510.

02:40PM  25   A.   WHAT'S THE NUMBER AGAIN, SIR?

02:40PM 1     Q.   10510.

02:40PM 2     A.   OKAY.

02:40PM 3     Q.   DO YOU SEE THIS IS A SERIES OF EMAIL EXCHANGES BETWEEN YOU

02:40PM 4     AND MS. HOLMES IN FEBRUARY OF 2015?

02:40PM 5     A.   OKAY.

02:41PM 6     Q.   IS THIS, IN FACT, AN EMAIL THAT YOU EXCHANGED WITH HER AT

02:41PM 7     THAT TIME?

02:41PM 8     A.   IT LOOKS ACCURATE, YES.  I MEAN, IT LOOKS LIKE IT IS.

02:41PM 9              MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

02:41PM 10    10510.

02:41PM 11             MR. BOSTIC:  NO OBJECTION.

02:41PM 12             THE COURT:  IT'S ADMITTED.

02:41PM 13         (DEFENDANT'S EXHIBIT 10510 WAS RECEIVED IN EVIDENCE.)

02:41PM 14    BY MR. DOWNEY:

02:41PM 15    Q.   IF YOU LOOK AT THE --

02:41PM 16             THE COURT:  AND IT MAY BE PUBLISHED.

02:41PM 17    BY MR. DOWNEY:

02:41PM 18    Q.   YOU GOT A PROMOTION.

02:41PM 19         THERE IS AN EMAIL ON FEBRUARY 11TH, AT 8:27 P.M.

02:41PM 20         AND IN THE FIRST BULLET POINT, MS. HOLMES ADDRESSES SOME

02:41PM 21    ISSUES THAT SHE WANTS A COMMITTEE TO THINK ABOUT.

02:41PM 22         DO YOU KNOW WHAT COMMITTEE THAT WAS?

02:41PM 23    A.   IT SAYS THE COMPENSATION COMMITTEE.

02:41PM 24    Q.   OKAY.  AND SHE SAYS, "WITH THIS COMMITTEE OWNING THE

02:42PM 25    COMPENSATION COMMITTEE FUNCTION, THE COMMITTEE WILL DETERMINE

02:42PM  1    CEO AND COO COMPENSATION."

02:42PM  2         YOU RECALL THAT THE BOARD DETERMINED THAT; CORRECT?

02:42PM  3    A.   THE BOARD DID, YES.

02:42PM  4    Q.   AND IT SAYS, "TOMORROW, WE WILL REVIEW CEO AND COO

02:42PM  5    COMPENSATION FOR 2014.  BOTH SUNNY AND I WANT OUR COMPENSATION

02:42PM  6    FOR 2014 TO BE ENTIRELY IN STOCK OPTIONS IN THE COMPANY."

02:42PM  7         DO YOU SEE THAT?

02:42PM  8    A.   YES.

02:42PM  9    Q.   AND DO YOU RECALL HER TELLING YOU THAT?

02:42PM  10   A.   NO, I DON'T.

02:42PM  11        I'M SURE IT HAPPENED.  IT'S RIGHT THERE.

02:42PM  12   Q.   OKAY.  AND DO YOU KNOW IF HER COMPENSATION WAS, IN FACT,

02:42PM  13   REDUCED ENTIRELY TO STOCK IN THE COMPANY?

02:42PM  14   A.   I DON'T KNOW IF THAT'S A REDUCTION OR NOT.  I ASSUME IF

02:42PM  15   THAT'S WHAT HAPPENED --

02:42PM  16   Q.   FAIR ENOUGH.  LET ME ASK IT DIFFERENTLY.  DO YOU KNOW IF

02:42PM  17   SHE RECEIVED ALL OF HER COMPENSATION IN STOCK OPTIONS IN 2014?

02:42PM  18   A.   THAT SOUNDS VERY FAMILIAR, YES.

02:43PM  19   Q.   AND THAT ATTITUDE WAS SIMILAR TO AN ATTITUDE THAT YOU HAD,

02:43PM  20   I THINK, AT THE BEGINNING OF YOUR SERVICE?  YOU DIDN'T HAVE TO

02:43PM  21   RECEIVE A SALARY; CORRECT?

02:43PM  22   A.   AT THAT TIME I THOUGHT SHE HAD STRONG BELIEF IN HER

02:43PM  23   COMPANY AND WAS WILLING TO MAKE THAT SORT OF A DECISION, OR A

02:43PM  24   RECOMMENDATION.

02:43PM  25   Q.   I WANT TO ASK YOU SOME QUESTIONS ABOUT YOUR UNDERSTANDING

02:43PM 1    ABOUT THE ABILITIES OF THERANOS'S TECHNOLOGY AT VARIOUS POINTS

02:43PM 2    IN TIME.

02:43PM 3        YOU MENTIONED WHEN YOU WERE ON DIRECT EXAMINATION THAT

02:43PM 4    MS. HOLMES CAME AND GAVE YOU A DEMONSTRATION, AND I THINK YOU

02:43PM 5    SAID IT WAS BACKSTAGE AT THE MARINE MEMORIAL HALL; IS THAT

02:43PM 6    RIGHT?

02:43PM 7    A.   I'M NOT SURE.  I THINK THAT'S WHERE IT WAS.  I WAS GIVING

02:43PM 8    A SPEECH THAT NIGHT IN SAN FRANCISCO ON MY WAY TO THE PACIFIC,

02:43PM 9    AND WE JUST STOPPED IN HERE LONG ENOUGH TO DO THE SPEECH FOR

02:44PM 10   SECRETARY SHULTZ.

02:44PM 11       AND IT MAY HAVE BEEN -- IT MAY HAVE BEEN SOMEWHERE ELSE,

02:44PM 12   THOUGH.  IT MAY HAVE BEEN AT HIS HOME.  I THINK THERE WAS A

02:44PM 13   DINNER AFTER THE SPEECH.

02:44PM 14       I JUST DON'T -- I JUST CAN'T PLACE IT.

02:44PM 15   Q.   OKAY.  DO YOU KNOW HOW MANY TESTS THE BOX COULD PERFORM,

02:44PM 16   OR MS. HOLMES REPRESENTED THE BOX COULD PERFORM AT THAT TIME?

02:44PM 17   A.   NO.

02:44PM 18   Q.   DO YOU RECALL THAT SHE SAID THAT THE GOAL WAS FOR THE BOX

02:44PM 19   TO BE ABLE TO PERFORM A COMPLETE SET OF RESULTS A PHYSICAL

02:44PM 20   LABORATORY COULD PERFORM, BUT THE BOX WAS NOT ABLE TO PERFORM

02:44PM 21   THAT MANY TESTS AT THE TIME OF THE MEETING?

02:44PM 22   A.   NO, I DON'T RECALL THAT.  BUT I KNEW IT WAS COMING ONLINE,

02:44PM 23   SO I DON'T THINK -- WHEN SHE SAID THAT SHE WAS READY DURING

02:44PM 24   THAT CONVERSATION TO DEPLOY IT, A COMPARISON, I THOUGHT IT WAS

02:45PM 25   GOOD ENOUGH TO PUT IN THE FIELD.

MATTIS CROSS BY MR. DOWNEY

02:45PM 1    Q.   LET ME ASK YOU TO LOOK AT 11200 IN YOUR NOTEBOOK, AND I'LL

02:45PM 2    DIRECT YOU TO THE LAST SENTENCE OF THE THIRD PARAGRAPH.

02:45PM 3    A.   RIGHT.

02:45PM 4    Q.   JUST TAKE A MOMENT TO REVIEW THE TWO FINAL SENTENCES --

02:45PM 5    A.   RIGHT.

02:45PM 6    Q.   -- OF THAT PARAGRAPH.

02:45PM 7         DO YOU SEE THAT?

02:45PM 8    A.   RIGHT.  YES.

02:45PM 9    Q.   AND DOES THAT REFRESH YOUR RECOLLECTION THAT YOU WERE TOLD

02:45PM 10   AT THAT TIME THAT THE BOX WAS NOT ABLE TO PERFORM THAT MANY

02:45PM 11   TESTS?

02:45PM 12   A.   WHAT SHE ALLUDED TO -- WHAT SHE SAID WAS THAT SHE COULD

02:45PM 13   DEPLOY IT AND PROVE THAT IT COULD DO THIS AT THAT TIME, AND I

02:45PM 14   WENT BACK WITH THAT UNDERSTANDING.

02:46PM 15   Q.   OKAY.  AND YOU UNDERSTOOD THAT WITH RESPECT TO THE

02:46PM 16   TECHNOLOGY -- WELL, LET ME STRIKE THAT.

02:46PM 17        YOU UNDERSTOOD THAT IN ADDITION TO THE DEVICE, THERE HAD

02:46PM 18   TO BE ASSAYS THAT COULD RUN ON THE DEVICE; CORRECT?

02:46PM 19   A.   YES.

02:46PM 20   Q.   OKAY.  AND AT THAT TIME, DID YOU KNOW HOW MANY ASSAYS HAD

02:46PM 21   BEEN DEVELOPED FOR THE DEVICE?

02:46PM 22   A.   I ASSUMED FROM WHAT SHE WAS SAYING IT WAS A SUFFICIENT

02:46PM 23   NUMBER TO MAKE IT WORTHWHILE TO DEPLOY.

02:46PM 24   Q.   OKAY.  BUT YOU DIDN'T HAVE A SPECIFIC UNDERSTANDING OF

02:46PM 25   THAT, DID YOU?

02:46PM  1    A.   NO.  IT WAS READY TO GO HEAD TO HEAD AGAINST WHAT WE WERE

02:46PM  2    DOING THEN --

02:46PM  3    Q.   OKAY.

02:46PM  4    A.   -- IS WHAT I ASSUMED.

02:46PM  5    Q.   OKAY.  AND LATER WHEN YOU JOINED THE BOARD, THAT WAS

02:46PM  6    AROUND THE TIME OF THE WALGREENS LAUNCH; CORRECT?

02:46PM  7    A.   YES.

02:46PM  8    Q.   LET ME ASK YOU TO LOOK AT PAGE 3 OF THE SAME DOCUMENT,

02:47PM  9    11200.  I'M DIRECTING YOUR ATTENTION TO REVIEW THE FIFTH FULL

02:47PM  10   PARAGRAPH OF THAT DOCUMENT.

02:47PM  11   A.   IT STARTS WITH, "WHEN GENERAL MATTIS"?

02:47PM  12   Q.   YES.  JUST READ IT TO YOURSELF.

02:47PM  13   A.   YEAH, OKAY.  I'VE READ IT.

02:47PM  14   Q.   IS IT ACCURATE THAT WHEN YOU JOINED THE BOARD YOU LEARNED

02:47PM  15   ABOUT THE GOAL OF THE NUMBER OF TESTS THAT THE MACHINE COULD

02:47PM  16   RUN?

02:47PM  17   A.   YEAH, 2,000.

02:47PM  18   Q.   AND IS IT ACCURATE THAT DURING BOARD MEETINGS YOU WOULD BE

02:48PM  19   SHOWN TESTS THAT COULD TELL ACTIONABLE EARLY DETECTION OF

02:48PM  20   MEDICAL PROBLEMS?  I'M ASKING, DID YOU LOOK AT PARTICULAR

02:48PM  21   TESTS?

02:48PM  22   A.   EXCUSE ME.  GO AHEAD.

02:48PM  23   Q.   YEAH.  DID YOU LOOK AT PARTICULAR TESTS FOR WHICH THE

02:48PM  24   DEVICE COULD BE USED?

02:48PM  25   A.   THERE WAS SOME DISCUSSION ABOUT PARTICULAR TESTS, BUT THE

02:48PM  1     PREDICTIVE CAPABILITY SHOWED A VERY BROAD ABILITY TO FORECAST

02:48PM  2     ILLNESS IF WE CAN GET ENOUGH RESULTS.

02:48PM  3     Q.   AND THAT WAS BY COMPILING DATA FROM THE RESULTS OF THOSE

02:48PM  4     DEVICES; CORRECT?

02:48PM  5     A.   THAT'S CORRECT.

02:48PM  6     Q.   AND DID YOU UNDERSTAND AT THE TIME THAT YOU JOINED THE

02:48PM  7     BOARD THAT THE MACHINE COULD RUN A LIMITED NUMBER OF TESTS AT

02:48PM  8     THAT TIME?

02:48PM  9     A.   I WOULD JUST SAY THAT LIMITED WAS NOT -- I WAS STILL

02:48PM  10    COMING FROM THE IDEA THAT WE WERE GOING TO PUT IT IN THE FIELD

02:49PM  11    AND HAVE IT RUN AGAINST WHAT WE WERE ALREADY DOING.  I ASSUMED

02:49PM  12    IT WAS MORE THAN A HANDFUL OF TESTS, OBVIOUSLY, OR IT WOULD

02:49PM  13    HAVE BEEN WORTHLESS TO US.

02:49PM  14    Q.   AND THERE ARE -- YOU UNDERSTAND AS A RESULT OF YOUR BOARD

02:49PM  15    SERVICE NOW THAT THERE ARE MANY DIFFERENT PROCESSES INVOLVED IN

02:49PM  16    DEVELOPING THESE PARTICULAR ASSAYS; CORRECT?

02:49PM  17    A.   AND GETTING IT CERTIFIED, YES.

02:49PM  18    Q.   AND GETTING IT CERTIFIED FOR USE OUTSIDE OF A CLINICAL

02:49PM  19    LAB; CORRECT?

02:49PM  20    A.   YES.

02:49PM  21    Q.   BECAUSE THAT WOULD REQUIRE FDA APPROVAL; RIGHT?

02:49PM  22    A.   RIGHT.

02:49PM  23    Q.   IS IT TRUE THAT AT SOME POINT WHEN YOU WERE IN

02:49PM  24    CONVERSATION WITH MS. HOLMES EARLY IN YOUR BOARD SERVICE THAT

02:49PM  25    YOU EXPRESSED THAT YOU KNEW THE DEVICE WAS NOT FULLY MATURE?

02:49PM  1    A.   YES.  IT WAS COMING ONLINE, BUT THAT IT WAS MATURE ENOUGH

02:50PM  2    TO GO COMMERCIAL, BUT WE HAD TO KEEP GROWING IT.  WE HAD A

02:50PM  3    DISCUSSION GOING OVER TO NEWARK WHERE SHE AND I WERE IN THE CAR

02:50PM  4    GOING OVER TO LOOK AT THE FACILITY WHERE WE BUILT THE MACHINES.

02:50PM  5    Q.   AND THAT WAS A MANUFACTURING FACILITY; CORRECT?

02:50PM  6    A.   YES.  EXCUSE ME, YES.

02:50PM  7    Q.   AND THAT ARE FOR THE PURPOSE OF PRODUCING THE MACHINES?

02:50PM  8    A.   YES, BUT THE DISCUSSION THERE ACTUALLY TOUCHED ON WHAT YOU

02:50PM  9    WERE TALKING ABOUT.  I JUST REMEMBERED ONE OF THOSE.

02:50PM  10   Q.   AND LET ME ASK YOU TO LOOK AT EXHIBIT 4196.

02:50PM  11        I BEG YOUR PARDON, SECRETARY.  THIS IS ACTUALLY IN THE

02:50PM  12   WHITE NOTEBOOK THAT MR. BOSTIC GAVE YOU.

02:50PM  13            THE COURT:  4196?

02:50PM  14            MR. DOWNEY:  4196.

02:50PM  15            THE COURT:  I THINK IT'S IN YOURS AS WELL.

02:50PM  16            MR. DOWNEY:  BOTH PLACES.

02:50PM  17            THE CLERK:  IT IS ADMITTED, YOUR HONOR.

02:50PM  18            THE COURT:  YES.

02:51PM  19            THE WITNESS:  IS THIS THE EMAIL SENT ON

02:51PM  20   SEPTEMBER 14TH?

02:51PM  21            MR. DOWNEY:  IT IS.  IT IS.

02:51PM  22            THE WITNESS:  YEAH, I'VE GOT IT.

02:51PM  23            MR. DOWNEY:  IS IT ALL RIGHT TO PUBLISH THIS,

02:51PM  24   YOUR HONOR?

02:51PM  25            THE COURT:  YES.

02:51PM  1    BY MR. DOWNEY:

02:51PM  2    Q.   ALL RIGHT.  I WANT TO DIRECT YOUR ATTENTION TO THIS EMAIL

02:51PM  3    THAT YOU DISCUSSED WITH MR. BOSTIC.

02:51PM  4         DO YOU SEE THE SECOND BULLET POINT WHICH BEGINS, "HOW OUR

02:51PM  5    TECHNOLOGY WORKS"?

02:51PM  6    A.   RIGHT.  CORRECT.

02:51PM  7    Q.   AND MS. HOLMES WAS TELLING YOU IN CONNECTION WITH THIS

02:51PM  8    EMAIL THAT YOU MAY BE ASKED THE QUESTION OF WHETHER THERE'S A

02:51PM  9    SINGLE DEVICE THAT DOES ALL OF THE TESTS THAT THERANOS IS

02:51PM 10    OFFERING; RIGHT?

02:51PM 11    A.   CORRECT.

02:51PM 12    Q.   AND HER ADVICE TO YOU WAS TO TELL HIM THAT YOU DON'T TALK

02:51PM 13    ABOUT THAT ON THE RECORD?

