1

2                    UNITED STATES DISTRICT COURT

3                  NORTHERN DISTRICT OF CALIFORNIA

4                        SAN JOSE DIVISION

5

     UNITED STATES OF AMERICA,        )   CR-18-00258-EJD
6                                     )
                        PLAINTIFF,    )   SAN JOSE, CALIFORNIA
7                                     )
             VS.                      )   VOLUME 16
8                                     )
     ELIZABETH A. HOLMES,             )   OCTOBER 6, 2021
9                                     )
                        DEFENDANT.    )   PAGES 2775 - 3000
10   _____ )

11
                     TRANSCRIPT OF TRIAL PROCEEDINGS
12               BEFORE THE HONORABLE EDWARD J. DAVILA
                     UNITED STATES DISTRICT JUDGE
13
     A P P E A R A N C E S:
14
     FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
15                          BY:  JOHN C. BOSTIC
                                 JEFFREY B. SCHENK
16                          150 ALMADEN BOULEVARD, SUITE 900
                            SAN JOSE, CALIFORNIA 95113
17
                            BY:  ROBERT S. LEACH
18                               KELLY VOLKAR
                            1301 CLAY STREET, SUITE 340S
19                          OAKLAND, CALIFORNIA 94612

20        (APPEARANCES CONTINUED ON THE NEXT PAGE.)

21
     OFFICIAL COURT REPORTERS:
22                               IRENE L. RODRIGUEZ, CSR, RMR, CRR
                                 CERTIFICATE NUMBER 8074
23                               LEE-ANNE SHORTRIDGE, CSR, CRR
                                 CERTIFICATE NUMBER 9595
24
          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25             TRANSCRIPT PRODUCED WITH COMPUTER

1

     A P P E A R A N C E S: (CONT'D)

2


3     FOR DEFENDANT HOLMES:   WILLIAMS & CONNOLLY LLP
                              BY:   KEVIN M. DOWNEY
4                                   LANCE A. WADE
                                    KATHERINE TREFZ
5                                   RICHARD CLEARY
                                    J.R. FLEURMONT
6                                   ANDREW LEMENS
                              725 TWELFTH STREET, N.W.
7                             WASHINGTON, D.C. 20005

8                             LAW OFFICE OF JOHN D. CLINE
                              BY:   JOHN D. CLINE
9                             ONE EMBARCADERO CENTER, SUITE 500
                              SAN FRANCISCO, CALIFORNIA 94111
10

11    ALSO PRESENT:           FEDERAL BUREAU OF INVESTIGATION
                              BY:   ADELAIDA HERNANDEZ
12
                              OFFICE OF THE U.S. ATTORNEY
13                            BY:   LAKISHA HOLLIMAN, PARALEGAL
                                    MADDI WACHS, PARALEGAL
14
                              WILLIAMS & CONNOLLY
15                            BY:   TIMIKA ADAMS-SHERMAN, PARALEGAL

16                            TBC
                              BY:   BRIAN BENNETT, TECHNICIAN
17

18

19

20

21

22

23

24

25

INDEX OF PROCEEDINGS

GOVERNMENT'S:


**ADAM ROSENDORFF**
REDIRECT EXAM BY MR. BOSTIC                    P. 2804
RECROSS-EXAM BY MR. WADE                       P. 2890


**STEVEN BURD**
DIRECT EXAM BY MR. LEACH                        P. 2938

1                          INDEX OF EXHIBITS

2
                                          IDENT.      EVIDENCE
3      GOVERNMENT'S:

4      1113                                           2819
       4316                                           2846
5      1295                                           2849
       5417                                           2861
6      336                                            2950
       370                                            2959
7      378                                            2965
       387                                            2969
8      423                                            2982
       5426                                           2986
9      495                                            2987
       496                                            2989
10     718                                            2994

11

12

13     DEFENDANT'S:

14     13950                                          2892

15

16

17

18

19

20

21

22

23

24

25

```
 1      SAN JOSE, CALIFORNIA                    OCTOBER 6, 2021

 2                         P R O C E E D I N G S

 3           (COURT CONVENED AT 8:35 A.M.)

 4           (JURY OUT AT 8:35 A.M.)

 5               THE COURT:  THANK YOU.  PLEASE BE SEATED.

 6           AND WE'RE BACK ON THE RECORD IN UNITED STATES VERSUS

 7      HOLMES.  ALL COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT.

 8           WE'RE OUTSIDE THE PRESENCE OF THE JURY.

 9           I THINK COUNSEL WANTED TO MEET THIS MORNING.

10           MR. DOWNEY, YOU HAD A QUESTION, I THINK.

11               MR. DOWNEY:  I DO, YOUR HONOR.

12           YOUR HONOR, THIS IS RELATED TO OUR SECOND WITNESS TODAY,

13      THE NEW WITNESS WHO IS STEVEN BURD, WHO IS THE FORMER CEO OF

14      SAFEWAY.

15           AS THE COURT KNOWS, SAFEWAY WAS A CONTRACTUAL COUNTERPARTY

16      OF THERANOS UNDER AN AGREEMENT WHERE THERANOS WAS TO OPEN SITES

17      WITHIN SAFEWAY STORES.  THAT WAS DONE PURSUANT TO A SERIES OF

18      CONTRACTS UNDER WHICH SAFEWAY PAID UNDER FAIRLY COMPLEX

19      ARRANGEMENTS WHICH AREN'T REALLY RELEVANT TO THE DISCUSSION I

20      WANT TO HAVE WITH THE COURT THIS MORNING.

21           WE RAISED THE ISSUE, AS YOUR HONOR KNOWS, IN THE PRETRIAL

22      PHASE AS TO WHETHER THAT CONSTITUTED AN INVESTMENT.

23           THE COURT HAS ALREADY RULED THAT IT DOES, SO THERE'S NO

24      QUESTION, I THINK, FOR PRESENT PURPOSES THAT THE ASSUMPTION IS

25      THAT THE MONEY SPENT BY SAFEWAY UNDER THAT CONTRACT ARE THE
```

08:36:36  1    PROPERTY OF WHICH IT WAS DEPRIVED, AND IT'S BEEN DETERMINED BY

08:36:39  2    YOUR HONOR THAT THAT WAS AN INVESTMENT.

08:36:41  3         THAT EVIDENCE I ANTICIPATE WILL ALL COME IN.

08:36:45  4         THIS DISCUSSION RELATES TO A SEPARATE SET OF EVIDENCE,

08:36:50  5    WHICH IS TESTIMONY FROM MR. BURD ABOUT RENOVATION EXPENSES THAT

08:36:53  6    SAFEWAY INCURRED TO PLACE THERANOS IN ITS STORES.

08:36:59  7         I DON'T THINK THERE'S ANY SERIOUS QUESTION THAT THAT IS

08:37:01  8    NOT AN INVESTMENT.  IT'S FAIRLY -- IT'S NOT AN INVESTMENT, NOR

08:37:05  9    IS IT PROPERTY UNDER THE WIRE FRAUD STATUTE.  I THINK THE

08:37:10  10   SUPREME COURT CASE LAW IS VERY CLEAR, INCLUDING IN THE LAST

08:37:14  11   TERM UNDER UNITED STATES VERSUS KELLY, THAT THAT DOES NOT

08:37:17  12   CONSTITUTE PROPERTY, WHICH IS -- WHICH THE VICTIM IS DEPRIVED

08:37:23  13   OF.

08:37:24  14        SO I DON'T THINK UNDER 401 IT HAS DIRECT RELEVANCE.

08:37:28  15        THAT'S NOT REALLY THE ISSUE, BECAUSE THE COURT MIGHT SAY

08:37:30  16   THERE'S SOME OTHER REASON THAT A DISCUSSION OF THAT IS

08:37:33  17   RELEVANT.

08:37:34  18        IT'S A VERY COMPLEX ISSUE, YOUR HONOR.  WE WOULD HAVE TO

08:37:39  19   PUT IN EVIDENCE REBUTTING THE REASONS WHY SAFEWAY SPENT THAT

08:37:43  20   MONEY, THERANOS'S OFFER TO ACTUALLY PAY TO LEASE THAT SPACE,

08:37:48  21   WHETHER THAT MONEY, THE DETERMINATION TO PAY THAT MONEY WAS

08:37:55  22   SAFEWAY'S OWN DECISION OR NOT.

08:37:56  23        SO WE'RE EXPOSED TO A VARIETY OF MINI TRIALS AS OPPOSED TO

08:38:00  24   PREJUDICE FROM SHOWING THE AMOUNT OF THE EXPENDITURE, WHICH IS

08:38:03  25   SAID TO BE IN THE HUNDREDS OF MILLIONS OF DOLLARS.

```
08:38:06   1          SO I WOULD LIKE TO ASK THAT THAT BE EXCLUDED FROM
08:38:09   2    MR. BURD'S TESTIMONY, WHICH I THINK WILL LARGELY BE ORAL.
08:38:12   3               THE COURT:  OKAY.  THANK YOU.
08:38:14   4          MR. LEACH, DO YOU WANT TO COMMENT ON THIS?  LET'S SEE IF
08:38:18   5    THIS -- MAYBE YOU KNOW MR. LEACH IS GOING TO GO INTO THIS.  I
08:38:22   6    DON'T KNOW.
08:38:22   7               MR. DOWNEY:  I DON'T KNOW FOR SURE, BUT WE DID CHAT
08:38:26   8     YESTERDAY AND I SUSPECT SO.
08:38:27   9               MR. LEACH:  WE ARE GOING TO GET INTO IT, YOUR HONOR,
08:38:30  10     ABSENT THE COURT SUSTAINING AN OBJECTION.
08:38:33  11          AND JUST TO BE CLEAR, SAFEWAY IS AN INVESTOR.  THEY
08:38:37  12    ENTERED INTO A CONTRACTUAL ARRANGEMENT WITH THERANOS WHEREBY
08:38:42  13    THEY NEED TO HAVE THE RIGHTS TO ACQUIRE CONVERTIBLE NOTES.
08:38:49  14          A NUMBER OF REPRESENTATIONS ARE MADE DIRECTLY BY
08:38:52  15    MS. HOLMES TO MR. BURD ABOUT WHAT THERANOS'S TECHNOLOGY CAN DO,
08:38:57  16    WHAT THERANOS'S FINANCIAL STATUS IS, THEIR RELATIONSHIP WITH
08:39:02  17    PHARMACEUTICAL COMPANIES, AND THE BONA FIDES OF THE TECHNOLOGY.
08:39:06  18          BASED ON THOSE STATEMENTS, SAFEWAY SPENT APPROXIMATELY
08:39:10  19    $300 MILLION BUILDING OUT ITS STORES IN ANTICIPATION OF THE
08:39:14  20    DEVICE BEING PLACED INTO THE SAFEWAY STORES.
08:39:19  21          THE AMOUNTS THAT SAFEWAY SPENDS IS DIRECTLY RELEVANT TO
08:39:23  22    THE MATERIALITY OF MS. HOLMES'S STATEMENTS.  IT SHOWS THE
08:39:27  23    SERIOUSNESS WITH WHICH SAFEWAY TOOK MS. HOLMES'S
08:39:31  24    REPRESENTATIONS IN REAL TIME.  I THINK IT'S DIRECTLY RELEVANT
08:39:36  25    TO ONE OF THE ESSENTIAL ELEMENTS OF THE OFFENSE, WHICH IS
```

08:39:40  1    MATERIALITY.

08:39:41  2         AND, FRANKLY, I DON'T UNDERSTAND THE PREJUDICE OF THIS

08:39:48  3    NUMBER.

08:39:49  4         PERHAPS THERE ARE SOME ALTERNATIVE REASONS WHY SAFEWAY DID

08:39:51  5    THIS.  YOU CAN EXPLORE THAT IN CROSS-EXAMINATION.

08:39:54  6         BUT I'M TALKING ABOUT ONE, MAYBE TWO DOCUMENTS WHERE

08:39:57  7    MR. BURD MAKES REFERENCE TO THE NUMBER OR THE NUMBER OF STORES

08:40:01  8    DIRECTLY TO MS. HOLMES.  ONE OF THEM IS IN A POWERPOINT THAT

08:40:05  9    SHE HAD A HAND IN PREPARING FOR THE SAFEWAY BOARD.

08:40:09  10        AND I REALLY THINK THIS IS DIRECTLY RELEVANT TO

08:40:12  11   MATERIALITY.

08:40:13  12        IT'S ALSO DIRECTLY RELEVANT TO THE STATE OF MIND OF THE

08:40:16  13   VICTIM AND WHY IT -- ONE OF THE VICTIMS AND WHY IT DID WHAT IT

08:40:20  14   DID.

08:40:21  15        THE OBJECTION I HEAR FROM MR. DOWNEY IS THAT THERE'S

08:40:25  16   SOMEHOW SOME CONFUSION ABOUT WHAT THE MONEY OR PROPERTY THAT'S

08:40:30  17   AT ISSUE WITHIN -- FOR PURPOSES OF THE WIRE FRAUD STATUTE.

08:40:36  18        THAT CAN BE CURED WITH INSTRUCTION, AS I ANTICIPATE THE

08:40:40  19   COURT WILL DO IN FINAL INSTRUCTIONS.

08:40:42  20        BUT THE AMOUNT THAT SAFEWAY SPENDS TO BUILD OUT ITS STORES

08:40:45  21   IS DIRECTLY RELEVANT TO THE MATERIALITY OF MS. HOLMES'S

08:40:50  22   REPRESENTATIONS.  IT SHOWS THE SERIOUSNESS WITH WHICH THEY TOOK

08:40:53  23   THIS INVESTMENT IN WHAT SHE WAS SAYING, AND IT'S A VERY

08:40:57  24   IMPORTANT PIECE OF THE GOVERNMENT'S PROOF.

08:41:00  25        SO I DON'T -- I DON'T THINK THERE'S A BASIS UNDER 403 TO

08:41:03  1    EXCLUDE IT HERE.

08:41:07  2            MR. DOWNEY:  INJECTING THOSE ISSUES INTO THIS CASE,

08:41:09  3    YOUR HONOR, REQUIRES AN EXAMINATION OF WHY SAFEWAY SPENT THAT

08:41:12  4    MONEY.

08:41:13  5        ITS DECISION TO SPEND THAT MONEY WASN'T THE RESULT OF ANY

08:41:16  6    AGREEMENT WITH THERANOS.  IT WAS THE RESULT OF ITS OWN

08:41:18  7    DECISIONS AS TO WHEN IT WOULD BUILD THOSE FACILITIES, ITS

08:41:22  8    EFFORTS TO PRESSURE THERANOS TO HAVE TECHNOLOGY READY AT

08:41:25  9    PARTICULAR POINTS IN TIME.

08:41:26 10        THAT SPACE IS, IN FACT, USED FOR OTHER PURPOSES TODAY.  IT

08:41:31 11    HAD MULTIPLE USES.  THOSE POTENTIAL USES EXISTED AT THAT TIME

08:41:35 12    AND, IN FACT, ANOTHER PROVIDER OF BLOOD TESTING SERVICES SITS

08:41:40 13    IN THAT SPACE TODAY, WHICH SAFEWAY ALWAYS KNEW WAS POSSIBLE.

08:41:44 14        SO I THINK TO GET INTO THIS ISSUE AND, YOU KNOW, SPEND

08:41:48 15    TIME ON IT IS, IS MORE WITNESSES AND MORE DAYS WHEN IT'S REALLY

08:41:52 16    NOT -- I THINK IT'S CONCEDED THAT IT'S NOT PROPERTY OF WHICH

08:41:56 17    SAFEWAY IS DEPRIVED.

08:41:57 18            THE COURT:  IS IT THE -- MR. DOWNEY, IS IT THE NUMBER

08:42:00 19    THAT TROUBLES YOU?  IS THAT WHAT IT IS?  IS IT THE FACT THAT

08:42:05 20    SAFEWAY, EITHER IN RELIANCE OR BECAUSE OF THEIR RELATIONSHIP,

08:42:11 21    DID SOMETHING TO FURTHER THEIR SIDE OF THE AGREEMENT?

08:42:15 22        ISN'T THAT RELEVANT AND SHOULDN'T THE JURY KNOW THAT?  AND

08:42:21 23    THEN THEY CAN DECIDE WHETHER OR NOT -- ISN'T THAT A JURY

08:42:23 24    QUESTION, TO DECIDE WHETHER OR NOT THAT HAS ANY RELATION?

08:42:27 25            MR. DOWNEY:  WELL, I THINK IT'S BOTH, YOUR HONOR,

08:42:30  1    BOTH THE PREJUDICE OF THE NUMBER, BUT ALSO DISTRACTING INTO

08:42:34  2    THAT ISSUE AS A SIDE ISSUE.

08:42:36  3         I THINK WHAT WE WOULD SAY TO YOUR HONOR IS THE NOTION --

08:42:40  4    THERE'S NO CONDUCT ON THERANOS'S PART THAT AUTHORIZES OR

08:42:45  5    ENCOURAGES SAFEWAY TO UNDERTAKE THE DECISION TO BUILD THESE

08:42:50  6    FACILITIES AT THAT TIME.  THERANOS HAS NO INVOLVEMENT IN THEIR

08:42:55  7    SUBSEQUENT USE OF THOSE PROPERTIES OF -- YOU KNOW, THOSE

08:42:58  8    RENOVATIONS FOR OTHER PURPOSES.

08:43:00  9         SO ALL OF THOSE ISSUES BECOME RELEVANT AND IT SWITCHES A

08:43:03  10   BURDEN TO US THAT I THINK IS, YOU KNOW, CUMULATIVE AND A

08:43:06  11   DISTRACTION AND WILL LEAD TO, YOU KNOW, A LOT OF EVIDENCE ON AN

08:43:12  12   ISSUE THAT'S NOT CENTRALLY RELEVANT HERE.

08:43:14  13             THE COURT:  THANK YOU.

08:43:15  14             MR. DOWNEY:  SO IT IS THE NUMBER, AND THAT'S A

08:43:17  15   PREJUDICE ISSUE.

08:43:17  16             THE COURT:  RIGHT.

08:43:17  17             MR. DOWNEY:  BUT IT'S ALSO A QUESTION OF WHAT IT'S

08:43:19  18   PUTTING INTO THIS TRIAL.

08:43:21  19             THE COURT:  WELL, IT -- MR. LEACH SUGGESTS IF THERE

08:43:24  20   IS AN ISSUE ABOUT THAT AS TO WHETHER OR NOT THAT'S APPROPRIATE

08:43:27  21   FOR THE JURY TO CONSIDER WHEN THEY CONSIDER A WIRE FRAUD

08:43:34  22   CONDUCT, AN INSTRUCTION CAN CERTAINLY GUIDE THEM AS TO WHAT

08:43:39  23   THEY MAY OR MAY NOT USE, THE NUMBER OR ANYTHING ABOUT IT, IN

08:43:44  24   THEIR DELIBERATIONS.  WOULDN'T THAT BE PROPHYLACTIC?

08:43:47  25             MR. DOWNEY:  YOUR HONOR, I THINK THE NOTION THAT

08:43:49   1    THERE'S A LARGE NUMBER PUT IN FRONT OF THE JURY AND THAT IT'S

08:43:52   2    CURED BY AN INSTRUCTION WOULD EVISCERATE REALLY THE PURPOSES OF

08:43:58   3    403.

08:44:00   4        I MEAN, I THINK IT'S -- WHEN YOU COMBINE THE PREJUDICE OF

08:44:03   5    THE NUMBER WITH THE FACT THAT YOU HAVE COMPLEX CIRCUMSTANCES

08:44:06   6    AROUND DECISIONS SAFEWAY MADE THAT HAVE NOTHING TO DO WITH

08:44:10   7    THERANOS, YOU KNOW, I THINK IT'S -- IT'S LEADING TO A

08:44:14   8    DISTRACTION IN THE CASE THAT WE DON'T NEED AND THAT I THINK

08:44:19   9    ISN'T NECESSARY FOR THE GOVERNMENT TO PROVE ITS CASE.

08:44:22  10        WE ALL AGREE IT'S NOT THE PROPERTY THAT'S AT ISSUE.  THEY

08:44:27  11    SAY THAT IT'S A DEMONSTRATION OF MATERIALITY.  THEY CAN ELICIT

08:44:33  12    THAT SAFEWAY BEGAN TO BUILD FACILITIES WITHOUT GETTING INTO

08:44:39  13    NUMBERS AND DETAILS ABOUT THAT.

08:44:41  14            THE COURT:  WELL, LET -- MY SENSE IS THE NUMBER IS,

08:44:45  15    IS WHAT'S CONSUMING THE CONVERSATION HERE.

08:44:48  16        IS THERE ANY WAY TO GET THIS INFORMATION IN WITHOUT

08:44:52  17    MENTIONING A NUMBER OR MENTIONING PERHAPS A RANGE OR SOME

08:44:56  18    ALTERNATIVE, MR. LEACH?

08:44:57  19            MR. LEACH:  I CERTAINLY COULD DO IT WITHOUT THE

08:45:00  20    NUMBER, YOUR HONOR.  BUT THE NUMBER ITSELF IS EVIDENCE OF THE

08:45:05  21    WEIGHT SAFEWAY PUT ON THE DEFENDANT'S MISREPRESENTATIONS.

08:45:10  22        SAFEWAY DIDN'T SPEND 30 BUCKS BUILDING OUT A SINGLE STORE.

08:45:14  23    IT SPENT $300 MILLION BUILDING OUT HUNDREDS OF STORES BASED ON

08:45:19  24    THIS CONTRACT, THIS INVESTMENT, THE REPRESENTATIONS OF THE

08:45:23  25    DEFENDANT.

| | | |
|---|---|---|
| 08:45:24 | 1 | I CAN'T THINK OF MANY THINGS MORE PROBATIVE OF |
| 08:45:27 | 2 | MATERIALITY -- |
| 08:45:28 | 3 | THE COURT:  SURE. |
| 08:45:28 | 4 | MR. LEACH:  -- THAN WHAT THE VICTIM DOES IN RESPONSE |
| 08:45:31 | 5 | TO THOSE STATEMENTS. |
| 08:45:32 | 6 | THE COURT:  SO IF THE -- |
| 08:45:33 | 7 | MR. LEACH:  THERE ARE A LOT OF BIG NUMBERS IN THIS |
| 08:45:35 | 8 | CASE, YOUR HONOR. |
| 08:45:36 | 9 | THE COURT:  YEAH, WE'VE HEARD SEVERAL ALREADY. |
| 08:45:38 | 10 | IF THEY -- IF YOU ASKED HIM, WHAT DID YOU DO?  WE BUILT |
| 08:45:43 | 11 | HUNDREDS OF STORES.  DID YOU SPEND MILLIONS OF DOLLARS?  WE |
| 08:45:47 | 12 | DID. |
| 08:45:48 | 13 | MR. LEACH:  I COULD DO IT THAT WAY, YOUR HONOR.  I |
| 08:45:50 | 14 | DON'T THINK IT'S NECESSARY. |
| 08:45:51 | 15 | MR. DOWNEY:  WELL, YOUR HONOR, I STILL OBJECT TO |
| 08:45:52 | 16 | THAT.  I THINK THAT PUTS A BURDEN ON US TO SHOW THE CONTEXT IN |
| 08:45:56 | 17 | WHICH THOSE DECISIONS WERE MADE INTERNALLY AT SAFEWAY THAT JUST |
| 08:46:01 | 18 | SHOULD NOT BE PART OF THIS TRIAL. |
| 08:46:02 | 19 | THE COURT:  WELL, IS THAT SOMETHING THAT YOU WOULD BE |
| 08:46:04 | 20 | ABLE TO PROBE WITH THIS WITNESS? |
| 08:46:06 | 21 | MR. DOWNEY:  POSSIBLY.  BUT POSSIBLY NOT. |
| 08:46:09 | 22 | AND IT CERTAINLY WOULD INTRODUCE A BURDEN THAT SHOULDN'T |
| 08:46:12 | 23 | BE HERE FOR, YOU KNOW, AN EXCHANGE OF MONEY THAT HAS NOTHING TO |
| 08:46:17 | 24 | DO WITH THE PROPERTY THAT THIS DEFENDANT IS ACCUSED OF -- |
| 08:46:21 | 25 | THE COURT:  SURE, OKAY. |

08:46:22  1          MR. DOWNEY:  -- DEFRAUDING THEM OF.

08:46:26  2          THE COURT:  ARE YOU INTENDING TO GET INTO THIS TODAY?

08:46:28  3   WILL THIS COME UP TODAY, MR. LEACH?  OF COURSE, THAT'S

08:46:31  4   DEPENDENT ON DR. ROSENDORFF'S TESTIMONY.

08:46:33  5          MR. LEACH:  YES, I DO BELIEVE IT'LL COME UP TODAY,

08:46:36  6   YOUR HONOR.

08:46:36  7          THE COURT:  PROBABLY NOT THIS MORNING.  MY SENSE IS

08:46:38  8   WE'RE GOING TO FINISH DR. ROSENDORFF THIS MORNING.

08:46:41  9      OKAY.  THANK YOU.  THANK YOU FOR GIVING ME THE HEADS UP.

08:46:43 10      BEFORE YOU LEAVE THE LECTERNS, I DO WANT TO TALK ABOUT A

08:46:46 11   COUPLE OF OTHER ISSUES.

08:46:48 12      APPARENTLY ONE OF THE JURORS HAS CONTACTED MS. KRATZMANN

08:46:51 13   AND THE JUROR HAS ASKED TO SPEAK WITH ME PRIVATELY.  AND I'M

08:46:59 14   INFORMED THIS IS IN REGARDS TO THIS JUROR'S THOUGHTS AND

08:47:04 15   FEELINGS ABOUT CONTINUED SERVICE AS A JUROR IN THE CASE.

08:47:09 16      I HAVEN'T RESPONDED TO THE JUROR THROUGH MS. KRATZMANN

08:47:14 17   YET.  I WANTED TO RAISE IT TO YOUR ATTENTION.

08:47:17 18      MY SENSE IS -- AND I -- MS. KRATZMANN SHARED WITH ME SOME

08:47:22 19   OF THE COMMENTS THAT THIS JUROR HAS MADE, AND IT -- IT SOUNDS

08:47:28 20   LIKE THE JUROR HAS EXPRESSED, I THINK -- I'M NOT TRYING TO

08:47:36 21   QUOTE WHAT SHE TOLD MS. KRATZMANN -- THAT IT WAS ANXIETY ABOUT

08:47:39 22   CONTINUING AND HAVING SOME CONCERNS ABOUT -- AND, AGAIN, THIS

08:47:44 23   ISSUE OF PUNISHMENT APPARENTLY CAME UP AND THIS JUROR IS

08:47:49 24   CONCERNED ABOUT PUNISHMENT AND WHETHER OR NOT HER CONTINUED

08:47:54 25   SERVICE WILL CREATE ISSUES FOR THAT.

```
08:47:57   1            I THINK SHE EXPRESSED SOME RELIGIOUS FEELINGS TO
08:48:01   2    MS. KRATZMANN.
08:48:02   3            SO I THINK WE NEED TO TALK WITH HER.  SHE ASKED TO SPEAK
08:48:06   4    WITH ME PRIVATELY.  I'M GOING TO TELL MS. KRATZMANN TO INFORM
08:48:10   5    THE JUROR THAT THAT'S NOT POSSIBLE, UNLESS YOU CONSENT TO THAT.
08:48:19   6            BUT WHAT I WOULD INTEND TO DO IS TO BRING HER TO THE
08:48:23   7    COURTROOM AND SEE IF I CAN ENGAGE A DIALOGUE WITH HER.  IF
08:48:28   8    SHE -- IF SHE TELLS ME THAT SHE WANTS TO SPEAK PRIVATELY
08:48:36   9    OUTSIDE THE COURTROOM, WE'LL SEE IF -- I WON'T DO THAT WITHOUT
08:48:40  10    COUNSEL PRESENT.
08:48:42  11            BUT PERHAPS WE SHOULD ENGAGE THAT BEFORE WE START OUR
08:48:45  12    EVIDENCE THIS MORNING.
08:48:47  13                 MR. LEACH:  THAT'S FINE WITH THE GOVERNMENT, YOUR
08:48:49  14    HONOR.
08:48:49  15                 THE COURT:  OKAY.
08:48:50  16                 MR. DOWNEY:  THAT'S FINE HERE, YOUR HONOR.
08:48:51  17                 THE COURT:  OKAY, GREAT.
08:48:52  18                 MR. DOWNEY:  WHILE WE'RE DISCUSSING THE JURY, I DID
08:48:55  19    WANT TO SEE IF WE SHOULD CLOSE THE LOOP ON ALTERNATE JUROR 3.
08:48:58  20    I THINK SHE WAS GOING TO GET BACK TO US.  I THINK SHE, SHE
08:49:01  21    LIKELY HAS ADDRESSED THE ISSUE, BUT I THINK FOR PURPOSES OF THE
08:49:04  22    RECORD, MAYBE WE SHOULD HAVE A FURTHER COLLOQUY WITH HER.
08:49:07  23                 THE COURT:  MS. KRATZMANN RECEIVED AN EMAIL -- YOU'RE
08:49:13  24    PRESCIENT, MR. DOWNEY -- MS. KRATZMANN RECEIVED AN EMAIL AND
08:49:18  25    THE ISSUE OF THAT EMPLOYMENT IS NO LONGER ON THE TABLE, SO SHE
```

```
08:49:21   1        WILL BE ABLE TO CONTINUE WITH HER SERVICE AS I UNDERSTAND IT.

08:49:25   2            IS THAT CORRECT, MS. KRATZMANN?

08:49:27   3                THE CLERK:  YES, YOUR HONOR.

08:49:27   4                THE COURT:  ALL RIGHT.

08:49:30   5        ALL RIGHT.  SO LET'S -- I'LL STAND DOWN AND WE'LL SEE IF,

08:49:33   6    IF AND WHEN THE JUROR ARRIVES, AND THEN WE'LL INVITE THAT JUROR

08:49:36   7    OUT AND WE'LL HAVE A CONVERSATION.

08:49:38   8                MR. LEACH:  THANK YOU, YOUR HONOR.

08:49:39   9                THE COURT:  ALL RIGHT.  THANK YOU.

08:49:40  10                MR. DOWNEY:  THANK YOU, YOUR HONOR.

08:49:40  11                THE CLERK:  COURT IS IN RECESS.

08:49:42  12            (RECESS FROM 8:49 A.M. UNTIL 8:57 A.M.)

08:57:46  13            (JURY OUT AT 8:57 A.M.)

08:57:48  14                THE COURT:  ALL RIGHT.  WE'RE BACK ON THE RECORD.

08:57:57  15    ALL COUNSEL ARE PRESENT.  DR. ROSENDORFF WAS IN THE ROOM, HE'S

08:58:00  16    LEAVING NOW.

08:58:09  17        AND WE'RE OUTSIDE THE PRESENCE OF THE JURY.

08:58:15  18        MS. KRATZMANN, IF YOU COULD PLEASE BRING IN JUROR

08:58:18  19    NUMBER 4.

08:58:19  20                THE CLERK:  YES, YOUR HONOR.

08:58:37  21            (JUROR NUMBER 4 PRESENT.)

08:58:41  22                JUROR:  GOOD MORNING.

08:58:41  23                THE COURT:  GOOD MORNING, JUROR NUMBER 4.  PLEASE,

08:58:44  24    SIT DOWN, PLEASE.  THANK YOU.

08:58:45  25        AND I BROUGHT YOU OUT HERE BECAUSE MS. KRATZMANN, OUR
```

08:58:50  1    COURTROOM DEPUTY, TOLD ME THAT YOU WANTED TO SPEAK WITH ME, AND

08:58:53  2    I'M GOING TO IDENTIFY YOU AS JUROR NUMBER 4.  AND MS. KRATZMANN

08:58:59  3    SAID YOU WANTED TO TALK WITH ME ABOUT SOMETHING ABOUT YOUR JURY

08:59:03  4    SERVICE.

08:59:05  5                    JUROR:  YES.

08:59:07  6                    THE COURT:  IF YOU COULD USE THE MICROPHONE, THAT --

08:59:10  7                    JUROR:  YES.

08:59:11  8         MY NAME IS MINH NGUYEN, AND I AM A BUDDHIST, AND SO I

08:59:15  9     PRACTICE FOR COMPASSION, YOU KNOW, FOR, LIKE, NOT KILLING

08:59:21 10     PEOPLE, FOR LOVING AND FORGIVENESS.

08:59:24 11         SO FROM BEGINNING, I ONLY THINK FOR FAIR.

08:59:28 12         BUT THEN, IF I BE FAIR FOR BOTH SIDES AND THEN MAYBE I

08:59:32 13    HAVE TO VOTE, MAYBE I HAVE TO VOTE FOR HER GUILTY, AND THEN I'M

08:59:37 14    THINKING ALL THE TIME SHE IN JAIL AND I WOULD BE SO SAD.  SO

08:59:45 15    IT'S REALLY HARD FOR ME.

08:59:47 16         FROM BEGINNING, I DIDN'T THINK ANYTHING LIKE THAT.  I JUST

08:59:51 17    THINK TO BE FAIR.

08:59:52 18         BUT NOW I'M THINKING, WHAT HAPPEN IF SHE HAVE TO BE IN

08:59:58 19    THERE FOR LONG, LONG TIME, AND THEN I AM OUT HERE.

09:00:00 20                    THE COURT:  OKAY.

09:00:01 21                    JUROR:  I FEEL LIKE IT'S MY FAULT AND I FEEL GUILTY

09:00:04 22     FOR THAT.

09:00:04 23                    THE COURT:  SO -- THANK YOU.  AND LET ME SAY, JUROR

09:00:07 24    NUMBER 4, FIRST OF ALL, YOUR RESPONSIBILITY AS A JUROR, AND ALL

09:00:15 25     OF YOUR COLLEAGUES, YOUR FELLOW JURORS, YOUR RESPONSIBILITY IS

09:00:18   1    TO ONLY DECIDE THE FACTS OF THE CASE.

09:00:23   2           JUROR:  YEAH.

09:00:24   3           THE COURT:  YOU ARE NOT TO DETERMINE, YOU ARE NOT TO

09:00:27   4    DETERMINE ANY PUNISHMENT AT ALL.  THAT'S FOR THE COURT TO

09:00:31   5    DECIDE.  THAT'S NOT YOUR DECISION.

09:00:34   6       DO YOU UNDERSTAND THAT?  AS A MATTER OF FACT, YOU'LL BE

09:00:38   7    INSTRUCTED THAT YOU MAY NOT CONSIDER PUNISHMENT AT ALL IN YOUR

09:00:42   8    DELIBERATIONS.

09:00:47   9           JUROR:  BUT, YOU KNOW, I STILL FEEL -- I'M NOT -- I

09:00:56  10    KEEP THINKING ABOUT THIS EVERY DAY, EVERY TIME.

09:00:58  11           THE COURT:  I SEE.  HAS THAT -- WELL, LET ME -- AND

09:01:01  12    THANK YOU FOR YOUR CANDOR.  THANK YOU FOR BEING HONEST.  I'M

09:01:04  13    GRATEFUL FOR YOU TELLING ALL OF US THIS.

09:01:07  14       I THINK WHAT I HEARD YOU SAY EARLIER IS YOU'RE A BUDDHIST.

09:01:11  15           JUROR:  YES, I AM.

09:01:12  16           THE COURT:  AND YOUR FAITH PERMITS YOU TO EXPRESS

09:01:17  17    COMPASSION.

09:01:20  18           JUROR:  YES.

09:01:21  19           THE COURT:  I THINK I HEARD YOU SAY THAT.

09:01:23  20           JUROR:  YEAH.  THAT'S WHY FOR, YOU KNOW, FOR LOVING,

09:01:26  21    FORGIVENESS.

09:01:27  22           THE COURT:  YES.  ALL RIGHT.

09:01:29  23       ARE YOU -- DO YOU THINK, MA'AM, DO YOU THINK YOU'RE ABLE

09:01:33  24    TO SEPARATE, TO SEPARATE YOUR BELIEFS, YOUR RELIGIOUS AND YOUR

09:01:40  25    PERSONAL BELIEFS, CAN YOU SEPARATE THOSE FROM YOUR JOB TO

```
09:01:45   1    DECIDE THE FACTS IN THIS CASE?  IS THAT SOMETHING THAT YOU CAN

09:01:48   2    DO?

09:01:49   3              JUROR:  I -- I CAN -- YOU KNOW, THE FACTS, YOU KNOW,

09:01:55   4    I CAN DO THAT.  BUT THEN I STILL -- IF SOMETHING, YOU KNOW, IS

09:02:01   5    LIKE -- IT'S TO VOTE, AND THEN I FEEL LIKE IT'S BECOME MY, MY

09:02:09   6    VOTE IS A VOTE FOR THE FUTURE OF HERS.  SO THAT'S THE THING I

09:02:16   7    WOULD --

09:02:17   8              THE COURT:  I SEE.  OKAY.  AND IF YOU COULD SPEAK

09:02:19   9    INTO THE MICROPHONE, PLEASE.

09:02:20  10         AND DO YOU THINK THAT THOSE FEELINGS ARE GOING TO STAY

09:02:28  11    WITH YOU IF YOU REMAIN ON THIS JURY?

09:02:30  12              JUROR:  I CAN -- IF IN THE FUTURE, LET'S SAY, LET'S

09:02:37  13    SAY IF SHE GUILTY AND THEN, YOU KNOW, SHE GET PUNISHMENT FROM

09:02:44  14    THE GOVERNMENT AND, YOU KNOW, AND IT'S -- IT WILL STAY WITH ME

09:02:49  15    BECAUSE I KEEP THINKING OF THAT EVERY DAY --

09:02:52  16              THE COURT:  I SEE.

09:02:54  17              JUROR:  -- IN MY LIFE.

09:02:56  18              THE COURT:  I SEE.  AND DO YOU THINK THAT -- IT

09:02:58  19    SOUNDS LIKE THAT'S GIVING YOU TROUBLE TO SIT AS A JUROR IN THIS

09:03:01  20    CASE.  IS THAT -- IS THAT WHAT YOU'RE FEELING NOW?  YOU'RE

09:03:09  21    FEELING PROBLEMS ABOUT SITTING AS A JUROR BECAUSE OF THAT?

09:03:12  22              JUROR:  I CAN SIT, BUT MY -- MAY I NOT VOTE?

09:03:16  23              THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

09:03:18  24         ALL RIGHT.  I'M GOING TO ASK THE LAWYERS IF THEY HAVE ANY

09:03:21  25    QUESTIONS FOR YOU.
```

```
09:03:23   1              MR. SCHENK:  NO FURTHER QUESTIONS, THANK YOU.

09:03:25   2              MR. DOWNEY:  NOT FROM US, YOUR HONOR.

09:03:26   3              THE COURT:  ALL RIGHT.

09:03:27   4          IS THERE ANYTHING ELSE YOU WOULD LIKE ME TO KNOW?

09:03:29   5              JUROR:  NO.  I OKAY TO SIT HERE UNTIL THE END, BUT

09:03:33   6      MY -- IF I CAN -- IF I'M NOT TO VOTE, I WILL BE OKAY.

09:03:36   7              THE COURT:  IF YOU DON'T HAVE TO VOTE, YOU'D BE OKAY.

09:03:39   8      ALL RIGHT.  OKAY.

09:03:41   9          ALL RIGHT.  WELL, THANK YOU VERY MUCH.  THANK YOU VERY

09:03:43  10      MUCH.

09:03:43  11          YOU CAN LEAVE THE MICROPHONE, AND MS. KRATZMANN WILL TAKE

09:03:46  12      YOU BACK.

09:03:48  13              JUROR:  THANK YOU.

09:03:48  14              THE COURT:  YOU'RE WELCOME.

09:03:49  15              JUROR:  THANK YOU, EVERYONE.

09:03:57  16          (JUROR NUMBER 4 NOT PRESENT.)

09:04:00  17              THE COURT:  ALL RIGHT.  THE RECORD SHOULD REFLECT

09:04:02  18      THAT WE HAVE FINISHED OUR CONVERSATION WITH JUROR NUMBER 4.

09:04:07  19          I'M HAPPY TO HEAR FROM COUNSEL NOW.  AND YOU CAN COME UP

09:04:12  20      TO THE LECTERN.  I DON'T KNOW, MR. DOWNEY, ARE YOU SPEAKING FOR

09:04:15  21      YOUR TEAM?

09:04:15  22              MR. DOWNEY:  YES.

09:04:17  23              MR. SCHENK:  YOUR HONOR, I THINK WE SHOULD EXCUSE

09:04:20  24      JUROR NUMBER 4.  HER BELIEFS SEEM TO BE SINCERELY HELD.  I

09:04:25  25      FOUND IT INSIGHTFUL THAT SHE OFFERED TO STAY ON AND SIT THROUGH
```

09:04:28 1    THE TRIAL IF SHE DIDN'T HAVE TO VOTE, AND THAT CERTAINLY

09:04:32 2    SUGGESTS SHE'S NOT SAYING THIS TO TRY TO GET OUT OF THE REST OF

09:04:37 3    HER SERVICE, BUT INSTEAD THAT THESE ARE SINCERELY HELD BELIEFS

09:04:40 4    THAT ARE CAUSING A SIGNIFICANT AMOUNT OF STRESS AND ANXIETY,

09:04:43 5    AND THAT CERTAINLY ISN'T SOMETHING WE WANT THE TRIAL TO CAUSE.

09:04:46 6         SO WE THINK THAT SHE SHOULD BE EXCUSED.

09:04:48 7              MR. DOWNEY:  YOUR HONOR, WE DON'T HAVE -- MOVE FOR

09:04:51 8    HER EXCUSAL, BUT WE DON'T HAVE AN OBJECTION TO IT.

09:04:53 9              THE COURT:  ALL RIGHT.  THANK YOU.  AND THANK YOU FOR

09:04:58 10   HEARING JUROR NUMBER 4.  SHE -- WE ALL HEARD WHAT SHE SAID.

09:05:02 11   SHE DID EXPRESS HER RELIGIOUS BELIEFS.

09:05:05 12        I KNOW I READ -- I THINK I READ TO THE PANEL 7.4 EARLIER

09:05:09 13   ABOUT PUNISHMENT AND THEY MAY NOT CONSIDER PUNISHMENT.  WE HAD

09:05:14 14   ANOTHER ISSUE WITH ANOTHER JUROR AND I READ THAT AGAIN.

09:05:17 15        AND I APPRECIATE JUROR NUMBER 4'S CANDOR.  IT APPEARS THAT

09:05:22 16   HER DEEPLY HELD RELIGIOUS CONVICTIONS WOULD CAUSE HER SOME

09:05:27 17   DIFFICULTY.  THEY ARE CAUSING HER DIFFICULTY.  SHE'S EXPRESSED

09:05:33 18   SOME CONCERN, IF NOT ANXIOUSNESS, ABOUT CONTINUED SERVICE.

09:05:37 19        AND EVEN THOUGH, AS I TOLD HER, EVEN THOUGH THE PUNISHMENT

09:05:43 20   IS SOMETHING THEY MAY NOT CONSIDER, IT'S SOMETHING THAT THE

09:05:45 21   JURORS DO NOT CONSIDER, THAT'S THE COURT'S PROVINCE, THAT DID

09:05:48 22   NOT SEEM TO, TO ASSUAGE HER FROM HER FEELINGS.

09:05:55 23        SO I DO THINK IT'S APPROPRIATE AT THIS TIME TO EXCUSE

09:05:57 24   JUROR NUMBER 4, AND WE WILL EXCUSE JUROR NUMBER 4 AND WE'LL

09:06:01 25   HAVE OUR NEXT ALTERNATE MOVE IN, MS. KRATZMANN, TO THAT SEAT.

```
09:06:05   1                    THE CLERK:  YES, YOUR HONOR.

09:06:07   2                    THE COURT:  ALL RIGHT.

09:06:07   3                    THE CLERK:  THAT WOULD BE MS. -- JUROR NUMBER --

09:06:12   4          ALTERNATE 2.

09:06:12   5                    THE COURT:  YES, THANK YOU.

09:06:16   6             AND WE CAN INFORM -- MS. KRATZMANN, YOU'LL INFORM JUROR

09:06:19   7       NUMBER 4 OF THAT, AND PLEASE SEND HER OUR THANKS FROM COUNSEL

09:06:24   8       AND THE COURT.

09:06:25   9                    THE CLERK:  YES, YOUR HONOR.

09:06:25  10             THE COURT:  AND WE'LL TAKE A RECESS FOR ABOUT FIVE

09:06:29  11       MINUTES TO GET THINGS SET UP AND THEN WE'LL BEGIN THE

09:06:32  12       EXAMINATION.

09:06:33  13             THANK YOU.

09:06:33  14                    MR. DOWNEY:  THANK YOU, YOUR HONOR.

09:06:34  15                    MR. SCHENK:  THANK YOU.

09:06:35  16                    THE CLERK:  COURT IS IN RECESS.

09:06:37  17             (RECESS FROM 9:06 A.M. UNTIL 9:23 A.M.)

09:23:19  18                    THE COURT:  DOCTOR, CAN I ASK YOU TO WAIT OUTSIDE?

09:23:24  19                    THE WITNESS:  SURE.

09:23:24  20                    THE COURT:  WE'RE BACK ON THE RECORD.  ALL COUNSEL

09:23:26  21       ARE PRESENT.  MS. HOLMES IS PRESENT.

09:23:31  22             THE WITNESS, DR. ROSENDORFF, IS LEAVING THE COURTROOM.

09:23:34  23             I JUST WANT TO TALK TO COUNSEL ABOUT SOMETHING.

09:23:47  24             AND THE RECORD SHOULD REFLECT DR. ROSENDORFF HAS LEFT THE

09:23:50  25       COURTROOM.
```

```
09:23:51   1         AS WE WERE COLLECTING -- AS MS. KRATZMANN WAS COLLECTING

09:23:59   2    THE JURORS TO COME AND RETURN, SHE WAS APPROACHED BY ALTERNATE

09:24:02   3    NUMBER 2, WHO WOULD REPLACE THE JUST RELEASED JUROR.  ALTERNATE

09:24:10   4    NUMBER 2 APPARENTLY EXPRESSED TO MS. KRATZMANN SIMILAR CONCERNS

09:24:14   5    ABOUT CONTINUING HER SERVICE.  SO WE'RE GOING TO BRING HER IN

09:24:23   6    AND HAVE A CONVERSATION WITH HER.

09:24:55   7         (PAUSE IN PROCEEDINGS.)

09:24:55   8             THE CLERK:  ARE YOU READY, YOUR HONOR?

09:24:59   9             THE COURT:  YES.

09:25:00  10             THE CLERK:  OKAY.

09:25:04  11         (JUROR NUMBER 4, FORMER ALTERNATE JUROR NUMBER 2,

09:25:06  12    PRESENT.)

09:25:11  13             THE COURT:  GOOD MORNING.  PLEASE BE SEATED.  THANK

09:25:13  14    YOU.  AND GOOD MORNING.

09:25:15  15         YOU ARE ALTERNATE -- ACTUALLY, YOU'RE NOW SEATED JUROR

09:25:23  16    NUMBER 4.

09:25:24  17         YOU HAD -- I UNDERSTAND YOU EXPRESSED SOME COMMENTS TO

09:25:28  18    MS. KRATZMANN, OUR COURTROOM DEPUTY, ABOUT YOUR SERVICE.

09:25:32  19             JUROR:  YES, SIR.

09:25:33  20             THE COURT:  YES.  WHAT WOULD YOU LIKE ME TO KNOW

09:25:35  21    ABOUT THAT?  AND PLEASE SPEAK INTO THE MICROPHONE.

09:25:37  22             JUROR:  WELL, I PREFER TO SPEAK PRIVATELY, PLEASE.

09:25:40  23             THE COURT:  YES.  WELL, I -- I'M NOT ABLE TO DO THAT.

09:25:44  24    I NEED TO HAVE THESE LAWYERS HERE LISTENING.

09:25:46  25             JUROR:  IT'S OKAY.
```

09:25:47  1          THE COURT:  YES, PLEASE.  SO --

09:25:49  2          JUROR:  WELL, AS I TOLD YOU FROM THE BEGINNING,

09:25:53  3  ENGLISH IS NOT MY FIRST LANGUAGE.  AND I'M FOLLOWING ALL THE

09:25:59  4  SITUATION HERE.  IT'S MY FIRST TIME IN THIS SITUATION, AND IT'S

09:26:10  5  HER FUTURE.

09:26:12  6     I DON'T KNOW IF I'M 100 PERCENT READY TO PARTICIPATE IN

09:26:21  7  SOMETHING LIKE THIS BEING ENGLISH NOT MY FIRST LANGUAGE, AND I

09:26:28  8  COULD MAKE A MISTAKE IN SOMETHING.

09:26:30  9     SO I DON'T KNOW.

09:26:37  10        THE COURT:  OKAY.  WELL, THANK YOU FOR TELLING US

09:26:39  11  ABOUT THIS.

09:26:40  12     FIRST OF ALL, THIS IS YOUR FIRST JURY TRIAL.  YOU'VE NEVER

09:26:45  13  SAT ON A JURY BEFORE.

09:26:46  14        JUROR:  YES.

09:26:47  15        THE COURT:  AND I THINK THERE ARE -- MANY OF YOUR

09:26:52  16  FELLOW JURORS HAVE THE SAME EXPERIENCE.  THE FIRST TIME FOR

09:26:59  17  ANYTHING CAN BE SOMETIMES CHALLENGING.  I UNDERSTAND THAT.

09:27:02  18     SO I HOPE YOU DON'T FEEL THAT -- AND YOU SHOULDN'T FEEL --

09:27:08  19  THAT JUST BECAUSE IT'S YOUR FIRST TIME, THAT ANY, ANY FEELINGS

09:27:13  20  YOU HAVE, NERVOUS FEELINGS ABOUT YOUR SERVICE SHOULD PRESENT A

09:27:18  21  PROBLEM.  THAT'S VERY NORMAL FOR JURORS TO BE NERVOUS ABOUT THE

09:27:26  22  PROCEEDING.

09:27:27  23     YOU TALKED ABOUT ENGLISH NOT BEING YOUR FIRST LANGUAGE.

09:27:31  24  YOU MENTIONED THAT IN YOUR QUESTIONNAIRE, AND THESE LAWYERS

09:27:34  25  HAVE HAD AN OPPORTUNITY READ YOUR QUESTIONNAIRE ABOUT THAT.

09:27:36  1    THERE WERE QUESTIONS ASKED ABOUT YOU BEFORE YOUR JURY SERVICE.

09:27:40  2        AND I THINK YOU'VE TOLD ME THAT YOU'RE FOLLOWING THINGS,

09:27:46  3    YOU'RE ABLE TO UNDERSTAND.

09:27:47  4        I THINK I MENTIONED ALSO AT THE BEGINNING OF THE TRIAL

09:27:50  5    THAT THIS COURT WHERE WE SIT, WE DRAW, WE DRAW -- WE ASK PEOPLE

09:27:58  6    TO COME IN TO SIT AS JURORS FROM MANY, MANY DIFFERENT

09:28:02  7    NEIGHBORHOODS, GEOGRAPHIC REGIONS, MANY DIFFERENT PARTS ALL THE

09:28:09  8    WAY FROM MONTEREY COUNTY UP TO SANTA CLARA COUNTY AND

09:28:12  9    EVERYTHING IN BETWEEN, SAN BENITO, SANTA CRUZ.

09:28:17  10       AND SO WE PULL PEOPLE IN FROM ALL THESE REGIONS AND WE

09:28:22  11   ENJOY THE DIVERSITY OF THOSE PEOPLE WHO COME, PEOPLE WHO COME

09:28:26  12   FROM DIFFERENT CULTURES, DIFFERENT BACKGROUNDS, DIFFERENT

09:28:29  13   GENDERS, AND OFTEN TIMES PEOPLE WHO SPEAK DIFFERENT LANGUAGES

09:28:33  14   AS THEIR PRIMARY LANGUAGE.

09:28:35  15       BUT THEY'VE COME HERE TO LIVE IN THIS AREA, AND WE RESPECT

09:28:40  16   AND ENJOY OUR COMMUNITIES THAT ARE MADE UP BY THIS RICH, RICH

09:28:47  17   COLLECTION OF INDIVIDUALS.

09:28:48  18       AND WE RECOGNIZE THAT IN OUR COUNTRY, THIS IS A COUNTRY

09:28:51  19   THAT WAS CREATED FROM IMMIGRANTS, WASN'T IT?  WE KNOW THAT.

09:28:55  20   AND WE KNOW THAT WHEN PEOPLE COME TO THE COUNTRY FROM DIFFERENT

09:28:58  21   PLACES, TO THIS COUNTRY FROM DIFFERENT PLACES, THEY BRING THEIR

09:29:03  22   CULTURE, THEIR LANGUAGE.

09:29:05  23       BUT WHEN THEY ALSO COME AND THEY SERVE THE COMMUNITY AS

09:29:09  24   YOU'RE DOING, AND AS YOU'VE DONE -- YOUR QUESTIONNAIRE INFORMS

09:29:14  25   US THAT YOUR BACKGROUND AND YOUR ABILITY TO LIVE AND WORK IN

09:29:17  1       THE COMMUNITY USING ENGLISH, WE RECOGNIZE IT'S NOT YOUR FIRST

09:29:22  2   LANGUAGE.  THESE LAWYERS RECOGNIZE THAT.

09:29:27  3       AND I THINK I ALSO MENTIONED THAT, RECOGNIZING THAT, THE

09:29:29  4   LAWYERS WILL DO THEIR BEST, NOT JUST FOR YOU, BUT FOR YOUR

09:29:34  5   FELLOW JURORS, THEY WILL DO THEIR BEST TO MAKE THE INFORMATION

09:29:40  6   ACCESSIBLE, MAKE IT UNDERSTANDABLE, TO NOT USE COMPLICATED

09:29:45  7   WORDS THAT MIGHT CONFUSE ANYONE.  THAT'S WHAT LAWYERS TRY TO

09:29:53  8   DO, TO HELP THE JURY UNDERSTAND THE EVIDENCE, NOT TO CONFUSE

09:29:59  9   THE JURY.

09:30:00 10       AND THAT'S WHAT MY SENSE IS THESE LAWYERS ARE DOING IN

09:30:03 11   THIS CASE.

09:30:05 12       NOW, THE OTHER POINT YOU RAISED, YOU MENTIONED SHE'S SO

09:30:09 13   YOUNG, AND I THINK YOU WERE REFERRING TO THE DEFENDANT,

09:30:12 14   MS. HOLMES IN THIS CASE, AND THAT SUGGESTS TO ME THAT YOU HAVE

09:30:16 15   CONCERNS ABOUT THE QUESTION OF PUNISHMENT.

09:30:24 16       AND YOU SHOULD NOT BECAUSE YOU'RE NOT PERMITTED AS A JUROR

09:30:27 17   TO EVEN CONSIDER THAT AT ALL IN YOUR DELIBERATIONS.  THAT HAS

09:30:31 18   TO BE OFF THE TABLE.  YOU ARE ONLY, AS A JUROR, THE JUDGES OF

09:30:38 19   THE FACTS.  YOU GET TO DECIDE WHAT HAPPENED OR WHAT DIDN'T

09:30:42 20   HAPPEN.  YOU GET TO DECIDE WHAT THE EVIDENCE IS, AND THEN YOU

09:30:45 21   COME AND YOU TELL, YOU TELL ME, YOU TELL THE LAWYERS, YOU TELL

09:30:48 22   THE PUBLIC WHAT YOUR JURY FINDING IS.  AND THAT'S IT.

09:30:53 23       YOU MAY NOT CONSIDER PUNISHMENT IN ANY WAY.  THAT'S

09:30:59 24   FORBIDDEN.  YOU MAY NOT DO THAT.

09:31:01 25       AND I TELL YOU THAT TO -- HOPEFULLY THAT HELPS YOU, THAT

09:31:06  1    EASES YOUR CONSCIOUS.  NUMBER ONE, YOU WON'T BE CALLED UPON TO

09:31:10  2    DECIDE PUNISHMENT IN THE CASE SHOULD THAT BECOME AN ISSUE IN

09:31:13  3    THE CASE.  THAT'S NOT -- THAT'S NOT FOR YOUR DECISION.  THE

09:31:16  4    JURY DOESN'T DECIDE THAT.

09:31:19  5         DO YOU UNDERSTAND THAT?

09:31:19  6              JUROR:  UM-HUM.

09:31:20  7              THE COURT:  ALL RIGHT.  DOES THAT GIVE YOU SOME MORE

09:31:23  8    CONFIDENCE, OR DOES THAT GIVE YOU SOME REASSURANCE ABOUT YOUR

09:31:27  9    CONTINUED SERVICE AS A JUROR?

09:31:29 10              JUROR:  YES, SIR.

09:31:32 11              THE COURT:  OKAY.  I'M GOING TO ASK THESE LAWYERS IF

09:31:34 12    THEY HAVE ANY QUESTIONS FOR YOU.

09:31:36 13              MR. SCHENK:  THANK YOU.  JUST ONE QUESTION.

09:31:37 14              THE COURT:  YES.

09:31:38 15              MR. SCHENK:  I WANT TO JUST CONFIRM, YOU SAID THAT

09:31:41 16    YOU HAVE BEEN ABLE TO UNDERSTAND EVERYTHING SO FAR; IS THAT

09:31:43 17    RIGHT?

09:31:44 18              JUROR:  YES.

09:31:45 19              MR. SCHENK:  OKAY.  THANK YOU.

09:31:46 20              MR. DOWNEY:  NOTHING FROM US.

09:31:47 21              THE COURT:  OKAY.  THANK YOU.

09:31:49 22         DO YOU HAVE ANY OTHER QUESTIONS FOR ME?

09:31:51 23              JUROR:  NO, SIR.

09:31:52 24              THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

09:31:53 25         SO I HOPE I'VE -- AND THANK YOU FOR RAISING THIS.  THIS IS

09:31:57   1   THE APPROPRIATE THING TO DO AND I'M GRATEFUL THAT YOU TALKED TO

09:32:00   2   MS. KRATZMANN TO RAISE THIS, THIS QUESTION.  IT'S ABOUT YOUR

09:32:04   3   JURY SERVICE.

09:32:05   4       AND I JUST WANT TO INFORM YOU, IN THE STRONGEST TERMS

09:32:11   5   POSSIBLE, JURORS DO NOT DECIDE PUNISHMENT.  THAT'S NOT ANYTHING

09:32:15   6   THAT THEY SHOULD DO, THINK ABOUT, CONSIDER AT ALL WHEN THEY

09:32:20   7   DELIBERATE THE FACTS OF THE CASE.  YOU HAVE TO DECIDE WHAT

09:32:25   8   HAPPENED AND THEN YOU'LL RETURN AND YOU'LL TELL US ALL WHAT THE

09:32:29   9   JURY DECIDED IN THE CASE.

09:32:31  10       THE COURT WILL DO WHATEVER IT NEEDS TO DO AFTER IT HEARS

09:32:35  11   YOUR DECISION.  OKAY?

09:32:37  12           JUROR:  OKAY.

09:32:37  13           THE COURT:  ALL RIGHT.  ANY QUESTION ABOUT THAT?

09:32:39  14           JUROR:  NO.

09:32:39  15           THE COURT:  OKAY.  THANK YOU VERY MUCH.  THANK YOU.

09:32:42  16           JUROR:  THANK YOU.

09:32:43  17           THE COURT:  YOU'RE WELCOME.

09:32:51  18       (JUROR NUMBER 4, FORMER ALTERNATE JUROR NUMBER 2, NOT

09:32:54  19   PRESENT.)

09:32:55  20           THE COURT:  ALL RIGHT.  THANK YOU.  PLEASE BE SEATED.

09:32:58  21    THANK YOU.

09:32:59  22       THE RECORD SHOULD REFLECT FORMER ALTERNATE, NOW SEATED

09:33:02  23   JUROR NUMBER 4, HAS LEFT.

09:33:08  24       ANYTHING FURTHER FROM THE GOVERNMENT?

09:33:09  25       MR. DOWNEY, YOU WANT TO COME FORWARD?

09:33:16  1          MR. SCHENK:  YOUR HONOR, IT SEEMS LIKE THERE'S TWO

09:33:18  2     ISSUES HERE, WHETHER THERE'S A LANGUAGE BARRIER AND WHETHER HER

09:33:21  3     CONCERNS ABOUT PUNISHMENT MAKE THIS NOT THE RIGHT TRIAL FOR

09:33:28  4     HER.

09:33:28  5          I THINK THAT THAT COLLOQUY DEMONSTRATED THAT NEITHER ONE

09:33:31  6     OF THOSE AT THIS POINT ARE A BASIS TO EXCUSE THE JUROR.  SHE

09:33:34  7     CONFIRMED SHE HAS UNDERSTOOD THE CONTENT OF THE PROCEEDINGS SO

09:33:38  8     FAR AND SHE UNDERSTOOD THAT PUNISHMENT IS NOT AN ISSUE BEFORE

09:33:41  9     THE JURY AND THEY'RE NOT TO CONSIDER THAT IN THEIR

09:33:45  10    DELIBERATIONS, AND IT SEEMED TO GIVE HER A MEASURE OF COMFORT.

09:33:49  11         SO I DON'T THINK IT'S NECESSARY TO EXCUSE HER.

09:33:51  12         MR. DOWNEY:  YOUR HONOR, I HAVE MY OWN VIEW OF THIS,

09:33:53  13    BUT MAY I JUST HAVE ONE MOMENT TO CONSULT WITH MY CLIENT?

09:33:57  14         THE COURT:  SURE, OF COURSE.

09:34:28  15         (PAUSE IN PROCEEDINGS.)

09:34:39  16         MR. CLINE:  YOUR HONOR, EXCUSE US JUST ONE SECOND,

09:34:42  17    PLEASE.

09:34:45  18         (DISCUSSION OFF THE RECORD AMONGST DEFENSE COUNSEL.)

09:34:45  19         MR. DOWNEY:  IT'S ALWAYS EASIER TO AGREE.  I THINK WE

09:34:51  20    AGREE THIS JUROR SHOULD CONTINUE.

09:34:52  21         THE COURT:  OKAY.  THANK YOU.

09:34:54  22         ALL RIGHT.  WE'LL BRING OUR PANEL IN IN JUST A MOMENT.

09:34:57  23         WE'RE NOT GOING TO MOVE THE ALTERNATE DOWN.  I THINK

09:34:59  24    IT'S -- IT MIGHT BE EASIER JUST TO ALLOW THE JUROR TO REMAIN IN

09:35:03  25    THE SEAT THAT SHE CURRENTLY OCCUPIES, AND THEN NEXT WEEK WE'RE

| | | |
|---|---|---|
| 09:35:08 | 1 | GOING TO DO THE LINEUP CHANGE AND -- A LINE CHANGE, AND YOU CAN |
| 09:35:14 | 2 | TELL MR. BOSTIC WHAT THAT IS. |
| 09:35:17 | 3 | (LAUGHTER.) |
| 09:35:20 | 4 | MR. SCHENK:  YES, YOUR HONOR. |
| 09:35:22 | 5 | THE COURT:  I'M HERE TO HELP, MR. BOSTIC. |
| 09:35:24 | 6 | ALL RIGHT.  THANK YOU. |
| 09:35:25 | 7 | MR. SCHENK:  THANK YOU. |
| 09:35:27 | 8 | THE CLERK:  COURT'S IN RECESS. |
| 09:35:32 | 9 | (RECESS FROM 9:35 A.M. UNTIL 9:38 A.M.) |
| 09:38:18 | 10 | (JURY IN AT 9:38 A.M.) |
| 09:38:28 | 11 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 09:38:48 | 12 | WE ARE BACK ON THE RECORD IN THE HOLMES MATTER.  ALL |
| 09:38:53 | 13 | COUNSEL ARE PRESENT, MS. HOLMES IS PRESENT.  OUR RECONSTITUTED |
| 09:38:59 | 14 | JURY IS PRESENT, AND ALTERNATE NUMBER 2 IS NOW JUROR NUMBER 4. |
| 09:39:06 | 15 | BUT WE'LL MOVE YOU NEXT WEEK WHEN WE DO A REARRANGEMENT.  THANK |
| 09:39:10 | 16 | YOU. |
| 09:39:10 | 17 | BEFORE WE BEGIN, MR. BOSTIC, I DO WANT TO INQUIRE OF THE |
| 09:39:14 | 18 | JURY, DURING THE BREAK, HAS ANYONE OR DID ANYONE HAVE CAUSE TO |
| 09:39:19 | 19 | SEE, HEAR, DISCUSS OR COME ACROSS ANY OUTSIDE INFORMATION ABOUT |
| 09:39:25 | 20 | THIS CASE SUCH THAT THEY'D LIKE TO INFORM ME? |
| 09:39:28 | 21 | IF SO, WOULD YOU PLEASE RAISE YOUR HAND AND LET ME KNOW? |
| 09:39:33 | 22 | AND, AGAIN, IF YOU WANT TO TALK PRIVATELY ABOUT THIS, I'M |
| 09:39:37 | 23 | HAPPY TO DO THAT. |
| 09:39:38 | 24 | I SEE NO HANDS.  THANK YOU. |
| 09:39:41 | 25 | DR. ROSENDORFF, IF YOU COULD PLEASE STATE YOUR NAME AGAIN |

| | | |
|---|---|---|
| 09:39:43 | 1 | FOR THE RECORD, PLEASE. |
| 09:39:44 | 2 | THE WITNESS:  ADAM ROSENDORFF. |
| 09:39:46 | 3 | THE COURT:  THANK YOU.  YOU'RE STILL UNDER OATH. |
| 09:39:49 | 4 | **(GOVERNMENT'S WITNESS, ADAM ROSENDORFF, WAS PREVIOUSLY** |
| 09:39:49 | 5 | **SWORN.)** |
| 09:39:49 | 6 | THE COURT:  AND MR. BOSTIC. |
| 09:39:50 | 7 | MR. BOSTIC:  THANK YOU, YOUR HONOR. |
| 09:39:52 | 8 | **REDIRECT EXAMINATION (RESUMED)** |
| 09:39:53 | 9 | BY MR. BOSTIC: |
| 09:39:53 | 10 | Q.   GOOD MORNING, DR. ROSENDORFF. |
| 09:39:55 | 11 | A.   GOOD MORNING, SIR. |
| 09:39:56 | 12 | Q.   DO YOU RECALL WHEN WE LEFT OFF YESTERDAY, WE HAD BEEN |
| 09:39:58 | 13 | LOOKING AT SOME EMAILS REPORTING QUALITY CONTROL FAILURE FOR |
| 09:40:04 | 14 | THE EDISON ANALYZERS? |
| 09:40:05 | 15 | A.   YES, FROM LANGLY GEE. |
| 09:40:08 | 16 | Q.   CORRECT.  AND DO YOU RECALL LOOKING AT AN EMAIL WHERE ON A |
| 09:40:11 | 17 | GIVEN DAY MORE THAN HALF OF THE EDISON ANALYZERS HAD FAILED QC? |
| 09:40:16 | 18 | A.   YES. |
| 09:40:17 | 19 | Q.   WHEN IT CAME TO QUALITY CONTROLS PROBLEMS AT THERANOS, |
| 09:40:21 | 20 | WERE THOSE PROBLEMS LIMITED TO THE HCG ASSAY? |
| 09:40:25 | 21 | A.   NO. |
| 09:40:25 | 22 | Q.   I'D LIKE TO SHOW YOU EXHIBIT 13809, WHICH IS IN EVIDENCE. |
| 09:40:29 | 23 | IF WE COULD PUBLISH THAT. |
| 09:40:34 | 24 | DR. ROSENDORFF, DO YOU SEE IN FRONT OF YOU A THERANOS |
| 09:40:37 | 25 | PRESENTATION ENTITLED QUALITY SYSTEMS PRESENTATION? |

09:40:40  1    A.   YES.

09:40:41  2    Q.   DO YOU RECALL REVIEWING THIS SLIDE DECK WITH MR. WADE

09:40:45  3    DURING YOUR CROSS-EXAMINATION?

09:40:46  4    A.   YES.

09:40:46  5    Q.   LET'S TURN TO WHAT I THINK IS PAGE 12 OF THIS EXHIBIT.

09:40:54  6         AND, DR. ROSENDORFF, DO YOU SEE A SLIDE TITLED QUALITY

09:40:57  7    CONTROL IN FRONT OF YOU?

09:40:58  8    A.   YES.

09:40:59  9    Q.   WE'VE REVIEWED OTHER DOCUMENTS IN EVIDENCE DURING THIS

09:41:05  10   TRIAL THAT SPEAK TO QUALITY CONTROL FAILURE RATES OF EDISON

09:41:10  11   DEVICES; CORRECT?

09:41:11  12   A.   YES.

09:41:11  13   Q.   AS LAB DIRECTOR AT THERANOS, DID YOU HAVE A GENERAL

09:41:16  14   UNDERSTANDING OF HOW THE EDISONS PERFORMED ON QUALITY CONTROL?

09:41:21  15   A.   YES.

09:41:21  16   Q.   WHEN IT COMES TO THE SPECIFIC NUMBERS DEPICTED IN THE

09:41:25  17   EXHIBIT IN FRONT OF YOU, CAN YOU VOUCH FOR THOSE SPECIFIC

09:41:28  18   NUMBERS?

09:41:29  19   A.   NO.  MY RECOLLECTION IS NOT GOOD ENOUGH TO VOUCH FOR THOSE

09:41:37  20   NUMBERS.

09:41:37  21   Q.   I'LL DRAW YOUR ATTENTION TO THE MIDDLE SECTION OF THAT

09:41:45  22   GRAPH AND THE RIGHT MOST SECTION.  THEY BOTH LIST QUALITY

09:41:50  23   CONTROL PERFORMANCE FOR QUARTER 1 OF 2014; IS THAT RIGHT?

09:41:54  24   A.   THE -- YES, THE MIDDLE AND THE RIGHT, CORRECT.

09:41:59  25   Q.   THE MIDDLE SECTION SAYS Q1 PREDICATE.  WHAT DOES PREDICATE

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                    2806

09:42:03   1    MEAN IN THIS CONTEXT?

09:42:05   2    A.   THE FDA APPROVED INSTRUMENTS.

09:42:08   3    Q.   THE NON-THERANOS INSTRUMENTS?

09:42:11   4    A.   CORRECT.

09:42:11   5    Q.   WHAT ABOUT Q1 THERANOS?  WHICH INSTRUMENTS WOULD THAT

09:42:15   6    REFER TO?

09:42:15   7    A.   ALL OF THE THERANOS LABORATORY DEVELOPED TESTS.

09:42:18   8    Q.   WOULD THAT INCLUDE THE EDISONS?

09:42:20   9    A.   YES.

09:42:20   10   Q.   WOULD IT ALSO INCLUDE, TO YOUR UNDERSTANDING, THE THERANOS

09:42:23   11   MODIFIED THIRD PARTY DEVICES?

09:42:25   12   A.   YES.

09:42:25   13   Q.   DO YOU SEE THAT UNDER EACH OF THOSE HEADINGS, THERE ARE

09:42:29   14   FOUR BULLET POINTS?

09:42:30   15   A.   YES.

09:42:31   16   Q.   I'LL DRAW YOUR ATTENTION TO THE THIRD BULLET POINT DOWN IN

09:42:34   17   EACH OF THOSE.  DO YOU SEE THAT THAT LISTS CONTROLS FAILED?

09:42:38   18   A.   YES.

09:42:39   19   Q.   IS THAT REFERRING TO QUALITY CONTROL PERFORMANCE?

09:42:41   20   A.   I BELIEVE SO, YES.

09:42:42   21   Q.   UNDER PREDICATE, THIS CHART INDICATES THAT .75 PERCENT

09:42:49   22   CONTROLS FAILED.

09:42:50   23        DO YOU SEE THAT?

09:42:51   24   A.   YES.

09:42:51   25   Q.   FOR THE THERANOS DEVICES IN CONTRAST, 2.9 PERCENT CONTROLS

09:42:55  1    FAILED.

09:42:56  2         DO YOU SEE THAT?

09:42:57  3    A.   YES.

09:42:57  4    Q.   IN OTHER WORDS, THE THERANOS DEVICES FAILED CONTROLS MORE

09:43:00  5    THAN THREE TIMES AS OFTEN AS THE NON-THERANOS DEVICES ACCORDING

09:43:04  6    TO THIS?

09:43:04  7    A.   ACCORDING TO THIS, YES.

09:43:06  8    Q.   AND IS THAT GENERALLY CONSISTENT WITH YOUR RECOLLECTION OF

09:43:10  9    HOW THOSE TWO GROUPS OF ANALYZERS PERFORMED?

09:43:13 10    A.   NO.  THE MONTHLY QC FAILURE RATES I REVIEWED WITH LANGLY

09:43:20 11    SHOWED A MUCH HIGHER PERCENTAGE CONTROL FAILURE.

09:43:23 12    Q.   FOR WHICH CATEGORY OF DEVICE?

09:43:25 13    A.   JUST, JUST -- I THINK IT WAS ACROSS ALL THE DEVICES, THE

09:43:31 14    QC WAS SHOWING ACROSS ALL THE DEVICES.

09:43:34 15    Q.   HOW ABOUT WHEN IT COMES TO ANY DIFFERENCES IN PERFORMANCE

09:43:36 16    BETWEEN THE THERANOS DEVICE QUALITY CONTROL PERFORMANCE AND THE

09:43:41 17    UNMODIFIED DEVICE QUALITY CONTROL PERFORMANCE?  DID YOU SEE A

09:43:48 18    DIFFERENCE THERE AT THERANOS?

09:43:50 19    A.   YES.

09:43:50 20    Q.   AND WHAT WAS THAT DIFFERENCE?

09:43:52 21    A.   THE QUALITY CONTROL FAILED MUCH MORE FREQUENTLY ON THE

09:43:54 22    THERANOS DEVICES, OR LDT'S.

09:43:57 23    Q.   LET'S LOOK BRIEFLY AT PAGE 4 OF EXHIBIT 13809.

09:44:05 24         DO YOU SEE, DR. ROSENDORFF, A SLIDE ENTITLED THERANOS

09:44:08 25    LABORATORY LICENSURES?

09:44:09  1    A.   YES.

09:44:10  2    Q.   THE THIRD BULLET DOWN MENTIONS CLIA ARIZONA.

09:44:13  3         DO YOU SEE THAT?

09:44:14  4    A.   YES.

09:44:15  5    Q.   DID THERANOS OPERATE A LAB IN ARIZONA DURING YOUR TIME AS

09:44:18  6    LAB DIRECTOR?

09:44:19  7    A.   YES.

09:44:20  8    Q.   THIS INDICATES THAT THE LICENSE WAS RECEIVED ON JUNE 24TH,

09:44:24  9    2014.

09:44:25  10        DO YOU SEE THAT?

09:44:26  11   A.   YES.

09:44:27  12   Q.   DID YOU HAVE AN UNDERSTANDING DURING YOUR TIME AT THE

09:44:31  13   COMPANY OF WHAT KINDS OF TESTS WERE RUN IN THE ARIZONA LAB

09:44:34  14   VERSUS IN THE CALIFORNIA LAB?

09:44:36  15   A.   MY UNDERSTANDING WAS ARIZONA WAS FDA APPROVED PREDICATE

09:44:40  16   INSTRUMENTS ONLY.

09:44:42  17   Q.   SO IN OTHER WORDS, NO THERANOS SPECIFIC DEVICES IN THE

09:44:45  18   ARIZONA LAB?

09:44:46  19   A.   CORRECT.

09:44:46  20   Q.   ON THAT SAME TOPIC OF LICENSES, YOU TESTIFIED THAT

09:44:53  21   THERANOS HAD A CLIA LICENSE IN 2013 AT THE TIME OF THE LAUNCH;

09:44:57  22   IS THAT CORRECT?

09:44:58  23   A.   YES.

09:44:58  24   Q.   WHO ISSUED THAT CLIA LICENSE?

09:45:01  25   A.   LABORATORY FIELD SERVICES, STATE OF CALIFORNIA.

09:45:05  1    Q.   AND IS THERE AN AFFILIATION THERE WITH CMS?

09:45:08  2    A.   YES.  LFS PERFORMANCE INSPECTIONS ISSUES LICENSURE ON

09:45:15  3    BEHALF OF CMS.

09:45:16  4    Q.   AND DID THE GRANTING OF THAT LICENSE MEAN THAT EITHER CMS

09:45:23  5    OR LFS HAD EVALUATED AND APPROVED THE EDISON DEVICE

09:45:27  6    SPECIFICALLY?

09:45:27  7    A.   NO.

09:45:28  8    Q.   OKAY.  WE CAN TAKE THAT EXHIBIT DOWN.  THANK YOU.

09:45:33  9         I'D LIKE TO TALK BRIEFLY ABOUT A COUPLE OTHER ASSAYS OR

09:45:37  10   ASSAY CATEGORIES THAT YOU DISCUSSED WITH MR. WADE.

09:45:41  11        FIRST, DO YOU RECALL DISCUSSION YESTERDAY ABOUT A SPATE OF

09:45:44  12   LOW HDL RESULTS THAT THE THERANOS TECHNOLOGY PRODUCED?

09:45:49  13   A.   YES.

09:45:49  14   Q.   DO YOU RECALL A DISCUSSION OF THE STEPS THAT THERANOS TOOK

09:45:53  15   TO TRY AND ADDRESS THAT ISSUE?

09:45:55  16   A.   YES.

09:45:55  17   Q.   AND DO YOU RECALL THAT INCLUDING A DISCUSSION OF A STUDY

09:45:59  18   COMPARING RESULTS BETWEEN TWO DIFFERENT ADVIA MACHINES?

09:46:04  19   A.   YES.

09:46:05  20   Q.   OR AT LEAST MULTIPLE ADVIA MACHINES?

09:46:07  21   A.   YES.

09:46:08  22   Q.   CAN YOU REMIND US, WHAT KIND OF DEVICE AT THERANOS WAS

09:46:10  23   USED DURING THIS TIME TO TEST HDL?

09:46:12  24   A.   ADVIA 1800 MODIFIED FOR THE THERANOS LDT.

09:46:20  25   Q.   SO IT WAS A MODIFIED THIRD PARTY DEVICE NO LONGER IN THE

09:46:24  1    FDA APPROVED CATEGORY?

09:46:25  2    A.   CORRECT.  AS SOON AS YOU MAKE A MODIFICATION TO AN FDA

09:46:30  3    APPROVED DEVICE, IT IMMEDIATELY BECOMES A LABORATORY DEVELOPED

09:46:33  4    TEST.

09:46:34  5    Q.   YESTERDAY YOU MENTIONED THAT THAT STUDY SHOWED SOME

09:46:42  6    VARIATION BETWEEN ADVIA INSTRUMENTS WHEN IT CAME TO HDL.

09:46:47  7         DO YOU RECALL THAT?

09:46:48  8    A.   YES.

09:46:49  9    Q.   DO YOU RECALL WHETHER THE SAMPLE TYPE, VEIN OR

09:46:54  10   FINGERSTICK, HAD ANY EFFECT IN THAT STUDY ON THE LEVEL OF

09:46:58  11   VARIATION BETWEEN THOSE DEVICES?

09:46:59  12   A.   YES, IT DID.  THE VARIATION COMPARING VENOUS TO

09:47:06  13   FINGERSTICK WAS MUCH MORE PRONOUNCED WHEN FINGERSTICK SAMPLES

09:47:09  14   WERE ASSAYED ON EITHER INSTRUMENT.

09:47:12  15        THERE'S DATA TO THAT EFFECT.

09:47:16  16   Q.   AND HOW DID THERANOS ACTUALLY TEST HDL IN THE LAB?  WAS IT

09:47:21  17   ON VEIN SAMPLES ON THE MODIFIED SIEMENS ADVIA OR DID THEY USE

09:47:26  18   FINGERSTICK SAMPLES?

09:47:27  19   A.   FINGERSTICK.

09:47:28  20   Q.   DOES THAT MEAN THAT USING THE THERANOS APPROACH ON THESE

09:47:34  21   DEVICES ACTUALLY MADE THE DEVICES PERFORM WORSE?

09:47:38  22   A.   YES.  IT -- IT INCREASED THE, THE DIFFERENCES IN RESULTS

09:47:49  23   BETWEEN INSTRUMENTS.

09:47:51  24   Q.   AND ARE THOSE KINDS OF DIFFERENCES AND RESULTS BETWEEN

09:47:56  25   INSTRUMENTS SOMETHING THAT'S GOOD TO SEE IN A BLOOD TESTING LAB

09:47:59    1    OR BAD?

09:47:59    2    A.    BAD.

09:48:03    3    Q.    MR. WADE SUGGESTED TO YOU ON CROSS-EXAMINATION THAT THE

09:48:07    4    HDL PROBLEMS AT THERANOS WERE NOT THERANOS ASSAY PROBLEMS.

09:48:11    5          DO YOU RECALL THAT?

09:48:12    6    A.    SORRY.  I -- MR. WADE SUGGESTED THAT?

09:48:16    7    Q.    DO YOU RECALL A DISCUSSION ABOUT WHETHER THE HDL PROBLEMS

09:48:19    8    AT THERANOS WERE THERANOS ASSAY PROBLEMS OR NOT?

09:48:24    9    A.    YES.

09:48:25   10    Q.    WHAT WAS YOUR CONCLUSION AT THE TIME AS TO WHETHER THIS

09:48:29   11    REPRESENTED A PROBLEM WITH THE ASSAY OR NOT?

09:48:31   12    A.    I THOUGHT THERE WAS A PROBLEM WITH THE ASSAY.

09:48:33   13    Q.    MR. WADE, ON CROSS-EXAMINATION, SAID, I THINK, THAT HE

09:48:42   14    DIDN'T WANT TO HEAR YOUR ANALYSIS CURRENTLY.

09:48:45   15          I WOULD, THOUGH.  HOW DO YOU REACH THAT CONCLUSION THAT

09:48:49   16    THE HDL ISSUES WERE PROBLEMS WITH THE THERANOS ASSAY?

09:48:52   17    A.    SO WE, WE DID A STUDY WITH MATCHED VENOUS AND FINGERSTICK

09:49:06   18    WHERE THE RESULTS SHOULD BE VERY CLOSE TO EACH OTHER, COMPARING

09:49:11   19    ON EACH INSTRUMENT JUST LOOKING FROM INSTRUMENT TO INSTRUMENT.

09:49:15   20    THE VENOUS AND FINGERSTICK RESULT SHOULD BE PRETTY CLOSE, EVEN

09:49:19   21    IF THERE ARE DIFFERENCES BETWEEN THE TWO INSTRUMENTS.  IF YOU

09:49:21   22    JUST LOOK AT ONE INSTRUMENT, THOSE RESULTS SHOULD MATCH PRETTY

09:49:25   23    CLOSELY, AND THEY WEREN'T MATCHING.

09:49:26   24          SO TO MY MIND, THAT INDICATED A PROBLEM WITH -- THAT THE

09:49:31   25    ASSAY -- THE OTHER ISSUE WAS -- YEAH, I'LL JUST LEAVE IT THERE,

09:49:34   1      YEAH.

09:49:35   2      Q.   I DON'T WANT TO CUT YOU OFF, THOUGH.

09:49:36   3      A.   NO.

09:49:38   4      Q.   PLEASE COMPLETE YOUR ANSWER.

09:49:40   5      A.   THAT'S FINE, YEAH.

09:49:41   6      Q.   LET'S TALK NEXT ABOUT ISE ASSAYS.  DO YOU RECALL A

09:49:46   7      DISCUSSION ON CROSS-EXAMINATION ABOUT THAT CATEGORY?

09:49:48   8      A.   YES.

09:49:49   9      Q.   IF WE COULD BRING UP, PLEASE, EXHIBIT 13893, WHICH IS IN

09:49:52  10      EVIDENCE.

09:50:01  11           DR. ROSENDORFF, DO YOU SEE AN EMAIL IN FRONT OF YOU THAT'S

09:50:03  12      DATED MAY 24TH, 2014?

09:50:07  13      A.   YES.

09:50:08  14      Q.   AND DO YOU RECALL DISCUSSING THIS EMAIL CHAIN ABOUT ISE'S

09:50:13  15      WITH MR. WADE ON CROSS?

09:50:14  16      A.   YES.

09:50:15  17      Q.   LET'S GO TO PAGE 2 OF THIS EMAIL, PLEASE.  AND LET'S ZOOM

09:50:24  18      IN ON THE -- SEE IF WE CAN CAPTURE ALL THAT TEXT IN DR. YOUNG'S

09:50:29  19      EMAIL.

09:50:32  20           AND, DR. ROSENDORFF, I WANT TO DRAW YOUR ATTENTION TO

09:50:35  21      ABOUT HALFWAY DOWN THAT SELECTION WHERE IT SAYS "ADDITIONAL

09:50:38  22      ISSUES THAT I PLAN TO HAVE THE TEAM ADDRESS."

09:50:41  23           DO YOU SEE THAT?

09:50:43  24      A.   YES.

09:50:43  25      Q.   THE BULLET POINT UNDER THAT SAYS "WE HAVE SEEN THAT

09:50:47  1    DILUTED VENOUS SAMPLES HAVE MUCH BETTER PRECISION THAN DILUTED

09:50:52  2    PCTN/CAPILLARY SAMPLES."

09:50:55  3        DO YOU SEE THAT?

09:50:57  4    A.  YES.

09:50:57  5    Q.  CAN YOU EXPLAIN IN PLAIN LANGUAGE WHAT THAT'S SAYING?

09:51:01  6    A.  SO JUST TO TRY TO EXPLAIN IT TO THE JURY, PRECISION MEANS

09:51:05  7    WHEN YOU TAKE A SAMPLE AND YOU DO REPEATED MEASUREMENT OF IT

09:51:08  8    AND YOU MAKE SURE THAT THE RESULT MATCHES EACH TIME YOU

09:51:14  9    MEASURE.  THAT'S WHAT PRECISION IS.

09:51:16  10       SO DANIEL IS DOING PRECISION ON DILUTED VENOUS BLOOD, AND

09:51:22  11   HE'S ALSO LOOKING AT PRECISION FOR THE -- FOR THIS -- WITH

09:51:28  12   THESE ISE ASSAYS ON CAPILLARY SAMPLES AND HE'S SAYING THAT THE

09:51:33  13   PRECISION IS MUCH BETTER WITH THE DILUTED VENOUS BLOOD THAN

09:51:37  14   WITH THE CAPILLARY BLOOD SAMPLES.

09:51:39  15   Q.  IS CAPILLARY ANOTHER WAY TO DESCRIBE FINGERSTICK SAMPLES?

09:51:42  16   A.  YES.

09:51:42  17   Q.  AND HOW DID THERANOS TEST ISE ANALYTES AT THIS TIME?  WAS

09:51:53  18   IT THROUGH VENOUS SAMPLES OR FINGERSTICK SAMPLES?

09:51:56  19   A.  FINGERSTICK.

09:51:57  20   Q.  THE KIND OF SAMPLE THAT WAS SHOWING HIGHER VARIABILITY; IS

09:52:01  21   THAT RIGHT?

09:52:02  22   A.  CORRECT.

09:52:02  23   Q.  THE BULLET POINT DOWN TOWARDS THE BOTTOM OF THE SELECTION

09:52:06  24   SAYS, "WE STARTED THIS WEEK MEASURING LITHIUM IN OUR

09:52:14  25   PCTN/CAPILLARY SAMPLES" --

09:52:15  1    A.    YES.

09:52:16  2    Q.    -- "TO ASSESS HEPARIN CONCENTRATIONS."

09:52:18  3          DO YOU SEE THAT?

09:52:18  4    A.    YES.

09:52:19  5    Q.    "INITIAL DATA SUGGEST A WIDE RANGE OF CONCENTRATIONS IN

09:52:22  6    OUR CAPILLARY SAMPLES, AND POSSIBLY CONCENTRATIONS THAT ARE

09:52:24  7    VERY HIGH."

09:52:25  8          DO YOU SEE THAT?

09:52:27  9    A.    YES.

09:52:27  10   Q.    AND HE SAYS THEY'RE CONTINUING TO WORK ON THAT; IS THAT

09:52:30  11   RIGHT?

09:52:30  12   A.    YES.

09:52:31  13   Q.    BASED ON THAT, WAS IT YOUR UNDERSTANDING, OR IS IT YOUR

09:52:33  14   UNDERSTANDING THAT THE ISE ISSUES AT THERANOS WERE SOLVED AT

09:52:37  15   THIS TIME, OR WAS THERE MORE WORK TO BE DONE?

09:52:40  16   A.    MORE WORK TO BE DONE.

09:52:41  17   Q.    WHEN IT COMES TO DIFFERENCES IN BEHAVIOR BETWEEN

09:52:49  18   FINGERSTICK SAMPLES AND VEIN SAMPLES, WAS THAT A RECURRING

09:52:53  19   SOURCE OF DIFFICULTY OR PROBLEMS AT THERANOS?

09:52:55  20   A.    YES.

09:52:56  21   Q.    OKAY.  WE CAN PUT THAT EXHIBIT ASIDE.  THANK YOU.

09:53:06  22         I'D LIKE TO TALK BRIEFLY ABOUT THE BICARBONATE ASSAY.  DO

09:53:10  23   YOU REMEMBER DISCUSSING THAT WITH MR. WADE?

09:53:13  24   A.    YES.

09:53:14  25   Q.    DO YOU RECALL A DISCUSSION OF A STUDY THAT DANIEL YOUNG

09:53:16   1     WAS DOING TO TRY AND ADDRESS PROBLEMS THAT THERANOS WAS HAVING

09:53:19   2     WITH THE BICARBONATE TEST?

09:53:21   3     A.   I DON'T RECALL THAT SPECIFICALLY.

09:53:26   4     Q.   ARE YOU GENERALLY -- LET ME START AGAIN.

09:53:31   5          DURING YOUR TIME AT THERANOS, WERE YOU GENERALLY AWARE OF

09:53:34   6     STUDIES THAT DR. YOUNG WOULD CONDUCT TO TRY TO ADDRESS ACCURACY

09:53:39   7     AND RELIABILITY PROBLEMS THAT POPPED UP WITH THERANOS TESTS?

09:53:42   8     A.   YES, CONTINUALLY.

09:53:44   9     Q.   THAT WAS A COMMON OCCURRENCE OR SITUATION AT THERANOS?

09:53:47  10     A.   VERY COMMON, YES.

09:53:48  11     Q.   AS A WHOLE, DID DR. YOUNG'S STUDIES GIVE YOU ANY REASON TO

09:53:55  12     DOUBT YOUR ULTIMATE DECISION TO LEAVE THE COMPANY IN 2014?

09:53:59  13     A.   NO.

09:54:00  14     Q.   WHY NOT?

09:54:01  15     A.   FREQUENTLY THE TROUBLESHOOTING WOULD BE DONE ON VENOUS

09:54:07  16     BLOOD, DILUTED VENOUS BLOOD, WHEREAS ACTUAL PATIENT SAMPLES WAS

09:54:11  17     CAPILLARY BLOOD COLLECTED IN CTN.

09:54:14  18          SO THE TROUBLESHOOTING DIDN'T CAPTURE ISSUES WITH BLOOD

09:54:19  19     COLLECTION.

09:54:25  20          NOT TO BE TOO CRITICAL, BUT AT TIMES I DIDN'T FULLY TRUST

09:54:29  21     THE DATA THAT WAS COMING OUT OF R&D FOR TROUBLESHOOTING.

09:54:35  22          EVEN AFTER THE SO-CALLED FIXES, I WAS STILL SEEING

09:54:39  23     ANOMALIES IN THE RESULTS, TOO MANY COMING OUT HIGH OR LOW, NOT

09:54:45  24     MATCHING UP WITH OTHER REFERENCE LABORATORIES, ET CETERA.

09:54:49  25     Q.   AND ARE YOU REFERRING TO --

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)

09:54:51  1        MR. WADE:  YOUR HONOR, I MOVE TO STRIKE THAT LAST

09:54:53  2    ANSWER.

09:54:54  3        MR. BOSTIC:  I THINK IT'S DIRECTLY RESPONSIVE, YOUR

09:54:57  4    HONOR.

09:54:57  5        THE COURT:  OVERRULED.

09:55:00  6    BY MR. BOSTIC:

09:55:01  7    Q.   DR. ROSENDORFF, WHEN YOU SAY THAT YOU SAW CONTINUED

09:55:06  8    PROBLEMS NOT MATCHING UP TO REFERENCE LABS -- IS THAT WHAT YOU

09:55:11  9    JUST SAID?

09:55:11  10   A.   YES.

09:55:12  11   Q.   ARE YOU REFERRING TO RESULTS THAT YOU SAW FROM PATIENT

09:55:16  12   TESTING AT THERANOS?

09:55:17  13   A.   YES.

09:55:18  14   Q.   I'D LIKE TO SHIFT GEARS AND TALK ABOUT THE TIMING OF WHEN

09:55:26  15   THERANOS BEGAN OFFERING ITS TESTING SERVICES.

09:55:30  16        DO YOU RECALL SOME DISCUSSION ON CROSS-EXAMINATION ABOUT

09:55:34  17   WHEN THERANOS ACTUALLY LAUNCHED ITS SERVICES?

09:55:37  18   A.   YES.

09:55:37  19   Q.   DURING YOUR DIRECT EXAMINATION, WE TALKED ABOUT A DATE

09:55:43  20   THAT WAS IN YOUR MIND IN THE FIRST PART OF SEPTEMBER.

09:55:50  21        DO YOU RECALL THAT?

09:55:51  22   A.   YES.

09:55:51  23   Q.   AND THERE WAS A QUESTION ABOUT, OR A SERIES OF QUESTIONS

09:55:54  24   FROM MR. WADE ABOUT WHETHER THAT WAS A TRUE LAUNCH OR A SOFT

09:55:56  25   LAUNCH I THINK HE SAID.

09:55:58  1            DO YOU RECALL THAT DISCUSSION?

09:55:59  2       A.   YES.

09:55:59  3       Q.   I'D LIKE YOU TO LOOK AT EXHIBIT 5407, WHICH IS IN

09:56:03  4       EVIDENCE.

09:56:08  5            IF WE COULD PUBLISH THAT, AND IF WE COULD ZOOM IN ON THE

09:56:15  6       BOTTOM HALF OF THIS PAGE, PLEASE.

09:56:21  7            OKAY.  DR. ROSENDORFF, YOU ARE NOT ON THIS EMAIL; CORRECT?

09:56:25  8       A.   CORRECT.

09:56:26  9       Q.   DO YOU SEE AN EMAIL AT THE TOP OF THAT SELECTION FROM

09:56:32 10       ELIZABETH HOLMES TO JIM, AND IT'S ADDRESSED TO GENERAL MATTIS?

09:56:36 11       A.   YES.

09:56:37 12       Q.   AND THE DATE IS SEPTEMBER 7TH, 2013; CORRECT?

09:56:40 13       A.   YES.

09:56:43 14       Q.   TWO DAYS BEFORE THE SEPTEMBER 9TH DATE THAT YOU

09:56:45 15       IDENTIFIED?

09:56:46 16       A.   CORRECT.

09:56:47 17       Q.   AND MS. HOLMES SAYS IN HER EMAIL, "GENERAL MATTIS, FYI,

09:56:53 18       THE BELOW WILL GO OUT TO OUR SHAREHOLDERS TONIGHT.  WE HAVE

09:56:56 19       BEGUN THE LAUNCH."

09:56:57 20            DO YOU SEE THAT?

09:56:58 21       A.   YES.

09:56:59 22       Q.   BELOW THAT, THERE'S A MESSAGE FROM MS. HOLMES APPARENTLY

09:57:02 23       TO THERANOS SHAREHOLDERS.

09:57:04 24            DO YOU SEE THAT?

09:57:04 25       A.   YES.

09:57:05  1    Q.   AND THAT MESSAGE SAYS, "TO OUR SHAREHOLDERS, I AM

09:57:09  2    DELIGHTED TO SHARE THAT WE HAVE NOW BEGUN THE COMMERCIAL LAUNCH

09:57:11  3    OF THE NEW PRODUCTS AND SERVICES WE'VE BEEN WORKING ON FOR THE

09:57:14  4    PAST YEARS."

09:57:15  5         DO YOU SEE THAT?

09:57:16  6    A.   YES.

09:57:17  7    Q.   DO YOU SEE ANY MENTION OF A SOFT LAUNCH IN THIS MESSAGE?

09:57:20  8    A.   NO.

09:57:20  9    Q.   I'D LIKE TO SHOW YOU WHAT WE'VE MARKED AS EXHIBIT 1113,

09:57:33  10   AND I'M HANDING A COPY OF THAT TO THE COURT, AS WELL AS THE

09:57:35  11   NEXT FEW EXHIBITS THAT I'D LIKE TO INTRODUCE (HANDING).

09:57:39  12        THESE HAVE BEEN PROVIDED TO THE DEFENSE ALREADY.

09:57:49  13        MAY I APPROACH THE WITNESS, YOUR HONOR?

09:57:51  14             THE COURT:  YES.

09:57:53  15             MR. BOSTIC:  (HANDING.)

09:57:55  16             THE WITNESS:  THANK YOU.

09:57:56  17   BY MR. BOSTIC:

09:57:57  18   Q.   DR. ROSENDORFF, DO YOU HAVE EXHIBIT 1113 IN FRONT OF YOU?

09:58:00  19   A.   YES.

09:58:00  20   Q.   OKAY.  AND I'LL GIVE YOU A SECOND TO LOOK IT OVER, BUT CAN

09:58:05  21   YOU TELL ME GENERALLY WHAT IT IS?

09:58:07  22   A.   IT APPEARS TO BE A PRESS RELEASE THAT'S DATED

09:58:22  23   SEPTEMBER 9TH, 2013.  IT APPEARS TO BE A JOINT PRESS RELEASE

09:58:27  24   BETWEEN THERANOS AND WALGREENS, AND STATING THAT THERANOS IS

09:58:33  25   NOW ABLE TO --

09:58:34   1    Q.   AND ACTUALLY, BEFORE YOU GET INTO THE CONTENTS, APOLOGIES.

09:58:37   2    A.   OH, I'M SORRY.

09:58:39   3    Q.   IS IT GENERALLY ON THE LAUNCH OF TESTING SERVICES?

09:58:42   4    A.   YES.

09:58:42   5            MR. BOSTIC:   YOUR HONOR, THE GOVERNMENT MOVES TO

09:58:43   6    ADMIT EXHIBIT 1113.

09:58:45   7            MR. WADE:   NO OBJECTION, YOUR HONOR.

09:58:46   8            THE COURT:   IT'S ADMITTED, IT MAY BE PUBLISHED.

09:58:48   9        (GOVERNMENT'S EXHIBIT 1113 WAS ADMITTED IN EVIDENCE.)

09:58:49  10    BY MR. BOSTIC:

09:59:01  11    Q.   AND, DR. ROSENDORFF, DO YOU SEE THAT AT THE TOP OF THAT

09:59:05  12    PAGE, THIS IS A PRESS RELEASE DATED SEPTEMBER 9TH, 2013?

09:59:08  13    A.   YES.

09:59:09  14    Q.   THAT SEPTEMBER 9TH DATE, IS THAT THE DATE THAT YOU

09:59:13  15    RECALLED AS BEING THE LAUNCH DATE?

09:59:15  16    A.   YES.

09:59:15  17    Q.   THAT FIRST PARAGRAPH READS, "THERANOS, INCORPORATED AND

09:59:21  18    WALGREENS TODAY ANNOUNCED A LONG-TERM PARTNERSHIP TO BRING

09:59:24  19    ACCESS TO THERANOS'S NEW LAB TESTING SERVICE THROUGH WALGREENS

09:59:28  20    PHARMACIES NATIONWIDE."

09:59:30  21        DO YOU SEE THAT?

09:59:31  22    A.   YES.

09:59:31  23    Q.   IT SAYS, "AS THE SERVICE BECOMES AVAILABLE THROUGH

09:59:35  24    THERANOS WELLNESS CENTERS INSIDE WALGREENS STORES, CONSUMERS

09:59:38  25    WILL BE ABLE TO ACCESS LESS INVASIVE AND MORE AFFORDABLE

09:59:42   1    CLINICIAN-DIRECTED LAB TESTING, FROM A BLOOD SAMPLE AS SMALL AS

09:59:46   2    A FEW DROPS, OR 1/1000 THE SIZE OF A TYPICAL BLOOD DRAW."

09:59:52   3        DO YOU SEE THAT?

09:59:52   4    A.   YES.

09:59:53   5    Q.   THERE'S SOME MENTION OF A FINGERSTICK METHOD OR

09:59:56   6    MICRO-SAMPLE.

09:59:57   7        DO YOU SEE THAT IN THE REMAINDER OF THAT PARAGRAPH?

09:59:59   8    A.   YES.

09:59:59   9    Q.   AND I'LL DRAW YOUR ATTENTION TO THE BOTTOM PARAGRAPH IN

10:00:07  10    THIS PAGE.  DO YOU SEE THAT THE SECOND SENTENCE OF THE THIRD

10:00:15  11    PARAGRAPH SAYS, "THERANOS'S PROPRIETARY LABORATORY

10:00:18  12    INFRASTRUCTURE MINIMIZES HUMAN ERROR THROUGH EXTENSIVE

10:00:21  13    AUTOMATION TO PRODUCE HIGH QUALITY RESULTS."

10:00:25  14        DO YOU SEE THAT?

10:00:27  15    A.   YES.

10:00:27  16    Q.   ANYWHERE IN THIS PRESS RELEASE DO YOU SEE THE PHRASE "SOFT

10:00:32  17    LAUNCH"?

10:00:33  18    A.   NO.

10:00:34  19    Q.   OKAY.  WE CAN PUT THAT EXHIBIT ASIDE.

10:00:40  20        THE PHRASE "SOFT LAUNCH," IS THAT A MEDICAL TERM IN YOUR

10:00:44  21    EXPERIENCE?

10:00:44  22    A.   NO.

10:00:45  23    Q.   IS THE PHRASE "SOFT LAUNCH" A TERM FROM CLINICAL

10:00:50  24    LABORATORY TESTING?

10:00:51  25    A.   NO.

10:00:52  1    Q.   DO YOU RECALL THAT YOU DISCUSSED WITH MR. WADE ON A FEW

10:00:59  2    OCCASIONS THE CLIA REGULATIONS AND HOW THEY GOVERN CLINICAL LAB

10:01:04  3    TESTING?

10:01:05  4    A.   YES.

10:01:06  5    Q.   TO YOUR KNOWLEDGE, DO THOSE CLIA REGULATIONS PROVIDE ANY

10:01:09  6    SPECIAL, MORE RELAXED RULES FOR SOMETHING CALLED A SOFT LAUNCH?

10:01:13  7    A.   NO.

10:01:13  8    Q.   DURING YOUR CROSS, THERE WAS SOME DISCUSSION ABOUT THE

10:01:22  9    OVERALL TESTING VOLUME IN THE DAYS FOLLOWING SEPTEMBER 9TH.

10:01:27 10         DO YOU RECALL THAT?

10:01:27 11    A.   YES.

10:01:28 12    Q.   THERE WAS A SUGGESTION THAT THE OVERALL TESTING VOLUME

10:01:32 13    MIGHT HAVE BEEN RELATIVELY LOW.

10:01:34 14         DO YOU RECALL DISCUSSING THAT?

10:01:36 15    A.   YES.

10:01:37 16    Q.   DO YOU HAVE PERSONAL KNOWLEDGE OF THAT?  IN OTHER WORDS,

10:01:40 17    ARE YOU ABLE TO TESTIFY ONE WAY OR ANOTHER ABOUT THE ACTUAL

10:01:43 18    NUMBER OF TESTS THAT THERANOS WAS RUNNING DURING THAT TIME

10:01:46 19    PERIOD?

10:01:46 20    A.   NO.

10:01:46 21    Q.   ASSUMING THAT THE OVERALL TEST VOLUME WAS LOW DURING THE

10:01:51 22    INITIAL WEEKS FOLLOWING THAT LAUNCH DATE, WOULD THAT ELIMINATE

10:01:56 23    YOUR CONCERNS ABOUT ACCURACY PROBLEMS THAT THERANOS WAS SEEING

10:01:59 24    AT THAT TIME?

10:02:00 25    A.   NO.

10:02:00  1    Q.   WHY NOT?

10:02:01  2    A.   IT -- SO IF YOU -- WHILE IT'S TRUE, IF YOU HAVE ACCURACY

10:02:13  3    PROBLEMS, YOU'RE GOING TO SEE MORE THE MORE TESTS THAT YOU RUN.

10:02:20  4    THAT'S JUST -- IF IT'S A FIXED PERCENTAGE OF TESTS THAT ARE

10:02:22  5    INACCURATE, YOU'RE GOING TO GET MORE INACCURATE TESTS THE MORE

10:02:26  6    TESTS YOU RUN.

10:02:27  7         BUT IN MY MIND, EVEN TESTING ONE PATIENT WITH A HIGH

10:02:30  8    PROBABILITY OF INACCURACY WAS HIGHLY PROBLEMATIC FOR ME.

10:02:35  9    Q.   DO YOU RECALL THAT SOME OF THE INCIDENTS WE REVIEWED

10:02:41  10   DURING YOUR DIRECT EXAMINATION RELATED TO INACCURATE TEST

10:02:46  11   RESULTS THAT WERE RELEASED BY THERANOS?

10:02:47  12   A.   YES.

10:02:48  13   Q.   ASSUMING THAT THE OVERALL TEST VOLUME WAS LOW DURING THAT

10:02:52  14   TIME PERIOD --

10:02:53  15   A.   YES.

10:02:54  16   Q.   -- DOES THAT HAVE ANY EFFECT ON THE SIGNIFICANCE OF

10:02:57  17   INDIVIDUAL INACCURATE TEST RESULTS?

10:03:00  18   A.   NO.

10:03:01  19   Q.   HOW ABOUT WHEN YOU PUT THOSE RESULTS INTO CONTEXT AND TRY

10:03:06  20   TO DETERMINE HOW SERIOUS A RED FLAG THEY ARE?  DOES IT MATTER

10:03:12  21   HOW MANY TESTS THE LAB IS PERFORMING IN THE BACKGROUND?

10:03:18  22        LET ME ASK A BETTER QUESTION.

10:03:21  23        IF YOU SEE -- I'LL GIVE YOU A HYPOTHETICAL.  IF YOU SEE 5

10:03:25  24   INACCURATE TEST RESULTS OUT OF A TOTAL OF 10,000 TESTS THAT A

10:03:30  25   LAB DID DURING A CERTAIN TIME PERIOD --

10:03:32  1    A.   YES.

10:03:33  2    Q.   -- VERSUS SEEING 5 INACCURATE TEST RESULTS OUT OF A TOTAL

10:03:36  3    OF 50 --

10:03:38  4    A.   YES.

10:03:38  5    Q.   -- RESULTS THAT A LAB DID DURING A CERTAIN TIME PERIOD, DO

10:03:42  6    THOSE TWO SITUATIONS CAUSE YOU TO HAVE DIFFERENT VIEWS ABOUT

10:03:45  7    THE LAB'S OVERALL PERFORMANCE?

10:03:47  8    A.   YES.

10:03:48  9    Q.   CAN YOU EXPLAIN WHY?

10:03:49  10   A.   IF THERE ARE 5 INACCURATE TESTS OUT OF 50, THAT'S A 10

10:03:54  11   PERCENT FAILURE RATE, FOR WANT OF A BETTER TERM.

10:04:00  12        IF IT'S 5 OUT OF 50,000, IT'S A MUCH LOWER RATE OF

10:04:05  13   FAILURE.

10:04:06  14        SO ANY ANALYTIC SYSTEM WILL GIVE YOU FAILURES, BUT YOU --

10:04:12  15   SO IT'S REALLY IMPORTANT TO TRACK THE SCALE AND THE PERIOD OF

10:04:17  16   TIME TABLES THAT YOU'RE SEEING.

10:04:19  17   Q.   ASSUMING THAT THERE WAS A RELATIVELY LOW TEST VALUE IN THE

10:04:24  18   DAYS FOLLOWING THE LAUNCH AT THERANOS --

10:04:28  19   A.   YES.

10:04:28  20   Q.   -- WERE YOU SATISFIED WITH THE NUMBER OF INACCURATE TEST

10:04:35  21   RESULTS THAT YOU WERE SEEING AT THE TIME?

10:04:36  22   A.   NO.

10:04:37  23   Q.   SPEAKING OF TESTING VOLUME, DO YOU RECALL YOUR PREVIOUS

10:04:44  24   TESTIMONY THAT YOU REVIEWED AT A DEPOSITION WHERE YOU COMPARED

10:04:48  25   THE NUMBER OF COMPLAINTS YOU RECEIVED AT THERANOS TO WHAT YOU

10:04:51  1    SAW AT UNIVERSITY OF PITTSBURGH?

10:04:53  2    A.   YES.

10:04:53  3    Q.   JUST SO THE RECORD IS CLEAR, WERE YOU TROUBLED BY THE

10:04:58  4    NUMBER OF DOCTOR AND PATIENT COMPLAINTS THAT YOU SAW COME IN

10:05:02  5    THE DOOR AT THERANOS?

10:05:03  6    A.   YES.

10:05:03  7    Q.   BY THE WAY, DID YOU KNOW ABOUT EACH AND EVERY DOCTOR OR

10:05:08  8    PATIENT COMPLAINT THAT CAME IN TO THE COMPANY DURING YOUR TIME

10:05:11  9    AS LAB DIRECTOR?

10:05:12  10   A.   NO.

10:05:13  11   Q.   THE ONES YOU SAW STILL TROUBLED YOU?

10:05:15  12   A.   YES.

10:05:18  13   Q.   WAS THE LEVEL OF COMPLAINTS THAT YOU SAW AT UNIVERSITY OF

10:05:22  14   PITTSBURGH EQUALLY TROUBLING TO YOU?

10:05:24  15   A.   NO.

10:05:27  16   Q.   WHY NOT?  WHY WERE THOSE TWO SITUATIONS DIFFERENT?

10:05:30  17   A.   SO AT THE UNIVERSITY OF PITTSBURGH, THE DISCUSSIONS WITH

10:05:37  18   THE PHYSICIANS WERE FREQUENTLY ABOUT WHAT TEST METHOD WE SHOULD

10:05:42  19   USE.  I REMEMBER FREQUENT CONVERSATIONS WITH THE

10:05:44  20   ENDOCRINOLOGISTS ABOUT HORMONES THAT WERE PRESENT IN VERY LOW

10:05:51  21   LEVELS THAT CAN BE TRICKY TO TEST ACCURATELY AND WHAT THE BEST

10:05:56  22   METHOD SHOULD BE.

10:05:57  23        THERE WERE A COUPLE OF COMPLAINTS, I REMEMBER ONE WAS

10:06:01  24   ABOUT A VERY HIGH PHOSPHOROUS.  IT HAD TO DO WITH A NURSE

10:06:08  25   DRAWING BLOOD FROM A CENTRAL CATHETER INSTEAD OF FROM THE ARM.

10:06:12  1        THE COMPLAINTS WERE NOT ABOUT TEST ACCURACY, PER SE.  THEY

10:06:18  2   WERE ABOUT -- THEY WERE COMPLAINTS ABOUT RESULTS, OCCASIONAL

10:06:23  3   FLIERS, RESULTS THAT DIDN'T MAKE SENSE.

10:06:25  4        BUT IT WAS NOT -- NONE OF THE CLINICIANS WERE QUESTIONING

10:06:29  5   THE ACCURACY OF THE LABORATORY.

10:06:31  6   Q.   I'D LIKE TO SHIFT GEARS AND TALK ABOUT PROFICIENCY

10:06:39  7   TESTING.

10:06:40  8        ON DIRECT, YOU TESTIFIED ABOUT THE LACK OF PROFICIENCY

10:06:44  9   TESTING AT THERANOS.

10:06:45 10        DO YOU RECALL THAT?

10:06:46 11   A.   YES.

10:06:47 12   Q.   THERE WAS, HOWEVER, SOME PROFICIENCY TESTING AT THE

10:06:50 13   COMPANY; ISN'T THAT RIGHT?

10:06:51 14   A.   YES.

10:06:52 15   Q.   ON WHAT DEVICES DID THERANOS CONDUCT REGULAR PROFICIENCY

10:06:58 16   TESTING WHEN YOU WERE AT THE COMPANY?

10:07:00 17   A.   THE -- THE ONLY PROFICIENCY TESTING DATA THAT I CAN RECALL

10:07:13 18   BEING RUN ACCORDING TO THE AAP WAS FOR VITAMIN D, I BELIEVE.

10:07:20 19   Q.   AND FOR NOW I'M ASKING YOU A BROADER QUESTION, NOT JUST

10:07:23 20   ABOUT AAP, BUT PROFICIENCY TESTING IN GENERAL.

10:07:29 21        DO YOU RECALL STANDARD PROFICIENCY TESTING OCCURRING AT

10:07:32 22   THERANOS?

10:07:32 23   A.   YES.

10:07:32 24   Q.   ON FDA APPROVED DEVICES?

10:07:34 25   A.   YES.

10:07:35   1   Q.   WOULD THAT BE THE NON-THERANOS AND NON-THERANOS MODIFIED

10:07:41   2   DEVICES?

10:07:41   3   A.   YES.

10:07:42   4   Q.   WHEN YOU ANSWERED ON DIRECT THAT THERE WAS NO PROFICIENCY

10:07:48   5   TESTING AT THERANOS, WAS THERE SOMETHING THAT WAS CONFUSING YOU

10:07:52   6   AT THAT TIME THAT CAUSED YOU TO GIVE THAT ANSWER?

10:07:53   7   A.   I, I WANTED TO CLARIFY THAT EVEN THOUGH I HAD WRITTEN AN

10:08:05   8   SOP OR AAP, BUT IT WASN'T BEING IMPLEMENTED ACROSS ALL OF THE

10:08:10   9   ASSAYS.

10:08:11   10   Q.   OUR CONVERSATION DURING DIRECT, DID IT FOCUS MORE ON THE

10:08:17   11   THERANOS SPECIFIC DEVICES OR THE UNMODIFIED FDA APPROVED

10:08:22   12   DEVICES?

10:08:22   13   A.   I ASSUMED YOU WERE TALKING ABOUT THE THERANOS DEVICES,

10:08:25   14   YES.

10:08:25   15   Q.   HOW ABOUT YOUR CONCERNS WHEN IT CAME TO TESTING ACCURACY?

10:08:29   16   DID THOSE CONCERNS RELATE MOSTLY TO THE THERANOS SPECIFIC

10:08:34   17   DEVICES OR THE UNMODIFIED THIRD PARTY DEVICES?

10:08:38   18   A.   THERANOS SPECIFIC DEVICES.

10:08:39   19   Q.   OKAY.  I'D LIKE TO SHOW YOU BRIEFLY EXHIBIT 10029, WHICH

10:08:46   20   IS IN EVIDENCE.

10:09:00   21       AND IF WE COULD ZOOM IN JUST ON THE TOP PART OF THE PAGE.

10:09:04   22       DR. ROSENDORFF, DO YOU SEE A COMPARATIVE EVALUATION REPORT

10:09:08   23   FROM THE AMERICAN PROFICIENCY INSTITUTE?

10:09:10   24   A.   YES.

10:09:10   25   Q.   DO YOU RECALL REVIEWING THIS DOCUMENT WITH MR. WADE DURING

10:09:14   1    CROSS-EXAMINATION?

10:09:15   2    A.   YES.

10:09:15   3    Q.   I'LL ASK YOU TO TAKE A LOOK AT THIS PAGE.  FIRST OF ALL,

10:09:22   4    THIS IS DATED 2014.

10:09:25   5        DO YOU SEE THAT IN THE TOP LEFT?

10:09:27   6    A.   YES.

10:09:28   7    Q.   THE PROFICIENCY TESTING RESULTS THAT ARE REPORTED IN THIS

10:09:35   8    EXHIBIT, ARE THEY A RESULT OF PROFICIENCY TESTING ON THE

10:09:41   9    THERANOS EDISON DEVICE?

10:09:43  10    A.   NO.

10:09:44  11    Q.   WHAT DEVICE OR WHAT CATEGORY OF DEVICES IS REFLECTED IN

10:09:50  12    THIS PROFICIENCY TESTING DATA?

10:09:52  13    A.   THESE ARE IMMUNOASSAYS AS INDICATED ON THE, ON THE REPORT,

10:10:00  14    OR EVALUATION.  THEY WERE RUN ON THE SIEMENS IMMULITE 2000 WITH

10:10:08  15    IMMULITE REAGENT.

10:10:09  16    Q.   AND SO WOULD THAT HAVE BEEN AN UNMODIFIED, NON-THERANOS,

10:10:13  17    FDA APPROVED TESTING METHOD?

10:10:15  18    A.   CORRECT.

10:10:15  19    Q.   IF WE COULD ZOOM OUT.

10:10:17  20        DR. ROSENDORFF, LET ME KNOW IF THE TEXT IS TOO SMALL AND

10:10:20  21    WE CAN ZOOM BACK IN, BUT LOOKING AT THE ACTUAL ASSAYS INVOLVED

10:10:27  22    HERE, WERE ANY OF THESE ASSAYS RUN ON THE EDISON AT THERANOS?

10:10:34  23    A.   YES, ON -- YES, I BELIEVE ON PROLACTIN, PSA, TESTOSTERONE,

10:10:45  24    ESTRADIOL, FSH.  THOSE ARE THE ONES THAT I CAN RECALL.

10:10:49  25    Q.   AND ACTUALLY, I SHOULD HAVE ASKED YOU, WERE ANY OF THOSE

10:10:52  1    ASSAYS RUN ON EITHER THE EDISON OR THE THERANOS MODIFIED THIRD

10:10:56  2    PARTY DEVICES?  WOULD THAT CHANGE YOUR ANSWER?

10:11:01  3    A.   THEY WERE RUN ON THE EDISON.

10:11:04  4         THERE WAS ALSO -- I SHOULD SAY, THERE WAS ALSO AN ATTEMPT

10:11:07  5    TO RUN DILUTED FINGERSTICK SAMPLES ON THE IMMULITE.  I DON'T

10:11:13  6    RECALL WHETHER THAT WAS ACTUALLY IMPLEMENTED FOR PATIENTS OR

10:11:16  7    NOT.

10:11:17  8    Q.   OKAY.  UNDERSTOOD.

10:11:20  9         IN 2013 -- OR SORRY.

10:11:22  10        IN 2014, WERE SOME OF THESE ASSAYS BEING RUN ON THERANOS

10:11:28  11   SPECIFIC DEVICES OR THERANOS MODIFIED DEVICES?

10:11:32  12   A.   SOME OF THEM WERE BEING RUN ON THERANOS SPECIFIC DEVICES

10:11:37  13   AND OTHERS ON -- I'M SORRY.

10:11:39  14        SOME OF THEM WERE RUN ON FDA APPROVED DEVICES AND SOME OF

10:11:42  15   THEM ON THE EDISONS.

10:11:44  16   Q.   DO YOU HAVE AN UNDERSTANDING THEN AS TO WHY, FOR

10:11:47  17   PROFICIENCY TESTING, THE PROFICIENCY TESTING WOULD HAVE BEEN

10:11:52  18   DONE USING THE UNMODIFIED THIRD PARTY DEVICES?

10:11:54  19   A.   I DID NOT THINK THAT THIS WAS APPROPRIATE GIVEN THE FACT

10:12:02  20   THAT THE REGULATIONS STATE THAT YOU'RE SUPPOSED TO DO

10:12:05  21   PROFICIENCY TESTING ON YOUR MOST COMMONLY USED METHOD.  IN MANY

10:12:13  22   CASES, WE WERE NOT USING THE IMMULITE FOR A NUMBER OF THESE

10:12:19  23   ANALYTES.

10:12:23  24        I SENT AN E-MAIL LISTING THE ANALYTES FOR WHICH WE SHOULD

10:12:28  25   STOP THE CMS REPORTING BECAUSE CMS WAS UNDER THE IMPRESSION

10:12:33  1    THAT WE WERE STILL USING THE FDA DEVICES AS THE PREDOMINANT

10:12:38  2    DEVICES.

10:12:38  3    Q.   WE SAW THAT EMAIL DURING YOUR CROSS-EXAMINATION.  IS THAT

10:12:42  4    THE ONE YOU'RE REFERRING TO?

10:12:43  5    A.   YES, YES.

10:12:44  6    Q.   OKAY.  WE CAN TAKE THAT EXHIBIT DOWN.  THANK YOU.

10:12:48  7         AS TO THE EDISON AND THE MODIFIED THIRD PARTY DEVICES,

10:12:53  8    BASED ON WHAT YOU SAW AT THERANOS, WAS THERE EVER REGULAR

10:12:57  9    PROFICIENCY TESTING ACTUALLY IMPLEMENTED FOR THOSE KINDS OF

10:13:01 10    TESTS?

10:13:01 11    A.   NO.

10:13:02 12    Q.   ON CROSS-EXAMINATION, YOU WERE SHOWN AN SOP RELATING TO

10:13:08 13    THAT KIND OF PROFICIENCY TESTING ON THOSE DEVICES.

10:13:11 14         DO YOU RECALL THAT?

10:13:11 15    A.   YES.

10:13:12 16    Q.   IS THERE A DIFFERENCE IN A LAB BETWEEN HAVING A WRITTEN

10:13:17 17    SOP AND ACTUALLY IMPLEMENTING OR CARRYING OUT THAT SOP?

10:13:20 18    A.   YES, HUGE DIFFERENCE.

10:13:21 19    Q.   ON CROSS-EXAMINATION, YOU ALSO SAW THAT PROFICIENCY

10:13:27 20    TESTING AND AAP REMAINED A SUBJECT OF DISCUSSION THROUGHOUT

10:13:32 21    YOUR TIME AT THE COMPANY; IS THAT CORRECT?

10:13:35 22    A.   YES.

10:13:35 23    Q.   DID ANY OF THAT DISCUSSION REFRESH YOUR RECOLLECTION THAT

10:13:42 24    THERE WAS PROFICIENCY TESTING ON THOSE METHODS THAT YOU HAD

10:13:46 25    FORGOTTEN ABOUT, FOR EXAMPLE?

10:13:48  1    A.    SO R&D WAS DOING WHAT THEY WERE CALLING IQP.  I NEVER SAW

10:13:58  2    OR APPROVED THE PROCEDURE FOR IQP.  THEY WERE DOING THEIR OWN

10:14:02  3    THING.

10:14:03  4    Q.    I THINK WE'RE ABOUT TO LOOK AT SOME RELEVANT EXHIBITS FOR

10:14:08  5    THAT.

10:14:09  6          LET'S TAKE A QUICK LOOK AT EXHIBIT 2009 FIRST.  AND THIS

10:14:13  7    IS IN EVIDENCE.

10:14:23  8          DR. ROSENDORFF, DO YOU SEE EXHIBIT 2009 IS AN EMAIL CHAIN

10:14:26  9    FROM EARLY OCTOBER 2014?

10:14:28  10   A.    YES.

10:14:28  11   Q.    AND DO YOU RECALL DISCUSSING THIS EMAIL CHAIN AND THESE

10:14:33  12   CIRCUMSTANCES DURING YOUR TESTIMONY?

10:14:35  13   A.    YES.

10:14:35  14   Q.    LET'S LOOK NEXT AT EXHIBIT 7482, WHICH IS ALSO IN

10:14:40  15   EVIDENCE.  AND LET'S GO TO THE NEXT PAGE.

10:14:57  16         AND, DR. ROSENDORFF, DO YOU SEE THAT THIS IS A CONTINUED

10:15:03  17   EMAIL DISCUSSION ABOUT, I BELIEVE, TESTOSTERONE RESULTS?

10:15:21  18   A.    YES.

10:15:21  19   Q.    IF WE COULD ZOOM ON THE BOTTOM HALF OF THIS PAGE, PLEASE.

10:15:25  20         DO YOU RECALL REVIEWING THIS EMAIL DURING YOUR

10:15:27  21   CROSS-EXAMINATION WHERE YOU SAY, PLEASE LET CHRISTIAN HANDLE

10:15:32  22   THE COMMUNICATION WITH THE DOCTOR?

10:15:35  23   A.    YES.

10:15:36  24   Q.    DURING DIRECT, WE SPOKE ABOUT CHRISTIAN HOLMES'S ROLE IN

10:15:40  25   DEALING WITH INQUIRIES FROM PATIENTS AND DOCTORS.

10:15:44   1        DO YOU RECALL THAT?

10:15:44   2   A.   YES.

10:15:45   3   Q.   GENERALLY SPEAKING, WHAT WAS YOUR POSITION ON THE WAY THAT

10:15:51   4   CHRISTIAN HOLMES WAS INVOLVED IN SPEAKING WITH DOCTORS AND

10:15:56   5   PATIENTS AT THERANOS?

10:15:57   6   A.   I KNOW THAT CHRISTIAN WAS A MIDDLEMAN, INTERMEDIARY

10:16:05   7   BETWEEN CUSTOMER SERVICE OR THE REMOTE SITE IN ARIZONA AND

10:16:10   8   MYSELF.  SO HE WOULD BE RECEIVING THESE QUERIES AND COMPLAINTS.

10:16:18   9        AND I DON'T KNOW WHAT WOULD -- WHAT -- IN HIS MIND, I

10:16:22  10   DON'T KNOW WHAT DETERMINED WHAT SHOULD BE ESCALATED TO ME OR

10:16:25  11   WHAT HE COULD HANDLE HIMSELF OR HE WOULD BE HANDLING THROUGH

10:16:29  12   DANIEL.

10:16:30  13        I ASSUMED THAT IF THERE WERE MEDICAL ISSUES AT PLAY, HE

10:16:34  14   WOULD BE FORWARDING THOSE TO ME.

10:16:35  15   Q.   DID MR. HOLMES'S INVOLVEMENT IN THIS AREA HAVE AN EFFECT,

10:16:41  16   IN YOUR MIND, ON YOUR COMMUNICATIONS WITH DOCTORS AND PATIENTS?

10:16:44  17   A.   I -- I GUESS I WASN'T CLEAR ON WHAT CHRISTIAN HAD ALREADY

10:16:54  18   COMMUNICATED TO DOCTORS ON MANY OCCASIONS.

10:16:57  19   Q.   YOU TESTIFIED ON DIRECT ABOUT PRESSURE THAT YOU FELT IN

10:17:02  20   CONNECTION WITH YOUR COMMUNICATIONS WITH DOCTORS AND PATIENTS.

10:17:08  21        DO YOU RECALL THAT TESTIMONY?

10:17:09  22   A.   YES.

10:17:09  23   Q.   WAS CHRISTIAN HOLMES PART OF THAT PRESSURE?

10:17:12  24   A.   YES.

10:17:12  25   Q.   WHY IN THIS CASE, IN OCTOBER 2014, DID YOU EXPRESS A

10:17:16  1      PREFERENCE FOR CHRISTIAN TO HANDLE THIS PARTICULAR

10:17:18  2      COMMUNICATION WITH THAT DOCTOR?

10:17:19  3      A.   IN ORDER TO TALK HONESTLY AND TRANSPARENTLY WITH THE

10:17:24  4      DOCTOR, I NEEDED MORE INFORMATION FROM THE ELISA GROUP ON THAT

10:17:31  5      PARTICULAR ASSAY AND THAT RUN, ET CETERA.  I DID NOT RECEIVE

10:17:34  6      THAT, SO I DIDN'T FEEL LIKE I WAS EQUIPPED TO ADDRESS THE

10:17:39  7      ISSUES WITH THE DOCTOR.

10:17:40  8      Q.   LET'S GO TO PAGE 1 OF THIS EXHIBIT, AND LET'S ZOOM IN ON

10:17:51  9      THE TOP HALF OF THIS PAGE.

10:17:58  10         DR. ROSENDORFF, DO YOU RECALL REVIEWING THIS PORTION OF

10:18:00  11     THE EMAIL WITH MR. WADE?

10:18:01  12     A.   YES.

10:18:02  13     Q.   FIRST OF ALL, THIS IS AN EMAIL FROM SUNNY BALWANI TO YOU

10:18:08  14     CC'ING ELIZABETH HOLMES.

10:18:13  15         DO YOU SEE THAT?

10:18:13  16     A.   YES.

10:18:14  17     Q.   OR RATHER BCC'ING ELIZABETH HOLMES.

10:18:17  18         DO YOU SEE THAT?

10:18:18  19     A.   YES.

10:18:18  20     Q.   HIS EMAIL SAYS THAT WE ARE IN THE PROCESS OF RESPONDING TO

10:18:21  21     THE DOCTOR, BUT HE WANTS TO SHARE WITH YOU A FEW THOUGHTS.

10:18:26  22         UNDER NUMBER 1 HERE, MR. BALWANI SAYS THE SPURIOUS RESULT

10:18:32  23     IN ALL LIKELIHOOD SEEMS TO BE DUE TO HEMOLYSIS.

10:18:36  24         DO YOU SEE THAT?

10:18:36  25     A.   YES.

10:18:37   1    Q.   CAN YOU REMIND US WHAT HEMOLYSIS IS?

10:18:40   2    A.   HEMOLYSIS IS BREAKING OPEN OF RED BLOOD CELLS WITHIN THE

10:18:45   3    SAMPLE BEFORE IT'S TESTED.

10:18:47   4    Q.   AND WAS THAT A RECURRING SOURCE OF ISSUES AT THERANOS IN

10:18:51   5    YOUR EXPERIENCE?

10:18:52   6    A.   YES.

10:18:54   7    Q.   WAS THAT PROBLEM MORE OR LESS COMMON WITH FINGERSTICK

10:18:58   8    SAMPLES AS OPPOSED TO VEIN SAMPLES?

10:19:00   9    A.   MUCH, MUCH MORE COMMON WITH FINGERSTICK.

10:19:03  10    Q.   ALL RIGHT.  NUMBER 2 IN MR. BALWANI'S LIST HERE SAYS, "WE

10:19:09  11    ARE DOING MONTHLY (MOST CASES WEEKLY) IQP (AAP) FOR EACH ASSAY

10:19:16  12    ON EDISON AND OTHER DEVICES DOWNSTAIRS."

10:19:19  13         DO YOU SEE THAT?

10:19:20  14    A.   YES.

10:19:21  15    Q.   DID YOU AGREE WITH THAT STATEMENT?

10:19:22  16    A.   NO.

10:19:23  17    Q.   WHY NOT?

10:19:23  18    A.   I NEVER -- SO AS I'VE TESTIFIED, THERE WAS NOT A FORMAL

10:19:30  19    IQP POLICY OR SOP.  I DID NOT VIEW IQP AND AAP AS

10:19:39  20    INTERCHANGEABLE.  AND I DID NOT SEE THE DATA THAT HE'S

10:19:41  21    REFERRING TO.

10:19:42  22    Q.   DID YOU EVER HAVE A CHANCE TO LOOK AT ANY PORTION OF THE

10:19:46  23    DATA THAT RESULTED FROM THIS KIND OF TESTING AT THERANOS?

10:19:51  24    A.   YES.  I BELIEVE THAT I DID SEE DATA OVER THE COURSE OF A

10:19:57  25    WEEK LOOKING AT POTASSIUM VALUES THAT DANIEL HAD GENERATED.

10:20:03   1        I DON'T RECALL WHAT THE DATA INDICATED.

10:20:05   2    Q.   OKAY.   WERE YOU ABLE TO REACH ANY CONCLUSIONS ABOUT THE

10:20:12   3    COMPLETENESS OF THAT DATA OR THE APPROPRIATENESS OF THE TESTING

10:20:14   4    THAT THERANOS WAS RUNNING AT THAT TIME?

10:20:17   5    A.   INCOMPLETE.

10:20:17   6    Q.   AND WHAT MADE YOU CONCLUDE THAT THAT DATA WAS INCOMPLETE?

10:20:20   7    A.   WELL, FOR INSTANCE, FOR THE CBC ASSAY, I KEPT -- I KEPT

10:20:27   8    ASKING FOR THE AAP DATA, AND THEN EVENTUALLY SOMEBODY FROM R&D

10:20:35   9    SAID IT'S IN THIS FOLDER, IT'S ALL IN THIS FOLDER.

10:20:39   10       I WENT INTO THE FOLDER, IT WAS AN EXCEL SPREADSHEET THAT

10:20:42   11   WASN'T ANNOTATED, AND I NOTICED THAT THE SPREADSHEET ACTUALLY

10:20:46   12   HAD BEEN CHANGED A FEW MINUTES BEFORE MY INQUIRY.

10:20:53   13       AND I BELIEVE THERE'S AN EMAIL TO THAT EFFECT WITH

10:20:57   14   MR. BALWANI CHASTISING ME FOR MY FRUSTRATION ABOUT THAT.

10:21:00   15   Q.   AND DURING YOUR CROSS-EXAMINATION, YOU REVIEWED PORTIONS

10:21:07   16   OF THE CLIA REGULATIONS WITH MR. WADE.

10:21:10   17       DO YOU RECALL THAT?

10:21:10   18   A.   YES.

10:21:11   19   Q.   WHOSE RESPONSIBILITY UNDER THE REGULATIONS IS IT TO

10:21:14   20   IMPLEMENT PROFICIENCY TESTING AT A CLINICAL LABORATORY?

10:21:17   21   A.   THE LAB DIRECTOR.

10:21:21   22   Q.   WHEN YOU WERE ASKED THAT QUESTION ON CROSS-EXAMINATION,

10:21:25   23   YOU STARTED TO EXPLAIN THE PRACTICAL CONCERNS AROUND ACTUALLY

10:21:30   24   IMPLEMENTING --

10:21:31   25   A.   YES.

10:21:32  1    Q.   -- PROFICIENCY TESTING.

10:21:34  2    A.   YES.

10:21:34  3    Q.   CAN YOU EXPLAIN WHAT IT TAKES TO ACTUALLY IMPLEMENT

10:21:37  4    PROFICIENCY TESTING AT A LAB LIKE THERANOS?

10:21:39  5    A.   SO THERE WERE -- I DON'T KNOW HOW MANY ASSAYS WERE BEING

10:21:45  6    RUN, BUT IT WAS MANY, MANY ASSAYS ON DIFFERENT PLATFORMS.  AND

10:21:54  7    IT WOULD HAVE REQUIRED MAJOR COORDINATED EFFORTS WITHIN R&D AND

10:21:59  8    CLIA.  IT WOULD HAVE REQUIRED PEOPLE TO BE ASSIGNED DUTIES AND

10:22:03  9    TIMELINES TO COMPLETE THIS, A PLAN FORMED TO RECORD THE RESULTS

10:22:10 10    OF THE PROFICIENCY TESTING.

10:22:12 11         IT ALSO WOULD HAVE TIED UP A LOT OF EDISONS AND THE OTHER

10:22:18 12    LDT'S FOR THE PURPOSES OF PROFICIENCY TESTING AT VARIOUS TIMES.

10:22:26 13         IT ALSO WOULD HAVE INVOLVED REALLY DISCUSSING HOW TO DO

10:22:29 14    THE PROFICIENCY TESTING SPECIFICALLY FOR THE LDT'S THAT WERE

10:22:37 15    BEING RUN ON THE ADVIA.

10:22:39 16         DANIEL HAD MADE A FEW SUGGESTIONS, BUT THE SOP THAT I

10:22:42 17    WROTE WAS SPECIFIC FOR THE EDISONS, SO --

10:22:45 18    Q.   AND WHEN YOU THINK ABOUT ALL OF THE THINGS THAT WOULD BE

10:22:47 19    REQUIRED TO ACTUALLY IMPLEMENT AND FOLLOW THROUGH ON

10:22:50 20    PROFICIENCY TESTING --

10:22:51 21    A.   YES.

10:22:52 22    Q.   -- AS YOU'RE DESCRIBING, ARE THOSE THINGS THAT YOU COULD

10:22:56 23    HAVE ALL DONE ON YOUR OWN AT THERANOS?

10:22:58 24    A.   THAT I COULD HAVE DONE ON MY OWN?

10:23:01 25    Q.   YES.

10:23:01  1    A.   NO, ABSOLUTELY NOT.

10:23:03  2    Q.   WERE THERE THINGS THAT WOULD HAVE BEEN REQUIRED THAT WOULD

10:23:06  3    HAVE NEEDED THE SUPPORT OF UPPER MANAGEMENT IN ORDER TO

10:23:09  4    ACTUALLY FOLLOW THROUGH ON PROFICIENCY TESTING?

10:23:11  5    A.   YES.

10:23:11  6    Q.   WHEN YOU WERE AT THERANOS, DID YOU FEEL THAT YOU HAD THE

10:23:15  7    SUPPORT OF UPPER MANAGEMENT -- AND I SPECIFICALLY MEAN

10:23:19  8    MS. HOLMES AND MR. BALWANI -- WHEN IT CAME TO IMPLEMENTING

10:23:22  9    PROFICIENCY TESTING?

10:23:22  10   A.   NO.

10:23:23  11   Q.   WHAT MADE YOU FEEL THAT WAY?

10:23:25  12   A.   AFTER THE MEETING IN 2014 WHERE PROFICIENCY TESTING WAS

10:23:32  13   DISCUSSED, THERE WAS NO FOLLOW THROUGH.

10:23:44  14   Q.   THERE WAS SOME DISCUSSION DURING DIRECT AND ON

10:23:46  15   CROSS-EXAMINATION OF I BELIEVE A TEST THAT YOU CALLED A SPOT

10:23:49  16   CHECK.

10:23:50  17        DO YOU REMEMBER THAT?

10:23:50  18   A.   YES.

10:23:51  19   Q.   AND, FIRST OF ALL, LET'S LOOK AT EXHIBIT 1548, WHICH IS IN

10:23:56  20   EVIDENCE.

10:24:10  21        AND, DR. ROSENDORFF, DO YOU SEE AN EMAIL FROM FEBRUARY

10:24:13  22   2014?

10:24:13  23   A.   YES.

10:24:14  24   Q.   LET'S LOOK AT THE ATTACHMENT TO THIS EMAIL IN NATIVE.

10:24:25  25        OKAY.  DR. ROSENDORFF, DO YOU SEE IN FRONT OF YOU DATA

10:24:28   1    FROM THAT SPOT CHECK THAT WE PREVIOUSLY DISCUSSED?

10:24:30   2    A.   YES.

10:24:31   3    Q.   DURING CROSS-EXAMINATION, THERE WAS SOME DISCUSSION OF HOW

10:24:38   4    AAP OR ALTERNATIVE ASSESSMENT AND PROFICIENCY WAS DIFFERENT

10:24:41   5    FROM STANDARD PT.

10:24:43   6         DO YOU REMEMBER THAT?

10:24:44   7    A.   YES.

10:24:44   8    Q.   YOUR PREFERENCE BETWEEN THOSE TWO OPTIONS -- WELL, LET ME

10:24:51   9    JUST ASK.  WHAT WAS YOUR PREFERENCE BETWEEN THOSE TWO OPTIONS

10:24:53  10    AT THERANOS?  SHOULD THERANOS HAVE BEEN USING STANDARD

10:24:57  11    PROFICIENCY TESTING OR AAP FOR ITS COMPANY SPECIFIC TESTS?

10:25:00  12    A.   AAP.

10:25:01  13    Q.   THE DATA THAT WE'RE LOOKING AT IN THIS CHART DOES NOT

10:25:05  14    RESULT FROM AAP; IS THAT CORRECT?

10:25:07  15    A.   CORRECT.

10:25:07  16    Q.   YOU CALLED IT A SPOT CHECK BEFORE.  CAN YOU EXPLAIN WHAT

10:25:14  17    MADE YOU USE THAT TERM?  WHY IS THIS A SPOT CHECK IN YOUR VIEW?

10:25:17  18    A.   IT'S A -- IT'S A SNAPSHOT IN TIME USING COMMERCIALLY

10:25:23  19    AVAILABLE PT SPECIMENS TO BE RUN ON THE EDISONS.

10:25:30  20         THOSE PT SPECIMENS DID WORK ON THE IMMULITE AND THE

10:25:35  21    EDISONS WERE VALIDATED AGAINST THE IMMULITE.

10:25:42  22         SO I -- IN DISCUSSING THIS WITH THE GROUP, I THOUGHT IT

10:25:44  23    WAS A REASONABLE SPOT CHECK AND AUTHORIZED IT EVEN THOUGH IT

10:25:49  24    WASN'T PART OF A FORMAL SOP.

10:25:51  25    Q.   SO DESPITE YOUR PREFERENCE FOR AAP AND YOUR ADVOCACY FOR



10:25:56   1    AAP IN THE COMPANY, DID YOU FEEL THAT THIS TEST WAS USEFUL IN

10:26:02   2    ASSESSING THE ACCURACY OF THERANOS TESTS?

10:26:06   3    A.   YES.

10:26:06   4    Q.   WHO WERE THE OTHER PEOPLE IN THE LAB WHO WERE INVOLVED IN

10:26:14   5    CONDUCTING THIS TESTING AND LOOKING AT THE DATA, IF YOU RECALL?

10:26:18   6    A.   I KNOW LANGLY GEE WAS COORDINATING IT.  MARK PANDORI AND

10:26:25   7    MYSELF DISCUSSED THE PLAN.  ERIKA CHEUNG, I BELIEVE, RAN MANY

10:26:30   8    OF THESE SAMPLES.

10:26:31   9    Q.   AND DID THOSE INDIVIDUALS SUPPORT THIS APPROACH OF DOING

10:26:36   10   THIS TESTING TO ASSESS THE ACCURACY OF THERANOS'S ASSAYS?

10:26:43   11   A.   YES.

10:26:43   12   Q.   MARK PANDORI ALSO HAD A SUPERVISORY POSITION IN THE LAB;

10:26:47   13   IS THAT CORRECT?

10:26:48   14   A.   I DON'T RECALL.

10:26:50   15   Q.   DO YOU RECALL GENERALLY WHAT MARK PANDORI'S ROLE AT

10:26:56   16   THERANOS WAS?

10:26:56   17   A.   I BELIEVE HE WAS HIRED AS A CO-LABORATORY DIRECTOR.  HE

10:27:01   18   HAD A LOT OF EXPERIENCE IN MICROBIOLOGY, SO THE COMPANY WAS --

10:27:08   19   I GUESS IT'S -- WELL, WHAT MARK TOLD ME WAS THAT HE WAS GOING

10:27:11   20   TO HEAD UP THE MICRO EFFORT AT THERANOS.

10:27:16   21   Q.   AND DID -- IS IT DR. PANDORI?

10:27:18   22   A.   YES.

10:27:19   23   Q.   DID DR. PANDORI KNOW WHAT AAP WAS?

10:27:22   24   A.   YES.

10:27:22   25   Q.   DID DR. PANDORI SUPPORT THE USE OF OR THE IMPLEMENTATION

10:27:28   1     OF AAP AT THERANOS?

10:27:29   2     A.   WELL, AT THE TIME THE SPOT CHECK WAS DONE, DR. PANDORI WAS

10:27:34   3     NOT AWARE OF THE DISCUSSIONS -- PERHAPS WAS NOT AWARE OF THE

10:27:38   4     DISCUSSIONS THAT HAD HAPPENED BETWEEN ME AND DANIEL PREVIOUSLY

10:27:41   5     ON THE TOPIC OF AAP.

10:27:42   6     Q.   OKAY.  I UNDERSTAND THAT.

10:27:46   7          DURING YOUR TIME AT THERANOS, DID YOU COME TO UNDERSTAND

10:27:49   8     WHETHER DR. PANDORI HAD A PREFERENCE ON THE USE OF AAP AT

10:27:53   9     THERANOS?  DID HE SUPPORT IT OR WAS HE AGAINST IT?

10:27:55  10     A.   IN MY DISCUSSIONS WITH HIM, HE -- HE DIDN'T SEEM TO RULE

10:28:06  11     ONE WAY OR THE OTHER.

10:28:08  12     Q.   DO YOU RECALL REVIEWING A PRESENTATION ON AAP AND THE

10:28:10  13     BENEFITS OF AAP --

10:28:11  14     A.   YES.

10:28:12  15     Q.   -- PREPARED PARTLY BY DR. PANDORI?

10:28:14  16     A.   YES.

10:28:14  17     Q.   DID DR. PANDORI SUPPORT THE GENERATION OF THE TEST DATA

10:28:24  18     THAT WE'RE LOOKING AT HERE?

10:28:25  19     A.   YES, HE DID.

10:28:26  20     Q.   HOW WOULD YOU RESPOND TO THE CLAIM THAT BECAUSE THIS TEST

10:28:36  21     DATA WAS NOT GENERATED THROUGH THE FORMAL AAP SOP, THE FORMER

10:28:43  22     PROCEDURE -- THE FORMAL PROCEDURE AT THERANOS, THAT WE SHOULD

10:28:47  23     IGNORE THIS DATA, THAT IT DOESN'T MEAN ANYTHING?  WOULD YOU

10:28:49  24     AGREE WITH THAT?

10:28:50  25     A.   NO.  IT'S VERY FREQUENT IN CLINICAL LABORATORIES TO DO QC

10:28:58  1    CHECKS, PILOT STUDIES, TO DO EVALUATION OF METHODS THAT WOULD

10:29:02  2    NOT BE AN ONGOING PROCESS, SO IT WOULDN'T HAVE TO BE CAPTURED

10:29:06  3    IN SOP BECAUSE YOU'RE NOT PLANNING ON IMPLEMENTING IT ON A

10:29:09  4    REGULAR CADENCE.

10:29:13  5    Q.   THE --

10:29:15  6    A.   AS LONG AS EVERYBODY IS CLEAR ON WHAT NEEDED TO BE DONE

10:29:19  7    AND HOW THE RESULTS WERE TO BE INTERPRETED.

10:29:21  8    Q.   WE WERE JUST TALKING ABOUT DR. PANDORI AT THERANOS.  WAS

10:29:26  9    HE STILL AT THE COMPANY WHEN YOU DEPARTED IN NOVEMBER 2014?

10:29:30 10    A.   NO.

10:29:31 11    Q.   DO YOU HAVE AN UNDERSTANDING AS TO WHY HE LEFT THE

10:29:34 12    COMPANY?

10:29:35 13    A.   YES, I CAN TELL YOU WHAT HE TOLD ME.

10:29:37 14    Q.   WHAT DID HE SAY?

10:29:38 15         MR. WADE:  OBJECTION, YOUR HONOR.  HEARSAY.

10:29:40 16         THE COURT:  SUSTAINED.

10:29:42 17         MR. BOSTIC:  THIS IS UNDER 803(3), YOUR HONOR.

10:29:53 18         THE COURT:  I'M GOING TO SUSTAIN THE OBJECTION.

10:29:56 19    BY MR. BOSTIC:

10:29:58 20    Q.   DR. ROSENDORFF, LET'S SHIFT GEARS.

10:30:01 21         WE CAN TAKE THAT EXHIBIT DOWN.

10:30:02 22         DO YOU RECALL A DISCUSSION DURING CROSS-EXAMINATION ABOUT

10:30:05 23    PATENTS HELD BY THERANOS?

10:30:07 24    A.   YES.

10:30:08 25    Q.   YOU SAID THAT THERANOS'S PATENTS, WHEN YOU WERE DECIDING

10:30:13   1    TO JOIN THE COMPANY, INCREASED YOUR EXCITEMENT ABOUT BEING PART

10:30:17   2    OF IT; IS THAT CORRECT?

10:30:18   3    A.   YES.

10:30:19   4    Q.   ONCE YOU DID JOIN, COULD YOU HAVE SKIPPED THE VALIDATION

10:30:23   5    PROCESS, IGNORED QUALITY CONTROL, AND JUST RELIED ON THOSE

10:30:27   6    PATENTS AS EVIDENCE THAT THE TESTS WERE ACCURATE?

10:30:30   7    A.   NO.

10:30:33   8    Q.   DOES THE FACT THAT A BLOOD TESTING METHOD IS PATENTED MEAN

10:30:36   9    THAT IT'S ACCURATE?

10:30:37   10   A.   NO.

10:30:37   11   Q.   DOES ONE HAVE ANYTHING TO DO WITH THE OTHER?

10:30:40   12   A.   NO.

10:30:41   13   Q.   DO YOU RECALL DISCUSSION DURING YOUR DIRECT EXAMINATION OF

10:30:52   14   A PRACTICE AT THERANOS OF GENERATING MULTIPLE RESULTS FOR A

10:30:55   15   GIVEN ASSAY AND THEN REMOVING TWO OF THEM AND AVERAGING THE

10:30:59   16   REST?

10:31:00   17   A.   YES.

10:31:00   18   Q.   DURING CROSS-EXAMINATION, YOU WERE ASKED SOME MORE

10:31:09   19   QUESTIONS ABOUT THAT.

10:31:10   20       DO YOU RECALL?

10:31:10   21   A.   YES.

10:31:11   22   Q.   I WANT TO BE CLEAR ABOUT WHETHER THAT PRACTICE WAS USED BY

10:31:15   23   THE THIRD PARTY DEVICES THAT YOU'VE WORKED WITH.

10:31:18   24       CAN WE BRING UP EXHIBIT 392, PLEASE.  THAT'S IN EVIDENCE.

10:31:32   25       AND, DR. ROSENDORFF, DO YOU SEE THAT EXHIBIT 392 IS THE

10:31:36   1    OPERATOR'S GUIDE FOR THE IMMULITE 2000?

10:31:39   2    A.   YES.

10:31:40   3    Q.   WAS THIS A THIRD PARTY DEVICE THAT YOU HAD EXPERIENCE WITH

10:31:43   4    AT THERANOS?

10:31:44   5    A.   YES.

10:31:45   6    Q.   LET'S GO TO PAGE 40 OF THIS EXHIBIT, PLEASE.

10:31:54   7         I'M SORRY, PAGE 40.  AND IF WE COULD ZOOM IN ON THE BOTTOM

10:32:03   8    HALF OF THAT PAGE.

10:32:07   9         DR. ROSENDORFF, DO YOU SEE A SECTION HERE TITLED

10:32:09  10    TECHNOLOGY, DATA REDUCTION AND THE CHEMILUMINESCENT REACTION

10:32:15  11    INTERNAL CALCULATIONS?

10:32:16  12    A.   YES.

10:32:17  13    Q.   JUST AT A VERY GENERAL LEVEL, WHAT DOES CHEMILUMINESCENT

10:32:22  14    MEAN IN THIS CONTEXT?

10:32:23  15    A.   IT'S THE SIGNAL THAT IS GENERATED WHEN THE ANALYTE IS

10:32:28  16    DETECTED BY THE ANTIBODY IN THE INSTRUMENT.  SO IT'S -- THAT

10:32:33  17    SIGNAL IS THEN TRANSLATED INTO AN ACTUAL CONCENTRATION.

10:32:38  18    Q.   IN OTHER WORDS, IS THE DEVICE MEASURING AN AMOUNT OF LIGHT

10:32:42  19    OUTPUT AND THEN CONVERTING THAT INTO A CONCENTRATION?

10:32:45  20    A.   YES.

10:32:45  21    Q.   THE LIST HERE TALKS ABOUT INTERNAL CALCULATIONS PERFORMED

10:32:55  22    BY THE SYSTEM WHEN DETERMINING TEST RESULTS.

10:32:59  23         DO YOU SEE THAT NEAR THE TOP OF THAT SECTION?

10:33:00  24    A.   YES.

10:33:01  25    Q.   TAKE A MOMENT TO JUST FAMILIARIZE YOURSELF WITH THE STEPS

10:33:04   1    1, 2, 3 LISTED HERE.

10:33:07   2    A.   OKAY.

10:33:08   3         (PAUSE IN PROCEEDINGS.)

10:33:27   4    BY MR. BOSTIC:

10:33:29   5    Q.   AND I'LL HAVE A QUESTION FOR YOU ABOUT SOMETHING ON THE

10:33:31   6    FOLLOWING PAGE.

10:33:41   7    A.   OKAY.

10:33:41   8    Q.   OKAY.  IF WE COULD TURN TO THE NEXT PAGE, PAGE 41.  AND

10:33:47   9    ZOOM IN ON THE TOP PORTION ONCE WE GET THERE.

10:33:58   10        DR. ROSENDORFF, DO YOU SEE THE CONTINUATION OF THAT LIST

10:33:59   11   WE WERE JUST LOOKING AT?

10:34:01   12   A.   YES.

10:34:01   13   Q.   ITEM 4 IN THIS LIST OF STEPS --

10:34:06   14   A.   YES.

10:34:07   15   Q.   -- TALKS ABOUT TAKING FIVE ONE-SECOND READINGS.

10:34:11   16        DO YOU SEE THAT?

10:34:11   17   A.   YES.

10:34:12   18   Q.   IS THIS THE SAME THING THAT THE THERANOS ANALYZER WAS

10:34:18   19   DOING?  IN OTHER WORDS, GENERATING MULTIPLE RESULTS FOR EACH

10:34:22   20   ASSAY AND THEN MANAGING THOSE MULTIPLE RESULTS?

10:34:26   21   A.   NO.  IF YOU LOOK AT NUMBER 5, WHAT THEY'RE SAYING IS THEY

10:34:32   22   TAKE DARK COUNT READINGS, WHICH I BELIEVE IS BACKGROUND, AND

10:34:39   23   THEY'RE SUBTRACTING IT FROM THE ACTUAL -- THERE'S FIVE READINGS

10:34:43   24   THAT ARE TAKEN.  THEY SUBTRACT THE BACKGROUND AND THEN THEY

10:34:46   25   AVERAGE THE FIVE.

10:34:47  1        BUT THEY'RE NOT DISCARDING ANY OF THOSE FIVE.

10:34:49  2   Q.   SO NONE OF THE ACTUAL RESULTS ARE BEING DISCARDED IN THE

10:34:53  3   THIRD PARTY DEVICE; IS THAT CORRECT?

10:34:55  4   A.   CORRECT, CORRECT.

10:34:56  5   Q.   WHEN IT TALKS ABOUT TAKING FIVE ONE-SECOND READINGS, DOES

10:35:00  6   THAT MEAN THAT THE CHEMICAL REACTION IS ACTUALLY OCCURRING FIVE

10:35:06  7   SEPARATE TIMES?

10:35:06  8   A.   NO.  IT'S OCCURRING ONCE.  IT'S A -- IT'S DIFFERENT

10:35:10  9   SNAPSHOTS OF THE LIGHT THAT'S BEING PUT OUT DURING THOSE FIVE

10:35:15  10  SECONDS.

10:35:16  11  Q.   IN OTHER WORDS, LIKE TAKING FIVE PICTURES --

10:35:19  12  A.   PICTURES.

10:35:21  13  Q.   -- OF THE SAME OBJECT?

10:35:22  14  A.   YEAH, YEAH.

10:35:22  15  Q.   IS THAT DIFFERENT FROM HOW THE THERANOS DEVICE WORKED?

10:35:25  16  A.   RIGHT.  SO THE THERANOS DEVICE HAD SIX SEPARATE TIPS, AT

10:35:35  17  LEAST IN THE 3.5 CONFIGURATION, AND EACH TIP WOULD BE PUTTING

10:35:40  18  OUT ITS OWN CHEMILUMINESCENCE, OR LIGHT.

10:35:45  19  Q.   SO THIS IS NOT THE SAME AS THAT?

10:35:47  20  A.   NO, THEY'RE NOT.  THESE ARE FIVE READINGS FROM THE SAME

10:35:50  21  PIECE OF INSTRUMENTATION.  IT'S NOT SIX SEPARATE TIPS.

10:35:54  22  Q.   BY THE WAY, AT THERANOS, DO YOU RECALL DISCUSSION OF HOW

10:36:02  23  EDISON DEVICES WERE USED IN GROUPS OF THREE TO RUN A SINGLE

10:36:06  24  ASSAY?

10:36:06  25  A.   YES.

10:36:07  1    Q.   AT THERANOS, WAS THAT APPROACH EVER TAKEN WITH THIRD PARTY

10:36:11  2    DEVICES?  DID IT REQUIRE MULTIPLE THIRD PARTY DEVICES TO RETURN

10:36:14  3    A SINGLE RESULT?

10:36:15  4    A.   NO.

10:36:16  5    Q.   WE CAN TAKE THAT EXHIBIT DOWN.  THANK YOU.

10:36:26  6         CHANGING TOPICS.

10:36:29  7         DO YOU RECALL TESTIMONY THAT YOU GAVE ABOUT AN INSPECTION

10:36:32  8    OF THERANOS IN 2013 AND WHERE THE INSPECTOR WAS GOING TO

10:36:37  9    INSPECT?

10:36:37 10    A.   YES.

10:36:38 11    Q.   LET'S LOOK BRIEFLY AT EXHIBIT 4047, WHICH IS IN EVIDENCE.

10:36:53 12    IF WE COULD ZOOM IN ON THE TOP HALF.  LET'S CAPTURE THE TEXT

10:37:03 13    BELOW ALSO.  ACTUALLY, IF WE COULD CAPTURE MS. HOLMES'S EMAIL

10:37:10 14    AT THE BOTTOM, PLEASE.  PERFECT.  THANK YOU.

10:37:18 15         DR. YOUNG, DO YOU SEE THIS EMAIL THAT YOU PREVIOUSLY

10:37:20 16    REVIEWED WHERE MS. HOLMES IS ASKING, IN ADVANCE OF AN

10:37:25 17    INSPECTION, ABOUT WHAT THE PATH WILL BE FOR WALKING THE

10:37:28 18    AUDITORS IN AND DOWNSTAIRS?

10:37:30 19    A.   YES.

10:37:30 20    Q.   IN FRONT OF YOU, YOU SHOULD HAVE -- ACTUALLY, YOU DON'T

10:37:37 21    HAVE IT BECAUSE I HAVEN'T GIVEN IT TO YOU YET.

10:37:40 22         MAY I APPROACH, YOUR HONOR?

10:37:42 23              THE COURT:  YES.

10:37:46 24              MR. BOSTIC:  (HANDING.)

10:37:49 25    Q.   I'VE JUST HANDED YOU WHAT'S MARKED AS EXHIBIT 4316.

10:37:53   1        DO YOU SEE THAT IN FRONT OF YOU?

10:37:55   2   A.   YES.

10:37:55   3   Q.   AND IS THAT AN EMAIL WHERE THE BOTTOM CHAIN IS FROM

10:38:02   4   DECEMBER 3RD, 2013?

10:38:03   5   A.   YES.

10:38:04   6   Q.   AND IS IT ANOTHER EMAIL ON THE TOPIC OF THESE INSPECTORS

10:38:10   7   AND WHERE THE INSPECTORS WILL BE ACTUALLY PHYSICALLY LOCATED IN

10:38:14   8   THE HEADQUARTERS?

10:38:15   9   A.   YES.

10:38:15  10        MR. BOSTIC:  YOUR HONOR, MOVE TO ADMIT EXHIBIT 4316.

10:38:21  11        MR. WADE:  NO OBJECTION, YOUR HONOR.

10:38:22  12        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:38:25  13        (GOVERNMENT'S EXHIBIT 4316 WAS ADMITTED IN EVIDENCE.)

10:38:25  14        MR. BOSTIC:  AND IF WE COULD ZOOM IN ON THE BOTTOM

10:38:34  15   HALF OF PAGE 1.

10:38:38  16   Q.   DR. ROSENDORFF, DO YOU SEE THAT EMAIL FROM DANIEL YOUNG TO

10:38:44  17   YOU ON DECEMBER 3RD, 2013?

10:38:45  18   A.   YES.

10:38:46  19   Q.   THIS IS A FEW DAYS AFTER THE EMAIL FROM MS. HOLMES THAT WE

10:38:48  20   JUST LOOKED AT; CORRECT?

10:38:50  21   A.   CORRECT.

10:38:50  22   Q.   THE TEXT OF THAT EMAIL SAYS, "LET'S NOT REMIND HER ABOUT

10:38:53  23   THE DOWNSTAIRS LAB UNLESS SHE ASKS AGAIN.  JUST SIMPLER IF WE

10:38:58  24   CAN JUST SHOW HER THE LAB UPSTAIRS."

10:39:00  25        DO YOU SEE THAT?

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)

10:39:02  1    A.   YES.

10:39:02  2    Q.   WAS THIS DAY THE DAY OF THE INSPECTION?

10:39:04  3    A.   YES.

10:39:05  4    Q.   THE "HER" THAT DANIEL YOUNG IS REFERRING TO, IS THAT THE

10:39:09  5    INSPECTOR?

10:39:10  6    A.   YES.

10:39:10  7    Q.   AND CAN YOU REMIND US WHAT THE DIFFERENCE WAS BETWEEN THE

10:39:12  8    DOWNSTAIRS LAB AND THE UPSTAIRS LAB?

10:39:14  9    A.   THE DOWNSTAIRS LAB HAD THE LDT'S, THE MODIFIED METHODS,

10:39:22  10   MODIFIED -- THE THERANOS METHODS, ESSENTIALLY.

10:39:27  11        THE UPSTAIRS LAB HAD THE FDA APPROVED INSTRUMENTS.

10:39:30  12   Q.   MS. HOLMES'S EMAIL THAT WE JUST LOOKED AT, EXHIBIT 4047,

10:39:37  13   DO YOU RECALL WHETHER THAT INCLUDED DANIEL YOUNG ON THE EMAIL?

10:39:41  14   A.   I'M SORRY, I DON'T RECALL THE RECIPIENT LIST.

10:39:46  15   Q.   THAT'S OKAY.  LET'S GO BACK TO IT BRIEFLY.  AND LET'S --

10:40:01  16   THANK YOU.

10:40:01  17        DO YOU SEE THAT MS. HOLMES'S EMAILS, BOTH OF THEM ON THIS

10:40:05  18   CHAIN INCLUDED DANIEL YOUNG?

10:40:08  19   A.   YES.

10:40:08  20   Q.   NOW LET'S GO BACK TO EXHIBIT 4316 AND ZOOM BACK IN ON THE

10:40:18  21   BOTTOM PART.

10:40:22  22        DR. ROSENDORFF, ON NOVEMBER 7TH, 2014, IT APPEARS THAT YOU

10:40:29  23   FORWARDED THIS MESSAGE.

10:40:30  24        DO YOU SEE THAT?

10:40:31  25   A.   YES.

10:40:32  1    Q.   AND WE'VE REDACTED THE EMAIL ADDRESS THAT YOU FORWARDED IT

10:40:36  2    TO, BUT DO YOU RECALL FORWARDING THIS EMAIL TO YOUR GMAIL

10:40:40  3    ACCOUNT ON THAT DATE?

10:40:41  4    A.   YES, YES.

10:40:42  5    Q.   WHY DID YOU DO THAT ALMOST A YEAR LATER IN NOVEMBER 2014?

10:40:46  6    A.   I -- AGAIN, I WAS CONCERNED ABOUT POSSIBLE GOVERNMENT OR

10:40:54  7    CMS INVESTIGATIONS IN THE LABORATORY AND I WANTED TO HAVE

10:40:56  8    DOCUMENTATION OF THE DISCUSSIONS AROUND THE, THE DAY OF THE

10:41:00  9    INSPECTION.

10:41:01  10   Q.   AND WHAT WAS IT ABOUT THIS PARTICULAR EMAIL THAT YOU

10:41:03  11   THOUGHT NEEDED TO BE DOCUMENTED?

10:41:04  12   A.   IT TROUBLED ME THAT WE WEREN'T TALKING ABOUT THE

10:41:13  13   DOWNSTAIRS LAB.  IT APPEARS FROM DR. YOUNG'S EMAIL THAT SHE HAD

10:41:20  14   ASKED ABOUT IT.  I'M NOT REALLY -- I DON'T HAVE A VERY CLEAR

10:41:25  15   RECOLLECTION OF WHAT THE DISCUSSION WAS WITH THE REGULATOR.

10:41:29  16   THERE WAS SOMETHING ABOUT IT THAT BOTHERED ME, THOUGH.

10:41:33  17   Q.   DID YOU FEEL THAT THERANOS SHOULD HAVE BEEN MORE

10:41:35  18   TRANSPARENT WITH THE REGULATOR ON THAT OCCASION?

10:41:38  19   A.   WELL, WE -- WE SHOWED THE REGULATOR EVERYTHING SHE WANTED

10:41:43  20   TO SEE IN THE LAB, SO I THINK WE RESPONDED TO THE AUDIT

10:41:50  21   APPROPRIATELY.

10:41:51  22   Q.   DO YOU RECALL RECEIVING ANY ADDITIONAL INSTRUCTION FROM

10:42:02  23   MANAGEMENT ABOUT HOW TO HANDLE IT IF THE INSPECTOR DID ASK

10:42:06  24   ABOUT THE DOWNSTAIRS LAB OR ENTERED THE DOWNSTAIRS LAB?

10:42:10  25   A.   NO.

```
10:42:11   1    Q.   I'D LIKE TO SHOW YOU WHAT WE'VE MARKED AS EXHIBIT 1295.

10:42:17   2         MAY I APPROACH, YOUR HONOR?

10:42:18   3             THE COURT:  YES.

10:42:19   4             MR. BOSTIC:  (HANDING.)

10:42:22   5    Q.   DR. ROSENDORFF, DO YOU HAVE EXHIBIT 1295 IN FRONT OF YOU?

10:42:32   6    A.   YES.

10:42:32   7    Q.   AND IS IT AN EMAIL DATED, AGAIN, DECEMBER 3RD, 2013, THE

10:42:42   8    SAME DATE AS THE INSPECTION?

10:42:44   9    A.   YES.

10:42:45  10    Q.   AND IS IT FROM SUNNY BALWANI TO YOU, DANIEL YOUNG, AND

10:42:48  11    OTHER EMPLOYEES AT THERANOS?

10:42:49  12    A.   YES.

10:42:50  13             MR. BOSTIC:  YOUR HONOR, MOVE TO ADMIT EXHIBIT 1295.

10:42:52  14             MR. WADE:  NO OBJECTION.

10:42:52  15             THE COURT:  IT'S ADMITTED, IT MAY BE PUBLISHED.

10:43:06  16         (GOVERNMENT'S EXHIBIT 1295 WAS ADMITTED IN EVIDENCE.)

10:43:06  17    BY MR. BOSTIC:

10:43:07  18    Q.   IF WE COULD ZOOM IN.

10:43:09  19         OKAY.  DR. ROSENDORFF, DO YOU SEE THAT THIS IS AN E-MAIL

10:43:12  20    FROM SUNNY BALWANI TO YOU AND OTHER MEMBERS OF THE STAFF ON THE

10:43:14  21    DATE OF THE INSPECTION?

10:43:16  22    A.   YES.

10:43:16  23    Q.   THE TEXT OF THE EMAIL READS, "FOR THE AREA INSIDE THE

10:43:19  24    NORMANDY LAB THAT IS CORDONED OFF BY THE DIVIDERS, IF THE

10:43:23  25    INSPECTOR ASKS, WE SHOULD SAY THIS AREA IS FOR FUTURE GROWTH
```

10:43:26   1      AND IS BEING ORGANIZED (AS IS THE CASE) BUT IS STILL RESTRICTED

10:43:31   2      ONLY TO THE CLIA LAB AND AUTHORIZED TEAM (AS IS THE CASE)."

10:43:37   3          DO YOU SEE THAT?

10:43:38   4      A.   YES.

10:43:38   5      Q.   DO YOU RECALL A PORTION OF THE NORMANDY LAB BEING BEHIND

10:43:42   6      DIVIDERS FOR THIS INSPECTION?

10:43:44   7      A.   YES.

10:43:45   8      Q.   DO YOU RECALL WHAT WAS ON THE OTHER SIDE OF THAT DIVIDED

10:43:47   9      PORTION?

10:43:48   10     A.   THE EDISONS.

10:43:49   11     Q.   IN YOUR EXPERIENCE AS A LABORATORY DIRECTOR, IS IT NORMAL

10:43:53   12     FOR MANAGEMENT TO GIVE THIS KIND OF SCRIPTING TO A LABORATORY

10:43:57   13     DIRECTOR DIRECTING THEM ON HOW TO RESPOND TO INSPECTOR

10:44:01   14     QUESTIONS?

10:44:01   15     A.   NO.

10:44:02   16     Q.   OKAY.  WE CAN PUT THAT ASIDE.

10:44:14   17         DO YOU RECALL SOME DISCUSSION DURING CROSS-EXAMINATION OF

10:44:19   18     SITUATIONS WHERE A LAB DIRECTOR MIGHT COVER MULTIPLE LABS AT

10:44:23   19     THE SAME TIME?

10:44:23   20     A.   YES.

10:44:23   21     Q.   AND YOU TESTIFIED THAT YOU HAD SUPERVISED UP TO THREE LABS

10:44:28   22     AT ONCE IN YOUR CAREER?

10:44:29   23     A.   YES.

10:44:29   24     Q.   DURING YOUR TIME AT THERANOS, WERE YOU SERVING AS A LAB

10:44:33   25     DIRECTOR ANYWHERE ELSE?

10:44:35   1    A.   NO.

10:44:36   2    Q.   AND WHY WAS THAT?

10:44:39   3    A.   I WANTED TO GIVE MY FULL ENERGY AND ATTENTION TO THERANOS.

10:44:45   4    IT WAS A COMPLICATED LABORATORY WITH CONSTANT ISSUES COMING UP.

10:44:54   5    I DIDN'T FEEL I HAD THE BANDWIDTH TO BE RESPONSIBLE FOR ANOTHER

10:44:59   6    LABORATORY AT THAT TIME.

10:45:00   7    Q.   ARE SOME CLINICAL LABORATORIES MORE COMPLICATED TO

10:45:04   8    SUPERVISE THAN OTHERS?

10:45:05   9    A.   YES.

10:45:06   10   Q.   AND HOW DOES -- OR HOW DID THERANOS STACK UP IN YOUR

10:45:11   11   EXPERIENCE?

10:45:11   12   A.   IT'S THE MOST COMPLICATED LABORATORY I'VE EVER HAD TO

10:45:15   13   SUPERVISE OR DIRECT.

10:45:17   14   Q.   AND DID PART OF THAT RELATE TO THE PROBLEMS THAT YOU SAW

10:45:20   15   WHEN YOU WERE LABORATORY DIRECTOR?

10:45:22   16   A.   YES.

10:45:22   17   Q.   DO YOU RECALL A DISCUSSION DURING CROSS-EXAMINATION

10:45:30   18   REGARDING A TIME WHEN YOU CONSIDERED BRINGING SOMETHING CALLED

10:45:33   19   A QUI TAM LAWSUIT AGAINST THERANOS?

10:45:35   20   A.   YES.

10:45:36   21   Q.   BASED ON YOUR UNDERSTANDING, DOES THAT KIND OF LAWSUIT

10:45:40   22   INVOLVE THE FEDERAL GOVERNMENT AT ALL?

10:45:42   23   A.   YES.

10:45:42   24   Q.   HOW SO?  WHAT'S YOUR UNDERSTANDING?

10:45:45   25   A.   I BELIEVE THE LAWSUIT IS BROUGHT TO THE FEDERAL GOVERNMENT

10:45:56  1    EITHER THROUGH CMS OR THROUGH SOME OTHER AGENCY WITHIN THE

10:46:00  2    FEDERAL GOVERNMENT, HEALTH AND HUMAN SERVICES?  I'M NOT REALLY

10:46:06  3    SURE.  I KNOW THAT IT INVOLVES MEDICARE, WHICH IS A GOVERNMENT

10:46:09  4    RUN PROGRAM.

10:46:11  5         THERE IS A RELATER OR SOMEBODY WHO COMMUNICATES THE FRAUD

10:46:17  6    TO THE GOVERNMENT.

10:46:19  7         I KIND OF LOST TRACK OF YOUR QUESTION.  I DON'T KNOW, I'M

10:46:21  8    JUST -- I'M DESCRIBING MY UNDERSTANDING OF A QUI TAM.

10:46:24  9    Q.   THAT'S FINE.  I THINK YOU'VE ANSWERED IT.

10:46:27  10   A.   YEAH.

10:46:27  11   Q.   ON CROSS, MR. WADE SUGGESTED THAT YOU WERE SEEKING A

10:46:30  12   FINANCIAL REWARD IN EXPLORING THAT OPTION.

10:46:33  13        DO YOU RECALL THAT?

10:46:34  14   A.   YES.

10:46:34  15   Q.   WAS THAT YOUR GOAL IN CONSIDERING TAKING THAT STEP?

10:46:36  16   A.   NO.

10:46:37  17   Q.   WHAT WAS YOUR GOAL?

10:46:38  18   A.   TO CORRECT -- TO RIGHT THE WRONGS, BASICALLY, TO ALERT THE

10:46:49  19   PUBLIC OF WHAT WAS GOING ON AT THERANOS.  I FELT A

10:46:52  20   RESPONSIBILITY FOR THIS TO SEE THE LIGHT OF DAY.

10:46:55  21        I WAS UNSURE WHAT AVENUE TO PURSUE.  I WAS EXPLORING

10:46:59  22   DIFFERENT AVENUES.

10:47:00  23   Q.   OKAY.  WHEN YOU WERE QUESTIONED ABOUT THE POSSIBILITY OF A

10:47:02  24   FINANCIAL REWARD, YOU MENTIONED THE EXTENT TO WHICH THERANOS

10:47:07  25   WAS INVOLVED IN MEDICARE.

10:47:09  1        DO YOU REMEMBER THAT?

10:47:10  2   A.   YES.

10:47:11  3   Q.   EXPLAIN WHAT THE CONNECTION WAS THERE IN YOUR MIND.

10:47:14  4   A.   MY UNDERSTANDING WHILE I WORKED AT THERANOS IS THAT MOST

10:47:17  5   OF THE PATIENTS WERE ACTUALLY PAYING OUT OF POCKET FOR THESE

10:47:21  6   TESTS BECAUSE THERANOS WAS TOUTING THE TESTS AS BEING MUCH

10:47:25  7   CHEAPER THAN OTHER LABS.

10:47:27  8        AND I -- I BELIEVE THERE WERE SOME PRIVATE INSURERS THAT

10:47:32  9   WERE INVOLVED IN PAYING FOR THE TESTS.

10:47:35  10       THERE WAS AN EFFORT TO RECOVER MONIES FROM PRIVATE

10:47:41  11  INSURERS BECAUSE THERE WAS SOME PAPERWORK ISSUE WITH BILLING.

10:47:46  12  I REMEMBER THAT.  SO I KNOW THAT PRIVATE INSURERS WERE

10:47:50  13  INVOLVED.

10:47:50  14       BUT I NEVER SAW ANY INFORMATION REGARDING MEDICARE

10:47:53  15  BILLING, SO I DIDN'T THINK THAT THERE ACTUALLY WOULD BE ANY

10:47:56  16  MONEY RECOVERABLE ON THE BASIS OF MEDICARE FRAUD.

10:47:58  17  Q.   IT WAS YOUR UNDERSTANDING THAT ANY FINANCIAL RECOVERY YOU

10:48:02  18  MIGHT GET FROM THE LAWSUIT WOULD BE BASED ON THE AMOUNT OF

10:48:06  19  THERANOS'S WORK WITH MEDICARE?

10:48:08  20  A.   YES.  IS THAT ACCURATE?  SORRY.

10:48:15  21  Q.   I DON'T WANT YOU TO REVEAL THE CONTENT OF ANY PRIVILEGED

10:48:19  22  CONVERSATION THAT YOU HAD WITH YOUR ATTORNEY --

10:48:21  23  A.   YES.

10:48:22  24  Q.   -- BUT CAN YOU TELL US WHEN YOU FIRST STARTED EXPLORING

10:48:25  25  THE POSSIBILITY OF A QUI TAM LAWSUIT AGAINST THERANOS?

10:48:28  1    A.   I BELIEVE MY FIRST MEETING WITH THE ATTORNEY WAS MID-2014.

10:48:35  2    Q.   ULTIMATELY, YOU DID NOT GET INVOLVED IN THAT KIND OF

10:48:39  3    LAWSUIT; CORRECT?

10:48:40  4    A.   CORRECT.

10:48:40  5    Q.   AND JUST TO BE CLEAR, YOU'RE TESTIFYING HERE IN A CRIMINAL

10:48:44  6    PROSECUTION; CORRECT?

10:48:45  7    A.   CORRECT.

10:48:46  8    Q.   DO YOU HAVE ANY HOPE OR EXPECTATION OF RECEIVING ANY

10:48:51  9    BENEFIT IN CONNECTION WITH YOUR TESTIMONY IN THIS PROSECUTION?

10:48:54  10   A.   NO.  ON THE CONTRARY.

10:48:56  11   Q.   DO YOU RECALL A DISCUSSION ABOUT YOUR FINANCIAL

10:49:01  12   COMPENSATION AT THERANOS?

10:49:03  13   A.   YES.

10:49:03  14   Q.   YOU TESTIFIED THAT WHEN YOU LEFT THE COMPANY, MR. BALWANI

10:49:08  15   INVITED YOU TO SAY ON.

10:49:09  16   A.   YES.

10:49:10  17   Q.   DID YOU ASK MR. BALWANI FOR A RAISE AT THAT TIME?

10:49:13  18   A.   NO.

10:49:13  19   Q.   WHEN YOU LEFT THE COMPANY, WAS YOUR DECISION TO LEAVE THE

10:49:17  20   COMPANY ABOUT MONEY?

10:49:18  21   A.   NO.

10:49:19  22   Q.   WHAT WAS IT ABOUT?

10:49:20  23   A.   IT WAS ABOUT PATIENT CARE AND MY INTEGRITY AS A PHYSICIAN.

10:49:25  24   Q.   I WANT TO CIRCLE BACK TO THE PRACTICE THAT YOU HAD OF

10:49:31  25   FORWARDING CERTAIN EMAILS TO YOUR PERSONAL EMAIL ACCOUNT.

| | | |
|---|---|---|
| 10:49:35 | 1 | DO YOU RECALL TESTIFYING ABOUT THAT? |
| 10:49:36 | 2 | A.   YES. |
| 10:49:37 | 3 | Q.   DURING YOUR CROSS-EXAMINATION, MR. WADE ACCUSED YOU OF |
| 10:49:42 | 4 | STEALING COMPANY TRADE SECRET INFORMATION. |
| 10:49:45 | 5 | DO YOU RECALL THAT? |
| 10:49:45 | 6 | A.   YES. |
| 10:49:46 | 7 | Q.   DID YOU EVER DISCLOSE ANY OF THE INFORMATION IN THE EMAILS |
| 10:49:50 | 8 | YOU FORWARDED TO ANY OTHER LABS OR COMPETITORS OF THERANOS? |
| 10:49:54 | 9 | A.   NO. |
| 10:49:54 | 10 | Q.   DID YOU EVER CONSIDER DOING THAT? |
| 10:49:56 | 11 | A.   NO. |
| 10:49:57 | 12 | Q.   BASED ON YOUR EXPERIENCE WITH THE THERANOS TESTING |
| 10:50:02 | 13 | METHODS, WOULD YOU HAVE WANTED OTHER METHODS -- EXCUSE ME. |
| 10:50:05 | 14 | WOULD YOU HAVE WANTED OTHER LABORATORIES TO USE THOSE |
| 10:50:09 | 15 | METHODS? |
| 10:50:09 | 16 | A.   NO. |
| 10:50:10 | 17 | Q.   MR. WADE ALSO CRITICIZED YOU FOR FORWARDING AN EMAIL TO |
| 10:50:17 | 18 | YOURSELF THAT CONTAINED PATIENT IDENTIFYING INFORMATION. |
| 10:50:20 | 19 | DO YOU RECALL THAT? |
| 10:50:20 | 20 | A.   YES. |
| 10:50:21 | 21 | Q.   DID THE WELFARE OF THOSE PATIENTS PLAY ANY ROLE IN YOUR |
| 10:50:30 | 22 | DECISION TO FORWARD THAT EMAIL TO YOURSELF? |
| 10:50:32 | 23 | A.   YES. |
| 10:50:32 | 24 | Q.   HOW SO? |
| 10:50:33 | 25 | A.   AS LABORATORY DIRECTOR, THOSE WERE PATIENTS UNDER MY CARE |

10:50:39   1    AND I -- I WANTED TO BE ABLE TO RESPOND TO QUERIES THAT CAME TO

10:50:46   2    ME AFTER I LEFT THERANOS FROM ANY OF THOSE PATIENTS.

10:50:53   3         I DID NOT SHARE ANY OF THAT INFORMATION WITH THIRD

10:50:57   4    PARTIES.

10:50:57   5         AND AS I TESTIFIED, I DELETED ALL OF THOSE EMAILS I

10:51:02   6    BELIEVE THE EVENING THAT I LEFT THERANOS.

10:51:05   7    Q.   ON CROSS-EXAMINATION, MR. WADE ASKED YOU WHETHER CUSTOMER

10:51:12   8    SERVICE WAS IMPORTANT AT THERANOS.

10:51:13   9         DO YOU REMEMBER THAT QUESTION?

10:51:14  10    A.   YES.

10:51:15  11    Q.   YOUR ANSWER AT THE TIME WAS THAT YOU COULDN'T ANSWER YES

10:51:18  12    OR NO.

10:51:18  13         DO YOU REMEMBER THAT?

10:51:19  14    A.   YES.

10:51:19  15    Q.   WHAT'S THE COMPLETE ANSWER TO THAT QUESTION?  WHY COULDN'T

10:51:24  16    YOU ANSWER YES OR NO?

10:51:25  17    A.   I -- I THINK BECAUSE IF CUSTOMER SERVICE WAS TRULY

10:51:33  18    IMPORTANT TO THE COMPANY, THERE WOULD HAVE BEEN MUCH GREATER

10:51:35  19    DEGREE OF TRANSPARENCY WITH THE PUBLIC.

10:51:39  20    Q.   LET'S TALK SOME MORE ABOUT THE CLIA REGULATIONS GOVERNING

10:51:44  21    CLINICAL LAB PRACTICE.

10:51:46  22    A.   YES.

10:51:46  23    Q.   ON CROSS-EXAMINATION, MR. WADE SHOWED YOU SECTIONS OF THE

10:51:53  24    REGULATIONS THAT GIVE THE LABORATORY DIRECTOR RESPONSIBILITY

10:51:57  25    AND POWER OVER A NUMBER OF ISSUES IN THE LAB; IS THAT CORRECT?

10:52:01  1    A.   CORRECT.

10:52:01  2    Q.   AND IS THAT CONSISTENT WITH WHAT YOUR UNDERSTANDING WAS OF

10:52:04  3    THE ROLE WHEN YOU WERE LAB DIRECTOR AT THERANOS?

10:52:08  4    A.   SO CLIA ALSO MAKES THE OWNER OR THE OPERATOR OF THE

10:52:16  5    LABORATORY RESPONSIBLE IN THE EVENT THAT THERE ARE ANY

10:52:21  6    VIOLATIONS OF ANY OF THE CLIA STATUTES UNDER C.F.R. 493.

10:52:28  7         GO AHEAD.  I'M SORRY.

10:52:29  8    Q.   AND WERE YOU GENERALLY AWARE OF THE PROVISIONS OF THOSE

10:52:34  9    REGULATIONS DURING YOUR TIME AS LAB DIRECTOR AT THERANOS?

10:52:37  10   A.   YES.

10:52:41  11   Q.   DO YOU AGREE THAT THE POSITION OF LABORATORY DIRECTOR

10:52:45  12   COMES WITH CONSIDERABLE AUTHORITY?

10:52:46  13   A.   IT COMES WITH CONSIDERABLE RESPONSIBILITY AND AN

10:52:54  14   ASSUMPTION OF AUTHORITY, YEAH.

10:52:56  15   Q.   CAN YOU EXPLAIN THE DIFFERENCE BETWEEN RESPONSIBILITY AND

10:53:04  16   AUTHORITY IN THAT CONTEXT?

10:53:05  17   A.   SO RESPONSIBILITY IS WHAT YOU'RE LEGALLY RESPONSIBLE FOR

10:53:10  18   IN THE EYES OF CMS IN TERMS OF HOW THE LAB FUNCTIONS AND

10:53:13  19   PERFORMS, THE ACCURACY OF ITS TESTING, HOW THE LAB REPORTS

10:53:19  20   TESTING, HOW IT HANDLES SAMPLES, ET CETERA, ET CETERA.

10:53:22  21        AUTHORITY IS THE ACTUAL POWER TO MAKE THOSE THINGS HAPPEN

10:53:25  22   AND IMPLEMENT THEM IN THE LABORATORY.

10:53:30  23   Q.   LET'S TALK ABOUT ACTUAL POWER AT THERANOS THEN.

10:53:38  24        IN YOUR EXPERIENCE AT THE COMPANY, WHAT WAS THE POWER

10:53:40  25   DYNAMIC LIKE BETWEEN YOU ON THE ONE HAND AND ELIZABETH HOLMES

10:53:48   1     ON THE OTHER HAND, FOR EXAMPLE?

10:53:50   2     A.   CAN YOU BE -- CAN YOU BE MORE SPECIFIC?

10:54:00   3     Q.   SURE.

10:54:00   4     A.   YEAH.

10:54:01   5     Q.   IN YOUR ROLE AS LAB DIRECTOR AT THERANOS, DID YOU HAVE

10:54:05   6     CO-EQUAL POWER WITH MS. HOLMES IN THE COMPANY?  DID ONE OF YOU

10:54:10   7     HAVE AUTHORITY OVER THE OTHER?  TELL US HOW THAT WORKED.

10:54:13   8     A.   WELL, MR. BALWANI WAS HEAVILY INVOLVED IN DIRECTING THE

10:54:18   9     CLIA LABORATORY.  HE WOULD MAKE FIRING DECISIONS WITHOUT ME.

10:54:28  10          AND ALSO, AS WE'VE SEEN THROUGH THIS TRIAL, NUMEROUS

10:54:33  11     LABORATORY AND OPERATIONAL DECISIONS THAT DIDN'T INVOLVE ME.

10:54:37  12          AND I ASSUMED HE WAS DISCUSSING THOSE WITH ELIZABETH.

10:54:40  13     Q.   GENERALLY SPEAKING IN THE COMPANY, WHO HAD MORE POWER, YOU

10:54:45  14     OR THE CEO, MS. HOLMES?

10:54:47  15     A.   MS. HOLMES.

10:54:49  16     Q.   DID MS. HOLMES'S POWER AND HER AUTHORITY IN THE COMPANY

10:54:53  17     COME FROM THE CLIA REGULATIONS?

10:54:56  18     A.   NO.  IT CAME FROM BUSINESS PRIORITIES.

10:54:59  19     Q.   AND HER POSITION AT THE COMPANY?

10:55:01  20     A.   YES.

10:55:02  21     Q.   IF YOU HAD BEEN LAB DIRECTOR AND CEO OF THERANOS, IF YOU

10:55:17  22     HAD HAD THE POWER TO DO WHATEVER YOU WANTED AT THE COMPANY, CAN

10:55:20  23     YOU GIVE US SOME EXAMPLES OF THINGS THAT WOULD HAVE BEEN

10:55:22  24     DIFFERENT, THINGS THAT YOU WOULD HAVE DONE DIFFERENTLY?

10:55:25  25          MR. WADE:  OBJECTION, YOUR HONOR.

10:55:27   1                THE COURT:  SUSTAINED.

10:55:30   2           YOU CAN ASK A DIFFERENT METHOD.  AS TO THE FORM OF THE

10:55:37   3    QUESTION, OBJECTION SUSTAINED.

10:55:39   4    BY MR. BOSTIC:

10:55:39   5    Q.   DR. ROSENDORFF, DURING YOUR TIME AT THERANOS, WERE THERE

10:55:42   6    THINGS THAT YOU THOUGHT SHOULD HAVE BEEN DONE TO ENSURE THE

10:55:48   7    ACCURACY OF THE TESTING THAT YOU DIDN'T HAVE THE POWER TO DO?

10:55:52   8    A.   I MIGHT SUGGEST -- FOR INSTANCE, I MADE SUGGESTIONS ABOUT

10:56:01   9    BEING TRANSPARENT WITH CUSTOMERS ABOUT WHETHER FINGERSTICK OR

10:56:05  10    VENOUS BLOOD HAD BEEN DRAWN AND WHAT METHOD HAD BEEN USED.

10:56:10  11    THAT DIDN'T HAPPEN.

10:56:12  12           I HAD HAD A, AN ARGUMENT, PER SE, OR A DISCUSSION WITH

10:56:18  13    DANIEL DURING THE VALIDATION PHASE ABOUT THE FACT THAT ACTUALLY

10:56:24  14    PAIRED VENOUS AND FINGERSTICK SAMPLES WOULD BE A BETTER WAY TO

10:56:28  15    ASSESS ACCURACY THAN JUST DILUTING VENOUS.

10:56:31  16           BUT IN VIEW OF THE RUSH FOR THE LAUNCH, THAT WASN'T

10:56:34  17    SOMETHING THAT THE COMPANY WAS GOING TO AGREE TO.

10:56:41  18    Q.   IN THE SITUATIONS THAT YOU JUST DESCRIBED, WERE YOU THE

10:56:45  19    ULTIMATE DECIDER ON HOW THE COMPANY HANDLED THOSE SITUATIONS?

10:56:48  20    A.   NO.

10:56:49  21    Q.   WHO WERE THE ULTIMATE DECIDERS IN THOSE SITUATIONS?

10:56:54  22    A.   THE EXECUTIVES.

10:56:55  23    Q.   WHO ARE WE TALKING ABOUT THERE?

10:56:57  24    A.   ELIZABETH, SUNNY, AND DANIEL, WHO WAS THE VICE PRESIDENT.

10:57:00  25    Q.   DO YOU RECALL TESTIMONY DURING CROSS-EXAMINATION ABOUT

10:57:08   1      YOUR VIEW OF MS. HOLMES'S QUALIFICATIONS AND WHETHER SHE WOULD

10:57:11   2      HAVE BEEN QUALIFIED, FOR EXAMPLE, TO BE A LAB DIRECTOR HERSELF?

10:57:14   3      A.   YES.

10:57:14   4      Q.   AND YOU WERE ANSWERING BASED ON WHAT THE REGULATIONS

10:57:20   5      REQUIRE; IS THAT RIGHT?

10:57:22   6      A.   CORRECT.

10:57:23   7      Q.   IN PRACTICE AT THERANOS -- WELL, LET ME ASK A SEPARATE

10:57:30   8      QUESTION FIRST.

10:57:32   9           DOES THE SAME GO FOR MR. BALWANI AND YOUR TESTIMONY ABOUT

10:57:37  10      HIS QUALIFICATIONS?

10:57:38  11      A.   YES.

10:57:38  12      Q.   IN PRACTICE AT THERANOS, DID MS. HOLMES AND MR. BALWANI

10:57:47  13      NEED TO QUALIFY UNDER THE REGULATIONS TO INFLUENCE OPERATIONS

10:57:51  14      IN THE LABORATORY?

10:57:52  15      A.   YES.

10:57:52  16      Q.   AND THAT'S -- THAT WAS A REQUIREMENT BASED ON THE

10:57:56  17      REGULATIONS; CORRECT?

10:57:57  18      A.   YES.

10:57:57  19      Q.   IS THAT HOW IT ACTUALLY WORKED AT THE COMPANY IN PRACTICE?

10:58:00  20      A.   NO.

10:58:01  21      Q.   HOW DID IT WORK AT THE COMPANY IN PRACTICE?

10:58:03  22      A.   SUNNY HAD A STRONG HAND IN, IN THE OPERATIONS OF THE LAB.

10:58:10  23      FOR INSTANCE, HIS DECISION BEHIND MY BACK THAT VACUTAINERS

10:58:15  24      SHOULD BE ALIQUOTED INTO CTN'S THAT I HAD NO AWARENESS OF.

10:58:21  25           DANIEL YOUNG WAS HEAVILY INVOLVED IN CLIA LAB OPERATIONS.

10:58:24  1          AND MS. HOLMES WAS AWARE OF ALL OF THAT.

10:58:33  2     Q.   I'D LIKE TO SHOW YOU WHAT'S BEEN MARKED AS EXHIBIT 5417.

10:58:37  3          MAY I APPROACH, YOUR HONOR?

10:58:39  4               THE COURT:  YES.

10:58:40  5               MR. BOSTIC:  (HANDING.)

10:58:43  6     Q.   AND, DR. ROSENDORFF, DO YOU HAVE EXHIBIT 5417 IN FRONT OF

10:58:53  7     YOU?

10:58:53  8     A.   YES.

10:58:54  9     Q.   IS THAT AN EMAIL CHAIN WITH THE SUBJECT LINE PHYSICIAN

10:59:00  10    QUESTIONING RESULTS BETWEEN INDIVIDUALS AT THERANOS, INCLUDING

10:59:04  11    MR. BALWANI AND ELIZABETH HOLMES?

10:59:06  12    A.   YES.

10:59:06  13              MR. BOSTIC:  YOUR HONOR, MOVE TO ADMIT EXHIBIT 5417.

10:59:15  14              MR. WADE:  COURT'S INDULGENCE FOR ONE MOMENT.

10:59:18  15         (PAUSE IN PROCEEDINGS.)

10:59:31  16              MR. WADE:  NO OBJECTION.

10:59:31  17              THE COURT:  IT'S ADMITTED AND IT MAY BE PUBLISHED.

10:59:39  18         (GOVERNMENT'S EXHIBIT 5417 WAS ADMITTED IN EVIDENCE.)

10:59:39  19    BY MR. BOSTIC:

10:59:40  20    Q.   AND THIS IS AN EMAIL CHAIN, DR. ROSENDORFF, ABOUT THE

10:59:42  21    PHYSICIAN QUESTIONING RESULTS.

10:59:45  22         DO YOU SEE THAT?

10:59:46  23    A.   YES.

10:59:46  24    Q.   I'D LIKE TO DRAW YOUR ATTENTION TO THE BOTTOM OF THE FIRST

10:59:49  25    PAGE, PLEASE.

10:59:49  1    A.   OKAY.

10:59:50  2    Q.   AND IF WE COULD ZOOM IN JUST ON THE BOTTOM TWO MESSAGES.

10:59:56  3         DR. ROSENDORFF, DO YOU SEE AT THE BOTTOM, THERE'S AN EMAIL

10:59:58  4    FROM SUNNY BALWANI TO SOMEONE NAMED NICHOLAS MENCHEL?

11:00:02  5    A.   YES.

11:00:06  6    Q.   DO YOU RECALL WHO NICHOLAS MENCHEL WAS AT THE COMPANY?

11:00:10  7    A.   SO THERE WERE THREE INDIVIDUALS WHO WENT TO, OR ATTENDED

11:00:13  8    DUKE UNIVERSITY WITH EACH OTHER.  IT WAS MAX, NICK, AND ANOTHER

11:00:18  9    PERSON.  THEY WERE FACTOTUMS OF A SORT.  THEY PERFORMED MANY

11:00:26 10    DIFFERENT FUNCTIONS IN THE LAB.

11:00:28 11    Q.   OKAY.  MR. BALWANI'S E-MAIL TO MR. MENCHEL ON JULY 19TH,

11:00:33 12    2014 SAYS, "NICK, THIS WAS NOT COMMUNICATED TO ME UNTIL I SAW

11:00:39 13    THIS A FEW MINUTES AGO."  HE'S REFERRING TO AN EARLIER

11:00:42 14    CONVERSATION HERE.

11:00:43 15         HE THEN SAYS, "YOU KNOW, I AM RUNNING CLIA LAB NOW SO IF

11:00:47 16    YOU WANT TO STAY INVOLVED FROM CALL CENTER PERSPECTIVE, YOU

11:00:50 17    NEED TO MAKE APPOINT THAT I GET LOOKED IN."

11:00:55 18         DO YOU SEE THAT?

11:00:56 19    A.   YES, I DO.

11:00:57 20    Q.   JULY 2014, WERE YOU STILL PRESENT AT THE COMPANY?

11:01:02 21    A.   YES, I WAS.

11:01:03 22    Q.   WHAT WAS YOUR POSITION AT THE COMPANY IN JULY 2014?

11:01:05 23    A.   LABORATORY DIRECTOR.

11:01:07 24    Q.   WHAT'S YOUR REACTION TO MR. BALWANI'S STATEMENT, "I AM

11:01:10 25    RUNNING CLIA LAB NOW"?

11:01:12  1    A.   AFTER MARK PANDORI'S EXIT FROM THE COMPANY, SUNNY BALWANI

11:01:19  2    COMMUNICATED TO ME THAT HE HAD A UNIQUE SET OF SKILLS AND

11:01:24  3    TALENTS THAT WOULD QUALIFY HIM TO DIRECT THE CLIA LAB

11:01:27  4    ESSENTIALLY.

11:01:28  5         I DIDN'T RESPOND TO THAT.

11:01:32  6         AND SO I'M NOT SURPRISED THAT HE'S SAYING HERE, "I'M

11:01:35  7    RUNNING THE CLIA LAB NOW."  HE'S CLEARLY NOT QUALIFIED UNDER

11:01:39  8    THE REGULATIONS.

11:01:40  9    Q.   I'LL DRAW YOUR ATTENTION TO THE VERY TOP OF PAGE 1, AND IF

11:01:47 10    WE CAN ZOOM IN JUST ON THE TOP MESSAGE.

11:01:57 11         DO YOU SEE THAT AT THE TOP OF THIS EMAIL CHAIN, THERE'S

11:01:59 12    ANOTHER MESSAGE FROM MR. BALWANI ON THAT SAME DATE TO

11:02:02 13    NICHOLAS MENCHEL AND BCC'ING ELIZABETH HOLMES --

11:02:06 14    A.   YES.

11:02:07 15    Q.   -- FORWARDING TO HER THE REST OF THIS EMAIL CHAIN.

11:02:09 16         DO YOU SEE THAT?

11:02:10 17    A.   YES.

11:02:10 18    Q.   DID THE CLIA REGULATIONS GIVE YOU THE POWER AT THERANOS TO

11:02:21 19    OVERRULE ELIZABETH HOLMES AND SUNNY BALWANI?

11:02:25 20    A.   UM --

11:02:26 21    Q.   AND I'M ASKING IN PRACTICE BASED ON HOW IT ACTUALLY WORKED

11:02:30 22    AT THE COMPANY.

11:02:31 23    A.   SO THERE'S A CLEAR CONFLICT BETWEEN THE ORGANIZATIONAL

11:02:38 24    CHART AT THE COMPANY WHERE BOTH SUNNY AND ELIZABETH ARE ABOVE

11:02:43 25    ME IN THAT ORG CHART, I REPORT TO THEM AND I'M RESPONSIBLE TO

11:02:47  1    THEM.

11:02:48  2         ON THE OTHER HAND, THE CLIA REGULATIONS SAY THAT I'M

11:02:50  3    RESPONSIBLE FOR ESSENTIALLY EVERYTHING THAT HAPPENS IN THE

11:02:53  4    LABORATORY.

11:02:54  5    Q.   AND IN PRACTICE AT THERANOS, DID ELIZABETH HOLMES AND

11:02:58  6    SUNNY BALWANI DEFER TO YOU ON THOSE ISSUES BASED ON THE CLIA

11:03:03  7    REGULATIONS?

11:03:04  8    A.   AT TIMES.

11:03:05  9    Q.   ALL THE TIME?

11:03:07  10   A.   NO.

11:03:07  11   Q.   DO YOU RECALL REVIEWING, DURING YOUR TESTIMONY, AN EMAIL

11:03:12  12   INCLUDING MR. BALWANI AND ELIZABETH HOLMES WHERE YOU RAISED

11:03:17  13   ISSUES REGARDING CLIA COMPLIANCE?

11:03:19  14   A.   YES.

11:03:20  15   Q.   AND IN CONNECTION WITH THE ISSUES YOU RAISED THERE, DID

11:03:25  16   MS. HOLMES AND MR. BALWANI DEFER TO YOUR JUDGMENT?

11:03:28  17   A.   SO I BELIEVE THAT WAS AN EMAIL I SENT ON A SUNDAY STATING

11:03:33  18   THAT WE WEREN'T IN COMPLIANCE WITH A NUMBER OF CLIA STATUTES.

11:03:38  19        AND SUNNY RESPONDED THAT HE WAS GOING TO GET THE TEAMS TO

11:03:40  20   WORK ON IT AND SPEND LONG HOURS.

11:03:43  21   Q.   DO YOU REMEMBER MS. HOLMES DIRECTING THAT EMAIL THAT NO

11:03:46  22   ONE SHOULD BE GUESSING ABOUT THOSE ISSUES?

11:03:48  23   A.   MS. HOLMES'S EMAIL ABOUT THE GUESSING WAS ABOUT -- WAS

11:03:54  24   BASICALLY PUTTING A STOP TO THE BACK AND FORTH ABOUT

11:03:58  25   PROFICIENCY TESTING.

11:04:00  1              SO IT WAS FOLLOWING ON THE HEELS OF THAT SPOT CHECK THAT

11:04:03  2     WE DISCUSSED, AND THERE WAS A DISCUSSION BETWEEN DANIEL AND

11:04:08  3     MYSELF AND SUNNY ABOUT WHAT'S APPROPRIATE IN TERMS OF

11:04:11  4     PROFICIENCY TESTING, AND ELIZABETH SAID, YOU KNOW, WE ENGAGED

11:04:16  5     DIRECTLY WITH YOUR COUNSEL A LONG TIME ABOUT THIS AND NOBODY

11:04:18  6     SHOULD BE GUESSING ON THESE MATTERS.

11:04:20  7     Q.   AND AT THE TIME, DID YOU FEEL THAT THAT'S WHAT YOU WERE

11:04:23  8     DOING?  WERE YOU GUESSING ON THOSE REGULATORY MATTERS?

11:04:26  9     A.   NO.

11:04:26  10    Q.   IN THAT SITUATION, DID MS. HOLMES DEFER TO YOU AS LAB

11:04:30  11    DIRECTOR?

11:04:31  12    A.   NO.

11:04:40  13              MR. BOSTIC:  MAY I HAVE A MOMENT, YOUR HONOR?

11:04:42  14              THE COURT:  YES.

11:04:44  15         (DISCUSSION OFF THE RECORD AMONGST GOVERNMENT COUNSEL.)

11:04:59  16    BY MR. BOSTIC:

11:05:02  17    Q.   DR. ROSENDORFF, YOU TESTIFIED A MOMENT AGO THAT UNDER THE

11:05:05  18    REGULATIONS, THE OWNER OR OPERATOR OF A LAB ALSO HAS

11:05:08  19    RESPONSIBILITIES.

11:05:09  20    A.   YES.

11:05:10  21    Q.   CAN YOU EXPLAIN HOW THAT FITS INTO THE PICTURE BASED ON

11:05:12  22    YOUR UNDERSTANDING?

11:05:13  23    A.   IF CMS DECIDES TO SANCTION THE LABORATORY BASED ON

11:05:21  24    NONCOMPLIANCE, IT CAN IMPOSE FINES AND PENALTIES ON EITHER THE

11:05:26  25    LABORATORY DIRECTOR OR THE OWNER/OPERATOR OR BOTH.

11:05:31   1    Q.   DO YOU RECALL TESTIMONY DURING CROSS-EXAMINATION WHERE

11:05:39   2    MR. WADE ASKED YOU ABOUT WHETHER EVERY LAB MAKES OCCASIONAL

11:05:42   3    MISTAKES?

11:05:43   4    A.   YES.

11:05:44   5    Q.   AND DO YOU AGREE WITH THAT STATEMENT, THAT EVERY LAB

11:05:47   6    SOMETIMES MAKES MISTAKES?

11:05:48   7    A.   YES.

11:05:48   8    Q.   YOU'VE WORKED AT MULTIPLE LABS; IS THAT CORRECT?

11:05:52   9    A.   YES, MANY, MANY LABS.

11:05:54   10   Q.   APPROXIMATELY HOW MANY LABS HAVE YOU WORKED AT IN YOUR

11:05:57   11   13 YEARS OF EXPERIENCE?

11:05:58   12   A.   IT'S SIX NOW.   YEAH.

11:06:07   13   Q.   NONE OF THOSE LABS HAS BEEN PERFECT; IS THAT RIGHT?

11:06:10   14   A.   CORRECT.

11:06:11   15   Q.   WERE THE PROBLEMS THAT YOU SAW AT THERANOS IN LINE WITH

11:06:18   16   WHAT YOU WOULD EXPECT TO SEE AT ANY LABORATORY?

11:06:20   17   A.   NO.

11:06:20   18   Q.   WERE THEY WORSE THAN THAT?

11:06:22   19   A.   YES.

11:06:23   20   Q.   AT ANY OTHER LABORATORY, DID YOU EVER RESORT TO FORWARDING

11:06:29   21   EVIDENCE TO YOUR PERSONAL EMAIL ACCOUNT BECAUSE YOU WORRIED

11:06:31   22   ABOUT FUTURE INVESTIGATIONS INTO LAB PRACTICES?

11:06:34   23   A.   NO.

11:06:36   24        MR. BOSTIC:   NO FURTHER QUESTIONS.

11:06:37   25        THANK YOU, YOUR HONOR.

2867

```
11:06:38  1            THE COURT:  LET'S TAKE OUR MORNING BREAK NOW, LADIES
11:06:40  2        AND GENTLEMEN.
11:06:41  3            LET'S TAKE 45 MINUTES, 45 MINUTES.  AND THEN WE'LL COME
11:06:45  4        BACK.
11:06:46  5            WILL YOU HAVE CROSS-EXAMINATION, OR RECROSS?
11:06:48  6            MR. WADE:  I WILL, YOUR HONOR.
11:06:49  7            THE COURT:  ALL RIGHT.  THANK YOU.
11:06:52  8            THE CLERK:  COURT IS IN RECESS.
11:07:07  9            THE COURT:  YOU CAN STAND DOWN, DOCTOR, AS WELL.
11:07:12 10        (JURY OUT AT 11:07 A.M.)
11:07:28 11            THE COURT:  ALL RIGHT.  PLEASE BE SEATED.
11:07:30 12        THE RECORD SHOULD REFLECT OUR JURY HAS LEFT FOR THE BREAK,
11:07:33 13    AND DR. ROSENDORFF HAS LEFT THE COURTROOM.
11:07:36 14        MR. WADE?
11:07:36 15            MR. WADE:  YOUR HONOR, COUNSEL JUST, WITH A SERIES OF
11:07:40 16    QUESTIONS, ELICITED A COMPARISON OF THE THERANOS LAB AND ISSUES
11:07:45 17    WITHIN THE THERANOS LAB TO EVERY OTHER LAB IN WHICH
11:07:50 18    DR. ROSENDORFF WORKED OVER THE PERIOD OF 13 YEARS AND COMPARED
11:07:53 19    THE SIGNIFICANCE OF THOSE ISSUES.
11:07:56 20        THAT HAS OPENED THE DOOR TO THE CROSS-EXAMINATION THAT THE
11:07:59 21    GOVERNMENT TRIED TO PRECLUDE YESTERDAY, THAT THEY HAVE PUT THAT
11:08:04 22    AT ISSUE.  HE HAS TESTIFIED BEFORE THIS COURT, OR BEFORE THIS
11:08:07 23    JURY, AND NOW IT'S ONLY FAIR TO GO INTO THE PROBLEMS THAT
11:08:11 24    EXISTED WITHIN THOSE LABS SO THE JURY UNDERSTANDS THE FULL
11:08:14 25    PICTURE.
```

11:08:15   1          WITHOUT IT, IT'S A VERY MISLEADING CHARACTERIZATION BASED

11:08:20   2     ON QUESTIONS THAT THE GOVERNMENT JUST ASKED.

11:08:22   3          MR. BOSTIC:  I DISAGREE, YOUR HONOR.  THAT WAS IN

11:08:24   4     RESPONSE TO QUESTIONS ON CROSS ABOUT WHETHER LABS MAKE

11:08:30   5     MISTAKES, AND I THINK THE SIMPLE QUESTION OF WHETHER

11:08:35   6     DR. ROSENDORFF CATEGORIZES THE ISSUES AT THERANOS AS JUST

11:08:39   7     SIMPLE RUN OF THE MILL LABORATORY MISTAKES IS IN DIRECT

11:08:42   8     RESPONSE TO THAT LINE OF QUESTIONING ON CROSS.

11:08:45   9          I DON'T THINK HE SAID ANYTHING THAT OPENS THE DOOR TO THE

11:08:48  10     WIDE RANGE OF EVIDENCE THAT MR. WADE IS REFERENCING.

11:08:52  11          MR. WADE:  YOUR HONOR, THE TRANSCRIPT SPEAKS FOR

11:08:54  12     ITSELF.  HE -- HE OPENED UP 13 YEARS OF HIS LAB EXPERIENCE, ALL

11:08:58  13     OF HIS OTHER EXPERIENCES, AND ASKED HIM TO COMPARE THOSE ERRORS

11:09:03  14     TO THE ERRORS OF ALL THOSE OTHER COMPANIES AND HE SAID THERANOS

11:09:07  15     IS WORSE.

11:09:08  16          AND SO I THINK IT'S ONLY FAIR TO ALLOW THE DEFENSE TO GO

11:09:14  17     INTO THAT.

11:09:15  18          OTHERWISE IT'S AN INCREDIBLY MISLEADING PICTURE TO THE

11:09:18  19     JURY.  THE JURY CAN ASSESS WHETHER THEY'RE BETTER OR WORSE.

11:09:21  20          WE DON'T HAVE TO RELY ON DR. ROSENDORFF'S

11:09:24  21     CHARACTERIZATION.  WE NOW SHOULD HAVE THE ABILITY TO PROBE

11:09:26  22     THAT.

11:09:26  23          THE COURT:  WELL, THAT WOULD THEN -- IF WE ASK THE

11:09:29  24     JURY TO MAKE THAT DETERMINATION, THAT WOULD BE A SEPARATE MINI

11:09:32  25     TRIAL THAT YOU'VE TALKED TO ME ABOUT THAT CAUSED ME TO HAVE

1    CONCERN ABOUT OTHER ISSUES.

2         NOW, I -- I UNDERSTAND THE NATURE OF THE QUESTION AND THE

3    FACT THAT, YOU KNOW, I THINK I'VE SAID FREQUENTLY, AND YOU

4    PROBABLY KNOW, THERE'S A DIFFERENCE BETWEEN TURNING THE KNOB

5    AND OPENING THE DOOR.

6         HAS THIS DOOR BEEN OPENED THEN AS TO THIS?

7         I DON'T SEE IT OPEN SUCH THAT YOU CAN GET INTO ALL OF THE

8    OTHER ISSUES THAT WERE IN THE OTHER THREE LABS.  I THINK THAT'S

9    WHAT WE'RE TALKING ABOUT.  IS THAT RIGHT?

10            MR. WADE:  THERE WERE THREE LABS THAT HAD -- HAVE HAD

11   MAJOR ISSUES --

12            THE COURT:  RIGHT.

13            MR. WADE:  -- IN HIS TENURE.

14            THE COURT:  RIGHT.  THE ONES WE TALKED ABOUT

15   YESTERDAY.

16            MR. WADE:  RIGHT, EXACTLY.

17            THE COURT:  FIRST OF ALL, THE MIDDLE LAB REGARDING

18   THE CRIMINAL INVESTIGATION, I DON'T THINK THIS LINE OF

19   QUESTIONING TOUCHES ON THAT AT ALL AND I WOULD NOT ALLOW YOU TO

20   PROBE INTO THAT.  I THINK THAT STILL IS PRECLUDED BASED ON THE

21   COURT'S RULING YESTERDAY.

22        ON THE OTHER ISSUES ABOUT WHETHER OR NOT HE'S SEEN

23   DIFFERENCES IN THE OTHER LABS, I MAY ALLOW YOU TO PROBE A

24   LITTLE BIT, BUT WE'RE NOT GOING TO GET INTO THE DOCUMENTS, ANY

25   OF THAT COLLATERAL TYPE EXTRINSIC MATERIAL.  I STILL THINK

```
11:10:38   1      THAT'S INAPPROPRIATE TO DO.

11:10:40   2           I MAY PERMIT YOU TO ASK SOME QUESTIONS, TO FOLLOW UP

11:10:46   3      ABOUT, WELL, YOU SAID, HE TALKED ABOUT THE OTHER PLACES HE'S

11:10:49   4      WORKED AT WERE NOT AS BAD AS THIS, AND YOU CAN ASK HIM A LITTLE

11:10:52   5      BIT ABOUT THAT.

11:10:53   6           BUT WE'RE NOT GOING TO GET INTO A MINI TRIAL ON ALL THE

11:10:56   7      OTHER SUBJECTS AND THAT.

11:10:58   8           YOU CAN TALK TO HIM IN GENERAL.  I THINK THIS WAS A

11:11:00   9      GENERAL PROBE ABOUT A -- AND I UNDERSTAND YOUR CONCERN ABOUT

11:11:04  10      THE IMPACT IT MIGHT HAVE ON THE JURY.  YOU CAN CERTAINLY PROBE

11:11:07  11      WHETHER OR NOT THERE WERE ISSUES OF OTHER TRIALS.  YOU'VE

11:11:11  12      ELICITED FROM HIM YESTERDAY THAT AT ONE OF THE LABS HE WAS AT,

11:11:16  13      THEY HAD AN INVESTIGATION.

11:11:17  14           SO, AGAIN, AS WE TALKED YESTERDAY PRIOR TO YOUR

11:11:20  15      EXAMINATION ON THE TOPIC, I'LL ALLOW SOME LIMITED, VERY LIMITED

11:11:24  16      PROBING OF THIS.

11:11:26  17           I THINK YOUR QUESTIONING MAY ACTUALLY ENHANCE THE DAMAGE

11:11:30  18      THAT YOU'RE SEEKING TO AVOID BY RAISING SOME OTHER QUESTIONS,

11:11:35  19      BUT YOU KNOW, IT'S YOUR CASE.

11:11:37  20           BUT I WILL PERMIT SOME QUESTIONING ON THAT, BUT GENERALLY.

11:11:42  21      WE'RE NOT GOING TO GET INTO THE CMS REPORTS AND ALL OF THAT.  I

11:11:46  22      DON'T THINK THAT'S NECESSARY.

11:11:47  23           MR. WADE:  YOUR HONOR, I'LL CONFER WITH MY COLLEAGUES

11:11:51  24      DURING THE BREAK ON THIS ISSUE.

11:11:53  25           I WOULD JUST ASK IF -- ALTERNATIVELY, IF WE COME BACK AND
```

11:11:58  1    ASK THAT THAT EVIDENCE BE STRICKEN AND THAT THE GOVERNMENT BE

11:12:00  2    ADMONISHED.  I MEAN, THE COURT GAVE CLEAR DIRECTION ON THIS

11:12:04  3    ISSUE YESTERDAY.  YOU SAID YOU DIDN'T WANT MINI TRIALS.  WE

11:12:08  4    TALKED ABOUT THE POSSIBILITY OF OPENING THIS DOOR, WHICH IS NOW

11:12:13  5    WIDE OPEN AS THE GOVERNMENT -- AS THE GOVERNMENT WELL KNEW WHEN

11:12:18  6    IT WAS ASKING THOSE QUESTIONS ABOUT THE BREADTH OF HIS

11:12:20  7    EXPERIENCE.

11:12:21  8             THE COURT:  SO --

11:12:21  9             MR. WADE:  I WAS VERY -- I WAS VERY CAREFUL, AS THE

11:12:24  10    COURT OBSERVED I'M SURE YESTERDAY, OF TRYING TO DRAW THE LINE

11:12:28  11    IN THE DIRECTION OF THE COURT, AND NOW WE HAVE COUNSEL, AT THE

11:12:34  12    END OF THE CROSS-EXAMINATION, OR AT THE END OF THE REDIRECT

11:12:38  13    EXAMINATION JUST BLOWING IT WIDE OPEN.

11:12:40  14             MR. BOSTIC:  YOUR HONOR, IF I CAN RESPOND TO THAT?

11:12:41  15             THE COURT:  WELL, WHAT YOU DID YESTERDAY WAS YOU GOT

11:12:44  16    HIS RESPONSE THAT HE HAS CONCERNS ABOUT HIS LICENSE BEING

11:12:48  17    SUSPENDED FOR TWO YEARS, AND YOU CHOSE TO STOP YOUR EXAMINATION

11:12:50  18    THEN.  YOU COULD HAVE GONE AND ASKED OTHER QUESTIONS, BUT YOU

11:12:53  19    STOPPED THERE, AND THAT'S WHERE IT IS.

11:12:57  20        I -- I WANT -- I'LL, OF COURSE, ALLOW YOU TO SPEAK,

11:13:00  21    MR. BOSTIC.

11:13:00  22        BUT I'D ALSO LIKE YOU TO COMMENT ON WHETHER OR NOT THE

11:13:03  23    COURT SHOULD JUST STRIKE THE LAST QUESTION AND ANSWER, THAT IS,

11:13:09  24    WERE -- THE COMPARING THE LABS IN HIS CAREER.  MAYBE WE STRIKE

11:13:14  25    THAT AND THAT TAKES CARE OF THE ISSUE.

2872

11:13:16  1            MR. BOSTIC:  SO, YOUR HONOR, FIRST, AS TO THE NEXUS

11:13:22  2    BETWEEN THAT QUESTIONING AND WHAT HAD COME BEFORE IN

11:13:25  3    DR. ROSENDORFF'S TESTIMONY, DURING HIS DIRECT, HE HAD SPOKEN

11:13:27  4    ABOUT HIS PREVIOUS EXPERIENCE.

11:13:30  5            DURING CROSS-EXAMINATION, I RECALL QUESTIONS SPECIFICALLY

11:13:33  6    ASKING DR. ROSENDORFF TO COMPARE HIS EXPERIENCE AT THERANOS,

11:13:38  7    AND SPECIFICALLY THE FREQUENCY OF COMPLAINTS TO THE FREQUENCY

11:13:41  8    OF COMPLAINTS THAT HE SAW AT UNIVERSITY OF PITTSBURGH.

11:13:46  9            SO THAT'S THE SAME KIND OF GENERAL QUESTION THAT DEFENSE

11:13:49  10   COUNSEL ASKED, ASKING DR. ROSENDORFF TO COMPARE THE SEVERITY

11:13:51  11   AND FREQUENCY OF ISSUES BETWEEN THOSE TWO LABS.

11:13:54  12           HE ANSWERED THAT QUESTION.  I ASKED HIM SOME QUESTIONS

11:13:58  13   ABOUT THAT ON REDIRECT, AGAIN, IN RESPONSE TO THAT LINE OF

11:14:01  14   QUESTIONING.

11:14:02  15           AS TO THE COURT'S PROPOSAL AS TO WHETHER STRIKING THAT

11:14:05  16   ANSWER WOULD BE PREFERABLE TO OPENING THE DOOR TO THE

11:14:08  17   INADMISSIBLE LINES OF QUESTIONING THAT THE DEFENSE RAISED

11:14:11  18   YESTERDAY, I THINK YES, THAT WOULD BE A CLEANER APPROACH AND

11:14:15  19   WOULD SOLVE ANY PREJUDICE THAT THE DEFENSE IS WORRIED ABOUT.

11:14:18  20           MR. WADE:  WELL, LET ME CONFER AS TO WHETHER WE CAN

11:14:20  21   UNRING THE BELL, BECAUSE THE JURY HAS ALREADY HEARD IT.  IT WAS

11:14:23  22   ONE OF THE LAST QUESTIONS THAT THEY HEARD AND THE ANSWERS THEY

11:14:27  23   HEARD BEFORE THE BREAK.

11:14:28  24           WITH RESPECT TO THE CROSS-EXAMINATION, IT WAS ACTUALLY THE

11:14:31  25   GOVERNMENT WHO EXAMINED DR. ROSENDORFF ON DIRECT COMPARING HIS

11:14:36   1    EXPERIENCE AT THERANOS TO HIS PAST EXPERIENCE AT THE UNIVERSITY

11:14:40   2    OF PITTSBURGH AND ELICITED TESTIMONY THAT WAS DIRECTLY AT ODDS

11:14:43   3    WITH HIS PRIOR SWORN TESTIMONY, AND I IMPEACHED THE WITNESS ON

11:14:48   4    THAT.

11:14:48   5         I DID NOT GO INTO FUTURE EMPLOYMENT.  WE GOT DIRECTION

11:14:51   6    FROM THE COURT ON THAT AND I HONORED THAT DIRECTION.  SO --

11:14:54   7              THE COURT:  RIGHT.  WELL, I THINK THAT THE -- YOU'VE

11:14:58   8    ASKED ME TO STRIKE, MR. WADE, THROUGHOUT THE COURSE OF THIS

11:15:01   9    WITNESS'S TESTIMONY, CERTAIN TESTIMONY AND I'VE GRANTED THAT

11:15:04   10   REQUEST AND I'VE ADMONISHED THE JURY THEY'RE NOT TO CONSIDER

11:15:07   11   THAT EVIDENCE THAT'S STRICKEN.

11:15:09   12        THEY'LL BE INFORMED OF THAT, INSTRUCTED OF THAT IN THE

11:15:11   13   FINAL INSTRUCTIONS, AND I THINK THE JURY WILL FOLLOW THE

11:15:17   14   COURT'S INSTRUCTION.

11:15:18   15        SO LET ME JUST SAY, THAT'S MY INTENTION IS I'M GOING TO --

11:15:22   16   WHEN THEY COME OUT, I'LL HAVE THAT LAST QUESTION AT MY

11:15:26   17   FINGERTIPS FROM THE COURT REPORTER AND I WILL -- THAT ANSWER,

11:15:28   18   QUESTION AND ANSWER, AND I'LL HAVE THAT STRICKEN.  THEY'RE NOT

11:15:31   19   TO CONSIDER IT.  AND I THINK THAT TAKES CARE OF THE ISSUE, AND

11:15:34   20   THEN IT'S DONE.

11:15:34   21              MR. WADE:  I WOULD MAYBE JUST ADD, IF THE COURT COULD

11:15:37   22   SAY THAT WAS NOT AN APPROPRIATE QUESTION AND AN APPROPRIATE

11:15:39   23   ANSWER FOR THIS TRIAL.  BECAUSE --

11:15:41   24              THE COURT:  WELL --

11:15:42   25              MR. WADE:  -- IF IT'S JUST STRICKEN, YOU'RE RIGHT,

2874

11:15:44  1    THERE'S ALL SORTS OF STUFF THAT'S BEEN STRICKEN AND I'M NOT

11:15:47  2    SURE THAT'S AN ADEQUATE REMEDY BECAUSE HE'S NOW COMPARED THIS

11:15:50  3    TO ALL THESE OTHER LABS WHERE THERE ARE ALL THESE OTHER ISSUES.

11:15:54  4         THE COURT:  WELL, THAT CALLS ME THEN TO -- YOU'RE

11:15:56  5    ASKING THE COURT THEN TO MAKE A MEASUREMENT AS TO EVERYTHING

11:15:58  6    THAT'S STRICKEN AND PUT SOME KIND OF VALUE ON THAT AS TO

11:16:02  7    WHETHER OR NOT I NEED TO ENHANCE THE COURT'S STRIKING.

11:16:08  8         THE PRELIMINARY INSTRUCTIONS INFORMED THE JURY THAT WHEN

11:16:10  9    SOMETHING IS STRICKEN, THEY MAY NOT CONSIDER IT.  THEY'RE NOT

11:16:13 10    TO CONSIDER IT.  WE DON'T HAVE GRADATIONS OF THAT.  THIS IS THE

11:16:17 11    LEVEL 1, A LEVEL 2, A LEVEL 3 VIOLATION.  THEY ARE NOT TO

11:16:20 12    CONSIDER IT AT ALL.

11:16:22 13         AND WE PRESUME THAT THE JURIES FOLLOW THE COURT'S

11:16:26 14    INSTRUCTIONS.

11:16:27 15         BUT I WILL ADMONISH THEM.  I'LL DO THAT.  AND MY SENSE

11:16:32 16    IS -- WE HAVE HOW MANY WEEKS LEFT IN THE TRIAL?  MY SENSE IS

11:16:37 17    THAT AN INSTRUCTION STRIKING THIS WILL, WILL SUFFICE TO REMEDY

11:16:43 18    WHAT WE NEED TO DO IN THIS CASE.  I THINK THAT'S SUFFICIENT.

11:16:46 19         SO I'LL CALL IT UP FROM THE COURT REPORTER AND WE'LL -- I

11:16:50 20    DON'T KNOW HOW STRONG YOU'D LIKE ME TO EMPHASIZE IT.  I KNOW

11:16:53 21    YOU WANT ME TO CHASTISE THE GOVERNMENT IN FRONT OF THE JURY.  I

11:16:57 22    DON'T THINK THAT'S NEEDED AT THIS POINT AND I DON'T THINK

11:16:59 23    THAT'S APPROPRIATE.

11:16:59 24         MR. WADE:  YOUR HONOR, WHAT I PARTICULARLY DON'T WANT

11:17:01 25    YOU TO DO IS READ THE TESTIMONY AGAIN BECAUSE -- AND THAT'S WHY

2875

11:17:05  1      I'D LIKE TO CONFER WITH MY COLLEAGUES AND MAYBE WE CAN ADDRESS

11:17:08  2      THIS FOR TWO MINUTES BEFORE WE PULL THE JURY BACK.

11:17:11  3          I MEAN, THAT EXACERBATES THE PROBLEM.  LIKE I SAID, IT WAS

11:17:15  4      ONE OF THE LAST QUESTIONS.  IT WAS NOT -- AND YOU CAN'T UNRING

11:17:18  5      THAT BELL.  SO IT MAY BE THAT --

11:17:20  6              THE COURT:  WELL, I CAN.  I CAN TELL THEM NOT TO

11:17:23  7      CONSIDER IT AND IT'S THE APPROPRIATE THING TO DO.

11:17:25  8          AND THEN THEY'LL HAVE TO JUST -- THEY'LL FORGET ABOUT IT

11:17:30  9      AT THAT POINT, OR AT LEAST THEY WON'T LET IT INTO THEIR

11:17:33 10      DELIBERATIONS, AND IF THE GOVERNMENT TRIES TO ARGUE THAT, I'LL

11:17:37 11      SHUT THE GOVERNMENT DOWN IN THEIR FINAL ARGUMENT IF THEY TRY TO

11:17:40 12      RAISE THIS POINT.  THIS WAS THE WORST LAB HE'S EVER WORKED IN,

11:17:44 13      THEY WON'T BE PERMITTED TO ARGUE THAT.

11:17:46 14          SO I THINK WE CAN -- I THINK WE CAN RESOLVE IT.

11:17:50 15          I UNDERSTAND YOUR CONCERN.  I DO.  IT WAS AT THE END OF

11:17:54 16      HIS INFORMATION, AND IT WAS A LENGTHY EXAMINATION.

11:17:59 17          THIS WITNESS HAS ENDURED NOW FIVE DAYS OF EXAMINATION,

11:18:02 18      WHICH IS TO SAY, THE JURY HAS ENDURED FIVE DAYS OF QUESTION AND

11:18:06 19      ANSWER FROM THIS PARTICULAR WITNESS.  SO I THINK WE ALL

11:18:10 20      RECOGNIZE THAT.

11:18:10 21              MR. WADE:  I THINK WE ALL HAVE, YOUR HONOR.

11:18:13 22          MIGHT WE COME BACK JUST TWO MINUTES BEFORE WE CALL THE

11:18:16 23      JURY BACK --

11:18:17 24              THE COURT:  SURE, OF COURSE.

11:18:18 25              MR. WADE:  -- SO THAT I CAN CLARIFY THIS?

2876

```
11:18:20   1              THE COURT:  SURE.

11:18:20   2              MR. BOSTIC:  AND YOUR HONOR, FINAL POINT, TO

11:18:22   3       MR. WADE'S POINT ABOUT REREADING THE TESTIMONY, I THINK THAT

11:18:25   4       CAN BE ADDRESSED BY THE COURT DESCRIBING THE QUESTION ONLY AND

11:18:28   5       NOT READING THE ANSWER ITSELF.  THE GOVERNMENT WOULD HAVE NO

11:18:31   6       OBJECTION TO THAT, OF COURSE.

11:18:32   7              THE COURT:  OKAY.  THANK YOU.

11:18:33   8              MR. WADE:  YOUR HONOR, WILL WE GO UNTIL 3:00 TODAY?

11:18:36   9              THE COURT:  YES, YES.

11:18:38  10              THE CLERK:  COURT IS IN RECESS.

11:18:39  11          (THE LUNCH RECESS WAS TAKEN FROM 11:18 A.M. UNTIL

11:56:34  12       11:56 A.M.)

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25
```

2877

|  |  |  |
|---|---|---|
| 11:56:36 | 1 | **AFTERNOON SESSION** |
| 11:56:54 | 2 | (JURY OUT AT 11:56 A.M.) |
| 11:56:54 | 3 | THE COURT:  ALL RIGHT.  WE'RE BACK ON THE RECORD IN |
| 11:57:09 | 4 | THE HOLMES MATTER.  WE ARE OUTSIDE THE PRESENCE OF THE JURY. |
| 11:57:14 | 5 | ALL COUNSEL ARE PRESENT AND MS. HOLMES IS PRESENT. |
| 11:57:18 | 6 | MR. WADE:  YOUR HONOR, THANK YOU. |
| 11:57:19 | 7 | JUST FOLLOWING UP ON THE MATTER THAT WE WERE DISCUSSING |
| 11:57:22 | 8 | BEFORE THE BREAK, WE LOOKED BACK AT OUR NOTES RELATING TO THE |
| 11:57:27 | 9 | QUESTION AND ANSWER AND THE IMPACT OF THAT QUESTION AND ANSWER |
| 11:57:30 | 10 | AND WE BELIEVE IT'S NECESSARY TO EXPLORE THOSE OTHER |
| 11:57:35 | 11 | PROFESSIONAL EXPERIENCES. |
| 11:57:36 | 12 | THE COURT:  OF COURSE.  OF COURSE YOU DO, YES. |
| 11:57:39 | 13 | MR. BOSTIC? |
| 11:57:39 | 14 | MR. BOSTIC:  SO, YOUR HONOR, I UNDERSTAND THAT THE |
| 11:57:42 | 15 | COURT'S INTENTION WAS TO STRIKE -- I WASN'T SURE -- IT WASN'T |
| 11:57:47 | 16 | CLEAR HOW MUCH WE WERE TALKING ABOUT STRIKING. |
| 11:57:50 | 17 | MY UNDERSTANDING IS THAT THE CONTROVERSY IS OVER A |
| 11:57:56 | 18 | QUESTION ABOUT ISSUES ENCOUNTERED AT DR. ROSENDORFF'S OTHER |
| 11:58:00 | 19 | LABS AND WHETHER THE ISSUES AT THERANOS WERE WHAT HE CONSIDERED |
| 11:58:04 | 20 | TO BE TYPICAL LABORATORY ISSUES. |
| 11:58:07 | 21 | IN THE CONTEXT OF PREVIOUS QUESTIONS, I DON'T BELIEVE THAT |
| 11:58:11 | 22 | THAT HAS A PREJUDICIAL EFFECT. |
| 11:58:13 | 23 | TO THE EXTENT IT DOES, I THINK THAT STRIKING THAT SINGLE |
| 11:58:16 | 24 | QUESTION AND ANSWER IS THE REMEDY.  I DON'T THINK THAT GOING |
| 11:58:19 | 25 | INTO THE INADMISSIBLE LINES OF QUESTIONING THAT WE DISCUSSED |

|       |    |                                                                        |
|-------|----|------------------------------------------------------------------------|
| 11:58:22 | 1  | YESTERDAY IS THE SOLUTION HERE. |
| 11:58:24 | 2  | BUT WE'RE GUIDED BY THE COURT. |
| 11:58:26 | 3  | THE COURT:  YOU FLIPPED YOUR LECTERNS HERE, HAVEN'T |
| 11:58:29 | 4  | YOU? |
| 11:58:30 | 5  | MR. WADE:  I WAS KIND OF OCCUPYING THE SPACE HERE, SO |
| 11:58:33 | 6  | WE THOUGHT WE'D CHANGE PACE. |
| 11:58:35 | 7  | YOUR HONOR, FOR THE REASONS THAT I STATED PREVIOUSLY, WE |
| 11:58:38 | 8  | THINK THE BELL HAS BEEN RUNG.  THE GOVERNMENT OPENED THE DOOR. |
| 11:58:41 | 9  | I THINK AN INSTRUCTION WOULDN'T BE SUFFICIENT TO, TO CURE THAT |
| 11:58:46 | 10 | AND WE'LL NEED TO EXPLORE WITH HIM THE OTHER ISSUES THAT HE |
| 11:58:51 | 11 | ENCOUNTERED AT HIS LAB AND LET THE JURY DECIDE THE COMPARISON |
| 11:58:56 | 12 | BETWEEN THOSE, BECAUSE RIGHT NOW -- |
| 11:58:58 | 13 | THE COURT:  WELL, LET'S TALK ABOUT THE DANGER OF THAT |
| 11:59:01 | 14 | THOUGH, MR. WADE.  I THINK THERE IS SOME PRESENT DANGER IN |
| 11:59:04 | 15 | DOING THAT. |
| 11:59:05 | 16 | WHAT WE WOULD BE DOING THEN IS TO ENGAGE IN THOSE MINI |
| 11:59:08 | 17 | TRIALS THAT YOU HAVE SUGGESTED I AVOID IN OUR MIL HEARING AND |
| 11:59:12 | 18 | OTHERS, AND IF WE -- IF WE PUT THE COMPARATORS, THAT IS, THE |
| 11:59:17 | 19 | OTHER LABORATORIES AND THIS WITNESS'S EXPERIENCE IN THEM TO THE |
| 11:59:21 | 20 | JURY AND ASK THEM TO WEIGH THAT AS THEY DELIBERATE THE FACTS OF |
| 11:59:29 | 21 | THIS CASE, I DO BELIEVE THAT PUTS YOUR CLIENT AT GREAT RISK, |
| 11:59:35 | 22 | BECAUSE WHAT IF THEY DECIDE, YOU KNOW, HE WAS RIGHT, THERANOS |
| 11:59:39 | 23 | WAS THE WORST PLACE HE WORKED AT?  THESE OTHER PLACES DIDN'T |
| 11:59:42 | 24 | HAVE THE SAME TYPE OF VIOLATIONS OR THIS AND THAT.  THEY DIDN'T |
| 11:59:46 | 25 | RISE TO THAT SEVERITY CERTAINLY THAT BRINGS A FEDERAL |

11:59:50   1    PROSECUTION.

11:59:51   2         MY CONCERN IS THAT THEY MIGHT THEN INAPPROPRIATELY USE

11:59:55   3    THAT TO JUDGE YOUR CLIENT AND THE CONDUCT OF THE ALLEGATIONS IN

11:59:59   4    THIS CASE.

12:00:02   5         IN ESSENCE, WE WOULD BE ASKING THE JURY TO SAY, OKAY, IN

12:00:06   6    DECIDING THE CREDIBILITY OF THIS WITNESS AND WHETHER OR NOT YOU

12:00:09   7    SHOULD BELIEVE THIS OR NOT, WE'RE GOING TO SHARE WITH YOU HIS

12:00:12   8    EXPERIENCES AND YOU CAN CONSIDER THOSE.

12:00:15   9         AND I THINK THERE'S GREAT PERIL FOR MS. HOLMES IF THEY

12:00:19  10    DECIDE, YOU KNOW, I THINK THAT WITNESS WAS RIGHT, ALL THE

12:00:22  11    EXPERIENCE HE HAD, LOOK AT THIS, LOOK AT THE CONDUCT HERE, IT

12:00:25  12    DOES NOT AT ALL COME CLOSE TO THIS.

12:00:28  13         AND I HAVE -- YOU KNOW, I HAVE GREAT RESPECT FOR THE

12:00:30  14    PROCESS HERE AND I DON'T THINK IT'S, IT'S FAIR TO PUT A JURY,

12:00:35  15    TO HAVE THEM MAKE THAT DECISION ON A COLLATERAL, EXTRINSIC

12:00:41  16    MATTER THAT RELATES TO THE WITNESS'S TESTIMONY AND THAT MIGHT

12:00:44  17    IN SOME WAY AFFECT THEIR DELIBERATIVE PROCESS.

12:00:48  18         NOW, I UNDERSTAND, WE CAN INSTRUCT THEM, YOU'RE NOT TO DO

12:00:51  19    THAT.  BUT, AGAIN, THEN WE START RINGING MULTIPLE BELLS, DON'T

12:00:55  20    WE?

12:00:56  21         I HOPE YOU APPRECIATE MY COMMENTS HERE AND MY CONCERN.  MY

12:00:59  22    THOUGHT IS THAT PERHAPS THE MOST EFFICIENT WAY TO RESOLVE THIS

12:01:03  23    IS TO TELL THEM THAT THERE WAS THIS QUESTION, AND I WON'T -- AT

12:01:06  24    YOUR SUGGESTION, I WON'T REPEAT IT TO RING THE BELL YET

12:01:10  25    AGAIN -- BUT I THINK THE CONTEXT OF THAT QUESTION WAS, WAS TO

12:01:14   1    ELICIT, THIS WAS THE WORST PLACE HE WORKED AT, OR THERE WERE

12:01:17   2    MORE VIOLATIONS THAN ANY OTHER, AND I DON'T THINK THAT NEEDS --

12:01:22   3    THAT'S NOT NECESSARY FOR THEM, THE JURY, TO MAKE THEIR

12:01:25   4    DECISION.

12:01:25   5         MR. WADE:  IT WAS DESIGNED TO ELICIT HIS COMPARISON,

12:01:29   6    WHICH IS 702 INFORMATION.  IT'S AN ISSUE THAT THE GOVERNMENT --

12:01:35   7    I MEAN, THE COURT COULDN'T HAVE BEEN CLEARER YESTERDAY ON THESE

12:01:38   8    MATTERS AND THE GOVERNMENT ELICITED THAT TESTIMONY SPECIFICALLY

12:01:43   9    ON ITS DIRECT EXAMINATION.

12:01:45   10   SO WHILE I UNDERSTAND THE RISKS, WE THINK -- WE HAVE TO

12:01:50   11   BALANCE RISKS IN THIS CASE IN TERMS OF THE RISKS OF THAT ANSWER

12:01:54   12   AND CREDITING THAT TESTIMONY VERSUS OUR ABILITY TO TEST THAT

12:01:59   13   ANSWER AND TO LET THE JURY DECIDE WHETHER THEY -- WHICH

12:02:04   14   EVIDENCE THEY WANT TO BELIEVE.

12:02:05   15        THE COURT:  WELL, WHY DON'T WE JUST DISCARD THAT

12:02:08   16   EVIDENCE FROM THEIR, FROM THEIR KNOWLEDGE BY STRIKING IT SUCH

12:02:12   17   THAT THEY DON'T HAVE TO GO THROUGH THAT THOUGHT PROCESS AT ALL

12:02:16   18   AND, THEREFORE, WE CAN AVOID ANY DANGER THAT MIGHT COME FROM

12:02:22   19   IT?

12:02:22   20   I UNDERSTAND YOUR NEED NOW TO RISE AND RESPOND TO IT.  I

12:02:27   21   RESPECT THAT.  I DO.

12:02:28   22   BUT AS I SAID, I HAVE GREAT CONCERNS THAT IT COULD -- AND

12:02:33   23   YOU'VE WARNED ME SEVERAL TIMES OVER THE PAST MONTHS ABOUT MINI

12:02:38   24   TRIALS -- AND I SEE THIS AS A MINI TRIAL THAT DOESN'T BENEFIT

12:02:42   25   EITHER SIDE AND IT PERHAPS PRESENTS GREATER PERIL TO THE

```
12:02:45   1    DEFENSE HERE.

12:02:50   2         MR. BOSTIC?

12:02:50   3             MR. BOSTIC:  NOT MUCH TO ADD, YOUR HONOR.

12:02:51   4         THE GOVERNMENT'S INTENT IN ASKING THAT QUESTION WAS TO

12:02:54   5     PROVIDE A RESPONSE TO PREVIOUS ANSWERS ABOUT LABS IN GENERAL,

12:02:56   6     THE FACT THAT MISTAKES HAPPEN AT LABS.

12:03:00   7         THE PARTIES DISAGREE AS TO THE EFFECT OF THAT QUESTION.

12:03:03   8         OF COURSE IT'S THE COURT'S VIEW THAT CONTROLS.

12:03:07   9         TO THE EXTENT THE EFFECT OF THAT QUESTION CARRIES SOME

12:03:11  10    DANGER OF SOME PREJUDICE TO THE DEFENSE, THE GOVERNMENT AGREES

12:03:14  11    WITH THE COURT THAT STRIKING THE QUESTION IS THE ANSWER.

12:03:17  12         WE'RE TALKING ABOUT ONE QUESTION AND ANSWER IN A VERY

12:03:21  13    LENGTHY WITNESS EXAMINATION, WHICH IS NOT YET OVER.  WE'RE

12:03:24  14    ABOUT TO ENTER RECROSS.  IT WON'T BE THE LAST THING THE WITNESS

12:03:27  15    SAYS ON THE STAND.  THIS WON'T BE THE LAST THING THE JURY

12:03:30  16    HEARS.

12:03:31  17         THERE ARE WEEKS LEFT IN THE TRIAL, AS THE COURT POINTED

12:03:33  18    OUT.  SO THIS IS NOT A SITUATION WHERE ANYTHING MORE THAN

12:03:36  19    STRIKING THAT ANSWER IS REQUIRED.

12:03:38  20             MR. WADE:  YOUR HONOR, OUR POSITION IS CLEAR ON THIS.

12:03:41  21     I UNDERSTAND MR. BOSTIC'S POSITION.  BUT HE ASKED THE QUESTION

12:03:44  22     AND THE ANSWER WAS GIVEN AND WE'VE MADE OUR JUDGMENT.  OUR

12:03:47  23     POSITION WOULD BE WE SHOULD EXPLORE IT.

12:03:50  24         IF THE COURT IS UNWILLING TO ALLOW US THE LATITUDE TO DO

12:03:54  25    THAT, I COULD GIVE A SPECIFIC PROFFER AS TO EXACTLY WHAT WE
```

2882

12:03:59  1   WOULD -- THE WAY WE WOULD EXPLORE IT EITHER NOW ORALLY OR IN

12:04:04  2   WRITING AND THE COURT COULD CONSIDER IT.

12:04:07  3       IF THE COURT'S NOT GOING TO CONSIDER THAT, WE WOULD ALSO

12:04:10  4   HAVE A PROPOSED INSTRUCTION THAT WE WOULD HAND UP.

12:04:12  5       WE DO NOT THINK THIS IS A CIRCUMSTANCE IN WHICH SIMPLY

12:04:18  6   STRIKING THIS QUESTION, GIVEN THE SIGNIFICANCE OF IT RIGHT

12:04:21  7   BEFORE THE BREAK, ONE OF THE LAST QUESTIONS, I BELIEVE IT MAY

12:04:24  8   HAVE BEEN KIND OF SET UP AS A SERIES OF QUESTIONS, WE DON'T

12:04:28  9   THINK THAT'S SUFFICIENT.

12:04:29  10          THE COURT:  ALL RIGHT.  WELL, THANK YOU.

12:04:31  11      WELL, I -- I APPRECIATE YOUR CONCERN.  YOU'VE TALKED ABOUT

12:04:35  12  YOUR BELIEF IN THE IMPACT OF THAT QUESTION ON THE JURY, THE

12:04:40  13  TIMING, THE STRATEGIC NATURE OF THE WAY IT WAS PRESENTED, ET

12:04:44  14  CETERA.  AND TRIALS ARE STRATEGIC.  I KNOW BOTH SIDES PREPARE

12:04:47  15  AND DO THE BEST YOU CAN.

12:04:49  16      THE QUESTION WAS -- LET ME SAY THIS:  IT'S UNFORTUNATE

12:04:52  17  THAT THE QUESTION WAS ASKED.  I'LL CONCEDE THAT.  I DO THINK

12:04:55  18  THAT IT DID CRACK PERHAPS THE DOOR, IT DID RAISE THE ISSUE.

12:04:59  19  THAT'S WHY WE'RE DISCUSSING IT HERE.

12:05:01  20      I DO THINK THAT THE REMEDY, THOUGH, THE APPROPRIATE REMEDY

12:05:04  21  HERE IS NOT TO ENGAGE IN A SERIES OF MINI TRIALS TO TEST

12:05:08  22  WHETHER OR NOT THERANOS WAS THE PLACE THAT HAD GREATER PROBLEMS

12:05:13  23  THAN ANY OTHER.

12:05:14  24      AS I TOLD YOU BEFORE, I WOULD ALLOW YOU SOME LATITUDE IN

12:05:19  25  TALKING ABOUT THAT SUBJECT WITHOUT GETTING INTO THE EXTRINSIC

```
12:05:23   1    EVIDENCE, THOUGH, AND I -- I EXPECT THAT YOU WILL DELICATELY

12:05:29   2    ADVANCE THOSE QUESTIONS.

12:05:31   3         BUT I DO THINK THE APPROPRIATE REMEDY HERE, UNDER 403 AND

12:05:39   4    UNDER THE COURT'S INHERENT DISCRETION TO RUN THE TRIAL, IS THAT

12:05:43   5    TO ALLOW MINI TRIALS TO ENGAGE ON THIS PARTICULAR ISSUE WOULD

12:05:50   6    BE WASTEFUL OF TIME, IT WOULD CONFUSE THE JURY ON COLLATERAL

12:05:54   7    ISSUES THAT REALLY AREN'T, AREN'T GERMANE TO THE TRIAL IN THIS

12:05:59   8    CASE.

12:06:00   9         I WILL, THOUGH -- I DO RECOGNIZE THE IMPORT OF THE

12:06:03  10    QUESTION AND WHAT IT CAUSES AND MAY CAUSE THE JURY TO SPECULATE

12:06:07  11    ON, SO I WILL STRIKE THAT LAST QUESTION.

12:06:11  12         YOU HAVE SOMETHING YOU'D LIKE ME TO LOOK AT?

12:06:13  13              MR. WADE:  I WOULD.  IF I COULD HAND IT UP, YOUR

12:06:16  14    HONOR (HANDING)?

12:06:17  15         AND I'LL GIVE A COPY TO THE COURT REPORTER, TOO, SO IT CAN

12:06:24  16    BE MADE PART OF THE RECORD.

12:06:26  17              THE COURT:  THANK YOU.

12:06:26  18              MR. WADE:  WOULD THE COURT PREFER THAT I READ THIS SO

12:06:29  19    IT'S PART OF THE RECORD, OR CAN WE JUST APPEND IT AS PART OF

12:06:32  20    THE RECORD?

12:06:32  21              THE COURT:  LET ME ASK FIRST FOR MR. BOSTIC'S

12:06:35  22    COMMENTS ON THIS.

12:06:36  23         YOU HAVE THIS, MR. BOSTIC?

12:06:37  24              MR. BOSTIC:  I DO, YOUR HONOR.

12:06:39  25         I THINK THAT TO ACCOMPLISH THE PURPOSE, I'M NOT SURE IT'S
```

12:06:43   1   NECESSARY TO CHARACTERIZE THE QUESTION.  I THINK THE COURT

12:06:47   2   COMMENTED EARLIER ON ITS INCLINATION TO MAKE A JUDGMENT LIKE

12:06:55   3   THAT IN FRONT OF THE JURY.  I DON'T KNOW IF THE COURT'S

12:06:57   4   THINKING HAS CHANGED, BUT MY THINKING IS ALIGNED WITH WHAT I

12:07:01   5   UNDERSTAND THE COURT'S POSITION TO BE.

12:07:03   6        SO I'M NOT SURE CHARACTERIZING THE QUESTION IS NECESSARY.

12:07:06   7        I THINK OTHERWISE I'M NOT SURE FOR THE NEED TO DEVIATE

12:07:11   8   FROM THE COURT'S STANDARD INSTRUCTION WHEN IT COMES TO STRIKING

12:07:14   9   ANSWERS FROM THE RECORD.  BUT OTHERWISE I HAVE NO SUBSTANTIVE

12:07:20   10  OBJECTIONS TO THIS LANGUAGE.

12:07:21   11       MR. WADE:  YOUR HONOR, AS WE'VE MADE CLEAR IN SEEKING

12:07:24   12  TO EXPLORE THIS IN CROSS-EXAMINATION, WE THINK THIS IS

12:07:28   13  DIFFERENT IN KIND FROM THE OTHER ANSWERS AND REQUIRES MORE OF A

12:07:31   14  REMEDY.  THAT'S WHY WE'VE PROPOSED THIS INSTRUCTION.

12:07:34   15       OUR PREFERENCE WOULD BE TO EXPLORE IT IN

12:07:36   16  CROSS-EXAMINATION, BUT SHORT OF THAT, UNDERSTANDING THE COURT'S

12:07:40   17  RULING UNDER THE RULES OF EVIDENCE, WE WOULD ASK THAT THIS

12:07:45   18  INSTRUCTION BE GIVEN TO CURE THIS, THIS ISSUE.

12:07:48   19       THE COURT:  ALL RIGHT.  THANK YOU.

12:07:50   20       MR. WADE:  SHOULD I READ THIS, JUST FOR THE RECORD?

12:07:52   21       THE COURT:  I BEG YOUR PARDON.  YOU'D LIKE ME TO --

12:07:55   22  YOU WOULD LIKE ME TO ADVISE THE JURY OF THIS NOW WHEN THEY COME

12:08:00   23  IN?

12:08:00   24       MR. WADE:  YES.

12:08:00   25       THE COURT:  YOU SAID INSTRUCTION.  YOU MEANT NOW AS

```
12:08:02   1      OPPOSED TO A FINAL INSTRUCTION?

12:08:04   2              MR. WADE:  YEAH, RIGHT.  RIGHT WHEN THE JURY RETURNS,

12:08:08   3      YOUR HONOR.

12:08:08   4              THE COURT:  RIGHT.  ALL RIGHT.  THANK YOU.

12:08:10   5          WELL, I LOOK AT THIS, I AM GOING TO STRIKE THE, THE MIDDLE

12:08:14   6      SENTENCE IN THE THIRD LINE.  I DON'T THINK THAT'S NECESSARY.

12:08:20   7          BUT I WILL READ TO THE JURY, WHEN THEY RETURN, THE

12:08:24   8      FOLLOWING:  "AT THE END OF HIS REDIRECT EXAMINATION,

12:08:29   9      DR. ROSENDORFF WAS ASKED TO COMPARE THERANOS WITH OTHER LABS

12:08:33  10      WHERE HE HAS WORKED.  YOU MUST ENTIRELY DISREGARD BOTH THE

12:08:38  11      QUESTION AND DR. ROSENDORFF'S ANSWER.  IT WOULD BE IMPROPER FOR

12:08:44  12      YOU TO GIVE ANY WEIGHT WHATSOEVER EITHER TO THE QUESTION OR TO

12:08:49  13      THE ANSWER."

12:08:51  14          THAT'S WHAT I'LL READ TO THEM WHEN THEY COME OUT.

12:08:55  15              MR. WADE:  AND JUST FOR THE RECORD, YOU'LL SKIP OVER

12:08:58  16      THE SENTENCE "THAT WAS AN INAPPROPRIATE QUESTION" THAT WE HAD

12:09:03  17      REQUESTED?

12:09:03  18              THE COURT:  THE ONE THAT YOU JUST READ INTO THE

12:09:05  19      RECORD, THAT YOU WANTED TO READ INTO THE RECORD?

12:09:07  20              MR. WADE:  YES, I DID, YOUR HONOR, JUST TO MAKE SURE

12:09:09  21      WE'RE CLEAR.

12:09:10  22              THE COURT:  YES.  THANK YOU FOR DOING THAT.  I WAS

12:09:12  23      GOING TO SUGGEST THAT WHAT I DELETED WAS WHAT MR. WADE JUST

12:09:15  24      READ --

12:09:16  25              MR. WADE:  THANK YOU, YOUR HONOR.
```

12:09:17  1          THE COURT:  -- FROM THE PROPOSED INSTRUCTION.

12:09:20  2          OKAY.  ANYTHING ELSE?

12:09:21  3          OH, LET ME -- BUT, MR. WADE, I DID SAY THAT I WOULD ALLOW

12:09:25  4      YOU TO PROBE SOMEWHAT.

12:09:27  5          HAVING READ THIS INSTRUCTION, THOUGH, THEY'RE NOT TO

12:09:30  6      CONSIDER THAT, YOU SEE, SO THIS PRESENTS THEN ANOTHER DOOR THAT

12:09:34  7      YOU'RE FACING, DOESN'T IT?

12:09:36  8          MR. WADE:  MAYBE I'M NOT CLEAR ON WHAT IT IS THE

12:09:39  9      COURT IS WILLING TO LET ME PROBE.

12:09:41 10          THE COURT:  RIGHT.

12:09:41 11          MR. WADE:  I HAD UNDERSTOOD THE COURT SAYING I CAN'T

12:09:44 12      PROBE IT, SO MAYBE --

12:09:46 13          THE COURT:  WELL, I -- I FIRST SAID, WHEN WE WERE

12:09:50 14      TALKING ABOUT POSSIBLE REMEDIES, I SAID I MIGHT LET YOU PROBE

12:09:53 15      INTO THIS.

12:09:54 16          BUT IF I'M GOING TO READ THIS INSTRUCTION NOW, I THINK IT

12:09:56 17      BEST TO KEEP THE WHITE BOARD COMPLETELY CLEAN SO THEY'RE NOT

12:09:59 18      REMINDED ABOUT ANYTHING.

12:10:04 19          IF I ALLOW YOU TO, AS I SAID I WAS GOING TO DO, ALLOW YOU

12:10:07 20      TO PROBE A LITTLE BIT ON THE AREA OF WHETHER OR NOT THIS WAS

12:10:12 21      THE WORST PLACE, OR WHATEVER IT WAS HE SAID ABOUT THAT, THAT

12:10:16 22      TANGENTIALLY KEEPS THAT -- THIS -- THAT QUESTION IN THEIR

12:10:21 23      MINDS, AND I'M ASKING THEM TO STRIKE IT.

12:10:23 24          SO WHAT I'M SUGGESTING NOW IS MAYBE WE SHOULD MOVE ON AND

12:10:26 25      YOU DON'T NEED TO ASK ANY QUESTIONS ABOUT IT BECAUSE THAT

```
12:10:28   1    QUESTION ISN'T IN THEIR MIND.
12:10:32   2              MR. WADE:  I APOLOGIZE IF I WAS CONFUSED, YOUR HONOR.
12:10:34   3    I UNDERSTOOD THAT YOU WERE NOT GOING TO ALLOW US TO PROBE THAT.
12:10:37   4    THAT'S WHAT I UNDERSTOOD TO BE THE COURT'S RULING.
12:10:39   5              THE COURT:  RIGHT.
12:10:40   6              MR. WADE:  WHAT MY REFERENCE WOULD BE WOULD BE TO
12:10:42   7    PROBE WITH RESPECT TO THE TWO, TWO PLACES OF EMPLOYMENT WHERE
12:10:48   8    THERE WERE SIGNIFICANT ISSUES WITHIN THE LAB, ONE BEING INVITAE
12:10:55   9    AND THE VOIDING OF THE 50,000 TESTS, THERE BEING A NUMBER OF
12:10:59   10   ERRONEOUS TESTS AND HIS SEPARATION FROM THE COMPANY AS A RESULT
12:11:02   11   OF THAT; AND THE OTHER BEING THE SIGNIFICANT ISSUES, INCLUDING
12:11:08   12   THE TESTING ACCURACY AND LAB PRACTICES DEFICIENCIES AT
12:11:13   13   PERKIN ELMER.
12:11:15   14      THAT WOULD HAVE BEEN WHAT I WOULD HAVE INTENDED TO PROBE,
12:11:17   15   AND I HAD UNDERSTOOD THAT THE COURT DOESN'T, DOESN'T WANT ME TO
12:11:21   16   GO INTO THAT.
12:11:22   17         AM I --
12:11:22   18              THE COURT:  THAT'S RIGHT.  AND I'M SORRY, WE'RE
12:11:24   19   TALKING KIND OF -- WE'RE SHIPS PASSING.
12:11:27   20              MR. WADE:  OKAY.
12:11:27   21              THE COURT:  BUT WHAT I'M GOING TO DO, BECAUSE THIS
12:11:29   22   ISSUE HAS BEEN RAISED AND IN LIGHT OF YESTERDAY'S RULING WHERE
12:11:32   23   I SAID YOU CAN'T GET INTO ANY OF THAT, TODAY THIS ISSUE CAME UP
12:11:38   24   FROM MR. BOSTIC'S QUESTION AND THE ANSWER.
12:11:40   25              THE REMEDY TODAY IS TO STRIKE THAT QUESTION AND THAT
```

```
12:11:43   1      ANSWER, AND I THINK THAT TAKES CARE OF IT SUCH THAT YOU DON'T

12:11:46   2      NEED TO GO INTO ANY OF THE OTHER THINGS THAT I TALKED ABOUT.

12:11:50   3              MR. WADE:  RIGHT.  AND I UNDERSTAND THE COURT WILL

12:11:52   4      NOT LET ME GO INTO THOSE ISSUES.  CORRECT?

12:11:55   5              THE COURT:  I WILL NOT LET YOU GO INTO THOSE.

12:11:58   6              MR. WADE:  RIGHT, UNDERSTOOD.

12:11:59   7              THE COURT:  AS WE PREVIOUSLY DISCUSSED.

12:12:01   8              MR. WADE:  UNDERSTOOD.

12:12:01   9              THE COURT:  THAT'S NOT TO SAY THAT YOU CAN'T --

12:12:04  10      YOU'RE GOING TO DO WHATEVER YOU'RE GOING TO DO ON RECROSS BASED

12:12:07  11      ON WHAT THE REDIRECT WAS.

12:12:09  12              MR. WADE:  RIGHT.

12:12:09  13              THE COURT:  OKAY.  ANY QUESTION ABOUT THAT?

12:12:11  14              MR. BOSTIC:  NOT FROM THE GOVERNMENT, YOUR HONOR.

12:12:12  15      THANK YOU.

12:12:12  16              THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

12:12:14  17          SHOULD WE ASK THE DOCTOR TO COME IN AND ASK OUR JURY TO

12:12:17  18      COME IN NOW?

12:12:19  19              MR. WADE:  SURE.

12:12:19  20              MR. BOSTIC:  YES, YOUR HONOR.

12:12:20  21              THE COURT:  ARE WE READY?

12:12:26  22              MR. BOSTIC:  YES.

12:12:27  23              THE COURT:  OKAY.

12:12:36  24          (PAUSE IN PROCEEDINGS.)

12:12:37  25              THE COURT:  OKAY.  FOLKS, I JUST WANT TO REMIND
```

```
12:12:40   1      EVERYONE THAT WE DON'T -- THOSE IN THE GALLERY, WE'RE NOT

12:12:43   2      HAVING BEVERAGES, AND SO IF YOU BROUGHT A BEVERAGE IN, YOU NEED

12:12:50   3      TO PLEASE REMOVE THE BEVERAGE, COFFEE DRINKS OR THOSE KINDS OF

12:12:54   4      THINGS.

12:12:57   5           (PAUSE IN PROCEEDINGS.)

12:14:12   6           THE COURT:  CAN I ASK COUNSEL, IS IT STILL SUGGESTED

12:14:16   7      THAT -- WE'RE GOING TO GO UNTIL 3:00 TODAY.  IS IT SUGGESTED

12:14:21   8      STILL THAT WE BREAK AT THE 1:30 TIMEFRAME?  IS THAT A GOOD

12:14:24   9      TIMEFRAME?

12:14:25  10           MR. WADE:  COURT'S INDULGENCE.

12:14:29  11        (DISCUSSION OFF THE RECORD AMONGST DEFENSE COUNSEL.)

12:14:40  12           MR. WADE:  (NODS HEAD UP AND DOWN.)

12:14:42  13           THE COURT:  OKAY.

12:14:43  14        (JURY IN AT 12:14 P.M.)

12:15:00  15           THE COURT:  ALL RIGHT.  THANK YOU.  PLEASE BE SEATED.

12:15:07  16      WE'RE BACK ON THE RECORD.  OUR JURY AND ALTERNATES ARE

12:15:11  17      PRESENT.  ALL COUNSEL AND MS. HOLMES ARE PRESENT.

12:15:14  18      DR. ROSENDORFF IS ON THE STAND AGAIN.

12:15:15  19           AND YOU HAVE SOME -- YOU'D LIKE TO ASK SOME QUESTIONS ON

12:15:18  20      RECROSS?

12:15:19  21           MR. WADE:  I DO, YOUR HONOR.

12:15:21  22           THE COURT:  YES.

12:15:22  23      BUT FIRST, LADIES AND GENTLEMEN, BEFORE WE BEGIN

12:15:25  24      MR. WADE'S QUESTIONING, I DO WANT TO INSTRUCT YOU ON SOMETHING,

12:15:28  25      SO PLEASE DO LISTEN.
```

12:15:31   1          AT THE END OF HIS REDIRECT EXAMINATION, DR. ROSENDORFF WAS

12:15:35   2   ASKED TO COMPARE THERANOS WITH OTHER LABS WHERE HE HAS WORKED.

12:15:43   3   YOU MUST ENTIRELY DISREGARD BOTH THE QUESTION, THAT QUESTION,

12:15:48   4   AND DR. ROSENDORFF'S ANSWER.  IT WOULD BE IMPROPER FOR YOU TO

12:15:53   5   GIVE ANY WEIGHT WHATSOEVER EITHER TO THE QUESTION OR TO THE

12:15:58   6   ANSWER.

12:16:00   7          JUST TO BE CLEAR, I AM STRIKING THOSE, THE QUESTION AND

12:16:03   8   THE ANSWER FROM THE RECORD AND YOU ARE NOT, NOT TO CONSIDER

12:16:07   9   EITHER OF THOSE THINGS IN YOUR DELIBERATIONS.  THEY ARE

12:16:10  10   STRICKEN.

12:16:12  11          THANK YOU.

12:16:13  12              MR. WADE:  THANK YOU, YOUR HONOR.  MAY I PROCEED?

12:16:14  13              THE COURT:  YES.

12:16:16  14                      **RECROSS-EXAMINATION**

12:16:16  15   BY MR. WADE:

12:16:17  16   Q.   GOOD AFTERNOON, DR. ROSENDORFF.

12:16:19  17   A.   HELLO.

12:16:20  18   Q.   I'D LIKE TO START BY BRINGING UP EXHIBIT 5417, WHICH IS IN

12:16:27  19   EVIDENCE AND THE GOVERNMENT ASKED YOU QUESTIONS ABOUT IT.

12:16:33  20          WE'LL PUT IT UP ON THE SCREEN IF IT'S EASIER FOR YOU,

12:16:36  21   DOCTOR.

12:16:36  22   A.   ALL RIGHT.

12:16:37  23   Q.   THIS WAS ONE OF THE LOOSE DOCUMENTS THAT THE GOVERNMENT

12:16:39  24   HANDED YOU.

12:16:40  25   A.   YES.

12:16:41   1        Q.   OKAY.  DO YOU RECALL THIS DOCUMENT?

12:16:42   2        A.   I HAVE IT IN FRONT OF ME.

12:16:44   3        Q.   OKAY.  IT'S A -- AND IF YOU'D LOOK AT THE -- IF WE CAN

12:16:48   4    BLOW UP THE BOTTOM EMAIL, YOU WERE ASKED SOME QUESTIONS ABOUT

12:16:50   5    THIS.

12:16:51   6             DO YOU SEE THAT?

12:16:52   7        A.   YES.

12:16:53   8        Q.   AND THE QUESTIONS THAT YOU WERE ASKED RELATED TO THE FACT

12:16:59   9    THAT MR. BALWANI STATED THAT HE WAS RUNNING THE CLIA LAB NOW,

12:17:06  10    SO HE WAS ASKING TO BE KEPT IN THE LOOP; RIGHT?

12:17:08  11        A.   YES.

12:17:09  12        Q.   AND YOU THOUGHT THIS WAS INAPPROPRIATE; CORRECT?

12:17:12  13        A.   YES.

12:17:13  14        Q.   OKAY.  AND I BELIEVE YOU TESTIFIED THAT HE MENTIONED

12:17:18  15    SOMETHING ABOUT THIS, BUT YOU HAD NO RESPONSE; RIGHT?

12:17:21  16        A.   CORRECT.

12:17:21  17        Q.   OKAY.  LET'S LOOK AT EXHIBIT 13950.

12:17:30  18             MAY I APPROACH, YOUR HONOR?

12:17:31  19                  THE COURT:  YES.

12:17:34  20                  MR. WADE:  (HANDING.)

12:17:36  21        Q.   DO YOU RECOGNIZE THIS TO BE AN EMAIL BETWEEN YOU AND

12:17:54  22    MR. BALWANI IN JUNE OF 2014 REGARDING CLIA LAB OPS?

12:18:00  23        A.   YES.

12:18:01  24                  MR. WADE:  OKAY.  MOVE THE ADMISSION OF 13950.

12:18:05  25                  MR. BOSTIC:  NO OBJECTION.

```
12:18:06   1              THE COURT:  IT'S ADMITTED AND IT MAY BE PUBLISHED.

12:18:09   2              (DEFENDANT'S EXHIBIT 13950 WAS ADMITTED IN EVIDENCE.)

12:18:09   3              MR. WADE:  THANK YOU.

12:18:10   4       Q.   LET'S START AT THE BOTTOM.

12:18:12   5            NOW, YOU PREVIOUSLY TESTIFIED THAT DR. PANDORI LEFT THE

12:18:15   6       LAB AROUND THIS TIME; RIGHT?

12:18:17   7       A.   YES.

12:18:17   8       Q.   AND IN RESPONSE TO THAT, FROM AN OPERATIONAL STANDPOINT,

12:18:23   9       MR. BALWANI STEPPED IN TO GIVE ASSISTANCE; CORRECT?

12:18:25  10       A.   YES.

12:18:29  11       Q.   OKAY.  AND IN THIS EMAIL, HE SPECIFICALLY RAISES THAT WITH

12:18:34  12       YOU; CORRECT?

12:18:35  13       A.   YES.

12:18:36  14       Q.   HE DIDN'T JUST WALK INTO THE LAB AND TAKE CONTROL OF IT

12:18:38  15       WITHOUT DISCUSSION WITH YOU, DID HE?

12:18:40  16       A.   YES.

12:18:41  17       Q.   THAT WOULD HAVE BEEN INAPPROPRIATE IF HE DID THAT; RIGHT?

12:18:43  18       A.   YES.

12:18:43  19       Q.   OKAY.  INSTEAD HE SENT YOU AN EMAIL AND HE SUGGESTED THAT

12:18:50  20       SINCE YOU'RE OUT FOR THE NEXT FEW DAYS, THIS IS NEEDED NO

12:18:53  21       MATTER WHAT.

12:18:54  22            DO YOU SEE THAT?

12:18:55  23       A.   YES.

12:18:56  24       Q.   BECAUSE YOU WERE ACTUALLY TAKING SOME VACATION DURING THIS

12:18:59  25       PERIOD.
```

| | | |
|---|---|---|
| 12:19:00 | 1 | DO YOU RECALL THAT? |
| 12:19:01 | 2 | A.   I DON'T RECALL. |
| 12:19:01 | 3 | Q.   OKAY.  BUT IS THAT WHAT YOU INFER FROM THAT COMMENT? |
| 12:19:04 | 4 | A.   YES. |
| 12:19:05 | 5 | Q.   OKAY.  AND IF DR. PANDORI WASN'T THERE AND YOU WEREN'T |
| 12:19:07 | 6 | THERE, HE WANTED TO MAKE SURE THERE WAS SOMEONE THERE TO HELP |
| 12:19:11 | 7 | KEEP THINGS MOVING; RIGHT? |
| 12:19:12 | 8 | A.   MY UNDERSTANDING IS THAT MR. BALWANI WANTED THIS TO BE A |
| 12:19:18 | 9 | PERMANENT ARRANGEMENT. |
| 12:19:21 | 10 | Q.   OKAY.  WELL, SO HE'S SAYING, BECAUSE -- NOW, WHEN |
| 12:19:24 | 11 | DR. PANDORI WAS THERE, YOU TESTIFIED THAT HE HAD SOME |
| 12:19:27 | 12 | SPECIALTIES? |
| 12:19:28 | 13 | A.   YES. |
| 12:19:29 | 14 | Q.   RIGHT?  BUT HE ALSO WAS VERY FOCUSSED ON THE LAB |
| 12:19:32 | 15 | OPERATIONS; RIGHT? |
| 12:19:33 | 16 | A.   YES. |
| 12:19:34 | 17 | Q.   HE WAS TAKING A LEAD ROLE IN THAT; RIGHT? |
| 12:19:36 | 18 | A.   WE BOTH WERE. |
| 12:19:37 | 19 | Q.   OKAY.  BUT IN THE LAB OPERATIONS, YOU DON'T NECESSARILY |
| 12:19:39 | 20 | HAVE TO BE A LAB DIRECTOR IF YOU'RE SUPERVISED BY A LAB |
| 12:19:42 | 21 | DIRECTOR; RIGHT? |
| 12:19:43 | 22 | A.   CORRECT. |
| 12:19:44 | 23 | Q.   OKAY.  AND SO DR. PANDORI WAS VERY INVOLVED IN TRYING TO |
| 12:19:48 | 24 | IMPLEMENT SOME OF THE PRACTICES AND PROCEDURES WITHIN THE LAB; |
| 12:19:51 | 25 | RIGHT? |

12:19:51   1      A.   YES.

12:19:52   2      Q.   OKAY.  AND SO WHEN HE LEFT, MR. BALWANI GIVES YOU NOTICE

12:19:58   3      THAT HE WANTS TO STEP IN ON THE OPS ISSUES.

12:20:03   4           DO YOU SEE THAT?

12:20:04   5      A.   YES.

12:20:04   6      Q.   OKAY.  LIKE SCHEDULING, DEVICES, ORDERING INVENTORY,

12:20:09   7      DEPARTMENTALIZING PEOPLE, TEAM STRUCTURES, ET CETERA.

12:20:12   8           DO YOU SEE THAT?

12:20:13   9      A.   YES.

12:20:13  10      Q.   OKAY.  AND HE SAYS HE'LL FINALIZE AND PUT THIS IN PLACE

12:20:18  11      THIS WEEK.

12:20:19  12           YOU SEE THAT, OF COURSE?

12:20:20  13      A.   YES.

12:20:20  14      Q.   OKAY.  AND HE'LL KEEP YOU IN THE LOOP IN EVERY SINGLE

12:20:27  15      RELEVANT EMAIL OF COURSE, BUT BASICALLY WE NEED TO GET THE LAB

12:20:30  16      IN ORDER AS WE SCALE.

12:20:32  17           DO YOU SEE THAT?

12:20:32  18      A.   YES.

12:20:33  19      Q.   THAT'S BECAUSE THE NUMBER OF PATIENTS WAS INCREASING;

12:20:36  20      RIGHT?

12:20:36  21      A.   YES.

12:20:37  22      Q.   OKAY.  AND HE WANTED TO COME IN AND HELP FROM AN

12:20:40  23      OPERATIONAL STANDPOINT; RIGHT?

12:20:41  24      A.   WELL, HE WAS -- HE WAS DOING FAR MORE THAN THAT.

12:20:49  25      Q.   WELL, HE'S TELLING YOU HERE THAT HE'S GOING TO GET

12:20:51  1      INVOLVED IN THE LAB FROM AN OPERATIONAL STANDPOINT?

12:20:54  2      A.   THAT'S WHAT HE'S SAYING, YEAH.

12:20:56  3      Q.   AND HE ACTUALLY SAYS, I'M UNIQUELY GIFTED AT

12:20:59  4      ORGANIZATIONAL STRUCTURES AND OPS.

12:21:00  5           DO YOU SEE THAT?

12:21:01  6      A.   YES.

12:21:02  7      Q.   HE FELT, BASED ON HIS BUSINESS EXPERIENCE, HIS EXTENSIVE

12:21:07  8      PRIOR BUSINESS EXPERIENCE, THAT HE HAD TALENTS IN THE

12:21:11  9      OPERATIONAL ISSUES; RIGHT?

12:21:12  10     A.   YES.

12:21:12  11     Q.   OKAY.  AND HE SAYS HE'LL FOCUS ON THIS FOR THE NEXT FEW

12:21:15  12     WEEKS; RIGHT?

12:21:16  13     A.   YES.

12:21:16  14     Q.   AND YOUR RESPONSE -- LET'S LOOK AT YOUR RESPONSE.

12:21:23  15     A.   I'M READING IT.

12:21:25  16     Q.   YEAH.  YOU AGREED; RIGHT?

12:21:26  17     A.   I JUST ACKNOWLEDGED HIS EMAIL.

12:21:29  18     Q.   WELL, YOU SAY THANKS; RIGHT?

12:21:31  19     A.   I DIDN'T SAY GO AHEAD AND, YOU KNOW, TAKE CONTROL OF THE

12:21:34  20     CLIA LAB.  I JUST ACKNOWLEDGED HIS EMAIL.  THAT'S IT.

12:21:37  21     Q.   YOU SAID THANKS; RIGHT?

12:21:39  22     A.   YES.

12:21:40  23     Q.   OKAY.  AND SO YOU KNEW HE WAS COMING IN AND YOU SAID

12:21:42  24     THANKS; RIGHT?  THAT'S WHAT THE EMAIL SAYS?  THOSE ARE YOUR

12:21:49  25     WORDS?

12:21:50   1    A.   I'M THANKING HIM FOR HIS EMAIL.

12:21:51   2    Q.   OKAY.  AND YOU THEN TALK ABOUT ANOTHER PROPOSAL THAT YOU

12:21:54   3    HAVE SINCE MARK PANDORI IS GONE; RIGHT?

12:21:57   4    A.   YES.

12:21:57   5    Q.   AND SOME, SOME DIFFERENT WORK THAT YOU'RE GOING TO TAKE

12:22:00   6    ON?

12:22:00   7    A.   YES.

12:22:00   8    Q.   RIGHT?  SO THIS WAS -- I BELIEVE YOU, IN YOUR DIRECT -- IN

12:22:06   9    YOUR REDIRECT TESTIMONY, YOU ACTUALLY USED THE WORDS UNIQUELY

12:22:09  10    GIFTED AT ORGANIZATIONAL STRUCTURES OR SOMETHING TO THAT

12:22:12  11    EFFECT; RIGHT?

12:22:13  12    A.   YES.

12:22:13  13    Q.   OKAY.  AND THAT'S, IN FACT, WHAT HE WROTE IN THIS EMAIL?

12:22:17  14    A.   YES.

12:22:18  15    Q.   AND THE GOVERNMENT DIDN'T SHOW YOU THIS EMAIL IN YOUR

12:22:22  16    PREPARATION, EITHER, DID THEY?

12:22:23  17    A.   NO.

12:22:24  18    Q.   NO.  AND THIS IS IN, I'LL NOTE, IN JUNE OF 2014.

12:22:28  19         DO YOU SEE THAT?

12:22:29  20    A.   YES.

12:22:29  21    Q.   AND JUNE OF 2014, RIGHT IN THIS PERIOD IS THE PERIOD WHEN

12:22:36  22    YOU WERE ALSO DEALING WITH SOME OF THOSE HCG ISSUES AND OTHER

12:22:42  23    THINGS; RIGHT?

12:22:43  24    A.   OKAY.

12:22:43  25    Q.   DO YOU REMEMBER THAT?

12:22:44    1    A.   I THINK SO.

12:22:44    2    Q.   OKAY.  AND SO YOU WERE ASKED A LOT OF QUESTIONS ABOUT THE

12:22:48    3    FACT THAT MR. BALWANI WAS ON EMAILS DURING THIS PERIOD, BUT HE

12:22:51    4    WAS TELLING YOU THAT HE WAS GOING TO BE ON THE EMAILS AND WORK

12:22:55    5    TO INCLUDE YOU BECAUSE HE'S GOING TO TRY AND ADDRESS

12:22:58    6    OPERATIONAL ISSUES; RIGHT?  HE'S TELLING YOU THAT?

12:23:01    7    A.   IS THERE A QUESTION HERE, SIR?

12:23:05    8    Q.   YEAH.  HE'S TELLING YOU THAT, RIGHT, IN THIS EMAIL?

12:23:09    9    A.   HE'S SAYING THAT HE'S GOING TO BE INVOLVED IN OPERATIONAL

12:23:12   10    ISSUES, YES.

12:23:13   11    Q.   HE'S GIVING YOU NOTICE OF THAT AND HE'S SAYING, "I WILL

12:23:19   12    KEEP YOU IN THE LOOP IN EVERY SINGLE RELEVANT EMAIL OF COURSE."

12:23:23   13         DO YOU SEE THAT?

12:23:24   14    A.   YES.

12:23:24   15    Q.   OKAY.  AND YOU THANKED HIM FOR IT.

12:23:45   16         AND JUST SO WE'RE CLEAR, SIR, YOU TESTIFIED THAT THERE

12:23:48   17    WERE SEVERAL LABS THAT YOU WORKED IN WHERE YOU WERE A PART-TIME

12:23:48   18    LAB DIRECTOR; RIGHT?

12:23:50   19    A.   CORRECT.

12:23:51   20    Q.   AND WHEN YOU WEREN'T -- THAT MEANS SOMETIMES YOU WEREN'T

12:23:52   21    THERE; RIGHT?

12:23:54   22    A.   AT THERANOS?

12:23:55   23    Q.   NO, NOT AT THERANOS.

12:23:57   24         WHEN YOU SERVE ON OCCASION AS A PART-TIME LAB DIRECTOR --

12:23:57   25    A.   YES.

12:23:59  1    Q.   -- THAT MEANS SOMETIMES YOU'RE NOT ON SITE AT THE LAB?

12:24:02  2    A.   CORRECT.

12:24:02  3    Q.   AND WHEN THAT HAPPENS, THERE ARE OTHER PEOPLE WHO TAKE ON

12:24:05  4    RESPONSIBILITIES TO IMPLEMENT THINGS IN, IN AID OF YOUR

12:24:09  5    DIRECTORSHIP?

12:24:10  6    A.   YES, THEY'RE ON THE ROSTER.

12:24:12  7    Q.   RIGHT.

12:24:12  8    A.   SUNNY WASN'T ON THE ROSTER.

12:24:16  9    Q.   WELL, WE'LL DEAL WITH THAT SEPARATELY.

12:24:19  10        IN FACT, HE WAS ON THE ROSTER OF THE CLIA LAB, WAS HE NOT?

12:24:23  11   A.   I DON'T BELIEVE.  THAT'S NEWS TO ME.

12:24:26  12   Q.   OKAY.

12:24:26  13   A.   IN WHAT CAPACITY, SIR?

12:24:29  14   Q.   ISN'T IT TRUE THAT MR. BALWANI WAS LISTED IN THE CLIA FORM

12:24:32  15   ON THE ROSTER FOR THE CLIA LAB?

12:24:34  16   A.   I DON'T BELIEVE HE WAS, NO.

12:24:36  17   Q.   OKAY.

12:24:39  18   A.   HE WOULDN'T HAVE QUALIFIED FOR ANY POSITION.

12:24:42  19   Q.   I WANT TO ASK YOU ABOUT THE LAUNCH.  OKAY?

12:24:53  20   A.   OKAY.

12:24:54  21   Q.   THE GOVERNMENT SHOWED YOU EXHIBIT 1113.  LET'S PULL THAT

12:25:04  22   UP.

12:25:12  23        AND THIS APPEARS, I BELIEVE YOU SAID, TO BE A PRESS

12:25:14  24   RELEASE; RIGHT?

12:25:15  25   A.   YES.

12:25:16  1    Q.   YOU DON'T RECALL SEEING THIS PRESS RELEASE AT THE TIME?

12:25:18  2    A.   NO.

12:25:18  3    Q.   AND THE GOVERNMENT SHOWED YOU THE FIRST AND THIRD

12:25:23  4    PARAGRAPHS.  LET'S LOOK AT THE MIDDLE PARAGRAPH.

12:25:27  5         OKAY.  THIS SAYS THAT THERANOS AND WALGREENS ARE TAKING

12:25:32  6    THE FIRST STEP IN MAKING THIS SERVICE AVAILABLE TO CONSUMERS.

12:25:36  7         DO YOU SEE THAT?

12:25:37  8    A.   YES.

12:25:38  9    Q.   WITH THE FIRST THERANOS WELLNESS CENTER LOCATION OPENING

12:25:42  10   THIS MONTH.

12:25:44  11        DO YOU SEE THAT?

12:25:45  12   A.   YES.

12:25:46  13   Q.   IT DOESN'T SAY WHEN; RIGHT?

12:25:47  14   A.   YES.

12:25:48  15   Q.   IT DOESN'T SAY ON THAT DAY, DOES IT?  IT DOESN'T SAY IT'S

12:25:51  16   GOING TO HAPPEN ON SEPTEMBER 9TH?

12:25:54  17   A.   YES, CORRECT.

12:25:56  18   Q.   RIGHT.  AND, IN FACT, WHEN PEOPLE WERE WANTING TO MAKE

12:26:02  19   SURE THERE WAS TIME TO IMPLEMENT PROCEDURES, IN FACT, THEY

12:26:05  20   DELAYED THE PUBLIC LAUNCH UNTIL NOVEMBER OF 2013; CORRECT?

12:26:12  21   A.   I CAN'T SPECULATE ON WHY THE PUBLIC LAUNCH WAS DELAYED,

12:26:17  22   SIR.

12:26:17  23   Q.   BUT YOU KNOW IT WAS DELAYED?

12:26:18  24   A.   CORRECT.

12:26:19  25   Q.   OKAY.  AND --

12:26:21  1    A.  I'M ALSO NOT CLEAR ON WHAT YOU MEAN BY "PUBLIC."  YOU

12:26:24  2    KNOW, FRIENDS AND FAMILY ARE STILL MEMBERS OF THE PUBLIC.

12:26:27  3    Q.  RIGHT.  SO -- I'M GLAD YOU RAISED THAT, BECAUSE YOU WERE

12:26:30  4    ASKED SOME QUESTIONS ABOUT FRIENDS AND FAMILY.

12:26:31  5    A.  YEAH.

12:26:32  6    Q.  DO YOU RECALL THAT?

12:26:33  7    A.  YES.

12:26:34  8    Q.  AND YOU WERE ASKED ABOUT IF THERE WERE ISSUES WITH THOSE

12:26:36  9    TESTS OR THINGS, THOSE WOULD STILL BE REAL ISSUES; RIGHT?

12:26:42  10   THEY'RE STILL PATIENTS; RIGHT, IF THEY'RE FRIENDS AND FAMILY?

12:26:46  11        DO YOU RECALL THAT?

12:26:48  12   A.  YES.

12:26:48  13   Q.  OKAY.  AND THE GOVERNMENT SAID, AND IF ISSUES AROSE, EVEN

12:26:52  14   WITH A SMALL VOLUME, THOSE ARE STILL ISSUES THAT ARE SERIOUS;

12:26:57  15   RIGHT?

12:26:57  16   A.  CORRECT.

12:26:58  17   Q.  DO YOU RECALL THAT?

12:26:59  18   A.  CORRECT.

12:26:59  19   Q.  AND YOU SAID THEY WERE; RIGHT?

12:27:02  20   A.  YES.

12:27:02  21   Q.  NOW, YOU ACTUALLY DON'T KNOW OF ANY ISSUES THAT CAME UP

12:27:04  22   WITH RESPECT TO THE LAB RESULTS THAT WERE ACTUALLY PERFORMED

12:27:07  23   DURING THAT PUBLIC LAUNCH, DO YOU?

12:27:10  24   A.  I DON'T RECALL.

12:27:11  25   Q.  YOU HAVEN'T BEEN SHOWN A SINGLE EMAIL THAT SUGGESTS THAT

12:27:13  1    THERE WAS AN ISSUE WITH RESPECT TO THOSE FEW LAB TESTS THAT

12:27:18  2    WERE OFFERED IN THAT FRIENDS AND FAMILY LAUNCH, HAVE YOU?

12:27:22  3    A.   SO FROM WHAT YOU SHOWED ME, IT LOOKS LIKE THEY WERE

12:27:27  4    RUNNING CBC'S AND A1C'S FOR THE FIRST TWO WEEKS OR SO.

12:27:31  5    Q.   RIGHT.  THEY WERE RUNNING TWO TESTS; RIGHT, SIR?

12:27:34  6    A.   YES.

12:27:34  7    Q.   I JUST WANT THERE TO BE CLARITY ON THIS ISSUE.  TWO TESTS?

12:27:37  8    DO YOU RECALL THAT?

12:27:38  9    A.   YES.

12:27:39 10    Q.   INITIALLY, YOU THOUGHT THAT THEY WERE RUNNING A WHOLE

12:27:41 11    RANGE OF TESTS; RIGHT?

12:27:42 12    A.   THAT'S WHAT I BELIEVED, YES.

12:27:44 13    Q.   BUT IT LOOKS -- THERE'S NO EVIDENCE OF THAT; RIGHT?

12:27:46 14    A.   WELL, I -- I HAD NO TRANSPARENCY, OR I WAS NOT AWARE OF

12:27:51 15    EXACTLY WHAT THEY WERE OFFERING AT THAT TIME.

12:27:52 16    Q.   WELL, THERE WERE NO VALIDATION REPORTS IN PLACE BEFORE

12:27:55 17    THEN; RIGHT?

12:27:56 18    A.   YES.

12:27:56 19    Q.   SO YOU WOULDN'T HAVE -- YOU WOULDN'T HAVE LET A TEST IN

12:27:59 20    THE LAB IF THERE WAS NO VALIDATION REPORT, WOULD YOU?

12:28:02 21    A.   OF COURSE NOT.

12:28:03 22    Q.   OKAY.  AND YOU RECALL -- I'M HAPPY TO BRING UP THAT

12:28:12 23    EMAIL -- BUT YOU RECALL THE EXCHANGE THAT YOU HAD WITH

12:28:15 24    MR. BALWANI WHERE HE ASKED IF THERE WAS ANYTHING THAT YOU

12:28:17 25    NEEDED IN ADVANCE OF THE GENERAL PUBLIC LAUNCH IN EARLY

12:28:22  1      NOVEMBER OF 2013?

12:28:24  2      A.   YES.

12:28:24  3      Q.   YOU RECALL THAT?

12:28:25  4      A.   YES.

12:28:25  5      Q.   OKAY.  AND THAT'S WHEN THE LAB OPENED TO THE GENERAL

12:28:28  6      PUBLIC; RIGHT, SIR?

12:28:29  7      A.   FRIENDS AND FAMILY IS STILL THE PUBLIC.

12:28:34  8      Q.   OKAY.  LET'S BRING UP 24 -- 12464, WHICH IS IN EVIDENCE.

12:28:52  9           LET'S LOOK AT THE BOTTOM.

12:29:00  10          DO YOU SEE THAT?

12:29:01  11     A.   YES.

12:29:01  12     Q.   LET'S GO TO THE NEXT PAGE.

12:29:13  13          DO YOU SEE THAT THIS WAS THE POINT IN WHICH THIS WAS OPEN

12:29:17  14     TO PEOPLE OTHER THAN FRIENDS AND FAMILY; RIGHT, SIR?

12:29:19  15     A.   YES.

12:29:20  16     Q.   OKAY.  YOU WERE ASKED SOME QUESTIONS ABOUT THE

12:29:31  17     INSPECTIONS?

12:29:32  18     A.   YES.

12:29:32  19     Q.   THE INSPECTION IN 2013; CORRECT?

12:29:35  20     A.   YES.

12:29:35  21     Q.   NOW, THE GOVERNMENT BROUGHT UP A SERIES OF DOCUMENTS.

12:29:43  22     LET'S START WITH 4047, WHICH IS IN EVIDENCE.

12:29:55  23          OKAY.  YOU RECALL THAT THEY SHOWED YOU THIS ONE?

12:29:57  24     A.   YES.

12:29:58  25     Q.   OKAY.  AND THIS RELATES TO DISCUSSION ABOUT GOING TO THE

| 12:30:02 | 1 | LAB; RIGHT? |

12:30:02  1    LAB; RIGHT?

12:30:03  2    A.   YES.

12:30:03  3    Q.   AND THEN LET'S BRING UP 4316.

12:30:18  4         THEY SHOWED YOU THIS DOCUMENT; CORRECT?

12:30:21  5    A.   YES.

12:30:22  6    Q.   AND MS. HOLMES IS NOT ON THIS DOCUMENT; RIGHT?

12:30:26  7    A.   CORRECT.

12:30:26  8    Q.   NOW, LET'S BRING UP 12479.  AND LET'S BLOW UP THE TOP.

12:30:50  9         AND, AGAIN, THIS DOCUMENT THEY DIDN'T SHOW YOU, DID THEY?

12:30:56  10   A.   NO, I'VE SEEN IT BEFORE.

12:31:01  11   Q.   YOU'VE SEEN IT BEFORE, BUT THEY DIDN'T SHOW THIS TO YOU IN

12:31:05  12   THE REDIRECT, DID THEY?

12:31:07  13   A.   NOT IN THE REDIRECT, NO.

12:31:08  14   Q.   AND THEY DIDN'T EMPHASIZE THAT YOU HAD PREVIOUSLY

12:31:11  15   TESTIFIED THAT MS. HOLMES SEEMED WILLING TO SHOW THEM THE LAB

12:31:15  16   DOWNSTAIRS; RIGHT?  YOU PREVIOUSLY TESTIFIED TO THAT?

12:31:20  17   A.   YES.

12:31:21  18   Q.   YEAH.  AND JUST SO WE'RE CLEAR, BECAUSE I -- YOU NEVER

12:31:27  19   CONCEALED ANYTHING FROM THESE INSPECTORS; RIGHT, SIR?

12:31:30  20   A.   CORRECT.

12:31:31  21   Q.   YOU WOULDN'T DO THAT, WOULD YOU?

12:31:32  22   A.   NO.

12:31:32  23   Q.   IF SOMEONE ASKED YOU TO DO IT, YOU WOULDN'T DO IT?

12:31:35  24   A.   CORRECT.

12:31:35  25   Q.   RIGHT.  AND WITH RESPECT TO THE EDISON LABS, YOU SHOWED

12:31:45  1    THEM AN EDISON VALIDATION REPORT; RIGHT?

12:31:47  2    A.   CORRECT.

12:31:48  3    Q.   YOU DISCUSSED THE EDISONS WITH THEM; RIGHT?

12:31:52  4    A.   YES, YES.

12:31:53  5    Q.   AND ARE YOU AWARE THERE WERE DETAILED -- THERE WAS

12:31:55  6    DETAILED INFORMATION ABOUT THE EDISONS AND ITS WHOLE TEST MENU

12:31:59  7    PROVIDED TO THE FDA AND CMS DURING THIS VERY SAME TIME PERIOD?

12:32:03  8    ARE YOU AWARE OF THAT?

12:32:04  9    A.   I WAS AWARE THAT THERANOS WAS VOLUNTARILY SUBMITTING DATA

12:32:09 10    TO THE FDA, OSTENSIBLY FOR THE PURPOSES OF GETTING FDA

12:32:17 11    APPROVAL.  I'M NOT REALLY SURE WHY THEY WERE DOING THAT.

12:32:20 12         I'M NOT AWARE OF ANY DOCUMENTATION THAT WAS SENT TO CMS

12:32:23 13    REGARDING THE EDISONS DURING THIS TIME.

12:32:25 14    Q.   OKAY.  YOU WEREN'T AWARE THAT THEY WERE DOING THAT BECAUSE

12:32:29 15    YOU WEREN'T INVOLVED IN THOSE PROCESSES; CORRECT?

12:32:31 16    A.   I DON'T -- I DON'T RECALL.

12:32:33 17    Q.   OKAY.  AND -- BUT YOU WERE AWARE THAT YOU SHARED

12:32:36 18    INFORMATION WITH THE INSPECTOR WHO WALKED IN THE DOOR IN 2013;

12:32:39 19    RIGHT?

12:32:39 20    A.   YES.

12:32:40 21    Q.   OKAY.  AND IF SHE HAD ASKED YOU TO GO DOWNSTAIRS AND SEE

12:32:45 22    THOSE DEVICES, YOU WOULD HAVE WALKED HER RIGHT DOWN; RIGHT?

12:32:48 23    A.   YES.

12:32:49 24    Q.   OKAY.  NOW, THE GOVERNMENT BROUGHT UP A LITTLE -- SOME

12:33:05 25    TESTIMONY WHERE IT WAS COMPARING THERANOS DEVICES AND

12:33:09  1    UNMODIFIED DEVICES; RIGHT?

12:33:10  2    A.   YES.

12:33:11  3    Q.   DO YOU RECALL THAT?

12:33:12  4    A.   YES.

12:33:12  5    Q.   AND THERE WERE A LOT OF TESTS THAT WERE PERFORMED ON

12:33:15  6    UNMODIFIED DEVICES; RIGHT?

12:33:17  7    A.   CORRECT.

12:33:17  8    Q.   AND YOU TALKED ABOUT THE ARIZONA LABORATORY.

12:33:22  9         DO YOU RECALL THAT?

12:33:23  10   A.   YES.

12:33:23  11   Q.   AND THAT LABORATORY WAS A MODERATE COMPLEXITY LABORATORY;

12:33:26  12   RIGHT?

12:33:27  13   A.   I DON'T RECALL.

12:33:27  14   Q.   OKAY.  THAT -- BUT YOU DO RECALL THAT IT ONLY HAD

12:33:31  15   COMMERCIAL DEVICES?

12:33:32  16   A.   YES.

12:33:33  17   Q.   CORRECT?

12:33:33  18   A.   THAT WAS MY BELIEF, YES.

12:33:35  19   Q.   AND THERE WAS A LOT OF VOLUME OF TESTING THAT WAS

12:33:37  20   HAPPENING ON COMMERCIAL DEVICES AT THERANOS; CORRECT?

12:33:40  21   A.   CAN YOU BE MORE SPECIFIC?

12:33:46  22   Q.   YEAH.  THERE WAS A -- THERE WERE A MENU OF DIFFERENT TESTS

12:33:51  23   THERE WERE BEING OFFERED; RIGHT?

12:33:52  24   A.   YES.

12:33:53  25   Q.   AND I FORGET THE EXACT NUMBER, BUT YOU SAID MAYBE SEVEN TO

```
12:33:57   1    NINE TESTS WERE OFFERED ON THE EDISON; RIGHT?

12:34:00   2    A.   IN WHAT TIME PERIOD?

12:34:02   3    Q.   IN YOUR TENURE AT THERANOS.

12:34:05   4    A.   YES.

12:34:05   5    Q.   OKAY.  SO IN THAT TENURE, THERE WERE ABOUT SEVEN TO NINE

12:34:09   6    TESTS ON THE EDISON DEVICE?

12:34:10   7    A.   YES.

12:34:11   8    Q.   OKAY.  AND WHAT -- THERE WERE MAYBE ANOTHER 50 TO 60 OF

12:34:18   9    THE MODIFIED PREDICATES THAT WERE RUN ON THE ADVIA; IS THAT

12:34:23   10   RIGHT?

12:34:23   11   A.   THERE WERE 50 TO 60 THAT WERE VALIDATED, I BELIEVE.  I

12:34:33   12   CAN'T TESTIFY HERE TODAY, MY RECOLLECTION IS NOT GOOD ENOUGH TO

12:34:38   13   SAY HOW MANY WERE ACTUALLY DONE USING THE LDT.

12:34:41   14   Q.   OKAY.  AND THE THIRD CATEGORY ARE THOSE COMMERCIAL

12:34:44   15   DEVICES; RIGHT?

12:34:45   16   A.   YES.

12:34:45   17   Q.   AND THERE WERE OVER 100 TESTS THAT WERE AVAILABLE ON THE

12:34:48   18   COMMERCIAL DEVICES; RIGHT?

12:34:49   19   A.   YES.

12:34:50   20   Q.   AND I BELIEVE YOUR TESTIMONY IS THAT THERE WERE BASICALLY

12:34:53   21   NO ISSUES WITH RESPECT TO THOSE TESTS; RIGHT?

12:34:55   22   A.   THE COMMERCIAL DEVICES?

12:34:56   23   Q.   YEAH.  THEY PERFORMED WELL; RIGHT?

12:34:59   24   A.   IN GENERAL, YES.

12:35:01   25   Q.   OKAY.  LET'S PULL UP 13893.
```

12:35:27   1          YOU RECALL YOU WERE ASKED SOME QUESTIONS ABOUT THIS, THE

12:35:29   2     ISE'S?

12:35:30   3     A.   YES.

12:35:30   4     Q.   LET'S GO TO THE SECOND PAGE.  THIS WAS THE REPORT OUT FROM

12:35:38   5     DR. YOUNG.

12:35:39   6          DO YOU RECALL THAT?

12:35:40   7     A.   YES.

12:35:40   8     Q.   AND WE TESTIFIED -- WE HAD SOME DISCUSSION ABOUT THIS ON

12:35:43   9     CROSS-EXAMINATION.

12:35:45   10         DO YOU RECALL?

12:35:45   11    A.   I BELIEVE SO.

12:35:46   12    Q.   OKAY.  AND WE TALKED ABOUT SOME OF THE FINDINGS IN THE

12:35:50   13    FIRST HALF.

12:35:51   14         DO YOU SEE THAT?

12:35:52   15    A.   YES.

12:35:53   16    Q.   AND THEN WE, WE NOTED THAT THERE WAS STILL WORK THAT WAS

12:35:56   17    GOING TO BE DONE; RIGHT?

12:35:57   18    A.   YES.

12:35:58   19    Q.   BECAUSE EVEN THOUGH THERE HAD BEEN SOME SUCCESS, THERE WAS

12:36:03   20    STILL A DESIRE TO CONTINUE TO IMPROVE THE ASSAY; CORRECT?

12:36:06   21    A.   YES.

12:36:06   22    Q.   AND LET'S GO BACK TO THE FIRST PAGE.

12:36:09   23         AND YOU -- IN THIS EMAIL, YOU CONGRATULATED DR. YOUNG ON

12:36:16   24    HAVING CRACKED THIS; RIGHT?

12:36:17   25    A.   YES.

12:36:18   1    Q.   BECAUSE EVERYONE BELIEVED AT THE TIME THAT THAT IS WHAT

12:36:20   2    HAD HAPPENED; RIGHT?

12:36:21   3    A.   YES.

12:36:22   4    Q.   IN GOOD FAITH; RIGHT?

12:36:23   5    A.   YES.

12:36:23   6    Q.   AND WHEN YOU OFFERED THE TEST, YOU BELIEVED IN GOOD FAITH

12:36:28   7    THAT IT WAS -- THAT THE PROBLEM HAD BEEN SOLVED?

12:36:30   8    A.   YES.

12:36:31   9    Q.   OKAY.  YOU WERE ASKED SOME QUESTIONS ON DIRECT ABOUT THE

12:36:46   10   LIS, OR ON REDIRECT ABOUT THE LIS.

12:36:50   11        DO YOU RECALL THAT?

12:36:50   12   A.   YES.

12:36:51   13   Q.   AND ONE THING THE GOVERNMENT ASKED YOU ABOUT WAS WHETHER

12:36:54   14   THE TEST RESULT INFORMATION THAT YOU WOULD GET FROM OTHER

12:36:58   15   COMPANIES WAS STORED WITHIN LIS.

12:37:02   16        DO YOU RECALL THAT?

12:37:02   17   A.   YES, YES.

12:37:03   18   Q.   AND YOU SAID OF COURSE IT WAS NOT; RIGHT?

12:37:05   19   A.   YES.

12:37:06   20   Q.   YEAH.  WHEN -- BUT WHEN INQUIRIES OF THAT KIND WOULD COME

12:37:12   21   IN AND YOU WOULD HAVE TO CONSIDER HOW THOSE RESULTS COMPARED TO

12:37:19   22   THERANOS'S RESULTS, YOU'D HAVE TO GO AND PULL A WHOLE LOT OF

12:37:23   23   INFORMATION FROM THE LIS INFORMATION SYSTEM; RIGHT?

12:37:26   24   A.   YES.  I WOULD SEE HOW THE THERANOS RESULTS HAD BEEN

12:37:31   25   TRENDING, I WOULD SEE HOW MANY ARE OUT OF REFERENCE RANGE, I

12:37:36   1      WOULD DO AN INVESTIGATION.

12:37:36   2      Q.   DETAILS OF THE VISIT, PATIENT VISIT THAT WERE IN THERE;

12:37:40   3      RIGHT?  ANY INFORMATION?

12:37:42   4      A.   AT THE THERANOS COLLECTION SITE?

12:37:44   5      Q.   TO THE EXTENT THERE WAS INFORMATION ABOUT WHEN THE SAMPLE

12:37:46   6      WAS LOGGED?

12:37:48   7      A.   OH, YEAH, THAT'S PART OF THE ACCESSION.

12:37:54   8      Q.   DETAILS OF THE DEVICE IT WAS RUN ON?

12:37:57   9      A.   YES.

12:37:57  10      Q.   TIME AND LOCATION OF THE DRAW?

12:38:00  11      A.   YES.

12:38:01  12      Q.   THE PHLEBOTOMIST MAYBE IF IT WAS IN THERE?

12:38:07  13      A.   I DON'T RECALL.  THAT'S NOT A REQUIREMENT.

12:38:09  14      Q.   OKAY.  THE IMAGES OF THE SAMPLE YOU MIGHT LOOK AT?  WE'VE

12:38:12  15      SEEN THAT?

12:38:13  16      A.   I -- I DON'T RECALL IF THE IMAGES WERE AVAILABLE IN LIS.

12:38:17  17      Q.   YOU RECALL PULLING THOSE FOR PURPOSES OF LOOKING AT

12:38:20  18      WHETHER THERE WAS HEMOLYSIS IN THE SAMPLE?  YOU'D LOOK AT THE

12:38:24  19      IMAGES OF THE SAMPLE?

12:38:25  20      A.   I THINK IT WAS CLOTTING, AND I THINK SOMEBODY SENT ME

12:38:28  21      THOSE IMAGES.

12:38:29  22      Q.   OKAY.  BUT IN ANY EVENT, YOU MIGHT LOOK AT THE REFERENCE

12:38:32  23      RANGE; CORRECT?

12:38:32  24      A.   YES.

12:38:33  25      Q.   YOU MIGHT LOOK AT A WHOLE HOST OF OTHER INFORMATION THAT

12:38:36   1      YOU HAVE WITHIN THE LAB AT THERANOS; RIGHT?

12:38:38   2      A.   YES.

12:38:39   3      Q.   AND THAT WOULD -- THE VAST MAJORITY OF THAT INFORMATION

12:38:42   4      WOULD BE STORED WITHIN LIS; CORRECT?

12:38:44   5      A.   YES, YES.

12:38:45   6      Q.   AND WITH RESPECT TO WHETHER -- HOW THE RESULTS COMPARED TO

12:38:55   7      OTHER RESULTS, THAT'S NOT SOMETHING THAT YOU KNOW JUST FROM --

12:39:01   8      OFF THE CUFF; RIGHT?  YOU NEED TO GATHER ALL THE RELEVANT FACTS

12:39:05   9      TO KNOW IF YOU'RE COMPARING APPLES TO APPLES; RIGHT?

12:39:08  10      A.   YES.

12:39:09  11      Q.   AND THERE IS -- I BELIEVE YOU'VE TESTIFIED BEFORE THERE'S

12:39:12  12      ALWAYS VARIABILITY TO A DEGREE, OR OFTEN VARIABILITY BETWEEN

12:39:16  13      TWO TESTS; RIGHT?

12:39:17  14      A.   CAN YOU CLARIFY YOUR STATEMENT?

12:39:20  15      Q.   WELL, YOU RECALL I WAS TALKING ABOUT THE SCALE THAT I

12:39:23  16      WOULD STEP ON, AND OFTENTIMES --

12:39:25  17      A.   OKAY.

12:39:26  18      Q.   I COULD DO IT THREE TIMES IN A ROW AND IT MIGHT BE A

12:39:29  19      LITTLE DIFFERENT?

12:39:29  20      A.   MINOR VARIATIONS.

12:39:31  21      Q.   MINOR VARIATIONS.

12:39:32  22           AND SO THERE COULD BE DIFFERENT VARIATIONS THAT WOULD --

12:39:35  23      THAT MIGHT -- THAT YOU HAVE TO ASSESS WHEN YOU'RE CONSIDERING

12:39:38  24      WHETHER OR NOT THE DIFFERENCES BETWEEN THE THERANOS TEST AND

12:39:43  25      THE TEST AT ANOTHER LAB ARE MEANINGFUL; RIGHT?

12:39:47  1      A.   RIGHT.  SO THE ONE ISSUE IS WHAT IS THE ERROR WITHIN THE

12:39:54  2      SAME METHOD IF YOU REPEAT THE SAMPLE?  THAT'S CALLED PRECISION.

12:39:59  3           THE OTHER MEDICAL ISSUE IS IF YOU GET A VASTLY DIFFERENT

12:40:03  4      RESULT DESPITE THE -- DESPITE THE SMALL AMOUNT OF ERROR THAT

12:40:09  5      HAPPENS WITH A GOOD LABORATORY TEST -- GOOD LABORATORY TESTS

12:40:13  6      DON'T HAVE VERY MUCH ERROR, RIGHT?

12:40:16  7           SO AS A PHYSICIAN, I WOULD HAVE TO LOOK AT THE QUEST

12:40:21  8      RESULTS, FOR INSTANCE, AND DETERMINE WHETHER THEY WERE

12:40:23  9      COMPARABLE TO THE THERANOS RESULTS.

12:40:25  10     Q.   AND BECAUSE SOMETIMES DIFFERENT METHODS REACH DIFFERENT

12:40:29  11     RESULTS ON THE SAME BLOOD; RIGHT?

12:40:34  12     A.   THEY SHOULDN'T BE THAT DIFFERENT.  NO, THEY SHOULDN'T BE.

12:40:37  13     Q.   WELL, YOU'RE AWARE THAT THERE'S A WHOLE MOVEMENT WITHIN

12:40:39  14     THE LAB, LABORATORY SCIENCE ABOUT HARMONIZATION OF DATA.  ARE

12:40:43  15     YOU AWARE OF THAT?

12:40:44  16     A.   I'M AWARE OF IT FOR A1C.

12:40:46  17     Q.   OKAY.  AND IT EXISTS FOR VITAMIN D AS WELL; RIGHT?

12:40:51  18          AND ARE YOU AWARE THAT THERE ARE EFFORTS AND TASK FORCES

12:40:56  19     THAT LOOK AT DIFFERENCES BETWEEN DATA AND TRY TO FIND WAYS TO

12:40:59  20     MAKE -- TO HARMONIZE THEM ACCORDING TO ONE STANDARD; RIGHT?

12:41:03  21     A.   YES.

12:41:03  22     Q.   OKAY.  BECAUSE SOMETIMES THOSE DIFFERENCES EXIST BETWEEN

12:41:06  23     DIFFERENT ASSAYS; RIGHT?

12:41:08  24     A.   RIGHT.  GO AHEAD.

12:41:10  25     Q.   SO THAT'S WHY, WHEN YOU GET THAT INFORMATION IN, YOU HAVE

12:41:13   1    TO ACTUALLY LOOK AT ALL OF THE RELEVANT FACTS BEFORE REACHING A

12:41:17   2    JUDGMENT; RIGHT?

12:41:17   3    A.   YES.

12:41:18   4    Q.   YOU WERE ASKED SOME QUESTIONS ABOUT AAP ON REDIRECT.

12:42:25   5         DO YOU RECALL THAT?

12:42:26   6    A.   YES.

12:42:27   7    Q.   AND THEY BROUGHT YOU BACK TO THAT EMAIL THAT MS. CHEUNG

12:42:36   8    SENT AROUND; RIGHT?

12:42:37   9    A.   YES.

12:42:38   10   Q.   AND AT THE TIME, JUST SO THE RECORD IS CLEAR, THAT WASN'T

12:42:41   11   AN APPLICATION OF THE AAP POLICY; CORRECT?

12:42:44   12   A.   NO.

12:42:44   13   Q.   OKAY.  AND IF THERE WAS CONFUSION AS A RESULT OF THAT,

12:42:49   14   THAT PEOPLE THOUGHT THAT TESTS FAILED AAP OR PT, THEY WOULD BE

12:42:55   15   MISTAKEN; CORRECT?

12:42:56   16   A.   CORRECT.

12:42:57   17   Q.   BECAUSE THAT WASN'T AAP OR PT?

12:43:00   18   A.   WELL, IT WAS A QC SPOT CHECK USING PT SAMPLES.  SO I CAN

12:43:06   19   UNDERSTAND THE LEVEL OF CONCERN THAT WAS IN THE COMPANY.

12:43:08   20   Q.   WELL, AND YOU CAN UNDERSTAND WHY THERE WAS SOME CONFUSION;

12:43:11   21   RIGHT?  BECAUSE IT WAS PRECISION TESTING MATERIAL; RIGHT?

12:43:14   22   A.   PROFICIENCY.

12:43:15   23   Q.   THANK YOU AGAIN, DOCTOR.

12:43:18   24        PROFICIENCY TESTING MATERIAL?

12:43:21   25   A.   YES.

12:43:22  1    Q.   BUT IT WASN'T BEING USED IN -- ACCORDING TO THE

12:43:25  2    PROFICIENCY TESTING POLICY AT THERANOS; RIGHT?

12:43:27  3    A.   CORRECT.

12:43:29  4    Q.   OKAY.  AND THE -- AGAIN, THAT PROFICIENCY TESTING POLICY

12:43:43  5    AND THE IMPLEMENTATION OF IT WAS THE RESPONSIBILITY OF YOU AND

12:43:47  6    MR. GEE AND OTHERS WITHIN THE LABORATORY; CORRECT?

12:43:53  7    A.   I THINK WE'VE DISCUSSED THE CHALLENGES AROUND THE

12:43:55  8    IMPLEMENTATION.

12:43:57  9    Q.   I THINK WE HAVE DISCUSSED THE CHALLENGES AROUND

12:44:00  10   IMPLEMENTATION, BUT IT WAS YOUR RESPONSIBILITY; RIGHT?

12:44:02  11   A.   YES.

12:44:03  12   Q.   AND I ALSO BELIEVE THAT YOU'VE TESTIFIED THAT THERE WAS

12:44:08  13   NOT A SINGLE EMAIL THAT YOU SENT ASKING FOR MORE RESOURCES FROM

12:44:12  14   MS. HOLMES THAT WAS NOT RESPONDED TO; CORRECT?

12:44:15  15   A.   IT WAS DISCUSSED IN THE MEETING WITH -- IN THE AAP

12:44:18  16   MEETING.

12:44:18  17   Q.   IN OCTOBER OF 2014?

12:44:20  18   A.   YEAH.

12:44:20  19   Q.   THE ONE YOU RESCHEDULED; RIGHT?

12:44:23  20   A.   CORRECT.

12:44:24  21   Q.   YEAH.  AND THE ONE THAT THERE WAS FOLLOW-UP ALMOST

12:44:28  22   IMMEDIATELY; CORRECT?

12:44:29  23   A.   CORRECT.

12:44:29  24   Q.   AND THE ONE WHERE YOU LEFT ABOUT A MONTH LATER; RIGHT?

12:44:32  25   A.   I BELIEVE SO.

12:44:32  1    Q.   OKAY.  YOU WERE QUESTIONED ABOUT THE CLIA REGULATIONS.

12:44:58  2         DO YOU RECALL THAT?

12:44:59  3    A.   IN -- ON REDIRECT?

12:45:01  4    Q.   ON REDIRECT.

12:45:01  5    A.   YEAH.

12:45:02  6    Q.   I'M TRYING TO LIMIT MY QUESTIONING TO MATTERS THAT WERE

12:45:04  7    RAISED BY MR. BOSTIC RECENTLY.

12:45:06  8    A.   UM-HUM.

12:45:07  9    Q.   DO YOU RECALL THAT?

12:45:08  10   A.   YES.

12:45:08  11   Q.   AND THERE WAS DISCUSSION OF -- WITH MR. BOSTIC ABOUT YOUR

12:45:15  12   RESPONSIBILITY UNDER THOSE REGULATIONS; CORRECT?

12:45:17  13   A.   YES.

12:45:18  14   Q.   AND HE ASKED YOU ABOUT -- YOU NOTED THE FACT THAT THE

12:45:22  15   OWNER AND OPERATOR IS RESPONSIBLE; RIGHT?

12:45:25  16   A.   YES.

12:45:26  17   Q.   OKAY.  AND THAT DOESN'T MEAN THAT THERE -- THAT THEY HAVE

12:45:31  18   THE SAME AUTHORITY; RIGHT?

12:45:32  19   A.   CLIA DOES NOT USE THE WORD "AUTHORITY" OR ADDRESS

12:45:40  20   AUTHORITY IN THE REGULATIONS.

12:45:41  21   Q.   RIGHT.  THAT'S MY POINT.  THE RESPONSIBILITY FOR ACTUALLY

12:45:43  22   DOING THE FUNCTIONS IS THE LAB DIRECTOR'S; RIGHT?

12:45:46  23   A.   YES.

12:45:47  24   Q.   AND THE RESPONSIBILITY FOR IMPLEMENTING ALL OF THE

12:45:52  25   PROCEDURES IS THE LAB DIRECTOR'S; RIGHT?

12:45:59   1    A.   I TAKE OBJECTION TO YOUR INFERENCE THAT I WAS RESPONSIBLE

12:46:03   2    FOR THE EXECUTION OF THESE PROCEDURES.

12:46:07   3    Q.   WELL, ULTIMATELY THE REGULATIONS THERE SAY THAT IT IS YOUR

12:46:12   4    RESPONSIBILITY UNDER THE FEDERAL CLIA REGULATIONS TO IMPLEMENT

12:46:19   5    QUALITY CONTROL, AAP, TEST VALIDATION AND VERIFICATION, AND

12:46:26   6    OTHER ITEMS; CORRECT?

12:46:28   7    A.   YES.

12:46:28   8    Q.   OKAY.  AND YOU'RE ABLE TO DELEGATE THAT RESPONSIBILITY TO

12:46:32   9    PEOPLE?

12:46:32   10   A.   YES.

12:46:33   11   Q.   CORRECT?

12:46:34   12   A.   YES.

12:46:34   13   Q.   BUT ULTIMATELY IF IT GOES WRONG, IT'S YOUR RESPONSIBILITY;

12:46:38   14   RIGHT?

12:46:38   15   A.   AND THE OWNER/OPERATOR.

12:46:41   16   Q.   RIGHT.  BUT YOU HAVE TO BE SPECIALLY QUALIFIED TO DO THAT

12:46:44   17   WORK; RIGHT?

12:46:45   18   A.   YES.

12:46:45   19   Q.   OKAY.  AND JUST BECAUSE SOMEONE IS AN OWNER/OPERATOR

12:46:48   20   DOESN'T MEAN THEY CAN COME IN AND BE A LAB DIRECTOR; RIGHT?

12:46:51   21   A.   NO.

12:46:52   22   Q.   RIGHT.  SO IF THE OWNER/OPERATOR CAME IN AND STARTED

12:46:57   23   SAYING, LET'S OFFER THESE TESTS, THAT WOULD BE WRONG; RIGHT?

12:46:59   24   A.   YES.

12:47:00   25   Q.   AND IF THE OWNER/OPERATOR CAME IN AND STARTED ISSUING

12:47:03  1      DIRECTIVES AND TELLING YOU EXACTLY WHAT TO DO WITHOUT THE

12:47:07  2      REQUISITE TRAINING, THAT WOULD BE WRONG; RIGHT, SIR?

12:47:09  3      A.   YES.

12:47:10  4      Q.   OKAY.  AND MS. HOLMES NEVER DID THAT; RIGHT?  SHE NEVER

12:47:16  5      DIRECTED YOU TO DO THINGS OR OVERRULED YOU ON THINGS, DID SHE?

12:47:23  6      A.   NO.

12:47:23  7      Q.   THE GOVERNMENT WENT THROUGH A BUNCH OF QUESTIONS ON HCG.

12:47:49  8           DO YOU RECALL THAT?

12:47:50  9      A.   YES.

12:47:51  10     Q.   AND THE GIST OF THE QUESTIONS RELATED TO KIND OF WHAT WAS

12:47:59  11     HAPPENING IN THIS FIRST WEEKEND IN JUNE WHEN YOU PUT A HALT TO

12:48:06  12     REPORTING RESULTS FROM THE EDISON ON HCG; RIGHT?

12:48:11  13     A.   IT WAS MAY 30TH.

12:48:12  14     Q.   MAY 30TH IS WHEN YOU PUT THE HALT TO IT; RIGHT?

12:48:15  15     A.   CORRECT.

12:48:16  16     Q.   AND THE ISSUE HAD COME UP THE DAY BEFORE INITIALLY; RIGHT?

12:48:19  17     A.   I BELIEVE SO.

12:48:19  18     Q.   AND I THINK MAYBE EVEN ON THAT DAY, THEY WERE TEMPORARILY

12:48:23  19     HALTED, AND THEN IT WAS PERMANENTLY HALTED THE NEXT DAY; RIGHT?

12:48:27  20     A.   TO BE HONEST, REVIEWING THE EMAILS, I'M NOT SURE WHAT

12:48:32  21     WAS -- I'M NOT SURE -- I'VE SEEN EMAILS TO THE EFFECT THAT THEY

12:48:36  22     CONTINUED RUNNING THEM ON EDISONS.  I WAS SEEKING CLARIFICATION

12:48:40  23     OF WHAT METHOD WE WERE ACTUALLY USING.  DANIEL WAS CLAIMING

12:48:45  24     THAT HE WASN'T INFORMED THAT THE HCG SHOULD GO ON THE EDISONS.

12:48:49  25           SO IT'S A LITTLE UNCLEAR TO ME.

12:48:51   1      Q.   RIGHT.  AND I THINK YOU TESTIFIED YOU ACTUALLY -- APART

12:48:54   2      FROM THESE EMAILS, YOU DON'T HAVE ANY RECOLLECTION OF THIS;

12:48:57   3      RIGHT?

12:48:58   4      A.   I -- I DO NOT HAVE INDEPENDENT -- I REMEMBER THERE WAS A

12:49:02   5      PROBLEM WITH THE HCG.

12:49:03   6      Q.   YOU REMEMBER THERE WAS AN ISSUE THAT CAME UP WITH HCG?

12:49:05   7      A.   YES.

12:49:06   8      Q.   BUT WITH RESPECT TO WHO WAS DOING WHAT EXACTLY, YOU DON'T

12:49:09   9      RECALL THAT, DO YOU?

12:49:10  10      A.   NO.

12:49:11  11      Q.   OKAY.  LET'S LOOK -- I JUST WANT TO GO THROUGH -- I'VE

12:49:25  12      CREATED A DEMONSTRATIVE WHICH I'LL PUT UP, WHICH IS JUST

12:49:44  13      EXCERPTS FROM EMAILS THAT ARE IN EVIDENCE, AND I'M GOING TO

12:49:52  14      HAND IT TO YOU IN A SECOND.  I JUST WANT TO TELL YOU WHAT IT

12:49:55  15      IS.  OKAY?

12:49:55  16           YOU RECALL THAT THERE'S A LITTLE BIT OF CONFUSION AROUND

12:50:00  17      THIS ISSUE BECAUSE THERE ARE SEVERAL DIFFERENT EMAIL STRINGS

12:50:03  18      THAT ARE FROM DIFFERENT -- THAT HAVE DIFFERENT TIMED EMAILS ON

12:50:06  19      IT AND THEY'RE ALL KIND OF FLYING AROUND AT THE SAME TIME.

12:50:08  20           DO YOU RECALL THAT?

12:50:09  21      A.   YES.

12:50:09  22      Q.   OKAY.  WHAT WE'VE DONE IS WE'VE GONE THROUGH THOSE THREE

12:50:12  23      DIFFERENT EXHIBITS AND WE'VE JUST PUT THEM IN ORDER, OKAY,

12:50:17  24      ACCORDING TO THE TIME ON THE EMAILS.  OKAY?

12:50:19  25      A.   OKAY.

12:50:20  1              MR. WADE:  AND I'M GOING TO OFFER THAT TO THE WITNESS

12:50:22  2      IF I MAY APPROACH.

12:50:23  3              THE COURT:  YES.

12:50:24  4              THE WITNESS:  YOUR HONOR, I HAVE TO PICK UP MY

12:50:25  5      DAUGHTER AT 3:45 AND I RESPECTFULLY ASK THE COURT THAT I BE

12:50:29  6      EXCUSED AT 2:00 O'CLOCK.

12:50:31  7              THE COURT:  ALL RIGHT.  THANK YOU FOR LETTING ME KNOW

12:50:33  8      THAT.  THANK YOU.

12:50:37  9              MR. WADE:  (HANDING.)

12:50:40 10              THE WITNESS:  THANK YOU.

12:50:42 11              MR. WADE:  YOUR HONOR, 2:00 O'CLOCK SHOULD NOT BE AN

12:50:44 12      ISSUE FROM OUR STANDPOINT.  I HOPE TO BE DONE WELL BEFORE 2:00

12:50:49 13      O'CLOCK.

12:50:53 14              THE COURT:  OKAY.

12:51:01 15              THE CLERK:  I'M JUST CONFIRMING THAT THIS CAN BE

12:51:04 16      DISPLAYED.

12:51:05 17              MR. WADE:  MAY I DISPLAY THIS, YOUR HONOR?

12:51:07 18              MR. BOSTIC:  NO OBJECTION FROM THE GOVERNMENT, YOUR

12:51:08 19      HONOR.

12:51:08 20      BY MR. WADE:

12:51:09 21      Q.   OKAY.  AND, AGAIN, ALL OF THESE EXHIBITS, I'M NOT -- I'M

12:51:13 22      TRYING TO SIMPLIFY THIS A LITTLE BIT.  BUT IF IT'S EVER

12:51:16 23      CONFUSING AND YOU WANT TO LOOK BACK AT THE INDIVIDUAL EXHIBITS,

12:51:19 24      FEEL FREE.  OKAY?

12:51:20 25      A.   SURE THING.

12:51:21  1   Q.  OKAY.  LET'S START WITH 5419.  OKAY?

12:51:24  2   A.  UM-HUM.

12:51:25  3   Q.  AND IN 5419, THIS IS -- I'M JUST PICKING UP AT THE TIME OF

12:51:30  4   YOUR DIRECTION.

12:51:32  5       DO YOU SEE THAT?

12:51:32  6   A.  YES.

12:51:33  7   Q.  OKAY.  AND YOU SAY IN THAT FIRST ENTRY, "ALL FURTHER HCG

12:51:38  8   TESTING (CTN OR VACUTAINER) IS TO BE RUN ON THE IMMULITE."

12:51:46  9       RIGHT?

12:51:47  10  A.  YES.

12:51:47  11  Q.  OKAY.  YOU THEN SAY, "HOLD ALL EDISON CTN RESULTS - DO NOT

12:51:53  12  RELEASE."  RIGHT?

12:51:54  13  A.  YES.

12:51:55  14  Q.  THAT WAS IMPORTANT; CORRECT?

12:51:56  15  A.  YES.

12:51:56  16  Q.  BECAUSE THE MOST IMPORTANT THING IS YOU WANT TO MAKE

12:51:58  17  SURE -- YOU DIDN'T WANT TO MAKE SURE THAT THERE WERE -- THAT

12:52:00  18  THE ACTUAL RESULTS WENT OUT THE DOOR UNTIL THE ISSUE WAS

12:52:03  19  UNDERSTOOD; CORRECT?

12:52:04  20  A.  CORRECT.

12:52:04  21  Q.  OKAY.  AND THEN YOU TALKED ABOUT THE NEED TO GO BACK AND

12:52:11  22  MAKE CONTACT IF THERE WAS A NEED FOR A REDRAW DUE TO

12:52:15  23  INSUFFICIENT VOLUME FOR THE IMMULITE.

12:52:17  24      DO YOU SEE THAT?

12:52:18  25  A.  YES.

12:52:18   1    Q.   OKAY.  SO THEN THAT WAS AT 7:52 ON THE 30TH; RIGHT?

12:52:22   2    A.   YES.

12:52:23   3    Q.   OKAY.  IF WE GO TO THE NEXT EMAIL ON THE CHAIN, YOU CAN

12:52:26   4    SEE THAT'S JUNE 4TH AT 5:03.

12:52:30   5         DO YOU SEE THAT?

12:52:31   6    A.   YES.

12:52:32   7    Q.   AND MS. ALAMDAR NOTES THAT THERE WERE SOME RESULTS IN LIS

12:52:39   8    FOR HCG FOR EDISON.

12:52:41   9         DO YOU SEE THAT?

12:52:42  10    A.   YES.

12:52:42  11    Q.   AND SHE'S WONDERING WHETHER IT CAN BE RELEASED?

12:52:50  12    A.   YES.

12:52:50  13    Q.   BECAUSE SHE WASN'T ON THE OTHER EMAIL MAYBE, OR DIDN'T SEE

12:52:53  14    IT, IT WOULD SEEM.

12:52:54  15    A.   SHE WAS ON THE CLS EMAIL DISTRIBUTION LIST, YES, SHE WAS.

12:52:59  16    Q.   OKAY.  AND SHE'S ASKING YOU A QUESTION AS TO WHETHER SHE

12:53:01  17    CAN RELEASE IT?

12:53:02  18    A.   YES.

12:53:02  19    Q.   OKAY.  AND THAT WOULD HAVE BEEN YOUR JUDGMENT TO RESPOND

12:53:04  20    TO HER AT THAT POINT; RIGHT?

12:53:05  21    A.   I'M JUST REALLY CONFUSED AS TO WHY THE TEST WAS RUN ON THE

12:53:09  22    EDISON AND ON THE IMMULITE AT THIS TIME.

12:53:11  23    Q.   WELL, YOU MADE THE -- YOU HALTED THE TESTS ON FRIDAY;

12:53:16  24    RIGHT?

12:53:17  25    A.   CORRECT.

12:53:17  1    Q.   AND IT MAY HAVE BEEN THAT IT TOOK AWHILE TO GET OUT TO THE

12:53:21  2    PATIENT SERVICE CENTERS TO REVISE THE METHOD FOR HCG; RIGHT?

12:53:26  3    THEY MIGHT HAVE KEPT GOING FOR AWHILE WITH CTN'S?

12:53:30  4    A.   IT'S POSSIBLE.

12:53:31  5    Q.   OKAY.  BUT THE MOST IMPORTANT THING WAS THAT THE RESULTS

12:53:33  6    NOT BE REPORTED; CORRECT?

12:53:35  7    A.   CORRECT.

12:53:35  8    Q.   OKAY.  AND SHE'S ASKING WHETHER THE RESULTS COULD BE

12:53:38  9    REPORTED?

12:53:38  10   A.   YES.

12:53:39  11   Q.   AND I DON'T KNOW THAT WE HAVE A RESPONSE, BUT SHE'S

12:53:44  12   DIRECTING THAT INQUIRY TO YOU; RIGHT?

12:53:46  13   A.   YES.

12:53:47  14   Q.   OKAY.  LET'S LOOK AT THE NEXT EMAIL AT 5:09.

12:53:52  15        DO YOU SEE THAT?

12:53:53  16   A.   YES.

12:53:53  17   Q.   OKAY.  AND THAT SAYS THAT DANIEL -- DANIEL REPORTS TO

12:53:59  18   MR. BALWANI THAT HE WAS JUST SPEAKING WITH YOU ABOUT THIS.

12:54:02  19        DO YOU SEE THAT?

12:54:03  20   A.   YES.

12:54:03  21   Q.   AND DO YOU RECALL THERE WAS THAT EMAIL WHERE MR. BALWANI

12:54:06  22   WAS KIND OF MAD, HE WANTED TO MAKE SURE HE GOT YOU IN THE LOOP

12:54:10  23   WITH DANIEL, WITH DR. YOUNG AND DR. PANGARKAR?

12:54:13  24   A.   SEPARATE ISSUE.

12:54:15  25   Q.   NO, IT WAS ON THIS ISSUE IN THIS TIME PERIOD.

12:54:18  1      A.   I RECALL AN EMAIL ABOUT R&D RUNNING EXPERIMENTS IN THE

12:54:21  2      CLIA LAB AND ME WANTING TO BE INFORMED OF THAT.

12:54:27  3      Q.   RIGHT.  AND DO YOU RECALL THOSE WERE HCG RESULTS RELATING

12:54:30  4      TO A STUDY THEY WERE DOING RIGHT IN THIS SAME TIME PERIOD?

12:54:33  5      A.   I DON'T RECALL.

12:54:33  6      Q.   OKAY.  WE'LL KEEP GOING.

12:54:35  7           DO YOU SEE THEN THE NEXT EMAIL IN THAT CHAIN, WHICH IS AT

12:54:39  8      5:12 -- OH, BY THE WAY, THE PRIOR EMAIL, IT SAYS, "WE WILL HOLD

12:54:44  9      THE RESULT," THE EMAIL FROM DANIEL, IT SAYS, "WE WILL HOLD THE

12:54:49  10     RESULT UNTIL THE STUDY WE ARE RUNNING ON THE EDISON ASSAY IS

12:54:53  11     DONE."

12:54:54  12          DO YOU SEE THAT?

12:54:55  13     A.   YES.

12:54:55  14     Q.   OKAY.  SO, AGAIN, HOLDING THE RESULTS; CORRECT?

12:54:58  15     A.   YES.

12:54:59  16     Q.   OKAY.  THAT WAS THE MOST IMPORTANT THING; RIGHT?

12:55:01  17     A.   YES.

12:55:01  18     Q.   OKAY.  LET'S GO TO THE NEXT EMAIL.

12:55:05  19          THIS IS AT 5:12 P.M.

12:55:07  20     A.   IT'S NOT CLEAR TO ME FROM DANIEL'S EMAIL WHAT RESULT HE'S

12:55:11  21     REFERRING TO, WHETHER IT'S RESULTS FROM THE IMMULITE OR RESULTS

12:55:14  22     FROM EDISON.

12:55:15  23     Q.   WELL, HE REFERS TO THE EDISON ASSAY, RIGHT, IN THAT EMAIL?

12:55:20  24     A.   YES.

12:55:20  25     Q.   OKAY.  BUT I -- FAIR POINT.  IT'S NOT CLEAR; RIGHT?  BUT

12:55:25  1    HE SAYS HE'S HOLDING RESULTS UNTIL THE STUDY IS DONE?

12:55:30  2    A.   YEAH.  SO WHY IS HE WEIGHING IN ABOUT WHAT RESULTS SHOULD

12:55:34  3    BE HELD AND WHAT SHOULD BE RELEASED?

12:55:36  4    Q.   I THINK -- YOU SEE HE SAYS HERE, I WAS JUST SPEAKING WITH

12:55:40  5    ADAM ABOUT THIS?

12:55:40  6    A.   OKAY.

12:55:41  7    Q.   RIGHT?  MAYBE YOU WERE WEIGHING IN AND HE WAS JUST

12:55:44  8    CONVEYING THAT TO MR. BALWANI?

12:55:45  9    A.   I DON'T RECALL.

12:55:46  10   Q.   OKAY.  BECAUSE YOU DON'T REMEMBER ANY OF THIS; RIGHT?

12:55:49  11   A.   I'M SORRY?

12:55:51  12   Q.   DIDN'T YOU SAY --

12:55:52  13   A.   THAT'S A VERY BROAD STATEMENT.

12:55:54  14   Q.   YOU RECALL THERE WAS AN ISSUE; RIGHT?

12:55:55  15   A.   YES.

12:55:56  16   Q.   BUT YOU DON'T RECALL ANY OF THE SPECIFICS; RIGHT?

12:55:58  17   A.   CORRECT.

12:55:58  18   Q.   OKAY.  LET'S GO TO THE NEXT EMAIL.

12:56:02  19        AND IT SAYS -- THAT'S AN EMAIL FROM, IN RESPONSE TO THE

12:56:07  20   PRIOR ONE THAT SAYS, FROM DANIEL YOUNG, "BY THE WAY, WE NEVER

12:56:13  21   SWITCHED TO IMMULITE IN LIS - IT WAS NOT CLEAR TO ME THAT THIS

12:56:17  22   DECISION WAS MADE."

12:56:19  23        DO YOU SEE THAT?

12:56:20  24   A.   YES.

12:56:22  25   Q.   AND YOU DON'T KNOW WHAT "THIS DECISION" HE'S REFERRING TO

12:56:24   1    THERE IS, DO YOU?

12:56:26   2    A.   I THINK HE'S TALKING ABOUT THE DECISION TO SWITCH HCG ONTO

12:56:29   3    THE IMMULITE.

12:56:29   4    Q.   RIGHT.  AND THAT'S WHETHER OR NOT IT WOULD BE COMMUNICATED

12:56:34   5    OUT TO THE PATIENT SERVICE CENTERS TO ALTER THE DRAW METHOD;

12:56:38   6    RIGHT?

12:56:38   7    A.   THAT WOULD BE PART OF IT, YEAH.

12:56:41   8    Q.   RIGHT?

12:56:41   9    A.   I DON'T KNOW IF DANIEL WAS ON THE CLS DISTRIBUTION LIST.

12:56:45  10    I JUST DON'T REMEMBER THAT.

12:56:46  11    Q.   BUT HE'S NOT SAYING THERE THAT YOU'RE GOING TO RELEASE ANY

12:56:49  12    RESULTS; RIGHT?  IT'S JUST A QUESTION OF WHETHER THAT CHANGE IN

12:56:53  13    COLLECTION METHOD HAD BEEN IMPLEMENTED IN LIS; RIGHT?

12:56:56  14    A.   I DON'T UNDERSTAND YOUR QUESTION.

12:57:02  15    Q.   DO YOU SEE ANY INDICATION THERE THAT HE'S GOING TO RELEASE

12:57:04  16    RESULTS?

12:57:09  17    A.   NO.

12:57:09  18    Q.   NO.  LET'S GO TO THE NEXT EMAIL.

12:57:13  19    A.   WELL, HE MIGHT BE -- I DON'T KNOW.  HE MIGHT BE STILL

12:57:16  20    AUTHORIZING RELEASE OF IMMULITE RESULTS.  I JUST DON'T -- IT'S

12:57:19  21    NOT CLEAR TO ME.

12:57:20  22    Q.   YOU DON'T SEE ANY INDICATION THAT HE IS, THOUGH, FROM

12:57:23  23    THESE EMAILS, DO YOU?  DO YOU?

12:57:24  24    A.   I CAN'T ANSWER YES OR NO.

12:57:25  25    Q.   OKAY.  YOU DON'T REMEMBER THAT LEVEL OF DETAIL ABOUT THESE

12:57:29   1    EVENTS; RIGHT?

12:57:31   2    A.   NO.  IT WAS SEVEN YEARS AGO.

12:57:33   3    Q.   OKAY.

12:57:33   4    A.   MORE THAN SEVEN YEARS AGO.

12:57:34   5    Q.   LET'S JUST KEEP LOOKING AT THE EMAILS, BECAUSE I BELIEVE

12:57:37   6    THAT'S WHAT YOU'VE BEEN TESTIFYING ABOUT AND I JUST WANT TO

12:57:39   7    MAKE SURE THE RECORD IS CLEAR ON THE EMAILS.  OKAY?

12:57:42   8    A.   OKAY.

12:57:43   9    Q.   OKAY.  SO THEN THE NEXT EMAIL AT 5:14 IS A QUESTION FROM

12:57:46  10    MR. BALWANI ABOUT THE STUDY?

12:57:47  11    A.   YES.

12:57:48  12    Q.   YOU'RE NOT ON THAT?

12:57:48  13    A.   YES.

12:57:49  14    Q.   AND THEN THE NEXT EMAIL AT 5:16 IS AN EMAIL FROM YOU;

12:57:53  15    RIGHT?

12:57:53  16    A.   YES.

12:57:54  17    Q.   OKAY.  AND YOU, YOU NOTE THAT DANIEL, CHINMAY AND I

12:58:01  18    DISCUSSED THE PLAN FOR HCG; RIGHT?

12:58:03  19    A.   YES.

12:58:03  20    Q.   YOU'RE WORKING TOGETHER ON THIS; RIGHT?

12:58:05  21    A.   YES.

12:58:06  22    Q.   OKAY.  AND ALTHOUGH THERE ARE SEPARATE EMAIL CHAINS GOING,

12:58:09  23    YOU'RE BOTH REFERRING TO DISCUSSIONS YOU'RE HAVING WITH EACH

12:58:12  24    OTHER; RIGHT?

12:58:12  25    A.   YES.

12:58:13   1    Q.   AND YOU -- I TAKE IT IF YOU WROTE THAT YOU WERE DISCUSSING

12:58:16   2    THAT WITH THEM, YOU BELIEVED THAT TO BE TRUE AT THE TIME?

12:58:18   3    A.   YES.

12:58:19   4    Q.   OKAY.  AND YOU TALKED ABOUT THE METHOD --

12:58:21   5    A.   SIR, TO -- I BELIEVE WE'VE GONE OVER THIS EMAIL BEFORE IN

12:58:24   6    YOUR PRIOR QUESTIONING.  IS IT NECESSARY TO REVISIT IT?

12:58:30   7    Q.   YOUR OBJECTION IS NOTED.

12:58:32   8         LET'S LOOK AT THE --

12:58:33   9              THE COURT:  HE GETS TO ASK YOU QUESTIONS.

12:58:35  10              THE WITNESS:  OKAY.

12:58:36  11    BY MR. WADE:

12:58:36  12    Q.   LET'S LOOK AT THE GOING FORWARD.

12:58:39  13         OKAY?  DO YOU SEE THE GOING FORWARD?

12:58:40  14    A.   YES.

12:58:41  15    Q.   OKAY.  AND YOU ARE THE ONE WHO LAYS OUT EXACTLY WHAT'S

12:58:44  16    GOING TO HAPPEN THERE; RIGHT?

12:58:46  17    A.   YES.

12:58:46  18    Q.   OKAY.  BASED ON YOUR DISCUSSIONS WITH DANIEL AND CHINMAY;

12:58:49  19    RIGHT?

12:58:50  20    A.   YES.

12:58:50  21    Q.   AND YOU'RE REPORTING THAT TO MR. BALWANI?

12:58:52  22    A.   YES.

12:58:53  23    Q.   CORRECT?

12:58:54  24    A.   YES.

12:58:54  25    Q.   OKAY.  AND THEN THE NEXT EMAIL IN THIS WINDOW IS FROM

```
12:58:59   1        DR. PANGARKAR.

12:59:00   2            DO YOU SEE THAT?

12:59:01   3    A.   YES.

12:59:02   4    Q.   AND THAT'S EXHIBIT 5419.  THAT'S AN EMAIL WHERE HE'S

12:59:09   5    TALKING ABOUT THE STUDY THAT'S BEING DONE?

12:59:11   6    A.   YES.

12:59:11   7    Q.   AND THE IQP?

12:59:13   8            DO YOU SEE THAT?

12:59:14   9    A.   YES.

12:59:14   10   Q.   OKAY.  AND WE HAVE JUST TWO MORE.  I'LL BRING YOU TO THE

12:59:23   11   NEXT PAGE.

12:59:26   12           THIS IS NOW AT 6:29 P.M.; RIGHT?

12:59:29   13   A.   YES.

12:59:30   14   Q.   AND WE'RE IN A DIFFERENT EMAIL CHAIN NOW?

12:59:31   15   A.   YES.

12:59:32   16   Q.   BUT JUST AFTER THAT, IT'S THE NEXT EMAIL SEQUENTIALLY.

12:59:37   17           DANIEL NOTES THAT THEY'RE REPEATING THE IQP; RIGHT?

12:59:41   18   A.   YES.

12:59:42   19   Q.   AND THEN HE NOTES, IF WE NEED TO COLLECT THE VACUTAINERS

12:59:46   20   TOMORROW, WE'LL NEED TO SEND SPECIAL INSTRUCTIONS TO THE PSC'S;

12:59:51   21   RIGHT?

12:59:51   22           DO YOU SEE THAT?

12:59:52   23   A.   YES.

12:59:52   24   Q.   AND IT'S -- AND YOU'RE ON THIS EMAIL?

12:59:54   25   A.   YES.
```

12:59:55   1    Q.   OKAY.  AND IT SAYS RIGHT NOW WE'RE NOT PLANNING ON DOING

12:59:58   2    THIS; RIGHT?

12:59:58   3    A.   YES.

12:59:59   4    Q.   OKAY.  AND SO WHAT HE'S SAYING IS THERE'S BASICALLY A

01:00:04   5    HOLD, AND IF WE DECIDE WE NEED REDRAWS SO THAT WE CAN SWITCH

01:00:10   6    THIS, THE CTN'S THAT WERE GOING TO THE EDISONS TO VACUTAINERS,

01:00:15   7    WE'LL DO IT; RIGHT?

01:00:16   8    A.   YES.

01:00:16   9    Q.   THAT'S WHAT HE'S SAYING RIGHT THERE; RIGHT?

01:00:18   10   A.   MY READING OF THIS IS THAT HE'S UNWILLING TO TELL THE

01:00:27   11   PSC'S TO SWITCH TO VACUTAINERS.

01:00:30   12   Q.   WELL, THERE'S A STUDY UNDERWAY; RIGHT, DOCTOR?

01:00:32   13   A.   YES.

01:00:33   14   Q.   OKAY.  AND WHAT HE'S -- ISN'T WHAT HE'S ESSENTIALLY SAYING

01:00:36   15   IS LET'S -- WE'RE ALMOST DONE, LET'S WAIT AND SEE WHAT IT

01:00:39   16   SHOWS?

01:00:39   17   A.   YES.

01:00:40   18   Q.   AND IF WE DON'T NEED TO GO OUT AND BOTHER THESE PEOPLE TO

01:00:43   19   GET ANOTHER BLOOD DRAW, WE WON'T DO IT; RIGHT?

01:00:46   20   A.   YES.

01:00:46   21   Q.   BUT IF WE DO NEED TO BOTHER THEM, WE'LL DO IT; RIGHT?

01:00:51   22   A.   THAT'S -- THAT'S AN INFERENCE.

01:00:57   23   Q.   IT SAYS, IF WE NEED TO COLLECT VACUTAINERS TOMORROW, WE

01:01:01   24   WOULD NEED TO SEND SPECIAL INSTRUCTIONS TO THE PSC'S; RIGHT?

01:01:04   25   A.   YES.

01:01:05  1    Q.   OKAY.  AND THEN THE LAST EMAIL IN THIS CHAIN JUST RELATES

01:01:11  2    TO HOW THAT WILL WORK WITHIN THE OPERATIONAL COMPONENTS OF THE

01:01:16  3    LIS; RIGHT?

01:01:17  4    A.   YES.

01:01:18  5    Q.   AND HOW IT WOULD BE COMMUNICATED OUT TO THE LAB, OR TO THE

01:01:23  6    PSC'S; RIGHT?

01:01:25  7    A.   YES.

01:01:25  8    Q.   THERE'S NOTHING IN ANY OF THESE EMAILS THAT SAYS THAT

01:01:28  9    THEY'RE GOING TO RELEASE RESULTS; RIGHT?

01:01:30  10   A.   CORRECT.

01:01:30  11   Q.   OKAY.  AND THERE'S NOTHING IN ANY OF THESE EMAILS THAT

01:01:35  12   SUGGESTS THAT YOUR DIRECTION, WHICH WAS THE FIRST EMAIL IN THE

01:01:38  13   CHAIN, HAS BEEN COUNTERMANDED; RIGHT?

01:01:40  14   A.   I'M NOT SURE IF THE CLS'S WERE RELEASING RESULTS BETWEEN

01:01:45  15   MAY 30TH AND JUNE 4TH.  I JUST DON'T KNOW.

01:01:48  16   Q.   WELL, YOU SEE THAT THEY'RE, THEY'RE ASKING YOU QUESTIONS

01:01:51  17   ABOUT WHETHER THEY CAN RELEASE RESULTS; RIGHT?

01:01:53  18   A.   YES.

01:01:54  19   Q.   AND WOULD YOU HAVE ANSWERED THOSE QUESTIONS IF THEY ASKED

01:01:56  20   THEM?

01:01:57  21   A.   YES.

01:01:57  22   Q.   AND WHAT ANSWER WOULD YOU HAVE GIVEN?

01:01:59  23   A.   TO NOT RELEASE RESULTS.

01:02:01  24   Q.   OKAY.  AND THE GOVERNMENT ALSO SHOWED YOU SOME DOCUMENTS

01:02:09  25   THAT RELATED TO QC THAT WAS PERFORMED.

01:02:16  1          DO YOU RECALL THAT?  ON THE EDISONS IN JUNE OF 2014?

01:02:24  2     A.   ON REDIRECT?

01:02:28  3     Q.   YES.

01:02:28  4     A.   ON REDIRECT?

01:02:29  5     Q.   YES.  DO YOU RECALL THAT?

01:02:30  6     A.   YES, I THINK AT THE VERY -- AT THE VERY BEGINNING OF THE

01:02:36  7     DAY, YES.

01:02:37  8     Q.   OKAY.  AND YOU'LL RECALL, MUCH OF THE QUESTIONING ON

01:02:43  9     CROSS-EXAMINATION CAME UP BECAUSE THE QUESTION WAS ASKED OF YOU

01:02:50  10    IN YOUR DIRECT EXAMINATION WHETHER YOU KNEW ABOUT THE FACT THAT

01:02:56  11    HCG WENT BACK ONTO EDISONS AFTER YOU ISSUED THAT DIRECTIVE AND

01:03:03  12    YOU SAID YOU WERE UNAWARE OF THAT; RIGHT?

01:03:06  13    A.   YES.

01:03:06  14    Q.   OKAY.  AND I SHOWED YOU SOME DOCUMENTS IN

01:03:11  15    CROSS-EXAMINATION THAT SUGGESTED YOU PROBABLY WERE AWARE IN MID

01:03:16  16    TO LATE MARCH; RIGHT?

01:03:18  17         DO YOU RECALL THAT?

01:03:18  18    A.   MY ORDER TO CEASE TESTING FOR HCG ON THE EDISONS WENT OUT

01:03:25  19    ON MAY 30TH.

01:03:27  20    Q.   RIGHT.  AND DO YOU RECALL IN CROSS-EXAMINATION I SHOWED

01:03:29  21    YOU MANY EMAILS FROM MID TO LATE MARCH THAT INDICATED THAT

01:03:32  22    EDISON WAS BACK ON?

01:03:34  23         DO YOU RECALL THAT?

01:03:35  24    A.   I'M SORRY.  MARCH IS BEFORE MAY.

01:03:39  25    Q.   I'M SORRY.

01:03:39   1      A.   I DON'T UNDERSTAND YOUR TIMELINE.

01:03:41   2      Q.   I'M SORRY.  I'M CONFUSING MY MONTHS BETWEEN MY HEAD AND MY

01:03:46   3      MOUTH.

01:03:46   4      A.   YOU REALLY ARE.

01:03:47   5      Q.   YEAH, I AM.  THANKS.

01:03:49   6           LET ME TRY IT AGAIN.

01:03:52   7           I SHOWED YOU A NUMBER OF EMAILS IN MID TO LATE JUNE --

01:03:58   8      A.   YES.

01:04:00   9      Q.   -- THAT SUGGESTED THAT YOU WERE AWARE THAT EDISON HCG

01:04:05  10      TESTS WERE BACK UP AND RUNNING; RIGHT?

01:04:07  11      A.   YES.

01:04:07  12      Q.   DO YOU RECALL THAT?

01:04:08  13      A.   YES.

01:04:09  14      Q.   AND THE GOVERNMENT DIDN'T SHOW YOU THOSE; RIGHT?

01:04:12  15      A.   CORRECT.

01:04:13  16      Q.   AND THEY DIDN'T SHOW YOU THOSE IN THE MEETING; RIGHT?

01:04:16  17      A.   CORRECT.

01:04:17  18      Q.   THAT YOU HAD ANSWERED WERE YOU AWARE, AND YOU SAID I WAS

01:04:19  19      NOT AWARE; RIGHT?

01:04:20  20      A.   YES.

01:04:20  21      Q.   OKAY.  LET'S LOOK AT EXHIBITS 5421 AND 5422.

01:04:39  22           NOW, THESE ARE GOVERNMENT EXHIBITS ABOUT THE QUALITY

01:04:43  23      CONTROL ON EDISONS; RIGHT?

01:04:46  24      A.   YES.

01:04:48  25      Q.   IN LATE JUNE; RIGHT?

01:04:49  1      A.   YES.

01:04:50  2      Q.   AND IT TALKS ABOUT THE FACT THAT HCG IS COMING UP ON THE

01:04:54  3      EDISON; RIGHT?

01:04:55  4      A.   YES.

01:04:56  5      Q.   OKAY.  AND SO WHEN THE GOVERNMENT WAS ASKING YOU

01:04:59  6      QUESTIONS, THEY KNEW THAT HCG HAD COME BACK UP ON EDISONS AND

01:05:06  7      THAT YOU WERE AWARE OF IT BECAUSE THEY HAD THESE EMAILS, BUT

01:05:08  8      THEY DIDN'T SHOW YOU THESE EMAILS, DID THEY?

01:05:11  9      A.   THIS EMAIL SAYS THAT NINE EDISONS ARE FAILING LEVEL 1 FOR

01:05:19  10     HCG.

01:05:21  11     Q.   RIGHT.  BUT IT SAYS THEY'RE BRINGING UP HCG ON EDISONS;

01:05:24  12     RIGHT?  ISN'T THAT THE IMPLICATION OF THIS EMAIL?

01:05:27  13     A.   IT SAYS INSTRUMENT BRING UP.

01:05:31  14     Q.   RIGHT.  THEY'RE BRINGING THE HCG TEST --

01:05:33  15     A.   THEY'RE TRYING TO.

01:05:35  16     Q.   RIGHT.  SO IT WAS BACK ON EDISONS IF IT PASSED QUALITY

01:05:38  17     CONTROL; RIGHT?

01:05:39  18     A.   BUT IT -- THIS EMAIL INDICATES THAT HCG DID NOT PASS

01:05:43  19     QUALITY CONTROL.

01:05:44  20     Q.   WHICH EMAIL ARE YOU LOOKING AT, SIR?

01:05:46  21     A.   THE ONE ON THE LEFT.

01:05:47  22     Q.   THE ONE ON THE LEFT.  RIGHT.

01:05:52  23          AND IT INDICATES THAT WITHIN THE LABORATORY BRING UP,

01:05:56  24     THEY'RE WORKING TO GET THE HCG UP ONTO THE EDISON; RIGHT?

01:06:00  25     A.   YES.

01:06:00  1    Q.   OKAY.  AND THE OTHER EMAIL INDICATES THAT AS WELL; RIGHT?

01:06:03  2    A.   YES.

01:06:03  3    Q.   YEAH.  AND WE SAW THE OTHER DOCUMENTS WHERE YOU KNEW THAT

01:06:07  4    THE GOVERNMENT DIDN'T SHOW YOU; RIGHT?  THE OTHER DOCUMENTS

01:06:10  5    WHERE YOU KNEW IN LATE JUNE THAT HCG WAS BROUGHT UP ON THE

01:06:13  6    EDISON?

01:06:16  7    A.   THESE EMAILS SHOW THAT QC WAS BEING RUN FOR HCG ON THE

01:06:21  8    EDISONS.

01:06:22  9    Q.   SIR, THE GOVERNMENT NEVER SHOWED YOU THESE EMAILS ON YOUR

01:06:25  10   DIRECT TESTIMONY WHEN YOUR TESTIMONY WAS IN ERROR; RIGHT?

01:06:30  11   A.   CORRECT.

01:06:31  12   Q.   YEAH.  AND BY THE WAY, THOSE -- THE QUALITY CONTROL

01:06:56  13   RESULTS THAT WERE DEPICTED IN THOSE DOCUMENTS, YOU WERE GETTING

01:06:59  14   THEM IT LOOKED LIKE DAILY; RIGHT?  THEY SHOWED YOU A COUPLE OF

01:07:02  15   DAYS WORTH OF THOSE EMAILS FROM MR. GEE; RIGHT?

01:07:06  16   A.   NO, I WAS NOT RECEIVING QC INFORMATION DAILY FROM MR. GEE,

01:07:10  17   NO.

01:07:11  18   Q.   WELL, YOU SAW THE INSTRUMENT BRING UP INFORMATION?

01:07:13  19   A.   YES.

01:07:13  20   Q.   AND YOU WERE GETTING THOSE EMAILS DAILY; RIGHT?

01:07:15  21   A.   JUST IN THAT TIME PERIOD, THE 6-24 TIME PERIOD, 6-24,

01:07:23  22   6-25, YES.

01:07:23  23   Q.   BUT YOU GOT THAT INFORMATION; RIGHT, SIR?

01:07:25  24   A.   YES.

01:07:25  25   Q.   AND WE'VE TALKED ABOUT HOW YOU GOT OTHER INFORMATION FROM

01:07:28  1    MR. GEE ON QUALITY CONTROL; RIGHT?

01:07:29  2    A.   YES.

01:07:30  3    Q.   AND IF YOU HAD ANY CONCERNS AS A RESULT OF THAT

01:07:32  4    INFORMATION ABOUT THE ACCURACY AND RELIABILITY OF THE TEST, YOU

01:07:35  5    WOULD HAVE TAKEN ACTION IMMEDIATELY; RIGHT?

01:07:37  6    A.   YES.

01:07:37  7    Q.   OKAY.  AND THAT'S TRUE GENERALLY WITH RESPECT TO CONCERNS,

01:07:43  8    BECAUSE YOU TALKED SOMETIMES ABOUT CONCERNS -- AND MAYBE IT

01:07:47  9    COMES UP WITH THE BENEFIT OF HINDSIGHT OR SOMETHING -- BUT WHEN

01:07:50 10    YOU WERE IN THE LAB IN REAL TIME, IF THERE WAS A CONCERN ABOUT

01:07:52 11    THE ACCURACY OR RELIABILITY OF A TEST, YOU ACTED ON IT; RIGHT?

01:07:56 12    A.   YES.

01:07:56 13    Q.   AND YOU WERE THE MOST KNOWLEDGEABLE, QUALIFIED, COMPETENT

01:08:00 14    PERSON TO ACT IN THAT REGARD WITHIN THERANOS; RIGHT?

01:08:03 15    A.   YES.

01:08:10 16    Q.   YOU WERE ASKED ON REDIRECT ABOUT COMPLAINTS.

01:08:18 17         DO YOU RECALL THAT?

01:08:19 18    A.   YES.

01:08:19 19    Q.   AND YOU WENT BACK ESSENTIALLY TO THE TESTIMONY THAT THE

01:08:27 20    COMPLAINTS WERE MORE FREQUENT AT THERANOS THAN THEY WERE AT THE

01:08:30 21    UNIVERSITY OF PITTSBURGH.

01:08:32 22         DO YOU RECALL THAT?

01:08:33 23    A.   ON A PERCENTAGE BASIS, YES.

01:08:35 24    Q.   YEAH.  YOU RECALL THAT THEY WERE MORE FREQUENT; RIGHT?

01:08:39 25    A.   ON A PERCENTAGE BASIS.

01:08:40   1    Q.   AND YOU RECALL I SHOWED YOU YESTERDAY YOUR TESTIMONY FROM

01:08:44   2    2019 IN WHICH YOU SAID THAT THE DOCTOR COMPLAINTS WERE NOT MORE

01:08:49   3    FREQUENT; RIGHT?

01:08:51   4    A.   JUST IN TERMS OF THE NUMBER OF COMPLAINTS.  I BELIEVE I

01:08:54   5    CLARIFIED MY MEANING.

01:08:55   6    Q.   RIGHT.  YOU TESTIFIED THAT -- WELL, WE CAN LOOK AT IT.

01:09:00   7    LET'S LOOK AT IT.  11000, WHICH IS IN YOUR YELLOW BINDER.  AND

01:09:23   8    IT'S PAGE 122, DOCTOR.

01:09:43   9    A.   OKAY.

01:09:44  10    Q.   AND IF YOU LOOK AT LINE 12 OF 122?

01:09:50  11    A.   YES.

01:09:57  12    Q.   DOES THIS REFRESH YOUR RECOLLECTION THAT YOU WERE ASKED,

01:10:01  13    "WERE THESE TYPES OF PHYSICIAN COMPLAINTS COMMON DURING YOUR

01:10:04  14    TIME AT THERANOS?"

01:10:07  15         AND YOU ANSWERED, "THEY WEREN'T MORE COMMON THAN WHAT ONE

01:10:11  16    USUALLY SEES IN SOME LABS WITH HIGH VOLUME."

01:10:15  17         DO YOU SEE THAT?

01:10:16  18    A.   YES.

01:10:16  19    Q.   AND WAS THAT TRUTHFUL TESTIMONY AT THE TIME?

01:10:18  20    A.   YES.

01:10:19  21    Q.   OKAY.  AND YOU WERE ASKED IN THE NEXT QUESTION AND ANSWER

01:10:24  22    ABOUT HOW IT COMPARED TO YOUR TIME -- OR YOU OFFERED A

01:10:30  23    COMPARISON TO YOUR TIME AT UNIVERSITY OF PITTSBURGH.

01:10:33  24         DO YOU SEE THAT?

01:10:33  25    A.   YES.

01:10:34  1    Q.   OKAY.  AND YOU TESTIFIED THAT THEY WERE NOT MORE ANOMALOUS

01:10:41  2    THAN WHAT YOU SAW AT THE UNIVERSITY OF PITTSBURGH; CORRECT?

01:10:47  3    A.   YES.

01:10:48  4    Q.   OKAY.  AND THIS TESTIMONY THAT YOU OFFERED WAS IN 2019;

01:10:51  5    RIGHT?

01:10:51  6    A.   YES.

01:10:52  7    Q.   THAT WAS BEFORE THE EVENTS RELATING TO YOUR INSPECTION AT

01:10:58  8    CMS, AT PERKIN ELMER; RIGHT?

01:11:03  9    A.   YES.

01:11:05  10   Q.   AND YOU WERE TRUTHFUL IN THIS TESTIMONY; RIGHT, SIR?

01:11:15  11   A.   YES.

01:11:18  12            MR. WADE:  I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

01:11:43  13            THE COURT:  MR. BOSTIC?

01:11:44  14            MR. BOSTIC:  NO FURTHER QUESTIONS, YOUR HONOR.  THANK

01:11:46  15   YOU.

01:11:46  16            THE COURT:  MAY THIS WITNESS BE EXCUSED?

01:11:48  17            MR. BOSTIC:  FROM THE GOVERNMENT'S PERSPECTIVE, YES.

01:11:50  18            MR. WADE:  HE MAY, YOUR HONOR.

01:11:52  19            THE COURT:  YOU'RE EXCUSED, SIR.  THANK YOU.

01:11:55  20            THE WITNESS:  THANK YOU VERY MUCH, YOUR HONOR.

01:11:56  21            THE COURT:  YOU'RE WELCOME.

01:12:22  22        DOES THE GOVERNMENT HAVE ANOTHER WITNESS?

01:12:25  23            MR. LEACH:  WE DO, YOUR HONOR.  THE UNITED STATES

01:12:27  24   CALLS STEVE BURD.

01:12:29  25            THE CLERK:  YOUR HONOR, I NEED A FEW MINUTES TO

```
01:12:31   1    COLLECT THESE ITEMS.

01:12:32   2            THE COURT:  OKAY.  ARE THESE -- ARE THESE YOUR

01:12:35   3    DOCUMENTS HERE?

01:12:42   4         THANK YOU.

01:12:46   5         (PAUSE IN PROCEEDINGS.)

01:13:29   6            THE COURT:  SIR, JUST GIVE ME JUST A MOMENT.  IF YOU

01:13:32   7    WOULD JUST WAIT JUST A MOMENT, SIR.  JUST HANG ON A SECOND.

01:13:37   8         (PAUSE IN PROCEEDINGS.)

01:13:53   9            THE COURT:  LADIES AND GENTLEMEN, STAND UP AND

01:13:55  10    STRETCH IF YOU'D LIKE FOR A MOMENT.

01:13:58  11         (STRETCH BREAK.)

01:14:10  12            THE COURT:  WE'RE GOING TO BREAK AT 3:00 O'CLOCK.  I

01:14:12  13    UNDERSTAND WE'LL PROBABLY TAKE A BRIEF RECESS IN ABOUT 20

01:14:17  14    MINUTES, LADIES AND GENTLEMEN.  IT'LL BE A BRIEF RECESS AND

01:14:19  15    THEN WE'LL CONTINUE.

01:14:21  16         ALL RIGHT.  SIR, IF YOU'D COME FORWARD, PLEASE.

01:14:24  17         PLEASE BE SEATED.  THANK YOU.

01:14:25  18         IF YOU'D COME FORWARD.  AND IF YOU WOULD FACE OUR

01:14:29  19    COURTROOM DEPUTY AND RAISE YOUR RIGHT HAND, SHE HAS A QUESTION

01:14:32  20    FOR YOU.

01:14:33  21            THE WITNESS:  OKAY.

01:14:35  22    (GOVERNMENT'S WITNESS, STEVE BURD, WAS SWORN.)

01:14:37  23            THE WITNESS:  YES.

01:14:43  24            THE COURT:  THANK YOU, SIR.

01:14:44  25         LET ME INVITE YOU TO TAKE A SEAT HERE AND MAKE YOURSELF
```

BURD DIRECT BY MR. LEACH

01:14:48  1    COMFORTABLE.  FEEL FREE TO ADJUST THE CHAIR AND MICROPHONE AS

01:14:51  2    YOU NEED, AND I'LL ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE

01:14:54  3    MICROPHONE.

01:14:55  4         WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

01:14:57  5    AND THEN SPELL IT, PLEASE.

01:14:59  6              THE WITNESS:  SURE.  MY NAME IS STEVE BURD, SPELLED

01:15:03  7    S-T-E-V-E, LAST NAME B-U-R-D.

01:15:07  8              THE COURT:  THANK YOU.

01:15:09  9         COUNSEL.

01:15:10  10             MR. LEACH:  THANK YOU, YOUR HONOR.

01:15:11  11                        **DIRECT EXAMINATION**

01:15:12  12   BY MR. LEACH:

01:15:13  13   Q.   MR. BURD, IF YOU'RE VACCINATED AND COMFORTABLE, WITH THE

01:15:17  14   COURT'S PERMISSION, YOU'RE FREE TO REMOVE YOUR MASK.

01:15:20  15             THE COURT:  YES.

01:15:21  16             THE WITNESS:  THANK YOU.

01:15:22  17             THE COURT:  YOU'RE WELCOME.

01:15:23  18   BY MR. LEACH:

01:15:24  19   Q.   GOOD AFTERNOON.  HOW ARE YOU, SIR?

01:15:25  20   A.   I'M TERRIFIC.

01:15:26  21   Q.   GREAT.  WAS THERE A TIME WHEN YOU SERVED AS THE CHIEF

01:15:29  22   EXECUTIVE OFFICER, OR CEO, OF SAFEWAY?

01:15:33  23   A.   YES, FOR A TOTAL OF 20 YEARS.

01:15:35  24   Q.   OKAY.  WHEN WERE YOU THE CEO OF SAFEWAY?

01:15:37  25   A.   IT WOULD HAVE BEEN MAY OF 1993 AT THE ANNUAL SHAREHOLDER'S

01:15:47  1    MEETING, RETIRING 20 YEARS LATER IN 2013 AT THAT SAME ANNUAL

01:15:53  2    SHAREHOLDER'S MEETING.

01:15:54  3    Q.   AND SAFEWAY IS THE SUPERMARKET CHAIN WITH THE LARGE

01:15:59  4    PRESENCE HERE IN THE NORTHERN DISTRICT OF CALIFORNIA?

01:16:01  5    A.   THAT'S CORRECT.

01:16:02  6    Q.   OKAY.  WAS SAFEWAY A PUBLIC COMPANY WHILE YOU WERE THE

01:16:06  7    CEO?

01:16:06  8    A.   IT WAS A PUBLIC COMPANY.

01:16:07  9    Q.   OKAY.  AND WHAT DOES THAT MEAN, TO BE A PUBLIC COMPANY?

01:16:10  10   A.   IT MEANS YOU HAVE A LARGE NUMBER OF SHAREHOLDERS AND YOU

01:16:16  11   HAVE OBLIGATIONS TO REPORT YOUR EARNINGS AND DISCUSS THE

01:16:21  12   DETAILS OF THOSE EARNINGS ON A QUARTERLY BASIS.

01:16:25  13        AND YOU OPERATE, I THINK, UNDER A SLIGHTLY DIFFERENT

01:16:28  14   REGULATORY AND SECURITY STRUCTURE THAN A PRIVATELY HELD

01:16:31  15   COMPANY.

01:16:31  16   Q.   OKAY.  AND YOU STEPPED DOWN AS THE CEO OF SAFEWAY IN ABOUT

01:16:35  17   MAY OF 2013?

01:16:37  18   A.   THAT'S CORRECT.

01:16:37  19   Q.   OKAY.  CAN YOU GIVE US A BALLPARK OF WHAT SAFEWAY'S ANNUAL

01:16:42  20   REVENUES IN THAT 2013 TIME PERIOD WERE?

01:16:45  21   A.   SURE.  IT WOULD HAVE BEEN IN THE RANGE OF $45 BILLION IN

01:16:50  22   SALES.  WE OPERATED IN 22 U.S. STATES, FIVE CANADIAN PROVINCES.

01:16:57  23   THOSE STATES INCLUDED ALASKA AND HAWAII.

01:17:00  24        AND WE HAD A 49 PERCENT INTEREST IN A MEXICAN RETAILER,

01:17:05  25   THE COMPANY WAS CALLED CASA LEY, C-A-S-A, L-E-Y.

BURD DIRECT BY MR. LEACH

01:17:14   1   Q.   AND WOULD YOU BRIEFLY DESCRIBE YOUR EDUCATIONAL AND

01:17:17   2   PROFESSIONAL BACKGROUND BEFORE YOU BECAME THE CEO OF SAFEWAY?

01:17:20   3   A.   SURE.   TWO DEGREES IN ECONOMICS, ONE FROM CARROLL

01:17:27   4   UNIVERSITY IN WAUKESHA, WISCONSIN; A GRADUATE DEGREE AND

01:17:32   5   MASTER'S DEGREE IN ECONOMICS FROM THE UNIVERSITY OF WISCONSIN

01:17:36   6   IN MILWAUKEE.

01:17:37   7        I TOOK MY FIRST JOB IN SAN FRANCISCO WITH WHAT I WOULD

01:17:40   8   CALL A MINI CONGLOMERATE CONTROLLED BY A RAILROAD CALLED

01:17:44   9   SOUTHERN PACIFIC.   THEY, FOR EXAMPLE, FOUNDED THE COMPANY

01:17:47   10  CALLED SPRINT TODAY, WHICH EVERYBODY KNOWS.

01:17:49   11       I SPENT ABOUT FOUR YEARS THERE; WENT BACK TO WASHINGTON,

01:17:52   12  D.C., SERVED AS AN ECONOMIST FOR THE ASSOCIATION OF AMERICAN

01:17:57   13  RAILROADS; CAME BACK, ENDED UP IN THE FINANCE DEPARTMENT AT

01:18:01   14  THIS RAILROAD; LEFT THERE IN THE EARLY '80S TO JOIN A

01:18:05   15  CONSULTING FIRM, ARTHUR D. LITTLE.

01:18:08   16       I HAD BUILT A REPUTATION OF BEING A BIT OF A TURNAROUND

01:18:13   17  MANAGEMENT LEADER, AND SO I STARTED A STEADY LINE OF TURNAROUND

01:18:20   18  WORK, STUMBLED INTO A PRIVATE EQUITY FIRM CALLED KKR,

01:18:28   19  KOHLBERG, KRAVIS, ROBERTS & COMPANY, AND THEY GAVE ME A STEADY

01:18:30   20  DIET OF WORK.

01:18:31   21       PRIVATE EQUITY IS A TECHNIQUE WHERE YOU BUY COMPANIES,

01:18:34   22  MUCH THE WAY MOST OF US BUY HOMES, AND SO MOSTLY DEBT AND A

01:18:39   23  LITTLE BIT OF EQUITY.

01:18:40   24       AND SAFEWAY WAS ONE OF THOSE INVESTMENTS.   THEY INSTALLED

01:18:45   25  ME AS PRESIDENT IN 1992, AND SIX MONTHS LATER I WAS THE CEO.

BURD DIRECT BY MR. LEACH

01:18:48   1    Q.   I'D LIKE TO DRAW YOUR ATTENTION, PLEASE, TO THE TIME

01:18:53   2    PERIOD 2010.

01:18:54   3         DO YOU HAVE THAT TIME PERIOD IN MIND?

01:18:56   4    A.   SURE.

01:18:57   5    Q.   IN OR AROUND THIS TIME, DID YOU BECOME FAMILIAR WITH A

01:19:00   6    COMPANY CALLED THERANOS?

01:19:01   7    A.   I DID.

01:19:01   8    Q.   HOW DID YOU BECOME FAMILIAR WITH THERANOS?

01:19:04   9    A.   I HAD FORMED A COMPANY CALLED SAFEWAY HEALTH, IT WAS FULLY

01:19:12  10    OWNED BY SAFEWAY, BECAUSE WE HAD DONE SOME EXTRAORDINARY THINGS

01:19:15  11    IN HEALTH CARE AND WE DECIDED WE WOULD DO THOSE THINGS FOR

01:19:18  12    OTHERS.

01:19:19  13         SO A COUPLE OF THE FOLKS FROM SAFEWAY HEALTH HAD HAD A

01:19:23  14    MEETING WITH ELIZABETH HOLMES SOMETIME IN I THINK MARCH OF THAT

01:19:32  15    YEAR, AND I DON'T KNOW HOW I LEARNED ABOUT IT, BUT SOMEBODY

01:19:35  16    TOLD ME ABOUT THIS MEETING AND I WAS IMMEDIATELY INTERESTED IN,

01:19:41  17    IN MEETING THERANOS, AND PARTICULARLY THE FOUNDER.

01:19:45  18         SO WE REACHED OUT, SET UP ANOTHER MEETING, AND I CAN

01:19:49  19    RECALL -- I DON'T KNOW THE DATE -- BUT IT WAS THE DAY I WAS

01:19:52  20    LEAVING FOR EUROPE ON VACATION, SO IT REALLY NEEDED TO HAPPEN

01:19:57  21    QUICKLY.

01:19:58  22    Q.   WHY WERE YOU IMMEDIATELY INTERESTED?

01:20:00  23    A.   IT WAS A FASCINATING CONCEPT.  YOU KNOW, THE NOTION -- YOU

01:20:06  24    KNOW, I WORKED FOR SAFEWAY FOR 20 YEARS, WHICH IS A LOW MARGIN

01:20:10  25    RETAILER.  WE MAKE 1 TO 3 PERCENT ON EACH DOLLAR OF SALES.

BURD DIRECT BY MR. LEACH

01:20:15  1      AND SO THE COST REDUCTION APPEALED TO ME, THE IDEA OF

01:20:19  2   GETTING A BLOOD TEST IN 20 OR 30 MINUTES APPEALED TO ME, THE

01:20:24  3   IDEA THAT IT WAS MINIATURIZED.

01:20:27  4      YOU KNOW, WE MADE A PRACTICE OF PUTTING DIFFERENT

01:20:29  5   BUSINESSES INSIDE OF OUR STORE SO WE COULD CONTINUE TO GROW TOP

01:20:33  6   LINE SALES, WE PUT PHARMACIES IN, WE PUT DELIS IN, WE PUT

01:20:40  7   BAKERIES IN.

01:20:40  8      THIS WAS AN OPPORTUNITY TO DO SOMETHING THAT WOULD BRING

01:20:43  9   EXTRA BUSINESS TO THE STORE.

01:20:44  10     WE BUILT 400-PLUS GAS STATIONS.  WHEN I PUT A GAS STATION

01:20:50  11  IN THE PARKING LOT, MY SALES WENT UP 6 PERCENT IN THE STORE.

01:20:54  12     SO I KNEW THIS WOULD HAVE NOT ONLY A PROFIT INTEREST OF

01:20:57  13  ITS OWN, BUT IT WOULD ALSO AFFECT THE ATTRACTION OF SAFEWAY TO

01:21:00  14  SHOPPERS AT LARGE.

01:21:02  15  Q.  AND I THINK I HEARD YOU SAY YOU WERE IMMEDIATELY

01:21:04  16  INTERESTED IN MEETING THE FOUNDER.  DID I HEAR THAT RIGHT?

01:21:07  17  A.  CORRECT.

01:21:07  18  Q.  WHY WAS THAT?

01:21:08  19  A.  WELL, THEY WERE STILL A SMALL COMPANY.  VISION WAS

01:21:14  20  IMPORTANT TO ME, AND WHO BETTER COULD EXPLAIN THAT VISION THAN

01:21:17  21  THE FOUNDER?

01:21:18  22     AND WHAT I HAD BEEN TOLD ABOUT ELIZABETH HOLMES, I WAS

01:21:24  23  EAGER TO MEET HER.

01:21:26  24  Q.  OKAY.  AND IN BETWEEN MARCH OF 2010 AND SEPTEMBER OF 2010,

01:21:31  25  DID YOU PURSUE THE POSSIBILITY OF A COMMERCIAL ARRANGEMENT WITH

01:21:36  1    THERANOS?

01:21:36  2    A.   WE DID.  IF I RECALL CORRECTLY, IT WAS SOMETIME IN

01:21:40  3    SEPTEMBER, AFTER MONTHS OF DISCUSSION AND NEGOTIATION, THAT WE

01:21:45  4    ACTUALLY SIGNED A CONTRACT.

01:21:47  5    Q.   OKAY.  IN BETWEEN THAT MARCH TIMEFRAME AND THE SIGNING OF

01:21:51  6    THE CONTRACT, DID YOU MEET WITH MS. HOLMES?

01:21:52  7    A.   ABSOLUTELY.

01:21:53  8    Q.   AND DID YOU HAVE CONVERSATIONS WITH HER?

01:21:55  9    A.   I DID.

01:21:55 10    Q.   OKAY.  ON MORE THAN ONE OCCASION?

01:21:58 11    A.   MORE THAN ONE OCCASION.

01:21:59 12    Q.   AND WERE YOU IMPRESSED?

01:22:00 13    A.   I WAS VERY IMPRESSED.

01:22:03 14    Q.   HOW SO?

01:22:04 15    A.   WELL, YOU KNOW, THERE ARE VERY FEW PEOPLE THAT I'VE MET IN

01:22:08 16    BUSINESS THAT I WOULD ACTUALLY SAY ARE CHARISMATIC.  SHE WAS

01:22:13 17    CLEARLY CHARISMATIC.  SHE WAS VERY SMART, OKAY?  AND SHE WAS

01:22:21 18    DOING ONE OF THE HARDEST THINGS THAT YOU CAN DO IN BUSINESS,

01:22:25 19    AND THAT'S TO CREATE AN ENTERPRISE FROM SCRATCH.

01:22:28 20         I HAVE DONE SIX STARTUPS ON MY OWN.  I'VE CREATED SEVERAL

01:22:33 21    COMPANIES INSIDE OF SAFEWAY.  THAT'S EASY.

01:22:36 22         DOING IT ON THE OUTSIDE IS REALLY HARD.

01:22:38 23    Q.   AND WHAT WAS THE NATURE OF THE BUSINESS RELATIONSHIP THAT

01:22:42 24    YOU WERE DISCUSSING WITH MS. HOLMES IN OR AROUND THIS TIME

01:22:45 25    PERIOD?

BURD DIRECT BY MR. LEACH

01:22:45   1      A.   SURE.  YOU KNOW, AS SOON AS I HEARD THE STORY, I REMEMBER

01:22:51   2   SENDING AN EMAIL, YOU KNOW, THE NEXT DAY, EVEN THOUGH I WAS IN

01:22:56   3   EUROPE, AND IT WAS -- IT WAS A SOMEWHAT DETAILED EMAIL.

01:23:00   4        I CAN'T GIVE YOU EVERY SPECIFIC, BUT WHEN SOMEBODY NEW

01:23:03   5   COMES IN WITH A PRODUCT OR WHATEVER, FIRST THING I WANT IS I

01:23:10   6   WANT AN EXCLUSIVE.  IF I CAN'T GET AN EXCLUSIVE, I WANT IT FOR

01:23:13   7   A YEAR.  YOU KNOW, I WANT SOMETHING BECAUSE I WANT TO PUT SOME

01:23:16   8   EFFORT INTO HELPING MAKE THIS HAPPEN, AND SO I WANT TO OWN IT

01:23:20   9   FOR AWHILE.

01:23:22  10        AND WE DID THAT WITH PRODUCE.  THERE'S A WATERMELON CALLED

01:23:26  11   A PURE HEART AND IT HAS A VERY SMALL RIND.  I MEAN -- AND WE

01:23:34  12   HAD THAT FOR OURSELVES FOR OVER A YEAR.

01:23:36  13        SO THAT WAS ONE THING I WANTED.

01:23:38  14        THE OTHER THING, WE HAD BUILT A COMPANY THAT WE LATER TOOK

01:23:44  15   PUBLIC, IT HAD A VALUATION OF ABOUT $3 AND A HALF BILLION, AND

01:23:47  16   IT WAS A -- IT WAS A FINANCIAL COMPANY THAT IF YOU GO INTO ANY

01:23:51  17   SUPERMARKET IN THE UNITED STATES, YOU'RE LIKELY TO FIND GIFT

01:23:55  18   CARDS THAT WE RESELL.

01:23:57  19        SO WE HAD CREATED A NETWORK INITIALLY THAT DIDN'T COMPETE

01:24:00  20   WITH SAFEWAY, AND THEN LEARNED WE COULD ACTUALLY SELL THEM TO

01:24:04  21   EVERY SUPERMARKET.

01:24:05  22        SO I WANTED TO BUILD A NETWORK FOR THIS NEW, NEW LAB

01:24:12  23   COMPANY THAT WOULD GIVE ME ANOTHER STREAM OF INCOME, NOT JUST

01:24:16  24   THE INCOME FOR HAVING A LAB IN OUR STORES.

01:24:18  25      Q.   OKAY.  YOU TALKED A LITTLE BIT ABOUT EXCLUSIVITY, A LITTLE

01:24:23   1      BIT ABOUT HAVING THE NETWORK.

01:24:26   2           LET'S TAKE A STEP BACK, AND DESCRIBE FOR ME WHAT WAS IT

01:24:29   3      YOU THOUGHT THERANOS COULD OFFER SAFEWAY?

01:24:31   4      A.   WELL, YOU KNOW, THEY WERE TALKING ABOUT REPLACING A FULL

01:24:35   5      SCALE LAB, WHICH MEANT THAT YOU COULD DO ALMOST EVERY BLOOD

01:24:41   6      TEST IMAGINABLE.  I MEAN, EVEN, EVEN SOME OF THE NAME BRAND

01:24:45   7      LABS OUT THERE WILL GO TO A REFERENCE LAB FOR SOME VERY UNIQUE

01:24:49   8      THINGS.

01:24:50   9           AND SO WE THOUGHT, THAT'S A NICE CONNECTION TO THE

01:24:54   10     PHARMACIST.  WE WERE ALREADY DEEPLY INTO THE VACCINATION

01:24:59   11     BUSINESS, SO IT WAS AN ADD-ON INCOME STREAM.

01:25:04   12          IMAGINE COMING IN WITH A SCRIPT FOR HAVING A BLOOD TEST,

01:25:08   13     GETTING YOUR BLOOD DRAWN, AND WHILE SHOPPING -- IF YOU'RE DOING

01:25:12   14     YOUR WEEKLY SHOPPING, YOU'RE GOING TO BE IN THAT STORE FOR MORE

01:25:16   15     THAN 30 MINUTES.  AND BEFORE YOU LEAVE, YOU KNOW THE RESULTS OF

01:25:21   16     THAT BLOOD TEST -- THAT WAS THE OFFERING -- AND YOU COULD THEN

01:25:28   17     GO BACK TO THE PHARMACY AND, AFTER HAVING CALLED YOUR DOCTOR ON

01:25:32   18     YOUR CELL PHONE, YOU COULD GET A PRESCRIPTION.

01:25:34   19          SO THAT WAS AN INCREDIBLE PROCESS THAT WAS APPEALING TO

01:25:39   20     US.

01:25:39   21     Q.   AT ANY POINT IN TIME, DID MS. HOLMES SHOW YOU THE DEVICE

01:25:44   22     WITH WHICH SHE WOULD REPLACE THE CENTRAL LAB?

01:25:47   23     A.   SHE DID.  SHE ACTUALLY BROUGHT IT TO ONE OF OUR BOARD

01:25:51   24     MEETINGS.  I HAD HER PRESENT TO THE BOARD.  WE HAD A BOX IN THE

01:25:57   25     BACK OF THE ROOM.

01:25:59  1        A BOARD MEMBER OFFERED TO BE A TEST CASE AND WE SAID, YOU

01:26:06  2    KNOW, JUST DO A PSA TEST, WHICH IS A PROSTATE SPECIFIC ANTIGEN

01:26:13  3    THAT YOU WANT TO KEEP AN EYE ON AS YOU GROW OLDER BECAUSE IT

01:26:17  4    COULD BE AN INDICATOR POSSIBLY OF EARLY PROSTATE CANCER.

01:26:22  5        AND SO THE BLOOD WAS DRAWN IN THE FINGERSTICK, IT WAS PUT

01:26:25  6    INTO THE MACHINE, THE MACHINE MADE A BUNCH OF NOISE -- IT

01:26:28  7    WASN'T REAL LOUD, BUT YOU COULD HEAR SOMETHING GOING ON -- AND

01:26:30  8    WE NEVER GOT A RESULT.

01:26:33  9        AND LATER, AS THIS BOARD MEMBER REACHED OUT TO FIND OUT

01:26:38  10   WHAT HIS PSA WAS -- AND IT WASN'T THE PSA HE WAS INTERESTED IN,

01:26:42  11   HE WANTED TO MAKE SURE THAT THERE WAS SOME CONFIRMATION

01:26:45  12   THERE -- HE WAS APPARENTLY TOLD --

01:26:48  13            MR. DOWNEY:  YOUR HONOR, JUST OBJECTION, HEARSAY, THE

01:26:51  14   NATURE OF THE TESTIMONY.

01:26:52  15            THE WITNESS:  I'M SORRY.

01:26:53  16            THE COURT:  WHY DON'T YOU ASK ANOTHER QUESTION?

01:26:55  17            THE WITNESS:  YEAH.

01:26:56  18            THE COURT:  ASK ANOTHER QUESTION.

01:26:57  19   BY MR. LEACH:

01:26:58  20   Q.   WAS THERE SOMETHING ABOUT THE SIZE OF THE DEVICE THAT WAS

01:27:00  21   ATTRACTIVE TO YOU?

01:27:01  22   A.   IT WAS QUITE SMALL.

01:27:03  23   Q.   WHY WAS THAT OF INTEREST TO SAFEWAY?

01:27:05  24   A.   IT WAS OF INTEREST BECAUSE IF IT WAS GOING TO TAKE 20 OR

01:27:08  25   30 MINUTES TO PROCESS A CARTRIDGE, I COULDN'T HAVE 12 PEOPLE IN

01:27:11  1      THE WAITING ROOM AND JUST IMAGINE SIX HOURS FROM NOW WE'LL GET

01:27:15  2      TO YOU.

01:27:17  3           AND SO THE CONCEPT WAS TO STACK SIX OF THESE ON TOP OF ONE

01:27:21  4      ANOTHER AND PUT ANOTHER SIX NEXT TO IT, SO WE CREATED A SPACE

01:27:26  5      MUCH THE SIZE OF A LARGE REFRIGERATOR.

01:27:29  6      Q.   YOU ALSO TALKED ABOUT THE TIME PERIOD WITHIN WHICH RESULTS

01:27:33  7      COULD BE RETURNED, POSSIBLY WHEN SOMEBODY WAS SHOPPING.  WHY --

01:27:40  8      WAS THERE SOMETHING ABOUT THE SPEED OF THE DEVICE WHICH WAS OF

01:27:43  9      INTEREST TO YOU?

01:27:43  10     A.   YEAH.  IT WAS -- YOU KNOW, IF YOU HAVE A REALLY GOOD LAB,

01:27:46  11     YOUR DOCTOR MIGHT GET THE RESULTS IN 24 HOURS.  THEY MIGHT

01:27:49  12     DRIBBLE IN TO YOU A BIT AFTER THAT.

01:27:52  13          BUT AS I SAID EARLIER, THIS NOTION OF GETTING THE RESULTS

01:27:56  14     AND GETTING A PRESCRIPTION POSSIBLY BEFORE EVEN LEAVING THE

01:27:59  15     STORE, WE KNEW THAT WOULD BE APPEALING TO CUSTOMERS.

01:28:02  16     Q.   AND DID MS. HOLMES MAKE REPRESENTATIONS TO YOU IN THIS

01:28:06  17     PRELIMINARY PERIOD ABOUT THE SPEED WITH WHICH THERANOS COULD

01:28:09  18     TURN AROUND RESULTS?

01:28:10  19     A.   YES.  IT WAS DESCRIBED AS A RANGE OF 20 TO 30 MINUTES.

01:28:13  20     Q.   DID SHE ALSO DESCRIBE FOR YOU THE ACCURACY OF THE RESULTS

01:28:19  21     THAT COULD BE PRODUCED BY THE DEVICE?

01:28:20  22     A.   IN ONE OF HER PRESENTATIONS, THERE WAS A -- THERE WAS --

01:28:26  23     THERE WAS SOME COMMENT ABOUT THE ACCURACY, YOU KNOW, BEING EVEN

01:28:29  24     MORE ACCURATE THAN, YOU KNOW, TRADITIONAL, TRADITIONAL TESTING

01:28:33  25     UNITS.

BURD DIRECT BY MR. LEACH

01:28:35  1          BUT IT WAS NEVER -- WE NEVER GOT ANY DEEP INFORMATION

01:28:38  2     ABOUT THAT.  AND I'D BE HAPPY IF IT WERE JUST AS ACCURATE.

01:28:42  3     Q.   WAS ACCURACY RELEVANT TO YOU?

01:28:45  4     A.   OF COURSE.

01:28:45  5     Q.   WHY DO YOU SAY OF COURSE?

01:28:47  6     A.   WELL, WE -- YOU KNOW, WHEN YOU PUT ANOTHER BRAND IN YOUR

01:28:51  7     STORE -- AND WE PUT MANY OF THEM, YOU'LL FIND WELLS FARGOS AND

01:28:55  8     OTHER BRANDS IN OUR STORE, MAYBE A PANDA EXPRESS HERE AND

01:28:59  9     THERE -- OUR BRAND IS ON THE FRONT, THEIR BRAND IS INSIDE.

01:29:02  10         PEOPLE ARE GOING TO COME BACK TO US IF THEY GOT A NUMBER

01:29:06  11    THAT DIDN'T MAKE ANY SENSE TO THEIR PHYSICIAN.

01:29:11  12         AND, YOU KNOW, WE MUCH PREFER THEY COME BACK TO THERANOS,

01:29:14  13    BUT WE KNOW IT HAPPENED IN OUR STORE.

01:29:16  14         AND SO I THINK IT'S ALWAYS TRUE IN BUSINESS THAT YOU WANT

01:29:22  15    TO ALWAYS DEAL WITH FIRST RATE COMPANIES, PARTICULARLY WHEN YOU

01:29:29  16    ARE IN THE SAME ENVIRONMENT.

01:29:31  17         AND SO THAT WAS IMPORTANT TO US.

01:29:32  18    Q.   DID MS. HOLMES ALSO DESCRIBE FOR YOU THE NUMBER OF TESTS

01:29:36  19    THAT THE DEVICE COULD PERFORM?

01:29:37  20    A.   IT WAS DESCRIBED VARIOUS DIFFERENT WAYS.  SOMETIMES

01:29:43  21    REPLACING A TRADITIONAL LAB.  THAT WOULD IMPLY WELL OVER 300

01:29:49  22    DIFFERENT TESTS.

01:29:52  23         I REMEMBER ONE OF HER CARTRIDGE WAS DESCRIBED AS CAPABLE

01:29:56  24    OF DOING 95 PERCENT OF ALL TESTS.  THAT WAS IMPORTANT TO US

01:30:01  25    BECAUSE WE HAD TO INVENTORY THE CARTRIDGES AND WE HAD A LIMITED

01:30:05  1    AMOUNT OF SPACE.

01:30:06  2         SO WE WERE CONSISTENTLY TOLD THAT IT ESSENTIALLY REPLACES

01:30:11  3    A TRADITIONAL, FULL BLOWN LAB.

01:30:15  4              MR. LEACH:  MAY I APPROACH THE WITNESS, YOUR HONOR?

01:30:17  5              THE COURT:  YES.

01:30:20  6              MR. LEACH:  (HANDING.)

01:30:27  7              THE WITNESS:  THANK YOU.

01:30:29  8    BY MR. LEACH:

01:30:33  9    Q.   MR. BURD, I'VE PLACED BEFORE YOU A BINDER OF DOCUMENTS AND

01:30:37  10   I'D LIKE TO DRAW YOUR ATTENTION, PLEASE, TO WHAT WE HAVE MARKED

01:30:41  11   AS EXHIBIT 336.

01:30:54  12   A.   YES, I SEE IT.

01:30:56  13   Q.   DO YOU SEE THERE'S SOME HANDWRITING ON THE FIRST PAGE OF

01:30:59  14   336 UP IN THE TOP RIGHT CORNER?

01:31:02  15   A.   YES.

01:31:02  16   Q.   DO YOU RECOGNIZE THE HANDWRITING?

01:31:04  17   A.   IT'S MY HANDWRITING.

01:31:05  18   Q.   OKAY.  AND DO YOU SEE A DATE DOWN IN THE BOTTOM LEFT

01:31:08  19   CORNER WHERE IT SAYS "BOARD MEETING, MAY 19TH, 2010"?

01:31:13  20   A.   I DO.

01:31:14  21   Q.   DO YOU RECOGNIZE THIS DOCUMENT?

01:31:15  22   A.   YES.

01:31:17  23   Q.   IS THIS A TRUE AND CORRECT COPY OF A POWERPOINT THAT YOU

01:31:22  24   PRESENTED TO THE SAFEWAY BOARD IN OR AROUND THIS TIME PERIOD?

01:31:25  25   A.   THAT'S CORRECT.

BURD DIRECT BY MR. LEACH

01:31:27  1    Q.   OKAY.  AND DID YOU PREPARE THIS AT OR NEAR THE TIME OF THE

01:31:30  2    BOARD MEETING?

01:31:31  3    A.   IT WOULD HAVE BEEN PREPARED VERY CLOSE TO THE BOARD

01:31:36  4    MEETING.  YOU KNOW, I ALWAYS WAS IMPROVING THINGS, SO THESE DID

01:31:43  5    NOT GET HANDED OUT IN ADVANCE OF THE BOARD MEETING.  THIS WAS

01:31:46  6    PRESENTED LIVE TO THE BOARD MEMBERS FOR THE FIRST TIME.

01:31:50  7    Q.   OKAY.  AND DID YOU KEEP POWERPOINTS SUCH AS THIS IN THE

01:31:53  8    ORDINARY COURSE OF BUSINESS?

01:31:55  9    A.   WE USED THEM ALL THE TIME.

01:31:57  10   Q.   OKAY.  IT WAS YOUR REGULAR PRACTICE TO CREATE

01:31:59  11   PRESENTATIONS FOR THE BOARD ABOUT POSSIBLE OPPORTUNITIES FOR

01:32:03  12   THE COMPANY?

01:32:03  13   A.   IT WAS THE WAY WE CONDUCTED OUR BOARD MEETINGS, SO ALL THE

01:32:06  14   OTHER MATERIAL WAS IN A PRESENTATION FORMAT.

01:32:08  15   Q.   OKAY.  AND DID YOU DO YOUR BEST TO ACCURATELY REPORT THE

01:32:12  16   OPPORTUNITY THERANOS PRESENTED HERE TO SAFEWAY'S BOARD?

01:32:16  17   A.   ABSOLUTELY.

01:32:16  18   Q.   OKAY.  AND DOES THIS REFLECT YOUR UNDERSTANDING OF THE

01:32:19  19   POSSIBLE ARRANGEMENT FOR SAFEWAY?

01:32:21  20   A.   THAT'S CORRECT.

01:32:22  21        MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 336.

01:32:25  22        MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

01:32:26  23        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:32:30  24   (GOVERNMENT'S EXHIBIT 336 WAS ADMITTED IN EVIDENCE.)

01:32:30  25        MR. LEACH:  AND, MS. HOLLIMAN, IF WE COULD PLEASE GO

01:32:38  1     TO PAGE 2 OF THIS EXHIBIT.

01:32:40  2     Q.   DO YOU SEE UP AT THE TOP, MR. BURD, WHERE IT SAYS

01:32:43  3     DISRUPTIVE TECHNOLOGY OPPORTUNITY?

01:32:45  4     A.   CORRECT.

01:32:46  5     Q.   AND BENEATH THAT, THERE'S A BULLET, "CREATE A NEW IN STORE

01:32:51  6     PHARMACY SERVICE WITH A MINI-DIAGNOSTIC LAB."

01:32:55  7          IS THAT A TERM THAT MS. HOLMES USED WITH YOU,

01:32:59  8     MINI-DIAGNOSTIC LAB?

01:33:01  9     A.   YES.

01:33:02  10    Q.   I DIDN'T MEAN TO CUT YOU OFF.

01:33:03  11    A.   WELL, I WAS GOING TO TELL YOU THAT IT WOULD BE -- IT WOULD

01:33:07  12    BE COMMON PRACTICE FOR ME TO REVIEW THIS, YOU KNOW, WITH

01:33:13  13    ELIZABETH BEFORE I PRESENTED IT BECAUSE I'M OUT OF MY POWER

01:33:21  14    ALLEY, YOU KNOW, IN PRESENTING THESE THINGS.

01:33:24  15         SO I CAN'T -- I CAN'T TELL YOU FOR CERTAIN I DID, BUT THAT

01:33:27  16    WAS MY PRACTICE.

01:33:27  17    Q.   OKAY.  IS IT FAIR TO SAY THE INFORMATION RELATING TO

01:33:30  18    THERANOS IN THIS POWERPOINT CAME IN ONE FORM OR ANOTHER FROM

01:33:34  19    MS. HOLMES?

01:33:35  20    A.   CORRECT.

01:33:35  21    Q.   OKAY.  AND THAT TERM, "MINI-DIAGNOSTIC LAB," WHAT DID THAT

01:33:40  22    MEAN TO YOU?

01:33:41  23    A.   IT DOES WHAT A BIG LAB DOES.

01:33:43  24    Q.   AND WAS THAT ATTRACTIVE TO YOU AT THE TIME?

01:33:47  25    A.   VERY MUCH SO.

BURD DIRECT BY MR. LEACH

01:33:48  1    Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO PAGE 3.  AND IF WE

01:33:55  2    COULD ZOOM IN ON THE FOUR BULLETS.

01:33:57  3         DO YOU SEE WHERE IT SAYS "FULL DIAGNOSTIC BLOOD, SALIVA

01:34:02  4    AND URINE LAB IN A BOX"?

01:34:06  5    A.   CORRECT.

01:34:06  6    Q.   IS THAT LAB IN A BOX SYNONYMOUS WITH MINI-DIAGNOSTIC LAB?

01:34:12  7    A.   CORRECT.

01:34:13  8    Q.   THE NEXT BULLET SAYS "BLOOD TEST SAMPLES RESULT FROM A

01:34:17  9    FINGERSTICK."

01:34:18  10        IS THAT YOUR UNDERSTANDING OF WHAT THERANOS WAS OFFERING?

01:34:21  11   A.   CORRECT.

01:34:21  12   Q.   THERE'S THE TEST RESULTS IN 20 MINUTES.

01:34:23  13        IS THAT A REFERENCE TO GETTING THE TEST WHILE FOLKS WERE

01:34:26  14   GETTING THEIR GROCERIES?

01:34:27  15   A.   YES.

01:34:27  16   Q.   AND WAS THAT TIMING IMPORTANT TO YOU?

01:34:29  17   A.   IT WAS IMPORTANT, SURE.

01:34:31  18   Q.   AND WHY WAS THAT?

01:34:32  19   A.   BECAUSE THEY'LL GET THE RESULTS BEFORE THEY LEAVE THE

01:34:34  20   STORE.

01:34:35  21   Q.   THE LAST BULLET SAYS, "RETAIL PRICE IS 40 TO 70 PERCENT

01:34:39  22   LOWER THAN TWO DOMINANT COMPETITORS."

01:34:42  23        DO YOU SEE THAT LANGUAGE?

01:34:44  24   A.   YES.

01:34:44  25   Q.   WAS THAT RELEVANT TO YOU?

01:34:45   1      A.   YES, IT WAS.

01:34:46   2      Q.   HOW SO?

01:34:47   3      A.   IT'S MUCH EASIER TO TAKE MARKET SHARE FROM EXISTING

01:34:54   4      COMPETITORS IF YOUR PRICE POINT IS CONSIDERABLY LOWER.

01:34:58   5           AND THAT WOULD ALSO BE ATTRACTIVE TO ALL OF THE INSURANCE

01:35:00   6      COMPANIES THAT WOULD BE, YOU KNOW, ADJUDICATING THESE CLAIMS

01:35:05   7      FOR ANYBODY THAT GOES TO A LAB.

01:35:07   8      Q.   AND WAS IT YOUR IMPRESSION, BASED ON YOUR DIALOGUE WITH

01:35:10   9      MS. HOLMES, THAT THIS WAS SOMETHING THERANOS COULD DO

01:35:13  10      PROFITABLY?

01:35:14  11      A.   YES.  THEY WEREN'T IN THE BUSINESS FOR CHARITY.  THEY

01:35:19  12      OBVIOUSLY MADE MONEY ON IT SOMEHOW.

01:35:20  13      Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO THE NEXT PAGE,

01:35:24  14      PAGE 4.

01:35:31  15           DO YOU SEE WHERE IT SAYS PHYSICAL DEVICE AND CARTRIDGES?

01:35:34  16      A.   UM-HUM.

01:35:35  17      Q.   AND THERE'S AN IMAGE --

01:35:37  18      A.   YES.

01:35:38  19      Q.   -- OF THE DEVICE?

01:35:39  20      A.   YES.

01:35:39  21      Q.   OKAY.  AT ANY POINT, DID YOU SEE A DEVICE LIKE THAT?

01:35:42  22      A.   I SAW A SIMILAR DEVICE.  I USED TO DESCRIBE IT AS A, THE

01:35:47  23      SIZE OF A LARGE BAGEL TOASTER, YOU KNOW?

01:35:51  24           SO I DIDN'T SEE THIS EXACT DEVICE.  IT WAS GOING THROUGH A

01:35:55  25      SERIES OF CHANGES, AND IT CONTINUED TO GO THROUGH CHANGES ALL

BURD DIRECT BY MR. LEACH

01:36:01   1    DURING OUR DISCUSSIONS BECAUSE THIS WOULD NOT HAVE BEEN

01:36:03   2    STACKABLE IN THE SAME WAY THAT I HAD TALKED ABOUT EARLIER.

01:36:07   3    Q.   OKAY.  BUT YOUR UNDERSTANDING WAS IT WAS A DEVICE,

01:36:10   4    SOMETHING THE SIZE OF A BAGEL TOASTER, THAT COULD RUN A LARGE

01:36:16   5    VOLUME OF TESTS?

01:36:17   6    A.   YES.  I SAW PICTURES OF OTHER GENERATIONS OF THIS, AND SO

01:36:22   7    I'VE SEEN IT EVOLVE.

01:36:23   8    Q.   OKAY.  AND TO THE RIGHT THERE'S SOMETHING CALLED

01:36:26   9    CARTRIDGE.

01:36:27   10       WHAT WAS YOUR UNDERSTANDING OF THE CARTRIDGE?

01:36:29   11   A.   THE CARTRIDGE LOOKED TO ME LIKE IT WAS MADE OUT OF SOME

01:36:34   12   PLASTIC MATERIAL, AND THE EXTRACTED BLOOD SAMPLE WOULD GO

01:36:39   13   SOMEWHERE INTO THAT CARTRIDGE AND THE CARTRIDGE WOULD GO INTO

01:36:42   14   THE MACHINE.

01:36:43   15   Q.   WE'LL COME BACK TO THE CARTRIDGE IN A MINUTE.

01:36:48   16       BUT LET'S LOOK AT PAGE 5, IF WE COULD.

01:36:59   17       UP AT THE TOP, DO YOU SEE WHERE IT SAYS TECHNOLOGY

01:37:01   18   PARTNER - THERANOS?

01:37:04   19   A.   I DO.

01:37:05   20   Q.   OKAY.  I WANT TO DRAW YOUR ATTENTION TO THE SECOND BULLET

01:37:09   21   WHERE IT SAYS, "CURRENTLY CASH FLOW NEUTRAL WITH A CLIENT BASE

01:37:13   22   OF PHARMACEUTICAL COMPANIES."

01:37:15   23       IS THAT SOMETHING MS. HOLMES TOLD YOU?

01:37:18   24   A.   YES, IT IS.

01:37:19   25   Q.   OKAY.  WAS THAT RELEVANT TO YOU?

01:37:21   1    A.   IT IS, BECAUSE IF THEY'RE CASH NEUTRAL AND WE'RE ABOUT TO

01:37:24   2    CREATE SOMETHING MUCH LARGER, IT SUGGESTS THAT WE CAN EASILY

01:37:28   3    GET THE PROFITABILITY, WHICH WOULD MAKE IT EASIER FOR HER TO

01:37:32   4    SHARE A MARGIN WITH US.

01:37:33   5    Q.   IF THERANOS WERE NOT CASH FLOW NEUTRAL, WOULD THAT HAVE

01:37:38   6    BEEN A DETERRENT TO YOU GOING FORWARD?

01:37:40   7    A.   IT WOULDN'T HAVE NECESSARILY PREVENTED US, BUT IT WOULD

01:37:45   8    HAVE BEEN CONSIDERED BECAUSE THEN THE ISSUE IS, WELL, HOW CLOSE

01:37:49   9    ARE YOU?  HOW MUCH MORE CAPITAL DO YOU NEED?  WHEN IS THIS

01:37:52   10   GOING TO GET DONE?

01:37:53   11        BUT THE FACT THAT THEY WERE CASH FLOW NEUTRAL SUGGESTED

01:37:56   12   THAT THEY HAD A REVENUE STREAM.

01:37:57   13   Q.   OKAY.  AND THEY WERE READY TO SCALE UP RIGHT NOW?  IS THAT

01:38:00   14   FAIR?

01:38:01   15   A.   THEY WERE READY TO GO.

01:38:02   16        MR. LEACH:  OKAY.  YOUR HONOR, THIS IS -- WOULD THIS

01:38:06   17   BE A CONVENIENT TIME FOR A BREAK?

01:38:08   18        THE COURT:  I THINK IT WOULD.  THANK YOU.

01:38:10   19        WE'RE GOING TO TAKE A BREAK JUST NOW, LADIES AND

01:38:12   20   GENTLEMEN.  LET'S TAKE ABOUT 15 MINUTES, PLEASE, 15 MINUTES.

01:38:16   21        YOU CAN STAND DOWN, SIR, AND WE'LL CONTINUE IN 15 MINUTES.

01:38:32   22        (RECESS FROM 1:38 P.M. UNTIL 1:59 P.M.)

01:59:46   23        (JURY IN AT 1:59 P.M.)

01:59:48   24        THE COURT:  ALL RIGHT.  WE'RE BACK ON THE RECORD.

01:59:53   25   OUR JURY IS PRESENT.  ALL COUNSEL AND MS. HOLMES ARE PRESENT.

01:59:57  1        AND YOU CAN CONTINUE YOUR EXAMINATION.

01:59:58  2             MR. LEACH:  THANK YOU, YOUR HONOR.

01:59:59  3   Q.   MR. BURD, WE WERE, BEFORE THE BREAK, ON EXHIBIT 336, AND

02:00:07  4   I'D LIKE TO NOW DRAW YOUR ATTENTION, PLEASE, TO PAGE 16.

02:00:11  5        THIS IS YOUR POWERPOINT PRESENTATION TO THE SAFEWAY BOARD

02:00:14  6   ABOUT THE THERANOS OPPORTUNITY.

02:00:17  7   A.   OKAY.  YOU SAY 16.  I'M NOT SURE WHERE I WOULD FIND THAT.

02:00:31  8   SO I'M JUST PAGING THROUGH TO MATCH WHAT YOU HAVE ON THE

02:00:35  9   SCREEN.

02:00:35 10   Q.   DOWN AT THE BOTTOM OF THE DOCUMENT --

02:00:37 11   A.   OH, OKAY, IN THE FAR RIGHT.  I WAS LOOKING FOR 1-6 AND I

02:00:43 12   WASN'T LOOKING FOR 0-0-1-6.

02:00:44 13   Q.   OKAY.  WE DO IT TO MAXIMIZE CONFUSION.

02:00:47 14   A.   OKAY.

02:00:47 15   Q.   ARE YOU NOW ON PAGE 16, AND YOU SEE IT ON THE SCREEN?

02:00:50 16   A.   YES, I AM.

02:00:51 17   Q.   OKAY.  AND THIS IS A SLIDE TITLED ROLLOUT STRATEGY?

02:00:54 18   A.   YES.

02:00:54 19   Q.   OKAY.  AND THIS WAS WHAT YOU WERE ENVISIONING AT THE TIME

02:00:59 20   FOR A POTENTIAL ROLLOUT OF THE THERANOS DEVICE WITHIN SAFEWAY

02:01:03 21   STORES?

02:01:04 22   A.   CORRECT.

02:01:05 23   Q.   OKAY.  THE FOURTH BULLET, "BUILD A NETWORK OF MINI-LABS

02:01:21 24   AND PREPARE FOR LAUNCH," WHAT DID THAT REFER TO?

02:01:26 25   A.   THAT REFERRED TO GETTING OUR SUPERMARKETS TO ULTIMATELY

```
02:01:29   1        PARTICIPATE IN PUTTING MINI LABS IN THEIR STORES, AND BECAUSE

02:01:33   2        WE HAD BUILT A NETWORK FOR THIS OTHER COMPANY CALLED BLACK HAWK

02:01:37   3        NETWORK, WE THOUGHT WE COULD DO IT HERE.

02:01:41   4        Q.   LET'S LOOK AT THE NEXT PAGE, PAGE 17.

02:01:46   5             DO YOU SEE WHERE IT SAYS, ANTICIPATED PROGRAM ROLLOUT?

02:01:49   6        A.   I DO.

02:01:50   7        Q.   AND IS THIS YOUR DESCRIPTION OF THE TIMELINE YOU AND

02:01:56   8        MS. HOLMES HAD BEEN DISCUSSING ABOUT A POTENTIAL ROLLOUT OF THE

02:02:00   9        THERANOS MINI LAB?

02:02:02  10        A.   YES, AT THAT TIME, AND THIS WAS IN MAY OF 2010, THAT WAS

02:02:10  11        THE SCHEDULE.

02:02:12  12        Q.   OKAY.  AND DID THAT CHANGE AT SOME POINT?

02:02:18  13        A.   IT CONTINUOUSLY CHANGED.

02:02:21  14        Q.   OKAY.  TO THE LEFT, THERE'S A COLUMN ACTIVITY/WORK STEPS,

02:02:24  15        AND THERE'S ROW, CLOSE DEAL.

02:02:27  16             DO YOU SEE THAT?

02:02:28  17        A.   I DO.

02:02:29  18        Q.   OKAY.  AND THAT WAS ANTICIPATED FOR THE SECOND QUARTER OF

02:02:32  19        2010?

02:02:32  20        A.   YES, AND THAT'S THE -- CLOSE DEAL MEANT THE CONTRACT WHICH

02:02:36  21        WAS DONE IN SEPTEMBER.

02:02:37  22        Q.   OKAY.  CAN YOU EXPLAIN FOR US WHAT IS MEANT BY THE OTHER

02:02:39  23        ROWS, REIMBURSEMENT NEGOTIATIONS, UNDER-THE-RADAR TEST,

02:02:44  24        NORTHERN CALIFORNIA PILOT, AND SO FORTH?

02:02:46  25        A.   SURE.  REIMBURSEMENT NEGOTIATIONS MEANT THAT THERANOS
```

02:02:50   1    NEEDED TO HAVE DISCUSSIONS WITH ALL THE KEY INSURANCE COMPANIES

02:02:57   2    TO MAKE SURE THAT THEY WOULD ACCEPT THEM AS A LAB AND THEY

02:03:01   3    WOULD AGREE TO A CERTAIN LEVEL OF PAY.  SO THAT WAS NOT -- THAT

02:03:05   4    WAS NOT SAFEWAY'S BURDEN, THAT WAS THE BURDEN OF THERANOS.

02:03:10   5         UNDER-THE-RADAR TEST, YOU KNOW, THERANOS WAS ALWAYS

02:03:16   6    CONCERNED ABOUT SECRECY, AND SO RATHER THAN DO THIS IN THE

02:03:22   7    BAY AREA -- WHICH I WOULD HAVE ENJOYED, BUT I UNDERSTOOD THE

02:03:29   8    SECRECY ASPECTS -- WE WOULD DO IT IN A REMOTE LOCATION WHERE

02:03:33   9    THERE WAS NOT EITHER A LABCORP OR QUEST, AND THOSE ARE THE TWO

02:03:36  10    LARGEST LABS IN THE NATION.  THEY EACH HAVE ABOUT 8,000 LABS.

02:03:42  11    Q.  AND THEN THE NORTHERN CALIFORNIA PILOT, WHAT DID THAT

02:03:45  12    MEAN?

02:03:46  13    A.  AT SOME POINT, ONCE WE CONFIRMED THAT EVERYTHING WAS

02:03:51  14    WORKING, THAT, YOU KNOW, OUR COSTS AND MARGINS WERE, YOU KNOW,

02:03:57  15    NEAR WHAT WE EXPECTED, WE WOULD CONSIDER A NORTHERN CALIFORNIA

02:04:01  16    PILOT.

02:04:03  17         NORTHERN -- SAFEWAY WAS ORGANIZED BY DIVISIONS, AND SO

02:04:07  18    NORTHERN CALIFORNIA, WHICH YOU CAN CONSIDER FROM ABOUT FRESNO

02:04:11  19    NORTH, THAT WAS NORTHERN CALIFORNIA.  SO SOMEWHERE IN THAT

02:04:15  20    GEOGRAPHY WE WOULD, WE WOULD DO A PILOT.

02:04:18  21    Q.  OKAY.  AND YOU WERE TELLING THE SAFEWAY BOARD, BASED ON

02:04:22  22    YOUR CONVERSATIONS WITH MS. HOLMES, THAT THIS WAS CONTEMPLATED

02:04:26  23    FOR THE FIRST QUARTER OF 2011?

02:04:29  24    A.  THAT'S -- THAT'S CORRECT.

02:04:30  25    Q.  OKAY.  THE NEXT ROW IS SWY CHAIN ROLLOUT.  IS SWY AN

```
02:04:36   1    ACRONYM FOR SAFEWAY?

02:04:37   2    A.   YES, IT IS.

02:04:38   3    Q.   AND THAT'S A ROLLOUT WITHIN SAFEWAY STORES AS OPPOSED TO

02:04:43   4    THE BLACK HAWK NETWORK THAT YOU'VE DESCRIBED?

02:04:46   5    A.   IT -- YES.  IT WAS SAFEWAY ONLY.

02:04:51   6         BLACK HAWK WAS JUST A VEHICLE WE'D USED ONCE BEFORE.  THIS

02:04:55   7    WOULDN'T BE BLACK HAWK.

02:04:57   8         THIS WOULD BE A NETWORK THAT WE CREATED, BUT WE WOULD

02:05:00   9    BEGIN IN SOME OF THOSE MARKETS AT THE SAME TIME WE ROLLED OUT,

02:05:03  10    BUT IT WOULD TAKE US LONGER TO COMPLETE.

02:05:05  11    Q.   SO THIS IS IN MAY OF 2010, MR. BURD.

02:05:11  12         I'D LIKE TO MOVE FORWARD IN TIME TO JULY OF 2010 AND DRAW

02:05:15  13    YOUR ATTENTION TO WHAT HAS BEEN MARKED AS EXHIBIT 370.

02:05:25  14         AND I OFFER 370 INTO EVIDENCE.

02:05:27  15         MR. DOWNEY:  NO OBJECTION.

02:05:28  16         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:05:30  17    (GOVERNMENT'S EXHIBIT 370 WAS ADMITTED IN EVIDENCE.)

02:05:31  18         MR. LEACH:  AND, MS. HOLLIMAN, IF WE COULD PLEASE

02:05:33  19    ENLARGE THE SUBSTANCE OF THE EMAIL IN THE FIRST HALF, WITH THE

02:05:37  20    HEADER.  IF WE COULD CAPTURE THE NAME AT THE TOP, TOO, PLEASE,

02:05:41  21    THAT WOULD BE GREAT.  THANK YOU.

02:05:46  22    Q.   MR. BURD, DOES THIS APPEAR TO BE AN EMAIL FROM MS. HOLMES

02:05:54  23    TO YOU AND SOMEONE NAMED ROBERT EDWARDS WITH A COPY TO

02:05:59  24    SUNNY BALWANI?

02:05:59  25    A.   THAT'S CORRECT.
```

02:06:00   1      Q.   OKAY.  WHO IS ROBERT EDWARDS?

02:06:01   2      A.   ROBERT EDWARDS AT THE TIME WAS THE CHIEF FINANCIAL OFFICER

02:06:04   3      OF SAFEWAY.

02:06:05   4      Q.   AND UP IN THE LEFT, THERE'S THE NAME BOB GORDON.

02:06:10   5           DO YOU SEE THAT?

02:06:12   6      A.   I DO.

02:06:13   7      Q.   WHO IS BOB GORDON?

02:06:15   8      A.   BOB GORDON WAS THE GENERAL COUNSEL OF SAFEWAY AT THAT

02:06:18   9      TIME.

02:06:18  10      Q.   OKAY.  AND THE SUBJECT OF THIS IS THERANOS FINANCIAL

02:06:23  11      PROJECTIONS.

02:06:24  12           DO YOU SEE THAT?

02:06:25  13      A.   I DO.

02:06:25  14      Q.   AND DO YOU SEE THERE'S AN ATTACHMENT, THERANOS PRO FORMA

02:06:29  15      STATEMENTS.XLS?

02:06:31  16      A.   YES.

02:06:32  17      Q.   AND DO YOU SEE WHERE MS. HOLMES WROTE, "DEAR STEVE,

02:06:36  18      ROBERT, AS PROMISED, PLEASE FIND HIGH LEVEL PROJECTIONS

02:06:39  19      ATTACHED TO THIS EMAIL."

02:06:42  20           WHAT'S YOUR UNDERSTANDING OF WHY MS. HOLMES WAS SENDING

02:06:45  21      THIS TO YOU?

02:06:46  22      A.   WE HAD ASKED FOR IT.

02:06:47  23      Q.   OKAY.  WHY DID YOU ASK FOR THIS?

02:06:48  24      A.   WE WANTED TO UNDERSTAND HOW THEY WERE PROJECTING THE

02:06:53  25      FUTURE AND HOW FAST THE BUSINESS MIGHT RAMP UP, AND THIS MIGHT

02:06:59  1    BE HELPFUL.  HIGH LEVEL MEANS NOT A FULL INCOME STATEMENT LINE

02:07:02  2    BY LINE, VERY HIGH LEVEL.

02:07:04  3    Q.   WAS THIS RELEVANT INFORMATION FOR YOU ASSESSING TO ENTER

02:07:13  4    INTO THE POSSIBLE OPPORTUNITY WITH THERANOS?

02:07:14  5    A.   YES, IT WAS.

02:07:16  6    Q.   HOW SO?

02:07:17  7    A.   WELL, THE REVENUE PROJECTIONS, YOU KNOW, WERE VERY STRONG,

02:07:24  8    AND THE OPERATING EXPENSES, YOU KNOW, WERE OBVIOUSLY LESS,

02:07:30  9    SAYING THAT WE'D BE PROFITABLE, THERANOS WOULD BE PROFITABLE.

02:07:33  10         AND, YOU KNOW, WHEN YOU HAVE A PARTNER IN BUSINESS AND YOU

02:07:37  11   NEGOTIATE AS BEST YOU CAN FOR YOUR MARGIN, YOU HAVE TO MAKE

02:07:40  12   SURE YOU'VE LEFT ENOUGH MARGIN FOR THEM THAT THEY ALSO MAKE

02:07:44  13   MONEY.  OTHERWISE YOU DON'T HAVE A PARTNERSHIP.

02:07:47  14   Q.   YOU'VE USED THAT TERM "MARGIN" A COUPLE TIMES, MR. BURD.

02:07:50  15   A.   YES.

02:07:51  16   Q.   CAN YOU JUST EXPLAIN TO US WHAT MARGIN IS?

02:07:53  17   A.   SURE.  SO MARGIN, IT'S USED IN LOTS OF DIFFERENT WAYS.

02:07:56  18        IN THIS PARTICULAR CASE, I'M TALKING ABOUT YOU GET, YOU

02:07:59  19   GET $10 IN REVENUE AND YOU'VE GOT $7 IN COST, YOUR MARGIN WOULD

02:08:03  20   BE $3.

02:08:05  21        AND OUT OF THAT MARGIN YOU HAVE TO PAY -- YOU KNOW, THAT'S

02:08:09  22   PER TEST.  YOU HAVE TO PAY SALARIES AND RENT ON THE STORES AND

02:08:12  23   A BUNCH OF OTHER THINGS.

02:08:14  24   Q.   SO LOW MARGIN MEANS YOU'RE MAKING A SMALL AMOUNT ON ANY

02:08:17  25   GIVEN SALE, AND A HIGH MARGIN MEANS YOU'RE MAKING A LARGE

02:08:20   1   AMOUNT ON ANY GIVEN SALE?

02:08:22   2   A.   THAT'S CORRECT.

02:08:23   3   Q.   OKAY.  LET'S LOOK AT THE PROJECTIONS THAT ARE ATTACHED.

02:08:26   4        IF WE COULD PLEASE GO TO PAGE 2, AND IF IT'S POSSIBLE TO

02:08:29   5   HIGHLIGHT THE SUBSTANCE, ALL THE WAY DOWN.  GREAT.

02:08:40   6        DO YOU SEE WHERE IT SAYS PRO FORMA STATEMENT OF INCOME,

02:08:43   7   MR. BURD?

02:08:44   8   A.   YES, I DO.

02:08:45   9   Q.   AND TO THE RIGHT, THERE'S DIFFERENT YEARS, 2010, 2011,

02:08:49   10  2012, AND 2013?

02:08:51   11  A.   YES.

02:08:52   12  Q.   OKAY.  WHY WERE YOU INTERESTED IN A PRO FORMA STATEMENT OF

02:08:56   13  INCOME FROM THERANOS?

02:08:58   14  A.   WELL, IF THEY WEREN'T GOING TO BE PROFITABLE, THEN THIS

02:09:02   15  PARTNERSHIP WASN'T GOING TO LAST LONG.  SO WE WANTED TO SEE HOW

02:09:07   16  THEY WERE GOING TO PROJECT THEIR OWN RESULTS HERE.

02:09:11   17  Q.   OKAY.  IN THE COLUMN 2011, THERE'S A ROW FOR U.S. REVENUE,

02:09:18   18  REVENUE FROM SAFEWAY NETWORK.

02:09:21   19       DID YOU UNDERSTAND THAT TO BE THE REVENUE THERANOS

02:09:24   20  ANTICIPATED EARNING FROM A RELATIONSHIP WITH SAFEWAY?

02:09:31   21       LET ME ASK A BETTER QUESTION.

02:09:33   22  A.   YEAH.

02:09:34   23  Q.   WHAT DID YOU UNDERSTAND THAT TO MEAN?

02:09:36   24  A.   YOU KNOW, LOOKING AT THIS THING 11 YEARS LATER, IT'S NOT

02:09:42   25  CLEAR TO ME -- IT'S LABELED REVENUE FROM SAFEWAY NETWORK.  THAT

02:09:47  1    WOULD SUGGEST IT'S THE NETWORK REVENUE ONLY.

02:09:50  2    Q.   OKAY.

02:09:50  3    A.   RIGHT?  AND THEN THE ALL OTHER REVENUE, IT'S ANYBODY'S

02:09:56  4    GUESS.  IS THAT OTHER CLIENTS PLUS SAFEWAY?  OR IS THAT JUST

02:10:00  5    SAFEWAY?  I CAN'T TELL YOU.

02:10:02  6    Q.   OKAY.  I DRAW YOUR ATTENTION TO -- WHAT WAS THE TOTAL U.S.

02:10:06  7    REVENUE THAT WAS PROJECTED BY THERANOS FOR 2011?

02:10:10  8    A.   223 MILLION.

02:10:14  9    Q.   OKAY.  AND THEN BENEATH THAT, THERE'S OPERATING EXPENSES

02:10:18  10   AND COST OF REVENUE AND THERE'S 167 MILLION IN PARENTHESES.

02:10:23  11        WHAT DID YOU UNDERSTAND THAT TO BE?

02:10:26  12   A.   THAT WOULD BE -- YOU KNOW, ALL OF THE -- I'M NOT SURE WHY

02:10:30  13   THEY SAY COST OF REVENUE, BUT IT WOULD BE ALL THE OPERATING

02:10:33  14   EXPENSES OF THE BUSINESS.

02:10:34  15   Q.   OKAY.  AND WAS IT ATTRACTIVE TO YOU THAT THERANOS WAS

02:10:39  16   PROJECTING 223 MILLION IN REVENUE WITH OPERATING EXPENSES OF

02:10:44  17   167 MILLION?

02:10:44  18   A.   YES.

02:10:45  19   Q.   OKAY.  HOW SO?

02:10:46  20   A.   WELL, IT SAYS THEY'RE PROFITABLE.  IF YOU LOOK DOWN ONE

02:10:50  21   LINE FURTHER, IT'S CALLED EBITDA, IT'S IN THE SECOND BOX, THEY

02:10:56  22   HAVE CASH FLOW POSITIVE, AFTER PAYING ALL EXPENSES, OF

02:10:59  23   $56 MILLION.  THAT'S A GOOD RESULT.

02:11:03  24   Q.   AND WAS THIS CONSISTENT WITH STATEMENTS MS. HOLMES HAD

02:11:06  25   MADE TO YOU ABOUT THERANOS BEING CASH FLOW NEUTRAL?

02:11:09  1    A.   WELL, YOU KNOW, THIS WAS 2010, SO THERE'S REALLY NOTHING

02:11:13  2    ON THE INCOME SIDE OF THIS STATEMENT THAT SAYS ANYTHING ABOUT

02:11:18  3    2010.  SO WE DIDN'T GET ANY CONFIRMATION THAT THEY WERE CASH

02:11:22  4    FLOW NEUTRAL IN 2010.

02:11:25  5    Q.   OTHER THAN WHAT MS. HOLMES HAD TOLD YOU PREVIOUSLY?

02:11:28  6    A.   CORRECT.

02:11:29  7    Q.   THIS WASN'T GIVING YOU CONFIRMATION OF THAT?

02:11:31  8    A.   IT DIDN'T GIVE US ANY NUMBERS.

02:11:34  9    Q.   OKAY.  HOW ABOUT THE FUTURE PERIODS, THE REVENUE OF

02:11:38  10   464 MILLION IN 2012 AND 934 MILLION IN 2013?  WAS THAT

02:11:45  11   ATTRACTIVE TO YOU?

02:11:46  12   A.   YES.

02:11:46  13   Q.   OKAY.  HOW SO?

02:11:48  14   A.   WELL, IT SAYS THE BUSINESS IS CONTINUING TO BUILD AND CASH

02:11:53  15   FLOW AND INCOME WOULD CONTINUE TO RISE, AND SO WE'RE NOT JUST

02:11:58  16   THREE YEARS AND IT'S OVER.  YOU KNOW, THERE'S SOME

02:12:02  17   SUSTAINABILITY HERE.

02:12:03  18   Q.   OKAY.  LET ME DRAW YOUR ATTENTION, PLEASE, TO EXHIBIT 378.

02:12:20  19        DO YOU HAVE THAT IN FRONT OF YOU, SIR?

02:12:23  20   A.   I BELIEVE I DO.  AUGUST 24TH?

02:12:25  21   Q.   YES.

02:12:26  22   A.   YES.

02:12:26  23   Q.   DO YOU SEE SOME HANDWRITING IN THE, I GUESS IT'S THE UPPER

02:12:32  24   LEFT CORNER IF IT'S ONE WAY, THE UPPER RIGHT CORNER IF

02:12:36  25   YOU'RE --

02:12:37   1      A.   YES.

02:12:37   2      Q.   OKAY.  AND DO YOU SEE THE FOOTER, BOARD MEETING UNDERSCORE

02:12:42   3      AUGUST 24TH, 2010?

02:12:43   4      A.   I DO.

02:12:44   5      Q.   OKAY.  IS THIS ANOTHER POWERPOINT RELATING TO THERANOS

02:12:49   6      THAT YOU PRESENTED TO THE SAFEWAY BOARD?

02:12:50   7      A.   YES, IT IS.

02:12:55   8           MR. LEACH:  OKAY.  YOUR HONOR, I OFFER EXHIBIT 378

02:12:57   9      INTO EVIDENCE.

02:12:58   10          MR. DOWNEY:  NO OBJECTION.

02:12:59   11          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:13:01   12      (GOVERNMENT'S EXHIBIT 378 WAS ADMITTED IN EVIDENCE.)

02:13:02   13          MR. LEACH:  AND MS. HOLLIMAN, IF WE COULD PLEASE GO

02:13:08   14      TO PAGE 2.

02:13:11   15      Q.   DO YOU SEE WHERE IT SAYS, THERANOS MINI BLOOD LAB DEAL,

02:13:16   16      MR. BURD?

02:13:17   17      A.   I DO.

02:13:17   18      Q.   OKAY.  AND IS THAT A REFERENCE TO THE MINI LAB DEVICE THAT

02:13:21   19      YOU UNDERSTOOD THERANOS WANTED TO PUT IN SAFEWAY STORES?

02:13:25   20      A.   YES, IT IS.

02:13:26   21      Q.   OKAY.  AND THERE ARE FOUR BULLETS, THE NETWORK; FEE

02:13:31   22      STRUCTURE; SAFEWAY'S FINANCIAL COMMITMENT; AND FINANCIALS.

02:13:35   23          DO YOU SEE THAT?

02:13:38   24      A.   YES.

02:13:39   25      Q.   I WANT TO DRAW YOUR ATTENTION, PLEASE, TO THE SLIDE FOR

02:13:41   1    THE THERANOS FEE STRUCTURE.  IT'S ON PAGE 4.

02:13:54   2        DO YOU SEE THE FIRST BULLET, "WALGREENS AND SAFEWAY WILL

02:13:58   3    BE GUARANTEED TO HAVE THE LOWEST COST OF GOODS"?

02:14:04   4    A.   YES.

02:14:05   5    Q.   WHAT DID THAT MEAN?

02:14:06   6    A.   WE HAD BEEN TOLD THAT WALGREENS WAS ALSO GOING TO CARRY

02:14:09   7    THIS MINI LAB, AND IT WAS IMPORTANT TO US THAT THEY NOT GET OUT

02:14:13   8    AHEAD OF US.

02:14:15   9        AND SO THIS SAID THAT, ON THE COST SIDE OF THE EQUATION,

02:14:20  10    THEY WOULDN'T HAVE A COST ADVANTAGE.  WE'D HAVE -- YOU KNOW,

02:14:24  11    BOTH COMPANIES WOULD HAVE THE LOWEST COST, WHICH GAVE THEM THE

02:14:27  12    FREEDOM TO CHARGE NEW RETAILERS A HIGHER PRICE IF THEY CHOSE TO

02:14:32  13    DO SO.

02:14:34  14    Q.   OKAY.  AND THEN THE NEXT BULLET SAYS, "SAFEWAY WILL BE

02:14:39  15    GUARANTEED AN AVERAGE $10 GROSS MARGIN PER TEST."

02:14:47  16        WHAT DID THAT REFER TO?

02:14:48  17    A.   WHENEVER YOU DRAW BLOOD, HOWEVER YOU DRAW IT, IT CAN BE --

02:14:54  18    YOU CAN OFTEN GET SEVERAL DIFFERENT BLOOD TESTS FROM A SINGLE

02:14:58  19    VIAL OR A SINGLE SAMPLE.

02:15:00  20        AND SO IF YOU HAD A CHOLESTEROL TEST, THAT'S ONE TEST.  IF

02:15:05  21    YOU HAD A PSA TEST, THAT'S A SECOND TEST.  IF YOU HAD AN HBA1C,

02:15:11  22    ET CETERA.

02:15:13  23    Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO THE NEXT PAGE,

02:15:18  24    PAGE 5, AND FOCUS ON SAFEWAY'S FINANCIAL COMMITMENT.

02:15:27  25        AT A HIGH LEVEL, MR. BURD, CAN YOU DESCRIBE FOR US WHAT'S

02:15:32  1    DEPICTED HERE?

02:15:33  2    A.   WELL, WE INDICATED A POSSIBLE INVESTMENT IN THERANOS THAT

02:15:41  3    WOULD BE $55 MILLION.  THAT WOULD COME IN TWO EVENTS.  ONE IS A

02:15:49  4    PRE-PURCHASE OF INVENTORY WHEN CERTAIN MILESTONES WERE HIT, AND

02:15:56  5    THE 25 WOULD COME LATER.

02:15:57  6         AND THEN WE -- EARLY ON, WE ANTICIPATED SPENDING

02:16:01  7    $30 MILLION OF MONEY REMODELING OUR STORES.  THAT NUMBER TURNED

02:16:05  8    OUT TO BE VERY LOW BECAUSE WE PUT A BATHROOM IN EACH FACILITY,

02:16:09  9    WHICH MEANT WE DUG UP THE STORE AND THE CONCRETE.

02:16:12  10   Q.   OKAY.  SO I THINK YOU'RE REFERRING TO THE, AT FIRST, THE

02:16:17  11   FIRST BULLET, 55 MILLION CASH INVESTMENT.

02:16:21  12        DO YOU SEE THAT LANGUAGE?

02:16:22  13   A.   YES.

02:16:22  14   Q.   AND THEN IT SAYS, "25 MILLION IN NOTES CONVERTIBLE TO

02:16:25  15   EQUITY."

02:16:26  16        DO YOU SEE THAT?

02:16:27  17   A.   YES.

02:16:28  18   Q.   WHAT ARE NOTES CONVERTIBLE TO EQUITY?

02:16:31  19   A.   NOTES ARE BASICALLY A LOAN, YOU KNOW, LIKE A MORTGAGE OR

02:16:34  20   SOMETHING.  BUT YOU COULD CONVERT THAT INTO EQUITY AT SOME

02:16:38  21   POINT IN THE FUTURE IF THAT MADE GOOD SENSE TO YOU.

02:16:41  22   Q.   AND WHY WAS SAFEWAY INTERESTED IN DOING THAT?

02:16:45  23   A.   WELL, IF THE COMPANY WAS GOING TO BE A HIGH FLIER, YOU

02:16:50  24   KNOW, WE WOULDN'T WANT TO JUST HOLD DEBT.  WE WOULD WANT SOME

02:16:54  25   EQUITY IN THE COMPANY.

BURD DIRECT BY MR. LEACH

02:16:55  1    Q.   AND THEN THERE'S A "30 MILLION FOR PRE-PURCHASE OF

02:17:00  2    INVENTORY."

02:17:02  3         WHAT IS INVENTORY IN THIS CONTEXT?

02:17:05  4    A.   IN THIS CONTEXT, IT WAS THE CARTRIDGES.

02:17:09  5         SO AT THIS POINT, I'M NOT SURE WE HAD AN AGREEMENT ON THE

02:17:12  6    PRICE OF THE CARTRIDGE, BUT WE HAD TO WAREHOUSE THESE

02:17:17  7    CARTRIDGES AND WE HAD TO KEEP THEM IN OUR STORES.

02:17:20  8    Q.   LET'S LOOK AT THE NEXT PAGE, PLEASE, PAGE 6.

02:17:29  9         DO YOU SEE WHERE IT SAYS PILOT TESTS?

02:17:32  10   A.   YES.

02:17:33  11   Q.   AND THE FIRST BULLET, "JANUARY 2011 SCHEDULED FOR INITIAL

02:17:36  12   TEST."

02:17:37  13   A.   CORRECT.

02:17:38  14   Q.   WAS THAT YOUR UNDERSTANDING OF THE TIMING THAT YOU WERE

02:17:40  15   LOOKING FOR FOR THIS DEAL?

02:17:42  16   A.   YES.

02:17:43  17   Q.   OKAY.  "RURAL WASHINGTON STATE MARKET SELECTED DUE TO LACK

02:17:47  18   OF RETAIL LAB COMPETITORS."

02:17:51  19        YOU MENTIONED REMOTE LOCATIONS.  IS THAT RURAL WASHINGTON

02:17:55  20   STATE?

02:17:55  21   A.   THAT'S IT.

02:17:55  22   Q.   OKAY.  THAT'S WHERE YOU WANTED TO DO THE MINI PILOT?

02:17:59  23   A.   YES.

02:17:59  24   Q.   OKAY.  THAT'S WHERE THERANOS WANTED TO DO THE MINI PILOT?

02:18:03  25   A.   YEAH.  I THINK WE CALLED IT THE INITIAL TEST.

02:18:12    1    Q.   OKAY.  LET'S BRIEFLY LOOK AT PAGE 9, PLEASE.

02:18:22    2         AND IS THIS ANOTHER DESCRIPTION OF THE ANTICIPATED PROGRAM

02:18:26    3    ROLLOUT AS YOU SAW IT IN THIS TIME PERIOD?

02:18:29    4    A.   YES, IT IS.

02:18:31    5    Q.   OKAY.  THIS IS SIMILAR TO THE SLIDE WE SAW IN THE PRIOR

02:18:35    6    BOARD MEETING?

02:18:36    7    A.   SIMILAR.

02:18:36    8    Q.   OKAY.  LET ME PLEASE DRAW YOUR ATTENTION TO WHAT HAS BEEN

02:18:40    9    MARKED AS EXHIBIT 387.

02:18:46   10         AND I OFFER THIS INTO EVIDENCE.

02:18:48   11         MR. DOWNEY:  YOUR HONOR, I HAVE NO OBJECTION TO THIS.

02:18:50   12    I THINK THIS IS THE SAME AS THE SIGNED VERSION OF THE

02:18:53   13    DOCUMENT.  THIS VERSION IS NOT FULLY SIGNED, SO MAYBE WE CAN

02:18:57   14    SUBSTITUTE THAT AT THE APPROPRIATE TIME.

02:18:59   15         MR. LEACH:  I THINK IT'S SIGNED IN DIFFERENT PARTS,

02:19:01   16    WHICH I'LL GO THROUGH, YOUR HONOR.

02:19:03   17         THE COURT:  OKAY.  THIS IS ADMITTED AND IT MAY BE

02:19:05   18    PUBLISHED.

02:19:05   19         (GOVERNMENT'S EXHIBIT 387 WAS ADMITTED IN EVIDENCE.)

02:19:06   20         MR. LEACH:  AND IF WE COULD PLEASE HIGHLIGHT THE --

02:19:14   21    OR ZOOM IN ON THE SUBSTANCE OF THE DOCUMENT, MS. HOLLIMAN, ALL

02:19:18   22    THE WAY DOWN TO SCHEDULE H.

02:19:22   23         THE WITNESS:  DID YOU SAY A OR 8?

02:19:25   24    BY MR. LEACH:

02:19:26   25    Q.   I WAS GIVING MS. HOLLIMAN, OUR PARALEGAL, SOME DIRECTIONS

02:19:30  1      ON WHAT TO HIGHLIGHT ON THE SCREEN.

02:19:31  2      A.   OKAY.

02:19:32  3      Q.   SO I'M GOING TO STAY ON PAGE 1 FOR NOW, AND YOU CAN EITHER

02:19:36  4      LOOK ON THE SCREEN OR AT THE HARD COPY, WHATEVER YOU PREFER,

02:19:39  5      MR. BURD.

02:19:40  6           DO YOU SEE AT THE TOP WHERE IT SAYS THERANOS MASTER

02:19:43  7      PURCHASE AGREEMENT?

02:19:44  8      A.   I DO.

02:19:45  9      Q.   OKAY.  AND IS THIS THE WRITTEN AGREEMENT BETWEEN SAFEWAY

02:19:47  10     AND THERANOS THAT WE'VE BEEN -- THAT YOU WERE CONTEMPLATING UP

02:19:52  11     UNTIL THIS POINT?

02:19:53  12     A.   YES.

02:19:53  13     Q.   OKAY.  AND YOU HAD A HAND IN NEGOTIATING THIS?

02:19:56  14     A.   I DID.

02:19:56  15     Q.   WHO DID YOU NEGOTIATE WITH FROM THERANOS?

02:19:59  16     A.   IT WAS ALMOST EXCLUSIVELY WITH ELIZABETH HOLMES.

02:20:08  17     SUNNY BALWANI WAS INVOLVED IN A COUPLE OF DISCUSSIONS, BUT MOST

02:20:12  18     OF IT WAS WITH ELIZABETH.

02:20:14  19     Q.   OKAY.  WAS THAT UNUSUAL?

02:20:18  20     A.   WHAT WAS UNUSUAL ABOUT IT IS THAT WE NEVER SAW AN

02:20:24  21     ATTORNEY.  AND YOU KNOW IT'S CUSTOMARY, WHEN YOUR GENERAL

02:20:28  22     COUNSEL IS IN THE ROOM, THEIR GENERAL COUNSEL'S ON THE PHONE.

02:20:31  23          SO ELIZABETH APPEARED TO BE NEGOTIATING THIS COMPLETELY ON

02:20:34  24     HER OWN, PROBABLY TALKING TO COUNSEL OFFLINE.  BUT I'VE NEVER

02:20:38  25     SEEN THAT DONE.

BURD DIRECT BY MR. LEACH

02:20:38 1    Q.   THE DATE OF THIS AT THE TOP IS SEPTEMBER 20TH, 2010.  IS

02:20:44 2    THAT CONSISTENT WITH YOUR MEMORY?

02:20:46 3    A.   YES.

02:20:50 4    Q.   OKAY.  AND THIS AGREEMENT CONSISTS OF DIFFERENT SCHEDULES

02:20:53 5    A THROUGH H.

02:20:54 6         DO YOU SEE THAT IN THE BOTTOM RIGHT?

02:20:55 7    A.   I DO.

02:20:56 8    Q.   OKAY.  AND IF WE LOOK AT PAGE 2, PLEASE.

02:21:09 9         DO YOU SEE MS. HOLMES'S SIGNATURE?

02:21:13 10   A.   I DO.

02:21:14 11   Q.   OKAY.  AND IF WE COULD PLEASE GO TO PAGE 54.

02:21:27 12        IS THAT YOUR SIGNATURE?

02:21:29 13   A.   YES, IT IS.

02:21:30 14   Q.   OKAY.  AND YOU THINK THIS MAY HAVE BEEN -- OR COULD IT

02:21:33 15   HAVE BEEN THIS WAS SIGNED AT DIFFERENT TIMES BY THE DIFFERENT

02:21:36 16   PARTIES?

02:21:37 17   A.   IF IT WAS, IT WAS, YOU KNOW, ONE DAY AND THEN THE NEXT.

02:21:40 18   Q.   OKAY.  LET'S LOOK AT THE SCHEDULE A, PROGRAM OVERVIEW, ON

02:21:45 19   PAGE 3.  AND IF WE COULD ZOOM IN ON THE TOP HALF OF THE

02:21:56 20   DOCUMENT, PLEASE, MS. HOLLIMAN.

02:22:02 21        MR. BURD, DO YOU SEE THE FIRST PARAGRAPH UNDER THE

02:22:04 22   HEADING 1, BACKGROUND?

02:22:07 23   A.   YES.

02:22:08 24   Q.   OKAY.

02:22:09 25   A.   YES.

BURD DIRECT BY MR. LEACH

02:22:09  1    Q.   AND THIS SAYS, "THERANOS HAS DEVELOPED, AND IS DEVELOPING,

02:22:13  2    GENERATIONS OF 'MINI-LAB' DEVICES THAT CAN RUN ANY BLOOD TEST

02:22:19  3    IN REAL-TIME FOR LESS THAN THE TRADITIONAL COST OF CENTRAL LAB

02:22:23  4    TESTS."

02:22:24  5         IS THAT SOMETHING THAT MS. HOLMES HAD SAID TO YOU

02:22:26  6    PREVIOUSLY?

02:22:27  7    A.   YES, SHE DID.

02:22:28  8    Q.   OKAY.  AND WAS THAT RELEVANT TO YOU IN DECIDING TO ENTER

02:22:32  9    INTO THIS AGREEMENT AND PURCHASE THE NOTES?

02:22:35  10   A.   IT WAS ESSENTIAL.

02:22:36  11   Q.   OKAY.  "THE THERANOS SYSTEMS WILL RUN ROUTINE LABORATORY

02:22:41  12   TESTS AND PROPRIETARY TESTS THAT DETECT THE APPEARANCE OF

02:22:44  13   DISEASES, ENABLING EARLY INTERVENTION AND INITIATION OF

02:22:48  14   TREATMENT LONG BEFORE COMPLICATIONS EMERGE."

02:22:50  15        WAS THAT SOMETHING MS. HOLMES DESCRIBED TO YOU?

02:22:53  16   A.   YES.

02:22:53  17   Q.   OKAY.  AND WAS THAT RELEVANT TO YOU?

02:22:55  18   A.   YES.

02:22:56  19   Q.   WHY WAS THAT?

02:22:58  20   A.   I THINK THIS WAS PART OF THE VISION THAT, YOU KNOW,

02:23:03  21   CONSUMERS WOULD SOME DAY BE ABLE TO DO THIS ON THEIR OWN AND

02:23:08  22   OBVIOUSLY GET IT INTERPRETED BY A PROFESSIONAL.

02:23:11  23        BUT THAT WOULD SAY THAT IT WOULD BE HIGH DEMAND, YOU KNOW,

02:23:15  24   FOR THIS KIND OF SERVICE.

02:23:17  25   Q.   TO THE RIGHT THERE'S AN IMAGE OF WHAT LOOKS LIKE A MOBILE

02:23:23    1       DEVICE AND THEN ANOTHER DEVICE IN THE MIDDLE AND SOMETHING TO

02:23:28    2       THE RIGHT.

02:23:29    3           DOES THAT APPEAR TO BE THE CARTRIDGE AND THE DEVICE THAT

02:23:32    4       WAS IN SOME OTHER BOARD SLIDES WE'VE LOOKED AT?

02:23:34    5       A.   IT DOES.

02:23:35    6       Q.   OKAY.  AND IS THIS WHAT YOU WERE CONTEMPLATING WOULD BE

02:23:39    7       USED IN SAFEWAY STORES?

02:23:41    8       A.   YOU KNOW, IT OR SOME VERSION OF IT.  YOU KNOW, AS I SAID,

02:23:44    9       IT CONTINUED TO EVOLVE.

02:23:46   10       Q.   OKAY.  IF WE COULD PLEASE ZOOM OUT, MS. HOLLIMAN, AND GO

02:23:50   11       TO THE BOTTOM TWO PARAGRAPHS.

02:23:57   12           MR. BURD, DO YOU SEE WHERE IT SAYS, "THE ABILITY TO RUN

02:24:00   13       BLOOD TESTS FROM A FINGER-STICK IN 30 MINUTES OR LESS AT

02:24:03   14       SAFEWAY'S STORES CREATES A NEW WORKFLOW AND A NEW DIAGNOSTIC

02:24:09   15       PARADIGM FOR HEALTH CARE"?

02:24:10   16           IS THAT CONSISTENT WITH REPRESENTATIONS THAT MS. HOLMES

02:24:14   17       MADE TO YOU?

02:24:14   18       A.   YES.

02:24:15   19       Q.   AND WAS THAT RELEVANT TO YOU?

02:24:16   20       A.   YES.

02:24:17   21       Q.   AND WAS THAT SOMETHING YOU BELIEVED THERANOS COULD DO AT

02:24:21   22       THE TIME?

02:24:21   23       A.   I SURE DID.

02:24:25   24       Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO PAGE 5.  WE'VE TALKED

02:24:38   25       A LITTLE BIT ABOUT THE CONVERTIBLE NOTES, MR. BURD.

02:24:41   1          AND IF WE COULD PLEASE HIGHLIGHT THE ENTIRETY OF 6A AND B?

02:24:45   2   DOWN A LITTLE BIT MORE, PLEASE.  A LITTLE BIT MORE.  THAT'LL

02:24:50   3   DO, MS. HOLLIMAN.  THAT'S GREAT.  THANK YOU.

02:24:55   4          DO YOU SEE IN NUMBER 6 WHERE IT SAYS CONVERTIBLE NOTES,

02:24:59   5   MR. BURD, UP IN THE TOP LEFT?

02:25:04   6   A.    YEAH, UP IN THE TOP LEFT.

02:25:08   7          IN THE FIRST PARAGRAPH, SMALL A?

02:25:10   8   Q.    WELL, I WAS TALKING JUST ABOUT THE HEADING, 6?

02:25:12   9   A.    OH, IN THE HEADING.  OKAY.  I WAS A LITTLE LOWER THAN YOU.

02:25:15  10   Q.    OKAY.  AND I WANTED TO DRAW YOUR ATTENTION TO 6B?

02:25:20  11   A.    YES.

02:25:21  12   Q.    1, 2, 3.

02:25:23  13          DOES THIS PROVIDE FOR SAFEWAY ACQUIRING -- HAVING THE

02:25:28  14   OPTION TO ACQUIRE A CONVERTIBLE NOTE IN THE AMOUNT OF

02:25:34  15   $10 MILLION?

02:25:34  16   A.    YES.

02:25:35  17   Q.    OKAY.  AND THERE ARE CERTAIN CONDITIONS ON SAFEWAY'S

02:25:39  18   ABILITY TO DO THAT?

02:25:40  19   A.    CORRECT.

02:25:41  20   Q.    AND WHEN YOU SAY CONVERTIBLE NOTE, AT SOME POINT THAT CAN

02:25:45  21   BE CONVERTED INTO EQUITY?

02:25:46  22   A.    CORRECT.

02:25:47  23   Q.    IS THAT WHAT YOU SAID EARLIER?  OKAY.

02:25:50  24          LET'S START -- LET ME DRAW YOUR ATTENTION TO THE BOTTOM

02:25:54  25   PART.  AND DO YOU SEE WHERE IT SAYS ADDITIONAL CONVERTIBLE

02:26:04   1    NOTE?

02:26:04   2    A.   I DO.

02:26:05   3    Q.   AND DOES THIS PROVIDE FOR -- GIVE SAFEWAY THE ABILITY TO

02:26:09   4    ACQUIRE AN ADDITIONAL NOTE CONVERTIBLE INTO EQUITY, INTO

02:26:15   5    THERANOS EQUITY?

02:26:16   6    A.   YES, IT DOES.

02:26:17   7    Q.   OKAY.  LET ME DRAW YOUR ATTENTION, PLEASE, TO PAGE 8.

02:26:30   8         AND IF WE COULD ZOOM IN ON THE TOP PORTION OF THIS, ALL

02:26:34   9    THE WAY DOWN TO 3B.

02:26:42   10        MR. BURD, DO YOU SEE WHERE IT SAYS SCHEDULE B, PURCHASING

02:26:46   11   TERMS AND CONDITIONS?

02:26:47   12   A.   YES.

02:26:48   13   Q.   AND DOES THIS SCHEDULE LAY OUT ADDITIONAL TERMS OF THE

02:26:55   14   PURCHASE OF CARTRIDGES, THE PILOT PROGRAM, AND OTHER DETAILS

02:26:58   15   RELATING TO THE POTENTIAL LAUNCH IN SAFEWAYS?

02:27:01   16   A.   YES.

02:27:01   17   Q.   OKAY.  PARAGRAPH 2 INCLUDES SOMETHING CALLED BEST PRICE

02:27:06   18   GUARANTEE.

02:27:07   19        DO YOU SEE THAT?

02:27:08   20   A.   YES, I DO.

02:27:09   21   Q.   OKAY.  AND THIS SAYS, "FOR ALL CARTRIDGES DEFINED AS

02:27:15   22   AVAILABLE CARTRIDGES, THERANOS AGREES THAT NO UNITED STATES

02:27:20   23   RETAILER OR ENTITY OPERATING IN A RETAIL ENVIRONMENT SELLING

02:27:24   24   THERANOS SYSTEMS OR ANY DOCTOR," AND THEN IT CONTINUES.

02:27:31   25        IS THIS THE -- WHAT IS THIS PARAGRAPH GETTING AT?

02:27:33   1   A.   IN SOME CONTEXTS, THIS IS REFERRED TO AS KIND OF A FAVORED

02:27:37   2   NATIONS CLAUSE.  IT BASICALLY SAYS THAT WE WILL ALWAYS HAVE THE

02:27:43   3   LOWEST PRICE OFFERED IN THE MARKET.

02:27:44   4   Q.   OKAY.  AND WAS THAT IMPORTANT TO YOU?

02:27:47   5   A.   YES.

02:27:47   6   Q.   OKAY.  IF WE CAN PLEASE ZOOM OUT, MS. HOLLIMAN, AND I WANT

02:27:52   7   TO FOCUS ON 3B, THE PRE-PILOT PERIOD.  ALL THE WAY DOWN, YES.

02:28:09   8        DOES THIS PORTION LAY OUT SOME OF THE RESPONSIBILITIES OF

02:28:12   9   THE PARTIES RELATING TO THE PRE-PILOT PERIOD, MR. BURD?

02:28:16  10   A.   YES, IT DOES.

02:28:16  11   Q.   OKAY.  AND IN 3B1, IT SAYS, "THERANOS WILL SECURE THE

02:28:22  12   REGULATORY APPROVALS AND SAFEWAY WILL SECURE ANY APPROVALS

02:28:25  13   REQUIRED FOR THE PILOT OF THE PROGRAM UNDER CLIA AND OTHER

02:28:29  14   APPLICABLE LAWS, RULES AND REGULATIONS."

02:28:32  15        WAS THAT RELEVANT TO YOU?

02:28:33  16   A.   YES.

02:28:34  17   Q.   WHY WAS THERANOS SECURING REGULATORY APPROVALS RELEVANT TO

02:28:38  18   YOU?

02:28:38  19   A.   YOU CAN'T OPERATE A LAB ANYWHERE IN THIS COUNTRY THAT'S

02:28:45  20   NOT CLIA APPROVED, AND SO THEY NEEDED THAT TO GET SANCTIONED TO

02:28:54  21   HAVE A LAB AT ALL.

02:28:55  22   Q.   FURTHER DOWN IN 3B5, IT SAYS, "THERANOS WILL MEET AGREED

02:29:00  23   UPON SERVICE STANDARDS, INCLUDING THE PROVISION OF BLOOD TEST

02:29:03  24   RESULTS IN 30 MINUTES OR LESS, AND SATISFACTORY SERVICE AND

02:29:06  25   SUPPORT OF THE DELIVERABLES."

02:29:08  1            DO YOU SEE THAT LANGUAGE?

02:29:10  2       A.  YES.

02:29:10  3       Q.  AND WAS THAT 30 MINUTES OR LESS RELEVANT TO YOU?

02:29:12  4       A.  YES, THAT'S WHY IT WAS PUT HERE.

02:29:15  5       Q.  OKAY.  LET'S MOVE AHEAD TO PAGE 26.

02:29:33  6            AND DOES THIS SCHEDULE, MR. BURD, LAY OUT SOME OF THE

02:29:36  7       DEFINITIONS THAT ARE USED IN THIS AGREEMENT?

02:29:38  8       A.  YES.

02:29:39  9       Q.  OKAY.  IS THIS AN IMPORTANT PART OF THE AGREEMENT FOR YOU?

02:29:41  10      A.  YOU KNOW, DEFINITIONS ARE IMPORTANT.  THEY'RE IN EVERY

02:29:45  11      CONTRACT REGARDLESS OF WHO YOU'RE SIGNING IT WITH.

02:29:48  12      Q.  OKAY.  I'D LIKE TO DRAW YOUR ATTENTION TO NUMBER 8,

02:29:55  13      DEVICE.

02:29:58  14           DO YOU SEE WHERE IT SAYS, "'DEVICE' MEANS THERANOS'S

02:30:05  15      READER CAPABLE OF RUNNING CARTRIDGES," AND THEN CONTINUING ON?

02:30:09  16      A.  YES, I SEE THAT.

02:30:11  17      Q.  OKAY.  IS THAT CONSISTENT WITH YOUR IDEA OF THE MINI LAB

02:30:15  18      THAT WAS GOING TO BE PUT IN SAFEWAY STORES?

02:30:17  19      A.  YES, IT IS.

02:30:18  20      Q.  AT ANY POINT IN TIME, DID YOU DISCUSS WITH MS. HOLMES THE

02:30:23  21      IDEA OF PUTTING THIRD PARTY MACHINES IN SAFEWAY STORES?

02:30:30  22      A.  MEANING ANOTHER LAB?

02:30:32  23      Q.  CORRECT.

02:30:32  24      A.  NO.

02:30:32  25      Q.  HOW ABOUT MACHINES MANUFACTURED BY SOME PARTY OTHER THAN

02:30:36   1    THERANOS?

02:30:36   2    A.   NO.

02:30:37   3    Q.   WERE YOU AT ALL INTERESTED IN THAT?

02:30:39   4    A.   NO.

02:30:39   5    Q.   WHY NOT?

02:30:43   6    A.   IT DIDN'T -- WHEN YOU CREATE A NEW BUSINESS LIKE THIS AND

02:30:47   7    A NEW OPPORTUNITY FOR A PARTNER, IT HAS TO BE SUFFICIENTLY

02:30:51   8    DIFFERENT FROM EVERYBODY ELSE IN THE MARKET.  IT HAS TO BE

02:30:54   9    LOWER COST, IT HAS TO BE QUICKER, IT HAS TO BE BETTER.  THOSE

02:30:57   10   ARE FEATURES THAT ARE ATTRACTIVE TO NEW CONSUMERS.

02:31:01   11   Q.   SO SAFEWAY SIGNS THE AGREEMENT WITH THERANOS IN OR AROUND

02:31:08   12   SEPTEMBER OF 2010?

02:31:10   13   A.   CORRECT.

02:31:10   14   Q.   OKAY.  SUBSEQUENT TO THAT TIME PERIOD, DID YOU HAVE

02:31:16   15   MEETINGS AND CONVERSATIONS WITH MS. HOLMES ABOUT THE ONGOING

02:31:19   16   RELATIONSHIP?

02:31:20   17   A.   WE, WE HAD LOTS OF PHONE CALLS, EMAILS.  WE WORKED -- WE

02:31:29   18   BOTH WORKED VERY HARD ON THIS, AND THIS WAS -- IT WAS STRATEGIC

02:31:33   19   TO SAFEWAY, WHICH IS WHY THE CEO OF SAFEWAY IS INVOLVED IN

02:31:37   20   THIS.  IT'S A BIG DEAL.

02:31:38   21   Q.   THAT'S WHAT I WANTED TO GET AT, MR. BURD.

02:31:40   22        WHO AT THERANOS DID YOU HAVE CONTACT WITH?

02:31:43   23   A.   MY CONTACT WAS ELIZABETH HOLMES.

02:31:46   24   Q.   OKAY.  DID YOU HAVE CONTACT WITH OTHERS AT THERANOS?

02:31:49   25   A.   SOME.  I HAD CONTACT WITH SUNNY BALWANI.  HE WOULD HAVE

02:31:56  1      BEEN THE SECOND MOST CONTACTED.

02:31:59  2          I HAD CONTACT WITH ELIZABETH'S BROTHER, I THINK HIS FIRST

02:32:05  3      NAME WAS CHRISTOPHER, BUT MUCH MORE LIMITED.

02:32:09  4          AND THEN I MET A FEW PEOPLE FROM THERANOS, BUT ONLY WHILE

02:32:13  5      DOWN AT THERANOS.

02:32:14  6      Q.   OKAY.  DID YOU MEET WITH THEM ONE ON ONE, OR WAS

02:32:18  7      MS. HOLMES INVOLVED IN THOSE CONTACTS?

02:32:20  8      A.   WE HAD A -- WE HAD A SMALL TEAM AT SAFEWAY THAT HAD A BIT

02:32:26  9      MORE INTERACTION WITH ELIZABETH'S BROTHER.  I WAS INVOLVED IN A

02:32:34 10      COUPLE OF THOSE PHONE CALLS.

02:32:37 11          WHEN ELIZABETH CAME UP TO THE COMPANY, MORE OFTEN THAN NOT

02:32:42 12      IT WAS JUST HER.

02:32:43 13          WHEN I WENT DOWN TO THERANOS -- I HAVE TO THINK ABOUT IT.

02:32:49 14      I THINK IT WAS COMMON FOR THE MEETING TO BE MOSTLY ELIZABETH

02:32:52 15      AND SHE WOULD BRING PEOPLE IN MAYBE FOR DIFFERENT THINGS.

02:32:55 16      Q.   OKAY.  WERE THERE OCCASIONS WHERE YOU MET WITH MS. HOLMES

02:32:59 17      AND MR. BALWANI TOGETHER?

02:33:00 18      A.   YES.

02:33:01 19      Q.   IN THOSE MEETINGS, WHO WAS IN CHARGE?

02:33:04 20      A.   ELIZABETH.

02:33:05 21      Q.   WHY DO YOU SAY THAT?

02:33:07 22      A.   I SAY THAT BECAUSE SHE NEVER HESITATED -- OR SHE NEVER

02:33:15 23      LOOKED OVER AT SUNNY TO SEE WHAT HE MIGHT HAVE BEEN THINKING.

02:33:19 24      SHE ANSWERED THESE QUESTIONS HERSELF.

02:33:24 25          YOU KNOW, SHE'S THE KIND OF LEADER -- YOU KNOW, IN MANY

02:33:28   1    WAYS, I'M THAT KIND OF LEADER.  I'M INTO THE DETAILS AND I CAN

02:33:35   2    ANSWER ALL OF THE QUESTIONS THAT YOU WOULD ASK ME ABOUT A

02:33:38   3    SUPERMARKET.

02:33:38   4    Q.   SO AS THE CEO OF SAFEWAY, I TAKE IT YOU'VE HAD

02:33:42   5    INTERACTIONS WITH CEO'S OF OTHER COMPANIES?

02:33:45   6    A.   YES.

02:33:45   7    Q.   AND YOU'VE HAD INTERACTIONS WITH POLITICIANS OR REGULATORS

02:33:51   8    RELEVANT TO SAFEWAY'S BUSINESS?

02:33:52   9    A.   IN BOTH CATEGORIES, HUNDREDS.

02:33:54 10    Q.   OKAY.  AND HOW WOULD YOU COMPARE THOSE INTERACTIONS TO

02:33:58 11    YOUR INTERACTIONS WITH MS. HOLMES?

02:33:59 12    A.   I WOULD SAY THAT NOT ALL CEO'S ARE ALIKE, AND SHE WOULD

02:34:12 13    RISE TO THE TOP OF THE PILE IN TERMS OF, IN TERMS OF VISION, IN

02:34:18 14    TERMS OF COMMAND OF THE INFORMATION, CLEARLY IN TERMS OF

02:34:24 15    DELIVERY.  THERE WAS NOTHING ABOUT ELIZABETH HOLMES THAT WAS --

02:34:32 16    SHE WAS ALWAYS DECISIVE.

02:34:36 17    Q.   HOW ABOUT HER COMMAND WITHIN A PARTICULAR MEETING?  WOULD

02:34:41 18    YOU COMPARE IT TO ANYBODY ELSE?

02:34:42 19    A.   YOU KNOW, I'VE SOMETIMES USED THE TERM "OWNS THE ROOM,"

02:34:52 20    OKAY?  SO WHEN SHE PRESENTED TO OUR BOARD, WHEN SHE WAS

02:34:56 21    TALKING, SHE OWNED THE ROOM.

02:35:00 22        WHEN SHE -- WHENEVER SHE WAS TALKING, SHE OWNED THE ROOM.

02:35:05 23        I'VE HAD THE, I GUESS THE PRIVILEGE OF MEETING FOUR U.S.

02:35:09 24    PRESIDENTS.  WHEN THE PRESIDENT IS IN THE ROOM, LET ME JUST

02:35:13 25    TELL YOU, THE PRESIDENT OWNS THE ROOM.  NO ONE TALKS UNLESS

02:35:18  1    SPOKEN TO.

02:35:20  2         BUT I WOULD TELL YOU THAT HER STYLE WAS VERY -- IT WAS

02:35:25  3    WARM, IT WAS FRIENDLY, IT WASN'T DICTATORIAL.  I ALWAYS THOUGHT

02:35:32  4    SHE WAS A GOOD LISTENER.

02:35:33  5    Q.   WERE YOU AWARE AT ANY POINT -- OR PRIOR TO 2015, WERE YOU

02:35:39  6    AWARE THAT MS. HOLMES HAD A ROMANTIC RELATIONSHIP WITH

02:35:43  7    MR. BALWANI?

02:35:43  8    A.   NO.  NO, I WAS NOT.

02:35:45  9    Q.   OKAY.  WOULD THAT HAVE BEEN RELEVANT TO YOU?

02:35:47 10    A.   YES.

02:35:50 11    Q.   WHY?

02:35:50 12    A.   IT WOULD HAVE SAID THAT -- I MEAN, IF I FOUND OUT MID-WAY,

02:35:58 13    I WOULD HAVE SAID, YOU KNOW, WHY DIDN'T I KNOW THIS BEFORE?

02:36:01 14    YOU KNOW?

02:36:02 15         IT JUST RAISES A QUESTION OF WHAT ELSE IS HIDDEN FROM

02:36:06 16    VIEW.

02:36:06 17    Q.   LET ME MOVE FORWARD IN TIME.  SO THE AGREEMENT IS SIGNED

02:36:12 18    IN SEPTEMBER OF 2010.  I WANT TO DRAW YOUR ATTENTION TO WHAT

02:36:18 19    WE'VE MARKED AS EXHIBIT 423.

02:36:34 20         DO YOU HAVE THAT IN FRONT OF YOU, SIR?

02:36:36 21    A.   I DO.

02:36:36 22    Q.   OKAY.  AND DO YOU SEE AN EMAIL FROM MS. HOLMES TO YOU

02:36:39 23    DATED MARCH 15TH, 2011?

02:36:41 24    A.   YES.

02:36:43 25    Q.   AND IS THE SUBJECT PRESENTATION FOR TOMORROW?  OR IT LOOKS

02:36:50  1    LIKE IT MIGHT BE A MISSPELLING?

02:36:51  2    A.   I'M GOING TO HAVE TO LOOK AT THIS A LITTLE BIT.  PLEASE

02:36:56  3    SEE ATTACHED.

02:37:04  4         YES, WHAT SHE'S REFERRING TO IS THE PRESENTATION AT THE

02:37:07  5    UPCOMING SAFEWAY BOARD MEETING, WHICH SHE WILL PRESENT.  MUCH

02:37:15  6    THE WAY I WOULD SHARE MY MATERIALS, SHE SHARED HERS.

02:37:19  7              MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 423.

02:37:22  8              MR. DOWNEY:  NO OBJECTION.

02:37:23  9              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:37:26  10        (GOVERNMENT'S EXHIBIT 423 WAS ADMITTED IN EVIDENCE.)

02:37:27  11             MR. LEACH:  AND IF WE COULD ZOOM IN ON THE TOP.

02:37:34  12   PERFECT, MS. HOLLIMAN.  THANK YOU.

02:37:36  13   Q.   SO THE ATTACHMENT, MR. BURD, SAYS THERANOS SWY BOD

02:37:44  14   MEETING.

02:37:44  15        YOU BELIEVE THAT TO BE A REFERENCE TO A SAFEWAY BOARD

02:37:47  16   MEETING WHERE MS. HOLMES PRESENTED?

02:37:49  17   A.   YES, IT IS.

02:37:50  18   Q.   OKAY.  AND YOU TESTIFIED EARLIER ABOUT A MEETING WHERE A

02:37:52  19   BOARD MEMBER'S FINGER WAS PRICKED AND TESTED ON THE THERANOS

02:37:57  20   DEVICE.

02:37:57  21   A.   YES.

02:37:58  22   Q.   OKAY.  AND WHAT HAPPENED WHEN -- DESCRIBE THAT FOR US, NOT

02:38:04  23   WHAT WAS -- NOT WHAT WAS REPORTED TO YOU LATER, BUT WHAT

02:38:07  24   HAPPENED IN THE BOARD MEETING WHEN THAT HAPPENED.

02:38:09  25   A.   WE LOOKED FOR A VOLUNTEER.  MIKE SHANNON SAID HE WOULD

02:38:16  1    VOLUNTEER.  AND HE WENT THROUGH THE FINGER PRICK, WHICH IS NOT

02:38:20  2    A BIG DEAL, AND THE SAMPLE WAS EXTRACTED AND ULTIMATELY PUT

02:38:26  3    INTO A CARTRIDGE.

02:38:27  4    Q.   AND WAS A RESULT GENERATED?

02:38:29  5    A.   A RESULT WAS NOT GENERATED WHILE WE WERE IN THE ROOM.

02:38:33  6    Q.   OKAY.  DID MS. HOLMES SAY ANYTHING?

02:38:35  7    A.   SHE SAID SOMETHING THAT MADE US THINK WE WOULD GET IT

02:38:40  8    LATER.

02:38:40  9    Q.   OKAY.  TO YOUR KNOWLEDGE, DID SAFEWAY GET IT LATER?

02:38:43  10   A.   NO.

02:38:43  11   Q.   LET'S LOOK AT THE POWERPOINT, PLEASE.  IF WE COULD DRAW

02:38:48  12   YOUR ATTENTION TO PAGE 2.

02:38:52  13        DO YOU SEE WHERE IT SAYS THERANOS AT SAFEWAY, EXECUTIVE

02:38:57  14   BRIEFING 03.2011?

02:39:02  15   A.   I'M ALWAYS ONE AHEAD OF YOU HERE.

02:39:04  16        I SEE THAT, YES.

02:39:06  17   Q.   OKAY.  AND YOU BELIEVE THIS TO BE A POWERPOINT THAT

02:39:08  18   MS. HOLMES PRESENTED TO THE SAFEWAY BOARD?

02:39:10  19   A.   YES, I DO.

02:39:11  20   Q.   OKAY.  LET'S LOOK AT PAGE 3, PLEASE.

02:39:21  21        AND I WANT TO DRAW YOUR ATTENTION, MR. BURD, TO THE FIRST

02:39:25  22   BULLET ON THIS POWERPOINT WHERE IT SAYS, "THERANOS'S

02:39:30  23   PROPRIETARY, PATENTED TECHNOLOGY RUNS COMPREHENSIVE BLOOD TESTS

02:39:34  24   FROM A FINGER-STICK AND TESTS FROM MICRO-SAMPLES AND OTHER

02:39:40  25   MATRICES IN REAL-TIME OUTSIDE THE TRADITIONAL LAB SETTINGS AND

02:39:43   1    GENERATES SIGNIFICANTLY HIGHER INTEGRITY DATA THAN CURRENTLY

02:39:47   2    POSSIBLE."

02:39:47   3         DO YOU SEE THAT LANGUAGE?

02:39:49   4    A.   I DO.

02:39:50   5    Q.   AND WAS THAT CONSISTENT WITH WHAT MS. HOLMES HAD BEEN

02:39:52   6    SAYING TO YOU FOR THE BETTER COURSE OF A YEAR IN CONNECTION

02:39:55   7    WITH THE SAFEWAY ARRANGEMENT?

02:39:56   8    A.   IT IS.  I THINK THE, THE INTEGRITY ELEMENT, MEANING

02:40:00   9    SUPERIOR, WASN'T SOMETHING THAT I LOCKED IN ON.  IT MAY HAVE

02:40:06  10    BEEN SAID BEFORE.  IT MAY NOT HAVE BEEN.

02:40:08  11    Q.   OKAY.  IT'S BEING SAID HERE IN THE POWERPOINT TO THE

02:40:11  12    SAFEWAY BOARD?

02:40:11  13    A.   YES.

02:40:14  14    Q.   AND WAS THAT RELEVANT TO YOU?

02:40:16  15    A.   YOU KNOW, AS LONG AS IT WAS JUST AS ACCURATE, I WAS FINE.

02:40:21  16         BUT THE OTHER ELEMENTS WERE QUITE RELEVANT, YOU KNOW,

02:40:25  17    REAL-TIME, COMPREHENSIVE.

02:40:29  18    Q.   OKAY.  LET'S LOOK AT PAGE 5, PLEASE.

02:40:38  19         IS THIS ANOTHER DEPICTION OF THE MINI LAB DEVICE AND THE

02:40:42  20    CARTRIDGES THAT WE'VE SEEN PREVIOUSLY?

02:40:44  21    A.   YES, IT IS.

02:40:47  22    Q.   AND WAS THIS CONSISTENT WITH YOUR UNDERSTANDING OF

02:40:50  23    THERANOS'S SYSTEMS?

02:40:51  24    A.   YES.

02:40:52  25    Q.   OKAY.  LET ME LOOK -- DRAW YOUR ATTENTION TO PAGE 6.

```
02:41:00   1            DO YOU SEE WHERE IT SAYS, "VALIDATION OF THERANOS

02:41:04   2     SYSTEMS"?

02:41:04   3     A.   I DO.

02:41:05   4     Q.   AND THE FIRST PARAGRAPH, "THERANOS SYSTEMS HAVE BEEN

02:41:09   5     COMPREHENSIVELY VALIDATED OVER THE COURSE OF THE LAST SEVEN

02:41:12   6     YEARS BY TEN OF THE FIFTEEN LARGEST PHARMACEUTICAL COMPANIES,

02:41:16   7     WITH HUNDREDS OF THOUSANDS OF ASSAYS PROCESSED."

02:41:19   8            WAS THAT INFORMATION RELEVANT TO YOU?

02:41:21   9     A.   YES.

02:41:22  10     Q.   WHY?

02:41:23  11     A.   WELL, IT, IT MADE A BOLD STATEMENT THAT IT HAD BEEN FIELD

02:41:29  12     TESTED.  RESPECTABLE, YOU KNOW, COMPANIES, TECHNOLOGY

02:41:36  13     COMPANIES, YOU KNOW, HAD PROVED THIS TECHNOLOGY TO BE TRUE.

02:41:39  14     Q.   LET'S MOVE FORWARD IN TIME TO AUGUST OF 2011, AND I DRAW

02:41:49  15     YOUR ATTENTION, PLEASE, TO EXHIBIT 5426.

02:42:04  16     A.   YOU SAID 5426?

02:42:07  17     Q.   5426.  IT SHOULD BE IN THE BACK.

02:42:09  18     A.   OH, OKAY.

02:42:10  19            MR. LEACH:  AND I'LL OFFER THIS IN EVIDENCE.

02:42:15  20            THE WITNESS:  THAT WAS A HELPFUL HINT.  I'D HAVE BEEN

02:42:18  21     UP HERE FOR AWHILE.  OKAY.

02:42:21  22            MR. DOWNEY:  SORRY, YOUR HONOR.  BEAR WITH ME ONE

02:42:23  23     SECOND, PLEASE.

02:42:24  24         (PAUSE IN PROCEEDINGS.)

02:42:38  25            MR. DOWNEY:  NO OBJECTION.
```

BURD DIRECT BY MR. LEACH

02:42:39   1          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:42:42   2          (GOVERNMENT'S EXHIBIT 5426 WAS ADMITTED IN EVIDENCE.)

02:42:42   3          MR. LEACH:  IF WE -- IF THERE'S A WAY TO HIGHLIGHT

02:42:49   4   THE SUBSTANCE ALL THE WAY FROM BANK OF AMERICA DOWN,

02:42:52   5   MS. HOLLIMAN.

02:42:58   6   Q.   DOES THIS APPEAR TO BE A, A WIRE PAYMENT BETWEEN THERANOS

02:43:05   7   AND SAFEWAY, MR. BURD?

02:43:08   8   A.   THAT'S WHAT IT APPEARS TO BE.

02:43:09   9   Q.   OKAY.  AND DO YOU SEE IN THE DEBIT AMOUNT THE VALUE,

02:43:16  10   $30 MILLION?

02:43:16  11   A.   YES.

02:43:17  12   Q.   OKAY.  AND IS THAT CONSISTENT WITH YOUR MEMORY OF THE

02:43:21  13   AMOUNT OF MONEY THAT SAFEWAY PAID TO THERANOS IN PART FOR THE

02:43:26  14   CONVERTIBLE NOTES?

02:43:27  15   A.   YES, IT IS.

02:43:28  16   Q.   OKAY.  AND DO YOU SEE THE VALID DATE, AUGUST 19TH, 2011?

02:43:36  17   A.   YES.

02:43:36  18   Q.   AND IS THAT CONSISTENT WITH YOUR MEMORY OF THE TIME PERIOD

02:43:40  19   OF SAFEWAY'S PAYMENT OF THE 30 MILLION?

02:43:42  20   A.   I DON'T ACTUALLY RECALL THE TIMEFRAME.

02:43:45  21   Q.   OKAY.

02:43:49  22          LET ME DRAW YOUR ATTENTION, PLEASE, TO EXHIBIT 495.

02:43:58  23          AND I OFFER 495 INTO EVIDENCE.

02:44:00  24          MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

02:44:02  25          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:44:04  1              (GOVERNMENT'S EXHIBIT 495 WAS ADMITTED IN EVIDENCE.)

02:44:05  2       BY MR. LEACH:

02:44:10  3       Q.   MR. BURD, DOES THIS APPEAR TO BE A COPY OF ONE OF THE

02:44:13  4       CONVERTIBLE PROMISSORY NOTES THAT SAFEWAY PURCHASED?

02:44:17  5       A.   YES.

02:44:18  6       Q.   OKAY.  AND DO YOU SEE THE DOLLAR AMOUNT IN THE LEFT FOR

02:44:20  7       $10 MILLION?

02:44:21  8       A.   I DO.

02:44:22  9       Q.   OKAY.  AND TO THE RIGHT, DO YOU SEE THE DATE,

02:44:25 10       DECEMBER 30TH, 2011?

02:44:26 11       A.   YES.

02:44:29 12       Q.   I DRAW YOUR ATTENTION, PLEASE, TO PAGE 6.

02:44:42 13              DO YOU SEE IN PARAGRAPH 3, IT SAYS, "REPRESENTATIONS AND

02:44:46 14       WARRANTIES OF INVESTOR"?

02:44:48 15              DO YOU SEE THAT?

02:44:50 16       A.   YES.

02:44:50 17       Q.   OKAY.  AND THE INVESTOR IN THIS CONTEXT IS SAFEWAY?

02:44:53 18       A.   LET ME JUST READ THIS A LITTLE BIT.

02:44:58 19       Q.   YES, PLEASE.

02:44:59 20              (PAUSE IN PROCEEDINGS.)

02:45:12 21                 THE WITNESS:  CAN YOU ASK YOUR QUESTION AGAIN?

02:45:14 22       BY MR. LEACH:

02:45:15 23       Q.   THE INVESTOR IN THIS CONTEXT, IS THAT SAFEWAY?

02:45:22 24       A.   YES.

02:45:22 25       Q.   OKAY.  ONE OF THE REPRESENTATIONS AND WARRANTIES OF

02:45:24  1    INVESTOR IN 3B, THERE'S A HEADING, EXPERIENCE.

02:45:30  2        DO YOU SEE THAT?

02:45:31  3    A.   YES.

02:45:31  4    Q.   AND IT SAYS, "INVESTOR IS EXPERIENCED IN INVESTING IN THE

02:45:35  5    SECURITIES OF DEVELOPMENT STAGE COMPANIES SUCH AS THE COMPANY.

02:45:39  6    INVESTOR IS ABLE TO FEND FOR ITSELF, CAN BEAR THE ECONOMIC

02:45:43  7    RISK."

02:45:43  8        DO YOU SEE THAT LANGUAGE?

02:45:44  9    A.   I DO.

02:45:45 10    Q.   AND THIS REPRESENTATION WAS TRUE AT THE TIME?

02:45:47 11    A.   YES.

02:45:56 12    Q.   FURTHER DOWN, IN F, THERE'S A PARAGRAPH, ACCREDITED

02:46:02 13    INVESTOR.

02:46:09 14    A.   I DO.

02:46:09 15    Q.   DO YOU SEE WHERE IT SAYS, "INVESTOR REPRESENTS THAT IT IS

02:46:12 16    AN 'ACCREDITED INVESTOR'"?

02:46:17 17    A.   I DO.

02:46:17 18    Q.   DO YOU UNDERSTAND THAT TO BE A TERM OF ART UNDER THE

02:46:20 19    SECURITIES LAWS?

02:46:21 20    A.   YEAH, SOMETHING TO DO WITH SECURITIES LAWS.  BUT MY

02:46:24 21    GENERAL COUNSEL WOULD TELL ME THAT WE'RE ACCREDITED.

02:46:29 22    Q.   OKAY.  THE THRUST IS THAT SAFEWAY IS SOPHISTICATED AND

02:46:31 23    CAPABLE?

02:46:31 24    A.   CAPABLE, YES.

02:46:32 25    Q.   AND AT THE TIME YOU MADE THE DECISION -- DID YOU APPROVE

02:46:34  1    THE PURCHASE OF THE CONVERTIBLE NOTES?

02:46:36  2    A.   I DID.

02:46:37  3    Q.   AT THE TIME, DID YOU RELY ON THE REPRESENTATIONS THAT

02:46:39  4    MS. HOLMES HAD MADE TO YOU OVER THE COURSE OF A NUMBER OF

02:46:42  5    YEARS?

02:46:42  6    A.   YES.

02:46:42  7    Q.   AND DID YOU BELIEVE THEM TO BE TRUE AND ACCURATE?

02:46:47  8    A.   I DID AT THE TIME.

02:46:48  9    Q.   LET'S LOOK BRIEFLY AT PAGE 11.

02:47:00  10         DO YOU SEE MS. HOLMES'S SIGNATURE LINE IN THE CONVERTIBLE

02:47:04  11   NOTE?

02:47:04  12   A.   YES.

02:47:05  13   Q.   LET ME DRAW YOUR ATTENTION TO 496.

02:47:11  14         AND I OFFER EXHIBIT 496 INTO EVIDENCE.

02:47:23  15              MR. DOWNEY:  I'M SORRY, MR. LEACH.  I DON'T THINK I

02:47:26  16   HAVE 496.

02:47:27  17              MR. LEACH:  I THINK I SHOWED IT TO YOU THIS MORNING.

02:47:30  18   YOU CAN HAVE MINE (HANDING).

02:47:38  19              MR. DOWNEY:  OBJECTION, YOUR HONOR.

02:47:40  20              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:47:43  21         (GOVERNMENT'S EXHIBIT 496 WAS ADMITTED IN EVIDENCE.)

02:47:44  22   BY MR. LEACH:

02:47:47  23   Q.   MR. BURD, IS THIS THE SECOND OF THE CONVERTIBLE NOTES THAT

02:47:50  24   SAFEWAY PURCHASED AT SOME POINT IN 2011?

02:47:52  25   A.   IT APPEARS TO BE.

02:47:56   1    Q.   OKAY.  DO YOU SEE THE AMOUNT OF $15 MILLION TO THE LEFT?

02:47:59   2    A.   I DO.

02:48:00   3    Q.   OKAY.  AND DO YOU SEE THE DATE OF DECEMBER 30TH, 2011 TO

02:48:03   4    THE RIGHT?

02:48:04   5    A.   YES.

02:48:04   6    Q.   OKAY.  AND DO YOU SEE MS. HOLMES'S SIGNATURE ON PAGE 10?

02:48:08   7    A.   I DO.

02:48:19   8    Q.   LET ME MOVE FORWARD IN TIME, MR. BURD, TO THE TIME PERIOD

02:48:23   9    OF 2012.

02:48:26  10         DO YOU HAVE THAT TIME PERIOD IN MIND?

02:48:28  11    A.   OKAY.

02:48:29  12    Q.   OKAY.  AT THIS POINT, HAD SAFEWAY ROLLED OUT ANY THERANOS

02:48:36  13    DEVICES IN ITS STORES?

02:48:38  14    A.   NO.

02:48:38  15    Q.   BY THE END OF 2012, HAD THAT HAPPENED?

02:48:45  16    A.   NO.

02:48:45  17    Q.   OKAY.  OVER THE COURSE OF TIME, WERE YOU BECOMING

02:48:50  18    FRUSTRATED?

02:48:51  19    A.   YES.

02:48:51  20    Q.   WHY WERE YOU BECOMING FRUSTRATED?

02:48:53  21    A.   YOU KNOW, DEADLINES WERE CONTINUING TO BE MISSED.  WE

02:49:01  22    OFTEN WEREN'T GIVEN A LOT OF EXPLANATION FOR THAT.

02:49:03  23         AND I KEPT ASKING, YOU KNOW, GIVE ME SOME DETAILS HERE,

02:49:11  24    YOU KNOW, MAYBE WE CAN HELP.  WE'RE A BIG COMPANY, WE'VE GOT

02:49:14  25    LOTS OF RESOURCES.

02:49:16   1          SO THAT WAS THE FRUSTRATING PART.

02:49:18   2          WE ALWAYS TRIED TO HELP THEM IN ANY WAY THAT WE COULD.

02:49:22   3   Q.    DID MS. HOLMES EVER ATTRIBUTE -- EVER ATTRIBUTE DELAYS IN

02:49:28   4   THE LAUNCH TO SOME TECHNICAL ISSUE WITH THE MINI LAB DEVICE?

02:49:32   5   A.    THE ONLY TECHNICAL ISSUE I GUESS THAT I RECALL WAS I WAS

02:49:40   6   TOLD THAT PART OF THE DELAY WAS THAT IN THINKING THROUGH

02:49:45   7   STACKING, YOU KNOW, SIX OF THESE MACHINES AND SIDE-BY-SIDE --

02:49:52   8   BECAUSE IF IT TAKES 30 MINUTES, YOU'VE GOT TO HAVE MORE THAN

02:49:55   9   ONE MACHINE -- THAT THERE WAS A LOT OF HEAT GENERATED AND THEY

02:50:00  10   WERE STRUGGLING WITH HOW TO DISSIPATE THAT HEAT SO THAT IT

02:50:04  11   WOULDN'T COMPROMISE THE INTEGRITY OF THE MACHINES.

02:50:07  12          AND I IMMEDIATELY OFFERED UP MY ENGINEERING TEAM BECAUSE

02:50:11  13   WE DEAL WITH HEAT AND COLD A LOT.

02:50:16  14          BUT SHE SAID THEY WOULD, THEY WOULD SOLVE IT.

02:50:18  15   Q.    OTHER THAN THIS HEAT ISSUE THAT AROSE FROM STACKING OF THE

02:50:22  16   DEVICES, DID MS. HOLMES EVER ATTRIBUTE THE DELAY TO SOME FORM

02:50:27  17   OF TECHNICAL ISSUE WITH THE MINI LAB DEVICE?

02:50:29  18   A.    I DON'T RECALL EVER HEARING ABOUT A TECHNICAL ISSUE.

02:50:32  19   Q.    OKAY.  DID SHE EVER TELL YOU THAT THERANOS HAD YET TO

02:50:36  20   VALIDATE A SINGLE TEST ON ITS MINI LAB DEVICE FOR USE IN THE

02:50:39  21   CLIA LAB?

02:50:40  22   A.    NO.

02:50:40  23   Q.    IN 2012, WOULD IT SURPRISE YOU TO LEARN THAT THERANOS HAD

02:50:47  24   YET TO VALIDATE A SINGLE TEST ON ITS MINI LAB DEVICE FOR USE IN

02:50:51  25   THE CLIA LAB?

02:50:52  1    A.   YES.

02:50:53  2    Q.   WHY WOULD THAT HAVE SURPRISED YOU?

02:50:55  3    A.   BECAUSE I THOUGHT THE VALIDATION HAD TAKEN PLACE MUCH

02:50:58  4    EARLIER.

02:50:59  5    Q.   OKAY.  DID MS. HOLMES EVER TELL YOU THAT THERANOS WAS

02:51:03  6    USING ONLY FDA APPROVED MACHINES AND FDA APPROVED TESTS IN THE

02:51:07  7    CLIA LAB IN THIS 2012 TIME PERIOD?

02:51:10  8    A.   I'M NOT SURE I UNDERSTAND THE QUESTION.  ARE YOU -- ARE

02:51:14  9    YOU ASKING IF THEY'RE USING MACHINES THAT THEY DIDN'T DEVELOP?

02:51:18  10   Q.   YES.

02:51:18  11   A.   THAT'S A LITTLE COMPLICATED.

02:51:27  12   Q.   LET ME ASK --

02:51:28  13   A.   I CAN ANSWER IT.

02:51:32  14        WE WANTED THEM TO PUT A LAB ON CAMPUS SO WE COULD HAVE

02:51:35  15   REAL TIME, YOU KNOW, EXPERIENCE, AND WE THOUGHT THAT LAB WAS

02:51:40  16   GOING TO BE A MINI LAB.

02:51:43  17        AND THEN ELIZABETH EXPRESSED CONCERN ABOUT SECRECY BECAUSE

02:51:47  18   ONLY SAFEWAY EMPLOYEES WOULD BE USING THIS LAB.

02:51:51  19        AND SO WE KNEW AT THAT POINT THAT THEY WERE DRAWING BOTH

02:51:56  20   FINGERSTICK WHERE THEY COULD AND FULL VIALS AND THAT THEY WERE,

02:52:02  21   THEY WERE, I THINK, DOING SOME KIND OF VALIDATION, AND I THINK

02:52:05  22   IT WAS DESCRIBED MAYBE AS, YOU KNOW, REFINING.  OKAY?

02:52:09  23        AND SO SOME OF THOSE VIALS I BELIEVE WERE USED TO CREATE A

02:52:15  24   NUMBER OF BLOOD SAMPLES TO MAKE SURE YOU GOT CONSISTENT -- I

02:52:20  25   CONSIDERED IT AS A CALIBRATION PROCESS.

BURD DIRECT BY MR. LEACH

02:52:23   1        AND WE ALSO KNEW THAT THEY WERE SENDING SOME OF THOSE OUT

02:52:27   2   TO OTHER LABS.

02:52:30   3   Q.   SO LET ME TRY TO UNPACK THAT A LITTLE BIT.

02:52:33   4        AT SOME POINT DID SAFEWAY REQUEST FOR SOME FORM OF PILOT

02:52:38   5   TO BE DONE ON ITS CAMPUS TO TEST THE THERANOS PROCESS?

02:52:42   6   A.   YES.

02:52:42   7   Q.   TELL US ABOUT THAT, PLEASE.

02:52:43   8   A.   WELL, WE WERE FAR INTO THIS THING AND WE'D NEVER REALLY

02:52:50   9   SEEN THE BOX WORK.  SO WE HAD A WELLNESS CENTER ON CAMPUS.  WE

02:52:56  10   HAD NURSES ON CAMPUS.  AND SO THAT BUILDING WAS SEPARATED FROM

02:53:01  11   THE MAIN OFFICE, SO WE THOUGHT IT WAS A PERFECT PLACE TO PUT

02:53:05  12   THIS LAB.

02:53:08  13        AND INITIALLY I THOUGHT WE WERE GOING TO GET THE REAL MINI

02:53:13  14   LAB, AND THEN I WAS TOLD, NO, WE'RE NOT GOING TO GET THE NEW

02:53:16  15   MINI LAB, WE'LL CONTINUE TO DO THOSE ANALYTICS DOWN AT

02:53:21  16   THERANOS.

02:53:21  17   Q.   OKAY.  AND I GUESS MY QUESTION WAS, DID MS. HOLMES EVER

02:53:28  18   TELL YOU THAT THE ONLY MACHINES THEY WERE USING IN THE CLIA LAB

02:53:31  19   WERE FDA APPROVED MACHINES IN THIS TIME PERIOD?

02:53:35  20   A.   SEE, I'M NOT SURE WHAT AN FDA APPROVED MACHINE IS, SO I

02:53:42  21   STRUGGLE WITH THAT QUESTION.

02:53:44  22        ARE YOU -- IF YOU'RE SAYING THEY'RE ONLY USING THE CLIA

02:53:52  23   WAVE MACHINES THAT THEY DEVELOPED THEMSELVES, IF THAT'S THE

02:53:54  24   QUESTION?

02:53:55  25   Q.   LET ME ASK A BETTER QUESTION.  WHEN YOU ENVISIONED WHAT

02:53:58   1    WAS HAPPENING IN THE CLIA LAB, DID YOU ENVISION THERANOS USING

02:54:01   2    THE MINI LAB DEVICES THAT HAD BEEN SHOWN TO YOU?

02:54:04   3    A.   YES.

02:54:05   4    Q.   AND IN 2012, WOULD IT SURPRISE YOU THAT NO MINI LAB WAS

02:54:13   5    USED IN THE CLIA LAB IN 2012?

02:54:15   6    A.   THAT NO MINI LAB?  YES.

02:54:20   7    Q.   AND WHY IS THAT?

02:54:21   8    A.   BECAUSE I THOUGHT THEY WERE USING PREDOMINANTLY THEIR MINI

02:54:28   9    LAB, BUT THAT THEY WERE, YOU KNOW, CALIBRATING THE MACHINE.  SO

02:54:33   10   IT DIDN'T BOTHER ME THAT THEY MIGHT HAVE SOME STANDARD

02:54:36   11   EQUIPMENT, YOU KNOW, AS A CALIBRATION DEVICE.

02:54:42   12        BUT IF THEY WERE USING OTHER MACHINES ONLY, THEN ALL WE

02:54:49   13   WERE TESTING WAS THE PHLEBOTOMIST'S ABILITY TO PRICK A FINGER

02:54:54   14   AND DRAW BLOOD, AND WE WANTED TO TEST THE TECHNOLOGY.

02:54:57   15   Q.   OKAY.  LET ME DRAW YOUR ATTENTION, PLEASE, TO WHAT HAS

02:55:04   16   BEEN MARKED AS EXHIBIT 718.

02:55:24   17        AND I BELIEVE THERE'S A STIPULATION FOR 718.  I OFFER IT

02:55:28   18   INTO EVIDENCE.

02:55:28   19            MR. DOWNEY:  YES, YOUR HONOR.  NO OBJECTION.

02:55:30   20            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:55:33   21        (GOVERNMENT'S EXHIBIT 718 WAS ADMITTED IN EVIDENCE.)

02:55:34   22   BY MR. LEACH:

02:55:36   23   Q.   MR. BURD, DOES THIS APPEAR TO BE AN EMAIL EXCHANGE BETWEEN

02:55:39   24   YOU AND MS. HOLMES IN OR AROUND DECEMBER 18TH, 2012?

02:55:43   25   A.   YES.

02:55:43  1    Q.   OKAY.  AND THE SUBJECT IS PHONE CALL TO DISCUSS SCHEDULE.

02:55:47  2         DO YOU SEE THAT?

02:55:48  3    A.   YES.

02:55:49  4    Q.   AND AT THIS POINT IN TIME, ARE YOU WORKING HARD TO TRY TO

02:55:55  5    GET THE SAFEWAY LAUNCH HAPPENING?

02:55:57  6    A.   YES.

02:55:58  7    Q.   I DRAW YOUR ATTENTION TO THE SECOND PARAGRAPH FROM THE

02:56:04  8    BOTTOM.  DO YOU SEE WHERE IT SAYS, "WITHOUT RECOUNTING ALL THE

02:56:09  9    MISSED DEADLINES, IT IS CRYSTAL CLEAR THAT EITHER THE MOST

02:56:12  10   RECENTLY COMMITTED DATES (SEPTEMBER 24TH AND LATER

02:56:17  11   DECEMBER 6TH) WERE FAR TOO AMBITIOUS, OR THERE HAVE BEEN SOME

02:56:20  12   OVERWHELMING SURPRISES ALONG THE WAY.  I ALSO WORRY THAT THE

02:56:24  13   DEMANDS OF YOUR CORE BUSINESS OR THE NEWLY ACQUIRED DOD

02:56:28  14   BUSINESS ARE CONSUMING RESOURCES THAT WOULD OTHERWISE BE

02:56:30  15   COMMITTED TO LAUNCH."

02:56:32  16        DO YOU SEE THAT LANGUAGE?

02:56:33  17   A.   I DO.

02:56:34  18   Q.   WHAT DID YOU MEAN BY "THE NEWLY ACQUIRED DOD BUSINESS"?

02:56:39  19   A.   YOU KNOW, AS I KEPT PRESSING, YOU KNOW, FOR LAUNCH, ALWAYS

02:56:47  20   WANTING TO MAKE SURE THAT WE HAD NAILED EVERYTHING DOWN, I KEPT

02:56:52  21   ASKING WHY, WHAT ARE THE OBSTACLES, WHAT'S IN THE WAY?

02:56:55  22        AND ON -- IT WAS EITHER A PHONE CALL OR AN EMAIL, SHE TOLD

02:56:59  23   ME THAT THEY HAD BEEN DOING SOME WORK FOR THE DEPARTMENT OF

02:57:03  24   DEFENSE, THAT HER DEVICE WAS IN MEDEVAC UNITS AROUND THE WORLD

02:57:11  25   IN PLACES THAT, YOU KNOW, A LOT OF AMERICANS DIDN'T EVEN KNOW

02:57:15   1      WE WERE.

02:57:17   2           AND WHEN I THOUGHT ABOUT THE COMPOSITION OF HER BOARD,

02:57:22   3      THAT WASN'T THAT -- IT WAS DISAPPOINTING, BUT IT WASN'T THAT

02:57:25   4      SURPRISING.

02:57:28   5      Q.   WHEN -- YOU MENTIONED SOMETHING ABOUT A MEDEVAC UNIT.

02:57:35   6      A.   YES.

02:57:36   7      Q.   WHAT DO YOU MEAN BY THAT?

02:57:37   8      A.   THAT MIGHT NOT BE THE RIGHT TERMINOLOGY HERE.

02:57:40   9           BUT, YOU KNOW, THAT'S WHERE YOU HAVE A -- YOU HAVE MEDICAL

02:57:45  10      CAPABILITY IN THE FIELD OF BATTLE THAT IS DEALING WITH INJURIES

02:57:54  11      WHEN PEOPLE THAT HAVE BEEN SHOT, AND OFTEN INFECTION IN THAT

02:57:59  12      FIELD IS A BIG DEAL.

02:58:01  13           AND SO TO BE ABLE TO, IN 20 MINUTES, DETERMINE THE KIND OF

02:58:05  14      INFECTION COULD SAVE SOMEBODY'S LIFE.

02:58:09  15           AND SO IT MADE SENSE THAT THE DOD WOULD WANT THIS UNIT IF

02:58:14  16      IT COULD DO THAT.

02:58:15  17           AND THEN THERE WERE GENERALS AND ADMIRALS AND OTHERS ON

02:58:20  18      THE BOARD, SO, YOU KNOW, I DIDN'T LIKE THE IDEA -- SHE SAID

02:58:24  19      THAT, TRUST ME, YOU KNOW, STRATEGICALLY, THIS WILL HAVE VALUE

02:58:28  20      TO US.

02:58:29  21           I THINK PRESUMABLY SOME KIND OF BRANDING VALUE WHEN YOU

02:58:33  22      COULD MAKE IT AVAILABLE.

02:58:34  23      Q.   IN THIS CONTEXT, DID MS. HOLMES TELL YOU THAT THERANOS

02:58:38  24      DEVICES WERE BEING USED ON THE BATTLEFIELD?

02:58:41  25      A.   I DON'T KNOW ABOUT THE WORD BATTLEFIELD BECAUSE, YOU KNOW,

02:58:47   1      WE'VE HAD THESE SKIRMISHES, YOU KNOW.  BUT YOU CAN THINK OF

02:58:53   2      IRAQ OR AFGHANISTAN OR SOMETHING LIKE THAT.

02:58:55   3          BUT I'M NOT SURE THAT BATTLEFIELD IS THE RIGHT

02:58:59   4      DESCRIPTION, YOU KNOW, OF THAT.

02:59:00   5      Q.   LET ME ASK A BETTER QUESTION.  WHAT -- DESCRIBE THE

02:59:03   6      SUBSTANCE OF WHAT MS. HOLMES SAID TO YOU IN CONNECTION WITH THE

02:59:07   7      DOD.

02:59:07   8      A.   THE SUBSTANCE WAS WHERE THERE'S A MEDICAL NEED IN THE

02:59:11   9      MILITARY IN A REMOTE OUTPOST WHERE LABS ARE NOT AVAILABLE, WE

02:59:21   10     HAVE THE PERFECT SOLUTION.

02:59:22   11     Q.   OKAY.  AND SHE WAS USING THIS AS AN EXPLANATION FOR WHY

02:59:25   12     THERANOS WAS UNABLE TO GO FORWARD WITH SAFEWAY?

02:59:27   13     A.   THAT HAD NOT YET PULLED THE PLUG ON GOING FORWARD.

02:59:32   14     Q.   WITH SAFEWAY?

02:59:32   15     A.   WITH SAFEWAY.

02:59:33   16     Q.   OKAY.  AND DID SHE MAKE REFERENCE TO A MEDEVAC HELICOPTER?

02:59:37   17     A.   YES.

02:59:38   18     Q.   OKAY.  WHAT DID SHE SAY?

02:59:40   19     A.   I THINK SHE USED THE TERM THAT THEY WERE IN MEDEVAC

02:59:45   20     HELICOPTERS, SO THAT'S EVEN CLOSER THAN, YOU KNOW, HAVING A,

02:59:51   21     YOU KNOW, FACILITY SOMEWHERE IN AFGHANISTAN.

02:59:54   22     Q.   DID SHE TELL YOU THAT THIS INFORMATION COULD BE WIDELY

02:59:59   23     SHARED OR DISTRIBUTED WITHIN SAFEWAY?

03:00:02   24     A.   SHE SAID IT WAS, YOU KNOW, VERY CONFIDENTIAL.

03:00:05   25     Q.   AND AT THE TIME, WAS THIS EXPLANATION SATISFACTORY TO YOU?

03:00:14  1      A.   THAT KIND OF IMPLIES I WAS HAPPY.

03:00:22  2           I WAS BOTHERED BY IT.   I WAS DISAPPOINTED.

03:00:28  3           IT SEEMED PLAUSIBLE.   IT JUST SEEMED LIKE ONE MORE DELAY

03:00:32  4      FOR US.

03:00:32  5      Q.   YOU WERE BOTHERED BY THE DELAY, BUT THE EXPLANATION AT THE

03:00:35  6      TIME MADE SENSE TO YOU?   IS THAT FAIR?

03:00:37  7      A.   IT MADE -- IT MADE SENSE.

03:00:39  8           MR. LEACH:   OKAY.

03:00:40  9           YOUR HONOR, I'M MINDFUL OF THE TIME.   THIS MIGHT BE A GOOD

03:00:43 10      TIME FOR A BREAK.

03:00:43 11           THE COURT:   ALL RIGHT.   LET'S DO THAT.

03:00:45 12           LADIES AND GENTLEMEN, I PROMISED YOU WE'D BREAK AT 3:00

03:00:49 13      TODAY, 3:00 TODAY.

03:00:50 14           WE'LL HAVE TO RESUME TUESDAY NEXT.   TUESDAY AT 9:00 A.M.,

03:00:54 15      COUNSEL, WE'LL RESUME.

03:00:56 16           SO, SIR, YOU'LL HAVE TO COME BACK TUESDAY NEXT AT

03:01:00 17      9:00 A.M. TO CONTINUE YOUR EXAMINATION.

03:01:02 18           THE WITNESS:   SURE.

03:01:02 19           THE COURT:   THANK YOU.

03:01:03 20           LADIES AND GENTLEMEN, IT'S A LONG WEEKEND, AND I JUST WANT

03:01:06 21      TO REMIND YOU AGAIN OF THE ADMONITION.

03:01:10 22           PLEASE DO NOT DO ANY INVESTIGATION ABOUT ANYONE, ANYTHING

03:01:14 23      INVOLVED IN THIS CASE.   DO NOT VISIT ANY LOCATIONS.   AND

03:01:18 24      PLEASE, AS BEST YOU CAN, AVOID ANY SOCIAL MEDIA, ANY RADIO,

03:01:25 25      TELEVISION, NEWSPAPER, ANYTHING THAT TOUCHES ON THIS ARTICLE.

2999

```
03:01:27   1        SHOULD YOU INADVERTENTLY COME ACROSS SOMETHING, PLEASE
03:01:30   2   TURN THAT, DISABLE THE DEVICE, TURN AWAY, DON'T OPEN THE PAGE
03:01:33   3   OF THE NEWSPAPER.  I DON'T REMEMBER HOW MANY OF YOU READ HARD
03:01:36   4   COPY NEWSPAPERS AS OPPOSED TO YOUR DEVICES, BUT PLEASE DON'T
03:01:40   5   ENGAGE THAT AT ALL.
03:01:43   6        IF DO YOU COME ACROSS THAT, WE'LL TALK ABOUT IT TUESDAY
03:01:46   7   WHEN I ASK YOU WHETHER OR NOT ANY OF THESE THINGS HAVE
03:01:49   8   HAPPENED.
03:01:50   9        THANK YOU FOR THAT.
03:01:51  10        ENJOY YOUR LONG WEEKEND.  BE SAFE, BE HEALTHY, AND WE'LL
03:01:55  11   SEE YOU BACK NEXT WEEK.  THANK YOU.
03:02:07  12            THE WITNESS:  EXCUSE ME.  I CAN LEAVE THIS RIGHT
03:02:09  13    HERE?
03:02:09  14            THE COURT:  YES, JUST LEAVE EVERYTHING THERE, SIR.
03:02:13  15            THE WITNESS:  THANK YOU.
03:02:14  16            THE COURT:  YOU'RE WELCOME.
03:02:19  17    (JURY OUT AT 3:02 P.M.)
03:02:25  18            THE COURT:  AND YOU CAN STAND DOWN, SIR.  THANK YOU.
03:02:27  19            THE WITNESS:  OKAY.  THANK YOU.
03:02:38  20            THE COURT:  PLEASE BE SEATED.
03:02:53  21        ALL RIGHT.  THE RECORD SHOULD REFLECT THAT THE JURY -- OUR
03:02:56  22   JURY HAS LEFT FOR THE WEEKEND.  THE WITNESS HAS LEFT THE
03:02:59  23   COURTROOM.  ALL COUNSEL AND THE DEFENDANT ARE PRESENT.
03:03:01  24        ANYTHING FURTHER BEFORE WE BREAK FROM THE GOVERNMENT?
03:03:04  25            MR. LEACH:  NO, YOUR HONOR.
```

3000

03:03:08  1            MR. DOWNEY:  NOTHING FROM THE DEFENSE, YOUR HONOR.

03:03:09  2            THE COURT:  ALL RIGHT.  THANK YOU.

03:03:10  3        ENJOY YOUR LONG WEEKEND, AND I HOPE YOU CAN SEE FAMILY

03:03:14  4    AGAIN PERHAPS OVER THE WEEKEND.  ENJOY.  WE'LL SEE YOU TUESDAY

03:03:18  5    NEXT.  THANK YOU.

03:03:20  6            MR. DOWNEY:  THANK YOU, YOUR HONOR.

03:03:20  7            MR. LEACH:  THANK YOU, YOUR HONOR.

03:03:21  8            THE CLERK:  COURT IS ADJOURNED.

03:03:23  9        (THE EVENING RECESS WAS TAKEN AT 3:03 P.M.)

         10

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

1

2

3                          CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8     UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9     CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10    HEREBY CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16         _____
           IRENE RODRIGUEZ, CSR, CRR
           CERTIFICATE NUMBER 8076
17

18

19         _____
           LEE-ANNE SHORTRIDGE, CSR, CRR
20         CERTIFICATE NUMBER 9595

21         DATED:  OCTOBER 6, 2021

22

23

24

25