1

2                         UNITED STATES DISTRICT COURT

3                        NORTHERN DISTRICT OF CALIFORNIA

4                             SAN JOSE DIVISION

5

      UNITED STATES OF AMERICA,          )   CR-18-00258-EJD
6                                        )
                         PLAINTIFF,      )   SAN JOSE, CALIFORNIA
7                                        )
                 VS.                     )   VOLUME 17
8                                        )
      ELIZABETH A. HOLMES,               )   OCTOBER 12, 2021
9                                        )
                         DEFENDANT.      )   PAGES 3001 - 3278
10    _____   )   **PAGES 3203 - 3278 SEALED**

11

12                    TRANSCRIPT OF TRIAL PROCEEDINGS
                 BEFORE THE HONORABLE EDWARD J. DAVILA
13                    UNITED STATES DISTRICT JUDGE

      A P P E A R A N C E S:
14

15    FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                             BY:  JOHN C. BOSTIC
16                                JEFFREY B. SCHENK
                             150 ALMADEN BOULEVARD, SUITE 900
17                           SAN JOSE, CALIFORNIA 95113

18                           BY:  ROBERT S. LEACH
                                  KELLY VOLKAR
19                           1301 CLAY STREET, SUITE 340S
                             OAKLAND, CALIFORNIA 94612

20        (APPEARANCES CONTINUED ON THE NEXT PAGE.)

21

22    OFFICIAL COURT REPORTERS:
                             IRENE L. RODRIGUEZ, CSR, RMR, CRR
                             CERTIFICATE NUMBER 8074
23                           LEE-ANNE SHORTRIDGE, CSR, CRR
                             CERTIFICATE NUMBER 9595
24

25           PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                 TRANSCRIPT PRODUCED WITH COMPUTER

```
 1        A P P E A R A N C E S: (CONT'D)

 2

 3     FOR DEFENDANT HOLMES:    WILLIAMS & CONNOLLY LLP
                                BY:  KEVIN M. DOWNEY
 4                                   LANCE A. WADE
                                     KATHERINE TREFZ
 5                                   RICHARD CLEARY
                                     PATRICK LOOBY
 6                              725 TWELFTH STREET, N.W.
                                WASHINGTON, D.C. 20005
 7
                                LAW OFFICE OF JOHN D. CLINE
 8                              BY:  JOHN D. CLINE
                                ONE EMBARCADERO CENTER, SUITE 500
 9                              SAN FRANCISCO, CALIFORNIA 94111

10
       ALSO PRESENT:           FEDERAL BUREAU OF INVESTIGATION
11                             BY:  ADELAIDA HERNANDEZ

12                             OFFICE OF THE U.S. ATTORNEY
                               BY:  LAKISHA HOLLIMAN, PARALEGAL
13                                  MADDI WACHS, PARALEGAL

14                             WILLIAMS & CONNOLLY
                               BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL
15
                               TBC
16                             BY:  BRIAN BENNETT, TECHNICIAN

17

18

19

20

21

22

23

24

25
```

3003

INDEX OF PROCEEDINGS

GOVERNMENT'S:


**STEVEN BURD**
DIRECT EXAM BY MR. LEACH (RES.)          P. 3021
CROSS-EXAM BY MR. DOWNEY                  P. 3048
REDIRECT EXAM BY MR. LEACH               P. 3145
RECROSS-EXAM BY MR. DOWNEY               P. 3156

**WADE MIQUELON**
DIRECT EXAM BY
CROSS-EXAM BY
REDIRECT EXAM BY
RECROSS-EXAM BY

**NIMESH JHAVERI**
DIRECT EXAM BY
CROSS-EXAM BY
REDIRECT EXAM BY
RECROSS-EXAM BY

3004

1                           INDEX OF EXHIBITS

2
                                          IDENT.      EVIDENCE
3        GOVERNMENT'S:

4        375                                           3022
         670, PAGES 1 & 2                              3029
5        684                                           3032
         693                                           3035
6        699                                           3036
         701                                           3037
7        715                                           3039
         770                                           3042
8        813                                           3044
         820                                           3046
9        281                                           3058
         332                                           3083

10

11

12       DEFENDANT'S:

13       7190                                          3073
         7104                                          3091
14       10537                                         3119
         7196                                          3124
15       12283                                         3128
         10568 & 10569                                 3136

16

17

18

19

20

21

22

23

24

25

3005

```
        1    SAN JOSE, CALIFORNIA                    OCTOBER 12, 2021

08:20AM  2                    P R O C E E D I N G S

08:35AM  3         (COURT CONVENED AT 8:35 A.M.)

08:35AM  4         (JURY OUT AT 8:35 A.M.)

08:35AM  5             THE COURT:  LET'S GO ON THE RECORD IN THE HOLMES

08:35AM  6    MATTER.  LET ME JUST CAPTURE THE APPEARANCES OF THE PARTIES,

08:36AM  7    PLEASE, ONCE AGAIN.

08:36AM  8         WHO APPEARS FOR THE GOVERNMENT?

08:36AM  9             MR. LEACH:  GOOD MORNING, YOUR HONOR.

08:36AM 10         ROBERT LEACH, JEFF SCHENK, JOHN BOSTIC, AND KELLY VOLKAR

08:36AM 11    FOR THE UNITED STATES.

08:36AM 12             THE COURT:  THANK YOU.  GOOD MORNING.

08:36AM 13         AND FOR THE DEFENSE?

08:36AM 14             MR. DOWNEY:  GOOD MORNING, YOUR HONOR.

08:36AM 15         KEVIN DOWNEY, LANCE WADE, KATIE TREFZ, AND ANDREW LEMENS

08:36AM 16    FROM WILLIAMS & CONNOLLY FOR MS. HOLMES, AND OUR COCOUNSEL

08:36AM 17    JOHN CLINE IS PRESENT, AND SO IS MS. HOLMES.

08:36AM 18             THE COURT:  THANK YOU.  GOOD MORNING.

08:36AM 19         I WANTED TO TOUCH BASE ABOUT THIS WEEK'S PROCEEDINGS.  WE

08:36AM 20    HAVE ONE WITNESS ON THE STAND, AND IF I RECALL CORRECTLY ABOUT

08:36AM 21    THE TIME ESTIMATE, YOU HAVE ABOUT ANOTHER HOUR OR SO,

08:36AM 22    MR. LEACH?

08:36AM 23             MR. LEACH:  YES, THAT'S RIGHT.

08:36AM 24             THE COURT:  OKAY.  AND THEN YOUR CROSS?

08:36AM 25             MR. DOWNEY:  YOUR HONOR, I THOUGHT WE WOULD PROBABLY
```

08:36AM 1    BE TO SORT OF MID TO LATE AFTERNOON, SO I ADVISED MR. LEACH TO

08:36AM 2    HAVE ANOTHER WITNESS AVAILABLE.

08:36AM 3         THE COURT:  GREAT.  OKAY.  THANK YOU.

08:36AM 4       AS FAR AS SCHEDULING, I WOULD LIKE TO GO UNTIL 3:00 TODAY

08:37AM 5    IF WE COULD.  I'LL ASK THE JURY THAT, AND PERHAPS AS WELL

08:37AM 6    TOMORROW, MAYBE 4:00 O'CLOCK TOMORROW IF WE CAN.

08:37AM 7       FRIDAY WE'LL HAVE TO END AT 1:00 O'CLOCK, 1:00 O'CLOCK ON

08:37AM 8    FRIDAY.  SO I'LL INFORM OUR JURY OF THAT SCHEDULE.

08:37AM 9       ALSO, YOU RECALL THERE WAS AN ANCILLARY MOTION REGARDING

08:37AM 10   THE QUESTIONNAIRES THAT WE HAD TALKED ABOUT, AND I INDICATED

08:37AM 11   THAT I WOULD LIKE TO MEET WITH THE JURORS AND TALK WITH THEM IN

08:37AM 12   MY CHAMBERS.

08:37AM 13      YOU HAVE HAD THE WEEKEND TO THINK ABOUT THAT PROCESS.

08:37AM 14      LET ME ASK, MR. DOWNEY, WHAT IS YOUR POSITION ABOUT

08:37AM 15   WHETHER OR NOT YOU OR A MEMBER OF YOUR TEAM WOULD LIKE TO JOIN

08:37AM 16   IN NOT THE CONVERSATION, BUT JUST TO BE PRESENT?

08:37AM 17         MR. DOWNEY:  YOUR HONOR, AS I'VE SAID LAST WEEK, I

08:37AM 18   THINK WE WOULD LIKE TO BE PRESENT.  OUR VIEW IS THAT UNDER

08:38AM 19   RULE 43 AND INDEED UNDER THE DUE PROCESS CLAUSE, IT'S AN

08:38AM 20   ELEMENT OF TRIAL FOR WHICH DEFENSE COUNSEL SHOULD BE PRESENT.

08:38AM 21         THE COURT:  OKAY.

08:38AM 22         MR. SCHENK:  GOOD MORNING, YOUR HONOR.

08:38AM 23      I'VE LOOKED AT CASES BETWEEN OUR LAST CONVERSATION AND

08:38AM 24   THIS MORNING AND I WOULD BE HAPPY TO SEND THEM TO THE COURT OR

08:38AM 25   PROVIDE THEM TO THE DEFENSE.

08:38AM 1      MY UNDERSTANDING IS THAT THERE'S NOT A TON OF CASE LAW ON

08:38AM 2  THIS ISSUE.  THERE IS NO CONSTITUTIONAL RIGHT.  I THINK THE

08:38AM 3  CASE LAW IS PRETTY CLEAR ON THAT.

08:38AM 4      UNDER THE RULES OF PROCEDURE, THOUGH, I THINK THE QUESTION

08:38AM 5  IS A LITTLE BIT LESS CLEAR.

08:38AM 6      I THINK THAT WHEN THE JURY HAS NOT YET BEEN IMPANELED, THE

08:38AM 7  CASE LAW INSTRUCTS US THAT MS. HOLMES HAS A RIGHT TO BE

08:38AM 8  PRESENT.

08:38AM 9      I DON'T, THOUGH, THINK THAT THAT RIGHT IS THE SAME ONCE

08:38AM 10 THE JURY HAS BEEN SEATED, AND TO ENTERTAIN A MOTION OR A MATTER

08:39AM 11 LIKE THIS ONE, WHICH IS ANCILLARY TO THE SPECIFIC TRIAL

08:39AM 12 PROCEEDING.  IN FACT, THE COURT COULD CERTAINLY HAVE THIS

08:39AM 13 DIALOGUE AT THE END OF THE TRIAL WITH THE JURORS TO ASK THEM

08:39AM 14 HOW THEY FEEL ABOUT THE RELEASE OF CERTAIN INFORMATION IN THEIR

08:39AM 15 QUESTIONNAIRES, AND I DON'T THINK ANYBODY WOULD BE ARGUING TO

08:39AM 16 THE COURT THAT THE DEFENDANT HAS A RIGHT TO BE PRESENT AT THAT

08:39AM 17 STAGE.

08:39AM 18      AND I'M NOT SURE THAT THE ANALYSIS CHANGES ALL THAT MUCH,

08:39AM 19 BECAUSE THE CONVERSATION IS THE SAME.  THE COURT'S CONVERSATION

08:39AM 20 WITH THESE JURORS WOULD BE IDENTICAL IF IT HAD IT TODAY OR IF

08:39AM 21 IT HAD IT POST-TRIAL, AND I THINK IT WOULD BE FINE FOR THE

08:39AM 22 COURT TO HAVE THAT CONVERSATION WITH JURORS WITHOUT THE

08:39AM 23 PRESENCE OF THE DEFENDANT, THOUGH I WANT TO ANNOUNCE FOR THE

08:39AM 24 COURT, I THINK THE CASE LAW IS A LITTLE BIT UNCLEAR OR MAYBE

08:39AM 25 LESS THAN COMPLETELY DECIDED IN THE CIRCUIT.  AND, AGAIN, I'LL

08:39AM 1    BE HAPPY TO PROVIDE THE CASES THAT I'VE LOOKED AT TO COME TO

08:39AM 2    THAT CONCLUSION.

08:39AM 3              THE COURT:  WELL, THANK YOU.  THAT WAS MY INITIAL

08:40AM 4    ANALYSIS AS WELL, AND THAT'S WHAT I WAS TALKING ABOUT LAST

08:40AM 5    WEEK, MR. DOWNEY.

08:40AM 6        I KNOW YOU TALK ABOUT DUE PROCESS, AND I'M NOT CERTAIN

08:40AM 7    I'VE SEEN IT, AND MAYBE YOU CAN EDUCATE ME IN A WAY.  THE TRIAL

08:40AM 8    HAS BEGUN AND THE JURORS ARE HERE.  THIS IS TOUCHING ON NOT AN

08:40AM 9    EVIDENTIARY MATTER THAT THE JURY WOULD RECEIVE AND OTHERWISE

08:40AM 10   CONSIDER IN THEIR DELIBERATIONS, BUT IT'S MORE FUNCTIONALLY

08:40AM 11   WITH THE COURT AND PERSONAL TO THEM AS TO QUESTIONNAIRES AND

08:40AM 12   INFORMATION THAT MIGHT OR MIGHT NOT BE RELEASED PURSUANT TO THE

08:40AM 13   SECONDARY MOTION THAT IS NOT PART OF OUR TRIAL OTHER THAN IT'S

08:40AM 14   THE MEDIA COALITION, I THINK, DESIRE'S TO GAIN INFORMATION

08:40AM 15   ABOUT OUR JURY BASED ON THE ANSWER TO THE QUESTIONNAIRES.

08:40AM 16       SO, AGAIN, I, I AM NOT CERTAIN I SEE THE DUE PROCESS, IT

08:40AM 17   RISES TO A DUE PROCESS ISSUE.  I'M HAPPY TO RECEIVE SOMETHING

08:40AM 18   FROM YOU IF YOU WOULD LIKE TO PRESENT SOMETHING TO ME, ALTHOUGH

08:41AM 19   I THOUGHT WE SHOULD GET THE ISSUE RESOLVED SOMEHOW.

08:41AM 20       I EXPRESSED TO YOU LAST WEEK MY INITIAL RETICENCE ABOUT

08:41AM 21   HAVING COUNSEL PRESENT, AND IT'S NOT LIKE I DON'T WANT COUNSEL

08:41AM 22   PRESENT, I ENJOY COUNSEL, BUT FOR THIS PURPOSE I DIDN'T WANT TO

08:41AM 23   OTHERWISE OFFER ANY INTIMIDATION FOR OUR JURY IN THIS

08:41AM 24   QUESTIONNAIRE.

08:41AM 25       I'M TRYING TO THINK IF I HAD YOU OR A REPRESENTATIVE OF

3009

08:41AM 1       YOUR TEAM, IT WOULD BE ONE FROM EACH TEAM BACK IN MY OFFICE.  I

08:41AM 2       SUPPOSE I CAN SEAT EACH OF YOU COMFORTABLY IN THE CORNER AND

08:41AM 3       HAVE THEIR BACKS TO YOU, AND I DON'T KNOW IF ANY OF YOU WOULD

08:41AM 4       OBJECT TO THAT.

08:41AM 5           AND I DON'T MEAN TO BE FLIP, I JUST DON'T WANT THE JURORS

08:41AM 6       TO BE OTHERWISE IN DISCOMFORT SUCH THAT THEIR RESPONSES TO MY

08:41AM 7       QUESTIONS WOULD BE LESS THAN CANDID AND THEY MIGHT OTHERWISE BE

08:41AM 8       INTIMIDATED FOR THE PURPOSE.

08:42AM 9           I ALSO DON'T WANT TO IN ANY WAY AFFECT THEIR JUDGMENT.

08:42AM 10          I SEE THEM AS TWO SEPARATE ISSUES.  THEY WILL SOON BE

08:42AM 11      DELIBERATING THIS CASE AND TO HAVE CONTACT WITH COUNSEL IN THE

08:42AM 12      INTIMACY OF THE JUDGE'S CHAMBERS WHILE THE CASE IS BEING TRIED

08:42AM 13      IS SOMETHING THAT CAUSES ME CONCERN AS WELL.

08:42AM 14          I KNOW YOU WON'T BE PARTICIPANTS OF THE CONVERSATION, THAT

08:42AM 15      IS, I'M NOT GOING TO PERMIT YOU TO SPEAK TO THE JURORS.  YOU'RE

08:42AM 16      THERE TO WITNESS.

08:42AM 17          BUT, AGAIN, I'M CONCERNED A LITTLE BIT ABOUT UNTOWARD

08:42AM 18      CONTACT WITH OUR JURORS IN THAT RESPECT ALSO.

08:42AM 19          THOSE ARE THE THINGS THAT I'M THINKING ABOUT FOR YOUR

08:42AM 20      BENEFIT.  I DON'T WANT THAT TO INFLUENCE THEIR DELIBERATIVE

08:42AM 21      PROCESS IN ANY WAY.

08:42AM 22          ANYTHING YOU WOULD LIKE TO SAY, MR. DOWNEY?

08:42AM 23              MR. DOWNEY:  NO, YOUR HONOR.  I THINK REALLY ONLY

08:42AM 24      TWO POINTS.

08:42AM 25          I THINK SOME OF THE CONCERNS THAT THE COURT HAS ARE THE

08:42AM  1    SAME CONCERNS THAT DEFENSE COUNSEL SHARES.

08:43AM  2        WE'RE CONCERNED ABOUT ADDRESSING THE JURORS ON THIS MATTER

08:43AM  3    PRIOR TO DELIBERATIONS AND, RESPECTFULLY, I THINK WE WOULD BE

08:43AM  4    CONCERNED ABOUT COUNSEL HAVING A COLLOQUY WITH THEM ON THIS

08:43AM  5    SUBJECT.

08:43AM  6        BUT WE'RE ALSO CONCERNED ABOUT THE COURT HAVING A DIALOGUE

08:43AM  7    WITH THEM, NOT BECAUSE THE COURT HAS ANY IMPROPER INTENT, BUT

08:43AM  8    JUST BECAUSE THAT TYPE OF A DIALOGUE, AS I SAID LAST WEEK, IS

08:43AM  9    UNPREDICTABLE AND CAN HAVE AN INFLUENCE ON THE DELIBERATIONS

08:43AM  10   LATER THAT NONE OF US CAN SEE.

08:43AM  11       SO I'M CONCERNED ABOUT THE PROCEDURE FOR THAT REASON,

08:43AM  12   WHICH IS ONE OF THE REASONS THAT ANIMATES OUR REQUEST TO BE

08:43AM  13   PRESENT.

08:43AM  14       SO I DON'T FUNDAMENTALLY DISAGREE ABOUT THE DYNAMIC AND

08:43AM  15   IT'S AWKWARDNESS, BUT IT'S JUST A QUESTION OF HOW WE CONDUCT IT

08:43AM  16   AND THE ABILITY TO PROTECT MS. HOLMES'S RIGHTS.

08:43AM  17       I THINK THE SECOND ISSUE ON WHICH I THINK WE HAD A

08:43AM  18   DISAGREEMENT LAST WEEK, AND I DISAGREE WITH MR. SCHENK FOR THE

08:44AM  19   SAME REASON, THE JURORS ARE ONLY HERE TO PARTICIPATE IN THIS

08:44AM  20   PROCEEDING.  THEY'RE NOT HERE IN AN ANCILLARY PROCEEDING.  THEY

08:44AM  21   WERE SUMMONED FOR THIS PROCEEDING.

08:44AM  22       THE MEDIA COALITION INTERVENED IN THIS PROCEEDING.  THIS

08:44AM  23   IS NOT A MATTER THAT IS ANCILLARY TO THE TRIAL.  THIS IS PART

08:44AM  24   OF THE TRIAL, AND I THINK HAVING A DIALOGUE WITH THEM ABOUT IT

08:44AM  25   PRIOR TO THE TIME THAT THEY DELIBERATE RUNS A LOT OF RISK.

08:44AM 1          THE COURT:  WELL, IT'S NOT PART OF THE TRIAL PROCESS

08:44AM 2    IN THE SENSE THAT IT'S EVIDENTIARY.  IT'S SEPARATE.  I SEE IT

08:44AM 3    AS A SEPARATE ISSUE.

08:44AM 4          IT RELATES TO THEM, THE JURORS PERSONALLY, AS TO THEIR

08:44AM 5    PERSONAL INFORMATION AND HOW MUCH, IF ANY, WILL BE RELEASED

08:44AM 6    PURSUANT TO THE MOTION OF THE MEDIA COALITION.

08:44AM 7          IT DOESN'T HAVE ANYTHING TO DO WITH THE EVIDENCE THAT IS

08:44AM 8    COMING IN IN THIS CASE OR ANYTHING ABOUT THEIR THOUGHT PROCESS

08:44AM 9    IN THAT REGARD.  IT RELATES TO THEM PERSONALLY AS I SAID WITH

08:44AM 10   THIS PERSONAL INFORMATION.

08:44AM 11         I SEE IT -- IT'S IN THE SAME TRIAL, BUT I DO THINK IT'S A

08:44AM 12   SEPARATE ISSUE IN AND OF ITSELF.

08:45AM 13         ALL RIGHT.  WELL, AND DO YOU HAVE A -- I DIDN'T ASK YOU TO

08:45AM 14   DO THIS, BUT LET ME ASK YOU, DO YOU HAVE THOUGHTS ABOUT --

08:45AM 15   YOU'RE CONCERNED ABOUT THE CONVERSATION THAT THE COURT HAS.

08:45AM 16         DO YOU WANT TO OFFER A SCRIPT?  DO YOU HAVE A SCRIPT TO

08:45AM 17   OFFER THE COURT FOR THIS PURPOSE?

08:45AM 18          MR. DOWNEY:  I DON'T.  I'M SURE YOUR HONOR HAS A

08:45AM 19   SCRIPT IN MIND.  I'D BE HAPPY TO RECEIVE IT FROM YOU AND TO

08:45AM 20   COMMENT AND, IF THERE'S ANY CONCERN ABOUT IT, TO LET THE COURT

08:45AM 21   KNOW THAT.

08:45AM 22          THE COURT:  WELL, I APPRECIATE THAT OFFER, BUT --

08:45AM 23          MR. DOWNEY:  I DON'T REALLY HAVE IN MIND PRECISELY

08:45AM 24   THE INFORMATION THAT THE COURT WOULD LIKE TO RECEIVE FROM THE

08:45AM 25   JURORS.

3012

08:45AM 1      I RECOGNIZE THE AWKWARDNESS OF THE SITUATION NOT ONLY

08:45AM 2   BECAUSE OF THE DYNAMICS, BUT ALSO BECAUSE WE CONSENTED TO A

08:45AM 3   STATEMENT IN THE QUESTIONNAIRE THAT IT WOULD BE CONFIDENTIAL.

08:45AM 4   HOW THEY TOOK THAT, FRANKLY, I DON'T KNOW.

08:45AM 5      AND SO I'M RELUCTANT TO PRESCRIBE FOR THE COURT EXACTLY

08:46AM 6   HOW YOU CONDUCT THAT CONVERSATION.

08:46AM 7          THE COURT:  WELL, THANK YOU.

08:46AM 8      I THINK THIS IS APPROPRIATE.  IT WAS THE COURT'S

08:46AM 9   PROMISE -- LET ME SAY, WE HAD A HEARING ON THIS, IT WAS A

08:46AM 10  PUBLIC HEARING, AND I INDICATED TO THE MEDIA COALITION'S

08:46AM 11  LAWYERS, IT WAS THE COURT'S PROMISE THAT THIS WOULD BE

08:46AM 12  CONFIDENTIAL, AND NOW THE MEDIA COALITION HAS BROUGHT TO MY

08:46AM 13  ATTENTION THAT, JUDGE, YOU SHOULDN'T HAVE -- MR. ZANSBERG SAID

08:46AM 14  YOU SHOULDN'T HAVE PROMISED THAT BECAUSE, YOU KNOW, THERE'S

08:46AM 15  CERTAIN CASE LAW THAT SUGGESTS YOU SHOULDN'T HAVE DONE THAT.

08:46AM 16     SO IF ANYTHING, IT'S THE COURT TO FALL ON ITS SWORD, IF

08:46AM 17  YOU WILL, TO SAY, LADIES AND GENTLEMEN, PERHAPS I MISSPOKE, BUT

08:46AM 18  LET'S HAVE A CONVERSATION ABOUT THAT.

08:46AM 19     SO IT'S ON THE COURT TO HAVE THAT CONVERSATION, AND I'M

08:46AM 20  NOT GOING TO ASK COUNSEL TO OTHERWISE OPINE OR SPEAK TO THAT.

08:46AM 21     ALL RIGHT.  THANK YOU FOR THAT.

08:46AM 22     LET ME MOVE TO ANOTHER ISSUE, AND THIS IS THE ISSUE

08:46AM 23  THAT -- THIS INVOLVES MR. LEACH.

08:46AM 24     THANK YOU, MR. SCHENK.

08:46AM 25          MR. SCHENK:  THANK YOU.

08:46AM  1        THE COURT:  THIS IS THE QUESTION ABOUT WHETHER OR

08:46AM  2   NOT THE JURY SHOULD HEAR ABOUT MONETARY SUMS EXPENDED FOR THE

08:47AM  3   DEVELOPMENT OF SAFEWAY STORES IN ANTICIPATION OF THERANOS

08:47AM  4   MACHINES COMING IN.

08:47AM  5        WE TALKED ABOUT THIS.  I THINK THE NUMBER WAS 300 MILLION,

08:47AM  6   OR SOMETHING LIKE THAT.

08:47AM  7        MR. DOWNEY, YOU OBJECTED TO, I THINK, THE NUMBER

08:47AM  8   SPECIFICALLY, AND TALKED ABOUT ITS RELEVANCE TO THE CASE.  THIS

08:47AM  9   ISN'T PERHAPS, I THINK YOU SUGGEST, NOT THE APPROPRIATE FORUM

08:47AM 10   TO RAISE THAT NUMBER AT THIS TIME.

08:47AM 11        ANY MORE THOUGHTS -- I THINK YOU ASKED TO DISCUSS THIS IF

08:47AM 12   I'M NOT MISTAKEN, BUT MR. LEACH?

08:47AM 13        MR. LEACH:  WE DID DISCUSS IT, YOUR HONOR.  I DO

08:47AM 14   ANTICIPATE THAT IT WILL COME UP SHORTLY WITH MR. BURD.  THE

08:47AM 15   GOVERNMENT'S POSITION IS THAT THIS IS HIGHLY RELEVANT EVIDENCE

08:47AM 16   AND NOT UNDULY PREJUDICIAL.  IT'S EMBEDDED IN A NUMBER OF

08:47AM 17   EMAILS THAT MR. BURD SENDS TO MS. HOLMES.  IT SPEAKS TO THE

08:47AM 18   MATERIALITY OF THE STATEMENTS THAT WERE MADE TO MR. BURD.

08:48AM 19        IT SPEAKS TO MS. HOLMES'S STATE OF MIND TO SHOW HER

08:48AM 20   KNOWLEDGE THAT SAFEWAY WAS RELYING ON THE REPRESENTATIONS SHE

08:48AM 21   WAS MAKING.

08:48AM 22        THE NUMBER IS BIG.  IT'S AT 1.3 -- OVER 350 MILLION, AND

08:48AM 23   ANOTHER .400 MILLION.  BUT THERE ARE A LOT OF BIG NUMBERS IN

08:48AM 24   THIS CASE, AND IF THE RESPONSE TO IT IS SAFEWAY DIDN'T HAVE TO

08:48AM 25   DO THAT, THAT WAS GRATUITOUS AND THEY'VE GOT ANOTHER USE FOR

08:48AM 1    IT, THAT'S CERTAINLY INFORMATION THAT COULD BE DEVELOPED IN

08:48AM 2    CROSS-EXAMINATION.

08:48AM 3         BUT I DON'T SEE -- THIS IS HIGHLY RELEVANT.  I DON'T THINK

08:48AM 4    IT'S EXCLUDABLE UNDER 403 IN THE BALANCING, AND IT GOES TO HER

08:48AM 5    STATE OF MIND.  SO WE WOULD INTEND TO ELICIT IT.

08:48AM 6              THE COURT:  OKAY.  THANK YOU.

08:48AM 7              MR. DOWNEY:  YOUR HONOR, TO REMIND THE COURT,

08:48AM 8    YOUR HONOR IS RIGHT, WE'RE CONCERNED ABOUT THE NUMBER.  IT'S

08:48AM 9    ALSO AN ISSUE THAT REQUIRES A GREAT DEAL OF ADDITIONAL

08:48AM 10   EVIDENCE, AS I MENTIONED ON FRIDAY.

08:48AM 11        WE HAVE TO SHOW -- FIRST OF ALL, THERANOS INVESTED AN

08:49AM 12   ENORMOUS AMOUNT OF MONEY IN CUSTOMIZING ITS DEVICES TO BE

08:49AM 13   PLACED IN THAT SPACE.  SAFEWAY DEVELOPED THOSE SPACES KNOWING

08:49AM 14   THAT THEY HAD ALTERNATIVE USES, AND THEY USED THEM

08:49AM 15   ALTERNATIVELY TODAY.

08:49AM 16        IT'S NOT RELEVANT TO THE ISSUE, THE CENTRAL ISSUE, WHICH

08:49AM 17   IS, IS THAT MONEY OF WHICH THEY WERE DEFRAUDED?  IT'S CLEARLY

08:49AM 18   NOT.  IT'S A SIDE ISSUE UNDER WHICH BOTH PARTIES UNDERTOOK

08:49AM 19   SUBSTANTIAL EXPENSES AND SAFEWAY WAS ULTIMATELY NOT HARMED,

08:49AM 20   SOMETHING THIS WITNESS CAN'T TESTIFY TO BECAUSE THIS WITNESS

08:49AM 21   WASN'T AT SAFEWAY WHEN ALTERNATIVE USE WAS MADE OF THIS SPACE.

08:49AM 22             THE COURT:  IS IT RELEVANT TO SHOW, IF YOU WILL,

08:49AM 23   SUBSEQUENT CONDUCT OF SAFEWAY?  AND PUT ASIDE THE NUMBER FOR A

08:49AM 24   MOMENT, BUT I SUPPOSE IT SPEAKS TO A MATERIALITY, PERHAPS NOT

08:49AM 25   AS TO THE WIRE FRAUD MATERIALITY, BUT IT SEEMS TO HAVE SOME

08:50AM   1    RELEVANCE THAT SAFEWAY, THE FACT THAT THEY EXPENDED SOME

08:50AM   2    EFFORTS -- LET'S JUST CALL IT EFFORTS WITHOUT PUTTING A DOLLAR

08:50AM   3    SIGN ON IT -- THEY EXPENDED SOME EFFORTS AS A RESULT OF THE

08:50AM   4    CONTRACTUAL RELATIONSHIP THAT THEY HAD.

08:50AM   5         AND WITHOUT THAT, ISN'T IT MISLEADING TO THE JURY TO HEAR,

08:50AM   6    WELL, THEY INVESTED MONEY AND THEN THERE'S A WHOLE -- THERE'S A

08:50AM   7    VACUUM OF, WELL, OKAY, BUT WHAT DID THEY DO?  THEY DIDN'T DO

08:50AM   8    ANYTHING ABOUT IT, THEY JUST INVESTED THIS MONEY.

08:50AM   9         THAT DOESN'T TELL THE WHOLE STORY, IF YOU WILL, FOR A 403

08:50AM   10   ANALYSIS, NOT 404.  BUT THAT TYPE OF A STORY, I THINK, THE JURY

08:50AM   11   IS ENTITLED TO HEAR.

08:50AM   12        NOW, THE QUESTION IS, SHOULD THEY HEAR IT'S 380,

08:50AM   13   $400 MILLION?  AND, MR. LEACH, I TEND TO, I TEND TO AGREE THAT

08:50AM   14   UNDER A 403 ANALYSIS, THAT MIGHT BE MORE PREJUDICIAL THAN IT IS

08:50AM   15   PROBATIVE.  IT WOULD CAUSE THE JURY THEN TO THINK ABOUT --

08:51AM   16   THEY'LL FOCUS ON, JUST BECAUSE WE'RE HUMANS AND THAT'S WHAT WE

08:51AM   17   DO, THEY FOCUS ON THE BIGGER NUMBER.

08:51AM   18        THE 55 MILLION, WHICH IS THE INVESTMENT, AND WHICH IS THE

08:51AM   19   ALLEGATIONS OF THE FRAUD ITSELF I SUPPOSE, THAT'S THE NUMBER

08:51AM   20   SAFEWAY INVESTED, AT LEAST THAT'S WHAT WE HAVE HEARD SO FAR,

08:51AM   21   THAT WOULD BE DWARFED BY THE EXPENDITURE THAT THEY MADE ON ALL

08:51AM   22   OF THEIR STORES.

08:51AM   23        AND I HAVE SOME CONCERN THAT THE JURY, NOTWITHSTANDING THE

08:51AM   24   COURT'S INSTRUCTION OTHERWISE, THEY MIGHT FOCUS ON THAT IN SOME

08:51AM   25   UNTOWARD MANNER.

3016

08:51AM 1       I'M WONDERING IF WE CAN FILTER, SANITIZE THE LANGUAGE.  I

08:51AM 2   THINK LAST WEEK I USED SUBSTANTIAL.  YOU CAN THINK OF ANY OTHER

08:51AM 3   ADJECTIVE YOU WANT I SUPPOSE.

08:51AM 4           MR. LEACH:  THERE'S TWO EXHIBITS, YOUR HONOR, WHERE

08:51AM 5   THE DOLLAR AMOUNT IS MENTIONED.  ONE OF THEM I CAN REFRAIN FROM

08:51AM 6   OFFERING.

08:51AM 7       THE SECOND ONE, I THINK IT'S EXHIBIT 770 FOR DEFENSE

08:52AM 8   COUNSEL, THERE'S A REFERENCE TO SAFEWAY IN TWO AND ONE HALF

08:52AM 9   YEARS INVESTED 400 MILLION AND MORE THAN 50,000 MAN HOURS.  I

08:52AM 10  CAN REDACT THE NUMBER BOTH FOR THE DOLLAR AMOUNT EXPENDED AND

08:52AM 11  THE NUMBER OF HOURS IF THAT'S THE COURT'S RULING.

08:52AM 12          THE COURT:  WELL, THANK YOU.

08:52AM 13      AS I SAID, IT DOES HAVE SOME RELEVANCE.  IT DOES.

08:52AM 14      I THINK, MR. DOWNEY, IF THE JURY IS NOT INFORMED THAT

08:52AM 15  SAFEWAY DID SOMETHING ABOUT IT, I THINK THAT'S NOT THE FULL

08:52AM 16  STORY BECAUSE CLEARLY SAFEWAY DID.

08:52AM 17      THE QUESTION ABOUT THE AMOUNT OF FUNDS THAT THEY EXPENDED

08:52AM 18  AND THE TENSION THAT I HAVE BETWEEN THAT AND THE ACTUAL CHARGE

08:52AM 19  IS SOMETHING THAT I'M CONCERNED ABOUT.

08:52AM 20          MR. DOWNEY:  I THINK AT THE END OF THE DAY,

08:52AM 21  YOUR HONOR, I THINK PRESENTED WITH THESE EXHIBITS WITH THAT

08:52AM 22  REDACTION, THAT'S FINE WITH US.

08:52AM 23      I DON'T WANT TO BE PUT IN THE POSITION CORRESPONDINGLY

08:53AM 24  WHERE WE HAVE A TRIAL WHERE WE SHOW ALL OF THE COSTS THAT WERE

08:53AM 25  UNDERTAKEN ON THE THERANOS SIDE WHICH DEMONSTRATES THEIR BELIEF

08:53AM  1    AND GOOD FAITH AS TO THE IMMINENCE OF THE PROJECT, HOW ANY

08:53AM  2    PURPORTED LOSS OF THOSE MONIES HAS BEEN MITIGATED AND WAS KNOWN

08:53AM  3    TO BE CAPABLE OF MITIGATION AT THE TIME THIS WAS UNDERTAKEN.

08:53AM  4        IF THE FACT IN EVIDENCE IS THAT THEY BELIEVED THAT THEY

08:53AM  5    WERE GOING TO HAVE A PARTNERSHIP WITH THERANOS AND THAT THERE

08:53AM  6    WERE GOING TO BE PATIENT SERVICE CENTERS IN THEIR STORES

08:53AM  7    WITHOUT TRYING TO QUANTIFY OR IMPLYING MORE ABOUT IT, THAT'S

08:53AM  8    FINE WITH US, YOUR HONOR.

08:53AM  9            THE COURT:  WELL, AND I DO THINK IT'S FAIR FOR THE

08:53AM  10   GOVERNMENT TO BE ABLE TO PROBE SUBSTANTIAL CHANGES TO THE

08:53AM  11   STORES.  IT SOUNDS LIKE THAT'S WHAT THEY DID.

08:53AM  12       IF THAT'S WHAT THE EVIDENCE IS, I THINK THEY'RE ENTITLED

08:53AM  13   TO, HE'S -- IF THIS WITNESS HAS KNOWLEDGE, HE WOULD BE ENTITLED

08:53AM  14   TO TESTIFY ABOUT WHAT THEY WERE GOING TO DO WITH THE ROLLOUT,

08:54AM  15   ET CETERA, ET CETERA.

08:54AM  16       I THINK HE TOLD US THEIR GAME PLAN WAS TO ALLOW FOR A

08:54AM  17   CUSTOMER TO COME IN AND DO FULL STOP SERVICE ON THEIR HEALTH

08:54AM  18   NEEDS WHILE THEY'RE SHOPPING, AND I THINK HE CAN DEVELOP THAT.

08:54AM  19            MR. DOWNEY:  YOUR HONOR, THAT'S NOT -- I DON'T HAVE

08:54AM  20   A CONCERN THAT THE PLAN AT LEAST AS OF THE TIME THAT THE

08:54AM  21   CONTRACT WAS SIGNED IN 2010 AND THEREAFTER WAS TO HAVE PATIENT

08:54AM  22   SERVICE CENTERS, THAT THE POTENTIAL THAT THOSE PATIENT SERVICE

08:54AM  23   CENTERS HAD A NUMBER OF IMPLICATIONS, THAT'S NOT SOMETHING TO

08:54AM  24   WHICH I OBJECT.

08:54AM  25            THE COURT:  ALL RIGHT.  THANK YOU.

08:54AM   1        SO, MR. LEACH, JUST TO BE CLEAR, I'M GOING TO -- THE

08:54AM   2    NUMBER -- I'M NOT GOING TO ALLOW YOU TO GET THE NUMBER IN, THE

08:54AM   3    300, 400, THAT TYPE OF THING.

08:54AM   4        BUT I WILL ALLOW YOU TO EXAMINE THE WITNESS AS TO THE

08:54AM   5    TYPES OF CHANGES THEY MADE, ANTICIPATED THINGS THAT THEY DID,

08:54AM   6    IF IT'S SUBSTANTIAL, WHATEVER THEY HAD TO DO ACROSS I DON'T

08:54AM   7    KNOW HOW MANY STORES THEY DID IT, BUT THAT WOULD BE

08:55AM   8    APPROPRIATE.

08:55AM   9        AGAIN, WE HAVE TO BE CAREFUL ABOUT DOORS.  I JUST REMIND

08:55AM  10    EVERYBODY ABOUT THAT.  OKAY.

08:55AM  11        ANYTHING FURTHER?

08:55AM  12        MR. LEACH:  JUST TO BE CLEAR, YOUR HONOR, THE NUMBER

08:55AM  13    OF STORES THAT THEY MADE RENOVATIONS TO, I CAN EXPLORE THAT

08:55AM  14    NUMBER?

08:55AM  15        THE COURT:  YES.

08:55AM  16        MR. LEACH:  IT'S JUST NOT THE TOTAL DOLLAR AMOUNT?

08:55AM  17        THE COURT:  CORRECT.

08:55AM  18        MR. LEACH:  UNDERSTOOD.  THANK YOU.

08:55AM  19        THE COURT:  ANY COMMENT ABOUT THAT, MR. DOWNEY?

08:55AM  20        MR. DOWNEY:  NO, YOUR HONOR.

08:55AM  21        THE COURT:  OKAY.

08:55AM  22        MR. DOWNEY:  YOUR HONOR, JUST ONE QUESTION.

08:55AM  23        HOWEVER THE ISSUE IS RESOLVED AROUND THE COLLOQUY WITH THE

08:55AM  24    JURORS, JUST SO WE CAN HAVE A MEANINGFUL DIALOGUE BETWEEN US AS

08:55AM  25    TO WHEN THE GOVERNMENT NEEDS TO HAVE THEIR WITNESSES PRESENT,

08:55AM   1       DID YOU HAVE A TIME SLOT IN MIND?

08:55AM   2              THE COURT:  THANK YOU.  WHAT I WAS HOPING TO DO IS

08:55AM   3   TO -- I'M NOT GOING TO TELL THEM ABOUT THIS THIS MORNING BEFORE

08:55AM   4   WE START EVIDENCE.  I JUST DON'T WANT THEM TO FOCUS ON THAT

08:55AM   5   WHILE THEY'RE HEARING THIS TESTIMONY.

08:55AM   6       I MAY TELL THEM JUST BEFORE THE BREAK THAT WHAT I INTEND

08:55AM   7   TO DO IS TALK TO THEM ABOUT THE MEDIA COALITION MOTION,

08:56AM   8   ET CETERA.  I INTEND TO PROVIDE THEM WITH THEIR QUESTIONNAIRES

08:56AM   9   AT THE BREAK SO THEY CAN LOOK THOSE OVER IF THEY WISH.

08:56AM  10       IF ANY JUROR WOULD LIKE TO SPEAK WITH ME TODAY, I'M HAPPY

08:56AM  11   TO RECEIVE THAT AND WE CAN DO THAT.  THEY'LL -- AND WE'LL END

08:56AM  12   TODAY AT 3:00 HOPEFULLY, AND THEN THEY CAN STAY AFTER IF

08:56AM  13   THEY'RE WILLING TO.

08:56AM  14       IF NOT, THEN I WILL TELL THEM IF SOME OF THEM WANT TO TAKE

08:56AM  15   THE QUESTIONNAIRE HOME WITH THEM, WE'LL PROVIDE THEM AN

08:56AM  16   ENVELOPE THAT THEY CAN TAKE IT IN, AND THEN TOMORROW WE CAN

08:56AM  17   DISCUSS IT EITHER AT A BREAK OR AT SOME TIME IN THE MORNING.

08:56AM  18       WE'LL SEE WHO CHOOSES TO DO THAT, AND THEN WE'LL

08:56AM  19   INCORPORATE THAT INTO OUR TIMEFRAME.

08:56AM  20       I'D LIKE TO DO IT AT THE END OF THE DAY IF I CAN, BUT --

08:56AM  21   AND I EXPECT, I ANTICIPATE THAT PROCESS IS GOING TO TAKE

08:56AM  22   PROBABLY 90 MINUTES I'M THINKING, IF EACH JUROR WANTS TO DO

08:56AM  23   THAT, QUERY WHETHER THEY'LL WANT TO STICK AROUND FOR THAT LONG

08:57AM  24   ALL AT ONE TIME.

08:57AM  25       SO WE'LL JUST DO THE BEST THAT WE CAN.

3020

08:57AM   1           MR. DOWNEY:  AND IS IT THE COURT'S PREMISE THAT SOME

08:57AM   2    OF THEIR ADDRESSES AND SO FORTH FOR THE JURORS, WOULD SOME OF

08:57AM   3    THE INFORMATION BE REDACTED IN ANY EVENT?

08:57AM   4           THE COURT:  THEIR ADDRESSES ARE NOT --

08:57AM   5           MR. DOWNEY:  OKAY.

08:57AM   6           THE COURT:  -- IN THE QUESTIONNAIRE.  GEOGRAPHIC

08:57AM   7    LOCATION IS, BUT NOT ADDRESSES.

08:57AM   8           MR. DOWNEY:  OKAY.

08:57AM   9           THE COURT:  YES.  AND I DON'T THINK THE COALITION --

08:57AM   10   I THINK THE COALITION'S LAWYER INDICATED, I DON'T THINK HIS

08:57AM   11   COALITION OR ANY OF THE MEMBERS WERE SEEKING ADDRESSES.  SO,

08:57AM   12   YES.

08:57AM   13          MR. DOWNEY:  THANK YOU, YOUR HONOR.

08:57AM   14          MR. LEACH:  THANK YOU, YOUR HONOR.

08:57AM   15          THE COURT:  ALL RIGHT.  THANK YOU.

08:57AM   16          THE CLERK:  COURT IS IN RECESS.

08:57AM   17      (RECESS FROM 8:57 A.M. UNTIL 9:09 A.M.)

09:09AM   18      (JURY IN AT 9:09 A.M.)

09:09AM   19          THE COURT:  GOOD MORNING EVERYONE.  WE'RE BACK ON

09:09AM   20   THE RECORD WITH OUR JURY AND ALTERNATES ARE PRESENT,

09:09AM   21   RECONSTITUTED IN THE SEATING.  THANK YOU.  GOOD MORNING,

09:09AM   22   EVERYONE.

09:09AM   23      ALL COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT.

09:09AM   24      AND MR. BURD IS ON THE STAND AGAIN.

09:09AM   25      BEFORE WE RESUME EXAMINATION, LADIES AND GENTLEMEN, LET ME

09:09AM  1    ASK YOU MEMBERS OF THE JURY AND OUR ALTERNATES, DURING THE LONG

09:09AM  2    WEEKEND, WHICH I HOPE YOU ALL ENJOYED, DID ANY OF YOU HAVE

09:09AM  3    OCCASION OR CAUSE TO COME ACROSS ANY INFORMATION OR DISCUSS

09:09AM  4    WITH ANYONE ANYTHING ABOUT THIS CASE?  DID YOU READ, HEAR,

09:09AM  5    LISTEN OR SPEAK WITH ANYONE ABOUT ANYTHING THAT INVOLVES THIS

09:09AM  6    CASE?

09:09AM  7          IF SO, WOULD YOU PLEASE RAISE YOUR HAND?

09:09AM  8          I SEE NO HANDS.

09:10AM  9          THANK YOU.

09:10AM 10          LET'S SEE, DID YOU WANT TO CONTINUE WITH YOUR DIRECT

09:10AM 11    EXAMINATION?

09:10AM 12                MR. LEACH:  I DID, YOUR HONOR.  THANK YOU.

09:10AM 13                THE COURT:  PLEASE, LET'S PROCEED.

09:10AM 14          SIR, IF YOU COULD ONCE AGAIN STATE YOUR NAME FOR THE

09:10AM 15    RECORD.

09:10AM 16                THE WITNESS:  MY NAME IS STEVE BURD, SPELLED

09:10AM 17    B-U-R-D.

09:10AM 18                THE COURT:  THANK YOU, SIR.  AND I'LL REMIND YOU,

09:10AM 19    SIR, YOU ARE STILL UNDER OATH.

09:10AM 20          **(GOVERNMENT'S WITNESS, STEVEN BURD, WAS PREVIOUSLY SWORN.)**

09:10AM 21                     **DIRECT EXAMINATION (RESUMED)**

09:10AM 22    BY MR. LEACH:

09:10AM 23    Q.   GOOD MORNING, MR. BURD.

09:10AM 24    A.   GOOD MORNING.

09:10AM 25    Q.   WHEN WE BROKE LAST WEEK WE WERE ON EXHIBIT 718 FROM

09:10AM   1    DECEMBER OF 2012, AND DO YOU RECALL TESTIFYING ABOUT STATEMENTS

09:10AM   2    THAT MS. HOLMES MADE TO YOU ABOUT THERANOS'S RELATIONSHIP WITH

09:10AM   3    THE MILITARY?

09:10AM   4    A.   YES, I HAVE IT.

09:10AM   5    Q.   OKAY.  DO YOU RECALL TESTIFYING ABOUT STATEMENTS THAT

09:11AM   6    MS. HOLMES MADE TO YOU ABOUT THERANOS'S RELATIONSHIP WITH THE

09:11AM   7    MILITARY?

09:11AM   8    A.   YES, I DO.

09:11AM   9    Q.   AND THE DATE OF THIS EMAIL, EXHIBIT 718, IS IN OR AROUND

09:11AM   10   DECEMBER OF 2012; IS THAT CORRECT?

09:11AM   11   A.   CORRECT.

09:11AM   12   Q.   I'D LIKE TO MOVE A LITTLE BACKWARD IN TIME TO AUGUST OF

09:11AM   13   2012, AND IF I COULD PLEASE DRAW YOUR ATTENTION TO WHAT WE HAVE

09:11AM   14   MARKED AS EXHIBIT 375.

09:11AM   15   A.   I HAVE IT.

09:11AM   16   Q.   OKAY.  DOES THIS APPEAR TO BE AN EMAIL FROM

09:11AM   17   ELIZABETH HOLMES TO YOU ATTACHING A POWERPOINT IN ADVANCE OF A

09:11AM   18   SAFEWAY BOARD MEETING?

09:11AM   19   A.   YES.

09:11AM   20        MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 375.

09:11AM   21        MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

09:11AM   22        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:12AM   23        (GOVERNMENT'S EXHIBIT 375 WAS RECEIVED IN EVIDENCE.)

09:12AM   24        MR. LEACH:  MS. HOLLIMAN, IF WE CAN PLEASE ZOOM IN

09:12AM   25   ON THE TOP PORTION OF THE EMAIL.

BURD DIRECT BY MR. LEACH (RES.)                    3023

```
09:12AM   1              THANK YOU.

09:12AM   2        Q.   MR. BURD, DID MS. HOLMES PRESENT TO THE SAFEWAY BOARD ON

09:12AM   3   OCCASION?

09:12AM   4        A.   YES, I CAN RECALL AT LEAST TWICE WHEN SHE DID THAT.

09:12AM   5        Q.   OKAY.  AND LET ME DRAW YOUR -- ON OCCASION, DID SHE

09:12AM   6   PRESENT POWERPOINTS TO THE SAFEWAY BOARD OF DIRECTORS?

09:12AM   7        A.   ON ONE OCCASION FOR SURE.

09:12AM   8        Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO PAGE 2 OF THIS

09:12AM   9   EXHIBIT.

09:12AM   10             DO YOU SEE THE DATE AUGUST OF 2012?

09:12AM   11       A.   I DO.

09:12AM   12       Q.   OKAY.  AT A HIGH LEVEL, WHAT WAS YOUR LEVEL OF

09:13AM   13   SATISFACTION WITH THE PACE OF THE ROLLOUT IN SAFEWAY STORES FOR

09:13AM   14   THERANOS'S DEVICES AT THIS POINT IN TIME?

09:13AM   15       A.   I WOULD SAY I WAS DISAPPOINTED BECAUSE WE MET -- THE

09:13AM   16   ORIGINAL DEADLINE FOR A PILOT WAS GOING TO BE IN THE FIRST

09:13AM   17   QUARTER.  THAT DIDN'T HAPPEN.

09:13AM   18             AT THIS POINT WE'RE INTO THE THIRD QUARTER.  SO, YOU KNOW,

09:13AM   19   THE DATES JUST KEPT BEING PUSHED BACK.

09:13AM   20       Q.   AND WAS THIS A SENTIMENT SHARED BY THE SAFEWAY BOARD?

09:13AM   21       A.   I WOULD SAY ANY TIME YOU MISS A DEADLINE THEY'RE

09:13AM   22   CONCERNED, RIGHT.

09:13AM   23             BUT IT WASN'T THE BIGGEST ISSUE ON THE TABLE.

09:13AM   24       Q.   THE BIGGEST ISSUE IN TERMS OF SAFEWAY OVERALL?

09:13AM   25       A.   CORRECT.
```

09:13AM  1     Q.   LET ME DRAW YOUR ATTENTION TO PAGE 3.

09:13AM  2          DO YOU SEE THE HEADINGS OR THE BULLET:  SAFEWAY READINESS;

09:14AM  3     THERANOS READINESS; PACE OF ROLLOUT; AND FINANCIAL

09:14AM  4     IMPLICATIONS?

09:14AM  5     A.   YES.

09:14AM  6     Q.   AND WAS THIS A DOCUMENT THAT YOU AND MS. HOLMES WORKED ON

09:14AM  7     TOGETHER?

09:14AM  8     A.   WHEN YOU SAY "WORKED TOGETHER" THIS IS, ON THE THERANOS

09:14AM  9     PIECE, WHICH IS THIS LARGELY ABOUT.  IF I HAD DONE SOME SLIDES,

09:14AM  10    I WOULD HAVE SHOWN THEM TO HER, AND IF SHE HAD DONE SOME

09:14AM  11    SLIDES, SHE WOULD HAVE SHOWN THEM TO ME.

09:14AM  12    Q.   OKAY.  SO YOU WERE SPEAKING TO SAFEWAY'S READINESS AND SHE

09:14AM  13    WAS SPEAKING TO THERANOS'S READINESS; IS THAT FAIR?

09:14AM  14    A.   I CAN'T TELL UNTIL I GET TO THE SLIDES, BUT THE

09:14AM  15    INFORMATION ON THERANOS READINESS CAME FROM ELIZABETH.

09:14AM  16    Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO PAGE 4.

09:14AM  17         DO YOU SEE WHERE IT SAYS PREPARING SAFEWAY FOR LAUNCH?

09:14AM  18    A.   YES.

09:14AM  19    Q.   AND THE BULLETS ARE:  COMPLETE ALL CONSTRUCTION; HIRE AND

09:15AM  20    TRAIN NEW EMPLOYEES; CREATE PR BUZZ TO FACILITATE ADOPTION; AND

09:15AM  21    FINALIZE LOGISTICS.

09:15AM  22         DO YOU SEE THAT?

09:15AM  23    A.   I DO.

09:15AM  24    Q.   AND LET ME FOCUS ON THE "COMPLETED ALL CONSTRUCTION," AND

09:15AM  25    I DRAW YOUR ATTENTION TO PAGE 5.

BURD DIRECT BY MR. LEACH (RES.)                                    3025

09:15AM   1    A.    YES.

09:15AM   2    Q.    AND DO YOU SEE THE PHASE I CONSTRUCTION, 969 U.S. UNITS?

09:15AM   3    A.    I DO.

09:15AM   4    Q.    AND WHAT DOES THAT REFER TO?

09:15AM   5    A.    WE INTENDED TO PUT THE MINILAB IN 969 U.S. UNITS.

09:15AM   6    Q.    AND HAD SAFEWAY TAKEN EFFORTS TO MODIFY THOSE UNITS TO GET

09:15AM   7    THEM READY FOR THE THERANOS ROLLOUT?

09:15AM   8    A.    YES.  THE -- THIS IS JUST DEPICTING WHERE WE ARE IN THAT

09:15AM   9    PROCESS.

09:15AM  10    Q.    AND WHAT IS MEANT BY THE TWO COLUMNS PLANS COMPLETE AND

09:15AM  11    CONSTRUCTION COMPLETE?

09:15AM  12    A.    THE FIRST THING YOU HAVE TO DO IS DRAW PLANS, AND OFTEN

09:15AM  13    LOCAL APPROVALS ON THOSE.  ONCE THE PLANS ARE APPROVED AND A

09:16AM  14    PERMIT IS GRANTED, THEN YOU CAN BE IN CONSTRUCTION.

09:16AM  15    Q.    OKAY.  AND THAT WAS DONE FOR 100 PERCENT OF THE 969 U.S.

09:16AM  16    UNITS IN PHASE I?

09:16AM  17    A.    THAT'S CORRECT.

09:16AM  18    Q.    AND CONSTRUCTION WAS ACTUALLY COMPLETE AT THIS POINT IN

09:16AM  19    TIME FOR 98 PERCENT OF THE 969 U.S. UNITS?

09:16AM  20    A.    YES.

09:16AM  21    Q.    OKAY.  THERE'S A REFERENCE TO PHASE II CONSTRUCTION.  WHAT

09:16AM  22    IS THAT?

09:16AM  23    A.    WE DECIDED THAT THE VOLUME WOULD BE SUCH THAT WE SHOULD

09:16AM  24    REALLY HAVE TWO PLACES IN THE STORE, AND SO WE CREATED A SECOND

09:16AM  25    ROOM.  IT WAS 9 FEET DEEP, 5 FEET WIDE.  WE ALSO NEEDED THAT

09:16AM   1    BECAUSE SAFEWAY HAD A GROWING VACCINATION BUSINESS AND WE

09:16AM   2    NEEDED TO COEXIST WITH THE LAB IN THAT SPACE.

09:16AM   3    Q.   LET ME NEXT DRAW YOUR ATTENTION, PLEASE, TO PAGE 11.

09:17AM   4         DO YOU SEE THE HEADING LAUNCH WITH HEAVY PR EFFORT?

09:17AM   5    A.   I DO.

09:17AM   6    Q.   OKAY.  IS PR AN ACRONYM FOR PUBLIC RELATIONS?

09:17AM   7    A.   YES.

09:17AM   8    Q.   AND THE FIRST BULLET SAYS, "ELIZABETH WILL MEET WITH

09:17AM   9    EDITORIAL BOARDS OF ALL LOCAL NEWSPAPERS."

09:17AM   10        DO YOU SEE THAT?

09:17AM   11   A.   I DO.

09:17AM   12   Q.   AND WHERE DID THAT IDEA COME FROM?

09:17AM   13   A.   YOU KNOW, THE -- CREATING THE LAUNCH EFFORT AND THE

09:17AM   14   MARKETING, THAT WAS LARGELY IN THERANOS'S DOMAIN.  YOU KNOW, WE

09:17AM   15   PROVIDED SOME INPUT ON THAT, BUT THAT WAS LARGELY SOMETHING

09:17AM   16   THAT THEY WOULD DO.

09:17AM   17   Q.   "A WSJ ARTICLE WILL BE RELEASED THE DAY OF OUR LAUNCH."

09:17AM   18        DO YOU KNOW WHERE THAT IDEA CAME FROM?

09:17AM   19   A.   AGAIN, IT WOULD HAVE COME FROM THERANOS.

09:17AM   20   Q.   OKAY.  LET ME DRAW YOUR ATTENTION, PLEASE, TO PAGE 12.

09:18AM   21        DO YOU SEE THE HEADING OPERATIONAL LOGISTICS?

09:18AM   22   A.   YES.

09:18AM   23   Q.   AND THEN IN THE FIRST BULLET IT SAYS, "ONE CARTRIDGE WILL

09:18AM   24   SATISFY 95 PERCENT OF ALL CPT CODES."

09:18AM   25        WHERE DID THAT INFORMATION COME FROM?

09:18AM  1     A.   THAT CAME FROM THERANOS.

09:18AM  2     Q.   DID IT COME FROM MS. HOLMES?

09:18AM  3     A.   IT DID.

09:18AM  4     Q.   AND WHAT DOES THAT MEAN, THAT ONE CARTRIDGE WILL SATISFY

09:18AM  5     95 PERCENT OF ALL CPT CODES?

09:18AM  6     A.   IT MEANS THAT THE CARTRIDGES WHICH GO INTO THE MACHINES,

09:18AM  7     THAT A SINGLE CARTRIDGE, A SINGLE CONFIGURATION WILL BE CAPABLE

09:18AM  8     OF DOING ALL CPT CODES, AND A CPT CODE IS A BILLING CODE AND IT

09:18AM  9     IDENTIFIES A SPECIFIC BLOOD TEST.

09:18AM  10    Q.   AND WAS THIS INFORMATION RELEVANT TO YOU?

09:18AM  11    A.   IT WAS GREAT NEWS.

09:18AM  12    Q.   AND WHY WAS IT GREAT NEWS?

09:18AM  13    A.   BECAUSE WE HAD TO INVENTORY THESE CARTRIDGES IN EACH OF

09:19AM  14    THOSE STORES, AND IT MEANT THAT WE COULD HAVE MOSTLY THIS ONE

09:19AM  15    CARTRIDGE THAT DID 95 PERCENT, AND THEN A FEW OTHER CARTRIDGES

09:19AM  16    THAT WOULD, YOU KNOW, GET SOME LEVEL OF VOLUME, AND THEN THE

09:19AM  17    MOST ESOTERIC OF BLOOD TESTS MIGHT GO OUTSIDE.

09:19AM  18    Q.   AND BASED ON STATEMENTS FROM MS. HOLMES, WAS IT YOUR

09:19AM  19    UNDERSTANDING THAT THIS WAS SOMETHING THAT THERANOS COULD DO IN

09:19AM  20    AUGUST OF 2012?

09:19AM  21    A.   YES.

09:19AM  22    Q.   LET ME DRAW YOUR ATTENTION TO THE NEXT PAGE, PAGE 13.

09:19AM  23         DO YOU SEE WHERE IT SAID THERANOS READINESS ON KEY TASKS?

09:19AM  24    A.   YES.

09:19AM  25    Q.   AND THERE'S A REFERENCE TO:  ON-CAMPUS FACILITY; STATUS OF

09:19AM 1    ONLINE ADJUDICATION; PRODUCTION RATE OF PROCESSING PLATFORM;

09:19AM 2    PRODUCTION RATE OF CARTRIDGES.

09:19AM 3         DO YOU SEE THOSE BULLETS?

09:19AM 4    A.   I DO.

09:19AM 5    Q.   AND WHAT DID YOU UNDERSTAND PRODUCTION RATE OF PROCESSING

09:20AM 6    PLATFORM AND PRODUCTION OF RATE OF CARTRIDGES TO MEAN?

09:20AM 7    A.   IN ORDER TO DO THE MINILAB, YOU NEEDED BOTH A MACHINE AND

09:20AM 8    YOU NEEDED CARTRIDGES TO GO IN IT.

09:20AM 9         AND SO AS YOU BUILD UP FOR A LAUNCH, YOU NEED TO HAVE

09:20AM 10   AMPLE INVENTORY SO YOUR BUSINESS DOESN'T GET DISRUPTED.

09:20AM 11   Q.   AT ANY POINT IN TIME IN THIS BOARD MEETING OR THIS

09:20AM 12   AUGUST 2012 TIME PERIOD, DID MS. HOLMES RAISE WITH YOU ANY TYPE

09:20AM 13   OF TECHNOLOGICAL ISSUE WITH THE MINILAB DEVICE THAT WAS HOLDING

09:20AM 14   UP THE ROLLOUT?

09:20AM 15   A.   I DON'T RECALL THE TIMEFRAME, BUT THE ONLY TECHNICAL ISSUE

09:20AM 16   THAT I RECALL WAS THIS EXCESS HEAT GENERATED BY STACKING ONE

09:20AM 17   UNIT ON TOP OF THE OTHER.

09:20AM 18   Q.   THANK YOU.

09:20AM 19        YOU CAN PUT THAT -- I'D LIKE TO DRAW YOUR ATTENTION TO THE

09:20AM 20   NEXT DOCUMENT, MR. BURD, WHICH IS EXHIBIT 670.  I'M ONLY

09:21AM 21   FOCUSSED ON PAGES 2 AND 3 OF 670, MR. BURD.

09:21AM 22   A.   YES.

09:21AM 23   Q.   AND DOES IT APPEAR TO BE AN EMAIL EXCHANGE BETWEEN YOU AND

09:21AM 24   MS. HOLMES DATED SEPTEMBER 12TH, 2012?

09:21AM 25   A.   YES.

09:21AM   1          MR. LEACH:  YOUR HONOR, I OFFER PAGES 2 AND 3 OF

09:21AM   2    EXHIBIT 670.

09:21AM   3          MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

09:21AM   4          THE COURT:  THEY'RE ADMITTED, AND THEY MAY BE

09:21AM   5    PUBLISHED.

09:21AM   6       (GOVERNMENT'S EXHIBIT 670, PAGES 2 AND 3 WAS RECEIVED IN

09:21AM   7    EVIDENCE.)

09:21AM   8          MR. LEACH:  MS. HOLLIMAN, IF WE CAN PLEASE FOCUS ON

09:21AM   9    THE BOTTOM EMAIL IN THE CHAIN ON THE FIRST PAGE.

09:22AM  10    Q.   DO YOU SEE YOUR EMAIL ADDRESS IN THE FROM LINE, MR. BURD?

09:22AM  11    A.   I DO.

09:22AM  12    Q.   AND THE SUBJECT OF THIS IS ON CAMPUS FACILITY PERFORMANCE?

09:22AM  13    A.   CORRECT.

09:22AM  14    Q.   AND WHAT WAS THE ON CAMPUS FACILITY?

09:22AM  15    A.   WE HAD A HEALTH CENTER ON OUR CAMPUS, YOU KNOW, FOUR OR

09:22AM  16    FIVE BUILDINGS, AND THAT SEEMED THE LOGICAL PLACE TO PUT THIS

09:22AM  17    LAB, SO WE PUT IT OVER THERE IN THAT BUILDING.  THAT ALSO

09:22AM  18    CONTAINED AN EXERCISE FACILITY.

09:22AM  19    Q.   AND WHEN YOU SAY "PUT THIS LAB," WHAT DO YOU MEAN?  WHAT

09:22AM  20    WAS --

09:22AM  21    A.   WELL, THE ORIGINAL EXPECTATION IS THAT WE WOULD PUT A

09:22AM  22    THERANOS UNIT IN THERE.  THAT WAS THE REASON FOR WANTING AN ON

09:22AM  23    CAMPUS LAB, AND SO WE WOULD GET SOME REAL EXPERIENCE BECAUSE I

09:22AM  24    WAS REQUIRING THAT ALL SAFEWAY EMPLOYEES AND FAMILIES THAT

09:22AM  25    LIVED IN A CERTAIN RADIUS, THAT'S THE LAB THAT THEY WERE TO

09:22AM  1    USE.  IF THEY USED THAT LAB, WE WOULD PAY FOR THEIR LAB COSTS.

09:23AM  2         AS IT TURNED OUT, WE DIDN'T GET -- WE DIDN'T GET A LAB

09:23AM  3    UNIT FROM THERANOS.  WE ENDED UP DRAWING BLOOD.  I BELIEVE IT

09:23AM  4    WAS MOSTLY VEIN DRAW, BUT SOME OF THAT WAS ALSO FINGERSTICK IF

09:23AM  5    THE PATIENT AGREED TO TWO DIFFERENT FORMS, AND THEN THEY LEFT

09:23AM  6    THE FACILITY TO BE, TO BE ANALYZED.

09:23AM  7    Q.   THE BLOOD WAS TAKEN FROM THE SAFEWAY FACILITY SOMEWHERE

09:23AM  8    ELSE; IS THAT RIGHT?

09:23AM  9    A.   CORRECT.

09:23AM  10   Q.   OKAY.  AND DID MS. HOLMES GIVE YOU AN EXPLANATION FOR WHY

09:23AM  11   THERE WERE VENOUS AND FINGERSTICK DRAWS?

09:23AM  12   A.   THE -- I THINK THE EXPLANATION WAS THAT THEY WANTED TO,

09:23AM  13   YOU KNOW, CONTINUE TO TEST AND CALIBRATE, YOU KNOW, THEIR

09:23AM  14   UNITS, AND YOU COULD GET BOTH THE FINGERSTICK AND YOU COULD GET

09:24AM  15   A REGULAR DRAW AND IN THEORY THOSE ALL TO TURN OUT REMARKABLY

09:24AM  16   THE SAME.

09:24AM  17   Q.   IN THIS EMAIL TO MS. HOLMES YOU WROTE, "I AM GENUINELY

09:24AM  18   CONCERNED THAT SAFEWAY'S LAB REPUTATION GETS WORSE BY THE DAY.

09:24AM  19   KEEP IN MIND, I HAVE NOW REQUIRED THAT OUR EMPLOYEES AND THEIR

09:24AM  20   NEARBY DEPENDENTS USE THIS LAB."

09:24AM  21        WHAT WERE YOU GETTING AT THERE?

09:24AM  22   A.   WELL, EVEN THOUGH IT WAS A LAB ON OUR FACILITY, I THINK

09:24AM  23   OUR EMPLOYEES KNEW THAT WE WERE NOT REALLY THE ONES OPERATING

09:24AM  24   IT, RIGHT, AND THAT THERE WAS A LAB INVOLVED.

09:24AM  25        AND I THINK WHENEVER YOU START SOMETHING NEW, YOU'RE GOING

09:24AM  1    TO HAVE SOME ROUGH SPOTS.  BUT WE CONTINUED TO HAVE ROUGH

09:24AM  2    SPOTS.  WE HAD SAMPLES WHERE TEMPERATURE WAS NOT PROPERLY

09:24AM  3    CONTROLLED, WE HAD SAMPLES THAT WERE LOST, WE HAD RESULTS THAT

09:24AM  4    DIDN'T MAKE ANY SENSE.  THOSE ARE THE KINDS OF THINGS THAT I

09:25AM  5    WAS REFERRING TO.

09:25AM  6    Q.   OKAY.  LATER ON IN THAT PARAGRAPH YOU WROTE, "THE SOONER

09:25AM  7    WE GET TO 'FINGERSTICK,' THE BETTER WE WILL BE."

09:25AM  8         WHAT DID YOU MEAN BY THAT?

09:25AM  9    A.   WELL, WHAT I MEANT WAS THAT I REALLY WANTED A FULL TEST,

09:25AM  10   AND THE REASON WE DIDN'T END UP WITH A THERANOS UNIT IN THE

09:25AM  11   BUILDING IS THAT AFTER THINKING ABOUT IT MORE, ELIZABETH

09:25AM  12   THOUGHT THERE WAS A LOT MORE RISK THAT THE TECHNOLOGY GET OUT,

09:25AM  13   YOU KNOW, PARTICULARLY TO OTHER COMPETITORS.  THERE WAS

09:25AM  14   ACTUALLY A QUEST LOCATED ABOUT 50 YARDS FROM THIS BUILDING, A

09:25AM  15   QUEST LAB.

09:25AM  16   Q.   BENEATH YOU SUGGEST SOME CHANGES IN PROCEDURES, AND THEN

09:25AM  17   IN THE PARAGRAPH AFTER 4, YOU WROTE, "WHILE MY STAFF TELLS ME

09:25AM  18   THAT THERANOS PERFORMANCE IS MUCH BETTER THAN THE FIRST THREE

09:25AM  19   MONTHS, IT IS NOWHERE CLOSE TO THAT OF QUEST.  AS YOU KNOW, THE

09:26AM  20   VAST MAJORITY OF THEIR RESULTS ARE DELIVERED THE NEXT DAY."

09:26AM  21        WHAT WERE YOU GETTING AT THERE?

09:26AM  22   A.   WELL, THE TURN TIME WASN'T VERY PREDICTABLE, AND IT

09:26AM  23   TYPICALLY WOULD RUN TWO TO FOUR DAYS, AND SOME EVEN LONGER THAN

09:26AM  24   THAT.  AND SO IT'S DIFFICULT TO COMPETE, YOU KNOW, WITH A LAB

09:26AM  25   THAT GIVES YOU RESULTS SUBSTANTIALLY FASTER.

09:26AM   1    Q.   LET ME NEXT DRAW YOUR ATTENTION TO WHAT WE'VE MARKED AS

09:26AM   2    EXHIBIT 684.

09:26AM   3         DOES THIS APPEAR TO BE ANOTHER EMAIL EXCHANGE BETWEEN YOU

09:26AM   4    AND MS. HOLMES DURING THIS SEPTEMBER 2012 TIME PERIOD?

09:26AM   5    A.   YES.

09:26AM   6              MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 684.

09:26AM   7              MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

09:26AM   8              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:26AM   9         (GOVERNMENT'S EXHIBIT 684 WAS RECEIVED IN EVIDENCE.)

09:26AM   10             MR. LEACH:  AND IF WE CAN PLEASE ZOOM IN ON THE

09:27AM   11   MIDDLE EMAIL, MS. HOLLIMAN, THE ONE FROM MR. BURD.  THAT'S IT.

09:27AM   12   ALL OF THE WAY DOWN IF WE COULD.  PERFECT.

09:27AM   13   Q.   DO YOU SEE YOUR NAME IN THE FROM LINE OF THIS EMAIL,

09:27AM   14   MR. BURD?

09:27AM   15   A.   I DO.

09:27AM   16   Q.   AND THIS IS TO ELIZABETH HOLMES?

09:27AM   17   A.   YES.

09:27AM   18   Q.   IN THE FIRST PARAGRAPH YOU WROTE, "I THOUGHT I WOULD SHARE

09:27AM   19   WITH YOU WHAT YOUR TEAM HAS COMMUNICATED TO BRIAN HILLE."

09:27AM   20        WHO IS BRIAN HILLE?

09:27AM   21   A.   BRIAN HILLE WAS THE HEAD OF OUR PHARMACY OPERATIONS.

09:27AM   22   Q.   YOU THEN WRITE, "IF THE SOFT LAUNCH IS LIKELY TO BE AS

09:27AM   23   LATE AS OCTOBER 29TH, I NEED TO KNOW THAT NOW SO I CAN SLOW

09:27AM   24   DOWN THE HIRING EFFORT."

09:27AM   25        WHAT WERE YOU GETTING AT THERE?

09:27AM   1    A.   THE EMPLOYEES IN THE STORE WHO WOULD BE RESPONSIBLE FOR

09:27AM   2    THE LAB WORK WOULD ACTUALLY BE EMPLOYEES OF SAFEWAY, SO WE WERE

09:28AM   3    IN THE PROCESS OF HIRING, YOU KNOW, A LOT OF FOLKS.  AND

09:28AM   4    SOMEWHERE ALONG THE LINE ELIZABETH THOUGHT IT BEST, I DIDN'T

09:28AM   5    DISAGREE, THAT WE ACTUALLY HIRE A PHLEBOTOMIST, BECAUSE THAT'S

09:28AM   6    WHAT PEOPLE WERE USED TO DEALING WITH WAS A PHLEBOTOMIST.

09:28AM   7    Q.   SO SAFEWAY WAS HIRING A NUMBER OF PHLEBOTOMISTS?

09:28AM   8    A.   WE HIRED AN OUTSIDE AGENCY TO DO THE HIRING, AND WE HIRED

09:28AM   9    BOTH PEOPLE WITH EXPERIENCE AND WE HIRED PEOPLE WITHOUT

09:28AM  10    EXPERIENCE, AND I RECALL AT ONE POINT WE HAD 26 PEOPLE HIRED

09:28AM  11    AND ANOTHER 400 POSSIBILITIES IN THE WAITING.

09:28AM  12    Q.   ALL IN ANTICIPATION OF THE LAUNCH WITH THERANOS IN SAFEWAY

09:28AM  13    STORES?

09:28AM  14    A.   CORRECT.

09:28AM  15    Q.   AND IN THE NEXT PARAGRAPH YOU WROTE, "IT ALSO LOOKS LIKE

09:28AM  16    YOUR LAB WORK IS BEING SENT TO UTAH, NOT UCSF, AND NOT BEING

09:28AM  17    DONE ON SITE.  IT IS THE ONLY WAY IT COULD POSSIBLY TAKE 3 TO

09:29AM  18    5 DAYS."

09:29AM  19         WHAT WERE YOU GETTING AT THERE?

09:29AM  20    A.   WELL, I THINK THE ORIGINAL INTENT WAS TO USE UCSF FOR SOME

09:29AM  21    OF THE ANALYSIS, YOU KNOW, PARTICULARLY THE RARER TESTS.  AND

09:29AM  22    THIS IS INFORMATION THAT I GOT UNDOUBTEDLY FROM BRIAN HILLE,

09:29AM  23    AND I DON'T KNOW HOW HE LEARNED THAT IT WAS BEING SENT TO UTAH,

09:29AM  24    BUT THAT'S WHAT HE TOLD ME.

09:29AM  25    Q.   WAS THAT SURPRISING TO YOU?

09:29AM 1     A.   YEAH, IT'S A LONG WAYS AWAY.

09:29AM 2     Q.   AND DID MS. HOLMES GIVE YOU ANY EXPLANATION FOR WHY

09:29AM 3     THERANOS WAS SENDING TESTS EITHER TO UTAH OR TO UCSF?

09:29AM 4     A.   I DON'T RECALL AN EXPLANATION.  I KNEW THEY WERE DOING

09:29AM 5     SOME WORK DOWN IN THEIR FACILITY.

09:29AM 6     Q.   DID YOU THINK IT WAS FOR THE MAJORITY OF TESTS?  FOR A

09:29AM 7     PORTION OF THE TESTS?  WHAT WAS IN YOUR MIND?

09:29AM 8     A.   I REALLY DIDN'T KNOW.

09:30AM 9     Q.   IN THE THIRD PARAGRAPH YOU WROTE, "I FIRMLY BELIEVE THERE

09:30AM 10    ARE THINGS THAT WE SHOULD BE DOING DIFFERENTLY EVEN IN THE

09:30AM 11    SHORT RUN.  I AM SURE I DON'T HAVE ALL OF THE INFORMATION YOU

09:30AM 12    HAVE, BUT GIVEN THE SMALL NUMBER OF PATIENTS, WE COULD CREATE A

09:30AM 13    MUCH BETTER SHORT TERM EXPERIENCE WITH LITTLE OR NO ADDITIONAL

09:30AM 14    EFFORT.  IT PAINS ME NOT TO DO SO."

09:30AM 15         WHAT WERE YOU GETTING AT THERE?

09:30AM 16    A.   JUST THAT THE EXECUTION WASN'T GOOD.  YOU KNOW, IN THE

09:30AM 17    SUPERMARKET BUSINESS, WHICH IS SUCH LOW MARGIN, I MEAN,

09:30AM 18    OPERATIONS REALLY HAVE TO CLICK OR YOU DON'T MAKE ANY MONEY AT

09:30AM 19    ALL.

09:30AM 20         SO WE WERE REALLY FOCUSSED ON THE OPERATING ASPECTS OF

09:30AM 21    THIS FACILITY.

09:30AM 22    Q.   FURTHER DOWN BELOW YOU WROTE, "I JUST KNOW WE CAN DO

09:30AM 23    BETTER.  PROCESS IS SOMETHING THAT WE ARE VERY GOOD AT.  SORRY

09:30AM 24    TO BURDEN YOU WITH THIS."

09:30AM 25         WHAT WERE YOU COMMUNICATING THERE?

09:30AM 1    A.   IF THERE WAS SOMETHING THAT WE COULD DO TO HELP IMPROVE

09:30AM 2    THE PROCESS, WE WERE READY TO DO IT.

09:31AM 3    Q.   DID MS. HOLMES EVER TAKE YOU UP ON THAT?

09:31AM 4    A.   NO.

09:31AM 5    Q.   LET ME DRAW YOUR ATTENTION TO WHAT HAS BEEN MARKED AS

09:31AM 6    EXHIBIT 693.

09:31AM 7         IS THIS AN EMAIL EXCHANGE -- DOES THIS APPEAR TO BE AN

09:31AM 8    EMAIL EXCHANGE BETWEEN YOU AND ELIZABETH HOLMES IN THE

09:31AM 9    OCTOBER 2012 TIME PERIOD?

09:31AM 10   A.   YES.

09:31AM 11            MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 693.

09:31AM 12            MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

09:31AM 13            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:31AM 14       (GOVERNMENT'S EXHIBIT 693 WAS RECEIVED IN EVIDENCE.)

09:31AM 15            MR. LEACH:  AND IF WE CAN PLEASE ZOOM IN ON THE TOP

09:31AM 16   HALF.

09:31AM 17        THANK YOU, MS. HOLLIMAN.

09:31AM 18   Q.   MR. BURD, THE SUBJECT OF THIS IS SIX STORE LAUNCH

09:31AM 19   SCHEDULE.

09:31AM 20        DO YOU SEE THAT?

09:31AM 21   A.   YES.

09:31AM 22   Q.   AND WHAT DOES THAT REFER TO?

09:31AM 23   A.   THAT REFERS TO TRYING TO GO FROM THE ON CAMPUS FACILITY TO

09:32AM 24   SIX STORES, AND IT'S A BIT OF A PILOT.

09:32AM 25   Q.   AND THIS WAS SOMETHING THAT YOU WERE ENDEAVORING TO DO IN

09:32AM   1    THE FOURTH QUARTER OF 2012?

09:32AM   2    A.   THAT'S WHAT IT LOOKS LIKE FROM THIS MEMO.

09:32AM   3    Q.   OKAY.  DID MS. HOLMES EVER SAY TO YOU THAT THERE WAS SOME

09:32AM   4    TYPE OF TECHNOLOGICAL ISSUE GETTING IN THE WAY OF THAT?

09:32AM   5    A.   NO.

09:32AM   6    Q.   YOU WROTE, "WHERE ARE WE ON THE SCHEDULE?  WE HAVE HIRED

09:32AM   7    26 PHLEBOTOMISTS AND HAVE SCREENED, INTERVIEWED, AND HAVE

09:32AM   8    IDENTIFIED 181 OTHERS THAT WE ARE PREPARED TO HIRE."

09:32AM   9         IS THAT A REFERENCE TO THE HIRING THAT SAFEWAY ENGAGED IN

09:32AM  10    DURING THIS TIME PERIOD?

09:32AM  11    A.   YES.

09:32AM  12    Q.   LET ME NOW DRAW YOUR ATTENTION TO EXHIBIT 699.

09:32AM  13         IS THIS AN EMAIL BETWEEN YOU AND MS. HOLMES IN NOVEMBER OF

09:32AM  14    2012?

09:32AM  15    A.   YES.

09:32AM  16         MR. LEACH:  I OFFER EXHIBIT 699, YOUR HONOR.

09:32AM  17         MR. DOWNEY:  NO OBJECTION.

09:32AM  18         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:33AM  19         (GOVERNMENT'S EXHIBIT 699 WAS RECEIVED IN EVIDENCE.)

09:33AM  20    BY MR. LEACH:

09:33AM  21    Q.   DO YOU SEE THE SUBJECT SIX STORE LAUNCH, MR. BURD?

09:33AM  22    A.   YES.

09:33AM  23    Q.   AND IS THAT A REFERENCE SIMILAR TO THE EMAIL THAT WE JUST

09:33AM  24    LOOKED AT?

09:33AM  25    A.   CORRECT.

09:33AM 1    Q.   OKAY.  YOU WROTE IN THE BOTTOM EMAIL, "IF WE DON'T PICK A

09:33AM 2    LAUNCH DATE SOON, WE CAN FORGET ABOUT LAUNCHING EVEN SIX STORES

09:33AM 3    IN 2012.  IF YOU HAVE ALREADY DECIDED IT IS NOT GOING TO HAPPEN

09:33AM 4    UNTIL NEXT YEAR, I WOULD LIKE TO KNOW.  WHILE IT WOULD BE VERY

09:33AM 5    UNFORTUNATE TO NOT LAUNCH IN Q4, BASED ON THE INFORMATION I

09:33AM 6    HAVE, IT LOOKS PRETTY REMOTE.  I FEEL LIKE A JOGGER RUNNING IN

09:33AM 7    PLACE WAITING FOR THE STOPLIGHT TO TURN GREEN."

09:33AM 8         WHAT DID YOU MEAN IN THAT LAST SENTENCE, THAT YOU FELT

09:33AM 9    LIKE A JOGGER RUNNING IN PLACE?

09:33AM 10   A.   WELL, WE WERE READY.  ON OUR END WE WERE COMPLETELY READY,

09:33AM 11   AND WE WERE JUST WAITING ON THERANOS WITH NO REAL EXPLANATION

09:33AM 12   AS TO WHY IT WAS BEING DELAYED.

09:34AM 13        SO THE JOGGER MAKES NO PROGRESS AT A STOPLIGHT.

09:34AM 14   Q.   LET ME NEXT DRAW YOUR ATTENTION TO EXHIBIT 701.

09:34AM 15        DOES THIS APPEAR TO BE ANOTHER EMAIL BETWEEN YOU AND

09:34AM 16   MS. HOLMES IN OR AROUND NOVEMBER OF 2012?

09:34AM 17   A.   YES.

09:34AM 18        MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 701 INTO

09:34AM 19   EVIDENCE.

09:34AM 20        MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

09:34AM 21        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:34AM 22     (GOVERNMENT'S EXHIBIT 701 WAS RECEIVED IN EVIDENCE.)

09:34AM 23   BY MR. LEACH:

09:34AM 24   Q.   MR. BURD, THE SUBJECT OF THIS EMAIL IS BECOMING

09:34AM 25   DISCOURAGED.

BURD DIRECT BY MR. LEACH (RES.)                          3038

09:34AM 1        DO YOU SEE THAT LANGUAGE?

09:34AM 2   A.   I DO.

09:34AM 3   Q.   OKAY.  WERE YOU BECOMING DISCOURAGED AT THIS POINT IN

09:34AM 4   TIME?

09:34AM 5   A.   I WAS GETTING CLOSE.

09:34AM 6   Q.   YOU WROTE, "I CAN RECALL HAVING BEEN DISCOURAGED ONCE IN

09:34AM 7   THE LAST 62 YEARS.  THAT SAID, I AM GETTING CLOSE TO MY SECOND

09:35AM 8   EVENT."

09:35AM 9        WAS THAT TRUE AT THE TIME?

09:35AM 10  A.   YES.  I KNOW IT SOUNDS LIKE A BIT OF AN EXAGGERATION, BUT

09:35AM 11  I'M ONE OF THE MOST POSITIVE PEOPLE YOU'LL EVER MEET.  I DON'T

09:35AM 12  GET DISCOURAGED.

09:35AM 13  Q.   AND WHAT WAS DISCOURAGING YOU?

09:35AM 14  A.   WELL, DEADLINES WEREN'T MET, NO REAL EXPLANATION PROVIDED.

09:35AM 15  I FELT -- I FELT THAT THERE WERE OBSTACLES THAT WERE GETTING IN

09:35AM 16  THE WAY.  I DIDN'T THINK IT WAS THE BOX.  I THOUGHT THERE WERE

09:35AM 17  OTHER OBSTACLES.

09:35AM 18       AND WHEN YOU HAVE 185,000 EMPLOYEES, YOU'RE WILLING TO

09:35AM 19  DEVOTE SOME OF THOSE PEOPLE TO REMOVING THOSE OBSTACLES IF THAT

09:35AM 20  WOULD BE HELPFUL.

09:35AM 21  Q.   AND DID MS. HOLMES EVER TAKE YOU UP ON THAT?

09:35AM 22  A.   WE DID A COUPLE OF THINGS TOGETHER TO TRY TO GET THE

09:35AM 23  LOGISTICS RIGHT IN THE STORE, BUT THAT WAS A NATURAL THING.  IT

09:35AM 24  WAS GOING TO TAKE PLACE IN OUR STORES AND WE WORKED ON THAT

09:35AM 25  TOGETHER.

09:35AM  1           THERE WERE A NUMBER OF THINGS WE WORKED ON TOGETHER, BUT

09:35AM  2    WE DIDN'T REMOVE OBSTACLES TOGETHER.

09:35AM  3    Q.   LET ME NEXT DRAW YOUR ATTENTION TO EXHIBIT 715.

09:36AM  4           DOES THIS APPEAR TO BE AN EMAIL EXCHANGE BETWEEN YOU AND

09:36AM  5    MS. HOLMES IN THE DECEMBER 2012 TIME PERIOD?

09:36AM  6    A.   YES.

09:36AM  7               MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 715 INTO

09:36AM  8    EVIDENCE.

09:36AM  9               MR. DOWNEY:  NO OBJECTION.

09:36AM  10              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:36AM  11         (GOVERNMENT'S EXHIBIT 715 WAS RECEIVED IN EVIDENCE.)

09:36AM  12              MR. LEACH:  AND, MS. HOLLIMAN, IF WE COULD PLEASE

09:36AM  13   FOCUS ON THE BOTTOM EMAIL FROM MR. BURD.

09:36AM  14   Q.   LET ME DRAW YOUR ATTENTION TO THE FIRST PARAGRAPH,

09:36AM  15   MR. BURD.

09:36AM  16          DO YOU SEE WHERE YOU WROTE, "I HAVE LOTS OF DATA POINTS

09:36AM  17   FROM YOUR TEAM THAT SUGGESTS THAT SAFEWAY AND THERANOS MAY NOT

09:36AM  18   HAVE ALWAYS BEEN ON THE SAME PAGE"?

09:36AM  19   A.   YES.

09:36AM  20   Q.   AND THEN YOU PROVIDE A PARTIAL LIST OF THAT?

09:37AM  21   A.   I DO.

09:37AM  22   Q.   IN NUMBER 1 YOU WROTE, "THE ON CAMPUS LAB HAS OPERATED FOR

09:37AM  23   ALMOST A YEAR WITH A POOR PATIENT EXPERIENCE.  (THIS HAS

09:37AM  24   NOTHING TO DO WITH THE FACT THAT WE ARE DOING VEIN DRAW.)"

09:37AM  25           WAS THAT YOUR VIEW AT THE TIME?

09:37AM 1    A.   YES.

09:37AM 2    Q.   AND WAS THAT A TOPIC THAT YOU HAD DISCUSSED WITH

09:37AM 3    MS. HOLMES ON MORE THAN ONE OCCASION?

09:37AM 4    A.   YES, IT WAS.

09:37AM 5    Q.   AND NUMBER 2 YOU WROTE, "THERANOS HAS BEEN SLOW TO REACT

09:37AM 6    TO OUR CONCERNS ABOUT THE ON CAMPUS LAB AND UNWILLING TO ALLOW

09:37AM 7    US TO FIX THE PROCESS OURSELVES."

09:37AM 8         WAS THAT YOUR VIEW AT THE TIME?

09:37AM 9    A.   YES.

09:37AM 10   Q.   AND WAS THAT SOMETHING THAT YOU HAD DISCUSSED WITH

09:37AM 11   MS. HOLMES ON MORE THAN ONE OCCASION?

09:37AM 12   A.   YES.

09:37AM 13   Q.   IF WE CAN GO TO THE NEXT PAGE, MS. HOLLIMAN.

09:37AM 14        I DRAW YOUR ATTENTION TO NUMBER 4, MR. BURD.

09:37AM 15   A.   YES.

09:37AM 16   Q.   YOU WROTE, "MY REPEATED SUGGESTIONS THAT WE ENGAGE IN A

09:38AM 17   COLLABORATIVE REVIEW OF THE PATIENT EXPERIENCE HAVE YET TO

09:38AM 18   GENERATE A POSITIVE RESPONSE.  THE PATIENT EXPERIENCE HAS BEEN

09:38AM 19   DESIGNED ENTIRELY BY THERANOS.  THIS IS NOT MY ONLY EXPERIENCE,

09:38AM 20   THIS IS MY TEAM'S EXPERIENCE."

09:38AM 21        WHAT DID YOU MEAN BY THAT?

09:38AM 22   A.   THAT WE WERE NOT PART OF THAT DETAILED PROCESS.  THINK OF

09:38AM 23   IT AS THE LOGISTICS OF A PATIENT COMES IN, HOW THEY GET CHECKED

09:38AM 24   IN, WHERE THEY SIT, YOU KNOW, ALL OF THE INFORMATION BEHIND IT

09:38AM 25   SO THAT IT'S HIGHLY AUTOMATED.  YOU KNOW, OF THE TWO COMPANIES,

09:38AM   1    WE WERE THE COMPANY THAT HAD PROBABLY GIVEN MILLIONS OF

09:38AM   2    VACCINATIONS, SO WE HAD PATIENT EXPERIENCE, AND WE WANTED TO

09:38AM   3    LEND THAT EXPERIENCE TO THE PROCESS.

09:38AM   4    Q.   AND THEN DOWN AT THE BOTTOM YOU WROTE, "I AM SORRY IF THIS

09:38AM   5    SOUNDS A BIT BLUNT.  CHALK IT UP TO THE LIMITATIONS OF EMAIL."

09:39AM   6         DID YOU THINK YOU WERE BEING BLUNT HERE?

09:39AM   7    A.   I THOUGHT I WAS BEING BLUNT.

09:39AM   8    Q.   WHY WERE YOU BEING BLUNT?

09:39AM   9    A.   NOTHING ELSE HAD WORKED.

09:39AM   10   Q.   LET ME MOVE FORWARD IN TIME, MR. BURD, TO JANUARY OF 2013.

09:39AM   11   I DRAW YOUR ATTENTION TO EXHIBIT 770.

09:39AM   12        MAY I HAVE ONE MOMENT, YOUR HONOR?

09:39AM   13             THE COURT:  YES.

09:39AM   14        (PAUSE IN PROCEEDINGS.)

09:39AM   15   BY MR. LEACH:

09:39AM   16   Q.   DOES THIS APPEAR TO BE AN EMAIL EXCHANGE BETWEEN YOU AND

09:40AM   17   MS. HOLMES ON OR ABOUT JANUARY 20TH OF 2013?

09:40AM   18   A.   YES.

09:40AM   19             MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 770 INTO

09:40AM   20   EVIDENCE.

09:40AM   21             MR. DOWNEY:  SUBJECT TO THE REDACTIONS THAT COUNSEL

09:40AM   22   REPRESENTS WERE MADE, WE HAVE NO OBJECTION.

09:40AM   23             THE COURT:  ALL RIGHT.  YOU'VE MADE THOSE

09:40AM   24   REDACTIONS?

09:40AM   25             MR. LEACH:  WE HAVE, YOUR HONOR.

09:40AM   1          THE COURT:  THANK YOU.  IT IS ADMITTED AND IT MAY BE

09:40AM   2    PUBLISHED WITH THE REDACTIONS.

09:40AM   3          (GOVERNMENT'S EXHIBIT 770 WAS RECEIVED IN EVIDENCE.)

09:40AM   4    BY MR. LEACH:

09:40AM   5    Q.   LET ME DRAW YOUR ATTENTION, MR. BURD, TO THE BOTTOM

09:40AM   6    PORTION OF PAGE 1, THE EMAIL FROM YOU TO MS. HOLMES.

09:40AM   7          DO YOU SEE THE DATE OF JANUARY 19TH, 2013?

09:40AM   8    A.   I DO.

09:40AM   9    Q.   AND THE FIRST SENTENCE READS, "I CANNOT BEGIN TO TELL YOU

09:40AM   10   HOW DISAPPOINTED I AM THAT YOU REDESIGNED THE WORDMARK WITHOUT

09:40AM   11   EVER TELLING US YOU WERE DOING IT."

09:40AM   12         WHAT WERE YOU TALKING ABOUT THERE?

09:40AM   13   A.   WE HAD PREVIOUSLY DONE, IN COOPERATION WITH ELIZABETH,

09:40AM   14   SOME WORK ON THE LOGO, HOW THE WORDS WOULD APPEAR BOTH INSIDE

09:41AM   15   AND OUTSIDE OF THE STORE, HOW THEY MIGHT APPEAR ON A LETTERHEAD

09:41AM   16   AT A TIME WHEN SHE DID NOT HAVE A TEAM IN PLACE TO DO THIS, OR

09:41AM   17   OFTEN YOU WOULD DO SOMETHING LIKE THIS WITH OUTSIDE EXPERTS,

09:41AM   18   AND SO WE HAD DONE ALL OF THIS WORK.  WE ALL SEEMED TO LIKE IT.

09:41AM   19         AND REGARDLESS, IF I'M GOING TO PUT A BRAND INSIDE OF MY

09:41AM   20   STORES, I HAVE TO APPROVE THE LOOK OF THAT BRAND.  I HAVE TO

09:41AM   21   BE -- I HAVE TO APPROVE THE COLORS, I HAVE TO APPROVE

09:41AM   22   EVERYTHING ABOUT IT BECAUSE IT COULD AFFECT OUR BRAND.

09:41AM   23   Q.   AND IF WE COULD GO TO PAGE 2, AND I WANT TO FOCUS YOU ON

09:41AM   24   THE FIRST PARAGRAPH, MR. BURD, ROUGHLY IN THE MIDDLE OF THE --

09:41AM   25   IF WE CAN ZOOM IN ON THE TOP HALF THERE, MS. HOLLIMAN.

09:42AM  1          THANK YOU.

09:42AM  2          AND, MR. BURD, I WANT TO DRAW YOUR ATTENTION TO THE

09:42AM  3     LANGUAGE IN THE FIRST PARAGRAPH AT THE TOP WHERE YOU SAY, "I

09:42AM  4     DON'T MIND PASSING THE BATON TO EITHER THERANOS OR ANYONE

09:42AM  5     ELSE."

09:42AM  6     A.   CAN YOU TELL ME AGAIN WHAT YOU'RE CITING?

09:42AM  7     Q.   SURE.  WE'RE ON PAGE 2 OF EXHIBIT 770.

09:42AM  8     A.   YES.

09:42AM  9     Q.   AND I DRAW YOUR ATTENTION TO THE FIRST PARAGRAPH AT THE

09:42AM 10     TOP.

09:42AM 11     A.   YES.

09:42AM 12     Q.   AND ROUGHLY THE THIRD SENTENCE SAYS, "I DON'T MIND PASSING

09:42AM 13     THE BATON."

09:42AM 14     A.   CORRECT.

09:42AM 15     Q.   "AND WHAT I MIND IS HAVING IT RIPPED FROM MY HANDS.  I DO

09:42AM 16     NOT LIKE WASTING TIME.  THIS DOES NOT FEEL LIKE A PARTNERSHIP."

09:42AM 17          WHAT WERE YOU HAVE GETTING AT THERE?

09:42AM 18     A.   JUST AS MUCH AS THERE WERE A LOT OF EMAILS AND PHONE

09:42AM 19     CALLS, ON SOME OF THE BUSINESS ISSUES IT WASN'T AS

09:42AM 20     COLLABORATIVE AS I THOUGHT IT SHOULD BE.

09:42AM 21     Q.   AND HOW DOES THAT RELATE TO THE REDOING OF THE WORDMARK?

09:43AM 22     A.   I MEAN, IT'S THEIR BRAND AND THEY CAN DO WHAT THEY CHOOSE

09:43AM 23     AND I THOUGHT A COURTESY CALL AT A MINIMUM WOULD BE USEFUL.

09:43AM 24     Q.   AND LET ME DRAW YOUR ATTENTION TO THE THIRD PARAGRAPH

09:43AM 25     WHERE YOU SAY "I BELIEVE IN YOU.  I BELIEVE IN YOUR COMPANY.

09:43AM   1    AND I SHARE YOUR VISION.  I WANT SO MUCH TO HELP YOU CHANGE THE

09:43AM   2    WORLD.  WE ARE SO GOOD TOGETHER WHEN WE COLLABORATE.  BUT I

09:43AM   3    HAVE NEVER BEEN MORE FRUSTRATED."

09:43AM   4         WAS IT TRUE YOU HAD NEVER BEEN MORE FRUSTRATED?

09:43AM   5    A.   IT'S TRUE.

09:43AM   6    Q.   AND WHY WAS THAT?

09:43AM   7    A.   WELL, ALL OF THE MISSED DEADLINES, THE LACK OF

09:43AM   8    COLLABORATION ON KEY ISSUES.  REMEMBER, IT'S NOW BEEN ALMOST

09:43AM   9    TWO YEARS SINCE WE HAD A LAUNCH DATE SCHEDULED.

09:43AM  10    Q.   AND BESIDES THE STACKING OF THE DEVICES AND THE HEAT THAT

09:43AM  11    YOU'VE TALKED ABOUT, DID MS. HOLMES EVER ATTRIBUTE THIS TO SOME

09:43AM  12    FORM OF TECHNOLOGICAL ISSUE?

09:43AM  13    A.   NO.

09:44AM  14    Q.   LET ME MOVE FORWARD IN TIME, MR. BURD, TO MARCH OF 2013

09:44AM  15    AND DRAW YOUR ATTENTION TO WHAT WE HAVE MARKED AS EXHIBIT 813.

09:44AM  16         DOES THIS APPEAR TO BE AN EMAIL FROM BOB GORDON TO

09:44AM  17    MS. HOLMES, WITH A COPY TO YOU, ON OR ABOUT MARCH 19TH, 2013?

09:44AM  18    A.   YES.

09:44AM  19              MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 813.

09:44AM  20              MR. DOWNEY:  NO OBJECTION.

09:44AM  21              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:44AM  22         (GOVERNMENT'S EXHIBIT 813 WAS RECEIVED IN EVIDENCE.)

09:44AM  23    BY MR. LEACH:

09:44AM  24    Q.   MR. BURD, REMIND US, WHO IS BOB GORDON?

09:44AM  25    A.   BOB GORDON WAS THE GENERAL COUNSEL OF SAFEWAY.

09:44AM   1     Q.   SOMEONE YOU WORKED WITH CLOSELY?

09:44AM   2     A.   VERY CLOSELY.

09:44AM   3     Q.   AND THE SUBJECT IS THERANOS - INVOICE FOR INVENTORY

09:44AM   4     PRE-PURCHASE.

09:44AM   5          DO YOU SEE THAT?

09:44AM   6     A.   YES.

09:44AM   7     Q.   AND WHAT DOES THAT REFER TO?

09:44AM   8     A.   THERE WERE POINTS IN THE CONTRACT, POINTS OF PROGRESS, AND

09:45AM   9     WHEN THAT MILESTONE WAS REACHED, THERE WAS ADDITIONAL MONEY DUE

09:45AM   10    FROM US AND IT CAME IN THE FORM OF A PRE-PURCHASE OF INVENTORY.

09:45AM   11    Q.   SO SAFEWAY, UNDER THE CONTRACT, WAS OBLIGATED TO PAY

09:45AM   12    $25 MILLION TO PRE-PURCHASE SOME INVENTORY?

09:45AM   13    A.   YOU KNOW, IF CERTAIN CONDITIONS WERE MET.

09:45AM   14    Q.   AND WHAT WERE SOME OF THE CONDITIONS?

09:45AM   15    A.   THE CONDITIONS WOULD BE A PILOT THAT WE REGARDED AS A

09:45AM   16    SUCCESS, AND THE WAY -- WE SAID THAT WE ALONE WOULD DECIDE

09:45AM   17    WHETHER IT WAS SUCCESSFUL, AND THAT CONDITION HAD NOT BEEN MET.

09:45AM   18    Q.   AND HAD A PILOT TAKEN PLACE AT ALL AT THIS POINT?

09:45AM   19    A.   NO.

09:45AM   20    Q.   OKAY.  LET ME NEXT DRAW YOUR ATTENTION TO EXHIBIT 820.

09:46AM   21         DOES THIS APPEAR TO BE ANOTHER EMAIL RELATING TO THE

09:46AM   22    INVOICE THAT THERANOS SENT FOR THE $25 MILLION?

09:46AM   23    A.   YES.

09:46AM   24              MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 820.

09:46AM   25              MR. DOWNEY:  NO OBJECTION.

09:46AM   1          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:46AM   2          (GOVERNMENT'S EXHIBIT 820 WAS RECEIVED IN EVIDENCE.)

09:46AM   3          MR. LEACH:  IF WE CAN ZOOM IN ON THE SUBSTANCE.

09:46AM   4   THANK YOU, MS. HOLLIMAN.

09:46AM   5   Q.   THE SUBJECT IS TRIGGER POINT FOR THE 25 MILLION.

09:46AM   6        WHAT IS MEANT BY TRIGGER POINT?

09:46AM   7   A.   IT'S THE CONDITION IN THE CONTRACT THAT SAYS WHEN IT IS

09:46AM   8   MET WE WOULD PAY $25 MILLION.

09:46AM   9   Q.   AND YOUR VIEW AT THE TIME WAS THAT IT HAD NOT BEEN MET?

09:46AM   10  A.   CORRECT.

09:46AM   11  Q.   YOU WROTE, "I HAD A LONG CHAT WITH BOB GORDON EARLIER

09:46AM   12  TODAY ABOUT THE TRIGGERING EVENT.  AS WE DISCUSSED, WE WOULD

09:46AM   13  LIKE TO SEE THE SPU IN ACTION."

09:46AM   14       DO YOU SEE THAT?

09:46AM   15  A.   YES.

09:46AM   16  Q.   AND WHAT DID YOU MEAN BY THE SPU?

09:46AM   17  A.   THAT'S THE UNIT ITSELF, THE ANALYZER.

09:47AM   18  Q.   AND DID THAT EVER HAPPEN?

09:47AM   19  A.   NO.

09:47AM   20  Q.   YOU LEAVE SAFEWAY IN MAY OF 2013.  IS THAT YOUR TESTIMONY?

09:47AM   21  A.   CORRECT.

09:47AM   22  Q.   TO YOUR KNOWLEDGE, DID THERANOS EVER PUT A MINILAB DEVICE

09:47AM   23  IN A SAFEWAY STORE?

09:47AM   24  A.   TO MY KNOWLEDGE, NO.

09:47AM   25  Q.   TO YOUR KNOWLEDGE, DID SAFEWAY EVER SUCCESSFULLY OFFER

09:47AM  1      THERANOS BLOOD TESTING SERVICES TO THE PUBLIC?

09:47AM  2      A.   NO.

09:47AM  3      Q.   OTHER THAN THE STACKING OF THE DEVICES AND THE HEAT ISSUES

09:47AM  4      THAT YOU'VE DESCRIBED, DID MS. HOLMES EVER ATTRIBUTE DELAYS OR

09:47AM  5      FAILURES TO DO THAT TO SOME TYPE OF TECHNOLOGICAL ISSUE?

09:47AM  6      A.   NO.  LET ME GO BACK TO THE PUBLIC.  I WANT TO MAKE SURE,

09:47AM  7      WHEN I SAY THE PUBLIC, I'M THINKING OF NONEMPLOYEES OF SAFEWAY

09:47AM  8      AND THEIR FAMILIES.

09:47AM  9      Q.   OTHER THAN THE ON CAMPUS FACILITY THAT WE'VE TALKED ABOUT?

09:48AM 10      A.   RIGHT.

09:48AM 11      Q.   DID MS. HOLMES EVER SUGGEST USING MODIFIED THIRD PARTY

09:48AM 12      MACHINES TO DO FINGERSTICK TESTING?

09:48AM 13      A.   NO.

09:48AM 14      Q.   WOULD THAT HAVE BEEN OF INTEREST TO YOU?

09:48AM 15      A.   NO.

09:48AM 16              MR. LEACH:  MAY I HAVE A MOMENT, YOUR HONOR?

09:48AM 17              THE COURT:  YES.

09:48AM 18          (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

09:48AM 19              MR. LEACH:  THANK YOU, MR. BURD.

09:48AM 20          I HAVE NO FURTHER QUESTIONS.

09:48AM 21          THANK YOU, YOUR HONOR.

09:48AM 22              THE COURT:  CROSS-EXAMINATION?

09:48AM 23              MR. DOWNEY:  YES, YOUR HONOR.

09:48AM 24          YOUR HONOR, MAY I HAVE A MOMENT?

09:49AM 25              THE COURT:  YES.

09:49AM   1               (PAUSE IN PROCEEDINGS.)

09:49AM   2                    MR. DOWNEY:  YOUR HONOR, I HAVE A NOTEBOOK FOR THE

09:49AM   3      COURT AND THE WITNESS.  MAY I PASS A COPY UP AND APPROACH THE

09:49AM   4      WITNESS?

09:49AM   5                    THE COURT:  PLEASE.

09:49AM   6                    MR. DOWNEY:  (HANDING.)

09:49AM   7                          **CROSS-EXAMINATION**

09:49AM   8      BY MR. DOWNEY:

09:49AM   9      Q.   GOOD MORNING, MR. BURD.

09:49AM  10      A.   GOOD MORNING.

09:49AM  11      Q.   MY NAME IS KEVIN DOWNEY AND I REPRESENT MS. HOLMES.

09:49AM  12           I'M GOING TO REMOVE MY MASK, TOO, SO WE CAN HAVE THIS

09:50AM  13      CONVERSATION A LITTLE MORE COMPREHENSIBLY --

09:50AM  14      A.   GREAT.

09:50AM  15      Q.   -- FOR THE JURY.

09:50AM  16           AS I UNDERSTAND IT, YOU WERE THE CHIEF EXECUTIVE AT

09:50AM  17      SAFEWAY FOR ABOUT 20 YEARS.

09:50AM  18      A.   EXACTLY 20 YEARS.

09:50AM  19      Q.   AND I THINK YOU TESTIFIED ON DIRECT THAT SAFEWAY IS A VERY

09:50AM  20      LARGE, SUCCESSFUL ORGANIZATION; IS THAT RIGHT?

09:50AM  21      A.   CORRECT.

09:50AM  22      Q.   YOU MENTIONED $45 BILLION OR SO IN REVENUES AS OF 2010.

09:50AM  23           HOW MUCH OF THAT WOULD CONSTITUTE THE PROFIT OF SAFEWAY AT

09:50AM  24      THAT TIME?

09:50AM  25      A.   YOU KNOW, I DIDN'T COMMIT THOSE TO MEMORY, BUT WE USUALLY

BURD CROSS BY MR. DOWNEY                                    3049

09:50AM    1    HAD FREE CASH FLOW AFTER MEETING ALL EXPENSES AND AROUND A

09:50AM    2    BILLION THREE OR SOMETHING LIKE THAT.

09:50AM    3    Q.   AND PEOPLE THINK THAT BECAUSE YOU'RE THE CEO, YOU'RE THE

09:50AM    4    TOP GUY.  BUT, IN FACT, YOU HAD A BOARD OF DIRECTORS YOU HAD TO

09:50AM    5    REPORT TO; IS THAT CORRECT?

09:50AM    6    A.   THAT'S CORRECT.

09:50AM    7    Q.   AND IT WAS A VERY SOPHISTICATED BOARD?

09:50AM    8    A.   WE HAD PEOPLE WITH STRONG BUSINESS EXPERIENCE.  WE THINK

09:51AM    9    IT WAS A GOOD BOARD.

09:51AM   10    Q.   AND YOU HAD THE FORMER CHIEF EXECUTIVE OF WELLS FARGO;

09:51AM   11    CORRECT?

09:51AM   12    A.   CORRECT?

09:51AM   13    Q.   AND YOU HAD THE FORMER VICE CHAIR OF MACY'S; CORRECT?

09:51AM   14    A.   RIGHT.

09:51AM   15    Q.   AND YOU HAD THE FORMER CEO OF AT&T WIRELESS; CORRECT?

09:51AM   16    A.   CORRECT.

09:51AM   17    Q.   AND SO YOU HAD A LOT OF PEOPLE WHO HAD A LOT OF EXPERIENCE

09:51AM   18    IN BUSINESS?

09:51AM   19    A.   THAT'S CORRECT.

09:51AM   20    Q.   AND THEY WERE PEOPLE WHO WOULD ASK YOU QUESTIONS AND

09:51AM   21    COMMENT ON DECISIONS MANAGEMENT MADE IF THEY HAD AN ISSUE WITH

09:51AM   22    IT; CORRECT?

09:51AM   23    A.   CORRECT.

09:51AM   24    Q.   AND WITHIN THE COMPANY, OF COURSE YOU MENTIONED -- I THINK

09:51AM   25    YOU MENTIONED YOU HAD MORE THAN 175,000 EMPLOYEES AT THAT TIME;

BURD CROSS BY MR. DOWNEY                                        3050

09:51AM   1    CORRECT?

09:51AM   2    A.   CORRECT.

09:51AM   3    Q.   AND MANY OF THOSE ARE THE PEOPLE WE KNOW WHO WORK IN THE

09:51AM   4    STORES; CORRECT?

09:51AM   5    A.   MOST OF THEM WORK IN THE STORES.

09:51AM   6    Q.   OKAY.  BUT YOU ALSO HAVE A FUNCTION THAT YOU MIGHT CALL

09:51AM   7    THE CORPORATE FUNCTION, WHICH IS THE LAWYERS AND THE

09:51AM   8    ACCOUNTANTS AND SO FORTH?

09:51AM   9    A.   WE WOULD CALL THAT THE SUPPORT FUNCTION.

09:51AM  10    Q.   THE SUPPORT FUNCTION.

09:51AM  11         HOW MANY PEOPLE WORKED IN THE SUPPORT FUNCTION IN 2010?

09:51AM  12    A.   YOU KNOW, 2010 TO 2013 ARE KIND OF BLURRING, SO I'LL JUST

09:52AM  13    GIVE YOU ROUGH NUMBERS.

09:52AM  14    Q.   THAT'S FINE.

09:52AM  15    A.   ON CAMPUS WE HAD AROUND 3500 EMPLOYEES; AND THEN WE WERE

09:52AM  16    ORGANIZED DIVISIONALLY IN NINE DIVISIONS IN THE U.S. AND

09:52AM  17    CANADA, AND SO THEY HAD THEIR OWN SUPPORT FUNCTION.  IT MIGHT

09:52AM  18    BE ANYWHERE FROM 300 TO 700 PEOPLE.

09:52AM  19    Q.   AND YOU HAD, WORKING WITHIN THAT, A NUMBER OF PEOPLE WHO

09:52AM  20    REPORTED DIRECTLY TO YOU; CORRECT?

09:52AM  21    A.   CORRECT.

09:52AM  22    Q.   AND THAT WAS A STRONG EXECUTIVE TEAM IN YOUR VIEW?

09:52AM  23    A.   IT WAS.

09:52AM  24    Q.   OKAY.  YOU HAD A -- I THINK YOU MENTIONED YOU HAD A

09:52AM  25    GENERAL COUNSEL, MR. GORDON; CORRECT?

BURD CROSS BY MR. DOWNEY                                        3051

09:52AM   1      A.   CORRECT.

09:52AM   2      Q.   AND YOU HAD A CHIEF FINANCIAL OFFICER, ROBERT EDWARDS;

09:52AM   3      CORRECT?

09:52AM   4      A.   CORRECT.

09:52AM   5      Q.   AND YOU HAD A NUMBER OF OTHER SENIOR EXECUTIVE VICE

09:52AM   6      PRESIDENT TYPES; CORRECT?

09:52AM   7      A.   YES.

09:52AM   8      Q.   AND YOU HAD AN ENTIRE DIVISION THAT WAS DEVOTED TO HEALTH

09:52AM   9      ISSUES AT SAFEWAY; CORRECT?

09:53AM  10      A.   WE HAD A SMALL COMPANY, A STARTUP, PROBABLY NOT MORE THAN

09:53AM  11      FIVE EMPLOYEES.

09:53AM  12      Q.   AND THAT WAS CALLED SAFEWAY HEALTH?

09:53AM  13      A.   SAFEWAY HEALTH.

09:53AM  14      Q.   OKAY.  AND WHEN THE COMPANY HAD ISSUES ON WHICH IT DIDN'T

09:53AM  15      HAVE INTERNAL CAPACITY TO UNDERTAKE DECISIONS OR CONDUCT ITS

09:53AM  16      OPERATIONS, YOU WOULD GET OUTSIDE ADVISORS; CORRECT?

09:53AM  17      A.   WE WOULD.

09:53AM  18      Q.   AND SO IF YOU NEEDED LAWYERS, YOU MIGHT HIRE A LAW FIRM;

09:53AM  19      CORRECT?

09:53AM  20      A.   YES.

09:53AM  21      Q.   AND IF YOU NEEDED TO UNDERTAKE A TRANSACTION, YOU MIGHT

09:53AM  22      HIRE PEOPLE TO HELP YOU WITH THAT TRANSACTION; CORRECT?

09:53AM  23      A.   YES.

09:53AM  24      Q.   AND YOU MIGHT HIRE INVESTMENT BANKERS; CORRECT?

09:53AM  25      A.   YEAH, FOR LARGE TRANSACTIONS.  SMALL ONES WE DO OURSELVES.

BURD CROSS BY MR. DOWNEY                                          3052

09:53AM  1    Q.   AND ACQUISITION ADVISORS AND SO FORTH; CORRECT?

09:53AM  2    A.   CORRECT.

09:53AM  3    Q.   OKAY.  AND AT THIS POINT IN YOUR 17TH OR 18TH YEAR,

09:53AM  4    WHATEVER IT WAS, AS THE CHIEF EXECUTIVE, YOU HAD BECOME A

09:54AM  5    PRETTY SOPHISTICATED NEGOTIATOR; IS THAT RIGHT?

09:54AM  6    A.   I THINK I'M PRETTY GOOD AT IT.

09:54AM  7         ON THE OTHER HAND, WE HAD -- THIS WAS LARGELY A UNIONIZED

09:54AM  8    COMPANY, SO I HAD PEOPLE NEGOTIATE FOR ME.  BUT I SET THE

09:54AM  9    STRATEGY, THEY EXECUTED THE STRATEGY, AND I APPROVED THE

09:54AM 10    OUTCOME.

09:54AM 11    Q.   WELL, YOU MENTIONED EVEN BEFORE YOU CAME TO SAFEWAY YOU

09:54AM 12    HAD A BACKGROUND IN PRIVATE EQUITY; CORRECT?

09:54AM 13    A.   I WORKED FOR KOHLBERG, KRAVIS, ROBERTS & COMPANY NOT AS AN

09:54AM 14    EMPLOYEE BUT AS AN ADVISOR FOR ALMOST TEN YEARS.

09:54AM 15    Q.   AND THAT'S A LARGE PRIVATE EQUITY FIRM THAT MAKES

09:54AM 16    INVESTMENTS IN COMPANIES; CORRECT?

09:54AM 17    A.   IT IS.

09:54AM 18    Q.   AND YOUR AFFILIATION YOU SAY LASTED TEN YEARS?

09:54AM 19    A.   CLOSE TO TEN YEARS.

09:54AM 20    Q.   AND YOU WERE AROUND TRANSACTIONS IN CONNECTION WITH THEIR

09:54AM 21    WORK; CORRECT?

09:54AM 22    A.   I WAS.

09:54AM 23    Q.   AND AT SAFEWAY STORES, YOU'VE ALSO ENGAGED IN NEGOTIATIONS

09:54AM 24    RELATED TO A NUMBER OF ACQUISITIONS OF A NUMBER OF BUSINESSES;

09:54AM 25    CORRECT?

BURD CROSS BY MR. DOWNEY                                            3053

09:55AM  1    A.   YES.

09:55AM  2    Q.   AND YOU STARTED SOME BUSINESSES.  I THINK YOU MENTIONED

09:55AM  3    THAT.

09:55AM  4    A.   I STARTED SOME BUSINESSES.

09:55AM  5    Q.   AND THEN THOSE ARE THE GAS STATIONS AND SO FORTH?

09:55AM  6    A.   ACTUALLY, I HADN'T THOUGHT ABOUT THAT.  THAT WOULD BE

09:55AM  7    NUMBER SEVEN.  I STARTED SEVEN BUSINESSES.

09:55AM  8    Q.   SEVEN BUSINESSES?

09:55AM  9    A.   YES.

09:55AM  10   Q.   OKAY.  NOW, YOU FIRST LEARNED ABOUT THERANOS IN 2010 OR

09:55AM  11   LATE 2009?

09:55AM  12   A.   I REMEMBER THE MONTH.  THE YEAR IS SOMEWHERE IN THESE

09:55AM  13   BINDERS.  THE MONTH WAS MARCH.

09:55AM  14   Q.   OKAY.  AND BEFORE YOU MET WITH MS. HOLMES, I THINK YOU

09:55AM  15   MENTIONED THAT SOME OTHER EXECUTIVES OF THE COMPANY HAD MET

09:55AM  16   WITH MS. HOLMES; CORRECT?

09:55AM  17   A.   CORRECT.

09:55AM  18   Q.   AND DO YOU KNOW ON HOW MANY OCCASIONS THEY HAD MET WITH

09:55AM  19   MS. HOLMES?

09:55AM  20   A.   I BELIEVE IT WAS JUST ONE.

09:55AM  21   Q.   OKAY.  AND DO YOU RECALL WHETHER A BOARD MEMBER OF

09:55AM  22   THERANOS HAD HAD A DISCUSSION WITH A BOARD MEMBER OF SAFEWAY,

09:55AM  23   OR RATHER, WITH THE CHIEF FINANCIAL OFFICER OF SAFEWAY ABOUT

09:56AM  24   THERANOS?

09:56AM  25   A.   YES.

09:56AM   1    Q.   AND THE CHIEF FINANCIAL OFFICER, AS YOU SAID, WAS

09:56AM   2    MR. EDWARDS; CORRECT?

09:56AM   3    A.   CORRECT.

09:56AM   4    Q.   AND THE BOARD MEMBER FROM THERANOS WAS MR. DON LUCAS;

09:56AM   5    CORRECT?

09:56AM   6    A.   THAT IS CORRECT.  I BELIEVE THEY SERVED ON A BOARD

09:56AM   7    TOGETHER AND THAT'S HOW THEY KNEW ONE ANOTHER.

09:56AM   8    Q.   SO THEY HAD A PRIOR RELATIONSHIP?

09:56AM   9    A.   CORRECT.

09:56AM   10   Q.   AND DID YOU LEARN ABOUT THAT CONVERSATION BEFORE YOU

09:56AM   11   ENTERED INTO DISCUSSIONS WITH MS. HOLMES?

09:56AM   12   A.   I DID NOT KNOW ABOUT THAT CONVERSATION.  I THINK IT TOOK

09:56AM   13   PLACE AFTER I MET ELIZABETH AND HEARD THE THERANOS STORY.

09:56AM   14   Q.   AND WHEN YOU HEARD THAT MR. LUCAS WAS A BOARD MEMBER, DID

09:56AM   15   YOU RECOGNIZE WHO HE WAS?

09:56AM   16   A.   I DID.

09:56AM   17   Q.   YOU UNDERSTOOD THAT HE HAD BEEN A SUBSTANTIAL INVESTOR IN

09:56AM   18   TECHNOLOGY COMPANIES; IS THAT RIGHT?

09:56AM   19   A.   CORRECT.

09:56AM   20   Q.   AND YOU UNDERSTOOD THAT HE HAD BEEN AFFILIATED WITH SOME

09:56AM   21   OF THE SUCCESS STORIES IN TECHNOLOGY; IS THAT CORRECT?

09:57AM   22   A.   CORRECT.

09:57AM   23   Q.   ORACLE AND SO FORTH?

09:57AM   24   A.   CORRECT.

09:57AM   25   Q.   AND DID YOU LEARN DETAILS ABOUT THE BUSINESS FROM YOUR --

09:57AM    1    THE PEOPLE WHO WORKED FOR YOU PRIOR TO THE TIME THAT YOU MET

09:57AM    2    MS. HOLMES?

09:57AM    3    A.   NO.

09:57AM    4    Q.   THEY SIMPLY TOLD YOU THAT WE HAD A MEETING AND THEY WOULD

09:57AM    5    LIKE YOU TO HAVE A MEETING?

09:57AM    6    A.   WELL, THEY TOLD ME ABOUT THE MEETING.  I WOULDN'T SAY IT

09:57AM    7    WAS DETAILS.  I JUST HAD TO HEAR THAT IT WAS A MINILAB, RESULTS

09:57AM    8    IN 20, 30 MINUTES, AND I WAS IMMEDIATELY INTERESTED.

09:57AM    9    Q.   AND THEN YOU HAD THE MEETING I THINK YOU DESCRIBED ON

09:57AM   10    DIRECT; CORRECT?

09:57AM   11    A.   I'M SORRY.  SAY THAT AGAIN.

09:57AM   12    Q.   I'M SORRY.  YOU HAD THE MEETING WITH MS. HOLMES THAT YOU

09:57AM   13    DESCRIBED ON FRIDAY, WHICH I WON'T MAKE YOU REPEAT.

09:57AM   14    A.   YES.

09:57AM   15    Q.   BUT THIS WAS IN GENERAL TERMS.  THIS WAS THE MEETING WHERE

09:57AM   16    YOU WANTED TO GAIN AN IMPRESSION OF HER, LEARN ABOUT HER VISION

09:57AM   17    AND SO FORTH?

09:57AM   18    A.   CORRECT.

09:57AM   19    Q.   AND I THINK YOU TESTIFIED THAT YOU WERE IMPRESSED WITH HER

09:57AM   20    AS A RESULT OF THAT MEETING; CORRECT?

09:57AM   21    A.   YES.

09:58AM   22    Q.   YOU KNEW AT THE TIME THAT SHE WAS A VERY YOUNG

09:58AM   23    ENTREPRENEUR; CORRECT?

09:58AM   24    A.   YES.

09:58AM   25    Q.   YOU KNEW SHE WAS IN HER 20S OR SO?

09:58AM  1    A.   RIGHT.

09:58AM  2    Q.   AND OF COURSE YOU KNEW THE COMPANY WAS A STARTUP; CORRECT?

09:58AM  3    A.   I KNEW THAT.  I MEAN, IT WAS A, IT WAS -- IT HAD STILL

09:58AM  4    BEEN IN BUSINESS FOR A WHILE, BUT I WOULD CLASSIFY IT AS A

09:58AM  5    STARTUP.

09:58AM  6    Q.   IT WAS ABOUT FIVE AND A HALF YEARS OLD OR SO?

09:58AM  7    A.   YES, YES.

09:58AM  8    Q.   AND DID YOU KNOW HOW MANY EMPLOYEES THE COMPANY HAD?

09:58AM  9    A.   I DID NOT.

09:58AM 10    Q.   AND DID YOU KNOW WHETHER THE COMPANY HAD EVER BEEN PART OF

09:58AM 11    A RETAIL PARTNERSHIP BEFORE MS. HOLMES'S DISCUSSIONS WITH YOU

09:58AM 12    AND OTHERS AT SAFEWAY?

09:58AM 13    A.   YOU KNOW, SOMEWHERE ALONG THE LINE, NOT IN THAT FIRST

09:58AM 14    MEETING, I LEARNED THAT THEY HAD DISCUSSIONS WITH WALGREENS.

09:58AM 15    Q.   THAT AT THE SAME TIME THEY WERE JUST HAVING DISCUSSIONS

09:58AM 16    WITH SAFEWAY, THERANOS WAS ALSO DISCUSSING POTENTIAL RETAIL

09:58AM 17    PARTNERSHIPS WITH OTHER RETAIL COMPANIES; IS THAT WHAT YOU

09:59AM 18    MEAN?

09:59AM 19    A.   THAT'S WHAT I MEAN.

09:59AM 20    Q.   OKAY.  BUT AS OF THAT TIME, THEY HAD NOT YET RUN ANY

09:59AM 21    RETAIL OPERATIONS; CORRECT?

09:59AM 22    A.   CORRECT.

09:59AM 23    Q.   AND THEIR WORK, AS YOU UNDERSTOOD IT, HAD LARGELY BEEN IN

09:59AM 24    CONNECTION WITH WORK WITH THE PHARMACEUTICAL INDUSTRY; CORRECT?

09:59AM 25    A.   THAT'S INITIALLY WHO THEY SAID THEY HAD TESTED OUT THEIR

09:59AM   1    DEVICE WITH.

09:59AM   2    Q.   SO YOU UNDERSTOOD THAT SAFEWAY OR WALGREENS OR ONE OF THE

09:59AM   3    OTHER COMPANIES THAT THEY WERE TALKING TO, THIS WOULD BE THEIR

09:59AM   4    FIRST CONSUMER-BASED DEPLOYMENT OF TECHNOLOGY; CORRECT?

09:59AM   5    A.   CORRECT.

09:59AM   6    Q.   AND YOU UNDERSTOOD, OF COURSE, AS A RESULT THAT THEY NEVER

09:59AM   7    SCALED THIS TECHNOLOGY OR BUILT TECHNOLOGY ON A BROAD BASIS;

09:59AM   8    CORRECT?

09:59AM   9    A.   I KNEW THEY DIDN'T HAVE A LOT OF CUSTOMERS, OKAY, SO THEY

09:59AM  10    HADN'T GEARED UP FOR A LOT OF PRODUCTION.

09:59AM  11    Q.   OKAY.  BUT NEVERTHELESS, FOR THE REASONS THAT I THINK YOU

09:59AM  12    SAID ON FRIDAY, YOU WERE IMPRESSED WITH MS. HOLMES AND WITH THE

09:59AM  13    COMPANY BASED ON WHAT YOU HAD LEARNED; CORRECT?

10:00AM  14    A.   CORRECT.

10:00AM  15    Q.   AND I THINK YOU TESTIFIED THAT YOU ALMOST IMMEDIATELY WERE

10:00AM  16    INTERESTED IN PURSUING A POTENTIAL PARTNERSHIP WITH THERANOS;

10:00AM  17    CORRECT?

10:00AM  18    A.   CORRECT.

10:00AM  19    Q.   AND YOU MENTIONED THAT YOU, SHORTLY AFTER THE MEETING,

10:00AM  20    THAT YOU THOUGHT YOU SENT AN EMAIL TO MS. HOLMES.

10:00AM  21        DO YOU RECALL THAT?

10:00AM  22    A.   I BELIEVE I DID.

10:00AM  23    Q.   OKAY.  LET ME SHOW YOU IN THE BINDER THAT I'VE PLACED IN

10:00AM  24    FRONT OF YOU EXHIBIT 281.

10:00AM  25    A.   YES.

10:00AM  1    Q.   IS THAT A LETTER THAT YOU SENT TO MS. HOLMES IN 2010 AFTER

10:00AM  2    THE MEETING THAT YOU DESCRIBED ON DIRECT?

10:00AM  3    A.   CORRECT.

10:00AM  4            MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

10:00AM  5    281.

10:01AM  6            MR. LEACH:  NO OBJECTION.

10:01AM  7            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:01AM  8        (GOVERNMENT'S EXHIBIT 281 WAS RECEIVED IN EVIDENCE.)

10:01AM  9    BY MR. DOWNEY:

10:01AM  10   Q.   NOW, AM I RIGHT THAT AFTER YOU HEARD ABOUT THERANOS, THAT

10:01AM  11   YOU UNDERSTOOD THAT THIS OPPORTUNITY MIGHT BE ONE THAT HAD A

10:01AM  12   LOT OF POTENTIAL FOR SAFEWAY?

10:01AM  13   A.   CORRECT.

10:01AM  14   Q.   AND I THINK YOU SAID ON DIRECT THAT ONE OF THE POTENTIALS

10:01AM  15   WAS THAT JUST BY HAVING A NEW BUSINESS, YOU WOULD DRAW MORE

10:01AM  16   PEOPLE INTO SAFEWAY STORES; CORRECT?

10:01AM  17   A.   YES.

10:01AM  18   Q.   AND ANOTHER POSSIBILITY WAS THAT WITH RESPECT TO TESTS

10:01AM  19   THAT WERE PERFORMED IN SAFEWAY STORES, YOU MIGHT REALIZE A

10:01AM  20   LITTLE BIT OF A PROFIT ON EACH TEST THAT WAS PERFORMED;

10:01AM  21   CORRECT?

10:01AM  22   A.   CORRECT.

10:01AM  23   Q.   AND SO THAT THERANOS MIGHT BE OFFERING A TEST IN YOUR

10:01AM  24   STORE AT, SAY, $12 AND YOU MIGHT BE ABLE TO RETAIN TWO OF THOSE

10:01AM  25   DOLLARS; CORRECT?

10:01AM  1   A.   YES.  YOUR EXAMPLE, THOUGH, IS A PRETTY LOW NUMBER.  A

10:01AM  2   TYPICAL TEST WOULD BE, YOU KNOW, OVER $30.

10:02AM  3   Q.   OKAY.  AND OUT OF THAT, HOW MUCH WOULD SAFEWAY PROJECT IT

10:02AM  4   MIGHT BE ABLE TO CAPTURE?

10:02AM  5   A.   WE HAD SOMETHING IN THE CONTRACT THAT SUGGESTED THAT --

10:02AM  6   WELL, IT DIDN'T SUGGEST, IT SAID THAT WE WANTED TO MAKE $10 PER

10:02AM  7   TEST.

10:02AM  8   Q.   OKAY.  AND YOU ALSO TALKED ABOUT -- HOW MANY TESTS --

10:02AM  9   A.   CAN I CLARIFY THAT AND MAKE SURE EVERYBODY UNDERSTANDS?

10:02AM  10  Q.   YEAH.

10:02AM  11  A.   WE WANTED $10 IN REVENUE FOR DOING A TEST.  WHEN SOMEONE

10:02AM  12  COMES IN FOR A BLOOD TEST, THEY TYPICALLY HAVE THREE AND A HALF

10:02AM  13  TESTS, SO THAT WOULD BE $35.  AND THE FACILITY'S ON OUR

10:02AM  14  PROPERTY WITH OUR LABOR, THAT'S NOT THE PROFIT YOU MAKE, IT'S

10:02AM  15  THE REVENUE THAT YOU MAKE.

10:02AM  16  Q.   SO IT WOULD BE YOUR GROSS REVENUE, AND THEN OUT OF THAT

10:02AM  17  YOU WOULD REALIZE A SMALLER NUMBER AS PROFIT; CORRECT?

10:02AM  18  A.   CORRECT.

10:02AM  19  Q.   BUT IN TERMS OF THE LARGER STORE AND SO FORTH, THAT WAS

10:02AM  20  ALREADY BUILT, CORRECT, SO THIS WAS POTENTIALLY A PROFITABLE

10:02AM  21  BUSINESS?

10:02AM  22  A.   AT THE NUMBERS THAT WE WERE LOOKING AT, YES.

10:02AM  23  Q.   AND YOU ALSO MENTIONED THAT YOU MIGHT FEATURE TO OTHER

10:02AM  24  STORES A NETWORK IN WHICH THERANOS SERVICES MIGHT BE OFFERED.

10:03AM  25       COULD YOU EXPLAIN THAT?

10:03AM  1      A.   SURE.  WE HAD BUILT A NETWORK OF RETAILERS TO SELL GIFT

10:03AM  2      CARDS THAT YOU'LL SEE IN MOST SUPERMARKETS IN THE UNITED STATES

10:03AM  3      CALLED AN END CAP.

10:03AM  4           SO WE HAD THESE PARTNERSHIPS THAT EXISTED, AND WE FELT WE

10:03AM  5      COULD DO THE SAME THING FOR THERANOS BECAUSE WE WERE ONLY 1500,

10:03AM  6      1800 STORES IN THAT TIMEFRAME AND WE THOUGHT WE COULD PUT

10:03AM  7      TOGETHER A NATIONWIDE NETWORK OF OTHER RETAILERS AND WE WOULD

10:03AM  8      GET A REALLY SMALL SLIVER OF INCOME FROM THAT.

10:03AM  9      Q.   AND WOULD THAT BE DONE BY A LICENSING AGREEMENT BETWEEN

10:03AM 10      YOU AND THE OTHER STORES, OR HOW WOULD IT WORK?

10:03AM 11      A.   IT WOULD BE -- YOU KNOW, I DON'T THINK WE GOT FAR IN THAT

10:03AM 12      BUT WE ENVISIONED THAT WE WOULD PUT THAT NETWORK TOGETHER,

10:03AM 13      THERANOS WOULD APPROVE THOSE RETAILERS, AND THEN I CAN'T

10:04AM 14      RECALL, I THINK IT WAS OUR REVENUE WOULD COME FROM THE RETAILER

10:04AM 15      ITSELF, THAT SMALL BIT OF PROFIT.

10:04AM 16      Q.   AND YOU MENTIONED ON, ON -- A MOMENT AGO THAT YOU LEARNED

10:04AM 17      AT SOME POINT DURING THE COURSE OF YOUR DISCUSSIONS WITH

10:04AM 18      THERANOS THAT THEY WERE ALSO TALKING TO OTHER RETAILERS;

10:04AM 19      CORRECT?

10:04AM 20      A.   THE ONLY RETAILER I KNEW THAT THEY WERE TALKING TO WAS

10:04AM 21      WALGREENS.  AT LEAST THAT'S MY MEMORY.

10:04AM 22           I HAD INTRODUCED ELIZABETH TO PEOPLE AT PUBLIX, HY-VEE,

10:04AM 23      AND I THINK OTHER RETAILERS AT AN ANNUAL FMI CONFERENCE.

10:04AM 24      Q.   OKAY.  BUT WHATEVER -- AT THIS EARLY STAGE WHERE YOU WERE

10:04AM 25      MEETING MS. HOLMES FOR THE FIRST TIME, YOU RECOGNIZED THAT

10:04AM  1    WHATEVER RETAILER MIGHT GET AN EXCLUSIVE CONTRACT WITH

10:04AM  2    THERANOS, THAT THAT COULD BE A UNIQUELY PROFITABLE OPPORTUNITY

10:04AM  3    FOR THAT RETAILER; CORRECT?

10:04AM  4    A.   SURE.  AND THAT WAS NOT DISCUSSED AT THAT MEETING.  THAT

10:05AM  5    WAS LAID OUT IN THIS LETTER.

10:05AM  6    Q.   OKAY.  WELL, LET'S LOOK AT EXHIBIT 281 AND LET'S LOOK AT

10:05AM  7    THE FIRST PARAGRAPH.

10:05AM  8        IN THIS PARAGRAPH, YOU LAY OUT A POTENTIAL ARRANGEMENT

10:05AM  9    WHERE SAFEWAY WOULD HELP TO LAUNCH THE THERANOS BLOOD ANALYZER;

10:05AM 10    CORRECT?

10:05AM 11    A.   CORRECT.

10:05AM 12    Q.   AND IN RETURN, SAFEWAY WOULD GET THE EXCLUSIVE RIGHTS IN

10:05AM 13    ALL RETAIL FOR SOME PERIOD OF TIME; CORRECT?

10:05AM 14    A.   IT WAS CONFINED TO THE RETAIL SUPERMARKETS.

10:05AM 15    Q.   WELL, AT THIS POINT IN TIME, WERE YOU SEEKING ACTUALLY

10:05AM 16    EXCLUSIVE RIGHTS ACROSS ALL FORMS OF RETAIL?

10:05AM 17    A.   I DON'T BELIEVE SO.  I CAN READ THIS THING AGAIN.

10:05AM 18    Q.   SURE.

10:05AM 19        (PAUSE IN PROCEEDINGS.)

10:06AM 20            THE WITNESS:  WE WERE THINKING, YOU KNOW, WHETHER IT

10:06AM 21    SAYS IT HERE OR NOT, WE WERE THINKING EXCLUSIVELY ABOUT A

10:06AM 22    SUPERMARKET NETWORK.

10:06AM 23    BY MR. DOWNEY:

10:06AM 24    Q.   OKAY, SO THAT WOULD PRECLUDE RETAILERS LIKE KROGER AND

10:06AM 25    OTHERS FROM OFFERING IT IF YOU WERE ABLE TO ACHIEVE THAT TYPE

10:06AM 1    OF EXCLUSIVITY?

10:06AM 2    A.   WE WOULD TRY TO BUILD IT INITIALLY SO IT WAS RETAILERS

10:06AM 3    THAT WE DIDN'T COMPETE WITH, BUT WE LEARNED FROM THE BLACK HAWK

10:06AM 4    NETWORK THAT WE PUT TOGETHER FOR GIFT CARDS THAT WE ULTIMATELY

10:06AM 5    SOLD THEM TO EVERYBODY, EVEN THOSE WE COMPETED WITH, AND IT WAS

10:06AM 6    PROFITABLE TO DO SO.  BUT WE WOULD START WITH NONCOMPETING

10:06AM 7    RETAILERS.

10:06AM 8    Q.   OKAY.  AND SO WOULD YOU BE ABLE TO PRECLUDE, IN YOUR VIEW,

10:07AM 9    FOOD RETAILERS LIKE WAL-MART?

10:07AM 10   A.   WE WOULDN'T HAVE PICKED THEM BECAUSE WE COMPETE WITH THEM

10:07AM 11   SO BROADLY.

10:07AM 12   Q.   OKAY.  SO THEY WOULD NOT HAVE BEEN PART OF THE NETWORK?

10:07AM 13   A.   CORRECT.

10:07AM 14   Q.   SO IF YOU GOT AN EXCLUSIVE DEAL, YOU COULD PRECLUDE

10:07AM 15   WAL-MART FOR A PERIOD OF TIME FROM HOSTING THERANOS DEVICES?

10:07AM 16   A.   CORRECT.

10:07AM 17   Q.   OKAY.  AND THAT WOULD BE TRUE ALSO OF ANY OTHER RETAILER

10:07AM 18   THAT IS PART OF THE FOOD RETAIL CHAIN?

10:07AM 19   A.   YES.

10:07AM 20   Q.   OKAY.  IF YOU LOOK AT THE FIRST PARAGRAPH AFTER YOUR

10:07AM 21   INTRODUCTORY PARAGRAPH, YOU INDICATE THAT YOU WILL ARRANGE A

10:07AM 22   MEETING BETWEEN MS. HOLMES AND UCSF SO THAT IT COULD VERIFY

10:07AM 23   THAT THE BLOOD ANALYZER COULD PERFORM 85 PERCENT OF BLOOD WORK

10:07AM 24   DONE BY A STANDARD RETAIL LAB; CORRECT?

10:07AM 25   A.   CORRECT.

10:07AM  1    Q.   DID YOU ARRANGE THAT MEETING?

10:08AM  2    A.   WE DID ARRANGE A MEETING WITH UCSF WHICH INCLUDED THE CEO,

10:08AM  3    THE CHIEF MEDICAL OFFICER, AND THE HEAD OF LABS, BUT THAT

10:08AM  4    WASN'T UNTIL 2011.

10:08AM  5    Q.   WELL, DO YOU RECALL AT THE TIME OF THIS DISCUSSION WITH

10:08AM  6    MS. HOLMES THAT YOU DID ARRANGE A MEETING BETWEEN MS. HOLMES

10:08AM  7    AND PHYSICIANS AT UCSF?

10:08AM  8    A.   I DON'T QUITE UNDERSTAND THE QUESTION.

10:08AM  9    Q.   WELL, I THINK YOU JUST DESCRIBED A MEETING --

10:08AM  10   A.   ARE YOU ASKING, DID I DO THAT BEFORE 2011?

10:08AM  11   Q.   YES.

10:08AM  12   A.   I'D HAVE TO GO LOOK AT A BUNCH OF EMAILS.  I CAN'T COMMIT

10:08AM  13   ONE WAY OR THE OTHER ON THAT.

10:08AM  14   Q.   WELL, LET ME SHOW YOU ONE EMAIL TO SEE IF IT REFRESHES

10:08AM  15   YOUR RECOLLECTION.

10:08AM  16   A.   SURE.

10:08AM  17   Q.   AND THIS IS NOT FOR DISPLAY, BUT EXHIBIT 7101.  AND YOU

10:09AM  18   CAN REVIEW AS MUCH OF THIS AS YOU WOULD LIKE TO REVIEW, BUT I'M

10:09AM  19   JUST REALLY INTERESTED IN THE FIRST PARAGRAPH.

10:09AM  20        FIRST OF ALL, LET ME JUST ASK, IS KEVIN SHACHMUT ONE OF

10:09AM  21   THE EXECUTIVES WHO YOU MENTIONED WHO WORKED WITHIN SAFEWAY

10:09AM  22   HEALTH AT THIS TIME?

10:09AM  23   A.   THAT'S CORRECT.

10:09AM  24   Q.   IS IT ACCURATE THAT YOU, AS OF 2010, HAD CONTACTS AT UCSF?

10:09AM  25   A.   I HAD A LONGSTANDING RELATIONSHIP AT UCSF.

10:09AM  1          I HAVE TO READ THE COMPLETE LETTER.  CAN I DO THAT?

10:09AM  2     Q.   SURE.  OF COURSE.

10:09AM  3     A.   OKAY.

10:10AM  4          (PAUSE IN PROCEEDINGS.)

10:10AM  5              THE WITNESS:  OKAY.

10:10AM  6     BY MR. DOWNEY:

10:10AM  7     Q.   ALL RIGHT.  I ASKED YOU ABOUT MR. SHACHMUT.

10:10AM  8          IS BRAD WOLFSEN ALSO ANOTHER SAFEWAY HEALTH EXECUTIVE?

10:10AM  9     A.   HE WAS AT THE TIME.

10:10AM  10    Q.   AND YOU -- AS YOU SAID, YOU HAVE A LONGSTANDING

10:10AM  11    RELATIONSHIP WITH UCSF; IS THAT CORRECT?

10:10AM  12    A.   CORRECT.

10:10AM  13    Q.   AND IS THAT IN PART BECAUSE SAFEWAY HAS BEEN A GENEROUS

10:10AM  14    DONOR TO UCSF?

10:10AM  15    A.   SAFEWAY HAS, YES.

10:10AM  16    Q.   AND YOU PERSONALLY HAVE?

10:10AM  17    A.   I PERSONALLY HAVE.

10:10AM  18    Q.   AND SO YOU HAVE HAD GOOD RELATIONSHIPS WITHIN UCSF; IS

10:10AM  19    THAT CORRECT?

10:10AM  20    A.   CORRECT.

10:10AM  21    Q.   AND DOES THIS REFRESH YOUR RECOLLECTION THAT YOU REACHED

10:10AM  22    OUT AROUND THE TIME OF YOUR INITIAL MEETING WITH MS. HOLMES TO

10:10AM  23    ASK UCSF TO EVALUATE THERANOS'S TECHNOLOGY AND WHAT CAPACITIES

10:10AM  24    IT HAD AT THAT TIME?

10:10AM  25    A.   IT DOESN'T.  THIS LETTER STATES THAT STEVE WILL BE

10:11AM  1    REACHING OUT TO HIS CONTACTS --

10:11AM  2    Q.   YOU DON'T HAVE TO READ IT.  I'M JUST --

10:11AM  3              THE COURT:  EXCUSE ME, COUNSEL.

10:11AM  4         THE LAST PORTION IS STRICKEN, LADIES AND GENTLEMEN.  THE

10:11AM  5    PORTION ABOUT READING THE LETTER IS JUST TO REFRESH THE

10:11AM  6    WITNESS'S RECOLLECTION.

10:11AM  7              THE WITNESS:  RIGHT.

10:11AM  8    BY MR. DOWNEY:

10:11AM  9    Q.   I'M JUST ASKING YOU IF, HAVING READ IT, YOU RECALL IT OR

10:11AM  10   NOT.

10:11AM  11   A.   I DON'T BELIEVE THAT -- BY THE 24TH I HAD NOT YET REACHED

10:11AM  12   OUT TO UCSF.

10:11AM  13   Q.   DO YOU KNOW DR. SUE DESMOND-HELLMANN?

10:11AM  14   A.   SHE'S MY ALAMO NEIGHBOR.  I LIVE IN ALAMO AND SHE LIVES

10:11AM  15   NEXT DOOR.

10:11AM  16   Q.   AND DO YOU KNOW SHE'S DONE MANY THINGS, BUT AMONGST THEM

10:11AM  17   SHE'S A VERY PROMINENT EPIDEMIOLOGIST?

10:11AM  18   A.   SHE'S ACTUALLY A CANCER DOCTOR.

10:11AM  19   Q.   RIGHT.  AND SHE FOCUSES ON BIOSTATISTICS AND CANCER

10:11AM  20   RESEARCH AND SO FORTH?

10:11AM  21   A.   SHE DID THAT AT GENENTECH, AND THEN SHE SERVED AS THE

10:11AM  22   CHANCELLOR AT UCSF.

10:11AM  23   Q.   AND THEN SHE HELPED TO DEVELOP SEVERAL WELL-KNOWN AND

10:12AM  24   CRITICALLY IMPORTANT CANCER DRUGS; CORRECT?

10:12AM  25   A.   CORRECT.

10:12AM  1    Q.   AND DO YOU RECALL REACHING OUT TO DR. DESMOND-HELLMANN IN

10:12AM  2    2010 TO ASK HER TO LOOK AT THERANOS'S TECHNOLOGY AND DATA?

10:12AM  3    A.   IT WOULDN'T BE UNUSUAL FOR ME TO CALL HER OR CONTACT HER

10:12AM  4    VIA EMAIL.

10:12AM  5    Q.   AND WOULD IT ALSO BE LOGICAL FOR YOU AT THAT TIME TO HAVE

10:12AM  6    ASKED UCSF TO BE THE INSTITUTION THAT EVALUATED THE TECHNOLOGY?

10:12AM  7    A.   I WAS INTERESTED IN WHAT THEY THOUGHT OF THE TECHNOLOGY,

10:12AM  8    YES.

10:12AM  9    Q.   DO YOU KNOW THAT AT THAT TIME MS. HOLMES BROUGHT THE

10:12AM  10   THERANOS BLOOD ANALYZER AND OTHER COMPONENTS OF THERANOS

10:12AM  11   TECHNOLOGY TO UCSF?

10:12AM  12   A.   I'M NOT AWARE THAT -- I HAVE A VIVID RECOLLECTION OF A

10:12AM  13   MEETING I HAD WITH THE INDIVIDUALS I MENTIONED EARLIER.

10:12AM  14   Q.   THAT WAS IN 2011?

10:12AM  15   A.   THAT WAS IN 2011.

10:13AM  16        I DON'T RECALL.  MAYBE YOU CAN SHOW ME AN EMAIL.  I DON'T

10:13AM  17   RECALL A 2010 MEETING.

10:13AM  18   Q.   SO IF SUCH A MEETING HAPPENED, IT IS NOT SOMETHING THAT

10:13AM  19   YOU WERE PRESENT IN; CORRECT?

10:13AM  20   A.   IF IT HAPPENED, I WASN'T PRESENT OR I DON'T RECALL IT.

10:13AM  21   Q.   AND NOT SOMETHING THAT YOU WERE AWARE OF?  YOU WERE NOT

10:13AM  22   AWARE OF IT?

10:13AM  23   A.   IF IT HAPPENED, I WASN'T AWARE OF IT.

10:13AM  24   Q.   OKAY.  NOW, DID YOU, AFTER THIS ORIGINAL MEETING, THIS

10:13AM  25   MEETING THAT YOU DESCRIBED ON DIRECT, DID YOU START TO WORK ON

10:13AM  1    THE POTENTIAL STRUCTURE OF A DEAL WITH THERANOS?

10:13AM  2    A.   WE DID.  WE ALSO WORKED ON OUR DUE DILIGENCE PATH AS WELL.

10:13AM  3    Q.   WELL, I THINK -- DO YOU RECALL THAT MR. LEACH SHOWED YOU

10:13AM  4    ON DIRECT EXAMINATION A PRESENTATION THAT YOU HAD MADE TO THE

10:13AM  5    BOARD OF DIRECTORS OF SAFEWAY; CORRECT?

10:13AM  6    A.   CORRECT.

10:13AM  7    Q.   AND THAT WAS 45 DAYS LATER OR SO FORTH OR SOMETHING LIKE

10:14AM  8    THAT?

10:14AM  9    A.   I THINK IT WAS IN MAY.

10:14AM  10   Q.   IN MAY.

10:14AM  11        AND YOU TOLD THE BOARD AT THAT TIME THAT YOU WERE

10:14AM  12   EVALUATING A POTENTIAL DEAL WITH THERANOS; CORRECT?

10:14AM  13   A.   CORRECT.

10:14AM  14   Q.   AND YOU TOLD THE BOARD THAT YOU WOULD PERFORM DUE

10:14AM  15   DILIGENCE IN CONNECTION WITH THAT DEAL?

10:14AM  16   A.   CORRECT.

10:14AM  17   Q.   AND WERE YOU ASKED IN THAT MEETING ABOUT YOUR EVALUATION

10:14AM  18   OF THE REPRESENTATIONS THAT MS. HOLMES HAD MADE TO YOU

10:14AM  19   CONCERNING THE TECHNOLOGY?

10:14AM  20   A.   CAN YOU REPEAT THE QUESTION?

10:14AM  21   Q.   SURE.  DID BOARD MEMBERS ASK YOU WHAT THE CAPACITY OF THE

10:14AM  22   TECHNOLOGY WAS DURING THAT MEETING?

10:14AM  23   A.   YOU KNOW, I MADE A PRESENTATION, I REPRESENTED WHAT

10:14AM  24   THERANOS HAD REPRESENTED TO ME.  THEY ASKED QUESTIONS.  I

10:14AM  25   CERTAINLY DON'T REMEMBER WHAT THE QUESTIONS WERE.

10:14AM   1    Q.   BUT THEY ASKED YOU TO UNDERTAKE DUE DILIGENCE IN

10:15AM   2    CONNECTION WITH THOSE REPRESENTATIONS; CORRECT?

10:15AM   3    A.   WE TOLD THEM THAT WE WERE GOING TO DO DUE DILIGENCE.

10:15AM   4    Q.   IN FACT, IF YOU'D LET ME SHOW YOU THE EXHIBIT THAT YOU

10:15AM   5    WERE LOOKING AT ON DIRECT, IF YOU GO BACK TO THE WHITE BINDER

10:15AM   6    THAT MR. LEACH WAS SHOWING YOU AND GO TO EXHIBIT 336, WHICH IS

10:15AM   7    ALREADY IN EVIDENCE, AND I'M GOING TO DIRECT YOU TO PAGE 7.

10:15AM   8    A.   PAGE 7?

10:15AM   9    Q.   YES, SIR.

10:15AM  10         ON PAGE 7 AT A VERY HIGH LEVEL YOU OUTLINE A POSSIBLE DEAL

10:15AM  11    WITH THERANOS, AND THE FIRST THING YOU SAY, OF COURSE, IS THAT

10:15AM  12    IT WILL BE SUBJECT TO DUE DILIGENCE; CORRECT?

10:15AM  13    A.   I SAID THAT IN AN EARLIER CHART, I BELIEVE.

10:16AM  14    Q.   OKAY.  AND THE DEAL POINTS THAT YOU COMMUNICATED ON

10:16AM  15    PAGE 7, THIS WAS NOT THE DEAL THAT WAS ACTUALLY ULTIMATELY

10:16AM  16    NEGOTIATED, IS IT?

10:16AM  17    A.   NO.  IT WAS DIFFERENT.

10:16AM  18    Q.   OKAY.  SO, FOR EXAMPLE, YOU DID NOT MAKE -- SAFEWAY DID

10:16AM  19    NOT MAKE AN EQUITY INVESTMENT IN THERANOS, DID IT?

10:16AM  20    A.   NO, IT DID NOT.

10:16AM  21    Q.   AND SAFEWAY DID NOT TAKE A BOARD SEAT AT THERANOS, DID IT?

10:16AM  22    A.   IT WAS IN THE CONTRACT THAT THEY WOULD MAKE EVERY EFFORT

10:16AM  23    TO GIVE SAFEWAY A BOARD SEAT.

10:16AM  24    Q.   BUT YOU DID NOT ULTIMATELY TAKE A BOARD SEAT?

10:16AM  25    A.   WE DID NOT.  WE DID NOT.

BURD CROSS BY MR. DOWNEY                                              3069

10:16AM   1    Q.   OKAY.  LET ME ASK YOU -- AND, OF COURSE, AT ANY TIME IF

10:16AM   2    YOU WANT TO LOOK AT OTHER PARTS OF THE DOCUMENT, DO.

10:16AM   3    A.   SURE.

10:16AM   4    Q.   BUT I WANT TO DIRECT YOUR ATTENTION TO PAGE 18 OF THE SAME

10:17AM   5    EXHIBIT, 331.

10:17AM   6         PAGE 18 IS LABELED BUSINESS RISKS.

10:17AM   7         IS THIS PART OF A PRESENTATION THAT YOU GAVE TO THE

10:17AM   8    SAFEWAY BOARD ABOUT RISKS THAT HAD TO BE EVALUATED IN

10:17AM   9    CONNECTION WITH THE POTENTIAL DEAL WITH THERANOS?

10:17AM  10    A.   YES.

10:17AM  11    Q.   AND THE FIRST RISK THAT YOU IDENTIFIED IS REGULATORY

10:17AM  12    APPROVAL; CORRECT?

10:17AM  13    A.   CORRECT.

10:17AM  14    Q.   AND YOU UNDERSTOOD THAT THERE WERE POTENTIAL REGULATORY

10:17AM  15    RISKS INVOLVING VARIOUS FEDERAL REGULATORS; CORRECT?

10:17AM  16    A.   YES.

10:17AM  17    Q.   ANOTHER RISK WAS THAT THERANOS WOULD HAVE TO OBTAIN

10:17AM  18    CERTAIN APPROVALS OR WAIVERS UNDER CLIA; CORRECT?

10:17AM  19    A.   CORRECT.

10:17AM  20    Q.   AND CLIA IS ADMINISTERED BY CMS; CORRECT?

10:18AM  21    A.   CMS, WHICH IS MEDICARE.

10:18AM  22    Q.   OKAY.  AND I THINK YOU ALSO IDENTIFIED POTENTIAL RISKS

10:18AM  23    AROUND WHETHER THIRD PARTIES WHO WERE NECESSARY TO THE DEAL

10:18AM  24    WOULD AGREE TO THE DEAL.

10:18AM  25         SO, FOR EXAMPLE, YOU RECOGNIZED INSURANCE COMPANIES WOULD

BURD CROSS BY MR. DOWNEY                                           3070

10:18AM   1    HAVE TO SUPPORT THERANOS; CORRECT?

10:18AM   2    A.   CORRECT.

10:18AM   3    Q.   AND SO A RISK WAS THAT THAT WOULD NOT HAPPEN, THERANOS

10:18AM   4    WOULD NOT BE ABLE TO PERSUADE INSURANCE COMPANIES TO REIMBURSE

10:18AM   5    PATIENTS FOR THEIR SERVICES; CORRECT?

10:18AM   6    A.   CORRECT.

10:18AM   7    Q.   AND THAT'S -- THESE RISKS EXISTED BECAUSE IT WAS ALL VERY

10:18AM   8    EARLY IN TERMS OF THE DEAL; CORRECT?

10:18AM   9    A.   THAT'S RIGHT.

10:18AM  10    Q.   AND YOU WENT ON -- IF YOU WOULD JUST FLIP TO THE NEXT

10:18AM  11    PAGE -- YOU TELL THE BOARD AT THE END OF THIS PRESENTATION THAT

10:18AM  12    YOU WILL COMPLETE DUE DILIGENCE; CORRECT?

10:18AM  13    A.   CORRECT.

10:18AM  14    Q.   AND SOME OF THE ITEMS THAT YOU IDENTIFIED ON THE PRIOR

10:19AM  15    SLIDE, OR ADDRESSED, THAT YOU WOULD REVIEW THE REGULATORY

10:19AM  16    STRATEGY AND CONFIRM THE EQUITY VALUE AND THINGS LIKE THAT;

10:19AM  17    CORRECT?

10:19AM  18    A.   CORRECT.

10:19AM  19    Q.   AND YOU ALSO INDICATED THAT YOU WOULD VALIDATE THE

10:19AM  20    TECHNOLOGY WITH A SCIENTIFIC PANEL, INCLUDING JOHNS HOPKINS AND

10:19AM  21    UCSF; CORRECT?

10:19AM  22    A.   CORRECT.

10:19AM  23    Q.   NOW, IN TERMS OF CARRYING OUT THE DUE DILIGENCE OF THE

10:19AM  24    COMPANY, IT WAS ULTIMATELY YOUR RESPONSIBILITY, BUT OBVIOUSLY

10:19AM  25    YOU DIDN'T DO EVERY ASPECT OF IT; CORRECT?

10:19AM  1    A.   THAT'S CORRECT.

10:19AM  2    Q.   YOU HAD THE ABILITY TO DECIDE WHAT GOT DONE AND WHAT

10:19AM  3    DIDN'T GET DONE, BUT YOU DIDN'T NECESSARILY CARRY ALL OF IT

10:19AM  4    OUT; CORRECT?

10:19AM  5    A.   NOT ALL OF IT PERSONALLY, NO.

10:19AM  6    Q.   AND SO, FOR EXAMPLE, WITH RESPECT TO REGULATORY ISSUES,

10:19AM  7    YOU WOULD HAVE ASSIGNED -- YOU DID ASSIGN THAT RESPONSIBILITY

10:19AM  8    TO MR. GORDON, THE GENERAL COUNSEL; CORRECT?

10:20AM  9    A.   CORRECT.

10:20AM  10   Q.   AND WITH REGARD TO ANY FINANCIAL ISSUES, YOU WOULD HAVE

10:20AM  11   ASSIGNED THAT DUE DILIGENCE TO MR. EDWARDS; CORRECT?

10:20AM  12   A.   IN ALL LIKELIHOOD.

10:20AM  13   Q.   BY THE WAY, WITH RESPECT TO FINANCIAL ISSUES, DID YOU ASK

10:20AM  14   MS. HOLMES AT ANY TIME WHEN YOU WERE DEALING WITH HER, HOW MUCH

10:20AM  15   MONEY HAVE YOU SPENT DEVELOPING THIS TECHNOLOGY?

10:20AM  16   A.   I DON'T RECALL.

10:20AM  17   Q.   DO YOU KNOW IF MR. EDWARDS MADE THAT EVALUATION AS PART OF

10:20AM  18   HIS DUE DILIGENCE?

10:20AM  19   A.   I DON'T, I DON'T KNOW.

10:20AM  20   Q.   OKAY.  BUT IN TERMS OF THE BUSINESS MODEL, YOU WOULD HAVE

10:20AM  21   HAD SOME INPUT; CORRECT?

10:20AM  22   A.   THE BUSINESS MODEL, ABSOLUTELY.

10:20AM  23   Q.   AND MAYBE EXECUTIVES.  DID EXECUTIVES FROM SAFEWAY HEALTH

10:20AM  24   ALSO WORK ON DESIGNING THAT?

10:20AM  25   A.   THEY WOULD HAVE HAD A PERIPHERAL INVOLVEMENT.

BURD CROSS BY MR. DOWNEY                                      3072

10:20AM  1    Q.   OKAY.  SO BY THE END OF THE DAY, THERE WOULD BE A FAIRLY

10:20AM  2    BIG TEAM WORKING ON EVALUATING THERANOS; CORRECT?

10:20AM  3    A.   A NUMBER OF DISCIPLINES.

10:21AM  4    Q.   AND AS WELL BECAUSE THE ISSUES WERE COMPLICATED WITH

10:21AM  5    REGULATORS, DID SAFEWAY ALSO ENGAGE OUTSIDE LAWYERS?

10:21AM  6    A.   ON THE REGULATORY ISSUE, YES.

10:21AM  7    Q.   OKAY.  SO IS IT FAIR TO SAY THAT IN THE PROCESS OF

10:21AM  8    CONSIDERING WHETHER TO DO A DEAL, SAFEWAY DID HUNDREDS OF HOURS

10:21AM  9    OF DUE DILIGENCE?

10:21AM  10   A.   AT LEAST 100.

10:21AM  11   Q.   AND YOU WOULD HAVE COMMUNICATED, LET'S SAY, WITH THERANOS

10:21AM  12   DURING THAT PERIOD ALMOST DAILY ABOUT ONE ASPECT OR ANOTHER OF

10:21AM  13   THE DEAL; CORRECT?

10:21AM  14   A.   WE WERE ON A PARALLEL PATH TO DO THE DEAL AND DO THE DUE

10:21AM  15   DILIGENCE.

10:21AM  16   Q.   OKAY.  LOOK AT, IF YOU WOULD, EXHIBIT 7190.

10:21AM  17          THE COURT:  I JUST WANT TO CORRECT YOU.  I THINK YOU

10:22AM  18   INDICATED THE EXHIBIT YOU WERE JUST DISCUSSING WAS 331, AND I

10:22AM  19   THINK IT WAS 336.

10:22AM  20          MR. DOWNEY:  I BEG YOUR PARDON, YOUR HONOR.  I DID

10:22AM  21   MISIDENTIFY IT.

10:22AM  22          THE WITNESS:  WHICH BINDER ARE WE IN?

10:22AM  23          MR. DOWNEY:  YOU CAN RETURN TO THE BLACK BINDER.

10:22AM  24          THE WITNESS:  AND GIVE ME THE EXHIBIT AGAIN.

10:22AM  25   BY MR. DOWNEY:

BURD CROSS BY MR. DOWNEY                                             3073

```
10:22AM   1    Q.   THE EXHIBIT IS 7190.

10:22AM   2    A.   I HAVE IT.

10:22AM   3    Q.   I'LL GIVE YOU A MINUTE TO LOOK AT IT, BUT MY QUESTION AT

10:22AM   4    THIS POINT IS, IS THIS AN EMAIL FROM YOU TO RICK JURGENS OF

10:22AM   5    HY-VEE COPYING MS. HOLMES?

10:22AM   6    A.   CORRECT.

10:22AM   7    Q.   AND YOU SENT THIS IN OR AROUND JULY OF 2011; CORRECT?

10:22AM   8    A.   CORRECT.

10:22AM   9         MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

10:22AM   10   EXHIBIT 7190.

10:23AM   11        MR. LEACH:  NO OBJECTION.

10:23AM   12        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:23AM   13      (DEFENDANT'S EXHIBIT 7190 WAS RECEIVED IN EVIDENCE.)

10:23AM   14   BY MR. DOWNEY:

10:23AM   15   Q.   I JUST WANT TO ASK YOU IF THE STATEMENT IN HERE IS AN

10:23AM   16   ACCURATE CHARACTERIZATION OF THE DUE DILIGENCE THAT SAFEWAY

10:23AM   17   PERFORMED WITH RESPECT TO THERANOS.

10:23AM   18      FIRST OF ALL, LET ME ASK YOU, RICK JURGENS IS THE CEO OF

10:23AM   19   ANOTHER FOOD RETAILER; CORRECT?

10:23AM   20   A.   HE WAS AT THE TIME.

10:23AM   21   Q.   AND HE WAS THE CEO OF HY-VEE?

10:23AM   22   A.   CORRECT.

10:23AM   23   Q.   AND HY-VEE WAS ONE OF THE COMPANIES THAT YOU CONSIDERED

10:23AM   24   BRINGING INTO THE NETWORK; CORRECT?

10:23AM   25   A.   THAT'S CORRECT.
```

BURD CROSS BY MR. DOWNEY                                          3074

10:23AM  1    Q.   AND SO YOU WERE HAVING DISCUSSIONS WITH HIM ABOUT WHETHER

10:23AM  2    HY-VEE WOULD BE INTERESTED IN SUCH A DEAL; CORRECT?

10:23AM  3    A.   I ACTUALLY INTRODUCED ELIZABETH TO THEM.

10:23AM  4    Q.   OKAY.  AND YOU WERE DISCUSSING IN THIS EMAIL WHAT DUE

10:23AM  5    DILIGENCE HY-VEE SHOULD DO IN TERMS OF EVALUATING A POTENTIAL

10:23AM  6    DEAL; CORRECT?

10:23AM  7    A.   WE TALKED ABOUT SOME ELEMENTS OF THAT, SURE.

10:24AM  8    Q.   SO IN THE FIRST NUMBERED PARAGRAPH, YOU INDICATE THAT YOU

10:24AM  9    TALKED TO -- YOU INDICATE TO MR. JURGENS, "YOU SHOULD FOCUS

10:24AM 10    YOUR QUESTIONS WITH ME (SAFEWAY HAS SPENT HUNDREDS OF HOURS ON

10:24AM 11    ITS OWN DUE DILIGENCE AND HAS COMMUNICATED ALMOST DAILY WITH

10:24AM 12    ELIZABETH AND THERANOS FOR MORE THAN ONE YEAR).  THIS GIVES

10:24AM 13    ELIZABETH MORE TIME TO CONCENTRATE ON ALL THAT SHE MUST GET

10:24AM 14    DONE BEFORE SAFEWAY'S LAUNCH."

10:24AM 15         AT THE TIME THAT WAS AN ACCURATE STATEMENT?

10:24AM 16    A.   IT WAS AN ACCURATE STATEMENT, BUT IT DESERVES A LITTLE

10:24AM 17    EXPLANATION.

10:24AM 18         BECAUSE I WAS SENSITIVE TO ELIZABETH'S TIME AND WE HAD

10:24AM 19    BEEN THROUGH A GOOD DEAL OF OUR OWN DUE DILIGENCE, THEY COULD

10:24AM 20    ASK ME THE QUESTIONS THAT I PROBABLY ASKED ALREADY AND I COULD

10:24AM 21    PROVIDE THE ANSWERS SO THEY DIDN'T HAVE TO GO TO ELIZABETH.

10:24AM 22    Q.   I UNDERSTAND.  SO YOU WERE INDICATING THAT YOU THOUGHT THE

10:24AM 23    GREATEST EFFICIENCY WOULD BE FOR SAFEWAY TO PROVIDE ANY -- BE

10:25AM 24    CONTACTED FIRST ABOUT ANY DILIGENCE QUESTIONS; CORRECT?

10:25AM 25    A.   CONTACTED FIRST, YES.

10:25AM   1    Q.   BUT IT'S AN ACCURATE STATEMENT THAT SAFEWAY HAD SPENT

10:25AM   2    HUNDREDS OF HOURS ON DUE DILIGENCE ON THERANOS?

10:25AM   3    A.   IF I SAID IT IN THIS LETTER, IT'S TRUE.

10:25AM   4    Q.   AND DO YOU RECALL THAT SAFEWAY ASKED THERANOS FOR A NUMBER

10:25AM   5    OF DOCUMENTS DURING AND IN CONNECTION WITH PERFORMING DUE

10:25AM   6    DILIGENCE?

10:25AM   7    A.   WE DO -- I DO RECALL THAT, BUT I DON'T RECALL ALL OF THE

10:25AM   8    DOCUMENTS.

10:25AM   9    Q.   LET ME SHOW YOU A DOCUMENT WHICH IS IN THE BLACK NOTEBOOK,

10:25AM  10    WHICH IS EXHIBIT 10536.

10:26AM  11         NOW, THIS IS AN EMAIL THAT YOU ARE NOT A SENDER OR A

10:26AM  12    RECIPIENT.  I WANT TO ASK YOU IF THE DOCUMENTS LISTED ON HERE

10:26AM  13    ARE DOCUMENTS THAT YOU RECALL WERE PART OF THE DILIGENCE

10:26AM  14    PROCESS BETWEEN THERANOS AND SAFEWAY.

10:26AM  15    A.   IT LOOKS LIKE A NUMBER OF THEM WOULD HAVE BEEN PART OF

10:26AM  16    THAT PROCESS.

10:26AM  17    Q.   AND, FOR EXAMPLE, IT'S STANDARD AS PART OF DUE DILIGENCE,

10:26AM  18    ISN'T IT, FOR ONE COMPANY TO PROVIDE ITS CAPITALIZATION TABLE

10:26AM  19    TO THE OTHER COMPANY; CORRECT?

10:26AM  20    A.   TO ANY COMPANY LOOKING TO BUY OR INVEST IN THE COMPANY,

10:26AM  21    YES.

10:26AM  22    Q.   OKAY.  LET ME ASK YOU ABOUT A FEW ITEMS ON HERE.  DO YOU

10:26AM  23    RECALL WHETHER ANY ASSAY DEVELOPMENT REPORTS WERE SENT FROM

10:27AM  24    THERANOS TO SAFEWAY AS PART OF THE DILIGENCE PROCESS?

10:27AM  25    A.   I DON'T KNOW IF THIS IS A CORRECT DESCRIPTION, BUT WE WERE

10:27AM 1      PROVIDED WITH SOME INFORMATION REGARDING SOME WORK THAT

10:27AM 2      THERANOS HAD SAID THEY HAD DONE WITH SOME PHARMACEUTICAL

10:27AM 3      COMPANIES.

10:27AM 4      Q.   WELL, DO YOU REMEMBER RECEIVING A DEVELOPMENT REPORT ABOUT

10:27AM 5      HOW THEY HAD ACTUALLY GONE ABOUT DEVELOPING ASSAYS INTERNALLY

10:27AM 6      AT THERANOS?

10:27AM 7      A.   I DON'T RECALL.

10:27AM 8      Q.   OKAY.  BUT DO YOU RECALL RECEIVING PATENTS FROM THERANOS

10:27AM 9      THAT DETAILED THE INTELLECTUAL PROPERTY IT HAD OBTAINED?

10:27AM 10     A.   IT WOULD HAVE BEEN COMMON TO ASK FOR THEM, BUT THAT'S NOT

10:27AM 11     SOMETHING THAT I WOULD HAVE PERSONALLY REVIEWED.

10:27AM 12     Q.   WOULD THOSE ISSUES HAVE BEEN HANDLED BY MR. GORDON?

10:27AM 13     A.   THEY WOULD.

10:27AM 14     Q.   AND WITH REGARD TO ANY OF THE REPORTS THAT RELATED TO

10:28AM 15     SCIENTIFIC ISSUES, THE TECHNOLOGY OR THE DEVELOPMENT OF ASSAYS,

10:28AM 16     WHO WITHIN SAFEWAY WOULD HAVE EVALUATED THAT INFORMATION?

10:28AM 17     A.   I THINK THE FIRST LEVEL OF EVALUATION PROBABLY WOULD HAVE

10:28AM 18     BEEN KEN SHACHMUT AT SAFEWAY HEALTH; WE WOULD HAVE HAD OUR HEAD

10:28AM 19     OF PHARMACY LOOK AT THESE IN TERMS OF INTERNAL; I PERSONALLY

10:28AM 20     HAD CONVERSATIONS WITH THE LAB DIRECTORS AT JOHNS HOPKINS AND

10:28AM 21     THE LAB DIRECTOR AT UCSF.

10:28AM 22     Q.   OKAY.  LET'S TALK ABOUT -- WHO IS THE LAB DIRECTOR AT

10:28AM 23     JOHNS HOPKINS THAT YOU RECALL SPEAKING TO?

10:28AM 24     A.   YOU KNOW, WE'RE GOING BACK 11 YEARS, SO I DON'T RECALL.

10:28AM 25     I'M SURE WE CAN DO AN INTERNET SEARCH.

10:28AM   1    Q.   WELL, LET ME ASK YOU A FEW NAMES BECAUSE I DON'T KNOW

10:29AM   2    EXACTLY WHO YOU ARE REFERRING TO.

10:29AM   3    A.   YEAH.

10:29AM   4    Q.   LET ME ASK YOU, DO YOU RECALL CONTACTING A PHYSICIAN NAMED

10:29AM   5    DR. JONATHAN SIMONS?

10:29AM   6    A.   I RECALL TALKING TO JONATHAN.

10:29AM   7    Q.   OKAY.  AND DR. SIMONS WAS THE CEO OF THE PROSTATE CANCER?

10:29AM   8    A.   HE WAS AT THE TIME.

10:29AM   9    Q.   AND HE'S AN ONCOLOGIST?

10:29AM  10    A.   HE'S AN ONCOLOGIST.

10:29AM  11    Q.   AND HE'S SOMEONE FOR WHOM YOU HAVE HIGH REGARD?

10:29AM  12    A.   IN THE SCIENTIFIC COMMUNITY, YES.

10:29AM  13    Q.   AND YOU SPOKE TO HIM ABOUT THE COMPANY?

10:29AM  14    A.   I DID.

10:29AM  15    Q.   AND YOU WANTED TO GET HIS IMPRESSIONS AND HIS EVALUATION

10:29AM  16    OF THERANOS AND ITS TECHNOLOGY?

10:29AM  17    A.   I ACTUALLY HAD HIM MEET ELIZABETH AS WELL.

10:29AM  18    Q.   YOU HAD DR. SIMONS MEET WITH MS. HOLMES?

10:29AM  19    A.   AND I WAS IN THE ROOM.

10:29AM  20    Q.   AND DID THAT MEETING GIVE YOU ANY SENSE OF THE CAPACITIES

10:29AM  21    OF THERANOS'S TECHNOLOGY?

10:30AM  22    A.   YOU KNOW, OBVIOUSLY JONATHAN WAS IN NO POSITION AT A

10:30AM  23    DINNER MEETING TO EVALUATE THE TECHNOLOGY.  HE THOUGHT IF

10:30AM  24    THERANOS COULD DO THIS, THAT WOULD BE A BIT OF A GAME CHANGER.

10:30AM  25    Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 7164.

| | | |
|---|---|---|
| 10:30AM | 1 | A.   I HAVE IT. |
| 10:30AM | 2 | Q.   THIS WAS AN EMAIL THAT WAS SENT, APPEARS TO HAVE BEEN SENT |
| 10:30AM | 3 | FROM DR. SIMONS TO MS. HOLMES AND YOURSELF; CORRECT? |
| 10:30AM | 4 | A.   CORRECT. |
| 10:30AM | 5 | MR. DOWNEY:  I MOVE THE ADMISSION, YOUR HONOR, OF |
| 10:30AM | 6 | 7164. |
| 10:31AM | 7 | MR. LEACH:  HEARSAY, YOUR HONOR. |
| 10:31AM | 8 | THE COURT:  THERE ARE TWO DOCUMENTS HERE, |
| 10:31AM | 9 | MR. DOWNEY. |
| 10:31AM | 10 | MR. DOWNEY:  YOUR HONOR, I THINK IF YOU SEE -- |
| 10:31AM | 11 | THE COURT:  IS IT BOTH OF THEM YOU'RE SEEKING |
| 10:31AM | 12 | ADMISSION OF?  THE SECOND ITEM SEEMS TO BE A TWO-PAGE LETTER. |
| 10:31AM | 13 | MR. DOWNEY:  YES, YOUR HONOR. |
| 10:31AM | 14 | I THINK THE WAY THE DOCUMENT WORKS IS THAT THE FIRST PAGE |
| 10:31AM | 15 | IS AN EMAIL AND THE EMAIL HAS AS AN ATTACHMENT A MEMO WHICH IS |
| 10:31AM | 16 | REFERENCED IF YOU SEE THAT UNDER THE SUBJECT, AND THEN THERE'S |
| 10:31AM | 17 | AN ATTACHMENT OF A PDF AND WITHIN THE PDF THERE'S A COVER |
| 10:31AM | 18 | LETTER TO ANOTHER LETTER WHICH, IN TURN, FORWARDS THAT LETTER. |
| 10:32AM | 19 | AND THIS WAS BEING SHARED, I THINK, WITH THE RECIPIENTS OF THIS |
| 10:32AM | 20 | EMAIL. |
| 10:32AM | 21 | THE COURT:  AND THE SECOND LETTER, ARE YOU ASKING |
| 10:32AM | 22 | THAT THIS BE ADMITTED FOR THE TRUTH OF THE MATTER ASSERTED?  I |
| 10:32AM | 23 | THINK I WOULD SUSTAIN A HEARSAY OBJECTION TO THAT SECOND PAGE. |
| 10:32AM | 24 | MR. DOWNEY:  WELL, AT THE VERY LEAST, YOUR HONOR, |
| 10:32AM | 25 | I'M ASKING THAT IT BE ADMITTED TO THE DEFENDANT'S STATE OF |

10:32AM   1    MIND.

10:32AM   2        BUT I ALSO THINK IT GOES TO THE MATERIALITY ISSUES OF --

10:32AM   3    THIS WITNESS HAS TESTIFIED ON DIRECT ABOUT THOSE ISSUES WHICH

10:32AM   4    WERE IMPORTANT TO HIM IN EVALUATING AND CONTINUING UNDER THE

10:32AM   5    DEAL.

10:32AM   6        I THINK HE'S JUST TESTIFIED ABOUT CONVERSATIONS WITH THIS

10:33AM   7    WITNESS AND HIS REQUEST.  I THINK THIS RETAINS -- CONTAINS A

10:33AM   8    CONTEMPORANEOUS REFLECTION OF WHAT THOSE REFLECTIONS WERE.

10:33AM   9        THE COURT:  I'M GOING TO SUSTAIN THE OBJECTION.

10:33AM  10        MR. DOWNEY:  MAY I ASK, YOUR HONOR, IF ANY OF THE

10:33AM  11    COMPONENTS REFRESH THE RECOLLECTION OF THE WITNESS?

10:33AM  12        THE COURT:  YOU MAY, OF COURSE.  SURE.

10:33AM  13    BY MR. DOWNEY:

10:33AM  14    Q.   LET ME ASK YOU, MR. BURD, TO LOOK AT THE THIRD PAGE OF THE

10:33AM  15    EXHIBIT.  LET ME KNOW WHEN YOU HAVE THAT IN FRONT OF YOU.

10:33AM  16    A.   I DO.

10:33AM  17    Q.   AND LET ME ASK YOU TO LOOK AT THE -- THERE'S A SHORT

10:33AM  18    PARAGRAPH AND THEN THERE'S A QUESTION, AND UNDER THAT THERE'S

10:34AM  19    AN ANSWER.

10:34AM  20        IF YOU GO TO THE SECOND SENTENCE FROM THE BOTTOM, I WANT

10:34AM  21    TO ASK --

10:34AM  22    A.   ON THE FIRST PAGE OR THE SECOND PAGE?

10:34AM  23    Q.   ON THE FIRST PAGE.

10:34AM  24    A.   OKAY.

10:34AM  25    Q.   SO DO YOU SEE THAT THERE'S A QUESTION THAT BEGINS "WHAT DO

10:34AM   1    YOU KNOW"?

10:34AM   2    A.   I'M ON THE BOTTOM OF THE FIRST PAGE.

10:34AM   3    Q.   I'M ASKING YOU TO LOOK AT THE TOP OF THE THIRD PAGE OF THE

10:34AM   4    EXHIBIT, WHICH IS A LETTER, AND I THINK I CAN --

10:34AM   5    A.   OKAY.  ALL RIGHT.  SO I'M ON THAT PAGE.

10:34AM   6    Q.   ALL RIGHT.  SO I'M ASKING YOU TO LOOK AT THE FIRST

10:34AM   7    PARAGRAPH, THE PARAGRAPH UNDER THE FIRST QUESTION THAT IS POSED

10:34AM   8    THERE.

10:34AM   9    A.   YES.

10:34AM  10    Q.   AND THE SECOND TO THE LAST SENTENCE OF THAT ANSWER THAT

10:35AM  11    BEGINS "THERE ARE."

10:35AM  12    A.   CORRECT.

10:35AM  13    Q.   IS THAT -- IS THE STATEMENT CONTAINED THEREIN CONSISTENT

10:35AM  14    WITH WHAT DR. SIMONS CONVEYED TO YOU ABOUT THE STATE OF

10:35AM  15    THERANOS'S TECHNOLOGY?

10:35AM  16    A.   IT'S NOT SOMETHING THAT I RECALL.

10:35AM  17    Q.   OKAY.  DO YOU RECALL DR. SIMONS EVER SAYING TO YOU THERE

10:35AM  18    WERE OTHER EFFORTS THAT WERE BEING MADE WHICH WERE SIMILAR

10:35AM  19    EFFORTS TO THE EFFORT THAT THERANOS WAS UNDERTAKING TO GIVE

10:35AM  20    POINT OF CARE BLOOD TESTING?

10:35AM  21    A.   I DON'T RECALL THAT.

10:35AM  22    Q.   DO YOU RECALL HIM SAYING THAT THERANOS WAS IN A SUPERIOR

10:35AM  23    POSITION TO OTHER COMPANIES BASED ON ITS PATENTS?

10:35AM  24    A.   I DON'T RECALL THAT.

10:35AM  25    Q.   OKAY.  AND DO YOU RECALL LEARNING FROM HIM THAT RELATIVE

| | | |
|---|---|---|
| 10:36AM | 1 | TO OTHER BIOTECH COMPANIES IN THE SAME SPACE, HE THOUGHT THAT |
| 10:36AM | 2 | THERANOS WAS IN THE LEADING POSITION? |
| 10:36AM | 3 | A.   I DON'T RECALL THAT.  HE DIDN'T EVALUATE THE TECHNOLOGY. |
| 10:36AM | 4 | HE WAS ASKING OTHERS ABOUT WHAT THEY KNOW OF HER. |
| 10:36AM | 5 | Q.   OKAY.  I JUST WANT TO ASK YOU A QUESTION THAT IS A LITTLE |
| 10:36AM | 6 | BIT OFF TOPIC, BUT I'LL JUST ASK YOU TO GO BACK TO THE EMAIL -- |
| 10:36AM | 7 | A.   SURE. |
| 10:36AM | 8 | Q.   -- FOR A MOMENT. |
| 10:36AM | 9 | A.   YES. |
| 10:36AM | 10 | Q.   AND I WANT TO JUST ASK YOU TO LOOK AT THE LAST PARAGRAPH |
| 10:36AM | 11 | OF THE EMAIL THAT BEGINS "ELIZABETH." |
| 10:36AM | 12 | A.   YES. |
| 10:36AM | 13 | Q.   AND JUST TAKE A LOOK TO LOOK AT THAT. |
| 10:36AM | 14 | MY QUESTION IS, DO YOU RECALL REFERENCES TO A 3.0 OR A 4.0 |
| 10:36AM | 15 | IN DISCUSSING THERANOS TECHNOLOGY? |
| 10:36AM | 16 | A.   I DON'T. |
| 10:36AM | 17 | WHAT I RECALL FROM THE DINNER MEETING IS THAT THERE WAS A |
| 10:37AM | 18 | LOT OF DISCUSSION ABOUT CANCER BECAUSE HE WAS AN ONCOLOGIST, |
| 10:37AM | 19 | AND THOSE WERE SOME VISIONS THAT ELIZABETH HAD THAT SHE MIGHT |
| 10:37AM | 20 | BE ABLE TO DO WITH THE ANALYZER, AND JONATHAN WAS JUST |
| 10:37AM | 21 | DESCRIBING A JAR OF JELLY BEANS AND THE DIFFERENT COLORS AND HE |
| 10:37AM | 22 | WAS -- THAT'S WHEN HE STARTED TALKING ABOUT CYTOKINES, BUT THEY |
| 10:37AM | 23 | WERE TALKING AT A LEVEL OF DETAIL THAT WAS A LITTLE ABOVE ME. |
| 10:37AM | 24 | Q.   OKAY.  SO YOU DON'T REMEMBER HEARING AT THAT DINNER |
| 10:37AM | 25 | REFERENCES TO DIFFERENT VERSIONS OF THERANOS TECHNOLOGY? |

10:37AM  1     A.   I DON'T.

10:37AM  2     Q.   DO YOU RECALL LEARNING THAT AT ANY TIME?

10:37AM  3     A.   I WASN'T AWARE OF ANYBODY ELSE DOING IT.

10:37AM  4     Q.   WELL, DO YOU RECALL HEARING ABOUT DIFFERENT VERSIONS LIKE

10:37AM  5     A 2.0, A 3.0, A 4.0 OF THERANOS'S TECHNOLOGY?

10:37AM  6     A.   YES.  I THINK THAT, AS I SAID DURING MY DIRECT TESTIMONY,

10:37AM  7     THERE WERE -- THE BIO SENSOR, WHATEVER THE TERM IS, THE UNIT,

10:37AM  8     IT WENT THROUGH CONSTANT CHANGE, BOTH PHYSICAL AND I SUPPOSE IT

10:38AM  9     HAD NEW CAPABILITIES AND THEREFORE YOU'D HAVE A 1, 2, 3, JUST

10:38AM 10     AS MICROSOFT DOES.

10:38AM 11     Q.   AND AT THE TIME, NOT TODAY, BUT AT THE TIME --

10:38AM 12     A.   YES.

10:38AM 13     Q.   -- DID YOU HAVE AN UNDERSTANDING OF THE DIFFERENCES

10:38AM 14     BETWEEN THOSE VERSIONS?

10:38AM 15     A.   NO.

10:38AM 16     Q.   LET ME ASK YOU TO LOOK NOW AT EXHIBIT 332.

10:39AM 17     A.   ALL RIGHT.

10:39AM 18     Q.   IS THIS AN EMAIL THAT MS. HOLMES SENT TO DR. SIMONS

10:39AM 19     COPYING YOU IN 2010?

10:39AM 20     A.   IT IS.

10:39AM 21     Q.   AND IS THIS PART OF YOUR DISCUSSIONS WITH THERANOS ABOUT

10:39AM 22     ENTERING, POTENTIALLY ENTERING A DEAL?

10:39AM 23     A.   WAS IT PART OF THE THOUGHT PROCESS?  YES.

10:39AM 24          MR. DOWNEY:  YOUR HONOR, I WOULD MOVE THE ADMISSION

10:39AM 25     OF 332.

| | | |
|---|---|---|
| 10:39AM | 1 | MR. LEACH:  NO OBJECTION, YOUR HONOR. |
| 10:39AM | 2 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 10:39AM | 3 | (GOVERNMENT'S EXHIBIT 332 WAS RECEIVED IN EVIDENCE.) |
| 10:39AM | 4 | BY MR. DOWNEY: |
| 10:39AM | 5 | Q.  I'LL ASK YOU TO FOCUS ON THE SECOND FULL PARAGRAPH.  THE |
| 10:39AM | 6 | PARAGRAPH ABOVE, I'M SORRY, THE PARAGRAPH THAT BEGINS "THERANOS |
| 10:39AM | 7 | STARTED OUT." |
| 10:40AM | 8 | A.  YES. |
| 10:40AM | 9 | Q.  IN THAT PARAGRAPH, MS. HOLMES TOLD DR. SIMONS AND YOU THAT |
| 10:40AM | 10 | THERANOS HAD BUILT A MINILAB SYSTEM THAT AUTOMATES THE PROCESS |
| 10:40AM | 11 | OF RUNNING A BROAD RANGE OF ASSAYS ON ACCELERATED TIMELINES |
| 10:40AM | 12 | WITH MUCH SMALLER VOLUMES OF SAMPLE; CORRECT? |
| 10:40AM | 13 | A.  CORRECT. |
| 10:40AM | 14 | Q.  AND IS THAT CONSISTENT WITH WHAT SHE TOLD YOU IN YOUR |
| 10:40AM | 15 | MEETING IN MARCH OF 2010? |
| 10:40AM | 16 | A.  CORRECT. |
| 10:40AM | 17 | Q.  IN THE NEXT PARAGRAPH SHE GOES ON TO SAY, "WE HAVE HAD THE |
| 10:40AM | 18 | OPPORTUNITY TO PRESENT THE VALIDATION DATA ON THE TECHNOLOGY |
| 10:40AM | 19 | PLATFORM AND ON THE BROAD RANGE OF ASSAYS AT HOPKINS." |
| 10:40AM | 20 | CORRECT? |
| 10:40AM | 21 | A.  THAT'S WHAT IT SAYS. |
| 10:40AM | 22 | Q.  AND HOPKINS YOU UNDERSTOOD TO BE A REFERENCE TO |
| 10:41AM | 23 | JOHNS HOPKINS? |
| 10:41AM | 24 | A.  CORRECT. |
| 10:41AM | 25 | Q.  AND SHE THEN GOES ON TO IDENTIFY A VARIETY OF DOCTORS AT |

10:41AM   1    HOPKINS WHO HAVE PARTICIPATED IN THAT EVALUATION; CORRECT?

10:41AM   2    A.   CORRECT.

10:41AM   3    Q.   IS THIS WHEN YOU LEARNED THAT HOPKINS HAD UNDERTAKEN AN

10:41AM   4    EVALUATION OF THERANOS'S TECHNOLOGY?

10:41AM   5    A.   I CAN'T BE CERTAIN BECAUSE I KNOW PEOPLE AT HOPKINS AND

10:41AM   6    BECAUSE ELIZABETH SAID ONE OF THEIR ANALYZERS WAS PHYSICALLY ON

10:41AM   7    THEIR PROPERTY FOR A WHILE.  SHE INVITED ME TO TALK TO SOMEONE

10:41AM   8    AT HOPKINS, AND THAT'S THE PERSON THAT I CALLED.

10:41AM   9    Q.   AND IS THAT THE LABORATORY DIRECTOR THAT YOU ARE

10:41AM   10   RECALLING?

10:41AM   11   A.   I RECALL THEM AS A LABORATORY DIRECTOR.  IT ALMOST HAD TO

10:42AM   12   BE THE LABORATORY DIRECTOR BECAUSE THAT'S WHOSE OPINION I

10:42AM   13   WANTED TO HEAR.

10:42AM   14   Q.   DID YOU TALK TO ANY OF THE INDIVIDUALS WHO ARE IDENTIFIED

10:42AM   15   IN THE EMAIL THAT IS EXHIBIT 332?

10:42AM   16   A.   I DON'T RECALL TALKING.  THE NAME KICKLER SOUNDS A LITTLE

10:42AM   17   BIT FAMILIAR BUT, YOU KNOW, I TALKED TO THE PERSON THAT SHE

10:42AM   18   DIRECTED ME TO AND ASKED HIM WHETHER THIS BOX COULD DO WHAT SHE

10:42AM   19   SAID.

10:42AM   20   Q.   AND WAS THAT THE CONVERSATION THAT YOU HAD IN 2010?

10:42AM   21   A.   THAT WOULD HAVE BEEN IN 2010, YES.

10:42AM   22   Q.   OKAY.  AND WHAT DID THAT INDIVIDUAL TELL YOU?

10:42AM   23   A.   WHAT THEY SAID WAS THAT WE DIDN'T HAVE THE BOX HERE LONG

10:42AM   24   ENOUGH TO VALIDATE IT THE WAY WE WOULD LIKE.  IN OTHER WORDS,

10:42AM   25   THE BOX WAS TAKEN BACK BY THERANOS.

10:43AM   1          AND THE LAB DIRECTOR SAID, LOOK, IF THEY CAN DO THIS, IT'S

10:43AM   2     A GAME CHANGER, BUT I CAN'T VALIDATE FOR YOU THAT THEY'VE DONE

10:43AM   3     IT.  I DIDN'T HAVE ENOUGH TIME WITH THE BOX.

10:43AM   4     Q.   SO YOU UNDERSTOOD THAT IN 2010?

10:43AM   5     A.   CORRECT.

10:43AM   6     Q.   DID YOU LEARN FROM THAT DIRECTOR WHETHER OR NOT ANY DATA

10:43AM   7     HAD BEEN SHARED BY THERANOS WITH HOPKINS?

10:43AM   8     A.   I DID NOT.

10:43AM   9     Q.   NOW, IF I MIGHT ASK YOU, HOW FAMILIAR WERE YOU WITH THE

10:43AM  10     BLOOD TESTING BUSINESS BEFORE YOU BEGAN TALKING TO THERANOS IN

10:43AM  11     2010?

10:43AM  12     A.   YOU KNOW, I WAS FAMILIAR WITH WHO THE MAJOR LAB PLAYERS

10:43AM  13     WERE OUT THERE, QUEST AND LAB CORP., AND I WAS FAMILIAR WITH

10:43AM  14     THE TESTS, CPT CODES.

10:44AM  15          I KNEW THAT THOSE TWO LABS WERE MUCH CHEAPER THAN

10:44AM  16     OUTPATIENT HOSPITAL AND OTHERS, AND I ALSO KNEW -- AND THIS

10:44AM  17     SURPRISED ME -- THAT MEDICARE, WHO OFTEN HAS THE LOWEST RATES,

10:44AM  18     HAD THE HIGHEST LAB RATES.

10:44AM  19     Q.   SO YOU KNEW A LOT ABOUT THE BUSINESS?

10:44AM  20     A.   I KNOW MORE TODAY THAN I KNEW THEN.

10:44AM  21     Q.   BUT DID YOU ACTUALLY KNOW HOW THE MEDICAL PROCESS OF BLOOD

10:44AM  22     TESTING WORKED?

10:44AM  23     A.   IF YOU MEAN HOW ONE GETS A BLOOD TEST?  YOU GET A

10:44AM  24     PRESCRIPTION FROM A DOCTOR, THEY IDENTIFY THE TEST, THE SCRIPT

10:44AM  25     IS TAKEN TO A LAB AND THEY FULFILL THE REQUEST.

BURD CROSS BY MR. DOWNEY                                    3086

10:44AM   1      Q.   I MEANT SOMETHING SLIGHTLY DIFFERENT.

10:44AM   2      A.   OKAY.

10:44AM   3      Q.   I MEANT, DID YOU UNDERSTAND THAT WHEN A LAB IS ANALYZING A

10:44AM   4      BLOOD SAMPLE WHAT THE DIFFERENT ELEMENTS OF THAT ARE?

10:45AM   5      A.   I'M NOT SURE WHAT YOU MEAN BY "ELEMENTS."

10:45AM   6      Q.   WELL, DID YOU KNOW, FOR EXAMPLE, THAT THERE ARE DIFFERENT

10:45AM   7      FORMS OF BLOOD TESTING MACHINES THAT PERFORM DIFFERENT KINDS OF

10:45AM   8      BLOOD TESTS?

10:45AM   9      A.   I WAS FAMILIAR WITH THE FACT THAT, THAT MOST FULL SCALE

10:45AM  10      LABS CAN DO MOST ANYTHING, AND THEN THERE WERE REFERENCE LABS

10:45AM  11      THAT COULD DO A BIT MORE.

10:45AM  12      Q.   OKAY.  AND YOU UNDERSTOOD THAT THOSE WERE LABS THAT

10:45AM  13      CONTAINED A SUBSTANTIAL AMOUNT OF HEAVY EQUIPMENT TO PERFORM

10:45AM  14      THAT TESTING?

10:45AM  15      A.   CORRECT.

10:45AM  16      Q.   DID YOU -- WERE YOU FAMILIAR WITH THE TERM "ASSAY" BEFORE

10:45AM  17      DISCUSSION OF THERANOS?

10:45AM  18      A.   I HADN'T HEARD THE TERM USED IN THIS WAY, BUT I UNDERSTOOD

10:45AM  19      THE TERM WHEN USED.

10:45AM  20      Q.   OKAY.  AND DID YOU COME TO LEARN THAT THERE WERE DIFFERENT

10:45AM  21      FORMS OF ASSAYS, DIFFERENT METHODS BY WHICH ASSAYS WORKED?

10:46AM  22      A.   I'M NOT SURE.

10:46AM  23           NOW, ARE YOU EQUATING AN ASSAY TO A SPECIFIC CPT CODE?

10:46AM  24      Q.   WELL, IT IS -- EFFECTIVELY I AM.

10:46AM  25      A.   OKAY.

10:46AM  1    Q.   WHAT I AM REFERRING TO AS AN ASSAY IS THE METHOD BY WHICH

10:46AM  2    A PARTICULAR LAB ANALYZES AN ANALYTE IN THE BLOOD, SO A GLUCOSE

10:46AM  3    TEST OR A SODIUM TEST, THAT THERE ARE DIFFERENT ASSAYS FOR

10:46AM  4    EACH.

10:46AM  5    A.   SURE.

10:46AM  6    Q.   AND DID YOU UNDERSTAND THAT THE METHODS BY WHICH THEY WERE

10:46AM  7    ANALYZED FELL INTO DIFFERENT CATEGORIES?  WAS THAT SOMETHING

10:46AM  8    THAT YOU --

10:46AM  9    A.   NO, IT'S NOT THE LEVEL OF DETAIL THAT I HAD.

10:46AM  10   Q.   YOU KNEW THAT SOME BLOOD TESTS WERE PRETTY COMMONLY

10:46AM  11   ORDERED; CORRECT?

10:46AM  12   A.   CORRECT.

10:46AM  13   Q.   AND ONE OF YOUR GOALS, I THINK, IN DESIGNING THIS

10:46AM  14   PARTNERSHIP WAS TO MAKE SURE THAT THERANOS COULD TEST THOSE,

10:47AM  15   PLUS OTHER TESTS?

10:47AM  16   A.   CORRECT.

10:47AM  17   Q.   IN FACT, IN STARTING THE PARTNERSHIP, IS IT TRUE THAT

10:47AM  18   SAFEWAY PROVIDED TO THERANOS ITS DATA ABOUT WHICH TESTS WERE

10:47AM  19   ORDERED WITHIN SAFEWAY AND HOW FREQUENTLY THEY WERE ORDERED?

10:47AM  20   A.   WELL, WE HAD CLAIMS DATA.  I DON'T RECALL GIVING THEM

10:47AM  21   CLAIMS DATA.

10:47AM  22        BUT WE HAD INFORMATION THAT COULD TELL US THE TOP 25

10:47AM  23   ASSAYS, AS YOU REFER TO THEM, THE TOP 50, THE TOP 100, WHAT

10:47AM  24   THOSE PRICE POINTS WERE, YOU KNOW, FOR DIFFERENT LABS.  WE MAY

10:47AM  25   HAVE PROVIDED THAT.

10:47AM  1    Q.   SO WHEN YOU SAY CLAIMS DATA -- YOU, OF COURSE, PROVIDE

10:47AM  2    INSURANCE TO A NUMBER OF SAFEWAY EMPLOYEES; CORRECT?

10:47AM  3    A.   FOR THE BENEFIT OF THE JURY, ALL LARGE COMPANIES ARE

10:47AM  4    SELF-INSURED AND SO THEY PAY ALL OF THE MEDICAL BILLS, AND AN

10:47AM  5    INSURANCE COMPANY LIKE AN AETNA OR A BLUE SHIELD JUST DOES THE

10:48AM  6    MECHANICS OF PROCESSING THE CLAIM.

10:48AM  7    Q.   OKAY.  AND SO YOU, YOU RECALL GENERALLY IN SOME FORM THAT

10:48AM  8    YOU WERE ABLE TO AGGREGATE INFORMATION FROM THAT DATA AND

10:48AM  9    PROVIDE IT TO THERANOS?

10:48AM  10   A.   WE DID THAT OFTEN FOR OUR OWN ANALYSIS TO LOWER COSTS.

10:48AM  11   Q.   DO YOU RECALL PROVIDING IT TO THERANOS?

10:48AM  12   A.   I DON'T.  BUT IF THEY HAD ASKED FOR IT, I WOULD HAVE

10:48AM  13   PROVIDED IT ON AN AGGREGATED BASIS.

10:48AM  14   Q.   OKAY.  DO YOU RECALL DISCUSSIONS BETWEEN THERANOS AND

10:48AM  15   SAFEWAY AS TO WHICH TESTS WERE THE MOST COMMONLY ORDERED TESTS?

10:48AM  16   A.   I DON'T RECALL.  BUT WE KNEW WHAT THEY WERE, AND IF WE

10:48AM  17   WERE ASKED, WE PROVIDED IT.

10:48AM  18   Q.   OKAY.  NOW, DID YOU UNDERSTAND AT THE TIME THAT YOU WERE

10:48AM  19   HAVING CONVERSATIONS WITH THERANOS THAT THERANOS HAD NOT YET

10:49AM  20   DEVELOPED AN ASSAY FOR EACH BLOOD TEST THAT CAN POTENTIALLY BE

10:49AM  21   OFFERED?

10:49AM  22   A.   WE THOUGHT THAT THERANOS HAD DEVELOPED ASSAYS FOR ALMOST

10:49AM  23   ALL.  AND IF YOU GET TO PROBABLY 200 ASSAYS, YOU WOULD BE

10:49AM  24   95 PERCENT OF ALL ASSAYS, AND MAYBE AT 100 YOU WOULD BE AT

10:49AM  25   LEAST AT 75 PERCENT.

10:49AM  1    Q.   SO AT SOME POINT SAFEWAY HAD THAT UNDERSTANDING OF WHAT

10:49AM  2    THERANOS HAD DONE?

10:49AM  3    A.   WELL, WE WERE RELYING ON THE FACT THAT THEY SAID THAT THEY

10:49AM  4    COULD DO VIRTUALLY ALL ASSAY TYPES.

10:49AM  5    Q.   AND DID YOU AUTHORIZE MR. WOLFSEN AND MR. SHACHMUT TO HAVE

10:49AM  6    CONVERSATIONS WITH MS. HOLMES ABOUT THAT?

10:49AM  7    A.   THEY MADE A TRIP DOWN TO THERANOS AND SPENT A FEW HOURS.

10:49AM  8    Q.   AND I THINK YOU INDICATED IN YOUR EMAIL TO MR. JURGENS

10:50AM  9    THAT SAFEWAY WAS COMMUNICATING ALMOST DAILY WITH THERANOS.

10:50AM  10   A.   IN ONE FORM OR ANOTHER.

10:50AM  11   Q.   AND DID MR. SHACHMUT AND MR. WOLFSEN COMMUNICATE WITH

10:50AM  12   REPRESENTATIVES OF THERANOS BY EMAIL ABOUT THE POTENTIAL DEAL?

10:50AM  13   A.   THEY WERE PART OF A DUE DILIGENCE TEAM, SO I DON'T THINK

10:50AM  14   THEY WOULD HAVE BEEN TALKING ABOUT A POTENTIAL DEAL.  BUT THEY

10:50AM  15   WOULD HAVE BEEN PURSUING DIFFERENT AVENUES OF DUE DILIGENCE.

10:50AM  16   Q.   AND THEY WOULD HAVE BEEN TRYING TO UNDERSTAND WHAT

10:50AM  17   THERANOS'S CAPACITIES WERE; CORRECT?

10:50AM  18   A.   CORRECT.

10:50AM  19   Q.   AND OTHER ASPECTS OF THERANOS?

10:50AM  20   A.   RIGHT.

10:50AM  21   Q.   AND THAT WAS TRUE BOTH BEFORE THE DEAL WAS AGREED TO AND

10:50AM  22   THEN AS TIME WENT ON AND PAYMENTS WERE REQUESTED BY THERANOS;

10:50AM  23   CORRECT?

10:50AM  24   A.   CORRECT.

10:50AM  25   Q.   AND IN DOING THAT, DID YOU UNDERSTAND THAT THEY AND OTHER

BURD CROSS BY MR. DOWNEY

10:51AM 1    SAFEWAY EMPLOYEES COMMUNICATED WITH THERANOS EMPLOYEES AND

10:51AM 2    EXECUTIVES BY EMAIL?

10:51AM 3    A.   THERE WOULD BE SOME EMAILS EXCHANGED I THINK DURING THE

10:51AM 4    DUE DILIGENCE PROCESS, AND THEN ONCE WE GOT DOWN TO THE

10:51AM 5    LOGISTICS AT THE STORE LEVEL, THERE WAS A SMALL TEAM AT

10:51AM 6    THERANOS AND A SMALL TEAM AT SAFEWAY.

10:51AM 7        BUT THE VAST MAJORITY OF COMMUNICATION WAS BETWEEN EITHER

10:51AM 8    MYSELF AND BOB GORDON, ELIZABETH, AND SUNNY.

10:51AM 9    Q.   AND TO THE EXTENT THAT EMPLOYEES COMMUNICATED BY EMAIL,

10:51AM 10   WAS THERE A SYSTEM AT SAFEWAY BY WHICH THAT EMAIL WAS

10:51AM 11   PRESERVED?

10:51AM 12   A.   I CAN'T TELL YOU.

10:51AM 13   Q.   DID YOU EVER SEE A LIBRARY OF ASSAYS THAT THERANOS -- THAT

10:51AM 14   YOU UNDERSTOOD THAT THERANOS COULD PERFORM?

10:51AM 15   A.   IN ONE OF THE EXHIBITS THEY OFFERED UP ABOUT JUST AS AN

10:52AM 16   EXAMPLE OF THEIR PRICING, AND THOSE WERE SOME OF THE TOP ASSAYS

10:52AM 17   IN TERMS OF VOLUME.

10:52AM 18   Q.   AND DO YOU KNOW THAT MS. HOLMES TOLD MR. WOLFSEN BY EMAIL

10:52AM 19   THAT THERANOS WAS NOT PRESENTLY CAPABLE OF PERFORMING ALL OF

10:52AM 20   THOSE TESTS?

10:52AM 21   A.   I DON'T KNOW THAT.  I'D LIKE TO SEE THE EMAIL.

10:52AM 22   Q.   WELL, LET ME ASK YOU TO LOOK AT EXHIBIT 7104.

10:52AM 23       YOUR HONOR, 7104 IS NOT AN EMAIL ON WHICH THIS WITNESS IS

10:52AM 24   COPIED.  I DO THINK THAT THIS IS AN IMPORTANT COMMUNICATION FOR

10:53AM 25   PURPOSES OF REFLECTING THE INTENT OF MS. HOLMES BOTH IN TERMS

BURD CROSS BY MR. DOWNEY                                                3091

10:53AM   1    OF SENDING AND RECEIVING THE EMAIL.  SO I THINK IT COULD BE

10:53AM   2    ADMITTED ON THAT BASIS.

10:53AM   3         BUT ALTERNATIVELY I'LL HAVE TO CALL EITHER MR. WOLFSEN OR

10:53AM   4    MR. SHACHMUT.  SO I MOVE TO ADMIT IT.

10:53AM   5              MR. LEACH:  NO OBJECTION, YOUR HONOR.

10:53AM   6              THE COURT:  TO THE ADMISSION OF THIS EMAIL?

10:53AM   7              MR. LEACH:  CORRECT.

10:53AM   8              THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

10:53AM   9         (DEFENDANT'S EXHIBIT 7104 WAS RECEIVED IN EVIDENCE.)

10:53AM  10    BY MR. DOWNEY:

10:53AM  11    Q.  IF YOU LOOK AT THE BOTTOM OF THE EMAIL THAT STARTS ON

10:53AM  12    PAGE 1, MR. WOLFSEN WRITES TO MS. HOLMES AND SAYS HE'S RECEIVED

10:54AM  13    A REQUEST FROM PRESUMABLY SAFEWAY'S LAWYERS TO SEND THE

10:54AM  14    SELECTED ASSAYS FROM THE THERANOS ASSAY LIBRARY TO OUR OUTSIDE

10:54AM  15    COUNSEL WHO IS ASSISTING IN VARIOUS REGULATORY RESEARCH.

10:54AM  16         AND THEN HE GOES ON TO DISCUSS SOME REGULATORY ISSUES.

10:54AM  17         DO YOU SEE THAT AT THE BOTTOM OF THE FIRST PAGE?

10:54AM  18    A.  YES.

10:54AM  19    Q.  AND HE SENDS THAT EMAIL TO MS. HOLMES AND MR. SHACHMUT;

10:54AM  20    CORRECT?

10:54AM  21    A.  YES.

10:54AM  22    Q.  AND MS. HOLMES RESPONDS TO THAT AND SAYS THIS IS FINE, BUT

10:54AM  23    THAT LIST IS NOT AN ACCURATE REFLECTION OF THE TESTS WE WILL

10:54AM  24    ACTUALLY MAKE AVAILABLE IN THE STORES, THAT LIST IS THE LIBRARY

10:55AM  25    WE PROVIDE FOR OUR PHARMACEUTICAL CLIENTS' CLINICAL TRIALS.

10:55AM   1          DO YOU SEE THAT?

10:55AM   2     A.   I SEE THAT.

10:55AM   3     Q.   AND I THINK YOU MENTIONED YOU UNDERSTOOD THAT THERANOS,

10:55AM   4     PRIOR TO THE TIME THAT THEY ENTERED NEGOTIATIONS WITH SAFEWAY,

10:55AM   5     HAD BEEN PURSUING PARTNERSHIPS WITH PHARMACEUTICAL COMPANIES;

10:55AM   6     CORRECT?

10:55AM   7     A.   THAT'S WHAT WE WERE TOLD, RIGHT.

10:55AM   8     Q.   AND MS. HOLMES IS SAYING TO MR. WOLFSEN, THIS IS A LIBRARY

10:55AM   9     OF ASSAYS WE FEATURE AND CAN DEVELOP AND VALIDATE AS PART OF

10:55AM   10    OUR TRIAL WITH YOU; CORRECT?

10:55AM   11              MR. LEACH:  OBJECTION.  THAT MISSTATES WHAT THIS

10:55AM   12    SAYS, AND IT CALLS FOR SPECULATION.

10:55AM   13              MR. DOWNEY:  I'LL WITHDRAW IT, YOUR HONOR.

10:55AM   14              THE COURT:  THE QUESTION IS WITHDRAWN.

10:55AM   15    BY MR. DOWNEY:

10:55AM   16    Q.   IN ANY EVENT, MR. WOLFSEN RESPONDS TO MS. HOLMES AND SAYS,

10:55AM   17    THANK YOU FOR THE CLARIFICATION, I HAD FORGOTTEN THAT THE LIST

10:55AM   18    WAS A COMPOSITE OF CURRENT AND FUTURE TESTS.

10:56AM   19          DO YOU SEE THAT?

10:56AM   20    A.   I SEE THAT.

10:56AM   21    Q.   IS THIS AN EMAIL AND THE COMMUNICATIONS CONTAINED HEREIN,

10:56AM   22    DO YOU RECALL ANY CONVERSATION WITH MR. WOLFSEN OR MR. SHACHMUT

10:56AM   23    ABOUT THAT IN OR AROUND APRIL OF 2010?

10:56AM   24    A.   I DO NOT.

10:56AM   25              THEY WERE SENT DOWN TO DISCUSS THE WORK THAT HAD BEEN DONE

10:56AM   1    WITH PHARMACEUTICAL COMPANIES, AND THOSE PRESUMABLY WERE UNITS

10:56AM   2    IN PATIENT'S HOMES THAT WERE VALIDATING SOME VERY SPECIFIC

10:56AM   3    ASPECTS OF SOME DRUG THAT THEY WERE DEVELOPING.

10:56AM   4    Q.   AND APPARENTLY THEY WERE ALSO IN TOUCH WITH SAFEWAY'S

10:56AM   5    OUTSIDE LAWYERS; CORRECT?

10:56AM   6    A.   I THINK THAT BOB GORDON WOULD HAVE BEEN FOR SURE.

10:56AM   7         BUT, AGAIN, I THINK WE'RE TALKING ABOUT APPLES AND ORANGES

10:56AM   8    HERE.  THE KIND OF TESTS THAT WERE RUN FOR PHARMACEUTICAL TO MY

10:56AM   9    KNOWLEDGE WOULDN'T BE THE SAME KIND OF TESTS YOU WOULD RUN FOR

10:57AM  10    INDIVIDUALS, AND WE WERE REPEATEDLY TOLD THAT THEY COULD DO

10:57AM  11    VIRTUALLY ALL.

10:57AM  12    Q.   WELL, THAT REMAINS -- THAT DEPENDS ON THE EMAIL, I

10:57AM  13    SUPPOSE.

10:57AM  14         BUT I WANT TO ASK YOU WHAT YOUR UNDERSTANDING OF THE

10:57AM  15    PHARMACEUTICAL BUSINESS WAS.

10:57AM  16         DID YOU UNDERSTAND THAT THEY WOULD PARTNER WITH

10:57AM  17    PHARMACEUTICAL COMPANIES IN CONNECTION WITH PARTICULAR ASSAYS?

10:57AM  18    DID YOU UNDERSTAND THAT?

10:57AM  19    A.   I UNDERSTOOD THAT THEY WERE WORKING WITH PHARMACEUTICAL

10:57AM  20    COMPANIES AND, JUST AS I SAID, THEY WERE TRYING TO EVALUATE

10:57AM  21    REALTIME HOW THOSE DRUGS WERE AFFECTING MAYBE, YOU KNOW, PARTS

10:57AM  22    OF TRADITIONAL ASSAYS I DON'T KNOW.

10:57AM  23    Q.   BUT YOU UNDERSTOOD --

10:57AM  24    A.   IT'S A DIFFERENT APPLICATION.

10:57AM  25    Q.   BUT YOU UNDERSTOOD THAT THEY WERE WORKING WITH DIFFERENT

10:57AM 1    PHARMACEUTICAL COMPANIES; CORRECT?

10:57AM 2    A.   I UNDERSTOOD THAT THAT'S WHAT THEY SAID THEY WERE DOING.

10:57AM 3    I NEVER PERSONALLY VALIDATED THAT.

10:57AM 4    Q.   OKAY.  BUT DID YOU UNDERSTAND THAT THE NATURE OF THOSE

10:57AM 5    PARTNERSHIPS WAS THAT THEY WOULD INVOLVE ONE OR TWO ASSAYS?

10:58AM 6    A.   I KNEW THAT.

10:58AM 7    Q.   LET ME ASK YOU ABOUT SOME REGULATORY ISSUES THAT WE

10:58AM 8    TOUCHED ON BEFORE.

10:58AM 9         YOUR HONOR, I THOUGHT, BECAUSE WE WILL GO UNTIL 3:00, I

10:58AM 10   THOUGHT WE MIGHT GO UNTIL 11:15 TODAY IF THAT'S -- GO UNTIL

10:58AM 11   11:15 AND HAVE A LITTLE BIT OF A LONGER BREAK.  SO LET ME JUST

10:58AM 12   COVER THIS MATTER.

10:58AM 13            THE COURT:  YOU PREVIEWED ME ASKING THE JURY IF THEY

10:58AM 14   CAN GO UNTIL 3:00.

10:58AM 15            MR. DOWNEY:  I BEG YOUR PARDON.

10:58AM 16            THE COURT:  SO THANKS FOR THAT.

10:58AM 17            MR. DOWNEY:  I'M BREAKING IT TO THEM SOFTLY.

10:58AM 18   Q.   LET ME ASK YOU ABOUT SAFEWAY'S EVALUATION OF THE LEGAL AND

10:58AM 19   REGULATORY ISSUES.

10:58AM 20        WE MENTIONED BEFORE CMS, AND THAT WAS ONE REGULATOR YOU

10:58AM 21   KNEW WOULD BE RELEVANT HERE; CORRECT?

10:58AM 22   A.   CORRECT.

10:58AM 23   Q.   AND THE FDA WAS ANOTHER; CORRECT?

10:58AM 24   A.   MAYBE THE FDA, MAYBE NOT.

10:59AM 25   Q.   THAT WAS AN OPEN QUESTION; CORRECT?

BURD CROSS BY MR. DOWNEY                                    3095

10:59AM   1    A.   CORRECT.

10:59AM   2    Q.   BUT YOU -- AND WHEN YOU ULTIMATELY ENTERED INTO AN

10:59AM   3    AGREEMENT, YOU ULTIMATELY INCLUDED A PROVISION WHICH SAID IF

10:59AM   4    THE FDA OBJECTS, WE HAVE THE RIGHT TO TERMINATE THE AGREEMENT;

10:59AM   5    CORRECT?

10:59AM   6    A.   I DON'T RECALL THAT, BUT THE DOCUMENT'S IN THESE BINDERS.

10:59AM   7    Q.   OKAY.  YOU UNDERSTOOD OVER TIME THAT THERANOS WAS WORKING

10:59AM   8    WITH BOTH OF THOSE REGULATORS; CORRECT?

10:59AM   9    A.   THEY SAID THEY WERE WORKING WITH BOTH, AND I KNEW THEY

10:59AM   10   WERE WORKING WITH CLIA, CLIA WAIVERS, BECAUSE I RECALLED THE

10:59AM   11   TIME WHEN ELIZABETH CALLED ME AND SAID THAT THEY HAD JUST BEEN

10:59AM   12   CLIA APPROVED.

10:59AM   13   Q.   RIGHT.  AT SOME POINT DURING THE RELATIONSHIP, THEIR LAB

10:59AM   14   HAD GOTTEN A CERTIFICATION FROM CLIA TO OPERATE AS A LAB?

10:59AM   15   A.   CORRECT, CORRECT.

10:59AM   16   Q.   BUT DURING THE TIME THAT YOU WERE NEGOTIATING THE

10:59AM   17   AGREEMENT IN 2010, MS. HOLMES NEVER SAID WE HAVE A CLIA

10:59AM   18   CERTIFICATION; CORRECT?

10:59AM   19   A.   NO, SHE DID NOT.  BUT SHE WAS EXPECTING TO GET ONE, AND I

11:00AM   20   BELIEVE THEY ULTIMATELY DID.

11:00AM   21   Q.   AND, IN FACT, FOR THE AGREEMENT TO GO FORWARD, THEY HAD TO

11:00AM   22   GET THAT; CORRECT?

11:00AM   23   A.   CORRECT.

11:00AM   24   Q.   AND SIMILARLY, DID YOU KNOW THAT THERANOS WAS TALKING TO

11:00AM   25   THE FDA ABOUT VARIOUS APPROVALS?

11:00AM   1    A.   I DO RECALL ELIZABETH SAYING THAT THEY WOULD PREFER TO GET

11:00AM   2    I GUESS A BIGGER GOLD STAMP OF APPROVAL WHICH THEY REGARDED AS

11:00AM   3    THE FDA.

11:00AM   4    Q.   AND DID YOU TALK TO MS. HOLMES ABOUT FDA APPROVAL IN 2010?

11:00AM   5    A.   WE MAY HAVE HAD SOME DISCUSSION.  BUT, YOU KNOW, TO

11:00AM   6    OPERATE A LAB, ALL YOU NEED IS CLIA WAIVED.

11:00AM   7    Q.   BUT YOU DIDN'T UNDERSTAND IN 2010 -- SHE NEVER TOLD YOU IN

11:01AM   8    2010 THAT THEY HAD ANY APPROVALS FROM THE FDA, DID SHE?

11:01AM   9    A.   I DON'T RECALL HER SAYING THAT.

11:01AM  10    Q.   OKAY.  AND AT THE TIME, DID YOU PERSONALLY LOOK AT THOSE

11:01AM  11    ISSUES VERY CLOSELY?

11:01AM  12    A.   IN TERMS OF CLIA AND FDA, WE WOULD HAVE RELIED ON OUTSIDE

11:01AM  13    COUNSEL.

11:01AM  14    Q.   AND THAT WOULD BE LATHAM & WATKINS?

11:01AM  15    A.   CORRECT.

11:01AM  16    Q.   AND THOSE, IN FACT, ARE THE LAWYERS WHO ARE REPRESENTING

11:01AM  17    YOU IN CONNECTION WITH YOUR APPEARANCE HERE TODAY; CORRECT?

11:01AM  18    A.   CORRECT.

11:01AM  19    Q.   AND THAT'S A VERY REPUTABLE, WELL-KNOWN LAW FIRM; CORRECT?

11:01AM  20    A.   YES.

11:01AM  21    Q.   NOW, IS THERE ANY ASPECT OF REGULATORY APPROVAL THAT YOU

11:01AM  22    RECALL RECEIVING A REPRESENTATION FROM THERANOS ABOUT THAT YOU

11:01AM  23    LATER CAME TO BELIEVE WAS UNTRUE?  DID THEY TELL YOU SOMETHING

11:02AM  24    ABOUT HAVING A REGULATORY APPROVAL THAT YOU THINK WAS FALSE?

11:02AM  25    A.   THE ONLY ONE I RECALL ELIZABETH SAYING WAS THAT THEY HAD

11:02AM  1    BEEN CLIA APPROVED.

11:02AM  2    Q.   OKAY.  BUT THAT WAS TRUE; CORRECT?

11:02AM  3    A.   AND THAT WAS TRUE.

11:02AM  4    Q.   OKAY.  AND LET ME --

11:02AM  5         THIS NEXT SUBJECT IS A LITTLE LONG, YOUR HONOR, SO IT

11:02AM  6    MIGHT BE A LOGICAL TIME FOR A BREAK.

11:02AM  7              THE COURT:  TIME FOR A BREAK?  ALL RIGHT.  WE'LL

11:02AM  8    TAKE A BREAK NOW.

11:02AM  9         SIR, YOU CAN STAND DOWN NOW IF YOU WANT TO TAKE YOUR

11:02AM  10   BREAK.

11:02AM  11             THE WITNESS:  SURE.

11:02AM  12             THE COURT:  I NEED TO TALK TO THE JURY FOR A FEW

11:02AM  13   MINUTES.  WE'LL COME BACK IN ABOUT 30 MINUTES, I THINK, ABOUT

11:02AM  14   30 MINUTES WOULD BE GOOD.

11:02AM  15        MR. DOWNEY, YOU CAN HAVE A SEAT.

11:02AM  16        LADIES AND GENTLEMEN, AS YOU'VE HEARD, I'D LIKE TO GO

11:02AM  17   UNTIL 3:00 THIS AFTERNOON, IF WE MAY, AND TOMORROW I'D LIKE TO

11:02AM  18   SEE IF WE CAN GO UNTIL 4:00 P.M.  FRIDAY WE WILL NEED TO BREAK

11:03AM  19   AT 1:00 P.M., 1:00 P.M. IN THE AFTERNOON.

11:03AM  20        ALSO, LADIES AND GENTLEMEN, BEFORE WE TAKE OUR BREAK, I DO

11:03AM  21   WANT TO INFORM YOU OF AN ACTION THAT HAS OCCURRED THAT AFFECTS

11:03AM  22   THE JURY QUESTIONNAIRES THAT YOU COMPLETED IN THE JURY

11:03AM  23   SELECTION PROCESS OF THIS CASE.

11:03AM  24        AS YOU RECALL, EACH OF YOU COMPLETED A JURY QUESTIONNAIRE

11:03AM  25   PRIOR TO YOUR COMING TO COURT TO BE QUESTIONED AS POTENTIAL

BURD CROSS BY MR. DOWNEY                                                    3098

11:03AM   1    JURORS FOR THIS CASE.

11:03AM   2         THE QUESTIONNAIRE HAD TWO PAGES OF INSTRUCTIONS, AND ON

11:03AM   3    THE SECOND PAGE ABOVE MY SIGNATURE WAS THE STATEMENT THAT YOUR

11:03AM   4    ANSWERS WOULD BE CONFIDENTIAL.  YOU WERE INFORMED THAT THE

11:03AM   5    COURT WAS SENSITIVE TO YOUR PRIVACY.  YOU WERE INFORMED THAT

11:03AM   6    THE QUESTIONNAIRES WOULD BE REVIEWED BY THE LAWYERS AND THE

11:03AM   7    COURT AND THAT THEY WOULD BE KEPT WITH THE CLERK OF THE COURT

11:03AM   8    UNDER SEAL AND WOULD BE DISCLOSED, IF AT ALL, WITH NAMES AND

11:04AM   9    OTHER IDENTIFYING INFORMATION REMOVED.

11:04AM  10         NOW, I NEED TO INFORM YOU THAT ABOUT TEN DAYS AGO THE

11:04AM  11    COURT RECEIVED A MOTION FROM AN ENTITY CALLED "MEDIA COALITION"

11:04AM  12    ASKING THAT THE COURT UNSEAL THE QUESTIONNAIRES SUCH THAT THEY

11:04AM  13    MIGHT HAVE ACCESS TO THEM.

11:04AM  14         THE MEDIATION COALITION IDENTIFIES THEMSELVES AS THE

11:04AM  15    FOLLOWING:  AMERICAN BROADCASTING COMPANY, INCORPORATED DOING

11:04AM  16    BUSINESS AS ABC NEWS; THE ASSOCIATED PRESS; BLOOMBERG LP; THE

11:04AM  17    DAILY MAIL; DOW JONES & COMPANY INCORPORATED; NBC UNIVERSAL

11:04AM  18    MEDIA LLC; THE NEW YORK TIMES COMPANY; PORTFOLIO MEDIA

11:05AM  19    INCORPORATED, PUBLISHER OF LAW 360; 3 UNCANNY 4 LLC; AND THE

11:05AM  20    WASHINGTON POST COMPANY.

11:05AM  21         NOW, LAST WEEK, A FEW DAYS AGO, I HAD A HEARING ON THIS

11:05AM  22    MOTION WITH THE MEDIA COALITION ATTORNEY WHO BROUGHT THE

11:05AM  23    MOTION.  ALSO PRESENT WERE ATTORNEYS INVOLVED IN THIS CASE, AN

11:05AM  24    ATTORNEY FOR MS. HOLMES, AND THE UNITED STATES ATTORNEY'S

11:05AM  25    OFFICE PROSECUTING THIS CASE.

BURD CROSS BY MR. DOWNEY                                    3099

11:05AM  1       WE DISCUSSED THE QUESTION OF CONFIDENTIALITY OF THE

11:05AM  2   QUESTIONNAIRES AND I TOLD THE PARTIES THAT PRIOR TO ME DECIDING

11:05AM  3   WHAT, IF ANYTHING, IS TO BE RELEASED, I WOULD SPEAK TO EACH ONE

11:05AM  4   OF YOU PRIVATELY TO HEAR YOUR COMMENTS, IF ANY, ON THIS ISSUE.

11:05AM  5       NOW, WHAT I'D LIKE TO DO TODAY, LADIES AND GENTLEMEN, IS

11:05AM  6   AT THE BREAK, MS. KRATZMANN IS GOING TO PROVIDE YOU WITH COPIES

11:06AM  7   OF YOUR QUESTIONNAIRES, THE QUESTIONNAIRES THAT YOU FILLED OUT,

11:06AM  8   COPIES OF THEM.

11:06AM  9       MY THOUGHT IS THAT YOU MIGHT LIKE TO REVIEW THESE

11:06AM 10   QUESTIONNAIRES AT OUR BREAK.  AFTER WE FINISH EVIDENCE TODAY,

11:06AM 11   WHICH I SUGGESTED WOULD BE ABOUT 3:00 P.M., I WILL ASK IF ANY

11:06AM 12   OF YOU WISH TO SPEAK TO ME TODAY ABOUT YOUR QUESTIONNAIRES AND

11:06AM 13   THESE ISSUES.

11:06AM 14       IF YOU DO, WE WILL SPEAK IN MY CHAMBERS.  IF YOU WISH TO

11:06AM 15   THINK ABOUT IT OVERNIGHT, YOU MAY DO THAT AND I'LL ASK TOMORROW

11:06AM 16   IF YOU WISH TO SPEAK WITH ME, WHICH IS TO SAY THAT I WILL

11:06AM 17   PERMIT YOU TO TAKE YOUR QUESTIONNAIRE HOME WITH YOU, A COPY OF

11:06AM 18   YOUR QUESTIONNAIRE.  WE'LL PROVIDE AN ENVELOPE FOR YOU SUCH

11:06AM 19   THAT IT CAN REMAIN CONVENIENT TO YOU KEEPING IT PRIVATE, AND

11:06AM 20   THEN TOMORROW I'LL ASK YOU IF YOU WISH TO SPEAK WITH ME ABOUT

11:06AM 21   THIS.

11:06AM 22       OUR CONVERSATION WILL BE BRIEF.

11:06AM 23       NOW, I'VE TALKED TO THE LAWYERS HERE.  WE'LL MEET IN MY

11:07AM 24   CHAMBERS, IN MY OFFICE.  I'LL DO THAT ONE AT A TIME WITH EACH

11:07AM 25   OF YOU.  IT WILL BE RECORDED, SO THERE WILL BE A COURT REPORTER

11:07AM  1   PRESENT.  THE LAWYERS WILL HAVE ONE LAWYER PRESENT.  THEY WILL

11:07AM  2   NOT PARTICIPATE IN THE CONVERSATION.  THEY WILL BE THERE TO

11:07AM  3   OBSERVE ONLY.  I MAY HAVE SOME OF MY STAFF PRESENT AS WELL.

11:07AM  4        I TELL YOU THIS IN ADVANCE TO TRY TO LET YOU KNOW WHAT THE

11:07AM  5   CIRCUMSTANCES WILL BE SUCH THAT YOU WON'T BE INTIMIDATED WHEN

11:07AM  6   YOU WALK IN A ROOM AND SEE PEOPLE THERE.

11:07AM  7        MY GOAL IS NOT TO MAKE THIS INTIMIDATING AT ALL, BECAUSE

11:07AM  8   IT SHOULDN'T BE.  IT'S GOING TO BE A CONVERSATION WITH YOU AND

11:07AM  9   WITH ME, AND I HAVE SOME PREPARED QUESTIONS THAT I'M GOING TO

11:07AM 10   ASK EACH OF YOU REGARDING THIS ISSUE AND REGARDING YOUR

11:07AM 11   QUESTIONNAIRES.

11:07AM 12        SO THAT'S THE SCHEDULE FOR TODAY.

11:07AM 13        AT THE BREAK MS. KRATZMANN WILL PROVIDE YOU, AS I SAID,

11:07AM 14   WITH COPIES OF YOUR QUESTIONNAIRES IF YOU WOULD LIKE TO REVIEW

11:08AM 15   THOSE.

11:08AM 16        AGAIN, IF YOU WOULD LIKE TO SPEAK WITH ME TODAY AFTER

11:08AM 17   3:00 O'CLOCK, I'M HAPPY TO DO THAT.  IF YOU WANT TO WAIT UNTIL

11:08AM 18   TOMORROW, OF COURSE WE CAN DO THAT AS WELL.

11:08AM 19        I WILL ASK YOU, IF YOU DO LEAVE WITH YOUR QUESTIONNAIRES,

11:08AM 20   PLEASE DO NOT SHARE THEM WITH ANYONE ELSE, AND PLEASE BRING

11:08AM 21   THEM, BRING THEM WITH YOU TOMORROW BACK TO COURT AND WE'LL

11:08AM 22   COLLECT THOSE AGAIN.

11:08AM 23        ALL RIGHT.  THANK YOU.

11:08AM 24        COUNSEL, ANYTHING FURTHER?

11:08AM 25             MR. SCHENK:  NO.  THANK YOU, YOUR HONOR.

11:08AM   1            MR. DOWNEY:  NO, YOUR HONOR.

11:08AM   2            THE COURT:  ALL RIGHT.  WE'LL TAKE ABOUT A 30 MINUTE

11:08AM   3     BREAK.  THANK YOU.

11:08AM   4         (LUNCH RECESS TAKEN AT 11:08 A.M.)

          5

          6

          7

          8

          9

         10

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

11:46AM  1                    **AFTERNOON SESSION**

11:46AM  2          (JURY IN AT 11:46 A.M.)

11:46AM  3              THE COURT:  WE'RE BACK ON THE RECORD.  ALL PARTIES

11:46AM  4     PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.

11:46AM  5              MR. DOWNEY, YOU WANTED TO CONTINUE?

11:46AM  6                  MR. DOWNEY:  YES, SIR.

11:46AM  7              THE COURT:  YES?

11:46AM  8                  MR. DOWNEY:  YES.

11:46AM  9     Q.   MR. BURD, WE WERE TALKING A LITTLE BIT THIS MORNING ABOUT

11:46AM  10    THE PROCESS OF DUE DILIGENCE BEFORE YOU ENTERED INTO AN

11:46AM  11    AGREEMENT WITH THERANOS.

11:46AM  12         I WANT TO TALK NOW ABOUT THE AGREEMENT THAT YOU ULTIMATELY

11:46AM  13    ENTERED INTO, AND YOU MIGHT FIND IT HELPFUL TO HAVE IT IN FRONT

11:46AM  14    OF YOU.  IT'S EXHIBIT 387 IN THE WHITE BINDER.

11:47AM  15              THE CLERK:  THAT WAS PREVIOUSLY ADMITTED.

11:47AM  16              MR. DOWNEY:  IT WAS.

11:47AM  17    Q.   BEFORE WE GET INTO THIS DOCUMENT, YOU HAD MENTIONED THAT

11:47AM  18    WITH RESPECT TO THIS AGREEMENT, MS. HOLMES NEGOTIATED A LOT OF

11:47AM  19    THE TERMS OF THE AGREEMENT ON HER OWN; CORRECT?

11:47AM  20    A.   YES, MEANING SHE -- MEANING WE NEVER SAT WITH A LAWYER

11:47AM  21    FROM THERANOS, WHICH IS CUSTOMARY.

11:47AM  22    Q.   AND YOU UNDERSTOOD FROM THERANOS THAT THIS WAS A BIG DEAL?

11:47AM  23    A.   I THOUGHT IT WAS, SURE.

11:47AM  24    Q.   OKAY.  LET ME DIRECT YOUR ATTENTION IN THE EXHIBIT THAT IS

11:47AM  25    IN FRONT OF YOU TO PAGE 8, AND I'M GOING TO BE LOOKING AT THE

11:47AM  1    PART OF IT THAT IS THE CARRY-OVER SECTION IN 3B WHICH CARRIES

11:48AM  2    OVER BETWEEN PAGES 8 AND 9.

11:48AM  3         DO YOU SEE THAT?

11:48AM  4    A.   YES.

11:48AM  5    Q.   NOW, YOU HAD TALKED DURING YOUR DIRECT EXAMINATION ABOUT A

11:48AM  6    PILOT PROGRAM.

11:48AM  7         DO YOU RECALL THAT?

11:48AM  8    A.   I DO.

11:48AM  9    Q.   BUT, IN FACT, THE AGREEMENT SET UP A SYSTEM UNDER WHICH

11:48AM  10   THERE WOULD BE THREE PHASES IN THE AGREEMENT; CORRECT?  THERE

11:48AM  11   WOULD BE A PRE-PILOT, A PILOT, AND THEN THERE WOULD BE A

11:48AM  12   LAUNCH.

11:48AM  13        DO YOU RECALL THAT?

11:48AM  14   A.   YES.

11:48AM  15   Q.   AND IN PARAGRAPH 3B OF THE AGREEMENT, THE OBLIGATIONS OF

11:48AM  16   THE PARTIES WERE SET FORWARD; CORRECT?

11:48AM  17   A.   CORRECT.

11:48AM  18   Q.   AND THERANOS WAS OBLIGATED UNDER THIS SECTION OF THE

11:48AM  19   AGREEMENT TO OBTAIN APPROVALS BY CLIA; CORRECT?

11:49AM  20   A.   YES.

11:49AM  21   Q.   AND THEY WERE ALSO REQUIRED TO OBTAIN APPROVALS REQUIRED

11:49AM  22   BY ANY OTHER REGULATOR OR LEGAL AUTHORITY; CORRECT?

11:49AM  23   A.   YES.

11:49AM  24   Q.   AND BEFORE THEY LAUNCHED AT SAFEWAY, THEY WERE REQUIRED TO

11:49AM  25   TAKE THEIR TECHNOLOGY AND CUSTOMIZE IT TO SAFEWAY.

11:49AM  1          DO YOU RECALL THAT?

11:49AM  2     A.   THERE IS SOME LANGUAGE IN HERE TO THAT FACT.

11:49AM  3     Q.   WELL, IT WAS A REQUIREMENT OF THE AGREEMENT, WASN'T IT?

11:49AM  4     A.   I'M LOOKING AT SECTION 3B II.

11:49AM  5          LET ME JUST READ IT FOR A SECOND.

11:49AM  6     Q.   CERTAINLY.

11:49AM  7          (PAUSE IN PROCEEDINGS.)

11:49AM  8          THE WITNESS:  YEAH, I THINK CUSTOMIZATION REFERRED

11:50AM  9     TO SORT OF INTEGRATING IT WITH THE BALANCE OF SAFEWAY SYSTEMS.

11:50AM  10    BY MR. DOWNEY:

11:50AM  11    Q.   OKAY.  AND SO SOFTWARE WOULD HAVE TO BE CREATED THAT DID

11:50AM  12    THAT?

11:50AM  13    A.   CORRECT.

11:50AM  14    Q.   AND DO YOU RECALL SUBSEQUENTLY THAT YOU ALSO WANTED TO

11:50AM  15    CUSTOMIZE THE DEVICE IN TERMS OF HOW IT APPEARED IN SAFEWAY

11:50AM  16    STORES.

11:50AM  17         DO YOU REMEMBER THAT?

11:50AM  18    A.   YES.  THERANOS WAS, YOU KNOW, GOING THROUGH SOME CHANGES

11:50AM  19    ON THEIR OWN AND SO I OFFERED UP, YOU KNOW, WHAT WOULD LOOK

11:50AM  20    GOOD FOR US.

11:50AM  21    Q.   OKAY.  AND JUST FROM A RETAIL PERSPECTIVE YOU OFFERED

11:50AM  22    THOUGHTS.

11:50AM  23    A.   RIGHT.

11:50AM  24    Q.   SO, FOR EXAMPLE, DO YOU RECALL THAT YOU SUGGESTED THAT THE

11:50AM  25    SCREEN OF THE DEVICE BE SEPARATED OUT FROM THE DEVICE?  DO YOU

11:50AM   1    REMEMBER THAT?

11:50AM   2    A.   IF IT'S IN -- IF IT'S IN ONE OF THE EMAILS, I'M SURE I

11:50AM   3    DID.

11:50AM   4    Q.   WELL, LET'S GO BACK TO THE AGREEMENT.

11:50AM   5        SO IN ADDITION TO WHAT WE'VE ALREADY DISCUSSED, THE

11:50AM   6    OBLIGATION WAS IMPOSED ON THERANOS BY THIS AGREEMENT TO

11:50AM   7    NEGOTIATE WITH PAYORS WHO PAY FOR THE MEDICAL COSTS OF

11:51AM   8    PATIENTS; CORRECT?

11:51AM   9    A.   CORRECT.

11:51AM   10   Q.   AND THEY HAD TO GAIN ACCEPTANCE THAT WAS SATISFACTORY TO

11:51AM   11   SAFEWAY BEFORE THERE WAS A LAUNCH; CORRECT?

11:51AM   12   A.   CORRECT.

11:51AM   13   Q.   AND THAT'S TRUE SPECIFICALLY WITH REGARD TO INSURERS;

11:51AM   14   CORRECT?

11:51AM   15   A.   YES.

11:51AM   16   Q.   AND THOSE OBLIGATIONS ARE COVERED IN B III AND IV;

11:51AM   17   CORRECT?

11:51AM   18   A.   YES.

11:51AM   19   Q.   AND THEN THERE WAS ALSO AN OBLIGATION THAT THERANOS HAD TO

11:51AM   20   MEET SERVICE STANDARDS SET BY SAFEWAY, INCLUDING THAT THE

11:51AM   21   RESULTS OF TESTS BE AVAILABLE IN 30 MINUTES OR LESS; CORRECT?

11:51AM   22   A.   YES.

11:51AM   23   Q.   AND THEN THERE WERE SOME OTHER PROVISION ABOUT THERANOS

11:51AM   24   REPLACING DEVICES THAT MALFUNCTIONED.

11:52AM   25       AND THEN SAFEWAY OBTAINED -- STRIKE THAT.

| | | |
|---|---|---|
| 11:52AM | 1 | SAFEWAY WAS OBLIGATED TO HELP THERANOS IN GAINING |
| 11:52AM | 2 | GOVERNMENT APPROVAL; CORRECT? |
| 11:52AM | 3 | A.   CORRECT. |
| 11:52AM | 4 | Q.   AND IT WAS OBLIGATED TO ASSIST THERANOS IN CONNECTION WITH |
| 11:52AM | 5 | A MARKETING STRATEGY; CORRECT? |
| 11:52AM | 6 | A.   YES. |
| 11:52AM | 7 | Q.   AND THEN REMODELING OF THE STORE WOULD BE SAFEWAY'S |
| 11:52AM | 8 | OBLIGATION, NOT THERANOS'S; CORRECT? |
| 11:52AM | 9 | A.   THAT'S CORRECT. |
| 11:52AM | 10 | Q.   AND ALL OF THIS WAS BEFORE THE PILOT PROGRAM LAUNCHED; |
| 11:52AM | 11 | CORRECT? |
| 11:52AM | 12 | A.   CORRECT. |
| 11:52AM | 13 | Q.   OKAY.  SO ALL OF THESE TASKS HAD TO BE COMPLETED TO EACH |
| 11:52AM | 14 | PARTY'S SATISFACTION IF IT WAS AN OBLIGATION OF THE OTHER PARTY |
| 11:52AM | 15 | BEFORE THERE COULD EVER BE A PILOT LAUNCH AT SAFEWAY; CORRECT? |
| 11:52AM | 16 | A.   CORRECT. |
| 11:52AM | 17 | Q.   AND IF IT WERE TO PASS THAT THERANOS DID NOT MEET ONE OF |
| 11:52AM | 18 | THOSE OBLIGATIONS OR MORE THAN ONE OF THOSE OBLIGATIONS, |
| 11:53AM | 19 | SAFEWAY HAD THE RIGHT TO TERMINATE THE AGREEMENT; CORRECT? |
| 11:53AM | 20 | A.   IT'S NOT SOMETHING THAT I RECALL, BUT I WOULD, I WOULD |
| 11:53AM | 21 | HAVE BEEN DISAPPOINTED IF GENERAL COUNSEL DIDN'T HAVE IT IN |
| 11:53AM | 22 | HERE. |
| 11:53AM | 23 | Q.   OKAY.  AND AFTER THE PRE-PILOT PERIOD WAS COMPLETED TO THE |
| 11:53AM | 24 | SATISFACTION OF SAFEWAY, A PILOT PROGRAM COULD ACTUALLY LAUNCH; |
| 11:53AM | 25 | CORRECT? |

BURD CROSS BY MR. DOWNEY                                    3107

| | | |
|---|---|---|
| 11:53AM | 1 | A.   CORRECT. |
| 11:53AM | 2 | Q.   AND THAT'S DETAILED IN PARAGRAPH C ON PAGE 9; CORRECT? |
| 11:53AM | 3 | A.   YES. |
| 11:53AM | 4 | Q.   AND THE EXPECTATION OF THE PARTIES WAS THAT THE PILOT |
| 11:53AM | 5 | PROGRAM WOULD LAST ABOUT 90 DAYS; CORRECT? |
| 11:53AM | 6 | A.   YES. |
| 11:53AM | 7 | Q.   AND ALSO THAT THE PILOT PROGRAM WOULD RUN CONCURRENTLY |
| 11:53AM | 8 | WITH THE PILOT PROGRAM THAT WALGREENS WOULD RUN; CORRECT? |
| 11:53AM | 9 | A.   YES. |
| 11:54AM | 10 | Q.   AND AGAIN, AS WITH THE PRE-PILOT PERIOD, THE PILOT PERIOD |
| 11:54AM | 11 | HAD TO BE COMPLETED TO SAFEWAY'S SATISFACTION; CORRECT? |
| 11:54AM | 12 | A.   CORRECT. |
| 11:54AM | 13 | Q.   AND AGAIN, IF SAFEWAY DID NOT -- IF SAFEWAY WERE |
| 11:54AM | 14 | UNSATISFIED WITH THERANOS'S PERFORMANCE, IT COULD TERMINATE THE |
| 11:54AM | 15 | AGREEMENT; CORRECT? |
| 11:54AM | 16 | A.   CORRECT. |
| 11:54AM | 17 | Q.   AND IF THE AGREEMENT WAS TERMINATED, THERANOS WAS |
| 11:54AM | 18 | OBLIGATED TO RETURN ANY MONIES PAID BY SAFEWAY TO DATE; |
| 11:54AM | 19 | CORRECT? |
| 11:54AM | 20 | A.   I'D HAVE TO -- I'D HAVE TO READ THIS AND GIVE YOU AN |
| 11:54AM | 21 | ANSWER ON THAT. |
| 11:54AM | 22 | Q.   OKAY.  BUT DO YOU RECALL GENERALLY TRYING TO NEGOTIATE AN |
| 11:54AM | 23 | AGREEMENT -- |
| 11:54AM | 24 | A.   CORRECT. |
| 11:54AM | 25 | Q.   -- THAT PROVIDED FINANCIAL PROTECTION FOR SAFEWAY? |

11:54AM  1        A.   RIGHT.

11:54AM  2        Q.   AND YOU HAD MENTIONED THIS MORNING THAT YOU WERE CONCERNED

11:54AM  3   TO ACHIEVE EXCLUSIVITY IN CONNECTION WITH THE FOOD RETAIL

11:54AM  4   MARKET; CORRECT?

11:54AM  5        A.   YES.

11:55AM  6        Q.   AND DO YOU RECALL THAT YOU WERE SUCCESSFUL IN THAT REGARD

11:55AM  7   AND THAT YOU DID OBTAIN A COMMITMENT FROM THERANOS THAT YOU

11:55AM  8   COULD BE THE -- THAT SAFEWAY COULD BE THE EXCLUSIVE FOOD

11:55AM  9   RETAILER TO LAUNCH FOR A PERIOD?

11:55AM 10        A.   YES.

11:55AM 11        Q.   AND IF YOU LOOK AT PARAGRAPH 5 ON PAGE 11, DOES THAT

11:55AM 12   REFLECT THAT PROVISION?

11:55AM 13        A.   I THINK THAT 5 JUST REFERS TO HOW MUCH OF THE INSURANCE

11:55AM 14   MARKET SHE HAS TO HAVE PRICING ARRANGEMENT WITH BEFORE THE

11:55AM 15   PROGRAM WOULD LAUNCH.

11:55AM 16        Q.   I'M SORRY.  I MAY HAVE DIRECTED YOU TO THE WRONG PLACE.

11:55AM 17           I'M LOOKING AT PAGE 11, B 5.  I THINK THAT'S EXCERPTED ON

11:56AM 18   YOUR SCREEN IF THAT'S HELPFUL AS WELL.

11:56AM 19           MY QUESTION WAS, THIS PROVISION PROVIDED THAT SAFEWAY

11:56AM 20   WOULD HAVE THE EXCLUSIVE RIGHT TO DEPLOY THERANOS IN THE FOOD

11:56AM 21   RETAIL CHANNEL; CORRECT?

11:56AM 22        A.   LET ME JUST FINISH THIS.

11:56AM 23           (PAUSE IN PROCEEDINGS.)

11:56AM 24              THE WITNESS:  CORRECT.

11:56AM 25   BY MR. DOWNEY:

11:56AM  1    Q.   NOW, THERE WERE OTHER FOOD RETAILERS AT THAT TIME WHO WERE

11:56AM  2    LARGER FOOD RETAILERS; CORRECT?

11:56AM  3    A.   WAL-MART WAS LARGER, KROGER WAS LARGER.

11:56AM  4    Q.   SAFEWAY ABOUT A THIRD?

11:56AM  5    A.   A THIRD.

11:56AM  6    Q.   AND ALSO UNDER THE AGREEMENT, DID -- SO THEY WOULD BE

11:56AM  7    PRECLUDED UNDER THE AGREEMENT FROM LAUNCHING THERANOS SYSTEMS?

11:56AM  8    A.   WE GAVE THE LIST OF ONES WE CONSIDERED TO BE THE PLAYERS,

11:56AM  9    AND IT'S IN THE DOCUMENT SOMEWHERE, BUT WE WOULD NOT HAVE PUT

11:57AM  10   WAL-MART ON THE LIST AND WE WOULD PROBABLY EXCLUDE KROGER.

11:57AM  11   BUT, AGAIN, IT'S IN THE DOCUMENT.

11:57AM  12   Q.   OKAY.  AND WE'VE BEEN TALKING ALSO ABOUT YOUR RIGHT TO

11:57AM  13   TERMINATE, AND I JUST WANT TO GIVE YOU AN ABILITY TO LOOK AT

11:57AM  14   THAT PROVISION AS WELL.  THAT'S ON PAGE 19.

11:57AM  15   A.   YES.

11:57AM  16   Q.   SECTION 26B.

11:57AM  17   A.   I HAVE IT.

11:57AM  18   Q.   OKAY.  AND PARAGRAPH 26B PROVIDES "IN THE EVENT THAT

11:57AM  19   SAFEWAY DETERMINES IN ITS SOLE DISCRETION THAT THE PILOT OF THE

11:57AM  20   PROGRAM HAS BEEN UNSUCCESSFUL, SAFEWAY HAS THE RIGHT TO

11:57AM  21   TERMINATE THIS AGREEMENT WITHOUT CAUSE ON THIRTY (30) CALENDAR

11:57AM  22   DAYS' PRIOR WRITTEN NOTICE TO THERANOS.  UPON ANY SUCH

11:58AM  23   TERMINATION, THERANOS SHALL PROMPTLY RETURN ALL PREPAYMENT

11:58AM  24   AMOUNTS ATTRIBUTABLE TO UNDELIVERED INVENTORY UNDER SECTION 10

11:58AM  25   ABOVE."

11:58AM  1          DO YOU SEE THAT?

11:58AM  2     A.   YES.

11:58AM  3     Q.   AND THE REFERENCE TO INVENTORY REFERS TO THE FACT THAT

11:58AM  4     PAYMENTS UNDER THE CONTRACT WERE BEING MADE AS PAYMENTS TO

11:58AM  5     PREPAY FOR CARTRIDGES THAT WERE PART OF THE THERANOS SYSTEMS?

11:58AM  6     A.   CORRECT.

11:58AM  7     Q.   OKAY.  SO ANY PAYMENTS MADE FOR THAT, THERANOS WOULD HAVE

11:58AM  8     AN OBLIGATION TO PREPAY; CORRECT?

11:58AM  9     A.   CORRECT.

11:58AM  10    Q.   AND IT WAS ALSO THE CASE UNDER PARAGRAPH 2 THAT IF THE FDA

11:58AM  11    TOOK ADVERSE ACTION AGAINST THERANOS, THAT SAFEWAY WOULD HAVE

11:58AM  12    THE RIGHT TO TERMINATE THE AGREEMENT; CORRECT?

11:58AM  13    A.   CORRECT.

11:58AM  14    Q.   WAS THAT A RISK THAT YOU BECAME AWARE OF DURING YOUR

11:58AM  15    EVALUATION OF THE DEAL?

11:59AM  16    A.   MY UNDERSTANDING AT THE TIME WAS THAT CLIA APPROVAL WAS

11:59AM  17    SUFFICIENT AND THEY DIDN'T NECESSARILY NEED FDA APPROVAL.

11:59AM  18          ELIZABETH POSITIONED THAT AS MORE OF A BULLETPROOF TYPE OF

11:59AM  19    APPROVAL.

11:59AM  20    Q.   BUT THE AGREEMENT CONTEMPLATED THE POSSIBILITY THAT THE

11:59AM  21    FDA MIGHT TAKE THE OPPOSITE POSITION; CORRECT?

11:59AM  22    A.   SURE.

11:59AM  23    Q.   AND THE RIGHTS AS TO WHO WOULD HAVE THE ABILITY TO

11:59AM  24    TERMINATE THE AGREEMENT DID NOT LIE WITH THERANOS, DID THEY?

11:59AM  25    THEY LAID WITH SAFEWAY; CORRECT?

| | | |
|---|---|---|
| 11:59AM | 1 | A.   YES. |
| 11:59AM | 2 | Q.   AND INDEED, AS WE TALKED ABOUT THIS MORNING, THERANOS WAS |
| 11:59AM | 3 | A RELATIVELY YOUNG COMPANY; CORRECT? |
| 11:59AM | 4 | A.   CORRECT. |
| 11:59AM | 5 | Q.   AND I ASSUME YOU HAD SOME UNCERTAINTY AS TO WHETHER THEY |
| 11:59AM | 6 | WOULD HAVE THE ABILITY TO REPAY IF SAFEWAY UNDERTOOK TO |
| 11:59AM | 7 | TERMINATE THE CONTRACT; CORRECT? |
| 12:00PM | 8 | A.   WE INITIALLY GOT A LETTER OF CREDIT SUPPORTING THE MONEY |
| 12:00PM | 9 | WE PUT UP AND THAT GAVE US SOME COMFORT. |
| 12:00PM | 10 | Q.   SO IF THERE WAS A TERMINATION OF THE AGREEMENT THAT |
| 12:00PM | 11 | THERANOS ITSELF WAS UNABLE TO PAY, SAFEWAY WOULD STILL BE |
| 12:00PM | 12 | REPAID UNDER THAT LETTER OF CREDIT; CORRECT? |
| 12:00PM | 13 | A.   RIGHT. |
| 12:00PM | 14 | Q.   AND IN CONNECTION WITH THE EXECUTION OF THE SAFEWAY |
| 12:00PM | 15 | AGREEMENT, SAFEWAY MADE A COMMITMENT TO BUY ABOUT $10 MILLION |
| 12:00PM | 16 | WORTH OF CARTRIDGES; IS THAT RIGHT? |
| 12:00PM | 17 | A.   I DON'T SEE 10 MILLION CARTRIDGES.  I SEE $10 MILLION. |
| 12:00PM | 18 | BUT MAYBE YOU CAN REFER ME TO A SECTION. |
| 12:00PM | 19 | Q.   YES.  IT'S PARAGRAPH 10. |
| 12:01PM | 20 | A.   PARAGRAPH 10. |
| 12:01PM | 21 | Q.   AND IT'S LABELLED AS INVENTORY PRE-PURCHASES.  PAGE 12. |
| 12:01PM | 22 | A.   PAGE 12. |
| 12:01PM | 23 | Q.   AND IT'S REFERRING TO INITIAL PRE-PURCHASE? |
| 12:01PM | 24 | A.   AND THIS WAS SIGNED 11 YEARS AGO. |
| 12:01PM | 25 | Q.   I UNDERSTAND. |

12:01PM  1    A.   A.   OKAY.

12:01PM  2         SO IT WAS $10 MILLION FOR APPROXIMATELY 715,000 UNITS.

12:01PM  3    Q.   OKAY.  AND THAT WAS THE PAYMENT THAT WAS MADE IN

12:01PM  4    CONNECTION WITH THE AGREEMENT WHEN YOU SIGNED IT; CORRECT?

12:01PM  5    A.   CORRECT.

12:01PM  6    Q.   AND THE PROTECTIONS THAT SAFEWAY HAD WERE IF THE AGREEMENT

12:01PM  7    DIDN'T WORK OUT, IT COULD TERMINATE IT; CORRECT?

12:01PM  8    A.   CORRECT.

12:01PM  9    Q.   AND THERE WAS SOME SECURITY, THERANOS AGREED TO REPAY

12:01PM 10    THAT; CORRECT?

12:02PM 11    A.   RIGHT.

12:02PM 12    Q.   AND IF THERANOS DID NOT REPAY IT, THERE WAS FINANCING THAT

12:02PM 13    ENSURED THE PAYMENT WOULD BE MADE TO SAFEWAY?

12:02PM 14    A.   CORRECT.

12:02PM 15    Q.   AND IN EXCHANGE FOR THAT DEAL, SAFEWAY GOT THE EXCLUSIVITY

12:02PM 16    THAT YOU TALKED ABOUT AT THE OUTSET; CORRECT?

12:02PM 17    A.   YES.

12:02PM 18    Q.   AND IF THE DEAL WERE TO WORK OUT, THE VARIOUS PROFIT

12:02PM 19    ADVANTAGES THAT SAFEWAY MIGHT ACHIEVE WOULD FLOW TO IT DURING

12:02PM 20    THAT EXCLUSIVITY PERIOD; CORRECT?

12:02PM 21    A.   CORRECT.

12:02PM 22    Q.   AND THIS BEING DRAFTED BY LAWYERS, IT CONTAINED A CLAUSE

12:02PM 23    REFERRED TO AS AN INTEGRATION CLAUSE.

12:02PM 24         IS THAT A TERM THAT YOU'RE FAMILIAR WITH?

12:02PM 25    A.   NOT REFERRING TO IT AS A CLAUSE.  INTEGRATION CLAUSE IS AT

BURD CROSS BY MR. DOWNEY

12:02PM 1    THE INTEGRATION OF THE SOFTWARE.

12:03PM 2    Q.   WELL, LET ME ASK YOU TO LOOK AT PARAGRAPH 22 OF THE

12:03PM 3    AGREEMENT.  I'M SORRY, PAGE 22 OF THE AGREEMENT.

12:03PM 4    A.   OKAY.

12:03PM 5    Q.   IT'S JUST PARAGRAPH I.  IT'S THE ONLY PARAGRAPH ON THAT

12:03PM 6    PAGE.

12:03PM 7        AND IT SPECIFIES THAT EACH PARTY AGREES THAT THIS

12:03PM 8    AGREEMENT, INCLUDING ITS SCHEDULES, EMBODIES THE ENTIRE

12:03PM 9    UNDERSTANDING BETWEEN THE PARTIES AND SUPERSEDES AND REPLACES

12:03PM 10   ANY AND ALL PRIOR UNDERSTANDINGS, ARRANGEMENTS, AND AGREEMENTS,

12:03PM 11   WHETHER ORAL OR IN WRITING RELATING TO IT.

12:03PM 12       YOU'VE SEEN PARAGRAPHS LIKE THAT BEFORE?

12:03PM 13   A.   I DON'T RECALL SEEING IT, AND SO I'M REALLY NOT FAMILIAR

12:03PM 14   WITH THE INTEGRATION CLAUSE.

12:03PM 15       I LIKE THE LANGUAGE OF THIS AGREEMENT, YOU KNOW, BUT IT'S

12:03PM 16   NOT A TERM THAT I HAVE USED BEFORE.

12:04PM 17   Q.   OKAY.  BUT FOR WHATEVER REASON, IT'S INCLUDED IN THE

12:04PM 18   AGREEMENT?

12:04PM 19   A.   SURE.

12:04PM 20   Q.   OKAY.  NOW, LET ME RETURN FOR JUST ONE MOMENT TO THE

12:04PM 21   SUBJECT OF THE REGULATORY RISKS AND THE PATH THAT WENT FORWARD

12:04PM 22   FROM THE SIGNING OF THE AGREEMENT UNTIL THE TIME PERIOD THAT

12:04PM 23   YOU TALKED ABOUT IN EARLY 2013.

12:04PM 24       FIRST OF ALL, LET ME SAY, YOU REPEATEDLY REFERRED TO

12:04PM 25   TALKING ABOUT A LAUNCH AT A SPECIFIED TIME, BUT THERE WERE NO

12:04PM  1    PARTICULAR DEADLINES IN THIS AGREEMENT, WERE THERE?

12:04PM  2    A.   NO.   THERE WAS -- I THINK WE MAY HAVE LISTED AN

12:04PM  3    EXPECTATION.  BUT, YOU KNOW, WE KNEW WE WERE DEALING WITH

12:04PM  4    TECHNOLOGY AND IT'S SOMETIMES DIFFICULT TO NAIL THAT DOWN.

12:04PM  5        IF WE WERE GOING TO OPEN A GROCERY STORE, WE WOULD GIVE

12:05PM  6    YOU A SPECIFIC DAY.

12:05PM  7    Q.   BECAUSE THAT'S SOMETHING THAT YOU'VE BEEN DOING FOR A LONG

12:05PM  8    TIME?

12:05PM  9    A.   CORRECT.

12:05PM 10    Q.   OKAY.  AND YOU UNDERSTOOD THAT THE DELAYS THAT OCCURRED IN

12:05PM 11    THE PARTIES' ABILITY TO LAUNCH WERE DELAYS IN THE DEVELOPMENT

12:05PM 12    OF THE TECHNOLOGY AT THE TIME?

12:05PM 13    A.   I DID NOT.

12:05PM 14    Q.   WELL, I THOUGHT I ASKED YOU WHY YOU DIDN'T INCLUDE

12:05PM 15    DEADLINES IN THE AGREEMENT AND YOU SAID IT WAS BECAUSE OF THE

12:05PM 16    TECHNOLOGY.

12:05PM 17    A.   JUST THE IDEA OF GETTING EVERY INSURANCE COMPANY IN THE

12:05PM 18    COUNTRY TO BUY INTO YOUR PRICE SCHEDULE, THAT'S A BIG EXERCISE

12:05PM 19    IN ITS OWN, AND THEN WRITE SOFTWARE TO INTEGRATE IT WITH

12:05PM 20    SAFEWAY, THAT'S A BIG EXERCISE, LAUNCHING, MARKETING, ALL OF

12:05PM 21    THAT STUFF.

12:05PM 22        I WAS NEVER TOLD THERE WAS A TECHNOLOGY PROBLEM WITH THE

12:05PM 23    BOX ITSELF.

12:05PM 24    Q.   BUT YOU UNDERSTOOD THAT THE TECHNOLOGY HAD NOT BEEN SCALED

12:05PM 25    TO A LARGE DEGREE?

12:05PM  1    A.   WHEN I THINK OF SCALE, I THINK OF THE ABILITY TO PRODUCE,

12:06PM  2    YOU KNOW, SAY A THOUSAND OF THESE BOXES PER DAY AND A

12:06PM  3    PRODUCTION PLAN, YOU KNOW, MAYBE HUNDREDS OF THOUSANDS OF

12:06PM  4    CARTRIDGES.

12:06PM  5         THEY DID BUY A PLANT IN FREMONT, AND I ASSUMED IT WAS FOR

12:06PM  6    THAT PURPOSE.

12:06PM  7    Q.   AND YOU TOURED AT SOME POINT THE MANUFACTURING FACILITY?

12:06PM  8    A.   I DID NOT TOUR.  I DID NOT GET TO SEE THE FREMONT

12:06PM  9    FACILITY.

12:06PM  10   Q.   BUT YOU TOURED THE RESEARCH LAB?

12:06PM  11   A.   I TOURED PART OF THE RESEARCH LAB AND THE OFFICE OF THE

12:06PM  12   COMPANY.

12:06PM  13   Q.   OKAY.  BUT TO RETURN TO THE AGREEMENT, IT DIDN'T SAY WE

12:06PM  14   HAVE TO LAUNCH BY A PARTICULAR DAY, DID IT?

12:06PM  15   A.   IT DIDN'T SAY THAT, BUT THE AGREEMENT SPELLED OUT THAT

12:06PM  16   THEY CAN DO ALMOST ALL, YOU KNOW, ASSAYS.

12:06PM  17   Q.   AND THERE WAS NO DEADLINE IN CONNECTION WITH THE AGREEMENT

12:06PM  18   IS MY QUESTION TO YOU.

12:06PM  19   A.   NO DEADLINE BECAUSE ALL OF THE OTHER PUZZLE PIECES NEEDED

12:06PM  20   TO GET DONE.

12:06PM  21   Q.   OKAY.  AND YOU, YOU -- SO THE PARTIES HAD AN EXPECTATION

12:06PM  22   THAT THERE MIGHT BE A LAUNCH AS EARLY AS 2011; CORRECT?

12:07PM  23   A.   I THINK THAT WAS SUPPOSED TO BE THE PILOT.

12:07PM  24   Q.   OKAY.  BUT DO YOU KNOW WHEN -- DO YOU RECALL WHEN THE

12:07PM  25   REGULATORY APPROVAL FROM CLIA WAS OBTAINED?

12:07PM  1    A.   I JUST RECALL WHERE I WAS WHEN I GOT THE CELL CALL.

12:07PM  2    Q.   BUT YOU DON'T RECALL THE DATE IN 2011?

12:07PM  3    A.   NO.

12:07PM  4    Q.   AND YOU DON'T RECALL THAT THE DATE WAS WELL AFTER THE DATE

12:07PM  5    THAT YOU HAD PROJECTED THE PILOT PERIOD TO BEGIN?

12:07PM  6    A.   IT WAS AFTER, AND I THINK IT'S JUST ONE OF THE

12:07PM  7    UNCERTAINTIES.

12:07PM  8    Q.   OKAY.  AND ALSO DO YOU KNOW WHEN THE NEGOTIATIONS WITH THE

12:07PM  9    INSURERS WERE CONCLUDED?

12:07PM 10    A.   I DON'T KNOW WHEN THEY WERE CONCLUDED.  I REMEMBER GETTING

12:07PM 11    A PROGRESS REPORT ALONG THE WAY, BUT I DON'T RECALL A MOMENT

12:07PM 12    WHERE SOMEONE SAID, WE'RE DONE.

12:07PM 13    Q.   OKAY.  NOW, WE SAW IN THE AGREEMENT THAT WALGREENS ALSO

12:08PM 14    HAD OBTAINED EXCLUSIVITY RIGHTS IN A DIFFERENT CHANNEL FROM THE

12:08PM 15    CHANNEL THAT SAFEWAY HAD OBTAINED; CORRECT?

12:08PM 16    A.   WELL, THE ONLY COMPANY THEY TALKED ABOUT WAS WALGREENS

12:08PM 17    AND, YOU KNOW, THEY'RE SMART ENOUGH TO ASK FOR AN EXCLUSIVE IN

12:08PM 18    THEIR CHANNEL.

12:08PM 19    Q.   AND YOU UNDERSTOOD THAT WALGREENS AND SAFEWAY WERE BOTH

12:08PM 20    WORKING WITH THERANOS AT THE SAME TIME?

12:08PM 21    A.   I DID.

12:08PM 22    Q.   AND I THINK WE TALKED ABOUT A MOMENT AGO YOU UNDERSTOOD

12:08PM 23    THAT THE LAUNCHES OF, OF THERANOS WOULD BE ANNOUNCED IN

12:08PM 24    CONNECTION WITH BOTH STORES AT THE SAME TIME; CORRECT?

12:08PM 25    A.   THAT WAS THE AGREEMENT.

BURD CROSS BY MR. DOWNEY

12:08PM 1    Q.   NOW, DID THERE COME A TIME IN EARLY 2012 WHERE YOU LEARNED

12:08PM 2    FROM MS. HOLMES THAT WALGREENS WAS UNWILLING TO LAUNCH UNDER

12:08PM 3    THE MODEL WHERE DEVICES WOULD BE PLACED IN STORES?  IS THAT

12:09PM 4    SOMETHING THAT YOU LEARNED FROM HER?

12:09PM 5    A.   I DIDN'T LEARN IT IN CONNECTION WITH WAL-MART.

12:09PM 6         I LEARNED IT IN CONNECTION WITH CONVERSATIONS THAT I HAD

12:09PM 7    WITH ELIZABETH WHERE THEY WERE NOW SUGGESTING THAT THE

12:09PM 8    PROCESSING ITSELF WOULDN'T TAKE PLACE IN THE STORE.

12:09PM 9         WE TALKED ABOUT A COURIER NETWORK.  I OFFERED TO GIVE HER

12:09PM 10   SOME HELP ON HOW TO BUILD THAT.

12:09PM 11        BUT IT WAS DESCRIBED AS AN EFFICIENT WAY TO START AND, YOU

12:09PM 12   KNOW, UPON REFLECTION, IT WASN'T WHERE WE STARTED, BUT THEY

12:09PM 13   THOUGHT THAT THAT WAS WHAT THE CURRENT SITUATION CALLED FOR.

12:09PM 14   Q.   BUT DID YOU HAVE ANY VISIBILITY ON WHAT THE POSITION OF

12:09PM 15   WALGREENS WAS WITH RESPECT TO THAT?

12:09PM 16   A.   NO.

12:09PM 17   Q.   BUT YOU DID LEARN THAT THERANOS SAID TO INITIATE THE

12:09PM 18   PROGRAM WE ARE ACTUALLY GOING TO DEVELOP A LABORATORY AT OUR

12:09PM 19   MAIN HEADQUARTERS; RIGHT?

12:10PM 20   A.   THEY WOULD BE DOING THE PROCESSING THERE, CORRECT.

12:10PM 21   Q.   OKAY.  AND YOU REFERENCED A COURIER SERVICE.  BLOOD

12:10PM 22   SAMPLES WOULDN'T BE PROCESSED IN THE STORE, THEY WOULD COME

12:10PM 23   BACK TO THAT CENTRAL FACILITY; CORRECT?

12:10PM 24   A.   THAT'S CORRECT.

12:10PM 25   Q.   AND OF COURSE WHEN THAT WAS DONE, PRESUMABLY THERE HAD TO

```
12:10PM   1    BE CHANGES TO THE SOFTWARE AND OTHER CHANGES THAT WOULD

12:10PM   2    ACCOMMODATE THAT TYPE OF AN ALTERATION IN THE AGREEMENT?

12:10PM   3    A.   WELL, THERE WAS NEVER AN ALTERATION IN THE AGREEMENT.

12:10PM   4    BUT, YOU KNOW, YOU POINTED OUT THE INTEGRATION PARAGRAPH.  IT

12:10PM   5    SAYS WE HAVE TO PUT IT IN WRITING IF IT'S GOING TO BE TRUE.

12:10PM   6    Q.   YOU'RE SAYING THERE'S NO AMENDMENT TO THE --

12:10PM   7    A.   CORRECT.

12:10PM   8    Q.   ALL RIGHT.  BUT SAFEWAY HAD ITS TERMINATION RIGHTS THE

12:10PM   9    ENTIRE TIME?

12:10PM  10    A.   CORRECT.

12:10PM  11    Q.   AND IN RESPONSE TO ANY OF THIS INFORMATION COULD HAVE

12:10PM  12    TERMINATED THE AGREEMENT; CORRECT?

12:10PM  13    A.   CORRECT.

12:10PM  14    Q.   I WANT TO SHOW YOU AN EMAIL FROM 2012 IF I MIGHT.  IT'S

12:10PM  15    EXHIBIT 10537.

12:11PM  16    A.   IN THE WHITE BOOK OR THE BLACK?

12:11PM  17    Q.   NO, IT SHOULD BE IN THE BLACK.

12:11PM  18    A.   10357?

12:11PM  19    Q.   I BEG YOUR PARDON, 10537.

12:11PM  20         AND THIS WILL BE ON YOUR SCREEN AS WELL AS IN THE BOOK.

12:11PM  21             THE CLERK:  I DON'T BELIEVE THIS HAS BEEN ADMITTED

12:11PM  22    INTO EVIDENCE.

12:11PM  23             MR. DOWNEY:  I BEG YOUR PARDON.

12:11PM  24    Q.   LET ME ASK YOU IF THIS IS -- JUST TO LOOK INITIALLY AT THE

12:11PM  25    GENERAL NATURE OF THE EMAIL AND ASK YOU IF THIS IS AN EMAIL
```

12:11PM   1    EXCHANGE BETWEEN YOU AND MS. HOLMES IN 2012.

12:12PM   2    A.   IT SURE LOOKS THAT WAY.

12:12PM   3    Q.   AND THIS RELATES TO THE SAFEWAY-THERANOS RELATIONSHIP;

12:12PM   4    CORRECT?

12:12PM   5    A.   YES.

12:12PM   6         MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

12:12PM   7    10537.

12:12PM   8         MR. LEACH:  NO OBJECTION, YOUR HONOR.

12:12PM   9         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:12PM  10       (DEFENDANT'S EXHIBIT 10537 WAS RECEIVED IN EVIDENCE.)

12:12PM  11    BY MR. DOWNEY:

12:12PM  12    Q.   ON THE BOTTOM OF THE EMAIL YOU'LL SEE THAT THERE IS AN

12:12PM  13    EMAIL FROM YOU TO MS. HOLMES IN JANUARY 2012.

12:12PM  14         DO YOU SEE THAT?

12:12PM  15    A.   YES.

12:12PM  16    Q.   AND YOU INDICATE IN THE FIRST SENTENCE, "WHILE I AM

12:12PM  17    COMMITTED TO GETTING THE GROCERY NETWORK UNDER CONTRACT WITHIN

12:12PM  18    TWO AND A ONE HALF MONTHS OF SAFEWAY'S LAUNCH, I AM VERY

12:12PM  19    CONCERNED ABOUT ALLOWING NETWORK PARTNERS OR ANYONE ELSE TO

12:12PM  20    LAUNCH WITH A MERE FINGER STICK."

12:13PM  21         DO YOU SEE THAT?

12:13PM  22    A.   I DO.

12:13PM  23    Q.   AND IN YOUR COMMENTS ABOUT A GROCERY NETWORK THERE, YOU'RE

12:13PM  24    REFERRING TO GETTING PARTNERS WHO YOU HAD MADE PART OF A

12:13PM  25    GROCERY NETWORK, YOU WERE TALKING ABOUT THE TIMING OF THEIR

12:13PM  1    LAUNCH; CORRECT?

12:13PM  2    A.   CORRECT.

12:13PM  3    Q.   BUT YOU EXPRESSED THAT YOU WERE VERY CONCERNED ABOUT

12:13PM  4    EITHER THE PARTNERS OR ANYONE ELSE LAUNCHING WITH WHAT YOU

12:13PM  5    TERMED "A MERE FINGER STICK;" CORRECT?

12:13PM  6    A.   CORRECT.

12:13PM  7    Q.   AND "A MERE FINGER STICK" REFERS TO A MODEL UNDER WHICH

12:13PM  8    THE BLOOD WAS COLLECTED AT A RETAIL STORE AND THEN THE BLOOD

12:13PM  9    WAS SENT BACK TO THERANOS FOR ANALYSIS IN THEIR CENTRAL LAB;

12:13PM 10    CORRECT?

12:13PM 11    A.   CORRECT.

12:13PM 12    Q.   AND THAT'S THE PROCESS THAT WE WERE TALKING ABOUT A MOMENT

12:13PM 13    AGO; CORRECT?

12:13PM 14    A.   CORRECT.

12:13PM 15    Q.   AND YOU SUGGESTED THAT MODEL WOULD SEVERELY COMPROMISE AND

12:14PM 16    PERMANENTLY DAMAGE THE BRAND WE ARE TRYING TO CREATE; CORRECT?

12:14PM 17    A.   IT CERTAINLY WASN'T THE ORIGINAL BRAND THAT WE TALKED

12:14PM 18    ABOUT.

12:14PM 19    Q.   RIGHT.  THE ORIGINAL PLAN WAS THAT YOU WOULD PLACE THE

12:14PM 20    ANALYZERS IN THE STORE; CORRECT?

12:14PM 21    A.   CORRECT.

12:14PM 22    Q.   BUT MS. HOLMES HAD PROVIDED INFORMATION TO YOU IN JANUARY

12:14PM 23    OF 2012 THAT SAID THERANOS WAS NO LONGER IN A POSITION TO DO

12:14PM 24    THAT; CORRECT?

12:14PM 25    A.   THAT'S WHY WE -- THAT'S CORRECT.  THAT'S WHY SHE OFFERED

BURD CROSS BY MR. DOWNEY

12:14PM  1    THE COURIER NETWORK, BUT I EXPECTED -- I ANTICIPATED THAT WOULD

12:14PM  2    BE SHORT TERM.

12:14PM  3    Q.   AND YOU, YOU HAD A VARIETY OF CONCERNS THAT YOU EXPRESSED

12:14PM  4    TO HER IN JANUARY OF 2012 ABOUT THAT MODEL; CORRECT?

12:14PM  5    A.   CORRECT.

12:14PM  6    Q.   AND FIRST AMONG THEM WAS THAT THE EXPERIENCE THAT PEOPLE

12:14PM  7    MIGHT HAVE BETWEEN LOCATIONS MIGHT BE VERY INCONSISTENT;

12:15PM  8    CORRECT?

12:15PM  9    A.   NO.  THAT, PLUS THE ORIGINAL PROMISE HAS GONE AWAY.

12:15PM  10   Q.   WELL, AND, IN FACT, YOU SAY IN NUMBER 2 THAT YOU WOULD NOT

12:15PM  11   BE ABLE TO HAVE A SCIENTIFIC STANDARD WHERE BLOOD WOULD BE

12:15PM  12   BEING ANALYZED AS FRESH BLOOD; CORRECT?

12:15PM  13   A.   CORRECT.

12:15PM  14   Q.   AND THAT WAS A CONCERN THAT YOU HAD.

12:15PM  15        AND YOU LAY OUT A VARIETY OF OTHER CONCERNS IN THIS

12:15PM  16   JANUARY 2012 AGREEMENT; CORRECT?

12:15PM  17   A.   CORRECT.

12:15PM  18   Q.   BUT MS. HOLMES TOLD YOU AT THIS POINT THAT THIS WAS THE

12:15PM  19   MODEL THAT THERANOS WAS GOING TO PURSUE WITH WALGREENS;

12:15PM  20   CORRECT?

12:15PM  21   A.   I DON'T RECALL IF SHE SAID WALGREENS, BUT SHE SAID WE'VE

12:15PM  22   DECIDED AT THERANOS THAT THIS IS THE BEST WAY FOR US TO START

12:15PM  23   THIS COMPANY.

12:15PM  24   Q.   DID YOU UNDERSTAND THAT THAT WAS MOTIVATED BY SAFEWAY --

12:15PM  25   BY WALGREENS' POSITION AS TO THE LEGAL REQUIREMENTS BEING

12:15PM 1    IMPOSED BY FDA?

12:15PM 2    A.   I DID NOT.

12:15PM 3    Q.   ALL RIGHT.  YOU MENTIONED THAT AT SOME LATER POINT THERE

12:16PM 4    WAS AN AGREEMENT, AND I DON'T MEAN THE AGREEMENT WAS AMENDED,

12:16PM 5    BUT THERE WAS AN INFORMAL AGREEMENT BETWEEN YOU AND MS. HOLMES

12:16PM 6    THAT THERE WOULD BE A TYPE OF PILOT RUN IN THE ON CAMPUS

12:16PM 7    FACILITY AT SAFEWAY; CORRECT?

12:16PM 8    A.   I'M NOT SURE WE USED THE WORD "PILOT," BUT THAT WE WOULD

12:16PM 9    PUT ONE OF THEIR ANALYZERS ON PROPERTY AND WE WOULD SUBMIT TO

12:16PM 10   DOING SOME VOLUME AND WE COULD TEST OUT VIRTUALLY EVERY ASPECT

12:16PM 11   OF THE OFFERING.

12:16PM 12   Q.   AND YOU TESTIFIED ON DIRECT EXAMINATION ABOUT A NUMBER OF

12:17PM 13   EMAILS THAT YOU EXCHANGED WITH MS. HOLMES ABOUT YOUR CRITICISMS

12:17PM 14   OF HOW THAT WAS RUNNING; CORRECT?

12:17PM 15   A.   CORRECT.

12:17PM 16   Q.   BUT YOU KNEW AT THE OUTSET OF THAT PROGRAM THAT THAT

12:17PM 17   PROGRAM WOULD RUN UNDER THIS MODEL WHERE BLOOD WOULD BE TAKEN

12:17PM 18   FROM A SAFEWAY LOCATION BACK TO THERANOS; CORRECT?  IS THAT

12:17PM 19   RIGHT OR NOT?

12:17PM 20   A.   NO.

12:17PM 21   Q.   YOU THOUGHT THE TESTING WOULD TAKE PLACE IN THE STORES?

12:17PM 22   A.   I CAN EXPLAIN.

12:17PM 23   Q.   LET ME ASK YOU, DID YOU KNOW THAT THE BLOOD WOULD BE TAKEN

12:17PM 24   FROM THE STORES TO A CENTRAL LAB AT THERANOS FOR ANALYSIS?  DID

12:17PM 25   YOU KNOW THAT?

BURD CROSS BY MR. DOWNEY                                    3123

12:17PM   1      A.   WHAT TIMEFRAME?

12:17PM   2      Q.   WHEN THE CAMPUS PROJECT WAS BEING DISCUSSED BETWEEN YOU

12:17PM   3      AND MS. HOLMES.

12:17PM   4      A.   WHEN THE CAMPUS PROJECT WAS BEING DISCUSSED, WE WERE GOING

12:17PM   5      TO GET A BOX.

12:17PM   6           NOW, THE BOX NEVER ARRIVED AND WE STARTED WITH A CONCEPT

12:17PM   7      SIMILAR TO WHAT YOU DESCRIBED, BUT THE BLOOD WOULD BE DRAWN AND

12:18PM   8      THEN IT WOULD GO TO THERANOS.

12:18PM   9      Q.   OKAY.  AND YOU KNEW THAT'S HOW THE STORE WAS OPERATING;

12:18PM  10      CORRECT?

12:18PM  11      A.   HOW WHAT STORE?

12:18PM  12      Q.   HOW THE STORE WAS OPERATING AND THE CAMPUS?

12:18PM  13      A.   THE CAMPUS.  I KNEW ALMOST EVERYTHING ABOUT HOW IT WAS

12:18PM  14      OPERATING.

12:18PM  15      Q.   WE LOOKED IN THE AGREEMENT ABOUT THE OBLIGATION THAT

12:18PM  16      SAFEWAY HAD TO ASSIST THERANOS WITH MARKETING.

12:18PM  17           DO YOU RECALL THAT?

12:18PM  18      A.   I'M SURE THERE'S SOME OFFERING TO HELP THEM.

12:18PM  19      Q.   AND THAT'S AN AREA OF ISSUE.

12:18PM  20           YOU JUST RECALL HAVING DISCUSSIONS ABOUT MARKETING WITH

12:19PM  21      MS. HOLMES; CORRECT?

12:19PM  22      A.   CORRECT.

12:19PM  23      Q.   AND THAT WAS A CONVERSATION THAT YOU HAD WITH HER OVER A

12:19PM  24      LONG PERIOD OF TIME; CORRECT?

12:19PM  25      A.   YES.

12:19PM  1    Q.   I'M GOING TO SHOW YOU AN EMAIL FROM JULY OF 2011, WHICH IS

12:19PM  2    EXHIBIT 7196, AND MY QUESTION WOULD SIMPLY BE AT THE OUTSET IF

12:19PM  3    THIS IS AN EMAIL BETWEEN YOU AND MS. HOLMES IN THAT TIME

12:19PM  4    PERIOD?

12:19PM  5    A.   YES.

12:19PM  6    Q.   AND IF YOU LOOK AT YOUR EMAIL, WE CAN --

12:19PM  7         MAY WE DISPLAY THAT, YOUR HONOR?

12:19PM  8              THE CLERK:  IT'S NOT BEEN ADMITTED, COUNSEL.

12:19PM  9              MR. DOWNEY:  I'M SORRY.  I MOVE FOR ITS ADMISSION.

12:19PM 10              MR. LEACH:  NO OBJECTION.

12:19PM 11              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:19PM 12         (DEFENDANT'S EXHIBIT 7196 WAS RECEIVED IN EVIDENCE.)

12:20PM 13    BY MR. DOWNEY:

12:20PM 14    Q.   I WANT TO FOCUS ON YOUR EMAIL AT THE BOTTOM, THE EMAIL

12:20PM 15    THAT YOU SENT AT 9:13 P.M.

12:20PM 16         YOUR ADDRESS IS AT THE BOTTOM, BUT I THINK THE EMAIL

12:20PM 17    ITSELF IS CONTAINED AT THE TOP OF THE NEXT PAGE.

12:20PM 18         DO YOU SEE THAT?

12:20PM 19    A.   THE DISCUSSION ABOUT PRE-LAUNCH?

12:20PM 20    Q.   RIGHT.

12:20PM 21         (PAUSE IN PROCEEDINGS.)

12:20PM 22    BY MR. DOWNEY:

12:20PM 23    Q.   AND YOU WERE PUSHING MS. HOLMES IN THIS EMAIL TO FOCUS ON

12:20PM 24    BRANDING AND MARKETING; CORRECT?

12:20PM 25    A.   CORRECT.

12:20PM  1    Q.   AND THE GIST OF THIS EMAIL WAS THAT YOU WERE SAYING THAT

12:20PM  2    THERE'S A LOT OF WORK TO GET DONE TO DO MARKETING AND YOU

12:21PM  3    HADN'T GOTTEN IT DONE; CORRECT?

12:21PM  4    A.   CORRECT.

12:21PM  5    Q.   OKAY.  LET'S LOOK AT HER EMAIL --

12:21PM  6    A.   LET ME RESTATE.  THERE'S A LOT OF MARKETING WORK TO BE

12:21PM  7    DONE.  WE WERE NOT SAYING IT WAS OUR RESPONSIBILITY AND WE DID

12:21PM  8    NOT GET IT DONE.

12:21PM  9         SO YOU USED THE TERM -- I THOUGHT YOU IMPLIED THAT SAFEWAY

12:21PM  10   FAILED IN ITS MISSION TO IMPROVE THE MARKETING.

12:21PM  11   Q.   NO, NO.  SAFEWAY WAS ONLY TO ASSIST THERANOS; CORRECT?

12:21PM  12   A.   CORRECT.

12:21PM  13   Q.   BUT YOU WERE SAYING TO MS. HOLMES THAT YOU, THERANOS, HAD

12:21PM  14   NOT GOTTEN DONE ALL OF THE WORK YOU NEEDED TO GET DONE TO

12:21PM  15   MARKET THE COMPANY; CORRECT?

12:21PM  16   A.   TO MARKET THE PRODUCT.

12:21PM  17   Q.   OKAY.  AND SHE RESPONDED TO THAT EMAIL IT LOOKS LIKE A

12:21PM  18   LITTLE BIT LATER, AND THAT'S IN THE MIDDLE OF THE PAGE, AND

12:21PM  19   THAT'S BLOWN UP ON THE SCREEN.

12:21PM  20        AND SHE SAYS YOU HAD SAID IN YOUR EMAIL THERE'S A LOT OF

12:21PM  21   MOUNTAINS TO MOVE.  SHE SAID, I APPRECIATE YOUR COMMENTS ON

12:22PM  22   MOVING MOUNTAINS.  AS YOU KNOW, WE ARE WORKING 24 HOURS A DAY,

12:22PM  23   7 DAYS A WEEK ON OUR END AS WELL TOWARD OUR COMMON GOALS.

12:22PM  24        AND HER SECOND PARAGRAPH SAID, "THE MOST IMPORTANT THING

12:22PM  25   FOR THERANOS TO SPEND TIME ON RIGHT NOW IS SCALING UP OUR

12:22PM  1      INFRASTRUCTURE TO ESTABLISH OUR FOOTPRINT AND GO LIVE

12:22PM  2      NATIONWIDE.  OUR PRIORITY AND OBLIGATION THROUGH LAUNCH IS THE

12:22PM  3      PRODUCT, OPERATIONS, SOFTWARE, PAYOR, PROVIDER IN PRACTICE

12:22PM  4      STRUCTURES, AND THE THOUSANDS OF ASSOCIATED DETAILS FUNDAMENTAL

12:22PM  5      TO BUILDING THIS COMPANY.  THAT'S NOT TO SAY THAT OUR MARKETING

12:22PM  6      PLAN IS ANY LESS IMPORTANT THAN ANY OF THESE, BUT WITH THE

12:22PM  7      LIMITED RESOURCES OF A GROWING COMPANY, WE CANNOT DO BOTH AT

12:22PM  8      THE SAME TIME UNTIL WE FREE UP RESOURCES TO GIVE THIS THE TIME

12:22PM  9      AND ATTENTION THAT IT IS DUE."

12:22PM  10          DO YOU SEE THAT --

12:22PM  11     A.   I DO.

12:22PM  12     Q.   -- IN HER EMAIL?

12:22PM  13          AND THEN SHE TALKED ABOUT GETTING TOGETHER TO TALK ABOUT

12:23PM  14     IT AND THE COSTS ASSOCIATED WITH IT AND GIVES SOME MORE DETAILS

12:23PM  15     AS TO WHEN YOU MIGHT HAVE A MEETING.

12:23PM  16          DO YOU SEE THAT?

12:23PM  17     A.   YES.

12:23PM  18     Q.   OKAY.  AND YOU RESPONDED TO THIS EMAIL.

12:23PM  19          YOU SAID "I COMPLETELY UNDERSTAND THE PRIORITIES."

12:23PM  20          AND THEN YOU WENT ON IN SEVERAL SENTENCES AND SAID YOU

12:23PM  21     COULD HELP WITH MARKETING IN ESSENCE?

12:23PM  22     A.   CORRECT.

12:23PM  23     Q.   ALL RIGHT.  YOU CAN TAKE THAT DOWN.

12:23PM  24          NOW, AS WE TALKED ABOUT IN CONNECTION WITH THE AGREEMENT,

12:23PM  25     THE AGREEMENT ITSELF CONTEMPLATED THAT THERE WOULD BE A

BURD CROSS BY MR. DOWNEY

12:23PM   1   PRE-PILOT, A PILOT, AND THEN A LAUNCH; CORRECT?

12:24PM   2   A.   CORRECT.

12:24PM   3   Q.   BUT AT SOME POINT DURING THE PERIOD AFTER THE AGREEMENT

12:24PM   4   WAS SIGNED, YOU CAME UP WITH AN IDEA TO ALTER HOW THE LAUNCH

12:24PM   5   WOULD BE DONE, DIDN'T YOU?

12:24PM   6   A.   WE HAD DISCUSSIONS, BUT YOU HAVE TO GIVE ME MORE THAN

12:24PM   7   THAT.

12:24PM   8   Q.   WELL, DO YOU RECALL DEVELOPING A STRATEGY THAT YOU

12:24PM   9   REFERRED TO AS SHOCK AND AWE?

12:24PM   10   A.   THAT WAS ACTUALLY -- WE STILL WANTED THE PILOT, AND THAT

12:24PM   11   DIDN'T SAY YOU WOULDN'T DO A PILOT.  REMEMBER WE TALKED ABOUT

12:24PM   12   DOING A PILOT IN A REMOTE AREA.

12:24PM   13       VERY EARLY ON WE TALKED ABOUT KIND OF A SHOCK AND AWE.

12:24PM   14   THAT'S WHY WE PREPARED OVER 900 FACILITIES TO HAVE THIS SPACE

12:24PM   15   AVAILABLE FOR THERANOS.

12:24PM   16   Q.   AND YOU UNDERSTOOD THAT TO CHANGE THE TERMS OF THE

12:24PM   17   AGREEMENT TO HAVE THOUSANDS OF STORES -- HOW MANY STORES WOULD

12:24PM   18   LAUNCH IN A SHOCK AND AWE STRATEGY?

12:24PM   19   A.    IT COULD BE AS FEW AS A SINGLE DIVISION OR IT COULD BE 22

12:25PM   20   STATES.

12:25PM   21   Q.   AND HOW MANY WOULD BE IN 22 STATES?

12:25PM   22   A.   A LITTLE OVER 900.

12:25PM   23   Q.   AND THAT WAS NEVER DONE, WAS IT?

12:25PM   24   A.   NEVER.

12:25PM   25   Q.   AND THE AGREEMENT WAS NEVER AMENDED TO ENCOMPASS THAT?

12:25PM  1    A.   WELL, I DON'T THINK THE AGREEMENT NECESSARILY CALLED FOR

12:25PM  2    SHOCK AND AWE.

12:25PM  3    Q.   OKAY.  LET'S TALK A LITTLE BIT ABOUT THE TESTIMONY YOU

12:25PM  4    GAVE ON DIRECT, ABOUT THE EXPERIENCE THAT PATIENTS WERE HAVING

12:25PM  5    ON CAMPUS ON SAFEWAY WHEN THEY GOT THEIR BLOOD DRAWN.

12:25PM  6         AND I WANT TO DIRECT YOUR ATTENTION TO EXHIBIT 12283.

12:26PM  7    A.   ALL RIGHT.

12:26PM  8    Q.   IS THIS AN EMAIL EXCHANGE THAT YOU HAD WITH MS. HOLMES IN

12:26PM  9    SEPTEMBER OF 2012?

12:26PM  10   A.   IT APPEARS TO BE.

12:26PM  11   Q.   AND IS THIS A DISCUSSION OF PERFORMANCE AT THE LAB ON

12:26PM  12   CAMPUS AT SAFEWAY?

12:26PM  13   A.   YES.

12:26PM  14        MR. DOWNEY:  YOUR HONOR, I WOULD MOVE THE ADMISSION

12:26PM  15   OF 12283.

12:26PM  16        MR. LEACH:  NO OBJECTION, YOUR HONOR.  I THINK THIS

12:26PM  17   IS ALSO IN EVIDENCE AS EXHIBIT 670.

12:26PM  18        MR. DOWNEY:  THERE IS AT LEAST PART OF IT AS 670,

12:26PM  19   AND MAYBE ALL OF THIS.

12:27PM  20        THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

12:27PM  21        (DEFENDANT'S EXHIBIT 12283 WAS RECEIVED IN EVIDENCE.)

12:27PM  22   BY MR. DOWNEY:

12:27PM  23   Q.   I WANT TO FOCUS ON MS. HOLMES'S RESPONSE TO -- WELL, DO

12:27PM  24   YOU RECALL AT THE BOTTOM OF THIS, IN THE EMAIL THAT YOU SENT TO

12:27PM  25   MS. HOLMES, YOU RAISED A NUMBER OF CONCERNS ABOUT PERFORMANCE;

12:27PM  1    CORRECT?

12:27PM  2    A.   YES.

12:27PM  3    Q.   IN HER RESPONSE SHE SAYS, "AS YOU KNOW, WE WERE NOT EAGER

12:27PM  4    TO START THE MANDATE FOR ALL EMPLOYEES FOR THIS REASON."

12:27PM  5         DO YOU SEE THAT IN THE FIRST PARAGRAPH?

12:27PM  6    A.   I SEE THAT.

12:27PM  7    Q.   AND SHE GOES ON TO SAY, "AS YOU KNOW, WE DO NOT HAVE ALL

12:27PM  8    TESTS RUN IN OUR LAB ONSITE," REFERRING TO THE THERANOS LAB;

12:27PM  9    CORRECT?

12:28PM 10    A.   NOT NECESSARILY.  IT COULD BE THE ESOTERIC AND THE SELDOM

12:28PM 11    USED, WHICH THEY WOULD USE SOMETHING ELSE.

12:28PM 12    Q.   THOSE TESTS MIGHT GO OUT TO UCSF OR UTAH?

12:28PM 13    A.   RIGHT.

12:28PM 14    Q.   AND THEN SHE GOES ON TO DESCRIBE THE DIFFICULTIES THAT

12:28PM 15    THEY ARE HAVING, AND SHE SAYS THEY GET A LOT OF PHONE CALLS

12:28PM 16    THAT IN ESSENCE ARE ASKING WHEN WILL WE -- WHEN CAN MY PATIENT

12:28PM 17    HAVE HER RESULTS OR HIS RESULTS?

12:28PM 18    A.   YES.

12:28PM 19    Q.   AND SHE COMPLAINS THAT PERSONNEL ARE COMMUNICATING TO

12:28PM 20    PATIENTS THAT THE TESTS WILL BE AVAILABLE ON A TIMEFRAME THAT

12:28PM 21    THERANOS CAN'T MAKE THEM AVAILABLE.

12:28PM 22         DO YOU SEE THAT?

12:28PM 23    A.   I SEE THAT.

12:28PM 24    Q.   AND SHE GOES ON TO SAY, "THIS PROCESS DOES NOT TRANSLATE

12:29PM 25    TO THE THERANOS TESTING PROCESS AS YOU KNOW."

BURD CROSS BY MR. DOWNEY                                                    3130

12:29PM   1              DO YOU SEE THAT?

12:29PM   2    A.   I SEE THAT.

12:29PM   3    Q.   AND DID YOU SEE THAT THAT -- DO YOU UNDERSTAND THAT AT THE

12:29PM   4    TIME TO MEAN THAT THIS IS NOT THE PROCESS WHERE THERANOS WOULD

12:29PM   5    HAVE A DEVICE ON SITE IN A STORE OR ANOTHER LOCATION AND RUN

12:29PM   6    THE TESTS THERE?

12:29PM   7    A.   THAT'S TRUE.  BUT THAT'S NOT HOW THIS ON CAMPUS FACILITY

12:29PM   8    STARTED.  IT STARTED THAT WE WERE GOING TO GET A BOX, AND THEN

12:29PM   9    THAT, FOR SECRECY REASONS, NO, NOW WE'RE GOING TO DO IT AT THE

12:29PM  10    COMPANY.

12:29PM  11              MR. DOWNEY:  WELL, I MOVE TO STRIKE THAT,

12:29PM  12    YOUR HONOR.  I JUST MOVE TO STRIKE EVERYTHING AFTER "THAT'S

12:29PM  13    TRUE."

12:29PM  14              THE COURT:  I'LL LEAVE THAT IN.  YOU CAN ASK ANOTHER

12:29PM  15    QUESTION.

12:29PM  16    BY MR. DOWNEY:

12:29PM  17    Q.   WELL, MY QUESTION IS THAT THE SENTENCE IN THE EMAIL WHERE

12:29PM  18    SHE SAYS A PROCESS THAT WAS CURRENTLY HAPPENING WAS NOT THE

12:29PM  19    THERANOS PROCESS WHERE A DEVICE WOULD BE PLACED ON SITE;

12:29PM  20    CORRECT?

12:29PM  21    A.   I AGREE WITH THAT.

12:29PM  22    Q.   AND SHE SAID WE'RE DOING THIS PROCESS TO SERVE SAFEWAY

12:30PM  23    PATIENTS, BUT IT DOES NOT MAKE SENSE FOR US, MEANING THERANOS,

12:30PM  24    TO INVEST IN A FULL SERVICE DINOSAUR LAB.

12:30PM  25              DO YOU SEE THAT?

BURD CROSS BY MR. DOWNEY

12:30PM 1    A.   I SEE IT.  THAT WASN'T OUR PURPOSE.

12:30PM 2    Q.   AND DID YOU UNDERSTAND HER TO BE REFERRING TO THE FACT

12:30PM 3    THAT SOME RESULTS ARE DELAYED BECAUSE THEY ACTUALLY HAVE TO

12:30PM 4    SEND THEM OUT TO ANOTHER LAB?

12:30PM 5    A.   I DID.

12:30PM 6    Q.   AND THEN SHE GOES ON TO INDICATE THAT SHE WILL SEND YOU

12:30PM 7    OTHER INFORMATION THAT YOU HAD REQUESTED.

12:30PM 8         BUT YOU CONTINUED TO, I THINK, HAVE SOME CONCERNS, AND WE

12:30PM 9    SAW THAT ON DIRECT, YOU CONTINUED TO RAISE ISSUES WITH THE ON

12:30PM 10   CAMPUS FACILITY; CORRECT?

12:30PM 11   A.   WELL, I FINALLY -- I THINK WE HAD A PHONE CALL AND I SAID

12:31PM 12   THAT EITHER WE FIX IT OR LET'S GET RID OF IT, AND WE DECIDED ON

12:31PM 13   THAT CALL TO GET RID OF IT.

12:31PM 14   Q.   BUT IN -- I WANT TO SHOW YOU AN EMAIL, I BELIEVE 715.

12:31PM 15        I BELIEVE THIS IS IN EVIDENCE.

12:31PM 16             MR. LEACH:  WHICH ONE?

12:31PM 17             MR. DOWNEY:  715.

12:31PM 18             THE COURT:  DO YOU SHOW IT IN EVIDENCE?

12:31PM 19             THE WITNESS:  IS IT IN THE BLACK BINDER?

12:31PM 20   BY MR. DOWNEY:

12:31PM 21   Q.   IT SHOULD BE IN THE WHITE BOOK.  I'M SORRY.

12:32PM 22   A.   ALL RIGHT.  I HAVE IT.

12:32PM 23   Q.   AND YOU SEE AT THE BOTTOM OF THAT EMAIL YOU TALK ABOUT

12:32PM 24   SOME OF THE CONCERNS ABOUT PATIENT EXPERIENCE; CORRECT?

12:32PM 25   A.   CORRECT.

12:32PM  1    Q.   AND THEN SHE RESPONDS SAYING THAT THERANOS'S FOCUS ON

12:32PM  2    PATIENT EXPERIENCE HAS BEEN IN THE CONTEXT OF OUR ACTUAL

12:32PM  3    PRODUCT; CORRECT?

12:32PM  4    A.   CAN YOU REPEAT THAT?

12:32PM  5    Q.   YEAH.  SHE RESPONDS TO YOUR COMPLAINTS ABOUT PATIENT

12:32PM  6    EXPERIENCE BY SAYING, "AS DISCUSSED, OUR FOCUS ON PATIENT

12:32PM  7    EXPERIENCE HAS BEEN IN THE CONTEXT OF OUR ACTUAL PRODUCT."

12:33PM  8         DO YOU SEE THAT IN THE FIRST SENTENCE OF HER RESPONSE?

12:33PM  9    A.   I DO.

12:33PM  10   Q.   AND SHE GOES ON TO SAY, "WHAT WE HAVE RUNNING AT THE

12:33PM  11   HEALTH CENTER IS NOT THAT."

12:33PM  12        AND THEN SHE GOES ON TO TALK ABOUT AN INDIVIDUAL FROM

12:33PM  13   THERANOS WHO WAS PART OF A CALL AND HE WAS REALLY NOT AN EXPERT

12:33PM  14   IN PATIENT EXPERIENCE.

12:33PM  15        DO YOU SEE THAT?

12:33PM  16   A.   I DO.

12:33PM  17   Q.   AND THEN YOU GO ON TO SAY YOU WANT TO COME TO AN AGREEMENT

12:33PM  18   AS TO HOW THE ON CAMPUS FACILITY SHOULD BE RUN; RIGHT?

12:33PM  19   A.   RIGHT.

12:33PM  20   Q.   AND WAS IT AS A RESULT OF THIS EXCHANGE THAT YOU AGREED TO

12:33PM  21   SHUT DOWN THE ON CAMPUS FACILITY?

12:33PM  22   A.   I DON'T KNOW IF IT WAS THIS EXCHANGE, BUT THERE WAS AN

12:33PM  23   EXCHANGE WHERE WE HAD THIS CONVERSATION, AND I SAID IF WE CAN'T

12:33PM  24   GET IT RIGHT, LET'S SHUT IT DOWN, AND SHE AGREED.

12:33PM  25   Q.   NOW, I THINK YOU TESTIFIED ON DIRECT THAT YOU LEFT SAFEWAY

12:34PM  1      IN MAY OF 2013; IS THAT RIGHT?

12:34PM  2      A.   CORRECT.

12:34PM  3      Q.   AND YOU ANNOUNCED THAT YOU WOULD BE LEAVING IN EARLY

12:34PM  4      JANUARY OF 2013; CORRECT?

12:34PM  5      A.   I CAN'T SAY IT WAS EARLY JANUARY.  I ACTUALLY THOUGHT IT

12:34PM  6      WAS SOMETIME IN LATE DECEMBER.

12:34PM  7      Q.   DECEMBER OF 2012?

12:34PM  8      A.   CORRECT.

12:34PM  9      Q.   BUT AT SOME POINT FIVE OR SO MONTHS BEFORE THE ANNUAL

12:34PM  10     MEETING?

12:34PM  11     A.   CORRECT.

12:34PM  12     Q.   AND YOU HAD BEEN THE PERSON AT SAFEWAY WHO HAD REALLY

12:34PM  13     CHAMPIONED THE THERANOS PROJECT; CORRECT?

12:34PM  14     A.   I WAS THE -- I WAS THE WHAT YOU WOULD CALL THE SPONSOR

12:35PM  15     CHAMPION, SURE.

12:35PM  16     Q.   AND TELL US WHAT THAT MEANS.

12:35PM  17     A.   WELL, IT MEANS THAT I HOLD MYSELF PERSONALLY RESPONSIBLE

12:35PM  18     FOR GETTING THIS DEAL DONE AND EXECUTED.

12:35PM  19     Q.   NOW, IN 2012, IS IT FAIR TO SAY THAT THE STOCK PERFORMANCE

12:35PM  20     OF SAFEWAY WAS, WAS LESS SUCCESSFUL THAN IT HAD BEEN IN PRIOR

12:35PM  21     YEARS?

12:35PM  22     A.   I'D HAVE TO LOOK AT THE -- AND IT'S HARD TO DO TODAY

12:35PM  23     BECAUSE WE'RE NO LONGER A PUBLIC COMPANY, SO I CAN'T CONFIRM

12:35PM  24     THAT.

12:35PM  25     Q.   WELL, DO YOU RECALL THAT THERE WAS A SIGNIFICANT DROP IN

12:35PM   1    THE SAFEWAY STOCK PRICE IN 2012?

12:35PM   2    A.   IN 20 YEARS, THAT HAPPENED FREQUENTLY.

12:35PM   3    Q.   WELL, LET ME SHOW YOU AN EXHIBIT WHERE WE CAN JUST FOCUS

12:36PM   4    ON 2012.  IT'S EXHIBIT 10568.

12:36PM   5    A.   WHITE BOOK?

12:36PM   6    Q.   BLACK BOOK.

12:36PM   7    A.   BLACK BOOK.

12:36PM   8         OKAY.

12:36PM   9    Q.   AND I'LL ALSO GIVE YOU AND ASK YOU TO LOOK AT

12:36PM   10   EXHIBIT 10569 JUST SO YOU CAN HAVE THOSE AVAILABLE FOR -- TO

12:36PM   11   REVIEW BECAUSE THEY'RE RELATED AS I THINK YOU'LL SEE.

12:36PM   12   A.   SO THE FIRST ONE IS JUST TAKING A DAILY READ ON THE STOCK

12:37PM   13   PRICE.

12:37PM   14   Q.   WELL, LET ME HAVE A CONVERSATION WITH THE JUDGE BEFORE YOU

12:37PM   15   DESCRIBE IT.

12:37PM   16        THE WITNESS:  OKAY.

12:37PM   17        MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

12:37PM   18   10568 AND -69.

12:37PM   19        MR. LEACH:  THERE'S NOT YET A FOUNDATION LAID FOR IT

12:37PM   20   YET, YOUR HONOR.  THERE MIGHT BE.

12:37PM   21        MR. DOWNEY:  WELL, I THINK --

12:37PM   22        THE COURT:  DO YOU WANT TO LAY A FOUNDATION FOR

12:37PM   23   THIS?

12:37PM   24   BY MR. DOWNEY:

12:37PM   25   Q.   DO YOU RECALL THIS AS BLOOMBERG CHARTS TRACKING THE DAILY

12:37PM  1    PERFORMANCE OF SAFEWAY STOCK IN 2000 -- THE PERIOD BETWEEN 2010

12:37PM  2    AND 2013?

12:37PM  3    A.   IT SAYS IT'S BLOOMBERG.  IT'S NOT THE WAY THAT WE TRACK

12:37PM  4    THE STOCK.

12:37PM  5    Q.   BUT YOU RECOGNIZE THAT THAT'S WHAT THIS IS?

12:37PM  6    A.   I RECOGNIZE IT AS A DAILY KIND OF THE OPEN HIGH, LOW, AND

12:37PM  7    CLOSE.

12:37PM  8              MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

12:37PM  9    10568 AND -69.

12:37PM  10             THE COURT:  WELL, DID YOU COMMENT?  I DON'T THINK

12:37PM  11   THIS WITNESS HAS COMMENTED ON -69 YET.

12:37PM  12             THE WITNESS:  I HAVE NOT.

12:37PM  13   BY MR. DOWNEY:

12:37PM  14   Q.   WELL, DO YOU RECOGNIZE 10569?

12:38PM  15   A.   WELL, WHAT IT IS PRESUMABLY DESCRIBING -- I'M NOT

12:38PM  16   DISPUTING THAT THESE ARE THE NUMBERS.  IT'S JUST THAT I HAVE

12:38PM  17   NOT SEEN THIS EXHIBIT.

12:38PM  18        BUT AS I SAID EARLIER, YOU HAD YOUR UPS AND DOWNS OVER THE

12:38PM  19   COURSE OF, YOU KNOW, 20 YEARS.

12:38PM  20   Q.   FOR NOW I'M JUST FOCUSSED ON THE DOCUMENT.

12:38PM  21        DO YOU SEE AT THE BOTTOM OF 10568 THERE'S AN INTERNET

12:38PM  22   ADDRESS?

12:38PM  23   A.   HANG ON A SECOND.

12:38PM  24        ON THE BOTTOM OF THE VERY FIRST PAGE?

12:38PM  25   Q.   AT THE BOTTOM OF THE VERY FIRST PAGE, YES.

12:38PM  1      A.   SURE, SURE.

12:38PM  2      Q.   AND DO YOU SEE THE SAME ON THE BOTTOM OF 10569?

12:38PM  3      A.   I DO.

12:38PM  4           MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

12:38PM  5      10568 AND 10569.

12:39PM  6           THE COURT:  SIR, DO YOU HAVE ANY DOUBT ABOUT THE

12:39PM  7      RELIABILITY OF EITHER OF THESE DOCUMENTS?

12:39PM  8           THE WITNESS:  I DON'T HAVE ANY DOUBT.  IT'S JUST

12:39PM  9      THAT IT'S NOT THE WAY THAT WE RECOVERED THE INFORMATION.  IT

12:39PM  10     WAS ALWAYS AN ONLINE SOURCE, YOU KNOW, NOT OFTEN PRINTED.  BUT

12:39PM  11     IF IT COMES FROM BLOOMBERG, IT SHOULD BE ACCURATE.

12:39PM  12          THE COURT:  I'LL ADMIT IT AND IT MAY BE PUBLISHED.

12:39PM  13          (DEFENDANT'S EXHIBITS 10569 AND 10569 WERE RECEIVED IN

12:39PM  14     EVIDENCE.)

12:39PM  15          THE COURT:  THANK YOU, SIR.

12:39PM  16          THE WITNESS:  SURE.

12:39PM  17     BY MR. DOWNEY:

12:39PM  18     Q.   LET ME FOCUS ON THE PERIOD THAT STARTS IN 2012 ON 10569.

12:39PM  19     A.   I'M SORRY.  CAN YOU GIVE ME THE PAGE NUMBER?

12:40PM  20     Q.   I'M SORRY.  I'M ON 10569, WHICH IS JUST THE GRAPH.

12:40PM  21     A.   OH, OKAY.

12:40PM  22     Q.   AND FOR NOW I'M JUST LOOKING AT THE PICTURE.

12:40PM  23          AND DO YOU SEE EARLY, IF YOU LOOK AT THE BOTTOM AXIS, YOU

12:40PM  24     CAN SEE THAT THAT REFLECTS TIMES AND VARIOUS DATES IN 2010 ALL

12:40PM  25     OF THE WAY THROUGH 2013?

BURD CROSS BY MR. DOWNEY

12:40PM  1      A.   YES.

12:40PM  2      Q.   AND IF YOU SEE ON THE GRAPH ON THE LEFT SIDE THAT IS

12:40PM  3      VERTICAL, THAT REFLECTS THE PRICE OF SAFEWAY STOCK.

12:40PM  4           DO YOU SEE THAT?

12:40PM  5      A.   I DO.

12:40PM  6      Q.   AND DO YOU SEE, IF YOU LOOK AT THE PRICE POINT FOR

12:40PM  7      JANUARY 1, 2012, YOU SEE IT APPEARS THAT THE STOCK APPEARS TO

12:40PM  8      HAVE BEEN RISING AROUND THAT DATE?  DO YOU SEE THAT?

12:40PM  9      A.   YES.

12:40PM  10     Q.   AND THEN IN A PERIOD A LITTLE BIT THEREAFTER, DO YOU SEE

12:41PM  11     THAT A VERY PRECIPITOUS DECLINE IN THE PRICE OF SAFEWAY STOCK

12:41PM  12     BEGINS?

12:41PM  13     A.   YES.

12:41PM  14     Q.   SO THAT BY MID-YEAR, THE STOCK PRICE IS CONSIDERABLY LOWER

12:41PM  15     THAN IT HAD BEEN AT THE BEGINNING OF THE YEAR; CORRECT?

12:41PM  16     A.   CORRECT.

12:41PM  17     Q.   AND IF YOU LOOK AT THE DAILY CHART, THE DAILY PRICING

12:41PM  18     TABLE THAT IS CONTAINED IN 10568, YOU WILL SEE THAT THE PRICE

12:41PM  19     OF SAFEWAY STOCK DROPPED FROM ABOUT $19 A SHARE TO ABOUT $14

12:41PM  20     PER SHARE.

12:41PM  21          DO YOU SEE THAT?  BETWEEN JANUARY 1ST AND JULY 1ST?

12:41PM  22     A.   OF 2012?

12:41PM  23     Q.   YES, SIR.

12:42PM  24     A.   I MEAN, IT CERTAINLY REFLECTS THAT ON THE GRAPH.  I'M

12:42PM  25     STILL NOT FINDING JANUARY ON THE TABLES.

12:42PM  1    Q.   LET ME SEE IF I CAN GIVE YOU A HAND.

12:42PM  2         IF YOU LOOK AT --

12:42PM  3    A.   IF YOU'RE LOOKING AT 1/1/12.

12:42PM  4    Q.   DO YOU HAVE IT ON PAGE 10 OF 10568?

12:42PM  5    A.   OKAY.  AND WHAT IS THE DATE THAT YOU'RE LOOKING FOR?

12:42PM  6    Q.   AND YOU COMPARE THAT TO -- LOOK AT JANUARY 3RD, 2012.

12:42PM  7    A.   JANUARY 3RD.  YES.

12:42PM  8    Q.   DO YOU SEE THE CLOSE ON THAT DAY IS ABOUT 19.2?

12:43PM  9    A.   CORRECT.

12:43PM  10   Q.   AND THEN IF YOU FORWARD FROM THERE TO JULY 1ST, YOU WILL

12:43PM  11   SEE THAT IT WASN'T TRADED ON JULY 1ST, BUT AS OF JULY 2ND, IT'S

12:43PM  12   ABOUT 16.2, 16.3.

12:43PM  13   A.   YES.

12:43PM  14   Q.   AND THEN BY JULY 17TH, IT HAD DROPPED DOWN TO ABOUT 14 AND

12:43PM  15   A QUARTER?  CLOSER TO 14 AND A HALF AT THE CLOSE?

12:43PM  16   A.   ARE YOU SAYING JULY 13TH?

12:43PM  17   Q.   JULY 17TH?

12:43PM  18   A.   17TH.  YES.  14.6.

12:43PM  19   Q.   AND THEN IT BEGAN TO DROP AGAIN.

12:43PM  20        AND DO YOU SEE BY AUGUST 6TH THE STOCK HAD DROPPED ALL OF

12:44PM  21   THE WAY TO WHERE IT CLOSED AROUND 14.1, WHICH WAS JUST SLIGHTLY

12:44PM  22   UP FROM 13.8, AND THEN IT STABILIZED AROUND THAT POINT.

12:44PM  23        DO YOU SEE IT?

12:44PM  24   A.   IT STABILIZED FOR AWHILE.

12:44PM  25   Q.   SO BETWEEN 14 AND, OVER THE NEXT PERIOD, SOMEWHERE BETWEEN

12:44PM   1    14 AND 14 AND A HALF THROUGH OCTOBER.

12:44PM   2         DO YOU SEE THAT?

12:44PM   3    A.   I SEE THAT.

12:44PM   4    Q.   AND DID YOU BELIEVE THAT THE RELATIONSHIP BETWEEN THERANOS

12:44PM   5    AND SAFEWAY HAD ANY RELATIONSHIP TO THE DROP IN THE VALUE OF

12:44PM   6    SAFEWAY STOCK?

12:44PM   7    A.   I CAN'T IMAGINE THAT I DID BECAUSE I DON'T THINK I EVER

12:45PM   8    THOUGHT THAT.

12:45PM   9    Q.   CAN I ASK YOU TO LOOK IN THE BLACK NOTEBOOK AT

12:45PM   10   EXHIBIT 13947.

12:45PM   11        YOUR HONOR, THIS IS RATHER A RECORD OF A COMMUNICATION

12:45PM   12   THAT WOULD CONTAIN A MOBILE PHONE NUMBER WHICH WE HAVE REDACTED

12:45PM   13   FOR PURPOSES OF DISPLAYING PUBLICLY OR ADMITTING AS AN EXHIBIT.

12:45PM   14   A.   DID YOU SAY 13, 13 --

12:45PM   15   Q.   -947?

12:45PM   16   A.   -- 947.

12:45PM   17             THE COURT:  13947?

12:46PM   18             MR. DOWNEY:  YES, SIR.

12:46PM   19             THE WITNESS:  I DON'T HAVE 13947.  MY LAST ONE IN

12:46PM   20   THE BINDER IS 12293 IN THE BLACK.

12:46PM   21   BY MR. DOWNEY:

12:46PM   22   Q.   ALL RIGHT.  BEAR WITH ME FOR A MOMENT.

12:46PM   23        THAT'S BECAUSE I HAVE ALL OF THE COPIES.

12:46PM   24   A.   THAT EXPLAINS IT.

12:46PM   25             MR. DOWNEY:  YOUR HONOR, IS THAT ALSO MISSING FROM

12:46PM 1    YOUR NOTEBOOK?

12:46PM 2                    THE COURT:  IT IS.

12:47PM 3                    MR. DOWNEY:  (HANDING.)

12:47PM 4         MAY I APPROACH THE WITNESS, YOUR HONOR?

12:47PM 5                    THE COURT:  YOU MAY.

12:47PM 6                    MR. DOWNEY:  (HANDING.)

12:47PM 7    Q.   MY QUESTION IS, JUST BEFORE ANYTHING ELSE, IS THIS A TEXT

12:47PM 8    MESSAGE THAT WAS EXCHANGED -- A SERIES OF TEXT MESSAGES THAT

12:47PM 9    WERE EXCHANGED BETWEEN YOU AND MS. HOLMES IN JULY OF 2012?

12:48PM 10   A.   I CAN'T SAY FOR CERTAIN BECAUSE I DON'T KNOW HOW THESE

12:48PM 11   MESSAGES WERE CAPTURED.

12:48PM 12   Q.   DO YOU KNOW IF YOU TEXTED MS. HOLMES IN 2000 -- JULY OF

12:48PM 13   2012 TO THE EFFECT THAT THE SHARE PRICE OF SAFEWAY WOULD

12:48PM 14   IMPROVE SIGNIFICANTLY IF WE LAUNCHED, CALL ME WHEN YOU CAN?

12:48PM 15                    MR. LEACH:  OBJECTION, YOUR HONOR.

12:48PM 16                    THE COURT:  SUSTAINED.  I'M NOT SURE THAT WAS A

12:48PM 17   QUESTION.

12:48PM 18        WHY DON'T YOU REPHRASE YOUR QUESTION?

12:48PM 19   BY MR. DOWNEY:

12:48PM 20   Q.   WELL, DID YOU COMMUNICATE WITH MS. HOLMES, BY TEXT OR

12:48PM 21   OTHERWISE, AND TELL HER THAT YOU THOUGHT THE STOCK PRICE OF

12:48PM 22   SAFEWAY WOULD IMPROVE IF YOU COULD ANNOUNCE A LAUNCH OF

12:48PM 23   THERANOS PRODUCT IN SAFEWAY STORES?

12:48PM 24   A.   I CAN'T SAY FOR CERTAIN.

12:48PM 25        I WOULD TELL YOU, SITTING HERE TODAY, THAT I THINK IT

12:49PM  1    WOULD HAVE MOVED THE STOCK PRICE UP HAD WE LAUNCHED.

12:49PM  2    Q.    BUT AS TO WHETHER IT HAPPENED OR NOT YOU JUST DON'T --

12:49PM  3    A.    DON'T KNOW.

12:49PM  4    Q.    -- RECALL?

12:49PM  5          LET ME ASK YOU ABOUT A FEW OF THE AREAS BRIEFLY THAT YOU

12:49PM  6    TOUCHED ON DURING THE COURSE OF YOUR DIRECT TESTIMONY.

12:49PM  7          YOU TALKED BRIEFLY ABOUT THE FACT THAT RENOVATIONS WERE

12:49PM  8    MADE IN SAFEWAY STORES TO ACCOMMODATE THERANOS BEING IN THE

12:49PM  9    STORES; CORRECT?

12:49PM 10    A.    CORRECT.

12:49PM 11    Q.    AND IF YOU WALK INTO A SAFEWAY TODAY, DO YOU KNOW WHAT IS

12:50PM 12    IN MANY OF THOSE LOCATIONS?

12:50PM 13    A.    YEAH.  I DON'T KNOW THE COUNT, BUT ONE OF THE STORES THAT

12:50PM 14    I GET PHARMACY PRESCRIPTIONS FROM HAS A QUEST LAB IN IT.

12:50PM 15    Q.    SO IN THE SPACES THAT WERE INTENDED FOR THERANOS, PERHAPS

12:50PM 16    WITH SOME MODIFICATION, THERE'S AN OPERATOR OF ONE OF ITS

12:50PM 17    COMPETITORS; CORRECT?

12:50PM 18    A.    CORRECT.

12:50PM 19    Q.    AND DO YOU KNOW HOW BLOOD IS DRAWN FROM THE PATIENTS AT

12:50PM 20    THOSE LOCATIONS?

12:50PM 21    A.    I DO.

12:50PM 22    Q.    AND HOW IS IT DRAWN?

12:50PM 23    A.    IT'S DRAWN THROUGH, TYPICALLY FOR ADULTS AT LEAST, A VEIN

12:50PM 24    IN THE ARM.

12:51PM 25              MR. DOWNEY:  YOUR HONOR, WILL YOU BEAR WITH ME FOR

12:51PM  1    ONE MOMENT?

12:51PM  2            THE COURT:  OF COURSE.

12:51PM  3        (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

12:51PM  4    BY MR. DOWNEY:

12:51PM  5    Q.   ONE LAST QUESTION, MR. BURD.  I WANT TO ASK YOU ABOUT THE

12:51PM  6    AGREEMENTS BETWEEN THERANOS AND OTHER PARTIES, NOT ITS

12:51PM  7    AGREEMENT WITH SAFEWAY.

12:51PM  8        WE'VE TALKED ABOUT THE AGREEMENT THAT THERANOS HAD REACHED

12:51PM  9    WITH WALGREENS AT SOME POINT; CORRECT?

12:51PM 10    A.   YES.

12:51PM 11    Q.   DO YOU RECALL THAT?

12:51PM 12        AND DO YOU ALSO RECALL HEARING AT SOME POINT FROM

12:52PM 13    MS. HOLMES ABOUT THE DEPARTMENT OF DEFENSE AND THERANOS HAVING

12:52PM 14    A RELATIONSHIP WITH THE DEPARTMENT OF DEFENSE AND YOU TESTIFIED

12:52PM 15    ABOUT MEDEVAC AND SO FORTH?

12:52PM 16    A.   YES.

12:52PM 17    Q.   DID MS. HOLMES TELL YOU AS PART OF ANY CONVERSATION THAT

12:52PM 18    THERANOS HAD ENTERED INTO A CONTRACT WITH THE DEPARTMENT OF

12:52PM 19    DEFENSE IN LATE 2012 TO TEST ITS DEVICES BY CENTRAL COMMAND IN

12:52PM 20    AFGHANISTAN?

12:52PM 21    A.   NO.

12:52PM 22    Q.   I WANT TO JUST SHOW YOU A DOCUMENT WHICH YOU MAY OR MAY

12:52PM 23    NOT HAVE SEEN BEFORE, SO MY QUESTION IS SIMPLY -- WILL SIMPLY

12:52PM 24    BE WHETHER YOU'VE EVER HAD OCCASION TO SEE THE DOCUMENT, AND

12:53PM 25    IT'S 10547 IN THE BLACK NOTEBOOK.

BURD CROSS BY MR. DOWNEY

12:53PM  1         IF YOU WOULD LOOK AT THE -- WELL, LET ME ASK YOU, DO YOU

12:53PM  2    RECALL EVER SEEING THIS DOCUMENT BEFORE?

12:53PM  3    A.   NO.

12:53PM  4    Q.   DID YOU KNOW DANIEL EDLIN AT THERANOS?

12:53PM  5    A.   NO.

12:53PM  6    Q.   OTHER THAN MS. HOLMES, DID YOU KNOW ANY OF THE OTHER

12:53PM  7    SENDERS OR RECIPIENTS OF THESE EMAILS, CHRISTIAN HOLMES,

12:53PM  8    DANIEL EDLIN?

12:53PM  9    A.   CHRISTIAN I MET.

12:53PM  10   Q.   AND YOU DON'T RECALL HER TELLING YOU IN DECEMBER OF 2012

12:54PM  11   THAT AN AGREEMENT HAD BEEN EXECUTED APPROVING A PROTOCOL FOR

12:54PM  12   THERANOS WITH THE DEPARTMENT OF DEFENSE?  THAT'S JUST A

12:54PM  13   QUESTION --

12:54PM  14   A.   YEAH.

12:54PM  15   Q.   THAT'S THE SPECIFIC QUESTION.

12:54PM  16   A.   I CAN TELL YOU WHAT I DO RECALL IF YOU WANT.

12:54PM  17   Q.   I'M JUST ASKING YOU ABOUT THE AGREEMENT BETWEEN THERANOS

12:54PM  18   AND THE DEPARTMENT OF DEFENSE.

12:54PM  19        YOU DON'T RECALL TALKING ABOUT ANY CONTRACT?

12:54PM  20   A.   NO.

12:54PM  21   Q.   OKAY.  AND YOU ALSO TESTIFIED THAT THE BUSINESS MADE SENSE

12:54PM  22   TO YOU BECAUSE THERE WERE, I THINK YOU SAID, ADMIRALS AND

12:54PM  23   GENERALS ON THE BOARD; CORRECT?

12:54PM  24   A.   CORRECT.

12:54PM  25   Q.   AND IS THAT A REFERENCE TO GENERAL MATTIS?

12:55PM  1    A.   THERE WERE -- THAT WAS JUST MY IMPRESSION.   IT HAD

12:55PM  2    CREDIBILITY, AND SHE SAID SHE HAD THESE BECAUSE OF THE

12:55PM  3    COMPOSITION OF HER BOARD.   THERE WERE NO NAMES MENTIONED.

12:55PM  4    Q.   I JUST WANT TO BE CERTAIN THAT I UNDERSTAND YOUR TESTIMONY

12:55PM  5    ON ONE LAST SUBJECT, WHICH IS EXHIBIT 370 WHICH YOU WERE SHOWN

12:55PM  6    AND WHICH WAS ADMITTED ON DIRECT.

12:56PM  7    A.   370?

12:56PM  8    Q.   YES, SIR.   THAT'S IN THE WHITE NOTEBOOK.

12:56PM  9    A.   I THOUGHT I HAD THE WHITE NOTEBOOK.

12:56PM  10        I HAVE IT.

12:56PM  11   Q.   OKAY.   AND I THINK YOU TESTIFIED THAT THE ITEM IN HERE

12:56PM  12   WHICH SAYS REVENUE FROM SAFEWAY NETWORK IS A PROJECTION ABOUT

12:56PM  13   REVENUE THAT SAFEWAY MIGHT RECEIVE FROM OTHER PARTNERS; IS THAT

12:56PM  14   RIGHT?

12:56PM  15   A.   I ACTUALLY SAID I WASN'T SURE IF ALL OTHER REVENUE --

12:56PM  16   REVENUE FROM SAFEWAY NETWORK, THAT WOULD CLEARLY BE THE NETWORK

12:56PM  17   THAT WE WERE GOING TO BUILD.

12:56PM  18        ALL OTHER REVENUE, WITHOUT SEEING SOME OTHER DOCUMENTS,

12:57PM  19   EITHER REFERS TO THE DIRECT WORK THAT WE DID AT OUR STORES WITH

12:57PM  20   THESE LABS, OR IT REFERS TO ALL REVENUE, ALL OTHER REVENUE THAT

12:57PM  21   THERANOS HAS.

12:57PM  22   Q.   BUT WITHOUT SEEING MORE DOCUMENTATION, YOU DON'T KNOW?

12:57PM  23   A.   CORRECT.

12:57PM  24   Q.   OKAY.

12:57PM  25        THAT'S ALL I HAVE OF THIS WITNESS ON CROSS-EXAMINATION.

| | | |
|---|---|---|
| 12:57PM | 1 | THE COURT: OKAY. |
| 12:57PM | 2 | REDIRECT? |
| 12:57PM | 3 | MR. LEACH: BRIEFLY, YOUR HONOR, YES. |
| 12:57PM | 4 | THE COURT: FOLKS, FEEL FREE TO STAND AND STRETCH |
| 12:57PM | 5 | FOR A MOMENT IF YOU WOULD LIKE. |
| 12:57PM | 6 | YOU MAY AS WELL, SIR, WHILE WE DO A TRANSITION. |
| 12:57PM | 7 | (STRETCHING.) |
| 12:58PM | 8 | THE COURT: MR. LEACH. |
| 12:58PM | 9 | MR. LEACH: THANK YOU, YOUR HONOR. |
| 12:58PM | 10 | **REDIRECT EXAMINATION** |
| 12:58PM | 11 | BY MR. LEACH: |
| 12:58PM | 12 | Q. MR. BURD, I'D LIKE TO DRAW YOUR ATTENTION TO EXHIBIT 332, |
| 12:58PM | 13 | WHICH IS IN THE WHITE BINDER. |
| 12:58PM | 14 | A. YES. |
| 12:58PM | 15 | Q. AND I BELIEVE IT'S IN EVIDENCE. |
| 12:58PM | 16 | MR. BURD, DO YOU HAVE THE PRINT COPY OF 332 IN FRONT OF |
| 12:59PM | 17 | YOU? |
| 12:59PM | 18 | A. I DO. |
| 12:59PM | 19 | Q. AND DO YOU SEE THE SECOND LINE OF THE -- OR THE FIRST LINE |
| 12:59PM | 20 | OF THE SECOND PARAGRAPH, THERANOS STARTED OUT OF STANFORD |
| 12:59PM | 21 | UNIVERSITY IN 2003. |
| 12:59PM | 22 | DO YOU SEE THAT LANGUAGE? |
| 12:59PM | 23 | A. I DO. |
| 12:59PM | 24 | Q. AND YOU WERE ASKED A NUMBER OF QUESTIONS ON |
| 12:59PM | 25 | CROSS-EXAMINATION BY MR. DOWNEY ABOUT WHETHER THERANOS WAS A |

12:59PM  1     STARTUP OR WHAT YOUR UNDERSTANDING WAS.

12:59PM  2          DO YOU RECALL THOSE QUESTIONS?

12:59PM  3     A.   I DO.

12:59PM  4     Q.   AND YOU UNDERSTOOD IN 2010 THAT THERANOS HAD BEEN IN

12:59PM  5     BUSINESS FOR ROUGHLY SEVEN YEARS?

12:59PM  6     A.   CORRECT.

12:59PM  7     Q.   AND YOU UNDERSTOOD IN 2013 THAT IT HAD BEEN IN BUSINESS

12:59PM  8     FOR ABOUT TEN YEARS BY THAT PERIOD OF TIME?

12:59PM  9     A.   YES.

12:59PM  10    Q.   AND YOU ALSO TESTIFIED THAT MS. HOLMES TOLD YOU THERANOS

12:59PM  11    WAS CASH FLOW NEUTRAL.

12:59PM  12         DO YOU RECALL THAT TESTIMONY?

12:59PM  13    A.   CORRECT.

12:59PM  14    Q.   AND WAS THAT RELEVANT TO YOU?

12:59PM  15    A.   YES.

12:59PM  16    Q.   HOW SO?

12:59PM  17    A.   IT MADE US FEEL BETTER ABOUT THE COMPANY, THAT THEY WERE

12:59PM  18    NOT JUST, YOU KNOW, LOOKING FORWARD NUMBERS, THEY ACTUALLY HAD

12:59PM  19    ACHIEVED A LEVEL OF PERFORMANCE WHICH MADE THEM CASH FLOW

01:00PM  20    NEUTRAL, MEANING REVENUE AND EXPENSES WERE MATCHING.

01:00PM  21    Q.   AND DO YOU DIFFERENTIATE A BUSINESS THAT IS SEVEN TO TEN

01:00PM  22    YEARS OLD FROM A STARTUP THAT IS OPENING UP OUT OF A GARAGE ON

01:00PM  23    DAY ONE?

01:00PM  24    A.   YES.

01:00PM  25    Q.   EXPLAIN THAT FOR US, PLEASE.

01:00PM   1    A.   WELL, I THINK -- I MEAN, THERE'S NO MAGIC LINE HERE WHEN

01:00PM   2    ONE SHIFTS FROM A STARTUP TO A SMALL COMPANY, BUT IF YOU HAVE

01:00PM   3    VERY FEW REVENUE DOLLARS, I THINK YOU WOULD CONSIDER A STARTUP.

01:00PM   4        IF YOU'RE HITTING SOME STRONG REVENUE DOLLARS RELATIVE TO

01:00PM   5    YOUR SIZE AND YOU'RE MAKING MONEY, I WOULD SAY, YOU KNOW, YOU

01:00PM   6    WERE ON YOUR WAY.

01:00PM   7        SO I WOULD ALWAYS ARGUE THAT WITH THE CEO OF BLACK HAWK

01:00PM   8    NETWORK THAT HE WAS NO LONGER A STARTUP, YOU KNOW, HE WAS

01:00PM   9    GENERATING A HUNDRED MILLION IN PROFITS.

01:00PM  10        SO THIS WAS A STARTUP FOR AT LEAST SEVEN YEARS.

01:01PM  11    Q.   LET ME DRAW YOUR ATTENTION -- THANK YOU FOR THAT.

01:01PM  12        LET ME DRAW YOUR ATTENTION TO ANOTHER DOCUMENT THAT YOU

01:01PM  13    WERE EXAMINED ABOUT, AND THAT IS EXHIBIT 7104.  IT SHOULD BE IN

01:01PM  14    YOUR BLACK BINDER.

01:01PM  15    A.   I HAVE IT.

01:01PM  16    Q.   MS. KRATZMANN, MAY I USE THE ELMO.

01:01PM  17        MR. BURD, DO YOU RECALL QUESTIONS ABOUT THIS EXHIBIT

01:01PM  18    DURING YOUR CROSS-EXAMINATION?

01:01PM  19    A.   I DO.

01:01PM  20    Q.   AND YOU'RE NOT ON THIS EMAIL, RIGHT?  THIS IS NOT

01:01PM  21    SOMETHING THAT YOU SAW AT THE TIME?

01:02PM  22    A.   THAT'S CORRECT.

01:02PM  23    Q.   OKAY.  I WANTED TO DRAW YOUR ATTENTION TO THE ENTIRETY OR

01:02PM  24    THE FIRST PART OF THE EMAIL CHAIN WHERE BRAD WOLFSEN IS WRITING

01:02PM  25    TO ELIZABETH HOLMES AND KEN SHACHMUT WITH A REQUEST TO SHARE

01:02PM   1      INFORMATION WITH OUTSIDE COUNSEL.

01:02PM   2          DO YOU SEE THAT?

01:02PM   3      A.   YES.

01:02PM   4      Q.   AND REMIND US, WHO IS KEN SHACHMUT?

01:02PM   5      A.   KEN SHACHMUT WAS THE CHIEF FINANCIAL OFFICER OF SAFEWAY

01:02PM   6      HEALTH.

01:02PM   7      Q.   AND BRAD WOLFSEN, WHO WAS HE?

01:02PM   8      A.   BRAD WORKED FOR SAFEWAY HEALTH.  I DON'T RECALL HIS EXACT

01:02PM   9      RESPONSIBILITIES.

01:02PM   10     Q.   OKAY.  AND MR. WOLFSEN IS WRITING, "ELIZABETH,

01:02PM   11         "I'VE RECEIVED A REQUEST FROM OUR LAWYERS TO SEND THE

01:02PM   12     'SELECTED ASSAYS FROM THE THERANOS ASSAY LIBRARY' TO OUR

01:03PM   13     OUTSIDE COUNSEL WHO IS ASSISTING WITH THE CLIA AND STATE

01:03PM   14     REGULATIONS RESEARCH."

01:03PM   15         DO YOU SEE THAT LANGUAGE?

01:03PM   16     A.   I DO.

01:03PM   17     Q.   AND DO YOU SEE MS. HOLMES'S RESPONSE, "BRAD, THIS IS FINE,

01:03PM   18     BUT THAT LIST IS NOT AN ACCURATE REFLECTION OF THE TESTS WE

01:03PM   19     WILL ACTUALLY MAKE AVAILABLE IN THE STORES - THAT LIST IS THE

01:03PM   20     LIBRARY WE PROVIDE FOR OUR PHARMACEUTICAL CLIENTS CLINICAL

01:03PM   21     TRIALS."

01:03PM   22         DO YOU SEE THAT?

01:03PM   23     A.   YES.

01:03PM   24     Q.   AND SITTING HERE TODAY, DO YOU UNDERSTAND THAT TO MEAN THE

01:03PM   25     PHARMACEUTICAL LIST IS ACTUALLY NARROWER THAN WHAT IS GOING TO

01:03PM   1    BE OFFERED ON THE THERANOS DEVICE?

01:03PM   2    A.   YES, I BELIEVE IT'S NARROWER.

01:03PM   3    Q.   OKAY.  IF WE CAN GO NOW PLEASE TO EXHIBIT 375, PAGE 12.

01:03PM   4    A.   IN THE WHITE BINDER?

01:03PM   5    Q.   IN THE WHITE BINDER.

01:04PM   6         DO YOU RECALL THIS PORTION OF THE AUGUST 2012 BOARD

01:04PM   7    PRESENTATION -- LET ME ASK A BETTER QUESTION.

01:04PM   8         DO YOU RECALL THIS AS A PORTION OF THE POWERPOINT THAT WAS

01:04PM   9    PREPARED IN CONNECTION WITH THE AUGUST 2012 SAFEWAY BOARD

01:04PM  10    MEETING?

01:04PM  11    A.   YES.

01:04PM  12    Q.   OKAY.  AND THAT'S A BOARD MEETING THAT MS. HOLMES

01:04PM  13    ATTENDED, AT LEAST IN PART?

01:04PM  14    A.   YES, SHE DID IN PART.

01:04PM  15    Q.   AND I DRAW YOUR ATTENTION TO THE PORTION "ONE CARTRIDGE

01:04PM  16    WILL SATISFY 95 PERCENT OF ALL CPT CODES."

01:04PM  17         DO YOU SEE THAT?

01:04PM  18    A.   WHAT PAGE?

01:04PM  19    Q.   PAGE 11.  OR PAGE 12, EXCUSE ME.

01:04PM  20    A.   SORRY FOR BEING SO CASUAL.

01:04PM  21         OKAY.  YES.

01:04PM  22    Q.   AND IS THAT INFORMATION THAT YOU GOT FROM MS. HOLMES?

01:04PM  23    A.   YES, IT IS.

01:04PM  24    Q.   AND WAS THAT YOUR UNDERSTANDING OF WHAT THE THERANOS

01:05PM  25    DEVICE AND CARTRIDGE COULD DO AT THIS TIME PERIOD IN AUGUST OF

01:05PM   1       2012?

01:05PM   2       A.   YES.

01:05PM   3       Q.   YOU ALSO TESTIFIED ABOUT RECEIVING A CALL FROM MS. HOLMES

01:05PM   4       ABOUT CLIA CERTIFICATION OR CLIA APPROVAL.

01:05PM   5            DO YOU RECALL THAT?

01:05PM   6       A.   I DO.

01:05PM   7       Q.   AND THAT WAS GOOD NEWS TO YOU, WASN'T IT?

01:05PM   8       A.   IT WAS GREAT NEWS.

01:05PM   9       Q.   AND WHY WAS IT GREAT NEWS?

01:05PM   10      A.   I THOUGHT AT THE TIME IT MEANT THAT THE REGULATORY BODY

01:05PM   11      HERE WAS ACTUALLY BUYING INTO ALL OF THE ASSAYS.  I LEARNED

01:05PM   12      LATER THAT'S NOT THE CASE, BUT THAT'S WHAT I THOUGHT.

01:05PM   13      Q.   SO AT THE TIME YOU THOUGHT IT REFLECTED APPROVAL OF THE

01:05PM   14      DEVICE IN SOME FORM?

01:05PM   15      A.   CORRECT.

01:05PM   16      Q.   APPROVAL OF THE ASSAYS THAT WERE GOING TO BE RUN ON THE

01:05PM   17      DEVICE?

01:05PM   18      A.   CORRECT.

01:05PM   19      Q.   AND YOU HAVE A DIFFERENT UNDERSTANDING SITTING HERE TODAY?

01:05PM   20      A.   I DO JUST BECAUSE OF WHAT I HAVE LEARNED.

01:06PM   21      Q.   BUT AT THE TIME YOU VIEWED THAT AS GOOD NEWS?

01:06PM   22      A.   YES.

01:06PM   23      Q.   AND CMS VALIDATION OF THE DEVICE?

01:06PM   24      A.   IT WAS AN IMPORTANT MILESTONE.  BUT I, OF COURSE, THOUGHT

01:06PM   25      IT MEANT ALL OF THE CPT CODES.

01:06PM  1    Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO THE MASTER SERVICES

01:06PM  2    AGREEMENT, EXHIBIT 387.  YOU WERE ASKED SOME QUESTIONS ABOUT

01:06PM  3    THAT ON CROSS-EXAMINATION.

01:06PM  4    A.   ALL RIGHT.

01:06PM  5    Q.   AND IF WE COULD GO TO PAGE 9.

01:06PM  6    A.   YES.

01:06PM  7    Q.   YOU WERE ASKED SOME QUESTIONS ABOUT THE TIMING OF THE

01:06PM  8    SAFEWAY PRE-PILOT, THE SAFEWAY PRE-PILOT AND THE SAFEWAY LAUNCH

01:06PM  9    VIS-A-VIS WALGREENS.

01:06PM  10        DO YOU RECALL THOSE QUESTIONS?

01:06PM  11   A.   YES.

01:06PM  12   Q.   OKAY.  IN PARAGRAPH C IT SAYS, I DRAW YOUR ATTENTION TO

01:07PM  13   THE LANGUAGE, "THE PARTIES' EXPECTATION IS THAT THE PILOT WILL

01:07PM  14   LAST FOR APPROXIMATELY 90 CALENDAR DAYS, AND THAT THE PILOT OF

01:07PM  15   THE PROGRAM AT SAFEWAY WILL RUN CONCURRENTLY WITH ANY PILOT OF

01:07PM  16   THE PROGRAM CONDUCTED BY WALGREENS."

01:07PM  17        DO YOU SEE THAT LANGUAGE?

01:07PM  18   A.   YES.

01:07PM  19   Q.   AND DID YOU VIEW THAT AS AN OBLIGATION TO HAVE THEM RUN

01:07PM  20   CONCURRENTLY OR AN EXPECTATION?

01:07PM  21   A.   AN EXPECTATION.

01:07PM  22   Q.   SO IF YOU HAD SAID TO MS. HOLMES, WALGREENS SEEMS LIKE

01:07PM  23   THEY'RE WAY BEHIND US, I WANT TO GO FORWARD WITH THE PILOT, IS

01:07PM  24   THAT SOMETHING THAT YOU FELT FREE TO DO?

01:07PM  25   A.   REPEAT THAT, PLEASE.

BURD REDIRECT BY MR. LEACH                                          3152

01:07PM   1    Q.   SO IF YOU BELIEVED WALGREENS WAS TAKING TOO MUCH TIME,

01:07PM   2    THAT THEY WERE WAY BEHIND YOU, DID YOU FEEL FREE TO GO TO

01:07PM   3    MS. HOLMES AND SAY, I'D LIKE TO GO FORWARD WITH THE PILOT NOW?

01:07PM   4    A.   I THOUGHT THAT MIGHT BE A PROBLEM, THAT WE WOULD HAVE TO

01:08PM   5    GO TOGETHER.

01:08PM   6    Q.   LET ME DRAW YOUR ATTENTION TO WHERE IT SAYS "THE LAUNCH OF

01:08PM   7    THE PROGRAM WILL NOT OCCUR AT WALGREENS STORES PRIOR TO THE

01:08PM   8    LAUNCH OF THE PROGRAM AT SAFEWAY STORES."

01:08PM   9         WHAT DID THAT MEAN?

01:08PM  10    A.   NOW WE'RE BEYOND THE PILOT AND NOW IT'S LAUNCHED, AND IT

01:08PM  11    SAID IT WOULD LAUNCH SIMULTANEOUSLY.

01:08PM  12    Q.   DID IT SAY SIMULTANEOUSLY OR THAT WALGREENS WON'T GO

01:08PM  13    FIRST?

01:08PM  14    A.   IT SAYS THAT WALGREENS WON'T GO FIRST, BUT MY EXPECTATION

01:08PM  15    IS THAT IT WOULD GO AROUND THE SAME TIME.

01:08PM  16    Q.   OKAY.  YOU WANTED THEM TO GO AT THE SAME TIME?

01:08PM  17    A.   CORRECT.

01:08PM  18    Q.   AND WHY WAS THAT?

01:08PM  19    A.   WELL, WE DIDN'T WANT, YOU KNOW, WALGREENS TO HAVE AN EDGE

01:08PM  20    ON US, AND MY GUESS IS THAT THEY FELT THE SAME WAY.

01:09PM  21         SO RATHER THAN BARGAIN FROM THEM INSISTING THAT WE GO

01:09PM  22    FIRST, WE WERE CONTENT THAT WE WOULD GO AT THE SAME TIME.

01:09PM  23    Q.   IN THE DECEMBER 2012 TIME PERIOD, DID MS. HOLMES EVER

01:09PM  24    ATTRIBUTE DELAYS OF THE LAUNCH TO WALGREENS?

01:09PM  25    A.   NO.

01:09PM  1    Q.   DID SHE EVER ATTRIBUTE THE DELAYS TO SOME ISSUE WITH THE

01:09PM  2    MAIN LAB OR THE DEVICE THAT YOU'D BEEN SHOWN?

01:09PM  3    A.   NO.

01:09PM  4    Q.   LET ME PLEASE DRAW YOUR ATTENTION TO WHAT IS IN EVIDENCE

01:09PM  5    AS EXHIBIT 10537.

01:09PM  6    A.   WHICH BOOK?

01:09PM  7    Q.   THE BLACK BOOK PLEASE.

01:10PM  8    A.   I HAVE IT.

01:10PM  9    Q.   AND DO YOU RECALL BEING ASKED QUESTIONS ABOUT YOUR EMAIL

01:10PM 10    WHERE YOU WROTE IN THE FIRST PARAGRAPH, "I'M VERY CONCERNED

01:10PM 11    ABOUT ALLOWING NETWORK PARTNERS OR ANYONE ELSE TO LAUNCH WITH A

01:10PM 12    MERE FINGER STICK."

01:10PM 13         DO YOU RECALL BEING ASKED QUESTIONS ABOUT THAT?

01:10PM 14    A.   YES.

01:10PM 15    Q.   AND FURTHER DOWN IN THE EMAIL YOU WROTE, "I ALSO

01:10PM 16    UNDERSTAND THAT THIS IS INTENDED AS ONLY A 'STOP GAP MEASURE.'"

01:10PM 17         DO YOU SEE THAT LANGUAGE?

01:10PM 18    A.   I DON'T.  HELP ME OUT A LITTLE BIT.

01:10PM 19    Q.   SECOND TO THE LAST PARAGRAPH ON THE BOTTOM, YOU WROTE, "I

01:10PM 20    REALIZE THAT YOU HAVE INFORMATION THAT I DON'T HAVE THAT IS

01:10PM 21    CAUSING YOU TO THINK ABOUT A POSSIBLE FINGER STICK ONLY LAUNCH.

01:10PM 22    I ALSO UNDERSTAND THAT THIS IS INTENDED AS ONLY A 'STOP GAP

01:10PM 23    MEASURE.'"

01:10PM 24         DO YOU SEE THAT?

01:10PM 25    A.   I DO.

01:10PM   1    Q.   AND WHAT DID YOU MEAN BY "STOP GAP MEASURE"?

01:10PM   2    A.   I WOULD HAVE TO READ THE WHOLE MEMO, BUT I KNEW WE DIDN'T

01:10PM   3    DO FINGERSTICK EXCLUSIVELY, YOU KNOW, IN THE ON CAMPUS LAB AND

01:11PM   4    WE WERE ANTICIPATING THAT WHEN YOU LAUNCH, YOU WOULD BE DOING

01:11PM   5    FINGERSTICK.

01:11PM   6    Q.   AND THIS EMAIL IS FROM JANUARY OF 2012?

01:11PM   7    A.   CORRECT.

01:11PM   8    Q.   BY THE DECEMBER 2012 TIME PERIOD, DID MS. HOLMES INDICATE

01:11PM   9    TO YOU THAT THERE WAS ANY ISSUE WITH PUTTING THE DEVICE IN

01:11PM  10    SAFEWAY STORES?

01:11PM  11    A.   NO.

01:11PM  12         WELL, LET ME BACK UP ONE SECOND.

01:11PM  13    Q.   PLEASE.

01:11PM  14    A.   I DON'T RECALL WHEN THIS COURIER MODEL WAS DONE, BUT THAT

01:11PM  15    WAS CONSIDERED TO BE TEMPORARY, AND THE INTENT ALL ALONG HAS

01:11PM  16    BEEN DEVICES IN THE STORES.  OTHERWISE YOU CAN'T ACCOMPLISH 20

01:11PM  17    TO 30 MINUTES.

01:11PM  18    Q.   LET ME NEXT DRAW YOUR ATTENTION TO EXHIBIT 7196, WHICH

01:12PM  19    SHOULD BE IN YOUR BLACK BINDER.

01:12PM  20    A.   I HAVE IT.

01:12PM  21         MR. LEACH:  YOUR HONOR, WITH THE COURT'S PERMISSION,

01:12PM  22    I'D LIKE TO INQUIRE ABOUT -- THIS IS IN EVIDENCE, BUT THERE'S A

01:12PM  23    MATTER THAT I WOULD LIKE TO INQUIRE ABOUT, THE TOP EMAIL.

01:12PM  24         THE COURT:  THIS WAS -- THE DEFENSE PUT THIS IN

01:12PM  25    EVIDENCE.

01:12PM  1               MR. DOWNEY:  YES.

01:12PM  2               THE COURT:  YOU CAN ASK YOUR QUESTION.

01:12PM  3               MR. LEACH:  OKAY.  THANK YOU, YOUR HONOR.

01:12PM  4               MR. DOWNEY:  YOUR HONOR, I HAD INTENDED TO REDACT

01:12PM  5       THAT AND I WONDER, CONSISTENT WITH THE PRIOR DISCUSSION --

01:12PM  6               THE COURT:  NO.  IT WAS MOVED INTO EVIDENCE BY YOU

01:12PM  7       WITHOUT OBJECTION.

01:12PM  8               MR. DOWNEY:  THAT'S FINE, YOUR HONOR.

01:12PM  9               THE COURT:  SO --

01:12PM  10              MR. LEACH:  THERE WERE ALSO NEVER QUESTIONS ABOUT

01:12PM  11      THE REASONS FOR THE TERMINATION.

01:12PM  12              THE COURT:  YOU CAN ASK YOUR QUESTION.

01:12PM  13              MR. DOWNEY:  YOUR HONOR, THE REASON THAT I DID NOT

01:13PM  14      PRESENT THE REDACTED FORM IN EITHER THE WITNESS'S NOTEBOOK AND

01:13PM  15      THE WITNESS'S AND YOURS AND THE ONE ON THE SCREEN IS BECAUSE WE

01:13PM  16      DIDN'T HAVE A RULING WHEN WE PREPARED THIS.  BUT I UNDERSTAND

01:13PM  17      THE COURT'S RULING.

01:13PM  18              THE COURT:  WELL, I'M LEFT IN A BIT OF A QUANDARY

01:13PM  19      HERE.  IT WAS ADMITTED AND OFFERED BY YOU WITHOUT ANY

01:13PM  20      REDACTIONS AS I RECALL.

01:13PM  21              MR. DOWNEY:  I UNDERSTAND.

01:13PM  22              THE COURT:  IT WAS ADMITTED WITHOUT OBJECTION.

01:13PM  23          SO IN ANY EVENT, YOU CAN ASK A QUESTION IF YOU HAVE ONE.

01:13PM  24              MR. LEACH:  OKAY.

01:13PM  25      Q.  MR. BURD, MY ONLY QUESTION WAS THERE'S A REFERENCE IN --

01:13PM 1    DO YOU RECALL BEING ASKED QUESTIONS ABOUT THIS EMAIL REGARDING

01:13PM 2    THE PLAN LAUNCH IN CONNECTION WITH MARKETING?

01:13PM 3    A.   YES.

01:13PM 4    Q.   AND THERE'S A LINE IN YOUR RESPONSE WHERE YOU QUOTE, "I

01:13PM 5    ALSO WANT TO MAXIMIZE MY RETURN ON MY $275 MILLION REMODEL

01:13PM 6    INVESTMENT."

01:13PM 7        DO YOU SEE THAT LANGUAGE?

01:13PM 8    A.   YES.

01:13PM 9    Q.   AND WHAT IS THAT A REFERENCE TO?

01:13PM 10   A.   WELL, WE MADE THE INVESTMENT AND WE NEEDED TO LAUNCH.  IF

01:14PM 11   THE BOX WORKS AS WE THOUGHT IT DOES, THEN WE WOULD GENERATE A

01:14PM 12   REVENUE STREAM AND GENERATE PROFITS.

01:14PM 13   Q.   AND THE REMODEL INVESTMENT, WHAT DO YOU MEAN BY THAT?  IS

01:14PM 14   THAT MONEY THAT YOU GAVE TO THERANOS OR MONEY THAT YOU --

01:14PM 15   A.   NO.  THIS WAS MONEY THAT WE USED TO REMODEL THE STORES.

01:14PM 16   Q.   I HAVE NO FURTHER QUESTIONS.

01:14PM 17       THANK YOU, MR. BURD.

01:14PM 18           THE COURT:  MR. DOWNEY.

01:14PM 19                   **RECROSS-EXAMINATION**

01:14PM 20   BY MR. DOWNEY

01:15PM 21   Q.   VERY BRIEFLY, MR. BURD.

01:15PM 22       YOU WERE JUST ASKED A QUESTION ABOUT A REFERENCE IN A

01:15PM 23   DOCUMENT TO A REMODEL INVESTMENT.

01:15PM 24       DO YOU RECALL THAT?

01:15PM 25   A.   YES.

01:15PM  1    Q.   AND DO YOU RECALL TESTIFYING ON DIRECT EXAMINATION THAT

01:15PM  2    QUEST STORES NOW SIT IN MANY OF THOSE LOCATIONS?

01:15PM  3    A.   I DON'T KNOW HOW MANY, BUT I WOULD BET THAT IT'S -- THEY

01:15PM  4    STARTED IN ARIZONA, BUT I DON'T KNOW HOW MANY.

01:15PM  5    Q.   OKAY.  BUT LOCATIONS OF THE STORES YOU'RE FAMILIAR WITH,

01:15PM  6    ARE THOSE THE SAME LOCATIONS?

01:15PM  7    A.   CORRECT.

01:15PM  8    Q.   I WANT TO ASK YOU ABOUT YOUR EXCHANGE WITH MS. HOLMES IN

01:15PM  9    EARLY 2012 WHEN YOU WERE TALKING ABOUT YOUR DISAPPOINTMENT WITH

01:15PM 10    GOING TO A FINGERSTICK ONLY MODEL.

01:15PM 11         DO YOU RECALL THAT?

01:15PM 12    A.   ARE YOU TALKING ON CAMPUS?

01:15PM 13    Q.   WELL, I DON'T KNOW IF THE CAMPUS PROJECT HAD BEEN

01:16PM 14    INITIATED OR NOT.

01:16PM 15         BUT YOU SENT HER AN EMAIL IN JANUARY OF 2010 EXPRESSING A

01:16PM 16    CONCERN ABOUT EITHER ANY NETWORK PARTNER OR ANY OTHER PARTNER

01:16PM 17    OR ANY OTHER -- ANYONE ELSE LAUNCHING UNDER WHAT YOU TERMED A

01:16PM 18    FINGERSTICK ONLY MODEL.

01:16PM 19         DO YOU RECALL THAT?

01:16PM 20    A.   SURE, THAT RINGS A BELL.

01:16PM 21    Q.   AND AM I RIGHT TO SAY THAT YOU SAY YOU DID NOT UNDERSTAND

01:16PM 22    THAT THAT WAS HAPPENING BECAUSE OF A REQUEST FROM WALGREENS?

01:16PM 23    A.   CORRECT.

01:16PM 24    Q.   AND YOU DID NOT UNDERSTAND IT TO BE HAPPENING BECAUSE OF A

01:16PM 25    REGULATORY REQUIREMENT?

01:16PM  1    A.   CORRECT.

01:16PM  2    Q.   WHAT DID YOU UNDERSTAND WAS THE REASON AS TO WHY THERE WAS

01:16PM  3    NOT A LAUNCH WITHOUT -- UNDER THE MODEL THAT HAD ORIGINALLY

01:16PM  4    BEEN CONTEMPLATED?

01:16PM  5    A.   SO THE ORIGINAL MODEL WAS FINGERSTICK RESULTS IN STORE.

01:16PM  6         WE KNOW THAT THERE WAS A TEMPORARY MODEL THAT WAS VEIN

01:17PM  7    DRAW PROCESSED ELSEWHERE.

01:17PM  8         SO I DIDN'T WANT, I DIDN'T WANT OTHER NETWORK PLAYERS TO

01:17PM  9    LAUNCH FINGERSTICK WHILE WE WERE DOING SOMETHING DIFFERENT.

01:17PM  10   Q.   I UNDERSTAND THAT.  MY QUESTION TO YOU IS, WHAT WAS YOUR

01:17PM  11   UNDERSTANDING AS TO WHY THERANOS WAS PROPOSING LAUNCHING A

01:17PM  12   FINGERSTICK ONLY PROCESS WITH THOSE --

01:17PM  13   A.   CAN YOU DIRECT ME TO THE EMAIL?

01:17PM  14   Q.   SURE.

01:17PM  15        PULL IT UP FOR ONE MOMENT.

01:18PM  16        (PAUSE IN PROCEEDINGS.)

01:18PM  17   BY MR. DOWNEY:

01:18PM  18   Q.   THE DOCUMENT I WAS REFERRING TO, MR. BURD, IS 10537 IN THE

01:19PM  19   WHITE NOTEBOOK.

01:19PM  20   A.   IN THE WHITE?

01:19PM  21   Q.   BUT I DON'T MEAN TO CONFINE YOU TO THAT.  THERE ARE OTHER

01:19PM  22   DOCUMENTS THAT REFERENCE FINGERSTICK ONLY AS WELL.

01:19PM  23   A.   YEAH.  YOU SAID 10357 WHAT?

01:19PM  24   Q.   10537.

01:19PM  25   A.   10537.  YOU SAID WHITE?

01:19PM   1    Q.   I'M SORRY, I BEG YOUR PARDON.  BLACK.

01:19PM   2    A.   OKAY.  GIVE ME A MOMENT AND I'LL READ THE EMAIL FROM THE

01:19PM   3    TOP DOWN.

01:19PM   4    Q.   I THINK IT ACTUALLY GOES FROM THE BOTTOM UP.

01:20PM   5    A.   YEAH, OKAY.  BUT I'LL START WITH THE -- IT'S MY EMAIL THAT

01:20PM   6    YOU'RE REFERRING TO; RIGHT?

01:20PM   7    Q.   THAT'S RIGHT.  AND I'M JUST REFERRING TO YOUR REFERENCE TO

01:20PM   8    FINGERSTICK ONLY.

01:20PM   9    A.   SURE.

01:20PM  10        (PAUSE IN PROCEEDINGS.)

01:20PM  11            THE WITNESS:  OKAY.  I DON'T HAVE THE CONTEXT.

01:20PM  12    BY MR. DOWNEY:

01:20PM  13    Q.   IF YOU SEE THE SECOND TO THE LAST PARAGRAPH, YOU SAY, "I

01:20PM  14    REALIZE THAT YOU HAVE INFORMATION THAT I DON'T HAVE THAT IS

01:20PM  15    CAUSING YOU TO THINK ABOUT A POSSIBLE FINGER STICK ONLY

01:21PM  16    LAUNCH."

01:21PM  17        DO YOU SEE THAT?

01:21PM  18    A.   I DO.

01:21PM  19    Q.   AND DOES THAT -- DID YOU HAVE A CONVERSATION BEFORE YOU

01:21PM  20    WROTE THIS EMAIL WHERE YOU LEARNED SHE WAS CONTEMPLATING THAT?

01:21PM  21    A.   WE MUST HAVE.

01:21PM  22        SO WHAT I NOW UNDERSTAND FINGERSTICK TO MEAN WHEN IT SAYS

01:21PM  23    "FINGER STICK ONLY," I DIDN'T LIKE THE IDEA OF LAUNCHING WITH A

01:21PM  24    FINGERSTICK AND THEN HAVE EVERYTHING PROCESS OFF THE STORE

01:21PM  25    PROPERTY.

01:21PM  1    Q.   OKAY.  SO, IN OTHER WORDS, THE SAMPLE WOULD BE SENT BACK

01:21PM  2    TO A LAB AT THERANOS?

01:21PM  3    A.   YES, YES.

01:21PM  4    Q.   AND MS. HOLMES TOLD YOU AT SOME POINT PRIOR TO

01:21PM  5    JANUARY 12TH THAT THERANOS WAS CONSIDERING THAT MODEL WITH SOME

01:21PM  6    PARTNER?

01:21PM  7             THE COURT:  MR. BURD, WHY DON'T YOU SPEAK IN THE

01:21PM  8    MICROPHONE THERE?  THANK YOU.

01:21PM  9             THE WITNESS:  NO, NO, I DON'T RECALL THAT.

01:22PM  10   BY MR. DOWNEY:

01:22PM  11   Q.   OKAY.  WHAT PROMPTED YOU TO WRITE THIS EMAIL?

01:22PM  12   A.   WELL, WE MUST HAVE HAD A CONVERSATION ABOUT LAUNCHING PURE

01:22PM  13   FINGERSTICK, WHICH IS DISTINGUISHING PURE FINGERSTICK FROM YOU

01:22PM  14   DRAW THE BLOOD THAT WAY, AND IN THIS CASE YOU PICK IT UP WITH A

01:22PM  15   COURIER AND YOU TAKE IT TO A CENTRAL LOCATION.

01:22PM  16       WHAT WE WANTED WAS THE ORIGINAL DESIGN AT LAUNCH, WHICH

01:22PM  17   GAVE US RESULTS IN 20, 30 MINUTES, WHICH COULD ONLY HAPPEN IF

01:22PM  18   DONE IN THE STORE.

01:22PM  19   Q.   YOU SAY IN THE SECOND SENTENCE OF THIS EMAIL, "I AM VERY

01:22PM  20   CONCERNED ABOUT ALLOWING NETWORK PARTNERS FOR ANYONE ELSE TO

01:22PM  21   LAUNCH WITH A MERE FINGER STICK."

01:22PM  22       DO YOU SEE THAT?

01:22PM  23   A.   I SEE THAT, AND, YOU KNOW, REMEMBER, I'M NOW TRYING TO

01:22PM  24   RECALL, YOU KNOW, EIGHT, NINE YEARS AGO.  BUT, YOU KNOW, IN

01:22PM  25   BUILDING THE NETWORK, WE WERE MAKING THE SAME PROMISE, YOU

01:23PM 1    KNOW, TO THE -- TO OTHER SUPERMARKETS THAT HAD BEEN MADE TO US,

01:23PM 2    AND I THINK THAT'S WHAT THIS REFERS TO, THAT THEY WOULDN'T GET

01:23PM 3    THAT PROMISE, AND IT DIDN'T LOOK LIKE WE WERE GOING TO GET THAT

01:23PM 4    EITHER.

01:23PM 5    Q.   AND IS IT FAIR TO SAY THAT IN TERMS OF WHATEVER THE

01:23PM 6    CONVERSATION THAT YOU HAD WITH MS. HOLMES THAT PROMPTED THIS

01:23PM 7    EMAIL, TODAY YOU DON'T REMEMBER IT?

01:23PM 8    A.   CORRECT.

01:23PM 9    Q.   THANK YOU, MR. BURD.

01:23PM 10            THE COURT:  MR. LEACH?

01:23PM 11            MR. LEACH:  NOTHING FURTHER, YOUR HONOR.  THANK YOU.

01:23PM 12            THE COURT:  MAY THIS WITNESS BE EXCUSED?

01:23PM 13            MR. LEACH:  HE MAY, YES.

01:23PM 14            MR. DOWNEY:  YES.

01:23PM 15            THE COURT:  SIR, YOU'RE EXCUSED.  THANK YOU.

01:23PM 16            THE WITNESS:  THANK YOU.

01:23PM 17            THE COURT:  YOU'RE WELCOME.

01:23PM 18            THE WITNESS:  I'M JUST GOING TO LEAVE THE BOOKS

01:23PM 19    THERE.

01:23PM 20            THE COURT:  JUST LEAVE IT THERE.  THEY'LL CLEAN IT

01:23PM 21    UP.

01:23PM 22            THE WITNESS:  OKAY.

01:23PM 23            THE COURT:  WE WILL TAKE OUR AFTERNOON BREAK NOW,

01:23PM 24    LADIES AND GENTLEMEN.  IS 20 MINUTES ABOUT RIGHT?  WHY DON'T WE

01:23PM 25    TAKE 30 MINUTES?  LET'S TAKE A 30 MINUTE BREAK, PLEASE.  WE'LL

3162

01:24PM 1      COME BACK -- THE GOVERNMENT WILL HAVE A WITNESS, I THINK?

01:24PM 2                  MR. SCHENK:  YES, YOUR HONOR.

01:24PM 3                  THE COURT:  ALL RIGHT.  WE'LL TAKE OUR RECESS.

01:24PM 4      THANK YOU.

01:24PM 5                  THE CLERK:  COURT IS IN RECESS.

01:24PM 6          (RECESS FROM 1:24 P.M. UNTIL 2:11 P.M.)

02:11PM 7                  THE COURT:  THANK YOU.  WE'RE BACK ON THE RECORD.

02:11PM 8      ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT AGAIN.  OUR JURY AND

02:11PM 9      ALTERNATES ARE PRESENT.

02:11PM 10         THANK YOU FOR YOUR PATIENTS.

02:11PM 11         IN THE SPIRIT OF FULL DISCLOSURE, WE WERE GETTING MY

02:12PM 12     OFFICE READY AND THAT MEANT MOVING BOXES.  I'LL LEAVE IT AT

02:12PM 13     THAT.

02:12PM 14         DOES THE GOVERNMENT HAVE ANOTHER WITNESS?

02:12PM 15                 MR. SCHENK:  YES, YOUR HONOR.

02:12PM 16         THE GOVERNMENT CALLS WADE MIQUELON.

02:12PM 17                 THE COURT:  IF YOU WOULD STAND AND FACE OUR

02:12PM 18     COURTROOM DEPUTY WHILE YOU RAISE YOUR RIGHT HAND, SHE HAS A

02:12PM 19     QUESTION FOR YOU.

02:12PM 20         **(GOVERNMENT'S WITNESS, WADE MIQUELON, WAS SWORN.)**

02:12PM 21                 THE WITNESS:  YES.

02:12PM 22                 THE COURT:  THANK YOU.

02:12PM 23         PLEASE HAVE A SEAT HERE, SIR, AND MAKE YOURSELF

02:12PM 24     COMFORTABLE.

02:12PM 25         FEEL FREE TO ADJUST THAT CHAIR AND MICROPHONE.  I'LL

02:12PM   1    ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE MICROPHONE.

02:13PM   2        THE LAWYER WILL HAVE A QUESTION FOR YOU ABOUT YOUR MASK IN

02:13PM   3    JUST A MOMENT.  BUT, FIRST OF ALL, IF YOU COULD PLEASE STATE

02:13PM   4    YOUR NAME AND THEN SPELL IT, PLEASE.

02:13PM   5        THE WITNESS:  YES, YOUR HONOR.  MY NAME IS WADE

02:13PM   6    MIQUELON.  W-A-D-E, M-I-Q-U-E-L-O-N.

02:13PM   7        THE COURT:  THANK YOU.

02:13PM   8    COUNSEL.

02:13PM   9                      **DIRECT EXAMINATION**

02:13PM  10    BY MR. SCHENK:

02:13PM  11    Q.   GOOD AFTERNOON, MR. MIQUELON.  I SEE YOU'VE TAKEN OFF YOUR

02:13PM  12    MASK.  WITH THE COURT'S PERMISSION AND IF YOU'RE FULLY

02:13PM  13    VACCINATED, YOU CAN REMOVE YOUR MASK AND I'LL DO THE SAME.

02:13PM  14    A.   THANK YOU.

02:13PM  15        THE COURT:  THANK YOU, COUNSEL.

02:13PM  16        MR. SCHENK:  THANK YOU, YOUR HONOR.

02:13PM  17    Q.   MR. MIQUELON, WERE YOU THE CFO AT WALGREENS?

02:13PM  18    A.   YES, I WAS.

02:13PM  19    Q.   AND WHEN WERE YOU THE CFO AT WALGREENS?

02:13PM  20    A.   FROM JUNE 2016 TO AUGUST 3RD OR 4TH 2014.

02:13PM  21    Q.   DO YOU MIND PULLING THE MICROPHONE A LITTLE BIT CLOSER TO

02:13PM  22    YOUR MOUTH?

02:13PM  23    A.   FROM JUNE -- JUNE 2008 -- I APOLOGIZE -- TO AUGUST 4TH,

02:14PM  24    2014.

02:14PM  25    Q.   SO 2008 UNTIL 2014?

02:14PM  1    A.   THAT'S CORRECT.

02:14PM  2    Q.   AND WE'LL COME BACK TO THAT IN A MOMENT.

02:14PM  3         LET'S START WITH YOUR EDUCATIONAL BACKGROUND.  WHERE DID

02:14PM  4    YOU GO TO UNDERGRAD, AND IF YOU HAVE GRADUATE DEGREES?

02:14PM  5    A.   I WENT TO UNDERGRADUATE SCHOOL AT PURDUE UNIVERSITY AND I

02:14PM  6    WAS AN ENGINEER, AND I WENT TO GRADUATE SCHOOL AT WASHINGTON

02:14PM  7    UNIVERSITY AT ST. LOUIS FOR MY MBA.

02:14PM  8    Q.   FOR YOUR?

02:14PM  9    A.   MBA.

02:14PM  10   Q.   THANK YOU.  HOW ABOUT YOUR WORK HISTORY BEFORE YOU BECAME

02:14PM  11   CFO AT WALGREENS?

02:14PM  12   A.   AFTER GRADUATE SCHOOL, I SPENT 17 YEARS AT

02:14PM  13   PROCTOR & GAMBLE, THE FIRST MORE OR LESS FIVE YEARS IN

02:14PM  14   CINCINNATI, AND THE NEXT 12 YEARS I SPENT IN ASIA AND EUROPE.

02:14PM  15        AND FROM THERE I WENT TO TYSON FOODS WHERE I BECAME THE

02:14PM  16   CHIEF FINANCIAL OFFICER FOR TWO YEARS, AND AFTER TYSON FOODS I

02:14PM  17   WENT TO WALGREENS WHERE I WAS THEIR CHIEF FINANCIAL OFFICER FOR

02:15PM  18   MORE OR LESS SIX YEARS.

02:15PM  19   Q.   AND AFTER WALGREENS, HAVE YOU REMAINED EMPLOYED SINCE YOU

02:15PM  20   LEFT WALGREENS?

02:15PM  21   A.   YES.

02:15PM  22   Q.   AND WHAT HAVE YOU DONE SINCE THEN?

02:15PM  23   A.   I WAS THE CHIEF FINANCIAL OFFICER FOR THE LARGE ARTS AND

02:15PM  24   CRAFTS RETAILER, JOANN, AND I'M CURRENTLY THE CEO OF THE SAME

02:15PM  25   COMPANY.

02:15PM   1    Q.   YOU'RE CURRENTLY THE CHIEF EXECUTIVE OFFICER?

02:15PM   2    A.   YES.

02:15PM   3    Q.   OKAY.  WHILE YOU WERE THE CFO AT WALGREENS, WOULD YOU

02:15PM   4    DESCRIBE FOR THE JURY SOME OF YOUR RESPONSIBILITIES AS CFO?

02:15PM   5    A.   GENERAL OVERSIGHT FOR ALL FINANCIAL AND ACCOUNTING MATTERS

02:15PM   6    TYPICAL OF A TYPICAL CFO ROLE, FROM THE GOVERNMENT ASPECTS OF

02:15PM   7    ACCOUNTING THROUGH FINANCIAL ANALYSIS ASPECTS OF THE BUSINESS,

02:15PM   8    AS WELL AS I HAD OVERSIGHT FOR MERGERS AND ACQUISITION, WHAT WE

02:15PM   9    CALL M & A, NEW BUSINESS DEVELOPMENT, AND FOR A PERIOD OF TIME

02:15PM  10    I ALSO HAD OVERSIGHT FOR THE INTERNATIONAL EXPANSION OF THE

02:15PM  11    COMPANY.

02:15PM  12    Q.   WAS WALGREENS A PUBLICLY TRADED COMPANY WHILE YOU WERE

02:15PM  13    CFO?

02:16PM  14    A.   YES.

02:16PM  15    Q.   AND DO YOU RECALL WHAT THE TICKER SIMPLE OR THE TRADING

02:16PM  16    SYMBOL WAS?

02:16PM  17    A.   IT WAS -- AT THE TIME WHEN I JOINED IT WAS W-A-G, BUT THE

02:16PM  18    TICKER SYMBOL IS DIFFERENT NOW.

02:16PM  19    Q.   OKAY.  AND WHAT IS IT NOW, IF YOU KNOW?

02:16PM  20    A.   W-P-A.

02:16PM  21    Q.   OKAY.  THANK YOU.

02:16PM  22         HAVE YOU HEARD OF A COMPANY CALLED THERANOS?

02:16PM  23    A.   YES.

02:16PM  24    Q.   WHEN DID YOU BECOME FIRST FAMILIAR WITH THAT COMPANY?

02:16PM  25    A.   I BELIEVE IT WAS IN THE EARLY SPRING OF 2010, AROUND

02:16PM 1      MARCH.

02:16PM 2      Q.   AROUND MARCH OF 2010?

02:16PM 3      A.   CORRECT.

02:16PM 4      Q.   AND DO YOU REMEMBER THE CIRCUMSTANCES?  DID SOMEONE BRING

02:16PM 5      THE COMPANY TO YOUR ATTENTION?

02:16PM 6      A.   YES.  WE WERE LOOKING AT A LOT OF DIFFERENT LAY OUT

02:16PM 7      TECHNOLOGY COMPANIES AT WALGREENS TRYING TO SEE IF POTENTIAL

02:16PM 8      COMPANIES COULD BE A GOOD PARTNER FOR WHAT WE WANTED TO DO IN

02:16PM 9      TERMS OF EXPANDING CLINICAL OFFERINGS THROUGH LAB, AND I RECALL

02:16PM 10     DR. JAY ROSAN HAD COME TO ME WHILE WE WERE SEARCHING VARIOUS

02:16PM 11     COMPANIES AND HE WAS VERY EXCITED ABOUT THE COMPANY THAT HE

02:17PM 12     HEARD ABOUT CALLED THERANOS.

02:17PM 13     Q.   AND DR. ROSAN WAS ANOTHER EMPLOYEE AT WALGREENS?

02:17PM 14     A.   YES.  HE WAS MORE OR LESS THE MEDICAL EXPERT FOR THE NEW

02:17PM 15     BUSINESS DEVELOPMENT DIVISION OF THE COMPANY.

02:17PM 16     Q.   AND YOU DESCRIBED WALGREENS HAVING SOME INTEREST IN LABS.

02:17PM 17     COULD YOU DESCRIBE THAT FOR US?

02:17PM 18     A.   CORRECT.  EVEN THOUGH WALGREENS HAS BEEN A TRADITIONAL

02:17PM 19     PHARMACY, OVER TIME THEY'VE WORKED TO FIND OTHER HEALTH CARE

02:17PM 20     OFFERINGS THAT CAN MORE OR LESS PUSH THE HEALTH CARE CLOSER AND

02:17PM 21     CLOSER TO THE INDIVIDUAL IN THE COMMUNITY.

02:17PM 22          ONE EXAMPLE WOULD BE VACCINATIONS WHERE THEY'RE A VERY

02:17PM 23     LARGE PLAYER, AS WELL AS OTHER CLINICS AND THERE'S PRACTITIONER

02:17PM 24     SERVICES.  LAB WAS ANOTHER ADJACENCY THAT THAT WE WERE VERY

02:17PM 25     EXCITED ABOUT.

02:17PM   1    Q.   AND HOW DID THERANOS FIT INTO THIS INTEREST OF WALGREENS?

02:17PM   2    A.   THERANOS AT THE TIME -- AND THERE WAS A LOT OF, A LOT OF

02:17PM   3    COMPANIES THAT WERE LOOKING TO REALLY CHANGE THE WAY THAT

02:18PM   4    TRADITIONAL LAB HAD BEEN DONE THROUGH VARIOUS PLATFORMS, AND

02:18PM   5    THERE WAS A FAIR AMOUNT OF WORK TO TRY TO UNDERSTAND WHO THE

02:18PM   6    LEADER IN THAT SPACE MIGHT BE.

02:18PM   7         BUT AS WE GOT TO KNOW THERANOS, WE FELT THAT THEY WERE

02:18PM   8    PERHAPS THE FARTHEST ALONG AND THE MOST RELEVANT FOR WHAT THE

02:18PM   9    COMPANY WAS LOOKING TO ACHIEVE.

02:18PM  10    Q.   AND WHEN, IN THE EARLY DAYS IN 2010, YOU BEGAN TO LEARN

02:18PM  11    ABOUT THERANOS, WHAT KINDS OF THINGS DID YOU DO TO LEARN MORE

02:18PM  12    ABOUT THERANOS?

02:18PM  13    A.   AS A STARTING POINT I WAS ABLE TO GO OUT WITH

02:18PM  14    DR. JAY ROSAN AND SPEND SOME TIME AT THERANOS JUST TO LEARN

02:18PM  15    FROM ELIZABETH AND SUNNY WHAT THEY WERE DOING, WHAT THEY HAD

02:18PM  16    BEEN DOING, AND THAT WAS PROBABLY THE STARTING POINT OF THE

02:18PM  17    JOURNEY OF LEARNING.

02:18PM  18    Q.   YOU SAID GO OUT TO THERANOS.  WHAT DO YOU MEAN BY THAT?

02:18PM  19    WHERE WERE YOU AND WHERE DID YOU GO TO?

02:18PM  20    A.   I WAS BASED IN DEERFIELD, ILLINOIS, AND WE WENT TO THEIR

02:18PM  21    HEADQUARTERS AT THE TIME IN PALO ALTO.

02:18PM  22    Q.   IS THAT -- IS ILLINOIS WHERE WALGREENS IS HEADQUARTERED?

02:19PM  23    A.   CORRECT.

02:19PM  24    Q.   I THINK I PLACED A BINDER ON THE DESK IN FRONT OF YOU.  IF

02:19PM  25    YOU COULD OPEN IT UP TO TAB 278.

02:19PM  1          AT EXHIBIT 278, DO YOU RECOGNIZE THE DOCUMENTS THERE?

02:19PM  2     A.   YES.

02:19PM  3     Q.   WHAT ARE THE FIRST TWO PAGES, JUST GENERALLY?

02:19PM  4     A.   AN EMAIL MESSAGE.

02:19PM  5     Q.   DOES IT BEGIN AN EMAIL MESSAGE FROM MS. HOLMES TO YOU AND

02:19PM  6     DR. ROSAN, AN INDIVIDUAL YOU JUST REFERENCED?

02:19PM  7     A.   THAT'S CORRECT.

02:19PM  8     Q.   AND THEN IS THERE ANOTHER MESSAGE FROM YOU, AND THEN

02:19PM  9     ANOTHER MESSAGE WITHIN WALGREENS?

02:20PM 10     A.   THAT'S CORRECT.

02:20PM 11     Q.   AND HOW ABOUT THE ATTACHMENT?  DO YOU RECOGNIZE THE

02:20PM 12     ATTACHMENT?

02:20PM 13     A.   YES, I DO.

02:20PM 14     Q.   AND WHAT IS THE ATTACHMENT GENERALLY?

02:20PM 15     A.   IT WAS A PRESENTATION THAT HAD BEEN MADE TO US WHEN WE

02:20PM 16     VISITED AND SUBSEQUENTLY FORWARDED TO ME VIA EMAIL AND WHICH I

02:20PM 17     WAS SHARING WITH SOME EXECUTIVES IN THE COMPANY.

02:20PM 18     Q.   AND A PRESENTATION MADE TO YOU BY WHOM?

02:20PM 19     A.   BY THERANOS, BY MS. HOLMES AND MR. BALWANI.

02:20PM 20     Q.   THANK YOU.

02:20PM 21          YOUR HONOR, THE GOVERNMENT OFFERS 278.

02:20PM 22          MR. DOWNEY:  NO OBJECTION.

02:20PM 23          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:20PM 24     (GOVERNMENT'S EXHIBIT 278 WAS RECEIVED IN EVIDENCE.)

02:20PM 25          MR. SCHENK:  MS. HOLLIMAN, IF WE COULD START WITH

02:20PM 1    THE EMAIL AT THE BOTTOM OF THE PAGE, PICK UP WITH THE FROM AND

02:20PM 2    TO LINES.

02:20PM 3    Q.   MR. MIQUELON, YOU CAN START ON YOUR SCREEN, WE SEE AN

02:20PM 4    EMAIL FROM MS. HOLMES TO YOU IN MARCH OF 2010.

02:20PM 5         DO YOU SEE THAT?

02:20PM 6    A.   YES.

02:20PM 7    Q.   AND IF WE COULD CARRY OVER TO THE NEXT PAGE, THE SECOND

02:20PM 8    PAGE OF THIS EXHIBIT TO CAPTURE THE TEXT OF THE EMAIL,

02:21PM 9    MS. HOLMES WRITES, "WADE.

02:21PM 10        "IT WAS GREAT TO MEET YOU.

02:21PM 11        "AS PROMISED, PLEASE FIND THE PRESENTATION WE PRESENTED

02:21PM 12   TODAY."

02:21PM 13        DO YOU SEE THAT?

02:21PM 14   A.   YES.

02:21PM 15   Q.   AND WAS THIS THE PRESENTATION THAT YOU TRAVELLED TO

02:21PM 16   PALO ALTO TO ATTEND IN PERSON?

02:21PM 17   A.   YES.

02:21PM 18   Q.   AND NOW IF WE COULD LOOK ONE EMAIL UP BACK ON THE FIRST

02:21PM 19   PAGE, THE EMAIL IN THE MIDDLE, THE EMAIL FROM YOU, IF WE COULD

02:21PM 20   CAPTURE THAT EMAIL TO THE JURY.

02:21PM 21        YOU WROTE THAT EMAIL TO AN INDIVIDUAL NAMED GREG WASSON.

02:21PM 22        DO YOU SEE THAT?

02:21PM 23   A.   YES.

02:21PM 24   Q.   AND WHO WAS MR. WASSON?

02:21PM 25   A.   MR. WASSON WAS THE CHIEF EXECUTIVE OFFICER OF WALGREENS

02:21PM   1    AND HE WAS MY BOSS AT THE TIME.

02:21PM   2    Q.   IN THE EMAIL YOU DESCRIBE TO HIM YOUR BEGINNING EFFORTS AT

02:21PM   3    DUE DILIGENCE REGARDING THERANOS; IS THAT RIGHT?

02:21PM   4    A.   YES, THAT'S CORRECT.

02:21PM   5    Q.   AND WHAT WERE YOU TRYING TO COMMUNICATE TO THE CEO AT THIS

02:21PM   6    TIME?

02:21PM   7    A.   I THINK JUST THAT A LOT OF ENTHUSIASM ABOUT THE

02:22PM   8    POSSIBILITY OF WORKING WITH THEM AND THE FACT THAT IT WAS VERY

02:22PM   9    EXCITING AND IT SEEMED TO BE THEY WERE PRETTY MUCH OUT FRONT

02:22PM  10    FOR WHAT WE WERE LOOKING FOR.

02:22PM  11    Q.   I'D LIKE TO SHOW YOU SOME SLIDES FROM THE PRESENTATION,

02:22PM  12    BUT BEFORE WE DO THAT, DESCRIBE THE SETTING.  WHERE DID YOU GO

02:22PM  13    WHEN YOU WERE IN PALO ALTO, AND I'M WONDERING WHO WAS PRESENT

02:22PM  14    IN THE ROOM?

02:22PM  15    A.   WE WENT TO THEIR HEADQUARTERS AND WE WERE IN A SMALL

02:22PM  16    CONFERENCE ROOM RIGHT OFF OF THE RECEPTION AREA, WHICH WAS THE

02:22PM  17    FOUR OF US.

02:22PM  18    Q.   AND WHO WERE THE FOUR THAT WERE PRESENT?

02:22PM  19    A.   MYSELF, DR. ROSAN, MS. HOLMES, AND MR. BALWANI.

02:22PM  20    Q.   AND WHAT WAS IN THE ROOM IF YOU REMEMBER?  WAS THERE A

02:22PM  21    SCREEN OR A LAPTOP?  WAS THERE A DEVICE?

02:22PM  22    A.   I DON'T REMEMBER IF THE PRESENTATION WAS ON A LAPTOP OR IF

02:22PM  23    THERE WERE HANDOUTS AS WELL.

02:22PM  24    Q.   OKAY.  HOW ABOUT A THERANOS DEVICE OR DEVICES?  DID YOU

02:22PM  25    SEE ANYTHING?

02:22PM   1    A.   I SAW A THERANOS DEVICE LATER, BUT MY RECOLLECTION IS THAT

02:22PM   2    IT WAS OUTSIDE OF THE ROOM AND SLIGHTLY AROUND THE CORNER.

02:23PM   3    Q.   AND WHEN YOU SAY "LATER," DO YOU MEAN LATER THAT SAME DAY?

02:23PM   4    A.   LATER THAT SAME DAY.

02:23PM   5    Q.   OKAY.  IF WE COULD NOW TURN TO THE FIRST PAGE OF THE

02:23PM   6    PRESENTATION, THAT'S THE THIRD PAGE OF THE EXHIBIT.

02:23PM   7         IS THIS THE PRESENTATION THAT MS. HOLMES AND MR. BALWANI

02:23PM   8    PRESENTED TO YOU AND DR. ROSAN THAT DAY?

02:23PM   9    A.   YES.

02:23PM   10   Q.   AND IF YOU COULD TURN TO PAGE 5 OF THE EXHIBIT.  THERE'S A

02:23PM   11   SLIDE THAT BEGINS THERANOS INCORPORATED, AND I'D LIKE TO ASK

02:23PM   12   YOU SOME QUESTIONS ABOUT A FEW OF THE BULLETS.

02:23PM   13        IT BEGINS, "THERANOS IS A SILICON VALLEY-BASED HEALTH CARE

02:23PM   14   TECHNOLOGY COMPANY FOUNDED IN 2003."

02:23PM   15        DID MS. HOLMES SAY THAT TO YOU?  DID SHE DESCRIBE TO YOU

02:23PM   16   THAT THERANOS WAS A TECHNOLOGY COMPANY THAT WAS FOUNDED IN

02:23PM   17   2003?

02:23PM   18   A.   I DON'T KNOW IF THOSE WERE THE EXACT WORDS, BUT MORE OR

02:23PM   19   LESS SHE GAVE SOME PERSPECTIVE ON THE STARTUP AND THE COMPANY

02:23PM   20   HAD BEEN AROUND FOR, YOU KNOW, EFFECTIVELY SEVEN YEARS.

02:24PM   21   Q.   AND DID THAT SORT OF DESCRIBE THE WAY THE MEETING WENT?

02:24PM   22   WERE SLIDES SHOWN AND EITHER MS. HOLMES OR MR. BALWANI TALKED

02:24PM   23   ABOUT THE SLIDES WHILE THEY WERE BEING DISPLAYED?

02:24PM   24   A.   THAT'S CORRECT.

02:24PM   25   Q.   THE FIRST BULLET READS, "THERANOS'S PROPRIETARY, PATENTED

02:24PM   1        TECHNOLOGY RUNS COMPREHENSIVE BLOOD TESTS FROM A FINGERSTICK IN

02:24PM   2        REAL-TIME AT THE POINT OF CARE, OUTSIDE OF TRADITIONAL LAB

02:24PM   3        SETTINGS."

02:24PM   4             IS THAT CONSISTENT WITH THE WAY THAT MS. HOLMES DESCRIBED

02:24PM   5        THE TECHNOLOGY TO YOU WHEN YOU WERE IN PALO ALTO?

02:24PM   6        A.   YES.

02:24PM   7        Q.   WHAT DID YOU UNDERSTAND "RUNS COMPREHENSIVE BLOOD TESTS,"

02:24PM   8        TO MEAN?

02:24PM   9        A.   MY UNDERSTANDING WAS A PRETTY BROAD RANGE OF IMMUNOASSAY

02:24PM  10        TESTS, YOU KNOW, BLOOD TESTS, THAT EXACTLY.

02:24PM  11        Q.   OKAY.  WHEN THIS CONCEPT WAS BEING DISCUSSED, DO YOU

02:24PM  12        REMEMBER IF MS. HOLMES OR MR. BALWANI OR BOTH OF THEM WERE

02:25PM  13        TALKING ABOUT IT?  DO YOU HAVE A RECOLLECTION OF WHO DID THE

02:25PM  14        SPEAKING?

02:25PM  15        A.   I THINK IT WAS VERY INTERACTIVE, SO I WOULD SAY THAT IT

02:25PM  16        WAS INTERACTIVE.

02:25PM  17        Q.   WHAT DO YOU MEAN BY "INTERACTIVE"?

02:25PM  18        A.   I MEAN WE WOULD TALK ABOUT DIFFERENT POINTS AND WE WOULD

02:25PM  19        ASK QUESTIONS AND BOTH WOULD CHIME IN.  BUT IT WOULD BE HARD TO

02:25PM  20        SAY ANYONE SAID ONE SPECIFIC LINE OR ANY ONE LINE.

02:25PM  21        Q.   OKAY.  THE BULLET CONTINUES, "FROM A FINGERSTICK IN

02:25PM  22        REAL-TIME AT THE POINT OF CARE."

02:25PM  23             WHAT DID YOU UNDERSTAND THAT TO MEAN?

02:25PM  24        A.   WELL, JUST PART OF THE VALUE PROPOSITION, WHICH OBVIOUSLY

02:25PM  25        ONE DROP OF BLOOD WOULD HAVE BENEFITS, YOU KNOW, VERSUS AN

02:25PM   1    ENTIRE VIAL.

02:25PM   2         BUT BEING ABLE TO HAVE, AGAIN, THAT DECENTRALIZED LAB, I

02:25PM   3    THINK, AKIN MOVING FROM A MAINFRAME TO A LAPTOP, BEING ABLE TO

02:25PM   4    HAVE EFFECTIVELY A DEVICE THAT COULD AT THAT POINT OF CARE BE

02:25PM   5    ABLE TO TAKE THE BLOOD AND GATHER THE RESULTS HAD A LOT OF

02:25PM   6    ADDITIONAL BENEFITS AS WELL.

02:25PM   7    Q.   AND THEN IT CONTINUES, "OUTSIDE OF TRADITIONAL LAB

02:26PM   8    SETTINGS."

02:26PM   9         WHAT DID YOU UNDERSTAND THAT TO MEAN?

02:26PM   10   A.   YOU KNOW, A TRADITIONAL LAB SETTING WOULD HAVE LARGE

02:26PM   11   MACHINES CAPABLE OF DOING SOME TESTS.  TYPICALLY YOU'RE WITH

02:26PM   12   LOOKING AT KIND OF VENA PUNCTURE, BEING ABLE TO DO THAT, THE

02:26PM   13   PATIENT MAY HAVE TO GO TO INDUSTRIAL COURT TO GET THEIR BLOOD

02:26PM   14   DRAWN, BUT THIS WOULD BE ABLE TO TAKE THE LAB TESTING AND

02:26PM   15   MOVING IT INTO THE PHARMACY WHERE IT WAS VERY CLOSE TO LOTS AND

02:26PM   16   LOTS OF PATIENTS.

02:26PM   17   Q.   SO THIS FIRST BULLET THAT WE JUST TALKED ABOUT, WAS THIS

02:26PM   18   ATTRACTIVE TO YOU AND TO WALGREENS?

02:26PM   19   A.   CERTAINLY.

02:26PM   20   Q.   WHY?

02:26PM   21   A.   AGAIN, WHEN YOU THINK ABOUT -- I THINK THE DATA SAYS 70 TO

02:26PM   22   80 PERCENT OF HEALTH CARE DECISIONS BY THE DOCTOR REQUIRES SOME

02:26PM   23   FORM OF LAB.  YOU KNOW, LAB IN MANY WAYS IS A GATEWAY TO GOOD

02:26PM   24   HEALTH.  BEING ABLE TO TEST ACCURATELY, FREQUENTLY, MAKING IT

02:26PM   25   ACCESSIBLE FOR PEOPLE, ALL OF THAT IS A WONDERFUL EXTENSION OF

02:26PM  1    HEALTH CARE.

02:26PM  2    Q.   THE THIRD BULLET ON THE SCREEN IN FRONT OF YOU READS, "OUR

02:27PM  3    CURRENT AND PAST CLIENTS INCLUDE 10 OF THE TOP 15 MAJOR

02:27PM  4    PHARMACEUTICAL COMPANIES, MID SIZED BIO-PHARMAS, PROMINENT

02:27PM  5    RESEARCH INSTITUTIONS, AND U.S. AND FOREIGN GOVERNMENT HEALTH

02:27PM  6    AND MILITARY ORGANIZATIONS."

02:27PM  7         DID YOU HEAR MS. HOLMES OR MR. BALWANI DISCUSS THIS TOPIC

02:27PM  8    WHEN YOU WERE IN PALO ALTO?

02:27PM  9    A.   YES, WE DID.

02:27PM 10    Q.   AND WHAT DO YOU RECALL ABOUT THAT?

02:27PM 11    A.   WHAT I RECALL WAS REALLY 10 OF THE 15 PHARMACEUTICAL

02:27PM 12    COMPANIES, AS WELL AS SOME DISCUSSION ON THE WORK WITH THE

02:27PM 13    MILITARY.

02:27PM 14    Q.   AND WHAT DID YOU UNDERSTAND THAT THE PHARMACEUTICAL

02:27PM 15    COMPANIES DID FOR THERANOS?

02:27PM 16    A.   MY UNDERSTANDING WAS SOMEWHAT LIMITED BECAUSE THEY SAID

02:27PM 17    THAT THEY WERE UNDER NDA AND COULDN'T SHARE A LOT.

02:27PM 18         WHAT THEY HAD SAID IS THAT THEY WERE DOING WORK FOR, AND

02:27PM 19    IN VARIOUS DEGREES, SOME CLINICAL TRIAL WORK.

02:28PM 20         EARLY ON WHEN THEY STARTED WORKING WITH THE PHARMA

02:28PM 21    COMPANIES IT WAS -- YOU KNOW, A LOT OF THE REVENUE WAS DERIVED

02:28PM 22    FROM CREATING ALGORITHMS FOR THEM.

02:28PM 23         BUT THEY HAD BEEN MORPHING INTO BEING ABLE TO DO TESTING

02:28PM 24    FOR CLINICAL WORK AND HOPED TO TAKE THAT FURTHER OVER TIME.

02:28PM 25    Q.   DID THERE COME A TIME LATER ON IN YOUR INTERACTIONS WITH

02:28PM 1    THERANOS WHEN YOU GAINED MORE INFORMATION ABOUT WHAT MS. HOLMES

02:28PM 2    SAID THE THERANOS PHARMACEUTICAL WORK INVOLVED?

02:28PM 3    A.   YES.

02:28PM 4    Q.   AND WOULD YOU DESCRIBE THAT FOR US?

02:28PM 5    A.   I BELIEVE THERE WERE THREE PAPERS THAT WERE PRODUCED FOR

02:28PM 6    US TO SEE FROM THREE DIFFERENT PHARMA COMPANIES THAT HAD

02:28PM 7    BASICALLY OUTLINED SOME OF THE WORK THAT THEY HAD DONE

02:28PM 8    TOGETHER, AS WELL AS THE FINDINGS OF THE PHARMA COMPANIES.

02:28PM 9    Q.   OKAY.  THANK YOU.  WE'LL COME BACK TO THAT IN A MOMENT.

02:28PM 10        THE FINAL BULLET ON THE SCREEN READS, "THERANOS IS

02:28PM 11   LAUNCHING THERANOS SYSTEMS TO CONSUMERS IN 2010."

02:28PM 12   A.   CORRECT.

02:28PM 13   Q.   AND WHAT DID YOU UNDERSTAND THAT TO MEAN?

02:28PM 14   A.   I DON'T KNOW THAT WE TALKED ABOUT THAT IN DETAIL.

02:29PM 15        I DO BELIEVE AT THAT TIME THERE WAS SOME DISCUSSION OF

02:29PM 16   SOME WORK THAT THEY WERE DOING WITH ANOTHER LARGE RETAILER, AND

02:29PM 17   I BELIEVE OVER THE NEXT FEW MONTHS THERE WAS A LITTLE BIT OF

02:29PM 18   LIGHT SHED ON SOME OF THAT WORK AND SOME OF THE TESTING OF

02:29PM 19   THOSE EMPLOYEES.

02:29PM 20        BUT, AGAIN, I THINK THAT -- MY UNDERSTANDING WAS THAT THAT

02:29PM 21   WAS ALLUDING TO THAT OTHER RETAILER.

02:29PM 22   Q.   AND WHICH RETAILER WAS THAT?  DO YOU REMEMBER?

02:29PM 23   A.   TO MY BELIEF, IT'S SAFEWAY.  I'M NOT SURE THAT THAT WAS

02:29PM 24   EXPLICIT, BUT THAT IS WHAT I BELIEVED TO BE TRUE.

02:29PM 25   Q.   THANK YOU.

02:29PM   1          COULD WE TURN NOW TO PAGE 7.

02:29PM   2          THIS SLIDE IS ENTITLED OVERVIEW:  THERANOS SYSTEMS, AND

02:29PM   3   UNDER THE THERANOS SYSTEMS THERE ARE THREE PICTURES.

02:29PM   4          DO YOU SEE THOSE IMAGES?

02:29PM   5   A.   YES.

02:29PM   6   Q.   AND THE FIRST IMAGE IS LABELED DEVICES.

02:29PM   7          DO YOU RECOGNIZE THAT IMAGE?

02:29PM   8   A.   YES.

02:29PM   9   Q.   AND WHAT IS THAT?

02:29PM  10   A.   THAT WAS -- I DON'T KNOW AT THAT TIME WHAT IT WAS CALLED,

02:29PM  11   BUT IT BECAME EFFECTIVELY KNOWN AS THE EDISON MACHINE.

02:30PM  12   Q.   AND WHEN YOU WERE IN PALO ALTO, DID YOU SEE THE PHOTO OR

02:30PM  13   DID YOU SEE AN ACTUAL MACHINE?

02:30PM  14   A.   I SAW AN ACTUAL MACHINE.

02:30PM  15   Q.   AND WHERE WAS THAT MACHINE LOCATED?

02:30PM  16   A.   AGAIN, I BELIEVE THAT WAS RIGHT OUTSIDE OF THE CONFERENCE

02:30PM  17   ROOM IN A SMALL, YOU KNOW, CONCLAVE OFF TO THE RIGHT.

02:30PM  18   Q.   AND THE NEXT PHOTO IS LABELLED CARTRIDGES.

02:30PM  19          DID MS. HOLMES OR MR. BALWANI EXPLAIN TO YOU HOW

02:30PM  20   CARTRIDGES PLAYED A ROLE IN THE THERANOS SYSTEMS?

02:30PM  21   A.   CORRECT.

02:30PM  22   Q.   AND WHAT DID YOU LEARN?

02:30PM  23   A.   SO IT WAS -- MY UNDERSTANDING WAS ALWAYS THAT WHAT

02:30PM  24   THERANOS WAS ACTUALLY DOING WAS, AGAIN, KIND OF AKIN TO

02:30PM  25   MAINFRAMES MOVING TO LAPTOP.  IT WASN'T CHANGING HOW LAB HAD

02:30PM  1    BEEN DONE FOR IMMUNOASSAY.  IT WAS MAKING IT MUCH MORE

02:30PM  2    EFFECTIVE.

02:30PM  3         SO ESSENTIALLY YOU WOULD HAVE A CARTRIDGE WHICH HAD

02:30PM  4    VARIOUS CHAMBERS, YOU KNOW, LET'S SAY 8 BY 8 OR 64 POTENTIAL

02:30PM  5    CHAMBERS, AND EACH ONE CAN HOLD A SPECIFIC ANTIGEN, AND IF YOU

02:30PM  6    HAD A DROP OF BLOOD THAT WAS THEN MOVED INTO THE CHAMBERS, YOU

02:31PM  7    COULD HAVE A REACTION AND IT COULD BE READ THROUGH THE OPTICS

02:31PM  8    SIMILAR TO WHAT WOULD HAPPEN ON A, YOU KNOW, VERY BIG

02:31PM  9    EXPENSIVE, YOU KNOW, INDUSTRIAL MACHINE.  BUT IT WOULD HAPPEN,

02:31PM 10    YOU KNOW, MUCH MORE EFFICIENTLY AT THE POINT OF CARE THERE.

02:31PM 11         SO THE ESSENTIAL KEY OVER TIME WOULD BE TO CREATE

02:31PM 12    CARTRIDGES THAT WERE RELEVANT TO WHAT YOU WANTED TO TEST.  SO

02:31PM 13    IF YOU WERE DOING GENERAL CHEMISTRY, YOU WOULD HAVE TO HAVE A

02:31PM 14    CARTRIDGE THAT HAS THE VARIOUS ANTIGENS OF THE VARIOUS

02:31PM 15    CHEMISTRY THAT YOU'RE TRYING TO DO.

02:31PM 16    Q.   AND DID YOU HAVE AN UNDERSTANDING OF THE RELATIONSHIP

02:31PM 17    BETWEEN THE CARTRIDGE AND THE DEVICE?

02:31PM 18    A.   CORRECT.  I GUESS I ALWAYS THOUGHT OF IT REALLY AS A

02:31PM 19    PLATFORM, THE WAY THIS TECHNOLOGY WAS DEVELOPED, AND WHAT WAS

02:31PM 20    PRETTY EXCITING I THINK IS THAT THAT DEVICE IS REALLY A

02:31PM 21    PLATFORM TO TEST EFFECTIVELY ALMOST ANYTHING AS LONG AS YOU

02:31PM 22    HAVE THE PROPER CARTRIDGE FOR THE PROPER SPECIFIC TEST.

02:31PM 23    Q.   AND DID YOU SEE THE CARTRIDGE BEING PLACED INTO THE

02:31PM 24    DEVICE?

02:31PM 25    A.   I DON'T KNOW IF I SAW IT ON THAT DAY.  I DID LATER ON, BUT

02:32PM   1    I'M NOT SURE ON THAT PARTICULAR DAY THAT I DID.

02:32PM   2    Q.   YOU CAN'T RECALL IF IT WAS THAT DAY IN 2010, BUT AT SOME

02:32PM   3    POINT?

02:32PM   4    A.   AT SOME POINT I DID, YEAH.

02:32PM   5    Q.   AND THE THIRD IMAGE ON THE TOP IS CALLED MOBILE

02:32PM   6    APPLICATIONS.

02:32PM   7         DID YOU GAIN AN UNDERSTANDING OF WHAT THAT MEANT DURING

02:32PM   8    THE MEETING?

02:32PM   9    A.   YEAH, I THINK ANOTHER EXCITING THING THAT THEY WERE DOING

02:32PM  10    REALLY WAS THE I.T. AROUND THE ENTIRE VALUE PROPOSITION.

02:32PM  11         SO TO THE EXTENT THAT YOU COULD TEST REALTIME AT THE POINT

02:32PM  12    OF CARE WITH THE DEVICE AND THE CARTRIDGE, THE DATA, THE

02:32PM  13    RESULTS, IF YOU WILL, WILL BE FED INTO THE CLOUD AND GO INTO

02:32PM  14    THEIR CENTRAL LAB IN PALO ALTO FOR, YOU KNOW, PATHOLOGISTS TO

02:32PM  15    REVIEW OR AN ALGORITHM TO REVIEW.

02:32PM  16         BUT YOU WERE EFFECTIVELY PUTTING THIS INFORMATION ON THE

02:32PM  17    WEB AND PUTTING IT OUT MORE OR LESS REALTIME.

02:32PM  18    Q.   OKAY.  AND WAS THAT ATTRACTIVE TO WALGREENS?

02:32PM  19    A.   I THINK IT'S AN ATTRACTIVE PART OF THE PROPOSITION BECAUSE

02:32PM  20    YOU DON'T HAVE TO HAVE, YOU KNOW, AN EXPERT OR A PATHOLOGIST OR

02:32PM  21    A DOCTOR WHERE THE MACHINE IS.  YOU ONLY HAVE TO HAVE IT IN A

02:33PM  22    CENTRAL LOCATION WHERE THE DATA CAN BE ANALYZED PROPERLY.

02:33PM  23    Q.   IF YOU WOULD NOW TURN TO PAGE 8.

02:33PM  24         WE SEE ANOTHER PHOTO UNDER THERANOS SYSTEMS DEVICES.

02:33PM  25         IS THIS PHOTO ALSO SIMILAR TO THE DEVICE THAT YOU SAW IN

02:33PM   1    PALO ALTO?

02:33PM   2    A.   VERY SIMILAR.

02:33PM   3    Q.   DID MS. HOLMES OR MR. BALWANI EVER TELL YOU THAT THERANOS

02:33PM   4    TESTED BLOOD ON NON-THERANOS DEVICES, ON SOME OTHER DEVICE?

02:33PM   5    A.   NOT TO MY RECOLLECTION, EXCEPT TO THE EXTENT THAT I KNOW

02:33PM   6    THAT THEY HAD DONE A LOT OF WORK TO CORRELATE THE THERANOS

02:33PM   7    EDISON DEVICE WITH CONVENTIONAL TESTING.

02:33PM   8         SO I GUESS MY UNDERSTANDING WAS THAT THEY MUST BE DOING,

02:33PM   9    YOU KNOW, THAT TESTING ON CONVENTIONAL LAB EQUIPMENT, WHETHER

02:33PM  10    IT BE IN HOUSE OR OUTSOURCED, BUT THAT THOSE CORRELATIONS WOULD

02:33PM  11    HAVE TO BE, YOU KNOW, DONE SOMEHOW.

02:33PM  12    Q.   SO DO I UNDERSTAND WHAT YOU'RE SAYING IS THAT THEY WOULD

02:34PM  13    TEST ON THE EDISON DEVICE, AND ALSO ON CONVENTIONAL DEVICES,

02:34PM  14    BUT FOR THE PURPOSES OF COMPARING THE RESULTS?

02:34PM  15    A.   RIGHT.  FOR PURPOSES OF DRAWING CORRELATIONS THAT WOULD,

02:34PM  16    YOU KNOW, DEMONSTRATE IT TO BE AS GOOD AS.

02:34PM  17    Q.   AND HOW ABOUT FOR THE WALGREENS BUSINESS PROPOSITION?  IF

02:34PM  18    WALGREENS WAS GOING TO PARTNER WITH THERANOS, DID YOU HAVE AN

02:34PM  19    UNDERSTANDING THAT THERANOS WOULD TEST BLOOD ON CONVENTIONAL

02:34PM  20    DEVICES?

02:34PM  21    A.   YES.

02:34PM  22    Q.   AND DESCRIBE THAT TO US.

02:34PM  23    A.   THE VALUE PROPOSITION WAS TO HAVE, YOU KNOW, 90,

02:34PM  24    95 PERCENT OF ALL TESTS THAT COULD BE DONE IN A CONVENTIONAL

02:34PM  25    LAB DONE ON A THERANOS DEVICE.

02:34PM  1          THERE WERE SOME DISCUSSIONS AT SOME TIME THAT IF WE HAD A

02:34PM  2    FULL LAB OFFERING AND THERE WERE OTHER, YOU KNOW, MORE OBSCURE

02:34PM  3    TESTS OR TESTS THAT WEREN'T RELEVANT TECHNOLOGY, THAT THOSE

02:34PM  4    MIGHT BE DONE THROUGH A LAB SETTING.  BUT THAT WAS, YOU KNOW,

02:34PM  5    IT WOULD BE A VERY SMALL MINORITY OF THE TOTAL.

02:34PM  6    Q.   SO THE MAJORITY WERE ON THE THERANOS DEVICE, AND AS YOU

02:34PM  7    SAID, SOME OBSCURE TESTS WOULD BE TESTED ON CONVENTIONAL

02:35PM  8    DEVICES?

02:35PM  9    A.   RIGHT.

02:35PM 10    Q.   WOULD YOU TURN TO PAGE 9.  THIS SLIDE IS ENTITLED

02:35PM 11    VALIDATION OF THERANOS SYSTEMS.  THE FIRST PARAGRAPH READS,

02:35PM 12    "THERANOS SYSTEMS HAVE BEEN COMPREHENSIVELY VALIDATED OVER THE

02:35PM 13    COURSE OF THE LAST SEVEN YEARS BY 10 OF THE 15 LARGEST

02:35PM 14    PHARMACEUTICAL COMPANIES."

02:35PM 15          DID MS. HOLMES OR MR. BALWANI EXPLAIN THAT TO YOU WHEN YOU

02:35PM 16    WERE IN PALO ALTO?

02:35PM 17    A.   AGAIN, IT WAS THE ATTESTATIONS THAT THEY HAD BEEN DOING

02:35PM 18    WORK FOR 10 OF THE 15 PHARMACEUTICAL COMPANIES.  WE GOT A

02:35PM 19    LITTLE MORE INFORMATION ON THREE OF THOSE COMPANIES.  BUT WE

02:35PM 20    DISCUSSED THAT.  AND THERE WAS A POINT IN WHICH, AGAIN, BECAUSE

02:35PM 21    THEY WERE UNDER NDA, THE LEVEL OF INFORMATION WAS DIMINISHED.

02:35PM 22    Q.   SO AT SOME POINT LATER YOU ACTUALLY RECEIVED SOME OF THESE

02:35PM 23    REPORTS; IS THAT RIGHT?

02:35PM 24    A.   I BELIEVE WE RECEIVED THREE DIFFERENT REPORTS.

02:35PM 25    Q.   OKAY.  COULD WE NOW TURN TO PAGE 17.  THIS SLIDE IS TITLED

02:36PM  1    THERANOS GENERAL CHEMISTRY TESTS.  THE FIRST BULLET READS,

02:36PM  2    "REAL-TIME, FINGER-STICK-BASED TESTS. "

02:36PM  3         WHEN YOU WERE AT THE THERANOS HEADQUARTERS, DID MS. HOLMES

02:36PM  4    OR MR. BALWANI EXPLAIN TO YOU THAT THERANOS TESTS WERE DONE BY

02:36PM  5    DRAWING BLOOD FROM A FINGERSTICK?

02:36PM  6    A.   THAT WAS MY UNDERSTANDING.

02:36PM  7    Q.   AND WHERE DID THAT UNDERSTANDING COME FROM?

02:36PM  8    A.   FROM THE DISCUSSIONS THAT I HAD WITH MR. BALWANI AND

02:36PM  9    MS. HOLMES.

02:36PM  10   Q.   OKAY.  AND THEY USED THE WORD REAL-TIME.

02:36PM  11        DID YOU HAVE AN UNDERSTANDING OF WHAT THAT MEANT?

02:36PM  12   A.   AGAIN, IT'S JUST THE FACT THAT YOU COULD TAKE BLOOD AND

02:36PM  13   ENTER IT INTO A DEVICE AND IDEALLY IN 15 MINUTES THE DEVICE

02:36PM  14   WOULD HAVE DONE THE ANALYSIS, VERSUS IF YOU WERE IN A LAB

02:36PM  15   SETTING, YOU MIGHT HAVE MULTIPLE HANDOFFS OF BLOOD VIALS

02:36PM  16   ULTIMATELY GOING TO A LAB AND THEN WAITING TO BE PROCESSED.

02:37PM  17   Q.   THE SECOND BULLET SAYS THAT "AT LESS THAN 70 PERCENT OF

02:37PM  18   THE COST OF CURRENT LAB TESTS."

02:37PM  19        WAS THERE SOME DISCUSSION ABOUT SOME COST ADVANTAGES TO

02:37PM  20   THE THERANOS SYSTEM?

02:37PM  21   A.   THERE WAS.  WE FELT THIS COULD BE MUCH MORE COST EFFECTIVE

02:37PM  22   THAN A TRADITIONAL LAB FOR A VARIETY OF REASONS.

02:37PM  23   Q.   WAS THAT ATTRACTIVE TO WALGREENS, THE COST ASPECT?

02:37PM  24   A.   I THINK ATTRACTIVE TO EVERYONE.

02:37PM  25   Q.   WHY?

02:37PM 1   A.   I THINK, YOU KNOW, THE THING THAT EXCITED ME FOR SURE SO

02:37PM 2   MUCH WAS THAT THERANOS HELD THE PROMISE OF BEING ABLE TO DO LAB

02:37PM 3   TESTING BETTER, FASTER, AND CHEAPER, ALL OF WHICH LEAD TO

02:37PM 4   BETTER OUTCOMES FOR PATIENTS.

02:37PM 5   Q.   IF YOU'LL NOW TURN PLEASE TO PAGE 27.

02:37PM 6        THIS SLIDE IS TITLED REAL-TIME FINGER-STICK-BASED TESTS

02:38PM 7   FOR LAUNCH AT WALGREENS IN 2010.

02:38PM 8        THEN THERE'S A NUMBERS 1, 2, AND 3, GENERAL CHEMISTRY

02:38PM 9   PANELS AND STANDARD BLOOD TESTS, THE SECOND IS INFLUENZA, THE

02:38PM 10  THIRD IS FERTILITY, AND THE SLIDE TALKS ABOUT LAUNCH AT

02:38PM 11  WALGREENS IN 2010.

02:38PM 12       WAS THERE DISCUSSION ABOUT LAUNCHING WITH

02:38PM 13  FINGERSTICK-BASED TESTS AT WALGREENS THAT YEAR IN 2010?

02:38PM 14  A.   THERE WERE DISCUSSIONS.  EVERYBODY WAS EXCITED ABOUT THE

02:38PM 15  PROPOSITION AND WONDERING, YOU KNOW, HOW LONG IT WOULD TAKE TO

02:38PM 16  BRING THIS TO REALITY, BUT THERE WERE SOME EARLIER DISCUSSIONS

02:38PM 17  FOR SURE.

02:38PM 18  Q.   AND WHEN YOU WERE HAVING THOSE DISCUSSIONS, DID MS. HOLMES

02:38PM 19  DRAW A DISTINCTION BETWEEN THE TESTS, THE BLOOD TESTS THAT WERE

02:38PM 20  READY IN 2010 VERSUS BLOOD TESTS THAT WOULD BE READY LATER OR

02:38PM 21  SOMETIME IN THE FUTURE?

02:38PM 22  A.   I DON'T BELIEVE SO.

02:38PM 23  Q.   WHAT DO YOU MEAN?

02:38PM 24  A.   THE -- YOU KNOW, AGAIN, EITHER ON THIS DAY OR IN THE NEXT

02:38PM 25  FEW MONTHS, THERE WAS A LOT OF DISCUSSION THAT THE COMPANY WAS

02:38PM   1    VERY ADEPT AT DOING KIND OF THE STANDARD TESTING.

02:39PM   2        BUT WE BUCKETED OVER TIME, YOU KNOW, THREE DIFFERENT

02:39PM   3    VERSIONS.  I THINK MORE OR LESS WE HAD THE TESTS THAT ARE THE

02:39PM   4    OVERWHELMING, YOU KNOW, STANDARD TESTS DONE; THERE WERE

02:39PM   5    SPECIALTY TESTS WHICH WERE A BIT MORE DIFFICULT; AND THEN WE

02:39PM   6    TALKED ABOUT SOMETHING CALLED V3, YOU KNOW, WHICH WERE TESTS

02:39PM   7    ULTIMATELY WHICH WOULD BE PREDICTIVE AND NEW TO THE WORLD, BUT

02:39PM   8    THAT DIDN'T REALLY EXIST YET.

02:39PM   9    Q.   AND WHEN YOU SAY V3, DO YOU MEAN VERSION?

02:39PM  10    A.   VERSION 3.

02:39PM  11    Q.   DID YOU HAVE AN UNDERSTANDING FROM MS. HOLMES WHAT THE

02:39PM  12    FIRST BUCKET, AS YOU DESCRIBED IT, WHAT WAS INVOLVED, OR WHAT

02:39PM  13    TYPES OF TESTS WERE INVOLVED IN THAT FIRST BUCKET?

02:39PM  14    A.   YOU KNOW, AGAIN, IT'S PRIMARY, YOU KNOW, BLOOD TESTS DONE

02:39PM  15    THROUGH IMMUNOASSAY, THE, THE ANTIGEN TESTS, WHICH NUMBER IN

02:39PM  16    THE HUNDREDS, BUT THOSE TESTS WERE EITHER READY TO GO OR WOULD

02:39PM  17    BE SHORTLY.

02:39PM  18    Q.   DID YOU LEAVE THE MEETING WITH AN UNDERSTANDING THAT THERE

02:39PM  19    WERE A NUMBER OF TESTS THAT WERE AVAILABLE IN 2010?

02:40PM  20    A.   YES, AND I DON'T KNOW HOW MANY SPECIFICALLY.  AGAIN, I

02:40PM  21    DON'T KNOW IF WE HAD A NUMBER.

02:40PM  22        WE, WE FELT THAT THEY WERE DOING A FAIRLY BROAD RANGE OF

02:40PM  23    TESTS WITH THE PHARMA COMPANIES, AS WELL AS OUR UNDERSTANDING

02:40PM  24    WAS THAT THEY WERE ALREADY DOING SOME WORK WITH THE OTHER

02:40PM  25    RETAILER IN THAT REGARD.

02:40PM   1    Q.   OKAY.  WOULD YOU NOW TURN TO PAGE 30.  THIS IS TITLED

02:40PM   2    REAL-TIME FINGER-STICK-BASED TESTS FOR LAUNCH AT WALGREENS IN

02:40PM   3    2011, AND IT INCLUDES WOMEN'S AND MEN'S HEALTH.

02:40PM   4         DURING THE MEETING, DID MS. HOLMES MAKE A DISTINCTION

02:40PM   5    BETWEEN THE TESTS THAT WOULD BE READY IN 2010 VERSUS THE TESTS

02:40PM   6    IN 2011?

02:40PM   7    A.   I RECALL SOME DIALOGUE.  I DON'T KNOW IF IT WAS THAT

02:40PM   8    MEETING OR NOT, WHETHER WE WOULD WANT TO TAKE A COUPLE OF

02:40PM   9    SPECIFIC TESTS TO GET SOME PILOT LEARNINGS, THESE TYPES OF

02:40PM   10   TESTS; OR WHETHER WE WOULD, YOU KNOW, WAIT AND DO KIND OF THE

02:41PM   11   BROADER GENERAL CHEMISTRY.

02:41PM   12        AGAIN, THIS WAS VERY EARLY DISCUSSIONS, BUT IT WAS JUST,

02:41PM   13   AGAIN, A DIALOGUE ON WHAT MIGHT BE THE NEXT BEST STEP TO BE

02:41PM   14   ABLE TO PILOT AND GET MORE INFORMATION.

02:41PM   15   Q.   DURING THE MEETING, DID YOU GET AN IMPRESSION ABOUT

02:41PM   16   MS. HOLMES'S ABILITY TO DESCRIBE TO YOU PRESENT CAPABILITIES AS

02:41PM   17   OPPOSED TO FUTURE CAPABILITIES?

02:41PM   18   A.   I DON'T KNOW IF I COULD SAY IN THAT VERY FIRST MEETING OR

02:41PM   19   NOT.  I THINK BOTH OF US WERE UNDER THE IMPRESSION, DR. ROSAN

02:41PM   20   AND I, THAT CERTAINLY THIS TECHNOLOGY WOULD WORK FOR, YOU KNOW,

02:41PM   21   A NUMBER OF TESTS AND THAT EXPANDING TESTS WAS JUST, AGAIN, A

02:41PM   22   MATTER OF JUST PERFECTING THE REAGENTS AND OTHER THINGS.  WE

02:41PM   23   CERTAINLY HAD AN UNDERSTANDING IT WORKED FOR MANY TESTS.  I

02:41PM   24   CAN'T SPECIFY HOW MANY.

02:41PM   25   Q.   YOU DIDN'T KNOW THE CURRENT NUMBER, BUT YOU UNDERSTOOD

02:42PM   1     THAT IT WAS PRESENTLY CAPABLE OF WORKING FOR SOME?

02:42PM   2     A.   RIGHT.  AND I WAS TOLD THAT ANY BLOOD, ANY BLOOD, URINE,

02:42PM   3     OTHER FLUID SAMPLE SHOULD BE ABLE TO BE WORKABLE UPON THAT

02:42PM   4     TECHNOLOGY.

02:42PM   5     Q.   I'M SORRY?

02:42PM   6     A.   ANY BLOOD, SALIVA, OR URINE, ALMOST ANY TEST SHOULD BE

02:42PM   7     ABLE TO WORK ON THAT PLATFORM.

02:42PM   8     Q.   IF YOU'LL TURN ONE PAGE NOW TO PAGE 31.

02:42PM   9          THIS SLIDE IS TITLED LAUNCH OF THERANOS SYSTEMS AT

02:42PM  10     WALGREENS AND IT READS, "THERANOS WOULD LIKE TO CEMENT A

02:42PM  11     PARTNERSHIP WITH WALGREENS BY END OF APRIL 2010 TO LAUNCH THE

02:42PM  12     GENERAL CHEMISTRY, INFLUENZA, AND FERTILITY TESTS IN Q4 2010."

02:42PM  13          DO YOU REMEMBER A DISCUSSION AROUND THIS TOPIC?

02:42PM  14     A.   VAGUELY, BUT YES.

02:42PM  15     Q.   AND THE MEETING WAS OCCURRING IN MARCH OF 2010; IS THAT

02:42PM  16     RIGHT?

02:42PM  17     A.   CORRECT.

02:43PM  18     Q.   AND SO WAS THERANOS SUGGESTING THAT YOU COULD BEGIN THE

02:43PM  19     PARTNERSHIP NEXT MONTH IN APRIL OF 2010?

02:43PM  20     A.   I THINK ON A SMALL SCALE, YES, THAT'S WHAT THEY'RE

02:43PM  21     SUGGESTING.

02:43PM  22     Q.   AND YOU SAID ON A SMALL SCALE.  IT DESCRIBES A LAUNCH WITH

02:43PM  23     CERTAIN TESTS, GENERAL CHEMISTRY, INFLUENZA AND FERTILITY.  DO

02:43PM  24     YOU REMEMBER THOSE BEING DISCUSSED?

02:43PM  25     A.   YES.

02:43PM 1    Q.   AND WHAT DO YOU RECALL ABOUT THAT?

02:43PM 2    A.   AGAIN, THAT THESE MIGHT BE SOME LOW HANGING FRUIT, SO TO

02:43PM 3    SPEAK, IN ORDER TO BE ABLE TO GET IN THE MARKET AND START TO

02:43PM 4    UNDERSTAND THINGS LIKE CONSUMER ACCEPTANCE OF LAB IN A DRUG

02:43PM 5    STORE AND OTHER LEARNINGS.

02:43PM 6    Q.   OKAY.  WOULD YOU NOW TURN TO EXHIBIT 291 IN YOUR BINDER.

02:43PM 7         THE FIRST PAGE HAS A COUPLE OF EMAILS ON IT, AND THEN

02:43PM 8    THERE ARE SOME ATTACHMENTS.  WOULD YOU JUST SPEND A MINUTE AND

02:43PM 9    FLIP THROUGH THAT AND I'M GOING TO ASK YOU IF YOU RECOGNIZE THE

02:44PM 10   ATTACHMENTS.

02:44PM 11   A.   OKAY.

02:44PM 12   Q.   DO YOU RECOGNIZE THE ATTACHMENTS?

02:44PM 13   A.   I DO.

02:44PM 14   Q.   AND WHAT ARE THE ATTACHMENTS?

02:44PM 15   A.   THESE ARE EXCERPTS FROM THE THREE PHARMA COMPANIES,

02:44PM 16   DOCUMENTS THAT WERE SHARED WITH US MORE OR LESS VALIDATING THE

02:44PM 17   WORK THAT THEY HAD DONE WITH THEM.

02:44PM 18   Q.   SO EARLIER WHEN YOU TALKED ABOUT SEEING SOME VALIDATION

02:44PM 19   REPORTS FROM PHARMACEUTICAL COMPANIES, ARE THESE THOSE REPORTS?

02:44PM 20   A.   YES.

02:44PM 21   Q.   AND THEN THE EMAIL ON THE TOP OF THE FIRST PAGE FROM

02:44PM 22   MS. HOLMES TO TWO EMPLOYEES, INCLUDING DR. ROSAN ON THIS EMAIL,

02:44PM 23   YOU'RE NOT ON THIS EMAIL; IS THAT RIGHT?

02:44PM 24   A.   I'M NOT.

02:44PM 25   Q.   BUT YOU STILL SAW THESE ATTACHMENTS AT SOME POINT?

02:45PM 1    A.   YEAH.  I RECALL DR. ROSAN SHARING THOSE WITH ME.

02:45PM 2              MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS THE

02:45PM 3    FIRST EMAIL ON THE FIRST PAGE, THE ONE FROM MS. HOLMES AND THE

02:45PM 4    ATTACHMENTS.

02:45PM 5              MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

02:45PM 6              THE COURT:  THOSE ARE ADMITTED, AND THEY MAY BE

02:45PM 7    PUBLISHED.

02:45PM 8         (GOVERNMENT'S EXHIBIT 291 WAS RECEIVED IN EVIDENCE.)

02:45PM 9    BY MR. SCHENK:

02:45PM 10   Q.   LET'S START FIRST WITH AN EMAIL FROM MS. HOLMES ON

02:45PM 11   APRIL 2010.

02:45PM 12        DO YOU SEE THAT EMAIL?

02:45PM 13   A.   YES.

02:45PM 14   Q.   AND IT READS "DR. JAY, ALEX.

02:45PM 15        "AS PER OUR DISCUSSION, PLEASE FIND THREE INDEPENDENT DUE

02:45PM 16   DILIGENCE REPORTS ON THERANOS SYSTEMS ATTACHED TO THIS EMAIL.

02:45PM 17   THESE REPORTS ARE FROM GLAXOSMITHKLINE, PFIZER, AND

02:45PM 18   SCHERING-PLOUGH AFTER THEIR OWN TECHNICAL VALIDATION AND

02:46PM 19   EXPERIENCE WITH THERANOS SYSTEMS IN THE FIELD.  PLEASE NOTE

02:46PM 20   THAT THESE DOCUMENTS ARE STRICTLY CONFIDENTIAL UNDER OUR CDA."

02:46PM 21        IN THE EMAIL, SHE WRITES "INDEPENDENT DUE DILIGENCE

02:46PM 22   REPORTS."  IS THAT CONSISTENT WITH YOUR UNDERSTANDING OF WHAT

02:46PM 23   THESE REPORTS WERE?

02:46PM 24   A.   YES.

02:46PM 25   Q.   AND SHE ALSO WRITES THAT GLAXO, PFIZER, AND

02:46PM   1      SCHERING-PLOUGH DID THIS AFTER THEIR, QUOTE, "OWN TECHNICAL

02:46PM   2      VALIDATION."

02:46PM   3          DID YOU ALSO UNDERSTAND THAT THE PHARMA COMPANIES DID

02:46PM   4      THEIR OWN TECHNICAL VALIDATIONS AND PREPARED THESE REPORTS?

02:46PM   5      A.   YES.

02:46PM   6      Q.   LET'S NOW TURN TO THE REPORTS.  I'D LIKE TO FIRST SHOW YOU

02:46PM   7      PAGE 2.

02:46PM   8          THIS ONE IS FROM GSK.  WHEN YOU WERE CFO AT WALGREENS, YOU

02:46PM   9      SAID THAT DR. JAY SHARED THESE REPORTS WITH YOU.

02:46PM   10         DO YOU RECALL THAT?

02:46PM   11     A.   YES.

02:46PM   12     Q.   AND DO YOU REMEMBER WHAT YOU MADE OF THEM WHEN YOU

02:46PM   13     RECEIVED THE REPORTS?

02:47PM   14     A.   I THOUGHT IT WAS AT LEAST A TERRIFIC PIECE OF INFORMATION

02:47PM   15     ABOUT THE VALIDITY OF WHAT THEY WERE WORKING ON TO BE ABLE TO

02:47PM   16     HAVE THREE PHARMA COMPANIES USE IT, AND MOST OF THESE COMPANIES

02:47PM   17     HAVE VERY BIG LABS AND VERY BIG R&D BUDGETS FOR LABS, AND TO BE

02:47PM   18     ABLE TO VALIDATE SOME COMPONENTS OF WHAT THEY WERE DOING.

02:47PM   19     Q.   AND DID THAT PIECE OF VALIDATION MATTER TO YOU OR MATTER

02:47PM   20     TO WALGREENS AS YOU'RE DECIDING WHETHER TO CREATE A PARTNERSHIP

02:47PM   21     WITH THERANOS?

02:47PM   22     A.   CERTAINLY AN IMPORTANT PIECE.

02:47PM   23     Q.   WHY?

02:47PM   24     A.   AGAIN, THE PHARMACY COMPANIES IN GENERAL ARE MUCH MORE

02:47PM   25     ADEPT AT THE LAB WORK THAT THEY DO BOTH FOR THE CLINICAL WORK

02:47PM  1    FOR THEIR DRUG DEVELOPMENT, AS WELL AS MANY CASES FOR THEIR LAB

02:47PM  2    WORK OUTRIGHT.

02:47PM  3        SO BEING ABLE TO HAVE, AGAIN, THEIR VALIDATION, THEIR

02:47PM  4    ANALYSIS, JUST BEING ABLE TO KNOW THAT 10 OF THE TOP 15 WERE

02:47PM  5    ACTIVELY WORKING AND THREE WOULD BE WORKING TO VALIDATE AND

02:48PM  6    PUBLISH OR AT LEAST TO CREATE A PARTNER WE THOUGHT WAS VERY

02:48PM  7    IMPORTANT.

02:48PM  8    Q.   AND IF YOU WOULD NOW TURN TO PAGE 8 IN THE DOCUMENT.  WE

02:48PM  9    SEE THE VALIDATION REPORT FROM PFIZER.

02:48PM  10        DO YOU SEE THAT?

02:48PM  11   A.   I DO.

02:48PM  12   Q.   AND DID YOU NOTICE THAT PFIZER'S LOGO WAS ON THE DOCUMENT

02:48PM  13   WHEN YOU LOOKED AT THIS INITIALLY?

02:48PM  14   A.   YES.

02:48PM  15   Q.   AND WHAT DID YOU MAKE OF THAT FACT?

02:48PM  16   A.   MY ASSUMPTION WAS JUST THAT THIS WAS EITHER WRITTEN BY

02:48PM  17   PFIZER WITH THE APPROVAL OF THERANOS TO SHARE, OR IT WAS

02:48PM  18   WRITTEN BY THERANOS WITH PFIZER'S APPROVAL THAT THEY AGREED TO

02:48PM  19   WHAT WAS WRITTEN.

02:48PM  20   Q.   I'D NOW LIKE TO DRAW YOUR ATTENTION TO PAGE 34 IN THE

02:48PM  21   DOCUMENT.

02:48PM  22        NOW WE'RE LOOKING AT THE VALIDATION REPORT FROM SCHERING

02:49PM  23   CORPORATION, SCHERING-PLOUGH.

02:49PM  24        DO YOU NOTICE THAT THE SCHERING-PLOUGH LOGO WAS ON THIS

02:49PM  25   DOCUMENT ALSO?

02:49PM  1    A.   YES.

02:49PM  2    Q.   AND IN THE SECOND LINE, IS THE WORD "INSTITUTE"

02:49PM  3    MISSPELLED?

02:49PM  4    A.   YES.

02:49PM  5    Q.   AND DID YOU NOTICE THAT AT THE TIME?

02:49PM  6    A.   NO.

02:49PM  7    Q.   COULD WE NOW TURN TO EXHIBIT 300 IN YOUR BINDER.

02:49PM  8         AFTER YOU LEFT THE THERANOS HEADQUARTERS AND WENT BACK TO

02:49PM  9    ILLINOIS, DID YOU CONTINUE TO HAVE FURTHER MEETINGS WITH

02:49PM 10    THERANOS?

02:49PM 11    A.   YES.

02:49PM 12    Q.   FOR WHAT PURPOSE?  WHAT WERE YOU -- WHAT WAS WALGREENS

02:49PM 13    CONSIDERING?

02:49PM 14    A.   LIKE I SAID BEFORE, I THINK WE THOUGHT THAT THIS WAS ONE

02:50PM 15    OF THE MOST EXCITING COMPANIES THAT WE HAD SEEN, MAYBE NOT JUST

02:50PM 16    IN LAB BUT IN GENERAL; THAT WHAT THEY WERE DOING WAS VERY

02:50PM 17    DISRUPTIVE AND COULD BE BETTER, FASTER, CHEAPER THAN WHAT HAD

02:50PM 18    BEEN DONE BEFORE; THAT IT COULD REALLY CHANGE THE GAME IN TERMS

02:50PM 19    OF PROVIDING MORE ACCESSIBLE LAB AND BETTER OUTCOMES FOR

02:50PM 20    PATIENTS, AND SO WE WERE VERY EXCITED ABOUT FORMING A

02:50PM 21    PARTNERSHIP.

02:50PM 22    Q.   AND WAS ONE OF THE NEXT STEPS YOU TOOK TO HAVE ANOTHER

02:50PM 23    MEETING, THIS TIME IN ILLINOIS, WITH MS. HOLMES AND

02:50PM 24    MR. BALWANI?

02:50PM 25    A.   YES.

02:50PM  1    Q.   AND IS EXHIBIT 300 AN EMAIL FROM YOU TO OTHER FOLKS AT

02:50PM  2    WALGREENS IN ADVANCE OF THAT MEETING?

02:50PM  3    A.   YES.

02:50PM  4            MR. SCHENK:   YOUR HONOR, THE GOVERNMENT OFFERS

02:50PM  5    EXHIBIT 300.

02:50PM  6            MR. DOWNEY:   NO OBJECTION, YOUR HONOR.

02:50PM  7            THE COURT:   IT'S ADMITTED.   IT MAY BE PUBLISHED.

02:50PM  8        (GOVERNMENT'S EXHIBIT 300 WAS RECEIVED IN EVIDENCE.)

02:50PM  9    BY MR. SCHENK:

02:50PM  10   Q.   IF WE CAN START WITH YOUR EMAIL THAT BEGINS ON THE MIDDLE

02:50PM  11   OF THE PAGE AND CAPTURE THE REST OF THE SCREEN ALL OF THE WAY

02:50PM  12   DOWN.

02:51PM  13       YOU WROTE THIS APRIL 26TH, 2010, SO ABOUT A MONTH AFTER

02:51PM  14   YOUR TRIP TO THERANOS HEADQUARTERS; IS THAT RIGHT?

02:51PM  15   A.   CORRECT.

02:51PM  16   Q.   AND YOU WROTE TO SEVERAL INDIVIDUALS FROM WALGREENS.   SORT

02:51PM  17   OF GENERALLY, WHO WERE THESE INDIVIDUALS?

02:51PM  18   A.   THIS WOULD BE A COMPILATION OF, YOU KNOW, EIGHT, NINE OF

02:51PM  19   THE TOP OFFICERS IN THE COMPANY, AS WELL AS EXECUTIVES WHO

02:51PM  20   OVERSAW NEW BUSINESS DEVELOPMENT, AS WELL AS EXECUTIVES WHO

02:51PM  21   WERE FROM A HEALTH CARE BACKGROUND.

02:51PM  22   Q.   AND THE FIRST NAME WE SEE IS GREG WASSON.   WAS HE THE CEO

02:51PM  23   AT THE TIME?

02:51PM  24   A.   YES, HE WAS.

02:51PM  25   Q.   IN THE EMAIL YOU WRITE, "AS YOU KNOW, PROVIDING DIAGNOSTIC

02:51PM  1    SERVICES IN THE STORES, RETAIL CLINICS, WORK SITE HEALTH

02:51PM  2    CENTERS, HOME CARE, ET CETERA, IS IN OUR STRATEGIC DOCUMENT AND

02:51PM  3    HAS BEEN PART OF OUR BOARD DISCUSSIONS."

02:51PM  4         WHAT DID YOU MEAN BY THAT, IN OUR STRATEGIC DOCUMENT AND

02:51PM  5    HAS BEEN PART OF OUR BOARD DISCUSSIONS?

02:52PM  6    A.   WELL, LIKE ANY COMPANY, WALGREENS HAS A STRATEGY OF BOTH

02:52PM  7    OVERARCHING THEMES, AS WELL AS SPECIFIC INITIATIVES, AND WE

02:52PM  8    WERE WORKING TO KEEP MOVING AGAIN INTO ADDITIONAL SPACES IN

02:52PM  9    HEALTH CARE THAT WE THOUGHT MADE SENSE FOR THE COMPANY.

02:52PM  10        AGAIN, ONE OF THE ONES MOST PEOPLE WOULD BE FAMILIAR WITH

02:52PM  11   WOULD BE VACCINATIONS, BUT THAT MOVING INTO THE LAB SPACE AND

02:52PM  12   PROVIDING MORE ACCESSIBLE LAB FOR PATIENTS WAS ANOTHER VERY

02:52PM  13   INTERESTING OPPORTUNITY.

02:52PM  14   Q.   A SENTENCE DOWN, OR TWO SENTENCES DOWN, YOU WRITE, "ON

02:52PM  15   FRIDAY NEXT WEEK WE HAVE ASKED A COMPANY, THERANOS, WHO HAS A

02:52PM  16   NEW TECHNOLOGY (AND WE BELIEVE TO POTENTIALLY BE THE LEADER IN

02:52PM  17   THE SPACE) TO PRESENT TO OUR SENIOR TEAM."

02:52PM  18        IS THAT TRUE, DID YOU ASK THERANOS TO COME AND PRESENT?

02:52PM  19   A.   YES.

02:52PM  20   Q.   AND THEN YOU WRITE, "THE REASONS WHY WE ARE SO ENCOURAGED

02:52PM  21   ARE," AND THEN I'D LIKE TO GO THROUGH SOME OF THESE REASONS

02:52PM  22   WITH YOU.

02:52PM  23        BUT FIRST, WHERE DID YOU GET THE INFORMATION THAT YOU

02:52PM  24   WROTE IN THIS LIST?  WHERE DID THAT COME FROM?

02:53PM  25   A.   THIS LIST WAS A MIX OF THE PRESENTATION THAT I SAW, AS

02:53PM 1    WELL AS THE DISCUSSION, THE Q & A AND THE DIALOGUE THAT WE HAD

02:53PM 2    AT THE PRIOR MEETING.

02:53PM 3    Q.   SO THE PRESENTATION THAT WE LOOKED AT, THE POWERPOINT

02:53PM 4    SLIDES?

02:53PM 5    A.   CORRECT.

02:53PM 6    Q.   AND THEN THE QUESTIONS AND ANSWERS THAT YOU RECEIVED WHEN

02:53PM 7    YOU WERE AT HEADQUARTERS FOR THERANOS?

02:53PM 8    A.   CORRECT, JUST MY PERSONAL NOTES THAT I WOULD HAVE TAKEN

02:53PM 9    FROM THE MEETING.

02:53PM 10   Q.   NUMBER 1 IS "50 TO 70 PERCENT CHEAPER THAN TESTS DONE AT

02:53PM 11   NORMAL LABS WHILE ALLOWING US TO EARN A ROBUST GROSS/NET

02:53PM 12   PROFIT.

02:53PM 13       "A.   DISRUPTIVE TECHNOLOGY THAT CUTS ENTIRE INFRASTRUCTURE

02:53PM 14   OF A CLINICAL LAB, NO COURIERS, NO EXPENSIVE TESTING EQUIPMENT,

02:53PM 15   NO TEAMS OF TRAINED LAB TECHS, NO BIG BUILDINGS, PHARM TECH

02:53PM 16   LEVEL PERSON CAN RUN DEVICE?"

02:53PM 17       SO HELP ME TO UNDERSTAND WHAT YOU MEANT WHEN YOU WROTE

02:53PM 18   "DISRUPTIVE TECHNOLOGY THAT CUTS ENTIRE INFRASTRUCTURE OF A

02:54PM 19   CLINICAL LAB."

02:54PM 20   A.   I THINK THIS REALLY GOES TO PART OF THE VALUE PROPOSITION

02:54PM 21   OF, YOU KNOW, 50 TO 70 PERCENT LESS EXPENSIVE.

02:54PM 22       AGAIN, WHEN YOU THINK OF CONVENTIONAL LABS WHERE YOU HAVE

02:54PM 23   VERY EXPENSIVE MACHINES, WHERE YOU HAVE, AGAIN, REAL ESTATE TO

02:54PM 24   HOUSE THAT, WHERE YOU MIGHT HAVE RELATIONSHIPS WITH OFFICE

02:54PM 25   SPACE AND INDUSTRIAL PARKS TO COLLECT SAMPLES, WHERE YOU HAVE

02:54PM  1    COURIERS THAT HAVE TO, YOU KNOW, COURIER YOUR SAMPLES, YOU CAN

02:54PM  2    ARGUE THERE'S A LOT OF ROOM FOR EFFICIENCY AND OPPORTUNITY, AND

02:54PM  3    WE BELIEVED AT SCALE, AS I DO BELIEVE THAT SUNNY AND ELIZABETH

02:54PM  4    DID, THAT THERE WAS AN TREMENDOUS OPPORTUNITY TO REDUCE THAT

02:54PM  5    WASTE AND TO GIVE VALUE TO CUSTOMERS.

02:54PM  6    Q.   YOU THEN WROTE, "NO COURIERS."  DID YOU UNDERSTAND THAT

02:54PM  7    BLOOD TESTING THROUGH THERANOS WOULD NOT REQUIRE COURIERS TO

02:54PM  8    TRANSPORT BLOOD?

02:54PM  9    A.   CORRECT.  AND, AGAIN, I THINK TO THE EXTENT THAT YOU HAVE

02:54PM 10    AN EDISON IN FRONT OF YOU, THAT'S CORRECT.

02:55PM 11         AGAIN, TO THE EXTENT THAT YOU'RE GOING TO TAKE BLOOD

02:55PM 12    SAMPLES AND THEN SEND THEM TO AN EDISON, YOU'D HAVE SOME

02:55PM 13    COURIER PROCESS.

02:55PM 14    Q.   SURE.  AND THEN YOU WRITE "NO EXPENSIVE TESTING

02:55PM 15    EQUIPMENT."

02:55PM 16         WHAT DID YOU MEAN BY THAT?

02:55PM 17    A.   AGAIN, IT MIGHT BE SOMEWHAT ILLUSTRATIVE, BUT MY

02:55PM 18    UNDERSTANDING IS THAT CONVENTIONAL LAB WILL HAVE VERY EXPENSIVE

02:55PM 19    MACHINES, VERY LARGE MACHINES THAT HAVEN'T CHANGED MUCH IN MANY

02:55PM 20    YEARS, HUNDREDS OF THOUSANDS OF DOLLARS, IF NOT MILLIONS, AND

02:55PM 21    THAT YOU NEED SEVERAL OF THOSE TO BE ABLE TO DO A BROAD MENU OF

02:55PM 22    TESTS.

02:55PM 23         SO BEING ABLE, AGAIN, TO MOVE IT FROM MORE OF THAT

02:55PM 24    MAINFRAME TO A LAPTOP TO WHERE YOU'RE CREATING LOTS OF EDISONS

02:55PM 25    THAT ARE MORE CLOSER TO THE CUSTOMER VERSUS, AGAIN, INVESTING

02:55PM  1    IN THOSE VERY EXPENSIVE TRADITIONAL LAB TESTING MACHINES.

02:55PM  2    Q.   SO IN YOUR MIND, WAS ONE OF THE BENEFITS TO THERANOS THAT

02:55PM  3    THEY DID NOT USE THIS EXPENSIVE TRADITIONAL LAB TESTING

02:56PM  4    EQUIPMENT?

02:56PM  5    A.   CORRECT.

02:56PM  6    Q.   AND IF, IN FACT, THERANOS DID USE THIS EXPENSIVE

02:56PM  7    TRADITIONAL LAB TESTING EQUIPMENT, YOU WOULD LOSE THAT BENEFIT

02:56PM  8    THAT YOU JUST DESCRIBED TO US?

02:56PM  9    A.   CORRECT.

02:56PM  10   Q.   YOU WROTE, "NO TEAMS OF TRAINED LAB TECHS, NO BIG

02:56PM  11   BUILDINGS, AND THAT THE PHARM TECH LEVEL PERSON CAN RUN THE

02:56PM  12   DEVICE."

02:56PM  13        WHAT DID YOU MEAN BY THAT?

02:56PM  14   A.   AGAIN, IT'S -- IF YOU LOOK AT HOW A LAB IS DONE TODAY,

02:56PM  15   IT'S -- SOME OF THE LARGE LAB PLAYERS, THEY'RE NOT ONLY

02:56PM  16   INVESTING IN INFRASTRUCTURE OF LAB MACHINES, THEY'RE ALSO

02:56PM  17   INVESTING IN INFRASTRUCTURE OF COLLECTION POINTS.  AGAIN, IT

02:56PM  18   MIGHT BE AN OFFICE BUILDING, REAL ESTATE.  IT MIGHT BE IN AN

02:56PM  19   INDUSTRIAL PARK.

02:56PM  20        AND, AGAIN, WITH THE SINGLE BLOOD DROP AND THE NANOTAINER

02:56PM  21   BEING ABLE TO DO THAT AT THE POINT OF CARE, AND PERHAPS WITH

02:56PM  22   SOMEBODY WHO IS NOT A PHLEBOTOMIST WAS ALSO A BENEFIT.

02:56PM  23   Q.   AND DID YOU UNDERSTAND THAT WHEN USING THE EDISON DEVICE,

02:56PM  24   YOU DID NOT NEED A PHLEBOTOMIST TO DRAW BLOOD?

02:57PM  25   A.   CORRECT.

02:57PM  1    Q.   AND WHAT WAS A PHARMA TECH LEVEL PERSON?

02:57PM  2    A.   A PHARMA TECH WOULD BE SOMEBODY WHO IS NOT A PHARMACIST,

02:57PM  3    BUT WHO HAS HAD A FAIR AMOUNT OF TRAINING IN PHARMACY AND TO

02:57PM  4    BECOME A CERTIFIED TECHNICIAN.

02:57PM  5    Q.   BUT NOT A PHLEBOTOMIST?

02:57PM  6    A.   BUT NOT A PHLEBOTOMIST.

02:57PM  7    Q.   SO IF, IN FACT, THERANOS DREW BLOOD THROUGH A VEIN THAT

02:57PM  8    REQUIRED A PHLEBOTOMIST, YOU WOULD LOSE THAT ADVANTAGE; IS THAT

02:57PM  9    RIGHT?

02:57PM  10   A.   THAT WOULD BE TRUE.

02:57PM  11   Q.   IN NUMBER 2 YOU WRITE, "96 PERCENT OF TESTS DONE AT BIG

02:57PM  12   LABS ($52 BILLION MARKET) WILL BE ABLE TO BE DONE ON THESE

02:57PM  13   DEVICES."

02:57PM  14        WHAT DID YOU MEAN BY THAT?

02:57PM  15   A.   AGAIN, THAT WAS MY UNDERSTANDING OF THE PERCENT OF TESTS

02:57PM  16   THAT COULD BE DONE VIA WHETHER BLOOD, SALIVA, URINE, VIA THAT

02:57PM  17   IMMUNOASSAY TECHNOLOGY OF HAVING AN ANTIGEN REACT AND HAVING A,

02:58PM  18   YOU KNOW, A PROTEIN MARKER AND AN OPTIC READER BE ABLE TO

02:58PM  19   DECIDE.  SO IT WAS AN AMOUNT OF TESTING IN THEORY TO BE DONE ON

02:58PM  20   AN EDISON PLATFORM.

02:58PM  21   Q.   AND WHERE DID YOU GET THAT UNDERSTANDING?

02:58PM  22   A.   THAT WAS WITH MY DISCUSSION WITH SUNNY AND ELIZABETH.

02:58PM  23   Q.   NUMBER 3, YOU WRITE, "CONSUMER BENEFITS, A IS FINGERSTICK

02:58PM  24   VERSUS BLOOD DRAW."

02:58PM  25        WHAT DID YOU MEAN BY THAT?

02:58PM  1    A.   WELL, THERE'S A LOT OF BENEFITS FOR ONE DROP OF BLOOD

02:58PM  2    VERSUS PHLEBOTOMY FOR A LOT OF PEOPLE.  SOME PEOPLE DON'T LIKE

02:58PM  3    BLOOD, BUT THERE ARE PEOPLE WHO HAVE CHILDREN WITH SMALL VEINS

02:58PM  4    AND THERE ARE PEOPLE WITH SMALL VEINS, AND THERE MIGHT BE

02:58PM  5    PEOPLE WHO HAVE CANCER TREATMENT OR WHERE THEY HAVE HAD A LOT

02:58PM  6    OF VENA PUNCTURE DONE.

02:58PM  7         AND SO THERE'S A LOT OF LEGITIMATE REASONS FOR LESS BLOOD

02:58PM  8    TO BE VIABLE OR BETTER.

02:58PM  9    Q.   OKAY.  AND FROM YOUR DISCUSSIONS WITH MS. HOLMES, DID YOU

02:58PM  10   UNDERSTAND THAT THE THERANOS TECHNOLOGY TESTED BLOOD DRAWN FROM

02:59PM  11   A FINGERSTICK?

02:59PM  12   A.   YES.

02:59PM  13   Q.   B IS "RESULTS IN 30 MINUTES INSTEAD OF TOMORROW."

02:59PM  14        WHAT WERE YOU COMMUNICATING THERE?

02:59PM  15   A.   MY UNDERSTANDING WAS THAT ONCE YOU DREW THE BLOOD AND PUT

02:59PM  16   THE BLOOD IN THE MACHINE AND THE CARTRIDGE IN THE MACHINE, THAT

02:59PM  17   IT WOULD TAKE ABOUT 15 OR 20 MINUTES FOR THE EDISON MACHINE TO

02:59PM  18   BE ABLE TO INTERPRET THE RESULTS AND THEN THOSE RESULTS WOULD,

02:59PM  19   AGAIN, GET FED INTO THE CLOUD SOMEWHERE FOR A PATHOLOGIST OR AN

02:59PM  20   ALGORITHM OR WHATEVER TO BE ABLE TO DECIPHER THE FINAL OUTCOME.

02:59PM  21   Q.   AND DID YOU UNDERSTAND THAT THAT WAS FASTER THAN

02:59PM  22   TRADITIONAL TESTING?  YOU WROTE "INSTEAD OF TOMORROW"?

02:59PM  23   A.   YES.  IF YOU HAVE GO INTO AN INDUSTRIAL PARK AND THEY TAKE

02:59PM  24   A VIAL OF YOUR BLOOD, YOU'RE GOING TO HAVE TO, YOU KNOW, WAIT

02:59PM  25   FOR THAT VIAL TO BE SHIPPED TO A CONVENTIONAL LAB AND WAIT FOR

03:00PM 1    THAT TO BE RUN ON A TEST IN A CONVENTIONAL LAB, AND SO

03:00PM 2    EFFECTIVELY YOU'RE CUTTING OUT A LOT OF THAT TIME.

03:00PM 3    Q.   WAS THIS ASPECT OF SPEED IMPORTANT TO WALGREENS?

03:00PM 4    A.   I THINK BEING ABLE TO GIVE DOCTORS AND THEIR PATIENTS THE

03:00PM 5    DIAGNOSTIC RESULTS FASTER IS ALWAYS BETTER ON AN APPLES TO

03:00PM 6    APPLES BASIS.

03:00PM 7    Q.   AND IF IN FACT THERANOS WAS TESTING BLOOD ON CONVENTIONAL

03:00PM 8    DEVICES THAT TOOK THE LONGER TURNAROUND TIME, WOULD YOU LOSE

03:00PM 9    THE ADVANTAGE THAT YOU JUST DESCRIBED?

03:00PM 10   A.   YOU WOULD LOSE THE ADVANTAGE.

03:00PM 11   Q.   NUMBER 4 YOU WRITE, "7 YEARS IN DEVELOPMENT LED BY FUNDING

03:00PM 12   OF SILICON VALLEY EXPERTS SUCH AS LARRY ELLISON WITH STRONG

03:00PM 13   EXPERIENCED MANAGEMENT TEAM (VERY WELL FUNDED COMPANY)."

03:00PM 14       WHAT DID YOU MEAN BY THAT?

03:00PM 15   A.   JUST WHAT IT SAYS, WHICH IS OUR UNDERSTANDING IS THAT THEY

03:00PM 16   HAD HAD MR. ELLISON AND PERHAPS SOME VERY OTHER INFLUENTIAL

03:00PM 17   OTHER PEOPLE INVEST, AND I THINK THAT'S ALWAYS A GOOD SIGN WHEN

03:01PM 18   YOU HAVE PEOPLE WHO ARE IN THIS COMMUNITY OF TECHNOLOGY AND

03:01PM 19   WANT TO INVEST THEIR OWN MONEY, IT SPEAKS HIGHLY FOR THAT

03:01PM 20   COMPANY.

03:01PM 21   Q.   AND HOW ABOUT THAT THE COMPANY HAD BEEN AROUND FOR

03:01PM 22   SEVEN YEARS AT THAT TIME, DID THAT MATTER TO YOU?

03:01PM 23   A.   I DON'T KNOW IF THAT MATTERED.  IT SEEMED LIKE THEY HAD

03:01PM 24   ACCOMPLISHED A LOT IN THAT PERIOD, BUT I GUESS THE FACT THAT IT

03:01PM 25   HADN'T JUST STARTED THE DAY BEFORE IS PROBABLY IMPORTANT TO

MIQUELON DIRECT BY MR. SCHENK

03:01PM   1    GIVE SOME LEGITIMACY.

03:01PM   2    Q.   YOU SAY IT SEEMED LIKE THEY HAD ACCOMPLISHED A LOT DURING

03:01PM   3    THAT PERIOD OF TIME.

03:01PM   4         WHERE DID YOU GET THAT IMPRESSION?

03:01PM   5    A.   WELL, I MEAN, I WOULD SAY IF AFTER SEVEN YEARS YOU'RE

03:01PM   6    DOING CLINICAL WORK WITH 10 OF THE TOP 15 PHARMA COMPANIES,

03:01PM   7    THAT'S PRETTY IMPRESSIVE.

03:01PM   8    Q.   AND DID MS. HOLMES TELL YOU THAT?

03:01PM   9    A.   MS. HOLMES AND MR. BALWANI, YEAH.

03:01PM  10    Q.   THE LAST ITEM ON THIS PAGE IS NUMBER 1 AND IT READS, "DOES

03:01PM  11    NOT EVEN VALUE NEW TESTS SUCH AS BREAST CANCER AND PROSTATE

03:01PM  12    CANCER TESTS THEY ARE DEVELOPING."

03:02PM  13         WHAT DID YOU MEAN BY THAT?

03:02PM  14    A.   THIS WAS MORE OF THE KIND OF FUTURISTIC THINGS THAT THEY

03:02PM  15    WERE WORKING ON.  I THINK WE CALLED IT, YOU KNOW, VERSION 3.

03:02PM  16    SO IT WASN'T ANYTHING THAT THEY HAD -- SO THEY HAD ALREADY

03:02PM  17    DONE.  IT WAS MORE, AGAIN, WHEN YOU -- YOU KNOW, IF I JUST

03:02PM  18    PARSE, YOU KNOW, IF YOU THINK ABOUT A PSA TEST, GETTING A PSA

03:02PM  19    TEST FREQUENTLY AND HAVING IT VERY ACCURATE IS A BENEFIT.

03:02PM  20         IF YOU HAVE A PSA TEST DONE INFREQUENTLY AND IT'S DONE ON

03:02PM  21    TWO DIFFERENT MACHINES, THEY COULD BE CALIBRATED DIFFERENTLY

03:02PM  22    AND THE RESULT MAY NOT BE MEANINGFUL.

03:02PM  23         ON THE BREAST CANCER SIDE, THEY WERE LOOKING AT I THINK A

03:02PM  24    FEW SPECIFIC CANCERS WHERE THERE HAD BEEN NO BIOMARKER THAT HAD

03:02PM  25    BEEN EVER DISCOVERED, AND MAYBE THERE WON'T BE, BUT BY BEING

03:02PM  1    ABLE TO TEST FREQUENTLY AND ACCURATELY ACROSS MANY DIFFERENT

03:02PM  2    FACETS AND THEN RUNNING ALGORITHMS, YOU MIGHT SEE SEVERAL

03:03PM  3    MARKERS CHANGE WHICH WOULD BE PERHAPS AN INDICATION OF

03:03PM  4    PREDICTIVENESS OF FUTURE BREAST CANCER.

03:03PM  5    Q.   AND YOU WROTE "DOES NOT EVEN VALUE NEW TESTS."

03:03PM  6         WHAT DOES THAT MEAN?  DID YOU UNDERSTAND THAT NEW TESTS

03:03PM  7    WERE COMING IN THE FUTURE AS OPPOSED TO CURRENT CAPABILITIES?

03:03PM  8    A.   RIGHT.  THOSE FUTURE BASED TESTS, THOSE VERSION 3 I WOULD

03:03PM  9    SAY, AGAIN, I THINK THOSE WERE ALWAYS PRESENTED AS A

03:03PM 10    POSSIBILITY DOWN THE ROAD.  SO THAT WASN'T THE BASIS FOR OUR

03:03PM 11    PARTNERSHIP.

03:03PM 12         THE OTHER COMPONENT OF THIS IS JUST WHEN YOU LOOK AT THE

03:03PM 13    LAB SPACES, YOU KNOW, 50-, $60 BILLION OF LAB SALES AT THE TIME

03:03PM 14    I BELIEVE WAS ABOUT A BILLION TESTS DONE AT ABOUT $60 ON

03:03PM 15    AVERAGE, ALTHOUGH IT VARIES.

03:03PM 16         THERE WAS A BELIEF THAT IF YOU COULD DO THIS TYPE OF

03:03PM 17    TESTING WITH A DROP OF BLOOD ACCURATELY, YOU KNOW, CLOSER TO

03:03PM 18    THE CUSTOMER, THAT YOU WOULD ACTUALLY SEE A LOT MORE TESTING

03:03PM 19    INCUR.

03:03PM 20              MR. SCHENK:  THANK YOU, YOUR HONOR.

03:04PM 21         YOUR HONOR, I WAS GOING TO MOVE TO ANOTHER DOCUMENT.  I'M

03:04PM 22    CONSCIOUS OF THE TIME.

03:04PM 23              THE COURT:  THANK YOU.  LET'S TAKE OUR EVENING BREAK

03:04PM 24    NOW, SIR.  WE'LL BEGIN TOMORROW AT 9:00 O'CLOCK.  WE'LL BEGIN

03:04PM 25    AT 9:00 O'CLOCK, PLEASE.

03:04PM 1      LADIES AND GENTLEMEN, WE'LL TAKE OUR EVENING BREAK.  I

03:04PM 2  KNOW SOME OF YOU ARE GOING TO STAY AND SPEAK WITH ME, BUT LET

03:04PM 3  ME TELL ALL OF YOU, PLEASE, AGAIN, I'D LIKE TO ADMONISH YOU

03:04PM 4  THAT YOU DO NOT DO ANY INVESTIGATION ON YOUR OWN ABOUT ANYTHING

03:04PM 5  ABOUT THIS CASE OR ANYONE INVOLVED IN IT.

03:04PM 6      PLEASE AVOID ANY MEDIA, SOCIAL MEDIA, NEWS, NEWSPAPERS,

03:04PM 7  PERIODICALS, OR ANY OTHER NEWS ABOUT THIS CASE.

03:04PM 8      SHOULD YOU COME ACROSS THAT INADVERTENTLY, I'M GOING TO

03:04PM 9  ASK YOU TO PLEASE TURN IT OFF, CLOSE THE BOOK, TURN DOWN THE

03:04PM 10  VOLUME, AND I'LL ASK YOU TOMORROW MORNING AGAIN WHETHER OR NOT

03:04PM 11  THIS HAS HAPPENED TO ANYONE.

03:04PM 12      PLEASE HAVE A GOOD EVENING.

03:04PM 13      TOMORROW WE'LL BEGIN AT 9:00 A.M.

03:04PM 14      THOSE WHO ARE GOING TO REMAIN, MS. KRATZMANN WILL TAKE YOU

03:04PM 15  BACK TO THE JURY ROOM AND I'LL CALL YOU IN ONE AT A TIME FOR

03:04PM 16  OUR CONVERSATION.

03:04PM 17      THANK YOU VERY MUCH.

03:04PM 18      ANYTHING FURTHER BEFORE WE RECESS?

03:05PM 19          MR. SCHENK:  NO.  THANK YOU.

03:05PM 20          MR. DOWNEY:  NOTHING FURTHER.

03:05PM 21      THE COURT:  ALL RIGHT.  THANK YOU.

03:05PM 22  THANK YOU, SIR.  YOU MAY STAND DOWN.  THANK YOU.

03:05PM 23  (JURY OUT AT 3:05 P.M.)

03:05PM 24      THE COURT:  PLEASE BE SEATED.  THANK YOU.

03:05PM 25  COUNSEL, YOU'LL IDENTIFY ONE OF YOU WHO WILL COME BACK TO

03:05PM  1      CHAMBERS AND THEN JUST LET MS. KRATZMANN KNOW AND WE'LL LET YOU

03:05PM  2      KNOW WHEN WE HAVE THINGS SET UP.

03:05PM  3                  MR. SCHENK:   THANK YOU.

03:06PM  4           (RECESS FROM 3:06 P.M. UNTIL 3:20 P.M.)

03:06PM  5           (SEALED PROCEEDINGS IN CHAMBERS.)

03:06PM  6      ///

03:06PM  7      ///

03:06PM  8

03:20PM  9

        10

        11

        12

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

1

2

3                  CERTIFICATE OF REPORTERS

4

5

6

7        WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8   UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9   CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10  HEREBY CERTIFY:

11       THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12  A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13  ABOVE-ENTITLED MATTER.

14

15

16  _____
    IRENE RODRIGUEZ, CSR, CRR
    CERTIFICATE NUMBER 8076
17

18

19  _____
    LEE-ANNE SHORTRIDGE, CSR, CRR
    CERTIFICATE NUMBER 9595
20

21       DATED:  OCTOBER 12, 2021

22

23

24

25