1

2                   UNITED STATES DISTRICT COURT

3                 NORTHERN DISTRICT OF CALIFORNIA

4                       SAN JOSE DIVISION

5

    UNITED STATES OF AMERICA,        )   CR-18-00258-EJD
6                                     )
                    PLAINTIFF,        )   SAN JOSE, CALIFORNIA
7                                     )
              VS.                     )   VOLUME 20
8                                     )
    ELIZABETH A. HOLMES,              )   OCTOBER 15, 2021
9                                     )
                    DEFENDANT.        )   PAGES 3758 - 3880
10   _____    )

11                  TRANSCRIPT OF TRIAL PROCEEDINGS
12            BEFORE THE HONORABLE EDWARD J. DAVILA
                  UNITED STATES DISTRICT JUDGE
13
     A P P E A R A N C E S:
14
     FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
15                          BY:  JOHN C. BOSTIC
                                 JEFFREY B. SCHENK
16                          150 ALMADEN BOULEVARD, SUITE 900
                            SAN JOSE, CALIFORNIA 95113
17
                            BY:  ROBERT S. LEACH
18                               KELLY VOLKAR
                            1301 CLAY STREET, SUITE 340S
19                          OAKLAND, CALIFORNIA 94612

20         (APPEARANCES CONTINUED ON THE NEXT PAGE.)

21
     OFFICIAL COURT REPORTERS:
22                          IRENE L. RODRIGUEZ, CSR, RMR, CRR
                            CERTIFICATE NUMBER 8074
23                          LEE-ANNE SHORTRIDGE, CSR, CRR
                            CERTIFICATE NUMBER 9595
24
          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25             TRANSCRIPT PRODUCED WITH COMPUTER

1       A P P E A R A N C E S: (CONT'D)
2

3       FOR DEFENDANT HOLMES:    WILLIAMS & CONNOLLY LLP
                                BY:  KEVIN M. DOWNEY
4                                    LANCE A. WADE
                                     KATHERINE TREFZ
5                                    ANDREW LEMENS
                                     PATRICK LOOBY
6                                    RICHARD CLEARY
                                725 TWELFTH STREET, N.W.
7                               WASHINGTON, D.C. 20005

8                               LAW OFFICE OF JOHN D. CLINE
                                BY:  JOHN D. CLINE
9                               ONE EMBARCADERO CENTER, SUITE 500
                                SAN FRANCISCO, CALIFORNIA 94111
10

11      ALSO PRESENT:           FEDERAL BUREAU OF INVESTIGATION
                                BY:  ADELAIDA HERNANDEZ
12
                                OFFICE OF THE U.S. ATTORNEY
13                              BY:  LAKISHA HOLLIMAN, PARALEGAL
                                     MADDI WACHS, PARALEGAL
14
                                WILLIAMS & CONNOLLY
15                              BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL

16                              TBC
                                BY:  BRIAN BENNETT, TECHNICIAN
17

18

19

20

21

22

23

24

25

1

INDEX OF PROCEEDINGS

2

    GOVERNMENT'S:

3

4

**SUNIL DHAWAN**
CROSS-EXAM BY MR. WADE (RES.)            P. 3779

5    REDIRECT EXAM BY MR. SCHENK            P. 3827
    RECROSS-EXAM BY MR. WADE                P. 3836

6    FURTHER REDIRECT EXAM BY MR. SCHENK     P. 3836

7

8

**DANIEL EDLIN**
DIRECT EXAM BY MR. BOSTIC                P. 3846

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>INDEX OF EXHIBITS</u>

```
                                    IDENT.      EVIDENCE
GOVERNMENT'S:

4533                                            3803
4528                                            3822
959                                             3872


DEFENDANT'S:

10566                                           3781
10567                                           3782
10562                                           3783
10525                                           3785
10526                                           3786
10529                                           3789
10577                                           3795
10578                                           3797
9941                                            3806
9962                                            3807
10010                                           3809
10527                                           3812
10528                                           3813
```

```
         1      SAN JOSE, CALIFORNIA                    OCTOBER 15, 2021

08:33AM  2                       P R O C E E D I N G S

08:33AM  3           (COURT CONVENED AT 8:33 A.M.)

08:33AM  4           (JURY OUT AT 8:33 A.M.)

08:33AM  5               THE COURT:  LET'S GO ON THE RECORD IN THE HOLMES

08:33AM  6      MATTER.  ALL COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT.

08:34AM  7           WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.

08:34AM  8           I UNDERSTAND THAT COUNSEL WANTED TO SPEAK ABOUT SOMETHING

08:34AM  9      THIS MORNING?

08:34AM  10              MR. DOWNEY:  GOOD MORNING, YOUR HONOR.

08:34AM  11          KEVIN DOWNEY FOR MS. HOLMES.  I WANTED TO PREVIEW FOR THE

08:34AM  12     COURT TWO ISSUES THAT MAY ARISE DURING THE TESTIMONY OF

08:34AM  13     DAN EDLIN, WHO I THINK WILL BE CALLED AT SOME POINT LATER THIS

08:34AM  14     MORNING.

08:34AM  15          ONE OF THE ISSUES IS FAMILIAR TO THE COURT, BUT I WANTED

08:34AM  16     TO REFAMILIARIZE THE COURT BECAUSE IT'S BEEN A WHILE SINCE IT

08:34AM  17     CAME UP.

08:34AM  18          TWO OF THE EXHIBITS THAT ARE ON THE GOVERNMENT'S LIST OF

08:34AM  19     EXHIBITS FOR MR. EDLIN SEEM TO RELATE TO A CLAIM THAT

08:34AM  20     MS. HOLMES ATTEMPTED TO DEFRAUD OR MAKE MISREPRESENTATIONS TO

08:34AM  21     THE DEPARTMENT OF DEFENSE.

08:34AM  22          I THINK THE GOVERNMENT AGREES WITH US THAT DEFRAUDING THE

08:34AM  23     DEPARTMENT OF DEFENSE IS NOT PART OF THE CASE.  IT'S NOT 404(B)

08:34AM  24     EVIDENCE.  SO I THINK THE -- I THINK THAT THAT PROHIBITION

08:35AM  25     APPLIES AS AGREED TO BY THE GOVERNMENT.
```

08:35AM 1          THEY SAY, HOWEVER, THAT THE PRESENTATION SENT TO THE DOD

08:35AM 2     IS INEXTRICABLY INTERTWINED WITH THE REST OF MS. HOLMES'S

08:35AM 3     CONDUCT AND MS. HOLMES'S REPRESENTATIONS TO INVESTORS.

08:35AM 4          THAT REALLY CAN'T BE TRUE.  WE KNOW THAT THE

08:35AM 5     REPRESENTATIONS THAT THEY SEEK TO INTRODUCE WERE MADE ABOUT A

08:35AM 6     YEAR AND A HALF AFTER THERE WERE REPRESENTATIONS TO INVESTORS

08:35AM 7     IN THE WAVE IN 2010 INVESTORS AND ABOUT A YEAR AND A HALF

08:35AM 8     BEFORE THE NEXT SET OF INVESTORS.

08:35AM 9          THERE'S NO APPARENT RELATIONSHIP BETWEEN THE

08:35AM 10    REPRESENTATIONS MADE IN THIS POWERPOINT PRESENTATION MADE TO

08:35AM 11    THE DOD OR ANY RELATIONSHIP TO DIRECT REPRESENTATIONS TO

08:35AM 12    INVESTORS.

08:35AM 13         ALSO, OBVIOUSLY THE NATURE OF THE EVIDENCE IS POTENTIALLY

08:36AM 14    INFLAMMATORY, SO THERE'S ALSO A 403 ISSUE.

08:36AM 15         SO WE HAVE ASKED PREVIOUSLY THAT THIS BE EXCLUDED IN A

08:36AM 16    PRIOR PLEADING, BUT I WANTED TO REFAMILIARIZE THE COURT.

08:36AM 17         IF YOU WOULD LIKE ME TO PASS UP THE TWO EXHIBITS THAT I

08:36AM 18    THINK WE HAVE CONCERNS ABOUT, I'D BE HAPPY TO.

08:36AM 19              THE COURT:  WELL, THAT WOULD BE HELPFUL.  SURE.

08:36AM 20              THE CLERK:  DO YOU HAVE AN EXTRA COPY, COUNSEL?

08:36AM 21              MR. DOWNEY:  I HAVE AN EXTRA COPY FOR THE COURT.  I

08:36AM 22    DON'T THINK I HAVE A SECOND COPY.  I CAN PROVIDE THESE

08:36AM 23    (HANDING.)

08:36AM 24         THESE ARE, YOUR HONOR, EXHIBITS 504 AND 551.  551 IS A

08:36AM 25    MORE LENGTHY POWERPOINT PRESENTATION.  504 IS A SHORTER

08:36AM 1    DOCUMENT WHICH JUST HAS AT THE BACK A NUMBER OF REPRESENTATIONS

08:37AM 2    THAT I ANTICIPATE THAT MR. BOSTIC WILL SEEK TO ASK MR. EDLIN

08:37AM 3    ABOUT ON HIS DIRECT EXAMINATION.

08:37AM 4         THE COURT:  ALL RIGHT.  THANK YOU.

08:37AM 5    I'M NOT GOING TO GO THROUGH THESE JUST NOW, BUT I DO WANT

08:37AM 6    TO HEAR COMMENT.

08:37AM 7    GOOD MORNING, MR. BOSTIC.

08:37AM 8        MR. BOSTIC:  GOOD MORNING, YOUR HONOR.

08:37AM 9    JOHN BOSTIC FOR THE UNITED STATES.

08:37AM 10    I'M HAPPY TO EXPLAIN HOW THESE PARTICULAR EXHIBITS FIT IN

08:37AM 11    WITH THIS CASE AND WHY THEY'RE ADMISSIBLE.

08:37AM 12    FIRST, THE GOVERNMENT DOESN'T AGREE THAT THESE WOULD NOT

08:37AM 13    BE ADMISSIBLE UNDER 404.  I'LL CIRCLE BACK TO THAT, BUT JUST TO

08:37AM 14    MAKE THAT CLEAR.

08:37AM 15    THEY ARE ABSOLUTELY INEXTRICABLY INTERTWINED WITH THE

08:37AM 16    FRAUD CHARGED IN THIS CASE.  THE PRESENTATIONS THAT DEFENSE

08:37AM 17    COUNSEL IS REFERENCING ARE PART OF HOW THERANOS'S RELATIONSHIP

08:37AM 18    AND CONTACTS WITH THE MILITARY BEGAN AND WERE MAINTAINED.  THE

08:37AM 19    NATURE OF THAT RELATIONSHIP WITH THE MILITARY IS A CORE PART OF

08:38AM 20    THIS CASE BECAUSE PART OF THIS CASE INVOLVES MS. HOLMES'S FALSE

08:38AM 21    STATEMENTS TO OTHERS ABOUT THE NATURE OF THAT RELATIONSHIP.

08:38AM 22    SO THE GOVERNMENT NEEDS TO BE ABLE TO SHOW WHAT THE TRUTH

08:38AM 23    WAS, WHAT WAS ACTUALLY HAPPENING, AND THE PROGRESSION AND

08:38AM 24    NATURE OF THAT RELATIONSHIP OVER TIME.

08:38AM 25    THESE COMMUNICATIONS WITH THE MILITARY ARE PART OF TELLING

08:38AM 1    THAT STORY, SO THE JURY NEEDS TO HAVE THAT CONTEXT.

08:38AM 2        MORE SPECIFIC TO THE FALSE STATEMENTS IN THOSE

08:38AM 3    COMMUNICATIONS, THEY'RE INEXTRICABLY INTERTWINED WITH THE

08:38AM 4    SCHEME TO DEFRAUD HERE BECAUSE, LIKE MANY OF THE TOPICS AT

08:38AM 5    ISSUE, THE DEFENDANT'S MISLEADING STATEMENTS ON THE TOPIC OF

08:38AM 6    THE MILITARY OFTEN CAME IN THE FORM OF EXAGGERATIONS,

08:38AM 7    INCREASING THE IMAGE OR IMPRESSION OF WHAT WAS ACTUALLY

08:38AM 8    HAPPENING WITH THE MILITARY, WHEREAS WHERE THINGS ACTUALLY

08:38AM 9    STOOD WERE AT A MUCH MORE KIND OF RUDIMENTARY OR SUPERFICIAL

08:39AM 10   LEVEL.

08:39AM 11       IN ORDER TO HAVE SOMETHING TO EXAGGERATE IN THE FIRST

08:39AM 12   PLACE, MS. HOLMES HAD TO GET THE MILITARY ON THE HOOK, AS IT

08:39AM 13   WERE.  SHE HAD TO GET THEM INTERESTED IN THERANOS'S TECHNOLOGY

08:39AM 14   SO THAT THERE COULD BE SOME LEVEL OF CONTACT FOR HER TO THEN

08:39AM 15   CHARACTERIZE TO OTHERS.

08:39AM 16       IN ORDER TO GET THE MILITARY INTERESTED IN THERANOS'S

08:39AM 17   TECHNOLOGY, MISREPRESENTATIONS ABOUT WHAT THAT TECHNOLOGY COULD

08:39AM 18   DO WERE NECESSARY.

08:39AM 19       SO THAT WAS PART OF THE OVERALL SCHEME TO DEFRAUD BECAUSE

08:39AM 20   IT WAS NECESSARY TO INITIATE AND CONTINUE AND MAINTAIN THAT

08:39AM 21   CONTACT WITH THE MILITARY IN ORDER, REALLY IN SERVICE OF THE

08:39AM 22   CHARGED FRAUD AS TO INVESTORS IN THIS CASE.

08:39AM 23       IT'S ALSO VERY RELEVANT TO MS. HOLMES'S KNOWLEDGE OF THE

08:39AM 24   FALSITY OF THE REPRESENTATIONS SHE MADE LATER.  BECAUSE

08:39AM 25   MS. HOLMES KNEW THAT THE MILITARY'S INTEREST WAS PREMISED ON

08:40AM 1    THE MILITARY'S IMPRESSION OF WHAT THE THERANOS TECHNOLOGY WAS

08:40AM 2    CAPABLE OF, AND BECAUSE SHE KNEW THAT IMPRESSION WAS FALSE

08:40AM 3    BASED ON HER MISLEADING STATEMENTS IN THE EARLY STAGES OF THOSE

08:40AM 4    CONVERSATIONS, SHE WAS AWARE THAT THE DEALINGS WITH THE

08:40AM 5    MILITARY WERE LIKELY NOT TO GET OFF THE GROUND, AND THAT THE

08:40AM 6    MILITARY WAS UNLIKELY TO ACTUALLY BE ABLE TO USE THERANOS'S

08:40AM 7    TECHNOLOGY.

08:40AM 8        SO BEING ABLE TO SHOW THAT IS VERY RELEVANT AND PROBATIVE

08:40AM 9    OF HER KNOWLEDGE OF FALSITY AND HER INTENT TO DECEIVE LATER

08:40AM 10   REGARDING THOSE STATEMENTS TO THE MILITARY.

08:40AM 11            THE COURT:  SO IT'S THE TIMING THAT I THINK YOU'RE

08:40AM 12   CONCERNED WITH, MR. DOWNEY.

08:40AM 13            MR. DOWNEY:  IT'S IN PART, YOUR HONOR, THE TIMING,

08:40AM 14   BUT IT'S ALSO A DIFFERENT ISSUE.

08:40AM 15       JUST TO RESET THE TABLE AS TO WHAT THE ALLEGATIONS ARE AS

08:40AM 16   TO DOD, THEY'RE NOT ABOUT EXAGGERATIONS OF THE CAPACITY OF

08:40AM 17   THERANOS TECHNOLOGY.

08:40AM 18       THE ALLEGATION OF THE INDICTMENT AS IT RELATES TO DOD IS

08:41AM 19   THAT INVESTORS WERE TOLD THAT THERE WAS REVENUE IN CONNECTION

08:41AM 20   WITH DOD PROJECTS, BUT THERE WAS NOT SIGNIFICANT REVENUE IN

08:41AM 21   CONNECTION WITH THOSE PROJECTS.

08:41AM 22       THAT HAS NOTHING TO DO WITH STATEMENTS MADE 18 MONTHS AWAY

08:41AM 23   FROM ANY REPRESENTATIONS TO INVESTORS.

08:41AM 24       THE QUESTION IS SIMPLY A FINANCIAL ONE OF WHAT WAS THE

08:41AM 25   FINANCIAL STRENGTH OF THAT RELATIONSHIP.

08:41AM 1      I THINK TO SUGGEST THAT PRESENTATIONS MADE TO DOD OVER A

08:41AM 2   LONG PERIOD OF TIME NEED TO COME INTO THE CASE HAS NOTHING TO

08:41AM 3   DO WITH THE ALLEGATION.

08:41AM 4      NOT TO MENTION, YOUR HONOR, THAT IT'S CLEARLY BOTH

08:41AM 5   DESIGNED TO AND IS INFLAMMATORY.

08:41AM 6           MR. BOSTIC:  AND, YOUR HONOR, JUST TO CORRECT A

08:41AM 7   POINT THERE.  IT'S NOT THE CASE THAT THE MISREPRESENTATIONS

08:41AM 8   ABOUT THE MILITARY WERE LIMITED TO THE AMOUNT OF REVENUE THAT

08:41AM 9   THERANOS WAS GETTING.  I THINK THE COURT HAS ALREADY HEARD

08:41AM 10  TESTIMONY FROM WITNESSES WHO WERE TOLD THAT THE THERANOS DEVICE

08:41AM 11  WAS BEING USED BY THE MILITARY.

08:41AM 12     INVESTORS WILL, OR ARE EXPECTED TO TESTIFY THAT MS. HOLMES

08:42AM 13  TOLD THEM THAT THE THERANOS DEVICE WAS IN ACTIVE USE BY THE

08:42AM 14  MILITARY AND THAT WAS A MATERIAL FACT FOR THEM.  THEY CARED

08:42AM 15  ABOUT THAT.

08:42AM 16     THAT FACT WAS NOT TRUE.  AND IN ORDER TO SHOW THAT

08:42AM 17  MS. HOLMES KNEW THAT IT WASN'T TRUE, IT'S IMPORTANT FOR THE

08:42AM 18  JURY TO UNDERSTAND THAT THAT USE WAS NEVER GOING TO OCCUR

08:42AM 19  BECAUSE THE MILITARY'S INTEREST IN THE DEVICE IN THE FIRST

08:42AM 20  PLACE WAS BASED ON A FALSE IMPRESSION OF WHAT THE DEVICE COULD

08:42AM 21  DO.

08:42AM 22          THE COURT:  DO YOU INTEND TO, DO YOU INTEND TO

08:42AM 23  INTRODUCE THE ENTIRETY OF THIS -- I GUESS THIS IS A POWERPOINT

08:42AM 24  PRESENTATION?

08:42AM 25          MR. BOSTIC:  I WOULD, YOUR HONOR.

08:42AM  1        AND I READ THE DEFENSE'S OBJECTION AS ONLY APPLYING TO THE

08:42AM  2   FALSE STATEMENTS, SO THAT'S WHAT I'M FOCUSSING ON.

08:42AM  3        BUT IT'S THE FALSE STATEMENTS THAT ARE A VERY PIVOTAL PART

08:42AM  4   OF THAT EXHIBIT, AGAIN, FOR THE PURPOSES OF SHOWING

08:42AM  5   MS. HOLMES'S KNOWLEDGE THAT THE MILITARY WAS UNLIKELY TO END UP

08:43AM  6   USING THE THERANOS DEVICE, AND THAT MONTHS LATER WHEN SHE WAS

08:43AM  7   TELLING INDIVIDUALS THAT THE DEVICE WAS IN USE BY THE MILITARY,

08:43AM  8   THAT COULD NOT HAVE BEEN TRUE BECAUSE OF WHAT THE MILITARY

08:43AM  9   ACTUALLY WANTED.

08:43AM 10        THE COURT:  AND TELL ME AGAIN THE TIMING OF WHEN

08:43AM 11   THIS PRESENTATION WAS PRESENTED.

08:43AM 12        MR. BOSTIC:  I BELIEVE -- LET'S SEE.  I'LL TURN TO

08:43AM 13   THOSE EXHIBITS, BUT I BELIEVE THEY'RE IN 2012.  MAYBE DEFENSE

08:43AM 14   COUNSEL HAS --

08:43AM 15        MR. DOWNEY:  IT'S JANUARY OF 2012, YOUR HONOR.

08:43AM 16        THE COURT:  THANK YOU.

08:43AM 17        MR. BOSTIC:  IT'S CERTAINLY WITHIN THE TIME PERIOD

08:43AM 18   OF THE CHARGED FRAUD.

08:43AM 19        THE COURT:  IT SOUNDS LIKE WE'LL GET TO THIS WITNESS

08:43AM 20   TODAY, AND YOU INTEND TO EXAMINE ON THIS TODAY AT SOME TIME?

08:43AM 21        MR. BOSTIC:  WE WILL GET TO THIS WITNESS TODAY.  I'M

08:43AM 22   NOT SURE WHETHER WE'LL GET TO THIS TOPIC TODAY.

08:43AM 23        THE COURT:  OKAY.

08:43AM 24        MR. BOSTIC:  AND WE WON'T GET TO THIS TOPIC BEFORE A

08:43AM 25   BREAK TODAY, IF THE COURT INTENDS TO TAKE A BREAK.

08:43AM 1          THE COURT:  I THINK WE WILL TAKE A BREAK AT 11:00

08:43AM 2     AND IT PROBABLY WILL BE A 30 MINUTE BREAK OR SOMETHING LIKE

08:43AM 3     THAT AS I UNDERSTAND IT.

08:43AM 4          MR. DOWNEY:  YOUR HONOR, JUST TO HELP THE COURT, TO

08:44AM 5     THE EXTENT THAT IT IS HELPFUL, THIS WAS THE SUBJECT OF TWO OR

08:44AM 6     THREE PAGES OF BRIEFING BY BOTH SIDES AT 1000 AND 1004 OF THE

08:44AM 7     DOCKET.  AND JUST SO THE COURT HAS IT HANDY, I COULD HAND THOSE

08:44AM 8     PLEADINGS UP.

08:44AM 9          THE COURT:  I DO RECALL THE COLLOQUY ON THAT.  I'M

08:44AM 10    HAPPY TO RECEIVE THEM.

08:44AM 11        YOU'VE BEEN IN MY OFFICE.  YOU'VE SEEN THE BOXES, SO I'M

08:44AM 12    SURE WE COULD FIND IT.

08:44AM 13         MR. DOWNEY:  WELL, I'M HAPPY TO KEEP THEM, TOO.

08:44AM 14        IF IT'S GOOD FOR THE COURT.

08:44AM 15        BUT IF I MAY, I'LL PASS IT UP THROUGH MS. KRATZMANN IF

08:44AM 16    IT'S HANDY.

08:44AM 17         THE COURT:  SURE.

08:44AM 18         MR. DOWNEY:  I HAVE TO SAY I'M ALSO A LITTLE

08:44AM 19    UNCERTAIN AS TO WHAT MR. BOSTIC IS DESCRIBING AS FALSE

08:44AM 20    STATEMENTS, SO I CAN'T REALLY RESPOND TO HIS ARGUMENT.

08:44AM 21        BUT I CAN TELL YOU HIS CHARACTERIZATION OF WHAT IS IN THE

08:44AM 22    INDICTMENT IS AN OVERSTATEMENT OF THE CHARGE.

08:44AM 23        THERE'S NOT SOME GENERAL ALLEGATION THAT THERE ARE

08:44AM 24    MISREPRESENTATIONS ABOUT DOD.  IT'S VERY FOCUSSED ON REVENUE AS

08:44AM 25    YOU WOULD EXPECT.

08:44AM 1              THE COURT:  WELL, THAT WAS PART OF OUR -- THERE WAS

08:44AM 2     A BILL OF PARTICULARS, THERE WAS A MOTION TO DISMISS, AND IT

08:45AM 3     DID TOUCH ON JUST WHAT WAS THE MILITARY REPRESENTATION, THE

08:45AM 4     REPRESENTATION TO THE MILITARY, WHAT WAS THAT ALLEGATION ABOUT,

08:45AM 5     AND I RECALL US TALKING AT LENGTH ABOUT THE REPRESENTATION

08:45AM 6     ABOUT THE MONETARY INVESTMENT AND WHETHER OR NOT THERE WERE --

08:45AM 7     THE CONTRACT WAS AS LARGE AS IT WAS REPRESENTED.

08:45AM 8          ALL RIGHT.  WELL, THANK YOU FOR BRINGING THIS TO MY

08:45AM 9     ATTENTION.  I'M GOING TO NEED TO LOOK AT IT, AND THANK YOU FOR

08:45AM 10    LETTING ME KNOW THAT.

08:45AM 11         WE MAY OR MAY NOT GET TO THAT, BUT I'LL LOOK TO IT DURING

08:45AM 12    OUR BREAK TODAY.  WE'RE ONLY GOING UNTIL 1:00 TODAY AS YOU

08:45AM 13    KNOW.

08:45AM 14             MR. DOWNEY:  ONE OTHER ISSUE, YOUR HONOR.

08:45AM 15             THE COURT:  YES.

08:45AM 16             MR. DOWNEY:  IT MAY OR MAY NOT BE PART OF TODAY'S

08:45AM 17    PRESENTATION.  THERE'S A DOCUMENT THAT THE GOVERNMENT SENT US

08:45AM 18    LAST NIGHT AS A POTENTIAL EXHIBIT, WHICH IS EXHIBIT 1496, 1496,

08:45AM 19    WHICH CONTAINS A REPORT WHICH WAS PREPARED BY MR. EDLIN AND

08:45AM 20    SENT TO MS. HOLMES, WHICH IS THE COMMENTARY OF A NUMBER OF

08:46AM 21    INDIVIDUALS, A COMPTROLLER IN THE MILITARY, UNIDENTIFIED OTHER

08:46AM 22    PERSONNEL, WHICH ARE IN THE NATURE OF SPECULATING CRITICISM OF

08:46AM 23    THERANOS.

08:46AM 24         I THINK THAT THAT EVIDENCE, IF YOU JUST TAKE A LOOK AT THE

08:46AM 25    EXHIBIT, YOU'LL SEE THAT THERE'S NO FOUNDATION FOR THE HEARSAY

08:46AM 1    COMMENTS THAT ARE CONTAINED IN THE DOCUMENT, AND I THINK IT

08:46AM 2    IS -- EVEN IF A FOUNDATION WERE LAID, I THINK IT'S 403 EVIDENCE

08:46AM 3    WITH HIGHLY INFLAMMATORY, NOT TO MENTION UNINFORMED, COMMENTS.

08:46AM 4         MR. BOSTIC:  SO, YOUR HONOR, THIS IS AN EMAIL FROM

08:46AM 5    THE WITNESS, DANIEL EDLIN, TO MS. HOLMES AND HER BROTHER,

08:46AM 6    CHRISTIAN HOLMES, REPORTING ON A MEETING THAT HE HAD JUST HAD

08:46AM 7    WITH REPRESENTATIVES FROM THE MILITARY.  THIS IS IN JANUARY OF

08:46AM 8    2014.

08:46AM 9         AS REPORTED BY MR. EDLIN DIRECTLY TO THE DEFENDANT, THE

08:46AM 10   MILITARY WAS SKEPTICAL AND CRITICAL OF THE INFORMATION THAT IT

08:47AM 11   HAD RECEIVED FROM THERANOS AT THAT POINT.

08:47AM 12        THIS IS RELEVANT.  IT GOES TO THE DEFENDANT'S STATE OF

08:47AM 13   MIND AND HER KNOWLEDGE REGARDING THE STATUS OF THE RELATIONSHIP

08:47AM 14   WITH THE MILITARY AND THE HEALTH OF THAT RELATIONSHIP, THE

08:47AM 15   INTEREST OF THE MILITARY IN THE THERANOS DEVICE.

08:47AM 16        THE WITNESS IS EXPECTED TO TESTIFY ABOUT THE SUBSTANCE OF

08:47AM 17   THIS CONVERSATION.  THE EMAIL CONSTITUTES HIS NOTES FROM THAT

08:47AM 18   CONVERSATION AND SHOWS THAT THE SUBSTANCE WAS REPORTED DIRECTLY

08:47AM 19   TO THE DEFENDANT.

08:47AM 20        IT'S RELEVANT AS TO ANY SUBSEQUENT, FOR EXAMPLE, ANY

08:47AM 21   SUBSEQUENT STATEMENTS THAT SHE MADE ABOUT THE STATUS OF THINGS

08:47AM 22   WITH THE MILITARY.

08:47AM 23        MR. DOWNEY:  WELL, AGAIN, YOUR HONOR, THESE ARE NOT

08:47AM 24   COMMENTS ABOUT THE VIEWS OF THE, QUOTE-UNQUOTE, MILITARY.

08:47AM 25        THIS IS A DISCUSSION OF ONE MEETING IN WHICH PEOPLE WITH

08:47AM 1   NO EXPERTISE IN THE TECHNOLOGY MAKE SPECULATIVE COMMENTS ABOUT

08:47AM 2   THE TECHNOLOGY.

08:47AM 3       IT'S NOT AN ELEMENT OF THE MILITARY THAT IS ANY KIND OF A

08:47AM 4   BASIS FOR MS. HOLMES'S CLAIMS ABOUT REVENUE FROM DOD.  SO IT'S

08:48AM 5   A LITTLE BIT LIKE ADMITTING IN A CASE EVIDENCE ABOUT A CUSTOMER

08:48AM 6   WHO DECLINES TO BUY A PRODUCT AND CLAIMING THAT THAT POTENTIAL

08:48AM 7   CUSTOMER IS, YOU KNOW, THE VICTIM OF EITHER A FRAUD OR SOME

08:48AM 8   KIND OF DEFECTIVE PRODUCT.

08:48AM 9       THIS IS AMONGST MANY ELEMENTS OF THE MILITARY WITH WHICH

08:48AM 10  THERANOS DEALT AND IT HAS REALLY NOTHING TO DO WITH THE CLAIMS

08:48AM 11  MADE OR THE CLAIMS ALLEGED TO BE FALSE.

08:48AM 12      THE COURT:  SO ARE THESE -- THIS IS MR. EDLIN'S

08:48AM 13  INTERPRETATION, OR HIS NOTES OF COMMENTS AT A MEETING WHERE IT

08:48AM 14  SOUNDS LIKE THE TECHNOLOGY WAS PRESENTED.

08:48AM 15      MR. DOWNEY:  WELL, I THINK ACTUALLY IN GENERAL TERMS

08:48AM 16  THAT'S CORRECT.

08:48AM 17      BUT ACTUALLY WHAT MS. HOLMES ASKED MR. EDLIN TO DO WAS TO

08:48AM 18  SEND THE MOST EGREGIOUS COMMENTS THAT HAD BEEN MADE, NOT ALL OF

08:48AM 19  THE COMMENTS THAT TOOK PLACE IN A MEETING.  SHE WANTED TO KNOW,

08:49AM 20  WHAT ARE THE CRITICISMS OF US BY THESE PARTICULAR PEOPLE IN THE

08:49AM 21  MEETING SO I CAN KNOW WHAT THEY ARE?

08:49AM 22      THE COURT:  DOESN'T THAT GO TO MR. BOSTIC'S POINT IS

08:49AM 23  HER STATE OF MIND?

08:49AM 24      MR. DOWNEY:  IT WOULD ONLY GO THERE IF THE CLAIM WAS

08:49AM 25  THAT SHE WAS MAKING REPRESENTATIONS ABOUT THIS ELEMENT OF THE

08:49AM  1      MILITARY AND SAYING THIS ELEMENT OF THE MILITARY HAS NEVER BEEN

08:49AM  2      CRITICAL OF US.

08:49AM  3          THAT'S NOT THE ISSUE IN THE CASE.

08:49AM  4          THE ISSUE IS, WHAT IS THE REVENUE ASSOCIATED WITH ANY

08:49AM  5      ELEMENT OF DOD?

08:49AM  6          AND I THINK WHEN YOUR HONOR HEARS THE EVIDENCE, THE

08:49AM  7      PERSONNEL REFERENCED HERE HAVE NOTHING TO DO WITH ANY ELEMENT

08:49AM  8      OF THE MILITARY THAT WAS RELEVANT ULTIMATELY TO THERANOS OR ITS

08:49AM  9      PROGRAMS.

08:49AM  10          MR. BOSTIC:  YOUR HONOR, IT'S SIMPLY NOT TRUE THAT

08:49AM  11      THE ISSUE IS LIMITED TO THE AMOUNT OF REVENUE DERIVED FROM THE

08:49AM  12      CONTACTS WITH THE MILITARY.

08:49AM  13          ALSO AT THE ISSUE IS STATEMENTS THAT MS. HOLMES MADE ABOUT

08:49AM  14      THE MILITARY'S USE OF THE PRODUCT, THE MILITARY'S INTEREST IN

08:49AM  15      THE PRODUCT.

08:49AM  16          MS. HOLMES'S STATEMENTS WERE NOT SPECIFIC TO INDIVIDUAL

08:49AM  17      COMPONENTS OF THE MILITARY.  THEY TENDED TO BE MORE VAGUE THAN

08:50AM  18      THAT.  SHE SPOKE ABOUT THE MILITARY AND THE DEPARTMENT OF

08:50AM  19      DEFENSE IN GENERAL.

08:50AM  20          GIVEN THAT, INPUT FROM INDIVIDUALS ASSOCIATED WITH THE

08:50AM  21      MILITARY ABOUT THEIR INTEREST IN THE THERANOS DEVICE, ABOUT

08:50AM  22      INFORMATION THAT THEY HADN'T RECEIVED FROM THERANOS,

08:50AM  23      INFORMATION THAT THEY WOULD NEED TO BE ABLE TO MOVE FORWARD,

08:50AM  24      THESE THINGS ARE CLEARLY RELEVANT TO HER MENTAL STATE AND HER

08:50AM  25      KNOWLEDGE OF WHERE THINGS STOOD ON THAT FRONT.

08:50AM   1          THE FACT THAT THIS IS A SELECTION OF COMMENTS FROM THAT

08:50AM   2     MEETING ISN'T RELEVANT.  THE DEFENSE CAN CERTAINLY COVER THAT

08:50AM   3     ON CROSS IF THEY NEED TO.

08:50AM   4          IT'S ALSO EVIDENT FROM THE DOCUMENT ITSELF AND THAT'S WHAT

08:50AM   5     THE WITNESS WILL TESTIFY TO.

