UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR-18-00258-EJD |
| | ) | |
| PLAINTIFF, | ) | SAN JOSE, CALIFORNIA |
| | ) | |
| VS. | ) | VOLUME 21 |
| | ) | |
| ELIZABETH A. HOLMES, | ) | OCTOBER 19, 2021 |
| | ) | |
| DEFENDANT. | ) | PAGES 3881 - 4102 |
| _____ | ) | |


TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE EDWARD J. DAVILA
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                       BY:  JOHN C. BOSTIC
                            JEFFREY B. SCHENK
                       150 ALMADEN BOULEVARD, SUITE 900
                       SAN JOSE, CALIFORNIA 95113

                       BY:  ROBERT S. LEACH
                            KELLY VOLKAR
                       1301 CLAY STREET, SUITE 340S
                       OAKLAND, CALIFORNIA 94612

     (APPEARANCES CONTINUED ON THE NEXT PAGE.)


OFFICIAL COURT REPORTERS:
                         IRENE L. RODRIGUEZ, CSR, RMR, CRR
                         CERTIFICATE NUMBER 8074
                         LEE-ANNE SHORTRIDGE, CSR, CRR
                         CERTIFICATE NUMBER 9595

     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
          TRANSCRIPT PRODUCED WITH COMPUTER

A P P E A R A N C E S: (CONT'D)


FOR DEFENDANT HOLMES:    WILLIAMS & CONNOLLY LLP
                         BY:  KEVIN M. DOWNEY
                              LANCE A. WADE
                              KATHERINE TREFZ
                              PATRICK LOOBY
                              J.R. FLEURMONT
                              RICHARD CLEARY
                              ANDREW LEMENS
                         725 TWELFTH STREET, N.W.
                         WASHINGTON, D.C. 20005

                         LAW OFFICE OF JOHN D. CLINE
                         BY:  JOHN D. CLINE
                         ONE EMBARCADERO CENTER, SUITE 500
                         SAN FRANCISCO, CALIFORNIA 94111


ALSO PRESENT:            FEDERAL BUREAU OF INVESTIGATION
                         BY:  ADELAIDA HERNANDEZ

                         OFFICE OF THE U.S. ATTORNEY
                         BY:  LAKISHA HOLLIMAN, PARALEGAL
                              MADDI WACHS, PARALEGAL

                         WILLIAMS & CONNOLLY
                         BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL

                         TBC
                         BY:  BRIAN BENNETT, TECHNICIAN

3883

1

2                          <u>INDEX OF PROCEEDINGS</u>

3        GOVERNMENT'S:

4        **DANIEL EDLIN**

         DIRECT EXAM BY MR. BOSTIC (RES.)        P. 3915
5        CROSS-EXAM BY MR. DOWNEY                 P. 4060

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3884

1                              INDEX OF EXHIBITS

2
                                         IDENT.      EVIDENCE
3        GOVERNMENT'S:

4        860                                          3917
         871                                          3926
5        905                                          3929
         966                                          3933
6        957                                          3936
         1014                                         3938
7        1157                                         3943
         2327                                         3947
8        4366                                         3950
         3070                                         3952
9        528                                          3958
         3965                                         3966
10       3981                                         3969
         5438                                         3973
11       1090                                         3982
         1753                                         3988
12       1940                                         3994
         4869                                         3997
13       5413                                         4003
         4237                                         4007
14       504                                          4014
         551                                          4037
15       588                                          4043
         1027                                         4045
16       5435                                         4051

17

18
         DEFENDANT'S:
19
         7747                                         4063
20       13982                                        4063
         9790                                         4065
21       12715                                        4074
         10462                                        4087
22

23

24

25

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | SAN JOSE, CALIFORNIA                    OCTOBER 19, 2021      |
| 08:38AM | 2  | P R O C E E D I N G S                                    |
| 08:38AM | 3  | (COURT CONVENED AT 8:38 A.M.)                              |
| 08:38AM | 4  | (JURY OUT AT 8:38 A.M.)                                    |
| 08:38AM | 5  | THE COURT:  LET'S GO ON THE RECORD IN THE HOLMES          |
| 08:38AM | 6  | MATTER.  ALL COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT. |
| 08:38AM | 7  | WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.                |
| 08:38AM | 8  | I WANTED TO TALK ABOUT A COUPLE OF THINGS WITH COUNSEL.   |
| 08:38AM | 9  | FIRST OF ALL, WE HAD CONVERSATION LAST WEEK WITH A JUROR  |
| 08:38AM | 10 | WHO LOST A RELATIVE.  I UNDERSTAND -- I'VE RECEIVED INFORMATION |
| 08:39AM | 11 | ABOUT THAT JUROR'S TRAVEL PLANS.  RESPECTING THAT, WE WILL NOT |
| 08:39AM | 12 | BE IN SESSION ON OCTOBER 29TH, FRIDAY, OCTOBER 29TH.  THE JUROR |
| 08:39AM | 13 | PLANS TO TRAVEL THE 27TH OR 28TH, BUT WE'LL RETURN THE   |
| 08:39AM | 14 | FOLLOWING WEEK, SO IT SHOULDN'T DISRUPT OUR SCHEDULE THE  |
| 08:39AM | 15 | FOLLOWING WEEK.                                            |
| 08:39AM | 16 | WE WILL BE ABLE TO RESUME ON -- I THINK NOVEMBER 2ND WOULD |
| 08:39AM | 17 | BE THE NEXT TRIAL DAY?                                     |
| 08:39AM | 18 | THE CLERK:  YES, YOUR HONOR.                              |
| 08:39AM | 19 | THE COURT:  SO THAT WILL BE OUR SCHEDULE.  WE'LL TRY      |
| 08:39AM | 20 | TO MAKE UP SOME OF OUR TIME.  I'LL ASK IF MAYBE WE CAN EXTEND |
| 08:39AM | 21 | OUR COURT DAYS UNTIL 4:00 O'CLOCK A COUPLE OF DAYS.       |
| 08:39AM | 22 | SO THAT'S THAT FOR SCHEDULING.  I'LL INFORM THE JURY OF   |
| 08:39AM | 23 | THAT WHEN THEY COME IN.                                    |
| 08:39AM | 24 | AND THEN I RECEIVED DOCUMENT 1098.  MR. CLINE, I THINK YOU |
| 08:40AM | 25 | FILED THAT.                                                |

| | | |
|---|---|---|
| 08:40AM | 1 | MR. CLINE:  I DID, YOUR HONOR. |
| 08:40AM | 2 | THE COURT:  GOOD MORNING. |
| 08:40AM | 3 | MR. CLINE:  THIS HAS TO DO WITH DR. WEBER WHO I |
| 08:40AM | 4 | DON'T THINK WILL BE ON TODAY.  THIS WILL BE AN EDLIN DAY. |
| 08:40AM | 5 | PERHAPS WE CAN TAKE IT UP TOMORROW MORNING. |
| 08:40AM | 6 | THE COURT:  SURE.  WE CAN CHAT ABOUT IT A LITTLE |
| 08:40AM | 7 | MORE TODAY SINCE YOU'RE HERE. |
| 08:40AM | 8 | MR. CLINE:  THAT'S FINE. |
| 08:40AM | 9 | THE COURT:  MR. LEACH. |
| 08:40AM | 10 | MR. LEACH:  YES, YOUR HONOR. |
| 08:40AM | 11 | THE GOVERNMENT INTENDS TO CALL SHANE WEBER, WHO WAS A |
| 08:40AM | 12 | DIRECTOR OF DIAGNOSTICS AT PFIZER.  HIS JOB WAS ESSENTIALLY TO |
| 08:40AM | 13 | EVALUATE TECHNOLOGIES THAT MIGHT BE OF INTEREST TO PFIZER, AND |
| 08:40AM | 14 | IN THE COURSE OF HIS WORK HE PREPARED A REPORT REVIEWING |
| 08:40AM | 15 | THERANOS'S TECHNOLOGY. |
| 08:40AM | 16 | THIS REPORT IS DEEPLY RELEVANT TO THE ALLEGATIONS IN THE |
| 08:40AM | 17 | INDICTMENT.  THE DEFENDANT MADE SWEEPING CLAIMS TO INVESTORS |
| 08:40AM | 18 | THAT PFIZER HAD VALIDATED THERANOS'S TECHNOLOGY.  SHE |
| 08:40AM | 19 | ESSENTIALLY TOLD HER INVESTORS WHAT PFIZER THOUGHT, AND THE |
| 08:41AM | 20 | FIRST STEP OF PROVING THAT IS TO SHOW WHAT PFIZER ACTUALLY |
| 08:41AM | 21 | THOUGHT, AND THIS DOCUMENT DOES THAT IN MANY, MANY WAYS. |
| 08:41AM | 22 | THE DOCUMENT PROVES THE FALSITY OF THE DEFENDANT'S |
| 08:41AM | 23 | STATEMENTS TO INVESTORS, AND FOR THAT REASON IT PASSES ANY 401 |
| 08:41AM | 24 | RELEVANCE OBJECTION. |
| 08:41AM | 25 | WITH RESPECT TO 403, I UNDERSTAND THE ARGUMENT TO BE, |

08:41AM 1    WELL, THIS DOCUMENT DOESN'T GO DIRECTLY TO ELIZABETH HOLMES,

08:41AM 2    AND THEREFORE, THE JURY MIGHT WRONGLY INFER THAT THIS DOCUMENT

08:41AM 3    WAS PROVIDED TO THE DEFENDANT.

08:41AM 4        THAT'S A MATTER FOR CROSS-EXAMINATION.  THE GOVERNMENT

08:41AM 5    WILL NOT SUGGEST THAT THE DOCUMENT WENT DIRECTLY TO HER, AND

08:41AM 6    THAT'S A MATTER THAT MR. CLINE CAN EXPLORE AND EVALUATE WITH

08:41AM 7    THIS PARTICULAR WITNESS.

08:41AM 8        BUT IT DOESN'T UNDERCUT THE PROBITY OF THE EVIDENCE IN

08:41AM 9    TERMS OF SHOWING THE FALSITY OF THE STATEMENT, AND THERE'S NO

08:42AM 10   GENUINE PREJUDICE IF YOU CAN EXPLORE THAT PARTICULAR ASPECT OF

08:42AM 11   IT.

08:42AM 12       I WILL SAY THAT DR. WEBER DOES HAVE A CONVERSATION WITH

08:42AM 13   MS. HOLMES AFTER THE REVIEW WHERE HE TELLS MS. HOLMES PFIZER

08:42AM 14   HAS NO INTEREST IN GOING FORWARD WITH THERANOS'S TECHNOLOGY.

08:42AM 15       HE DOESN'T COMMUNICATE THE SPECIFIC REASONS TO HER, AND

08:42AM 16   THE GOVERNMENT WON'T SUGGEST THAT THE DOCUMENT WENT TO HER, BUT

08:42AM 17   THEY ARE TIED IN THAT WAY, AND THE EVIDENCE IS PROBATIVE OF

08:42AM 18   FALSITY, WHICH IS SOMETHING THAT THE GOVERNMENT NEEDS TO

08:42AM 19   SUPPORT ITS ALLEGATIONS.

08:42AM 20       THERE'S ALSO A BUSINESS RECORDS OBJECTION TO THIS.  I

08:42AM 21   BELIEVE I CAN LAY A FOUNDATION WITH DR. WEBER THAT THIS IS THE

08:42AM 22   TYPE OF DOCUMENT THAT HE PREPARED IN THE ORDINARY COURSE OF

08:42AM 23   BUSINESS, THAT HE WAS UNDER A DUTY TO REPORT ACCURATELY, THAT

08:42AM 24   THIS WAS MAINTAINED IN THE ORDINARY COURSE, THAT THIS WAS THE

08:42AM 25   FINAL VERSION OF HIS REPORT TO HIS SUPERIORS.

08:42AM 1          SO I BELIEVE THAT WE CAN LAY A FOUNDATION UNDER 803(6) FOR

08:42AM 2    THE BUSINESS RECORDS EXCEPTION.

08:43AM 3          AND FOR ALL OF THOSE REASONS, THIS IS HIGHLY PROBATIVE

08:43AM 4    EVIDENCE THAT SHOWS THE FALSITY OF WHAT MS. HOLMES WAS SAYING

08:43AM 5    ABOUT WHAT PFIZER DID AND THOUGHT AND IT SHOULD COME IN.

08:43AM 6          THE COURT:  LET ME ASK YOU -- THANK YOU.  LET ME ASK

08:43AM 7    YOU, TWO OTHER OBJECTIONS WERE 702 AND THEN 403, OF COURSE, AND

08:43AM 8    UNDER 702, IT SEEMS LIKE THERE'S A COUPLE OF THE PARAGRAPHS --

08:43AM 9    THERE'S 25 QUESTIONS THAT WERE ANSWERED.  THIS IS THE PART THAT

08:43AM 10   I'M FOCUSSING ON.

08:43AM 11         AND THERE WERE THREE OR FOUR QUESTIONS, PERHAPS MORE, THAT

08:43AM 12   TALK ABOUT SPECIFIC, USE SPECIFIC SCIENTIFIC TERMS AND WHETHER

08:43AM 13   CERTAIN PROCESSES WERE USED, AND THAT MIGHT BE A 702 ISSUE.  I

08:43AM 14   LOOKED AT THAT, AND YOU'RE SEEKING TO INTRODUCE THE DOCUMENT IN

08:43AM 15   TOTO I ASSUME?

08:43AM 16         MR. LEACH:  YES, YOUR HONOR.  ALTHOUGH IF THERE ARE

08:43AM 17   PARTICULAR QUESTIONS IN THE QUESTIONS THAT MR. WEBER PUT TO THE

08:43AM 18   FOLKS AT THERANOS, I THINK THOSE CAN BE REDACTED.

08:43AM 19         I DO THINK THIS IS MORE ALONG THE LINES OF PERCIPIENT --

08:44AM 20   IT'S A PERCIPIENT EVALUATION.  THERE'S CERTAINLY SOME TECHNICAL

08:44AM 21   ASPECTS TO WHAT HE'S ASKING, BUT IT'S NO DIFFERENT THAN WHAT

08:44AM 22   DR. ROSENDORFF, THE ASPECTS OF WHAT DR. ROSENDORFF TESTIFIED TO

08:44AM 23   THAT SHEKAR GANGAKHEDKAR TESTIFIED TO, AND I THINK THOSE ARE

08:44AM 24   QUITE -- BUT IF THERE ARE PARTICULAR QUESTIONS THAT THE COURT

08:44AM 25   VIEWS IN THAT LAND, I AM PREPARED TO REDACT THOSE.

08:44AM  1          THE COURT:  WELL, MAYBE THEY WERE -- MAYBE I WAS

08:44AM  2     USING MY PERSONAL STANDARD, BUT YOU LOOK AT 17 THROUGH 20,

08:44AM  3     SOMETHING LIKE THAT, AND IN THAT RANGE I THINK THERE ARE SOME

08:44AM  4     VERY TECHNICAL -- IT LOOKS LIKE THERE ARE TECHNICAL QUESTIONS

08:44AM  5     THAT -- AND I DON'T KNOW IF THAT'S SOMETHING THAT WOULD BE

08:44AM  6     REDACTED OR WHATEVER, BUT THAT WAS THE 702 ISSUE THAT I LOOKED

08:44AM  7     AT.

08:44AM  8          AND THEN FROM A 403 STANDPOINT, THERE'S SOME -- IT SEEMS

08:44AM  9     LIKE HE USES SOME TERMS, "UNCONVINCING" AND OTHER TERMS LIKE

08:44AM  10    THAT THAT MY SENSE IS WHAT THE 403 OBJECTIONS WERE ABOUT.

08:45AM  11          MR. LEACH:  THE -- YOUR HONOR, I DON'T THINK THERE'S

08:45AM  12    A 403 ISSUE THERE BECAUSE IT'S MS. HOLMES THAT IS PURPORTING TO

08:45AM  13    TALK ABOUT WHAT PFIZER THOUGHT, AND IF WHAT PFIZER THOUGHT WAS

08:45AM  14    THE REPORT THAT WE RECEIVED FROM THERANOS IS UNCONVINCING OR

08:45AM  15    LACKING IN FOUNDATION, YOU KNOW, THAT'S PROBATIVE EVIDENCE OF

08:45AM  16    WHAT WAS IN, YOU KNOW, THIS WITNESS'S MIND AT THE TIME WHEN

08:45AM  17    HE'S ASKED TO REVIEW THE TECHNOLOGY.

08:45AM  18          AND SO --

08:45AM  19          THE COURT:  I'M SORRY TO INTERRUPT YOU.  PARDON ME.

08:45AM  20     ON PAGE 3 I THINK IT IS, QUESTION 3 USES A TERM "ARE NOT

08:45AM  21    BELIEVABLE, UNCONVINCINGLY, POORLY PREPARED," THOSE TYPES OF

08:45AM  22    STATEMENTS.  I'M NOT ADVOCATING FOR MR. CLINE, BUT BASED ON HIS

08:45AM  23    PLEADINGS, IT SEEMS LIKE THAT'S WHAT HE'S REFERENCING.

08:45AM  24          MR. CLINE:  AND I MIGHT ADD -- SORRY TO INTERRUPT,

08:46AM  25    YOUR HONOR -- BUT TERMS LIKE "EVASIVE" AND "NONRESPONSIVE" --

3890

08:46AM 1    AND AGAIN, I'M SORRY TO INTERRUPT MR. LEACH AND YOUR HONOR --

08:46AM 2    BUT THIS WAS AN INTERNAL PFIZER REPORT.  NOT ONLY DID IT NOT GO

08:46AM 3    TO MS. HOLMES, IT DIDN'T GO TO THERANOS AT ALL.

08:46AM 4         MR. -- DR. WEBER DID HAVE A CONVERSATION WITH MS. HOLMES.

08:46AM 5            THE COURT:  SIXTY MINUTES ACCORDING TO THIS, IT WAS

08:46AM 6    ABOUT AN HOUR.

08:46AM 7            MR. CLINE:  WELL, THERE WAS THAT CONVERSATION AND HE

08:46AM 8    CAN TESTIFY ABOUT THAT OF COURSE, BUT THEN THERE WAS A LATER

08:46AM 9    CONVERSATION IN JANUARY OF 2009 WHERE HE CONVEYED THE VIEW, AS

08:46AM 10   MR. LEACH HAS SAID, THAT PFIZER DID NOT HAVE AN INTEREST IN

08:46AM 11   DOING BUSINESS WITH THERANOS.

08:46AM 12        HE CAN TESTIFY ALL ABOUT THAT CONFERENCE BECAUSE THAT

08:46AM 13   OBVIOUSLY GOES TO MS. HOLMES'S KNOWLEDGE AND INTENT.

08:46AM 14        IT'S THE PEJORATIVE NATURE OF THIS INTERNAL TO PFIZER, NOT

08:46AM 15   CONVEYED TO MS. HOLMES THAT IS SO OBJECTIONABLE UNDER 403, AND

08:46AM 16   THEN, OF COURSE, THERE'S THE 702 ISSUE THAT YOUR HONOR HAS ALSO

08:46AM 17   FLAGGED.

08:46AM 18           THE COURT:  BUT IS IT APPROPRIATE FOR HIM TO SAY, AS

08:47AM 19   A REPRESENTATIVE OF PFIZER, I WAS TASKED TO DO, MY JOB IS TO

08:47AM 20   LOOK AT BUSINESS OPPORTUNITIES TO EVALUATE WHETHER OR NOT THAT

08:47AM 21   BUSINESS ARRANGEMENT AND ENGAGEMENT IS SOMETHING THAT IS

08:47AM 22   APPROPRIATE FOR OUR BUSINESS, SOMETHING THAT WE SHOULD DO.

08:47AM 23        AND MY ANALYSIS OF THAT IS THE FOLLOWING.

08:47AM 24        ISN'T THAT APPROPRIATE?

08:47AM 25           MR. CLINE:  I THINK IT IS.  I THINK WHAT HE COULD

08:47AM 1    SAY IS, I WAS TASKED TO REVIEW THIS, I DID REVIEW IT, I TALKED

08:47AM 2    TO PEOPLE INTERNALLY AT PFIZER, AND I CONCLUDED THAT THERE WAS

08:47AM 3    NO BUSINESS -- NO BASIS FOR FURTHER BUSINESS BETWEEN PFIZER AND

08:47AM 4    THERANOS, I RECOMMENDED THAT INTERNALLY, AND THEN I CALLED

08:47AM 5    MS. HOLMES IN JANUARY OF 2009 AND I CONVEYED, WHATEVER HE'S

08:47AM 6    GOING TO SAY HE CONVEYED TO HER.  THERE'S AN EMAIL WHERE HE

08:47AM 7    TALKS ABOUT IT.

08:47AM 8         ALL OF THAT IS FAIR GAME.

08:47AM 9         IT'S THE SORT OF DETAILED BOTH SCIENTIFIC ON ONE HAND THAT

08:47AM 10   IS THE 702 ISSUE, AND THEN THE SORT OF HIGHLY PEJORATIVE

08:47AM 11   CHARACTERIZATION THAT IS THE 403 ISSUE THAT I DON'T THINK

08:48AM 12   SHOULD COME IN.

08:48AM 13            THE COURT:  OKAY.

08:48AM 14        MR. LEACH?

08:48AM 15            MR. LEACH:  YOUR HONOR, THE DEFENDANT PURPORTED TO

08:48AM 16   SPEAK ABOUT WHAT PFIZER THOUGHT.  THIS IS THE BEST EVIDENCE

08:48AM 17   AVAILABLE OF WHAT THIS PARTICULAR WITNESS FROM PFIZER REALLY

08:48AM 18   THOUGHT IN THE MOMENT WHILE HE'S GETTING ANSWERS FROM

08:48AM 19   MS. HOLMES ABOUT HER TECHNOLOGY.

08:48AM 20        HE PUTS QUESTIONS TO HER, SHE DOESN'T ANSWER THEM.  SHE

08:48AM 21   DEFLECTS.  THEY'RE NONINFORMATIVE.  THAT'S HIS CONCLUSION IN

08:48AM 22   THE MOMENT.

08:48AM 23        AND I -- YOU KNOW, PART OF THE GOVERNMENT -- YOU KNOW,

08:48AM 24   PART OF THE ALLEGATION IS PROVING THE FALSITY OF THE STATEMENT.

08:48AM 25            AND SO, YES, THESE ARE HARSH WORDS, BUT THESE ARE WORDS

3892

08:48AM 1    THAT HE THOUGHT IN THE MOMENT, THEY'RE WORDS THAT WERE RELEVANT

08:48AM 2    TO HIM IN ASSESSING THE TECHNOLOGY, AND THEY'RE FODDER FOR

08:48AM 3    CROSS-EXAMINATION, HOW THOROUGH WAS YOUR REVIEW?  YOU KNOW,

08:48AM 4    WHAT WAS THE SPECIFIC QUESTION?

08:48AM 5        BUT THIS IS A PERCIPIENT REACTION TO WHAT, YOU KNOW, HE

08:49AM 6    WAS DOING IN THE MOMENT, AND THE FACT THAT THEY DON'T LIKE WHAT

08:49AM 7    HE CONCLUDED IS NOT A 403 PROBLEM, PARTICULARLY IN LIGHT OF HOW

08:49AM 8    PROBATIVE THIS IS OF, OF THE FALSITY OF THE DEFENDANT'S

08:49AM 9    STATEMENTS.

08:49AM 10           THE COURT:  IT LOOKS LIKE THE TRAJECTORY, THE

08:49AM 11   GENESIS I SHOULD SAY IS THE OCTOBER -- THIS IS EXHIBIT 2, I

08:49AM 12   THINK, IF I'M READING YOUR PLEADINGS CORRECT, AN OCTOBER 11,

08:49AM 13   2008 EMAIL FROM YOUR CLIENT TO PFIZER, I THINK, HERE'S OUR

08:49AM 14   REPORT.  IT'S ALMOST LIKE AN INVITATION.  HERE'S WHAT WE HAVE

08:49AM 15   DONE, THIS IS WHAT WE CAN DO, THIS IS OUR PRODUCT, GO FOR IT,

08:49AM 16   LOOK AT IT.

08:49AM 17       AND THEN MR. WEBER IS TASKED BY PFIZER TO DO JUST THAT,

08:49AM 18   AND THEN HE FILES HIS REPORT.

08:49AM 19       IS THAT THE CHRONOLOGY?

08:49AM 20           MR. LEACH:  THAT'S EXACTLY RIGHT, YOUR HONOR.

08:49AM 21           MR. CLINE:  THAT IS THE CHRONOLOGY.  THERE HAD BEEN

08:49AM 22   A LENGTHY INTERACTION BETWEEN THERANOS AND PFIZER BEFORE

08:49AM 23   DR. WEBER EVER GOT INVOLVED.

08:50AM 24       THEN PFIZER TASKED HIM, IN OCTOBER OR SO, TO REVIEW THE

08:50AM 25   REPORT THAT THERANOS SUBMITTED.

3893

08:50AM 1    HE CONDUCTS THE REVIEW OVER THE NEXT COUPLE OF MONTHS.  HE

08:50AM 2    DOES HAVE THIS CONVERSATION WITH MS. HOLMES AND OTHERS, AND HE

08:50AM 3    PREPARES THIS INTERNAL DOCUMENT, WHICH IS THE SUBJECT OF OUR

08:50AM 4    MOTION.

08:50AM 5        HE THEN HAS A TELEPHONE CALL IN JANUARY OF 2009, AND THE

08:50AM 6    INTERNAL DOCUMENT, AS I'VE SAID, DIDN'T EVER GO TO THERANOS OR

08:50AM 7    MS. HOLMES.  IT WAS PURELY FOR INTERNAL PFIZER USE.

08:50AM 8        THEN HE HAS A TELEPHONE CALL WITH MS. HOLMES IN JANUARY OF

08:50AM 9    2009 WHERE HE SAYS POLITELY, AS HE SAYS IN HIS EMAIL

08:50AM 10   MEMORIALIZING THIS CONVERSATION, THAT THERE'S NO -- HE DOESN'T

08:50AM 11   SEE ANY BUSINESS FUTURE BETWEEN -- AT THE MOMENT BETWEEN

08:50AM 12   THERANOS AND PFIZER.  HE KEEPS OPEN THE POSSIBILITY OF SOME

08:50AM 13   CHANGE.

08:50AM 14       WITH ALL DUE RESPECT TO MR. LEACH, THAT'S THE BEST

08:50AM 15   EVIDENCE OF MS. HOLMES'S KNOWLEDGE AND INTENT, WHAT SHE WAS

08:50AM 16   ACTUALLY TOLD, NOT SOME INTERNAL PFIZER DOCUMENT THAT IS

08:51AM 17   HARSHLY CRITICAL BUT NEVER GOES TO HER.  SHE NEVER SEES IT.

08:51AM 18   IT'S NEVER CONVEYED TO HER.

08:51AM 19       THAT'S NOT EVIDENCE OF HER KNOWLEDGE OR INTENT AT ALL.

08:51AM 20   IT'S JUST PREJUDICIAL.

08:51AM 21           THE COURT:  WELL, IS HE ENTITLED, IS MR. LEACH

08:51AM 22   ENTITLED TO QUESTION THE WITNESS AS TO WHY HE FORMED -- WHY

08:51AM 23   PFIZER -- AS A REPRESENTATIVE OF PFIZER, WHY PFIZER DECIDED NOT

08:51AM 24   TO DO BUSINESS?  CAN'T HE PROBE THAT?

08:51AM 25           MR. CLINE:  I THINK PERHAPS AT A HIGH LEVEL HE CAN.

3894

```
08:51AM   1        I MEAN, I'M NOT SAYING THAT DR. WEBER CAN'T SAY ANYTHING ABOUT

08:51AM   2     WHY HE CAME TO THE CONCLUSION THAT HE CAME TO.

08:51AM   3        WHAT I'M SAYING IS THAT THE SORT OF SCIENTIFIC ANALYSIS,

08:51AM   4     WHICH IS THE 702 ISSUE, SHOULD NOT COME IN.  IT CAN BE

08:51AM   5     DESCRIBED AT A HIGH LEVEL.  IT SHOULD NOT COME IN IN DETAIL.

08:51AM   6        AND THE PEJORATIVE CHARACTERIZATION ABOUT THE INTERACTIONS

08:51AM   7     WITH THERANOS SHOULD NOT COME IN.

08:51AM   8             THE COURT:  OKAY.

08:51AM   9             MR. CLINE:  BECAUSE, AGAIN, IF HE HAD TOLD

08:51AM  10     MS. HOLMES, I THINK YOU'RE BEING EVASIVE AND DEFLECTIVE, YOU'RE

08:52AM  11     A BAD PERSON, MAYBE THAT COMES IN BECAUSE IT GOES TO HIS

08:52AM  12     KNOWLEDGE AND INTENT.

08:52AM  13        HE DIDN'T.  HE HAD A MUCH DIFFERENT CONVERSATION WITH HER

08:52AM  14     THAN WHAT IS REPRESENTED IN THIS REPORT.

08:52AM  15        AND I THINK IT'S JUST UNFAIR TO HER AND MISLEADING TO THE

08:52AM  16     JURY TO SUGGEST THAT SOMEHOW THIS REPORT REFLECTS WHAT WAS IN

08:52AM  17     MS. HOLMES'S MIND AND HER KNOWLEDGE AND INTENT.

08:52AM  18             THE COURT:  MR. LEACH?

08:52AM  19             MR. LEACH:  THE WHY IS IMPORTANT, YOUR HONOR, AND

08:52AM  20     THE WHY IS IMPORTANT NOT JUST FOR MS. HOLMES'S INTENT, BUT THE

08:52AM  21     FALSITY OF THE STATEMENTS THAT SHE'S MAKING.

08:52AM  22        THE GOVERNMENT DOESN'T NEED TO PROVE THROUGH A SINGLE

08:52AM  23     PIECE OF EVIDENCE ALL OF THE ELEMENTS, KNOWLEDGE AND FALSITY

08:52AM  24     AND MATERIALITY.  WE CAN DO THAT IN PIECES.

08:52AM  25        THIS IS EVIDENCE OF THE FALSITY OF THE DEFENDANT'S
```

3895

08:52AM 1    STATEMENTS.  SHE HELD HERSELF OUT AS BEING KNOWLEDGEABLE ABOUT

08:52AM 2    WHAT PFIZER REALLY THOUGHT.

08:52AM 3        PFIZER THOUGHT HER ANSWERS WERE DEFLECTIVE, EVASIVE,

08:53AM 4    NONINFORMATIVE, AND THEY MEMORIALIZED THAT IN A REPORT THAT IS

08:53AM 5    PART OF THEIR ROUTINE BUSINESS ACTIVITIES.

08:53AM 6        I UNDERSTAND THAT IT LOOKS FORCEFUL IN DEMONSTRATING HOW

08:53AM 7    STRONGLY PFIZER FELT ABOUT THIS, AND THIS IS CRITICAL CONTEXT

08:53AM 8    FOR WHY THERE'S NO MORE WORK AFTER THIS.

08:53AM 9        SO WE WILL NOT SUGGEST THAT THE DOCUMENT WENT TO

08:53AM 10   MS. HOLMES.

08:53AM 11       BUT THE WHY HERE IS CRITICAL.  I REALLY -- IT, IT -- THE

08:53AM 12   GOVERNMENT DOESN'T NEED TO PROVE KNOWLEDGE, FALSITY,

08:53AM 13   MATERIALITY, AND THE WHY ALL IN ONE COMMUNICATION.  WE CAN DO

08:53AM 14   IT IN PIECES, AND THIS IS AN IMPORTANT PIECE OF THE FALSITY.

08:53AM 15           THE COURT:  OKAY.  ALL RIGHT.

08:53AM 16       WELL, THANK YOU FOR THE HELP THIS MORNING.

08:53AM 17       I THINK -- WOULD YOU AGREE, MR. LEACH, THAT WE'RE NOT

08:53AM 18   GOING TO GET TO THIS WITNESS TODAY?

08:53AM 19           MR. LEACH:  IF WE'RE GOING TO GET TO HIM, I THINK IT

08:53AM 20   WOULD BE VERY LATE.

08:53AM 21           THE COURT:  RIGHT.

08:53AM 22           MR. LEACH:  SO I THINK IT WOULD BE VERY LATE.  I

08:53AM 23   THINK WE HAVE TIME TO REACH A CONCLUSION ON THIS.

08:53AM 24           THE COURT:  OKAY.  OKAY.

08:53AM 25           MR. LEACH:  AND I CERTAINLY WON'T GET INTO IT

08:54AM 1     WITHOUT ANOTHER DISCUSSION.

08:54AM 2             THE COURT:  ALL RIGHT.  THANK YOU.  OF COURSE.

08:54AM 3     THANK YOU FOR THAT.

08:54AM 4         LET'S TALK WITH MR. BOSTIC ABOUT MR. EDLIN AND SEE WHERE

08:54AM 5     THAT GOES.

08:54AM 6             MR. CLINE:  THANK YOU, YOUR HONOR.

08:54AM 7             THE COURT:  THANK YOU, MR. CLINE.

08:54AM 8         I THINK WE WERE HAVING A DISCUSSION ABOUT A DOCUMENT,

08:54AM 9     MR. BOSTIC.

08:54AM 10            MR. BOSTIC:  YES.  GOOD MORNING, YOUR HONOR.

08:54AM 11            THE COURT:  GOOD MORNING.

08:54AM 12            MR. BOSTIC:  THE DEFENSE HAD RAISED CONCERNS ABOUT

08:54AM 13    TWO EXHIBITS THAT I BELIEVE THE GOVERNMENT INTENDED TO EXPLORE

08:54AM 14    WITH MR. EDLIN.

08:54AM 15        THOSE TWO EXHIBITS WERE 504 AND 551.  THOSE SHOULD BE IN

08:54AM 16    THE COURT'S BINDER.

08:54AM 17        THEY BOTH INCLUDE PRESENTATIONS OR MEMORANDA SENT FROM

08:54AM 18    THERANOS TO THE MILITARY.  THOSE PRESENTATION WERE APPROVED BY

08:54AM 19    MS. HOLMES WE EXPECT THIS WITNESS WILL TESTIFY.

08:54AM 20        AND THE CONTENT INCLUDES SOME FALSE STATEMENTS.

08:54AM 21    SPECIFICALLY EXHIBIT 504 INCLUDES THE REPRESENTATION TO THE

08:54AM 22    MILITARY, EACH THERANOS DEVICE CAN RUN EVERY TEST CURRENTLY

08:55AM 23    AVAILABLE THROUGH TRADITIONAL OR HOSPITAL LAB INFRASTRUCTURE.

08:55AM 24    I PARAPHRASED THE SECOND PORTION OF THAT.

08:55AM 25        THAT WAS NOT TRUE AT THE TIME.  IT WAS NEVER TRUE DURING

08:55AM 1    THE OPERATION OF THERANOS.

08:55AM 2        THE FACT THAT THAT REPRESENTATION WAS MADE TO THE MILITARY

08:55AM 3    IS NOT BEING PRESENTED AS CHARACTER EVIDENCE AGAINST

08:55AM 4    MS. HOLMES.  IT'S ANYTHING BUT EXTRANEOUS TO THE CHARGED FRAUD.

08:55AM 5    IT'S INEXTRICABLY INTERTWINED WITH THE CHARGED FRAUD FOR TWO

08:55AM 6    REASONS.

08:55AM 7        FIRST, THIS WAS PART OF THE OVERALL SCHEME TO MISLEAD

08:55AM 8    INVESTORS AS TO THE NATURE OF THERANOS'S CONTACTS WITH THE

08:55AM 9    MILITARY.

08:55AM 10       IN ORDER TO MAKE THAT DECEPTION MORE BELIEVABLE, IN ORDER

08:55AM 11   TO ADD A KERNEL OF TRUTH TO FALSE STATEMENTS ABOUT THERANOS'S

08:55AM 12   CONTACT WITH THE MILITARY, IT WAS IMPORTANT FOR THE MILITARY TO

08:55AM 13   HAVE SOME LEVEL OF CONNECTION WITH THERANOS.  IT WAS NECESSARY

08:56AM 14   TO GET THE MILITARY ON THE HOOK, AS IT WERE, AND TO ESTABLISH

08:56AM 15   THAT RELATIONSHIP THAT COULD THEN BE EXAGGERATED LATER.

08:56AM 16       SECONDLY, THIS EVIDENCE IS IMPORTANT BECAUSE IT SHOWS THAT

08:56AM 17   MS. HOLMES WAS AWARE OF THE FALSITY OF HER STATEMENTS WHEN SHE

08:56AM 18   WAS CLAIMING THAT THE THERANOS DEVICE HAD BEEN DEPLOYED BY THE

08:56AM 19   MILITARY.

08:56AM 20       AND BY THE WAY, JUST TO BE CLEAR, THE INDICTMENT IN THIS

08:56AM 21   CASE EXPRESSLY SAYS THAT A CATEGORY OF FALSE STATEMENTS AT

08:56AM 22   ISSUE HERE IS NOT JUST THE AMOUNT OF REVENUE IN THE THERANOS

08:56AM 23   MILITARY RELATIONSHIP, BUT ALSO WHETHER THE DEVICE WAS, IN

08:56AM 24   FACT, DEPLOYED.

08:56AM 25       THE INDICTMENT ALLEGES THAT HOLMES SAID IT WAS WHEN, IN

3898

08:56AM 1    FACT, IT WAS NOT.

08:56AM 2         TO PROVE THAT SHE WAS AWARE THAT THAT WAS NOT HAPPENING,

08:56AM 3    IT'S IMPORTANT FOR THE JURY TO UNDERSTAND THAT THE MILITARY'S

08:56AM 4    INTEREST IN THE THERANOS DEVICE IN THE FIRST PLACE WAS PREMISED

08:56AM 5    ON A FALSEHOOD.

08:56AM 6         THE MILITARY WANTED A DEVICE THAT COULD DO ALL OF THESE

08:57AM 7    TESTS, A LAB IN A BOX THAT COULD DO EVERYTHING THAT A

08:57AM 8    CONVENTIONAL LAB COULD DO.  THAT WAS THE BASIS FOR THE

08:57AM 9    MILITARY'S INTEREST, AND THOSE WERE THE TERMS ON WHICH

08:57AM 10   MS. HOLMES GOT THE MILITARY INTERESTED.

08:57AM 11        BECAUSE SHE KNEW THAT'S WHAT THEY WANTED, AND BECAUSE SHE

08:57AM 12   KNEW THAT THE COMPANY COULDN'T DELIVER ON THAT SPECIFIC

08:57AM 13   PROMISE, SHE WAS WELL AWARE THAT THE DEVICE WAS NOT BEING USED

08:57AM 14   BY THE MILITARY WHEN SHE WAS TELLING PEOPLE IT WAS, AND THAT IT

08:57AM 15   WAS UNLIKELY TO BE USED BY THE MILITARY IN ITS CURRENT FORM

08:57AM 16   BECAUSE IT COULD NOT DO WHAT SHE TOLD THE MILITARY IT COULD DO.

08:57AM 17        THE COURT:  AND WHAT IS THE CHRONOLOGY -- WE TALKED

08:57AM 18   ABOUT THIS BEFORE WITH MR. DOWNEY.

08:57AM 19        I THINK MR. DOWNEY'S POINT WAS A POINT THAT YOU RAISED,

08:57AM 20   THE FINANCIAL ARRANGEMENT, AND HE SUGGESTS, MR. DOWNEY -- AND I

08:57AM 21   DON'T MEAN TO SPEAK FOR YOU, MR. DOWNEY -- BUT YOU SUGGESTED

08:57AM 22   LAST WEEK THAT THAT WAS THE CRITICAL -- YOU CAN COME FORWARD.

08:57AM 23   THANK YOU. -- THAT WAS THE COMPONENT THAT THE INDICTMENT

08:57AM 24   SUGGESTS, THAT THE FINANCIAL RELATIONSHIP WAS NOT AS GREAT AS

08:58AM 25   SHE SUGGESTS THAT IT WAS, AND THAT WAS THE FALSITY, IF YOU

3899

08:58AM   1    WILL, AS OPPOSED TO BEING AN INTEGRAL PART, AN IMPORTANT PART

08:58AM   2    OF THE OVERALL SCHEME, IF YOU WILL, THE PLAN AS YOU'VE JUST

08:58AM   3    ARTICULATED.

08:58AM   4         THERE IS A DISTINCTION THERE, MR. DOWNEY.

08:58AM   5              MR. BOSTIC:  AND, YOUR HONOR, MR. DOWNEY AND I ARE

08:58AM   6    TALKING ABOUT THE SAME PARAGRAPH OF THE INDICTMENT.  IT'S JUST

08:58AM   7    THAT HE'S TALKING ABOUT ONE PORTION OF IT, WHILE I'M TALKING

08:58AM   8    ABOUT ANOTHER.

08:58AM   9              THE COURT:  SURE.

08:58AM   10             MR. DOWNEY:  YOUR HONOR, I THINK THERE'S A COUPLE OF

08:58AM   11   ISSUES.

08:58AM   12        ONE IS WE KNOW AS A BASIC MATTER THIS CAN'T BE INTRODUCED

08:58AM   13   AS PROPENSITY EVIDENCE.  MUCH OF WHAT MR. BOSTIC JUST SAID IS

08:58AM   14   OF THE NATURE THAT THERE IS, YOU KNOW, THESE FALSE STATEMENTS

08:58AM   15   WERE MADE IN ONE PLACE, AND THEY'RE MADE IN ANOTHER PLACE, AND

08:58AM   16   MAKING THEM IN MULTIPLE PLACES MAKES THEM MORE CREDIBLE IN

08:58AM   17   OTHER PLACES.  THAT'S DRESSED UP PROPENSITY EVIDENCE THAT IS

08:58AM   18   PRECLUDED UNDER 404(A).

08:59AM   19        SECOND, THE HISTORY OF THIS CASE IS IMPORTANT.  AS

08:59AM   20   YOUR HONOR KNOWS, WE ASKED, AFTER THE INDICTMENT WAS

08:59AM   21   SUPERSEDED, WHO ARE THE RELEVANT BUSINESS PARTNERS?  AND WE

08:59AM   22   SPECIFICALLY ASKED, IS THE DEPARTMENT OF DEFENSE, FOR ANY

08:59AM   23   REASON, ONE OF THOSE BUSINESS PARTNERS THAT IS BEING REFERENCED

08:59AM   24   IN ANY WAY IN THE INDICTMENT?

08:59AM   25        THE GOVERNMENT SAID NO.

3900

08:59AM   1          AS WELL IN THE HISTORY OF THE CASE, WE -- THE 404(B)

08:59AM   2    NOTICE GAVE 80 PAGES OF DISCLOSURE OF REPRESENTATIONS,

08:59AM   3    MISREPRESENTATIONS THAT WERE MADE ON THE VERY ISSUES THAT

08:59AM   4    MR. BOSTIC IS NOW TOUCHING ON, AND NONE OF IT REFERENCED ANY OF

08:59AM   5    WHAT HE'S REFERRING TO NOW, INCLUDING THE EXHIBIT THAT IS AT

08:59AM   6    ISSUE HERE.  551.

08:59AM   7          SO I, I THINK IT'S -- HE IS NOW LEFT SORT OF STANDING ON

08:59AM   8    THE THIN READ OF TRYING TO MAKE AN INEXTRICABLY INTERTWINED

09:00AM   9    EVIDENCE, BUT WHAT HE'S TRYING TO ARGUE IS CONTRARY TO THE

09:00AM  10    RECORD.

09:00AM  11          THE INVESTOR PRESENTATIONS, THE DEPARTMENT OF DEFENSE

09:00AM  12    PRESENTATIONS THAT HE WANTS TO INTRODUCE LONG POST-DATE THE

09:00AM  13    RELATIONSHIP BETWEEN THERANOS AND THE DEPARTMENT OF DEFENSE.

09:00AM  14          EXHIBIT 551 IS A DOCUMENT THAT WAS SENT TO AN ARMY SURGEON

09:00AM  15    THAT THERANOS HAD BEEN WORKING WITH FOR YEARS.

09:00AM  16          SO I THINK WE CAN MISPORTRAY THE HISTORY OF THE CASE,

09:00AM  17    MISPORTRAY WHETHER IT'S PROPENSITY EVIDENCE, AND MISPORTRAY THE

09:00AM  18    FACTS, BUT UNDER NOT -- BUT UNDER ANY OF THOSE THREE CONCERNS,

09:00AM  19    NONE OF THIS SHOULD COME IN.

09:00AM  20            THE COURT:  SO I THINK WHAT I HEAR MR. BOSTIC SAYING

09:00AM  21    IS THAT IN ORDER TO GET AND KEEP INVESTORS INTERESTED AND TO

09:00AM  22    USE THE MILITARY AS AN IMPRIMATUR, WE HAVE THE MILITARY, SO

09:00AM  23    THAT SHOULD BE AN INTEREST TO AN INVESTOR BECAUSE IF THE

09:01AM  24    MILITARY IS INTERESTED IN THE TOPIC IN THE TECHNOLOGY, THEN

09:01AM  25    THAT IMPRIMATUR WILL ENCOURAGE OTHER INVESTORS TO INVEST.

09:01AM 1        I THINK -- IS THAT WHAT YOU'RE SAYING, MR. BOSTIC?

09:01AM 2           MR. BOSTIC:  YES, YOUR HONOR.  I THINK IT'S THE

09:01AM 3    FALSE STATEMENTS ABOUT THERANOS'S RELATIONSHIP WITH THE

09:01AM 4    MILITARY WERE MATERIAL TO INVESTORS.  THE JURY WILL HEAR THAT.

09:01AM 5        IN ORDER TO MAKE THOSE STATEMENTS MORE CREDIBLE, AND IN

09:01AM 6    ORDER TO MAKE THEM MORE DIFFICULT TO DETECT AS FALSE

09:01AM 7    STATEMENTS, IT WAS IMPORTANT FOR THERANOS TO HAVE AN ACTUAL

09:01AM 8    RELATIONSHIP WITH THE MILITARY, AND IN ORDER TO CREATE THAT

09:01AM 9    RELATIONSHIP, IN ORDER TO CREATE THAT INTEREST ON THE PART OF

09:01AM 10   THE MILITARY, MS. HOLMES RELIED ON FALSE MISREPRESENTATIONS TO

09:01AM 11   THE MILITARY.

09:01AM 12       SO IT WAS ALL IN SERVICE OF THE SCHEME TO DEFRAUD

09:01AM 13   INVESTORS.

09:01AM 14          THE COURT:  AND WHAT ABOUT THE TIMING?  THIS IS

09:01AM 15   SOMETHING I'M CONCERNED ABOUT, THE TIMING OF IT.  IT SOUNDS

09:02AM 16   LIKE THERE'S AN 18-MONTH SWING ON EITHER SIDE OF THIS, AND DOES

09:02AM 17   THAT DO ANYTHING TO THE RELEVANCE OF IT THEN?

09:02AM 18          MR. BOSTIC:  SO I'M NOT SURE I UNDERSTAND

09:02AM 19   MR. DOWNEY'S POINT THERE, TO BE HONEST.

09:02AM 20       THE KEY CHRONOLOGY POINT HERE IS THAT THOSE FALSE

09:02AM 21   STATEMENTS TO THE MILITARY PREDATED FALSE STATEMENTS THAT

09:02AM 22   MS. HOLMES MADE TO INVESTORS AND OTHERS ABOUT THE STATUS OF THE

09:02AM 23   THERANOS MILITARY RELATIONSHIP.

09:02AM 24       SO BECAUSE MS. HOLMES KNEW ABOUT THESE FALSE STATEMENTS TO

09:02AM 25   THE MILITARY, KNEW THAT THE MILITARY'S CONTINUED INTEREST WAS

3902

09:02AM   1     BASED ON A FALSE IMPRESSION OF WHAT THE THERANOS DEVICE COULD

09:02AM   2     DO, SHE KNEW MONTHS LATER, YEARS LATER, THAT WHEN SHE WAS

09:02AM   3     TELLING ANYONE THAT THE THERANOS DEVICE WAS BEING USED BY THE

09:02AM   4     MILITARY, THAT THAT WAS FALSE, THAT THAT COULD NOT BE THE CASE

09:02AM   5     BECAUSE THE MILITARY WASN'T INTERESTED IN THE THERANOS DEVICE

09:02AM   6     AS IT EXISTED, IT WAS INTERESTED IN THE THERANOS DEVICE AS IT

09:02AM   7     HAD BEEN REPRESENTED BY MS. HOLMES EARLIER.

09:02AM   8          THE COURT:  AND SO DOES IT MATTER ABOUT THE TIMING

09:02AM   9     OF THOSE?  I UNDERSTAND THAT IF THERE WAS KNOWLEDGE AT TIME ONE

09:03AM  10     THAT THIS DIDN'T WORK OR THERE WAS AN ISSUE WITH IT, AND THEN

09:03AM  11     TIME THREE I'M MAKING A REPRESENTATION TO INVESTORS THAT'S

09:03AM  12     CONTRARY TO -- THAT'S MISLEADING, THAT'S ONE THING.

09:03AM  13          AND I'M NOT SURE -- AND I THINK THAT'S WHAT IS MR. DOWNEY

09:03AM  14     IS TALKING ABOUT, THAT -- THERE'S SOME BREAK THERE IN THAT

09:03AM  15     TIMELINE.

09:03AM  16          MR. BOSTIC:  I THINK THESE EVENTS DO OCCUR IN THE

09:03AM  17     CORRECT ORDER FOR ADMISSIBILITY BECAUSE THE FALSE STATEMENTS TO

09:03AM  18     THE MILITARY THAT WE'RE SEEKING TO ADMIT DO PREDATE THE FALSE

09:03AM  19     STATEMENTS TO INVESTORS.

09:03AM  20          IF I WERE SEEKING TO ADMIT A FALSE STATEMENT TO THE

09:03AM  21     MILITARY IN 2016 OR 2017, THEN IT MIGHT BE LESS CLEAR HOW THAT

09:03AM  22     RELATES TO MS. HOLMES'S KNOWLEDGE YEARS EARLIER WHEN SHE WAS

09:03AM  23     MISREPRESENTING TO INVESTORS THE NATURE OF THE MILITARY

09:03AM  24     RELATIONSHIP.  BECAUSE THIS IS IN 2012, IT DOES BEAR ON HER

09:03AM  25     KNOWLEDGE LATER WHEN THOSE STATEMENTS WERE MADE.

3903

09:04AM 1    THE COURT:  SO YOU SEEK TO GET THIS INFORMATION IN

09:04AM 2    NOW, AND THEN PERHAPS LATER YOU'LL CALL IN INVESTORS WHO ACTED

09:04AM 3    IN RELIANCE ON THIS EVIDENCE?  IS THAT HOW THAT WILL WORK?

09:04AM 4    MR. BOSTIC:  SO THE INVESTORS RELIED ON WHAT

09:04AM 5    MS. HOLMES TOLD THEM ABOUT THE STATUS OF MILITARY RELATIONSHIP

09:04AM 6    AFTER SHE HAD MADE THESE MISREPRESENTATIONS TO THE MILITARY.

09:04AM 7    THESE MISREPRESENTATIONS ARE IMPORTANT TO SHOW THAT WHEN

09:04AM 8    MS. HOLMES SAID WHAT SHE SAID TO INVESTORS, SHE KNEW IT WAS

09:04AM 9    FALSE.

09:04AM 10   MR. DOWNEY:  YOUR HONOR, IF I MAY?

09:04AM 11   THE STATUS OF THE RELATIONSHIP WITH THE MILITARY WHEN

09:04AM 12   MS. HOLMES SPEAKS TO INVESTORS IS WHAT IT IS.

09:04AM 13   IF THE REPRESENTATIONS ARE IN 2013, LATE 2013, AND WE'RE

09:04AM 14   TALKING ABOUT EARLY 2012 IS WHEN THIS DOCUMENT IS, THE STATUS

09:04AM 15   OF THAT RELATIONSHIP IS WHAT IT IS.  THAT SHOULD BE EVALUATED

09:04AM 16   BY AN EVALUATION OF WHAT THAT RELATIONSHIP LOOKED LIKE AND

09:05AM 17   MS. HOLMES'S STATE OF MIND AS TO WHERE IT WAS AND WHERE IT WAS

09:05AM 18   GOING.

09:05AM 19   IT HAS NOTHING TO DO WITH THE INITIATION OF THE

09:05AM 20   RELATIONSHIP OR REPRESENTATIONS THAT WERE MADE TO CREATE IT,

09:05AM 21   YOU KNOW, 18 TO 24 OF MONTHS BEFORE.

09:05AM 22   IT'S COMPLETELY DISCONNECTED AND BEING INTRODUCED TO SHOW

09:05AM 23   SOME PURPORTED PROPENSITY.

09:05AM 24   I THINK THE CONCERN THAT THE GOVERNMENT HAS IS THERE'S A

09:05AM 25   VERY RICH DIALOGUE BETWEEN THE GOVERNMENT AND THERANOS OVER A

09:05AM  1    LONG PERIOD OF TIME, MANY YEARS, DATING YEARS BACK BEFORE THE

09:05AM  2    PRESENTATION THAT THE GOVERNMENT IS ATTEMPTING TO INTRODUCE,

09:05AM  3    AND THEY WANT TO NULLIFY THE SIGNIFICANCE OF THAT.

09:05AM  4         THAT'S WHAT THIS IS ABOUT.

09:05AM  5              MR. BOSTIC:  YOUR HONOR, ON THAT --

09:05AM  6              THE COURT:  ISN'T THAT SOMETHING YOU CAN PROBE ON

09:05AM  7    CROSS-EXAMINATION?

09:05AM  8              MR. DOWNEY:  WELL, OF COURSE I CAN.

09:05AM  9         BUT IT HAS NOTHING REALLY TO DO WITH THESE

09:05AM 10    REPRESENTATIONS.  WHAT I'LL BE PROBING ON CROSS-EXAMINATION IS,

09:05AM 11    WHAT WAS THE STATUS OF THE RELATIONSHIP.  THAT'S WHAT IS

09:05AM 12    RELEVANT IN THE CASE.

09:05AM 13              MR. BOSTIC:  YOUR HONOR, I JUST HAVE TO POINT OUT

09:06AM 14    SOME TENSION IN THE POSITION THAT THE DEFENSE IS TAKING NOW

09:06AM 15    VERSUS THE POSITION THAT IT TOOK A FEW MINUTES AGO WHEN IT SAID

09:06AM 16    THAT ALL THAT MATTERED WAS MS. HOLMES'S STATE OF MIND, THAT

09:06AM 17    IT'S ALL ABOUT SHOWING WHAT SHE WAS AWARE OF, HER KNOWLEDGE,

09:06AM 18    HER INTENT, AND THAT THESE THINGS NEED TO BE JUDGED FROM HER

09:06AM 19    PERSPECTIVE, NOT JUST BASED ON WHAT THE REALITY WAS.

09:06AM 20         I'M NOW HEARING SOMETHING LIKE THE OPPOSITE, THAT THE

09:06AM 21    GOVERNMENT IS ONLY ENTITLED TO EXPLORE WHAT WAS HAPPENING IN

09:06AM 22    THAT RELATIONSHIP AND THAT EVIDENCE OF WHAT MS. HOLMES KNEW AND

09:06AM 23    THE STATEMENTS THAT SHE MADE AREN'T RELEVANT.

09:06AM 24         BUT, OF COURSE, THIS IS A WIRE FRAUD CASE.  IT DOES ALL

09:06AM 25    COME BACK TO MS. HOLMES'S INTENT, AND HER STATEMENTS JUST

3905

09:06AM 1    MONTHS BEFORE SHE WAS MAKING FALSE MISREPRESENTATIONS TO

09:06AM 2    INVESTORS ON THIS SAME TOPIC ARE HIGHLY PROBATIVE OF HER INTENT

09:06AM 3    THERE.

09:06AM 4              MR. DOWNEY:  YOUR HONOR, IF I MAY, AND I KNOW WE'VE

09:06AM 5    EXHAUSTED THIS ISSUE, I THINK THAT STATEMENT DEMONSTRATES THE

09:06AM 6    PROBLEM.  THE GOVERNMENT IS ENTITLED TO EXPLORE MS. HOLMES'S

09:06AM 7    STATE OF MIND.  THEY'RE NOT ENTITLED TO EXPLORE IT THROUGH

09:07AM 8    PROPENSITY EVIDENCE.

09:07AM 9              THE COURT:  ALL RIGHT.  THANK YOU FOR THE

09:07AM 10   CONVERSATION.  I APPRECIATE IT.

09:07AM 11        I'LL STEP DOWN AND I'LL BRING OUR JURY OUT.

09:07AM 12             MR. DOWNEY:  YOUR HONOR, UNFORTUNATELY, I HAVE ONE

09:07AM 13   OTHER THING BASED ON A DISCLOSURE THAT I GOT FROM THE

09:07AM 14   GOVERNMENT THIS MORNING.

09:07AM 15             THE COURT:  OH.

09:07AM 16             MR. DOWNEY:  THIS IS NOT A NEW ISSUE TO THE COURT,

09:07AM 17   BUT TO US IT WAS A SURPRISING ONE.

09:07AM 18        MR. BOSTIC DISCLOSED TO US THIS MORNING THAT HE WANTS TO

09:07AM 19   SEEK TO INTRODUCE THROUGH THIS WITNESS THE CUSTOMER

09:07AM 20   SPREADSHEETS THAT WERE THE SUBJECT OF PRETRIAL LITIGATION, OR

09:07AM 21   THE SUBJECT OF THE COURT'S MOTION IN LIMINE ORDER.

09:07AM 22        THE -- APPARENTLY HE INTENDS TO INTRODUCE THE ENTIRE

09:07AM 23   EXHIBIT.  AS THE COURT KNOWS, THE COURT HAS ALREADY RULED THAT

09:07AM 24   THE CONTENTS OF THAT SPREADSHEET ARE INADMISSIBLE UNDER 403 AND

09:07AM 25   FOR OTHER REASONS AS CONFUSING, UNDULY PREJUDICIAL, NOT

09:08AM  1    RELEVANT.

09:08AM  2         THE COURT DID RULE THAT THE EXISTENCE OF THAT KIND OF LOG

09:08AM  3    MIGHT BE SOMETHING THAT COULD BE EXPLORED AT TRIAL.

09:08AM  4         THIS WITNESS WAS ASKED LAST WEEK IF HE HAD EVER SEEN THIS.

09:08AM  5    HE SAID THAT HE HAD NOT.

09:08AM  6         THERE'S NOTHING IN MANY, MANY INTERVIEWS, I THINK EIGHT OR

09:08AM  7    NINE JENCKS INTERVIEWS, THAT REFLECTS ANY KNOWLEDGE OR ANY

09:08AM  8    CONVEYING OF THIS TO MS. HOLMES.

09:08AM  9         I'M AT A LOSS TO UNDERSTAND WHY WE'RE IN THIS LITIGATION

09:08AM  10   HAVING SPENT A LOT OF TIME ON IT PRETRIAL.

09:08AM  11             THE COURT:  MR. BOSTIC?

09:08AM  12             MR. BOSTIC:  YOUR HONOR, FIRST, I HAVE A COPY OF THE

09:08AM  13   EXHIBIT AND REPORT THAT I'M HANDING UP A COPY OF NOW (HANDING).

09:08AM  14             THE COURT:  SURE.  THANK YOU. -

09:08AM  15             MR. BOSTIC:  SO, YOUR HONOR, THIS IS EXHIBIT 5439,

09:08AM  16   WHICH IS AN EMAIL FROM A THERANOS EMPLOYEE TO SUNNY BALWANI

09:08AM  17   ATTACHING A LOG OF COMPLAINTS AS OF SEPTEMBER 2013.  THE

09:08AM  18   COMPLAINT LOG CONTAINS I THINK SOMEWHERE NORTH OF 150 PATIENT

09:09AM  19   COMPLAINT ENTRIES.

09:09AM  20        IN PRETRIAL LITIGATION IN THE MOTION IN LIMINE STAGE, MY

09:09AM  21   UNDERSTANDING WAS THAT THE COURT DEFERRED RULING ON THE

09:09AM  22   ADMISSIBILITY OF THE COMPLAINT LOGS.  THE COURT RECOGNIZED THAT

09:09AM  23   THERE WAS CASE LAW SUBMITTED BY THE GOVERNMENT SHOWING THAT

09:09AM  24   THOSE COMPLAINT LOGS CAN BE ADMISSIBLE AT LEAST FOR NOTICE,

09:09AM  25   SOMETIMES FOR THE TRUTH OF THE MATTER DEPENDING ON THE

09:09AM  1    FOUNDATION LAID.

09:09AM  2         THE GOVERNMENT HELD -- EXCUSE ME.  THE COURT HELD THAT IF

09:09AM  3    A BUSINESS RECORDS FOUNDATION CAN BE LAID, THEN SUCH A LOG

09:09AM  4    MIGHT COME IN FOR THE TRUTH.  IF NOT, THEN THE LOG MAY BE

09:09AM  5    ADMITTED FOR NOTICE.

09:09AM  6         IN THIS CASE, I'M NOT SURE HOW MUCH FOUNDATION THIS

09:09AM  7    WITNESS WILL BE ABLE TO LAY FOR THIS PARTICULAR COMPLAINT LOG,

09:09AM  8    BUT THE WITNESS MAY BE ABLE TO LAY A FOUNDATION FOR EMAIL USE

09:09AM  9    AT THERANOS GENERALLY SPEAKING, AND THE USE OF EMAILS TO CONVEY

09:09AM  10   INFORMATION ABOUT COMPLAINTS.  THAT MAY BE SUFFICIENT TO BRING

09:10AM  11   THIS IN AS A BUSINESS RECORD.

09:10AM  12        I ALSO WANT TO POINT OUT THAT IN THE TRIAL TO DATE, THE

09:10AM  13   DEFENSE HAS ON SEVERAL OCCASIONS PUBLISHED TO THE JURY

09:10AM  14   FAVORABLE CUSTOMER FEEDBACK FROM THERANOS.  IN THE OPENING,

09:10AM  15   DEFENSE COUNSEL SAID, I BELIEVE THIS IS PAGE 562 OF THE

09:10AM  16   TRANSCRIPT, THAT "THERANOS RECEIVED FAVORABLE CUSTOMER REVIEWS

09:10AM  17   FROM DOCTORS AND PATIENTS LIKE THIS PHYSICIAN WHO TOLD THE

09:10AM  18   COMPANY THAT," AND THEN WENT ON TO DISPLAY AND QUOTE A

09:10AM  19   FAVORABLE ACCOUNT FROM A DOCTOR ABOUT THE EXPERIENCE AND THE

09:10AM  20   ACCURACY OF THERANOS RESULTS.

09:10AM  21        SINCE THEN, IN THE CROSS OF DR. ROSENDORFF WITH

09:10AM  22   EXHIBIT 13809 AND IN THE CROSS-EXAMINATION OF MR. JHAVERI WITH

09:10AM  23   EXHIBIT 2394, THE DEFENSE AGAIN PUBLISHED TO THE JURY THE

09:10AM  24   SUBSTANCE OF FAVORABLE PATIENT FEEDBACK ASKING THE WITNESSES

09:10AM  25   ABOUT THE LACK OF NEGATIVE FEEDBACK.

09:10AM 1      IN SO DOING, THE DEFENSE ACTUALLY INJECTED INTO THE CASE

09:11AM 2  THE QUESTION OF WHETHER THERANOS RECEIVED COMPLAINTS, HOW MANY,

09:11AM 3  AND WHAT THE SUBSTANCE WAS.

09:11AM 4      SO ON THAT BASIS ALSO THE GOVERNMENT WOULD SEEK TO ADMIT

09:11AM 5  AT LEAST PORTIONS OF THE EXHIBIT IN FRONT OF THE COURT.

09:11AM 6      AND WE WOULD, I THINK, BE SEEKING TO ADMIT IT TODAY IF WE

09:11AM 7  CAN LAY A FOUNDATION, AND THEN PUBLISH IT AT ANOTHER TIME AFTER

09:11AM 8  DISCUSSING SOME REDACTION ISSUES WITH THE DEFENSE AND THE

09:11AM 9  COURT.

09:11AM 10          THE COURT:  WOULD YOU -- THANK YOU.  WOULD YOU SEEK

09:11AM 11  TO INTRODUCE THE TOTALITY OF THIS -- THE DOCUMENT ITSELF OR

09:11AM 12  PARSE IT OUT OR -- I DON'T KNOW WHAT THE TIMEFRAME IS OR OTHER

09:11AM 13  QUESTIONS ABOUT THE COMPLAINTS.

09:11AM 14          MR. BOSTIC:  I WOULD SEEK TO ADMIT THE ENTIRE THING,

09:11AM 15  YOUR HONOR, I THINK SUBJECT TO REDACTING SENSITIVE INFORMATION

09:11AM 16  AND SUBJECT TO OTHER THOUGHTS THAT THE COURT MIGHT HAVE ON

09:11AM 17  PORTIONS THAT COULD NOT COME IN.  BUT, YES.

09:11AM 18          THE COURT:  AND IT REMAINS TO BE SEEN WHETHER THE

09:11AM 19  WITNESS CAN LAY THE FOUNDATION IN ANY EVENT.

09:11AM 20          MR. BOSTIC:  THAT'S RIGHT, YOUR HONOR.

09:11AM 21      I THINK THIS WITNESS IS NOT FAMILIAR WITH THIS PARTICULAR

09:12AM 22  COMPILATION OF COMPLAINTS, BUT CERTAINLY CAN TESTIFY TO, LIKE I

09:12AM 23  SAID, THE USE OF EMAILS AT THERANOS AND IN CONNECTION WITH

09:12AM 24  COMPLAINTS GENERALLY.

09:12AM 25          THE COURT:  OKAY.

3909

09:12AM  1          MR. DOWNEY?

09:12AM  2              MR. DOWNEY:  YOUR HONOR, JUST TO SORT OF LAY OUT THE

09:12AM  3     ISSUES THAT I THINK WILL PRESENT.

09:12AM  4          THIS WILL NOT BE QUALIFIED AS A BUSINESS RECORD BY THIS

09:12AM  5     WITNESS, OR BY ANY OTHER, BECAUSE, FIRST OF ALL, THIS IS NOT

09:12AM  6     SOMETHING THAT IS A RECORD OF DETAILS OR COMPLAINTS THAT WAS

09:12AM  7     MADE AT OR NEAR THE TIME THAT THOSE COMPLAINTS WERE RECEIVED.

09:12AM  8          THIS IS A COMPILATION EXHIBIT OF INFORMATION FROM MANY

09:12AM  9     DIFFERENT SOURCES THAT WAS PREPARED IN THE SECOND HALF OF 2015

09:12AM 10     APPARENTLY.  IT'S NOT A BUSINESS RECORD THAT WAS BEING KEPT IN

09:12AM 11     REAL TIME, OR THE EVENTS THAT IT DESCRIBES ARE BEING DISCUSSED

09:12AM 12     AND RECORDED IN THE MANNER OF A BUSINESS RECORD.

09:13AM 13          MANY OF THE ENTRIES, I THINK, IF THE COURT HAS THE TIME TO

09:13AM 14     LOOK AT THEM, THE COURT WOULD RECOGNIZE THAT THE NATURE OF THE

09:13AM 15     SPREADSHEET IS NOT THAT.  THAT'S APPARENT FROM MANY OF THE

09:13AM 16     ENTRIES.

09:13AM 17          ALSO, THIS IS NOT A RECORD OF THERANOS INFORMATION.  THIS

09:13AM 18     IS A RECORD OF HEARSAY STATEMENTS, OFTEN MADE MANY MONTHS

09:13AM 19     BEFORE, BY DOCTORS, CUSTOMERS, OTHER PROVIDERS.

09:13AM 20          THE CONTENT OF THE STATEMENTS WITHIN THIS RECORD ARE

09:13AM 21     CLEARLY HEARSAY AND WOULD THEMSELVES BE PRECLUDED.  SO THERE'S

09:13AM 22     A SECOND LEVEL OF HEARSAY THAT I THINK WOULD BE INADMISSIBLE.

09:13AM 23          AND THE BUSINESS RECORDS ISSUE, EVEN IF SOMEHOW OVERCOME

09:13AM 24     AT THE FIRST LEVEL, WOULD NOT BE OVERCOME AT THE SECOND LEVEL.

09:13AM 25          THAT'S A LOT OF THE CONVERSATION THAT WE HAD WITH

09:13AM 1     YOUR HONOR IN THE PRETRIAL PERIOD.

09:13AM 2          ALSO, YOUR HONOR, I THINK IF THE PURPOSE OF THE ADMISSION

09:13AM 3     OF THIS DOCUMENT IS TO SHOW THAT THERE WERE PROBLEMS OR

09:14AM 4     INACCURACY IN THE TECHNOLOGY, I THINK THAT IS WHAT YOUR HONOR'S

09:14AM 5     ORDER PRECLUDED DURING THE PRETRIAL PHASE.

09:14AM 6          AND I DON'T MEAN TO SPEAK OR CONSTRUE YOUR HONOR'S ORDER.

09:14AM 7     YOU CAN CERTAINLY DO THAT.  BUT THAT'S AT 798 OF THE DOCKET.

09:14AM 8          SO I DON'T SEE ANY SCENARIO UNDER WHICH THIS CAN BE

09:14AM 9     QUALIFIED AS A BUSINESS RECORD, AND I THINK TALKING IN FRONT OF

09:14AM 10    THE JURY ABOUT THIS DOCUMENT IN AND OF ITSELF RUNS THE RISK OF

09:14AM 11    PREJUDICE.

09:14AM 12         AS TO THE ISSUE OF WHAT WE HAVE TALKED ABOUT BEFORE, I'M

09:14AM 13    HAPPY TO TALK ABOUT THOSE OTHER INSTANCES.

09:14AM 14         BUT, FOR EXAMPLE, WITH MR. JHAVERI, MR. JHAVERI CLAIMED

09:14AM 15    THAT BECAUSE OF VARIOUS ISSUES OF PERFORMANCE, THE

09:14AM 16    WALGREENS-THERANOS RELATIONSHIP WAS FALLING APART.  THIS WAS

09:14AM 17    USED TO CAST DOUBT ON THAT GIVEN THAT THE FEEDBACK THAT THEY

09:15AM 18    WERE GETTING ALL EXCEEDED THE METRICS THAT THEY HAD MADE.

09:15AM 19         THAT WAS REFLECTED IN A WALGREENS BUSINESS RECORD, NOT IN

09:15AM 20    A THERANOS BUSINESS RECORD, AND WASN'T INTRODUCED FOR ANY

09:15AM 21    PURPOSE OTHER THAN TO CAST DOUBT ON WHAT MR. JHAVERI WAS

09:15AM 22    SAYING.

09:15AM 23         SO I THINK THIS IS -- WE RAISE THIS BECAUSE THIS IS A BIG

09:15AM 24    ISSUE, AND I THINK TO BE TALKING ABOUT IT IN FRONT OF THE JURY

09:15AM 25    WITHOUT A REAL PROFFER AS TO WHAT THIS WITNESS KNOWS WHEN WE

09:15AM  1    KNOW HE SAID HE DIDN'T KNOW ABOUT IT IS NOT PROPER.

09:15AM  2         THE COURT:  I GUESS WE'LL JUST SEE WHAT THE WITNESS

09:15AM  3    SAYS AND WHETHER OR NOT -- THANK YOU FOR THE HEADS UP.  AND I

09:15AM  4    APPRECIATE YOUR CANDOR THAT HE MAY NOT BE ABLE TO ESTABLISH IT

09:15AM  5    FOR THIS, AND YOU MIGHT HAVE TO FIND ANOTHER PURPOSE.

09:15AM  6       BUT WHAT MR. MR. BOSTIC'S POINT THAT YOUR TEAM HAS RAISED,

09:15AM  7    ON A COUPLE OF OCCASIONS, NOTICES FROM DOCTORS, COMMENTS FROM

09:15AM  8    DOCTORS THAT HAVE BEEN APPROVING OF THE TECHNOLOGY?  AND

09:15AM  9    MR. BOSTIC, I HEAR HIM SAYING, WE SHOULD BE ABLE TO COUNTER

09:16AM 10    THAT WITH THE FACT THAT ACTUALLY THERE WERE COMPLAINTS

09:16AM 11    RECEIVED.

09:16AM 12         MR. DOWNEY:  YEAH, THERE'S A SIGNIFICANT DIFFERENCE

09:16AM 13    BETWEEN THOSE TWO CATEGORIES.

09:16AM 14       I WILL TELL THE COURT THAT I CAN SHOW AS SOON AS TODAY

09:16AM 15    THAT THE COMMENTS THAT WE'RE REFERRING TO WERE CONVEYED TO

09:16AM 16    MS. HOLMES.

09:16AM 17       WE KNOW THAT THE GOVERNMENT HAS NO PROFFER, NO PROOF IN

09:16AM 18    THE RECORD FROM THEIR EXTENSIVE PRETRIAL INVESTIGATION THAT

09:16AM 19    THESE LOGS, ANY CONTENTS OF THESE LOGS WERE CONVEYED TO

09:16AM 20    MS. HOLMES.  THAT'S CRITICAL, YOUR HONOR, AS TO THE ISSUE.

09:16AM 21       WHAT WE HAVE BEEN INTRODUCING EITHER IS FOR A DIFFERENT

09:16AM 22    PURPOSE OR WILL BE INTRODUCED BECAUSE IT RELATES TO ACTUAL

09:16AM 23    FACTS KNOWN BY THE DEFENDANT.

09:16AM 24         MR. BOSTIC:  AND, YOUR HONOR, ON THAT POINT, ONE

09:16AM 25    REASON THAT THE GOVERNMENT IS SEEKING TO INTRODUCE THIS

09:16AM 1    PARTICULAR EXHIBIT, AS OPPOSED TO OTHER COMPLAINT LOGS, IS THAT

09:16AM 2    THIS ONE ACTUALLY WAS SENT DIRECTLY TO MR. BALWANI.

09:16AM 3    MR. BALWANI IS THE INDICTED COCONSPIRATOR IN THIS CASE.

09:16AM 4        THERE HAS ALREADY BEEN EVIDENCE, AND THERE WILL CONTINUE

09:16AM 5    TO BE MORE EVIDENCE IN THE TRIAL, ABOUT THE CLOSE WORKING

09:17AM 6    AND/OR PERSONAL RELATIONSHIP THAT MS. HOLMES AND MR. BALWANI

09:17AM 7    HAD.

09:17AM 8        MR. BALWANI'S KNOWLEDGE OF SOMETHING LIKE THIS IS

09:17AM 9    PROBATIVE AS TO WHETHER MS. HOLMES HAD KNOWLEDGE OR NOT.

09:17AM 10        THE COURT:  THAT'S A DIFFERENT ISSUE ALSO,

09:17AM 11   MR. DOWNEY, ISN'T IT?

09:17AM 12        MR. DOWNEY:  WELL, THAT'S A DIFFERENT ISSUE, BUT I

09:17AM 13   THINK MR. BOSTIC HAS STATED THE PRECISE REASON THAT IT IS

09:17AM 14   PROHIBITED TO INTRODUCE IT.

09:17AM 15       IT'S NINTH CIRCUIT LAW THAT KNOWLEDGE TO A COCONSPIRATOR

09:17AM 16   CANNOT BE CONTRIBUTED TO THE DEFENDANT.  I CAN GIVE THE COURT A

09:17AM 17   CITE TO THAT.  IT'S PHILLIPS VERSUS UNITED STATES, 356 F.2D 297

09:17AM 18   AT 306.

09:17AM 19        THE COURT:  I THINK MR. WADE INFORMED US OF THAT

09:17AM 20   CASE SOME TIME AGO.

09:17AM 21        MR. DOWNEY:  YEAH, IT'S ONE OF HIS FAVORITES.

09:17AM 22       (LAUGHTER.)

09:17AM 23        MR. DOWNEY:  BUT I THINK THAT THE STATEMENT THAT

09:17AM 24   MR. BOSTIC MAKES AS TO WHY AND HOW HE WANTS TO INTRODUCE IT

09:17AM 25   SHOWS IT RUNS INTO THE PROHIBITED PURPOSE.

09:17AM 1          THE COURT:  WELL, FOR THAT REASON.

09:17AM 2          MR. DOWNEY:  YES.

09:17AM 3          THE COURT:  UNDER A COCONSPIRATOR.

09:17AM 4          MR. DOWNEY:  RIGHT.

09:17AM 5          THE COURT:  RIGHT.  UNDERSTOOD.

09:17AM 6      ALL RIGHT.  WELL, THIS IS A GREAT WAY TO START THE

09:18AM 7  MORNING.

09:18AM 8          MR. DOWNEY:  I APOLOGIZE, YOUR HONOR.  I STARTED THE

09:18AM 9  MORNING THE SAME WAY.

09:18AM 10         THE COURT:  WELL, GREAT.  THANK YOU.

09:18AM 11     I'LL STEP DOWN AND WE'LL BRING OUR JURY OUT AND AT LEAST

09:18AM 12 START SOME EVIDENCE NOW.

09:18AM 13     THANK YOU FOR THE CONVERSATIONS.

09:18AM 14     ANYTHING ELSE BEFORE I STEP DOWN?

09:18AM 15         MR. DOWNEY:  NO, YOUR HONOR.

09:18AM 16         MR. BOSTIC:  NO, YOUR HONOR.

09:18AM 17     JUST ON THE MILITARY EXHIBITS, THE GOVERNMENT DOES INTEND

09:18AM 18 TO COVER THOSE WITH MR. EDLIN.  I'M NOT SURE WHETHER IT WILL

09:18AM 19 HAPPEN BEFORE OUR FIRST BREAK, BUT I CERTAINLY WON'T DO SO

09:18AM 20 WITHOUT FURTHER GUIDANCE FROM THE COURT.

09:18AM 21         THE COURT:  THANK YOU.  I APPRECIATE THAT.

09:18AM 22     SHOULD OUR BREAK BE -- DO YOU KNOW, MR. DOWNEY, WHAT TIME

09:18AM 23 THAT SHOULD BE?

09:18AM 24         MR. DOWNEY:  I THINK IN THAT 11:00 O'CLOCK WINDOW,

09:18AM 25 BUT I'D LEAVE IT TO MR. BOSTIC TO IDENTIFY WHEN HE'S AT A

09:18AM   1    LOGICAL POINT.

09:18AM   2         THE COURT:  OKAY.  SO WE'LL LOOK AT 11:00, 11:15,

09:18AM   3    SOMETHING LIKE THAT.  ALL RIGHT.  CLOSER TO 11:00.

09:18AM   4       OKAY.  THANK YOU.

09:18AM   5         MR. DOWNEY:  THANK YOU, YOUR HONOR.

09:18AM   6         THE COURT:  ALL RIGHT.

09:18AM   7         THE CLERK:  COURT IS IN RECESS.

09:18AM   8      (RECESS FROM 9:18 A.M. UNTIL 9:30 A.M.)

09:30AM   9      (JURY IN AT 9:30 A.M.)

09:30AM  10         THE COURT:  ALL RIGHT.  THANK YOU.  GOOD MORNING.

09:30AM  11      WE ARE BACK ON THE RECORD IN THE HOLMES MATTER.  ALL

09:30AM  12    COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT.

09:30AM  13      OUR JURY AND ALTERNATES ARE PRESENT.  GOOD MORNING, LADIES

09:30AM  14    AND GENTLEMEN.  I HOPE YOU HAD A PLEASANT WEEKEND.

09:30AM  15      LET ME FIRST ASK YOU THAT QUESTION THAT I ASK YOU EVERY

09:30AM  16    DAY IN THE MORNING.  DURING OUR BREAK, YOUR BREAK, HAVE ANY OF

09:30AM  17    YOU HAD OCCASION TO DO ANY INVESTIGATION, HAVE COMMUNICATIONS

09:30AM  18    WITH OR SEE ANYTHING ABOUT THIS CASE OR ANYTHING TO DO WITH IT

09:30AM  19    OVER YOUR BREAK?

09:30AM  20      IF SO, PLEASE RAISE YOUR HAND IF YOU WOULD.

09:30AM  21      I SEE NO HANDS.  THANK YOU.

09:30AM  22      I DO WANT TO TELL YOU ABOUT A CHANGE IN OUR SCHEDULE.  WE

09:31AM  23    WILL NOT BE IN SESSION ON FRIDAY, OCTOBER 29TH.  SO WE'LL -- WE

09:31AM  24    WILL NOT BE IN SESSION THAT DAY.

09:31AM  25      WE WILL BE IN SESSION THE FOLLOWING TUESDAY, THE 2ND, BUT

09:31AM   1    WE'LL NOT BE IN SESSION -- THIS IS NEXT WEEK, I BELIEVE.  MY

09:31AM   2    GOODNESS, THE MONTH IS FLYING.  THE WEEK OF THE 26TH, 25TH,

09:31AM   3    WE'LL BE IN SESSION THAT TUESDAY AND WEDNESDAY ONLY, AND THEN

09:31AM   4    NOT THAT FRIDAY, JUST FOR YOUR SCHEDULING PURPOSES.

09:31AM   5         GREAT.  THANK YOU.

09:31AM   6         MR. BOSTIC, ARE YOU READY TO CONTINUE?

09:31AM   7              MR. BOSTIC:  YES, YOUR HONOR.

09:31AM   8              THE COURT:  GREAT.

09:31AM   9         MR. EDLIN, COULD YOU PLEASE STATE YOUR NAME AGAIN FOR THE

09:31AM  10    RECORD.

09:31AM  11              THE WITNESS:  YES, YOUR HONOR.

09:31AM  12         DANIEL EDLIN.

09:31AM  13              THE COURT:  THANK YOU.  AND I'LL REMIND YOU, SIR,

09:31AM  14    YOU ARE STILL UNDER OATH.

09:31AM  15         **(GOVERNMENT'S WITNESS, DANIEL EDLIN, WAS PREVIOUSLY**

09:31AM  16    **SWORN.)**

09:31AM  17              THE COURT:  MR. BOSTIC.

09:32AM  18              MR. BOSTIC:  THANK YOU, YOUR HONOR.

09:32AM  19                   **DIRECT EXAMINATION (RESUMED)**

09:32AM  20    BY MR. BOSTIC:

09:32AM  21    Q.   MR. EDLIN, IF YOU ARE STILL COMFORTABLE TESTIFYING WITHOUT

09:32AM  22    A MASK, I UNDERSTAND THE COURT WILL PERMIT YOU TO REMOVE YOURS.

09:32AM  23         WELCOME BACK, MR. EDLIN.

09:32AM  24    A.   THANK YOU.

09:32AM  25    Q.   LAST WEEK WE TALKED ABOUT TECHNOLOGY DEMONSTRATIONS AT

EDLIN DIRECT BY MR. BOSTIC (RES.)

09:32AM  1    THERANOS.

09:32AM  2        DO YOU RECALL THAT TESTIMONY?

09:32AM  3    A.   YES.

09:32AM  4    Q.   AND THESE DEMONSTRATIONS WERE FOR VIP VISITORS AT

09:32AM  5    THERANOS; IS THAT CORRECT?

09:32AM  6    A.   PREDOMINANTLY, YES.

09:32AM  7    Q.   DO YOU RECALL TESTIFYING ABOUT SOMETHING CALLED THE NULL

09:32AM  8    PROTOCOL AND SOMETHING ELSE CALLED THE DEMO APP BEING USED IN

09:32AM  9    CONNECTION WITH THOSE DEMONSTRATIONS?

09:32AM 10    A.   YES, I DO.

09:32AM 11    Q.   AND CAN YOU REMIND US WHAT THOSE WERE, STARTING WITH THE

09:32AM 12    NULL PROTOCOL, JUST IN YOUR OWN WORDS?

09:32AM 13    A.   THE NULL PROTOCOL WAS A PART OF THE DEMO APPLICATION.

09:32AM 14        DEMO APPLICATION WAS SET UP ON DEVICES FOR TECHNOLOGY

09:32AM 15    DEMONSTRATIONS, AND PER SOME OF THE EMAILS WE'VE REVIEWED LAST

09:33AM 16    WEEK, IN THE DEMO APPLICATION IT SHIELDED DEVICE ERRORS FROM

09:33AM 17    VIEW.

09:33AM 18        AND THE NULL PROTOCOL WAS USED FOR -- WAS NOT INTENDED FOR

09:33AM 19    THE SAMPLES TO BE TESTED FOR USE.

09:33AM 20    Q.   WHEN THE NULL PROTOCOL WAS ACTIVE, IS IT CORRECT THAT THE

09:33AM 21    MACHINE MADE NO ATTEMPT TO ACTUALLY ANALYZE THE SAMPLE IN THE

09:33AM 22    DEVICE?

09:33AM 23    A.   I BELIEVE SO, YES.

09:33AM 24    Q.   IN CONTRAST WITH JUST THE DEMO APP ALONE, THE DEVICE WOULD

09:33AM 25    ATTEMPT TO RETURN A RESULT IF POSSIBLE?

09:33AM   1      A.   YES.

09:33AM   2      Q.   BUT WHEN THE DEMO APP WAS FUNCTIONING, IF THE DEVICE TRIED

09:33AM   3      TO RETURN A RESULT AND ENCOUNTERED AN ERROR, WOULD THAT ERROR

09:33AM   4      APPEAR ON THE SCREEN?

09:33AM   5      A.   I DON'T BELIEVE SO.

09:33AM   6      Q.   IF I COULD ASK YOU TO TURN IN THE BINDER IN FRONT OF YOU

09:34AM   7      TO EXHIBIT 860.

09:34AM   8           AND DO YOU HAVE 860 IN FRONT OF YOU?

09:34AM   9      A.   YES.

09:34AM  10      Q.   IS THIS AN EMAIL CHAIN BETWEEN EMPLOYEES AT THERANOS,

09:34AM  11      INCLUDING YOURSELF, ELIZABETH HOLMES, AND SUNNY BALWANI?

09:34AM  12      A.   YES.

09:34AM  13      Q.   AND DOES THIS RELATE TO THE PROCESSING OF ONE OF THE

09:34AM  14      DEMONSTRATION SAMPLES WE'VE BEEN TALKING ABOUT?

09:34AM  15      A.   YES.

09:34AM  16           MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

09:34AM  17      EXHIBIT 860.

09:34AM  18           MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

09:34AM  19           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:35AM  20      (GOVERNMENT'S EXHIBIT 860 WAS RECEIVED IN EVIDENCE.)

09:35AM  21           MR. BOSTIC:  MS. HOLLIMAN, IF WE CAN START ON

09:35AM  22      PAGE 12.  AND IF WE CAN JUST ZOOM IN ON THE BOTTOM OF PAGE 12

09:35AM  23      TO GET THE HEADER INFORMATION.

09:35AM  24      Q.   MR. EDLIN, DO YOU SEE WE'RE ABOUT TO LOOK AT AN EMAIL FROM

09:35AM  25      YOU ON MAY 31ST, 2013?

09:35AM  1    A.   YES.

09:35AM  2    Q.   AND THE SUBJECT LINE IS "SAMPLE RUNNING RIGHT NOW."

09:35AM  3         DO YOU SEE THAT?

09:35AM  4    A.   I DO.

09:35AM  5    Q.   AND LET'S GO TO THE NEXT PAGE, PAGE 13.  AND LET'S ZOOM IN

09:35AM  6    ON THE TOP OF THE PAGE.

09:35AM  7         MR. EDLIN, YOU WRITE, "WHAT IS THE STATUS?  IT'S ALREADY

09:35AM  8    BEEN RUNNING FOR 1 HOUR AND 15 MINUTES AND HAS BEEN STUCK ON

09:35AM  9    99 PERCENT FOR ABOUT 8 MINUTES."

09:35AM 10         DO YOU SEE THAT?

09:35AM 11    A.   YES.

09:35AM 12    Q.   IS THIS RELATING TO AN ONGOING DEMONSTRATION TEST THAT WAS

09:36AM 13    HAPPENING AT THE TIME?

09:36AM 14    A.   YES.

09:36AM 15    Q.   AND WHAT WAS THE PURPOSE OF THIS EMAIL THAT YOU SENT?

09:36AM 16    A.   THIS -- I RECALL THAT WE HAD A MEETING, AND IN THE MEETING

09:36AM 17    A DEMO TEST WAS RUN ON AN EDISON DEVICE, AND THE SAMPLE WAS

09:36AM 18    PROCESSING AS THE MEETING CONTINUED, AND I WAS JUST KEEPING

09:36AM 19    TABS OF HOW LONG IT HAD BEEN RUNNING AND THE STATUS, AND I'M

09:36AM 20    SENDING AN EMAIL BACK TO SOME OF THE SOFTWARE DEVELOPERS AND

09:36AM 21    ENGINEERS TO CHECK WHAT WAS THE STATUS OF THE TEST.

09:36AM 22    Q.   OKAY.  LET'S MOVE FORWARD IN TIME AND WE'LL MOVE PAST SOME

09:36AM 23    MORE DISCUSSION ABOUT THAT TIMING.

09:36AM 24         LET'S GO TO PAGE 10 OF THIS EXHIBIT.  MR. EDLIN, DO YOU

09:36AM 25    SEE AT THE BOTTOM OF THE PAGE THERE IS THE DATA THAT RESULTED

09:37AM   1    FROM THAT DEMONSTRATION RUN?

09:37AM   2    A.   YES.

09:37AM   3    Q.   LET'S GO UP FROM THERE AND LET'S ZOOM IN ON THE TEXT OF

09:37AM   4    THE EMAIL IN THE MIDDLE OF THE PAGE THAT READS "HI DANIEL."

09:37AM   5         DO YOU SEE THAT?

09:37AM   6    A.   YES.

09:37AM   7    Q.   AND WHO IS THIS EMAIL MESSAGE FROM?

09:37AM   8    A.   THIS MESSAGE IS FROM ME TO DANIEL YOUNG.

09:37AM   9    Q.   OKAY.  AND WHAT WAS DANIEL YOUNG'S ROLE IN CONNECTION WITH

09:37AM   10   TECHNOLOGY DEMONSTRATIONS LIKE THIS?

09:37AM   11   A.   DANIEL WAS, I BELIEVE, AT SOME POINT A VICE PRESIDENT OF

09:37AM   12   THERANOS SYSTEMS, AND DANIEL WOULD REVIEW AND APPROVE ALL DEMO

09:37AM   13   REPORTS AND RESULTS BEFORE THEY WERE SENT OUT TO THE RESPECTIVE

09:37AM   14   PATIENT.

09:37AM   15   Q.   AT THE BOTTOM OF YOUR EMAIL YOU SAY THAT YOU'LL BASE YOUR

09:38AM   16   SCHEDULE ON DANIEL YOUNG'S AVAILABILITY SO THAT WE CAN FINALIZE

09:38AM   17   THE REPORTS AND GET THEM TO EAH FOR APPROVAL AS SOON AS

09:38AM   18   POSSIBLE.

09:38AM   19        DO YOU SEE THAT?

09:38AM   20   A.   YES.

09:38AM   21   Q.   AND WHO WAS EAH?

09:38AM   22   A.   ELIZABETH.

09:38AM   23   Q.   AND WHAT DID THAT MEAN, GETTING THE REPORTS TO HER FOR

09:38AM   24   APPROVAL?

09:38AM   25   A.   I THINK IN THIS CASE ELIZABETH WANTED TO REVIEW THE

09:38AM  1    REPORTS BEFORE THEY WERE SENT OUT.

09:38AM  2    Q.   AND WAS THAT SOMETHING THAT HAPPENED AT OTHER TIMES IN

09:38AM  3    CONNECTION WITH THESE TECHNOLOGY DEMONSTRATIONS?

09:38AM  4    A.   THERE WERE OTHER TIMES WHEN THAT HAPPENED, YES.

09:38AM  5    Q.   LET'S LOOK AT THE BOTTOM HALF OF PAGE 8.  APOLOGIES FOR

09:38AM  6    THE FORMATTING HERE.

09:38AM  7        DO YOU SEE AN EMAIL FROM YOU LATER ON IN THIS CHAIN?

09:39AM  8    A.   YES.

09:39AM  9    Q.   AND YOU ARE WRITING TO DANIEL YOUNG AND CC'ING

09:39AM  10   ELIZABETH HOLMES AND SUNNY BALWANI; IS THAT CORRECT?

09:39AM  11   A.   YES.

09:39AM  12   Q.   STARTING IN THE SECOND PARAGRAPH OF YOUR EMAIL, AND IT

09:39AM  13   STARTS AT THE VERY BOTTOM OF THE PAGE, IT SAYS, "IT LOOKS" --

09:39AM  14   AND THEN LET'S GO ON TO PAGE 9.

09:39AM  15       IF WE CAN ZOOM IN ON THE TOP OF PAGE 9.

09:39AM  16       YOU SAY, "IT LOOKS LIKE THERE IS SOME DISCREPANCY BETWEEN

09:39AM  17   THE TWO INFECTIOUS PANEL RUNS.

09:39AM  18       "- ANY THOUGHTS ON WHY THIS IS THE CASE?"

09:39AM  19       DO YOU SEE THAT?

09:39AM  20   A.   YES.

09:39AM  21   Q.   AND DO YOU RECALL WHY THERE WERE TWO DIFFERENT RUNS IN

09:39AM  22   CONNECTION WITH THIS TECHNOLOGY DEMONSTRATION?

09:39AM  23   A.   ONE OF THE RUNS TOOK PLACE IN THE MEETING, WHICH WAS IN

09:39AM  24   NEW YORK, AND THEN ANOTHER RUN TOOK PLACE IN PALO ALTO.

09:40AM  25   Q.   AND DO YOU RECALL WHETHER THOSE TWO RUNS WERE TAKEN FROM

09:40AM  1    THE SAME PATIENTS OR DIFFERENT PATIENTS?

09:40AM  2    A.   I BELIEVE THEY WERE TAKEN FROM THE SAME PATIENT.

09:40AM  3    Q.   AND HOW ABOUT WHETHER THEY WERE TESTED ON TWO DIFFERENT

09:40AM  4    DEVICES OR THE SAME DEVICE?

09:40AM  5    A.   I DON'T RECALL THAT SPECIFICALLY.

09:40AM  6    Q.   OKAY.  LET'S LOOK AT THE TOP OF -- LET'S GO TO PAGE 7

09:40AM  7    ACTUALLY AND LOOK AT THE BOTTOM HALF OF THAT.

09:40AM  8         AND DO YOU SEE ANOTHER EMAIL FROM YOU IN THE BOTTOM HALF

09:40AM  9    OF PAGE 7?

09:40AM  10    A.   YES.

09:40AM  11    Q.   AND IN THAT EMAIL YOU TALK ABOUT HOW ONE SAMPLE WAS

09:40AM  12    DEPOSITED INTO A CARTRIDGE AND RUN ONSITE AND THAT IT HAD BEEN

09:40AM  13    SHIPPED TO NEW YORK CITY IN STANDARD PACKAGING.

09:40AM  14         DO YOU SEE THAT?

09:40AM  15    A.   YES.

09:40AM  16    Q.   AND LET'S FLIP THE PAGE AND GO TO PAGE 8, THE TOP OF

09:40AM  17    PAGE 8.  AND IT TALKS ABOUT SOME OTHER PROCESSING DETAILS.

09:41AM  18         AND THEN YOU SAY, "BOTH CARTRIDGES WERE RUN ON THE SAME

09:41AM  19    READER."

09:41AM  20         DO YOU SEE THAT?

09:41AM  21    A.   YES.

09:41AM  22    Q.   AND SO THIS IS A SITUATION WHERE THE TWO RUNS INVOLVE THE

09:41AM  23    SAME PATIENT AND THE SAME ANALYZER; CORRECT?

09:41AM  24    A.   CORRECT.

09:41AM  25    Q.   LET'S GO BACK TO PAGE 7, AND ZOOM IN ON MS. HOLMES'S EMAIL

EDLIN DIRECT BY MR. BOSTIC (RES.)                                3922

09:41AM   1    AT THE TOP OF THAT PAGE.

09:41AM   2         MS. HOLMES SAYS, "THE DISCREPANCY WILL BE A PROBLEM.  WE

09:41AM   3    NEED TO SEE IF WE CAN CORRECT FOR IT."

09:41AM   4         DO YOU SEE THAT?

09:41AM   5    A.   YES.

09:41AM   6    Q.   LET'S GO TO -- FIRST, IF YOU WOULD JUST LOOK AT PAGE 5 IN

09:41AM   7    FRONT OF YOU.

09:41AM   8         DO YOU SEE THAT AT THE BOTTOM THERE'S AN EMAIL FROM

09:41AM   9    DANIEL YOUNG FURTHER ON IN THIS CHAIN?

09:41AM  10    A.   YES.

09:41AM  11    Q.   OKAY.  LET'S LOOK AT THE BODY OF THAT MESSAGE ON PAGE 6.

09:42AM  12    AND IF WE CAN ZOOM IN ON THE MIDDLE PARAGRAPH.

09:42AM  13         DR. YOUNG SAYS, "FOR MUMPS, I AM INCLINED TO BELIEVE THAT

09:42AM  14    THE RUN IN P.A. IS CORRECT."

09:42AM  15         IS THAT PALO ALTO?

09:42AM  16    A.   THAT'S CORRECT.

09:42AM  17    Q.   AND HE HAVE SAYS FOR A NUMBER OF REASONS.  HE EXPLAINS HIS

09:42AM  18    THINKING.

09:42AM  19         AND THEN HE SAYS IN THE BOTTOM OF THAT PARAGRAPH, "ALL

09:42AM  20    TESTS RAN HIGHER IN THE SECOND RUN IN PALO ALTO, SUGGESTING TO

09:42AM  21    ME, THAT THE ASSAY RUNS WERE A LITTLE LOW IN THE RUN IN

09:42AM  22    NEW YORK CITY (NOT SURE WHY)."

09:42AM  23         DO YOU SEE THAT?

09:42AM  24    A.   YES.

09:42AM  25    Q.   AND HE SAYS, "THERE COULD HAVE BEEN TOO LITTLE SAMPLE IN

09:42AM  1    THE FIRST RUN, A PROBLEM IN THE DILUTION, OR AN ISSUE WITH THE

09:42AM  2    CARTRIDGE."

09:42AM  3         IN OTHER WORDS, DR. YOUNG DOESN'T HAVE A SOLID EXPLANATION

09:42AM  4    FOR WHAT MIGHT BE GOING ON HERE; IS THAT RIGHT?

09:42AM  5    A.   I THINK THAT'S FAIR.

09:42AM  6    Q.   LET'S GO TO PAGE 5 AND LOOK AT THE MIDDLE.

09:43AM  7         ACTUALLY, IF YOU COULD JUST CAPTURE THE TOP HALF OF THAT

09:43AM  8    PAGE.

09:43AM  9         LET'S START A LITTLE FURTHER DOWN.  IF WE CAN CAPTURE JUST

09:43AM  10   THE, JUST THE MIDDLE MESSAGE FOR NOW.

09:43AM  11        IN THIS EMAIL YOU WRITE TO MS. HOLMES, DO YOU SEE THAT,

09:43AM  12   HER ADDRESS IN THE SECOND PARAGRAPH?

09:43AM  13        YOU SAY "ELIZABETH -- PLEASE ADVISE ON HOW TO REPORT THE

09:43AM  14   INFECTIOUS PANEL RESULTS."

09:43AM  15        WAS IT MS. HOLMES'S FINAL DECISION AS TO HOW THIS

09:43AM  16   DISCREPANCY WAS GOING TO BE RESOLVED?

09:43AM  17   A.   IN THIS CASE.

09:43AM  18        I THINK THERE WAS --

09:43AM  19   Q.   GO AHEAD.

09:43AM  20   A.   -- CONVERSATION BETWEEN HER AND DANIEL ON THIS AND

09:43AM  21   TOGETHER THEY DECIDED, RIGHT.

09:43AM  22   Q.   OKAY.  LET'S LOOK AT THE FINAL OUTCOME, AND THAT'S ON

09:44AM  23   PAGE 4, AND IF WE CAN ZOOM IN ON THE TOP HALF OF PAGE 4.

09:44AM  24        DO YOU SEE THERE MS. HOLMES RESPONDING TO THE INPUT FROM

09:44AM  25   DR. YOUNG SAYS, "AGREE ON THE PALO ALTO MEASLES RESULT.  WE'LL

09:44AM  1    ONLY INCLUDE THAT ONE FROM PALO ALTO.  I WOULD INTEGRATE THE

09:44AM  2    PALO ALTO ONLY INFECTIOUS RESULTS WITH THE REST OF THE REPORT

09:44AM  3    RESULTS AND THEN ONLY CALL OUT AS INFECTIOUS THE ONES WE

09:44AM  4    KNOW --" I'M SORRY, "THE ONES WE SHOW FOR BOTH PALO ALTO AND

09:44AM  5    NEW YORK."

09:44AM  6         DO YOU SEE THAT?

09:44AM  7    A.   YES.

09:44AM  8    Q.   LET'S LOOK BRIEFLY AT PAGE 3 IN THIS EXHIBIT.  AND IF WE

09:44AM  9    CAN ZOOM IN ON THE MIDDLE MESSAGE THERE FROM DANIEL YOUNG.

09:44AM 10         IN THIS EMAIL DANIEL YOUNG BEGINS A PARAGRAPH "DAN, FOR

09:45AM 11    BILIRUBIN, TOTAL."

09:45AM 12         DO YOU SEE THAT?

09:45AM 13    A.   YES.

09:45AM 14    Q.   ARE YOU THE DAN THAT HE'S ADDRESSING THERE?

09:45AM 15    A.   YES.

09:45AM 16    Q.   AND HE SAYS, "CAN YOU CHANGE THE REFERENCE RANGE TO .1 TO

09:45AM 17    1.0 AND REMOVE THE L INDICATOR, PLEASE?"

09:45AM 18         CAN YOU EXPLAIN WHAT THAT MEANS?

09:45AM 19    A.   IN THE TEST RESULTS REPORT, THERE WERE A NUMBER OF PIECES

09:45AM 20    OF INFORMATION.  THERE WAS THE RESULT AND THEN ALSO A REFERENCE

09:45AM 21    RANGE.  AND IF A RESULT WAS OUT OF THE REFERENCE RANGE, A HIGH

09:45AM 22    OR LOW, REPRESENTED BY AN H OR L, WAS INCLUDED IN THE REPORT.

09:45AM 23         AND IN THIS INSTRUCTION HE ASKED ME TO CHANGE THE

09:45AM 24    REFERENCE RANGE TO .1 TO 1.0 AND REMOVE THE L INDICATOR, WHICH

09:45AM 25    STANDS FOR LOW.

09:45AM  1    Q.   SO WOULD THE EFFECT OF THIS CHANGE BE TO CONVERT WHAT WAS

09:46AM  2    GOING TO BE A LOW RESULT INTO A NORMAL RESULT?

09:46AM  3    A.   I THINK THAT WOULD BE THE OUTCOME OF THIS CHANGE, BUT I'M

09:46AM  4    NOT SURE IF THAT WAS THE INTENT TO CHANGE THE REFERENCE RANGE.

09:46AM  5    Q.   UNDERSTOOD.

09:46AM  6         LOOKING AT THE PARAGRAPH JUST BELOW THAT ONE, THERE'S SOME

09:46AM  7    TALK ABOUT CALCIUM.

09:46AM  8         DO YOU SEE THAT?

09:46AM  9    A.   YES.

09:46AM  10   Q.   AND DR. YOUNG SAYS, "DAN, CAN YOU CHANGE THE RANGE TO 8.4

09:46AM  11   TO 10.7?  IT DOES NOT CHANGE THE OUTCOME, BUT SHOWS THE RESULT

09:46AM  12   TO BE CLOSER TO THE REFERENCE RANGE."

09:46AM  13        DO YOU SEE THAT?

09:46AM  14   A.   YES.

09:46AM  15   Q.   AND THE REFERENCE RANGE DEFINES WHAT THE NORMAL RESULT IS

09:46AM  16   FOR A BLOOD TEST; IS THAT ACCURATE?

09:46AM  17   A.   RIGHT.  I BELIEVE WITHIN THAT RANGE IS, QUOTE-UNQUOTE,

09:46AM  18   HEALTHY OR NORMAL.

09:46AM  19   Q.   OKAY.  IF I COULD ASK YOU TO LOOK IN YOUR BINDER AT

09:46AM  20   EXHIBIT 871.  THAT SHOULD BE THE NEXT ONE IN ORDER.

09:47AM  21        AND LET ME KNOW WHEN YOU HAVE IT IN FRONT OF YOU.

09:47AM  22   A.   I DO.

09:47AM  23   Q.   IS THIS AN EMAIL CHAIN INCLUDING YOU, IF YOU LOOK AT THE

09:47AM  24   SECOND PAGE, AND THEN PROGRESSING TO AN EMAIL FROM

09:47AM  25   SUNNY BALWANI TO ELIZABETH HOLMES ABOUT ANOTHER DEMO?

09:47AM   1        A.   YES.

09:47AM   2                  MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

09:47AM   3        EXHIBIT 871.

09:47AM   4                  MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

09:47AM   5                  THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:47AM   6             (GOVERNMENT'S EXHIBIT 871 WAS RECEIVED IN EVIDENCE.)

09:47AM   7                  MR. BOSTIC:  AND LET'S START WITH PAGE 2 OF 871.

09:47AM   8             AND IF WE COULD ZOOM IN ON THE BOTTOM HALF.

09:47AM   9        Q.   DO YOU SEE THAT THIS STARTS WITH AN EMAIL FROM

09:47AM  10        CHRISTIAN HOLMES TO YOU, DANIEL YOUNG, AND SAMARTHA ANEKAL

09:47AM  11        ABOUT A DEMO NEXT TUESDAY?

09:48AM  12        A.   YES, I'M COPIED ON THAT FIRST EMAIL.

09:48AM  13        Q.   AND CHRISTIAN HOLMES SAYS, SUNNY MENTIONED HE'D LIKE TO

09:48AM  14        RUN A DEMO DURING AN EXEC MEETING NEXT TUESDAY, RUNS FROM 12:00

09:48AM  15        TO 2:00 P.M. IN OUR OFFICE HERE.

09:48AM  16             DO YOU SEE THAT?

09:48AM  17        A.   YES.

09:48AM  18        Q.   LET'S LOOK AT THE TOP HALF OF THIS PAGE.

09:48AM  19             THERE'S AN EMAIL FROM YOU IN THAT SELECTION THAT SAYS,

09:48AM  20        "JUST CAUGHT UP WITH SUNNY.  HE DEFINITELY WANTS TO HAVE A

09:48AM  21        MINILAB, AND THEN EITHER A 4S OR MONO BAY (WHICHEVER IS WORKING

09:48AM  22        BETTER)."

09:48AM  23             DO YOU SEE THAT?

09:48AM  24        A.   YES.

09:48AM  25        Q.   AND THOSE THREE DEVICES, THE 4S, THE MINILAB, AND THE

09:48AM   1    MONOBAY, CAN YOU REMIND US WHICH CATEGORY THOSE DEVICES FELL

09:48AM   2    INTO?  WERE THEY KIND OF CURRENT GEN THERANOS TECHNOLOGY OR

09:48AM   3    NEXT GENERATION THERANOS TECHNOLOGY?

09:48AM   4    A.   THOSE DEVICES WERE PART OF THE NEXT GENERATION, WHICH WAS

09:48AM   5    THE 4.0 SYSTEM.

09:49AM   6    Q.   TO YOUR KNOWLEDGE, WERE THESE NEXT GEN DEVICES EVER USED

09:49AM   7    BY THERANOS IN ACTUAL CLINICAL PATIENT TESTING?

09:49AM   8    A.   NOT TO MY KNOWLEDGE.

09:49AM   9    Q.   AS PART OF YOUR ROLE IN CONNECTION WITH THESE

09:49AM  10    DEMONSTRATIONS, WERE YOU IN CHARGE OF MAKING SURE THAT THE

09:49AM  11    REQUESTED DEVICES WERE ACTUALLY PLACED IN THE CONFERENCE ROOMS?

09:49AM  12    A.   I WOULD COMMUNICATE THE NEED TO CERTAIN PERSONNEL, LIKE

09:49AM  13    ENGINEERS, WHO WOULD OFTENTIMES ACTUALLY PUT THE DEVICES IN THE

09:49AM  14    ROOMS.

09:49AM  15    Q.   AND SO YOU COORDINATED IT, BUT YOU WEREN'T NECESSARILY THE

09:49AM  16    ONE PHYSICALLY PUTTING THE DEVICES IN PLACE?

09:49AM  17    A.   CORRECT.

09:49AM  18    Q.   WHOSE DECISION WAS IT WHICH DEVICES ACTUALLY ENDED UP IN

09:49AM  19    THE CONFERENCE ROOMS WHERE THE VIP'S MET?

09:49AM  20    A.   THE DECISION ON THE TYPES OF DEVICES WAS USUALLY DIRECTED

09:49AM  21    BY ELIZABETH AND/OR SUNNY, AND THEN THE ENGINEERS WOULD DECIDE

09:49AM  22    WHICH OF THOSE DEVICES WERE WORKING IN THE RIGHT WAY AND THEY

09:49AM  23    WOULD PUT THEM IN THERE.

09:49AM  24    Q.   OKAY.  LET'S LOOK AT PAGE 1 OF THIS EXHIBIT, AND LET'S

09:50AM  25    ZOOM IN ON THE MIDDLE OF THIS PAGE.

09:50AM  1          WE TALKED ABOUT THE DESIRE TO HAVE A MINILAB IN THIS ROOM;

09:50AM  2    IS THAT CORRECT?

09:50AM  3    A.   THAT'S CORRECT.

09:50AM  4    Q.   AND THERE'S A MESSAGE FROM SUNNY BALWANI IN THE MIDDLE OF

09:50AM  5    THE PAGE SAYING, "GIVEN ML DOESN'T HAVE CYTO, WHAT ARE WE

09:50AM  6    PLANNING ON RUNNING ON ML? "

09:50AM  7          DO YOU SEE THAT?

09:50AM  8    A.   YES.

09:50AM  9    Q.   AND IS ML SHORT FOR MINILAB?

09:50AM 10    A.   YES.

09:50AM 11    Q.   AND DO YOU HAVE AN UNDERSTANDING AS TO WHAT CYTO REFERS

09:50AM 12    TO?

09:50AM 13    A.   I BELIEVE IT REFERS TO CYTOMETRY.

09:50AM 14    Q.   AND WOULD THAT INCLUDE TESTS LIKE A CBC, COMPLETE BLOOD

09:50AM 15    COUNT?

09:50AM 16    A.   THAT'S MY UNDERSTANDING.

09:50AM 17    Q.   LET'S LOOK AT THE TOP PART OF THE PAGE ABOVE THAT.

09:50AM 18          AND DO YOU SEE THAT DANIEL YOUNG RESPONDS TO MR. BALWANI,

09:51AM 19    "RIGHT NOW, WE ARE NOT PLANNING ON RUNNING ANYTHING ON THE ML,

09:51AM 20    UNFORTUNATELY.  THE GENERAL CHEMISTRY AND ELISA ASSAYS ARE NOT

09:51AM 21    PERFORMING ADEQUATELY FOR A DEMO AT THE MOMENT."

09:51AM 22          DO YOU SEE THAT?

09:51AM 23    A.   I DO.

09:51AM 24    Q.   AND AT THE TOP OF THE PAGE, DO YOU SEE THAT MR. BALWANI

09:51AM 25    FORWARDS THAT MESSAGE TO MS. HOLMES WITH "VERY FRUSTRATING"?

09:51AM  1    A.   YES.

09:51AM  2    Q.   OKAY.  WE CAN PUT THAT ONE ASIDE.

09:51AM  3         LET'S TURN NEXT TO EXHIBIT 905.

09:51AM  4         LOOKING AT 905, WAS THIS ANOTHER EMAIL CHAIN RELATING TO A

09:51AM  5    DEMONSTRATION AND PROCESSING THOSE RESULTS AT THERANOS?

09:51AM  6    A.   YES.

09:51AM  7              MR. BOSTIC:  YOUR HONOR, MOVE EXHIBIT 905 INTO

09:51AM  8    EVIDENCE.

09:51AM  9              MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

09:51AM  10             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:52AM  11        (GOVERNMENT'S EXHIBIT 905 WAS RECEIVED IN EVIDENCE.)

09:52AM  12             MR. BOSTIC:  AND IF WE CAN START, MS. HOLLIMAN, ON

09:52AM  13   PAGE 5.  AND IF WE CAN ZOOM IN ON THE BOTTOM TWO-THIRDS OF THE

09:52AM  14   PAGE.

09:52AM  15   Q.   MR. EDLIN, DO YOU SEE AN EMAIL FROM YOU TO DANIEL YOUNG

09:52AM  16   AND ELIZABETH HOLMES WITH THE SUBJECT OF DEMO RESULTS FOR 7/11?

09:52AM  17   A.   YES.

09:52AM  18   Q.   AND YOU SAY, "ATTACHED PLEASE FIND THE 6 DEMO REPORTS FOR

09:52AM  19   TODAY."

09:52AM  20        IS THAT CORRECT?

09:52AM  21   A.   YES.

09:52AM  22   Q.   AND THEN YOU SAY, "PLEASE NOTE THE FOLLOWING:"

09:52AM  23        YOU SAY, "CREATINE HAS BEEN REMOVED FOR ALL REPORTS AS PER

09:52AM  24   PAUL'S SUGGESTION."

09:52AM  25        DO YOU SEE THAT?

09:52AM  1   A.   YES.

09:52AM  2   Q.   AND YOU ASK WHETHER THAT SECTION NEEDS TO CHANGE ITS NAME

09:52AM  3   TO JUST METABOLIC PANEL.

09:52AM  4       DO YOU SEE THAT?

09:53AM  5   A.   YES.

09:53AM  6   Q.   AND YOU THEN NOTE THAT VITAMIN D HAS BEEN REMOVED FOR ALL

09:53AM  7   MALE HEALTH PANELS.

09:53AM  8       IS THAT RIGHT?

09:53AM  9   A.   YES.

09:53AM  10  Q.   AND THEN YOU NOTE THAT TT4 AND TT3 HAS BEEN REMOVED FROM

09:53AM  11  ALL THYROID PANELS.

09:53AM  12      IS THAT RIGHT?

09:53AM  13  A.   YES, PER DANIEL'S SUGGESTION.

09:53AM  14  Q.   AND THEN YOU ALSO SAY FT4 HAS ALSO BEEN REMOVED FROM THE

09:53AM  15  THYROID PANEL IN F2.

09:53AM  16      DO YOU SEE THAT?

09:53AM  17  A.   YES.

09:53AM  18  Q.   AND DO YOU HAVE AN UNDERSTANDING AS TO WHY THESE RESULTS

09:53AM  19  WERE BEING REMOVED FROM THE DEMONSTRATION REPORTS?

09:53AM  20  A.   THEY WERE REMOVED BECAUSE THAT'S WHAT DANIEL AND THE

09:53AM  21  SCIENTISTS RECOMMENDED THAT I DO.

09:53AM  22  Q.   AND BASED ON YOUR TIME AT THERANOS AND YOUR EXPERIENCE

09:53AM  23  WITH THESE DEMONSTRATIONS, WHAT WERE THE REASONS WHY INDIVIDUAL

09:53AM  24  RESULTS MIGHT BE TAKEN OUT OF REPORTS BEFORE THEY WERE SENT TO

09:53AM  25  VIP'S?

09:53AM  1      A.   THEY MIGHT BE TAKEN OUT IF WHOEVER REVIEWED IT DIDN'T

09:53AM  2      THINK THAT THEY WERE VALID OR THAT THEY HAD PERFORMED

09:53AM  3      ADEQUATELY.

09:54AM  4      Q.   AND LET'S LOOK JUST AT THE TOP OF PAGE 5 WHILE WE ARE

09:54AM  5      HERE.

09:54AM  6           AND DO YOU SEE THE TAIL END OF AN EMAIL FROM DANIEL YOUNG

09:54AM  7      THERE ON YOUR SCREEN?

09:54AM  8      A.   YES.

09:54AM  9      Q.   AND HE SAYS, "I AM CONCERNED ABOUT THE TSH VALUES F2, M5

09:54AM 10      AND M6" --

09:54AM 11           WERE THOSE DIFFERENT INDIVIDUALS WHO HAD THEIR BLOOD TEST

09:54AM 12      THE?

09:54AM 13      A.   YES.  I THINK THEY STAND FOR MALE AND FEMALE.

09:54AM 14      Q.   -- "WHICH WERE ALL DONE ON THE THYROID PANEL.  I DO THINK

09:54AM 15      THAT THESE ARE ALL RUNNING LOW, POSSIBLY ABNORMALLY.  TO BE

09:54AM 16      CONSERVATIVE, I WOULD REMOVE ALL OF THESE THREE RESULTS."

09:54AM 17           IS THAT THE REASON WHY YOU WERE SAYING THAT THE RESULTS

09:54AM 18      MIGHT BE TAKEN OUT?

09:54AM 19      A.   YES.

09:54AM 20      Q.   LET'S LOOK AT PAGE 4 BRIEFLY.  AND IF WE CAN ZOOM IN ON

09:54AM 21      THE BOTTOM HALF OF THAT PAGE.

09:54AM 22           OKAY.  UNDER M4 FOR THAT INDIVIDUAL, DO YOU SEE

09:55AM 23      DANIEL YOUNG SAYS, "I THINK THIS RESULT OF LESS THAN 3.2 DOES

09:55AM 24      NOT SEEM RIGHT.  I WOULD JUST REMOVE THIS RESULT COMPLETELY"?

09:55AM 25      A.   YES.

09:55AM   1    Q.   AND AT THE BOTTOM OF THE PAGE HE SAYS, "FOR M5, I WOULD

09:55AM   2    REMOVE THE OUT OF RANGE RESULTS FOR ALKALINE PHOSPHATASE AND

09:55AM   3    CHLORIDE."

09:55AM   4        DO YOU SEE THAT?

09:55AM   5    A.   YES.

09:55AM   6    Q.   AND DID YOU HAVE A BASIS AT THE TIME TO JUDGE THE REASONS

09:55AM   7    FOR REMOVING THESE INDIVIDUAL RESULTS?

09:55AM   8    A.   I DID NOT.

09:55AM   9    Q.   AND THEN FINALLY, LET'S GO TO PAGE 1 OF THIS EXHIBIT.  AND

09:55AM   10   IF WE CAN ZOOM IN ON THE BOTTOM PORTION OF THE PAGE, THE BOTTOM

09:55AM   11   HALF.

09:55AM   12       DO YOU SEE AT THE TOP OF THAT SELECTION AN EMAIL FROM

09:55AM   13   DANIEL YOUNG TO YOU, CC'ING ELIZABETH HOLMES?

09:56AM   14   A.   YES.

09:56AM   15   Q.   AND HE SAYS, FOR SUBJECT F2, "PLEASE CHANGE BUN TO 6-21

09:56AM   16   MILLIGRAMS PER DECILITER."

09:56AM   17       DO YOU SEE THAT?

09:56AM   18   A.   YES.

09:56AM   19   Q.   HE SAYS, "THIS BRINGS THE RESULTS IN THE REFERENCE RANGE."

09:56AM   20       DO YOU SEE THAT?

09:56AM   21   A.   YES.

09:56AM   22   Q.   AND IS THIS ANOTHER CHANGE OF THE RANGE THAT BRINGS A

09:56AM   23   DEMONSTRATION RESULT WITHIN THAT RANGE OR HEALTHY RANGE?

09:56AM   24   A.   THAT'S WHAT THIS MESSAGE INDICATES.

09:56AM   25   Q.   YOU CAN PUT THAT ONE ASIDE.

09:56AM 1          LET'S LOOK NEXT AT EXHIBIT 966, PLEASE.

09:56AM 2          AND, MR. EDLIN, DO YOU SEE THAT THIS EMAIL RELATES TO

09:56AM 3   ANOTHER SERIES OF DEMONSTRATION RESULTS FROM AUGUST OF 2013?

09:57AM 4   A.   YES.

09:57AM 5          MR. BOSTIC:  YOUR HONOR, I OFFER EXHIBIT 966.

09:57AM 6          MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

09:57AM 7          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:57AM 8          (GOVERNMENT'S EXHIBIT 966 WAS RECEIVED IN EVIDENCE.)

09:57AM 9   BY MR. BOSTIC:

09:57AM 10  Q.   AND, MR. EDLIN, DO YOU SEE THAT THIS IS AN EMAIL THAT

09:57AM 11  ATTACHES SOME LAB REPORTS?

09:57AM 12  A.   YES.

09:57AM 13  Q.   AND WE'RE NOT GOING TO PUBLISH THE LAB REPORTS THEMSELVES,

09:57AM 14  BUT DO YOU RECALL A TIME IN AUGUST OF 2013 WHEN A GROUP OF

09:57AM 15  INDIVIDUALS FROM WALGREENS VISITED THERANOS?

09:57AM 16  A.   YES.

09:57AM 17  Q.   DO YOU SEE THAT THE ATTACHED LAB REPORTS INCLUDE THE

09:57AM 18  INITIALS N.J.?

09:57AM 19  A.   YES.

09:57AM 20  Q.   AND DO YOU RECALL MEETING AN INDIVIDUAL FROM WALGREENS

09:57AM 21  NAMED NIMESH JHAVERI?

09:57AM 22  A.   I DON'T RECALL.

09:57AM 23  Q.   OKAY.  DO YOU SEE THAT THERE'S ANOTHER REPORT FOR THE

09:58AM 24  INITIALS B.W.?

09:58AM 25  A.   YES.

09:58AM  1     Q.   AND DO YOU RECALL HAVING ANY CONTACT WITH AN INDIVIDUAL

09:58AM  2     FROM WALGREENS NAMED BRADLEY WASSON?

09:58AM  3     A.   I DON'T RECALL SPECIFICALLY.

09:58AM  4     Q.   OKAY.  IN THIS EMAIL -- FIRST OF ALL, THIS IS AN EMAIL

09:58AM  5     FROM DANIEL YOUNG TO YOU, CHRISTIAN HOLMES, ELIZABETH HOLMES,

09:58AM  6     AND SUNNY BALWANI AMONG OTHERS; CORRECT?

09:58AM  7     A.   YES.

09:58AM  8     Q.   AND IN THAT EMAIL, DANIEL YOUNG SAYS IN THE SECOND

09:58AM  9     PARAGRAPH -- LET'S ZOOM IN ON THE TEXT.

09:58AM  10         HE SAYS, "I 'CORRECTED,'" AND HE PUTS THAT IN QUOTES, "I

09:58AM  11    'CORRECTED' ASSAY RESULTS THAT I ATTRIBUTED TO BCD COLLECTION

09:58AM  12    PROBLEMS."

09:58AM  13         DO YOU SEE THAT?

09:58AM  14    A.   YES.

09:58AM  15    Q.   AND WHAT DOES BCD STAND FOR?

09:58AM  16    A.   BCD STANDS FOR BLOOD COLLECTION DEVICE.  IT WAS THE TOOL

09:59AM  17    USED TO COLLECT FINGERSTICK BLOOD FROM A PATIENT.

09:59AM  18    Q.   AND WAS THAT A THERANOS SPECIFIC DEVICE?

09:59AM  19    A.   YES.  IT WOULD COLLECT BLOOD AND THEN TRANSFER IT INTO A

09:59AM  20    NANOTAINER.

09:59AM  21    Q.   DR. YOUNG SAYS, "THE GC RESULTS LOOK GOOD AFTER SUCH

09:59AM  22    CLEANUP."

09:59AM  23         DO YOU SEE THAT?

09:59AM  24    A.   YES.

09:59AM  25    Q.   AND TWO PARAGRAPHS DOWN HE SAYS, "EACH SUBJECT HAD THE

09:59AM   1    THYROID PANEL PERFORMED.  I REMOVED THE THYROID RESULTS THAT I

09:59AM   2    FELT WERE QUESTIONABLE."

09:59AM   3         DO YOU SEE THAT?

09:59AM   4    A.   YES.

09:59AM   5    Q.   AND HE SAYS, "THERE ARE A FEW OUT OF RANGE RESULTS LEFT IN

09:59AM   6    THE REPORT, BUT THEY ARE VERY CLOSE TO THE REFERENCE RANGE."

09:59AM   7         AND HE SAYS, "(NOTE THAT I THINK THERE IS SOMETHING WRONG

09:59AM   8    WITH THE TT3 ASSAY/REAGENTS, AND AM FOLLOWING UP WITH SHARADA.

09:59AM   9    I REMOVED ALL TT3 RESULTS.)"

09:59AM  10         DO YOU SEE THAT?

09:59AM  11    A.   YES.

09:59AM  12    Q.   DO YOU KNOW WHETHER THE INDIVIDUALS FROM WALGREENS WERE

10:00AM  13    TOLD ABOUT THE ERRORS ENCOUNTERED IN CONNECTION WITH THEIR DEMO

10:00AM  14    TESTS?

10:00AM  15    A.   I DON'T KNOW.

10:00AM  16    Q.   YOU CAN PUT THAT ASIDE.

10:00AM  17         LET'S LOOK AT EXHIBIT 957, PLEASE.

10:00AM  18         DO YOU HAVE 957?

10:00AM  19    A.   YES.  YES.

10:00AM  20    Q.   IS THIS ANOTHER EMAIL EXCHANGE RELATING TO THAT SAME GROUP

10:00AM  21    OF SIX SAMPLES FOR DEMONSTRATION?

10:00AM  22    A.   I BELIEVE SO.  IT WAS ON THE SAME DAY.

10:00AM  23              MR. BOSTIC:  YOUR HONOR, I OFFER EXHIBIT 957.

10:00AM  24              MR. DOWNEY:  YOUR HONOR, I DON'T KNOW IF HE'S

10:00AM  25    OFFERING THE ENTIRE EXHIBIT OR SOMETHING LESS THAN THE ENTIRE

| | | |
|---|---|---|
| 10:00AM | 1 | EXHIBIT. |
| 10:00AM | 2 | THE COURT:  MR. BOSTIC? |
| 10:00AM | 3 | MR. BOSTIC:  YOUR HONOR, I HAVE THIS AS A FIVE PAGE |
| 10:01AM | 4 | EXHIBIT, AND MY INTENTION IS TO OFFER THE ENTIRE THING. |
| 10:01AM | 5 | MR. DOWNEY:  WOULD YOU GIVE ME A MOMENT, YOUR HONOR? |
| 10:01AM | 6 | THE COURT:  SURE. |
| 10:01AM | 7 | (PAUSE IN PROCEEDINGS.) |
| 10:01AM | 8 | MR. DOWNEY:  NO OBJECTION, YOUR HONOR. |
| 10:01AM | 9 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 10:01AM | 10 | (GOVERNMENT'S EXHIBIT 957 WAS RECEIVED IN EVIDENCE.) |
| 10:01AM | 11 | MR. BOSTIC:  AND IF WE CAN START WITH PAGE 2 OF |
| 10:01AM | 12 | EXHIBIT 957, MS. HOLLIMAN.  AND LET'S ZOOM IN ON THE MIDDLE OF |
| 10:01AM | 13 | THIS PAGE.  IF WE CAN CAPTURE THE MIDDLE TWO MESSAGES. |
| 10:01AM | 14 | Q.   MR. EDLIN, DO YOU SEE THAT YOU'RE LOOKING AT TWO EMAILS |
| 10:01AM | 15 | FROM YOU ON AUGUST 13TH, 2013? |
| 10:01AM | 16 | A.   YES. |
| 10:01AM | 17 | Q.   CAN YOU EMAIL THIS GROUP TO SAY, "HI ALL - WE WILL BE |
| 10:02AM | 18 | COLLECTING THE FINGERSTICK SAMPLES VERY SOON." |
| 10:02AM | 19 | DO YOU SEE THAT? |
| 10:02AM | 20 | A.   YES. |
| 10:02AM | 21 | Q.   AND YOUR NEXT EMAIL SAYS, "WE HAVE SIX SAMPLES; PLEASE |
| 10:02AM | 22 | MEET IN THE LAB FOR THE HANDOFF." |
| 10:02AM | 23 | DO YOU SEE THAT? |
| 10:02AM | 24 | A.   YES. |
| 10:02AM | 25 | Q.   AND CAN YOU REMIND US HOW THIS WORKFLOW WORKED?  WHERE |

10:02AM   1    WERE THE SAMPLES COLLECTED, AND THEN WHAT HAPPENED NEXT TO GET

10:02AM   2    THEM ACTUALLY PROCESSED?

10:02AM   3    A.   IN THIS CASE, SAMPLES WERE COLLECTED IN A MEETING ROOM.  I

10:02AM   4    BELIEVE THAT THERE WERE PHLEBOTOMISTS COLLECTING FINGERSTICK

10:02AM   5    SAMPLES AND THEY WERE PUT INTO A SHIPPING CONTAINER.

10:02AM   6         IN THIS EMAIL -- THIS IS AN EMAIL TO ALL OF THE SCIENTISTS

10:02AM   7    AND -- WHO WOULD BE PERFORMING THE TESTS.

10:02AM   8         SO I'M NOTIFYING THEM THAT THE SAMPLES WILL BE COLLECTED

10:02AM   9    SOON, AND THEN I MET THEM IN THE LAB AND GAVE THEM THE SAMPLES

10:02AM  10    FOR THEM TO PROCESS.

10:02AM  11    Q.   OKAY.  LET'S LOOK AT PAGE 1 OF EXHIBIT 957.  AND LET'S

10:03AM  12    ZOOM IN ON THE BOTTOM PORTION OF THE PAGE.

10:03AM  13         THERE'S AN EMAIL FROM SOMEONE NAMED NICHOLAS HAASE.

10:03AM  14         DO YOU SEE THAT?

10:03AM  15    A.   YES.

10:03AM  16    Q.   AND WHO WAS HE AT THERANOS?

10:03AM  17    A.   I BELIEVE HE WAS ONE OF THE SCIENTISTS.

10:03AM  18    Q.   HIS EMAIL SAYS, "UPDATE:  WE JUST STARTED THE ADVIA RUN OF

10:03AM  19    ALL SAMPLES."

10:03AM  20         DO YOU SEE THAT?

10:03AM  21    A.   YES.

10:03AM  22    Q.   AND FOR THIS DEMONSTRATION, WAS ALL THE TESTING TAKING

10:03AM  23    PLACE ON A THERANOS MANUFACTURED ANALYZER?

10:03AM  24    A.   I DON'T KNOW.

10:03AM  25    Q.   DO YOU KNOW WHAT ADVIA REFERS TO IN THAT EMAIL?

| | | |
|---|---|---|
| 10:03AM | 1 | A.    I DO. |
| 10:03AM | 2 | Q.    AND WHAT IS THAT? |
| 10:03AM | 3 | A.    ADVIA IS A THIRD PARTY DEVICE. |
| 10:03AM | 4 | Q.    OKAY.  WERE YOU PRESENT FOR ANY PORTION OF THE MEETING |
| 10:04AM | 5 | WITH THE WALGREENS INDIVIDUALS, OTHER THAN THE DRAW OF THE |
| 10:04AM | 6 | FINGERSTICK SAMPLES? |
| 10:04AM | 7 | A.    I BELIEVE SO. |
| 10:04AM | 8 | Q.    DO YOU KNOW WHETHER ANY OF THE INDIVIDUALS FROM WALGREENS |
| 10:04AM | 9 | WERE TOLD THAT THEIR SAMPLES WERE GOING TO BE RUN ON THIRD |
| 10:04AM | 10 | PARTY DEVICES AS OPPOSED TO THERANOS DEVICES? |
| 10:04AM | 11 | A.    I DON'T KNOW. |
| 10:04AM | 12 | Q.    LET'S LOOK NOW AT EXHIBIT 1014.  IF YOU COULD TURN TO THAT |
| 10:04AM | 13 | ONE IN YOUR BINDER.  LET ME KNOW WHEN YOU HAVE 1014. |
| 10:04AM | 14 | A.    I DO. |
| 10:04AM | 15 | Q.    AND IS EXHIBIT 1014 ANOTHER EMAIL CHAIN RELATING TO |
| 10:04AM | 16 | PLANNING AND RESULTS FOR A TECHNOLOGY DEMONSTRATION AT |
| 10:04AM | 17 | THERANOS? |
| 10:04AM | 18 | A.    YES. |
| 10:04AM | 19 | MR. BOSTIC:  YOUR HONOR, MOVE TO ADMIT EXHIBIT 1014. |
| 10:05AM | 20 | MR. DOWNEY:  NO OBJECTION, YOUR HONOR. |
| 10:05AM | 21 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 10:05AM | 22 | (GOVERNMENT'S EXHIBIT 1014 WAS RECEIVED IN EVIDENCE.) |
| 10:05AM | 23 | MR. BOSTIC:  AND IF WE CAN START WITH PAGE 4. |
| 10:05AM | 24 | Q.    MR. EDLIN, DO YOU RECALL ARRANGING A DEMONSTRATION FOR A |
| 10:05AM | 25 | JOURNALIST WITH "THE WALL STREET JOURNAL" NAMED JOSEPH RAGO? |

10:05AM  1    A.   YES.

10:05AM  2    Q.   AND WAS IT IN APPROXIMATELY AUGUST OF 2013 THAT THAT

10:05AM  3    HAPPENED?

10:05AM  4    A.   YES.

10:05AM  5    Q.   LET'S ZOOM IN ON THE BOTTOM PORTION OF PAGE 4, PLEASE.

10:05AM  6         OKAY.  MR. EDLIN, DO YOU SEE AN EMAIL FROM YOU TO A GROUP

10:05AM  7    OF INDIVIDUALS AT THERANOS?

10:05AM  8    A.   YES.

10:05AM  9    Q.   AND THE SUBJECT LINE IS IMPORTANT DEMO THIS THURSDAY,

10:06AM 10    8/22?

10:06AM 11    A.   YES.

10:06AM 12    Q.   YOUR EMAIL MENTIONS THERE IS GOING TO BE ONE MALE PATIENT,

10:06AM 13    ONE FINGERSTICK DRAW, AND TIMING IS TO BE DECIDED.

10:06AM 14         DO YOU SEE THAT?

10:06AM 15    A.   YES.

10:06AM 16    Q.   AND YOU SAY IN THE NEXT SECTION, "PLANNED TESTS WILL

10:06AM 17    CONSIST OF SOME COMBINATION OF THE FOLLOWING:  CBC, CHEMICAL

10:06AM 18    14, LIPIDS, THYROID PANEL OR MALE HEALTH."

10:06AM 19         DO YOU SEE THAT?

10:06AM 20    A.   YES.

10:06AM 21    Q.   AND YOU THEN SAY, "FOR THIS DEMO WE WILL NEED TO TURN

10:06AM 22    AROUND RESULTS FASTER THAN EVER BEFORE -- IDEALLY IN 1 HOUR AND

10:06AM 23    NO LONGER THAN 2 HOURS."

10:06AM 24         DO YOU SEE THAT?

10:06AM 25    A.   YES.

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    3940

10:06AM  1    Q.   AND CAN YOU EXPLAIN WHAT YOU MEAN BY "FASTER THAN EVER

10:06AM  2    BEFORE" IN CONNECTION WITH THIS 1 TO 2 HOUR TIME GOAL?

10:06AM  3    A.   TYPICALLY FOR DEMOS, RESULTS WOULD BE RETURNED WITHIN THAT

10:06AM  4    DAY, LIKELY BY THE END OF THE DAY, AND THIS MEETING TOOK PLACE

10:06AM  5    IN THE MIDDLE OF THE DAY AND THE GOAL WAS TO RETURN THOSE

10:06AM  6    RESULTS IN THE MIDDLE OF THE DAY, SO NOT THAT EVENING.

10:07AM  7    Q.   BELOW THAT SECTION WHERE YOU TALK ABOUT THE EQUIPMENT THAT

10:07AM  8    WILL BE NECESSARY, YOU SAY, "SAM AND MICHAEL - SIMILAR TO LAST

10:07AM  9    WEEK, PLEASE SET UP TWO MINILABS, ONE 4S AND ONE 3.5, IN

10:07AM  10   INTERVIEW ROOM NUMBER 1."

10:07AM  11        DO YOU SEE THAT?

10:07AM  12   A.   YES.

10:07AM  13   Q.   AND YOU SAY THAT "THOSE ANALYZERS SHOULD HAVE THE DEMO APP

10:07AM  14   THAT CAN RUN NULL PROTOCOLS."

10:07AM  15        DO YOU SEE THAT?

10:07AM  16   A.   YES.

10:07AM  17   Q.   AND I'LL ASK YOU TO LOOK AT PAGE 3 OF EXHIBIT 1014.

10:07AM  18        DO YOU SEE IN FRONT OF YOU THE PROPOSED WORKFLOW FOR THAT

10:07AM  19   UPCOMING DEMO?

10:07AM  20   A.   YES.

10:07AM  21   Q.   CAN YOU EXPLAIN -- FROM REVIEWING THIS DOCUMENT, CAN YOU

10:07AM  22   TELL WHETHER THIS DEMO WAS GOING TO REQUIRE THE USE OF THIRD

10:08AM  23   PARTY DEVICES OR WHETHER ALL OF THE TESTING COULD BE

10:08AM  24   ACCOMPLISHED USING THERANOS DEVICES?

10:08AM  25   A.   I CAN'T TELL.

10:08AM   1    Q.   OKAY.  LET'S LOOK AT PAGE 2.  AND LET'S ZOOM IN ON THE TOP

10:08AM   2    PART OF THAT PAGE.

10:08AM   3         DO YOU SEE AT THE TOP OF THAT PAGE AN EMAIL FROM YOU TO

10:08AM   4    SUNNY BALWANI?

10:08AM   5    A.   YES.

10:08AM   6    Q.   AND YOU SAY, "SUNNY.

10:08AM   7         "UNFORTUNATELY BY THE LOOKS OF THE THYROID PANEL RESULTS

10:08AM   8    BELOW IT APPEARS TO HAVE HAD MAJOR ISSUES AGAIN.  THIS IS AFTER

10:08AM   9    CALIBRATION WAS RE-DONE YESTERDAY, AFTER A CLINICAL CORRECTION

10:08AM  10    WAS PUT IN PLACE FOR TT3, AND AFTER DANIEL REVIEWED RECENT DATA

10:08AM  11    AND SAID HE WAS CONFIDENT THAT AT LEAST 5 OF THESE RESULTS

10:08AM  12    WOULD WORK."

10:08AM  13         DO YOU SEE THAT?

10:08AM  14    A.   YES.

10:08AM  15    Q.   AND DO YOU RECALL AROUND THIS TIME THE THYROID PANEL

10:08AM  16    RESULTS WERE THROWING UP REPEATED PROBLEMS?

10:08AM  17    A.   I DO.

10:08AM  18    Q.   AND JUST TO BE CLEAR, THIS IS BEFORE THERANOS BEGAN

10:09AM  19    OFFERING TESTING SERVICES TO THE PUBLIC; IS THAT RIGHT?

10:09AM  20    A.   THAT'S CORRECT.

10:09AM  21    Q.   APPROXIMATELY HOW MUCH IN ADVANCE OF THE PUBLIC LAUNCH WAS

10:09AM  22    THIS DEMO TAKING PLACE?

10:09AM  23    A.   THIS WAS ABOUT A MONTH BEFORE THE INITIAL LAUNCH WITH

10:09AM  24    WALGREENS.

10:09AM  25    Q.   OKAY.  LET'S LOOK AT PAGE 1 TO SEE MR. BALWANI'S RESPONSE.

10:09AM  1     AND LET'S ZOOM IN ON THE BOTTOM PORTION OF THAT PAGE.

10:09AM  2          MR. BALWANI SAYS, "TO SAY THIS IS DEEPLY DISAPPOINTING

10:09AM  3     WILL BE A GROSS UNDERSTATEMENT.  WE HAVE BEEN ASKING TO GET

10:09AM  4     THIS CARTRIDGE BUILT AND QAED AND TESTING FOR MONTHS NOW AND

10:09AM  5     EVERY SINGLE RUN WE HAVE HAD ON THYROID PANEL HAS BEEN A

10:09AM  6     DISASTER."

10:09AM  7          DO YOU SEE THAT?

10:09AM  8     A.   YES.

10:09AM  9     Q.   LET'S LOOK AT THE EMAIL MESSAGE JUST ABOVE THAT ONE FROM

10:10AM 10     SUREKHA GANGAKHEDKAR.

10:10AM 11          AND IN HER EMAIL, SHE MENTIONS THAT THE TG AB ASSAY WAS

10:10AM 12     OORL DUE TO SUBSTRATE EVAPORATION.

10:10AM 13          DO YOU SEE THAT?

10:10AM 14     A.   YES.

10:10AM 15     Q.   AND WHAT DOES OORL STAND FOR IF YOU RECALL?

10:10AM 16     A.   I BELIEVE IT'S OUT OF RANGE LOW.

10:10AM 17     Q.   UNDER NUMBER 6 ON THAT LIST, UNDER FT4, IT SAYS "RESULT

10:10AM 18     REPORTED HIGH."  THEN IT SAYS, "SINCE WE DO NOT HAVE SAMPLE TO

10:10AM 19     TEST ON THE REFERENCE METHOD, NOT POSSIBLE TO MAKE A CONCLUSION

10:10AM 20     ON THE HIGH RESULTS."

10:10AM 21          DO YOU SEE THAT?

10:10AM 22     A.   YES.

10:10AM 23     Q.   FINALLY, AT THE TOP OF THIS PAGE, CAN YOU SEE THAT

10:11AM 24     MR. BALWANI FORWARDS THIS EMAIL CHAIN TO MS. HOLMES?

10:11AM 25     A.   YES.

10:11AM  1   Q.   OKAY.  LET'S LOOK AT EXHIBIT 1157 NEXT.

10:11AM  2        ARE YOU LOOKING AT 1157?

10:11AM  3   A.   YES.

10:11AM  4   Q.   AND IS THIS ANOTHER EMAIL CHAIN BETWEEN YOU AND OTHERS AT

10:11AM  5   THERANOS RELATING TO THE COORDINATION OF A DEMONSTRATION?

10:11AM  6   A.   YES.

10:11AM  7        MR. BOSTIC:  YOUR HONOR, I OFFER EXHIBIT 1157.

10:11AM  8        MR. DOWNEY:  IS THIS OFFERED AS A BUSINESS RECORD,

10:11AM  9   YOUR HONOR?  OR ON WHAT BASIS IS IT OFFERED?  I WOULD JUST ASK

10:11AM 10   THE COURT TO INQUIRE OF MR. BOSTIC.

10:12AM 11        THE COURT:  MR. BOSTIC?

10:12AM 12        MR. BOSTIC:  AS A BUSINESS RECORD, YOUR HONOR,

10:12AM 13   CONSISTENT WITH THE PAST FEW EXHIBITS.

10:12AM 14        MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

10:12AM 15        THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

10:12AM 16        (GOVERNMENT'S EXHIBIT 1157 WAS RECEIVED IN EVIDENCE.)

10:12AM 17        MR. BOSTIC:  AND, MS. HOLLIMAN, IF WE CAN START ON

10:12AM 18   PAGE 2, PLEASE, AND ZOOM IN ON THE BOTTOM HALF.

10:12AM 19   Q.   MR. EDLIN, THE DATE THAT THIS WAS HAPPENING IS

10:12AM 20   SEPTEMBER 23RD, 2013, APPROXIMATELY; IS THAT RIGHT?

10:12AM 21   A.   YES.

10:12AM 22   Q.   AND WAS THIS AFTER THE PUBLIC LAUNCH THAT YOU REFERENCED A

10:12AM 23   MINUTE OR TWO AGO?

10:12AM 24   A.   I BELIEVE SO.  SHORTLY THEREAFTER.

10:12AM 25   Q.   IN YOUR MESSAGE, YOU NOTE THAT A PATIENT IS COMING IN THE

```
10:12AM   1     FOLLOWING MORNING.  AND YOU SAY "PLEASE PLAN TO RUN THE SAME

10:12AM   2     TEST THAT WE DID FOR LAST WEEK'S PATIENT."  AND YOU LIST THE

10:13AM   3     TEST THERE.

10:13AM   4          DO YOU SEE THAT?

10:13AM   5     A.   YES.

10:13AM   6     Q.   AND YOU SAY, "WE WILL ALSO NEED TO SET UP MINILABS AND A

10:13AM   7     4S IN INTERVIEW ROOM NUMBER 1."

10:13AM   8          DO YOU SEE THAT?

10:13AM   9     A.   YES.

10:13AM  10     Q.   LET'S LOOK AT PAGE 1 BRIEFLY.  AND LET'S ZOOM IN ON THE

10:13AM  11     TOP MESSAGE.

10:13AM  12          HERE'S AN EMAIL FROM YOU TO THE GROUP SAYING "PAUL AND

10:13AM  13     TEAM.

10:13AM  14          "PLEASE PLAN ON RUNNING THIS SAMPLE USING THE SAME

10:13AM  15     PROCESSES AS LAST WEEK, IE, THE CURRENT WORKFLOW IN NORMANDY."

10:13AM  16          DO YOU SEE THAT?

10:13AM  17     A.   YES.

10:13AM  18     Q.   AND WHAT WAS NORMANDY AT THERANOS?

10:13AM  19     A.   NORMANDY WAS ONE OF THE LABS.

10:13AM  20     Q.   WAS THAT THE CLINICAL LAB WHERE PATIENT SAMPLES WERE

10:13AM  21     TESTED?

10:13AM  22     A.   IT WAS THE NAME OF ANOTHER LAB.

10:13AM  23     Q.   YOU THEN SAY, "TO ANSWER PAUL'S QUESTION, I BELIEVE THAT

10:13AM  24     ADVIA IS USED FOR THIS FOR GC ASSAYS."

10:14AM  25          DO YOU SEE THAT?
```

10:14AM  1    A.   YES.

10:14AM  2    Q.   AND YOU TESTIFIED BEFORE THAT ADVIA WAS A THIRD PARTY

10:14AM  3    DEVICES, NOT A THERANOS DEVICE?

10:14AM  4    A.   THAT'S MY UNDERSTANDING NOW, YES.

10:14AM  5    Q.   DID YOU HAVE A DIFFERENT UNDERSTANDING AT THE TIME?

10:14AM  6    A.   I DIDN'T -- THIS ISN'T INFORMATION THAT I WOULD HAVE HAD,

10:14AM  7    AND SO IT'S SOMETHING THAT I WOULD HAVE -- INFORMATION I WOULD

10:14AM  8    HAVE PASSED ALONG.

10:14AM  9    Q.   DURING THIS TIME PERIOD, WHO DID YOU RELY ON FOR YOUR

10:14AM 10    KNOWLEDGE OF WHAT DEVICES WERE USED FOR WHAT?

10:14AM 11    A.   MAINLY DANIEL YOUNG OR SOME OF THE OTHER SCIENTISTS.

10:14AM 12         BUT LOOKING AT THIS EMAIL, GIVEN THAT THE MESSAGE BEFORE

10:14AM 13    WAS SENT TO DANIEL, IT LOOKS LIKE I WOULD HAVE GOTTEN THAT

10:14AM 14    INFORMATION FROM DANIEL AND PASSED IT BACK TO PAUL.

10:14AM 15    Q.   SO JUST TO BE CLEAR ABOUT WHAT IS HAPPENING FOR THE DEMO

10:14AM 16    IN THIS EMAIL, YOU SAW THAT IN THE CONFERENCE ROOM WERE

10:15AM 17    MINILABS AND A 4S IN THE INTERVIEW ROOM.

10:15AM 18         DO YOU RECALL THAT?

10:15AM 19    A.   I DON'T RECALL IT SPECIFICALLY, BUT THAT'S WHAT IT SAYS IN

10:15AM 20    THE EMAIL, YEAH.

10:15AM 21    Q.   OKAY.  AND THE TEST ITSELF WAS GOING TO BE RUN PURSUANT TO

10:15AM 22    THE CURRENT WORKFLOW IN NORMANDY, WHICH WOULD INCLUDE THE

10:15AM 23    ADVIA; IS THAT CORRECT?

10:15AM 24    A.   COULD YOU REPEAT THE QUESTION, SIR?

10:15AM 25    Q.   SURE.  WAS THE ACTUAL TEST GOING TO BE RUN BASED ON THE

EDLIN DIRECT BY MR. BOSTIC (RES.)

10:15AM 1    CURRENT WORKFLOW IN NORMANDY AS YOUR EMAIL SAYS, AND WOULD THAT

10:15AM 2    INCLUDE THE ADVIA THIRD PARTY ANALYZER?

10:15AM 3    A.   I DON'T KNOW WHERE THAT, WHERE THAT, WHERE THE ADVIA WAS.

10:15AM 4    Q.   I SEE.  OKAY.

10:15AM 5         LET ME JUST ASK THEN, WAS THIS TEST GOING TO BE RUN, AT

10:15AM 6    LEAST PARTLY, ON THE THIRD PARTY ADVIA BASED ON YOUR

10:16AM 7    UNDERSTANDING?

10:16AM 8    A.   BASED ON MY UNDERSTANDING IN THIS EMAIL.

10:16AM 9         BUT I DON'T REMEMBER SPECIFICALLY.

10:16AM 10   Q.   OKAY.  WERE YOU EVER ASKED TO PLACE A THIRD PARTY ANALYZER

10:16AM 11   IN AN INTERVIEW ROOM FOR A VIP MEETING?

10:16AM 12   A.   NOT THAT I RECALL.

10:16AM 13   Q.   DO YOU KNOW WHAT THE TECAN DEVICE IS?

10:16AM 14   A.   I'M FAMILIAR WITH THAT NAME.

10:16AM 15   Q.   AND DID THERANOS HAVE TECAN DEVICES THAT IT WOULD USE TO

10:16AM 16   DILUTE SAMPLES?

10:16AM 17   A.   I LEARNED LATER IN 2016 THAT THAT WAS A TOOL THAT WAS USED

10:16AM 18   TO DILUTE SAMPLES, YES.

10:16AM 19   Q.   DURING YOUR TIME WHEN YOU WERE WORKING ON THESE TECHNOLOGY

10:16AM 20   DEVICES, WERE YOU EVER ASKED TO PUT A TECAN INTO AN INTERVIEW

10:16AM 21   ROOM FOR A VIP MEETING?

10:16AM 22   A.   I WAS NOT.

10:16AM 23   Q.   YOU TESTIFIED EARLIER THAT YOU DON'T EVER RECALL GIVING A

10:17AM 24   VIP A TOUR OF THE CLINICAL LABORATORY WHERE THE ANALYZERS WERE;

10:17AM 25   IS THAT CORRECT?

10:17AM 1      A.   THAT'S CORRECT.

10:17AM 2      Q.   OKAY.  WE CAN PUT THAT ONE ASIDE.

10:17AM 3           I'LL ASK YOU TO TURN TO EXHIBIT 2327, PLEASE.

10:17AM 4           LET ME KNOW IF YOU DON'T HAVE THAT ONE.  I HAVE A --

10:17AM 5      A.   I HAVE IT.

10:17AM 6      Q.   AND IS EXHIBIT 2327 AN EMAIL BETWEEN ELIZABETH HOLMES AND

10:17AM 7      RUPERT MURDOCH?

10:17AM 8      A.   YES.

10:17AM 9      Q.   AND DO YOU RECOGNIZE MS. HOLMES'S EMAIL ADDRESS?

10:17AM 10     A.   I DO.

10:17AM 11          MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

10:17AM 12     EXHIBIT 2327.

10:17AM 13          MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

10:17AM 14          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:18AM 15     (GOVERNMENT'S EXHIBIT 2327 WAS RECEIVED IN EVIDENCE.)

10:18AM 16          MR. BOSTIC:  LET'S ZOOM IN ON THE TOP PORTION TO

10:18AM 17     CAPTURE THOSE TWO EMAIL MESSAGES.

10:18AM 18     Q.   MR. EDLIN, WHO IS RUPERT MURDOCH?

10:18AM 19     A.   I DON'T KNOW HIS EXACT TITLE, BUT I BELIEVE HE'S THE

10:18AM 20     CHAIRMAN OF FOX.

10:18AM 21     Q.   DO YOU RECALL A TIME AT THERANOS WHEN HE HAD SOME

10:18AM 22     COMMUNICATIONS OR INVOLVEMENT WITH THE COMPANY?

10:18AM 23     A.   I DO REMEMBER THAT HE CAME FOR A MEETING.

10:18AM 24     Q.   IN THIS EMAIL MS. HOLMES WRITES TO HIM, "IT WAS WONDERFUL

10:18AM 25     TO HAVE YOU HERE TODAY."

10:18AM  1          THIS IS DATED JANUARY 2015.

10:18AM  2          DO YOU SEE THAT?

10:18AM  3     A.   YES.

10:18AM  4     Q.   AND SHE SAYS, "I SO LOOK FORWARD TO THE OPPORTUNITY TO

10:18AM  5     CONTINUE OUR CONVERSATIONS, INCLUDING ONE DAY A MORE DETAILED

10:18AM  6     CONVERSATION ON CHINA...

10:18AM  7          "I WOULD BE AN HONOR TO HAVE YOU AS PART OF OUR COMPANY."

10:19AM  8          DO YOU SEE THAT?

10:19AM  9     A.   YES.

10:19AM 10     Q.   AND DO YOU RECALL MR. MURDOCH CONSIDERING A POTENTIAL

10:19AM 11     INVESTMENT IN THERANOS AROUND THIS TIME?

10:19AM 12     A.   I DO RECALL THAT INVESTMENT BINDERS WERE SENT TO HIM AT

10:19AM 13     ONE POINT, AND I DO RECALL THAT HE CAME TO THERANOS FOR A

10:19AM 14     MEETING.

10:19AM 15     Q.   WERE YOU INVOLVED IN THE CREATION OR SENDING OF THOSE

10:19AM 16     INVESTMENT BINDERS?

10:19AM 17          THE COURT:  SIR, COULD YOU SPEAK INTO THAT

10:19AM 18     MICROPHONE.  PULL THAT A LITTLE CLOSER TO YOU.  THAT MIGHT BE

10:19AM 19     HELPFUL.  AND IF YOU COULD REPEAT YOUR LAST ANSWER, PLEASE.

10:19AM 20          MR. BOSTIC:  WOULD YOU LIKE THE PREVIOUS QUESTION?

10:19AM 21          THE WITNESS:  YES.

10:19AM 22          THE COURT:  WHY DON'T YOU DO THAT?  THANK YOU,

10:19AM 23     MR. BOSTIC.

10:19AM 24     BY MR. BOSTIC:

10:19AM 25     Q.   THE QUESTION WAS, DO YOU RECALL A TIME WHEN MR. MURDOCH

10:19AM  1    WAS CONSIDERING INVESTING IN THERANOS?

10:19AM  2    A.   I RECALL THAT INVESTMENT BINDERS WERE SENT TO HIM, AND HE

10:19AM  3    DID COME TO THERANOS FOR A MEETING AS WELL.

10:19AM  4    Q.   AND DID YOU HAVE A ROLE IN PREPARING OR SENDING THOSE

10:19AM  5    INVESTOR BINDERS?

10:19AM  6    A.   I DON'T REMEMBER.

10:19AM  7    Q.   IN MR. MURDOCH'S RESPONSE TO MS. HOLMES, HE SAYS, "THANKS,

10:20AM  8    ELIZABETH.  ENJOYED EVERY MINUTE OF IT.  ANY BLOOD RESULTS?"

10:20AM  9         DO YOU SEE THAT?

10:20AM 10    A.   YES.

10:20AM 11    Q.   LET'S LOOK AT EXHIBIT 4366.

10:20AM 12    A.   OKAY.

10:20AM 13    Q.   AND LET'S SEE.

10:20AM 14         IS THIS AN EMAIL DISCUSSING DEMONSTRATION RESULTS FOR

10:20AM 15    MR. MURDOCH?

10:20AM 16    A.   YES.

10:21AM 17              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT MOVES TO

10:21AM 18    ADMIT EXHIBIT 4366.

10:21AM 19              MR. DOWNEY:  YOUR HONOR, I DON'T HAVE ANY OBJECTION

10:21AM 20    TO IT.

10:21AM 21         I DON'T KNOW IF THERE'S A PROTOCOL AROUND REDACTION OF ANY

10:21AM 22    INFORMATION.  THERE'S A LOT OF DISCUSSION OF HEALTH INFORMATION

10:21AM 23    IN HERE, SO I DON'T KNOW WHAT THE GOVERNMENT'S INTENT IS.

10:21AM 24              MR. BOSTIC:  AND, YOUR HONOR, THE GOVERNMENT'S COPY

10:21AM 25    OF THIS THAT WILL BE PUBLISHED HAS BEEN SIGNIFICANTLY REDACTED.

10:21AM    1                THE COURT:  ALL RIGHT.  THANK YOU.

10:21AM    2          THANK YOU FOR THE INQUIRY.

10:21AM    3                MR. DOWNEY:  FAIR ENOUGH.

10:21AM    4                THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED

10:21AM    5     IN REDACTED FORM.

10:21AM    6          (GOVERNMENT'S EXHIBIT 4366 WAS RECEIVED IN EVIDENCE.)

10:21AM    7                MR. BOSTIC:  LET'S JUST LOOK FIRST AT THE TOP

10:21AM    8     SECTION OF THIS PAGE, PLEASE.

10:22AM    9     Q.   MR. EDLIN, DO YOU SEE SOME DISCUSSION OF SOME QUESTIONS

10:22AM   10     ABOUT RESULTS THAT WERE RETURNED IN CONNECTION WITH THIS

10:22AM   11     DEMONSTRATION?

10:22AM   12     A.   YES.

10:22AM   13     Q.   AND ONE NOTE SAYS, "C02 IS RUN WAY EARLIER THAN USUAL, SO

10:22AM   14     IT'S A BIT HIGH."

10:22AM   15          DO YOU HAVE AN UNDERSTANDING OF WHAT THAT WAS REFERRING

10:22AM   16     TO?

10:22AM   17     A.   NO.

10:22AM   18     Q.   THE NEXT BULLET SAYS, "ISE'S ARE A BIT LOW."

10:22AM   19          WHAT DID ISE STAND FOR?

10:22AM   20     A.   IT WAS A CLASSIFICATION OF CERTAIN TESTS.

10:22AM   21     Q.   DO YOU RECALL WHETHER THAT CATEGORY OF TESTS WAS RUN ON

10:22AM   22     THE EDISON OR ON A THIRD PARTY DEVIC DEVICE?

10:22AM   23     A.   I DON'T.

10:22AM   24     Q.   THERE'S ALSO A QUESTION WHETHER THERE'S A WAY FOR US TO

10:22AM   25     VALIDATE LIPIDS IN THE FUTURE VIA SOME SORT OF FORMULA.

10:22AM   1            DO YOU SEE THAT?

10:22AM   2     A.   YES.

10:22AM   3     Q.   AND THEN FINALLY THERE A NOTE, "WE HAVE NO SAMPLE FOR

10:22AM   4     RERUN SINCE IT WAS A SHORT DRAW."

10:22AM   5            DO YOU SEE THAT?

10:22AM   6     A.   YES.

10:22AM   7     Q.   AND DO YOU KNOW WHAT "SHORT DRAW" REFERS TO?

10:23AM   8     A.   IT REFERS TO THE AMOUNT OF BLOOD THAT WAS COLLECTED IN THE

10:23AM   9     SAMPLE.  SO A SHORT DRAW WOULD BE LESS, LESS BLOOD.

10:23AM   10    Q.   THIS WAS JANUARY 2015.  AT THIS POINT, FOR APPROXIMATELY

10:23AM   11    HOW LONG HAD THERANOS BEEN PERFORMING CLINICAL PATIENT TESTING?

10:23AM   12    A.   SO THERANOS BEGAN TESTING IN WELLNESS CENTERS IN I BELIEVE

10:23AM   13    IT WAS SEPTEMBER OF 2013.

10:23AM   14    Q.   SO A YEAR AND CHANGE?

10:23AM   15    A.   YES.

10:23AM   16    Q.   AND YOU CAN PUT THAT ASIDE.

10:23AM   17            LET'S LOOK AT EXHIBIT 3070, PLEASE.

10:23AM   18    A.   CAN YOU REPEAT THE EXHIBIT PLEASE?

10:23AM   19    Q.   3070.  LET ME KNOW WHEN YOU'RE THERE.

10:24AM   20    A.   I'M THERE.

10:24AM   21    Q.   ARE YOU LOOKING AT AN EMAIL FROM THE DECEMBER 2015 TIME

10:24AM   22    PERIOD?

10:24AM   23    A.   YES.

10:24AM   24    Q.   AND IS THIS AN EMAIL CHAIN RELATING TO RESULTS FOR ANOTHER

10:24AM   25    VIP GUEST?

10:24AM 1        A.   YES.

10:24AM 2                 MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

10:24AM 3        EXHIBIT 3070 IN REDACTED FORM.

10:24AM 4                 MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

10:24AM 5                 THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED IN

10:24AM 6        REDACTED FORM.

10:24AM 7                 (GOVERNMENT'S EXHIBIT 3070 WAS RECEIVED IN EVIDENCE.)

10:24AM 8                 MR. BOSTIC:  AND IF WE CAN ZOOM IN ON THE BOTTOM

10:24AM 9        MESSAGE.

10:24AM 10       Q.   MR. EDLIN, DO YOU SEE WE'RE ABOUT TO LOOK AT AN EMAIL FROM

10:24AM 11       YOU TO DANIEL YOUNG AND SOMEONE NAMED BROOKE BUCHANAN AT

10:25AM 12       THERANOS?

10:25AM 13       A.   YES.

10:25AM 14       Q.   AND THE SUBJECT SAYS MESSAGING FOR VIP GUEST, AND THE NAME

10:25AM 15       REDACTED?

10:25AM 16       A.   YES.

10:25AM 17       Q.   AND LET'S LOOK AT PAGE 2.

10:25AM 18            AND YOUR EMAIL SAYS AT THE TOP, "YESTERDAY WE SENT THIS

10:25AM 19       INDIVIDUAL HIS RESULTS FROM THE STUDY IN WHICH WE COMPARE

10:25AM 20       FINGERSTICK CTN RESULTS TO VENOUS RESULTS."

10:25AM 21            DO YOU SEE THAT?

10:25AM 22       A.   YES.

10:25AM 23       Q.   DO YOU RECALL AROUND THIS TIME PERIOD THERE WAS A STUDY

10:25AM 24       COMPARING THERANOS FINGERSTICK RESULTS TO VENOUS RESULTS?

10:25AM 25       A.   YES.

10:25AM  1    Q.   THE NEXT LINE OF YOUR EMAIL SAYS, "IN CONNECTION WITH

10:25AM  2    THOSE RESULTS, WE WERE UNABLE TO RETURN 5 TEST RESULTS FOR THE

10:25AM  3    CTN FOR THE FOLLOWING REASONS."

10:25AM  4         DO YOU SEE THAT?

10:25AM  5    A.   YES.

10:25AM  6    Q.   AND UNDER POTASSIUM, CHLORIDE, AND SODIUM, IT SAYS,

10:25AM  7    "SAMPLE BECAME CONTAMINATED UNDER CENTRIFUGATION."

10:26AM  8         DO YOU SEE THAT?

10:26AM  9    A.   YES.

10:26AM  10   Q.   AND UNDER ROOT CAUSE, IT SAYS, "THE CONTAMINATION OF THE

10:26AM  11   CTN IS NOT DUE TO ANY HUMAN ERROR."

10:26AM  12        DO YOU SEE THAT?

10:26AM  13   A.   YES.  THAT'S WHAT TINA, A SCIENTIST, TOLD ME.

10:26AM  14   Q.   AND IT LOOKS LIKE SHE ALSO TOLD YOU, WE DON'T KNOW WHY OR

10:26AM  15   HOW THIS HAPPENED.

10:26AM  16        DO YOU SEE THAT?

10:26AM  17   A.   YES.

10:26AM  18   Q.   SHE SAYS, OR YOU REPORT, "WHEN WE DID REVIEWS OF THESE

10:26AM  19   FAILED SAMPLES IN THE PAST, WE SAW A THINNER GEL LAYER THAN

10:26AM  20   USUAL, BUT IT WASN'T THE CASE FOR THIS SAMPLE."

10:26AM  21        SO, IN OTHER WORDS, THIS WAS A MYSTERY; IS THAT RIGHT?

10:26AM  22   A.   YES.  I TOOK THIS PARAGRAPH DIRECTLY FROM TINA AND THIS IS

10:26AM  23   WHAT SHE INDICATED, SO SHE DIDN'T KNOW WHY.

10:26AM  24   Q.   MOVING DOWN TO CALCIUM AND TOTAL PROTEIN, YOU REPORT,

10:26AM  25   "THESE TWO RESULTS WERE STATISTICALLY SIGNIFICANTLY TOO HIGH

10:26AM   1   RELATIVE TO THE VENOUS REPORT, AND THEREFORE DANIEL RECOMMENDED

10:26AM   2   WE DID NOT REPORT THESE."

10:26AM   3        IN OTHER WORDS, WAS THERE TOO GREAT OF A DIFFERENCE OR A

10:26AM   4   DISAGREEMENT BETWEEN THE THERANOS FINGERSTICK RESULTS AND THE

10:27AM   5   VENOUS RESULTS?

10:27AM   6   A.   THAT'S RIGHT.

10:27AM   7   Q.   AND UNDER B THERE, AGAIN, IT SAYS "ROOT CAUSE - UNKNOWN."

10:27AM   8        DO YOU SEE THAT?

10:27AM   9   A.   YES.

10:27AM  10   Q.   AND LET'S GO TO PAGE 1 OF THIS EXHIBIT AND LET'S ZOOM IN

10:27AM  11   ON THE BOTTOM HALF.

10:27AM  12        AND DO YOU SEE A MESSAGE FROM CHRISTIAN HOLMES TO

10:27AM  13   ELIZABETH HOLMES AND SUNNY BALWANI ON DECEMBER 27TH ON THIS

10:27AM  14   TOPIC?

10:27AM  15   A.   YES.

10:27AM  16   Q.   CHRISTIAN HOLMES SAYS "FYI - THIS IS THE DOC EAH" --

10:27AM  17        IS THAT ELIZABETH HOLMES?

10:27AM  18   A.   YES.

10:27AM  19   Q.   "THIS IS THE DOC ELIZABETH HOLMES MET AT FORBES CONFERENCE

10:27AM  20   AND INVITED TO DO COMPARISON.  HE WAS VERY PLEASANT IN PERSON

10:27AM  21   BUT NOTED HE INTENDS TO WRITE ABOUT HIS EXPERIENCE AND

10:27AM  22   RESULTS."

10:27AM  23        DO YOU SEE THAT?

10:27AM  24   A.   YES.

10:27AM  25   Q.   AND LET'S LOOK AT MS. HOLMES'S RESPONSE JUST ABOVE THAT.

10:27AM  1          AND MS. HOLMES WRITES, CC'ING YOU HERE; IS THAT RIGHT?

10:28AM  2     A.   YES.

10:28AM  3     Q.   SHE SAYS, "YOU CAN SAY WE DO RUN THOSE ASSAYS, BUT WE'RE

10:28AM  4     NOT ABLE TO RUN THEM ON THIS SAMPLE, APPARENTLY DUE TO A HUMAN

10:28AM  5     ERROR IN SAMPLE HANDLING."

10:28AM  6          DO YOU SEE THAT?

10:28AM  7     A.   YES.

10:28AM  8     Q.   DO YOU RECALL THAT WE JUST READ A PORTION OF THE EMAIL

10:28AM  9     WHERE TINA REPORTED THAT THE CONTAMINATION OF THE CTN WAS NOT

10:28AM 10     DUE TO ANY HUMAN ERROR?

10:28AM 11     A.   I DO RECALL THAT.

10:28AM 12     Q.   AND MS. HOLMES WAS SAYING THAT WE WERE NOT ABLE TO RUN

10:28AM 13     THOSE ASSAYS ON THE SAMPLE, BUT, IN FACT, DIDN'T THE EARLIER

10:28AM 14     PORTION OF THE EMAIL INDICATE THAT THOSE ASSAYS HAD BEEN RUN ON

10:28AM 15     THE SAMPLE, THEY JUST PRODUCED QUESTIONABLE RESULTS?

10:28AM 16     A.   THAT'S RIGHT.

10:28AM 17          MR. DOWNEY:  I'M SORRY TO INTERRUPT.  I'M SORRY,

10:28AM 18     MR. BOSTIC.

10:28AM 19          ON THE ISSUE THAT I HAD ON THE REDACTIONS, I JUST WANT TO

10:29AM 20     MAKE SURE WE HAVE A CONSISTENT APPROACH.  THE NAME OF THIS

10:29AM 21     PATIENT HAS BEEN REDACTED THROUGHOUT, WHICH SEEMS CORRECT

10:29AM 22     BECAUSE THERE'S A DISCUSSION OF HOW WE'VE ADMITTED A FEW AND

10:29AM 23     PUBLISHED A FEW EXHIBITS WHERE THE SAME KIND OF INFORMATION HAS

10:29AM 24     BEEN ASSOCIATED WITH PARTICULAR INDIVIDUALS.

10:29AM 25          WE'LL FOLLOW WHATEVER PROTOCOL THE COURT WISHES, AND I'M

10:29AM   1    SURE MR. BOSTIC WILL, TOO.

10:29AM   2         I JUST WANT TO BE CLEAR SO AS TO NOT INADVERTENTLY HAVE A

10:29AM   3    PUBLICATION OF PERSONAL HEALTH INFORMATION.

10:29AM   4              THE COURT:  WELL, THANK YOU FOR THAT.  I THINK NONE

10:29AM   5    OF US WANT THAT TO HAPPEN.

10:29AM   6         OUR BINDERS, THAT IS, YOURS AND MINE, MAY HAVE EXHIBITS

10:29AM   7    THAT ARE DIFFERENT THAN WHAT IS IN YOUR BINDER, MR. BOSTIC,

10:29AM   8    THAT ULTIMATELY WOULD BE PUBLISHED, OR AT LEAST THE EXHIBITS

10:29AM   9    THAT HAVE BEEN SUBMITTED TO THE COURT FOR PUBLICATION.

10:29AM  10         IS THAT RIGHT?

10:29AM  11              MR. BOSTIC:  THAT'S CORRECT, YOUR HONOR.

10:29AM  12         AND DEPENDING ON THE EXHIBIT, SOMETIMES THE NAME WILL BE

10:29AM  13    REDACTED OR THE RESULTS, THE PRIVATE INFORMATION WILL BE

10:29AM  14    REDACTED.

10:29AM  15              THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

10:30AM  16    BY MR. BOSTIC:

10:30AM  17    Q.   MR. EDLIN, YOU TESTIFIED BEFORE THAT THIS WAS ALL IN

10:30AM  18    CONNECTION WITH A STUDY THAT WAS MEANT TO COMPARE THE THERANOS

10:30AM  19    FINGERSTICK RESULTS TO VENOUS DRAW; IS THAT CORRECT?

10:30AM  20    A.   THAT'S RIGHT.

10:30AM  21    Q.   AND IS THAT THE SAME THING, OR IS THAT A WAY TO TEST THE

10:30AM  22    ACCURACY OF THE THERANOS RESULTS?

10:30AM  23    A.   THE INTENT WAS TO ASSESS HOW THOSE FINGERSTICK RESULTS

10:30AM  24    COMPARE TO THE VENOUS RESULTS.

10:30AM  25    Q.   OKAY.  WE CAN PUT THAT ONE ASIDE.

10:30AM 1    LET'S TALK ABOUT THERANOS'S INVOLVEMENT WITH

10:30AM 2  PHARMACEUTICAL COMPANIES.

10:30AM 3    DID YOU HAVE ANY ROLE THERE IN THERANOS'S PARTNERSHIPS AND

10:30AM 4  WORK WITH PHARMACEUTICAL COMPANIES?

10:30AM 5  A.   I DID HAVE A SMALL ROLE.

10:30AM 6  Q.   CAN YOU GIVE US AN OVERVIEW OF WHAT THAT ROLE WAS?

10:30AM 7  A.   I BELIEVE THERE WERE A COUPLE DIFFERENT EXISTING

10:30AM 8  RELATIONSHIPS WITH PHARMACEUTICAL COMPANIES, AND AT ONE POINT

10:31AM 9  ELIZABETH ASKED ME TO FACILITATE INFORMATION SHARING AND

10:31AM 10  COMMUNICATION WITH THOSE COMPANIES.

10:31AM 11  Q.   AND DO YOU RECALL APPROXIMATELY WHEN IN YOUR TIME AT

10:31AM 12  THERANOS YOU STARTED TO WORK ON THOSE PROJECTS?

10:31AM 13  A.   THIS WAS PROBABLY IN THE FIRST SIX MONTHS OR SO.

10:31AM 14  Q.   AND AROUND THAT TIME, WAS THERE SIGNIFICANT WORK HAPPENING

10:31AM 15  WITH PHARMACEUTICAL COMPANIES AT THERANOS AS FAR AS YOU SAW?

10:31AM 16  A.   I PERSONALLY DIDN'T SEE SIGNIFICANT WORK HAPPENING, BUT

10:31AM 17  THAT'S NOT SOMETHING THAT I HAD MUCH INSIGHT INTO.

10:31AM 18  Q.   I'LL ASK YOU TO LOOK AT EXHIBIT 528 IN YOUR BINDER.

10:32AM 19  A.   528?

10:32AM 20  Q.   528, UH-HUH.

10:32AM 21  A.   OKAY.

10:32AM 22  Q.   AND IS THIS AN EMAIL CHAIN INCLUDING YOU,

10:32AM 23  ELIZABETH HOLMES, AND OTHERS AT THERANOS ABOUT WORK WITH

10:32AM 24  CELGENE?

10:32AM 25  A.   YES.

10:32AM  1          MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

10:32AM  2     EXHIBIT 528.

10:32AM  3          MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

10:32AM  4          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:32AM  5          (GOVERNMENT'S EXHIBIT 528 WAS RECEIVED IN EVIDENCE.)

10:32AM  6     BY MR. BOSTIC:

10:32AM  7     Q.  AND AROUND THIS TIME, MR. EDLIN, DO YOU REMEMBER THERANOS

10:32AM  8     HAVING A CONTRACT TO PERFORM SOME TESTING FOR A PHARMACEUTICAL

10:32AM  9     COMPANY CALLED CELGENE?

10:32AM  10    A.  I DON'T REMEMBER THE NATURE OF THAT CONTRACT.

10:32AM  11    Q.  LET'S LOOK AT THIS EMAIL CHAIN.  LET'S GO TO PAGE 8 FIRST,

10:33AM  12    AND IF WE CAN ZOOM IN ON THE TOP PART OF THE PAGE, THE TOP

10:33AM  13    HALF.

10:33AM  14         MR. EDLIN, DO YOU SEE THAT YOU'RE LOOKING AT AN EMAIL FROM

10:33AM  15    DANIEL YOUNG ON THIS TOPIC?

10:33AM  16    A.  YES.

10:33AM  17    Q.  HE SAYS, "BASED ON THE LATEST INFO, I THINK WE MAY BE ABLE

10:33AM  18    TO PERFORM THE FOLLOWING TESTS AT THERANOS WITH 1 MILLILITER OF

10:33AM  19    WHOLE BLOOD, BUT SOME QUESTIONS STILL REMAIN."

10:33AM  20         DO YOU SEE THAT?

10:33AM  21    A.  YES.

10:33AM  22    Q.  AND THEN HE PROVIDES TWO LISTS.  ONE IS TITLED "ASSAYS ON

10:33AM  23    THERANOS DEVICES," AND THE OTHER SAYS, "KITS."

10:33AM  24         DO YOU SEE THAT?

10:33AM  25    A.  YES.

10:33AM  1    Q.   AND CAN YOU EXPLAIN WHAT WE'RE LOOKING AT HERE?  WHAT ARE

10:33AM  2    THESE TWO LISTS?

10:33AM  3    A.   I CAN'T GIVE MUCH DETAIL BEYOND WHAT IS ON HERE.  IT LOOKS

10:33AM  4    LIKE THE TOP ARE TESTS THAT CAN BE RUN ON A THERANOS DEVICE,

10:34AM  5    AND I THINK A KIT REFERS TO A THIRD PARTY DEVICE.

10:34AM  6    Q.   IN OTHER WORDS, THE ASSAYS RUN ON KITS WOULD NOT BE RUN ON

10:34AM  7    A THERANOS MANUFACTURED DEVICE?

10:34AM  8    A.   I DON'T KNOW.  I DON'T KNOW DEFINITIVELY WHETHER OR NOT

10:34AM  9    THEY COULD.

10:34AM  10   Q.   IN THE PARAGRAPH -- ACTUALLY, MS. HOLLIMAN, IF WE CAN

10:34AM  11   SCROLL DOWN A LITTLE BIT TO CAPTURE THE REST OF THAT PARAGRAPH

10:34AM  12   AT THE BOTTOM.  PERFECT.  THANK YOU.

10:34AM  13        DO YOU SEE, MR. EDLIN, UNDER HEPCIDIN, THERE'S SOME

10:34AM  14   REFERENCE TO DRG'S KIT.

10:34AM  15        DO YOU SEE THAT?

10:34AM  16   A.   YES.

10:34AM  17   Q.   AND THEN THERE'S A REFERENCE TO INTRINSIC LIFESCIENCES.

10:34AM  18        DO YOU SEE THAT?

10:34AM  19   A.   YES.

10:34AM  20   Q.   THERE'S ANOTHER REFERENCE TO MY BIOSOURCE?

10:34AM  21   A.   YES.

10:34AM  22   Q.   AND WERE ANY OF THOSE COMPANIES AFFILIATED WITH OR PART OF

10:35AM  23   THERANOS IN ANY WAY?

10:35AM  24   A.   I DIDN'T HAVE -- NOT TO MY KNOWLEDGE.

10:35AM  25   Q.   LET'S LOOK AT PAGE 5, PLEASE.  AND AT THE BOTTOM OF THAT

10:35AM 1    PAGE, IF WE CAN ZOOM IN ON THE MESSAGE FROM MS. HOLMES.

10:35AM 2         MS. HOLMES WRITES TO DANIEL YOUNG, YOU, AND

10:35AM 3    SUREKHA GANGADKHEDKAR.

10:35AM 4         DO YOU SEE THAT?

10:35AM 5    A.   YES.

10:35AM 6    Q.   SHE SAYS, "OK - DAN, IN PARALLEL WITH THIS FOLLOW UP WITH

10:35AM 7    SUREKHA, PLEASE PREPARE A DRAFT TO VICKI TO SEND OUT AS EARLY

10:35AM 8    AS POSSIBLE TOMORROW MORNING AFTER WE'VE REVIEWED AND SIGNED

10:35AM 9    OFF ON IT."

10:35AM 10        DO YOU SEE THAT?

10:35AM 11   A.   YES.

10:35AM 12   Q.   AND WAS SHE GIVING THIS DIRECTION TO DANIEL YOUNG OR TO

10:35AM 13   YOU?  WHAT WAS YOUR UNDERSTANDING?

10:35AM 14   A.   MY UNDERSTANDING IS THAT SHE GAVE THIS DIRECTION TO ME.

10:36AM 15   Q.   AND IS THAT CONSISTENT WITH YOUR ROLE AS BEING INVOLVED IN

10:36AM 16   THE PHARMACEUTICAL COMPANY BUSINESS WITH THERANOS?

10:36AM 17   A.   THAT'S CONSISTENT WITH MY ROLE, YES.

10:36AM 18   Q.   SHE SAYS IN HER EMAIL, "THE DRAFT SHOULD CONFIRM THE

10:36AM 19   SAMPLE VOLUME AND LIST OF ASSAYS THAT WILL BE AVAILABLE,

10:36AM 20   INCLUDING THE BREAKDOWN OF WHICH ONES WILL BE DONE THROUGH THE

10:36AM 21   CLIA LAB."

10:36AM 22        DO YOU SEE THAT?

10:36AM 23   A.   YES.

10:36AM 24   Q.   LET'S LOOK AT PAGE 4, AND IF WE CAN ZOOM IN ON THE DRAFT

10:36AM 25   EMAIL THAT YOU PREPARED.

10:36AM   1          AND HERE'S YOUR DRAFT EMAIL; IS THAT CORRECT?

10:36AM   2     A.   YES.

10:36AM   3     Q.   AND IF WE SCROLL DOWN A LITTLE BIT, WE SEE THAT YOU

10:36AM   4     INCLUDE THOSE LISTS.  ONE LIST THAT SAYS ASSAYS DEVELOPED ON

10:36AM   5     THERANOS DEVICES.

10:36AM   6          DO YOU SEE THAT?

10:37AM   7     A.   YES.

10:37AM   8     Q.   AND THE BOTTOM PORTION OF THIS PAGE.

10:37AM   9          AND THEN IF WE JUST GLANCE QUICKLY AT PAGE 5, AT THE TOP

10:37AM  10     THERE'S A SECTION WHERE YOU LIST "ASSAYS USING THIRD PARTY KIT

10:37AM  11     THROUGH THERANOS'S CLIA LAB."

10:37AM  12          DO YOU SEE THAT?

10:37AM  13     A.   YES.  I'M TAKING JUST WHAT DANIEL YOUNG HAD SAID IN THE

10:37AM  14     PREVIOUS EMAIL AND PUTTING THAT INTO AN EMAIL DRAFT.

10:37AM  15     Q.   SHOWING THE BREAKDOWN BETWEEN WHAT THERANOS COULD DO AND

10:37AM  16     WHAT IT NEEDED TO RELY ON KITS FOR; CORRECT?

10:37AM  17     A.   CORRECT.

10:37AM  18     Q.   AND LET'S LOOK AT PAGE 3 OF THIS EXHIBIT, AND LET'S ZOOM

10:37AM  19     IN ON THE TOP HALF OF THE PAGE.

10:37AM  20          DANIEL YOUNG SAYS HERE, "COMMENTS ON THE DRAFT."

10:37AM  21          HIS FIRST BULLET POINT SAYS, "WE SHOULD NOT DISTINGUISH IF

10:37AM  22     WE ARE USING THERANOS DEVICES/CHEMISTRY OR KITS.  WE CAN JUST

10:38AM  23     STAR SOME ASSAYS AS ONES THAT WILL BE RUN IN THE THERANOS CLIA

10:38AM  24     LAB (AND POSSIBLY NOTE THAT THE OTHERS WILL BE TRANSITIONED

10:38AM  25     INTO THE CLIA LAB OVER TIME)."

10:38AM  1          DO YOU SEE THAT?

10:38AM  2     A.   YES.

10:38AM  3     Q.   AND HE ALSO SAYS, FOR LANGUAGE READING, "PLEASE SEE BELOW

10:38AM  4     FOR OUR LIST OF ASSAYS THAT WE PLAN TO DEVELOP BY MARCH.  WE

10:38AM  5     SHOULD NOT MENTION THIS HERE, BUT JUST SAY THAT WE AIM TO

10:38AM  6     DEPLOY IN THEIR TRIAL."

10:38AM  7          DO YOU SEE THAT?

10:38AM  8     A.   YES.

10:38AM  9     Q.   LET'S LOOK AT PAGE 2 OF THIS EXHIBIT AND SEE YOUR REVISED

10:38AM  10    DRAFT.  AND IF WE CAN ZOOM IN ON THE TOP PORTION.  AND LET'S

10:38AM  11    CAPTURE A LITTLE BIT MORE SO WE CAN GET THE TEXT OF THE

10:38AM  12    ASTERISK COMMENT.

10:38AM  13         PERFECT.  THANK YOU.

10:38AM  14         MR. EDLIN, IS THIS THE REVISED DRAFT THAT YOU PREPARED IN

10:39AM  15    RESPONSE TO MR. YOUNG'S COMMENTS, OR DR. YOUNG'S COMMENTS?

10:39AM  16    A.   YES.

10:39AM  17    Q.   YOU SAY "HI VICKI.

10:39AM  18         "PLEASE SEE BELOW FOR OUR LIST OF ASSAYS WHICH WE AIM TO

10:39AM  19    DEPLOY IN YOUR TRIAL."

10:39AM  20         AND NOW INSTEAD OF TWO LISTS, THERE'S ONE LIST; IS THAT

10:39AM  21    CORRECT?

10:39AM  22    A.   THAT'S RIGHT.

10:39AM  23    Q.   AND THE LIST INCLUDES THE ASSAYS THAT WE PREVIOUSLY SAW

10:39AM  24    COULD BE DONE ON THERANOS DEVICES AND THE ONES THAT NEEDED

10:39AM  25    KITS; IS THAT CORRECT?

10:39AM   1      A.   CORRECT.

10:39AM   2      Q.   AND THIS REVISED DRAFT EMAIL MAKES NO MENTION OF THIRD

10:39AM   3      PARTY KITS, THOUGH; IS THAT CORRECT?

10:39AM   4      A.   NO.  PER DANIEL YOUNG'S COMMENTS, IT SAYS BELOW THAT

10:39AM   5      OTHERS MAY BE TRANSITIONED INTO THE CLIA LAB OVER TIME.

10:39AM   6      Q.   LET'S LOOK AT THE TOP OF PAGE 1 OF THIS EXHIBIT.  AND THE

10:39AM   7      FINAL EMAIL IN THIS CHAIN IS FROM ELIZABETH HOLMES AND SHE

10:40AM   8      SAYS, IN CONNECTION WITH THESE CELGENE ASSAYS AND THE DRAFT

10:40AM   9      MESSAGE, "I AM ON BOARD WITH THIS.

10:40AM  10           "OK TO SEND OUT WITH DANIEL'S COMMENTS BELOW."

10:40AM  11           DO YOU SEE THAT?

10:40AM  12      A.   I DO.

10:40AM  13           AND THERE WAS ONE ADDITIONAL SUGGESTION FROM THE DRAFT

10:40AM  14      THAT WE JUST REVIEWED.

10:40AM  15      Q.   CORRECT.  THAT'S MENTIONED BELOW?

10:40AM  16      A.   RIGHT.

10:40AM  17      Q.   IN THE MIDDLE OF PAGE 1?

10:40AM  18      A.   RIGHT.

10:40AM  19      Q.   LET'S TAKE A QUICK LOOK AT THAT.

10:40AM  20           SO IN ADDITION TO DR. YOUNG'S PREVIOUS COMMENTS, HE MAKES

10:40AM  21      ANOTHER SUGGESTION ABOUT THE CONTENT OF YOUR DRAFT EMAIL;

10:40AM  22      CORRECT?

10:40AM  23      A.   CORRECT.

10:40AM  24      Q.   AND MS. HOLMES SIGNS OFF ON THE DRAFT EMAIL AND GIVES YOU

10:40AM  25      THE OKAY TO SEND IT?

10:40AM  1    A.   YES.

10:40AM  2    Q.   OKAY.  WE CAN PUT THAT ASIDE.

10:40AM  3         DURING YOUR TIME AT THERANOS, DID YOU HAVE A ROLE IN

10:40AM  4    CONNECTION WITH THE MARKETING OF THE COMPANY'S SERVICES?

10:41AM  5    A.   I DID.

10:41AM  6    Q.   DID THAT ROLE INCLUDE ANY INPUT OR WORK ON THE PUBLIC

10:41AM  7    WEBSITE OF THE COMPANY?

10:41AM  8    A.   YES.

10:41AM  9    Q.   AND CAN YOU GIVE US AN OVERVIEW OF THAT WORK?

10:41AM  10   A.   SO THE COMPANY -- THERANOS WORKED WITH A NUMBER OF

10:41AM  11   DIFFERENT MARKETING AND/OR COMMUNICATIONS OR PUBLIC RELATIONS

10:41AM  12   COMPANIES IN THE LEAD UP TO THE COMMERCIAL LAUNCH WITH

10:41AM  13   WALGREENS AND THEREAFTER, AND I WORKED WITH THOSE COMPANIES

10:41AM  14   ALONGSIDE SOME OF THE MEMBERS OF THE PROJECT MANAGEMENT TEAM TO

10:41AM  15   INTERFACE WITH THEM, TRACK DELIVERABLES, MAKE SURE THAT THINGS

10:41AM  16   GOT COMPLETED.

10:41AM  17   Q.   DID YOU -- DID THAT WORK INCLUDE WORKING WITH MS. HOLMES

10:42AM  18   ON MARKETING FOR THE COMPANY?

10:42AM  19   A.   YES.  YEP.

10:42AM  20   Q.   GO AHEAD.  HOW DID, HOW DID YOU AND MS. HOLMES WORK OR

10:42AM  21   COLLABORATE IN CONNECTION WITH THAT TOPIC?

10:42AM  22   A.   ELIZABETH WORKED CLOSELY WITH THE MARKETING AGENCIES AND

10:42AM  23   THE PERSONNEL TO DISCUSS THE VISION AND ALSO STRATEGY FOR THE

10:42AM  24   CONTENT.

10:42AM  25   Q.   AND WHEN IT CAME TO THE WEBSITE SPECIFICALLY, WAS

10:42AM 1    MS. HOLMES INVOLVED IN CREATING, REVIEWING, AND APPROVING THE

10:42AM 2    CONTENT?

10:42AM 3    A.   SHE WAS INVOLVED IN REVIEWING AND APPROVING.

10:42AM 4        AS FOR THE CREATING, USUALLY THE MARKETING AGENCIES WOULD

10:42AM 5    CREATE CONTENT BASED ON DISCUSSIONS THAT THEY DID HAVE WITH

10:42AM 6    ELIZABETH AND A GROUP OF PEOPLE.

10:42AM 7    Q.   FROM YOUR TIME AT THE COMPANY AND YOUR WORK ON THAT

10:43AM 8    PROJECT, HOW WOULD YOU CHARACTERIZE MS. HOLMES'S LEVEL OF

10:43AM 9    INVOLVEMENT IN REVIEWING AND APPROVING THAT CONTENT?  WAS SHE

10:43AM 10   VERY INVOLVED?  DETAIL ORIENTED?  WAS SHE KIND OF CHECKED OUT?

10:43AM 11   WHAT WAS YOUR EXPERIENCE?

10:43AM 12   A.   VERY INVOLVED AND DETAIL ORIENTED.

10:43AM 13       THERE WERE STEPS ALONG THE WAY IN TERMS OF DEVELOPMENT

10:43AM 14   THAT PROBABLY DIDN'T REACH HER REVIEW EVERY TIME.  BUT FOR THE

10:43AM 15   END PRODUCT AND WHAT ACTUALLY WENT ONTO THE WEBSITE, SHE DID

10:43AM 16   HAVE A HAND -- SHE DID REVIEW THAT.

10:43AM 17   Q.   I'LL ASK YOU TO LOOK AT EXHIBIT 3965 IN YOUR BINDER.  LET

10:43AM 18   ME KNOW ONCE YOU GET THERE.

10:44AM 19   A.   OKAY, I'M THERE.

10:44AM 20   Q.   AND DO YOU SEE AN EMAIL FROM JEFFREY BLICKMAN TO

10:44AM 21   MS. HOLMES, CC'ING SUNNY BALWANI AND YOU, ADDRESSING THE

10:44AM 22   CONTENT OF THE DRAFT THERANOS WEBSITE?

10:44AM 23   A.   YES.

10:44AM 24       MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

10:44AM 25   EXHIBIT 3965.

10:44AM  1            MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

10:44AM  2            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:44AM  3        (GOVERNMENT'S EXHIBIT 3965 WAS RECEIVED IN EVIDENCE.)

10:44AM  4            MR. BOSTIC:  IF WE COULD -- LET'S START WITH WHO IS

10:44AM  5    ON THIS EMAIL.

10:44AM  6    Q.   FIRST, WHO WAS JEFF BLICKMAN ON THIS EMAIL?

10:44AM  7    A.   JEFF BLICKMAN WAS A PROJECT MANAGER AND WE WERE ON THE

10:44AM  8    SAME TEAM.

10:44AM  9    Q.   IN HIS EMAIL, HE WRITES TO ELIZABETH SAYING, "HERE'S THE

10:44AM 10    PDF SCREENSHOT OF LATEST DOT COM" --

10:44AM 11        WAS THAT THE DRAFT WEBSITE?

10:44AM 12    A.   YES.

10:44AM 13    Q.   -- "TO SEND TO COUNSEL, ALONG WITH JIM'S (ABRIDGED)

10:45AM 14    FEEDBACK FROM TODAY, REMOVED ANYTHING BASED ON PERSONAL

10:45AM 15    OPINION."

10:45AM 16        DO YOU SEE THAT?

10:45AM 17    A.   YES.

10:45AM 18    Q.   AND THIS EMAIL WAS DATED SEPTEMBER 4TH, 2013; IS THAT

10:45AM 19    RIGHT?

10:45AM 20    A.   THAT'S RIGHT.

10:45AM 21    Q.   AND WHEN WAS THE WEBSITE GOING TO GO PUBLIC?  OR WHEN WERE

10:45AM 22    THOSE CHANGES GOING TO TAKE EFFECT, IF YOU KNOW?

10:45AM 23    A.   THESE CHANGES WERE INTENDED TO GO PUBLIC AT THE SAME TIME,

10:45AM 24    OR THE NIGHT BEFORE THE WALGREENS, THE FIRST WALGREENS STORED

10:45AM 25    OPENED.

10:45AM  1   Q.   SO WITHIN A WEEK OR SO OF THE DATE OF THE EMAIL THAT WE'RE

10:45AM  2   LOOKING AT, APPROXIMATELY?

10:45AM  3   A.   I'M NOT SURE OF THE EXACT DATE, SO IT COULD BE NINE DAYS

10:45AM  4   OR TEN DAYS.  BUT IN THAT GENERAL TIMEFRAME.

10:45AM  5   Q.   IN THESE COMMENTS THAT ARE BEING PASSED ON TO MS. HOLMES,

10:45AM  6   QUESTION 1 SAYS, "WHAT IS THE SOURCE/BACKUP DATA FOR 'AT

10:45AM  7   THERANOS, WE CAN PERFORM ALL LAB TESTS ON A SAMPLE 1/1,000TH

10:46AM  8   THE SIZE OF A TYPICAL BLOOD DRAW.'"

10:46AM  9        DO YOU SEE THAT?

10:46AM 10   A.   YES.

10:46AM 11   Q.   POINT NUMBER 2 SAYS, FOR THE CONTENT, "OUR REVOLUTION/OUR

10:46AM 12   TECHNOLOGY," AND THE QUOTE, "A TINY DROP IS ALL IT TAKES.  WE

10:46AM 13   OFTEN USE MORE THAN ONE DROP, SO WE SHOULD SAY," AND THEN THERE

10:46AM 14   ARE SOME ALTERNATIVES INCLUDED.

10:46AM 15        DO YOU SEE THAT?

10:46AM 16   A.   YES.

10:46AM 17   Q.   AND DO YOU KNOW WHETHER THESE CHANGES WERE IMPLEMENTED ON

10:46AM 18   THE THERANOS PUBLIC WEBSITE?

10:46AM 19   A.   I DON'T RECALL SPECIFICALLY.

10:46AM 20   Q.   LET'S LOOK AT PAGE 4 OF THIS EXHIBIT.  LET'S ZOOM IN ON

10:46AM 21   THE TOP PORTION AND SEE IF WE CAN GET THE TEXT TO SHOW UP.

10:46AM 22        IS THIS A PAGE FROM THE DRAFT THERANOS WEBSITE AS IT

10:46AM 23   EXISTED AT THE TIME OF THE EMAIL THAT WE'VE BEEN LOOKING AT?

10:46AM 24   A.   YES, I BELIEVE SO.

10:46AM 25   Q.   HERE UNDER THE GRAPHIC AND THE TEXT, THE LAB TESTS

10:47AM  1    REINVENTED, DO YOU SEE THERE'S TEXT THAT SAYS, "AT THERANOS WE

10:47AM  2    CAN PERFORM ALL LAB TESTS ON A SAMPLE 1/1,000TH THE SIZE OF A

10:47AM  3    TYPICAL BLOOD DRAW."

10:47AM  4    A.   YES.

10:47AM  5    Q.   IS THAT THE TEXT THAT WAS BEING ADDRESSED IN THE COMMENT

10:47AM  6    THAT WE JUST LOOKED AT?

10:47AM  7    A.   YES.

10:47AM  8    Q.   I JUST WANT TO POINT OUT TO YOU A COUPLE OF OTHER THINGS

10:47AM  9    ON THIS PAGE.

10:47AM  10       FIRST, JUST BELOW THAT, DO YOU SEE SOME TEXT READING, "A

10:47AM  11   TINY DROP IS ALL IT TAKES"?

10:47AM  12   A.   YES.

10:47AM  13   Q.   AND THEN IF WE ZOOM OUT.  AND ZOOM IN ON THE PORTION

10:47AM  14   READING 10 PERCENT.  SORRY, A LITTLE HIGHER TO THE LEFT WHERE

10:47AM  15   IT SAYS, "HIGHEST LEVELS OF ACCURACY."

10:47AM  16       DO YOU SEE THAT PORTION?

10:47AM  17   A.   YES.

10:47AM  18   Q.   IF I COULD ASK YOU NOW TO TURN TO EXHIBIT 3981.

10:48AM  19   A.   OKAY.

10:48AM  20   Q.   AND ARE WE LOOKING NOW AT AN EMAIL CHAIN INCLUDING YOU AND

10:48AM  21   OTHER INDIVIDUALS AT THERANOS ALSO ON THE TOPIC OF WEBSITE

10:48AM  22   COMMENTS?

10:48AM  23   A.   YES.  I'M ON THE LAST EMAIL OF THIS CHAIN.

10:48AM  24           MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

10:48AM  25   EXHIBIT 3981.

10:48AM  1          MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

10:48AM  2          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:48AM  3          (GOVERNMENT'S EXHIBIT 3981 WAS RECEIVED IN EVIDENCE.)

10:48AM  4          MR. BOSTIC:  LET'S ZOOM IN ON THE BOTTOM HALF OF

10:48AM  5   THIS PAGE.

10:48AM  6   Q.   MR. EDLIN, DO YOU SEE AN EMAIL FROM KATE BEARDSLEY TO

10:48AM  7   ELIZABETH HOLMES?

10:48AM  8   A.   YES.

10:48AM  9   Q.   AND MS. BEARDSLEY'S EMAIL ADDRESS IS @BEARDSLEYLAWPLLC.

10:49AM  10          DO YOU SEE THAT?

10:49AM  11   A.   YES.

10:49AM  12   Q.   AND WHO WAS KATE BEARDSLEY?

10:49AM  13   A.   I DON'T BELIEVE I KNEW HER.

10:49AM  14   Q.   AND SHE WROTE IN HER EMAIL, "I AM FORWARDING THE

10:49AM  15   HYMAN, PHELPS COMMENTS."

10:49AM  16          DO YOU SEE THAT?

10:49AM  17   A.   YES.

10:49AM  18   Q.   AND DO YOU KNOW WHAT HYMAN, PHELPS WAS?

10:49AM  19   A.   I DON'T RECALL.

10:49AM  20   Q.   I'LL DRAW YOUR ATTENTION TO AN EMAIL BELOW THAT FROM

10:49AM  21   SOMEONE NAMED JAMIE WOLSZON.

10:49AM  22          DO YOU SEE THAT?

10:49AM  23   A.   YES.

10:49AM  24   Q.   AND DO YOU REMEMBER WHO THAT WAS?

10:49AM  25   A.   NO.

10:49AM 1    Q.   IN JAMIE'S EMAIL, WE SEE, "PLEASE FIND BELOW MY COMMENTS

10:49AM 2    TO THE THERANOS WEBSITE.  SEVERAL OF THESE COMMENTS REPEAT

10:49AM 3    THROUGHOUT THE WEBSITE SO I DO NOT NECESSARILY MENTION EACH

10:49AM 4    INSTANCE.  AS DISCUSSED, THEY FALL WITHIN THE CATEGORIES OF

10:49AM 5    SUBSTANTIATION FOR SUPERLATIVE OR COMPARATIVE PERFORMANCE

10:49AM 6    CLAIMS," AND OTHER TOPICS.

10:50AM 7         DO YOU SEE THAT?

10:50AM 8    A.   YES.

10:50AM 9    Q.   LET'S TURN THE PAGE AND GO TO PAGE 2.

10:50AM 10        IF WE CAN ZOOM IN ON THE TOP PORTION.

10:50AM 11        DO YOU SEE NOW WE'RE LOOKING AT BULLET COMMENTS GIVING

10:50AM 12   FEEDBACK TO THE DRAFT BEFORE IT IS LAUNCHED?

10:50AM 13   A.   YES.

10:50AM 14   Q.   AND LET'S LOOK AT SOME OF THESE POINTS OF FEEDBACK.

10:50AM 15        THE TOP ONE SAYS, "PLEASE REMOVE REFERENCES TO 'ALL' TESTS

10:50AM 16   AND REPLACE WITH STATEMENTS SUCH AS 'MULTIPLE' OR 'SEVERAL.'

10:50AM 17   IT IS HIGHLY UNLIKELY THAT THE LABORATORY CAN PERFORM EVERY

10:50AM 18   CONCEIVABLE TEST BOTH FROM A LOGISTICAL STANDPOINT AND BECAUSE

10:50AM 19   THE CLIA CERTIFICATION DESIGNATES SPECIFIC SPECIALTIES OF TESTS

10:50AM 20   THE LAB PERFORMS."

10:50AM 21        DO YOU SEE THAT COMMENT?

10:51AM 22   A.   YES.

10:51AM 23   Q.   AND JUST BELOW THAT THERE ANOTHER COMMENT THAT SAYS, "FOR

10:51AM 24   A SIMILAR REASON, REPLACE 'FULL RANGE' WITH 'BROAD RANGE.'"

10:51AM 25        DO YOU SEE THAT?

10:51AM   1    A.   YES.

10:51AM   2    Q.   AND DO YOU KNOW WHETHER THESE COMMENTS WERE IMPLEMENTED ON

10:51AM   3    THE THERANOS WEBSITE?

10:51AM   4    A.   I DON'T RECALL SPECIFICALLY.

10:51AM   5    Q.   AND DO YOU RECALL A DISCUSSION WITH MS. HOLMES ABOUT THIS

10:51AM   6    FEEDBACK?

10:51AM   7    A.   NO.

10:51AM   8    Q.   LET'S GO DOWN A LITTLE BIT.  THERE'S A BULLET THAT SAYS

10:51AM   9    REPLACE, AND IT SAYS, "REPLACE 'FASTER AND EASIER' WITH 'FAST

10:51AM  10    AND EASY.'"

10:51AM  11        DO YOU SEE THAT CHANGE?

10:51AM  12    A.   YES:

10:51AM  13    Q.   THERE'S A SUGGESTION BELOW IT, OR A REQUEST TO REPLACE

10:51AM  14    THE, QUOTE, "'HIGHEST QUALITY' WITH 'HIGH QUALITY.'"

10:51AM  15        DO YOU SEE THAT?

10:51AM  16    A.   YES.

10:51AM  17    Q.   AND LET'S ZOOM BACK OUT AND ZOOM BACK IN ON THE BOTTOM

10:51AM  18    HALF OF THIS PAGE.

10:52AM  19        AND DO YOU SEE THERE IS A QUESTION THAT SAYS, "WHAT

10:52AM  20    SUBSTANTIATION DO YOU HAVE FOR 'HAVE RESULTS TO YOU AND YOUR

10:52AM  21    DOCTOR FASTER THAN PREVIOUSLY POSSIBLE?'"

10:52AM  22    A.   YES.

10:52AM  23    Q.   AND THERE'S ALSO ANOTHER COMMENT SIMILAR TO WHAT WE SAW

10:52AM  24    BEFORE, THIRD FROM THE BOTTOM, THAT SAYS, "REPLACE 'HIGHEST

10:52AM  25    LEVELS OF ACCURACY' WITH 'HIGH LEVELS OF ACCURACY.'"

10:52AM  1          DO YOU SEE THAT?

10:52AM  2     A.   YES.

10:52AM  3     Q.   LET'S GO TO THE NEXT PAGE, PAGE 3, AND WE'LL JUST

10:52AM  4     HIGHLIGHT A FEW MORE POINTS OF FEEDBACK HERE.

10:52AM  5          DO YOU SEE THE THIRD ONE DOWN SAYS, "CHANGE 'MORE PRECISE'

10:52AM  6     TO 'PRECISE'"?

10:52AM  7     A.   YES.

10:52AM  8     Q.   AND LET'S ZOOM IN ON THE BOTTOM HALF OF THIS PAGE.

10:53AM  9          DO YOU SEE, THIRD FROM THE BOTTOM, THERE'S A REQUEST TO

10:53AM 10     "REMOVE REFERENCES TO ONCOLOGY AND PEDIATRICS - THIS INCREASES

10:53AM 11     RISK."

10:53AM 12          DO YOU SEE THAT?

10:53AM 13     A.   YES.

10:53AM 14     Q.   AND FINALLY, LET'S GO TO PAGE 4 OF THIS EXHIBIT.  AT THE

10:53AM 15     TOP THERE IT SAYS, "ENSURE SUBSTANTIATION FOR 'UNPRECEDENTED

10:53AM 16     SPEED AND ACCURACY.'"

10:53AM 17          DO YOU SEE THAT?

10:53AM 18     A.   YES.

10:53AM 19     Q.   AND IS THIS A REQUEST, IN OTHER WORDS, TO MAKE SURE

10:53AM 20     THERE'S BACKUP FOR THAT CLAIM?

10:53AM 21     A.   I THINK SUBSTANTIATION AND BACKUP ARE PROBABLY SYNONYMS

10:53AM 22     HERE.

10:53AM 23     Q.   AND FINALLY, LET'S LOOK AT THE BOTTOM OF THIS LIST, AND

10:53AM 24     THE SECOND BULLET FROM THE BOTTOM, WHICH SAYS, "REMOVE

10:53AM 25     'UNRIVALLED ACCURACY.'"

| | | |
|---|---|---|
| 10:54AM | 1 | DO YOU SEE THAT? |
| 10:54AM | 2 | A.   YES. |
| 10:54AM | 3 | Q.   AND LET'S LOOK AT A SIMILAR EMAIL FROM A LITTLE BIT |
| 10:54AM | 4 | EARLIER.  LET'S LOOK AT 5438. |
| 10:54AM | 5 | FOR THE COURT'S REFERENCE AND COUNSEL'S REFERENCE, THIS |
| 10:54AM | 6 | MIGHT BE INSIDE THE RED WELD INSIDE OF THE BINDER? |
| 10:54AM | 7 | THE COURT:  THANK YOU. |
| 10:54AM | 8 | THE WITNESS:  I SEE THAT. |
| 10:54AM | 9 | BY MR. BOSTIC: |
| 10:54AM | 10 | Q.   IS EXHIBIT 5438 AN EMAIL CHAIN INCLUDING YOU, MS. HOLMES, |
| 10:54AM | 11 | AND OTHERS AT THERANOS ABOUT THE WEBSITE CONTENT? |
| 10:54AM | 12 | A.   YES. |
| 10:54AM | 13 | MR. BOSTIC:  YOUR HONOR, I OFFER EXHIBIT 5438. |
| 10:55AM | 14 | MR. DOWNEY:  NO OBJECTION, YOUR HONOR. |
| 10:55AM | 15 | THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED. |
| 10:55AM | 16 | (GOVERNMENT'S EXHIBIT 5438 WAS RECEIVED IN EVIDENCE.) |
| 10:55AM | 17 | MR. BOSTIC:  AND LET'S START BY ZOOMING IN ON THE |
| 10:55AM | 18 | BOTTOM HALF OF THE PAGE. |
| 10:55AM | 19 | Q.   MR. EDLIN, DO YOU SEE THAT AT THE BOTTOM OF THE PAGE |
| 10:55AM | 20 | THERE'S AN EMAIL FROM YOU TO MS. HOLMES ABOUT WEBSITE CONTENT? |
| 10:55AM | 21 | A.   YES. |
| 10:55AM | 22 | Q.   AND AT THE TOP OF THE SELECTION SHE SAYS, "THEY SHOULD NOT |
| 10:55AM | 23 | USE THE WORLD UNRIVALLED IN ACCURACY AS WE'VE DISCUSSED MANY |
| 10:55AM | 24 | TIMES." |
| 10:55AM | 25 | DO YOU SEE THAT? |

10:55AM  1    A.   YES.

10:55AM  2    Q.   AND THEN LET'S LOOK AT YOUR EMAIL IN RESPONSE IN THE TOP

10:55AM  3    PORTION OF THE PAGE.

10:56AM  4         AND YOU RESPOND WITH WHAT YOU SAY ARE SOME SUGGESTIONS

10:56AM  5    INSTEAD OF UNRIVALLED ACCURACY.

10:56AM  6         DO YOU SEE THAT?

10:56AM  7    A.   YES.

10:56AM  8    Q.   AND ONE SAYS UNRIVALLED QUALITY?

10:56AM  9    A.   YES.

10:56AM 10    Q.   AND WHAT WAS THE THINKING IN SUGGESTING "QUALITY" INSTEAD

10:56AM 11    OF "ACCURACY," IF YOU RECALL?

10:56AM 12    A.   I DON'T RECALL.

10:56AM 13    Q.   AND DID YOU VIEW THOSE TERMS AS SYNONYMOUS?

10:56AM 14    A.   YES.

10:56AM 15    Q.   AND LET'S GO BACK TO MS. HOLMES'S EMAIL IN THE MIDDLE OF

10:56AM 16    THE PAGE.

10:56AM 17         SHE SAYS AT THE BOTTOM OF THAT SELECTION, "IN AUTO REFLEX

10:56AM 18    TESTING, WE SHOULD ADD A LINE ABOUT BECAUSE WE CAN RUN THE FULL

10:56AM 19    RANGE OF ASSAYS FROM A SINGLE MICRO-SAMPLE."

10:56AM 20         DO YOU SEE THAT CLAIM?

10:56AM 21    A.   I DO.

10:56AM 22    Q.   AND WE CAN PUT THAT ONE ASIDE.

10:56AM 23         YOUR HONOR, IF THE COURT WANTED TO BREAK AT 11:00, I'M

10:57AM 24    ABOUT TO MOVE TO A DIFFERENT TOPIC.

10:57AM 25              THE COURT:  LET'S DO THAT NOW.  LET'S TAKE OUR

```
10:57AM   1    BREAK.  IT WILL BE ABOUT 30 MINUTES, 30 MINUTES.

10:57AM   2         AND, LADIES AND GENTLEMEN, I THOUGHT WE WOULD GO UNTIL

10:57AM   3    3:00 TODAY.  IS THAT ALL RIGHT?  ANY ONE IN THE JURY WITH AN

10:57AM   4    OBJECTION TO THAT?

10:57AM   5         I SEE NO HANDS.  THANK YOU.

10:57AM   6         WE'LL GO UNTIL 3:00 TODAY, MAYBE 4:00 TOMORROW.  IF YOU

10:57AM   7    COULD CHECK WITH YOUR NEEDS AND I'LL ASK YOU AT THE END OF

10:57AM   8    TODAY WHETHER OR NOT WE CAN DO THAT.

10:57AM   9         LET'S TAKE OUR BREAK NOW.  THANKS VERY MUCH.

10:58AM   10        (JURY OUT AT 10:58 A.M.)

10:58AM   11        THE COURT:  PLEASE BE SEATED.  THANK YOU.

10:58AM   12        THE RECORD SHOULD REFLECT --

10:58AM   13        AND YOU CAN STAND DOWN, SIR.

10:58AM   14        THE WITNESS:  THANK YOU.

10:58AM   15        THE COURT:  THANK YOU.  OUR JURY HAS LEFT.  ALL

10:58AM   16   COUNSEL AND MS. HOLMES ARE PRESENT, AND THE WITNESS HAS LEFT

10:58AM   17   THE COURTROOM.  MR. EDLIN HAS LEFT.

10:58AM   18        ANYTHING FURTHER, MR. BOSTIC, BEFORE WE BREAK?

10:58AM   19        MR. BOSTIC:  NO, YOUR HONOR.  THANK YOU.

10:58AM   20        THE COURT:  MR. DOWNEY?

10:58AM   21        MR. DOWNEY:  NO, YOUR HONOR.

10:58AM   22   JUST OUTSIDE OF THE PRESENCE OF THE JURY, ON THE ISSUE I

10:58AM   23   RAISED, THE ISSUE RELATED TO PERSONAL HEALTH INFORMATION, IT'S

10:58AM   24   COMPLEX WITH THESE EXHIBITS.

10:58AM   25        SO THERE WERE TWO INDIVIDUALS WITH WHOM MR. BOSTIC IN HIS
```

10:58AM  1    QUESTIONING ASSOCIATED RESULTS WHICH WERE THEN DISCUSSED IN THE

10:58AM  2    EMAILS THAT HE WAS MENTIONING.

10:58AM  3         YOU KNOW, IT MAY NOT BE A SUFFICIENT CONNECTION, BUT THE

10:59AM  4    APPROACH WITH A DIFFERENT EMAIL WAS TO TAKE THE SAME KIND OF

10:59AM  5    INFORMATION AND MAKE ALL OF THE DOCUMENTS THEN CONSISTENT WITH

10:59AM  6    ANY FORM OF DISCLOSURE AND HE DIDN'T USE THE PATIENT'S NAME.

10:59AM  7         WE SHOULD JUST HAVE A CONSISTENT APPROACH, AND WHATEVER

10:59AM  8    APPROACH THE COURT PREFERS IS FINE WITH ME.

10:59AM  9              THE COURT:  MR. BOSTIC?

10:59AM 10              MR. BOSTIC:  SO, YOUR HONOR, I'M NOT SURE -- I

10:59AM 11    APPRECIATE WHERE COUNSEL IS COMING FROM, AND THIS IS AN ISSUE

10:59AM 12    THAT IS VERY IMPORTANT TO THE COURT AND BOTH PARTIES.

10:59AM 13         A CONSISTENT APPROACH ISN'T POSSIBLE HERE, OR NOT THE BEST

10:59AM 14    WAY TO GO BECAUSE DIFFERENT EXHIBITS ARE OFFERED FOR DIFFERENT

10:59AM 15    PURPOSES.

10:59AM 16         SOMETIMES IT'S IMPORTANT TO KNOW THAT A CERTAIN INDIVIDUAL

10:59AM 17    WHO ENDED UP INVESTING IN THE COMPANY CAME IN FOR A

10:59AM 18    DEMONSTRATION, AND THAT DEMONSTRATION WAS RUN ON NON-THERANOS

10:59AM 19    EQUIPMENT.

10:59AM 20         AT OTHER TIMES THE IDENTITY OF THE PERSON MIGHT BE BESIDE

10:59AM 21    THE POINT AND THE RESULTS MIGHT BE MORE IMPORTANT BECAUSE THEY

10:59AM 22    HIGHLIGHT ISSUES THAT THERANOS WAS HAVING WITH THE EQUIPMENT

11:00AM 23    THAT WERE ELEVATED OR KNOWN BY MS. HOLMES.

11:00AM 24         SO IN THOSE TWO SITUATIONS, DIFFERENT PORTIONS OF THE

11:00AM 25    DOCUMENTS WOULD BE REDACTED.

11:00AM 1       IT'S THE GOVERNMENT'S APPROACH TO TRY TO MAKE SURE THAT AT

11:00AM 2   NO POINT ARE WE PUBLICIZING SOMEONE'S IDENTITY ALONG WITH

11:00AM 3   SENSITIVE HEALTH INFORMATION, BUT BECAUSE OF THE NATURE OF THIS

11:00AM 4   CASE --

11:00AM 5       THE COURT:  RIGHT.  I CAPTURE THAT DISTINCTION, AND

11:00AM 6   I THINK YOU DO, TOO, MR. DOWNEY.  DIFFERENT PURPOSES COMING IN.

11:00AM 7       BUT I DO APPRECIATE THAT WE SHOULD HAVE SOME PROPHYLACTIC

11:00AM 8   MEASURES FOR RELEASE OF PII AND HEALTH INFORMATION.  THAT'S

11:00AM 9   CRITICAL.  WE DON'T WANT TO HAVE A MISTAKE ON THAT.

11:00AM 10      AND SOMETIMES, AS WE NOTED, YOU AND I, MR. DOWNEY, HAVE

11:00AM 11  BINDERS THAT HAVE UNREDACTED, I THINK, INFORMATION, AND THE

11:00AM 12  GOVERNMENT IS, IN THEIR EXAMINATION, USING PERHAPS THE SAME

11:00AM 13  DOCUMENTS.

11:00AM 14      BUT THE ONES THAT ACTUALLY GET ADMITTED AND PUBLISHED WILL

11:00AM 15  HAVE REDACTIONS.  I'M TAKING IT ON GOOD FAITH FROM BOTH SIDES

11:01AM 16  THAT THAT IS GOING TO OCCUR.

11:01AM 17      MR. BOSTIC:  THAT'S CORRECT, YOUR HONOR.

11:01AM 18      AND JUST TO BE CLEAR, THE VERSION APPEARING ON THE COURT'S

11:01AM 19  SCREEN IS THE SAME VERSION THAT IS BEING SHOWN TO THE JURY AND

11:01AM 20  THE VERSION THAT SHOULD CONTAIN THE REDACTIONS THAT WE'VE PUT

11:01AM 21  IN PLACE.

11:01AM 22      THE COURT:  RIGHT.  THAT'S HOW I THINK WE HAVE BEEN

11:01AM 23  PROCEEDING.

11:01AM 24      MR. DOWNEY:  TO BE SURE, THE EXHIBITS ARE REDACTED,

11:01AM 25  AND TO BE SURE, MR. BOSTIC IS DOING THE BEST HE CAN, AS WE ARE,

11:01AM  1    AND NO ONE --

11:01AM  2              THE COURT:  SURE.

11:01AM  3              MR. DOWNEY:  -- IS PERFECT WITH THIS.

11:01AM  4         THE ISSUE, THOUGH, IS A LITTLE DIFFERENT.  THE ISSUE IS

11:01AM  5    THERE WAS A NAME IN THE QUESTIONING ABOUT WALGREENS, FOR

11:01AM  6    EXAMPLE.  ONE COULD PUT TOGETHER THE DISCUSSION OF THE TEST

11:01AM  7    RESULTS IN THE EMAIL AND ASSOCIATE IT WITH THAT NAME AND KNOW

11:01AM  8    WHAT RESULTS WERE.

11:01AM  9         NOW, I SHOULD SAY THAT THESE DEMONSTRATIONS AREN'T DONE

11:01AM  10   FOR CLINICAL PURPOSES AND SO IN A SENSE THEY MAY NOT -- THE

11:01AM  11   ISSUE MAY NOT MATTER.

11:01AM  12        BUT, FOR EXAMPLE, WITH ANOTHER OF THE INDIVIDUALS WITH THE

11:02AM  13   LATE DECEMBER 2015 EMAIL, I DON'T HAVE THE NUMBER, THAT -- THE

11:02AM  14   NAME WAS REMOVED AND THE RESULT -- IN ALL RELEVANT PLACES, SO

11:02AM  15   IT WAS JUST A DIFFERENT APPROACH.

11:02AM  16        I THINK WE SHOULD JUST DO THE BEST WE CAN, AND I'M NOT,

11:02AM  17   CERTAINLY NOT CRITICIZING --

11:02AM  18              THE COURT:  RIGHT.

11:02AM  19              MR. DOWNEY:  -- MR. BOSTIC IN ANY WAY.

11:02AM  20        I JUST WANT TO BE CAUTIOUS BECAUSE OF THE OBVIOUS ISSUES.

11:02AM  21              THE COURT:  RIGHT.  THANK YOU FOR THAT.

11:02AM  22        AND THE COURT NEEDS TO BE COGNIZANT OF THAT AS WELL.

11:02AM  23        I DO UNDERSTAND THAT THE DOCUMENTS SOMETIMES ARE USED FOR

11:02AM  24   DIFFERENT PURPOSES, AND THAT'S WHERE THERE -- WE HAVE TO TRACK

11:02AM  25   THAT.  IT SOUNDS LIKE BOTH OF YOU HAVE RECOGNIZED THAT AND THE

11:02AM  1    EXHIBITS THAT YOU INTEND TO OFFER, THE PURPOSES THAT THEY'RE

11:02AM  2    BEING OFFERED FOR AND THE NEEDS OF REDACTION, OR NOT, AS TO

11:02AM  3    THOSE DOCUMENTS.

11:02AM  4         I'M SURE YOU HAVE THE SAME ISSUES, BUT I APPRECIATE BOTH

11:02AM  5    SIDES' ATTENTION TO THIS.

11:02AM  6              MR. DOWNEY:  THERE'S NO QUESTION IT'S A DIFFICULT

11:02AM  7    ISSUE.

11:02AM  8              THE COURT:  RIGHT.  IT IS INDEED.  ALL RIGHT.  THANK

11:03AM  9    YOU.

11:03AM  10              MR. DOWNEY:  THANK YOU, YOUR HONOR.

11:03AM  11              THE CLERK:  COURT IS IN RECESS.

11:03AM  12         (RECESS FROM 11:03 A.M. UNTIL 11:37 A.M.)

11:37AM  13         (JURY IN AT 11:37 A.M.)

11:37AM  14              THE COURT:  ALL RIGHT.  THANK YOU.  THANK YOU FOR

11:37AM  15    YOUR PATIENCE.  WE'RE BACK ON THE RECORD.  ALL PARTIES

11:37AM  16    PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.

11:37AM  17         MR. BOSTIC.

11:37AM  18              MR. BOSTIC:  THANK YOU, YOUR HONOR.

11:37AM  19    Q.   MR. EDLIN, DURING YOUR TIME WORKING AT THERANOS, DID YOU

11:37AM  20    HAVE ANY CONTACT WITH JOURNALISTS WHO WERE COVERING THE

11:37AM  21    COMPANY?

11:37AM  22    A.   YES.

11:37AM  23    Q.   AND HOW DID THAT COME TO BE?  WHAT WAS YOUR ROLE IN

11:37AM  24    CONNECTION WITH DEALING WITH JOURNALISTS?

11:37AM  25    A.   INITIALLY JOURNALISTS WOULD SEND EMAILS TO THE COMPANY

11:37AM  1    REQUESTING MEETINGS OR THAT THEY WERE INTERESTED IN DOING A

11:37AM  2    PIECE, AND I WOULD INTERFACE AND OFTEN HELP COORDINATE THEIR

11:38AM  3    VISITS.

11:38AM  4    Q.   IN THAT ROLE, DID YOU COME TO HAVE ANY CONTACT WITH A

11:38AM  5    REPORTER NAMED JOSEPH RAGO FROM "THE WALL STREET JOURNAL"?

11:38AM  6    A.   I DO RECALL THAT HE, THAT HE DID VISIT.  I DON'T BELIEVE

11:38AM  7    THAT I COMMUNICATED WITH HIM FOR THAT VISIT.

11:38AM  8    Q.   YOU RECALL HIM VISITING THERANOS?

11:38AM  9    A.   YES.

11:38AM  10   Q.   DO YOU RECALL HIM INTERVIEWING MS. HOLMES?

11:38AM  11   A.   YES.

11:38AM  12   Q.   I'LL ASK YOU --

11:38AM  13   A.   I WASN'T PRESENT FOR THE INTERVIEW, BUT I DO RECALL THAT

11:38AM  14   HE DID THAT.

11:38AM  15   Q.   OKAY.  UNDERSTOOD.

11:38AM  16       DO YOU RECALL APPROXIMATELY WHEN HE WAS WORKING ON A STORY

11:38AM  17   REGARDING THERANOS?

11:38AM  18   A.   IT WAS, I BELIEVE, WITHIN TWO TO THREE WEEKS OF THE

11:38AM  19   WALGREENS LAUNCH.

11:38AM  20   Q.   SO APPROXIMATELY SEPTEMBER OF 2013?

11:38AM  21   A.   YES.

11:38AM  22   Q.   I'LL ASK YOU TO LOOK AT EXHIBIT 1090 IN THE BINDER IN

11:38AM  23   FRONT OF YOU.

11:39AM  24       AND FOR THE COURT AND THE DEFENSE, THIS MIGHT BE IN THE

11:39AM  25   RED WELD.

11:39AM   1          THE COURT:  THANK YOU.

11:39AM   2          THE WITNESS:  OKAY.  I SEE IT.

11:39AM   3     BY MR. BOSTIC:

11:39AM   4     Q.  YOU'RE LOOKING AT EXHIBIT 1090?

11:39AM   5     A.  YES.

11:39AM   6     Q.  IS IT AN EMAIL CHAIN INCLUDING YOU, ELIZABETH HOLMES,

11:39AM   7     SUNNY BALWANI, AND OTHERS AT THERANOS REGARDING THE CONTENT OF

11:39AM   8     THAT JOSEPH RAGO ARTICLE?

11:39AM   9     A.  YES.

11:39AM  10          MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

11:39AM  11     EXHIBIT 1090.

11:39AM  12          MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

11:39AM  13          THE COURT:  DO YOU HAVE IT, MR. DOWNEY?

11:39AM  14          MR. DOWNEY:  I HAVE IT.

11:39AM  15          THE COURT:  OKAY.

11:39AM  16          MR. DOWNEY:  YOUR HONOR, MAY I JUST DOUBLE-CHECK

11:39AM  17     WITH MR. BOSTIC?

11:40AM  18          THE COURT:  SURE.

11:40AM  19        (DISCUSSION OFF THE RECORD.)

11:40AM  20          THE COURT:  I THINK I DO.

11:40AM  21        IT WILL BE ADMITTED.  IT MAY BE PUBLISHED.  I DON'T THINK

11:40AM  22     I HAVE A COPY IN THE BINDER OR THE RED WELD, BUT IT MAY HAVE

11:40AM  23     BEEN --

11:40AM  24          THE CLERK:  (HANDING.)

11:40AM  25          MR. BOSTIC:  APOLOGIES FOR THAT, YOUR HONOR.

| | | |
|---|---|---|
| 11:40AM | 1 | THE COURT:  THANK YOU.  IT'S ADMITTED, AND IT MAY BE |
| 11:40AM | 2 | PUBLISHED. |
| 11:40AM | 3 | (GOVERNMENT'S EXHIBIT 1090 WAS RECEIVED IN EVIDENCE.) |
| 11:40AM | 4 | BY MR. BOSTIC: |
| 11:40AM | 5 | Q.   MR. EDLIN, I'D DIRECT YOUR ATTENTION TO THE BOTTOM HALF, |
| 11:40AM | 6 | IF WE CAN ZOOM IN, THE BOTTOM HALF OF PAGE 1. |
| 11:40AM | 7 | AND DO YOU SEE AN EMAIL FROM JOSEPH RAGO TO |
| 11:40AM | 8 | ELIZABETH HOLMES AND JEFFREY BLICKMAN? |
| 11:40AM | 9 | A.   YES. |
| 11:40AM | 10 | Q.   AND IS THE SUBJECT LINE READ BACK? |
| 11:40AM | 11 | A.   YES. |
| 11:40AM | 12 | Q.   AND LET'S LOOK AT PAGE 2 OF THIS EXHIBIT. |
| 11:41AM | 13 | AND IF WE CAN ZOOM IN ON THE TOP HALF OF THE PAGE. |
| 11:41AM | 14 | SO, MR. EDLIN, WHAT WE'RE LOOKING AT NOW, IS THIS THE TEXT |
| 11:41AM | 15 | OF THE DRAFT ARTICLE THAT HAD NOT YET BEEN PUBLISHED? |
| 11:41AM | 16 | A.   I BELIEVE SO. |
| 11:41AM | 17 | Q.   THIS EMAIL WAS SENT ON SEPTEMBER 6TH, 2013. |
| 11:41AM | 18 | WAS THIS BEFORE THE WALGREENS LAUNCH AND BEFORE THE |
| 11:41AM | 19 | PUBLICATION OF THIS ARTICLE? |
| 11:41AM | 20 | A.   YES. |
| 11:41AM | 21 | Q.   SO WHAT WE'RE LOOKING AT IS THE JOURNALIST SENDING A DRAFT |
| 11:41AM | 22 | OF THE ARTICLE TO MS. HOLMES IN ADVANCE OF THE PUBLICATION? |
| 11:41AM | 23 | A.   EITHER THE ARTICLE OR PARTS OF THE ARTICLE. |
| 11:41AM | 24 | Q.   OKAY.  LET'S LOOK AT THE TOP HALF OF PAGE 1. |
| 11:41AM | 25 | WHILE WE'RE ZOOMING IN THERE, DO YOU HAVE AN UNDERSTANDING |

11:42AM   1    AS TO WHAT THE PURPOSE WAS OF PROVIDING MS. HOLMES WITH A DRAFT

11:42AM   2    OF THE ARTICLE IN ADVANCE, OR PORTIONS OF IT?

11:42AM   3    A.   AS I'M LOOKING AT HIS EMAIL BELOW, HE ASKED IF ANY POINTS

11:42AM   4    NEED TO BE CLARIFIED OR IF HE HAS EXPLAINED SOMETHING

11:42AM   5    INCOMPLETELY OR LEFT SOMETHING OUT, THAT OFFERED THE

11:42AM   6    OPPORTUNITY FOR ELIZABETH AND JEFF TO CORRECT IT IN THIS CASE.

11:42AM   7    Q.   OKAY.  AND SO, IN OTHER WORDS, IF THERE WAS SOMETHING THAT

11:42AM   8    NEEDED TO BE CHANGED OR SOMETHING CLARIFIED, THIS WOULD BE THE

11:42AM   9    CHANCE TO DO IT BEFORE THE PUBLICATION OF THE ARTICLE?

11:42AM  10    A.   THAT'S RIGHT.

11:42AM  11    Q.   LOOKING AT THE TOP PORTION OF PAGE 1, DO YOU SEE AN EMAIL

11:42AM  12    FROM JEFF BLICKMAN TO ELIZABETH HOLMES AND OTHERS AT THERANOS?

11:42AM  13    A.   YES.

11:42AM  14    Q.   HE SAYS, "WENT THROUGH THIS AND HIGHLIGHTED A FEW THINGS

11:42AM  15    IN YELLOW DIRECTLY IN HIS EMAIL, AND SUMMARIZED BELOW.  THERE

11:42AM  16    ARE A FAIR AMOUNT OF ISSUES THAT I'VE NOTED, SOME MORE

11:42AM  17    CONCERNING THAN OTHERS, PLEASE TAKE A LOOK."

11:43AM  18         DO YOU SEE THAT?

11:43AM  19    A.   YES.

11:43AM  20    Q.   AND I NOTES A FEW ITEMS.  FIRST, FOR EXAMPLE, UNDER QUOTE

11:43AM  21    NUMBER 2, MR. BLICKMAN NOTES THAT THE ARTICLE CALLED MS. HOLMES

11:43AM  22    A 30-SOMETHING CHEMICAL ENGINEER, AND HE SAID THAT WAS

11:43AM  23    INACCURATE.

11:43AM  24         DO YOU SEE THAT?

11:43AM  25    A.   RIGHT.

11:43AM 1    Q.   QUOTE NUMBER 3, HE NOTICED A, QUOTE, "GROUP COLLEGE-KID

11:43AM 2    HOUSE."  HE THOUGHT THAT WAS POORLY WORDED.

11:43AM 3         DO YOU SEE THAT?

11:43AM 4    A.   I DO.

11:43AM 5    Q.   AND THE SECTION LABELLED MAIN COPY, THE FIRST BULLET POINT

11:43AM 6    SAYS THAT NEARLY 500 EMPLOYEES WOULD BE AN OVERSTATEMENT.

11:43AM 7         DO YOU SEE THAT COMMENT?

11:43AM 8    A.   I DO.

11:43AM 9    Q.   AND A FEW DOWN FROM THERE, THERE'S A BULLET POINT THAT

11:43AM 10   SAYS "HE CALLS OUT QUOTE 'IMPROVED ACCURACY' WHEN TALKING ABOUT

11:43AM 11   REDUCTION OF HUMAN ERROR THRU AUTOMATION."

11:43AM 12        DO YOU SAY THAT?  OR DO YOU SEE THAT?

11:43AM 13   A.   YES.

11:43AM 14   Q.   AND DO YOU HAVE AN UNDERSTANDING AS TO WHY MR. BLICKMAN

11:43AM 15   WAS INCLUDING THIS MENTION OF IMPROVED ACCURACY IN THIS LIST OF

11:44AM 16   THINGS THAT NEEDED TO BE FIXED ABOUT THE DRAFT ARTICLE?

11:44AM 17   A.   I DON'T KNOW WHY SPECIFICALLY HE CALLED IT OUT, BUT THERE

11:44AM 18   WAS AN ONGOING DISCUSSION ABOUT WORDING AROUND ACCURACY AND HOW

11:44AM 19   THAT WOULD BE REPRESENTED ON THE WEBSITE.

11:44AM 20   Q.   AND WAS THAT ONGOING DISCUSSION PART OF WHAT WE SAW IN

11:44AM 21   PREVIOUS EXHIBITS ABOUT THE WEBSITE CONTENT?

11:44AM 22   A.   YES.

11:44AM 23   Q.   DO YOU RECALL THAT DISCUSSION ABOUT ACCURACY CLAIMS IN ANY

11:44AM 24   OTHER CONTEXTS BESIDES THE WEBSITE CONTENT AND THE CONTENT OF

11:44AM 25   THIS ARTICLE?

```
11:44AM   1      A.   NOTHING ELSE IS COMING TO MIND RIGHT NOW.

11:44AM   2      Q.   DO YOU RECALL -- LET ME ASK, WERE YOU PART OF ANY

11:44AM   3    DISCUSSIONS FOLLOWING UP ON THIS EMAIL ABOUT WHETHER THAT

11:44AM   4    IMPROVED ACCURACY CLAIM NEEDED TO BE CLARIFIED IN THE DRAFT

11:45AM   5    ARTICLE?

11:45AM   6      A.   NOT THAT I RECALL.

11:45AM   7      Q.   LET'S LOOK AT THE ARTICLE ITSELF, WHICH IS ALREADY IN

11:45AM   8    EVIDENCE.  IF I COULD PUBLISH EXHIBIT 1106.

11:45AM   9           MR. EDLIN, DO YOU SEE THAT THIS IS THE PUBLISHED

11:45AM  10    "WALL STREET JOURNAL" ARTICLE TITLED "ELIZABETH HOLMES:  THE

11:45AM  11    BREAKTHROUGH OF INSTANT DIAGNOSIS"?

11:45AM  12           SORRY.  I DON'T THINK THIS IS IN YOUR BINDER, BUT IT'S ON

11:45AM  13    THE SCREEN IN FRONT OF YOU.

11:45AM  14      A.   OKAY.  I SEE THIS ARTICLE.

11:45AM  15      Q.   AND DO YOU SEE THIS IS BY JOSEPH RAGO AND PUBLISHED

11:45AM  16    SEPTEMBER 8TH, 2013?

11:45AM  17      A.   YES.

11:45AM  18      Q.   AND THAT'S APPROXIMATELY TWO DAYS AFTER THE EMAIL THAT WE

11:45AM  19    WERE JUST LOOKING AT?

11:45AM  20      A.   YES.

11:45AM  21      Q.   LET'S ZOOM OUT AND ZOOM BACK IN ON THE FIRST INDENTED

11:45AM  22    PARAGRAPH, ABOUT HALFWAY DOWN THAT PAGE.

11:46AM  23           DO YOU SEE THIS PARAGRAPH IN THE FINAL ARTICLE READS, "THE

11:46AM  24    SECRET THAT HUNDREDS OF EMPLOYEES ARE NOW REFINING INVOLVES

11:46AM  25    DEVICES THAT AUTOMATE AND MINIATURIZE MORE THAN 1,000
```

11:46AM   1    LABORATORY TESTS."

11:46AM   2         DO YOU SEE THAT?

11:46AM   3    A.   YES.

11:46AM   4    Q.   AND IT THEN SAYS, "THERANOS'S PROCESSES ARE FASTER,

11:46AM   5    CHEAPER AND MORE ACCURATE THAN THE CONVENTIONAL METHODS AND

11:46AM   6    REQUIRE ONLY MICROSCOPIC BLOOD VOLUMES."

11:46AM   7         DO YOU SEE THAT?

11:46AM   8    A.   YES.

11:46AM   9    Q.   THE FINAL ARTICLE THEN DOES CONTAIN CLAIMS ABOUT

11:46AM  10    THERANOS'S PROCESSES BEING MORE ACCURATE?

11:46AM  11    A.   YEAH, I'M LOOKING AT JEFF'S EMAIL, AND THE QUOTE THERE WAS

11:46AM  12    IMPROVED ACCURACY.

11:46AM  13    Q.   LET'S LOOK AT PAGE 2 OF THIS ARTICLE.

11:47AM  14         FROM YOUR PERSPECTIVE, IS THERE A DIFFERENCE BETWEEN A

11:47AM  15    TEST BEING MORE ACCURATE AND HAVING IMPROVED ACCURACY?

11:47AM  16    A.   I THINK THEY'RE SYNONYMOUS.

11:47AM  17    Q.   ON PAGE 2 THERE'S A PARAGRAPH THAT BEGINS, TOWARD THE

11:47AM  18    BOTTOM OF THE PAGE, IT SAYS, "ANOTHER THERANOS ADVANCE"?

11:47AM  19    A.   YES.

11:47AM  20    Q.   AND IT SAYS "ANOTHER THERANOS ADVANCE IS ITS TESTING'S

11:47AM  21    ACCURACY.  MS. HOLMES BELIEVES THE CHAIN OF CONVENTIONAL

11:47AM  22    LABORATORY CUSTODY INTRODUCES TOO MANY OPPORTUNITIES FOR ERROR,

11:47AM  23    'WHICH IS BASICALLY WHERE EVER HUMANS ARE INVOLVED.'" AND THEN

11:47AM  24    IT GOES ON TO EXPLAIN A LITTLE MORE ABOUT THAT.

11:47AM  25         SO DO YOU SEE ANOTHER CLAIM ABOUT THERANOS TESTING

EDLIN DIRECT BY MR. BOSTIC (RES.)

11:47AM  1    ACCURACY IN THE FINAL ARTICLE?

11:47AM  2    A.   I DO.

11:47AM  3    Q.   WE CAN PUT THAT ASIDE.

11:48AM  4         THE ARTICLE THAT WE JUST LOOKED AT, THE JOSEPH RAGO PIECE,

11:48AM  5    WERE YOU PART OF ANY DISCUSSIONS AT THERANOS ABOUT WHETHER THAT

11:48AM  6    ARTICLE SHOULD BE SENT TO INVESTORS OR POTENTIAL INVESTORS IN

11:48AM  7    THERANOS, IF YOU RECALL?

11:48AM  8    A.   I DON'T RECALL.

11:48AM  9    Q.   I'LL ASK YOU TO LOOK NEXT AT EXHIBIT 1753.

11:48AM  10        AND WHILE YOU'RE TURNING THERE, DO YOU RECALL INTERACTING

11:48AM  11   WITH ANOTHER JOURNALIST NAMED ROGER PARLOFF?

11:48AM  12   A.   I DO.

11:48AM  13   Q.   AND WHO WAS ROGER PARLOFF?

11:48AM  14   A.   ROGER PARLOFF WAS A REPORTER FOR "FORTUNE" MAGAZINE.

11:48AM  15   Q.   AND HOW DID YOU COME TO HAVE CONTACT WITH HIM WHEN YOU

11:48AM  16   WERE WORKING AT THERANOS?

11:48AM  17   A.   I BELIEVE THAT ONE OF THE PUBLIC RELATIONS CONSULTANTS WHO

11:49AM  18   WAS WORKING FOR THERANOS SET UP THAT INTERVIEW BETWEEN

11:49AM  19   ELIZABETH AND MR. PARLOFF.

11:49AM  20        IN FOLLOWUP TO THEIR INTERVIEW, THERE WERE A NUMBER OF

11:49AM  21   FOLLOW-UP ITEMS AND REQUESTED INFORMATION THAT ELIZABETH ASKED

11:49AM  22   THAT I HELP COMPILE.

11:49AM  23   Q.   LOOKING AT EXHIBIT 1753, DO YOU SEE AN EMAIL CHAIN BETWEEN

11:49AM  24   YOU AND MS. HOLMES AND OTHERS DEALING WITH THAT TO DO LIST FOR

11:49AM  25   THE JOURNALIST ROGER PARLOFF?

11:49AM  1    A.   YES.

11:49AM  2              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

11:49AM  3    EXHIBIT 1753.

11:49AM  4              MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

11:49AM  5              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:49AM  6         (GOVERNMENT'S EXHIBIT 1753 WAS RECEIVED IN EVIDENCE.)

11:49AM  7              MR. BOSTIC:  AND IF WE CAN START ON PAGE 5.  AND IF

11:49AM  8    WE CAN ZOOM IN ON THE MIDDLE OF THE PAGE STARTING WITH THAT

11:49AM  9    EMAIL MESSAGE.

11:49AM  10   Q.   MR. EDLIN, DO YOU SEE AN EMAIL FROM YOU TO MS. HOLMES AND

11:50AM  11   OTHERS ON MAY 21ST, 2014?

11:50AM  12   A.   YES.

11:50AM  13   Q.   AND WAS THIS DURING THE TIME PERIOD WHERE MR. PARLOFF WAS

11:50AM  14   WORKING ON HIS ARTICLE ON THERANOS?

11:50AM  15   A.   I BELIEVE SO.

11:50AM  16   Q.   YOU WRITE, "ELIZABETH, PLEASE SEE BELOW FOR THE UPDATED,

11:50AM  17   AGGREGATED LIST OF FOLLOW-UP ITEMS FOR ROGER PARLOFF."

11:50AM  18        DO YOU SEE THAT?

11:50AM  19   A.   YES.

11:50AM  20   Q.   AND WHAT WAS THIS LIST OF FOLLOW-UP ITEMS?

11:50AM  21   A.   THIS WAS A LIST OF REQUESTED INFORMATION THAT WAS BROKEN

11:50AM  22   DOWN INTO TOPIC AND INFORMATION AREA.

11:50AM  23   Q.   AND WERE THESE ALL ITEMS THAT WERE INTENDED TO GO TO

11:50AM  24   MR. PARLOFF TO BE INCORPORATED INTO HIS ARTICLE?

11:50AM  25   A.   I DON'T KNOW EXACTLY.  THESE WERE, THESE WERE FOLLOW-UP

11:50AM  1    QUESTIONS FROM AN INTERVIEW THAT MR. PARLOFF CONDUCTED WITH

11:50AM  2    ELIZABETH.  I DIDN'T KNOW HOW OR WHETHER THEY WOULD BE USED IN

11:50AM  3    THE ARTICLE.

11:50AM  4    Q.   DID MR. PARLOFF HAVE ANY OTHER DEALINGS WITH THERANOS

11:51AM  5    SEPARATE FROM WORKING ON THE ARTICLE THAT HE INTENDED TO

11:51AM  6    PUBLISH?

11:51AM  7    A.   NOT TO MY KNOWLEDGE.

11:51AM  8    Q.   I'LL DRAW YOUR ATTENTION TO JUST TO A COUPLE OF ITEMS IN

11:51AM  9    THIS LIST OF ACTION ITEMS.

11:51AM  10       FIRST LET'S ZOOM OUT AND ZOOM BACK IN ON THE BOTTOM HALF

11:51AM  11   OF THE PAGE.

11:51AM  12       FIRST -- SO WE SEE A NUMBERED LIST WITH ACTION ITEMS HERE;

11:51AM  13   CORRECT?

11:51AM  14   A.   YES.

11:51AM  15   Q.   AND THEN IN THE FAR RIGHT COLUMN THERE ARE INITIALS

11:51AM  16   LISTED.

11:51AM  17       DO YOU SEE THOSE?

11:51AM  18   A.   YES.

11:51AM  19   Q.   AND WHAT DOES THAT TELL US, THE INITIALS THAT MIGHT BE

11:51AM  20   NEXT TO A CERTAIN ACTION ITEM?

11:51AM  21   A.   THAT TELLS US WHO AT THE COMPANY WOULD BE RESPONSIBLE FOR

11:51AM  22   PROVIDING THAT INFORMATION.

11:51AM  23   Q.   OKAY.  SO WHEN WE LOOK AT, FOR EXAMPLE, ITEM NUMBER 12

11:51AM  24   WHERE IT SAYS "LANGUAGE ON WHAT HE CAN SAY ABOUT OUR HAVING

11:51AM  25   DEVICES, AND HOW MANY DEVICES WE ARE USING IN EACH FACILITY.

11:52AM  1        "HOW MANY ANALYZERS PER SAMPLE HE'S ALLOWED TO TALK ABOUT.

11:52AM  2        "BEING ABLE TO WORK WITHIN A SMALLER SPACE - LANGUAGE ON

11:52AM  3    THIS."

11:52AM  4        WHO WAS RESPONSIBLE FOR HANDLING THAT ACTION ITEM IN

11:52AM  5    CONNECTION WITH MR. PARLOFF'S ARTICLE?

11:52AM  6    A.   ELIZABETH'S NAME IS NEXT TO THAT.

11:52AM  7    Q.   HOW ABOUT FOR NUMBER 16?  THERE'S AN ACTION ITEM

11:52AM  8    REQUESTING, "LANGUAGE ON WHY WE DO SOME VENIPUNCTURE."

11:52AM  9        DO YOU SEE THAT?

11:52AM 10    A.   YES.

11:52AM 11    Q.   AND SO, IN OTHER WORDS, THE REASON WHY THERANOS DID SOME

11:52AM 12    VENOUS DRAW SAMPLES?

11:52AM 13    A.   CORRECT.

11:52AM 14    Q.   AND WHO WAS ASSIGNED TO HANDLE THAT ACTION ITEM FOR

11:52AM 15    MR. PARLOFF?

11:52AM 16    A.   ELIZABETH.

11:52AM 17    Q.   AND HOW ABOUT NUMBER 17, "LANGUAGE ON THE DEVICE

11:52AM 18    COMPARISON AND LAB COMPARISON BETWEEN THERANOS AND QUEST."

11:52AM 19        WHO WAS RESPONSIBLE FOR THAT ONE?

11:52AM 20    A.   ELIZABETH.

11:52AM 21    Q.   LET'S GO BACK TO PAGE 1 OF THIS EXHIBIT.

11:53AM 22        AND IF WE LOOK AT THE TOP PORTION OF THE PAGE.  LET'S

11:53AM 23    ACTUALLY CAPTURE FROM THE VERY TOP DOWN TO ABOUT A THIRD DOWN.

11:53AM 24        PERFECT.  THANK YOU.

11:53AM 25        MR. EDLIN, DO YOU SEE AT THE TOP THERE'S AN EMAIL FROM

EDLIN DIRECT BY MR. BOSTIC (RES.)

11:53AM   1    ELIZABETH HOLMES TO YOU ON JUNE 1ST, 2014?

11:53AM   2    A.   YES.

11:53AM   3    Q.   AND THIS EMAIL ATTACHES A PDF.

11:53AM   4         DO YOU SEE THAT?

11:53AM   5    A.   YES.

11:53AM   6    Q.   AND THE PDF IS TITLED PFIZER THERANOS SYSTEM VALIDATION

11:53AM   7    FINAL REPORT.

11:53AM   8         IS THAT RIGHT?

11:53AM   9    A.   YES.

11:53AM   10   Q.   AND LET'S TAKE A QUICK LOOK AT THAT ATTACHMENT, AND IT'S

11:53AM   11   ON PAGE 7 OF THE EXHIBIT.

11:53AM   12        AND, MS. HOLLIMAN, LET'S ZOOM IN ON THE TOP HALF OF THE

11:53AM   13   PAGE.

11:54AM   14        MR. EDLIN, DO YOU SEE THE REPORT THAT MS. HOLMES ATTACHED

11:54AM   15   IN HER EMAIL TO YOU THAT WE WERE JUST LOOKING AT?

11:54AM   16   A.   I DO.

11:54AM   17   Q.   AND DO YOU RECOGNIZE THIS DOCUMENT?

11:54AM   18   A.   I, I RECOGNIZE IT, YES.

11:54AM   19   Q.   WHAT'S YOUR UNDERSTANDING OF WHAT THIS DOCUMENT IS?

11:54AM   20   A.   MY UNDERSTANDING IS THAT THIS REPORT DETAILS A STUDY THAT

11:54AM   21   THERANOS COLLABORATED WITH PFIZER ON.

11:54AM   22   Q.   DO YOU KNOW HOW THIS REPORT WAS PRODUCED?

11:54AM   23        AND LET ME ASK ACTUALLY, DO YOU KNOW WHO ACTUALLY CREATED

11:54AM   24   THIS REPORT?

11:54AM   25   A.   I DON'T.

11:54AM  1    Q.   WERE YOU INVOLVED IN THE CREATION OF THIS REPORT?

11:54AM  2    A.   NO.

11:54AM  3    Q.   HOW ABOUT THE PFIZER LOGO AT THE TOP?

11:54AM  4         DO YOU KNOW HOW THE PFIZER LOGO CAME TO APPEAR AT THE TOP

11:54AM  5    OF THIS REPORT?

11:54AM  6    A.   I DON'T.

11:54AM  7    Q.   WERE YOU INVOLVED IN THE PLACEMENT OF THE PFIZER LOGO AT

11:54AM  8    THE TOP OF THIS REPORT?

11:54AM  9    A.   NO.

11:54AM  10   Q.   WERE YOU PART OF ANY DISCUSSIONS AT THERANOS ABOUT THE

11:55AM  11   PLACEMENT OF THE PFIZER LOGO ON THIS REPORT?

11:55AM  12   A.   NO.

11:55AM  13   Q.   OKAY.  WE CAN PUT THAT ASIDE.

11:55AM  14        SO BESIDES JOSEPH RAGO AND ROGER PARLOFF, ARE YOU FAMILIAR

11:55AM  15   WITH A REPORTER NAMED JENNY GOLD WORKING ON A PIECE REGARDING

11:55AM  16   THERANOS?

11:55AM  17   A.   I DON'T KNOW IF SHE EVER WROTE A PIECE.  I DO REMEMBER

11:55AM  18   THAT SHE WAS INTERESTED IN WRITING A PIECE.

11:55AM  19   Q.   DO YOU REMEMBER GETTING A QUESTION OR QUESTIONS FROM HER

11:55AM  20   ABOUT THERANOS IN CONNECTION WITH HER REPORTING?

11:55AM  21   A.   YES.

11:55AM  22   Q.   AND WHAT QUESTION OR QUESTIONS DO YOU REMEMBER GETTING

11:55AM  23   FROM MS. GOLD?

11:55AM  24   A.   I REMEMBER SHE WAS PREDOMINANTLY INTERESTED IN A

11:55AM  25   PERCENTAGE OF WHICH THERANOS TEST COULD BE RUN ON A FINGERSTICK

11:55AM   1    COMPARED TO A VENOUS DRAW.

11:55AM   2    Q.   WHEN WE LOOKED AT THE LIST OF ACTION ITEMS FOR

11:56AM   3    ROGER PARLOFF, USE OF VENOUS DRAWS WAS AN ITEM ASSIGNED TO

11:56AM   4    MS. HOLMES; IS THAT CORRECT?

11:56AM   5    A.   YES.

11:56AM   6    Q.   WHEN YOU WERE ASKED THIS QUESTION BY MS. GOLD, DID YOU

11:56AM   7    SEEK ANY GUIDANCE FROM MS. HOLMES ON HOW TO RESPOND?

11:56AM   8    A.   I DID.

11:56AM   9    Q.   AND DID YOU GET GUIDANCE?

11:56AM   10   A.   I DID.

11:56AM   11   Q.   WHAT DID MS. HOLMES TELL YOU?

11:56AM   12   A.   THE GUIDANCE WAS ESSENTIALLY TO NOT PROVIDE AN EXACT

11:56AM   13   PERCENTAGE BECAUSE THAT PERCENTAGE WAS ALWAYS CHANGING WEEK BY

11:56AM   14   WEEK BASED ON WHAT WAS ACTUALLY BEING ORDERED IN THE LAB.

11:56AM   15   Q.   ALL RIGHT.  LET'S SHIFT TOPICS AND TALK ABOUT CONTACT WITH

11:56AM   16   INVESTORS.

11:56AM   17        AS PART OF YOUR KIND OF MULTIFACETED ROLE AT THE COMPANY,

11:56AM   18   DID YOU HAVE ANY CONTACT WITH POTENTIAL OR ACTUAL INVESTORS

11:57AM   19   WITH THERANOS?

11:57AM   20   A.   I DID.

11:57AM   21   Q.   AND WHAT WAS THE NATURE OF THAT CONTACT?

11:57AM   22   A.   ON OCCASION -- THIS WAS RARE -- AN INVESTOR OR A POTENTIAL

11:57AM   23   INVESTOR WOULD COME TO THERANOS OFFICES, AND I THINK WE

11:57AM   24   DISCUSSED EARLIER ON SIMILAR OCCASIONS, I WOULD GIVE A TOUR IF

11:57AM   25   ELIZABETH COULDN'T GIVE THE TOUR OR DID NOT GIVE THE TOUR.

11:57AM   1          I WAS ALSO ASKED AT TIMES TO PREPARE BINDERS AND SEND

11:57AM   2   BINDERS TO THE INVESTORS BASED ON AN APPROVED CHECKLIST OF

11:57AM   3   ITEMS, AND I WOULD -- ONCE I COMPILED THOSE BINDERS, I WOULD

11:57AM   4   HAVE -- OR ELIZABETH ASKED TO REVIEW THEM, AND ONCE THEY WERE

11:57AM   5   REVIEWED AND APPROVED, ON SOME OCCASIONS I WOULD SEND THOSE OUT

11:58AM   6   TO INVESTORS.

11:58AM   7   Q.   AND THESE WERE BINDERS OF INFORMATION ABOUT THERANOS TO GO

11:58AM   8   TO INVESTORS?

11:58AM   9   A.   YES.

11:58AM  10   Q.   YOU SAID THAT THE MATERIALS FOR THOSE BINDERS CAME FROM A

11:58AM  11   PREAPPROVED LIST OF MATERIALS; IS THAT RIGHT?

11:58AM  12   A.   YES.

11:58AM  13   Q.   WHO APPROVED THE LIST OF PREAPPROVED MATERIALS?

11:58AM  14   A.   ELIZABETH.

11:58AM  15   Q.   OKAY.  LET'S LOOK AT EXHIBIT 1940.

11:58AM  16        DO YOU HAVE 1940 IN FRONT OF YOU?

11:58AM  17   A.   YES.  YES.

11:58AM  18   Q.   IS THIS AN EMAIL FROM YOU TO MS. HOLMES IN SEPTEMBER OF

11:58AM  19   2014 ABOUT ASSEMBLING INVESTMENT MATERIALS BINDERS?

11:58AM  20   A.   YES.

11:58AM  21          MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

11:58AM  22   EXHIBIT 1940.

11:59AM  23          MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

11:59AM  24          THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

11:59AM  25        (GOVERNMENT'S EXHIBIT 1940 WAS RECEIVED IN EVIDENCE.)

11:59AM  1          MR. BOSTIC:  AND LET'S LOOK FIRST AT PAGE 2.  ZOOM

11:59AM  2     IN AT THE TOP.

11:59AM  3     Q.  MR. EDLIN, DO YOU SEE AN EMAIL FROM MS. HOLMES TO YOU AND

11:59AM  4     JEFF BLICKMAN ON SEPTEMBER 15TH, 2014 ASKING FOR THE CONTENTS

11:59AM  5     OF THE TWO BINDERS AND WHAT'S NOT IN THEM THAT WAS IN OTHERS?

11:59AM  6     A.  I DO.

11:59AM  7     Q.  AND THEN LET'S GO TO PAGE 1.  AND LET'S ZOOM IN ON THE TOP

11:59AM  8     HALF OF PAGE 1.

11:59AM  9          CAN YOU EXPLAIN WHAT INFORMATION YOU'RE PROVIDING IN THE

11:59AM 10     EMAIL ON THE SCREEN?

11:59AM 11     A.  THIS INFORMATION RELATES TO THE CONTENT THAT WAS IN EACH

12:00PM 12     OF THE INVESTMENT BINDERS.

12:00PM 13     Q.  AND IS THIS THE LIST OF EXACTLY WHAT WAS IN THOSE BINDERS

12:00PM 14     THAT MS. HOLMES WAS JUST ASKING FOR IN THE EMAIL THAT WE LOOKED

12:00PM 15     AT?

12:00PM 16     A.  YES, THESE ARE THE DIFFERENT DOCUMENTS THAT EACH HAD THEIR

12:00PM 17     OWN LABEL IN THE BINDER.

12:00PM 18     Q.  OKAY.  AND WAS EACH OF THESE ITEMS PART OF THAT LIST OF

12:00PM 19     PREAPPROVED ITEMS THAT YOU WERE JUST REFERENCING?

12:00PM 20     A.  YES.

12:00PM 21     Q.  AND ARE THESE THE KINDS OF ITEMS THAT WERE ROUTINELY SENT

12:00PM 22     TO POTENTIAL INVESTORS IN THE COMPANY?

12:00PM 23     A.  AS IT RELATES TO WHAT I HELPED TO PREPARE, YES.

12:00PM 24     Q.  OKAY.  YOU CAN PUT THAT ONE ASIDE.

12:00PM 25          MAY I APPROACH, YOUR HONOR?

| | | |
|---|---|---|
| 12:00PM | 1 | THE COURT:  YES. |
| 12:01PM | 2 | MR. BOSTIC:  (HANDING.) |
| 12:01PM | 3 | MS. KRATZMANN, THANK YOU. |
| 12:01PM | 4 | BY MR. BOSTIC: |
| 12:01PM | 5 | Q.   (HANDING.) |
| 12:01PM | 6 | MR. EDLIN, I'VE PUT IN FRONT OF YOU WHAT HAS BEEN MARKED |
| 12:01PM | 7 | AS EXHIBIT 4869. |
| 12:01PM | 8 | DO YOU HAVE THAT? |
| 12:01PM | 9 | A.   I DO. |
| 12:01PM | 10 | Q.   AND I'LL POINT OUT THAT THERE'S A COVER PAGE AND THEN |
| 12:01PM | 11 | EXCERPTED MATERIALS BEHIND IT. |
| 12:01PM | 12 | I'LL ASK YOU IF YOU, GENERALLY SPEAKING, CAN TELL US WHAT |
| 12:01PM | 13 | EXHIBIT 4869 IS? |
| 12:01PM | 14 | A.   I BELIEVE THIS REFERS TO NUMBER 7, CONFIDENTIAL THERANOS |
| 12:02PM | 15 | BRIEFING. |
| 12:02PM | 16 | Q.   SO IS THIS A PORTION OF AN INVESTOR BINDER? |
| 12:02PM | 17 | A.   YES, I BELIEVE SO. |
| 12:02PM | 18 | Q.   AND IS THIS THE KIND OF ITEM THAT YOU WOULD HAVE INCLUDED |
| 12:02PM | 19 | IN THE PACKAGES THAT YOU SENT OUT AT MS. HOLMES'S REQUEST? |
| 12:02PM | 20 | A.   THIS WOULD HAVE BEEN INCLUDED IN A TYPICAL INVESTMENT |
| 12:02PM | 21 | RELATED BINDER. |
| 12:02PM | 22 | Q.   OKAY.  AND CAN YOU TELL FROM THIS SPECIFIC EXHIBIT WHICH |
| 12:02PM | 23 | INVESTOR THIS PRESENTATION WENT TO? |
| 12:02PM | 24 | A.   I CAN. |
| 12:02PM | 25 | Q.   I'M SORRY? |

12:02PM   1     A.   I CAN.

12:02PM   2     Q.   AND WHO WAS THAT?

12:02PM   3     A.   RUPERT MURDOCH.

12:02PM   4          MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT MOVES TO

12:02PM   5     ADMIT EXHIBIT 4869.

12:02PM   6          MR. DOWNEY:  YOUR HONOR, I HAVE NO OBJECTION TO THE

12:02PM   7     ADMISSION OF 4869.

12:02PM   8          THERE'S AN ATTACHED 4869A, WHICH I'M SURE I WILL NOT HAVE

12:03PM   9     AN OBJECTION TO.

12:03PM   10         THERE'S A LOT OF MATERIAL IN BETWEEN THAT IS MISSING, AND

12:03PM   11    I AGREE WITH MR. BOSTIC THAT I WOULD REVIEW THAT FOR

12:03PM   12    COMPLETENESS, AND IF THERE IS ANY NEED TO SUPPLEMENT THIS WITH

12:03PM   13    A 4869B, I'LL DO THAT DURING MY EXAMINATION.

12:03PM   14         THE COURT:  THANK YOU.

12:03PM   15    MR. BOSTIC, YOU'RE FINE WITH THAT?

12:03PM   16         MR. BOSTIC:  YES.  THANK YOU.

12:03PM   17         THE COURT:  ALL RIGHT.  THIS WILL BE ADMITTED.  IT

12:03PM   18    MAY BE PUBLISHED.

12:03PM   19         (GOVERNMENT'S EXHIBIT 4869 WAS RECEIVED IN EVIDENCE.)

12:03PM   20    BY MR. BOSTIC:

12:03PM   21    Q.   AND, MR. EDLIN, WHILE WE'RE ON THAT TOPIC, THE INVESTOR

12:03PM   22    BINDERS, AS WE JUST SAW FROM THE EMAIL, WOULD INCLUDE MANY

12:03PM   23    COMPONENTS; IS THAT CORRECT?

12:03PM   24    A.   THAT IS CORRECT.

12:03PM   25    Q.   THE PRESENTATION THAT WE'RE ABOUT TO LOOK AT WOULD JUST BE

12:03PM   1    ONE COMPONENT OF MANY THAT WOULD BE INCLUDED IN A TYPICAL

12:03PM   2    INVESTMENT BINDER?

12:03PM   3    A.   THAT'S CORRECT.

12:03PM   4    Q.   I'D LIKE TO JUST SHOW YOU SOME OF THE CONTENT OF THIS

12:04PM   5    PRESENTATION.

12:04PM   6         FIRST, LET'S START WITH PAGE 3.  AND DO YOU SEE THERE A

12:04PM   7    SLIDE ENTITLED THERANOS INCORPORATED?

12:04PM   8    A.   YES.

12:04PM   9    Q.   AND DO YOU SEE THAT UNDER THE LINE THAT SAYS THAT THERANOS

12:04PM   10   IS HEADQUARTERED IN PALO ALTO, CALIFORNIA AND IS A

12:04PM   11   SILICON VALLEY-BASED COMPANY FOUNDED IN 2003, THERE'S A

12:04PM   12   PARAGRAPH THAT SAYS, "THERANOS'S PROPRIETARY, PATENTED

12:04PM   13   TECHNOLOGY RUNS COMPREHENSIVE BLOOD TESTS FROM A FINGERSTICK."

12:04PM   14        DO YOU SEE THAT?

12:04PM   15   A.   I DO.

12:04PM   16   Q.   AND IT ALSO SAYS THAT THE TECHNOLOGY TESTS FROM

12:04PM   17   MICRO-SAMPLES OF OTHER MATRICES.

12:04PM   18        DO YOU SEE THAT?

12:04PM   19   A.   YES.

12:04PM   20   Q.   AND IT SAYS "IT GENERATES SIGNIFICANTLY HIGHER INTEGRITY

12:04PM   21   DATA THAN CURRENTLY POSSIBLE."

12:04PM   22        DID I READ THAT CORRECTLY?

12:04PM   23   A.   YES.

12:04PM   24   Q.   LET'S LOOK AT SLIDE 15 OF THIS EXHIBIT.  AND DO YOU SEE A

12:05PM   25   SLIDE ENTITLED COST SAVINGS?

12:05PM  1    A.   YES.

12:05PM  2    Q.   AND IN THE SECOND BULLET POINT FROM THE BOTTOM, THE

12:05PM  3    PRESENTATION SAYS, "THE UNPRECEDENTED LACK OF VARIATION FROM

12:05PM  4    SYSTEM TO SYSTEM YIELDS HIGHER INTEGRITY DATA AND LONGITUDINAL

12:05PM  5    TRENDING, ENABLING EARLIER INSIGHT INTO THE ONSET/PROGRESSION

12:05PM  6    OF DISEASE AND REDUCING UNNECESSARY SECONDARY PROCEDURES FROM

12:05PM  7    RESULTS WHICH CURRENTLY SHOW UP AS FALSE POSITIVE RESULTS."

12:05PM  8         DO YOU SEE THAT?

12:05PM  9    A.   YES.

12:05PM 10    Q.   AND IS THIS ANOTHER CLAIM ABOUT THE ACCURACY OF THERANOS

12:05PM 11    TESTS?

12:05PM 12    A.   MY UNDERSTANDING IS THAT VARIATION AND COEFFICIENT OF

12:06PM 13    VARIATION DOES RELATE TO ACCURACY, SO YES.

12:06PM 14    Q.   LET'S LOOK NEXT AT PAGE 28 OF THIS PRESENTATION.

12:06PM 15         DO YOU SEE A SLIDE THAT SAYS, SAME TESTS, A WHOLE NEW

12:06PM 16    APPROACH?

12:06PM 17    A.   I DO.

12:06PM 18    Q.   AND BENEATH THAT IT READS, "THE ACTIONABLE INFORMATION YOU

12:06PM 19    NEED 1/1000TH THE SIZE OF A TYPICAL BLOOD DRAW."

12:06PM 20         DO YOU SEE THAT?

12:06PM 21    A.   YES.

12:06PM 22    Q.   AND THAT 1/1000TH LANGUAGE, DO YOU RECALL THAT BEING

12:06PM 23    HIGHLIGHTED AS SOMETHING THAT THERE WAS SOME QUESTION ABOUT IN

12:06PM 24    CONNECTION WITH THE WEBSITE CONTENT?

12:06PM 25    A.   I DO, NOT SPECIFICALLY WHAT IT WAS, BUT I DO REMEMBER THAT

12:06PM  1      IT WAS CALLED OUT.

12:06PM  2      Q.   ON THAT SAME PAGE THERE'S A LINE THAT SAYS, "THERANOS RUNS

12:06PM  3      ANY TEST AVAILABLE IN CENTRAL LABORATORIES, AND PROCESSES ALL

12:06PM  4      SAMPLE TYPES," BENEATH A PHOTO OF THE FINGERSTICK METHOD.

12:07PM  5           DO YOU SEE THAT?

12:07PM  6      A.   I DO.

12:07PM  7      Q.   AND THE BOTTOM PARAGRAPH, "THE THERANOS PROVIDES THE

12:07PM  8      HIGHEST LEVEL OF OVERSIGHT, AUTOMATION, AND STANDARDIZATION IN

12:07PM  9      OUR PRE AND POST ANALYTICAL PROCESSES, ENSURING THE HIGHEST

12:07PM 10      LEVELS OF ACCURACY AND PRECISION."

12:07PM 11           DO YOU SEE THAT?

12:07PM 12      A.   YES.

12:07PM 13      Q.   AND THAT KIND OF LANGUAGE ABOUT THE HIGHEST LEVELS OF

12:07PM 14      ACCURACY AND PRECISION, IS THAT THE KIND OF LANGUAGE THAT WE

12:07PM 15      READ A FEW EXHIBITS AGO WHERE THERE WERE SOME CONCERNS ABOUT

12:07PM 16      INCLUDING THAT KIND OF LANGUAGE ON THE WEBSITE?

12:07PM 17      A.   YES.

12:07PM 18      Q.   WERE YOU PART OF ANY DISCUSSIONS WITH MS. HOLMES ABOUT

12:07PM 19      WHETHER THAT KIND OF LANGUAGE SHOULD BE INCLUDED IN INVESTOR

12:07PM 20      PRESENTATIONS?

12:07PM 21      A.   NOT THAT I RECALL.

12:07PM 22      Q.   DO YOU RECALL EVER RECEIVING ANY DIRECTION FROM MS. HOLMES

12:07PM 23      TO REMOVE ANY LANGUAGE LIKE THAT ABOUT ACCURACY FROM THE

12:07PM 24      INVESTOR PRESENTATIONS?

12:07PM 25      A.   NO.

EDLIN DIRECT BY MR. BOSTIC (RES.)                          4001

12:07PM   1    Q.   FINALLY, LET'S TAKE A LOOK AT PAGE 30 AND LET'S ZOOM IN ON

12:08PM   2    THE CONTENT THERE.

12:08PM   3         BENEATH THE GRAPHIC ABOUT -- ACTUALLY ABOVE THE GRAPHIC

12:08PM   4    ABOUT A 10 PERCENT COEFFICIENT OF VARIATION, THERE'S LANGUAGE

12:08PM   5    THAT READS, "THE HIGHEST LEVELS OF ACCURACY."

12:08PM   6         DO YOU SEE THAT?

12:08PM   7    A.   I DO.

12:08PM   8    Q.   AND BENEATH THAT GRAPHIC THE TEXT READS, "BY

12:08PM   9    SYSTEMATICALLY CONTROLLING AND STANDARDIZING OUR PROCESSES,

12:08PM  10    THERANOS OFFERS TESTS WITH THE HIGHEST LEVELS OF ACCURACY."

12:08PM  11         DID I READ THAT CORRECTLY?

12:08PM  12    A.   YES.

12:08PM  13    Q.   THIS PRESENTATION, WAS IT CREATED SPECIFICALLY FOR

12:09PM  14    CONSIDERATION BY RUPERT MURDOCH?

12:09PM  15    A.   I THINK MOST OF, OR AT LEAST A PART OF THIS PRESENTATION

12:09PM  16    ALREADY EXISTED AND IT WAS PART OF A GROUP OF DOCUMENTS, RIGHT,

12:09PM  17    THAT WERE INCLUDED IN THE BINDERS.

12:09PM  18         SO I'M NOT SURE IF ANYTHING CHANGED BETWEEN THIS BINDER

12:09PM  19    AND A DIFFERENT BINDER.  BUT THIS PRESENTATION OF ITSELF, THE

12:09PM  20    CONFIDENTIAL THERANOS BRIEFING, THAT WAS INCLUDED IN ALL OF THE

12:09PM  21    INVESTMENT BINDERS TO MY KNOWLEDGE.

12:09PM  22    Q.   THANK YOU.  SORRY TO INTERRUPT.

12:09PM  23         SO YOU RECALL AT LEAST VERSIONS OF THE SAME PRESENTATION

12:09PM  24    BEING SENT TO OTHER POTENTIAL INVESTORS IN THE COMPANY?

12:09PM  25    A.   YES.

12:09PM   1    Q.   OKAY.  WE CAN PUT THAT ASIDE.

12:10PM   2         LET'S SWITCH TOPICS.  LET ME ASK, WERE YOU GENERALLY AWARE

12:10PM   3    OF CALLS OR COMMUNICATIONS THAT THERANOS WOULD GET FROM

12:10PM   4    PATIENTS OR DOCTORS ABOUT QUESTIONABLE OR INACCURATE TEST

12:10PM   5    RESULTS?

12:10PM   6    A.   I'M AWARE THAT THERE WAS A CUSTOMER SERVICE GROUP THAT

12:10PM   7    FIELDED CUSTOMER COMPLAINTS, BUT THAT REALLY WASN'T PART OF MY

12:10PM   8    JOB RESPONSIBILITIES.

12:10PM   9    Q.   THE PEOPLE WHO WORKED IN THAT CUSTOMER SERVICE GROUP,

12:10PM  10    WHERE DID THEY SIT, IF YOU RECALL?

12:10PM  11    A.   WE WERE IN A COUPLE OF DIFFERENT BUILDINGS.  I REMEMBER IN

12:10PM  12    THE 1601 BUILDING THEY SAT IN A ROOM AT THE THERANOS

12:11PM  13    HEADQUARTERS.

12:11PM  14    Q.   AND THAT WAS IN PALO ALTO?

12:11PM  15    A.   THAT'S RIGHT.

12:11PM  16    Q.   I'LL ASK YOU TO LOOK AT EXHIBIT 5413 IN YOUR BINDER.

12:11PM  17    A.   OKAY.

12:11PM  18    Q.   AND IS EXHIBIT 5413 AN EMAIL CHAIN IN JULY 2014 INCLUDING

12:11PM  19    YOU AND MS. HOLMES ABOUT A PATIENT CALL?

12:11PM  20    A.   I'M COPIED ON THE EMAIL.  THERE ARE A NUMBER OF OTHER

12:11PM  21    PEOPLE ON THE EMAIL AS WELL.

12:11PM  22    Q.   OTHERWISE DID I ACCURATELY DESCRIBE EXHIBIT 5413?

12:12PM  23    A.   YES.

12:12PM  24    Q.   AND AS PART OF THERANOS'S BUSINESS, WERE THERE SOMETIMES

12:12PM  25    EMAIL COMMUNICATIONS RELATING TO PATIENT CALLS OR TESTING

12:12PM  1    ISSUES THAT AROSE AT THE COMPANY?

12:12PM  2    A.   YES.

12:12PM  3              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT MOVES TO

12:12PM  4    ADMIT 5413.

12:12PM  5              MR. DOWNEY:  NO OBJECTION TO 5413, YOUR HONOR.

12:12PM  6              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:12PM  7         (GOVERNMENT'S EXHIBIT 5413 WAS RECEIVED IN EVIDENCE.)

12:12PM  8              MR. BOSTIC:  AND IF WE CAN START ON PAGE 2 AT THE

12:12PM  9    BOTTOM.  AND IF WE CAN ZOOM IN THERE.

12:12PM  10   Q.   MR. EDLIN, DO YOU RECALL -- DO YOU SEE THAT THIS BEGINS

12:13PM  11   WITH AN EMAIL FROM SOMEONE NAMED AMELIA AGUIRRE TO

12:13PM  12   CHRISTIAN HOLMES AND YOURSELF?

12:13PM  13   A.   YES.

12:13PM  14   Q.   AND MS. AGUIRRE WRITES, "I RECEIVED A CALL FROM PATIENT,"

12:13PM  15   AND WE REDACTED THE NAME.  "HE EXPRESSED THAT HE DOES NOT

12:13PM  16   BELIEVE THAT OUR RESULTS WERE NOT ACCURATE FROM HIS LAST VISIT

12:13PM  17   AND HIS PHYSICIAN AGREES (NOT CONSISTENT WITH HISTORY)."

12:13PM  18        LET'S CONTINUE READING ON THE FOLLOWING PAGE, PAGE 3.

12:13PM  19        AND THE EMAIL GOES ON TO SAY, "THE PATIENT CAME TO

12:13PM  20   THERANOS MOST RECENTLY ON 7/22 AND THE RESULTS FOR INR WERE .9.

12:13PM  21   HIS PHYSICIAN SENT HIM TO LAB CORP. TWO DAYS LATER BECAUSE HE

12:13PM  22   BELIEVED THE LAB RESULTS WERE LOW AND HIS RESULT AT LAB CORP.

12:13PM  23   FOR INR WAS 3.1 (WHICH PATIENT SAYS IS MORE CONSISTENT WITH HIS

12:13PM  24   HISTORY, WHICH IS USUALLY 2.0 AND 3.0.)"

12:14PM  25        DO YOU SEE THAT?

12:14PM   1      A.   YES.

12:14PM   2      Q.   IT GOES ON TO SAY, "HE CURRENTLY HAS STANDING IN ORDER FOR

12:14PM   3      PT/INR FROM HIS DOCTOR, HOWEVER, HE DOES NOT WANT TO CONTINUE

12:14PM   4      TO COME TO THERANOS EVEN THOUGH HE HAS A STANDING ORDER UNTIL

12:14PM   5      WE VERIFY THAT OUR RESULTS ARE ACCURATE."

12:14PM   6           DO YOU SEE THAT?

12:14PM   7      A.   YES, I DO.

12:14PM   8      Q.   LET'S LOOK BACK AT PAGE 2 OF THIS EXHIBIT AND ZOOM IN ON

12:14PM   9      THE MIDDLE OF THE PAGE.

12:14PM   10          DO YOU SEE AN EMAIL THERE FROM CHRISTIAN HOLMES IN

12:14PM   11     RESPONSE FORWARDING THIS TO SOMEONE NAMED MAX FOSQUE.

12:14PM   12     A.   YES.

12:14PM   13     Q.   AND CHRISTIAN SAYS, "MAX - WITH DAN AND ME OUT, CAN YOU

12:14PM   14     PULL THE RESULTS HISTORY FOR THIS PATIENT ON THE INR HE'S

12:14PM   15     ASKING ABOUT?  ELIZABETH WANTS TO REVIEW THEN HAVE SOMEONE CALL

12:15PM   16     THE PATIENT/DOC BACK."

12:15PM   17          DO YOU SEE THAT?

12:15PM   18     A.   YES.

12:15PM   19     Q.   FROM YOUR EXPERIENCE AT THE COMPANY AND WORKING WITH

12:15PM   20     MS. HOLMES, DO YOU HAVE AN UNDERSTANDING WHAT HER ROLE WAS IN

12:15PM   21     THESE SITUATIONS REVIEWING INSTANCES WHERE PATIENTS CALLED?

12:15PM   22     A.   I THINK SOMETIMES SHE WOULD BE INVOLVED AND SOMETIMES SHE

12:15PM   23     WOULD NOT BE INVOLVED.

12:15PM   24     Q.   WHEN SHE WAS INVOLVED, DO YOU HAVE AN UNDERSTANDING OF

12:15PM   25     WHAT SHE WOULD DO, WHAT HER FUNCTION WAS?

12:15PM 1   A.   I BELIEVE SHE DISCUSSED MESSAGING WITH WHOEVER WAS

12:15PM 2   INTERFACING OR INTERACTING WITH THE CUSTOMER OR THE PHYSICIAN.

12:15PM 3   Q.   LET'S LOOK AT PAGE 1 OF THIS EXHIBIT, AND LET'S ZOOM IN ON

12:15PM 4   THE TOP MESSAGE.

12:15PM 5        ACTUALLY, LET'S SEE IF WE CAN CAPTURE THE TOP HALF OF THE

12:15PM 6   PAGE DOWN THROUGH THAT MESSAGE.

12:15PM 7        PERFECT.

12:16PM 8        MR. EDLIN, DO YOU SEE AN EMAIL FROM MS. HOLMES TO

12:16PM 9   MAX FOSQUE, CHRISTIAN HOLMES, YOU, AND SUNNY BALWANI AT THE

12:16PM 10  BOTTOM THERE?

12:16PM 11  A.   YES.

12:16PM 12  Q.   SHE SAYS, "MAX - NEED YOU TO TRIAGE THIS, THEN COME BRIEF

12:16PM 13  ME ON WHAT HAPPENED.  FROM THERE WE'LL DECIDE WHO WILL CALL."

12:16PM 14       DO YOU SEE THAT?

12:16PM 15  A.   YES.

12:16PM 16  Q.   AND ON THE TOP EMAIL, CHRISTIAN HOLMES SAYS, "BASICALLY

12:16PM 17  HAVE NISHIT LOOK AT THE DATA AND SEE IF ANYTHING WENT WRONG

12:16PM 18  (IDENTIFY THE ISSUE) THEN WORK WITH ELIZABETH ON SCRIPTING

12:16PM 19  WHILE SUNNY ADDRESSES ROOT CAUSE OF ANY ISSUE INTERNALLY."

12:16PM 20       DO YOU SEE THAT?

12:16PM 21  A.   I DO.

12:16PM 22  Q.   AND WHAT IS YOUR UNDERSTANDING OF WHAT "SCRIPTING" MEANT

12:16PM 23  IN THIS CONTEXT?

12:16PM 24  A.   I DON'T RECALL THIS SPECIFIC ISSUE, BUT WHAT THIS SEEMS TO

12:16PM 25  ME IS THAT IT'S REFERRING TO TALKING POINTS OR MESSAGING.

| | | |
|---|---|---|
| 12:16PM | 1 | Q.   YOU CAN PUT THAT ONE ASIDE, AND I'LL ASK YOU TO TURN TO |
| 12:17PM | 2 | EXHIBIT 4237. |
| 12:17PM | 3 | LET ME KNOW ONCE YOU'RE THERE. |
| 12:17PM | 4 | A.   OKAY. |
| 12:17PM | 5 | Q.   AND I'LL ASK YOU TO LOOK AT PAGE 4 OF EXHIBIT 4237. |
| 12:17PM | 6 | AND ON THAT PAGE, DO YOU SEE AN EMAIL FROM SOMEONE NAMED |
| 12:17PM | 7 | ELENA SCHEER TO YOU AND CHRISTIAN HOLMES AND OTHERS? |
| 12:17PM | 8 | A.   YES. |
| 12:17PM | 9 | Q.   AND IS THIS RELATED TO ANOTHER PATIENT CALL OR PATIENT |
| 12:17PM | 10 | COMPLAINT? |
| 12:17PM | 11 | A.   YES. |
| 12:17PM | 12 | MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 4237. |
| 12:18PM | 13 | MR. DOWNEY:  I'M NOT CERTAIN WHAT THE BASIS IS FOR |
| 12:18PM | 14 | ADMISSION, SO I WOULD OBJECT ON 801 GROUNDS. |
| 12:18PM | 15 | MR. BOSTIC:  YOUR HONOR, I BELIEVE THIS SHOULD COME |
| 12:18PM | 16 | IN AS A BUSINESS RECORD. |
| 12:18PM | 17 | THE COURT:  DO YOU WANT HIM TO LAY A FOUNDATION IF |
| 12:18PM | 18 | HE CAN, MR. DOWNEY? |
| 12:18PM | 19 | MR. DOWNEY:  MAY I JUST TAKE A MOMENT? |
| 12:18PM | 20 | THE COURT:  SURE.  OF COURSE. |
| 12:18PM | 21 | (PAUSE IN PROCEEDINGS.) |
| 12:18PM | 22 | MR. DOWNEY:  NO, YOUR HONOR. |
| 12:18PM | 23 | WITH THE OPPORTUNITY TO REVIEW, I DON'T THINK IT'S |
| 12:18PM | 24 | NECESSARY. |
| 12:18PM | 25 | THE COURT:  THANK YOU.  IT IS ADMITTED.  IT MAY BE |

12:18PM    1    PUBLISHED.

12:18PM    2            (GOVERNMENT'S EXHIBIT 4237 WAS RECEIVED IN EVIDENCE.)

12:18PM    3                MR. BOSTIC:  THANK YOU, YOUR HONOR.

12:18PM    4    Q.   MR. EDLIN, LET'S GO BACK TO PAGE 4 AND READ THAT ORIGINAL

12:18PM    5    EMAIL.

12:18PM    6         AT THE BOTTOM THERE, DO YOU SEE THIS IS AN EMAIL FROM

12:19PM    7    ELENA SCHEER TO YOU, CHRISTIAN HOLMES, AND MAX FOSQUE?

12:19PM    8    A.   YES.

12:19PM    9    Q.   AND THE SUBJECT LINE IS PHYSICIAN AND PATIENT CALL

12:19PM   10    NEEDED -- HCG RESULTS.

12:19PM   11         DO YOU SEE THAT?

12:19PM   12    A.   YES.

12:19PM   13    Q.   AND DO YOU RECALL WHO ELENA SCHEER WAS AT THE COMPANY?

12:19PM   14    A.   SHE WAS A CUSTOMER SERVICE ASSOCIATE.

12:19PM   15    Q.   SHE WAS ONE OF THE STAFF MEMBERS WHO DEALT WITH INCOMING

12:19PM   16    CALLS AND COMPLAINTS FROM PATIENTS?

12:19PM   17    A.   THAT'S RIGHT.

12:19PM   18    Q.   LET'S LOOK AT THE TEXT OF HER EMAIL AND TURN TO PAGE 5 OF

12:19PM   19    THIS EXHIBIT.

12:19PM   20         AND HER EMAIL READS, "I JUST SPOKE TO," AND THEN PATIENT

12:19PM   21    NAME, "SHE IS A WAG TECH."

12:19PM   22         IS "WAG" SHORT FOR WALGREENS?

12:19PM   23    A.   YES.

12:19PM   24    Q.   "SHE IS A WALGREENS TECH AND TOLD HER DOCTOR SHE WANTED TO

12:19PM   25    USE OUR SERVICES FOR HER HCG QUANT TEST.  SHE CAME IN TWICE -

12:19PM  1    ONCE ON THE 24TH (RESULT 120.20 MILLIUNITS PER MILLILITER) AND

12:20PM  2    ONCE ON THE 26TH, (LESS THAN 7.82 MILLIUNITS PER MILLILITER)."

12:20PM  3        DO YOU SEE THAT?

12:20PM  4    A.  YES.

12:20PM  5    Q.  SHE WRITES, "DOCTOR WAS UNSURE ABOUT THE RESULTS SO HAD

12:20PM  6    HER GO TO QUEST WHERE HER RESULT WAS MUCH, MUCH HIGHER."

12:20PM  7        DO YOU SEE THAT?

12:20PM  8    A.  YES.

12:20PM  9    Q.  AND SHE SAYS, "NOW THEY ARE WONDERING ABOUT ACCURACY OR IF

12:20PM 10    HER SAMPLE WAS SWITCHED."

12:20PM 11        IS THAT CORRECT?

12:20PM 12    A.  YES.

12:20PM 13    Q.  LET'S GO FORWARD IN TIME IN THIS EMAIL CHAIN TO PAGE 1,

12:20PM 14    AND LET'S ZOOM IN ON THE TOP PORTION OF THE PAGE.

12:20PM 15        FIRST, DO YOU HAVE AN UNDERSTANDING OF WHAT THE HCG TEST

12:20PM 16    WAS AND HOW IT WAS USED?

12:20PM 17    A.  I BELIEVE IT WAS A PREGNANCY TEST.

12:20PM 18    Q.  DO YOU SEE ON YOUR SCREEN AN EMAIL FROM CHINMAY PANGARKAR

12:20PM 19    TO MAX FOSQUE, DANIEL YOUNG, AND CHRISTIAN HOLMES?

12:21PM 20    A.  YES.

12:21PM 21    Q.  AND RESPONDING ON THIS TOPIC, CHINMAY PANGARKAR SAYS, "IT

12:21PM 22    IS POSSIBLE THAT THE SAMPLE GOT SWITCHED?  OTHERWISE, THIS ONE

12:21PM 23    SEEMS LIKE ANOTHER ONE OF THESE OUTLIERS.  WE ARE GETTING MORE

12:21PM 24    OF THESE.  THE HCG FOR THIS PATIENT (ASSUMING IT IS NORMAL

12:21PM 25    PREGNANCY) SHOULD BE MORE THAN 240."

12:21PM  1          DO YOU SEE THAT?

12:21PM  2     A.   YES.

12:21PM  3     Q.   DO YOU HAVE IN FRONT OF YOU AN EXHIBIT MARKED 5439?

12:21PM  4          I THINK YOU MIGHT NOT.

12:21PM  5          MAY I APPROACH, YOUR HONOR?

12:21PM  6               THE COURT:  YES.

12:21PM  7               THE WITNESS:  I DON'T.

12:21PM  8     BY MR. BOSTIC:

12:22PM  9     Q.   (HANDING.)

12:22PM 10          MR. EDLIN, DO YOU HAVE EXHIBIT 5439 IN FRONT OF YOU?

12:22PM 11     A.   YES.

12:22PM 12     Q.   THIS IS AN EMAIL THAT YOU'RE NOT ON; IS THAT CORRECT?

12:22PM 13     A.   YES.

12:22PM 14     Q.   CAN YOU TELL US WHO THE EMAIL IS FROM AND TO?

12:22PM 15     A.   THE EMAIL IS FROM MAX FOSQUE TO SUNNY BALWANI.

12:22PM 16     Q.   AND I'LL ASK YOU TO JUST FLIP THROUGH THE ATTACHED PAGES

12:22PM 17     IF YOU WOULDN'T MIND.

12:22PM 18          I'LL ASK YOU ALSO TO JUST TAKE A QUICK LOOK AT THE NAMES

12:22PM 19     OF THE ATTACHMENTS ON THE FIRST PAGE AND FAMILIARIZE YOURSELF

12:22PM 20     WITH THAT.

12:23PM 21     A.   OKAY.

12:23PM 22     Q.   YOU PREVIOUSLY TESTIFIED THAT YOU WERE AWARE THAT THERE

12:23PM 23     WERE INDIVIDUALS AT THERANOS WHO KIND OF HELMED THE PHONE LINES

12:23PM 24     SO THAT WHEN CALLS FROM PATIENTS OR DOCTORS CAME IN, THERE

12:23PM 25     WOULD BE SOMEONE TO ANSWER?

12:23PM 1    A.   THAT'S RIGHT.

12:23PM 2    Q.   DID YOU HAVE AN UNDERSTANDING OF WHAT HAPPENED WHEN THOSE

12:23PM 3    CALLS CAME IN?  OBVIOUSLY THE THERANOS EMPLOYEE WOULD SPEAK TO

12:23PM 4    THE PATIENT OR DOCTOR; IS THAT RIGHT?

12:23PM 5    A.   A CUSTOMER SERVICE REPRESENTATIVE.

12:23PM 6    Q.   RIGHT.  WHAT WAS THE PROCESS AFTER THAT?  FOR EXAMPLE, WAS

12:23PM 7    INFORMATION GAINED DURING THOSE CALLS PRESERVED AT THERANOS?

12:23PM 8        DO YOU KNOW?

12:23PM 9    A.   WELL, THIS EXHIBIT LOOKS LIKE SOME TYPE OF LOG, BUT THIS

12:23PM 10   IS THE FIRST TIME THAT I'M SEEING THIS.

12:23PM 11   Q.   THIS IS THE FIRST TIME THAT YOU'RE SEEING THIS TYPE OF

12:23PM 12   DOCUMENT?

12:23PM 13   A.   RIGHT.

12:23PM 14        MR. DOWNEY:  OBJECTION, YOUR HONOR, TO FURTHER

12:24PM 15   DISCUSSION OF THE EMAIL FOR THE REASONS THAT WE DISCUSSED.

12:24PM 16        THE COURT:  WELL, LET'S SEE YOUR NEXT QUESTION, WHAT

12:24PM 17   THE NEXT QUESTION IS.

12:24PM 18   BY MR. BOSTIC:

12:24PM 19   Q.   DURING YOUR TIME AT THERANOS, WERE YOU AWARE THAT THE

12:24PM 20   COMPANY PRESERVED RECORDS OF CALLS AND COMPLAINTS THAT CAME IN

12:24PM 21   FROM DOCTORS OR PATIENTS?

12:24PM 22   A.   I WAS NOT AWARE OF THAT.

12:24PM 23   Q.   WERE YOU HAVE GENERALLY AWARE THAT THE COMPANY -- THAT

12:24PM 24   INDIVIDUALS AT THE COMPANY USED EMAIL TO COMMUNICATE ABOUT

12:24PM 25   CALLS AND COMPLAINTS THAT CAME IN FROM DOCTORS AND PATIENTS?

12:24PM    1    A.   I WOULDN'T SAY I HAD SPECIFIC KNOWLEDGE OF THAT, OF HOW

12:24PM    2    EMAIL WAS USED FOR THAT.  EMAIL WAS USED AS THE PRIMARY METHOD

12:24PM    3    OF COMMUNICATION AT THE COMPANY I WOULD SAY.

12:24PM    4    Q.   AND WOULD THAT HAVE INCLUDED ISSUES THAT CAME UP THAT WERE

12:24PM    5    RAISED BY DOCTORS AND PATIENTS, FOR EXAMPLE?

12:24PM    6    A.   IT LIKELY COULD HAVE.

12:24PM    7    Q.   AND DO YOU HAVE AN UNDERSTANDING, BASED ON YOUR TIME AT

12:25PM    8    THE COMPANY, OF THE ROLE THAT MR. BALWANI PLAYED WHEN IT CAME

12:25PM    9    TO THE TESTING SERVICES OF THE COMPANY?

12:25PM   10    A.   SUNNY WAS THE PRESIDENT AND CHIEF OPERATING OFFICER, AND

12:25PM   11    MY UNDERSTANDING WAS THAT HE OVERSAW THE CLINICAL LAB

12:25PM   12    OPERATION.

12:25PM   13    Q.   WHEN ISSUES CAME UP RELATING TO PATIENT TESTS, WERE THOSE

12:25PM   14    ISSUES ROUTINELY RAISED TO MR. BALWANI AS PART OF THE NORMAL

12:25PM   15    OPERATION OF THE COMPANY?

12:25PM   16    A.   I DON'T KNOW.  I WASN'T REALLY A PART OF THAT PROCESS.

12:25PM   17    Q.   DO YOU RECALL WHETHER MR. BALWANI HAD ANY RESPONSIBILITIES

12:25PM   18    IN CONNECTION WITH THE OPERATION OF THE CLINICAL LAB AT

12:26PM   19    THERANOS?

12:26PM   20    A.   YES.

12:26PM   21    Q.   AND WHAT WERE HIS RESPONSIBILITIES?

12:26PM   22    A.   AS THE CHIEF OPERATING OFFICER, I BELIEVE HE OVERSAW THE

12:26PM   23    CLINICAL LAB OPERATION AND WAS IN.

12:26PM   24         MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT MOVES TO

12:26PM   25    ADMIT 5439.

12:26PM  1          MR. DOWNEY:  OBJECTION UNDER 403, 404(A), 801, AND

12:26PM  2     THE REASONS WE DISCUSSED THIS MORNING.

12:26PM  3          THE COURT:  MR. BOSTIC, I'M GOING TO HAVE TO SUSTAIN

12:26PM  4     THE OBJECTION.

12:26PM  5          MR. BOSTIC:  OKAY.  ALL RIGHT.  I CAN MOVE ON FOR

12:26PM  6     NOW.

12:26PM  7     Q.   MR. EDLIN, YOU CAN PUT THAT ASIDE.  THANK YOU.

12:26PM  8          LET'S SHIFT GEARS AND TALK ABOUT THERANOS'S DEALINGS WITH

12:26PM  9     THE MILITARY IF WE COULD.

12:26PM  10          FIRST, ARE YOU AWARE, DURING YOUR TIME AT THE COMPANY, OF

12:26PM  11     ANY COMMUNICATIONS THAT THERANOS HAD WITH REPRESENTATIVES OF

12:26PM  12     THE U.S. ARMED FORCES?

12:26PM  13     A.   I AM.

12:26PM  14     Q.   DID YOU HAVE A ROLE IN THOSE COMMUNICATIONS?

12:27PM  15     A.   I DID.

12:27PM  16     Q.   AND WHAT WAS YOUR ROLE GENERAL SPEAKING?

12:27PM  17     A.   I HELPED TO SUPPORT RELATIONSHIPS WITH DIFFERENT PARTS OF

12:27PM  18     THE MILITARY AND WITH THE DEPARTMENT OF DEFENSE, AND I WORKED

12:27PM  19     DIRECTLY WITH ELIZABETH TO SUPPORT THOSE RELATIONSHIPS AND

12:27PM  20     COMMUNICATE WITH REPRESENTATIVE FROM EACH DEPARTMENT.

12:27PM  21     Q.   AND WHEN YOU TALK ABOUT "RELATIONSHIPS," WHAT DO YOU MEAN?

12:27PM  22     WHAT WAS THE END GOAL OF THESE COMMUNICATIONS?

12:27PM  23     A.   THE END GOAL WAS TO SET UP A RESEARCH PROGRAM THAT WOULD

12:27PM  24     COMPARE THERANOS TESTING TO THE TESTING AVAILABLE AT THE

12:27PM  25     MILITARY AT THAT TIME, OR AVAILABLE TO THE MILITARY AT THAT

12:27PM  1    TIME.

12:27PM  2    Q.   UNDERSTOOD.

12:28PM  3         SO THE GOAL WAS TO HAVE THAT COMPARISON WHERE THE THERANOS

12:28PM  4    TECHNOLOGY COULD BE PUT UP AGAINST WHAT WAS CURRENTLY BEING

12:28PM  5    USED BY THE MILITARY?

12:28PM  6    A.   THAT'S RIGHT, IN COMPARISON.

12:28PM  7         AND THE STUDIES WERE SET UP IN A SET OF SORT OF PHASED

12:28PM  8    APPROACH WHERE CERTAIN COMPARATIVE TESTING WAS DONE FIRST, AND

12:28PM  9    THEN THERE WERE OTHER SERIES OF TESTING AFTERWARD IF THOSE

12:28PM  10   PRECEDING PHASES WERE ACCEPTABLE.

12:28PM  11   Q.   AND WHAT ABOUT THE PLAN FOR AFTER THAT TESTING PHASE?

12:28PM  12   WHAT WAS THE POINT OF HAVING THIS KIND OF AN EVALUATION DONE?

12:28PM  13   A.   THE POINT WAS TO DETERMINE WHETHER OR NOT THERANOS TESTING

12:28PM  14   DEVICES AND THE SYSTEMS COULD BE USED FOR SOLDIERS AND

12:28PM  15   PERSONNEL IN THE MILITARY IN THE FIELD.

12:29PM  16   Q.   FROM THERANOS'S PERSPECTIVE, DID YOU UNDERSTAND THAT THE

12:29PM  17   COMPANY WAS INTERESTED IN PURSUING THAT KIND OF POTENTIAL USE

12:29PM  18   BY THE MILITARY?

12:29PM  19   A.   I THINK THERE WAS MUTUAL INTEREST IN PURSUING THAT

12:29PM  20   APPROACH.

12:29PM  21   Q.   I'LL ASK YOU TO LOOK IN YOUR BINDER AT EXHIBIT 504,

12:29PM  22   PLEASE.

12:29PM  23        FIRST, LET ME JUST ASK YOU, TO YOUR KNOWLEDGE, DID THE

12:29PM  24   MILITARY EVER END UP USING THERANOS TECHNOLOGY IN THE CLINICAL

12:29PM  25   TREATMENT OF SOLDIERS?

12:29PM 1      A.   NOT TO MY KNOWLEDGE.

12:29PM 2      Q.   DO YOU HAVE EXHIBIT 504 IN FRONT OF YOU?

12:29PM 3      A.   I DO.

12:30PM 4      Q.   IS IT AN EMAIL CHAIN INCLUDING YOU, MS. HOLMES, AND

12:30PM 5      SOMEONE NAMED STEPHEN COOK?

12:30PM 6      A.   YES.

12:30PM 7      Q.   AND WHO WAS STEPHEN COOK?

12:30PM 8      A.   STEPHEN COOK, STEPHEN COOK WAS A PART OF SPECIAL

12:30PM 9      OPERATIONS COMMAND AND MY POINT OF CONTACT FOR -- REGARDING

12:30PM 10     THIS PROPOSED RESEARCH STUDY.

12:30PM 11     Q.   AND WAS THIS EMAIL COMMUNICATION IN FURTHERANCE OF

12:30PM 12     EXPLORING THAT RELATIONSHIP BETWEEN THERANOS AND THE MILITARY?

12:30PM 13     A.   YES.

12:30PM 14          MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT MOVES TO

12:30PM 15     ADMIT EXHIBIT 504.

12:30PM 16          MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

12:30PM 17          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:30PM 18        (GOVERNMENT'S EXHIBIT 504 WAS RECEIVED IN EVIDENCE.)

12:31PM 19          MR. BOSTIC:  AND IF WE CAN ZOOM IN ON -- ACTUALLY,

12:31PM 20     LET'S START ON PAGE 4 OF THE EXHIBIT.  AND IF WE CAN ZOOM IN ON

12:31PM 21     THE TOP HALF OF THE PAGE.

12:31PM 22     Q.   MR. EDLIN, DO YOU SEE AN EMAIL SENT ON DECEMBER 15TH,

12:31PM 23     2011?

12:31PM 24     A.   YES.

12:31PM 25     Q.   AND THE EMAIL IS FROM MAJOR STEPHEN COOK.

12:31PM   1          DO YOU SEE THAT?

12:31PM   2     A.   YES.

12:31PM   3     Q.   AND IT'S ADDRESSED TO MS. HOLMES.

12:31PM   4          AND IN THE MIDDLE OF THE EMAIL IT MENTIONS "MORE EXTENSIVE

12:31PM   5     ENVIRONMENTAL TESTING - AND DEVICE FUNCTION ON BOARD EVACUATION

12:31PM   6     PLATFORMS."

12:31PM   7          DO YOU SEE THAT?

12:31PM   8     A.   YES.

12:31PM   9     Q.   AND CAN YOU EXPLAIN WHAT YOU UNDERSTOOD THAT TO MEAN AT

12:31PM   10    THE TIME IN CONNECTION WITH MILITARY INVOLVEMENT?

12:31PM   11    A.   AT THE TIME OF THIS EMAIL, I HAD BEEN AT THE COMPANY FOR

12:32PM   12    ABOUT THREE MONTHS SO I'M NOT SURE IF I HAD THAT UNDERSTANDING

12:32PM   13    AT THAT POINT IN TIME, BUT I BELIEVE AN ONBOARD EVACUATION

12:32PM   14    PLATFORM REFERS TO A MEDEVAC.

12:32PM   15    Q.   AND IS A MEDEVAC A KIND OF MILITARY VEHICLE?

12:32PM   16    A.   YES, A HELICOPTER, I BELIEVE.

12:32PM   17    Q.   AND LOOKING AT THE PARAGRAPH ABOVE THAT, THERE'S INTEREST

12:32PM   18    EXPRESSED IN RECEIVING A SUMMARY OF THE EXISTING TECHNOLOGY AND

12:32PM   19    THERANOS'S IMPRESSION OF WHERE SOMEONE NAMED KYLE SIMS WOULD

12:32PM   20    LIKE TO TAKE THE TECHNOLOGY.

12:32PM   21          DO YOU SEE THAT?

12:32PM   22    A.   YES.

12:32PM   23    Q.   LET'S TURN THE PAGE TO LOOK AT PAGE 3 OF THIS EXHIBIT.

12:32PM   24    LET'S ZOOM IN ON THE MIDDLE OF THE PAGE.

12:32PM   25          AND DO YOU SEE A FOLLOW-UP EMAIL FROM MAJOR COOK?

12:33PM 1    A.   YES.

12:33PM 2    Q.   HE SAYS TO YOU AND MS. HOLMES, "STILL WAITING FOR FEEDBACK

12:33PM 3    ON THE BELOW INQUIRY."

12:33PM 4         AND THEN HE SAYS HE'S "TRYING TO DETERMINE IF OUR

12:33PM 5    ASSESSMENT WILL BE IN THE FORM OF APPROXIMATELY 3 EACH DEVICES

12:33PM 6    OVER A TRIAL OF 12-MONTH SERVICE CONTRACT."

12:33PM 7         DO YOU SEE THAT?

12:33PM 8    A.   YES.

12:33PM 9    Q.   AND IS IT YOUR UNDERSTANDING THAT THIS TRIAL PERIOD WOULD

12:33PM 10   INVOLVE ACTUAL CLINICAL USE OF THE DEVICE, OR IS IT EVALUATION

12:33PM 11   OF THE DEVICE FOR POTENTIAL USE?

12:33PM 12   A.   EVALUATION OF THE DEVICE FOR POTENTIAL USE.

12:33PM 13   Q.   LET'S LOOK AT PAGE 2 OF THIS EMAIL.  ZOOM IN ON THE MIDDLE

12:33PM 14   OF THE PAGE HERE.

12:34PM 15        AND WE SEE AN EMAIL FROM YOU TO MAJOR COOK IN JANUARY OF

12:34PM 16   2012; IS THAT CORRECT?

12:34PM 17   A.   CORRECT.

12:34PM 18   Q.   AND IN THE MIDDLE OF THE FIRST FULL PARAGRAPH THERE, YOU

12:34PM 19   SAY, "WITH REGARD TO THE ROUGH ORDER OF MAGNITUDE THAT WOULD

12:34PM 20   SUPPORT A 12-MONTH EVALUATION PERIOD, WE KINDLY ASK THAT YOU

12:34PM 21   SEND A TOTAL LIST OF ASSAYS YOU WOULD LIKE TO TEST."

12:34PM 22        DO YOU SEE THAT?

12:34PM 23   A.   YES.

12:34PM 24   Q.   AT THIS TIME IN EARLY 2012, DID YOU PERSONALLY HAVE AN

12:34PM 25   UNDERSTANDING OF WHAT ASSAYS THE THERANOS-BUILT ANALYZER COULD

12:34PM  1    ACTUALLY RUN?

12:34PM  2    A.   NO.

12:34PM  3    Q.   DID YOU UNDERSTAND AT THIS TIME THAT THERE WERE SOME

12:34PM  4    ASSAYS THE THERANOS DEVICE COULD PERFORM AND OTHERS IT COULD

12:34PM  5    NOT?

12:34PM  6    A.   I'M NOT SURE.  I DIDN'T KNOW WHICH TESTS COULD BE

12:34PM  7    PERFORMED AND WHICH COULDN'T.

12:34PM  8    Q.   DID YOU LATER COME TO HAVE A BETTER UNDERSTANDING THAT

12:34PM  9    THERE WERE SOME TESTS THE DEVICE COULD DO AND OTHERS THAT IT

12:35PM  10   COULD NOT?

12:35PM  11   A.   I DID COME TO THAT UNDERSTANDING.

12:35PM  12   Q.   LET'S LOOK AT PAGE 1 OF THIS EXHIBIT.  ZOOM IN ON THE

12:35PM  13   BOTTOM HALF.

12:35PM  14        IN THIS EMAIL FROM MAJOR COOK, HE SAYS, "ACTUALLY MY

12:35PM  15   VERBAL REQUESTS OF LAST WEEK CHANGED FROM MY WRITTEN INQUIRY

12:35PM  16   THAT YOU ANSWERED BELOW.  AS YOU KNOW, WE'RE LOOKING TO

12:35PM  17   EVALUATE YOUR SYSTEM TO DETERMINE ITS UTILITY ACROSS THE

12:35PM  18   OPERATIONS AND ENVIRONMENTS IN WHICH WE'D LIKE TO DEPLOY IT."

12:35PM  19        DO YOU SEE THAT?

12:35PM  20   A.   YES.

12:35PM  21   Q.   AND A COUPLE OF PARAGRAPHS DOWN HE TALKS ABOUT 3 DEVICES

12:35PM  22   (GPS DISABLED) - RUNNING UP TO 400 ASSAYS EACH PER MONTH,

12:35PM  23   INCLUDING ASSAYS LIKE COMPLETE BLOOD COUNT AND CHEM 7.

12:35PM  24        DO YOU SEE THAT?

12:35PM  25   A.   YES.

12:35PM    1    Q.   LET'S LOOK AT THE TOP MESSAGE IN THIS EMAIL CHAIN.

12:36PM    2         THIS IS A MESSAGE FROM YOU BACK TO MAJOR COOK; IS THAT

12:36PM    3    RIGHT?

12:36PM    4    A.   YES.

12:36PM    5    Q.   AND YOU THANK HIM FOR THE INFORMATION THAT HE PROVIDED,

12:36PM    6    AND YOU ATTACH WHAT YOU CALL AN OVERVIEW OF THE THERANOS U.S.A.

12:36PM    7    SOC PROJECT.

12:36PM    8         DO YOU SEE THAT?

12:36PM    9    A.   YES.

12:36PM   10    Q.   LET'S LOOK AT THAT ATTACHMENT ON PAGE 5 OF THAT EXHIBIT.

12:36PM   11    AND IF WE CAN ZOOM IN ON THE TOP HALF OF THE PAGE.

12:36PM   12         FIRST OF ALL, MR. EDLIN, ARE YOU GENERALLY FAMILIAR WITH

12:36PM   13    THE DOCUMENT THAT WE'RE LOOKING AT?

12:36PM   14    A.   YES.

12:36PM   15    Q.   WHO CREATED THIS DOCUMENT?

12:36PM   16    A.   I DON'T REMEMBER SPECIFICALLY.

12:36PM   17    Q.   DO YOU RECALL WHETHER YOU MADE ANY CHANGES TO THIS

12:37PM   18    DOCUMENT BEFORE SENDING IT TO MAJOR COOK ON THIS DATE?

12:37PM   19    A.   I BELIEVE THAT I DID MAKE CHANGES, YES.

12:37PM   20    Q.   WAS MS. HOLMES INVOLVED AT ALL IN FINALIZING OR APPROVING

12:37PM   21    THE CONTENT OF THIS DOCUMENT BEFORE YOU SENT IT TO MAJOR COOK?

12:37PM   22    A.   YES, EVERY -- EVERYTHING IN THIS DOCUMENT WAS REVIEWED AND

12:37PM   23    APPROVED BY ELIZABETH.

12:37PM   24    Q.   TELL ME ABOUT HOW THAT WORKED IN GENERAL WHEN IT CAME TO

12:37PM   25    YOUR COMMUNICATIONS WITH THE MILITARY.  WHAT WAS MS. HOLMES'S

12:37PM   1    LEVEL OF INVOLVEMENT THERE?

12:37PM   2    A.   SHE WAS HIGHLY INVOLVED.  I WOULD SAY ANY SUBSTANTIVE

12:37PM   3    COMMUNICATION THAT I HAD WITH THE MILITARY I EITHER DISCUSSED

12:37PM   4    WITH HER AHEAD OF TIME, OUR DISCUSSIONS INFORMED EMAIL DRAFTS

12:38PM   5    THAT I WOULD THEN SEND BACK TO HER TO REVIEW AND APPROVE BEFORE

12:38PM   6    I SENT THEM BACK OUT.

12:38PM   7         I ALSO MADE SURE THAT SHE WAS AWARE OF ANY INBOUND

12:38PM   8    COMMUNICATION THAT WE DID GET FROM MEMBERS OF THE MILITARY.

12:38PM   9         AND ASIDE FROM, YOU KNOW, SCHEDULING AND THINGS LIKE THAT,

12:38PM  10    I REVIEWED EVERYTHING WITH HER.

12:38PM  11    Q.   LET'S LOOK AT THIS MEMORANDUM SPECIFICALLY.  AND UNDER

12:38PM  12    BACKGROUND, THIS MEMORANDUM SENT TO THE MILITARY SAYS,

12:38PM  13    "THERANOS HAS CREATED A POINT-OF-SERVICE LABORATORY

12:38PM  14    INFRASTRUCTURE THAT GENERATES REAL-TIME DATA FROM A FINGERSTICK

12:38PM  15    OF BLOOD OR OTHER MICRO-VOLUMES OF DIFFERENT SAMPLE TYPES

12:38PM  16    DELIVERING HIGHER QUALITY DATA THAN PREVIOUSLY POSSIBLE."

12:38PM  17         DO YOU SEE THAT?

12:38PM  18    A.   YES.

12:38PM  19    Q.   AND IT GOES ON TO SAY, "THIS TECHNOLOGY IS AN INDUSTRY

12:38PM  20    FIRST, WITH PROFOUND EFFECTS ON THE ABILITY TO TRIAGE AND

12:38PM  21    STABILIZE PATIENTS VIA QUANTITATIVE READS FROM MICRO-SAMPLE

12:39PM  22    SIZES IN REAL-TIME IN THE FIELD."

12:39PM  23         DO YOU SEE THAT?

12:39PM  24    A.   YES.

12:39PM  25    Q.   AND THERE'S A LIST OF BULLET POINTS.  THE FIRST ONE READS,

12:39PM  1    "EACH THERANOS DEVICE CAN RUN EVERY TEST CURRENTLY AVAILABLE

12:39PM  2    THROUGH THE TRADITIONAL CENTRALIZED OR HOSPITAL LABORATORY

12:39PM  3    INFRASTRUCTURE."

12:39PM  4        DO YOU SEE THAT?

12:39PM  5    A.   YES.

12:39PM  6    Q.   AT THE TIME THAT YOU SENT THIS PRESENTATION TO THE

12:39PM  7    MILITARY, DID YOU KNOW WHETHER THAT PARTICULAR STATEMENT WAS

12:39PM  8    TRUE?

12:39PM  9    A.   I DID NOT.

12:39PM  10   Q.   DID YOU ASSUME IT WAS TRUE?

12:39PM  11   A.   I ASSUMED IT WAS TRUE.  I HAD NO REASON TO THINK IT WASN'T

12:39PM  12   TRUE.

12:39PM  13   Q.   WHEN IT SAYS, "EACH THERANOS DEVICE CAN RUN EVERY TEST

12:39PM  14   CURRENTLY AVAILABLE THROUGH THE TRADITIONAL CENTRALIZED OR

12:39PM  15   HOSPITAL LABORATORY INFRASTRUCTURE," WHAT WAS YOUR SENSE AS TO

12:39PM  16   WHY THAT FACT WOULD MATTER TO THE MILITARY?

12:39PM  17   A.   CAN YOU REPEAT WHICH FACT THAT WAS?

12:39PM  18   Q.   SURE.

12:39PM  19   A.   THE HIGHLIGHTED?

12:39PM  20   Q.   IT'S THE FIRST BULLET POINT --

12:39PM  21   A.   UH-HUH.

12:40PM  22   Q.   -- ABOUT EACH DEVICE BEING ABLE TO RUN EVERY TEST.

12:40PM  23   A.   I'M SORRY.  CAN YOU REPEAT THE QUESTION?

12:40PM  24   Q.   SURE.  THE QUESTION IS, WHAT WAS YOUR SENSE AS TO WHY

12:40PM  25   SOMETHING LIKE THAT WOULD MATTER TO THE MILITARY?

12:40PM 1    A.   WELL, THE MILITARY DID EXPRESS INTEREST IN, IN ONE DEVICE

12:40PM 2    THAT COULD DO ALL OF ITS DESIRED TESTING, AND I WAS TOLD THAT

12:40PM 3    THIS DEVICE WAS SMALLER, MORE PORTABLE THAN THE EXISTING

12:40PM 4    EQUIPMENT THAT THEY DID HAVE, AND THAT HAD A NUMBER OF

12:40PM 5    DIFFERENT BENEFITS.

12:40PM 6    Q.   A FEW BULLET POINTS DOWN, THE SECOND TO THE BOTTOM BULLET

12:40PM 7    POINT SAYS, "THERANOS MANUFACTURES ALL OF ITS TECHNOLOGIES AND

12:40PM 8    SYSTEMS WITHIN THE UNITED STATES."

12:40PM 9         DO YOU SEE THAT?

12:40PM 10   A.   I DO.

12:40PM 11   Q.   AT THIS TIME DO YOU KNOW WHETHER THE COMPANY OWNED ANY

12:41PM 12   THIRD PARTY ANALYZERS?

12:41PM 13   A.   I BELIEVE IT DID.

12:41PM 14   Q.   LET'S LOOK AT THE NEXT PAGE.  THAT'S PAGE 6 OF THIS

12:41PM 15   DOCUMENT.

12:41PM 16        AND UNDER PROJECT SCOPE, DO YOU SEE THERE'S A SECTION

12:41PM 17   TITLED THERE MEDEVAC?

12:41PM 18   A.   YES.

12:41PM 19   Q.   AND IN THIS THERANOS MEMO IT SAYS, "MEDEVAC:  THE ABILITY

12:41PM 20   TO TEST AND TRIAGE WOUNDED SOLDIERS AT THE TIME OF IMPACT AND

12:41PM 21   DURING EVACUATION (E.G. IN A HELICOPTER) AND AVOID DELAYED CARE

12:41PM 22   DUE TO UNAVAILABLE MEDICAL INFORMATION WHILE THE SOLDIER IS IN

12:41PM 23   TRANSIT."

12:41PM 24        DO YOU SEE THAT?

12:41PM 25   A.   YES.

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    4022

12:41PM   1    Q.   AND UNDER TELECOMMUNICATIONS, THE END OF THAT PARAGRAPH

12:41PM   2    TALKS ABOUT "THERANOS FIELD SYSTEM'S RUGGED, MODULAR DESIGN

12:42PM   3    WITH INTEGRATED COMMUNICATIONS CAPABILITY AND GPS ENABLE FULL

12:42PM   4    OPERABILITY IN THE FIELD."

12:42PM   5         DO YOU SEE THAT?

12:42PM   6    A.   I DO.

12:42PM   7    Q.   AND BASED ON YOUR KNOWLEDGE AT THE TIME, DID YOU HAVE A

12:42PM   8    BASIS TO KNOW WHETHER THOSE STATEMENTS WERE TRUE OR FALSE?

12:42PM   9    A.   I DIDN'T HAVE THAT BASIS.

12:42PM  10    Q.   THIS PRESENTATION AT THE TOP SAYS U.S.A. SOC AND THERANOS;

12:42PM  11    IS THAT RIGHT?

12:42PM  12    A.   YES.

12:42PM  13    Q.   AND WHAT DID U.S.A. SOC STAND FOR?

12:42PM  14    A.   UNITED STATES OF AMERICA SPECIAL OPERATIONS COMMAND.

12:42PM  15    Q.   WHAT DO YOU RECALL ABOUT FUTURE DEVELOPMENTS BETWEEN

12:42PM  16    THERANOS AND U.S. SPECIAL OPERATIONS COMMAND?

12:42PM  17         FOR EXAMPLE, DID SPECIAL OPERATIONS COMMAND EVER RECEIVE

12:43PM  18    DEVICES FROM THERANOS?

12:43PM  19    A.   YES, I BELIEVE THEY RECEIVED THREE DEVICES.

12:43PM  20    Q.   AND TELL ME ABOUT WHAT.  WHAT DO YOU RECALL?

12:43PM  21    A.   I RECALL THAT WE HAD SPENT MONTHS, IF NOT YEARS,

12:43PM  22    DISCUSSING A POTENTIAL RESEARCH PROGRAM WITH SPECIAL OPERATIONS

12:43PM  23    COMMAND, AND AT ONE POINT I THINK THERE WAS AN AGREEMENT OR A

12:43PM  24    CONTRACT IN PLACE, AND TOWARDS THE END OF THAT RELATIONSHIP

12:43PM  25    THERANOS SENT THREE DEVICES TO A WAREHOUSE IN KENTUCKY, I

12:43PM   1    BELIEVE, TO SPECIAL OPERATIONS COMMAND.

12:43PM   2    Q.   AND THOSE DEVICES, AGAIN, WERE THEY FOR THE PURPOSE OF USE

12:43PM   3    IN CLINICAL TESTING TO TREAT SOLDIERS, OR WERE THEY FOR

12:43PM   4    EVALUATION PURPOSES?

12:43PM   5    A.   THEY WERE FOR EVALUATION PURPOSES.

12:44PM   6    Q.   DO YOU RECALL ANYTHING ABOUT THE CAPABILITY OF THOSE

12:44PM   7    DEVICES, WHAT THEY COULD DO, WHAT THEY COULD NOT DO?

12:44PM   8    A.   I DO.

12:44PM   9    Q.   AND WHAT DO YOU REMEMBER ABOUT THAT?

12:44PM   10   A.   I REMEMBER THAT THE DEVICES COULD DO A CERTAIN SUBSET.  I

12:44PM   11   WAS TOLD THAT THE DEVICES COULD DO A CERTAIN SUBSET OF TESTING,

12:44PM   12   BUT NOT ALL TESTING.

12:44PM   13   Q.   DO YOU RECALL WHETHER THE DEVICES THAT WERE SENT TO

12:44PM   14   SPECIAL OPERATIONS COMMAND COULD DO A CBC, FOR EXAMPLE?

12:44PM   15   A.   I RECALL BEING TOLD THAT THEY COULD NOT.

12:44PM   16   Q.   HOW ABOUT KIND OF WHAT BECAME OF THOSE DEVICES?  ARE YOU

12:44PM   17   AWARE OF SPECIAL OPERATIONS COMMAND EVER ACTUALLY USING THOSE

12:44PM   18   DEVICES AS PART OF THE EVALUATION THAT WE'VE BEEN TALKING

12:44PM   19   ABOUT?

12:44PM   20   A.   I'M NOT AWARE THAT THAT HAPPENED.  I RECALL THAT THE

12:44PM   21   DEVICES WERE SENT, RECEIVED, BUT THEN NO ADDITIONAL ACTION WAS

12:45PM   22   TAKEN.

12:45PM   23   Q.   I'LL ASK YOU NOW TO LOOK AT EXHIBIT 551 IN YOUR BINDER.

12:45PM   24        DO YOU HAVE THAT IN FRONT OF YOU?

12:45PM   25   A.   I DO.

12:45PM   1    Q.   IS THIS AN EMAIL BETWEEN YOU, MS. HOLMES, AND SOMEONE

12:45PM   2    NAMED KEVIN CHUNG?

12:45PM   3    A.   YES.

12:45PM   4    Q.   WHO WAS KEVIN CHUNG?

12:45PM   5    A.   KEVIN CHUNG WAS A DOCTOR.

12:45PM   6    Q.   AND WHO DID HE WORK FOR?

12:45PM   7    A.   JUDGING BY HIS EMAIL, IT WAS THE ARMY, I BELIEVE, AND I

12:45PM   8    THINK HE WAS BASED IN -- AT THE U.S.A. ARMY INSTITUTE OF

12:45PM   9    SURGICAL RESEARCH IN SAN ANTONIO.

12:45PM   10   Q.   DO YOU RECALL HAVING INTERACTIONS WITH THAT COMPONENT OF

12:45PM   11   THE MILITARY WHEN YOU WERE AT THERANOS?

12:45PM   12   A.   I DO.

12:46PM   13              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

12:46PM   14   EXHIBIT 551.

12:46PM   15              MR. DOWNEY:  OBJECTION FOR THE REASONS THAT WE

12:46PM   16   DISCUSSED EARLIER, YOUR HONOR.

12:46PM   17              THE COURT:  IS IT THE ENTIRE CONTENT OF 551,

12:46PM   18   INCLUDING THE EXHIBIT IN THE BACK?

12:46PM   19              MR. BOSTIC:  YES, YOUR HONOR.

12:46PM   20              THE COURT:  AND I'D LIKE TO TALK TO COUNSEL ABOUT

12:46PM   21   THIS.

12:46PM   22        MAYBE WE SHOULD HAVE A SIDE-BAR.

12:46PM   23        MS. RODRIGUEZ, SHOULD WE DO THAT IN THE BACK?  LET'S DO

12:46PM   24   THAT.

12:46PM   25        SO, MR. DOWNEY, WOULD YOU JOIN MR. BOSTIC AND MYSELF?

12:46PM  1        LADIES AND GENTLEMEN, I JUST NEED TO TALK TO THESE LAWYERS

12:46PM  2   ABOUT SOMETHING.  WE'RE GOING TO STEP -- OUR PROTOCOL FOR THIS

12:46PM  3   IS WE'RE GOING TO STEP INTO THE ROOM JUST BEHIND US HERE TO DO

12:46PM  4   THIS.  I'M GOING TO TAKE OUR COURT REPORTER WITH US.

12:46PM  5        WHILE I'M GONE, YOU ARE NOT TO DISCUSS ANYTHING ABOUT THIS

12:46PM  6   CASE AT ALL, YOU'RE NOT TO FORM ANY OPINIONS, YOU'RE NOT TO IN

12:46PM  7   ANY WAY REACH ANY CONCLUSION ABOUT ANYTHING ABOUT THE CASE.

12:46PM  8        WHAT YOU MAY DO WHILE I'M GONE IS STAND AND STRETCH.  I

12:47PM  9   DON'T THINK THIS WILL BE LONG AT ALL.

12:47PM 10        AND, SIR, MR. EDLIN, SAME WITH YOU, SIR.  YOU CAN STAY IN

12:47PM 11   PLACE AND STAND DOWN AND STRETCH IF YOU WOULD LIKE, BUT THERE

12:47PM 12   WILL BE NO TALKING IF YOU WOULD LIKE.

12:47PM 13             JUROR:  CAN I USE THE RESTROOM FACILITIES?

12:47PM 14             THE COURT:  SHOULD WE TAKE A BREAK?  WHY DON'T WE DO

12:47PM 15   THAT?  WE'LL TAKE A 10 MINUTE BREAK, OR A 12 MINUTE BREAK.

12:47PM 16        MY THOUGHT WAS WE WOULD TAKE A BREAK AT 1:30 FOR ABOUT

12:47PM 17   30 MINUTES, BUT LET'S TAKE A 10 MINUTE BREAK NOW.

12:47PM 18        FOLKS, I THINK YOU CAN STAY.

12:47PM 19        YOU CAN STAND DOWN, SIR, IF YOU WOULD, AND I'LL ASK YOU TO

12:47PM 20   STEP OUT INTO THE HALLWAY IF YOU WOULD, SIR.

12:47PM 21             THE WITNESS:  THANK YOU, YOUR HONOR.

12:47PM 22        (JURY OUT AT 12:47 P.M.)

12:48PM 23             THE COURT:  THANK YOU.  PLEASE BE SEATED.

12:48PM 24        THE RECORD SHOULD REFLECT THAT OUR JURY HAS LEFT.  ALL

12:48PM 25   COUNSEL AND MS. HOLMES REMAIN.

12:48PM  1          MR. DOWNEY, WHY DON'T YOU COME FORWARD.  THANK YOU.

12:48PM  2          OKAY.  SO NOW WE'RE AT 551.  WE TALKED ABOUT THIS A LITTLE

12:48PM  3    THIS MORNING.

12:48PM  4          AND, MR. BOSTIC, TELL ME AGAIN, YOU SEEK TO INTRODUCE NOT

12:48PM  5    JUST THE EMAILS, WHICH ARE PREFATORY TO THE EXHIBIT, BUT THE

12:48PM  6    EXHIBIT ITSELF IN TOTO.

12:48PM  7          AND I THINK WE HAD SOME DISCUSSION THIS MORNING ABOUT WERE

12:48PM  8    YOU GOING TO LOOK THROUGH THE EXHIBIT TO SEE IF THERE WAS

12:48PM  9    ANYTHING THAT YOU WANTED TO CALL OR PULL FROM IT, OR HAVE YOU

12:48PM  10   DECIDED YOU SEEK TO ADMIT THE ENTIRETY OF THE EXHIBIT?

12:48PM  11          MR. BOSTIC:  SO, YOUR HONOR, I'M VERY OPEN TO THE

12:48PM  12   COURT'S THOUGHTS ON THAT, AND I'M SENSITIVE TO THE DEFENSE'S

12:49PM  13   CONCERNS, ALTHOUGH I DISAGREE WITH THEM.

12:49PM  14          I -- AT THIS TIME I WOULD SEEK TO ADMIT THE ENTIRE

12:49PM  15   PRESENTATION, THE PRESENTATION AS A WHOLE, AND IN PART IT

12:49PM  16   CONSTITUTES STATEMENTS MADE BY MS. HOLMES, THROUGH MR. EDLIN AS

12:49PM  17   AN AGENT, TO THE MILITARY.

12:49PM  18          TO THE EXTENT THAT THERE ARE FALSE STATEMENTS, THEY ARE

12:49PM  19   RELEVANT FOR THE REASONS DISCUSSED PREVIOUSLY.

12:49PM  20          THE COURT:  OKAY.  THANK YOU.

12:49PM  21          MR. DOWNEY?

12:49PM  22          MR. DOWNEY:  YOUR HONOR, I DON'T HAVE TO ADD REALLY

12:49PM  23   TO WHAT WE DISCUSSED THIS MORNING.  I HAVE THE CONCERNS

12:49PM  24   UNDER -- FOR VARIOUS REASONS ABOUT THIS EXHIBIT, SO WE OBJECT

12:49PM  25   TO THE ADMISSION AT LEAST OF THE ATTACHMENT TO THE EXHIBIT.

12:49PM   1          THE COURT:  WELL, WHAT WE HAVE NOW, I THINK WHAT'S

12:49PM   2   DIFFERENT NOW, MR. DOWNEY, IS THIS WITNESS INDICATING THAT IN

12:49PM   3   ALL OF HIS, I'LL CALL IT INTERFACE COMMUNICATIONS WITH THE

12:49PM   4   MILITARY, HE RAN THOSE THROUGH YOUR CLIENT AND BY YOUR CLIENT

12:50PM   5   FOR HER AFFIRMATION, AND SHE, PER HIS TESTIMONY, APPROVED THOSE

12:50PM   6   COMMUNICATIONS.

12:50PM   7          IT WOULD SEEM THEN THAT THERE IS AT LEAST A PERSONAL

12:50PM   8   RATIFICATION THROUGH AGENCY OR OTHERWISE FOR THE DOCUMENT TO

12:50PM   9   COME IN.

12:50PM  10          MR. DOWNEY:  WELL, THE ISSUE, YOUR HONOR, THE REASON

12:50PM  11   WE WERE OBJECTING WAS NOT AS TO THAT.

12:50PM  12          THE REASON WE ARE OBJECTING IS THAT THIS IS IN THE NATURE

12:50PM  13   OF PROPENSITY EVIDENCE.

12:50PM  14          IT'S ALSO NOT RELEVANT TO THE CONSPIRACY THAT IS ALLEGED

12:50PM  15   IN THE INDICTMENT WHICH RELATES TO THE STATUS AT A LATER POINT.

12:50PM  16          SO I, I ACKNOWLEDGE THE TESTIMONY OF THE WITNESS, BUT THAT

12:50PM  17   FUNDAMENTALLY WAS NOT OUR -- THE BASIS ON WHICH WE OBJECT.

12:50PM  18          THE COURT:  SURE.  SO I'M JUST KIND OF GOING THROUGH

12:50PM  19   THIS STEP BY STEP.

12:50PM  20          FOUNDATIONALLY AT LEAST, IT WOULD SEEM TO BE ADMISSIBLE

12:50PM  21   FOR THAT -- ON THOSE GROUNDS.

12:50PM  22          BUT LET ME MOVE TO YOUR OBJECTION, WHICH IS YOU THINK IT'S

12:50PM  23   DISCONNECTED FROM THE CHARGES THAT ARE IN THE INDICTMENT.

12:51PM  24          AND LET ME JUST ASK THIS QUESTION, MR. BOSTIC.  AGAIN,

12:51PM  25   GOING OVER OUR CONVERSATION THIS MORNING, IT WOULD SEEM THAT IF

12:51PM  1    THE GOVERNMENT HAD A WITNESS WHO WOULD TESTIFY OR HAD TESTIFIED

12:51PM  2    PRIOR TO MR. EDLIN THAT HE OR SHE INVESTED IN RELIANCE ON A

12:51PM  3    REPRESENTATION THAT THERE WAS A RELATIONSHIP, BUSINESS

12:51PM  4    RELATIONSHIP WITH THE MILITARY, THAT WOULD SUPPORT THE RELIANCE

12:51PM  5    OF THAT INVESTOR, AND THEN PERHAPS COULD BE SEEN, AS YOU

12:51PM  6    REPRESENTED THIS MORNING -- AND I THINK IT MOVES AWAY FROM A

12:51PM  7    404 OR ANY OF THAT OTHER ANALYSIS -- I THINK THEN IT MOVES MORE

12:51PM  8    TOWARDS THE INEXTRICABLY INTERTWINED THAT MR. BOSTIC WAS

12:51PM  9    TALKING ABOUT, MR. DOWNEY.  IT WOULD SEEM THAT THAT WOULD BE

12:52PM 10    THE PATH, OR AT LEAST A LOGICAL PATH TO PURSUE UNDER THE

12:52PM 11    INEXTRICABLY INTERTWINED AS PART OF THE OVERALL SCHEME, PLAN,

12:52PM 12    M.O., ET CETERA.

12:52PM 13        I THINK MR. BOSTIC, BY INTRODUCING THIS NOW, I SUPPOSE I

12:52PM 14    WOULD ASK YOU, DO YOU HAVE A WITNESS THAT IS GOING TO SO

12:52PM 15    TESTIFY OR LAY THAT -- SOME TYPE OF FOUNDATION FOR THAT?

12:52PM 16            MR. BOSTIC:  SO JUST TWO THINGS I WOULD NOTE ON

12:52PM 17    THAT, YOUR HONOR.  THE FIRST IS JUST TO POINT OUT, AS THE

12:52PM 18    COURT, OF COURSE, KNOWS, RELIANCE IS NOT AN ELEMENT HERE.

12:52PM 19            THE COURT:  RIGHT.

12:52PM 20            MR. BOSTIC:  INSTEAD, THE FOCUS IS ON THE

12:52PM 21    DEFENDANT'S MENTAL STATE AND WHETHER SHE INTENDED TO DECEIVE

12:52PM 22    WITH THE STATEMENTS SHE WAS MAKING.

12:52PM 23        AND, OF COURSE, THAT INCORPORATES THE CONCEPT OF

12:52PM 24    MATERIALITY.

12:52PM 25        I THINK THE MATERIALITY OF THESE FALSE STATEMENTS IS

12:52PM  1    SELF-EVIDENT.  IT'S EASY TO UNDERSTAND WHY A -- SOMEONE SEEKING

12:52PM  2    INVESTMENT FOR HER COMPANY MIGHT WANT TO EXAGGERATE OR

12:53PM  3    MISREPRESENT THE EXTENT OF A RELATIONSHIP WITH THE MILITARY.

12:53PM  4        THE MILITARY BRINGS PRESTIGE.  IT SENDS A SIGNAL THAT A

12:53PM  5    PIECE OF TECHNOLOGY OR A PIECE OF EQUIPMENT HAS REACHED A

12:53PM  6    CERTAIN LEVEL THAT IS GOOD ENOUGH FOR THE STRONGEST MILITARY

12:53PM  7    FORCE IN THE WORLD.

12:53PM  8        SO I THINK FOR THOSE REASONS MATERIALITY IS SELF-EVIDENT

12:53PM  9    REGARDLESS OF WHAT A WITNESS SAYS.

12:53PM 10        THAT SAID, I DO EXPECT UPCOMING WITNESSES TO TESTIFY THAT

12:53PM 11    THAT WAS A MATERIAL FACT TO THEM.  I DON'T THINK THEY'LL FRAME

12:53PM 12    IT IN TERMS OF RELIANCE I THINK FOR THE REASON I JUST

12:53PM 13    DISCUSSED.

12:53PM 14            THE COURT:  AND I USED THE WORD "RELIANCE" AND I

12:53PM 15    MEANT TO SAY "MATERIAL," I BEG YOUR PARDON, THANK YOU FOR

12:53PM 16    CORRECTING ME, BECAUSE YOU'RE ABSOLUTELY RIGHT, RELIANCE

12:53PM 17    DOESN'T HAVE THAT.  AT LEAST FOR THIS PURPOSE, IT DOESN'T.

12:53PM 18        THE WITNESS MAY HAVE A DIFFERENT VIEW OF IT.

12:53PM 19        SO THAT'S WHAT I WAS LOOKING AT, MR. DOWNEY, AND IT WOULD

12:53PM 20    SEEM THAT THAT IS A STRONGER STATEMENT FOR ADMISSION AS PART OF

12:54PM 21    THE INEXTRICABLY INTERTWINED SCOPE OF THE SCHEME, I'LL CALL IT

12:54PM 22    SCHEME, I'LL JUST USE THAT FOR OUR CONVERSATION, THE PLAN.

12:54PM 23            MR. DOWNEY:  WELL, NONE OF WHAT MR. BOSTIC JUST SAID

12:54PM 24    RELATES TO WHAT WAS REPRESENTED TO THE DEPARTMENT OF DEFENSE.

12:54PM 25        IT RELATES TO, WHAT IS THE STATUS OF THAT RELATIONSHIP?

12:54PM  1    WHAT IS THE NATURE OF THAT RELATIONSHIP?  ET CETERA.

12:54PM  2        THE REPRESENTATIONS THAT WERE MADE TO INITIATE THE

12:54PM  3    RELATIONSHIP -- WHICH BY THE WAY, THIS POWERPOINT IS NOT --

12:54PM  4    ISN'T RELEVANT TO THAT.  SHE'S NOT CLAIMING TO THE INVESTORS, I

12:54PM  5    SAID SOMETHING DIFFERENT THAN WHAT IS IN THIS POWERPOINT.

12:54PM  6        I DON'T SEE THE RELATIONSHIP BETWEEN, YOU KNOW, A SERIES

12:54PM  7    OF REPRESENTATIONS MADE WITH ONE ASPECT OF THE MILITARY AT SOME

12:54PM  8    POINT DURING THEIR RELATIONSHIP TO WHAT AN INVESTOR BELIEVES

12:55PM  9    LATER ABOUT THE STATUS OF THE RELATIONSHIP OR THE CHARACTER OF

12:55PM 10    THE RELATIONSHIP, OR AS THE INDICTMENT IS ACTUALLY ABOUT,

12:55PM 11    WHETHER THERE'S REVENUE OR NOT.

12:55PM 12             MR. BOSTIC:  SO I'M TRYING TO FIND A DIFFERENT WAY

12:55PM 13    TO SAY IT.

12:55PM 14        EVERY COMMUNICATION WITH THE MILITARY WOULD NECESSARILY

12:55PM 15    AFFECT THE ONGOING STATUS AND HEALTH OF THE RELATIONSHIP

12:55PM 16    BETWEEN THERANOS AND THE MILITARY.

12:55PM 17        SO THE FACT THAT THIS WASN'T THE FIRST COMMUNICATION

12:55PM 18    DOESN'T MEAN THAT THIS WASN'T PART OF WHAT WENT INTO THE

12:55PM 19    MILITARY'S THINKING WHEN IT DECIDED TO CONTINUE ITS

12:55PM 20    RELATIONSHIP AND ITS DISCUSSIONS WITH THERANOS.

12:55PM 21        SO EVERYTHING SAID BY HOLMES TO THE MILITARY IS RELEVANT

12:55PM 22    TO THE ONGOING STATUS OF THAT RELATIONSHIP GOING FORWARD IN

12:55PM 23    TIME.

12:55PM 24        MORE IMPORTANTLY, THOUGH, IT'S HOLMES'S KNOWLEDGE THAT IS

12:56PM 25    IMPORTANT HERE.  THE FACT THAT HOLMES MADE DELIBERATE

12:56PM 1    MISREPRESENTATIONS TO THE MILITARY BEFORE THAN MAKING

12:56PM 2    MISREPRESENTATIONS ABOUT THE STATUS OF THE RELATIONSHIP WITH

12:56PM 3    THE MILITARY IS RELEVANT BECAUSE ONE SHOWS HER KNOWLEDGE OF THE

12:56PM 4    OTHER.

12:56PM 5        BECAUSE HOLMES KNEW THAT THE RELATIONSHIP WITH THE

12:56PM 6    MILITARY, THE MILITARY'S INTEREST IN THE THERANOS DEVICE WAS

12:56PM 7    PREMISED ON FALSEHOODS, THAT THE MILITARY WAS INTERESTED IN A

12:56PM 8    VERSION OF THE DEVICE THAT DIDN'T ACTUALLY EXIST, BECAUSE SHE

12:56PM 9    KNEW THAT, SHE KNEW THAT THE DEVICE WAS UNLIKELY OR COULD NEVER

12:56PM 10   BE USED BY THE MILITARY IN ITS CURRENT FORM.

12:56PM 11       AND THAT MEANS THAT WHEN SHE REPRESENTED TO OTHERS THAT IT

12:56PM 12   WAS DEPLOYED, THAT IT WAS BEING USED TO TREAT SOLDIERS, THAT IT

12:56PM 13   HAD BEEN ON A HELICOPTER, THERE'S NO WAY THAT SHE COULD HAVE

12:56PM 14   BEEN MISTAKEN ABOUT THAT BECAUSE IN HER MIND SHE WOULD REMEMBER

12:57PM 15   THAT MONTHS EARLIER, A YEAR EARLIER, SHE HAD TOLD THE MILITARY

12:57PM 16   THAT THE DEVICE COULD DO SOMETHING THAT IT COULD NOT DO.

12:57PM 17       AND SHE WOULD KNOW THAT UNLESS SHE MADE THAT FALSEHOOD

12:57PM 18   TRUE, THAT THE RELATIONSHIP WITH THE MILITARY COULD NOT HAVE

12:57PM 19   PROGRESSED TO THE POINT THAT SHE WAS REPRESENTING IT TO BE AT.

12:57PM 20       THAT'S WHY IT MATTERS.

12:57PM 21           THE COURT:  THANK YOU, MR. BOSTIC.

12:57PM 22       IS IT PREDICATED ON ANOTHER WITNESS COMING FORWARD AND

12:57PM 23   INDICATING THAT THE REPRESENTATION WAS MADE?

12:57PM 24           MR. BOSTIC:  YOUR HONOR, I THINK THE COURT HAS

12:57PM 25   ALREADY HEARD AND THE JURY HAS ALREADY HEARD FROM WITNESSES WHO

12:57PM  1    TESTIFIED ABOUT REPRESENTATIONS THAT THEY HEARD FROM MS. HOLMES

12:57PM  2    ABOUT THE STATUS OF THINGS WITH THE MILITARY.

12:57PM  3         MORE OF THAT IS COMING.

12:57PM  4         IF THE COURT VIEWS THE ADMISSIBILITY OF THIS DOCUMENT AS

12:57PM  5    CONTINGENT ON THAT, I WOULD ASK THAT IT BE CONDITIONALLY

12:57PM  6    ADMITTED TODAY SUBJECT TO A MOTION TO STRIKE IF THAT FOUNDATION

12:57PM  7    ISN'T LAID, BUT IT WILL BE.

12:57PM  8         MR. DOWNEY:  YOUR HONOR, EVEN IF SUCH A WITNESS WERE

12:57PM  9    TO BE PRODUCED, THERE ARE ABOUT 20 LAYERS OF IMPLICATION OR

12:58PM  10   INFERENCE BETWEEN THESE REPRESENTATIONS IN JANUARY OF 2012 AND

12:58PM  11   WHAT MS. HOLMES WAS THINKING IN SEPTEMBER OF 2013 OR

12:58PM  12   THEREAFTER, OR MUCH LESS WHAT SHE WAS THINKING TWO YEARS

12:58PM  13   BEFORE.

12:58PM  14        AND I DON'T THINK THERE IS ANY KIND OF A FOUNDATION THAT

12:58PM  15   HAS BEEN LAID FOR THAT, NOR DO I THINK THAT THEY COULD PROMISE

12:58PM  16   A WITNESS TO SHOW IT.

12:58PM  17        I HAVE NO ISSUE, YOUR HONOR, WITH THE TYPES OF DISCUSSIONS

12:58PM  18   OF THE RELATIONSHIP THAT MR. BOSTIC HAS BEEN ELICITING.

12:58PM  19        IT'S TO TRY TO PUT A POWERPOINT IN AND THEN ESSENTIALLY

12:58PM  20   INTRODUCE A NEW THEORY OF CRIMINAL LIABILITY, WHICH IS THAT

12:58PM  21   MS. HOLMES DEFRAUDED THE DEPARTMENT OF DEFENSE AFTER WE'VE HAD,

12:58PM  22   YOU KNOW, A GREAT DEAL OF PRETRIAL PRACTICE AND NO NOTICE AS TO

12:58PM  23   THE THEORY THAT MR. BOSTIC HAS ARTICULATED.

12:58PM  24        THE COURT:  WELL, LET'S ASK MR. BOSTIC IF THAT'S

12:59PM  25   WHAT HIS INTENT IS.

12:59PM   1              MR. BOSTIC:  NO, YOUR HONOR, AND THE GOVERNMENT

12:59PM   2      WON'T ARGUE TO THE CONTRARY AT ANY POINT TO THE JURY.

12:59PM   3              THE COURT:  SO LET ME ASK YOU, MR. BOSTIC,

12:59PM   4      THERE'S -- THE REPORT IS, WHAT IS IT, 80-SOME PAGES, 75 PAGES,

12:59PM   5      76 PAGES LONG SOME OF THIS INFORMATION -- AND THANK YOU,

12:59PM   6      MR. DOWNEY, FOR -- I THINK WHAT I HEAR YOU SAYING IS THAT I

12:59PM   7      DON'T HAVE ANY PROBLEM WITH HIM TALKING ABOUT THESE DOCUMENTS.

12:59PM   8      SOME OF THEM, THE INTRODUCTION IS WHAT IT SOUNDS LIKE WHAT YOU

12:59PM   9      OBJECT TO AS TO SOME OF THOSE SLIDES HERE.

12:59PM  10              FOLLICLE STIMULATING HORMONE, IS THAT IMPORTANT FOR THE

12:59PM  11      PURPOSE THAT YOU ARE SEEKING TO INTRODUCE THIS?  THAT'S ON

12:59PM  12      PAGE 54.

12:59PM  13              CLINICAL SAMPLES OF COUMADIN.  I DON'T WANT TO GO THROUGH

12:59PM  14      THOSE.

12:59PM  15              THE CARBON DIOXIDE, ALL OF THE TESTING AND ASSAYS, IS THAT

12:59PM  16      SOMETHING THAT YOU NEED TO GET INTO?

12:59PM  17              IS THE PURPOSE TO SHOW THAT MR. HOLMES REACHED OUT THROUGH

01:00PM  18      MR. EDLIN TO FURTHER A RELATIONSHIP WITH THE MILITARY?  IS THAT

01:00PM  19      REALLY THE PURPOSE AT THIS POINT IN TIME?

01:00PM  20              MR. BOSTIC:  IT IS, YOUR HONOR, AND TO SHOW THE

01:00PM  21      REPRESENTATIONS THAT WERE MADE ABOUT WHAT THE THERANOS

01:00PM  22      TECHNOLOGY COULD DO.

01:00PM  23              THE COURT:  RIGHT.

01:00PM  24              MR. BOSTIC:  AND I THINK, TO THE COURT'S QUESTION,

01:00PM  25      THE IMPORTANT PARTS OF THE PRESENTATION FOR THAT PURPOSE GO UP

01:00PM   1    THROUGH APPROXIMATELY PAGE 26.

01:00PM   2        AND I THINK AS TO THE PORTIONS AFTERWARDS THAT DELVE MORE

01:00PM   3    INTO TECHNICAL DETAILS, I WOULD BE HAPPY TO FOREGO ADMITTING

01:00PM   4    THAT IF THAT WOULD ADDRESS THE COURT'S CONCERNS.

01:00PM   5        THE COURT:  I LOOK AT -- MAYBE I'M -- I LOOK AT

01:00PM   6    PAGE 29 AS PROBABLY THE PAGE THAT CONCLUDES THE CONVERSATION.

01:00PM   7    PAGE 30 IS THE PRICING.  I DON'T KNOW IF --

01:00PM   8        MR. DOWNEY:  WELL, YOUR HONOR, BEFORE YOU LABOR

01:00PM   9    THROUGH THE DOCUMENT, I BELIEVE IT'S A BINARY CHOICE BETWEEN --

01:00PM  10        THE COURT:  RIGHT.

01:00PM  11        MR. DOWNEY:  -- EITHER THE EMAIL AND THE

01:00PM  12    PRESENTATION.

01:00PM  13        I ACTUALLY WOULDN'T WANT TO OMIT THE BALANCE OF THE DATA

01:01PM  14    HERE BECAUSE THIS IS A PRESENTATION BEING SENT TO A PHYSICIAN

01:01PM  15    TO BE REVIEWED BY OTHER PHYSICIANS AND PEOPLE WITH EXPERTISE ON

01:01PM  16    THE SUBJECT.

01:01PM  17        AND THE DATA REFLECTS WHAT STAGE THE DEVELOPMENT OF THE

01:01PM  18    ASSAYS ARE AT, WHAT THE VARIATION IS, ET CETERA.

01:01PM  19        SO THEY'RE NOT RECEIVING THIS AND HEARING THIS AS

01:01PM  20    MR. BOSTIC IS EXPRESSING IT OR TRYING TO CHARACTERIZE THE FIRST

01:01PM  21    26 PAGES.

01:01PM  22        I THINK ACTUALLY THE BALANCE OF THE EXHIBIT IS QUITE

01:01PM  23    IMPORTANT IF IT COMES IN AT ALL.

01:01PM  24        THE COURT:  WELL, THANK YOU FOR THAT.

01:01PM  25        IT SEEMS TO ME, I THINK WHAT WE HEARD MR. EDLIN SAY, IS

01:01PM   1    THAT THERE WERE PHASES OF THIS RELATIONSHIP, AND THIS MAY OR

01:01PM   2    MAY NOT HAVE BEEN THE INITIAL START OF THE RELATIONSHIP.

01:01PM   3        IT JUST SEEMED TO ME THAT THE OTHER INFORMATION, THE

01:01PM   4    ASSAYS AND ALL OF THE TESTINGS, MIGHT BE A LITTLE TECHNICAL FOR

01:01PM   5    THE PURPOSE SOUGHT.

01:01PM   6        IF YOU WANT ALL OF IT IN SO YOU CAN EXAMINE, I'M CERTAINLY

01:02PM   7    GOING TO ALLOW THAT TO COME IN.

01:02PM   8        I WAS CERTAINLY TRYING TO MAKE IT SOMEWHAT ACCESSIBLE FOR

01:02PM   9    ALL OF YOU, AND PARTICULARLY FOR THE JURY.

01:02PM   10       WELL, THANK YOU FOR THE CONVERSATION.  I AM GOING TO

01:02PM   11   RECOGNIZE YOUR OBJECTIONS AND OVERRULE THE OBJECTIONS AND ALLOW

01:02PM   12   THIS TO BE ADMITTED FOR THE REASONS STATED.

01:02PM   13       I DO THINK, AT LEAST PRESENTLY, THE EVIDENCE HAS SHOWN

01:02PM   14   THAT THIS IS MATERIAL.  IT IS, AT LEAST AS SHOWN TO DATE NOW,

01:02PM   15   THIS COULD BE ARGUED AS INEXTRICABLY INTERTWINED WITH THE SCOPE

01:02PM   16   OF THE SCHEME/PLAN.

01:02PM   17       YOU INDICATE THAT YOU HAVE A WITNESS THAT IS GOING TO

01:02PM   18   TESTIFY ABOUT THE MATERIALITY.  THAT WOULD BE HELPFUL.

01:02PM   19       I DON'T LIKE TO PROVISIONALLY ADMIT THINGS.  I THINK I

01:02PM   20   HAVE DONE THAT ON TWO PIECES OF EVIDENCE NOW, AND AT THE TIME

01:02PM   21   WHEN WE COME TO OUR CHARGING CONFERENCE, WE'LL HAVE TO ALL

01:02PM   22   REMEMBER WHAT THOSE WERE AGAIN AND SEE IF THE FOUNDATION HAS

01:02PM   23   BEEN LAID.

01:02PM   24       BUT I DO THINK, JUST BASED ON THE EVIDENCE NOW, THAT THE

01:02PM   25   COURT CAN FIND IT'S NOT 404(B), IT'S NOT INTRODUCED FOR THAT

01:03PM  1    PURPOSE, BUT RATHER IT CAN BE SEEN AND WOULD BE INTRODUCED AS

01:03PM  2    EVIDENCE THAT IS INEXTRICABLY INTERTWINED WITH THE PLAN.

01:03PM  3         SO I'LL OVERRULE YOUR OBJECTIONS AS YOU'VE STATED THEM AND

01:03PM  4    WE'LL ADMIT THE DOCUMENT IN TOTO BASED ON YOUR COMMENTS.

01:03PM  5         THANK YOU, MR. DOWNEY.

01:03PM  6         SHOULD WE BRING OUR JURY IN?  SHOULD WE BREAK AGAIN AT

01:03PM  7    1:30?

01:03PM  8              MS. TREFZ:  YES, PLEASE.

01:03PM  9              THE COURT:  LET'S BRING OUR JURY IN AND THEN WE'LL

01:03PM 10    GO --

01:03PM 11              MR. DOWNEY:  THANK YOU, YOUR HONOR.

01:03PM 12              THE COURT:  THANK YOU.

01:03PM 13         (JURY IN AT 1:03 P.M.)

01:05PM 14              THE COURT:  ALL RIGHT.  THANK YOU.  PLEASE BE

01:05PM 15    SEATED.  WE'RE BACK ON THE RECORD.  OUR JURY IS PRESENT.

01:05PM 16         ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.

01:05PM 17         MR. EDLIN HAS RETURNED TO THE STAND.

01:05PM 18         THANK YOU, LADIES AND GENTLEMEN, FOR THE BREAK.

01:05PM 19         I DO WANT TO TELL YOU, I DO NEED TO TAKE A BREAK AT 1:30,

01:05PM 20    1:35 AGAIN, AND IT WILL BE OUR 30 MINUTE BREAK, AND THEN WE'LL

01:05PM 21    GO UNTIL 3:00 TODAY.  AND THEN I'LL ASK YOU, WHEN WE FINISH

01:06PM 22    TODAY, IF WE CAN GO UNTIL 4:00 TOMORROW.  THANK YOU.

01:06PM 23         MR. BOSTIC.

01:06PM 24              MR. BOSTIC:  THANK YOU, YOUR HONOR.

01:06PM 25    Q.   MR. EDLIN, WHEN WE STARTED OUR BREAK WE WERE LOOKING AT

01:06PM   1      EXHIBIT 551 IN OUR BINDER.

01:06PM   2           DO YOU HAVE THAT IN FRONT OF YOU?

01:06PM   3      A.   I DO.

01:06PM   4              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT MOVES TO

01:06PM   5      ADMIT EXHIBIT 551.

01:06PM   6              THE COURT:  I'LL ADMIT IT, NOTING MY COMMENTS

01:06PM   7      EARLIER.  THANK YOU.

01:06PM   8           (GOVERNMENT'S EXHIBIT 551 WAS RECEIVED IN EVIDENCE.)

01:06PM   9              MR. BOSTIC:  MAY I PUBLISH IT, YOUR HONOR?

01:06PM  10              THE COURT:  YES.

01:06PM  11              MR. BOSTIC:  MS. HOLLIMAN, IF WE CAN ZOOM IN ON THE

01:06PM  12      TOP HALF OF THIS PAGE.

01:06PM  13           MR. EDLIN, WE WERE TALKING ABOUT KEVIN CHUNG AND THE

01:06PM  14      SURGICAL INSTITUTE COMPONENT.

01:06PM  15           DO YOU RECALL THAT?

01:06PM  16      A.   YES.

01:06PM  17      Q.   WAS THIS ANOTHER INTERACTION THAT THERANOS HAD WITH A

01:06PM  18      COMPONENT OF THE U.S. MILITARY?

01:06PM  19      A.   YES.

01:07PM  20      Q.   AND GIVE US A PREVIEW, WHAT WAS THE CULMINATION OF THIS

01:07PM  21      INTERACTION WITH THE MILITARY?

01:07PM  22      A.   KEVIN CHUNG -- WELL, FOR THIS SPECIFIC EMAIL OR WITH

01:07PM  23      DR. CHUNG?

01:07PM  24      Q.   I MEAN WITH DR. CHUNG IN GENERAL.  FOR EXAMPLE, DID THIS

01:07PM  25      INTERACTION EVENTUALLY RESULT IN THERANOS DEVICES BEING USED

01:07PM   1      FOR A STUDY?

01:07PM   2      A.   YES.  SO DR. CHUNG WAS THE LEAD INVESTIGATOR FOR A

01:07PM   3      RESEARCH STUDY, ALONG WITH THE AMERICAN BURN ASSOCIATION, AND

01:08PM   4      IN THAT STUDY THERANOS DEVICES WERE USED IN A NUMBER OF

01:08PM   5      DIFFERENT ACADEMIC RESEARCH INSTITUTIONS AND HOSPITALS IN THE

01:08PM   6      U.S. FOR TECH -- FOR RESEARCH PURPOSES FOR CERTAIN BIOMARKERS.

01:08PM   7      Q.   AND THAT USE IN THOSE INSTITUTIONS, WAS THAT CLINICAL USE

01:08PM   8      OF THE DEVICE?  AND WHAT I MEAN WAS, WERE DOCTORS USING THE

01:08PM   9      RESULTS GENERATED BY THE THERANOS ANALYZERS TO MAKE TREATMENT

01:08PM  10      DECISIONS ABOUT PATIENTS?

01:08PM  11      A.   I DON'T BELIEVE SO, NO.

01:08PM  12      Q.   AND WAS ALL OF THE USE IN CONNECTION WITH THAT -- WITH

01:08PM  13      THIS STUDY ON U.S. SOIL AS FAR AS YOU KNOW?

01:08PM  14      A.   AS FAR AS I KNOW, ALL OF THE DIFFERENT HOSPITALS THAT WERE

01:08PM  15      A PART OF THE STUDY WERE IN THE U.S.

01:08PM  16      Q.   SO THIS STUDY DIDN'T INVOLVE THE USE OF THERANOS

01:09PM  17      TECHNOLOGY IN WAR ZONES OVERSEAS, FOR EXAMPLE?

01:09PM  18      A.   THAT'S CORRECT.

01:09PM  19      Q.   LET'S TURN TO PAGE 7 OF THIS EXHIBIT.

01:09PM  20           AND ARE WE LOOKING AT AN ATTACHMENT, OR A PORTION OF AN

01:09PM  21      ATTACHMENT THAT YOU SENT TO DR. CHUNG ATTACHED TO THE EMAIL

01:09PM  22      THAT WE JUST SAW?

01:09PM  23      A.   YES.

01:09PM  24      Q.   AND LIKE I ASKED YOU FOR THE LAST ATTACHMENT, DID

01:09PM  25      MS. HOLMES REVIEW AND APPROVE THIS IN PARTICULAR BEFORE YOU

01:09PM  1    SENT IT TO DR. CHUNG?

01:09PM  2    A.   I BELIEVE SHE DID, YES.

01:09PM  3    Q.   AND WAS HER INVOLVEMENT WITH THIS INTERACTION WITH THE

01:09PM  4    MILITARY ON THE SAME LEVEL AS WHAT YOU PREVIOUSLY DISCUSSED?

01:10PM  5    A.   YES.

01:10PM  6    Q.   LOOKING AT THE TEXT ON THE SCREEN, I JUST WANT TO POINT

01:10PM  7    YOU TO A FEW PORTIONS.

01:10PM  8        FIRST, UNDER THAT FIRST BULLET POINT, DO YOU SEE WHERE IT

01:10PM  9    SAYS, "THERANOS'S PROPRIETARY, PATENTED TECHNOLOGY RUNS

01:10PM  10   COMPREHENSIVE BLOOD TESTS FROM A FINGERSTICK"?

01:10PM  11   A.   YES.

01:10PM  12   Q.   IT ALSO SAYS, "TESTS FOR MICRO-SAMPLES OF OTHER MATRICES

01:10PM  13   IN REAL-TIME OUTSIDE OF TRADITIONAL LAB SETTINGS AND GENERATES

01:10PM  14   SIGNIFICANTLY HIGHER INTEGRITY DATA THAN CURRENTLY POSSIBLE."

01:10PM  15       DO YOU SEE THAT?

01:10PM  16   A.   I DO.

01:10PM  17   Q.   LET'S TURN TO PAGE 15 IN THIS PRESENTATION.

01:10PM  18       DO YOU SEE A SLIDE TITLED OVERVIEW:  THERANOS SYSTEMS?

01:10PM  19   A.   I DO.

01:11PM  20   Q.   DO YOU RECOGNIZE THE DEVICES THAT ARE PICTURED IN THE

01:11PM  21   UPPER LEFT HAND OF THAT PAGE?

01:11PM  22   A.   I DO.

01:11PM  23   Q.   AND WHAT ARE THOSE DEVICES?

01:11PM  24   A.   THE MULTICOLORED DEVICE ON THE LEFT IS AN EDISON 3 SERIES

01:11PM  25   OR 3.0.

01:11PM  1      THE PICTURE ON THE RIGHT IS OF THE MINILAB TOWER, AND

01:11PM  2   THAT'S NOT TO SCALE.

01:11PM  3   Q.   OKAY.  HOW MUCH BIGGER WAS THE MINILAB TOWER THAN THE

01:11PM  4   EDISON?

01:11PM  5   A.   THE EDISON -- IT WAS SIGNIFICANTLY BIGGER OR TALLER.  I

01:11PM  6   THINK THE MINILAB TOWER WAS SOMEWHERE BETWEEN FOUR TO FIVE

01:11PM  7   FEET.  I DON'T REMEMBER EXACTLY.

01:11PM  8      THE EDISON WAS SOMEWHERE BETWEEN ONE AND TWO FEET TALL.

01:11PM  9   Q.   AND BASED ON YOUR EARLIER TESTIMONY, WAS THE EDISON 3

01:12PM 10   SERIES USED BY THERANOS IN ACTUAL PATIENT TESTING?

01:12PM 11   A.   I HAVE -- I LEARNED THAT IT WAS, YES.

01:12PM 12   Q.   WAS THE MINILAB TOWER USED BY THERANOS IN ACTUAL CLINICAL

01:12PM 13   PATIENT TESTING?

01:12PM 14   A.   NOT TO MY KNOWLEDGE.

01:12PM 15   Q.   LET'S TURN THE PAGE TO PAGE 16.  ZOOM IN ON THE TOP OF

01:12PM 16   PAGE 16.

01:12PM 17      AND DO YOU SEE WHERE IT SAYS, "UNLIKE EXISTING POINT OF

01:12PM 18   CARE TECHNOLOGIES, THERANOS ANALYZERS RUN ANY TEST AVAILABLE IN

01:12PM 19   CENTRAL LABORATORIES"?

01:12PM 20   A.   I DO SEE THAT.

01:12PM 21   Q.   AT THE TIME THIS WAS SENT IN MARCH OF 2012, DID YOU HAVE A

01:12PM 22   BASIS TO UNDERSTAND WHETHER THAT STATEMENT WAS TRUE OR NOT?

01:12PM 23   A.   I DIDN'T HAVE THE BASIS TO UNDERSTAND WHETHER IT WAS TRUE

01:13PM 24   OR NOT, BUT I HAD NO REASON TO BELIEVE THAT IT WASN'T TRUE.

01:13PM 25   Q.   HOW ABOUT THE SECOND BULLET POINT THERE?  IT SAYS,

01:13PM 1    "THERANOS IS CAPABLE OF RUNNING ANY COMBINATION OF TEST WITHIN

01:13PM 2    THE SAME CARTRIDGE FOOTPRINT."

01:13PM 3         WOULD IT BE THE SAME ANSWER FOR THAT, THAT YOU DIDN'T HAVE

01:13PM 4    A BASIS TO KNOW, BUT YOU HAD NO REASON TO DOUBT IT?

01:13PM 5    A.   THAT'S CORRECT.

01:13PM 6    Q.   LET'S LOOK AT PAGE 23, PLEASE.

01:13PM 7         AND ON PAGE 23, DO YOU SEE THERE'S A SECTION ADDRESSING

01:13PM 8    ACCURACY?

01:13PM 9    A.   YES.

01:13PM 10   Q.   AND THE TEXT TO THE RIGHT OF THAT SAYS, "THE LESS THAN

01:13PM 11   5 PERCENT CV YIELDED IN THERANOS'S ANALYSIS RESULTS FROM

01:13PM 12   ELIMINATION OF PRE-ANALYTIC ERRORS, AND PROVIDES FOR PRECISE

01:14PM 13   AND ACTIONABLE INFORMATION THAT WAS PREVIOUSLY INACCESSIBLE."

01:14PM 14        DO YOU SEE THAT?

01:14PM 15   A.   I DO.

01:14PM 16   Q.   AND AT THE BOTTOM THERE IS A LINE THAT SAYS, "THERANOS HAS

01:14PM 17   QUICKER TEST RUN TIMES AND COMMUNICATES MOST RESULTS IN LESS

01:14PM 18   THAN 20 MINUTES."

01:14PM 19        DO YOU SEE THAT?

01:14PM 20   A.   I DO.

01:14PM 21   Q.   THE TIMING CLAIM, WAS THAT YOUR EXPERIENCE WHEN IT CAME TO

01:14PM 22   YOUR WORK WITH THE DEMOS OF THERANOS TECHNOLOGY?

01:14PM 23   A.   THAT WAS NOT MY EXPERIENCE.

01:14PM 24   Q.   HOW WAS IT DIFFERENT FROM YOUR EXPERIENCE?

01:14PM 25   A.   THE RUN TIMES IN DEMOS WERE USUALLY LONGER THAN 20

01:14PM   1       MINUTES.

01:14PM   2       Q.   LET'S LOOK AT PAGE 24.  AND ON PAGE 24, DO YOU SEE THE

01:14PM   3       SLIDE IS TITLED FINGERSTICK-BASED TESTING?

01:14PM   4       A.   YES.

01:14PM   5       Q.   AND THERE'S A BULLET POINT ON THE LEFT SIDE THAT SAYS,

01:15PM   6       "ALL 2000 PLUS CURRENTLY RUN TESTS/CPT CODES ARE AVAILABLE

01:15PM   7       THROUGH THERANOS."

01:15PM   8           DO YOU SEE THAT?

01:15PM   9       A.   YES.

01:15PM  10       Q.   AND IT SAYS BELOW THAT, "THERANOS RUNS ANY TEST AVAILABLE

01:15PM  11       IN CENTRAL LABORATORIES."

01:15PM  12       A.   I SEE THAT.

01:15PM  13       Q.   AND IN MARCH OF 2012, DID YOU KNOW WHETHER THE THERANOS

01:15PM  14       ANALYZERS THAT WE JUST LOOKED AT WERE CAPABLE OF RUNNING THIS

01:15PM  15       WIDE RANGE OF TESTS?

01:15PM  16       A.   IN MARCH OF 2012, I DID NOT HAVE THAT KNOWLEDGE.

01:15PM  17       Q.   ON THE RIGHT SIDE OF THE PAGE, UNDER HIGHER QUALITY DATA,

01:15PM  18       THERE'S A BULLET POINT THAT SAYS, "THE UNPRECEDENTED LACK OF

01:15PM  19       VARIATION WITH THERANOS YIELDS HIGHER INTEGRITY DATA AND

01:15PM  20       LONGITUDINAL TRENDING."

01:15PM  21           DO YOU SEE THAT?

01:15PM  22       A.   I DO.

01:15PM  23       Q.   AND WE CAN PUT THAT ASIDE.

01:15PM  24           I'LL ASK YOU TO LOOK AT EXHIBIT 588, PLEASE.

01:16PM  25           DO YOU HAVE 588 IN FRONT OF YOU?

01:16PM   1     A.   I DO.

01:16PM   2     Q.   IS THIS AN EMAIL CHAIN BETWEEN MS. HOLMES AND SOMEONE

01:16PM   3     NAMED ERIN EDGAR?

01:16PM   4     A.   YES.

01:16PM   5              MR. BOSTIC:  YOUR HONOR, I MOVE TO ADMIT

01:16PM   6     EXHIBIT 588.

01:16PM   7              MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

01:16PM   8              THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

01:16PM   9         (GOVERNMENT'S EXHIBIT 588 WAS RECEIVED IN EVIDENCE.)

01:16PM  10     BY MR. BOSTIC:

01:16PM  11     Q.   AND MR. EDLIN, CAN YOU TELL US WHO ERIN EDGAR WAS?

01:16PM  12     A.   COLONEL EDGAR WAS IN U.S. CENTRAL COMMAND.

01:16PM  13     Q.   AND WHAT IS U.S. CENTRAL COMMAND?

01:16PM  14     A.   A DIVISION OF THE DEPARTMENT OF DEFENSE.

01:16PM  15     Q.   AND IS THERE A PARTICULAR GEOGRAPHICAL AREA THAT U.S.

01:16PM  16     CENTRAL COMMAND OVERSEES?

01:16PM  17     A.   I BELIEVE IT'S THE MIDDLE EAST.

01:16PM  18     Q.   DO YOU RECALL HAVING CONVERSATIONS WITH ERIN EDGAR IN

01:16PM  19     CONNECTION WITH POTENTIAL USE OF THERANOS TECHNOLOGY?

01:16PM  20     A.   I'M NOT SURE IF I COMMUNICATED WITH HIM DIRECTLY, BUT I DO

01:17PM  21     RECALL SEEING AND BEING ON EMAILS WHERE -- WITH HIM.

01:17PM  22     Q.   LOOKING AT THE BOTTOM EMAIL IN THIS CHAIN, COLONEL EDGAR

01:17PM  23     EMAILS MS. HOLMES AND SAYS, "ELIZABETH.

01:17PM  24         "I'VE GOTTA UPDATE THE BOSS ON WEDNESDAY ON OUR EFFORT TO

01:17PM  25     GET THE ANALYZERS INTO THE THEATRE."

EDLIN DIRECT BY MR. BOSTIC (RES.)                         4044

01:17PM  1        AND THE SUBJECT LINE SAYS THERANOS UPDATE TO

01:17PM  2   GENERAL MATTIS.

01:17PM  3        DO YOU SEE THAT?

01:17PM  4   A.   YES.

01:17PM  5   Q.   AND WHAT DO YOU RECALL AROUND THIS TIME ABOUT ONGOING

01:17PM  6   EFFORTS TO GET THE ANALYZERS INTO THEATRE WITH CENTCOM?

01:17PM  7   A.   SIMILAR TO THE WORK THAT WAS DONE WITH SPECIAL OPERATIONS

01:17PM  8   COMMAND, THERE WAS A SET OF EVALUATIVE STEPS THAT THERANOS AND

01:17PM  9   U.S. CENTRAL COMMAND WERE TRYING TO PLAN WITH THE GOAL OF

01:18PM 10   HAVING THERANOS TESTING, YOU KNOW, ULTIMATELY AVAILABLE IN

01:18PM 11   HOSPITALS, I BELIEVE IT WAS IN AFGHANISTAN.

01:18PM 12        BUT FIRST THE RESEARCH PROCESS REQUIRED EVALUATIVE STEPS

01:18PM 13   AND COMPARATIVE STUDIES BETWEEN THERANOS TESTING AND AVAILABLE

01:18PM 14   TESTING AT THE MILITARY.

01:18PM 15   Q.   WAS THAT EVALUATION A PREREQUISITE TO ACTUAL CLINICAL USE

01:18PM 16   BY THE MILITARY BASED ON YOUR UNDERSTANDING?

01:18PM 17   A.   YES.   THERE WAS ALSO SOME SECURITY RELATED TESTING THAT

01:18PM 18   WAS ALSO A PREREQUISITE.

01:18PM 19   Q.   LET'S LOOK AT EXHIBIT 1027, AND WE'RE MOVING FROM APRIL

01:18PM 20   AHEAD A FEW MONTHS.   LET ME KNOW WHEN YOU HAVE 1027 IN FRONT OF

01:18PM 21   YOU.

01:19PM 22   A.   I DO.

01:19PM 23   Q.   AND IS 1027 AN EMAIL BETWEEN YOU, REPRESENTATIVES OF

01:19PM 24   CENTCOM, AND THEN INCLUDING ELIZABETH HOLMES AT THE TOP?

01:19PM 25   A.   YES.

01:19PM  1              MR. BOSTIC:  YOUR HONOR, I OFFER 1027.

01:19PM  2              MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

01:19PM  3              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:19PM  4         (GOVERNMENT'S EXHIBIT 1027 WAS RECEIVED IN EVIDENCE.)

01:19PM  5              BY MR. BOSTIC:  AND IF WE CAN START ON PAGE 5 OF

01:19PM  6    THIS EXHIBIT.  AND IF WE CAN ZOOM IN ON THE MESSAGE IN THE

01:19PM  7    MIDDLE OF THE PAGE.

01:19PM  8    Q.   MR. EDLIN, IS THIS FURTHER COMMUNICATION IN ATTEMPTS TO

01:19PM  9    TRY TO GET THE THERANOS ANALYZERS IN CENTCOM'S HANDS FOR

01:19PM 10    EVALUATION?

01:19PM 11    A.   YES.

01:19PM 12    Q.   AND SOMEONE NAMED MARTIN DRAKE WITH CENTCOM EMAILS

01:20PM 13    MS. HOLMES AND IDENTIFIES HIMSELF AS THE SCIENCE ADVISOR WITH

01:20PM 14    U.S. CENTRAL COMMAND.

01:20PM 15         DO YOU SEE THAT?

01:20PM 16    A.   YES.

01:20PM 17    Q.   HE SAYS, "GENERAL MATTIS CHARGED OUR COMMAND SURGEON AND

01:20PM 18    ME TO CONDUCT INVESTIGATION INTO THE COMPARATIVE BENEFITS OF

01:20PM 19    YOUR TECHNOLOGY."

01:20PM 20         DO YOU SEE THAT?

01:20PM 21    A.   I DO.

01:20PM 22    Q.   A COUPLE LINES DOWN, HE SAYS, "REGRETTABLY THE WINDOW OF

01:20PM 23    OPPORTUNITY IS CLOSING FOR ME TO BE ABLE TO CONTINUE TO

01:20PM 24    DEDICATE RESOURCES TO THIS EXPERIMENT.  FUNDING IS EXPIRING AND

01:20PM 25    PERSONNEL ARE BEING RE-DIRECTED TO OTHER ONGOING PROJECTS."

01:20PM  1          HAD THIS PROJECT BEEN IN THE WORKS FOR SOME TIME AT THIS

01:20PM  2     POINT?

01:20PM  3     A.   YES.

01:20PM  4     Q.   AND WHAT WAS YOUR SENSE AT THIS TIME AS TO WHY THERE HAD

01:20PM  5     BEEN DELAYS, OR WHAT THE REASON WAS THAT IT HADN'T MOVED PAST

01:20PM  6     THE POINT OF WHERE IT WAS AT?

01:21PM  7     A.   I'M NOT SURE IF I KNOW EXACTLY WHY OR IF I COULD PINPOINT

01:21PM  8     EXACTLY WHY, BUT THERE WAS THIS FUNDING OPPORTUNITY THAT WAS

01:21PM  9     CLOSING AND THE PERSONNEL WERE GOING ON TO OTHER PROJECTS, SO

01:21PM 10     WE JUST DIDN'T HAVE ENOUGH TIME TO COMPLETE, TO COMPLETE THE

01:21PM 11     STUDY.

01:21PM 12     Q.   LET'S LOOK AT PAGE 1 OF THIS EXHIBIT, AND LET'S ZOOM IN ON

01:21PM 13     THE MESSAGE IN THE MIDDLE OF THE PAGE.

01:21PM 14          HERE'S ANOTHER MESSAGE FROM MARTIN DRAKE.

01:21PM 15          DO YOU SEE THAT?

01:21PM 16     A.   YES.

01:21PM 17     Q.   AND IN THE SECOND FULL PARAGRAPH OF HIS MESSAGE, HE SAYS,

01:21PM 18     "IN ORDER FOR US TO REQUEST RESOURCES IN FINANCIAL YEAR '14 TO

01:21PM 19     CONDUCT THIS LOE, WE WILL REQUIRE A FIRM COMMITMENT FROM YOU

01:21PM 20     WHEN THERANOS WILL BE AVAILABLE, IN THEATRE, AND READY FOR

01:21PM 21     TEST."

01:21PM 22          DO YOU SEE THAT?

01:21PM 23     A.   YES.

01:21PM 24     Q.   AND THAT ABBREVIATION HE USES LOE.  DO YOU RECALL WHAT

01:22PM 25     THAT STANDS FOR?

01:22PM    1      A.   IT STANDS FOR LIMITED OBJECTIVE EXPERIMENT.

01:22PM    2      Q.   AND WOULD THIS LIMITED OBJECTIVE EXPERIMENT BE ACTUAL

01:22PM    3   CLINICAL USE OF THE THERANOS ANALYZER IN THE TREATMENT OF

01:22PM    4   SOLDIERS, OR MERELY EVALUATION?

01:22PM    5      A.   EVALUATION.

01:22PM    6      Q.   HIS EMAIL GOES ON TO SAY, "PLEASE PICK A DATE IN CALENDAR

01:22PM    7   YEAR 2014 WHEN YOU KNOW BEYOND DOUBT YOU WILL BE READY TO

01:22PM    8   TEST."

01:22PM    9        DO YOU SEE THAT?

01:22PM   10      A.   I DO.

01:22PM   11      Q.   DID YOU HAVE A CONVERSATION WITH MS. HOLMES ABOUT HOW TO

01:22PM   12   RESPOND TO THIS REQUEST FROM THE MILITARY FOR A DATE CERTAIN?

01:22PM   13      A.   I DID, YES.

01:22PM   14      Q.   AND WHAT DIRECTION DID YOU GET FROM MS. HOLMES?

01:22PM   15      A.   THE DIRECTION I GOT WAS FIRST TO I THINK CONSULT WITH AND

01:23PM   16   SPEAK TO ONE OF THE -- I DON'T KNOW IF I SPOKE TO HIM DIRECTLY

01:23PM   17   OR IF HE SPOKE TO ELIZABETH, BUT HE WAS ONE OF THE SYSTEMS

01:23PM   18   ENGINEERING LEADS, SAM ANEKAL, AND HE WAS NOTIFIED OF THIS

01:23PM   19   PLAN, AND I WAS DIRECTED TO PROVIDE A DATE OF I BELIEVE IT WAS

01:23PM   20   A YEAR LATER, AUGUST OF 2014.

01:23PM   21      Q.   THANK YOU.  SORRY TO TALK OVER YOU.

01:23PM   22        LET'S LOOK AT THAT.

01:23PM   23      A.   OKAY.

01:23PM   24      Q.   IN THE TOP EMAIL ON THIS PAGE.

01:23PM   25        LOOKING AT THE PARAGRAPH THAT SAYS, "LOOKING AHEAD TO

EDLIN DIRECT BY MR. BOSTIC (RES.)                           4048

01:23PM   1    2014."

01:23PM   2         DO YOU SEE THAT?

01:23PM   3    A.   YES.

01:23PM   4    Q.   IT SAYS, "WE WOULD BE ABLE TO DELIVER ALL OF OUR EQUIPMENT

01:23PM   5    TO THEATRE AND BEGIN TESTING BY AUGUST 1ST."

01:23PM   6         DO YOU SEE THAT?

01:23PM   7    A.   I DO.

01:23PM   8    Q.   WAS IT MS. HOLMES'S DIRECTION TO YOU THAT YOU SHOULD

01:24PM   9    PROPOSE A DATE ONE YEAR OUT FOR THE DATE WHEN THERANOS COULD BE

01:24PM  10    READY FOR THE TEST?

01:24PM  11    A.   YES.

01:24PM  12    Q.   WHEN IT CAME TO THE CENTCOM RELATIONSHIP AND THOSE

01:24PM  13    CONTACTS, WAS THERE A POINT AT WHICH A THERANOS DEVICE ACTUALLY

01:24PM  14    WENT TO A MILITARY BASE?

01:24PM  15    A.   NOT TO MY KNOWLEDGE.

01:24PM  16    Q.   WAS THERE A POINT WHERE THE THERANOS DEVICE WAS BROUGHT TO

01:24PM  17    A MILITARY FACILITY FOR CYBER TESTING?

01:24PM  18    A.   YES.

01:24PM  19    Q.   WHAT DO YOU RECALL ABOUT THAT?

01:24PM  20    A.   I RECALL VISITING THE MACDILL AIR FORCE BASE IN TAMPA,

01:24PM  21    FLORIDA.  CHRISTIAN HOLMES AND I WENT DOWN TO WORK WITH CYBER

01:24PM  22    SECURITY TESTING TEAM THERE.

01:25PM  23         I BELIEVE WE TRAVELED WITH TWO THERANOS DEVICES, AND THEY

01:25PM  24    WERE BROUGHT TO A TESTING FACILITY, AND SECURITY TESTING, AND

01:25PM  25    THEY UNDERWENT SECURITY TESTING.

01:25PM 1    Q.   DID THAT TESTING HAVE ANYTHING TO DO WITH THE CLINICAL

01:25PM 2    PERFORMANCE OF THE ANALYZER?

01:25PM 3    A.   NO.  IT WAS MORE -- I THINK THE GOAL OF THAT TESTING WAS

01:25PM 4    TO MAKE SURE THAT IF A THERANOS DEVICE WENT ON TO THE MILITARY

01:25PM 5    SERVER, THAT IT WOULD BE SECURE AND WOULDN'T HAVE SECURITY

01:25PM 6    VULNERABILITIES.

01:25PM 7    Q.   AS PART OF THAT TESTING, WERE THERE ANY BLOOD SAMPLES OR

01:25PM 8    ACTUAL ANALYSES PERFORMED BY THE DEVICE?

01:25PM 9    A.   NO.

01:25PM 10   Q.   AS PART OF THE CONVERSATIONS WITH CENTCOM, TO YOUR

01:25PM 11   KNOWLEDGE, WAS A DEVICE EVER SENT TO A MILITARY BASE IN THE

01:26PM 12   MIDDLE EAST?

01:26PM 13   A.   NOT TO MY KNOWLEDGE.

01:26PM 14   Q.   DO YOU RECALL SEPARATE DEALINGS BETWEEN THERANOS AND A

01:26PM 15   COMPONENT OF THE MILITARY CALLED AFRICOM?

01:26PM 16   A.   YES, I DO.

01:26PM 17   Q.   AND WHAT WAS AFRICOM?

01:26PM 18   A.   AFRICOM WAS A COMPONENT OF THE DEPARTMENT OF DEFENSE IN

01:26PM 19   AFRICA, SO AFRICA COMMAND.

01:26PM 20   Q.   AND SO WAS THERE A POINT AT WHICH THERANOS DEVICES WERE

01:26PM 21   GIVEN TO REPRESENTATIVES FROM AFRICOM?

01:26PM 22   A.   YES.

01:26PM 23   Q.   AND WHAT DO YOU REMEMBER ABOUT THAT?

01:26PM 24   A.   I RECALL THAT AFTER AN IN-PERSON MEETING WITH LIEUTENANT

01:26PM 25   COLONEL IN AFRICA COMMAND, THERE WAS INTEREST IN PURSUING A

01:26PM  1    RESEARCH STUDY WITH THERANOS, AND FOLLOWING THAT MEETING, WE

01:27PM  2    DID ENGAGE IN A PROOF OF CONCEPT STUDY FOR THE LIEUTENANT

01:27PM  3    COLONEL TO GET EXPERIENCE USING THERANOS DEVICES AT A TRAINING

01:27PM  4    SITE IN AFRICA.

01:27PM  5    Q.   AND DID THE DEVICE ACTUALLY TRAVEL TO AFRICA FOR USE AT

01:27PM  6    THAT TRAINING SITE?

01:27PM  7    A.   IT DID.

01:27PM  8    Q.   DID THAT USE INVOLVE THE ACTUAL CLINICAL TESTING OF

01:27PM  9    PATIENT SAMPLES BY THE MILITARY?

01:27PM  10   A.   THAT'S NOT MY UNDERSTANDING OF IT.

01:27PM  11   Q.   AND DID THAT USE INVOLVE ANY CLINICAL USE OF THE DEVICE?

01:27PM  12   IN OTHER WORDS, DID DOCTORS LOOK AT THE RESULTS AND RELY ON

01:27PM  13   THEM TO MAKE TREATMENT DECISIONS FOR PATIENTS?

01:27PM  14   A.   NO.

01:27PM  15   Q.   I'LL ASK YOU TO TURN IN YOUR BINDER TO EXHIBIT 5435.

01:28PM  16        AND FOR THE COURT AND THE DEFENSE, THIS MAY BE IN THE RED

01:28PM  17   WELD.

01:28PM  18        MR. EDLIN, DO YOU HAVE EXHIBIT 5435 IN FRONT OF YOU?

01:28PM  19   A.   YES.

01:28PM  20   Q.   AND IS THIS AN EMAIL CHAIN INCLUDING YOU, MS. HOLMES --

01:28PM  21   ACTUALLY JUST BETWEEN YOU AND MS. HOLMES RELATING TO THAT

01:28PM  22   AFRICOM CONTACT?

01:28PM  23   A.   YES.

01:28PM  24        MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

01:28PM  25   EXHIBIT 5435.

01:28PM    1              MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

01:28PM    2              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:28PM    3              (GOVERNMENT'S EXHIBIT 5435 WAS RECEIVED IN EVIDENCE.)

01:28PM    4         BY MR. BOSTIC:

01:28PM    5         Q.   AFTER THE AFRICOM USE, DO YOU RECALL SOME DISCUSSION

01:28PM    6    WITHIN THERANOS ABOUT THE EDISON'S TEMPERATURE MEASUREMENT?

01:29PM    7         A.   YES.

01:29PM    8         Q.   AND HOW DID THAT TOPIC COME UP?

01:29PM    9         A.   WELL, THE TEMPERATURE CONDITIONS IN AFRICA AND AT THE

01:29PM   10    TRAINING SITES INCLUDED HIGH TEMPERATURES, AND THE LIEUTENANT

01:29PM   11    COLONEL WAS INTERESTED IN DATA TO REPRESENT HOW THE THERANOS

01:29PM   12    DEVICES PERFORMED IN THOSE HIGH TEMPERATURES.

01:29PM   13              AND AT ONE POINT I COMMUNICATED WITH VARIOUS DEPARTMENT

01:29PM   14    HEADS IN THERANOS TO UNDERSTAND WHETHER THAT DATA HAD BEEN

01:29PM   15    GENERATED OR IF IT EXISTED.

01:29PM   16         Q.   AND WERE YOU ABLE TO FIND DATA TO RESPOND TO THE INQUIRY

01:29PM   17    FROM THE MILITARY WHEN IT CAME TO THAT TEMPERATURE ISSUE?

01:29PM   18         A.   I WAS, I WAS SENT SUMMARIES OF THE DATA, BUT I DON'T

01:30PM   19    BELIEVE THAT IT WAS ACTUALLY SENT TO THE MILITARY.

01:30PM   20         Q.   LET'S LOOK AT PAGE 4 OF THIS EXHIBIT.

01:30PM   21              MR. EDLIN, DO YOU SEE AN EMAIL FROM YOU TO

01:30PM   22    ELIZABETH HOLMES ON MARCH 28TH, 2013?

01:30PM   23         A.   YES.

01:30PM   24         Q.   AND DOES THIS RELATE TO THE TOPIC THAT WE'VE BEEN

01:30PM   25    DISCUSSING?

01:30PM  1    A.   YES.

01:30PM  2    Q.   THIS EMAIL CONTAINS INFORMATION ABOUT THE EDISON'S

01:30PM  3    TEMPERATURE MANAGEMENT CAPABILITIES; IS THAT RIGHT?

01:30PM  4    A.   THAT'S RIGHT.

01:30PM  5    Q.   AT THE BOTTOM OF THE SELECTION HERE, THERE'S INFORMATION

01:30PM  6    AND IT LOOKS LIKE IT CAME FROM GARY.  DO YOU RECALL WHO GARY

01:30PM  7    WAS AT THERANOS?

01:30PM  8    A.   GARY WAS A SCIENTIST, AND HE HAD BEEN WITH THE COMPANY FOR

01:30PM  9    A NUMBER OF YEARS.

01:30PM 10    Q.   THERE'S A QUOTE BELOW HIS NAME THAT SAYS, "NOPE, THE

01:31PM 11    EDISON DID NOT HAVE A WAY TO COOL DOWN.  THEY WOULD HAVE SHUT

01:31PM 12    DOWN."

01:31PM 13         DO YOU SEE THAT?

01:31PM 14    A.   I DO.

01:31PM 15    Q.   IS THAT INFORMATION THAT YOU GOT ABOUT THE EDISON'S

01:31PM 16    CAPABILITIES?

01:31PM 17    A.   YES.

01:31PM 18    Q.   LET'S LOOK BELOW THAT AT THE NEXT SET OF BULLET POINTS.

01:31PM 19         BELOW THE NAME TONY, THERE'S A QUOTE THAT SAYS, "THE

01:31PM 20    EDISON 3.0 FOR VARIOUS REASONS OPERATES IN A FAIRLY NARROW

01:31PM 21    INDOOR AMBIENT TEMPERATURE RANGE OF 22 TO 28 DEGREES CELSIUS.

01:31PM 22    72 TO 82 DEGREES FAHRENHEIT."

01:31PM 23         DO YOU SEE THAT?

01:31PM 24    A.   I DO.

01:31PM 25    Q.   AND BELOW THAT IT SAYS, "LOWER THAN THIS REQUIRED TOO LONG

01:31PM   1      TO REACH INTERNAL OPERATING TEMPERATURE.

01:31PM   2           "HIGHER THAN THIS, WE HAVE NO WAY TO COOL THE DEVICE."

01:31PM   3           DO YOU SEE THAT?

01:31PM   4      A.   I DO.

01:31PM   5      Q.   IS THIS INDICATING THAT THE EDISON NEEDS TO BE KEPT IN A

01:31PM   6      TEMPERATURE RANGE OF 72 TO 82 DEGREES TO FUNCTION PROPERLY?

01:31PM   7      A.   THAT SEEMS TO BE WHAT THIS DESCRIPTION INDICATES, YES.

01:32PM   8      Q.   AND DOES THE MILITARY IN THE MIDDLE EAST AND IN AFRICA

01:32PM   9      OPERATE IN SOME AREAS WHERE IT GETS MUCH COLDER THAN 72 DEGREES

01:32PM   10     AND MUCH HOTTER THAN 82 DEGREES, IF YOU KNOW?

01:32PM   11     A.   I KNOW THAT IT GETS MUCH HOTTER.

01:32PM   12     Q.   DID THE CONVERSATIONS WITH AFRICOM EVER RESULT IN CLINICAL

01:32PM   13     USE ON PATIENTS OF THE THERANOS ANALYZER?

01:32PM   14     A.   NOT TO MY KNOWLEDGE.

01:32PM   15     Q.   THINKING OF ALL OF YOUR CONTACTS WITH THE MILITARY DURING

01:32PM   16     YOUR TIME AT THERANOS AND ALL OF YOUR KNOWLEDGE, TO YOUR

01:32PM   17     KNOWLEDGE, WAS THE THERANOS ANALYZER EVER USED BY THE MILITARY

01:32PM   18     CLINICALLY IN THE TREATMENT OF DEPLOYED SOLDIERS?

01:32PM   19     A.   NOT TO MY KNOWLEDGE.

01:32PM   20     Q.   TO YOUR KNOWLEDGE, WAS THE THERANOS ANALYZER EVER DEPLOYED

01:33PM   21     TO A BATTLEFIELD OR A WAR ZONE FOR CLINICAL USE?

01:33PM   22     A.   NOT TO MY KNOWLEDGE.

01:33PM   23     Q.   TO YOUR KNOWLEDGE, WAS THE THERANOS ANALYZER EVER SENT TO

01:33PM   24     THE MIDDLE EAST BY THE MILITARY AT ALL?

01:33PM   25     A.   NOT TO MY KNOWLEDGE.

01:33PM 1    Q.   AND TO YOUR KNOWLEDGE, DID THE MILITARY EVER INSTALL A

01:33PM 2    THERANOS ANALYZER ON A MEDEVAC OR OTHER MILITARY HELICOPTER?

01:33PM 3    A.   NOT TO MY KNOWLEDGE.

01:33PM 4         MR. BOSTIC:  YOUR HONOR, THIS MIGHT BE A GOOD TIME

01:33PM 5    FOR A BREAK.

01:33PM 6         THE COURT:  YOU HAVE ADDITIONAL EXAMINATION?

01:33PM 7         MR. BOSTIC:  I DO.  NOT MUCH, BUT SOME.

01:33PM 8         THE COURT:  OKAY.  LET'S TAKE OUR AFTERNOON RECESS,

01:33PM 9    LADIES AND GENTLEMEN.  WE'LL TAKE 30 MINUTES, AND WE'LL BE

01:33PM 10   BACK.

01:33PM 11        YOU CAN STAND DOWN, SIR.

01:33PM 12        (RECESS TAKEN AT 1:33 P.M.)

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

01:33PM  1                        **AFTERNOON SESSION**

02:04PM  2          (JURY IN AT 2:03 P.M.)

02:04PM  3              THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.  PLEASE

02:04PM  4      BE SEATED.

02:04PM  5          WE'RE BACK ON THE RECORD.  THE JURY IS PRESENT.  COUNSEL

02:04PM  6      AND MS. HOLMES ARE PRESENT.

02:04PM  7          MR. BOSTIC.

02:04PM  8              MR. BOSTIC:  THANK YOU, YOUR HONOR.

02:04PM  9      Q.   MR. EDLIN, WHEN WE STOPPED FOR THE BREAK, WE WERE

02:04PM  10     DISCUSSING THE VARIOUS CONTACTS THAT THERANOS HAD HAD WITH THE

02:04PM  11     MILITARY.

02:04PM  12         DO YOU RECALL THAT TESTIMONY?

02:04PM  13     A.   YES.

02:04PM  14     Q.   AND WE TALKED ABOUT HOW NONE OF THOSE CONTACTS RESULTED IN

02:04PM  15     ACTUAL CLINICAL USE OF THE ANALYZER; IS THAT CORRECT?

02:04PM  16     A.   YES.

02:04PM  17     Q.   DID YOU EVER DISCUSS WITH MS. HOLMES THE REASON WHY NONE

02:04PM  18     OF THOSE ENGAGEMENTS WENT BEYOND THE POINTS THAT THEY DID?

02:04PM  19     A.   THERE WAS A DISCUSSION DURING THE PROCESS OF WHY CERTAIN

02:04PM  20     THINGS COULD NOT GET INITIATED AT THAT TIME, AT THOSE TIMES.

02:05PM  21     Q.   SORRY.  AND WHAT, IF ANYTHING, DO YOU RECALL MS. HOLMES

02:05PM  22     TELLING YOU ABOUT THAT?

02:05PM  23     A.   IT WAS MY UNDERSTANDING, BASED ON CONVERSATIONS WITH

02:05PM  24     ELIZABETH, THAT THE RESOURCES REQUIRED TO SUPPORT THOSE

02:05PM  25     PROGRAMS WERE DIRECTED IN SUPPORT OF THE CLINICAL LAUNCH WITH

02:05PM   1    WALGREENS AND THE RETAIL LAUNCH.

02:05PM   2    Q.   IN OTHER WORDS, THERANOS COULDN'T DO BOTH THINGS AT ONCE,

02:05PM   3    PROCEED WITH THE COMMERCIAL LAUNCH AND MOVE FORWARD WITH THE

02:05PM   4    MILITARY PROJECT?

02:05PM   5    A.   WELL, THE MILITARY PROJECTS WOULD HAVE REQUIRED CERTAIN

02:05PM   6    RESOURCES BEING ALLOCATED THERE AND THEY NEVER WERE IN A WAY

02:05PM   7    THAT WOULD SUPPORT THOSE PROGRAMS.

02:05PM   8    Q.   DID MS. HOLMES EVER TELL YOU THAT PART OF THE REASON WHY

02:05PM   9    THOSE PROJECTS NEVER GOT OFF THE GROUND HAD SOMETHING TO DO

02:05PM   10   WITH LIMITATIONS IN THE CAPABILITIES OF THE THERANOS ANALYZER?

02:06PM   11   A.   SHE DID NOT TELL ME THAT.

02:06PM   12   Q.   AS PART OF YOUR EMPLOYMENT AT THERANOS, DID YOU HAVE

02:06PM   13   OPPORTUNITIES TO OBSERVE MS. HOLMES AND MR. BALWANI WORKING

02:06PM   14   TOGETHER?

02:06PM   15   A.   I DID.

02:06PM   16   Q.   HOW DID YOU HAVE THOSE OPPORTUNITIES?

02:06PM   17   A.   ON SEVERAL OCCASIONS I WAS IN MEETINGS WITH THE TWO OF

02:06PM   18   THEM AND OBSERVED THEM WORKING AND INTERACTING.

02:06PM   19   Q.   AND WHERE WAS YOUR DESK OR OFFICE LOCATED IN RELATION TO

02:06PM   20   MR. BALWANI'S AND MS. HOLMES'S OFFICES?

02:06PM   21   A.   SO IN MY TIME AT THERANOS I WAS IN THREE DIFFERENT

02:06PM   22   OFFICES, AND IN THE FIRST TWO OFFICES MY DESK WAS IN A POD OF

02:06PM   23   OTHER DESKS THAT WERE OUTSIDE OF THEIR TWO OFFICES.  I THINK IN

02:07PM   24   ALL THREE BUILDINGS BOTH ELIZABETH AND SUNNY'S OFFICE WERE NEXT

02:07PM   25   DOOR TO EACH OTHER AND THEY HAD GLASS DOORS, THEY COULD -- OR

02:07PM 1    GLASS WALLS SO YOU COULD SEE INSIDE.

02:07PM 2        AND IN THE THIRD BUILDING I WAS IN, I WAS DOWN THE HALL

02:07PM 3    FROM THEIR OFFICES.

02:07PM 4    Q.   AND DID THAT PROXIMITY GIVE YOU MORE OPPORTUNITIES TO SEE

02:07PM 5    HOW THEY WORKED TOGETHER?

02:07PM 6    A.   IT GAVE ME OPPORTUNITIES TO SEE WHAT WAS HAPPENING IN

02:07PM 7    THEIR OFFICES AND THEY OFTENTIMES, YOU KNOW, ATE LUNCH TOGETHER

02:07PM 8    AND WERE IN DISCUSSION WITH ONE ANOTHER.

02:07PM 9    Q.   SO BESIDES THEM, YOU SAID, EATING LUNCH TOGETHER AND BEING

02:07PM 10   IN DISCUSSION WITH EACH OTHER, WAS THERE ANYTHING ELSE THAT

02:07PM 11   STANDS OUT TO YOU ABOUT THEIR WORKING RELATIONSHIP AND THE WAY

02:07PM 12   THEY WORKED TOGETHER AT THE COMPANY?

02:07PM 13   A.   NOTHING REALLY STANDS OUT.

02:08PM 14   Q.   HOW ABOUT THE DYNAMIC BETWEEN THEM?  DID THEY OPERATE,

02:08PM 15   FROM WHAT YOU SAW, AS CO-EQUALS IN THE COMPANY WITH THE SAME

02:08PM 16   LEVEL OF AUTHORITY OR WAS ONE IN CHARGE COMPARED TO THE OTHER?

02:08PM 17   A.   I WAS IN MEETINGS WHERE SUNNY, SUNNY SAID THAT HE WOULD

02:08PM 18   DEFER TO ELIZABETH ON CERTAIN THINGS AND GENERALLY, YOU KNOW,

02:08PM 19   ELIZABETH WAS THE CEO, AND I THINK SHE HAD KIND OF THE FINAL

02:08PM 20   DECISION MAKING AUTHORITY.

02:08PM 21       BUT I WAS ONLY PRESENT WITH THE TWO OF THEM IN KIND OF A

02:08PM 22   SUBSET OF THEIR INTERACTIONS.

02:08PM 23   Q.   DURING THOSE INTERACTIONS, DO YOU RECALL EVER SEEING THEM

02:08PM 24   DISAGREE ABOUT ANYTHING WHEN IT CAME TO OPERATION OF THE

02:08PM 25   COMPANY?

02:08PM  1     A.   I DID SEE THEM DISAGREE ABOUT, I'M NOT SURE IF I COULD

02:09PM  2     CONSIDER IT THE OPERATION, BUT ABOUT CERTAIN TOPICS.

02:09PM  3     Q.   OKAY.  AND TOPICS RELATED TO THERANOS?

02:09PM  4     A.   RIGHT.

02:09PM  5     Q.   AND WHEN THERE WERE DISAGREEMENTS BETWEEN THE TWO OF THEM,

02:09PM  6     WHEN THEY SAW THINGS DIFFERENTLY, WHICH ONE OF THEM WAS IN

02:09PM  7     CHARGE?  WHICH ONE OF THEM MADE THE FINAL DECISION IF YOU

02:09PM  8     RECALL?

02:09PM  9     A.   I DON'T RECALL THAT THERE WAS ALWAYS NECESSARILY A

02:09PM  10    DECISION THAT WAS MADE.  SOMETIMES THERE WAS A DISCUSSION THAT

02:09PM  11    WAS LEFT UNRESOLVED, BUT I DID HEAR TIMES WHEN SUNNY WOULD

02:09PM  12    DEFER TO ELIZABETH.

02:09PM  13    Q.   DID YOU EVER SEE MR. BALWANI OVERRULE MS. HOLMES WHEN IT

02:09PM  14    CAME TO SOMETHING ABOUT WHAT WOULD HAPPEN AT THERANOS?

02:09PM  15    A.   I THINK THERE WERE CERTAIN SUBJECTS WHERE HE HAD MORE OF

02:09PM  16    AN EXPERTISE BUT -- I'M SORRY, WHAT WAS THE QUESTION THERE?

02:10PM  17    Q.   THE QUESTION WAS WHETHER YOU EVER SAW HIM OVERRULE HER,

02:10PM  18    OVERRULE A DECISION THAT SHE HAD MADE AT THERANOS?

02:10PM  19    A.   I CAN'T RECALL A SPECIFIC MOMENT, BUT I AM -- YEAH, I

02:10PM  20    CAN'T THINK OF ONE THAT I CAN REMEMBER OFF THE TOP OF MY HEAD.

02:10PM  21    Q.   HOW ABOUT THEIR PERSONAL RELATIONSHIP.  WHEN YOU WERE

02:10PM  22    WORKING AT THE COMPANY, WERE YOU AWARE THAT THEY WERE

02:10PM  23    ROMANTICALLY INVOLVED?

02:10PM  24    A.   I WAS.

02:10PM  25    Q.   AND HOW DID YOU KNOW THAT?

02:10PM 1    A.   WHEN I WAS FIRST INTRODUCED TO SUNNY WHILE I WAS IN

02:10PM 2    COLLEGE HE WAS INTRODUCED TO ME AS ELIZABETH'S BOYFRIEND.

02:10PM 3    Q.   AND APPROXIMATELY WHAT YEAR WOULD THAT HAVE BEEN?

02:10PM 4    A.   AROUND 2004, 2005.

02:10PM 5    Q.   AND WHEN YOU WERE WORKING AT THE COMPANY, WERE YOU AWARE

02:10PM 6    THAT THEY WERE IN A RELATIONSHIP?

02:10PM 7    A.   YES.

02:10PM 8    Q.   DID YOU EVER HAVE THE OPPORTUNITY TO SPEND TIME WITH THEM

02:11PM 9    SOCIALLY OUTSIDE OF THE OFFICE?

02:11PM 10   A.   YES.

02:11PM 11   Q.   HOW DID THAT HAPPEN?

02:11PM 12   A.   ON SOME OCCASIONS ELIZABETH INVITED CHRISTIAN AND MYSELF

02:11PM 13   AND OTHER MEMBERS OF THE PROJECT MANAGEMENT TEAM OUT TO DINNER

02:11PM 14   OR TO SUNNY'S HOUSE FOR DINNER.

02:11PM 15   Q.   AND WAS MS. HOLMES LIVING WITH MR. BALWANI AT THE TIME?

02:11PM 16   A.   YES.

02:11PM 17   Q.   DURING THOSE INTERACTIONS, WAS THERE ANYTHING THAT STOOD

02:11PM 18   OUT IN YOUR MIND ABOUT THE WAY THAT MS. HOLMES AND MR. BALWANI

02:11PM 19   ACTED TOGETHER?

02:11PM 20   A.   NOT IN PARTICULAR.  IT WAS ALWAYS MORE OF A RELAXED, YOU

02:11PM 21   KNOW, SETTING OUTSIDE OF WORK.  WE DIDN'T REALLY DISCUSS WORK.

02:11PM 22   IT WAS MUCH MORE RELAXED.  SOCIAL.

02:12PM 23          MR. BOSTIC:  MAY I HAVE A MOMENT, YOUR HONOR?

02:12PM 24          THE COURT:  YES.

02:12PM 25          (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

02:12PM  1              MR. BOSTIC:  THANK YOU, YOUR HONOR.

02:12PM  2          NO FURTHER QUESTIONS AT THIS TIME.

02:12PM  3              THE COURT:  ALL RIGHT.  THANK YOU.

02:12PM  4          CROSS-EXAMINATION?

02:12PM  5              MR. DOWNEY:  YOUR HONOR, MAY I JUST TAKE A MOMENT TO

02:12PM  6  GET SET UP?

02:12PM  7              THE COURT:  YES.

02:12PM  8          (PAUSE IN PROCEEDINGS.)

02:13PM  9              MR. DOWNEY:  MAY I APPROACH THE WITNESS, YOUR HONOR?

02:13PM 10              THE COURT:  YES.  THANK YOU.

02:13PM 11              MR. DOWNEY:  (HANDING.)

02:13PM 12                          **CROSS-EXAMINATION**

02:13PM 13  BY MR. DOWNEY:

02:13PM 14  Q.  GOOD AFTERNOON, MR. EDLIN.  MY NAME IS KEVIN DOWNEY, AND I

02:13PM 15  REPRESENT MS. HOLMES.

02:13PM 16      I WANT TO START --

02:13PM 17  A.  HELLO.

02:13PM 18  Q.  THANK YOU.  I WANT TO START BY ASKING YOU ABOUT THE

02:13PM 19  TECHNOLOGY AT THERANOS AND TRYING TO GET THE VARIOUS FORMS OF

02:13PM 20  TECHNOLOGY STRAIGHT SO IT'S CLEAR.

02:13PM 21      FIRST OF ALL, YOU REMEMBER THAT THERE WAS A -- WELL, I

02:13PM 22  SHOULD START BY SAYING YOU YOURSELF WERE NOT AN EXPERT IN THE

02:13PM 23  TECHNOLOGY; CORRECT?

02:13PM 24  A.  CORRECT.

02:13PM 25  Q.  YOU WERE A RELATIVELY RECENT COLLEGE GRADUATE WHEN YOU

02:14PM  1    STARTED AT THERANOS?

02:14PM  2    A.   THAT'S RIGHT.

02:14PM  3    Q.   AND YOU -- I THINK YOUR MAJOR WAS IN PUBLIC POLICY?

02:14PM  4    A.   THAT'S RIGHT.

02:14PM  5    Q.   BUT YOU CAME TO BE FAMILIAR WITH THE TECHNOLOGY DURING THE

02:14PM  6    COURSE OF YOUR TIME AT THE COMPANY; IS THAT RIGHT?

02:14PM  7    A.   THAT'S RIGHT.

02:14PM  8    Q.   I WANT TO SHOW YOU SOME PICTURES OF VARIOUS FORMS OF THE

02:14PM  9    TECHNOLOGY AND ASK IF YOU CAN IDENTIFY THEM.

02:14PM  10        FIRST OF ALL, I WANT TO SHOW YOU AN EXHIBIT THAT HAS BEEN

02:14PM  11   PREVIOUSLY ADMITTED AS EXHIBIT 5388.

02:14PM  12        AND THIS IS IN EVIDENCE, YOUR HONOR.

02:14PM  13            THE COURT:  THANK YOU.

02:14PM  14   BY MR. DOWNEY:

02:14PM  15   Q.   IT SHOULD BE ON THE SCREEN.  IT'S ALREADY IN EVIDENCE.

02:14PM  16   A.   OKAY.

02:14PM  17   Q.   DO YOU RECOGNIZE THAT AS A SERIES 3 THERANOS DEVICE?

02:15PM  18   A.   YES, I DO.

02:15PM  19   Q.   AND THIS DEVICE IS A 3.0 DEVICE; CORRECT?

02:15PM  20   A.   I THINK IT COULD BE A 3.0 OR A 3.5.

02:15PM  21   Q.   OKAY.  THE INTERNAL WORKINGS MIGHT BE DIFFERENT, BUT THE

02:15PM  22   EXTERNAL APPEARANCE IS THE SAME BETWEEN A 3.0 AND A 3.5;

02:15PM  23   CORRECT?

02:15PM  24   A.   CORRECT.

02:15PM  25   Q.   AND YOU UNDERSTOOD THAT THE 3.0 HAD THE ABILITY TO PROCESS

02:15PM   1      CERTAIN CLASSES OF ASSAYS; CORRECT?

02:15PM   2      A.   THERE BECAME A TIME WHEN I LEARNED WHAT IT COULD DO,

02:15PM   3      THAT'S RIGHT.

02:15PM   4      Q.   AND YOU UNDERSTOOD THAT THE 3.5 HAD THE CAPACITY TO

02:15PM   5      PROCESS SOME ADDITIONAL ASSAYS; IS THAT RIGHT?

02:15PM   6      A.   I'M NOT SURE I HAD THAT UNDERSTANDING.

02:15PM   7      Q.   OKAY.

02:15PM   8      A.   I KNOW THAT THE INTERNAL COMPONENTS WERE DIFFERENT, WERE

02:15PM   9      UPDATED.

02:15PM   10     Q.   OKAY.  BUT YOU DIDN'T HAVE EXPERTISE IN WHAT ASSAY IS

02:16PM   11     ASSOCIATED WITH WHICH DEVICE OR HOW THEY WORK FROM AN INTERNAL

02:16PM   12     PERSPECTIVE; IS THAT FAIR?

02:16PM   13     A.   I DIDN'T HAVE AN EXPERTISE.

02:16PM   14     Q.   YOU WERE FAMILIAR WITH THE 3.0, BECAUSE IT WAS INVOLVED IN

02:16PM   15     SOME OF THE PROJECTS THAT YOU WERE INVOLVED WITH; CORRECT?

02:16PM   16     A.   IT WAS INVOLVED IN SOME OF THE PROJECTS AND IN MEETINGS

02:16PM   17     AND DEMONSTRATIONS.

02:16PM   18     Q.   OKAY.  FOR EXAMPLE, THE 3.0 WAS INVOLVED IN THE BURN STUDY

02:16PM   19     THAT YOU DISCUSSED WITH MR. BOSTIC; CORRECT?

02:16PM   20     A.   CORRECT.

02:16PM   21     Q.   OKAY.  I'D LIKE YOU TO LOOK IN YOUR NOTEBOOK AT

02:16PM   22     EXHIBIT 7747.

02:16PM   23     A.   I SEE IT.

02:16PM   24     Q.   DO YOU RECOGNIZE THIS DEVICE AS A 4. -- A 4S DEVICE OF

02:17PM   25     THERANOS?

02:17PM   1        A.   YES.

02:17PM   2        Q.   OKAY.

02:17PM   3             YOUR HONOR, I MOVE THE ADMISSION OF EXHIBIT 7747.

02:17PM   4                  MR. BOSTIC:  NO OBJECTION.

02:17PM   5                  THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:17PM   6             (DEFENDANT'S EXHIBIT 7747 WAS RECEIVED IN EVIDENCE.)

02:17PM   7        BY MR. DOWNEY:

02:17PM   8        Q.   AND IS THIS A DEVICE, A DEVICE THAT WAS DEVELOPED

02:17PM   9        SPECIFICALLY IN CONNECTION WITH THERANOS'S WORK WITH THE

02:17PM  10        MILITARY?

02:17PM  11        A.   YES.

02:17PM  12        Q.   LET ME ASK YOU TO LOOK IN YOUR BINDER AT EXHIBIT 13982.

02:18PM  13        A.   JUST A MOMENT.

02:18PM  14        Q.   I CAN GIVE YOU A COPY IF YOU HAVE TROUBLE LOCATING IT.

02:18PM  15        A.   OKAY.  I'VE GOT IT.

02:18PM  16        Q.   IS THIS A SERIES 4.0 DEVICE OF THERANOS?

02:18PM  17        A.   I BELIEVE IT IS, YES.

02:18PM  18                  MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT

02:18PM  19        EXHIBIT 13982.

02:18PM  20                  MR. BOSTIC:  NO OBJECTION.

02:18PM  21                  THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:18PM  22             (DEFENDANT'S EXHIBIT 13982 WAS RECEIVED IN EVIDENCE.)

02:18PM  23        BY MR. DOWNEY:

02:19PM  24        Q.   AND THIS 4.0 DEVICE IS CAPABLE OF RUNNING ONE TEST AT A

02:19PM  25        TIME; IS THAT CORRECT?

02:19PM   1      A.   I'M NOT SURE.

02:19PM   2      Q.   YOU CAME TO LEARN THAT THERE WAS A DIFFERENT VERSION IN

02:19PM   3      THE 4 SERIES CALLED A MINILAB; CORRECT?

02:19PM   4      A.   SO THE MINILAB REFERRED TO TWO DIFFERENT VERSIONS OF THE

02:19PM   5      4 SERIES WHILE I WAS AT THE COMPANY.  INITIALLY THE MINILAB

02:19PM   6      REFERRED TO A STACKED TOWER, AND THEN LATER ON THE MINILAB

02:19PM   7      REFERRED TO THE 4S DEVICE.

02:19PM   8      Q.   WHAT WAS THE DIFFERENCE BETWEEN THE MINILAB AND THIS 4.0

02:19PM   9      DEVICE?

02:19PM   10     A.   BETWEEN THE MINILAB ALSO KNOWN AS THE 4S AND THIS 4.0

02:19PM   11     DEVICE; RIGHT?

02:20PM   12     Q.   THAT'S FAIR, YES.

02:20PM   13     A.   THE 4S WAS SMALLER IN SIZE.

02:20PM   14     Q.   I'M SORRY.  I WAS ASKING YOU WHAT'S THE DIFFERENCE BETWEEN

02:20PM   15     THE 4.0 DEVICE THAT IS ON THE SCREEN.

02:20PM   16     A.   AND THE 4S MINILAB?

02:20PM   17     Q.   LET'S TAKE THEM ONE AT A TIME.

02:20PM   18     A.   OKAY.

02:20PM   19     Q.   WHAT IS THE DIFFERENCE BETWEEN THE 4S AND THE 4.0 DEVICE?

02:20PM   20     A.   THE 4.0 DEVICE WAS ALSO REFERRED TO AS A MONOBAY, AND THE

02:20PM   21     MONOBAY 4.0 WAS LARGER IN SIZE THAN THE 4S.

02:20PM   22     Q.   OKAY.  AND DID THEY HAVE DIFFERENT INTENDED USES?

02:20PM   23     A.   MY UNDERSTANDING WAS THAT THE 4S WAS DEVELOPED BECAUSE IT

02:20PM   24     WAS SMALLER, LIGHTER, AND MORE PORTABLE THAN THE MONOBAY, THAN

02:21PM   25     THIS 4.0.

02:21PM  1    Q.   OKAY.  AND WHAT IS THE DIFFERENCE BETWEEN THE 4.0 AND THE

02:21PM  2    MINILAB TOWER THAT YOU MENTIONED?

02:21PM  3    A.   THE MINILAB TOWER, MY UNDERSTANDING, IS ESSENTIALLY THE

02:21PM  4    SAME COMPONENTS THAT YOU HAVE IN THIS 4.0 STACKED ON TOP OF

02:21PM  5    EACH OTHER.  SO THERE'S ESSENTIALLY FOUR OR FIVE OF THESE

02:21PM  6    STACKED ON ONE ANOTHER.

02:21PM  7    Q.   OKAY.  SO INSTEAD OF RUNNING ONE SAMPLE AT A TIME, THEY

02:21PM  8    HAVE THE CAPACITY TO RUN MULTIPLE SAMPLES AT A TIME?

02:21PM  9    A.   THAT WAS WHAT I WAS TOLD THAT DEVICE WAS DESIGNED TO DO.

02:21PM 10    Q.   OKAY.  LET ME ASK YOU TO LOOK AT EXHIBIT 9790.

02:22PM 11    A.   OKAY.

02:22PM 12    Q.   ARE THE TWO LARGE DEVICES IN THIS PHOTOGRAPH THERANOS

02:22PM 13    MINILABS?

02:22PM 14    A.   THEY APPEAR TO BE.

02:22PM 15         MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

02:22PM 16    9790.

02:22PM 17         MR. BOSTIC:  NO OBJECTION.

02:22PM 18         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:22PM 19    (DEFENDANT'S EXHIBIT 9790 WAS RECEIVED IN EVIDENCE.)

02:22PM 20    BY MR. DOWNEY:

02:22PM 21    Q.   AND IF YOU LOOK AT THIS PHOTOGRAPH YOU SEE THE TWO DEVICES

02:22PM 22    SET UP NEXT TO EACH OTHER.  GIVE US A SENSE OF HOW LARGE THOSE

02:22PM 23    DEVICES ARE?

02:22PM 24    A.   I DON'T RECALL SPECIFICALLY, BUT I THINK THEY WERE IN THE

02:22PM 25    FOUR TO FIVE FEET RANGE.

02:22PM    1    Q.   OKAY.  AND IS THE DEVICE, THE SMALLER DEVICE, THAT FROM

02:23PM    2    OUR PERSPECTIVE IS ON THE LEFT, IS THAT A DIFFERENT 4 SERIES

02:23PM    3    DEVICE?

02:23PM    4    A.   I DON'T KNOW.

02:23PM    5    Q.   DO YOU KNOW WHEN WORK ON THE STACKED TOWER MINILAB BEGAN

02:23PM    6    AT THERANOS?

02:23PM    7    A.   I DON'T KNOW SPECIFICALLY.

02:23PM    8    Q.   BUT ALL OF THESE DEVICES WERE ANALYZERS THAT WERE USED IN

02:23PM    9    CONNECTION WITH ANALYZING BLOOD SAMPLES; CORRECT?

02:23PM   10    A.   ALL OF THESE DEVICES WERE ANALYZERS.  THE -- AND I THINK

02:23PM   11    THEY WERE INTENDED TO BE USED TO ANALYZE SAMPLES, RIGHT, BLOOD

02:23PM   12    SAMPLES, YES.

02:23PM   13    Q.   AND WHAT THEY HAD IN COMMON WAS THAT THE SAMPLES THAT THEY

02:24PM   14    WERE INTENDED TO PROCESS WERE SMALL SAMPLES OF BLOOD; CORRECT?

02:24PM   15    A.   THAT'S MY UNDERSTANDING.  MY UNDERSTANDING IS THAT THEY

02:24PM   16    PROCESSED NANOTAINERS WHICH HAD SMALL SAMPLES.

02:24PM   17    Q.   AND THE NANOTAINERS ARE DEVICES THAT THE BLOOD WAS

02:24PM   18    DEPOSITED INTO AFTER IT WAS DRAWN; CORRECT?

02:24PM   19    A.   RIGHT.

02:24PM   20    Q.   AND THEN THE NANOTAINER WAS PLACED IN THESE DEVICES AND

02:24PM   21    THE BLOOD TEST WAS RUN; CORRECT?

02:24PM   22    A.   IT WAS PLACED INTO A CARTRIDGE, AND THEN THE CARTRIDGE WAS

02:24PM   23    PLACED INTO THESE DEVICES AND RUN.

02:24PM   24    Q.   SO THERE ARE FOUR OR FIVE DIFFERENT PIECES OF HARDWARE

02:24PM   25    THAT WERE REFERENCED DURING YOUR TIME AT THERANOS; CORRECT?

EDLIN CROSS BY MR. DOWNEY

02:24PM  1    A.   CORRECT.

02:24PM  2    Q.   AND TO USE THOSE ANALYZERS TO ANY EFFECT, YOU HAD TO HAVE

02:25PM  3    AN ASSAY, CORRECT, DEVELOPED TO ACTUALLY RUN THE TEST?

02:25PM  4    A.   CAN YOU REPEAT THE QUESTION.

02:25PM  5    Q.   LET ME REPHRASE THE QUESTION TO BE BETTER.

02:25PM  6    A.   YEAH.

02:25PM  7    Q.   AN ASSAY IS THE CHEMISTRY THAT IS USED TO ACTUALLY ANALYZE

02:25PM  8    A SAMPLE OF BLOOD; CORRECT?

02:25PM  9    A.   THAT'S MY UNDERSTANDING.

02:25PM 10    Q.   AND FOR THESE -- IN CONNECTION WITH THESE DEVICES, THE

02:25PM 11    ASSAY IS ON THE CARTRIDGE; RIGHT?  THAT IS DEPOSITED INTO THE

02:25PM 12    DEVICE TO RUN THE TEST; IS THAT CORRECT?

02:25PM 13    A.   MY UNDERSTANDING WAS THAT CERTAIN CHEMICALS WERE ON THE

02:25PM 14    CARTRIDGE, AND THAT ONCE THE CARTRIDGE WAS PLACED INTO THE

02:25PM 15    DEVICE, DIFFERENT COMPONENTS IN THE DEVICE WOULD RUN TESTS

02:25PM 16    USING THOSE MATERIALS.

02:25PM 17    Q.   OKAY.  AND YOU UNDERSTOOD DURING YOUR TIME AT THERANOS

02:25PM 18    THAT DIFFERENT ASSAYS WERE BEING DEVELOPED; CORRECT?

02:25PM 19    A.   CORRECT.

02:25PM 20    Q.   AND AT SOME POINT YOU SAW REPORTS ABOUT THE DEVELOPMENT OF

02:26PM 21    ASSAYS; CORRECT?

02:26PM 22    A.   CORRECT.

02:26PM 23    Q.   AND IN YOUR RESPONSIBILITIES WORKING WITH MS. HOLMES, YOU

02:26PM 24    WERE SOMETIMES RESPONSIBLE FOR MAKING AVAILABLE CERTAIN

02:26PM 25    MATERIALS THAT BUSINESS PARTNERS MIGHT BE INTERESTED IN;

02:26PM  1    CORRECT?

02:26PM  2    A.   CORRECT.

02:26PM  3    Q.   AND SOMETIMES HOSPITALS, FOR EXAMPLE, MIGHT BE INTERESTED

02:26PM  4    IN SEEING THOSE DEVELOPMENT REPORTS; CORRECT?

02:26PM  5    A.   I DON'T RECALL WHETHER A HOSPITAL SAW THE DEVELOPMENT

02:26PM  6    REPORT.  THEY DID SEE A PRESENTATION THAT INCLUDED CLINICAL --

02:26PM  7    IT WAS A CLINICAL OVERVIEW, AND THERE WERE COMPARISONS BETWEEN

02:26PM  8    THERANOS TESTS AND PREDICATE METHODS.

02:27PM  9    Q.   OKAY.  HOW MANY ASSAYS DID YOU SEE DEVELOPMENT REPORTS

02:27PM  10   FOR?

02:27PM  11   A.   I DON'T REMEMBER SPECIFICALLY, BUT IT WAS PROBABLY NORTH

02:27PM  12   OF AT LEAST 40.

02:27PM  13   Q.   OKAY.  AND ANOTHER ELEMENT OF THE TECHNOLOGY THAT YOU

02:27PM  14   UNDERSTOOD THERANOS WAS USING WAS SOFTWARE; CORRECT?

02:27PM  15   A.   YES.

02:27PM  16   Q.   AND SOFTWARE HAD MANY, MANY DIFFERENT PURPOSES IN

02:27PM  17   CONNECTION WITH THE TECHNOLOGY; CORRECT?

02:27PM  18   A.   CORRECT.

02:27PM  19   Q.   SOME OF IT WAS JUST USED TO RUN THE DEVICE; CORRECT?

02:27PM  20   A.   CORRECT.

02:27PM  21   Q.   BUT SOME OF IT WAS USED FOR THINGS LIKE PREDICTIVE

02:27PM  22   MODELING; CORRECT?

02:27PM  23   A.   THAT'S MY UNDERSTANDING, YES.

02:27PM  24   Q.   AND OVER TIME YOU SAW INSTANCES WHERE SOFTWARE ON THE

02:27PM  25   DEVICE WAS MODIFIED; CORRECT?

02:27PM  1    A.   YES.

02:27PM  2    Q.   AND IT MIGHT BE MODIFIED DEPENDING ON THE INTENDED USE OF

02:28PM  3    THE DEVICE; CORRECT?

02:28PM  4    A.   THAT'S RIGHT.

02:28PM  5    Q.   AND ALL OF THE TECHNOLOGIES THAT WE'VE JUST TALKED ABOUT

02:28PM  6    WORKING TOGETHER WERE REFERRED TO IN THERANOS AS THERANOS

02:28PM  7    SYSTEMS; CORRECT?

02:28PM  8    A.   I'M TRYING TO REMEMBER.  I BELIEVE THEY WERE REFERRED TO

02:28PM  9    AS THERANOS SYSTEMS, YES.

02:28PM  10   Q.   OKAY.  AND MUCH OF WHAT YOU'RE RECOUNTING NOW ABOUT THE

02:28PM  11   TECHNOLOGY AT THERANOS IS THINGS THAT YOU LEARNED FROM OTHERS

02:28PM  12   AT THERANOS; CORRECT?

02:28PM  13   A.   THAT'S CORRECT.

02:28PM  14   Q.   AND YOU HAD OCCASION DURING THE COURSE OF YOUR SERVICE AT

02:28PM  15   THERANOS TO INTERACT WITH A HARDWARE TEAM, FOR EXAMPLE?

02:29PM  16   A.   I INTERACTED WITH CERTAIN MEMBERS OF THAT TEAM ON

02:29PM  17   OCCASION.

02:29PM  18   Q.   OKAY.  I THINK YOU MENTIONED ON DIRECT AN INTERACTION WITH

02:29PM  19   DR. ANEKAL; IS THAT RIGHT?

02:29PM  20   A.   THAT'S RIGHT.

02:29PM  21   Q.   AND YOUR INTERACTIONS WITH THEM WOULD LARGELY BE AROUND

02:29PM  22   GATHERING INFORMATION EITHER AT MS. HOLMES'S REQUEST OR IN

02:29PM  23   CONNECTION WITH SOMETHING RELATED TO WHAT SHE WAS DOING; IS

02:29PM  24   THAT RIGHT?

02:29PM  25   A.   YES.

02:29PM   1    Q.   OKAY.  SO, FOR EXAMPLE, YOU TALKED ON YOUR DIRECT

02:29PM   2    EXAMINATION ABOUT THE WEBSITE; CORRECT?

02:29PM   3    A.   THAT'S RIGHT.

02:29PM   4    Q.   AND DO YOU RECALL THAT YOU WENT TO VARIOUS MEMBERS OF THE

02:29PM   5    VARIOUS SCIENTIFIC TEAMS TO ASK THEM QUESTIONS ABOUT ASPECTS OF

02:29PM   6    THERANOS'S TECHNOLOGY?

02:29PM   7    A.   I REMEMBER FROM WHAT I SAW IN THE MATERIALS IN THE DIRECT

02:30PM   8    THAT I DID COMMUNICATE WITH DR. YOUNG, WITH DANIEL YOUNG.  I

02:30PM   9    DON'T RECALL THE EXTENT OF THOSE CONVERSATIONS WITH OTHER

02:30PM  10    MEMBERS OF THE TEAM.

02:30PM  11    Q.   OKAY.  BUT OVER TIME DURING YOUR TIME THERE YOU TALKED TO

02:30PM  12    AT LEAST ONE MEMBER OF THE HARDWARE TEAM; CORRECT?

02:30PM  13    A.   CORRECT.

02:30PM  14    Q.   AND YOU TALKED TO THE ASSAY TEAM LEADS ON SOME OCCASIONS;

02:30PM  15    CORRECT?

02:30PM  16    A.   CORRECT.

02:30PM  17    Q.   AND YOU ALSO TALKED TO SOME OF THE INDIVIDUALS INVOLVED IN

02:30PM  18    SOFTWARE; CORRECT?

02:30PM  19    A.   CORRECT.

02:30PM  20    Q.   AND AS A RESULT OF THAT, YOU BECAME SOMEWHAT FAMILIAR WITH

02:30PM  21    WHAT EACH OF THEIR DUTIES WERE IN THE COMPANY; CORRECT?

02:30PM  22    A.   I'D SAY AT A HIGH LEVEL.

02:30PM  23    Q.   OKAY.  DID YOU INTERACT AT ALL WHILE YOU WERE AT THE

02:30PM  24    COMPANY WITH CHANNING ROBERTSON?

02:30PM  25    A.   YES.

02:30PM  1    Q.   AND ON WHAT OCCASIONS DID YOU DO THAT?

02:31PM  2    A.   I RECALL CERTAIN OCCASIONS WHERE HE CAME TO THE OFFICE AND

02:31PM  3    HIS WORKSPACE WAS CLOSE TO MY WORKSPACE AND SOMETIMES WE WOULD

02:31PM  4    INTERACT.

02:31PM  5    Q.   OKAY.  AND DR. ROBERTSON HAD BEEN A MENTOR TO MS. HOLMES

02:31PM  6    AT STANFORD; CORRECT?

02:31PM  7    A.   CORRECT.

02:31PM  8    Q.   AND HE PLAYED A FORMAL ROLE AT THE COMPANY; CORRECT?

02:31PM  9    A.   WHEN I WAS THERE, I'M NOT SURE WHETHER I WOULD CONSIDER

02:31PM  10   THE ROLE A FORMAL ROLE.

02:31PM  11   Q.   HOW WOULD YOU DESCRIBE DR. ROBERTSON'S ROLE?

02:31PM  12   A.   I KNEW THAT HE HAD INTERACTIONS WITH ELIZABETH, AND I'M

02:31PM  13   AWARE THAT ON SOME OCCASIONS HE WOULD ATTEND MEETINGS WITH SOME

02:32PM  14   OF THE SCIENTIFIC LEADS AT THE COMPANY, BUT BEYOND THAT, I'M

02:32PM  15   NOT EXACTLY SURE WHAT HIS ROLE WAS IN THE COMPANY.

02:32PM  16   Q.   AND DR. ROBERTSON IS A PROMINENT CHEMICAL ENGINEER;

02:32PM  17   CORRECT?

02:32PM  18   A.   YES.

02:32PM  19   Q.   OKAY.  AND HE HAS AN EXCELLENT REPUTATION IN THE FIELD OF

02:32PM  20   CHEMICAL ENGINEERING; CORRECT?

02:32PM  21   A.   I BELIEVE SO.

02:32PM  22   Q.   OKAY.  YOU DON'T RECALL PRECISELY YOUR INTERACTIONS WITH

02:32PM  23   HIM, BUT YOU THINK YOU HAD THEM OVER TIME?  IS THAT A FAIR

02:32PM  24   SUMMARY OF WHAT YOU RECALL?

02:32PM  25   A.   I RECALL THAT WE HAD SOME INTERACTIONS AFTER THE FIRST

02:32PM  1     ARTICLES CAME OUT IN "THE WALL STREET JOURNAL," WHICH WAS IN

02:32PM  2     OCTOBER OF 2015, AND I THINK HE WAS CONCERNED ABOUT THOSE

02:32PM  3     ARTICLES AND WHAT THE COMPANY WAS DOING TO TRY TO REBUT SOME OF

02:32PM  4     THOSE CLAIMS OR HOW HE WAS WORKING THROUGH THAT.  I THINK WE

02:32PM  5     HAD SOME CONVERSATIONS AROUND THAT.

02:32PM  6     Q.   IS THAT THE FIRST TIME THAT YOU RECALL INTERACTING WITH

02:32PM  7     HIM?

02:32PM  8     A.   WE INTERACTED EARLIER THAN THAT.

02:33PM  9     Q.   OKAY.  ALL RIGHT.  BUT UP UNTIL THEN YOU DON'T RECALL WHAT

02:33PM  10    THOSE INTERACTIONS WERE?

02:33PM  11    A.   I DON'T RECALL THAT THEY WERE WORK RELATED.

02:33PM  12    Q.   OKAY.

02:33PM  13    A.   THEY WERE MORE NON-WORK RELATED.

02:33PM  14    Q.   OKAY.  I WANT TO ASK YOU ABOUT SOME OF THE DOCUMENTS THAT

02:33PM  15    YOU WERE SHOWN ON YOUR DIRECT EXAMINATION, SO I'M GOING TO PUT

02:33PM  16    UP EXHIBIT 5419, WHICH IS A DOCUMENT THAT IS ALREADY IN

02:33PM  17    EVIDENCE THAT YOU WENT THROUGH WITH MR. BOSTIC.

02:33PM  18         I'LL DRAW THIS UP ON THE SCREEN AND JUST TO REMIND YOU.

02:33PM  19    IF YOU GO TO THE SECOND PAGE OF THE DOCUMENT.  THIS IS

02:33PM  20    DISCUSSION ABOUT A PATIENT ABOUT HCG.

02:33PM  21         DO YOU REMEMBER THAT DISCUSSION?

02:33PM  22    A.   YES.

02:33PM  23    Q.   OKAY.  NOW, YOU DON'T HAVE ANY RECOLLECTION OF ISSUES

02:34PM  24    RELATED TO THAT OTHER THAN WHAT YOU'VE HEARD ON -- IN -- FROM

02:34PM  25    REVIEWING THE DOCUMENTS TODAY; IS THAT RIGHT?

02:34PM  1    A.    THAT'S RIGHT.

02:34PM  2                MR. BOSTIC:  YOUR HONOR, I'M SORRY.  MY APOLOGIES.

02:34PM  3    I DON'T BELIEVE THIS DOCUMENT WAS SHOWN TO THIS WITNESS JUST TO

02:34PM  4    CLARIFY.

02:34PM  5                THE COURT:  I'M NOT SURE -- IS THIS IN EVIDENCE?

02:34PM  6    I'M NOT SURE IT IS.

02:34PM  7                THE CLERK:  YOUR HONOR, HE -- I BELIEVE YOU STATED

02:34PM  8    5419.

02:34PM  9         5413 IS IN EVIDENCE, BUT NOT 5419 TODAY.

02:34PM  10               MR. DOWNEY:  LET ME CHECK.

02:34PM  11        (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

02:34PM  12               MR. DOWNEY:  YES, I BEG YOUR PARDON, 5413.

02:34PM  13   Q.    THIS IS THE DOCUMENT RELATED TO PATIENT TESTING ISSUES

02:34PM  14   THAT MR. BOSTIC SHOWED YOU.

02:35PM  15        DO YOU REMEMBER THAT?

02:35PM  16   A.    YES, THIS LOOKS MORE FAMILIAR.

02:35PM  17   Q.    OKAY.  AND THIS RELATES TO A CALL THAT A PATIENT HAD MADE

02:35PM  18   TO THERANOS AND A DISCUSSION OF THE RESPONSE TO THAT CALL;

02:35PM  19   CORRECT?

02:35PM  20   A.    CORRECT.

02:35PM  21   Q.    AND YOU RECALL TESTIFYING ON YOUR DIRECT EXAMINATION THAT

02:35PM  22   ON SOME OCCASIONS MS. HOLMES WOULD BE -- BECOME INVOLVED WITH

02:35PM  23   THOSE ISSUES; CORRECT?

02:35PM  24   A.    CORRECT.

02:35PM  25   Q.    DO YOU KNOW WITH RESPECT TO THE EXAMPLE IN THIS EMAIL WHAT

02:35PM  1     THE RESOLUTION OF IT WAS?

02:35PM  2     A.   I DON'T KNOW.

02:35PM  3     Q.   CAN I ASK YOU TO LOOK IN YOUR BINDER AT EXHIBIT 12715.

02:35PM  4     A.   I SEE THAT.

02:36PM  5     Q.   AND IF YOU LOOK AT THIS EMAIL, YOU SEE PART OF IT CONTAINS

02:36PM  6     THE CONVERSATION THAT TAKES PLACE IN EXHIBIT 5413?

02:36PM  7     A.   YES.

02:36PM  8     Q.   AND THEN YOU SEE THE CONVERSATION CONTINUES THEREAFTER

02:36PM  9     ABOVE ON THE SAME SUBJECT?

02:36PM  10    A.   THAT'S RIGHT.

02:36PM  11    Q.   CORRECT?

02:36PM  12         YOUR HONOR, I MOVE THE ADMISSION OF 12715.

02:36PM  13              MR. BOSTIC:  NO OBJECTION.

02:36PM  14              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:36PM  15         (DEFENDANT'S EXHIBIT 12715 WAS RECEIVED IN EVIDENCE.)

02:36PM  16    BY MR. DOWNEY:

02:36PM  17    Q.   IF YOU GO TO THE THIRD PAGE OF THIS EXHIBIT, DO YOU SEE

02:36PM  18    THE EMAIL AT THE BOTTOM IS AN EMAIL BETWEEN MS. HOLMES AND

02:37PM  19    MR. FOSQUE?

02:37PM  20    A.   YES.

02:37PM  21    Q.   AND DO YOU REMEMBER THIS WAS AN INSTANCE WHERE A COMPLAINT

02:37PM  22    WAS RAISED TO HER AND SHE'S ASKING MR. FOSQUE TO COME TALK AND

02:37PM  23    TO FIGURE OUT WHAT HAPPENED; CORRECT?

02:37PM  24    A.   CORRECT.

02:37PM  25    Q.   AND THEN IF YOU MOVE UP THE EXHIBIT AND GO TO THE PRIOR

02:37PM   1     PAGE, YOU SEE THAT MR. FOSQUE PROVIDED SOME DATA AS TO WHAT WAS

02:37PM   2     HAPPENING WITH THAT PATIENT; CORRECT?

02:37PM   3     A.   CORRECT.

02:37PM   4     Q.   AND HE PROVIDED SOME DATA ABOUT WHEN THE SAMPLE WAS TAKEN

02:37PM   5     AND ANALYSIS OF QUALITY CONTROL IN CONNECTION WITH THE SAMPLE;

02:37PM   6     CORRECT?

02:37PM   7     A.   I KNOW HE MENTIONS NISHIT IS LOOKING INTO THE QUALITY

02:37PM   8     CONTROL DATA.  I'M NOT SURE IF THIS IS THAT OR NOT, BUT --

02:38PM   9     Q.   OKAY.  AND WHO IS NISHIT?

02:38PM   10    A.   I BELIEVE HE WAS A SCIENTIST AT THERANOS.

02:38PM   11    Q.   OKAY.  IF YOU GO TO THE PRIOR PAGE YOU SEE ANOTHER EMAIL

02:38PM   12    FROM MR. FOSQUE IN THE MIDDLE OF THE PAGE, AND HE EXPLAINS

02:38PM   13    FURTHER AN ANALYSIS OF THE PROBLEM THAT IS SHOWN WITH RESPECT

02:38PM   14    TO THAT DATA; CORRECT?

02:38PM   15    A.   RIGHT.

02:38PM   16    Q.   AND THIS IS NOT I THINK A PORTION THAT YOU TALKED ABOUT

02:38PM   17    THIS MORNING, BUT IF YOU SEE IN THE FIRST PARAGRAPH, IT SEEMS

02:38PM   18    TO INDICATE THAT HE HAD A CONVERSATION WITH ADAM; IS THAT

02:38PM   19    RIGHT?

02:38PM   20    A.   YES.

02:38PM   21    Q.   AND IS ADAM A REFERENCE TO DR. ROSENDORFF?

02:38PM   22    A.   THAT'S MY INTERPRETATION HERE.

02:38PM   23    Q.   OKAY.  AND HE -- DR. ROSENDORFF, OF COURSE, WAS A CLINICAL

02:39PM   24    LAB DIRECTOR; CORRECT?

02:39PM   25    A.   CORRECT.

02:39PM   1    Q.   OKAY.  YOU CAN GO TO THE TOP OF THE EMAIL AT THE TOP OF

02:39PM   2    THE PAGE.

02:39PM   3         YOU SEE THAT THIS IS AN EMAIL FROM MR. BALWANI TO

02:39PM   4    MR. FOSQUE AND HE SAYS, "ADAM CAN HANDLE THIS."

02:39PM   5         DO YOU SEE THAT?

02:39PM   6    A.   YES.

02:39PM   7    Q.   AND HE SAYS, "GIVE HIM ALL THE DATA"?

02:39PM   8    A.   CORRECT.

02:39PM   9    Q.   CORRECT.  AND YOU'RE COPIED ON THIS EMAIL; CORRECT?

02:39PM  10    A.   CORRECT.

02:39PM  11    Q.   AND IT WOULD HAVE BEEN A SENSIBLE PROCESS FOR THE CLINICAL

02:39PM  12    LAB DIRECTOR TO HAVE A CONVERSATION WITH A PATIENT IN THESE

02:39PM  13    CIRCUMSTANCES; IS THAT CORRECT?

02:39PM  14    A.   I THINK THAT'S SENSIBLE.

02:39PM  15    Q.   OKAY.  DO YOU RECALL THIS SPECIFIC INCIDENT OR NOT?

02:39PM  16    A.   I DON'T.

02:39PM  17    Q.   OKAY.  NOW I'D LIKE TO BRING UP EXHIBIT 4237, WHICH IS

02:40PM  18    ALREADY IN EVIDENCE.

02:40PM  19         IF YOU GO TO THE BOTTOM OF THAT PAGE --

02:40PM  20    A.   IS THIS IN THE BINDER OR ALREADY ON THE SCREEN?

02:40PM  21    Q.   YOU CAN LOOK AT THE SCREEN.  IT'S ALREADY ADMITTED INTO

02:40PM  22    EVIDENCE.

02:40PM  23    A.   OKAY.

02:40PM  24    Q.   AND IF YOU SEE AT THE TOP THIS IS A DISCUSSION OF A

02:40PM  25    PHYSICIAN AND PATIENT CALL ABOUT HCG RESULTS.

EDLIN CROSS BY MR. DOWNEY                                    4077

02:40PM   1         DO YOU REMEMBER BEING SHOWN THIS DOCUMENT ON YOUR DIRECT

02:40PM   2    EXAMINATION?

02:40PM   3    A.   YES.

02:40PM   4    Q.   IF YOU GO TO THE BOTTOM OF PAGE 4 AND YOU CARRY OVER TO

02:40PM   5    THE NEXT PAGE.

02:40PM   6         DO YOU SEE THERE'S AN EMAIL THERE FROM MS. SCHEER TO YOU

02:41PM   7    AND TO MR. FOSQUE AND MS. HOLMES; CORRECT?

02:41PM   8    A.   YES.

02:41PM   9    Q.   AND SHE RECOUNTS WHAT THE COMPLAINT IS THAT HAD COME IN;

02:41PM  10    CORRECT?

02:41PM  11    A.   CORRECT.

02:41PM  12    Q.   BUT IF YOU REVIEW THIS EXHIBIT FROM THERE YOU CAN DRAW

02:41PM  13    THAT DOWN AND CONTINUE UP.  YOU CAN GO TO THE PRIOR PAGE.  YOU

02:41PM  14    CAN GO TO THE PRIOR PAGE FROM THAT.  KEEP GOING.  ALL RIGHT.

02:41PM  15         DO YOU SEE ON THE BOTTOM EMAIL THAT STARTS ON PAGE 1 AND

02:41PM  16    CARRIES OVER, YOU WERE THEN DROPPED FROM THIS CONVERSATION;

02:41PM  17    CORRECT?

02:41PM  18    A.   CORRECT.

02:41PM  19    Q.   AND IT'S NOT SOMETHING THAT WAS FURTHER SOMETHING THAT YOU

02:41PM  20    RECALLED DISCUSSING WITH MS. HOLMES OR ANYONE ELSE; CORRECT?

02:41PM  21    A.   CORRECT.

02:41PM  22    Q.   LET ME ASK YOU ABOUT YOUR TESTIMONY CONCERNING

02:42PM  23    RELATIONSHIPS WITH PHARMACEUTICAL COMPANIES.

02:42PM  24         I THINK YOU WERE ASKED ABOUT A RELATIONSHIP BETWEEN

02:42PM  25    THERANOS AND CELGENE.

```
02:42PM   1          DO YOU REMEMBER THAT?

02:42PM   2     A.   I DO.

02:42PM   3     Q.   AND DID YOU PLAY A LARGE ROLE WITH REGARD TO THAT PROJECT?

02:42PM   4     A.   NO.

02:42PM   5     Q.   AND DID YOU HAVE A FULL UNDERSTANDING OF ALL OF THE

02:42PM   6     PROGRAMS THAT WERE IN PLACE BETWEEN CELGENE AND THERANOS?

02:42PM   7     A.   NO.

02:42PM   8     Q.   OKAY.  DO YOU ACTUALLY RECALL ANY OF THE PROGRAMS THAT

02:42PM   9     WERE IN PLACE?

02:42PM  10     A.   I ONLY RECALL THE PROGRAM THAT WAS DISCUSSED IN THE EMAIL

02:42PM  11     CHAIN THAT WE REVIEWED EARLIER.

02:42PM  12     Q.   OKAY.  TAKE A LOOK AT EXHIBIT 528.  GO TO THE BOTTOM OF

02:43PM  13     THE EMAIL.  I'M SORRY, THE VERY BOTTOM.  THE LAST PAGE.

02:43PM  14          DO YOU RECALL THAT -- YOU CAN MOVE UP FROM THERE AND GO TO

02:43PM  15     THE PRIOR PAGE.

02:43PM  16          DO YOU RECALL THIS DISCUSSION ABOUT 16 DIFFERENT ASSAYS

02:43PM  17     BEING RUN WITH CELGENE?

02:43PM  18     A.   YES.

02:43PM  19     Q.   AND IN THIS INSTANCE THERE WAS A DISCUSSION OF SOME ASSAYS

02:43PM  20     BEING RUN WITH THERANOS ASSAYS; CORRECT?

02:43PM  21     A.   CORRECT.

02:43PM  22     Q.   AND SOME ASSAYS BEING RUN ON KITS; CORRECT?

02:44PM  23     A.   CORRECT.

02:44PM  24     Q.   CAN YOU GO TO THE PRIOR PAGE.

02:44PM  25          DID YOU KNOW WHAT A KIT WAS AT THE TIME THAT YOU RECEIVED
```

02:44PM  1    THIS EMAIL?

02:44PM  2    A.   I DON'T RECALL.

02:44PM  3    Q.   LET ME ASK YOU ABOUT THE SUBJECT OF TRADE SECRETS.

02:44PM  4         DO YOU REMEMBER YOU TALKED A LITTLE BIT ABOUT

02:44PM  5    CONFIDENTIALITY ON FRIDAY?

02:44PM  6    A.   YES.

02:44PM  7    Q.   DID YOU HEAR DISCUSSION ABOUT TRADE SECRETS WHEN YOU WERE

02:44PM  8    AT THERANOS?

02:44PM  9    A.   I DID.

02:44PM  10   Q.   OKAY.  DID YOU UNDERSTAND THAT THERANOS WAS CONCERNED

02:45PM  11   ABOUT PROTECTING TRADE SECRETS?

02:45PM  12   A.   YES.

02:45PM  13   Q.   AND DID YOU HEAR THAT FROM MR. BALWANI, FOR EXAMPLE?

02:45PM  14   A.   I DID.

02:45PM  15   Q.   AND YOU HEARD THAT FROM OTHERS AT THE COMPANY?

02:45PM  16   A.   YES.

02:45PM  17   Q.   AND DID YOU UNDERSTAND THAT THE COMPANY THOUGHT THAT IT

02:45PM  18   HAD DEVELOPED VERY VALUABLE TECHNOLOGY; CORRECT?

02:45PM  19   A.   THAT'S RIGHT.

02:45PM  20   Q.   AND YOU TESTIFIED FRIDAY ABOUT A NUMBER OF PRACTICES

02:45PM  21   RESTRICTING THE FLOW OF INFORMATION AT THE COMPANY.

02:45PM  22        DO YOU REMEMBER THAT?

02:45PM  23   A.   I DO.

02:45PM  24   Q.   AND DID YOU UNDERSTAND THAT SOME OF THOSE PROCEDURES WERE

02:45PM  25   ASSOCIATED WITH PROTECTING THERANOS'S TRADE SECRETS?

EDLIN CROSS BY MR. DOWNEY                                                4080

02:45PM   1    A.   YES.

02:45PM   2    Q.   OKAY.  YOU, HOWEVER, WERE ABLE, BECAUSE OF YOUR ROLE AT

02:45PM   3    THE COMPANY, TO INTERACT WITH DIFFERENT TEAMS IN CONNECTION

02:45PM   4    WITH YOUR DUTIES; CORRECT?

02:45PM   5    A.   THAT'S RIGHT.

02:45PM   6    Q.   SO YOU INTERACTED WITH SCIENTISTS AND GOT SOME INFORMATION

02:45PM   7    FROM THEM; CORRECT?

02:46PM   8    A.   CORRECT.

02:46PM   9    Q.   AND YOU WOULD OFTEN RELY ON SCIENTISTS IN CARRYING OUT

02:46PM  10    YOUR DUTIES; CORRECT?

02:46PM  11    A.   I WOULD RELY ON THE INFORMATION THAT THEY GAVE ME, RIGHT.

02:46PM  12    Q.   OKAY.  WELL, YOU MENTIONED DURING THE COURSE OF YOUR

02:46PM  13    TESTIMONY THIS MORNING DR. YOUNG; CORRECT?

02:46PM  14    A.   CORRECT.

02:46PM  15    Q.   AND YOU MENTIONED THAT HE WAS THE VICE PRESIDENT OF THE

02:46PM  16    COMPANY; CORRECT?

02:46PM  17    A.   HE WAS A VICE PRESIDENT I BELIEVE, RIGHT.

02:46PM  18    Q.   AND HE WAS THE SENIOR SCIENTIST AT THE COMPANY; CORRECT?

02:46PM  19    A.   CORRECT.

02:46PM  20    Q.   AND YOU FOUND HIM, DURING YOUR TIME AT THE COMPANY, TO BE

02:46PM  21    KNOWLEDGEABLE; CORRECT?

02:46PM  22    A.   YES.

02:46PM  23    Q.   AND YOU HAD CONFIDENCE IN WHAT HE WAS TELLING YOU?

02:46PM  24    A.   DEFINITELY.

02:46PM  25    Q.   AND IF ISSUES RELATED TO A QUESTION INVOLVING SCIENCE OR

02:46PM  1    TECHNOLOGY CAME UP, YOU WOULD CERTAINLY DEFER TO HIS JUDGMENT;

02:46PM  2    CORRECT?

02:46PM  3    A.   CERTAINLY.

02:46PM  4    Q.   AND ON MANY OCCASIONS WHEN YOU HAD TO GET -- PROVIDE

02:46PM  5    INFORMATION TO MS. HOLMES, YOU ACTUALLY GOT THAT INFORMATION

02:47PM  6    FROM DR. YOUNG; CORRECT?

02:47PM  7    A.   THAT DID HAPPEN OFTEN.

02:47PM  8    Q.   AND ON MANY OCCASIONS WHEN THERE WERE PROGRAMS THAT

02:47PM  9    INVOLVED THE DEVELOPMENT, FURTHER DEVELOPMENT OF ASSAYS AND SO

02:47PM  10   FORTH, DR. YOUNG WOULD BE ONE SOURCE FOR WHOM YOU WOULD GET THE

02:47PM  11   INFORMATION; CORRECT?

02:47PM  12   A.   CORRECT.

02:47PM  13   Q.   AND YOU ALSO HAD THE CHANCE TO INTERACT WITH MEMBERS OF

02:47PM  14   THE ASSAY TEAM; CORRECT?

02:47PM  15   A.   CORRECT, THERE WERE A NUMBER OF DIFFERENT TEAMS.

02:47PM  16   Q.   OKAY.  AND IF THEY PROVIDED YOU WITH INFORMATION, YOU

02:47PM  17   RELIED ON IT; CORRECT?

02:47PM  18   A.   YES.

02:47PM  19   Q.   AND SAME WITH REGARD TO THE SOFTWARE TEAM; CORRECT?

02:47PM  20   A.   CORRECT.

02:47PM  21   Q.   AND THE HARDWARE TEAM; CORRECT?

02:47PM  22   A.   CORRECT.

02:47PM  23   Q.   AND SO IN CARRYING OUT YOUR DUTIES FROM THE TIME THAT YOU

02:47PM  24   STARTED AT THERANOS UNTIL LATE IN 2015, YOU NEVER TOOK A STEP

02:47PM  25   ON BEHALF OF THE COMPANY WHERE YOU THOUGHT YOU WERE DECEIVING

02:47PM  1    SOMEONE; CORRECT?

02:47PM  2    A.   CORRECT.

02:47PM  3    Q.   YOU NEVER MADE A STATEMENT TO THE DEPARTMENT OF DEFENSE

02:48PM  4    THAT YOU THOUGHT WAS FALSE; CORRECT?

02:48PM  5    A.   CORRECT.

02:48PM  6    Q.   YOU NEVER FACILITATED THE DELIVERY OF INFORMATION TO

02:48PM  7    INVESTORS THAT YOU BELIEVED WAS FALSE; CORRECT?

02:48PM  8    A.   CORRECT.

02:48PM  9    Q.   YOU NEVER HAD ANY INTERACTIONS WITH REPRESENTATIVES OF

02:48PM  10   PHARMACEUTICAL COMPANIES THAT YOU BELIEVED WAS FRAUDULENT; IS

02:48PM  11   THAT RIGHT?

02:48PM  12   A.   THAT'S RIGHT.

02:48PM  13   Q.   YOU NEVER IN ALL OF YOUR WORK ON MARKETING AND THE WEBSITE

02:48PM  14   OF THE COMPANY, YOU NEVER TOOK STEPS TO PUT FORWARD ANY CLAIM

02:48PM  15   THAT YOU BELIEVED TO BE FALSE; CORRECT?

02:48PM  16   A.   CORRECT.

02:48PM  17   Q.   AND THE SAME WOULD BE TRUE THAT -- WITH RESPECT TO

02:48PM  18   JOURNALISTS; CORRECT?

02:48PM  19   A.   CORRECT.

02:48PM  20   Q.   ALL OF THE INFORMATION THAT YOU PROVIDED TO JOURNALISTS

02:48PM  21   YOU BELIEVED TO BE CORRECT; CORRECT?

02:48PM  22   A.   CORRECT.

02:48PM  23   Q.   AND IN PART, THAT INFORMATION WAS OFTEN RELIANT ON

02:49PM  24   INFORMATION THAT YOU HAD GOTTEN FROM THE SCIENTISTS IN THE

02:49PM  25   COMPANY; CORRECT?

02:49PM   1    A.   CORRECT.

02:49PM   2    Q.   OKAY.  ALL RIGHT.  LET'S TALK ABOUT THE RELATIONSHIP

02:49PM   3    BETWEEN THERANOS --

02:49PM   4         WELL, YOUR HONOR, I'M STARTING A NEW TOPIC.  SHOULD --

02:49PM   5              THE COURT:  YOU WON'T FINISH IT IN 12 MINUTES?

02:49PM   6              MR. DOWNEY:  WELL, IF WE HAVE 12 MINUTES, I THINK I

02:49PM   7    CAN MAKE SOME PROGRESS.

02:49PM   8              THE COURT:  SURE.  LET'S DO THAT.

02:49PM   9              MR. DOWNEY:  OKAY.

02:49PM  10    Q.   LET'S TALK ABOUT THE RELATIONSHIP THAT THERANOS HAD WHICH

02:49PM  11    GENERATED THE BURN STUDY.

02:49PM  12    A.   OKAY.

02:49PM  13    Q.   I THINK YOU MENTIONED THAT DR. CHUNG WAS INVOLVED IN THAT;

02:49PM  14    CORRECT?

02:49PM  15    A.   CORRECT.

02:49PM  16    Q.   AND THAT RELATIONSHIP WAS ALREADY IN PLACE AT THE TIME

02:49PM  17    THAT YOU ARRIVED AT THE COMPANY; CORRECT?

02:49PM  18    A.   CORRECT.

02:49PM  19    Q.   AND HAD THE STUDY STARTED WHEN YOU CAME TO THE COMPANY?

02:49PM  20    A.   AT LEAST SOME PART OF THE STUDY HAD STARTED, YES.

02:49PM  21    Q.   OKAY.  BUT FROM THE TIME THAT YOU ARRIVED UNTIL REALLY THE

02:50PM  22    TIME THAT YOU LEFT THERANOS, THAT'S AN ISSUE THAT YOU HAD

02:50PM  23    MANAGEMENT RESPONSIBILITY WITH RESPECT TO; CORRECT?

02:50PM  24    A.   MY ROLE IN THAT STUDY WAS AS A CLIENT SOLUTIONS LEAD.

02:50PM  25    Q.   TELL US WHAT THAT MEANS.

02:50PM 1    A.    SO WHEN I -- AFTER I JOINED THE COMPANY THERE WAS A, A

02:50PM 2    MEMBER OF DANIEL YOUNG'S TEAM WHO HAD BEEN PLAYING A CLIENT

02:50PM 3    SOLUTIONS LEAD, AND HE LEFT THE COMPANY, AND ELIZABETH ASKED ME

02:50PM 4    TO STEP IN HIS PLACE.

02:50PM 5         AND THAT ROLE LARGELY SUPPORTED THE STUDY WHEN IT CAME TO

02:50PM 6    COMMUNICATIONS WITH THE DIFFERENT RESEARCH COORDINATORS AT THE

02:50PM 7    DIFFERENT HOSPITALS.

02:50PM 8    Q.    UH-HUH.

02:50PM 9    A.    IF THEY HAD ANY ISSUES WITH DEVICES, THEY WOULD CONTACT ME

02:50PM 10   AND I WOULD -- I PERSONALLY WOULD COMMUNICATE WITH THE SOFTWARE

02:50PM 11   ENGINEERS AND HELP TRIAGE THOSE ISSUES, AND IF A DEVICE NEEDED

02:51PM 12   TO BE REPLACED, I WORKED WITH THE RESEARCH COORDINATORS TO DO

02:51PM 13   THAT.

02:51PM 14        AT ONE POINT I ALSO DID A TRAINING AT ONE OR MORE OF THE

02:51PM 15   HOSPITALS WITH THE RESEARCH COORDINATORS, AND THAT WAS

02:51PM 16   PREDOMINANTLY MY ROLE IN THAT PROGRAM.

02:51PM 17   Q.    WELL, LET'S TAKE A STEP BACK.  DR. CHUNG WAS THE LEADING

02:51PM 18   DOCTOR IN CONNECTION WITH THAT PROGRAM; CORRECT?

02:51PM 19   A.    RIGHT.

02:51PM 20   Q.    AND THE STUDY WAS BEING CONDUCTED OUT OF THE U.S. ARMY

02:51PM 21   INSTITUTE OF SURGICAL RESEARCH; CORRECT?

02:51PM 22   A.    THERE WERE MULTIPLE SITES THAT PARTICIPATED IN THE STUDY,

02:51PM 23   BUT I BELIEVE THAT WAS THE -- I DON'T KNOW HOW I WOULD DESCRIBE

02:51PM 24   IT IN THE CONTEXT OF THE STUDY.

02:51PM 25   Q.    OKAY.  WHEN YOU SAY, "MULTIPLE SITES," YOU MEAN THAT

02:51PM   1       THERANOS DEVICES WERE DEPLOYED AND WERE SENT TO BE LOCATED IN

02:51PM   2       DIFFERENT HOSPITALS ACROSS THE UNITED STATES; IS THAT RIGHT?

02:51PM   3       A.   THAT'S RIGHT.

02:52PM   4       Q.   AND THE POINT OF THE STUDY WAS TO DO AN EVALUATION OF

02:52PM   5       SEPSIS IN CONNECTION WITH BURN VICTIMS; CORRECT?

02:52PM   6       A.   I BELIEVE SO.

02:52PM   7       Q.   AND YOU CAME TO LEARN AS A RESULT OF YOUR WORK IN

02:52PM   8       CONNECTION WITH THE BURN STUDY, THAT BURN VICTIMS HAVE A

02:52PM   9       PARTICULAR SUSCEPTIBILITY TO DEVELOPING SEPSIS AND THE

02:52PM   10      INFECTION CONSEQUENCES THAT FOLLOW FROM THAT; CORRECT?

02:52PM   11      A.   I CAME TO THAT UNDERSTANDING, YES.

02:52PM   12      Q.   OKAY.  AND IN CONNECTION WITH THE STUDIES, SOME OF THE

02:52PM   13      PATIENTS WHO WERE UNDER ANALYSIS WERE MILITARY MEMBERS;

02:52PM   14      CORRECT?

02:52PM   15      A.   I DIDN'T KNOW THAT.

02:52PM   16      Q.   OKAY.  DO YOU KNOW THAT THE ARMY INSTITUTE OF SURGICAL

02:52PM   17      RESEARCH, FOR EXAMPLE, TREATS MEMBERS OF THE MILITARY?

02:52PM   18      A.   I'M NOT SURE I KNOW THAT.

02:53PM   19      Q.   OKAY.  YOU MENTIONED THAT YOU BECAME INVOLVED WITH DEVICES

02:53PM   20      AT THE DIFFERENT LOCATIONS; CORRECT?

02:53PM   21      A.   CORRECT.

02:53PM   22      Q.   AND YOU'RE REFERRING TO THE LOCATIONS THAT WERE PART OF

02:53PM   23      THE BURN STUDY DURING THE TIME THAT YOU WERE AT THERANOS;

02:53PM   24      CORRECT?

02:53PM   25      A.   THEY WERE PARTICIPATING SITES IN THAT STUDY, RIGHT.

02:53PM  1    Q.   OKAY.  AND THE WAY THAT YOUR INVOLVEMENT REALLY BEGAN IS

02:53PM  2    THAT YOU HELD A TRAINING TO TRAIN PERSONNEL FROM THOSE

02:53PM  3    DIFFERENT HOSPITALS HOW TO USE THE THERANOS DEVICE; CORRECT?

02:53PM  4    A.   I DON'T BELIEVE THAT THAT WAS HOW MY ROLE STARTED, BUT

02:53PM  5    THAT DID HAPPEN AT SOME POINT.

02:53PM  6    Q.   OKAY.  TELL US HOW YOUR ROLE STARTED?

02:53PM  7    A.   WELL, I MENTIONED THAT ONE OF THE MEMBERS OF

02:53PM  8    DANIEL YOUNG'S TEAM WHO HELD HIS CLIENT SOLUTIONS LEAD, HE LEFT

02:54PM  9    THE COMPANY AND ELIZABETH ASKED THAT I STEP IN AND THAT I STEP

02:54PM  10   INTO THAT ROLE.  SO THAT'S HOW -- THAT'S WHERE MY INVOLVEMENT

02:54PM  11   IN THAT STUDY STARTED.

02:54PM  12   Q.   OKAY.  AND AFTER THAT POINT YOU BECAME INVOLVED WITH

02:54PM  13   SENDING THE DEVICES TO LOCATIONS ACROSS THE COUNTRY; CORRECT?

02:54PM  14   A.   WHEN I STARTED, DEVICES WERE IN SOME LOCATIONS AND THEN

02:54PM  15   ADDITIONAL HOSPITALS JOINED.  SO I DID SEND TO HOSPITALS THAT

02:54PM  16   DID NOT YET HAVE THE DEVICES.

02:54PM  17   Q.   OKAY.  LET'S LOOK AT -- I'M SORRY.  DID YOU WANT TO SAY

02:54PM  18   MORE?

02:54PM  19   A.   AND THROUGHOUT THAT PROCESS I PARTNERED WITH SOFTWARE

02:54PM  20   ENGINEERS TO PREPARE THOSE DEVICES AND PACKAGE THEM AND GET

02:54PM  21   THEM SENT OUT.

02:54PM  22   Q.   OKAY.  LET'S LOOK AT EXHIBIT 10462.

02:55PM  23        TAKE A MOMENT TO REVIEW THAT IN YOUR BINDER.

02:55PM  24        (PAUSE IN PROCEEDINGS.)

02:55PM  25             THE WITNESS:  OKAY.

02:55PM  1    BY MR. DOWNEY:

02:55PM  2    Q.   IS THIS AN EMAIL SENT TO YOU BY A REPRESENTATIVE OF U.S.A.

02:55PM  3    MEDCOM IN CONNECTION WITH THE BURN STUDY?

02:55PM  4    A.   YES.

02:55PM  5              MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

02:55PM  6    10462.

02:55PM  7              MR. BOSTIC:  NO OBJECTION.

02:55PM  8              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:55PM  9         (DEFENDANT'S EXHIBIT 10462 WAS RECEIVED IN EVIDENCE.)

02:56PM 10    BY MR. DOWNEY:

02:56PM 11    Q.   IF YOU GO TO THE BOTTOM EMAIL ON PAGE 2, THIS IS AN EMAIL

02:56PM 12    TO A WOMAN NAMED ELSA COATES TO A LARGE NUMBER OF PEOPLE

02:56PM 13    INCLUDING YOURSELF.

02:56PM 14         DO YOU SEE THAT?

02:56PM 15    A.   I DO.

02:56PM 16    Q.   AND SHE IS SETTING UP A TRAINING PROGRAM, AMONG OTHER

02:56PM 17    THINGS, ON THERANOS READERS.

02:56PM 18         DO YOU SEE THAT IN THE PARAGRAPH THAT BEGINS, "OUR

02:56PM 19    OBJECTIVE IS TO"?

02:56PM 20    A.   YES.

02:56PM 21    Q.   OKAY.  AND THIS IS THE TRAINING THAT YOU WERE REFERRING TO

02:56PM 22    A MOMENT AGO?

02:56PM 23    A.   THIS WAS ONE OF THE TRAININGS.  THERE WERE MULTIPLE.

02:56PM 24    Q.   OKAY.  AND DO YOU SEE THAT THERE'S A LARGE LIST OF

02:56PM 25    ATTENDEES AT THE TOP OF THE EMAIL?

02:56PM  1    A.   I DO.

02:56PM  2    Q.   AND IS ELSA COATES SOMEONE WHO YOU WORKED WITH TO

02:56PM  3    COORDINATE THE STUDY?

02:56PM  4    A.   YES.

02:56PM  5    Q.   AND IS SHE AN ARMY NURSE?

02:57PM  6    A.   I THINK IT SAYS THAT SHE'S A CLINICAL RESEARCH NURSE

02:57PM  7    COORDINATOR.

02:57PM  8    Q.   AND SHE WORKED WITH DR. CHUNG IN CONNECTION WITH THE

02:57PM  9    STUDY; CORRECT?

02:57PM 10    A.   CORRECT.

02:57PM 11    Q.   SO WHEN YOU PERFORMED THE TRAINING, THE DEVICES WOULD THEN

02:57PM 12    BE LOCATED IN THE HOSPITAL; CORRECT?

02:57PM 13    A.   YES.

02:57PM 14    Q.   AND YOU WOULD ON OCCASION TALK TO PEOPLE AT THE LOCATIONS

02:57PM 15    ABOUT THEIR USE OF THE THERANOS DEVICE; CORRECT?

02:57PM 16    A.   CORRECT.

02:57PM 17    Q.   SOMETIMES THERE WOULD BE AN ISSUE WITH THEIR CONNECTIVITY,

02:57PM 18    FOR EXAMPLE?

02:57PM 19    A.   THAT'S RIGHT.

02:57PM 20    Q.   OR SOMETIMES THEY NEEDED CARTRIDGES TO REPLACE THE

02:57PM 21    CARTRIDGES THAT THEY HAD; CORRECT?

02:57PM 22    A.   CORRECT.

02:57PM 23    Q.   AND YOU WERE THE PERSON AT THERANOS RESPONSIBLE FOR

02:57PM 24    GETTING THAT TO THEM OR PROVIDING THEM WITH THAT INFORMATION?

02:57PM 25    A.   AS IT RELATED TO THE NURSE COORDINATORS, RIGHT.

EDLIN CROSS BY MR. DOWNEY

02:58PM 1          IF IT RELATED TO GETTING CERTAIN SUPPLIES OR HELPING TO

02:58PM 2     TRIAGE AN ISSUE WITH THE READER, I DID COMMUNICATE WITH THEM,

02:58PM 3     YES.

02:58PM 4     Q.   AND IN CONNECTION WITH THE STUDY, DATA WAS BEING

02:58PM 5     GENERATED; CORRECT?

02:58PM 6     A.   YES.

02:58PM 7     Q.   AND THE THERANOS READERS WERE TAKING BLOOD SAMPLES.  BLOOD

02:58PM 8     SAMPLES WERE BEING TAKEN FROM PATIENTS AND ANALYZED IN THE

02:58PM 9     THERANOS READERS; CORRECT?

02:58PM 10    A.   YES.

02:58PM 11    Q.   AND THEN THE RESULTS OF THOSE TESTS WOULD BE SENT BACK

02:58PM 12    DIGITALLY TO THERANOS; CORRECT?

02:58PM 13    A.   YES.

02:58PM 14    Q.   AND YOU WOULD PROVIDE DATA FROM THAT STUDY TO DR. CHUNG;

02:58PM 15    CORRECT?

02:58PM 16    A.   I'M NOT SURE WHETHER I PROVIDED IT OR DANIEL YOUNG

02:58PM 17    PROVIDED IT BECAUSE I DID PARTNER WITH HIM.  HE, HE WAS LEADING

02:58PM 18    THE THERANOS EFFORTS ON THE STUDY BEFORE I JOINED AND BEFORE I

02:59PM 19    BECAME INVOLVED, AND WHEN IT CAME TO DATA, I WOULD CONSULT WITH

02:59PM 20    HIM BECAUSE THAT WAS HIS AREA OF EXPERTISE.

02:59PM 21    Q.   HOW MANY YEARS DID THE STUDY GO ON FOR?

02:59PM 22    A.   I DON'T REMEMBER EXACTLY, BUT I THINK THREE TO FOUR.

02:59PM 23    Q.   YOU SAW THE EXHIBIT THAT WE -- YOU SAW THE EXHIBIT DURING

02:59PM 24    YOUR DIRECT EXAMINATION OF MATERIALS BEING SENT TO DR. CHUNG;

02:59PM 25    CORRECT?

02:59PM   1    A.   CORRECT.

02:59PM   2    Q.   BY THE TIME THAT THAT EMAIL WAS SENT, DID THERANOS ALREADY

02:59PM   3    HAVE A RELATIONSHIP WITH DR. CHUNG?

02:59PM   4    A.   I BELIEVE SO.  THERANOS HAD THE RELATIONSHIP BEFORE I EVEN

03:00PM   5    GOT THERE.

03:00PM   6         MR. DOWNEY:  ALL RIGHT.  YOUR HONOR, THIS MIGHT BE A

03:00PM   7    GOOD PLACE.

03:00PM   8         THE COURT:  SURE.  THANK YOU, MR. DOWNEY.

03:00PM   9    LET'S TAKE OUR EVENING BREAK, LADIES AND GENTLEMEN.  I

03:00PM  10    UNDERSTAND THAT WE WILL ONLY BE ABLE TO GO UNTIL 3:00 TOMORROW,

03:00PM  11    JUST UNTIL 3:00 TOMORROW.

03:00PM  12    I DON'T KNOW IF FRIDAY WE CAN CAPTURE UNTIL 4:00.  I'D

03:00PM  13    LIKE TO DO THAT JUST TO GET SOME TIME.

03:00PM  14    BUT IN THE INTERIM, LADIES AND GENTLEMEN, I REMIND YOU OF

03:00PM  15    THE ADMONITION, PLEASE DO NOT DO ANY INDEPENDENT INVESTIGATION,

03:00PM  16    DO NOT DO ANY RESEARCH INVOLVED IN THIS CASE OR ANYONE INVOLVED

03:00PM  17    WITH IT.

03:00PM  18    PLEASE REFRAIN FROM LOOKING AT SOCIAL MEDIA THAT MIGHT

03:00PM  19    TOUCH ON THIS CASE OR ANY OTHER NEWS MEDIA.  IF YOU DO COME

03:00PM  20    ACROSS SOMETHING, PLEASE TURN AWAY AND TURN IT OFF, AND I'LL

03:00PM  21    ASK YOU AGAIN TOMORROW MORNING WHETHER OR NOT ANY OF THOSE

03:00PM  22    CIRCUMSTANCES HAVE OCCURRED.

03:00PM  23    HAVE A GOOD AFTERNOON, GOOD EVENING.  WE'LL SEE YOU

03:00PM  24    TOMORROW, PLEASE, AT 9:00 O'CLOCK.

03:00PM  25    9:00 O'CLOCK, PLEASE, MR. EDLIN.

03:01PM 1          THE WITNESS:  YES, YOUR HONOR.  THANK YOU.

03:01PM 2          (JURY OUT AT 3:01 P.M.)

03:01PM 3          THE COURT:  PLEASE BE SEATED.  THANK YOU.

03:01PM 4       THE RECORD SHOULD REFLECT THAT OUR JURY HAS LEFT FOR THE

03:01PM 5   EVENING, AND THE WITNESS HAS LEFT THE COURTROOM.  AND ALL

03:01PM 6   COUNSEL ARE PRESENT AND MS. HOLMES IS PRESENT.

03:01PM 7       LET ME JUST ASK, JUST TIMING, MR. DOWNEY, WHAT DO YOU

03:01PM 8   THINK?  HOW MUCH --

03:01PM 9          MR. DOWNEY:  I THINK IT WILL BE A GOOD CHUNK OF THE

03:01PM 10  DAY TOMORROW.

03:01PM 11         THE COURT:  WITH THIS WITNESS?

03:01PM 12         MR. DOWNEY:  WITH THIS WITNESS.

03:01PM 13         THE COURT:  OKAY.

03:01PM 14         MR. DOWNEY:  AND SHORTENING OF IT MIGHT EVEN BE THE

03:01PM 15  TOTAL OF THE DAY.

03:01PM 16         THE COURT:  GOTCHA.  OKAY.  I JUST ASK THAT FOR THE

03:02PM 17  GOVERNMENT'S INFORMATION FOR THEIR NEXT WITNESS.

03:02PM 18       MR. LEACH.

03:02PM 19         MR. LEACH:  YES, YOUR HONOR.  BRIEFLY, IF I MAY, ON

03:02PM 20  THAT POINT.

03:02PM 21       WE HAVE TWO OUT-OF-TOWN WITNESSES LINED UP:  SHANE WEBER,

03:02PM 22  WHO WE TALKED ABOUT EARLIER THIS MORNING; AND LISA PETERSON,

03:02PM 23  WHO IS A REPRESENTATIVE OF ONE OF THE INVESTORS.

03:02PM 24       BASED ON THE REPRESENTATIONS FROM MR. DOWNEY, I DOUBT

03:02PM 25  WE'LL GET TO MS. PETERSON, BUT IF WE DO, SHE'S UNAVAILABLE ON

4092

03:02PM   1    FRIDAY.  SO I WOULD ASK THE COURT'S PERMISSION TO, IF WE START,

03:02PM   2    TO BE ABLE TO TAKE OTHER WITNESSES OUT OF ORDER AND CONTINUE

03:02PM   3    WHEN SHE BECOMES AVAILABLE AGAIN.

03:02PM   4          THE COURT:  OH, I SEE.  AS OPPOSED TO TRYING TO GET

03:02PM   5    HER IN THIS WEEK?

03:02PM   6          MR. LEACH:  CORRECT.  I SEE NO PROSPECT OF

03:02PM   7    COMPLETING HER ON WEDNESDAY, AND WE HAVE ADDITIONAL WITNESSES

03:02PM   8    FOR FRIDAY.  I SEE SOME POSSIBILITY OF STARTING HER, BUT HER

03:02PM   9    NOT BEING AVAILABLE ON FRIDAY, AND I JUST WANT TO MAKE SURE

03:02PM  10    THAT THAT'S OKAY WITH THE COURT.

03:02PM  11          THE COURT:  SURE.  THAT'S FINE WITH ME.

03:03PM  12      AND I'M SURE IF YOU MEET AND CONFER WITH DEFENSE COUNSEL,

03:03PM  13    THEY'RE NOT GOING TO OBJECT TO THAT.  IT MAKES SENSE NOT TO

03:03PM  14    INTERRUPT A WITNESS'S TESTIMONY BY A DAY OR TWO OR THREE,

03:03PM  15    WHATEVER IT IS.  SO THANK YOU FOR LETTING ME KNOW THAT.

03:03PM  16          MR. LEACH:  OKAY.

03:03PM  17          THE COURT:  AND I WILL ENDEAVOR TO SEE IF WE CAN

03:03PM  18    INCREASE OUR TIME WITH THE JURY.  PLEASE RECALL INITIALLY I

03:03PM  19    SAID 2:00 O'CLOCK, AND THAT WAS IN REGARDS TO OUR COVID

03:03PM  20    SITUATION AND ASSURING THE JURY OF KEEPING THEM FROM BEING IN

03:03PM  21    AN ENCLOSED ENVIRONMENT NOTWITHSTANDING THE MEASURES THAT WE

03:03PM  22    HAVE TAKEN TO ASSIST.

03:03PM  23      I DO THINK AS THE TRIAL HAS GONE ON, THE JURY HAS BECOME A

03:03PM  24    LITTLE MORE COMFORTABLE ABOUT STAYING, AND AT LEAST THAT'S MY

03:03PM  25    SENSE.  THERE'S BEEN NO OBJECTIONS, OTHER THAN SOME SCHEDULE

03:03PM   1    CONFLICTS, TO STAYING LATER.  SO I'LL CONTINUE TO ADVANCE THAT

03:03PM   2    WITH THEM.

03:03PM   3         ANYTHING FURTHER?  MR. DOWNEY, WERE YOU GOING TO --

03:03PM   4              MR. DOWNEY:  YOUR HONOR, I JUST WANT TO SAY, I THINK

03:04PM   5    THIS IS ABUNDANTLY CLEAR, BUT I JUST WANT TO MAKE SURE THE

03:04PM   6    WITNESS, WHILE THE WITNESS IS UNDER CROSS-EXAMINATION HE

03:04PM   7    DOESN'T CONSULT WITH THE GOVERNMENT.  HE DID MEET WITH

03:04PM   8    MR. BOSTIC YESTERDAY AFTER HIS TESTIMONY BEGAN, SO I JUST WANT

03:04PM   9    TO MAKE SURE THAT DURING CROSS-EXAMINATION THERE'S NO FURTHER

03:04PM  10    INTERACTION.

03:04PM  11              THE COURT:  OKAY.

03:04PM  12              MR. BOSTIC:  WE'LL ABIDE BY THAT, YOUR HONOR.

03:04PM  13              THE COURT:  OKAY.

03:04PM  14         (DISCUSSION OFF THE RECORD.)

03:04PM  15              THE COURT:  THANK YOU.  LADIES AND GENTLEMEN, I HAVE

03:04PM  16    TO BRING SOMETHING TO -- THIS IS NOT REALLY COUNSEL'S ISSUE,

03:04PM  17    BUT IT DOES AFFECT OUR JURORS.

03:04PM  18         APPARENTLY THERE IS SOMEONE USING A KEYBOARD THAT IS NOT A

03:04PM  19    SILENT KEYBOARD IN THE AUDIENCE, AND I'M GOING TO ASK YOU TO

03:04PM  20    PLEASE, IF WHOEVER YOU ARE, I DON'T KNOW IF YOU ARE OR IF THAT

03:05PM  21    IS HAPPENING, WE'RE GETTING THE REPORTS FROM THE JURORS THAT

03:05PM  22    THEY CAN HEAR SOMEONE OPERATING A KEYBOARD.

03:05PM  23         AS YOU RECALL, I HAD PERMITTED, OF COURSE, THOSE DEVICES,

03:05PM  24    BUT THEY MUST BE SILENT, SILENT KEYBOARDS.

03:05PM  25         IF IT CONTINUES, I THINK I'M GOING TO ASK THE

03:05PM    1    UNITED STATES MARSHAL STAND IN THE COURTROOM AND SHOULD SHE

03:05PM    2    HEAR A KEYBOARD, I'LL ASK HER TO TAKE APPROPRIATE ACTION.

03:05PM    3    THAT'S ABOUT ALL I CAN DO.

03:05PM    4            THE CLERK:  THEY CAN GO TO THE OVERFLOW ROOM.

03:05PM    5            THE COURT:  THAT'S TRUE.

03:05PM    6        AND IF YOU HAVE A KEYBOARD THAT YOU CAN'T DISABLE OR

03:05PM    7    YOU'RE UNABLE TO OBTAIN A SILENT KEYBOARD, I WOULD INVITE YOU

03:05PM    8    TO THE OVERFLOW ROOM THAT WE HAVE.  I'M TOLD THAT THERE'S

03:05PM    9    GENEROUS SEATING AVAILABLE THERE.

03:05PM   10        SO IT COULD BE THAT THE MARSHAL WILL ASK THE OFFENDING

03:05PM   11    PARTY, AND I DON'T MEAN TO PUT IT THAT WAY, BUT THE PARTY WITH

03:05PM   12    THE KEYBOARD TO GO TO THE OVERFLOW ROOM SUCH THAT OUR JURORS

03:06PM   13    ARE NOT -- OUR JURY IS NOT DISTRACTED FROM THAT NOISE.  SO I

03:06PM   14    JUST WANT TO PUT THAT OUT THERE.

03:06PM   15        MS. VOLKAR, DID YOU HAVE SOMETHING THAT YOU WANTED TO

03:06PM   16    ADDRESS?  YES, I SEE YOU NODDING YOUR HEAD.  SO WHY DON'T YOU

03:06PM   17    COME FORWARD IF YOU WOULD, PLEASE.

03:06PM   18        OH.  NOW I'M REALLY CONFUSED.

03:06PM   19        MS. VOLKAR, NICE TO SEE YOU AGAIN.

03:06PM   20        MS. TREFZ, NICE TO SEE YOU.

03:06PM   21            MS. VOLKAR:  THANK YOU, YOUR HONOR.  WE STROVE FOR

03:06PM   22    MAXIMUM CONFUSION IN THAT SETUP.

03:06PM   23        WE REALLY JUST WANTED TO BRING THE TEXT MESSAGES TO A

03:06PM   24    CLOSE.  OVER THE PAST SEVERAL WEEKS THE PARTIES HAVE BEEN

03:06PM   25    WORKING TO NARROW ANY DISAGREEMENTS, AND WE HAVE GOTTEN IT DOWN

03:07PM  1    TO ABOUT ONE PAGE YOU'LL BE HAPPY TO HEAR I HOPE.

03:07PM  2         AND WITH THAT WE SUBMITTED THROUGH MS. KRATZMANN THE ONE

03:07PM  3    PAGE WITH BATES ENDING IN 293.

03:07PM  4         THE GOVERNMENT'S POINT HERE -- I'M SORRY, THE GOVERNMENT

03:07PM  5    HAS AGREED TO THE VAST MAJORITY OF DEFENDANT'S RULE 106

03:07PM  6    COMPLETENESS DESIGNATIONS, AND THIS IS THE SOLE PAGE WHERE WE

03:07PM  7    HAVE A REMAINING OBJECTION.

03:07PM  8         THE OBJECTION IS REALLY THAT THE CHUNK OF PAGES IN THE

03:07PM  9    MIDDLE -- AND I DO HAVE A COPY.  I THINK MS. KRATZMANN MAY HAVE

03:07PM  10   JUST PROVIDED ONE, BUT I DO HAVE A COPY TO HAND UP IF THAT'S

03:07PM  11   HELPFUL.

03:07PM  12             THE COURT:  IS THIS THE SAME (INDICATING)?  YEAH.

03:07PM  13             MS. VOLKAR:  (HANDING.)

03:07PM  14        SO, YOUR HONOR, YOU MAY SEE THAT THE FIRST BATCH OF TEXT

03:07PM  15   MESSAGES ARE SUBMITTED BY DEFENSE COUNSEL FOR RULE 106 ARE

03:08PM  16   ACTUALLY FOR AN ENTIRELY DIFFERENT DAY.  THEY OCCUR ON

03:08PM  17   AUGUST 27TH, 2015.  THEY REFER TO A CALL OR REFERRING TO

03:08PM  18   DANIEL, I ASSUME DR. YOUNG.  THEY DO NOT APPEAR TO HAVE ANY

03:08PM  19   CONNECTION, FROM THE GOVERNMENT'S PERSPECTIVE, WITH THE BOTTOM

03:08PM  20   TWO TEXT MESSAGES WHICH WERE OUR ORIGINAL SUGGESTED ADMISSIONS,

03:08PM  21   AND, THEREFORE, WE REQUEST THAT THE APPROXIMATELY SIX TEXT

03:08PM  22   MESSAGES IN THAT FIRST BATCH BE STRUCK AS INAPPROPRIATE UNDER

03:08PM  23   RULE 106.

03:08PM  24             THE COURT:  OKAY.  THANK YOU.

03:08PM  25             MS. TREFZ:  YOUR HONOR, THE TEXT MESSAGES FROM

4096

03:08PM  1    AUGUST 27TH ARE RELATED, AS ARE THE ONES FROM AUGUST 28TH, TO

03:08PM  2    THE ONGOING FDA INSPECTION.

03:08PM  3         THE RELEVANT TOPIC WAS ACTUALLY DISCUSSED THE DAY BEFORE

03:08PM  4    IN THE MESSAGES THAT THE GOVERNMENT IS SEEKING TO INTRODUCE AND

03:08PM  5    THE DAY AFTER BECAUSE THE FDA INSPECTION WAS ONGOING.

03:09PM  6         DR. YOUNG AND DR. ANEKAL BOTH HAD ROLES IN RESPONDING TO

03:09PM  7    THAT INVESTIGATION OR INSPECTION INCLUDING RELATED TO CTN'S AND

03:09PM  8    THE NANOTAINERS AND THE 4.1 DEVICE.  WE THINK THESE ARE

03:09PM  9    APPROPRIATE UNDER 106 TO, YOU KNOW, IN FAIRNESS BE KIND OF READ

03:09PM  10   AT THE SAME TIME.  IT'S OBVIOUSLY A LITTLE BIT HARD WHEN YOU'RE

03:09PM  11   READING SOMEONE ELSE'S TEXT MESSAGES TO UNDERSTAND WHAT THE

03:09PM  12   CONTEXT IS FOR THEM, BUT I'M --

03:09PM  13        THE COURT:  WELL, THAT'S THE REAL -- CAN YOU EXPLAIN

03:09PM  14   THAT?  I KNOW YOU JUST TOLD ME THAT THEY RELATE TO A TOPIC THAT

03:09PM  15   HAPPENED A DAY BEFORE.  SO UNDER THE 106 CONTEXT, HOW DOES THIS

03:09PM  16   FULFILL 106 OBJECTIVE?

03:09PM  17        MS. TREFZ:  RIGHT.  SO THE FDA INSPECTION WAS

03:09PM  18   ONGOING BEFORE AND IT WAS ONGOING AFTER THESE MESSAGES.

03:09PM  19        THE TEXT MESSAGES ON AUGUST 28TH THAT FOLLOW THESE ARE

03:10PM  20   ALSO RELATED TO THE FDA INSPECTION AS ARE THE ONES ON PRIOR

03:10PM  21   PAGES FROM PRIOR DAYS.

03:10PM  22        AND SO WE WOULD SUBMIT THAT IF WE'RE GOING TO PUT IN TEXT

03:10PM  23   MESSAGES ABOUT KIND OF SOME OF THESE FDA INSPECTION ISSUES,

03:10PM  24   THEN IT'S RELEVANT AND IMPORTANT TO UNDERSTAND MS. HOLMES'S

03:10PM  25   STATE OF MIND AND HER -- AND THE INFORMATION THAT SHE'S BEING

4097

03:10PM   1    PROVIDED THROUGHOUT THAT INSPECTION.  AND THE ONES FROM

03:10PM   2    AUGUST 27TH ARE RELATED TO, YOU KNOW, TO THE FDA INSPECTION AS

03:10PM   3    WELL.

03:10PM   4             MS. VOLKAR:  YOUR HONOR, WHILE IT MAY HAVE OCCURRED

03:10PM   5    DURING THE COURSE OF THE FDA INSPECTION, IT'S HARD TO SEE WHAT

03:10PM   6    "GOOD TIME TO CALL DANIEL OR SAM," "YES WE R DONE," "CALL ME

03:10PM   7    WITH THEM," "MEANING VERY GOOD," HAS ANYTHING TO DO WITH THE

03:11PM   8    POTASSIUM DATA ON 4.1 AND 4.5 IS ON ADVIA.

03:11PM   9         IT'S JUST THAT THE MESSAGES THAT THE DEFENSE COUNSEL

03:11PM   10   IDENTIFIED THESE AS BEING RULE 106 TO ON THEIR FACE DO NOT SEEM

03:11PM   11   TO HAVE ANY REAL CONNECTION.

03:11PM   12        AND I WOULD SAY IF DEFENSE COUNSEL WANTS TO SUBMIT TEXT

03:11PM   13   MESSAGES OF THEIR OWN, OF COURSE WE'LL HAVE TO DEAL WITH ANY

03:11PM   14   HEARSAY PROBLEMS OR DIFFERENT BARRIERS THAT THEY MAY HAVE TO

03:11PM   15   OVERCOME, BUT RULE 106 DOES NOT SEEM TO BE THE APPROPRIATE

03:11PM   16   METHOD TO INTRODUCE THESE TEXT MESSAGES.

03:11PM   17             THE COURT:  MS. TREFZ, I'M TRYING TO FIND THE

03:11PM   18   CONNECTION HERE.  THERE SEEMS TO BE SOME ATTENUATION BETWEEN

03:11PM   19   THESE TEXTS.

03:11PM   20             MS. TREFZ:  WELL, IT'S HARD TO READ TEXTS OUT OF

03:11PM   21   CONTEXT IF YOU'RE NOT THE PERSON WHO WROTE THEM OR RECEIVED

03:11PM   22   THEM, SO I UNDERSTAND THAT.

03:11PM   23        I THINK WHAT YOU SEE HERE IS MR. BALWANI TELLING

03:11PM   24   MS. HOLMES ON AUGUST 27TH "INCREDIBLE DAY TO BE HONEST,"

03:12PM   25   "MEANING VERY GOOD."

03:12PM 1      THE INSPECTION THEN CONTINUES THE NEXT DAY AND HE IS --

03:12PM 2   YOU KNOW, REPORTS FURTHER INTERACTIONS ABOUT THE INSPECTION.

03:12PM 3      IT'S HARD FOR ME TO -- BECAUSE THE TEXT MESSAGES DON'T

03:12PM 4   LITERALLY SAY THE FDA INSPECTION WAS VERY GOOD, ALL I CAN DO IS

03:12PM 5   REPRESENT TO THE COURT THAT THIS IS WHAT THEY'RE ABOUT.

03:12PM 6      AND, YOU KNOW, I THINK 106'S REQUIREMENT IS THAT IT CAN BE

03:12PM 7   A PART OF THE SAME DOCUMENT OR IT CAN BE A SEPARATE DOCUMENT

03:12PM 8   BUT IN FAIRNESS SHOULD BE PRESENTED AT THE SAME TIME.

03:12PM 9      YOU KNOW, THE GOVERNMENT, I THINK, IN MANY CASES HAS, YOU

03:12PM 10   KNOW, READ PARTS OF TEXT MESSAGES, YOU KNOW, THROUGH WITNESSES

03:12PM 11   AND OTHER ITEMS, AND WE WOULD JUST SUGGEST THAT IT'S

03:12PM 12   APPROPRIATE TO INCLUDE THE TEXT MESSAGES AND THE EXHIBIT, I

03:12PM 13   GUESS, REGARDLESS OF WHETHER WHOEVER IS PRESENTING THEM AND

03:12PM 14   WHATEVER WITNESS IS READING THEM, YOU KNOW, AND ACTUALLY READS

03:13PM 15   THEM OUT LOUD.

03:13PM 16      THE COURT:  NO.  SURE.  AND WE'VE GONE THROUGH THIS

03:13PM 17   WITH OTHER TEXTS, AND I THINK I AGREED WITH MANY OF THE

03:13PM 18   OFFERINGS OF THE DEFENSE THAT THEY WERE 106 CONNECTED.

03:13PM 19      I HAVE TO CONFESS AS I SIT HERE AND LOOK AT THEM, AND

03:13PM 20   AGAIN, I JUST LOOKED AT THIS NOW, AND I JUST SEE THERE'S SOME

03:13PM 21   ATTENUATION.  I JUST DON'T SEE THE CONNECTION, THE REAL 106

03:13PM 22   CONNECTION.

03:13PM 23      MS. TREFZ:  IF I MAY, YOUR HONOR?

03:13PM 24      I THINK MS. VOLKAR PROVIDED YOU ONE PAGE, BUT THE TEXT

03:13PM 25   MESSAGES FROM AUGUST 28TH CONTINUE ON TO THE NEXT COUPLE OF

4099

03:13PM  1    PAGES OF THE EXHIBIT, AND SO I JUST HOPE IF WE DON'T RESOLVE

03:13PM  2    THIS NOW AND YOU WANT TO GO BACK AND TAKE A LOOK AT THEM.

03:13PM  3              THE COURT:  WELL, THAT'S A GOOD SUGGESTION.  LET ME

03:13PM  4    DO THAT.

03:13PM  5              MS. TREFZ:  I'M SORRY.

03:13PM  6              MS. VOLKAR:  YOUR HONOR, IF I MAY?

03:13PM  7         HOPING THAT WE COULD GET TO A RESOLUTION ON THIS, IF NOT

03:13PM  8    TODAY, SOON, THE GOVERNMENT HAS PREPARED AND WOULD LIKE TO MOVE

03:13PM  9    TO ADMIT IN THE NEAR FUTURE EXHIBIT 5387D, WHICH IS ALL OF THE

03:14PM  10   TEXT MESSAGES THAT THE GOVERNMENT SOUGHT TO ADMIT WITH ALL OF

03:14PM  11   THE RULE 106 COMPLETENESS SUGGESTIONS, INCLUDING THE ONES THAT

03:14PM  12   ARE AT ISSUE RIGHT NOW BECAUSE WE WERE NOT SURE WHETHER -- WHAT

03:14PM  13   THE COURT'S RULING ON THOSE WOULD BE.  SO WE WOULD BE HAPPY TO

03:14PM  14   PASS THIS UP AND ALSO EITHER NOW OR IN THE VERY NEAR FUTURE WE

03:14PM  15   WOULD LIKE TO MOVE IT INTO EVIDENCE.

03:14PM  16             THE COURT:  SURE.

03:14PM  17        AND THIS, THIS -- WHAT YOU HAVE IN YOUR HAND INCORPORATES

03:14PM  18   WHAT I WAS JUST TALKING WITH MS. TREFZ ABOUT, THE INCLUSION OF

03:14PM  19   106 THAT THE DEFENSE WANTED.

03:14PM  20             MS. VOLKAR:  THAT'S CORRECT.  IT HAS THE TEXTS

03:14PM  21   SEVERAL TIMES AND SO THERE WAS 5387B, WHICH IS ABOUT 30 PAGES

03:14PM  22   YOUR HONOR WENT THROUGH AND ACCEPTED MOST OF THE RULE 106, AND

03:14PM  23   I THINK YOU MAYBE SUSTAINED THE OBJECTION TO THREE OR FOUR OF

03:14PM  24   THOSE HAVE BEEN REDACTED FROM THIS VERSION.

03:14PM  25             THE COURT:  RIGHT.

4100

```
03:14PM   1              MS. VOLKAR:  SO THIS INCORPORATES EVERYTHING TO DATE

03:14PM   2    OF THE COURT'S RULING AND SOME TEXT MESSAGES THAT WE HAD BEEN

03:14PM   3    IN DISCUSSION WITH DEFENSE ABOUT FOR THE LAST SEVERAL WEEKS,

03:15PM   4    BUT WE WANTED ONE HOLISTIC DOCUMENT TO BE ABLE TO PROVIDE TO

03:15PM   5    THE JURY WAS OUR WISH.

03:15PM   6              THE COURT:  SURE.  OF COURSE.

03:15PM   7              MS. VOLKAR:  AND IT DOES HAVE RIGHT NOW THEIR

03:15PM   8    SUGGESTIONS ON THIS PAGE 293, BECAUSE WE WERE NOT YET SURE WHAT

03:15PM   9    YOUR HONOR'S RULING WOULD BE.

03:15PM  10              THE COURT:  DOES IT HAVE THE CONTEXTUAL CONNECTION

03:15PM  11    THAT MS. TREFZ IS SUGGESTING?

03:15PM  12              MS. VOLKAR:  IT DOES, YOUR HONOR, AND I'M HAPPY TO

03:15PM  13    POINT YOU TO THOSE PAGES IF THAT WOULD BE HELPFUL.

03:15PM  14              THE COURT:  YES, THAT WOULD BE HELPFUL.  I'M GOING

03:15PM  15    TO TAKE MS. TREFZ SUGGESTION AND LOOK AT THIS TONIGHT.

03:15PM  16         DID YOU WANT TO TELL ME WHICH PAGE I SHOULD LOOK AT,

03:15PM  17    MS. VOLKAR?

03:15PM  18              MS. VOLKAR:  I'M HAPPY TO, YOUR HONOR.  SO IF YOU

03:15PM  19    LOOK AT THE EXHIBIT NUMBER IN THE BOTTOM MIDDLE.

03:15PM  20              THE COURT:  YES.

03:15PM  21              MS. VOLKAR:  THE ONE PAGE I HANDED YOU IS PAGE

03:15PM  22    NUMBER 96 OF THE EXHIBIT.

03:15PM  23              THE COURT:  OKAY.

03:15PM  24              MS. VOLKAR:  AND THE PAGE THAT MS. TREFZ WAS

03:15PM  25    REFERRING TO CONTINUES ON TO PAGE 97.
```

03:16PM   1          MS. TREFZ:  AND THEN I WOULD JUST NOTE THAT IF YOU

03:16PM   2   COULD KIND OF LOOK BACK A DAY AND YOU CAN SEE THE KIND OF --

03:16PM   3   SOME OF THE BEGINNING OF THE FDA INSPECTION.  AND AS WE SAID,

03:16PM   4   IT'S HARD TO UNDERSTAND THE FULL CONTEXT OF THE MESSAGES KIND

03:16PM   5   OF IN A VACUUM, BUT HOPEFULLY THAT WILL HELP.

03:16PM   6          THE COURT:  SO IF I LOOK AT IT, MS. TREFZ, IT WILL

03:16PM   7   BE CRYSTAL CLEAR WHAT YOU'RE TELLING ME?

03:16PM   8          MS. TREFZ:  WE'LL SEE, YOUR HONOR.  I'M SURE YOU'LL

03:16PM   9   LET ME KNOW.

03:16PM  10          THE COURT:  OKAY.

03:16PM  11          MS. VOLKAR:  AND, YOUR HONOR, IF I MAY?

03:16PM  12      I JUST WANT TO POINT OUT THAT EVEN IF THEY'RE MEETING WITH

03:16PM  13   THE FDA OVER A SERIES OF DAYS, A CONVERSATION ABOUT ONE MEETING

03:16PM  14   DOESN'T ALWAYS NECESSARILY BLEED INTO OR RELATE TO THE OTHER

03:16PM  15   MEETING.

03:16PM  16      AND THE GOVERNMENT'S POSITION IS THE ONLY REASON WE RAISED

03:16PM  17   AN OBJECTION TO THIS ONE IS, FROM OUR PERSPECTIVE, EVEN WITH

03:16PM  18   THE BENEFIT OF THE PAGES BEFORE AND AFTER, WE JUST DO NOT SEE

03:16PM  19   ANY CONNECTION BETWEEN THAT DAY, THE AUGUST 27TH MESSAGES, AND

03:17PM  20   THE NEXT DAY WHEN THEY'RE TALKING ABOUT THE NANOTAINER.

03:17PM  21      AND I WILL POINT OUT FOR THE RECORD, WE DID ACCEPT DEFENSE

03:17PM  22   COUNSEL'S SUGGESTED ADDITION OF THE TOP OF THOSE THREE BOTTOM

03:17PM  23   ONES THAT IS ON THE SAME SUBJECT AND ON THE SAME DAY TALKING

03:17PM  24   ABOUT THERE WERE GOOD DATA ON THE NANOTAINERS AND THEN OUR TWO

03:17PM  25   NEXT MESSAGES WERE ALSO ABOUT THE NANOTAINER.

4102

03:17PM 1          SO WE DID IN GOOD FAITH LOOK AT WHAT WAS ON THE SAME TOPIC

03:17PM 2     AND FAIRLY COVERED BY RULE 106.

03:17PM 3                    THE COURT:  OKAY.  GREAT.

03:17PM 4          WELL, THANK YOU.  I'LL LOOK AT THESE THIS EVENING AND THEN

03:17PM 5     MAYBE WE CAN TALK ABOUT IT IN THE MORNING.  GREAT.

03:17PM 6                    MS. VOLKAR:  THANK YOU, YOUR HONOR.

03:17PM 7                    MS. TREFZ:  THANK YOU.

03:17PM 8                    THE COURT:  ANYTHING ELSE FROM EITHER SIDE?

03:17PM 9                    MR. BOSTIC:  NO, YOUR HONOR.

03:17PM 10                   MR. DOWNEY:  NO, YOUR HONOR.

03:17PM 11                   THE COURT:  OKAY.  THANK YOU.

03:17PM 12                   THE CLERK:  COURT IS ADJOURNED.

03:17PM 13         (COURT ADJOURNED AT 3:17 P.M.)

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

1
2
3                    CERTIFICATE OF REPORTERS
4
5
6
7        WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE
8   UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
9   CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO
10  HEREBY CERTIFY:
11       THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS
12  A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE
13  ABOVE-ENTITLED MATTER.
14
15
16       _____
         IRENE RODRIGUEZ, CSR, CRR
17       CERTIFICATE NUMBER 8076
18
         _____
19       LEE-ANNE SHORTRIDGE, CSR, CRR
20       CERTIFICATE NUMBER 9595
21       DATED:  OCTOBER 19, 2021
22
23
24
25