1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                         SAN JOSE DIVISION

5

     UNITED STATES OF AMERICA,          )   CR-18-00258-EJD
6                                       )
                         PLAINTIFF,     )   SAN JOSE, CALIFORNIA
7                                       )
              VS.                       )   VOLUME 22
8                                       )
     ELIZABETH A. HOLMES,               )   OCTOBER 20, 2021
9                                       )
                         DEFENDANT.     )   PAGES 4103 - 4317
10   _____    )

11                   TRANSCRIPT OF TRIAL PROCEEDINGS

12             BEFORE THE HONORABLE EDWARD J. DAVILA
                     UNITED STATES DISTRICT JUDGE

13   A P P E A R A N C E S:

14

15   FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                           BY:  JOHN C. BOSTIC
16                              JEFFREY B. SCHENK
                           150 ALMADEN BOULEVARD, SUITE 900
17                         SAN JOSE, CALIFORNIA 95113

18                         BY:  ROBERT S. LEACH
                               KELLY VOLKAR
19                         1301 CLAY STREET, SUITE 340S
                           OAKLAND, CALIFORNIA 94612

20        (APPEARANCES CONTINUED ON THE NEXT PAGE.)

21

     OFFICIAL COURT REPORTERS:
22                           IRENE L. RODRIGUEZ, CSR, RMR, CRR
                             CERTIFICATE NUMBER 8074
23                           LEE-ANNE SHORTRIDGE, CSR, CRR
                             CERTIFICATE NUMBER 9595
24
          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25            TRANSCRIPT PRODUCED WITH COMPUTER

1     A P P E A R A N C E S: (CONT'D)
2

3     FOR DEFENDANT HOLMES:   WILLIAMS & CONNOLLY LLP
                              BY:  KEVIN M. DOWNEY
4                                  LANCE A. WADE
                                   KATHERINE TREFZ
5                                  PATRICK LOOBY
                                   J.R. FLEURMONT
6                                  ANDREW LEMENS
                              725 TWELFTH STREET, N.W.
7                             WASHINGTON, D.C. 20005

8                             LAW OFFICE OF JOHN D. CLINE
                              BY:  JOHN D. CLINE
9                             ONE EMBARCADERO CENTER, SUITE 500
                              SAN FRANCISCO, CALIFORNIA 94111
10

11    ALSO PRESENT:           FEDERAL BUREAU OF INVESTIGATION
                              BY:  ADELAIDA HERNANDEZ
12
                              OFFICE OF THE U.S. ATTORNEY
13                            BY:  LAKISHA HOLLIMAN, PARALEGAL
                                   MADDI WACHS, PARALEGAL
14
                              WILLIAMS & CONNOLLY
15                            BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL

16                            TBC
                              BY:  BRIAN BENNETT, TECHNICIAN
17

18

19

20

21

22

23

24

25

INDEX OF PROCEEDINGS

GOVERNMENT'S:

**DANIEL EDLIN**
CROSS-EXAM BY MR. DOWNEY (RES.)          P. 4128
REDIRECT EXAM BY MR. BOSTIC              P. 4267
RECROSS-EXAM BY MR. DOWNEY               P. 4305

**SHANE WEBER**
DIRECT EXAM BY MR. LEACH                 P.
CROSS-EXAM BY MR. CLINE                  P.
REDIRECT EXAM BY MR. LEACH               P.
RECROSS-EXAM BY MR. CLINE                P.

INDEX OF EXHIBITS

|  | IDENT. | EVIDENCE |
|---|---|---|
| GOVERNMENT'S: | | |
| 5387D | | 4108 |
| 3696 | | 4225 |
| | | |
| DEFENDANT'S: | | |
| 7694 | | 4128 |
| 10444 | | 4133 |
| 13993 | | 4137 |
| 13986 | | 4141 |
| 10446 | | 4142 |
| 10457 | | 4148 |
| 10472 | | 4153 |
| 13977 | | 4159 |
| 7244 | | 4168 |
| 7243 | | 4177 |
| 13988 | | 4199 |
| 10464 | | 4218 |
| 7217 | | 4221 |
| 10466 | | 4224 |
| 10469 | | 4227 |
| 10468 | | 4228 |
| 10532 | | 4231 |
| 13935 | | 4234 |
| 10467 | | 4238 |
| 13979 | | 4242 |
| 13980 | | 4244 |
| 7365 | | 4247 |
| 10554 | | 4251 |
| 10555 | | 4254 |
| 10558 | | 4256 |
| 7687 | | 4265 |
| 12251 | | 4280 |

4107

1    SAN JOSE, CALIFORNIA                    OCTOBER 20, 2021

08:37AM   2                   P R O C E E D I N G S

08:37AM   3         (COURT CONVENED AT 8:37 A.M.)

08:37AM   4         (JURY OUT AT 8:37 A.M.)

08:37AM   5              THE COURT:  WE ARE ON THE RECORD IN THE HOLMES

08:37AM   6    MATTER.  ALL COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT.

08:37AM   7         GOOD MORNING.

08:37AM   8         WE'RE OUTSIDE THE PRESENCE OF THE JURY.

08:37AM   9         I JUST WANTED TO -- IS MS. VOLKAR HERE?  YES.  I SEE

08:37AM  10    MS. VOLKAR IS HERE.  MS. TREFZ IS HERE.

08:37AM  11         I THOUGHT WE WOULD ADDRESS THE ISSUE OF THE TEXTS, AND I

08:37AM  12    DID REVIEW THE DOCUMENTS AGAIN LAST NIGHT AT MS. TREFZ'S

08:38AM  13    REQUEST AND MS. VOLKAR'S REQUEST.

08:38AM  14         AS I SAID LAST -- YESTERDAY, THE CONNECTION BETWEEN THESE

08:38AM  15    TWO TEXTS FROM THE 27TH AND 28TH, THE SIXTH TEXT -- OH, YOU'RE

08:38AM  16    BACK AGAIN.

08:38AM  17              MS. TREFZ:  YES, JUST FOR MAXIMUM CONFUSION,

08:38AM  18    YOUR HONOR.

08:38AM  19         (LAUGHTER.)

08:38AM  20              THE COURT:  AS I SAID LAST NIGHT, THEY SEEM TO BE

08:38AM  21    ATTENUATED.  106 TALKS ABOUT FAIRNESS AND WHAT IS FAIR FOR

08:38AM  22    COMPLETENESS TO COMPLETE THE CONVERSATION, THE CONTEXTUAL

08:38AM  23    NATURE OF IT.

08:38AM  24         I LOOK AT THESE AND I THINK, WELL, IT IS -- AS I SAID, I

08:38AM  25    SUPPOSE THERE'S A WAY TO READ INTO IT THAT THERE IS SOME

4108

08:38AM  1    CONTEXTUAL CONTACT WITH WHAT WAS OCCURRING ON THE 28TH.

08:38AM  2         IN THE SPIRIT OF THAT AND IN THE SPIRIT OF 106, I WILL

08:39AM  3    ALLOW THOSE TO COME IN, MS. VOLKAR.  AND YOU'VE PREPARED, I

08:39AM  4    THINK, THE DOCUMENT ACCORDING WITH THAT, SO I'LL ALLOW -- I

08:39AM  5    DON'T KNOW IF IT WAS A REQUEST FROM MS. TREFZ, BUT I'LL ALLOW

08:39AM  6    THEM IN.

08:39AM  7         AND THEN WOULD YOU SEEK THEN, IS THIS GOING TO BE ADMITTED

08:39AM  8    NOW?  WOULD YOU LIKE TO DO THAT NOW?

08:39AM  9              MS. VOLKAR:  YES, YOUR HONOR, THANK YOU.

08:39AM  10        THE UNITED STATES WOULD LIKE TO MOVE TRIAL EXHIBIT 5387D.

08:39AM  11             THE COURT:  OKAY.

08:39AM  12             MS. TREFZ:  WE MAY HAVE SPECIFIC OBJECTIONS TO

08:39AM  13   PARTICULAR PARTS SHOULD THEY CHOOSE TO READ THEM, BUT THERE'S

08:39AM  14   NO AUTHENTICATION, AS WE'VE ALREADY DISCUSSED, OBJECTION AND I

08:39AM  15   THINK WE ADDRESSED RULE 106, SO I THINK IT CAN COME IN WITH THE

08:39AM  16   POTENTIAL FOR PARTICULAR SECTIONS TO BE STRICKEN IF THERE'S AN

08:39AM  17   OBJECTION AT THE TIME THAT THEY'RE READ.

08:39AM  18             THE COURT:  OKAY.  WHAT I HEARD YOU SAY IS NO REAL

08:39AM  19   OBJECTION NOW, JUDGE, BUT IF WE HAVE FURTHER OBJECTIONS, WE'LL

08:39AM  20   RAISE THEM AT THE MOMENT.

08:39AM  21             MS. TREFZ:  CORRECT.

08:39AM  22             THE COURT:  GREAT.  OKAY.  IT'S RECEIVED WITH THAT

08:39AM  23   RECOGNITION.  THANK YOU.

08:40AM  24             MS. VOLKAR:  THANK YOU, YOUR HONOR.

08:40AM  25        (GOVERNMENT'S EXHIBIT 5387D WAS RECEIVED IN EVIDENCE.)

08:40AM 1          THE COURT:  ANYTHING ELSE ON THIS?

08:40AM 2          MS. VOLKAR:  NO, YOUR HONOR.

08:40AM 3          THE COURT:  LET ME INQUIRE AS TO THE CURRENT WITNESS

08:40AM 4   WE HAVE.  MAYBE I'LL TURN TO MR. DOWNEY.

08:40AM 5          MR. DOWNEY:  YOUR HONOR, I THINK MY EXPECTATION IS

08:40AM 6   THAT WE WOULD FINISH HIM TODAY, AND WE HOPEFULLY WILL START THE

08:40AM 7   OTHER WITNESS THAT THE GOVERNMENT HAS HERE, MR. WEBER.

08:40AM 8      I THINK IT SOUNDS LIKE, FROM OUR CONVERSATIONS WITH THE

08:40AM 9   GOVERNMENT, IF MR. WEBER IS -- STARTS AFTER THE SECOND BREAK,

08:40AM 10  HE MIGHT BE FINISHED TODAY.  THAT SOUNDS TO BE THE CASE, BUT

08:40AM 11  I'LL LET MR. LEACH SPEAK TO THAT.

08:40AM 12         THE COURT:  OKAY.  THANK YOU.

08:40AM 13         MR. LEACH:  I ANTICIPATE ABOUT 45 MINUTES OF DIRECT

08:40AM 14  EXAMINATION FOR MR. WEBER, YOUR HONOR.

08:40AM 15         THE COURT:  OKAY.  SO IT SOUNDS LIKE MR. EDLIN WILL

08:40AM 16  BE ON THROUGH OUR MORNING BREAK AT LEAST.

08:40AM 17         MR. DOWNEY:  YES.

08:40AM 18         THE COURT:  AT LEAST WITH YOU.

08:41AM 19         MR. DOWNEY:  YES.

08:41AM 20         THE COURT:  MR. DOWNEY, AND THEN I DON'T KNOW IF

08:41AM 21  THERE'S ANY REDIRECT, RECROSS AFTER THAT, BUT WE MAY GET INTO

08:41AM 22  MR. WEBER SOMETIME -- I'M HOPING THAT WE CAN GO UNTIL 4:00

08:41AM 23  TODAY, AS I SAID, AND WE MAY GET INTO -- YES, I THINK WE'RE

08:41AM 24  GOING UNTIL 4:00.

08:41AM 25         MR. LEACH:  I THOUGHT THE COURT INDICATED 3:00 -- I

08:41AM 1   THOUGHT WE WERE GOING TO ASK THE JURORS, AND THEN AT SOME POINT

08:41AM 2   YESTERDAY IT SEEMED LIKE ONE OF THE JURORS COULD NOT GO UNTIL

08:41AM 3   4:00, BUT MAYBE I AM, TOO.

08:41AM 4        THE SMARTEST PERSON IN THE ROOM, THE COURT REPORTER, JUST

08:41AM 5   SAID 3:00.

08:41AM 6        (LAUGHTER.)

08:41AM 7            THE COURT:  SO WE'LL GO UNTIL 3:00.  IF WE CAN GO TO

08:41AM 8   4:00, WE WILL DO IT.

08:41AM 9        I HAVE TOMORROW AVAILABLE, AND MS. KRATZMANN EMAILED THE

08:41AM 10  JURORS TO SEE IF THEY COULD COME IN TOMORROW.  ONE OF THEM

08:41AM 11  CANNOT, SO THAT ELIMINATES TOMORROW.  SO WE WILL NOT BE IN

08:42AM 12  SESSION TOMORROW.

08:42AM 13       AND I THINK I ASKED FOR 4:00 ON FRIDAY.  I'M PRETTY

08:42AM 14  CONFIDENT THAT I DID THAT.  WE'LL SEE WHAT WE CAN DO.  YES, I

08:42AM 15  DID THAT.

08:42AM 16       OKAY.  SO BACK TO MR. WEBER.  HE PROBABLY WOULD START THEN

08:42AM 17  AT MAYBE 1:00 O'CLOCK OR SOMETHING LIKE THAT?  IS THAT AFTER

08:42AM 18  THAT BREAK DO YOU THINK?

08:42AM 19            MR. LEACH:  THAT SOUNDS ABOUT RIGHT.

08:42AM 20            THE COURT:  I'M NOT PUTTING TIME CONSTRAINTS.

08:42AM 21            MR. DOWNEY:  I'M NOT TOTALLY CERTAIN.  I WAS

08:42AM 22  THINKING MORE AFTER THE SECOND BREAK.

08:42AM 23            THE COURT:  OKAY.

08:42AM 24            MR. DOWNEY:  YEAH.

08:42AM 25            THE COURT:  AND I THINK WE DO STILL HAVE TO --

08:42AM 1    THERE'S AN ISSUE AS TO MR. WEBER, STILL, AND THERE'S SOME

08:42AM 2    DOCUMENTS.

08:42AM 3            MR. DOWNEY:  THAT'S RIGHT.

08:42AM 4            THE COURT:  WHEN SHOULD WE TALK ABOUT THAT AGAIN?

08:42AM 5            MR. LEACH:  I'M PLEASED TO DO IT NOW, YOUR HONOR, OR

08:42AM 6    AFTER -- DURING THE FIRST BREAK.

08:42AM 7            THE COURT:  MR. CLINE IS --

08:42AM 8            MR. CLINE:  WHATEVER YOUR HONOR WOULD LIKE.

08:42AM 9            THE COURT:  WELL, LET'S, LET'S CHAT A LITTLE BIT

08:42AM 10   ABOUT IT NOW FOR A COUPLE OF MINUTES.

08:42AM 11       MR. CLINE, WHY DON'T YOU CONTINUE YOUR COMMENTS ABOUT

08:42AM 12   THAT.

08:43AM 13           MR. CLINE:  WELL, WHAT WE'RE TALKING ABOUT IS THIS

08:43AM 14   INTERNAL REPORT THAT DR. WEBER PREPARED AT PFIZER, AND THERE

08:43AM 15   ARE SEVERAL ISSUES WITH IT.  ONE IS A 702 ISSUE BECAUSE IT

08:43AM 16   CONTAINS SPECIALIZED KNOWLEDGE FOR SURE THAT WOULD FALL UNDER

08:43AM 17   702.

08:43AM 18       THE OTHER ISSUE IS A 403 ISSUE BECAUSE IT HAS A VARIETY OF

08:43AM 19   PRETTY PEJORATIVE COMMENTS ABOUT MS. HOLMES, ABOUT THERANOS,

08:43AM 20   WHICH I THINK ARE CERTAINLY UNFAIRLY PREJUDICIAL, AND THE

08:43AM 21   PROBATIVE VALUE PERHAPS IS NOT ZERO, BUT IT'S PRETTY LOW, AND

08:43AM 22   IT'S LOW BECAUSE THIS DOCUMENT WAS NEVER COMMUNICATED TO

08:43AM 23   THERANOS OR TO MS. HOLMES.

08:43AM 24       THERE WAS A PHONE CALL BETWEEN DR. WEBER AND MS. HOLMES

08:43AM 25   WHERE HE CONVEYED THAT PFIZER DID NOT -- WASN'T INTERESTED AT

08:43AM  1       THAT POINT IN DOING FURTHER BUSINESS, AND OF COURSE THAT'S FAIR

08:43AM  2       GAME.

08:43AM  3           I ALSO, AS I THINK WE DISCUSSED YESTERDAY, YOUR HONOR,

08:44AM  4       DON'T HAVE ANY OBJECTION TO DR. WEBER TESTIFYING THAT HE WAS

08:44AM  5       ASKED TO PREPARE AND CONDUCT A REVIEW, THAT HE CONDUCTED THE

08:44AM  6       REVIEW, THAT HE CONCLUDED THAT THERE WAS NO BUSINESS BASIS FOR

08:44AM  7       THERANOS AND PFIZER TO GO FORWARD, THAT HE CONVEYED THAT

08:44AM  8       RECOMMENDATION TO HIS SUPERIORS AT PFIZER, THAT HE THEN TALKED

08:44AM  9       TO MS. HOLMES ABOUT THAT CONCLUSION.  THAT'S ALL, AS FAR AS I'M

08:44AM 10       CONCERNED, THAT'S ALL FAIR GAME.

08:44AM 11           BUT TO ALLOW IN THIS QUITE PREJUDICIAL INTERNAL REPORT

08:44AM 12       THAT MS. HOLMES, NEITHER MS. HOLMES NOR ANYONE ELSE AT THERANOS

08:44AM 13       EVER SAW UNTIL THIS CASE BEGAN JUST SEEMS PROFOUNDLY UNFAIR TO

08:44AM 14       ME, AND SO THAT'S WHY WE'VE ASKED TO EXCLUDE IT.

08:44AM 15               THE COURT:  MR. LEACH?

08:44AM 16               MR. LEACH:  YOUR HONOR, THE DEFENDANT MADE SWEEPING

08:44AM 17       CLAIMS PURPORTING TO SPEAK ABOUT WHAT PFIZER THOUGHT.  SHE

08:45AM 18       CLAIMED TO HAVE THAT KNOWLEDGE.  SHE CLAIMED TO KNOW PFIZER

08:45AM 19       VALIDATED THIS TECHNOLOGY.

08:45AM 20           PFIZER DID NOT VALIDATE THIS TECHNOLOGY.  MR. WEBER LOOKED

08:45AM 21       AT IT AND IT DETAILED WHAT PFIZER THOUGHT.

08:45AM 22           THIS IS POWERFUL EVIDENCE OF THE FALSITY OF THE

08:45AM 23       DEFENDANT'S STATEMENTS.  THE WHY HERE IS VERY IMPORTANT BECAUSE

08:45AM 24       I EXPECT PART OF THE CROSS TO BE, WELL, PFIZER LEFT OPEN THE

08:45AM 25       POSSIBILITY OF RECONNECTING IN SIX MONTHS, THERE WAS -- THE

08:45AM 1     DEFENSE HAS MARKED SOME EXHIBITS AFTER THIS REPORT WHERE

08:45AM 2     MS. HOLMES IS PROPOSING NEW BUSINESS TO PFIZER.

08:45AM 3          AND THIS DOCUMENT SPEAKS TO THE CONVICTION OF THEIR

08:45AM 4     FEELINGS AT THE TIME AND THE DEFINITIVENESS OF THE REVIEW THAT

08:45AM 5     THEY DID.

08:45AM 6          SHE PURPORTED TO SPEAK ABOUT WHAT THEY THOUGHT, AND IT

08:45AM 7     JUST SEEMS THAT THERE'S NO 403 ISSUE WITH THIS WITNESS TELLING

08:46AM 8     THIS JURY WHAT HE THOUGHT AT THE TIME ABOUT WHAT HE WAS ASKED

08:46AM 9     TO REVIEW.

08:46AM 10          AND I ALSO DON'T UNDERSTAND THE DISTINCTION BETWEEN ASKING

08:46AM 11     THIS MAN, WHAT DID YOU DO, WHAT DID YOU CONCLUDE, WHY DID YOU

08:46AM 12     COME TO THAT CONCLUSION, BUT NOT ADMITTING THE BUSINESS RECORD

08:46AM 13     THAT HE PREPARED MEMORIALIZING ALL OF THAT.

08:46AM 14          SO THIS DEFENDANT PURPORTED TO SPEAK FOR PFIZER, PURPORTED

08:46AM 15     TO COMMUNICATE THAT PFIZER VALIDATED THIS TECHNOLOGY.

08:46AM 16          THIS IS EVIDENCE THAT THOSE STATEMENTS ARE FALSE.

08:46AM 17     CROSS-EXAMINATION IS THE CURE FOR THIS, YOU KNOW, WHAT DID YOU

08:46AM 18     DO?  WHAT DID YOU MEAN?  WHAT WERE THE LIMITS OF YOUR REVIEW?

08:46AM 19          BUT I DON'T THINK THERE'S ANY REASON TO SANITIZE THE

08:46AM 20     CONCLUSIONS THAT THIS PERCIPIENT WITNESS CAME TO.

08:46AM 21          THE COURT:  WELL, THAT WAS OUR DISCUSSION YESTERDAY,

08:46AM 22     I THINK.  I HAD RAISED -- I THINK I SHARED WITH YOU, AT LEAST

08:46AM 23     MY RECOGNITION, OF SOME OF THE WORDS THAT WERE PEJORATIVE,

08:47AM 24     PERHAPS HIS OPINION, AND WHETHER OR NOT THOSE SHOULD BE

08:47AM 25     REDACTED OR NOT, OR YOUR COMMENTS ON IT.

08:47AM  1       I THINK, MR. CLINE, I THINK THAT'S WHAT YOU FOUND MOST

08:47AM  2   OFFENSIVE.

08:47AM  3       MR. CLINE:  WORDS LIKE "EVASIVE," "DEFLECTIVE,"

08:47AM  4   "UNFOUNDED," THERE'S REALLY A WHOLE SERIES OF REALLY PEJORATIVE

08:47AM  5   TERMS THAT HE USED, AND IT'S UNDERSTANDABLE THAT HE WOULD USE

08:47AM  6   THEM IN AN INTERNAL PFIZER DOCUMENT.  HE'S COMMUNICATING

08:47AM  7   CANDIDLY WITH HIS COLLEAGUES.

08:47AM  8       BUT NONE OF THAT WAS COMMUNICATED TO MS. HOLMES AND THAT'S

08:47AM  9   THE PROBLEM.

08:47AM 10       WHAT THE JURY WILL END UP WITH IS THIS EXTREMELY

08:47AM 11   PEJORATIVE DOCUMENT AND, YES, WE CAN ALWAYS ARGUE IT DIDN'T GO

08:47AM 12   TO MS. HOLMES.  BUT THEY'RE GOING TO HAVE IT THERE AND IT'S

08:47AM 13   GOING TO HAVE A REAL POWERFUL IMPACT.

08:47AM 14       YOU KNOW, I WAS -- WHAT MS. HOLMES ALLEGEDLY SAID FALSELY

08:48AM 15   WAS THAT PFIZER HAD COMPREHENSIVELY VALIDATED THE THERANOS

08:48AM 16   TECHNOLOGY.  THAT'S THE FALSITY.

08:48AM 17       I DON'T HAVE ANY PROBLEM WITH DR. WEBER TESTIFYING THAT HE

08:48AM 18   DID NOT COMPREHENSIVELY VALIDATE THE TECHNOLOGY AND, AS FAR AS

08:48AM 19   HE KNOWS, NO ONE AT PFIZER DID EITHER.

08:48AM 20       THAT'S FINE.  AND IF I WERE TO ATTACK HIM FOR STATING

08:48AM 21   THAT, THEN I SUPPOSE I MIGHT OPEN THE DOOR SOMEWHERE.  P.

08:48AM 22       BUT THIS REPORT IS SO DAMAGING IN ITS TONE AND IN SOME OF

08:48AM 23   THE TERMS THAT IT USES THAT I JUST DON'T THINK THAT IT SHOULD

08:48AM 24   COME IN.

08:48AM 25       MR. LEACH:  YOUR HONOR, RESPECTFULLY, I THINK THAT

08:48AM 1  PROVES THE POWER OF THIS DOCUMENT AND WHY 403 CAN'T POSSIBLY

08:48AM 2  KEEP IT OUT.

08:48AM 3       THE SALIENT ISSUE IS, DID PFIZER VALIDATE THERANOS'S

08:48AM 4  TECHNOLOGY?

08:48AM 5       THE ANSWER IN THIS DOCUMENT IS A DEFINITIVE ABSOLUTELY

08:48AM 6  NOT.

08:48AM 7       AND THE DEFENSE HAS TRIED TO SUGGEST WITH OTHER PHARMA

08:49AM 8  COMPANIES, WELL, THEY PAID FOR IT, THAT'S KIND OF VALIDATION,

08:49AM 9  WELL, THERANOS COMPLETED THIS STUDY, THAT'S KIND OF VALIDATION.

08:49AM 10       THIS IS THE PROOF THAT PFIZER DID NOT VALIDATE THIS, AND

08:49AM 11  THE FORCEFULNESS WITH WHICH THEY DID IT, YOU KNOW, IS RELEVANT.

08:49AM 12       AND YES, THAT BOTTOM LINE TONE IS NOT COMMUNICATED TO

08:49AM 13  THERANOS, BUT THAT SHOULD NOT COME AS A SURPRISE TO ANYBODY.  I

08:49AM 14  DON'T THINK PEOPLE IN BUSINESS SAY THINGS LIKE THIS WHEN

08:49AM 15  THEY'RE TRYING TO KEEP OPEN SOME -- YOU KNOW, WHEN THEY'RE

08:49AM 16  TRYING TO KEEP OPEN POSSIBILITIES.

08:49AM 17       SO I JUST THINK THAT EVERYTHING THAT MR. CLINE JUST SAID

08:49AM 18  IS PROOF OF THE PROBATIVE VALUE OF THIS.

08:49AM 19       WE'RE NOT TALKING ABOUT SOME STRAY ISSUES, SOMETHING, YOU

08:49AM 20  KNOW, THAT 403 WOULD TYPICALLY THINK ABOUT, YOU KNOW, NOT

08:49AM 21  RELATING TO AN ELEMENT OF THE OFFENSE.

08:49AM 22       THIS IS THE CORE OF ONE OF HER MAIN CLAIMS AND I THINK THE

08:49AM 23  FORCEFULNESS WITH WHICH PFIZER IS COMING TO ITS CONCLUSIONS IS

08:49AM 24  POWERFUL PROOF THAT THEY DIDN'T VALIDATE THIS AND SOMETHING

08:50AM 25  THAT WE SHOULD BE PERMITTED TO DEMONSTRATE.

08:50AM  1          THE COURT:  WELL, I THINK I TALKED YESTERDAY ABOUT

08:50AM  2     THE GENESIS OF THE REPORT, THAT IS, I THINK FROM -- MS. HOLMES

08:50AM  3     REACHED OUT, THERE WAS AN INTERNAL THEN WORK DONE, ANALYSIS

08:50AM  4     DONE OF THE REPORT FROM MS. HOLMES FOR HER COMPANY, AND THEN

08:50AM  5     THIS IS THE WORK PRODUCT.

08:50AM  6          MR. CLINE:  WHAT HAPPENED, YOUR HONOR, IS THERANOS

08:50AM  7     DID A BUNCH OF WORK FOR PFIZER, SUBMITTED A REPORT.

08:50AM  8          PFIZER THEN ASSIGNED DR. WEBER TO EVALUATE IT.  HE DID.

08:50AM  9          THAT EVALUATION IS THIS INTERNAL REPORT, AND HE THEN

08:50AM 10     COMMUNICATED WITH MS. HOLMES.

08:50AM 11          IF THE FACT THAT HE DID NOT -- "HE" DR. WEBER -- DID NOT

08:50AM 12     COMPREHENSIVELY VALIDATE THERANOS'S TECHNOLOGY, I DOUBT VERY

08:50AM 13     MUCH THAT I'M GOING TO CHALLENGE THAT ON CROSS.

08:51AM 14          WHETHER OTHERS AT PFIZER LATER TOOK A DIFFERENT VIEW IS

08:51AM 15     SOMETHING THAT HE KNOWS NOTHING ABOUT, AND THAT'S NOT GOING TO

08:51AM 16     BE THE SUBJECT OF MY CROSS.

08:51AM 17          WHAT IS TROUBLING HERE IS, FIRST OF ALL, THERE'S THE 702

08:51AM 18     ISSUE BECAUSE THERE'S A LOT OF SORT OF DETAILED SCIENCE

08:51AM 19     DOCUMENTS.

08:51AM 20          AND THEN THERE'S THE 403 ISSUE, WHICH REALLY HAS NOTHING

08:51AM 21     TO DO WITH WHETHER PFIZER COMPREHENSIVELY VALIDATED THE

08:51AM 22     TECHNOLOGY.  IT'S MORE ABOUT THEY WERE EVASIVE, THEY WERE

08:51AM 23     DEFLECTIVE AND THEY WERE JUST PEJORATIVE KIND OF STUFF THAT

08:51AM 24     GOES TO MS. HOLMES'S HONESTY BASICALLY.

08:51AM 25          AND I DON'T SEE HOW THAT CAN COME IN.

4117

08:51AM  1      LET ME DRAW A CONTRAST HERE TO SHOW THE DISTINCTION THAT

08:51AM  2  I'M DRAWING.

08:51AM  3      DR. SUNG TESTIFIED, AS YOU RECALL, ABOUT THE CELGENE

08:51AM  4  INTERACTION, THE INTERACTION BETWEEN CELGENE AND THERANOS.  AND

08:51AM  5  SHE PRESENTED IN HER TESTIMONY A POWERPOINT THAT SHE AND ONE OF

08:52AM  6  HER COLLEAGUES HAD PREPARED THAT SORT OF ANALYZED THERANOS'S

08:52AM  7  PERFORMANCE VERSUS THE PERFORMANCE OF ANOTHER PLATFORM.

08:52AM  8      WE DIDN'T HAVE ANY OBJECTION TO THAT.  IT CAME IN AND WE

08:52AM  9  DISCUSSED IT.  THE REASON IS THAT POWERPOINT GOT CONVEYED TO

08:52AM  10  MS. HOLMES.  THERE'S NO DISPUTE ABOUT THAT.

08:52AM  11      IF THE REPORT THAT WE HAVE BEEN TALKING ABOUT NOW HAD BEEN

08:52AM  12  CONVEYED TO MS. HOLMES, WE WOULD HAVE A DIFFERENT STORY HERE.

08:52AM  13      BUT IT WASN'T.  IT WASN'T.  THIS WAS SOMETHING THAT SAT IN

08:52AM  14  THE BOWELS OF PFIZER UNDISCLOSED FOR YEARS AND IT'S NOW

08:52AM  15  SURFACING JUST, IN MY VIEW, TO TAINT THIS CASE.  IT SHOULDN'T

08:52AM  16  BE ALLOWED.

08:52AM  17          THE COURT:  MR. LEACH, WHAT ABOUT THAT, THE

08:52AM  18  DISTINCTION BETWEEN DR. SUNG'S TESTIMONY AND WHAT THEY DID WITH

08:52AM  19  THE TECHNOLOGY AND THEIR OPINION ON IT?

08:52AM  20          MR. LEACH:  I NOTED WHAT THEY DID WITH DR. SUNG,

08:53AM  21  YOUR HONOR.

08:53AM  22      BUT I DON'T THINK IT MATTERS IN ANY WAY.  ONE OF THE

08:53AM  23  THINGS THAT THE GOVERNMENT HAS TO PROVE IS THE FALSITY OF THE

08:53AM  24  STATEMENT, LET ALONE THE INTENT OF MS. HOLMES AND THE KNOWLEDGE

08:53AM  25  OF THE FALSITY.

08:53AM  1         SO, YES, THEY CHOSE THAT TACTIC WITH DR. SUNG, BUT I DON'T

08:53AM  2    THINK IT'S DISPOSITIVE OR ILLUMINATIVE OF WHETHER THIS

08:53AM  3    PARTICULAR DOCUMENT IS ADMISSIBLE.

08:53AM  4         HE HAD A CONVERSATION WITH ELIZABETH HOLMES AND I THINK

08:53AM  5    IT'S COMPLETELY FAIR GAME TO ASK, DID SHE ANSWER YOUR

08:53AM  6    QUESTIONS?  WAS SHE RESPONSIVE?  WERE YOU PERSUADED BY THAT?

08:53AM  7         AND, YOU KNOW, THE WITNESS -- I DON'T THINK THERE'S A

08:53AM  8    MEANINGFUL DIFFERENCE BETWEEN I WASN'T SATISFIED WITH IT OR I

08:53AM  9    FOUND IT WAS UNRESPONSIVE OR, YOU KNOW, SHE WAS EVADING THE

08:53AM 10    QUESTION OR AVOIDING THE QUESTION.

08:53AM 11         I MEAN, THOSE ARE QUESTIONS THAT WE PUT TO WITNESSES ALL

08:53AM 12    OF THE TIME IN THEIR INTERACTIONS WITH OTHER WITNESSES.

08:53AM 13         AND THEY -- PART OF THE DEFENSE HERE IS THE PHARMA

08:53AM 14    COMPANIES DID VALIDATE THERANOS'S TECHNOLOGY OR THEY DID DO

08:54AM 15    WORK WITH SOME OF THE PHARMA COMPANIES, AND THIS IS THE PROOF

08:54AM 16    THAT IT WAS NOT VALIDATION.

08:54AM 17         AND SO SOME OF THE MATTERS IN THIS MEMO ARE COMMUNICATED

08:54AM 18    TO MS. HOLMES, THE BOTTOM LINE THAT WE DON'T WANT TO CONTINUE

08:54AM 19    BUSINESS.

08:54AM 20         I GRANT MR. CLINE'S POINT BUT NOT EVERY WORD IS USED

08:54AM 21    THERE.

08:54AM 22         BUT THIS IS EVIDENCE OF THE FALSITY OF THE STATEMENT, AND

08:54AM 23    THE FALSITY OF THE STATEMENT IS VERY MUCH AT ISSUE IN THIS

08:54AM 24    CASE.

08:54AM 25         THE PREJUDICE HERE, YOU KNOW, THE TONE THAT HE'S TAKING,

08:54AM 1    THE HARSH WORDS ARE THINGS THAT CAN BE CONVEYED THROUGH

08:54AM 2    CROSS-EXAMINATION THAT THIS DOCUMENT NEVER WENT TO HER.

08:54AM 3    THERE'S NO RISK OF UNFAIR PREJUDICE FROM THAT.

08:54AM 4         SO I JUST DON'T SEE HOW 403 CAN KEEP THIS OUT, AND THIS IS

08:54AM 5    VERY PROBATIVE EVIDENCE OF FALSITY OF THE STATEMENT.

08:54AM 6              THE COURT:  SO HE HAD A CONVERSATION WITH MS. HOLMES

08:54AM 7    PRIOR TO THIS REPORT BEING DRAFTED.  THIS REPORT --

08:54AM 8              MR. LEACH:  YES.

08:55AM 9              THE COURT:  THIS REPORT REFLECTS HIS INVESTIGATION,

08:55AM 10   HIS WORK, AS WELL AS HIS THOUGHTS SUBSEQUENT TO HIS

08:55AM 11   CONVERSATION WITH MS. HOLMES?

08:55AM 12             MR. LEACH:  YES.

08:55AM 13             MR. CLINE:  I'M SORRY, YOUR HONOR.  I JUST WANTED TO

08:55AM 14   SAY HE HAD A ONE-HOUR CONFERENCE CALL WITH MS. HOLMES AND

08:55AM 15   VARIOUS OTHER PEOPLE FROM THERANOS.  MS. HOLMES APPARENTLY DID

08:55AM 16   THE TALKING ACCORDING TO HIM.  BUT I THINK THAT WAS THE EXTENT

08:55AM 17   OF HIS CONTACT WITH MS. HOLMES.

08:55AM 18             THE COURT:  I SEE.  SO THAT WAS THAT ONE PHONE CALL?

08:55AM 19             MR. LEACH:  THERE WAS ONE PHONE CALL WITH MS. HOLMES

08:55AM 20   AND HER TEAM.  I ANTICIPATE THE WITNESS WILL TESTIFY THAT

08:55AM 21   MS. HOLMES DID VIRTUALLY ALL OF THE TALKING DURING THE CALL.

08:55AM 22             THE COURT:  AND THEN FOLLOWING THAT PHONE CALL AND

08:55AM 23   HIS RESEARCH, HE THEN DRAFTED THE REPORT THAT WE'RE TALKING

08:55AM 24   ABOUT?

08:55AM 25             MR. LEACH:  YES.

4120

08:55AM 1          THE COURT:  AND THE REPORT IN ESSENCE IS THIS THE

08:55AM 2     DOCUMENT THAT SAYS PFIZER IS NOT INTERESTED?

08:55AM 3          MR. LEACH:  YES.

08:55AM 4          THE COURT:  AND SOMEHOW THAT WAS CONVEYED TO

08:55AM 5     MS. HOLMES OR HER COMPANY?

08:55AM 6          MR. LEACH:  YES.  AND THERE'S THE -- THE REPORT

08:56AM 7     ITSELF IS DATED DECEMBER 31ST, 2008.  THERE ARE RECOMMENDATIONS

08:56AM 8     IN IT TO THE EFFECT OF THERANOS DOES NOT HAVE ANY DIAGNOSTIC OR

08:56AM 9     CLINICAL INTEREST TO PFIZER.  IT'S RECOMMENDED THAT NO FURTHER

08:56AM 10    INVESTMENT BE MADE.

08:56AM 11         AND THEN AT THE END OF JANUARY THERE'S A CALL BETWEEN THIS

08:56AM 12    WITNESS AND MS. HOLMES WHERE HE CONVEYS THE BOTTOM LINE

08:56AM 13    CONCLUSION THAT WE'RE NOT GOING TO GO FORWARD, THAT WE DON'T

08:56AM 14    HAVE AN INTEREST, YOU KNOW, YOU CAN CALL US IN SIX MONTHS IF

08:56AM 15    YOU WANT.

08:56AM 16         BUT THOSE BOTTOM LINE CONCLUSIONS ARE COMMUNICATED TO

08:56AM 17    MS. HOLMES SUBSEQUENT TO HIS REVIEW, WHICH SHE KNEW HE WAS

08:56AM 18    UNDERTAKING, OR PFIZER WAS UNDERTAKING.

08:56AM 19         THE COURT:  AND THAT PHONE CALL, WHEN THAT

08:56AM 20    INFORMATION WAS GIVEN TO MS. HOLMES, WAS THAT THE BOARD CALL,

08:56AM 21    THIS CALL THAT YOU WERE TALKING ABOUT, MR. CLINE?

08:56AM 22         MR. CLINE:  NO.  HERE'S THE SEQUENCE, YOUR HONOR.

08:56AM 23    IT GETS A LITTLE CONVOLUTED.

08:56AM 24         DR. WEBER'S FIRST CONTACT WITH THERANOS IS NOVEMBER 2008,

08:56AM 25    THIS IS WHEN HE'S ASKED TO CONDUCT THIS REVIEW.

08:56AM 1        SHORTLY AFTER THAT, I THINK ON THE 13TH, HE HAS A CALL

08:57AM 2   WITH THERANOS, INCLUDING MS. HOLMES, WHERE, ACCORDING TO HIM,

08:57AM 3   MS. HOLMES DOES ALL OF THE TALKING.

08:57AM 4        HE GETS OTHER MATERIALS AND HE PREPARES THIS INTERNAL

08:57AM 5   REPORT WHICH IS NOT COMMUNICATED TO THERANOS.  IT'S DATED, AS

08:57AM 6   MR. LEACH SAID, I THINK DECEMBER 30TH OR 31ST, 2008.

08:57AM 7        AT THE END OF JANUARY, LIKE JANUARY 30TH OR SO, 2009, HE

08:57AM 8   HAS A PHONE CALL WITH MS. HOLMES WHERE HE CONVEYS, AS MR. LEACH

08:57AM 9   SAYS, SORT OF THE TOP LINE CONCLUSION.

08:57AM 10       TO BE CLEAR, WE HAVE NO PROBLEM AT ALL IN HIM DESCRIBING

08:57AM 11  THAT PHONE CALL IN AS MUCH DETAIL AS HE WANTS.  THERE'S AN

08:57AM 12  EMAIL IN WHICH HE SUMMARIZES IT.  ALL OF THAT IS FINE.

08:57AM 13       HE CAN ALSO TESTIFY ABOUT THE PHONE CALL THAT HE HAD WITH

08:57AM 14  MS. HOLMES BEFORE HE PREPARED THE REPORT.

08:57AM 15       BUT THE REPORT ITSELF WITH ITS PEJORATIVE

08:57AM 16  CHARACTERIZATIONS IS UNFAIRLY PREJUDICIAL AND SHOULD NOT COME

08:57AM 17  IN.

08:57AM 18       I WANT TO ADD ONE OTHER THING.  I AM NOT GOING TO SUGGEST

08:58AM 19  FOR A SECOND -- AND I DON'T THINK ANYBODY ON OUR SIDE WILL

08:58AM 20  SUGGEST -- THAT DR. WEBER VALIDATED THE THERANOS TECHNOLOGY.

08:58AM 21  IT IS PERFECTLY CLEAR THAT DR. WEBER DIDN'T LIKE THERANOS'S

08:58AM 22  TECHNOLOGY.

08:58AM 23       WHETHER OTHERS AT PFIZER AT SOME LATER POINT OR, FOR THAT

08:58AM 24  MATTER, AT AN EARLIER POINT HAD A DIFFERENT VIEW IS NOT

08:58AM 25  SOMETHING THAT HE CAN TESTIFY ABOUT.  HE WAS INVOLVED IN THIS

4122

08:58AM 1    FOR ABOUT THREE MONTHS, NOVEMBER, DECEMBER, JANUARY, THERE'S AN

08:58AM 2    EMAIL IN FEBRUARY, JUST A STRAY EMAIL.  BUT BASICALLY HE HAD

08:58AM 3    ABOUT A THREE MONTH ENGAGEMENT IN A MULTIYEAR RELATIONSHIP.

08:58AM 4        HE DID NOT COMPREHENSIVELY VALIDATE THE THERANOS

08:58AM 5    TECHNOLOGY.  THERE'S NO QUESTION ABOUT THAT, AND I'M NOT GOING

08:58AM 6    TO FOR A SECOND SUGGEST OTHERWISE.

08:58AM 7        BUT TO ALLOW IN THIS INTERNAL UNDISCLOSED PEJORATIVE

08:58AM 8    ASSESSMENT, AGAIN, I THINK IS UNFAIRLY PREJUDICIAL.

08:58AM 9            THE COURT:  WELL, COULDN'T MR. LEACH IN HIS DIRECT

08:58AM 10   EXAMINATION GO LINE BY LINE, IF HE WANTED TO, WITH THIS REPORT

08:59AM 11   AND ASK THE WITNESS HIS THOUGHTS?  WOULDN'T HE BE ABLE TO DO

08:59AM 12   THAT?

08:59AM 13           MR. CLINE:  UP TO A POINT, AND IT WOULD PROBABLY BE

08:59AM 14   POSSIBLE TO REDACT THIS REPORT OR TO HAVE THAT TYPE OF

08:59AM 15   TESTIMONY.

08:59AM 16       WHAT I DON'T THINK HE SHOULD BE PERMITTED TO DO IS HAVE

08:59AM 17   DR. WEBER TESTIFY THAT MS. HOLMES WAS EVASIVE OR DEFLECTIVE.  I

08:59AM 18   MEAN, THAT'S IN ESSENCE A COMMENT ON HER CREDIBILITY.

08:59AM 19           THE COURT:  NO.  I THINK I CAPTURE THAT.

08:59AM 20       BUT IF MR. LEACH WERE TO POSE, WELL, YOU HAD THIS

08:59AM 21   CONVERSATION, YOU PUT THIS FORWARD, WHAT WAS HER RESPONSE?

08:59AM 22   HE'LL SAY WHATEVER IT WAS.

08:59AM 23       AND THEN MR. LEACH, IS HE THEN ABLE TO ASK, WELL, HOW DID

08:59AM 24   YOU FIND HER RESPONSE?

08:59AM 25           MR. CLINE:  AND HE CAN SAY, I FOUND THE RESPONSE

08:59AM  1    UNSATISFACTORY.  IT DIDN'T ANSWER MY QUESTION.  WHAT

08:59AM  2    HAPPENED --

08:59AM  3            THE COURT:  COULD HE SAY, I FOUND HER EVASIVE?

08:59AM  4            MR. CLINE:  I DON'T THINK HE COULD, BECAUSE AGAIN,

09:00AM  5    THEN HE'S COMMENTING ON HER CREDIBILITY AND I DON'T THINK HE

09:00AM  6    CAN DO THAT.

09:00AM  7        WHAT HE CAN -- WHAT HAPPENED AFTER THIS PHONE CALL, THIS

09:00AM  8    WAS SORT OF AN INTRODUCTORY PHONE CALL.  THIS WAS ONE WEEK

09:00AM  9    AFTER DR. WEBER GOT INVOLVED.

09:00AM  10       THEN THERE WAS A SERIES OF WRITTEN QUESTIONS THAT HE PUT

09:00AM  11   TO THERANOS.

09:00AM  12       THERANOS RESPONDED, NOT MS. HOLMES, SOMEONE ELSE AT

09:00AM  13   THERANOS RESPONDED TO THESE QUESTIONS.

09:00AM  14       THAT'S A DOCUMENT, AND THAT DOCUMENT CAN COME IN, AND HE

09:00AM  15   CAN SAY, I DIDN'T FIND THESE ANSWERS TO BE SATISFACTORY.

09:00AM  16       I DON'T HAVE, AGAIN, ANY PROBLEM WITH HIS SORT OF BOTTOM

09:00AM  17   LINE CONCLUSION THAT HE WAS NOT SATISFIED WITH -- HE CONCLUDED

09:00AM  18   THAT THERANOS AND PFIZER DID NOT HAVE ANY BASIS FOR A BUSINESS

09:00AM  19   RELATIONSHIP.  THAT CLEARLY IS HIS CONCLUSION.

09:00AM  20           THE COURT:  IT SOUNDS LIKE WHAT YOU'RE CONCERNED

09:00AM  21   ABOUT, MR. CLINE, IS HIM USING THESE TERMS.

09:00AM  22           MR. CLINE:  I'M CONCERNED, REALLY, ABOUT TWO MAIN

09:00AM  23   THINGS.  ONE IS HIM USING THESE TERMS, AND IN PARTICULAR HAVING

09:01AM  24   THIS DOCUMENT COME IN SO IT'S NOT JUST A BIT OF TESTIMONY THAT

09:01AM  25   PASSES AND I'VE CROSS-EXAMINED.

4124

09:01AM 1        THIS IS A DOCUMENT THAT IS GOING TO BE IN FRONT OF THE

09:01AM 2   JURY WHEN IT DELIBERATES, AND CHARACTERIZING MS. HOLMES AS

09:01AM 3   EVASIVE AND DEFLECTIVE AND A SERIES OF OTHER PEJORATIVE --

09:01AM 4        THE COURT:  WELL, THAT'S HIS OPINION.

09:01AM 5        IS THAT PROPER OPINION, MR. LEACH?  WHY ISN'T THAT COMMENT

09:01AM 6   ON HER CHARACTER?

09:01AM 7        MR. LEACH:  THESE ARE PERCIPIENT OBSERVATIONS OF A

09:01AM 8   WITNESS.  I THINK ALL OF THE TIME -- FIRST OF ALL, YOUR HONOR,

09:01AM 9   THIS IS A FRAUD CASE AND THE FACT THAT THE DEFENDANT IS BEING

09:01AM 10  MISLEADING IN THIS INTERACTION, YOU KNOW, ISN'T OUT OF PLACE

09:01AM 11  HERE.

09:01AM 12       BUT I THINK WE ASK WITNESSES ALL OF THE TIME, DID SOMEBODY

09:01AM 13  ANSWER THAT QUESTION?

09:01AM 14       NO.

09:01AM 15       DID YOU THINK THEY WERE BEING EVASIVE WITH YOU?

09:01AM 16       YES.

09:01AM 17       THESE ARE THE CONCLUSIONS HE REACHED IN THE MOMENT.  THIS

09:01AM 18  IS WITHIN 701, NOT 702.

09:01AM 19       AND I DON'T UNDERSTAND WHY WE NEED TO SANITIZE THE WORDS

09:01AM 20  IF WE CAN SAY HE WASN'T SATISFIED, AS OPPOSED TO THE CONCLUSION

09:02AM 21  THAT HE ACTUALLY REACHED.

09:02AM 22       I HAVE SOME OTHER COMMENTS WITH RESPECT TO THE CHRONOLOGY,

09:02AM 23  YOUR HONOR.

09:02AM 24       IT'S CORRECT THAT MR. WEBER COMES ON THE SCENE IN 2008 AND

09:02AM 25  HE REVIEWS THE WORK THAT HAPPENS BEFORE THEN.

09:02AM  1    BUT THERE IS ZERO WORK BETWEEN PFIZER AND THERANOS AFTER

09:02AM  2    HIM, AND MR. WEBER IS AT THE COMPANY DURING THIS TIME PERIOD.

09:02AM  3        SO, YOU KNOW, MR. WEBER WAS THE GUY WHO WAS TASKED WITH

09:02AM  4    THIS, WHO WOULD HAVE BEEN CONSULTED IF THERE WAS SOME GREATER

09:02AM  5    RELATIONSHIP DOWN THE LINE.

09:02AM  6        THE QUESTIONS ARE ACTUALLY SENT BEFORE THE MEETING WITH

09:02AM  7    MS. HOLMES, AND I JUST -- SHE SENT A REPORT TO PFIZER, SHE

09:02AM  8    ASKED THEM TO REVIEW IT.  THIS IS THE MAN WHO REVIEWED IT.  HE

09:02AM  9    SHOULD BE ALLOWED TO TESTIFY TO WHAT HE THOUGHT ABOUT IT.

09:02AM 10        THE COURT:  YES, I GET THAT.  AND I CAME OUT HERE

09:02AM 11    WITHOUT THE DOCUMENT IN MY HAND.

09:02AM 12        WHAT EXHIBIT NUMBER IS IT AGAIN?

09:02AM 13        MR. CLINE:  167.

09:02AM 14        THE COURT:  THANK YOU.  WE'LL TRACK IT DOWN HERE,

09:03AM 15    AND I WANT TO LOOK AT IT AGAIN DURING THE BREAK.

09:03AM 16        I DO WANT TO ASK, I KNOW WE TALKED ABOUT THIS YESTERDAY,

09:03AM 17    TOO --

09:03AM 18        DO YOU HAVE A COPY FOR ME, MR. CLINE?  THANK YOU.  THAT'S

09:03AM 19    VERY KIND OF YOU.

09:03AM 20        MR. CLINE:  I BELIEVE I DO.

09:03AM 21        THE COURT:  WE WERE TALKING ABOUT SOME OF THE

09:03AM 22    SCIENTIFIC TERMS AND WHETHER OR NOT THAT GETS INTO EITHER 702

09:03AM 23    TERRITORY, AND IT SOUNDS LIKE, MR. LEACH, I THINK YESTERDAY YOU

09:03AM 24    SAID YOU NEED NOT GO INTO THAT, YOU DON'T INTEND TO.

09:03AM 25        MR. LEACH:  CORRECT, YOUR HONOR.

4126

```
09:03AM   1                 THE COURT:  AND HOW WOULD YOU HANDLE THAT, THEN,
09:03AM   2     WITH THIS EXHIBIT?
09:03AM   3                 MR. LEACH:  I WOULD BE PREPARED TO REDACT THE
09:03AM   4     QUESTIONS, YOUR HONOR, MENTIONED.  I THINK IT STARTED AT
09:03AM   5     QUESTION 17 ON PAGE 5.  I DIDN'T INTEND TO ASK HIM QUESTIONS
09:03AM   6     ABOUT THOSE, AND IF WE'RE WORRIED ABOUT THAT GOING INTO THE
09:03AM   7     RECORD, WE'RE PREPARED TO REDACT THOSE.
09:03AM   8                 THE COURT:  I THINK I MENTIONED SOME NUMBERS
09:03AM   9     YESTERDAY THAT I HAD LOOKED AT.
09:04AM  10           (PAUSE IN PROCEEDINGS.)
09:04AM  11                 THE COURT:  ALL RIGHT.  ALL RIGHT.
09:04AM  12           WELL, THANK YOU FOR THE HELP.  I'M NOT GOING TO -- I'M
09:04AM  13     GOING TO LOOK AT THIS SOME MORE.  WE'RE GOING TO HAVE SOME TIME
09:04AM  14     TODAY TO LOOK AT THIS BEFORE WE CALL THE WITNESS.
09:04AM  15           ANYTHING ELSE IN CLOSING, MR. CLINE?
09:04AM  16                 MR. LEACH:  NO, YOUR HONOR.  THANK YOU.
09:04AM  17                 THE COURT:  GREAT.  THANKS VERY MUCH.  GREAT.  THANK
09:04AM  18     YOU.
09:04AM  19           ANYTHING ELSE BEFORE WE BRING OUR JURY IS IN?
09:04AM  20                 MR. DOWNEY:  NOT FROM US, YOUR HONOR.
09:04AM  21                 THE COURT:  WE'LL TAKE A BREAK ABOUT 11:00 A.M.
09:04AM  22           MR. DOWNEY, WILL THAT WORK?
09:04AM  23                 MR. DOWNEY:  THAT'S FINE.
09:04AM  24                 THE COURT:  ALL RIGHT.  THANK YOU.
09:04AM  25           (RECESS FROM 9:04 A.M. UNTIL 9:11 A.M.)
```

4127

09:11AM 1          (JURY IN AT 9:11 A.M.)

09:11AM 2              THE COURT:  ALL RIGHT.  THANK YOU.  GOOD MORNING.

09:11AM 3          WE'RE BACK ON THE RECORD.  ALL COUNSEL ARE PRESENT.

09:12AM 4      MS. HOLMES IS PRESENT.  OUR JURY IS PRESENT.

09:12AM 5          WE'LL CALL OUR WITNESS IN IN JUST A MOMENT.

09:12AM 6          BUT, LADIES AND GENTLEMEN, GOOD MORNING.  LET ME JUST ASK

09:12AM 7      YOU AGAIN THAT QUESTION.

09:12AM 8          DURING OUR BREAK, DID ANY OF YOU HAVE ANY OCCASION TO COME

09:12AM 9      ACROSS ANY INFORMATION VIA MEDIA OR CONVERSATION WITH A LIVE

09:12AM 10     PERSON OR DO ANY INVESTIGATION ABOUT ANYTHING ABOUT THIS CASE?

09:12AM 11         IF SO, PLEASE RAISE YOUR HAND.  AND AGAIN, PLEASE KNOW

09:12AM 12     THAT WE CAN TALK PRIVATELY ABOUT THAT IF THAT OCCURRED.

09:12AM 13         I SEE NO HANDS.  THANK YOU VERY MUCH.

09:12AM 14         WE'LL GO UNTIL 3:00 TODAY, LADIES AND GENTLEMEN.  AND THEN

09:12AM 15     I'M HOPING THAT WE CAN GO UNTIL 4:00 ON FRIDAY.

09:12AM 16         I SEE NO HANDS TO OBJECT TO THAT.  GREAT.  THANK YOU VERY

09:12AM 17     MUCH.  THANK YOU.

09:12AM 18         AND, MR. EDLIN, THANK YOU.  MAKE YOURSELF COMFORTABLE

09:12AM 19     THERE.  IT LOOKS LIKE YOU'LL HAVE TO ADJUST THAT MICROPHONE

09:13AM 20     SOMEHOW.

09:13AM 21             THE WITNESS:  THANK YOU.

09:13AM 22             THE COURT:  WHEN YOU ARE COMFORTABLE, WOULD YOU

09:13AM 23     PLEASE STATE YOUR NAME AGAIN, PLEASE.

09:13AM 24         AND THEN, MR. DOWNEY, YOU HAVE ADDITIONAL QUESTIONS I

09:13AM 25     THINK.

09:13AM  1                    THE WITNESS:  DANIEL EDLIN.

09:13AM  2                    THE COURT:  THANK YOU.  AND YOU'RE STILL UNDER OATH,

09:13AM  3        SIR.

09:13AM  4            **(GOVERNMENT'S WITNESS, DANIEL EDLIN, WAS PREVIOUSLY**

09:13AM  5        **SWORN.)**

09:13AM  6                       **CROSS-EXAMINATION (RESUMED)**

09:13AM  7        BY MR. DOWNEY:

09:13AM  8        Q.   GOOD MORNING, MR. EDLIN.

09:13AM  9        A.   GOOD MORNING.

09:13AM  10       Q.   I'D LIKE TO BEGIN TODAY BY ASKING YOU TO LOOK IN THE

09:13AM  11       NOTEBOOK THAT I GAVE YOU AT EXHIBIT 7694.

09:13AM  12            DO YOU RECALL YESTERDAY THAT WE WERE TALKING ABOUT THE

09:14AM  13       BURN STUDY WHICH THERANOS COLLABORATED WITH DR. CHUNG?

09:14AM  14       A.   YES.

09:14AM  15       Q.   WERE THE RESULTS OF THAT STUDY ULTIMATELY PUBLISHED?

09:14AM  16       A.   YES.

09:14AM  17       Q.   AND IS EXHIBIT 7694 A COPY OF THAT PUBLISHED STUDY?

09:14AM  18       A.   YES.

09:14AM  19                    MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT

09:14AM  20       EXHIBIT 7694.

09:14AM  21                    MR. BOSTIC:  NO OBJECTION.

09:14AM  22                    THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:14AM  23            (DEFENDANT'S EXHIBIT 7694 WAS RECEIVED IN EVIDENCE.)

09:14AM  24       BY MR. DOWNEY:

09:14AM  25       Q.   IF YOU LOOK AT THE FIRST PAGE OF THAT EXHIBIT, IS THAT A

09:14AM   1    SCIENTIFIC CHARACTERIZATION OF THE STUDY AND THE TITLE?

09:14AM   2    A.   YES.

09:14AM   3    Q.   AND IF YOU LOOK AT -- IF I COULD DIRECT YOUR ATTENTION TO

09:14AM   4    THE SEVENTH PAGE OF THE EXHIBIT, YOU'LL SEE STARTING IN THE

09:14AM   5    BOTTOM LEFT-HAND CORNER, THERE'S A SERIES OF ACKNOWLEDGEMENTS?

09:14AM   6    A.   YES.

09:14AM   7    Q.   AND DO YOU SEE THAT YOU AND MS. HOLMES AND DR. CHUNG WERE

09:15AM   8    ACKNOWLEDGED FOR YOUR ASSISTANCE IN CONNECTION WITH THIS STUDY?

09:15AM   9    A.   YES.

09:15AM   10   Q.   AND DO YOU RECALL THAT THIS STUDY TOOK PLACE OVER FOUR

09:15AM   11   YEARS?

09:15AM   12   A.   THAT SOUNDS ABOUT RIGHT.

09:15AM   13   Q.   AND IF YOU WOULD LOOK BACK AT THE FIRST PAGE, DO YOU SEE

09:15AM   14   THAT THE PUBLICATION OF THIS STUDY WAS IN EARLY 2017?

09:15AM   15   A.   YES.

09:15AM   16   Q.   AND THAT WAS ABOUT FIVE YEARS AFTER THE EXHIBIT THAT THE

09:15AM   17   GOVERNMENT WENT THROUGH WITH YOU WHERE YOU FORWARDED A

09:15AM   18   PRESENTATION TO DR. CHUNG.

09:15AM   19        DO YOU RECALL THAT?

09:15AM   20   A.   I DO.

09:15AM   21   Q.   LET ME ASK YOU TO LOOK BACK AT THAT EXHIBIT.  IT'S IN YOUR

09:15AM   22   GOVERNMENT BINDER AND IT'S EXHIBIT 551.

09:16AM   23        AND I THINK YOU TESTIFIED -- DO YOU HAVE THAT?

09:16AM   24   A.   I DO.

09:16AM   25   Q.   AND THIS IS ALREADY ADMITTED, YOUR HONOR.

09:16AM   1           I THINK YOU TESTIFIED THAT DR. CHUNG HAD BEEN INVOLVED

09:16AM   2    WITH THERANOS FOR A PERIOD BEFORE YOUR INITIAL CONTACT WITH

09:16AM   3    HIM; CORRECT?

09:16AM   4    A.   CORRECT.

09:16AM   5    Q.   I'D LIKE TO ASK YOU TO FLIP THROUGH, WITHOUT REALLY

09:16AM   6    STUDYING, PAGES 36 AND FORWARD IN THIS PRESENTATION UNTIL THE

09:16AM   7    END OF THE PRESENTATION ON PAGE 80.

09:17AM   8    A.   OKAY.

09:17AM   9    Q.   AND DO YOU SEE THAT MOST OF THIS PRESENTATION IS DATA THAT

09:17AM  10    THERANOS WAS PROVIDING TO DR. CHUNG ABOUT THE PERFORMANCE OF

09:17AM  11    ITS ASSAYS?

09:17AM  12    A.   YES.

09:17AM  13    Q.   AND DO YOU SEE ON PAGE 36 THAT THERE IS A LIST OF ABOUT

09:17AM  14    EIGHT ASSAYS AND SOME DATA ABOUT HOW THEY PERFORM?

09:17AM  15    A.   YES.

09:17AM  16    Q.   AND IS THE SIGNIFICANCE OF THIS DATA, IN LAYMAN'S TERMS,

09:17AM  17    THAT THEY SHOW A STRAIGHT LINE AND YOU LOOK FOR HOW CLOSE THE

09:17AM  18    DOTS ARE TO THAT LINE TO EVALUATE THE EFFECTIVENESS OF THE

09:17AM  19    ASSAY?

09:17AM  20    A.   I BELIEVE A STRAIGHT LINE WOULD BE A CORRELATION OF 1.0,

09:18AM  21    AND THAT CLOSER TO THAT STRAIGHT LINE, THE HIGHER THE

09:18AM  22    CORRELATION.

09:18AM  23    Q.   OKAY.  AND DO YOU SEE, IF YOU LOOK THROUGH THIS, THAT SOME

09:18AM  24    OF THE CORRELATIONS ARE QUITE GOOD, LIKE ON PAGE 36 IN THE

09:18AM  25    UPPER RIGHT-HAND CORNER, THE CORRELATION IS .999?

09:18AM 1    A.   YES.

09:18AM 2    Q.   BUT DO YOU SEE IN OTHER PLACES IN THE PRESENTATION THAT

09:18AM 3    THE CORRELATION IS LESS GOOD?

09:18AM 4         LET ME DIRECT YOUR ATTENTION, FOR EXAMPLE, TO SLIDE NUMBER

09:18AM 5    48, WHICH IS ON TRIAL PAGE -- TRIAL EXHIBIT PAGE 52.

09:18AM 6         AND DO YOU SEE HERE ON THE LEFT-HAND SIDE, FOR EXAMPLE,

09:18AM 7    WITH ASSAYS BASED ON URINE, THERE'S A SIGNIFICANT DROP IN THE

09:18AM 8    PERCENTAGE OF CORRELATION FROM .999 TO .966; CORRECT?

09:19AM 9    A.   I'M NOT SURE I WOULD CONSIDER THAT A SIGNIFICANT DROP.

09:19AM 10   Q.   OKAY.

09:19AM 11   A.   IT'S HUNDREDTHS OF THE PERCENTAGE.

09:19AM 12   Q.   OKAY.  BUT IT VARIES FROM THE .999 IN THE OTHER ASSAY?

09:19AM 13   A.   IT DOES VARY.

09:19AM 14   Q.   AND IF YOU CONTINUE FORWARD THROUGH THE PRESENTATION, YOU

09:19AM 15   SEE THAT THERE IS JUST DATA ABOUT A NUMBER OF THE ASSAYS THAT

09:19AM 16   THERANOS HAD DEVELOPED; CORRECT?

09:19AM 17   A.   CORRECT.

09:19AM 18   Q.   AND ALL OF THAT WAS PRESENTED TO DR. CHUNG; CORRECT?

09:19AM 19   A.   CORRECT.

09:19AM 20   Q.   DO YOU BELIEVE THAT DR. CHUNG HAD THE ABILITY TO

09:19AM 21   UNDERSTAND THAT DATA?

09:19AM 22   A.   I DO.  I HAVE NO REASON TO DOUBT IT.

09:19AM 23   Q.   DO YOU KNOW WHAT AUDIENCE DR. CHUNG WAS PRESENTING THIS

09:19AM 24   DATA TO?

09:19AM 25   A.   I'D HAVE TO JUST LOOK EARLIER IN THE EMAIL.

09:19AM  1    Q.   LET ME JUST ASK YOU IF YOU LOOK BACK AT PAGE -- AT

09:20AM  2    EXHIBIT 551 AT THE TOP OF PAGE 3.

09:20AM  3    A.   CLINICAL -- IT SAYS CLINOPS.

09:20AM  4    Q.   ALL RIGHT.  AND HE SUGGESTS HE'S GOING TO SHARE IT WITH

09:20AM  5    THE CLINOPS GUY IN THE MILITARY?

09:20AM  6    A.   RIGHT.

09:20AM  7    Q.   DO YOU KNOW WHO CLINOPS ARE?

09:20AM  8    A.   I DON'T KNOW FOR SURE.

09:20AM  9    Q.   I THINK YOU'VE TESTIFIED YESTERDAY THAT YOU -- YOU CAN PUT

09:20AM  10   THOSE EXHIBITS ASIDE.

09:20AM  11       I THINK YOU TESTIFIED YESTERDAY THAT YOU HAD DISCUSSIONS,

09:20AM  12   ON THERANOS'S BEHALF, WITH THE UNITED STATES AFRICAN COMMAND.

09:20AM  13       DO YOU RECALL THAT?

09:20AM  14   A.   YES.

09:20AM  15   Q.   AND YOUR PRINCIPAL CONTACT AT THE UNITED STATES AFRICAN

09:20AM  16   COMMAND WAS DR. MELISSA GIVENS; IS THAT RIGHT?

09:20AM  17   A.   THAT'S RIGHT.

09:20AM  18   Q.   AND THE SHORTHAND REFERENCE FOR THE UNITED STATES AFRICAN

09:21AM  19   COMMAND IS AFRICOM; CORRECT?

09:21AM  20   A.   CORRECT.

09:21AM  21   Q.   AND THAT'S THE UNIFIED COMMAND OF ALL OF THE MILITARY

09:21AM  22   SERVICES IN THE UNITED STATES THAT HAVE SOME OPERATION IN

09:21AM  23   AFRICA; CORRECT?

09:21AM  24   A.   I'M NOT POSITIVE ON THE SPECIFIC DIRECTION.

09:21AM  25   Q.   AND COLONEL GIVENS WAS A SENIOR MEDICAL OFFICER WITHIN

09:21AM 1    AFRICOM; CORRECT?

09:21AM 2    A.   I BELIEVE SO.

09:21AM 3    Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 10444.

09:21AM 4    A.   OKAY.

09:21AM 5    Q.   DO YOU HAVE THAT IN FRONT OF YOU?

09:21AM 6    A.   I DO.

09:21AM 7    Q.   AND IF YOU LOOK AT THE TOP OF THAT EMAIL, DO YOU SEE THAT

09:21AM 8    THIS IS A SERIES OF EMAIL CHANGES BETWEEN YOU AND DR. GIVENS

09:21AM 9    AND MS. HOLMES RELATED TO POTENTIAL WORK BY THERANOS WITH

09:22AM 10   AFRICOM?

09:22AM 11   A.   YES.

09:22AM 12        MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

09:22AM 13   10444.

09:22AM 14        MR. BOSTIC:  NO OBJECTION.

09:22AM 15        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:22AM 16     (DEFENDANT'S EXHIBIT 10444 WAS RECEIVED IN EVIDENCE.)

09:22AM 17   BY MR. DOWNEY:

09:22AM 18   Q.   COULD I DIRECT YOUR ATTENTION TO THE SECOND PAGE OF THIS

09:22AM 19   EXHIBIT, WHICH I'LL DISPLAY ON THE SCREEN.

09:22AM 20     AND IS THIS AN EMAIL THAT DR. GIVENS SENT TO YOU AND

09:22AM 21   MS. HOLMES IN APRIL OF 2012?

09:22AM 22   A.   YES.

09:22AM 23   Q.   AND DO YOU SEE IN THE FIRST PARAGRAPH SHE'S LOOKING TO SET

09:22AM 24   UP A MEETING WITH YOU AND MS. HOLMES?

09:22AM 25   A.   YES.

09:22AM 1    Q.   AND SHE ASKS THE QUESTION, "HAS THERE BEEN ANY PROGRESS IN

09:22AM 2    CONFIGURING A SYSTEM THAT WE WOULD SOON BE ABLE TO --" AND I'M

09:22AM 3    NOT SURE WHAT THE NEXT WORD IS, EITHER EMPLOY OR DEPLOY, "SOON

09:23AM 4    TO AFRICA?"

09:23AM 5         DO YOU SEE THAT?

09:23AM 6    A.   YES.

09:23AM 7    Q.   AND HAD YOU BEEN HAVING DISCUSSIONS AT THIS TIME WITH

09:23AM 8    DR. GIVENS ABOUT DEPLOYING THE SYSTEM TO AFRICA?

09:23AM 9    A.   I BELIEVE THOSE DISCUSSIONS WERE UNDERWAY.

09:23AM 10   Q.   AND IF YOU LOOK AT THE SECOND PARAGRAPH, SHE GOES ON TO

09:23AM 11   DETAIL THE KIND OF SYSTEM THAT SHE WOULD BE ABLE TO OPERATE

09:23AM 12   WITH IN AFRICA; CORRECT?

09:23AM 13   A.   YES.

09:23AM 14   Q.   AND SHE'S DESCRIBING A BLOOD ANALYZER HERE; CORRECT?

09:23AM 15   A.   YES.

09:23AM 16   Q.   AND SHE'S DESCRIBING THE FEATURES OF A BLOOD ANALYZER THAT

09:23AM 17   WOULD WORK FOR HER FOR, AT LEAST AN INITIAL EVALUATION AND

09:23AM 18   DEPLOYMENT IN AFRICA; CORRECT?

09:23AM 19   A.   CORRECT.

09:23AM 20   Q.   AND IF YOU LOOK AT THE SECOND SENTENCE OF THAT PARAGRAPH,

09:23AM 21   SHE SAYS, "I HAVE SEVERAL TRIPS TO AFRICA COMING UP IN THE NEXT

09:23AM 22   FEW MONTHS AND REALLY WANT TO TEST THE EQUIPMENT/PROCESS AND

09:24AM 23   THEN MOVE FORWARD WITH FIELDING IT FOR FULL TIME USE IF THE

09:24AM 24   TEST RUNS GO WELL."

09:24AM 25        DO YOU SEE THAT?

09:24AM   1    A.   YES.

09:24AM   2    Q.   AND SHE WAS TRYING TO ARRANGE A MEETING WITH YOU AND

09:24AM   3    MS. HOLMES TO PURSUE THAT; CORRECT?

09:24AM   4    A.   YES.

09:24AM   5    Q.   DID YOU ULTIMATELY HAVE A MEETING WITH DR. GIVENS TO

09:24AM   6    PURSUE THAT KIND OF AN ARRANGEMENT?

09:24AM   7    A.   I RECALL HAVING ONE MEETING IN PERSON WITH HER.  IT WAS

09:24AM   8    LIKELY BEFORE THIS, ALTHOUGH I'M NOT EXACTLY SURE.

09:24AM   9    Q.   OKAY.  BUT YOU CONTINUED DISCUSSIONS AFTER THIS ABOUT THE

09:24AM  10    POSSIBILITY OF DEPLOYING A DEVICE IN AFRICA WITH

09:24AM  11    COLONEL GIVENS?

09:24AM  12    A.   YES.

09:24AM  13    Q.   DO YOU SEE IN THIS -- IN THE REFERENCE IN THE SECOND

09:24AM  14    PARAGRAPH ASKING ABOUT PROGRESS, SHE REFERS TO CONFIGURING A

09:24AM  15    SYSTEM.

09:24AM  16         DO YOU SEE THAT?

09:24AM  17    A.   YES.

09:24AM  18    Q.   WHAT DOES THAT MEAN?

09:24AM  19    A.   CUSTOMIZING THE SYSTEM FOR THIS SPECIFIC USE CASE.

09:25AM  20    Q.   OKAY.  SO THE THERANOS ANALYZERS WEREN'T JUST

09:25AM  21    OFF-THE-SHELF PRODUCTS.  IF THEY WERE USED FOR A PARTICULAR

09:25AM  22    PURPOSE, THEY WOULD HAVE TO BE CUSTOMIZED FOR THAT PURPOSE; IS

09:25AM  23    THAT RIGHT?

09:25AM  24    A.   THAT'S RIGHT.

09:25AM  25    Q.   AND THEN YOU SEE IF THE TEST WENT WELL, SHE WANTED TO MOVE

09:25AM  1    FORWARD WITH DEPLOYING THE DEVICE; CORRECT?

09:25AM  2    A.   YES.

09:25AM  3    Q.   AND THAT TEST DID GO FORWARD; CORRECT?

09:25AM  4    A.   THERE WAS, THERE WAS A STUDY WITH HER, WITH -- YES.

09:25AM  5    Q.   AND AFTER THE DISCUSSION WITH HER, DID SHE WORK ON

09:25AM  6    DESIGNING A PROTOCOL FOR THAT STUDY?

09:25AM  7    A.   YES.

09:25AM  8    Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 13993.

09:26AM  9         YOUR HONOR, MAY I APPROACH THE WITNESS?

09:26AM  10             THE COURT:  YES.

09:26AM  11             MR. DOWNEY:  THIS IS NOT IN HIS NOTEBOOK.

09:26AM  12        (HANDING.)

09:26AM  13   Q.   IF YOU LOOK AT THE TOP OF EXHIBIT 13993, DO YOU SEE THAT

09:26AM  14   THIS IS A SERIES OF EMAILS BETWEEN YOU AND DR. GIVENS FROM JUNE

09:26AM  15   OF 2012 RELATED TO DEPLOYING AN AFRICAN -- A THERANOS DEVICE

09:26AM  16   FOR AFRICOM?

09:26AM  17   A.   YES.

09:26AM  18             MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT

09:26AM  19   EXHIBIT 13993.

09:26AM  20             MR. BOSTIC:  YOUR HONOR, NO OBJECTION.

09:27AM  21        I JUST NOTE THAT THIS EXHIBIT IS MISSING THE ATTACHMENT,

09:27AM  22   OR APPEARS TO BE.

09:27AM  23             THE COURT:  SAY AGAIN.

09:27AM  24             MR. BOSTIC:  THERE APPEARS TO BE AN ATTACHMENT TO

09:27AM  25   THIS EMAIL THAT THIS EXHIBIT IS MISSING.

09:27AM   1          MR. DOWNEY:  WELL, I'D BE HAPPY TO SUPPLEMENT THAT,

09:27AM   2   YOUR HONOR, AND I'LL FIND THE ATTACHMENT.

09:27AM   3          THE COURT:  OKAY.

09:27AM   4          MR. DOWNEY:  AND I'LL ATTACH IT AS EXHIBIT A TO

09:27AM   5   13993.

09:27AM   6          THE COURT:  ALL RIGHT.  13993 IS ADMITTED.  IT MAY

09:27AM   7   BE PUBLISHED.

09:27AM   8       AND YOU'LL SUPPLY AN ATTACHMENT AS NEEDED.

09:27AM   9          MR. DOWNEY:  YES, SIR.

09:27AM  10          THE COURT:  THANK YOU.

09:27AM  11       (DEFENDANT'S EXHIBIT 13993 WAS RECEIVED IN EVIDENCE.)

09:27AM  12          MR. DOWNEY:  IF WE CAN GO ON THE SCREEN TO THE

09:27AM  13   BOTTOM OF PAGE 2 OF THIS SERIES OF EMAILS.

09:27AM  14   Q.  DO YOU SEE THAT YOU'RE DISCUSSING HERE WITH DR. GIVENS

09:27AM  15   SOME OF THE DETAILS OF THE CUSTOMIZATION OF THE DEVICE?

09:28AM  16   A.  YES.

09:28AM  17   Q.  AND DO YOU SEE THAT IF YOU GO UP -- AND YOU'RE ASKING HER

09:28AM  18   A SERIES OF QUESTIONS ABOUT HOW THE CARTRIDGES WILL BE STORED;

09:28AM  19   CORRECT?

09:28AM  20   A.  CORRECT.

09:28AM  21   Q.  AND HOW THE DEVICE WILL BE POWERED, IF YOU LOOK AT THE

09:28AM  22   LAST SECTION OF THE EMAIL?

09:28AM  23   A.  CORRECT.

09:28AM  24   Q.  AND THEN YOU ASK HER, IN THE SECOND TO LAST QUESTION THAT

09:28AM  25   YOU ASKED TOWARDS THE BOTTOM OF THE EMAIL, YOU ASK, "HOW WILL

09:28AM  1    THE DEVICE BE TRANSPORTED IN THE FIELD?  DO YOU PLAN ON KEEPING

09:28AM  2    THE DEVICE IN ITS PACKAGING IN BETWEEN USE?  WHAT KIND OF

09:28AM  3    CONDITIONS MIGHT BE ON THE MEDEVAC FROM GERMANY TO UGANDA?"

09:28AM  4        DO YOU SEE YOU WERE ASKING THOSE QUESTIONS?

09:28AM  5    A.   YES.

09:28AM  6    Q.   AND WHY WERE YOU ASKING HER THOSE QUESTIONS?

09:28AM  7    A.   I BELIEVE THIS INFORMATION WAS REQUESTED BY SOME OF THE

09:29AM  8    MEMBERS OF THE TEAM THAT OPERATE, THAT OPERATED THE DEVICE, AND

09:29AM  9    IT WAS CUSTOMIZING THE DEVICE.

09:29AM 10    Q.   SO THAT WOULD BE DR. YOUNG AND PEOPLE WORKING UNDER HIM?

09:29AM 11    A.   THAT'S RIGHT.

09:29AM 12    Q.   AND SHE RESPONDS TO THIS EMAIL BEGINNING ON THE PRIOR PAGE

09:29AM 13    AND SHE DESCRIBES THE LOGISTICS THAT THE DEVICE WILL GO THROUGH

09:29AM 14    TO GET TO AFRICA; CORRECT?

09:29AM 15    A.   RIGHT.

09:29AM 16    Q.   AND SHE DESCRIBES IN THE SECOND PARAGRAPH THAT THE

09:29AM 17    EQUIPMENT WILL BE FLOWN COMMERCIALLY; CORRECT?

09:29AM 18    A.   CORRECT.

09:29AM 19    Q.   AND THEN IN THE LAST PART OF THAT PARAGRAPH, SHE DESCRIBES

09:29AM 20    WHAT -- THE SITE WHERE THE DEVICE WILL BE LOCATED, THE

09:29AM 21    CONDITIONS THERE; CORRECT?

09:29AM 22    A.   CORRECT.

09:29AM 23    Q.   AND SHE INDICATES THERE'S NO AIR CONDITIONING IN THE

09:30AM 24    BUILDING AND THE TEMPERATURE WILL BE BETWEEN 100 AND

09:30AM 25    110 DEGREES FAHRENHEIT; CORRECT?

09:30AM   1      A.   CORRECT.

09:30AM   2      Q.   AND SHE ALSO DETAILS HOW SHE'S GOING TO SHIP THE DEVICE.

09:30AM   3           AND SO YOU'RE WORKING ON ALL OF THOSE LOGISTICS WITH HER;

09:30AM   4      RIGHT?

09:30AM   5      A.   CORRECT.

09:30AM   6      Q.   IF YOU LOOK TOWARD THE SECOND TO THE LAST SENTENCE, SHE

09:30AM   7      GOES ON AGAIN TO EMPHASIZE THAT THE TEMPERATURES WILL RANGE

09:30AM   8      FROM 100 DEGREES FAHRENHEIT WITH HIGH HUMIDITY, BUT THEN IN

09:30AM   9      FLIGHT THE TEMPERATURES WILL DROP TO ABOUT 60 DEGREES

09:30AM   10     FAHRENHEIT.

09:30AM   11          DO YOU SEE THAT?  THAT'S ON THE SECOND PAGE TOWARDS THE

09:30AM   12     END OF THAT EMAIL.

09:31AM   13     A.   I DO SEE THAT.

09:31AM   14     Q.   SO YOU'RE WORKING ON THIS PROTOCOL WITH HER KNOWING THAT

09:31AM   15     THIS IS GOING TO BE A DEPLOYMENT IN SEVERE WEATHER CONDITIONS

09:31AM   16     POTENTIALLY?

09:31AM   17     A.   RIGHT.

09:31AM   18     Q.   AND YOU WERE INFORMING THE SCIENTISTS AT THERANOS THAT

09:31AM   19     THESE WOULD BE THE CONDITIONS?

09:31AM   20     A.   YES.

09:31AM   21     Q.   IN PART BECAUSE THIS WAS INFORMATION THAT THEY HAD ASKED

09:31AM   22     FOR; CORRECT?

09:31AM   23     A.   RIGHT.

09:31AM   24     Q.   DO YOU KNOW WHETHER THE DEVICE WAS CONFIGURED BY THE

09:31AM   25     SCIENTISTS AT THERANOS TO DEAL WITH THOSE EXTREME WEATHER

09:31AM  1    CONDITIONS?

09:31AM  2    A.   I DON'T KNOW.

09:31AM  3    Q.   OKAY.

09:31AM  4         YOUR HONOR, MAY I APPROACH THE WITNESS AGAIN?

09:31AM  5              THE COURT:  YES.

09:32AM  6              MR. DOWNEY:  (HANDING.)

09:32AM  7    Q.   I'M SHOWING YOU WHAT HAS BEEN MARKED AS EXHIBIT 13986.  IS

09:32AM  8    THIS AN EMAIL BETWEEN DR. YOUNG AND MS. HOLMES AND YOURSELF AND

09:32AM  9    CHRISTIAN HOLMES RELATED TO THERANOS'S AFRICOM DEPLOYMENT?

09:32AM  10   A.   YES.

09:32AM  11             MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT

09:32AM  12   EXHIBIT 13986.

09:33AM  13             MR. BOSTIC:  YOUR HONOR, APOLOGIES.  I DON'T SEE A

09:33AM  14   BATES NUMBER ON THIS DOCUMENT.

09:33AM  15             MR. DOWNEY:  WE HAVE RECOVERED IT FROM -- WE DID NOT

09:33AM  16   GET IT OUT OF THE PRODUCTION FROM THERANOS.  I'D BE HAPPY TO

09:33AM  17   EXPLAIN TO THE COURT HOW WE DID.

09:33AM  18             THE COURT:  DO YOU HAVE A --

09:33AM  19             MR. DOWNEY:  I THINK THE WITNESS HAS AUTHENTICATED

09:33AM  20   IT.

09:33AM  21             THE COURT:  RIGHT, HE HAS.

09:33AM  22        AND, MR. BOSTIC, YOU'RE CONCERNED THAT THIS IS OUTSIDE OF

09:33AM  23   DISCOVERY?

09:33AM  24             MR. BOSTIC:  THAT'S MY CONCERN, YOUR HONOR.  I'M

09:33AM  25   JUST RAISING IT AS A QUESTION.

09:33AM   1          THE COURT:  RIGHT.  I'LL ADMIT IT NOW, AND WE CAN

09:33AM   2   HAVE A DISCUSSION ABOUT IT LATER, BUT I THINK THE FOUNDATION IS

09:33AM   3   THERE.  SO IT'S ADMITTED, AND IT MAY BE PUBLISHED.

09:33AM   4          (DEFENDANT'S EXHIBIT 13986 WAS RECEIVED IN EVIDENCE.)

09:33AM   5          MR. DOWNEY:  I'LL SHOW YOU AND BLOW UP THE TOP OF

09:33AM   6   THIS EMAIL SO IT'S EASIER TO SEE.

09:33AM   7   Q.   DO YOU SEE THIS IS AN EMAIL FROM DR. YOUNG TO YOU IN JUNE

09:34AM   8   OF 2012 RELATED TO THE AFRICOM PROJECT?

09:34AM   9   A.   I DO.

09:34AM  10   Q.   AND HE'S REPORTING TO YOU ABOUT TESTING THAT HE DID ON THE

09:34AM  11   DEVICE THAT IS BEING SENT TO DR. GIVENS FOR DEPLOYMENT IN

09:34AM  12   AFRICA; CORRECT?

09:34AM  13   A.   CORRECT.

09:34AM  14   Q.   AND HE REPORTS THAT HE'S DONE "48 HOURS OF CONTINUAL

09:34AM  15   TESTING OF THE READER AT 110 DEGREES FAHRENHEIT COMPLETED

09:34AM  16   SUCCESSFULLY TONIGHT.  WE RAN 100 PROTOCOLS SEQUENTIALLY - SO I

09:34AM  17   FEEL VERY GOOD ABOUT RELIABILITY FOR THIS DEPLOYMENT."

09:34AM  18          DO YOU SEE THAT?

09:34AM  19   A.   YES.

09:34AM  20   Q.   AND DO YOU RECALL THAT THERE WAS CONFIGURATION OF THE

09:34AM  21   DEVICE RELATED TO THE TEMPERATURE IN AFRICA?

09:34AM  22   A.   THIS REFRESHES MY RECOLLECTION.

09:34AM  23   Q.   OKAY.  AND DID YOU THEN SEND THE DEVICE TO DR. GIVENS FOR

09:35AM  24   DEPLOYMENT IN AFRICA?

09:35AM  25   A.   YES.

09:35AM   1     Q.   CAN I ASK YOU TO LOOK AT EXHIBIT 10446.

09:35AM   2     A.   YES.

09:35AM   3     Q.   IS THIS AN EMAIL EXCHANGE BETWEEN YOU AND DR. GIVENS AND

09:35AM   4     MS. HOLMES RELATED TO THE AFRICOM DEPLOYMENT?

09:35AM   5     A.   YES.

09:35AM   6              MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

09:35AM   7     EXHIBIT 10446.

09:35AM   8              MR. BOSTIC:  NO OBJECTION.

09:35AM   9              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:35AM  10         (DEFENDANT'S EXHIBIT 10446 WAS RECEIVED IN EVIDENCE.)

09:35AM  11              MR. DOWNEY:  CAN WE BLOW UP THE BOTTOM HALF OF THE

09:35AM  12     EMAIL.

09:36AM  13     Q.   IS THIS A REPORT THAT DR. GIVENS HAD GIVEN YOU AFTER SHE

09:36AM  14     HAD TAKEN THE DEVICE TO AFRICA AND USED IT IN LOCATIONS OVER

09:36AM  15     THERE?

09:36AM  16     A.   YES.

09:36AM  17     Q.   AND DO YOU SEE SHE REPORTED, "I MADE IT BACK FROM 2 TRIPS

09:36AM  18     TO AFRICA AND MANAGED TO WORK THROUGH ALL THE CASES IN THE

09:36AM  19     PROTOCOL."

09:36AM  20         DO YOU SEE THAT?

09:36AM  21     A.   I DO.

09:36AM  22     Q.   AND WHEN SHE REFERS TO THE PROTOCOL, THIS WAS NOT ACTUAL

09:36AM  23     TESTING ON PATIENTS; CORRECT?

09:36AM  24     A.   CORRECT.

09:36AM  25     Q.   AND THE STUDY WAS NOT DESIGNED TO CONDUCT ACTUAL BLOOD

09:36AM  1    TESTING ON PATIENTS, WAS IT?

09:36AM  2    A.   IT WAS NOT.

09:36AM  3    Q.   AT DR. GIVENS'S REQUEST, THE RESULTS THAT WERE TO BE

09:36AM  4    GENERATED WERE ARTIFICIAL RESULTS AND SHE WAS TESTING THE

09:36AM  5    VIABILITY OF THE DEVICE IN A DEPLOYED ENVIRONMENT; RIGHT?

09:36AM  6    A.   CORRECT.

09:36AM  7    Q.   AND SHE GOES ON TO SAY, "THE MACHINE TRAVELED WELL AND

09:37AM  8    FUNCTIONED WELL.  MY ONLY COMPLAINT IS THE TOUCH SCREEN - VERY

09:37AM  9    FRUSTRATING."

09:37AM 10       AND WAS SHE REFERRING THERE TO THE INTERFACE ON THE FRONT

09:37AM 11    OF THE THERANOS ANALYZER?

09:37AM 12    A.   YES.

09:37AM 13    Q.   AND SHE HAD SOME DIFFICULTY OPERATING THAT INTERFACE?

09:37AM 14    A.   YES.

09:37AM 15    Q.   OKAY.  AND THEN SHE GOES ON TO REPORT THAT SHE'LL BE

09:37AM 16    PREPARING A FULL REPORT AND SHE'LL HAVE SEVERAL PICTURES OF THE

09:37AM 17    MACHINE BEING USED IN CAMEROON, UGANDA, AND SOUTH SUDAN.

09:37AM 18       IS THIS THE FIRST TIME THAT YOU HAD LEARNED THAT SHE HAD

09:37AM 19    ACTUALLY DEPLOYED THE DEVICE IN THOSE LOCATIONS?

09:37AM 20    A.   I BELIEVE THERE WAS PREVIOUS COMMUNICATION ABOUT CAMEROON

09:37AM 21    AND UGANDA, BUT I THINK THIS WAS THE FIRST TIME THAT I HAD

09:37AM 22    HEARD OF SOUTH SUDAN.

09:37AM 23    Q.   AND THEN SHE GOES ON TWO PARAGRAPHS LATER TO WRITE,

09:37AM 24    "BECAUSE THE MACHINE SEEMED TO FUNCTION WELL IN THE

09:38AM 25    ENVIRONMENT, I AM GOING TO WRITE A PRE-PROPOSAL TO SUBMIT TO

09:38AM   1    THE U.S. SOCOM."  THAT'S A REFERENCE TO SPECIAL OPERATIONS;

09:38AM   2    CORRECT?

09:38AM   3    A.   YES.

09:38AM   4    Q.   AND SHE WAS HOPING TO GAIN FUNDING FOR A FULL PROPOSAL;

09:38AM   5    CORRECT?

09:38AM   6    A.   CORRECT.

09:38AM   7    Q.   NOW, DO YOU RECALL YESTERDAY THAT MR. BOSTIC SHOWED YOU AN

09:38AM   8    EXHIBIT RELATED TO QUESTIONS ABOUT THE OPERATION OF THE DEVICE

09:38AM   9    IN EXTREME TEMPERATURES?

09:38AM   10   A.   YES.

09:38AM   11   Q.   LET ME ASK YOU TO PULL THAT BACK UP, WHICH IS ALREADY IN

09:38AM   12   EVIDENCE, AND I'LL PULL IT ON THE SCREEN.  IT'S EXHIBIT 5435.

09:38AM   13        AND I'LL DIRECT YOUR ATTENTION AND ASK THAT THE SCREEN BE

09:38AM   14   DIRECTED TO PAGE 4 OF THAT EXHIBIT.

09:38AM   15        AND DO YOU RECALL MR. BOSTIC SHOWING YOU THIS YESTERDAY

09:39AM   16   WITH THE COMMENTS OF SEVERAL OF THE SCIENTISTS ABOUT WHETHER

09:39AM   17   THE DEVICE COULD OPERATE IN EXTREME TEMPERATURES?

09:39AM   18   A.   YES.

09:39AM   19   Q.   AND YOU HAD RAISED QUESTIONS WITH THIS -- REGARDING THIS

09:39AM   20   WITH DR. YOUNG; CORRECT?  THAT'S --

09:39AM   21   A.   CORRECT.

09:39AM   22   Q.   THAT'S THE REFERENCE TO DANIEL?

09:39AM   23   A.   CORRECT.

09:39AM   24   Q.   AND AT THIS TIME YOU HADN'T HEARD BACK FROM HIM; CORRECT?

09:39AM   25   A.   CORRECT.

09:39AM   1     Q.   AND THEN BELOW THAT YOU HAD ALSO ASKED QUESTIONS OF

09:39AM   2     MR. FRENZEL, CORRECT, GARY FRENZEL?

09:39AM   3     A.   CORRECT.

09:39AM   4     Q.   AND MR. FRENZEL WAS NOT A HARDWARE PERSON AT THERANOS, WAS

09:39AM   5     HE?

09:39AM   6     A.   I BELIEVE HE WAS ON THE SCIENCE AND CHEMISTRY SIDE.

09:39AM   7     Q.   OKAY.  AND HE SAYS, "THE EDISON DID NOT HAVE A WAY TO COOL

09:39AM   8     DOWN.  THEY WOULD HAVE SHUT DOWN."

09:39AM   9          DO YOU SEE THAT?

09:40AM  10     A.   I DO.

09:40AM  11     Q.   NOW, MR. FRENZEL WAS NOT INVOLVED IN THE AFRICOM PROJECT,

09:40AM  12     WAS HE?

09:40AM  13     A.   NO.

09:40AM  14     Q.   AND AFTER THE DEPLOYMENT BY DR. GIVENS, THE DEVICE DID NOT

09:40AM  15     SHUT DOWN, DID IT?

09:40AM  16     A.   I HAVE NO KNOWLEDGE OF IT SHUTTING DOWN.

09:40AM  17     Q.   OKAY.  DO YOU RECALL THAT SHE REPORTED BACK TO YOU THAT

09:40AM  18     THE DEVICE FUNCTIONED WELL?

09:40AM  19     A.   YES.

09:40AM  20     Q.   LET'S GO DOWN TO THE NEXT TWO COMMENTS.

09:40AM  21          THESE ARE ALSO COMMENTS FROM INDIVIDUALS WHO WERE NOT

09:40AM  22     INVOLVED IN THE AFRICOM DEPLOYMENT; CORRECT?

09:40AM  23     A.   CORRECT.

09:40AM  24     Q.   THAT'S TRUE OF TONY; CORRECT?

09:40AM  25     A.   CORRECT.

09:40AM   1    Q.   AND IF YOU GO TO THE BOTTOM, IT REFERENCES SUREKHA;

09:40AM   2    CORRECT?

09:40AM   3    A.   CORRECT.

09:40AM   4    Q.   AND THAT'S A REFERENCE TO MS. GANGAKHEDKAR?

09:40AM   5    A.   CORRECT.  I DON'T RECALL EXACTLY WHO WAS INVOLVED WITH THE

09:40AM   6    PREPARATION OF THE EQUIPMENT AND CARTRIDGES AND THE DEVICE, BUT

09:41AM   7    SHE WAS ON ONE OF THE ASSAY DEVELOPMENT -- SHE LED ONE OF THE

09:41AM   8    ASSAY DEVELOPMENT TEAMS.

09:41AM   9    Q.   SHE DID SOMETHING SIMILAR TO WHAT MR. FRENZEL DID?

09:41AM  10    A.   I DON'T KNOW EXACTLY WHAT THEY DID.

09:41AM  11    Q.   OTHER THAN DR. YOUNG, DO YOU KNOW WHO WAS INVOLVED IN THE

09:41AM  12    PREPARATION OF THE DEVICE A YEAR BEFORE THIS EMAIL?

09:41AM  13    A.   DANIEL HAD A TEAM, AND I BELIEVE AT THAT TIME I JUST

09:41AM  14    INTERACTED WITH DANIEL ABOUT THIS.

09:41AM  15    Q.   OKAY.  BUT YOU DIDN'T KNOW WHO WAS ON MR. -- DR. YOUNG'S

09:41AM  16    TEAM?

09:41AM  17    A.   CORRECT.

09:41AM  18    Q.   OKAY.  I WANT TO ASK YOU NOW ABOUT THE RELATIONSHIP

09:41AM  19    BETWEEN THERANOS AND CENTCOM.

09:41AM  20         DO YOU RECALL DURING THE COURSE OF THAT RELATIONSHIP YOU

09:41AM  21    HAD CONTACT WITH A DOCTOR AT CENTCOM NAMED ERIN EDGAR?

09:42AM  22    A.   CORRECT.

09:42AM  23    Q.   LET ME ASK YOU TO LOOK BACK AT EXHIBIT 588, WHICH IS IN

09:42AM  24    EVIDENCE.

09:42AM  25         I WANT TO SHOW YOU AT THE TOP OF THIS A DATE BY WHICH

09:42AM 1    DISCUSSIONS WERE HAPPENING BETWEEN THERANOS AND CENTCOM RELATED

09:42AM 2    TO A POTENTIAL DEPLOYMENT.

09:42AM 3        DO YOU SEE THAT THERE WERE DISCUSSIONS AT LEAST AS EARLY

09:42AM 4    AS APRIL 24TH, 2012?

09:42AM 5    A.   YES.

09:42AM 6    Q.   AND DO YOU KNOW IF DISCUSSIONS BETWEEN CENTCOM AND

09:42AM 7    THERANOS REGARDING A POTENTIAL THERANOS DEPLOYMENT HAD BEEN

09:42AM 8    GOING ON BEFORE APRIL OF 2012?

09:42AM 9    A.   I'M NOT SURE.

09:43AM 10   Q.   ULTIMATELY I THINK YOU TESTIFIED YESTERDAY THAT CENTCOM

09:43AM 11   DID APPROVE A LIMITED OBJECTIVE EXPERIMENT TO EVALUATE

09:43AM 12   THERANOS'S TECHNOLOGY; CORRECT?

09:43AM 13   A.   CORRECT.

09:43AM 14   Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 10457.

09:43AM 15       IF YOU'LL LOOK AT THE FIRST PAGE, IS THIS AN EMAIL FROM

09:43AM 16   YOU TO MS. HOLMES FORWARDING THE MILITARY'S APPROVAL OF THAT

09:43AM 17   LOE?

09:43AM 18   A.   YES.

09:43AM 19   Q.   AND THIS APPROVAL WAS SENT TO MS. HOLMES IN DECEMBER OF

09:43AM 20   2012; CORRECT?

09:43AM 21   A.   CORRECT.

09:43AM 22   Q.   DO YOU KNOW WHY IT TOOK FROM EARLIER IN THE YEAR, APRIL OF

09:44AM 23   2012 AT LEAST, UNTIL THE END OF THE YEAR FOR AN EXPERIMENT TO

09:44AM 24   BE APPROVED BY THE MILITARY?

09:44AM 25   A.   THAT'S JUST HOW LONG IT TOOK TO PLAN IT AND HAVE BACK AND

09:44AM   1    FORTH BETWEEN THE COMPANIES TO ALIGN ON THE, ON THE GOALS OF

09:44AM   2    THE OBJECTIVE EXPERIMENT.

09:44AM   3    Q.   OKAY.  SOME OF THAT RELATES TO CUSTOMIZATION OF THE

09:44AM   4    DEVICE; CORRECT?

09:44AM   5    A.   CORRECT.

09:44AM   6    Q.   AND SOME OF IT RELATES TO THE MILITARY DECIDING WHAT

09:44AM   7    ASSAYS IT WANTS TO USE IN CONNECTION WITH THE EXPERIMENT;

09:44AM   8    CORRECT?

09:44AM   9    A.   CORRECT.

09:44AM   10   Q.   AND THEN THERE ARE OTHER ASPECTS TO DEALING WITH THE

09:44AM   11   GOVERNMENT BUREAUCRACY THAT YOU HAD TO DEAL WITH AND CUT

09:44AM   12   THROUGH TO GET THE EXPERIMENT APPROVED; CORRECT?

09:44AM   13   A.   CORRECT.

09:44AM   14   Q.   AND DO YOU SEE IN THE EMAIL AT THE TOP OF 10457 THAT YOU

09:44AM   15   INDICATE THAT EVEN IN THE APPROVAL --

09:44AM   16        MR. BOSTIC:  YOUR HONOR, I DON'T BELIEVE THIS IS IN

09:45AM   17   EVIDENCE.

09:45AM   18        MR. DOWNEY:  WELL, I WASN'T GOING TO ADMIT IT, BUT

09:45AM   19   I'LL MOVE TO ADMIT 10547.

09:45AM   20        THE COURT:  ANY OBJECTION?

09:45AM   21        MR. BOSTIC:  NO OBJECTION.

09:45AM   22        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:45AM   23     (DEFENDANT'S EXHIBIT 10457 WAS RECEIVED IN EVIDENCE.)

09:45AM   24   BY MR. DOWNEY:

09:45AM   25   Q.   DO YOU SEE IN THE SECOND SENTENCE, MS. HOLMES -- YOU'RE

09:45AM   1    TELLING MS. HOLMES THAT EVEN AS THIS WAS APPROVED, THE MILITARY

09:45AM   2    HAD ADJUSTED THE ASSAYS THAT IT WANTED FOR THE LIMITED

09:45AM   3    OBJECTIVE EXPERIMENT?

09:45AM   4    A.   I DO SEE THAT, YES.

09:45AM   5    Q.   OKAY.  AND IT LOOKS LIKE IT HAD ADDED ABOUT FOUR NEW

09:45AM   6    ASSAYS; CORRECT?

09:45AM   7    A.   CORRECT.

09:45AM   8    Q.   NOW, AFTER THE EXPERIMENT WAS APPROVAL BY THE MILITARY, I

09:45AM   9    THINK YOU TESTIFIED THAT YOU TRAVELED TO A MILITARY BASE WITH

09:45AM   10   THE DEVICE; IS THAT RIGHT?

09:45AM   11   A.   I BELIEVE IT WAS SHIPPED THERE.  BUT I DID TRAVEL THERE,

09:46AM   12   YES.

09:46AM   13   Q.   OKAY.  AND SO YOU -- THE DEVICE WAS SHIPPED, BUT YOU ALSO

09:46AM   14   WENT THERE AND SHOWED THE DEVICE TO MEMBERS OF THE MILITARY?

09:46AM   15   A.   CORRECT.  WELL, THEY -- I THINK IT WAS A MIX OF

09:46AM   16   CONTRACTORS AND MEMBERS OF THE MILITARY, YES.

09:46AM   17   Q.   OKAY.  AND WAS ONE OF THE PURPOSES OF THAT TO EVALUATE

09:46AM   18   WHETHER OR NOT THE DEVICE WAS SECURE SO THAT IT COULD BE

09:46AM   19   DEPLOYED?

09:46AM   20   A.   YES.

09:46AM   21   Q.   AND DID THERANOS'S DEVICE PASS THOSE SECURITY TESTS?

09:46AM   22   A.   I BELIEVE SO.

09:46AM   23   Q.   WERE THERE ANY SPECIAL CONFIGURATIONS THAT HAD TO BE MADE

09:46AM   24   TO THE DEVICE TO QUALIFY IT TO BE PART OF AN EXPERIMENT WITH

09:46AM   25   THE MILITARY?

09:46AM  1    A.   YES.

09:47AM  2    Q.   AND CAN YOU DESCRIBE THOSE?

09:47AM  3    A.   UM, I'M SORRY, CAN YOU REPEAT THE QUESTION?

09:47AM  4    Q.   WERE THERE ANY MODIFICATIONS, FOR SECURITY PURPOSES, THAT

09:47AM  5    HAD TO BE MADE TO THE DEVICE FOR THIS PROGRAM?

09:47AM  6    A.   YES.   THERE WAS CONCERN FROM -- MAINLY FROM SUNNY THAT

09:47AM  7    GIVING THE DEVICE TO THE TEAM THAT TESTED IT IN -- DURING THAT

09:47AM  8    TESTING WOULD OPEN UP A POSSIBILITY OF INFORMATION BEING

09:47AM  9    DISCLOSED THAT SUNNY DID NOT WANT BEING DISCLOSED.   HE THOUGHT

09:47AM 10    THAT IT LEFT OPEN THE CHANCE THAT ANYONE LOOKING AT THE DEVICE

09:47AM 11    WOULD BE ABLE TO UNDERSTAND ALL OF THE DIFFERENT COMPONENTS AND

09:47AM 12    CONFIGURATIONS IN THE DEVICE, AND HE DID NOT WANT TO GIVE THAT

09:48AM 13    OPEN OF A DEVICE TO THOSE TESTING IT.

09:48AM 14         SO HE -- PER HIS DIRECTION, THE TEAM OF ENGINEERS, I

09:48AM 15    THINK, DISABLED SOME OF THE PORTS SO THAT THE PEOPLE TESTING IT

09:48AM 16    WOULDN'T BE ABLE TO RUN A FULL SET OF TESTS, I BELIEVE.

09:48AM 17    Q.   AND HOW LONG DID THAT RECONFIGURATION TAKE?

09:48AM 18    A.   I DON'T REMEMBER.

09:48AM 19    Q.   WHEN YOU SHOWED THE DEVICE TO THE MILITARY, DID THEY HAVE

09:48AM 20    A COMMENT ABOUT THE HARDWARE IN CONNECTION WITH THE MILITARY

09:48AM 21    USE?

09:48AM 22    A.   YES.

09:48AM 23    Q.   DO YOU RECALL THEM SAYING THAT THEY THOUGHT THE DEVICE WAS

09:48AM 24    TOO BIG?

09:48AM 25    A.   YES, TOO BIG AND TOO HEAVY.

09:48AM 1    Q.   AND WAS THE DEVICE THAT YOU HAD TAKEN -- STRIKE THAT.

09:48AM 2         WAS THE DEVICE THAT YOU HAD SHIPPED A 4.0 MONOBAY?

09:49AM 3    A.   YES.

09:49AM 4    Q.   AND IN RESPONSE TO THAT FEEDBACK FROM THE MILITARY, DID

09:49AM 5    THERANOS BEGIN TO WORK ON A SPECIALIZED MILITARY DEVICE?

09:49AM 6    A.   YES, THE 4S.

09:49AM 7    Q.   AND DO YOU RECALL THE DATE OF THAT TRIP TO THE MILITARY

09:49AM 8    BASE?

09:49AM 9    A.   I BELIEVE IT WAS IN 2013.

09:49AM 10   Q.   AND WAS THAT THE MACDILL AIR FORCE BASE IN TAMPA?

09:49AM 11   A.   YES.

09:49AM 12   Q.   NOW, SHORTLY AFTER THAT TRIP, DID PERSONS IN THE MILITARY

09:49AM 13   BEGIN TO COMMUNICATE WITH YOU SAYING THAT THEY WANTED TO DEPLOY

09:49AM 14   THE DEVICE RIGHT AWAY?

09:49AM 15   A.   THEY WERE INTERESTED IN DEPLOYING THE DEVICE AS SOON AS

09:49AM 16   POSSIBLE.

09:49AM 17   Q.   LET ME SHOW YOU EXHIBIT 10472.

09:50AM 18        IS THIS AN EMAIL FROM YOU TO VARIOUS MEMBERS OF THE

09:50AM 19   MILITARY AND VARIOUS THERANOS PERSONNEL THAT IS PART OF A LONG

09:50AM 20   CHAIN OF COMMUNICATIONS RELATED TO THE THERANOS CENTCOM

09:50AM 21   PROJECT?

09:50AM 22   A.   YES.

09:50AM 23   Q.   AND IF YOU LOOK AT THE SECOND EMAIL ON THE FIRST PAGE,

09:50AM 24   THERE'S A COMMUNICATION FROM A JAMES SOMMER.

09:50AM 25        DO YOU SEE THAT?

09:50AM  1    A.   YES.

09:50AM  2    Q.   WHO IS JAMES SOMMER?

09:50AM  3    A.   JAMES SOMMER WORKED AT CENTCOM.  I BELIEVE HE WAS AN ARMY

09:51AM  4    SCIENCE ADVISOR, AND HE WORKED TO -- WORKED WITH THERANOS TO

09:51AM  5    HELP TO SECURE THE DEVICES FOR THE STUDY, OBTAIN THE DEVICES

09:51AM  6    FOR THE STUDY.

09:51AM  7    Q.   OKAY.  SO HE SENT THIS IN FEBRUARY OF 2013; CORRECT?

09:51AM  8    A.   YES.

09:51AM  9    Q.   AND THIS WAS JUST A COUPLE OF MONTHS AFTER THE LIMITED

09:51AM  10   OBJECTIVE EXPERIMENT WAS USED; CORRECT?

09:51AM  11   A.   CAN YOU REPEAT THE QUESTION?

09:51AM  12   Q.   THIS WAS JUST A COUPLE OF MONTHS AFTER THE LIMITED

09:51AM  13   OBJECTIVE EXPERIMENT HAD BEEN APPROVED BY THE MILITARY?

09:52AM  14   A.   I DON'T KNOW EXACTLY WHEN IT WAS APPROVED.

09:52AM  15   Q.   LET ME JUST ASK YOU TO LOOK BACK AT EXHIBIT 10457, WHICH

09:52AM  16   WAS JUST ADMITTED A MOMENT AGO, AND WE CAN DISPLAY THE FIRST

09:52AM  17   PAGE OF THAT.

09:52AM  18   A.   YEP.  YES.

09:52AM  19   Q.   AND DO YOU SEE ON THE TOP THAT THAT'S AN EMAIL AT LEAST OF

09:52AM  20   YOU FORWARDING IT TO MS. HOLMES IN DECEMBER; CORRECT?

09:52AM  21   A.   YES, THAT'S CORRECT.

09:52AM  22   Q.   AND THEN BELOW THAT THERE'S AN INDICATION THAT THE

09:52AM  23   APPROVAL MAY HAVE BEEN IN NOVEMBER; CORRECT?

09:52AM  24   A.   CORRECT.

09:52AM  25   Q.   SO MR. SOMMER IS COMMUNICATING TO YOU IN FEBRUARY THAT

09:52AM  1    THINGS WERE GETTING MESSED UP WITH THE SEQUESTRATION.

09:52AM  2        DO YOU SEE THAT?

09:52AM  3    A.   I DO.

09:52AM  4    Q.   AND HE INDICATED THAT THAT WOULD AFFECT THE UPCOMING

09:52AM  5    LIMITED OBJECTIVE EXPERIMENT; CORRECT?

09:52AM  6    A.   CORRECT.

09:52AM  7    Q.   AND HE SAID -- ESSENTIALLY ASKED YOU TO SHIP THE DEVICE

09:53AM  8    SOON BECAUSE OTHERWISE HE WOULD NOT BE ABLE TO TRAVEL TO

09:53AM  9    THEATRE WITH IT; CORRECT?

09:53AM 10    A.   CORRECT.

09:53AM 11    Q.   NOW, YOU RESPONDED TO THIS EMAIL THAT SAME DAY.

09:53AM 12        DO YOU SEE THAT ABOVE?

09:53AM 13    A.   YES.

09:53AM 14    Q.   OKAY.

09:53AM 15        YOUR HONOR, I WOULD MOVE TO ADMIT 10472.

09:53AM 16            MR. BOSTIC:  NO OBJECTION.

09:53AM 17            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:53AM 18        (DEFENDANT'S EXHIBIT 10472 WAS RECEIVED IN EVIDENCE.)

09:53AM 19    BY MR. DOWNEY:

09:53AM 20    Q.   AND ON THE TOP OF THIS PAGE, DO YOU SEE THAT YOU'RE

09:53AM 21    RESPONDING TO MR. SOMMER'S SUGGESTION THAT THE DEVICE HAD TO BE

09:53AM 22    SHIPPED SOON.

09:53AM 23        DO YOU SEE THAT?

09:53AM 24    A.   YES.

09:53AM 25    Q.   I'D LIKE TO HIGHLIGHT THE PARAGRAPH THAT IS IN ITALICS.

EDLIN CROSS BY MR. DOWNEY (RES.)

09:53AM 1      AND YOU TELL HIM IN THIS EMAIL, "AS PER OUR PREVIOUS

09:53AM 2  DISCUSSIONS, THE 4S DEVICES WE ARE SHIPPING HAVE BEEN SPECIALLY

09:54AM 3  BUILT FOR THE PURPOSES OF OUR LIMITED OBJECTIVE EXPERIMENT."

09:54AM 4      CORRECT?

09:54AM 5  A.   CORRECT.

09:54AM 6  Q.   AND THAT WAS TRUE?

09:54AM 7  A.   TO MY KNOWLEDGE.

09:54AM 8  Q.   AND YOU SAID, "IN SO DOING WE HAVE HAD TO REVALIDATE AND

09:54AM 9  RETEST EVERY ASPECTS OF THE DEVICE CONFIGURATION TO ENSURE THAT

09:54AM 10  THESE SYSTEMS MEET OUR STANDARDS AND EXPECTATIONS."

09:54AM 11      DO YOU SEE THAT?

09:54AM 12  A.   YES.

09:54AM 13  Q.   AND YOU UNDERSTOOD FROM DR. YOUNG AND OTHERS THAT THAT WAS

09:54AM 14  TRUE; CORRECT?

09:54AM 15  A.   AND FROM ELIZABETH, YES.

09:54AM 16  Q.   AND FROM MR. BALWANI; CORRECT?

09:54AM 17  A.   I DON'T REMEMBER EXACTLY.

09:54AM 18  Q.   OKAY.  AND IN THE NEXT SENTENCE YOU SAY THAT "WE HAVE

09:54AM 19  SIGNIFICANTLY ACCELERATED THERANOS'S PREVIOUSLY PLANNED RELEASE

09:54AM 20  OF 4S IN ORDER TO MEET OUR OBJECTIVES FOR THIS PROGRAM."

09:55AM 21      DO YOU SEE THAT?

09:55AM 22  A.   YES.

09:55AM 23  Q.   AND THAT WAS TRUE AS FAR AS YOU KNEW?

09:55AM 24  A.   YES.

09:55AM 25  Q.   HAD YOU BEEN FAMILIAR BEFORE WITH THE SCHEDULE FOR RELEASE

09:55AM  1    OF THE MILITARY 4S?

09:55AM  2    A.   I'M NOT SURE I UNDERSTAND THE QUESTION.

09:55AM  3    Q.   WELL, DID YOU KNOW WHAT THE SCHEDULED RELEASE DATE

09:55AM  4    ORIGINALLY WAS FOR THE 4S AT THERANOS?

09:55AM  5    A.   NO.

09:55AM  6    Q.   OKAY.  IF YOU SEE THE NEXT SENTENCE, YOU GO ON TO SAY,

09:55AM  7    "FURTHER, WE HAVE ADDED ADDITIONAL FEATURES TO OUR USER

09:55AM  8    INTERFACE CAPABILITIES FOLLOWING OUR VTC SESSION WITH

09:55AM  9    MAJOR NELSON, AND WE HAVE BEEN INCORPORATING NEWLY RECEIVED

09:55AM  10   INFORMATION FROM --" IS THAT LIEUTENANT COLONEL ROMERO?

09:55AM  11   A.   YES.

09:55AM  12   Q.   "-- TO ENSURE THAT THE DEVICE IS ABLE TO OPERATE UNDER THE

09:55AM  13   I.T. AND SECURITY REQUIREMENTS OF THE NETWORK IN THEATRE."

09:55AM  14        AND WAS THAT A DESCRIPTION OF WHAT THE COMPANY HAD BEEN

09:55AM  15   DOING AS A RESULT OF THE FEEDBACK THAT YOU GOT AT THE MEETING

09:56AM  16   AT THE MACDILL AIR FORCE BASE?

09:56AM  17   A.   THAT'S WHAT I WAS TOLD.

09:56AM  18   Q.   AND YOU TOLD HIM THAT THESE PROCESSES GUIDED OUR DELIVERY

09:56AM  19   TIMELINES.

09:56AM  20        DO YOU SEE THAT?

09:56AM  21   A.   YES.

09:56AM  22   Q.   AND THEN YOU -- YOU GO ON TO SAY IN THE LAST SENTENCE, "AS

09:56AM  23   A RAPIDLY GROWING COMPANY, WE ARE" -- "AS A RAPIDLY GROWING

09:56AM  24   COMPANY WE ARE MANAGING THESE TIMELINES AS BEST AS POSSIBLE

09:56AM  25   WHILE MAKING SURE THAT THE INTEGRITY OF OUR PRODUCTS AND

09:56AM   1   PROGRAM GOALS ARE NOT COMPROMISED."

09:56AM   2        NOW, YOU COULD OBSERVE EVERY DAY THAT THIS WAS A RAPIDLY

09:56AM   3   GROWING COMPANY; CORRECT?

09:56AM   4   A.   CORRECT.

09:56AM   5   Q.   AND YOU KNEW YOU WERE WORKING HARD IN CONNECTION WITH THIS

09:56AM   6   PROJECT; CORRECT?

09:56AM   7   A.   CORRECT.

09:56AM   8   Q.   THIS IS A PROJECT THAT YOU WANTED -- PERSONALLY WOULD HAVE

09:56AM   9   LIKED TO HAVE SEEN HAPPEN; CORRECT?

09:56AM   10   A.   CORRECT.

09:56AM   11   Q.   AND YOUR WORK HERE WAS DESIGNED TO BENEFIT BOTH THERANOS;

09:57AM   12   CORRECT?

09:57AM   13   A.   CORRECT.

09:57AM   14   Q.   BUT ALSO MEMBERS OF THE MILITARY WHO MIGHT BENEFIT FROM

09:57AM   15   THIS DEPLOYMENT; CORRECT?

09:57AM   16   A.   CORRECT.

09:57AM   17   Q.   AND YOU PROCEEDED IN GOOD FAITH IN TRYING TO DO THAT;

09:57AM   18   CORRECT?

09:57AM   19   A.   YES.

09:57AM   20   Q.   ALL RIGHT.  NOW, DID YOU HAVE FURTHER DISCUSSIONS AFTER

09:57AM   21   THIS EXCHANGE WITH MEMBERS OF THE MILITARY ABOUT DEPLOYING THE

09:57AM   22   4S DEVICE AT CENTCOM?

09:57AM   23   A.   YES.

09:57AM   24   Q.   AND I THINK WE SAW YESTERDAY THAT THERE WAS AN EXCHANGE

09:57AM   25   ABOUT REQUESTING THAT THE DEPLOYMENT BE DEFERRED UNTIL 2014.

09:57AM   1          DO YOU RECALL THAT?

09:57AM   2     A.   YES.

09:57AM   3     Q.   OKAY.  LET ME ASK YOU TO LOOK BACK AT EXHIBIT 1027.

09:58AM   4          AND IF YOU SEE ON THE TOP HERE, THIS IS AN EMAIL, DRAFT

09:58AM   5     EMAIL THAT YOU SENT TO MS. HOLMES; CORRECT?

09:58AM   6     A.   CORRECT.

09:58AM   7     Q.   AND YOU PROPOSED A DATE, BASED ON YOUR CONVERSATION WITH

09:58AM   8     DR. ANEKAL, OF AUGUST 1ST FOR THE DEPLOYMENT; CORRECT?

09:58AM   9     A.   CORRECT.

09:58AM  10     Q.   AND WAS THAT DEPLOYMENT THEN DEFERRED UNTIL AUGUST 1ST OF

09:58AM  11     2014?

09:58AM  12     A.   WELL, IT DIDN'T INITIATE ON AUGUST 1ST.

09:58AM  13     Q.   CORRECT.  BUT AS OF AUGUST 1ST, 2013, WAS THE DATE OF

09:58AM  14     DEPLOYMENT DEFERRED UNTIL AUGUST 1ST, 2014?

09:58AM  15     A.   YES.

09:58AM  16     Q.   AND DID YOU CONTINUE TO WORK IN CONNECTION WITH THIS

09:58AM  17     PROGRAM AFTER AUGUST 1ST OF 2013?

09:58AM  18     A.   YES.

09:58AM  19     Q.   AND YOU WERE ALSO WORKING ON A NUMBER OF ISSUES RELATED TO

09:58AM  20     THE RETAIL LAUNCH; CORRECT?

09:59AM  21     A.   YES.

09:59AM  22     Q.   AND YOU WERE WORKING ON A NUMBER OF ISSUES RELATED TO

09:59AM  23     RAISING MONEY FOR INVESTORS; CORRECT?

09:59AM  24     A.   I WOULDN'T NECESSARILY SAY THAT.

09:59AM  25     Q.   WELL, YOU HAD SOME DUTIES THAT TOOK TIME FROM YOUR

EDLIN CROSS BY MR. DOWNEY (RES.)                                4158

09:59AM   1    CALENDAR, DIDN'T YOU?

09:59AM   2    A.   YES.

09:59AM   3    Q.   AND YOU HAD A NUMBER OF OTHER DUTIES THAT ALSO WERE

09:59AM   4    IMPORTANT; CORRECT?

09:59AM   5    A.   YES.

09:59AM   6    Q.   AND THIS WAS AN ENVIRONMENT THAT WAS VERY HECTIC; CORRECT?

09:59AM   7    A.   YES.

09:59AM   8    Q.   AND I THINK YOU'VE TESTIFIED ON DIRECT THAT YOU OBSERVED

09:59AM   9    MS. HOLMES WORKING VERY HARD EVERY DAY.  CORRECT?

09:59AM   10   A.   CORRECT.

09:59AM   11   Q.   BUT YOU ALSO WERE WORKING VERY HARD EVERY DAY; CORRECT?

09:59AM   12   A.   CORRECT.

09:59AM   13   Q.   OKAY.  LET'S TALK FOR A FEW MINUTES ABOUT THE RELATIONSHIP

09:59AM   14   BETWEEN THERANOS AND THE SPECIAL OPERATIONS COMMAND.

09:59AM   15        SPECIAL OPERATIONS COMMAND IS THE UNIFIED COMMAND FOR ALL

09:59AM   16   OF THE MILITARY SERVICES SPECIAL OPERATIONS; CORRECT?

09:59AM   17   A.   CORRECT.

09:59AM   18   Q.   OKAY.  LET ME ASK YOU TO LOOK BACK AT EXHIBIT 504, WHICH

10:00AM   19   IS IN EVIDENCE AND WHICH MR. BOSTIC SHOWED YOU DURING HIS

10:00AM   20   EXAMINATION.

10:00AM   21        IF YOU LOOK AT THE TOP OF THE EMAIL ON PAGE 1, WHICH IS

10:00AM   22   BLOWN UP ON YOUR SCREEN, THIS IS A DIALOGUE FROM A LITTLE BIT

10:00AM   23   EARLIER IN TIME BETWEEN SPECIAL OPERATIONS AND THERANOS;

10:00AM   24   CORRECT?

10:00AM   25   A.   CORRECT.

10:00AM   1    Q.   THIS IS FROM JANUARY OF 2012; CORRECT?

10:00AM   2    A.   CORRECT.

10:00AM   3    Q.   AND IN THE FIRST PARAGRAPH OF THIS DOCUMENT, YOU ASKED A

10:00AM   4    REPRESENTATIVE OF SOCOM TO PROVIDE A COMPREHENSIVE LIST OF ALL

10:00AM   5    OF THE ASSAYS THAT SOCOM PLANNED TO TEST IN CONNECTION WITH ITS

10:01AM   6    EVALUATION OF THERANOS DEVICES; CORRECT?

10:01AM   7    A.   CORRECT.

10:01AM   8    Q.   AND WHY DID YOU NEED THAT INFORMATION?

10:01AM   9    A.   THAT INFORMATION WAS NEEDED IN ORDER TO CUSTOMIZE ALL OF

10:01AM  10    THE EQUIPMENT.

10:01AM  11    Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 13977, WHICH IS IN THE

10:01AM  12    NOTEBOOK THAT I JUST GAVE YOU.

10:01AM  13    A.   OKAY.

10:01AM  14    Q.   IS THIS AN EXCHANGE OF EMAILS BETWEEN YOURSELF AND

10:01AM  15    REPRESENTATIVES OF THE MILITARY RELATED TO POTENTIALLY

10:01AM  16    DEPLOYING THERANOS EQUIPMENT FOR SPECIAL OPERATIONS?

10:02AM  17    A.   YES.

10:02AM  18         MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT 13977.

10:02AM  19         MR. BOSTIC:  NO OBJECTION.

10:02AM  20         THE COURT:  IT'S ADMITTED AND IT MAY BE PUBLISHED.

10:02AM  21    (DEFENDANT'S EXHIBIT 13977 WAS RECEIVED IN EVIDENCE.)

10:02AM  22         MR. DOWNEY:  I'D LIKE TO GO TO THE BOTTOM OF PAGE 2.

10:02AM  23    Q.   THIS IS A DOCUMENT BEING FORWARDED TO YOU BY AN INDIVIDUAL

10:02AM  24    NAMED NATHAN JORDAN.

10:02AM  25         DO YOU SEE THAT?

10:02AM 1   A.   YES.

10:02AM 2   Q.   AND DO YOU KNOW WHO THAT IS?

10:02AM 3   A.   A CONTRACTOR.

10:02AM 4   Q.   A MILITARY --

10:02AM 5   A.   A MILITARY CONTRACTOR, YES.

10:02AM 6   Q.   A MILITARY CONTRACTOR.

10:02AM 7        AND HE'S FORWARDING YOU HERE A COUNTERSIGNED MODIFICATION

10:02AM 8   FOR YOUR RECORDS; CORRECT?

10:02AM 9   A.   YES.

10:02AM 10  Q.   AND DOES THAT REFER TO A MODIFICATION OF THE AGREEMENT

10:02AM 11  THAT HAD BEEN ENTERED INTO BETWEEN SPECIAL OPERATIONS AND --

10:03AM 12  SPECIAL OPERATIONS COMMAND AND THERANOS TO CONDUCT AN

10:03AM 13  EXPERIMENT?

10:03AM 14  A.   YES.

10:03AM 15  Q.   OKAY.  IF YOU RECALL THE DOCUMENT THAT I SHOWED YOU A

10:03AM 16  MOMENT AGO, IT WAS DATED JANUARY 2012; CORRECT?

10:03AM 17  A.   CORRECT.

10:03AM 18  Q.   AND THE DOCUMENT WAS STILL BEING MODIFIED MORE THAN A YEAR

10:03AM 19  LATER; CORRECT?

10:03AM 20  A.   YES.

10:03AM 21  Q.   STRIKE THAT.

10:03AM 22       AND THE TERMS OF THE RELATIONSHIP WERE STILL BEING

10:03AM 23  NEGOTIATED MORE THAN A YEAR LATER; CORRECT?

10:03AM 24  A.   YES.

10:03AM 25  Q.   SO THIS WAS IN FEBRUARY OF 2013; CORRECT?

10:03AM   1    A.   CORRECT.

10:03AM   2    Q.   AND IF YOU GO TO THE EMAIL ABOVE THAT -- I'M SORRY, THE

10:03AM   3    NEXT EMAIL UP TOWARDS THE TOP OF THE PAGE.

10:03AM   4         THIS IS AN EMAIL SENT TO YOU BY STEPHANIE ELDER.  WHO WAS

10:04AM   5    STEPHANIE ELDER?

10:04AM   6    A.   I DON'T REMEMBER HER EXACT TITLE, BUT SHE WAS PART OF THE

10:04AM   7    MILITARY.  I WAS IN DISCUSSIONS WITH HER REGARDING PLANS FOR

10:04AM   8    THIS STUDY.

10:04AM   9    Q.   OKAY.  AND SO IN APRIL OF 2013, SHE ASKED YOU FOR AN

10:04AM  10    UPDATE ON WHERE YOU ARE WITH THE DEVICES; CORRECT?

10:04AM  11    A.   CORRECT.

10:04AM  12    Q.   AND THIS IS ABOUT TWO MONTHS AFTER THE MODIFICATION HAD

10:04AM  13    BEEN SIGNED; CORRECT?

10:04AM  14    A.   CORRECT.

10:04AM  15    Q.   OKAY.  IF YOU GO TO THE EMAIL ABOVE THAT.

10:04AM  16         DO YOU SEE THAT YOU RESPONDED TO HER SAYING, "THANK YOU

10:04AM  17    FOR YOUR EMAIL; I HOPE YOU ARE DOING WELL.  WE HAVE BEEN

10:04AM  18    PREPARING FOR THIS AND I AM HOPING TO CONNECT WITH YOU, IF YOU

10:04AM  19    THINK IT WOULD BE OF VALUE, TO DISCUSS THE PLANS FOR INITIATING

10:04AM  20    OUR PROGRAM."

10:04AM  21         AND YOU GIVE HER A PHONE NUMBER; CORRECT?

10:05AM  22    A.   CORRECT.

10:05AM  23    Q.   AND IF YOU CAN GO TO THE EMAIL ABOVE THAT.  THIS IS ABOUT

10:05AM  24    FIVE DAYS LATER.

10:05AM  25         YOU SAY, "I JUST WANTED TO MAKE SURE THAT YOU SAW MY

10:05AM  1    EMAIL."  CORRECT?

10:05AM  2    A.   YES.

10:05AM  3    Q.   AND YOU WANTED TO MAKE SURE YOU HEARD FROM HER; CORRECT?

10:05AM  4    A.   YES.

10:05AM  5    Q.   AND LET'S GO TO THE NEXT EMAIL.  THIS IS ABOUT A MONTH

10:05AM  6    LATER; CORRECT?

10:05AM  7    A.   CORRECT.

10:05AM  8    Q.   AND YOU SENT ANOTHER EMAIL TO MS. ELDER; CORRECT?

10:05AM  9    A.   CORRECT.

10:05AM 10    Q.   AND YOU ASKED HER AGAIN TO CONNECT; CORRECT?

10:05AM 11    A.   CORRECT.

10:05AM 12    Q.   AND IF YOU GO TO THE EMAIL ABOVE THAT, YOU FOLLOWED UP

10:05AM 13    AGAIN IN JULY; CORRECT?

10:05AM 14    A.   YES.

10:05AM 15    Q.   SO YOU WERE TRYING TO CONNECT WITH MS. ELDER ABOUT THE

10:05AM 16    DETAILS OF DEPLOYING A DEVICE, AND AT LEAST IN THIS PERIOD SHE

10:05AM 17    WAS NOT BEING RESPONSIVE; CORRECT?

10:05AM 18    A.   CORRECT.

10:05AM 19    Q.   OKAY.  ULTIMATELY, I THINK YOU TESTIFIED YESTERDAY, THAT

10:05AM 20    YOU WERE ABLE TO SHIP SOME DEVICES TO SOCOM; CORRECT?

10:06AM 21    A.   CORRECT.

10:06AM 22    Q.   AND ARE THOSE THE MODIFIED DEVICES THAT YOU DESCRIBED

10:06AM 23    EARLIER TODAY THAT WERE MODIFIED PER MR. BALWANI'S DIRECTION?

10:06AM 24    A.   THEY'RE DIFFERENT.

10:06AM 25    Q.   OKAY.  WERE THEY 4S DEVICES?

10:06AM 1    A.   THEY WERE 4S DEVICES.

10:06AM 2    Q.   AND DID SOCOM PERFORM THE EXPERIMENT WITH THOSE DEVICES?

10:06AM 3    A.   NO.

10:06AM 4    Q.   DID YOU EVER HEAR FROM SOCOM AS TO WHY?

10:06AM 5    A.   NO.

10:06AM 6    Q.   ALL RIGHT.  I WANT TO TURN TO A DIFFERENT TOPIC.

10:06AM 7         DO YOU RECALL DISCUSSING YESTERDAY WITH MR. BOSTIC A

10:06AM 8    NUMBER OF DEMONSTRATIONS THAT THERANOS DID FOR VARIOUS VIP'S?

10:06AM 9    A.   YES.

10:06AM 10   Q.   AND I THINK YOU TESTIFIED THAT YOU PLAYED SOME ROLE WITH

10:07AM 11   REGARD TO THOSE DEMONSTRATIONS; CORRECT?

10:07AM 12   A.   CORRECT.

10:07AM 13   Q.   YOU WERE A COORDINATOR OF THE LOGISTICS?

10:07AM 14   A.   CORRECT.

10:07AM 15   Q.   OKAY.  AND YOU WOULD DO THINGS LIKE MAKE SURE THE ROOM WAS

10:07AM 16   SET UP; CORRECT?

10:07AM 17   A.   CORRECT.

10:07AM 18   Q.   AND YOU WOULD MAKE SURE THAT THE ENGINEERS HAD GOTTEN THE

10:07AM 19   DEVICES INTO THE ROOM THAT MR. BALWANI OR MS. HOLMES EXPECTED;

10:07AM 20   CORRECT?

10:07AM 21   A.   CORRECT.

10:07AM 22   Q.   AND YOU WOULD WORK WITH OTHERS ON THE TEAM AT THERANOS TO

10:07AM 23   ENSURE THAT THE DEMONSTRATION WAS READY TO GO; CORRECT?

10:07AM 24   A.   CORRECT.

10:07AM 25   Q.   AND SOMETIMES IN A PARTICULAR DEMONSTRATION THERE MIGHT BE

10:07AM 1    AS MANY AS 15 TO 20 PEOPLE INVOLVED; CORRECT?

10:07AM 2    A.   IN TERMS OF THE NUMBER OF PEOPLE AT THE COMPANY, AT

10:07AM 3    THERANOS, INVOLVED IN PREPARING?

10:07AM 4    Q.   LET ME STRIKE THAT.

10:07AM 5        I THINK WE SAW YESTERDAY SOME EMAILS BETWEEN YOU AND A

10:07AM 6    NUMBER OF PEOPLE AT THERANOS WHO WERE SCIENTISTS RELATED TO THE

10:07AM 7    DEMONSTRATIONS; CORRECT?

10:07AM 8    A.   CORRECT.

10:07AM 9    Q.   AND ANY NUMBER OF THOSE SCIENTISTS MIGHT BE INVOLVED IN

10:08AM 10   ONE WAY OR ANOTHER WITH THE DEMONSTRATION; CORRECT?

10:08AM 11   A.   CORRECT.

10:08AM 12   Q.   OKAY.  AND DR. YOUNG WAS THE TECHNICAL LEAD FOR THE

10:08AM 13   DEMONSTRATIONS; CORRECT?

10:08AM 14   A.   HE ULTIMATELY REVIEWED AND APPROVED ALL OF THE RESULTS

10:08AM 15   FROM THE DEMOS.

10:08AM 16   Q.   OKAY.  AND HE WOULD, HE WOULD WORK WITH THE SCIENTISTS TO

10:08AM 17   GET READY FOR THE DEMONSTRATION; CORRECT?

10:08AM 18   A.   CORRECT.

10:08AM 19   Q.   AND IF ANY SCIENTIFIC OR TECHNICAL ISSUES AROSE, HE WAS

10:08AM 20   THE PERSON WHO WAS THERE TO ADDRESS THEM; CORRECT?

10:08AM 21   A.   THERE WERE -- I THINK THERE WERE SPECIFIC INSTANCES WHERE

10:08AM 22   OTHER ENGINEERS WOULD ADDRESS PROBLEMS AS WELL.

10:08AM 23   Q.   IN SOME INSTANCES IT MIGHT BE SOMEBODY WORKING UNDER

10:08AM 24   DR. YOUNG; CORRECT?

10:08AM 25   A.   WELL, THERE ARE A NUMBER OF DIFFERENT TEAMS ON THE

10:08AM  1    HARDWARE SIDE, AND I KNOW THAT -- I DON'T KNOW WHETHER DANIEL

10:08AM  2    MANAGED ALL OF THEM.

10:08AM  3    Q.    OKAY.  SO THERE MIGHT BE AN EXAMPLE OF AN INSTANCE WHERE

10:09AM  4    THERE WAS AN ISSUE WITH RESPECT TO THE HARDWARE AND YOU TALK TO

10:09AM  5    A HARDWARE ENGINEER; CORRECT?

10:09AM  6    A.    RIGHT.

10:09AM  7    Q.    AND AT THE END, I THINK -- DID YOU SAY THAT DR. YOUNG

10:09AM  8    WOULD VERIFY THE SAMPLE?  OR WHAT WAS THE TERMINOLOGY THAT YOU

10:09AM  9    USED?

10:09AM 10    A.    REVIEW, APPROVE, AND VERIFY.

10:09AM 11    Q.    NOW, NOT ALL OF THE DEMONSTRATIONS WERE THE SAME; CORRECT?

10:09AM 12    A.    CORRECT.

10:09AM 13    Q.    SOME TOOK PLACE IN LOCATIONS THAT WERE AWAY FROM THERANOS;

10:09AM 14    RIGHT?

10:09AM 15    A.    CORRECT.

10:09AM 16    Q.    MS. HOLMES AND OTHERS MIGHT TRAVEL TO SOMEONE ELSE'S

10:09AM 17    OFFICE AND PERFORM A DEMONSTRATION THERE; CORRECT?

10:09AM 18    A.    CORRECT.

10:09AM 19    Q.    AND SOMETIMES THE DEMONSTRATION WOULD BE AT THERANOS'S

10:09AM 20    HEADQUARTERS; CORRECT?

10:09AM 21    A.    CORRECT.

10:09AM 22    Q.    AND WERE THERE INSTANCES WHERE EVEN SOME INDIVIDUALS

10:09AM 23    WANTED TO GO TO THE WALGREENS STORE AND HAVE A DEMONSTRATION

10:09AM 24    THERE?

10:09AM 25    A.    YES.  THEY WENT TO THE WALGREENS STORE.  I WOULD CONSIDER

10:10AM   1    THAT DIFFERENT FROM A DEMONSTRATION BECAUSE IN WALGREENS IT

10:10AM   2    WAS -- THAT WAS THE CLINICAL LAB TESTING PROCESS VERSUS A

10:10AM   3    DEMONSTRATION, WHICH WAS SEPARATE.

10:10AM   4    Q.   SO THOSE WHO WENT TO WALGREENS GOT AN ACTUAL CLINICAL

10:10AM   5    TEST; CORRECT?

10:10AM   6    A.   CORRECT.

10:10AM   7    Q.   THEY, THEY MIMICKED WHAT ANY PATIENT COMING IN WHO WANTED

10:10AM   8    A BLOOD TEST FROM WALGREENS WOULD GET?

10:10AM   9    A.   CORRECT.

10:10AM  10    Q.   I'D LIKE TO ASK YOU TO LOOK AT EXHIBIT 7244.

10:11AM  11    A.   OKAY.

10:11AM  12    Q.   IS THIS AN EMAIL EXCHANGE BETWEEN SEVERAL INDIVIDUALS AT

10:11AM  13    THERANOS, INCLUDING YOURSELF, RELATED TO A DEMONSTRATION THAT

10:11AM  14    WAS DONE IN 2012?

10:11AM  15    A.   YES.

10:11AM  16         MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT 7244.

10:11AM  17         MR. BOSTIC:  HEARSAY, YOUR HONOR.

10:11AM  18    BY MR. DOWNEY:

10:11AM  19    Q.   WERE RECORDS RELATED TO THE DEMONSTRATIONS THAT WERE

10:11AM  20    PERFORMED AT THERANOS PREPARED CONTEMPORANEOUS WITH THE

10:11AM  21    DEMONSTRATION?

10:11AM  22    A.   CAN YOU REPEAT THAT?

10:11AM  23    Q.   SURE.  WERE -- SOMETIMES DEMONSTRATIONS WERE PERFORMED AT

10:11AM  24    THERANOS; CORRECT?

10:11AM  25    A.   CORRECT.

10:11AM 1    Q.   AND THERE WOULD BE DETAILS RELATED TO THE LOGISTICS OF

10:11AM 2    SETTING UP THE DEMONSTRATION; CORRECT?

10:11AM 3    A.   CORRECT.

10:11AM 4    Q.   AND THERE MIGHT BE DETAILS ABOUT MAKING ARRANGEMENTS AFTER

10:12AM 5    THE DEMONSTRATION WAS PERFORMED; CORRECT?

10:12AM 6    A.   CORRECT.

10:12AM 7    Q.   AND INDIVIDUALS AT THERANOS WOULD COMMUNICATE WITH EACH

10:12AM 8    OTHER BY EMAIL OFTEN ABOUT THAT; CORRECT?

10:12AM 9    A.   CORRECT.

10:12AM 10   Q.   AND THOSE COMMUNICATIONS WOULD BE AROUND THE SAME TIME AS

10:12AM 11   THE DEMONSTRATION; CORRECT?

10:12AM 12   A.   CORRECT.

10:12AM 13   Q.   AND EMAILS AT THERANOS WERE PRESERVED IN THE THERANOS

10:12AM 14   SYSTEM; CORRECT?

10:12AM 15   A.   I BELIEVE SO.

10:12AM 16   Q.   OKAY.

10:12AM 17        YOUR HONOR, I MOVE TO ADMIT 7244.

10:12AM 18        MR. BOSTIC:  YOUR HONOR, SAME OBJECTION.  THIS EMAIL

10:12AM 19   SEEMS TO BE AFTER THE FACT FROM THE PROCESSES THAT MR. DOWNEY

10:12AM 20   WAS ASKING ABOUT.

10:12AM 21        THE COURT:  IS THIS CONTEMPORANEOUS WITH THE

10:12AM 22   DEMONSTRATION THAT YOU'RE SEEKING?

10:12AM 23        MR. DOWNEY:  WELL, IT'S A COUPLE WEEKS AFTER BECAUSE

10:12AM 24   IT'S A REPORT BACK FROM AN INDIVIDUAL WHO PARTICIPATED.

10:12AM 25        THE COURT:  SO I THINK FOR 803(6), MAYBE YOU CAN

10:12AM   1     DEVELOP A LITTLE MORE FOUNDATION ON THAT.

10:12AM   2              MR. DOWNEY:  SURE.

10:12AM   3     Q.  WELL, FIRST OF ALL, LET ME ASK YOU, WAS THIS EMAIL

10:13AM   4     COMMUNICATED TO MS. HOLMES?

10:13AM   5     A.  YES.

10:13AM   6              MR. DOWNEY:  YOUR HONOR, UNDER 803 I THINK I'M

10:13AM   7     ENTITLED TO ADMIT IT.

10:13AM   8              THE COURT:  I'LL ADMIT IT.  IT MAY BE PUBLISHED.

10:13AM   9          (DEFENDANT'S EXHIBIT 7244 WAS RECEIVED IN EVIDENCE.)

10:13AM   10    BY MR. DOWNEY:

10:13AM   11    Q.  LET ME ASK YOU TO LOOK AT THE BOTTOM HALF OF THE FIRST

10:13AM   12    PAGE.

10:13AM   13         DO YOU SEE THIS IS AN EMAIL FROM MR. BALWANI IN 2012 ABOUT

10:13AM   14    A DEMONSTRATION; CORRECT?

10:13AM   15    A.  YES.

10:13AM   16    Q.  AND IF YOU LOOK AT THE SUBJECT, IT'S ABOUT A DEMONSTRATION

10:13AM   17    THAT WAS DONE IN THE MIDDLE OF JULY IN 2012 IN CHICAGO.

10:13AM   18         DO YOU SEE THAT?

10:13AM   19    A.  I DO.

10:13AM   20    Q.  AND THAT WAS ABOUT A LITTLE OVER A YEAR BEFORE THE RETAIL

10:13AM   21    LAUNCH IN WALGREENS; CORRECT?

10:13AM   22    A.  YES.

10:13AM   23    Q.  AND THE REFERENCE TO CHICAGO CAUSES ME TO ASK, WAS THIS A

10:13AM   24    DEMONSTRATION DONE FOR WALGREENS EXECUTIVES?

10:14AM   25    A.  I'M NOT POSITIVE, BUT THEY DID HAVE OFFICES IN ILLINOIS.

10:14AM  1    Q.   AND DO YOU SEE THAT MR. BALWANI WAS REPORTING BACK ON

10:14AM  2    INFORMATION THAT HE LEARNED ABOUT THE DEMONSTRATION IN THE

10:14AM  3    FIRST PARAGRAPH OF HIS EMAIL AT THE BOTTOM?

10:14AM  4    A.   YES.

10:14AM  5    Q.   AND DO YOU SEE THAT HE'S COMMUNICATING THAT TO DR. YOUNG;

10:14AM  6    CORRECT?

10:14AM  7    A.   YES.

10:14AM  8    Q.   AND TO VARIOUS REPRESENTATIVES OF ASSAY TEAMS WITHIN THE

10:14AM  9    COMPANY; CORRECT?

10:14AM 10    A.   YES.

10:14AM 11    Q.   AND ALSO TO PERSONNEL WHO WORKED ON THE HARDWARE AT THE

10:14AM 12    COMPANY; CORRECT?

10:14AM 13    A.   CORRECT.

10:14AM 14    Q.   AND TO THE CLINICAL, THEN CLINICAL LAB DIRECTOR; CORRECT?

10:14AM 15    A.   CORRECT.

10:14AM 16    Q.   AND HAD ALL OF THOSE INDIVIDUALS BEEN INVOLVED IN ONE WAY

10:14AM 17    OR ANOTHER WITH PREPARING FOR THIS DEMONSTRATION?

10:14AM 18    A.   I DON'T RECALL.

10:14AM 19    Q.   OKAY.  BUT OFTEN PERSONNEL, THE PERSONNEL IN ALL OF THOSE

10:14AM 20    CATEGORIES WOULD BE INVOLVED IN PREPARING FOR A DEMONSTRATION?

10:15AM 21    A.   I'M NOT SURE IF I WOULD SAY THAT ALWAYS.

10:15AM 22    Q.   BUT YOU DO RECALL OCCASIONS WHERE PERSONNEL FROM THE ASSAY

10:15AM 23    TEAM, THE HARDWARE TEAM, DR. YOUNG, AND OTHER SCIENTISTS WERE

10:15AM 24    INVOLVED; CORRECT?

10:15AM 25    A.   YES.

10:15AM 1    Q.   ALL RIGHT.  IF YOU SEE THE REPORT THAT MR. BALWANI GIVES

10:15AM 2    IN THE PARAGRAPH THAT BEGINS, "I HEARD BACK," HE REPORTS THAT

10:15AM 3    HE HEARD BACK FROM AN EXECUTIVE THAT THEY HAD PERFORMED A

10:15AM 4    DEMONSTRATION ON, AND HE REPORTS THAT THE EXECUTIVE'S RESULTS

10:15AM 5    FROM THE DEMONSTRATION WERE IDENTICAL TO RESULTS THAT THE

10:15AM 6    EXECUTIVE GOT FROM A DOCTOR.

10:15AM 7         DO YOU SEE THAT?

10:15AM 8    A.   I DO.

10:15AM 9    Q.   NOW, YOU WERE SHOWN YESTERDAY A NUMBER OF DOCUMENTS THAT

10:16AM 10   RELATED TO DEMONSTRATIONS WHERE THERE WAS A DISCUSSION BETWEEN

10:16AM 11   INDIVIDUALS AT THERANOS RELATED TO SOME DISCREPANCY OR

10:16AM 12   UNCERTAINTY ABOUT THE RESULTS.

10:16AM 13        DO YOU RECALL THAT?

10:16AM 14   A.   YES.

10:16AM 15   Q.   BUT DOZENS OF DEMONSTRATIONS WERE PERFORMED AT THERANOS;

10:16AM 16   CORRECT?

10:16AM 17   A.   CORRECT.

10:16AM 18   Q.   AND MANY OF THEM RESULTED IN REPORTS BACK FROM THOSE WHO

10:16AM 19   RECEIVED THE DEMONSTRATION THAT THE RESULTS WERE SIMILAR OR

10:16AM 20   IDENTICAL TO THOSE THAT THEY RECEIVED FROM OTHER BLOOD TESTS?

10:16AM 21   A.   I REALLY DIDN'T RECEIVE COMMUNICATION BACK FROM THE

10:16AM 22   INDIVIDUALS WHO DID THE DEMO REGARDING THEIR TEST RESULTS.

10:16AM 23   Q.   YOU DID NOT PARTICIPATE IN THAT?

10:16AM 24   A.   I DID NOT.

10:16AM 25   Q.   OKAY.  NOW, AS WELL AS BEING AT DIFFERENT LOCATIONS -- BY

10:17AM   1   THE WAY, WITH REGARD TO THE DEMONSTRATION THAT WE JUST LOOKED

10:17AM   2   AT, THAT'S A DEMONSTRATION WHERE THE DEVICE WAS TAKEN TO

10:17AM   3   CHICAGO; CORRECT?

10:17AM   4   A.   YES.

10:17AM   5   Q.   AND THAT'S A DEMONSTRATION THAT WOULD HAVE BEEN RUN WHERE

10:17AM   6   THE BLOOD WAS DRAWN FROM THE EXECUTIVE; CORRECT?

10:17AM   7   A.   I WASN'T THERE, BUT, YES, THAT'S WHAT WOULD HAVE HAPPENED.

10:17AM   8   Q.   OKAY.  AND THEN THAT WOULD BE INSERTED INTO A CARTRIDGE;

10:17AM   9   CORRECT?

10:17AM  10   A.   CORRECT.

10:17AM  11   Q.   AND THE CARTRIDGE WOULD BE INSERTED INTO THE ANALYZER;

10:17AM  12   CORRECT?

10:17AM  13   A.   CORRECT.

10:17AM  14   Q.   AND THE BLOOD TEST RESULTS WOULD BE GENERATED FROM THAT;

10:17AM  15   CORRECT?

10:17AM  16   A.   CORRECT.

10:17AM  17   Q.   AND THAT'S ONE FORM OF DEMONSTRATION; CORRECT?

10:17AM  18       THERE ARE OTHER FORMS OF DEMONSTRATION; CORRECT?

10:17AM  19   A.   CORRECT.

10:17AM  20   Q.   AT SOME POINTS PEOPLE WOULD COME TO THERANOS AND THEY

10:17AM  21   WOULDN'T WANT TO HAVE THEIR BLOOD DRAWN, BUT THEY WOULD WANT TO

10:17AM  22   SEE HOW THE DEVICE WORKED; CORRECT?

10:17AM  23   A.   CORRECT.

10:17AM  24   Q.   AND THEY MIGHT BE INTERESTED IN THE INTERFACE OF THE

10:17AM  25   DEVICE, FOR EXAMPLE?

10:17AM  1    A.   CORRECT.

10:17AM  2    Q.   AND CAN YOU DESCRIBE TO US WHAT KIND OF INFORMATION WAS

10:18AM  3    CONVEYED BY THE INTERFACE OF THE THERANOS DEVICE?

10:18AM  4    A.   IT WAS A GRAPHIC USER INTERFACE, AND THERE WERE CERTAIN

10:18AM  5    BUTTONS THAT COULD BE PRESSED THAT WOULD INDICATE IF THE USER

10:18AM  6    WANTED TO RUN A TEST OR NOT.

10:18AM  7    Q.   OKAY.  AND WOULD INFORMATION ABOUT THE PATIENT GETTING THE

10:18AM  8    BLOOD TEST BE ENTERED INTO THE USER INTERFACE, FOR EXAMPLE?

10:18AM  9    A.   YES.

10:18AM  10   Q.   AND MEDICAL HISTORY; CORRECT?

10:18AM  11   A.   IT COULD BE.

10:18AM  12   Q.   OKAY.  AND SOME INDIVIDUALS WOULD JUST WANT TO SEE HOW

10:18AM  13   THAT INTERFACE WORKED; CORRECT?

10:18AM  14   A.   YES.

10:18AM  15   Q.   BUT IF YOU RAN THE DEVICE WITHOUT BLOOD IN IT, THE DEVICE

10:18AM  16   WOULD AUTOMATICALLY SHUT DOWN; CORRECT?

10:18AM  17   A.   I DON'T THINK I AGREE WITH THAT.

10:19AM  18   Q.   OKAY.  WELL, WAS THE -- WAS THERE A PROTOCOL THAT NORMALLY

10:19AM  19   WAS IN PLACE ON THE DEVICE, REFERRED TO AS THE NORMANDY

10:19AM  20   PROTOCOL?

10:19AM  21   A.   THAT WAS ONE OF THE PROTOCOLS.  AT ONE POINT THERE -- THE

10:19AM  22   PROTOCOLS WERE CONTINUALLY DEVELOPED, AND AT ONE POINT THERE

10:19AM  23   WAS THE DEMO PROTOCOL WHICH WE DISCUSSED, OR THE DEMO APP WHICH

10:19AM  24   WE DISCUSSED YESTERDAY.

10:19AM  25   Q.   WELL, LET'S TALK ABOUT THE NORMANDY PROTOCOL FIRST AND

10:19AM  1    THEN WE'LL TALK ABOUT THE OTHER PROTOCOLS.

10:19AM  2    A.   OKAY.

10:19AM  3    Q.   UNDER THE NORMANDY PROTOCOL, WHAT WOULD HAPPEN IF YOU

10:19AM  4    INSERTED A CARTRIDGE INTO A DEVICE BUT THERE WAS NO BLOOD

10:19AM  5    SAMPLE IN IT?

10:19AM  6    A.   I DON'T RECALL.

10:19AM  7    Q.   OKAY.  IF YOU, IF YOU USED THE NULL PROTOCOL SOFTWARE,

10:19AM  8    WHAT WOULD HAPPEN IF YOU INSERTED A CARTRIDGE AND THERE WAS NO

10:19AM  9    BLOOD SAMPLE IN IT?

10:19AM  10   A.   THE NULL PROTOCOL WOULD RUN, BUT --

10:20AM  11   Q.   BUT NO TEST WOULD BE PERFORMED; CORRECT?

10:20AM  12   A.   CORRECT.

10:20AM  13   Q.   AND IN SOME INSTANCES, I THINK WE DISCUSSED A MOMENT AGO,

10:20AM  14   INDIVIDUALS WOULD COME AND THEY WOULDN'T WANT THEIR BLOOD

10:20AM  15   DRAWN; CORRECT?

10:20AM  16   A.   CORRECT.

10:20AM  17   Q.   AND THE NULL PROTOCOL COULD BE USED IN CONNECTION WITH

10:20AM  18   THOSE DEMONSTRATIONS; CORRECT?

10:20AM  19   A.   CORRECT.

10:20AM  20   Q.   LET ME SHOW YOU IN THE GOVERNMENT'S BINDER AN EXHIBIT THAT

10:20AM  21   WAS ADMITTED YESTERDAY, WHICH IS EXHIBIT 959.

10:20AM  22   A.   OKAY.

10:20AM  23   Q.   IF YOU GO TO WHERE THE EMAIL CHAIN STARTS ON THE SECOND

10:20AM  24   PAGE, THIS APPEARS TO BE YOU SETTING UP -- DIRECTING THE SETUP

10:21AM  25   OF EQUIPMENT BASED ON DIRECTIONS YOU HAD GOTTEN FROM EITHER

10:21AM   1    MS. HOLMES OR MR. BALWANI; CORRECT?

10:21AM   2    A.   YES.

10:21AM   3    Q.   AND YOU'RE ASKING THAT CERTAIN THERANOS DEVICES BE SET UP

10:21AM   4    IN AN INTERVIEW ROOM; CORRECT?

10:21AM   5    A.   YES.

10:21AM   6    Q.   AND THESE COMMUNICATIONS WERE IN CONNECTION WITH A, WITH A

10:21AM   7    PLANNED DEMONSTRATION; CORRECT?

10:21AM   8    A.   YES.

10:21AM   9    Q.   AND IF YOU LOOK AT THE EMAIL TOWARDS THE -- THE SECOND

10:21AM  10    EMAIL, YOU'RE ASKING, SHOULD WE USE THE NORMANDY APP OR THE

10:21AM  11    DEMO APP; CORRECT?

10:21AM  12    A.   CORRECT.

10:21AM  13    Q.   AND THEN IN THE NEXT -- AND THEN IN THE SECOND TO THE LAST

10:21AM  14    PARAGRAPH, YOU SAY, "IF WE RUN THE NULL PROTOCOL, WE DON'T NEED

10:21AM  15    THE CARTRIDGE TO BE AS TIGHT AS IT WAS LAST TIME IN THE CONTEXT

10:22AM  16    OF INSERTING THE COLLECTION CONTAINERS."

10:22AM  17         DO YOU SEE THAT?

10:22AM  18    A.   YES.

10:22AM  19    Q.   AND THEN DO YOU RECALL IN THE EMAIL CHAIN ABOVE

10:22AM  20    MICHAEL CRAIG RECOMMENDED TO YOU THAT YOU USE THE DEMO APP;

10:22AM  21    CORRECT?

10:22AM  22    A.   CORRECT.

10:22AM  23    Q.   NONE OF THIS CONVERSATION WAS ABOUT PLAYING A TRICK ON THE

10:22AM  24    PEOPLE GETTING A DEMO, WAS IT?

10:22AM  25    A.   NO.

EDLIN CROSS BY MR. DOWNEY (RES.)                    4175

10:22AM  1    Q.   THIS WAS -- THIS CONVERSATION WAS ABOUT THE VARIOUS THINGS

10:22AM  2    THAT COULD HAPPEN WHEN PEOPLE CAME TO GET A DEMONSTRATION AT

10:22AM  3    THERANOS; CORRECT?

10:22AM  4    A.   CORRECT.

10:22AM  5    Q.   SOMEONE MIGHT SHOW UP AND SAY, I DON'T WANT TO HAVE MY

10:22AM  6    BLOOD DRAWN TODAY; CORRECT?

10:22AM  7    A.   CORRECT.

10:22AM  8    Q.   SOMEBODY MIGHT SHOW UP AND SAY, I DO WANT TO HAVE MY BLOOD

10:22AM  9    DRAWN; CORRECT?

10:22AM  10   A.   CORRECT.  IT WAS VERY IN THE MOMENT.

10:22AM  11   Q.   RIGHT.  AND SO YOU NEEDED TO BE PREPARED FOR ALL OF THESE

10:22AM  12   DIFFERENT SCENARIOS; CORRECT?

10:22AM  13   A.   CORRECT.

10:22AM  14   Q.   AND THERE WERE DIFFERENT PROTOCOLS DESIGNED FOR ALL OF

10:22AM  15   THOSE DIFFERENT SCENARIOS; CORRECT?

10:23AM  16   A.   CORRECT.

10:23AM  17   Q.   BECAUSE AT THE END OF THE DAY, YOU WERE WORKING AS HARD AS

10:23AM  18   YOU COULD TO DEMONSTRATE THE TECHNOLOGY IN THE MOST APPEALING

10:23AM  19   WAY POSSIBLE; CORRECT?

10:23AM  20   A.   CORRECT.

10:23AM  21   Q.   BUT YOU WERE NOT TRYING TO DECEIVE ANYBODY IN THIS

10:23AM  22   DEMONSTRATION PROCESS, WERE YOU?

10:23AM  23   A.   OF COURSE NOT.

10:23AM  24   Q.   AND YOU DID NOT UNDERSTAND THAT ANYONE ELSE AT THERANOS

10:23AM  25   WAS TRYING TO DECEIVE ANYONE ELSE; CORRECT?

10:23AM 1    A.   CORRECT.

10:23AM 2    Q.   ALL RIGHT.  LET ME DIRECT YOUR ATTENTION TO THE TOP OF

10:23AM 3    THIS EMAIL.

10:23AM 4    A.   YES.

10:23AM 5    Q.   AND THERE'S A COMMUNICATION FROM DR. ANEKAL TO YOU.

10:23AM 6         DO YOU SEE THAT?

10:23AM 7    A.   YES.

10:23AM 8    Q.   AND HE SAYS, IF WE BLOW UP THE FIRST PARAGRAPH OF THAT

10:23AM 9    EMAIL, HE SAYS, "DAN, THE ASSAY TEAMS ARE PLANNING ON USING THE

10:24AM 10   3.5 DEVICES TOMORROW, BUT WE CAN MOVE ONE OF THE R&D UNITS IF

10:24AM 11   IT'S JUST FOR SHOW-AND-TELL."

10:24AM 12        DO YOU SEE THAT?

10:24AM 13   A.   YES.

10:24AM 14   Q.   AND HIS REFERENCE TO SHOW-AND-TELL THERE IS A REFERENCE TO

10:24AM 15   AN INSTANCE WHERE SOMEONE MIGHT JUST WANT TO SEE THE DEVICE;

10:24AM 16   CORRECT?

10:24AM 17   A.   CORRECT.

10:24AM 18   Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 7243.

10:24AM 19   A.   OKAY.

10:24AM 20   Q.   IS THIS AN EMAIL BETWEEN MS. HOLMES, YOURSELF, AND

10:24AM 21   DR. YOUNG REGARDING SETTING UP A DEMONSTRATION IN JULY AND

10:24AM 22   AUGUST OF 2012?

10:24AM 23   A.   YES.

10:24AM 24        MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

10:25AM 25   7243.

10:25AM  1              MR. BOSTIC:  NO OBJECTION.

10:25AM  2              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:25AM  3         (DEFENDANT'S EXHIBIT 7243 WAS RECEIVED IN EVIDENCE.)

10:25AM  4    BY MR. DOWNEY:

10:25AM  5    Q.  IF YOU GO TO THE EMAIL AT THE VERY BOTTOM, DO YOU SEE

10:25AM  6    THAT?

10:25AM  7         MS. HOLMES ASKS DR. YOUNG, "DO WE HAVE A COUPLE OF

10:25AM  8    MINILABS THAT ARE FULLY ASSEMBLED WITH FUNCTIONAL

10:25AM  9    SCREENS/ELECTRONICS THAT ARE EASY TO SHOW A CLIENT TOMORROW

10:25AM 10    MIDDAY?"

10:25AM 11         AND THEN IF YOU GO ABOVE THAT, DR. YOUNG SAYS, "YES, WE

10:25AM 12    HAVE FULLY FUNCTIONAL MINILABS.  I WILL MAKE SURE THE DISPLAY

10:25AM 13    IS READY."

10:25AM 14         AND THEN IN THE NEXT PARAGRAPH OF THAT, HE ASKS, WHERE IT

10:25AM 15    BEGINS, "ALSO, DO YOU WANT ANY TESTS RUN ON THE MACHINE, OR

10:25AM 16    JUST HAVE IT POWERED UP WITH THE DISPLAY SHOWING SOMETHING

10:26AM 17    INTERESTING?"

10:26AM 18         OKAY.  AND IF YOU GO -- DO YOU SEE THAT?

10:26AM 19    A.  YES.

10:26AM 20    Q.  AND IF YOU GO TO THE EMAIL ABOVE THAT, MS. HOLMES

10:26AM 21    RESPONDS, "WE CAN PUT THEM IN AN INTERVIEW ROOM."

10:26AM 22         CORRECT?

10:26AM 23    A.  YES.

10:26AM 24    Q.  AND SHE SAYS, "IF WE CAN EASILY HAVE THEM READY TO ACCEPT

10:26AM 25    CARTRIDGES WE SHOULD.  ALSO YES ON THE SCREEN... WE SHOULD NOT

10:26AM  1      DO A LOT OF EXTRA WORK FOR THIS."

10:26AM  2          DO YOU SEE THAT?

10:26AM  3      A.   YES.

10:26AM  4      Q.   AND IF YOU GO ABOVE THAT, DR. YOUNG SAYS -- I'M SORRY, TO

10:26AM  5      THE EMAIL FROM DR. YOUNG, HE SAYS HE WILL GET IT SET UP IN THAT

10:26AM  6      WAY, BUT HE SAYS, WE ARE NOT READY TO RUN WHOLE BLOOD SAMPLES

10:26AM  7      IN THE MINILAB THAT HE'S SETTING UP; CORRECT?

10:26AM  8          DO YOU SEE THAT?

10:26AM  9      A.   YES.

10:26AM  10     Q.   AND DO YOU SEE THE EMAIL FROM MS. HOLMES?  SHE SAYS,

10:26AM  11     "WE'RE NOT RUNNING SAMPLES - JUST DEMONSTRATING THE HARDWARE."

10:26AM  12         DO YOU SEE THAT?

10:27AM  13     A.   CORRECT.

10:27AM  14     Q.   NOW, I TAKE IT THAT YOU HAD A GENERAL SENSE OF WHAT THE

10:27AM  15     ENGINEERING WAS RELATED TO -- WELL, STRIKE THAT.

10:27AM  16         YOU'RE NOT AN ENGINEER; CORRECT?

10:27AM  17     A.   CORRECT.

10:27AM  18     Q.   AND YOU'RE NOT INTIMATELY FAMILIAR WITH ALL OF THE

10:27AM  19     DEVELOPMENT OF THE SOFTWARE IN CONNECTION WITH THESE PROTOCOLS;

10:27AM  20     CORRECT?

10:27AM  21     A.   CORRECT.

10:27AM  22     Q.   AND THAT WAS DONE BY MICHAEL CRAIG AND HIS TEAM; CORRECT?

10:27AM  23     A.   I'M NOT SURE IF HE LED THE TEAM, BUT I KNOW HE WAS ON THE

10:27AM  24     TEAM.

10:27AM  25     Q.   OKAY.  NOW, WE'VE BEEN TALKING ABOUT THE SCENARIO WHERE

10:27AM  1    PEOPLE DON'T WANT TO GET A BLOOD TEST, BUT THERE WERE TIMES

10:27AM  2    WHEN PEOPLE CAME IN AND SAID, I DO WANT TO GET A BLOOD TEST;

10:27AM  3    CORRECT?

10:27AM  4    A.   CORRECT.

10:27AM  5    Q.   AND THAT YOU REFERRED, WHEN YOU WERE TESTIFYING ON DIRECT

10:28AM  6    YESTERDAY, TO TWO DIFFERENT SCENARIOS WHEN SOMEONE WANTED TO

10:28AM  7    GET THEIR BLOOD TESTED; CORRECT?

10:28AM  8    A.   THERE WERE MULTIPLE SCENARIOS.

10:28AM  9    Q.   OKAY.  WELL, ONE WAS THAT YOU COULD ACTUALLY TEST THE

10:28AM  10   SAMPLE ON THE DEVICE; CORRECT?

10:28AM  11   A.   CORRECT.

10:28AM  12   Q.   AND THAT WAS DONE IN MANY INSTANCES; CORRECT?

10:28AM  13   A.   YES.

10:28AM  14   Q.   AND THE OTHER WAS TO TEST THE SAMPLE IN THE THERANOS

10:28AM  15   LABORATORY; CORRECT?

10:28AM  16   A.   CORRECT.

10:28AM  17   Q.   AND THAT, BY THE WAY, WAS NOT THE CLINICAL LABORATORY, WAS

10:28AM  18   IT?

10:28AM  19   A.   I DON'T KNOW EXACTLY.

10:28AM  20   Q.   OKAY.  BUT IT WAS DONE FOR PURPOSES OF RESEARCH AND

10:28AM  21   DEVELOPMENT; CORRECT?

10:28AM  22   A.   WHEN I WOULD HAND, WHEN I WOULD HAND OFF SAMPLES TO

10:28AM  23   SCIENTISTS, IT WAS NOT IN THE CLINICAL LAB.

10:28AM  24   Q.   OKAY.  NOW, YOU TALKED AT SOME LENGTH YESTERDAY ABOUT AN

10:28AM  25   AUGUST 2013 DEMONSTRATION THAT WAS PERFORMED FOR WALGREENS

10:28AM  1      EXECUTIVES.

10:28AM  2           DO YOU REMEMBER THAT?

10:28AM  3      A.   YES.

10:28AM  4      Q.   AND THAT WAS SHORTLY BEFORE THE LAUNCH OF RETAIL SERVICES

10:29AM  5      AT WALGREENS?

10:29AM  6      A.   YES.

10:29AM  7      Q.   AND IN CONNECTION WITH THIS DEMONSTRATION, THERE WERE A

10:29AM  8      NUMBER OF EXECUTIVES MEETING WITH MS. HOLMES AND MR. BALWANI;

10:29AM  9      CORRECT?

10:29AM 10      A.   CORRECT.

10:29AM 11      Q.   AND A DEMONSTRATION WAS GOING TO BE PERFORMED FOR THEM;

10:29AM 12      CORRECT?

10:29AM 13      A.   CORRECT.

10:29AM 14      Q.   AND YOU WERE INVOLVED IN HELPING TO SET UP AND PREPARE

10:29AM 15      THAT DEMONSTRATION; CORRECT?

10:29AM 16      A.   CORRECT.

10:29AM 17      Q.   LET ME SHOW YOU AGAIN 959.

10:29AM 18           IF YOU WOULD LOOK AT THE SECOND -- AT THE EMAIL ON PAGE 2,

10:29AM 19      LOOK AT THE FIRST PARAGRAPH AGAIN.

10:29AM 20           YOU'RE DIRECTING THE EQUIPMENT THAT YOU WERE REQUESTING BE

10:29AM 21      PUT IN THE INTERVIEW RAN.

10:29AM 22           DO YOU SEE THAT?

10:30AM 23      A.   YES.

10:30AM 24      Q.   AND THEN YOU DIRECT WHAT KIND OF PROTOCOLS ARE GOING TO BE

10:30AM 25      RUN ON EACH DEVICE; CORRECT?

10:30AM   1      A.   CORRECT.

10:30AM   2      Q.   AND YOU ALSO SAY IN THE FOURTH PARAGRAPH, "MOST LIKELY WE

10:30AM   3      WILL COLLECT A NUMBER OF SAMPLES AND STORE THEM IN THE SHIPPING

10:30AM   4      CONTAINER LIKE THE LAST MEETING WE HAD, AND THEN PROCESS THEM

10:30AM   5      SEPARATELY IN THE LAB."

10:30AM   6           CORRECT?

10:30AM   7      A.   CORRECT.

10:30AM   8      Q.   AND THAT'S REFERRING TO A PRIOR DEMONSTRATION THAT YOU DID

10:30AM   9      WHERE BLOOD SAMPLES WERE COLLECTED AT A MEETING; CORRECT?

10:30AM  10      A.   CORRECT.

10:30AM  11      Q.   AND THE SAMPLES, WHEN THEY WERE TAKEN, WERE PLACED IN THE

10:30AM  12      TINY LITTLE NANOTAINER; CORRECT?

10:30AM  13      A.   CORRECT.

10:30AM  14      Q.   AND THE NANOTAINER WAS PLACED IN THE SHIPPING CONTAINER

10:30AM  15      BOX; CORRECT?

10:30AM  16      A.   CORRECT.

10:30AM  17      Q.   AND THE BOX WAS TAKEN AND TAKEN TO THE LAB AND TESTING WAS

10:30AM  18      PERFORMED THERE; CORRECT?

10:30AM  19      A.   CORRECT.

10:30AM  20      Q.   AGAIN, THAT WAS NOT DONE TO DECEIVE ANYONE, WAS IT?

10:30AM  21      A.   NO.

10:30AM  22      Q.   YOU KNEW AT THE STAGE THAT THIS MEETING WAS TAKING PLACE

10:31AM  23      THAT THE RELATIONSHIP BETWEEN THERANOS AND WALGREENS HAD

10:31AM  24      CHANGED FROM ITS ORIGINAL CONCEPTION OF DEPLOYING DEVICES IN

10:31AM  25      STORES; CORRECT?

10:31AM   1        LET ME ALTER THAT.

10:31AM   2        DID YOU -- YOU KNEW THAT WHEN TESTS WERE TO BE DONE AT

10:31AM   3   WALGREENS STORES, THEY WOULD NOT BE PERFORMED ON SITE AT THE

10:31AM   4   WALGREENS STORES; CORRECT?

10:31AM   5   A.   CORRECT.

10:31AM   6   Q.   INSTEAD WHEN A TEST WAS DONE AT A WALGREENS STORE, THE

10:31AM   7   BLOOD WOULD BE TAKEN INTO THE NANOTAINER; CORRECT?

10:31AM   8   A.   CORRECT.

10:31AM   9   Q.   PLACED INTO A CARTRIDGE; CORRECT?

10:31AM   10   A.   CORRECT.

10:31AM   11   Q.   PLACED INTO A --

10:31AM   12   A.   I'M SORRY.  IT WAS PLACED INTO A SHIPPING CONTAINER.

10:31AM   13   Q.   SORRY, PLACED INTO A NANOTAINER; CORRECT?

10:31AM   14   A.   CORRECT.

10:31AM   15   Q.   AND THE NANOTAINER WAS PLACED IN THE SHIPPING CONTAINER;

10:31AM   16   CORRECT?

10:31AM   17   A.   CORRECT.

10:31AM   18   Q.   AND SHIPPED TO THERANOS'S CENTRAL LAB; CORRECT?

10:31AM   19   A.   CORRECT.

10:31AM   20   Q.   AND SO WATCHING THIS DEMONSTRATION IN AUGUST OF 2013 IN

10:32AM   21   THE CONFERENCE ROOM AT THERANOS WOULD MIMIC THE PROCESS THAT

10:32AM   22   WAS ABOUT TO HAPPEN AT WALGREENS IN A FEW WEEKS; CORRECT?

10:32AM   23   A.   YES, WITHOUT THE ASSOCIATED SOFTWARE APPLICATIONS THAT

10:32AM   24   WERE IN THE WALGREENS STORES.

10:32AM   25        BUT FROM THE COLLECTION PROCESS --

10:32AM  1    Q.   RIGHT.

10:32AM  2    A.   -- AND GETTING THAT SAMPLE TO THE LAB, YES.

10:32AM  3    Q.   IF YOU WATCHED THAT PROCESS, YOU COULD SEE EXACTLY HOW IT

10:32AM  4    WAS GOING TO WORK FROM THE PERSPECTIVE OF A PATIENT AT

10:32AM  5    WALGREENS; CORRECT?

10:32AM  6    A.   CORRECT.

10:32AM  7    Q.   OKAY.  NOW, DURING THE DEMONSTRATION, DO YOU RECALL

10:32AM  8    DISCUSSING WITH MR. BOSTIC THAT YOU ARE THE PERSON WHO ACTUALLY

10:32AM  9    BROUGHT THE SAMPLES BACK TO THE LAB; CORRECT?

10:33AM 10    A.   YES.

10:33AM 11    Q.   AND DO YOU RECALL HOW MANY OF THE EXECUTIVES ACTUALLY GAVE

10:33AM 12    A BLOOD SAMPLE AT THAT MEETING?

10:33AM 13    A.   I BELIEVE IT WAS FIVE OR SIX.

10:33AM 14    Q.   AND DID YOU ACTUALLY DRAW THEIR BLOOD?

10:33AM 15    A.   I DON'T BELIEVE SO.  I THINK THERE WERE PHLEBOTOMISTS WHO

10:33AM 16    DID THAT.

10:33AM 17    Q.   OKAY.  ON SOME OCCASIONS, EVEN YOU WOULD DRAW THEIR BLOOD;

10:33AM 18    CORRECT?

10:33AM 19    A.   ON EARLY OCCASIONS BEFORE PHLEBOTOMISTS TOOK OVER THAT

10:33AM 20    ROLE FULL TIME.

10:33AM 21    Q.   EARLY IN YOUR TIME AT THERANOS?

10:33AM 22    A.   CORRECT.

10:33AM 23    Q.   OKAY.  AND BY THE WAY, THERANOS HAD BELIEVED THAT IT EVEN

10:33AM 24    HAD SPECIAL PROCESSES FOR EXTRACTING BLOOD FROM THE FINGER;

10:33AM 25    CORRECT?

10:33AM   1     A.   CORRECT.

10:33AM   2     Q.   AND IT OBTAINED INTELLECTUAL PROPERTY IN CONNECTION WITH

10:33AM   3     THAT; CORRECT?

10:33AM   4     A.   CORRECT.

10:33AM   5     Q.   AND YOU HOLD A PATENT IN CONNECTION WITH THAT; CORRECT?

10:33AM   6     A.   I'M NOT SURE WHAT THE STATUS OF THE PATENT IS, BUT I WAS

10:33AM   7     LISTED, RIGHT, FOR THE GRIP TECHNIQUE FOR THE COLLECTION.

10:33AM   8     Q.   OKAY.  I'D LIKE TO INFORM YOU IT'S BEEN GRANTED, SO

10:33AM   9     CONGRATULATIONS.

10:34AM   10    A.   THANK YOU.

10:34AM   11    Q.   BUT I -- AND THAT WAS JUST ANOTHER INSTANCE WHERE THERANOS

10:34AM   12    THOUGHT IT WAS DEVELOPING INNOVATIVE METHODS ON ELEMENTS OF

10:34AM   13    BLOOD COLLECTION; CORRECT?

10:34AM   14    A.   YES.

10:34AM   15    Q.   NOW, I THINK YOU WERE SHOWN SOME EMAILS YESTERDAY BY

10:34AM   16    MR. BOSTIC RELATING TO THE DISCUSSION OF THE RESULTS OF THAT

10:34AM   17    DEMONSTRATION ON WALGREENS EXECUTIVES; CORRECT?

10:34AM   18    A.   CORRECT.

10:34AM   19    Q.   DO YOU REMEMBER THAT?

10:34AM   20    A.   YES.

10:34AM   21    Q.   AND LET ME ASK YOU TO LOOK AT EXHIBIT 966, WHICH WAS

10:34AM   22    SHOWED TO YOU BY MR. BOSTIC.

10:34AM   23         AND DO YOU SEE THIS IS AN EMAIL FROM DR. YOUNG REPORTING

10:35AM   24    ON WHAT HAS HAPPENED WITH THE RESULTS; CORRECT?

10:35AM   25    A.   YES.

10:35AM  1    Q.   AND HE PUTS IN QUOTATIONS THAT HE CORRECTED THE ASSAY

10:35AM  2    RESULTS; CORRECT?

10:35AM  3    A.   CORRECT.

10:35AM  4    Q.   AND HE REPORTS THAT THE RESULTS LOOK GOOD; CORRECT?

10:35AM  5    A.   THE GC RESULTS, YES.

10:35AM  6    Q.   YES.

10:35AM  7    A.   YEP.

10:35AM  8    Q.   AND HE INDICATED THAT THERE WERE SOME -- HE REMOVED

10:35AM  9    THYROID RESULTS IN SOME INSTANCES WHERE HE THOUGHT THEY WEREN'T

10:35AM  10   ACCURATE; CORRECT?

10:35AM  11   A.   YES.

10:35AM  12   Q.   AND HE ALSO NOTED A FEW OUT OF RANGE RESULTS; CORRECT?

10:35AM  13   A.   YES.

10:35AM  14   Q.   AND HE SPECULATED THAT THERE MIGHT BE SOMETHING WRONG

10:35AM  15   RELATIVE TO SOME OF THE ASSAYS IN CONNECTION WITH THE

10:35AM  16   DEMONSTRATION; CORRECT?

10:35AM  17   A.   CORRECT.

10:35AM  18   Q.   AND YOU WERE RELIANT ON HIM TO TRANSMIT THESE RESULTS TO

10:36AM  19   ANY EXECUTIVE AT WALGREENS; CORRECT?

10:36AM  20   A.   IN THIS CASE, YES.

10:36AM  21   Q.   OKAY.

10:36AM  22   A.   AND IN OTHER CASES IF I WERE TO, OR IF THE LAB WERE TO

10:36AM  23   SUBMIT THE RESULTS, WE RELIED ON DANIEL TO REVIEW AND APPROVE

10:36AM  24   THE RESULTS.

10:36AM  25   Q.   OKAY.  AND YOU NEVER RECALL AN INSTANCE WHERE YOU

10:36AM  1    CONTRADICTED HIS JUDGMENT ON WHAT WAS AN APPROPRIATE RESULT IN

10:36AM  2    A BLOOD TEST, DO YOU?

10:36AM  3    A.   NEVER.

10:36AM  4    Q.   LET ME ASK YOU TO LOOK AT THE ATTACHMENT TO THIS EXHIBIT,

10:36AM  5    WHICH I BELIEVE HAS BEEN REDACTED.

10:36AM  6         BEFORE WE PUT IT UP, CAN WE JUST VERIFY THAT THERE'S A

10:36AM  7    REDACTION.

10:36AM  8         THE PATIENT NAME IN CONNECTION WITH THIS DEMONSTRATION HAS

10:36AM  9    BEEN REDACTED.  ORDINARILY I THINK IT APPEARS AT THE TOP.

10:36AM 10         BUT DO YOU SEE THAT THE DATE OF THIS WAS AUGUST 13TH,

10:37AM 11    2013?  DO YOU SEE THAT DOWN UNDER TEST DETAIL?

10:37AM 12    A.   I DO.

10:37AM 13    Q.   AND THAT'S THE DATE OF THIS WALGREENS DEMONSTRATION;

10:37AM 14    CORRECT?

10:37AM 15    A.   CORRECT.

10:37AM 16    Q.   AND DO YOU SEE AT THE TOP THAT THIS IS REFERRED TO AS A

10:37AM 17    TEST REPORT TECHNOLOGY DEMONSTRATION; CORRECT?

10:37AM 18    A.   CORRECT.

10:37AM 19    Q.   AND DO YOU SEE UNDER PATIENT INFORMATION, ALL OF THOSE

10:37AM 20    CATEGORIES DO NOT PROVIDE ANY INFORMATION ABOUT THE

10:37AM 21    PATIENT'S --

10:37AM 22    A.   YES.

10:37AM 23    Q.   -- DATE OF BIRTH, THEIR GENDER OR THEIR MEDICATIONS, ET

10:37AM 24    CETERA; IS THAT CORRECT?

10:37AM 25    A.   THAT'S RIGHT.

10:37AM  1    Q.   AND THAT'S BECAUSE YOU WERE NOT AT THERANOS PERFORMING A

10:37AM  2    CLINICAL EVALUATION WHEN DOING THESE DEMONSTRATIONS; CORRECT?

10:37AM  3    A.   RIGHT.   UNLESS THE LAB TEST WAS ORDERED BY A PHYSICIAN,

10:37AM  4    ALL OF THE DEMONSTRATIONS WERE, I BELIEVE, LABELLED TECHNOLOGY

10:37AM  5    DEMONSTRATION.

10:37AM  6    Q.   OKAY.   AND A PATIENT COULD BRING THEIR OWN LAB TEST ORDER

10:37AM  7    FORM, CORRECT, AND HAVE A DEMONSTRATION IF THEY WERE OTHERWISE

10:38AM  8    TOURING THERANOS?

10:38AM  9    A.   I BELIEVE IN THOSE CASES TESTS WERE ACTUALLY PROCESSED

10:38AM  10   THROUGH THE CLINICAL LAB WITH THE ACTUAL PHYSICIAN ORDER.

10:38AM  11   Q.   OKAY.   SO THEY WERE NOT --

10:38AM  12   A.   AND THE TECHNOLOGY DEMONSTRATION WAS SEPARATE FROM THAT.

10:38AM  13   Q.   OKAY.   SO THE TECHNOLOGY -- THE DEMONSTRATIONS WERE NEVER

10:38AM  14   USED FOR CLINICAL EVALUATION OF THE PERSON RECEIVING IT?

10:38AM  15   A.   THEY WERE LABELLED TECHNOLOGY DEMONSTRATION SO THAT IT

10:38AM  16   WOULD BE DISTINGUISHED FROM A CLINICAL VALUE OR SOMETHING THAT

10:38AM  17   COULD BE USED FOR CLINICAL USE.

10:38AM  18   Q.   RIGHT.   AND YOU CAN SEE THAT RIGHT ON THE TOP OF THE PAGE;

10:38AM  19   CORRECT?

10:38AM  20   A.   CORRECT.

10:38AM  21   Q.   NOW, SOMETIMES PATIENTS WOULD -- SOMETIMES PERSONS GETTING

10:38AM  22   THE DEMONSTRATION WOULD COMPARE IT TO THEIR RESULTS IN OTHER

10:38AM  23   TESTS; CORRECT?

10:38AM  24   A.   CORRECT.

10:38AM  25   Q.   AND SOMETIMES NOT; CORRECT?

10:38AM  1     A.   CORRECT.

10:38AM  2     Q.   I WANT TO ASK YOU ABOUT A FEW OF THE EXAMPLES THAT

10:39AM  3     MR. BOSTIC WENT THROUGH WITH YOU YESTERDAY AND ASK YOU TO LOOK

10:39AM  4     AT EXHIBIT 860.

10:39AM  5          THIS IS ALREADY IN EVIDENCE.

10:39AM  6          JUST TAKE A MOMENT TO LOOK THROUGH THAT.

10:39AM  7          DO YOU RECALL THIS DISCUSSION OF A DEMONSTRATION THAT WAS

10:39AM  8     PERFORMED IN NEW YORK IN 2013?

10:39AM  9     A.   YES.

10:39AM  10    Q.   AND IS IT THE CASE THAT INDIVIDUALS WHO WERE RECEIVING

10:39AM  11    THIS DEMONSTRATION WERE CLINICAL LAB SCIENTISTS AT

10:39AM  12    SLOAN KETTERING?

10:39AM  13    A.   THEY WERE MEDICAL PROFESSIONALS.  I'M NOT SURE OF THEIR

10:39AM  14    EXACT TITLES.

10:39AM  15    Q.   OKAY.  DO YOU KNOW THAT SOME OF THEM WERE CLINICAL LAB

10:39AM  16    SPECIALISTS?

10:39AM  17    A.   I DON'T RECALL.

10:39AM  18    Q.   BUT, BUT IN ANY EVENT --

10:40AM  19    A.   THEY ALL WORKED IN -- THEY WERE ALL PART OF THE HOSPITAL,

10:40AM  20    YEAH.

10:40AM  21    Q.   OKAY.  AND THERANOS WAS DEMONSTRATING ITS TECHNOLOGY TO

10:40AM  22    PEOPLE AT THAT HOSPITAL; CORRECT?

10:40AM  23    A.   CORRECT.

10:40AM  24    Q.   MEDICAL PROFESSIONALS?

10:40AM  25    A.   CORRECT.

10:40AM   1    Q.   AND THERE WASN'T ANY EFFORT, AGAIN, TO DECEIVE ANY OF

10:40AM   2    THOSE PERSONNEL AS TO WHAT WAS GOING ON IN THE DEMONSTRATION;

10:40AM   3    CORRECT?

10:40AM   4    A.   CORRECT.

10:40AM   5    Q.   YOU SAW IN THE EMAIL EXCHANGE THAT'S CONTAINED IN

10:40AM   6    EXHIBIT 860 THAT THERE WAS A DISCUSSION OF TWO SAMPLES BEING

10:40AM   7    RUN; CORRECT?

10:40AM   8    A.   CORRECT.

10:40AM   9    Q.   YOU DON'T REMEMBER TODAY WHY THAT WAS DONE; IS THAT RIGHT?

10:40AM  10    A.   I THINK THERE WAS INTEREST IN SEEING HOW THE SAMPLES --

10:40AM  11    THEM SEEING TEST RESULTS FROM NEW YORK AND IN PALO ALTO.

10:40AM  12    Q.   AND SO ONE OF THE SAMPLES WAS TESTED ON THE DEVICE IN

10:41AM  13    NEW YORK; CORRECT?

10:41AM  14    A.   CORRECT.

10:41AM  15    Q.   AND ANOTHER WAS PACKAGED IN A CONTAINER AND TAKEN BACK TO

10:41AM  16    PALO ALTO; CORRECT?

10:41AM  17    A.   CORRECT.

10:41AM  18    Q.   AND THAT TEST WAS RUN LATER; CORRECT?

10:41AM  19    A.   CORRECT.

10:41AM  20    Q.   AND THEN YOU HAD THE ISSUE THAT THE RESULTS DID NOT AGREE

10:41AM  21    WITH EACH OTHER; CORRECT?

10:41AM  22    A.   CORRECT.

10:41AM  23    Q.   AND THERE THEN WAS A DIALOGUE BETWEEN MS. HOLMES,

10:41AM  24    DR. YOUNG, AND YOU WERE AT LEAST COPIED ON SOME OF THOSE

10:41AM  25    EMAILS; CORRECT?

10:41AM  1    A.   CORRECT.

10:41AM  2    Q.   LET ME ASK YOU TO LOOK AT PAGE 6 OF THE EXHIBIT.

10:41AM  3         IF YOU GO TO THE TOP OF THIS EMAIL, YOU WILL SEE -- ON THE

10:41AM  4    PRIOR PAGE -- YOU WILL SEE THAT THIS IS AN EMAIL FROM DR. YOUNG

10:41AM  5    TO MS. HOLMES, MR. BALWANI, AND YOU ARE COPIED.

10:41AM  6         DO YOU SEE THAT?

10:41AM  7    A.   I THINK SUNNY IS COPIED HERE, BUT -- BASED ON WHAT I'M

10:42AM  8    SEEING ON MY SCREEN.

10:42AM  9    Q.   YES.

10:42AM  10   A.   YES.

10:42AM  11   Q.   AND IF YOU GO TO THE NEXT PAGE, I WANT TO FOCUS ON THE

10:42AM  12   PARAGRAPH THAT BEGINS "FOR MUMPS IGG."

10:42AM  13   A.   YES.

10:42AM  14   Q.   AND DR. YOUNG, TALKING ABOUT THE DISCREPANT RESULTS, SAYS,

10:42AM  15   "I AM INCLINED TO BELIEVE THAT THE RUN IN PALO ALTO IS CORRECT

10:42AM  16   FOR A NUMBER OF REASONS."

10:42AM  17        CORRECT?

10:42AM  18   A.   YES.

10:42AM  19   Q.   AND HE GOES ON TO BELIEVE -- TO DETAIL ALL OF THE REASONS

10:42AM  20   THAT HE THINKS THE PALO ALTO RUN IS BETTER THAN THE RUN THAT

10:42AM  21   WAS DONE IN NEW YORK.

10:42AM  22        DO YOU SEE THAT?

10:42AM  23   A.   YES.

10:42AM  24   Q.   AND THEN IF YOU GO TO THE PRIOR PAGE, MS. HOLMES ASKS

10:42AM  25   DR. YOUNG AT THE TOP OF THAT PAGE, "DANIEL - IS OUR READ THAT

10:42AM   1    THE SECOND RUN IN PALO ALTO IS THE MOST ACCURATE FOR ALL THREE

10:43AM   2    DISCREPANCIES?"

10:43AM   3        DO YOU SEE THAT?

10:43AM   4    A.   YES.

10:43AM   5    Q.   AND SO SHE WAS ASKING HIM HIS VIEW AS TO WHICH RESULTS

10:43AM   6    WERE THE RIGHT RESULTS; CORRECT?

10:43AM   7    A.   CORRECT.

10:43AM   8    Q.   AND THEN IF YOU GO TO THE PAGE BEFORE THAT, DR. YOUNG

10:43AM   9    SAYS, "YES, I TRUST THE SECOND RUN IN PALO ALTO."

10:43AM   10       AND HE GOES ON TO EXPLAIN HIS REASON; CORRECT?

10:43AM   11   A.   CORRECT.

10:43AM   12   Q.   NOW, BOTH OF THESE ANALYSES WERE RUN ON SMALL SAMPLES;

10:43AM   13   CORRECT?

10:43AM   14   A.   CORRECT.

10:43AM   15   Q.   AND BOTH WERE RUN WITH THERANOS ASSAYS; CORRECT?

10:43AM   16   A.   CORRECT.

10:43AM   17   Q.   AND A JUDGMENT HAD TO BE MADE WHEN THERE WAS A DIFFERENCE

10:43AM   18   BETWEEN THE TWO RESULTS; CORRECT?

10:43AM   19   A.   CORRECT.

10:43AM   20   Q.   AND YOU WOULD HAVE DEFERRED TO DR. YOUNG AND HIS JUDGMENT;

10:43AM   21   CORRECT?

10:43AM   22   A.   CORRECT.

10:43AM   23   Q.   AND IN THIS INSTANCE MS. HOLMES DEFERRED TO DR. YOUNG AND

10:43AM   24   HIS JUDGMENT; CORRECT?

10:43AM   25   A.   I THINK SHE ASKED FOR HIS OPINION AND THEN OFFERED HER

10:44AM 1    OPINION AS WELL.

10:44AM 2    Q.   RIGHT.  IF YOU CONTINUE TO SCROLL THROUGH, THERE'S FURTHER

10:44AM 3    DISCUSSION?

10:44AM 4    A.   RIGHT.

10:44AM 5    Q.   RIGHT?  BUT IF YOU LOOK AT THE FIRST PAGE, THE ULTIMATE

10:44AM 6    DECISION IS TO REPORT THE PALO ALTO RESULTS; CORRECT?

10:44AM 7    A.   CORRECT.

10:44AM 8    Q.   ALL RIGHT.  NOW, IN CONNECTION WITH DOING THAT

10:44AM 9    DEMONSTRATION AT SLOAN KETTERING, YOU DON'T RECALL THAT THERE

10:44AM 10   WAS ANY CONCERN THAT THE DEMONSTRATION WOULD LEAD TO INACCURATE

10:44AM 11   RESULTS IN ADVANCE, DO YOU?

10:44AM 12   A.   NO.

10:44AM 13   Q.   AND THERANOS WAS EAGER TO SHOWCASE ITS TECHNOLOGY AT

10:44AM 14   SLOAN KETTERING, WASN'T IT?

10:44AM 15   A.   YES.

10:44AM 16   Q.   AND MS. HOLMES THOUGHT THIS MIGHT BE A GOOD OPPORTUNITY TO

10:44AM 17   EXPAND FUTURE BUSINESS AND RELATIONSHIPS FOR THERANOS; CORRECT?

10:44AM 18          MR. BOSTIC:  OBJECTION.  FOUNDATION.

10:45AM 19          MR. DOWNEY:  FAIR ENOUGH.  I'LL WITHDRAW THAT.

10:45AM 20          THE COURT:  THE QUESTION IS WITHDRAWN.

10:45AM 21   BY MR. DOWNEY:

10:45AM 22   Q.   OKAY.  YOU DON'T SEE ANY SIGN OF HESITATION ON EITHER

10:45AM 23   MS. HOLMES'S PART OR ANYONE ELSE IN CONDUCTING THIS

10:45AM 24   DEMONSTRATION IN NEW YORK?

10:45AM 25   A.   NO.

10:45AM  1   Q.   OKAY.  YOU WERE ALSO ASKED YESTERDAY ABOUT A JULY 2013

10:45AM  2   DEMONSTRATION THAT WAS DONE FOR A WALGREENS EXECUTIVE.

10:45AM  3        DO YOU REMEMBER THAT?

10:45AM  4   A.   YES.

10:45AM  5   Q.   LET ME ASK YOU TO LOOK BACK AT EXHIBIT 905.  IF YOU GO --

10:45AM  6   DO YOU SEE THIS IS THE EMAIL EXCHANGE IN JULY OF 2013 ABOUT

10:45AM  7   REPORTING THE RESULTS FROM THAT DEMONSTRATION?

10:45AM  8   A.   YES.

10:45AM  9   Q.   AND IF YOU GO TO PAGE 4 AND YOU LOOK AT DR. YOUNG'S EMAIL,

10:46AM 10   YOU SEE IN THE SECOND TO LAST PARAGRAPH THAT DR. YOUNG REPORTS

10:46AM 11   THAT THERE'S BEEN A LOW GLUCOSE RESULT; CORRECT?

10:46AM 12   A.   CORRECT.

10:46AM 13   Q.   AND HE INDICATES THAT, YOU KNOW, THE RESULT FOR SOMEONE

10:46AM 14   WHO IS FASTING PRIOR TO THE TEST IS LESS THAN 100; CORRECT?

10:46AM 15   A.   CORRECT.

10:46AM 16   Q.   TYPICALLY?  TO BE IN A NORMAL RANGE?

10:46AM 17   A.   CORRECT.

10:46AM 18   Q.   AND THEN HE ASKS MS. HOLMES, "DO WE KNOW THE STATE OF THE

10:46AM 19   PATIENT?"

10:46AM 20        CORRECT?

10:46AM 21   A.   CORRECT.

10:46AM 22   Q.   AND THEN SHE RESPONDS IN THE EMAIL ABOVE THAT, AND SHE

10:46AM 23   SAYS -- IT'S TOWARDS THE BOTTOM OF THE PAGE.  IF YOU COULD BLOW

10:46AM 24   THAT UP.

10:46AM 25        SHE SAYS, "I DON'T KNOW.  IT'S 50/50.  WE MIGHT FLAG IT."

10:47AM 1        RIGHT?

10:47AM 2    A.   RIGHT.

10:47AM 3    Q.   "IT'S 50/50 WHETHER THEY WERE OR NOT.  WE MIGHT FLAG IT

10:47AM 4    AND SPECIFY THAT HIGH OR LOW REFERENCE RANGE DEPENDS ON WHETHER

10:47AM 5    THE PATIENT WAS FASTING OR NOT."

10:47AM 6        DO YOU SEE THAT?

10:47AM 7    A.   YES.

10:47AM 8    Q.   AND SO SHE WANTED TO CONVEY TO THE PATIENT THAT THE RESULT

10:47AM 9    WAS UNCERTAIN; CORRECT?

10:47AM 10   A.   SHE WANTED TO INCLUDE THIS, THIS ADDITIONAL DISCLAIMER OR

10:47AM 11   THIS ADDITIONAL INFORMATION.

10:47AM 12   Q.   OKAY.

10:47AM 13   A.   YEAH.

10:47AM 14   Q.   BECAUSE IT WOULD HELP THE PATIENT IN THE EVENT THAT THEIR

10:47AM 15   GLUCOSE WASN'T ORDINARILY LOW, THEY WOULDN'T BE ALARMED IF THEY

10:47AM 16   HADN'T BEEN FASTING, FOR EXAMPLE?

10:47AM 17   A.   RIGHT.  IT PROVIDES INFORMATION AND CONTEXT.

10:47AM 18   Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 1014.

10:48AM 19       THIS WAS ADMITTED INTO EVIDENCE YESTERDAY.

10:48AM 20       AND THIS RELATES TO THE DEMONSTRATION THAT WAS PERFORMED

10:48AM 21   AT THERANOS FOR THE JOURNALIST JOE RAGO.

10:48AM 22       DO YOU REMEMBER DISCUSSING THAT YESTERDAY?

10:48AM 23   A.   YES.

10:48AM 24   Q.   AND I THINK YOU TESTIFIED YESTERDAY THAT THIS

10:48AM 25   DEMONSTRATION WAS PROCESSED IN THERANOS'S LABORATORY; CORRECT?

10:48AM  1    A.   CORRECT.

10:48AM  2    Q.   AND AGAIN, THIS PROCESS FOR THIS DEMONSTRATION WAS THAT

10:48AM  3    THE BLOOD WAS COLLECTED FROM THE FINGER, PUT IN THE NANOTAINER,

10:48AM  4    PUT IN THE SHIPPING CONTAINER, AND TAKEN TO THE LAB; CORRECT?

10:48AM  5    A.   I BELIEVE SO.

10:48AM  6    Q.   IF YOU LOOK AT PAGE 2, JUST TO REORIENT YOU, AT THE BOTTOM

10:49AM  7    OF THAT PAGE, IF YOU WOULD BLOW THAT EMAIL UP.

10:49AM  8         YOU SAY, "I'M HEADING IN TO COLLECT THE FINGERSTICK

10:49AM  9    SAMPLE, PLEASE BE READY TO MEET IN THE LAB IN THE NEXT FEW

10:49AM 10    MINUTES."

10:49AM 11         CORRECT?

10:49AM 12    A.   YEAH.

10:49AM 13    Q.   AND SO THIS IS ANOTHER EXAMPLE OF THE SAMPLE BEING

10:49AM 14    COLLECTED IN THE ROOM AND TAKEN TO THE LAB; CORRECT?

10:49AM 15    A.   CORRECT.

10:49AM 16    Q.   AND, AGAIN, YOU DID NOT DO ANYTHING IN CONNECTION WITH

10:49AM 17    THIS TO TRY TO DECEIVE MR. RAGO, DID YOU?

10:49AM 18    A.   NO.

10:49AM 19    Q.   YOU WERE NOT TRYING TO CONVEY ANYTHING FALSE ABOUT

10:49AM 20    THERANOS, WERE YOU?

10:49AM 21    A.   NO.

10:49AM 22    Q.   YOU TOOK THE SAMPLE IN THE SHIPPING CONTAINER INTO THE LAB

10:49AM 23    FOR EVALUATION; CORRECT?

10:49AM 24    A.   CORRECT.

10:49AM 25    Q.   AND THEN MR. --

10:49AM   1    A.   I GAVE -- I GAVE IT TO SCIENTISTS WHO CONDUCTED THAT.

10:49AM   2    Q.   THAT'S CORRECT.

10:49AM   3    A.   RIGHT.

10:49AM   4    Q.   YOU DIDN'T PERFORM THE TESTS YOURSELF?

10:49AM   5    A.   RIGHT.

10:49AM   6    Q.   AND THEN MR. -- LATER MR. RAGO WROTE AN ARTICLE ABOUT

10:49AM   7    THERANOS; CORRECT?

10:49AM   8    A.   CORRECT.

10:49AM   9    Q.   AND I'D LIKE TO DIRECT YOUR ATTENTION TO EXHIBIT 1106,

10:50AM  10    WHICH IS ALREADY IN EVIDENCE.

10:50AM  11         AND I WANT TO BLOW UP A PARAGRAPH IN WHICH THE PROCESS FOR

10:50AM  12    THIS -- FOR THERANOS IS DESCRIBED.

10:50AM  13         DO YOU SEE IT'S THE BOTTOM PARAGRAPH?  WE'LL BLOW IT UP

10:50AM  14    FOR YOU.

10:50AM  15    A.   YES.

10:50AM  16    Q.   AND THIS IS MR. RAGO'S ARTICLE DISCUSSING THERANOS;

10:50AM  17    CORRECT?

10:50AM  18    A.   YES.

10:50AM  19    Q.   AND HE SAYS -- IT DESCRIBES HOW THERANOS'S TECHNICIANS GET

10:50AM  20    THE CIRCULATION GOING IN THE HANDS SO THAT THERE'S MORE BLOOD

10:50AM  21    CIRCULATION; CORRECT?

10:50AM  22    A.   CORRECT.

10:50AM  23    Q.   AND THEN HE DESCRIBES HOW THE BLOOD IS PLACED IN A

10:50AM  24    NANOTAINER; CORRECT?

10:50AM  25    A.   CORRECT.

10:50AM  1    Q.   AND THEN HE SAYS IT'S THEN RUN THROUGH ANALYZERS IN A

10:50AM  2    THERANOS LAB; CORRECT?

10:50AM  3    A.   CORRECT.

10:50AM  4    Q.   AND THAT'S EXACTLY THE PROCESS THAT HE HAD GOTTEN WHEN HE

10:50AM  5    VISITED THERANOS?

10:50AM  6    A.   CORRECT.

10:50AM  7    Q.   RIGHT?  AND THAT'S THE PROCESS THAT WAS BEING DEMONSTRATED

10:51AM  8    WHEN YOU TOOK THE SAMPLE FROM THE ROOM INTO THE THERANOS LAB?

10:51AM  9    A.   CORRECT.

10:51AM  10   Q.   I'M GOING TO TURN TO JUST BRIEFLY TO ANOTHER TOPIC.

10:51AM  11        AND THEN AFTER THIS, YOUR HONOR, IT MIGHT BE A GOOD TIME

10:51AM  12   FOR A BREAK.

10:51AM  13        DO YOU RECALL THAT WE'VE BEEN DISCUSSING A LOT OF

10:51AM  14   DEMONSTRATIONS THAT TOOK PLACE PRIOR TO THE, PRIOR TO THE

10:51AM  15   RETAIL LAUNCH AT WALGREENS; CORRECT?  A NUMBER OF PRESENTATIONS

10:51AM  16   AND A NUMBER OF DEMONSTRATIONS IN 2013?

10:51AM  17   A.   CORRECT.

10:51AM  18   Q.   DO YOU REMEMBER THAT AS THERANOS WAS WORKING ON ITS

10:51AM  19   PARTNERSHIP WITH WALGREENS, IT ALSO APPLIED TO THE FDA FOR

10:51AM  20   APPROVAL OF CERTAIN OF ITS TECHNOLOGIES?

10:51AM  21   A.   I'M NOT SURE EXACTLY WHICH TIME THAT WAS DONE, BUT I --

10:51AM  22   YES, I'M AWARE THAT THE COMPANY DID APPLY FOR FDA APPROVAL FOR

10:52AM  23   ITS TECHNOLOGIES.

10:52AM  24   Q.   OKAY.  AND DO YOU RECALL THAT THE FDA DID APPROVE

10:52AM  25   THERANOS'S TECHNOLOGY IN CONNECTION WITH TESTING FOR HSV-1?

| | | |
|---|---|---|
| 10:52AM | 1 | A.   YES. |
| 10:52AM | 2 | Q.   LET ME SHOW YOU EXHIBIT 13988. |
| 10:52AM | 3 | IS THIS AN EMAIL THAT MS. HOLMES SENT IN JULY OF 2015 IN |
| 10:52AM | 4 | CONNECTION WITH -- |
| 10:52AM | 5 | (CELL PHONE GOING OFF.) |
| 10:52AM | 6 | THE WITNESS:  I DON'T BELIEVE I HAVE THAT EXHIBIT. |
| 10:52AM | 7 | MR. DOWNEY:  I APOLOGIZE, YOUR HONOR.  WE'RE OVER |
| 10:52AM | 8 | TECHNIFIED. |
| 10:53AM | 9 | Q.   LET ME SHOW YOU -- |
| 10:53AM | 10 | A.   MY BINDER GOES TO 13983. |
| 10:53AM | 11 | Q.   I'M SORRY.  MAYBE I MISREAD THE NUMBER.  MAYBE THAT'S THE |
| 10:53AM | 12 | PROBLEM. |
| 10:53AM | 13 | EXHIBIT 13988.  I HAVE AN EXTRA COPY HERE. |
| 10:53AM | 14 | MR. BOSTIC:  I DON'T HAVE A COPY OF THAT EITHER, |
| 10:53AM | 15 | COUNSEL. |
| 10:53AM | 16 | MR. DOWNEY:  (HANDING.) |
| 10:53AM | 17 | THE COURT:  IT DIDN'T MAKE IT INTO MY BINDER EITHER, |
| 10:53AM | 18 | SO -- |
| 10:53AM | 19 | MR. DOWNEY:  MAY I APPROACH THE WITNESS, YOUR HONOR? |
| 10:53AM | 20 | THE COURT:  PLEASE. |
| 10:53AM | 21 | BY MR. DOWNEY: |
| 10:53AM | 22 | Q.   (HANDING.) |
| 10:53AM | 23 | A.   THANK YOU. |
| 10:53AM | 24 | Q.   SHOWING YOU EXHIBIT 13988, IS THIS AN EMAIL FROM |
| 10:54AM | 25 | MS. HOLMES TO ALL THERANOS EMPLOYEES IN JULY OF 2015? |

EDLIN CROSS BY MR. DOWNEY (RES.)

10:54AM 1    A.   YES.

10:54AM 2            MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

10:54AM 3    13988.

10:54AM 4            MR. BOSTIC:  NO OBJECTION.

10:54AM 5            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:54AM 6        (DEFENDANT'S EXHIBIT 13988 WAS RECEIVED IN EVIDENCE.)

10:54AM 7            MR. DOWNEY:  JUST BLOW UP THE EMAIL AT THE TOP.

10:54AM 8    Q.   DO YOU SEE THE FIRST PARAGRAPH, IT INDICATES -- MS. HOLMES

10:54AM 9    IS INDICATING THAT THERANOS HAD RECEIVED IT'S FIRST FDA

10:54AM 10   CLEARANCE ON OUR SYSTEM AND THE FIRST LABORATORY DEVELOPED TEST

10:54AM 11   WE FILED:  HSV-1.

10:54AM 12       DO YOU SEE THAT?

10:54AM 13   A.   YES.

10:54AM 14   Q.   AND YOU YOURSELF DID NOT DEAL WITH THE FDA DURING THE

10:54AM 15   COURSE OF YOUR DUTIES AT THERANOS, DID YOU?

10:54AM 16   A.   NO.

10:54AM 17   Q.   BUT YOU UNDERSTOOD THAT THIS FDA APPROVAL WAS AN APPROVAL

10:54AM 18   FOR RUNNING THE HSV-1 ASSAY ON THERANOS SYSTEMS; CORRECT?

10:55AM 19   A.   YES.

10:55AM 20           MR. DOWNEY:  YOUR HONOR, THIS MIGHT BE A GOOD TIME

10:55AM 21   FOR A BREAK.

10:55AM 22           THE COURT:  LET'S TAKE OUR BREAK NOW, MR. DOWNEY.

10:55AM 23       LADIES AND GENTLEMEN, WE'LL TAKE A 30 MINUTE BREAK, A 30

10:55AM 24   MINUTE BREAK, PLEASE.  AND WE'LL SEE YOU BACK IN JUST A MOMENT.

10:55AM 25       THANK YOU.

10:55AM 1          YOU CAN STAND DOWN AS WELL, SIR.  THANK YOU.

10:55AM 2          (JURY OUT AT 10:55 A.M.)

10:55AM 3             THE COURT:  ALL RIGHT.  THANK YOU.  PLEASE BE

10:55AM 4     SEATED.  THANK YOU.

10:55AM 5          THE RECORD SHOULD REFLECT THAT THE JURY HAS LEFT, AND

10:55AM 6     MR. EDLIN IS LEAVING THE COURTROOM.  HE'S GONE NOW.  THANK YOU.

10:56AM 7          MR. DOWNEY, DURING YOUR EXAMINATION OF MR. EDLIN, THE

10:56AM 8     COURT DID HEAR A DEVICE THAT WENT OFF IN THE AUDIENCE, AND I

10:56AM 9     FOUND IT DISRUPTIVE.

10:56AM 10         I LOOKED OUT AT THE AUDIENCE AND I SAW THE GENTLEMAN IN

10:56AM 11    THE BLUE SHIRT SEATED IN THE BACK ROW FUMBLING WITH HIS DEVICE

10:56AM 12    AND TRYING TO TURN IT DOWN.

10:56AM 13         I JUST HAVE TO SAY THIS IS THE SECOND TIME THAT IT HAS

10:56AM 14    BEEN BROUGHT TO MY ATTENTION, SIR, THAT YOUR DEVICE HAS

10:56AM 15    DISRUPTED THESE PROCEEDINGS.

10:56AM 16         IF IT HAPPENS AGAIN, SIR, YOU'LL HAVE TO GO DOWN TO THE

10:56AM 17    OTHER ROOM AND WATCH THIS, SHOULD YOU CARE TO WATCH IT.

10:56AM 18         OTHERWISE I'LL ASK YOU TO LEAVE YOUR DEVICE WITH THE

10:56AM 19    UNITED STATES MARSHALS DOWNSTAIRS IF YOU HAVE DIFFICULTY IN

10:56AM 20    THAT REGARD.

10:56AM 21         IF YOU HAVE DIFFICULTY OPERATING YOUR MACHINE, I'LL CALL

10:56AM 22    THE MARSHAL UP NOW IF YOU WANT TO STAY HERE, AND PERHAPS HE CAN

10:56AM 23    HELP YOU DISABLE THAT DEVICE.  THEY'RE VERY GOOD AT THAT.

10:57AM 24         SO I WOULD ASK YOU, SIR, TO PLEASE -- AND EVERYONE -- SIR,

10:57AM 25    I'M CALLING YOU OUT BECAUSE I HEARD IT AND SAW YOU.

10:57AM  1          BUT EVERYONE ELSE, PLEASE DO RESPECT THESE PROCEEDINGS AND

10:57AM  2     DISABLE YOUR DEVICES.  IT'S DISRUPTIVE TO THE PROCEEDINGS.

10:57AM  3     IT'S NOT FAIR TO THE GOVERNMENT.  IT'S NOT FAIR TO MS. HOLMES

10:57AM  4     TO HAVE WITNESSES AND THE JURY BE DISTRACTED BY THAT.

10:57AM  5          SO THANK YOU VERY MUCH.

10:57AM  6          ANYTHING FURTHER, COUNSEL --

10:57AM  7               MR. BOSTIC:  NO, YOUR HONOR.

10:57AM  8               THE COURT:  -- BEFORE WE BREAK?

10:57AM  9               MR. DOWNEY:  NOTHING ON OUR SIDE.

10:57AM 10               THE COURT:  ALL RIGHT.  THANK YOU.

10:57AM 11               THE CLERK:  COURT IS IN RECESS.

10:57AM 12          (RECESS FROM 10:57 A.M. UNTIL 11:34 A.M.)

11:34AM 13          (JURY OUT AT 11:34 A.M.)

11:34AM 14               THE COURT:  ALL RIGHT.  THANK YOU.  WE'RE BACK ON

11:34AM 15     THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE

11:34AM 16     AGAIN.  WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.

11:34AM 17          COUNSEL, DID YOU WANT TO DISCUSS SOMETHING?

11:34AM 18               MR. DOWNEY:  YOUR HONOR, IT'S MY INTENTION TO

11:35AM 19     INTRODUCE SOME EXHIBITS DURING MR. EDLIN'S EXAMINATION WHICH

11:35AM 20     WON'T TAKE LONG, BUT WHICH ARE FAIRLY BULKY.  THEY ARE THE,

11:35AM 21     THEY ARE THE WEEKLY OR BIWEEKLY REPORTS OF CUSTOMER FEEDBACK

11:35AM 22     THAT MR. EDLIN AND MS. HOLMES RECEIVED IN AGGREGATED FORM.

11:35AM 23          AS I UNDERSTAND, MR. BOSTIC HAS AN ISSUE WITH IT.

11:35AM 24          I DON'T THINK I'M GOING TO GIVE YOUR HONOR THE -- WHAT THE

11:35AM 25     DOCUMENTS ARE.  I THINK THE EVIDENTIARY ISSUE IS THE SAME FOR

11:35AM  1     EVERY DOCUMENT, SO IT'S JUST ESSENTIALLY A REPEAT.  I WAS

11:35AM  2     ACTUALLY HOPEFUL THAT WE MIGHT GET A STIPULATION.

11:35AM  3               THE COURT:  MR. BOSTIC?

11:35AM  4               MR. BOSTIC:  I HAVE A FEW CONCERNS ABOUT THIS

11:35AM  5     CATEGORY OF EVIDENCE.  I UNDERSTAND A COPY HAS BEEN PROVIDED TO

11:35AM  6     THE COURT.

11:35AM  7          FROM MY BRIEF REVIEW, AND I RECEIVED THIS TODAY, THIS

11:35AM  8     APPEARS TO BE A COLLECTION OF ANECDOTAL REPORTS OF CUSTOMER

11:36AM  9     FEEDBACK FROM WALGREENS.

11:36AM  10         EVERY ONE THAT I'VE SEEN SO FAR IS POSITIVE AS TO

11:36AM  11    THERANOS.

11:36AM  12         I'M NOT SURE -- FIRST, WITHOUT THE WITNESS ON THE STAND,

11:36AM  13    I'M NOT SURE WHAT KIND OF FOUNDATION COULD BE LAID FOR THE

11:36AM  14    ADMISSION OF THESE ACCOUNTS FOR THEIR TRUTH.  I THINK IT'S ONE

11:36AM  15    THING IF THE WITNESS IS ABLE TO LAY A FOUNDATION FOR AN EMAIL,

11:36AM  16    YOU KNOW, THAT HE WAS ON, BUT IT'S A DIFFERENT THING TO BE ABLE

11:36AM  17    TO LAY A PROPER FOUNDATION SUCH THAT THESE ACCOUNTS -- AND

11:36AM  18    THEY'RE VERY HIGH IN VOLUME -- SUCH THAT THESE ACCOUNTS CAN BE

11:36AM  19    ADMITTED FOR THE TRUTH OF THE CONTENT OF THESE PATIENT

11:36AM  20    ACCOUNTS.

11:36AM  21         IT'S UNCLEAR FROM THE FACE OF THE DOCUMENTS WHO COLLECTED

11:36AM  22    THEM, HOW THEY WERE COMPILED, WHETHER THEY WERE CURATED IN ANY

11:36AM  23    WAY, WHETHER THIS IS A SELECTION OR A COMPLETE LIST, AND SO I

11:36AM  24    HAVE SOME QUESTIONS ABOUT THAT AND SOME CONCERNS.

11:36AM  25         SEPARATELY, I CONTINUE TO BE CONCERNED, AND THIS IS

11:37AM 1    INCREASING MY CONCERNS ABOUT THE JURY BEING PRESENTED WITH AN

11:37AM 2    UNBALANCED VIEW OF WHAT CUSTOMER AND PATIENT FEEDBACK ABOUT

11:37AM 3    THERANOS WAS.

11:37AM 4        I THINK ADMITTING THE HIGH VOLUME OF POSITIVE CUSTOMER

11:37AM 5    SURVEY RESULTS OR FEEDBACK, ANECDOTES LIKE THIS, WITHOUT

11:37AM 6    ALLOWING THE JURY TO SEE THE OTHER SIDE, FOR EXAMPLE, THE

11:37AM 7    COMPLAINT LOGS THAT WE JUST TALKED ABOUT THE OTHER DAY, RISKS

11:37AM 8    GIVING THEM THE WRONG IMPRESSION.

11:37AM 9        AND SO, AGAIN, IF THIS DOES END UP COMING INTO EVIDENCE,

11:37AM 10   IT SHOULD REOPEN THE DISCUSSION ABOUT WHETHER COMPLAINT LOGS

11:37AM 11   NEED TO BE PRESENTED TO THE JURY.

11:37AM 12       THE COURT:  THOSE COMPLAINT LOGS WERE FROM -- WERE

11:37AM 13   THOSE FROM WALGREENS ALSO?

11:37AM 14       MR. BOSTIC:  SO, YOUR HONOR, I THINK THAT WOULD HAVE

11:37AM 15   COME IN DIRECTLY TO THERANOS.  IT'S NOT CLEAR WHETHER WALGREENS

11:37AM 16   STAFF OR THERANOS STAFF COLLECTED THE ACCOUNTS THAT WE'RE

11:37AM 17   LOOKING AT IN THIS BINDER.

11:37AM 18       THE COURT:  OKAY.

11:37AM 19       MR. DOWNEY:  I THINK I CAN SPEAK TO THAT A LITTLE

11:37AM 20   BIT, YOUR HONOR.

11:37AM 21       THE COURT:  SURE.

11:37AM 22       MR. DOWNEY:  THIS IS -- FIRST OF ALL, I'M NOT

11:38AM 23   OFFERING THE REPORTS FOR THE PURPOSES OF THEIR TRUTH.  THESE

11:38AM 24   ARE WEEKLY REPORTS WHICH WENT TO THE DEFENDANT AND THE EFFECT

11:38AM 25   OF HER STATE OF MIND ABOUT THERANOS SERVICES.

11:38AM  1      BUT THESE ARE WEEKLY REPORTS THAT ARE COMPILED FROM TWO

11:38AM  2  SOURCES.  ONE IS THAT THERE'S A THERANOS APP THAT ALLOWS

11:38AM  3  CUSTOMERS TO PROVIDE FEEDBACK IN WRITING, AND I THINK

11:38AM  4  MR. BOSTIC HAS ALREADY EFFECTIVELY ESTABLISHED THAT MUCH OF

11:38AM  5  THAT FEEDBACK IS GIVEN IN ADVANCE OF THE -- OF KNOWING TEST

11:38AM  6  RESULTS, AT LEAST FOR PATIENTS WHO ARE FIRST-TIME USERS.

11:38AM  7      THE OTHER SOURCE OF IT IS THAT PHLEBOTOMISTS IN THE STORES

11:38AM  8  ENGAGED WITH PATIENTS AND THEY ASKED THEM WHAT THEIR EXPERIENCE

11:38AM  9  WAS ON THIS VISIT, ON PRIOR VISITS, WHAT THE PURPOSE OF THEIR

11:38AM 10  CHOOSING THERANOS WAS, ET CETERA, AND THIS WAS COMPILED AND

11:38AM 11  SHARED WITH MR. EDLIN AND MS. HOLMES, ET CETERA.

11:39AM 12      I THINK IT'S, IT'S -- YOU KNOW, HE'S CERTAINLY FREE TO

11:39AM 13  CROSS-EXAMINE AS TO WHETHER IT'S, YOU KNOW, LIMITED BY, YOU

11:39AM 14  KNOW, SOME EFFORT TO FIND POSITIVE FEEDBACK, ET CETERA.

11:39AM 15      BUT I DON'T THINK IT'S INADMISSIBLE WHEN IT'S A DISCUSSION

11:39AM 16  OF, YOU KNOW, WHAT IS AT THE HEART OF THE CASE, WHICH IS THE

11:39AM 17  QUALITY OF THE BLOOD TESTING SERVICES PROVIDED BY THERANOS.

11:39AM 18          THE COURT:  WELL, IT SOUNDS LIKE THIS MIGHT BE A --

11:39AM 19  IS THIS A REVIEW OF THE PHLEBOTOMISTS THEMSELVES AS OPPOSED TO

11:39AM 20  JUST THE TECHNOLOGY?  IS THAT THE CUSTOMER SATISFACTION?  HOW

11:39AM 21  WAS YOUR EXPERIENCE?  WERE THE ROOMS WELL LIT?  WAS THE CARPET

11:39AM 22  CLEAN?  WAS THE SEATING COMFORTABLE?

11:39AM 23          MR. DOWNEY:  WELL, I THINK THERE'S SOME OF THAT, AND

11:39AM 24  THERE'S AN OVERWHELMING AMOUNT OF DISCUSSION OF THE PRICE, AND

11:39AM 25  THERE'S ALSO DISCUSSION OF THE RELATIVE COMFORT OF THE THERANOS

11:39AM  1    METHOD OF DRAW DEMONSTRATES THE FREQUENCY WITH WHICH THE

11:39AM  2    FINGERSTICK METHOD WAS ACTUALLY USED IN THE STORES.

11:40AM  3             THE COURT:  SO I THINK WHAT IS RELEVANT, ISN'T IT,

11:40AM  4    IS THE TECHNOLOGY ITSELF.

11:40AM  5        DO THESE TALK ABOUT THE TECHNOLOGY OR THE EXPERIENCE?  AND

11:40AM  6    ARE THOSE SEVERABLE?

11:40AM  7             MR. DOWNEY:  WELL, YOUR HONOR, SOME OF THESE

11:40AM  8    ANECDOTES ARE FROM PATIENTS WHO HAVE USED THERANOS SERVICES AND

11:40AM  9    THERANOS TECHNOLOGY OVER A PERIOD OF, YOU KNOW, FROM THE TIME

11:40AM  10   OF THE LAUNCH UNTIL, YOU KNOW, THE TIME THE BLOOD TESTING

11:40AM  11   SERVICES WERE CEASED.

11:40AM  12       I DON'T THINK IT'S FAIR TO NECESSARILY ASK IF IT'S ABOUT

11:40AM  13   THE TECHNOLOGY.  I DON'T THINK THE WITNESSES THAT THE

11:40AM  14   GOVERNMENT HAS OFFERED, YOU KNOW, THE PATIENT THAT THE

11:40AM  15   GOVERNMENT OFFERED WAS COMMENTING ON THE TECHNOLOGY.

11:40AM  16            MR. BOSTIC:  SO, YOUR HONOR --

11:40AM  17            THE COURT:  WHAT ABOUT 5439?  5439?

11:40AM  18            MR. DOWNEY:  I THINK THERE WAS A FAILURE TO

11:40AM  19   ESTABLISH A FOUNDATION THAT ANY OF THAT INFORMATION WAS

11:40AM  20   COMMUNICATED TO MS. HOLMES OR THAT IT WAS A BUSINESS RECORD.

11:40AM  21       I UNDERSTAND THE ARGUMENT THAT THERE SHOULD BE PARITY

11:41AM  22   HERE, BUT I THINK THE QUESTION IS NOT PARITY BETWEEN THE SIDES

11:41AM  23   AS LAWYERS LITIGATING.  THE QUESTION IS, WHAT IS THE

11:41AM  24   DEFENDANT'S STATE OF MIND AT THE TIME?

11:41AM  25            MR. BOSTIC:  SO, YOUR HONOR, I THINK THAT'S TRUE IF

11:41AM  1    NONE OF THIS COMES IN FOR ITS TRUTH.

11:41AM  2         THE CONCERNS ABOUT PARITY AND PRESENTING A DISTORTED IMAGE

11:41AM  3    TO THE JURY ARE AT LEAST PARTLY ADDRESSED IF THERE'S AN

11:41AM  4    INSTRUCTION THAT NONE OF THESE ACCOUNTS ARE COMING IN FOR THE

11:41AM  5    TRUTH.

11:41AM  6         BUT THAT DOESN'T ADDRESS AT ALL THE RELEVANCE CONCERNS

11:41AM  7    THAT THE COURT JUST RAISED, AND I THINK THE COURT IS RIGHT TO

11:41AM  8    HIT ON THAT.

11:41AM  9         AT ISSUE IN THIS CASE IS NOT THE QUALITY OF THERANOS'S

11:41AM 10    SERVICES AT LARGE, WHETHER PATIENTS WERE HAPPY WITH THEIR

11:41AM 11    EXPERIENCE AT WALGREENS, WHETHER THE PHLEBOTOMIST WAS KIND TO

11:41AM 12    THEM, WHETHER THE PRICE WAS LOW, THESE THINGS AREN'T

11:41AM 13    NECESSARILY IN DISPUTE IN THE CASE.

11:41AM 14         WHAT IS IN DISPUTE IS THE ACCURACY OF THE TESTS AND THE

11:41AM 15    QUALITY OF THE RESULTS.

11:41AM 16         BASED ON MY READ OF THESE ANECDOTES, THEY APPEAR TO HAVE

11:42AM 17    BEEN GIVEN BY CUSTOMERS PROBABLY BEFORE THEY EVEN RECEIVED

11:42AM 18    THEIR RESULTS.

11:42AM 19         TESTIMONY FROM DR. ROSENDORFF SHOWS THAT IT'S UNCLEAR, OR

11:42AM 20    IT CAN BE UNCLEAR WHETHER A GIVEN LAB RESULT WAS ACCURATE OR

11:42AM 21    INACCURATE EVEN AFTER IT'S RECEIVED.

11:42AM 22         SO I JUST SEE THIS AS BEING TOO FAR AFIELD FROM THE ACTUAL

11:42AM 23    ISSUE IN THE CASE WHICH WAS, WERE THE TEST RESULTS ACCURATE?

11:42AM 24         THIS HAS TO DO MORE WITH THE EXPERIENCE OF PATIENTS AND

11:42AM 25    WHETHER THEY HAD A PLEASANT TIME AT THERANOS, AND I THINK THAT

11:42AM    1    RAISES 401 AND 403 CONCERNS.

11:42AM    2              MR. DOWNEY:  YOUR HONOR, LET ME JUST --

11:42AM    3              THE COURT:  THAT'S MY CONCERN, MR. DOWNEY.  I'M

11:42AM    4    SORRY.

11:42AM    5              MR. DOWNEY:  YES.  LET ME JUST COMMENT ON THE

11:42AM    6    CHARACTERIZATION OF THE DOCUMENTS.

11:42AM    7         YOUR HONOR MAY RECALL THAT IN OPENING STATEMENT, MR. WADE

11:42AM    8    SHOWED AN EXCERPT OF ONE OF THESE DOCUMENTS IN WHICH A STANFORD

11:42AM    9    PHYSICIAN IS COMMENTING ON THE SERVICES OF THERANOS, AND HE

11:42AM   10    COMMENTS ON A COMPARISON BETWEEN OTHER BLOOD TESTING SERVICES

11:42AM   11    THAT HE'S RECEIVED AND THERANOS'S BLOOD TESTING SERVICES IN

11:43AM   12    LIGHT OF THE ACCURACY OF THE TESTS AND THE RELATIVE COSTS.

11:43AM   13              THE COURT:  WELL, THAT'S A WHOLE SEPARATE -- IT'S

11:43AM   14    ALWAYS INTERESTING IN OPENING STATEMENTS THAT COUNSEL WILL PUT

11:43AM   15    THINGS IN THAT HAVEN'T YET BEEN INTRODUCED INTO EVIDENCE, SO --

11:43AM   16              MR. DOWNEY:  NO, NO, I UNDERSTAND.  I'M JUST

11:43AM   17    RESPONDING TO MR. BOSTIC --

11:43AM   18              THE COURT:  YES.

11:43AM   19              MR. DOWNEY:  -- WHO IS SAYING THE FEEDBACK HAS

11:43AM   20    NOTHING TO DO WITH --

11:43AM   21              THE COURT:  SO THE ISSUE I HAVE, THE CONCERN I HAVE

11:43AM   22    IS THE MESSAGE FROM THE SURVEYS.

11:43AM   23         IS IT A PLEASANT EXPERIENCE BECAUSE PARKING WAS GOOD,

11:43AM   24    BECAUSE THE STORE WAS WELL LIT, BECAUSE THEY WERE GREETED, THAT

11:43AM   25    TYPE OF AN EXPERIENCE.

EDLIN CROSS BY MR. DOWNEY (RES.)

11:43AM 1          AND HOW DO YOU, CAN YOU, DO THEY SEPARATE THAT FROM

11:43AM 2    THERANOS AND THE TECHNOLOGY AND HOW IT -- HOW SATISFIED THEY

11:43AM 3    ARE WITH THE TESTING RESULTS.

11:43AM 4          IF THEY SAY, YEAH, THE FINGER TEST WAS TERRIFIC AND I

11:43AM 5    REALLY ENJOYED THAT EXPERIENCE, WHATEVER IT IS.

11:44AM 6          I DON'T KNOW HOW TO PARSE THAT OUT.  I HAVEN'T LOOKED AT

11:44AM 7    THESE.

11:44AM 8          BUT THAT'S MY CONCERN IS THAT THERE ARE GOING TO BE

11:44AM 9    SURVEYS FOR WALGREENS AS OPPOSED TO THERANOS.

11:44AM 10         AND I DON'T KNOW IF YOU CAN DO THAT.  I DON'T KNOW.

11:44AM 11             MR. DOWNEY:  WELL, YOUR HONOR, THE PHLEBOTOMISTS ARE

11:44AM 12   ALMOST ALWAYS THERANOS EMPLOYEES.  WALGREENS IS FUNCTIONING AS

11:44AM 13   A PARTNER, BUT A LOCATION AND PROVIDING COROLLARY SERVICES.  SO

11:44AM 14   I DON'T THINK IT'S RIGHT TO SAY IT'S AN EXPERIENCE ABOUT

11:44AM 15   WALGREENS.

11:44AM 16         IF ANYTHING, THIS ISN'T REALLY RELEVANT, BUT I THINK IF

11:44AM 17   YOU REVIEWED IT, A LOT OF THE COMPLAINTS ARE ABOUT SORT OF THE

11:44AM 18   ADJACENT WALGREENS SERVICES AND SO FORTH.

11:44AM 19             THE COURT:  SURE.

11:44AM 20             MR. DOWNEY:  BUT I DON'T THINK IT'S FAIR TO SAY

11:44AM 21   THAT, YOU KNOW, THE WHOLE EXPERIENCE OF THESE SERVICES, YOU

11:44AM 22   KNOW, IS NOT RELEVANT TO THE DEFENDANT'S STATE OF MIND AS TO,

11:44AM 23   YOU KNOW, HOW THE PRODUCT THAT IS BEING OFFERED IS BEING

11:44AM 24   RECEIVED BY THE PUBLIC.

11:45AM 25         I MEAN --

11:45AM  1                    THE COURT:  SO THIS IS BEING -- I'M SORRY TO CUT YOU

11:45AM  2      OFF.

11:45AM  3          THESE ARE BEING OFFERED, THE RELEVANCE OF THEM IS STATE OF

11:45AM  4      MIND.

11:45AM  5                    MR. DOWNEY:  THAT'S RIGHT.

11:45AM  6                    THE COURT:  YOUR CLIENT'S STATE OF MIND.

11:45AM  7                    MR. DOWNEY:  THAT'S CORRECT, YOUR HONOR.

11:45AM  8                    THE COURT:  BECAUSE SHE RECEIVED, AND MR. EDLIN

11:45AM  9      RECEIVED THESE ON A WEEKLY BASIS AND THEY AFFECT HER STATE OF

11:45AM 10      MIND IN WHICH MANNER?

11:45AM 11                    MR. DOWNEY:  THAT'S CORRECT.

11:45AM 12                    THE COURT:  THAT WAS A QUESTION.

11:45AM 13                    MR. DOWNEY:  NO, THAT IS -- THAT IS THE REASON THAT

11:45AM 14      THEY'RE BEING OFFERED.

11:45AM 15          CERTAINLY THE POINTS THAT MR. BOSTIC MAKES, YOU KNOW, ARE,

11:45AM 16      ARE A FRUITFUL BASIS FOR HIS EXAMINATION ON REDIRECT THAT, YOU

11:45AM 17      KNOW --

11:45AM 18                    THE COURT:  THAT WAS A QUESTION.  I WAS BEING

11:45AM 19      LITERAL.  THAT WAS A QUESTION.

11:45AM 20          WHAT IS THE STATE OF MIND THAT IT AFFECTS?  I DON'T

11:45AM 21      CAPTURE.

11:45AM 22                    MR. DOWNEY:  WELL, CERTAINLY WHEN PATIENTS ARE

11:45AM 23      RETURNING TO THERANOS OVER A PERIOD OF MANY YEARS AND

11:45AM 24      DELIVERING POSITIVE REVIEWS, AND THERE ARE INDICATIONS OF THAT

11:45AM 25      TO THE DEFENDANT, IT'S CERTAINLY NOT AN INDICATION OF KNOWLEDGE

11:45AM 1      OF INACCURACY OR UNRELIABILITY IN THE BLOOD TESTING SERVICE

11:46AM 2      THAT IS BEING OFFERED, IF THAT'S RESPONSIVE TO YOUR HONOR'S

11:46AM 3      QUESTION.

11:46AM 4              MR. BOSTIC:  YOUR HONOR, THE POINT IS THAT THIS

11:46AM 5      DOESN'T SPEAK ONE WAY OR THE OTHER TO THE ACCURACY AND

11:46AM 6      RELIABILITY OF THESE TESTS, AND THAT'S WHAT AT ISSUE IN THE

11:46AM 7      CASE AND THAT'S WHAT IS ALLEGED IN THE INDICTMENT.

11:46AM 8          I OPENED TO A RANDOM PAGE -- AGAIN, I HAVEN'T HAD A CHANCE

11:46AM 9      TO REVIEW EVERYTHING HERE -- BUT MR. DOWNEY'S EXAMPLE OF THE

11:46AM 10     ACCOUNT THAT WAS PUBLISHED IN THE OPENING WHERE THE DOCTOR

11:46AM 11     COMPARED THE THERANOS TEST RESULTS TO A THIRD PARTY RESULT WITH

11:46AM 12     AN IMPLICATION ABOUT ACCURACY, THAT DOES NOT APPEAR TO BE

11:46AM 13     REPRESENTATIVE OF THE BULK OF THESE ACCOUNTS.

11:46AM 14         HERE'S ONE THAT TALKS ABOUT A FIRST-TIME GUEST WHO SAID

11:46AM 15     THAT HER DOCTOR RECOMMEND THAT SHE COME HERE SINCE SHE HAS A

11:46AM 16     HIGH DEDUCTIBLE FOR INSURANCE, SHE THOUGHT IT WAS CONVENIENT

11:46AM 17     AND CAME HERE TO HAVE BLOOD WORK AND GET MEDICATION IF SHE

11:46AM 18     NEEDS TO, THIS LOCATION IS TWO MINUTES AWAY FROM HER HOME,

11:46AM 19     WHICH SHE LOVED.

11:46AM 20         THERE'S A LOT OF POSITIVE FEEDBACK ABOUT THE PRICES AND

11:47AM 21     THE CONVENIENCE.

11:47AM 22         THOSE AREN'T ISSUES IN THE CASE, AND THE EFFECT THAT THEY

11:47AM 23     HAD ON MS. HOLMES'S MENTAL STATE ON THOSE TOPICS IS NOT

11:47AM 24     RELEVANT HERE.

11:47AM 25         BECAUSE THEY HAVE SUCH LOW PROBATIVE VALUE, IT MAKES IT

11:47AM   1    EASIER FOR THAT PROBATIVE VALUE TO BE GREATLY OUTWEIGHED BY THE

11:47AM   2    PREJUDICIAL VALUE OF HAVING A LARGE WEIGHT OF POSITIVE CUSTOMER

11:47AM   3    REVIEWS OF THERANOS RESULTS WITHOUT THE JURY BEING ABLE TO SEE

11:47AM   4    THE COMPLAINT RECORDS.

11:47AM   5              MR. DOWNEY:  WELL, RECALL ALSO, YOUR HONOR, THE

11:47AM   6    TECHNOLOGY IS AN ISSUE IN THE CASE.

11:47AM   7         BUT REMEMBER THAT MR. JHAVERI TESTIFIED, IN ESSENCE, AND

11:47AM   8    I'M PARAPHRASING, BUT THAT THE RELATIONSHIP WITH WALGREENS WAS

11:47AM   9    UNSUCCESSFUL FROM A CONSUMER EXPERIENCE PERSPECTIVE AND THAT,

11:47AM  10    THEREFORE, IT WAS KNOWN OR SHOULD HAVE BEEN KNOWN TO THE

11:47AM  11    DEFENDANT THAT THAT RELATIONSHIP WAS NOT GOING TO CONTINUE TO

11:47AM  12    EXPAND TOWARDS A NATIONAL ROLLOUT.

11:47AM  13         CERTAINLY CONTEMPORANEOUS FEEDBACK FROM HUNDREDS OF

11:47AM  14    PATIENTS WHO ARE USING THE SERVICES AT THE VERY TIME THERE'S NO

11:48AM  15    COMMUNICATION TO THE DEFENDANT BY MR. JHAVERI OF THOSE CONCERNS

11:48AM  16    IS RELEVANT TO THAT ISSUE IF NOT TO MEDICAL ISSUES IN THE CASE.

11:48AM  17              MR. BOSTIC:  AND, YOUR HONOR, I UNDERSTAND THOSE

11:48AM  18    CONCERNS FOCUSSED ON THE NUMBER OF VENOUS DRAWS THAT THERANOS

11:48AM  19    WAS NEEDING TO DO, THAT'S RELEVANT TO THE CAPABILITY OF THE

11:48AM  20    TECHNOLOGY, I DON'T SEE THAT TOPIC ADDRESSED IN ANY KIND OF

11:48AM  21    RIGOROUS WAY.

11:48AM  22              THE COURT:  I HAVEN'T LOOKED AT THEM.  I THINK I

11:48AM  23    WOULD HAVE TO.

11:48AM  24         BUT IT JUST SEEMS TO ME THAT GENERAL PLEASANT EXPERIENCE,

11:48AM  25    MR. BOSTIC POINTED ONE OUT, IT WAS CLOSE TO MY HOME.  THAT'S

11:48AM   1     NOT RELEVANT.  THE GEOGRAPHY OF SOMEONE'S RESIDENCE VIS-A-VIS

11:48AM   2     THEIR VISITING A STORE ISN'T RELEVANT AT ANY POINT IN THE CASE

11:48AM   3     OTHER THAN THEIR PLEASANT EXPERIENCE.

11:48AM   4          BUT -- SO I THINK THOSE KINDS OF THINGS WOULD HAVE TO BE

11:48AM   5     PARSED OUT.

11:48AM   6          AND I DON'T KNOW IF YOU CAN DO THAT TODAY OR NOT.

11:48AM   7               MR. DOWNEY:  NO, I DON'T THINK I CAN, YOUR HONOR.

11:49AM   8          WOULD IT BE ALL RIGHT IF I JUST AUTHENTICATED THE

11:49AM   9     DOCUMENTS WITH THIS WITNESS, AND THEN IF THERE'S A HEARSAY OR

11:49AM  10     RELEVANCE ISSUE, YOU KNOW, AND YOUR HONOR DECIDES NOT TO ADMIT

11:49AM  11     THEM, BUT I'LL DO IT WITH A REQUEST TO ADMIT AND I THINK --

11:49AM  12               THE COURT:  SURE.  YOU CAN ASK HIM -- I THINK IT'S

11:49AM  13     FAIR TO ASK HIM WHETHER OR NOT THERE WERE A CHAIN OF CUSTOMER

11:49AM  14     SURVEYS --

11:49AM  15               MR. DOWNEY:  YES.

11:49AM  16               THE COURT:  -- THAT CUSTOMERS, NOT ALL, BUT SOME

11:49AM  17     PARTICIPATED IN AND WHAT THAT WAS.

11:49AM  18          BUT I'M NOT LIKELY TO INTRODUCE THIS BINDER RIGHT NOW

11:49AM  19     WITHOUT HAVING IT PARSED THROUGH TO SEE IF THERE'S ANY OF THE

11:49AM  20     INFORMATION.  LIKE MR. BOSTIC POINTED OUT, I DON'T THINK THAT'S

11:49AM  21     RELEVANT.  I THINK YOU WOULD PROBABLY AGREE, YOU DON'T HAVE TO

11:49AM  22     STATE IT --

11:49AM  23               MR. DOWNEY:  I DON'T, BUT I UNDERSTAND.

11:49AM  24               THE COURT:  RIGHT.  ALL RIGHT.  LET'S DO THAT.

11:49AM  25               MR. DOWNEY:  SO I'LL ASK HIM IF THESE ARE AUTHENTIC

11:49AM  1    COPIES OF THAT.

11:50AM  2            THE COURT:  SURE.  THAT'S FINE.

11:50AM  3        DID OUR CSO LEAVE?  CAN WE GET HIM BACK?

11:50AM  4        LADIES AND GENTLEMEN, BEFORE WE CALL THE JURY IN, THIS

11:50AM  5    RELATES BACK TO THE NOISE IN THE COURTROOM.

11:50AM  6        MS. KRATZMANN HAS POINTED OUT TO ME THAT JURORS CONTINUE

11:50AM  7    TO HEAR KEYBOARDS AND IT'S DISTRACTING TO THEM.  THIS IS

11:50AM  8    PRIMARILY OUR JURORS WHO ARE SEATED IN THE -- NOT IN THE WELL

11:50AM  9    SECTION, BUT IN THE SEATS IN THE AUDIENCE.

11:50AM  10       WE DO HAVE A ROW BEHIND THEM THAT IS NOT SEATED, BUT THEY

11:50AM  11   HAVE, THE JURORS HAVE REPORTED THAT THEY CONTINUE TO HEAR

11:50AM  12   KEYBOARDS.

11:50AM  13       AND JUST TO BE FRANK AND CANDID AND TRANSPARENT, THE NOISE

11:50AM  14   THAT THEY HEAR IS COMING FROM MY LEFT SIDE OF THE COURTROOM.

11:50AM  15   THEY HAVE HEARD THAT.

11:50AM  16       I'M CALLING A CSO IN, A REPRESENTATIVE OF THE MARSHAL'S

11:50AM  17   OFFICE, AND I'VE ASKED THEM TO MONITOR AND SEE IF THEY HEAR ANY

11:51AM  18   OF THIS NOISE.

11:51AM  19       IT WAS DISTRACTING TO MR. DOWNEY'S EXAMINATION, AND THAT'S

11:51AM  20   NOT FAIR TO MS. HOLMES TO HAVE THAT TYPE OF DISTRACTION.  IT

11:51AM  21   CAN IMPAIR HER RIGHT TO A FAIR TRIAL.  IF A JUROR IS NOT

11:51AM  22   LISTENING OR IS DISTRACTED AT A KEY MOMENT WHEN A CRITICAL

11:51AM  23   PIECE OF EVIDENCE IS COMING IN, EXAMINATION IS COMING IN, THAT

11:51AM  24   IS NOT FAIR.  AND I INTEND TO HOLD A FAIR TRIAL FOR THE

11:51AM  25   DEFENDANT IN THIS CASE.

EDLIN CROSS BY MR. DOWNEY (RES.)

11:51AM 1        IF, IF I AM INFORMED THAT A KEYBOARD OR OTHER NOISE IS

11:51AM 2   INTERFERING WITH THAT FUNDAMENTAL CONSTITUTIONAL RIGHT, I'LL

11:51AM 3   PROVIDE AN ALTERNATIVE TO WHOEVER THAT IS USING THEIR KEYBOARD.

11:51AM 4        AND WE DO HAVE AN ALTERNATIVE.  YOU CAN -- I'M NOT GOING

11:51AM 5   TO BANISH YOU FROM THE COURTHOUSE, YOU CAN STILL CONTINUE TO

11:51AM 6   PARTICIPATE IN THIS TRIAL THROUGH OUR OVERFLOW ROOM WHERE WE

11:51AM 7   HAVE A SCREEN, THERE'S NO JURY PRESENT, AND YOU CAN WATCH AND

11:52AM 8   OBTAIN THE SAME EXPERIENCE THERE.

11:52AM 9        AND IT MAY BE THAT IF I HEAR ANY REPORTS THAT THE

11:52AM 10  KEYBOARD'S THERE, I'LL ASK OUR MARSHAL TO ESCORT THAT PERSON

11:52AM 11  DOWN SUCH THAT THEIR ABILITY TO CONTINUE TO PARTICIPATE AS AN

11:52AM 12  OBSERVER IN THIS PUBLIC PROCEEDING IS NOT INTERRUPTED, BUT THEY

11:52AM 13  DO IT IN A WAY THAT DOES NOT INTERFERE WITH THE DEFENDANT'S

11:52AM 14  SIXTH AMENDMENT RIGHT TO A TRIAL AND THE GOVERNMENT'S ABILITY

11:52AM 15  TO PROSECUTE THE CASE ACCORDINGLY.

11:52AM 16       SO I'VE ASKED AN OFFICIAL OF THE MARSHAL'S OFFICE TO BE

11:52AM 17  PRESENT.  I'VE GIVEN THAT MARSHAL INSTRUCTIONS THAT IF THERE'S

11:52AM 18  ANY DISTURBANCE, HE CAN TAKE ACTION ACCORDINGLY.

11:52AM 19       SO I JUST WANT TO LET EVERYONE KNOW THAT, AND I APOLOGIZE

11:52AM 20  TO COUNSEL FOR THAT DISRUPTION IN YOUR CASE.  THAT SHOULDN'T

11:52AM 21  HAPPEN IN A COURTROOM, PARTICULARLY IN ANY CRIMINAL CASE THAT

11:52AM 22  IS IMPORTANT TO -- THAT HAS LIBERTY RISKS, AND IT HAS ISSUES

11:53AM 23  THAT THE GOVERNMENT WISHES TO PRESENT IN THEIR PROSECUTION.

11:53AM 24       SO THANK YOU.  ANY -- I DON'T KNOW IF YOU WANT TO MAKE ANY

11:53AM 25  COMMENT, MR. BOSTIC?

11:53AM   1                    MR. BOSTIC:  NO, YOUR HONOR.  THANK YOU.

11:53AM   2                    MR. DOWNEY:  THANK YOU.

11:53AM   3                    THE COURT:  ALL RIGHT.  SO WE'LL PROCEED ACCORDINGLY

11:53AM   4       THEN, MR. DOWNEY.

11:53AM   5            SHOULD WE BRING THE JURY IN THEN?

11:53AM   6                    THE CLERK:  YES, YOUR HONOR.

11:54AM   7            (PAUSE IN PROCEEDINGS.)

11:54AM   8            (JURY IN AT 11:54 A.M.)

11:55AM   9                    THE COURT:  ALL RIGHT.  THANK YOU.  PLEASE BE

11:55AM  10       SEATED.

11:55AM  11            WE'RE BACK ON THE RECORD.  ALL COUNSEL ARE PRESENT.

11:55AM  12       MS. HOLMES IS PRESENT.  THE WITNESS IS ON THE STAND.

11:55AM  13            MR. DOWNEY, YOU WOULD LIKE TO CONTINUE?

11:55AM  14                    MR. DOWNEY:  YES, SIR.

11:55AM  15       Q.   MR. EDLIN, DO YOU RECALL YESTERDAY DISCUSSING WITH

11:55AM  16       MR. BOSTIC THE SUBJECT OF COMPILING SLIDE DECKS FOR

11:55AM  17       PRESENTATIONS?

11:55AM  18       A.   YES.

11:55AM  19       Q.   AND SOMETIMES THOSE PRESENTATION WERE SHARED WITH

11:55AM  20       INVESTORS; CORRECT?

11:55AM  21       A.   CORRECT.

11:55AM  22       Q.   AND THEY WERE SHARED WITH STRATEGIC PARTNERS OF THERANOS;

11:55AM  23       CORRECT?

11:55AM  24       A.   CORRECT.

11:55AM  25       Q.   AND THEY MIGHT BE SHARED WITH THE PRESS, FOR EXAMPLE?

11:55AM  1    A.   WITH THE PRESS?

11:55AM  2    Q.   YEAH, WITH JOURNALISTS WHO WERE WRITING ABOUT THERANOS?

11:55AM  3    A.   I DON'T RECALL WHETHER THOSE PRESENTATIONS WERE SENT TO

11:56AM  4    THEM.

11:56AM  5    Q.   GIVE US A SENSE OF WHAT KINDS OF PEOPLE RECEIVED THOSE

11:56AM  6    PRESENTATIONS?

11:56AM  7    A.   IT WASN'T COMMON TO SEND THOSE PRESENTATIONS OVER AN

11:56AM  8    EMAIL, FOR EXAMPLE, BUT -- AND THE OVERVIEW PRESENTATIONS

11:56AM  9    DIFFERED BASED ON THE AUDIENCE.

11:56AM 10         SO THE BOARD, THERE WERE INVESTORS, BUSINESS PARTNERS,

11:56AM 11    HOSPITAL SYSTEMS.  SO THOSE TYPES OF PEOPLE AT LEAST VIEWED --

11:56AM 12    WELL, I WOULDN'T SAY THEY WERE GIVEN THE PRESENTATION.

11:56AM 13         IN A MEETING, CERTAIN SLIDES WOULD BE DISCUSSED.  BUT IT

11:56AM 14    WASN'T COMMON TO GO THROUGH THE PRESENTATION SLIDE BY SLIDE

11:56AM 15    SEQUENTIALLY.  IT KIND OF DEPENDED ON THE CONVERSATION.

11:56AM 16    Q.   OKAY.  AND THERE MIGHT BE SUBJECT MATTERS THAT MS. HOLMES

11:56AM 17    THOUGHT THAT A PARTICULAR AUDIENCE WAS INTERESTED IN?

11:56AM 18    A.   RIGHT.

11:56AM 19    Q.   SO SHE MIGHT DISCUSS CERTAIN SLIDES, BUT NOT OTHERS DURING

11:57AM 20    THE COURSE OF THE MEETING?

11:57AM 21    A.   CORRECT.

11:57AM 22    Q.   AND DID YOU MAINTAIN A KIND OF MASTER COPY OF A

11:57AM 23    PRESENTATION ON A SHARED DRIVE AT THERANOS?

11:57AM 24    A.   I'D SAY MULTIPLE PEOPLE HAD THE ABILITY TO EDIT AND

11:57AM 25    MAINTAIN IT, BUT THERE WAS A MASTER VERSION THAT WAS SAVED ON A

11:57AM   1    SHARED DRIVE.

11:57AM   2    Q.   OKAY.  AND THAT WAS SORT OF A STANDARD FORM THAT COULD BE

11:57AM   3    ALTERED BASED ON THE PARTICULAR AUDIENCE THAT WAS GOING TO

11:57AM   4    RECEIVE THE PRESENTATION?

11:57AM   5    A.   I RECALL THERE BEING MULTIPLE VERSIONS OF PRESENTATIONS

11:57AM   6    FOR AN INTENDED -- FOR A SPECIFIC AUDIENCE.

11:57AM   7    Q.   OKAY.  SO WERE THERE SOME PRESENTATIONS, FOR EXAMPLE, FOR

11:57AM   8    HOSPITALS?

11:57AM   9    A.   YES.

11:57AM   10   Q.   AND THEY WOULD BE DIFFERENT FROM PRESENTATIONS FOR

11:57AM   11   STRATEGIC PARTNERS?

11:57AM   12   A.   YES.

11:57AM   13   Q.   AND THEY MIGHT BE DIFFERENT, AGAIN, FROM PRESENTATIONS FOR

11:57AM   14   INVESTORS; CORRECT?

11:57AM   15   A.   CORRECT.

11:57AM   16   Q.   BUT WHAT ALL OF THEM HAD IN COMMON WAS THAT THEY SHARED

11:58AM   17   DATA ABOUT THERANOS'S ASSAY PERFORMANCE; CORRECT?

11:58AM   18   A.   GENERALLY, YES.

11:58AM   19   Q.   LET ME SHOW YOU AN EXHIBIT THAT IS MARKED AS 10464.

11:58AM   20        YOUR HONOR, THIS IS ANOTHER BULKY EXHIBIT, SO I JUST

11:58AM   21   SEPARATED IT INTO --

11:58AM   22             THE COURT:  THANK YOU.

11:58AM   23             MR. DOWNEY:  -- A SEPARATE BINDER WHICH I'LL PASS

11:58AM   24   UP.

11:58AM   25        (HANDING.)

11:58AM   1                    THE COURT:  OKAY.

11:58AM   2                    MR. DOWNEY:  MAY I APPROACH THE WITNESS?

11:58AM   3                    THE COURT:  YES.  THANK YOU.

11:58AM   4        BY MR. DOWNEY:

11:58AM   5        Q.   (HANDING.)

11:58AM   6        A.   THANK YOU.

11:58AM   7        Q.   LET'S TAKE A MOMENT TO REVIEW 10464 AND SEE IF IT'S

11:59AM   8        SOMETHING THAT YOU RECOGNIZE.

11:59AM   9             (PAUSE IN PROCEEDINGS.)

11:59AM  10                    THE WITNESS:  I DO RECOGNIZE IT AS A CONFIDENTIAL

11:59AM  11        OVERVIEW PRESENTATION.

11:59AM  12        BY MR. DOWNEY:

11:59AM  13        Q.   OKAY.

11:59AM  14        A.   BUT I CAN'T IDENTIFY WHO THE ACTUAL INTENDED AUDIENCE IS.

11:59AM  15        Q.   DO YOU SEE ON THE FRONT THAT THIS IS AN EMAIL FROM YOU TO

11:59AM  16        MS. HOLMES, MR. BALWANI, AND CHRISTIAN HOLMES?

11:59AM  17        A.   ONE MOMENT.

12:00PM  18             YES.

12:00PM  19                    MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

12:00PM  20        10464.

12:00PM  21                    MR. BOSTIC:  NO OBJECTION.

12:00PM  22                    THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:00PM  23             (DEFENDANT'S EXHIBIT 10464 WAS RECEIVED IN EVIDENCE.)

12:00PM  24        BY MR. DOWNEY:

12:00PM  25        Q.   I'LL SHOW YOU THAT FIRST PAGE, AND THIS IS JUST AN EMAIL

12:00PM  1    WITH YOU TRANSMITTING THE PRESENTATION TEMPLATE THAT EXISTED AS

12:00PM  2    OF JUNE 2013 TO MS. HOLMES; CORRECT?

12:00PM  3    A.   CORRECT.

12:00PM  4    Q.   AND IF YOU GO TO THE PRESENTATION THAT IS ATTACHED, IT'S A

12:00PM  5    VERY LONG PRESENTATION; CORRECT?

12:00PM  6    A.   YES.

12:00PM  7    Q.   OKAY.  AND IF YOU GO FORWARD IN THE PRESENTATION TO THE

12:00PM  8    SLIDE THAT IS MARKED AS SLIDE 28, AND YOU SEE THAT HAS THE WORD

12:00PM  9    IMMUNO CHEMISTRY; CORRECT?

12:00PM  10   A.   YES.

12:00PM  11   Q.   AND THAT'S A REFERENCE TO A CATEGORY OF ASSAY; CORRECT?

12:00PM  12   A.   YES.

12:00PM  13   Q.   AND IF YOU FLIP FORWARD THROUGH THAT TO THE FOLLOWING

12:01PM  14   PAGES IN THE EXHIBIT, YOU SEE THAT THERE ARE JUST DOZENS AND

12:01PM  15   DOZENS OF PAGES ABOUT THE PERFORMANCE OF THERANOS ASSAYS;

12:01PM  16   CORRECT?

12:01PM  17   A.   CORRECT.

12:01PM  18   Q.   AND SOMETIMES THIS WOULD BE SHARED WITH, I THINK WITH

12:01PM  19   POTENTIAL HOSPITAL PARTNERS; CORRECT?

12:01PM  20   A.   CORRECT.

12:01PM  21   Q.   AND SOMETIMES IT WOULD BE SHARED WITH AUDIENCES WHO

12:01PM  22   THEMSELVES DIDN'T HAVE THE ABILITY TO EVALUATE THE DATA;

12:01PM  23   CORRECT?

12:01PM  24   A.   CORRECT.

12:01PM  25   Q.   BUT THEY MIGHT, FOR EXAMPLE, CALL ON SOME THIRD PARTY TO

12:01PM   1   EVALUATE THAT DATA FOR THEM?

12:01PM   2   A.   THAT SOUNDS ACCURATE, YES.

12:01PM   3   Q.   OKAY.  LET ME FOCUS ON THE PROCESS THAT YOU WENT

12:01PM   4   THROUGH -- AND YOU PARTICIPATED IN COMPILING SOME OF THE DATA

12:01PM   5   THAT IS IN THESE SLIDES; CORRECT?

12:01PM   6   A.   CORRECT.

12:01PM   7   Q.   LET ME FOCUS ON THAT PROCESS FOR A MINUTE.

12:01PM   8        FIRST OF ALL, YOU PERSONALLY DIDN'T GENERATE ANY OF THIS

12:02PM   9   DATA; CORRECT?

12:02PM   10  A.   CORRECT.

12:02PM   11  Q.   OKAY.  INSTEAD, MS. HOLMES WOULD ASK YOU TO REACH OUT TO

12:02PM   12  THE VARIOUS SCIENCE AND ENGINEERING TEAMS WITHIN THERANOS FOR

12:02PM   13  THE LATEST INFORMATION; CORRECT?

12:02PM   14  A.   CORRECT, THE LATEST AND GREATEST DATA.

12:02PM   15  Q.   WELL, IF YOU LOOK AT EXHIBIT 7217.  LET ME ASK YOU IF YOU

12:02PM   16  CAN IDENTIFY THIS AS AN EMAIL EXCHANGE BETWEEN YOURSELF,

12:02PM   17  MS. HOLMES, AND OTHERS AT THERANOS.

12:02PM   18  A.   IS THIS IN THE --

12:02PM   19  Q.   7217.

12:03PM   20  A.   OKAY.

12:03PM   21  Q.   AND DO YOU SEE THAT AT THE BOTTOM OF THE FIRST PAGE THERE,

12:03PM   22  THERE'S AN EMAIL EXCHANGE, AND THEN IT GOES UP FROM THERE, AND

12:03PM   23  IT'S BETWEEN MS. HOLMES, YOURSELF, AND OTHERS AT THERANOS?

12:03PM   24  A.   YES.

12:03PM   25          MR. DOWNEY:  I WOULD MOVE THE ADMISSION OF 7217,

12:03PM   1    YOUR HONOR.

12:03PM   2               MR. BOSTIC:  NO OBJECTION.

12:03PM   3               THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:03PM   4         (DEFENDANT'S EXHIBIT 7217 WAS RECEIVED IN EVIDENCE.)

12:03PM   5    BY MR. DOWNEY:

12:03PM   6    Q.   IF YOU LOOK AT THE BOTTOM OF THAT PAGE, THAT'S THE FIRST

12:03PM   7    EMAIL THAT IS FROM MS. HOLMES, AND THEN IT'S TO A GROUP OF

12:03PM   8    PEOPLE THERE.

12:03PM   9         DO YOU SEE THAT?

12:03PM   10   A.   YES.

12:03PM   11   Q.   AND THOSE ARE THE PRODUCT MANAGERS IN THERANOS; CORRECT?

12:03PM   12   A.   YES.

12:03PM   13   Q.   AND ALL OF THEM HAD DIFFERENT RESPONSIBILITIES IN

12:03PM   14   DIFFERENT AREAS OF THE COMPANY; CORRECT?

12:03PM   15   A.   CORRECT.

12:03PM   16   Q.   AND IT WAS COPIED TO MR. BALWANI.

12:03PM   17        DO YOU SEE THAT?

12:03PM   18   A.   YES.

12:03PM   19   Q.   AND IN THE EMAIL SHE SAYS, "WE HAVE A DOD MEETING TOMORROW

12:04PM   20   AT 8:45.  PLEASE TAKE A LOOK AT THE ATTACHED AND LET ME KNOW IF

12:04PM   21   THERE IS ANY UPDATED CONTENT WE HAVE THAT WE ARE MISSING, OR IF

12:04PM   22   THERE IS CONTENT THAT YOU WOULD UPDATE."

12:04PM   23        AND THEN YOU GO TO THE EMAIL ABOVE THAT.

12:04PM   24        AND DO YOU SEE HERE THAT SHE CC'S A NEW AUDIENCE OF PEOPLE

12:04PM   25   IN THIS EMAIL?

12:04PM   1    A.   YES.

12:04PM   2    Q.   AND SHE COPIES IN THE ASSAY LEADS AT THE COMPANY; CORRECT?

12:04PM   3    A.   YES.

12:04PM   4    Q.   AND SHE'S ASKING THEM IN THIS EMAIL, DO THEY HAVE MORE AND

12:04PM   5    RECENT DATA ABOUT THE PERFORMANCE OF THERANOS ASSAYS RELATIVE

12:04PM   6    TO OTHER -- EITHER A REFERENCE METHOD OR THE PERFORMANCE OF

12:04PM   7    OTHER COMPANY'S ASSAYS?

12:04PM   8    A.   YES.

12:04PM   9    Q.   AND IF YOU GO TO THE EMAIL ABOVE THAT, THERE'S AN EMAIL

12:04PM   10   FROM DR. PANGARKAR.

12:04PM   11        DO YOU SEE THAT?

12:04PM   12   A.   YES.

12:04PM   13   Q.   AND HE INDICATES IN THE EMAIL THAT THEY DO HAVE MORE DATA

12:05PM   14   ON ONE CATEGORY OF THE ASSAYS; CORRECT?

12:05PM   15   A.   CORRECT.

12:05PM   16   Q.   AND IF YOU GO TO THE TOP, MS. HOLMES ASKS THAT THAT

12:05PM   17   INFORMATION BE SENT?

12:05PM   18   A.   I DO SEE THAT.

12:05PM   19   Q.   OKAY.  AND THAT -- THIS WAS A FAIRLY STANDARD DISCUSSION

12:05PM   20   THAT WOULD HAPPEN IN CONNECTION WITH UPDATING THE PRESENTATION

12:05PM   21   DECK THAT WAS MAINTAINED AT THERANOS; CORRECT?

12:05PM   22   A.   CORRECT.

12:05PM   23   Q.   LET ME ASK YOU TO LOOK AT 10448.

12:05PM   24        DO YOU SEE THAT THIS IS AN EMAIL EXCHANGE BETWEEN YOU AND

12:05PM   25   DR. YOUNG?

12:06PM  1              ARE YOU ABLE TO FIND THAT?

12:06PM  2      A.   I WAS NOT ABLE TO FIND THAT.

12:06PM  3      Q.   I HAVE A COPY HERE FOR YOU.

12:06PM  4              THE COURT:  I DON'T THINK THAT MADE IT INTO MINE,

12:06PM  5      EITHER.  10448?

12:06PM  6              MR. DOWNEY:  LET ME PASS THAT EXHIBIT --

12:06PM  7              THE COURT:  SURE.

12:06PM  8              MR. DOWNEY:  -- AND THEN I'LL COME BACK AND DO

12:06PM  9      ANOTHER ONE.

12:06PM 10      Q.   LET ME ASK YOU TO LOOK AT 104666?

12:06PM 11      A.   10466?

12:06PM 12      Q.   104666.

12:06PM 13              MR. BOSTIC:  IT'S TOO MANY DIGITS.

12:07PM 14              THE WITNESS:  I DON'T SEE 104666.  I SEE 10466.

12:07PM 15      BY MR. DOWNEY:

12:07PM 16      Q.   WELL, LET ME --

12:07PM 17              YOUR HONOR, DO YOU HAVE 104666?

12:07PM 18              THE COURT:  I HAVE 10466, YES.

12:07PM 19              IS THAT A 10-14 EMAIL?

12:07PM 20              MR. DOWNEY:  YES, BUT I HAVE THAT MARKED AS 10466.

12:07PM 21              THE COURT:  THAT'S WHAT I HAVE.  10466, DO YOU HAVE

12:07PM 22      THAT, SIR?

12:07PM 23              THE WITNESS:  TWO 6'S AT THE END.

12:07PM 24              MR. DOWNEY:  YES.

12:07PM 25              THE WITNESS:  YES.

12:07PM  1    BY MR. DOWNEY:

12:07PM  2    Q.   IF, IF -- IS THIS AN EMAIL EXCHANGE BETWEEN YOU AND

12:07PM  3    VARIOUS SCIENTISTS AND MS. HOLMES AND MR. BALWANI AT THERANOS?

12:07PM  4    A.   YES.

12:07PM  5    Q.   AND IF YOU LOOK AT THE --

12:07PM  6         YOUR HONOR, I MOVE FOR THE ADMISSION OF 10466.

12:08PM  7              MR. BOSTIC:  NO OBJECTION, YOUR HONOR.

12:08PM  8              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:08PM  9         (DEFENDANT'S EXHIBIT 10466 WAS RECEIVED IN EVIDENCE.)

12:08PM  10   BY MR. DOWNEY:

12:08PM  11   Q.   IF YOU LOOK AT THE EMAIL AT THE BOTTOM OF 10466, YOU SEE

12:08PM  12   THAT MS. HOLMES IS AGAIN TELLING THE SCIENTISTS THAT THERE'S AN

12:08PM  13   EXTREMELY IMPORTANT MEETING AND SHE -- DO YOU SEE IN THE SECOND

12:08PM  14   SENTENCE THAT SHE SAYS, "DAN" -- REFERRING TO YOU?  IS THAT IN

12:08PM  15   REFERENCE TO YOU?

12:08PM  16   A.   YES.

12:08PM  17   Q.   -- "WILL BE SENDING THE RELEVANT SECTIONS FROM THE

12:08PM  18   PRESENTATION THAT DETAIL CLINICAL CORRELATIONS."

12:08PM  19        CORRECT?

12:08PM  20   A.   CORRECT.

12:08PM  21   Q.   AND SHE ASKED THAT THEY EACH REVIEW THE PRESENTATION TO

12:08PM  22   MAKE SURE THAT IT WAS ACCURATE; CORRECT?

12:08PM  23   A.   CORRECT.

12:08PM  24   Q.   AND AS PART OF YOUR RESPONSIBILITIES, YOU WOULD OFTEN

12:08PM  25   FOLLOW UP WITH THE SCIENTISTS MANY TIMES TO MAKE SURE THAT WHAT

12:08PM    1    WAS IN THOSE SLIDES WAS ACCURATE; CORRECT?

12:08PM    2    A.   YES.

12:08PM    3    Q.   LET ME ASK YOU TO LOOK AT THE BINDER THAT I GAVE YOU A

12:09PM    4    MOMENT AGO AT THE DOCUMENT THAT IS MARKED 3696.

12:09PM    5         DO YOU SEE THAT?

12:09PM    6    A.   YES.  YES, I SEE IT.

12:09PM    7    Q.   I'M GOING TO ASK YOU TO TAKE A MINUTE TO FLIP THROUGH THAT

12:09PM    8    DOCUMENT TO SEE IF YOU RECOGNIZE IT.

12:09PM    9    A.   IT LOOKS FAMILIAR.

12:09PM   10    Q.   OKAY.  IS THIS A PRESENTATION THAT WAS SENT TO AN INVESTOR

12:09PM   11    IN THERANOS?

12:09PM   12    A.   I DON'T KNOW.

12:09PM   13    Q.   DO YOU SEE THE REFERENCE IN THE BOTTOM OF THE DOCUMENT TO

12:09PM   14    MOSLEY FAMILY HOLDINGS?

12:09PM   15    A.   YES.

12:09PM   16    Q.   AND IS THAT A NAME THAT YOU RECOGNIZE?

12:09PM   17    A.   YES.

12:09PM   18    Q.   WHO IS THAT?

12:09PM   19    A.   AN INVESTOR.

12:10PM   20            MR. DOWNEY:  OKAY.  YOUR HONOR, I MOVE THE ADMISSION

12:10PM   21    OF EXHIBIT 3696.

12:10PM   22            MR. BOSTIC:  NO OBJECTION.

12:10PM   23            THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

12:10PM   24        (GOVERNMENT'S EXHIBIT 3696 WAS RECEIVED IN EVIDENCE.)

12:10PM   25    BY MR. DOWNEY:

12:10PM   1    Q.   SO THIS IS THE COVER PAGE THAT IS BEING DISPLAYED NOW ON

12:10PM   2    PAGE 1 OF THE EXHIBIT; CORRECT?

12:10PM   3    A.   CORRECT.

12:10PM   4    Q.   I'D LIKE TO ASK YOU TO GO FORWARD TO PAGE 23 OF THE

12:10PM   5    EXHIBIT, WHICH I'LL HAVE DISPLAYED ON THE SCREEN.

12:10PM   6    A.   OKAY.

12:10PM   7    Q.   DO YOU SEE THAT SLIDE?  IT'S LABELLED BETTER DATA FROM

12:10PM   8    FRESHER SAMPLES?

12:10PM   9    A.   YES.

12:10PM  10    Q.   AND DO YOU RECALL WORKING ON THE DEVELOPMENT OF THIS SLIDE

12:10PM  11    WHEN YOU WERE AT THERANOS?

12:10PM  12    A.   I DON'T RECALL SPECIFICALLY.

12:10PM  13    Q.   CAN YOU EXPLAIN TO US IF YOU KNOW WHAT THIS SLIDE CONVEYS?

12:10PM  14    A.   I'M NOT THE EXPERT HERE, BUT JUST BY READING THE

12:11PM  15    DESCRIPTION HERE, IT SAYS THAT THERANOS RAPIDLY PROCESSES

12:11PM  16    SAMPLES AND ALLOWS FOR ANALYSIS OF KEY MARKERS BEFORE THEIR

12:11PM  17    ANALYTE DECAY RATES AFFECT RESULT INTEGRITY.

12:11PM  18         I BELIEVE IT REFERS TO THE AMOUNT OF TIME THAT PASSED

12:11PM  19    BETWEEN WHEN A SAMPLE IS COLLECTED AND WHEN IT'S TESTED.

12:11PM  20    Q.   AND WAS IT TRYING TO CONVEY THAT BECAUSE THERANOS WAS ABLE

12:11PM  21    TO PROCESS ITS SAMPLES MORE QUICKLY THAN ITS COMPETITORS, THAT

12:11PM  22    LED TO BETTER DATA?

12:11PM  23    A.   YES.

12:11PM  24    Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 10469.

12:12PM  25    A.   OKAY.

12:12PM  1    Q.   AND IT MIGHT BE HELPFUL AT THE SAME TIME TO LOOK AT

12:12PM  2    EXHIBIT 10468, AND WE'LL DEAL WITH THEM IN SEQUENCE.

12:12PM  3    A.   OKAY.

12:12PM  4    Q.   OKAY.  IF YOU LOOK AT 10469, IS THIS AN EMAIL IN WHICH

12:12PM  5    YOU'RE CONVEYING OPTIONS FOR A GRAPH TO MS. HOLMES ABOUT HOW

12:12PM  6    THIS CONCEPT OF BETTER DATA FROM FRESHER SAMPLES MIGHT BE

12:13PM  7    PRESENTED IN THE SLIDE DECK?

12:13PM  8    A.   YES.

12:13PM  9    Q.   BUT, BUT THE DATA THAT GOES INTO THIS SLIDE IS NOT DATA

12:13PM  10   THAT YOU YOURSELF COMPILED; CORRECT?

12:13PM  11   A.   CORRECT.

12:13PM  12   Q.   IF YOU WOULD LOOK AT --

12:13PM  13        WELL, YOUR HONOR, I MOVE TO ADMIT 10469.

12:13PM  14             MR. BOSTIC:  NO OBJECTION.

12:13PM  15             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:13PM  16        (DEFENDANT'S EXHIBIT 10469 WAS RECEIVED IN EVIDENCE.)

12:13PM  17   BY MR. DOWNEY:

12:13PM  18   Q.   AND IF YOU LOOK AT 10468, IS THIS AN EMAIL EXCHANGE

12:13PM  19   BETWEEN MS. HOLMES, DR. YOUNG, AND YOURSELF RELATED TO THE SAME

12:13PM  20   SLIDE?

12:13PM  21   A.   YES.

12:13PM  22   Q.   AND IF YOU LOOK AT THE EMAIL AT THE BOTTOM OF 10468, DO

12:13PM  23   YOU SEE THAT THAT IS THE SAME EMAIL WITH YOU CONVEYING THE

12:14PM  24   DRAFT SLIDES TO MS. HOLMES?

12:14PM  25   A.   YES.

12:14PM   1    Q.   AND THEN --

12:14PM   2         COULD WE PUBLISH 10468, YOUR HONOR?

12:14PM   3              THE COURT:   YES.

12:14PM   4              MR. BOSTIC:   IT'S NOT IN EVIDENCE.

12:14PM   5              MR. DOWNEY:   I'M SORRY.   I MOVE ITS ADMISSION.

12:14PM   6              MR. BOSTIC:   NO OBJECTION.

12:14PM   7              THE COURT:   IT MAY BE PUBLISHED, YES.

12:14PM   8         (DEFENDANT'S EXHIBIT 10468 WAS RECEIVED IN EVIDENCE.)

12:14PM   9    BY MR. DOWNEY:

12:14PM  10    Q.   IF YOU LOOK AT THE EMAIL AT THE BOTTOM, YOU WILL SEE THAT

12:14PM  11    THIS IS -- AT THE VERY BOTTOM IT'S AGAIN THE EMAIL OF YOU

12:14PM  12    FORWARDING OPTIONS TO MS. HOLMES AS TO HOW THE GRAPH MIGHT

12:14PM  13    LOOK?

12:14PM  14    A.   YES.

12:14PM  15    Q.   AND IF YOU SEE MS. HOLMES'S RESPONSE TO THAT EMAIL SAYING,

12:14PM  16    "DANIEL:   ARE YOU SAYING 2 HOURS FROM THE TIME IT BECOMES SERUM

12:14PM  17    IN THE BELOW GRAPH."

12:14PM  18         DO YOU SEE THAT?

12:14PM  19    A.   RIGHT.   AND THAT'S REFERRING TO DANIEL YOUNG.

12:14PM  20    Q.   RIGHT.   AND SHE'S RESPONDING TO YOUR EMAIL ON WHICH

12:14PM  21    DR. YOUNG WAS COPIED BY ASKING DR. YOUNG ABOUT THE CONTENT OF

12:15PM  22    THE EMAIL; CORRECT?

12:15PM  23    A.   CORRECT.

12:15PM  24    Q.   AND IF YOU GO ABOVE THAT TO THE NEXT SERIES OF EMAILS,

12:15PM  25    DR. YOUNG RESPONDS AND SAYS AT THE BOTTOM, HE TALKS ABOUT THE

12:15PM   1    TIME OF SAMPLE COLLECTION AND THE DECAY RATE OF THE BLOOD, ET

12:15PM   2    CETERA.

12:15PM   3    A.   CORRECT.

12:15PM   4    Q.   AND HE'S TELLING MS. HOLMES ABOUT HOW HE COMPILED THE DATA

12:15PM   5    HE HAD GIVEN TO YOU; CORRECT?

12:15PM   6    A.   YES.

12:15PM   7    Q.   AND THEN MS. HOLMES RESPONDS TO THAT ASKING A QUESTION

12:15PM   8    ABOUT REFRIGERATION; CORRECT?

12:15PM   9    A.   YES.

12:15PM  10    Q.   BECAUSE THE -- WHETHER OR NOT THE BLOOD SAMPLES WERE

12:15PM  11    REFRIGERATED COULD AFFECT THE DECAY RATE; CORRECT?

12:15PM  12    A.   YES.

12:15PM  13    Q.   AND THEN MS. HOLMES SUGGESTS -- DR. YOUNG RESPONDS IT

12:15PM  14    DOESN'T.

12:15PM  15         DO YOU SEE THAT?

12:15PM  16    A.   YES.

12:15PM  17    Q.   AND MS. HOLMES SAYS, WELL, "IF THEY CURRENTLY DO

12:16PM  18    REFRIGERATE THEN WE SHOULD REFLECT THAT SO WE ARE MAKING AN

12:16PM  19    ACCURATE CLAIM."

12:16PM  20         DO YOU SEE THAT?

12:16PM  21    A.   YES.

12:16PM  22    Q.   ALL RIGHT.  LET ME ASK YOU TO LOOK AT EXHIBIT 3696.  AND

12:16PM  23    I'M DIRECTING YOUR ATTENTION --

12:16PM  24    A.   WHICH BINDER IS THAT IN?

12:16PM  25    Q.   I BEG YOUR PARDON.  THIS WAS THE POWERPOINT THAT WE

12:16PM   1   ADMITTED A MOMENT AGO, THE SLIDE DECK THAT WE ADMITTED A MOMENT

12:16PM   2   AGO.

12:16PM   3   A.   OKAY.

12:16PM   4   Q.   AND I'LL POINT YOU ON THE SCREEN WHERE I WOULD LIKE TO GO.

12:16PM   5        NOW I WANT TO LOOK AT PAGE 24.

12:17PM   6        AND DO YOU SEE THAT THIS SLIDE IS ANOTHER SLIDE THAT IS

12:17PM   7   COMMENTING ON THE ACCURACY OF THERANOS'S BLOOD TESTING

12:17PM   8   SERVICES?

12:17PM   9   A.   YES.

12:17PM  10   Q.   AND DO YOU RECOGNIZE THIS AS A SLIDE THAT WAS INCLUDED IN

12:17PM  11   SLIDE DECKS SENT TO OR DISCUSSED WITH EXTERNAL AUDIENCES?

12:17PM  12   A.   YES.

12:17PM  13   Q.   AND DO YOU RECOGNIZE IT AS ALSO SOMETHING WHICH APPEARED

12:17PM  14   ON THE THERANOS WEBSITE AT CERTAIN TIMES?

12:17PM  15   A.   YES.

12:17PM  16   Q.   OKAY.  LET ME ASK YOU NOW TO LOOK AT EXHIBIT 10532.

12:18PM  17   A.   OKAY.

12:18PM  18   Q.   DO YOU SEE THAT THIS IS A SERIES OF EMAILS BETWEEN

12:18PM  19   YOURSELF, DR. YOUNG, AND ANOTHER THERANOS EMPLOYEES NAMED

12:18PM  20   JEFFREY BLICKMAN?

12:18PM  21   A.   YES.

12:18PM  22   Q.   AND MR. BLICKMAN WAS ANOTHER PRODUCT MANAGER AT THERANOS;

12:18PM  23   CORRECT?

12:18PM  24   A.   YES.

12:18PM  25   Q.   AND HE WAS INVOLVED WITH THE CREATION OF SOME ELEMENTS OF

12:18PM  1     THE WEBSITE; CORRECT?

12:18PM  2     A.   HE WORKED WITH A WEB DEVELOPMENT TEAM AND WAS THE MAIN

12:18PM  3     PRODUCT MANAGER WHO WORKED ON THAT PARTICULAR ASPECT.

12:18PM  4     Q.   OKAY.  AND HE IN THIS, IN THE EMAIL THAT IS AT THE --

12:18PM  5          YOUR HONOR, I MOVE THE ADMISSION OF 10532.

12:18PM  6               MR. BOSTIC:  NO OBJECTION.

12:18PM  7               THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:18PM  8          (DEFENDANT'S EXHIBIT 10532 WAS RECEIVED IN EVIDENCE.)

12:18PM  9     BY MR. DOWNEY:

12:18PM  10    Q.   I'D LIKE TO HIGHLIGHT THE EMAIL AT THE BOTTOM, AND THEN

12:19PM  11    BRING UP THE NEXT PAGE AS WELL.

12:19PM  12         DO YOU SEE ON THE SECOND PAGE OF THE EXHIBIT THAT HE

12:19PM  13    PROPOSED A GRAPHIC WHICH WAS ABOUT HOW WELL THE VITAMIN D ASSAY

12:19PM  14    PERFORMED FOR THERANOS.

12:19PM  15         DO YOU SEE THAT?

12:19PM  16    A.   YES.

12:19PM  17    Q.   AND HE'S DISCUSSING THERE A DEGREE OF VARIANCE.

12:19PM  18         DO YOU SEE THAT?

12:19PM  19    A.   YES.

12:19PM  20    Q.   AND WHAT DOES THAT REFER TO?

12:19PM  21    A.   I BELIEVE IT REFERS TO ACCURACY.

12:19PM  22    Q.   AND HE'S IN THIS DRAFT CONVEYING THAT HIS UNDERSTANDING OF

12:19PM  23    THE DEGREE OF VARIANCE IS PLUS OR MINUS 3.0.

12:19PM  24         DO YOU SEE THAT?

12:19PM  25    A.   YES.

12:19PM  1     Q.   OKAY.  AND IF YOU GO BACK TO THE FIRST PAGE, DO YOU SEE IN

12:20PM  2     THE SECOND EMAIL FROM THE BOTTOM DR. YOUNG RESPONDS AND HE

12:20PM  3     PROVIDES DATA REGARDING THE DEGREE OF VARIANCE FOR VITAMIN D.

12:20PM  4         DO YOU SEE THAT?

12:20PM  5     A.   YES.

12:20PM  6     Q.   AND IN THE FOURTH PARAGRAPH, OR THIRD PARAGRAPH, HE SAYS,

12:20PM  7     "I WOULD SAY THAT THE VARIANCE IS LESS THAN 10 PERCENT.  NOT

12:20PM  8     SURE WHERE THE PLUS OR MINUS 3 CAME FROM."

12:20PM  9         DO YOU SEE THAT?

12:20PM  10    A.   YES.

12:20PM  11    Q.   AND IF YOU LOOK BACK AT THE SLIDE THAT IS PART OF

12:20PM  12    EXHIBIT 3696 ABOUT THIS ISSUE WITH VITAMIN D --

12:20PM  13    A.   RIGHT.

12:20PM  14    Q.   -- DO YOU SEE THAT THIS IS THE FORM THAT EXISTED IN THE

12:20PM  15    SLIDE DECK THAT YOU SENT OUT TO MR. MOSLEY?

12:20PM  16    A.   I DON'T REMEMBER WHETHER I SENT IT TO MR. MOSLEY, BUT IT'S

12:21PM  17    IN THE -- IT IS IN THE DECK RELATED TO MR. MOSLEY.

12:21PM  18    Q.   OKAY.  IT'S IN THE SLIDE DECK AS OF 2014; CORRECT?

12:21PM  19    A.   I'M NOT SURE EXACTLY WHEN THE DECK WAS SENT.

12:21PM  20    Q.   ALL RIGHT.  WITHIN EXHIBIT 3696, CAN WE ALSO LOOK AT

12:21PM  21    PAGE 27.

12:21PM  22    A.   YES.

12:21PM  23    Q.   AND DO YOU SEE THAT THE LABEL FOR THIS SLIDE IS FASTER

12:21PM  24    RESULTS, FASTER ANSWERS; CORRECT?

12:21PM  25    A.   YES.

12:21PM   1    Q.   AND THIS IS A COMMENTARY ON HOW QUICKLY THERANOS COULD

12:21PM   2    TURN AROUND BLOOD TESTING RESULTS; CORRECT?

12:21PM   3    A.   YES.

12:21PM   4    Q.   AND IN THE SECOND PARAGRAPH, THE BOTTOM TWO PARAGRAPHS, IT

12:22PM   5    INDICATES, "DATA REPORTED IN HIGH QUALITY AND IN REAL-TIME

12:22PM   6    BECOMES ACTIONABLE INFORMATION FOR IMPROVED DECISION MAKING."

12:22PM   7         DO YOU SEE THAT?

12:22PM   8    A.   YES.

12:22PM   9    Q.   AND THAT WAS SOMETHING THAT THERANOS FREQUENTLY CONVEYED

12:22PM  10    TO EXTERNAL AUDIENCES; CORRECT?

12:22PM  11    A.   YES.

12:22PM  12    Q.   AND DO YOU SEE IN THE PARAGRAPH ABOVE THAT IT SAYS,

12:22PM  13    "THERANOS'S MICRO-SAMPLE ANALYSIS IS PERFORMED AT AMAZING

12:22PM  14    SPEEDS, SO WE CAN REPORT RESULTS FASTER THAN PREVIOUSLY

12:22PM  15    POSSIBLE."

12:22PM  16         DO YOU SEE THAT?

12:22PM  17    A.   YES.

12:22PM  18    Q.   AND NOW LET ME ASK YOU TO LOOK AT EXHIBIT 13935.

12:23PM  19    A.   OKAY.

12:23PM  20    Q.   DO YOU HAVE THAT?

12:23PM  21    A.   YES.

12:23PM  22    Q.   IS THIS AN EMAIL EXCHANGE ON WHICH YOU WERE COPIED

12:23PM  23    INVOLVING COMMUNICATIONS BY THERANOS PERSONNEL WITH AN OUTSIDE

12:23PM  24    BRANDING FIRM THAT IT HAD ENGAGED?

12:23PM  25    A.   YES.

12:23PM 1        MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

12:23PM 2    13935.

12:23PM 3        MR. BOSTIC:  NO OBJECTION.

12:23PM 4        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:23PM 5        (DEFENDANT'S EXHIBIT 13935 WAS RECEIVED IN EVIDENCE.)

12:23PM 6    BY MR. DOWNEY:

12:23PM 7    Q.   IF YOU LOOK AT THE FIRST PAGE OF THIS DOCUMENT, YOU SEE

12:23PM 8    IT'S AN EMAIL THAT IS FROM SOMEONE NAMED MIKE PEDITTO.  WHO WAS

12:24PM 9    MIKE PEDITTO?

12:24PM 10   A.   HE WAS A MANAGEMENT SUPERVISOR AND ACCOUNT MANAGER AT

12:24PM 11   TBWACHIAT/DAY.

12:24PM 12   Q.   AND YOU SEE YOU'RE LISTED AS ONE OF THE RECIPIENTS;

12:24PM 13   CORRECT?

12:24PM 14   A.   YES.

12:24PM 15   Q.   AND ANOTHER INDIVIDUAL NAMED STAN FIORITO IS LISTED.

12:24PM 16       DO YOU SEE THAT?

12:24PM 17   A.   YES.

12:24PM 18   Q.   AND WHO WAS HE?

12:24PM 19   A.   HE WAS AN ACCOUNT EXECUTIVE, IF NOT A HIGHER TITLE, AT

12:24PM 20   CHIAT/DAY.

12:24PM 21   Q.   OKAY.  AND IT SAYS BELOW THAT, PLEASE FIND A CONFERENCE

12:24PM 22   REPORT FROM A MEETING THAT HAD TAKEN PLACE THE WEDNESDAY

12:24PM 23   BEFORE; CORRECT?

12:24PM 24   A.   RIGHT.

12:24PM 25   Q.   AND THEN ATTACHED TO THIS IS A DOCUMENT WHICH LOOKS LIKE

12:24PM  1    IT'S SOME NOTES ON A MEETING THAT HAPPENED THE DAY BEFORE;

12:24PM  2    CORRECT?

12:24PM  3    A.   RIGHT.

12:24PM  4    Q.   AND IF YOU LOOK AT THE ATTENDEES, YOU SEE THAT THERE ARE

12:24PM  5    VARIOUS PEOPLE FROM THERANOS AND THERE ARE VARIOUS PEOPLE FROM

12:25PM  6    CHIAT/DAY, AND A COUPLE OF OTHER FIRMS; CORRECT?

12:25PM  7    A.   YES.

12:25PM  8    Q.   AND JUST TO REFER TO THEM, WORKING UP FROM THE BOTTOM,

12:25PM  9    GROW IS ANOTHER FIRM THAT THERANOS PAID FOR CONSULTATION IN

12:25PM  10   CONNECTION WITH BRANDING AND MEDIA; CORRECT?

12:25PM  11   A.   I'M NOT SURE OF THE EXACT STATUS OF THE PAYMENT, BUT THEY

12:25PM  12   DID WORK WITH GROW MARKETING, YES.

12:25PM  13   Q.   AND WHAT ABOUT PHD?

12:25PM  14   A.   I DON'T RECALL.

12:25PM  15   Q.   OKAY.  AND SHOPPER LAB?

12:25PM  16   A.   I ALSO DON'T RECALL.

12:25PM  17   Q.   OKAY.  BUT THIS IS A MEETING THAT IS ABOUT ANTICIPATING

12:25PM  18   SOME OF THE CONTENT THAT THERANOS MIGHT USE IN CONNECTION WITH

12:25PM  19   ITS WEBSITE AND OTHER PUBLIC FACING MATERIALS; CORRECT?

12:25PM  20   A.   RIGHT, IT'S A MARKETING AND COMMUNICATIONS MEETING.

12:25PM  21   Q.   OKAY.  AND LET ME ASK YOU TO LOOK AT PAGE 3.  AND IF YOU

12:25PM  22   GO TO THE SECTION ON PAGE 3 THAT IS COMMENTING ON A KEYNOTE

12:26PM  23   SPEECH, YOU SEE IT'S LABELLED A BETTER WAY?

12:26PM  24   A.   YES.

12:26PM  25   Q.   DO YOU SEE THE SECOND BULLET POINT UNDER THAT SAYS,

12:26PM  1    "CLIENT AND T/C/D?

12:26PM  2         IS T/C/D ANOTHER WAY OF SAYING CHIAT/DAY?

12:26PM  3    A.   YES.

12:26PM  4    Q.   AND THAT THEY DISCUSSED CHANGING THE CLOCK ON THE WEBSITE

12:26PM  5    TO REFLECT 30 MINUTE PROCESS.

12:26PM  6         DO YOU SEE THAT?

12:26PM  7    A.   YES.

12:26PM  8    Q.   AND IS THAT A REFERENCE TO THE FACT THAT THERANOS BELIEVED

12:26PM  9    IF A BLOOD TEST WERE RUN ON ITS DEVICE WHEN THE DEVICE WAS IN

12:26PM 10    THE LOCATION, IT WOULD TAKE AROUND 30 MINUTES?

12:26PM 11    A.   I DON'T KNOW IF IT WAS DEVICE SPECIFICALLY.  I THINK IT

12:26PM 12    WAS RELATED TO A THERANOS TEST.

12:26PM 13    Q.   OKAY.  AND OF COURSE WALGREENS AND THERANOS WERE NO LONGER

12:27PM 14    PLANNING TO DO THE TESTS ON SITE AT WALGREENS; CORRECT?

12:27PM 15    A.   I'M NOT SURE THAT WAS THE CASE AT THE TIME OF THIS EMAIL.

12:27PM 16    Q.   WELL, DO YOU SEE IN THE SECOND LINE IT SAYS, "SUNNY

12:27PM 17    BROUGHT UP THE FACT THAT THE INITIAL TURN AROUND IN WALGREENS

12:27PM 18    WILL BE UNDER 24 HOURS"?

12:27PM 19    A.   YES.

12:27PM 20    Q.   AND DOES THIS INDICATE THAT IT HAD BEEN AFTER THE TIME

12:27PM 21    THAT THERE HAD ALREADY BEEN A DECISION TO MOVE THE ANALYSIS OFF

12:27PM 22    SITE?

12:27PM 23    A.   I DON'T KNOW THAT FOR SURE.

12:27PM 24    Q.   OKAY.  LET ME ASK YOU TO LOOK BACK -- IN ANY EVENT, THE

12:27PM 25    SENTENCE "SUNNY BROUGHT UP THE FACT THAT INITIAL TURN AROUND IN

12:27PM   1    WALGREENS WILL BE UNDER 24 HOURS."

12:28PM   2        "T/C/D AND CLIENT" -- DOES "CLIENT" THERE REFER TO

12:28PM   3    THERANOS?

12:28PM   4    A.   I BELIEVE SO.

12:28PM   5    Q.   -- "ALIGNED TO USE CONSISTENT VERBIAGE TO REFLECT

12:28PM   6    UNPRECEDENTED TURN AROUND TIME, WITH NO SPECIFIC TIME MENTION."

12:28PM   7        DO YOU SEE THAT?

12:28PM   8    A.   YES.

12:28PM   9    Q.   AND IF YOU GO BACK TO EXHIBIT 3696 --

12:28PM   10   A.   YES.

12:28PM   11   Q.   -- AND YOU LOOK AT PAGE 27 --

12:28PM   12   A.   YES.

12:28PM   13   Q.   -- YOU SEE THAT THIS IS THE SLIDE SENT TO INVESTORS AND

12:28PM   14   DISPLAYED ON THE THERANOS WEBSITE THAT TALKS ABOUT THE SPEED

12:28PM   15   WITH WHICH TESTS WILL BE PERFORMED; CORRECT?

12:28PM   16   A.   CORRECT.

12:28PM   17   Q.   AND IT SAYS THAT THE RESULTS WILL BE IN HOURS, NOT DAYS.

12:28PM   18        DO YOU SEE THAT?

12:28PM   19   A.   YES.

12:28PM   20   Q.   BUT THERE'S NO CLAIM ABOUT THE SPEED BEING IN 30 MINUTES

12:28PM   21   OR ANYTHING LIKE THAT; CORRECT?

12:28PM   22   A.   CORRECT.

12:28PM   23   Q.   DID YOU HEAR THE TERM, WHEN YOU WERE AT THERANOS, AUTO

12:29PM   24   REFLEX TESTING?

12:29PM   25   A.   YES.

12:29PM  1    Q.   AND WHAT DID YOU UNDERSTAND THAT TO MEAN?

12:29PM  2    A.   I UNDERSTOOD THAT TO MEAN THAT ADDITIONAL TESTING COULD BE

12:29PM  3    PERFORMED ON A SAMPLE BASED ON THE INITIAL SET OF TESTS DONE

12:29PM  4    AND BASED ON THE RESULTS OF THE INITIAL SET OF TESTS DONE.

12:29PM  5    Q.   OKAY.  AND CAN I ASK YOU TO LOOK AT EXHIBIT 10467.

12:29PM  6    A.   OKAY.

12:29PM  7    Q.   IS THIS AN EMAIL EXCHANGE BETWEEN YOURSELF AND DR. YOUNG,

12:29PM  8    COPYING MR. BLICKMAN?

12:29PM  9         I BEG YOUR PARDON.  IS THIS AN EMAIL EXCHANGE BETWEEN

12:29PM  10   DR. YOUNG AND MR. BLICKMAN, COPYING YOU?

12:29PM  11   A.   YES.

12:30PM  12   Q.   AND IS THIS IN CONNECTION WITH PREPARING CONTENT TO BE

12:30PM  13   DISPLAYED ON THE THERANOS WEBSITE?

12:30PM  14   A.   YES.

12:30PM  15              MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

12:30PM  16   EXHIBIT 10467.

12:30PM  17              MR. BOSTIC:  NO OBJECTION.

12:30PM  18              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:30PM  19        (DEFENDANT'S EXHIBIT 10467 WAS RECEIVED IN EVIDENCE.)

12:30PM  20   BY MR. DOWNEY:

12:30PM  21   Q.   DO YOU SEE IN THE BOTTOM EMAIL ON THE SECOND TO THE LAST

12:30PM  22   PAGE, YOU SEND AN EMAIL TO DR. YOUNG ON AUGUST 9TH AT ABOUT

12:30PM  23   2:10 A.M.?

12:30PM  24   A.   YES.

12:30PM  25   Q.   AND YOU ASK HIM THERE -- YOU INDICATE YOU WANT TO ASK SOME

12:30PM   1    QUESTIONS BASED ON HIS EXPERTISE.

12:30PM   2        DO YOU SEE THAT?

12:30PM   3    A.   YES.   YES.

12:31PM   4    Q.   AND YOU LIST A NUMBER OF ITEMS ON THE NEXT PAGE THAT YOU

12:31PM   5    WANT TO ASK QUESTIONS ABOUT?

12:31PM   6    A.   YES.

12:31PM   7    Q.   AND IN NUMBER 3, YOU INDICATE ONE OF THE ITEMS IS AUTO

12:31PM   8    REFLEX TESTING.

12:31PM   9        DO YOU SEE THAT?

12:31PM  10    A.   YES.

12:31PM  11    Q.   AND YOU ASK HIM IN THE SECOND SENTENCE THERE, "CAN YOU

12:31PM  12    PROVIDE SOME EXAMPLE OF A COMMON TEST WITH ITS ASSOCIATED

12:31PM  13    REFLEX TESTS AND LIST ANY TESTS THAT WOULD COME BEFORE/AFTER IT

12:31PM  14    ON A LAB ORDER FORM."

12:31PM  15        DO YOU SEE THAT?

12:31PM  16    A.   YES.

12:31PM  17    Q.   AND YOU'RE TRYING TO GET AN UNDERSTANDING OF HOW THIS

12:31PM  18    COMPLEX CONCEPT COULD BE CONVEYED ON THE WEBSITE; CORRECT?

12:31PM  19    A.   CORRECT.

12:31PM  20    Q.   BUT IT'S A TOPIC ON WHICH YOU WOULD NEED INFORMATION FROM

12:31PM  21    AN EXPERT; CORRECT?

12:31PM  22    A.   CORRECT.

12:31PM  23    Q.   AND THAT'S WHY YOU WENT TO DR. YOUNG; CORRECT?

12:31PM  24    A.   CORRECT.

12:31PM  25    Q.   AND DR. YOUNG RESPONDS IN THE SECOND EMAIL FROM THE BOTTOM

12:32PM 1    ON THE PRIOR PAGE, DO YOU SEE THAT, ABOUT 2:50 P.M. ON THE NEXT

12:32PM 2    DAY?

12:32PM 3    A.   YES.

12:32PM 4    Q.   AND HE INDICATES AND OFFERS EXAMPLES OF SOME TESTS.

12:32PM 5         DO YOU SEE THAT?

12:32PM 6    A.   YES.

12:32PM 7    Q.   AND THAT INITIATES A DISCUSSION OF THE DATA THAT YOU MIGHT

12:32PM 8    USE TO DISPLAY THIS CONCEPT ON THE WEBSITE?

12:32PM 9    A.   YES.

12:32PM 10   Q.   AND IF YOU GO TO THE ULTIMATE -- IF YOU GO TO THE EMAIL

12:32PM 11   THAT IS IN THE MIDDLE OF THE THIRD PAGE OF THE EXHIBIT,

12:32PM 12   AUGUST 11TH AT 8:50 P.M. --

12:32PM 13   A.   YES.

12:32PM 14   Q.   -- DO YOU SEE THAT?

12:32PM 15        AND DR. YOUNG PROVIDES TO YOU AND MR. BLICKMAN BASIC

12:33PM 16   REFLEX INFORMATION AND TESTS THAT IT ASSOCIATES WITH; CORRECT?

12:33PM 17   A.   CORRECT.

12:33PM 18   Q.   ALL RIGHT.  AND YOU KNOW THAT ONE CLAIM THAT THERANOS

12:33PM 19   FREQUENTLY MADE WAS WITH RESPECT TO THE AFFORDABILITY OF ITS

12:33PM 20   BLOOD TESTING PRODUCT; CORRECT?

12:33PM 21   A.   CORRECT.

12:33PM 22   Q.   AND ON THAT SUBJECT MATTER, YOU ALSO GAINED INFORMATION

12:33PM 23   FROM OTHERS IN THE COMPANY ABOUT WHAT YOUR COMPETITORS WERE

12:33PM 24   CHARGING AS RETAIL PRICES FOR BLOOD TESTING SERVICES; CORRECT?

12:33PM 25   A.   CORRECT.

12:33PM 1    Q.   SO ANY OF THE SUBJECT MATTERS THAT REQUIRED PARTICULARIZED

12:33PM 2    EXPERTISE, YOU WOULD GO TO THE RELEVANT PERSON AND, AND ASK FOR

12:33PM 3    INFORMATION THAT WOULD BE HELPFUL IN PREPARING A POTENTIAL

12:33PM 4    SLIDE; CORRECT?

12:33PM 5    A.   CORRECT.

12:33PM 6    Q.   OR CONFIRMING A SLIDE THAT CHIAT/DAY HAD PREPARED;

12:34PM 7    CORRECT?

12:34PM 8    A.   CORRECT.

12:34PM 9    Q.   I'D LIKE TO TALK FOR A FEW MINUTES ABOUT THE CONVERSATION

12:34PM 10   THAT YOU HAD YESTERDAY WITH MR. BOSTIC ABOUT JOURNALISTS AND

12:34PM 11   OTHERS BOTH MR. RAGO AND MR. PARLOFF.

12:34PM 12        DO YOU REMEMBER THE SERIES OF QUESTIONS THAT YOU WERE

12:34PM 13   ASKED ON THAT?

12:34PM 14   A.   YES.

12:34PM 15   Q.   AND WE MENTIONED A MOMENT AGO GROW MARKETING.

12:34PM 16        DO YOU RECALL THAT?

12:34PM 17   A.   YES.

12:34PM 18   Q.   AND DO YOU RECALL THAT THERANOS RETAINED GROW MARKETING TO

12:34PM 19   HELP WITH ITS PRESS STRATEGY AROUND ANNOUNCING ITS -- BOTH

12:34PM 20   ITSELF AS A CORPORATION AND ITS CONSUMER LAUNCH?

12:34PM 21   A.   YES.

12:34PM 22   Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 13979.

12:35PM 23   A.   OKAY.

12:35PM 24   Q.   DO YOU RECOGNIZE THIS?

12:35PM 25   A.   IT'S THE FIRST TIME I'VE SEEN IT IN A NUMBER OF YEARS,

12:35PM    1        BUT --

12:35PM    2        Q.    TAKE A MOMENT.

12:35PM    3        A.    OKAY.

12:36PM    4              (PAUSE IN PROCEEDINGS.)

12:36PM    5                  THE WITNESS:  OKAY.  I RECOGNIZE IT.

12:36PM    6        BY MR. DOWNEY:

12:36PM    7        Q.    AND IS THIS AN EMAIL EXCHANGE BETWEEN A REPRESENTATIVE OF

12:36PM    8        GROW AND YOURSELF AND OTHER EMPLOYEES AT THERANOS?

12:36PM    9        A.    YES.

12:36PM   10        Q.    AND IS THIS EMAIL IN CONNECTION WITH GROW PROVIDING A

12:36PM   11        MEDIA TRAINING DECK FOR MS. HOLMES?

12:36PM   12        A.    YES.

12:36PM   13                  MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

12:36PM   14        13979.

12:36PM   15                  MR. BOSTIC:  YOUR HONOR, JUST A RELEVANCE QUESTION.

12:36PM   16            I DON'T SEE MS. HOLMES ON THIS EMAIL.

12:36PM   17                  MR. DOWNEY:  THE WITNESS JUST TESTIFIED IT WAS MEDIA

12:36PM   18        TRAINING FOR MS. HOLMES.

12:36PM   19                  THE COURT:  I'LL ALLOW IT.  IT'S ADMITTED.  IT MAY

12:36PM   20        BE PUBLISHED.

12:36PM   21            (DEFENDANT'S EXHIBIT 13979 WAS RECEIVED IN EVIDENCE.)

12:37PM   22        BY MR. DOWNEY:

12:37PM   23        Q.    I'LL ASK YOU TO LOOK AT SLIDE 8.

12:37PM   24            NOW, MS. HOLMES WAS GOING TO BE INTERVIEWED BY MR. RAGO IN

12:37PM   25        LATE AUGUST OF 2013; CORRECT?

12:37PM   1    A.   CORRECT.

12:37PM   2    Q.   AND GROW WAS PROVIDING ADVICE TO HER AS TO HOW SHE SHOULD

12:37PM   3    HANDLE THAT INTERVIEW; CORRECT?

12:37PM   4    A.   CORRECT.

12:37PM   5    Q.   AND THERE WERE MEDIA TRAINING SESSIONS WHERE GROW PROVIDED

12:37PM   6    ADVICE TO MS. HOLMES AS TO HOW SHE SHOULD ANSWER QUESTIONS;

12:37PM   7    CORRECT?

12:37PM   8    A.   CORRECT.

12:37PM   9    Q.   AND TOPICS SHE MIGHT WANT TO DISCUSS WITH THE REPORTER;

12:37PM  10    CORRECT?

12:37PM  11    A.   CORRECT.

12:37PM  12    Q.   IF YOU WOULD LOOK AT SLIDE, THE SLIDE THAT IS DESIGNATED

12:37PM  13    AS PAGE 8 IN THE EXHIBIT, IT HAS A HEADER COMPANY LAUNCH

12:37PM  14    OBJECTIVES.

12:37PM  15         DO YOU SEE THAT?

12:37PM  16    A.   YES.

12:37PM  17    Q.   AND IF YOU REVIEW THAT, DO YOU GENERALLY RECALL THAT GROW

12:38PM  18    MARKETING'S ADVICE WAS THAT THE MEDIA STRATEGY SHOULD SEEK TO

12:38PM  19    ACHIEVE THESE OBJECTIVES?

12:38PM  20    A.   YES.

12:38PM  21    Q.   DO YOU RECALL THAT IN CONNECTION WITH THE INITIAL LAUNCH,

12:38PM  22    MS. HOLMES DID NOT WANT TO TALK ABOUT THERANOS'S PROPRIETARY

12:38PM  23    DEVICE?

12:38PM  24    A.   I DO RECALL THAT.

12:38PM  25    Q.   LET ME ASK YOU NOW TO LOOK AT EXHIBIT 13980.

12:38PM  1    A.   OKAY.

12:38PM  2    Q.   DO YOU RECALL THAT IN CONNECTION WITH THE INTERVIEW WITH

12:38PM  3    MR. RAGO, GROW MARKETING COORDINATED PROVIDING INFORMATION TO

12:38PM  4    MR. RAGO ABOUT THERANOS?

12:38PM  5    A.   I DON'T RECALL SPECIFICALLY.

12:39PM  6    Q.   OKAY.

12:39PM  7    A.   BUT THEY DID HELP, I THINK, COORDINATE THAT CONVERSATION.

12:39PM  8    Q.   OKAY.  LET ME ASK YOU TO LOOK AT 13980, AND I'M ASKING IF

12:39PM  9    THIS IS AN EMAIL BETWEEN A REPRESENTATIVE OF GROW MARKETING AND

12:39PM  10   MS. HOLMES, YOURSELF, AND OTHERS?

12:39PM  11   A.   YES.

12:39PM  12          MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

12:39PM  13   13980.

12:39PM  14          MR. BOSTIC:  NO OBJECTION.

12:39PM  15          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:39PM  16       (DEFENDANT'S EXHIBIT 13980 WAS RECEIVED IN EVIDENCE.)

12:39PM  17   BY MR. DOWNEY:

12:39PM  18   Q.   DO YOU SEE ON THE FIRST PAGE THAT THERE'S AN EMAIL

12:39PM  19   BETWEEN -- SENT BY MS. ANDERSON AT GROW MARKETING?

12:39PM  20   A.   YES.

12:39PM  21   Q.   AND SHE WAS ONE OF THE MEDIA CONSULTING PEOPLE HELPING

12:40PM  22   THERANOS HERE?

12:40PM  23   A.   YES.

12:40PM  24   Q.   AND YOU SEE IN THE FIRST PARAGRAPH THAT SHE'S FORWARDING

12:40PM  25   AN ATTACHED -- AS AN ATTACHED, AN UPDATED THERANOS STORY

12:40PM   1   DOCUMENT, INCLUDING STATISTICS?

12:40PM   2   A.   YES.

12:40PM   3   Q.   AND THOSE STATISTICS RELATED TO THINGS LIKE

12:40PM   4   OVER-PRESCRIPTION AND OTHER ISSUES IN THE HEALTH INDUSTRY THAT

12:40PM   5   WOULD MAKE THERANOS'S SERVICES ATTRACTIVE; CORRECT?

12:40PM   6   A.   CORRECT.

12:40PM   7   Q.   DID YOU PARTICIPATE IN THE MEDIA TRAINING THAT MS. HOLMES

12:40PM   8   RECEIVED FROM GROW MARKETING?

12:40PM   9   A.   I ATTENDED.  I WOULDN'T SAY I PARTICIPATED.

12:40PM   10   Q.   YOU WERE JUST AN OBSERVER IN CONNECTION WITH THAT?

12:40PM   11   A.   CORRECT.

12:40PM   12   Q.   OKAY.  NOW, WE DISCUSSED EARLIER THE WEBSITE AND

12:40PM   13   CHIAT/DAY'S ROLE IN ADVISING THERANOS WITH RESPECT TO THE

12:41PM   14   LAUNCH OF ITS WEBSITE.

12:41PM   15       WAS THAT DONE AROUND THE SAME TIME AS THE ARTICLE WAS

12:41PM   16   PUBLISHED BY MR. RAGO?

12:41PM   17   A.   YES.

12:41PM   18   Q.   AND CREATING THAT WEBSITE WAS A HUGE PROJECT, WASN'T IT?

12:41PM   19   A.   YES.

12:41PM   20   Q.   THERANOS HAD A VERY PRIMITIVE WEBSITE PRIOR TO THAT TIME?

12:41PM   21   A.   YES.

12:41PM   22   Q.   AND SEVERAL OF THE PRODUCT MANAGERS WERE INVOLVED IN THE

12:41PM   23   CREATION OF CONTENT RELATED TO THE WEBSITE; CORRECT?

12:41PM   24   A.   YES.

12:41PM   25   Q.   AND SEVERAL OF THE SCIENTISTS PROVIDED INFORMATION IN

12:41PM   1    CONNECTION WITH CREATION OF THE WEBSITE; CORRECT?

12:41PM   2    A.   CORRECT.

12:41PM   3    Q.   AND THERE WERE OUTSIDE BRANDING AND MEDIA ADVISORS WHO

12:41PM   4    ADVISED ON HOW THE WEBSITE SHOULD LOOK; CORRECT?

12:41PM   5    A.   CORRECT.

12:41PM   6    Q.   AND THERE WERE LAWYERS WHO REVIEWED THE CONTENT OF THE

12:41PM   7    WEBSITE PRIOR TO THE TIME THAT IT WAS -- WENT LIVE?

12:41PM   8    A.   CORRECT.

12:41PM   9    Q.   AND THEN AFTER THE WEBSITE WAS LAUNCHED, THERE CONTINUED

12:42PM  10    TO BE UPDATES TO THE WEBSITE EVERY FEW WEEKS OR SO; CORRECT?

12:42PM  11    A.   I DON'T RECALL THE CADENCE, BUT THERE WERE UPDATES MADE

12:42PM  12    AFTER IT LAUNCHED.

12:42PM  13    Q.   OKAY.  LET ME ASK YOU TO LOOK AT EXHIBIT 37 -- 7365.

12:42PM  14    7365.

12:42PM  15    A.   OKAY.

12:42PM  16    Q.   IS THIS AN EMAIL EXCHANGE INVOLVING MS. HOLMES, YOURSELF,

12:42PM  17    AND OTHERS AT THERANOS ABOUT THE THERANOS WEBSITE IN NOVEMBER

12:43PM  18    OF 2013?

12:43PM  19    A.   YES.

12:43PM  20         MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

12:43PM  21    EXHIBIT 7365.

12:43PM  22         MR. BOSTIC:  I'M STILL TRYING TO FIND THIS ONE.

12:43PM  23    WHICH BINDER IS THIS IN, COUNSEL?

12:43PM  24         MR. DOWNEY:  IT SHOULD BE IN THE BINDER THAT I GAVE

12:43PM  25    YOU YESTERDAY.

12:43PM   1              (PAUSE IN PROCEEDINGS.)

12:43PM   2                  MR. BOSTIC:  NO OBJECTION.

12:43PM   3                  THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:43PM   4          (DEFENDANT'S EXHIBIT 7365 WAS RECEIVED IN EVIDENCE.)

12:43PM   5                  MR. DOWNEY:  GO TO THE BOTTOM EMAIL ON THE FIRST

12:43PM   6     PAGE HERE.

12:43PM   7     Q.   AND THIS IS AN EMAIL FROM MS. BLICKMAN -- OR MR. BLICKMAN

12:43PM   8     TO MS. HOLMES AND YOU'RE COPIED.

12:43PM   9          DO YOU SEE THAT?

12:43PM  10     A.   YES.

12:43PM  11     Q.   AND HE REPORTS IN THE FIRST PARAGRAPH THAT THE CALL CENTER

12:43PM  12     AT THERANOS HAD RECEIVED COMPLAINTS ABOUT AN ENTRY ON THE

12:43PM  13     WEBSITE NOT BEING CLEAR.

12:43PM  14          DO YOU SEE THAT?

12:43PM  15     A.   YES.

12:43PM  16     Q.   AND THAT WEBSITE RELATED TO THE FACT THAT SOME PEOPLE WERE

12:43PM  17     CALLING AND SAYING, I WASN'T EXPECTING TO GET A VENOUS DRAW;

12:43PM  18     CORRECT?

12:43PM  19     A.   I BELIEVE SO.

12:43PM  20     Q.   AND SO HE PROPOSED THAT THERE BE A CLARIFICATION TO THE

12:44PM  21     WEBSITE THAT HAD BEEN ADVISED BY CHIAT/DAY.

12:44PM  22          DO YOU SEE THAT?

12:44PM  23     A.   YES.

12:44PM  24     Q.   AND IF YOU LOOK AT THE PROPOSAL BELOW, IT'S THE CLIP THAT

12:44PM  25     BEGINS "THE ONLY THING"?

12:44PM 1   A.   YES.

12:44PM 2   Q.   OKAY.  AND IN THE BODY OF THE EMAIL, IT SAYS, "INSTEAD OF

12:44PM 3   A BIG, INTIMIDATING NEEDLE, OUR CERTIFIED PHLEBOTOMISTS CAN USE

12:44PM 4   A TINY FINGERSTICK OR A MICRO-SAMPLE FROM A VENOUS DRAW."

12:44PM 5        DO YOU SEE THAT?

12:44PM 6   A.   YES.

12:44PM 7   Q.   AND THAT REFERS TO TWO OF THE WAYS THAT BLOOD WOULD BE

12:44PM 8   DRAWN IN CONNECTION WITH THERANOS BLOOD TESTING; CORRECT?

12:44PM 9   A.   CORRECT.

12:44PM 10  Q.   AND SOMETIMES THERE WOULD BE THE FINGERSTICK, WHICH WE'VE

12:44PM 11  BEEN DISCUSSING; CORRECT?

12:44PM 12  A.   CORRECT.

12:44PM 13  Q.   AND SOMETIMES THERE WOULD BE A MICRO-SAMPLE DRAWN FROM THE

12:44PM 14  ARM; CORRECT?

12:44PM 15  A.   THERE WOULD BE A VENOUS SAMPLE DRAWN FROM THE ARM.

12:44PM 16  Q.   RIGHT.  BUT THE SAMPLE THAT WAS DRAWN WAS SMALLER THAN A

12:45PM 17  TYPICAL VENOUS SAMPLE; CORRECT?

12:45PM 18  A.   YES.

12:45PM 19  Q.   AND THAT'S WHAT THE REFERENCE TO MICRO-SAMPLE IS; CORRECT?

12:45PM 20  A.   YES.

12:45PM 21  Q.   AND THEN THIS CLIP FROM CHIAT/DAY PROPOSED THAT THERE BE A

12:45PM 22  FOOTNOTE SAYING "OCCASIONALLY, A VENIPUNCTURE MAY BE REQUIRED,

12:45PM 23  BASED ON THE LAB ORDER."

12:45PM 24        DO YOU SEE THAT?

12:45PM 25  A.   YES.

12:45PM   1    Q.   "THIS IS UNCOMMON, AND WE AIM TO ELIMINATE THIS SCENARIO

12:45PM   2    ENTIRELY."

12:45PM   3         DO YOU SEE THAT?

12:45PM   4    A.   YES.

12:45PM   5    Q.   AND IN TERMS OF THE LAST PHRASE, DID YOU UNDERSTAND THAT

12:45PM   6    THERANOS WAS WORKING TO VALIDATE NEW ASSAYS ALL OF THE TIME?

12:45PM   7    A.   YES.

12:45PM   8    Q.   AND WHEN IT HAD NOT YET VALIDATED ASSAYS IN ITS CLIA LAB,

12:45PM   9    IT WAS STILL USING VENIPUNCTURE DRAW?

12:45PM  10    A.   YES.

12:45PM  11    Q.   AND SO MR. BLICKMAN FORWARDED CHIAT'S RECOMMENDATION, AND

12:46PM  12    LET'S LOOK AT MS. HOLMES'S RESPONSE.

12:46PM  13         DO YOU SEE THE FIRST PARAGRAPH SHE SAYS, "I DID NOT SEE

12:46PM  14    THIS CONCEPT OF THE ASTERISK SENT TO ME OR MENTIONED TO ME AT

12:46PM  15    ALL.  IF WE ARE GOING TO SAY SOMETHING LIKE THIS WE NEED TO OWN

12:46PM  16    IT AND NOT CONTRADICT OURSELVES.  SEE BELOW.  THIS COPY SHOULD

12:46PM  17    BE UPDATED ASAP."

12:46PM  18         AND DO YOU SEE IN THE NEXT PARAGRAPH SHE SAYS, "INSTEAD OF

12:46PM  19    A BIG, INTIMIDATING NEEDLE, OUR CERTIFIED PHLEBOTOMISTS CAN USE

12:46PM  20    A TINY FINGER STICK OR A MICRO-SAMPLE FROM A VENOUS DRAW."

12:46PM  21         AND SHE THEN INSERTS THE SENTENCE ABOUT VENIPUNCTURE INTO

12:46PM  22    THE TEXT THAT WILL APPEAR ON THE WEBSITE, AND IT SAYS, THE

12:46PM  23    VENIPUNCTURE MAY BE REQUIRED BUT IT IS UNCOMMON AND THE AIM IS

12:46PM  24    TO ELIMINATE IT.

12:46PM  25         DO YOU SEE THAT?

12:46PM   1    A.   YES.

12:46PM   2    Q.   AND IF YOU GO TO THE TOP, YOU SEE MR. BLICKMAN RESPONDS

12:46PM   3    THAT HE UNDERSTANDS AND THAT THE TEAM WILL MAKE THE CHANGE

12:46PM   4    ASAP.

12:46PM   5         DO YOU SEE THAT?

12:46PM   6    A.   CAN YOU ACTUALLY GO BACK TO YOUR PREVIOUS QUESTION?

12:46PM   7    Q.   SURE.

12:46PM   8    A.   IS THAT POSSIBLE?

12:47PM   9    Q.   SURE.  WELL, LET ME ASK YOU, DO YOU SEE THE SECTION OF THE

12:47PM  10    EMAIL FROM MS. HOLMES TO MR. BLICKMAN ON NOVEMBER 27TH, 2013,

12:47PM  11    AT 8:18 P.M.?

12:47PM  12         DO YOU SEE THAT?

12:47PM  13    A.   YES.

12:47PM  14    Q.   AND DO YOU SEE THAT SHE MOVED WHAT WAS PREVIOUSLY PROPOSED

12:47PM  15    TO BE A FOOTNOTE INTO THE TEXT; RIGHT?

12:47PM  16    A.   YES.

12:47PM  17    Q.   AND DO YOU SEE THEN AT THE TOP THAT THERE'S AN EMAIL FROM

12:47PM  18    MR. BLICKMAN TO MS. HOLMES; CORRECT?

12:47PM  19    A.   YES.

12:47PM  20    Q.   AND DO YOU SEE THAT HE SAYS, "UNDERSTOOD," AND HE'LL ASK

12:47PM  21    THE TEAM TO MAKE THIS UPDATE ASAP.

12:47PM  22         CORRECT?

12:47PM  23    A.   YES.  I THOUGHT I MISUNDERSTOOD YOUR QUESTION, BUT I DID

12:47PM  24    NOT.

12:47PM  25    Q.   I WANT TO JUST ASK YOU ABOUT A FEW OTHER DOCUMENTS RELATED

12:47PM  1      TO CHIAT/DAY, AND MY QUESTIONING WITH RESPECT TO THEM IS BRIEF.

12:48PM  2          LET ME ASK YOU TO LOOK AT EXHIBIT 10554.

12:48PM  3      A.   OKAY.

12:48PM  4      Q.   IS EXHIBIT 10554 AN EXHIBIT EXCHANGE BETWEEN

12:48PM  5      REPRESENTATIVES OF GROW MARKETING, MS. HOLMES, YOURSELF, AND

12:48PM  6      OTHERS AT THERANOS?

12:48PM  7      A.   YES.

12:48PM  8      Q.   AND LET ME ASK YOU TO LOOK AT THE EMAIL AT THE TOP --

12:49PM  9      WELL, AND YOU SEE THAT'S AN EMAIL THAT CHRISTIAN HOLMES SENT TO

12:49PM 10      A REPRESENTATIVE OF GROW MARKETING; CORRECT?

12:49PM 11      A.   YES.

12:49PM 12              MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

12:49PM 13      10554.

12:49PM 14              MR. BOSTIC:  NO OBJECTION.

12:49PM 15              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:49PM 16          (DEFENDANT'S EXHIBIT 10554 WAS RECEIVED IN EVIDENCE.)

12:49PM 17      BY MR. DOWNEY:

12:49PM 18      Q.   DO YOU SEE AT THE TOP MR. HOLMES IS PROVIDING A COMMENT ON

12:49PM 19      A STATS AND SOURCES DOCUMENT FOR THE JOE RAGO INTERVIEW.

12:49PM 20          DO YOU SEE THAT?

12:49PM 21      A.   YES.

12:49PM 22      Q.   AND DO YOU SEE WHERE HE INDICATES "A FEW COMMENTS ON THE

12:49PM 23      STATS/SOURCES."

12:49PM 24          AND THEN THERE'S A BULLET POINT THAT SAYS STANDARD

12:49PM 25      THERANOS STATISTICS.

EDLIN CROSS BY MR. DOWNEY (RES.)

12:49PM 1        DO YOU SEE THAT?

12:49PM 2    A.   YES.

12:49PM 3    Q.   AND IF YOU LOOK BELOW THAT -- NOW, THE WAY THAT THIS EMAIL

12:49PM 4    HAS BEEN CONSTRUCTED IS AT THE BOTTOM EMAIL, THE SECOND HALF,

12:50PM 5    THE BOTTOM EMAIL THERE'S AN EMAIL FROM MS. FOGELMAN, AND IN THE

12:50PM 6    SECOND PARAGRAPH SHE SAYS, "WE NEED YOUR HELP TO NAIL DOWN THE

12:50PM 7    FOLLOWING STATISTICS AND THEIR SOURCES ASAP."

12:50PM 8        DO YOU SEE THAT?

12:50PM 9    A.   YES.

12:50PM 10   Q.   AND SO SHE'S ASKING CHRISTIAN HOLMES AND OTHERS TO PROVIDE

12:50PM 11   HELP NAILING DOWN STATISTICS; CORRECT?

12:50PM 12   A.   CORRECT.

12:50PM 13   Q.   AND IF YOU LOOK, THE FIRST QUESTION SHE ASKS IS ABOUT

12:50PM 14   STANDARD THERANOS STATISTICS; CORRECT?

12:50PM 15   A.   CORRECT.

12:50PM 16   Q.   AND IF YOU GO DOWN A LITTLE FURTHER FROM THERE, SHE LISTS

12:50PM 17   A NUMBER OF QUESTIONS ABOUT PERCENTAGES OF LAB TESTING AND

12:50PM 18   BACKGROUND ON THE LAB INDUSTRY, ET CETERA?

12:50PM 19   A.   CORRECT.

12:50PM 20   Q.   AND IF YOU LOOK AT THE STATISTIC, THAT ONE STATISTIC THAT

12:51PM 21   SHE ASKED FOR RELATES TO ACCURACY AND RELIABILITY IN BLOOD

12:51PM 22   TESTING.

12:51PM 23       DO YOU SEE THAT THERE?

12:51PM 24   A.   WHICH BULLET?

12:51PM 25   Q.   THERE'S A BULLET AT THE TOP OF THE PAGE THAT SAYS, "THE

12:51PM   1    PRE AND POST ANALYTICAL PHASES OF THE LAB TESTING PROCESS

12:51PM   2    ACCOUNT FOR 93 PERCENT OF ERRORS."

12:51PM   3        DO YOU SEE THAT?

12:51PM   4    A.   I DO.

12:51PM   5    Q.   AND SHE ASKS, "IS THERE MORE A MORE RECENT STATISTIC THAN

12:51PM   6    THIS 1993 AACC ARTICLE."

12:52PM   7        DO YOU SEE THAT?

12:52PM   8    A.   I DO.

12:52PM   9    Q.   AND AACC IS A CLINICAL ORGANIZATION RELATING TO BLOOD

12:52PM  10    TESTING; CORRECT?

12:52PM  11    A.   YES.

12:52PM  12    Q.   AND IF YOU GO TO THE PRIOR PAGE AND YOU LOOK AT THE

12:52PM  13    RESPONSES THAT MR. HOLMES GIVES, IF YOU GO DOWN TO THE FOURTH

12:52PM  14    PARAGRAPH, MR. HOLMES TELLS MS. FOGELMAN, "THE SOURCE OF THIS

12:52PM  15    STAT CAME FROM A CLINICAL CHEMISTRY ARTICLE IN 1993," AND THEN

12:52PM  16    HE UPDATES IT AND SAYS THAT THERE IS ANOTHER ARTICLE IN 2009

12:52PM  17    WHICH ALSO INDICATES THE SAME STATISTICS; CORRECT?

12:52PM  18    A.   CORRECT.

12:52PM  19    Q.   AND THE POINT OF THAT EXCHANGE IS THAT THERANOS WAS MAKING

12:52PM  20    THE CLAIM THAT HUMAN INTERVENTION IN THE BLOOD TESTING PROCESS

12:52PM  21    WAS A CAUSE OF INACCURACY; CORRECT?

12:53PM  22    A.   YES.

12:53PM  23    Q.   AND THERANOS HOPED, THROUGH ITS BLOOD TESTING PROCESSES,

12:53PM  24    TO ELIMINATE OR LIMIT HUMAN INVENTION IN THE BLOOD TESTING

12:53PM  25    PROCESS; CORRECT?

12:53PM  1     A.   CORRECT.

12:53PM  2     Q.   AND GROW MARKETING IS ESSENTIALLY ASKING, WELL, HOW DO WE

12:53PM  3     KNOW THAT HUMAN INVENTION IS THE SOURCE OF SO MANY ERRORS;

12:53PM  4     CORRECT?

12:53PM  5     A.   CORRECT.

12:53PM  6     Q.   AND MR. HOLMES IS PROVIDING THIS BACKGROUND ACADEMIC

12:53PM  7     LITERATURE; CORRECT?

12:53PM  8     A.   CORRECT.

12:53PM  9     Q.   ALL RIGHT.  LET ME ASK YOU TO LOOK AT EXHIBIT 10555.

12:53PM  10    A.   I THINK THAT'S WHAT WE WERE -- OH, YES.

12:53PM  11    Q.   IT SHOULD BE THE NEXT EXHIBIT IN YOUR BINDER.

12:53PM  12    A.   YES.

12:53PM  13    Q.   OKAY.  IS THIS ANOTHER EMAIL EXCHANGE BETWEEN

12:54PM  14    REPRESENTATIVES OF THERANOS AND REPRESENTATIVES OF CHIAT/DAY

12:54PM  15    ABOUT LAUNCHING THE THERANOS WEBSITE?

12:54PM  16    A.   YES.

12:54PM  17              MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

12:54PM  18    10555.

12:54PM  19              MR. BOSTIC:  NO OBJECTION.

12:54PM  20              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:54PM  21         (DEFENDANT'S EXHIBIT 10555 WAS RECEIVED IN EVIDENCE.)

12:54PM  22    BY MR. DOWNEY:

12:54PM  23    Q.   IF YOU LOOK AT THE SECOND EMAIL ON THE FIRST PAGE, YOU SEE

12:54PM  24    IT'S AN EMAIL FROM CHRISTIAN HOLMES?

12:54PM  25    A.   YES.

12:54PM   1    Q.   AND DO YOU SEE THAT HE'S, HE'S PROVIDING COMMENT ON SOME

12:54PM   2    OF THE CONTENT FOR A WEBSITE OR THERANOS PUBLIC PRESENTATION?

12:55PM   3    A.   YES.

12:55PM   4    Q.   AND DO YOU SEE HE WRITES, "ANNIE -- FEW COMMENTS."

12:55PM   5         DO YOU SEE THAT THERE?

12:55PM   6    A.   YES.

12:55PM   7    Q.   AND UNDER WALGREENS -- W-A-G IS WALGREENS; CORRECT?

12:55PM   8    A.   YES.

12:55PM   9    Q.   AND HIS SECOND BULLET POINT REFERS TO A SLIDE 24.

12:55PM   10        DO YOU SEE THAT?

12:55PM   11   A.   YES.

12:55PM   12   Q.   AND HE SAYS, "PLEASE CHANGE THIS TO 'MORE ACCURATE, MORE

12:55PM   13   COMFORTABLE' (OR SOMETHING SIMILAR TO THIS).  WE CAN DISCUSS

12:55PM   14   THIS IN MORE DETAIL AFTER THE WALGREENS MEETING, BUT THE

12:55PM   15   CORRECT STATIC IS THAT HUMAN ERROR ACCOUNTS FOR 93 PERCENT OF

12:55PM   16   TESTING ERRORS, WHICH ARE ELIMINATED THROUGH THE THERANOS

12:55PM   17   PLATFORM."

12:55PM   18        DO YOU SEE THAT?

12:55PM   19   A.   YES.

12:55PM   20   Q.   AND THAT'S A COMMENT ON THE SAME SUBJECT THAT WE WERE

12:55PM   21   TALKING ABOUT A MOMENT AGO?

12:55PM   22   A.   YES.

12:55PM   23   Q.   LET ME ASK YOU NOW TO LOOK AT EXHIBIT 10558.

12:56PM   24   A.   OKAY.

12:56PM   25   Q.   DO YOU SEE THIS IS AN EMAIL FROM MR. HOLMES, FROM

12:56PM  1    CHRISTIAN HOLMES TO MIKE YAGI AT CHIAT?

12:56PM  2    A.   YES.

12:56PM  3    Q.   AND YOU'RE COPIED ON THIS EMAIL?

12:56PM  4    A.   YES.

12:56PM  5    Q.   AND THIS IS COMMENTING ON THE PREPARATION OF A BROCHURE

12:56PM  6    THAT WILL BE AVAILABLE AT WALGREENS PATIENT SERVICE CENTERS AT

12:56PM  7    WALGREENS STORES?

12:56PM  8    A.   YES.

12:56PM  9             MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

12:56PM 10    10558.

12:56PM 11             MR. BOSTIC:  NO OBJECTION.

12:56PM 12             THE COURT:  IT'S ADMITTED AND MAY BE PUBLISHED.

12:56PM 13        (DEFENDANT'S EXHIBIT 10558 WAS RECEIVED IN EVIDENCE.)

12:56PM 14    BY MR. DOWNEY:

12:56PM 15    Q.   DO YOU SEE IN THE EMAIL THAT CHRISTIAN HOLMES REPORTS TO

12:56PM 16    MIKE YAGI AT CHIAT.

12:56PM 17        DO YOU SEE THAT?

12:56PM 18    A.   YES.

12:56PM 19    Q.   AND I SAYS, "MIKE.

12:56PM 20        "I HOPE YOU'RE DOING WELL.  I JUST CAUGHT UP WITH

12:57PM 21    ELIZABETH - SHE HAD A CONVERSATION WITH OUR REGULATORY FOLKS

12:57PM 22    AND THEY WANT TO MAKE A FEW CHANGES ON THE BROCHURE FOR

12:57PM 23    WALGREENS.  THESE ARE RELATIVELY MINOR BUT WILL NEED TO

12:57PM 24    IMPLEMENT THEM AS SOON AS WE CAN FOR THE ADDITIONAL PRINTING OF

12:57PM 25    THE BROCHURE.  HERE IS THE FEEDBACK."

12:57PM 1          AND THEN HE GOES ON TO LIST THAT FEEDBACK.

12:57PM 2          DO YOU SEE THAT?

12:57PM 3     A.   YES.

12:57PM 4     Q.   AND THEN THE FIRST ITEM IS "THE BROCHURE DOES NOT DISCLOSE

12:57PM 5     THAT A PRESCRIPTION IS NEEDED."

12:57PM 6          DO YOU SEE THAT?

12:57PM 7     A.   YES.

12:57PM 8     Q.   AND THE SECOND IS THAT "IT SOUNDS AS IF THE PATIENT GETS

12:57PM 9     THE RESULTS DIRECTLY RATHER THAN THROUGH THEIR DOCTORS."

12:57PM 10         DO YOU SEE THAT?

12:57PM 11    A.   YES.

12:57PM 12    Q.   AND MS. HOLMES WAS CONVEYING THROUGH HER BROTHER THAT SHE

12:57PM 13    WANTED THAT CHANGED TO BE CLEARER TO PATIENTS; CORRECT?

12:57PM 14    A.   CORRECT.

12:57PM 15    Q.   AND THEN THE THIRD ENTRY SAYS "ON THE 'ONE TINY DROP

12:57PM 16    CHANGES EVERYTHING' PANEL, I WOULD SAY 'TINY' RATHER THAN 'THE

12:57PM 17    TINIEST.'"

12:57PM 18         DO YOU SEE THAT?

12:57PM 19    A.   YES.

12:57PM 20    Q.   AND THAT IS A REFERENCE TO DEPICTIONS TO THE AMOUNT OF

12:58PM 21    BLOOD THAT WOULD BE DRAWN AT THERANOS PATIENT SERVICE CENTERS;

12:58PM 22    CORRECT?

12:58PM 23    A.   YES.

12:58PM 24    Q.   AND THEN SHE SAYS, "ON 'ONE DROP A WORLD OF ANSWERS'

12:58PM 25    PANEL, I ASSUME WE ARE NOT PROVIDING EVERY TEST THAT ANYONE

12:58PM 1    MIGHT WANT.  YOU MIGHT WANT TO SAY 'A FULL RANGE OF

12:58PM 2    STANDARD/COMMON/MOST FREQUENT TESTS,' OR SOMETHING ALONG THOSE

12:58PM 3    LINES."

12:58PM 4         DO YOU SEE THAT?

12:58PM 5    A.   YES.

12:58PM 6    Q.   AND MS. HOLMES WAS CONVEYING THROUGH CHRISTIAN HOLMES THAT

12:58PM 7    SHE THOUGHT THE PROSPECT OF SUGGESTING THAT THE COMPANY OFFERED

12:58PM 8    EVERY TEST SHOULDN'T BE FEATURED IN THE BROCHURE; CORRECT?

12:58PM 9    A.   RIGHT.

12:58PM 10   Q.   AND THE FIFTH ITEM, THERE'S A COMMENT ON "'BETTER ANSWERS

12:58PM 11   FASTER,'" AND SHE CONVEYS THROUGH MR. HOLMES THAT IT IS A

12:58PM 12   TROUBLING HEADER BECAUSE IT CREATES AN UNDEFINED COMPARISON.

12:58PM 13        DO YOU SEE THAT?

12:58PM 14   A.   YES.

12:58PM 15   Q.   SHE SAYS, "BETTER THAN WHAT?  FASTER THAN WHAT?"

12:59PM 16        DO YOU SEE THAT?

12:59PM 17   A.   YES.

12:59PM 18   Q.   AND THE LAST ITEM IS, SHE SAYS, "IF THERE ARE RISKS OR

12:59PM 19   POPULATIONS WHO SHOULDN'T USE THIS SERVICE OR OTHER RISK-TYPE

12:59PM 20   INFORMATION, WE SHOULD THINK ABOUT DISCLOSING IT."

12:59PM 21        DO YOU SEE THAT?

12:59PM 22   A.   YES.

12:59PM 23   Q.   LET ME TALK ABOUT THE CONVERSATION THAT YOU HAD YESTERDAY

12:59PM 24   WITH MR. BOSTIC ABOUT ROGER PARLOFF.

12:59PM 25        DO YOU RECALL THAT?

12:59PM   1    A.    YES.

12:59PM   2    Q.    AND LET ME ASK YOU IF WE CAN DRAW UP EXHIBIT 1753, WHICH

12:59PM   3    IS ALREADY IN EVIDENCE.

01:00PM   4         DO YOU RECALL YESTERDAY THAT MR. BOSTIC SHOWED YOU A LIST

01:00PM   5    OF ITEMS AND WHO WAS RESPONSIBLE FOR PROVIDING FEEDBACK IN

01:00PM   6    CONNECTION WITH THOSE ITEMS?

01:00PM   7    A.    YES.

01:00PM   8    Q.    AND HE POINTED YOU TO A NUMBER OF ITEMS THAT MS. HOLMES

01:00PM   9    WAS RESPONSIBLE FOR PROVIDING FOLLOWUP ON?

01:00PM  10    A.    YES.

01:00PM  11    Q.    AND THERE WERE OTHER REQUESTS BY MR. PARLOFF THAT OTHERS

01:00PM  12    AT THERANOS WERE RESPONSIBLE FOR PROVIDING INFORMATION ON;

01:00PM  13    CORRECT?

01:00PM  14    A.    CORRECT.

01:00PM  15    Q.    IF YOU LOOK AT THE FIRST PAGE OF EXHIBIT 1753, YOU RECALL

01:00PM  16    THAT THIS IS YOUR EMAIL TO MS. HOLMES LISTING THE ACTION ITEMS

01:00PM  17    WITH REGARD TO MR. PARLOFF?

01:00PM  18    A.    YES.

01:00PM  19    Q.    AND THERE'S A LIST OF ITEMS, AND THEN THE PERSON

01:00PM  20    RESPONSIBLE IS ON THE RIGHT-HAND SIDE; CORRECT?

01:01PM  21    A.    CORRECT.

01:01PM  22    Q.    AND YOU SEE THAT WITH REGARD TO ITEMS 3 THROUGH 8, THERE

01:01PM  23    WAS APPARENTLY A REQUEST OR A DISCUSSION FOR SEVERAL ISSUES

01:01PM  24    RELATED TO THE SCIENCE OF THERANOS BLOOD TESTING.

01:01PM  25         DO YOU SEE THAT?

01:01PM  1    A.   YES.

01:01PM  2    Q.   AND DO YOU SEE THAT DR. YOUNG WAS LISTED AS THE

01:01PM  3    RESPONSIBLE PARTY FOR GATHERING THAT INFORMATION?

01:01PM  4    A.   YES.

01:01PM  5    Q.   IF YOU GO TO THE NEXT PAGE, WHICH IS PAGE 2.  WE CAN BLOW

01:01PM  6    UP ITEMS 33 AND 34.

01:01PM  7         DO YOU RECALL THAT THERE WAS A REQUEST BY MR. PARLOFF TO

01:01PM  8    SEE INFORMATION RELATED TO THERANOS'S INTELLECTUAL PORTFOLIO --

01:01PM  9    I MEAN INTELLECTUAL PROPERTY PORTFOLIO?

01:01PM  10   A.   YES.

01:02PM  11   Q.   AND ON THE RIGHT-HAND SIDE, THE IP TEAM WAS LISTED AS

01:02PM  12   BEING RESPONSIBLE; CORRECT?

01:02PM  13   A.   CORRECT.

01:02PM  14   Q.   AND THOSE ARE THE LAWYERS WHO PREPARED, FILED, AND

01:02PM  15   DEFENDED PATENTS FOR THERANOS; CORRECT?

01:02PM  16   A.   CORRECT.

01:02PM  17   Q.   AND YOU UNDERSTOOD WHEN YOU WERE AT THERANOS THAT THERANOS

01:02PM  18   BELIEVED IT HAD A VERY VALUABLE INTELLECTUAL PROPERTY

01:02PM  19   PORTFOLIO?

01:02PM  20   A.   YES.

01:02PM  21        MR. DOWNEY:  YOUR HONOR, IF I MIGHT HAVE ONE MOMENT?

01:02PM  22   I'M PRETTY CLOSE TO DONE.

01:02PM  23        THE COURT:  SURE.

01:03PM  24        (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

01:03PM  25        MR. DOWNEY:  YOUR HONOR, I'M GOING TO ASK ABOUT THE

01:03PM   1    SUBJECT MATTER THAT WE'VE DISCUSSED.

01:03PM   2              THE COURT:  YES.

01:03PM   3              MR. DOWNEY:  MAY I APPROACH THE WITNESS?

01:03PM   4              THE COURT:  YES.

01:03PM   5              MR. DOWNEY:  (HANDING.)

01:03PM   6              THE COURT:  THANK YOU.

01:03PM   7    BY MR. DOWNEY:

01:04PM   8    Q.   MR. EDLIN, I'VE PLACED IN FRONT OF YOU A BINDER OF

01:04PM   9    ADDITIONAL DOCUMENTS, BUT DON'T WORRY, I'M NOT GOING TO ASK YOU

01:04PM  10    ABOUT ALL OF THEM.

01:04PM  11    A.   THANK YOU.

01:04PM  12    Q.   I'LL ASK YOU TO LOOK AT EXHIBIT 7476.

01:04PM  13    A.   OKAY.

01:04PM  14    Q.   DO YOU RECALL THAT THERANOS WOULD CONDUCT EXPERIENCE

01:04PM  15    SURVEYS OF PATIENTS WHO USED ITS BLOOD TESTING SERVICES?

01:04PM  16    A.   YES.

01:04PM  17    Q.   AND DO YOU RECALL THAT PHLEBOTOMISTS IN THERANOS PATIENT

01:05PM  18    SERVICE CENTERS WOULD ALSO INTERACT WITH PATIENTS FOR THEIR

01:05PM  19    FEEDBACK ON PATIENT SERVICES?

01:05PM  20    A.   YES.

01:05PM  21    Q.   AND DO YOU UNDERSTAND THAT THAT INFORMATION WAS THEN OFTEN

01:05PM  22    AGGREGATED INTO REPORTS?

01:05PM  23    A.   YES.

01:05PM  24    Q.   AND THOSE REPORTS WERE SHARED WITH, AMONG OTHERS, WITH

01:05PM  25    MS. HOLMES; CORRECT?

01:05PM  1    A.   CORRECT.

01:05PM  2    Q.   AND THAT WAS DONE ON A WEEKLY OR BIWEEKLY BASIS; CORRECT?

01:05PM  3    A.   CORRECT.

01:05PM  4             MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

01:05PM  5    7476.

01:05PM  6             MR. BOSTIC:  401.

01:06PM  7         (PAUSE IN PROCEEDINGS.)

01:06PM  8             THE COURT:  THIS IS WHAT WE DISCUSSED EARLIER, I

01:06PM  9    THINK.

01:06PM  10            MR. DOWNEY:  THAT'S CORRECT, YOUR HONOR.

01:06PM  11            THE COURT:  I'M GOING TO SUSTAIN THE OBJECTION ON

01:06PM  12   THIS.  THE OBJECTION IS SUSTAINED.

01:06PM  13            MR. DOWNEY:  YOUR HONOR, ON THE SAME FOUNDATION, I

01:06PM  14   WOULD HAVE MOVED TO ADMIT A SERIES OF ADDITIONAL EXHIBITS,

01:06PM  15   WHICH I'LL JUST LIST FOR THE RECORD.

01:06PM  16       EXHIBIT 7557, EXHIBIT 7561, EXHIBIT 7571, EXHIBIT 7573,

01:06PM  17   EXHIBIT 7575, EXHIBIT 7576, EXHIBIT 7579, EXHIBIT 7583, AND

01:07PM  18   EXHIBIT 7586.

01:07PM  19   Q.   MR. EDLIN, DO YOU RECALL TESTIFYING YESTERDAY --

01:07PM  20            THE COURT:  I SHOULD PROBABLY RULE.

01:07PM  21            MR. DOWNEY:  OH, I'M SORRY.  I THOUGHT THAT WAS

01:07PM  22   IMPLICIT.  I HOPE I DO BETTER.

01:07PM  23            THE COURT:  WELL, YOU NEVER KNOW.

01:07PM  24       I DID WANT TO LOOK AT THESE.  WE DID TALK ABOUT THESE

01:07PM  25   EARLIER.  I HAVEN'T HAD A CHANCE TO LOOK AT THEM.

01:07PM 1        BUT IF YOU CAN REPRESENT TO ME THAT THESE CONTAIN THE

01:07PM 2   COMMENTS THAT WE DISCUSSED EARLIER, THEN I WOULD SUSTAIN THE

01:07PM 3   OBJECTION BASED ON 401 GROUNDS AND THE LIMITATION.

01:08PM 4        IF THERE'S SOME WAY TO PARSE OUT THESE EXHIBITS IN THE

01:08PM 5   MANNER THAT I HAD PREVIOUSLY DISCUSSED, I'LL LOOK AT THEM, I'LL

01:08PM 6   REVISIT THEM.

01:08PM 7        BUT THE COLLECTIVE, I THINK, IS -- I'M GOING TO SUSTAIN

01:08PM 8   THE OBJECTION.

01:08PM 9            MR. DOWNEY:  YOUR HONOR, IF THERE ARE PARTICULAR

01:08PM 10  SEGMENTS OF THEM THAT WE THINK ARE CONSISTENT WITH THE COURT'S

01:08PM 11  RULING, MAY WE CONSIDER THAT AN ADEQUATE FOUNDATION HAS BEEN

01:08PM 12  LAID BY THIS WITNESS TO ADMIT THEM, ASSUMING THEY'RE NOT

01:08PM 13  INADMISSIBLE ON SOME OF THE GROUNDS THAT WE DISCUSSED EARLIER?

01:08PM 14            THE COURT:  SURE.  I DON'T HAVE A PROBLEM WITH THAT,

01:08PM 15  YOU RAISING THOSE AGAIN, AND I'LL HEAR FROM MR. BOSTIC WHEN AND

01:08PM 16  IF YOU DECIDE TO PUT THAT COLLECTIVE BACK.

01:08PM 17        MR. BOSTIC, YOU'LL HAVE AN OPPORTUNITY TO COMMENT.

01:08PM 18            MR. BOSTIC:  UNDERSTOOD.  THANK YOU.

01:08PM 19            THE COURT:  ALL RIGHT.  THANK YOU.  SO THE OBJECTION

01:08PM 20  IS SUSTAINED.

01:08PM 21  BY MR. DOWNEY:

01:08PM 22  Q.   DO YOU RECALL TESTIFYING YESTERDAY, MR. EDLIN, ABOUT YOUR

01:08PM 23  RELATIONSHIP WITH DR. ROBERTSON?

01:08PM 24  A.   YES.

01:08PM 25  Q.   AND DO YOU RECALL AT THE END OF 2016 YOU PARTICIPATED WITH

01:09PM   1    DR. ROBERTSON IN ASSEMBLING A TECHNOLOGY ADVISORY BOARD AT

01:09PM   2    THERANOS?

01:09PM   3    A.   YES.

01:09PM   4    Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 7687.

01:09PM   5    A.   IS THAT IN THE MOST RECENT BINDER THAT YOU GAVE?

01:09PM   6    Q.   IT SHOULD BE IN THE BINDER THAT I GAVE YOU YESTERDAY.  I

01:09PM   7    THINK YOU CAN PUT ASIDE THE BINDER THAT WE JUST TALKED ABOUT.

01:10PM   8    A.   CAN YOU REPEAT THE NUMBER, PLEASE.

01:10PM   9    Q.   7687.

01:10PM  10    A.   OKAY.

01:10PM  11    Q.   IS THIS AN EMAIL BETWEEN YOURSELF, DR. ROBERTSON AND

01:10PM  12    MS. HOLMES AND OTHERS FROM DECEMBER OF 2016 RELATED TO A

01:10PM  13    TECHNOLOGY ADVISORY BOARD AT THERANOS?

01:10PM  14    A.   YES.

01:10PM  15    Q.   AND WHAT -- WHO WERE THE MEMBERS OF THE TECHNOLOGY

01:10PM  16    ADVISORY BOARD AT THERANOS?

01:10PM  17    A.   I SEE HERE HOWIE ROSEN IS ANOTHER NAME.  I DON'T REMEMBER

01:11PM  18    THE OTHER NAMES SPECIFICALLY.

01:11PM  19    Q.   BUT THIS BOARD OF -- WAS DESIGNED TO BE A BOARD TO ADVISE

01:11PM  20    THERANOS REGARDING ITS TECHNOLOGY AND HARDWARE?

01:11PM  21         DO YOU RECALL THAT?

01:11PM  22    A.   THAT'S RIGHT.

01:11PM  23    Q.   AND IT CONSISTED OF A NUMBER OF EXPERT ENGINEERS; CORRECT?

01:11PM  24    A.   YES.

01:11PM  25    Q.   AND THEY WERE EXTERNAL TO THE COMPANY; CORRECT?

01:11PM   1    A.   CORRECT.

01:11PM   2    Q.   AND DR. ROBERTSON WAS INVOLVED WITH IT BECAUSE HE HAD

01:11PM   3    PARTICULAR EXPERTISE AS A CHEMICAL ENGINEER; CORRECT?

01:11PM   4    A.   CORRECT.

01:11PM   5              MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT

01:11PM   6    EXHIBIT 7687.

01:12PM   7              MR. BOSTIC:  AS TO THIS TOPIC, 401, 403, ALSO BEYOND

01:12PM   8    THE SCOPE.

01:12PM   9              THE COURT:  7687?

01:12PM   10             MR. DOWNEY:  YES.

01:12PM   11             THE COURT:  IT'S THE TWO-PAGE EMAIL?

01:12PM   12             MR. DOWNEY:  YES.

01:12PM   13             THE COURT:  I'LL ADMIT IT -- OBJECTION IS

01:12PM   14    OVERRULED -- AND IT MAY BE PUBLISHED.

01:12PM   15        (DEFENDANT'S EXHIBIT 7687 WAS RECEIVED IN EVIDENCE.)

01:12PM   16    BY MR. DOWNEY:

01:12PM   17    Q.   IF YOU LOOK AT THE EMAIL, IN THE SECOND HALF OF PAGE 1 OF

01:12PM   18    THIS EXHIBIT, YOU SEE THAT'S AN EMAIL FROM YOU TO DR. ROBERTSON

01:12PM   19    AND OTHERS; CORRECT?

01:12PM   20    A.   YES.

01:12PM   21    Q.   AND YOU'RE APPRISING HIM OF WHAT MATERIALS MIGHT BE SHARED

01:12PM   22    WITH THE TECHNOLOGY ADVISORY BOARD; CORRECT?

01:12PM   23    A.   YES.

01:12PM   24    Q.   AND THIS LIST OF MATERIALS IS A LIST OF MATERIALS THAT

01:12PM   25    DR. YOUNG HAD RECOMMENDED BE SHARED WITH THAT GROUP?

01:13PM  1    A.   CORRECT.

01:13PM  2    Q.   WE TALKED YESTERDAY ABOUT ASSAY DEVELOPMENT REPORTS AT

01:13PM  3    THERANOS.

01:13PM  4         DO YOU RECALL THAT?

01:13PM  5    A.   YES.

01:13PM  6    Q.   AND DO YOU RECALL THAT THOSE REPORTS WERE STORED AT

01:13PM  7    THERANOS?

01:13PM  8    A.   YES.

01:13PM  9    Q.   AND THAT THERE WERE FULL VERSIONS AND REDACTED VERSIONS?

01:13PM  10   A.   YES.

01:13PM  11   Q.   DO YOU RECALL THAT THERE WERE MORE THAN 300 ASSAY

01:13PM  12   DEVELOPMENT REPORTS?

01:13PM  13   A.   YES.

01:13PM  14        MR. DOWNEY:  YOUR HONOR, I MIGHT BE DONE.

01:13PM  15       (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

01:14PM  16        MR. DOWNEY:  YOUR HONOR, I HAVE NOTHING FURTHER ON

01:14PM  17   CROSS-EXAMINATION.

01:14PM  18        THE COURT:  ALL RIGHT.  THANK YOU.

01:14PM  19     MR. BOSTIC, DO YOU HAVE REDIRECT?

01:14PM  20        MR. BOSTIC:  I DO, YOUR HONOR.

01:14PM  21        THE COURT:  MR. BOSTIC, WE'LL TAKE OUR AFTERNOON

01:14PM  22   BREAK AT THE BOTTOM OF THE HOUR.

01:14PM  23        MR. BOSTIC:  UNDERSTOOD.  THANK YOU, YOUR HONOR.

01:14PM  24   ///

01:14PM  25                      **REDIRECT EXAMINATION**

01:14PM  1    BY MR. BOSTIC:

01:14PM  2    Q.   GOOD AFTERNOON, MR. EDLIN.

01:15PM  3    A.   GOOD AFTERNOON.

01:15PM  4    Q.   I WANT TO FOLLOW UP ON A CONVERSATION THAT YOU HAD WITH

01:15PM  5    MR. DOWNEY ABOUT THERANOS'S INVOLVEMENT WITH THE MILITARY.

01:15PM  6         DO YOU RECALL THAT TESTIMONY?

01:15PM  7    A.   YES.

01:15PM  8    Q.   ON DIRECT YOU TESTIFIED ABOUT WHETHER A THERANOS ANALYZER

01:15PM  9    WAS EVER ACTUALLY USED BY THE MILITARY TO CONDUCT CLINICAL

01:15PM  10   TESTING FOR SOLDIERS.

01:15PM  11        DO YOU RECALL THAT QUESTION?

01:15PM  12   A.   YES.

01:15PM  13   Q.   AND WHAT WAS YOUR ANSWER TO THAT QUESTION?

01:15PM  14   A.   NO.

01:15PM  15   Q.   AND DOES THAT REMAIN YOUR TESTIMONY?

01:15PM  16   A.   YES.

01:15PM  17   Q.   I'D LIKE TO JUST CIRCLE BACK TO A COUPLE OF THE INDIVIDUAL

01:15PM  18   ENGAGEMENTS.

01:15PM  19        FIRST, LET'S TALK ABOUT THE BURN STUDY THAT WAS CONDUCTED

01:15PM  20   WITH MILITARY INVOLVEMENT.

01:15PM  21        DO YOU RECALL THAT PARTICULAR ENGAGEMENT?

01:16PM  22   A.   YES.

01:16PM  23             MR. BOSTIC:  MS. KRATZMANN, IF I COULD USE THE

01:16PM  24   OVERHEAD.

01:16PM  25   Q.   MR. EDLIN, I'M GOING TO SHOW YOU EXHIBIT 7694, WHICH IS IN

01:16PM  1    EVIDENCE.

01:16PM  2    A.   OKAY.

01:16PM  3    Q.   DO YOU RECOGNIZE THIS AS THE ARTICLE THAT WAS THE RESULT

01:16PM  4    OF THE STUDY THAT WAS CONDUCTED BY DR. CHUNG USING A THERANOS

01:16PM  5    ANALYZER?

01:16PM  6    A.   YES.

01:16PM  7    Q.   I JUST WANT TO POINT OUT A FEW DETAILS AND ASK YOUR

01:16PM  8    THOUGHTS.

01:16PM  9         FIRST, DO YOU SEE UNDER THE ABSTRACT THERE'S A SECTION

01:16PM 10    LABELLED RESULTS?

01:16PM 11    A.   YES.

01:16PM 12    Q.   IT SAYS THERE, "DURING A 4-YEAR PERIOD, A TOTAL OF NINE

01:17PM 13    SUBJECTS WERE ENROLLED FOR THE INVENTION DURING THE RAMP-IN

01:17PM 14    PHASE AND 28 SUBJECTS WERE RANDOMIZED, 14 EACH INTO THE CONTROL

01:17PM 15    AND HVHF ARMS RESPECTIVELY.  THE STUDY WAS TERMINATED DUE TO

01:17PM 16    SLOW ENROLLMENT."

01:17PM 17         DO YOU SEE THAT?

01:17PM 18    A.   I DO.

01:17PM 19    Q.   IS THAT CONSISTENT WITH YOUR UNDERSTANDING THAT

01:17PM 20    APPROXIMATELY 28 INDIVIDUALS PARTICIPATED IN THIS STUDY OVER A

01:17PM 21    FOUR YEAR PERIOD?

01:17PM 22    A.   YES.

01:17PM 23    Q.   IN THE SECTION ABOVE WHERE IT SAYS METHODS, IT TALKS ABOUT

01:17PM 24    HOW THIS WAS A CLINICAL TRIAL TO EVALUATE THE IMPACT OF HVHF.

01:17PM 25         DID YOU UNDERSTAND THAT TO REFER TO HIGH-VOLUME

01:17PM  1      HEMOFILTRATION?

01:17PM  2      A.   THAT SOUNDS RIGHT.

01:17PM  3      Q.   AND WAS THIS STUDY DESIGNED TO TEST WHETHER THAT TREATMENT

01:17PM  4      WAS BENEFICIAL TO BURN VICTIMS?

01:17PM  5      A.   I BELIEVE IT WAS.

01:17PM  6      Q.   WAS THAT HVHF TREATMENT DEVELOPED OR WORKED ON IN ANY WAY

01:18PM  7      BY THERANOS?

01:18PM  8      A.   NOT TO MY KNOWLEDGE.

01:18PM  9      Q.   ON PAGE 2 OF THIS EXHIBIT UNDER RESULTS, DO YOU SEE THAT

01:18PM  10     THERE'S A SECTION THAT BEGINS "ACROSS SEVEN PARTICIPATING BURN

01:18PM  11     CENTERS"?

01:18PM  12     A.   YES.

01:18PM  13     Q.   DO YOU KNOW OFFHAND WHAT THOSE SEVEN PARTICIPATING BURN

01:18PM  14     CENTERS WERE?

01:18PM  15     A.   I'M -- I DON'T THINK I KNOW ALL SEVEN OFFHAND.

01:18PM  16     Q.   DO YOU KNOW WHETHER THEY WERE ALL MILITARY AFFILIATED OR

01:18PM  17     WHETHER SOME WERE NONMILITARY?

01:18PM  18     A.   I BELIEVE SOME WERE ACADEMIC, UNIVERSITY AND MEDICAL

01:18PM  19     CENTERS.

01:18PM  20     Q.   SO, IN OTHER WORDS, THE PARTICIPANTS IN THIS STUDY WERE

01:18PM  21     NOT LIMITED TO SOLDIERS; IS THAT CORRECT?

01:18PM  22     A.   THAT'S MY UNDERSTANDING.

01:18PM  23     Q.   WE CAN PUT THAT ONE ASIDE.

01:19PM  24          I'D NEXT LIKE TO TALK TO YOU ABOUT THE DEALINGS THAT

01:19PM  25     THERANOS HAD WITH AFRICOM.

EDLIN REDIRECT BY MR. BOSTIC

01:19PM  1          DO YOU HAVE THAT IN YOUR MIND?

01:19PM  2     A.   YES.

01:19PM  3     Q.   AND I'D LIKE TO SHOW YOU WHAT WAS ADMITTED AS

01:19PM  4     EXHIBIT 12251.

01:19PM  5          MR. EDLIN, DO YOU SEE EXHIBIT 12251 ON THE SCREEN?

01:19PM  6     A.   YES.

01:19PM  7     Q.   AND DO YOU RECALL DISCUSSING THIS EMAIL WITH MR. DOWNEY?

01:19PM  8     A.   YES.

01:19PM  9     Q.   THIS EMAIL HAS AN ATTACHMENT; IS THAT CORRECT?

01:20PM 10     A.   I BELIEVE SO.

01:20PM 11     Q.   AND DO YOU SEE ON THE SCREEN IN FRONT OF YOU THE ACTUAL

01:20PM 12     DRAFT PROTOCOL FOR THE AFRICOM STUDY?

01:20PM 13     A.   YES.

01:20PM 14     Q.   OKAY.  I'D LIKE TO SHOW YOU SOME INFORMATION ON THE SECOND

01:20PM 15     PAGE OF THAT PROTOCOL.

01:20PM 16          FIRST, DO YOU SEE UNDER STUDY DESIGN WHERE THERE'S A

01:20PM 17     SECTION LABELLED "INTERVENTIONS"?

01:20PM 18     A.   YES.

01:20PM 19     Q.   AND DO YOU SEE THERE HIGHLIGHTED THERE'S A SECTION

01:20PM 20     LABELLED "STANDARD PHYSICAL EXAM TESTS ON 5 VOLUNTEERS"?

01:20PM 21     A.   YES.

01:20PM 22     Q.   AND DO YOU SEE SPECIFIC ASSAYS LISTED UNDERNEATH THAT?

01:20PM 23     A.   YES.

01:20PM 24     Q.   AND THE ASSAYS ARE CBC, CHEMISTRY, LIVER PANEL, UA, AND

01:21PM 25     LIPIDS.

01:21PM   1          DO YOU SEE THAT?

01:21PM   2     A.   YES.

01:21PM   3     Q.   DO YOU KNOW WHETHER -- WELL, LET ME ASK FIRST, WAS IT AN

01:21PM   4     EDISON 3.0 THAT WAS GIVEN TO AFRICOM IN CONNECTION WITH THIS

01:21PM   5     STUDY?

01:21PM   6     A.   YES.

01:21PM   7     Q.   DO YOU KNOW WHETHER THE EDISON 3.0 WAS EVEN CAPABLE OF

01:21PM   8     CONDUCTING THE ASSAYS THAT ARE LISTED HERE?

01:21PM   9     A.   I DON'T BELIEVE IT WAS CAPABLE OF CONDUCTING ALL OF THE

01:21PM  10     ASSAYS.

01:21PM  11     Q.   GOING FURTHER DOWN IN THAT SAME PROTOCOL, I'D LIKE TO DRAW

01:21PM  12     YOUR ATTENTION TO SUBSECTION 3.  DO YOU SEE SOME HIGHLIGHTED

01:21PM  13     LANGUAGE THERE?

01:21PM  14     A.   YES.

01:21PM  15     Q.   IT READS THERE, "MOCK PATIENT SCENARIO REQUIRING

01:21PM  16     LABORATORY ASSESSMENT WITH SUBSEQUENT EVALUATION FOR

01:21PM  17     CONFIRMATORY TESTING."

01:22PM  18          DO YOU SEE THAT?

01:22PM  19     A.   YES.

01:22PM  20     Q.   AND I'LL MOVE DOWN TO THE BOTTOM OF THIS PAGE.

01:22PM  21          DO YOU SEE AT THE BOTTOM, UNDER RISK TO SUBJECTS, THERE'S

01:22PM  22     SOME LANGUAGE BEGINNING AT THE BOTTOM, "ALL CLINICAL DATA WILL

01:22PM  23     BE NOTIONAL."

01:22PM  24          DO YOU SEE THAT?

01:22PM  25     A.   YES.

01:22PM  1    Q.   IT READS, "ALL CLINICAL DATA WILL BE NOTIONAL DATA,

01:22PM  2    CREATED AS A SCENARIO AND WILL NOT REPRESENT ANY TRUE CONDITION

01:22PM  3    OF THE RESEARCH SUBJECT."

01:22PM  4         DO YOU SEE THAT LANGUAGE?

01:22PM  5    A.   YES.

01:22PM  6    Q.   AND WHAT IS YOUR UNDERSTANDING OF WHAT THAT LANGUAGE

01:22PM  7    MEANS?

01:22PM  8    A.   THE RESULTS FOR EACH PATIENT WERE PREDETERMINED.

01:22PM  9    LIEUTENANT COLONEL GIVENS SENT TO THERANOS WHAT THE RESULTS FOR

01:22PM 10    EACH PATIENT SHOULD BE, AND THOSE WERE THE RESULTS FOR EACH

01:22PM 11    PATIENT THAT APPEARED ON THE DEVICE.

01:22PM 12    Q.   AND DOES THAT MEAN THAT IN CONNECTION WITH THIS AFRICOM

01:22PM 13    STUDY, THE ANALYZER ITSELF WASN'T ACTUALLY ANALYZING BLOOD AND

01:22PM 14    RETURNING RESULTS THAT WERE BEING USED?

01:22PM 15    A.   IT WASN'T RETURNING RESULTS THAT WERE BEING USED.  I'M NOT

01:22PM 16    SURE EXACTLY WHAT WAS DONE ON THE DEVICE.

01:22PM 17    Q.   BECAUSE THE RESULTS IN THE STUDY WERE PREDETERMINED AND

01:23PM 18    FICTIONAL; IS THAT CORRECT?

01:23PM 19    A.   THEY WERE -- I THINK THEY WERE DESCRIBED AS ARTIFICIAL.

01:23PM 20    Q.   I'D LIKE TO SHOW YOU NEXT WHAT WAS ADMITTED AS 10483.  AND

01:23PM 21    THIS WAS ADMITTED PREVIOUSLY.

01:23PM 22         MR. EDLIN, DO YOU RECALL DISCUSSING THIS EMAIL CHAIN WITH

01:23PM 23    LIEUTENANT COLONEL GIVENS WITH MR. DOWNEY?

01:23PM 24    A.   YES.

01:23PM 25    Q.   LET ME FIRST SHOW YOU AN EMAIL IN THIS CHAIN.  DO YOU SEE

01:24PM  1   ON THE PAGE IN FRONT OF YOU AN EMAIL FROM LIEUTENANT

01:24PM  2   COLONEL GIVENS, OR A PORTION OF AN EMAIL?

01:24PM  3   A.   YES.

01:24PM  4   Q.   AND DO YOU SEE IN THAT PORTION THERE'S HIGHLIGHTED

01:24PM  5   LANGUAGE THAT SAYS, "FOR THE 5 PATIENTS WHO ARE JUST HAVING

01:24PM  6   PHYSICAL EXAM TESTS - THESE CAN ALL BE NORMAL RESULTS.

01:24PM  7        "I SPECIFIED VALUES FOR THE REMAINING PATIENTS.  LET ME

01:24PM  8   KNOW IF I NEED TO INCLUDE UNITS."

01:24PM  9        DO YOU SEE THAT?

01:24PM 10   A.   YES.

01:24PM 11   Q.   IS THIS LIEUTENANT COLONEL GIVENS PROVIDING WHAT THE

01:24PM 12   ARTIFICIAL RESULTS ARE TO BE TO THERANOS IN ADVANCE OF THE

01:24PM 13   TEST?

01:24PM 14   A.   YES.

01:24PM 15   Q.   DO YOU RECALL THAT IN THIS EMAIL YOU ASKED A QUESTION

01:24PM 16   ABOUT WHAT THE CONDITIONS WOULD BE ON THE MEDEVAC FROM GERMANY

01:24PM 17   TO UGANDA?

01:24PM 18   A.   YES, YES.

01:24PM 19   Q.   LET ME SHOW YOU THAT LANGUAGE.

01:24PM 20        DO YOU SEE THAT ON THE SCREEN?

01:24PM 21   A.   YES.

01:25PM 22   Q.   AND THIS IS IN CONNECTION WITH THE QUESTION ABOUT HOW THE

01:25PM 23   DEVICE WAS GOING TO BE TRANSPORTED IN THE FIELD; IS THAT RIGHT?

01:25PM 24   A.   YES.

01:25PM 25   Q.   WAS IT YOUR UNDERSTANDING WHEN YOU WROTE THAT EMAIL THAT

01:25PM  1    THE DEVICE WAS GOING TO BE TRANSPORTED ON A MEDEVAC FROM

01:25PM  2    GERMANY TO UGANDA?

01:25PM  3    A.   YES.  OR I'M NOT SURE IF IT WAS A MEDEVAC, BUT I BELIEVE

01:25PM  4    IT WAS A HELICOPTER.

01:25PM  5    Q.   ON THE SCREEN IN FRONT OF YOU, DO YOU SEE LIEUTENANT

01:25PM  6    COLONEL GIVENS'S RESPONSE TO THAT QUESTION?

01:25PM  7    A.   YES.

01:25PM  8    Q.   SHE RESPONDS IN THAT SECOND PARAGRAPH THERE, "THE

01:25PM  9    EQUIPMENT AND CARTRIDGES WILL BE FLOWN COMMERCIAL AIR WITH ME

01:25PM  10   ON THE 23RD, AND I WILL FLY BACK TO GERMANY ON THE 2ND OF

01:25PM  11   JULY."

01:25PM  12        DO YOU SEE THAT?

01:25PM  13   A.   YES.

01:25PM  14   Q.   AND SHE THEN IN THE PARAGRAPH BELOW -- WELL, FIRST OF ALL,

01:25PM  15   DOES THIS INDICATE THAT THE DEVICE WAS NOT ACTUALLY TRANSPORTED

01:25PM  16   ON A MEDEVAC FROM GERMANY TO UGANDA?

01:26PM  17             THE COURT:  I'M SORRY, MR. BOSTIC.  WAS THIS

01:26PM  18   ADMITTED?

01:26PM  19             MR. BOSTIC:  IT WAS, YOUR HONOR.  I BELIEVE SO,

01:26PM  20   10483.

01:26PM  21             THE COURT:  MS. KRATZMANN, DO YOU SHOW THAT?

01:26PM  22             THE CLERK:  I DON'T SHOW THAT, YOUR HONOR, AS

01:26PM  23   ADMITTED.  I WENT UP TO 10480.

01:26PM  24             MR. BOSTIC:  I APOLOGIZE.  IT MAY HAVE BEEN A

01:26PM  25   DIFFERENT VERSION OF THIS EMAIL.

01:26PM  1        YOUR HONOR, THE GOVERNMENT WOULD MOVE TO ADMIT 10483 IF

01:26PM  2   IT'S NOT.

01:26PM  3            THE COURT:  IT MAY HAVE COME IN ATTACHED TO

01:26PM  4   SOMETHING ELSE.

01:26PM  5        ANY OBJECTION TO THIS COMING IN, MR. DOWNEY?

01:26PM  6            MR. DOWNEY:  WELL, MAYBE THE EASIEST THING IS THAT I

01:26PM  7   COULD JUST GIVE THE NUMBER OF THE EXHIBIT THAT WAS ADMITTED IF

01:26PM  8   YOU'LL BEAR WITH ME.  IT'S 13993.

01:26PM  9            THE COURT:  THANK YOU.

01:26PM 10            MR. BOSTIC:  APOLOGIES, YOUR HONOR.  I'M HAPPY TO

01:26PM 11   USE THAT VERSION.

01:26PM 12        13993?

01:27PM 13            THE COURT:  IT'S THE SAME DOCUMENT AND IT JUST HAS A

01:27PM 14   DIFFERENT NUMBER FOR EACH BINDER, EACH RESPECTIVE BINDER.  BUT

01:27PM 15   IT IS THE SAME DOCUMENT.

01:27PM 16            MR. BOSTIC:  THANK YOU, YOUR HONOR.

01:27PM 17   Q.   MR. EDLIN, I'M NOT SURE WHETHER I GOT AN ANSWER TO THE

01:27PM 18   QUESTION.

01:27PM 19        DO YOU RECALL WHETHER, IN FACT, THE DEVICE WAS TRANSPORTED

01:27PM 20   COMMERCIALLY FROM GERMANY TO UGANDA AND NOT BY MEDEVAC?

01:27PM 21   A.   I WOULD JUST HAVE TO LOOK AT THE EMAIL IF YOU DON'T MIND.

01:27PM 22        (PAUSE IN PROCEEDINGS.)

01:27PM 23            THE WITNESS:  YES, THAT'S WHAT IS INDICATED HERE,

01:27PM 24   COMMERCIAL AIR.

01:27PM 25   BY MR. BOSTIC:

01:27PM  1    Q.   THERE'S DISCUSSION IN THAT SAME EMAIL --

01:28PM  2              THE COURT:  IT'S NOT ON THE SCREEN IN THE AUDIENCE.

01:28PM  3    IT'S NOT ON THE JURY SCREEN?

01:28PM  4              JUROR:  NO.

01:28PM  5         IT'S COMING.

01:28PM  6              THE CLERK:  NO?  YES?

01:28PM  7              JUROR:  YES.

01:28PM  8              MR. BOSTIC:  THANK YOU, YOUR HONOR.

01:28PM  9    Q.   MR. EDLIN, DO YOU SEE SOMETHING ON THE SCREEN ABOUT HOW

01:28PM  10   YOU IT WOULD BE FLYING FROM UGANDA AND HOW IT -- SURE.

01:28PM  11        DO YOU SEE IN THE EMAIL LANGUAGE ABOUT FLYING THE

01:28PM  12   EQUIPMENT FROM UGANDA AND HOW IT WOULD BE ON A NON-PRESSURIZED

01:28PM  13   AIRCRAFT AT ALTITUDES LESS THAN 10,000 FEET?

01:28PM  14   A.   YES.

01:28PM  15   Q.   DO YOU RECALL DURING DIRECT WE LOOKED AT SOME DOCUMENTS

01:28PM  16   THAT DISCUSSED THE POSSIBILITY THAT A THERANOS ANALYSIS WOULD

01:28PM  17   BE USED ON A MILITARY MEDEVAC?

01:28PM  18   A.   YES.

01:28PM  19   Q.   AND CAN YOU DESCRIBE WHAT THAT WOULD MEAN?  WHAT THAT USE

01:28PM  20   WOULD LOOK LIKE?

01:28PM  21   A.   THIS WOULD BE, LIKE, A HYPOTHETICAL.

01:29PM  22        IN ORDER FOR THE DEVICE TO OPERATE, IT WOULD HAVE TO BE

01:29PM  23   INFLUENCED INTO A POWER SOURCE AND I THINK IT WOULD JUST, IT

01:29PM  24   WOULD NEED TO HAVE A DESIGNATED LOCATION WITHIN THE VEHICLE,

01:29PM  25   AND THAT WOULD LIKELY HAVE TO BE SECURED, STATIONARY.

01:29PM   1    Q.   AND YOU SAID IN ORDER FOR THE DEVICE TO OPERATE, IT WOULD

01:29PM   2    NEED A POWER SOURCE?

01:29PM   3    A.   RIGHT.

01:29PM   4    Q.   THAT'S WHAT I'M GETTING AT.

01:29PM   5         WHEN THAT POSSIBILITY WAS CONTEMPLATED BY THERANOS, WAS

01:29PM   6    THAT REFERRING TO THE MERE TRANSPORT OF AN ANALYZER FROM ONE

01:29PM   7    LOCATION TO ANOTHER ON A MILITARY PLANE?  OR WAS IT THE ACTUAL

01:29PM   8    OPERATION AND USE OF THE ANALYZER ON A MILITARY AIRCRAFT?

01:29PM   9    A.   THE OPERATION AND USE.

01:29PM  10    Q.   SO THEN MY QUESTION FOR YOU IS THAT IN CONNECTION WITH THE

01:30PM  11    AFRICOM STUDY THAT WE'RE TALKING ABOUT NOW, DID THAT HAPPEN?

01:30PM  12    WAS A THERANOS ANALYZER ACTUALLY INSTALLED AND USED ON A

01:30PM  13    MILITARY MEDEVAC?

01:30PM  14    A.   NO.

01:30PM  15    Q.   DO YOU RECALL REVIEWING WITH MR. DOWNEY AN EMAIL FROM

01:30PM  16    LIEUTENANT COLONEL GIVENS WHERE SHE TALKED ABOUT HOW THE DEVICE

01:30PM  17    HAD PERFORMED WELL?

01:30PM  18    A.   YES.

01:30PM  19    Q.   JUST TO BE CLEAR, AS PART OF THE WORK THAT SHE DID WITH

01:30PM  20    THE DEVICE, DID SHE ACTUALLY RUN ANY SAMPLES AND REVIEW THE

01:30PM  21    RESULTS?

01:30PM  22    A.   NO.

01:30PM  23    Q.   THAT SAME EMAIL TALKED ABOUT HER DESIRE TO GET SOME

01:30PM  24    ADDITIONAL DEVICES INTO THE FIELD FOR MORE TESTING.

01:30PM  25         DO YOU RECALL THAT?

01:30PM  1    A.   YES.

01:30PM  2    Q.   DID THAT EVER HAPPEN?  DID AFRICOM EVER GET THOSE

01:31PM  3    ADDITIONAL DEVICES AND CONDUCT THE KIND OF TESTING THAT

01:31PM  4    LIEUTENANT COLONEL GIVENS WAS TALKING ABOUT?

01:31PM  5    A.   NO.

01:31PM  6         MR. BOSTIC:  YOUR HONOR, I HAVE MORE TO TALK ABOUT

01:31PM  7    ON THE MILITARY, BUT THIS MIGHT BE A GOOD STOPPING POINT IF THE

01:31PM  8    COURT WANTS TO TAKE A BREAK.

01:31PM  9         THE COURT:  LET'S DO THAT.  LET'S TAKE OUR AFTERNOON

01:31PM  10   BREAK.

01:31PM  11        I JUST WANT TO -- BEFORE WE TAKE OUR BREAK, I JUST WANT TO

01:31PM  12   CLEAR THE RECORD, COUNSEL, FOR SOME DOCUMENTS.

01:31PM  13        EXHIBIT 12251 WAS NOT ADMITTED.  I DON'T KNOW IF THERE'S

01:31PM  14   ANOTHER NUMBER FOR THAT.

01:31PM  15        AND THEN 10483 IS -- I BELIEVE WE'VE -- THAT IS 13993.  SO

01:32PM  16   13993 WAS ADMITTED WITH THE ATTACHMENTS, SO THAT IS IN THE

01:32PM  17   RECORD.

01:32PM  18        I THINK THE 10483 WAS ANOTHER COPY OF THE SAME EXHIBIT,

01:32PM  19   BUT YOU JUST EXAMINED ON THAT.

01:32PM  20        JUST TO BE CLEAR, 10483 WAS NOT ADMITTED, BUT THE SAME

01:32PM  21   DOCUMENT APPEARS IN 13993, WHICH WAS ADMITTED.

01:32PM  22        12251 I DON'T BELIEVE WAS ADMITTED, AND I WILL JUST LEAVE

01:32PM  23   THE RECORD AT THAT.

01:32PM  24        MR. BOSTIC:  I'LL FIND THE CORRECT NUMBER FOR THAT

01:32PM  25   ONE, YOUR HONOR.  THANK YOU.

01:32PM   1        THE COURT:  ALL RIGHT.  THANK YOU.

01:32PM   2        LET'S TAKE OUR AFTERNOON BREAK.  IS IT 30 MINUTES WOULD BE

01:32PM   3   SUFFICIENT THEN?  30 MINUTES, LADIES AND GENTLEMEN.

01:32PM   4        AND YOU CAN STAND DOWN, SIR.  THANK YOU.

01:33PM   5        (JURY OUT AT 1:33 P.M.)

01:33PM   6        THE COURT:  PLEASE BE SEATED.  WE'RE ON A BREAK.

01:33PM   7   THANK YOU.

01:33PM   8        THE CLERK:  COURT IS IN RECESS.

01:33PM   9        (RECESS FROM 1:33 P.M. UNTIL 2:03 P.M.)

02:03PM   10       THE COURT:  ALL RIGHT.  WE'RE BACK ON THE RECORD.

02:03PM   11   WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.

02:03PM   12       BEFORE WE BRING THE JURY IN, I JUST WANTED TO ALERT THE

02:03PM   13   PARTIES, I RECEIVED -- MS. KRATZMANN RECEIVED AN EMAIL FROM ONE

02:03PM   14   OF OUR JURORS REMINDING US OF A LACK OF AVAILABILITY.  I THINK

02:03PM   15   THIS CAME UP DURING VOIR DIRE, WON'T BE AVAILABLE FRIDAY,

02:03PM   16   NOVEMBER 12TH AND FRIDAY, DECEMBER 3RD.

02:03PM   17       AND I THINK, IF YOU RECALL, THERE WAS SOME DISCUSSION

02:03PM   18   ABOUT SOME WEDDINGS THAT A JUROR WAS INVOLVED IN.

02:03PM   19       MR. DOWNEY:  I THINK THAT'S RIGHT.

02:03PM   20       THE COURT:  RIGHT.  HE WANTED TO REMIND US OF THAT.

02:03PM   21       I MAY HAVE -- ALSO, I'LL NEED TO CHECK, BUT I HAVE A

02:04PM   22   NINTH CIRCUIT COMMITTEE THAT I SIT ON, AND I THINK IT'S MEETING

02:04PM   23   IN MAYBE THE SECOND WEEK OF DECEMBER.  I'LL KEEP YOU APPRISED

02:04PM   24   OF THAT, BUT I BELIEVE IT'S GOING TO BE A TUESDAY/WEDNESDAY

02:04PM   25   EVENT, BUT I'LL KEEP YOU APPRISED AS WE GO FORWARD.

02:04PM  1          ALL RIGHT.  ANYTHING ELSE BEFORE -- CAN I JUST GET A TIME

02:04PM  2     ESTIMATE?  DO YOU THINK WE'LL FINISH THIS WITNESS TODAY?

02:04PM  3               MR. BOSTIC:  SO, YOUR HONOR, I HAVE APPROXIMATELY

02:04PM  4     ANOTHER HALF HOUR WITH THIS WITNESS.

02:04PM  5               MR. DOWNEY:  I THINK WE'LL FINISH THIS WITNESS,

02:04PM  6     YOUR HONOR.

02:04PM  7               THE COURT:  OKAY.  GREAT.  LET'S COLLECT EVERYONE.

02:06PM  8          (PAUSE IN PROCEEDINGS.)

02:06PM  9          (JURY IN AT 2:06 P.M.)

02:06PM 10               THE COURT:  ALL RIGHT.  THANK YOU.  PLEASE BE

02:06PM 11     SEATED.  WE'RE BACK ON THE RECORD.  OUR JURY IS PRESENT.  ALL

02:06PM 12     COUNSEL ARE PRESENT.  MR. EDLIN IS ON THE STAND.

02:06PM 13          MR. BOSTIC, YOU'D LIKE TO CONTINUE WITH YOUR REDIRECT?

02:07PM 14               MR. BOSTIC:  YES, PLEASE, YOUR HONOR.  THANK YOU.

02:07PM 15          FIRST, THE GOVERNMENT MOVES TO ADMIT EXHIBIT 12251.  I

02:07PM 16     BELIEVE THE DEFENSE HAS STIPULATED.

02:07PM 17               MR. DOWNEY:  YES, YOUR HONOR.

02:07PM 18               THE COURT:  ALL RIGHT.  THANK YOU.  THAT IS

02:07PM 19     ADMITTED.  THANK YOU.

02:07PM 20          (DEFENDANT'S EXHIBIT 12251 WAS RECEIVED IN EVIDENCE.)

02:07PM 21     BY MR. BOSTIC:

02:07PM 22     Q.   MR. EDLIN, BEFORE THE BREAK WE TALKED ABOUT THE MILITARY

02:07PM 23     BURN STUDY AND THE DEALINGS WITH AFRICOM; IS THAT CORRECT?

02:07PM 24     A.   CORRECT.

02:07PM 25     Q.   LET'S TALK ABOUT CENTCOM NEXT.  I'D LIKE TO SHOW YOU SOME

02:07PM  1    SECTIONS OF EXHIBIT 10457, WHICH I BELIEVE IS ALREADY IN

02:07PM  2    EVIDENCE.

02:07PM  3         MR. EDLIN, DO YOU SEE EXHIBIT 10457 IN FRONT OF YOU?

02:07PM  4    A.   YES.

02:07PM  5    Q.   DO YOU REMEMBER DISCUSSING THIS EMAIL WITH MR. DOWNEY?

02:07PM  6    A.   YES.

02:07PM  7    Q.   THIS EMAIL FROM YOU TO MS. HOLMES ATTACHES SOMETHING NAMED

02:07PM  8    THERANOS LOE PROTOCOL APPLICATION.

02:08PM  9         DO YOU SEE THAT?

02:08PM  10   A.   YES.

02:08PM  11   Q.   I'D LIKE TO SHOW YOU THAT ATTACHMENT.

02:08PM  12        OKAY.  DO YOU SEE THAT ON THE SCREEN?

02:08PM  13   A.   YES.

02:08PM  14   Q.   AND CAN YOU EXPLAIN IN GENERAL TERMS WHAT THIS IS?

02:08PM  15   A.   THIS IS AN OVERVIEW OF THE LIMITED OBJECTIVE EXPERIMENT TO

02:08PM  16   COMPARE THERANOS TESTING TO AVAILABLE EQUIPMENT AT THE --

02:08PM  17   AVAILABLE EQUIPMENT FOR THE MILITARY.

02:08PM  18   Q.   AND WHAT WAS THE OVERALL GOAL, AS YOU UNDERSTOOD IT, OF

02:08PM  19   THIS LIMITED OBJECTIVE EXPERIMENT?

02:08PM  20   A.   THE GOAL -- THIS EXPERIMENT WAS TO COMPARE THERANOS

02:08PM  21   TESTING TO THE AVAILABLE, COMMERCIALLY AVAILABLE TESTING.

02:08PM  22   Q.   AND WAS THAT TO SEE WHETHER IT WAS GOOD ENOUGH FOR ACTUAL

02:08PM  23   MILITARY CLINICAL USE?

02:08PM  24   A.   YES.

02:08PM  25   Q.   I'M SHOWING YOU SECTION 3 OF THIS PROTOCOL THAT'S LABELED

02:09PM  1    STUDY FACILITIES.

02:09PM  2         DO YOU SEE THAT?

02:09PM  3    A.   YES.

02:09PM  4    Q.   AND UNDER A HEADING THAT SAYS, LIST ALL LOCATIONS WHERE

02:09PM  5    STUDY PROCEDURES WILL BE PERFORMED, IT READS, "COMBINED JOINT

02:09PM  6    THEATRE HOSPITAL, BAGRAM AIR FORCE BASE, AFGHANISTAN."

02:09PM  7         DO YOU SEE THAT?

02:09PM  8    A.   YES.

02:09PM  9    Q.   IS THAT YOUR UNDERSTANDING OF WHERE THIS LOE WAS GOING TO

02:09PM  10   TAKE PLACE?

02:09PM  11   A.   YES.

02:09PM  12   Q.   DO YOU RECALL TESTIFYING ABOUT A TRIP THAT YOU TOOK TO

02:09PM  13   FLORIDA IN CONNECTION WITH THE DEALINGS WITH CENTCOM?

02:09PM  14   A.   YES.

02:09PM  15   Q.   THAT TRIP TO FLORIDA HAD NOTHING TO DO WITH ANY WORK IN

02:09PM  16   AFGHANISTAN, DID IT?

02:09PM  17   A.   THAT TRIP, I BELIEVE, WAS A PREREQUISITE TO THIS -- TO

02:09PM  18   ENGAGE IN THIS STUDY.  BUT THAT TRIP WAS SPECIFICALLY FOR

02:09PM  19   SECURITY TESTING.

02:09PM  20   Q.   AND THE SECURITY TESTING THAT OCCURRED ON THAT TRIP, DID

02:10PM  21   THAT INCORPORATE ANY BLOOD TESTING BY THE ANALYZER AT ALL?

02:10PM  22   A.   NO.

02:10PM  23   Q.   THIS SAYS THAT THIS PARTICULAR STUDY WAS GOING TO TAKE

02:10PM  24   PLACE IN AFGHANISTAN AT BAGRAM AIR FORCE BASE.

02:10PM  25        TO YOUR KNOWLEDGE, WERE DEVICES EVER SENT TO BAGRAM AIR

02:10PM 1    FORCE BASE IN AFGHANISTAN?

02:10PM 2    A.   NO.

02:10PM 3    Q.   THE EXPERIMENT THAT IS COVERED BY THIS DOCUMENT, DID IT

02:10PM 4    EVER ACTUALLY OCCUR ANYWHERE?

02:10PM 5    A.   NO.

02:10PM 6    Q.   I'D LIKE TO SHOW YOU SECTION 6 AT THE BOTTOM OF THIS PAGE.

02:10PM 7         DO YOU SEE A SECTION THAT READS TARGET POPULATIONS?

02:10PM 8    A.   YES.

02:10PM 9    Q.   AND I WANT TO TALK ABOUT WHAT THIS STUDY WAS GOING TO BE

02:10PM 10   HAD IT OCCURRED.

02:10PM 11        DO YOU SEE THERE'S A BOX CHECKED THAT SAYS, "OTHER:

02:10PM 12   PREEXISTING DE-IDENTIFIED LABORATORY SAMPLES"?

02:10PM 13   A.   YES.

02:10PM 14   Q.   I'M NOW SHOWING YOU A SECTION OF THE DOCUMENT MARKED

02:11PM 15   PROTOCOL.

02:11PM 16        DO YOU SEE THAT?

02:11PM 17   A.   YES.

02:11PM 18   Q.   AND IN THAT SECTION, THERE'S A HEADING, RESEARCH DESIGN

02:11PM 19   AND METHODS.

02:11PM 20        DO YOU SEE THAT?

02:11PM 21   A.   YES.

02:11PM 22   Q.   AND DO YOU SEE A BULLET WHERE IT SAYS, "TWO THERANOS

02:11PM 23   DEVICES WILL BE SENT FROM THE U.S. TO THE CJTH BAGRAM

02:11PM 24   LABORATORY"?

02:11PM 25   A.   YES.

02:11PM   1    Q.   DID THAT EVER HAPPEN?

02:11PM   2    A.   NO.

02:11PM   3    Q.   IT TALKS ABOUT WHAT WOULD HAPPEN NEXT.

02:11PM   4         DO YOU SEE THAT?

02:11PM   5    A.   YES.

02:11PM   6    Q.   I'M SHOWING YOU SOME MORE BULLET POINTS THAT ARE PART OF

02:11PM   7    THAT PROTOCOL.

02:11PM   8         DO YOU SEE UNDER A SECTION MARKED SAMPLE CHARACTERISTICS,

02:11PM   9    THERE'S A DESCRIPTION OF SUBJECTS?

02:12PM  10    A.   YES.

02:12PM  11    Q.   AND IT SAYS, "SAMPLES WILL BE SELECTED FROM PRE-EXISTING,

02:12PM  12    LEFTOVER LABORATORY SPECIMENS OF ACTIVE DUTY U.S. SERVICE

02:12PM  13    MEMBERS."

02:12PM  14         DO YOU SEE THAT?

02:12PM  15    A.   YES.

02:12PM  16    Q.   AND IT SAYS THE SAMPLES WILL BE DE-IDENTIFIED PRIOR TO

02:12PM  17    TESTING?

02:12PM  18    A.   YES.

02:12PM  19    Q.   IT SAYS, "THESE WILL BE SELECTED FROM LEFTOVER SAMPLES

02:12PM  20    FROM PHYSICIAN ORDERED LABORATORY TESTS THAT ARE COLLECTED

02:12PM  21    DURING THE EXECUTION OF THE PROTOCOL."

02:12PM  22         DO YOU SEE THAT?

02:12PM  23    A.   YES.

02:12PM  24    Q.   SO HAD THIS EXPERIMENT TAKEN PLACE, WOULD THERE HAVE BEEN

02:12PM  25    ANY WAY FOR THE RESULTS OF THE THERANOS BLOOD TESTS TO ACTUALLY

02:12PM    1    BE USED IN THE TREATMENT OF SOLDIERS?

02:12PM    2    A.   NO.

02:12PM    3    Q.   WHY NOT?

02:12PM    4    A.   BECAUSE THESE WERE LEFTOVER SPECIMENS AND THEY WERE

02:12PM    5    DEIDENTIFIED.

02:12PM    6    Q.   IN OTHER WORDS, THERE WAS NO WAY TO MATCH A GIVEN SAMPLE

02:12PM    7    EVEN WITH THE PATIENT THAT IT WENT WITH?

02:12PM    8    A.   CORRECT.

02:12PM    9    Q.   JUST TO UNDERSCORE THAT POINT.

02:13PM   10         DO YOU SEE A SUBSECTION LABELLED E ON THE SCREEN?

02:13PM   11    A.   YES.

02:13PM   12    Q.   IT SAYS, "THE INDIVIDUALS CARING FOR THE PATIENTS WILL BE

02:13PM   13    DIFFERENT FROM AND DO NOT SHARE INFORMATION ABOUT THE PATIENT

02:13PM   14    WITH THOSE CONDUCTING THE INVESTIGATION."

02:13PM   15         DO YOU SEE THAT?

02:13PM   16    A.   YES.

02:13PM   17    Q.   SO, IN OTHER WORDS, THE DOCTORS TREATING THE PATIENTS

02:13PM   18    WOULD BE A DIFFERENT GROUP OF PEOPLE FROM THE ONES RUNNING THIS

02:13PM   19    EXPERIMENT IF IT HAD TAKEN PLACE?

02:13PM   20    A.   YES.

02:13PM   21    Q.   WAS SUCCESSFUL COMPLETION OF THIS STUDY THAT NEVER TOOK

02:13PM   22    PLACE A PREREQUISITE TO ACTUAL CLINICAL USE OF THE DEVICE BY

02:13PM   23    CENTCOM?

02:13PM   24    A.   YES.

02:13PM   25    Q.   NEXT, LET'S TALK ABOUT SOCOM.

02:13PM  1          DO YOU RECALL TESTIFYING THAT IN CONNECTION WITH THE

02:13PM  2     MILITARY'S -- I'M SORRY, WITH THERANOS'S DEALINGS WITH SOCOM,

02:13PM  3     DEVICES WERE SHIPPED TO A BASE IN KENTUCKY?  WAS THAT YOUR

02:14PM  4     TESTIMONY?

02:14PM  5     A.   YES.

02:14PM  6     Q.   THE DEVICES THAT WERE SHIPPED TO KENTUCKY, WERE THEY

02:14PM  7     CAPABLE OF RUNNING A CBC BLOOD TEST?

02:14PM  8     A.   NO.

02:14PM  9     Q.   DO YOU KNOW WHETHER THE MILITARY EVER ACTUALLY RAN TESTS

02:14PM  10    ON THE DEVICES THAT WERE SENT TO KENTUCKY?

02:14PM  11    A.   I DON'T BELIEVE THEY DID.

02:14PM  12    Q.   THERE WAS SOME DISCUSSION ALSO WITH MR. DOWNEY ABOUT

02:14PM  13    CLAIMS THAT WERE MADE IN THERANOS MEMOS AND PRESENTATIONS TO

02:14PM  14    THE MILITARY.

02:14PM  15         DO YOU RECALL THAT TESTIMONY?

02:14PM  16    A.   YES.

02:14PM  17    Q.   YOU TESTIFIED THAT YOU BELIEVED THE CLAIMS IN THOSE

02:14PM  18    PRESENTATIONS AND MEMORANDA WERE TRUE AT THE TIME; IS THAT

02:14PM  19    CORRECT?

02:14PM  20    A.   YES.

02:14PM  21    Q.   AND WHAT WAS THAT BELIEF BASED ON?

02:14PM  22    A.   IT WAS -- THAT BELIEF WAS BASED ON WHAT I WAS TOLD BY THE

02:15PM  23    EXPERTS IN THE COMPANY.

02:15PM  24    Q.   AND DID THOSE EXPERTS INCLUDE ELIZABETH HOLMES?

02:15PM  25    A.   YES.

02:15PM   1    Q.   YOU SPOKE WITH MR. DOWNEY ABOUT PEOPLE IN THE COMPANY THAT

02:15PM   2    YOU RELIED UPON FOR INFORMATION THAT YOU DIDN'T KNOW FIRSTHAND.

02:15PM   3         DO YOU RECALL THAT?

02:15PM   4    A.   YES.

02:15PM   5    Q.   AND WAS MS. HOLMES ON THAT LIST OF PEOPLE WHO PROVIDED YOU

02:15PM   6    WITH INFORMATION?

02:15PM   7    A.   YES.

02:15PM   8    Q.   WHAT KIND OF INFORMATION DID YOU RECEIVE FROM MS. HOLMES,

02:15PM   9    GENERALLY SPEAKING?

02:15PM  10    A.   COULD YOU BE MORE SPECIFIC?

02:15PM  11    Q.   DID MS. HOLMES EVER PROVIDE YOU WITH INFORMATION ABOUT THE

02:15PM  12    TECHNOLOGY BEING USED BY THERANOS?

02:15PM  13    A.   YES.

02:15PM  14    Q.   DID MS. HOLMES PROVIDE YOU WITH INFORMATION ABOUT WHAT THE

02:15PM  15    DEVICES COULD DO AT THERANOS?

02:15PM  16    A.   YES.

02:15PM  17    Q.   BETWEEN MS. HOLMES AND MR. BALWANI, DID YOU GET A SENSE OF

02:15PM  18    HOW THEY DIVIDED THEIR AREAS OF EXPERTISE OR INFLUENCE WITHIN

02:16PM  19    THE COMPANY?  DID YOU HAVE A SENSE OF THAT?

02:16PM  20    A.   I HAD A, I THINK A GENERAL SENSE.

02:16PM  21    Q.   HOW WOULD YOU DESCRIBE HOW THEY BROKE THAT DOWN?

02:16PM  22    A.   SUNNY, SUNNY'S AREAS OF EXPERTISE WERE SOFTWARE, THE

02:16PM  23    CLINICAL LAB, MOST OF THE WALGREENS OPERATION.

02:16PM  24         AND ELIZABETH, I BELIEVE, FOCUSSED MORE ON THE SCIENCE AND

02:16PM  25    TECHNOLOGY, THE R&D, IN ADDITION TO MARKETING, COMMUNICATIONS

02:16PM   1    AS -- ALONG WITH MANY OTHER AREAS.

02:16PM   2    Q.   MR. DOWNEY ASKED YOU ABOUT A PATENT WHERE YOU WERE

02:16PM   3    ACTUALLY NAMED AS AN INVENTOR.

02:16PM   4         DO YOU RECALL THAT?

02:16PM   5    A.   YES.

02:16PM   6    Q.   IS MS. HOLMES NAMED AS AN INVENTOR ON ANY PATENTS AS FAR

02:16PM   7    AS YOU KNOW?

02:16PM   8    A.   YES.

02:16PM   9    Q.   MULTIPLE PATENTS?

02:16PM   10   A.   YES.

02:16PM   11   Q.   I'D LIKE TO TALK ABOUT DEMOS WITH YOU SOME MORE.

02:17PM   12        DO YOU RECALL DISCUSSING THAT TOPIC WITH MR. DOWNEY?

02:17PM   13   A.   YES.

02:17PM   14   Q.   YOU WERE ASKED ABOUT THE NULL PROTOCOL.

02:17PM   15        TO BE CLEAR, AT ANY TIME WHEN YOU WERE AT THERANOS, WAS IT

02:17PM   16   YOUR INTENTION TO MISLEAD SOMEONE?

02:17PM   17   A.   NO.

02:17PM   18   Q.   YOU WERE ASKED A QUESTION ABOUT THAT IN CONNECTION WITH

02:17PM   19   THE NULL PROTOCOL.

02:17PM   20        DO YOU RECALL THAT?

02:17PM   21   A.   YES.

02:17PM   22   Q.   WERE YOU INVOLVED IN THE DEVELOPMENT OF THE NULL PROTOCOL?

02:17PM   23   A.   NO.

02:17PM   24   Q.   WAS IT YOUR DECISION THAT THE NULL PROTOCOL BE DEVELOPED

02:17PM   25   AT THERANOS?

02:17PM  1    A.    NO.

02:17PM  2    Q.    WAS IT YOUR DECISION -- LET'S SEE.  LET ME ASK, WHEN YOU

02:17PM  3    TALKED ABOUT WHETHER THERE WAS AN INTENT TO DECEIVE ANYONE,

02:17PM  4    WERE YOU SPEAKING JUST ABOUT YOUR INTENT OR WERE YOU MAKING

02:17PM  5    ASSUMPTIONS ABOUT ANYONE ELSE AT THE COMPANY?

02:17PM  6    A.    I WAS SPEAKING ABOUT BOTH MY INTENT AND ASSUMPTIONS OF

02:18PM  7    OTHER PEOPLE'S INTENT.

02:18PM  8    Q.    OKAY.  WHEN YOU TALK ABOUT OTHER PEOPLE'S INTENT, THOUGH,

02:18PM  9    DO YOU HAVE A WAY TO READ THEIR MIND AND KNOW WHAT THEIR INTENT

02:18PM  10   WAS, OR ARE THOSE JUST ASSUMPTIONS?

02:18PM  11   A.    ASSUMPTIONS.

02:18PM  12   Q.    IN ADDITION TO THE NULL PROTOCOL, WE SPOKE DURING YOUR

02:18PM  13   DIRECT EXAMINATION ABOUT THE DEMO APP.

02:18PM  14       DO YOU RECALL THAT?

02:18PM  15   A.    YES.

02:18PM  16   Q.    AND IN SHORT, WHAT DID THE DEMO APP DO?

02:18PM  17   A.    THE DEMO APP INCLUDED A NUMBER OF DIFFERENT PROTOCOLS THAT

02:18PM  18   COULD EITHER TEST FOR SAMPLES ON A CARTRIDGE OR NOT TEST FOR

02:18PM  19   SAMPLES ON A CARTRIDGE.

02:18PM  20   Q.    AND WHAT WAS SPECIAL ABOUT THE DEMO APP AS OPPOSED TO THE

02:19PM  21   NORMAL SOFTWARE THAT WAS RUNNING WHEN THE ANALYZER WAS RUNNING

02:19PM  22   SAMPLES?

02:19PM  23   A.    THE DEMO APP, AS DISCUSSED IN THE EARLIER TESTIMONY, IT

02:19PM  24   SHIELDED ERRORS FROM THE VIEWER.

02:19PM  25   Q.    SO, IN OTHER WORDS, IF AN ERROR OCCURRED DURING A TEST

EDLIN REDIRECT BY MR. BOSTIC

02:19PM  1    RUN, IT WOULD NOT BE APPARENT TO ANYONE WATCHING THE DEVICE; IS

02:19PM  2    THAT TRUE?

02:19PM  3    A.    YES.

02:19PM  4    Q.    WHAT IS YOUR UNDERSTANDING OF THE REASON WHY THE DEMO APP

02:19PM  5    WAS CREATED?

02:19PM  6    A.    THE DEMO APP -- I RECALL THAT THE DEMO APP WAS CREATED TO

02:19PM  7    ACCOUNT FOR A NUMBER OF DIFFERENT SCENARIOS THAT COULD

02:19PM  8    POTENTIALLY HAPPEN DURING A TECHNOLOGY DEMONSTRATION, AND AS WE

02:19PM  9    DISCUSSED EARLIER, IF A VISITOR OR A VIP DID NOT WANT TO DO A

02:19PM 10    BLOOD TEST, OR SIMPLY THE HARDWARE OF THE TECHNOLOGY WAS BEING

02:20PM 11    DEMONSTRATED, THE DEMO APP WOULD NOT SHOW, LET'S SAY, AN ERROR

02:20PM 12    IF AN ERROR HAD NOT, IN FACT, TAKEN PLACE BASED ON THE, ON THE

02:20PM 13    INTENT OF WHAT THE PERSON SHOWING IT WAS TRYING TO CONVEY.

02:20PM 14    Q.    SO THE DEMO APP WAS INTENDED FOR USE SPECIFICALLY IN

02:20PM 15    CONNECTION WITH TECHNOLOGY DEMONSTRATIONS AS FAR AS YOU KNEW?

02:20PM 16    A.    YES.

02:20PM 17    Q.    THE MEETINGS THAT WE HAVE BEEN DISCUSSING WHERE THE VIP'S

02:20PM 18    WOULD COME TO A CONFERENCE ROOM AT THERANOS FOR THE BEGINNING

02:20PM 19    OF THESE TECHNOLOGY DEMONSTRATIONS, WERE YOU GENERALLY PRESENT

02:20PM 20    FOR THOSE ENTIRE MEETINGS?

02:20PM 21    A.    UM, IT VARIED.

02:20PM 22    Q.    GENERALLY SPEAKING, WHAT PORTIONS OF THE MEETINGS WOULD

02:20PM 23    YOU BE PRESENT FOR?

02:20PM 24    A.    IT DEPENDED ON THE SUBJECT MATTER OF THE MEETING.  IN SOME

02:21PM 25    INSTANCES THERE COULD BE A SHORT MEETING AND SOME INSTANCE

02:21PM  1    WHERE THERE WAS JUST AN HOUR LONG MEETING AND THERE'S A

02:21PM  2    DEMONSTRATION, AND THAT WAS IT.

02:21PM  3        AND OTHER TIMES THERE WERE MULTI-HOUR LONG MEETINGS WITH,

02:21PM  4    YOU KNOW, DIFFERENT SESSIONS, AND I WOULD ATTEND ONE OF THOSE

02:21PM  5    SESSIONS AND THE DEMO.

02:21PM  6        IN SOME CASES I ONLY ATTENDED ONE OF THOSE PARTS.

02:21PM  7    Q.   WERE THERE MEETINGS BETWEEN MS. HOLMES AND INVESTORS WHERE

02:21PM  8    YOU WERE NOT PRESENT FOR THE ENTIRETY OF THE MEETING?

02:21PM  9    A.   YES.

02:21PM 10    Q.   DO YOU HAVE ANY FIRSTHAND KNOWLEDGE OF ANYTHING THAT

02:21PM 11    MS. HOLMES MIGHT HAVE SAID TO THOSE INVESTORS DURING THE

02:21PM 12    PORTIONS OF THE MEETINGS WHERE YOU WEREN'T PRESENT?

02:21PM 13    A.   NO.

02:21PM 14    Q.   LET'S TAKE A LOOK AT EXHIBIT 905, WHICH IS IN EVIDENCE.

02:22PM 15        MS. HOLLIMAN, COULD WE PROJECT THIS.

02:22PM 16        OKAY.   MR. EDLIN, DO YOU RECALL DISCUSSING THIS EMAIL

02:22PM 17    CHAIN WITH MR. DOWNEY?

02:22PM 18    A.   YES.

02:22PM 19    Q.   AND DO YOU RECALL, IN CONNECTION WITH THIS EMAIL, THERE

02:22PM 20    WAS A QUESTION ABOUT WHETHER ONE OF THE SUBJECTS HAD BEEN

02:22PM 21    FASTING OR NOT?

02:22PM 22    A.   YES.

02:22PM 23    Q.   AND DO YOU RECALL THERE WAS AN EMAIL WHERE MS. HOLMES SAID

02:23PM 24    THAT IT MIGHT BE A GOOD IDEA TO FLAG THAT INFORMATION IN THE

02:23PM 25    TEST?

02:23PM 1       A.   YES.

02:23PM 2       Q.   I'LL ASK YOU TO LOOK AT PAGE 4 OF THIS EXHIBIT.

02:23PM 3            AND LET'S ZOOM IN ON THE BOTTOM.

02:23PM 4            AND TOWARDS THE BOTTOM OF THE SCREEN DO YOU SEE THAT

02:23PM 5       THERE'S A RECOMMENDATION ABOUT REMOVING CERTAIN RESULTS FROM

02:23PM 6       THIS DEMO?

02:23PM 7       A.   YES.

02:23PM 8       Q.   DO YOU SEE THAT, FOR EXAMPLE, AT THE BOTTOM OF THE PAGE,

02:23PM 9       FOR SUBJECT M5, DANIEL YOUNG WAS RECOMMENDING REMOVING THE OUT

02:23PM 10      OF RANGE RESULTS FOR ALKALINE PHOSPHATASE AND CHLORIDE?

02:23PM 11      A.   YES.

02:23PM 12      Q.   AND LET'S LOOK AT THE NEXT PAGE, PAGE 5.

02:24PM 13           DO YOU SEE HERE THERE IS SOME MORE LANGUAGE ABOUT WHETHER

02:24PM 14      THE TSH VALUES FOR THREE OF THE SUBJECTS WERE RUNNING LOW, AND

02:24PM 15      THERE'S A RECOMMENDATION THAT ALL THREE OF THOSE RESULTS BE

02:24PM 16      REMOVED?

02:24PM 17      A.   YES.

02:24PM 18      Q.   LET'S ZOOM IN ON THE BOTTOM HALF OF THIS PAGE.

02:24PM 19           AND, MR. EDLIN, DO YOU SEE HERE AN EMAIL FROM YOU

02:24PM 20      REPORTING THAT OTHER RESULTS HAD BEEN REMOVED FROM THESE

02:24PM 21      REPORTS, INCLUDING CREATININE, VITAMIN D, TT4, TT3, AND FT4?

02:24PM 22      A.   YES.

02:24PM 23      Q.   AND MS. HOLMES WAS ON ALL OF THESE EMAILS RELATING TO THE

02:24PM 24      REMOVAL OF RESULTS FROM THE DEMO REPORTS; CORRECT?

02:25PM 25      A.   YES.

02:25PM  1    Q.   LET'S LOOK AT EXHIBIT 860 AGAIN BRIEFLY.   THAT'S IN

02:25PM  2    EVIDENCE.

02:25PM  3         MS. HOLLIMAN, IF WE COULD DISPLAY THAT.

02:25PM  4         MR. EDLIN, DO YOU RECALL DISCUSSING THIS EMAIL CHAIN AND

02:25PM  5    THIS DEMO WITH MR. DOWNEY?

02:25PM  6    A.   YES.

02:25PM  7    Q.   DO YOU RECALL THAT IN CONNECTION WITH THIS DEMONSTRATION,

02:25PM  8    THERE WERE INCONSISTENT RESULTS OBTAINED EVEN THOUGH THE SAME

02:25PM  9    PATIENT GAVE A SAMPLE THAT WAS RUN ON THE SAME THERANOS

02:25PM  10   ANALYZER?

02:25PM  11   A.   YES.

02:25PM  12   Q.   AND DO YOU RECALL THAT IN THIS CASE SOME OF THOSE RESULTS

02:25PM  13   WERE REPORTED AND OTHERS WERE NOT?

02:25PM  14   A.   YES.

02:25PM  15   Q.   IN THIS CASE WERE THE CONFLICTING RESULTS, THE

02:26PM  16   INCONSISTENT RESULTS, ACTUALLY REPORTED BACK TO THE SUBJECT?

02:26PM  17   A.   I BELIEVE JUST ONE RESULT WAS REPORTED BACK.

02:26PM  18   Q.   OKAY.  YOU TESTIFIED ON CROSS-EXAMINATION ABOUT THE

02:26PM  19   PURPOSE, AS YOU UNDERSTOOD IT, OF THE TECHNOLOGY

02:26PM  20   DEMONSTRATIONS.

02:26PM  21        DO YOU REMEMBER THAT?

02:26PM  22   A.   YES.

02:26PM  23   Q.   YOU SAID THAT THE PURPOSE WAS NOT FOR CLINICAL USE.

02:26PM  24        WAS THAT YOUR UNDERSTANDING?

02:26PM  25   A.   YES.

02:26PM  1    Q.   WHAT WAS THE PURPOSE OF THE TECHNOLOGY DEMONSTRATIONS?

02:26PM  2    A.   THE PURPOSE WAS TO SHOWCASE OR DEMONSTRATE THE THERANOS

02:26PM  3    TECHNOLOGY.  IN SOME CASES, TESTS WERE RUN; IN SOME CASES,

02:26PM  4    OTHERS WEREN'T RUN.

02:26PM  5         AND THEN GENERALLY TO SHOW THE FUNCTIONALITY OF THERANOS'S

02:26PM  6    TECHNOLOGY.

02:26PM  7    Q.   WAS PART OF THAT A DESIRE TO SHOW THAT THE TECHNOLOGY

02:26PM  8    PERFORMED WELL?

02:27PM  9    A.   YES.

02:27PM  10   Q.   IN CONNECTION WITH THE DEMO APP THAT WOULD HIDE ERRORS,

02:27PM  11   HOW IS THE PURPOSE OF SHOWING HOW WELL THE TECHNOLOGY WORKS

02:27PM  12   SERVED BY HIDING RECORDS DURING A DEMO, IF YOU KNOW?

02:27PM  13   A.   I DON'T KNOW.

02:27PM  14   Q.   HOW ABOUT THE PRACTICE OF WITHHOLDING INDIVIDUAL RESULTS

02:27PM  15   FROM DEMO REPORTS?

02:27PM  16        HOW IS THE GOAL OF SHOWING HOW WELL THE TECHNOLOGY WORKS

02:27PM  17   SERVED BY WITHHOLDING RESULTS?

02:27PM  18   A.   I DON'T KNOW.

02:27PM  19   Q.   FINALLY, HOW ABOUT WHEN THERE ARE INCONSISTENT RESULTS AND

02:27PM  20   THE RESULTS DON'T MATCH THE WAY THEY SHOULD, HOW IS THAT GOAL

02:27PM  21   OF SHOWING HOW WELL THE TECHNOLOGY WORKS SERVED BY NOT

02:27PM  22   DISCLOSING THOSE INCONSISTENCIES?

02:27PM  23   A.   WELL, I THINK IT RELIES ON THE INTERPRETATION BY EXPERTS

02:28PM  24   IN THE COMPANY FOR CERTAIN OF RESULTS.

02:28PM  25        SO THAT IS, THAT IS PART OF THE PROCESS OF DEMONSTRATING

02:28PM  1    THE TECHNOLOGY.

02:28PM  2    Q.   DO YOU THINK THAT SOMEONE WHO WAS THE AUDIENCE FOR ONE OF

02:28PM  3    THESE DEMONSTRATIONS MIGHT HAVE WANTED TO KNOW ABOUT

02:28PM  4    INCONSISTENT RESULTS THAT CAME BACK DURING USE OF THE THERANOS

02:28PM  5    TECHNOLOGY?

02:28PM  6    A.   I PERSONALLY DON'T KNOW.  I CAN'T SPEAK FOR THEM.

02:28PM  7    Q.   THE CASES THAT WE LOOKED AT WHERE RESULTS WERE REMOVED

02:28PM  8    FROM DEMO REPORTS, WAS IT EVER YOUR DISCUSSION TO REMOVE THOSE

02:28PM  9    RESULTS?

02:28PM 10    A.   NO.

02:28PM 11    Q.   WHEN THERE WERE INCONSISTENCIES AND SOME CONFLICTING

02:28PM 12    RESULTS WEREN'T REPORTED, WAS THAT YOUR DECISION?

02:28PM 13    A.   NO.

02:28PM 14    Q.   WHO HAD FINAL SAY OVER WHAT RESULTS WERE REPORTED IN

02:29PM 15    CONNECTION WITH THE DEMO?

02:29PM 16    A.   DANIEL DID AND ELIZABETH DID.

02:29PM 17    Q.   LET'S SHIFT GEARS AND TALK ABOUT THERANOS'S FDA APPROVAL

02:29PM 18    FOR HSV.

02:29PM 19        DO YOU RECALL DISCUSSING THAT?

02:29PM 20    A.   YES.

02:29PM 21    Q.   AND DO YOU RECALL THE DATE WHEN THAT APPROVAL CAME

02:29PM 22    THROUGH?

02:29PM 23    A.   I BELIEVE IT WAS JULY OF 2015.

02:29PM 24    Q.   WAS THAT THERANOS'S FIRST FDA APPROVAL FOR ONE OF ITS

02:29PM 25    ASSAYS AS FAR AS YOU KNOW?

02:29PM   1    A.   I DON'T KNOW FOR SURE.   I RECALL IT WAS THE FIRST FDA

02:29PM   2    APPROVAL FOR THE THERANOS SYSTEM.

02:29PM   3    Q.   ARE YOU AWARE OF ANY FDA APPROVALS FOR THERANOS SPECIFIC

02:29PM   4    TESTS BEFORE JULY 2015?

02:29PM   5    A.   I DON'T -- NOT THAT I RECALL.

02:30PM   6    Q.   HOW ABOUT AFTER THE HSV APPROVAL?   ARE YOU AWARE OF ANY

02:30PM   7    OTHER ASSAYS THAT WERE THERANOS SPECIFIC THAT THE FDA APPROVED?

02:30PM   8    A.   NO.

02:30PM   9    Q.   WHAT IS THE HSV ASSAY?

02:30PM   10   A.   A HERPES TEST.

02:30PM   11   Q.   AND WAS THE FDA'S APPROVAL, AS YOU UNDERSTOOD IT, LIMITED

02:30PM   12   TO THAT ONE ASSAY?

02:30PM   13   A.   YES.

02:30PM   14   Q.   LET'S LOOK AT EXHIBIT 7365.

02:30PM   15        MS. KRATZMANN, IF I COULD USE THE OVERHEAD AGAIN.   I

02:31PM   16   BELIEVE THIS IS ADMITTED, 7365.

02:31PM   17             THE CLERK:   YES.

02:31PM   18   BY MR. BOSTIC:

02:31PM   19   Q.   MR. EDLIN, DO YOU RECALL DISCUSSING THIS EMAIL CHAIN WITH

02:31PM   20   MR. DOWNEY?

02:31PM   21   A.   YES.

02:31PM   22   Q.   AND THIS EMAIL CHAIN DEALT WITH LANGUAGE ON THE WEBSITE

02:31PM   23   ABOUT VENOUS DRAWS; IS THAT RIGHT?

02:31PM   24   A.   YES.

02:31PM   25   Q.   AND ON THE SCREEN RIGHT NOW, DO YOU SEE AN EMAIL FROM

02:31PM  1    MS. HOLMES ON NOVEMBER 27TH, 2013?

02:31PM  2    A.   YES.

02:31PM  3    Q.   AND IN THIS EMAIL, I'D LIKE TO DRAW YOUR ATTENTION TO THE

02:31PM  4    LANGUAGE THAT SHE IS SUGGESTING FOR THE WEBSITE.

02:31PM  5         DO YOU SEE THAT?

02:31PM  6    A.   YES.

02:31PM  7    Q.   AND IT SAYS, "INSTEAD OF A BIG, INTIMIDATING NEEDLE, OUR

02:31PM  8    CERTIFIED PHLEBOTOMISTS CAN USE A TINY FINGER STICK OR A

02:31PM  9    MICRO-SAMPLE FROM A VENOUS DRAW.  OCCASIONALLY, A VENIPUNCTURE

02:32PM  10   MAY BE REQUIRED BASED ON THE LAB ORDER, BUT THIS IS UNCOMMON,

02:32PM  11   AND OUR AIM IS TO ELIMINATE THAT SCENARIO ENTIRELY."

02:32PM  12        DO YOU SEE THAT?

02:32PM  13   A.   YES.

02:32PM  14   Q.   AS PART OF YOUR WORK ON THE WALGREENS PROJECT, DID YOU

02:32PM  15   HAVE A SENSE OF HOW COMMON IT WAS FOR PATIENTS TO GET A VEIN

02:32PM  16   DRAW INSTEAD OF A FINGERSTICK?

02:32PM  17   A.   NOT EXACTLY.

02:32PM  18   Q.   WOULD YOU BE SURPRISED TO HEAR THAT APPROXIMATELY

02:32PM  19   40 PERCENT OF WALGREENS'S PATIENTS GOT VEIN DRAWS?

02:32PM  20   A.   NO.

02:32PM  21   Q.   IF SOMETHING HAPPENS 40 PERCENT OF THE TIME, WOULD YOU

02:32PM  22   CHARACTERIZE THAT AS SOMETHING THAT IS UNCOMMON?

02:32PM  23   A.   NO.

02:32PM  24   Q.   LET'S LOOK NEXT AT EXHIBIT 10468.  I BELIEVE THAT'S IN

02:33PM  25   EVIDENCE.

02:33PM    1            OKAY.  MR. EDLIN, DO YOU SEE 10468 ON THE SCREEN?

02:33PM    2    A.   YES.

02:33PM    3    Q.   THIS WAS A SITUATION WHERE MS. HOLMES WAS WEIGHING IN ON

02:33PM    4    CONTENT FOR THE WEBSITE; IS THAT RIGHT?

02:33PM    5    A.   YES.

02:33PM    6    Q.   WAS THIS TO BE THERANOS'S PUBLIC WEBSITE THAT WAS VIEWABLE

02:33PM    7    BY ANYONE?

02:33PM    8    A.   YES.

02:33PM    9    Q.   AND DID THE COMPANY HAVE AN ESTIMATE OF HOW MANY PEOPLE

02:33PM   10    WERE GOING TO BE VIEWING THE WEBSITE?

02:33PM   11    A.   I'M SURE THE BACK END DEVELOPERS COULD DETERMINE THAT.

02:33PM   12    Q.   WOULD YOU ANTICIPATE THAT IT WOULD BE IN THE MANY

02:34PM   13    THOUSANDS AT LEAST?

02:34PM   14    A.   POTENTIALLY.

02:34PM   15    Q.   DO YOU RECALL A DISCUSSION DURING DIRECT AND SOME

02:34PM   16    DOCUMENTS THAT WE LOOKED AT RELATING TO CLAIMS ABOUT SUPERIOR

02:34PM   17    ACCURACY IN THE WEBSITE LANGUAGE?

02:34PM   18    A.   YES.

02:34PM   19    Q.   AND DO YOU RECALL MS. HOLMES SAYING IN CONNECTION WITH

02:34PM   20    THAT THAT THERE SHOULD NOT BE SUPERIOR ACCURACY CLAIMS ON THE

02:34PM   21    WEBSITE?

02:34PM   22    A.   THERE WAS SOME NUANCE.  I THINK THERE WAS A COMMENT ABOUT

02:34PM   23    UNRIVALLED ACCURACY AND A COMMENT ABOUT THE IMPROPER

02:34PM   24    COMPARISON.

02:34PM   25    Q.   TO YOUR KNOWLEDGE, DID CLAIMS ABOUT UNRIVALLED OR SUPERIOR

02:34PM 1    ACCURACY END UP APPEARING ON THE THERANOS PUBLIC WEBSITE?

02:34PM 2    A.   I BELIEVE THEY DID.

02:34PM 3    Q.   HOW ABOUT IN THE INVESTOR PRESENTATIONS?

02:34PM 4         DO YOU RECALL REVIEWING A PRESENTATION THAT WAS SENT TO

02:35PM 5    RUPERT MURDOCH?

02:35PM 6    A.   YES.

02:35PM 7    Q.   AND DO YOU RECALL SEEING THE LANGUAGE ABOUT THERANOS'S

02:35PM 8    ACCURACY AND THE CLAIMS THAT THAT PRESENTATION CONTAINED?

02:35PM 9    A.   YES.

02:35PM 10   Q.   THE INVESTOR PRESENTATIONS, WHAT WAS THE AUDIENCE FOR

02:35PM 11   THOSE?  HOW MANY PEOPLE WERE EXPECTED TO VIEW THEM?

02:35PM 12   A.   I THINK THEY WERE MEANT FOR INDIVIDUALS.

02:35PM 13   Q.   DID THERANOS REQUEST THAT THOSE INDIVIDUALS NOT SHARE

02:35PM 14   THOSE PRESENTATIONS WITH OTHERS?

02:35PM 15   A.   I BELIEVE THAT THERE WAS COMMENTARY THAT THE INFORMATION

02:35PM 16   WAS CONSIDERED CONFIDENTIAL.

02:35PM 17   Q.   SO, IN OTHER WORDS, THOSE INVESTOR PRESENTATIONS WERE NOT

02:35PM 18   FOR WIDE DISSEMINATION TO THE PUBLIC; IS THAT CORRECT?

02:35PM 19   A.   CORRECT.

02:35PM 20   Q.   LET'S LOOK AT 10558, WHICH I BELIEVE IS IN EVIDENCE.

02:36PM 21        I'LL CIRCLE BACK TO THAT ONE WHEN I CAN FIND IT.

02:36PM 22        DO YOU RECALL A DISCUSSION WITH MR. DOWNEY ABOUT THE

02:36PM 23   CONTENT OF THE INVESTOR PRESENTATIONS?

02:36PM 24   A.   YES.

02:36PM 25   Q.   AND YOU TALKED ABOUT WHERE THAT CONTENT CAME FROM.

02:36PM  1          DO YOU RECALL THAT?

02:36PM  2     A.   YES.

02:36PM  3     Q.   AND YOU SAID THAT SOME OF THE CONTENT IN THOSE

02:36PM  4     PRESENTATIONS WERE SOURCED FROM VARIOUS INDIVIDUALS IN THE

02:36PM  5     COMPANY?

02:36PM  6     A.   YES.

02:36PM  7     Q.   DID YOU HAVE THE ULTIMATE RESPONSIBILITY OF DOING THE

02:37PM  8     FINAL REVIEW OF THOSE PRESENTATIONS AND MAKING SURE THAT EACH

02:37PM  9     CLAIM WAS ACCURATE?

02:37PM  10    A.   NO.

02:37PM  11    Q.   AND WHO DID THE FINAL REVIEW OF THOSE PRESENTATIONS?

02:37PM  12    A.   ELIZABETH.

02:37PM  13    Q.   LET ME SHOW YOU -- ACTUALLY, LET ME ASK YOU, DO YOU RECALL

02:37PM  14    WITH MR. DOWNEY REVIEWING A DOCUMENT WHERE MS. HOLMES CONVEYED

02:37PM  15    INPUT ON WEBSITE LANGUAGE AFTER A CONVERSATION WITH REGULATORY?

02:37PM  16    A.   YES.

02:37PM  17    Q.   AND WHO WOULD THAT REFER TO?  WHO WAS REGULATORY?

02:37PM  18    A.   I DON'T KNOW WHO SPECIFICALLY THAT REFERRED TO.  THERANOS

02:37PM  19    DID HAVE IN-HOUSE COUNSEL, AND I BELIEVE EXTERNAL COUNSEL THAT

02:37PM  20    ADVISED ON THOSE TYPES OF MATTERS.

02:37PM  21    Q.   SO, IN OTHER WORDS, MS. HOLMES'S DIRECTION ON THE WEBSITE

02:38PM  22    CONTENT WAS FOLLOWING A CONVERSATION THAT SHE HAD HAD WITH

02:38PM  23    LAWYERS; IS THAT RIGHT?

02:38PM  24    A.   CORRECT.

02:38PM  25    Q.   WAS IT -- TO YOUR KNOWLEDGE, WAS IT PART OF THE USUAL WORK

02:38PM  1    WITH INVESTOR PRESENTATIONS THAT EACH INVESTOR PRESENTATION

02:38PM  2    WOULD BE REVIEWED BY LAWYERS?

02:38PM  3    A.   I'M NOT AWARE THAT THAT HAPPENED.

02:38PM  4    Q.   LET ME SHOW YOU NEXT EXHIBIT 13979.

02:39PM  5         I BELIEVE THIS IS IN EVIDENCE.

02:39PM  6         MR. EDLIN, DO YOU REMEMBER REVIEWING EXHIBIT 13979 WITH

02:39PM  7    MR. DOWNEY?

02:39PM  8    A.   YES.

02:39PM  9    Q.   AND YOU TESTIFIED THAT THE ATTACHED SLIDE PRESENTATION WAS

02:39PM  10   IN CONNECTION WITH MEDIA TRAINING THAT MS. HOLMES RECEIVED; IS

02:39PM  11   THAT RIGHT?

02:39PM  12   A.   YES.

02:39PM  13   Q.   I'D LIKE TO ASK YOU ABOUT A SLIDE THAT MR. DOWNEY DIDN'T

02:39PM  14   SHOW YOU.

02:39PM  15        DO YOU SEE IN FRONT OF YOU A SLIDE IN THIS MEDIA TRAINING

02:39PM  16   PRESENTATION TITLED MASTER BLOCKING AND BRIDGING?

02:39PM  17   A.   YES.

02:39PM  18   Q.   AND THE CONTENT HERE SAYS, "BLOCKING IS DEFTLY AVOIDING AN

02:39PM  19   UNWELCOME OR UNPRODUCTIVE QUESTION."

02:39PM  20        DO YOU SEE THAT?

02:40PM  21   A.   YES.

02:40PM  22   Q.   AND BELOW THAT IT SAYS, "BRIDGING IS TAKING THE DISCUSSION

02:40PM  23   FROM UNPRODUCTIVE TO PRODUCTIVE TERRITORY AND GETTING BACK TO

02:40PM  24   WHAT YOU WANT TO SAY."

02:40PM  25        DO YOU SEE THAT?

02:40PM    1    A.   YES.

02:40PM    2    Q.   THIS PRESENTATION CONTINUES ON THIS SAME TOPIC ON THE NEXT

02:40PM    3    SLIDE.

02:40PM    4         DO YOU SEE THAT?

02:40PM    5    A.   YES.

02:40PM    6    Q.   AND THE QUESTION IS, "WHAT IS AN UNWELCOME QUESTION?"

02:40PM    7         AND THE LIST SAYS, "NEEDLESSLY CONTROVERSIAL."

02:40PM    8         THE SECOND ITEM, "ASKS ABOUT SOMETHING YOU CANNOT OR DO

02:40PM    9    NOT WISH TO DISCLOSE."

02:40PM   10         DO YOU SEE THAT?

02:40PM   11    A.   YES.

02:40PM   12    Q.   AND THEN THE NEXT SLIDE ON THE SAME TOPIC SAYS, "HOW DO

02:40PM   13    YOU BLOCK AND BRIDGE?"

02:40PM   14         DO YOU SEE THAT?

02:40PM   15    A.   YES.

02:40PM   16    Q.   IT READS, "EITHER EXPLAIN WHY YOU CAN'T ANSWER OR RESPOND

02:40PM   17    TO THE DIRECT QUESTION QUICKLY AND MOVE ON."

02:40PM   18         IT SAYS, "AVOID 'NO COMMENT.'"

02:40PM   19         DO YOU SEE THAT?

02:40PM   20    A.   YES.

02:40PM   21    Q.   AND THE NEXT IS, "REFRAME THE QUESTION TO ONE YOU'D PREFER

02:41PM   22    TO ANSWER AND BRIDGE TO IT."

02:41PM   23         DO YOU SEE THAT?

02:41PM   24    A.   YES.

02:41PM   25    Q.   AND AT THE BOTTOM IT SAYS, "ONLY BLOCK A QUESTION WHEN

02:41PM  1    THERE IS GOOD REASON TO DO SO."

02:41PM  2         DO YOU SEE THAT?

02:41PM  3    A.   YES.

02:41PM  4    Q.   AND YOU WERE PRESENT AT THIS MEDIA TRAINING; IS THAT

02:41PM  5    RIGHT?

02:41PM  6    A.   YES.

02:41PM  7    Q.   AND THIS WAS PUT ON BY AN AGENCY CALLED GROW MARKETING; IS

02:41PM  8    THAT CORRECT?

02:41PM  9    A.   YES.

02:41PM 10    Q.   DURING THAT TRAINING, DID THE INDIVIDUALS FROM GROW GIVE

02:41PM 11    MS. HOLMES DIRECTION ON WHICH TOPICS TO USE THIS TECHNIQUE ON?

02:41PM 12    A.   I DON'T REMEMBER.

02:41PM 13    Q.   GENERALLY SPEAKING AT THERANOS, WHOSE DECISION WAS IT WHAT

02:41PM 14    INFORMATION WOULD BE DISCLOSED TO THE PUBLIC OR THE PRESS?

02:41PM 15    A.   IN MY EXPERIENCE, ELIZABETH WAS THE ONLY PERSON WHO

02:42PM 16    COMMUNICATED DIRECTLY WITH THE PRESS, SO --

02:42PM 17    Q.   AND IN YOUR EXPERIENCE, DID ANYONE ELSE MAKE DECISIONS

02:42PM 18    ABOUT WHAT SHE WAS ALLOWED TO SAY TO THE PRESS AND WHAT SHE WAS

02:42PM 19    NOT ALLOWED TO SAY?

02:42PM 20    A.   I DON'T KNOW IF SHE CONSULTED WITH ANYONE ABOUT THAT,

02:42PM 21    THAT -- THOSE DECISIONS.

02:42PM 22              MR. BOSTIC:  A MOMENT, YOUR HONOR?

02:42PM 23         (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

02:42PM 24    BY MR. BOSTIC:

02:42PM 25    Q.   FINALLY, MR. EDLIN, THERE WAS DISCUSSIONS ABOUT ACTIVITIES

02:42PM    1    AT THE COMPANY IN 2016.

02:42PM    2         DO YOU REMEMBER DISCUSSING THAT WITH MR. DOWNEY?

02:42PM    3    A.   YES.

02:42PM    4    Q.   REMIND US WHEN YOU DECIDED TO LEAVE THERANOS.

02:42PM    5    A.   DECEMBER OF 2016.

02:42PM    6    Q.   AND YOU MENTIONED THAT PART OF YOUR REASON TO LEAVE WAS

02:43PM    7    ABOUT THE DESIRE TO ATTEND BUSINESS SCHOOL?

02:43PM    8    A.   YES.

02:43PM    9    Q.   AND WERE THERE ALSO THINGS ABOUT THERANOS, OR THINGS THAT

02:43PM   10    YOU UNDERSTOOD, THAT CAUSED YOU TO NO LONGER WANT TO WORK

02:43PM   11    THERE?

02:43PM   12    A.   YES.

02:43PM   13    Q.   CAN YOU SUMMARIZE THOSE FOR US?

02:43PM   14    A.   WELL, IN THE YEAR AFTER THE INITIAL "WALL STREET JOURNAL"

02:43PM   15    ARTICLES CAME OUT, THE COMPANY CLAIMED THAT IT WOULD BE ABLE TO

02:43PM   16    PROVE THAT THE TECHNOLOGY WORKED AND PROVE THAT THOSE CLAIMS

02:43PM   17    WERE NOT TRUE, AND THE COMPANY WAS UNABLE TO CONVINCE ANYONE

02:43PM   18    THAT THOSE CLAIMS WERE UNTRUE AND THAT ITS TECHNOLOGY AND

02:43PM   19    SCIENCE WORKED, AND THAT GAVE ME SERIOUS DOUBTS AS TO WHETHER

02:43PM   20    THE COMPANY WAS CAPABLE OF PROVING THAT THE TECHNOLOGY WORKED.

02:43PM   21         AND THERE WERE A NUMBER OF DIFFERENT OPPORTUNITIES THAT

02:44PM   22    THE COMPANY HAD TO PROVE ITSELF, AND THEY ALL WERE

02:44PM   23    UNSUCCESSFUL.

02:44PM   24         AND I ULTIMATELY REACHED THE CONCLUSION THAT THOSE

02:44PM   25    ATTEMPTS WERE UNSUCCESSFUL BECAUSE THEY COULDN'T HAPPEN AND

02:44PM   1    THEY WERE NEVER GOING TO HAPPEN.

02:44PM   2    Q.   THANK YOU, MR. EDLIN.

02:44PM   3         NO FURTHER QUESTIONS, YOUR HONOR.

02:44PM   4              THE COURT:   MR. DOWNEY.

02:44PM   5              MR. DOWNEY:   JUST SOME BRIEF QUESTIONS, YOUR HONOR.

02:44PM   6                     **RECROSS-EXAMINATION**

02:44PM   7    BY MR. DOWNEY:

02:45PM   8    Q.   MR. EDLIN, I JUST HAVE A FEW QUESTIONS.

02:45PM   9         FIRST, LET ME ASK YOU ABOUT YOUR EXCHANGE WITH MR. BOSTIC

02:45PM  10    ON THE AFRICOM SITUATION.

02:45PM  11         DO YOU RECALL MR. BOSTIC ASKING YOU ABOUT THE GENERATION

02:45PM  12    OF ARTIFICIAL DATA IN CONNECTION WITH THAT PROGRAM?

02:45PM  13    A.   YES.

02:45PM  14    Q.   AND THE DECISION TO HAVE THE DATA GENERATED BE ARTIFICIAL

02:45PM  15    WAS A DECISION OF DR. GIVENS; CORRECT?

02:45PM  16    A.   I BELIEVE IT WAS A JOINT DECISION.

02:45PM  17    Q.   AND IF YOU RECALL OUR DISCUSSION ON CROSS-EXAMINATION,

02:45PM  18    DR. GIVENS CONTACTED THERANOS IN LATE APRIL 2012 TO TALK ABOUT

02:45PM  19    A POTENTIAL PROGRAM; CORRECT?

02:45PM  20    A.   YES.

02:45PM  21    Q.   AND BY EARLY JUNE, YOU AND DR. GIVENS WERE EXCHANGING

02:45PM  22    EMAILS ABOUT THAT EXPERIMENT; CORRECT?

02:45PM  23    A.   YES.

02:45PM  24    Q.   AND LATER THAT MONTH, A THERANOS DEVICE WAS SENT TO

02:46PM  25    DR. GIVENS IN AFRICA TO CONDUCT THAT EXPERIMENT; CORRECT?

02:46PM  1    A.   I'M NOT SURE EXACTLY WHEN IT WAS SENT.

02:46PM  2    Q.   LET ME ASK YOU TO JUST LOOK AT THE EXHIBIT THAT IS MARKED

02:46PM  3    AS 13993, WHICH WE WERE LOOKING AT ON YOUR REDIRECT.

02:46PM  4         IF YOU LOOK AT THE EMAIL ON THE BOTTOM OF THE FIRST PAGE,

02:46PM  5    DOES THAT REFRESH YOUR RECOLLECTION THAT YOU WERE SETTING UP

02:46PM  6    THE THERANOS DEMONSTRATION IN EARLY JUNE?

02:46PM  7    A.   YES.

02:46PM  8    Q.   SO THAT WAS JUST ABOUT 45 DAYS LATER AFTER YOU HAD

02:46PM  9    INITIATED THESE CONVERSATIONS; CORRECT?

02:46PM  10   A.   RIGHT.

02:46PM  11   Q.   AND ONE OF THE THOUGHTS THAT THERANOS AND DR. GIVENS HAD

02:47PM  12   AS TO WHY THE DATA WOULD BE ARTIFICIAL WAS TO AVOID THE

02:47PM  13   COMPLICATED APPROVAL REQUIREMENTS THAT WOULD BE IMPOSED ON THE

02:47PM  14   EXPERIMENT IF HUMAN SAMPLES WERE INVOLVED; CORRECT?

02:47PM  15   A.   I BELIEVE SO.

02:47PM  16   Q.   OKAY.  LET ME ASK YOU TO LOOK AT THE EMAIL THAT MR. BOSTIC

02:47PM  17   SHOWED YOU THAT IS THE CARRY-OVER EMAIL FROM PAGE 1 TO 2.

02:47PM  18        IF YOU LOOK AT YOUR EMAIL -- SORRY, DR. GIVENS'S EMAIL TO

02:47PM  19   YOU, SHE'S PROVIDING SOME DETAIL TO YOU ABOUT TRANSPORT OF THE

02:47PM  20   EQUIPMENT AND SO FORTH.

02:47PM  21        DO YOU SEE THAT?  DO YOU RECALL THAT?

02:47PM  22   A.   YES.

02:47PM  23   Q.   AND IF YOU GO TO THE EMAIL ON THE SECOND PAGE FROM YOU TO

02:47PM  24   DR. GIVENS, SHE'S RESPONDING IN THAT FIRST EMAIL TO QUESTIONS

02:47PM  25   YOU ASKED ABOUT HOW THE EQUIPMENT WOULD BE TRANSPORTED.

02:48PM  1         DO YOU SEE THAT?

02:48PM  2    A.   YES.

02:48PM  3    Q.   OKAY.  AND IF YOU GO ALMOST ALL OF THE WAY TO THE BOTTOM

02:48PM  4    OF YOUR EMAIL, THE SECOND TO THE LAST BULLET POINT SAYS, "HOW

02:48PM  5    WILL THE DEVICE BE TRANSPORTED IN THE FIELD?"

02:48PM  6         DO YOU SEE THAT?

02:48PM  7    A.   YES.

02:48PM  8    Q.   AND YOU ASK, "DO YOU PLAN ON KEEPING THE DEVICE IN ITS

02:48PM  9    PACKAGING IN BETWEEN USE?"

02:48PM  10        DO YOU SEE THAT?

02:48PM  11   A.   YES.

02:48PM  12   Q.   AND IF YOU GO BACK TO HER RESPONSE ON THE CARRY-OVER

02:48PM  13   PARAGRAPH, YOU SEE THAT SHE TALKS AT THE END OF THE PARAGRAPH

02:48PM  14   BEGINNING, "I INTEND TO PLUG."

02:48PM  15        DO YOU SEE THAT?

02:48PM  16   A.   YES.

02:48PM  17   Q.   AND SHE TALKS ABOUT HOW THE DEVICE WILL BE TRANSPORTED;

02:48PM  18   CORRECT?

02:48PM  19   A.   YES.

02:48PM  20   Q.   AND SHE TALKS THEN ABOUT HOW THE DEVICE WILL BE

02:48PM  21   TRANSPORTED WHEN IT'S IN AFRICA; CORRECT?

02:48PM  22   A.   YES.

02:48PM  23   Q.   AND THE -- DO YOU SEE THE SENTENCE WHERE SHE SAYS, "WHEN

02:48PM  24   WE FLY THE EQUIPMENT FROM UGANDA IT WILL BE ON A

02:49PM  25   NON-PRESSURIZED AIRCRAFT AT ALTITUDES OF LESS THAN

02:49PM  1      10,000 FEET."

02:49PM  2           DO YOU SEE THAT?

02:49PM  3      A.   YES.

02:49PM  4      Q.   AND SO THAT IS A DESCRIPTION OF THE TRANSPORT OF THE

02:49PM  5      DEVICE BETWEEN UGANDA AND CAMEROON AND SOUTH SUDAN; CORRECT?

02:49PM  6      A.   UM, I'M NOT SURE EXACTLY WHERE IT WENT FROM UGANDA, BUT

02:49PM  7      THOSE WERE OTHER GEOGRAPHIES THAT LIEUTENANT COLONEL GIVENS

02:49PM  8      REFERENCED.

02:49PM  9      Q.   OKAY.  WELL, SHE REFERENCED TRAVELLING ON NON-PRESSURIZED

02:49PM  10     AIRCRAFT.  SHE'S TALKING ABOUT TRAVEL WITHIN AFRICA; CORRECT?

02:49PM  11     A.   I BELIEVE SO.

02:49PM  12     Q.   AND DO YOU KNOW WHAT NON-PRESSURIZED AIRCRAFT THE DEVICE

02:49PM  13     WAS TRANSPORTED ON?

02:49PM  14     A.   I DON'T KNOW.

02:49PM  15     Q.   OKAY.  BUT YOU KNOW THAT THIS EXPERIMENT DID EVALUATE THE

02:50PM  16     DEVICE FLYING AT ALTITUDES LESS THAN 10,000 FEET; CORRECT?

02:50PM  17     A.   CAN YOU REPEAT THE QUESTION?

02:50PM  18     Q.   YOU KNOW THAT THIS EXPERIMENT EVALUATED THE DEVICE WHILE

02:50PM  19     FLYING AT ALTITUDES OF LESS THAN 10,000 FEET; CORRECT?

02:50PM  20     A.   THIS STATEMENT MENTIONS THAT IT WOULD TRAVEL THERE, BUT

02:50PM  21     I'M NOT SURE IF IT WAS EVALUATED IN THAT TIME.

02:50PM  22     Q.   OKAY.  BUT SHE REPORTED AT THE END OF THE TRIP THAT THE

02:50PM  23     DEVICE FUNCTIONED WELL; CORRECT?

02:50PM  24     A.   YES.

02:50PM  25     Q.   OKAY.  SO SHE DIDN'T REPORT ANY DAMAGE AS A RESULT OF THAT

02:50PM  1    TRAVEL; CORRECT?

02:50PM  2    A.   CORRECT.

02:50PM  3    Q.   OKAY.  AND MR. BOSTIC ASKED YOU ABOUT HOW THE DEVICE WAS

02:50PM  4    POWERED.

02:50PM  5         DO YOU SEE THAT?

02:50PM  6    A.   YES.

02:50PM  7    Q.   AND IF YOU GO TO THE DISCUSSION JUST ABOVE WHERE THE

02:50PM  8    AIRCRAFT IS DISCUSSED, SHE PROVIDES SOME INFORMATION ABOUT HOW

02:50PM  9    POWER WOULD BE GENERATED AT THE LOCATIONS IN AFRICA.

02:51PM  10        DO YOU SEE THAT?

02:51PM  11   A.   YES.

02:51PM  12   Q.   AND SHE INDICATES THAT FOR SOME TIME IT WILL BE -- SHE'LL

02:51PM  13   BE IN A LOCATION WHERE THERE IS POWER; CORRECT?

02:51PM  14   A.   CORRECT.

02:51PM  15   Q.   BUT FOR THE REMAINDER OF THAT TIME, THE DEVICE WOULD BE

02:51PM  16   OPERATED ON GENERATOR POWER.

02:51PM  17        DO YOU SEE THAT?

02:51PM  18   A.   YES.

02:51PM  19   Q.   AND DO YOU KNOW WHAT OPERATIONS THE UNITED STATES HAS IN

02:51PM  20   UGANDA AND CAMEROON AND SOUTH SUDAN?

02:51PM  21   A.   NOT SPECIFICALLY.

02:51PM  22   Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 13979.

02:51PM  23        THIS IS THE POWERPOINT PRESENTATION PROVIDED BY GROW

02:52PM  24   MARKETING TO THERANOS.

02:52PM  25        DO YOU SEE THAT?

02:52PM  1      A.   YES.

02:52PM  2      Q.   AND MR. BOSTIC REVIEWED SEVERAL OF THE SLIDES IN THAT

02:52PM  3      PRESENTATION WITH YOU?

02:52PM  4      A.   CORRECT.

02:52PM  5      Q.   AND THE ADVICE THAT WAS BEING CONVEYED IN THOSE SLIDES WAS

02:52PM  6      BEING CONVEYED BY GROW MEDIA TO THERANOS IN CONNECTION WITH

02:52PM  7      THAT MEDIA TRAINING; CORRECT?

02:52PM  8      A.   CORRECT.

02:52PM  9      Q.   YOU TALKED WITH MR. BOSTIC FOR A FEW MOMENTS ABOUT

02:52PM  10     DEMONSTRATIONS ON YOUR REDIRECT.

02:52PM  11          DO YOU REMEMBER THAT?

02:52PM  12     A.   YES.

02:52PM  13     Q.   AND YOU INDICATED -- YOU USE THE PHRASE THAT SAID, AGAIN,

02:52PM  14     AS YOU HAD ON YOUR DIRECT, THAT THE DEMO APP WOULD HIDE ERRORS;

02:52PM  15     CORRECT?

02:52PM  16     A.   CORRECT.

02:52PM  17     Q.   BUT THAT WAS FOR THE REASON THAT WE DISCUSSED ON YOUR

02:52PM  18     CROSS-EXAMINATION; CORRECT?

02:52PM  19     A.   CAN YOU REPEAT THE QUESTION?

02:52PM  20     Q.   SURE.   LET ME BE MORE SPECIFIC.

02:52PM  21          IN CERTAIN SETTINGS, THERE MIGHT BE AN ERROR IN CONNECTION

02:52PM  22     WITH OPERATION OF THE DEVICE BECAUSE THERE WAS, FOR EXAMPLE, NO

02:53PM  23     BLOOD SAMPLE IN THE DEVICE; CORRECT?

02:53PM  24     A.   CORRECT.

02:53PM  25     Q.   AND WITH THE DEMO APP, SOMEBODY GETTING A DEMONSTRATION

02:53PM   1    COULD STILL SEE THE USER INTERFACE OPERATING; CORRECT?

02:53PM   2    A.   YES.

02:53PM   3    Q.   AND YOU DID NOT, AS YOU OBSERVED ALL OF THAT, THINK THERE

02:53PM   4    WAS ANYTHING DECEPTIVE ABOUT IT; CORRECT?

02:53PM   5    A.   I DID NOT.

02:53PM   6    Q.   AND YOU GOT ADVICE FROM MR. CRAIG, DR. YOUNG, OTHERS ABOUT

02:53PM   7    WHICH APP WOULD BE APPROPRIATE FOR WHICH DEMONSTRATION;

02:53PM   8    CORRECT?

02:53PM   9    A.   YES.

02:53PM   10   Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 905.

02:53PM   11        YOUR HONOR, MAY I JUST RETRIEVE THAT FROM MY DESK?

02:53PM   12            THE COURT:   YES, YES, OF COURSE.

02:53PM   13   BY MR. DOWNEY:

02:54PM   14   Q.   AND I'M GOING TO ASK YOU TO LOOK IN EXHIBIT 905 AT PAGE 5

02:54PM   15   OF THE EXHIBIT.

02:54PM   16        DO YOU SEE THAT?

02:54PM   17   A.   YES.

02:54PM   18   Q.   NOW, THIS IS A DOCUMENT THAT MR. BOSTIC JUST REVIEWED WITH

02:54PM   19   YOU AND TALKED ABOUT THE REMOVAL OF RESULTS; CORRECT?

02:54PM   20   A.   YES.

02:54PM   21   Q.   IF YOU LOOK AT THE EMAIL THAT YOU SENT IN THE MIDDLE OF

02:54PM   22   THIS PAGE, DO YOU SEE THAT IT INDICATES UNDER "PLEASE NOTE THE

02:54PM   23   FOLLOWING," THE REMOVAL OF CERTAIN RESULTS?

02:54PM   24   A.   YES.

02:54PM   25   Q.   AND IN THE FIRST INSTANCE IT TALKS ABOUT A RESULT BEING

02:54PM  1    REMOVED "PER PAUL'S SUGGESTION."

02:54PM  2         DO YOU SEE THAT?

02:54PM  3    A.   YES.

02:54PM  4    Q.   AND WHO DOES THAT REFER TO?

02:54PM  5    A.   THAT REFERS TO PAUL PATEL.

02:54PM  6    Q.   AND WHO WAS PAUL PATEL?

02:55PM  7    A.   HE WAS THE HEAD OF ONE OF THE ASSAY TEAMS.

02:55PM  8    Q.   OKAY.  AND IT WAS HIS SUGGESTION THAT RESULTS BE REMOVED

02:55PM  9    IN CONNECTION WITH THIS REPORT?

02:55PM 10    A.   YES.

02:55PM 11    Q.   LET ME ASK YOU ABOUT THE DIALOGUE THAT YOU HAD WITH

02:55PM 12    MR. BOSTIC AT THE END OF YOUR EXAMINATION.

02:55PM 13         DO YOU RECALL ON CROSS-EXAMINATION WE LOOKED AT AN EMAIL

02:55PM 14    BETWEEN YOU AND DR. ROBERTSON AND THE TECHNOLOGY ADVISORY

02:55PM 15    BOARD?

02:55PM 16    A.   YES.

02:55PM 17    Q.   HOW LONG WAS THAT EMAIL SENT BEFORE YOU DEPARTED FROM THE

02:55PM 18    COMPANY?

02:55PM 19    A.   ABOUT TEN DAYS.

02:55PM 20    Q.   AND HAD THE TECHNOLOGY ADVISORY BOARD BEGUN ITS WORK AT

02:55PM 21    THAT POINT?

02:55PM 22    A.   UM, I BELIEVE IT HAD, IT HAD FORMED OR IT WAS FORMING.

02:55PM 23    Q.   OKAY.  AND AGAIN, THE POINT OF THAT BOARD WAS TO EVALUATE

02:55PM 24    AND ADVISE ON THE COMPANY'S TECHNOLOGY; CORRECT?

02:55PM 25    A.   YES.

02:55PM  1    Q.   OKAY.  AND YOU ASSISTED WITH ITS FORMATION; CORRECT?

02:55PM  2    A.   YES.

02:56PM  3    Q.   AND YOU DID THAT IN PART TO ASSIST THE COMPANY IN

02:56PM  4    ADDRESSING CONCERNS THAT HAD BEEN RAISED ABOUT THE TECHNOLOGY;

02:56PM  5    CORRECT?

02:56PM  6    A.   YES.

02:56PM  7    Q.   OKAY.  I HAVE NOTHING FURTHER.

02:56PM  8         THANK YOU, MR. EDLIN.

02:56PM  9              THE COURT:  MR. BOSTIC?

02:56PM  10             MR. BOSTIC:  NOTHING FURTHER, YOUR HONOR.

02:56PM  11             THE COURT:  MAY THIS WITNESS BE EXCUSED?

02:56PM  12             MR. BOSTIC:  YES, YOUR HONOR.

02:56PM  13             MR. DOWNEY:  YES, YOUR HONOR.

02:56PM  14             THE COURT:  ALL RIGHT.  THANK YOU, SIR.  YOU MAY BE

02:56PM  15   EXCUSED.  YOU CAN JUST LEAVE THE BINDERS THERE.

02:56PM  16        AND I THINK WE'VE EXHAUSTED OUR DAY TODAY, LADIES AND

02:56PM  17   GENTLEMEN.

02:56PM  18        WE'LL TAKE OUR RECESS NOW.

02:56PM  19        LET ME ASK YOU TO CONTINUE TO BE VIGILANT ON THE

02:56PM  20   ADMONITION.  DO NOT DO ANY INVESTIGATION, DO NOT READ OR

02:56PM  21   OTHERWISE TRY TO LEARN ANYTHING ABOUT THIS CASE OUTSIDE OF THE

02:56PM  22   COURTROOM, AND DO NOT FORM ANY OPINION ABOUT THIS CASE.

02:56PM  23        I'LL ASK YOU TOMORROW MORNING AGAIN WHETHER ANY OF THOSE

02:56PM  24   THINGS HAVE OCCURRED.

02:56PM  25             WE'RE NOT IN SESSION TOMORROW, THURSDAY.  WE WILL BE IN

02:56PM   1    SESSION FRIDAY, AND I'M HOPING WE CAN GO UNTIL 4:00 O'CLOCK

02:57PM   2    FRIDAY.

02:57PM   3         ANY OBJECTIONS TO THAT?  ANY PROBLEMS WITH THAT?

02:57PM   4         I SEE NO HANDS.  THANK YOU.  THANK YOU FOR YOUR GENEROSITY

02:57PM   5    WITH YOUR TIME.  I APPRECIATE IT.

02:57PM   6         I'M GOING TO PROBABLY, AS WE GO FORWARD, GOING TO CONTINUE

02:57PM   7    TO ASK YOU ABOUT EXTENDING.  AND ACTUALLY NOW LET ME SUGGEST

02:57PM   8    THAT IT MIGHT BE 3:00 O'CLOCK WOULD BE OUR STANDARD TIME TO

02:57PM   9    BREAK, AND I'D LIKE YOU TO THINK ABOUT THAT.  IF WE CAN DO THAT

02:57PM   10   INSTEAD OF THE 2:00 O'CLOCK TIME?

02:57PM   11        I FEEL GUILTY.  I FEEL LIKE I'VE KIND OF MORPHED YOU INTO

02:57PM   12   THAT, HAVEN'T I?  AND NOW I'M SLOWLY STEPPING UP TO 4:00

02:57PM   13   O'CLOCK.

02:57PM   14        BUT LET'S SEE WHERE THIS TAKES US.  I APPRECIATE YOUR

02:57PM   15   CONSIDERATION.

02:57PM   16        HAVE A GOOD EVENING.  WE'LL SEE YOU FRIDAY.

02:57PM   17        THANK YOU.

02:58PM   18        (JURY OUT AT 2:58 P.M.)

02:58PM   19            THE COURT:  PLEASE BE SEATED.  THANK YOU.

02:58PM   20        THE RECORD SHOULD REFLECT THAT THE JURY HAS LEFT, THE

02:58PM   21   WITNESS, MR. EDLIN, HAS BEEN EXCUSED.  HE IS GONE.

02:58PM   22        THE GOVERNMENT WILL HAVE A WITNESS ON FRIDAY, I TAKE IT?

02:58PM   23            MR. LEACH:  YES, YOUR HONOR.

02:58PM   24            THE COURT:  AND IS THAT THE WITNESS WE DISCUSSED,

02:58PM   25   WEBER?

02:58PM 1        MR. LEACH:  WE HAVEN'T HAD A CHANCE TO DEBRIEF ABOUT

02:58PM 2    THAT, BUT I ANTICIPATE --

02:58PM 3        THE COURT:  YOU WILL HAVE A WITNESS?

02:58PM 4        MR. LEACH:  -- WE WILL HAVE MORE THAN ONE WITNESS.

02:58PM 5        THE COURT:  OKAY.

02:58PM 6        MR. LEACH:  AND I ANTICIPATE MR. WEBER.

02:58PM 7        THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

02:58PM 8      ANYTHING FROM YOUR SIDE?

02:58PM 9        MR. DOWNEY:  NOTHING FROM OUR SIDE.

02:58PM 10        THE COURT:  OKAY.  THANK YOU.

02:58PM 11    I DO WANT TO INDICATE THAT AT THE BREAK -- THIS IS IN

02:58PM 12   REGARDS TO THE TYPING AND THE NOISE ISSUE -- MS. KRATZMANN

02:58PM 13   SPOKE WITH THE JURORS.  THE JURORS REPRESENTED THAT IT WAS

02:58PM 14   BETTER REGARDING THE TYPING ISSUE.

02:58PM 15    THEY, OF COURSE, DID NOT KNOW ANYTHING ABOUT THE COMMENTS

02:59PM 16   THAT I MADE, BUT THEY DID REPORT THAT THE ISSUE WAS BETTER.

02:59PM 17    I UNDERSTAND, THOUGH -- AND I DON'T KNOW IF YOU'VE

02:59PM 18   NOTICED, YOUR BACKS HAVE BEEN TO THE DOOR -- BUT WE HAVE HAD A

02:59PM 19   MARSHAL'S REPRESENTATIVE COME IN.

02:59PM 20    I'LL CONTINUE TO DO THAT AND HAVE HE OR SHE COME IN JUST

02:59PM 21   TO MONITOR THIS.

02:59PM 22    AND THOSE OF YOU WHO ARE TYPING, I RESPECT AND APPRECIATE

02:59PM 23   THE FACT THAT YOU'RE COMING TO YOUR COURT, YOUR PUBLIC COURT,

02:59PM 24   THIS IS OPEN TO THE PUBLIC AND YOU HAVE AN OPEN INVITATION TO

02:59PM 25   VISIT YOUR COURT AND TO SEE YOUR SYSTEM OF JUSTICE IN

02:59PM   1    OPERATION.

02:59PM   2          THE ONLY THING I DO ASK, AS I'VE SAID EARLIER THIS

02:59PM   3    AFTERNOON TO THOSE OF YOU WHO WERE HERE, IS TO PLEASE RESPECT

02:59PM   4    THE DECORUM AND THE IMPORTANCE OF THE ISSUES THAT ARE BEING

02:59PM   5    LITIGATED HERE, AND TO DO THAT, AS YOU KNOW IF YOU LOOK AT OUR

02:59PM   6    WEBSITE REGARDING THIS CASE, WE HAVE PERMITTED, I HAVE

02:59PM   7    PERMITTED TYPING DEVICES TO COME IN THE COURTROOM, BUT I'VE

03:00PM   8    REQUESTED THAT YOU HAVE A SILENT KEYBOARD.  THOSE WOULD BE

03:00PM   9    PERMITTED.  AND I UNDERSTAND THOSE ARE MARKETED AND AVAILABLE.

03:00PM  10          IF YOU DON'T HAVE ONE OF THOSE OR IF YOU'RE UNABLE TO

03:00PM  11    MANIPULATE YOUR KEYBOARD IN SUCH A WAY THAT IT CAN'T BE SILENT,

03:00PM  12    THEN I'M GOING TO NOT ASK YOU TO NOT COME TO THE COURTROOM, OR

03:00PM  13    COURTHOUSE, BUT AS I SAID BEFORE, SHIFT YOUR ABILITY TO WATCH

03:00PM  14    THIS PROCEEDING IN OUR OVERFLOW ROOM, WHICH DOES HAVE LIVE,

03:00PM  15    LIVE STREAM REALTIME CAMERAS SO YOU CAN HEAR AND SEE THE

03:00PM  16    WITNESS, AS WELL AS ANY QUESTIONING EXAMINATION.

03:00PM  17          AND IT MAY BE THAT IF WE -- IF I HEAR OF SOME OTHER

03:00PM  18    DISRUPTIONS FROM THE JURY SUCH THAT IT'S DISTRACTING THEM, I

03:00PM  19    MAY ASK SOMEONE TO LEAVE.

03:00PM  20          BUT I'D LIKE YOU TO SELF-POLICE, IF YOU CAN, AND PLEASE DO

03:00PM  21    THAT, AND BE RESPECTFUL OF THE JURY, BE RESPECTFUL OF THESE

03:01PM  22    PROCEEDINGS.

03:01PM  23          THAT'S ALL I HAVE TO SAY ON THE MATTER.

03:01PM  24          I APPRECIATE YOUR COOPERATION WITH THAT.

03:01PM  25          ANYTHING ELSE, COUNSEL?

4317

03:01PM  1          MR. BOSTIC:  NO, YOUR HONOR.

03:01PM  2          MR. DOWNEY:  NOTHING, YOUR HONOR.

03:01PM  3          THE COURT:  ALL RIGHT.  HAVE A GOOD EVENING.

03:01PM  4          THE CLERK:  COURT IS ADJOURNED.

03:01PM  5      (COURT ADJOURNED AT 3:01 P.M.)

         6

         7

         8

         9

        10

        11

        12

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

1

2

3                      CERTIFICATE OF REPORTER

4

5

6

7        I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8   STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9   280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10  CERTIFY:

11       THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12  A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13  ABOVE-ENTITLED MATTER.

14

15

16       IRENE RODRIGUEZ, CSR, RMR, CRR
         CERTIFICATE NUMBER 8074
17

18       DATED:  OCTOBER 20, 2021

19

20

21

22

23

24

25