1          UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3             SAN JOSE DIVISION

4

UNITED STATES OF AMERICA,        )   CR-18-00258-EJD

5                                 )

                 PLAINTIFF,       )   SAN JOSE, CALIFORNIA

6                                 )

         VS.                      )   VOLUME 27

7                                 )

ELIZABETH A. HOLMES,             )   NOVEMBER 3, 2021

8                                 )

                 DEFENDANT.       )   PAGES 5187 - 5382

9   _____ )

10

          TRANSCRIPT OF TRIAL PROCEEDINGS

11      BEFORE THE HONORABLE EDWARD J. DAVILA

          UNITED STATES DISTRICT JUDGE

12

13   A P P E A R A N C E S:

14   FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE

                          BY:  JOHN C. BOSTIC

14                             JEFFREY B. SCHENK

                          150 ALMADEN BOULEVARD, SUITE 900

15                        SAN JOSE, CALIFORNIA 95113

16                        BY:  ROBERT S. LEACH

                             KELLY VOLKAR

17                        1301 CLAY STREET, SUITE 340S

18                        OAKLAND, CALIFORNIA 94612

19       (APPEARANCES CONTINUED ON THE NEXT PAGE.)

20

     OFFICIAL COURT REPORTERS:

21                        IRENE L. RODRIGUEZ, CSR, RMR, CRR

                          CERTIFICATE NUMBER 8074

22                        LEE-ANNE SHORTRIDGE, CSR, CRR

                          CERTIFICATE NUMBER 9595

23

     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY

24        TRANSCRIPT PRODUCED WITH COMPUTER

25

1

2       A P P E A R A N C E S: (CONT'D)


3       FOR DEFENDANT HOLMES:    WILLIAMS & CONNOLLY LLP
                                 BY:  KEVIN M. DOWNEY
4                                     LANCE A. WADE
                                      KATHERINE TREFZ
5                                     PATRICK LOOBY
                                      RICHARD CLEARY
6                                     J.R. FLEURMONT
                                      SEEMA ROPER
7                                     PATRICK LOOBY
                                 725 TWELFTH STREET, N.W.
8                                WASHINGTON, D.C. 20005

9                                LAW OFFICE OF JOHN D. CLINE
                                 BY:  JOHN D. CLINE
10                               ONE EMBARCADERO CENTER, SUITE 500
                                 SAN FRANCISCO, CALIFORNIA 94111
11

12      ALSO PRESENT:            FEDERAL BUREAU OF INVESTIGATION
                                 BY:  ADELAIDA HERNANDEZ
13
                                 OFFICE OF THE U.S. ATTORNEY
14                               BY:  LAKISHA HOLLIMAN, PARALEGAL
                                      MADDI WACHS, PARALEGAL
15
                                 WILLIAMS & CONNOLLY
16                               BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL

17                               TBC
                                 BY:  BRIAN BENNETT, TECHNICIAN
18

19

20

21

22

23

24

25

5189

INDEX OF PROCEEDINGS

GOVERNMENT'S:

**DANIEL MOSLEY**
CROSS-EXAM BY MR. WADE (RES.)          P. 5217
REDIRECT EXAM BY MR. SCHENK            P. 5374

INDEX OF EXHIBITS

|  | IDENT. | EVIDENCE |
|---|---|---|

GOVERNMENT'S:

| 2110 | | 5342 |

DEFENDANT'S:

| 14118 | | 5226 |
| 14119 | | 5232 |
| 14149 | | 5328 |
| 14124 | | 5330 |
| 14151 | | 5336 |
| 14152 | | 5339 |
| 14153 | | 5340 |
| 14169 | | 5348 |
| 14135 | | 5353 |
| 14207 | | 5359 |
| 14208 | | 5363 |

```
         1    SAN JOSE, CALIFORNIA                    NOVEMBER 3, 2021

08:39AM  2                      P R O C E E D I N G S

08:39AM  3         (COURT CONVENED AT 8:39 A.M.)

08:39AM  4         (JURY OUT AT 8:39 A.M.)

08:39AM  5             THE COURT:  THANK YOU.  PLEASE BE SEATED.  LET'S GO

08:39AM  6    ON THE RECORD IN THE HOLMES MATTER.

08:39AM  7         ALL COUNSEL ARE PRESENT, MS. HOLMES IS PRESENT.

08:39AM  8         WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.  I'M JUST GOING

08:39AM  9    TO TAKE UP ONE MATTER THIS MORNING.  I BELIEVE THIS IS IN

08:39AM  10   RELATION TO THE WITNESS BB, I THINK IT IS.

08:39AM  11        MR. BOSTIC, WILL YOU SPEAK TO THAT?

08:39AM  12            MR. BOSTIC:  YES, YOUR HONOR.

08:40AM  13        GOOD MORNING, YOUR HONOR.

08:40AM  14        JOHN BOSTIC FOR THE UNITED STATES.

08:40AM  15            THE COURT:  THANK YOU.  GOOD MORNING.

08:40AM  16            MS. TREFZ:  GOOD MORNING, YOUR HONOR.

08:40AM  17        KATIE TREFZ FOR MS. HOLMES.

08:40AM  18            THE COURT:  THANK YOU.  GOOD MORNING.

08:40AM  19        AND THIS IS DOCKETED AT 1116.  MS. TREFZ, IT'S YOUR MOTION

08:40AM  20   TO EXCLUDE TESTIMONY OF BB.  THE GOVERNMENT'S OPPOSITION IS

08:40AM  21   1124, DOCUMENT 1124.

08:40AM  22        I'VE READ, I'VE READ THOSE.  I HAVE ALSO HAD OCCASION TO

08:40AM  23   REVIEW WHAT IS REFERENCED IN BOTH OF THESE MOTIONS.  IT'S

08:40AM  24   DOCUMENT 568, WHICH WAS OUR MOTION IN LIMINE DISCUSSION, AS

08:40AM  25   WELL AS DOCUMENT 711.  THOSE ARE BOTH THE DEFENDANT'S MOTION IN
```

08:40AM 1    LIMINE TO EXCLUDE AND THEIR REPLY, AND THE GOVERNMENT'S 664,

08:40AM 2    WHICH WAS THE OPPOSITION TO THE MOTION IN LIMINE.

08:40AM 3        I THINK THOSE WERE RELEVANT, WILL BE RELEVANT FOR OUR

08:40AM 4    DISCUSSION.

08:40AM 5        I'VE ALSO REVIEWED DOCUMENT 798, WHICH YOU KNOW IS THE

08:41AM 6    COURT'S MIL ORDER.  PAGES 78 THROUGH 80 I BELIEVE SPEAK TO AND

08:41AM 7    GIVE US SOME INFORMATION ABOUT THE MOTION HERE.

08:41AM 8        AND OF COURSE, I'VE REVIEWED THE THIRD SUPERSEDING

08:41AM 9    INDICTMENT.  AND I THINK PARAGRAPH 16 IS THE ONE THAT IS

08:41AM 10   PERTINENT IF I'M NOT MISTAKEN, AND OTHERS.

08:41AM 11       SO I'VE LOOKED AT THOSE.  THOSE HAVE BEEN HELPFUL, AND I'M

08:41AM 12   EAGER TO HEAR FROM YOU.

08:41AM 13       SO, MS. TREFZ, WHAT WOULD YOU LIKE ME TO KNOW?  YOU'RE THE

08:41AM 14   MOVING PARTY HERE.

08:41AM 15           MS. TREFZ:  THANK YOU, YOUR HONOR.

08:41AM 16       SO WITHOUT KIND OF RESTATING WHAT I THINK IS OBVIOUS, THE

08:41AM 17   BASIS OF OUR MOTION IS THE FACT THAT THE PATIENT LISTED IN

08:41AM 18   COUNT NINE, BB, WHOSE TEST ITSELF IS NOT LISTED IN COUNT NINE,

08:41AM 19   HAD A TEST, AND THE ONLY TESTS THAT HE HAD FROM THERANOS, AS

08:41AM 20   FAR AS WE CAN TELL, ARE NOT LISTED IN THE INDICTMENT OR THE

08:41AM 21   BILL OF PARTICULARS.

08:41AM 22       AND WE THINK UNDER THE COURT'S ORDERS, AND OF WHICH THE

08:42AM 23   GOVERNMENT HAS HAD AMPLE OPPORTUNITY TO BRIEF AND TO SUPPLEMENT

08:42AM 24   IF NEEDED, THEN IT SHOULD BE -- THEN HIS TESTIMONY ABOUT THE

08:42AM 25   ACCURACY OF HIS TEST RESULT, AND, FRANKLY, HIS TEST RESULT

08:42AM   1     OVERALL SHOULD BE EXCLUDED.

08:42AM   2              THE COURT:  AND HIS -- I'M SORRY TO INTERRUPT YOU.

08:42AM   3              MS. TREFZ:  YEAH.

08:42AM   4              THE COURT:  BUT HIS TEST IS CBC?  IS THAT RIGHT?  IS

08:42AM   5     THAT THE NATURE OF IT?  SHOULD I BE CONCERNED ABOUT WHAT TEST

08:42AM   6     HE TOOK?

08:42AM   7              MS. TREFZ:  I THINK THAT YOU NEED TO BE CONCERNED

08:42AM   8     ABOUT IT FROM THE PERSPECTIVE OF THE FACT THAT IT'S NOT LISTED

08:42AM   9     IN THE INDICTMENT, AND THE CBC PANEL IS THE -- ARE THE TESTS

08:42AM  10     THAT HE GOT.

08:42AM  11        IT APPEARS THAT THE ISSUE THAT'S BEEN DISCLOSED VIA HIS

08:42AM  12     INTERVIEW MEMOS IS A SPECIFIC TEST ABOUT PLATELETS, WHICH IS

08:42AM  13     LIKE A SUBSIDIARY MEASUREMENT IN THE CBC PANEL, AND --

08:43AM  14              THE COURT:  SO AS I UNDERSTAND YOUR MOTION, AND

08:43AM  15     PLEASE CORRECT ME, AND I'M GOING TO ASK MR. BOSTIC ABOUT THIS,

08:43AM  16     IT SEEMS LIKE YOU'RE SAYING THAT HE, BB, CAN'T TESTIFY BECAUSE

08:43AM  17     CBC WAS NOT LISTED IN THE INDICTMENT.  THAT WASN'T A PANEL THAT

08:43AM  18     WAS LISTED.

08:43AM  19        AND IN ADDITION, THERE WAS CONVERSATION AT THE MIL MOTION

08:43AM  20     ABOUT THIS IN DOCUMENT 568 AND SOME OTHERS.

08:43AM  21        THE GOVERNMENT INDICATED THAT THEY WOULD NOT PUT THIS ON

08:43AM  22     FOR THE PURPOSE OF SHOWING INACCURACY IN THE TEST RESULTS, BUT

08:43AM  23     IT COULD BE ADMITTED FOR OTHER, OTHER REASONS TO SHOW THE

08:43AM  24     NUMBER OF TESTS.

08:43AM  25        I THINK YOU TALK ABOUT THIS, MR. BOSTIC, IN YOUR

08:43AM   1    PLEADINGS, THE NUMBER OF TESTS AND THE TYPE OF TESTS, BUT NOT

08:43AM   2    FOR THIS WITNESS TO TESTIFY THAT HE TOOK THE TEST.

08:43AM   3         HE CALLED THE COMPANY BECAUSE HE FELT THAT THE TEST WAS

08:43AM   4    INACCURATE.

08:44AM   5         AND THAT'S ONE QUESTION THAT I'M CURIOUS ABOUT.  WHAT IS

08:44AM   6    THE RELEVANCE OF BB'S TESTIMONY?  IS IT -- DOES IT GO TO

08:44AM   7    INACCURACY OR ACCURACY, AND IF SO, THERE MIGHT BE AN ISSUE WITH

08:44AM   8    THAT.

08:44AM   9         DOES IT GO TO SOME OTHER PURPOSE?

08:44AM   10        IS CBC -- HAS CBC BEEN INTRODUCED INTO THE CASE SUCH THAT

08:44AM   11   THERE IS SOME RELEVANCE AS TO THAT, NOT NECESSARILY AS TO HIM

08:44AM   12   TAKING THAT TEST, BUT FOR SOME OTHER PURPOSE, I SUPPOSE.

08:44AM   13        BUT THAT'S WHAT I SEE YOU SAYING, THAT HE CAN'T TESTIFY

08:44AM   14   ABOUT CBC BECAUSE IT'S NOT IN THE INDICTMENT, IT WASN'T LISTED,

08:44AM   15   AND IT DOESN'T COME IN FOR THAT PURPOSE.

08:44AM   16        SO, MR. BOSTIC, MAYBE YOU HAVE ANOTHER PURPOSE?

08:44AM   17        MS. TREFZ, MAYBE YOU WANT TO FOLLOW UP.

08:44AM   18          MS. TREFZ:  THE ONLY THING THAT I WANTED TO CLARIFY,

08:44AM   19   YOUR HONOR, IS THAT IT'S NOT JUST THAT IT'S NOT LISTED.  THE

08:45AM   20   GOVERNMENT ALSO WITHDREW A NOTICE ABOUT EXPERT TESTIMONY

08:45AM   21   RELATED TO CBC, AND THAT'S IMPORTANT BECAUSE I'M SURE YOU'LL

08:45AM   22   RECALL THAT WE WERE IN FRONT OF YOU SEVERAL TIMES ASKING FOR

08:45AM   23   ADDITIONAL EXPERT DISCLOSURES.

08:45AM   24        INITIALLY THERE WAS AN IDENTIFICATION OF CBC AS A

08:45AM   25   POTENTIAL EXPERT ISSUE, AND, IN FACT, THE GOVERNMENT KIND OF

08:45AM 1    SAID IN ITS OPPOSITION TO THE MOTION IN LIMINE, IT MIGHT BE

08:45AM 2    THAT PROFESSIONALS WILL TESTIFY ABOUT THE PREVALENCE OF CBC AS

08:45AM 3    A NORMAL TEST OR AS AN EXPECTED TEST.

08:45AM 4            THE COURT:  RIGHT.

08:45AM 5            MS. TREFZ:  AND WHAT HAPPENED HERE WAS THAT IN JUNE

08:45AM 6    THE GOVERNMENT REMOVED CBC, AND THEN AT THE END OF JULY WHEN

08:45AM 7    THEY DID THEIR FINAL AMENDED EXPERT DISCLOSURES, NOT ONLY CBC

08:45AM 8    BUT THE DOCTOR THAT WAS POTENTIALLY GOING TO TESTIFY ABOUT CBC

08:45AM 9    WAS REMOVED FROM THE DISCLOSURE AS WELL.

08:45AM 10       SO WE THINK THAT NOT ONLY IS IT AN ISSUE OF NOTICE, WHICH

08:45AM 11   IS THE PRIMARY BASIS FOR THE MOTION, BUT WITHOUT THAT, THEN

08:45AM 12   TESTIMONY FROM A PATIENT LIKE THIS IS -- WITHOUT KIND OF AN

08:46AM 13   ACCOMPANYING EXPERT TESTIMONY IS HIGHLY MISLEADING AND QUITE

08:46AM 14   PREJUDICIAL.

08:46AM 15       AND NOTABLY, THE ADDITIONAL -- ALL OF THE ADDITIONAL

08:46AM 16   PATIENTS THAT WE'VE HEARD FROM, INCLUDING THE OTHERS LISTED IN

08:46AM 17   THE INDICTMENT OR IDENTIFIED IN THE INDICTMENT, HAVE AN

08:46AM 18   ACCOMPANYING PROVIDER THAT WE UNDERSTAND WILL TESTIFY AND THAT

08:46AM 19   HAS BEEN DISCLOSED.

08:46AM 20       SO IT'S A NOTICE ISSUE, BUT IT'S ALSO KIND OF -- THE

08:46AM 21   ISSUES THAT ARE EMBEDDED IN IT GO DEEPER THAN THAT BECAUSE IT'S

08:46AM 22   NOT SIMPLY A MATTER OF, AS I UNDERSTAND THE GOVERNMENT TO

08:46AM 23   SUGGEST IN ITS OPPOSITION, HE'S IN THE INDICTMENT, LIKE YOU

08:46AM 24   SHOULD HAVE KNOWN.  THAT'S NOT REALLY -- YOU KNOW, WE --

08:46AM 25           THE COURT:  ISN'T THAT NOTICE, THOUGH?

08:46AM 1       THEY SAY, OKAY, WE RECEIVED -- AFTER WE HAD SOME

08:46AM 2   LITIGATION ON THIS, WE THEN FILED AN INFORMATION AND THEN THE

08:46AM 3   GRAND JURY ISSUED THE THIRD SUPERSEDING INDICTMENT.

08:47AM 4       AND YOU'VE HAD NOTICE ABOUT THAT.  AND YOU'VE HAD NOTICE

08:47AM 5   ABOUT BB IN AT LEAST THIS CONTEXT SINCE THE MIL MOTION ALSO.

08:47AM 6       SO AREN'T YOU -- DIDN'T YOU HAVE A FULSOME KNOWLEDGE ABOUT

08:47AM 7   THE POTENTIAL FOR HIM TESTIFYING?

08:47AM 8           MS. TREFZ:  WELL, THE POTENTIAL FOR HIM POTENTIALLY

08:47AM 9   TESTIFYING ABOUT SOMETHING, AND IF THE GOVERNMENT HAD ACTUALLY

08:47AM 10  TAKEN ANY ACTUAL ACTION AS OPPOSED TO EITHER INACTION OR MOVING

08:47AM 11  TO DISCLAIM THIS PARTICULAR TEST, FOR EXAMPLE, IF THE

08:47AM 12  GOVERNMENT HAD AMENDED ITS BILL OF PARTICULARS TO INCLUDE CBC

08:47AM 13  IN OUR -- THEN WE MIGHT BE IN A DIFFERENT SITUATION.

08:47AM 14      FOR EXAMPLE, IN OUR REPLY TO OUR MOTION IN LIMINE, WE

08:47AM 15  SPECIFICALLY IDENTIFIED THIS PATIENT AND THIS ISSUE.

08:47AM 16      THAT WAS SIX MONTHS BEFORE TRIAL EVEN BEGAN IN THIS CASE,

08:47AM 17  BEFORE JURY SELECTION EVEN BEGAN IN THIS CASE, AND YOU WOULD

08:47AM 18  HAVE EXPECTED DURING THAT TIME PERIOD IF THERE WAS SOME KIND OF

08:47AM 19  A MISTAKE OR THE GOVERNMENT REALIZED IT HAD -- IF THERE WAS

08:47AM 20  SOME ERROR OR OVERSIGHT, THEN IT WOULD HAVE SAID, OH, BY THE

08:48AM 21  WAY, YOU'RE WRONG ABOUT THAT ONE, EITHER HERE'S A SUPPLEMENTAL

08:48AM 22  PLEADING BEFORE THE MOTIONS IN LIMINE AND HERE'S A MOTION FOR A

08:48AM 23  BILL OF PARTICULARS THAT HAS ANOTHER TEST, OR YES, WE ACTUALLY

08:48AM 24  DO HAVE AN EXPERT TO TESTIFY ON THIS.

08:48AM 25      IT HAD PLENTY OF OPPORTUNITY TO DO THAT AND, IN FACT, IT

08:48AM 1    DIDN'T AND IT TOOK ACTIONS IN THE OPPOSITE DIRECTION.

08:48AM 2          THE COURT:  WELL, WE'LL ASK MR. BOSTIC ABOUT THIS.

08:48AM 3       I NOTICE ON DOCUMENT 664 ON PAGE 2 AT FOOTNOTE 1, I THINK

08:48AM 4    THE GOVERNMENT INDICATES THAT SHOULD YOU WISH TO ADD TO OR

08:48AM 5    AMEND THE BILL OF PARTICULARS PRIOR TO THE TESTIMONY, THE

08:48AM 6    GOVERNMENT WOULD DO THAT, AND I'M NOT CERTAIN THAT THAT HAS

08:48AM 7    OCCURRED.

08:48AM 8       MR. BOSTIC?

08:48AM 9          MR. BOSTIC:  YES, YOUR HONOR.

08:48AM 10      SO AS TO THAT LAST POINT, THE GOVERNMENT HAS NOT AMENDED

08:48AM 11   ITS BILL OF PARTICULARS, AND, FRANKLY, IF WE COULD GO BACK IN

08:48AM 12   TIME AND AMEND THE BILL OF PARTICULARS TO AVOID THIS DISPUTE,

08:48AM 13   OF COURSE WE WOULD DO SO.

08:48AM 14      OUR GOAL IS NOT TO CREATE DISPUTES OR ANY

08:49AM 15   MISUNDERSTANDINGS.

08:49AM 16      BUT THE POINT OF THE BILL OF PARTICULARS, TO BEGIN WITH --

08:49AM 17   AND THIS HAS BEEN SINCE BEFORE THE COURT EVEN ORDERED THE BILL

08:49AM 18   OF PARTICULARS CREATED IN THIS CASE -- THE PURPOSE OF THE

08:49AM 19   DOCUMENT IS TO MAKE SURE THAT THE DEFENSE HAS NOTICE AS TO THE

08:49AM 20   NATURE OF THE CHARGES.  IT'S A SUPPLEMENT TO THE INFORMATION IN

08:49AM 21   THE INDICTMENT.

08:49AM 22      AND DUE TO THE WAY THAT THE EVENTS OCCURRED IN THIS CASE

08:49AM 23   WHERE THE BILL OF PARTICULARS WAS ORDERED, SUBSEQUENTLY THE

08:49AM 24   GOVERNMENT INTERVIEWED THE PATIENT BB, GATHERED INFORMATION

08:49AM 25   ABOUT HIS INACCURATE PLATELET RESULTS.

08:49AM  1        AND JUST TO BE CLEAR, THE RESULTS ARE FROM THE PLATELET OR

08:49AM  2   THE PLT ASSAY, WHICH IS AN -- THE TEST AT ISSUE HERE IS THE

08:49AM  3   PLT, OR PLATELET ASSAY, AND IT'S ONE ASSAY THAT IS GROUPED IN

08:50AM  4   THE CBC PANEL OF TESTS.

08:50AM  5        SO REALLY THE ONLY TEST RESULT WHOSE ACCURACY IS AT ISSUE

08:50AM  6   IN CONNECTION WITH PATIENT BB IS THE PLATELET TEST, OR PLT.

08:50AM  7        THE --

08:50AM  8             THE COURT:  IS THAT -- I'M SORRY TO INTERRUPT YOU.

08:50AM  9        IS THAT IN THE BILL OF PARTICULARS, THE PLT?

08:50AM 10             MR. BOSTIC:  THE PLT IS NOT LISTED IN THE BILL OF

08:50AM 11   PARTICULARS, YOUR HONOR.

08:50AM 12        AND I THINK WHEN IT COMES TO NOTICE TO THE DEFENSE, THE

08:50AM 13   CRITICAL POINT IS THAT THE INTERVIEW WITH BB AND THE FACT THAT

08:50AM 14   THE ONLY ASSAY AT ISSUE WITH HIM IS PLT WAS DISCLOSED TO THE

08:50AM 15   DEFENSE IN THE FIRST HALF OF LAST YEAR.

08:50AM 16        IN MAY OF LAST YEAR THE GOVERNMENT FILED AN AMENDING

08:50AM 17   CHARGING DOCUMENT INCLUDING FOR THE FIRST TIME BB AS THE BASIS

08:50AM 18   FOR AN ACTUAL WIRE FRAUD COUNT AS ONE OF THREE PATIENTS THAT

08:50AM 19   CURRENTLY ARE IN THE OPERATIVE INDICTMENT.

08:50AM 20             THE COURT:  THIS IS COUNT NINE, I BELIEVE.

08:51AM 21             MR. BOSTIC:  THAT'S CORRECT, YOUR HONOR.

08:51AM 22             THE COURT:  AND IT'S A PHONE CALL FROM ARIZONA TO

08:51AM 23   CALIFORNIA FROM BB TO THERANOS, I THINK.  IS THAT RIGHT?

08:51AM 24             MR. BOSTIC:  CORRECT, CORRECT.  AND THE SOLE TOPIC

08:51AM 25   OF THAT CALL WAS THE ACCURACY -- OR CONCERNS ABOUT THE ACCURACY

```
08:51AM   1     OF THIS PLT OR PLATELET TEST.

08:51AM   2          SO CERTAINLY AT LEAST SINCE MAY OF 2020 THE DEFENSE HAS

08:51AM   3     BEEN ON NOTICE THAT THIS IS A COUNT IN THE INDICTMENT, THAT THE

08:51AM   4     ONLY TOPIC, THE ONLY ASSAY THAT THIS PATIENT HAS DISCUSSED, THE

08:51AM   5     ONLY ASSAY THAT'S IMPACTED THIS PATIENT WAS THAT PLT, OR

08:51AM   6     PLATELET, ASSAY.

08:51AM   7          THE DEFENSE IS CORRECT THAT EARLIER THIS YEAR THE DEFENSE

08:51AM   8     NOTED IN A REPLY TO ITS MOTION ABOUT THE BILL OF PARTICULARS

08:51AM   9     THAT THAT PLATELET ASSAY WAS NOT LISTED IN THE BILL OF

08:51AM   10    PARTICULARS.

08:51AM   11         I THINK AT THAT TIME, IF MEMORY SERVES, FRANKLY, THERE MAY

08:51AM   12    HAVE BEEN SOME CONFUSION ON THE GOVERNMENT'S SIDE ABOUT WHETHER

08:51AM   13    THE PT ASSAY, WHICH IS LISTED IN THE INDICTMENT AND BILL OF

08:52AM   14    PARTICULARS, WAS THE SAME THING AS THE PLATELET ASSAY.  PT ALSO

08:52AM   15    INVOLVES CLOTTING, BLOOD CLOTTING.  SO I THINK THAT MIGHT HAVE

08:52AM   16    BEEN PART OF THE CONFUSION HERE.

08:52AM   17         TO THE DEFENSE'S CREDIT, THEY WERE NOT CONFUSED BY THAT.

08:52AM   18    THEY HAVE, THE RECORD SHOWS, UNDERSTOOD THE DIFFERENCE BETWEEN

08:52AM   19    THOSE TWO ASSAYS.

08:52AM   20         SO THEY'VE HAD THE BENEFIT OF UNDERSTANDING THAT BB WAS IN

08:52AM   21    THE CASE, WAS AN INTEGRAL PART OF THE CASE BY VIRTUE OF BEING

08:52AM   22    CONNECTED TO AN INDICTED COUNT, AND THAT HIS TESTIMONY RELATED

08:52AM   23    SOLELY TO THE ACCURACY OF THAT PLT RESULT.

08:52AM   24         SO IF THE PURPOSE OF THE BILL OF PARTICULARS WERE TO SET

08:52AM   25    UP TRAPS FOR THE GOVERNMENT WHERE THERE ARE VARIATIONS BETWEEN
```

08:52AM 1    THE PROOF AT TRIAL AND WHAT IS STRICTLY LAID OUT IN THE BILL,

08:52AM 2    THEN THAT WOULD BE ONE THING.

08:52AM 3        BUT BECAUSE, AS THE GOVERNMENT UNDERSTANDS IT, THE PURPOSE

08:52AM 4    OF THE BILL OF PARTICULARS IS TO SIMPLY ENSURE THAT THERE IS

08:53AM 5    NOTICE -- AND AGAIN, IT'S THE SUPPLEMENT TO THE INFORMATION IN

08:53AM 6    THE INDICTMENT AND THE INDICTMENT HERE INCLUDES THE BB COUNT,

08:53AM 7    WHICH RELATES ONLY TO THE PLATELET TEST -- AND THE LIST OF

08:53AM 8    ASSAYS, BY THE WAY, IN PARAGRAPH 16 OF THE INDICTMENT DOES

08:53AM 9    INDICATE THAT THAT LIST IS A LIST OF THE ASSAYS THAT ARE AT

08:53AM 10   ISSUE IN THE CASE AND THE LANGUAGE DOES INCLUDE, "INCLUDING BUT

08:53AM 11   NOT LIMITING TO."

08:53AM 12   SO CERTAINLY WE WOULD SUBMIT THAT AS TO ASSAYS

08:53AM 13   SPECIFICALLY TIED TO INDICTED COUNTS IN THAT SAME DOCUMENT, THE

08:53AM 14   SAME CHARGING DOCUMENT, THE DEFENSE HAS FAIR NOTICE.

08:53AM 15       THE COURT:  THANK YOU.  WHAT ABOUT, WHAT ABOUT

08:53AM 16   DOCUMENT 798 AND THE COURT'S RULING ON PAGES 78 THROUGH 80?  I

08:53AM 17   KNOW YOU'VE READ THAT.  AND THE COURT INDICATED THAT THE

08:53AM 18   GOVERNMENT IS PRECLUDED FROM INTRODUCING ANY EVIDENCE OR

08:53AM 19   ARGUMENT REGARDING THE PURPORTED INACCURACY AND UNRELIABILITY

08:53AM 20   OF TESTS NOT IDENTIFIED IN THE GOVERNMENT'S BILL OF

08:54AM 21   PARTICULARS.

08:54AM 22       AND THE ORDER GOES FURTHER TO SAY THAT THE GOVERNMENT MAY

08:54AM 23   STILL INTRODUCE EVIDENCE OR TESTIMONY ABOUT TESTS NOT LISTED IN

08:54AM 24   THE BILL OF PARTICULARS FOR PURPOSES UNRELATED TO THE ACCURACY

08:54AM 25   AND RELIABILITY OF THOSE TESTS.

5201

08:54AM 1    I GUESS THE THRESHOLD QUESTION I SHOULD HAVE ASKED IS, IS

08:54AM 2  BB, IS HIS TESTIMONY RELATED TO ACCURACY AND RELIABILITY?

08:54AM 3     MR. BOSTIC:  IT IS, YOUR HONOR.  IT IS.

08:54AM 4     THE COURT:  RIGHT.

08:54AM 5     MR. BOSTIC:  I THINK AS TO THE COURT'S ORDER, WE

08:54AM 6  WOULD ASK THAT THE COURT CONSTRUE IT TO INCLUDE INFORMATION

08:54AM 7  DISCLOSED IN THE INDICTMENT AS A WHOLE, WHICH WOULD INCLUDE

08:54AM 8  BB'S COUNT RELATING TO PLATELETS.  BECAUSE THE DEFENSE HAS BEEN

08:54AM 9  ON NOTICE OF THAT, WE BELIEVE IT'S APPROPRIATE AND THAT THERE'S

08:54AM 10  NO PREJUDICE ISSUE INVOLVED IN HAVING HIM TESTIFY ON THAT

08:54AM 11  TOPIC.

08:54AM 12     MS. TREFZ:  SO I HEARD A COUPLE OF THINGS THAT I

08:54AM 13  JUST WANT TO RESPOND TO.

08:54AM 14    ONE IS THE IDEA THAT THE GOVERNMENT DIDN'T KNOW WHAT

08:55AM 15  ASSAYS IT WAS CHARGING AND IT THOUGHT THAT PT INR IS THE SAME

08:55AM 16  THING AS PLATELETS IS PRETTY SHOCKING.  IT'S THE FIRST THING --

08:55AM 17  IT'S THE FIRST TIME I'VE HEARD OF THIS PARTICULAR ARGUMENT.

08:55AM 18    AND, I MEAN, I CAN'T BELIEVE THAT THE GOVERNMENT WOULD GO

08:55AM 19  FORWARD WITH AN INDICTMENT AND PROCEED, YOU KNOW, SEVERAL

08:55AM 20  MONTHS BEYOND THAT INTO THE MOTIONS IN LIMINE STAGE AND BE

08:55AM 21  SUDDENLY SURPRISED AT I DON'T KNOW WHAT POINT TO LEARN THAT

08:55AM 22  PLATELETS ARE DIFFERENT THAN PROTHROMBIN.

08:55AM 23    BUT THESE ARE TOTALLY DIFFERENT ASSAYS.  THIS IS THE

08:55AM 24  GOVERNMENT'S CASE.  IT'S A SCIENTIFIC CASE.  THEY SHOULD KNOW

08:55AM 25  WHICH ASSAYS THEY'RE CHARGING WHEN THEY CHARGE IT.  THAT'S

5202

08:55AM  1    NUMBER ONE.

08:55AM  2         NUMBER TWO IS TO THE EXTENT THAT MR. BOSTIC ASKS THE COURT

08:55AM  3    TO CONSTRUE THE COURT'S ORDER TO INCLUDE TESTS BEYOND THE 25,

08:55AM  4    THE COURT'S ORDER IS CLEAR.  IT SAYS 25.  THE 25 TESTS LISTED

08:56AM  5    IN THE BILL OF PARTICULARS, AND THE TSI ALSO LISTED THE SAME 25

08:56AM  6    ASSAYS.

08:56AM  7         OF COURSE THE COURT'S ORDER SAYS THAT BECAUSE DURING THE

08:56AM  8    MOTIONS IN LIMINE BRIEFING, THAT'S WHAT WE WERE TALKING ABOUT.

08:56AM  9    IT WAS VERY CLEAR.  THAT'S WHY WE FILED THE MOTION IN LIMINE ON

08:56AM  10   THE BILL OF PARTICULARS.

08:56AM  11        WE SPECIFICALLY IDENTIFIED CBC AND THE FACT THAT BB WAS

08:56AM  12   ABOUT A DIFFERENT SET OF ASSAYS, AND THE GOVERNMENT NOT ONLY

08:56AM  13   DIDN'T FILE AN UPDATED BILL OF PARTICULARS AT THE TIME, THERE

08:56AM  14   WERE TWO AND A HALF MONTHS BETWEEN THE TIME OF OUR REPLY AND

08:56AM  15   THE MOTION IN LIMINE HEARINGS IN WHICH THE GOVERNMENT

08:56AM  16   PRESUMABLY COULD HAVE, YOU KNOW, SAID, HEY, YOU GUYS ARE

08:56AM  17   MISTAKEN.  SORRY, WE THOUGHT THIS WAS SOMETHING DIFFERENT.  BY

08:56AM  18   THE WAY, YOU'RE ON NOTICE OF THIS.

08:56AM  19        AND INSTEAD OF DOING THAT, WHAT THEY DID -- ALL OF THEIR

08:56AM  20   ACTIONS WERE TO TAKE STEPS TO ESSENTIALLY DISCLAIM OR, OR NO

08:56AM  21   ACTION AT ALL WITH RESPECT TO THESE ASSAYS.

08:56AM  22        MR. BOSTIC:  AND, YOUR HONOR, JUST ON THAT

08:57AM  23   DISCLAIMING POINT, I DO WANT TO ADDRESS THAT BECAUSE I'M NOT

08:57AM  24   EXACTLY SURE WHAT EXPERT NOTICE MS. TREFZ IS REFERRING TO, BUT

08:57AM  25   I DON'T BELIEVE IT WAS AN EXPERT NOTICE RELATING TO THE

5203

08:57AM 1    ACCURACY OF CBC OR THE PLATELET TEST.  IT'S CERTAINLY NOT AN

08:57AM 2    EXPERT NOTICE RELATING TO THE ACCURACY OF MR. -- EXCUSE ME, OF

08:57AM 3    BB'S TEST RESULT.

08:57AM 4         SO IT'S NOT THE CASE THAT THE GOVERNMENT TOOK ACTION TO

08:57AM 5    STEP AWAY FROM OFFERING EXPERT TESTIMONY ON THE ACCURACY OF

08:57AM 6    THIS TEST.

08:57AM 7         I THINK THERE MAY HAVE BEEN SOME CONTEMPLATED EXPERT

08:57AM 8    TESTIMONY ABOUT THE PREVALENCE OF THIS TEST, BUT THAT'S NOT

08:57AM 9    RELEVANT TO THIS PATIENT'S TESTIMONY.  IT'S RELEVANT TO THE

08:57AM 10   CAPABILITIES OF THE DEVICE GENERALLY, FOR EXAMPLE, WHETHER THE

08:57AM 11   MILITARY WOULD HAVE BEEN INTERESTED IN A DEVICE THAT COULD NOT

08:57AM 12   PERFORM A CBC TEST, OR WHETHER INVESTORS KNEW THAT THE THERANOS

08:57AM 13   ANALYZER COULD NOT PERFORM A COMMON TEST SUCH AS CBC.

08:57AM 14        SO THAT'S THE SCOPE OF THE EXPERT TESTIMONY THAT WOULD

08:57AM 15   HAVE BEEN INVOLVED HERE.

08:58AM 16        BY NOT OFFERING THAT OR REMOVING NOTICE OF THAT, IT REALLY

08:58AM 17   SHOULD NOT HAVE CREATED ANY CONFUSION IN THE DEFENSE'S MIND

08:58AM 18   ABOUT WHETHER THE GOVERNMENT INTENDED TO PRESENT TESTIMONY FROM

08:58AM 19   THIS PATIENT ABOUT THE ACCURACY OF THIS PATIENT'S TEST.

08:58AM 20   THERE'S NOTHING ELSE THAT THIS PATIENT WOULD TESTIFY ABOUT.

08:58AM 21        SO, AGAIN, I THINK THE DEFENSE HAS BEEN ON NOTICE, AND IF

08:58AM 22   NOTICE IS THE CENTRAL ISSUE, I THINK THAT SHOULD CARRY THE DAY.

08:58AM 23            MS. TREFZ:  I'M SORRY, YOUR HONOR.  I DON'T MEAN TO

08:58AM 24   PROLONG THIS LONGER THAN NECESSARY, BUT JUST AS A QUICK POINT,

08:58AM 25   THAT'S WHY WE INCLUDED IT SPECIFICALLY IN OUR REPLY TO THE

08:58AM 1    MOTIONS IN LIMINE.  I THINK IT'S -- WE CAN READ THAT STATEMENT.

08:58AM 2    IT'S PRETTY CLEAR WHAT WE'RE TALKING ABOUT.

08:58AM 3         WE BASED -- WE ESSENTIALLY SAY THIS IS THE PANEL THAT THIS

08:58AM 4    PATIENT RECEIVED, IT'S NOT DISCLOSED, WE NEED TO KNOW WHAT ELSE

08:58AM 5    HE'S GOING TO TESTIFY TO.  THAT IS WHY WE MENTIONED IT IN THE

08:58AM 6    REPLY AND WE RECEIVED NO RESPONSE.

08:58AM 7         THEN -- AND JUST THE ADDITIONAL POINT THAT I WAS GOING TO

08:59AM 8    MAKE IS THIS PATIENT CAN'T COME IN AND TESTIFY ABOUT THE

08:59AM 9    INACCURACY OF HIS OWN TEST.  HE'S NOT A SCIENTIST.

08:59AM 10        THE GOVERNMENT HAS NOT EVEN INTERVIEWED HIS HEALTH CARE

08:59AM 11   PROVIDER, AND THERE'S NO EXPERT WHO CAN COME IN AND EXPLAIN THE

08:59AM 12   ACCURACY OR ISSUES RELATED TO HIS TEST.  I'M NOT --

08:59AM 13             THE COURT:  WELL, WHAT I THOUGHT HE WAS -- EXCUSE

08:59AM 14   ME.

08:59AM 15             MS. TREFZ:  YES.

08:59AM 16             THE COURT:  WHAT I THOUGHT HE WAS GOING TO TESTIFY

08:59AM 17   TO WAS HE'S KNOWLEDGEABLE ABOUT HIS HEALTH CONDITION AND HE

08:59AM 18   WOULD COMPARE BOTH TESTINGS THAT HE RECEIVED FROM OTHER

08:59AM 19   PROVIDERS AND THE NUMBERS WITH THE TESTING HE RECEIVED FROM

08:59AM 20   YOUR CLIENT'S COMPANY, AND THOSE NUMBERS WERE DISPARATE AND

08:59AM 21   THAT'S WHY HE CONTACTED AND REACHED OUT TO THE COMPANY TO MAKE

08:59AM 22   A COMPLAINT.

08:59AM 23        SO HE'LL SAY THE NUMBERS WERE -- CAUSED HIM SOME CONCERN.

08:59AM 24   THAT'S WITHIN HIS PERSONAL KNOWLEDGE, I WOULD PRESUME.

09:00AM 25             MS. TREFZ:  RIGHT.

09:00AM  1          BUT THE FACT THAT NUMBERS ARE DIFFERENT FROM A TEST

09:00AM  2     ACTUALLY DOESN'T MEAN ANYTHING ABOUT WHETHER THEY'RE CONSISTENT

09:00AM  3     OR INCONSISTENT.  NUMBERS ARE DIFFERENT FROM TESTS ALL OF THE

09:00AM  4     TIME.

09:00AM  5          AND IN PARTICULAR ABOUT THE -- WITH RESPECT TO THE

09:00AM  6     PARTICULAR TEST THAT WE UNDERSTAND IS AT ISSUE HERE, THE

09:00AM  7     NUMBERS ARE NOT INCONSISTENT AS A MATTER OF KIND OF CLIA

09:00AM  8     REGULATIONS, SO THAT'S WHY WE NEED A SCIENTIFIC -- WE NEED

09:00AM  9     SCIENTIFIC TESTIMONY TO UNDERSTAND WHETHER THEY'RE INCONSISTENT

09:00AM 10     OR NOT.

09:00AM 11          MY UNDERSTANDING IS THAT WHAT MR. B WAS GOING TO -- OR

09:00AM 12     WOULD POTENTIALLY TESTIFY TO IS THAT HE CALLED BECAUSE HE HAD

09:00AM 13     QUESTIONS ABOUT WHETHER THE -- THERE WAS AN EXPLANATION FOR THE

09:00AM 14     DISCREPANCY IN THE RESULTS, NOT THAT THEY ARE INHERENTLY

09:00AM 15     INCONSISTENT.

09:00AM 16          AND I DON'T THINK AS A LAYPERSON HE CAN TESTIFY THAT THEY

09:00AM 17     ARE INHERENTLY INCONSISTENT.  HE DOESN'T HAVE THAT TYPE OF

09:00AM 18     KNOWLEDGE, AND HE DOESN'T HAVE THAT TYPE OF KNOWLEDGE WITH

09:00AM 19     RESPECT TO EITHER THE COMPARATIVE TEST FROM ACCESS LABS OR THE

09:01AM 20     TESTS FROM THERANOS.

09:01AM 21          SO THESE ARE REALLY COMPLEX ISSUES AND THIS IS WHY WE'VE

09:01AM 22     SPENT SO MUCH TIME FOCUSSING ON WHICH ASSAYS, EXPERT TESTIMONY,

09:01AM 23     ACCURACY ISSUES, AND IT'S JUST -- I THINK IT'S PRETTY

09:01AM 24     PREJUDICIAL NOT JUST FROM A NOTICE PERSPECTIVE, BUT FROM THE

09:01AM 25     PERSPECTIVE OF, YOU KNOW, JUST MISLEADING TESTIMONY AND OUR

09:01AM 1    ABILITY TO CONFRONT THE WITNESS ABOUT HIS UNDERSTANDING, YOU

09:01AM 2    KNOW, AND ABOUT THE REALITY OF THE SITUATION.

09:01AM 3        AND IF THE GOVERNMENT DOESN'T HAVE SOMEBODY TO EXPLAIN

09:01AM 4    THAT THESE ARE ACTUALLY DIFFERENT, THEN, FRANKLY, IT WON'T BE

09:01AM 5    ABLE TO PROVE THAT IT'S AN INACCURATE TEST AND IT SHOULDN'T BE

09:01AM 6    ALLOWED TO SUGGEST THAT TO THE JURY IN THIS CIRCUMSTANCE.

09:01AM 7        THE COURT:  YOU'RE TALKING ABOUT A FOUNDATIONAL

09:01AM 8    HURDLE THAT THE GOVERNMENT HAS TO OVERCOME SEPARATE AND APART

09:01AM 9    FROM THE WITNESS'S TESTIMONY OR TO SUPPORT IT.

09:01AM 10       BUT LET ME ASK YOU YOUR THOUGHTS ABOUT -- MR. BOSTIC SAID

09:02AM 11   YOU'RE ON NOTICE BECAUSE THE DOCUMENT 469, WHICH IS THE TSI,

09:02AM 12   SUGGESTS ON PAGE 7 AT LINE 1, TESTS INCLUDING BUT NOT LIMITED

09:02AM 13   TO, AND THAT LANGUAGE, CONCURRENT WITH THE CONVERSATION ABOUT

09:02AM 14   THE OTHER, THE PLATELETS AND THE PLT AND THESE OTHERS, SHOULD

09:02AM 15   HAVE PUT YOU ON NOTICE.

09:02AM 16       WHY DOESN'T THAT PUT YOU ON NOTICE?

09:02AM 17       MS. TREFZ:  WELL, IT DOESN'T, YOUR HONOR, BECAUSE WE

09:02AM 18   MOVED TO EXCLUDE TESTS NOT SPECIFICALLY LISTED.  WE IDENTIFIED

09:02AM 19   THE TESTS THAT WERE LISTED.  EVERYBODY UNDERSTOOD THE TESTS

09:02AM 20   THAT WERE LISTED.

09:02AM 21       IT SOUNDS LIKE THE GOVERNMENT MAY HAVE BEEN CONFUSED AS TO

09:02AM 22   WHAT TESTS IT WAS CHARGING.

09:02AM 23       THAT IS NOT OUR FAULT.  MS. HOLMES SHOULD NOT BEAR THE

09:02AM 24   BURDEN OF THE GOVERNMENT'S FAILURE TO UNDERSTAND ITS OWN CASE.

09:02AM 25       AND SO I WOULD SAY WE SHOULDN'T FORGIVE THE GOVERNMENT'S

5207

09:02AM  1    MISUNDERSTANDING, IF THAT'S WHAT IT WAS, BECAUSE WE RAISED THE

09:02AM  2    ISSUE REPEATEDLY.

09:02AM  3         THEY DIDN'T DISAGREE, AND NOW THEY'RE SAYING, OH, WAIT A

09:03AM  4    MINUTE.  YOU KNOW, I THINK IT'S PRETTY UNFAIR AND IT'S THE

09:03AM  5    UNITED STATES GOVERNMENT, THIS IS A CRIMINAL CASE, THEY SHOULD

09:03AM  6    BE HELD TO A HIGHER STANDARD THAN THAT.

09:03AM  7              THE COURT:  ALL RIGHT.  THANK YOU.

09:03AM  8         LET ME ASK, YOU KNOW, THE OTHER QUESTION -- AND I DON'T

09:03AM  9    WANT TO GET AHEAD OF OURSELVES HERE, BUT PARDON ME.  JUST

09:03AM 10    LOOKING AT THE 302, WHICH WAS EXHIBIT 1 TO THE ATTACHMENT, THE

09:03AM 11    REDACTED VERSION, PAGE 2 OF 2 IN THE LAST PARAGRAPH THERE, I

09:03AM 12    GUESS FOUNDATIONALLY, WOULD THIS WITNESS BE ABLE TO TESTIFY

09:03AM 13    ABOUT ANYTHING?  IT SEEMS LIKE HE DIDN'T HAVE A CONVERSATION

09:03AM 14    WITH THE COMPANY.  MAYBE HE DID.  BUT THE 302 SEEMS TO BE A BIT

09:03AM 15    OPAQUE ON THAT.

09:03AM 16              MR. BOSTIC:  I'M SORRY.  THE COURT IS LOOKING AT

09:03AM 17    1116-2?

09:03AM 18              THE COURT:  PAGE 2 OF 2 IN THE LAST -- IT SAYS,

09:03AM 19    "TRIED TO CALL, DID NOT GET A RESPONSE.  IF THEY DID SPEAK, THE

09:04AM 20    ANSWER WAS UNSATISFYING AND HE DID NOT REMEMBER IT."

09:04AM 21              MR. BOSTIC:  SO, YOUR HONOR, THERE ARE INTERNAL

09:04AM 22    THERANOS DOCUMENTS DOCUMENTING THE CALL THAT DID GO THROUGH AND

09:04AM 23    THAT WAS RECEIVED BY A CUSTOMER SERVICE REPRESENTATIVE IN

09:04AM 24    CALIFORNIA.

09:04AM 25              THE COURT:  I SEE.  OKAY.

09:04AM 1          MR. BOSTIC:  SO THE CALL DID TAKE PLACE AND THAT'S

09:04AM 2    THE BASIS FOR THE WIRE CHARGE.

09:04AM 3          THE COURT:  OKAY.

09:04AM 4          MR. BOSTIC:  I'D LIKE TO RESPOND BRIEFLY ON THE

09:04AM 5    EXPERT ISSUE.

09:04AM 6          THE COURT:  PLEASE.

09:04AM 7          MR. BOSTIC:  SO I THINK THE NECESSITY OF AN EXPERT

09:04AM 8    IS OBVIOUSLY A DIFFERENT ARGUMENT THAN WHAT WAS RAISED IN THE

09:04AM 9    BRIEFING HERE, AND I'M HAPPY TO ADDRESS IT.

09:04AM 10         BUT I SHOULD POINT OUT THAT ARGUMENT, AS WELL AS THE

09:04AM 11   ARGUMENT ABOUT THE INCLUSION OF THE PLATELET TEST AND BB'S

09:04AM 12   RESULT IN THE BILL OF PARTICULARS, THESE ARE BOTH ISSUES THAT

09:04AM 13   COULD HAVE BEEN RAISED PRETRIAL MONTHS AGO.  I'LL JUST NOTE

09:04AM 14   THAT FOR THE RECORD.

09:04AM 15         REGARDING THE EXPERT ISSUE, LET ME BE CLEAR THAT THIS

09:04AM 16   WITNESS IS NOT GOING TO TAKE THE STAND AND RENDER AN OPINION,

09:05AM 17   AN ULTIMATE OPINION ABOUT THE ACCURACY OF THE THERANOS RESULTS.

09:05AM 18         UNLIKE A MEDICAL SERVICE PROVIDER, UNLIKE AN EXPERT, HE IS

09:05AM 19   NOT QUALIFIED TO TAKE THAT ULTIMATE STEP AND SAY, I HAVE

09:05AM 20   CONCLUDED THAT THAT TEST RESULT WAS INACCURATE.

09:05AM 21         HE CAN, THOUGH, TESTIFY ABOUT HIS EXPERIENCE WITH OTHER

09:05AM 22   TEST RESULTS AND, IN FACT, IN THIS CASE THERE'S A

09:05AM 23   CONTEMPORANEOUS RESULT FROM THE SAME DAY FROM A CONVENTIONAL

09:05AM 24   LAB THAT DOES SHOW A DISCREPANCY.  THAT DISCREPANCY WAS THE

09:05AM 25   REASON FOR HIS CALL TO THERANOS.

09:05AM 1       I UNDERSTAND THE DEFENSE'S ARGUMENTS, WHICH THEY'RE FREE

09:05AM 2   TO PRESENT TO THE JURY AND EXPLORE ON CROSS, BUT THIS DOESN'T

09:05AM 3   GO TO THE ADMISSIBILITY OF HIS TESTIMONY ABOUT WHAT IS HIS

09:05AM 4   PERSONAL KNOWLEDGE, NAMELY, HIS KNOWLEDGE OF HIS OWN HEALTH,

09:05AM 5   HOW RESULTS FROM THIS PARTICULAR ASSAY RELATE TO HIS SYMPTOMS,

09:05AM 6   AND THEN SEPARATELY, THE DIFFERENCES BETWEEN RESULTS THAT HE

09:05AM 7   GOT FROM A CONVENTIONAL LAB AND THERANOS ON THE SAME ASSAY ON

09:06AM 8   THE SAME DAY.  IT'S SIMPLE.

09:06AM 9       THE COURT:  AND THEN HE CALLS AND THAT'S THE BASIS

09:06AM 10  OF THE COUNT NINE IS THE PHONE CALL?

09:06AM 11      MR. BOSTIC:  YES, YOUR HONOR.  CORRECT.

09:06AM 12      THE COURT:  SO HE'LL SAY, I GOT DIFFERENT NUMBERS,

09:06AM 13  AND I CALLED TO EITHER COMPLAIN OR INQUIRE ABOUT THE NUMBERS,

09:06AM 14  AND THAT PHONE CALL THEN IS EVIDENCE OF FRAUD BECAUSE IT SHOWS

09:06AM 15  INACCURACY OR -- THAT'S WHAT I GUESS I'M STRUGGLING WITH.

09:06AM 16      MR. BOSTIC:  SURE.  SO THE PHONE CALL ITSELF I DON'T

09:06AM 17  THINK SHOWS THE INACCURACY OF THE TEST.  THE PHONE CALL IS AN

09:06AM 18  INTERSTATE WIRE COMMUNICATION IN FURTHERANCE OF THE SCHEME TO

09:06AM 19  DEFRAUD PATIENTS IN THIS CASE BECAUSE THERANOS SET UP ITS CALL

09:07AM 20  CENTER TO RECEIVE CALLS FROM PATIENTS, INCLUDING PATIENTS WHO

09:07AM 21  HAD RECEIVED QUESTIONABLE RESULTS.

09:07AM 22      SO I THINK THAT'S THE -- THAT'S WHY IT FORMS THE

09:07AM 23  APPROPRIATE BASIS FOR THE WIRE FRAUD COUNT.

09:07AM 24      BUT WHEN IT COMES TO THE ACCURACY OF THE TESTS, I THINK

09:07AM 25  THE EVIDENCE IS TWO-FOLD.  FIRST, THE PATIENT TESTIFYING ABOUT

5210

09:07AM   1    HOW RESULTS FROM THIS ASSAY HAVE CORRELATED IN HIS LENGTHY

09:07AM   2    EXPERIENCE TO THE PHYSICAL PRESENTATION OF THE SYMPTOMS OF THE

09:07AM   3    CONDITION THAT HE HAS; AND THEN, SECOND, SIMPLY THE CONCRETE

09:07AM   4    OBJECTIVE DIFFERENCES BETWEEN THE THERANOS TESTS AND THE

09:07AM   5    CONVENTIONAL LAB TESTS FOR THE PLATELET ASSAY ON THE SAME DAY.

09:07AM   6         THE COURT:  IN HIS PERSONAL EXPERIENCE.  THE NUMBERS

09:07AM   7    ARE DIFFERENT BASED ON HIS CONDITION, HIS FEELING, HIS

09:07AM   8    SYMPTOMS, WHATEVER IT IS.

09:07AM   9         HE'LL TESTIFY, WHEN I FEEL THIS WAY, MY NUMBERS ARE

09:07AM  10    USUALLY X.

09:08AM  11         MR. BOSTIC:  CORRECT, YOUR HONOR.

09:08AM  12         THE COURT:  WHEN I TOOK THEIR TESTS, THE NUMBERS

09:08AM  13    WERE Y AND I COULDN'T FIGURE THAT OUT AND I CALLED TO COMPLAIN.

09:08AM  14         MR. BOSTIC:  YES, YOUR HONOR.  THAT'S THE FIRST PART

09:08AM  15    OF HIS TESTIMONY.

09:08AM  16         THE COURT:  RIGHT.

09:08AM  17         MR. BOSTIC:  IT'S SEPARATE AND INDEPENDENT FROM THE

09:08AM  18    SIMPLE FACT THAT HE GOT COMPARISON TESTS ON THE SAME DAY AND

09:08AM  19    THE RESULTS ARE WHAT THEY ARE.

09:08AM  20         THE COURT:  OKAY.  BUT I'M STILL TROUBLED BY THE

09:08AM  21    MOTION AND WHAT IT REQUIRES THE COURT TO DO IN LIGHT OF THE

09:08AM  22    COURT'S RULING IN 798.

09:08AM  23         THE COURT WAS SPECIFIC IN THAT, INDICATING YOU CAN'T SHOW

09:08AM  24    ANY OTHER -- YOU CAN'T PUT ANY EVIDENCE ON.  YOU'RE LISTED --

09:08AM  25    YOU'RE RESTRICTED TO THOSE 25 ASSAYS OF WHATEVER THEY WERE, AND

5211

09:08AM 1    IF YOU WANT TO USE THEM FOR A DIFFERENT PURPOSE OTHER THAN

09:08AM 2    ACCURACY, RELIABILITY, THEY'RE CERTAINLY ADMISSIBLE.

09:08AM 3        AND I THINK YOU'VE SAID THAT IN YOUR PLEADINGS, THEY COULD

09:08AM 4    COME IN TO SHOW SOMETHING ELSE, THE NUMBER OF TESTS, FOR

09:08AM 5    EXAMPLE, AND I THINK 711 I THINK IS YOUR RESPONSE.  I CAN'T

09:09AM 6    REMEMBER THE DOCKET, BUT YOU SUGGESTED THERE ARE MANY OTHER

09:09AM 7    REASONS THAT IT COULD COME IN APART FROM.

09:09AM 8        AND THEN IN YOUR RESPONSE YOU SAID, WE'RE NOT GOING TO

09:09AM 9    INTRODUCE THAT FOR, AS I POINTED OUT IN THAT FOOTNOTE.  SO

09:09AM 10   I'M -- I FEEL LIKE A LITTLE BIT IN A CORNER HERE WITH THAT

09:09AM 11   BECAUSE IF I DON'T GRANT THE MOTION, THEN I DO VIOLENCE TO THE

09:09AM 12   COURT'S ORDER IN THE MIL MOTION.

09:09AM 13           MR. BOSTIC:  I UNDERSTAND, YOUR HONOR.

09:09AM 14       I THINK IF THIS WERE A SITUATION WHERE THE GOVERNMENT WERE

09:09AM 15   SEEKING TO TRULY ADD A NEW ASSAY TO THE CASE, IF THE GOVERNMENT

09:09AM 16   WERE SEEKING TO INTRODUCE EVIDENCE ABOUT THE ACCURACY OF AN

09:09AM 17   ASSAY THAT WASN'T ADDRESSED IN THE INDICTMENT AT ALL, THAT

09:09AM 18   WOULD BE A DIFFERENT QUESTION AND A MORE DIFFICULT SITUATION TO

09:09AM 19   NAVIGATE.

09:09AM 20       I THINK HERE, BECAUSE THE OPERATIVE INDICTMENT INCLUDES A

09:09AM 21   LIST OF ASSAYS THAT IS EXPRESSLY NOT EXCLUSIVE, AND BECAUSE

09:09AM 22   THAT SAME DOCUMENT, THAT SAME INDICTMENT ALSO LISTS THREE

09:10AM 23   PATIENT COUNTS, EACH OF WHICH CONCERN THE ACCURACY OF AN ASSAY,

09:10AM 24   AND ONE OF THOSE PATIENT COUNTS IS THE BB COUNT THAT COULD ONLY

09:10AM 25   RELATE TO THE ACCURACY OF THE PLT OR PLATELET TEST, I DON'T

09:10AM 1    THINK IT IS CONTRARY TO AT LEAST THE SPIRIT OF THE COURT'S

09:10AM 2    ORDER.

09:10AM 3         TO THE EXTENT A MODIFICATION OF THAT ORDER IS NECESSARY,

09:10AM 4    OR LEAVE TO AMEND THE BILL OF PARTICULARS AND TO ADD THOSE

09:10AM 5    THREE LETTERS TO IT, WE WOULD ASK FOR THAT IF THE COURT FEELS

09:10AM 6    IT'S NECESSARY.

09:10AM 7         THE COURT:  SURE.  OKAY.

09:10AM 8         MS. TREFZ:  JUST TO BE CLEAR, IN THE INDICTMENT

09:10AM 9    THERE ARE THREE PATIENT COUNTS.  MR. BOSTIC IS RIGHT.  THE

09:10AM 10   ASSAYS RELEVANT TO COUNTS ELEVEN AND TWELVE ARE LISTED IN THE

09:10AM 11   25 ASSAYS.

09:10AM 12        THAT'S WHY WE FILED THE MOTION, ONE OF THE REASONS WHY WE

09:10AM 13   FILED THE MOTION BACK IN NOVEMBER.  IT'S ONE OF THE REASONS WHY

09:10AM 14   WE SPECIFICALLY RAISED THE BB COUNT.

09:11AM 15        IT SOUNDS LIKE WHAT IT ISN'T IS AN OVERSIGHT.  IT SOUNDS

09:11AM 16   LIKE MR. BOSTIC HAD SAID EARLIER THAT THE GOVERNMENT WAS

09:11AM 17   CONFUSED AS TO ITS ASSAYS.  THAT IS BAFFLING TO ME AS AN

09:11AM 18   ARGUMENT, AND THE GOVERNMENT SHOULD NOT BE REWARDED FOR FAILING

09:11AM 19   TO UNDERSTAND ITS INDICTMENT.

09:11AM 20        THE COURT:  OKAY.  THANK YOU VERY MUCH.

09:11AM 21        WELL, IT'S -- I LOOK AT THIS, AND I'VE BEEN -- AS I SAID,

09:11AM 22   I FOCUSSED ON THE DOCUMENTS THAT I MENTIONED EARLIER, AND I'M

09:11AM 23   PARTICULARLY CONCERNED ABOUT THE COURT'S ORDER IN 798 AND THE

09:11AM 24   RESTRICTIVE NATURE OF THAT.

09:11AM 25        HOWEVER, I DID ALLOW FOR OTHER EVIDENCE TO COME IN, AS

5213

09:11AM  1    INDICATED ON PAGES 78 THROUGH 80, AND THE GOVERNMENT COULD HAVE

09:11AM  2    GIVEN NOTICE, AND/OR USING ANYTHING OUTSIDE OF THOSE 25 ASSAYS

09:11AM  3    FOR A DIFFERENT PURPOSE.  THE COURT DIDN'T HAVE ANY PROBLEM

09:11AM  4    WITH THAT.

09:11AM  5        AND LET ME ALSO NOTE -- I THINK I NOTED, MR. BOSTIC, IN

09:11AM  6    YOUR PLEADINGS, YOUR SIDE'S PLEADINGS, YOU SUGGESTED THERE

09:12AM  7    WASN'T A HEARING ON THIS, AND I THINK THAT'S RIGHT.  WE DIDN'T

09:12AM  8    DISCUSS THIS AT A FORMAL HEARING.  THERE WASN'T ANY ORAL

09:12AM  9    ARGUMENT ON THIS AT THE HEARING.

09:12AM  10        BUT IF MY RECOLLECTION IS CORRECT, I THINK THIS IS ONE OF

09:12AM  11    THOSE THREE OR FOUR MILS THAT THE PARTIES COLLECTIVELY SAID NO

09:12AM  12    ARGUMENT WAS NECESSARY.  I THINK THAT'S RIGHT.  I THINK THIS

09:12AM  13    FELL IN THAT CATEGORY.

09:12AM  14            MS. TREFZ:  YES, YOUR HONOR.

09:12AM  15            THE COURT:  AND THAT'S WHY WE DIDN'T HAVE AN ORAL

09:12AM  16    ARGUMENT ON IT.

09:12AM  17        WE HAD MANY OTHER THINGS TO TALK ABOUT, AND WE DID TALK

09:12AM  18    ABOUT, BUT THIS WAS ONE OF THREE OR FOUR YOU SAID WE'RE FINE

09:12AM  19    WITH, SO I RECOGNIZE THAT.

09:12AM  20        ALL RIGHT.  THANK YOU VERY MUCH FOR THIS.

09:12AM  21        LET ME JUST SAY, I'M GOING TO ISSUE A SHORT ORDER ON THIS.

09:12AM  22    I THINK IT'S APPROPRIATE TO GIVE YOU AN ORDER.

09:12AM  23        BUT, MR. BOSTIC, I'M TROUBLED BY THIS, AND THE COURT MAY

09:12AM  24    VERY WELL LIKELY GRANT THIS MOTION JUST BASED ON OUR

09:12AM  25    CONVERSATION HERE, AND THE COURT'S 798, AS WELL AS LOOKING BACK

5214

09:12AM   1    AT 568, 711, 664 AND THE OTHER DOCUMENTS THAT WE HAVE

09:12AM   2    DISCUSSED.  THAT IS THE HISTORY OF HOW WE GOT HERE.

09:13AM   3         SO I THINK I AM -- I THINK I OWE FIDELITY TO THE COURT'S

09:13AM   4    798, PAGES 78 THROUGH 80, IN THAT ANALYSIS HERE.  BUT I'LL GET

09:13AM   5    A SHORT ORDER.

09:13AM   6         THIS WITNESS IS SCHEDULED FOR NEXT WEEK, I BELIEVE.

09:13AM   7              MR. BOSTIC:  YOUR HONOR, THIS WITNESS WAS SCHEDULED

09:13AM   8    TO TESTIFY AS EARLY AS TOMORROW.

09:13AM   9              THE COURT:  OH, DEAR.

09:13AM  10              MR. BOSTIC:  HE IS IN TOWN, BUT CERTAINLY WE'RE

09:13AM  11    GUIDED BY THE COURT'S ORDER.

09:13AM  12              THE COURT:  OKAY.

09:13AM  13              MR. BOSTIC:  I'LL ONLY JUST EMPHASIZE MY POINT, I

09:13AM  14    THINK NOTICE TO THE DEFENSE SHOULD BE THE GUIDING PRINCIPLE

09:13AM  15    HERE, AND THE FACT THAT THERE WAS A MISUNDERSTANDING BEFORE --

09:13AM  16    I THINK, YOU KNOW, WITH RESPECT TO DEFENSE COUNSEL, I DON'T

09:13AM  17    THINK THE DEFENSE SHOULD BE REWARDED FOR SAVING THIS AS A TRAP

09:13AM  18    TO SPRING ON THE GOVERNMENT THE WEEK THAT THE WITNESS IS

09:13AM  19    PLANNING TO TESTIFY.

09:13AM  20         BUT WITH THAT I'LL SUBMIT.

09:13AM  21              THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.  THANK

09:13AM  22    YOU.

09:13AM  23              MS. TREFZ:  THANK YOU.

09:13AM  24              THE COURT:  WELL, I'LL STEP DOWN AND THEN WE'LL

09:13AM  25    BRING OUR JURY IN.

5215

09:13AM 1    ANYTHING BEFORE WE BRING THE JURY IN?  MR. SCHENK,

09:14AM 2    ANYTHING?

09:14AM 3         MR. SCHENK:  NOTHING FURTHER.

09:14AM 4         MR. WADE:  NO, YOUR HONOR.

09:14AM 5         THE COURT:  OKAY.  THANK YOU.

09:14AM 6         THE CLERK:  COURT IS IN RECESS.

09:14AM 7    (RECESS FROM 9:14 A.M. UNTIL 9:23 A.M.)

09:28AM 8    (JURY IN AT 9:28 A.M.)

09:28AM 9         THE COURT:  THANK YOU.  GOOD MORNING.  WE ARE BACK

09:28AM 10   ON THE RECORD IN THE HOLMES MATTER.  ALL COUNSEL ARE PRESENT.

09:28AM 11   MS. HOLMES IS PRESENT.

09:28AM 12        OUR JURY IS PRESENT.

09:28AM 13        THANK YOU FOR YOUR PATIENCE.  GOOD MORNING, LADIES AND

09:28AM 14   GENTLEMEN.

09:28AM 15        BEFORE WE BEGIN OUR SESSION TODAY, LET ME ASK THE JURORS

09:28AM 16   THE QUESTION YOU ALL KNOW.  DURING OUR RECESS, DID ANY OF YOU

09:28AM 17   HAVE ANY OCCASION TO HAVE CONTACT WITH OR COME ACROSS ANY

09:28AM 18   INFORMATION ABOUT THIS CASE OUTSIDE OF THE COURT?  AND IF SO,

09:28AM 19   PLEASE RAISE YOUR HAND.

09:29AM 20        ONCE AGAIN, I SEE NO HANDS.

09:29AM 21        THANK YOU AGAIN FOR YOUR VIGILANCE IN THAT REGARD.

09:29AM 22        LET ME JUST SAY A COUPLE OF THINGS ABOUT OUR COURTROOM.

09:29AM 23   YESTERDAY IT WAS OPPRESSIVELY HOT IN THE AFTERNOON HERE, AND

09:29AM 24   WE'RE TRYING TO GET THE HVAC SYSTEM ORGANIZED, AND WE'LL WORK

09:29AM 25   ON THAT.  IT MAY BE THAT IN THE AFTERNOON, AND I THINK I

5216

09:29AM   1    MENTIONED TO THE LAWYERS THAT IF IT DOES CONTINUE THAT WAY,

09:29AM   2    WE'RE GOING TO TAKE SOME STANDING BREAKS IN THE MIDDLE OF

09:29AM   3    TESTIMONY JUST TO KEEP OUR BLOOD FLOWING.  I KNOW IT'S

09:29AM   4    DIFFICULT TO FOCUS WHEN IT'S WARM, AND WE'LL TRY TO DO WHAT WE

09:29AM   5    CAN ABOUT THAT.

09:29AM   6         TODAY WE GO UNTIL 3:00.  PLEASE RECALL WE GO UNTIL 3:00

09:29AM   7    TODAY, AND HOPEFULLY TOMORROW WE'LL GO UNTIL 4:00 AND WE'LL

09:29AM   8    TAKE SOME BREAKS.

09:29AM   9         AND WHEN WE MET SEVERAL WEEKS AGO, I INDICATED IF ANYBODY

09:29AM   10   NEEDS TO TAKE A BREAK, INCLUDING THE PARTIES HERE, FOR ANY

09:30AM   11   REASON AT ALL, INCLUDING A FATIGUE BREAK, IF SOMEBODY NEEDS,

09:30AM   12   LIKE I JUST NEED TO GET FRESH AIR SUCH THAT WE HAVE IT IN THE

09:30AM   13   COURTHOUSE, PLEASE DON'T BE SHY ABOUT RAISING YOUR HAND AND

09:30AM   14   LETTING MS. KRATZMANN KNOW, LADIES AND GENTLEMEN OF THE JURY.

09:30AM   15   I STRIVE TO MAKE THESE PROCEEDINGS AS COMFORTABLE FOR YOU SO

09:30AM   16   YOU CAN CONTINUE TO FOCUS, AS YOU HAVE BEEN DOING THROUGHOUT

09:30AM   17   THE TRIAL, AND YOU KNOW I'M LOOKING AT YOU, I'M PAYING

09:30AM   18   ATTENTION TO YOU.

09:30AM   19        SO, PLEASE, IF YOU NEED A BREAK FOR ANY REASON, DON'T BE

09:30AM   20   SHY ABOUT LETTING ME KNOW.  I WANT TO ACCOMMODATE ANY OF THOSE

09:30AM   21   REQUESTS.

09:30AM   22        ALL RIGHT.  THANK YOU.

09:30AM   23        COUNSEL, ANYTHING BEFORE WE BEGIN?

09:30AM   24             MR. SCHENK:  NO, YOUR HONOR.

09:30AM   25             MR. WADE:  NO, YOUR HONOR.

09:30AM  1              THE COURT:  ALL RIGHT.  THANK YOU.  LET'S CALL OUR

09:30AM  2      WITNESS IN.

09:31AM  3              OH, YES.  AND TOMORROW WE BEGIN AT 9:30.

09:31AM  4              GOOD MORNING.

09:31AM  5              THE WITNESS:  GOOD MORNING.

09:31AM  6              THE COURT:  AND LET ME REMIND YOU TO ADJUST THE

09:31AM  7      CHAIR AND MICROPHONE AS YOU NEED.  YOU CAN REMOVE YOUR MASK IF

09:31AM  8      YOU WISH.

09:31AM  9              THE WITNESS:  THANK YOU.

09:31AM  10             THE COURT:  I'LL ENCOURAGE YOU TO SPEAK DIRECTLY

09:31AM  11     INTO THE MICROPHONE.

09:31AM  12         WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

09:31AM  13     AGAIN.

09:31AM  14             THE WITNESS:  DANIEL LYNN MOSLEY.

09:31AM  15         **(GOVERNMENT'S WITNESS, DANIEL MOSLEY, WAS PREVIOUSLY**

09:31AM  16     **SWORN.)**

09:31AM  17             THE COURT:  THANK YOU.

09:31AM  18             MR. WADE:  MAY I PROCEED, YOUR HONOR?

09:31AM  19             THE COURT:  YES, THANK YOU.

09:31AM  20                      **CROSS-EXAMINATION (RESUMED)**

09:31AM  21     BY MR. WADE:

09:31AM  22     Q.  AND YOU'LL RECALL YOU'RE STILL UNDER OATH HERE THIS

09:31AM  23     MORNING, RIGHT, MR. MOSLEY?

09:31AM  24     A.  I UNDERSTAND.

09:31AM  25     Q.  I'D LIKE TO PICK UP YOUR CALL AT THE BEGINNING OF

09:31AM 1    CROSS-EXAMINATION YESTERDAY.  I ASKED YOU SOME QUESTIONS ABOUT

09:31AM 2    SOME OF YOUR CLIENTS.

09:31AM 3        DO YOU RECALL THAT?

09:31AM 4    A.   I'M NOT SURE WHAT YOU'RE ASKING.

09:31AM 5    Q.   DO YOU RECALL WHEN I WAS ASKING YOU QUESTIONS ABOUT THE

09:31AM 6    WALTON FAMILY AND SOME OF THE OTHER FAMILIES THAT YOU DID WORK

09:32AM 7    FOR IN CONNECTION WITH THERANOS?

09:32AM 8    A.   YES, YOU WERE ASKING ME AND I SAID CLIENTS I INTRODUCED.

09:32AM 9    I DIDN'T NECESSARILY DO WORK FOR THOSE CLIENTS IN CONNECTION

09:32AM 10   WITH THERANOS.

09:32AM 11   Q.   OKAY.  BUT YOU RECALL THOSE QUESTIONS; CORRECT?

09:32AM 12   A.   I DO RECALL THOSE QUESTIONS.

09:32AM 13   Q.   AND DO YOU RECALL THAT YOU, YOU -- I BELIEVE YOU DIDN'T

09:32AM 14   RECALL FOR SURE WHETHER YOU REPRESENTED THE NIARCHOS

09:32AM 15   FOUNDATION?

09:32AM 16   A.   I SAID I DON'T REMEMBER SPECIFICALLY.  CERTAINLY

09:32AM 17   ANDREAS DRACOPOULOS WAS A CLIENT OF MINE AND I GAVE HIM A BROAD

09:32AM 18   RANGE OF ADVICE, PROBABLY IN MATTERS AFFECTING THE FOUNDATION

09:32AM 19   SINCE HE WAS THE PRESIDENT OR CO-PRESIDENT OF THE FOUNDATION.

09:32AM 20   Q.   OKAY.  COULD I HAVE YOU JUST LOOK IN YOUR BINDER AT TRIAL

09:32AM 21   EXHIBIT 4801?  AND IT'S A LEGAL DOCUMENT, A LEGAL SIZE

09:32AM 22   DOCUMENT, SO IT SHOULD BE EASY TO FIND IN THAT BINDER.

09:33AM 23   A.   I SEE IT.

09:33AM 24   Q.   DO YOU SEE THAT?

09:33AM 25   A.   I DO.

09:33AM  1     Q.   AND COULD YOU JUST TAKE A MINUTE AND REVIEW THE FIRST

09:33AM  2     COUPLE OF PAGES AND SEE IF THAT REFRESHES YOUR RECOLLECTION

09:33AM  3     THAT YOU PROVIDED LEGAL SERVICES TO THE NIARCHOS FOUNDATION AS

09:33AM  4     WELL?

09:34AM  5          (PAUSE IN PROCEEDINGS.)

09:34AM  6     BY MR. WADE:

09:34AM  7     Q.   AND IN PARTICULAR, MR. MOSLEY, IF YOU COULD LOOK AT

09:34AM  8     ENTRIES, FOR EXAMPLE, 18, 13, 14, 15, THAT MIGHT BE HELPFUL.

09:34AM  9     A.   OKAY.

09:34AM 10          (PAUSE IN PROCEEDINGS.)

09:35AM 11              THE WITNESS:  I'VE READ THOSE.  IT WAS A RATHER LONG

09:35AM 12     DOCUMENT.

09:35AM 13     BY MR. WADE:

09:35AM 14     Q.   NO.  THAT'S FINE.

09:35AM 15     A.   OKAY.

09:35AM 16     Q.   YOU'VE HAD A CHANCE TO LOOK AT THOSE ENTRIES?

09:35AM 17     A.   YES, I HAVE.

09:35AM 18     Q.   AND DOES THAT REFRESH YOUR RECOLLECTION THAT YOU HAD

09:35AM 19     PRIVILEGED COMMUNICATIONS WITH THE NIARCHOS FOUNDATION?

09:35AM 20     A.   IT DOES NOT BECAUSE NOTHING ON HERE REFERS TO THE NIARCHOS

09:35AM 21     FOUNDATION AND, YOU KNOW, A NUMBER OF THE THINGS REFER TO

09:35AM 22     EMAILS AND THE EMAIL ADDRESS OF ANDREAS DRACOPOULOS.

09:35AM 23          I DON'T SEE ANY -- I GUESS I SEE A REFERENCE TO A FELLOW

09:35AM 24     BY THE NAME OF VASILI TSAMIS WHO DOES WORK AT THE NIARCHOS

09:35AM 25     FOUNDATION, BUT I DON'T SEE ANYTHING MORE SPECIFIC THAN THAT.

09:36AM 1    IS THERE SOMETHING THAT I'M MISSING?

09:36AM 2    Q.   WELL, DO YOU RECALL THAT YOU TOOK A TRIP WITH MEMBERS OF

09:36AM 3    THE NIARCHOS FOUNDATION TO THERANOS?

09:36AM 4    A.   YES, I DID.

09:36AM 5    Q.   AND DO YOU RECALL FROM REVIEWING THIS DOCUMENT THAT YOU

09:36AM 6    COMMUNICATED WITH SEVERAL MEMBERS OF THE NIARCHOS FOUNDATION IN

09:36AM 7    CONNECTION WITH THERANOS WORK?

09:36AM 8    A.   AS I SAID, I INTRODUCED -- ACTUALLY, I THINK IF YOU GO

09:36AM 9    BACK AND THE LETTER THAT YOU SHOWED ME LAST -- YESTERDAY,

09:36AM 10   DR. KISSINGER CONTACTED ANDREAS DRACOPOULOS AND THE NIARCHOS

09:36AM 11   FOUNDATION, AND I CERTAINLY INTRODUCED THEM TO ELIZABETH, AND I

09:36AM 12   CERTAINLY DID TAKE A TRIP WITH TWO MEMBERS FROM THE FOUNDATION

09:36AM 13   OUT TO SEE THERANOS WITH THEM AS PART OF AN INTRODUCTION.

09:36AM 14   Q.   AND DO YOU RECALL THAT YOU'VE, YOU'VE ASSERTED PRIVILEGE

09:36AM 15   OVER MANY COMMUNICATIONS WITH MEMBERS OF THE NIARCHOS

09:37AM 16   FOUNDATION?

09:37AM 17   A.   I'M -- YOU KNOW, I DID NOT HANDLE THIS DOCUMENT DISCOVERY,

09:37AM 18   SO I DIDN'T -- MAYBE PRIVILEGE WAS ASSERTED ON MY BEHALF BY MY

09:37AM 19   ATTORNEYS, BUT THAT'S NOT SOMETHING THAT I PERSONALLY DID.

09:37AM 20   Q.   OKAY.  SO AS YOU SIT HERE TODAY, DO YOU HAVE A VIEW ONE

09:37AM 21   WAY OR THE OTHER WHETHER YOU REPRESENTED THE NIARCHOS

09:37AM 22   FOUNDATION?

09:37AM 23   A.   AS I SAID, I REALLY DON'T HAVE ANY RECOLLECTION OF

09:37AM 24   REPRESENTING THE NIARCHOS FOUNDATION.

09:37AM 25        I HAD -- AS I SAID, ANDREAS DRACOPOULOS, WHO IS THE

09:37AM 1    CO-PRESIDENT OF THE NIARCHOS FOUNDATION, WAS A CLIENT OF MINE,

09:37AM 2    AND I CERTAINLY HAD A LOT OF COMMUNICATIONS WITH ANDREAS AS

09:37AM 3    PART OF HIS BEING INTRODUCED.

09:37AM 4         AND AS PART OF THE NIARCHOS FOUNDATION, I DID TAKE A TRIP

09:37AM 5    WITH THEM, AND OBVIOUSLY ON THAT TRIP I DID HAVE CONVERSATIONS

09:37AM 6    WITH HIM.

09:37AM 7         BUT I DID NOT VIEW MYSELF AS REPRESENTING THE NIARCHOS

09:37AM 8    FOUNDATION.

09:37AM 9    Q.   OKAY.  THE -- WE TALKED A LITTLE BIT YESTERDAY ABOUT THE

09:38AM 10   COX -- YOUR REPRESENTATION OF THE COX FAMILY.

09:38AM 11        DO YOU RECALL THAT?

09:38AM 12   A.   YES.

09:38AM 13   Q.   AND I DON'T BELIEVE I ASKED YOU, BUT DID -- YOU CAME TO

09:38AM 14   LEARN THAT THEY INVESTED $100 MILLION IN THERANOS?

09:38AM 15   A.   I DID COME AT SOME POINT TO LEARN THAT THEY INVESTED

09:38AM 16   100 MILLION.  IT'S THE NUMBER THAT I WAS TOLD.

09:38AM 17   Q.   RIGHT.

09:38AM 18   A.   I WASN'T PERSONALLY INVOLVED, SO I DON'T KNOW -- I HAVEN'T

09:38AM 19   SEEN EVIDENCE SPECIFICALLY TO THAT, BUT THAT IS THE NUMBER THAT

09:38AM 20   I UNDERSTAND.

09:38AM 21   Q.   OKAY.  AND I THINK YOU GAVE SOME TESTIMONY YESTERDAY WITH

09:38AM 22   RESPECT TO SOME COMMUNICATIONS THAT YOU HAD WITH MEMBERS OF THE

09:38AM 23   OPPENHEIMER FAMILY.

09:38AM 24        DO YOU RECALL THAT?

09:38AM 25   A.   YES.  I -- NO, I DON'T THINK WE TALKED ABOUT THAT.

09:38AM 1    Q.   OKAY.  DO YOU RECALL YOU HAD SOME COMMUNICATIONS WITH

09:38AM 2    REPRESENTATIVES OF THE OPPENHEIMER FAMILY?

09:38AM 3    A.   I DID HAVE SOME COMMUNICATIONS, YES.

09:38AM 4    Q.   AND MR. SLACK IN PARTICULAR?

09:38AM 5    A.   YES.

09:38AM 6    Q.   AND HE WAS A FRIEND OF MR. KISSINGER'S?

09:38AM 7    A.   YES.

09:38AM 8    Q.   OR DR. KISSINGER'S?

09:38AM 9    A.   YES, HE WAS.

09:38AM 10   Q.   OKAY.  AND YOU UNDERSTAND THAT HE ULTIMATELY INVESTED

09:39AM 11   $20 MILLION?

09:39AM 12   A.   YOU KNOW, I WASN'T INVOLVED IN HOW MUCH THEY INVESTED, BUT

09:39AM 13   I WAS TOLD THAT THEY INVESTED 20 MILLION.

09:39AM 14   Q.   OKAY.  I'D LIKE TO USE A DEMONSTRATIVE.  I'LL PASS IT UP

09:39AM 15   TO THE COURT.

09:39AM 16       THE COURT'S INDULGENCE FOR ONE MOMENT?

09:39AM 17           THE COURT:  SURE.

09:39AM 18       (DISCUSSION OFF THE RECORD AMONGST COUNSEL FOR THE

09:39AM 19   GOVERNMENT AND DEFENSE.)

09:39AM 20           MR. WADE:  YOUR HONOR, I'VE PASSED UP A

09:39AM 21   DEMONSTRATIVE.  I WOULD JUST NOTE WITH RESPECT TO ONE OF THE

09:40AM 22   ENTRIES WITH RESPECT TO THE NIARCHOS FOUNDATION, WE'RE GOING TO

09:40AM 23   REMOVE THE ENTRY WITH RESPECT TO ATTORNEY THERE.

09:40AM 24       AND THEN I WOULD ASK TO DISPLAY THIS.

09:40AM 25           THE COURT:  DO YOU HAVE A COPY OF THIS, MR. SCHENK?

09:40AM 1          MR. SCHENK:  YES.

09:40AM 2          THE COURT:  OKAY.

09:40AM 3          MR. WADE:  JUST AS A DEMONSTRATIVE.  I WOULD DO THIS

09:40AM 4   ON A FLIP CHART, BUT WE DON'T SEEM TO HAVE THE SPACE FOR THIS.

09:40AM 5          THE COURT:  OKAY.  THAT'S FINE.  THANK YOU.

09:40AM 6   BY MR. WADE:

09:40AM 7   Q.   AND DO YOU SEE THIS CHART IS A SUMMARY OF SOME OF THE,

09:40AM 8   SOME OF THE FAMILIES THAT WE TALKED ABOUT AND YOUR

09:40AM 9   RELATIONSHIPS WITH THOSE FAMILIES?

09:40AM 10      DO YOU SEE THAT?

09:40AM 11  A.   I DO.

09:40AM 12  Q.   AND I CHANGED THE NIARCHOS FOUNDATION ENTRY, BUT THAT

09:41AM 13  WOULD BE A FRIEND OF DR. KISSINGER AS WELL?

09:41AM 14  A.   A FOUNDATION BEING A FRIEND OF SOMEBODY'S?

09:41AM 15      IT WAS SOMEBODY THAT HE WAS AWARE OF AND INTRODUCED

09:41AM 16  ELIZABETH AND THERANOS TO.

09:41AM 17  Q.   FAIR ENOUGH.

09:41AM 18      AND WITH RESPECT TO, WITH RESPECT TO THOSE -- THESE

09:41AM 19  FAMILIES WHERE YOU HAD AN ATTORNEY-CLIENT RELATIONSHIP, DO YOU

09:41AM 20  RECALL THAT AT DIFFERENT POINTS THROUGHOUT THE FALL YOU HAD

09:41AM 21  COMMUNICATIONS WITH THEM ABOUT THERANOS MATTERS THAT WERE

09:41AM 22  PRIVILEGED?

09:41AM 23          MR. SCHENK:  OBJECTION.  RELEVANCE.

09:41AM 24          THE COURT:  SUSTAINED AS TO THE FORM OF THE

09:41AM 25  QUESTION.  YOU CAN REASK IT.

09:41AM   1    BY MR. WADE:

09:41AM   2    Q.   DO YOU RECALL THAT YOU HAD COMMUNICATIONS WITH THE CLIENTS

09:42AM   3    WHO YOU REPRESENTED HERE WITH RESPECT TO THERANOS?

09:42AM   4    A.   SOME, SOME OF THESE.  I MEAN, THERE ARE SOME THAT I NEVER

09:42AM   5    HAD A CONVERSATION ABOUT THERANOS WITH.  BUT SOME OF THESE

09:42AM   6    INDIVIDUALS I DID HAVE CONVERSATIONS WITH.

09:42AM   7    Q.   OKAY.  AND, FOR EXAMPLE, AND WE'LL GO THROUGH SOME OF THE

09:42AM   8    COMMUNICATIONS, BUT YOU HAD COMMUNICATIONS WITH MR. PENNER,

09:42AM   9    MR. WALTON, AND MRS. WALTON?

09:42AM  10    A.   YES.

09:42AM  11    Q.   AND YOU HAD COMMUNICATIONS WITH MR. TUBERGEN?

09:42AM  12    A.   YES.

09:42AM  13    Q.   AND YOU HAD COMMUNICATIONS WITH MR. DYER AND MR. TAYLOR?

09:42AM  14    A.   I DID.

09:42AM  15    Q.   AND YOU HAD COMMUNICATIONS WITH MR. SLACK?

09:42AM  16    A.   YES, I DID.

09:42AM  17    Q.   OKAY.  YOU HAD COMMUNICATIONS WITH MR. DRACOPOULOS?

09:42AM  18    A.   YES, I DID.

09:42AM  19    Q.   YOU HAD COMMUNICATIONS WITH MR. KISSINGER?

09:42AM  20    A.   YES, I DID.

09:42AM  21    Q.   YOU HAD COMMUNICATIONS WITH OTHER MEMBERS OF THE NIARCHOS

09:42AM  22    FAMILY; CORRECT?

09:42AM  23    A.   NO.

09:42AM  24    Q.   NOT PRIVILEGED COMMUNICATIONS, YOU HAD COMMUNICATIONS WITH

09:42AM  25    MEMBERS OF THE NIARCHOS FOUNDATION OR ITS CO-PRESIDENT?

09:43AM   1    A.   THE CO-PRESIDENT IS ANDREAS DRACOPOULOS, SO, YES, I DID

09:43AM   2    HAVE CONVERSATIONS WITH HIM.

09:43AM   3    Q.   OKAY.

09:43AM   4    A.   AND I DON'T SPECIFICALLY RECALL, BUT I WOULD SUSPECT THAT

09:43AM   5    I HAD COMMUNICATIONS WITH ONE OR MORE INDIVIDUALS AT -- BECAUSE

09:43AM   6    I TOOK A TRIP WITH THEM, AS YOU KNOW.

09:43AM   7    Q.   OKAY.  AND YOU RECALL THAT YOU HAD SOME COMMUNICATIONS

09:43AM   8    WITH A REPRESENTATIVE, MR. ELKANN?

09:43AM   9    A.   I DID.

09:43AM  10    Q.   AND IS THAT MR. OHANA WHO YOU COMMUNICATED WITH?

09:43AM  11    A.   I DON'T REMEMBER, BUT THAT SOUNDS LIKE THAT'S PROBABLY

09:43AM  12    RIGHT.

09:43AM  13    Q.   IF I CAN CALL YOUR ATTENTION TO EXHIBIT 14118, WHICH I

09:43AM  14    BELIEVE SHOULD BE IN VOLUME TWO.

09:44AM  15    A.   I HAVE IT.

09:44AM  16    Q.   OKAY.  AND DO YOU RECOGNIZE THIS TO BE AN EMAIL BETWEEN,

09:44AM  17    AMONG OTHERS, YOU AND MS. HOLMES RELATING TO THERANOS MATTERS?

09:44AM  18    A.   THERE ARE ONE -- THERE ARE AT LEAST THREE, FOUR, FIVE

09:44AM  19    EMAILS HERE.  ARE WE TALKING ABOUT THE TOP ONE?

09:44AM  20    Q.   DO YOU RECOGNIZE IT TO BE A STRING OF COMMUNICATIONS WITH

09:44AM  21    RESPECT TO THOSE MATTERS?

09:44AM  22    A.   I DO.

09:44AM  23    Q.   OKAY.

09:44AM  24         MOVE THE ADMISSION OF 14118.

09:44AM  25              MR. SCHENK:  NO OBJECTION.

09:44AM  1          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:44AM  2          (DEFENDANT'S EXHIBIT 14118 WAS RECEIVED IN EVIDENCE.)

09:44AM  3     BY MR. WADE:

09:45AM  4     Q.  IF WE CAN GO TO THE SECOND -- WELL, LET'S GO TO THE BOTTOM

09:45AM  5     OF THE FIRST PAGE FOR A SECOND.

09:45AM  6          DO YOU SEE THE LAST ENTRY ON THE BOTTOM OF THE FIRST PAGE

09:45AM  7     INDICATES THAT THE EMAIL THAT FOLLOWS IS FROM MS. HOLMES?

09:45AM  8          DO YOU SEE THAT?

09:45AM  9     A.  THE ONE AUGUST THE 20TH?

09:45AM  10    Q.  YES.  IT CONTINUES ONTO THE SECOND PAGE?

09:45AM  11    A.  THE ONE FROM ME DATED ALSO AUGUST THE 20TH.

09:45AM  12    Q.  I'M SORRY.  I'M PROBABLY NOT PROVIDING CLARITY FOR YOU

09:45AM  13    HERE.

09:45AM  14         DO YOU HAVE 14118 IN FRONT OF YOU?

09:45AM  15    A.  I DO.

09:45AM  16    Q.  AND IF YOU WOULD LOOK AT THE VERY LAST LINE ON THE BOTTOM

09:45AM  17    OF THE PAGE?

09:45AM  18    A.  OH, THE ONE THAT SAYS FROM MS. HOLMES?

09:45AM  19    Q.  YEAH.  DO YOU SEE THAT?

09:45AM  20    A.  I DO SEE THAT.

09:45AM  21    Q.  AND DO YOU SEE THAT IT CONTINUES ACTUALLY OVER TO THE

09:45AM  22    EMAIL ON THE SECOND PAGE?

09:45AM  23    A.  I DO.

09:45AM  24    Q.  AND LET'S LOOK AT THAT EMAIL.  DO YOU RECALL YESTERDAY

09:45AM  25    THAT YOU SAID YOU HAD A CONVERSATION WITH MS. HOLMES ON

09:45AM  1    JULY 21ST I BELIEVE IT WAS INITIALLY.

09:45AM  2        DO YOU RECALL THAT?

09:46AM  3    A.   WHAT I RECALL IS THAT YOU SHOWED ME A MESSAGE SLIP THAT

09:46AM  4    SHE HAD CALLED ME ON A PARTICULAR DAY AND SAID -- LEFT HER

09:46AM  5    NUMBER AND SAID, PLEASE LET'S TALK ON MONDAY.

09:46AM  6        AND I TOLD YOU I DIDN'T REMEMBER WHETHER WE ACTUALLY SPOKE

09:46AM  7    ON MONDAY OR NOT.

09:46AM  8    Q.   YEAH.  FAIR ENOUGH.

09:46AM  9        I BELIEVE WE WERE ASKING AT THAT POINT ABOUT THE SECOND

09:46AM  10   CALL.  BUT DO YOU RECALL THAT THERE WAS AN INTRODUCTORY CALL

09:46AM  11   BEFORE THAT ON JULY 21ST, YOUR FIRST CALL WITH HER?

09:46AM  12   A.   I DON'T REMEMBER THE EXACT DATE, BUT, YES, I DID HAVE A

09:46AM  13   CALL SOMETIME AFTER DR. KISSINGER HAD INTRODUCED ME TO

09:46AM  14   ELIZABETH, YES.

09:46AM  15   Q.   AND THEN THERE WAS SOME COMMUNICATIONS ABOUT WAL-MART, OR

09:46AM  16   ABOUT THE WALTON FAMILY AFTER THAT.

09:46AM  17       DO YOU RECALL THAT?

09:46AM  18   A.   YES.

09:46AM  19   Q.   AND THEN WE WERE TRYING TO FIGURE OUT, I THINK WHEN WE

09:46AM  20   LEFT OFF OUR TESTIMONY, WHEN THE NEXT CONVERSATION WAS.  DO YOU

09:46AM  21   RECALL THAT?  AND I SHOWED YOU THAT MESSAGE.

09:46AM  22   A.   YOU SHOWED ME THE NEXT MESSAGE, YES.

09:47AM  23   Q.   AND LET'S LOOK AND SEE.  THIS WAS AN EMAIL FROM MS. HOLMES

09:47AM  24   TO YOU ON AUGUST 19TH, IN WHICH SHE SAYS IT WAS GREAT TO

09:47AM  25   CONNECT YESTERDAY.

09:47AM 1          DO YOU SEE THAT?

09:47AM 2     A.   YES.

09:47AM 3     Q.   AND SHE SENDS YOU A CDA.

09:47AM 4          DO YOU SEE THAT?

09:47AM 5     A.   YES.

09:47AM 6     Q.   AND WHAT IS A CDA?

09:47AM 7     A.   YES.

09:47AM 8     Q.   CAN YOU TELL THE JURY WHAT THAT IS?

09:47AM 9     A.   I TYPICALLY REFER IT TO AS AN NDA, A NONDISCLOSURE

09:47AM 10    AGREEMENT, AND CDA I THINK IT STANDS FOR THE SAME THING, A

09:47AM 11    CONFIDENTIAL DISCLOSURE AGREEMENT.

09:47AM 12         AND IT MERELY IS A DOCUMENT THAT SAYS WE'RE GOING TO GIVE

09:47AM 13    YOU INFORMATION THAT WE DON'T WANT YOU TO DISCLOSE TO OTHER

09:47AM 14    PEOPLE, AND BY GETTING THIS INFORMATION YOU AGREE YOU WILL KEEP

09:47AM 15    IT CONFIDENTIAL AND NOT GIVE IT TO ANYONE WITHOUT OUR CONSENT.

09:47AM 16    Q.   AND IN THE CORPORATE LEGAL WORLD, PRIVATE CLIENT WORLD IN

09:47AM 17    WHICH YOU'VE WORKED FOR DECADES, THESE ARE PRETTY COMMON;

09:48AM 18    RIGHT?

09:48AM 19    A.   I DON'T KNOW IF YOU WOULD SAY THEY'RE COMMON IN MY

09:48AM 20    PRACTICE, BUT THEY'RE COMMON WHEN YOU'RE DEALING WITH A

09:48AM 21    COMPANY.

09:48AM 22         INDIVIDUALS DON'T TYPICALLY HAVE THESE AGREEMENTS, BUT

09:48AM 23    WHEN YOU'RE DEALING WITH A COMPANY THAT HAS CONFIDENTIAL

09:48AM 24    INFORMATION THAT THEY DON'T WANT TO BE PUBLIC, IT IS VERY

09:48AM 25    COMMON TO BE ASKED TO SIGN AN NDA OR, IN THIS CASE, A CDA.

09:48AM 1    Q.   OKAY.  AND DOES THIS EMAIL REFRESH YOUR RECOLLECTION THAT

09:48AM 2    IN ABOUT THIS TIMEFRAME YOU HAD ANOTHER CALL WITH MS. HOLMES?

09:48AM 3    A.   YOU KNOW, I -- SEVEN YEARS AGO, I CAN'T REMEMBER EXACTLY

09:48AM 4    EVERY CALL I HAD AND EXACTLY WHAT TIME.

09:48AM 5         BUT IT CERTAINLY IS AN INDICATION THAT I SPOKE WITH

09:48AM 6    ELIZABETH ON THE DAY BEFORE, WHICH WOULD HAVE BEEN AUGUST

09:48AM 7    THE 18TH.

09:48AM 8    Q.   OKAY.  AND LET'S LOOK AT THE NEXT EMAIL UP THE CHAIN,

09:48AM 9    WHICH IS AN EMAIL FROM YOU.

09:48AM 10        AND I THINK IT'S FAIR TO SAY THAT'S CONSISTENT WITH THAT

09:48AM 11   UNDERSTANDING; IS THAT RIGHT?  AS TO THE TIMING OF THE

09:49AM 12   CONVERSATION?

09:49AM 13   A.   YES, IT IS.

09:49AM 14   Q.   OKAY.  AND HERE YOU NOTE THAT YOU FULLY UNDERSTAND THE

09:49AM 15   IMPORTANCE OF THE CONFIDENTIAL DISCLOSURE AGREEMENT; RIGHT?

09:49AM 16   A.   ABSOLUTELY.  I THINK WHAT I'M SAYING HERE IS THAT I WILL

09:49AM 17   NOT DISCLOSE ANY INFORMATION THAT I HAVE GOTTEN FROM THERANOS

09:49AM 18   OR FROM ELIZABETH TO ANY OF THESE OTHER PARTIES THAT MIGHT HAVE

09:49AM 19   AN INTEREST IN THE COMPANY UNTIL THEY HAVE SIGNED THEIR OWN

09:49AM 20   CONFIDENTIAL DISCLOSURE AGREEMENT.  I'M CARRYING OUT MY

09:49AM 21   OBLIGATIONS.

09:49AM 22   Q.   RIGHT.  AND YOU HAD REVIEWED THE SUBSTANCE OF THAT

09:49AM 23   AGREEMENT?

09:49AM 24   A.   YES, I DID.

09:49AM 25   Q.   AND YOU CONSIDERED IT TO BE BALANCED AND REASONABLE;

09:49AM  1    CORRECT?

09:49AM  2    A.   SUFFICIENTLY SO.   I OBVIOUSLY READ ONE AND SIGNED ONE

09:49AM  3    PERSONALLY.

09:49AM  4    Q.   AND YOU WROTE HERE IT'S A VERY BALANCED AND REASONABLE

09:49AM  5    DOCUMENT; CORRECT?

09:49AM  6    A.   I DID WRITE THAT, YES.

09:49AM  7    Q.   OKAY.   AND YOU BELIEVED THAT AT THE TIME, I ASSUME.

09:49AM  8    A.   I DID.

09:49AM  9    Q.   OKAY.   YOU SEE YOU THEN SAID THAT YOU WILL WORK TO GET IT

09:50AM 10    SIGNED BY THE FOUNDATION.

09:50AM 11        DO YOU SEE THAT?

09:50AM 12    A.   I SAID I WILL PROCEED TO GET IT SIGNED.

09:50AM 13    Q.   YEAH.   AND DO YOU RECALL DOING THAT?

09:50AM 14    A.   NOT SPECIFICALLY, BUT I BELIEVE IT HAPPENED BECAUSE I

09:50AM 15    WOULD NOT HAVE HAD ANY CONVERSATION WITH THE FOUNDATION ABOUT

09:50AM 16    THERANOS AND ANY OF ITS INFORMATION UNTIL THEY HAD SIGNED IT.

09:50AM 17    Q.   RIGHT.   AND YOU KNOW THAT YOU DID HAVE THOSE

09:50AM 18    CONVERSATIONS, SO YOU ASSUMED IT PROBABLY GOT SIGNED; CORRECT?

09:50AM 19    A.   EXACTLY.

09:50AM 20    Q.   OKAY.   AND IF WE LOOK AT THE NEXT LINE HERE, DO YOU SEE IT

09:50AM 21    SAYS YOU WILL ALSO GET IT SIGNED, AND YOU REFER TO MR. PENNER.

09:50AM 22        DO YOU SEE THAT?   AND YOU SAY YOU WILL GET IT SIGNED BY

09:50AM 23    MR. PENNER OR ANYONE IN THE WALTON FAMILY WHO WILL SEE THOSE

09:51AM 24    MATERIALS?

09:51AM 25    A.   YES, YES.

09:51AM   1    Q.   AND THAT'S A SIMILAR LEVEL OF CAUTION THAT YOU WERE TAKING

09:51AM   2    IN THAT APPROACH; IS THAT RIGHT?

09:51AM   3    A.   I WAS CARRYING OUT MY COMMITMENT UNDER MY OWN PERSONAL

09:51AM   4    CONFIDENTIAL DISCLOSURE AGREEMENT.

09:51AM   5    Q.   OKAY.  AND, AND YOU SEE THE LINE ON THE BOTTOM WHERE IT

09:51AM   6    SAYS YOU LOOK FORWARD TO REVIEWING THE MATERIALS ONCE THEY'VE

09:51AM   7    COME.

09:51AM   8         DO YOU SEE THAT?

09:51AM   9    A.   I SEE THAT.

09:51AM   10   Q.   AND SO AS OF AUGUST 20TH, YOU HADN'T RECEIVED THOSE

09:51AM   11   MATERIALS YET; RIGHT?

09:51AM   12   A.   I BELIEVE THAT'S CORRECT.

09:51AM   13   Q.   OKAY.  AND, IN FACT, IF WE JUST JUMP UP TO THE EMAIL ON

09:51AM   14   THE TOP, IF WE CAN JUST GO ALL OF THE WAY TO THE TOP, YOU SEE

09:51AM   15   MS. HOLMES INDICATES HERE THAT THOSE MATERIALS WERE SENT OUT.

09:51AM   16        DO YOU SEE THAT?

09:51AM   17   A.   I DO.  I SEE IT.

09:51AM   18   Q.   AND, AND I THINK WE SAW A LETTER YESTERDAY THAT WAS DATED

09:51AM   19   AROUND THE 18TH, SO MAYBE IT TOOK A COUPLE OF DAYS FOR THOSE

09:51AM   20   MATERIALS TO ARRIVE; RIGHT?

09:51AM   21   A.   THAT MAKES SENSE.

09:51AM   22   Q.   OKAY.  AND THE, THE -- AND I THINK IF WE GO TO 4173, I

09:52AM   23   BELIEVE IT IS IN EVIDENCE.

09:52AM   24        PERMISSION TO PUBLISH, YOUR HONOR?

09:52AM   25             THE COURT:  YES.

09:52AM  1          THE WITNESS:  IS THAT 14173?

09:52AM  2      BY MR. WADE:

09:52AM  3      Q.  IT'S UP ON THE SCREEN IF IT'S HELPFUL.  I'M GOING TO ASK A

09:52AM  4      QUICK QUESTION ABOUT IT.

09:52AM  5      A.  OKAY.

09:52AM  6      Q.  AND YOU UNDERSTOOD THIS TO BE THE TRANSMISSION LETTER FROM

09:52AM  7      THOSE THREE BINDERS OF MATERIALS THAT I WAS KIND ENOUGH TO HAND

09:52AM  8      UP TO YOU YESTERDAY?

09:52AM  9      A.  I DO.

09:52AM 10      Q.  AND LET'S GO TO 14119.

09:52AM 11      A.  I HAVE IT.

09:53AM 12      Q.  AND DO YOU SEE THAT'S AN EMAIL FROM YOU -- THE BOTTOM

09:53AM 13      EMAIL IS AN EMAIL FROM YOU TO MS. HOLMES ON SEPTEMBER 2ND

09:53AM 14      RELATING TO THERANOS MATTERS?

09:53AM 15      A.  I SEE IT.

09:53AM 16          MR. WADE:  I MOVE THE ADMISSION OF 14119.

09:53AM 17          MR. SCHENK:  NO OBJECTION.

09:53AM 18          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:53AM 19      (DEFENDANT'S EXHIBIT 14119 WAS RECEIVED IN EVIDENCE.)

09:53AM 20      (PAUSE IN PROCEEDINGS.)

09:53AM 21          MR. WADE:  THE COURT'S INDULGENCE FOR A MOMENT.

09:54AM 22      (PAUSE IN PROCEEDINGS.)

09:54AM 23      BY MR. WADE:

09:54AM 24      Q.  DO YOU HAVE THAT IN FRONT OF YOU, SIR?

09:54AM 25      A.  I DO.

09:54AM    1    Q.   AND I THINK I MOVED THE ADMISSION, AND I CAN'T REMEMBER IF

09:54AM    2    I DID.  IT'S BEEN ADMITTED; IS THAT RIGHT?

09:54AM    3         CAN I GO TO THE ELMO WHILE WE WORK OUT THE TECHNICAL

09:54AM    4    ISSUES HERE?

09:54AM    5              THE COURT:  SURE.

09:54AM    6              MR. WADE:  THANK YOU.  THANK GOODNESS.  I'M NEVER

09:54AM    7    GOOD WITH THIS ELMO.

09:55AM    8    Q.   DO YOU SEE THAT EMAIL UP ON THE SCREEN?

09:55AM    9         IF WE CAN GO TO THE BOTTOM EMAIL AND BLOW THAT UP?

09:55AM   10    A.   UH-HUH.

09:55AM   11    Q.   OKAY.  AND DO YOU SEE THIS IS SEPTEMBER 2ND, 2014?

09:55AM   12         DO YOU SEE THAT?

09:55AM   13    A.   I DO.

09:55AM   14    Q.   AND THAT'S THE SAME DATE AS THAT OUTLINE DOCUMENT THAT YOU

09:55AM   15    HAD PREPARED FOR DR. KISSINGER.

09:55AM   16         DO YOU RECALL THAT?

09:55AM   17    A.   THAT SOUNDS RIGHT.

09:55AM   18    Q.   OKAY.  AND, IN FACT, YOU REFER TO THAT IN THIS EMAIL?

09:55AM   19    A.   I DO.

09:55AM   20    Q.   OKAY.  AND I THINK YOU REFERENCE HERE THAT YOU HAD

09:55AM   21    ACTUALLY SPENT THE WEEKEND GOING THROUGH THE MATERIALS AND

09:55AM   22    PREPARING THAT OUTLINE; CORRECT?

09:55AM   23    A.   I DID.

09:55AM   24    Q.   AND YOU HAD NEVER SENT THE OUTLINE TO MS. HOLMES; CORRECT?

09:55AM   25    A.   I DON'T EVER RECALL SENDING IT TO HER.

09:55AM 1    Q.   OKAY.  AND YOU DON'T RECALL EVER SENDING IT TO ANYONE ELSE

09:55AM 2    AT THERANOS; CORRECT?

09:55AM 3    A.   I DON'T RECALL SENDING IT -- I DON'T UNDERSTAND THE

09:56AM 4    QUESTION.

09:56AM 5    Q.   YOU DON'T RECALL SENDING IT TO ANYONE ELSE AT THERANOS;

09:56AM 6    CORRECT?

09:56AM 7    A.   I DON'T RECALL IT.  I DO NOT.

09:56AM 8    Q.   OKAY.  AND YOU TALKED ABOUT, IN CONNECTION WITH THIS

09:56AM 9    EMAIL, HOW IMPRESSED YOU WERE BY THE COMPANY AND THE MATERIALS

09:56AM 10   THAT YOU READ?

09:56AM 11   A.   YES.

09:56AM 12   Q.   AND YOU MENTION THAT YOU -- DO YOU SEE IN THE THIRD LINE

09:56AM 13   THERE, YOU SAID -- OR THE BOTTOM OF THIS -- THE LAST PART OF

09:56AM 14   THE SECOND LINE, OR THIRD LINE, YOU SAY YOU HAD A CONVERSATION

09:56AM 15   WITH MR. KISSINGER FOLLOWING UP ON THAT; RIGHT?

09:56AM 16   A.   YES, DR. KISSINGER.

09:56AM 17   Q.   YES, THANK YOU, DR. KISSINGER.

09:56AM 18        AND I DON'T WANT TO ASK ANYTHING ABOUT THE SUBSTANCE OF

09:56AM 19   THOSE COMMUNICATIONS.

09:56AM 20        HE WAS YOUR CLIENT; CORRECT?

09:56AM 21   A.   CORRECT.

09:56AM 22   Q.   OKAY.  AND YOU NOTE THERE THAT YOU WERE GOING TO SEND THAT

09:57AM 23   TO DR. KISSINGER; CORRECT?

09:57AM 24   A.   YES.

09:57AM 25   Q.   AND DID YOU, IN FACT, SEND IT TO DR. KISSINGER?

09:57AM   1    A.   YES.  I THINK WE REVIEWED THE LETTER EARLIER THAT ENCLOSED

09:57AM   2    IT, YES.

09:57AM   3    Q.   I CERTAINLY SAW THE LETTER.

09:57AM   4         AND IT'S YOUR UNDERSTANDING THAT THAT WAS THEN ACTUALLY

09:57AM   5    COMMUNICATED TO DR. KISSINGER?

09:57AM   6    A.   YES.

09:57AM   7    Q.   OKAY.  YOU THEN -- YOU THEN, IN THE BOTTOM EMAIL, TALK

09:57AM   8    ABOUT THE WALTON FAMILY.

09:57AM   9         DO YOU SEE THAT?

09:57AM  10    A.   I DO.

09:57AM  11    Q.   AND YOU NOTE THAT YOU HAD CHECKED IN WITH MR. PENNER?

09:57AM  12    A.   YES.

09:57AM  13    Q.   AND YOU WERE HAVING -- AGAIN, NOT WANTING THE SUBSTANCE --

09:57AM  14    BUT AS HIS COUNSEL, YOU WERE HAVING SOME COMMUNICATIONS WITH

09:57AM  15    MR. PENNER IN THIS PERIOD.

09:57AM  16         DO YOU RECALL THAT?

09:57AM  17    A.   I WAS.  I DON'T KNOW IF I WOULD SAY "AS HIS COUNSEL."  I

09:57AM  18    WAS SIMPLY CHECKING TO SEE WHETHER HE HAD GOTTEN THE MATERIALS.

09:57AM  19    Q.   OKAY.  AND YOU NOTED HERE THAT HE HADN'T YET SEEN THOSE

09:57AM  20    MATERIALS?

09:57AM  21    A.   THAT'S WHAT IT SAYS.

09:57AM  22    Q.   BUT THAT HE SIGNED THE CDA.

09:57AM  23         DO YOU SEE THAT?

09:57AM  24    A.   THAT IS CORRECT.

09:57AM  25    Q.   AND SO GIVEN THAT, YOU WOULD HAVE FELT FREE TO COMMUNICATE

09:58AM  1    WITH MR. PENNER ABOUT THERANOS ISSUES; CORRECT?

09:58AM  2    A.   I WOULD HAVE, YES.

09:58AM  3    Q.   OKAY.  AND YOU WERE JUST CHECKING TO FOLLOW UP TO MAKE

09:58AM  4    SURE THAT THOSE MATERIALS WERE GOING TO BE SENT AGAIN.

09:58AM  5         DO YOU SEE THAT?

09:58AM  6    A.   YES.

09:58AM  7    Q.   OKAY.

09:58AM  8    A.   I THINK IT SAYS THAT I GOT TWO COPIES, AND I JUST WANTED

09:58AM  9    TO BE SURE THAT ONE OF THOSE COPIES WAS NOT INTENDED FOR

09:58AM  10   GREG PENNER.

09:58AM  11   Q.   UNDERSTOOD.  AND DO YOU SEE THE LAST LINE OF THE FIRST

09:58AM  12   PARAGRAPH, DO YOU SEE THERE IT SAYS, "I HAVE A FEW QUESTIONS

09:58AM  13   AND WANT TO FOLLOW UP ON YOUR OFFER OF A BRIEFING BUT THOUGHT I

09:58AM  14   WOULD WAIT UNTIL I HAVE ANY FURTHER QUESTIONS THAT MIGHT BE

09:58AM  15   RAISED BY THE NIARCHOS FOUNDATION PEOPLE AFTER THEY HAVE HAD A

09:58AM  16   CHANCE TO REVIEW THE MATERIALS AND MY OUTLINE."

09:58AM  17        DO YOU SEE THAT?

09:58AM  18   A.   I DO SEE THAT.

09:58AM  19   Q.   OKAY.  SO YOU KNEW THOSE MATERIALS THAT YOU LOOKED AT WERE

09:58AM  20   SORT OF THE FIRST SUBSTANTIVE MATERIALS ABOUT THERANOS THAT YOU

09:59AM  21   HAD SEEN; CORRECT?

09:59AM  22   A.   HUH -- YOU KNOW, I HAD CONVERSATIONS WITH ELIZABETH AND,

09:59AM  23   YES, THEY WERE THE FIRST SUBSTANTIVE MATERIALS.

09:59AM  24   Q.   AND NATURALLY AS A RESULT OF REVIEWING THREE BINDERS OF

09:59AM  25   MATERIALS, YOU HAD SOME QUESTIONS; RIGHT?

09:59AM  1    A.   I DID.  I DID.

09:59AM  2    Q.   OKAY.  BUT YOU WANTED TO BE EFFICIENT IN HOW YOU

09:59AM  3    APPROACHED IT; IS THAT FAIR?

09:59AM  4    A.   SURE.

09:59AM  5    Q.   OKAY.  AND AT SUBSEQUENT TIMES THERE WERE OTHER

09:59AM  6    COMMUNICATIONS THAT YOU HAD WITH MS. HOLMES ABOUT THERANOS

09:59AM  7    MATTERS?

09:59AM  8    A.   SURE.

09:59AM  9    Q.   IN THE PERIOD FOLLOWING SEPTEMBER 2ND; CORRECT?

09:59AM  10   A.   ABSOLUTELY.  ABSOLUTELY.

09:59AM  11   Q.   OKAY.  AND LET'S GO -- SO ON THIS SAME DATE, YOU PREPARED

10:00AM  12   THAT OUTLINE WHICH MR. SCHENK ASKED YOU ABOUT.  LET'S TAKE A

10:00AM  13   LOOK AT THAT.  THAT'S 4197.

10:00AM  14   A.   CAN YOU TELL ME WHAT -- CAN YOU TELL ME WHAT BINDER THAT

10:00AM  15   IS IN?

10:00AM  16   Q.   IT'S PROBABLY IN A COUPLE.  IF YOU LOOK AT VOLUME ONE OF

10:00AM  17   THE BINDER I GAVE YOU, MR. MOSLEY, I THINK YOU'LL SEE --

10:00AM  18   A.   I'M IN VOLUME TWO.

10:00AM  19        OKAY.  I HAVE IT.

10:00AM  20   Q.   OKAY.  AND THIS WAS -- AGAIN, JUST TO SORT OF ORIENT US

10:00AM  21   HERE, THIS IS THE OUTLINE THAT YOU HAD PREPARED OVER THE

10:00AM  22   WEEKEND THAT YOU SAID YOU WERE GOING TO SEND OVER TO

10:01AM  23   DR. KISSINGER; CORRECT?

10:01AM  24   A.   YES.

10:01AM  25   Q.   AND THAT YOU -- I BELIEVE YOUR TESTIMONY WAS THAT YOU DID

10:01AM 1    SEND IT TO DR. KISSINGER?

10:01AM 2    A.   YES, I DID.

10:01AM 3    Q.   AND TO YOUR KNOWLEDGE AS YOU SIT HERE TODAY, YOU NEVER

10:01AM 4    PREPARED AN UPDATED DRAFT OF THIS DOCUMENT IN THE FUTURE, DID

10:01AM 5    YOU?

10:01AM 6    A.   NO, I DIDN'T.

10:01AM 7    Q.   OKAY.  AND --

10:01AM 8    A.   NOT THAT I'M AWARE OF.

10:01AM 9    Q.   OKAY.  AND IN CONNECTION WITH THIS, IS IT FAIR TO SAY THAT

10:01AM 10   THE PRINCIPAL SOURCE OF THE MATERIAL THAT YOU REFERENCED HERE

10:01AM 11   ARE THE THREE BINDERS THAT YOU RECEIVED FROM MS. HOLMES?

10:01AM 12   A.   I THINK IN COMBINATION WITH THAT AND MY CONVERSATIONS WITH

10:01AM 13   ELIZABETH.

10:01AM 14   Q.   OKAY.  AND DID YOU HAVE ANY NOTES OR ANY DETAILED

10:01AM 15   INFORMATION THAT YOU RECEIVED FROM MS. HOLMES THAT YOU KNOW

10:01AM 16   THAT YOU WORKED INTO THIS ANALYSIS?

10:01AM 17   A.   I DON'T THINK SO.  I THINK MOST OF IT CAME DIRECTLY FROM

10:01AM 18   THE PRINTED MATERIALS.

10:01AM 19   Q.   OKAY.  AND YOU WANTED TO GET THOSE MATERIALS AND GET A

10:02AM 20   LITTLE MORE GROUNDED BEFORE YOU HAD A SUBSTANTIVE CONVERSATION

10:02AM 21   I THINK YOU MENTIONED IN YOUR EMAIL TO HER; CORRECT?

10:02AM 22   A.   RIGHT.

10:02AM 23   Q.   AND AS I LOOK THROUGH THIS, I DON'T SEE ANY REFERENCE, FOR

10:02AM 24   EXAMPLE, TO ANY MEDIA ARTICLES OR ANYTHING OF THAT NATURE

10:02AM 25   WITHIN YOUR OUTLINE.

10:02AM 1          DO YOU SEE ANY?

10:02AM 2     A.   I DON'T.

10:02AM 3     Q.   OKAY.  AND WOULD YOU THINK THAT YOU PROBABLY AT THAT POINT

10:02AM 4     HADN'T DONE ANY OF THAT KIND OF REVIEW?

10:02AM 5     A.   I WOULD, I WOULD BE SHOCKED IF I HADN'T DONE A GOOGLE

10:02AM 6     SEARCH AND READ WHATEVER MEDIA ARTICLES THAT I COULD EVEN

10:02AM 7     BEFORE I GOT THE MATERIALS.

10:02AM 8     Q.   OKAY.  AND WOULD YOU MAYBE POKE AROUND THE COMPANY WEBSITE

10:02AM 9     OR SOMETHING, TOO?

10:02AM 10    A.   I DON'T KNOW.

10:02AM 11    Q.   OKAY.

10:02AM 12    A.   BUT CERTAINLY I PROBABLY READ THE MEDIA ARTICLES.

10:02AM 13    Q.   OKAY.  BUT YOU DON'T SEE ANY REFERENCES TO ANY OF THOSE

10:02AM 14    SPECIFICALLY IN THE OUTLINE, DO YOU?

10:02AM 15    A.   NO.

10:02AM 16    Q.   OKAY.  AND AGAIN, AT THIS POINT IN TIME YOU HADN'T GONE

10:03AM 17    OUT AND DONE ANY INDEPENDENT RESEARCH OR ANYTHING ON THE

10:03AM 18    COMPANY THAT WAS SIGNIFICANT IN NATURE, HAD YOU?

10:03AM 19    A.   I DON'T THINK I HAD ANY WAY TO DO THAT AT THIS POINT.

10:03AM 20    Q.   WELL, DR. KISSINGER HAD ASKED YOU TO TAKE A LOOK AT THE

10:03AM 21    COMPANY?  I BELIEVE THAT WAS YOUR TESTIMONY; RIGHT?

10:03AM 22    A.   YES, HE ASKED ME TO SPEAK WITH ELIZABETH AND TAKE A LOOK

10:03AM 23    AT THE COMPANY, YES.

10:03AM 24    Q.   AND YOU GOT THE MATERIALS AND YOU PREPARED THE OUTLINE;

10:03AM 25    RIGHT?

10:03AM   1    A.   ABSOLUTELY.

10:03AM   2    Q.   OKAY.  IF WE GO TO -- LET'S GO TO THE LETTER, THE FIRST

10:03AM   3    PAGE, TO DR. KISSINGER.  AND DO YOU SEE THERE THE SECOND FULL

10:03AM   4    SENTENCE, IT SAYS, "ELIZABETH IS QUITE UNDERSTANDABLY VERY

10:03AM   5    CAREFUL ABOUT OBTAINING NONDISCLOSURE AGREEMENTS BEFORE

10:04AM   6    PROVIDING ANY IN-DEPTH INFORMATION ABOUT THERANOS"?

10:04AM   7         DO YOU SEE THAT?

10:04AM   8    A.   I DO.

10:04AM   9    Q.   AND YOU DID UNDERSTAND THAT; RIGHT?

10:04AM   10   A.   AND WE JUST TALKED ABOUT IT.  I CERTAINLY RESPECTED IT.

10:04AM   11   Q.   YEAH.

10:04AM   12   A.   AND FULLY UNDERSTOOD IT.

10:04AM   13   Q.   AND GIVEN THAT IT WAS A TECHNOLOGY COMPANY THAT HAD A LOT

10:04AM   14   OF INTELLECTUAL PROPERTY AND THE LIKE, YOU FELT LIKE IT WAS

10:04AM   15   APPROPRIATE TO BE PROTECTIVE OF THAT INFORMATION?

10:04AM   16   A.   YES.

10:04AM   17   Q.   YEAH.  AND YOU HAD -- YOU HAVE INFORMATION AS A LAWYER

10:04AM   18   THAT INFORMS YOUR UNDERSTANDING THERE; CORRECT?

10:04AM   19   A.   THAT'S CORRECT.

10:04AM   20   Q.   LET'S GO TO THE SECOND PAGE.

10:04AM   21        AND I WANT TO ASK YOU SOME QUESTIONS ABOUT YOUR OUTLINE.

10:04AM   22   OKAY?  AND THIS IS WHERE THOSE THREE BINDERS THAT I HANDED YOU

10:04AM   23   WILL COME INTO PLAY A LITTLE BIT.

10:04AM   24        DO YOU SEE THERE UNDER ROMAN NUMERAL I(A), THERE'S A

10:05AM   25   REFERENCE TO SUBSTANTIAL DATA THAT ATTEST TO THE QUALITY AND

10:05AM 1      PERFORMANCE OF THE THERANOS TECHNOLOGY AND EQUIPMENT?

10:05AM 2      A.   I SEE IT.

10:05AM 3      Q.   AND DO YOU SEE SUBSTANTIAL IS UNDERLINED?

10:05AM 4      A.   YES.

10:05AM 5      Q.   AND BY THE WAY, DO YOU KNOW WHO UNDERLINED THAT?

10:05AM 6      A.   I BELIEVE IT WAS ME.

10:05AM 7      Q.   OKAY.

10:05AM 8      A.   IT LOOKS LIKE MY ATTEMPTED UNDERLYING.  I DON'T USE A

10:05AM 9      RULER, SO...

10:05AM 10     Q.   IT'S PRETTY STRAIGHT.

10:05AM 11          AND THE -- AND IF I COULD JUST LOOK, YOU HAVE THE THREE

10:05AM 12     BINDERS IN FRONT OF YOU?

10:05AM 13     A.   UH-HUH.

10:05AM 14     Q.   WHAT I'M GOING TO DO, I'M GOING TO ASK YOU SOME QUESTIONS

10:05AM 15     ABOUT THIS, AND THEN I'M GOING TO ASK YOU SOME QUESTIONS THAT

10:05AM 16     RELATE TO THE BINDERS THAT I THINK MIGHT BE RELATED.

10:05AM 17          IF I COULD MOVE YOUR ATTENTION OR DRAW YOUR ATTENTION,

10:05AM 18     WITHIN THE BINDER THREE OF THAT SET, TO PAGE 507.

10:06AM 19          AND THIS IS IN EVIDENCE, YOUR HONOR.  PERMISSION TO

10:06AM 20     PUBLISH?

10:06AM 21               THE COURT:  YES.

10:06AM 22               THE WITNESS:  JUST GIVE ME ONE SECOND.

10:06AM 23          (PAUSE IN PROCEEDINGS.)

10:06AM 24               THE WITNESS:  ALL RIGHT.

10:06AM 25     BY MR. WADE:

10:06AM  1    Q.   IT SHOULD BE RIGHT NEAR THE FRONT OF BINDER THREE.

10:06AM  2    A.   I WAS LOOKING IN THE BACK.  IT IS RIGHT IN THE FRONT OF

10:06AM  3    BINDER THREE.

10:06AM  4    Q.   MY APOLOGIES.

10:06AM  5    A.   NO, NO.

10:06AM  6    Q.   DO YOU SEE THERE THAT IT SAYS INFECTIOUS DISEASE WORK AND

10:06AM  7    SELECT CLINICAL CORRELATIONS?

10:06AM  8    A.   I SEE THAT.

10:06AM  9    Q.   OKAY.  AND THIS WAS AMONG THE MATERIALS THAT YOU REVIEWED;

10:06AM  10   RIGHT?

10:06AM  11   A.   I BELIEVE IT WAS.

10:06AM  12   Q.   OKAY.  LET'S LOOK AT THE NEXT PAGE.

10:06AM  13   A.   OKAY.

10:07AM  14   Q.   OKAY.  AND DO YOU SEE HERE IT TALKS ABOUT THERANOS

10:07AM  15   INFECTIOUS DISEASE WORK AND SELECT CLINICAL CORRELATIONS, AND

10:07AM  16   IT PROVIDES AN OUTLINE -- I'LL GIVE YOU A SECOND.

10:07AM  17   A.   YEAH, I JUST NEED TO FIND IT AND KEEP SOME ORDER HERE.

10:07AM  18        (PAUSE IN PROCEEDINGS.)

10:07AM  19           THE WITNESS:  OKAY.  SORRY ABOUT THAT.  OKAY.

10:07AM  20   BY MR. WADE:

10:07AM  21   Q.   AND DO YOU SEE THAT DOCUMENT?  IT'S UP ON THE SCREEN.  OR

10:07AM  22   WHATEVER IS EASIER FOR YOU.

10:07AM  23   A.   I SEE IT.

10:07AM  24   Q.   OKAY.  AND DO YOU SEE THAT IT REFERENCES THERANOS

10:07AM  25   INFECTIOUS DISEASE WORK AND SELECT CLINICAL CORRELATIONS THERE?

10:07AM  1      A.   I SEE IT.

10:07AM  2      Q.   AND THEN THERE ARE DIFFERENT CATEGORIES OF INFORMATION

10:07AM  3      THAT IT IDENTIFIES THAT ARE PROVIDED, FIVE DIFFERENT

10:07AM  4      CATEGORIES.

10:07AM  5           DO YOU SEE THAT?

10:07AM  6      A.   I DO.

10:07AM  7      Q.   AND YOU UNDERSTOOD AT THIS TIME THAT THERANOS -- AS PART

10:07AM  8      OF THERANOS'S FUTURE BUSINESS MODELS, IT WANTED TO GET INTO

10:08AM  9      INFECTIOUS DISEASE WORK.

10:08AM  10          DO YOU RECALL THAT?

10:08AM  11     A.   YES, I DO.

10:08AM  12     Q.   AND IT WASN'T NECESSARILY DOING A LOT OF IT NOW, BUT THAT

10:08AM  13     WAS PART OF ELIZABETH HOLMES'S VISION; CORRECT?

10:08AM  14     A.   YOU KNOW, I DON'T RECALL THINKING THAT THEY WEREN'T

10:08AM  15     ALREADY IN THAT BUSINESS, BUT I DO KNOW IT WAS VERY MUCH A PART

10:08AM  16     OF THE VISION.

10:08AM  17     Q.   OKAY.  AND THAT THERE WERE A VARIETY OF DIFFERENT

10:08AM  18     APPLICATIONS THAT COULD HAVE REAL BENEFITS AS THEY SORT OF

10:08AM  19     ROLLED THAT OUT OVER TIME.

10:08AM  20          DO YOU RECALL THAT?

10:08AM  21     A.   ABSOLUTELY.

10:08AM  22     Q.   OKAY.  AND THAT'S, AND THAT'S REFERENCED HERE ON THIS

10:08AM  23     PAGE.

10:08AM  24          AND DO YOU SEE THAT THERE'S ALSO A REFERENCE THERE TO --

10:08AM  25     NUMBER 2 IS A REFERENCE TO REAL-TIME SELF-LEARNING

```
10:08AM   1    EPIDEMIOLOGICAL MODELS?

10:08AM   2    A.    EPIDEMIOLOGICAL.

10:08AM   3    Q.    THANK YOU, MODELS.

10:08AM   4          DO YOU SEE THAT?

10:08AM   5    A.    I SEE THAT.

10:08AM   6    Q.    AND THE IDEA THERE, AND WE'LL TALK ABOUT IT IN A MINUTE,

10:08AM   7    WAS TO ENABLE THE CONTAINMENT OF OUTBREAKS THROUGH THE USE OF A

10:09AM   8    THERANOS SYSTEM; RIGHT?

10:09AM   9    A.    YES.

10:09AM  10    Q.    OKAY.  AND THEN BELOW THAT, THERE ARE A COUPLE OF

10:09AM  11    DIFFERENT CATEGORIES OF DIFFERENT TYPES OF ASSAYS AND DATA

10:09AM  12    RELATED TO THAT THAT ARE REFERENCED.

10:09AM  13          DO YOU SEE THAT?

10:09AM  14    A.    I DO.

10:09AM  15    Q.    AND IF WE JUST LOOK -- DO YOU RECOGNIZE THAT FROM THIS

10:09AM  16    PAGE 2 TO PAGE 204, THERE IS VERY DETAILED DATA THAT IS

10:09AM  17    PROVIDED WITH RESPECT TO THERANOS'S ASSAYS?

10:09AM  18    A.    YOU'RE NOW TALKING ABOUT THE PAGES THAT ARE BUILT INTO THE

10:09AM  19    SLIDES, NOT THE BOTTOM RIGHT CORNER?

10:09AM  20    Q.    YES, I'M TALKING ABOUT THE SLIDES.  DO YOU RECOGNIZE THAT

10:09AM  21    THERE ARE APPROXIMATELY 200 PAGES THERE OF DATA WITH RESPECT TO

10:10AM  22    TESTS?

10:10AM  23    A.    YES.

10:10AM  24    Q.    AND I JUST WANT TO ASK YOU SOME QUESTIONS ABOUT A COUPLE

10:10AM  25    OF THEM.  LET'S GO TO 12, WHICH IS BATES LABELED 518.
```

10:10AM   1    A.   I HAVE IT.

10:10AM   2    Q.   AND DO YOU SEE THAT?

10:10AM   3    A.   YES.

10:10AM   4    Q.   AND HERE IT GIVES AN OVERVIEW OF SOME DIFFERENT PANELS IN

10:10AM   5    FURTHERANCE OF SOME OF THAT WORK THAT THERANOS WAS WORKING TO

10:10AM   6    DEVELOP.

10:10AM   7         DO YOU SEE THAT?

10:10AM   8    A.   YES, THERE'S A LIST OF PANELS.

10:10AM   9    Q.   AND RELATING TO DIFFERENT FORMS OF INFECTIOUS DISEASE THAT

10:10AM   10   THEY WERE DOING WORK ON HOPING TO UTILIZE IN THE FUTURE; RIGHT?

10:10AM   11   A.   YOU KNOW, ALL I CAN -- ALL I CAN SAY IS THAT THERE ARE A

10:10AM   12   LIST OF DIFFERENT PANELS.

10:11AM   13   Q.   OKAY.  AND YOU'RE NOT AN EXPERT ON LAB TESTING?

10:11AM   14   A.   I MOST CERTAINLY AM NOT.

10:11AM   15   Q.   AND YOU SEE SOMEWHAT FAMILIAR, FOR EXAMPLE, THERE ARE MANY

10:11AM   16   DIFFERENT CORONAVIRUS ASSAYS THERE.

10:11AM   17        DO YOU SEE THAT?

10:11AM   18   A.   YOU'LL HAVE TO POINT ME TO IT.

10:11AM   19   Q.   IN THE LEFT COLUMN IN THE MIDDLE BOX.

10:11AM   20   A.   THE LEFT COLUMN IN THE MIDDLE BOX?

10:11AM   21        YEAH, THERE'S A NUMBER THAT SAY CORONAVIRUS AND WITH SOME

10:11AM   22   DESIGNATIONS AFTER IT.

10:11AM   23   Q.   RIGHT.  AND THERE ARE DIFFERENT INFLUENZA ASSAYS.

10:11AM   24        DO YOU SEE THOSE REFERENCED?

10:11AM   25   A.   YES, IN THE SAME BOX RIGHT ON THE RIGHT-HAND SIDE.

10:11AM  1    Q.   AND INFLUENZA AND VARIOUS OTHER INFECTIOUS DISEASES;

10:11AM  2    RIGHT?

10:11AM  3    A.   YES.

10:11AM  4    Q.   AND THIS WAS TO PROVIDE -- THIS INFORMATION WAS PROVIDED

10:11AM  5    TO GIVE YOU A SENSE OF THE TYPE OF WORK THAT THEY WERE DOING;

10:11AM  6    RIGHT?

10:11AM  7    A.   YES.

10:11AM  8    Q.   OKAY.  LET'S GO TO PAGE 45 OF THE SLIDE DECK, BATES

10:12AM  9    LABELLED 552.

10:12AM  10   A.   YES.

10:12AM  11   Q.   DID YOU UNDERSTAND THAT THERANOS ALSO HAD A DATA GROUP

10:12AM  12   THAT WAS WORKING TO DEVELOP ANALYTICAL TOOLS TO TRY TO HELP

10:12AM  13   ADDRESS FUTURE OUTBREAKS?

10:12AM  14   A.   YES, I DID UNDERSTAND THAT.  THAT WAS ONE OF THE THINGS

10:12AM  15   THAT THEY WERE WORKING ON.

10:12AM  16   Q.   OKAY.  AND SOME OF THE MATERIALS THAT ARE REFERENCED HERE

10:12AM  17   IS SORT OF A MOCK-UP OF HOW THAT MIGHT WORK IN PRACTICE;

10:12AM  18   CORRECT?

10:12AM  19   A.   UM, YOU KNOW, I DON'T KNOW.  I DON'T KNOW HOW TO INTERPRET

10:12AM  20   ALL OF THIS.

10:12AM  21   Q.   FAIR ENOUGH.

10:12AM  22        BUT YOU RECALL THERE WAS THAT KIND OF GROUP; CORRECT?

10:12AM  23   A.   I DO REMEMBER THAT WAS A REAL FOCUS THAT ELIZABETH HAD

10:12AM  24   DISCUSSED WITH ME.

10:13AM  25   Q.   AND THAT WAS ONE OF -- THAT WAS A BIG PART OF HER VISION

10:13AM   1   FOR THE WAYS IN WHICH SHE THOUGHT THE TECHNOLOGY THAT WAS BEING

10:13AM   2   DEVELOPED COULD REALLY HAVE BENEFITS OVER THE LONG RUN; RIGHT?

10:13AM   3   A.   IT CERTAINLY SOUNDED LIKE IT, AND, YOU KNOW, IT WAS PART

10:13AM   4   OF THE ATTRACTIVENESS OF THIS, THAT IT COULD BE USED FOR THAT

10:13AM   5   PURPOSE, THIS TECHNOLOGY.

10:13AM   6   Q.   FAIR ENOUGH.

10:13AM   7        LET ME TURN YOU TO BATES LABELLED 632.

10:13AM   8   A.   IN THE SAME?

10:13AM   9   Q.   SAME DOCUMENT.

10:13AM  10   A.   OKAY.

10:13AM  11   Q.   OKAY.  AND HERE YOU SEE THEY'RE TALKING ABOUT SOME GENERAL

10:13AM  12   CHEMISTRY TESTS AND PROVIDING CORRELATION DATA?

10:13AM  13   A.   YES.

10:13AM  14   Q.   AND DO YOU SEE THE PURPOSE OF THESE TESTS ARE TO COMPARE

10:14AM  15   THERANOS'S TESTS TO REFERENCE RANGES?

10:14AM  16        DO YOU SEE THAT?

10:14AM  17   A.   THAT IS MY UNDERSTANDING OF IT, YES.

10:14AM  18   Q.   AND DID YOU UNDERSTAND THAT THAT WAS COMPARING THERANOS'S

10:14AM  19   REFERENCE TESTS TO SORT OF THE STANDARD FDA APPROVED TEST?

10:14AM  20   A.   YES.

10:14AM  21   Q.   AND IN THE MANY PAGES -- AND DO YOU KNOW AS YOU SIT HERE

10:14AM  22   WHAT, FOR EXAMPLE, IN THE UPPER LEFT-HAND CORNER WHAT AN

10:14AM  23   R SQUARED OF .997 MEANS?

10:14AM  24   A.   I DON'T, BUT MY INTERPRETATION OF IT WOULD BE THAT IT

10:14AM  25   MEANS HOW CLOSE THE CORRELATIONS ARE THAT ARE SHOWN ON THE

10:14AM  1    GRAPH.

10:14AM  2    Q.   OKAY.  AND DO YOU UNDERSTAND 1.0 TO BE IDEAL?

10:14AM  3    A.   I'M NOT, I'M NOT A CHEMIST.

10:14AM  4    Q.   FAIR ENOUGH.

10:14AM  5        BUT IN THE MANY PAGES THAT FOLLOW HERE, THERE'S

10:15AM  6    SUBSTANTIAL ADDITIONAL DATA WITH -- THAT'S PROVIDED IN

10:15AM  7    CONNECTION WITH THE VARIOUS ASSAYS THAT THERANOS HAD BEEN

10:15AM  8    WORKING TO DEVELOP; CORRECT?

10:15AM  9    A.   UM --

10:15AM  10   Q.   SIMILAR KINDS OF COMPARISONS; CORRECT?

10:15AM  11   A.   THERE ARE A LOT OF, THERE ARE A LOT OF CHARTS THAT SEEM TO

10:15AM  12   HAVE THE SAME ANALYSIS WHETHER -- THE CORRELATION LEVEL.

10:15AM  13   Q.   OKAY.  AND IF I COULD PULL YOU BACK TO EXHIBIT 4197,

10:15AM  14   PAGE 2.

10:15AM  15   A.   IS THIS BACK IN VOLUME TWO?

10:15AM  16   Q.   YEAH.  AND IT'S UP ON THE SCREEN THERE.

10:15AM  17   A.   THIS IS MY OUTLINE?

10:15AM  18   Q.   THIS IS YOUR OUTLINE.

10:15AM  19       AND YOU SEE THERE THAT YOU REFER TO THAT SUBSTANTIAL DATA?

10:15AM  20       DO YOU SEE THAT?

10:15AM  21   A.   YES.

10:15AM  22   Q.   OKAY.

10:15AM  23   A.   WHAT WAS THE, WHAT WAS THE CITE TO THAT?

10:16AM  24   Q.   SURE.  IT'S 4197, MR. MOSLEY.

10:16AM  25   A.   OKAY.  I HAVE IT.

10:16AM  1    Q.   OKAY.  AND I THINK YOU SAID THAT YOU SEE THAT YOU REFER TO

10:16AM  2    THAT SUBSTANTIAL DATA IN YOUR OUTLINE; CORRECT?

10:16AM  3    A.   I DO.

10:16AM  4    Q.   OKAY.  AND THEN IF WE CAN GO TO PAGE 3 OF THE MEMO, OR

10:16AM  5    OUTLINE.  I'M SORRY.

10:16AM  6    A.   OKAY.

10:16AM  7    Q.   AND IF WE CAN LOOK AT THE TOP, DO YOU SEE THERE'S THAT

10:16AM  8    REFERENCE TO THAT JOHNS HOPKINS RESEARCH?

10:16AM  9         DO YOU SEE THAT?

10:16AM  10   A.   ON PAGE 3 OF THE MEMO?

10:16AM  11   Q.   I'M SORRY.  PAGE 2.

10:16AM  12   A.   OKAY.  I DO SEE THAT REFERENCE.

10:16AM  13   Q.   OKAY.  AND YOU RECALL YESTERDAY THAT YOU ENDED UP GETTING

10:16AM  14   A COPY OF THAT DOCUMENT; CORRECT?

10:16AM  15   A.   YES, I DID.

10:16AM  16   Q.   OKAY.  AND YOU SEE THE SECOND REFERENCE THERE RELATES TO

10:17AM  17   WALGREENS?

10:17AM  18   A.   I SEE THAT.

10:17AM  19   Q.   DO YOU SEE THAT?

10:17AM  20        AND YOU WERE AWARE AT THIS TIME THAT THERANOS HAD ENTERED

10:17AM  21   INTO A WALGREENS -- A RELATIONSHIP WITH WALGREENS; CORRECT?

10:17AM  22   A.   YES, I WAS.

10:17AM  23   Q.   AND THAT WAS AN IMPORTANT ISSUE FOR YOU IN TERMS OF THE

10:17AM  24   DECISION TO INVEST IN THE COMPANY; RIGHT?

10:17AM  25   A.   YES, IT WAS.

10:17AM 1    Q.   A COMPANY LIKE WALGREENS PROVIDED CREDIBILITY TO THE

10:17AM 2    COMPANY; IS THAT RIGHT?

10:17AM 3    A.   YES, IT DID.

10:17AM 4    Q.   AND YOU KNEW FROM YOUR EXPERIENCE THAT A COMPANY LIKE

10:17AM 5    WALGREENS WOULD DO PRETTY EXTENSIVE DUE DILIGENCE BEFORE THEY

10:17AM 6    WOULD GET INVOLVED IN THAT KIND OF A RELATIONSHIP; RIGHT?

10:17AM 7    A.   I WOULD EXPECT THAT, YES.

10:17AM 8    Q.   AND THAT THEY WOULD LOOK AT THE TECHNOLOGY; RIGHT?

10:17AM 9    A.   I WOULD CERTAINLY EXPECT THAT.

10:17AM 10   Q.   AND, AND YOU ASSUMED THAT WHEN YOU, WHEN YOU WERE

10:17AM 11   ANALYZING THESE MATERIALS AND MAKING YOUR INVESTMENT DECISION;

10:18AM 12   IS THAT FAIR?

10:18AM 13   A.   WELL, I OBVIOUSLY READ THE JOHNS HOPKINS REPORT WHICH

10:18AM 14   TALKED ABOUT WALGREENS, AND IT SEEMS TO BE COMMISSIONED BY

10:18AM 15   WALGREENS, AND CERTAINLY THE JOHNS HOPKINS REPORT WAS ONE OF

10:18AM 16   THE THINGS THAT IS BOTH COVERED IN THIS OUTLINE AND WAS

10:18AM 17   IMPORTANT.

10:18AM 18   Q.   AND YOU SEE THE REFERENCE THERE TO 30 WALGREENS CENTERS;

10:18AM 19   RIGHT?

10:18AM 20   A.   I DO.

10:18AM 21   Q.   AND YOU KNEW AT THE TIME THAT WALGREENS WAS -- THE

10:18AM 22   RELATIONSHIP WAS GOING TO BE IN A ROLLOUT OVER TIME; CORRECT?

10:18AM 23   A.   I WAS TOLD THAT.

10:18AM 24   Q.   OKAY.

10:18AM 25   A.   I DON'T BELIEVE -- I DON'T THINK I HAD SEEN -- I'M QUITE

10:18AM 1    SURE I HAD NOT SEEN THE CONTRACT WITH WALGREENS.

10:18AM 2    Q.   OKAY.  BUT YOU -- LET'S LOOK AT, LET'S LOOK BACK IN YOUR

10:19AM 3    BINDER SET, BINDER TWO OF YOUR THREE BINDER SET.  AND IF YOU

10:19AM 4    KEEP THAT ONE CLOSED, MR. MOSLEY, WE'RE GOING TO BE BACK AND

10:19AM 5    FORTH WITH YOUR OUTLINE HERE A BIT.

10:19AM 6    A.   OKAY.  AND WE'RE IN BINDER TWO?

10:19AM 7    Q.   WE'RE IN BINDER TWO OF THE MATERIALS THAT YOU RECEIVED.

10:19AM 8    A.   WHAT PAGE?

10:19AM 9    Q.   BATES PAGE 284.

10:19AM 10   A.   OKAY.

10:19AM 11   Q.   AND THAT'S EXHIBIT 14206.

10:19AM 12        DO YOU SEE THAT?  AND WITHIN THIS -- NOW, 14206, WE'RE

10:19AM 13   BACK IN THE BINDER SET THAT YOU HAD BEEN PROVIDED BY THE

10:20AM 14   COMPANY; CORRECT?

10:20AM 15   A.   CORRECT.

10:20AM 16   Q.   AND THIS WAS AMONG THE SLIDES THAT YOU HAD BEEN PRESENTED;

10:20AM 17   CORRECT?

10:20AM 18   A.   I BELIEVE IT WAS.

10:20AM 19   Q.   OKAY.  AND THEY WERE TALKING ABOUT HOW -- WITHIN THESE

10:20AM 20   SLIDES THEY TALK ABOUT HOW THERANOS SAW ITSELF GOING INTO THE

10:20AM 21   RETAIL SPACE; CORRECT?

10:20AM 22   A.   YES.

10:20AM 23   Q.   OKAY.  LET'S GO TO THE SECOND -- THE NEXT PAGE.  SORRY.

10:20AM 24   A.   OKAY.  IT'S LABELED THERANOS INFRASTRUCTURE?

10:20AM 25   Q.   RIGHT.

10:20AM  1     A.   OKAY.

10:20AM  2     Q.   AND DO YOU SEE HERE IT SAYS, "NATIONAL RETAIL FOOTPRINT

10:20AM  3     AND HEALTH PLAN PARTNERSHIPS THROUGHOUT THE UNITED STATES FOR

10:20AM  4     AN UNPRECEDENTED INFRASTRUCTURE WHICH EXCEED THAT OF ANY

10:20AM  5     COMMERCIAL LABORATORY IN TODAY'S MARKET"?

10:20AM  6          DO YOU SEE THAT?

10:20AM  7     A.   I DO.

10:20AM  8     Q.   AND KNEW AT THE TIME THAT THEY DIDN'T YET HAVE THAT

10:20AM  9     NATIONAL RETAIL FOOTPRINT; CORRECT?

10:20AM  10    A.   YES, I DID.  I UNDERSTOOD THAT.

10:20AM  11    Q.   THEY HAD ABOUT 30 STORES; RIGHT?

10:20AM  12    A.   YES.

10:20AM  13    Q.   MOST OF THEM IN ARIZONA, AND ONE IN CALIFORNIA?

10:21AM  14    A.   THAT'S WHAT I HAD BEEN TOLD, AND THAT'S WHAT I UNDERSTOOD.

10:21AM  15    Q.   BUT YOU UNDERSTOOD THAT THE GOAL WAS TO HAVE A NATIONAL

10:21AM  16    DEPLOYMENT WITH WALGREENS; RIGHT?

10:21AM  17    A.   THAT'S WHAT I UNDERSTOOD.

10:21AM  18    Q.   AND YOU UNDERSTOOD THAT THERE WERE A COUPLE OF PHASES TO

10:21AM  19    THAT, IF YOU WILL.  YOU KNEW THAT INITIALLY THE SAMPLES WERE

10:21AM  20    PICKED UP AT THE WALGREENS AND BROUGHT TO A THERANOS

10:21AM  21    LABORATORY; CORRECT?

10:21AM  22    A.   I THINK I DID KNOW THAT THE THERANOS MACHINE WAS NOT ON

10:21AM  23    SITE.  IT WAS LOCATED OFF SITE AT THE TIME.

10:21AM  24    Q.   RIGHT.  IT WAS NOT YET IN THE WALGREENS; RIGHT?

10:21AM  25    A.   I, I -- YOU KNOW, CERTAINLY I CAME TO KNOW THAT AT SOME

10:21AM 1    POINT BEFORE I INVESTED, BUT I -- AND I DON'T KNOW AT THIS

10:21AM 2    PARTICULAR TIME WHETHER I KNEW THAT OR NOT, BUT I CERTAINLY

10:21AM 3    CAME TO KNOW THAT.

10:21AM 4    Q.   FAIR ENOUGH.

10:21AM 5         AND THAT THE GOAL OF THE COMPANY WAS TO GET FURTHER

10:21AM 6    REGULATORY APPROVAL AND THEN TO DISTRIBUTE THE DEVICES IN

10:22AM 7    VARIOUS GEOGRAPHIC LOCATIONS; CORRECT?

10:22AM 8    A.   I DIDN'T -- YOU KNOW, HONESTLY, I DIDN'T KNOW WHETHER

10:22AM 9    THERE WAS ANY FURTHER REGULATORY APPROVAL REQUIRED TO EXPAND

10:22AM 10   IT.  I DID NOT KNOW THAT.

10:22AM 11        OR, YOU KNOW, THAT'S -- YOU'RE ASKING ME IF I KNEW THAT?

10:22AM 12   NO.

10:22AM 13   Q.   OKAY.  I MIGHT BE ABLE TO REFRESH YOUR RECOLLECTION --

10:22AM 14   A.   SURE, SURE.

10:22AM 15   Q.   -- AND YOUR KNOWLEDGE ON THAT.  I KNOW IT'S BEEN A LONG

10:22AM 16   TIME.

10:22AM 17   A.   YEAH, ABSOLUTELY.

10:22AM 18   Q.   BUT YOU KNEW THAT AT SOME POINT IN THE FUTURE -- SETTING

10:22AM 19   ASIDE FOR THE TIME BEING THE REGULATORY APPROVAL -- YOU KNEW

10:22AM 20   THAT THERE WAS THIS DESIRE TO DEPLOY THESE DEVICES?

10:22AM 21   A.   ABSOLUTELY.

10:22AM 22   Q.   OKAY.  AND PART OF MS. HOLMES'S VISION THAT SHE

10:22AM 23   COMMUNICATED ABOUT IT IN TERMS OF THE APPLICATIONS THAT THE

10:22AM 24   TECHNOLOGY COULD HAVE WERE WHEN THE DEVICE WAS DISTRIBUTED OUT

10:22AM 25   IN VARIOUS SETTINGS; CORRECT?

10:22AM  1      A.   YEAH, THAT WAS A BIG PART OF THE PLAN AS I UNDERSTOOD IT.

10:22AM  2      Q.   OKAY.  AND IF WE GO JUST COUPLE MORE SLIDES FORWARD HERE,

10:23AM  3      THE NEXT SLIDE, WHICH IS BATES 286, THIS SHOWS SORT OF THE HOPE

10:23AM  4      OF THAT NATIONAL FOOTPRINT WHEN FULLY IMPLEMENTED; CORRECT?

10:23AM  5      A.   I BELIEVE IT DOES.

10:23AM  6      Q.   AND LET'S GO ONE MORE SLIDE FORWARD.

10:23AM  7           AND THIS TALKS ABOUT -- DO YOU SEE IT SAYS, "THERANOS'S

10:23AM  8      FOOTPRINT AT RETAIL" THERE?

10:23AM  9      A.   I DO SEE IT.

10:23AM  10     Q.   BUT THIS WAS TALKING ABOUT THE FUTURE VISION OF IT?

10:23AM  11     A.   ABSOLUTELY.

10:23AM  12     Q.   OKAY.  AND PART OF MS. HOLMES'S FUTURE VISION WAS TO BE

10:23AM  13     WITHIN A FEW MILES OF BASICALLY EVERY CUSTOMER IN AMERICA;

10:23AM  14     RIGHT?

10:23AM  15     A.   I CLEARLY UNDERSTOOD THAT, YES.

10:23AM  16     Q.   OKAY.  AND THIS VISION AND THE PROMISE OF WHAT THE

10:24AM  17     TECHNOLOGY MIGHT BE ABLE TO DO WAS AN IMPORTANT THING TO YOU IN

10:24AM  18     CONNECTION WITH YOUR INVESTMENT?

10:24AM  19     A.   ABSOLUTELY.

10:24AM  20     Q.   OKAY.  AND LET'S GO BACK NOW TO YOUR MEMO, OR YOUR

10:24AM  21     OUTLINE, WHICH IS 4197.

10:24AM  22     A.   OKAY.  I HAVE IT.

10:24AM  23     Q.   AT PAGE 3.

10:24AM  24     A.   PAGE 3?

10:24AM  25     Q.   YEAH.

10:24AM   1     A.   OKAY.

10:24AM   2     Q.   DO YOU HAVE THAT IN FRONT OF YOU?

10:25AM   3     A.   I DO.

10:25AM   4     Q.   OKAY.  AND DO YOU SEE THERE IN THE BOTTOM YOU REFERENCED

10:25AM   5     THE PFIZER STUDY?

10:25AM   6          DO YOU SEE THAT?

10:25AM   7     A.   IT'S ON PAGE 2 OF THE MEMO OF THE OUTLINE.  BUT, YES, I DO

10:25AM   8     SEE IT.

10:25AM   9     Q.   I OFTENTIMES AM ONE OFF.

10:25AM  10     A.   SORRY.

10:25AM  11     Q.   JUST SO THE RECORD IS CLEAR, WE'RE ON PAGE 3 OF THE

10:25AM  12     EXHIBIT, PAGE 2 OF THE MEMO; CORRECT?

10:25AM  13     A.   I'M THERE.

10:25AM  14     Q.   OKAY.  AND YOU SEE THE PFIZER STUDY REFERENCE; CORRECT?

10:25AM  15     A.   I DO.

10:25AM  16     Q.   AND LET'S GO DOWN AND LOOK AT, JUST BRIEFLY, UP TOP HERE

10:25AM  17     WHEN YOU SET FORTH THE FACTS RELATING TO THE PFIZER STUDY.

10:25AM  18          YOU UNDERSTOOD THAT THIS WAS A STUDY WHERE THERANOS

10:25AM  19     DEVICES WERE ACTUALLY LOCATED OUT IN 32 REMOTE LOCATIONS WHERE

10:26AM  20     THEY WERE USED BY CONSUMERS TO DO TESTING?

10:26AM  21          RIGHT?

10:26AM  22     A.   YES.  I DON'T REMEMBER HOW MANY OF THOSE.  AS I REMEMBER

10:26AM  23     THE REPORT, SOME NUMBER OF THEM WERE IN INDIVIDUALS' HOMES, AND

10:26AM  24     THERE WERE MAYBE ONE OR TWO OR SOMETHING IN A PARTICULAR

10:26AM  25     CENTER.

10:26AM  1        BUT, YES, THERE WAS SOMETHING LIKE 30-PLUS.

10:26AM  2   Q.   AND, IN FACT, IF YOU LOOK AT THE SECOND PARAGRAPH, YOU SEE

10:26AM  3   THERE, DO YOU SEE 27 WERE DEPLOYED DIRECTLY IN PATIENT'S HOMES,

10:26AM  4   AND 4 INSTRUMENTS WERE DEPLOYED AT THE CLINICAL SITE?

10:26AM  5   A.   I SEE THAT, YES.

10:26AM  6   Q.   YOU SEE THAT?

10:26AM  7        AND YOU UNDERSTOOD THAT THOSE WERE SHIPPED AND THEY WERE

10:26AM  8   USED SO THEY COULD TEST THIS HYPOTHESIS OF WHETHER THE DEVICE

10:26AM  9   COULD BE USED WITHIN A PATIENT'S HOME?

10:26AM 10   A.   THAT'S WHAT THE REPORT SAID, YES.

10:26AM 11   Q.   AND YOU THOUGHT THAT TO BE SIGNIFICANT, THE ABILITY TO DO

10:26AM 12   THAT; RIGHT?

10:26AM 13   A.   ABSOLUTELY.

10:27AM 14   Q.   OKAY.  AND AS YOU SIT HERE TODAY, YOU DON'T HAVE ANY

10:27AM 15   REASON TO BELIEVE THAT THEY DIDN'T DO EXACTLY THAT EXPERIMENT,

10:27AM 16   DO YOU?

10:27AM 17   A.   I HAVE NO, I HAVE NO REASON TO BELIEVE OR NOT BELIEVE.

10:27AM 18   Q.   OKAY.  BUT YOU WERE PROVIDED THE REPORT AND YOU NOTED

10:27AM 19   THOSE FACTS AND THE DESCRIPTION OF THAT WORK THAT WAS DONE AS A

10:27AM 20   FACTOR THAT WAS SIGNIFICANT TO YOU; CORRECT?

10:27AM 21   A.   ABSOLUTELY.

10:27AM 22   Q.   OKAY.  AND I THINK YOU -- ON YOUR DIRECT TESTIMONY YOU

10:27AM 23   SAID YOU CAME TO THE VIEW THAT PFIZER HAD DRAFTED THIS REPORT;

10:27AM 24   CORRECT?

10:27AM 25   A.   THAT WAS MY VIEW.

10:27AM  1    Q.   OKAY.  AND YOU NEVER WENT BACK AND SOUGHT ANY

10:27AM  2    CLARIFICATION ON WHO ACTUALLY DRAFTED THE REPORT FROM THERANOS;

10:27AM  3    CORRECT?

10:27AM  4    A.   I DID NOT.

10:27AM  5    Q.   OKAY.  AND I WOULD LIKE TO GO TO PAGE 3 OF THE MEMO,

10:27AM  6    PAGE 4 OF THE EXHIBIT, AND LOOK AT THERANOS BUSINESS APPROACH.

10:28AM  7    A.   I'M THERE.

10:28AM  8    Q.   OKAY.  DO YOU SEE THERE YOU PROVIDE A SUMMARY OF SOME OF

10:28AM  9    YOUR ANALYSIS HERE?

10:28AM  10        DO YOU SEE THAT?

10:28AM  11   A.   YES.  I MEAN, YES.

10:28AM  12   Q.   AND A NUMBER OF BULLET THAT GO --

10:28AM  13   A.   WELL, I'M JUST TALKING ABOUT MY UNDERSTANDING OF THE

10:28AM  14   BUSINESS APPROACH AS RELAYED TO ME BY THE MATERIALS AND BY

10:28AM  15   ELIZABETH.

10:28AM  16   Q.   WHICH IS EXACTLY WHAT DR. KISSINGER ASKED YOU FOR; RIGHT?

10:28AM  17   A.   YEAH, HE ASKED ME FOR MY VIEWS ON IT, YES.

10:28AM  18   Q.   AND YOU PROVIDED THAT BASED ON THESE MATERIALS?

10:28AM  19   A.   YES.

10:28AM  20   Q.   AND IN DOING THAT, YOU SEE IN THAT FIRST BULLET THERE'S A

10:28AM  21   REFERENCE TO THE FACT THAT THE WALGREENS PARTNERSHIP WAS

10:28AM  22   PUBLICLY ANNOUNCED IN THE FALL OF 2013.

10:28AM  23        DO YOU SEE THAT?

10:29AM  24   A.   I DO.

10:29AM  25   Q.   AND DO YOU RECALL WHETHER YOU LOOKED AT ANY OF THE PRESS

10:29AM  1    RELEASES OR ANYTHING RELATING TO THAT?

10:29AM  2    A.   I, I AM CERTAIN THAT I HAD READ "THE WALL STREET JOURNAL"

10:29AM  3    ARTICLE --

10:29AM  4    Q.   OKAY.

10:29AM  5    A.   -- THAT PRECEDED THIS THAT ANNOUNCED THE PARTNERSHIP.

10:29AM  6    Q.   OKAY.  DO YOU KNOW WHETHER -- WELL, LET ME SEE IF I CAN

10:29AM  7    REFRESH YOUR RECOLLECTION.

10:29AM  8         EXHIBIT 1113 IS IN EVIDENCE.  PERMISSION TO PUBLISH,

10:29AM  9    YOUR HONOR.

10:29AM  10              THE COURT:  YES.

10:29AM  11   BY MR. WADE:

10:29AM  12   Q.   YOU DON'T HAVE A COPY OF THAT, MR. MOSLEY, BUT I'LL

10:29AM  13   APPROACH AND GIVE YOU A COPY AND PUT ONE ON THE SCREEN.

10:29AM  14   A.   OKAY.

10:29AM  15   Q.   (HANDING.)

10:29AM  16        DOES THE COURT NEED A COPY?

10:29AM  17              THE COURT:  NO.  THAT'S FINE.  THANK YOU.

10:29AM  18   BY MR. WADE:

10:29AM  19   Q.   AND DO YOU SEE THAT THIS IS THE JOINT PRESS RELEASE OF

10:30AM  20   THERANOS AND WALGREENS ANNOUNCING THEIR PARTNERSHIP IN

10:30AM  21   SEPTEMBER OF 2013?

10:30AM  22   A.   IT CERTAINLY LOOKS LIKE A PRESS RELEASE.  I CAN'T -- YES,

10:30AM  23   IT DOES SAY THERANOS INC. AND WALGREENS ANNOUNCED TODAY.

10:30AM  24        I DON'T KNOW.  I CAN'T CHARACTERIZE IT AS A JOINT OR A

10:30AM  25   PRESS RELEASE OR A PRESS RELEASE BY ONE OF THE TWO COMPANIES.

10:30AM 1    Q.   FAIR ENOUGH.

10:30AM 2    A.   I'M, I'M --

10:30AM 3    Q.   LET ME DRAW YOUR ATTENTION TO THE LAST SENTENCE IN THE

10:30AM 4    FIRST PARAGRAPH.

10:30AM 5    A.   YES.

10:30AM 6    Q.   DO YOU SEE THERE IN THE PRESS RELEASE IT SAYS, "THE

10:30AM 7    SAMPLES ARE EITHER TAKEN FROM A TINY FINGERSTICK OR A

10:30AM 8    MICRO-SAMPLE TAKEN FROM TRADITIONAL METHODS, ELIMINATING THE

10:30AM 9    NEED FOR LARGER NEEDLES AND NUMEROUS VIALS OF BLOOD REQUIRED

10:31AM 10   FOR MOST DIAGNOSTIC LAB TESTING."

10:31AM 11        DO YOU SEE THAT?

10:31AM 12   A.   I DO.

10:31AM 13   Q.   AND DO YOU REMEMBER WHETHER YOU REVIEWED THIS PRESS

10:31AM 14   RELEASE IN CONNECTION WITH THE PREPARATION OF YOUR MEMO?

10:31AM 15   A.   I'M NOT SURE WHETHER -- I REVIEWED IT AT THE TIME I

10:31AM 16   PREPARED THE MEMO OVER THE COURSE OF A WEEKEND, AND I DO NOT

10:31AM 17   KNOW WHETHER I HAD THIS AS PART OF THE MATERIALS.

10:31AM 18   Q.   OKAY.  AND YOU SEE THERE WHERE IT SAYS, "MICRO-SAMPLE

10:31AM 19   TAKEN FROM TRADITIONAL METHODS," DO YOU UNDERSTAND THAT TO MEAN

10:31AM 20   VENOUS METHODS?

10:31AM 21   A.   NO.  IT SAYS, "EITHER TAKEN FROM A TINY FINGERSTICK OR A

10:31AM 22   MICRO-SAMPLE TAKEN FROM TRADITIONAL METHODS."

10:31AM 23        I CAN'T SAY THAT I FOCUSSED ON THOSE WORDS AND REACHED ANY

10:31AM 24   CONCLUSION.

10:31AM 25   Q.   AND BASED ON YOUR EXPERIENCE, DO YOU KNOW HOW BLOOD IS

10:31AM 1    TRADITIONALLY DRAWN?

10:31AM 2    A.   YES, I DO, FROM A VEIN.

10:31AM 3    Q.   OKAY.  BUT YOU DON'T RECALL WHETHER YOU FOCUSSED ON THAT

10:32AM 4    LANGUAGE AT THE TIME THAT YOU WERE LOOKING AND PREPARING YOUR

10:32AM 5    OUTLINE?

10:32AM 6    A.   I DON'T, AND I DON'T KNOW WHETHER THIS MIGHT HAVE BEEN

10:32AM 7    REFERRING TO OTHER TYPES OF BODY FLUID.

10:32AM 8    Q.   SURE.  WE'LL TRY TO SEPARATE OUR --

10:32AM 9    A.   SORRY.

10:32AM 10   Q.   -- OUR FRIENDLY DIALOGUE HERE SO OUR COURT REPORTER IS

10:32AM 11   ABLE TO GET EVERYTHING DOWN.

10:32AM 12   A.   I'M SORRY.

10:32AM 13   Q.   YOU DON'T RECALL HAVING ANY DISCUSSION WITH ANYONE ABOUT

10:32AM 14   THAT EITHER, I TAKE IT THEN.

10:32AM 15   A.   I DON'T.

10:32AM 16   Q.   OKAY.  LET'S GO BACK TO 4197.

10:32AM 17   A.   OKAY.

10:32AM 18   Q.   BUT YOU DID UNDERSTAND, BASED UPON THE MEMO, THAT THAT

10:32AM 19   PARTNERSHIP HAD STARTED IN THE FALL OF 2013; RIGHT?

10:33AM 20   A.   THAT WAS MY UNDERSTANDING, YES.

10:33AM 21   Q.   AND SO AT THE TIME YOU WERE LOOKING AT THIS, IT WAS JUST

10:33AM 22   UNDER A YEAR OLD?

10:33AM 23   A.   THAT PARTNERSHIP, YES.

10:33AM 24   Q.   OKAY.  AND IF WE CAN -- DO YOU SEE A COUPLE BULLETS DOWN

10:33AM 25   IT SAYS THEY FILED PATENT APPLICATIONS FOR 400 OR MORE PATENTS

10:33AM  1      IN THE U.S. AND IN A NUMBER OF DIFFERENT COUNTRIES.

10:33AM  2          DO YOU SEE THAT?

10:33AM  3      A.   I DO SEE IT.

10:33AM  4      Q.   AND DO YOU RECALL THAT THAT, AMONG THE MATERIALS PROVIDED

10:33AM  5      IN YOUR THREE BINDER SET, WAS A VERY EXTENSIVE LIST OF PATENT

10:33AM  6      APPLICATIONS, PATENTS THAT WERE APPROVED, AND VARIOUS OTHER

10:34AM  7      TRADEMARKS AND THE LIKE?

10:34AM  8      A.   I DO REMEMBER THERE BEING SOME LISTING OF PATENTS AND

10:34AM  9      TRADEMARKS, YES.

10:34AM  10     Q.   AND YOU UNDERSTOOD THAT PROTECTING INTELLECTUAL PROPERTY

10:34AM  11     WAS IMPORTANT?

10:34AM  12     A.   ABSOLUTELY.

10:34AM  13     Q.   OKAY.  PARTICULARLY FOR A TECHNOLOGY COMPANY?

10:34AM  14     A.   YES.

10:34AM  15     Q.   IF WE CAN GO TO THE TOP OF PAGE 4.  I'M SORRY, THE TOP OF

10:34AM  16     PAGE 5 OF THE EXHIBIT, WHICH IS PAGE 4 OF THE MEMO.

10:34AM  17     A.   YES.

10:34AM  18     Q.   JUST TO TRULY CONFUSE US ALL.

10:34AM  19          YOU SEE UP THERE IT SAYS, "ELIZABETH HOLMES AND THERANOS

10:34AM  20     APPEAR TO HAVE ACCOMPLISHED THIS BEFORE ITS MAJOR COMPETITORS

10:35AM  21     HAD A CHANCE TO UNDERSTAND HOW DISRUPTIVE THERANOS WOULD BE."

10:35AM  22          DO YOU SEE THAT?

10:35AM  23     A.   I DO.

10:35AM  24     Q.   AND YOU UNDERSTOOD THAT THEY WERE IN A KIND OF STEALTH

10:35AM  25     MODE FOR A LONG TIME AS THEY WERE DOING A LOT OF RESEARCH AND

10:35AM   1    DEVELOPMENT WORK?

10:35AM   2    A.   THAT WAS MY UNDERSTANDING.

10:35AM   3    Q.   AND THAT THEY HAD BEEN ABLE TO MAINTAIN THE SECRECY OF A

10:35AM   4    LOT OF THEIR INTELLECTUAL PROPERTY AND WHAT THEY WERE DOING

10:35AM   5    WHICH HAD COMPETITIVE BENEFITS FOR THEM?

10:35AM   6    A.   THAT WAS MY UNDERSTANDING.

10:35AM   7    Q.   AND YOU, YOU THOUGHT THAT WAS A SMART BUSINESS MOVE;

10:35AM   8    CORRECT?

10:35AM   9    A.   I DID.

10:35AM   10   Q.   OKAY.  AND IF WE GO TO A COUPLE OF BULLETS DOWN YOU SEE

10:35AM   11   THAT THERE'S A REFERENCE, THERE'S A REFERENCE THERE TO I

10:35AM   12   BELIEVE FIVE ITEMS BUT THERE ARE TWO ROMAN NUMERAL IV'S.

10:36AM   13       DO YOU SEE THAT?

10:36AM   14   A.   MY TYPO.

10:36AM   15   Q.   WE'RE ALL HUMAN.

10:36AM   16       AND DO YOU SEE ONE REFERENCE IS AN ARRAY OF TESTS.

10:36AM   17       DO YOU SEE THAT, THE FIRST ROMAN NUMERAL?

10:36AM   18   A.   YES, IT -- OH, THE -- I THINK YOU'RE TALKING ABOUT THE

10:36AM   19   FIRST ROMAN NUMERAL IV IT SAYS, "THE ABILITY TO PERFORM A VAST

10:36AM   20   NUMBER OF TESTS."

10:36AM   21   Q.   RIGHT.  AND DO YOU SEE THE SECOND ROMAN NUMERAL IV SAYS,

10:36AM   22   "THE ABILITY A VAST NUMBER OF TESTS WITH ONLY A FEW DROPS OF

10:36AM   23   BLOOD REQUIRING JUST A FINGER PRICK."

10:36AM   24       DO YOU SEE THAT?

10:36AM   25   A.   I DO SEE THAT.

10:36AM 1    Q.   AND YOU UNDERSTOOD THAT THERE WERE SOME TESTS THAT

10:36AM 2    THERANOS COULDN'T PERFORM ON A FINGERSTICK; RIGHT?

10:36AM 3    A.   I DIDN'T KNOW THAT AT THE TIME, AND I'M NOT SURE THAT THIS

10:36AM 4    ASSESSED THAT.

10:36AM 5    Q.   OKAY.  ONE JUST TALKS ABOUT A VAST ARRAY OF TESTS;

10:37AM 6    CORRECT?

10:37AM 7    A.   THAT IS CORRECT.

10:37AM 8    Q.   AND THE OTHER TALKS ABOUT FINGERSTICK TESTS; RIGHT?

10:37AM 9    A.   YES, IT DOES.

10:37AM 10   Q.   AND DO YOU RECALL AT ONE POINT YOU WENT TO THE COMPANY AND

10:37AM 11   YOU SAW A HIGH THROUGHPUT COMMERCIAL MACHINE?

10:37AM 12   A.   I DID GO TO THE COMPANY AND I DID GET A, FROM ELIZABETH, A

10:37AM 13   TOUR OF SOME OF THE LABS, AND I DID SEE ONE, MAYBE ONE OR MORE,

10:37AM 14   I DON'T REMEMBER SPECIFICALLY, VERY LARGE PIECES OF EQUIPMENT.

10:37AM 15       BUT, FRANKLY, I'M NOT QUALIFIED TO TELL YOU WHAT IT WAS OR

10:37AM 16   WHAT IT WAS DOING.

10:37AM 17   Q.   OKAY.  AND -- BUT YOU SAW IT WHILE YOU WITH THERE ON THE

10:37AM 18   TOUR?

10:37AM 19   A.   I DID SEE ONE VERY LARGE PIECE OF EQUIPMENT, YES.

10:37AM 20   Q.   AND I THINK YOU SAID MAYBE MORE?

10:37AM 21   A.   AND THERE COULD HAVE BEEN MORE.

10:37AM 22   Q.   YEAH.  AND YOU DIDN'T FORM A COMPLETE UNDERSTANDING AS TO

10:37AM 23   WHAT THE CAPACITY OF THOSE MACHINES WERE?

10:38AM 24   A.   I DID NOT FORM -- I DIDN'T REALLY HAVE A JUDGMENT EVEN AS

10:38AM 25   TO WHAT THE MACHINES WERE.

10:38AM   1    Q.   OKAY.

10:38AM   2    A.   BUT I ASSUMED THAT THEY SOMEHOW INVOLVED THE WORK THAT

10:38AM   3    THERANOS WAS DOING.

10:38AM   4    Q.   FAIR ENOUGH.  BUT YOU SAW THOSE AS YOU WERE WALKING

10:38AM   5    THROUGH THE COMPANY?

10:38AM   6    A.   YES, I DID.

10:38AM   7    Q.   WE SHOULD MAKE SURE THAT I FINISH THE QUESTION.

10:38AM   8    A.   I'M SORRY.  I'M SORRY.

10:38AM   9    Q.   SO NEITHER ONE OF US GET IN TROUBLE HERE.

10:38AM  10         THE, THE -- YOU JUST SAW THIS AS MS. HOLMES WAS TAKING YOU

10:38AM  11    THROUGH THE COMPANY AND SHOWING YOU A VARIETY OF DIFFERENT

10:38AM  12    ITEMS; CORRECT?

10:38AM  13    A.   THAT IS CORRECT.

10:38AM  14    Q.   AND JUST SO WE'RE CLEAR, THAT WAS AFTER THE DATE OF THIS

10:38AM  15    MEMO; RIGHT?

10:38AM  16    A.   YES.

10:38AM  17    Q.   OKAY.  AND IF WE GO DOWN, AND IF WE CAN RESET THE BULLET

10:38AM  18    POINTS AND START WITH THE BULLET WITH "THE PARTNERSHIP WITH

10:39AM  19    WALGREENS IS BRILLIANT."

10:39AM  20         NO, NEXT ONE DOWN.  SORRY.

10:39AM  21         YES, I WANT TO MAKE SURE THAT EVERYONE CAN SEE THAT.

10:39AM  22         I'M SORRY, MR. BENNETT.  CAN WE GO UP ONE.  YEAH, THERE WE

10:39AM  23    GO.

10:39AM  24         DO YOU SEE THERE IN YOUR MEMO IT SAYS, "THE PARTNERSHIP

10:39AM  25    WITH WALGREENS IS BRILLIANT."

10:39AM  1          DO YOU SEE THAT?

10:39AM  2     A.   YES.

10:39AM  3     Q.   AND YOU BELIEVED THAT AT THE TIME?

10:39AM  4     A.   I DID.

10:39AM  5     Q.   AND THIS WAS AN IMPORTANT PART OF YOUR INVESTMENT?

10:39AM  6     A.   IT WAS.

10:39AM  7     Q.   AND THAT'S BECAUSE IT WAS GOING TO PROVIDE THIS

10:39AM  8     DISTRIBUTION CHANNEL WHERE THE COMPANY WAS GOING TO BE ABLE TO

10:39AM  9     START CENTRALIZED TESTING AND THEN DEPLOY ITS DEVICES; CORRECT?

10:39AM 10     A.   WELL, I THOUGHT IT WAS BRILLIANT BECAUSE IT WAS A WAY TO

10:39AM 11     GET THEIR TEST OUT TO INDIVIDUALS AND WIDELY DISTRIBUTE THEIR

10:39AM 12     TESTS BECAUSE OF THE NUMBER OF WALGREENS LOCATIONS.

10:39AM 13          AND WE LOOKED AT EARLIER THE DESCRIPTION OF THE PROXIMITY

10:40AM 14     OF THE WALGREENS STORES TO THE VAST ARRAY OF THE POPULATION OF

10:40AM 15     THE UNITED STATES.

10:40AM 16     Q.   FAIR ENOUGH.

10:40AM 17          AND IF YOU LOOK AT THAT, THE SECOND BULLET THAT IS UP ON

10:40AM 18     THE SCREEN THERE, IT TALKS ABOUT THOSE, THOSE CONCEPTS WHERE IT

10:40AM 19     TALKS ABOUT GREAT CONVENIENCE AND AFFORDABLE PRICING BEING A

10:40AM 20     SIGNIFICANT PART OF THE THERANOS APPROACH AND BENEFITS; RIGHT?

10:40AM 21     A.   YES.

10:40AM 22     Q.   OKAY.  AND THAT WAS SIGNIFICANT TO YOU IN TERMS OF YOUR

10:40AM 23     INVESTMENT DECISION?

10:40AM 24     A.   IT WAS.

10:40AM 25     Q.   OKAY.  AND IF WE CAN GO TO THE SECOND TO THE LAST BULLET

10:40AM  1    THAT IS ON THE SCREEN, DO YOU SEE IT SAYS, "THE WALGREENS

10:40AM  2    PARTNERSHIP INCENTS WALGREENS TO ROLL OUT THE THERANOS WELLNESS

10:41AM  3    CENTERS EXPEDITIOUSLY;" RIGHT?

10:41AM  4    A.   I SEE THAT.

10:41AM  5    Q.   BECAUSE IT WOULD BRING IN FOOT TRAFFIC TO WALGREENS, IS

10:41AM  6    THAT WHY YOU THOUGHT THAT?

10:41AM  7    A.   I'M NOT SURE WHY I THOUGHT THAT AT THE TIME.  I MEAN, I

10:41AM  8    THINK THE BENEFIT OF IT DRIVING FOOT TRAFFIC IN WALGREENS

10:41AM  9    STORES WAS CERTAINLY -- I WOULD HAVE THOUGHT THAT AS BEING AN

10:41AM 10    INCENTIVE TO WALGREENS TO ROLL THIS OUT, BUT I DON'T KNOW

10:41AM 11    EVERYTHING THAT WENT INTO THE THOUGHT BEHIND THAT SENTENCE.

10:41AM 12    Q.   OKAY.

10:41AM 13    A.   BUT I SUSPECT THAT THAT WAS PRINCIPALLY IT.

10:41AM 14    Q.   OKAY.  AND YOU UNDERSTOOD AT THIS TIME THAT THE KEY --

10:41AM 15    THAT THIS ROLLOUT WAS A PRETTY BIG UNDERTAKING; RIGHT?

10:41AM 16    A.   I DID.

10:41AM 17    Q.   YEAH.  TO GO FROM 30 STORES TO THOUSANDS OF STORES IS A

10:41AM 18    BIG DEAL; RIGHT?

10:41AM 19    A.   YES.

10:41AM 20    Q.   YOU HAVE SOME CLIENTS WHO HAVE SOME RETAIL EXPERIENCE AND

10:41AM 21    YOU KNOW THAT THAT'S A BIG AND TOUGH ASSIGNMENT; RIGHT?

10:42AM 22    A.   IT WAS A BIG UNDERTAKING, YES.

10:42AM 23    Q.   AND THE ABILITY TO HAVE -- I'LL WITHDRAW THE QUESTION.

10:42AM 24        LET ME GO DOWN TO THE -- IN THE MEMO TO THE SCOPE OF THE

10:42AM 25    THERANOS OPPORTUNITY.

10:42AM   1          AND HERE YOU TALK ABOUT THE POTENTIAL SCOPE AS ENORMOUS;

10:42AM   2   RIGHT?

10:42AM   3   A.   YES.

10:42AM   4   Q.   AND YOU SAW A LOT OF POTENTIAL FOR THE PERFORMANCE OF THE

10:42AM   5   COMPANY BASED UPON THE VISION THAT YOU HAD HEARD; RIGHT?

10:42AM   6   A.   I DID.

10:42AM   7   Q.   OKAY.  AND LET'S GO TO THE NEXT PAGE, PAGE 5 OF THE MEMO,

10:42AM   8   PAGE 6 OF THE EXHIBIT SO THE RECORD IS CLEAR.

10:42AM   9          I WANT TO FOCUS YOU ON ITEM C THERE.

10:42AM  10          DO YOU SEE THAT?

10:43AM  11   A.   I DO.

10:43AM  12   Q.   AND THIS RELATES TO WHAT WE WERE JUST TALKING ABOUT;

10:43AM  13   RIGHT?

10:43AM  14   A.   IT DOES.

10:43AM  15   Q.   AND YOU RECOGNIZE THAT THE PENETRATION INTO WALGREENS AT

10:43AM  16   THIS TIME WAS PRETTY SMALL; RIGHT?

10:43AM  17   A.   I SAID IT WAS REALLY SMALL.

10:43AM  18   Q.   YEAH.  THEY JUST STARTED THE PARTNERSHIP IN SEPTEMBER OF

10:43AM  19   2013; CORRECT?

10:43AM  20   A.   CORRECT.

10:43AM  21   Q.   AND THEN THEY HAD 13 STORES; RIGHT?  OR 30 STORES?

10:43AM  22   A.   THIRTY STORES.

10:43AM  23   Q.   AND THERE WAS A LONG WAY TO GO?

10:43AM  24   A.   ABSOLUTELY.

10:43AM  25   Q.   OKAY.  AND IF WE CAN GO DOWN TO THE BOTTOM POINT IN G.

10:43AM   1      DO YOU SEE THAT IT SAYS -- YOU TALK ABOUT SOME OF THE

10:43AM   2   PATENTS AND HOW IT SUGGESTS THAT THERE ARE OTHER POSSIBILITIES

10:43AM   3   THAT WERE CREATED BY THEIR INTELLECTUAL PROPERTY PORTFOLIO.

10:43AM   4      DO YOU SEE THAT?

10:43AM   5   A.   I DO.

10:43AM   6   Q.   AND YOU HAD DONE SOME -- I THINK YOU NOTED IN YOUR MEMO

10:44AM   7   THAT YOU HAD DONE SOME LOOKING AT THAT -- THOSE MATERIALS

10:44AM   8   RELATING TO THE PORTFOLIO?

10:44AM   9      DO YOU RECALL THAT?

10:44AM  10   A.   I DON'T REMEMBER AND, YOU KNOW, I CAN'T HONESTLY SAY THAT

10:44AM  11   I CAN LOOK AT A LIST OF PATENTS AND HAVE A GOOD JUDGMENT, BUT I

10:44AM  12   THINK I HAD SEEN REFERENCES, AND IT COULD HAVE BEEN IN THE

10:44AM  13   PRESS OR OTHER PLACES, TO THIS IDEA THAT THERE WOULD BE A

10:44AM  14   NUMBER OF OTHER DISRUPTIVE POTENTIALS OF THIS TECHNOLOGY.

10:44AM  15   Q.   AND, IN FACT, IF WE LOOK AT THE CARRYOVER OF THAT

10:44AM  16   LANGUAGE, BASED ON THEIR INTELLECTUAL PROPERTY, IT COULD BE

10:44AM  17   THERE COULD BE SOME WEARABLE DEVICES OR OTHER THINGS THAT COULD

10:44AM  18   BE DEVELOPED IN THE FUTURE?

10:44AM  19   A.   IT SAYS THAT, AND THAT WAS MY UNDERSTANDING.

10:44AM  20   Q.   OKAY.  NOW, LET'S GO -- LET'S CONTINUE THROUGH THE MEMO.

10:44AM  21      DO YOU SEE THERE IT SAYS, "THE CURRENT AND PROJECTED

10:45AM  22   FINANCIAL RESULTS"?

10:45AM  23   A.   I SEE IT.

10:45AM  24   Q.   OKAY.  AND I THINK MR. SCHENK HAD ASKED YOU A FEW

10:45AM  25   QUESTIONS ABOUT THIS.

10:45AM   1          DO YOU RECALL THAT?

10:45AM   2     A.   I DO.

10:45AM   3     Q.   AND IF I CAN CALL -- AND THIS MATERIAL CAME OUT OF SOME OF

10:45AM   4     THE PROJECTIONS, SPREADSHEETS THAT THE COMPANY PROVIDED TO YOU

10:45AM   5     IN THE THREE VOLUME SET OF MATERIALS; CORRECT?

10:45AM   6     A.   I BELIEVE THAT'S CORRECT.

10:45AM   7     Q.   OKAY.  IF I CAN DRAW YOUR ATTENTION TO THE BACK OF BINDER

10:45AM   8     TWO OF THE MATERIALS THERANOS PROVIDED YOU, WHICH IS

10:45AM   9     EXHIBIT 14206, BATES PAGE 481.

10:45AM  10     A.   VOLUME TWO OF THREE?

10:45AM  11     Q.   VOLUME TWO OF THREE, PLEASE.

10:45AM  12     A.   AND THAT PAGE NUMBER AGAIN, PLEASE.

10:45AM  13     Q.   481, SIR.  IT SHOULD BE RIGHT NEAR THE BACK.  MAYBE FOUR

10:46AM  14     OR FIVE PAGES IN.

10:46AM  15     A.   OKAY.  THANK YOU.

10:46AM  16          OKAY.

10:46AM  17     Q.   DO YOU HAVE THAT IN FRONT OF YOU, SIR?

10:46AM  18     A.   I DO.

10:46AM  19     Q.   OKAY.  AND THESE, THESE ARE, THESE ARE SOME OF THE

10:46AM  20     PROJECTIONS THAT MR. SCHENK WAS ASKING YOU ABOUT.

10:46AM  21          DO YOU RECALL THAT?

10:46AM  22     A.   I DO.

10:46AM  23     Q.   AND I THINK APART FROM JUST LOOKING AT THE DOCUMENTS, YOU

10:46AM  24     DON'T HAVE A SIGNIFICANT RECOLLECTION ABOUT A LOT OF THE

10:46AM  25     SPECIFICS WITHIN THESE SPREADSHEETS, DO YOU?

10:46AM 1    A.   NOT A LOT OF DETAILED.

10:46AM 2    Q.   OKAY.  DO YOU RECALL THAT -- AND I THINK IT'S REFERENCED

10:46AM 3    LATER IN YOUR MEMO, WHICH WE'LL GET TO.

10:46AM 4        BUT YOU HAD SOME QUESTIONS ABOUT SOME OF THE NUMBERS.

10:46AM 5        DO YOU RECALL THAT?

10:46AM 6    A.   YES.

10:46AM 7    Q.   AND DO YOU RECALL THAT YOU HAD SOME CONVERSATIONS OR YOU

10:46AM 8    HAD POSED SOME QUESTIONS TO MR. BALWANI ABOUT THE 2015

10:47AM 9    PROJECTIONS?

10:47AM 10   A.   YOU KNOW, I DID HAVE QUESTIONS ABOUT THE 2015 PROJECTIONS.

10:47AM 11   I DON'T REMEMBER WHO I ADDRESSED THEM TO OR WHEN I ADDRESSED

10:47AM 12   THEM.

10:47AM 13   Q.   OKAY.

10:47AM 14   A.   BUT I CERTAINLY HAD QUESTIONS.

10:47AM 15   Q.   OKAY.  YOU RECALL THAT YOU HAD A MEETING WITH THE

10:47AM 16   GOVERNMENT WAY BACK IN 2017.

10:47AM 17       DO YOU REMEMBER THAT?

10:47AM 18   A.   YES, I DID.

10:47AM 19   Q.   AND YOU SAT DOWN IN A CONFERENCE ROOM?

10:47AM 20   A.   RIGHT.

10:47AM 21   Q.   AND THEY ASKED YOU SOME QUESTIONS?

10:47AM 22   A.   UH-HUH.

10:47AM 23   Q.   AND YOU GAVE THEM ANSWERS.

10:47AM 24       DO YOU RECALL THAT?

10:47AM 25   A.   OH, YES, I WAS INTERVIEWED BY THE S.E.C. AND THE FBI.

10:47AM   1    Q.   OKAY.  LET ME JUST SEE IF I CAN REFRESH YOUR RECOLLECTION

10:47AM   2    ON THIS POINT.  IF I CAN -- WE CAN LEAVE THIS DOCUMENT UP, BUT

10:47AM   3    IF YOU CAN GO TO 1 -- IN VOLUME TWO -- I'M SORRY, IN VOLUME ONE

10:48AM   4    OF --

10:48AM   5    A.   THIS ISN'T THE MATERIALS THAT I -- THIS ISN'T THE VOLUME

10:48AM   6    OF THE THREE SET, IT'S THE OTHER?

10:48AM   7    Q.   NO.  IF YOU CAN GO -- KEEP THAT CLOSE, THOUGH --

10:48AM   8    A.   OKAY.

10:48AM   9    Q.   -- BECAUSE WE'RE GOING TO LOOK AT THAT.

10:48AM  10    A.   UM --

10:48AM  11    Q.   IF YOU CAN GO TO --

10:48AM  12    A.   VOLUME ONE?

10:48AM  13    Q.   -- VOLUME ONE.

10:48AM  14         AND I'M GOING TO DRAW YOUR ATTENTION TO EXHIBIT 11115.  SO

10:48AM  15    FOUR 1'S AND A 5.

10:48AM  16    A.   OKAY.  I HAVE IT.

10:48AM  17    Q.   OKAY.  AND IF YOU CAN GO TO PAGE 3.

10:48AM  18         AND IF YOU -- DO YOU SEE THE FIRST FULL PARAGRAPH THERE

10:48AM  19    STARTING WITH "MOSLEY."

10:48AM  20    A.   THE ONE THAT SAYS, "MOSLEY SAW THESE DOCUMENTS"?

10:48AM  21    Q.   PLEASE DON'T READ IT.  I'M GOING TO ASK YOU TO READ IT TO

10:48AM  22    YOURSELF.  I'M JUST TRYING TO REFRESH YOUR RECOLLECTION.

10:48AM  23    A.   OKAY.  SORRY.

10:48AM  24    Q.   NOPE.  IF YOU CAN READ FROM THERE THROUGH THE WORD

10:49AM  25    "PROJECTIONS" ON THE FIFTH LINE -- SIXTH LINE TO YOURSELF.

10:49AM  1          MR. SCHENK:  YOUR HONOR, BEFORE WE DO THIS, I'M

10:49AM  2   GOING TO OBJECT ON RELEVANCE AND FOUNDATION.  WE NEED TO

10:49AM  3   IDENTIFY THE TIMEFRAME, IS THIS 2015 OR NOT, TO DETERMINE IF

10:49AM  4   IT'S RELEVANT.

10:49AM  5          MR. WADE:  I NEED TO SEE.

10:49AM  6          THE COURT:  DO YOU WANT TO DO THAT?

10:49AM  7          MR. WADE:  WELL, I NEED TO SEE IF I CAN REFRESH HIS

10:49AM  8   RECOLLECTION BEFORE I CAN KNOW THE TIMEFRAME.

10:49AM  9      WHY DON'T I SEE IF THIS REFRESHES HIS RECOLLECTION, AND

10:49AM 10   THEN I'LL ASK HIM ABOUT THE TIMEFRAME.

10:49AM 11          THE COURT:  ALL RIGHT.

10:49AM 12      (PAUSE IN PROCEEDINGS.)

10:49AM 13   BY MR. WADE:

10:49AM 14   Q.  HAVE YOU HAD A CHANCE, MR. MOSLEY, TO READ TO YOURSELF THE

10:49AM 15   FIRST SIX LINES OF THAT DOCUMENT?

10:49AM 16   A.  YES, I HAVE.

10:49AM 17   Q.  OKAY.  AND DOES THAT REFRESH YOUR RECOLLECTION THAT

10:49AM 18   MR. BALWANI PROVIDED YOU ANSWERS --

10:50AM 19          MR. SCHENK:  YOUR HONOR, THAT'S WHAT I'M GOING TO

10:50AM 20   OBJECT TO.

10:50AM 21          MR. WADE:  I DON'T KNOW HOW ELSE TO DO IT BECAUSE SO

10:50AM 22   FAR HE HAS TO BE ABLE TO SAY IT REFRESHED HIS RECOLLECTION.

10:50AM 23          THE COURT:  WELL, ARE YOU TALKING ABOUT A 2015 TIME

10:50AM 24   PERIOD OR WHAT TIME PERIOD ARE YOU TALKING ABOUT?

10:50AM 25          MR. WADE:  THE PROJECTIONS FOR 2015, WHICH ARE

10:50AM   1    REFERENCED IN THE EXHIBIT THAT THE WITNESS HAS BEEN ASKED ABOUT

10:50AM   2    EXTENSIVELY.

10:50AM   3             THE COURT:  I SEE THAT.  I SEE THAT.

10:50AM   4             MR. WADE:  YEAH.

10:50AM   5             THE COURT:  I THINK MR. SCHENK'S OBJECTION IS A LACK

10:50AM   6    OF FOUNDATION AS TO THE TIMING OF -- MAYBE YOU SHOULD LAY A

10:50AM   7    FOUNDATION A LITTLE BIT MORE ABOUT --

10:50AM   8             MR. WADE:  I'M REFRESHING HIS RECOLLECTION.  WE

10:50AM   9    DON'T HAVE AN ANSWER YET.

10:50AM  10             THE COURT:  WHY DON'T YOU TRY IT AGAIN.

10:50AM  11             MR. WADE:  OKAY.

10:50AM  12    Q.   MR. MOSLEY, DO YOU RECALL THAT YOU HAD SOME COMMUNICATIONS

10:50AM  13    WITH MR. BALWANI IN CONNECTION WITH THE FINANCIAL PROJECTIONS

10:50AM  14    THAT WERE PROVIDED BY THE GOVERNMENT?

10:50AM  15    A.   I DON'T REMEMBER IT SPECIFICALLY, BUT I MIGHT WELL HAVE

10:51AM  16    HAD A CONVERSATION WITH HIM BECAUSE I DID HAVE QUESTIONS ABOUT

10:51AM  17    THE 2015 PROJECTIONS.

10:51AM  18    Q.   OKAY.  AND AS YOU SIT HERE TODAY, YOU DON'T REMEMBER

10:51AM  19    WHETHER IT WAS MR. BALWANI WHO PROVIDED THAT INFORMATION TO

10:51AM  20    YOU?

10:51AM  21    A.   I DON'T.

10:51AM  22    Q.   OKAY.  AND THE MATERIALS THAT YOU JUST READ DON'T REFRESH

10:51AM  23    YOUR RECOLLECTION AS TO WHETHER HE PROVIDED THAT INFORMATION TO

10:51AM  24    YOU IN CONNECTION WITH THESE PROJECTIONS THAT WERE IN YOUR

10:51AM  25    BINDER?

10:51AM  1    A.   YOU KNOW, OBVIOUSLY WHEN I WAS INTERVIEWED I SAID WHAT I

10:51AM  2    KNEW AND UNDERSTOOD AT THAT TIME AND ASSUMING THAT THEY

10:51AM  3    CORRECTLY TOOK THAT DOWN, THEN I CERTAINLY THOUGHT AT THAT TIME

10:51AM  4    THAT SUNNY BALWANI HAD RESPONDED TO THOSE QUESTIONS.

10:51AM  5    Q.   OKAY.  OKAY.  AND IF WE CAN GO BACK TO THE DOCUMENT

10:52AM  6    ITSELF.

10:52AM  7         AND JUST SO WE'RE -- NO, I'M SORRY.  IF WE CAN GO BACK TO

10:52AM  8    THE SPREADSHEET THAT YOU WERE JUST ON, MR. BENNETT, 14206, 481.

10:52AM  9         OKAY.  YOU SEE IN THE UPPER LEFT-HAND CORNER THESE WERE

10:52AM  10   PROJECTED STATEMENT OF INCOME; RIGHT?

10:52AM  11   A.   I DO.

10:52AM  12   Q.   AND YOU KNEW THEY WEREN'T THE ACTUAL NUMBERS; CORRECT?

10:52AM  13   A.   YES.

10:52AM  14   Q.   AND THE GOVERNMENT ASKED YOU ABOUT SOME OF THESE

10:52AM  15   PROJECTIONS FOR THE DIFFERENT YEARS.

10:52AM  16        DO YOU RECALL THAT?

10:52AM  17   A.   YES.

10:52AM  18   Q.   OKAY.  I'D LIKE TO TURN YOUR ATTENTION TO THE SECOND PAGE

10:52AM  19   OR THE NEXT PAGE.

10:52AM  20        AND DO YOU SEE THAT THIS IS A PROJECTED STATEMENT OF CASH

10:52AM  21   FLOW?

10:52AM  22   A.   I SEE THAT.

10:53AM  23   Q.   DO YOU SEE THAT?

10:53AM  24   A.   I DO.

10:53AM  25   Q.   AND THIS IS A DOCUMENT THAT SETS FORTH THE CASH THAT THE

10:53AM 1      COMPANY IS TO RECEIVE IN CONNECTION WITH IN 2000 -- I'M JUST

10:53AM 2      FOCUSSED ON '14 AND '15.

10:53AM 3          DO YOU SEE THAT?

10:53AM 4      A.   I DO.

10:53AM 5      Q.   AND DO YOU SEE THAT IN CONNECTION WITH THE SERVICES NBL BY

10:53AM 6      WALGREENS, THAT THERE IS NOTHING THERE?  THERE ARE ZEROS?

10:53AM 7      A.   ON '14 AND '15, YES.

10:53AM 8      Q.   OKAY.  AND YOU SEE ALSO IN CONNECTION WITH SAFEWAY THERE'S

10:53AM 9      ZEROS THERE FROM A CASH STANDPOINT?

10:53AM 10     A.   WELL, THERE'S A BLANK, OR JUST A DASH.

10:53AM 11     Q.   BUT THERE ARE NO NUMBERS?

10:53AM 12     A.   THERE ARE NO NUMBERS.

10:53AM 13     Q.   OKAY.  AND IF WE CAN GO TO THE NEXT PAGE, DO YOU RECOGNIZE

10:54AM 14     THIS DOCUMENT?

10:54AM 15     A.   I DO.

10:54AM 16     Q.   IT'S A BALANCE SHEET?

10:54AM 17     A.   YES.

10:54AM 18     Q.   OKAY.  AND YOU SEE THAT IT INDICATES THAT THE FINANCIAL

10:54AM 19     NUMBERS THAT WERE PROVIDED WERE THE PERIOD ENDED JULY 14TH,

10:54AM 20     2014?

10:54AM 21     A.   THAT'S THE DATE ON THIS BALANCE SHEET, YES.

10:54AM 22     Q.   OKAY.  AND IF WE JUST GO DOWN, DO YOU SEE THE LINE ENTRY

10:54AM 23     FOR DEFERRED REVENUE AND CUSTOMER DEPOSITS?

10:54AM 24         DO YOU SEE THAT?

10:54AM 25     A.   I DO SEE THAT.

10:54AM  1    Q.   AND YOU UNDERSTAND THIS TO BE IN MILLIONS; CORRECT?

10:54AM  2    A.   YES, I DO.

10:54AM  3    Q.   AND SO THE NUMBER THERE IS 1 -- ALMOST $169 MILLION IN

10:54AM  4    DEFERRED REVENUE?

10:54AM  5    A.   THAT IS CORRECT.

10:54AM  6    Q.   OKAY.  AND, AND YOU UNDERSTAND THAT SOMETIMES EVENTS NEED

10:54AM  7    TO HAPPEN BEFORE REVENUE CAN ACTUALLY BE RECOGNIZED AND IT

10:54AM  8    NEEDS TO BE DEFERRED UNTIL THOSE EVENTS HAPPEN; RIGHT?

10:54AM  9    A.   I DO UNDERSTAND THAT.

10:55AM 10    Q.   IF WE CAN GO BACK TO YOUR MEMO AND GO TO THE NEXT PAGE.

10:55AM 11    A.   CAN YOU DIRECT ME BACK TO THE VOLUME NUMBER AND THE PAGE

10:55AM 12    NUMBER?

10:55AM 13    Q.   I APOLOGIZE.  I SHOULD HAVE JUST PRINTED OUT A SEPARATE

10:55AM 14    COPY FOR YOU.

10:55AM 15    A.   IS IT IN VOLUME ONE?

10:55AM 16    Q.   IT'S IN VOLUME ONE, EXHIBIT 4197.

10:56AM 17    A.   SORRY ABOUT THAT.  OKAY.

10:56AM 18    Q.   DO YOU HAVE THAT IN FRONT OF YOU?

10:56AM 19    A.   I DO.

10:56AM 20         MR. WADE:  MAY I APPROACH, YOUR HONOR?

10:56AM 21         THE COURT:  YES.

10:56AM 22    BY MR. WADE:

10:56AM 23    Q.   I HAVE AN EXTRA COPY OF 4197, AND I'LL JUST HAND IT TO YOU

10:56AM 24    AND MAYBE THAT WILL MAKE IT A LITTLE EASIER FOR YOU (HANDING).

10:56AM 25    A.   THAT WILL MAKE IT A LITTLE EASIER.  I APPRECIATE IT.

10:56AM   1    Q.    AND DO YOU SEE IN PARAGRAPH E YOU TALK A LITTLE BIT ABOUT

10:56AM   2    THE VALUATION OF THE COMPANY?  I'M ON EXHIBIT PAGE 8, MEMO

10:56AM   3    PAGE 7.

10:56AM   4    A.    MEMO PAGE 7.

10:57AM   5         I'M THERE.

10:57AM   6    Q.    OKAY.  AND DO YOU SEE THAT YOU SET THE VALUE OF THERANOS

10:57AM   7    AGAINST THE TWO PRINCIPAL PUBLICLY TRADED DIAGNOSTIC TEST

10:57AM   8    PROVIDERS?

10:57AM   9    A.    YES, THAT'S WHAT THIS PARAGRAPH DISCUSS.

10:57AM   10   Q.    AND THOSE -- THAT WAS QUEST AND LABCORP WERE THE TWO

10:57AM   11   COMPETITORS; CORRECT?

10:57AM   12   A.    THAT'S CORRECT.

10:57AM   13   Q.    AND THEY EACH HAD A MARKET CAP OF ABOUT $9 BILLION; IS

10:57AM   14   THAT CORRECT?

10:57AM   15   A.    THAT'S CORRECT.

10:57AM   16   Q.    AND YOU UNDERSTOOD THAT THE VALUATION BASED ON THE

10:57AM   17   OFFERING PRICE IN THE C-2 ROUND WOULD HAVE VALUED THERANOS AT

10:57AM   18   ABOUT 8.8 BILLION?

10:57AM   19   A.    I WAS AWARE OF THAT, YES.

10:57AM   20   Q.    OKAY.  AND LET'S GO TO PAGE 8 OF YOUR MEMO, PAGE 9 OF THE

10:57AM   21   EXHIBIT, WHICH WOULD BE THE NEXT PAGE.

10:57AM   22   A.    I HAVE IT.

10:57AM   23   Q.    AND HERE YOU SET FORTH SOME QUESTIONS, CONCERNS, AND

10:58AM   24   RISKS.

10:58AM   25        DO YOU SEE THAT?

10:58AM   1    A.   I DO.

10:58AM   2    Q.   AND YOU UNDERSTAND GENERALLY THAT INVESTMENTS COME WITH

10:58AM   3    RISK; RIGHT?

10:58AM   4    A.   ABSOLUTELY.

10:58AM   5    Q.   AND THAT THIS INVESTMENT IN PARTICULAR WAS A SPECULATIVE

10:58AM   6    INVESTMENT.

10:58AM   7         DO YOU RECALL THAT?

10:58AM   8    A.   YOU KNOW, I DON'T KNOW IF I WOULD CHARACTERIZE IT QUITE

10:58AM   9    THE WAY YOU WOULD, BUT IT CERTAINLY INVOLVED RISK.

10:58AM  10    Q.   OKAY.  AND YOU RECALLED THE SHAREHOLDER AGREEMENT THAT

10:58AM  11    MR. SCHENK SHOWED YOU?

10:58AM  12    A.   I DO.

10:58AM  13    Q.   AND DO YOU RECALL THE PROVISION IN THERE, THE COVENANT

10:58AM  14    THAT REFERRED TO THIS AS A SPECULATIVE --

10:58AM  15    A.   I DO.

10:58AM  16    Q.   -- INVESTMENT?

10:58AM  17    A.   I DO.

10:58AM  18    Q.   OKAY.  AND YOU UNDERSTOOD THAT AT THE TIME; RIGHT?

10:58AM  19    A.   YES, I DID.

10:58AM  20    Q.   OKAY.  AND YOU KNEW THIS WAS A YOUNG COMPANY; RIGHT?

10:58AM  21    A.   I DID.

10:58AM  22    Q.   AND THAT THEY WERE LESS THAN A YEAR INTO THEIR PRINCIPAL

10:58AM  23    COMMERCIAL RELATIONSHIP; RIGHT?

10:59AM  24    A.   WITH WALGREENS, YES.

10:59AM  25    Q.   OKAY.  AND YOU KNEW IT HAD A YOUNG CEO; RIGHT?

10:59AM  1      A.   YES, I DID.

10:59AM  2      Q.   AND YOU KNEW THAT THERANOS ITSELF HAD -- DID NOT HAVE A

10:59AM  3      LOT OF RETAIL EXPERIENCE; RIGHT?

10:59AM  4      A.   I DID.

10:59AM  5      Q.   OKAY.  AND THAT AS A RESULT, THAT THIS WAS ONE OF THOSE

10:59AM  6      COMPANIES THAT HAD A FAIR AMOUNT OF RISK?  YOU COULD LOSE ALL

10:59AM  7      OF YOUR MONEY; RIGHT?

10:59AM  8      A.   IT CERTAINLY HAD RISK, AND IT WAS CERTAINLY POSSIBLE TO

10:59AM  9      LOSE ALL OF YOUR MONEY, YES.

10:59AM 10      Q.   OKAY.  BUT THERE WAS, THERE WAS -- YOU ALSO SAW A REAL

10:59AM 11      POTENTIAL IN THE COMPANY WITH RESPECT TO MS. HOLMES'S VISION AS

10:59AM 12      WE'VE DISCUSSED?

10:59AM 13      A.   I DID.

10:59AM 14      Q.   OKAY.  AND YOU'VE SET FORTH SOME OF THOSE RISKS HERE

10:59AM 15      WITHIN THIS DOCUMENT; RIGHT?

10:59AM 16      A.   I DID.

10:59AM 17      Q.   AND THIS WAS JUST BASED UPON YOUR PRELIMINARY ASSESSMENT;

10:59AM 18      RIGHT?

10:59AM 19      A.   THAT IS CORRECT.

10:59AM 20      Q.   I'M SURE IF YOU HAD UPDATED THIS MEMO, YOU MIGHT HAVE EVEN

10:59AM 21      ADDED SOME MORE RISKS; IS THAT FAIR?

11:00AM 22      A.   I HAVEN'T SAT DOWN AND THOUGHT ABOUT IT, BUT IT'S POSSIBLE

11:00AM 23      I WOULD HAVE ADDED MORE RISKS.

11:00AM 24      Q.   OKAY.  AND IN PARTICULAR, YOU NOTE THE RISK RELATING TO

11:00AM 25      WALGREENS AS THE FIRST RISK THERE; RIGHT?

11:00AM  1      A.   YES.

11:00AM  2      Q.   AND YOU UNDERSTOOD THAT AT THE TIME?

11:00AM  3      A.   YES, I DID.

11:00AM  4      Q.   AND THE SECOND RISK THAT YOU IDENTIFY RELATES TO THE

11:00AM  5      PROJECTED INCREASE IN REVENUE.

11:00AM  6           DO YOU SEE THAT?

11:00AM  7      A.   I DO.

11:00AM  8      Q.   AND IN THAT, THE INCREASE IN REVENUES TO $990 MILLION IS A

11:00AM  9      VERY SUBSTANTIAL INCREASE; CORRECT?

11:00AM  10     A.   JUST WHAT I SAID.

11:00AM  11     Q.   SO, IS THAT CORRECT, IT WAS A VERY SUBSTANTIAL INCREASE?

11:00AM  12     A.   YES, VERY SUBSTANTIAL.

11:00AM  13     Q.   AND SO THIS IS ONE OF THE AREAS WHERE YOU ACTUALLY SAID

11:01AM  14     THAT YOU WANTED TO MAYBE GET A LITTLE MORE INFORMATION ON THAT;

11:01AM  15     RIGHT?

11:01AM  16     A.   I DID.

11:01AM  17     Q.   OKAY.  AND I THINK MR. SCHENK HAD ASKED YOU ABOUT SOME

11:01AM  18     NOTES THAT ACTUALLY RELATE TO THAT ISSUE; RIGHT?

11:01AM  19     A.   YES.

11:01AM  20     Q.   OKAY.  AND LET'S --

11:01AM  21     A.   SOME HANDWRITTEN NOTES, YES.

11:01AM  22     Q.   LET'S LOOK AT THAT.  THOSE NOTES WERE ACTUALLY ENTERED

11:01AM  23     INTO THAT BINDER?

11:01AM  24     A.   THIS BINDER (INDICATING)?

11:01AM  25     Q.   NO.  THEY WERE ENTERED INTO A PAGE ON THAT BINDER --

11:01AM  1    A.   I THINK THEY WERE, YEAH.   THEY WERE HANDWRITTEN ON A PAGE

11:01AM  2    IN THAT BINDER, YES.

11:01AM  3    Q.   OKAY.   LET'S TAKE A LOOK AT THAT.   THAT'S IN BINDER TWO

11:01AM  4    RIGHT NEAR THE FRONT, SIR.   IT'S 126.

11:02AM  5    A.   IT'S THE WRONG BINDER.

11:02AM  6    Q.   IT'S BINDER TWO OF YOUR INVESTMENT MATERIALS.

11:02AM  7    A.   YEAH, IT'S -- OKAY.   OH, THE MATERIALS THAT WERE OF THE

11:02AM  8    THREE SET BINDER.

11:02AM  9    Q.   YES.

11:02AM  10   A.   OKAY.

11:02AM  11   Q.   CORRECT, SIR.

11:02AM  12   A.   JUST GIVE ME ONE SECOND, PLEASE.

11:02AM  13        AND WHAT PAGE WAS THAT?

11:02AM  14   Q.   126.

11:02AM  15   A.   126.   I HAVE IT.

11:02AM  16   Q.   OKAY.   AND WE'VE PUT THAT UP ON THE SCREEN.

11:02AM  17        AND THESE ARE NOTES THAT YOU TOOK WHEN YOU WERE MAKING

11:02AM  18   INQUIRIES WITH RESPECT TO THAT ISSUE ON THE 2015 PROJECTIONS;

11:03AM  19   CORRECT?

11:03AM  20   A.   YOU KNOW, HONESTLY, I DON'T REMEMBER -- THEY'RE OBVIOUSLY

11:03AM  21   NOTES I TOOK, BUT I DON'T REMEMBER EXACTLY WHEN I TOOK THEM OR

11:03AM  22   WHAT IT WAS BASED ON, A CONVERSATION OR BASED ON THE MATERIALS.

11:03AM  23   Q.   OKAY.   BUT IN EITHER EVENT, YOU UNDERSTOOD THAT THE

11:03AM  24   2014 -- EXCUSE ME.   LET ME START OVER.

11:03AM  25        THE 2015 NUMBERS YOU UNDERSTOOD INCLUDED AN ASSUMPTION

11:03AM 1    THAT THERE WOULD BE SIGNIFICANT PENETRATION WITHIN THE

11:03AM 2    WALGREENS RELATIONSHIP; RIGHT?

11:03AM 3    A.   I THOUGHT THAT, YES.

11:03AM 4    Q.   OKAY.  AND IF WE CAN GO BACK TO YOUR MEMO, WHICH I HOPE

11:03AM 5    YOU HAVE A LOOSE COPY IN FRONT OF YOU TO MAKE IT EASIER.

11:03AM 6    A.   I DO.  I DO.  THANKS.

11:03AM 7    Q.   AND IF WE CAN GO TO PARAGRAPH D.

11:03AM 8        DO YOU SEE THAT?

11:04AM 9    A.   I DO.

11:04AM 10   Q.   AND YOU RECALL MR. SCHENK ASKED YOU SOME QUESTIONS ABOUT

11:04AM 11   VARIOUS SHAREHOLDER RIGHTS ISSUES YOU IDENTIFIED?

11:04AM 12   A.   YES.

11:04AM 13   Q.   OKAY.  ONE OF THE ISSUES YOU IDENTIFIED WAS IN CONNECTION

11:04AM 14   WITH -- IT'S NOT RELATED TO THIS PARAGRAPH, BUT IT RELATED TO A

11:04AM 15   LIQUIDATION PREFERENCE.

11:04AM 16       DO YOU RECALL THAT?

11:04AM 17   A.   YES, WE DID TALK ABOUT LIQUIDATION PREFERENCE, YES.

11:04AM 18   Q.   OKAY.  AND WHAT THAT MEANT BASICALLY IS IF THERE WAS A

11:04AM 19   BANKRUPTCY OR SOMETHING, THAT THE C-2 INVESTORS WOULD SORT OF

11:04AM 20   BE AT THE FRONT OF THE LINE; CORRECT?

11:04AM 21   A.   THAT IS CORRECT.

11:04AM 22   Q.   AND MS. HOLMES OWNED CLASS B SHARES; CORRECT?

11:04AM 23   A.   CLASS B COMMON SHARES, YES.

11:04AM 24   Q.   RIGHT.  AND IN TERMS OF THAT LINE, IF THERE WAS A

11:04AM 25   BANKRUPTCY, SHE WOULD COME LOWER IN PRIORITY; RIGHT?

11:04AM  1    A.   YES, SHE WOULD COME AT THE COMMON LEVEL, WHICH WOULD BE

11:04AM  2    BELOW ALL OF THE PREFERRED, YES.

11:04AM  3    Q.   AND, AND YOU ALSO UNDERSTAND, AS A RESULT OF REVIEWING THE

11:05AM  4    MATERIALS, THAT ESSENTIALLY THERE WAS A TIME WHERE MS. HOLMES

11:05AM  5    OWNED THE WHOLE COMPANY, OR SUBSTANTIALLY ALL OF THE COMPANY;

11:05AM  6    RIGHT?

11:05AM  7    A.   I SUSPECT WHEN IT WAS FIRST SET UP AND BEFORE THEY HAD

11:05AM  8    ISSUED ANY PREFERRED OR OTHER COMMON STOCK, SHE PROBABLY OWNED

11:05AM  9    100 PERCENT.

11:05AM  10   Q.   YEAH.

11:05AM  11   A.   I WOULD HAVE GUESSED THAT.

11:05AM  12   Q.   AND WITH FOUNDERS, OFTENTIMES OVER TIME AS THEY ISSUE

11:05AM  13   STOCK TO INVESTORS, THEY KIND OF DILUTE THEMSELVES?

11:05AM  14   A.   YES, THAT'S COMMON.

11:05AM  15   Q.   OKAY.  AND YET, MS. HOLMES MAINTAINED, BECAUSE OF THOSE

11:05AM  16   CLASS B SHARES, A VOTING MAJORITY WITHIN THE COMPANY; RIGHT?

11:05AM  17   A.   A VERY SUBSTANTIAL VOTING MAJORITY, YES.

11:05AM  18   Q.   OKAY.  AND AS A RESULT OF THAT, IF SHE HAD WANTED, SHE

11:05AM  19   COULD HAVE PUT HERSELF, VIRTUALLY BY HER OWN VOTE, INTO A

11:05AM  20   LIQUIDATION PREFERENCE OVER THE C-2 INVESTORS AND MADE HERSELF

11:06AM  21   BE FRONT OF THE LINE?

11:06AM  22   A.   THAT'S NOT MY UNDERSTANDING OF THE LAW.

11:06AM  23   Q.   IT'S NOT YOUR UNDERSTANDING OF THE LAW?

11:06AM  24   A.   NO.

11:06AM  25   Q.   OKAY.  YOU UNDERSTOOD, THOUGH, WHEN YOU WERE INVESTING

11:06AM 1    THAT YOURSELF AND THE OTHER PEOPLE WHO WERE COMING IN WERE

11:06AM 2    GOING TO GET THAT PREFERENCE IN CONNECTION WITH THE INVESTMENT?

11:06AM 3    A.   YEAH.  I UNDERSTOOD ANYBODY, UNDER THE ARTICLES OF

11:06AM 4    INCORPORATION OF THE COMPANY, WHICH ARE LEGALLY BINDING, THAT

11:06AM 5    THE C-2 SHAREHOLDERS WOULD BE PAID OFF FIRST.

11:06AM 6    Q.   OKAY.  AND THE OTHER SHAREHOLDER ISSUE THAT YOU LOOKED AT

11:06AM 7    RELATED TO A REDEMPTION RIGHT ISSUE; RIGHT?

11:06AM 8    A.   THAT IS CORRECT.

11:06AM 9    Q.   AND WAS THE BASIC CONCEPT THERE THAT THE COMPANY HAD THE

11:06AM 10   RIGHT TO REPURCHASE SHARES IF IT WAS DETERMINED THAT THE VALUE

11:06AM 11   OF THE COMPANY DROPPED BELOW $15 OR SOMETHING LIKE THAT?

11:06AM 12   A.   THAT WAS NOT MY UNDERSTANDING OF IT.

11:06AM 13   Q.   WHAT WAS YOUR UNDERSTANDING OF IT?

11:06AM 14   A.   MY UNDERSTANDING, HAVING READ IT, AND I THINK THE -- MAYBE

11:06AM 15   THE QUOTE IS BURIED IN THIS PARAGRAPH D.  THERE WAS A PROVISION

11:07AM 16   IN THE ARTICLES OF INCORPORATION THAT BASICALLY SAID THAT AT

11:07AM 17   ANY TIME THE SHARE -- THE BOARD COULD HAVE THE COMPANY VALUED,

11:07AM 18   WHATEVER THE BOARD OR AN APPRAISER DETERMINED THE VALUE WAS AT

11:07AM 19   THAT TIME, AND THEN THE BOARD WOULD HAVE THE RIGHT TO REDEEM

11:07AM 20   SHARES FROM ANY, ANY ONE OR MORE SHAREHOLDERS AT WHATEVER PRICE

11:07AM 21   THE BOARD DETERMINED THE FAIR MARKET VALUE TO BE AT THAT TIME.

11:07AM 22   Q.   OKAY.  AND YOU WERE CONCERNED BECAUSE YOU WANTED TO MAKE

11:07AM 23   SURE THAT THEY COULDN'T REDEEM THE SHARES FOR BELOW $17, BELOW

11:07AM 24   THE INVESTMENT AMOUNT; RIGHT?

11:07AM 25   A.   YES.  WELL, BECAUSE IT WOULD BE, IN MY JUDGMENT,

11:07AM  1    COMPLETELY INAPPROPRIATE TO BE -- TO SELL SHARES FOR $17 AND

11:07AM  2    THEN COME BACK SIX MONTHS LATER AND SAY, THE BOARD THINKS IT'S

11:07AM  3    WORTH 12, WE'RE GOING TO BUY YOUR SHARES BACK AT 12.

11:08AM  4    Q.   AND WE'LL GET TO THIS LATER, BUT YOU ULTIMATELY RAISED

11:08AM  5    THIS ISSUE WITH THE COMPANY; RIGHT?

11:08AM  6    A.   YES, I DID.

11:08AM  7    Q.   AND YOU REQUESTED A CHANGE FOR YOURSELF AND FOR YOUR

11:08AM  8    CLIENTS?

11:08AM  9         DO YOU RECALL THAT?

11:08AM  10   A.   YEAH, I REQUESTED A CLARIFICATION THAT THIS WOULDN'T BE

11:08AM  11   APPLIED.

11:08AM  12   Q.   AND THAT CHANGE WAS MADE; CORRECT?

11:08AM  13   A.   NO, THERE WAS NO CHANGE MADE IN THE ARTICLES OF

11:08AM  14   INCORPORATION.

11:08AM  15        BUT THERE WAS A SHORT NOTE THAT ELIZABETH SENT TO ME

11:08AM  16   SAYING THAT WE WOULD NOT INVOKE THIS WITH RESPECT TO YOU OR ANY

11:08AM  17   OF YOUR CLIENTS THAT HAPPENED TO INVEST.

11:08AM  18   Q.   FAIR ENOUGH.  THERE WAS A SIDE LETTER THAT --

11:08AM  19   A.   YES.

11:08AM  20   Q.   AND THAT MEMORIALIZED THE AGREEMENT, OR THE UNDERSTANDING?

11:08AM  21   A.   YES.

11:08AM  22   Q.   OKAY.

11:08AM  23        YOUR HONOR, NOW MIGHT BE A NICE TIME TO BREAK.

11:08AM  24            THE COURT:  IT WOULD BE.  LET'S TAKE OUR 30 MINUTE

11:08AM  25   BREAK, LADIES AND GENTLEMEN, 30 MINUTES.

11:09AM   1            (RECESS FROM 11:09 A.M. UNTIL 11:46 A.M.)

11:46AM   2            (JURY OUT AT 11:46 A.M.)

11:46AM   3                 THE COURT:  THANK YOU.  PLEASE BE SEATED.  WE'RE

11:46AM   4       BACK ON THE RECORD OUTSIDE OF THE PRESENCE OF THE JURY.

11:46AM   5                 MR. BOSTIC, I THINK, DID YOU WANT TO AUGMENT THE RECORD,

11:46AM   6       SIR, IN REGARDS TO OUR DISCUSSION THIS MORNING?

11:46AM   7                 MR. BOSTIC:  YES, YOUR HONOR.

11:46AM   8            WITH THE COURT'S PERMISSION, I'LL SWITCH SIDES NOT TO

11:46AM   9       DISTURB MR. WADE'S NOTES.

11:46AM  10                 THE COURT:  SURE.  RIGHT.

11:46AM  11                 MR. BOSTIC:  I GAVE MS. TREFZ A HEADS UP ABOUT THIS.

11:46AM  12            I JUST WANTED TO RAISE ONE ADDITIONAL THOUGHT TO THE COURT

11:46AM  13       REGARDING THE DEFENSE'S MOTION TO PRECLUDE THE TESTIMONY OF

11:46AM  14       PATIENT VICTIM BB.

11:46AM  15                 THE COURT:  YES.

11:46AM  16                 MR. BOSTIC:  AND I UNDERSTAND THE COURT'S PREVIOUS

11:46AM  17       COMMENTS.

11:46AM  18            TO THE EXTENT THE COURT'S CONCERNS ARE ABOUT NOTICE TO THE

11:46AM  19       DEFENSE AND THE DEFENSE'S OPPORTUNITY TO PREPARE, I HAD

11:46AM  20       MENTIONED THAT THIS WITNESS WAS PREPARING TO TESTIFY AS EARLY

11:46AM  21       AS TOMORROW.

11:46AM  22            I JUST WANTED TO RAISE FOR THE COURT THAT THE GOVERNMENT

11:47AM  23       IS, OF COURSE, WILLING TO DEFER THAT WITNESS'S TESTIMONY AND

11:47AM  24       HAVE THE WITNESS TESTIFY TOWARDS THE VERY END OF THE

11:47AM  25       GOVERNMENT'S CASE TO THE EXTENT THAT WOULD ADDRESS THE COURT'S

11:47AM 1    CONCERN ABOUT NOTICE.

11:47AM 2        I COULDN'T HELP BUT NOTE THAT DURING THE ARGUMENT EARLIER,

11:47AM 3    MS. TREFZ CITED CLIA REGULATIONS AND THE PERMISSIBLE DEGREE OF

11:47AM 4    VARIATION WHEN IT CAME TO THE SPECIFIC ASSAY.

11:47AM 5        THAT MAKES ME OPTIMISTIC THAT THE DEFENSE IS EITHER

11:47AM 6    CURRENTLY PREPARED TO ADDRESS THIS ASSAY WITH THIS PATIENT, OR

11:47AM 7    COULD BE IN THAT POSITION GIVEN A LITTLE BIT OF ADDITIONAL

11:47AM 8    TIME.

11:47AM 9        SO I WANTED TO RAISE THAT IN CASE IT'S A SOLUTION TO THE

11:47AM 10   PROBLEM.

11:47AM 11           THE COURT:  THANK YOU.  THANK YOU.

11:47AM 12       MS. TREFZ.

11:47AM 13           MS. TREFZ:  IT WILL BE NO SURPRISE TO YOUR HONOR TO

11:47AM 14   LEARN THAT WE DO NOT THINK THAT THAT IS A SOLUTION TO THE

11:47AM 15   PROBLEM.

11:47AM 16       IT IS NOT A SOLUTION BECAUSE THESE ASSAYS ARE VERY

11:47AM 17   COMPLICATED, AND WE'VE RAISED THIS ISSUE FOR QUITE A LONG TIME.

11:47AM 18   I DON'T ASSUME THAT THE GOVERNMENT HAS SIX MONTHS LEFT IN ITS

11:48AM 19   CASE.  IF WE'RE WRONG, I'D LIKE TO KNOW THAT.

11:48AM 20       BUT WE'RE AT THIS POINT EIGHT MONTHS BEYOND WHERE WE

11:48AM 21   LITERALLY IDENTIFIED THIS PARTICULAR PATIENT AND THIS

11:48AM 22   PARTICULAR ISSUE, AND ESSENTIALLY I'M NOT SURE WHEN THE

11:48AM 23   GOVERNMENT FIRST UNDERSTOOD THAT PLATELETS ARE A DIFFERENT

11:48AM 24   ASSAY THAN PT, BUT I THINK THAT SHOULD GIVE THE COURT PAUSE IN

11:48AM 25   AND OF ITSELF THAT THIS WOULD -- THAT, YOU KNOW, ALLOWING THE

11:48AM  1    GOVERNMENT TO FIX ITS CASE, YOU KNOW, AFTER MONTHS AND MONTHS

11:48AM  2    OF RELIANCE ON THE GOVERNMENT'S REPRESENTATIONS AND THE BILL OF

11:48AM  3    PARTICULARS, THE FACT THAT WE COULD POTENTIALLY COME UP WITH AN

11:48AM  4    ARGUMENT SIMPLY DOES NOT FIX THE ISSUE.

11:48AM  5         AND THE GOVERNMENT -- AND THE COURT SHOULD NOT HELP THE

11:48AM  6    GOVERNMENT CORRECT ITS CASE IN A CRIMINAL, IN A CRIMINAL CASE

11:48AM  7    LIKE THIS.

11:49AM  8              THE COURT:  WELL, THANK YOU.

11:49AM  9         MR. BOSTIC SUGGESTS THAT YOUR EXPRESSION SUGGESTS A GREAT

11:49AM  10   FLUENCY ABOUT THE TECHNOLOGY HERE AND THE ASSAYS SUCH THAT YOU

11:49AM  11   WOULD NOT SUFFER GREAT PREJUDICE, PARTICULARLY IF THE WITNESS

11:49AM  12   WERE PUT LATER ON THE LIST SUCH THAT YOU DIDN'T HAVE TO PREPARE

11:49AM  13   THIS WEEK, BUT PERHAPS IN THE WEEKS TO COME, AND THAT WOULD

11:49AM  14   THEREFORE MITIGATE ANY PREJUDICE THAT YOU MIGHT ENGAGE.

11:49AM  15              MS. TREFZ:  IS THE WITNESS GOING TO BE PERMITTED TO

11:49AM  16   TESTIFY AS TO SCIENTIFIC PRINCIPLES?  BECAUSE I DON'T THINK HE

11:49AM  17   HAS THE BASIS TO DO THAT.

11:49AM  18        AND I BELIEVE IT'S PROBLEMATIC FOR US TO BE PUT TO THE

11:49AM  19   BURDEN OF ESSENTIALLY COMING UP WITH THE SCIENTIFIC

11:49AM  20   UNDERSTANDING THAT, FRANKLY, THE GOVERNMENT HAS THE BURDEN TO

11:49AM  21   PUT ON AND HAS NO ABILITY TO DO THAT BASED ON THE CURRENT

11:49AM  22   DISCLOSURES THAT HAVE BEEN PENDING FOR A LONG TIME IN THIS

11:49AM  23   CASE.

11:49AM  24        SO I DON'T THINK THAT'S A SUFFICIENT SOLUTION.  I THINK

11:49AM  25   BASICALLY WHAT HAS BEEN PRETTY CLEAR HERE IS THAT THE

11:49AM  1    GOVERNMENT DID NOT UNDERSTAND THAT IT HAD THIS ISSUE, AND THAT

11:50AM  2    IS THROUGH NO FAULT OF OURS.  WE RAISED THE ISSUE BACK IN

11:50AM  3    FEBRUARY, AND ACTUALLY BEFORE THAT IN NOVEMBER.

11:50AM  4        AND I BELIEVE THE COURT SHOULD CONTINUE TO HOLD THE

11:50AM  5    GOVERNMENT TO THE HIGH STANDARD THAT IT SHOULD HOLD ITSELF TO

11:50AM  6    IN A CRIMINAL CASE WHERE MY CLIENT IS FACING A LIBERTY,

11:50AM  7    OBSTRUCTION OF HER LIBERTY.

11:50AM  8           MR. BOSTIC:  I'LL ONLY ADD, YOUR HONOR, THAT THE

11:50AM  9    PURPOSE OF THE BILL OF PARTICULARS, AS I SAID BEFORE, AND I

11:50AM  10   THINK THIS IS THE COURT'S UNDERSTANDING, TOO, BASED ON THE

11:50AM  11   RULING, WAS TO PROVIDE NOTICE TO THE DEFENSE.

11:50AM  12       WE'RE SEARCHING FOR A PRACTICAL SOLUTION HERE THAT ALLOWS

11:50AM  13   THIS VICTIM TO BE HEARD IN THIS CASE, WHILE AT THE SAME TIME

11:50AM  14   NOT PREJUDICING THE DEFENSE.  WE BELIEVE WE HAVE SUGGESTED THAT

11:50AM  15   SOLUTION, BUT WE LEAVE IT TO THE COURT'S JUDGMENT.

11:50AM  16           THE COURT:  THANK YOU VERY MUCH.  THANK YOU BOTH

11:50AM  17   VERY MUCH.

11:50AM  18           THANK YOU, MR. BOSTIC.

11:50AM  19           THANK YOU, MS. TREFZ.  AND WE CAN BRING THE JURY IN NOW.

11:51AM  20       ARE WE GOING TO TAKE A BREAK AT 1:00 O'CLOCK -- OR EXCUSE

11:51AM  21   ME, 1:30?

11:52AM  22           MS. TREFZ:  THANK YOU.

11:52AM  23           MR. BOSTIC:  THANK YOU.

11:52AM  24           THE COURT:  MR. DOWNEY, MR. SCHENK, MAY I SEE YOU AT

11:52AM  25   SIDE-BAR.

11:52AM  1          (SIDE-BAR DISCUSSION WITH MR. DOWNEY AND MR. SCHENK AND

11:52AM  2     THE COURT OFF THE RECORD.)

12:05PM  3               MR. WADE:  YOUR HONOR, IS IT OKAY IF I'M AT THE

12:05PM  4     PODIUM?

12:05PM  5               THE COURT:  YOU HAVE NO PLACE ELSE TO GO?

12:05PM  6               MR. WADE:  I FEEL THE CHAIN.

12:07PM  7          (PAUSE IN PROCEEDINGS.)

12:07PM  8          (JURY IN AT 12:07 P.M.)

12:07PM  9               THE COURT:  ALL RIGHT.  THANK YOU.  PLEASE BE

12:07PM 10     SEATED.

12:07PM 11          WE'RE BACK ON THE RECORD IN THE HOLMES MATTER.  ALL

12:07PM 12     PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.

12:08PM 13          MR. MOSLEY IS ON THE STAND.

12:08PM 14          MR. WADE, YOU'D LIKE TO CONTINUE?

12:08PM 15               MR. WADE:  I WOULD, YOUR HONOR.  THANK YOU.

12:08PM 16     Q.  GOOD AFTERNOON, MR. MOSLEY.

12:08PM 17     A.  HI.

12:08PM 18     Q.  DO YOU STILL HAVE 4197 IN FRONT OF YOU THERE?

12:08PM 19     A.  I DO.

12:08PM 20     Q.  OKAY.  I JUST HAVE A COUPLE MORE QUICK QUESTIONS.

12:08PM 21          DO YOU HAVE THE FIRST PAGE OF THAT DOCUMENT UP, THE LETTER

12:08PM 22     TO DR. KISSINGER?

12:08PM 23     A.  YES, I DO.

12:08PM 24     Q.  OKAY.  LET'S BLOW THAT UP.

12:08PM 25          DO YOU SEE IN THE BOTTOM, DO YOU SEE HOW YOU MENTION THAT

12:08PM   1        "IT WOULD BE BEST TO OBTAIN A NONDISCLOSURE AGREEMENT FROM

12:08PM   2    ANYONE BEFORE PROVIDING THEM WITH A COPY OF MY OUTLINE"?

12:08PM   3        DO YOU SEE THAT?

12:08PM   4    A.   I DO SEE THAT.

12:08PM   5    Q.   AND TO FACILITATE THAT, YOU ACTUALLY NOTE THAT YOU'VE

12:08PM   6    ENCLOSED A COPY OF THE BLANK CONFIDENTIAL DISCLOSURE AGREEMENT

12:09PM   7    THAT YOU GOT FROM THERANOS.

12:09PM   8    A.   I SEE THAT.

12:09PM   9    Q.   AND AS YOU SIT HERE TODAY, DO YOU KNOW WHETHER

12:09PM   10   DR. KISSINGER DISBURSED THIS MEMO?

12:09PM   11   A.   I DON'T.

12:09PM   12   Q.   OKAY.  AND I NOTED WITHIN THE MEMO ITSELF -- AND, AGAIN,

12:09PM   13   THIS MEMO WAS MEANT FOR DR. KISSINGER IN THE FIRST INSTANCE;

12:09PM   14   CORRECT?

12:09PM   15   A.   IN THE ONLY INSTANCE.

12:09PM   16   Q.   OKAY.  AND YOU HAD COMMUNICATIONS WITH HIM, APART FROM

12:09PM   17   THIS, WITHOUT ASKING ABOUT THE SUBSTANCE OF THE COMMUNICATIONS?

12:09PM   18   A.   I TALKED TO HIM ON A REGULAR BASIS.  SO, YES, I BELIEVE I

12:09PM   19   HAD COMMUNICATIONS WITH HIM OVER THIS PERIOD.

12:09PM   20   Q.   OKAY.  AND SO AS A RESULT OF THAT, DID YOU NOT FEEL A NEED

12:09PM   21   TO PUT ANY SORT OF LIMITATIONS ON THE MATERIALS THAT YOU HAD

12:09PM   22   LOOKED AT OR REVIEWED IN CONNECTION WITH YOUR PREPARATION OF

12:09PM   23   THIS DOCUMENT?

12:09PM   24   A.   I'M NOT SURE I UNDERSTAND WHAT YOU'RE ASKING.

12:10PM   25   Q.   WELL, YOU DIDN'T QUALIFY YOUR ANALYSIS WITHIN THE MEMO AS

12:10PM 1  ONE THAT WAS A PRELIMINARY ANALYSIS THAT WAS LIMITED IN SOME

12:10PM 2  NATURE; CORRECT?

12:10PM 3  A.   I THOUGHT THAT WAS SUFFICIENTLY CLEAR GIVEN THAT I WAS

12:10PM 4  PROVIDING IT TO HIM WITHIN A RELATIVELY SHORT PERIOD OF TIME OF

12:10PM 5  HAVING GOTTEN THE MATERIALS.

12:10PM 6  Q.   OKAY.  YOU THOUGHT THAT AS A RESULT -- AGAIN, WITHOUT

12:10PM 7  GOING INTO THE SUBSTANCE OF THE COMMUNICATION -- YOU THOUGHT

12:10PM 8  THAT WAS CLEAR TO DR. KISSINGER?

12:10PM 9  A.   I DID.

12:10PM 10  Q.   OKAY.  THE -- BEFORE THE BREAK WE HAD ASKED -- I HAD ASKED

12:10PM 11  YOU A COUPLE OF QUESTIONS ABOUT THE FDA AND CLIA REGULATIONS.

12:10PM 12     DO YOU RECALL THAT?

12:10PM 13  A.   I DON'T.

12:10PM 14  Q.   WELL, THE NEED FOR THE COMPANY'S DESIRE TO GO AND GET FDA

12:10PM 15  APPROVAL?

12:10PM 16  A.   I DON'T REMEMBER YOU ASKING.

12:11PM 17  Q.   OKAY.  DO YOU RECALL, DO YOU RECALL THAT THE COMPANY HAD

12:11PM 18  PLANS TO GO AND GET FDA APPROVAL IN A CLIA WAIVER?

12:11PM 19  A.   I CERTAINLY KNEW THAT THE COMPANY PLANNED TO GET FDA

12:11PM 20  APPROVAL, AND I THINK THE MATERIALS SAID THAT THEY HAD ALREADY

12:11PM 21  RECEIVED A CLIA WAIVER.

12:11PM 22  Q.   WELL, THE LAB WAS APPROVED?

12:11PM 23  A.   OKAY.

12:11PM 24  Q.   CORRECT?

12:11PM 25     BUT DID YOU UNDERSTAND -- DO YOU RECALL UNDERSTANDING THAT

12:11PM  1    THE FDA APPROVAL AND A CLIA WAIVER WAS REQUIRED TO DISTRIBUTE

12:11PM  2    THE DEVICE?

12:11PM  3    A.   NO, I DID NOT.

12:11PM  4    Q.   OKAY.  LET ME SEE IF I CAN REFRESH YOUR RECOLLECTION.  IF

12:11PM  5    YOU CAN GO IN THE FIRST BINDER --

12:11PM  6    A.   OF THE MATERIALS?

12:11PM  7    Q.   -- OF MY MATERIALS.  NO, NOT YOUR MATERIALS, OF MY

12:11PM  8    MATERIALS.  I THINK WE'LL BE DONE WITH THE BINDERS PROBABLY FOR

12:11PM  9    THE BALANCE OF YOUR TESTIMONY.

12:12PM  10   A.   OKAY.

12:12PM  11   Q.   SO IF YOU GO INTO VOLUME ONE OF THE MATERIALS THAT I

12:12PM  12   PROVIDED YOU --

12:12PM  13   A.   OKAY.

12:12PM  14   Q.   -- AND GO TO EXHIBIT 11117, FOUR 1'S AND A 7.

12:12PM  15   A.   OKAY.

12:12PM  16   Q.   AND TELL ME WHEN YOU HAVE THAT EXHIBIT IN FRONT OF YOU.

12:12PM  17   A.   I DO.

12:12PM  18   Q.   OKAY.  IF I COULD DIRECT YOUR ATTENTION TO PAGE 151 OF THE

12:12PM  19   TESTIMONY?

12:12PM  20   A.   OKAY.  I'M THERE.

12:12PM  21   Q.   OKAY.  AND IF YOU COULD JUST READ TO YOURSELF 151 AND TELL

12:12PM  22   ME WHEN YOU'VE COMPLETED READING THAT TO YOURSELF.

12:12PM  23        (PAUSE IN PROCEEDINGS.)

12:13PM  24          THE WITNESS:  OKAY.  I'VE READ IT.

12:13PM  25   BY MR. WADE:

12:13PM 1    Q.   OKAY.  AND JUST CALLING YOUR ATTENTION IN PARTICULAR TO

12:13PM 2    LINE 21.  DOES THIS REFRESH YOUR RECOLLECTION THAT YOU

12:13PM 3    UNDERSTOOD THAT THERANOS'S BUSINESS IN THE FUTURE WOULD DEPEND

12:13PM 4    ON GETTING AN FDA APPROVAL AND A CLIA WAIVER AND THAT THAT

12:13PM 5    MIGHT NOT HAPPEN?

12:13PM 6    A.   YOU KNOW, THIS DOESN'T REALLY -- I'M NOT, OBVIOUSLY, A

12:14PM 7    REGULATORY EXPERT BY ANY MEANS, BUT I DID NOT -- MY

12:14PM 8    UNDERSTANDING AT THE TIME -- AND THIS IS OBVIOUSLY A DEPOSITION

12:14PM 9    I GAVE.

12:14PM 10        BUT MY UNDERSTANDING, I BELIEVE AT ALL TIMES, WAS THAT FDA

12:14PM 11   APPROVAL WASN'T NEEDED, AND I HAD A NUMBER OF CONVERSATIONS

12:14PM 12   WITH ELIZABETH WHO SAID, WE INTEND TO GET FDA APPROVAL BECAUSE

12:14PM 13   THAT IS THE GOLD STANDARD.

12:14PM 14   Q.   OKAY.  JUST DRAWING YOUR ATTENTION TO THIS, YOU KNOW THIS

12:14PM 15   WAS A DEPOSITION THAT YOU GAVE UNDER OATH?

12:14PM 16   A.   YES, I DO.

12:14PM 17   Q.   IN A PRIOR PROCEEDING?

12:14PM 18   A.   UM, YES.

12:14PM 19   Q.   IN A PRIOR DEPOSITION, YOU RECALL THAT YOU --

12:14PM 20   A.   YES, I DO.

12:14PM 21   Q.   -- GAVE TESTIMONY --

12:14PM 22   A.   I DID.  OH, I'M SORRY.

12:14PM 23   Q.   YOU GAVE TESTIMONY UNDER OATH AND THERE WAS A COURT

12:14PM 24   REPORTER THERE WHO TOOK DOWN YOUR ANSWERS?

12:14PM 25   A.   YES, I DO REMEMBER THAT.

12:14PM 1    Q.   OKAY.  AND YOU RECALL IN CONNECTION WITH THAT YOU WERE

12:15PM 2    ASKED, DID YOU UNDERSTAND THAT IF THERANOS'S -- THERANOS'S

12:15PM 3    BUSINESS IN THE FUTURE WOULD DEPEND ON GETTING AN FDA APPROVAL

12:15PM 4    AND A CLIA WAIVER, THAT THAT MIGHT NOT HAPPEN?

12:15PM 5         AND YOU ANSWERED, YES, I UNDERSTOOD THAT IT WAS A

12:15PM 6    CONDITION?

12:15PM 7         DID I READ THAT CORRECTLY?

12:15PM 8    A.   UM, JUST ONE SECOND.  LET ME READ THE -- YES, I SAID,

12:15PM 9    "YES, I UNDERSTOOD THAT WAS A CONDITION."

12:15PM 10   Q.   I READ THAT CORRECTLY?

12:15PM 11   A.   YES, YOU DID.

12:15PM 12   Q.   OKAY.  BACK TO YOUR MEMO AT 4197.

12:16PM 13        IF WE CAN JUST GO IN THE BOTTOM RIGHT-HAND CORNER.

12:16PM 14        DO YOU SEE THERE'S A BATES LABEL FOR DYNASTY.

12:16PM 15        DO YOU SEE THAT?

12:16PM 16   A.   I DO.

12:16PM 17   Q.   AND DID YOU UNDERSTAND DYNASTY TO BE SECRETARY BETSY DEVOS

12:16PM 18   AND MR. DICK DEVOS'S FAMILY ENTITY?

12:16PM 19   A.   I CERTAINLY DIDN'T UNDERSTAND IT TO BE BECAUSE I NEVER

12:16PM 20   REFERRED TO IT AS THAT.

12:16PM 21   Q.   OKAY.  YOU'RE NOT FAMILIAR WITH THAT ENTITY?

12:16PM 22   A.   I'M FAMILIAR WITH THEIR -- I'M FAMILIAR THAT DICK AND

12:16PM 23   BETSY HAVE A FAMILY OFFICE, BUT I COULDN'T TELL YOU WHAT THEY

12:16PM 24   CALL IT.

12:16PM 25   Q.   OKAY.  FAIR ENOUGH.

| | | |
|---|---|---|
| 12:16PM | 1 | LET ME TURN YOUR ATTENTION TO 4202. |
| 12:17PM | 2 | A.    VOLUME ONE OR VOLUME TWO? |
| 12:17PM | 3 | Q.    VOLUME ONE. |
| 12:17PM | 4 | A.    OKAY. |
| 12:17PM | 5 | Q.    OKAY.  AND DO YOU RECOGNIZE THIS -- JUST TO SET US ON THE |
| 12:17PM | 6 | DATES AGAIN, THE MEMO WAS DATED SEPTEMBER 2ND, 2014.  YOUR |
| 12:17PM | 7 | OUTLINE FOR MR. -- FOR DR. KISSINGER WAS DATED SEPTEMBER 2ND, |
| 12:17PM | 8 | 2014; CORRECT? |
| 12:17PM | 9 | A.    YES, YES. |
| 12:17PM | 10 | Q.    AND DO YOU SEE THIS TO BE EMAIL CORRESPONDENCE STARTING ON |
| 12:17PM | 11 | THAT DATE, AND THEN IN SOME DAYS AFTER THAT IN SEPTEMBER OF |
| 12:17PM | 12 | 2014 RELATING TO THERANOS? |
| 12:17PM | 13 | A.    YES. |
| 12:17PM | 14 | Q.    BETWEEN YOU AND MS. HOLMES? |
| 12:17PM | 15 | A.    YES. |
| 12:17PM | 16 | Q.    OKAY. |
| 12:17PM | 17 | MOVE THE ADMISSION OF 1202. |
| 12:18PM | 18 | THE COURT:  4202? |
| 12:18PM | 19 | MR. WADE:  4202. |
| 12:18PM | 20 | MR. SCHENK:  YOUR HONOR, IT'S BEEN DISPLAYED.  I |
| 12:18PM | 21 | ASSUMED IT WAS ADMITTED. |
| 12:18PM | 22 | MR. WADE:  OH, I APOLOGIZE.  GOVERNMENT COUNSEL MAY |
| 12:18PM | 23 | HAVE ADMITTED THAT IN ITS EXAMINATION. |
| 12:18PM | 24 | Q.    IF YOU GO TO THE BOTTOM OF THE EMAIL ON THE SECOND PAGE. |
| 12:18PM | 25 | DO YOU JUST RECALL THIS WAS THE EMAIL WHERE YOU FOLLOWED |

12:18PM  1    UP WITH MS. HOLMES AFTER YOU REVIEWED THE MATERIALS?  DO YOU

12:18PM  2    REMEMBER WE LOOKED AT A DIFFERENT VERSION OF THIS EARLIER?

12:18PM  3    A.   YES.  YES.

12:18PM  4    Q.   OKAY.  AND THEN IF WE CAN GO UP TO YOUR RESPONSE HERE, YOU

12:18PM  5    SEND AN EMAIL ON SEPTEMBER 3RD TO MS. HOLMES.

12:18PM  6         DO YOU SEE THAT?

12:18PM  7    A.   I SEE IT.

12:18PM  8    Q.   AND YOU NOTED THAT YOUR -- THAT MS. HOLMES WAS GOING TO BE

12:18PM  9    SPEAKING AT BYRON TROTT'S CONFERENCE ON TUESDAY, SEPTEMBER 16TH

12:19PM  10   IN CHICAGO?

12:19PM  11   A.   YES.

12:19PM  12   Q.   DO YOU SEE THAT?

12:19PM  13   A.   YES, I DO.

12:19PM  14   Q.   AND, IN FACT, YOU WERE GOING TO BE SPEAKING AT THE SAME

12:19PM  15   CONFERENCE; IS THAT RIGHT?

12:19PM  16   A.   I WAS.

12:19PM  17   Q.   AND ATTENDING THE CONFERENCE AS WELL?

12:19PM  18   A.   YES.

12:19PM  19   Q.   AND YOU NOTED THAT HERE THAT IF -- YOU ALSO NOTED THAT

12:19PM  20   MR. PENNER WAS GOING TO BE THERE; CORRECT?

12:19PM  21   A.   YES, I DID.

12:19PM  22   Q.   AND MR. ROB WALTON WAS GOING TO BE THERE AS WELL?

12:19PM  23   A.   YES, I DID NOTE THAT.

12:19PM  24   Q.   OKAY.  AND YOU SUGGESTED THAT MAYBE IT WOULD WORK TO SET

12:19PM  25   UP A MEETING WITH THE WALTON FAMILY AT THE BDT CONFERENCE;

12:19PM 1      CORRECT?

12:19PM 2      A.   YES, I DID.

12:19PM 3      Q.   OKAY.  LET'S GO UP THIS CHAIN.

12:19PM 4           DO YOU SEE THERE'S A RESPONSE FROM MS. HOLMES ABOUT THE

12:20PM 5      FACT THAT SHE WAS ALSO GOING TO BE HOSTING A DINNER THERE?

12:20PM 6           DO YOU SEE THAT?

12:20PM 7      A.   YES, I DO.

12:20PM 8      Q.   AND THAT WAS WITH TOBY COSGROVE.

12:20PM 9           DO YOU SEE THAT?

12:20PM 10     A.   I DO.

12:20PM 11     Q.   AND DO YOU KNOW WHO MR. COSGROVE IS?

12:20PM 12     A.   HE'S THE FORMER CEO OF CLEVELAND CLINIC.

12:20PM 13     Q.   OKAY.  IS IT DR. COSGROVE?

12:20PM 14     A.   I BELIEVE SO.

12:20PM 15     Q.   OKAY.  AND DID YOU ATTEND THAT DINNER?  DO YOU KNOW?

12:20PM 16     A.   I DID NOT.

12:20PM 17     Q.   OKAY.  AND IN ANY EVENT, THERE WAS FURTHER CORRESPONDENCE

12:20PM 18     UP THIS CHAIN ABOUT FACILITATING A MEETING WITH GREG PENNER AND

12:20PM 19     ROB WALTON; CORRECT?

12:20PM 20     A.   CORRECT.

12:20PM 21     Q.   AND DID YOU ACTUALLY THEN COME TO LEARN THAT ACTUALLY

12:20PM 22     MR. PENNER WENT TO VISIT THERANOS EVEN BEFORE THE BDT

12:20PM 23     CONFERENCE?

12:20PM 24     A.   I DIDN'T KNOW THAT.

12:21PM 25     Q.   OKAY.  LET'S --

12:21PM   1    A.   OR I MAY HAVE AT THE TIME, BUT I CERTAINLY DON'T HAVE ANY

12:21PM   2    RECOLLECTION THAT HE DID, BUT I WOULDN'T BE SURPRISED.  HE HAD

12:21PM   3    ALREADY BEEN INTRODUCED TO ELIZABETH AND HE WAS FREE TO DO

12:21PM   4    ANYTHING HE WANTED TO DO AFTER THAT OBVIOUSLY.

12:21PM   5    Q.   SURE.  YOU HAD INTRODUCED THEM PREVIOUSLY?

12:21PM   6    A.   EXACTLY.

12:21PM   7    Q.   AND YOU KNEW THEY WERE COMMUNICATING; CORRECT?

12:21PM   8    A.   I PROBABLY DID.  I DON'T -- YOU KNOW, I DON'T HAVE ANY

12:21PM   9    PARTICULAR RECOLLECTION OF IT.  I REALLY WASN'T TERRIBLY

12:21PM  10    INVOLVED, BUT I SUSPECT THAT THEY WERE.

12:21PM  11    Q.   OKAY.  AND YOU WERE SETTING UP A MEETING WITH THE TWO OF

12:21PM  12    THEM, BUT YOU UNDERSTOOD THAT MR. PENNER WAS BASED LOCALLY HERE

12:21PM  13    IN SILICON VALLEY; CORRECT?

12:21PM  14    A.   YES, I DO.

12:21PM  15    Q.   OKAY.  LET'S LOOK AT THE EMAIL UP AT THE TOP.

12:21PM  16         AND DO YOU SEE IT SAYS THERE, MS. HOLMES REPORTS THAT SHE

12:21PM  17    HAD A MEETING WITH MR. PENNER THERE AT THERANOS THAT WEEK?

12:22PM  18    A.   I DO SEE THAT.

12:22PM  19    Q.   OKAY.  AND DOES THAT REFRESH YOUR RECOLLECTION THAT YOU'RE

12:22PM  20    AWARE THAT THERE WAS A MEETING?

12:22PM  21    A.   YOU KNOW, I DON'T -- I DON'T REMEMBER IT, BUT I THINK THIS

12:22PM  22    IS PROBABLY PRETTY GOOD EVIDENCE THAT THEY HAD MET, OR AT LEAST

12:22PM  23    ELIZABETH WAS TELLING ME THAT THEY HAD MET ON THE 13TH.

12:22PM  24    Q.   RIGHT.  AND THAT WAS BEFORE THE BDT CONFERENCE; CORRECT?

12:22PM  25    A.   YES.

12:22PM 1    Q.   AND THE BDT CONFERENCE, YOU ATTENDED THAT THIS YEAR IN

12:22PM 2    2014?

12:22PM 3    A.   I DID.

12:22PM 4    Q.   AND YOU HAD ATTENDED IT ON OTHER OCCASIONS; IS THAT RIGHT?

12:22PM 5    A.   I THINK THIS MAY HAVE BEEN THE FIRST ONE THAT I HAD

12:22PM 6    ATTENDED.

12:22PM 7    Q.   OKAY.  AND IS THAT SORT OF A WOODSTOCK FOR PRIVATE FAMILY

12:22PM 8    OFFICES, IF YOU WILL?

12:22PM 9    A.   I WOULDN'T DESCRIBE IT THAT WAY.  IT'S A SORT OF CONVENING

12:22PM 10   OF GROUPS OF INDIVIDUALS AND FAMILIES THAT ARE ASSOCIATED WITH

12:23PM 11   BDT FOR A CONFERENCE.

12:23PM 12   Q.   OKAY.  AND IT'S, FOR THE MOST PART, HIGH NET WORTH

12:23PM 13   INDIVIDUALS?

12:23PM 14   A.   YES.

12:23PM 15   Q.   AND MANY OF THEM ARE FAMILY BUSINESSES IN PARTICULAR; IS

12:23PM 16   THAT RIGHT?

12:23PM 17   A.   YES.

12:23PM 18   Q.   OKAY.  AND IT WAS ACTUALLY -- IT WAS AT BDT WHERE YOU MET

12:23PM 19   MS. HOLMES IN PERSON FOR THE FIRST TIME; IS THAT RIGHT?

12:23PM 20   A.   THAT IS CORRECT.

12:23PM 21   Q.   LET ME DRAW YOUR ATTENTION TO 1938.

12:23PM 22   A.   IS THAT IN THE SAME VOLUME?

12:23PM 23   Q.   RIGHT NEAR THE FRONT OF THE FIRST VOLUME, SIR?

12:23PM 24   A.   OKAY.  THANK YOU.

12:24PM 25        I SEE IT.

12:24PM 1    Q.   AND TAKE A MINUTE TO REVIEW IT.  YOU SEE THAT IT'S A

12:24PM 2    MULTIPLE PAGE AGENDA FOR THE 2014 BDT CONFERENCE?

12:24PM 3    A.   I SEE THAT.

12:24PM 4    Q.   AND YOU ATTENDED THAT CONFERENCE?

12:24PM 5    A.   YES, I DID.  THIS IS THE ONE WE WERE JUST TALKING ABOUT.

12:24PM 6    Q.   YEP.

12:24PM 7         I MOVE THE ADMISSION OF 1938.

12:24PM 8              MR. SCHENK:  YOUR HONOR, RELEVANCE AND 403.

12:24PM 9              THE COURT:  WHAT'S -- I'M NOT CERTAIN OF THE

12:24PM 10   RELEVANCE OF THIS.

12:24PM 11             MR. WADE:  I'D BE HAPPY TO DO THIS NOW IN THE

12:24PM 12   PRESENCE OF THE JURY, OR TO APPROACH.

12:24PM 13        BUT IF YOUR HONOR LOOKS AT MANY OF THE ENTRIES, I THINK

12:24PM 14   YOU'LL SEE THAT MANY OF THE PEOPLE WHO MR. MOSLEY WAS

12:24PM 15   REPRESENTING SPOKE AT THE CONFERENCE, MR. MOSLEY SPOKE AT THE

12:24PM 16   CONFERENCE, AND MS. HOLMES SPOKE AT THE CONFERENCE.

12:25PM 17        AND THIS IS IN THE PERIOD WHERE THERE WERE MEETINGS AROUND

12:25PM 18   THE BDT CONFERENCE, AND SO PEOPLE WHO ARE INVESTING ARE

12:25PM 19   OBTAINING INFORMATION IN ADVANCE OF THE INVESTMENT DECISION AT

12:25PM 20   THE CONFERENCE.

12:25PM 21             THE COURT:  MAYBE YOU SHOULD LAY THAT FOUNDATION

12:25PM 22   FIRST.

12:25PM 23             MR. WADE:  OKAY.

12:25PM 24   Q.   YOU'LL RECALL THAT MR. WALTON AND MR. PENNER SPOKE AT THIS

12:25PM 25   CONFERENCE?

12:25PM 1    A.   YES.  I THINK THEY WERE ON A PANEL --

12:25PM 2    Q.   OKAY.  AND YOU --

12:25PM 3    A.   -- DISCUSSION.

12:25PM 4    Q.   OH, I'M SORRY.  THEY WERE ON A PANEL DISCUSSION.

12:25PM 5         IN FACT, MR. PENNER WAS ON TWO PANEL DISCUSSIONS; RIGHT?

12:25PM 6    A.   YOU KNOW, I'D HAVE TO STUDY THIS, BUT -- LET ME SEE.  I

12:25PM 7    SEE ONE, AND I SEE A SECOND ONE, YES.

12:25PM 8    Q.   OKAY.  AND MS. HOLMES GAVE A -- SAT ON A PANEL DISCUSSION

12:25PM 9    IN FRONT OF THE AUDIENCE AT THIS CONFERENCE; CORRECT?

12:26PM 10   A.   I BELIEVE SHE DID.

12:26PM 11        CAN YOU TELL ME WHAT PAGE THAT WAS?

12:26PM 12   Q.   PAGE 2 MAY REFRESH YOUR RECOLLECTION AS TO THAT, SIR.

12:26PM 13   A.   OKAY.

12:26PM 14        (PAUSE IN PROCEEDINGS.)

12:26PM 15        THE WITNESS:  YES, I SEE THAT.

12:26PM 16   BY MR. WADE:

12:26PM 17   Q.   OKAY.  AND IF YOU GO TO PAGE 4, DO YOU RECALL MR. TUBERGEN

12:26PM 18   SPOKE AT THIS CONFERENCE?

12:26PM 19   A.   I DIDN'T RECALL THAT, BUT I'M JUST LOOKING DOWN A LIST

12:26PM 20   HERE TO SEE IF HE'S LISTED.  THERE WERE A LOT OF -- THERE WERE

12:26PM 21   A LOT OF SMALL BREAKOUTS ON PARTICULAR SUBJECTS.  SO AS YOU CAN

12:26PM 22   SEE, THERE'S A LOT OF ENTRIES HERE.

12:27PM 23   Q.   OKAY.  MAYBE PAGE 8 WILL REFRESH YOUR RECOLLECTION AS TO

12:27PM 24   WHETHER MR. TUBERGEN SPOKE.

12:27PM 25   A.   PAGE 8.  OKAY.

12:27PM 1          YES, I DO SEE HIM LISTED ON A -- THIS WAS -- I SEE AT THE

12:27PM 2     TOP OF PAGE 7 IT SAYS CURRENT BREAKOUT SESSIONS.  THESE WERE

12:27PM 3     LITTLE SESSIONS THAT PEOPLE COULD INDIVIDUALLY CHOOSE TO GO TO,

12:27PM 4     AND IN SOME CASES THEY MIGHT ONLY HAVE TEN PEOPLE IN THERE.

12:27PM 5     Q.   RIGHT.  AND DO YOU RECALL THAT THERE WERE, ON THE AGENDA

12:27PM 6     THERE WERE SOME PRIVATE BREAKOUT DINNERS THAT PEOPLE ATTENDED

12:27PM 7     AS WELL IN THE EVENINGS?

12:27PM 8     A.   I, I HAVE SOME RECOLLECTION OF THAT, BUT I WASN'T --

12:27PM 9     OBVIOUSLY I WASN'T INVOLVED IN SETTING ALL OF THIS UP.

12:27PM 10         BUT I BELIEVE THERE WERE SOME -- I BELIEVE THAT THERE WERE

12:27PM 11    INDIVIDUAL DINNERS THAT WERE SET UP FOR VARIOUS GROUPS OF

12:27PM 12    PEOPLE.

12:27PM 13    Q.   OKAY.  AND SO REPRESENTATIVES OF THE WALTON FAMILY

12:27PM 14    ATTENDED THIS CONFERENCE; RIGHT?

12:27PM 15    A.   I BELIEVE THAT -- I BELIEVE THAT GREG PENNER, ROB WALTON,

12:28PM 16    AND I DON'T KNOW IF ANYBODY ELSE DID, BUT THEY MAY HAVE.

12:28PM 17    Q.   AND REPRESENTATIVES OF THE DEVOS FAMILY ATTENDED THIS

12:28PM 18    CONFERENCE?

12:28PM 19    A.   JERRY TUBERGEN WAS OBVIOUSLY THERE.  I DON'T KNOW WHETHER

12:28PM 20    ANYBODY ELSE WAS THERE.

12:28PM 21              MR. WADE:  YOUR HONOR, I MOVE THE ADMISSION OF 1938.

12:28PM 22              MR. SCHENK:  THE RELEVANCE OBJECTION WAS BASED ON

12:28PM 23    ITS CONNECTION TO THERANOS OR THIS CASE.

12:28PM 24              THE COURT:  I'M GOING TO SUSTAIN THE OBJECTION FOR

12:28PM 25    LACK OF FOUNDATION.

12:28PM   1    BY MR. WADE:

12:28PM   2    Q.   DO YOU RECALL THAT MS. HOLMES WAS THERE SPEAKING ABOUT,

12:28PM   3    SPEAKING ABOUT HER WORK AT THERANOS?

12:28PM   4         DO YOU RECALL THAT, SIR?

12:28PM   5    A.   I DO RECALL SHE WAS THERE, AND I DO KNOW SHE PARTICIPATED

12:28PM   6    IN A PANEL.

12:28PM   7    Q.   AND THAT WAS IN THE, IN THE MAIN THEATRE OF THE

12:28PM   8    CONFERENCE; CORRECT?

12:28PM   9    A.   YES, I BELIEVE IT WAS.

12:28PM  10    Q.   AND THAT'S THE PART WHERE THE PEOPLE WOULD COME TO CONVENE

12:29PM  11    FOR THE MAIN SESSIONS OF THE CONFERENCE?

12:29PM  12    A.   I THINK THAT'S WHERE THE BIGGER SESSIONS WERE HELD.

12:29PM  13    Q.   OKAY.

12:29PM  14         I MOVE THE ADMISSION OF 1938.

12:29PM  15              THE COURT:  I DON'T SEE ANY RELEVANCE TO THE

12:29PM  16    ENTIRETY OF THE DOCUMENT.

12:29PM  17         IF YOU'RE TRYING TO ESTABLISH THAT MS. HOLMES SPOKE AT

12:29PM  18    THIS EVENT, YOU CAN DO THAT WITHOUT THE ENTIRETY OF THE

12:29PM  19    DOCUMENT.  THERE ARE OTHER BREAKOUTS AND OTHER SESSIONS

12:29PM  20    INVOLVED HERE THAT HAVE NOTHING TO DO, AT LEAST THERE'S NO

12:29PM  21    FOUNDATION YET --

12:29PM  22              MR. WADE:  OKAY.

12:29PM  23              THE COURT:  -- AS TO WHAT THEY HAVE TO DO.

12:29PM  24         THE FACT THAT MS. HOLMES WAS AT THIS CONFERENCE AND SPOKE,

12:29PM  25    THAT MAY HAVE SOME RELEVANCE.

12:29PM   1          THE FACT THAT OTHER INVESTORS WERE AT THIS CONFERENCE AND

12:29PM   2    ATTENDED THE REFERENCE, I JUST DON'T SEE THE RELEVANCE YET.

12:29PM   3          ARE YOU GOING TO GO THROUGH EVERY INVESTOR AND ASK TO SEE

12:29PM   4    WHERE THEY VISITED AND WHAT CONFERENCE THEY ATTENDED?  IF IT

12:29PM   5    RELATES TO THEIR INVESTMENT DECISION IN REGARDS TO THE COMPANY

12:30PM   6    AND WHETHER OR NOT THEY WERE VICTIMS AND WHETHER OR NOT THEY

12:30PM   7    MADE DECISIONS BASED ON WHAT THEY HEARD THERE, THAT'S A

12:30PM   8    DIFFERENT THING.

12:30PM   9          BUT FOR NOW, MR. WADE, I DON'T SEE IT FOR THE ENTIRETY OF

12:30PM  10    THE DOCUMENT TO COME IN.  YOU ESTABLISHED THAT THERE WAS A

12:30PM  11    CONFERENCE AND YOUR CLIENT WAS AT THE CONFERENCE AND SHE SPOKE,

12:30PM  12    AND I DON'T THINK YOU NEED THE DOCUMENT IN FOR THAT.

12:30PM  13          AND PARDON ME FOR ME ANSWERING IN A SPEAKING ANSWER LIKE

12:30PM  14    THIS, BUT I JUST WANTED TO GIVE YOU MY THOUGHTS AND GUIDANCE ON

12:30PM  15    THE TOTALITY OF THE DOCUMENT.

12:30PM  16          I THINK THERE'S RELEVANCE ISSUES AS TO THE ENTIRETY OF THE

12:30PM  17    DOCUMENT THAT INCLUDES OTHER BREAKOUTS, OTHER SPEAKERS.

12:30PM  18              MR. WADE:  OKAY.  COULD I ASK THE COURT IF WE COULD

12:30PM  19    PRODUCE A REDACTED FORM OF THE VERSION THAT REFERENCES

12:30PM  20    MS. HOLMES'S SPEECH ON THE MAIN STAGE?

12:30PM  21              THE COURT:  LET'S SEE.  I THINK THAT'S ON PAGE 3 OF

12:30PM  22    THE DOCUMENT.

12:30PM  23              MR. WADE:  PAGE 2, I BELIEVE, YOUR HONOR, BATES

12:31PM  24    LABEL 4689 -- 4687.

12:31PM  25              THE COURT:  YES, IT'S TRIAL EXHIBIT 1938, PAGE 3.

12:31PM 1          MR. WADE:  CORRECT, YOUR HONOR, YES.

12:31PM 2          THE COURT:  AND IF YOU WANT TO REDACT AND SHOW THAT

12:31PM 3   BETWEEN 8:05 AND 9:05, YOUR CLIENT APPEARED ON A PANEL WITH

12:31PM 4   OTHERS ENTITLED GAME CHANGERS.

12:31PM 5          MR. WADE:  MAYBE WE CAN BLOW UP THAT PORTION AND

12:31PM 6   DEAL WITH THE OTHER PORTION LATER.

12:31PM 7          THE COURT:  SURE.  I THINK SO.

12:31PM 8          MR. WADE:  THANK YOU.

12:31PM 9   Q.   AND WHILE WE'RE PULLING THAT UP, MR. MOSLEY, AT THE BDT

12:31PM 10  CONFERENCE, IT'S HELD WITHIN A THEATRE; CORRECT?

12:31PM 11  A.   NO.  I THINK I -- I THINK WHAT I POINTED OUT THAT THERE

12:31PM 12  WERE -- MY MEMORY OF IT, THERE WERE SOME SESSIONS IN THE

12:32PM 13  THEATRE AND THERE WERE SOME SESSIONS IN BREAKOUT ROOMS.

12:32PM 14       YOU'VE ALREADY POINTED OUT THERE WERE SOME DINNERS.

12:32PM 15  Q.   UH-HUH.

12:32PM 16  A.   SO IT'S A COMBINATION OF DIFFERENT ACTIVITIES.

12:32PM 17  Q.   OKAY.  AND THE MAIN -- WHEN THE CONFERENCE WOULD START IN

12:32PM 18  THE MORNING, A LOT OF PEOPLE WOULD START IN THE FEINBERG

12:32PM 19  THEATRE AND THERE WOULD BE GREETINGS AND THEN THERE WOULD BE

12:32PM 20  SOME MAIN STAGE PRESENTATIONS.

12:32PM 21       IS THAT NOT RIGHT?

12:32PM 22  A.   YOU KNOW, I REALLY WASN'T THAT DEEPLY INVOLVED, BUT I

12:32PM 23  THINK THE BIGGER SESSIONS WERE IN THE THEATRE IS MY

12:32PM 24  RECOLLECTION.

12:32PM 25  Q.   OKAY.  AND DO YOU RECALL THAT MS. HOLMES GAVE A

12:32PM  1    PRESENTATION IN THE THEATRE AT THAT CONFERENCE?

12:32PM  2    A.   YES, I DO.

12:32PM  3    Q.   AND DID YOU ATTEND THAT?

12:32PM  4    A.   YES, I DID.

12:32PM  5    Q.   OKAY.  AND DO YOU KNOW WHETHER, WHETHER MR. TUBERGEN

12:32PM  6    ATTENDED THAT?

12:32PM  7    A.   I HAVE NO IDEA.

12:32PM  8    Q.   DO YOU KNOW WHETHER ANY MEMBERS OF THE WALTON FAMILY

12:32PM  9    ATTENDED THAT?

12:32PM  10   A.   I DON'T KNOW.

12:32PM  11   Q.   OKAY.  DO YOU KNOW WHETHER ANY OF YOUR OTHER CLIENTS WHO

12:33PM  12   CONSIDERED THERANOS INVESTMENTS ATTENDED THAT?

12:33PM  13   A.   I REALLY DON'T KNOW.

12:33PM  14   Q.   OKAY.  AND IN CONNECTION WITH THIS PRESENTATION, I THINK

12:33PM  15   WE TALKED ABOUT THE DINNER, AND I BELIEVE YOUR TESTIMONY WAS

12:33PM  16   THAT YOU DID NOT ATTEND A DINNER WITH MS. HOLMES AND

12:33PM  17   DR. COSGROVE?

12:33PM  18   A.   I DID NOT.

12:33PM  19   Q.   OKAY.  DO YOU KNOW WHETHER ANY OF YOUR CLIENTS ATTENDED

12:33PM  20   THAT DINNER?

12:33PM  21   A.   I HAVE NO IDEA.

12:33PM  22   Q.   OKAY.  BY THE WAY, DO YOU RECALL MR. ELKANN ALSO ATTENDING

12:33PM  23   THE BDT CONFERENCE IN SEPTEMBER OF 2014?

12:33PM  24   A.   I DON'T.  I'M NOT SURE AT THIS POINT THAT I EVER MET HIM,

12:33PM  25   SO...

12:33PM  1    Q.   OKAY.  DO YOU RECALL THAT MR. HANK SLACK FROM THE

12:33PM  2    OPPENHEIMER FAMILY HAD ATTENDED THE BDT CONFERENCE?

12:33PM  3    A.   I DON'T.  I NEVER MET HIM UP UNTIL THIS POINT, SO I HAVE

12:34PM  4    NO IDEA WHETHER HE ATTENDED.

12:34PM  5    Q.   FAIR ENOUGH.

12:34PM  6         AT THE BDT CONFERENCE, YOU ENDED UP HAVING --

12:34PM  7    PARTICIPATING IN THREE MEETINGS THAT INVOLVED SOME OF YOUR

12:34PM  8    CLIENTS.

12:34PM  9         DO YOU RECALL THAT?

12:34PM 10    A.   I THINK THAT'S RIGHT.

12:34PM 11    Q.   OKAY.  AND I THINK I NEGLECTED TO ASK YOU, THE COX FAMILY

12:34PM 12    WAS ALSO IN ATTENDANCE AT THE 2014 CONFERENCE; RIGHT?

12:34PM 13    A.   I BELIEVE AT LEAST -- YOU KNOW, I BELIEVE AT LEAST ONE

12:34PM 14    MEMBER AND THEN ONE PERSON FROM THE COMPANY ATTENDED.

12:34PM 15    Q.   OKAY.

12:34PM 16    A.   I SHOULD SAY I DON'T KNOW WHETHER A PERSON ATTENDED FROM

12:34PM 17    THE COMPANY.  I SHOULD SAY I ONLY KNOW ONE PERSON WHO ATTENDED

12:34PM 18    FROM THE FAMILY.

12:34PM 19    Q.   AND WAS THAT ALEX TAYLOR?

12:34PM 20    A.   YES, IT WAS.

12:34PM 21    Q.   AND ALEX TAYLOR WAS A PERSON WITH WHOM YOU ARRANGED -- YOU

12:34PM 22    PARTICIPATED IN A MEETING WITH MS. HOLMES; CORRECT?

12:34PM 23    A.   YEAH, I HAD A MEETING TO INTRODUCE ALEX TO ELIZABETH.

12:34PM 24    Q.   OKAY.  AND WAS THIS A MEETING THAT HAPPENED SORT OF IN A

12:34PM 25    VENUE ADJACENT TO THE CONFERENCE?

12:35PM  1    A.   I DON'T REMEMBER.

12:35PM  2    Q.   OKAY.  DO YOU REMEMBER ANYTHING ABOUT THAT MEETING?

12:35PM  3    A.   I THINK I JUST REMEMBER -- THE ONLY THING I REALLY

12:35PM  4    REMEMBER WAS THAT ELIZABETH SPOKE AND DESCRIBED THE COMPANY AND

12:35PM  5    WHAT SHE WAS TRYING TO ACCOMPLISH FOR ALEX SO HE COULD HAVE AN

12:35PM  6    UNDERSTANDING.

12:35PM  7    Q.   AND THIS WAS SORT OF AN INTRODUCTORY MEETING?

12:35PM  8    A.   IT WAS AN INTRODUCTION, YES.

12:35PM  9    Q.   OKAY.  AND YOU HAD A SIMILAR MEETING THERE WITH

12:35PM 10    MR. TUBERGEN; CORRECT?

12:35PM 11    A.   THAT IS CORRECT.

12:35PM 12    Q.   OKAY.  AND THAT WAS AN INTRODUCTORY MEETING AS WELL, WAS

12:35PM 13    IT NOT?

12:35PM 14    A.   YES.

12:35PM 15    Q.   OKAY.  AND DO YOU RECALL IN ADVANCE OF THAT MEETING THAT

12:35PM 16    YOU SENT MR. TUBERGEN A COPY OF THE "FORTUNE" ARTICLE THAT HAD

12:35PM 17    BEEN PUBLISHED RELATING TO MS. HOLMES?

12:35PM 18    A.   IT'S POSSIBLE, BUT I CERTAINLY DON'T REMEMBER.

12:35PM 19    Q.   OKAY.  LET'S TAKE A LOOK AT 12751.

12:36PM 20         I'M SORRY -- YEAH, 1 -- THE COURT'S INDULGENCE FOR ONE

12:36PM 21    SECOND.  LET ME MAKE SURE I GET THE RIGHT NUMBER.

12:36PM 22         (PAUSE IN PROCEEDINGS.)

12:36PM 23             MR. WADE:  12751, WHICH I BELIEVE IS IN EVIDENCE,

12:36PM 24    YOUR HONOR.

12:36PM 25             THE WITNESS:  OKAY.

12:36PM  1    BY MR. WADE:

12:36PM  2    Q.   AND DO YOU SEE UP ON THE SCREEN, OR IN THE BOOK, WHICHEVER

12:36PM  3    IS EASIER FOR YOU, THAT YOU SENT MR. TUBERGEN A COPY OF THE

12:36PM  4    "FORTUNE" ARTICLE IN ADVANCE OF THE MEETING THAT YOU HAD WITH

12:36PM  5    MS. HOLMES?

12:36PM  6    A.   YEAH.  I'M ASSUMING THAT.  IT SAYS THERANOS.PDF AND -- AND

12:37PM  7    IT SAYS COVER STORY FROM "FORTUNE," SO I'M ASSUMING THAT'S WHAT

12:37PM  8    WAS ATTACHED, YES.

12:37PM  9    Q.   OKAY.  AND DO YOU RECALL GETTING A COPY OF THIS FROM

12:37PM  10   DR. KISSINGER?

12:37PM  11   A.   OF THIS?

12:37PM  12   Q.   OF THIS ARTICLE?

12:37PM  13   A.   I DON'T REMEMBER WHETHER I GOT IT FROM DR. KISSINGER OR I

12:37PM  14   GOT IT OUT OF "FORTUNE" MAGAZINE.  I HAVE NO RECOLLECTION.

12:37PM  15   Q.   OKAY.

12:37PM  16   A.   I CERTAINLY HAD GOTTEN THE ARTICLE AND READ THE ARTICLE,

12:37PM  17   YES.

12:37PM  18   Q.   OKAY.  AND YOU HAD READ THE ARTICLE AT SOME POINT AFTER

12:37PM  19   YOUR OUTLINE, BUT BEFORE THE BDT CONFERENCE; IS THAT FAIR?

12:37PM  20   A.   I, I CAN'T PICK THE TIME AT WHICH I READ THE ARTICLE.

12:37PM  21   Q.   FAIR ENOUGH.

12:37PM  22        LET'S GO TO THE FIRST PAGE OF THE ARTICLE THAT SAYS, "NEW

12:37PM  23   BLOOD."

12:37PM  24        DO YOU SEE THAT?

12:37PM  25   A.   I DO.

12:37PM  1    Q.   OKAY.  AND YOU RECOGNIZE THAT THIS WAS SOMETHING OF A

12:37PM  2    PORTRAYAL OF MS. HOLMES AND HER MISSION WITH RESPECT TO

12:38PM  3    THERANOS; CORRECT?

12:38PM  4    A.   I DIDN'T QUITE UNDERSTAND WHAT YOU -- HOW YOU

12:38PM  5    CHARACTERIZED IT.

12:38PM  6    Q.   MAYBE I DIDN'T CHARACTERIZE IT WELL.

12:38PM  7         THIS ARTICLE TALKED ABOUT MS. HOLMES AND HER VISION AT

12:38PM  8    THERANOS; CORRECT?

12:38PM  9    A.   YES.

12:38PM  10   Q.   OKAY.  AND IF YOU LOOK AT THAT FIRST PAGE, YOU SEE THAT IN

12:38PM  11   THE TEXT THERE THAT IT -- LET'S BLOW THAT UP SO WE'RE SURE THE

12:38PM  12   JURY CAN SEE THAT.

12:38PM  13        YOU SEE IT TALKS ABOUT HOW SHE FOUNDED THIS COMPANY AS A

12:38PM  14   19-YEAR-OLD SOPHOMORE AT STANFORD.

12:38PM  15        DO YOU SEE THAT?

12:38PM  16   A.   I DO.

12:38PM  17   Q.   AND DO YOU SEE REFERENCES TO HER INTERACTIONS WITH A

12:38PM  18   CHEMICAL ENGINEERING PROFESSOR AT STANFORD NAMED

12:38PM  19   CHANNING ROBERTSON?

12:38PM  20   A.   I SEE THAT REFERENCE.

12:38PM  21   Q.   AND IT KIND OF GIVES A BIT OF THE ORIGIN STORY OF THE

12:39PM  22   COMPANY, OR STARTS TO; CORRECT?

12:39PM  23   A.   YES, I ASSUME THAT'S THE REASON FOR IT, YES.

12:39PM  24   Q.   AND IF YOU CAN CONTINUE ON PAGE 3 OF THE ARTICLE.

12:39PM  25        AND IF WE CAN JUST BLOW UP, IN THE LEFT-HAND COLUMN, THE

12:39PM 1    FIRST COUPLE OF PARAGRAPHS.

12:39PM 2        IT TALKS ABOUT SOME OF THE WORK THAT SHE DID THERE AND

12:39PM 3    THEN THE FOUNDING OF THE COMPANY.

12:39PM 4        DO YOU SEE THAT?

12:39PM 5    A.   I DO SEE IT.

12:39PM 6    Q.   AND THIS WAS A PRETTY COMPELLING STORY, WAS IT NOT?

12:39PM 7    A.   VERY COMPELLING.

12:39PM 8    Q.   OKAY.  AND IF YOU LOOK IN THE PARAGRAPH, THERE'S

12:39PM 9    DISCUSSION WITH PROFESSOR ROBERTSON ABOUT HIS OBSERVATIONS OF

12:39PM 10   MS. HOLMES WHEN SHE WAS 19 YEARS OLD; CORRECT?

12:39PM 11   A.   YOU'RE TALKING ABOUT THE SECOND PARAGRAPH THAT SAYS, "I

12:40PM 12   REMEMBER HER SAYING"?

12:40PM 13   Q.   YEAH.  JUST GENERALLY, YOU SEE PROFESSOR ROBERTSON IS

12:40PM 14   PROVIDING HIS VIEWS OF MS. HOLMES AS A TEENAGER JUST IN

12:40PM 15   COLLEGE.

12:40PM 16       DO YOU SEE THAT?

12:40PM 17   A.   YEAH, AND IT SAYS, "AND I KIND OF KICKED MYSELF.  I'D

12:40PM 18   CONSULTED IN THIS AREA FOR 30 YEARS, BUT I'D NEVER SAID, HERE,

12:40PM 19   WE CAN MAKE ALL OF THESE GIZMOS THAT MEASURE" -- YES, I SEE

12:40PM 20   THAT.

12:40PM 21   Q.   HE HAD BEEN WORKING IN THE AREA FOR 30 YEARS, BUT AS A

12:40PM 22   19-YEAR-OLD, SHE CAME UP WITH AN IDEA THAT HE HAD NEVER THOUGHT

12:40PM 23   OF.

12:40PM 24       DO YOU SEE THAT?

12:40PM 25   A.   I -- YOU KNOW, I CAN'T TELL YOU WHAT HE THOUGHT OF AND HAD

12:40PM  1    NOT THOUGHT OF.

12:40PM  2    Q.   BUT YOU SEE HOW HE'S QUOTED THERE; RIGHT?

12:40PM  3    A.   I SEE HIS QUOTE.

12:40PM  4    Q.   AND IF WE GO DOWN A COUPLE OF PARAGRAPHS, IN THE PARAGRAPH

12:41PM  5    THAT STARTS, "THAT CLINCHED IT FOR HIM," AND BLOW THAT UP.

12:41PM  6         IT TALKS ABOUT WHEN HE FINALLY CONNECTED -- "WHEN I

12:41PM  7    FINALLY CONNECTED WITH WHAT ELIZABETH FUNDAMENTALLY IS" --

12:41PM  8    A.   RIGHT.

12:41PM  9    Q.   HE SAYS, "I REALIZED THAT I COULD HAVE JUST AS WELL BEEN

12:41PM 10    LOOKING INTO THE EYES OF A STEVE JOBS OR BILL GATES."

12:41PM 11         DO YOU SEE THAT?

12:41PM 12    A.   I SEE THAT.

12:41PM 13    Q.   AND THIS IS A CHEMICAL ENGINEERING PROFESSOR AT STANFORD;

12:41PM 14    RIGHT?

12:41PM 15    A.   I DON'T KNOW MR. ROBERTSON, BUT I BELIEVE THAT'S WHAT HE

12:41PM 16    WAS, YES.

12:41PM 17    Q.   AND THIS WAS A PRETTY COMPELLING STORY, WAS IT NOT?

12:41PM 18    A.   A VERY COMPELLING STORY.

12:41PM 19    Q.   YEAH.  AND IF WE CAN JUMP TO PAGE 4, THE RIGHT-HAND

12:41PM 20    COLUMN, AND BLOW UP THAT FIRST PARAGRAPH.

12:42PM 21         YOU SEE THERE THE WALGREENS CEO, GREG WASSON, IS

12:42PM 22    REFERENCED?

12:42PM 23    A.   YES.

12:42PM 24    Q.   AND THIS IS IN CONNECTION WITH THE MOST IMPORTANT

12:42PM 25    COMMERCIAL RELATIONSHIP THAT THERANOS HAS AT THAT TIME; RIGHT?

12:42PM   1      A.   CERTAINLY FOR RETAIL DISTRIBUTION OF THEIR EQUIPMENT, YES.

12:42PM   2      Q.   YEAH.  AND HE TALKS ABOUT, IN THIS ARTICLE, HOW HE HOPES

12:42PM   3      TO EVENTUALLY PUT THEM IN THE PHARMACIES OF THE COMPANY'S

12:42PM   4      EUROPEAN CHAINS AS WELL; RIGHT?

12:42PM   5          DO YOU SEE THAT?

12:42PM   6      A.   YES, THEIR EUROPEAN PARTNER, ALLIANCE BOOTS.

12:42PM   7      Q.   YEAH.  AND IF YOU GO DOWN -- AND YOU LEARNED FROM THIS

12:42PM   8      ARTICLE ABOUT SOME WORK IN CONNECTION WITH UCSF.

12:42PM   9          DO YOU RECALL THAT?

12:42PM  10      A.   I SEE THAT.  I SEE THAT IT DISCUSSES UCSF, YES.

12:42PM  11      Q.   AND DO YOU SEE THE CEO OF UCSF IS QUOTED IN THE ARTICLE

12:43PM  12      THERE, AND HE TALKS ABOUT HOW THIS IS THE TRUE TRANSFORMATION

12:43PM  13      OF HEALTH CARE RIGHT HERE IN FRONT OF US; RIGHT?

12:43PM  14      A.   I SEE THAT.

12:43PM  15      Q.   AND WAS -- IS IT FAIR TO SAY THAT THIS WAS A PRETTY

12:43PM  16      IMPACTFUL ARTICLE WHEN YOU READ IT AT THE TIME?

12:43PM  17      A.   YES, IT WAS VERY IMPORTANT.

12:43PM  18      Q.   YEAH.  AND IF WE CAN GO TO -- IF YOU LOOK AT THE BOTTOM,

12:43PM  19      AND DO YOU SEE THE QUOTE THAT STARTS AT THE BOTTOM, IT SAYS,

12:43PM  20      "THE FIRST TIME I HEARD ABOUT THIS, I THOUGHT IT WAS SNAKE

12:43PM  21      OIL," AND WE'LL CONTINUE UP, "AND MIRRORS."

12:43PM  22          AND IF WE CAN BLOW UP THE PARAGRAPH UP ON THE TOP.

12:43PM  23          DO YOU SEE THAT?

12:43PM  24      A.   I DO SEE THAT.

12:43PM  25      Q.   AND THAT'S A QUOTE FROM THE CHIEF OF ORTHOPEDIC TRAUMA AT

12:44PM 1      THE HOSPITAL FOR SPECIAL SURGERY IN MANHATTAN?

12:44PM 2      A.   I SEE THAT.

12:44PM 3      Q.   DO YOU SEE THAT?

12:44PM 4           AND THEN IT NOTES THAT, "BUT AFTER REVIEWING VOLUMINOUS

12:44PM 5      VALIDATION STUDIES SUPPLIED TO HIM BY THE COMPANY, HE HAS

12:44PM 6      BECOME A BELIEVER AND IS URGING HIS HOSPITAL TO CONSIDER

12:44PM 7      ADOPTION."

12:44PM 8           DO YOU SEE THAT?

12:44PM 9      A.   I DO SEE THAT.

12:44PM 10     Q.   OKAY.  AND IF WE LOOK AT THE LITTLE PIECE THAT FOLLOWS

12:44PM 11     THAT.

12:44PM 12          DR. HELFET SAYS THERE, "IT'S REAL DATA, HE SAYS.  IT'S NOT

12:44PM 13     THEIR INTERPRETATION."

12:44PM 14          DO YOU SEE THAT?

12:44PM 15     A.   I DO SEE THAT.

12:44PM 16     Q.   AND WAS THAT IMPACTFUL FOR YOU AT THE TIME?

12:44PM 17     A.   THAT'S AN IMPORTANT STATEMENT.

12:44PM 18     Q.   AND IF WE CAN GO TO PAGE 6 OF THE ARTICLE, AND IF WE CAN

12:44PM 19     BLOW UP THE PARAGRAPH THAT SAYS, "THERANOS" KIND OF IN THE

12:44PM 20     MIDDLE OF THE FIRST COLUMN.

12:45PM 21          I'M SORRY, NOT THAT.  I HAVE THE WRONG PARAGRAPH.

12:45PM 22          IF I CAN GO TO PAGE 7, AND IN THE RIGHT-HAND COLUMN WITH

12:45PM 23     THE "SHE LOOKS LIKE 19."

12:45PM 24          DO YOU SEE THAT?

12:45PM 25          OKAY.  AND DO YOU SEE THERE DR. KISSINGER, YOUR CLIENT, IS

12:45PM  1      QUOTED?

12:45PM  2      A.   OKAY.  NOW WHAT -- THIS IS ON PAGE 7?

12:45PM  3      Q.   SURE.  IT'S ON THE SCREEN, BUT IT'S ON THE BOTTOM OF

12:45PM  4      PAGE 7 OF 9 IN THE RIGHT-HAND COLUMN.

12:45PM  5           DO YOU SEE DR. KISSINGER IS QUOTED IN THIS ARTICLE AS

12:45PM  6      WELL?

12:45PM  7      A.   I SEE HE IS.  I SEE HE'S QUOTED, YES.

12:45PM  8      Q.   AND YOU HAD RESPECT FOR HIM BASED ON YOUR RELATIONSHIP; IS

12:45PM  9      THAT FAIR?

12:45PM  10     A.   ENORMOUS RESPECT.

12:45PM  11     Q.   AND HE SAYS, "SHE LOOKS LIKE 19."

12:45PM  12          DO YOU SEE THAT?

12:45PM  13     A.   YES.

12:45PM  14     Q.   AND HE SAID "ASKED TO ASSESS HER AS A LEADER - BECAUSE

12:46PM  15     HE'S SEEN A FEW."

12:46PM  16          AND YOU THOUGHT THAT WAS A FAIR STATEMENT; CORRECT?

12:46PM  17     A.   YES, I DID.

12:46PM  18     Q.   DR. KISSINGER HAD SEEN A FEW LEADERS IN HIS DAY?

12:46PM  19     A.   HE WAS 91, YES.

12:46PM  20     Q.   AND HE HAD DONE WORK FOR, YOU KNOW, PRESIDENTS AND MANY

12:46PM  21     PROMINENT PEOPLE IN THE WORLD; CORRECT?

12:46PM  22     A.   HE HAD BEEN THE SECRETARY OF STATE.

12:46PM  23     Q.   YES.  AND THERE HE SAYS, "ASKED TO ASSESS HER AS A

12:46PM  24     LEADER -- BECAUSE HE'S SEEN A FEW -- HE RESPONDS, I CAN'T

12:46PM  25     COMPARE HER TO ANYONE ELSE BECAUSE I HAVEN'T SEEN ANYONE WITH

12:46PM 1    HER SPECIAL ATTRIBUTES.  SHE HAS IRON WILL, STRONG

12:46PM 2    DETERMINATION.  BUT NOTHING DRAMATIC.  THERE IS NO PERFORMANCE

12:46PM 3    ASSOCIATED WITH HER.  I HAVE SEEN NO SIGN THAT FINANCIAL GAIN

12:46PM 4    IS OF ANY INTEREST TO HER.  SHE'S LIKE A MONK.  SHE ISN'T

12:46PM 5    FLASHY.  SHE WOULDN'T WALK INTO A ROOM AND TAKE IT OVER.  BUT

12:46PM 6    SHE WOULD ONCE THE SUBJECT GETS TO HER FIELD."

12:46PM 7        DO YOU SEE THAT?

12:46PM 8    A.  I DO SEE THAT.

12:47PM 9    Q.  THAT'S A PRETTY IMPACTFUL STATEMENT BY DR. KISSINGER, IS

12:47PM 10   IT NOT?

12:47PM 11   A.  IT'S VERY COMPLIMENTARY.

12:47PM 12           MR. SCHENK:  OBJECTION.  COUNSEL IS TESTIFYING NOW.

12:47PM 13           THE COURT:  CLOSE TO IT.

12:47PM 14       WHY DON'T YOU ASK YOUR NEXT QUESTION?

12:47PM 15   BY MR. WADE:

12:47PM 16   Q.  IF WE CAN GO TO PAGE 9 AND BLOW UP THE PARAGRAPH IN THE

12:47PM 17   RIGHT-HAND COLUMN THAT SAYS, "ALTHOUGH."

12:47PM 18       IT SAYS, "ALTHOUGH I BELIEVE" -- I'M SORRY.  IN THE BOTTOM

12:47PM 19   THERE.  "THERE ARE PIECES OF THE PUZZLE WE HAVEN'T SEEN YET."

12:47PM 20       DO YOU SEE THAT?

12:47PM 21   A.  JUST ONE SECOND PLEASE.

12:47PM 22       YES, THERE ARE PIECES, RIGHT.

12:48PM 23   Q.  OKAY.  DO YOU SEE WHERE IT SAYS THAT?

12:48PM 24   A.  I DO SEE WHERE IT SAYS THAT.

12:48PM 25   Q.  AND IT SAYS, "IN SOME CASES SHE MAY BE WAITING FOR

12:48PM  1    REGULATORY APPROVAL."

12:48PM  2    A.   I DO SEE THAT.

12:48PM  3    Q.   "WHILE IN OTHERS SHE MAY JUST BE WAITING, LIKE STEVE JOBS,

12:48PM  4    TO FINISH PERFECTING HER NEXT PRODUCT BEFORE UNVEILING IT WITH

12:48PM  5    A FLOURISH."

12:48PM  6         DO YOU SEE THAT?

12:48PM  7    A.   I DO SEE THAT.

12:48PM  8    Q.   AND DID YOU UNDERSTAND AT THE TIME THAT THE COMPANY WAS

12:48PM  9    WORKING ON MULTIPLE FUTURE ITERATIONS OF ITS PRODUCT?

12:48PM  10   A.   I DID.

12:48PM  11   Q.   AND IN THIS ARTICLE, IN SHARING IT, YOU THOUGHT THIS WOULD

12:48PM  12   BE A GOOD INTRODUCTORY PIECE OR A QUICK READ TO GIVE

12:48PM  13   MR. TUBERGEN SOME FAMILIARITY; IS THAT FAIR?

12:48PM  14   A.   I DID.

12:48PM  15   Q.   OKAY.  AND AGAIN, THE MEETING WITH MR. TUBERGEN, THAT WAS

12:48PM  16   AT THAT POINT KIND OF AN INTRODUCTORY MEET AND GREET; IS THAT

12:49PM  17   FAIR?

12:49PM  18   A.   YEAH, IT WAS A PERSONAL INTRODUCTION OF JERRY TO

12:49PM  19   ELIZABETH.

12:49PM  20   Q.   JUST MORE CASUALLY ACROSS THE TABLE AS OPPOSED TO A SLIDE

12:49PM  21   PRESENTATION OR ANYTHING LIKE THAT?

12:49PM  22   A.   YES.

12:49PM  23   Q.   OKAY.  AND WOULD IT BE FAIR TO DESCRIBE YOU ALSO

12:49PM  24   PARTICIPATED IN A MEETING LIKE THAT WITH MR. TAYLOR?

12:49PM  25   A.   I DID.

12:49PM 1    Q.   AND WAS THAT A SIMILAR KIND OF MEETING?

12:49PM 2    A.   YES.

12:49PM 3    Q.   OKAY.  DO YOU RECALL WHETHER YOU SENT MR. TAYLOR A COPY OF

12:49PM 4    THE "FORTUNE" ARTICLE IN ADVANCE?

12:49PM 5    A.   I DON'T RECALL.

12:49PM 6    Q.   OKAY.  AND DO YOU RECALL WHETHER YOU SENT A COPY OF THE

12:49PM 7    "FORTUNE" ARTICLE EITHER TO MR. PENNER OR MR. WALTON?

12:49PM 8    A.   I DON'T REMEMBER, BUT I SUSPECT THAT THEY HAD ALREADY READ

12:49PM 9    THE ARTICLE.

12:49PM 10   Q.   OKAY.  DO YOU KNOW, DO YOU KNOW THAT MANY OF THOSE PEOPLE,

12:49PM 11   THOSE CLIENTS WHO PARTICIPATED IN THOSE MEETINGS CAME OUT OF

12:49PM 12   THOSE MEETINGS VERY INTERESTED IN INVESTING IN THERANOS?

12:50PM 13   A.   I COULDN'T TELL YOU EXACTLY WHAT THEY WERE THINKING, BUT I

12:50PM 14   WOULD SUSPECT THAT THEY WERE VERY IMPRESSED, AS WAS I

12:50PM 15   OBVIOUSLY.

12:50PM 16   Q.   OKAY.  AND YOU HAD THE -- YOU CONTINUED TO HAVE

12:50PM 17   INTERACTIONS DURING THE FALL WITH THOSE CLIENTS RELATING TO

12:50PM 18   THERANOS; CORRECT?

12:50PM 19   A.   YOU KNOW, I DON'T REMEMBER SPECIFICALLY, BUT I SUSPECT

12:50PM 20   GIVEN THAT I WAS TALKING TO THESE INDIVIDUALS FROM TIME TO TIME

12:50PM 21   THAT THEY WOULD SAY, WE'RE DOING OUR WORK ON THERANOS OR -- AND

12:50PM 22   THEY MAY HAVE TOLD ME THINGS FROM TIME TO TIME.  BUT I DON'T

12:50PM 23   HAVE ANY SPECIFIC RECOLLECTION.

12:51PM 24   Q.   AND IF I COULD JUST ORIENT US A BIT.

12:51PM 25        YOUR HONOR, MAY I PASS UP A DEMONSTRATIVE WHICH I'VE

12:51PM  1    SHARED WITH THE GOVERNMENT?  AND I THINK THE GOVERNMENT HAS NO

12:51PM  2    OBJECTION TO MY USING IT WITH THE WITNESS.

12:51PM  3                THE COURT:  YES.

12:51PM  4                MR. SCHENK:  THAT'S CORRECT.

12:51PM  5                THE COURT:  ALL RIGHT.

12:51PM  6                MR. WADE:  (HANDING.)

12:51PM  7          IF I COULD USE THE ELMO?

12:51PM  8                THE COURT:  SURE.

12:51PM  9    BY MR. WADE:

12:51PM 10    Q.   DO YOU SEE HERE, MR. MOSLEY, I SET ON THE SCREEN JUST A

12:51PM 11    CALENDAR THAT SETS FORTH THE MONTHS FROM JULY 2014 TO

12:51PM 12    DECEMBER 2014?

12:51PM 13    A.   YES.

12:51PM 14    Q.   OKAY.  AND I JUST WANT TO NOTE, I THINK WE SAID YOUR

12:51PM 15    INITIAL CALL WITH MS. HOLMES WAS ON JULY 21ST; IS THAT RIGHT?

12:52PM 16    A.   YOU KNOW, I DON'T REMEMBER THE EXACT DATE, BUT THAT'S --

12:52PM 17    IT'S IN THAT RANGE.

12:52PM 18    Q.   I'LL CIRCLE THAT.

12:52PM 19          BUT IT WAS IN ABOUT THAT RANGE IF IT WASN'T PRECISELY THAT

12:52PM 20    RANGE?

12:52PM 21    A.   I THINK THAT'S RIGHT.

12:52PM 22    Q.   AND I THINK YOU SAID YOU REVIEWED, YOU REVIEWED THE

12:52PM 23    MATERIALS OVER THE WEEKEND BEFORE YOU FINALIZED THAT OUTLINE ON

12:52PM 24    SEPTEMBER 2ND; CORRECT?

12:52PM 25    A.   I THINK THAT'S CORRECT.

12:52PM 1    Q.   OKAY.  SO SEPTEMBER 2ND IS HERE (INDICATING).

12:52PM 2         AND THEN THE BDT CONFERENCE THAT YOU WERE AT, THAT WAS A

12:52PM 3    THREE-DAY CONFERENCE, WAS IT NOT?

12:52PM 4    A.   I DON'T REMEMBER SPECIFICALLY, BUT IT WAS AT LEAST TWO

12:52PM 5    DAYS.

12:52PM 6         BUT IT MAY HAVE BEEN THREE DAYS.  I WASN'T IN CHARGE.

12:52PM 7    Q.   YOU DON'T RECALL.  YOU WEREN'T WORKING THAT?

12:52PM 8    A.   I WAS JUST AN ATTENDEE.

12:53PM 9    Q.   AND THIS WAS BEFORE YOU WERE WORKING AT BDT; CORRECT?

12:53PM 10   A.   YES, IT WAS.

12:53PM 11   Q.   BUT IT WAS ABOUT FROM SEPTEMBER 15TH TO SEPTEMBER 17TH.

12:53PM 12        DO YOU RECALL THAT?

12:53PM 13   A.   IT WAS IN THAT RANGE BECAUSE I THINK ELIZABETH SPOKE ON

12:53PM 14   THE 16TH.

12:53PM 15   Q.   OKAY.

12:53PM 16   A.   AND I MAY BE WRONG, BUT I THINK THAT WAS THE DATE.

12:53PM 17   Q.   OKAY.  AND WHY DON'T I CIRCLE IT.

12:53PM 18        AND DO YOU RECALL IN THIS WINDOW HERE THERE WERE ALSO SOME

12:53PM 19   MEETINGS WITH MR. -- WITH YOUR CLIENTS?

12:53PM 20        DO YOU RECALL THAT?

12:53PM 21   A.   THAT -- YOU KNOW, WE HAD JUST GONE THROUGH THAT.  I

12:53PM 22   INTRODUCED HER TO SEVERAL OF MY CLIENTS, YES.

12:53PM 23   Q.   YES, YES.

12:53PM 24        AND I THINK ON DIRECT YOU HAD TALKED ABOUT THE FACT THAT

12:53PM 25   YOUR PERSONAL INVESTMENT DECISION WAS MADE AT THE END OF

12:53PM   1    OCTOBER; CORRECT?

12:53PM   2    A.   IN THAT -- SOMEWHERE BETWEEN DURING LATE SEPTEMBER AND

12:53PM   3    OCTOBER.

12:53PM   4    Q.   OKAY.  AND WE CAN COME BACK AND REFRESH THAT, BUT DO YOU

12:53PM   5    RECALL THAT THE WIRE TRANSFER THAT MR. SCHENK SHOWED YOU WENT

12:54PM   6    OUT ON OR ABOUT HALLOWEEN OF 2014?

12:54PM   7    A.   I THINK THAT'S RIGHT.  I'D HAVE TO LOOK BACK AT IT AGAIN

12:54PM   8    TO PICK THE EXACT DATE.

12:54PM   9    Q.   I'LL CIRCLE THAT FOR NOW AND WE CAN GO BACK THROUGH THAT.

12:54PM  10    A.   OKAY.  OKAY.

12:54PM  11    Q.   AND SO AFTER THIS POINT IN TIME WHERE YOU PREPARED THE

12:54PM  12    MEMO, YOU CONTINUE TO GET INFORMATION AND LEARN MORE ABOUT

12:54PM  13    THERANOS; RIGHT?

12:54PM  14    A.   I DID.

12:54PM  15    Q.   OKAY.  AND I'M GOING TO GO THROUGH AND SHOW YOU SOME

12:54PM  16    DOCUMENTS.

12:54PM  17         IN THIS PERIOD HERE BETWEEN, BETWEEN THE 2ND AND YOUR

12:54PM  18    INVESTMENT, THERE WERE -- THERE WERE A COUPLE OF TRIPS TO

12:54PM  19    THERANOS AS WELL?

12:54PM  20    A.   THERE WERE.

12:54PM  21    Q.   AND YOU WERE LEARNING MORE KIND OF THROUGHOUT THIS

12:54PM  22    PROCESS; CORRECT?

12:54PM  23    A.   INCREMENTALLY, YES.

12:54PM  24    Q.   OKAY.  LET'S GO TO EXHIBIT 4221.

12:55PM  25    A.   IS THAT IN THE SAME VOLUME?

12:55PM  1    Q.   IT SHOULD BE IN VOLUME ONE OF THE MATERIALS THAT I'VE

12:55PM  2    PROVIDED --

12:55PM  3    A.   OH, I HAVE IT.  I HAVE IT.

12:55PM  4    Q.   -- AND I BELIEVE IT'S IN EVIDENCE.

12:55PM  5         COULD WE PUBLISH THAT?

12:55PM  6         YOU MAY NEED TO FLIP THE SWITCH, MS. KRATZMANN.  THANK

12:55PM  7    YOU.

12:56PM  8         OKAY.  AND IF WE CAN GO TO THE SECOND PAGE AND BLOW UP THE

12:56PM  9    EMAIL AT THE TOP.

12:56PM 10         THIS -- HERE THERE'S A NOTE THAT YOU HAD FOLLOWED UP TO

12:56PM 11    GET THE CDA SIGNED WITH THE COX AND DEVOS FAMILIES; CORRECT?

12:56PM 12    A.   I'M TRYING TO FIND THE REFERENCES TO THE CONFIDENTIAL

12:56PM 13    DISCLOSURE AGREEMENTS.

12:56PM 14         YOU'RE TALKING IN THE FIRST, THE TOP EMAIL ON --

12:56PM 15    Q.   I'M FOCUSSED ON THE SCREEN, SIR, BUT IF YOU PREFER THE

12:56PM 16    PAPER --

12:56PM 17    A.   OKAY.

12:56PM 18    Q.   -- IT'S ON THE SECOND PAGE.

12:57PM 19    A.   OKAY.

12:57PM 20    Q.   AND DO YOU SEE THERE'S AN EMAIL SEPTEMBER 18TH, 2014?

12:57PM 21    A.   YES, I DO.

12:57PM 22    Q.   AND THAT'S FROM YOU TO MS. HOLMES.

12:57PM 23         DO YOU SEE THAT?

12:57PM 24    A.   YES.

12:57PM 25    Q.   AND THIS IS JUST WITHIN A DAY OR SO AFTER THE BDT

12:57PM   1    CONFERENCE; CORRECT?

12:57PM   2    A.   THAT'S CORRECT.

12:57PM   3    Q.   AND AFTER THE MEETINGS THAT WE JUST DISCUSSED; CORRECT?

12:57PM   4    A.   THAT'S CORRECT.

12:57PM   5    Q.   OKAY.  AND HERE IT SAYS -- YOU LET MS. HOLMES KNOW THAT

12:57PM   6    YOU'RE FOLLOWING UP TO GET THE CDA SIGNED BY THE COX, TUBERGEN,

12:57PM   7    AND DEVOS FAMILIES; CORRECT?

12:57PM   8    A.   THE COX AND THE DEVOS FAMILIES.  JERRY TUBERGEN JUST

12:57PM   9    WORKED FOR THE DEVOS FAMILY.

12:57PM   10   Q.   THANK YOU.

12:57PM   11        AND IT NOTES THAT YOU'VE SUGGESTED THAT BOTH SIGN AND GET

12:57PM   12   IT FORWARDED TO HER; CORRECT?

12:57PM   13   A.   YES.

12:57PM   14   Q.   OKAY.  AND DOES THIS INDICATE THAT, TO YOU AT THIS TIME

12:57PM   15   THAT THERE HADN'T BEEN A LOT OF DETAILED CONFIDENTIAL

12:57PM   16   INFORMATION THAT WAS SHARED YET, THOSE MEETINGS WERE JUST

12:58PM   17   PRELIMINARY MEET AND GREETS; RIGHT?

12:58PM   18   A.   THEY WERE JUST INTRODUCTIONS.

12:58PM   19   Q.   OKAY.  AND DO YOU SEE THE NEXT SENTENCE THERE, IT SAYS,

12:58PM   20   "THEY HAVE BOTH CALLED TO SAY HOW EXCITED THEY ARE TO BE

12:58PM   21   CONSIDERED AS POSSIBLE INVESTORS IN THERANOS."

12:58PM   22        DO YOU SEE THAT?

12:58PM   23   A.   I DO SEE THAT.

12:58PM   24   Q.   OKAY.  AND COMING OUT OF THE BDT CONFERENCE -- AND, AGAIN,

12:58PM   25   I DON'T WANT THE SUBSTANCE -- BUT YOU HAD SOME TELEPHONIC

12:58PM 1    COMMUNICATIONS WITH CLIENTS; CORRECT?

12:58PM 2    A.   WELL, BASED ON THIS, I ASSUME THEY CALLED ME AND SAID,

12:58PM 3    YES, WE WOULD LIKE TO TAKE A LOOK AT THIS.

12:58PM 4    Q.   OKAY.  AND I DON'T WANT TO GO BEYOND WHAT IS IN THE

12:58PM 5    EMAIL --

12:58PM 6    A.   RIGHT.

12:58PM 7    Q.   -- BUT THERE WAS SOME FOLLOW-UP THAT YOU PARTICIPATED IN

12:58PM 8    COMING OUT OF THOSE MEETINGS; CORRECT?

12:58PM 9    A.   YEAH.  IT INDICATES THAT THEY BOTH HAD CALLED ME AND SAID

12:58PM 10   THAT THEY WERE EXCITED ABOUT THE OPPORTUNITY.

12:58PM 11   Q.   OKAY.  AND YOU SEE THERE IT SAYS, "I HOPE YOUR TRIP TO

12:58PM 12   CLEVELAND IS GOING WELL."

12:58PM 13   A.   RIGHT.

12:58PM 14   Q.   AND WAS THAT YOUR UNDERSTANDING, THAT MS. HOLMES WAS GOING

12:59PM 15   TO THE CLEVELAND CLINIC?

12:59PM 16   A.   I DON'T RECALL.

12:59PM 17   Q.   OKAY.  FAIR ENOUGH.

12:59PM 18       LET'S GO UP TO THE NEXT EMAIL IN THE CHAIN.

12:59PM 19       JUST QUICKLY.  SHE ACKNOWLEDGES THIS AND OFFERS TO HAVE

12:59PM 20   YOU OUT TO CALIFORNIA AND SAYS THAT YOU'RE WELCOME THERE;

12:59PM 21   CORRECT?

12:59PM 22   A.   YES.

12:59PM 23   Q.   OKAY.  LET'S GO UP AND LOOK AT YOUR RESPONSE.

12:59PM 24       AND DO YOU SEE THERE'S A REFERENCE IN THE FIRST PARAGRAPH

12:59PM 25   ABOUT SETTING UP A MEETING WITH ANDREAS AND THE NIARCHOS

12:59PM   1    FOUNDATION?

12:59PM   2    A.   YES.

12:59PM   3    Q.   AND SO YOU WERE WORKING WITH THOSE FOLKS TO GET SOMETHING

12:59PM   4    SET UP TO GO OUT TO CALIFORNIA?

12:59PM   5    A.   I WAS WORKING TO MAKE AN INTRODUCTION TO THEM SINCE THEY

12:59PM   6    HADN'T OBVIOUSLY BEEN INTRODUCED AT THE BDT CONFERENCE.

12:59PM   7    Q.   RIGHT.   RIGHT.   AND THEN IN THE NEXT SENTENCE -- I'M

01:00PM   8    SORRY, THE NEXT PARAGRAPH YOU NOTE THAT GREG PENNER IS WORKING

01:00PM   9    ON ANOTHER DATE WITH HIS TEAM AS WELL.

01:00PM  10        DO YOU SEE THAT?

01:00PM  11    A.   I DO SEE THAT.

01:00PM  12    Q.   AND YOU NOTE THAT JERRY TUBERGEN HAS A DATE WITH THE DEVOS

01:00PM  13    FAMILY; CORRECT?

01:00PM  14    A.   YES.

01:00PM  15    Q.   AND THEN IN THE NEXT SENTENCE YOU REFER TO THE COX FAMILY,

01:00PM  16    AND YOU DON'T KNOW IF THEY HAVE A DATE, BUT YOU'VE BEEN HAVING

01:00PM  17    SOME DISCUSSIONS WITH THE COX FAMILY ABOUT THERANOS; CORRECT?

01:00PM  18    A.   YEAH.

01:00PM  19    Q.   AND, AGAIN, I DON'T WANT TO KNOW THE SUBSTANCE.

01:00PM  20    A.   WELL, IT SAID I HAD A DISCUSSION ABOUT THEM COMING OUT TO

01:00PM  21    SEE ELIZABETH IN CALIFORNIA.

01:00PM  22    Q.   FAIR ENOUGH.

01:00PM  23        AND THEN YOU MENTION THAT YOU HAD ALSO, YOU SEE, TALKED

01:00PM  24    WITH DR. KISSINGER ABOUT A COUPLE OF OTHER FAMILIES --

01:01PM  25    A.   YES.

01:01PM 1    Q.   -- WHO MIGHT BE INTERESTED IN INVESTING.

01:01PM 2         DO YOU SEE THAT?

01:01PM 3    A.   YES, I DO SEE THAT.

01:01PM 4    Q.   OKAY.  AND YOU MENTION WITHIN THERE THE POSSIBILITY THAT

01:01PM 5    YOU MIGHT SHARE A MEMO THAT YOU PREPARED?

01:01PM 6    A.   THAT'S THE MEMO THAT WE ALREADY DISCUSSED.

01:01PM 7    Q.   RIGHT.  AND YOU JUST WANTED TO ASSURE MS. HOLMES THAT IF

01:01PM 8    YOU WERE GOING TO DISCLOSE THE MEMO, THAT YOU'D GET A CDA

01:01PM 9    BEFORE YOU SHARED IT; CORRECT?

01:01PM 10   A.   THIS WAS A QUESTION ABOUT DR. KISSINGER SENDING THAT MEMO

01:01PM 11   ON TO OTHER FAMILIES.

01:01PM 12   Q.   RIGHT.  AND YOU WERE JUST --

01:01PM 13   A.   AND HE SAID -- HE HAD ASKED ME WHETHER I WAS COMFORTABLE

01:01PM 14   WITH IT.

01:01PM 15        AND THEN I SAID, YES, IF THEY FIRST HAD BEEN CLEARED BY

01:01PM 16   THERANOS AND ELIZABETH.

01:01PM 17   Q.   RIGHT.  AND AS YOU SIT HERE, YOU DON'T KNOW WHETHER HE

01:01PM 18   ACTUALLY COMMUNICATED THAT TO OTHER PEOPLE?

01:01PM 19   A.   I DON'T.

01:01PM 20   Q.   OKAY.  AND IF WE JUST GO UP THE CHAIN, THIS IS

01:02PM 21   SEPTEMBER 28TH, DO YOU SEE THERE'S A NOTE THAT GREG WAS GOING

01:02PM 22   TO BE GOING TO THERANOS THAT WEEK?

01:02PM 23   A.   YES.  THIS IS ELIZABETH TELLING ME THAT I GUESS SHE HAD

01:02PM 24   SET UP A TIME FOR GREG TO GO TO THERANOS THAT WEEK.

01:02PM 25   Q.   RIGHT.  AND THAT IS GREG PENNER YOU UNDERSTAND HER TO BE

01:02PM   1    REFERRING TO?

01:02PM   2    A.   I UNDERSTOOD IT TO BE A REFERENCE TO GREG PENNER.

01:02PM   3    Q.   AND THEN JERRY WAS GOING TO BE SETTING UP A DATE SHORTLY

01:02PM   4    AS WELL.

01:02PM   5         DO YOU SEE THAT?

01:02PM   6    A.   THAT'S WHAT ELIZABETH SAID IN THE EMAIL, AND I UNDERSTOOD

01:02PM   7    THAT TO BE JERRY TUBERGEN.

01:02PM   8    Q.   OKAY.  IF I CAN NEXT DRAW YOUR ATTENTION ON VOLUME TWO TO

01:03PM   9    EXHIBIT 14149.

01:03PM   10   A.   I'M THERE.

01:03PM   11   Q.   DO YOU SEE THAT?

01:04PM   12        AND DO YOU RECOGNIZE THIS TO BE EMAIL CORRESPONDENCE IN

01:04PM   13   LATE SEPTEMBER BETWEEN YOU AND MS. HOLMES WITH RESPECT TO

01:04PM   14   THERANOS INVESTMENT MATTERS?

01:04PM   15   A.   YES, IT IS A SERIES OF EMAILS IN LATE SEPTEMBER.

01:04PM   16   Q.   I THINK WE LOST YOUR MIKE.  IF YOU COULD JUST PULL IT?

01:04PM   17   A.   I'M SORRY.

01:04PM   18        YES, IT IS -- IT DOES APPEAR TO BE A SERIES OF EMAILS

01:04PM   19   BETWEEN ME AND ELIZABETH, AND THEY ALL APPEAR TO BE SEPTEMBER

01:04PM   20   THE 25TH THROUGH SEPTEMBER THE 29TH.

01:04PM   21             MR. WADE:  MOVE THE ADMISSION OF 14149.

01:04PM   22             MR. SCHENK:  NO OBJECTION.

01:04PM   23             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:04PM   24        (DEFENDANT'S EXHIBIT 14149 WAS RECEIVED IN EVIDENCE.)

01:04PM   25             MR. WADE:  IF WE CAN GO TO THE BOTTOM EMAIL ON THE

01:04PM  1    FIRST PAGE.

01:04PM  2              THE WITNESS:  YES.

01:05PM  3              MR. WADE:  AND BLOW THAT UP.

01:05PM  4    Q.  THIS IS AN EMAIL WHERE YOU'RE TRYING TO ARRANGE A TRIP FOR

01:05PM  5    MEMBERS OF THE NIARCHOS FOUNDATION TO MEET WITH MS. HOLMES?

01:05PM  6    A.  THAT'S CORRECT.

01:05PM  7    Q.  AND HER TEAM; CORRECT?

01:05PM  8    A.  YES.

01:05PM  9    Q.  OKAY.  AND THEN YOU SEE THAT MR. DRACOPOULOS --

01:05PM  10   A.  DRACOPOULOS.

01:05PM  11   Q.  DRACOPOULOS -- THANK YOU -- MAY NOT BE ABLE TO MAKE THE

01:05PM  12   TRIP, BUT IF NOT, HE'LL TRY TO DO IT ANOTHER TIME.

01:05PM  13        DO YOU SEE THAT?

01:05PM  14   A.  LET'S SEE.  LET'S SEE.  THAT WAS -- YES, IN THE, IN THE

01:06PM  15   SORT OF SECOND -- WELL, THE TOP EMAIL, OR NEXT TO THE TOP

01:06PM  16   EMAIL.

01:06PM  17   Q.  OKAY.  AND SO THE IDEA WAS THEN GOING TO BE THAT YOU WERE

01:06PM  18   GOING TO ATTEND THE MEETING WITH OTHER MEMBERS OF THE

01:06PM  19   FOUNDATION, AND YOU COULD LOOP BACK WITH MR. DRACOPOULOS?

01:06PM  20   A.  YES.

01:06PM  21   Q.  OKAY.  LET ME BRING YOU TO EXHIBIT 4221, WHICH IS IN

01:06PM  22   VOLUME ONE.

01:06PM  23        OH, I'M SORRY.  WRONG DOCUMENT.

01:06PM  24        14 -- GO BACK TO THE OTHER BINDER.  14 --

01:06PM  25   A.  BACK TO VOLUME ONE.

01:06PM  1    Q.  VOLUME TWO.  14124.

01:07PM  2    A.  I'M THERE.

01:07PM  3    Q.  AND THIS IS A COMMUNICATION IN EARLY OCTOBER OF 2014 WITH

01:07PM  4    RESPECT TO THERANOS INVESTMENT MATTERS; CORRECT?

01:07PM  5    A.  YES.

01:07PM  6    Q.  AND BETWEEN YOU AND MS. HOLMES; CORRECT?

01:07PM  7    A.  THAT'S CORRECT.

01:07PM  8    Q.  OKAY.

01:07PM  9        MOVE THE ADMISSION OF 14124.

01:07PM  10            MR. SCHENK:  NO OBJECTION.

01:07PM  11            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:07PM  12        (DEFENDANT'S EXHIBIT 14124 WAS RECEIVED IN EVIDENCE.)

01:07PM  13    BY MR. WADE:

01:07PM  14    Q.  IF WE CAN START WITH THE EMAIL ON THE BOTTOM OF THE FIRST

01:07PM  15    PAGE.

01:07PM  16        YOU NOTE SHE SAYS, "I AM HAPPY THAT EACH OF THE POTENTIAL

01:08PM  17    INVESTORS FROM THE WALTON, COX, DEVOS, AND NIARCHOS FAMILIES

01:08PM  18    ARE PROCEEDING VERY WELL AS I WOULD EXPECT."

01:08PM  19        DO YOU SEE THAT?

01:08PM  20    A.  THAT'S WHAT I STATE, YES.

01:08PM  21    Q.  YEP.  AND THEN THERE'S SOME REFERENCES THERE, THERE'S AN

01:08PM  22    INDICATION THAT MR. PENNER BROUGHT YOU UP TO SPEED.

01:08PM  23        DO YOU SEE THAT?

01:08PM  24    A.  YES, I DO SEE IT.

01:08PM  25    Q.  AND DO YOU BELIEVE THAT YOU WERE HAVING TELEPHONIC

01:08PM   1    COMMUNICATIONS WITH MR. PENNER?

01:08PM   2    A.   YOU KNOW, I'M SURE I TALKED TO HIM PERIODICALLY.

01:08PM   3    Q.   OKAY.  AND DO YOU SEE IT NOTES, THERE ARE A COUPLE OF OPEN

01:08PM   4    QUESTIONS THAT MR. PENNER HAD FLAGGED FOR YOU AND YOU INTENDED

01:08PM   5    TO RAISE THOSE WITH MS. HOLMES.

01:08PM   6         DO YOU SEE THAT?

01:08PM   7    A.   YES.

01:08PM   8    Q.   OKAY.  AS YOU SIT HERE TODAY, DO YOU RECALL WHAT THOSE

01:08PM   9    ISSUES WERE?

01:08PM  10    A.   I DON'T.

01:08PM  11    Q.   OKAY.  AND THEN THE NEXT PARAGRAPH MENTIONS THAT YOU WERE

01:08PM  12    AWARE THAT MR. TUBERGEN HAD SET THE MEETING IN PALO ALTO ON THE

01:09PM  13    14TH.

01:09PM  14         DO YOU SEE THAT?

01:09PM  15    A.   YEAH.

01:09PM  16    Q.   AND YOU NOTED THAT HE'S BRINGING SEVERAL FAMILY MEMBERS,

01:09PM  17    INCLUDING DOUG DEVOS, WHO IS THE CEO OF AMWAY; CORRECT?

01:09PM  18    A.   I SEE.

01:09PM  19    Q.   OKAY.  AND YOU HAD BEEN IN CONTACT WITH MR. TUBERGEN AS

01:09PM  20    WELL DURING THIS PERIOD?

01:09PM  21    A.   I'M ASSUMING JERRY TOLD ME THAT HE HAD SET UP THIS MEETING

01:09PM  22    FOR THE MEMBERS OF THE DEVOS FAMILY AND ELIZABETH.

01:09PM  23    Q.   OKAY.  AND THEN YOU NOTE THAT YOU'RE GOING TO SEE

01:09PM  24    MS. HOLMES ON THE 17TH WITH AT LEAST TWO MEMBERS OF THE

01:09PM  25    FOUNDATION?

01:09PM 1    A.   TO INTRODUCE THE NIARCHOS FOUNDATION, YES.

01:09PM 2    Q.   AND THEN ON THE COX FAMILY, YOU GIVE A REPORT BACK ON THAT

01:09PM 3    MEETING.

01:09PM 4         DO YOU SEE THAT?

01:09PM 5    A.   I SAID, "IT SOUNDS LIKE YOU HAD A VERY GOOD MEETING WITH

01:10PM 6    ALEX TAYLOR."

01:10PM 7    Q.   RIGHT.  SO BY THE POINT OF THIS MEETING, THERE HAD ALREADY

01:10PM 8    BEEN A MEETING BETWEEN MS. HOLMES AND ALEX TAYLOR?

01:10PM 9    A.   I ASSUME THAT'S CORRECT.  I WASN'T KEPT UP TO SPEED ON ALL

01:10PM 10   THE MEETINGS, BUT THIS IS CERTAINLY AN INDICATION THAT I KNEW

01:10PM 11   ABOUT THAT MEETING.

01:10PM 12   Q.   AND AGAIN, WITHOUT REVEALING THE SUBSTANCE, THAT YOU HAD

01:10PM 13   BEEN IN COMMUNICATION WITH MR. TAYLOR ABOUT THE MEETING;

01:10PM 14   CORRECT?

01:10PM 15   A.   COULD YOU ASK THAT AGAIN?  I DIDN'T QUITE UNDERSTAND IT.

01:10PM 16   Q.   YEAH, I DON'T WANT THE SUBSTANCE OF THE COMMUNICATIONS

01:10PM 17   BECAUSE OF YOUR RELATIONSHIP.

01:10PM 18   A.   RIGHT.

01:10PM 19   Q.   BUT IN THIS TIME PERIOD YOU WERE IN COMMUNICATION WITH

01:10PM 20   MR. TAYLOR ABOUT THE THERANOS MATTERS; CORRECT?

01:10PM 21   A.   WELL, IT OBVIOUSLY -- IT WOULD APPEAR HE CERTAINLY TOLD ME

01:10PM 22   THAT HE HAD A GOOD MEETING WITH ELIZABETH.

01:10PM 23   Q.   AND DO YOU SEE IN THE EMAIL CHAIN ABOVE, MS. HOLMES JUST

01:10PM 24   GIVES YOU A REPORT BACK ON THE STATUS OF THESE CONTACTS AS WELL

01:11PM 25   AND THE FACT THAT SHE HAD BEEN IN COMMUNICATION WITH SOME OF

01:11PM 1      YOUR CLIENTS.

01:11PM 2          DO YOU SEE THAT?

01:11PM 3      A.   YES.

01:11PM 4      Q.   AND DO YOU RECALL THAT DURING THE -- THIS TIME PERIOD

01:11PM 5      THAT -- LET ME HAVE YOU LOOK AT 14125.

01:12PM 6          YOUR HONOR, I WOULD MOVE THE ADMISSION OF 14125 FOR THE

01:12PM 7      NONHEARSAY PURPOSE OF MY CLIENT'S STATE OF MIND, AND IN PART SO

01:12PM 8      THAT I CAN ALLOW THE WITNESS TO KNOW WHAT HE CAN TALK ABOUT

01:12PM 9      WITHOUT GOING INTO PRIVILEGE MATTERS.

01:12PM 10         (PAUSE IN PROCEEDINGS.)

01:12PM 11              MR. SCHENK:  FOUNDATION AND HEARSAY, YOUR HONOR.

01:12PM 12              THE COURT:  I'M NOT SURE I UNDERSTAND THE CONNECTION

01:12PM 13     THAT YOU JUST SPOKE TO, MR. WADE.

01:12PM 14              MR. WADE:  WELL, THE INVOLVEMENT OF MR. MOSLEY IN

01:12PM 15     THESE COMMUNICATIONS WITH HIS CLIENT IS KNOWN TO MS. HOLMES,

01:13PM 16     AND SO I OFFER THE DOCUMENT FOR THAT PURPOSE.

01:13PM 17         AS A PRACTICAL MATTER, I WOULD ASSUME THAT MR. MOSLEY

01:13PM 18     WOULD WANT TO BE CAUTIOUS ABOUT THE COMMUNICATIONS HE WAS

01:13PM 19     HAVING WITH MR. TAYLOR.

01:13PM 20         BUT TO THE EXTENT THAT THOSE COMMUNICATIONS ARE

01:13PM 21     COMMUNICATED BY MR. TAYLOR TO MS. HOLMES, I THINK HE COULD BE

01:13PM 22     COMFORTABLE DISCUSSING THEM WITHOUT CONCERN ABOUT PRIVILEGE.

01:13PM 23              THE COURT:  CAN YOU JUST ASK HIM QUESTIONS ABOUT IF

01:13PM 24     THIS GOES TO AN ISSUE ABOUT THE INVESTMENT OR AN ISSUE ABOUT

01:13PM 25     THE --

01:13PM  1          MR. WADE:  YEAH, IT'S ALL ABOUT THE INVESTMENT.

01:13PM  2          THE COURT:  OKAY.  JUST ASK HIM QUESTIONS.

01:13PM  3          MR. WADE:  OKAY.

01:13PM  4   Q.  DO YOU RECALL THAT YOU WERE HAVING COMMUNICATIONS WITH

01:13PM  5   MR. TAYLOR FROM COX AND JOHN DYER ABOUT THE THERANOS INVESTMENT

01:13PM  6   IN EARLY OCTOBER 2014?

01:13PM  7   A.  YOU KNOW, I SUSPECT I HAD HAD ONE OR MORE CONVERSATIONS

01:13PM  8   WITH THEM.

01:13PM  9       I DON'T REALLY HAVE ANY PARTICULAR MEMORY OF IT OR

01:14PM 10   HONESTLY WHAT IT WAS REALLY ABOUT, BUT I SUSPECT I HAD SOME

01:14PM 11   CONVERSATIONS DURING THAT PERIOD.

01:14PM 12   Q.  AND DO YOU RECALL THAT MEMBERS OF THE COX FAMILY WANTED

01:14PM 13   YOU TO COME OUT AND PARTICIPATE IN THE MEETING WITH THEM AT

01:14PM 14   THERANOS?

01:14PM 15   A.  AT SOME POINT THEY DID SUGGEST AND ASK ME WHETHER I WAS

01:14PM 16   AVAILABLE TO ATTEND.

01:14PM 17   Q.  AND DO YOU RECALL THAT -- AND YOU DID, IN FACT, ATTEND;

01:14PM 18   CORRECT?

01:14PM 19   A.  YES, I DID.

01:14PM 20   Q.  OKAY.  AND DID A MEETING HAPPEN IN A CONFERENCE ROOM?

01:14PM 21   A.  I DON'T REMEMBER.

01:14PM 22   Q.  OKAY.  AND I GUESS WHAT I'M ASKING IS, WERE THE PARTIES

01:14PM 23   SITTING ACROSS FROM ONE ANOTHER HAVING A DISCUSSION?

01:14PM 24   A.  I CERTAINLY REMEMBER SITTING IN A CONFERENCE TABLE.

01:14PM 25   Q.  OKAY.  AND DO YOU REMEMBER WHETHER YOU WERE SITTING NEXT

01:14PM  1    TO MR. TAYLOR OR NEXT TO MS. HOLMES?

01:14PM  2    A.   I DON'T.

01:14PM  3    Q.   OKAY.  DO YOU RECALL ONE OF THE ISSUES THAT WAS -- SOME OF

01:15PM  4    THE ISSUES THAT WERE UNDER DISCUSSION WAS EXECUTION OF THE 2015

01:15PM  5    GROWTH PLAN?

01:15PM  6    A.   I DON'T SPECIFICALLY REMEMBER.

01:15PM  7    Q.   DO YOU RECALL AN AREA THAT YOU WERE INTERESTED IN

01:15PM  8    DISCUSSING WITH MR. TAYLOR WAS THE WALGREENS AND SAFEWAY

01:15PM  9    CONTRACTS AND THEIR TERMS, DURATION, AND REVENUE ISSUES?

01:15PM  10   A.   YOU KNOW, I DON'T.  I DON'T SPECIFICALLY REMEMBER.

01:15PM  11   Q.   DOES LOOKING AT 14125 REFRESH YOUR RECOLLECTION THAT THE

01:15PM  12   WALGREENS AND SAFEWAY EXECUTION IN 2015 WAS ONE OF THE ISSUES

01:16PM  13   THAT YOU WERE DISCUSSING WITH MR. TAYLOR IN OCTOBER OF 2014?

01:16PM  14   A.   I MEAN, THIS IS OBVIOUSLY AN EMAIL WHICH I WASN'T A PARTY

01:16PM  15   TO.  IT, IT DOESN'T SPECIFICALLY -- I DON'T HAVE ANY PARTICULAR

01:16PM  16   MEMORY OF THAT.

01:16PM  17   Q.   OKAY.  AND DOES LOOKING AT THIS EMAIL REFRESH YOUR

01:16PM  18   RECOLLECTION THAT THE WALGREENS AND SAFEWAY CONTRACTS IN THEIR

01:16PM  19   TERMS, DURATION, AND REVENUE SPLIT WERE ISSUES THAT YOU WERE

01:16PM  20   INTERESTED IN?

01:16PM  21   A.   UM, GIVEN THAT WALGREENS IN PARTICULAR WAS EXPECTED TO BE

01:16PM  22   A MAJOR SOURCE OF REVENUE, I WAS CERTAINLY INTERESTED IN IT.

01:16PM  23   Q.   OKAY.  AND DO YOU RECALL THAT THAT WAS AN ISSUE THAT YOU

01:17PM  24   WERE COMMUNICATING WITH MR. TAYLOR?

01:17PM  25   A.   I DON'T.

01:17PM  1    Q.   OKAY.  IF I CAN BRING YOU TO DOCUMENT 14151.

01:17PM  2         DO YOU HAVE THAT IN FRONT OF YOU?

01:17PM  3    A.   I DO.

01:17PM  4    Q.   AND DO YOU SEE THAT TO BE AN EMAIL BETWEEN YOU AND

01:18PM  5    MS. HOLMES ABOUT THERANOS INVESTMENT MATTERS IN OCTOBER OF

01:18PM  6    2014?

01:18PM  7    A.   THERE -- I THINK THERE ARE TWO EMAILS HERE, BUT THEY DO

01:18PM  8    SEEM -- CERTAINLY ABOUT THAT SUBJECT, YES.

01:18PM  9              MR. WADE:  MOVE THE ADMISSION OF 14151.

01:18PM 10              MR. SCHENK:  NO OBJECTION.

01:18PM 11              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:18PM 12         (DEFENDANT'S EXHIBIT 14151 WAS RECEIVED IN EVIDENCE.)

01:18PM 13    BY MR. WADE:

01:18PM 14    Q.   AND I'M FOCUSSED JUST ON THE EMAIL ON THE TOP.

01:18PM 15    A.   OKAY.

01:18PM 16    Q.   THE WHOLE THING THERE.  THANK YOU.

01:18PM 17         AND DO YOU SEE HERE THAT YOU NOTE THAT YOU WERE PLANNING

01:18PM 18    TO MAKE A TRIP WITH ALEX TAYLOR ON FRIDAY, THE 10TH?

01:18PM 19         DO YOU SEE THAT?

01:18PM 20    A.   I DO SEE THAT.

01:18PM 21    Q.   AND THAT YOU WERE THEN GOING TO MAKE ANOTHER TRIP ON

01:19PM 22    OCTOBER THE 17TH WITH THE NIARCHOS FOUNDATION?

01:19PM 23    A.   I SEE THAT.

01:19PM 24    Q.   OKAY.  AND YOU DID, IN FACT, MAKE THOSE TRIPS ON THOSE

01:19PM 25    DATES; CORRECT?

01:19PM  1    A.   UM, I CAN'T -- YOU KNOW -- I ASSUME -- YOU'RE TELLING ME

01:19PM  2    IT WAS ON THE 10TH, FRIDAY WAS THE 10TH, THEN IT WAS FRIDAY THE

01:19PM  3    10TH.  BUT, YOU KNOW, I DON'T HAVE A CALENDAR IN FRONT OF ME.

01:19PM  4    Q.   I'M JUST INFERRING FROM FRIDAY IS ALSO THE 17TH.

01:19PM  5         DO YOU SEE THAT?

01:19PM  6    A.   OKAY.  THAT'S A FAIR INFERENCE.

01:19PM  7    Q.   IS IT A FAIR INFERENCE THAT THE PRIOR FRIDAY IS THE 10TH?

01:19PM  8    A.   I THINK SO.

01:19PM  9    Q.   OKAY.  AND YOU DID, IN FACT, ATTEND THOSE MEETINGS?

01:19PM 10    A.   YES, I DID.

01:19PM 11    Q.   OKAY.  AND LET'S GO TO -- DO YOU RECALL HOW LONG THE

01:19PM 12    MEETINGS WERE?

01:19PM 13    A.   I DON'T REMEMBER.

01:20PM 14    Q.   APPROXIMATELY?

01:20PM 15    A.   IT WAS CERTAINLY MORE THAN AN HOUR, MAYBE A COUPLE OF

01:20PM 16    HOURS.  I DON'T KNOW.  SOMETHING IN THAT RANGE.

01:20PM 17    Q.   OKAY.  AND DURING THAT THERE WAS DISCUSSION ABOUT A

01:20PM 18    VARIETY OF DIFFERENT THERANOS MATTERS?

01:20PM 19    A.   YES.

01:20PM 20    Q.   AND DO YOU HAVE ANY SPECIFIC RECOLLECTION OF WHAT WAS

01:20PM 21    DISCUSSED AS YOU SIT HERE TODAY?

01:20PM 22    A.   YOU KNOW, I DON'T.

01:20PM 23    Q.   AND DO YOU KNOW WHETHER YOU TOOK ANY NOTES DURING THOSE

01:20PM 24    MEETINGS?

01:20PM 25    A.   YOU KNOW, I HAVE A, I HAVE A NORMAL HABIT OF TAKING NOTES,

01:20PM   1    SO I SUSPECT THAT I DID.  BUT I ALSO HAVE A NORMAL HABIT OF

01:20PM   2    THROWING AWAY MY NOTES.

01:20PM   3    Q.   OKAY.  FAIR ENOUGH.

01:20PM   4         IF I COULD GO TO THE ELMO FOR JUST A SECOND,

01:20PM   5    MS. KRATZMANN.

01:20PM   6         I JUST WANT TO ADD IN -- I BELIEVE WE SAID THE FIRST

01:20PM   7    MEETING WAS ON THE 10TH, AND THE NEXT MEETING WAS ON THE 17TH;

01:20PM   8    CORRECT?

01:20PM   9    A.   CORRECT.

01:20PM  10    Q.   IF I COULD DRAW YOUR ATTENTION TO 14152.

01:21PM  11         AND DO YOU SEE THAT TO BE AN EMAIL BETWEEN YOU AND

01:22PM  12    MS. HOLMES IN ADVANCE OF THE NIARCHOS FAMILY?

01:22PM  13    A.   ON THE 17TH?  YES.

01:22PM  14    Q.   OKAY.  AND YOU HAD SENT, YOU HAD SENT SOME QUESTIONS THAT

01:22PM  15    THEY HAD IN ADVANCE SO SHE COULD PREPARE FOR THE MEETING; IS

01:22PM  16    THAT RIGHT?

01:22PM  17    A.   I'M NOT SURE I SEE REFERENCES TO IT.  BUT IS THERE A

01:22PM  18    REFERENCE TO HAVING SENT SOMETHING TO HER IN ADVANCE?

01:22PM  19    Q.   DO YOU SEE THE ATTACHMENT ON THE NEXT PAGE?

01:22PM  20    A.   OH, YES, IT SAYS THERANOS QUESTIONS.

01:22PM  21         YEAH, SO I -- I'M ASSUMING I SENT THIS AND IT WAS PREPARED

01:22PM  22    BY, A LIST OF QUESTIONS PREPARED BY THEIR INVESTMENT STAFF,

01:23PM  23    WHICH INCLUDED THE COO, THE CHIEF INVESTMENT OFFICER, AND

01:23PM  24    ANOTHER MEMBER OF THE INVESTMENT GROUP.

01:23PM  25    Q.   OKAY.  AND THIS IS --

01:23PM  1          I MOVE THE ADMISSION OF 14152.

01:23PM  2               MR. SCHENK:  NO OBJECTION.

01:23PM  3               THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:23PM  4          (DEFENDANT'S EXHIBIT 14152 WAS RECEIVED IN EVIDENCE.)

01:23PM  5     BY MR. WADE:

01:23PM  6     Q.   AND THIS IS THE COMMUNICATION.  YOU SEE THE REFERENCE TO

01:23PM  7     THOSE QUESTIONS THERE?

01:23PM  8     A.   YES.

01:23PM  9     Q.   AND THOSE HAD BEEN SHARED WITH YOU BY MEMBERS OF THE

01:23PM 10     NIARCHOS FOUNDATION; CORRECT?

01:23PM 11     A.   YES.

01:23PM 12     Q.   OKAY.

01:23PM 13     A.   THEY'RE CERTAINLY NOT QUESTIONS THAT I PUT TOGETHER.

01:23PM 14     Q.   OKAY.  IF YOU GO TO THE SECOND PAGE, YOU SEE A LIST OF

01:23PM 15     THOSE QUESTIONS; RIGHT?

01:23PM 16     A.   I DO.

01:23PM 17     Q.   OKAY.  LET'S GO BACK TO THE FIRST PAGE FOR JUST A SECOND.

01:23PM 18          DO YOU SEE THERE'S A REFERENCE THERE ACTUALLY AT THE START

01:23PM 19     OF THIS EMAIL TO A GREAT REPORT FROM JERRY TUBERGEN AFTER YOUR

01:23PM 20     MEETING, WHICH OBVIOUSLY WENT VERY WELL.

01:23PM 21          DO YOU SEE THAT?

01:23PM 22     A.   YES.

01:24PM 23     Q.   AND THAT MEETING WAS RIGHT AROUND THAT VERY TIME PERIOD;

01:24PM 24     RIGHT?

01:24PM 25     A.   I DON'T KNOW THE EXACT DATE OF THEIR MEETING.  YOU KNOW, I

01:24PM  1    WASN'T PRESENT AND DIDN'T HAVE ANY PART IN SETTING IT UP.

01:24PM  2    Q.   OKAY.  AND WITHOUT REVEALING THE SUBSTANCE, DO YOU RECALL

01:24PM  3    MR. TUBERGEN GIVING YOU A CALL TO GIVE YOU A REPORT?

01:24PM  4    A.   I DON'T RECALL SPECIFICALLY, BUT THIS WAS CERTAINLY AN

01:24PM  5    INDICATION THAT SAID I GOT A GREAT REPORT FROM JERRY, SO I

01:24PM  6    ASSUME THAT HE CALLED ME AND SAID WE HAD A NICE TIME.

01:24PM  7    Q.   UNDERSTOOD.  BUT BEYOND THAT --

01:24PM  8    A.   I DON'T SPECIFICALLY REMEMBER THE CALL.

01:24PM  9    Q.   UNDERSTOOD.

01:24PM 10         CAN I DRAW YOUR ATTENTION TO 14153?

01:24PM 11    A.   OKAY.

01:24PM 12    Q.   DO YOU SEE THAT TO BE ANOTHER EMAIL BETWEEN YOU AND

01:25PM 13    MS. HOLMES RELATING TO THE THERANOS INVESTMENT?

01:25PM 14    A.   IT LOOKS LIKE IT'S THREE EMAILS.

01:25PM 15    Q.   AN EMAIL CHAIN IN OCTOBER OF 2014?

01:25PM 16    A.   CORRECT.

01:25PM 17    Q.   OKAY.

01:25PM 18         MOVE THE ADMISSION OF 14153.

01:25PM 19             MR. SCHENK:  NO OBJECTION.

01:25PM 20             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:25PM 21         (DEFENDANT'S EXHIBIT 14153 WAS RECEIVED IN EVIDENCE.)

01:25PM 22    BY MR. WADE:

01:25PM 23    Q.   AND IF WE GO TO THE TOP EMAIL THERE.

01:25PM 24         DO YOU SEE THAT YOU COMMUNICATE ABOUT SEEING MS. HOLMES ON

01:25PM 25    IT LOOKS LIKE OCTOBER 17TH, 2014?

01:25PM  1    A.   I THINK THAT'S CORRECT.

01:25PM  2    Q.   AND YOU NOTE THAT ANDREAS IS UNABLE TO ATTEND?

01:25PM  3    A.   YES.

01:25PM  4    Q.   AND THEN YOU NOTE IN THE SECOND LINE, "FORTUNATELY,

01:26PM  5    ANDREAS TRUSTS MY JUDGMENT (AS WELL AS DR. KISSINGER'S) AND I

01:26PM  6    AM KEEPING HIM FULLY UP TO SPEED."

01:26PM  7         DO YOU SEE THAT?

01:26PM  8    A.   I DO SEE THAT.

01:26PM  9    Q.   OKAY.  SO YOU WERE GIVING BRIEFINGS TO MR. DRACOPOULOS

01:26PM  10   ABOUT WHAT WAS HAPPENING AT THESE MEETINGS?

01:26PM  11   A.   I HADN'T EVEN HAD THE MEETING YET, SO -- THIS WAS BEFORE

01:26PM  12   THE MEETING.

01:26PM  13   Q.   OKAY.  AND YOU SAY THAT "I AM KEEPING HIM FULLY UP TO

01:26PM  14   SPEED."

01:26PM  15        IS THAT WITH RESPECT TO THERANOS MATTERS GENERALLY?

01:26PM  16   A.   PROBABLY AT THIS POINT IT WAS ABOUT THE TIME OF THE

01:26PM  17   MEETING.

01:26PM  18   Q.   OKAY.  AND LET'S GO TO 2110.

01:26PM  19   A.   IS THAT IN THE OTHER VOLUME?

01:26PM  20   Q.   THAT SHOULD BE IN THE FRONT, TOWARD THE FRONT OF

01:26PM  21   VOLUME ONE, SIR.

01:27PM  22   A.   WHAT WAS THAT NUMBER AGAIN?

01:27PM  23   Q.   2110.

01:27PM  24   A.   OKAY.

01:27PM  25   Q.   AND DO YOU RECOGNIZE THIS TO BE AN EMAIL BETWEEN YOU AND

01:27PM 1     MS. HOLMES ON OCTOBER 21ST, 2014 RELATING TO THERANOS?

01:27PM 2     A.   I DO.

01:27PM 3             MR. WADE:  MOVE THE ADMISSION OF 2110.

01:27PM 4             MR. SCHENK:  I BELIEVE IT WAS ADMITTED, YOUR HONOR.

01:27PM 5             MR. WADE:  OH.  I STAND CORRECTED.

01:27PM 6             THE COURT:  WOULD YOU LIKE IT PUBLISHED?

01:27PM 7             MR. WADE:  I DON'T SEE IT AS ADMITTED.  MAYBE A

01:28PM 8     DIFFERENT VERSION?

01:28PM 9             MR. SCHENK:  NO OBJECTION.

01:28PM 10            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:28PM 11        (GOVERNMENT'S EXHIBIT 2110 WAS RECEIVED IN EVIDENCE.)

01:28PM 12    BY MR. WADE:

01:28PM 13    Q.   AND THIS IS JUST THE DATE OF THE EMAIL?

01:28PM 14         DO YOU SEE THAT?

01:28PM 15         AND DO YOU SEE THE REFERENCE, THE SUBJECT IS MEETING LAST

01:28PM 16    FRIDAY?

01:28PM 17    A.   I SEE THAT.

01:28PM 18    Q.   AND THAT REFERS TO YOUR MEETING OF OCTOBER 17TH WITH THE

01:28PM 19    NIARCHOS FOUNDATION?

01:28PM 20    A.   I BELIEVE IT DOES.

01:28PM 21    Q.   WITH MS. HOLMES AND THE NIARCHOS FOUNDATION?

01:28PM 22    A.   YES, AND THE INVESTMENT PEOPLE FROM THE NIARCHOS

01:28PM 23    FOUNDATION.

01:28PM 24    Q.   AND DO YOU SEE IT STARTS IN THE SECOND PARAGRAPH THERE, IT

01:28PM 25    SAYS, "OVER THE WEEKEND, I HAD A CHANCE TO FILL ANDREAS IN ON

01:28PM  1    THE MEETING."

01:28PM  2         DO YOU SEE THAT?

01:28PM  3    A.   I DO.

01:28PM  4    Q.   AND THAT'S MR. DRACOPOULOS?

01:28PM  5    A.   YES, IT IS.

01:28PM  6    Q.   OKAY.  AND IT NOTES THAT BEFORE YOU HAD A CHANCE TO FILL

01:28PM  7    HIM IN, HE STATED THAT HE THOUGHT SOME OF THE FOUNDATION

01:29PM  8    MEMBERS HAD SOME ISSUES OR SOMETHING.

01:29PM  9         DO YOU SEE THAT?

01:29PM  10   A.   YES.

01:29PM  11   Q.   AND DO YOU RECALL THAT SOME OF THE FOUNDATION MEMBERS

01:29PM  12   SEEMED TO BE FOCUSSED ON WHAT WERE TECHNICAL, CONSIDERED TO BE

01:29PM  13   SORT OF TECHNICAL ISSUES?

01:29PM  14   A.   I THINK THEY WANTED, YOU KNOW, WANTED TO BE ABLE TO GET

01:29PM  15   INTO A LOT MORE INFORMATION THAN THEY HAD AVAILABLE AT THE

01:29PM  16   TIME.

01:29PM  17   Q.   OKAY.  AND DO YOU SEE A COUPLE LINES DOWN THERE, HE SAYS,

01:29PM  18   "HE ASKED ME TO APOLOGIZE FOR NOT BEING THERE TO CUT THROUGH

01:29PM  19   THE NONSENSE"?

01:29PM  20   A.   YES.

01:29PM  21   Q.   AND HE THEN -- LATER IN THE EMAIL, OR IN THE -- YEAH, THAT

01:29PM  22   PARAGRAPH RIGHT THERE.  IF WE CAN BLOW THAT UP.

01:29PM  23        YOU SAY IN THE SECOND SENTENCE, "HOWEVER, ANDREAS WANTED

01:29PM  24   ME TO ASK IF YOU WOULD BE AGREEABLE TO HIS MAKING A PERSONAL

01:30PM  25   INVESTMENT OF $25 MILLION."

01:30PM  1              DO YOU SEE THAT?

01:30PM  2     A.   I DO SEE THAT.

01:30PM  3     Q.   AND NOTES THAT HE CAN CLOSE BY THE END OF THE MONTH.

01:30PM  4              DO YOU SEE THAT?

01:30PM  5     A.   I DO SEE THAT.

01:30PM  6     Q.   AND SO MR. DRACOPOULOS WAS MAKING THIS INVESTMENT DECISION

01:30PM  7     WITHOUT HAVING VISITED THERANOS; CORRECT?

01:30PM  8     A.   HE HAD OBVIOUSLY DEBRIEFED WITH HIS INVESTMENT TEAM AND

01:30PM  9     OBVIOUSLY, AS STATED IN THE FIRST PARAGRAPH, STATED THAT HE

01:30PM  10    DIDN'T THINK THAT THEY WERE GOING TO GET TO THE POINT WHERE THE

01:30PM  11    FOUNDATION WOULD BE COMFORTABLE INVESTING.

01:30PM  12             BUT THEN HE OBVIOUSLY ASKED ME IF I WOULD ASK ELIZABETH,

01:30PM  13    WOULD SHE BE COMFORTABLE TAKING A $25 MILLION INVESTMENT FROM

01:30PM  14    HIM PERSONALLY.

01:30PM  15    Q.   RIGHT.  AND YOU RECALL THAT YOU, IN THE PRIOR EMAIL, YOU

01:30PM  16    HAD COMMITTED TO KEEPING -- YOU TOLD MS. HOLMES THAT YOU WERE

01:30PM  17    KEEPING HIM FULLY BRIEFED ON WHAT WAS GOING ON?

01:30PM  18    A.   WE DISCUSSED THAT THAT WAS BEFORE THE MEETING --

01:31PM  19    Q.   YES.

01:31PM  20    A.   -- AND SO I THINK THE ONLY THING I WAS KEEPING HIM BRIEFED

01:31PM  21    ON WAS THAT WE WERE GOING TO HAVE A MEETING.

01:31PM  22    Q.   WELL, YOU SAID HE TRUSTED YOUR JUDGMENT; RIGHT?

01:31PM  23    A.   HE'D BEEN A LONG-TERM CLIENT OF MINE.

01:31PM  24    Q.   OKAY.  AND SO DID YOU ENCOURAGE HIM TO MAKE THE

01:31PM  25    INVESTMENT?

01:31PM  1    A.   I DID NOT.

01:31PM  2    Q.   OKAY.  IF YOU, IF YOU GO DOWN, YOU SEE THE PARAGRAPH

01:31PM  3    STARTING "JERRY TUBERGEN"?

01:31PM  4    A.   YES.

01:31PM  5    Q.   AND AT THIS POINT, OCTOBER 21ST, 2014, YOU LEARNED THAT

01:31PM  6    THERE WAS AN AGREEMENT FOR THEM TO INVEST $100 MILLION;

01:31PM  7    CORRECT?

01:31PM  8    A.   WELL, I SAY THAT JERRY SENT ME AN EMAIL OBVIOUSLY THAT

01:31PM  9    THEY HAD, BETWEEN ELIZABETH AND JERRY, AGREED TO A $100 MILLION

01:31PM  10   INVESTMENT, YES.

01:31PM  11   Q.   RIGHT.  AND YOU WERE RELAYING THAT THEY WERE EXCITED ABOUT

01:31PM  12   IT; RIGHT?

01:31PM  13   A.   YES, THAT THEY WERE VERY EXCITED.

01:31PM  14   Q.   AND THEN YOU ALSO GAVE AN UPDATE ON THE WALTON INVESTMENT

01:32PM  15   IN THAT SAME PARAGRAPH.

01:32PM  16        DO YOU SEE THAT?

01:32PM  17   A.   I THINK ALL I SAY IS, YOU KNOW, AS I SAID, THERE WERE -- I

01:32PM  18   THINK GREG AND HIS TEAM WERE LOOKING AT THE COMPANY, AND ALL I

01:32PM  19   SAY IS THAT I SPOKE WITH GREG AND UNDERSTAND THE WAL-MART GROUP

01:32PM  20   IS NOT COMING UNTIL THE 29TH.

01:32PM  21        I DON'T THINK I GIVE ANY OTHER INFORMATION OTHER THAN

01:32PM  22   THAT.

01:32PM  23   Q.   RIGHT.  AND THAT THEY MIGHT MAKE AN INVESTMENT AFTER THE

01:32PM  24   FIRST CLOSING AT THE END OF OCTOBER; RIGHT?

01:32PM  25   A.   IT SAYS WITH THE POSSIBILITY OF THEIR COMING IN AFTER YOUR

01:32PM   1    FIRST CLOSING, YES, I SAY THAT.

01:32PM   2    Q.   OKAY.  AND I THINK MR. SCHENK HAD SHOWN YOU THIS EMAIL ON

01:32PM   3    DIRECT EXAMINATION, BECAUSE IN THIS EMAIL YOU ALSO COMMUNICATED

01:32PM   4    YOUR HOPE TO INVEST $6 MILLION; RIGHT?

01:32PM   5    A.   YES.

01:32PM   6    Q.   OKAY.  AND THIS IS WHEN YOU COMMUNICATED THAT HOPE TO

01:32PM   7    MS. HOLMES; CORRECT?

01:32PM   8    A.   THAT IS CORRECT.

01:32PM   9    Q.   OKAY.

01:33PM  10         MR. WADE:  YOUR HONOR, I DON'T RECALL WHEN YOU SAID

01:33PM  11    WE WERE GOING TO TAKE A BREAK.

01:33PM  12         THE COURT:  YOU SAID THAT WE WERE GOING TO FINISH

01:33PM  13    WITH THIS WITNESS BY THE END OF TODAY.

01:33PM  14         MR. WADE:  YEAH, I THINK MY HOPE IS THAT WE WILL BE

01:33PM  15    IN A POSITION TO DO THAT.

01:33PM  16         THE COURT:  AND WHEN YOU SAY "WE," THAT MEANT YOU

01:33PM  17    AND THE GOVERNMENT AND THE GOVERNMENT'S REDIRECT AND RECROSS

01:33PM  18    THAT NEEDED TO BE ACCOMPLISHED.

01:33PM  19       ARE WE STILL ON TASK FOR THAT?

01:33PM  20         MR. WADE:  YEAH.  MY HOPE IS THAT WE ARE, YEAH.

01:33PM  21         THE COURT:  ALL RIGHT.  SO LET'S TAKE OUR RECESS

01:33PM  22    NOW, LADIES AND GENTLEMEN.  30 MINUTES, LADIES AND GENTLEMEN,

01:33PM  23    30 MINUTES, PLEASE.

01:33PM  24         (LUNCH RECESS TAKEN AT 1:33 P.M.)

         25

| | | |
|---|---|---|
| 01:33PM | 1 | **AFTERNOON SESSION** |
| 02:05PM | 2 | (JURY IN AT 2:05 P.M.) |
| 02:05PM | 3 | THE COURT:  PLEASE BE SEATED.  OUR JURY IS PRESENT |
| 02:05PM | 4 | AND ALL COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT. |
| 02:05PM | 5 | OUR WITNESS WILL BE HERE IN JUST A MOMENT. |
| 02:05PM | 6 | (PAUSE IN PROCEEDINGS.) |
| 02:05PM | 7 | THE COURT:  ALL RIGHT.  WE'RE BACK ON THE RECORD. |
| 02:05PM | 8 | MR. MOSLEY IS ON THE STAND. |
| 02:05PM | 9 | YOU'D LIKE TO CONTINUE WITH YOUR EXAMINATION, MR. WADE? |
| 02:05PM | 10 | MR. WADE:  I WOULD, YOUR HONOR.  THANK YOU. |
| 02:05PM | 11 | Q.  MR. MOSLEY, IF I COULD DRAW YOUR ATTENTION TO |
| 02:06PM | 12 | EXHIBIT 14169. |
| 02:06PM | 13 | A.  IS THAT IN VOLUME TWO? |
| 02:06PM | 14 | Q.  IT IS, SIR. |
| 02:06PM | 15 | THE CLERK:  THAT EXHIBIT NUMBER AGAIN, COUNSEL, |
| 02:06PM | 16 | PLEASE? |
| 02:06PM | 17 | MR. WADE:  14169. |
| 02:06PM | 18 | THE CLERK:  THANK YOU. |
| 02:06PM | 19 | THE WITNESS:  OKAY. |
| 02:06PM | 20 | BY MR. WADE: |
| 02:06PM | 21 | Q.  DO YOU HAVE THAT IN FRONT OF YOU? |
| 02:06PM | 22 | A.  I DO. |
| 02:06PM | 23 | Q.  AND DO YOU SEE IN THIS EMAIL IN NOVEMBER OF 2014 YOU WERE |
| 02:07PM | 24 | TRANSMITTING A CONFIDENTIAL DISCLOSURE AGREEMENT RELATING TO |
| 02:07PM | 25 | THERANOS FROM MR. HANK SLACK TO MS. HOLMES? |

02:07PM  1    A.   YES, YES IT IS.

02:07PM  2              MR. WADE:  I MOVE THE ADMISSION OF 14169.

02:07PM  3              MR. SCHENK:  NO OBJECTION.

02:07PM  4              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:07PM  5         (DEFENDANT'S EXHIBIT 14169 WAS RECEIVED IN EVIDENCE.)

02:07PM  6    BY MR. WADE:

02:07PM  7    Q.   IF WE CAN FOCUS -- THIS IS, AGAIN, NOVEMBER 19TH, 2014.

02:07PM  8         DO YOU SEE THAT?

02:07PM  9    A.   YES.

02:07PM 10    Q.   AND IF WE CAN FOCUS ON THE FIRST SENTENCE IN THE SECOND

02:07PM 11    PARAGRAPH.

02:07PM 12         HERE YOU CONVEY TO MS. HOLMES THAT MR. SLACK HAD MENTIONED

02:08PM 13    TO YOU THAT HE SAW MS. HOLMES SPEAK AT THE BDT CONFERENCE.

02:08PM 14         DO YOU RECALL THAT?

02:08PM 15    A.   THAT'S WHAT IT SAYS, YES.

02:08PM 16    Q.   OKAY.  AND YOU'RE GIVING THIS AS BACKGROUND TO HER SO

02:08PM 17    SHE'S AWARE OF IT IN ADVANCE OF ANY COMMUNICATIONS SHE MAY HAVE

02:08PM 18    WITH MR. SLACK?

02:08PM 19    A.   YES.

02:08PM 20    Q.   OKAY.

02:08PM 21    A.   I GUESS.

02:08PM 22    Q.   OKAY.  AND AGAIN, MR. SLACK IS A REPRESENTATIVE OF THE

02:08PM 23    OPPENHEIMER FAMILY?

02:08PM 24    A.   HE IS A, YOU KNOW -- NEVER BEEN A CLIENT OF MINE, AND I

02:08PM 25    DON'T KNOW HANK VERY WELL, BUT HE WAS A MEMBER OF THE

02:08PM  1    OPPENHEIMER FAMILY.  I THINK HE'S DIVORCED FROM HIS SPOUSE, WHO

02:08PM  2    WAS THE MEMBER OF THE FAMILY.  SO I DON'T KNOW WHETHER THAT

02:08PM  3    MAKES HIM A MEMBER OF THE FAMILY OR NOT.

02:08PM  4    Q.   AND HE WAS ALSO A FRIEND OF DR. KISSINGER'S; CORRECT?

02:08PM  5    A.   YES, HE WAS.

02:08PM  6    Q.   OKAY.  AND IF WE CAN GO TO 14168.

02:09PM  7         DO YOU HAVE THAT STRING OF EMAILS IN FRONT OF YOU, SIR?

02:09PM  8    A.   I DO.

02:09PM  9    Q.   AND DO YOU SEE THAT WITHIN THIS EMAIL YOU'RE PROVIDING

02:09PM  10   MS. HOLMES WITH AN INTRODUCTION TO MR. SLACK AND VICE VERSA?

02:09PM  11   A.   YES.

02:09PM  12          MR. WADE:  MOVE THE ADMISSION OF 14168.

02:09PM  13          MR. SCHENK:  YOUR HONOR, OBJECTION.  RELEVANCE BASED

02:09PM  14   ON THE DATE.

02:09PM  15          MR. WADE:  I THINK IT'S RELEVANT WITHIN THE BROADER

02:09PM  16   COUNT ONE, YOUR HONOR.

02:09PM  17          THE COURT:  BROADER COUNT ONE?

02:10PM  18          MR. WADE:  WITHIN THE DURATION OF COUNT ONE.  I'D BE

02:10PM  19   HAPPY TO APPROACH AND EXPLAIN IT TO THE COURT.

02:10PM  20       I DON'T HAVE MANY QUESTIONS ON THIS.

02:10PM  21          THE COURT:  WHY DON'T YOU MOVE ON TO SOMETHING ELSE,

02:10PM  22   AND THEN WE'LL SAVE THIS UNTIL THE END OF YOUR EXAMINATION, IF

02:10PM  23   YOU CAN.

02:10PM  24       CAN YOU DO THAT?

02:10PM  25          MR. WADE:  SURE.

02:10PM   1          WELL, I HAVE TWO MORE DOCUMENTS THAT ARE SIMILAR TO THIS

02:10PM   2     THAT PROBABLY RAISE THE SAME ISSUE.

02:10PM   3              THE COURT:  THE SAME TIME PERIOD?

02:10PM   4              MR. WADE:  YEAH.  FOR THE COURT'S BENEFIT, 14138 AND

02:10PM   5     14139, AND FOR COUNSEL'S BENEFIT.

02:10PM   6              THE COURT:  LET ME TAKE A LOOK AT THOSE.

02:11PM   7          (PAUSE IN PROCEEDINGS.)

02:11PM   8              THE COURT:  MR. SCHENK, DO YOU WANT TO BE HEARD ON

02:11PM   9     THE OTHERS?

02:11PM  10              MR. SCHENK:  SAME OBJECTION, I THINK.

02:11PM  11              THE COURT:  IS IT POSSIBLE FOR YOU TO CONTINUE YOUR

02:11PM  12     EXAMINATION ON OTHER TOPICS AND THEN WE CAN TAKE A BREAK AND

02:11PM  13     TALK ABOUT THESE?

02:11PM  14              MR. WADE:  SURE.

02:11PM  15              THE COURT:  I JUST DON'T WANT TO DISRUPT THINGS.

02:11PM  16              MR. WADE:  UNDERSTOOD, YOUR HONOR.

02:12PM  17     Q.   MR. MOSLEY, DO YOU RECALL GIVING TESTIMONY ON DIRECT

02:12PM  18     EXAMINATION WITH RESPECT TO THAT SIDE LETTER THAT YOU

02:12PM  19     NEGOTIATED RELATING TO THE REDEMPTION ISSUE?

02:12PM  20     A.   YES, I DO.

02:12PM  21     Q.   AND IT WAS -- IF WE CAN JUST GO QUICKLY TO DOCUMENT 2172.

02:12PM  22     A.   IS THAT IN VOLUME ONE?

02:12PM  23     Q.   IT SHOULD BE, YES, OR IT'S IN THE GOVERNMENT'S BINDER.

02:12PM  24     WHICHEVER IS EASIER FOR YOU, SIR.

02:12PM  25     A.   OH, I'VE GOT THE GOVERNMENT'S BINDER RIGHT HERE, SO IF YOU

02:12PM   1    COULD GIVE ME THE CITE, THE --

02:12PM   2    Q.   2172, PLEASE.

02:12PM   3    A.   OKAY.  I HAVE IT.

02:12PM   4    Q.   AND IT'S IN EVIDENCE.  I HAVE IT ON THE SCREEN.  IT'S JUST

02:13PM   5    A PARAGRAPH DOCUMENT IF THAT'S EASIER.

02:13PM   6    A.   OKAY, I HAVE IT.

02:13PM   7    Q.   OKAY.  DO YOU SEE THAT DOCUMENT?

02:13PM   8    A.   YES.

02:13PM   9    Q.   AND THIS IS ACTUALLY LANGUAGE THAT YOU PROPOSED TO

02:13PM   10   MS. HOLMES OR TO THE COMPANY.

02:13PM   11        DO YOU RECALL THAT?

02:13PM   12   A.   I DO NOT RECALL HAVING PROPOSED THIS LANGUAGE.  IT'S

02:13PM   13   POSSIBLE, BUT I DON'T RECALL THAT.

02:13PM   14   Q.   OKAY.  AND YOU SEE THE REFERENCE IN THAT FIRST SENTENCE

02:13PM   15   WHERE IT REFERS TO A CONFIRMATION WHICH YOUR CLIENTS ARE

02:13PM   16   SUBSCRIBING.

02:13PM   17        DO YOU SEE THE LANGUAGE RELATING TO YOUR CLIENTS?

02:13PM   18   A.   I DO SEE THAT.

02:13PM   19   Q.   AND I THINK YOU TALKED BEFORE ABOUT THIS WAS SOMETHING

02:13PM   20   THAT HAD COME UP IN CONNECTION WITH SOME OF YOUR CLIENTS, AS

02:13PM   21   WELL AS YOU PERSONALLY; CORRECT?

02:13PM   22   A.   I'M NOT SURE IT EVER CAME UP.  YOU KNOW, OBVIOUSLY MY

02:13PM   23   CLIENTS HAD A LOT OF DEALINGS WITH THE COMPANY AND ELIZABETH

02:13PM   24   THAT I WASN'T A PARTY TO.

02:13PM   25        I DON'T KNOW WHETHER IT EVER CAME UP FROM A CLIENT.

02:13PM   1        IT CERTAINLY CAME UP IN MY OWN PERSONAL LOOK AT THE

02:14PM   2   COMPANY.

02:14PM   3   Q.   OKAY.  IN ANY EVENT, YOU RECALL, AS YOU'RE NEGOTIATING

02:14PM   4   THIS, THIS WAS SOMETHING THAT WAS BEING ADDRESSED ON BEHALF OF

02:14PM   5   ALL OF YOUR CLIENTS; RIGHT?

02:14PM   6   A.   I, I ASKED FOR IT FOR MYSELF PERSONALLY, AND I'M NOT SURE

02:14PM   7   WHETHER ANY -- I DON'T THINK ANY OF MY CLIENTS INVESTED, AND I

02:14PM   8   DIDN'T KNOW WHETHER THEY WOULD.

02:14PM   9        BUT AS A LAWYER WITH A DUTY TO CLIENTS, I WANTED TO BE

02:14PM  10   SURE THAT IF I OBTAINED THE BENEFIT OF A PROVISION SUCH AS THIS

02:14PM  11   ON MY PERSONAL BEHALF, THAT IT WOULD ALSO APPLY TO ANY OF MY

02:14PM  12   CLIENTS THAT MIGHT HAPPEN TO ALSO INVEST.

02:14PM  13   Q.   OKAY.  BECAUSE YOU UNDERSTOOD THAT YOU HAD CERTAIN ETHICAL

02:14PM  14   OBLIGATIONS WITH RESPECT TO YOUR CLIENTS; IS THAT RIGHT?

02:14PM  15   A.   SITTING HERE, I DON'T KNOW WHETHER IT WOULD BE COVERED BY

02:14PM  16   ETHICAL OBLIGATIONS.

02:14PM  17        BUT IT WOULD CERTAINLY BE COVERED BY THE WAY THAT I FELT

02:14PM  18   ABOUT MY CLIENTS.

02:14PM  19   Q.   OKAY.  AND DO YOU RECALL IN YOUR DIRECT TESTIMONY YOU WERE

02:15PM  20   ALSO ASKED WHETHER YOU ENCOURAGED ANY OF YOUR CLIENTS TO INVEST

02:15PM  21   AND YOU SAID THAT YOU HAD NOT?

02:15PM  22   A.   THAT'S CORRECT.

02:15PM  23   Q.   OKAY.  CAN I DRAW YOUR ATTENTION TO PAGE --

02:15PM  24   DOCUMENT 14135.

02:15PM  25   A.   OKAY.

02:15PM  1    Q.   AND DO YOU HAVE THAT DOCUMENT IN FRONT OF YOU?

02:15PM  2    A.   I DO.

02:15PM  3    Q.   AND DO YOU RECALL IN CONNECTION WITH THIS REDEMPTION

02:15PM  4    RIGHTS ISSUE THAT YOU WERE DEALING WITH THE BOIES,

02:15PM  5    DAVID BOIES'S LAW FIRM?

02:15PM  6    A.   I DO REMEMBER HAVING CONVERSATIONS AND DEALING WITH DAVID

02:15PM  7    ON THIS ISSUE.

02:15PM  8    Q.   AND ALSO WITH HIS SON, CHRIS BOIES?

02:16PM  9         DO YOU RECALL THAT?

02:16PM  10   A.   I THINK I DO REMEMBER HAVING SOME INTERACTION WITH

02:16PM  11   CHRIS BOIES AS WELL.

02:16PM  12   Q.   AND THEY WERE INVOLVED IN WORKING WITH YOU TO FIND THE

02:16PM  13   LANGUAGE THAT WOULD ADDRESS YOUR CONCERN; CORRECT?

02:16PM  14   A.   YES.

02:16PM  15   Q.   OKAY.  AND THIS EMAIL RELATES TO THAT ISSUE; CORRECT?

02:16PM  16   A.   WELL, THERE ARE A NUMBER OF -- WHICH PARTICULAR EMAIL ARE

02:16PM  17   YOU REFERRING TO?

02:16PM  18   Q.   THIS STRING OF EMAILS RELATES TO THAT ISSUE; IS THAT

02:16PM  19   CORRECT?

02:16PM  20   A.   YEAH, IT CERTAINLY APPEARS THAT THESE, ALL OF THESE EMAILS

02:16PM  21   RELATE TO THAT QUESTION.

02:16PM  22            MR. WADE:  MOVE THE ADMISSION OF 14135.

02:16PM  23            MR. SCHENK:  NO OBJECTION.

02:16PM  24            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:16PM  25         (DEFENDANT'S EXHIBIT 14135 WAS RECEIVED IN EVIDENCE.)

02:16PM   1                    MR. WADE:  AND IF WE CAN BLOW UP THE EMAIL, YOUR

02:16PM   2    EMAIL ON OCTOBER 30TH.

02:17PM   3    Q.   DO YOU SEE THAT?

02:17PM   4         AND THIS IS AN EMAIL WITH RESPECT TO WHETHER OR NOT THAT

02:17PM   5    ISSUE IS GOING TO BE GIVEN UP BY THE COMPANY; CORRECT?

02:17PM   6    A.   YES, IT IS, CORRECT.

02:17PM   7    Q.   AND YOU WRITE, "I AM MORE THAN OKAY WITH THIS AND HOPE

02:17PM   8    ELIZABETH DOES NOT THINK IT IS NECESSARY."

02:17PM   9         DO YOU SEE THAT?

02:17PM  10    A.   I DO SEE IT.

02:17PM  11    Q.   AND YOU WRITE, "IF I DID NOT HAVE DEEP TRUST AND FAITH IN

02:17PM  12    ELIZABETH, I WOULD NOT BE INVOLVED WITH THERANOS AND

02:17PM  13    RECOMMENDING AN INVESTMENT BY MY CLIENTS."

02:17PM  14    A.   I SEE THAT.

02:17PM  15    Q.   BLESS YOU.

02:17PM  16                    THE REPORTER:  THANK YOU.

02:17PM  17                    THE COURT:  IT SAYS "CLIENTS."  IT DIDN'T SAY "BY MY

02:17PM  18    CLIENTS."

02:17PM  19                    MR. WADE:  SORRY.  THANK YOU.

02:17PM  20    Q.   YOU SEE IT IS "BY CLIENTS."  THE COURT HAS THE BENEFIT OF

02:18PM  21    THE TRANSCRIPT.

02:18PM  22    A.   THAT'S CORRECT.

02:18PM  23    Q.   AND BY "CLIENTS," DID YOU MEAN BY YOUR CLIENTS?

02:18PM  24    A.   I PROBABLY MEANT THAT.

02:18PM  25    Q.   OKAY.  THE -- YOU HAD SOME OTHER CONVERSATIONS WITH

02:18PM  1    MR. BOIES RELATING TO THERANOS; CORRECT?

02:18PM  2    A.   YES, I BELIEVE I DID.

02:18PM  3    Q.   AND JUST FOR CONTEXT, DAVID BOIES IS A PROMINENT LAWYER;

02:18PM  4    CORRECT?

02:18PM  5    A.   YES, HE IS.

02:18PM  6    Q.   HE WAS, HE WAS ACTUALLY A PARTNER AT YOUR LAW FIRM FOR A

02:18PM  7    COUPLE OF DECADES; RIGHT?

02:18PM  8    A.   YES.

02:18PM  9    Q.   AND AT SOME POINT HE LEFT YOUR LAW FIRM, CRAVATH, AND

02:18PM  10   STARTED HIS OWN LAW FIRM?

02:18PM  11   A.   THAT'S CORRECT.

02:18PM  12   Q.   AND YOU CAME TO LEARN THAT HE WAS REPRESENTING THERANOS;

02:18PM  13   CORRECT?

02:19PM  14   A.   I DID.

02:19PM  15   Q.   AND IN CONNECTION WITH THIS, WITH YOUR DEALINGS WITH

02:19PM  16   THERANOS, YOU HAD A COUPLE OCCASIONS TO INTERACT WITH MR. BOIES

02:19PM  17   ON THERANOS MATTERS?

02:19PM  18   A.   YES.

02:19PM  19   Q.   IS THAT RIGHT?

02:19PM  20   A.   I BELIEVE -- YES.

02:19PM  21   Q.   AND IN ADVANCE OF YOUR INVESTMENT, YOU -- AND IN THE

02:19PM  22   SUMMER OF 2014, YOU CONTACTED MR. BOIES; CORRECT?

02:19PM  23   A.   I CERTAINLY CONTACTED HIM.  I DON'T REMEMBER THE EXACT

02:19PM  24   TIMING.

02:19PM  25   Q.   OKAY.  AND DO YOU RECALL THAT YOU CONTACTED HIM BECAUSE

02:19PM   1    YOU WANTED TO GET A LITTLE BIT OF HIS READ ON THE COMPANY?

02:19PM   2    A.   YES.

02:19PM   3    Q.   BECAUSE YOU HAD KNOWN MR. BOIES FOR DECADES?

02:19PM   4    A.   YES.

02:20PM   5    Q.   MAYBE 30 YEARS OR SO?

02:20PM   6    A.   WELL, I BECAME A PARTNER AT CRAVATH IN 1987, AND I DON'T

02:20PM   7    REMEMBER -- AND DAVID WAS ALREADY A PARTNER AT THAT TIME, SO I

02:20PM   8    KNEW HIM FROM 1987 ON.

02:20PM   9    Q.   OKAY.

02:20PM  10    A.   AND I PROBABLY KNEW HIM BEFORE I WAS PARTNER.

02:20PM  11    Q.   UNDERSTOOD.  SO YOU HAD KNOWN HIM FOR A LONG, LONG TIME?

02:20PM  12    A.   I HAD KNOWN HIM FOR A LONG TIME.

02:20PM  13    Q.   OKAY.  AND YOU RECALL THAT -- WELL, YOU MAY NOT KNOW AT

02:20PM  14    THE TIME, BUT YOU CALLED HIM TO GET HIS TAKE ON THE COMPANY IN

02:20PM  15    ADVANCE OF MAKING AN INVESTMENT PERSONALLY?

02:20PM  16    A.   YES, I DID.

02:20PM  17    Q.   AND WHEN YOU DID THAT, MR. BOIES TOLD YOU THAT HE THOUGHT

02:20PM  18    THAT THE TECHNOLOGY THE COMPANY HAD DEVELOPED WAS GOOD;

02:20PM  19    CORRECT?

02:20PM  20    A.   YES.

02:20PM  21    Q.   AND -- BUT HE THOUGHT THAT THE LARGEST RISK THAT THE

02:20PM  22    COMPANY FACED WAS WITH RESPECT TO THE ROLLOUT OF THE COMPANY;

02:20PM  23    CORRECT?

02:20PM  24    A.   HE DID TELL ME THAT, YES.

02:21PM  25    Q.   OKAY.  AND DO YOU RECALL -- AND YOU DON'T RECALL WHEN HE

02:21PM 1    TOLD YOU THAT?

02:21PM 2    A.   I DON'T REMEMBER THE TIMING OF IT --

02:21PM 3    Q.   OKAY.

02:21PM 4    A.   -- OF THE TELEPHONE CONVERSATION.

02:21PM 5         IT WAS A TELEPHONE CONVERSATION THAT I DON'T REMEMBER

02:21PM 6    EXACTLY WHAT DAY.

02:21PM 7    Q.   OKAY.

02:21PM 8    A.   BUT IT WAS BEFORE I INVESTED.

02:21PM 9    Q.   OKAY.  AND PART OF WHAT MR. BOIES WAS GOING TO WAS -- TO

02:21PM 10   TELL YOU, AS YOU SCALE UP A COMPANY THAT HAS NEW TECHNOLOGY,

02:21PM 11   THERE'S SOME RISK THAT IS ASSOCIATED WITH HOW THE TECHNOLOGY

02:21PM 12   WILL PERFORM; CORRECT?

02:21PM 13   A.   TO BE MORE PRECISE, HE SAID THAT HE THOUGHT THE TECHNOLOGY

02:21PM 14   WAS ABSOLUTELY SOUND AND WAS PERFORMING WELL, BUT THERE WOULD

02:21PM 15   ALWAYS BE A QUESTION OF WHETHER IT WOULD PERFORM AT THE SAME

02:21PM 16   LEVEL WHEN IT WAS COMPLETELY ROLLED OUT IN MULTIPLE -- MANY,

02:21PM 17   MANY LOCATIONS.

02:21PM 18   Q.   OKAY.  AND THE INFORMATION THAT MR. BOIES IMPARTED TO YOU,

02:22PM 19   WAS THAT INFORMATION THAT YOU SHARED WITH ALL OF YOUR CLIENTS?

02:22PM 20   A.   YOU KNOW, I DON'T REMEMBER SPECIFICALLY, BUT, YOU KNOW, IT

02:22PM 21   CERTAINLY WOULD BE MY PRACTICE, IF I HEARD ANYTHING FROM

02:22PM 22   ANYBODY THAT I THOUGHT WOULD BE RELEVANT TO SOMEBODY WHO

02:22PM 23   WOULD -- A CLIENT OF MINE WHO IS CONSIDERING AN INVESTMENT, I

02:22PM 24   CERTAINLY WOULD HAVE RELAYED THAT INFORMATION.

02:22PM 25        SO I SUSPECT I DID.

02:22PM   1    Q.   OKAY.  AND SO IT WOULDN'T NECESSARILY BE SPECIFIC TO

02:22PM   2    MR. BOIES; CORRECT?  IF YOU LEARNED SOMETHING DURING THE COURSE

02:22PM   3    OF YOUR INTERACTIONS WITH THERANOS THAT YOU THOUGHT WAS

02:22PM   4    RELEVANT, YOU WOULD HAVE RELAYED THAT TO YOUR CLIENTS?

02:22PM   5    A.   THAT IS CORRECT.

02:22PM   6    Q.   OKAY.  I THINK YOU TESTIFIED ON DIRECT THAT YOU WEREN'T

02:23PM   7    CERTAIN WHETHER YOU KNEW OR WHEN YOU LEARNED ABOUT THE COMPANY

02:23PM   8    DOING VENOUS DRAWS.

02:23PM   9         DO YOU RECALL THAT?

02:23PM  10    A.   I DON'T RECALL THAT.

02:23PM  11    Q.   OKAY.  DO YOU RECALL WHETHER, IN CONNECTION WITH YOUR DUE

02:23PM  12    DILIGENCE AT THE COMPANY, WHETHER YOU LOOKED AT ALL AT THE

02:23PM  13    COMPANY'S WEBSITE?

02:23PM  14    A.   YOU KNOW, I'M SURE I -- IT'S LIKELY THAT I DID, BUT I

02:23PM  15    DON'T SPECIFICALLY REMEMBER IT.

02:23PM  16         BUT I CAN'T IMAGINE THAT I DIDN'T LOOK AT THEIR WEBSITE.

02:23PM  17    Q.   OKAY.  AND DO YOU RECALL WHETHER YOU LOOKED AT THE

02:23PM  18    WALGREENS WEBSITE AT ALL?

02:23PM  19    A.   I DON'T REMEMBER.

02:23PM  20    Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO EXHIBIT 14207.

02:24PM  21    A.   OKAY.

02:24PM  22    Q.   DO YOU HAVE THAT DOCUMENT IN FRONT OF YOU?

02:24PM  23    A.   I DO.  IT'S TWO PAGES.

02:24PM  24    Q.   RIGHT.  AND, AND DO YOU RECOGNIZE THIS TO BE A SNAPSHOT OF

02:24PM  25    A WALGREENS WEBSITE RELATING TO THERANOS SERVICES?

02:24PM  1    A.   THAT'S WHAT IT APPEARS TO BE, YES.

02:25PM  2              MR. WADE:  I MOVE THE ADMISSION OF 14207.

02:25PM  3              MR. SCHENK:  FOUNDATION.

02:25PM  4              THE COURT:  WOULD YOU LAY A LITTLE FOUNDATION FOR

02:25PM  5    THIS?

02:25PM  6              MR. WADE:  CERTAINLY.

02:25PM  7    Q.   DO YOU RECALL -- I THINK WE TALKED ABOUT SOME OF YOUR

02:25PM  8    GOOGLE SEARCHES BEFORE.

02:25PM  9         DO YOU RECALL THAT?

02:25PM 10    A.   YES.

02:25PM 11    Q.   AND I THINK YOU SAID THAT YOU LOOKED -- YOU PROBABLY

02:25PM 12    LOOKED AROUND ON THE INTERNET, MAYBE AT THE THERANOS WEBSITE.

02:25PM 13         DO YOU RECALL?

02:25PM 14    A.   I CERTAINLY WOULD HAVE LOOKED FOR ANYTHING THAT I COULD

02:25PM 15    FIND AND I, YOU KNOW, MAY HAVE WELL LOOKED AT THIS WEBSITE.

02:25PM 16    BUT I CAN'T TELL YOU IF I DID OR DIDN'T.

02:25PM 17              MR. WADE:  YOUR HONOR, I WOULD ASK THAT THE DOCUMENT

02:25PM 18    BE CONDITIONALLY ADMITTED.  WE HAVE A DECLARATION WITH RESPECT

02:25PM 19    TO ITS AUTHENTICITY, AND I HAVE NO DOUBT THAT A NUMBER OF

02:25PM 20    WITNESSES COULD AUTHENTICATE THIS DOCUMENT.  BUT I WOULD LIKE

02:25PM 21    TO ASK THIS WITNESS ABOUT IT.

02:25PM 22              THE COURT:  ALL RIGHT.  WE'LL ADMIT IT AND YOU CAN

02:26PM 23    ASK THIS WITNESS.

02:26PM 24              MR. WADE:  THANK YOU, YOUR HONOR.

02:26PM 25         (DEFENDANT'S EXHIBIT 14207 WAS RECEIVED IN EVIDENCE.)

02:26PM   1          MR. WADE:  MAY I PUBLISH?

02:26PM   2          THE COURT:  YES.

02:26PM   3   BY MR. WADE:

02:26PM   4   Q.   IF YOU LOOK AT THE TOP, DO YOU SEE THAT THIS IS THE

02:26PM   5   WALGREENS WEBSITE?

02:26PM   6   A.   YES.

02:26PM   7   Q.   AND AGAIN, YOU UNDERSTOOD THAT WALGREENS WAS OFFERING

02:26PM   8   THERANOS SERVICES THROUGH ITS -- SOME OF ITS PHYSICAL

02:26PM   9   LOCATIONS; CORRECT?

02:26PM  10   A.   I DID.

02:26PM  11   Q.   OKAY.  AND THIS PROVIDES SOMEWHAT OF AN OVERVIEW -- THESE

02:26PM  12   WEB PAGES KIND OF PROVIDE AN OVERVIEW OF SOME OF THOSE

02:26PM  13   SERVICES.

02:26PM  14       DO YOU SEE THAT?

02:26PM  15   A.   UM, THAT'S WHAT IT SEEMS TO BE DOING, YES.

02:26PM  16   Q.   OKAY.  AND IF WE -- IF I CAN GO UP TO THE HEADER, DO YOU

02:26PM  17   SEE THE DATE IN THE UPPER RIGHT-HAND CORNER, OCTOBER 9TH, 2014?

02:26PM  18       DO YOU SEE THAT?

02:26PM  19   A.   YES.  THERE'S ANOTHER DATE ON THE LEFT-HAND SIDE THAT IS

02:27PM  20   SOMETHING -- MARCH 30TH, 2014.  THERE ARE A LOT OF DATES ACROSS

02:27PM  21   THE TOP OF THIS.

02:27PM  22   Q.   YES.  AND DO YOU SEE THIS DATE OVER HERE, OCTOBER 9TH,

02:27PM  23   2014?

02:27PM  24   A.   I DO.

02:27PM  25   Q.   AND CAN I DRAW YOUR ATTENTION TO THE SECOND PAGE, THE NEXT

02:27PM  1    WEBSITE, AND IF WE CAN BLOW UP THE TOP WHERE IT SAYS "GOODBYE,

02:27PM  2    BIG BAD NEEDLE"?

02:27PM  3    A.   IS THIS A DIFFERENT WEBSITE OR IS IT THE SAME WEBSITE?

02:27PM  4    Q.   SAME WEBSITE, JUST A SCROLL DOWN.

02:27PM  5    A.   THE SECOND PAGE.

02:27PM  6    Q.   OR MAYBE, AS IT APPEARS ON THE INTERNET, YOU WOULD BE ABLE

02:27PM  7    TO SCROLL DOWN ON YOUR COMPUTER TO LOOK AT IT.

02:27PM  8    A.   RIGHT, RIGHT.  I UNDERSTAND.

02:27PM  9    Q.   AND YOU SAW AN IMAGE OF THIS CUTE LITTLE BOY IN SOME OF

02:27PM  10   THE MATERIALS THAT MR. SCHENK SHOWED YOU; RIGHT?

02:27PM  11   A.   I DID.

02:27PM  12   Q.   AND THE PHRASE "GOODBYE, BIG BAD NEEDLE"?

02:27PM  13   A.   RIGHT.

02:27PM  14            JUROR:  WE HAVE A PICTURE OF THE COURTROOM

02:27PM  15   OVERLAYING WHAT YOU'RE SHOWING.

02:28PM  16            THE COURT:  OKAY.

02:28PM  17            THE CLERK:  OKAY?

02:28PM  18            JUROR:  IT'S REMOVED.

02:28PM  19            MR. WADE:  THE WEBSITE IS BACK UP?

02:28PM  20            JUROR:  YES.

02:28PM  21   BY MR. WADE:

02:28PM  22   Q.   AND DO YOU SEE UNDER THIS IT SAYS, "INSTEAD OF A HUGE

02:28PM  23   NEEDLE, THERANOS-TRAINED TECHNICIANS CAN USE A TINY FINGERSTICK

02:28PM  24   OR COLLECT A MICRO-SAMPLE FROM A VENOUS DRAW"?

02:28PM  25            DO YOU SEE THAT?

02:28PM  1    A.   I DO SEE THAT.

02:28PM  2    Q.   AND DO YOU SEE THAT THERE'S -- AND IT SAYS THAT "IT'S

02:28PM  3    PRACTICALLY PAINLESS AND A LOT LESS SCARY."

02:28PM  4    A.   I SEE THAT.

02:28PM  5    Q.   OKAY.  AND IF WE GO DOWN TO FOOTNOTE TWO, WHICH WAS

02:28PM  6    REFERENCED THERE.  IF WE CAN PUT THAT UP TOWARDS THE TOP?

02:28PM  7         DO YOU SEE THERE IT SAYS, "BLOOD MAY BE DRAWN BY A

02:28PM  8    FINGERSTICK OR VENOUS DRAW BY A THERANOS-TRAINED TECHNICIAN FOR

02:28PM  9    THERANOS TESTING PERFORMED IN THEIR CLIA-CERTIFIED LABORATORY."

02:29PM  10        DO YOU SEE THAT?

02:29PM  11   A.   I DO.

02:29PM  12   Q.   DO YOU RECALL, WHEN YOU WERE DOING SOME OF YOUR RESEARCH

02:29PM  13   ON THERANOS, WHETHER YOU SAW OR NOTICED THIS LANGUAGE?

02:29PM  14   A.   NOT THAT I CAN REMEMBER.

02:29PM  15   Q.   OKAY.  CAN I DRAW YOUR ATTENTION TO 14208.

02:29PM  16   A.   OKAY.

02:29PM  17   Q.   AND DO YOU RECOGNIZE THIS TO BE A THERANOS WEB PAGE?

02:29PM  18   A.   IT LOOKS LIKE THAT'S WHAT IT IS.

02:29PM  19             MR. WADE:  I MOVE THE ADMISSION OF 14208.

02:29PM  20             MR. SCHENK:  SAME OBJECTION.

02:29PM  21             MR. WADE:  WITH THE SAME CONDITIONAL REQUEST.

02:29PM  22             THE COURT:  MEANING THAT YOU'RE GOING TO CALL A

02:29PM  23   WITNESS AT SOME POINT IN TIME, CERTAINLY NOT TODAY BECAUSE WE

02:29PM  24   DON'T HAVE TIME FOR IT, BUT AT SOME TIME IN THE FUTURE YOU'LL

02:29PM  25   CALL A WITNESS WHO WILL AUTHENTICATE THIS?

02:29PM   1            MR. WADE:  YEAH, WE HAVE AN AFFIDAVIT OF

02:29PM   2   AUTHENTICITY WHICH WE CAN PROFFER TO THE COURT.

02:30PM   3            THE COURT:  ALL RIGHT.  THANK YOU.

02:30PM   4        IT WILL BE ADMITTED CONDITIONALLY FOR THAT PURPOSE.  THANK

02:30PM   5   YOU.

02:30PM   6            (DEFENDANT'S EXHIBIT 14208 WAS RECEIVED IN EVIDENCE.)

02:30PM   7            MR. WADE:  MAY I PUBLISH?

02:30PM   8            THE COURT:  YES.

02:30PM   9            MR. WADE:  THANK YOU.

02:30PM  10   Q.   AND IF WE CAN JUST LOOK UP AT THE TOP, YOU SEE IN BLACK,

02:30PM  11   AUGUST 19TH, 2014?

02:30PM  12   A.   I SEE THAT.

02:30PM  13   Q.   OKAY.  AND LET'S GO DOWN.  DO YOU SEE THEY TALK ABOUT --

02:30PM  14        LET'S BLOW UP THAT FIRST SECTION.

02:30PM  15        IT SAYS, "SAME TESTS.  SMALLER SAMPLE."

02:30PM  16   A.   I SEE THAT.

02:30PM  17   Q.   AND IT GIVES SOME COMMENTARY ON THE SERVICES THAT THEY

02:30PM  18   PROVIDE.

02:30PM  19        DO YOU SEE THAT?

02:30PM  20   A.   I DO.

02:30PM  21   Q.   OKAY.  AND IF, IF WE GO TO THE LEFT, DO YOU SEE WHERE IT

02:30PM  22   SAYS "NO BIG NEEDLES" THERE?

02:30PM  23        CAN WE BLOW THAT UP?

02:30PM  24   A.   I SEE THAT.

02:30PM  25   Q.   AND IT LOOKS LIKE THERE'S A PICTURE THERE THAT MAYBE

02:30PM  1    DIDN'T CATCH IN THE ARCHIVE.

02:30PM  2        BUT DID YOU EVER COME TO LEARN THAT THERANOS, WHEN IT

02:30PM  3    WOULD DO ITS VENOUS DRAWS, WOULD OFTEN USE A MUCH SMALLER

02:31PM  4    NEEDLE AND DRAW MUCH -- A MUCH SMALLER AMOUNT OF BLOOD IN MANY

02:31PM  5    CASES?

02:31PM  6    A.   I DON'T REMEMBER, YOU KNOW, WHEN I LEARNED THAT, OR IF I

02:31PM  7    LEARNED IT HONESTLY.

02:31PM  8    Q.   OKAY.  AND IF WE CAN GO DOWN TO THE BOTTOM OF THAT PAGE,

02:31PM  9    "THE ONLY THING WE WANT YOU TO FEEL IS BETTER."

02:31PM  10       DO YOU SEE THAT?

02:31PM  11   A.   I DO.

02:31PM  12   Q.   AND DO YOU SEE THE LANGUAGE THERE, IT SAYS, "INSTEAD OF A

02:31PM  13   BIG, INTIMIDATING NEEDLE, OUR CERTIFIED PHLEBOTOMISTS CAN USE A

02:31PM  14   TINY FINGERSTICK OR A MICRO-SAMPLE FROM A VENOUS DRAW"?

02:31PM  15       DO YOU SEE THAT?

02:31PM  16   A.   I DO, UH-HUH.

02:31PM  17   Q.   AND THE MICRO-SAMPLE FROM THE VENOUS DRAW, THAT SUGGESTS

02:31PM  18   THAT THE AMOUNT OF BLOOD WOULD BE A SMALLER AMOUNT?

02:31PM  19   A.   I'M ASSUMING THAT'S WHAT IT MEANS.

02:31PM  20   Q.   AND THEN IT GOES ON TO SAY, "OCCASIONALLY, A VENIPUNCTURE

02:32PM  21   MAY BE REQUIRED BASED ON THE LAB ORDER, BUT THIS IS UNCOMMON,

02:32PM  22   AND OUR AIM IS TO ELIMINATE THAT SCENARIO," ALTOGETHER.

02:32PM  23       DO YOU SEE THAT?

02:32PM  24   A.   I DO.

02:32PM  25   Q.   AND DO YOU RECALL WHETHER YOU LEARNED THIS INFORMATION

02:32PM   1    BETWEEN AUGUST AND OCTOBER WHEN YOU WERE MAKING YOUR INVESTMENT

02:32PM   2    WITH THERANOS?

02:32PM   3    A.   I DON'T BELIEVE I KNEW THIS AT THE TIME.

02:32PM   4              MR. WADE:  THE COURT'S INDULGENCE FOR ONE MOMENT?

02:32PM   5              THE COURT:  YES.

02:32PM   6         (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

02:32PM   7              MR. WADE:  YOUR HONOR, APART FROM THOSE DOCUMENTS, I

02:32PM   8    DON'T HAVE ANY FURTHER QUESTIONS OF MR. MOSLEY AT THIS TIME.

02:32PM   9              THE COURT:  ALL RIGHT.  LET ME MEET WITH COUNSEL.

02:32PM  10       THE RECORD SHOULD REFLECT THAT IT'S 2:32 P.M.  WE'RE GOING

02:32PM  11    TO FINISH AT 3:00 TODAY.

02:33PM  12       LET ME SEE COUNSEL AT THE SIDE-BAR.

02:33PM  13       FOLKS, JUST REMAIN HERE, PLEASE, AND DON'T DISCUSS THE

02:33PM  14    CASE OR TALK TO ANYONE.  YOU CAN STAND AND STRETCH, OF COURSE.

02:33PM  15    AND WE'LL JUST BE A COUPLE OF MINUTES.

02:33PM  16       LIKEWISE, MR. MOSLEY.

02:33PM  17              THE WITNESS:  THANK YOU.

02:45PM  18         (SIDE-BAR CONFERENCE ON THE RECORD.)

02:45PM  19              THE COURT:  WE'RE ON THE RECORD.  WE'RE OUTSIDE OF

02:45PM  20    THE PRESENCE OF THE JURY.

02:45PM  21       MR. SCHENK IS PRESENT AND MR. WADE IS PRESENT.

02:45PM  22       WE'RE TALKING ABOUT 14168, 14139, AND 14138.

02:45PM  23       MR. SCHENK, YOUR OBJECTION?

02:45PM  24              MR. SCHENK:  YES, YOUR HONOR.  THE EXHIBITS ARE

02:45PM  25    AFTER MR. MOSLEY'S INVESTMENT.

02:45PM  1        WE DISCUSSED YESTERDAY THE IDEA OF THE KNOWLEDGE INSIDE AN

02:45PM  2   INVESTOR'S HEAD BEING RELEVANT UP UNTIL THE POINT OF

02:45PM  3   INVESTMENT, AND CONSISTENT WITH THAT, I ENDED MY DIRECT EXAM AT

02:45PM  4   THE MOMENT OF MR. MOSLEY'S WIRE.

02:45PM  5        THESE ARE AFTER THE WIRE, AND IT IS FOR THAT REASON THAT I

02:45PM  6   QUESTION THEIR RELEVANCE.

02:45PM  7             MR. WADE:  IF YOUR HONOR NOTES THE THREE DOCUMENTS,

02:45PM  8   I BELIEVE 14169, 14168, AND 14138 --

02:45PM  9             THE COURT:  I HAVE 14138, 14139, AND 14168.

02:45PM 10             MR. WADE:  OH, I'M SORRY.  CORRECT.

02:45PM 11             THE COURT:  THOSE ARE THE THREE DOCUMENTS?

02:45PM 12             MR. WADE:  CORRECT.

02:45PM 13             THE COURT:  THEY'RE EMAILS THAT ARE POST INVESTMENT

02:45PM 14   OF THIS WITNESS, AND THEY'RE INTRODUCTORY EMAILS TO MS. HOLMES

02:45PM 15   FOR VARIOUS PEOPLE.  THEY SAY FLATTERING THINGS ABOUT

02:45PM 16   MS. HOLMES AND THAT TYPE OF THING.

02:45PM 17        BUT I'M INCLINED TO SUSTAIN THE OBJECTION.  THEY'RE

02:45PM 18   OUTSIDE THE PERIOD.

02:45PM 19             MR. WADE:  THEY'RE NOT OUTSIDE THE PERIOD OF THE

02:45PM 20   CONSPIRACY, YOUR HONOR.  AND IN PARTICULAR, THE WALTON

02:45PM 21   INVESTMENT IS AN INVESTMENT WHERE THE -- 14139 IS A MEMBER OF

02:45PM 22   THE WALTON FAMILY WHO HAD BEEN IN COMMUNICATIONS WITH

02:45PM 23   MR. MOSLEY THROUGHOUT THE TIME PERIOD STARTING AS EARLY AS

02:45PM 24   AUGUST OF 2014.

02:45PM 25        AND SO THEY'RE DIFFERENT MEMBERS OF THE WALTON FAMILY.

02:45PM 1        EARLY IN HIS TESTIMONY, MR. MOSLEY TESTIFIED THAT

02:45PM 2   ALICE WALTON WAS SOMEONE WHO HE INTERACTED WITH ON THE

02:45PM 3   INVESTMENT, AND THERE ARE, ON MR. MOSLEY'S PRIVILEGE LOG, I

02:45PM 4   BELIEVE ABOUT 60 PRIVILEGED COMMUNICATIONS WITH MEMBERS OF THE

02:45PM 5   WALTON FAMILY THROUGHOUT THE TIME PERIOD WHERE HE'S INTERACTING

02:45PM 6   AND OBTAINING INFORMATION.

02:45PM 7        AND THEN THE LAST BIT OF THAT FOR THE WALTON INVESTMENT IS

02:45PM 8   TO LOOP IN MS. WALTON.

02:45PM 9        THE INVESTOR CONSPIRACY GOES WELL PAST 2015, AND I BELIEVE

02:45PM 10  THIS -- IT GOES UNTIL THE END OF 2015, AND I BELIEVE THIS

02:45PM 11  EVIDENCE IS RELEVANT TO OUR DEFENSE IN THAT CONSPIRACY, AND

02:45PM 12  THIS IS THE WITNESS WHO PROVIDES THE INTRODUCTION.  HE'S

02:45PM 13  SOMEONE WHO IS INTERACTING EXTENSIVELY WITH A NUMBER OF PEOPLE

02:45PM 14  THROUGHOUT A PERIOD.  THERE'S BEEN A LOT OF TESTIMONY ABOUT

02:45PM 15  THAT.

02:45PM 16       AND HE CONTINUES TO PROVIDE, TO ENCOURAGE PEOPLE TO INVEST

02:45PM 17  IN THE COMPANY.

02:45PM 18            THE COURT:  WELL, HE'S NEGOTIATING HERE

02:45PM 19  INTRODUCTIONS.  HE'S FACILITATING INTRODUCTIONS IN THESE THREE

02:45PM 20  EMAILS.

02:45PM 21            MR. WADE:  HE IS IN THESE THREE EMAILS, WHO ARE

02:45PM 22  PEOPLE WHO INVEST.

02:45PM 23       I DON'T INTEND TO ASK -- TO BE HONEST, YOUR HONOR, I DON'T

02:45PM 24  INTEND TO ASK HIM ANY QUESTIONS ABOUT IT.  I JUST INTEND TO

02:45PM 25  ADMIT THE DOCUMENTS THAT SHOW THAT HE IS THE ONE WHO PROVIDED

1    THE INTRODUCTION TO MS. HOLMES.

2          THE COURT:  CAN'T YOU ASK HIM ABOUT THAT?  DIDN'T

3    YOU INTRODUCE HANK?  DIDN'T YOU INTRODUCE NOAM?  DIDN'T YOU

4    INTRODUCE ALICE?

5          MR. WADE:  I CERTAINLY CAN.

6       I JUST THINK THE DOCUMENTS ARE RELEVANT.  I THINK THE

7    DOCUMENTS TO THE END OF 2015 ARE RELEVANT TO THE INVESTOR

8    CONSPIRACY AND I THINK THEY'RE FAIR GAME.

9       I'M NOT -- I HOPE THE COURT KNOWS, I TRIED TO ADHERE TO

10   MR. SCHENK'S REQUEST.  I DIDN'T GO INTO ANY OF THE EMAILS FROM

11   2015 RELATING TO MR. SLACK IN MORE DETAILED INTERACTIONS

12   BECAUSE THAT WOULD HAVE BEEN MORE INTO THE SUBSTANCE OF WHAT

13   WAS GOING ON WITH MR. SLACK.

14      I THINK THERE'S AN ARGUMENT THAT IT'S RELEVANT, BUT JUST

15   IN THE INTEREST OF EFFICIENCY I STOPPED.

16      AND I'M NOT EVEN GOING INTO THE BLOOD TESTS.

17      SO I'VE TRIED TO CURTAIL IT.  I JUST THINK TO THE END OF

18   THIS PERIOD WHEN HE'S IN ACTIVE COMMUNICATION WITH ALL OF THESE

19   CLIENTS, ONE OF WHOM IS MS. WALTON WHO IS PART OF THE FAMILY,

20   THE FIRST FAMILY HE STARTED TO COMMUNICATE WITH.

21          THE COURT:  SO I LOOK AT THIS AND I THINK, OKAY, THE

22   REAL VALUE OF THIS IS TO GET IN FRONT OF THE JURY THIS AUTHOR'S

23   WRITING SAYING, I KNOW YOU HAVE ALWAYS LOOKED FOR OPPORTUNITIES

24   TO SUPPORT WOMEN, I CAN'T THINK OF A BETTER EXAMPLE THAN

25   ELIZABETH.

02:45PM 1       IT SEEMS TO ME -- AND ALL OF THESE EMAILS HAVE FLATTERING

02:45PM 2   LANGUAGE FOR YOUR CLIENT, AND IT SEEMS LIKE THAT'S THE REAL

02:45PM 3   PURPOSE.  MAYBE YOU DON'T HAVE TO ANSWER THAT QUESTION.

02:45PM 4       MR. WADE:  NO, YOUR HONOR.  THAT PURPOSE SHOWS THE

02:45PM 5   RELEVANCE OF THE DOCUMENTS BECAUSE THEY REFLECT, THEY REFLECT

02:45PM 6   THIS WITNESS'S BELIEF AND FOCUS ON INFORMATION AROUND THE TIME

02:45PM 7   PERIOD THAT HE MADE THE INVESTMENT.

02:45PM 8       HE'S NOT FOCUSSING ON, FOR EXAMPLE, WHO PUT THE LOGO ON

02:45PM 9   THE PFIZER REPORT.

02:45PM 10      HE'S FOCUSSED ON THE BROAD VISION OF THE CLIENT AND HER

02:45PM 11  CHARACTERISTICS, YOU KNOW, AS A PROMINENT FEMALE LEADER.

02:45PM 12      I THINK THAT THAT IS RELEVANT TO SHOW WHAT WAS MATERIAL TO

02:45PM 13  HIM IN CONNECTION WITH HIS INVESTMENT DECISION RIGHT IN THE

02:45PM 14  SAME WINDOW.

02:45PM 15      THE COURT:  BUT THE WINDOW IS CLOSED HERE.  THIS IS

02:45PM 16  WELL AFTER HIS INVESTMENT.

02:45PM 17      MR. WADE:  NO.  BUT AGAIN, YOUR HONOR, THIS RELATES

02:45PM 18  TO A POINT THAT I RAISED WITH THE COURT YESTERDAY, AND ALL I'M

02:45PM 19  LOOKING TO GET IN IS THE INTRODUCTION SO WE HAVE THE ABILITY TO

02:45PM 20  SHOW THAT THIS INVESTOR HAD SUCH BELIEF IN THE, IN THE COMPANY

02:45PM 21  THAT HE CONTINUED TO PUT PEOPLE INTO IT.

02:45PM 22      AND I THINK THERE IS SOME OTHER EVIDENCE THAT MAY COME OUT

02:45PM 23  IN THIS WINDOW, THAT THE FACT THAT HE CONTINUED TO BELIEVE THAT

02:45PM 24  I THINK IS RELEVANT AND IS APPROPRIATE FOR US TO ARGUE.

02:45PM 25      THE COURT:  ONE OF THE OTHER THINGS THAT HAS COME UP

02:45PM  1    THROUGH THE FIVE AND A HALF HOURS OF YOUR EXAMINATION OF THIS

02:45PM  2    WITNESS IS IT ALMOST SOUNDS LIKE YOU'RE GOING TO BLAME THE

02:45PM  3    VICTIMS, THESE INVESTORS AND THINGS, AND I JUST -- I HAVEN'T

02:45PM  4    HEARD ANY OBJECTIONS ABOUT THAT, BUT -- AND OF COURSE NOW IS

02:45PM  5    NOT THE TIME TO OBJECT TO THAT AS IT WOULD BE IN CLOSING

02:45PM  6    ARGUMENTS.

02:45PM  7         BUT I JUST WANTED TO REMIND EVERYONE ABOUT THAT CAVEAT.

02:45PM  8    WE CAN'T DO THAT IN ARGUMENT, OF COURSE.

02:45PM  9              MR. WADE:  OF COURSE NOT, YOUR HONOR.

02:45PM 10         AND IT IS NOT OUR INTENT IN ANY WAY TO BLAME THE VICTIM.

02:45PM 11         BUT THE INFORMATION THAT THEY HAD AND THAT THEY CONSIDERED

02:45PM 12    DURING THIS TIME PERIOD IS RELEVANT.  THE GOVERNMENT PRESENTED

02:45PM 13    SUBSTANTIALLY ALL EVIDENCE THAT RELATES TO SEPTEMBER 2ND, 2014,

02:45PM 14    AND BY AND LARGE IT STOPPED.

02:45PM 15         AND THE REALITY IS THAT THIS WITNESS HAD A LOT OF ONGOING

02:45PM 16    INTERACTIONS THEREAFTER, SOME OF WHICH WE CAN'T EXPLORE BECAUSE

02:45PM 17    OF PRIVILEGE ISSUES.

02:45PM 18         BUT I THINK IT'S FAIR TO PUT INTO THE CASE ALL OF THE

02:45PM 19    INFORMATION THAT WAS AVAILABLE TO THE INVESTOR IN CONNECTION

02:45PM 20    WITH WHAT COULD HAVE BEEN MATERIAL TO THE INVESTOR IN MAKING

02:45PM 21    THE INVESTMENT DECISION.

02:45PM 22              THE COURT:  YOU MEAN THESE OTHER INVESTORS, NOT THIS

02:45PM 23    INVESTOR?

02:45PM 24              MR. WADE:  WELL, THIS INVESTOR.

02:45PM 25              THE COURT:  HE'S MADE HIS INVESTMENT, THOUGH, AT THE

02:45PM 1     TIME OF THESE EMAILS, HASN'T HE?

02:45PM 2          MR. WADE:  HE HAS MADE HIS INVESTMENT AT THE TIME OF

02:45PM 3     THESE EMAILS, BUT SUBSEQUENT ACTS, AS THE GOVERNMENT USUALLY

02:45PM 4     STATES AGAINST CLIENTS OF MINE, SUBSEQUENT ACTS CAN BE RELEVANT

02:45PM 5     AS TO THE PRIOR INTENT, AND I THINK THAT -- I THINK THAT HIS

02:45PM 6     COMMUNICATION AND FOCUS IS RELEVANT.

02:45PM 7          THE COURT:  MR. SCHENK?

02:45PM 8          MR. SCHENK:  I CAN IMAGINE WHERE THE PERIOD GOES

02:45PM 9     BEYOND THE DATE OF THE INVESTMENT, ACTIONS OF INVESTORS AFTER

02:45PM 10    THEIR INVESTMENT WOULD BE RELEVANT.

02:45PM 11         MY ARGUMENT IS NOT THAT AN INVESTOR'S ACTIONS BEYOND THE

02:45PM 12    DATE OF INVESTMENT COULD NEVER BE RELEVANT.  THESE THREE EMAILS

02:45PM 13    ARE NOT RELEVANT.

02:45PM 14         THESE THREE EMAILS DO NOT SUGGEST WHAT THE DEFENSE

02:45PM 15    BELIEVES THAT THEY DO.  THE CONCEPT CAN BE INQUIRED INTO

02:45PM 16    THROUGH A QUESTION.

02:45PM 17         IN FACT, I THINK THE QUESTION FOR SOME HAS ALREADY BEEN

02:45PM 18    ASKED WHETHER INTRODUCTIONS WERE MADE BETWEEN MS. HOLMES AND

02:45PM 19    MS. WALTON.  I MAY BE WRONG ABOUT THAT.

02:45PM 20         THE FACT HAS ALREADY BEEN ESTABLISHED.  AS THE COURT

02:45PM 21    NOTED, MR. WADE CAN CERTAINLY ASK QUESTIONS ABOUT THAT.

02:45PM 22         I DO NOT SEE THE RELEVANCE OF THE DOCUMENTS.

02:45PM 23         THE COURT:  ANYTHING FURTHER?

02:45PM 24         MR. WADE:  I DON'T.

02:45PM 25         THE COURT:  I'M GOING TO ALLOW YOU TO INQUIRE AND

02:45PM  1    YOU CAN ASK, DID YOU SAY FLATTERING THINGS IN REGARDS TO YOUR

02:45PM  2    INTRODUCTION, AND THAT TYPE OF THING.

02:45PM  3        BUT I THINK THE EMAILS, THE DATES AND THINGS, I THINK IT

02:45PM  4    GOES TOO FAR.

02:45PM  5        I THINK YOU CAN ACCOMPLISH WHAT YOU SEEK TO ACCOMPLISH

02:45PM  6    WITHOUT THE ACTUAL DOCUMENT GOING IN, AND I JUST DON'T SEE THE

02:45PM  7    RELEVANCE FOR THAT.

02:45PM  8        SO I'LL SUSTAIN THE OBJECTION, PARDON ME, AS TO 168, 138,

02:45PM  9    AND 139.

02:45PM 10        I WILL PERMIT YOU, THOUGH, TO MAKE INQUIRY ON THAT.

02:45PM 11        NOW, TIMING IS PROBLEM.  YOU KNOW, WE SAID YESTERDAY WE

02:45PM 12    WERE GOING TO FINISH THIS WITNESS.  YOU'VE HAD HIM ALL DAY AND

02:45PM 13    NOW THE GOVERNMENT HAS 12 MINUTES TO DO A REDIRECT.

02:45PM 14        YOU KNOW, I DON'T KNOW IF THAT WAS STRATEGIC OR WHAT THAT

02:45PM 15    WAS.  BUT, YOU KNOW, IT'S JUST NOT FAIR.

02:45PM 16            MR. WADE:  YOUR HONOR, I APOLOGIZE.  THERE WERE A

02:45PM 17    COUPLE OF THINGS THAT BLED INTO OUR TIME TODAY THAT CUT US A

02:45PM 18    LITTLE BIT WHERE WE GOT STARTED A LITTLE BIT SHORT AND THERE

02:45PM 19    WERE A COUPLE OF CONTINUANCES.

02:45PM 20        AND I'LL REQUEST, TOO -- I BELIEVE AT THE TIME I MADE THAT

02:45PM 21    STATEMENT, I THOUGHT WE WERE GOING UNTIL 4:00 O'CLOCK TODAY,

02:45PM 22    AND SO I TAKE RESPONSIBILITY FOR THAT.

02:45PM 23        AT THE BREAK, I'LL TELL THE COURT, I CUT ABOUT EIGHT

02:45PM 24    DOCUMENTS THAT I WAS PLANNING TO PUT IN TO TRY AND GET IT

02:45PM 25    FORWARD.

02:45PM  1          I WAS SURPRISED THAT THESE DOCUMENTS GOT OBJECTIONS, BUT

02:45PM  2      I'LL ASK THREE QUICK QUESTIONS AND PASS HIM TO THE GOVERNMENT.

02:45PM  3              THE COURT:  OKAY.  THAT WILL FULFILL YOUR NEEDS FOR

02:45PM  4      YOUR CROSS-EXAMINATION?

02:45PM  5              MR. WADE:  IT WILL.

02:45PM  6              THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

02:45PM  7              MR. SCHENK:  THANK YOU.

02:45PM  8          (END OF DISCUSSION AT SIDE-BAR.)

02:45PM  9              THE COURT:  ALL RIGHT.  THANK YOU.

02:45PM 10          WE ARE BACK ON THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT

02:45PM 11      ARE PRESENT AGAIN.

02:45PM 12          MR. MOSLEY IS ON THE STAND.

02:45PM 13          I'M GOING TO SUSTAIN THE OBJECTIONS AS TO THE ADMISSION OF

02:45PM 14      THE DOCUMENTS.

02:45PM 15              MR. WADE:  MAY I PROCEED, YOUR HONOR?

02:45PM 16              THE COURT:  YES.

02:45PM 17      BY MR. WADE:

02:45PM 18      Q.   MR. MOSLEY, JUST A COUPLE OF QUICK QUESTIONS.

02:45PM 19          DO YOU RECALL THAT YOU PROVIDED AN INTRODUCTION TO

02:45PM 20      MS. HOLMES -- THAT YOU PROVIDED MR. SLACK WITH AN INTRODUCTION

02:45PM 21      TO MS. HOLMES IN LATE FALL OF 2014?

02:45PM 22      A.   I THINK I DID PROVIDE AN INTRODUCTION AT THE REQUEST OF

02:45PM 23      DR. KISSINGER.

02:45PM 24      Q.   OKAY.  AND DO YOU ALSO RECALL THAT YOU --

02:45PM 25      A.   I DON'T THINK I EVER MET HANK SLACK AT THE TIME.

02:45PM  1    Q.   FAIR ENOUGH.

02:45PM  2         AND DO YOU ALSO RECALL IN THAT TIME PERIOD THAT YOU

02:46PM  3    PROVIDED AN INTRODUCTION TO MR. OHANA?

02:46PM  4    A.   I BELIEVE I DID, ONCE AGAIN, AT THE REQUEST OF

02:46PM  5    DR. KISSINGER, I THINK WHO CONTACTED JOHN ELKANN.

02:46PM  6    Q.   AND, AGAIN, THOSE WEREN'T YOUR CLIENTS?

02:46PM  7    A.   NO.

02:46PM  8    Q.   AND THERE WAS, ALSO IN THAT TIME PERIOD, MS. ALICE WALTON?

02:46PM  9    A.   YES.

02:46PM 10    Q.   AND SHE WAS A CLIENT OF YOURS?

02:46PM 11    A.   YES, SHE WAS.

02:46PM 12    Q.   AND DO YOU RECALL PROVIDING AN INTRODUCTION TO

02:46PM 13    FACILITATING A CONNECTION BETWEEN MS. HOLMES AND MS. WALTON?

02:46PM 14    A.   YEAH, I THINK I SENT AN EMAIL SUGGESTING THAT THEY OUGHT

02:46PM 15    TO FIND A TIME TO GET TOGETHER AND TALK.

02:46PM 16    Q.   AND SAYING SOME NICE THINGS ABOUT MS. HOLMES.

02:46PM 17         DO YOU RECALL THAT?

02:46PM 18    A.   ABSOLUTELY.

02:46PM 19              MR. WADE:  I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

02:46PM 20              THE COURT:  ALL RIGHT.

02:46PM 21         REDIRECT?

02:46PM 22              MR. SCHENK:  YES.  THANK YOU.

02:46PM 23                         **REDIRECT EXAMINATION**

02:46PM 24    BY MR. SCHENK:

02:47PM 25    Q.   GOOD AFTERNOON, MR. MOSLEY.

MOSLEY REDIRECT BY MR. SCHENK

02:47PM  1    A.   GOOD AFTERNOON.

02:47PM  2    Q.   I JUST HAVE A COUPLE OF QUESTIONS.  I WANT TO FOLLOW UP ON

02:47PM  3    SOME TOPICS THAT YOU DISCUSSED WITH MR. WADE, IF THAT WOULD BE

02:47PM  4    OKAY.

02:47PM  5    A.   ABSOLUTELY.

02:47PM  6    Q.   THERE WERE MANY QUESTIONS WHERE MR. WADE ASKED YOU IF YOU

02:47PM  7    UNDERSTOOD THAT A STATEMENT THAT MS. HOLMES WAS MAKING, OR THE

02:47PM  8    PURPOSE OF A MEETING WAS FOR MS. HOLMES TO COMMUNICATE HER

02:47PM  9    VISION.

02:47PM  10       MR. WADE USED THE WORD "VISION" QUITE OFTEN IN CERTAIN

02:47PM  11   INSTANCES WHERE MS. HOLMES WOULD COMMUNICATE HER VISION.

02:47PM  12       DO YOU RECALL THOSE QUESTIONS, AT LEAST GENERALLY?

02:47PM  13   A.   I DO YES, GENERALLY.

02:48PM  14   Q.   AND I WANT TO BE SPECIFIC WITH YOU RIGHT NOW.

02:48PM  15   A.   RIGHT.

02:48PM  16   Q.   AND I WANT TO ASK YOU SOME QUESTIONS ABOUT CERTAIN TOPICS,

02:48PM  17   WHEN THEY WERE COMMUNICATED TO YOU BY MS. HOLMES EITHER IN A

02:48PM  18   MEETING, ON THE PHONE, OR IN WRITTEN MATERIAL, WERE VISION AS

02:48PM  19   OPPOSED TO A CURRENT CAPABILITY OF THE TECHNOLOGY.

02:48PM  20       DO YOU UNDERSTAND THAT DISTINCTION?

02:48PM  21   A.   I DO.

02:48PM  22   Q.   WHEN MS. HOLMES COMMUNICATED TO YOU, OR WHEN YOU REACHED

02:48PM  23   THE CONCLUSION THAT THERANOS COULD PERFORM A VAST ARRAY OF

02:48PM  24   TESTS ON FINGERSTICK, DID YOU THINK THAT THAT WAS MS. HOLMES'S

02:48PM  25   VISION OR DID YOU THINK THAT THAT WAS A CURRENT CAPABILITY?

02:48PM  1            MR. WADE:  YOUR HONOR, JUST OBJECTION TO THE FORM AS

02:48PM  2     TO WHETHER IT WAS SOMETHING THAT HE LEARNED OR WHETHER IT WAS

02:48PM  3     SOMETHING THAT SHE SAID.

02:48PM  4         I THINK HE HAD A COMPOUND QUESTION.

02:48PM  5            THE COURT:  DO YOU WANT TO -- MAYBE YOU SHOULD

02:48PM  6     CLARIFY JUST SO MR. MOSLEY CAPTURES A COMPLETE UNDERSTANDING OF

02:48PM  7     THE QUESTION.

02:48PM  8            MR. SCHENK:  SURE.

02:48PM  9     Q.  DO YOU RECALL UNDERSTANDING AND WRITING IN YOUR OUTLINE AT

02:48PM  10    ONE POINT THAT THERANOS COULD PERFORM A VAST ARRAY OF TESTS?

02:48PM  11        DO YOU RECALL THAT?

02:48PM  12    A.  I DO.

02:48PM  13    Q.  DID YOU UNDERSTAND THAT THAT WAS A CURRENT CAPABILITY?

02:49PM  14    A.  I DID.

02:49PM  15    Q.  DID YOU GAIN THAT UNDERSTANDING FROM MS. HOLMES?

02:49PM  16    A.  I THINK I MAINLY GAINED THAT UNDERSTANDING FROM THE

02:49PM  17    MATERIALS --

02:49PM  18    Q.  OKAY.

02:49PM  19    A.  -- THAT I RECEIVED.

02:49PM  20    Q.  FROM THE WRITTEN MATERIALS, THE BINDERS THAT WE TALKED

02:49PM  21    ABOUT?

02:49PM  22    A.  THAT IS CORRECT.

02:49PM  23    Q.  DID YOU HAVE AN UNDERSTANDING, BEFORE YOU INVESTED

02:49PM  24    $6 MILLION, THAT THERANOS HAD THE ABILITY TO PROVIDE ACCURATE

02:49PM  25    BLOOD TESTS?

02:49PM   1    A.   YES, I BELIEVED THAT.

02:49PM   2    Q.   DID YOU THINK THAT WAS A CURRENT CAPABILITY OR THAT WAS

02:49PM   3    MS. HOLMES'S VISION?

02:49PM   4    A.   I BELIEVED THAT WAS A CURRENT CAPABILITY.

02:49PM   5    Q.   AND WHERE DID THAT UNDERSTANDING COME FROM?

02:49PM   6    A.   I WOULD SAY PRIMARILY FROM THE MATERIALS.

02:49PM   7    Q.   OKAY.  DID YOU HAVE AN UNDERSTANDING, BEFORE YOU INVESTED,

02:49PM   8    THAT THERANOS HAD A RELATIONSHIP -- AND I'LL USE THE WORD

02:49PM   9    "HEALTHY" -- A HEALTHY RELATIONSHIP WITH WALGREENS?

02:49PM  10         DID YOU HAVE THAT UNDERSTANDING?

02:49PM  11    A.   I BELIEVE I THOUGHT THAT THEY HAD A HEALTHY RELATIONSHIP.

02:50PM  12    Q.   AND DID YOU BELIEVE THAT THAT WAS A CURRENT STATEMENT

02:50PM  13    REGARDING THE RELATIONSHIP, OR WAS THAT MS. HOLMES'S VISION?

02:50PM  14    A.   I THOUGHT THAT WAS CURRENT.

02:50PM  15    Q.   AND WHERE DID YOU GET THAT UNDERSTANDING FROM?

02:50PM  16    A.   PRINCIPALLY FROM THE MATERIALS.  MAYBE THERE WAS ALSO A

02:50PM  17    REFERENCE IN THAT "FORBES" ARTICLE.

02:50PM  18    Q.   DID YOU MEAN "FORTUNE"?

02:50PM  19    A.   THE "FORTUNE" ARTICLE THAT WAS A QUOTE FROM -- AND I'M

02:50PM  20    SURE I READ THAT.

02:50PM  21    Q.   OKAY.

02:50PM  22    A.   SO IT COULD HAVE COME FROM SOME NUMBER OF SOURCES.

02:50PM  23    Q.   WHEN -- BEFORE YOU MADE THE DECISION TO INVEST, DID YOU

02:50PM  24    THINK THAT CURRENTLY THERANOS HAD MEANINGFUL REVENUE?

02:50PM  25    A.   I DID.

02:50PM  1    Q.   AND WAS THAT DIFFERENT THAN MS. HOLMES HAD A VISION TO

02:50PM  2    HAVE REVENUE?

02:50PM  3    A.   YES, I DID.

02:50PM  4    Q.   AND WHERE DID YOU GET THAT UNDERSTANDING FROM?

02:50PM  5    A.   AND I THINK THAT, ONCE AGAIN, CAME PRIMARILY FROM THE

02:50PM  6    MATERIALS THAT HAD A 2014 INCOME STATEMENT.

02:50PM  7    Q.   WHO SENT YOU THESE MATERIALS WE'VE BEEN REFERRING TO?

02:50PM  8    A.   ELIZABETH DID.

02:51PM  9    Q.   BEFORE YOU MADE THE DECISION TO INVEST, DID YOU HAVE THE

02:51PM 10    UNDERSTANDING THAT THERANOS ELIMINATED THE NEED FOR VIALS OF

02:51PM 11    BLOOD?

02:51PM 12    A.   I BELIEVE THEY WERE USING THE FINGERSTICK, WHICH DID NOT

02:51PM 13    REQUIRE VIALS OF BLOOD.  IT REQUIRED A VERY SMALL SAMPLE.

02:51PM 14    Q.   WAS THAT YOUR UNDERSTANDING OF ITS CURRENT CAPABILITY OR

02:51PM 15    WAS THAT MS. HOLMES'S VISION?

02:51PM 16    A.   THAT WAS MY UNDERSTANDING OF THE CURRENT CAPABILITY.

02:51PM 17    Q.   AND WHERE DID YOU GET THAT UNDERSTANDING FROM?

02:51PM 18    A.   THAT WAS PROBABLY A COMBINATION FROM TALKING TO ELIZABETH

02:51PM 19    AND THE MATERIALS.

02:51PM 20    Q.   BEFORE YOU DECIDED TO INVEST IN THERANOS, DID YOU HAVE AN

02:51PM 21    UNDERSTANDING ABOUT WHETHER THERANOS USED ITS OWN TECHNOLOGY,

02:51PM 22    ITS OWN DEVICES TO TEST THE BLOOD?

02:51PM 23    A.   I BELIEVE THAT IT WAS USING ITS OWN DEVICES.

02:51PM 24    Q.   WAS THAT A CURRENT CAPABILITY OR WAS THAT MS. HOLMES'S

02:51PM 25    VISION?

02:51PM 1      A.   I BELIEVED IT WAS A CURRENT CAPABILITY.

02:51PM 2      Q.   AND WHERE DID YOU GET THAT UNDERSTANDING?

02:52PM 3      A.   I THINK FROM A COMBINATION OF TALKING WITH ELIZABETH AND

02:52PM 4      FROM THE MATERIALS.

02:52PM 5      Q.   BEFORE YOU DECIDED TO INVEST, DID YOU THINK THAT PFIZER

02:52PM 6      HAD AUTHORED A GLOWING REPORT REGARDING THE THERANOS

02:52PM 7      TECHNOLOGY?

02:52PM 8      A.   I DID.

02:52PM 9      Q.   AND DID YOU THINK THAT MS. HOLMES'S HAD A VISION THAT ONE

02:52PM 10     DAY PFIZER WOULD WRITE SOMETHING GOOD ABOUT THERANOS, OR THAT

02:52PM 11     WAS CURRENT, THAT THAT HAD HAPPENED?

02:52PM 12     A.   I READ THAT REPORT AS A STUDY, A REPORT AND A STUDY THAT

02:52PM 13     HAD ALREADY OCCURRED.

02:52PM 14     Q.   MR. WADE ASKED YOU SOME QUESTIONS ABOUT A GROUP OF

02:52PM 15     INDIVIDUALS.  I'M NOT GOING TO GO THROUGH ALL OF THE NAMES, BUT

02:52PM 16     SOME WERE YOUR CLIENTS AND SOME WERE INDIVIDUALS THAT

02:52PM 17     DR. KISSINGER ASKED YOU TO MAKE INTRODUCTIONS?

02:52PM 18     A.   THAT'S CORRECT.

02:52PM 19     Q.   AND DO YOU RECALL THIS GROUP OF INDIVIDUALS?

02:52PM 20     A.   I DO.

02:52PM 21     Q.   DID YOU ENCOURAGE ANY OF THEM TO INVEST IN THERANOS?

02:52PM 22     A.   NO, I DIDN'T.

02:52PM 23     Q.   A MOMENT AGO WE SAW A DOCUMENT, AND IN THE DOCUMENT I

02:53PM 24     THINK IT HAD THE PHRASE "RECOMMENDATION" OR THAT YOU

02:53PM 25     RECOMMENDED CLIENTS.

02:53PM   1          DO YOU RECALL THAT DOCUMENT?  IT WAS --

02:53PM   2     A.   I DO.

02:53PM   3     Q.   -- AN EMAIL BETWEEN YOU AND MR. BOIES?

02:53PM   4     A.   YES, I BELIEVE IT WAS AN EMAIL BETWEEN DAVID BOIES, OR

02:53PM   5     CHRIS BOIES OR WHOEVER, AND MYSELF, AND IT DID HAVE THAT

02:53PM   6     REFERENCE TO IT IN IT.

02:53PM   7     Q.   EXPLAIN THAT TO ME.  YOU TOLD ME THAT YOU DIDN'T ENCOURAGE

02:53PM   8     ANYONE IN THIS GROUP TO INVEST IN LIGHT OF THAT SENTENCE.

02:53PM   9     A.   I THINK IT WAS JUST LOOSE LANGUAGE.  I MEAN, I THINK IT

02:53PM  10     WAS REFERRING TO THE CLIENTS I HAD INTRODUCED TO ELIZABETH OR

02:53PM  11     WHO HAD BEEN, YOU KNOW, REALLY THE CLIENTS THAT I HAD

02:53PM  12     INTRODUCED TO ELIZABETH.

02:53PM  13     Q.   OKAY.  SO THEN TO BE CLEAR ONE LAST TIME, DID YOU

02:53PM  14     ENCOURAGE ANY OF THE INDIVIDUALS THAT YOU -- THAT WE ARE

02:53PM  15     TALKING ABOUT RIGHT NOW, YOUR CLIENTS AND THE PEOPLE THAT

02:53PM  16     DR. KISSINGER ASKED YOU TO MAKE INTRODUCTIONS TO MS. HOLMES,

02:53PM  17     DID YOU ENCOURAGE ANY OF THEM TO INVEST IN THERANOS?

02:53PM  18     A.   NO, I DIDN'T.  THESE ARE HIGHLY SOPHISTICATED PARTIES WITH

02:54PM  19     LARGE INVESTMENT STAFFS IN ALMOST EVERY CASE -- I'M SORRY.

02:54PM  20          THESE WERE SOPHISTICATED CLIENTS THAT HAD SIGNIFICANT

02:54PM  21     INVESTMENT STAFFS THAT THEY USED TO VET INVESTMENTS.

02:54PM  22     Q.   THANK YOU.

02:54PM  23          THANK YOU, YOUR HONOR.  NO FURTHER QUESTIONS.

02:54PM  24               THE COURT:  MR. WADE?

02:54PM  25               MR. WADE:  NO FURTHER QUESTIONS.

5381

02:54PM 1                    THE COURT:  THANK YOU.  MAY THIS WITNESS BE EXCUSED?

02:54PM 2                    MR. WADE:  HE MAY.

02:54PM 3                    THE COURT:  THANK YOU.  YOU MAY BE EXCUSED.

02:54PM 4                    THE WITNESS:  THANK YOU.  I APPRECIATE IT.

02:54PM 5                    THE COURT:  I THINK THAT CONCLUDES OUR DAY AND

02:54PM 6     EVENING, LADIES AND GENTLEMEN.  WE'LL TAKE OUR EVENING BREAK

02:54PM 7     NOW.

02:54PM 8          PLEASE REMEMBER TOMORROW WE'LL BEGIN AT 9:30, 9:30.

02:54PM 9          REMIND ME, MS. KRATZMANN, TOMORROW ARE WE GOING UNTIL

02:54PM 10    4:00?

02:54PM 11                   THE CLERK:  YES.

02:54PM 12                   THE COURT:  SO TOMORROW IS A 4:00 O'CLOCK DAY.

02:54PM 13         SO BEFORE YOU LEAVE, PLEASE REMEMBER THE ADMONITION.

02:54PM 14    PLEASE AVOID READING, COMING INTO CONTACT, SPEAKING WITH

02:55PM 15    ANYONE, DOING ANY RESEARCH OR FORMING ANY OPINION ABOUT

02:55PM 16    ANYTHING THAT YOU'VE HEARD SO FAR IN THIS CASE.

02:55PM 17         I'LL ASK YOU TOMORROW MORNING FIRST IF YOU'VE HAD A

02:55PM 18    PLEASANT EVENING, AND THEN I'LL ASK YOU IF YOU HAD CAUSE TO

02:55PM 19    COME ACROSS ANY INFORMATION.

02:55PM 20         SO WE'LL BE IN RECESS.  HAVE A GOOD EVENING.  THANK YOU.

02:55PM 21         (JURY OUT AT 2:55 P.M.)

02:55PM 22                   THE COURT:  PLEASE BE SEATED.  THANK YOU.

02:55PM 23         THE RECORD SHOULD REFLECT THAT OUR JURY HAS LEFT FOR THE

02:55PM 24    DAY.  MR. MOSLEY HAS LEFT THE COURTROOM.

02:55PM 25         BEFORE WE ADJOURN, ANYTHING FURTHER BEFORE WE ADJOURN?

02:55PM   1          MR. SCHENK?

02:55PM   2                MR. SCHENK:

02:55PM   3                MR. WADE:  NO, YOUR HONOR.

02:55PM   4                THE COURT:  ALL RIGHT.  THANK YOU.  HAVE A GOOD

02:56PM   5     EVENING.

02:56PM   6          MR. SCHENK, MAY I SEE YOU AND MR. WADE FOR JUST A

02:56PM   7     MOMENT -- I'M SORRY.  MR. DOWNEY.

02:56PM   8          (DISCUSSION OFF THE RECORD.)

02:56PM   9                THE COURT:  MR. DOWNEY, MR. SCHENK, CAN I SEE YOU

02:56PM  10     FOR A SECOND?

02:56PM  11          WE'RE OTHERWISE IN RECESS FOR THE DAY.  THANK YOU VERY

02:56PM  12     MUCH.

02:56PM  13          (COURT ADJOURNED AT 2:56 P.M.)

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

1

2

3                        CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8     UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9     CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10    HEREBY CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16         _____
           IRENE RODRIGUEZ, CSR, CRR
           CERTIFICATE NUMBER 8076
17

18

19         _____
           LEE-ANNE SHORTRIDGE, CSR, CRR
           CERTIFICATE NUMBER 9595
20

21         DATED:  NOVEMBER 3, 2021

22

23

24

25