02:51PM 14    A.   RIGHT.

02:51PM 15    Q.   OKAY.

02:51PM 16    A.   DID YOU SAY ON THE RECORD?

02:51PM 17    Q.   ON THE RECORD?

02:51PM 18    A.   ON OR OFF THE RECORD, WE DON'T DISCUSS THAT.

02:52PM 19    Q.   DON'T TALK ABOUT IT AT ALL?

02:52PM 20    A.   YEAH.

02:52PM 21    Q.   I WANT TO ASK YOU ABOUT THE "FORTUNE" ARTICLE THAT

02:52PM 22    MR. BOSTIC SHOWED YOU, THE ROGER PARLOFF ARTICLE.

02:52PM 23         DO YOU RECALL LOOKING AT THAT WITH MR. BOSTIC?

02:52PM 24    A.   YES.

02:52PM 25    Q.   AND LET ME ASK YOU TO LOOK AT THAT BACK AT EXHIBIT 1776.

02:53PM  1          AND I BELIEVE YOU TESTIFIED THAT YOU REVIEWED THIS ARTICLE

02:53PM  2     WHEN IT WAS PUBLISHED.  CORRECT?

02:53PM  3     A.   I READ IT.  I READ IT AT THAT TIME, YES.

02:53PM  4     Q.   AND I JUST WANT TO ASK YOU ABOUT SOME OF THE REFERENCES IN

02:53PM  5     THE ARTICLE, AND I'D ASK YOU TO LOOK AT PAGE 8 IN THE EXHIBIT

02:53PM  6     IF YOU SEE THAT NUMBERING IN THE BOTTOM CENTER.

02:53PM  7     A.   YES.

02:53PM  8     Q.   ABOUT HALFWAY DOWN THE PAGE IT BEGINS, "AT LEAST AS

02:53PM  9     SIGNIFICANT, THREE HOSPITAL GROUPS ARE NOW WORKING CLOSELY WITH

02:53PM  10    THERANOS WITH THE AIM OF DEPLOYING ITS LAB SERVICES," AND IT

02:53PM  11    REFERS TO UCSF MEDICAL CENTER, WHICH OF COURSE IS FAMILIAR TO

02:53PM  12    YOU; CORRECT?

02:53PM  13    A.   YES.

02:53PM  14    Q.   AND DIGNITY HEALTH; CORRECT?

02:53PM  15    A.   YES.

02:53PM  16    Q.   AND INTERMOUNTAIN HEALTH CARE; CORRECT?

02:53PM  17    A.   RIGHT.

02:53PM  18    Q.   AND YOU WERE AWARE WHEN YOU WERE ON THE BOARD THAT

02:53PM  19    THERANOS WAS WORKING WITH THOSE COMPANIES, WITH THOSE

02:53PM  20    INSTITUTIONS; CORRECT?

02:53PM  21    A.   YES.

02:53PM  22    Q.   AND YOU ALSO LEARNED THAT THEY DID DUE DILIGENCE OF

02:54PM  23    THERANOS IN CONNECTION WITH ENTERING INTO AGREEMENTS WITH

02:54PM  24    THERANOS FOR PARTNERSHIPS; CORRECT?

02:54PM  25    A.   I ASSUMED THEY HAD, YES.

02:54PM   1    Q.   AND WAS THAT COMFORTING TO YOU AS A THIRD PARTY

02:54PM   2    VALIDATION?

02:54PM   3    A.   I THINK THE MORE CREDIBLE HEALTH ORGANIZATIONS REVIEWED IT

02:54PM   4    AND SAID IT WAS GOOD TO GO WAS VERY HELPFUL.

02:54PM   5    Q.   AND YOU SEE THERE THAT THERE IS A QUOTATION FROM THE CEO

02:54PM   6    OF UCSF, AND DID YOU RECOGNIZE THAT NAME, MARK LARET?

02:54PM   7    A.   I'VE HEARD IT.  I DON'T KNOW THE MAN.

02:54PM   8    Q.   THAT'S ALL FOR THAT EXHIBIT.

02:54PM   9         I WANT TO ASK YOU A FEW QUESTIONS ABOUT THE TOPIC YOU

02:54PM   10   ADDRESSED WITH MR. BOSTIC CONCERNING THE DEPARTMENT OF DEFENSE

02:55PM   11   AND YOUR TIME AT CENTCOM.

02:55PM   12   A.   UH-HUH.

02:55PM   13   Q.   YOU ALREADY TESTIFIED THAT YOU MET MS. HOLMES IN 2011, AND

02:55PM   14   THEN I THINK WE SAW YOU HAD A SERIES OF CONVERSATIONS WITH HER

02:55PM   15   IN -- THROUGHOUT 2012 ABOUT DEPLOYING THERANOS'S TECHNOLOGY.

02:55PM   16   A.   MOSTLY EMAIL CONVERSATIONS, NOT IN PERSON, YES.

02:55PM   17   Q.   WELL, ALMOST EXCLUSIVELY EMAIL; CORRECT?  YOU ONLY HAD ONE

02:55PM   18   IN PERSON?

02:55PM   19   A.   I THINK SO, YEAH.

02:55PM   20   Q.   OKAY.  AND BEFORE THAT COULD BE DONE, WAS THERE A

02:55PM   21   REQUIREMENT THAT THERANOS BE GRANTED AN LOE?

02:55PM   22   A.   FOR ME TO TALK TO HER?

02:55PM   23   Q.   NO.  FOR, FOR THE MILITARY TO ACTUALLY RUN SUCH A -- THE

02:55PM   24   PROGRAM ALONG THE LINES THAT YOU WERE IMAGINING.

02:55PM   25   A.   AN LOE IS A LIMITED OBJECTIVE EXPERIMENT SIDE-BY-SIDE

02:55PM  1    COMPARISON PILOT PROJECT.  I WANTED SOMETHING THAT WOULD ALLOW

02:55PM  2    ME TO KNOW, IS THIS SOMETHING WORTHY?  BECAUSE AT THAT JOB I

02:55PM  3    COULD PICK UP THE PHONE AND CALL THE CHAIRMAN OF THE JOINT

02:56PM  4    CHIEFS AND THE SECRETARY OF DEFENSE AND SAY I FOUND SOMETHING

02:56PM  5    THAT WAS GOING TO HELP US, IF I WAS ASSURED THAT IT COULD DO

02:56PM  6    IT.

02:56PM  7         SO I NEEDED MORE THAN TALKING TO SOMEONE.  I NEEDED IT TO

02:56PM  8    DELIVER.

02:56PM  9         SO THAT'S WHEN I GOT MY COMMAND SURGEON AND JUDGE ADVOCATE

02:56PM  10   GENERAL TO MAKE CERTAIN LEGAL AND ETHICAL, LEGAL REGULATORY

02:56PM  11   STUFF, AND THEN THE MEDICAL AND ETHICAL REGULATORY STUFF RIGHT

02:56PM  12   BECAUSE IT'S A VERY CONTROLLED ASPECT OF THE MILITARY, THE

02:56PM  13   MEDICAL PART.

02:56PM  14   Q.   DO YOU KNOW WHETHER THERANOS EVER ENTERED INTO A LIMITED

02:56PM  15   OBJECTIVE EXPERIMENT AGREEMENT WITH CENTCOM?

02:56PM  16   A.   THEY DID NOT WHILE I WAS THE COMMANDER, AND I AM NOT AWARE

02:56PM  17   OF IT SINCE I LEFT COMMAND.

02:56PM  18   Q.   AND THE PERSON WHO YOU HAD DESIGNATED YOUR CHIEF SURGEON

02:56PM  19   IS A COLONEL AARON EDGAR; IS THAT CORRECT?

02:56PM  20   A.   THAT'S CORRECT.

02:56PM  21   Q.   AND HE, IN TURN, DELEGATED RESPONSIBILITY TO A NUMBER OF

02:57PM  22   PEOPLE TO COMMUNICATE WITH THERANOS; CORRECT?

02:57PM  23   A.   THERE WERE DIFFERENT ASPECTS THAT HAD TO BE CHECKED OUT.

02:57PM  24   AND, YES, HE WOULD HAVE HAD DIFFERENT EXPERTS ON THAT.

02:57PM  25        JUST TO BE CLEAR, MY CHIEF OF STAFF WOULD HAVE BEEN

02:57PM  1    MAJOR GENERAL HORST, U.S. ARMY, WOULD HAVE BEEN THE PERSON

02:57PM  2    OVERSEEING THIS.

02:57PM  3        I WAS MOST OF THE TIME IN THE MIDDLE EAST, SO HE RUNS THE

02:57PM  4    STAFF IN MY ABSENCE.

02:57PM  5    Q.   DO YOU KNOW WHETHER ANY MILITARY PERSONNEL WITH CLINICAL

02:57PM  6    LAB EXPERTISE WENT TO THERANOS TO LOOK AT THE TECHNOLOGY?

02:57PM  7    A.   I'M NOT AWARE OF THOSE KINDS OF DETAILS.  THEY NORMALLY

02:57PM  8    WOULD BE BRIEFED TO ME.

02:57PM  9    Q.   YOU DON'T RECALL HEARING THAT?

02:57PM 10    A.   NO.

02:57PM 11    Q.   I WANT TO SHOW YOU JUST IN YOUR NOTEBOOK EXHIBIT 10547 FOR

02:58PM 12    PUBLICATION.

02:58PM 13    A.   YES.

02:58PM 14    Q.   YOU'RE NOT ON THE EMAIL THAT IS THE FIRST PAGE OF 10457,

02:58PM 15    AND I JUST WANT TO ASK YOU IF YOU HAVE EVER SEEN OR BEEN AWARE

02:58PM 16    OF THE DOCUMENT THAT IS ATTACHED TO 10457.

02:58PM 17    A.   I DON'T RECALL EVER SEEING THIS, NO.

02:58PM 18    Q.   AND YOU DON'T RECALL HEARING THAT AN LOE AGREEMENT WAS

02:58PM 19    ENTERED INTO?

02:58PM 20    A.   I MAY HAVE BEEN TOLD -- WE HAD A FEW OTHER THINGS GOING ON

02:58PM 21    IN THE MIDDLE EAST AT THIS POINT.

02:58PM 22    Q.   THAT'S FAIR ENOUGH.

02:58PM 23        (LAUGHTER.)

02:58PM 24            THE WITNESS:  YEAH, SO I -- I'M NOT TRYING TO MAKE

02:59PM 25    LIGHT OF IT.

02:59PM   1            IT'S JUST THAT THIS IS SOMETHING THAT MY CHIEF OF STAFF

02:59PM   2    KNOWING THAT I WANTED TO SEE IF THIS WOULD WORK AND SO IT WAS

02:59PM   3    KIND OF IN HIS HANDS.  IT WOULDN'T NORMALLY BE BRIEFED TO ME.

02:59PM   4    BY MR. DOWNEY:

02:59PM   5    Q.    OKAY.  DO YOU RECALL THAT THERE WERE SUBSTANTIAL DELAYS IN

02:59PM   6    THE DISCUSSIONS BETWEEN THERANOS AND REPRESENTATIVES OF DOD?

02:59PM   7    A.    I DO.  IT WAS FRUSTRATING TO ME.

02:59PM   8    Q.    AND DO YOU RECALL THERE WAS A LOT OF DIALOGUE ABOUT THE

02:59PM   9    REGULATORY STRUCTURE THAT WOULD HAVE TO BE USED --

02:59PM   10   A.    EXACTLY.

02:59PM   11   Q.    -- TO DEPLOY THE DEVICE?

02:59PM   12         ALL RIGHT.  I WANT TO MOVE TO THE TOPIC OF A COMPARISON

02:59PM   13   TEST ALONG THE LINES THAT YOU DESCRIBED.

02:59PM   14         AND THAT WAS SOMETHING THAT YOU HAD WANTED TO SEE DONE

02:59PM   15   WHEN YOU WERE IN THE MILITARY; CORRECT?

02:59PM   16   A.    RIGHT.

02:59PM   17   Q.    AND THEN WHEN QUESTIONS AROSE IN 2015 ABOUT THERANOS'S

02:59PM   18   TECHNOLOGY, YOU WANTED TO SEE IF SUCH A COMPARISON TEST COULD

03:00PM   19   BE RUN AGAIN; CORRECT?

03:00PM   20   A.    I WANTED TO DO SOMETHING THAT WOULD DEMONSTRATE THAT THE

03:00PM   21   EDISON WORKED AND LIVED UP TO ITS -- WHAT WE HAD BEEN SAYING

03:00PM   22   ABOUT IT.

03:00PM   23   Q.    AND DO YOU RECALL LOOKING WITH MR. BOSTIC ABOUT THE BOARD

03:00PM   24   DIALOGUE BETWEEN MS. KOVACEVICH -- MR. KOVACEVICH AND

03:00PM   25   MS. HOLMES?  DO YOU RECALL LOOKING AT THAT EMAIL EXCHANGE

03:00PM  1    EARLIER?

03:00PM  2    A.   YES.

03:00PM  3    Q.   AND YOU TESTIFIED THAT YOU WERE SURPRISED ABOUT WHAT

03:00PM  4    MS. HOLMES SAID IN THAT EMAIL?

03:00PM  5    A.   YES.

03:00PM  6    Q.   AND DO YOU KNOW IF YOU RESPONDED TO THAT EMAIL?

03:00PM  7    A.   DID -- PARDON?

03:00PM  8    Q.   DO YOU KNOW IF YOU RESPONDED TO THE EMAIL?

03:00PM  9    A.   NO.  I SPOKE WITH MS. HOLMES, I'M NOT SURE WHEN, BUT WE

03:00PM  10   TALKED ABOUT IT ON THE PHONE.

03:00PM  11   Q.   ALL RIGHT.  LET ME ASK YOU TO LOOK AT EXHIBIT 10506.

03:01PM  12        IS THIS A SERIES OF EMAIL EXCHANGES BETWEEN YOURSELF AND

03:01PM  13   MS. HOLMES AND OTHERS IN OCTOBER OF 2015?

03:01PM  14   A.   YES.

03:01PM  15           MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT 10506.

03:01PM  16           MR. BOSTIC:  NO OBJECTION.

03:01PM  17           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:01PM  18        (DEFENDANT'S EXHIBIT 10506 WAS RECEIVED IN EVIDENCE.)

03:01PM  19   BY MR. DOWNEY:

03:01PM  20   Q.   IF YOU GO TO THE SECOND PAGE OF THAT EXHIBIT -- SORRY, THE

03:01PM  21   THIRD PAGE, AND YOU LOOK IN THE MIDDLE.

03:01PM  22        AND YOU SEE THAT'S THE EMAIL FROM MS. HOLMES THAT WE WERE

03:02PM  23   LOOKING AT EARLIER; CORRECT?

03:02PM  24   A.   YES.

03:02PM  25   Q.   NOW, LET ME DIRECT YOUR ATTENTION TO THE TOP EMAIL ON THE

03:02PM   1    FIRST PAGE OF 10506, WHICH IS FROM YOU TO MS. HOLMES AND

03:02PM   2    OTHERS; CORRECT?

03:02PM   3    A.    YEAH.

03:02PM   4    Q.    AND DAVID BOIES IS COPIED; CORRECT?

03:02PM   5    A.    YES.

03:02PM   6    Q.    AND HE WAS A BOARD MEMBER; CORRECT?

03:02PM   7    A.    YES.

03:02PM   8    Q.    AND HE WAS ALSO AN ATTORNEY FOR THE COMPANY; CORRECT?

03:02PM   9    A.    YES.

03:02PM  10    Q.    AND ALSO H. KING IS COPIED.  THAT'S HEATHER KING; CORRECT?

03:02PM  11    A.    RIGHT.

03:02PM  12    Q.    AND SHE WAS GENERAL COUNSEL OF THE COMPANY?

03:02PM  13    A.    YES.

03:02PM  14    Q.    AND WHO WAS RILEY BECHTEL?

03:02PM  15    A.    ANOTHER MEMBER OF THE BOARD.

03:02PM  16    Q.    AND YOU BEGIN YOUR RESPONSE SAYING, "MY APOLOGIES FOR

03:02PM  17    BEING LATE COMING ONLINE.  I KNOW THE MANAGEMENT TEAM IS MOVING

03:02PM  18    IN REAL TIME TO ADDRESS THE POINTS RAISED IN THE ARTICLE AND TO

03:03PM  19    COUNTER THEM BEFORE THEIR REPETITION BECOMES ACCEPTED URBAN

03:03PM  20    MYTH."

03:03PM  21         FIRST OF ALL, IS THE ARTICLE THAT YOU REFER TO THERE "THE

03:03PM  22    WALL STREET JOURNAL" ARTICLE THAT YOU WERE DISCUSSING WITH

03:03PM  23    MR. BOSTIC?

03:03PM  24    A.    YES, AND YOU'LL SEE IT LATER IN THE EMAIL CHAIN.

03:03PM  25    Q.    AND IF YOU LOOK AT THE THIRD PARAGRAPH YOU WRITE, "I'LL BE

MATTIS CROSS BY MR. DOWNEY

03:03PM 1     OFFLINE FOR MUCH OF THE NEXT 24 HOURS, AND I'M TRYING TO CLOSE

03:03PM 2     OUT MY WORK ASAP SO I CAN FLY BACK EARLY FROM THE MID-EAST.