08:50AM   6          THE DEFENSE CAN ASK THE WITNESS ABOUT ANYTHING ELSE THAT

08:50AM   7     HE REMEMBERS FROM THAT MEETING.

08:50AM   8          AND AS TO COUNSEL'S COMMENT THAT THESE ARE UNINFORMED

08:50AM   9     COMMENTS, THEY'RE NOT BEING OFFERED FOR THE TRUTH TO THE EXTENT

08:51AM  10     THAT THEY CHARACTERIZE THE THERANOS TECHNOLOGY.

08:51AM  11          THE CRITICAL FACT HERE IS THAT THIS WAS THE MILITARY'S

08:51AM  12     VIEW, THESE REPRESENTATIVES' VIEW OF THE INFORMATION THAT THEY

08:51AM  13     RECEIVED FROM THERANOS AT THE TIME, AND IT GOES TO WHAT THEY'RE

08:51AM  14     TELLING THERANOS ABOUT THE LIKELIHOOD OF THINGS MOVING FORWARD

08:51AM  15     AND THEIR CONTINUED INTEREST, OR LACK THEREOF, IN THE THERANOS

08:51AM  16     TECHNOLOGY.

08:51AM  17          THE COURT:  SO DO WE NEED TO KNOW WHAT THE CONTEXT

08:51AM  18     OF THIS CONVERSATION WAS?  AND IT SEEMS LIKE THAT IS SOMETHING

08:51AM  19     THAT WOULD BE APPROPRIATE, THAT IS, WHAT IS THE FLOW OF THIS

08:51AM  20     CONVERSATION, MR. EDLIN?  DID MS. HOLMES ASK HIM TO SEEK OUT

08:51AM  21     INFORMATION?  WAS HE UNDER INSTRUCTIONS FROM HIS EMPLOYER TO

08:51AM  22     COLLECT THIS INFORMATION AND REPORT BACK?

08:51AM  23          THAT'S A DIFFERENT SCENARIO, I THINK, AND IT MIGHT HAVE

08:51AM  24     SOME STRONGER RELEVANCE PERHAPS IF HE WAS OPERATING UNDER THOSE

08:51AM  25     INSTRUCTIONS AND WAS REPORTING BACK AS REQUESTED FOR WHATEVER

08:52AM 1    REASON.

08:52AM 2         I JUST DON'T KNOW WHAT THE FOUNDATION IS AND HOW IT'S

08:52AM 3    GOING TO COME IN.  I APPRECIATE YOU TELLING ME THAT THIS

08:52AM 4    DOCUMENT EXISTS, BUT I THINK CONTEXTUALLY IT WOULD BE HELPFUL,

08:52AM 5    AND I'M SURE YOU'LL LAY A FOUNDATION FOR THIS.

08:52AM 6         I THINK I UNDERSTAND, MR. DOWNEY, WHAT YOU'RE TALKING

08:52AM 7    ABOUT, BUT --

08:52AM 8              MR. DOWNEY:  YOUR HONOR, I ACTUALLY AGREE.  I THINK

08:52AM 9    IT'S DIFFICULT TO PARSE WHAT EACH OF US IS SAYING, SO I THINK

08:52AM 10   THE FOUNDATION THAT WOULD NEED TO BE ESTABLISHED TO ADMIT THIS

08:52AM 11   DOCUMENT IS THAT SOMEHOW THESE INDIVIDUALS WITHIN ONE ELEMENT

08:52AM 12   OF DOD HAVE SOME RELATIONSHIP TO THE REPRESENTATIONS THAT

08:52AM 13   MS. HOLMES WAS MAKING.

08:52AM 14        I THINK YOU'LL SEE WHEN THE EVIDENCE COMES IN THESE

08:52AM 15   INDIVIDUALS DO NOT REPRESENT AN ELEMENT OF THE MILITARY WITH

08:52AM 16   WHICH THERANOS DEVELOPED OR SOUGHT TO DEVELOP A RELATIONSHIP.

08:52AM 17             MR. BOSTIC:  AND, YOUR HONOR, I WOULD JUST DISAGREE

08:52AM 18   THERE.  I THINK TO THE EXTENT THAT THIS DOCUMENT, FOR EXAMPLE,

08:52AM 19   REFLECTS COMMENTS FROM A CERTAIN LIEUTENANT COLONEL, IT'S NOT

08:53AM 20   THE CASE THAT THIS IS ONLY RELEVANT IF MS. HOLMES LATER MADE

08:53AM 21   FALSE STATEMENTS ABOUT WHAT THAT LIEUTENANT COLONEL THOUGHT OF

08:53AM 22   THE THERANOS TECHNOLOGY, THAT KIND OF ONE-TO-ONE RELATIONSHIP

08:53AM 23   IS TOO HIGH A BAR FOR RELEVANCE.

08:53AM 24             THE COURT:  I DON'T KNOW WHAT THE CONTEXT IS.  IF

08:53AM 25   MR. EDLIN WAS SENT OUT TO COLLECT INFORMATION FROM DOD

08:53AM 1    REPRESENTATIVES, MILITARY, WHOEVER IT MIGHT BE, AND IF IT'S A

08:53AM 2    GENERAL LARGE, BROAD CAST NET THAT WAS CAST, AND IF THESE ARE

08:53AM 3    REPRESENTATIVES OF, THAT'S ONE THING.

08:53AM 4        IF IT WAS SPECIFIC, I WANT YOU TO TALK TO THE AIR FORCE

08:53AM 5    AND ALL OF THAT, THAT'S A DIFFERENT CONTEXT, I THINK.

08:53AM 6            MR. DOWNEY:  AND I THINK WHAT YOUR HONOR WILL SEE,

08:53AM 7    BUT I AGREE WITH YOUR HONOR THE CONTEXT WILL BE IMPORTANT, I

08:53AM 8    THINK WHAT YOU'LL SEE IS THAT THIS IS A MEETING IN CONNECTION

08:53AM 9    WITH ADVANCING A PROGRAM IN CONNECTION WITH ONE ELEMENT OF THE

08:53AM 10   MILITARY.

08:53AM 11       A LOT OF THE CONTRACTING PERSONNEL I THINK HAD FRUSTRATION

08:53AM 12   WITH THERANOS.

08:54AM 13       ONE OF THE COMMENTS RELATES TO THE EXPRESSION OF

08:54AM 14   FRUSTRATION BECAUSE THEY HAVEN'T HIRED A MILITARY VETERAN TO

08:54AM 15   HELP WITH FACILITATING THE CONTRACTING PROCESSES, NOT SOMEONE

08:54AM 16   WHO HAD THE RELEVANT EXPERTISE OR THE NATURE OF THE MEETING IS

08:54AM 17   THAT, NOT SOMETHING BROADER THAN THAT.

08:54AM 18       I THINK ONE OF THE SPEAKERS IS IDENTIFIED AS A

08:54AM 19   COMPTROLLER.

08:54AM 20           THE COURT:  WELL, I THINK YOU HAVE EXPERIENCE WITH

08:54AM 21   THE GOVERNMENT, MR. DOWNEY, IN CASES AND YOU KNOW HOW THE

08:54AM 22   GOVERNMENT BUREAUCRACY WORKS WITH MEETINGS AND HOW DIFFERENT

08:54AM 23   INDIVIDUALS -- AND I KNOW MR. BOSTIC IS INTIMATE WITH

08:54AM 24   GOVERNMENT BUREAUCRACY -- WE KNOW HOW THOSE MEETINGS SOMETIMES

08:54AM 25   ARE STAFFED, THEY'RE CALLED, ET CETERA, AND THAT'S PART OF THE

08:54AM 1    CONTEXT I'M SURE WILL BE DEVELOPED BY BOTH SIDES.  BUT THANKS

08:54AM 2    FOR IDENTIFYING THIS EARLY.

08:54AM 3         I'VE JUST BEEN HANDED -- OH, ANYTHING ELSE FROM ON THIS?

08:54AM 4              MR. DOWNEY:  NO, NOT FROM US.

08:54AM 5              MR. BOSTIC:  NO, YOUR HONOR.

08:54AM 6              THE COURT:  I'VE JUST BEEN HANDED AN EMAIL FROM ONE

08:55AM 7    OF OUR JURORS WHO -- HE OVERSLEPT AND HE'S ON HIS WAY.  HIS

08:55AM 8    GOOGLE MAP TELLS HIM HE'LL BE HERE BY 9:30.  I PRESUME THAT

08:55AM 9    ASSUMES HE OBEYS ALL OF THE BASIC SPEED LAWS, WHICH WE HOPE HE

08:55AM 10   DOES, AND SO THAT'S -- IT SOUNDS LIKE WE WON'T START UNTIL 9:30

08:55AM 11   AT LEAST UNTIL HE GETS HERE.

08:55AM 12        PERHAPS HE WAS WATCHING SOME TERRIBLE T.V. SHOW LAST NIGHT

08:55AM 13   THAT CAUSED HIS DISMAY.

08:55AM 14        (LAUGHTER.)

08:55AM 15             MR. DOWNEY:  CONDOLENCES, YOUR HONOR.

08:55AM 16             THE COURT:  THERE'S NO JOY IN MUDVILLE.

08:55AM 17             MR. BOSTIC:  EVEN I HEARD ABOUT THAT, YOUR HONOR.

08:55AM 18        (LAUGHTER.)

08:55AM 19             THE COURT:  ALL RIGHT.  THANKS VERY MUCH.  THANKS

08:55AM 20   FOR THIS.  THAT GIVES US SOME TIME.  THANK YOU.

08:55AM 21             THE CLERK:  COURT WILL BE IN RECESS.

08:55AM 22        (RECESS FROM 8:55 A.M. UNTIL 9:47 A.M.)

09:47AM 23        (JURY IN AT 9:47 A.M.)

09:47AM 24             THE COURT:  ALL RIGHT.  GOOD MORNING.  LET'S GO ON

09:47AM 25   THE RECORD IN THE HOLMES MATTER.

3778

09:47AM 1        ALL COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT.

09:47AM 2        OUR JURY IS PRESENT.  GOOD MORNING, LADIES AND GENTLEMEN.

09:47AM 3        WE'LL CALL OUR WITNESS IN IN JUST A MOMENT.

09:47AM 4        LET ME JUST ASK THE JURY, OVER THE RECESS, DID ANY OF YOU

09:47AM 5   HAVE OCCASION TO COME ACROSS ANY INFORMATION, READ ANYTHING, OR

09:47AM 6   HAVE COMMUNICATION FROM ANYONE ABOUT ANYTHING TO DO WITH THIS

09:48AM 7   CASE?

09:48AM 8        IF SO, PLEASE SHOW ME YOUR HAND IF YOU WOULD.

09:48AM 9        I SEE NO HANDS.

09:48AM 10       THANK YOU VERY MUCH.  THANK YOU.

09:48AM 11       DO WE HAVE THE WITNESS HERE?  LET'S HAVE OUR WITNESS

09:48AM 12  RETURN.

09:48AM 13       MR. WADE, I THINK YOU WERE EXAMINING.

09:48AM 14            MR. WADE:  I AM, YOUR HONOR.

09:48AM 15            THE COURT:  THANK YOU.  GOOD MORNING, SIR.

09:48AM 16       IF YOU COULD TAKE THE STAND AGAIN, DOCTOR, WE'LL RESUME

09:48AM 17  YOUR EXAMINATION.

09:48AM 18       MAKE YOURSELF COMFORTABLE.  ADJUST THE CHAIR AND

09:48AM 19  MICROPHONE AS YOU NEED.

09:48AM 20       I THINK YOU INFORMED ME YESTERDAY THAT YOU HAD BEEN

09:48AM 21  VACCINATED.

09:48AM 22            THE WITNESS:  YES, SIR.

09:48AM 23            THE COURT:  AND IF YOU WISH TO TAKE YOUR MASK OFF,

09:48AM 24  YOU MAY.  THANK YOU.

09:48AM 25       IF YOU COULD STATE YOUR NAME AGAIN, PLEASE.

09:48AM   1          THE WITNESS:  SUNIL DHAWAN.

09:48AM   2          THE COURT:  THANK YOU.  I'LL ENCOURAGE YOU TO SPEAK

09:48AM   3   DIRECTLY INTO THE MICROPHONE.

09:48AM   4       I THINK THIS YOUNG MAN HAS SOME MORE QUESTIONS FOR YOU.

09:49AM   5                  **CROSS-EXAMINATION (RESUMED)**

09:49AM   6   BY MR. WADE:

09:49AM   7   Q.   GOOD MORNING, DR. DHAWAN.

09:49AM   8   A.   GOOD MORNING.

09:49AM   9   Q.   I THINK WHEN WE LEFT OFF WE WERE TALKING A LITTLE BIT

09:49AM  10   ABOUT SOME OF THE INTERACTIONS THAT YOU HAD WITH THERANOS AND

09:49AM  11   I'D LIKE TO PICK UP ON THAT.

09:49AM  12       YOU WERE SHOWN DOCUMENT 2553, WHICH IS IN EVIDENCE.

09:49AM  13       DO YOU STILL HAVE THAT DOCUMENT IN FRONT OF YOU?  IT'S THE

09:49AM  14   FIRST DOCUMENT IN THE BLACK BINDER, I BELIEVE.

09:49AM  15   A.   YES.

09:49AM  16   Q.   AND I'M JUST CALLING YOUR ATTENTION TO THE FIFTH PAGE OF

09:49AM  17   THIS EXHIBIT.

09:49AM  18       I THINK WHEN WE LEFT OFF THIS WAS -- WE WERE TALKING ABOUT

09:49AM  19   THE FACT THAT LYNETTE SAWYER SERVED AS THE CO-LABORATORY

09:50AM  20   DIRECTOR AT THERANOS DURING THIS PERIOD.

09:50AM  21       DO YOU RECALL THAT?

09:50AM  22   A.   I SEE HER NAME HERE, YES.

09:50AM  23   Q.   OKAY.  AND I'D JUST LIKE TO NOTE NEXT TO THE HOURS WORK

09:50AM  24   SPENT IN THIS DOCUMENT, DO YOU SEE THAT COLUMN UP THERE?

09:50AM  25   A.   YES.

09:50AM   1    Q.   IT NOTES THAT THE CO-LABORATORY DIRECTORS WERE ONLY GOING

09:50AM   2    TO WORK 1 TO 5 HOURS AS NEEDED; CORRECT?

09:50AM   3    A.   YES.

09:50AM   4    Q.   AND THERE'S NO SUGGESTION IN THIS DOCUMENT OR ANY

09:50AM   5    SUGGESTION THAT YOU'RE AWARE OF THAT YOU WERE GOING TO BE

09:50AM   6    WORKING FULL TIME ON THIS JOB; RIGHT?

09:50AM   7    A.   NO.

09:50AM   8    Q.   OKAY.  AND I THINK WHEN YOU WERE ON DIRECT EXAMINATION,

09:50AM   9    MR. SCHENK ASKS YOU SOME QUESTIONS ABOUT THIS PERIOD BETWEEN

09:50AM   10   NOVEMBER AND JULY AND NOTED THAT YOU HADN'T REALLY DONE MUCH ON

09:51AM   11   AN AS-NEEDED BASIS FOR THERANOS.

09:51AM   12        DO YOU RECALL THAT?

09:51AM   13   A.   YES.

09:51AM   14   Q.   AND DO YOU KNOW IF THAT'S BECAUSE WHEN THERE WERE SERVICES

09:51AM   15   THAT WERE NEEDED IN THIS PERIOD, THAT THEY WERE CALLING ON

09:51AM   16   MS. SAWYER TO DO THOSE SERVICES?

09:51AM   17   A.   I DON'T KNOW WHO THEY WERE CALLING.

09:51AM   18   Q.   OKAY.  BUT THEY WEREN'T CALLING YOU?

09:51AM   19   A.   NO.

09:51AM   20   Q.   RIGHT.  LET'S GO TO 10566 AND JUST FLESH OUT THIS

09:51AM   21   CHRONOLOGY A LITTLE BIT.  IT'S IN THAT SAME BOOK.

09:51AM   22        DO YOU HAVE THAT IN FRONT OF YOU, DOCTOR?

09:51AM   23   A.   YES.

09:51AM   24   Q.   OKAY.  DO YOU SEE 10566, IF YOU WOULD LOOK AT A COUPLE OF

09:52AM   25   PAGES, DO YOU RECOGNIZE THIS TO BE THE PAPERWORK RELATING TO

09:52AM   1    YOUR GOING ON TO THE CLIA LICENSE AT THERANOS?

09:52AM   2    A.   YES.

09:52AM   3              MR. WADE:  I WOULD MOVE THE ADMISSION OF 10566.

09:52AM   4              MR. SCHENK:  NO OBJECTION.

09:52AM   5              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:52AM   6         (DEFENDANT'S EXHIBIT 10566 WAS RECEIVED IN EVIDENCE.)

09:52AM   7    BY MR. WADE:

09:52AM   8    Q.   AND IF WE COULD JUST GO TO THE SECOND PAGE.

09:52AM   9         DO YOU SEE THAT THIS WAS FROM DOCTOR -- THIS WAS A LETTER

09:52AM  10    THAT WAS SENT TO THE REGULATORS FROM BRAD ARINGTON.

09:52AM  11         DO YOU SEE THAT?

09:52AM  12    A.   YES.

09:52AM  13    Q.   AND THAT WAS THE SENIOR REGULATORY COUNSEL AT THERANOS WHO

09:52AM  14    YOU WERE DEALING WITH WHEN YOU WERE SIGNING UP WITH THE

09:52AM  15    COMPANY.

09:52AM  16         DO YOU RECALL THAT?

09:52AM  17    A.   YES.

09:52AM  18    Q.   OKAY.  AND HE SENT IN THIS PAPERWORK, AND JUST FOCUSSING

09:52AM  19    ON THE SECOND PAGE, THIS NOTES THAT YOU WENT ON TO THE LICENSE

09:53AM  20    NOVEMBER 19TH, 2014.

09:53AM  21         DO YOU SEE THAT?

09:53AM  22    A.   YES.

09:53AM  23    Q.   AND DO YOU RECALL AT THE TIME WHEN YOU INITIALLY WENT ON

09:53AM  24    THE LICENSE THAT DR. ROSENDORFF WAS STILL ON THE LICENSE FOR

09:53AM  25    ABOUT A MONTH AS WELL?

09:53AM 1    A.   I DON'T RECALL THAT THAT WAS HAPPENING.

09:53AM 2    Q.   OKAY.  WELL, LET'S LOOK AT 10567.

09:53AM 3         YOUR HONOR, I BELIEVE THIS IS A PUBLIC RECORD.  I WOULD

09:53AM 4    MOVE THE ADMISSION OF 10567.

09:53AM 5              MR. SCHENK:  NO OBJECTION.

09:53AM 6              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:53AM 7         (DEFENDANT'S EXHIBIT 10567 WAS RECEIVED IN EVIDENCE.)

09:54AM 8    BY MR. WADE:

09:54AM 9    Q.   AND DO YOU SEE, DOCTOR, THIS IS A LETTER FROM

09:54AM 10   DR. ROSENDORFF IN WHICH HE WAS REMOVING HIMSELF FROM THE CLIA

09:54AM 11   LICENSE DECEMBER 17TH, 2014?

09:54AM 12   A.   YES.

09:54AM 13   Q.   OKAY.  AND SO AT THAT POINT, HE WAS NO LONGER GOING TO BE

09:54AM 14   SERVING AS THE CO-LABORATORY DIRECTOR WITH YOU?

09:54AM 15   A.   ACCORDING TO THIS PAPERWORK, YES.

09:54AM 16   Q.   OKAY.  ARE YOU AWARE ON ABOUT THAT SAME DATE THAT

09:54AM 17   MS. SAWYER WAS ADDED TO THE LICENSE?

09:54AM 18   A.   I DON'T SEE THAT HERE.

09:54AM 19   Q.   OKAY.  I'LL TURN YOUR ATTENTION TO 10562.

09:55AM 20        DO YOU HAVE THAT IN FRONT OF YOU, DOCTOR?

09:55AM 21   A.   YES.

09:55AM 22             MR. WADE:  AND THIS IS A PUBLIC RECORD, SO I WOULD

09:55AM 23   MOVE THE ADMISSION OF 10562.

09:55AM 24             MR. SCHENK:  NO OBJECTION.

09:55AM 25             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:55AM   1        (DEFENDANT'S EXHIBIT 10562 WAS RECEIVED IN EVIDENCE.)

09:55AM   2   BY MR. WADE:

09:55AM   3   Q.   AND DO YOU SEE THIS IS A LETTER I THINK THE SAME DAY OR

09:55AM   4   MAYBE THE NEXT DAY AFTER DR. ROSENDORFF WENT OFF THE LICENSE?

09:55AM   5   A.   YES.

09:55AM   6   Q.   AND DO YOU SEE, IF YOU TURN TO THE SECOND PAGE, THAT THIS

09:56AM   7   IS PAPERWORK THAT SHOWS THAT DR. SAWYER WAS GOING ON TO THE

09:56AM   8   LICENSE?

09:56AM   9   A.   YES.

09:56AM  10   Q.   AND IT WAS ACTUALLY EFFECTIVE AS OF NOVEMBER 19TH, 2014.

09:56AM  11        DO YOU SEE THAT?

09:56AM  12   A.   YES.

09:56AM  13   Q.   OKAY.  SO ACCORDING TO THIS PAPERWORK, SHE SERVED AS THE

09:56AM  14   CO-LABORATORY DIRECTOR AT THERANOS; CORRECT?

09:56AM  15   A.   YES.

09:56AM  16   Q.   OKAY.  AND YOU RECALL THAT WE SAW THAT ONE OF THOSE

09:56AM  17   POLICIES -- AND AGAIN, SHE WAS SERVING, ACCORDING TO THE RECORD

09:56AM  18   WE LOOKED AT BEFORE, IN A SIMILAR PART-TIME CAPACITY AS YOU

09:56AM  19   WERE ON AN AS-NEEDED BASIS; CORRECT?

09:56AM  20   A.   YES.

09:56AM  21   Q.   AND DO YOU RECALL YESTERDAY WE SAW ONE OF THE POLICIES

09:56AM  22   FROM THAT PERIOD BETWEEN NOVEMBER AND AUGUST WHERE DR. SAWYER

09:56AM  23   SIGNED ONE OF THE SOP'S?

09:56AM  24   A.   YES.

09:56AM  25   Q.   LET'S GO TO ANOTHER ONE, 10525.

09:57AM  1          DO YOU HAVE THAT IN FRONT OF YOU?

09:57AM  2     A.   YES.

09:57AM  3     Q.   AND DO YOU RECOGNIZE THIS AS A VERIFICATION DOCUMENT WHEN

09:57AM  4     THEY WERE BRINGING AN ASSAY ON TO A SIEMENS ADVIA 2400?

09:57AM  5     A.   THAT'S WHAT IT APPEARS TO BE, YES.

09:57AM  6     Q.   AND YOU SEE DR. SAWYER'S SIGNATURE DOWN THERE ON THE

09:57AM  7     BOTTOM (INDICATING)?

09:57AM  8     A.   YES.

09:57AM  9          MR. WADE:   I MOVE THE ADMISSION OF 10525.

09:57AM  10          MR. SCHENK:   FOUNDATION.

09:57AM  11          THE COURT:   DO YOU WANT TO LAY A LITTLE MORE

09:57AM  12    FOUNDATION, COUNSEL?

09:57AM  13    BY MR. WADE:

09:57AM  14    Q.   YOU UNDERSTAND THAT WHEN TESTS ARE BROUGHT ONTO LINE, OR

09:58AM  15    BROUGHT ONLINE WITHIN A LAB, THAT THERE ARE REGULATIONS WHERE

09:58AM  16    THE LAB DIRECTOR VERIFIES THAT IT'S APPROPRIATE TO BRING THE

09:58AM  17    TEST ONLINE?

09:58AM  18    A.   YES.

09:58AM  19    Q.   AND THAT EITHER LAB DIRECTOR CAN ATTEST TO THAT

09:58AM  20    VERIFICATION AND CERTIFY THAT IT'S APPROPRIATE FOR THE TEST TO

09:58AM  21    BE OFFERED WITHIN THE LAB?

09:58AM  22    A.   YES.

09:58AM  23    Q.   AND THAT -- AND YOUR CO-LABORATORY DIRECTOR, DR. SAWYER,

09:58AM  24    WOULD HAVE HAD THE ABILITY UNDER THE LAW TO, TO SERVE THAT

09:58AM  25    FUNCTION; CORRECT?

09:58AM  1    A.   IF THAT'S WHAT THE LAW STATES, YES.

09:58AM  2    Q.   AND WHEN THAT'S DONE, THESE RECORDS WOULD BE MAINTAINED

09:58AM  3    WITHIN THE CLIA LAB SO IF THERE ARE EVER ANY QUESTIONS ABOUT

09:58AM  4    WHETHER -- WHEN A TEST WAS VERIFIED, THERE WOULD BE

09:59AM  5    DOCUMENTATION OF THAT; CORRECT?

09:59AM  6    A.   YES.

09:59AM  7    Q.   OKAY.

09:59AM  8         I WOULD MOVE THE ADMISSION OF 10525.

09:59AM  9              MR. SCHENK:  NO OBJECTION.

09:59AM 10              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:59AM 11         (DEFENDANT'S EXHIBIT 10525 WAS RECEIVED IN EVIDENCE.)

09:59AM 12    BY MR. WADE:

09:59AM 13    Q.   AND YOU HAD MENTIONED THAT YOU SAW A SIEMENS ADVIA WHEN

09:59AM 14    YOU TOURED THE COMPANY.

09:59AM 15         DO YOU RECALL THAT?

09:59AM 16    A.   YES.

09:59AM 17    Q.   AND THAT'S ONE OF THE DEVICES THAT MR. BALWANI AND OTHERS

09:59AM 18    IN THE LAB SHOWED YOU?

09:59AM 19    A.   YES.

09:59AM 20    Q.   OKAY.  AND YOU UNDERSTOOD THAT THE COMPANY WAS USING

09:59AM 21    SIEMENS ADVIA EQUIPMENT?

09:59AM 22    A.   YES, I SEE THAT THERE.

09:59AM 23    Q.   OKAY.  I JUST WANT TO FOCUS YOUR ATTENTION ON THE BOTTOM.

09:59AM 24         AND DR. SAWYER -- BY THIS SIGNATURE, DR. SAWYER IS

09:59AM 25    VERIFYING THE APPROPRIATENESS OF USING THIS ASSAY IN THE

09:59AM 1    THERANOS CLINICAL LAB AS OF JANUARY 11TH, 2015; CORRECT?

10:00AM 2    A.   YES.

10:00AM 3    Q.   OKAY.  AND IF I CAN DRAW YOUR ATTENTION TO EXHIBIT 10526.

10:00AM 4         DO YOU HAVE THAT IN FRONT OF YOU?

10:00AM 5    A.   YES.

10:00AM 6    Q.   AND YOU UNDERSTAND THAT, FROM YOUR EXPERIENCE WITH YOUR

10:00AM 7    OWN LAB AND OTHERWISE, THAT WHEN TESTS ARE OFFERED IN A LAB,

10:00AM 8    STANDARD OPERATING PROCEDURES ARE CREATED?

10:00AM 9    A.   YES.

10:00AM 10   Q.   AND THOSE PROCEDURES SET FORTH A MANNER BY WHICH A TEST

10:00AM 11   SHOULD BE PERFORMED WITHIN THE LAB?

10:00AM 12   A.   YES.

10:00AM 13   Q.   AND THAT IT'S IMPORTANT TO DOCUMENT THAT STANDARD

10:00AM 14   PROCEDURE AND SIGN OFF ON IT SO THERE'S A RECORD IF ANYONE EVER

10:00AM 15   ASKS QUESTIONS ABOUT IT?

10:00AM 16   A.   YES.

10:00AM 17   Q.   OKAY.  AND DO YOU RECOGNIZE 10526 TO BE SUCH A RECORD?

10:01AM 18   A.   IT STATES THAT IT'S -- YEAH, STANDARD OPERATING PROCEDURE,

10:01AM 19   YES.

10:01AM 20        MR. WADE:  OKAY.  I MOVE THE ADMISSION OF 10526.

10:01AM 21        MR. SCHENK:  NO OBJECTION.

10:01AM 22        THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

10:01AM 23   (DEFENDANT'S EXHIBIT 10526 WAS RECEIVED IN EVIDENCE.)

10:01AM 24   BY MR. WADE:

10:01AM 25   Q.   AND THIS IS ONE OF THOSE STANDARD OPERATING PROCEDURES;

10:01AM   1    CORRECT?

10:01AM   2    A.   YES.

10:01AM   3    Q.   OKAY.   AND YOU SEE THERE THAT DR. SAWYER SIGNED OFF ON

10:01AM   4    THIS DOCUMENT LATE MARCH 2015?

10:01AM   5         DO YOU SEE THAT?

10:01AM   6    A.   YES.

10:01AM   7    Q.   AND YOU ALSO SEE THAT THERE ARE A NUMBER OF OTHER PEOPLE

10:01AM   8    WHO HAD WORKED ON THIS PROCEDURE WHO ALSO SIGNED OFF; CORRECT?

10:01AM   9    A.   YES.

10:01AM  10    Q.   AND THOSE ARE PEOPLE WHO HAVE DIFFERENT CLIA LICENSES OR

10:01AM  11    CERTIFICATIONS AS NOTED IN THEIR TITLES?

10:01AM  12    A.   YES.

10:01AM  13    Q.   AND JUST SO WE'RE CLEAR, THERE'S NOT A REQUIREMENT THAT

10:02AM  14    BOTH LAB DIRECTORS SIGN OFF ON DOCUMENTS; CORRECT?   IT ONLY

10:02AM  15    REQUIRES ONE LAB DIRECTOR TO SIGN OFF ON DOCUMENTS; CORRECT?

10:02AM  16    A.   AS FAR AS I'M AWARE OF, YES.

10:02AM  17    Q.   YEAH.   AND I TAKE IT, SIR, THERE WAS NOTHING THAT MADE YOU

10:02AM  18    UNCOMFORTABLE ABOUT THE FACT THAT THERANOS HAPPENED TO ASK

10:02AM  19    DR. SAWYER TO SIGN OFF ON THESE DURING THIS PERIOD RATHER THAN

10:02AM  20    YOU?   THAT DIDN'T UPSET YOU, DID IT?

10:02AM  21    A.   I WAS NEVER AWARE THAT SHE WAS SIGNING OFF ON ALL OF

10:02AM  22    THESE.

10:02AM  23    Q.   RIGHT.   BUT -- AND AS BEST YOU CAN TELL, SHE FILED THE

10:02AM  24    APPROPRIATE PAPERWORK WITH CLIA; CORRECT?

10:02AM  25              MR. SCHENK:   OBJECTION.   CALLS FOR SPECULATION.

DHAWAN CROSS BY MR. WADE (RES.)

10:03AM   1                    THE WITNESS:  I DON'T -- I --

10:03AM   2                    THE COURT:  EXCUSE ME FOR JUST A SECOND.

10:03AM   3              IF YOU WANT TO LAY A FOUNDATION.

10:03AM   4                    MR. WADE:  SURE.

10:03AM   5    Q.   YOU SAW THE PAPERWORK WHERE DR. SAWYER SIGNED THE

10:03AM   6    PAPERWORK TO BECOME A LAB DIRECTOR AT THERANOS; CORRECT?

10:03AM   7    A.   WHAT I JUST SAW, YES.

10:03AM   8    Q.   AND THE FACT THAT SHE WAS ACTING AS THE LABORATORY

10:03AM   9    DIRECTOR ON THERANOS SIGNED DOCUMENTS, THAT DOESN'T GIVE YOU

10:03AM   10   ANY CONCERN, DOES IT?

10:03AM   11   A.   I CAN'T GIVE YOU AN OPINION.  I MEAN, IF SHE'S CERTIFIED,

10:03AM   12   IF SHE'S A PH.D., THEN SHE'S ALLOWED TO BE A LAB DIRECTOR.

10:03AM   13        BUT I CAN'T VERIFY THAT SHE IS OR ISN'T.

10:03AM   14   Q.   RIGHT.  I UNDERSTAND.

10:03AM   15        BUT PUT DIFFERENTLY --

10:03AM   16   A.   UH-HUH.

10:03AM   17   Q.   -- IN THIS PERIOD WHERE THE GOVERNMENT WAS FOCUSSED ON

10:03AM   18   WHERE YOU WERE NOT ACTING AS THE LABORATORY DIRECTOR, IT

10:03AM   19   APPEARS THAT THERE WAS SOMEONE ELSE ACTING AS THE LABORATORY

10:03AM   20   DIRECTOR AT THERANOS; CORRECT?

10:03AM   21   A.   BASED ON THE SIGNATURES.  THAT'S ALL I CAN TELL YOU.

10:03AM   22   Q.   SURE.  I UNDERSTAND.

10:04AM   23        AND LET'S GO TO 10529.

10:04AM   24        DO YOU HAVE THAT DOCUMENT IN FRONT OF YOU, DOCTOR?

10:04AM   25   A.   YES.

10:04AM 1    Q.   AND DO YOU RECOGNIZE THIS TO BE AN EMAIL FROM LANGLY GEE

10:04AM 2    TO YOU?

10:04AM 3    A.   YES.

10:04AM 4    Q.   AND THIS RELATES TO SOME REGULATORY PAPERWORK RELATING TO

10:04AM 5    THERANOS LAB?

10:04AM 6    A.   YES.

10:04AM 7    Q.   OKAY.

10:04AM 8         I WOULD MOVE THE ADMISSION OF 10529.

10:05AM 9              MR. SCHENK:  YOUR HONOR, I THINK THIS IS IN

10:05AM 10   EVIDENCE.

10:05AM 11             THE COURT:  LET'S SEE.  MS. KRATZMANN?

10:05AM 12             MR. SCHENK:  I THINK IT'S 2972.

10:05AM 13             THE CLERK:  WHAT WAS THAT NUMBER, COUNSEL?

10:05AM 14             MR. SCHENK:  I'M SORRY, THAT'S NOT THE RIGHT NUMBER.

10:05AM 15        YOUR HONOR, NO OBJECTION.  I'M NOT SURE THIS IS IN OR NOT.

10:05AM 16             MR. WADE:  I THINK IT'S A DIFFERENT DOCUMENT, JEFF.