03:03PM 3     WILL KEEP YOU POSTED, BUT PLEASE KNOW THAT MY SILENCE IS DUE TO

03:03PM 4     LACK OF CONNECTIVITY, FOR I HAVE FULL FAITH IN OUR PLAN AND THE

03:03PM 5     OUTCOME AS WE EXECUTE IT RAPIDLY, THOROUGHLY, RAPIDLY (X2) AND

03:03PM 6     IN AN ANTICIPATORY MODE FOR THE FOLLOW-ON ATTACKS WE KNOW ARE

03:03PM 7     COMING..."

03:03PM 8          AND YOU WERE IN THE MIDDLE EAST AT THE TIME?

03:03PM 9     A.   I WAS.

03:04PM 10    Q.   DO YOU KNOW HOW LONG -- HOW MUCH LATER IT WAS THAT YOU

03:04PM 11    RETURNED TO THE U.S. FROM THAT TRIP?

03:04PM 12    A.   NO, I CAN'T RECALL.  IT SHOULDN'T HAVE BEEN TOO LONG, BUT

03:04PM 13    I CAN'T GIVE YOU A GOOD TIMELINE.

03:04PM 14    Q.   AND DO YOU RECALL IN THE DAYS THAT FOLLOWED THERE WAS MORE

03:04PM 15    MEDIA THAT WAS CRITICAL OF THERANOS?

03:04PM 16    A.   I ASSUMED THERE WOULD BE JUST FROM WHAT I HAD READ.  I --

03:04PM 17    IT'S, IT'S, UM -- YOU KNOW, IT'S SIX YEARS AGO NEARLY.  I DON'T

03:04PM 18    RECALL.

03:04PM 19    Q.   DO YOU RECALL A DISCUSSION AT THE BOARD OF ISSUING A

03:04PM 20    STATEMENT ABOUT THE SITUATION?

03:04PM 21    A.   YES.  YES.

03:04PM 22    Q.   AND A DRAFT STATEMENT WAS SHARED WITH THE BOARD; CORRECT?

03:04PM 23    A.   IT WAS, YES.

03:04PM 24    Q.   LET ME SHOW YOU THAT.  IF YOU WITH BRING UP -- I'M SORRY.

03:04PM 25         IF YOU COULD LOOK AT 10523.

03:05PM   1        I WILL DIRECT YOU TO THE BEGINNING OF THE FOURTH PAGE OF

03:05PM   2    THE EXHIBIT.

03:05PM   3    A.   YES.

03:05PM   4    Q.   IS THIS A STATEMENT THAT THE BOARD OF DIRECTORS ISSUED IN

03:05PM   5    RESPONSE TO "THE WALL STREET JOURNAL" ARTICLE AND FOLLOW-UP

03:05PM   6    MEDIA?

03:05PM   7    A.   THAT THIS IS A STATEMENT THAT AT THE TOP OF THE PAGE,

03:05PM   8    THOSE TWO PARAGRAPHS?

03:05PM   9    Q.   YES.

03:06PM  10    A.   YEAH, I MEAN, IT LOOKS FAMILIAR.  I'M NOT SURE.  THERE

03:06PM  11    WERE SEVERAL VERSIONS WHEN WE DID SOMETHING LIKE THIS, AND I

03:06PM  12    CAN'T TELL YOU IF THIS WAS THE FINAL VERSION.  IT LOOKS LIKE

03:06PM  13    IT, BUT I --

03:06PM  14    Q.   OKAY.  LET ME ASK YOU TO LOOK FIRST AND GET ORIENTED A

03:06PM  15    LITTLE BIT.

03:06PM  16        FIRST OF ALL, IS THIS A SERIES OF EMAIL EXCHANGES THAT

03:06PM  17    CULMINATE WITH EMAIL EXCHANGES BETWEEN YOU AND MS. HOLMES?

03:06PM  18    A.   UH-HUH.

03:06PM  19    Q.   DO YOU SEE THAT ON THE FIRST PAGE?

03:06PM  20    A.   YES.

03:06PM  21        MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

03:06PM  22    10523.

03:06PM  23        MR. BOSTIC:  NO OBJECTION.

03:06PM  24        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:06PM  25        (DEFENDANT'S EXHIBIT 10523 WAS RECEIVED IN EVIDENCE.)

03:06PM   1      BY MR. DOWNEY:

03:06PM   2      Q.   IF YOU LOOK AT THE MIDDLE OF PAGE 2, THERE'S AN EMAIL

03:07PM   3      ADDRESS THAT ORIGINATES FROM THERANOS AND IT'S "FOR OUR

03:07PM   4      SHAREHOLDERS."  IT'S SENT ON NOVEMBER THE 1ST.  IT'S ADDRESSED

03:07PM   5      TO SHAREHOLDERS OF THE COMPANY, AND THERE'S A VERY LONG

03:07PM   6      STATEMENT.

03:07PM   7           DO YOU SEE THAT?

03:07PM   8      A.   I DO.

03:07PM   9      Q.   AND THEN THE STATEMENT ON THE TOP OF PAGE 4 OF THE EXHIBIT

03:07PM  10      IS LABELLED AS A STATEMENT BY THE THERANOS BOARD OF DIRECTORS

03:07PM  11      AND COUNSELORS; CORRECT?

03:07PM  12      A.   UH-HUH, YES.

03:07PM  13      Q.   AND DID THE BOARD AUTHORIZE THE COMPANY TO MAKE THAT

03:07PM  14      STATEMENT AT THE TIME?

03:07PM  15      A.   IF THIS IS THE FINAL VERSION, YES.

03:07PM  16      Q.   ALL RIGHT.  AND AT THE SAME TIME THAT THE COMPANY WAS

03:08PM  17      REACTING TO THE MEDIA, THERE WAS AN INTERNAL DISCUSSION AT THE

03:08PM  18      BOARD, WAS THERE NOT, ABOUT WHAT THE RIGHT REACTION FOR THE

03:08PM  19      COMPANY SHOULD BE TO THE CRITICISMS THAT HAD ARISEN?

03:08PM  20      A.   YES.

03:08PM  21      Q.   AND THERE WERE SEVERAL DIFFERENT SUGGESTIONS PUT FORWARD

03:08PM  22      AS TO HOW THE COMPANY MIGHT RESPOND; CORRECT?

03:08PM  23      A.   YES.

03:08PM  24      Q.   AND MS. HOLMES TALKED TO YOU ABOUT THAT ISSUE; CORRECT?

03:08PM  25      A.   WE DID.  THERE WERE A LOT OF DISCUSSIONS DURING THIS

03:08PM  1    PERIOD WITH MEMBERS OF THE BOARD AND MS. HOLMES.

03:08PM  2    Q.   OKAY.  LET ME ASK YOU TO LOOK AT 10523 AGAIN, WHICH IS

03:08PM  3    ALREADY IN EVIDENCE, AND I'M DIRECTING YOUR ATTENTION TO THE

03:08PM  4    COMMUNICATION WITH MS. HOLMES THAT BEGINS AT THE BOTTOM OF

03:09PM  5    PAGE 1 AND CARRIES OVER TO PAGE 2.

03:09PM  6    A.   YES.

03:09PM  7    Q.   AND THIS IS AN EMAIL FROM MS. HOLMES TO THE BOARD;

03:09PM  8    CORRECT?

03:09PM  9    A.   IT IS, YES.

03:09PM  10   Q.   AND IF YOU LOOK AT THE TOP NUMBERED PARAGRAPHS ON PAGE 2,

03:09PM  11   SHE LAYS OUT POTENTIAL STEPS THE COMPANY MIGHT TAKE TO RESPOND

03:09PM  12   TO THE CRITICISM; CORRECT?

03:09PM  13   A.   YES.

03:09PM  14   Q.   AND ONE OF THE STEPS WAS PUBLISHING DATA ON THE COMPANY'S

03:09PM  15   ASSAYS; CORRECT?

03:09PM  16   A.   RIGHT.

03:09PM  17   Q.   AND ONE WAS PUBLISHING INFORMATION ABOUT ITS CLINICAL

03:09PM  18   LABORATORY PERFORMANCE; CORRECT?

03:09PM  19   A.   RIGHT.

03:09PM  20   Q.   AND ONE WAS PUBLISHING DATA THAT THEY HAD ALREADY

03:09PM  21   SUBMITTED TO THE FDA; CORRECT?

03:09PM  22   A.   YES.

03:09PM  23   Q.   NOW, YOU UNDERSTOOD THAT THE COMPANY HAD ALREADY SUBMITTED

03:09PM  24   A LARGE NUMBER OF APPLICATIONS TO THE FDA FOR THE APPROVAL OF

03:09PM  25   ITS ASSAYS; CORRECT?

MATTIS CROSS BY MR. DOWNEY

03:09PM 1   A.   YES.

03:09PM 2   Q.   AND DID YOU KNOW THAT IN CONNECTION WITH THOSE SUBMISSIONS

03:10PM 3   IT HAD SUBMITTED EXTENSIVE DATA ABOUT THE PERFORMANCE OF ITS

03:10PM 4   ASSAYS?

03:10PM 5   A.   I ASSUMED THAT WAS PART OF IT, YES.

03:10PM 6   Q.   AND DO YOU RECALL DELIBERATIONS IN THE BOARD AS TO WHETHER

03:10PM 7   OR NOT THAT DATA SHOULD BE RELEASED?

03:10PM 8   A.   VAGUELY, YES.

03:10PM 9   Q.   THE FOURTH SUGGESTION IS THAT THE COMPANY WORK WITH

03:10PM 10  CENTERS OF EXCELLENCE, AND THE FIFTH WAS TO INVITE PEOPLE TO

03:10PM 11  THERANOS TO DO A FINGERSTICK DEMONSTRATION AND A VENOUS BLOOD

03:10PM 12  DRAW AT THE SAME TIME AND SEE VARIANCE IN DATA, WHETHER THERE

03:10PM 13  WERE VARIANCES IN DATA; CORRECT?

03:10PM 14  A.   UH-HUH.

03:10PM 15  Q.   ALL RIGHT.  AND HOW DID YOU REACT TO THE SUGGESTIONS OF

03:10PM 16  THOSE STEPS?

03:10PM 17  A.   I THOUGHT IT WAS A STEP IN THE RIGHT DIRECTION.  IT WAS

03:10PM 18  TIME TO STAND AND DELIVER.

03:10PM 19  Q.   AND IS THE EMAIL IN THE MIDDLE OF PAGE 1 WHERE YOU SAY --

03:10PM 20  YOU WRITE TO MS. HOLMES AND SAY "THIS IS A STRONG PACKAGE."

03:10PM 21      IS THAT A REFERENCE TO WHAT SHE HAS OUTLINED, THE FIVE

03:11PM 22  STEPS SHE OUTLINED IN HER EMAIL?

03:11PM 23  A.   IT IS.  AGAIN, IT GOES BACK TO MY EARLIEST TIME THAT, YOU

03:11PM 24  KNOW, DEMONSTRATE WHAT IT CAN DO.

03:11PM 25  Q.   NOW, YOU MENTIONED THAT WHILE YOU WERE AT THE COMPANY YOU

03:11PM  1    THOUGHT THAT THE COMPANY WAS SOMEWHAT DATA DRIVEN.

03:11PM  2         YOU WERE SHOWN A LOT OF DATA IN BOARD MEETINGS; CORRECT?

03:11PM  3    A.   I WOULDN'T CALL IT DATA DRIVEN.  WE WERE SHOWN A LOT OF

03:11PM  4    DATA THOUGH, YES.

03:11PM  5    Q.   AND AMONG THE DATA THAT YOU WERE SHOWN AT BOARD MEETINGS

03:11PM  6    WAS ACTUALLY THERANOS'S PERFORMANCE IN COMPARATIVE STUDIES OF

03:11PM  7    ITS RESULTS TO VENOUS DRAWS.

03:11PM  8         DO YOU RECALL THAT?

03:11PM  9    A.   YES.

03:11PM  10   Q.   LET ME ASK YOU TO LOOK AT 11172.  I BEG YOUR PARDON.  LET

03:12PM  11   ME CORRECT THAT.  YOU WERE NOT ABLE TO FIND THAT?

03:12PM  12   A.   YEAH.

03:12PM  13   Q.   I BEG YOUR PARDON.

03:12PM  14        YOUR HONOR, MAY I HAVE JUST ONE MOMENT?

03:12PM  15        I BEG YOUR PARDON, GENERAL.  IT'S 1172, 1172.  AND I'D ASK

03:13PM  16   YOU TO LOOK AT PAGE --

03:13PM  17        THIS WAS PREVIOUSLY ADMITTED, YOUR HONOR.

03:13PM  18   A.   I DON'T THINK I -- WHAT WAS THE NUMBER AGAIN, SIR?

03:13PM  19   Q.   1172.

03:13PM  20        THE COURT:  IT'S NOT IN YOUR BINDER I THINK.

03:13PM  21        MR. DOWNEY:  I BEG YOUR PARDON.

03:13PM  22   Q.   ARE YOU LOOKING AT THE WHITE BINDER OR THE BLACK BINDER?

03:13PM  23   A.   OH, BLACK BINDER.

03:13PM  24   Q.   I THOUGHT IT WAS.  LET ME MOVE ON FROM THAT AND WE CAN

03:13PM  25   COME BACK TO THAT.

03:13PM  1          NOW, DID DISCUSSIONS CONTINUE -- YOU REMAINED ON THE BOARD

03:13PM  2     OF THERANOS AFTER THIS CONTROVERSY AROSE IN THE FALL OF 2015;

03:13PM  3     CORRECT?

03:13PM  4     A.   YES, 2015.  I REMAINED ON INTO 2016, YES.

03:14PM  5     Q.   OKAY.  TOWARDS THE END OF 2016 YOU RESIGNED?

03:14PM  6     A.   YES.

03:14PM  7     Q.   AND THERE WERE A LOT OF DISCUSSIONS ABOUT HOW TO CARRY OUT

03:14PM  8     THE STEPS THAT MS. HOLMES HAD OUTLINED THROUGHOUT THAT YEAR;

03:14PM  9     CORRECT?

03:14PM  10    A.   YES.

03:14PM  11    Q.   AND ONE OF THE STEPS THAT SHE HAD OUTLINED WAS THERANOS

03:14PM  12    COULD PUBLISH DATA ABOUT THE PERFORMANCE OF ITS ASSAYS;

03:14PM  13    CORRECT?

03:14PM  14    A.   YES.

03:14PM  15    Q.   AND DO YOU RECALL THAT MS. HOLMES GAVE A PRESENTATION TO

03:14PM  16    THE AMERICAN ASSOCIATION OF CLINICAL CHEMISTRY IN 2016 AND THAT

03:14PM  17    THERANOS PUBLISHED A LOT OF ITS DATA IN CONNECTION WITH THAT

03:14PM  18    PRESENTATION?

03:14PM  19    A.   IS THIS THE BRIEFING IN I THINK IT'S MARCH TO MAY

03:14PM  20    TIMEFRAME?  DOES THAT SOUND RIGHT?

03:14PM  21    Q.   NO.  THIS IS A LITTLE LATER IN THE YEAR.

03:14PM  22         THIS IS A PRESENTATION BY MS. HOLMES TO A PROFESSIONAL

03:15PM  23    GROUP?

03:15PM  24    A.   I VAGUELY RECALL IT, BUT I CAN'T RECALL MUCH MORE THAN

03:15PM  25    THAT IT HAPPENED.

03:15PM   1    Q.   OKAY.  LET ME ASK YOU TO LOOK AT EXHIBIT 7673.  AND I'LL

03:15PM   2    ONLY ASK YOU TO LOOK AT THE FIRST PAGE.

03:15PM   3        IS THIS A DOCUMENT THAT YOU SAW IN CONNECTION WITH BOARD

03:15PM   4    MEETINGS AT THERANOS?

03:15PM   5    A.   I DON'T RECALL THIS.

03:15PM   6    Q.   OKAY.  YOU CAN PUT THAT ASIDE.

03:15PM   7        NOW THE OTHER -- ONE OF THE OTHER STEPS THAT YOU HAD

03:15PM   8    DONE -- THAT THE BOARD HAD SUGGESTED WAS SOME FORM OF

03:15PM   9    COMPARATIVE STUDY BE DONE; IS THAT CORRECT?

03:15PM  10    A.   YES.

03:15PM  11    Q.   AND DO YOU RECALL THAT THERANOS ARRANGED WITH UCSF FOR A

03:15PM  12    COMPARATIVE STUDY OF ITS TESTS TO BE DONE?

03:16PM  13    A.   YES.

03:16PM  14    Q.   AND DO YOU RECALL WHAT THE RESULTS OF THAT COMPARISON

03:16PM  15    WERE?

03:16PM  16    A.   NO, I DO NOT.

03:16PM  17    Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 7717.

03:16PM  18        DO YOU RECOGNIZE THIS DOCUMENT?

03:16PM  19    A.   THIS IS THE FIRST TIME THAT I THINK I'VE SEEN IT.