10:05AM 17             THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

10:05AM 18        (DEFENDANT'S EXHIBIT 10529 WAS RECEIVED IN EVIDENCE.)

10:05AM 19   BY MR. WADE:

10:05AM 20   Q.   NOW, THIS IS AN EMAIL FROM LANGLY GEE.

10:05AM 21        DO YOU SEE THAT?

10:05AM 22   A.   YES.

10:05AM 23   Q.   AND YOU UNDERSTOOD THAT LANGLY GEE WAS THE FULL-TIME

10:05AM 24   QUALITY CONTROL AND QUALITY ASSURANCE MANAGER AT THERANOS?

10:05AM 25   A.   YES.

10:05AM 1   Q.   AND DO YOU RECALL, I BELIEVE MR. SCHENK SHOWED YOU A

10:05AM 2   DOCUMENT YESTERDAY, IN THE SAME TIME PERIOD WHERE MR. GEE TOLD

10:05AM 3   YOU THAT HE WAS GOING TO SEND YOU A FEW HUNDRED SOP'S TO

10:05AM 4   REVIEW.

10:05AM 5        DO YOU RECALL THAT?

10:05AM 6   A.   YES.

10:05AM 7   Q.   AND THERE'S ANOTHER EMAIL THAT I DON'T THINK MR. SCHENK

10:06AM 8   SHOWED YOU -- MAYBE IT WILL REFRESH YOUR RECOLLECTION -- THAT

10:06AM 9   YOU RESPONDED AND ASKED THAT HE SEND ABOUT 50 A WEEK SO YOU CAN

10:06AM 10  SPACE YOUR REVIEW OUT OVER TIME.

10:06AM 11       DO YOU RECALL THAT?

10:06AM 12  A.   YES.

10:06AM 13  Q.   AND THIS, I BELIEVE, WAS ONE OF THE FIRST PERIODS WHERE

10:06AM 14  YOU WERE BEING ASKED TO REVIEW POLICIES; CORRECT?

10:06AM 15  A.   YES.

10:06AM 16  Q.   OKAY.  AND I BELIEVE IT'S THE -- WITHIN A DAY OR TWO

10:06AM 17  MR. GEE SENDS YOU THIS DOCUMENT.

10:06AM 18       AND DO YOU SEE THAT THIS DOCUMENT NOTES THAT MS. SAWYER

10:06AM 19  WAS COMING OFF OF THE CLIA LICENSE IN THIS PERIOD AND THERE WAS

10:06AM 20  SOME PAPERWORK NEEDED IN CONNECTION WITH THAT?

10:06AM 21  A.   YES.

10:06AM 22  Q.   AND DOES THIS REFRESH YOUR RECOLLECTION THAT PART OF THE

10:07AM 23  REASON WHY YOU WEREN'T CALLED UPON TO REVIEW POLICIES AND

10:07AM 24  PROCEDURES UNTIL AUGUST WAS BECAUSE MS. SAWYER HAD SERVED THAT

10:07AM 25  FUNCTION PRIOR TO THEN?

10:07AM  1    A.   I WAS NEVER MADE AWARE THAT SHE WAS DOING THAT PREVIOUSLY.

10:07AM  2    Q.   ALL RIGHT.  WITHIN THIS DOCUMENT, YOU UNDERSTOOD THAT SHE

10:07AM  3    HAD PREVIOUSLY BEEN ON -- AS THE LAB DIRECTOR AND SHE WAS BEING

10:07AM  4    REMOVED AT THIS POINT; RIGHT?

10:07AM  5    A.   THAT'S -- YEAH, THAT'S WHAT IT SAYS.

10:07AM  6    Q.   AND THAT HAPPENS TO COINCIDE WITH THE TIME WHERE YOU'RE

10:07AM  7    NOW ASKED TO REVIEW POLICIES; CORRECT?

10:07AM  8    A.   YES.

10:07AM  9    Q.   OKAY.  AND IF YOU JUST -- IF WE LOOK AT THE NEXT PAGE, WE

10:07AM  10   SEE -- I THINK WE HAD -- THERE WAS A VERSION OF THIS BEFORE WE

10:07AM  11   LOOKED AT WHERE SHE WAS IDENTIFIED; CORRECT?

10:07AM  12   A.   YES.

10:07AM  13   Q.   BUT NOW THIS VERSION OF THE ROSTER, THE LABORATORY

10:08AM  14   PERSONNEL REPORT, NOW REMOVES HER FROM THAT; CORRECT?

10:08AM  15   A.   YES.

10:08AM  16   Q.   AND SO -- AND IN THIS TIME THEN, YOU'RE ASKED TO TAKE ON A

10:08AM  17   LITTLE MORE RESPONSIBILITY; CORRECT?

10:08AM  18   A.   YES.

10:08AM  19   Q.   OKAY.  AND THAT'S NOTED IN MR. GEE'S EMAIL IN THE FIRST

10:08AM  20   PAGE WHERE HE SAYS HE'S GOING TO START SENDING YOU 50 SOP'S PER

10:08AM  21   WEEK.

10:08AM  22        DO YOU SEE THAT?

10:08AM  23   A.   YES.

10:08AM  24   Q.   AND DO YOU UNDERSTAND THAT PART OF THE REASON WHY THESE

10:08AM  25   SOP'S WERE BEING SENT TO YOU WAS BECAUSE THE COMPANY WAS

10:08AM  1    GETTING ALL OF THEIR PAPERWORK IN ORDER BECAUSE THEY KNEW THAT

10:08AM  2    THE CLIA AUDIT WAS COMING UP AND THEY WANTED ALL OF THE I'S

10:08AM  3    DOTTED AND THE T'S CROSSED?

10:08AM  4    A.   YES.

10:08AM  5    Q.   OKAY.  AND YOU DIDN'T WANT ALL OF THOSE POLICIES AT ONE

10:08AM  6    TIME; CORRECT?

10:08AM  7    A.   NO.

10:08AM  8    Q.   YOU WANTED TO HAVE A LITTLE MORE TIME TO SPACE OUT YOUR

10:09AM  9    REVIEW OF THOSE DOCUMENTS; ISN'T THAT RIGHT?

10:09AM  10   A.   YES.

10:09AM  11   Q.   AND MR. GEE SAYS THAT HE'LL SEND YOU 50 A WEEK; IS THAT

10:09AM  12   RIGHT?

10:09AM  13   A.   YES.

10:09AM  14   Q.   AND IF WE GO TO THE SECOND PAGE OF THIS EXHIBIT, THIS

10:09AM  15   DOCUMENT IDENTIFIES CLIA PERSONNEL WHO WORK WITHIN THE LAB;

10:09AM  16   CORRECT?

10:09AM  17   A.   YES.

10:09AM  18   Q.   AND JUST SO WE'RE CLEAR, AT THE POINT THAT YOU WERE

10:09AM  19   SERVING IN THIS AS-NEEDED ROLE FOR THE LAB, THE LAB WAS PRETTY

10:09AM  20   WELL ESTABLISHED AT THIS POINT; CORRECT?

10:09AM  21   A.   THAT WOULD BE MY ASSUMPTION, YES.

10:09AM  22   Q.   YEAH.  I MEAN, YOU UNDERSTOOD THAT THEY HAD HAD A

10:09AM  23   LONG-TIME LAB DIRECTOR IN DR. ROSENDORFF PREVIOUSLY?

10:09AM  24   A.   YES.

10:09AM  25   Q.   AND MR. SCHENK SHOWED YOU A LOT OF THE DOCUMENTS WHERE YOU

10:09AM  1    REVIEWED HIS WORK ESSENTIALLY.

10:09AM  2         DO YOU RECALL THAT?

10:09AM  3    A.   YES.

10:09AM  4    Q.   AND WE'LL LOOK AT SOME OF THOSE DOCUMENTS, BUT AS A

10:10AM  5    GENERAL MATTER, DID THE ROSTER OF PEOPLE AND THE FACT THAT

10:10AM  6    THERE WAS THIS LAB DIRECTOR PREVIOUSLY GIVE YOU COMFORT AS TO

10:10AM  7    THE MATERIALS THAT YOU WERE SIGNING OFF ON?

10:10AM  8    A.   YES.  YOU'RE DEPENDENT ON THE PEOPLE WHO ARE WORKING ON

10:10AM  9    THESE DOCUMENTS.

10:10AM  10   Q.   AND, IN FACT, SIR, YOU'RE SPECIFICALLY AUTHORIZED TO

10:10AM  11   DEPEND ON THOSE PEOPLE WHEN YOU SERVE AS A LABORATORY DIRECTOR;

10:10AM  12   CORRECT?

10:10AM  13   A.   IF THAT'S IN THE STATUTE, YES.

10:10AM  14   Q.   YEAH, LET'S TAKE A LOOK AT THAT.

10:10AM  15        IF WE CAN GO TO 7603, AND THIS IS A BIG DOCUMENT, SO WE'LL

10:10AM  16   PUT UP ON THE SCREEN THE RELEVANT PORTION.  IT'S IN EVIDENCE.

10:10AM  17        YOU'RE WELCOME TO LOOK AT ANY PORTION, BUT I WANT TO DRAW

10:10AM  18   YOUR ATTENTION TO 1445.

10:10AM  19        DO YOU SEE THAT?  IT'S ON THE SCREEN.  IT'S ACTUALLY ON

10:11AM  20   THE SCREEN.

10:11AM  21        IF WE CAN JUST HIGHLIGHT (C) AND (D) JUST SO IT'S A LITTLE

10:11AM  22   BIT BIGGER.

10:11AM  23        DO YOU SEE THAT, DOCTOR?

10:11AM  24   A.   YES.

10:11AM  25   Q.   OKAY.  AND THIS NOTES THAT YOU HAVE TO BE ACCESSIBLE TO

10:11AM  1    THE LABORATORY TO PROVIDE ON SITE TELEPHONE OR ELECTRONIC

10:11AM  2    CONSULTATION AS NEEDED; RIGHT?

10:11AM  3    A.   YES.

10:11AM  4    Q.   AND YOU WERE SO AVAILABLE; CORRECT?

10:11AM  5    A.   YES.

10:11AM  6    Q.   AND THEN IT SAYS, "EACH INDIVIDUAL MAY DIRECT NO MORE THAN

10:11AM  7    FIVE LABORATORIES."

10:11AM  8        DO YOU SEE THAT?

10:11AM  9    A.   YES.

10:11AM  10   Q.   AND THAT MEANS THAT YOU COULD -- IT'S OKAY TO SERVE, UNDER

10:11AM  11   THE REGULATIONS, AS A PART-TIME LAB DIRECTOR?

10:11AM  12   A.   BASED ON WHAT (D) SAYS, YES.

10:11AM  13   Q.   AND YOU WERE A LAB DIRECTOR OF YOUR OWN LAB, BUT YOU WERE

10:12AM  14   JUST A LAB DIRECTOR OF TWO LABS; CORRECT?

10:12AM  15   A.   YES.

10:12AM  16   Q.   OKAY.  AND WHEN YOU'RE NOT A FULL-TIME LAB DIRECTOR, YOU

10:12AM  17   HAVE TO RELY UPON SOME PEOPLE TO PERFORM SOME OF THE DAY-TO-DAY

10:12AM  18   FUNCTIONS; CORRECT?

10:12AM  19   A.   YES.

10:12AM  20   Q.   BECAUSE NO ONE WAS PRETENDING THAT YOU WERE THERE EACH AND

10:12AM  21   EVERY DAY; RIGHT?  YOU WERE THERE AS NEEDED; CORRECT?

10:12AM  22   A.   THAT'S WHAT I WAS ASKED TO DO, YES.

10:12AM  23   Q.   RIGHT, RIGHT.  AND THAT'S WHAT THIS REGULATION ALLOWS;

10:12AM  24   CORRECT?

10:12AM  25   A.   YES.

10:12AM 1    Q.   AND DO YOU RECALL THAT AS A RESULT OF THAT, THAT YOU

10:12AM 2    PREPARED SOME FORMAL WRITTEN DELEGATIONS WHERE YOU FORMALLY

10:12AM 3    DELEGATED TASKS -- OR YOU SIGNED OFF ON FORMAL DELEGATIONS

10:12AM 4    WHERE YOU FORMALLY DELEGATED TASKS TO SOME OF THESE OTHER

10:13AM 5    FULL-TIME EMPLOYEES WITHIN THE CLIA LAB?

10:13AM 6    A.   I'D HAVE TO REVIEW THOSE, BUT --

10:13AM 7    Q.   WHY DON'T WE PULL ONE UP.  LET'S LOOK AT 10577.

10:13AM 8         DO YOU HAVE THAT IN FRONT OF YOU, DOCTOR?

10:13AM 9    A.   YES.

10:13AM 10   Q.   AND DO YOU SEE THAT 10577 IS A FORMAL WRITTEN DELEGATION

10:13AM 11   WHERE YOU'RE DELEGATING DAY-TO-DAY RESPONSIBILITIES TO

10:13AM 12   FULL-TIME EMPLOYEES WITHIN THE LABORATORY?

10:13AM 13   A.   YES.

10:13AM 14        MR. WADE:  OKAY.  I MOVE THE ADMISSION OF 10577.

10:13AM 15        MR. SCHENK:  NO OBJECTION.

10:13AM 16        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:13AM 17        (DEFENDANT'S EXHIBIT 10577 WAS RECEIVED IN EVIDENCE.)

10:13AM 18   BY MR. WADE:

10:13AM 19   Q.   OKAY.  AND THIS DOCUMENT ASSIGNS CERTAIN DAY-TO-DAY

10:14AM 20   RESPONSIBILITIES.

10:14AM 21        IF WE CAN -- WELL, FIRST OF ALL, IT SETS FORTH THE MINIMUM

10:14AM 22   QUALIFICATIONS NEEDED FOR SOMEONE TO SERVE AS THE TECHNICAL

10:14AM 23   SUPERVISOR; CORRECT?

10:14AM 24   A.   YES.

10:14AM 25   Q.   AND THAT WAS IMPORTANT BECAUSE YOU NEEDED TO MAKE SURE

10:14AM 1   THAT THEY MET THE REGULATORY STANDARDS; ISN'T THAT RIGHT?

10:14AM 2   A.   YES.

10:14AM 3   Q.   OKAY.  AND IF WE GO TO THE DUTIES AND RESPONSIBILITIES,

10:14AM 4   HERE THERE'S A FORMAL WRITTEN DELEGATION OF THOSE

10:14AM 5   RESPONSIBILITIES TO MS. ALAMDAR.

10:14AM 6        DO YOU REMEMBER MS. ALAMDAR?

10:14AM 7   A.   YES, I MET HER.

10:14AM 8   Q.   YEAH.  AND SHE WAS AN EXPERIENCED LAB PERSON.

10:14AM 9        DO YOU RECALL THAT?

10:14AM 10  A.   I DON'T HAVE HER CV IN FRONT OF ME, BUT I RECALL THAT SHE

10:14AM 11  WASN'T -- THAT THIS WAS HER POSITION, YES.

10:14AM 12  Q.   AND SHE WAS VERY INVOLVED IN THE ACTIVE DAY-TO-DAY

10:14AM 13  MANAGEMENT OF THE LABORATORY; CORRECT?

10:15AM 14  A.   THAT'S MY ASSUMPTION, YES.

10:15AM 15  Q.   AND BY THIS DOCUMENT, SHE'S DELEGATED A LOT OF THOSE

10:15AM 16  DAY-TO-DAY RESPONSIBILITIES; CORRECT?

10:15AM 17  A.   YES.

10:15AM 18  Q.   AND DO YOU SEE, FOR EXAMPLE, NUMBER 1 DELEGATES TO HER

10:15AM 19  THAT SHE'S RESPONSIBLE FOR PROVIDING DAY-TO-DAY SUPERVISION OF

10:15AM 20  THE HIGH COMPLEXITY TEST PERFORMANCE BY TESTING PERSONNEL.

10:15AM 21       DO YOU SEE THAT?

10:15AM 22  A.   YES.

10:15AM 23  Q.   AND THEN THERE ARE A NUMBER OF OTHER OBLIGATIONS THAT ARE

10:15AM 24  DELEGATED TO HER; CORRECT?

10:15AM 25  A.   YES.

10:15AM 1    Q.   AND AS A PART-TIME LAB DIRECTOR, IT'S NECESSARY FOR YOU TO

10:15AM 2    DO THIS BECAUSE YOU CAN'T BE THERE EVERY DAY AND PERFORM THESE

10:15AM 3    FUNCTIONS; CORRECT?

10:15AM 4    A.   YES.

10:15AM 5    Q.   OKAY.  AND LET'S GO TO 10578.

10:16AM 6         DO YOU HAVE THAT DOCUMENT IN FRONT OF YOU, DOCTOR?

10:16AM 7    A.   YES.

10:16AM 8    Q.   AND THIS IS ANOTHER DELEGATION, FORMAL WRITTEN DELEGATION

10:16AM 9    OF RESPONSIBILITIES TO ANOTHER FORMAL -- ANOTHER FULL-TIME LAB

10:16AM 10   EMPLOYEE AT THERANOS; CORRECT?

10:16AM 11   A.   YES.

10:16AM 12        MR. WADE:  MOVE THE ADMISSION OF 10578.

10:16AM 13        MR. SCHENK:  NO OBJECTION.

10:16AM 14        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:16AM 15        (DEFENDANT'S EXHIBIT 10578 WAS RECEIVED IN EVIDENCE.)

10:16AM 16   BY MR. WADE:

10:16AM 17   Q.   AND THE GENERAL SUPERVISOR IS ACTUALLY A PRETTY SENIOR

10:16AM 18   POSITION WITHIN THE LAB; CORRECT?

10:16AM 19   A.   YES.

10:16AM 20   Q.   AND THIS WAS DELEGATED -- IT'S A LITTLE HARD TO READ THE

10:16AM 21   PRINT -- TO MR. GODFRED MASINDE?

10:16AM 22   A.   I MET HIM, YES.

10:16AM 23   Q.   AND HE ASSUMED CERTAIN DAY-TO-DAY RESPONSIBILITIES TO

10:16AM 24   ENSURE THAT THE CLIA OBLIGATIONS WERE MET; CORRECT?

10:16AM 25   A.   YES.

10:16AM  1    Q.   OKAY.  AND THOSE ARE SET FORTH WITHIN THE NUMBERED ITEMS

10:17AM  2    IN THIS DOCUMENT; IS THAT RIGHT?

10:17AM  3    A.   YES.

10:17AM  4    Q.   AND YOU SIGNED OFF ON THIS DOCUMENT INFORMALLY DELEGATING

10:17AM  5    THOSE RESPONSIBILITIES TO HIM; CORRECT?

10:17AM  6    A.   YES.

10:17AM  7    Q.   AND LET'S GO BACK BRIEFLY TO EXHIBIT 2553, WHICH I THINK

10:17AM  8    IS THE FIRST DOCUMENT.

10:17AM  9         IF WE CAN JUST GO TO PAGE 10 OF THE EXHIBIT, I'M SORRY,

10:17AM 10    PAGE 11 OF THE EXHIBIT.

10:18AM 11         AND THE ROSTER OF PEOPLE, WE'VE TALKED ABOUT THESE A

10:18AM 12    COUPLE OF TIMES.

10:18AM 13         DO YOU RECALL?

10:18AM 14    A.   YES.

10:18AM 15    Q.   AND THE PEOPLE WHO YOU FORMERLY DELEGATED RESPONSIBILITIES

10:18AM 16    TO, AS A PART-TIME LAB DIRECTOR, YOU WERE DEPENDING ON THESE

10:18AM 17    PEOPLE TO PERFORM THEIR FUNCTIONS AS WELL; CORRECT?

10:18AM 18    A.   YES.

10:18AM 19    Q.   AND THIS ROSTER OF PEOPLE, THAT'S A PRETTY LONG ROSTER OF

10:18AM 20    PEOPLE WHO ARE INVOLVED IN RUNNING THE LAB ON A FULL-TIME

10:18AM 21    BASIS; ISN'T IT?

10:18AM 22    A.   THERE'S A LOT OF NAMES ON THIS LIST, YES.

10:18AM 23    Q.   RIGHT.  AND A LOT OF PEOPLE WORKING FULL TIME WITHIN THE

10:18AM 24    LAB; CORRECT?

10:18AM 25    A.   I ASSUME THEY ARE, YES.

10:18AM 1    Q.   WELL, YOU SAW SOME OF THEM WHEN YOU WERE THERE FOR YOUR

10:18AM 2    VISIT; RIGHT?

10:18AM 3    A.   YES, YES.

10:18AM 4    Q.   AND IT WAS A BUSY PLACE?

10:18AM 5    A.   YES, THERE WERE LOTS OF PEOPLE.

10:18AM 6    Q.   AND IN ADDITION TO THIS, YOU UNDERSTOOD MR. BALWANI WAS

10:19AM 7    VERY ACTIVE IN THE MANAGEMENT OF THE LAB; CORRECT?

10:19AM 8    A.   THAT WAS MY UNDERSTANDING.

10:19AM 9    Q.   HE WAS THE PERSON WHO HIRED AND FIRED PEOPLE AND HELPED

10:19AM 10   WITH PROCESSES; CORRECT?

10:19AM 11   A.   THAT WAS MY UNDERSTANDING, YES.

10:19AM 12   Q.   AND HE WAS A VERY SENIOR OFFICER WITHIN THE COMPANY.  I

10:19AM 13   THINK WE TALKED ABOUT YESTERDAY; CORRECT?

10:19AM 14   A.   YES, THAT'S MY UNDERSTANDING.

10:19AM 15   Q.   OKAY.  AND DO YOU RECALL YESTERDAY -- I BELIEVE ON THE

10:19AM 16   FLOOR THERE THERE'S A BIG BLACK BINDER.  IT'S SOMEWHAT

10:19AM 17   DAUNTING.

10:19AM 18       BUT MR. SCHENK ASKED YOU A COUPLE OF QUESTIONS ABOUT THE

10:20AM 19   VALIDATION REPORTS WITHIN THAT.

10:20AM 20       DO YOU RECALL THAT?

10:20AM 21   A.   YES.

10:20AM 22   Q.   AND YOU HAD SIGNED, YOU HAD SIGNED OFF ON THOSE VALIDATION

10:20AM 23   REPORTS, CORRECT, WITH THE EXCEPTION OF ONE, I BELIEVE.

10:20AM 24   A.   YES.

10:20AM 25   Q.   OKAY.  AND LET'S, LET'S TAKE A LOOK.  I THINK MR. SCHENK

10:20AM 1    SHOWED YOU I BELIEVE IT WAS 9387, WHICH IS TOWARD THE BACK.

10:20AM 2    A.   YES.

10:20AM 3    Q.   AND MR. -- THIS IS A VALIDATION REPORT FOR THE TPSA ELISA

10:21AM 4    ASSAY ON THE EDISON 3.X THERANOS SYSTEM.

10:21AM 5        DO YOU SEE THAT?

10:21AM 6    A.   YES.

10:21AM 7    Q.   AND THIS IS ONE OF THOSE INSTANCES WHERE YOU SEE YOU WERE

10:21AM 8    REVIEWING SOMETHING THAT FOUR PEOPLE HAD PREVIOUSLY SIGNED OFF

10:21AM 9    ON; CORRECT?

10:21AM 10   A.   YES.

10:21AM 11   Q.   AND THREE OF WHOM WERE PH.D.'S?

10:21AM 12   A.   YES.

10:21AM 13   Q.   AND YOU UNDERSTOOD THAT THESE WERE ALL FULL-TIME EMPLOYEES

10:21AM 14   AT THERANOS?

10:21AM 15   A.   THAT'S WHAT WOULD -- THAT'S WHAT I ASSUMED, YES.

10:21AM 16   Q.   AND THEY HAD SPENT A LOT OF TIME WORKING ON THIS; CORRECT?

10:21AM 17   A.   I DON'T KNOW HOW MUCH TIME THEY SPENT ON IT, BUT I WOULD

10:21AM 18   THINK SO, YEAH.

10:21AM 19   Q.   WELL, YOU SEE A LOT OF DATA AND INFORMATION?

10:21AM 20   A.   YEAH, YEAH, SO I WOULD ASSUME, YES.

10:21AM 21   Q.   AND YOU WERE ESSENTIALLY UPDATING THAT YOU HAD REVIEWED

10:21AM 22   THE DOCUMENT AS WELL, BUT YOU WERE RELYING UPON THEIR WORK; IS

10:21AM 23   THAT RIGHT?

10:21AM 24   A.   YES.

10:21AM 25   Q.   OKAY.  AND TO THE BEST OF YOUR KNOWLEDGE, THERE'S ACTUALLY

DHAWAN CROSS BY MR. WADE (RES.)                                    3801

```
10:21AM   1   NO REQUIREMENT THAT YOU HAVE TO SIGN OFF AGAIN ON VALIDATION

10:22AM   2   REPORTS ONCE THEY'RE PUT WITHIN THE LAB, IS THERE?

10:22AM   3   A.   I'D HAVE TO REVIEW THE STATUTE, BUT I DON'T BELIEVE THERE

10:22AM   4   IS.

10:22AM   5   Q.   YEAH.  AND MAYBE THIS WAS JUST DEEMED A GOOD PRACTICE,

10:22AM   6   SINCE YOU WERE COMING IN, TO HAVE YOU LOOK OVER EVERYTHING?

10:22AM   7   A.   IT'S ALWAYS A GOOD PRACTICE TO SIGN AND REVIEW.

10:22AM   8   Q.   YOU WERE HAPPY TO LOOK AT THESE WHEN THEY SHOWED THEM TO

10:22AM   9   YOU?

10:22AM  10   A.   I WAS GIVEN THAT JOB, AND YES.

10:22AM  11   Q.   AND YOU ACCEPTED IT?

10:22AM  12   A.   I DID IT.

10:22AM  13   Q.   SO IT WAS A GOOD PRACTICE, BUT IT WASN'T A LEGAL

10:22AM  14   REQUIREMENT OR ANYTHING?

10:22AM  15   A.   IF IT'S NOT IN THE STATUTE, YEAH.

10:22AM  16   Q.   AND YOU HAVE NEVER SEEN A STATUTE THAT WOULD REQUIRE IT?

10:22AM  17   A.   NO.

10:22AM  18   Q.   AND WITH RESPECT TO SOME OF THESE, I DON'T KNOW IF YOU

10:22AM  19   RECALL, BUT SOME OF THEM HAD AS MANY AS, YOU KNOW, NINE OR TEN

10:22AM  20   PEOPLE WHO SIGNED OFF ON THOSE.

10:22AM  21        AND IS IT FAIR TO SAY, IF I WENT THROUGH AND ASKED YOU

10:22AM  22   QUESTIONS ABOUT THAT, YOU WERE RELYING UPON THE GOOD WORK OF

10:22AM  23   THOSE PEOPLE WHO HAD DOCUMENTED ALL OF THIS WORK PREVIOUSLY;

10:23AM  24   CORRECT?

10:23AM  25   A.   YES.
```

10:23AM 1    Q.   AND YOU DIDN'T HAVE ANY REASON TO NOT -- TO THINK THAT

10:23AM 2    WORK WAS UNRELIABLE; CORRECT?

10:23AM 3    A.   NOTHING -- NO.  NO.

10:23AM 4    Q.   OKAY.  AND THIS PARTICULAR REPORT, THE 9387, THAT'S FOR

10:23AM 5    THE EDISON -- THAT'S FOR THE EDISON DEVICE.

10:23AM 6         DO YOU SEE THAT?

10:23AM 7    A.   YES.

10:23AM 8    Q.   AND MR. SCHENK ASKED YOU SOME QUESTIONS ABOUT THE EDISON

10:23AM 9    DEVICE.

10:23AM 10        DO YOU RECALL THAT?

10:23AM 11   A.   YES.

10:23AM 12   Q.   AND AGAIN, YOUR INTERACTIONS WITH THE COMPANY REALLY

10:23AM 13   INCREASED IN AUGUST AFTER MS. SAWYER LEFT; CORRECT?

10:23AM 14   A.   YES.

10:23AM 15   Q.   OKAY.  AND I DON'T THINK MR. SCHENK WENT THROUGH THIS, BUT

10:23AM 16   ARE YOU AWARE THAT AS OF AUGUST OF 2015, THERANOS WAS ACTUALLY

10:23AM 17   NOT RUNNING ANY TESTS ON THE THERANOS DEVICE, ON THE EDISON

10:23AM 18   DEVICE?

10:23AM 19   A.   I FOUND THAT OUT LATER, BUT, YES, I DIDN'T -- I WASN'T

10:24AM 20   AWARE THAT THEY WEREN'T RUNNING IT AT THAT TIME.

10:24AM 21   Q.   SO AT THE TIME THAT YOU'RE COMING IN IN AUGUST, THEY'RE

10:24AM 22   NOT RUNNING A SINGLE TEST ON THE EDISON DEVICE; CORRECT?

10:24AM 23   A.   THAT'S, THAT'S WHAT WAS -- THAT'S WHAT I'VE BEEN TOLD,

10:24AM 24   YEAH.

10:24AM 25        BUT I WAS NOT TOLD THAT AT THAT TIME.

10:24AM 1    Q.   WELL, LET'S LOOK AT EXHIBIT 4533, WHICH I'LL HAND UP.

10:24AM 2         MAY I APPROACH, YOUR HONOR?

10:24AM 3              THE COURT:  YES.

10:24AM 4              MR. WADE:  (HANDING.)

10:24AM 5    Q.   LET ME KNOW ONCE YOU'VE HAD A CHANCE TO REVIEW THAT,

10:25AM 6    DOCTOR.

10:25AM 7         (PAUSE IN PROCEEDINGS.)

10:25AM 8              THE WITNESS:  OKAY.

10:25AM 9    BY MR. WADE:

10:25AM 10   Q.   OKAY.  AND DOES THIS REFRESH YOUR RECOLLECTION THAT

10:25AM 11   THERANOS ACTUALLY, AT THE TIME THAT YOU ENGAGED IN AUGUST OF

10:25AM 12   2015, WASN'T RUNNING ANY TESTS ON THE EDISON DEVICE?

10:25AM 13   A.   ACCORDING TO THIS, YOU KNOW, ACCORDING TO THESE DOCUMENTS,

10:25AM 14   YES.

10:25AM 15              MR. WADE:  I MOVE THE ADMISSION OF 4533.

10:25AM 16              MR. SCHENK:  NO OBJECTION.

10:25AM 17              THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

10:25AM 18         (GOVERNMENT'S EXHIBIT 4533 WAS RECEIVED IN EVIDENCE.)

10:25AM 19              MR. WADE:  AND IF WE CAN BLOW UP THE BOX IN THE

10:25AM 20   BOTTOM.

10:25AM 21   Q.   ACTUALLY, WE SHOULD LOOK AT THE DATE FIRST.

10:25AM 22        DO YOU SEE THAT THIS IS DATED SEPTEMBER 23RD, 2015;

10:25AM 23   CORRECT?

10:25AM 24   A.   YES.

10:25AM 25   Q.   AND THIS IS JUST A SHORT TIME, WITHIN A COUPLE OF DAYS OF

10:25AM   1    THAT CMS INSPECTION.

10:25AM   2         DO YOU RECALL THAT?

10:25AM   3    A.   YES.

10:25AM   4    Q.   OKAY.  AND IF YOU LOOK AT THE BOTTOM, THIS IDENTIFIES WHEN

10:26AM   5    TESTS WERE FIRST RUN ON -- WHEN PARTICULAR ASSAYS WERE FIRST

10:26AM   6    RUN ON THE EDISON DEVICE AND WHEN THEY ENDED; CORRECT?

10:26AM   7    A.   YES.

10:26AM   8    Q.   AND THE LAST DATES IDENTIFIED THERE ARE JUNE 25TH, 2015;

10:26AM   9    CORRECT?

10:26AM  10    A.   YES.

10:26AM  11    Q.   AND THAT WAS BEFORE YOU ENGAGED ACTIVELY WITH THE COMPANY

10:26AM  12    AFTER DR. SAWYER LEFT; CORRECT?

10:26AM  13    A.   YES.

10:26AM  14    Q.   OKAY.  SO THERE WOULDN'T NECESSARILY EVEN HAVE BEEN A

10:26AM  15    REASON FOR MR. BALWANI OR OTHERS TO SHOW YOU THE EDISON DEVICE

10:26AM  16    ON THE TOUR; ISN'T THAT RIGHT?

10:26AM  17    A.   I CAN'T COMMENT.  I MEAN, YOU'LL HAVE TO MAKE THAT

10:26AM  18    ASSUMPTION.  YOU KNOW, I'M NOT SURE I CAN MAKE THAT COMMENT.

10:26AM  19    Q.   WELL, YOU DIDN'T ASK -- LET ME ASK THIS:  YOU DIDN'T ASK

10:26AM  20    THEM TO SHOW YOU THE OTHER DEVICES THAT THEY WEREN'T RUNNING

10:26AM  21    TESTS ON, DID YOU?

10:27AM  22    A.   IF THEY'RE NOT RUNNING TESTS ON THEM, YEAH.

10:27AM  23    Q.   RIGHT.  SO TO THE EXTENT THAT YOU'RE BEING ASKED TO SIGN

10:27AM  24    PAPERWORK THAT RELATES TO THE 3.5 DEVICE, THAT'S MAYBE -- WAS

10:27AM  25    THAT JUST LIKE A MINISTERIAL FUNCTION TO MAKE SURE THAT

10:27AM  1    EVERYTHING HAD BEEN DOCUMENTED AND THEY HAD IT FOR THE FILES?

10:27AM  2    A.   THAT'S NORMALLY WHAT -- WHEN YOU'RE COSIGNING DOCUMENTS,

10:27AM  3    THAT'S USUALLY TO MAKE SURE THAT, YEAH, THAT'S WHY IT'S DONE.

10:27AM  4    Q.   AND THEN THEY LOG THEM IN THE FILES SO IF ANYONE HAS ANY

10:27AM  5    QUESTIONS, THEY CAN COME AND PULL THEM OUT AND PEOPLE CAN LOOK

10:27AM  6    AT THEM; CORRECT?

10:27AM  7    A.   THAT'S USUALLY THE FUNCTION OF THAT, YES.

10:27AM  8    Q.   OKAY.  LET ME LOOK AT A COUPLE OF POLICIES.  I PROMISE YOU

10:27AM  9    I WON'T SHOW YOU EVERY DOCUMENT IN THE BINDER (INDICATING).

10:28AM 10        MAY I APPROACH, YOUR HONOR?

10:28AM 11            THE COURT:  YES.