03:16PM  20    Q.   OKAY.  LET ME ASK YOU TO LOOK AT PAGE 1.  ACTUALLY, IT'S

03:16PM  21    THE FOURTH PAGE OF THE EXHIBIT, BUT IT'S LABELLED PAGE 1.

03:17PM  22    A.   UH-HUH.

03:17PM  23    Q.   WITHOUT REGARD TO ANY DOCUMENT, DO YOU RECALL THAT A STUDY

03:17PM  24    WAS UNDERTAKEN TO EVALUATE THERANOS'S ANALYTICAL PERFORMANCE

03:17PM  25    COMPARED TO OTHER LABORATORY SYSTEMS?

03:17PM 1    A.   I KNOW WE HAD PUSHED FOR IT AND I KNOW THAT THERE WERE

03:17PM 2    EFFORTS UNDERWAY TO MAKE IT HAPPEN.

03:17PM 3         I DON'T RECALL THIS, BUT IT MAY BE -- WHAT -- IS THIS IN

03:17PM 4    LATE 2017?

03:17PM 5    Q.   I THINK THE DATE OF THIS DOCUMENT IS IN 2017, YES.

03:17PM 6    A.   IS WHEN?

03:17PM 7    Q.   IS IN 2017.

03:17PM 8    A.   IS IT IN LATE 2017?

03:17PM 9    Q.   I BELIEVE IT IS.  ASSUME IT IS.

03:17PM 10   A.   OH, IT IS DECEMBER 20TH -- OH, I THINK I HAVE RESIGNED

03:18PM 11   FROM THE BOARD BY THIS POINT, SIR.

03:18PM 12   Q.   OKAY.  BUT DID YOU LEARN WHILE YOU WERE ON THE BOARD THAT

03:18PM 13   AN INDEPENDENT EVALUATION HAD BEEN UNDERTAKEN?

03:18PM 14   A.   I BELIEVE I KNEW IT WAS UNDERWAY.

03:18PM 15        AGAIN, WHEN THE ARTICLE COMES OUT, WE'RE SCRAMBLING TO TRY

03:18PM 16   TO VALIDATE WHAT WE HAVE SAID THAT THERANOS CAN DO.

03:18PM 17        IT'S ROLL UP YOUR SLEEVES AND LET'S PROVE IT NOW BECAUSE

03:18PM 18   WE'RE UNDER ATTACK.  WE'VE GOT TO REACT TO THIS.

03:18PM 19   Q.   OKAY.  SO YOU ENCOURAGED THEM TO UNDERTAKE A COMPARATIVE

03:18PM 20   STUDY; CORRECT?

03:18PM 21   A.   I WANTED COMPARATIVE STUDIES ON THERANOS FROM DAY ONE SO

03:18PM 22   THAT WE COULD BRING IT ONLINE AND PROVE IT COULD --

03:18PM 23   Q.   AND YOU HAD LEARNED AT SOME POINT THAT THEY HAD UNDERTAKEN

03:18PM 24   TO PURSUE THAT KIND OF A STUDY; CORRECT?

03:18PM 25   A.   THAT I'M NOT SURE OF.

03:18PM  1    Q.    OKAY.  BUT IN ANY EVENT, THE RESULTS OF THIS STUDY WOULD

03:18PM  2    HAVE TAKEN PLACE AFTER YOU HAD LEFT THERANOS --

03:19PM  3    A.    THAT'S CORRECT.

03:19PM  4    Q.    -- FOR THE DEFENSE DEPARTMENT.

03:19PM  5          AND DO YOU RECALL AN EMAIL FROM MS. HOLMES LAYING OUT

03:19PM  6    POTENTIAL STEPS?  SHE SET FORTH THE POSSIBILITY OF BRINGING

03:19PM  7    INTO THE COMPANY OUTSIDERS WITH A LOT OF EXPERTISE WHO COULD

03:19PM  8    REVIEW DATA; IS THAT CORRECT?

03:19PM  9    A.    YES, THAT'S CORRECT.

03:19PM 10    Q.    AND LET ME ASK YOU TO LOOK AT EXHIBIT 10512 IN CONNECTION

03:19PM 11    WITH THAT.

03:19PM 12          AND IS THIS A SERIES OF EMAIL EXCHANGES BETWEEN --

03:19PM 13    CULMINATING IN EMAIL EXCHANGES BETWEEN YOURSELF AND MS. HOLMES

03:19PM 14    AND OTHERS.

03:19PM 15    A.    AND THE OTHER MEMBERS OF THE BOARD, YES.

03:19PM 16              MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT 10512.

03:19PM 17              MR. BOSTIC:  YOUR HONOR, I BELIEVE PORTIONS CONTAIN

03:19PM 18    HEARSAY.

03:20PM 19              THE COURT:  IS THIS OFFERED FOR THE TRUTH OF THE

03:20PM 20    MATTER ASSERTED?

03:20PM 21              MR. DOWNEY:  IT'S BEING OFFERED FOR THE STATE OF

03:20PM 22    MIND OF THE DEFENDANT.

03:20PM 23              THE COURT:  STATE OF MIND OF THE DEFENDANT?

03:20PM 24              MR. DOWNEY:  YES.

03:20PM 25              THE COURT:  LADIES AND GENTLEMEN, THIS WILL BE

03:20PM 1    ADMITTED NOT FOR THE TRUTH OF THE MATTER ASSERTED IN THE

03:20PM 2    DOCUMENT.  THIS ONLY GOES TO THE ISSUE OF THE STATE OF MIND OF

03:20PM 3    MS. HOLMES, AND THAT LIMITED PURPOSE ONLY.

03:20PM 4         YOU'LL BE SO INSTRUCTED LATER IN THE FINAL INSTRUCTIONS

03:20PM 5    HOW YOU MAY TREAT THIS EVIDENCE.

03:20PM 6         (DEFENDANT'S EXHIBIT 10512 WAS RECEIVED IN EVIDENCE.)

03:20PM 7              MR. DOWNEY:  LET ME ASK THAT THAT BE -- MAY THAT BE

03:20PM 8    PUBLISHED, YOUR HONOR?

03:20PM 9              THE COURT:  YES.

03:20PM 10   BY MR. DOWNEY:

03:20PM 11   Q.   I'LL DIRECT YOUR ATTENTION TO THE FIRST EMAIL AT THE

03:20PM 12   BOTTOM OF THE EXCHANGE.  THE EMAIL THAT IS FROM DAVID HELFET,

03:21PM 13   M.D.

03:21PM 14        DO YOU SEE THAT?

03:21PM 15   A.   YES.

03:21PM 16   Q.   AND DO YOU KNOW WHO DAVID HELFET IS?

03:21PM 17   A.   I KNOW HIS REPUTATION.

03:21PM 18   Q.   AND WHAT IS HIS REPUTATION?

03:21PM 19   A.   STRONG IN HIS FIELD.

03:21PM 20   Q.   AND HE GOES ON TO SAY IN THIS EMAIL -- HE THANKS PEOPLE

03:21PM 21   FOR PARTICIPATING IN A SESSION ON FRIDAY, AND HE THEN SAYS,

03:21PM 22   TOWARDS THE BOTTOM, "DESPITE SOME INITIAL SKEPTICISM I DO

03:21PM 23   BELIEVE ULTIMATELY WE WERE ALL CONVINCED," AND THEN HE SETS

03:21PM 24   FORTH A NUMBER OF BULLET POINTS, THE VACUTAINER WORKS, IF DONE

03:21PM 25   CORRECTLY, RELIABLE SMALL AMOUNTS OF BLOOD VIA FINGERSTICK CAN

03:21PM   1      BE OBTAINED FOR TESTING, THERANOS HAS THE TECHNOLOGY TO TEST

03:21PM   2      NANO AMOUNTS OF BLOOD WITH THE SAME TESTS AND ACCURACY AS

03:22PM   3      ROUTINELY DONE TODAY WITH TRADITIONAL VENAPUNCTURE.

03:22PM   4           AND THEN HE SAYS, THE LAB IN THE BOX IS A REALITY AND WILL

03:22PM   5      BE A GAME CHANGER.

03:22PM   6           AND ABOVE THAT HE IS RESPONDED TO BY A THOMAS KICKLER.

03:22PM   7           DO YOU KNOW WHO THOMAS KICKLER IS?

03:22PM   8      A.   NO.

03:22PM   9      Q.   AND DO YOU KNOW OF -- HAVE YOU EVER HEARD OF DR. KICKLER

03:22PM   10     IN CONNECTION WITH JOHNS HOPKINS UNIVERSITY?

03:22PM   11     A.   NO.

03:22PM   12     Q.   AND DO YOU KNOW THAT DR. KICKLER HAD PERFORMED THE FIRST

03:22PM   13     EVALUATION OF THERANOS TECHNOLOGY THAT WAS REFERENCED IN THE

03:22PM   14     BOARD PACKET THAT YOU LOOKED AT EARLIER WITH MR. BOSTIC?

03:22PM   15     A.   NO.

03:22PM   16     Q.   AND THIS GOES ON TO SAY, FROM DR. KICKLER, I WAS NOT ONLY

03:22PM   17     IMPRESSED WITH THE EXCELLENT WORK DONE BUT ALSO WITH THE TEAM

03:22PM   18     THAT HAS BEEN ASSEMBLED.  THE PRESENTATIONS WERE SCHOLARLY,

03:22PM   19     REFLECTED A BROAD KNOWLEDGE, CLEARLY PRESENTED, AND HE HAD THE

03:23PM   20     IMPRESSION OF A LOT OF COLLECTIVE EXPERTISE, EXPERTISE AND

03:23PM   21     EXPERIENCE AT THERANOS.

03:23PM   22           AND THEN MS. HOLMES FORWARDS THAT ON TO THE BOARD AND SETS

03:23PM   23     FORTH THE QUALIFICATIONS OF THE DOCTORS WHO HAD PARTICIPATED IN

03:23PM   24     THIS REVIEW; CORRECT?

03:23PM   25     A.   UH-HUH.

03:23PM 1    Q.   AND SHE WAS CLEARLY IMPRESSED WITH THE RESULTS OF THIS?

03:23PM 2    A.   YES.

03:23PM 3    Q.   AND YOU WROTE BACK TO MS. HOLMES AND SAID, "THANKS

03:23PM 4    ELIZABETH.  I'M HEARTENED BUT UNSURPRISED AT THE FINDINGS."

03:23PM 5         AND THEN YOU ASK, CAN WE HAVE THESE FIND THEIR WAY INTO

03:23PM 6    TRADE JOURNALS AND THE BUSINESS WORLD NEWS AND MEDIA TO REVERSE

03:23PM 7    THE CURRENT STORY?  CORRECT?

03:23PM 8    A.   YES.

03:23PM 9    Q.   AND YOU WERE CONCERNED THAT THE STORY WAS BECOMING, I

03:23PM 10   THINK YOU CALLED IT SORT OF AN URBAN MYTH; CORRECT?

03:23PM 11   A.   THAT'S CORRECT.  IF WE HAD DATA THAT REFUTED IT, WE NEEDED

03:23PM 12   TO GET IT OUT THERE.

03:24PM 13   Q.   AND THEN AFTER THIS EMAIL EXCHANGE BETWEEN YOU AND

03:24PM 14   MS. HOLMES, SHE SEPARATELY FORWARDS TO THE BOARD ANOTHER CHAIN

03:24PM 15   WHICH BEGINS WITH THE SAME BOTTOM CHAIN, AND THAT IS AT

03:24PM 16   EXHIBIT 7653.  IF YOU COULD LOOK AT THAT.

03:24PM 17        AND IS THIS ANOTHER EMAIL EXCHANGE BETWEEN MS. HOLMES AND

03:24PM 18   THE BOARD, INCLUDING YOURSELF?

03:24PM 19   A.   YES.

03:24PM 20   Q.   IF YOU LOOK UNDER HER FORWARDING OF THIS, YOU SEE THAT

03:25PM 21   IT'S AN EMAIL FROM BILL FOEGE TO MS. HOLMES; CORRECT?

03:25PM 22   A.   YES.

03:25PM 23   Q.   AND BILL FOEGE IS THE GENTLEMAN WHO WE MENTIONED WHO WAS

03:25PM 24   THE DIRECTOR FOR THE CENTER OF DISEASE CONTROL; CORRECT?

03:25PM 25   A.   THAT'S CORRECT.

03:25PM 1    Q.   AND HE'S HIGHLY RESPECTED IN THE FIELD OF PUBLIC HEALTH;

03:25PM 2    CORRECT?

03:25PM 3    A.   YES.

03:25PM 4    Q.   AND THEN HE REPORTS ON NOTES THAT HE HAD MADE OF HIS

03:25PM 5    DIALOGUE WITH THESE DOCTORS; CORRECT?

03:25PM 6    A.   YES.

03:25PM 7              MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

03:25PM 8    EXHIBIT 7653.

03:25PM 9              MR. BOSTIC:  SIMILAR HEARSAY OBJECTION, YOUR HONOR.

03:25PM 10             THE COURT:  IS THIS OFFERED FOR THE TRUTH?

03:25PM 11             MR. DOWNEY:  OFFERED FOR THE SAME PURPOSE.

03:25PM 12             THE COURT:  STATE OF MIND OF MS. HOLMES?

03:25PM 13             MR. DOWNEY:  YES, YES.

03:25PM 14             THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, THIS

03:25PM 15   IS ADMITTED.  BUT, AGAIN, THE LIMITED PURPOSE OF THIS IS NOT

03:25PM 16   FOR THE TRUTH OF THE MATTER ASSERTED IN THE DOCUMENT, BUT IT

03:25PM 17   GOES TO THE STATE OF MIND OF MS. HOLMES, AND THAT IS THE ONLY

03:25PM 18   REASON IT MAY BE CONSIDERED.

03:26PM 19        YOU'LL BE INSTRUCTED IN THE FINAL INSTRUCTIONS AS TO THAT

03:26PM 20   AS WELL.

03:26PM 21        (DEFENDANT'S EXHIBIT 7653 WAS RECEIVED IN EVIDENCE.)

03:26PM 22   BY MR. DOWNEY:

03:26PM 23   Q.   AND IF YOU LOOK AT THE ATTACHED NOTES, THESE APPEAR TO BE

03:26PM 24   NOTES THAT DR. FOEGE HAD TAKEN DURING THE MEETING; CORRECT?  OR

03:26PM 25   SUMMARIZED IN THE MEETING?

MATTIS CROSS BY MR. DOWNEY

03:26PM  1    A.    I GUESS SO.  YEAH, THEY LOOK PRETTY COMPLETE.

03:26PM  2    Q.    OKAY.  AND IF YOU LOOK AT, ON THE SECOND PAGE OF NOTES,

03:26PM  3    DR. FOEGE WRITES, NEXT TO NUMBER 1, "THE AMAZING DETAIL OF THE

03:26PM  4    PRESENTATIONS, THE HIGH QUALITY OF THE STUDIES IN THE ASSAYS.

03:26PM  5    THE PROFESSIONALISM AND THE QUALITY OF THE STAFF AND THE FACT

03:26PM  6    THAT THE THERANOS TEAM HAS IDENTIFIED AND PERFECTED SO MANY

03:26PM  7    PARTS OF THE PROGRAM OVER THE YEARS."

03:26PM  8         AND THEN HE GOES ON TO SAY THESE ARE ACADEMICS AND THEY'RE

03:27PM  9    HARSH JUDGES; CORRECT?

03:27PM  10   A.    RIGHT.

03:27PM  11   Q.    AND THEN IF YOU GO A COUPLE OF PARAGRAPHS ABOVE NUMBER 1,

03:27PM  12   HE RECOUNTS IN THE SECOND PARAGRAPH OF THE NOTES THAT

03:27PM  13   MS. HOLMES REVIEWED STUDIES OF THERANOS'S NANOTAINER; CORRECT?

03:27PM  14   A.    YES.

03:27PM  15   Q.    AND SHE PRESENTED THE DATA AS TO WHAT WAS KNOWN ABOUT HOW

03:27PM  16   THERANOS'S TECHNOLOGY COMPARED VERSUS VENOUS TECHNOLOGY;

03:27PM  17   CORRECT?

03:27PM  18   A.    YES.

03:27PM  19   Q.    AND THEN IT GOES ON TO SAY SHE USED SLIDES AND VIDEO AND

03:27PM  20   SHOWED HOW THE EQUIPMENT WORKS.

03:27PM  21        AND THEN DR. FOEGE RECOUNTED, "THE ATTITUDE OF THE GROUP

03:27PM  22   CHANGED PERCEPTIBLY DURING THE DAY.  SOON THEY SAID THEY HAD

03:27PM  23   SEEN ENOUGH OF THE ANALYTICAL METHODS, THE CAPILLARY VERSUS

03:27PM  24   VENOUS RESULTS SO THAT WE COULD GO ON TO OTHER THINGS."

03:27PM  25        DO YOU SEE THAT?

03:27PM   1    A.   YES.

03:27PM   2    Q.   AND DID YOU EVER DISCUSS WITH MS. HOLMES THE SIGNIFICANCE

03:28PM   3    THAT SHE TOOK FROM THE REACTION TO THE TECHNOLOGY THAT WAS

03:28PM   4    EXPRESSED DURING THIS SESSION?

03:28PM   5    A.   DID I DISCUSS WITH HER HER REACTIONS?