10:28AM 12    BY MR. WADE:

10:28AM 13    Q.   IF I COULD CALL YOUR ATTENTION TO EXHIBIT 9941, WHICH I

10:28AM 14    BELIEVE SHOULD BE THE FIRST DOCUMENT IN THE BINDER.

10:28AM 15        DO YOU SEE THAT?

10:28AM 16    A.   YES.

10:28AM 17    Q.   AND THIS IS A STANDARD OPERATING PROCEDURE FOR PROFICIENCY

10:29AM 18    TESTING FOR THERANOS LAB DEVELOPED TESTS.

10:29AM 19        DO YOU SEE THAT?

10:29AM 20    A.   YES.

10:29AM 21    Q.   AND YOU SIGNED OFF ON THIS IN SEPTEMBER OF 2015?

10:29AM 22    A.   YES.

10:29AM 23            MR. WADE:  MOVE THE ADMISSION OF 9941.

10:29AM 24            MR. SCHENK:  NO OBJECTION.

10:29AM 25            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:29AM  1          (DEFENDANT'S EXHIBIT 9941 WAS RECEIVED IN EVIDENCE.)

10:29AM  2     BY MR. WADE:

10:29AM  3     Q.   OKAY.  AND THIS WAS, THIS WAS ONE OF THOSE DOCUMENTS

10:29AM  4     WHERE, AFTER YOU CAME IN AND YOU WERE ENGAGED WITH THE COMPANY

10:29AM  5     IN AUGUST AND SEPTEMBER, WHERE YOU WERE ASKED TO REVIEW AND

10:29AM  6     SIGN; IS THAT CORRECT?

10:29AM  7     A.   YES.

10:29AM  8     Q.   AND YOU WERE RELYING UPON DR. SAKSENA AND DR. YOUNG AND

10:29AM  9     THEIR EXPERTISE WHEN YOU SIGNED OFF ON THIS; IS THAT CORRECT?

10:29AM 10     A.   YES.

10:29AM 11     Q.   IN FACT, DO YOU RECALL THAT DR. SAKSENA WAS ACTUALLY IN

10:29AM 12     THE PROCESS -- HE WAS A FULL-TIME EMPLOYEE AT THERANOS;

10:30AM 13     CORRECT?

10:30AM 14     A.   IF THAT'S IN THE RECORD, THEN YES.

10:30AM 15     Q.   AND DO YOU RECALL ACTUALLY THAT HE WAS IN THE PROCESS OF

10:30AM 16     GETTING SOME CERTIFICATIONS TO BECOME THE FULL-TIME LABORATORY

10:30AM 17     DIRECTOR AT THERANOS AND SOUGHT YOUR ASSISTANCE IN CONNECTION

10:30AM 18     WITH THAT?

10:30AM 19     A.   I DON'T RECALL THAT.

10:30AM 20     Q.   OKAY.  WE'LL COME BACK TO THAT.

10:30AM 21          BUT IN CONNECTION -- AND YOU SEE DR. YOUNG WAS A PH.D. AS

10:30AM 22     WELL; CORRECT?

10:30AM 23     A.   YES.

10:30AM 24     Q.   OKAY.  LET ME TURN YOU TOWARD THE BACK OF THE BINDER.  LET

10:30AM 25     ME TURN YOU TO EXHIBIT 9962.

10:31AM   1        DO YOU HAVE THAT ONE IN FRONT OF YOU?

10:31AM   2   A.   YES.

10:31AM   3   Q.   AND DO YOU RECOGNIZE THIS TO BE THE QUALITY SYSTEMS MANUAL

10:31AM   4   THAT YOU SIGNED OFF ON IN SEPTEMBER OF 2015?

10:31AM   5   A.   YES.

10:31AM   6        MR. WADE:  MOVE THE ADMISSION OF 9962.

10:31AM   7        MR. SCHENK:  NO OBJECTION.

10:31AM   8        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:31AM   9        (DEFENDANT'S EXHIBIT 9962 WAS RECEIVED IN EVIDENCE.)

10:31AM  10   BY MR. WADE:

10:31AM  11   Q.   AND AGAIN, THIS IS THE QUALITY SYSTEMS MANUAL THAT WAS

10:31AM  12   PREPARED BY NUMEROUS PEOPLE WITHIN THE COMPANY AND YOU WERE

10:31AM  13   ASKED TO REVIEW AND SIGN OFF ON; IS THAT RIGHT?

10:31AM  14   A.   YES.

10:31AM  15   Q.   AND THESE ARE PEOPLE WHO WERE ALL FULL-TIME EMPLOYEES AT

10:31AM  16   THERANOS?

10:31AM  17   A.   I BELIEVE SO, YES.

10:31AM  18   Q.   AND DO YOU SEE DR. MASINDE IS THE ONE WHO ACTUALLY

10:31AM  19   PREPARED THIS AS THE TECHNICAL SUPERVISOR?

10:31AM  20   A.   YES.

10:31AM  21   Q.   AND LANGLY GEE WAS INVOLVED IN THIS BECAUSE HE WAS DOING

10:32AM  22   FULL-TIME QUALITY ASSURANCE AND QUALITY CONTROL WORK?

10:32AM  23   A.   YES.

10:32AM  24   Q.   OKAY.  AND I WANT TO JUST DRAW YOUR ATTENTION TO THE LAST

10:32AM  25   PAGE OF THIS WHICH SHOWS THE REVISION HISTORY.

10:32AM 1          DO YOU SEE THAT?

10:32AM 2     A.   YES.

10:32AM 3     Q.   AND THE REVISION HISTORY YOU MADE -- BASED ON YOUR REVIEW

10:32AM 4     OF THESE DOCUMENTS AND OTHER DOCUMENTS, DO YOU UNDERSTAND THAT

10:32AM 5     ONE OF THE THINGS THAT THE FULL-TIME PEOPLE WOULD DO WITHIN THE

10:32AM 6     COMPANY IS THAT THEY WOULD CONTINUOUSLY UPDATE AND IMPROVE THE

10:32AM 7     PROCEDURES AS THEY GOT MORE AND MORE EXPERIENCE WITHIN THE LAB?

10:32AM 8     A.   YES.

10:32AM 9     Q.   AND THAT'S -- THIS REVISION HISTORY REFLECTS A NUMBER OF

10:32AM 10    ITERATIONS OF THIS DOCUMENT?

10:32AM 11    A.   YES.

10:32AM 12    Q.   AND YOU WERE JUST BEING ASKED TO SIGN OFF ON THE LATEST

10:32AM 13    COPY OF THIS WITH THE NEWEST IMPROVEMENTS; IS THAT RIGHT?

10:33AM 14    A.   YES.

10:33AM 15    Q.   OKAY.  LET ME SHOW YOU ONE MORE.

10:33AM 16         LET'S GO TO 110, WHICH I THINK IS THE SECOND TO THE LAST

10:33AM 17    DOCUMENT IN THAT BINDER.  SO THAT'S 10010 I GUESS I SHOULD SAY.

10:33AM 18         DO YOU HAVE THAT IN FRONT OF YOU, DOCTOR?

10:33AM 19    A.   YES.

10:33AM 20    Q.   AND DO YOU RECOGNIZE THIS TO BE A QUALITY CONTROL STANDARD

10:33AM 21    OPERATING PROCEDURE THAT YOU WERE ASKED TO SIGN OFF ON IN

10:33AM 22    SEPTEMBER OF 2015?

10:33AM 23    A.   YES.

10:33AM 24              MR. WADE:  MOVE THE ADMISSION OF 10010.

10:33AM 25              MR. SCHENK:  NO OBJECTION.

10:33AM   1          THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

10:33AM   2          (DEFENDANT'S EXHIBIT 10010 WAS RECEIVED IN EVIDENCE.)

10:34AM   3     BY MR. WADE:

10:34AM   4     Q.   OKAY.  SIMILAR TO OTHER DOCUMENTS, THERE ARE THREE

10:34AM   5     FULL-TIME EMPLOYEES WHO HAD PREPARED THIS IN ADVANCE OF YOUR

10:34AM   6     REVIEW OF IT; IS THAT CORRECT?

10:34AM   7     A.   YES.

10:34AM   8     Q.   INCLUDING MR. GEE, WHO WAS FULL TIME RESPONSIBLE FOR

10:34AM   9     QUALITY CONTROL?

10:34AM   10    A.   YES.

10:34AM   11    Q.   AND OTHER PEOPLE WHO WERE -- HAD SENIOR FUNCTIONS WITHIN

10:34AM   12    THE LAB AT THIS TIME; IS THAT RIGHT?

10:34AM   13    A.   YES.

10:34AM   14    Q.   OKAY.  AND SIMILARLY, IF WE JUST GO TO THE BACK OF THE

10:34AM   15    DOCUMENT AND LOOK AT THE REVISION HISTORY.

10:34AM   16          AS WITH OTHER POLICIES AND PROCEDURES THAT YOU SAW IN THE

10:34AM   17    LAB, THIS REFLECTED THAT THERE WERE NUMEROUS AND ONGOING

10:34AM   18    ITERATIONS AND DEVELOPMENTS OF THE POLICIES WITHIN THE LAB; IS

10:34AM   19    THAT RIGHT?

10:34AM   20    A.   YES.

10:34AM   21    Q.   OKAY.  THANK YOU.

10:34AM   22          YOU CAN SET THAT BINDER ASIDE.

10:35AM   23          LET ME ASK YOU, IN THE WHITE BINDER YOU WERE ASKED ABOUT A

10:35AM   24    POLICY BY MR. SCHENK, WHICH I BELIEVE IS EXHIBIT 3041, WHICH IS

10:35AM   25    IN EVIDENCE.

DHAWAN CROSS BY MR. WADE (RES.)

10:35AM 1          DO YOU SEE THAT?

10:35AM 2     A.   YES.

10:35AM 3     Q.   AND MR. SCHENK HAD ASKED YOU -- THIS RELATES TO CRITICAL

10:35AM 4     VALUES; CORRECT?

10:35AM 5     A.   YES.

10:35AM 6     Q.   AND FROM YOUR TRAINING, YOU'RE VERY FAMILIAR WITH CRITICAL

10:36AM 7     VALUES AND WHAT THEY ARE; RIGHT?

10:36AM 8     A.   YES.

10:36AM 9     Q.   OKAY.  AND IF YOU GO -- AND I THINK THERE WAS SOME

10:36AM 10    DISCUSSION ABOUT CRITICAL VALUES.  I JUST WANT TO MAKE SURE THE

10:36AM 11    RECORD IS CLEAR.

10:36AM 12         THE CRITICAL VALUES ARE ALL ACTUALLY SET FORTH IN THE BACK

10:36AM 13    OF THE DOCUMENT, IS THAT RIGHT, IN APPENDIX A ON PAGE 9?

10:36AM 14    A.   YES.

10:36AM 15    Q.   AND GOING FORWARD.

10:36AM 16    A.   YES.

10:36AM 17    Q.   AND JUST SO -- THERE MAY HAVE BEEN SOME CONFUSION.  I JUST

10:36AM 18    WANT TO MAKE SURE IT'S CLEAR.

10:36AM 19         THIS GIVES THE GUIDELINES FOR WHAT ARE CONSIDERED TO BE

10:36AM 20    CRITICAL VALUES BY THE COMPANY WHEN THEY GET RESULTS WITHIN THE

10:36AM 21    LABORATORY; CORRECT?

10:36AM 22    A.   YES.

10:36AM 23    Q.   AND THEN IF YOU LOOK EARLY IN THE PROCEDURE, IT THEN SAYS

10:36AM 24    EXACTLY WHAT PEOPLE ARE SUPPOSED TO DO WHEN THEY GET CRITICAL

10:36AM 25    VALUES; RIGHT?

10:36AM  1          IF I CAN CALL YOUR ATTENTION TO PAGE 4 OF THE EXHIBIT.

10:37AM  2          DO YOU SEE UNDER PARAGRAPH 7 THERE'S ACTUALLY A VERY

10:37AM  3     SPECIFIC PROCEDURE THERE?

10:37AM  4     A.   YES.

10:37AM  5     Q.   AND THAT PROCEDURE GOES DOWN TO THE LEVEL OF DETAIL WHERE

10:37AM  6     THEY PROVIDE A SCRIPT AS TO EXACTLY WHAT IS SUPPOSED TO BE SAID

10:37AM  7     WHEN A CRITICAL VALUE IS REPORTED TO A DOCTOR; RIGHT?

10:37AM  8     A.   YES.

10:37AM  9     Q.   AND THEY GIVE A SCRIPT AND A VERY PRECISE PROCEDURE ABOUT

10:37AM  10    WHAT IS SUPPOSED TO HAPPEN WHEN A CRITICAL VALUE IS REPORTED TO

10:37AM  11    A PATIENT; CORRECT?

10:37AM  12         IF YOU LOOK ON THE NEXT PAGE?

10:37AM  13    A.   YES.

10:37AM  14    Q.   AND DID THIS SEEM LIKE A GOOD PROCEDURE TO YOU?

10:38AM  15    A.   YES.

10:38AM  16    Q.   OKAY.  AND IF YOU GO TO THE FRONT PAGE OF THAT AGAIN JUST

10:38AM  17    QUICKLY.  BY THE TIME THIS WAS PREPARED, DO YOU SEE THAT THERE

10:38AM  18    WAS A NEW LABORATORY MANAGER REFLECTED THERE?

10:38AM  19    A.   YES.

10:38AM  20    Q.   MS. CENDEJAS.

10:38AM  21         AND THEN THERE'S A NEW TECHNICAL SUPERVISOR AND A NEW

10:38AM  22    GENERAL SUPERVISOR.

10:38AM  23         DO YOU SEE THAT?

10:38AM  24    A.   YES.

10:38AM  25    Q.   AND DO YOU RECALL THAT TOWARD THE END OF 2015 THAT THERE

10:38AM  1    WERE ACTUALLY A NUMBER OF NEW AND ADDITIONAL EXPERTS WHO WERE

10:38AM  2    BROUGHT IN TO THE LAB, NEW NAMES THAT WERE APPEARING?

10:38AM  3    A.   YEAH, THE NAMES THAT I SEE HERE, YES.

10:38AM  4    Q.   OKAY.  LET'S GO TO 10527.

10:39AM  5    A.   YES.

10:39AM  6    Q.   DO YOU HAVE THAT IN FRONT OF YOU, DOCTOR?

10:39AM  7    A.   YES.

10:39AM  8    Q.   AND I BELIEVE THIS -- WE TALKED ABOUT DIFFERENT EMAILS OF

10:39AM  9    THIS NATURE PREVIOUSLY.

10:39AM  10       DO YOU RECALL THAT?

10:39AM  11   A.   YES.

10:39AM  12   Q.   AND MR. SCHENK I BELIEVE SHOWED YOU THE BOTTOM EMAIL IN

10:39AM  13   THIS CHAIN.

10:39AM  14       DO YOU RECALL THAT?

10:39AM  15   A.   YES.

10:39AM  16           MR. WADE:  I MOVE THE ADMISSION OF 10527.

10:39AM  17           MR. SCHENK:  NO OBJECTION.

10:39AM  18           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:40AM  19       (DEFENDANT'S EXHIBIT 10527 WAS RECEIVED IN EVIDENCE.)

10:40AM  20   BY MR. WADE:

10:40AM  21   Q.   THIS WAS THE EMAIL WHERE YOU WERE ASKING THAT DOCTOR -- OR

10:40AM  22   MR. GEE SEND YOU ONLY 50 POLICIES A WEEK; CORRECT?

10:40AM  23   A.   YES.

10:40AM  24   Q.   AND I'M ASKING YOU THIS BECAUSE I WANT TO ASK SOME

10:40AM  25   QUESTIONS ABOUT THAT PERIOD LEADING UP TO THE CMS AUDIT AND

10:40AM  1    SOME QUESTIONS RELATING TO THAT.

10:40AM  2    A.   YES.

10:40AM  3    Q.   AND SO THAT KIND OF RAMP UP PERIOD STARTS HERE IN -- BLESS

10:40AM  4    YOU -- IN EARLY AUGUST?

10:40AM  5    A.   YES.

10:40AM  6    Q.   AND LET'S LOOK AT 10528, WHICH I BELIEVE IS IN EVIDENCE.

10:40AM  7    IT MIGHT BE A DIFFERENT --

10:40AM  8         THE COURT'S INDULGENCE FOR A MOMENT.

10:41AM  9         (PAUSE IN PROCEEDINGS.)

10:41AM  10           MR. WADE:  YOUR HONOR, THIS DOCUMENT MAY BE IN

10:41AM  11   EVIDENCE, AND WE'LL WORK IT OUT LATER.

10:41AM  12       IT'S THE SAME DOCUMENT.  I'LL JUST MOVE IT IN AND WE CAN

10:41AM  13   CLARIFY THAT.

10:41AM  14           MR. SCHENK:  NO OBJECTION.

10:41AM  15           THE COURT:  IT'S ADMITTED.

10:41AM  16       (DEFENDANT'S EXHIBIT 10528 WAS RECEIVED IN EVIDENCE.)

10:41AM  17           MR. WADE:  I JUST WANT TO MAKE SURE THAT THE

10:41AM  18   REDACTIONS ARE APPROPRIATE, AND I'M COMFORTABLE WITH THIS

10:41AM  19   DOCUMENT.

10:41AM  20   Q.   DO YOU HAVE 10528 IN FRONT OF YOU, SIR?

10:41AM  21   A.   YES.

10:41AM  22   Q.   OKAY.  I THINK YOU WERE ASKED SOME QUESTIONS ABOUT THIS BY

10:41AM  23   MR. SCHENK.

10:41AM  24       DO YOU RECALL THAT?

10:41AM  25   A.   YES.

10:41AM  1    Q.   AND AGAIN, THIS IS THE PERIOD WHERE DR. SAWYER LEFT AND

10:41AM  2    YOU WERE BEING ASKED TO SPEND MORE TIME AT THE COMPANY?

10:42AM  3    A.   YES.

10:42AM  4    Q.   OKAY.  AND MR. BALWANI HAD TALKED TO YOU ABOUT -- YOU SEE

10:42AM  5    HERE IN THE THIRD FULL PARAGRAPH, HE SAYS THAT WE HAVE A LAB

10:42AM  6    AUDIT COMING UP ON 9/22 AT 9:00 A.M.

10:42AM  7         DO YOU SEE THAT?

10:42AM  8    A.   YES.

10:42AM  9    Q.   AND HE NOTED THAT THEY HAPPEN EVERY TWO YEARS; RIGHT?

10:42AM  10   A.   YES.

10:42AM  11   Q.   AND YOU KNEW THAT BECAUSE YOU HAD BEEN THROUGH THESE

10:42AM  12   BEFORE; CORRECT?

10:42AM  13   A.   YES.

10:42AM  14   Q.   AND HE WANTED TO SEE IF YOU COULD BE PRESENT FOR THAT; IS

10:42AM  15   THAT RIGHT?

10:42AM  16   A.   YES.

10:42AM  17   Q.   OKAY.  AND HE THEN STATES, "I HAVE A VERY CAPABLE TEAM

10:42AM  18   THAT HAS TAKEN CARE OF ALL OF THE DETAILS AS ALWAYS, BUT WOULD

10:42AM  19   LIKE TO HAVE YOU HERE FOR THE FIRST PART OR SO AND THE

10:42AM  20   INTRODUCTION OF OUR TEAM."

10:43AM  21        DO YOU SEE THAT?

10:43AM  22   A.   YES.

10:43AM  23   Q.   OKAY.  AND DO YOU REMEMBER DISCUSSING WITH MR. BALWANI

10:43AM  24   THAT THE COMPANY HAD BROUGHT IN SOME OUTSIDE EXPERTS TO HELP IT

10:43AM  25   PREPARE AND DO MOCK AUDITS IN ADVANCE OF THIS CMS AUDIT?

10:43AM   1    A.   I DON'T RECALL THOSE CONVERSATIONS.  THIS IS GOING BACK

10:43AM   2    SIX YEARS.

10:43AM   3         SO IF THEY HAPPENED, THEY HAPPENED.  BUT I DON'T RECALL

10:43AM   4    THE SPECIFIC CONVERSATIONS ABOUT THE MOCK AUDITS.

10:43AM   5    Q.   OKAY.  FAIR ENOUGH.  I'LL SHOW YOU SOME DOCUMENTS AND SEE

10:43AM   6    IF I CAN REFRESH YOUR RECOLLECTION IN A MINUTE.

10:43AM   7    A.   YES.

10:43AM   8    Q.   BUT DO YOU SEE THAT HE SAID THAT HE HAD A FULL TEAM WHO

10:43AM   9    WAS PREPARING FOR IT; RIGHT?

10:43AM   10   A.   YES.

10:43AM   11   Q.   OKAY.  AND HE NOTES HERE THAT HE WILL PERSONALLY WALK YOU

10:43AM   12   THROUGH THE LATEST UPDATES WITH THE TEAM; RIGHT?

10:43AM   13   A.   YES.

10:43AM   14   Q.   AND I THINK YOU TESTIFIED ABOUT THAT.  YOU WENT AND YOU

10:43AM   15   DID A WALK THROUGH WITH THE WHOLE TEAM; CORRECT?

10:44AM   16   A.   YES.

10:44AM   17   Q.   AND WAS THAT HELPFUL TO YOU?

10:44AM   18   A.   YES.

10:44AM   19   Q.   AND THE NEXT CLAUSE THERE SAYS, "WE HAVE HIRED MANY

10:44AM   20   EXPERTS FROM THE INDUSTRY TO MAKE SURE LAB IS FLAWLESS AND

10:44AM   21   AUDIT READY, SO I DON'T ANTICIPATE ANY HICKUPS, BUT AS ALWAYS,

10:44AM   22   WANTED YOU TO BE FAMILIAR WITH IT."

10:44AM   23        DO YOU SEE THAT?

10:44AM   24   A.   YES.

10:44AM   25   Q.   OKAY.  SO WAS IT YOUR UNDERSTANDING THAT MR. BALWANI,

```
10:44AM   1    GOING INTO THIS AUDIT, THOUGHT THAT THE LAB WAS IN GREAT SHAPE;

10:44AM   2    RIGHT?

10:44AM   3              MR. SCHENK:  OBJECTION.  SPECULATION.

10:44AM   4              THE COURT:  YOU'RE ASKING HIM WHAT MR. BALWANI

10:44AM   5    THOUGHT.

10:44AM   6              MR. WADE:  I'M ASKING IF IT WAS HIS UNDERSTANDING

10:44AM   7    BASED ON WHAT MR. BALWANI TOLD HIM IN THIS DOCUMENT.

10:44AM   8              THE COURT:  WELL, YOU CAN ASK HIM ABOUT WHAT THE

10:44AM   9    DOCUMENT SAYS.

10:44AM  10              MR. WADE:  WELL, I -- I BELIEVE I CAN ASK HIM ABOUT

10:44AM  11    HIS UNDERSTANDING ABOUT -- BASED ON HIS INTERACTIONS WITH

10:44AM  12    MR. BALWANI.

10:44AM  13              THE COURT:  YOU CAN ASK HIM WHAT DOES THIS DOCUMENT

10:44AM  14    MEAN TO HIM.

10:44AM  15              MR. WADE:  OKAY.  WELL, YOUR HONOR, MAYBE IF I

10:44AM  16    WITHDRAW THIS QUESTION AND TRY AGAIN, MAYBE I'LL DRAW ANOTHER

10:45AM  17    OBJECTION.

10:45AM  18    Q.  WAS IT YOUR UNDERSTANDING, BASED ON THE COMMUNICATIONS

10:45AM  19    WITH MR. BALWANI, WRITTEN AND ORAL, THAT HE FELT LIKE THE LAB

10:45AM  20    WAS IN GOOD SHAPE GOING INTO THE AUDIT?

10:45AM  21              MR. SCHENK:  SPECULATION.

10:45AM  22              THE COURT:  SUSTAINED.  YOU CAN ASK IT ANOTHER WAY.

10:45AM  23    BY MR. WADE:

10:45AM  24    Q.  WAS IT YOUR UNDERSTANDING AS A RESULT OF THIS EMAIL,

10:45AM  25    RECEIVING THIS EMAIL, THAT THE LAB -- THAT PEOPLE AT THERANOS
```

10:45AM  1    BELIEVED THE LAB TO BE IN GOOD SHAPE?

10:45AM  2            MR. SCHENK:  SPECULATION.

10:45AM  3            THE COURT:  WE CAN GO A LONG WAYS WITH THIS, BUT IS

10:45AM  4    THERE ANOTHER WAY THAT YOU CAN ASK HIM THE QUESTION THAT IS NOT

10:45AM  5    SPECULATION?

10:45AM  6            MR. WADE:  I'M ASKING ABOUT HIS UNDERSTANDING AND

10:45AM  7    HE'S COMMUNICATING ON THESE ISSUES.

10:45AM  8            THE COURT:  AND THE OBJECTION HAS BEEN SPECULATION

10:45AM  9    AND THE COURT SUSTAINED IT, SO --

10:45AM  10   BY MR. WADE:

10:45AM  11   Q.   YOU RECEIVED THIS COMMUNICATION FROM MR. BALWANI; CORRECT?

10:45AM  12   A.   THE EMAIL, YES.

10:45AM  13   Q.   OKAY.  AND YOU SEE WHERE HE SAYS, "WE HAVE HIRED MANY

10:46AM  14   EXPERTS," RIGHT?  YOU SEE THAT?

10:46AM  15   A.   YES.

10:46AM  16   Q.   AND HE SAYS THAT THEY WANT TO MAKE SURE THAT THE LAB IS

10:46AM  17   FLAWLESS AND AUDIT READY.

10:46AM  18        DO YOU SEE THAT?

10:46AM  19   A.   YES.

10:46AM  20   Q.   AND YOU SEE WHERE HE SAYS HE DOESN'T ANTICIPATE ANY

10:46AM  21   HICCUPS.

10:46AM  22        DO YOU SEE THAT?

10:46AM  23   A.   YES.

10:46AM  24   Q.   AND WHAT DID YOU UNDERSTAND HIM TO MEAN BY HE DIDN'T

10:46AM  25   ANTICIPATE ANY HICCUPS?

DHAWAN CROSS BY MR. WADE (RES.)

10:46AM  1    A.   THAT THERE SHOULDN'T BE ANY ISSUES.

10:46AM  2    Q.   IN THE INSPECTION?

10:46AM  3    A.   YES.

10:46AM  4    Q.   OKAY.  BUT NOTWITHSTANDING ALL OF THOSE OUTSIDE EXPERTS

10:46AM  5    WHO WERE INVOLVED, HE WANTED TO MAKE SURE THAT YOU COULD COME

10:46AM  6    AND BE COMFORTABLE WITH EVERYTHING; CORRECT?

10:46AM  7    A.   HE WANTED ME TO BE THERE FOR AT LEAST PART OF THAT

10:46AM  8    INSPECTION, YES.

10:46AM  9    Q.   AND FOR A WALK THROUGH IN ADVANCE OF THAT; CORRECT?

10:46AM  10   A.   YES.

10:46AM  11   Q.   AND YOU ACTUALLY IN THIS PERIOD, STARTING AUGUST 8TH, OR

10:47AM  12   WHATEVER IT IS, UNTIL SEPTEMBER, YOU MADE A COUPLE OF TRIPS TO

10:47AM  13   THE COMPANY; CORRECT?

10:47AM  14   A.   I DON'T RECALL THE NUMBER, BUT I DID MAKE TRIPS TO THE

10:47AM  15   COMPANY, YES.

10:47AM  16   Q.   OKAY.  AND WHEN YOU WERE AT THE COMPANY, DID YOU INTERACT

10:47AM  17   WITH OTHER -- YOU INTERACTED WITH SOME OF THE OTHER LAB

10:47AM  18   EMPLOYEES AS WELL?

10:47AM  19   A.   I MET THEM.

10:47AM  20   Q.   AND THEY SHOWED YOU THE DIFFERENT -- THE STATE OF THE LAB

10:47AM  21   AT THE TIME?

10:47AM  22   A.   YES, WE DID A WALK THROUGH.

10:47AM  23   Q.   OKAY.  AND DID THEY COMMUNICATE TO YOU THE READINESS FOR

10:47AM  24   THE CLIA INSPECTION?

10:47AM  25   A.   WE DIDN'T HAVE ANY CONVERSATIONS -- I DIDN'T HAVE ANY

10:47AM  1    CONVERSATIONS PARTICULARLY ABOUT THE READINESS FOR THE CLIA

10:48AM  2    INSPECTION.

10:48AM  3    Q.   OKAY.  JUST THESE COMMUNICATIONS WITH MR. BALWANI?

10:48AM  4    A.   PREDOMINANTLY WITH MR. BALWANI, YES.

10:48AM  5    Q.   OKAY.  AND THEN DO YOU RECALL THAT THE COMPANY HAD A

10:48AM  6    LABORATORY CONSULTING FIRM THAT IT USED TO HELP MAKE SURE ITS

10:48AM  7    POLICIES AND PROCEDURES WERE STATE OF THE ART AND THAT IT WAS

10:48AM  8    PREPARED FOR THE CLIA INSPECTIONS?

10:48AM  9    A.   HE INDICATED THAT THERE WAS A COMPANY INVOLVED WITH THAT,

10:48AM  10   YES.

10:48AM  11   Q.   OKAY.  AND DO YOU RECALL THE NAME JERRY HURST?  IS THAT A

10:48AM  12   NAME THAT IS FAMILIAR TO YOU?

10:48AM  13   A.   I DON'T RECALL THAT NAME.

10:48AM  14   Q.   OKAY.  LET ME JUST SEE IF I COULD REFRESH YOUR

10:48AM  15   RECOLLECTION.

10:48AM  16       TAKE A LOOK AT 13173.

10:49AM  17       JUST READ IT TO YOURSELF AND LET ME KNOW WHEN YOU'VE HAD A

10:49AM  18   CHANCE TO REVIEW THE EMAIL, SIR.

10:50AM  19       (PAUSE IN PROCEEDINGS.)

10:50AM  20          THE WITNESS:  I'M DONE.

10:50AM  21   BY MR. WADE:

10:50AM  22   Q.   DOES THIS REFRESH YOUR RECOLLECTION THAT THERE WAS A

10:50AM  23   GENTLEMEN NAMED JERRY HURST AT LABORATORY CONSULTING SERVICES

10:50AM  24   WHO HELPED THE COMPANY PREPARE WITH MOCK AUDITS FOR THE CLIA

10:50AM  25   INSPECTION?

10:50AM   1   A.   I WAS MADE AWARE THAT SOMEBODY WAS HELPING WITH A MOCK

10:50AM   2   AUDIT, BUT I DIDN'T KNOW IT WAS MR. HURST.

10:50AM   3   Q.   OKAY.  AND DO YOU KNOW WHETHER THE COMPANY ACTUALLY DID

10:50AM   4   MULTIPLE MOCK AUDITS?

10:50AM   5   A.   I WAS NEVER TOLD THAT.

10:50AM   6   Q.   OKAY.  LET'S TAKE A LOOK AT 4528.

10:50AM   7            THE CLERK:  452A OR 8?

10:50AM   8            MR. WADE:  8.

10:51AM   9   Q.   AND I THINK ON YOUR DIRECT TESTIMONY YOU SAID WHEN YOU

10:51AM  10   ATTENDED THE AUDIT THAT THERE WAS SORT OF AN INTRODUCTORY

10:51AM  11   PRESENTATION THAT WAS GIVEN TO THE PEOPLE WHO WERE COMING IN

10:51AM  12   FOR THE INSPECTION.

10:51AM  13        DO YOU RECALL THAT?

10:51AM  14   A.   EVERYONE WAS INTRODUCED.

10:51AM  15   Q.   YEAH.  AND DO YOU RECALL THE POWERPOINT PRESENTATION THAT

10:51AM  16   WAS GIVEN ON SEPTEMBER 22ND, 2015 TO THOSE INSPECTORS?

10:51AM  17   A.   I DON'T RECALL THE EXACT PRESENTATION.

10:51AM  18   Q.   OKAY.  WELL, HAVE A LOOK AT EXHIBIT 4528 AND SEE IF

10:51AM  19   THIS -- IF YOU RECOGNIZE THIS TO BE A POWERPOINT PRESENTATION

10:51AM  20   THAT WAS GIVEN TO THE CLIA INSPECTORS?

10:52AM  21        (PAUSE IN PROCEEDINGS.)

10:52AM  22            THE WITNESS:  THIS LOOKS LIKE A CLIA PRESENTATION,

10:52AM  23   YEAH.

10:52AM  24   BY MR. WADE:

10:52AM  25   Q.   AND DO YOU RECALL BEING THERE FOR THAT PRESENTATION, AT

10:52AM  1      LEAST THE INTRODUCTION PORTION OF THAT PRESENTATION?

10:52AM  2      A.   THE INTRODUCTION, YES.

10:52AM  3               MR. WADE:  MOVE THE ADMISSION OF 4528.

10:52AM  4               MR. SCHENK:  FOUNDATION.

10:52AM  5               THE COURT:  MAYBE A LITTLE MORE FOUNDATION WOULD BE

10:52AM  6      HELPFUL.

10:52AM  7      BY MR. WADE:

10:52AM  8      Q.   I BELIEVE YOU TESTIFIED THAT EVERYONE SORT OF GATHERED

10:52AM  9      INITIALLY AND THERE WERE A NUMBER OF PEOPLE WHO WERE AROUND THE

10:52AM 10      TABLE AND YOU WERE SORT OF SITTING IN THE BACK; IS THAT RIGHT?

10:52AM 11      A.   YES.

10:52AM 12      Q.   AND AS PART OF THAT -- THIS WAS ON SEPTEMBER 22ND, 2015?

10:52AM 13      A.   YES.

10:52AM 14      Q.   AND THEN AS PART OF THE INTRODUCTION, THE COMPANY WANTED

10:52AM 15      TO GIVE SOME OVERVIEW INFORMATION ABOUT THEIR LAB OPERATIONS.

10:53AM 16          DO YOU RECALL THAT?

10:53AM 17      A.   YES.

10:53AM 18      Q.   AND KIND OF INTRODUCE WHO THE RELEVANT PEOPLE WERE IN THE

10:53AM 19      CLIA LAB?

10:53AM 20      A.   YES.

10:53AM 21      Q.   AND THEY DISPLAYED A POWERPOINT PRESENTATION AND KIND OF

10:53AM 22      WALKED THEM THROUGH THAT.

10:53AM 23          DO YOU RECALL THAT?