03:28PM   6    Q.   YES, WHAT HER REACTION WAS TO THIS SESSION AND THE

03:28PM   7    COMMENTS THAT WERE MADE BY EXPERTS DURING IT?

03:28PM   8    A.   THEY WERE POSITIVE.  YOU CAN SEE IN THE EMAIL FROM HER,

03:28PM   9    SHE FORWARDS IT -- I MEAN, CLEARLY THIS WAS A STEP IN THE RIGHT

03:28PM  10    DIRECTION TO GET EXPERTS IN AND REVIEW WHAT WE WERE DOING.

03:28PM  11    Q.   I JUST WANT TO ASK YOU WITH RESPECT TO ANOTHER THIRD PARTY

03:28PM  12    VALIDATION ISSUE.  I JUST WANT TO ASK YOU IF YOU HAVE EVEN SEEN

03:28PM  13    A DOCUMENT BEFORE OR NOT.  SO I'M GOING TO ASK YOU JUST TO LOOK

03:28PM  14    AT IT AND YOU CAN TELL ME YES OR NO WHETHER THIS IS A DOCUMENT

03:28PM  15    YOU THINK YOU'VE SEEN BEFORE.

03:28PM  16    A.   OKAY.

03:28PM  17    Q.   AND THIS WILL BE IN YOUR NOTEBOOK AS -- I WANT TO MAKE

03:29PM  18    SURE IT'S IN YOUR NOTEBOOK.  BEAR WITH ME.  EXHIBIT 302.

03:29PM  19         TAKE A MINUTE TO REVIEW THAT AND LET US KNOW IF YOU'VE

03:29PM  20    EVER SEEN THIS DOCUMENT BEFORE.

03:29PM  21    A.   NO.

03:29PM  22    Q.   NOW, DURING THE 2016 TIMEFRAME, A NUMBER OF CHANGES

03:29PM  23    HAPPENED AT THE COMPANY; CORRECT?

03:29PM  24    A.   2013?

03:29PM  25    Q.   2016?

03:29PM   1    A.   2016?  YES.

03:29PM   2    Q.   MR. BALWANI LEFT THE COMPANY; CORRECT?

03:29PM   3    A.   YES.

03:29PM   4    Q.   AND INDIVIDUALS WHO HAD SUBSTANTIAL EXPERIENCE IN THE

03:29PM   5    MEDICAL BUSINESS WERE BROUGHT INTO THE COMPANY TO OPERATE

03:29PM   6    PORTIONS OF IT; CORRECT?

03:29PM   7    A.   I'M NOT FAMILIAR WITH ALL OF THE DETAILS, BUT THERE WERE

03:30PM   8    THE CHANGES THAT YOU'RE TALKING ABOUT.

03:30PM   9    Q.   OKAY.  AND DID YOU GET TO MEET, FOR EXAMPLE, MR. BONNANI?

03:30PM  10    A.   I DON'T RECALL.

03:30PM  11    Q.   OKAY.  DID YOU CONTINUE TO COUNSEL MS. HOLMES DURING THAT

03:30PM  12    PERIOD AROUND LEADERSHIP ISSUES AND MANAGEMENT ISSUES?

03:30PM  13    A.   I DON'T RECALL WHEN WE STOPPED THOSE DISCUSSIONS.  BUT

03:30PM  14    EARLY 2016, WE WERE STILL TRYING TO GET THIRD PARTY VALIDATION,

03:30PM  15    SO I COULD IMAGINE I WAS WORKING WITH HER IN HOW SHE CONVEYED

03:30PM  16    THAT TO HER OWN TEAM FOR MORALE REASONS.  YOU KNOW, THE

03:30PM  17    COMPANY, YOU COULD LOSE PEOPLE IN THESE SITUATIONS, GOOD

03:30PM  18    PEOPLE.

03:30PM  19    Q.   AND SHE CONTINUED TO SEEK YOUR ADVICE DURING THAT PERIOD?

03:30PM  20    A.   IT'S BEEN A FEW YEARS.  I DON'T RECALL WHEN WE STOPPED.

03:30PM  21    OBVIOUSLY WE STOPPED IN ABOUT OCTOBER OR NOVEMBER, SOME TIME

03:31PM  22    BEFORE THAT.

03:31PM  23    Q.   LET ME ASK YOU TO LOOK AT 10524.

03:31PM  24    A.   YES.

03:31PM  25    Q.   IS THIS A LETTER FROM YOU TO MS. HOLMES?

03:31PM 1    A.   YES.

03:31PM 2              MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

03:31PM 3    THIS DOCUMENT.

03:31PM 4              MR. BOSTIC:  NO OBJECTION.

03:31PM 5              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:31PM 6         (DEFENDANT'S EXHIBIT 10524 WAS RECEIVED IN EVIDENCE.)

03:31PM 7    BY MR. DOWNEY:

03:31PM 8    Q.   AND THIS IS YOUR RESIGNATION TO THERANOS IN DECEMBER OF

03:31PM 9    2016; CORRECT?

03:31PM 10   A.   THAT'S CORRECT.

03:31PM 11             MR. DOWNEY:  YOUR HONOR, MAY I HAVE A MOMENT?  I MAY

03:31PM 12   BE DONE WITH CROSS-EXAMINATION.  EXCUSE ME ONE MOMENT.

03:31PM 13             THE COURT:  YES.

03:31PM 14        (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

03:32PM 15             MR. DOWNEY:  YOUR HONOR, I'LL PASS THE WITNESS.

03:32PM 16             THE COURT:  REDIRECT?

03:32PM 17             MR. BOSTIC:  THANK YOU, YOUR HONOR.

03:32PM 18                    **REDIRECT EXAMINATION**

03:32PM 19   BY MR. BOSTIC:

03:32PM 20   Q.   GOOD AFTERNOON, GENERAL MATTIS.

03:32PM 21        DURING YOUR DISCUSSION WITH MR. DOWNEY, YOU TALKED ABOUT

03:32PM 22   AN LOE.

03:32PM 23        DO YOU RECALL THAT DISCUSSION?

03:32PM 24   A.   YES.

03:32PM 25   Q.   AND WHAT IS AN LOE?  JUST REMIND US.

03:32PM  1      A.   A LIMITED OBJECTIVE EXPERIMENT.  WE WERE TRYING TO DEFINE

03:32PM  2      WHAT WE WANTED TO DO FOR THE SIDE-BY-SIDE COMPARISON.  WAS IT A

03:32PM  3      PILOT PROJECT?  A LIMITED OBJECTIVE EXPERIMENT?  WE WANTED TO

03:32PM  4      SEE IF WE COULD USE IT IN A MILITARY ENVIRONMENT.

03:33PM  5      Q.   AND DOES AN LOE HAPPEN BEFORE ACTUAL MEDICAL USE OF THE

03:33PM  6      DEVICE OR AT THE SAME TIME?

03:33PM  7      A.   WHAT I WANTED TO DO IS BEFORE I PUT MY REPUTATION ON THE

03:33PM  8      LINE SAYING THAT I WANT THIS THING IN THEATRE, I WANTED TO KNOW

03:33PM  9      IT WORKED.  THAT'S THE BOTTOM LINE.

03:33PM  10          I NEEDED TO HAVE THE DATA, AND THE BEST WAY TO DO IT IS TO

03:33PM  11     PUT ALONGSIDE WHAT WE WERE DOING AND HAVE IT STAND AND DELIVER

03:33PM  12     FASTER AND MORE ACCURATE RESULTS.

03:33PM  13     Q.   DO YOU REMEMBER SOME DISCUSSION WITH MR. DOWNEY ABOUT

03:33PM  14     WHETHER THERE WAS AN AGREEMENT OR NOT, OR A PROTOCOL TO CONDUCT

03:33PM  15     THAT LOE?

03:33PM  16     A.   WE ENGAGED IN THE EFFORT TO TRY TO DO IT.  WE DID NOT

03:33PM  17     ACHIEVE THAT WHILE I WAS THERE.

03:33PM  18     Q.   AND MY QUESTION IS JUST, IS A WRITTEN AGREEMENT TO CONDUCT

03:33PM  19     AN LOE THE SAME THING AS ACTUALLY FOLLOWING THROUGH AND

03:33PM  20     CONDUCTING THAT EXPERIMENT?

03:33PM  21     A.   NO, ABSOLUTELY NOT.  IT SIMPLY OPENS THE DOOR TO DO WHAT

03:34PM  22     WE NEEDED TO DO.

03:34PM  23     Q.   MORE RECENTLY IN YOUR CONVERSATION WITH MR. DOWNEY THERE

03:34PM  24     WAS SOME DISCUSSION AND YOU LOOKED AT SOME EMAILS ABOUT

03:34PM  25     DAVID HELFET AND A DAY THAT HE SPENT AT THERANOS; IS THAT

03:34PM  1    CORRECT?

03:34PM  2    A.   YES.

03:34PM  3    Q.   AND THAT WAS EXHIBIT 10512 THAT YOU JUST LOOKED AT.  YOU

03:34PM  4    CAN LOOK BACK AT IT IF YOU WOULD LIKE.

03:34PM  5         ACTUALLY, IF WE COULD --

03:34PM  6    A.   YES.

03:34PM  7    Q.   WELL, LET ME ASK, THE MEETING THAT MR. HELFET HAD AT

03:34PM  8    THERANOS THAT IS REFLECTED IN THE EMAIL, WERE YOU PRESENT AT

03:34PM  9    THAT MEETING?

03:34PM  10   A.   NO, I WAS NOT.

03:34PM  11   Q.   AND DO YOU KNOW WHETHER IT TOOK MORE THAN A SINGLE DAY AT

03:34PM  12   THERANOS?

03:34PM  13   A.   I DO NOT KNOW THE DETAILS.  WE HAD HEARD FROM MS. HOLMES

03:34PM  14   ABOUT HIS CREDENTIALS, AND THAT'S WHY I WAS HAPPY TO SEE AN

03:35PM  15   OUTSIDER COMING IN.

03:35PM  16   Q.   AND DO YOU KNOW WHETHER DAVID HELFET'S OPINION OF THERANOS

03:35PM  17   WAS BASED ON ANY DATA THAT WASN'T ACTUALLY SUPPLIED BY THERANOS

03:35PM  18   ITSELF?

03:35PM  19   A.   NO, I DO NOT.

03:35PM  20   Q.   YOU TESTIFIED ON CROSS-EXAMINATION THAT YOU BELIEVED THAT

03:35PM  21   THE BOARD OF DIRECTORS WERE CAPABLE OF ASKING THEIR OWN

03:35PM  22   QUESTIONS AND BEING CANDID WITH MS. HOLMES; IS THAT CORRECT?

03:35PM  23   A.   YES.

03:35PM  24   Q.   IF THE BOARD HAD BEEN INFORMED IN 2013 THAT THE EDISON

03:35PM  25   DEVICE COULD ONLY PERFORM A SMALL SLICE OF THE TESTS THAT

03:35PM  1    THERANOS WAS CONDUCTING, WOULD THE BOARD HAVE HAD QUESTIONS FOR

03:35PM  2    MS. HOLMES?

03:35PM  3    A.   WELL, QUESTIONS AND CONCERNS ABOUT ROLLING IT OUT IN A

03:35PM  4    COMMERCIAL WAY.

03:35PM  5    Q.   WHAT QUESTIONS AND CONCERNS?  CAN YOU EXPLAIN THAT?

03:35PM  6    A.   WELL, THE QUESTION IS, WERE WE ROLLING IT OUT TOO EARLY

03:36PM  7    AND LOSE OUR CREDIBILITY THAT IT COULD ONLY DO A SMALL NUMBER

03:36PM  8    OF THINGS THAT, BY THERANOS'S DEFINITION, REQUIRED ABOUT 2,000

03:36PM  9    TESTS TO BE FULLY OPERATIONAL.

03:36PM  10        THE CONCERN WOULD BE THAT WE COULD STUMBLE GOING OUT OF

03:36PM  11   THE STARTING GATE AND IT WOULD NOT HAVE THE CREDIBILITY AS A

03:36PM  12   RESULT.

03:36PM  13        I'M TALKING NOW WITH HINDSIGHT.

03:36PM  14   Q.   AND THAT'S MY NEXT QUESTION.

03:36PM  15        DID THE BOARD HAVE THE OPPORTUNITY TO ASK THOSE QUESTIONS

03:36PM  16   OF MS. HOLMES BACK IN 2013?

03:36PM  17   A.   WELL, WE HAD -- WE WERE IN THE ROOM WITH HER, BUT I TOOK

03:36PM  18   AS GOOD FAITH THAT WHAT WE WERE BEING TOLD WAS ACCURATE, AND I

03:36PM  19   ASSUMED THAT WHEN WE SAY THESE ARE THE THERANOS RESULTS, IT WAS

03:36PM  20   FROM THE THERANOS MACHINE.

03:36PM  21        LOOKING BACK, THAT PROBABLY WAS NOT ACCURATE.  BUT AT THE

03:36PM  22   TIME, THAT WAS THE ASSUMPTION THAT I HAD.  I WOULD NOT HAVE

03:37PM  23   TRIED TO DEPLOY IT IN A COUNTRY AS A CENTCOM COMMANDER IF I HAD

03:37PM  24   A DIFFERENT VIEW OF IT.

03:37PM  25   Q.   DURING YOUR DISCUSSION WITH MR. DOWNEY, YOU LOOKED AT SOME

03:37PM  1    CORRESPONDENCE THAT YOU HAD WITH MS. HOLMES FOLLOWING THE

03:37PM  2    PUBLICATION OF "THE WALL STREET JOURNAL" ARTICLE.

03:37PM  3        DO YOU RECALL THOSE EXHIBITS?

03:37PM  4    A.   YES.

03:37PM  5    Q.   THAT CORRESPONDENCE AS A WHOLE EXHIBITED A SUPPORTIVE

03:37PM  6    ATTITUDE OF YOURS TOWARDS THE COMPANY.

03:37PM  7        WOULD YOU SAY THAT'S FAIR?

03:37PM  8    A.   THAT'S ACCURATE.

03:37PM  9    Q.   THERE WAS AN EMAIL THAT MR. DOWNEY HAD YOU REVIEW WHERE

03:37PM  10   YOU TALKED ABOUT HAVING FULL FAITH IN THE THERANOS PLAN.

03:37PM  11       DO YOU RECALL THAT?

03:37PM  12   A.   YES.

03:37PM  13   Q.   THERE WAS ALSO A STATEMENT WHERE YOU EXPRESSED SOME

03:37PM  14   CONCERN ABOUT "THE WALL STREET JOURNAL" ALLEGATIONS BECOMING AN

03:37PM  15   URBAN MYTH.

03:37PM  16       DO YOU RECALL THAT?

03:37PM  17   A.   RIGHT.

03:37PM  18   Q.   AND DID THOSE EMAILS -- WERE THEY GENUINE?  WERE YOU

03:38PM  19   SUPPORTIVE OF THE COMPANY AT THAT TIME?  DID YOU STILL BELIEVE

03:38PM  20   IN THE COMPANY?

03:38PM  21   A.   THE OPERATIVE WORD IS "AT THAT TIME."  I STILL BELIEVED

03:38PM  22   WHAT WE HAD, AND I THOUGHT WE HAD TO GET OUT FRONT AND SAY

03:38PM  23   HERE'S THE DATA TO SHOW WE WERE RIGHT, YES.

03:38PM  24   Q.   AND DID THAT REMAIN YOUR VIEWPOINT IN THE MONTHS THAT

03:38PM  25   FOLLOWED?

03:38PM  1    A.   DURING 2016, PROBABLY BY MID-YEAR, I DIDN'T KNOW WHAT TO

03:38PM  2    BELIEVE ABOUT THE TECHNOLOGY.

03:38PM  3    Q.   AND JUST AT A HIGH LEVEL, WHY WAS THAT?  WHY DID YOUR

03:38PM  4    ATTITUDE TOWARDS THERANOS CHANGE?

03:38PM  5    A.   THERE HAD BEEN TOO MANY SURPRISES.  THERE WAS NOT THE

03:38PM  6    TRANSPARENCY WITH THE MEMBERS OF THE BOARD THAT WOULD HAVE

03:38PM  7    ALLOWED US TO BE IN FRONT OF THESE ISSUES AND TO HELP THE CEO

03:38PM  8    TO HELP GUIDE THE COMPANY THROUGH THESE KIND OF THINGS.

03:38PM  9         IF THE MACHINE WAS SHOWING PROBLEMS, IF IT WASN'T TURNING

03:38PM 10    OUT WHAT WE NEEDED, THEN TAKE THE TIME TO CORRECT IT.  DON'T

03:39PM 11    ROLL IT OUT.

03:39PM 12         MANY OF US HAD EXPERIENCE WHAT HAPPENS IF YOU GO

03:39PM 13    PREMATURELY ON THINGS.

03:39PM 14         SO WE WERE UNABLE TO HELP HER WITH THE FUNDAMENTAL ISSUES

03:39PM 15    THAT SHE WAS APPARENTLY GRAPPLING WITH.  WE ONLY SAW THEM IN

03:39PM 16    THE REARVIEW MIRROR.

03:39PM 17              MR. BOSTIC:  MAY I HAVE ONE MOMENT, YOUR HONOR?