10:53AM 24      A.   NOW THAT YOU'VE REFRESHED MY MEMORY, YES.

10:53AM 25      Q.   AND THIS IS THAT PRESENTATION, CORRECT, SIR?

10:53AM   1    A.   IT LOOKS LIKE IT.

10:53AM   2              MR. WADE:  OKAY.  I MOVE THE ADMISSION OF 4528.

10:53AM   3              MR. SCHENK:  NO OBJECTION.

10:53AM   4              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:53AM   5         (GOVERNMENT'S EXHIBIT 4528 WAS RECEIVED IN EVIDENCE.)

10:53AM   6    BY MR. WADE:

10:53AM   7    Q.   OKAY.  LET'S GO AND LOOK AT A COUPLE OF THESE SLIDES.  IN

10:53AM   8    PARTICULAR, LET'S GO TO I BELIEVE IT'S SLIDE 7.

10:54AM   9         THIS IS THE ORG CHART FOR THE CLIA LAB THAT WAS DISPLAYED

10:54AM  10    FOR THE INSPECTORS; IS THAT RIGHT?

10:54AM  11    A.   IT LOOKS LIKE IT, YES.

10:54AM  12    Q.   YES.  AND THIS SHOWS ALL OF THE DIFFERENT PERSONNEL WHO

10:54AM  13    WERE INVOLVED IN THE OPERATION OF THE CLIA LAB; IS THAT RIGHT?

10:54AM  14    A.   YES, YES.

10:54AM  15    Q.   OKAY.  INCLUDING THE PEOPLE -- AT THIS TIME THERE WERE TWO

10:54AM  16    PEOPLE SERVING AS THE GENERAL SUPERVISOR; IS THAT RIGHT?

10:54AM  17    A.   YES.

10:54AM  18    Q.   AND THERE WAS ONE PERSON SERVING AS THE TECHNICAL

10:54AM  19    SUPERVISOR; RIGHT?

10:54AM  20    A.   YES.

10:54AM  21    Q.   AND THOSE BELOW THE LABORATORY DIRECTOR, THOSE ARE THE

10:54AM  22    HIGHEST POSITIONS WITHIN A CLIA LAB; IS THAT RIGHT?

10:54AM  23    A.   USUALLY, YES.

10:54AM  24    Q.   OKAY.  AND THEN IF WE JUST GO TO THE NEXT PAGE -- WE WILL

10:55AM  25    NEED TO WIPE THIS, MS. KRATZMANN.

10:55AM  1          THANK YOU.

10:55AM  2          THE NEXT PAGE, DO YOU SEE THE SPECIFIC PERSONNEL WHO ARE

10:55AM  3     INVOLVED IN ALL OF THESE OPERATIONS ARE IDENTIFIED?

10:55AM  4     A.   YES.

10:55AM  5     Q.   AND THIS WAS A BIG OPERATION; IS THAT RIGHT?

10:55AM  6     A.   A LARGE NUMBER OF PEOPLE, YES.

10:55AM  7     Q.   YEAH.  AND IF YOU GO TO PAGE 11.  YOUR CREDENTIALS ARE

10:55AM  8     IDENTIFIED THERE.

10:55AM  9          DO YOU SEE THAT?

10:55AM  10    A.   YES.

10:55AM  11    Q.   AND IF YOU GO -- AND WE'VE TALKED ABOUT THOSE IN YOUR

10:55AM  12    DIRECT AND IN OUR INTRODUCTORY INTERACTIONS.

10:55AM  13         IF YOU GO TO THE NEXT PAGE, YOU SEE DR. DANIEL YOUNG --

10:55AM  14    A.   YES.

10:55AM  15    Q.   -- IS IDENTIFIED THERE.

10:55AM  16         AND DO YOU RECALL AT THIS TIME, IN ADDITION TO THE HIGH

10:55AM  17    COMPLEXITY LABORATORY THAT YOU SERVED AS THE LAB DIRECTOR FOR,

10:56AM  18    THERE WAS A MODERATE COMPLEXITY LABORATORY IN ARIZONA?

10:56AM  19    A.   YES, AND MY UNDERSTANDING WAS THAT DR. YOUNG WAS THE LAB

10:56AM  20    DIRECTOR THERE.

10:56AM  21    Q.   HE SERVED AS THE LAB DIRECTOR THERE; CORRECT?

10:56AM  22    A.   YES.

10:56AM  23    Q.   AND THAT'S REFLECTED HERE.

10:56AM  24         DO YOU SEE THAT?

10:56AM  25    A.   YES.

10:56AM  1    Q.   AND HE WAS ALSO INVOLVED IN ASSISTING WITH THE OPERATIONS

10:56AM  2    OF THE NEWARK LAB AS WELL; CORRECT?

10:56AM  3    A.   THAT WAS MY UNDERSTANDING.

10:56AM  4    Q.   YEAH.  AND IF YOU GO TO PAGE 14.

10:56AM  5         WE HAD TALKED ABOUT DR. SAKSENA.

10:56AM  6         DO YOU RECALL THAT?

10:56AM  7    A.   YES.

10:56AM  8    Q.   AND DR. SAKSENA HAD HAD SIGNIFICANT EXPERIENCE WORKING AS

10:56AM  9    THE DIRECTOR OF ASSAY SYSTEMS AT THERANOS.

10:56AM  10        DO YOU RECALL THAT?

10:56AM  11   A.   THAT'S WHAT IT STATES HERE, YES.

10:56AM  12   Q.   AND THEN IN ADDITION TO THAT THIS GOES THROUGH -- IF WE GO

10:57AM  13   TO 15 BRIEFLY -- THIS SETS FORTH THE QUALIFICATIONS AND

10:57AM  14   EXPERIENCE OF DR. MASINDE.

10:57AM  15        DO YOU SEE THAT?

10:57AM  16   A.   YES.

10:57AM  17   Q.   AND THE NEXT PAGE, THE QUALIFICATIONS OF MS. ALAMDAR.

10:57AM  18        DO YOU SEE THAT?

10:57AM  19   A.   YES.

10:57AM  20   Q.   AND THEN THE NEXT PAGE, MR. SIDHU TOOK ON A -- HAD A

10:57AM  21   SENIOR ROLE IN THE LAB.

10:57AM  22        DO YOU RECALL THAT?

10:57AM  23   A.   YES.

10:57AM  24   Q.   AND THEN FINALLY THE NEXT -- IT'S MR. GEE WAS THE

10:57AM  25   LONG-TIME QUALITY CONTROL MANAGER; CORRECT?

10:57AM   1    A.   YES.

10:57AM   2    Q.   AND DO YOU RECALL THAT IN CONNECTION WITH THESE

10:57AM   3    INTERACTIONS WITH THE REGULATORS IN 2015, THAT ONE OF THE

10:58AM   4    REGULATORS CAME IN AND MADE COMMENTS ABOUT HOW CMS WAS UNDER

10:58AM   5    PRESSURE TO INSPECT THERANOS BECAUSE OF REPORTERS THAT WERE

10:58AM   6    MAKING INQUIRIES OF CMS.

10:58AM   7         DO YOU RECALL THAT?

10:58AM   8    A.   I OVERHEARD THAT, YES.

10:58AM   9    Q.   YEAH.  AND THAT THEY WERE SAYING THAT AS A RESULT OF THOSE

10:58AM   10   INQUIRIES, THEY FELT A NEED TO COME IN IN A PARTICULAR WAY IN

10:58AM   11   THAT INSPECTION?

10:58AM   12   A.   I DIDN'T HEAR THAT STATEMENT.

10:58AM   13   Q.   OKAY.  WELL, WHAT DO YOU RECALL BEING SAID BY THAT

10:58AM   14   REGULATOR?

10:58AM   15   A.   THAT IT WAS REPEATEDLY SAID THAT THEY WERE UNDER SCRUTINY.

10:58AM   16   Q.   UH-HUH.

10:58AM   17   A.   THAT WAS BASICALLY MY UNDERSTANDING.

10:58AM   18   Q.   DO YOU RECALL WHETHER ANY OF THE REGULATORS SUGGESTED THAT

10:59AM   19   THERE WAS A PARTICULAR REPORTER WHO WAS ON A CRUSADE AGAINST

10:59AM   20   THE COMPANY?

10:59AM   21   A.   I DON'T RECALL THAT.

10:59AM   22   Q.   LET ME SEE IF I CAN REFRESH YOUR -- TAKE A LOOK AT 15324.

10:59AM   23   YOU'RE NOT ON THIS DOCUMENT.

10:59AM   24         JUST READ IT TO YOURSELF FOR A SECOND, DOCTOR.

10:59AM   25         (PAUSE IN PROCEEDINGS.)

10:59AM 1                    THE WITNESS:  OKAY.

11:00AM 2      BY MR. WADE:

11:00AM 3      Q.   DOES THAT REFRESH YOUR RECOLLECTION THAT SOMEONE WITHIN

11:00AM 4      CMS THOUGHT A PARTICULAR REPORTER WAS ON A CRUSADE AGAINST THE

11:00AM 5      COMPANY?

11:00AM 6      A.   I DIDN'T HEAR THAT SPECIFIC STATEMENT.

11:00AM 7      Q.   OKAY.  DID YOU COME LATER -- I THINK MR. SCHENK ASKED YOU

11:00AM 8      SOME QUESTIONS, YOU WERE CONTACTED BY REPORTERS YOURSELF.

11:00AM 9           DO YOU RECALL THAT?

11:00AM 10     A.   YES.

11:00AM 11     Q.   AND WERE YOU AWARE THAT THERE WAS A REPORTER WHO WAS

11:00AM 12     ACTUALLY THREATENING TO WRITE A STORY SUGGESTING THAT YOU WERE

11:00AM 13     NOT LEGALLY QUALIFIED TO SERVE AS THE LABORATORY DIRECTOR?

11:00AM 14     A.   I DON'T RECALL -- I DON'T REMEMBER GETTING -- HEARING

11:00AM 15     ABOUT THAT.

11:00AM 16     Q.   OKAY.  BUT YOU WERE LEGALLY QUALIFIED TO SERVE AS A LAB

11:00AM 17     DIRECTOR; CORRECT?

11:00AM 18     A.   I HAVE THE DEGREES AND THE -- YES.

11:00AM 19     Q.   AND YOU MET THE REQUIREMENTS, CORRECT, SIR?

11:00AM 20     A.   THE STATUTORY REQUIREMENTS.

11:00AM 21             MR. WADE:  OKAY.  I HAVE NO FURTHER QUESTIONS AT

11:01AM 22     THIS TIME, YOUR HONOR.  I PASS THE WITNESS.

11:01AM 23          THANK YOU, DOCTOR.

11:01AM 24             THE COURT:  REDIRECT?

11:01AM 25             MR. SCHENK:  YES, YOUR HONOR.

**REDIRECT EXAMINATION**

11:01AM 2   BY MR. SCHENK:

11:01AM 3   Q.   GOOD MORNING, DR. DHAWAN.

11:01AM 4   A.   GOOD MORNING, SIR.

11:01AM 5   Q.   I JUST WANT TO FOLLOW UP ON A COUPLE OF QUESTIONS THAT

11:01AM 6   MR. WADE ASKED YOU, AND I'LL TELL YOU SORT OF THE THEME OF MY

11:02AM 7   QUESTIONS IS GOING TO BE TO JUST CLARIFY, WHEN YOU WERE

11:02AM 8   ANSWERING QUESTIONS, WHETHER YOU WERE MAKING ASSUMPTIONS IN

11:02AM 9   YOUR ANSWERS OR WHETHER YOU KNEW THE FACTS THAT YOU WERE

11:02AM 10  SHARING.

11:02AM 11       AND I WANT TO START WITH -- I DON'T HAVE A PARTICULAR

11:02AM 12  PLACE TO POINT YOU TO, IT WAS ASKED OF YOU REPEATEDLY --

11:02AM 13  WHETHER THIS EMPLOYEE WAS A FULL-TIME EMPLOYEE AT THERANOS,

11:02AM 14  FILL IN THE BLANK WITH AN EMPLOYEE'S NAME, AND YOU WERE ASKED

11:02AM 15  IF THAT EMPLOYEE WAS A FULL-TIME EMPLOYEE.

11:02AM 16       YOU ANSWERED AT SOME TIMES YES.

11:02AM 17       DID YOU KNOW THAT THAT WAS A FULL TIME EMPLOYEE OR WERE

11:02AM 18  YOU MAKING ASSUMPTIONS?

11:02AM 19  A.   IT WAS ASSUMPTIONS.

11:02AM 20  Q.   OKAY.

11:02AM 21  A.   BASED ON SEEING THEM IN THE LAB, MY ASSUMPTION WAS THAT

11:02AM 22  THEY WERE FULL-TIME EMPLOYEES.

11:02AM 23  Q.   WHEN YOU WERE TELLING THIS JURY THAT X EMPLOYEE WAS A

11:02AM 24  FULL-TIME EMPLOYEE, YOU WERE SAYING, SORT OF BASED ON WHAT I

11:02AM 25  WOULD ASSUME TO BE TRUE.

11:02AM  1        BUT YOU NEVER MET THAT PARTICULAR EMPLOYEE, SO YOU DIDN'T

11:02AM  2   KNOW WHETHER THEY WERE FULL TIME; IS THAT FAIR?

11:03AM  3   A.   I DIDN'T SEE THEIR EMPLOYMENT RECORD, SO I COULDN'T SAY

11:03AM  4   THEY WERE FULL TIME.  I WOULD SEE THEM AT THE LAB, BUT THAT'S

11:03AM  5   ABOUT IT.

11:03AM  6   Q.   OKAY.  AND DID YOU EVER HAVE A CONVERSATION WITH AN

11:03AM  7   EMPLOYEE WITHIN THE LAB WHERE YOU ASKED THAT PERSON WHETHER

11:03AM  8   THEY WERE FULL TIME OR NOT?

11:03AM  9   A.   I NEVER ASKED THAT QUESTION.

11:03AM  10  Q.   YOU WERE ASKED A GROUP OF QUESTIONS ABOUT LYNETTE SAWYER.

11:03AM  11       DO YOU REMEMBER THAT?

11:03AM  12  A.   YES.

11:03AM  13  Q.   AND DO YOU KNOW WHETHER LYNETTE SAWYER EVER VISITED THE

11:03AM  14  LAB?

11:03AM  15  A.   I NEVER MET -- I DON'T RECALL EVER MEETING LYNETTE SAWYER,

11:03AM  16  SO I CAN'T TELL YOU WHETHER SHE EVER WENT TO THE LAB.

11:03AM  17  Q.   DO YOU KNOW WHETHER LYNETTE SAWYER WAS EVER SHOWN THE

11:03AM  18  EDISON DEVICE?

11:03AM  19  A.   I DON'T KNOW ANY OF THAT.

11:03AM  20  Q.   DO YOU KNOW WHETHER THERANOS GAVE LYNETTE SAWYER SOP'S

11:03AM  21  INVOLVING FDA CLEARED DEVICES AND THEN GAVE YOU THE EDISON

11:03AM  22  SOP'S?  DO YOU KNOW WHETHER THAT HAPPENED OR NOT?

11:03AM  23  A.   I DO NOT.

11:03AM  24  Q.   MR. WADE ASKED YOU, WHEN YOU WERE SIGNING SOP'S OR

11:04AM  25  VALIDATION DOCUMENTS, IF YOU WERE RELYING ON THE GOOD WORK OF

11:04AM   1     OTHER EMPLOYEES, THE NAMES THAT APPEARED ON THOSE DOCUMENTS

11:04AM   2     BEFORE YOUR NAME.

11:04AM   3          DO YOU RECALL THOSE QUESTIONS?

11:04AM   4     A.   YES.

11:04AM   5     Q.   AND YOU SAID YES, THAT YOU WERE RELYING ON THEIR GOOD

11:04AM   6     WORK.

11:04AM   7          I'M WONDERING IF YOU WERE MAKING AN ASSUMPTION THAT THEY

11:04AM   8     HAD DONE GOOD WORK, OR DO YOU KNOW THAT THEY HAD DONE GOOD

11:04AM   9     WORK?

11:04AM  10     A.   I WAS ASSUMING THAT THEY HAD DONE GOOD WORK.

11:04AM  11     Q.   OKAY.  AND WHEN YOU SAW THAT THE DOCUMENT WAS MULTIPLE

11:04AM  12     PAGES, THE VALIDATION REPORT OR THE SOP --

11:04AM  13     A.   YES.

11:04AM  14     Q.   -- AND IF THAT DOCUMENT HAD ADDITIONAL INFORMATION, LIKE

11:04AM  15     DATA, WERE YOU MAKING THE ASSUMPTION THAT THAT DATA WAS

11:04AM  16     ACCURATE?

11:04AM  17     A.   YES.  I WOULD ASSUME IF IT WAS THERE, IT WOULD BE

11:04AM  18     ACCURATE.

11:04AM  19     Q.   YOU DIDN'T ASK ANYBODY FOR INFORMATION TO SUBSTANTIATE THE

11:04AM  20     DATA; IS THAT RIGHT?

11:04AM  21     A.   MY ASSUMPTION WAS THAT THE DATA WAS CORRECT, SO I DIDN'T

11:04AM  22     GO FURTHER.

11:04AM  23     Q.   OKAY.  AND WHEN YOU WERE REVIEWING THOSE DOCUMENTS AND

11:05AM  24     ASSUMING THAT THE INDIVIDUALS WHO SIGNED IT BEFORE YOU, WERE

11:05AM  25     YOU ASSUMING THAT THEY HAD LOOKED AT THE UNDERLYING DATA?

11:05AM   1       A.   THAT'S GENERALLY THE STANDARD, THAT THEY HAVE LOOKED AT

11:05AM   2       THE DATA, AND THAT'S USUALLY WHAT HAPPENS.

11:05AM   3       Q.   OKAY.  MR. WADE ASKED YOU HOW MANY EMPLOYEES WERE IN YOUR

11:05AM   4       LAB AT THE DERMATOLOGY PRACTICE.

11:05AM   5            DO YOU RECALL THAT?

11:05AM   6       A.   UH-HUH, YES.

11:05AM   7       Q.   AND I THINK YOU SAID THERE WERE TWO OR THREE.

11:05AM   8       A.   YES.

11:05AM   9       Q.   IS THAT RIGHT?

11:05AM   10           HOW MANY WORKED AT THERANOS, DO YOU KNOW?

11:05AM   11      A.   THE NUMBER HERE, WHICH IS, YOU KNOW, 20, 30, 40, EXCLUDING

11:05AM   12      THE PEOPLE ON THE PHONE, THE BANK AND ALL THE OTHER PLACES.  I

11:05AM   13      MEAN, YEAH, IT WAS A LARGE NUMBER OF PEOPLE.

11:05AM   14      Q.   SIGNIFICANTLY MORE PEOPLE WORKED AT THERANOS THAN IN YOUR

11:05AM   15      LAB?

11:05AM   16      A.   YES.

11:05AM   17      Q.   AND AS LAB DIRECTOR, DID YOU SPEND SIGNIFICANTLY MORE TIME

11:05AM   18      WORKING AT YOUR LAB THAN AT THERANOS?

11:05AM   19      A.   YES.

11:05AM   20      Q.   AND WERE THE TESTS THAT WERE BEING DONE AT THERANOS MORE

11:05AM   21      COMPLICATED OR MORE DIFFICULT THAN THE TESTS THAT YOU RAN IN

11:06AM   22      YOUR LAB?

11:06AM   23      A.   YES.

11:06AM   24      Q.   WHY DO YOU SAY THAT?

11:06AM   25      A.   BECAUSE THERE WERE MORE COMPLEX BLOOD TESTS BEING DONE

11:06AM  1      THERE.

11:06AM  2      Q.   AND WERE YOU ASSUMING THAT PEOPLE AT THERANOS WERE

11:06AM  3      CONDUCTING THOSE TESTS IN AN ACCURATE MANNER?

11:06AM  4      A.   THAT WAS MY ASSUMPTION.

11:06AM  5      Q.   AND DID DO YOU ANYTHING TO CONFIRM THAT?

11:06AM  6      A.   I DIDN'T HAVE ANY REASON OR NEED TO CONFIRM IT.

11:06AM  7      Q.   AND WHY DO YOU SAY THAT?

11:06AM  8      A.   MY ASSUMPTION IS THAT PEOPLE WITH ADVANCED DEGREES SUCH AS

11:06AM  9      MINE ARE GOING TO DO WORK ACCURATELY AND APPROPRIATELY.

11:06AM 10      Q.   OKAY.  SO EVEN WHEN YOU WERE WORKING AT THERANOS, YOU WERE

11:06AM 11      MAKING SOME ASSUMPTIONS?

11:06AM 12      A.   YES, YES.

11:06AM 13      Q.   YOU WERE ASSUMING -- GOT IT.  GOT IT.

11:06AM 14           IN YOUR CURRENT LAB, HOW OFTEN DO YOU SPEAK TO THOSE TWO

11:06AM 15      OR THREE EMPLOYEES?

11:06AM 16      A.   SIX, EIGHT TIMES A DAY.

11:06AM 17      Q.   WAS THERE -- OTHER THAN MR. BALWANI --

11:06AM 18      A.   YES.

11:06AM 19      Q.   -- WAS THERE ANY EMPLOYEE AT THERANOS THAT YOU EVER SPOKE

11:07AM 20      TO SIX OR EIGHT TIMES THE ENTIRE TIME YOU WORKED AT THERANOS?

11:07AM 21      A.   NOT THAT I CAN RECALL, NO.

11:07AM 22      Q.   BUT YOUR OWN EMPLOYEES YOU SPEAK TO SIX OR EIGHT TIMES

11:07AM 23      EACH DAY?

11:07AM 24      A.   WE HAVE TO.

11:07AM 25      Q.   WITH LESS COMPLICATED TESTS?

11:07AM  1    A.   YES.

11:07AM  2    Q.   MR. WADE SHOWED YOU VALIDATION REPORTS THAT MS. SAWYER

11:07AM  3    SIGNED?

11:07AM  4    A.   YES.

11:07AM  5    Q.   DO YOU RECALL THAT?

11:07AM  6         ONE WAS FOR A SIEMENS DEVICE?

11:07AM  7    A.   YES.

11:07AM  8    Q.   AND ONE WAS FOR A ROCHE DEVICE?

11:07AM  9    A.   YES.

11:07AM  10   Q.   AND DID YOU EVER SEE THERANOS RUNNING SIEMENS MACHINES?

11:07AM  11   DID YOU INVESTIGATE THE WAY THAT THERANOS WAS USING THE SIEMENS

11:07AM  12   MACHINES?

11:07AM  13   A.   I WOULD -- I NEVER HAD THE OPPORTUNITY TO.

11:07AM  14   Q.   AND HOW ABOUT THE ROCHE?

11:08AM  15   A.   NEVER HAD THE OPPORTUNITY TO.

11:08AM  16   Q.   ON ONE OF THE ROSTERS, OR MAYBE MORE THAN ONE, I SAW

11:08AM  17   MR. BALWANI'S NAME.

11:08AM  18   A.   YES.

11:08AM  19   Q.   DID YOU KNOW THAT MR. BALWANI WAS WORKING IN THE LAB?

11:08AM  20   A.   I SAW HIS NAME ON THE ROSTER.  MY ASSUMPTION WAS THAT HE

11:08AM  21   WAS WORKING IN THE LAB.

11:08AM  22   Q.   IN ANY OF YOUR CONVERSATIONS WITH HIM BEFORE YOU TOOK THE

11:08AM  23   JOB, OR AT THE TIME, DID HE TELL YOU THAT HE WAS WORKING IN THE

11:08AM  24   LAB?

11:08AM  25   A.   OTHER THAN CHIEF OPERATING OFFICER, NO.  I MEAN, THERE WAS

11:08AM 1    NO STATEMENT THERE.

11:08AM 2    Q.   AND I THINK HE WAS LISTED UNDER A CLA, A CLINICAL

11:08AM 3    LABORATORY ASSISTANT; IS THAT RIGHT?

11:08AM 4    A.   I'D HAVE TO LOOK AT THE DOCUMENT, BUT, YES, I BELIEVE SO.

11:08AM 5    Q.   OKAY.  AND IS IT -- AND I'M HAPPY TO SHOW YOU THAT

11:08AM 6    DOCUMENT.  MAYBE LET'S DO THAT.

11:08AM 7         THE BINDER IN FRONT OF YOU, THE EXHIBIT THAT THE DEFENSE

11:08AM 8    WAS SHOWING YOU IN A BLACK BINDER, 4528.  THAT WAS THE

11:09AM 9    POWERPOINT FOR THE CMS INSPECTION.

11:09AM 10   A.   WHICH SLIDE WOULD YOU LIKE ME TO GO TO?

11:09AM 11   Q.   MY -- THE COPY I HAVE DOESN'T HAVE PAGE NUMBERS.  IT'S, I

11:09AM 12   WOULD SAY, ABOUT SEVEN OR EIGHT PAGES IN.  IT'S AN ORG CHART?

11:09AM 13   A.   YEAH, THE COMPLICATED ORG CHART.

11:09AM 14   Q.   YES.

11:09AM 15   A.   YES.

11:09AM 16   Q.   AND SO IF YOU LOOK ALL OF THE WAY TO THE RIGHT UNDER

11:09AM 17   CLINICAL LABORATORY ASSISTANT, DO YOU SEE MR. BALWANI LISTED

11:09AM 18   THERE?

11:09AM 19   A.   YES.

11:09AM 20        MR. SCHENK:  MS. KRATZMANN, COULD I -- THANK YOU.

11:10AM 21   Q.   SO YOU SEE THE CLINICAL LABORATORY ASSISTANT BUBBLE, AND

11:10AM 22   WITHIN THAT YOU SEE MR. BALWANI'S NAME?

11:10AM 23   A.   YES.

11:10AM 24   Q.   AND IN YOUR EXPERIENCE, DO CLA'S MAKE ALL OF THE HIRING

11:10AM 25   DECISIONS IN THE LAB?

11:10AM 1    A.   NORMALLY IT'S SOMEBODY HIGHER UP THAN THAT.

11:10AM 2    Q.   IN YOUR EXPERIENCE, DO CLA'S MAKE ALL OF THE FIRING

11:10AM 3    DECISIONS IN THE LAB?

11:10AM 4    A.   NO.  NORMALLY IT'S HIGHER LEVEL PEOPLE IN THE LAB.

11:10AM 5    Q.   AND IF A TEST THAT THE LAB IS RUNNING IS PRODUCING

11:10AM 6    CONCERNING RESULTS, IT'S INACCURATE OR MAYBE FAILING QC, WHO

11:10AM 7    MAKES THE DECISION TO STOP RUNNING THAT TEST?

11:10AM 8    A.   THE HIGHER LEVEL EMPLOYEES, LABORATORY DIRECTORS, THE

11:10AM 9    SUPERVISORS REPORTING UP TO THE LABORATORY DIRECTORS USUALLY.

11:10AM 10   Q.   WAS THERE EVER AN OCCASION WHILE YOU WERE LABORATORY

11:10AM 11   DIRECTOR AT THERANOS --

11:10AM 12   A.   YES.

11:10AM 13   Q.   -- WHERE YOU SAID, WE SHOULD STOP RUNNING THIS TEST?

11:10AM 14   A.   I WAS NEVER GIVEN ANY DATA TO SAY THAT.

11:11AM 15   Q.   MR. WADE SHOWED YOU SOME DOCUMENTS WHERE YOU WERE

11:11AM 16   DELEGATING AUTHORITY.  YOU DELEGATED AUTHORITY TO MS. ALAMDAR

11:11AM 17   AND THEN MR. MASINDE.

11:11AM 18       DO YOU RECALL THAT?

11:11AM 19   A.   YES.

11:11AM 20   Q.   AND WHEN YOU WERE TALKING ABOUT DELEGATING TO EITHER THE

11:11AM 21   TECHNICAL SUPERVISOR OR THE GS, AGAIN, WERE YOU MAKING AN

11:11AM 22   ASSUMPTION ASSUMING THAT THEY WERE DOING THEIR WORK, OR DID YOU

11:11AM 23   KNOW THAT THEY WERE DOING THEIR WORK?

11:11AM 24   A.   MY ASSUMPTION WAS THAT THEY WOULD BE DOING THEIR WORK.

11:11AM 25   Q.   MR. WADE SHOWED YOU THE VALIDATION REPORT THAT I SHOWED

11:11AM  1   YOU YESTERDAY ABOUT CRITICAL VALUES.

11:12AM  2         DO YOU REMEMBER THAT?

11:12AM  3   A.   YES.

11:12AM  4   Q.   AND MR. WADE SHOWED YOU THAT THERE WAS A SCRIPT IN THERE

11:12AM  5   THAT WAS TO BE READ.

11:12AM  6         DO YOU RECALL THAT?

11:12AM  7   A.   YES, YES.

11:12AM  8   Q.   AND DO YOU KNOW WHETHER THERANOS WAS FOLLOWING THAT SOP IN

11:12AM  9   PRACTICE?

11:12AM  10  A.   I DO NOT KNOW THAT.

11:12AM  11  Q.   DO YOU KNOW WHETHER THERANOS HAD A PRACTICE OF IGNORING A

11:12AM  12  CRITICAL VALUE OR NOT?

11:12AM  13  A.   I HAVE NO KNOWLEDGE OF THAT.

11:12AM  14  Q.   SO WHEN YOU SEE AN SOP ABOUT CRITICAL VALUES AND THE

11:12AM  15  SCRIPT, AND YOU SIGNED IT, WERE YOU MAKING THE ASSUMPTION THAT

11:12AM  16  THERANOS WOULD FOLLOW?

11:12AM  17  A.   THAT'S USUALLY WHAT YOU'RE SUPPOSED TO DO WITH SOP'S IS

11:12AM  18  FOLLOW THE SOP.

11:12AM  19  Q.   AND IF YOU'RE A LAB DIRECTOR WHO IS NOT GIVEN INFORMATION

11:12AM  20  ABOUT DEVIATIONS FROM THE SOP, YOU WOULDN'T KNOW WHETHER THEY

11:12AM  21  WERE FOLLOWING IT OR NOT; IS THAT RIGHT?

11:12AM  22  A.   YES, I WOULD NOT KNOW.

11:13AM  23         MR. SCHENK:  THANK YOU, YOUR HONOR.  NO FURTHER

11:13AM  24  QUESTIONS.

11:13AM  25         MR. WADE:  I BELIEVE I HAVE TWO QUESTIONS.

11:13AM 1          **RECROSS-EXAMINATION**

11:13AM 2     BY MR. WADE:

11:13AM 3     Q.   DR. DHAWAN, YOU WENT INTO THESE INTERACTIONS AND LOOKED AT

11:13AM 4     THESE POLICIES AND LOOKED AT THESE ORG CHARTS AND YOU ASSUMED

11:13AM 5     THAT THESE 30 OR 40 PEOPLE WERE GOING TO WORK EACH AND EVERY

11:13AM 6     DAY ACTING HONESTLY AND IN GOOD FAITH; CORRECT?

11:13AM 7     A.   THAT IS MY ASSUMPTION WITH ALL OF THE EMPLOYEES THAT WORK

11:13AM 8     FOR ME.

11:13AM 9     Q.   AND IS THAT YOUR ASSUMPTION AS A HUMAN BEING?

11:13AM 10         MR. SCHENK:  OBJECTION.  RELEVANCE.

11:13AM 11         MR. WADE:  WITHDRAWN.

11:14AM 12    Q.   YOU WERE RELYING UPON PEOPLE TO ACT IN ACCORDANCE WITH THE

11:14AM 13    POLICIES AND TO ACT IN GOOD FAITH; IS THAT RIGHT, SIR?

11:14AM 14    A.   YES.

11:14AM 15    Q.   AND YOU WERE NOT GIVEN ANY INFORMATION FOR YOU TO SUGGEST

11:14AM 16    THAT YOU SHOULD DO OTHERWISE, CORRECT, SIR?

11:14AM 17    A.   I WAS NOT GIVEN ANY OTHER INFORMATION, NO.

11:14AM 18         MR. WADE:  THANK YOU.

11:14AM 19         **FURTHER REDIRECT EXAMINATION**

11:14AM 20    BY MR. SCHENK:

11:14AM 21    Q.   WHEN YOU WERE MAKING THIS ASSUMPTION THAT THE EMPLOYEES OF

11:14AM 22    THERANOS WERE ACTING A CERTAIN WAY, WERE YOU AT THERANOS?  WERE

11:14AM 23    YOU PRESENT TO REACH THAT ASSUMPTION OR TO REACH THAT

11:14AM 24    CONCLUSION?

11:14AM 25    A.   I WAS NOT THERE.  I WAS NOT THERE, BUT MY ASSUMPTION WAS

11:14AM   1    THAT THEY WOULD BE DOING THE WORK THAT THEY WERE SUPPOSED TO

11:14AM   2    DO.

11:14AM   3    Q.   SO YOU WERE SITTING IN YOUR OFFICE --

11:14AM   4    A.   RIGHT.

11:14AM   5    Q.   -- WHEN YOU WERE MAKING THIS ASSUMPTION?

11:14AM   6    A.   RIGHT.

11:14AM   7         MR. SCHENK:  THANK YOU.

11:14AM   8         MR. WADE:  NO FURTHER QUESTIONS.

11:14AM   9         THE COURT:  MAY THIS WITNESS BE EXCUSED?

11:15AM   10        MR. SCHENK:  YES, SIR.

11:15AM   11        MR. WADE:  YES, SIR.

11:15AM   12        THE COURT:  YOU CAN STAND DOWN, SIR.  THANK YOU.

11:15AM   13    I THINK THE GOVERNMENT HAS ANOTHER WITNESS.

11:15AM   14        MR. BOSTIC:  YES, YOUR HONOR.

11:15AM   15        THE COURT:  LET ME STATE, WE WERE GOING TO TAKE OUR

11:15AM   16    BREAK, I THINK, AT 11:30, AND I THINK WE WERE GOING TO TAKE

11:15AM   17    ABOUT 30 MINUTES.

11:15AM   18    SHOULD WE TAKE OUR BREAK NOW?  IS THAT -- WHY DON'T WE DO

11:15AM   19    THAT.  LET'S TAKE OUR 30 MINUTE BREAK NOW, AND THEN WE'LL AT

11:15AM   20    LEAST GET YOUR NEXT WITNESS ON.

11:15AM   21    THANK YOU.  SO WE'LL BE IN RECESS, LADIES AND GENTLEMEN.