03:39PM 18              THE COURT:  YES.

03:39PM 19         (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

03:39PM 20              MR. BOSTIC:  NO FURTHER QUESTIONS, YOUR HONOR.

03:39PM 21    THANK YOU.

03:39PM 22    THANK YOU, GENERAL.

03:39PM 23              MR. DOWNEY:  NO FURTHER QUESTIONS, YOUR HONOR.

03:39PM 24              THE COURT:  MAY THIS WITNESS BE EXCUSED?

03:39PM 25              MR. DOWNEY:  YES, YOUR HONOR.

03:39PM  1                    THE COURT:  SIR, YOU'RE EXCUSED.  THANK YOU FOR

03:39PM  2      COMING IN.

03:39PM  3                    THE WITNESS:  THANK YOU.

03:40PM  4                    THE COURT:  LADIES AND GENTLEMEN OF THE JURY, IT'S

03:40PM  5      ABOUT 20 MINUTES TO 4:00, AND I KNOW I TOLD YOU WE WOULD

03:40PM  6      REASSESS OUR SCHEDULE.

03:40PM  7            LET ME TURN TO COUNSEL AND ASK THEM HOW LONG DO THEY THINK

03:40PM  8      THIS LAST WITNESS, THE WITNESS WE INTERRUPTED, MR. LEACH, DO

03:40PM  9      YOU HAVE AN ESTIMATE?

03:40PM 10            AND I'LL ASK YOUR COLLEAGUE OPPOSITE THE SAME, MS. TREFZ.

03:40PM 11                    MR. LEACH:  I ESTIMATE APPROXIMATELY 20 TO

03:40PM 12      30 MINUTES, YOUR HONOR.  AND I CAN WORK IN THAT TIME TO BE AS

03:40PM 13      EFFICIENT AS POSSIBLE, AND I'M GUIDED BY THE COURT AND THE JURY

03:40PM 14      ABOUT YOUR PREFERENCE.

03:40PM 15                    MS. TREFZ:  I ESTIMATE FIVE TO TEN MINUTES,

03:40PM 16      YOUR HONOR.

03:40PM 17                    THE COURT:  THANK YOU.  I ASKED THAT QUESTION IN

03:40PM 18      FRONT OF YOU, LADIES AND GENTLEMEN, FOR A REASON.  WE HAVE THAT

03:40PM 19      TIME ESTIMATE.

03:40PM 20            NOW, LET ME ASK, THOUGH, IN ALL SERIOUSNESS AND CANDOR, WE

03:40PM 21      CAN GO FORWARD AND FINISH THIS WITNESS TODAY.  I'M KEEPING YOU

03:40PM 22      LONGER THAN I HAD PROMISED.

03:40PM 23            OR WE CAN COME BACK AND START WITH THIS WITNESS ON FRIDAY

03:41PM 24      AND FINISH THIS WITNESS WITH THE 25, 30 MINUTES THAT THESE

03:41PM 25      LAWYERS HAVE SUGGESTED.

03:41PM  1          THE OTHER REASON I ASK THEM IN FRONT OF YOU IS I WANT TO

03:41PM  2   PUT THEM ON THE SPOT, DIDN'T I, AND ASK THEM THEIR TIME

03:41PM  3   ESTIMATES.

03:41PM  4          BUT, LADIES AND GENTLEMEN, IF WE STAYED TO FINISH THIS

03:41PM  5   WITNESS, OTHER THAN THE INCONVENIENCE THAT IT CAUSES, WILL THIS

03:41PM  6   CAUSE -- IN FACT THAT I TOLD YOU I'D LET YOU LEAVE EARLIER.

03:41PM  7          WILL THIS CAUSE ANY SIGNIFICANT DAMAGE OR HARM TO ANY OF

03:41PM  8   YOUR PLANS THIS EVENING?

03:41PM  9          THANK YOU AGAIN.  I APPRECIATE THAT, AS DO THESE LAWYERS.

03:41PM  10         WHY DON'T WE GO FORWARD AND CONTINUE WITH THE EXAMINATION

03:41PM  11   OF THE FORMER WITNESS, AND WE'LL START THAT AGAIN.

03:41PM  12             MR. LEACH:  THANK YOU, YOUR HONOR.

03:41PM  13         THE UNITED STATES WILL CONTINUE ITS EXAMINATION OF

03:41PM  14   JUSTIN OFFEN.

03:41PM  15             THE COURT:  THANK YOU.

03:42PM  16             MR. LEACH:  MAY I?

03:42PM  17             THE COURT:  YES.  YES.

03:42PM  18         (PAUSE IN PROCEEDINGS.)

03:42PM  19             THE COURT:  THANK YOU, SIR.  IF YOU WOULD RESUME THE

03:42PM  20   STAND.  THANK YOU FOR YOUR PATIENCE.

03:42PM  21         WE'RE GOING TO FINISH YOUR EXAMINATION NOW.

03:42PM  22         MR. LEACH WILL FINISH HIS EXAMINATION, AND THEN WE'LL SEE

03:42PM  23   IF THERE'S ANY CROSS-EXAMINATION.

03:42PM  24         I REMIND YOU, SIR, YOU'RE STILL UNDER OATH.

03:42PM  25         IF YOU COULD JUST STATE YOUR NAME AGAIN, PLEASE, FOR THE

03:42PM  1    RECORD.

03:42PM  2         **(GOVERNMENT'S WITNESS, JUSTIN OFFEN, WAS PREVIOUSLY**

03:42PM  3    **SWORN.)**

03:42PM  4              THE WITNESS:  JUSTIN OFFEN.

03:42PM  5              THE COURT:  THANK YOU.

03:43PM  6                   **DIRECT EXAMINATION (RESUMED)**

03:43PM  7    BY MR. LEACH:

03:43PM  8    Q.  MR. OFFEN, DO YOU STILL HAVE EXHIBIT 5387B IN FRONT OF

03:43PM  9    YOU?

03:43PM  10   A.  YES, SIR.

03:43PM  11   Q.  AND I DRAW YOUR ATTENTION TO PAGE 191.

03:43PM  12   A.  YES, SIR.

03:43PM  13             MR. LEACH:  YOUR HONOR, I OFFER PAGE 191.

03:43PM  14             THE CLERK:  I BELIEVE THAT'S PAGE 13 OF THE

03:43PM  15   DOCUMENT, COUNSEL.

03:43PM  16             MR. LEACH:  YES, THANK YOU, MS. KRATZMANN.  IT'S THE

03:43PM  17   BATES NUMBER PRH 191.

03:43PM  18             MS. TREFZ:  NO OBJECTION.

03:43PM  19             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:43PM  20             MR. LEACH:  THERE'S NO REASON TO PUBLISH IT.  I JUST

03:43PM  21   WANTED IT ADMITTED.

03:43PM  22             THE COURT:  ALL RIGHT.

03:43PM  23        (GOVERNMENT'S EXHIBIT 5387B, PAGE 13 WAS RECEIVED IN

03:43PM  24   EVIDENCE.)

03:43PM  25    BY MR. LEACH:

03:43PM   1    Q.   CAN YOU -- LET ME GO MORE SLOWLY.

03:44PM   2         I DIRECT YOUR ATTENTION TO BATES NUMBER ENDING 219.

03:44PM   3         AND I OFFER, YOUR HONOR, THE PAGES WITH BATES NUMBER

03:44PM   4    ENDING 219 THROUGH 222.

03:44PM   5              THE COURT:   THEY'RE ADMITTED.

03:44PM   6         (GOVERNMENT'S EXHIBIT 5387B, PAGES 14 THROUGH 17 WERE

03:44PM   7    RECEIVED IN EVIDENCE.)

03:44PM   8              MR. LEACH:   IF WE CAN DISPLAY 219, MS. HOLLIMAN.

03:44PM   9         IF YOU CAN PLEASE HIGHLIGHT THE TEXT AT THE BOTTOM OF THE

03:44PM  10    PAGE.

03:44PM  11              THE CLERK:   FOR THE RECORD, THIS IS PAGE 14 OF THAT

03:44PM  12    EXHIBIT.

03:45PM  13              MR. LEACH:   THANK YOU, MS. KRATZMANN.

03:45PM  14    Q.   WHAT IS THE DATE OF THESE TEXTS, MR. OFFEN?

03:45PM  15    A.   MAY 13TH, 2015.

03:45PM  16    Q.   AND BASED ON THE FORMATTING, THE BATES NUMBER AND

03:45PM  17    EVERYTHING ELSE HERE, YOU BELIEVE THIS TO BE DATA FROM

03:45PM  18    MS. HOLMES'S IPHONE?

03:45PM  19    A.   CORRECT.

03:45PM  20    Q.   AND DO YOU SEE THE MESSAGE AT THE BOTTOM, "I AM NARROWING

03:45PM  21    THIS DOWN AND CLIA.  DOWN TO 5 PEOPLE.  WILL NAIL THIS."

03:45PM  22         THEN THERE'S AN EXPLETIVE?

03:45PM  23    A.   YES.

03:45PM  24    Q.   LET ME DRAW YOUR ATTENTION TO THE NEXT PAGE, PLEASE.  THIS

03:45PM  25    IS PAGE 15 OF THE DOCUMENT, BATES NUMBER 220.

03:46PM 1        IF WE CAN DISPLAY THAT, MS. HOLLIMAN.  IF WE COULD

03:46PM 2    HIGHLIGHT THE TOP PORTION, THE RESPONSE TO THE PREVIOUS

03:46PM 3    MESSAGE.

03:46PM 4        DO YOU SEE WHERE IT SAYS "WHO DO U THINK," MR. OFFEN?

03:46PM 5    A.   YES.

03:46PM 6    Q.   AND THE SENDER OF THE TEXT IS ELIZABETH HOLMES?

03:46PM 7    A.   YES.

03:46PM 8    Q.   AND IF WE CAN GO DOWN FURTHER IN THIS DOCUMENT,

03:46PM 9    MS. HOLLIMAN, TO THE THIRD CHAIN IN THE MIDDLE.

03:46PM 10       DO YOU SEE THE LAST SENTENCE WHERE IT SAYS, "IT IS TYLER

03:46PM 11   ERIKA AND ADAM"?

03:46PM 12   A.   YES.

03:46PM 13   Q.   AND IS THIS A MESSAGE THAT APPEARS TO BE SENT BY

03:46PM 14   MR. BALWANI ON MAY 13TH, 2015?

03:46PM 15   A.   YES.

03:46PM 16   Q.   IF WE CAN GO PLEASE TO PAGE 16 OF THE DOCUMENTS, 221.

03:47PM 17       IF WE CAN ZOOM IN ON THE TOP PORTION OF THIS,

03:47PM 18   MS. HOLLIMAN.

03:47PM 19       DOES THIS APPEAR TO BE ANOTHER TEXT STRING DATED MAY 13TH,

03:47PM 20   2015?

03:47PM 21   A.   YES.

03:47PM 22   Q.   AND DO YOU SEE IN THE MESSAGE FOR THE FIRST ROW THE WORDS

03:47PM 23   "SECONDLY.  WE NEED A BETTER STRATEGY FOR NORMANDY.  FOR A LONG

03:47PM 24   TIME TO COME WE WILL HAVE HYBRID SOLUTIONS."

03:47PM 25       DO YOU SEE THAT LANGUAGE?

03:47PM  1      A.   YES.

03:47PM  2      Q.   AND THAT APPEARS TO BE SENT FROM MR. BALWANI TO

03:47PM  3      MS. HOLMES?

03:47PM  4      A.   YES.

03:48PM  5              MR. LEACH:  YOUR HONOR, I MOVE THE ADMISSION OF

03:48PM  6      PAGE 17 OF THE DOCUMENT -- OH, NO, PAGE 18 OF THE DOCUMENT,

03:48PM  7      BATES NUMBER 238.

03:48PM  8              MS. TREFZ:  NO OBJECTION.

03:48PM  9              THE COURT:  THAT'S ADMITTED WITHOUT OBJECTION.

03:48PM 10         (GOVERNMENT'S EXHIBIT 5387B, PAGE 18 WAS RECEIVED IN

03:48PM 11      EVIDENCE.)

03:48PM 12      BY MR. LEACH:

03:48PM 13      Q.   AND IF WE CAN PLEASE DISPLAY THAT, MS. HOLLIMAN.  ZOOM IN

03:48PM 14      ON THE BOTTOM PORTION.

03:48PM 15         DO THESE APPEAR TO BE TEXT MESSAGES BETWEEN MR. BALWANI

03:48PM 16      AND MS. HOLMES DATED JUNE 3RD, 2015, MR. OFFEN?

03:48PM 17      A.   YES.

03:48PM 18      Q.   AND I DRAW YOUR ATTENTION TO THE FIRST MESSAGE.

03:48PM 19         DO YOU SEE THE LANGUAGE, "WE NEED TO FOCUS ON BEING A

03:48PM 20      TECHNOLOGY COMPANY.  WE SPEND ALL OF OUR TIME WITH CLIA

03:48PM 21      MORONS"?

03:49PM 22         DO YOU SEE THAT LANGUAGE?

03:49PM 23      A.   YES.

03:49PM 24      Q.   AND THAT APPEARS TO BE SENT FROM MR. BALWANI TO MS. HOLMES

03:49PM 25      IN THIS JUNE TIME PERIOD?

03:49PM  1     A.   YES.

03:49PM  2     Q.   IF WE CAN PLEASE GO TO --

03:49PM  3          I OFFER PAGE 19, EXHIBIT 5387B, BATES NUMBER ENDING 254.

03:49PM  4              MS. TREFZ:  NO OBJECTION.

03:49PM  5              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:49PM  6          (GOVERNMENT'S EXHIBIT 5387B, PAGE 19 WAS RECEIVED IN

03:49PM  7     EVIDENCE.)

03:49PM  8     BY MR. LEACH:

03:49PM  9     Q.   IF WE CAN ZOOM IN HERE ON THE ONE MESSAGE, MS. HOLLIMAN.

03:49PM  10         WHAT IS THE DATE OF THIS EXCHANGE, MR. OFFEN?

03:49PM  11    A.   JUNE 26TH, 2015.

03:49PM  12    Q.   OKAY.  AND DOES THE MESSAGE SAY, "I AM OK SENDING LETTER

03:49PM  13    TO ERIKA AS IN HEATHERS EMAIL."

03:49PM  14    A.   YES.

03:49PM  15    Q.   AND DOES THIS APPEAR TO COME FROM MR. BALWANI TO

03:50PM  16    MS. HOLMES?

03:50PM  17    A.   YES.

03:50PM  18             MR. LEACH:  YOUR HONOR, THE GOVERNMENT MOVES THE

03:50PM  19    ADMISSION OF PAGES OF 20 AND 21 OF EXHIBIT 5387B, BATES NUMBER

03:50PM  20    264 TO 265.

03:50PM  21             MS. TREFZ:  NO OBJECTION.

03:50PM  22             THE COURT:  THEY'RE ADMITTED, AND THEY MAY BE

03:50PM  23    PUBLISHED.

03:50PM  24         (GOVERNMENT'S EXHIBIT 5387B, PAGES 20 AND 21, WAS RECEIVED

03:50PM  25    IN EVIDENCE.)

03:50PM  1          MR. LEACH:  IF WE CAN PLEASE ZOOM IN,

03:50PM  2   MS. HOLLIMAN -- YES, RIGHT THERE.  THE FIRST SIX OR SEVEN

03:50PM  3   MESSAGES.

03:50PM  4          WONDERFUL.  THANK YOU.

03:50PM  5   Q.   WHAT IS THE DATE OF THESE TEXT MESSAGES, MR. OFFEN?

03:50PM  6   A.   JULY 15TH, 2015.

03:50PM  7   Q.   OKAY.  AND I DRAW YOUR ATTENTION TO THE FIRST MESSAGE.

03:51PM  8          DO YOU SEE WHERE IT SAYS, "I WORKED FOR 6 YEARS DAY AND

03:51PM  9   NIGHT TO HELP YOU.  I AM SAD WHERE YOU AND I ARE.  I THOUGHT IT

03:51PM 10   WOULD BE BETTER.  I KNOW UR ANGRY IN UR WAY.  AND UPSET WITH ME

03:51PM 11   FOR NOT DOING EVERYTHING YOU WANTED ME TO DO."

03:51PM 12          DO YOU SEE THAT LANGUAGE?

03:51PM 13   A.   YES.

03:51PM 14   Q.   AND DOES THAT APPEAR TO BE A MESSAGE FROM MR. BALWANI TO

03:51PM 15   MS. HOLMES?

03:51PM 16   A.   YES.

03:51PM 17   Q.   AND DO YOU SEE THE TEXT AT 4:46:31 P.M., THE FOURTH ONE

03:51PM 18   DOWN, OR THE FIFTH ONE DOWN?

03:51PM 19   A.   YES.

03:51PM 20   Q.   AND WOULD YOU MIND READING THIS ONE FOR US, PLEASE?

03:51PM 21   A.   "I AM RESPONSIBLE FOR EVERYTHING AT THERANOS.  ALL HAVE

03:51PM 22   BEEN MY DECISIONS TOO."

03:51PM 23   Q.   AND THAT'S FROM MR. BALWANI TO MS. HOLMES?

03:51PM 24   A.   CORRECT.