11:15AM   22    THANK YOU.

11:16AM   23        (JURY OUT AT 11:16 A.M.)

11:16AM   24        THE COURT:  PLEASE BE SEATED.  THANK YOU.

11:16AM   25        THE RECORD SHOULD REFLECT THAT OUR JURY HAS LEFT FOR A

11:16AM 1   RECESS.  ALL COUNSEL AND MS. HOLMES IS PRESENT.

11:16AM 2        EXCUSE ME.  WE'RE STILL IN SESSION, PLEASE.  THANK YOU.

11:16AM 3        MR. WADE.

11:16AM 4          MR. WADE:  YOUR HONOR, I'D LIKE TO RAISE ONE ISSUE

11:16AM 5   THAT HAS NOW COME UP A COUPLE OF TIMES WITH A COUPLE OF

11:16AM 6   WITNESSES AND IT'S CONCERNING TO THE DEFENSE.

11:16AM 7        THE GOVERNMENT HAS ASKED QUESTIONS IN A WAY TO TRY TO

11:16AM 8   CREATE THE IMPRESSION WITH THIS JURY THAT SOME EMPLOYEES ARE

11:16AM 9   FALSIFYING INFORMATION OR FALSIFYING DATA AND ASKING QUESTIONS

11:16AM 10  THAT SUGGEST THAT THERE'S SOME UNDERLYING INTEGRITY ISSUE WITH

11:16AM 11  THE DATA WHEN THERE'S NO EVIDENCE TO THAT EFFECT IN THIS

11:16AM 12  RECORD.

11:16AM 13       AND, AND I'M DEEPLY TROUBLED BY THAT SUGGESTION AND THE

11:16AM 14  IMPLICATION OF THAT.

11:17AM 15       COUNSEL HAS TO HAVE A GOOD FAITH BASIS TO ASK THOSE

11:17AM 16  QUESTIONS AND SHOULD NOT TRY TO CREATE A FALSE IMPRESSION TO

11:17AM 17  THIS JURY.

11:17AM 18         THE COURT:  IS THIS RELATED TO MR. SCHENK'S RECENT

11:17AM 19  QUESTIONS?

11:17AM 20         MR. WADE:  SOME OF THE RECENT QUESTIONS RELATING

11:17AM 21  THAT YOU DIDN'T KNOW ABOUT THE DATA, AND THEY WERE ASKED IN A

11:17AM 22  WAY - AND THEY DID IT WITH DR. ROSENDORFF AS WELL -- TO TRY TO

11:17AM 23  CREATE THE IMPRESSION THAT THERE IS SOME UNDERLYING

11:17AM 24  FALSIFICATION OF DATA.

11:17AM 25       THERE'S NOT EVIDENCE OF THAT TO MY KNOWLEDGE IN THIS CASE,

11:17AM 1    BUT IT, IT IS INNUENDO THAT CREATES A FALSE IMPRESSION WITH THE

11:17AM 2    JURY, AND IT'S VERY TROUBLING TO THE DEFENSE.

11:17AM 3              THE COURT:  MR. SCHENK, DO YOU WANT TO COMMENT?

11:17AM 4              MR. SCHENK:  I'LL LIMIT MY COMMENTS TO DR. DHAWAN.

11:17AM 5         DR. DHAWAN WAS MAKING A TREMENDOUS NUMBER OF ASSUMPTIONS

11:17AM 6    IN HIS WORK AT THERANOS AND IN HIS ANSWERS TO MR. WADE.

11:17AM 7         WHAT I DID WAS HIGHLIGHT THAT FACT.

11:17AM 8         MR. DHAWAN HAD NO IDEA WHERE THE UNDERLYING DATA CAME

11:18AM 9    FROM, AND THAT WAS THE POINT THAT I HIGHLIGHTED FOR THE JURY.

11:18AM 10        MR. DHAWAN, DR. DHAWAN DID NOT DO ANY FURTHER LOOKING

11:18AM 11   BEYOND THE PAGES TO SEE WHERE THE DATA CAME FROM.

11:18AM 12        SO IT'S A DIFFERENT POINT THAN WHAT MR. WADE IS ACCUSING

11:18AM 13   ME OF DOING.

11:18AM 14        I WASN'T SUGGESTING TO DR. DHAWAN THAT SOMEONE AT THERANOS

11:18AM 15   WAS MANIPULATING DATA.  WHAT I WAS SUGGESTING WAS THAT

11:18AM 16   DR. DHAWAN HAD NO IDEA WHERE THE DATA CAME FROM.  DR. DHAWAN

11:18AM 17   SIGNED DOCUMENTS, AND HE DIDN'T KNOW WHERE THAT INFORMATION

11:18AM 18   CAME FROM OR THE SOURCE OF THE INFORMATION, AND THAT IS A

11:18AM 19   COMPLETELY APPROPRIATE FACT FOR THE JURY TO WEIGH.

11:18AM 20              THE COURT:  YOU KNOW, MR. WADE, THAT'S WHAT I

11:18AM 21   THOUGHT HE WAS DOING.  HE WAS -- IT SEEMED TO ME THE

11:18AM 22   EXAMINATION WAS, YOU SIGNED THESE 50, 49 DIFFERENT DOCUMENTS,

11:18AM 23   BUT YOU DIDN'T -- AND YOU RELAYED ON -- AND I THINK YOU DID A

11:18AM 24   GOOD JOB OF SAYING THAT'S COMPLETELY, ACCORDING TO STATUTE, YOU

11:18AM 25   RELIED ON SOMEBODY ELSE'S WORK; AND THEN THE REDIRECT WAS,

11:19AM 1    THAT'S RIGHT, BUT YOU DID NOT FLIP THROUGH THE PAGES AND DO ANY

11:19AM 2    OF THE ANALYSIS YOURSELF.

11:19AM 3        IS THAT IMPROPER?

11:19AM 4            MR. WADE:   I DON'T THINK IT'S IMPROPER TO SAY THAT

11:19AM 5    YOU DIDN'T DO ANY OF THE UNDERLYING ANALYSIS, AND I CAN LOOK AT

11:19AM 6    THE TRANSCRIPT AND WE CAN RAISE THIS AT ANOTHER TIME.

11:19AM 7        BUT THERE HAVE BEEN QUESTIONS, TO ME THE IMPLICATION OF

11:19AM 8    WHICH ARE THAT THERE IS SOME UNDERLYING INTEGRITY ISSUE WITH

11:19AM 9    THE DATA.

11:19AM 10       EXAMINATION OF, WITH RESPECT TO THIS DOCUMENT YOU DON'T

11:19AM 11   KNOW ANYTHING ABOUT THIS DATA, YOU DIDN'T PERFORM THE

11:19AM 12   CALCULATIONS, YOU WEREN'T INVOLVED IN THE DEVELOPMENT WORK,

11:19AM 13   THAT'S ONE THING.

11:19AM 14       THERE HAVE BEEN QUESTIONS WITH A COUPLE OF WITNESS NOW

11:19AM 15   THAT, TO OUR EAR -- AND WE CAN POINT THEM TO THE COURT AND

11:19AM 16   MAYBE SEEK A DIRECTION TO THE JURY ON IT -- THAT CREATE THE

11:19AM 17   IMPRESSION THAT THERE IS SOME UNDERLYING FALSIFICATION OR DATA

11:19AM 18   INTEGRITY ISSUE AND TO MY KNOWLEDGE THERE IS NOT.

11:19AM 19           THE COURT:   OKAY.   ARE YOU CONCERNED THAT THE

11:19AM 20   GOVERNMENT IN THEIR CLOSING ARGUMENT WILL SO ARGUE?   IS THAT

11:20AM 21   YOUR CONCERN?

11:20AM 22           MR. WADE:   I'M CONFIDENT, BASED ON WHAT MR. SCHENK

11:20AM 23   SAID, THAT THEY WON'T.

11:20AM 24       BUT I JUST DON'T WANT THIS CONTINUED ERROR OF THE

11:20AM 25   IMPLICATION BEING THAT THERE'S SOME UNDERLYING INTEGRITY ISSUE

11:20AM 1    BECAUSE I THINK THAT'S -- I THINK IT'S FALSE TO MY KNOWLEDGE.

11:20AM 2         I DON'T THINK THERE'S A GOOD FAITH BASIS TO ASK IT AND I

11:20AM 3    THINK IT CREATES A MISIMPRESSION TO THE JURY.

11:20AM 4         THE COURT:  DO YOU INTEND TO SO ARGUE TO THE JURY IN

11:20AM 5    CLOSING ARGUMENT?

11:20AM 6         MR. SCHENK:  IN CLOSING, THE GOVERNMENT IS GOING TO

11:20AM 7    ARGUE THE EVIDENCE.  SO WE WILL REVIEW THE TRANSCRIPT AND SEE

11:20AM 8    WHAT THE WITNESSES TESTIFIED TO AND LIMIT ARGUMENT TO THE FACTS

11:20AM 9    THAT HAVE COME IN THROUGH EVIDENCE.

11:20AM 10        I'D LIKE TO SPEND A LITTLE BIT OF TIME ON THE QUESTION OF

11:20AM 11   WHETHER THERE HAVE BEEN STATEMENTS FROM WITNESSES THAT CALL THE

11:20AM 12   INTEGRITY OF THE DATA INTO QUESTION.

11:20AM 13        MY RECOLLECTION IS THAT THERE ACTUALLY HAVE BEEN SOME

11:20AM 14   STATEMENTS FROM WITNESSES THAT HAVE CALLED INTO QUESTION THE

11:20AM 15   INTEGRITY OF THE DATA, WHICH WOULD ALLOW US TO MAKE THE EXACT

11:20AM 16   ARGUMENT THAT MR. WADE IS SUGGESTING WE SHOULDN'T MAKE.

11:20AM 17        SO I DON'T WANT TO COMMIT TO THE COURT RIGHT NOW THAT WE

11:21AM 18   WON'T MAKE THAT ARGUMENT.  WE WILL LOOK AT THE TRANSCRIPTS AND

11:21AM 19   SEE WHAT THE EVIDENCE THAT THE JURY HAS HEARD THAT ALLOWS ONE

11:21AM 20   TO CONCLUDE.

11:21AM 21        THE COURT:  WHAT ABOUT THIS WITNESS AND THIS

11:21AM 22   WITNESS'S TESTIMONY?

11:21AM 23        MR. SCHENK:  THIS WITNESS WASN'T THERE ENOUGH TO

11:21AM 24   KNOW ABOUT THE INTEGRITY OF THE DATA.  WE DEFINITELY DON'T

11:21AM 25   INTEND TO ARGUE THAT THIS WITNESS SUBSTANTIATES A CLAIM NOW

11:21AM 1    THAT THE INTEGRITY OF THE DATA AT THERANOS WAS FALSE.  THIS

11:21AM 2    WITNESS PROVES A DIFFERENT POINT.

11:21AM 3              THE COURT:  ANYTHING FURTHER YOU'D LIKE TO COMMENT

11:21AM 4    ABOUT MR. WADE'S OBSERVATIONS FROM HIS TEAM ABOUT AT LEAST THIS

11:21AM 5    LAST WITNESS?

11:21AM 6              MR. SCHENK:  NO.  THANK YOU.

11:21AM 7              MR. WADE:  WE'LL REST ON THE POSITION FOR NOW.

11:21AM 8         I WANTED TO RAISE IT WITH THE COURT BECAUSE WE'VE SEEN IT

11:21AM 9    IN A COUPLE OF INSTANCES, AND I WOULD SUGGEST THAT IF THAT'S AN

11:21AM 10   AREA WHERE MR. SCHENK BELIEVES IT'S APPROPRIATE TO INQUIRE,

11:21AM 11   THAT WE RAISE THAT ISSUE AND ADDRESS IT BEFORE IT SPILLS OUT IN

11:21AM 12   FRONT OF THE JURY BECAUSE IT, IT HAS OBVIOUSLY VERY PREJUDICIAL

11:21AM 13   IMPLICATIONS FOR OUR CLIENT AND I DON'T THINK IT'S SOMETHING

11:21AM 14   THAT SHOULD POP OUT WILLY NILLY, SO WE WOULD LIKE THE

11:22AM 15   OPPORTUNITY TO BE HEARD ON THAT.

11:22AM 16             THE COURT:  WELL, I APPRECIATE YOUR SENSITIVITY TO

11:22AM 17   IT, AND I KNOW THE DEFENSE EARS ARE SOMETIMES FINER TUNED

11:22AM 18   TOWARDS ISSUES AND THINGS.

11:22AM 19        BUT LET ME SAY THAT MY OBSERVATION WAS, AT LEAST WITH THIS

11:22AM 20   WITNESS, THE QUESTIONING WAS, PARTICULARLY ON REDIRECT, SEEMED

11:22AM 21   TO FOCUS ON, YOU DIDN'T DO ANY INDEPENDENT ANALYSIS, YOU RELIED

11:22AM 22   ON THE ASSUMPTIONS THAT YOU MADE, WHICH HE'S ENTITLED TO DO.

11:22AM 23   AS YOU POINTED OUT, THAT'S WHAT A LAB DIRECTOR CAN DO.

11:22AM 24        SO I THINK THERE WAS AN EVEN BALANCE ON THAT.  YOU DID

11:22AM 25   THAT ON YOUR CROSS AND RECROSS.

11:22AM 1      SO I DON'T THINK IT WAS AS MUCH OF AN ISSUE WITH THIS

11:22AM 2  WITNESS.  PERHAPS THE TUNE CAME UP ON IT WHICH CAUSED YOU TO

11:22AM 3  RISE TO YOUR FEET ON THIS, AND THERE MAY BE WITNESSES, PAST

11:22AM 4  WITNESSES THAT YOU HAD SOME CONCERN ABOUT AS WELL.

11:22AM 5      MR. WADE:  AND THE COURT MAY BE RIGHT, AND I

11:22AM 6  CERTAINLY ACCEPT THAT MR. SCHENK IS SAYING THAT IT WASN'T HIS

11:23AM 7  INTENTION AND I ACCEPT THAT FROM MR. SCHENK.

11:23AM 8      IF THERE'S SOME CONCERN WE SEE IN LOOKING AT THE

11:23AM 9  TRANSCRIPT, WE'LL RERAISE IT.  BUT I THINK IT'S GOOD TO HAVE

11:23AM 10 NOTED THIS ISSUE SO WE'RE ALL AWARE OF IT GOING FORWARD.

11:23AM 11     THE COURT:  OKAY.  GREAT.

11:23AM 12     MR. SCHENK:  THANK YOU.

11:23AM 13     MR. WADE:  THANK YOU.

11:23AM 14     THE COURT:  ALL RIGHT.  THANKS.

11:23AM 15     THE CLERK:  COURT IS IN RECESS.

11:23AM 16   (RECESS FROM 11:23 A.M. UNTIL 11:58 A.M.)

11:58AM 17   (JURY OUT AT 11:58 A.M.)

11:58AM 18     THE COURT:  ALL RIGHT.  THANK YOU.  WE'RE BACK ON

11:58AM 19 THE RECORD IN THE HOLMES MATTER.

11:58AM 20     ALL COUNSEL ARE PRESENT AND MS. HOLMES IS PRESENT.  THE

11:58AM 21 JURY IS NOT PRESENT.

11:58AM 22     I JUST WANTED TO BRING TO COUNSEL'S ATTENTION AN EMAIL

11:58AM 23 THAT MS. KRATZMANN RECEIVED FROM ONE OF OUR JURORS.

11:58AM 24     THE EMAIL INFORMS THAT THIS JUROR'S MOTHER-IN-LAW JUST

11:58AM 25 PASSED.  SHE DOESN'T KNOW YET ABOUT ARRANGEMENTS, BUT SHE MAY

11:58AM 1    NEED TO TRAVEL SOON.

11:58AM 2         SHE ASKED MS. KRATZMANN WHAT THE NEXT STEPS SHOULD BE.

11:58AM 3         I ASKED MS. KRATZMANN TO INQUIRE WHAT THE TRAVEL DISTANCE

11:58AM 4    MIGHT BE, AND I BELIEVE IT INVOLVES THE MIDWEST.  SO -- AND AS

11:58AM 5    OF YET, I'M INFORMED FROM MS. KRATZMANN THAT THIS WAS JUST

11:58AM 6    SUDDEN NEWS, SO WE WILL -- I'LL ASK MS. KRATZMANN TO KEEP IN

11:59AM 7    CONTACT WITH THE JUROR.  WE'LL GET WHATEVER INFORMATION WE

11:59AM 8    RECEIVE, AND THEN I'LL LET YOU KNOW AND WE CAN ADJUST

11:59AM 9    ACCORDINGLY.

11:59AM 10        WHILE WE'RE ON THE TOPIC, I SHOULD INFORM YOU, AND I'D

11:59AM 11   LIKE TO INFORM YOU, THAT I HAVE A DEAR FRIEND WHO IS CRITICALLY

11:59AM 12   ILL NOW AND PROBABLY WON'T MAKE IT MUCH LONGER I'M INFORMED,

11:59AM 13   AND THIS IS SOMEBODY WHO IS VERY CLOSE TO ME AND HIRED ME IN MY

11:59AM 14   FIRST JOB IN THE PUBLIC DEFENDER'S OFFICE, AND SO HE'S VERY

11:59AM 15   CLOSE TO ME AND MY FAMILY.

11:59AM 16        THAT MAY CAUSE ANOTHER BREAK.  IF THERE'S A MEMORIAL

11:59AM 17   SERVICE, I WOULD LIKE TO ATTEND THAT WITH YOUR PERMISSION, AND

11:59AM 18   IF WE CAN ADJUST THAT SHOULD THAT COME TO PASS, I'D LIKE TO DO

11:59AM 19   THAT.

11:59AM 20        BUT, AGAIN, WE'LL SEE WHAT BRINGS US.

11:59AM 21        AND I DID HAVE OCCASION TO LOOK AT MY SCHEDULE ALSO,

12:00PM 22   NOVEMBER 17TH IS A DATE THAT I'LL BE UNAVAILABLE FOR AN HOUR

12:00PM 23   FROM 10:30 TO 11:30.  I HAD PROMISED A LAW SCHOOL PROFESSOR

12:00PM 24   FRIEND THAT I WOULD MAKE MYSELF AVAILABLE TO HIM AND HIS CLASS

12:00PM 25   FOR THAT HOUR.  SO I APOLOGIZE FOR THAT INTERRUPTION, BUT I

12:00PM  1    WANT TO LET YOU KNOW THAT KNOW SO YOU CAN SCHEDULE AROUND THAT.

12:00PM  2    IT'S AN HOUR.

12:00PM  3         SO THAT'S THE LATEST NEWS FOR OUR SCHEDULE.

12:00PM  4         SO THANK YOU.  WE'LL KEEP YOU POSTED ON THE JUROR'S

12:00PM  5    SITUATION, AND I'LL TRY TO INFORM YOU AS BEST I CAN ON MY DEAR

12:00PM  6    FRIEND'S SITUATION.

12:00PM  7         OKAY.  THANK YOU.  I'LL STEP DOWN AND WE'LL BRING THE JURY

12:00PM  8    IN, AND WE'RE GOING TO END AT 1:00 O'CLOCK HERE TODAY.

12:00PM  9         I DON'T THINK WE'LL GET TO THIS ISSUE, MR. BOSTIC, THAT WE

12:00PM  10   TALKED ABOUT.

12:00PM  11              MR. BOSTIC:  NO, YOUR HONOR.  THAT WILL COME UP ON

12:01PM  12   TUESDAY.

12:01PM  13              THE COURT:  OKAY.  GREAT.  THANK YOU.

12:01PM  14              THE CLERK:  COURT IS IN RECESS.

12:01PM  15         (RECESS FROM 12:01 P.M. UNTIL 12:05 P.M.)

12:05PM  16              THE COURT:  ALL RIGHT.  THANK YOU.  WE'RE BACK ON

12:05PM  17   THE RECORD.

12:05PM  18         OUR JURY IS PRESENT, ALL COUNSEL ARE PRESENT, AND

12:05PM  19   MS. HOLMES IS PRESENT.

12:05PM  20         MR. BOSTIC, YOU HAVE ANOTHER WITNESS?

12:05PM  21              MR. BOSTIC:  YES, YOUR HONOR.

12:05PM  22         THE UNITED STATES CALLS DANIEL EDLIN.

12:05PM  23         (PAUSE IN PROCEEDINGS.)

12:05PM  24              THE COURT:  ALL RIGHT.  THANK YOU.

12:06PM  25         SIR, IF YOU WOULD PLEASE COME FORWARD, AND IF YOU COULD

12:06PM  1    STAND OVER HERE FACING OUR COURTROOM DEPUTY.  IF YOU WOULD

12:06PM  2    RAISE YOUR RIGHT HAND, SHE HAS A QUESTION FOR YOU.

12:06PM  3             **(GOVERNMENT'S WITNESS, DANIEL EDLIN, WAS SWORN.)**

12:06PM  4             THE WITNESS:  YES.

12:06PM  5             THE COURT:  THANK YOU.

12:06PM  6         PLEASE HAVE A SEAT HERE, SIR, AND MAKE YOURSELF

12:06PM  7    COMFORTABLE.  PLEASE FEEL FREE TO ADJUST THE CHAIR AND THE

12:06PM  8    MICROPHONE AS YOU NEED.

12:06PM  9         I'LL ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE MICROPHONE.

12:06PM  10        WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

12:06PM  11   AND THEN SPELL IT, PLEASE.

12:06PM  12            THE WITNESS:  DANIEL EDLIN.  D-A-N-I-E-L, E-D-L-I-N.

12:06PM  13            THE COURT:  COUNSEL.

12:06PM  14            MR. BOSTIC:  THANK YOU, YOUR HONOR.

12:06PM  15                     **DIRECT EXAMINATION**

12:06PM  16   BY MR. BOSTIC:

12:06PM  17   Q.   GOOD AFTERNOON, MR. EDLIN.

12:07PM  18   A.   GOOD AFTERNOON.

12:07PM  19   Q.   MR. EDLIN, IF YOU'RE FULLY VACCINATED AND COMFORTABLE

12:07PM  20   DOING SO, I UNDERSTAND THE COURT WILL GIVE YOU PERMISSION TO

12:07PM  21   TESTIFY WITHOUT YOUR MASK.

12:07PM  22   A.   YES, I AM.

12:07PM  23            THE COURT:  YOU CAN REMOVE YOUR MASK IF YOU WISH.

12:07PM  24   THANK YOU.

12:07PM  25            THE WITNESS:  THANK YOU.

12:07PM  1    BY MR. BOSTIC:

12:07PM  2    Q.   MR. EDLIN, WAS THERE A TIME WHEN YOU WERE EMPLOYED BY A

12:07PM  3    COMPANY CALLED THERANOS?

12:07PM  4    A.   YES.

12:07PM  5    Q.   AND WHAT WERE YOUR APPROXIMATE DATES OF EMPLOYMENT AT THE

12:07PM  6    COMPANY?

12:07PM  7    A.   I WAS EMPLOYED FROM SEPTEMBER 2011 THROUGH DECEMBER 2016.

12:07PM  8    Q.   OKAY.  WE'LL TALK MORE ABOUT THIS IN A LITTLE BIT, BUT FOR

12:07PM  9    NOW CAN YOU GIVE US AN OVERVIEW OF YOUR GENERAL ROLE OR YOUR

12:07PM  10   ROLES AT THE COMPANY?

12:07PM  11   A.   SO I WAS FIRST HIRED AS A SENIOR PRODUCT MANAGER AND I

12:07PM  12   REPORTED TO CHRISTIAN HOLMES, HE WAS THE TEAM LEAD.

12:07PM  13        WORK IN THAT ROLE MAINLY FOCUSSED ON SUPPORTING

12:07PM  14   RELATIONSHIPS WITH BUSINESS PARTNERS AND POTENTIAL PARTNERS.

12:07PM  15        I WAS ON A TEAM OF OTHER PRODUCT MANAGERS, AND IN SOME OF

12:08PM  16   THE ROLES I WORKED ALONGSIDE THEM.  THAT INCLUDED SUPPORTING

12:08PM  17   WORK WITH WALGREENS AND RETAIL PARTNERS.  I WORKED TO

12:08PM  18   OPERATIONALIZE THE WALGREENS PARTNERSHIP AND PLAN THE ROLLOUT

12:08PM  19   OF THERANOS CENTERS IN WALGREENS STORES.

12:08PM  20        I ALSO WORKED ALONGSIDE SOME OF THE OTHER PRODUCT MANAGERS

12:08PM  21   SUPPORTING WORK WITH MARKETING AND COMMUNICATIONS AGENCIES.

12:08PM  22        I ALSO WORKED DIRECTLY WITH ELIZABETH TO SUPPORT

12:08PM  23   RELATIONSHIPS WITH MILITARY AND PHARMACEUTICAL COMPANIES.

12:08PM  24        AND I ALSO COORDINATED TECHNOLOGY DEMONSTRATIONS FOR

12:08PM  25   GUESTS AND VISITORS.

12:08PM 1       SO I WAS IN THAT ROLE FOR ABOUT THREE YEARS.

12:08PM 2       AND AFTER KIND OF THE WALGREENS PARTNERSHIP GOT OFF THE

12:08PM 3   GROUND, I WAS WORKING MORE DIRECTLY WITH ELIZABETH, AND I

12:09PM 4   RECEIVED A PROMOTION TO A LEAD STRATEGIC OPERATIONS OFFICE OF

12:09PM 5   THE CEO, AND IN THAT ROLE I STILL SUPPORTED PARTNERSHIPS AND

12:09PM 6   POTENTIAL BUSINESS RELATIONSHIPS, STILL WORKED ON MEDIA AND

12:09PM 7   COMMUNICATIONS.

12:09PM 8       AND THEN THERE WAS ALSO KIND OF AN OPERATIONAL ASPECT TO

12:09PM 9   THE ROLE WHERE I WOULD WORK WITH SOME OF THE OTHER MEMBERS OF

12:09PM 10  ELIZABETH'S OFFICE, LIKE HER ASSISTANTS, TO MAKE SURE THAT

12:09PM 11  CERTAIN PROJECTS AND FEEDBACK THAT REQUIRED HER ATTENTION WERE

12:09PM 12  COMPLETED, YOU KNOW, IN A TIMELY FASHION.

12:09PM 13  Q.   THANK YOU.

12:09PM 14       THE PROMOTION THAT YOU JUST MENTIONED, WHEN DID IT TAKE

12:09PM 15  EFFECT?

12:09PM 16  A.   IT TOOK EFFECT END OF 2014 INTO THE BEGINNING OF 2015.

12:09PM 17  Q.   YOU SAID YOU LEFT THE COMPANY IN DECEMBER OF 2016; IS THAT

12:09PM 18  CORRECT?

12:09PM 19  A.   THAT'S RIGHT.

12:09PM 20  Q.   DID YOU LEAVE THE COMPANY VOLUNTARILY?

12:09PM 21  A.   YES, I DID.

12:09PM 22  Q.   AT A HIGH LEVEL IN GENERAL TERMS, WHAT WAS YOUR REASON FOR

12:10PM 23  DECIDING TO LEAVE THE COMPANY AT THAT TIME?

12:10PM 24  A.   I LEFT THE COMPANY FOR TWO BASIC REASONS.  FIRST WAS I

12:10PM 25  WANTED TO GO TO BUSINESS SCHOOL, WHICH I DID.

12:10PM 1          SECOND, YOU KNOW, AT THAT TIME I NO LONGER BELIEVED, BASED

12:10PM 2    ON WHAT I WAS SEEING, THAT THE COMPANY WAS CAPABLE OF STANDING

12:10PM 3    BEHIND THE CLAIMS IT HAD BEEN MAKING ABOUT THE TECHNOLOGY.

12:10PM 4          THIS WAS ABOUT A YEAR AFTER THE FIRST

12:10PM 5    "WALL STREET JOURNAL" CAME OUT, AND THE COMPANY MADE SEVERAL

12:10PM 6    ATTEMPTS TO PROVE ITS TECHNOLOGY, BUT THEY WERE ALL

12:10PM 7    UNSUCCESSFUL, AND I JUST NO LONGER WANTED TO BE IN THAT TYPE OF

12:10PM 8    ENVIRONMENT.

12:10PM 9    Q.   WE'LL CIRCLE BACK ON SOME OF THOSE DETAILS LATER, BUT FOR

12:10PM 10   NOW LET'S START AT THE BEGINNING OF THE STORY.

12:10PM 11         FIRST, CAN YOU SUMMARIZE YOUR EDUCATION FOR US AND ANY

12:10PM 12   WORK HISTORY THAT CAME BEFORE THERANOS.

12:10PM 13   A.   FOR MY UNDERGRADUATE, I ATTENDED DUKE UNIVERSITY.  I

12:10PM 14   MAJORED IN PUBLIC POLICY AND HAD A CERTIFICATE IN MARKETS AND

12:11PM 15   MANAGEMENT.

12:11PM 16         I ALSO RECEIVED MY MASTER'S IN BUSINESS ADMINISTRATION

12:11PM 17   FROM THE UCLA ANDERSON SCHOOL OF MANAGEMENT IN 2019.

12:11PM 18         I GRADUATED FROM DUKE IN 2009.

12:11PM 19         FIRST JOB WAS AS A SALES AND RESEARCH ASSISTANT AT TELSEY

12:11PM 20   ADVISORY GROUP, T-E-L-S-E-Y.  IT WAS AN EQUITY RESEARCH SALES

12:11PM 21   AND TRADING FIRM IN NEW YORK CITY.

12:11PM 22   Q.   WAS THAT YOUR ONLY JOB BEFORE JOINING THERANOS?

12:11PM 23   A.   YES.

12:11PM 24   Q.   LET'S TALK ABOUT THERANOS THEN.

12:11PM 25         HOW DID YOU INITIALLY HEAR ABOUT THE COMPANY?

12:11PM 1    A.   SO I ATTENDED DUKE WITH ELIZABETH'S BROTHER CHRISTIAN AND

12:11PM 2    HE'S ONE OF MY CLOSEST FRIENDS, AND I ACTUALLY FIRST MET

12:11PM 3    ELIZABETH WHEN I WAS IN COLLEGE AT, YOU KNOW, GRADUATION AND

12:11PM 4    BIRTHDAY DINNERS.  SHE WAS INTRODUCED, YOU KNOW, AS CHRISTIAN'S

12:12PM 5    SISTER, AND I WAS AWARE THAT SHE HAD DROPPED OUT OF STANFORD TO

12:12PM 6    START HER OWN COMPANY.

12:12PM 7         UNDER LESS THAN TWO YEARS AFTER GRADUATION, CHRISTIAN HAD

12:12PM 8    GONE TO WORK AT THERANOS AND I KNEW THAT HE WAS DOING THAT.

12:12PM 9         AND THEN A COUPLE MONTHS LATER, HE GAVE ME A CALL TO

12:12PM 10   ACTUALLY TELL ME THAT THERE WAS AN OPPORTUNITY OPEN AT THERANOS

12:12PM 11   TO JOIN THE COMPANY AND JOIN HIS TEAM, AND HE ALSO TOLD ME THAT

12:12PM 12   HE HAD PRESENTED THE SAME OPPORTUNITY TO A FEW OF OUR OTHER

12:12PM 13   CLASSMATES AND FRIENDS FROM DUKE UNIVERSITY.

12:12PM 14        SO WE DIDN'T REALLY DISCUSS TOO MANY DETAILS AT THE TIME,

12:12PM 15   BUT IT SOUNDED LIKE THERE WAS A LOT OF, YOU KNOW, POTENTIAL.

12:12PM 16        AND CAME TO THE THERANOS OFFICERS TO INTERVIEW AS A GROUP,

12:12PM 17   AND HEARD MORE ABOUT THE OPPORTUNITY.  IT SOUNDED INCREDIBLY

12:12PM 18   EXCITING AND SOUNDED LIKE A REALLY GREAT OPPORTUNITY AT THAT

12:13PM 19   TIME, I WAS 24 AT THE TIME, AND SO WE INTERVIEWED AND WE GOT

12:13PM 20   THE OFFERS AND, YEAH, WE DID THAT.

12:13PM 21   Q.   SORRY.

12:13PM 22   A.   YEAH, SURE.

12:13PM 23   Q.   THANK YOU.  LET ME ASK YOU SOME QUESTIONS ABOUT THAT.

12:13PM 24        SO AT THE TIME WHEN YOU WERE COMING OUT TO INTERVIEW AT

12:13PM 25   THERANOS, WHAT WAS EXCITING TO YOU ABOUT THAT OPPORTUNITY?

12:13PM   1    A.   OUR UNDERSTANDING -- MY UNDERSTANDING WAS THAT THE COMPANY

12:13PM   2    HAD DEVELOPED, YOU KNOW, BREAKTHROUGH, GROUNDBREAKING

12:13PM   3    PROPRIETARY TECHNOLOGY THAT WOULD MAKE IT POSSIBLE TO DO

12:13PM   4    FINGERSTICK BLOOD TESTING AND ELIMINATE THE NEED FOR VENOUS

12:13PM   5    SAMPLE, WHICH HAD THE OPPORTUNITY TO HELP PATIENTS IN A NUMBER

12:13PM   6    OF DIFFERENT WAYS WHO OTHERWISE COULDN'T GET THEIR BLOOD DRAWN,

12:13PM   7    YOU KNOW, THROUGH THE ARM.

12:13PM   8         AND TESTS WOULD BE MORE AFFORDABLE, THEY WOULD BE MORE

12:13PM   9    ACCESSIBLE.

12:14PM   10        I UNDERSTOOD THAT THE COMPANY HAD JUST SIGNED A DEAL WITH

12:14PM   11   WALGREENS, AND THAT PART OF MY ROLE WOULD BE TO OPERATIONALIZE

12:14PM   12   AND BRING TO LIFE THAT PARTNERSHIP.

12:14PM   13   Q.   AND WHAT WAS YOUR SOURCE FOR THIS INFORMATION?  WHEN WERE

12:14PM   14   YOU LEARNING THESE THINGS?

12:14PM   15   A.   THE SOURCE OF THE INFORMATION WAS ELIZABETH AND SUNNY AND

12:14PM   16   CHRISTIAN, AND WE FIRST HEARD ABOUT THIS INFORMATION DURING OUR

12:14PM   17   INTERVIEWS.  AND THEN WHEN I JOINED THE COMPANY WE LEARNED

12:14PM   18   MORE.