03:51PM 25   Q.   IF YOU COULD SKIP THE NEXT MESSAGE, AND THEN I DRAW YOUR

03:51PM  1    ATTENTION TO THE MESSAGES AT 4:46:56 P.M.

03:52PM  2         DO YOU SEE THOSE TWO MESSAGES FROM MR. BALWANI TO

03:52PM  3    MS. HOLMES?

03:52PM  4    A.   YES.

03:52PM  5    Q.   AND DOES THIS SAY, "I WON'T TRANSITION UNTIL UR IN A

03:52PM  6    PERFECT PLACE.  U KNOW THAT.

03:52PM  7         "UR UNDERESTIMATING THE CHALLENGES AND BEING CHILDISH.  I

03:52PM  8    HAVE BEEN TELLING U FOR MONTHS."

03:52PM  9         DO YOU SEE THAT LANGUAGE?

03:52PM  10   A.   YES.

03:52PM  11   Q.   AND THESE ARE MESSAGES FROM MR. BALWANI TO MS. HOLMES?

03:52PM  12   A.   CORRECT.

03:52PM  13             MR. LEACH:  I OFFER THE REMAINING PAGES OF

03:52PM  14   EXHIBIT 5387B.

03:52PM  15             MS. TREFZ:  NO OBJECTION.

03:52PM  16             THE COURT:  THEY'RE ADMITTED.  THEY MAY BE

03:52PM  17   PUBLISHED.

03:52PM  18        (GOVERNMENT'S EXHIBIT 5387B, PAGES 22 THROUGH 30, WAS

03:52PM  19   RECEIVED IN EVIDENCE.)

03:52PM  20             MR. LEACH:  IF WE CAN GO, PLEASE, MS. HOLLIMAN, TO

03:53PM  21   PAGE 21 -- EXCUSE ME, 22.  AND IF YOU CAN ZOOM IN ON THE TOP

03:53PM  22   TWO MESSAGES.

03:53PM  23   Q.   WHAT IS THE DATE OF THESE EXCHANGES, MR. OFFEN?

03:53PM  24   A.   JULY 28TH, 2015.

03:53PM  25   Q.   AND IS THE TOP MESSAGE FROM MR. BALWANI TO MS. HOLMES?

03:53PM   1    A.   CORRECT.

03:53PM   2    Q.   AND DOES IT READ, "WE NEED TO COMMIT TO EACH OTHER AND GET

03:53PM   3    OUT OF THIS HELL SO WE CAN LIVE IN PARADISE WE BOTH HAVE"?

03:53PM   4    A.   YES.

03:53PM   5    Q.   AND DOES IT APPEAR MS. HOLMES RESPONDS, "I HAVE LITERALLY

03:53PM   6    BEEN MEDITATING ON EXACT SAME.  WHOLE TIME I WAS RUNNING I WAS

03:53PM   7    THINKING THAT."

03:53PM   8         HAVE I READ THAT CORRECTLY?

03:53PM   9    A.   YES.

03:53PM   10   Q.   IF WE CAN PLEASE DISPLAY, MS. HOLLIMAN, THE TEXT ON 314,

03:54PM   11   WHICH IS PAGE 27 OF THE DOCUMENT.

03:54PM   12            THE CLERK:  BATES 314, COUNSEL, PAGE 26.

03:54PM   13            MR. LEACH:  PAGE 27.  I THINK THE REMAINDER HAVE

03:54PM   14   BEEN ADMITTED.

03:54PM   15       THIS IS PAGE 27.

03:54PM   16            THE CLERK:  IT REFLECTS A BATES NUMBER, COUNSEL, OF

03:54PM   17   315.

03:54PM   18   BY MR. LEACH:

03:54PM   19   Q.   WHAT ARE THE DATES OF THESE TEXT MESSAGES, MR. OFFEN?

03:55PM   20   A.   YOU SAID ON BATES 315?

03:55PM   21   Q.   YES.  I BELIEVE IT'S ON YOUR SCREEN.

03:55PM   22   A.   SEPTEMBER 22ND, 2015.

03:55PM   23            THE COURT:  IT LOOKS LIKE PAGE 26 IS ON THE SCREEN.

03:55PM   24            MR. LEACH:  YES.

03:55PM   25            THE WITNESS:  IT'S THE SAME DATE, BUT YEAH.

03:55PM   1      BY MR. LEACH:

03:55PM   2      Q.   OKAY.  WELL, LET'S START WITH 26.

03:55PM   3      A.   BATES 314?

03:55PM   4      Q.   YES.  SO PAGE 26, BATES 314.

03:55PM   5      A.   OKAY.

03:55PM   6      Q.   AND DO YOU SEE THE MESSAGE AT THE TOP WHERE IT SAYS, "VERY

03:55PM   7      HOSTILE SO FAR.  THEY SAY HAVE COMPLAINTS"?

03:55PM   8      A.   YES.

03:55PM   9      Q.   AND THAT APPEARS TO BE A MESSAGE FROM MR. BALWANI TO

03:55PM   10     MS. HOLMES?

03:55PM   11     A.   CORRECT.

03:55PM   12     Q.   OKAY.  AND DO YOU SEE THE TEXT MESSAGE AT 6:01 WHERE IT

03:56PM   13     SAYS, "PRAYING LITERALLY NON STOP"?

03:56PM   14     A.   YES.

03:56PM   15     Q.   AND THAT APPEARS TO BE FROM MS. HOLMES TO MR. BALWANI?

03:56PM   16     A.   YES.

03:56PM   17     Q.   AND NOW IF WE COULD CONTINUE TO PAGE 27, BATES NUMBER

03:56PM   18     ENDING 315.  AND IF WE CAN ZOOM IN ON THE TOP PORTION.

03:56PM   19          ARE THESE ADDITIONAL MESSAGES FROM SEPTEMBER 22ND, 2015?

03:56PM   20     A.   YES.

03:56PM   21     Q.   AND DO YOU SEE THE TOP MESSAGE WHERE IT SAYS AT

03:56PM   22     10:28:42 P.M.?

03:56PM   23     A.   YES.

03:56PM   24     Q.   AND DOES THIS READ, "OUR VALIDATION REPORTS ARE TERRIBLE.

03:56PM   25     REALLY PAINFUL GOING THRU THIS PROCESS.  SAME ISSUES FDA

03:56PM  1    POINTED OUT"?

03:56PM  2    A.   YES.

03:56PM  3    Q.   AND THAT APPEARS TO BE A MESSAGE FROM MR. BALWANI TO

03:57PM  4    MS. HOLMES?

03:57PM  5    A.   CORRECT.

03:57PM  6    Q.   AND COULD I DRAW YOUR ATTENTION TO THE BOTTOM PORTION OF

03:57PM  7    THIS DOCUMENT?

03:57PM  8         DO YOU SEE THE SECOND TEXT WHERE IT SAYS, "GOING BAD SO

03:57PM  9    FAR.  PRAY"?

03:57PM  10   A.   YES.

03:57PM  11   Q.   AND THAT APPEARS TO BE FROM MR. BALWANI TO MS. HOLMES?

03:57PM  12   A.   CORRECT.

03:57PM  13   Q.   AND MR. BALWANI ADDS, "DANIEL HAS NOTHING READY.

03:57PM  14        "TOLD ME EVERYTHING IS IN BINDERS."

03:57PM  15        DO YOU SEE THAT LANGUAGE?

03:57PM  16   A.   YES.

03:57PM  17   Q.   AND DO YOU SEE MS. HOLMES'S RESPONSE AT 4:28:18,

03:57PM  18   "PRAYING"?

03:57PM  19   A.   YES.

03:57PM  20   Q.   AND LET ME DRAW YOUR ATTENTION TO THE LAST PAGE OF THIS

03:58PM  21   EXHIBIT.  IT'S PAGE 30, BATES NUMBER ENDING 342.

03:58PM  22        WHAT IS THE DATE OF THIS MESSAGE?

03:58PM  23   A.   OCTOBER 21ST, 2015.

03:58PM  24   Q.   AND COULD YOU PLEASE READ THE SUBSTANCE OF THE MESSAGE FOR

03:58PM  25   US?

03:58PM   1    A.   "WORRIED ABOUT YOUR 'ALL FINGERSTICKS ON OUR TECHNOLOGY'

03:58PM   2    COMMENT.  SENT AN EMAIL.  THE WEB DOCUMENT IS FINE."

03:58PM   3    Q.   AND THIS APPEARS TO BE FROM MR. BALWANI TO MS. HOLMES?

03:58PM   4    A.   CORRECT.

03:58PM   5              MR. LEACH:  AND, YOUR HONOR, I JUST WANT TO MAKE

03:58PM   6    SURE THE RECORD IS CLEAR THAT THE GOVERNMENT HAS OFFERED PAGES

03:58PM   7    13 THROUGH 30 OF EXHIBIT 5387B.

03:58PM   8              THE COURT:  NOT THE ENTIRETY OF THIS DOCUMENT.  CAN

03:58PM   9    THE ENTIRETY OF THIS DOCUMENT BE ADMITTED?

03:59PM   10             MR. LEACH:  I THINK SUBJECT TO THE COURT'S PRIOR

03:59PM   11   RULING ABOUT COMPLETENESS, YES.  BUT I THINK SUBJECT TO THAT,

03:59PM   12   THE ENTIRE DOCUMENT CAN GO IN.

03:59PM   13             THE COURT:  ANY OBJECTION TO THAT?

03:59PM   14             MS. TREFZ:  NO.  WE WENT THROUGH MOST OF IT,

03:59PM   15   YOUR HONOR.

03:59PM   16             THE COURT:  YES.  SO I THINK IT'S CLEANER FOR THE

03:59PM   17   RECORD IF THE ENTIRETY OF THE DOCUMENT IS ENTERED, 5387B, AND

03:59PM   18   WHATEVER REDACTIONS NEED TO BE MADE PURSUANT TO THE COURT'S

03:59PM   19   RULINGS, I'LL HAVE YOU DO THAT SO THEY CAN BE ENTERED WITH

03:59PM   20   THOSE REDACTIONS.

03:59PM   21             MR. LEACH:  THANK YOU, YOUR HONOR.  THAT WORKS.

03:59PM   22             THE COURT:  THANK YOU.

03:59PM   23        (GOVERNMENT'S EXHIBIT 5387B, REDACTED, WAS ADMITTED.)

03:59PM   24   BY MR. LEACH:

03:59PM   25   Q.   MR. OFFEN, LET ME -- DO YOU STILL HAVE YOUR BINDER UP

03:59PM  1    THERE?

03:59PM  2    A.   YES.

03:59PM  3    Q.   AND LET ME DRAW YOUR ATTENTION TO WHAT HAS BEEN MARKED AS

03:59PM  4    5387A.

03:59PM  5    A.   YES.

03:59PM  6    Q.   DOES THIS APPEAR TO BE A SUBSET OF TEXT MESSAGES FROM

03:59PM  7    5387?

03:59PM  8    A.   BASED UPON THE FORMAT PAGES AND BATES NUMBERING, YES.

04:00PM  9         MR. LEACH:  YOUR HONOR, THE GOVERNMENT WOULD OFFER

04:00PM 10    5387A.  I UNDERSTAND THERE MIGHT BE SOME 401 AND 403 AND 802

04:00PM 11    OBJECTIONS, BUT IF THERE'S NO DISPUTE WITH RESPECT TO 901 AND

04:00PM 12    1002, WE WOULD LIKE THIS TO COME INTO EVIDENCE.

04:00PM 13         MS. TREFZ:  YOUR HONOR, WE DO -- THIS IS THE FULL,

04:00PM 14    THE FULLER SET, AND WE OBJECT TO -- WE'RE GOING TO OBJECT TO

04:00PM 15    SOME OF THESE MATERIALS.

04:00PM 16    WE ARE HAPPY TO, YOU KNOW, WORK OUT SOME OF THE SPECIFICS.

04:00PM 17    BUT WE DO NOT HAVE AN AUTHENTICITY OBJECTION TO THE

04:00PM 18    INDIVIDUAL TEXT MESSAGES IN HERE AS WE HAVE PREVIOUSLY

04:00PM 19    DISCUSSED.

04:00PM 20         THE COURT:  WELL, AS FAR AS AUTHENTICITY, THAT'S

04:00PM 21    FINE.  THEY CAN BE ADMITTED UNDER 902, 901.  SO I'LL ADMIT THEM

04:00PM 22    FOR THAT PURPOSE.

04:00PM 23    BUT YOU'RE GOING TO GO THROUGH ANY SPECIFIC --

04:01PM 24         MR. LEACH:  NOT TODAY, YOUR HONOR.  I JUST WANT TO

04:01PM 25    ENSURE THAT THAT HURDLE IS OVERCOME AND THERE'S NOT A NEED TO

04:01PM  1      RECALL MR. OFFEN ON THAT BASIS.

04:01PM  2              THE COURT:  SURE.  ALL RIGHT.  UNDERSTOOD.

04:01PM  3          SO IT'S ADMITTED FOR THAT PURPOSE, 901, 902.

04:01PM  4          ANY OTHER INDIVIDUAL OBJECTIONS CAN BE RAISED AT A LATER

04:01PM  5      TIME.  BUT THIS WITNESS WILL NOT BE NEEDED TO TESTIFY AS TO

04:01PM  6      AUTHENTICITY.

04:01PM  7          IS THAT RIGHT?

04:01PM  8              MS. TREFZ:  WE AGREE, YOUR HONOR.

04:01PM  9              THE COURT:  ALL RIGHT.

04:01PM 10      (GOVERNMENT'S EXHIBIT 5387A WAS RECEIVED IN EVIDENCE.)

04:01PM 11              MR. LEACH:  MAY I HAVE ONE MOMENT?

04:01PM 12              THE COURT:  YES.

04:01PM 13      (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

04:01PM 14              MR. LEACH:  THANK YOU, MR. OFFEN.

04:01PM 15      THANK YOU, YOUR HONOR.

04:01PM 16      I HAVE NOTHING FURTHER.

04:01PM 17              MS. TREFZ:  BRIEFLY, YOUR HONOR.

04:01PM 18              THE COURT:  MS. TREFZ.

04:01PM 19                          **CROSS-EXAMINATION**

04:01PM 20      BY MS. TREFZ:

04:01PM 21      Q.   HELLO, MR. OFFEN.  MY NAME IS KATIE TREFZ.  I REPRESENT

04:01PM 22      MS. HOLMES.

04:01PM 23      A.   HELLO.

04:01PM 24      Q.   I JUST HAVE A FEW QUESTIONS FOR YOU, STARTING WITH THE

04:02PM 25      FOLLOWING:

04:02PM  1          WE SAW EARLIER WHEN YOU WERE DISCUSSING EXHIBIT 5386 THAT

04:02PM  2     THE MAJORITY OF THE MESSAGES INCLUDED HERE WERE FROM

04:02PM  3     MS. HOLMES'S IPHONE?

04:02PM  4     A.   CORRECT.

04:02PM  5     Q.   AND WHEN WAS THAT COLLECTION DONE?

04:02PM  6     A.   JANUARY OF 2017.

04:02PM  7     Q.   OKAY.  SO IS IT FAIR TO SAY THAT THAT COLLECTION CAPTURED

04:02PM  8     WHATEVER MESSAGES WERE ON THE IPHONE AS OF JANUARY 2017?

04:02PM  9     A.   CORRECT.

04:02PM 10     Q.   OKAY.  THE FORMAT THAT WE HAVE BEEN LOOKING AT IN 5387B,

04:02PM 11     THAT IS NOT HOW WE WOULD NORMALLY SEE IT WHEN -- SEE MESSAGES

04:02PM 12     WHEN WE LOOK AT THEM ON OUR PHONES; CORRECT?

04:02PM 13     A.   CORRECT.

04:02PM 14     Q.   AND YOU PUT THAT TOGETHER FOR THE PURPOSE OF COMBINING

04:02PM 15     VARIOUS SOURCES AND PRESENTING IT HERE TODAY?

04:02PM 16     A.   CORRECT.

04:02PM 17     Q.   AT THE -- YOU TESTIFIED A LITTLE BIT ABOUT THE COLUMN

04:03PM 18     TITLED RECORD.

04:03PM 19     A.   YES.

04:03PM 20     Q.   AND I BELIEVE YOU SAID THAT THIS WAS AN IDENTIFICATION

04:03PM 21     NUMBER THAT YOU CREATED IN ORDER TO BE ABLE TO TELL DIFFERENT

04:03PM 22     MESSAGES FROM EACH OTHER TO GIVE THEM ALL UNIQUE NUMBERS; IS

04:03PM 23     THAT RIGHT?

04:03PM 24     A.   THE SOFTWARE CREATED THE I.D. AS PART OF THE INGESTION

04:03PM 25     PROCESS, YES.

OFFEN CROSS BY MS. TREFZ

04:03PM  1    Q.   OKAY.  AND CAN YOU GIVE US SOME INSIGHT AS TO HOW THEY'RE

04:03PM  2    ORDERED?  LIKE, WHAT -- WE CAN SEE THE DIFFERENT NUMBERS GO

04:03PM  3    FROM, YOU KNOW, JUST STARTING, FOR EXAMPLE, WITH PAGE 1 OF

04:03PM  4    5387B, WE CAN SEE THE NUMBERS GO FROM 7317, 7344, 7349.