12:14PM   19   Q.   AS PART OF THE JOB INTERVIEW PROCESS, DID YOU MEET

12:14PM   20   INDIVIDUALLY WITH MR. BALWANI AND MS. HOLMES?

12:14PM   21   A.   I DID.

12:14PM   22   Q.   AND DO YOU REMEMBER LEARNING OF SOME MORE DETAILS ABOUT

12:14PM   23   THE COMPANY AND ITS TECHNOLOGY DURING THOSE MEETINGS?

12:14PM   24   A.   THE INTERVIEWS WERE -- THERE WAS A GROUP PORTION OF THE

12:14PM   25   INTERVIEW AND AN INDIVIDUAL PORTION, AND IN EACH OF THOSE

12:14PM   1    CONVERSATIONS I WAS ABLE TO LEARN MORE ABOUT THE COMPANY.

12:14PM   2    Q.   AT SOME POINT DID YOU SIGN A NONDISCLOSURE AGREEMENT WITH

12:15PM   3    THERANOS?

12:15PM   4    A.   YES.

12:15PM   5    Q.   AND WAS THAT BEFORE OR AFTER YOU ACTUALLY STARTED WORKING

12:15PM   6    THERE?

12:15PM   7    A.   I'M NOT SURE EXACTLY.

12:15PM   8    Q.   AS A RESULT OF JOB INTERVIEWS THAT YOU HAD, WERE YOU

12:15PM   9    OFFERED A POSITION AT THERANOS?

12:15PM  10    A.   YES.

12:15PM  11    Q.   AND YOU ACCEPTED?

12:15PM  12    A.   YES.

12:15PM  13    Q.   OF THE GROUP THAT YOU WERE JUST MENTIONING, THE GROUP OF

12:15PM  14    YOU WHO HAD ALL GONE TO COLLEGE TOGETHER, DID OTHER INDIVIDUALS

12:15PM  15    ALSO ACCEPT SIMILAR POSITIONS AT THERANOS?

12:15PM  16    A.   YES, EVERYONE ACCEPTED OFFERS FOR THE SAME POSITION AS A

12:15PM  17    SENIOR PRODUCT MANAGER.

12:15PM  18    Q.   AND WHO ELSE WAS IN THAT GROUP?  WHAT ARE THEIR NAMES?

12:15PM  19    A.   JEFF BLICKMAN, NICK MENCHEL, SANI HADZIAHMETOVIC, WHICH

12:15PM  20    MIGHT BE DIFFICULT TO SPELL.  THOSE WERE THE FOUR OF US THAT

12:15PM  21    JOINED INITIALLY.

12:16PM  22         AND MAX FOSQUE JOINED A YEAR LATER.

12:16PM  23         AND THEN A FEW YEARS LATER ANOTHER PERSON JOINED AS WELL,

12:16PM  24    BUT THAT WAS -- YEAH.

12:16PM  25    Q.   WHEN YOU FIRST JOINED, WAS THIS IN 2011?

12:16PM 1   A.   YES.

12:16PM 2   Q.   AND WHAT MONTH IN 2011 APPROXIMATELY?

12:16PM 3   A.   SEPTEMBER.

12:16PM 4   Q.   OKAY.  AND YOU SAID THAT YOUR INITIAL JOB TITLE WAS SENIOR

12:16PM 5   PRODUCT MANAGER; IS THAT CORRECT?

12:16PM 6   A.   CORRECT.

12:16PM 7   Q.   AND WHO WERE YOU REPORTING TO IN THAT ROLE?

12:16PM 8   A.   I'VE REPORTED DIRECTLY TO CHRISTIAN.  HE WAS THE TEAM

12:16PM 9   LEAD.

12:16PM 10  Q.   AND BESIDES REPORTING WITH HIM -- SORRY.

12:16PM 11       BESIDES REPORTING TO HIM, DID YOU ALSO WORK WITH HIM IN

12:16PM 12  YOUR WORK AT THERANOS?

12:16PM 13  A.   YES.

12:16PM 14  Q.   AND DID THAT CHANGE OVER TIME?  IN OTHER WORDS, WHO YOU

12:16PM 15  WERE WORKING WITH AND WHO YOU WERE REPORTING TO, DID THAT

12:16PM 16  CHANGE OVER THE MONTHS AND YEARS THAT YOU WERE AT THERANOS?

12:16PM 17  A.   IT DID.  INITIALLY I REPORTED TO CHRISTIAN, AND THEN ONCE

12:17PM 18  I RECEIVED MY PROMOTION, I REPORTED TO ELIZABETH.

12:17PM 19  Q.   AND BEFORE YOU RECEIVED THE PROMOTION -- YOU SAID THAT WAS

12:17PM 20  AT THE BEGINNING OF 2015?

12:17PM 21  A.   THAT'S RIGHT.

12:17PM 22  Q.   BEFORE THAT TIME PERIOD, HAD YOU BEGUN TO WORK MORE AND

12:17PM 23  MORE WITH MS. HOLMES ON PROJECTS?

12:17PM 24  A.   YES.

12:17PM 25  Q.   AND COULD YOU GIVE ME A SENSE OF HOW FREQUENTLY YOU WERE

12:17PM  1    IN CONTACT WITH MS. HOLMES DURING YOUR TIME AT THE COMPANY?

12:17PM  2    AND I UNDERSTAND THAT THAT PROBABLY CHANGED OVER TIME.

12:17PM  3    A.   IT DID CHANGE OVER TIME.  I WOULD SAY, YOU KNOW, INITIALLY

12:17PM  4    A COUPLE TIMES A WEEK, IF NOT MORE, AND AS MY TIME PROGRESSED

12:17PM  5    AT THE COMPANY, IT EVENTUALLY BECAME ON A DAILY BASIS.

12:17PM  6    Q.   AND WHEN YOU TALK ABOUT CONTACT WITH MS. HOLMES, HOW DID

12:17PM  7    YOU COMMUNICATE WITH HER ABOUT WORK?  ARE WE TALKING EMAILS?

12:17PM  8    IN PERSON?  TELEPHONE?  SOME COMBINATION?

12:17PM  9    A.   IT WAS MAINLY EMAILS AND IN-PERSON CONVERSATIONS.

12:18PM  10   Q.   THROUGH YOUR CONTACT WITH MS. HOLMES AND THROUGH WORKING

12:18PM  11   WITH HER, DID YOU COME TO HAVE A SENSE OF HER WORKING HOURS AT

12:18PM  12   THE COMPANY, HOW FREQUENTLY SHE WAS THERE?

12:18PM  13   A.   YES.

12:18PM  14   Q.   AND WHAT WAS YOUR SENSE OF THAT?

12:18PM  15   A.   SHE WAS IN THE OFFICE ALL THE TIME REALLY FROM, YOU KNOW,

12:18PM  16   EARLY MORNING TO LATE IN THE EVENING.

12:18PM  17   Q.   AND WAS THAT TRUE THROUGHOUT YOUR TIME AT THE COMPANY AS

12:18PM  18   FAR AS YOU SAW?

12:18PM  19   A.   YES.

12:18PM  20   Q.   HOW ABOUT WEEKENDS?  WAS MS. HOLMES EVER THERE ON

12:18PM  21   WEEKENDS?

12:18PM  22   A.   YES.

12:18PM  23   Q.   WERE YOU THERE --

12:18PM  24   A.   REGULARLY, YES.

12:18PM  25   Q.   AND WERE YOU THERE ON WEEKENDS ALSO AND SEE HER THERE?

12:18PM  1    A.   YES.

12:18PM  2    Q.   I'D LIKE TO ASK YOU ABOUT HOW INFORMATION WAS HANDLED AT

12:18PM  3    THERANOS.   GENERALLY SPEAKING, DID YOU GET A SENSE OF HOW

12:18PM  4    INFORMATION MOVED AROUND THE COMPANY?

12:18PM  5    A.   I CAN ONLY REALLY SPEAK TO, I GUESS, MY TEAM AND THE

12:19PM  6    INFORMATION THAT I WAS INVOLVED WITH, BUT GENERALLY VIA EMAIL

12:19PM  7    OR IN PERSON MEETINGS WITHIN THE TEAM THAT I WAS ON.

12:19PM  8    Q.   AND LET ME ASK SPECIFICALLY IN YOUR EXPERIENCE, WAS

12:19PM  9    INFORMATION FREELY SHARED AT THE COMPANY BETWEEN EMPLOYEES,

12:19PM  10   BETWEEN GROUPS?

12:19PM  11   A.   I THINK THE INFORMATION WAS SHARED MORE AMONGST THAT

12:19PM  12   PARTICULAR TEAM, AND THERE WASN'T MUCH INFORMATION SHARING

12:19PM  13   ACROSS TEAMS, AT LEAST AS I OBSERVED.

12:19PM  14   Q.   AND IN YOUR EXPERIENCE, WAS THAT BECAUSE OF THE

12:19PM  15   PREFERENCES OF THE TEAM MEMBERS AND YOURSELF OR WAS THAT

12:19PM  16   BECAUSE OF DIRECTION FROM ABOVE IN THE COMPANY?

12:19PM  17   A.   DIRECTION FROM ABOVE.

12:19PM  18   Q.   AND CAN YOU EXPLAIN THAT?   WHAT WAS THAT DIRECTION?

12:19PM  19   A.   FOR THE PROJECTS THAT I WORKED ON, I WAS TOLD BY, YOU

12:20PM  20   KNOW, CHRISTIAN, AND ALSO ELIZABETH AND SUNNY, TO NOT SHARE

12:20PM  21   INFORMATION ABOUT WHAT WE WERE WORKING ON OUTSIDE OF, OUTSIDE

12:20PM  22   OF THE TEAM THAT I WAS ON BECAUSE IT WAS CONSIDERED

12:20PM  23   CONFIDENTIAL TO JUST THE TEAM THAT I WAS ON.

12:20PM  24   Q.   SO THAT WENT EVEN FOR OTHER EMPLOYEES OF THE COMPANY WHO

12:20PM  25   WERE NOT PART OF THAT TEAM WITHIN THE COMPANY?

12:20PM 1    A.   I CAN'T FULLY SPEAK FOR THEM.  BUT THERE WAS GENERALLY A

12:20PM 2    KIND OF INSTRUCTION THAT I WAS ON A, YOU KNOW, NEED-TO-KNOW

12:20PM 3    BASIS AND THAT INFORMATION THAT I NEEDED TO KNOW RELATIVE TO

12:20PM 4    THE WORK I WAS DOING I COULD SEEK, BUT ASIDE FROM THAT, I HAD

12:20PM 5    NO NEED TO ASK ABOUT IT AND SHOULDN'T ASK ABOUT IT.

12:20PM 6    Q.   HOW ABOUT AS TO INDIVIDUALS OUTSIDE OF THE COMPANY?  WERE

12:21PM 7    THERE RESTRICTIONS ON WHAT INFORMATION NEEDED TO BE KEPT WITHIN

12:21PM 8    THERANOS AND COULDN'T BE SHARED WITH THE PUBLIC, FOR EXAMPLE?

12:21PM 9    A.   WELL, IT WAS MY UNDERSTANDING THAT NO INFORMATION COULD BE

12:21PM 10   SHARED WITH THE PUBLIC UNLESS IT WAS, YOU KNOW, APPROVED, AND I

12:21PM 11   KNOW THAT EVERYONE WHO CAME TO THE COMPANY SIGNED A

12:21PM 12   NONDISCLOSURE AGREEMENT AND THE INTENT WAS TO MAKE SURE THAT

12:21PM 13   THAT INFORMATION WAS NOT COMMUNICATED EXTERNALLY.

12:21PM 14   Q.   AND WHO COMMUNICATED THAT DIRECTION OR POLICY TO YOU AT

12:21PM 15   THERANOS?

12:21PM 16   A.   I RECEIVED THAT FROM -- THAT DIRECTION FROM CHRISTIAN AND

12:21PM 17   ALSO FROM ELIZABETH AND FROM SUNNY.

12:21PM 18   Q.   WE WERE JUST TALKING ABOUT HOW SOME INDIVIDUALS AT

12:21PM 19   THERANOS WERE NOT TO KNOW CERTAIN THINGS THAT OTHER INDIVIDUALS

12:21PM 20   AT THE COMPANY KNEW.

12:21PM 21        IN YOUR EXPERIENCE, WAS THERE ANYTHING THAT NEEDED TO BE

12:22PM 22   KEPT FROM MS. HOLMES OR FROM MR. BALWANI?

12:22PM 23   A.   NO.

12:22PM 24   Q.   WERE THERE OTHER PEOPLE IN THE COMPANY BESIDES THOSE TWO

12:22PM 25   WHO YOU UNDERSTOOD WERE ALLOWED TO KNOW EVERY PIECE OF

EDLIN DIRECT BY MR. BOSTIC

12:22PM  1   INFORMATION AT THE COMPANY?

12:22PM  2   A.    NO.

12:22PM  3   Q.    YOU TESTIFIED A FEW MINUTES AGO THAT YOU HAD A ROLE IN

12:22PM  4   CONNECTION WITH THE ROLLOUT OF THERANOS TESTING AT WALGREENS;

12:22PM  5   IS THAT CORRECT?

12:22PM  6   A.    THAT'S CORRECT.

12:22PM  7   Q.    AND CAN YOU TELL US ABOUT THAT ROLE?  WHAT KIND OF WORK

12:22PM  8   DID YOU DO THERE?

12:22PM  9   A.    SO IN THAT ROLE I WAS ON A TEAM WITH OTHER PRODUCT

12:22PM  10  MANAGERS AND WE WORKED DIRECTLY WITH THE RETAIL PHARMACY

12:22PM  11  OPERATIONS TEAM FROM WALGREENS TO PLAN OUT THE STORE OPERATION.

12:22PM  12  THAT INCLUDED PICKING A GEOGRAPHY IN A PILOT AREA, WHICH WAS IN

12:23PM  13  ARIZONA.

12:23PM  14       AND MY WORK REALLY FOCUSSED ON THE FRONT END CUSTOMER

12:23PM  15  EXPERIENCE PROCESS FOR SOMEONE WHO VISITED A WALGREENS STORE,

12:23PM  16  AND THE FULL PROCESS THAT THEY WENT FROM BASICALLY BEGINNING OF

12:23PM  17  THAT VISIT UNTIL THE END.

12:23PM  18       SO THAT INCLUDED SOME OF THE BRANDING AND MARKETING IN THE

12:23PM  19  STORE.  THERE WAS AN ASPECT OF SOME SOFTWARE AND APPLICATIONS

12:23PM  20  THAT WERE -- THAT A PHARMACIST USED TO CHECK A PATIENT IN, AND

12:23PM  21  THEN THERE WAS A SOFTWARE, YOU KNOW, APP THAT GUIDED A

12:23PM  22  TECHNICIAN OR A PHLEBOTOMIST TO COLLECT -- USE THE RIGHT TUBES

12:23PM  23  TO COLLECT BLOOD FROM A PATIENT BASED ON THEIR ORDER.

12:23PM  24  Q.    AND JUST TO ORIENT US IN TIME, DO YOU HAVE A RECOLLECTION

12:23PM  25  OF WHEN THERANOS FIRST STARTED OFFERING TESTING SERVICES

12:23PM   1    THROUGH WALGREENS?

12:23PM   2    A.   YES.   IT WAS AROUND SEPTEMBER OF 2013.

12:24PM   3    Q.   AS PART OF YOUR ROLE IN CONNECTION WITH THAT TESTING

12:24PM   4    SERVICE, DID YOU COME TO HAVE SOME LEVEL OF UNDERSTANDING ABOUT

12:24PM   5    WHAT DEVICES THERANOS WAS USING TO PERFORM BLOOD TESTS?

12:24PM   6    A.   I WAS FAMILIAR WITH SOME OF THE DEVICES THAT THERANOS HAD

12:24PM   7    AT THE TIME.

12:24PM   8    Q.   AND WHAT DEVICES WERE YOU FAMILIAR WITH AT THERANOS?   AND

12:24PM   9    LET'S TALK ABOUT THE 2013, 2014 TIME PERIOD.

12:24PM   10   A.   RIGHT.   SO I WASN'T AWARE EXACTLY OF WHAT WAS USED TO

12:24PM   11   PERFORM THE TESTS FOR WALGREENS, BUT I DID BECOME FAMILIAR WITH

12:24PM   12   THE EDISON VERSION, EDISON 3.0 OF THE THERANOS DEVICE

12:24PM   13   RELATIVELY EARLY ON IN MY EMPLOYMENT.

12:24PM   14        I FIRST BECAME AWARE OF IT THROUGH SOME EXISTING SLIDE

12:25PM   15   DECK PRESENTATIONS THAT MY TEAM AND I WORKED TO BASICALLY

12:25PM   16   REFORMAT.

12:25PM   17        THERE WAS A SLIDE WITH AN IMAGE OF THE DEVICE, FOR

12:25PM   18   EXAMPLE.

12:25PM   19        I ALSO ATTENDED MEETINGS WHERE THE DEVICE WAS PRESENT IN A

12:25PM   20   ROOM AND THERE WAS A TECHNOLOGY DEMONSTRATION.

12:25PM   21   Q.   THE EDISON 3.0 AND DID YOU MENTION THE 3.5 AS WELL?

12:25PM   22   A.   THE 3.5 WAS A VERSION OF THE EDISON.   I THINK IT WAS IN

12:25PM   23   THE SAME ENCLOSURE, BUT I UNDERSTAND THAT THERE WAS SOME

12:25PM   24   DIFFERENT COMPONENTS WITHIN IT.

12:25PM   25   Q.   IN 2013 OR 2014, DID YOU HAVE AN UNDERSTANDING AS TO

12:25PM 1    WHETHER THERANOS WAS USING THE EDISON, EITHER THE 3.0 OR THE

12:25PM 2    3.5, TO CONDUCT PATIENT TESTING?

12:25PM 3    A.   AT THAT TIME I DID NOT HAVE THAT UNDERSTANDING.

12:25PM 4    Q.   LATER ON DID YOU COME TO LEARN WHETHER THERANOS WAS USING

12:26PM 5    THE EDISON FOR PATIENT TESTING?

12:26PM 6    A.   I DID.

12:26PM 7    Q.   AND WHAT WAS THE ANSWER THERE?

12:26PM 8    A.   THAT IT DID USE THOSE DEVICES FOR PATIENT TESTING.

12:26PM 9    Q.   IN 2013 AND 2014, DID YOU HAVE AN UNDERSTANDING OF WHAT

12:26PM 10   THE CAPABILITIES OF THE EDISON WERE?  IN OTHER WORDS, WHAT

12:26PM 11   KINDS OF TESTS IT COULD RUN, WHAT KINDS OF TESTS IT COULD NOT

12:26PM 12   RUN?

12:26PM 13   A.   I'M NOT SURE IF I KNEW THE FULL EXTENT IN 2013 OR 2014.

12:26PM 14   Q.   AND DID YOUR JOB IN 2013 AND 2014 REQUIRE YOU TO KNOW

12:26PM 15   EXACTLY WHICH ASSAYS COULD BE RUN ON THE EDISON AND WHICH COULD

12:26PM 16   NOT.

12:26PM 17   A.   NO.

12:26PM 18   Q.   BESIDES THE EDISON AND THE OTHER TWO VERSIONS THAT WE JUST

12:26PM 19   TALKED ABOUT, WERE THERE OTHER THERANOS BUILT ANALYZERS THAT

12:26PM 20   YOU BECAME FAMILIAR WITH WHILE YOU WERE AT THE COMPANY?

12:27PM 21   A.   YES.

12:27PM 22   Q.   AND WHAT WERE THOSE?

12:27PM 23   A.   THAT WAS THE MINILAB.  THERE ARE A FEW DIFFERENT NAMES.

12:27PM 24   THE MINILAB WAS ONE, THE EDISON 4.0 AND THE 4 SERIES.  THESE

12:27PM 25   WERE CONSIDERED THE NEXT GENERATION VERSION OF THE THERANOS

12:27PM  1      DEVICES, AND MY UNDERSTANDING WAS THAT THOSE DEVICES HAD

12:27PM  2      INCREASED CAPABILITIES AND THE ABILITY TO DO MORE TESTS THAN

12:27PM  3      THE EDISON VERSION, THE 3.0 VERSION.

12:27PM  4      Q.    THANK YOU.  YOU CALLED THOSE NEXT GENERATION DEVICES.

12:27PM  5            THESE NEXT GENERATION DEVICES, TO YOUR KNOWLEDGE, WERE

12:27PM  6      THOSE EVER USED FOR CLINICAL PATIENT TESTING DURING YOUR TIME

12:27PM  7      AT THE COMPANY?

12:27PM  8      A.    I DID LEARN THAT THEY WERE NOT USED FOR PATIENT TESTING IN

12:27PM  9      2016, MY LAST YEAR AT THE COMPANY.

12:27PM  10     Q.    AND JUST SO WE'RE CLEAR ON THAT ANSWER, YOU'RE SAYING THAT

12:28PM  11     YOU LEARNED IN 2016 ABOUT WHETHER THEY HAD BEEN USED FOR

12:28PM  12     CLINICAL PATIENT TESTING?

12:28PM  13     A.    CORRECT.

12:28PM  14     Q.    AND BASED ON WHAT YOU LEARNED IN 2016, HAD THEY BEEN USED

12:28PM  15     AT ANY POINT IN TIME FOR CLINICAL PATIENT TESTING AT THERANOS?

12:28PM  16     A.    NO.

12:28PM  17     Q.    IN THE 2013, 2014 TIME PERIOD, WERE YOU AWARE OF

12:28PM  18     THERANOS'S USE OF THIRD PARTY DEVICES TO RUN SOME BLOOD TESTS?

12:28PM  19     A.    I WAS AWARE THAT THERANOS USED THIRD PARTY DEVICES TO RUN

12:28PM  20     VENOUS TESTS AT THAT TIME, 2013, 2014.

12:28PM  21     Q.    OKAY.  UNDERSTOOD.

12:28PM  22            AT THAT TIME DID YOU HAVE ANY KNOWLEDGE OF THERANOS USING

12:28PM  23     MODIFIED THIRD PARTY DEVICES TO RUN FINGERSTICK BLOOD SAMPLES?

12:28PM  24     A.    NO.

12:28PM  25     Q.    AND DID YOU LEARN ABOUT THAT AT SOME POINT WHEN YOU WERE

12:28PM   1    AT THE COMPANY?

12:29PM   2    A.   YES.

12:29PM   3    Q.   AND WHEN DID YOU LEARN ABOUT THAT?

12:29PM   4    A.   I LEARNED THAT IN 2016.

12:29PM   5    Q.   AND HOW DID IT COME TO BE, IF YOU REMEMBER, THAT YOU

12:29PM   6    LEARNED ABOUT THE COMPANY'S USE OF MODIFIED THIRD PARTY

12:29PM   7    DEVICES?

12:29PM   8    A.   AT THAT TIME AT THE BEGINNING OF 2016, THERANOS HELD A

12:29PM   9    NUMBER OF DIFFERENT MEETINGS WITH A NUMBER OF LAB DIRECTORS

12:29PM   10   FROM ACROSS THE COUNTRY WITH THE GOAL BEING FORMING A

12:29PM   11   SCIENTIFIC AND MEDICAL ADVISORY BOARD, AND IN THOSE MEETINGS

12:29PM   12   ASPECTS OF THE DEVICES IN THE CLINICAL LAB WERE DISCUSSED, AND

12:29PM   13   IN THOSE CONVERSATIONS I LEARNED ABOUT LAB DEVELOPED TESTS THAT

12:29PM   14   HAD BEEN DEVELOPED ON THIRD PARTY ANALYZERS TO TEST FINGERSTICK

12:29PM   15   SAMPLES.

12:29PM   16   Q.   YOU SPOKE EARLIER ABOUT YOUR ROLE IN CONNECTION WITH THE

12:30PM   17   WALGREENS ROLLOUT SPECIFICALLY.

12:30PM   18        DO YOU RECALL THAT?

12:30PM   19   A.   YES.

12:30PM   20   Q.   AND IN CONNECTION WITH THAT ROLE, DID YOU COME TO HAVE A

12:30PM   21   BASIC UNDERSTANDING OF HOW THE THERANOS WALGREENS LOCATIONS

12:30PM   22   OPERATED?

12:30PM   23        I'M JUST ASKING YES OR NO FOR NOW.  DID YOU COME TO HAVE A

12:30PM   24   BASIC UNDERSTANDING OF HOW A THERANOS LOCATION AT A WALGREENS

12:30PM   25   WOULD WORK?

12:30PM 1    A.   YES, A WELLNESS CENTER, YEP, RIGHT.

12:30PM 2    Q.   AND WERE YOU INVOLVED AT ALL IN SETTING UP THOSE LOCATIONS

12:30PM 3    AND HELPING TO GET THEM OPERATIONAL?

12:30PM 4    A.   YES.

12:30PM 5    Q.   AT THE WALGREENS LOCATIONS, WHO WERE THE STAFF MEMBERS

12:30PM 6    THAT THERANOS PATIENTS WOULD ACTUALLY INTERACT WITH?

12:30PM 7    A.   PATIENTS INTERACTED WITH WALGREENS TECHNICIANS, AND ALSO

12:30PM 8    PHLEBOTOMISTS IN THE STORES.

12:30PM 9    Q.   AND AS TO THE TECHNICIANS AND PHLEBOTOMISTS, WERE THEY

12:31PM 10   BOTH WALGREENS EMPLOYEES OR WERE THEY THERANOS EMPLOYEES?

12:31PM 11        DO YOU RECALL?

12:31PM 12   A.   I BELIEVE INITIALLY THEY WERE WALGREENS EMPLOYEES, BUT

12:31PM 13   THERANOS EMPLOYEES WERE ALSO IN THAT ROLE.

12:31PM 14   Q.   AS TO THE INDIVIDUALS WHO WERE WORKING AT THE WALGREENS

12:31PM 15   WHO INTERACTED WITH PATIENTS, WAS THERANOS INVOLVED IN TRAINING

12:31PM 16   THOSE INDIVIDUALS?

12:31PM 17   A.   YES.

12:31PM 18   Q.   AND WERE YOU INVOLVED SPECIFICALLY IN THAT TRAINING?

12:31PM 19   A.   YES.

12:31PM 20   Q.   WHAT DO YOU RECALL ABOUT THAT TRAINING PROGRAM?

12:31PM 21   A.   I RECALL THAT THERE WERE MEETINGS WITH SEVERAL OF THE

12:31PM 22   WALGREENS TECHNICIANS WHERE, YOU KNOW, A CERTAIN PREDETERMINED

12:31PM 23   TRAINING PROGRAM WAS DEVELOPED, AND IN ONE MEETING I AND THE

12:31PM 24   OTHER PRODUCT MANAGERS GAVE A TRAINING, BUT THERE WAS A TRAIN

12:32PM 25   THE TRAINER TYPE OF MODEL.

12:32PM   1        SO THE IDEA WAS ONCE YOU TRAIN WALGREENS PHARMACISTS OR

12:32PM   2    TECHNICIANS, THEY WOULD THEN BE ABLE TO TRAIN THEIR COLLEAGUES.

12:32PM   3    Q.   AND BESIDES YOU AT THERANOS, WHO ELSE DO YOU RECALL BEING

12:32PM   4    INVOLVED IN KIND OF HELPING CREATE AND IMPLEMENT THAT TRAINING

12:32PM   5    PROGRAM?

12:32PM   6    A.   OTHER MEMBERS OF THE PRODUCT MANAGEMENT TEAM THAT WE

12:32PM   7    DISCUSSED.

12:32PM   8    Q.   THE OTHER INDIVIDUALS THAT YOU HAD GONE TO COLLEGE WITH?

12:32PM   9    A.   RIGHT.

12:32PM   10   Q.   DURING YOUR TIME AT THE COMPANY, WERE THERE SOME PROJECTS

12:32PM   11   THAT YOU WORKED ON THAT YOU HANDLED BY YOURSELF AND WERE THERE

12:32PM   12   OTHER PROJECTS THAT INVOLVED APPROVAL OR REQUIRED APPROVAL FROM

12:32PM   13   MS. HOLMES?

12:32PM   14   A.   YES.

12:32PM   15        AND I WOULD -- I WOULD ADD IN YOUR PRIOR QUESTION, THERE

12:32PM   16   WERE ALSO OTHER MEMBERS WITHIN, WITHIN THE COMPANY THAT WE

12:32PM   17   WORKED WITH TO DEVELOP THAT, TRAINING INCLUDING CONSUMABLES

12:33PM   18   ENGINEERS AND SOME OF THE OTHER ENGINEERS WITHIN THE COMPANY.

12:33PM   19   Q.   AND AS TO THAT TRAINING PROGRAM, DID THAT TRAINING PROGRAM

12:33PM   20   RISE TO THE LEVEL WHERE THE CEO, MS. HOLMES, WOULD HAVE BEEN

12:33PM   21   INVOLVED IN APPROVING ASPECTS OF IT?

12:33PM   22   A.   YES.

12:33PM   23   Q.   DID THAT TRAINING INCLUDE CONVEYING TO THE STAFF AT

12:33PM   24   WALGREENS SOME OF THE BENEFITS OR POSITIVE ATTRIBUTES OF THE

12:33PM   25   THERANOS TECHNOLOGY?

12:33PM   1    A.   I'M NOT SURE IF IT SPECIFICALLY MENTIONED THE TECHNOLOGY

12:33PM   2    ITSELF, BUT I DO REMEMBER THAT AS PART OF THE TRAINING THERE

12:33PM   3    WAS CONTENT RELATED TO IMPROVING ACCESSIBILITY AND

12:33PM   4    AFFORDABILITY FOR PATIENTS TO GET LAB TESTS DONE, AND THAT

12:33PM   5    THERANOS WAS AN INNOVATIVE SILICON VALLEY TECHNOLOGY COMPANY.

12:34PM   6    Q.   AND THAT POSITIVE INFORMATION ABOUT THE THERANOS SERVICE,

12:34PM   7    WHAT WAS THE PURPOSE OF INCLUDING THAT IN THE TRAINING PROGRAM,

12:34PM   8    IF YOU RECALL?

12:34PM   9    A.   THE PURPOSE WAS TO MAKE SURE THAT THE -- IT WAS TO HELP

12:34PM   10   THE WALGREENS TECHNICIANS GET EXCITED AND BUY INTO THE

12:34PM   11   TECHNOLOGY AND THE NEW LAB OFFERING AND CREATE SOME EXCITEMENT

12:34PM   12   BEHIND THIS NEW SERVICE THAT WAS BEING OFFERED.

12:34PM   13   Q.   AND IN DOING THAT, DID THE COMPANY ALSO HOPE TO CREATE

12:34PM   14   EXCITEMENT IN THE PATIENTS AND CUSTOMERS WHO WERE COMING INTO

12:34PM   15   THE WALGREENS LOCATIONS?

12:34PM   16   A.   CAN YOU REPEAT THE QUESTION?  SORRY.

12:34PM   17   Q.   SURE.  IN PROVIDING THAT POSITIVE INFORMATION TO THE

12:34PM   18   WALGREENS STAFF, WAS IT ALSO HOPED THAT THAT WOULD RESULT IN

12:34PM   19   BUILDING EXCITEMENT FOR THE WALGREENS CUSTOMERS WHO INTERACTED

12:34PM   20   WITH THE STAFF?

12:35PM   21   A.   I THINK THE INTENT WAS TO MAKE SURE THAT THOSE

12:35PM   22   INTERACTIONS WERE POSITIVE.

12:35PM   23        AND I WOULDN'T NECESSARILY SAY TO INCREASE THEIR

12:35PM   24   EXCITEMENT, BUT TO MAKE SURE THAT THOSE INTERACTIONS, YOU KNOW,

12:35PM   25   WERE POSITIVE FOR THE CUSTOMER EXPERIENCE.

12:35PM  1    Q.   AS PART OF YOUR ROLE AT THE COMPANY, DID YOU SOMETIMES

12:35PM  2    HANDLE TOURS OF THE THERANOS FACILITY?

12:35PM  3    A.   YES.

12:35PM  4    Q.   AND WHAT THERANOS FACILITIES DID YOU HANDLE TOURS FOR?

12:35PM  5    A.   I WAS ASKED TO, ON OCCASION, GIVE TOURS OF THE THERANOS --

12:35PM  6    I BELIEVE IT WAS THE 1701 FACILITY, AND -- YEAH, THAT'S WHAT I

12:35PM  7    CAN RECALL.

12:35PM  8         AND IN THOSE TOURS I WOULD WALK WITH GUESTS AROUND THE

12:36PM  9    BUILDING, WE WOULD LOOK AT SOME OF THE EMPLOYEE WORK SPACE,

12:36PM  10   OFTENTIMES THE R&D LAB, AND THAT WAS THE EXTENT.

12:36PM  11   Q.   AND WAS 1701, WAS THAT THE ADDRESS OF THE THERANOS

12:36PM  12   HEADQUARTERS?

12:36PM  13   A.   THAT WAS THE ADDRESS OF THE THERANOS HEADQUARTERS, RIGHT.

12:36PM  14   Q.   AND WHO WERE THE INDIVIDUALS RECEIVING THESE TOURS

12:36PM  15   GENERALLY SPEAKING?

12:36PM  16   A.   GENERALLY IT WAS A MIX OF INDIVIDUALS.

12:36PM  17        SOMETIMES IT WAS POTENTIAL BUSINESS PARTNERS AND VISITORS.

12:36PM  18   ESSENTIALLY ANY VISITOR WHO ASKED AND ELIZABETH GAVE PERMISSION

12:36PM  19   TO GIVE A TOUR, THAT WOULD BE THE POTENTIAL.

12:36PM  20   Q.   WHAT KIND OF PERMISSION OR APPROVAL WAS REQUIRED FOR

12:36PM  21   SOMEONE TO BE GRANTED A TOUR OF THE THERANOS HEADQUARTERS?

12:36PM  22   A.   APPROVAL FROM ELIZABETH AND/OR SUNNY.

12:36PM  23   Q.   YOU MENTIONED SOME AREAS THAT YOU RECALL GIVING TOURS OF.

12:37PM  24        DO YOU RECALL EVER GIVING ANYONE A TOUR OF THE THERANOS

12:37PM  25   CLINICAL LAB DURING ANY OF THOSE VISITS?

12:37PM    1    A.    NO.

12:37PM    2    Q.    AND ONCE SOMEONE WAS ALLOWED TO DO A TOUR, WHOSE DECISION

12:37PM    3    WAS IT, KIND OF WHAT AREAS OF THE FACILITY THAT THEY WERE

12:37PM    4    ALLOWED TO SEE?