04:04PM  5         HOW DO WE -- HOW WERE THOSE NUMBERED AND IN WHAT ORDER?

04:04PM  6    A.   YEAH.  SO THE SOFTWARE THAT WE LEVERAGE THAT WE DISCUSSED

04:04PM  7    EARLIER, AXIOM, WHEN IT INGESTS THE EVIDENCE FILE FROM THE

04:04PM  8    PHONE, IT ASSIGNS A SEQUENCE IN THE ORDER IN WHICH IT WRITES IT

04:04PM  9    TO ITS OWN INTERNAL DATABASE.

04:04PM  10        SO IT SIMPLY IS JUST AN INCREMENTAL NUMBER IN TERMS OF HOW

04:04PM  11   IT READS IT INTO THE DATABASE.

04:04PM  12   Q.   AND IS THERE A -- DOES IT READ IT IN IN A DATE OR TIME

04:04PM  13   ORDER?

04:04PM  14   A.   WHAT IT DOES IS IT INGESTS IT FROM THE EVIDENCE FILE AND

04:04PM  15   THE RECORDS ARE STORED ON THE PHONE IN THE EVIDENCE FILE IN A

04:04PM  16   SEQUENTIAL ORDER, BUT WE LEVERAGE PARALLEL PROCESSING, WHICH IS

04:04PM  17   A COMMON WAY THAT DATABASES EXECUTE FOR PURPOSES OF EFFICIENCY

04:04PM  18   AND LESS TIME IF YOU HAVE THAT KIND OF PROCESSING POWER.

04:05PM  19   Q.   UNDERSTOOD.

04:05PM  20   A.   SO OFTENTIMES THE NUMBERS ARE READ IN IN DIFFERENT -- I'M

04:05PM  21   SORRY, THE RECORDS ARE READ IN IN DIFFERENT SEQUENCES BASED

04:05PM  22   UPON THE PARALLEL PROCESSOR.

04:05PM  23   Q.   OKAY.  TURNING TO THE COLUMN THAT SAYS MESSAGE SENT,

04:05PM  24   DATE/TIME, ALL OF THE MESSAGES INCLUDED HERE ARE FROM

04:05PM  25   MS. HOLMES'S DEVICES; CORRECT?

04:05PM  1    A.   CORRECT.  THEY CAME OFF OF ONE OF THE THREE DEVICES WE

04:05PM  2    DISCUSSED EARLIER, YES.

04:05PM  3    Q.   AND THERE WERE THREE DEVICES, BUT THESE ARE ALL FROM

04:05PM  4    MS. HOLMES'S DEVICES?

04:05PM  5    A.   CORRECT.

04:05PM  6    Q.   AND SOME OF THE EMAILS OR MESSAGES, EXCUSE ME, ARE FROM,

04:05PM  7    ARE FROM MR. BALWANI TO MS. HOLMES, AND SO I WONDERED IF YOU

04:05PM  8    COULD HELP EXPLAIN WHETHER MESSAGE SENT, DATE/TIME SHOULD ALSO

04:05PM  9    INCLUDE MESSAGE RECEIVED/TIME IF IT'S -- IF THE RECIPIENT IS

04:05PM  10   MS. HOLMES RATHER THAN THE SENDER?

04:05PM  11   A.   SO THIS IS PART OF THE METADATA THAT IS CONTAINED WITHIN

04:05PM  12   THE MESSAGES, AND WHEN A MESSAGE COMES THROUGH ON THE EVIDENCE

04:05PM  13   FILE, IT RETAINS A SENT DATE AND A RECEIVED DATE.

04:06PM  14        WE CHOSE, FOR CONSISTENCY PURPOSES, TO HAVE SENT DATE ON

04:06PM  15   ALL OF THEM.  SO THIS SHOULD BE WHEN A MESSAGE WAS SENT, IN

04:06PM  16   THIS CASE FROM MR. BALWANI TO MS. HOLMES, THE SENT DATE IS

04:06PM  17   STILL THE DATE SENT FROM BALWANI WHICH COMES THROUGH ON THE

04:06PM  18   METADATA ON THE MESSAGE.

04:06PM  19   Q.   OKAY.  AND THEN YOU MENTIONED EARLIER TIME ZONES, AND I

04:06PM  20   WONDERED HERE WHAT TIME ZONE ARE THESE IN?

04:06PM  21   A.   UTC.

04:06PM  22   Q.   AND CAN YOU EXPLAIN TO THE JURY WHAT UTC IS?

04:06PM  23   A.   SURE.  IT STANDS FOR UNIVERSE TIME COORDINATED.  IT IS THE

04:06PM  24   COMPUTER VERSION OF GREENWICH MEAN TIME, BUT IT'S EFFECTIVELY

04:06PM  25   LONDON OR THE PRIME MERIDIAN.

04:06PM 1   Q.   AND THOSE OF US WHO WORK A LOT WITH ELECTRONIC DOCUMENTS

04:06PM 2   ARE WELL FAMILIAR WITH THIS PHENOMENON, BUT JUST TO FAMILIARIZE

04:06PM 3   EVERYBODY ELSE WITH THIS, THAT'S EITHER SEVEN OR EIGHT HOURS

04:06PM 4   FROM PACIFIC TIME; CORRECT?

04:06PM 5   A.   CORRECT.  UTC DOESN'T HAVE DAYLIGHT SAVINGS, SO DEPENDING

04:07PM 6   ON THE TIME OF YEAR, IT WOULD BE SEVEN OR EIGHT.

04:07PM 7   Q.   SO WHEN WE'RE LOOKING AT THESE, IN ORDER TO UNDERSTAND

04:07PM 8   WHAT TIME IT WAS ACTUALLY SENT OR RECEIVED, THEN IT WOULD

04:07PM 9   EITHER BE SEVEN HOURS EARLIER OR EIGHT HOURS EARLIER IF YOU'RE

04:07PM 10  IN CALIFORNIA?

04:07PM 11  A.   CORRECT.

04:07PM 12  Q.   AND THIS HAS NOT -- ALL OF THESE TIMES ARE IN GREENWICH

04:07PM 13  MEAN TIME, OR UTC; CORRECT?

04:07PM 14  A.   CORRECT.

04:07PM 15  Q.   AND SO IF MS. HOLMES IS IN CALIFORNIA AND MR. BALWANI IS

04:07PM 16  ON THE EAST COAST, WHAT YOU SEE IS GREENWICH MEAN TIME

04:07PM 17  REGARDLESS, OR UTC REGARDLESS?

04:07PM 18  A.   CORRECT.

04:07PM 19  Q.   OKAY.  AND WHEN YOU SORTED THE SPREADSHEET, I TAKE IT,

04:07PM 20  FIRST OF ALL, THAT YOU DID SORT THE SPREADSHEET IN ORDER TO

04:07PM 21  COME UP WITH THE NUMBERS OR THE MESSAGES IN THIS ORDER?

04:07PM 22  A.   WE SORTED BY MESSAGE SENT, DATE/TIME.

04:08PM 23  Q.   AND IF TWO MESSAGES WERE SENT AT THE EXACT SAME TIME, AND

04:08PM 24  THERE IS AT LEAST ONE EXAMPLE, HOW DID YOU -- HOW DID IT

04:08PM 25  DETERMINE WHICH MESSAGE WAS FIRST?

OFFEN CROSS BY MS. TREFZ

04:08PM  1    A.    I DO NOT KNOW WHAT THE SECONDARY SORT IS.  SO IT'S THE

04:08PM  2    QUESTION OF, WHAT IS THE SORT ORDER IF THERE'S A TIE?  I DO NOT

04:08PM  3    KNOW OFF THE TOP OF MY HEAD WHAT THE SECONDARY SORT IS.

04:08PM  4    Q.    OKAY.  CAN WE BRIEFLY BRING UP AS AN EXAMPLE 5387B, WHICH

04:08PM  5    WE KNOW IS IN EVIDENCE, PAGE 67.

04:08PM  6    A.    WHAT IS THE BATES NUMBER ON THAT, PLEASE?

04:08PM  7    Q.    THAT IS -- THAT'S THE -- SORRY.  THAT'S THE BATES 67.

04:08PM  8    A.    GREAT, BATES 67.

04:08PM  9    Q.    AND I'M NOT SURE WHICH -- IT'S MAYBE ABOUT SIX PAGES LONG.

04:08PM  10           THE CLERK:  THAT'S PAGE 4, COUNSEL.

04:09PM  11           MS. TREFZ:  PAGE 4.  THANK YOU.

04:09PM  12   Q.    AND IF WE CAN JUST FOCUS ON THE FIRST TWO MESSAGES THERE.

04:09PM  13          SO YOU SEE IN THESE TWO MESSAGES THEN THAT THEY'RE BOTH

04:09PM  14   SENT AT THE EXACT SAME TIME?

04:09PM  15   A.    YES.

04:09PM  16   Q.    AND THEN IF I CAN TURN YOUR ATTENTION BACK TO 3481, WHICH

04:09PM  17   IS IN YOUR -- IN THE BINDER UP THERE.

04:09PM  18   A.    THE EXHIBIT?

04:09PM  19   Q.    CORRECT, EXHIBIT 3481, AND THE PAGE ENDING IN 599.

04:09PM  20   A.    I'M SORRY.  I APOLOGIZE.  YOU'RE SAYING THE -- WHICH

04:09PM  21   EXHIBIT?

04:09PM  22   Q.    BINDER -- WITNESS BINDER ONE OF TWO.

04:09PM  23   A.    I DO NOT HAVE THAT I DON'T BELIEVE.

04:09PM  24   Q.    DO YOU NOT HAVE THAT UP THERE ANYMORE?

04:09PM  25   A.    I HAD IT EARLIER, BUT I DON'T BELIEVE I HAVE IT ANYMORE.

04:10PM 1          MS. TREFZ:  MAY I APPROACH, YOUR HONOR?

04:10PM 2          THE COURT:  YES.

04:10PM 3          MS. TREFZ:  (HANDING.)

04:10PM 4     Q.   APOLOGIES.

04:10PM 5     A.   NO, NO PROBLEM.  WHICH PAGE, PLEASE?

04:10PM 6     Q.   3481, THE PAGE ENDING 599.

04:10PM 7     A.   599.

04:10PM 8     Q.   AND, MR. BENNETT, IF YOU COULD KEEP THE OTHER ONE UP.

04:10PM 9          JUST COMPARE THE TWO MESSAGES AT THE TOP OF THE PAGE

04:10PM 10    ENDING 599 WITH THE TWO ON THE SCREEN.

04:10PM 11    A.   YES.

04:10PM 12    Q.   AND YOU SEE HERE THEY'RE IN A DIFFERENT ORDER; RIGHT?

04:10PM 13    A.   YES.

04:10PM 14    Q.   AND SO IN TERMS OF WHICH -- THERE'S A FURTHER RESPONSIVE

04:10PM 15    EMAIL OR TEXT MESSAGE, IF WE CAN TAKE ONE MORE DOWN,

04:10PM 16    MR. BENNETT.

04:10PM 17         THE MESSAGE "YES," IT'S NOT CLEAR WHICH ONE THAT ACTUALLY

04:10PM 18    COMES RIGHT AFTER; CORRECT?

04:11PM 19    A.   CORRECT.  IT COMES AFTER THE TWO PREVIOUS MESSAGES, YES.

04:11PM 20    Q.   AND WE DON'T KNOW HOW MS. HOLMES SAW THE FIRST TWO

04:11PM 21    MESSAGES?

04:11PM 22    A.   CORRECT.

04:11PM 23    Q.   AND THAT WOULD BE THE CASE WITH ANY OF THE OTHER ONES THAT

04:11PM 24    ARE SENT AT THE EXACT SAME TIME, WE DON'T KNOW WHICH ONE CAME

04:11PM 25    FIRST IN TERMS OF HOW IT WAS VIEWED BY MS. HOLMES OR

04:11PM  1     MR. BALWANI?

04:11PM  2     A.    CORRECT.

04:11PM  3              MS. TREFZ:  I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

04:11PM  4              THE COURT:  MR. LEACH, ANYTHING FURTHER?

04:11PM  5              MR. LEACH:  NO, YOUR HONOR.

04:11PM  6              THE COURT:  MAY THIS WITNESS BE EXCUSED?

04:11PM  7              MR. LEACH:  YES, YOUR HONOR.  SUBJECT TO OUR

04:11PM  8     DISCUSSION EARLIER, BUT, YES.

04:11PM  9              THE COURT:  IT SOUNDS LIKE WE WON'T NEED HIM.

04:11PM 10         IS THAT RIGHT, MS. TREFZ.

04:11PM 11              MS. TREFZ:  YES.  THANK YOU, YOUR HONOR.

04:11PM 12              THE COURT:  ALL RIGHT.

04:11PM 13         THANK YOU, SIR.  THANK YOU FOR YOUR PATIENCE.

04:12PM 14         LET ME ASK, WILL THE GOVERNMENT HAVE A WITNESS FRIDAY

04:12PM 15     MORNING?

04:12PM 16              MR. BOSTIC:  YES, YOUR HONOR.

04:12PM 17              THE COURT:  AND THAT WILL BE AT 9:00 O'CLOCK?

04:12PM 18              MR. BOSTIC:  YES, YOUR HONOR.

04:12PM 19              THE COURT:  LET'S TAKE OUR RECESS.  I APPRECIATE

04:12PM 20     YOUR ACCOMMODATION TODAY.  I APPRECIATE IT.

04:12PM 21         I THINK I SAID WE WOULD GO TO 3:00 ON FRIDAY AS WELL.

04:12PM 22         WILL THAT WORK FOR YOU?

04:12PM 23         THANK YOU.  I DON'T SEE ANY HANDS THAT SAY NO.

04:12PM 24         SO THANK YOU AGAIN FOR YOUR PATIENCE.

04:12PM 25         LET ME REMIND YOU OF THE ADMONITION.  PLEASE DO NOT ALLOW

OFFEN CROSS BY MS. TREFZ

04:12PM 1    YOURSELF TO ENCOUNTER ANYTHING IN THE MEDIA, YOUR SOCIAL MEDIA,

04:12PM 2    SPEAK TO ANY INDIVIDUAL, OR READ ANYTHING THAT HAS ANYTHING TO

04:12PM 3    DO WITH THE FACTS OF THIS CASE OR ANYONE INVOLVED WITH IT.

04:12PM 4         I'LL ASK YOU THAT QUESTION FRIDAY MORNING.

04:12PM 5         HAVE A GOOD EVENING.  HAVE A GOOD DAY OFF TOMORROW.  WE'LL

04:12PM 6    SEE YOU FRIDAY MORNING.  THANK YOU VERY MUCH.

04:12PM 7         (JURY OUT AT 4:12 P.M.)

04:13PM 8         THE COURT:  PLEASE BE SEATED.  THANK YOU.

04:13PM 9         THE RECORD SHOULD REFLECT THAT THE JURY HAS LEFT FOR THE

04:13PM 10   DAY.  ALL COUNSEL AND MS. HOLMES ARE PRESENT.

04:13PM 11        ANYTHING FURTHER BEFORE WE BREAK TODAY?

04:13PM 12        WHAT IS OUR SCHEDULE?

04:13PM 13        WE WILL HAVE WITNESSES FOR -- THAT WILL TAKE UP THE

04:13PM 14   ENTIRETY OF OUR TIME ON FRIDAY, I TAKE IT.

04:13PM 15        MR. SCHENK:  YES, YOUR HONOR.

04:13PM 16        THE COURT:  GREAT.  OKAY.

04:13PM 17        AND DO YOU ANTICIPATE ANY ISSUES ABOUT ANY EVIDENCE FOR

04:13PM 18   FRIDAY?

04:13PM 19        SHOULD I HAVE MS. -- SHOULD I HAVE OUR COURT REPORTER COME

04:14PM 20   IN AT 5:30 FRIDAY MORNING?

04:14PM 21        MR. WADE:  WELL, SHE WAKES UP AT 5:00, SO IT SEEMS

04:14PM 22   LIKE SHE COULD CERTAINLY BE HERE AT 5:30.

04:14PM 23        IN ALL SERIOUSNESS, WE WILL CONFER WITH THE GOVERNMENT AND

04:14PM 24   LET YOU KNOW IN ADVANCE GIVEN THE ESTIMATE OF THE AMOUNT OF

04:14PM 25   TIME.

04:14PM  1            THE COURT:  GREAT.  THAT WILL BE HELPFUL FOR OUR

04:14PM  2   SCHEDULING PURPOSES.  THANK YOU VERY MUCH.  I APPRECIATE IT.

04:14PM  3            THE CLERK:  COURT IS ADJOURNED.

04:14PM  4         (COURT ADJOURNED AT 4:14 P.M.)

         5

         6

         7

         8

         9

        10

        11

        12

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

1

2

3                    CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8     UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9     CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10    HEREBY CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16    _____
      IRENE RODRIGUEZ, CSR, CRR
      CERTIFICATE NUMBER 8076
17

18

19    _____
      LEE-ANNE SHORTRIDGE, CSR, CRR
      CERTIFICATE NUMBER 9595
20

21         DATED:  SEPTEMBER 22, 2021

22

23

24

25