12:37PM    5    A.    IT WAS ELIZABETH'S DECISION, AND I RECALL THAT WE HAD

12:37PM    6    DISCUSSED WHAT A POTENTIAL TOUR WOULD LOOK LIKE, AND THEN -- SO

12:37PM    7    WE ESTABLISHED WHAT THAT WOULD BE, AND THEN FOR FUTURE TOURS I

12:37PM    8    WOULD JUST FOLLOW THAT DIRECTION.

12:37PM    9    Q.    WERE THERE ANY OCCASIONS WHERE, IN ADVANCE OF TOURS, YOU

12:37PM    10   WERE ASKED TO MAKE CHANGES TO ANY AREAS OF THE FACILITY AT

12:37PM    11   THERANOS?

12:37PM    12   A.    YES.

12:37PM    13   Q.    WHAT DO YOU RECALL ABOUT THAT?

12:37PM    14   A.    I RECALL THAT IN ADVANCE OF A TOUR THERE WOULD BE CERTAIN

12:38PM    15   AREAS OF SOME OF THE LABS THAT WERE HIDDEN BY A PARTITION,

12:38PM    16   OFTENTIMES AREAS WHERE THERE WERE THERANOS DEVICES TO MAKE SURE

12:38PM    17   THAT WHOEVER WAS ON THE TOUR COULDN'T SEE THEM.

12:38PM    18   Q.    AND DO YOU REMEMBER THAT HAPPENING MORE THAN ONCE?

12:38PM    19   A.    YES.

12:38PM    20   Q.    HOW ABOUT SITUATIONS WHERE SOMETHING MIGHT BE ADDED TO ANY

12:38PM    21   OF THE FACILITIES AT THERANOS?  DO YOU RECALL EVER INSTALLING

12:38PM    22   OR SETTING UP DEVICES IN ADVANCE OF A TOUR?

12:38PM    23   A.    YES.

12:38PM    24   Q.    AND WHAT DO YOU REMEMBER ABOUT THAT?

12:38PM    25   A.    WELL, FOR, FOR TECHNOLOGY DEMONSTRATIONS, THERE WOULD

12:38PM  1    TYPICALLY BE A ROOM SET UP WITH THERANOS DEVICES, AND THAT WAS

12:38PM  2    KIND OF STANDARD OPERATING PROCEDURE FOR MOST VISITORS.

12:38PM  3         AND I DO RECALL ANOTHER INSTANCE IN WHICH, IN ONE OF THE

12:39PM  4    ROOMS ADJACENT TO THE CLINICAL LAB, ELIZABETH ASKED THAT I WORK

12:39PM  5    WITH DANIEL YOUNG, WHO WAS A SCIENTIST AT THERANOS, TO SET UP A

12:39PM  6    NUMBER OF THE MINILAB TOWER VERSION, SO THAT WAS THE MINILAB

12:39PM  7    THAT HAD COMPONENTS STACKED UPON ONE ANOTHER.

12:39PM  8         AND I SET THOSE UP IN ONE OF THE ROOMS ADJACENT TO THE

12:39PM  9    CLINICAL LAB ON ONE OCCASION.

12:39PM  10   Q.   AND WAS THAT OCCASION IN ADVANCE OF ONE OF THESE VIP

12:39PM  11   VISITS THAT WE'VE BEEN TALKING ABOUT?

12:39PM  12   A.   YES.

12:39PM  13   Q.   AND DO YOU RECALL APPROXIMATELY WHEN THAT WAS?

12:39PM  14   A.   I BELIEVE THAT THAT WAS AROUND THE SUMMER TIME OF 2013.

12:39PM  15   Q.   CAN YOU TELL US MORE ABOUT WHAT THAT ROOM LOOKED LIKE?

12:39PM  16   WHAT WAS THE DIRECTION FROM MS. HOLMES ABOUT WHAT WAS TO BE

12:39PM  17   THERE AND HOW TO SET IT UP?

12:39PM  18   A.   I DON'T RECALL WHAT -- IF THERE WAS ANYTHING IN THAT ROOM

12:40PM  19   BEFOREHAND.

12:40PM  20        ELIZABETH ASKED THAT I SET UP ABOUT 10 TO 15 OF THE

12:40PM  21   MINILAB DEVICES IN THAT ROOM KIND OF NEXT TO EACH OTHER AGAINST

12:40PM  22   THE WALL.

12:40PM  23        ALL OF THE DEVICES HAD -- YOU KNOW, OPERATED THE SAME,

12:40PM  24   TOUCHSCREEN AND KIND OF A SCREEN ON THE DEVICE.

12:40PM  25        ONE OF THEM COULD ALSO ACCEPT A CARTRIDGE IF NEEDED.

12:40PM   1        SO I THINK A DAY BEFORE THE MEETING I WORKED WITH DANIEL

12:40PM   2    TO SET THOSE DEVICES UP.

12:40PM   3        THE MEETING AND TOUR HAPPENED, AND THEN ABOUT A DAY OR TWO

12:40PM   4    LATER I ASKED ELIZABETH IF THOSE DEVICES SHOULD REMAIN IN THERE

12:40PM   5    AND SHE SAID NO, SO I WORKED WITH DANIEL TO GET THOSE REMOVED.

12:40PM   6    Q.   A FEW QUESTIONS ABOUT THAT.

12:40PM   7        FIRST OF ALL, IN THE 2013 TIME PERIOD, DO YOU KNOW WHETHER

12:40PM   8    THE MINILAB ANALYZER WAS BEING USED BY THERANOS TO RUN ANY

12:41PM   9    CLINICAL PATIENT TESTING?

12:41PM  10    A.   MY UNDERSTANDING IS THAT IT WASN'T -- AND THIS WAS PART OF

12:41PM  11    WHAT I LEARNED IN, YOU KNOW, IN 2016 -- WAS THAT NONE OF THE

12:41PM  12    MINILABS HAD BEEN USED FOR CLINICAL PATIENT TESTING.

12:41PM  13    Q.   OF THE DEVICES THAT MS. HOLMES ASKED YOU TO PLACE IN THAT

12:41PM  14    ROOM ON OCCASION, WERE ALL OF THEM CAPABLE OF ACCEPTING A

12:41PM  15    CARTRIDGE TO RUN A SAMPLE?

12:41PM  16    A.   I AM NOT SURE.  I ONLY REMEMBER MAKING SURE THAT ONE OF

12:41PM  17    THE DEVICES COULD.

12:41PM  18    Q.   AND WAS THAT THE INSTRUCTION FROM MS. HOLMES, THAT AT

12:41PM  19    LEAST ONE OF THEM NEEDED TO BE CAPABLE OF THAT?

12:41PM  20    A.   YES.

12:41PM  21    Q.   AND WERE THE DEVICES THERE FOR STORAGE?  IN OTHER WORDS,

12:41PM  22    WERE THEY JUST SITTING THERE UNPLUGGED, OR WERE THEY POWERED

12:41PM  23    ON?

12:41PM  24    A.   THEY WERE POWERED ON.

12:41PM  25    Q.   THE MEETING THAT MS. HOLMES ASKED YOU TO DO THAT IN

12:42PM  1    ADVANCE OF, WERE YOU PART OF THAT MEETING?

12:42PM  2    A.   THERE WERE SEVERAL PARTS OF THAT MEETING, AND I WAS A PART

12:42PM  3    OF SOME OF THEM, BUT NOT ALL OF THEM.

12:42PM  4    Q.   HOW ABOUT THE PART OF THE MEETING, IF THERE WAS ONE, WHERE

12:42PM  5    INDIVIDUALS WERE SHOWN THE ROOM THAT YOU SET UP?  DID YOU EVER

12:42PM  6    SEE INDIVIDUALS OBSERVE THAT ROOM?

12:42PM  7    A.   NO.

12:42PM  8    Q.   DO YOU RECALL WHETHER, FROM THAT ROOM THAT HELD THOSE

12:42PM  9    DEVICES, ANY OTHER PORTIONS OF THE CLINICAL LAB COULD BE SEEN?

12:42PM  10   A.   I DON'T KNOW IF THEY COULD OR NOT.

12:42PM  11   Q.   A FEW MINUTES AGO YOU TALKED ABOUT TECHNOLOGY

12:42PM  12   DEMONSTRATIONS OF THE THERANOS TECHNOLOGY; IS THAT RIGHT?

12:42PM  13   A.   RIGHT.

12:42PM  14   Q.   AND HOW DID THOSE DEMONSTRATIONS WORK?

12:42PM  15   A.   SO TYPICALLY I WOULD BE NOTIFIED THAT A GUEST WAS VISITING

12:43PM  16   THERANOS, EITHER BY -- I LEARNED THAT THROUGH MULTIPLE WAYS,

12:43PM  17   EITHER FROM ELIZABETH OR FROM HER ASSISTANTS, OR FROM SUNNY OR

12:43PM  18   HIS ASSISTANTS, AND MY ROLE WAS TO COORDINATE THE DIFFERENT

12:43PM  19   PERSONNEL WITHIN THE COMPANY, AND THERE WOULD BE A NUMBER OF

12:43PM  20   DIFFERENT GROUPS THAT WOULD CONTRIBUTE TO THAT PROCESS.

12:43PM  21        FIRST, THERE WOULD BE ENGINEERS WHO WOULD PREPARE THE

12:43PM  22   DEVICE AND CERTAIN CARTRIDGES, AND THEY WOULD SET UP A NUMBER

12:43PM  23   OF DEVICES IN A ROOM.  SO THEY -- I WOULD NOTIFY THEM.  THEY

12:43PM  24   WOULD MAKE SURE THAT EVERYTHING WAS IN THE ROOM.

12:43PM  25        I WOULD ALSO NOTIFY SOME OF THE LAB PERSONNEL AND

12:43PM 1    ENGINEERS THAT A DEMO COULD HAPPEN, A DEMONSTRATION COULD

12:43PM 2    HAPPEN, SO THAT IF A SAMPLE WAS COLLECTED AND THEY NEEDED TO

12:43PM 3    PROCESS THE SAMPLE, THAT THEY WOULD BE READY TO DO THAT AT A

12:44PM 4    MOMENT'S NOTICE.

12:44PM 5        THERE WERE ALSO PHLEBOTOMISTS WHO WOULD COLLECT THE ACTUAL

12:44PM 6    SAMPLE.  SO THEY WERE ALSO ON NOTICE THAT ONE OF THESE

12:44PM 7    TECHNOLOGY DEMONSTRATIONS COULD HAPPEN.

12:44PM 8        ONCE -- IF IT CAME TO THAT POINT IN TIME IN A MEETING TO

12:44PM 9    ACTUALLY DO THE DEMONSTRATION, I WOULD LET THE FOLKS KNOW THAT

12:44PM 10   IT WAS HAPPENING AND ENSURE THAT LAB PERSONNEL WERE AVAILABLE

12:44PM 11   TO EITHER RECEIVE A SAMPLE IF THE INTENT WAS TO TEST THE SAMPLE

12:44PM 12   IN THE LAB.

12:44PM 13       OTHER TIMES THE SAMPLE WAS JUST TESTED ON THE DEVICE

12:44PM 14   ITSELF IN THAT MOMENT.

12:44PM 15       THEN THE LAB PERSONNEL PROCESSED THE SAMPLE, AND THEN

12:44PM 16   OFTEN DANIEL YOUNG WOULD REVIEW THE FINAL TEST RESULTS AND

12:45PM 17   PROVIDE ANY EDITS OR COMMENTARY THAT WAS NEEDED.

12:45PM 18   Q.   AND AGAIN, WHO WAS THE BENEFICIARY OF THESE TECHNOLOGY

12:45PM 19   DEMONSTRATIONS?  WHO WAS THE AUDIENCE FOR THEM?

12:45PM 20   A.   IT WAS A RANGE OF DIFFERENT TYPES OF VISITORS, BUT

12:45PM 21   POTENTIAL BUSINESS PARTNERS, INVESTORS ON OCCASION, SOME BOARD

12:45PM 22   MEMBERS DID THIS, AND THEN JUST OTHER UNAFFILIATED, I WOULD

12:45PM 23   SAY, GUESTS, VIP'S.

12:45PM 24   Q.   AND WAS IT PART OF YOUR JOB TO COORDINATE THE PLACEMENT OF

12:45PM 25   DEVICES IN THE ACTUAL REFERENCE ROOMS WHERE THE MEETINGS WITH

12:45PM  1      THESE VIP'S WOULD BE HELD?

12:45PM  2      A.   YES.

12:45PM  3      Q.   AND GENERALLY SPEAKING, WHAT KINDS OF DEVICES WOULD YOU BE

12:45PM  4      ASKED TO PLACE IN THOSE CONFERENCE ROOMS?

12:45PM  5      A.   THE EDISON, THE EDISON VERSIONS AND THE MINILAB VERSIONS.

12:46PM  6      Q.   THE THERANOS MANUFACTURED ANALYZERS?

12:46PM  7      A.   THE THERANOS ANALYZERS, RIGHT.

12:46PM  8           MR. BOSTIC:  MAY I APPROACH, YOUR HONOR?

12:46PM  9           THE COURT:  YES.

12:46PM  10     BY MR. BOSTIC:

12:46PM  11     Q.   MR. EDLIN, I'VE HANDED YOU A BINDER OF DOCUMENTS.  IF I

12:46PM  12     COULD ASK YOU TO START BY TURNING TO TAB 959, PLEASE.

12:46PM  13          THE COURT:  WHILE HE DOES THAT, ANTHONY, CAN I SEE

12:46PM  14     YOU FOR JUST A SECOND?

12:46PM  15     BY MR. BOSTIC:

12:46PM  16     Q.   MR. EDLIN, JUST TAKE A MOMENT TO REVIEW EXHIBIT 959.

12:47PM  17          (DISCUSSION OFF THE RECORD.)

12:47PM  18          THE COURT:  THANK YOU, ANTHONY.

12:47PM  19     BY MR. BOSTIC:

12:47PM  20     Q.   MR. EDLIN, HAVE YOU HAD A MOMENT TO REVIEW EXHIBIT 959?

12:47PM  21     A.   YES.

12:47PM  22     Q.   AND ARE YOU LOOKING AT AN EMAIL CHAIN FROM AUGUST OF 2013

12:47PM  23     INVOLVING YOU AND OTHER INDIVIDUALS AT THERANOS?

12:47PM  24     A.   YES.

12:47PM  25     Q.   AND WITHOUT GETTING INTO THE CONTENT, WHAT IS THE GENERAL

12:47PM   1    SUBJECT MATTER OF THIS EMAIL?

12:47PM   2    A.   THE SUBJECT MATTER IS A TECHNOLOGY DEMONSTRATION.

12:47PM   3    Q.   WERE EMAILS USED FOR THE ROUTINE COORDINATION OF THESE

12:47PM   4    TECHNOLOGY DEMONSTRATIONS?

12:47PM   5    A.   THAT WAS THE PRIMARY METHOD THAT THESE WERE COORDINATED,

12:47PM   6    YES.

12:47PM   7    Q.   AND WAS THAT THE MECHANISM BY WHICH THE DIFFERENT

12:47PM   8    INDIVIDUALS INVOLVED IN THE DEMONSTRATION KNEW WHERE THINGS

12:48PM   9    STOOD STATUS-WISE AND WHAT THE NEXT STEPS WERE GOING TO BE?

12:48PM   10   A.   YES.

12:48PM   11   Q.   AND DID THE EMAILS THEN SERVE AS A RECORD OF THE PROCESS

12:48PM   12   FOR CONDUCTING THESE DEMONSTRATIONS AS PART OF THERANOS'S

12:48PM   13   BUSINESS?

12:48PM   14   A.   I THINK GENERALLY, YES.  THERE WERE, I'M SURE, OTHER

12:48PM   15   INSTANCES WHERE THERE WERE, YOU KNOW, VERBAL CONVERSATIONS AS

12:48PM   16   WELL.

12:48PM   17        MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT MOVES TO

12:48PM   18   ADMIT EXHIBIT 959.

12:48PM   19        MR. DOWNEY:  NO OBJECTION.

12:48PM   20        THE COURT:  IT'S ADMITTED, AND IT MAY BE SHOWN TO

12:48PM   21   THE JURY.

12:48PM   22        (GOVERNMENT'S EXHIBIT 959 WAS RECEIVED IN EVIDENCE.)

12:48PM   23        MR. BOSTIC:  MS. HOLLIMAN, IF WE CAN PROJECT THAT

12:48PM   24   AND START WITH PAGE 2.  AND IF WE CAN ZOOM IN ON THE TOP HALF

12:48PM   25   OF THE PAGE.

12:48PM 1    Q.    MR. EDLIN, DO YOU SEE AN EMAIL FROM YOU ON AUGUST 8TH,

12:48PM 2    2013?

12:48PM 3    A.    YES.

12:48PM 4    Q.    YOU EMAIL A GROUP OF INDIVIDUALS.  ARE THOSE OTHER

12:49PM 5    EMPLOYEES AT THERANOS?

12:49PM 6    A.    YES.

12:49PM 7    Q.    YOU SAY, "GENTLEMEN.

12:49PM 8          "FOR THE EXECUTIVE MEETING ON 8/13, WE'LL NEED TO HAVE A

12:49PM 9    4S AND MINILAB SET UP IN INTERVIEW ROOM NUMBER 1."

12:49PM 10         DO YOU SEE THAT?

12:49PM 11   A.    YES.

12:49PM 12   Q.    WAS THIS IN CONNECTION WITH AN UPCOMING TECHNOLOGY

12:49PM 13   DEMONSTRATION?

12:49PM 14   A.    YES.

12:49PM 15   Q.    AND YOU GO ON TO SAY, "PLAN A IS TO HAVE BOTH ABLE TO RUN

12:49PM 16   NULL PROTOCOLS."

12:49PM 17         DO YOU SEE THAT?

12:49PM 18   A.    YES.

12:49PM 19   Q.    AND IT SAYS, "PLAN B IS TO HAVE THE 4S ABLE TO RUN A CBC,

12:49PM 20   IF POSSIBLE."

12:49PM 21         DO YOU SEE THAT?

12:49PM 22   A.    YES.

12:49PM 23   Q.    AND DOES CBC STAND FOR COMPLETE BLOOD COUNT?

12:49PM 24   A.    YES.

12:49PM 25   Q.    AND WHAT WAS THE NULL PROTOCOL AT THERANOS?

12:49PM   1    A.   SO THE DEVICES RAN A NUMBER OF DIFFERENT PROTOCOLS BASED

12:49PM   2    ON A CARTRIDGE, AND A PROTOCOL IS ESSENTIALLY INSTRUCTIONS ON

12:49PM   3    THE PROCESSES THAT A DEVICE UNDERGOES.

12:50PM   4         A NULL PROTOCOL WAS ESSENTIALLY AN EMPTY PROTOCOL.

12:50PM   5         IF, LET'S SAY, NO CARTRIDGE WAS INSERTED INTO A DEVICE OR

12:50PM   6    IF A CARTRIDGE WAS INSERTED INTO A DEVICE WITHOUT A BLOOD

12:50PM   7    SAMPLE, BOTH OF THOSE CASES A TEST WASN'T INTENDED TO BE RUN,

12:50PM   8    THEN THE NULL PROTOCOL WOULD ACTIVATE.

12:50PM   9    Q.   AND WHAT WOULD IT DO THEN IF IT WASN'T RUNNING A SAMPLE?

12:50PM  10    A.   IF IT WASN'T RUNNING A SAMPLE, I'M NOT SURE EXACTLY WHAT

12:50PM  11    IT WOULD DO.

12:50PM  12    Q.   IF A SAMPLE WAS PUT INTO THE DEVICE THAT WAS SET TO RUN

12:50PM  13    THE NULL PROTOCOL, WOULD IT ACTUALLY CONDUCT THE SAMPLE AND --

12:50PM  14    I'M SORRY, LET ME START AGAIN.

12:50PM  15         IF A BLOOD SAMPLE WAS PUT INTO A DEVICE THAT WAS SET TO

12:50PM  16    RUN THE NULL PROTOCOL, WOULD THE DEVICE ACTUALLY ANALYZE THE

12:50PM  17    BLOOD?

12:50PM  18    A.   I DON'T BELIEVE SO.

12:50PM  19    Q.   THIS EMAIL SAYS "PLAN A IS TO HAVE BOTH DEVICES ABLE TO

12:51PM  20    RUN NULL PROTOCOLS.

12:51PM  21         "PLAN B IS TO HAVE THE 4S ABLE TO RUN A CBC, IF POSSIBLE."

12:51PM  22         DO YOU SEE THAT?

12:51PM  23    A.   YES.

12:51PM  24    Q.   AND WHY WAS THERE THE NEED FOR ALTERNATIVE PLANS HERE AND

12:51PM  25    WHY DOES IT SAY THAT THE 4S MIGHT BE ABLE TO RUN A CBC, IF

12:51PM   1   POSSIBLE?

12:51PM   2   A.   AT THIS TIME ENGINEERING TEAMS WERE -- I THINK IT WAS

12:51PM   3   UNSURE WHETHER OR NOT THE DEVICE WAS CAPABLE OF RUNNING THE

12:51PM   4   CBC.

12:51PM   5        SO IF IT WAS CAPABLE, THEN IT WOULD RUN THAT.  THAT'S WHY

12:51PM   6   IT SAYS "IF POSSIBLE."

12:51PM   7        IF NOT, THEN THE DEVICE WOULD NOT RUN THE CBC.

12:51PM   8   Q.   CONTINUING IN YOUR EMAIL.

12:51PM   9        YOU SAY, "MOST LIKELY WE WILL COLLECT A NUMBER OF SAMPLES

12:51PM   10  AND STORE THEM IN THE SHIPPING CONTAINER LIKE THE LAST MEETING

12:52PM   11  WE HAD, AND THEN PROCESS THEM SEPARATELY IN THE LAB."

12:52PM   12       IS THAT RIGHT?

12:52PM   13  A.   RIGHT.

12:52PM   14  Q.   IN THIS CASE, WHERE WOULD THE ACTUAL ANALYSIS HAPPEN?  WAS

12:52PM   15  THE SAMPLE BEING TESTED IN THE CONFERENCE ROOM?

12:52PM   16  A.   IN, IN THAT SCENARIO.

12:52PM   17       SO THE SCENARIO IN WHICH A NUMBER OF SAMPLES WERE STORED

12:52PM   18  IN A SHIPPING CONTAINER AND THEN PROCESSED SEPARATELY IN THE

12:52PM   19  LAB, THAT -- IN THAT SCENARIO, THE SAMPLES WOULD BE PROCESSED

12:52PM   20  IN THE LAB AS OPPOSED TO IN THE CONFERENCE ROOM ITSELF.

12:52PM   21  Q.   LET'S LOOK AT -- CONTINUING IN THIS EMAIL CHAIN, GO TO

12:52PM   22  PAGE 1 AND ZOOM IN ON THE BOTTOM HALF.

12:52PM   23       ON THE BOTTOM OF YOUR SCREEN THERE, DO YOU SEE AN EMAIL

12:52PM   24  FROM MICHAEL CRAIG?

12:52PM   25  A.   YES.

12:52PM   1    Q.   AND WHO WAS MICHAEL CRAIG AT THERANOS?

12:53PM   2    A.   MICHAEL WAS A SOFTWARE DEVELOPER, I BELIEVE.

12:53PM   3    Q.   HE RESPONDS TO THIS EMAIL THREAD TO SAY, "I WOULD

12:53PM   4    RECOMMEND THE DEMO APP, ALTHOUGH EITHER WOULD WORK.  THE DEMO

12:53PM   5    APP MERELY SHIELDS PROTOCOL FAILURES FROM THE CLIENT."

12:53PM   6         DO YOU SEE THAT?

12:53PM   7    A.   YES.

12:53PM   8    Q.   AND WHAT IS YOUR UNDERSTANDING OF WHAT THAT MEANT?

12:53PM   9    A.   MY UNDERSTANDING IS THAT THE DEMO APP WOULD BE USED IN

12:53PM   10   TECHNOLOGY DEMONSTRATIONS AND IF, DURING THE PROCESSING, AN

12:53PM   11   ERROR OCCURRED, THIS APP WOULD NOT SAY ON THE SCREEN, IT WOULD

12:53PM   12   NOT EXPRESS THAT AN ERROR HAD TAKEN PLACE.

12:53PM   13        I THINK IT WOULD SAY, YOU KNOW, RUNNING OR PROCESSING OR

12:53PM   14   INITIALIZING.

12:53PM   15   Q.   SO EVEN IN THE INDICATION OF AN ERROR THAT PREVENTED THE

12:53PM   16   MACHINE FROM RETURNING A RESULT, IT WOULD APPEAR TO BE STILL

12:53PM   17   WORKING ON THE RESULT.

12:53PM   18        IS THAT A FAIR DESCRIPTION?

12:54PM   19   A.   RIGHT.  AND, AND REGARDLESS OF WHAT WAS HAPPENING WITH THE

12:54PM   20   DEVICE, FOR EXAMPLE, IF NO CARTRIDGE WAS INSERTED OR IF A

12:54PM   21   CARTRIDGE WAS INSERTED, THE DEVICE WOULD EFFECTIVELY SHOW A

12:54PM   22   SIMILAR STATUS ON THE SCREEN.

12:54PM   23   Q.   OKAY.  YOU RESPOND TO THAT EMAIL AND YOU SAY, "NEVER A BAD

12:54PM   24   THING.  LET'S GO WITH DEMO, THANKS."

12:54PM   25        DO YOU SEE THAT?

EDLIN DIRECT BY MR. BOSTIC

12:54PM 1   A.   YES.

12:54PM 2   Q.   AND WHY DID YOU THINK THE DEMO APP WOULD BE THE BEST

12:54PM 3   CHOICE FOR THIS PARTICULAR DEMONSTRATION?

12:54PM 4   A.   WELL, MICHAEL RECOMMENDED TO ME THAT THAT APP SHOULD BE

12:54PM 5   USED AND I TRUSTED HIS RECOMMENDATION HERE.  AND THAT'S THE

12:54PM 6   MAIN REASON WHY I AGREED THAT THAT SHOULD BE USED.

12:54PM 7   Q.   IN THE NEXT EMAIL DANIEL YOUNG WRITES TO THE GROUP TO SAY,

12:54PM 8   "WE HAVE RE-ALLOCATED THE 4S DEVICES, SO THEY ARE NOT AVAILABLE

12:55PM 9   FOR PREPARING TO RUN CBC FOR THIS DEMO, UNFORTUNATELY."

12:55PM 10      DO YOU SEE THAT?

12:55PM 11  A.   (NODS HEAD UP AND DOWN.)

12:55PM 12  Q.   I'M SORRY.  WE JUST NEED AN AUDIBLE ANSWER FOR THE COURT

12:55PM 13  REPORTER.

12:55PM 14  A.   YES.

12:55PM 15  Q.   DOES THAT MEAN THAT ACTUALLY HAVING THE DEVICE RUN THE

12:55PM 16  TEST IN THE ROOM WOULD NO LONGER BE AN OPTION?

12:55PM 17  A.   YES.

12:55PM 18  Q.   LET'S ZOOM IN ON THE TOP HALF OF THIS PAGE, PLEASE.

12:55PM 19      OKAY.  MR. EDLIN, DO YOU SEE THAT YOU THEN RESPOND AND ASK

12:55PM 20  WHEN THE 4S AND MINILAB WERE SCHEDULED TO BE MOVED TO THE

12:55PM 21  INTERVIEW ROOM?

12:55PM 22  A.   YES.

12:55PM 23  Q.   AND THE ANSWER FROM SUMARTHA ANEKAL IS THAT THE ASSAY

12:56PM 24  TEAMS ARE PLANNING ON USING THE 3.5 DEVICES TOMORROW.

12:56PM 25      DO YOU SEE THAT?

EDLIN DIRECT BY MR. BOSTIC

12:56PM 1    A.   YES.

12:56PM 2    Q.   AND SAMARTHA ANEKAL SAYS, "I WILL HAVE A BETTER IDEA AFTER

12:56PM 3    LOOKING AT THE TSH DATA FROM TODAY IF WE CAN RUN THE TSH

12:56PM 4    ASSAY."

12:56PM 5         DO YOU HAVE AN UNDERSTANDING OF WHAT THAT WAS REFERRING

12:56PM 6    TO?

12:56PM 7    A.   NO.

12:56PM 8    Q.   THE DATE OF THIS EMAIL IS AUGUST 13TH, 2013.

12:56PM 9         DO YOU SEE THAT?

12:56PM 10   A.   YES.

12:56PM 11   Q.   AND WAS THIS A MONTH OR LESS UNTIL THERANOS BEGAN OFFERING

12:56PM 12   TESTING SERVICES?

12:56PM 13   A.   YES.

12:56PM 14   Q.   I'LL ASK YOU TO TURN TO --

12:56PM 15        ACTUALLY, YOUR HONOR, IF THE COURT WANTED TO BREAK AT

12:56PM 16   1:00, I'M ABOUT TO SWITCH TO A DIFFERENT EXHIBIT.

12:56PM 17             THE COURT:  MAYBE -- AND IT SOUNDS LIKE IT WILL TAKE

12:56PM 18   LONGER THAN THE TIME WE HAVE LEFT?

12:56PM 19             MR. BOSTIC:  I BELIEVE SO, YOUR HONOR.

12:56PM 20             THE COURT:  THANK YOU.  I APPRECIATE THAT.  WE'LL

12:57PM 21   CREATE SOME EFFICIENCIES HERE.

12:57PM 22        LADIES AND GENTLEMEN, WE'LL BREAK THEN FOR THE WEEKEND.

12:57PM 23   PLEASE RECALL THE ADMONITION THAT I'LL GIVE YOU ONCE AGAIN.

12:57PM 24        OVER THE WEEKEND, PLEASE DO NOT DO ANY RESEARCH ABOUT

12:57PM 25   ANYTHING INVOLVED WITH THIS CASE OR ANYONE INVOLVED WITH IT.

12:57PM 1    PLEASE AVOID ANY MEDIA, SOCIAL MEDIA, NEWS MEDIA, RADIO,

12:57PM 2    TELEVISION, OR OTHER CONVERSATIONS ABOUT THE CASE WITH YOUR

12:57PM 3    FAMILY, FRIENDS, OR OTHERS.  DO NOT TALK ABOUT THE CASE.  DO

12:57PM 4    NOT MAKE ANY DECISIONS OR EVEN ATTEMPT TO BEGIN DELIBERATIONS

12:57PM 5    ABOUT THIS CASE AT ALL.

12:57PM 6         REMEMBER, YOU'RE NOT PERMITTED TO DO THAT UNTIL THE CASE

12:57PM 7    IS OVER AND YOU ARE COLLECTIVELY IN THE JURY DELIBERATION ROOM

12:57PM 8    WITH YOUR FELLOW JURORS.  ONLY THEN WILL YOU BEGIN TO MAKE

12:57PM 9    DECISIONS ABOUT THE EVIDENCE IN THE CASE.

12:57PM 10        WITH THAT, LADIES AND GENTLEMEN, I WILL THANK YOU.

12:57PM 11        ENJOY YOUR WEEKEND.  I UNDERSTAND -- I THOUGHT I HEARD

12:57PM 12   SOMETHING ON THE RADIO THIS MORNING THAT THERE MIGHT BE

12:57PM 13   SOMETHING PRECIOUS CALLED RAIN THIS WEEKEND.  SO I HOPE IT

12:57PM 14   COMES.  I HOPE YOU ENJOY THAT.

12:58PM 15        (LAUGHTER.)

12:58PM 16          THE COURT:  AND HAVE A GOOD, RESTFUL WEEKEND.  WE'LL

12:58PM 17   SEE YOU ON TUESDAY NEXT, TUESDAY AT 9:00 A.M. WE'LL START.

12:58PM 18        AND IF YOU HAVE ANY OTHER INFORMATION REGARDING YOUR

12:58PM 19   SERVICE AT ALL, OR SCHEDULING ISSUES, WOULD YOU PLEASE CONTINUE

12:58PM 20   TO CONTACT MS. KRATZMANN ABOUT THAT INFORMATION?  THAT WOULD BE

12:58PM 21   HELPFUL.

12:58PM 22        AND I WILL SHARE THAT INFORMATION THAT WE RECEIVE WITH

12:58PM 23   COUNSEL AND WE CAN SCHEDULE ACCORDINGLY.

12:58PM 24        SO THANK YOU VERY MUCH FOR THAT.

12:58PM 25        ENJOY YOUR WEEKEND.  THANK YOU.

12:58PM   1        SIR, YOU CAN STAND DOWN.  WE'LL SEE YOU ON TUESDAY AT 9:00

12:58PM   2    O'CLOCK.

12:59PM   3        (JURY OUT AT 12:59 P.M.)

12:59PM   4        THE COURT:  MR. EDLIN, YOU CAN STAND DOWN.  THANK

12:59PM   5    YOU.

12:59PM   6        PLEASE BE SEATED, LADIES AND GENTLEMEN.

12:59PM   7        ALL RIGHT.  THANK YOU.  THE RECORD SHOULD REFLECT THAT OUR

12:59PM   8    JURY HAS LEFT FOR THE WEEKEND.  THE WITNESS HAS LEFT THE

12:59PM   9    COURTROOM.

12:59PM   10       ALL COUNSEL AND MS. HOLMES ARE PRESENT.

12:59PM   11       ANYTHING FURTHER BEFORE WE BREAK FOR THE WEEKEND, COUNSEL?

12:59PM   12       MR. SCHENK:  NOT FROM THE GOVERNMENT.

12:59PM   13       MR. DOWNEY:  NOTHING FROM THE DEFENSE, YOUR HONOR.

12:59PM   14       THE COURT:  ALL RIGHT.  THANK YOU.  ENJOY YOUR

12:59PM   15   WEEKENDS.  WE'LL SEE YOU NEXT WEEK.  THANK YOU.

12:59PM   16       MR. SCHENK:  THANK YOU.

12:59PM   17       THE CLERK:  COURT IS ADJOURNED.

01:01PM   18       (COURT ADJOURNED AT 1:01 P.M.)

          19

          20

          21

          22

          23

          24

          25

1

2

3                      CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16         IRENE RODRIGUEZ, CSR, CRR
           CERTIFICATE NUMBER 8076

17

18

19         LEE-ANNE SHORTRIDGE, CSR, CRR
           CERTIFICATE NUMBER 9595

20

21         DATED:  OCTOBER 15, 2021

22

23

24

25