```
 1

 2                    UNITED STATES DISTRICT COURT

 3                  NORTHERN DISTRICT OF CALIFORNIA

 4                        SAN JOSE DIVISION

 5
       UNITED STATES OF AMERICA,      )  CR-18-00258-EJD
 6                                     )
                       PLAINTIFF,      )  SAN JOSE, CALIFORNIA
 7                                     )
               VS.                     )  VOLUME 32
 8                                     )
       ELIZABETH A. HOLMES,            )  NOVEMBER 15, 2021
 9                                     )
                       DEFENDANT.      )  PAGES 6146 - 6301
10     _____ )

11
                  TRANSCRIPT OF TRIAL PROCEEDINGS
12              BEFORE THE HONORABLE EDWARD J. DAVILA
                   UNITED STATES DISTRICT JUDGE
13
       A P P E A R A N C E S:
14
       FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
15                           BY:  JOHN C. BOSTIC
                                  JEFFREY B. SCHENK
16                           150 ALMADEN BOULEVARD, SUITE 900
                             SAN JOSE, CALIFORNIA 95113
17
                             BY:  ROBERT S. LEACH
18                                KELLY VOLKAR
                             1301 CLAY STREET, SUITE 340S
19                           OAKLAND, CALIFORNIA 94612

20         (APPEARANCES CONTINUED ON THE NEXT PAGE.)

21
       OFFICIAL COURT REPORTERS:
22                             IRENE L. RODRIGUEZ, CSR, RMR, CRR
                               CERTIFICATE NUMBER 8074
23                             LEE-ANNE SHORTRIDGE, CSR, CRR
                               CERTIFICATE NUMBER 9595
24
             PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25               TRANSCRIPT PRODUCED WITH COMPUTER
```

```
 1      A P P E A R A N C E S: (CONT'D)

 2

 3      FOR DEFENDANT HOLMES:    WILLIAMS & CONNOLLY LLP
                                 BY:  KEVIN M. DOWNEY
 4                                    LANCE A. WADE
                                      KATHERINE TREFZ
 5                                    PATRICK LOOBY
                                      ANDREW LEMENS
 6                                    J.R. FLEURMONT
                                      RICHARD CLEARY
 7                                    SEEMA ROPER
                                 725 TWELFTH STREET, N.W.
 8                               WASHINGTON, D.C. 20005

 9                               LAW OFFICE OF JOHN D. CLINE
                                 BY:  JOHN D. CLINE
10                               ONE EMBARCADERO CENTER, SUITE 500
                                 SAN FRANCISCO, CALIFORNIA 94111
11

12      ALSO PRESENT:           FEDERAL BUREAU OF INVESTIGATION
                                 BY:  ADELAIDA HERNANDEZ
13
                                 OFFICE OF THE U.S. ATTORNEY
14                               BY:  LAKISHA HOLLIMAN, PARALEGAL
                                      MADDI WACHS, PARALEGAL
15
                                 WILLIAMS & CONNOLLY
16                               BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL

17                               TBC
                                 BY:  BRIAN BENNETT, TECHNICIAN
18

19

20

21

22

23

24

25
```

1

INDEX OF PROCEEDINGS

2

GOVERNMENT'S:

3

4    **ALAN EISENMAN**

CROSS-EXAM BY MR. DOWNEY (RES.)        P. 6157

5    REDIRECT EXAM BY MR. BOSTIC            P. 6277
     RECROSS-EXAM BY MR. DOWNEY             P. 6290

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          INDEX OF EXHIBITS

2

                                        IDENT.      EVIDENCE
3       GOVERNMENT'S:

4       1370                                        6240
        1362                                        6291
5

6

7

8       DEFENDANT'S:

9       14103                                       6158
        14225                                       6168
10      14224                                       6172
        14226                                       6174
11      12185                                       6178
        11253                                       6183
12      12999                                       6212
        13150                                       6260
13      13191                                       6266
        14109                                       6275
14

15

16

17

18

19

20

21

22

23

24

25

```
 1    SAN JOSE, CALIFORNIA                    NOVEMBER 15, 2021

 2                        P R O C E E D I N G S

 3         (COURT CONVENED AT 8:37 A.M.)

 4         (JURY OUT AT 8:37 A.M.)

 5              THE COURT:  GOOD MORNING EVERYONE.  WE'RE BACK ON

 6    THE RECORD IN THE HOLMES MATTER.

 7         ALL COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT.  WE'RE

 8    OUTSIDE OF THE PRESENCE OF THE JURY.

 9         GOOD MORNING.  I HOPE EVERYONE HAD A GOOD WEEKEND.

10         I JUST WANTED TO TOUCH BASE, AS I SAID LAST WEEK, JUST TO

11    DO A SCHEDULING CHECK AND SEE.

12         LET'S SEE, WE HAVE MR. EISENMAN ON.  I THINK, MR. DOWNEY,

13    YOU'RE CONTINUING WITH YOUR CROSS OF HIM TODAY, THIS MORNING.

14              MR. DOWNEY:  YES, SIR.

15              THE COURT:  AND WE'LL BE IN SESSION JUST IN THE

16    MORNING.  AND I WONDER IF WE COULD MAYBE GO UNTIL 1:00 O'CLOCK.

17    I HAVE A 1:30 CALENDAR.  I WAS THINKING IF WE COULD GO UNTIL

18    1:00 O'CLOCK, WE CAN CAPTURE AS MUCH EVIDENCE AS WE CAN, AND

19    THEN TOMORROW AT 9:00.

20         SO LET ME TURN TO YOU AND ASK YOU SCHEDULING.  WHAT -- DO

21    YOU THINK WE'LL FINISH WITH THIS WITNESS THIS MORNING?

22              MR. DOWNEY:  I WOULD EXPECT SO, YOUR HONOR.

23              THE COURT:  OKAY.

24              MR. DOWNEY:  I THINK BETWEEN THE PARTIES, THAT

25    SHOULD BE ENOUGH TIME TO FINISH HIM.  IF NOT, IT WOULD BE AN
```

Timestamps (left margin): 08:37AM (lines 3-16), 08:38AM (lines 17-25)

08:38AM   1    HOUR TO HOUR SOMETHING.  BUT I WOULD THINK THAT WE WILL.

08:38AM   2              THE COURT:  OKAY.  GREAT.

08:38AM   3         MR. LEACH?  MR. BOSTIC?  ANYTHING TO ADD?

08:38AM   4              MR. BOSTIC:  YOUR HONOR, ONLY TO AGREE ON

08:38AM   5    MR. EISENMAN.

08:38AM   6         I DON'T EXPECT LENGTHY REDIRECT, SO I THINK WE SHOULD BE

08:38AM   7    ABLE TO FINISH HIM AS WELL.

08:38AM   8              THE COURT:  OKAY.  AND THEN MAYBE WE'LL GET ANOTHER

08:38AM   9    WITNESS STARTED, OR AT LEAST INTRODUCED THIS MORNING?  THERE'S

08:38AM  10    A POSSIBILITY OF THAT?

08:38AM  11              MR. LEACH:  YES, YOUR HONOR, WE HAVE ANOTHER WITNESS

08:38AM  12    READY TO GO.

08:38AM  13              THE COURT:  OKAY.  ALL RIGHT.  GREAT.

08:39AM  14         ANYTHING ELSE THEN THAT YOU THINK WE SHOULD TALK ABOUT?

08:39AM  15              MR. BOSTIC:  JUST ONE MATTER BRIEFLY, YOUR HONOR.

08:39AM  16              THE COURT:  SURE.

08:39AM  17              MR. BOSTIC:  THANK YOU, YOUR HONOR.

08:39AM  18         AS TO THE WITNESS CURRENTLY ON THE STAND, HE HAD AN

08:39AM  19    INTERACTION WITH THE NATIONAL ASSOCIATION OF SECURITIES DEALERS

08:39AM  20    IN 2000, AND IT RELATED TO, I BELIEVE, TWO ORDERS THAT THIS

08:39AM  21    WITNESS HAD PLACED.  I'M NOT PRIVY TO ALL OF THE MATERIALS FROM

08:39AM  22    THAT INVESTIGATION, OR ANY OF THEM THAT AREN'T PUBLICLY

08:39AM  23    AVAILABLE, BUT I UNDERSTAND THAT THE MATTER RESULTED IN A FINE

08:39AM  24    TO THE WITNESS AND A SEVEN DAY SUSPENSION.

08:39AM  25         I ASKED THE DEFENSE WHETHER MR. DOWNEY INTENDED TO GET

08:39AM 1     INTO THIS ON CROSS-EXAMINATION, AND HE SAID POSSIBLY.

08:39AM 2        SO I WANTED TO RAISE IT WITH THE COURT.

08:39AM 3        WE DON'T SEE IT AS PROPER IMPEACHMENT IN THIS CASE.  THIS

08:39AM 4     WAS MORE THAN 20 YEARS AGO.  THIS OBVIOUSLY WAS NOT A CRIMINAL

08:39AM 5     CONVICTION, AND WE DON'T THINK IT'S SUFFICIENTLY PROBATIVE OF

08:40AM 6     HIS CREDIBILITY AND CERTAINLY HAS NO RELATION TO THE FACTS OF

08:40AM 7     THIS CASE.

08:40AM 8        THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

08:40AM 9       MR. DOWNEY, GOOD MORNING.

08:40AM 10        MR. DOWNEY:  HOW ARE YOU?

08:40AM 11        THE COURT:  WELL, THANKS.

08:40AM 12        MR. DOWNEY:  THANK YOU.

08:40AM 13     I TOLD MR. BOSTIC, I DON'T INTEND TO INTRODUCE THE

08:40AM 14     DOCUMENTS WHICH REFLECT, YOU KNOW, THE PAST ISSUES THAT

08:40AM 15     MR. EISENMAN HAS HAD, AND I DON'T INTEND TO INTRODUCE THE

08:40AM 16     DOCUMENTS FOR PURPOSES OF IMPEACHING HIM OR SUGGESTING THAT HE

08:40AM 17     ENGAGES IN A PATTERN OF THIS BEHAVIOR.

08:40AM 18     IT'S POSSIBLE, DEPENDING ON WHAT HE CONCEDES ABOUT HIS

08:40AM 19     KNOWLEDGE OF RESTRICTIONS ON THE ABILITY OF A SHAREHOLDER OR A

08:40AM 20     POTENTIAL INVESTOR TO OBTAIN INSIDE INFORMATION, THAT AN

08:40AM 21     EXCHANGE ABOUT THE KNOWLEDGE HE RECEIVED AS A RESULT OF HIS

08:40AM 22     PAST ISSUES COULD COME UP IN THE EXCHANGE.  BUT THAT WAS THE

08:41AM 23     ONLY PURPOSE FOR WHICH IT WAS INTRODUCED.

08:41AM 24        THE COURT:  AND HOW WOULD THAT -- WOULD YOU ASK HIM

08:41AM 25     THE STANDARD IMPEACHMENT QUESTIONS, "ISN'T IT A FACT THAT," OR

08:41AM  1          SOMETHING LIKE --

08:41AM  2                  MR. DOWNEY:  YES, YES.

08:41AM  3                  THE COURT:  I SEE.  WELL, IF IT WERE A CRIMINAL

08:41AM  4     CONVICTION, IT'S 20 YEARS OLD.  I WOULD DOUBT IT WOULD BE A

08:41AM  5     CRIMINAL CONVICTION IT SOUNDS LIKE.

08:41AM  6                  MR. DOWNEY:  IT WOULDN'T.  AND I DON'T THINK, IN A

08:41AM  7     SQUARE WAY, THE FACT OF THE SUSPENSION THAT WAS VISITED ON HIM

08:41AM  8     OR THE FINE THAT WAS VISITED ON HIM IS ADMISSIBLE.

08:41AM  9          I THINK ALL THAT IS REALLY ADMISSIBLE IS SOMETHING WHICH

08:41AM  10    EITHER REFRESHES HIM AS TO THE FACT THAT HE HAD KNOWLEDGE OF

08:41AM  11    THESE RESTRICTIONS, WHICH WE WOULD NEED TO EXPRESS IN FRONT OF

08:41AM  12    THE JURY, OR A QUESTION WHICH ASKS HIM IF HE'S EVER BEEN MADE

08:41AM  13    AWARE, YOU KNOW, THROUGH A COMMUNICATION OF SOME KIND THAT

08:41AM  14    THERE ARE SOME RESTRICTIONS.  THAT'S THE ONLY WAY.

08:41AM  15         IT REALLY IS NOT DESIGNED TO SHOW THAT PATTERN.

08:42AM  16                 MR. BOSTIC:  YOUR HONOR, I'M STILL NOT SEEING THE

08:42AM  17    CONNECTION BETWEEN THAT CONTEXT AND THIS ONE.  IN THAT CONTEXT

08:42AM  18    HE WAS, AS I UNDERSTAND IT, WORKING AS A TRADER TRADING IN

08:42AM  19    PUBLIC SECURITIES.

08:42AM  20         HERE HE'S AN INVESTOR IN A PRIVATE COMPANY.

08:42AM  21         SO I'M NOT SEEING THE CONNECTION BETWEEN THE INFORMATION

08:42AM  22    RESTRICTION RULES THAT WOULD APPLY IN BOTH OF THOSE CASES.

08:42AM  23         EVEN IF THERE WAS SOME OVERLAP, THOUGH, IT SOUNDS LIKE

08:42AM  24    MR. DOWNEY'S PURPOSE COULD BE ACCOMPLISHED WITHOUT ANY

08:42AM  25    REFERENCE TO THE PENALTIES THAT WERE IMPOSED 20 YEARS AGO.

08:42AM  1          MR. DOWNEY:  I THINK THAT'S FAIR, YOUR HONOR.

08:42AM  2          THE COURT:  I DON'T THINK YOU -- WHAT I THOUGHT I

08:42AM  3   HEARD YOU SAY, MR. DOWNEY, IS THAT YOU DON'T WANT TO GO INTO

08:42AM  4   THAT.

08:42AM  5          MR. DOWNEY:  I DON'T, THAT'S CORRECT.

08:42AM  6          THE COURT:  YOU'RE GOING TO ASK HIM IF HE HAS

08:42AM  7   KNOWLEDGE OF RESTRICTIONS, REGULATIONS IN TRADING, AND WHAT

08:42AM  8   THOSE REGULATIONS MEAN TO A TRADER, ET CETERA.

08:42AM  9          MR. DOWNEY:  THAT'S RIGHT.  OR TO, YOU KNOW,

08:42AM  10  INVESTORS OR PEOPLE WHO HAVE ACCESS TO INFORMATION THAT OTHER

08:43AM  11  INVESTORS OR POTENTIAL INVESTORS DON'T HAVE.

08:43AM  12         THE COURT:  AND YOU'RE NOT TRYING TO -- AND PARDON

08:43AM  13  ME FOR PUTTING IT THIS WAY, YOU'RE NOT TRYING TO SET HIM UP TO

08:43AM  14  ALLOW THE ANSWER TO COME IN, "ISN'T IT A FACT THAT"?  YOU'RE

08:43AM  15  NOT TRYING TO SET THAT UP?

08:43AM  16         MR. DOWNEY:  NO.  I EXPECT, BASED ON SOME OF WHAT WE

08:43AM  17  SAW FRIDAY, THAT HE COULD DENY KNOWLEDGE, WHICH I THINK HE

08:43AM  18  CLEARLY HAS.

08:43AM  19         THE COURT:  LET ME JUST SAY THEN IT WOULD BE A

08:43AM  20  LITTLE TOUCHY ABOUT HOW TO IMPEACH HIM ON THAT, AND SO I WOULD

08:43AM  21  ASK YOU TO BEAR CAUTION.

08:43AM  22     I THINK MR. BOSTIC'S POINT IS CORRECT, AND I THINK YOU

08:43AM  23  AGREE, IT'S IMPROPER FOR THE JURY TO HEAR THAT HE HAD THIS,

08:43AM  24  WHATEVER IT IS, A VIOLATION OF ANY KIND.

08:43AM  25         MR. DOWNEY:  I DON'T THINK -- I'M AWARE OF THAT.

08:43AM  1                    THE COURT:  RIGHT.

08:43AM  2                    MR. DOWNEY:  AND I THINK I'M JUST CONCERNED ABOUT

08:43AM  3     THE SCOPE OF WHAT THE WITNESS WILL ACKNOWLEDGE.

08:43AM  4          SO THIS STRIKES ME AS AN ISSUE THAT SHOULDN'T COME UP IF

08:43AM  5     THIS WITNESS HAS HAD SEVERAL MEETINGS WITH THE GOVERNMENT AND

08:44AM  6     DISCUSSED THIS ISSUE, BUT IT IS ALWAYS POSSIBLE.

08:44AM  7                    THE COURT:  OKAY.

08:44AM  8                    MR. BOSTIC:  THAT WOULD BE FINE, YOUR HONOR.  THANK

08:44AM  9     YOU.

08:44AM 10                    THE COURT:  THANK YOU.

08:44AM 11                    MR. DOWNEY:  THANK YOU.

08:44AM 12                    THE COURT:  ALL RIGHT.  WELL, WE'LL TAKE OUR BREAK

08:44AM 13     NOW UNLESS THERE'S ANYTHING ELSE FROM EITHER SIDE?

08:44AM 14          GREAT.  ALL RIGHT.

08:44AM 15          AND WE HAVE -- A MOTION WAS FILED I THINK OVER THE

08:44AM 16     WEEKEND, MAYBE IT WAS FRIDAY, BY THE DEFENSE TO CONSIDER SOME

08:44AM 17     EVIDENCE.  I THINK WE'RE TO DISCUSS THAT TOMORROW MORNING I

08:44AM 18     THINK IS WHAT MS. SAHARIA SAID IN HER PAPERS.

08:44AM 19          THERE'S A YOUNG MAN RISING BEHIND YOU.

08:44AM 20                    MR. DOWNEY:  I THINK THAT'S RIGHT, YOUR HONOR.

08:44AM 21                    THE COURT:  ALL RIGHT.  IS THAT RIGHT?

08:44AM 22                    MR. BOSTIC:  THAT'S FINE, YOUR HONOR.  THANK YOU.

08:44AM 23                    THE COURT:  YEAH, LET'S DO THAT.  I WAS THINKING

08:44AM 24     ABOUT MAYBE WE COULD DO THIS AFTERNOON, BUT LET'S, LET'S TALK

08:44AM 25     ABOUT IT TOMORROW MORNING.

08:44AM   1                OKAY.  THANK YOU.

08:44AM   2                (RECESS FROM 8:44 A.M. UNTIL 9:07 A.M.)

09:07AM   3                (JURY IN AT 9:07 A.M.)

09:07AM   4                THE COURT:  ALL RIGHT.  GOOD MORNING.  WE'RE ON THE

09:07AM   5      RECORD IN THE HOLMES MATTER.  OUR JURY IS PRESENT AND COUNSEL

09:07AM   6      ARE PRESENT AND MS. HOLMES IS PRESENT.

09:07AM   7                GOOD MORNING, LADIES AND GENTLEMEN.  I HOPE YOU ALL HAD A

09:07AM   8      GOOD LONG WEEKEND.  JUST TO REMIND YOU, WE'RE ONLY GOING HALF

09:07AM   9      DAY TODAY.  I HOPE WE CAN GO UNTIL 1:00 O'CLOCK TODAY, AND THE

09:07AM  10      REST OF THE WEEK WILL BE FULL DAYS AS NECESSARY.  WE MIGHT HAVE

09:07AM  11      A LATE START ON ONE OF THE DAYS.

09:07AM  12                BUT BEFORE WE BEGIN OUR EVIDENCE, LET ME ASK THE JURY THE

09:07AM  13      QUESTION AGAIN WHETHER OR NOT DURING THE BREAK ANY OF YOU HAD

09:07AM  14      OCCASION TO COME ACROSS, READ, DISCUSS ANY INFORMATION THAT HAD

09:07AM  15      ANYTHING TO DO WITH THIS CASE.

09:07AM  16                IF SO, PLEASE RAISE YOUR HAND.  IF YOU WOULD LIKE TO SPEAK

09:07AM  17      PRIVATELY ABOUT THAT, WE CAN DO THAT.

09:07AM  18                I SEE NO HANDS.

09:07AM  19                THANK AGAIN FOR YOUR CONTINUED VIGILANCE AND ADHERENCE TO

09:07AM  20      THE COURT'S ADMONITION.

09:07AM  21                WE HAVE A WITNESS, I THINK, MR. EISENMAN.  LET'S BRING HIM

09:07AM  22      IN.

09:07AM  23                MR. DOWNEY, YOU WOULD LIKE TO CONTINUE WITH YOUR

09:07AM  24      EXAMINATION?

09:07AM  25                MR. DOWNEY:  YES, SIR.

09:07AM  1                    THE COURT:  GOOD MORNING, SIR.

09:07AM  2                    THE WITNESS:  GOOD MORNING.

09:07AM  3                    THE COURT:  IF YOU COULD JUST RESUME YOUR SEAT

09:07AM  4     AGAIN.

09:07AM  5                    THE WITNESS:  OKAY.

09:08AM  6                    THE COURT:  AGAIN, MAKE YOURSELF COMFORTABLE AND

09:08AM  7     ADJUST THE CHAIR AND MICROPHONE AS YOU NEED.

09:08AM  8                    THE WITNESS:  THANK YOU.

09:08AM  9                    THE COURT:  YOU'RE WELCOME.

09:08AM 10          YOU CAN REFRESH YOURSELF WITH WATER THERE.  THERE'S FRESH

09:08AM 11     WATER IF YOU WOULD LIKE TO.

09:08AM 12                    THE WITNESS:  THANK YOU.

09:08AM 13                    THE COURT:  WHEN YOU ARE COMFORTABLE, WOULD YOU

09:08AM 14     STATE YOUR NAME AGAIN, PLEASE.

09:08AM 15                    THE WITNESS:  YES, SIR.  MY NAME IS ALAN EISENMAN.

09:08AM 16                    THE COURT:  THANK YOU, SIR.  I'LL REMIND YOU, SIR,

09:08AM 17     YOU'RE STILL UNDER OATH.

09:08AM 18                    THE WITNESS:  OKAY.

09:08AM 19            **(GOVERNMENT'S WITNESS, ALAN EISENMAN, WAS PREVIOUSLY**

09:08AM 20     **SWORN.)**

09:08AM 21                    THE COURT:  MR. DOWNEY.

09:08AM 22                          **CROSS-EXAMINATION**

09:08AM 23     BY MR. DOWNEY:

09:08AM 24     Q.   GOOD MORNING, MR. EISENMAN.

09:08AM 25     A.   GOOD MORNING.

09:08AM 1    Q.   I WANT TO RESUME TODAY BY TALKING ABOUT THE EVENTS IN 2010

09:08AM 2    THAT YOU TALKED ABOUT WITH MR. BOSTIC ON YOUR DIRECT

09:08AM 3    EXAMINATION.

09:08AM 4         DO YOU RECALL THAT?

09:08AM 5    A.   YOU'LL HAVE TO REFRESH MY MEMORY.

09:08AM 6    Q.   OKAY.  LET ME ASK YOU TO PULL UP, IN THE BLACK NOTEBOOK

09:08AM 7    THAT YOU HAVE, EXHIBIT 14103.

09:09AM 8    A.   14103?

09:09AM 9    Q.   YES, SIR.

09:09AM 10   A.   OKAY.

09:09AM 11   Q.   DO YOU SEE, FROM THE ADDRESS AT THE TOP OF THESE EMAILS,

09:09AM 12   THAT THIS IS AN EMAIL EXCHANGE BETWEEN YOU AND MS. HOLMES IN

09:09AM 13   MAY OF 2010 DISCUSSING YOUR THERANOS INVESTMENT?

09:09AM 14   A.   IT SAYS MAY 11TH.  IS THAT THE ONE YOU'RE TALKING ABOUT?

09:09AM 15   Q.   YES, SIR.  MAY 11TH, 2010?

09:09AM 16   A.   YES.

09:09AM 17            MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

09:10AM 18   14103.

09:10AM 19            MR. BOSTIC:  NO OBJECTION, YOUR HONOR.

09:10AM 20            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:10AM 21       (DEFENDANT'S EXHIBIT 14103 WAS RECEIVED IN EVIDENCE.)

09:10AM 22   BY MR. DOWNEY:

09:10AM 23   Q.   DO YOU RECALL THAT IN MARCH OF 2010 THAT YOU HAD ONE OF

09:10AM 24   YOUR QUARTERLY MEETING CALLS WITH MS. HOLMES?

09:10AM 25   A.   I DON'T RECALL.

09:10AM   1    Q.   OKAY.  LET ME ASK YOU TO LOOK AT THE SECOND PARAGRAPH OF

09:10AM   2    THE TOP EMAIL ON -- IT'S AT THE BOTTOM OF PAGE 1.  IF WE CAN

09:10AM   3    BRING THAT UP.

09:10AM   4    A.   I SEE IT NOW.

09:10AM   5    Q.   OKAY.  AND DO YOU RECALL THAT IN THE FIRST HALF OF 2010

09:10AM   6    MS. HOLMES TOLD YOU THAT TWO VERY IMPORTANT EVENTS WERE

09:10AM   7    HAPPENING AT THERANOS IN 2010?

09:10AM   8    A.   I DON'T RECALL.

09:10AM   9    Q.   WELL, DO YOU RECALL THAT SHE TOLD YOU THAT THERANOS WAS IN

09:10AM  10    NEGOTIATIONS WITH RETAILERS ABOUT POTENTIAL AGREEMENTS --

09:11AM  11              JUROR:  YOUR HONOR, OUR SCREENS ARE NOT ON.

09:11AM  12              THE COURT:  YOU HAVE A MONITOR ISSUE?

09:11AM  13              JUROR:  I'M SORRY.

09:11AM  14              THE COURT:  ARE THE MONITORS FUNCTIONING IN THE JURY

09:11AM  15    BOX?

09:11AM  16              JUROR:  JUST THAT ONE.

09:11AM  17              THE COURT:  OKAY.  GIVE US JUST -- I'M SORRY,

09:11AM  18    MR. DOWNEY.

09:11AM  19              MR. DOWNEY:  NOT AT ALL.

09:11AM  20         (PAUSE IN PROCEEDINGS.)

09:12AM  21              THE COURT:  YOU KNOW, KASSIE, SHE SOMETIMES REBOOTS

09:12AM  22    THE WHOLE SYSTEM.

09:12AM  23              THE CLERK:  YEAH, I'LL DO THAT NOW.

09:12AM  24              THE COURT:  OKAY.

09:12AM  25         (PAUSE IN PROCEEDINGS.)

09:12AM 1          MR. DOWNEY:  YOU KNOW, YOUR HONOR, I CAN CHECK.  I

09:12AM 2    CAN SEE IF WE HAVE CLEAN COPIES OF THE DOCUMENTS, AND WE CAN DO

09:13AM 3    IT OLD STYLE FOR THE TWO JURORS WHO DON'T HAVE ACCESS.

09:13AM 4          THE COURT:  SURE.  LET'S SEE.  IF YOU WANT TO CHECK,

09:13AM 5    THAT WOULD BE HELPFUL.  THANK YOU.

09:13AM 6          MR. DOWNEY:  WELL, I'VE CHECKED AND I DON'T HAVE TWO

09:13AM 7    CLEAN COPIES.

09:13AM 8       (LAUGHTER.)

09:13AM 9          THE COURT:  WELL, THERE'S SOME EFFICIENCY IN OLD

09:13AM 10   SCHOOL.

09:13AM 11         MR. DOWNEY:  YES.  SURE.  I'M SURE YOU THINK ABOUT

09:13AM 12   IT THESE DAYS.

09:13AM 13         THE COURT:  WE'LL SEE IF WE CAN GET COPIES.

09:13AM 14      IT LOOKS LIKE THE JURORS ARE SAYING THEY'RE GOING TO SHARE

09:13AM 15   A MONITOR.

09:13AM 16         JUROR:  THAT'S WHAT IT LOOKS LIKE.

09:14AM 17         THE COURT:  SO WE MAY HAVE TO WORK AROUND.

09:15AM 18      (PAUSE IN PROCEEDINGS.)

09:15AM 19         THE COURT:  LET ME ASK COUNSEL, WE HAVE COPIES.  IS

09:15AM 20   THERE ANY OBJECTION TO THE COURT PROVIDING COPIES TO THE

09:15AM 21   AFFECTED JURORS THERE?

09:15AM 22         MR. BOSTIC:  NO, YOUR HONOR.  THANK YOU.

09:15AM 23         THE COURT:  MR. DOWNEY, ANY OBJECTION TO THAT?

09:15AM 24         MR. DOWNEY:  I DON'T, YOUR HONOR.  WE'LL SEE HOW WE

09:15AM 25   CAN GET THROUGH THIS EXHIBIT, AND WE'LL SEE HOW THE NEXT ONE

EISENMAN CROSS BY MR. DOWNEY (RES.)                                      6161

09:15AM   1    GOES.

09:15AM   2                THE COURT:  SURE.  AND FOR THE RECORD, IT LOOKS LIKE

09:15AM   3    THE CLERK HAS PROVIDED TWO COPIES TO SOME OF THE JURORS IN THE

09:15AM   4    COURTROOM.  THE MONITORS HAVE BEEN TURNED TO ALLOW ACCESS TO

09:15AM   5    THOSE AFFECTED JURORS.

09:15AM   6        ONLY ONE MONITOR IS OUT.  I THINK YOU CAN CONTINUE NOW.

09:15AM   7    THANK YOU.

09:15AM   8                MR. DOWNEY:  THANK YOU.

09:15AM   9    Q.   DO YOU RECALL THAT MS. HOLMES TOLD YOU THAT THERANOS WAS

09:15AM  10    IN THE PROCESS OF NEGOTIATING AGREEMENTS WITH RETAILERS?

09:15AM  11    A.   YES.

09:15AM  12    Q.   AND DO YOU RECALL THAT SHE ALSO TOLD YOU IN THAT

09:15AM  13    MARCH 2010 MEETING THAT THERANOS WAS CONSIDERING AN EQUITY

09:16AM  14    OFFERING IN THERANOS STOCK?

09:16AM  15    A.   I'M A LITTLE CONFUSED.  ARE YOU TALKING ABOUT AN EQUITY

09:16AM  16    OFFERING TO ME?

09:16AM  17    Q.   NO.  I'M TALKING ABOUT AN EQUITY OFFERING GENERALLY TO

09:16AM  18    INVESTORS.

09:16AM  19    A.   I HAVE NOTES WHERE SHE WAS TALKING ABOUT AN IPO YEAR AFTER

09:16AM  20    YEAR AFTER YEAR.  IT'S COMING NEXT YEAR, IT'S COMING IN TWO

09:16AM  21    YEARS, IT'S COMING NEXT YEAR.

09:16AM  22        SO I HAVE A WHOLE TRAIL OF NOTES OVER A PERIOD OF YEARS

09:16AM  23    THAT SHE WAS HINTING THERE WAS AN IPO AROUND THE CORNER.

09:16AM  24    Q.   I DIDN'T ASK YOU ABOUT AN IPO, MR. EISENMAN.  I ASKED YOU

09:16AM  25    ABOUT AN EQUITY OFFERING IN ANY FORM.

09:16AM  1        DID SHE TELL YOU THERE WAS AN EQUITY OFFERING, PRIVATE,

09:16AM  2   PUBLIC, INDIVIDUAL, GROUP, TO WHOMEVER?  DID SHE TELL YOU IN

09:16AM  3   MARCH OF 2010 THAT THERANOS WAS CONSIDERING AN EQUITY OFFERING

09:16AM  4   IN 2010?

09:16AM  5   A.   MY RECOLLECTION WAS THAT THERE WAS DISCUSSION ABOUT AN

09:16AM  6   EQUITY OFFERING TO ME, BUT I DON'T RECALL AN EQUITY OFFERING TO

09:17AM  7   OTHERS OR TO THE PUBLIC.

09:17AM  8   Q.   OKAY.  LET ME ASK YOU TO LOOK AT 2000 -- I'M SORRY, 14103,

09:17AM  9   AND LOOK AT THE BOTTOM EMAIL ON PAGE 1, WHICH APPEARS TO BE AN

09:17AM  10  EMAIL FROM YOU TO MS. HOLMES.

09:17AM  11       DO YOU SEE THAT?

09:17AM  12  A.   YES.

09:17AM  13  Q.   AND DO YOU SEE IN THE SECOND PARAGRAPH YOU SAY, "SINCE IT

09:17AM  14  HAS BEEN 2 MONTHS SINCE WE TALKED, AND WILL PROBABLY BE ANOTHER

09:17AM  15  MONTH UNTIL WE TALK AGAIN, I WAS WONDERING IF YOU COULD EMAIL

09:17AM  16  ME A RESPONSE TO THE FOLLOWING ITEMS?"

09:17AM  17       DO YOU SEE THAT?

09:17AM  18  A.   YES.

09:17AM  19  Q.   AND THEN YOU GO ON TO ASK HER A SERIES OF ITEMS FOLLOWING

09:17AM  20  FROM THERE.

09:17AM  21       IS THAT REFERRING BACK TO THE CONVERSATION THAT YOU HAD IN

09:17AM  22  MARCH WITH MS. HOLMES?

09:17AM  23  A.   YES.

09:17AM  24  Q.   OKAY.  AND THEN YOU ASK HER FOR -- TO SCHEDULE A MEETING

09:18AM  25  AND, IN THE INTERIM, TO GET THE INFORMATION THAT YOU'RE

09:18AM  1    REQUESTING IN THE EMAIL; CORRECT?

09:18AM  2    A.   CORRECT.

09:18AM  3    Q.   AND THEN ABOUT A WEEK LATER, IF YOU GO TO THE EMAIL ABOVE,

09:18AM  4    DO YOU SEE THAT THERE'S ANOTHER EMAIL FROM YOU ASKING FOR A

09:18AM  5    RESPONSE?

09:18AM  6    A.   YES.

09:18AM  7    Q.   AND THEN IF YOU GO TO THE TOP EMAIL, DO YOU SEE THERE'S A

09:18AM  8    RESPONSE FROM MS. HOLMES TO YOU?

09:18AM  9    A.   YES.

09:18AM 10    Q.   AND IF YOU LOOK AT THE SECOND SENTENCE OF THE FIRST

09:18AM 11    PARAGRAPH, SHE SAYS, "AS YOU KNOW, WE DON'T DO QUARTERLY CALLS

09:18AM 12    WITH OUR OTHER INVESTORS, MANY OF WHOM INVESTED MUCH GREATER

09:18AM 13    AMOUNTS THAN YOU DID, AND I CANNOT COMMIT TO AN EXACT QUARTERLY

09:18AM 14    SCHEDULE GOING FORWARD."

09:18AM 15         DO YOU SEE THAT?

09:18AM 16    A.   YES.

09:18AM 17    Q.   AND THEN DO YOU SEE IN THE SECOND PARAGRAPH SHE SAID, "AS

09:18AM 18    DISCUSSED IN OUR CALL IN MARCH, WE CANNOT PROVIDE THE LEVEL OF

09:19AM 19    COMMUNICATION YOU KEEP REQUESTING."

09:19AM 20         DO YOU SEE THAT?

09:19AM 21    A.   YES.

09:19AM 22    Q.   AND IT WAS IN THE MARCH MEETING THAT SHE TOLD YOU THAT

09:19AM 23    THERE WOULD BE AN EQUITY OFFERING IN 2010 AND THAT THERANOS WAS

09:19AM 24    IN THE PROCESS OF NEGOTIATIONS WITH RETAILERS; CORRECT?

09:19AM 25    A.   I DON'T RECALL THE EQUITY OFFERING DISCUSSION.

09:19AM  1    Q.   OKAY.  AND IF YOU LOOK AT THE THIRD PARAGRAPH, SHE SAYS,

09:19AM  2    "WITH THE DEALS WE ARE FORMALIZING WITH RETAILERS WE ARE NOW

09:19AM  3    OBLIGATED NOT TO DISCLOSE OUR PRODUCTION VOLUMES AND CARTRIDGE

09:19AM  4    SALE PRICES.  I CANNOT PROVIDE YOU THE METRICS YOU ARE

09:19AM  5    REQUESTING IN YOUR EMAIL."

09:19AM  6         DO YOU SEE THAT?

09:19AM  7    A.   YES.

09:19AM  8    Q.   NOW, I THINK YOU TESTIFIED ON DIRECT THAT YOU WEREN'T EVEN

09:19AM  9    CERTAIN WHAT RETAILERS THERANOS WAS NEGOTIATING WITH; IS THAT

09:19AM  10   RIGHT?

09:19AM  11   A.   SHE HAD MENTIONED THE NAME WAL-MART, SHE HAD MENTIONED

09:19AM  12   CVS.  THERE WERE SOME NAMES THAT SHE HAD MENTIONED IN PRIOR

09:20AM  13   CONVERSATIONS THAT I'M NOT -- I'M NOT CERTAIN WHICH RETAILER

09:20AM  14   SHE WAS TALKING ABOUT IN THIS EMAIL.

09:20AM  15   Q.   OKAY.  SO I TAKE IT THAT YOU DID NOT SEE ANY DOCUMENTS

09:20AM  16   RELATED TO THAT NEGOTIATION?

09:20AM  17   A.   NO, I DIDN'T.

09:20AM  18   Q.   AND YOU DON'T KNOW WHETHER THERE WAS A RESTRICTION IMPOSED

09:20AM  19   ON EITHER THE RETAILER OR ON THERANOS AS TO INFORMATION THAT IT

09:20AM  20   COULD SHARE DURING THE PERIOD OF THOSE NEGOTIATIONS?

09:20AM  21   A.   I WASN'T AWARE.

09:20AM  22   Q.   AND YOU DON'T KNOW WHETHER, IN THE FINAL AGREEMENT THAT

09:20AM  23   WAS SUBSEQUENTLY NEGOTIATED, WHETHER THERE WAS A RESTRICTION ON

09:20AM  24   THE INFORMATION THAT THERANOS COULD SHARE?

09:20AM  25   A.   NO, I DON'T KNOW.

09:20AM  1    Q.   BECAUSE YOU'VE NEVER SEEN THAT AGREEMENT; RIGHT?

09:20AM  2    A.   NO.

09:20AM  3    Q.   NOW, YOU UNDERSTAND ALSO, DO YOU NOT, THAT DURING THE

09:20AM  4    PERIOD WHEN A COMPANY IS SELLING STOCK TO A GROUP OF INVESTORS,

09:20AM  5    BE IT THE PUBLIC OR TO A SMALLER GROUP OF INVESTORS, THERE

09:21AM  6    COULD BE RESTRICTIONS ON THE INFORMATION THAT IT'S IN A

09:21AM  7    POSITION TO SHARE.

09:21AM  8         YOU UNDERSTAND THAT, DON'T YOU?

09:21AM  9    A.   WELL, I'LL GO BACK TO MY EARLIER COMMUNICATION.  I WAS NOT

09:21AM 10    AWARE THAT THERE WAS ANY ATTEMPTS TO DO ANY KIND OF OFFERING.

09:21AM 11    IT WAS NOT MENTIONED TO ME.

09:21AM 12    Q.   I DIDN'T ASK YOU ABOUT THIS OFFERING.  I'M JUST ASKING YOU

09:21AM 13    ABOUT YOUR GENERAL LEVEL OF KNOWLEDGE AS A SOPHISTICATED

09:21AM 14    INVESTOR AND BROKER AND SO FORTH.

09:21AM 15         YOU'RE AWARE THAT THERE ARE RESTRICTIONS ON THE

09:21AM 16    INFORMATION THAT A COMPANY COULD SHARE WHEN IT'S DOING AN

09:21AM 17    EQUITY OFFERING, AREN'T YOU?

09:21AM 18    A.   I AM AWARE OF THAT.

09:21AM 19    Q.   AND YOU'RE AWARE THAT IF A POTENTIAL INVESTOR RECEIVES

09:21AM 20    INFORMATION THAT OTHER INVESTORS DON'T HAVE, THAT THAT INVESTOR

09:21AM 21    MIGHT BE UNDER RESTRICTIONS AS TO WHETHER HE OR SHE CAN SHARE

09:21AM 22    THAT INFORMATION; CORRECT?

09:21AM 23    A.   WELL, I WAS NOT MADE AWARE OF THE FACT THAT THEY WERE

09:21AM 24    DOING ANY KIND OF EQUITY OFFERING, SO IT SEEMS LIKE THIS IS

09:22AM 25    MOOT.

09:22AM    1    Q.   I'M NOT ASKING YOU ABOUT YOUR AWARENESS WITH RESPECT TO

09:22AM    2    THERANOS.  I'M ASKING YOU ABOUT WHAT YOU KNOW AS A

09:22AM    3    SOPHISTICATED INVESTOR, SHAREHOLDER, INVESTMENT ADVISOR,

09:22AM    4    PRIVATE INVESTOR, PUBLIC INVESTOR FOR 35 YEARS.

09:22AM    5    A.   SINCE I WAS NOT AWARE THAT THEY WERE ATTEMPTING TO DO ANY

09:22AM    6    KIND OF OFFERING, I CAN'T REALLY RESPOND TO THE QUESTION.

09:22AM    7         I WILL ALSO SAY THAT AS AN INVESTOR IN OTHER PRIVATE

09:22AM    8    COMPANIES, I HAVE SIGNED A NONDISCLOSURE AGREEMENT SO I COULD

09:22AM    9    BE PRIVY TO THOSE KINDS OF CONVERSATIONS AND PROMISE NOT TO

09:22AM   10    DISCLOSE TO ANYBODY.

09:22AM   11    Q.   I UNDERSTAND THAT.

09:22AM   12         I MOVE TO STRIKE THAT ANSWER.

09:22AM   13         AND I'LL ASK YOU THE SAME QUESTION FOR A THIRD TIME.

09:22AM   14              THE COURT:  I'LL STRIKE THAT.  THE LAST RESPONSE WAS

09:22AM   15    STRICKEN.

09:22AM   16         MR. DOWNEY, IF YOU COULD ASK YOUR ORIGINAL QUESTION AGAIN,

09:22AM   17    PLEASE.

09:22AM   18         JUST LISTEN TO HIS ORIGINAL QUESTION.

09:22AM   19              THE WITNESS:  I'M TRYING.  THANK YOU.

09:22AM   20    BY MR. DOWNEY:

09:22AM   21    Q.   THE QUESTION IS, YOU ARE AWARE THAT THERE ARE RESTRICTIONS

09:22AM   22    ON THE INFORMATION THAT A COMPANY CAN SHARE DURING THE PERIOD

09:23AM   23    WHERE IT IS MAKING AN EQUITY OFFERING, AREN'T YOU?

09:23AM   24    A.   AS A GENERAL RULE, YES.

09:23AM   25    Q.   OKAY.  AND YOU'RE ALSO AWARE, ARE YOU NOT, THAT IF A

09:23AM  1   POTENTIAL INVESTOR, OR INVESTOR, DISCOVERS INFORMATION ABOUT

09:23AM  2   THAT COMPANY THAT OTHER POTENTIAL INVESTORS DON'T HAVE, THAT

09:23AM  3   THAT INVESTOR MIGHT BE UNDER RESTRICTION AS TO WHETHER IT CAN

09:23AM  4   SHARE THAT INFORMATION; CORRECT?

09:23AM  5   A.   I'M SORRY.  I'M STILL NOT FOLLOWING THIS, BECAUSE I WAS

09:23AM  6   NOT GIVEN ANY INFORMATION THAT THEY WERE ATTEMPTING TO DO ANY

09:23AM  7   KIND OF OFFERING, SO THAT WOULD NOT RESTRICT ME FROM GAINING

09:23AM  8   INFORMATION.  IT'S NOT, YOU KNOW, PRIVY TO OTHER PEOPLE.

09:23AM  9          THE COURT:  MR. EISENMAN, I THINK HE'S JUST ASKING

09:23AM 10   YOU, DISASSOCIATED FROM YOUR INVESTMENT, JUST YOUR KNOWLEDGE

09:23AM 11   ABOUT GENERAL CONCEPTS.

09:23AM 12          THE WITNESS:  OKAY.  DISASSOCIATED WITH THIS

09:23AM 13   INVESTMENT WITH THERANOS, AS A GENERAL STATEMENT, YES, THAT IS

09:23AM 14   CORRECT.

09:23AM 15          MR. DOWNEY:  YOUR HONOR, I MOVE TO STRIKE THE PRIOR

09:23AM 16   ANSWER TO MY QUESTION.

09:24AM 17          THE COURT:  WELL, THE PRIOR ANSWER IS STRICKEN.

09:24AM 18      LADIES AND GENTLEMEN, THE LAST RESPONSE AFTER MY

09:24AM 19   INTERJECTION -- AND LET ME ASK YOU, WAS MY INTERJECTION

09:24AM 20   APPROPRIATE FOR YOUR QUESTION?

09:24AM 21          MR. DOWNEY:  IT WAS, YOUR HONOR, AND I THINK THAT

09:24AM 22   THE QUESTION AND ANSWER CAN REMAIN --

09:24AM 23          THE COURT:  ALL RIGHT.  THANK YOU.

09:24AM 24          MR. DOWNEY:  -- IN THE TRANSCRIPT.

09:24AM 25          THE COURT:  THANK YOU.  AND YOU CAN ASK ANOTHER

09:24AM  1    QUESTION.  THANK YOU.

09:24AM  2            MR. DOWNEY:  ALL RIGHT.

09:24AM  3    Q.  NOW, FOLLOWING ON THIS EMAIL IN WHICH MS. HOLMES TOLD YOU

09:24AM  4    SHE COULD NOT PROVIDE THE LEVEL OF INFORMATION THAT YOU WERE

09:24AM  5    REQUESTING, YOU CONTINUED TO REQUEST INFORMATION FROM THERANOS,

09:24AM  6    DID YOU NOT?

09:24AM  7    A.  YES.

09:24AM  8    Q.  LET ME ASK YOU TO LOOK IN THE BLACK NOTEBOOK THAT YOU HAVE

09:24AM  9    AT EXHIBIT 12285.

09:25AM  10       YOU KNOW, MR. EISENMAN, I APOLOGIZE.  I'M GOING TO HAVE

09:25AM  11   YOU LOOK AT A DIFFERENT EXHIBIT.

09:25AM  12   A.  OKAY.

09:25AM  13   Q.  LET ME ASK YOU TO LOOK FIRST AT THE EXHIBIT THAT IS MARKED

09:25AM  14   AS 14225.

09:25AM  15   A.  OKAY.

09:25AM  16   Q.  AND DO YOU SEE THAT THIS IS ALSO A SERIES OF EMAIL

09:25AM  17   EXCHANGES BETWEEN YOURSELF AND MS. HOLMES RELATED TO YOUR

09:25AM  18   INVESTMENT IN THERANOS?

09:25AM  19   A.  YES.

09:25AM  20           MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT 14225.

09:25AM  21           MR. BOSTIC:  NO OBJECTION.

09:25AM  22           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:26AM  23       (DEFENDANT'S EXHIBIT 14225 WAS RECEIVED IN EVIDENCE.)

09:26AM  24   BY MR. DOWNEY:

09:26AM  25   Q.  IF YOU GO TO THE BOTTOM OF PAGE 2, THERE'S AN EMAIL

09:26AM   1    EXCHANGE FROM YOU TO MS. HOLMES AND OTHERS ARE COPIED; CORRECT?

09:26AM   2    A.   YES.

09:26AM   3    Q.   AND THAT'S DATED JULY 13TH, 2010.

09:26AM   4         DO YOU SEE THAT?

09:26AM   5    A.   YES.

09:26AM   6    Q.   AND THE EMAIL SAYS, "ELIZABETH,

09:26AM   7         "I HEARD YESTERDAY THAT YOU COMPLETED AN EQUITY OFFERING."

09:26AM   8         DO YOU SEE THAT?

09:26AM   9    A.   YES.

09:26AM   10   Q.   AND MS. HOLMES RESPONDS TO YOUR EMAIL IN THE EMAIL ABOVE

09:26AM   11   BY SAYING, "PER MY PREVIOUS EMAIL, I WILL CALL YOU AS SOON AS

09:26AM   12   WE HAVE SOMETHING CONCRETE."

09:26AM   13        YOU THEN MOVE UP ABOVE THAT EMAIL AND THERE'S ANOTHER

09:27AM   14   SERIES OF EMAIL EXCHANGES.  YOU SAY IN THE EMAIL ABOVE THAT,

09:27AM   15   "ELIZABETH,

09:27AM   16        "I AM REALLY TRYING TO KEEP MY EMAILS TO A MINIMUM.  CAN

09:27AM   17   YOU RESPOND TO MY INQUIRY BELOW ABOUT THE PRICING OF THE EQUITY

09:27AM   18   ROUND, AND IF THE OFFER TO BUY OUR STOCK IS DELAYED UNTIL YEAR

09:27AM   19   END?"

09:27AM   20        AND THEN YOU SENT ANOTHER EMAIL THAT I THINK IS GENERALLY

09:27AM   21   JUST A REMINDER ABOVE THAT, OR A FURTHER REQUEST, IF YOU WILL.

09:27AM   22        DO YOU SEE THAT?

09:27AM   23   A.   YES.

09:27AM   24   Q.   AND THEN THERE'S A FEW MORE EMAILS ALONG THOSE LINES.

09:27AM   25        AND THEN AT THE TOP OF THE PAGE 1, DO YOU SEE THAT

09:27AM   1      MS. HOLMES RESPONDS TO THE EMAILS THAT YOU HAD SENT TO HER?

09:27AM   2      A.   YES.

09:27AM   3      Q.   LET'S TAKE A LOOK AT THAT EMAIL.

09:27AM   4           SHE SAYS, "ALAN,

09:27AM   5           "YOUR CONTINUED DAILY CALLS AND EMAILS --"

09:28AM   6           NOW, IS IT TRUE THAT YOU WERE CALLING AND EMAILING THE

09:28AM   7      COMPANY DAILY?

09:28AM   8      A.   THAT'S AN EXAGGERATION.

09:28AM   9      Q.   BUT YOU ACKNOWLEDGE THAT YOU WERE EMAILING AND CALLING THE

09:28AM  10      COMPANY AND ASKING FOR INFORMATION FREQUENTLY?

09:28AM  11           IS THAT FAIR?

09:28AM  12      A.   SEMI FAIR.  IT WAS FREQUENTLY BECAUSE I WASN'T GETTING

09:28AM  13      RESPONSES, SO I WOULD FOLLOW UP.

09:28AM  14      Q.   AND MS. HOLMES GOES ON TO SAY, "WE'VE ALREADY TOLD YOU WE

09:28AM  15      DO NOT HAVE ADDITIONAL INFORMATION WE CAN DISCLOSE BEYOND WHAT

09:28AM  16      WE'VE ALREADY SHARED WITH DAVID ARE UPSETTING TO US."

09:28AM  17           DO YOU SEE THAT?

09:28AM  18      A.   YES.

09:28AM  19      Q.   AND DAVID IS A REFERENCE TO MR. HARRIS; CORRECT?

09:28AM  20      A.   CORRECT.

09:28AM  21      Q.   AND MR. HARRIS WAS AN INDIVIDUAL WHO HAD FIRST INTRODUCED

09:28AM  22      YOU TO THERANOS; IS THAT RIGHT?

09:28AM  23      A.   THAT'S CORRECT.

09:28AM  24      Q.   AND MS. HOLMES WOULD FREQUENTLY TALK TO MR. HARRIS ABOUT

09:28AM  25      THERANOS; CORRECT?

09:28AM   1    A.   I DON'T KNOW IF IT WAS FREQUENT.  MY UNDERSTANDING IS THAT

09:28AM   2    IT WAS INFREQUENT.

09:28AM   3    Q.   BUT YOU WOULD SOMETIMES FIND OUT INFORMATION FROM

09:29AM   4    MS. HOLMES ABOUT MR. HARRIS?

09:29AM   5    A.   THAT'S FAIR.

09:29AM   6    Q.   AND SHE GOES ON TO SAY, "ONCE WE HAVE ADDITIONAL

09:29AM   7    INFORMATION WE CAN SHARE WITH YOU WE WILL CONTACT YOU AS

09:29AM   8    MENTIONED MULTIPLE TIMES BEFORE -- YOU'RE NOT GETTING A

09:29AM   9    RESPONSE BECAUSE IT IS NOT AN EFFECTIVE USE OF OUR TIME TO KEEP

09:29AM  10    REPEATING THIS."

09:29AM  11         DO YOU SEE THAT?

09:29AM  12    A.   YES.

09:29AM  13    Q.   AND DO YOU UNDERSTAND THAT SHE WAS FRUSTRATED WITH THE

09:29AM  14    FACT THAT SHE TOLD YOU SHE WAS NOT IN A POSITION TO DISCLOSE

09:29AM  15    THIS INTERNAL INFORMATION ABOUT THERANOS?

09:29AM  16              MR. BOSTIC:  CALLS FOR SPECULATION.  FOUNDATION.

09:29AM  17              MR. DOWNEY:  IF YOU KNOW ONE WAY OR ANOTHER.

09:29AM  18              THE COURT:  I'LL ALLOW HIM TO ANSWER THAT QUESTION.

09:29AM  19              THE WITNESS:  COULD YOU REPEAT THE QUESTION, PLEASE.

09:29AM  20    BY MR. DOWNEY:

09:29AM  21    Q.   DID YOU UNDERSTAND THAT SHE WAS FRUSTRATED THAT YOU KEPT

09:29AM  22    ASKING HER FOR INFORMATION THAT SHE HAD ALREADY TOLD YOU THAT

09:29AM  23    SHE WASN'T IN A POSITION TO DISCLOSE?

09:29AM  24    A.   NO.  I UNDERSTOOD THAT SHE WAS HIDING INFORMATION THAT I

09:29AM  25    SHOULD KNOW AS A SHAREHOLDER.

09:30AM  1    Q.   I SEE.

09:30AM  2         I MOVE TO STRIKE THAT.

09:30AM  3              THE COURT:  WELL, I THINK THAT'S HIS ANSWER,

09:30AM  4    MR. DOWNEY.

09:30AM  5              MR. DOWNEY:  WELL, HE DOESN'T HAVE ANY BASIS TO KNOW

09:30AM  6    THAT SHE WAS HIDING INFORMATION.

09:30AM  7              THE WITNESS:  I CAN ELABORATE IF YOU WANT ME TO.

09:30AM  8              THE COURT:  EXCUSE ME, SIR.  THAT WAS HIS OPINION OF

09:30AM  9    HIS UNDERSTANDING.

09:30AM  10              MR. DOWNEY:  FAIR ENOUGH.

09:30AM  11    Q.   LET ME ASK YOU TO GO FORWARD FROM THERE AND TO TAKE A LOOK

09:30AM  12    AT 14224, WHICH SHOULD BE JUST BEFORE WE WERE IN YOUR EMAIL.

09:30AM  13         AND IF YOU LOOK AT EXHIBIT 14224, THIS IS AN EMAIL BETWEEN

09:30AM  14    YOU AND MS. HOLMES ALSO FROM JULY OF 2010.

09:30AM  15         DO YOU SEE THAT?

09:30AM  16    A.   YES.

09:30AM  17    Q.   AND THIS CONCERNS YOUR INVESTMENT IN THERANOS; CORRECT?

09:31AM  18    A.   CORRECT.

09:31AM  19              MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT 14224.

09:31AM  20              MR. BOSTIC:  NO OBJECTION.

09:31AM  21              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:31AM  22         (DEFENDANT'S EXHIBIT 14224 WAS RECEIVED IN EVIDENCE.)

09:31AM  23    BY MR. DOWNEY:

09:31AM  24    Q.   AND IF YOU LOOK AT EXHIBIT 14224, IT'S AN EMAIL FROM YOU

09:31AM  25    TO MS. HOLMES; RIGHT?

09:31AM  1      A.   YES.

09:31AM  2      Q.   AND YOU SAY IN THE FIRST SENTENCE OF 14224, "I HAVEN'T

09:31AM  3      MADE A DECISION WHETHER TO SELL STOCK."

09:31AM  4           DO YOU SEE THAT?

09:31AM  5      A.   YES.

09:31AM  6      Q.   AND THAT WAS A COMMENT ON THE FACT THAT MS. HOLMES HAD

09:31AM  7      TOLD YOU THAT THERANOS WAS WILLING TO BUY YOUR STOCK BACK

09:31AM  8      BECAUSE OF YOUR FRUSTRATION WITH THE COMPANY; CORRECT?

09:31AM  9      A.   IT'S A LITTLE MORE COMPLICATED THAN THAT.

09:31AM 10      Q.   OKAY.  WELL, WE'LL TALK ABOUT THAT.

09:31AM 11      A.   I'LL BE HAPPY TO ELABORATE IF I'M ALLOWED TO.

09:32AM 12      Q.   WELL, WE'LL TALK ABOUT THE OFFER TO BUY YOUR STOCK IN A

09:32AM 13      LITTLE BIT.

09:32AM 14           AND YOU TRIED TO SCHEDULE ANOTHER CALL.  DO YOU SEE THAT?

09:32AM 15      A.   YES.

09:32AM 16      Q.   AND, NOW, DO YOU KNOW IF OTHERS WERE BUYING STOCK AT

09:32AM 17      THERANOS AT THE SAME TIME?

09:32AM 18      A.   I WASN'T AWARE.

09:32AM 19      Q.   OKAY.  ALL RIGHT.  LET ME ASK YOU NEXT TO LOOK AT

09:32AM 20      EXHIBIT 14226.

09:32AM 21           DO YOU HAVE THAT?

09:32AM 22      A.   YES.

09:32AM 23      Q.   AND DO YOU SEE THAT THIS IS ALSO AN EMAIL BETWEEN YOU AND

09:32AM 24      MS. HOLMES CONCERNING YOUR INVESTMENT IN THERANOS?

09:32AM 25      A.   YES.

09:32AM    1            MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT 14226.

09:32AM    2            MR. BOSTIC:  NO OBJECTION.

09:33AM    3            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:33AM    4        (DEFENDANT'S EXHIBIT 14226 WAS RECEIVED IN EVIDENCE.)

09:33AM    5    BY MR. DOWNEY:

09:33AM    6    Q.  IS EXHIBIT 14226 ANOTHER EMAIL FROM YOU TO MS. HOLMES --

09:33AM    7    A.  YES.

09:33AM    8    Q.  -- DISCUSSING YOUR INVESTMENT IN THERANOS?

09:33AM    9    A.  YES.

09:33AM   10    Q.  AND DO YOU SEE IN THE TOP OF THE EMAIL -- I'M SORRY, IN

09:33AM   11    THE BOTTOM EMAIL YOU SAY, "ELIZABETH,

09:33AM   12        "I NOTICED THAT LARRY IS NOT CURRENTLY LISTED AS A

09:33AM   13    DIRECTOR."

09:33AM   14        DO YOU SEE THAT?

09:33AM   15    A.  YES.

09:33AM   16    Q.  AND THAT WAS A REFERENCE TO LARRY ELLISON, RIGHT, WHO IS

09:33AM   17    THE SUBJECT OF THE EMAIL?

09:33AM   18    A.  YES.

09:33AM   19    Q.  AND YOU HAD RECEIVED A COMMUNICATION WHICH INDICATED THAT

09:33AM   20    MR. ELLISON WAS NO LONGER A BOARD MEMBER; CORRECT?

09:33AM   21    A.  CORRECT.

09:33AM   22    Q.  AND YOU GO ON TO SAY, "DID HE GO OFF THE BOARD?  IF SO,

09:33AM   23    WHY?  ALSO, DO YOU HAVE ANY VISIBILITY WHEN WE WILL RECEIVE

09:33AM   24    INFORMATION," ET CETERA.

09:33AM   25        DO YOU SEE THAT?

09:33AM 1    A.   YES.

09:33AM 2    Q.   AND THEN DO YOU SEE ABOVE THAT MS. HOLMES TELLS YOU "I

09:33AM 3    RECEIVED THIS EMAIL FROM SATURDAY AS WELL -- AT THIS POINT, PER

09:34AM 4    OUR CALL, THERE IS NO NEW INFORMATION TO BE SHARED WITH OUR

09:34AM 5    INVESTOR BASE.  AS DISCUSSED, WHEN WE COMMUNICATE ANYTHING WITH

09:34AM 6    OUR INVESTOR BASE, YOU WILL BE INCLUDED ON THOSE COMMUNICATIONS

09:34AM 7    AS WELL."

09:34AM 8        DO YOU SEE THAT?

09:34AM 9    A.   YES.

09:34AM 10   Q.   AND THERE HAD BEEN A COMMUNICATION WITH THE INVESTOR BASE

09:34AM 11   THAT WAS ALSO COMMUNICATED TO YOU ABOUT WHO THE BOARD MEMBERS

09:34AM 12   WERE; RIGHT?

09:34AM 13   A.   PRESUMABLY SO.  I DON'T RECALL.

09:34AM 14   Q.   OKAY.  AND YOU HAD BEEN INCLUDED ON THAT COMMUNICATION?

09:34AM 15   A.   I'M SAYING PRESUMABLY SO.  I DON'T RECALL.

09:34AM 16   Q.   OKAY.  NOW, IS IT FAIR TO SAY FROM THE TESTIMONY THAT YOU

09:34AM 17   GAVE ON WEDNESDAY OF LAST WEEK THAT YOU FELT FRUSTRATED BY THE

09:34AM 18   FACT THAT YOU COULDN'T GET INFORMATION FROM THERANOS

09:34AM 19   INDIVIDUALLY?  IS THAT FAIR TO SAY?

09:34AM 20   A.   INDIVIDUALLY AND COLLECTIVELY.  MY GROUP WAS ALSO TRYING

09:34AM 21   TO GET INFORMATION AND THEY WERE SIMILARLY FRUSTRATED.

09:35AM 22   Q.   OKAY.  BUT YOU, YOU -- IF THERANOS COMMUNICATED WITH

09:35AM 23   INVESTORS GENERALLY, YOU WERE INCLUDED ON THOSE COMMUNICATIONS;

09:35AM 24   CORRECT?

09:35AM 25   A.   WELL, THE ISSUE WAS THE LACK OF COMMUNICATION.  IT WAS A

09:35AM  1    LONG PERIOD OF TIME WHERE THERE WAS NO COMMUNICATION.

09:35AM  2    Q.   I'M SORRY.  I HAD ASKED YOU IF THERANOS HAD COMMUNICATED

09:35AM  3    GENERALLY WITH ITS INVESTORS.  YOU WERE INCLUDED IN THOSE

09:35AM  4    COMMUNICATIONS?

09:35AM  5    A.   THERE WAS NO COMMUNICATIONS TO INVESTORS GENERALLY EITHER.

09:35AM  6    Q.   WELL, DIDN'T WE JUST LOOK AT AN EMAIL IN WHICH YOU

09:35AM  7    ACKNOWLEDGED THAT THE CHANGE IN BOARD MEMBERS HAD BEEN

09:35AM  8    COMMUNICATED TO YOU?

09:35AM  9    A.   AS I SAID EARLIER, I DON'T RECALL WHERE I GOT THAT

09:35AM  10   INFORMATION.  THAT MIGHT HAVE BEEN FROM A CONVERSATION WITH

09:35AM  11   ELIZABETH AND DAVID HARRIS.  I DON'T RECALL WHERE THAT

09:35AM  12   INFORMATION CAME FROM.

09:35AM  13   Q.   OKAY.

09:35AM  14   A.   I DON'T THINK THEY COMMUNICATED THAT TO THEIR INVESTOR

09:35AM  15   BASE.

09:35AM  16   Q.   OKAY.  NOW, WE WERE TALKING FRIDAY ABOUT THE ISSUE OF YOUR

09:35AM  17   RIGHTS TO OBTAIN THE KIND OF INFORMATION THAT YOU WERE SEEKING

09:36AM  18   TO OBTAIN FROM THE COMPANY.

09:36AM  19        DO YOU REMEMBER THAT?

09:36AM  20   A.   YES.

09:36AM  21   Q.   AND YOU UNDERSTOOD THAT THE COMPANY DIDN'T HAVE ANY

09:36AM  22   OBLIGATION TO UPDATE YOU WITH THE KIND OF FREQUENT AND SPECIFIC

09:36AM  23   INFORMATION THAT YOU WERE REPEATEDLY REQUESTING?

09:36AM  24        YOU UNDERSTOOD THAT, DIDN'T YOU?

09:36AM  25   A.   I THINK, AS I RECALL, I DON'T HAVE A LEGAL RIGHT, BUT AS A

09:36AM 1    PRACTICAL MATTER, EVERY OTHER PRIVATE COMPANY I INVEST IN ARE

09:36AM 2    HAPPY TO TALK TO YOU, AND THIS WAS AN UNUSUAL FENCE BETWEEN

09:36AM 3    MANAGEMENT AND SHAREHOLDERS FOR AN EXTENDED PERIOD OF TIME.

09:36AM 4          MR. DOWNEY:  I MOVE TO STRIKE EVERYTHING AFTER

09:36AM 5    "LEGAL RIGHT."

09:36AM 6         ALL RIGHT.  LADIES AND GENTLEMEN, I'LL STRIKE THE RESPONSE

09:36AM 7    AFTER "I THINK, AS I RECALL, I DON'T HAVE A LEGAL RIGHT."

09:36AM 8         EVERYTHING AFTER THAT IS STRICKEN.

09:37AM 9    BY MR. DOWNEY:

09:37AM 10   Q.  ALL RIGHT.  LET'S LOOK AT ONE LAST DOCUMENT IN THIS 2010,

09:37AM 11   2011 TIMEFRAME, WHICH IS EXHIBIT 12185.

09:37AM 12        DO YOU HAVE THAT ONE?

09:37AM 13   A.  YES.

09:37AM 14   Q.  AND IS THIS A SERIES OF EXCHANGES BETWEEN YOU AND

09:37AM 15   MR. BALWANI RELATED TO YOUR INVESTMENT IN THERANOS?

09:37AM 16   A.  YES.

09:37AM 17   Q.  AND YOU UNDERSTOOD THAT MR. BALWANI HAD JOINED THE COMPANY

09:38AM 18   AS AN EXECUTIVE AT SOME POINT PRIOR TO 2011; CORRECT?

09:38AM 19   A.  I'M NOT SURE WHEN HE JOINED THE COMPANY.

09:38AM 20   Q.  OKAY.

09:38AM 21   A.  MY UNDERSTANDING IS THAT HE JOINED IT MUCH EARLIER, BUT WE

09:38AM 22   WERE NOT MADE AWARE OF THAT.

09:38AM 23   Q.  OKAY.  BUT AT THE TIME THAT YOU WERE COMMUNICATING WITH

09:38AM 24   HIM IN 2011, YOU UNDERSTOOD THAT HE WAS A THERANOS EXECUTIVE;

09:38AM 25   CORRECT?

09:38AM   1     A.   CORRECT.

09:38AM   2     Q.   NOW, YOU GO ON TO -- YOU ASK IN THE VERY BOTTOM EMAIL, AND

09:38AM   3     YOU ASK AGAIN FOR ANOTHER CALL.

09:38AM   4          DO YOU SEE THAT ON THE JANUARY 31ST EMAIL AND THE LAST

09:38AM   5     EMAIL ON PAGE 2?

09:38AM   6     A.   I SEE A FEBRUARY 1ST -- OH, JANUARY 31ST.  OKAY.

09:38AM   7     Q.   DO YOU SEE THAT?

09:38AM   8     A.   YES, I DO.

09:38AM   9              MR. DOWNEY:  YOUR HONOR, I SHOULD HAVE ADMITTED THIS

09:39AM  10     DOCUMENT IF I CAN.

09:39AM  11     Q.   THIS IS ANOTHER EMAIL RELATED TO YOUR INVESTMENT; CORRECT?

09:39AM  12     A.   CORRECT.

09:39AM  13              MR. DOWNEY:  YOUR HONOR, I MOVE EXHIBIT 12185.

09:39AM  14              MR. BOSTIC:  NO OBJECTION.

09:39AM  15              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:39AM  16          (DEFENDANT'S EXHIBIT 12185 WAS RECEIVED IN EVIDENCE.)

09:39AM  17     BY MR. DOWNEY:

09:39AM  18     Q.   AND I WAS JUST, FOR THE BENEFIT, I WAS JUST SHOWING YOU

09:39AM  19     THE FIRST EMAIL IN THE SERIES OF EMAILS.

09:39AM  20          AND IT'S JUST ANOTHER EMAIL FROM YOU ASKING FOR UPDATES

09:39AM  21     AND INFORMATION ABOUT THE COMPANY; CORRECT?

09:39AM  22     A.   CORRECT.

09:39AM  23     Q.   AND THEN MR. BALWANI RESPONDED TO THAT ABOVE THAT.

09:39AM  24          DO YOU SEE THAT?

09:39AM  25     A.   YES.

09:39AM   1      Q.   AND MR. BALWANI SAID, "THERE IS NO QUARTERLY UPDATE WE

09:39AM   2      PROVIDE.  AS MENTIONED TO YOU BEFORE, WE WILL SEND UPDATES TO

09:39AM   3      ALL INVESTORS AT THE SAME TIME."

09:39AM   4           DO YOU SEE THAT?

09:39AM   5      A.   YES.

09:39AM   6      Q.   AND THEN YOU, YOU DON'T RESPOND TO -- YOU DON'T ADDRESS

09:39AM   7      MR. BALWANI WHEN YOU RESPOND.  INSTEAD, YOU ADDRESSED

09:40AM   8      MS. HOLMES IN THE LAST FULL EMAIL ON PAGE 1.

09:40AM   9           AND YOU SAY THERE -- YOU ACKNOWLEDGE IN THE LAST SENTENCE,

09:40AM  10      "I UNDERSTAND YOU DON'T HAVE AN OBLIGATION TO UPDATE US, BUT IT

09:40AM  11      WOULD BE APPRECIATED IF YOU WOULD ARRANGE A CALL."

09:40AM  12           DO YOU SEE THAT?

09:40AM  13      A.   YES.

09:40AM  14      Q.   AND THEN YOU EMAILED AGAIN, RIGHT, IN THE EMAIL ABOVE

09:40AM  15      THAT?

09:40AM  16      A.   YES.

09:40AM  17      Q.   AND THEN ABOVE THAT MR. BALWANI HAD ALREADY TOLD YOU HE

09:40AM  18      RESPONDED; CORRECT?

09:40AM  19      A.   HE DIDN'T REALLY RESPOND, BUT OKAY.

09:40AM  20      Q.   WELL, HE TOLD YOU HE RESPONDED; CORRECT?

09:40AM  21      A.   HE SAID HE RESPONDED, BUT HE DIDN'T RESPOND.

09:40AM  22      Q.   OKAY.  YOU WEREN'T SATISFIED WITH HIS RESPONSE, BUT HE

09:40AM  23      TOLD YOU THAT YOU HAD GOTTEN THE RESPONSE THAT YOU WERE GOING

09:40AM  24      TO GET; CORRECT?

09:40AM  25      A.   THAT'S RIGHT.

09:40AM  1    Q.   NOW, BECAUSE YOU WANTED TO GET INFORMATION EITHER

09:41AM  2    PERSONALLY OR AS A GROUP WITH THE OTHER -- LET ME USE -- AGREE

09:41AM  3    ON A TERM WITH YOU IS I'M GOING TO CALL YOU AND MR. HARRIS AND

09:41AM  4    THE OTHER INDIVIDUALS FROM HOUSTON WHO INVESTED, THE HOUSTON

09:41AM  5    INVESTORS JUST.  OKAY?  JUST SO I DON'T HAVE A --

09:41AM  6    A.   OKAY.

09:41AM  7    Q.   SO YOU WANTED TO GET AN UPDATE EITHER FOR YOURSELF OR FOR

09:41AM  8    THE HOUSTON INVESTORS; IS THAT FAIR?

09:41AM  9    A.   THAT'S FAIR.

09:41AM  10   Q.   AND WHEN THERANOS TOLD YOU THAT IT WOULDN'T COMMUNICATE

09:41AM  11   WITH THAT GROUP WITHOUT COMMUNICATING WITH THE WHOLE INVESTOR

09:41AM  12   BASE, YOU WENT DIRECTLY TO THERANOS'S BOARD; CORRECT?

09:41AM  13   A.   I DON'T RECALL.

09:41AM  14   Q.   WELL, DIDN'T YOU TELL US ON WEDNESDAY THAT YOU MADE

09:41AM  15   EFFORTS TO TRY TO CONTACT THE CHAIRMAN OF THE BOARD, DON LUCAS?

09:41AM  16   A.   I DON'T HAVE THE TIMEFRAME, BUT THERE WERE SOME

09:41AM  17   CONVERSATIONS THAT I HAD WITH DON, AND DON WAS VERY WILLING TO

09:42AM  18   SHARE INFORMATION.

09:42AM  19   Q.   OKAY.  LET ME SHOW YOU AN EMAIL THAT IS MARKED

09:42AM  20   EXHIBIT 12252.

09:42AM  21       DO YOU KNOW WHO -- DO YOU SEE THE NAME THERE NANCY MINNIG,

09:42AM  22   M-I-N-N-I-G?

09:42AM  23   A.   I DO.

09:42AM  24   Q.   AND DO YOU KNOW WHO MS. MINNIG WAS?

09:42AM  25   A.   I THINK SHE WAS THE EXECUTIVE ASSISTANT FOR DON LUCAS; IS

09:42AM 1    THAT CORRECT?

09:42AM 2    Q.   AND THIS IS AN EMAIL EXCHANGE BETWEEN YOU AND MS. MINNIG

09:42AM 3    RELATED TO THE ISSUES THAT WE'VE BEEN TALKING ABOUT AT

09:43AM 4    THERANOS; CORRECT?

09:43AM 5    A.   WHICH EMAIL ARE YOU REFERRING TO?

09:43AM 6    Q.   THE EMAIL EXCHANGE FROM -- THERE ARE TWO EMAILS ON THE

09:43AM 7    DOCUMENT THAT IS 12252, AND BOTH OF THEM ARE EMAIL EXCHANGES

09:43AM 8    BETWEEN YOU AND MS. MINNIG; CORRECT?

09:43AM 9    A.   I'M SORRY, I'M ON THE WRONG TAB.  12252?

09:43AM 10   Q.   YES, SIR.

09:43AM 11   A.   YES.

09:43AM 12   Q.   DO YOU HAVE THAT NOW?

09:43AM 13   A.   YES.

09:43AM 14   Q.   AND DO YOU RECOGNIZE THOSE AS EMAIL EXCHANGES BETWEEN YOU

09:43AM 15   AND MS. MINNIG RELATED TO YOUR INVESTMENT IN THERANOS?

09:43AM 16   A.   YES.

09:43AM 17   Q.   OKAY.  AND IF YOU LOOK AT THE BOTTOM EMAIL, IT BEGINS, "HI

09:43AM 18   ALAN, MY APOLOGIES FOR NOT GETTING BACK TO YOU."

09:43AM 19        DO YOU SEE THAT?

09:43AM 20   A.   YES.

09:43AM 21   Q.   AND THAT APPEARS TO BE THAT YOU HAD TRIED TO CONTACT

09:44AM 22   MS. MINNIG AND SHE HAD NOT, AT LEAST FOR SOME PERIOD OF TIME,

09:44AM 23   RESPONDED TO YOU.

09:44AM 24        DO YOU SEE THAT?

09:44AM 25   A.   COULD YOU ASK THE QUESTION AGAIN.

09:44AM  1    Q.   I'M JUST ASKING YOU TO TELL US WHEN SHE SAID, "MY

09:44AM  2    APOLOGIES FOR NOT GETTING BACK TO YOU," DO YOU KNOW WHAT THAT

09:44AM  3    REFERRED TO?

09:44AM  4    A.   NOT EXACTLY.

09:44AM  5    Q.   BUT YOU AGREE WITH ME THAT IT APPEARS THAT YOU HAD EITHER

09:44AM  6    CALLED OR EMAILED AND SHE HADN'T RESPONDED FOR A WHILE AND SHE

09:44AM  7    WAS APOLOGIZING.

09:44AM  8         DO YOU SEE THAT?

09:44AM  9    A.   I DO SEE THAT.

09:44AM  10   Q.   OKAY.  AND THEN SHE CONVEYS TO YOU THAT SHE SPOKE TO

09:44AM  11   MR. LUCAS; CORRECT?

09:44AM  12   A.   YES.

09:44AM  13   Q.   AND HE DOESN'T HAVE ANY FURTHER INFORMATION; RIGHT?

09:44AM  14   A.   YES.

09:44AM  15   Q.   AND HE TOLD YOU, HE CONVEYED THAT THERE WERE ARTICLES IN

09:44AM  16   THE NEWS, AS YOU HAD MENTIONED; CORRECT?

09:44AM  17   A.   YOU KNOW, I DON'T RECALL THIS.  THERE WAS SOME ARTICLES IN

09:45AM  18   THE NEWS ABOUT MOVING TO A NEW HEADQUARTERS.  I'M NOT SURE IF

09:45AM  19   THAT IS WHAT THIS IS REFERRING TO.

09:45AM  20        IF YOU'RE ALLOWED TO REFRESH MY MEMORY.  IS THIS THE POINT

09:45AM  21   IN TIME WHEN THEY MOVED TO THEIR NEW HEADQUARTERS?

09:45AM  22   Q.   WELL, I COME NOT ALLOWED TO REFRESH YOU AND IN ANY EVENT

09:45AM  23   I'M NOT SURE I COULD.

09:45AM  24   A.   OKAY.

09:45AM  25             MR. DOWNEY:  BUT LET ME DO THIS, LET ME ADMIT 12252.

09:45AM  1          MR. BOSTIC:  NO OBJECTION.

09:45AM  2          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:45AM  3          (DEFENDANT'S EXHIBIT 11253 WAS RECEIVED IN EVIDENCE.)

09:45AM  4  BY MR. DOWNEY:

09:45AM  5  Q.   LET ME HIGHLIGHT THE BOTTOM EMAIL.

09:45AM  6          DO YOU SEE THAT SHE SAYS, "MY APOLOGIES FOR NOT GETTING

09:45AM  7  BACK TO YOU"?

09:45AM  8  A.   YES.

09:45AM  9  Q.   AND SHE GOES ON TO SAY THAT SHE SPOKE TO DON?

09:45AM  10  A.   CORRECT.

09:45AM  11  Q.   AND THAT'S A REFERENCE TO DON LUCAS; CORRECT?

09:45AM  12  A.   CORRECT.

09:45AM  13  Q.   AND SHE SAID HE DOESN'T HAVE ANY FURTHER INFORMATION;

09:45AM  14  CORRECT?

09:45AM  15  A.   CORRECT.

09:45AM  16  Q.   AND THEN SHE SAID WHATEVER THE SUBJECT MATTER WAS, THERE

09:45AM  17  WAS ARTICLES IN THE NEWS; CORRECT?

09:45AM  18  A.   CORRECT.

09:45AM  19  Q.   AND SHE HAD MENTIONED THAT YOU HAD TOLD HER THAT YOU WERE

09:45AM  20  AWARE OF THOSE ARTICLES; CORRECT?

09:45AM  21  A.   CORRECT.

09:45AM  22  Q.   AND MR. LUCAS SUGGESTED THAT YOU FOLLOW THE COMPANY IN

09:46AM  23  THAT MANNER; CORRECT?

09:46AM  24  A.   CORRECT.

09:46AM  25  Q.   AND HE SAID IF THERE WAS INFORMATION HE COULD SHARE WITH

09:46AM 1    YOU, THEY WILL; CORRECT?

09:46AM 2    A.   CORRECT.

09:46AM 3    Q.   ALL RIGHT.  NOW, AT SOME POINT YOU LEARNED THAT MR. LUCAS

09:46AM 4    HAD CONVEYED TO MS. HOLMES, AND OTHERS AT THERANOS, THAT YOU

09:46AM 5    WERE CALLING AND EMAILING HIM SEEKING INFORMATION.

09:46AM 6         YOU CAME TO UNDERSTAND THAT, DIDN'T YOU?

09:46AM 7    A.   YES.

09:46AM 8    Q.   AND YOU GOT A RESPONSE FROM MS. HOLMES RELATED TO THAT;

09:46AM 9    CORRECT?

09:46AM 10   A.   I'LL HAVE TO SEE THE RESPONSE.  I DON'T RECALL.

09:46AM 11   Q.   OKAY.  WELL, LET ME ASK YOU TO LOOK AT EXHIBIT 713.

09:47AM 12        DO YOU HAVE THAT?  IF NOT, I COULD GIVE YOU A COPY.

09:47AM 13   A.   713?

09:47AM 14   Q.   YES, SIR.

09:47AM 15   A.   I DON'T HAVE IT.

09:47AM 16   Q.   OKAY.

09:47AM 17        MAY I APPROACH THE WITNESS, YOUR HONOR?

09:47AM 18        THE COURT:  YES.  DO YOU HAVE COPIES FOR COUNSEL AND

09:47AM 19   THE COURT?

09:47AM 20        MR. DOWNEY:  I THINK THEY INTRODUCED THIS EXHIBIT.

09:47AM 21        THE COURT:  IT'S A GOVERNMENT EXHIBIT?

09:47AM 22        MR. DOWNEY:  YES.

09:47AM 23   Q.   (HANDING.)  HERE YOU GO.

09:48AM 24        DO YOU SEE THAT?

09:48AM 25   A.   YES.

09:48AM   1    Q.   OKAY.

09:48AM   2         YOUR HONOR, THIS DOCUMENT IS ALREADY IN EVIDENCE, BUT I'M

09:48AM   3    NOT SURE THAT THE VERSION THAT HE HAS, HAS THE REDACTIONS THAT

09:48AM   4    WE AGREED TO.

09:48AM   5         BUT I WILL JUST SHOW UNREDACTED PORTIONS FOR PURPOSES OF

09:48AM   6    THE JURY.

09:48AM   7              THE COURT:  I'M SORRY, UNREDACTED?

09:48AM   8              MR. DOWNEY:  THE PORTION THAT THE COURT HAS DIRECTED

09:48AM   9    SHOULD BE PUBLISHED AND NOT THE PORTIONS THAT SHOULD BE

09:48AM   10   REDACTED.

09:48AM   11             THE COURT:  ALL RIGHT.  THAT'S WHAT THE JURY HAS

09:48AM   12   NOW?

09:48AM   13             MR. DOWNEY:  THAT'S WHAT THE JURY IS LOOKING AT NOW.

09:48AM   14             THE COURT:  ALL RIGHT.

09:48AM   15   BY MR. DOWNEY:

09:48AM   16   Q.   WOULD YOU LOOK AT THE EMAIL THAT IS AT NOVEMBER 26TH,

09:48AM   17   2012, AT 2:10 P.M. AT THE BOTTOM OF PAGE 1?

09:48AM   18   A.   YES.

09:48AM   19   Q.   OKAY.  AND THIS WAS YOU CONTACTING MS. MINNIG AGAIN;

09:48AM   20   CORRECT?

09:48AM   21   A.   YES.

09:48AM   22   Q.   AND YOU WERE REACTING TO AN EMAIL THAT MS. HOLMES HAD SENT

09:48AM   23   YOU IN CONNECTION WITH THE FACT THAT YOU WERE COMMUNICATING

09:49AM   24   WITH MR. LUCAS AND SENDING EMAILS TO HIM AND CALLING AND SO

09:49AM   25   FORTH; RIGHT?

09:49AM 1  A.   I'M SORRY, WHAT'S THE QUESTION?

09:49AM 2  Q.   THE QUESTION IS WHETHER YOUR EMAIL TO MS. MINNIG IS YOUR

09:49AM 3  REACTION TO MS. HOLMES SENDING YOU AN EMAIL ABOUT YOUR EFFORTS

09:49AM 4  TO COMMUNICATE WITH MR. LUCAS?

09:49AM 5  A.   YES.

09:49AM 6  Q.   OKAY.  AND IF YOU GO BELOW THAT TO THE TOP OF PAGE 2, BUT

09:49AM 7  BELOW IN THE CHAIN.

09:49AM 8       ACTUALLY, GO TO THE EMAIL BELOW THAT.  AND IF YOU LOOK AT

09:49AM 9  THE FIRST LINE OF YOUR EMAIL IT SAYS, "IT HAS BEEN OVER 2 YEARS

09:49AM 10 SINCE YOU HAVE COMMUNICATED WITH YOUR INVESTORS."

09:49AM 11      DO YOU SEE THAT?

09:49AM 12 A.   YES.

09:49AM 13 Q.   AND IF YOU GO TO HER EMAIL ABOVE SHE RESPONDS AND SAYS TO

09:49AM 14 YOU, "NO, ALAN, IT HAS BEEN ABOUT THAT LONG SINCE YOU DECIDED

09:50AM 15 TO START HARASSING OUR CHAIRMAN, DESPITE THE FACT WE

09:50AM 16 COMMUNICATED MULTIPLE TIMES THAT IF WE DID SO, WE WOULD NO

09:50AM 17 LONGER RESPOND TO YOUR REQUESTS TO TALK WITH YOU IN LIGHT OF

09:50AM 18 ALL OF OUR PAST INTERACTIONS."

09:50AM 19      DO YOU SEE THAT?

09:50AM 20 A.   THAT'S A TOTAL MISCHARACTERIZATION.  I NEVER HARASSED

09:50AM 21 DON LUCAS.  WE HAD A VERY NICE RELATIONSHIP UNTIL COMMUNICATION

09:50AM 22 WAS CUT OFF PRESUMABLY FROM ELIZABETH.

09:50AM 23 Q.   OKAY.  BUT YOU SAY THIS IS WHAT SHE WAS CONVEYING, HER

09:50AM 24 UNDERSTANDING OF THE SITUATION?

09:50AM 25 A.   TOTAL MISCHARACTERIZATION.  I DO SEE THAT.  I'M NOT

09:50AM   1    AGREEING THAT THAT'S ACCURATE.

09:50AM   2    Q.   AND DO YOU SEE IN THE SECOND PARAGRAPH SHE SAYS THAT

09:50AM   3    SHE'LL BE TALKING TO DAVID AGAIN.

09:50AM   4         DO YOU SEE THAT?

09:50AM   5         (CELL PHONE RINGING.)

09:50AM   6              THE COURT:   JUST A SECOND.   SOMEONE'S DEVICE JUST

09:50AM   7    WENT OFF.   IF YOU COULD DISABLE IT OR LEAVE THE COURTROOM,

09:50AM   8    PLEASE.

09:50AM   9         I'M SORRY FOR THE INTERRUPTION, MR. DOWNEY.

09:50AM  10              MR. DOWNEY:   I APOLOGIZE, MR. EISENMAN.

09:50AM  11    Q.   I WAS JUST DIRECTING YOUR ATTENTION TO THE SECOND

09:50AM  12    PARAGRAPH WHERE MS. HOLMES SAYS SHE WILL BE TALKING TO DAVID

09:51AM  13    AGAIN.

09:51AM  14         DO YOU SEE THAT?

09:51AM  15    A.   YES.

09:51AM  16    Q.   AND THAT'S A REFERENCE TO MR. HARRIS AGAIN?

09:51AM  17    A.   THAT IS.

09:51AM  18    Q.   SO SHE WAS COMMUNICATING WITH HIM; CORRECT?

09:51AM  19    A.   YES.

09:51AM  20    Q.   OKAY.   NOW, AFTER MR. LUCAS DECLINED TO COMMUNICATE WITH

09:51AM  21    YOU, YOU WENT TO OTHER MEMBERS OF THE THERANOS BOARD ASKING FOR

09:51AM  22    INFORMATION; CORRECT?

09:51AM  23    A.   CORRECT.

09:51AM  24    Q.   YOU APPROACHED MR. FRIST; CORRECT?

09:51AM  25    A.   THAT IS CORRECT.

09:51AM   1    Q.   AND MR. FRIST WAS THE FORMER SENATOR, BILL FRIST; IS THAT

09:51AM   2    CORRECT?

09:51AM   3    A.   CORRECT.

09:51AM   4    Q.   AND HE WAS THE FORMER MAJORITY LEADER IN THE SENATE; IS

09:51AM   5    THAT CORRECT?

09:51AM   6    A.   THAT IS CORRECT.

09:51AM   7    Q.   AND ALSO A VERY RESPECTED SURGEON AND PHYSICIAN; CORRECT?

09:51AM   8    A.   THAT IS CORRECT.

09:51AM   9    Q.   AND YOU KNEW MR. FRIST -- WELL, YOU DIDN'T KNOW MR. FRIST

09:51AM  10    PERSONALLY YOURSELF, RIGHT, AT THE TIME HE CONTACTED YOU?

09:51AM  11    A.   HE'S A FAMILY FRIEND.  I DIDN'T KNOW HIM PERSONALLY.

09:52AM  12    Q.   HE'S A FRIEND OF YOUR FATHER-IN-LAW; CORRECT?

09:52AM  13    A.   THAT IS CORRECT.

09:52AM  14    Q.   AND BECAUSE SENATOR FRIST IS FROM TENNESSEE; CORRECT?

09:52AM  15    A.   CORRECT.

09:52AM  16    Q.   AND YOUR FATHER-IN-LAW LIVED IN TENNESSEE; CORRECT?

09:52AM  17    A.   CORRECT.

09:52AM  18    Q.   AND YOUR FATHER-IN-LAW IS A SUBSTANTIAL FIGURE IN

09:52AM  19    TENNESSEE; CORRECT?

09:52AM  20    A.   I'D RATHER NOT COMMENT.

09:52AM  21    Q.   WELL, HE'S A, HE'S A -- HE'S AN EXTREMELY WEALTHY

09:52AM  22    INDIVIDUAL IN TENNESSEE; CORRECT?

09:52AM  23    A.   I'M NOT GOING TO COMMENT.

09:52AM  24    Q.   WELL, YOU RECOGNIZE HIM TO BE ACTIVE IN MAKING POLITICAL

09:52AM  25    CONTRIBUTIONS AND ACTIVE AROUND POLITICS; CORRECT?

09:52AM  1    A.   I RECOGNIZE HIM BEING VERY PHILANTHROPIC.  AS FAR AS

09:52AM  2    POLITICAL CONTRIBUTIONS, I'M NOT AWARE.

09:52AM  3    Q.   AND YOU WERE REACHING OUT TO MR. FRIST REFERENCING YOUR

09:52AM  4    RELATIONSHIP WITH YOUR FATHER-IN-LAW; CORRECT?

09:52AM  5    A.   THIS IS INTERESTING BECAUSE I REACHED OUT TO HIM AS A

09:52AM  6    FAMILY FRIEND, AND IT WAS A CONFIDENTIAL COMMUNICATION, AND HOW

09:53AM  7    IT MADE IT INTO THE DOMAIN OF THERANOS IS A LITTLE BIT

09:53AM  8    IRREGULAR.

09:53AM  9    Q.   WELL, THAT'S RIGHT.

09:53AM  10        YOU REACHED OUT TO HIM ON A CONFIDENTIAL BASIS LETTING HIM

09:53AM  11   KNOW THAT YOU WERE THE SON-IN-LAW OF JOEL GORDON, YOUR

09:53AM  12   FATHER-IN-LAW; CORRECT?

09:53AM  13   A.   THAT IS CORRECT.

09:53AM  14   Q.   BUT YOU TOLD HIM YOU DIDN'T WANT MR. GORDON TO KNOW THAT

09:53AM  15   YOU WERE REACHING OUT TO HIM; CORRECT?

09:53AM  16   A.   MISLEADING.

09:53AM  17   Q.   OKAY.  WELL, LET'S LOOK AT EXHIBIT 2470.

09:53AM  18        THIS MAY BE ANOTHER ONE I HAVE TO HAND TO YOU.  I DON'T

09:54AM  19   THINK IT'S IN YOUR BLACK -- IS IT IN YOUR BLACK NOTEBOOK?

09:54AM  20   A.   I'M SORRY, WHAT IS THE NUMBER?

09:54AM  21   Q.   2470.

09:55AM  22        (DISCUSSION AMONGST COUNSEL OFF THE RECORD.)

09:55AM  23            MR. DOWNEY:  YOUR HONOR, MAY I APPROACH THE WITNESS?

09:55AM  24            THE COURT:  YES.

09:55AM  25            MR. DOWNEY:  (HANDING.)

09:55AM  1          YOUR HONOR, LET ME SAY BEFORE I HAVE A DISCUSSION WITH

09:55AM  2   THIS WITNESS ABOUT THIS DOCUMENT, THAT THERE WAS A PORTION OF

09:55AM  3   THIS DOCUMENT THAT WAS DIRECTED TO BE REDACTED.  I BELIEVE IN

09:55AM  4   ONE VERSION OF THIS, ONE PHRASE OR TWO PHRASES WERE REDACTED

09:55AM  5   THAT WERE BEYOND THE SCOPE OF THE COURT'S DIRECTION, AND WE'LL

09:55AM  6   FIX THAT IN THE PUBLIC EXHIBIT.

09:55AM  7          THE COURT:  THANK YOU.

09:55AM  8       DO YOU HAVE THIS, MR. BOSTIC?

09:55AM  9          MR. BOSTIC:  I DO, YOUR HONOR.

09:56AM  10      MY REQUEST WOULD BE THAT THE REDACTION SCOPE ISSUE BE

09:56AM  11  FIXED IN THE VERSIONS PUBLISHED TO THE JURY.

09:56AM  12         THE COURT:  I THINK THAT'S YOUR INTENT, ISN'T IT?

09:56AM  13         MR. DOWNEY:  YEAH, I THINK THAT CAN BE ACCOMPLISHED.

09:56AM  14      CAN IT?

09:56AM  15         THE COURT:  YES, LET ME GIVE YOU A MINUTE TO SPEAK

09:56AM  16  WITH YOUR PERSON.

09:56AM  17      (PAUSE IN PROCEEDINGS.)

09:56AM  18      (DISCUSSION AMONGST DEFENSE COUNSEL AND I.T. OFF THE

09:57AM  19  RECORD.)

09:57AM  20         MR. DOWNEY:  OKAY.  YOUR HONOR, TO AVOID DELAY, WHY

09:57AM  21  DON'T WE COME BACK TO THIS SO I DON'T TIE UP --

09:57AM  22         THE COURT:  WE'LL PASS THIS FOR A MOMENT?

09:57AM  23         MR. DOWNEY:  YES, WE'LL PASS THIS, AND WE'LL GET A

09:57AM  24  REDACTED VERSION THAT THE JURY IS IN A POSITION TO SEE

09:57AM  25  CONSISTENT WITH THE COURT'S ORDER.

09:57AM   1    Q.   LET ME SHOW YOU ANOTHER EMAIL ON THIS SAME SUBJECT, WHICH

09:57AM   2    I BELIEVE SHOULD BE IN YOUR NOTEBOOK.

09:57AM   3         WELL, WITHOUT SHOWING YOU THE EXHIBIT, LET ME JUST ASK

09:57AM   4    YOU, YOU REMEMBER REACHING OUT TO SENATOR FRIST, DO YOU?

09:57AM   5    A.   YES, I DO.

09:57AM   6    Q.   AND YOU ASKED HIM QUESTIONS ABOUT THERANOS; CORRECT?

09:57AM   7    A.   YES.

09:57AM   8    Q.   AND ULTIMATELY HE STOPPED COMMUNICATING WITH YOU ABOUT

09:57AM   9    THERANOS AS WELL; CORRECT?

09:58AM   10   A.   CAN I SAY THAT MY TALKING TO SENATOR FRIST WAS TOTALLY

09:58AM   11   APPROPRIATE.

09:58AM   12   Q.   WELL, LET ME ASK YOU ABOUT MY QUESTION FIRST.

09:58AM   13        YOU REACHED OUT TO SENATOR FRIST AND COMMUNICATED ABOUT

09:58AM   14   THERANOS; CORRECT?

09:58AM   15   A.   I REACHED OUT TO A DIRECTOR OF A COMPANY THAT I HAVE A

09:58AM   16   SUBSTANTIAL INVESTMENT IN, THAT I WAS SHUT OUT OF INFORMATION

09:58AM   17   FOR AN EXTENDED PERIOD OF TIME.

09:58AM   18   Q.   SO IS IT YES THAT YOU DID REACH OUT?

09:58AM   19   A.   AND IT WAS A POINT WHERE I MIGHT HAVE HAD AN OPPORTUNITY

09:58AM   20   TO SELL SOME OF MY INVESTMENT.

09:58AM   21        THE COURT:  MR. EISENMAN, MR. EISENMAN, FOR THE

09:58AM   22   EFFICIENCY OF THIS, TRY TO LISTEN TO HIS QUESTION AND ANSWER

09:58AM   23   HIS QUESTION, PLEASE.

09:58AM   24        THE WITNESS:  OKAY.

09:58AM   25        THE COURT:  WHY DON'T YOU ASK YOUR QUESTION AGAIN.

09:58AM  1    BY MR. DOWNEY:

09:58AM  2    Q.   YOU REACHED OUT TO DISCUSS THERANOS WITH SENATOR FRIST;

09:58AM  3    CORRECT?

09:58AM  4    A.   CORRECT.

09:58AM  5    Q.   AND YOU TOLD HIM THAT YOU WERE DOING THIS, BUT YOU DID NOT

09:58AM  6    WANT YOUR FATHER-IN-LAW TO KNOW THAT YOU WERE DOING IT;

09:58AM  7    CORRECT?

09:58AM  8    A.   THAT'S CORRECT, BUT THERE ARE REASONS THAT YOU'RE IMPLYING

09:59AM  9    THAT I DON'T THINK ARE CORRECT.

09:59AM 10    Q.   I HAVEN'T IMPLIED ANYTHING.  I JUST ASKED YOU ABOUT --

09:59AM 11    A.   OKAY.  I'M PUTTING THAT OUT.

09:59AM 12    Q.   AND AT THE TIME YOUR FATHER-IN-LAW, YOUR FATHER-IN-LAW WAS

09:59AM 13    ALSO, THROUGH HIS FAMILY OFFICE, AN INVESTOR IN THERANOS;

09:59AM 14    CORRECT?

09:59AM 15    A.   CORRECT.

09:59AM 16    Q.   NOW, THIS PATTERN OF SENDING EMAILS AFTER YOU'VE BEEN

09:59AM 17    INFORMED THAT YOU'RE NOT GOING TO GET THE INFORMATION OR IT'S

09:59AM 18    NOT APPROPRIATE FOR YOU TO GET THE INFORMATION, THAT'S

09:59AM 19    SOMETHING THAT YOU ENGAGE IN FREQUENTLY; IS THAT CORRECT?

09:59AM 20    A.   I TAKE EXCEPTION.  IT WAS TOTALLY APPROPRIATE FOR ME TO

09:59AM 21    GET THE INFORMATION AT THE TIME.  I WAS CONTEMPLATING SELLING

09:59AM 22    SOME OF MY INVESTMENT.

09:59AM 23    Q.   WELL, LET'S TALK ABOUT SOME OF THE EVENTS THAT HAVE

09:59AM 24    HAPPENED SINCE YOU LEFT THE STAND ON WEDNESDAY.

09:59AM 25         ON WEDNESDAY YOU LEFT THE STAND AFTER TESTIFYING ON DIRECT

09:59AM  1    EXAMINATION; CORRECT?

09:59AM  2    A.   CORRECT.

09:59AM  3    Q.   AND THEN YOU APPROACHED THE GOVERNMENT AND YOU ASKED THEM

09:59AM  4    ABOUT WHETHER YOU COULD RETURN TRAVEL TO HOUSTON THAT NIGHT;

10:00AM  5    RIGHT?

10:00AM  6    A.   I DON'T RECALL.

10:00AM  7    Q.   OKAY.  WOULD YOU RECALL SPEAKING TO THEM AFTER YOU LEFT

10:00AM  8    THE STAND?

10:00AM  9    A.   I DON'T RECALL.  MY HEAD WAS -- I WAS PRETTY TIRED.

10:00AM  10   Q.   OKAY.  DO YOU RECALL THAT THEY TOLD YOU THAT THEY COULD

10:00AM  11   TELL YOU, YOU WERE PERMITTED TO RETURN TO HOUSTON, BUT THAT

10:00AM  12   THEY COULD NOT DISCUSS ANY SUBSTANCE ABOUT THE TESTIMONY WITH

10:00AM  13   YOU?

10:00AM  14       DO YOU RECALL THAT THEY TOLD YOU THAT?

10:00AM  15   A.   YES.

10:00AM  16   Q.   THEY TOLD YOU NOT TO COMMUNICATE WITH ANY OF THE LAWYERS;

10:00AM  17   CORRECT?

10:00AM  18   A.   I DIDN'T RECALL AT THE TIME.  AS I MENTIONED, I WAS PRETTY

10:00AM  19   TIRED WHEN I LEFT THE STAND.

10:00AM  20   Q.   OKAY.  SO YOU'RE SAYING THAT YOU DON'T RECALL MR. SCHENK

10:00AM  21   OR MR. BOSTIC OR MR. LEACH TELLING YOU DO NOT COMMUNICATE WITH

10:00AM  22   US ABOUT THE SUBSTANCE OF YOUR TESTIMONY?

10:00AM  23   A.   I DO RECALL NOW.

10:00AM  24   Q.   OKAY.  AND YOU UNDERSTOOD WHEN THEY COMMUNICATED THAT TO

10:00AM  25   YOU THAT THAT'S IMPORTANT; RIGHT?  THAT RELATES TO THE

10:00AM  1    INTEGRITY OF THIS TRIAL; CORRECT?

10:00AM  2    A.   CORRECT.

10:00AM  3    Q.   AND YOU THEN RETURNED TO HOUSTON; CORRECT?

10:01AM  4    A.   YES.

10:01AM  5    Q.   AND HOW LONG DID IT TAKE YOU TO VIOLATE THE DIRECTION THAT

10:01AM  6    HAD BEEN GIVEN TO YOU BY MR. SCHENK, AND MR. BOSTIC, AND

10:01AM  7    MR. LEACH?  HOW LONG?

10:01AM  8    A.   I DON'T RECALL.  NOT, NOT --

10:01AM  9    Q.   WAS IT LESS THAN ABOUT 15 HOURS?

10:01AM 10    A.   I DON'T RECALL.

10:01AM 11    Q.   WELL, DIDN'T YOU EMAIL REPRESENTATIVES OF THE PROSECUTION

10:01AM 12    TEAM THE NEXT MORNING AFTER YOU RETURNED TO HOUSTON TO DISCUSS

10:01AM 13    THE SUBSTANCE OF YOUR TESTIMONY?

10:01AM 14    A.   I RECALL AN EMAIL, BUT I DON'T RECALL THE TIMELINE.

10:01AM 15    Q.   OKAY.  WELL, LET'S LOOK AT EXHIBIT 14223.

10:01AM 16         I'M SORRY, 14233.

10:01AM 17    A.   I DON'T HAVE THAT EXHIBIT.

10:02AM 18         THE COURT:  IT MIGHT NOT BE IN THE BINDER.

10:02AM 19         MR. DOWNEY:  IT PROBABLY IS NOT.  THANK YOU,

10:02AM 20    YOUR HONOR.

10:02AM 21         (PAUSE IN PROCEEDINGS.)

10:02AM 22         MR. DOWNEY:  YOUR HONOR, I'VE PASS THE UP

10:02AM 23    EXHIBIT 14233.  THERE ARE -- I'VE PASSED UP BOTH AN UNREDACTED

10:02AM 24    AND A REDACTED VERSION.  IT'S MY INTENTION TO INTRODUCE ONLY

10:03AM 25    THE REDACTED PORTION OF THE EMAIL.

EISENMAN CROSS BY MR. DOWNEY (RES.)

10:03AM 1          THE COURT:  ALL RIGHT.  DOES THE GOVERNMENT HAVE

10:03AM 2     THIS?  YOU HAVE THIS, MR. BOSTIC?

10:03AM 3          MR. BOSTIC:  I DO, YOUR HONOR.

10:03AM 4          MR. DOWNEY:  MAY I APPROACH THE WITNESS?

10:03AM 5          THE COURT:  YES.

10:03AM 6     BY MR. DOWNEY:

10:03AM 7     Q.   (HANDING.)

10:03AM 8          AND EXHIBIT 14233 IS AN EMAIL THAT YOU SENT TO

10:03AM 9     AGENT HERNANDEZ, IS IT NOT?

10:03AM 10    A.   YES.

10:03AM 11    Q.   AND THAT'S AGENT HERNANDEZ WHO IS SITTING RIGHT HERE AT

10:03AM 12    COUNSEL TABLE; CORRECT?

10:03AM 13    A.   CORRECT.

10:03AM 14    Q.   AND DESPITE THE FACT THAT YOU HAD BEEN TOLD NOT TO

10:03AM 15    COMMUNICATE WITH THE PROSECUTION TEAM ABOUT SUBSTANCE, YOU SENT

10:03AM 16    HER AN EMAIL WHICH DID JUST THAT; CORRECT?

10:03AM 17    A.   CORRECT.

10:03AM 18          MR. DOWNEY:  AND THAT EMAIL, WHICH I'LL INTRODUCE

10:03AM 19    THE REDACTED VERSION OF, WHICH IS 14233, I MOVE TO ADMIT.

10:04AM 20          MR. BOSTIC:  YOUR HONOR, I'D OBJECT TO THE

10:04AM 21    REDACTIONS.  I'M NOT SURE WHAT THE PURPOSE IS OF ADMITTING THE

10:04AM 22    EXHIBIT WITH 90 PERCENT REDACTED.

10:04AM 23          MR. DOWNEY:  FAIR ENOUGH.  YOU KNOW, YOUR HONOR,

10:04AM 24    I'LL WITHDRAW THE REQUEST TO ADMIT IT.

10:04AM 25    Q.   YOU ACKNOWLEDGE THAT YOU SENT AN EMAIL THE NEXT DAY AFTER

EISENMAN CROSS BY MR. DOWNEY (RES.)                                    6196

10:04AM   1    YOUR TESTIMONY; CORRECT?

10:04AM   2    A.   CORRECT.

10:04AM   3    Q.   AND YOU SENT IT TO AGENT HERNANDEZ; CORRECT?

10:04AM   4    A.   CORRECT.

10:04AM   5    Q.   AND YOU OFFERED SOME REFLECTIONS ON THE TESTIMONY THAT YOU

10:04AM   6    HAD GIVEN THE DAY BEFORE?

10:04AM   7    A.   CORRECT.

10:04AM   8    Q.   AND YOU DID THAT BECAUSE YOU WANTED TO GET SOME FEEDBACK

10:04AM   9    AND GUIDANCE AS TO HOW PEOPLE THOUGHT YOUR TESTIMONY WAS GOING;

10:04AM  10    RIGHT?

10:04AM  11    A.   INCORRECT.

10:04AM  12    Q.   OKAY.  NOW, THE GOVERNMENT REACTED TO THE FACT THAT YOU

10:04AM  13    HAD SENT THIS, THIS COMMUNICATION TO THEM, FORWARDING

10:04AM  14    INFORMATION AND DISCUSSING YOUR TESTIMONY, THEY CALLED YOU;

10:05AM  15    CORRECT?

10:05AM  16    A.   I DON'T RECALL.

10:05AM  17    Q.   AGENT HERNANDEZ CALLED YOU ON THE TELEPHONE.  YOU DON'T

10:05AM  18    RECALL?

10:05AM  19    A.   YES.

10:05AM  20    Q.   THIS WAS JUST LAST THURSDAY; RIGHT?

10:05AM  21    A.   CORRECT.

10:05AM  22    Q.   AND AGENT HERNANDEZ TOLD YOU DO NOT COMMUNICATE WITH THE

10:05AM  23    GOVERNMENT; CORRECT?

10:05AM  24    A.   CORRECT.

10:05AM  25    Q.   SHE SAID DO NOT CALL US; CORRECT?

10:05AM  1   A.   I DON'T RECALL WHAT SHE SAID, BUT THE GIST WAS WE CAN'T

10:05AM  2   COMMUNICATE.

10:05AM  3   Q.   RIGHT.  AND SHE SAID THAT SPECIFICALLY MEANS DO NOT CALL

10:05AM  4   US; RIGHT?

10:05AM  5   A.   COMMUNICATE, YES, IS A CALL, YES.

10:05AM  6   Q.   AND DO NOT TEXT US; RIGHT?

10:05AM  7   A.   YES.

10:05AM  8   Q.   AND DO NOT EMAIL US; CORRECT?

10:05AM  9   A.   I DON'T RECALL HER EXACT WORDS, BUT THE COMMUNICATION, AS

10:05AM  10  I SAID, WAS WE CANNOT TALK.

10:05AM  11  Q.   RIGHT.

10:05AM  12  A.   AND WE CANNOT COMMUNICATE.

10:05AM  13  Q.   AND YOU LEFT THAT -- WELL, IT WASN'T JUST TALK; RIGHT?  IT

10:05AM  14  WAS DON'T SEND US AN EMAIL, DON'T TEXT US, DON'T SEND A CARRIER

10:05AM  15  PIGEON.  YOU CANNOT COMMUNICATE WITH US; RIGHT?

10:05AM  16  A.   CORRECT.

10:05AM  17  Q.   AND SO YOU LEFT THAT CALL UNDERSTANDING THAT; CORRECT?

10:06AM  18  A.   CORRECT.

10:06AM  19  Q.   HOW LONG DID IT TAKE FROM THAT CALL UNTIL THE NEXT TIME

10:06AM  20  THAT YOU EMAILED THE GOVERNMENT?

10:06AM  21  A.   THERE WERE NO FURTHER EMAILS WITH ANYTHING SUBSTANTIVE.

10:06AM  22  Q.   HOW LONG DID IT TAKE UNTIL YOU EMAILED THE GOVERNMENT

10:06AM  23  AFTER THAT CALL?

10:06AM  24  A.   MY RECOLLECTION IS THAT THERE'S AN EMAIL ABOUT TRAVEL

10:06AM  25  ARRANGEMENTS.

10:06AM 1    Q.   OKAY.  HOW LONG WAS THE EMAIL THAT YOU RECALL SENT TO THE

10:06AM 2    GOVERNMENT AFTER THE, THE COMMUNICATION FROM AGENT HERNANDEZ

10:06AM 3    NOT TO TALK TO THE GOVERNMENT?

10:06AM 4    A.   ARE YOU REFERRING TO MY ATTEMPTED COMMUNICATION ABOUT

10:06AM 5    TRAVEL ARRANGEMENTS?

10:06AM 6    Q.   I'M ASKING YOU HOW LONG IT WAS.

10:06AM 7    A.   I DON'T KNOW.  YOU'LL HAVE TO SHOW ME THE EXHIBIT.

10:06AM 8         THE COURT:  EXCUSE ME, EXCUSE ME.  ONE AT A TIME,

10:06AM 9    PLEASE.

10:06AM 10        THE WITNESS:  I DON'T KNOW.

10:06AM 11        MR. DOWNEY:  I'M JUST --

10:06AM 12        THE COURT:  THAT WAS HIS ANSWER, "I DON'T KNOW."

10:06AM 13   BY MR. DOWNEY:

10:06AM 14   Q.   YOU DON'T KNOW HOW LONG IT WAS AFTER YOU SENT AN EMAIL

10:06AM 15   AFTER THAT COMMUNICATION; RIGHT?

10:06AM 16   A.   I DON'T KNOW.

10:06AM 17   Q.   WAS IT YOUR UNDERSTANDING THAT THE NEXT MORNING YOU SENT

10:07AM 18   THE GOVERNMENT AN EMAIL AGAIN?

10:07AM 19   A.   YOU'RE GOING TO HAVE TO SHOW ME THE EXHIBIT.  I DON'T

10:07AM 20   KNOW.

10:07AM 21   Q.   OKAY.

10:07AM 22        MAY I APPROACH THE WITNESS, YOUR HONOR?

10:07AM 23        THE COURT:  YES.

10:07AM 24   BY MR. DOWNEY:

10:07AM 25   Q.   (HANDING.)

10:07AM 1        DOES WHAT I'VE SHOWN YOU, WHICH IS EXHIBIT 14234, DOES

10:08AM 2    THAT REFRESH YOUR RECOLLECTION AS TO HOW LONG IT TOOK YOU TO

10:08AM 3    EMAIL THE GOVERNMENT AFTER AGENT HERNANDEZ HAD TOLD YOU NOT TO

10:08AM 4    EMAIL THE GOVERNMENT?

10:08AM 5    A.   AS I MENTIONED EARLIER, THIS EMAIL HAS NOTHING TO DO WITH

10:08AM 6    THE CASE.

10:08AM 7    Q.   WELL, DID THE GOVERNMENT VIEW IT THAT WAY?

10:08AM 8    A.   I DON'T KNOW.

10:08AM 9    Q.   WELL, THE GOVERNMENT CALLED YOU AFTER GETTING THIS

10:08AM 10   COMMUNICATION; CORRECT?

10:08AM 11   A.   CORRECT.

10:08AM 12   Q.   AND THIS TIME IT WASN'T JUST AGENT HERNANDEZ; CORRECT?

10:08AM 13   A.   CORRECT.

10:08AM 14   Q.   MR. BOSTIC, THE LAWYER FOR THE GOVERNMENT, CALLED YOU AS

10:08AM 15   WELL; RIGHT?

10:08AM 16   A.   CORRECT.

10:08AM 17   Q.   AND THEY TOLD YOU DO NOT COMMUNICATE WITH US AGAIN; RIGHT?

10:08AM 18   A.   CORRECT.

10:08AM 19   Q.   AND THAT WAS THE THIRD TIME THAT THE GOVERNMENT HAD TOLD

10:08AM 20   YOU DO NOT COMMUNICATE WITH US ABOUT THE TESTIMONY THAT IS

10:08AM 21   ONGOING IN JUDGE DAVILA'S COURT; RIGHT?

10:08AM 22   A.   THIS COMMUNICATION HAS NOTHING TO DO WITH THE TESTIMONY OR

10:08AM 23   THE CASE.

10:08AM 24   Q.   IS IT UP TO YOU WHAT STUFF HAS TO DO WITH WHAT?

10:08AM 25   A.   I'M A SMART GUY.  THIS HAS NOTHING TO DO WITH THE CASE.

10:09AM 1    Q.   DID THEY AGREE WITH YOUR SMART JUDGMENT?

10:09AM 2              MR. BOSTIC:  OBJECTION.

10:09AM 3              THE WITNESS:  I DID THIS ON MY OWN VOLITION.

10:09AM 4              THE COURT:  EXCUSE ME, SIR.  THERE'S AN OBJECTION.

10:09AM 5              MR. BOSTIC:  CALLS FOR SPECULATION.  LACKS

10:09AM 6    FOUNDATION.

10:09AM 7              THE COURT:  OVERRULED.  OVERRULED.

10:09AM 8         BUT I WANT YOU TO ASK ANOTHER QUESTION, PLEASE.

10:09AM 9              MR. DOWNEY:  SURE.  SURE.  ALL RIGHT.

10:09AM 10   Q.   NOW, SIMILARLY, OVER THE WEEKEND YOU GOT A SUBPOENA FROM

10:09AM 11   THE DEFENSE, FROM OUR TEAM; RIGHT?

10:09AM 12   A.   I DID.

10:09AM 13   Q.   AND WE ASKED YOU TO BRING TO COURT TODAY THE ORIGINALS OF

10:09AM 14   EXHIBIT 14, WHICH ARE THE NOTES THAT MR. BOSTIC HAD USED TO

10:09AM 15   REFRESH YOUR TESTIMONY, REFRESH YOUR RECOLLECTION WHEN YOU WERE

10:09AM 16   TESTIFYING ON YOUR DIRECT TESTIMONY.

10:09AM 17        DO YOU RECALL THAT?

10:09AM 18   A.   I DO.

10:09AM 19   Q.   DID YOU BRING THE ORIGINALS OF THOSE NOTES?

10:09AM 20   A.   I DID.

10:09AM 21   Q.   OKAY.  WILL YOU AT THE BREAK PASS THOSE NOTES TO THE

10:09AM 22   COURTROOM DEPUTY SO THAT WE MIGHT HAVE A CHANCE TO INSPECT

10:09AM 23   THEM?

10:09AM 24   A.   IT IS MY ONLY COPY OF MY HANDWRITTEN NOTES.  I WOULD

10:09AM 25   PREFER NOT TO RELEASE THEM.  I HAVE NOT HAD AN OPPORTUNITY TO

10:09AM  1    TALK TO EITHER THE PROSECUTION OR THE JUDGE, WHETHER THAT'S

10:10AM  2    APPROPRIATE, WHAT I'M REQUIRED OR REQUESTED TO DO.

10:10AM  3    Q.   WELL, I GUARANTEE YOU SHE'S A RELIABLE PERSON TO PASS THE

10:10AM  4    DOCUMENT TO.

10:10AM  5         ARE YOU GOING TO COMPLY WITH THAT SUBPOENA?

10:10AM  6    A.   I DON'T UNDERSTAND THE PROCESS.  IF I PASS THEM TO HER, DO

10:10AM  7    I GET THESE NOTES BACK?  DO THEY MAKE COPIES?  I'D LIKE TO KNOW

10:10AM  8    THE PROCESS.

10:10AM  9    Q.   ALL RIGHT.  LET'S GO BACK TO TALKING ABOUT THE

10:10AM  10   COMMUNICATIONS THAT YOU HAD WITH THERANOS AND TO THE SECOND

10:10AM  11   INVESTMENT THAT YOU MADE IN THERANOS IN 2013, OKAY?

10:10AM  12   A.   OKAY.

10:10AM  13   Q.   NOW, IT'S, IT'S FAIR TO SAY THAT YOU HAD A HIGH DEGREE OF

10:10AM  14   FRUSTRATION WITH THERANOS'S LEVEL OF COMMUNICATION WITH YOU IN

10:10AM  15   THE PERIOD BETWEEN 2010 AND 2013; CORRECT?

10:10AM  16   A.   CORRECT.

10:10AM  17   Q.   YOU HAD COMMUNICATED WITH -- YOU HAD SENT EMAILS

10:11AM  18   COMPLAINING ABOUT IT TO TWO MEMBERS OF MANAGEMENT; CORRECT?

10:11AM  19   A.   I'M SORRY, WHO WERE THE TWO MEMBERS OF MANAGEMENT?

10:11AM  20   Q.   WELL, I WAS THINKING OF MS. HOLMES AND MR. BALWANI.

10:11AM  21   CORRECT?

10:11AM  22   A.   I DON'T KNOW IF THEY WERE CRITICISMS, BUT THEY WERE

10:11AM  23   REQUESTS FOR INFORMATION.

10:11AM  24   Q.   IN FACT, NOW THAT I THINK ABOUT IT, YOU SENT IT TO SEVERAL

10:11AM  25   OTHER PEOPLE AT THERANOS AS WELL; CORRECT?

10:11AM 1    A.   NOT TO MY RECOLLECTION.

10:11AM 2    Q.   OKAY.  AND YOU HAD TRIED TO COMMUNICATE WITH -- SENT

10:11AM 3    COMMUNICATIONS TO MR. LUCAS; CORRECT?

10:11AM 4    A.   CORRECT.

10:11AM 5    Q.   AND YOU SENT COMMUNICATIONS TO SENATOR FRIST; CORRECT?

10:11AM 6    A.   I DO RECALL ONE OTHER PERSON AT THERANOS THAT I HAD

10:11AM 7    CONSTANT COMMUNICATION WITH, DANISE YAM, BECAUSE I WAS TRYING

10:11AM 8    TO CONVERT A STOCK CERTIFICATE INTO A DIFFERENT FAMILY NAME,

10:11AM 9    AND IT TOOK WELL OVER A YEAR AND MULTIPLE COMMUNICATIONS JUST

10:11AM 10   TO DO A SIMPLE TRANSACTION, WHICH ALSO RAISED A RED FLAG, WHY

10:11AM 11   CAN'T THEY TRANSFER A STOCK CERTIFICATE?  WHY DOES IT TAKE

10:11AM 12   MULTIPLE EMAILS AND A PERIOD OF WELL OVER A YEAR TO TRANSFER A

10:12AM 13   STOCK CERTIFICATE?

10:12AM 14   Q.   AND DID YOU GET THAT STOCK CERTIFICATE FROM MS. YAM AND

10:12AM 15   COMPLETE THAT TRANSACTION?

10:12AM 16   A.   EVENTUALLY.  I DON'T KNOW IF IT WAS DANISE OR SOMEONE ELSE

10:12AM 17   BECAUSE IT WAS KIND OF A REVOLVING DOOR OF PERSONNEL AT

10:12AM 18   THERANOS, BUT MY RECOLLECTION IS THAT I DID GET IT AND IT WAS

10:12AM 19   WELL OVER A YEAR AFTER I MADE THE REQUEST.

10:12AM 20   Q.   WELL, DANISE YAM WORKED AT THERANOS FOR ABOUT 13 YEARS,

10:12AM 21   DIDN'T SHE?

10:12AM 22   A.   I DON'T KNOW.

10:12AM 23   Q.   AND YOU COMMUNICATED WITH HER THROUGHOUT THAT PERIOD,

10:12AM 24   DIDN'T YOU?

10:12AM 25   A.   MY ONLY COMMUNICATION WAS ABOUT THE STOCK CERTIFICATES.

10:12AM  1    SO THERE WERE MULTIPLE COMMUNICATIONS WHERE THERE SHOULD HAVE

10:12AM  2    BEEN ONE.

10:12AM  3    Q.   OKAY.  BUT WHATEVER THE NUMBER OF COMMUNICATIONS WAS, YOU

10:12AM  4    WERE VERY FRUSTRATED WITH DEALING WITH THERANOS; IS THAT FAIR

10:12AM  5    TO SAY?

10:12AM  6    A.   THAT'S FAIR TO SAY.

10:12AM  7    Q.   OKAY.  AND THEN IN DECEMBER OF 2013, LO AND BEHOLD,

10:12AM  8    ANOTHER OPPORTUNITY AROSE FOR YOU TO INVEST IN THERANOS;

10:12AM  9    CORRECT?

10:12AM  10   A.   CORRECT.

10:12AM  11   Q.   NOW, DO YOU ACKNOWLEDGE THAT IN CONNECTION WITH THAT 2013

10:12AM  12   INVESTMENT, YOU NEVER SPOKE TO MS. HOLMES?  IS THAT FAIR?

10:12AM  13   A.   THERE WERE SOME CONVERSATIONS BEFORE WE MADE THE 2013

10:12AM  14   INVESTMENT RATIFYING THAT THE TECHNOLOGY WORKED AND THIS WAS

10:13AM  15   GROWTH CAPITAL.  THE RISK HAD BEEN TAKEN OUT OF THE COMPANY.

10:13AM  16   Q.   YOU DID NOT SPEAK TO MS. HOLMES BEFORE YOU MADE YOUR 2013

10:13AM  17   INVESTMENT IN THERANOS.

10:13AM  18       IS THAT TRUE OR FALSE?

10:13AM  19   A.   MY RECOLLECTION IS I TALKED TO SUNNY BALWANI.  I'D HAVE TO

10:13AM  20   REVIEW MY NOTES.  I DON'T RECALL IF I TALKED TO ELIZABETH.

10:13AM  21   Q.   OKAY.  YOU DON'T RECALL, AS YOU SIT HERE TODAY, SPEAKING

10:13AM  22   TO MS. HOLMES ABOUT YOUR 2013 INVESTMENT; RIGHT?

10:13AM  23   A.   THAT'S CORRECT.

10:13AM  24   Q.   OKAY.  YOU DO RECALL SPEAKING TO MR. BALWANI; CORRECT?

10:13AM  25   A.   YES, I DO.

10:13AM  1    Q.   AND YOU KNOW THAT AT SOME POINT AFTER THE SERIES OF 2010

10:13AM  2    EXCHANGES WITH MS. HOLMES THAT SHE ACTUALLY HAD CEASED

10:13AM  3    COMMUNICATING WITH YOU DIRECTLY; CORRECT?

10:13AM  4    A.   I DON'T RECALL WHEN THE COMMUNICATIONS CEASED.

10:13AM  5    Q.   OKAY.  BUT YOU RECALL THAT THEY CEASED AT SOME POINT?

10:13AM  6    A.   IT'S A LITTLE CONFUSING BECAUSE THERE WERE SOME

10:14AM  7    COMMUNICATIONS AFTER 2013.  THERE WERE SOME CALLS AND SOME

10:14AM  8    COMMUNICATIONS.

10:14AM  9    Q.   YOU CAN'T PRECISELY DATE WHEN SHE --

10:14AM  10   A.   NO, I CANNOT.

10:14AM  11   Q.   OKAY.  NOW, I THINK YOU TESTIFIED DURING YOUR DIRECT

10:14AM  12   EXAMINATION THAT MR. BALWANI PROVIDED YOU SOME COMMUNICATIONS

10:14AM  13   WHEN HE SPOKE TO YOU THAT ENCOURAGED YOU TO INVEST IN THERANOS

10:14AM  14   IN 2013.

10:14AM  15        IS THAT FAIR TO SAY, OR IS --

10:14AM  16   A.   YES.

10:14AM  17   Q.   OKAY.  BUT IS IT ALSO FAIR TO SAY THAT DURING -- WELL, LET

10:14AM  18   ME ASK YOU, WAS -- THE COMMUNICATION WITH MR. BALWANI WAS ON

10:14AM  19   THE TELEPHONE; CORRECT?

10:14AM  20   A.   CORRECT.

10:14AM  21   Q.   DID YOU HAVE ANY PERSON-TO-PERSON MEETING WITH MR. BALWANI

10:14AM  22   IN THAT WINDOW?

10:14AM  23   A.   NO.

10:14AM  24   Q.   OKAY.  AND IS IT FAIR TO SAY THAT YOU HAD A COUPLE CALLS

10:14AM  25   WITH HIM?

10:14AM 1    A.   I DON'T RECALL THE NUMBER OF CALLS.

10:14AM 2    Q.   OKAY.  BUT IN ANY EVENT, WHATEVER THE NUMBER OF CALLS WAS,

10:14AM 3    HE DID NOT DURING THOSE CALLS DESCRIBE THERANOS'S ACTIVITIES AT

10:15AM 4    ALL, DID HE?

10:15AM 5    A.   HE CONFIRMED THAT THE TECHNOLOGY WORKED BECAUSE THAT'S THE

10:15AM 6    QUESTION THAT I ASKED.

10:15AM 7    Q.   HE DID NOT DESCRIBE THERANOS'S ACTIVITIES AT ALL DURING

10:15AM 8    THAT CALL IN 2013 -- THOSE CALLS IN 2013?

10:15AM 9    A.   I DON'T UNDERSTAND WHAT YOU MEAN "DESCRIBE THERANOS'S

10:15AM 10   ACTIVITIES AT ALL."

10:15AM 11   Q.   OKAY.  WELL, DO YOU RECALL TELLING THAT TO AGENTS OF THE

10:15AM 12   FBI IN 2018?

10:15AM 13   A.   DO YOU HAVE AN EXHIBIT THAT YOU CAN SHOW ME TO REFRESH MY

10:15AM 14   RECOLLECTION?

10:15AM 15   Q.   I DO.  WELL, I CAN TRY TO REFRESH YOUR RECOLLECTION.

10:16AM 16        (HANDING.)

10:16AM 17        I THINK THIS IS, YOUR HONOR, IN OUR NOTEBOOKS.

10:16AM 18             THE COURT:  GREAT.  OKAY.

10:16AM 19             MR. BOSTIC:  I'M SORRY, YOUR HONOR.

10:16AM 20        CAN I KNOW WHAT EXHIBIT NUMBER?

10:16AM 21             MR. DOWNEY:  YES.  IT'S 11014.  IT SHOULD BE 11014.

10:16AM 22        DO YOU HAVE THAT?

10:16AM 23             THE COURT:  IT'S IN THE BINDER.

10:17AM 24             MR. DOWNEY:  DO YOU HAVE THAT?

10:17AM 25             MR. BOSTIC:  YES.

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 10:17AM  | 1  | BY MR. DOWNEY:                                                |
| 10:17AM  | 2  | Q.   I DON'T WANT YOU TO DESCRIBE WHAT IT IS THAT YOU'RE      |
| 10:17AM  | 3  | LOOKING AT AT ALL.                                            |
| 10:17AM  | 4  | A.   OKAY.                                                    |
| 10:17AM  | 5  | Q.   I'M JUST ASKING YOU -- I'D LIKE TO DIRECT YOUR ATTENTION |
| 10:17AM  | 6  | TO PAGE 4 OF THE EXHIBIT AND TO REVIEW THE PARAGRAPH THAT     |
| 10:17AM  | 7  | BEGINS "BALWANI DID NOT."                                     |
| 10:17AM  | 8  | DO YOU SEE THAT?                                              |
| 10:17AM  | 9  | A.   YES.                                                     |
| 10:17AM  | 10 | Q.   PAGE 4.                                                  |
| 10:17AM  | 11 | DOES THAT REFRESH YOUR RECOLLECTION THAT MR. BALWANI DID      |
| 10:17AM  | 12 | NOT DESCRIBE THERANOS'S ACTIVITIES DURING HIS CALLS WITH YOU IN |
| 10:17AM  | 13 | 2013?                                                         |
| 10:18AM  | 14 | (PAUSE IN PROCEEDINGS.)                                       |
| 10:18AM  | 15 | THE WITNESS:  OKAY.  WHAT IS THE QUESTION?                    |
| 10:18AM  | 16 | BY MR. DOWNEY:                                                |
| 10:18AM  | 17 | Q.   DOES YOUR REVIEW OF EXHIBIT 11014 REFRESH YOUR          |
| 10:18AM  | 18 | RECOLLECTION THAT MR. BALWANI DID NOT DESCRIBE THERANOS'S     |
| 10:18AM  | 19 | ACTIVITIES DURING YOUR CALLS WITH HIM IN 2013?               |
| 10:18AM  | 20 | A.   THE PLAIN READING OF THIS --                            |
| 10:18AM  | 21 | Q.   I DON'T WANT YOU TO DESCRIBE THE DOCUMENT.  I -- THAT'S  |
| 10:18AM  | 22 | IMPORTANT THAT YOU NOT DO THAT.                              |
| 10:18AM  | 23 | A.   I'M NOT GOING TO DESCRIBE THE DOCUMENT.                 |
| 10:18AM  | 24 | THE PLAIN READING OF THIS IMPLIES THAT I DID NOT DISCUSS      |
| 10:18AM  | 25 | THE MOST SUBSTANTIVE QUESTION WITH SUNNY AT THE TIME, AND I   |

10:19AM 1   DON'T HAVE A CRYSTAL CLEAR RECOLLECTION, BUT KNOWING THE KIND

10:19AM 2   OF INVESTOR I AM AND THE QUESTIONS I ASK, I MOST LIKELY ASKED

10:19AM 3   HIM IF THE TECHNOLOGY WORKED.

10:19AM 4   Q.   WELL, I DON'T WANT TO YOU SPECULATE, MR. EISENMAN.

10:19AM 5   A.   I'M NOT GOING TO SPECULATE.  BUT IT SAYS HERE THAT HE

10:19AM 6   REFERRED ME TO, HE REFERRED ME --

10:19AM 7           THE COURT:  EXCUSE ME.  YOU'RE NOT TO READ THE

10:19AM 8   DOCUMENT.

10:19AM 9           THE WITNESS:  OH, OKAY.

10:19AM 10          THE COURT:  THIS IS JUST FOR YOUR RECOLLECTION.

10:19AM 11          MR. DOWNEY:  OKAY.

10:19AM 12  Q.   LET ME TRY TO ASK A QUESTION AND GET REORIENTED HERE.

10:19AM 13          THE COURT:  LET'S RESET.

10:19AM 14          THE WITNESS:  ALL RIGHT.

10:19AM 15          THE COURT:  AND IT GOES BY QUESTION AND ANSWER.

10:19AM 16          THE WITNESS:  OKAY.

10:19AM 17          THE COURT:  AND THE LAWYERS GET TO ASK THE QUESTIONS

10:19AM 18  AND IT'S YOUR PRIVILEGE TO ANSWER THEM.

10:19AM 19          THE WITNESS:  OKAY.

10:19AM 20          THE COURT:  SO, MR. DOWNEY, WHY DON'T YOU ASK YOUR

10:19AM 21  QUESTION.

10:19AM 22  BY MR. DOWNEY:

10:19AM 23  Q.   OKAY.  YOU UNDERSTAND I'VE PUT AN EXHIBIT IN FRONT OF YOU;

10:19AM 24  CORRECT?

10:19AM 25  A.   CORRECT.

10:19AM  1    Q.   AND ALL I WANT TO KNOW IN CONNECTION WITH THE EXHIBIT THAT

10:19AM  2    I'M SHOWING YOU IS WHETHER IT REFRESHES YOUR RECOLLECTION OF A

10:19AM  3    FACT THAT I AM STATING.  OKAY?

10:20AM  4         DO YOU UNDERSTAND THAT?

10:20AM  5    A.   WHAT'S THE FACT THAT YOU'RE STATING?

10:20AM  6    Q.   I HAVEN'T STATED IT YET.

10:20AM  7    A.   OH, OKAY.

10:20AM  8    Q.   I'M JUST DESCRIBING THE PROCESS SO THAT WE ENGAGE SENSIBLY

10:20AM  9    IN A QUESTION AND ANSWER.  OKAY?

10:20AM  10   A.   OKAY.

10:20AM  11   Q.   DON'T -- I'M NOT GOING TO ASK YOU WHAT THE DOCUMENT SAYS

10:20AM  12   OR WHAT OTHER THINGS IT MAKES YOU REFLECT ON.  OKAY?

10:20AM  13        DOES EXHIBIT 11014 REFRESH YOUR RECOLLECTION THAT

10:20AM  14   MR. BALWANI DID NOT DESCRIBE THERANOS'S ACTIVITIES DURING HIS

10:20AM  15   CALLS WITH YOU REGARDING THE INVESTMENT IN 2013?

10:20AM  16   A.   NOT EXACTLY.

10:20AM  17   Q.   OKAY.  IS IT TRUE THAT YOU DID NOT TRY TO ASK MR. BALWANI

10:20AM  18   QUESTIONS ABOUT THERANOS DURING THAT CALL?

10:20AM  19   A.   PROBABLY NOT TRUE, BUT I DON'T HAVE A CRYSTAL

10:20AM  20   RECOLLECTION.

10:20AM  21   Q.   OKAY.  YOU DON'T HAVE A -- YOU DON'T RECALL RIGHT NOW

10:20AM  22   ASKING HIM QUESTIONS --

10:20AM  23   A.   I JUST KNOW --

10:20AM  24   Q.   -- IN THAT CALL?

10:20AM  25   A.   I JUST KNOW FROM THE WAY THAT I CONDUCT MY BUSINESS, THAT

10:21AM 1    BEFORE I MAKE AN INVESTMENT, I ASK THE PERTINENT QUESTIONS, AND

10:21AM 2    THE PERTINENT QUESTION IS, DOES THE TECHNOLOGY WORK?

10:21AM 3            MR. DOWNEY:  WELL, YOUR HONOR, I'M SORRY TO DO THIS,

10:21AM 4    BUT I HAVE TO CONTINUE TO MOVE TO STRIKE ON THESE ANSWERS.  I'M

10:21AM 5    ASKING HIM IF HE RECALLS ASKING QUESTIONS.

10:21AM 6    Q.  DO YOU ACTUALLY RECALL THAT, OR DO YOU NOT KNOW ONE WAY OR

10:21AM 7    THE OTHER?

10:21AM 8    A.  I DON'T RECALL.

10:21AM 9    Q.  OKAY.  NOW, IS IT TRUE THAT AT THE TIME THAT YOU HAD THIS

10:21AM 10   CONVERSATION WITH MR. BALWANI, YOUR RELATIONSHIP WITH HIM HAD

10:21AM 11   BEEN VERY HOSTILE FOR A NUMBER OF YEARS?

10:21AM 12       IS THAT FAIR?

10:21AM 13   A.  THAT'S FAIR.

10:21AM 14   Q.  YOU HAD FREQUENTLY SENT EMAILS OR CALLED THE COMPANY;

10:21AM 15   CORRECT?

10:21AM 16   A.  CORRECT.

10:21AM 17   Q.  AND HE HAD RESPONDED TO THOSE EMAILS, OR IN RESPONSE TO

10:21AM 18   YOUR CALLS, SENT YOU EMAILS; CORRECT?

10:21AM 19   A.  HE HAD RESPONDED FICTITIOUSLY, SO HIS CREDIBILITY WAS LOW.

10:21AM 20   Q.  WELL, I'M JUST ASKING YOU IF HE RESPONDED.  THAT'S ALL THE

10:21AM 21   QUESTION THAT'S ON THE TABLE RIGHT NOW.  HE RESPONDED --

10:22AM 22   A.  THE ONE ISSUE THAT HE RESPONDED TO WAS FICTITIOUS.

10:22AM 23   Q.  WELL, DID HE RESPOND OR DID HE NOT RESPOND?

10:22AM 24   A.  TO WHAT?

10:22AM 25   Q.  TO THE EMAILS THAT YOU WERE SENDING TO THE COMPANY.

10:22AM 1    A.   UM --

10:22AM 2    Q.   DID YOU SEND HIM AN EMAIL AND THEN HE HIT A REPLY AND SENT

10:22AM 3    AN EMAIL BACK TO YOU?

10:22AM 4    A.   FOR THE MOST PART THEY WERE IGNORED OR HE THREATENED THAT

10:22AM 5    THE NEXT EMAIL WOULD COME FROM COUNSEL.

10:22AM 6    Q.   EXACTLY.  SO HE HAD EITHER IGNORED YOU; CORRECT?

10:22AM 7    A.   IGNORED OR INTIMIDATED ME.

10:22AM 8    Q.   OR HE WAS HOSTILE TOWARD YOU; CORRECT?

10:22AM 9    A.   CORRECT.

10:22AM 10   Q.   NOW, YOU HAD GOTTEN THIS ANNOUNCEMENT FROM THERANOS THAT

10:22AM 11   YOU COULD INVEST AGAIN WITH THIS COMPANY WHERE THE CHIEF

10:22AM 12   OPERATING OFFICER WAS THREATENING YOU AND HOSTILE TO YOU.

10:22AM 13        IS THAT FAIR TO SAY?

10:22AM 14   A.   I'M NOT INVESTING BASED ON A PERSON.  I'M INVESTING BASED

10:22AM 15   ON THE PROGRESS OF A COMPANY.

10:22AM 16   Q.   WELL, YOU WERE -- YOU WERE NEVERTHELESS -- WOULD YOU AGREE

10:22AM 17   WITH ME THAT YOU HAD GOTTEN THIS COMMUNICATION OFFERING YOU THE

10:22AM 18   OPPORTUNITY TO INVEST AGAIN?

10:22AM 19        IS THAT FAIR?  I THINK THAT'S A YES OR NO QUESTION.

10:23AM 20   A.   I WAS GIVEN THE OPPORTUNITY TO INVEST AGAIN, THAT'S

10:23AM 21   CORRECT.

10:23AM 22   Q.   OKAY.  AND YOU ENDED UP, IN CONNECTION WITH THAT

10:23AM 23   INVESTMENT, SPEAKING WITH MR. BALWANI; CORRECT?

10:23AM 24   A.   CORRECT.

10:23AM 25   Q.   AND DURING THAT CONVERSATION, WHAT MR. BALWANI DID TELL

10:23AM  1    YOU IS, YOU KNOW, YOU CAN LOOK AT THE INFORMATION THAT IS

10:23AM  2    AVAILABLE TO EVERYBODY ELSE; CORRECT?

10:23AM  3    A.   HE SAID LOOK AT THE -- YES, THE PUBLIC INFORMATION.

10:23AM  4    Q.   RIGHT.  AND ALSO IN CONNECTION WITH OFFERING YOU THE

10:23AM  5    OPPORTUNITY TO INVEST IN THERANOS, THEY ACTUALLY SENT A LONG

10:23AM  6    COMMUNICATION TO YOU AND TO ALL OTHER SHAREHOLDERS WHO WERE

10:23AM  7    BEING OFFERED THE SAME OPPORTUNITY TO INVEST; CORRECT?

10:23AM  8    A.   CORRECT.

10:23AM  9    Q.   AND YOU READ THAT COMMUNICATION PRESUMABLY; RIGHT?

10:23AM  10   A.   CORRECT.

10:23AM  11   Q.   NOW, DO YOU, DO YOU DENY THAT MR. BALWANI DISCOURAGED YOU

10:23AM  12   FROM INVESTING AT THAT TIME?

10:23AM  13   A.   NO.  HE WAS ENCOURAGING.

10:24AM  14   Q.   OKAY.  LET ME ASK YOU TO LOOK AT EXHIBIT 12999.

10:24AM  15   A.   OKAY.

10:24AM  16   Q.   AND I, I WOULD JUST ASK YOU, IS THIS A SERIES OF

10:24AM  17   COMMUNICATIONS BETWEEN YOU AND MS. HOLMES WITH ONE OF THEM

10:24AM  18   INVOLVING -- SORRY.  A SERIES OF COMMUNICATIONS BETWEEN YOU AND

10:24AM  19   MR. BALWANI THAT ARE THEN SEEMINGLY FORWARDED TO MS. HOLMES?

10:25AM  20   IF YOU WOULD JUST LOOK AT THE TOP EMAIL AT THE BOTTOM -- THE

10:25AM  21   TOP EMAIL ON THE TOP OF PAGE 1.

10:25AM  22   A.   OKAY.

10:25AM  23   Q.   DO YOU RECOGNIZE THESE AS DISCUSSING YOUR INVESTMENT IN

10:25AM  24   THERANOS?

10:25AM  25   A.   YES.

| | | |
|---|---|---|
| 10:25AM | 1 | MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT |
| 10:25AM | 2 | EXHIBIT 12999. |
| 10:25AM | 3 | MR. BOSTIC:  NO OBJECTION. |
| 10:25AM | 4 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 10:25AM | 5 | (DEFENDANT'S EXHIBIT 12999 WAS RECEIVED IN EVIDENCE.) |
| 10:25AM | 6 | BY MR. DOWNEY: |
| 10:25AM | 7 | Q.  IF YOU GO TO THE BOTTOM EMAIL ON PAGE 2, THERE'S AN EMAIL |
| 10:25AM | 8 | FROM YOU TO MS. HOLMES AND TO MR. BALWANI, AND YOU SAY TO THEM |
| 10:26AM | 9 | THAT "THIS IS THE SECOND GOOGLE ALERT I HAVE RECEIVED RECENTLY |
| 10:26AM | 10 | THAT CLAIMS THAT THERANOS COULD BECOME OBSOLETE.  CAN WE HAVE A |
| 10:26AM | 11 | BRIEF CATCH UP CALL THIS WEEK?  PLEASE DON'T IGNORE THIS |
| 10:26AM | 12 | REQUEST." |
| 10:26AM | 13 | DO YOU SEE THAT? |
| 10:26AM | 14 | A.  YES. |
| 10:26AM | 15 | Q.  AND THEN ABOVE THAT MR. BALWANI RESPONDED; RIGHT? |
| 10:26AM | 16 | DO YOU SEE THAT, MR. BALWANI'S RESPONSE? |
| 10:26AM | 17 | A.  YES. |
| 10:26AM | 18 | Q.  AND HE TOLD YOU THAT HE THOUGHT THE EMAILS WERE BEYOND |
| 10:26AM | 19 | RIDICULOUS; RIGHT? |
| 10:26AM | 20 | A.  RIGHT. |
| 10:26AM | 21 | Q.  AND THAT THERANOS COULD BECOME OBSOLETE; CORRECT? |
| 10:26AM | 22 | A.  JUST A POINT OF INFORMATION.  THIS IS 2015 AND THE SECOND |
| 10:26AM | 23 | ROUND WAS 2013; CORRECT? |
| 10:26AM | 24 | Q.  NO, NO.  I UNDERSTAND THAT.  WE'RE GOING TO GET TO THAT IN |
| 10:26AM | 25 | A MOMENT. |

10:26AM   1          BUT HE TOLD YOU IN THIS EMAIL THAT THERANOS COULD BECOME

10:26AM   2    OBSOLETE; CORRECT?

10:26AM   3    A.   I JUST WANT TO MAKE SURE THAT I'VE GOT THE TIMELINE,

10:27AM   4    BECAUSE THIS IS TWO YEARS AFTER WE MADE THE SECOND INVESTMENT

10:27AM   5    AND THERE WAS ALL KINDS OF PUBLIC INFORMATION AND AN

10:27AM   6    ACKNOWLEDGEMENT FROM THE COMPANY THAT THE TECHNOLOGY WORKED.

10:27AM   7    Q.   WELL, DO YOU RECALL THAT YOUR SECOND INVESTMENT, YOUR 2013

10:27AM   8    INVESTMENT WAS AT THE END OF 2013, IN DECEMBER OF 2013?  DO YOU

10:27AM   9    RECALL THAT FROM YOUR TESTIMONY?

10:27AM  10    A.   YES.

10:27AM  11    Q.   AND YOU SEE THAT THIS EMAIL IS FROM JANUARY OF 2015;

10:27AM  12    CORRECT?

10:27AM  13    A.   CORRECT.

10:27AM  14    Q.   SO THIS IS ABOUT, YOU KNOW, A LITTLE OVER 12 MONTHS AFTER

10:27AM  15    YOU'VE MADE THAT INVESTMENT; CORRECT?

10:27AM  16    A.   CORRECT.

10:27AM  17    Q.   AND IF YOU LOOK AT THE SECOND PARAGRAPH HERE, DO YOU SEE

10:27AM  18    MR. BALWANI REFERRED BACK TO THE CONVERSATIONS THAT YOU HAD HAD

10:27AM  19    IN CONNECTION WITH THAT INVESTMENT?

10:27AM  20          DO YOU SEE THAT?

10:27AM  21    A.   YES.

10:27AM  22    Q.   AND HE SAYS, "YOU CONTINUE TO BOMBARD US WITH EMAILS AND

10:27AM  23    PHONE CALLS EVEN THOUGH JUST 12 SHORT MONTHS AGO I SPOKE WITH

10:27AM  24    YOU IN DETAIL THAT YOU WILL NOT GET ANY UPDATES."

10:28AM  25          DO YOU SEE THAT?

10:28AM 1    A.   YES.

10:28AM 2    Q.   AND DO YOU RECALL HIM, AT THE END OF 2013, TELLING YOU YOU

10:28AM 3    WOULD NOT GET ANY UPDATES BEFORE YOU MADE THE DECISION TO

10:28AM 4    INVEST IN THERANOS?

10:28AM 5    A.   I DON'T RECALL HIM SAYING THAT I WOULD NOT GET ANY

10:28AM 6    PROSPECTIVE UPDATES AFTER MY SECOND INVESTMENT.

10:28AM 7    Q.   OKAY.  AND THEN HE GOES ON TO SAY THAT YOU SHOULDN'T

10:28AM 8    INVEST.

10:28AM 9        DO YOU SEE THAT?

10:28AM 10   A.   I THINK IT'S TOO LATE.  WE ALREADY INVESTED.  WE'RE NOT

10:28AM 11   GOING TO INVEST AGAIN.

10:28AM 12   Q.   WELL, HE'S REFERRING BACK TO A CONVERSATION THAT HE HAD

10:28AM 13   WITH YOU IN DECEMBER OF 2013.

10:28AM 14       I'M ASKING IF YOU RECALL HIM TELLING YOU IN THAT

10:28AM 15   DECEMBER 2013 CONVERSATION THAT YOU SHOULDN'T INVEST?

10:28AM 16   A.   CAN YOU SHOW ME AN EXHIBIT TO REFRESH MY MEMORY?

10:28AM 17   Q.   I AM SHOWING YOU AN EXHIBIT.  I AM ASKING YOU IF WHAT HE

10:28AM 18   TOLD YOU IN THIS EXHIBIT IS SOMETHING THAT YOU RECALL HAPPENING

10:28AM 19   OR THAT YOU DON'T RECALL HAPPENING?

10:28AM 20   A.   WELL, THIS IS REFERRING TO SOMETHING IN 2013, AND UNLESS

10:29AM 21   YOU SHOW ME AN EXHIBIT FROM 2013, I DON'T RECALL.

10:29AM 22   Q.   OKAY.  AND THAT HE ALSO GOES ON TO SAY THAT HE TOLD YOU 12

10:29AM 23   SHORT MONTHS AGO THAT MANAGEMENT WOULD NOT BE SPENDING ANY TIME

10:29AM 24   WITH YOU OR PROVIDING UPDATES OR RESPONDING TO EMAILS ABOUT

10:29AM 25   OPERATION STRATEGY AND DETAILS.

10:29AM   1              DO YOU SEE THAT?

10:29AM   2       A.   YEAH.  THAT'S A LIE.

10:29AM   3       Q.   YOU DON'T RECALL HIM TELLING YOU THAT?

10:29AM   4       A.   NO, HE DID NOT TELL ME THAT.

10:29AM   5       Q.   OKAY.

10:29AM   6       A.   AND HE WOULDN'T TELL ME THAT.  THAT'S RIDICULOUS.  SORRY.

10:29AM   7       Q.   AND YOU SEE ABOVE AT THE VERY TOP OF 12999 THAT HE

10:29AM   8       FORWARDED THIS EMAIL ON TO MS. HOLMES.

10:29AM   9              DO YOU SEE THAT?

10:29AM   10      A.   I DO.

10:29AM   11      Q.   OKAY.  AND JUST BELOW WHERE HE FORWARDED IT, HE SAID,

10:29AM   12      "SUNNY,

10:29AM   13           "IT WASN'T A FIRM COMMITMENT, ONLY A COURTESY."

10:29AM   14           AND THEN YOU CONTINUE TO ASK FOR UPDATES AND SAY THAT

10:30AM   15      YOU'VE BEEN PATIENT.

10:30AM   16              DO YOU SEE THAT?

10:30AM   17      A.   YES.

10:30AM   18      Q.   DID YOU DISPUTE ANY OF THE OTHER THINGS THAT HE SAID IN

10:30AM   19      THE EMAIL?  DID YOU DISPUTE THAT HE TOLD YOU THAT YOU SHOULDN'T

10:30AM   20      INVEST?

10:30AM   21      A.   AGAIN, YOU'RE GOING TO HAVE TO SHOW ME AN EXHIBIT THAT HE

10:30AM   22      INDICATED THAT I SHOULDN'T INVEST.  I DON'T RECALL.

10:30AM   23      Q.   WELL, LET'S FOCUS ON EXHIBIT 12999.  THAT'S THE EXHIBIT

10:30AM   24      THAT WE'RE LOOKING AT.

10:30AM   25      A.   THIS IS FROM 2015, AND YOU'RE ASKING ME ABOUT SOMETHING

10:30AM   1    THAT HAPPENED IN 2013.

10:30AM   2    Q.   I'M ASKING YOU, MR. EISENMAN, IF IN THIS EMAIL YOU

10:30AM   3    DISPUTED THE PRIOR EMAIL WHERE MR. BALWANI TOLD YOU THAT HE HAD

10:30AM   4    DISCOURAGED YOU FROM INVESTING IN 2013?

10:30AM   5    A.   WELL, AGAIN, I DON'T RECALL HIM DISCOURAGING ME.  IF YOU

10:30AM   6    SHOW ME AN EXHIBIT, IT MIGHT REFRESH MY MEMORY.

10:30AM   7    Q.   IS THERE ANY RESPONSE IN THE EMAIL CHAIN WHERE HE MADE

10:30AM   8    THAT STATEMENT TO YOU WHERE YOU SAY, THAT'S NOT TRUE, YOU

10:30AM   9    DIDN'T DISCOURAGE ME FROM INVESTING, IN SUBSTANCE?

10:30AM  10    A.   I CAN'T ANSWER THE QUESTION BECAUSE YOU'RE ASKING ME

10:31AM  11    SOMETHING THAT I DON'T RECALL UNLESS YOU SHOW ME AN EXHIBIT.

10:31AM  12    Q.   WELL, LOOK AT EXHIBIT 12999 AND SEE IF YOU SEE ANYTHING IN

10:31AM  13    THERE WHERE YOU DISPUTE THAT MR. BALWANI --

10:31AM  14    A.   DO YOU WANT ME TO JUST LOOK AT THE MONITOR OR LOOK AT THE

10:31AM  15    WHOLE CHAIN?

10:31AM  16    Q.   YOU CAN LOOK AT THE WHOLE CHAIN.  WHATEVER YOU FEEL MORE

10:31AM  17    COMFORTABLE WITH.

10:31AM  18    A.   OKAY.  PLEASE REPEAT THE QUESTION.

10:31AM  19    Q.   DID YOU SEE ANYTHING IN EXHIBIT 12999 IN WHICH YOU

10:31AM  20    DISPUTED MR. BALWANI'S STATEMENT THAT HE HAD DISCOURAGED YOU

10:31AM  21    FROM INVESTING IN 2013?

10:31AM  22    A.   I DON'T SEE ANYTHING IN THIS EXHIBIT WHERE HE DISCOURAGES

10:31AM  23    ME FROM INVESTING.  CAN YOU POINT TO THE LANGUAGE?

10:32AM  24    Q.   AND IS IT FAIR TO SAY, MR. EISENMAN, THAT YOU DID NOT

10:32AM  25    RESPOND TO OR DISPUTE AT ALL -- WHEN MR. BALWANI MADE THAT

10:32AM   1      STATEMENT TO YOU, YOU DID NOT DISPUTE HIS STATEMENT THAT HE HAD

10:32AM   2      DISCOURAGED YOU FROM INVESTING --

10:32AM   3      A.   CAN YOU SHOW ME THE STATEMENT WHERE HE DISCOURAGED ME FROM

10:32AM   4      INVESTING?  MAYBE I'M NOT SEEING IT.  IS IT ON THIS EXHIBIT?

10:32AM   5      Q.   I THINK, MR. EISENMAN, I THINK YOU'RE HAVING TROUBLE

10:32AM   6      FOLLOWING ME.

10:32AM   7           LET ME SHOW YOU AGAIN THE EMAIL AT THE MIDDLE OF PAGE 2,

10:32AM   8      WHICH IS AN EMAIL FROM MR. BALWANI TO YOU AT -- ON JANUARY 21ST

10:32AM   9      AT 9:18 A.M.

10:32AM   10          DO YOU SEE THAT?

10:32AM   11     A.   YES.

10:32AM   12     Q.   LET'S LOOK AT THE SECOND PARAGRAPH, WHICH WE LOOKED AT

10:32AM   13     BEFORE, AND IN THE SECOND PARAGRAPH DO YOU SEE THAT MR. BALWANI

10:32AM   14     BEGINS BY SAYING, "YOU CONTINUE TO BOMBARD US WITH EMAILS AND

10:32AM   15     PHONE CALLS"?

10:33AM   16          DO YOU SEE THAT?

10:33AM   17     A.   YES.

10:33AM   18     Q.   AND THEN HE GOES ON TO SAY, "EVEN THOUGH JUST 12 SHORT

10:33AM   19     MONTHS AGO."

10:33AM   20          DO YOU SEE THAT?

10:33AM   21     A.   YES, I DO.  YEAH, THIS IS A DISCONNECT BECAUSE HE NEVER

10:33AM   22     DISCOURAGED ME FROM INVESTING.  THIS IMPLIES THAT HE

10:33AM   23     DISCOURAGED ME, AND UNLESS YOU CAN SHOW ME SOMETHING FROM 2013

10:33AM   24     TO REFRESH MY RECOLLECTION, I DON'T HAVE ANY RECOLLECTION.

10:33AM   25          I THINK HE WAS MOST ENCOURAGING AT THE TIME, NOT

10:33AM   1      DISCOURAGING.

10:33AM   2                  MR. DOWNEY:  YOUR HONOR, I MOVE TO STRIKE EVERYTHING

10:33AM   3      AFTER THE FIRST PHRASE, IF I MIGHT?

10:33AM   4                  THE COURT:  GIVE ME JUST A MOMENT, PLEASE.

10:33AM   5             (PAUSE IN PROCEEDINGS.)

10:33AM   6                  THE COURT:  THE QUESTION WAS, "AND THEN HE GOES ON

10:33AM   7      TO SAY 'EVEN THOUGH JUST 12 MONTHS AGO.'  DO YOU SEE THAT?

10:33AM   8             "YES, I DO."

10:33AM   9             EVERYTHING AFTER "YES, I DO" IS STRICKEN.

10:34AM  10      BY MR. DOWNEY:

10:34AM  11      Q.   LET ME TRY TO SET THE TABLE SO THAT YOU'RE NOT DEPRIVED OF

10:34AM  12      SAYING SOMETHING THAT YOU WANT TO SAY.

10:34AM  13             I UNDERSTAND THAT YOUR TESTIMONY TODAY IS THAT MR. BALWANI

10:34AM  14      DID NOT DISCOURAGE YOU FROM INVESTING.  RIGHT?

10:34AM  15      A.   IN 2013, NO, HE DID NOT DISCOURAGE ME.

10:34AM  16      Q.   OKAY.  I'M ASKING YOU ABOUT WHAT HAPPENED DURING THE

10:34AM  17      PERIOD WHEN YOU WERE AN INVESTOR IN THERANOS.  OKAY?

10:34AM  18      A.   2015?

10:34AM  19      Q.   YEAH.

10:34AM  20      A.   OKAY.

10:34AM  21      Q.   AND IN 2015, MR. BALWANI SENT YOU THIS EMAIL; CORRECT?

10:34AM  22      A.   CORRECT.

10:34AM  23      Q.   AND MY QUESTION TO YOU IS THAT, DID YOU RESPOND TO THIS

10:34AM  24      EMAIL BY SAYING, THAT'S NOT TRUE, YOU DIDN'T DISCOURAGE ME FROM

10:34AM  25      INVESTING?

10:34AM 1    A.   ARE YOU ASKING ME TO READ THE EXHIBIT AND THAT'S WHAT I

10:34AM 2    RESPONDED?

10:34AM 3    Q.   I'M ASKING YOU IF YOU SEE ANY DISPUTE WITH MR. BALWANI'S

10:34AM 4    CHARACTERIZATION OF WHAT HAPPENED.

10:34AM 5    A.   OH, YEAH, THIS IS A MISCHARACTERIZATION.  THAT'S WHAT

10:34AM 6    YOU'RE ASKING ME.

10:34AM 7    Q.   OKAY.  AND YOU DID NOT DISPUTE IT AT THE TIME.  IS THAT

10:34AM 8    WHAT YOU'RE TRYING TO AVOID SAYING?

10:34AM 9    A.   I DID NOT DISPUTE WHAT?

10:35AM 10   Q.   YOU DID NOT DISPUTE IN THIS EMAIL IN 2015 THAT MR. BALWANI

10:35AM 11   HAD DISCOURAGED YOU FROM INVESTING PRIOR TO THE TIME THAT YOU

10:35AM 12   MADE YOUR INVESTMENT IN 2013?

10:35AM 13   A.   YEAH.  TO REPEAT, HE DID NOT DISCOURAGE ME AT THE TIME OF

10:35AM 14   THE INVESTMENT IN 2013.  HE WAS MOST ENCOURAGING.

10:35AM 15   Q.   OKAY.  OKAY.  LET ME ASK YOU TO LOOK AT EXHIBIT 1371.

10:35AM 16         THE COURT:  MR. DOWNEY, I WONDER IF WE SHOULD TAKE

10:35AM 17   OUR MORNING BREAK NOW BEFORE WE MOVE INTO ANOTHER EXHIBIT?

10:35AM 18         MR. DOWNEY:  THAT'S FINE, YOUR HONOR.

10:35AM 19         THE COURT:  LET'S DO THAT.

10:35AM 20      LADIES AND GENTLEMEN, LET'S TAKE OUR MORNING BREAK.  IT

10:35AM 21   WILL BE ABOUT 30 MINUTES.  IT WILL BE ABOUT 30 MINUTES.

10:35AM 22         THE WITNESS:  WILL THERE BE A LATER BREAK FOR LUNCH,

10:35AM 23   OR IS THIS AN OPPORTUNITY --

10:35AM 24         THE COURT:  WE'RE GOING TO END AT 1:00 O'CLOCK

10:35AM 25   TODAY.

10:35AM   1          THE WITNESS:  OH, OKAY.

10:35AM   2          THE COURT:  ALL RIGHT.  WE'LL BE IN RECESS.

10:35AM   3      COUNSEL, PLEASE REMAIN FOR JUST A MOMENT.

10:36AM   4      (JURY OUT AT 10:36 A.M.)

10:36AM   5          THE COURT:  THANK YOU.  PLEASE BE SEATED.  THE

10:36AM   6   RECORD SHOULD REFLECT THAT THE JURY HAS LEFT.

10:36AM   7      MR. EISENMAN, YOU CAN LEAVE AS WELL.

10:36AM   8          MR. DOWNEY:  YOUR HONOR, BEFORE MR. EISENMAN LEAVES,

10:36AM   9   DO YOU WANT TO GIVE HIM ANY DIRECTION?

10:36AM  10          THE COURT:  I WANT TO TALK TO COUNSEL FIRST.

10:36AM  11          MR. DOWNEY:  OKAY.  THANK YOU.

10:36AM  12          THE COURT:  MR. EISENMAN, IF YOU WOULD LEAVE THE

10:36AM  13   COURTROOM FOR JUST A MOMENT.  IF YOU WOULD STAY OUTSIDE FOR

10:36AM  14   JUST A MOMENT, I MAY WANT TO TALK TO YOU A LITTLE BIT.

10:36AM  15          THE WITNESS:  OKAY.

10:36AM  16          THE COURT:  AND WE'LL CALL YOU BACK IN.

10:36AM  17          THE WITNESS:  THANK YOU.

10:36AM  18          THE COURT:  YOU'RE WELCOME.

10:37AM  19      ALL RIGHT.  ALL COUNSEL ARE PRESENT.  OUR JURY HAS LEFT.

10:37AM  20   THE WITNESS HAS LEFT THE COURTROOM.

10:37AM  21      DO YOU WANT TO EXCUSE YOUR CLIENT FOR THIS DISCUSSION, OR

10:37AM  22   DO YOU WANT TO TALK FOR JUST A MOMENT?  WHATEVER YOU WOULD LIKE

10:37AM  23   TO DO.

10:37AM  24          MR. DOWNEY:  LET ME JUST -- MAY WE JUST SPEAK FOR

10:37AM  25   ONE MOMENT, YOUR HONOR?

10:37AM  1          THE COURT:  YES.  OF COURSE.

10:37AM  2          MR. DOWNEY:  YOUR HONOR, WE'VE HAD THE OPPORTUNITY

10:37AM  3   TO CONSULT AND THAT'S FINE.

10:37AM  4          THE COURT:  ALL RIGHT.  THANK YOU.

10:37AM  5       WITH COUNSEL'S CONSENT, MS. HOLMES HAS STEPPED OUT.  ALL

10:37AM  6   OTHER PARTIES ARE PRESENT.

10:37AM  7       THIS IS REGARDING THE SUBPOENA ISSUE.

10:37AM  8          MR. DOWNEY:  YES.

10:37AM  9          THE COURT:  AND IT SOUNDS LIKE YOU ISSUED A

10:37AM 10   SUBPOENA, MR. DOWNEY.  THE NOTES OF MR. EISENMAN APPARENTLY ARE

10:38AM 11   HERE, HE HAS THEM, AND YOU WOULD LIKE THEM SUBMITTED TO THE

10:38AM 12   COURT.

10:38AM 13       TELL ME WHAT YOU WOULD LIKE TO HAVE.

10:38AM 14          MR. DOWNEY:  YES, YOUR HONOR.  THANK YOU.

10:38AM 15       WHAT HE WAS SUBPOENAED FOR WAS AN ORIGINAL COPY OF THE

10:38AM 16   NOTES THAT HE PROVIDED.  THOSE EXHIBITS ARE -- A COPY OF THOSE

10:38AM 17   NOTES IS ACTUALLY MARKED AS EXHIBIT 14, AND WE WOULD LIKE JUST

10:38AM 18   THE OPPORTUNITY TO INSPECT THE ORIGINAL OF THE NOTES.

10:38AM 19          THE COURT:  OKAY.  THANK YOU.

10:38AM 20       MR. BOSTIC?

10:38AM 21          MR. BOSTIC:  NO OBJECTION, YOUR HONOR.

10:38AM 22       THE GOVERNMENT WOULD LIKE AN OPPORTUNITY TO INSPECT

10:38AM 23   WHATEVER IS PROVIDED TO THE DEFENSE.

10:38AM 24          THE COURT:  HOW SHOULD WE -- LET'S TALK ABOUT THE

10:38AM 25   PROTOCOL OF THAT THEN.

10:38AM   1        I'M HAPPY TO LET YOU DO THAT.  IS THIS THE TIME THAT YOU

10:38AM   2    SHOULD DO THAT THEN DURING THIS BREAK?

10:38AM   3            MR. DOWNEY:  I THINK IT WOULD PROBABLY BE BEST IN

10:38AM   4    CASE WE FINISH WITH THIS WITNESS TODAY.

10:38AM   5            THE COURT:  RIGHT.  OKAY.  SO LET'S CALL HIM BACK.

10:38AM   6    I'LL TELL HIM THAT, MR. EISENMAN, PARDON ME, THAT I'LL --

10:38AM   7    PURSUANT TO THE SUBPOENA, THAT IF HE COULD LODGE HIS NOTES WITH

10:38AM   8    OUR COURTROOM DEPUTY -- AND THIS IS NOT FOR PHOTOCOPYING.  THIS

10:39AM   9    IS JUST FOR COUNSEL TO REVIEW; IS THAT CORRECT?

10:39AM  10            MR. DOWNEY:  THAT'S CORRECT, YOUR HONOR.  I THINK WE

10:39AM  11    HAVE -- I THINK, UNLESS MR. BOSTIC AND I ARE BOTH MISTAKEN, I

10:39AM  12    THINK WE HAVE A PHOTOCOPY.

10:39AM  13            MR. BOSTIC:  THAT'S MY UNDERSTANDING.

10:39AM  14            THE COURT:  ALL RIGHT.  WOULD YOU LIKE TO DO THAT

10:39AM  15    HERE IN THE COURTROOM?  WOULD YOU LIKE ME TO PROVIDE YOU A

10:39AM  16    SPACE TO DO THAT WHERE THE TWO OF YOU CAN DO THAT PRIVATELY?

10:39AM  17        MAYBE I CAN OFFER YOU OUR SMALL ANTE ROOM BEHIND HERE FOR

10:39AM  18    THAT PURPOSE.

10:39AM  19            MR. DOWNEY:  EITHER IS FINE, YOUR HONOR.

10:39AM  20            MR. BOSTIC:  WHATEVER WORKS BEST.

10:39AM  21            THE COURT:  LET'S HAVE YOU DO IT THE BACK.  I THINK

10:39AM  22    THAT MIGHT BE MORE ADVANTAGEOUS.

10:39AM  23        LET'S CALL MR. EISENMAN IN, PLEASE.

10:39AM  24        ANYTHING FURTHER BEFORE HE COMES BACK IN?

10:39AM  25            MR. DOWNEY:  NO, YOUR HONOR.

10:39AM    1                    MR. BOSTIC:  NO, YOUR HONOR.

10:39AM    2                    THE COURT:  AND THEN THEY'LL BE RETURNED BACK TO HIM

10:39AM    3    AFTER THE REVIEW.

10:39AM    4                    MR. DOWNEY:  IT DEPENDS ON WHAT WE SEE IN THE

10:39AM    5    REVIEW.  IF WE WANT TO RETAIN THEM OR HAVE FURTHER REVIEW BY AN

10:39AM    6    EXPERT, WE'LL CERTAINLY APPRISE THE COURT.

10:39AM    7                    THE COURT:  ALL RIGHT.

10:39AM    8         THANK YOU FOR COMING BACK, MR. EISENMAN.

10:40AM    9         I JUST WANT TO LET YOU KNOW, YOU DID BRING YOUR NOTES

10:40AM   10    PURSUANT TO THE SUBPOENA.  YOU HAVE A FOLDER IN YOUR HAND.

10:40AM   11    THANK YOU FOR THAT.

10:40AM   12         WHAT I'M GOING TO ASK YOU TO DO IS TO LODGE THEM WITH OUR

10:40AM   13    COURTROOM DEPUTY NOW.

10:40AM   14         LET ME TELL YOU WHAT IS GOING TO HAPPEN, SIR, WITH YOUR

10:40AM   15    NOTES.

10:40AM   16         I HAVE AGREED TO HAVE THE LAWYERS, BOTH SIDES, REVIEW THE

10:40AM   17    NOTES, AND THEY'RE GOING TO STEP INTO AN ANTE ROOM BEHIND ME

10:40AM   18    DURING OUR BREAK, AND THEY'RE JUST GOING TO REVIEW THOSE NOTES

10:40AM   19    WITH WHAT THEY HAVE.

10:40AM   20         MY ANTICIPATION IS THAT THE NOTES WILL BE RETURNED TO YOU.

10:40AM   21         HOWEVER, I WILL HAVE FURTHER DISCUSSION WITH THE LAWYERS

10:40AM   22    PRIOR TO THAT HAPPENING, AND I WILL INFORM YOU AS TO WHAT NEXT

10:40AM   23    IS GOING TO HAPPEN WITH THE NOTES.

10:40AM   24         ALL RIGHT, SIR?  YOU HAVE THOSE WITH YOU?

10:40AM   25                    THE WITNESS:  YES.

10:40AM   1          THE COURT:  GREAT.  WHY DON'T YOU BRING THOSE

10:40AM   2   FORWARD.  YOU CAN HAND THEM TO OUR COURTROOM DEPUTY HERE.  I

10:40AM   3   APPRECIATE THAT.  AND THERE'S A FOLDER.

10:40AM   4          THE WITNESS:  (HANDING.)

10:40AM   5          THE COURT:  THANK YOU, AND WE'LL BE ON A BREAK NOW.

10:40AM   6          THE WITNESS:  OKAY.

10:40AM   7          THE COURT:  AND WE'LL LET YOU KNOW -- THIS MAY

10:40AM   8   EXTEND LONGER THAN 30 MINUTES.  I DON'T KNOW.  BUT WE'LL

10:41AM   9   CERTAINLY LET YOU KNOW WHEN YOU CAN COME BACK.

10:41AM  10      THANK YOU, SIR.

10:41AM  11          THE WITNESS:  OKAY.  THANK YOU.

10:41AM  12          THE COURT:  YOU'RE WELCOME.

10:41AM  13      THE RECORD SHOULD REFLECT THAT THE WITNESS HAS LEFT THE

10:41AM  14   COURTROOM.

10:41AM  15      ANYTHING ELSE BEFORE WE BREAK, COUNSEL?

10:41AM  16          MR. BOSTIC:  NO, YOUR HONOR.

10:41AM  17          MR. DOWNEY:  NO, YOUR HONOR.

10:41AM  18          THE COURT:  ALL RIGHT.  THANK YOU.

10:41AM  19      THE NOTES ARE HERE.  OUR COURTROOM DEPUTY, MS. DIBBLE,

10:41AM  20   WILL ESCORT YOU TO THE ROOM BEHIND ME WHERE COUNSEL CAN REVIEW

10:41AM  21   THOSE NOTES, AND THEN YOU CAN LET ME KNOW IF THERE'S ANYTHING

10:41AM  22   ELSE WE NEED TO DO.

10:41AM  23          MR. BOSTIC:  THANK YOU, YOUR HONOR.

10:41AM  24          MR. DOWNEY:  THANK YOU, YOUR HONOR.

10:41AM  25      (RECESS FROM 10:41 A.M. UNTIL 11:21 A.M.)

EISENMAN CROSS BY MR. DOWNEY (RES.)

11:21AM  1          THE COURT:  WE'RE BACK ON THE RECORD.  ALL COUNSEL

11:21AM  2    ARE PRESENT.  MS. HOLMES IS PRESENT.

11:21AM  3          WE'RE OUTSIDE OF THE PRESENCE OF THE JURY AND THE WITNESS.

11:21AM  4          COUNSEL, YOU'VE HAD AN OPPORTUNITY TO REVIEW THE NOTES?

11:21AM  5          MR. DOWNEY:  WE DID, YOUR HONOR.

11:21AM  6          MR. BOSTIC:  YES, YOUR HONOR.

11:21AM  7          THE COURT:  ANYTHING YOU WANT TO TALK ABOUT?

11:21AM  8          MR. DOWNEY:  YES, THERE IS, YOUR HONOR.

11:21AM  9          I WANTED TO ASK IF THE COURT WOULD DO ONE OF TWO THINGS.

11:21AM  10   I GUESS I WOULD PREFER THE FIRST OPTION, BUT WE'LL TAKE THE

11:21AM  11   SECOND OPTION.

11:21AM  12         AS I SUSPECTED, THERE ARE SOME INDICATIONS IN THE NOTES

11:21AM  13   THAT THE NOTES ARE NOT WHAT MR. EISENMAN DESCRIBED ON HIS

11:21AM  14   DIRECT EXAMINATION AS BEING, YOU KNOW, CONTEMPORANEOUS NOTES OF

11:22AM  15   CONVERSATIONS THAT HE HAD WITH MS. HOLMES.  AT CERTAIN

11:22AM  16   IMPORTANT PLACES IN THE NOTES, ADDITIONAL INFORMATION HAS BEEN

11:22AM  17   INSERTED IN A DIFFERENT COLORED INK.

11:22AM  18         FOR EXAMPLE, THERE'S ONE EXAMPLE, I THINK IT'S ON PAGE 7

11:22AM  19   OF THE EXHIBIT, WHERE THERE'S A LIST OF PHARMACEUTICAL

11:22AM  20   COMPANIES THAT HAVE BEEN INSERTED IN BLUE INK WHEN THE

11:22AM  21   REMAINDER OF THE DOCUMENT IS IN BLACK INK.

11:22AM  22         NOW, ON DIRECT EXAMINATION, YOUR HONOR WILL RECALL THAT

11:22AM  23   MR. EISENMAN TESTIFIED ABOUT HOW IMPORTANT INFORMATION WAS THAT

11:22AM  24   MS. HOLMES WAS PROVIDING HIM ABOUT THE INVESTMENT, THE

11:22AM  25   PARTNERSHIPS WITH PHARMACEUTICAL COMPANIES, ET CETERA.

EISENMAN CROSS BY MR. DOWNEY (RES.)

11:22AM 1      AND IT DOES NOT APPEAR THAT IT WAS PART OF THE SAME -- DID

11:22AM 2  NOT HAPPEN AT THE SAME TIME I WILL SAY AT LEAST, THAT A LISTING

11:23AM 3  OF THOSE PHARMACEUTICAL COMPANIES IN THE NOTES WAS PUT IN

11:23AM 4  THERE.

11:23AM 5      I DON'T KNOW THE SIGNIFICANCE OF ANY OF THAT.  I WOULD

11:23AM 6  JUST LIKE AN OPPORTUNITY TO -- I'D ASK THE COURT, IN THE FIRST

11:23AM 7  INSTANCE, TO JUST RETAIN THE NOTES SO THAT WE MIGHT HAVE AN

11:23AM 8  OPPORTUNITY TO REVIEW THEM IN MORE DETAIL.  OVER THE COURSE OF

11:23AM 9  THE LAST 30 MINUTES OR SO, MR. BOSTIC AND I, I THINK, GOT

11:23AM 10  THROUGH THE NOTES ONCE.  SO I DON'T WANT TO SAY MORE THAN THAT

11:23AM 11  AT THIS POINT.

11:23AM 12      BUT I THINK SOME OF THE CONCERNS THAT I HAVE ABOUT THE

11:23AM 13  INTEGRITY OF THE NOTES ARE CONFIRMED.

11:23AM 14      THERE ALSO WAS LESS OF A FORENSIC ANALYSIS CONCERN, BUT

11:23AM 15  THERE WAS JUST A PRESENTATIONAL CONCERN.

11:23AM 16      THE NOTES WERE REORDERED IN THE PRODUCTION GIVEN TO THE

11:23AM 17  GOVERNMENT SO THAT THE SECOND PAGE WAS MADE TO APPEAR TO BE THE

11:23AM 18  FIRST PAGE.

11:23AM 19      THAT WAS IMPORTANT, I THINK, TO MR. EISENMAN'S

11:23AM 20  PRESENTATION BECAUSE IT'S EVIDENT IN THE MIDDLE OF THE PAGE

11:23AM 21  THAT HAD BEEN MOVED TO PAGE 1 THAT HE GETS MS. HOLMES'S

11:24AM 22  TELEPHONE NUMBER.  BUT ON THE ORIGINAL OF PAGE 1, WHICH I

11:24AM 23  BELIEVE REFLECTS CONVERSATIONS WITH MANY OTHER INDIVIDUALS

11:24AM 24  BEFORE HE EVER MET MS. HOLMES, THERE'S A GOOD DEAL OF

11:24AM 25  INFORMATION.

11:24AM  1      BY REORDERING THE NOTES, IT CONVEYED THAT THE INFORMATION

11:24AM  2  WAS OBTAINED FROM MS. HOLMES RATHER THAN FROM OTHERS.

11:24AM  3      SO IT -- THE NOTES CONCERN ME.  WE HAVE THE JURY HERE FOR

11:24AM  4  HALF A DAY TODAY, AND I'M VERY RELUCTANT TO, YOU KNOW, DELAY

11:24AM  5  THIS FURTHER OR DISTURB IT.

11:24AM  6      BUT I HAVE CONCERNS.  I'D LIKE THE OPPORTUNITY TO REVIEW

11:24AM  7  THE ORIGINAL FURTHER.

11:24AM  8      I'M HAPPY TO STAY OUT OF THIS ISSUE FOR THE BALANCE OF

11:24AM  9  TODAY, AND IF THERE IS ANY ISSUE THAT WE WANT TO ADDRESS AFTER

11:24AM  10  WE REVIEW THE NOTES, TO RECALL MR. EISENMAN.  BUT I WOULD LIKE

11:24AM  11  THE OPPORTUNITY TO FORENSICALLY REVIEW THEM.

11:24AM  12      ALTERNATIVELY, I'D LIKE TO -- THE OPPORTUNITY TO EXAMINE

11:25AM  13  MR. EISENMAN OUTSIDE OF THE PRESENCE OF THE JURY TO UNDERSTAND

11:25AM  14  WHAT THE EXPLANATION IS FOR SOME OF THE DISCREPANCIES, THE

11:25AM  15  ORDERING, ET CETERA.

11:25AM  16          THE COURT:  AND WHAT WOULD YOUR -- THANK YOU.  WHAT

11:25AM  17  WOULD YOUR INTENT BE AFTER YOU VOIR DIRE THE WITNESS ON THE

11:25AM  18  NOTES?

11:25AM  19          MR. DOWNEY:  WELL, IT MAY BE -- LET ME SAY BEFORE I

11:25AM  20  SAY ANY OF THIS, I BELIEVE THAT MR. BOSTIC RECEIVED THE SAME

11:25AM  21  COPY OF THE NOTES THAT I RECEIVED.  I DON'T HAVE ANY

11:25AM  22  INFORMATION OR INDICATION THAT THE GOVERNMENT WAS PROVIDED WITH

11:25AM  23  AN ORIGINAL SET OF THE NOTES.  SO I JUST WANT TO BE CLEAR ABOUT

11:25AM  24  THAT IN ADVANCE.

11:25AM  25          NEVERTHELESS, THE NOTES WERE USED ON DIRECT EXAMINATION

11:25AM  1    FOR PURPOSES OF REFRESHING THE WITNESS'S RECOLLECTION.

11:25AM  2         AS YOUR HONOR KNOWS, HE WAS QUITE AGGRESSIVE, AND THE

11:25AM  3    WITNESS WAS AGGRESSIVE IN TRYING TO READ HIS NOTES AND TO

11:25AM  4    SUGGEST THAT REVIEWING THE NOTES WOULD REFLECT THE ACTUAL

11:25AM  5    CONTENT OF CONVERSATIONS WITH MS. HOLMES.

11:25AM  6         I DO NOT BELIEVE THAT IS TRUE.  I THINK THAT TESTIMONY

11:25AM  7    SHOULD -- LIKELY THE REMEDY IS TO STRIKE THAT TESTIMONY.

11:26AM  8              THE COURT:  ALL RIGHT.

11:26AM  9         MR. BOSTIC?

11:26AM 10              MR. BOSTIC:  SO, YOUR HONOR, I HAVE TO DISAGREE WITH

11:26AM 11    COUNSEL'S CHARACTERIZATION OF WHAT THE ORIGINALS SHOW.

11:26AM 12         I THINK THERE ARE A LOT OF ASSUMPTIONS AND JUMPING TO

11:26AM 13    CONCLUSIONS BAKED INTO WHAT DEFENSE COUNSEL IS ALLEGING HERE,

11:26AM 14    AND I JUST DON'T THINK THAT IT'S SUPPORTED BY THE EVIDENCE.

11:26AM 15         THE ORIGINALS OF MR. EISENMAN'S NOTES DO SHOW IN A COUPLE

11:26AM 16    OF LOCATIONS WHERE A SINGLE PAGE WILL CONTAIN TWO COLORS OF

11:26AM 17    INK.

11:26AM 18         COUNSEL REFERRED TO PAGE 7 OF THE EXHIBIT.  I THINK HE

11:26AM 19    MEANT TO REFER TO PAGE 13 OF THE EXHIBIT, WHICH IS A PAGE WHERE

11:26AM 20    TWO COLORS OF INK APPEAR.  MOST OF THE TEXT IS IN BLACK.  A

11:26AM 21    LIST OF PHARMACEUTICAL COMPANIES AND OTHER INFORMATION APPEAR

11:26AM 22    IN BLUE.

11:26AM 23         I UNDERSTAND COUNSEL IS READING INTO THAT SOME KIND OF

11:26AM 24    NEFARIOUS INTENT TO DOCTOR THESE MATERIALS AFTER THEY WERE

11:27AM 25    CREATED.  I DON'T THINK THERE'S ANY REAL SHOWING THAT THAT'S

11:27AM  1      WHAT HAS HAPPENED HERE.

11:27AM  2          I WASN'T HERE WHEN THESE NOTES WERE CREATED, SO I DON'T

11:27AM  3      KNOW WHY THERE ARE TWO COLORS OF INK THERE, BUT I THINK IT'S

11:27AM  4      NOT FAIR TO ASSUME THAT THERE IS SOMETHING DISHONEST HAPPENING

11:27AM  5      AS A RESULT.

11:27AM  6          THESE NOTES ARE NOT IN EVIDENCE.  THEY WERE NOT ADMITTED.

11:27AM  7      THE JURY IS NOT RELYING ON THE SUBSTANCE OR THE AUTHENTICITY OF

11:27AM  8      THE NOTES IN THEIR REVIEW OF THE EVIDENCE IN THIS CASE.

11:27AM  9          THE POINTS THAT COUNSEL HAS RAISED ALSO DID NOT FEATURE

11:27AM 10      PROMINENTLY IN THE WITNESS'S TESTIMONY.

11:27AM 11          FOR EXAMPLE, THE ORDERING OF PAGE 1 VERSUS PAGE 2 OF THE

11:27AM 12      NOTES, WHETHER THE EXHIBIT HAS PAGE 1 AND 2 IN A DIFFERENT

11:27AM 13      ORDER FROM HOW THE NOTES WERE ORIGINALLY PREPARED HAS NO

11:27AM 14      RELEVANCE TO THE SUBSTANCE OF MR. EISENMAN'S TESTIMONY ON

11:27AM 15      DIRECT OR ON CROSS.

11:27AM 16          THE TESTIMONY REGARDING MS. HOLMES'S CELL PHONE NUMBER,

11:28AM 17      WHICH APPEARS IN THE NOTES, AS I RECALL, IT WAS SIMPLY

11:28AM 18      MR. EISENMAN TESTIFIED THAT IN THE EARLY DAYS OF THEIR

11:28AM 19      CONVERSATIONS, HE HAD ACCESS TO MS. HOLMES AND THAT HE HAD BEEN

11:28AM 20      PROVIDED HER CELL PHONE NUMBER.

11:28AM 21          THERE'S NO TESTIMONY ABOUT EXACTLY WHEN THAT OCCURRED, AND

11:28AM 22      I DON'T THINK THE JURY HAS BEEN ASKED TO MAKE ANY FINDINGS ON

11:28AM 23      THAT, ESPECIALLY NOT AS A RESULT OF THE ORDERING OF PAGES AND

11:28AM 24      NOTES.

11:28AM 25          SO I DON'T HAVE ANY OBJECTION, OF COURSE, TO THE COURT

11:28AM  1    RETAINING A COPY.

11:28AM  2        I WOULD OBJECT TO CROSS-EXAMINING THE WITNESS IN FRONT OF

11:28AM  3    THE JURY WITHOUT A MORE SUBSTANTIAL SHOWING THAT THERE'S A

11:28AM  4    BASIS FOR THAT, AND I ALSO HAVE CONCERNS ABOUT COUNSEL'S

11:28AM  5    SUGGESTION OF DELAYING THE PROGRESS OF THE TRIAL.

11:28AM  6            THE COURT:  WHAT ARE YOUR THOUGHTS ABOUT, MR. DOWNEY

11:28AM  7    SAID THAT HE WOULD LIKE TO VOIR DIRE THE WITNESS ON HIS NOTES

11:28AM  8    OUTSIDE OF THE PRESENCE OF THE JURY?

11:28AM  9            MR. BOSTIC:  I DEFER TO THE COURT ON WHETHER THE

11:28AM 10    COURT BELIEVES THAT THAT IS NECESSARY.  I'M DOUBTFUL AS TO

11:29AM 11    WHETHER A SUFFICIENT FOUNDATION HAS BEEN LAID EVEN TO WARRANT

11:29AM 12    THAT STEP, BUT I'LL LEAVE THAT TO THE COURT.

11:29AM 13            THE COURT:  OKAY.

11:29AM 14        MR. DOWNEY?

11:29AM 15            MR. DOWNEY:  YOUR HONOR, LET ME BE CLEAR.  I'M NOT

11:29AM 16    ALLEGING ANYTHING.  I'M JUST SEEING A SITUATION WHERE SOMETHING

11:29AM 17    HAS BEEN IMPORTANT TO A WITNESS'S TESTIMONY, AND I THINK IT'S

11:29AM 18    IMPORTANT TO UNDERSTAND SOME DISCREPANCIES.

11:29AM 19        WHAT MAKES THAT IMPORTANT IS NOT THAT THE EXHIBIT HAS BEEN

11:29AM 20    ADMITTED.  IT HASN'T.  MR. BOSTIC IS CORRECT IN THAT REGARD.

11:29AM 21        WHAT MAKES IT IMPORTANT IS THAT FOR A SUBSTANTIAL PORTION

11:29AM 22    OF HIS DIRECT, HE WAS LOOKING AT THE DOCUMENT IN QUESTION AND

11:29AM 23    ESSENTIALLY TESTIFYING OUT OF A RECOLLECTION OF WHAT HE WAS

11:29AM 24    SEEING WITHIN THAT DOCUMENT.  THAT'S, THAT'S THE SIGNIFICANCE

11:29AM 25    OF IT.

11:29AM 1       I DON'T MIND THE OPTION OF VOIR DIRING HIM OUTSIDE OF THE

11:29AM 2  JURY, BUT IT DOES SEEM TO ME THAT IF SOMEBODY WITH SOME

11:29AM 3  EXPERTISE BEYOND WHAT EXPERTISE I HAVE WERE TO REVIEW THE

11:29AM 4  NOTES, IT MIGHT ALLAY ANY CONCERNS THAT I HAVE AND IT MIGHT

11:30AM 5  MAKE SUCH A PROCEEDING UNNECESSARY.  AND BY THE SAME TOKEN, I

11:30AM 6  MIGHT PROCEED INTO SUCH A HEARING WITHOUT A FULL UNDERSTANDING

11:30AM 7  OF WHAT HAS OCCURRED WITH RESPECT TO THE NOTES.

11:30AM 8       SO I'M NOT ASKING TO HAVE THIS EXAMINATION IN FRONT OF THE

11:30AM 9  JURY.  I AGREE WITH MR. BOSTIC AT THIS POINT AS TO THAT.

11:30AM 10       BUT I DON'T WANT TO NOT ADDRESS THIS ISSUE AND DETERMINE

11:30AM 11  WHAT THE APPROPRIATE REMEDY IS IN LIGHT OF THE GOVERNMENT'S

11:30AM 12  SUBSTANTIAL RELIANCE ON GOVERNMENT'S 14 ON THE DIRECT.

11:30AM 13            THE COURT:  HOW WAS THAT RELIANCE?  WHAT WAS

11:30AM 14  RELIANCE?

11:30AM 15            MR. DOWNEY:  YOUR HONOR, IF YOU LOOK AT -- I'M NOT

11:30AM 16  SURE I CAN ARTICULATE IT TO A FULL EXTENT, BUT MR. EISENMAN WAS

11:30AM 17  UNABLE TO RECALL OF HIS OWN MEMORY CERTAIN CONVERSATIONS THAT

11:30AM 18  HE HAD HAD WITH MS. HOLMES.

11:30AM 19       AND IF YOU LOOK IN THE EARLY PART OF HIS DIRECT ON TRYING

11:31AM 20  TO IDENTIFY THE FIRST AMOUNT, THE FIRST PLACE THAT IT HAPPENS,

11:31AM 21  IT -- HE'S SHOWN THIS DOCUMENT FOR PURPOSES OF REFRESHING HIS

11:31AM 22  RECOLLECTION.  HE'S REFERRED BOTH ON HIS DIRECT AND HE REFERRED

11:31AM 23  TODAY TO, YOU KNOW, THE NOTES AS, YOU KNOW, A SUBJECT THAT, YOU

11:31AM 24  KNOW, WHERE HE BELIEVES IF HE HAD THE NOTES, HE WOULD BE ABLE

11:31AM 25  TO TESTIFY ACCURATELY.

11:31AM   1          THE QUESTION IS, IS THAT AN ACCURATE SUPPOSITION ON HIS

11:31AM   2     PART?  ARE THESE NOTES ACCURATE?

11:31AM   3          SO I THINK IF I -- I DON'T HAVE -- I'VE NOT GONE THROUGH,

11:31AM   4     IN THE BRIEF TIME THAT WE'VE HAD, ALL OF THE INSTANCES IN WHICH

11:31AM   5     HE WAS SHOWN EXHIBIT 14 IN HIS DIRECT, BUT IT WAS QUITE A FEW.

11:31AM   6          THE COURT:  SO -- ALL RIGHT.  THANK YOU.

11:31AM   7          SO IT SOUNDS LIKE WHAT YOU'RE SAYING IS THAT YOU THINK HE

11:31AM   8     MAY HAVE ALTERED THE NOTES, THE INTEGRITY OF THE NOTES MAY HAVE

11:31AM   9     BEEN DISTURBED FROM WHAT THE GOVERNMENT RECEIVED AND WHAT YOU

11:31AM  10     RECEIVED?

11:31AM  11          MR. DOWNEY:  I'M NOT AT THAT POINT YET, YOUR HONOR.

11:32AM  12          THE COURT:  SO WHAT IS THE -- I GUESS I'M TRYING TO

11:32AM  13     CAPTURE, IF HE CHANGED HIS NOTES, WHAT DOES THAT SAY TO US?

11:32AM  14          MR. DOWNEY:  WELL, HE'S TESTIFIED THAT THESE NOTES

11:32AM  15     ARE NOTES OF CONTEMPORANEOUS CONVERSATION WITH THE DEFENDANT.

11:32AM  16          THE COURT:  SO WHEN HE COMES BACK, WE HAVE THE

11:32AM  17     NOTES, HAVE YOU CHANGED THE NOTES AT ALL?  AND HE SAYS YES OR

11:32AM  18     NO, AND THEN YOU CAN FOLLOW UP WITH THAT.

11:32AM  19          BUT IS THE REAL ISSUE HERE, HAS HE CHANGED, OR DOES HIS

11:32AM  20     TESTIMONY -- WILL HIS TESTIMONY CHANGE BASED ON AN ALTERATION

11:32AM  21     OF NOTES IF, IN FACT, THAT HAPPENED?

11:32AM  22          MR. DOWNEY:  WELL, YOUR HONOR, I THINK THERE'S A

11:32AM  23     WHOLE RANGE OF POSSIBILITIES.  IF THE NOTES HAVE BEEN ALTERED,

11:32AM  24     IT'S CORRECT, ONE POSSIBILITY IS THAT IF HE WERE TO SEE THAT,

11:32AM  25     HE MIGHT SAY, OH, I'M SORRY, I DIDN'T MEAN TO SUGGEST THIS WAS

11:32AM  1    A CONTEMPORANEOUS NOTE OF A CONVERSATION.  IT'S ACTUALLY AN

11:32AM  2    ANALYSIS THAT I ENTERED AFTER THE CONVERSATION OR AFTER LOOKING

11:32AM  3    BACK AT THE NOTES, AND THAT MIGHT CLARIFY IT.

11:33AM  4        BUT, YOU KNOW, SO IT MIGHT BE AT THAT LEVEL.

11:33AM  5        HE MAY NOT RECALL WHY THE NOTES ARE DIFFERENT.  I THINK

11:33AM  6    THAT'S MOST LIKELY TO BE WHAT THE WITNESS HIMSELF IS GOING TO

11:33AM  7    SAY.

11:33AM  8        THE QUESTION IS, YOU KNOW, DO WE KNOW WHEN THAT WAS DONE

11:33AM  9    RELATIVE TO THE VALUE IN CONTROVERSY?

11:33AM 10        THE COURT:  SO THE VALUE, THE VALUE, I THINK WHAT IS

11:33AM 11    IMPORTANT TO YOU IS HE TESTIFIED THAT HE MADE, FOR EXAMPLE, IN

11:33AM 12    HIS CONVERSATION, CONTEMPORANEOUS NOTES.

11:33AM 13        MR. DOWNEY:  RIGHT.

11:33AM 14        THE COURT:  AND MAYBE HE HASN'T.

11:33AM 15        MR. DOWNEY:  RIGHT.

11:33AM 16        THE COURT:  AND MAYBE HE ADDED THAT LATER AND,

11:33AM 17    THEREFORE, THAT CALLS INTO QUESTION HIS TESTIMONY THAT, I MADE

11:33AM 18    CONTEMPORANEOUS NOTES AT THE TIME I TALKED.

11:33AM 19        MR. DOWNEY:  THAT'S RIGHT, YOUR HONOR.

11:33AM 20        AND AGAIN, JUST TO REFER TO THE EXAMPLE THAT I REFERRED TO

11:33AM 21    BEFORE AND THAT MR. BOSTIC REFERRED TO, THE ENTRY OF THE

11:33AM 22    PHARMACEUTICAL COMPANIES IN A DIFFERENT -- I THINK MR. BOSTIC

11:33AM 23    IS CORRECT IT'S ON PAGE 13, YOU KNOW, I THINK YOUR HONOR

11:34AM 24    RECALLS THAT ON WEDNESDAY THAT WAS A SUBJECT OF TESTIMONY FROM

11:34AM 25    HIM, IT WAS IMPORTANT TO HIM, IT WAS A VERIFICATION AS TO WHY

11:34AM  1    HE SHOULD INVEST.  I ASKED HIM SOME QUESTIONS ON CROSS.

11:34AM  2              THE COURT:  WHY DOES IT MATTER IF IT'S ON PAGE 7 OR

11:34AM  3    PAGE 13 OF HIS NOTES?

11:34AM  4              MR. DOWNEY:  IT DOESN'T MATTER.  I WAS IN ERROR

11:34AM  5    SAYING --

11:34AM  6              THE COURT:  WHY ARE THE PAGES -- IF IT'S NOT

11:34AM  7    PAGINATED CORRECTLY, WHY DOES THAT MATTER?

11:34AM  8              MR. DOWNEY:  THE ISSUE IS THAT IT'S IN A DIFFERENT

11:34AM  9    COLORED INK, AND IT WAS APPEARS TO HAVE BEEN ENTERED AT A

11:34AM  10   DIFFERENT TIME WHEN IT WAS PRESENTED AS CONTEMPORANEOUSLY

11:34AM  11   RECORDED NOTES FOR PURPOSES OF REFRESHING HIS RECOLLECTION OF A

11:34AM  12   CONVERSATION WITH MS. HOLMES AND HIM THEN SAYING, I HAD THIS

11:34AM  13   CONVERSATION, AND THAT'S THE REASON THAT I INVESTED.

11:34AM  14             THE COURT:  OKAY.  WELL, IT'S, IT'S NOW 11:35 OR SO.

11:34AM  15        WHERE ARE YOU WITH YOUR CROSS-EXAMINATION OF THE WITNESS?

11:35AM  16             MR. DOWNEY:  I'M STILL HOPEFUL THAT, OTHER THAN THIS

11:35AM  17   ISSUE, THE CROSS-EXAMINATION COULD PROBABLY FINISH BY 1:00,

11:35AM  18   WHICH WOULD BE OUR PLANNED ENDING TIME.

11:35AM  19        BUT I'M NOT SURE -- IT'S POSSIBLE THAT THE REDIRECT COULD

11:35AM  20   BE CONDUCTED AS WELL, BUT I'M NOT 100 PERCENT SURE OF THAT.

11:35AM  21             THE COURT:  IS THIS IN LIGHT OF THE NOTE ISSUE OR IS

11:35AM  22   THIS WHAT YOU HAD PLANNED ALL ALONG?

11:35AM  23             MR. DOWNEY:  NO, WITHOUT REGARD TO THE NOTE ISSUE.

11:35AM  24             THE COURT:  BECAUSE I THOUGHT OUR ORIGINAL PLAN WAS

11:35AM  25   THAT THEY WOULD FINISH THIS WITNESS TODAY AND WE WOULD HAVE

| | |
|---|---|
| 11:35AM | 1 |

11:35AM 1   TIME FOR ANOTHER WITNESS.

11:35AM 2           MR. DOWNEY:  YEAH, BUT I THINK WE'VE BEEN MORE

11:35AM 3   THAN -- HALF AN HOUR BEYOND OUR PROJECTED BREAK TIME.

11:35AM 4           THE COURT:  RIGHT.

11:35AM 5           MR. DOWNEY:  I THINK THAT'S THE ISSUE.

11:35AM 6           THE COURT:  RIGHT.  SO -- YOU KNOW, THE TIME

11:35AM 7   ESTIMATES ARE A LITTLE FUZZY HERE.

11:35AM 8           MR. DOWNEY:  I THINK IT'S --

11:35AM 9           THE COURT:  NOT JUST NOW, BUT WHENEVER WE HAVE

11:35AM 10  PROJECTED THROUGH THE TRIAL, I'VE ASKED FOR THAT QUESTION.  I

11:36AM 11  KNOW IT'S A MOVEABLE FEAST.  YOU CAN'T ALWAYS BE ACCURATE ON

11:36AM 12  TIMING.  BUT FOR ALL OF THE REASONS WE HAVE TALKED ABOUT, IT'S

11:36AM 13  IMPORTANT, AT LEAST FOR MY MANAGEMENT OF THE TRIAL, THAT I TRY

11:36AM 14  TO KEEP THINGS GOING.

11:36AM 15          MR. DOWNEY:  OF COURSE.

11:36AM 16          THE COURT:  WELL, WHY DON'T WE -- IT SOUNDS LIKE

11:36AM 17  THIS IS AN ISSUE FOR YOU, AND I'D LIKE TO TAKE CARE OF THIS AS

11:36AM 18  SOON AS WE CAN.

11:36AM 19      IF WE'RE GOING TO DISCUSS THESE NOTES, THERE'S TWO WAYS TO

11:36AM 20  DO IT.  WE CAN BRING HIM IN RIGHT NOW AND YOU CAN VOIR DIRE ON

11:36AM 21  A LIMITED BASIS ABOUT THE COLOR CHANGE OF THE INK, THE

11:36AM 22  PAGINATION, WHAT THEY WERE, THOSE TYPES OF THINGS, WHETHER OR

11:36AM 23  NOT THEY WERE CONTEMPORANEOUS WITH HIS CONVERSATION.

11:36AM 24      ARE THOSE THE THREE ISSUES THAT YOU WANT?

11:36AM 25          MR. DOWNEY:  WELL, YOUR HONOR, IN FAIRNESS, I HAVE

11:36AM  1    TO SAY THESE ARE ALMOST 40 PAGES OF NOTES.  I'VE ONLY HAD

11:36AM  2    30 MINUTES TO EXAMINE THEM.

11:36AM  3         SO MY PREFERENCE WOULD BE TO HAVE AN OPPORTUNITY -- I'M

11:36AM  4    NOT CERTAIN THERE WILL BE AN ISSUE HERE.

11:36AM  5         MY PREFERENCE WOULD BE TO HAVE AN OPPORTUNITY TO REVIEW

11:36AM  6    THEM MORE CAREFULLY COMPARED TO THE COPY THAT WAS INTRODUCED AS

11:37AM  7    EXHIBIT 14.  BUT IF THE REMEDY YOUR HONOR DECIDES ON IS THAT, I

11:37AM  8    CAN DO IT.

11:37AM  9         THE HESITATION I HAVE WITH THAT REMEDY IS THAT WE HAVE,

11:37AM 10    YOU KNOW -- YOU KNOW, WE'RE IMPINGING MORE ON, I KNOW, THE

11:37AM 11    ISSUE YOUR HONOR.

11:37AM 12              THE COURT:  WELL, IT'S JUST WHERE DO WE PUT THAT

11:37AM 13    DELAY, RIGHT, IN THE FRONT OR THE BACK?

11:37AM 14              MR. DOWNEY:  YEAH.

11:37AM 15              THE COURT:  BECAUSE IT SOUNDS LIKE IF WE DON'T DEAL

11:37AM 16    WITH IT TODAY -- AND PARDON ME, I DON'T WANT YOU TO FILL TIME

11:37AM 17    JUST TO FILL THE DAY KNOWING WE ARE GOING TO HAVE TO DEAL WITH

11:37AM 18    THIS.

11:37AM 19              MR. DOWNEY:  NO, YOUR HONOR.  WE HAVE SEVERAL OTHER

11:37AM 20    SUBJECTS RELATED TO HIS -- OFFERS TO THIS WITNESS TO BUY

11:37AM 21    THERANOS STOCK, YOU KNOW, FOUR OR FIVE DIFFERENT TIMES AND

11:37AM 22    TURNING IT DOWN AND SO FORTH.

11:37AM 23         I THINK THAT'S IN THE NEIGHBORHOOD OF AN HOUR, HOUR AND

11:37AM 24    15 MINUTES.  THAT'S WHAT I THINK WOULD -- THAT'S WHY

11:37AM 25    I'M HESITANT.

11:37AM  1          THE COURT:  THANK YOU FOR THAT.

11:37AM  2      I WONDER IF YOU JUST BROACH THESE QUESTIONS WITH HIM ABOUT

11:38AM  3   THE COLOR CHANGE, WHETHER THEY WERE CONTEMPORANEOUS OR NOT,

11:38AM  4   MAYBE YOU'LL GET THE ANSWER TO YOUR QUESTION TODAY, RIGHT NOW,

11:38AM  5   IF WE BRING HIM IN AND ASK HIM.

11:38AM  6          MR. DOWNEY:  WELL, YOUR HONOR, I'M HAPPY TO DO THAT.

11:38AM  7   I WOULD JUST ASK THAT IF WE APPROACH THE PROBLEM THAT WAY, THAT

11:38AM  8   WE BE ALLOWED TO -- THAT THE DEPUTY RETAIN THE NOTES AND WE BE

11:38AM  9   ALLOWED TO HAVE ACCESS TO THE NOTES FOR PURPOSES OF MAKING SURE

11:38AM 10   WE'RE COMFORTABLE WITH ANY TESTIMONY ALONG THOSE LINES.

11:38AM 11          THE COURT:  SO HOW ARE YOU GOING TO REVIEW THESE?

11:38AM 12   YOU DON'T HAVE COPIES OF THESE?

11:38AM 13          MR. DOWNEY:  I DON'T HAVE A COLOR COPY.  IT'S A

11:38AM 14   LITTLE BIT OF A DIFFICULT EXAMINATION TO CONDUCT FOR THAT

11:38AM 15   REASON, AND I DON'T THINK WE HAVE THE ABILITY IMMEDIATELY TO

11:38AM 16   MAKE A COLOR COPY THAT I KNOW OF.

11:38AM 17      LET ME CHECK ON THAT.

11:38AM 18      OH, WE COULD MAKE A COLOR COPY, SO MAYBE THAT WOULD BE

11:38AM 19   HELPFUL.

11:38AM 20          THE COURT:  ALL RIGHT.  WELL, LET'S BRING THE

11:38AM 21   WITNESS AND THE JURY IN.  LET'S CONTINUE YOUR EXAMINATION, AND

11:38AM 22   I'LL ASK YOU TO PROCEED WITH YOUR EXAMINATION.

11:38AM 23      WE'LL KEEP THE NOTES FOR NOW AND I'LL TELL HIM OUTSIDE OF

11:39AM 24   THE PRESENCE OF THE JURY THAT WE'RE GOING TO KEEP THEM, MAKE

11:39AM 25   PHOTOCOPIES.

11:39AM 1          IT SOUNDS LIKE HE'S NOT GOING TO BE DONE TODAY.  HE'S NOT

11:39AM 2     GOING TO BE FINISHED TODAY.

11:39AM 3               MR. DOWNEY:  LET'S TRY.

11:39AM 4               THE COURT:  I APPRECIATE THAT.

11:39AM 5               MR. DOWNEY:  YEAH.

11:39AM 6               MR. BOSTIC:  YOUR HONOR, I JUST WANT TO MAKE SURE

11:39AM 7     THAT WE'RE CLEAR.  MY UNDERSTANDING IS THAT THE PARTIES AGREE

11:39AM 8     THAT THIS TOPIC WON'T BE BROACHED WITH THE WITNESS IN FRONT OF

11:39AM 9     THE JURY, AT LEAST PENDING FURTHER DISCUSSION.

11:39AM 10              THE COURT:  THAT'S MY UNDERSTANDING.

11:39AM 11              MR. DOWNEY:  CERTAINLY.

11:39AM 12              MR. BOSTIC:  JUST TO CLARIFY, COUNSEL MADE REFERENCE

11:39AM 13    TO EXHIBIT 14 BEING INTRODUCED OR ENTERED, AND I WANT THE

11:39AM 14    RECORD CLEAR, IT'S NOT IN EVIDENCE AND IT HAS NOT BEEN OFFERED.

11:39AM 15              THE COURT:  THE NOTES ARE NOT EVIDENCE.

11:39AM 16              MR. DOWNEY:  I COMPLETELY RECOGNIZE THAT.

11:39AM 17              THE COURT:  THE NOTES WERE REFERENCED.  I SAW HIM

11:39AM 18    LOOK AT HIS NOTES WHILE HE WAS TESTIFYING, BOTH YOUR QUESTIONS,

11:39AM 19    MR. DOWNEY, AND THE GOVERNMENT'S, AND THERE WAS NO COMMENT.  I

11:39AM 20    THINK YOU ASKED HIM AT ONE TIME, ARE YOU READING YOUR NOTES

11:39AM 21    THERE?

11:39AM 22              MR. DOWNEY:  YES.

11:39AM 23              THE COURT:  AND YOU DIDN'T ASK ANYTHING FURTHER.

11:39AM 24              MR. DOWNEY:  NO.  THAT'S CORRECT.

11:39AM 25              THE COURT:  OKAY.  ALL RIGHT.  WE'LL BRING THE JURY

11:39AM  1      IN.

11:39AM  2                MR. BOSTIC:  THANK YOU, YOUR HONOR.

11:39AM  3            (JURY IN AT 11:39 A.M.)

11:42AM  4                THE COURT:  PLEASE BE SEATED.  COUNSEL ARE PRESENT.

11:42AM  5      MS. HOLMES IS PRESENT AND THE JURY IS PRESENT.

11:42AM  6            MR. EISENMAN HAS RETURNED TO THE STAND.

11:42AM  7            MR. DOWNEY, YOU HAVE ADDITIONAL QUESTIONS?

11:42AM  8                MR. DOWNEY:  I DO, YOUR HONOR.

11:42AM  9      Q.   MR. EISENMAN, YOU RECALL BEFORE WE BREAK WE WERE TALKING

11:42AM  10     ABOUT YOUR CONVERSATION WITH MR. BALWANI PRIOR TO YOUR

11:42AM  11     INVESTMENT IN 2013?

11:42AM  12     A.   YES.

11:42AM  13     Q.   I'D LIKE TO ASK YOU TO LOOK AT THE EXHIBIT THAT IS MARKED

11:42AM  14     AS 1370 IN YOUR NOTEBOOK.

11:43AM  15           DO YOU HAVE THAT?

11:43AM  16     A.   YES.

11:43AM  17     Q.   AND DO YOU SEE THAT THIS IS A LONG SERIES OF EMAIL

11:43AM  18     EXCHANGES IN CONNECTION WITH THE OFFER OF AN ADDITIONAL

11:43AM  19     INVESTMENT BY THERANOS AT THE END OF 2013?

11:43AM  20     A.   YES.

11:43AM  21                MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT 1370.

11:43AM  22                MR. BOSTIC:  I BELIEVE THAT IS ALREADY IN EVIDENCE,

11:43AM  23     YOUR HONOR.  OR IT MAY BE A DIFFERENT VERSION.

11:43AM  24           AT ANY RATE, THERE'S NO OBJECTION.

11:43AM  25                MR. DOWNEY:  I THINK IT'S A DIFFERENT VERSION.

11:43AM   1                    THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

11:43AM   2             (GOVERNMENT'S EXHIBIT 1370 WAS RECEIVED IN EVIDENCE.)

11:43AM   3        BY MR. DOWNEY:

11:43AM   4        Q.   AT THIS TIME, AT THE END OF THE YEAR IN 2013, YOU WERE

11:43AM   5        EXCHANGING MESSAGES AND PERHAPS EVEN PHONE CALLS WITH

11:43AM   6        MR. BALWANI ABOUT THE POTENTIAL INVESTMENT; CORRECT?

11:43AM   7        A.   CORRECT.

11:44AM   8        Q.   AND IF WE LOOK ON THE FIRST PAGE OF THE SECOND EMAIL, THE

11:44AM   9        ONE THAT IS FROM YOU TO MR. BALWANI --

11:44AM  10        A.   YES.

11:44AM  11        Q.   -- YOU ASKED MR. BALWANI BY EMAIL FOR INFORMATION ABOUT

11:44AM  12        THE THERANOS INVESTMENT; CORRECT?

11:44AM  13        A.   CORRECT.

11:44AM  14        Q.   YOU ASKED HIM HOW BIG THE ROUND WOULD BE; CORRECT?

11:44AM  15        A.   CORRECT.

11:44AM  16        Q.   AND WHETHER DIRECTORS WERE PARTICIPATING IN THE ROUND;

11:44AM  17        CORRECT?

11:44AM  18        A.   CORRECT.

11:44AM  19        Q.   AND WHETHER THERE WOULD BE ANOTHER EQUITY OFFERING AFTER

11:44AM  20        JANUARY 1ST; CORRECT?

11:44AM  21        A.   CORRECT.

11:44AM  22        Q.   AND HE RESPONDED TO YOU AT THE TOP OF PAGE 1 OF

11:44AM  23        EXHIBIT 1370, AND HE SAID, "WE CAN'T ANSWER YOUR QUESTIONS

11:44AM  24        ABOUT DIRECTORS, OTHER INVESTORS AND CERTAINLY NOT ABOUT ANY

11:44AM  25        FUTURE INVESTMENT ROUNDS AND SPECULATE ON WHAT THOSE VALUATIONS

11:45AM 1    MAY BE.  THOSE MAY OR MAY NOT HAPPEN."

11:45AM 2         DO YOU SEE THAT?

11:45AM 3    A.   THAT CONTRADICTED HIS EARLIER WORDS.

11:45AM 4    Q.   OKAY.  AND DO YOU SEE IN THE SECOND PARAGRAPH OF THE EMAIL

11:45AM 5    HE TOLD YOU THAT HIS PERSONAL ASSISTANTS WERE NOT PRIVY TO

11:45AM 6    CONFIDENTIAL FINANCIAL INFORMATION.

11:45AM 7         DO YOU SEE THAT?

11:45AM 8    A.   YES.

11:45AM 9    Q.   AND DO YOU KNOW WHY HE WAS TELLING YOU THAT?

11:45AM 10   A.   NO.

11:45AM 11   Q.   HAD YOU BEEN LEAVING MESSAGES WITH THEM ASKING FOR

11:45AM 12   FINANCIAL DETAILS ABOUT THE COMPANY?

11:45AM 13   A.   NOT TO MY RECOLLECTION.

11:45AM 14   Q.   HAD YOU BEEN ASKING THEM QUESTIONS ABOUT THE ACTIVITIES OF

11:45AM 15   THE COMPANY?

11:45AM 16   A.   NO.

11:45AM 17   Q.   NOW, I WANT TO SHOW YOU -- I JUST WANT TO SHOW YOU THIS

11:45AM 18   EXHIBIT FOR PURPOSES TO SEE IF IT REFRESHES YOUR RECOLLECTION,

11:45AM 19   SO I DON'T WANT YOU TO DESCRIBE THE EXHIBIT BECAUSE IT'S NOT IN

11:46AM 20   EVIDENCE.

11:46AM 21        TAKE A LOOK AT EXHIBIT -- WELL, LET ME PASS THAT EXHIBIT

11:46AM 22   BECAUSE IT WILL REQUIRE A BIT MORE TIME TO GO INTO THAT.

11:46AM 23        LET ME TURN TO THE QUESTIONS RELATED TO WHAT YOUR

11:46AM 24   UNDERSTANDING WAS OF THE RISK LEVEL OF THE INVESTMENT.  OKAY?

11:46AM 25   A.   OKAY.

11:46AM   1    Q.   YOU RECALL THAT BACK IN 2010 MS. HOLMES HAD TOLD YOU THAT

11:46AM   2    AN INVESTMENT IN THERANOS CARRIED IMMENSE RISKS.

11:46AM   3         DO YOU RECALL THAT?

11:46AM   4    A.   I DON'T.

11:46AM   5    Q.   LET ME ASK YOU TO PULL BACK UP EXHIBIT 12285.

11:47AM   6    A.   OKAY.

11:47AM   7    Q.   DO YOU HAVE THAT?

11:47AM   8    A.   UH-HUH.

11:47AM   9    Q.   OKAY.  IF YOU LOOK AT THIS EXHIBIT, YOU'LL SEE THAT THE

11:47AM   10   SECOND PART OF THIS EMAIL IS THE EMAIL THAT WE LOOKED AT BEFORE

11:47AM   11   FROM JUNE OF 2010.

11:47AM   12        DO YOU SEE THAT?

11:47AM   13   A.   YES.

11:47AM   14   Q.   AND IF YOU LOOK AT THE THIRD PARAGRAPH OF THE EMAIL THAT

11:48AM   15   BEGINS, "AS YOU'VE ACKNOWLEDGED."

11:48AM   16   A.   YES.

11:48AM   17   Q.   AND IT GOES ON TO SAY, AS YOU'VE ACKNOWLEDGED, THERANOS IS

11:48AM   18   AN EARLY LIFE STAGE SCIENCE, I THINK SHE MEANT TO SAY COMPANY.

11:48AM   19        I'M SORRY.  LET ME JUST REREAD IT.

11:48AM   20        "AS YOU HAVE ACKNOWLEDGED, THERANOS IS AN EARLY STAGE LIFE

11:48AM   21   SCIENCES STARTUP AND BY ITS VERY NATURE CARRIES IMMENSE RISK

11:48AM   22   AND UNPREDICTABILITY AS YOU ALREADY KNOW AS A SAVVY INVESTOR.

11:48AM   23   THIS MAY NOT CHANGE FOR YEARS TO COME."

11:48AM   24        DID MS. HOLMES TELL YOU THAT IN 2010 ABOUT INVESTING IN

11:48AM   25   THERANOS?

11:48AM 1     A.   THIS IS A SURPRISE AND A DIRECT CONTRADICTION TO MANY

11:48AM 2     OTHER EARLIER EMAILS AND CONVERSATIONS I HAD.   SIX YEARS AFTER

11:48AM 3     WE INVESTED, I HAD A WHOLE STREAM OF INFORMATION THAT THE

11:48AM 4     COMPANY WAS ON THEIR WAY TO DOING HUNDREDS OF MILLIONS OF

11:48AM 5     DOLLARS OF REVENUE, DOING CONTRACTS WITH MAJOR PHARMACEUTICAL

11:49AM 6     COMPANIES.   THEY HAD SEVEN, SEVEN CLINICAL TRIALS WITH

11:49AM 7     BRISTOL MYERS THAT WENT FLAWLESS.   I'VE GOT EMAIL AFTER EMAIL.

11:49AM 8          THIS IS A TOTAL CONTRADICTION TO EVERYTHING UP TO THIS

11:49AM 9     POINT.

11:49AM 10               MR. DOWNEY:  I MOVE TO STRIKE THAT, YOUR HONOR.  AND

11:49AM 11    I'M GOING TO TRY TO RE-ASK THE QUESTION.

11:49AM 12               THE COURT:  ALL RIGHT.  THAT LAST ANSWER IS STRICKEN

11:49AM 13    AS NONRESPONSIVE, AND YOU CAN ASK ANOTHER QUESTION.

11:49AM 14    BY MR. DOWNEY:

11:49AM 15    Q.   LET ME ASK YOU TO LOOK AT THE FOURTH BULLET POINT.

11:49AM 16         DO YOU SEE WHERE THERE'S A SERIES OF BULLET POINTS?

11:49AM 17    A.   I DO.

11:49AM 18    Q.   AND DO YOU SEE THERE IN THE FIRST BULLET POINT THE FIRST

11:49AM 19    SENTENCE READS, "WE DO NOT CURRENTLY HAVE PLANS TO GO IPO BY

11:49AM 20    THE END OF 2011."

11:49AM 21         DO YOU SEE THAT?

11:49AM 22    A.   I DO.

11:49AM 23    Q.   AND YOU ACKNOWLEDGE THAT YOU RECEIVED THIS EMAIL IN 2010?

11:50AM 24    A.   AGAIN, THIS IS A DIRECT CONTRADICTION TO MANY EARLIER

11:50AM 25    COMMUNICATIONS.

11:50AM  1                    THE COURT:  SIR, SIR, EXCUSE ME, SIR.  DID YOU HEAR

11:50AM  2      THE QUESTION?

11:50AM  3                    THE WITNESS:  I DID.  BUT IT'S MISLEADING.  I'M

11:50AM  4      SORRY.

11:50AM  5                    THE COURT:  THE WAY THIS WORKS, SIR, IS THAT A

11:50AM  6      QUESTION IS ASKED AND YOU'LL HAVE TO WAIT FOR THE QUESTION.

11:50AM  7                    THE WITNESS:  OKAY.  ASK THE QUESTION AGAIN AND I'LL

11:50AM  8      RESPOND.

11:50AM  9                    THE COURT:  WELL, HE'S NOT GOING TO DO THAT BECAUSE

11:50AM  10     I'M NOT FINISHED.

11:50AM  11                   THE WITNESS:  OKAY.

11:50AM  12                   THE COURT:  YOU SEE, THAT'S HOW IT WORKS.

11:50AM  13                   THE WITNESS:  OKAY.  SORRY.

11:50AM  14                   THE COURT:  NO, THAT'S QUITE ALL RIGHT.  YOU HAVE TO

11:50AM  15     WAIT UNTIL THE QUESTION IS COMPLETED, AND THEN TAKE WHATEVER

11:50AM  16     TIME YOU NEED TO GIVE A THOUGHTFUL ANSWER TO THE QUESTION, TO

11:50AM  17     THE QUESTION ITSELF.

11:50AM  18                   THE WITNESS:  OKAY.

11:50AM  19                   THE COURT:  ALL RIGHT.  IF YOU NEED CLARIFICATION OF

11:50AM  20     THE QUESTION, YOU CAN ASK A LAWYER IF THEY NEED TO CLARIFY

11:50AM  21     BECAUSE YOU DON'T UNDERSTAND, AND THAT'S FAIR.

11:50AM  22                   THE WITNESS:  OKAY.

11:50AM  23                   THE COURT:  WE WANT TO MAKE SURE EVERY WITNESS

11:50AM  24     UNDERSTANDS THE QUESTION SO THEY CAN GIVE A FULL ANSWER.

11:50AM  25                   THE WITNESS:  OKAY.

11:50AM   1          THE COURT:  THAT'S WHAT THIS IS.

11:50AM   2          SO I'LL ASK MR. DOWNEY TO ASK ANOTHER QUESTION, PLEASE.

11:50AM   3     BY MR. DOWNEY:

11:51AM   4     Q.   DO YOU ACKNOWLEDGE THAT MS. HOLMES TOLD YOU IN 2010 THAT

11:51AM   5     THERANOS WAS AN EARLY STAGE LIFE SCIENCES STARTUP THAT CARRIED

11:51AM   6     RISK.

11:51AM   7          DO YOU ACKNOWLEDGE THAT?

11:51AM   8     A.   I ACKNOWLEDGE THAT THIS IS WHAT WAS COMMUNICATED IN 2010,

11:51AM   9     BUT IT CONTRADICTS MANY OTHER THINGS THAT I WAS LED TO BELIEVE

11:51AM  10     PRIOR TO THIS.

11:51AM  11     Q.   OKAY.  AND YOU ACKNOWLEDGE THAT SHE TOLD YOU IN 2010 THAT

11:51AM  12     THERANOS'S STATUS AS AN EARLY STAGE LIFE SCIENCES STARTUP THAT

11:51AM  13     CARRIED IMMENSE RISK MIGHT NOT CHANGE FOR YEARS TO COME?  YOU

11:51AM  14     ACKNOWLEDGE THAT BASED ON THE --

11:51AM  15     A.   I ACKNOWLEDGE THAT BASED ON THIS EMAIL.

11:51AM  16          BUT IT CONTRADICTS EARLIER COMMUNICATIONS.

11:51AM  17     Q.   OKAY.  BUT YOU ACKNOWLEDGE THAT YOU RECEIVED THE EMAIL?

11:51AM  18     A.   I DO ACKNOWLEDGE THAT I RECEIVED THIS EMAIL, YES, SIR.

11:51AM  19     Q.   LET'S GO BACK TO THE INVESTMENT DECISION SORT OF IN THE

11:51AM  20     LATE YEAR OF 2013 AND LOOK AT THE COMMUNICATIONS THAT YOU

11:52AM  21     RECEIVED AROUND THAT OFFER.

11:52AM  22          AND TO DO THAT, IF YOU WOULD LOOK BACK AT EXHIBIT 1370.

11:52AM  23          AND WE HAVE LOOKED AT THIS EXHIBIT BEFORE, BUT NOW I'M

11:52AM  24     INTERESTED IN PAGE 4 OF THE EXHIBIT.

11:52AM  25     A.   OKAY.

11:52AM  1    Q.   DO YOU SEE THE EMAIL THAT IS SORT OF THE SECOND HALF, THE

11:52AM  2    BOTTOM EMAIL ON THE PAGE 4 OF 1370 THAT BEGINS, "DEAR

11:52AM  3    STOCKHOLDER"?

11:52AM  4    A.   YES.

11:52AM  5    Q.   AND THIS WAS A COMMUNICATION THAT WAS SENT OUT TO ALL OF

11:53AM  6    THE SHAREHOLDERS IN THE COMPANY, INCLUDING YOU; CORRECT?

11:53AM  7    A.   CORRECT.

11:53AM  8    Q.   AND THIS INFORMED YOU AS TO A NUMBER OF THINGS, THAT THERE

11:53AM  9    WAS AN INVESTMENT OFFER IN THERANOS; CORRECT?

11:53AM  10   A.   CORRECT.

11:53AM  11   Q.   I'D ASK YOU TO LOOK DOWN TO THE FOURTH LINE OF THE NEXT

11:53AM  12   PAGE, WHICH IS PAGE 5, AND I'LL ASK YOU TO BLOW THAT UP, WHICH

11:53AM  13   BEGINS "AS PART OF THIS INITIATIVE."

11:53AM  14   A.   OKAY.

11:53AM  15   Q.   AND THERE'S A REFERENCE IN THIS SENTENCE TO FINANCIAL

11:53AM  16   TRANSACTIONS WITH STRATEGIC PARTNERS THAT THERANOS WAS

11:53AM  17   CONCLUDING.

11:53AM  18        DO YOU SEE THAT?

11:54AM  19   A.   YES.

11:54AM  20   Q.   AND THEN IN THE NEXT SENTENCE, IT GOES ON TO SAY THAT

11:54AM  21   THERANOS WAS COMPLETING EQUITY TRANSACTIONS WITH STRATEGIC

11:54AM  22   ENTITIES WHO HAD PREVIOUSLY INVESTED IN THERANOS AND HAD THE

11:54AM  23   OPTION TO INVEST ADDITIONAL EQUITY THROUGH THE END OF 2013.

11:54AM  24        DO YOU SEE THAT?

11:54AM  25   A.   YES.

11:54AM  1    Q.   NOW, YOU KNEW THAT ABOUT THREE MONTHS BEFORE THIS EMAIL,

11:54AM  2    THERANOS HAD ANNOUNCED ITS PARTNERSHIP WITH WALGREENS; RIGHT?

11:54AM  3    A.   I DON'T RECALL THE TIMELINE.

11:54AM  4    Q.   OKAY.  BUT YOU RECALL IT WAS SOME POINT BEFORE YOUR

11:54AM  5    DECISION TO INVEST IN DECEMBER OF 2013 THAT YOU KNEW THAT THERE

11:54AM  6    WAS A PARTNERSHIP BETWEEN THERANOS AND WALGREENS; CORRECT?

11:54AM  7    A.   AGAIN, I DON'T RECALL THE TIMELINE.

11:54AM  8    Q.   OKAY.  DO YOU THINK THAT YOU DID NOT KNOW AT THE TIME OF

11:54AM  9    THIS INVESTMENT THAT THERANOS HAD A PARTNERSHIP WITH WALGREENS?

11:54AM 10    A.   I WOULD HAVE TO REVIEW MY NOTES OR REVIEW INFORMATION.  I

11:54AM 11    DON'T RECALL THE TIMELINE.

11:54AM 12    Q.   OKAY.  LET'S GO ON TO THE NEXT SENTENCE OF THIS EMAIL

11:55AM 13    WHICH GOES ON TO SAY, "THE PRICE PER SHARE OF THERANOS SERIES

11:55AM 14    C-1 PREFERRED STOCK IN THE TRANSACTIONS CLOSING BETWEEN NOW AND

11:55AM 15    DECEMBER 31ST, 2013 IS $75 A SHARE."

11:55AM 16         DO YOU SEE THAT?

11:55AM 17    A.   YES.

11:55AM 18    Q.   NOW, REMIND US WHAT YOU HAD PAID IN 2006 FOR SHARES IN

11:55AM 19    THERANOS IN SERIES C.

11:55AM 20    A.   I BELIEVE IT WAS $2.82.

11:55AM 21    Q.   $2.82.

11:55AM 22         SO WHEN YOU RECEIVED THIS COMMUNICATION, YOU REALIZED THAT

11:55AM 23    THE VALUE OF THOSE SHARES HAD GONE UP FROM $2.82 UP TO $75 PER

11:55AM 24    SHARE; CORRECT?

11:55AM 25    A.   CORRECT.

11:55AM   1    Q.   AND I THINK WE TALKED ON WEDNESDAY ABOUT THE FACT THAT

11:55AM   2    WHEN YOU INVESTED IN 2006 THAT YOU HAD PURCHASED A LITTLE OVER

11:55AM   3    2,000 SHARES; RIGHT?

11:56AM   4    A.   I DON'T RECALL THE NUMBER.

11:56AM   5    Q.   OKAY.  BUT YOU REMEMBER IN DOLLAR FIGURES YOUR INVESTMENT

11:56AM   6    WAS A LITTLE BIT OVER A MILLION ONE?

11:56AM   7    A.   YES.

11:56AM   8    Q.   NOW, IF YOU WERE TO MULTIPLY THE INVESTMENT THAT YOU MADE

11:56AM   9    IN 2006 BY THIS INCREASE IN THE VALUE OF SHARES, YOU REALIZED

11:56AM  10    WHEN YOU RECEIVED THIS COMMUNICATION THAT YOU WERE HOLDING

11:56AM  11    SHARES OF THERANOS THAT WERE NOW WORTH ABOUT $30 MILLION;

11:56AM  12    RIGHT?

11:56AM  13    A.   CORRECT.

11:56AM  14    Q.   AND THAT'S MORE THAN 2000 PERCENT RETURN; CORRECT?

11:56AM  15    A.   I'D HAVE TO USE A CALCULATOR.

11:56AM  16    Q.   BUT A BIG RETURN WE CAN AGREE; RIGHT?

11:56AM  17    A.   YES.

11:56AM  18    Q.   AND YOU HAD HEARD SOMETHING THAT YOU REFERENCED IN THE

11:56AM  19    EMAIL TO MR. BALWANI THAT THERE MIGHT BE ANOTHER EQUITY

11:56AM  20    OFFERING SHORTLY AFTER JANUARY 1, 2014; CORRECT?

11:56AM  21    A.   THAT WAS COMMUNICATION FROM SUNNY TO ME.

11:56AM  22    Q.   OKAY.  HE TOLD YOU THAT --

11:57AM  23    A.   HE TOLD ME THERE WAS GOING TO BE ANOTHER INSTITUTIONAL

11:57AM  24    ROUND SHORTLY AFTER THIS ONE CLOSED AT $17, THAT THIS IS WHAT

11:57AM  25    IS CALLED A FRIENDS AND FAMILY ROUND, AND IT WAS BASICALLY

11:57AM  1    DOING US A FAVOR SINCE WE HAD BEEN LONG-TIME SHAREHOLDERS.

11:57AM  2    Q.   RIGHT.  SINCE YOU HAD ALREADY INVESTED YEARS AGO, YOU

11:57AM  3    COULD BUY BEFORE THE END OF THE YEAR AT $15 A SHARE; CORRECT?

11:57AM  4    A.   CORRECT.

11:57AM  5    Q.   AND PRESUMABLY, IF YOU WANTED, YOU COULD BUY AFTER THE NEW

11:57AM  6    YEAR, BUT YOU WOULD GET A SLIGHTLY REDUCED PRICE?

11:57AM  7    A.   NO.  WE WEREN'T OFFERED -- WHAT WAS TOLD TO ME WAS IT WAS

11:57AM  8    AN INSTITUTIONAL ROUND AND THEY WERE SELLING IT TO

11:57AM  9    INSTITUTIONS, NOT TO INDIVIDUALS.

11:57AM  10   Q.   I SEE.  AND YOU WERE CURIOUS, IN YOUR COMMUNICATIONS, TO

11:57AM  11   VERIFY WITH MR. BALWANI WHETHER THAT WAS TRUE; RIGHT?  WE

11:57AM  12   LOOKED AT THAT A MOMENT AGO?

11:57AM  13   A.   YES.

11:57AM  14   Q.   DO YOU KNOW WHETHER THERANOS MADE AN OFFERING IN 2013 TO

11:57AM  15   INSTITUTIONAL INVESTORS OF $17 A SHARE?

11:57AM  16   A.   I TRIED TO FIND OUT, AND I WAS SHUT OUT OF THAT

11:57AM  17   COMMUNICATION.

11:58AM  18   Q.   OKAY.  BUT NOW IN 2021, YOU KNOW THAT THERANOS DID MAKE AN

11:58AM  19   EQUITY OFFERING OF SHARES AT $17 A SHARE TO INSTITUTIONAL

11:58AM  20   INVESTORS; CORRECT?

11:58AM  21   A.   I DON'T HAVE ANY INFORMATION TO CONFIRM THAT.

11:58AM  22   Q.   NOW, I WANT YOU TO JUST -- IN THE INTEREST OF TIME I'M

11:58AM  23   GOING TO SHOW YOU EXHIBIT 3530, AND I'M NOT GOING TO ASK YOU TO

11:58AM  24   REVIEW IT INDIVIDUALLY, BUT I WANT TO GIVE YOU A MOMENT TO LOOK

11:58AM  25   AT EXHIBIT 3530 AND TO CONFIRM FOR US THAT THIS IS THE STOCK

11:58AM   1    PURCHASE AGREEMENT THAT YOU'VE SIGNED IN CONNECTION WITH YOUR

11:58AM   2    2013 INVESTMENT.

11:58AM   3        AND IN THAT REGARD, I WOULD ASK YOU TO LOOK PARTICULARLY

11:58AM   4    AT PAGE 29, WHICH IS THE SIGNATURE PAGE.

11:59AM   5    A.   OKAY.

11:59AM   6    Q.   IS THAT RIGHT, THIS IS THE STOCK PURCHASE AGREEMENT THAT

11:59AM   7    YOU SIGNED IN CONNECTION WITH YOUR 2013 INVESTMENT?

11:59AM   8    A.   I DON'T KNOW BECAUSE THE FRONT PAGE SAYS INITIAL CLOSING

11:59AM   9    DATE JULY 1ST, 2010.

11:59AM  10    Q.   WELL, THAT'S AN AMENDMENT OF A STOCK PURCHASE AGREEMENT

11:59AM  11    THAT HAD BEEN MADE IN 2010, AND THIS WAS AN AMENDMENT THAT WAS

11:59AM  12    BEING ENACTED AT THE END OF 2013; CORRECT?

11:59AM  13    A.   I DON'T KNOW.

11:59AM  14    Q.   WELL, LET ME ASK YOU TO LOOK AT THE FIFTH PAGE OF THE

11:59AM  15    EXHIBIT.

11:59AM  16        JUST TAKE A MOMENT TO REVIEW THE FIRST PARAGRAPH AND THEN

11:59AM  17    THE PARAGRAPHS A THROUGH D.

12:00PM  18    A.   OKAY.

12:00PM  19    Q.   DOES THAT REFRESH YOUR RECOLLECTION THAT THERE HAD BEEN

12:00PM  20    A -- THAT THIS DOCUMENT WAS AN AMENDMENT OF AN EARLY STOCK

12:00PM  21    PURCHASE AGREEMENT AND THAT IT WAS IN CONNECTION WITH THE

12:00PM  22    CLOSINGS WHICH WERE HELD ON DECEMBER 31ST, 2013?

12:00PM  23    A.   IT DOESN'T REFLECT MY RECOLLECTION.  I'M READING IT NOW,

12:00PM  24    AND IT APPEARS THAT THIS WAS A 2010 AGREEMENT THAT WAS AMENDED,

12:00PM  25    BUT I DON'T RECALL.

12:00PM  1    Q.   OKAY.  LET ME ASK YOU TO LOOK BRIEFLY AT PAGE 11,

12:00PM  2    SECTION 4.  THAT'S PAGE 11 OF THE EXHIBIT.

12:00PM  3         AND MY QUESTION TO YOU IS ONLY, WITHOUT GOING THROUGH THEM

12:00PM  4    INDIVIDUALLY, YOU ACKNOWLEDGED THAT YOU MADE THE SAME

12:01PM  5    REPRESENTATIONS AND WARRANTIES ABOUT YOUR INVESTMENT IN 2013

12:01PM  6    THAT YOU HAD MADE IN 2006; IS THAT RIGHT?

12:01PM  7    A.   WELL, AGAIN, I'D HAVE TO LOOK AT THE 2006 AGREEMENT AND

12:01PM  8    THE 2010 AMENDED TO 2013.  I PRESUME IF YOU SAY SO, THAT THE

12:01PM  9    LANGUAGE IS THE SAME.  BUT I WOULDN'T KNOW WITHOUT COMPARING.

12:01PM 10    Q.   WELL, LET'S JUST LOOK THROUGH IT VERY QUICKLY.

12:01PM 11         IF YOU LOOK AT PARAGRAPH 4.4.  DO YOU SEE THAT?

12:01PM 12    A.   YES, I DO.

12:01PM 13    Q.   DO YOU AGREE WITH ME, DO YOU NOT, THAT THIS AGREEMENT

12:01PM 14    ACKNOWLEDGES THAT THE COMPANY HAD A LIMITED FINANCIAL AND

12:01PM 15    OPERATING HISTORY?

12:01PM 16    A.   I WOULDN'T AGREE WITH THAT AT ALL.

12:01PM 17    Q.   OKAY.  BUT YOU AGREE THAT YOU ACKNOWLEDGED IT WHEN YOU

12:01PM 18    SIGNED THIS AGREEMENT?

12:01PM 19    A.   I WOULD AGREE THAT THIS IS BOILERPLATE.  IT'S IN EVERY

12:01PM 20    AGREEMENT LIKE THIS, AND EVERYONE SIGNS IT.

12:02PM 21         BUT THERE'S ALSO AN UNDERSTANDING WHAT YOU'RE INVESTING

12:02PM 22    IN, AND THIS CONTRADICTS THE UNDERSTANDING WHAT I WAS INVESTING

12:02PM 23    IN AT THE TIME.

12:02PM 24    Q.   OKAY.  SO WHEN YOU SIGNED THIS LEGAL DOCUMENT SAYING THAT

12:02PM 25    YOU ACKNOWLEDGED THAT THE COMPANY HAD A LIMITED FINANCIAL AND

12:02PM  1   OPERATING HISTORY, YOU DID NOT MEAN FOR THERANOS TO RELY ON THE

12:02PM  2   DOCUMENT THAT YOU WERE SENDING BACK TO THEM SIGNED?

12:02PM  3   A.   AGAIN, THIS, THIS CONTRADICTS EVERYTHING THAT I'D

12:02PM  4   UNDERSTOOD UP TO THIS POINT IN TIME, AND THIS IS SOMETHING THAT

12:02PM  5   IS IN EVERY DOCUMENT THAT YOU'RE INVESTING IN A NON-PUBLIC

12:02PM  6   COMPANY, AND THIS IS WHAT WE CALL BOILERPLATE.

12:02PM  7   Q.   I'M ASKING YOU A LITTLE BIT OF A DIFFERENT QUESTION.

12:02PM  8       WHEN YOU SIGNED THIS LEGAL DOCUMENT AT THE COMPANY'S

12:02PM  9   REQUEST AND SENT IT BACK TO THEM, FIRST OF ALL, YOU

12:02PM  10  ACKNOWLEDGED THAT THE DOCUMENT ACKNOWLEDGED THAT YOU KNEW THE

12:02PM  11  COMPANY HAD A LIMITED FINANCIAL AND OPERATING HISTORY AND THAT

12:02PM  12  THE INVESTMENT WAS HIGHLY SPECULATIVE?

12:03PM  13  A.   NO.

12:03PM  14  Q.   YOU ACKNOWLEDGED THAT?

12:03PM  15  A.   NO, I'M NOT ACKNOWLEDGING THAT THAT'S MY UNDERSTANDING.

12:03PM  16       I'M ACKNOWLEDGING THAT THIS IS BOILERPLATE.  THAT IF YOU

12:03PM  17  WANT TO INVEST, YOU MUST SIGN THIS.  AND I HAD NO POWER TO

12:03PM  18  CHANGE THIS.  BUT THAT'S NOT MY UNDERSTANDING OF WHERE THE

12:03PM  19  COMPANY WAS.

12:03PM  20  Q.   WELL, THE COMPANY DIDN'T PUT A GUN TO YOUR HEAD AND MAKE

12:03PM  21  YOU INVEST, DID THEY?

12:03PM  22  A.   EXCUSE ME.  I DON'T UNDERSTAND YOUR QUESTION.

12:03PM  23  Q.   YOU WERE PERFECTLY FREE NOT TO SIGN THIS DOCUMENT, WEREN'T

12:03PM  24  YOU?

12:03PM  25  A.   SIGNING THE DOCUMENT WAS A PRECONDITION TO INVESTING IN

12:03PM  1    SOMETHING THAT I WAS MADE OF THE UNDERSTANDING THAT THIS WAS A

12:03PM  2    COMPANY THAT HAD PROVEN ITSELF, WAS SUCCESSFUL, AND THIS WAS A

12:03PM  3    FAVOR TO BE ABLE TO INVEST AT $15 BECAUSE THEY WERE SUCCESSFUL

12:03PM  4    AND ON THEIR WAY.  AND AROUND THE CORNER THEY WERE GOING TO

12:03PM  5    SELL A LOT OF STOCK TO INVESTORS AT $17 TO FURTHER HELP THE

12:03PM  6    COMPANY GROW.

12:03PM  7    Q.   I SEE.  SO YOU SAY THAT THE DOCUMENT WHICH CONSTITUTED THE

12:03PM  8    DOCUMENT REFLECTING YOUR AGREEMENT, THAT HAD NO MEANING;

12:04PM  9    CORRECT?  THAT'S WHAT YOU'RE SAYING?

12:04PM  10   A.   I'M NOT SAYING THAT IT HAD NO MEANING, BUT THIS IS LEGAL

12:04PM  11   BOILERPLATE THAT IS IN EVERY --

12:04PM  12   Q.   WHAT MEANING WOULD YOU ACKNOWLEDGE THAT IT HAD?

12:04PM  13   A.   CAN YOU REPHRASE YOUR QUESTION.  I DON'T UNDERSTAND IT.

12:04PM  14   Q.   WELL, YOU ACKNOWLEDGED THAT THIS LEGAL DOCUMENT, WHICH YOU

12:04PM  15   SIGNED, AND WHICH THERANOS RELIED ON, HAS SOME MEANING; RIGHT?

12:04PM  16   A.   NO, I DON'T ACKNOWLEDGE THAT.

12:04PM  17   Q.   YOU BELIEVE IT HAS NO MEANING.  OKAY.

12:04PM  18        LET'S MOVE NEXT TO THE ISSUE OF OPPORTUNITIES THAT YOU HAD

12:04PM  19   AT VARIOUS POINTS IN TIME TO SELL YOUR SHARES IN THERANOS.

12:04PM  20        DO YOU RECALL WHEN WE LOOKED AT SOME DOCUMENTS FROM MAY OF

12:04PM  21   2010 THAT THERE WAS A REFERENCE TO AN OFFER MADE TO YOU TO SELL

12:04PM  22   YOUR STOCK AT FIVE TIMES WHAT YOU PAID FOR THEM?

12:04PM  23   A.   NOT A GENUINE OFFER, BUT I DO RECALL.

12:04PM  24   Q.   LET'S LOOK BACK AT EXHIBIT 14103.

12:05PM  25        AND I'M LOOKING AT THE EMAIL AT THE TOP OF THAT EXHIBIT,

12:05PM   1    THE VERY TOP EMAIL EXCHANGE, WHICH IS AN EMAIL FROM MS. HOLMES

12:05PM   2    TO YOU.

12:05PM   3        DO YOU HAVE THAT?

12:05PM   4    A.   YES.

12:05PM   5    Q.   OKAY.  AND I'M JUST DIRECTING YOUR ATTENTION TO THE LAST

12:05PM   6    PARAGRAPH.

12:05PM   7        DO YOU SEE THAT?

12:05PM   8    A.   YES.

12:05PM   9    Q.   AND MS. HOLMES SAYS TO YOU, "GIVEN YOUR FRUSTRATION LEVEL

12:05PM   10   AND OUR FRUSTRATION LEVEL WITH THIS INTERACTION, I STRONGLY

12:05PM   11   ENCOURAGE YOU TO RE-CONSIDER THE OPPORTUNITY I PRESENTED ON OUR

12:05PM   12   LAST CALL TO REALIZE THE RETURN ON YOUR INVESTMENT.  WE

12:06PM   13   RECOGNIZE YOU HAVE BEEN AN INVESTOR FOR SOME TIME, AND IF WE

12:06PM   14   PROCEED WITH THE TRANSACTION WE ARE PROPOSING WE CAN PROVIDE

12:06PM   15   YOU WITH A GREATER THAN 5X RETURN ON YOUR INVESTMENT IN

12:06PM   16   THERANOS."

12:06PM   17       CORRECT?

12:06PM   18   A.   CORRECT.

12:06PM   19   Q.   NOW, HAD YOU SOLD YOUR SHARES IN 2013 IN THERANOS AT A 5X

12:06PM   20   VALUATION, THAT WOULD HAVE BEEN A LITTLE BIT UNDER $6 MILLION

12:06PM   21   FOR YOU; IS THAT RIGHT?

12:06PM   22   A.   THERE'S NO WAY I COULD HAVE SOLD MY SHARES AT 5X BECAUSE I

12:06PM   23   WAS SERIOUSLY CONSIDERING THIS OFFER, AND THE COMPANY NEVER

12:06PM   24   CAME THROUGH WITH THE OFFER.  THEY JUST MENTIONED IT, AND THEY

12:06PM   25   DROPPED THE BALL.

12:06PM 1    Q.   YOU DIDN'T RESPOND TO THIS EMAIL BY SAYING, BOY, I'LL TAKE

12:06PM 2    THAT OFFER, DID YOU?

12:06PM 3    A.   I DON'T RECALL HOW I RESPONDED.

12:06PM 4    Q.   WELL, IN FACT, YOU SENT A SERIES OF EMAILS OVER THE NEXT

12:06PM 5    SEVERAL MONTHS SAYING THAT YOU WANTED THIS PIECE OF

12:06PM 6    INFORMATION, AND THAT PIECE OF INFORMATION, AND ANOTHER PIECE

12:07PM 7    OF INFORMATION; CORRECT?

12:07PM 8    A.   WHICH IS A LOGICAL RESPONSE IF YOU'RE GOING TO SELL STOCK.

12:07PM 9    YOU WOULD LIKE TO BE AN INFORMED INVESTOR, NOT TO BE TOTALLY

12:07PM 10   HIDDEN AND ALL OF THE INFORMATION FROM THE COMPANY BEFORE YOU

12:07PM 11   MAKE AN INVESTMENT DECISION.  IT HAPPENS WITH EVERY OTHER

12:07PM 12   INVESTMENT I'VE EVER BEEN IN.  NOBODY HAS EVER TREATED ME THIS

12:07PM 13   WAY.

12:07PM 14   Q.   IN OTHER WORDS, WHAT YOU'RE SAYING IS THAT YOU KNEW AT THE

12:07PM 15   TIME THAT THE COMPANY WAS SIX YEARS OLD, THAT A RETURN WHICH

12:07PM 16   MADE YOU $5 AND A HALF MILLION WAS NOT SUFFICIENT FROM YOUR

12:07PM 17   PERSPECTIVE.  YOU NEEDED MORE INFORMATION TO MAKE THAT

12:07PM 18   DECISION; IS THAT RIGHT?

12:07PM 19   A.   IT IS CORRECT THAT TO MAKE ANY INVESTMENT DECISION YOU

12:07PM 20   HAVE TO HAVE KNOWLEDGE ABOUT WHAT IS GOING ON WITH THE COMPANY.

12:07PM 21       I DID NOT HAVE ANY KNOWLEDGE FOR AN EXTENDED PERIOD OF

12:07PM 22   TIME, BUT I DID HAVE PRIOR KNOWLEDGE THAT THEY PROMISED THEY

12:07PM 23   WERE GOING TO DO HUNDREDS OF MILLIONS OF DOLLARS OF REVENUE,

12:07PM 24   THEY HAD ALL OF THESE CONTRACTS WITH MAJOR INTERNATIONAL

12:07PM 25   PHARMACEUTICAL COMPANIES, THEY WERE, THEY WERE GOING INTO A

12:08PM   1    SECOND LINE OF BUSINESS BY SELLING DATA.  THERE WAS POTENTIAL

12:08PM   2    VALUE IN THIS COMPANY AT A MUCH EARLIER STAGE, AND I WAS

12:08PM   3    TOTALLY IN THE DARK FOR AN EXTENDED PERIOD OF TIME BEFORE THIS

12:08PM   4    OFFER WAS MADE.

12:08PM   5         AND AGAIN, I'LL EMPHASIZE, I CONSIDERED THIS OFFER, BUT IT

12:08PM   6    NEVER CAME THROUGH.  THEY NEVER FOLLOWED UP.

12:08PM   7    Q.   OKAY.  THEN AFTER YOU INVESTED AGAIN IN DECEMBER OF 2013,

12:08PM   8    YOU HAD OTHER OPPORTUNITIES TO SELL YOUR SHARES IN THERANOS; IS

12:08PM   9    THAT RIGHT?

12:08PM   10   A.   COULD YOU REFRESH MY MEMORY.

12:08PM   11   Q.   SURE.  LOOK AT --

12:09PM   12        YOUR HONOR, I'M SHOWING THE WITNESS EXHIBIT 2468, WHICH IS

12:09PM   13   IN THE GOVERNMENT'S NOTEBOOK FROM FRIDAY.

12:09PM   14        MAY I APPROACH THE WITNESS?

12:09PM   15             THE COURT:  YES, YES.

12:09PM   16   BY MR. DOWNEY:

12:09PM   17   Q.   (HANDING.)

12:09PM   18             THE COURT:  THIS IS THE REDACTED VERSION?

12:09PM   19             MR. DOWNEY:  CORRECT.  I BELIEVE SO.

12:10PM   20   Q.   AND ALL I'M REALLY INTERESTED IN HERE IS THE EMAIL AT THE

12:10PM   21   BOTTOM OF PAGE 2 AT 8:26 A.M. ON MARCH 30, 2015.

12:10PM   22        DO YOU SEE THAT?

12:10PM   23   A.   YES.

12:10PM   24   Q.   AND IN THIS EMAIL YOU TELL MR. BALWANI THAT YOU HAD BEEN

12:10PM   25   INFORMED OF AN OPPORTUNITY TO SELL THERANOS STOCK; IS THAT

12:10PM 1    RIGHT?

12:10PM 2    A.   YES.

12:10PM 3    Q.   AND I WANT TO GO UP ABOVE THAT.

12:10PM 4        AND MR. BALWANI TELLS YOU THAT "THE LAST TRANSACTION WAS

12:10PM 5    AT $17 PER SHARE AS YOU ALREADY KNOW."

12:10PM 6        HE DIDN'T SAY THAT THERANOS WOULD EVER CONSIDER A

12:10PM 7    LIQUIDITY EVENT IN 2015, AND HE DIDN'T KNOW ANYTHING ABOUT THE

12:10PM 8    TRANSACTION BELOW.

12:10PM 9        DO YOU SEE THAT?

12:10PM 10   A.   YES.

12:10PM 11   Q.   WHAT OPPORTUNITY HAD MR. BALWANI -- HAD COME TO YOUR

12:10PM 12   ATTENTION THAT YOU WERE EMAILING MR. BALWANI ABOUT?

12:11PM 13   A.   YOU KNOW, I'M NOT SURE OF THE TIMELINE, AND I'M NOT SURE

12:11PM 14   IF THIS WAS THE TRANSACTION.

12:11PM 15       BUT I WAS APPROACHED BY CHRIS BOIES, WHO IS THE SON OF

12:11PM 16   DAVID BOIES, WHO IS THE THERANOS COUNSEL, THAT IF I WAS WILLING

12:11PM 17   TO SELL ALL OF MY STOCK AND THERE WAS ANOTHER COINVESTOR WHO

12:11PM 18   WAS ALSO ASKING QUESTIONS, IF HE JOINED ME IN SELLING

12:11PM 19   100 PERCENT OF HIS STOCK, THAT THEY WERE WILLING TO BUY US OUT

12:11PM 20   OF ALL OF OUR STOCK.

12:11PM 21   Q.   OKAY.  LET ME -- WE'LL GET TO THAT IN A MOMENT.  LET ME

12:11PM 22   ASK YOU TO LOOK BRIEFLY AT THE TOP OF PAGE 3 OF THIS EMAIL TO

12:11PM 23   SEE IF THIS IS A DIFFERENT EVENT.

12:11PM 24       YOU CAN JUST HIGHLIGHT THE FIRST PARAGRAPH THERE.

12:11PM 25       AND DO YOU SEE THERE THAT THERE IS A REFERENCE TO AN

12:11PM 1    ENTITY CALLED BROADMARK?

12:11PM 2    A.   I DO.

12:11PM 3    Q.   AND WHAT IS BROADMARK?

12:11PM 4    A.   I DON'T RECALL.

12:11PM 5    Q.   IS THAT FORM OF SOME ENTITY THAT WAS CREATED SPECIALLY TO

12:12PM 6    INVEST IN THERANOS SHARES?

12:12PM 7    A.   CAN YOU TELL ME?  I DON'T RECALL WHO BROADMARK IS.

12:12PM 8    Q.   WELL, I'M ASKING YOU.  I DON'T KNOW.  I WASN'T PART OF

12:12PM 9    THESE EMAIL COMMUNICATIONS.

12:12PM 10   A.   YEAH, I DON'T RECALL WHO THEY ARE.

12:12PM 11   Q.   OKAY.  AND DO YOU SEE THAT THE EMAIL GOES ON TO SAY THAT

12:12PM 12   "THE SHARES ARE BEING SOLD BY EXISTING THERANOS SHAREHOLDERS"?

12:12PM 13   A.   YES.

12:12PM 14   Q.   AND THEN IT GOES ON TO DESCRIBE SOME FINANCIAL ISSUES,

12:12PM 15   VALUATION, AND PROVIDING AN OPPORTUNITY, ET CETERA; CORRECT?

12:12PM 16   A.   YEAH.  I ALSO SEE IT SAYS THAT THEY'RE SUBJECT TO A RIGHT

12:12PM 17   OF FIRST REFUSAL, SO YOU HAVE TO OFFER THEM TO THE COMPANY

12:12PM 18   FIRST AND GET THEIR PERMISSION PRESUMABLY.

12:12PM 19   Q.   RIGHT.  THIS WOULD NOT BE THE OFFER FROM THE COMPANY THAT

12:12PM 20   YOU MENTIONED A MOMENT AGO; RIGHT?

12:12PM 21   A.   I STAND CORRECTED.

12:12PM 22   Q.   THIS WOULD BE AN OFFER BY A THIRD PARTY, WE WILL BUY YOUR

12:12PM 23   SHARES; CORRECT?

12:12PM 24   A.   CORRECT.

12:12PM 25   Q.   AND THEN YOU WERE COMMUNICATING WITH MR. BALWANI ABOUT

12:13PM 1    THAT; CORRECT?

12:13PM 2    A.   CORRECT.

12:13PM 3    Q.   NOW, IN THIS OFFER IT CONVEYS THAT THERE WAS A $9 BILLION

12:13PM 4    VALUATION IN MAY OF 2014.

12:13PM 5         DO YOU SEE THAT?

12:13PM 6    A.   YES.

12:13PM 7    Q.   AND WHAT WOULD YOUR SHARES IN THERANOS BE WORTH, THE

12:13PM 8    SHARES THAT YOU PAID A MILLION DOLLARS FOR, WHAT WOULD THEY BE

12:13PM 9    WORTH AT A $9 BILLION VALUATION FOR THE COMPANY?

12:13PM 10   A.   I WOULD HAVE TO HAVE A CALCULATOR.  YOU COULD PROBABLY

12:13PM 11   TELL ME.

12:13PM 12   Q.   WELL, AM I RIGHT THAT IT WOULD BE SOMEWHERE BETWEEN $30

12:13PM 13   AND $35 MILLION?

12:13PM 14   A.   I DON'T KNOW.

12:13PM 15   Q.   OKAY.  NOW, DID YOU PROCEED WITH THIS OFFER FROM BROADMARK

12:13PM 16   TO SELL YOUR SHARES IN THERANOS?

12:13PM 17   A.   I, I DON'T HAVE A STRONG RECOLLECTION.  I'M SURE THAT I

12:13PM 18   PURSUED IT TO SEE IF IT WAS LEGITIMATE, AND I DON'T RECALL IF

12:13PM 19   THIS OFFER WAS LEGITIMATE OR NOT, IF IT WAS REALLY AN

12:14PM 20   OPPORTUNITY, BECAUSE THERE WERE A LOT OF OPPORTUNITIES FLOATING

12:14PM 21   AROUND IN THE MARKET, AND MOST OF THEM WERE NOT LEGITIMATE.

12:14PM 22   Q.   AND IS IT FAIR TO SAY, JUST BASED ON YOUR RECOLLECTION,

12:14PM 23   YOU DON'T HAVE A VERY STRONG RECOLLECTION OF THE BROADMARK

12:14PM 24   OFFER TO YOU ONE WAY OR THE OTHER?

12:14PM 25   A.   NO, I DON'T.

12:14PM 1    Q.   LET ME ASK YOU TO LOOK AT 13150.  AND I MAY HAVE TO GIVE

12:14PM 2    YOU -- OH, NO.  IT SHOULD BE IN YOUR NOTEBOOK.

12:14PM 3    A.   OKAY.

12:14PM 4    Q.   AND WITH RESPECT TO THE EMAIL, EXCHANGES IN THIS EMAIL,

12:14PM 5    ARE THEY EMAIL EXCHANGES BETWEEN -- ONE EMAIL IS BETWEEN YOU

12:15PM 6    AND CHRIS BOIES; CORRECT?

12:15PM 7    A.   CORRECT.

12:15PM 8    Q.   AND ONE EMAIL IS BETWEEN YOU AND MR. HARRIS, ANOTHER

12:15PM 9    INVESTOR FROM HOUSTON; IS THAT RIGHT?

12:15PM 10   A.   YES.

12:15PM 11   Q.   OKAY.  AND THESE ALL RELATE TO YOUR INVESTMENT IN

12:15PM 12   THERANOS; CORRECT?

12:15PM 13   A.   CORRECT.

12:15PM 14          MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT 13150.

12:15PM 15          MR. BOSTIC:  YOUR HONOR, JUST 401 AND BEYOND THE

12:15PM 16   SCOPE OF THE DIRECT IN LIGHT OF THE TIMING.

12:15PM 17       (PAUSE IN PROCEEDINGS.)

12:15PM 18          THE COURT:  ALL RIGHT.  THANK YOU.  I'LL ALLOW IT.

12:15PM 19   IT'S ADMITTED OVER OBJECTION.  IT CAN BE PUBLISHED.

12:16PM 20       (DEFENDANT'S EXHIBIT 13150 WAS RECEIVED IN EVIDENCE.)

12:16PM 21   BY MR. DOWNEY:

12:16PM 22   Q.   I'LL ASK YOU TO LOOK AT THE BOTTOM EMAIL FIRST.

12:16PM 23   A.   OKAY.

12:16PM 24   Q.   AND THIS IS AN EMAIL FROM YOU TO CHRIS BOIES; CORRECT?

12:16PM 25   A.   CORRECT.

12:16PM  1    Q.   AND YOU'RE REPORTING ON A CALL THAT YOU HAD HAD WITH SOME

12:16PM  2    OF THE OTHER HOUSTON INVESTORS; CORRECT?

12:16PM  3    A.   CORRECT.

12:16PM  4    Q.   YOU'RE ASKING ABOUT A $15 OFFER TO BUY YOUR SHARES IN

12:16PM  5    THERANOS; CORRECT?

12:16PM  6    A.   CORRECT.

12:16PM  7    Q.   AND $15 IS THE VALUATION THAT HAD BEEN GIVEN TO SHARES

12:16PM  8    ABOUT A LITTLE OVER 18 MONTHS BEFORE THIS; CORRECT?

12:16PM  9    A.   CORRECT.

12:16PM  10   Q.   AND THE COMPANY HAD TOLD YOU, FOLLOWING UP ON SOME

12:16PM  11   COMMUNICATIONS THAT YOU HAD WITH THEM, THAT IT WAS WILLING TO

12:16PM  12   REPURCHASE YOUR SHARES IN THERANOS AT $15 A SHARE; CORRECT?

12:16PM  13   A.   INCORRECT.

12:17PM  14   Q.   OKAY.  WELL, YOU REFERENCED $15 OFFERED BY THE COMPANY AT

12:17PM  15   THE END OF THE FIRST PARAGRAPH OF YOUR EMAIL WITH CHRIS BOIES.

12:17PM  16        DO YOU SEE THAT?

12:17PM  17   A.   THEY MADE AN OFFER AT $15 AND THEY NEVER FOLLOWED THROUGH.

12:17PM  18   I TRIED TO CONTACT CHRIS BOIES FOR A PERIOD OF MONTHS, AND HE

12:17PM  19   DID NOT RESPOND TO EMAILS OR CALLS, SO IT WAS A FALSE OFFER.

12:17PM  20   Q.   OKAY.  WELL, LET'S START WITH WHAT THIS EMAIL REFLECTS.

12:17PM  21   YOU'RE REFERRING TO A $15 OFFER FROM THE COMPANY THAT YOU HAD

12:17PM  22   RECEIVED; CORRECT?

12:17PM  23   A.   CORRECT.

12:17PM  24   Q.   AND THEN YOU SAY, WELL, THE CURRENT VALUATION IS PROBABLY

12:17PM  25   WELL IN EXCESS OF $15; CORRECT?

EISENMAN CROSS BY MR. DOWNEY (RES.)

12:17PM 1    A.   CORRECT.

12:17PM 2    Q.   AND YOU WANT TO FIND OUT MORE INFORMATION ABOUT THE

12:17PM 3    COMPANY THAT WOULD ALLOW YOU TO MAKE A JUDGMENT AS TO WHETHER

12:17PM 4    YOU SHOULD, IN FACT, BE INVESTING AT MORE THAN -- IN FACT, YOUR

12:17PM 5    INVESTMENT WAS WORTH MORE THAN $15 PER SHARE; CORRECT?

12:18PM 6    A.   A LOGICAL QUESTION BEFORE YOU MAKE AN INVESTMENT DECISION

12:18PM 7    IS TO BE ARMED WITH FINANCIAL INFORMATION, AND WE HAD --

12:18PM 8    Q.   AND THAT'S WHAT YOU WERE TRYING TO DO?

12:18PM 9    A.   WE HAD NO FINANCIAL INFORMATION TO MAKE A RATIONAL

12:18PM 10   DECISION.

12:18PM 11   Q.   OKAY.  AND JUST TO SORT OF REORIENT US TO THIS VALUATION,

12:18PM 12   IT'S THE SAME VALUATION AT WHICH YOU BOUGHT SHARES 18 MONTHS

12:18PM 13   BEFORE.  THIS OFFER, HOWEVER YOU CHARACTERIZE IT, THIS OFFER

12:18PM 14   WAS AN OFFER TO BUY YOUR SHARES IN THERANOS AT SOMEWHERE

12:18PM 15   BETWEEN $25 AND $30 MILLION IN THERANOS; RIGHT?

12:18PM 16   A.   RIGHT.

12:18PM 17   Q.   AND YOU THOUGHT THAT THE SHARES WERE PROBABLY WORTH ABOUT

12:18PM 18   ANOTHER $4 A SHARE, CORRECT, POTENTIALLY?

12:18PM 19   A.   I DIDN'T KNOW WHAT THEY WERE WORTH.  I DIDN'T HAVE ANY

12:18PM 20   INFORMATION TO BASE A RATIONAL DECISION.

12:19PM 21   Q.   OKAY.  BUT YOU TOLD THERANOS THAT YOU HAD HEARD THERE WAS

12:19PM 22   A, QUOTE-UNQUOTE, "POST-MONEY ROUND AT $19;" CORRECT?

12:19PM 23   A.   I DON'T RECALL.

12:19PM 24   Q.   WHAT DOES THAT MEAN "A POST-MONEY ROUND AT $19"?

12:19PM 25   A.   THAT MEANS THEY'VE RAISED MONEY FROM OTHER INSTITUTIONS AT

12:19PM   1      $19 PER SHARE.

12:19PM   2      Q.   OKAY.  SO YOU WERE SAYING I MIGHT WANT $19 A SHARE, TOO;

12:19PM   3      RIGHT?

12:19PM   4      A.   I DON'T RECALL WHAT I WAS SAYING.

12:19PM   5      Q.   OKAY.  BUT IF YOU WERE TO GET $19 A SHARE, YOU WOULD BE

12:19PM   6      PAID -- INSTEAD OF BETWEEN $25 AND $30 MILLION FOR YOUR

12:19PM   7      $1 MILLION INVESTMENT, YOU WOULD BE PAID SOMEWHERE BETWEEN $30

12:19PM   8      AND $35 MILLION; CORRECT?

12:19PM   9      A.   NO, THAT'S NOT A FAIR QUESTION BECAUSE IT DOESN'T MATTER

12:19PM   10     WHAT YOU GET PAID, YOU MAKE A DECISION BASED ON FINANCIAL

12:19PM   11     INFORMATION, AND THERE WAS NO FINANCIAL INFORMATION COMING FOR

12:19PM   12     AN EXTENDED PERIOD OF TIME.

12:19PM   13     Q.   AND YOU WERE CONTACTING MR. BOIES ABOUT THIS BECAUSE HE

12:20PM   14     WAS A LAWYER FOR THE COMPANY; CORRECT?

12:20PM   15     A.   HE CONTACTED ME FIRST, AND I WAS TRYING TO RESPOND.

12:20PM   16     Q.   FAIR ENOUGH.

12:20PM   17          THE DIALOGUE THAT YOU WERE HAVING WITH MR. BOIES WAS IN

12:20PM   18     HIS ROLE AS A LAWYER FOR THERANOS?

12:20PM   19     A.   WELL, HIS DAD WAS CHIEF COUNSEL.  I DON'T KNOW WHAT

12:20PM   20     CHRIS'S ROLE WAS.  HE'S SON OF DAVID, BUT I DON'T KNOW IF HE

12:20PM   21     HAD A ROLE WITH THE COMPANY OR IF THIS WAS JUST A ONE-OFF LEGAL

12:20PM   22     MATTER FOR HIM TO HANDLE.

12:20PM   23     Q.   RIGHT.  BUT YOUR UNDERSTANDING WAS THAT HE WAS

12:20PM   24     REPRESENTING THERANOS IN SOME CAPACITY --

12:20PM   25     A.   YES, THAT'S FAIR.

12:20PM  1     Q.   -- IN YOUR DEALINGS WITH HIM?

12:20PM  2          AND SO THAT TRANSACTION AT $15 A SHARE NEVER HAPPENED;

12:20PM  3     CORRECT?

12:20PM  4     A.   AS I MENTIONED, THEY DROPPED THE BALL.  THEY STOPPED

12:20PM  5     COMMUNICATING.

12:20PM  6     Q.   OKAY.  AND THEN ABOUT A MONTH AFTER THIS IN AUGUST, THIS

12:20PM  7     IS FROM AUGUST OF 2015; CORRECT?

12:20PM  8     A.   YES.

12:20PM  9     Q.   AND THEN ABOUT A MONTH LATER YOU WENT OUT TO SEE IF YOU

12:20PM  10    COULD EVEN GET A BETTER OFFER FROM SOMEBODY ELSE, YOU WENT TO

12:20PM  11    AN ENTITY CALLED SHARESPOST; RIGHT?

12:20PM  12    A.   YES.

12:21PM  13    Q.   OKAY.  LET ME ASK YOU TO LOOK AT EXHIBIT 13191.

12:21PM  14    A.   OKAY.

12:21PM  15    Q.   AND GO DOWN TO THE BOTTOM OF -- WELL, LET ME ASK YOU, THIS

12:21PM  16    IS AN EMAIL EXCHANGE ABOUT YOUR THERANOS INVESTMENT WITH AN

12:21PM  17    INDIVIDUAL FROM AN ENTITY CALLED SHARESPOST; RIGHT?

12:21PM  18    A.   YES.

12:21PM  19    Q.   AND WHAT IS SHARESPOST?

12:21PM  20    A.   MY UNDERSTANDING IS THAT IT'S A MARKET MAKER TO MATCH

12:21PM  21    BUYERS AND SELLERS AND PRIVATE SECURITIES.

12:21PM  22    Q.   AND CAN YOU GIVE US MORE EXPLANATION ABOUT WHAT A MARKET

12:22PM  23    MAKER IS?

12:22PM  24    A.   IF THERE'S AN ILLIQUID INVESTMENT, IT TRIES TO PUT

12:22PM  25    TOGETHER BUYERS AND SELLERS, AND THEY TAKE A COMMISSION, AND

12:22PM  1    THEY TRY TO MATCH BUYERS AND SELLERS.

12:22PM  2    Q.   SO AN INVESTMENT THAT IS IN A PRIVATE COMPANY LIKE

12:22PM  3    THERANOS, THAT'S NOT TRADED ON THE NEW YORK STOCK EXCHANGE OR

12:22PM  4    ANY STOCK EXCHANGE; CORRECT?

12:22PM  5    A.   NO.

12:22PM  6    Q.   SO IF PEOPLE WHO HOLD SHARES IN THERANOS WANT TO SELL

12:22PM  7    THEIR SHARES IN THERANOS, THEY HAVE TO FIND ON THEIR OWN

12:22PM  8    SOMEONE TO SELL THOSE SHARES TO; CORRECT?

12:22PM  9    A.   CORRECT.

12:22PM  10   Q.   BUT SHARESPOST IS AN ENTITY THAT SAYS, WELL, WE'LL DO THAT

12:22PM  11   WORK FOR YOU, WE'LL FIND SOMEBODY WHO IS WILLING TO BUY YOUR

12:22PM  12   SHARES AT A CERTAIN PRICE, AND THEN YOU CAN DECIDE WHETHER YOU

12:22PM  13   WANT TO SELL THE SHARES OR NOT; RIGHT?

12:22PM  14   A.   I DON'T RECALL IF IT'S A SOLID COMMITMENT OR A LESS SOLID

12:22PM  15   COMMITMENT.

12:22PM  16   Q.   OKAY.  BUT THE GIST OF IT IS THAT THEY LOOK FOR POTENTIAL

12:22PM  17   BUYERS; CORRECT?

12:22PM  18   A.   THEY MATCH BUYERS AND SELLERS AND THEY TAKE A COMMISSION.

12:22PM  19   Q.   RIGHT.  AND IN THIS INSTANCE YOU WERE A SELLER; CORRECT?

12:23PM  20   A.   CORRECT.

12:23PM  21   Q.   AND YOU WERE COMMUNICATING TO -- WITH THE REPRESENTATIVE

12:23PM  22   OF SHARESPOST IN EXHIBIT 13191 TO DETERMINE HOW MUCH YOUR

12:23PM  23   INVESTMENT IN THERANOS MIGHT BE WORTH; RIGHT?

12:23PM  24   A.   I WAS DETERMINING WHAT THE MARKET WAS WORTH AND WHAT

12:23PM  25   SOMEONE MIGHT PAY FOR MY SHARES.

EISENMAN CROSS BY MR. DOWNEY (RES.)

12:23PM   1              MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

12:23PM   2      13191.

12:23PM   3              MR. BOSTIC:  401.  BEYOND THE SCOPE.

12:23PM   4              THE COURT:  I'LL ALLOW IT.  IT'S ADMITTED OVER

12:23PM   5      OBJECTION.

12:23PM   6          (DEFENDANT'S EXHIBIT 13191 WAS RECEIVED IN EVIDENCE.)

12:23PM   7      BY MR. DOWNEY:

12:23PM   8      Q.  I WANT TO DIRECT YOUR ATTENTION TO AN EMAIL ON THE BOTTOM

12:23PM   9      OF THE PAGE, AND THIS IS AN EMAIL TO YOU FROM SOMEONE AT

12:23PM  10      SHARESPOST; CORRECT?

12:23PM  11      A.  I'M SORRY, WHAT IS THE QUESTION?

12:23PM  12      Q.  THE EMAIL THAT WE'RE LOOKING AT ON THE SCREEN, WHICH IS

12:24PM  13      THE BOTTOM EMAIL ON PAGE 1 OF THE EMAIL, IS AN EMAIL FROM

12:24PM  14      SHARESPOST TO YOU; CORRECT?

12:24PM  15      A.  CORRECT.

12:24PM  16      Q.  AND IN THIS EMAIL HE'S PROVIDING THE INFORMATION ABOUT THE

12:24PM  17      PRICE AT WHICH SHARESPOST HAS BEEN ABLE TO SET UP TRANSACTIONS

12:24PM  18      IN THERANOS STOCK; CORRECT?

12:24PM  19      A.  CORRECT.

12:24PM  20      Q.  AND HE TELLS YOU THAT THEY WERE ABLE TO DO A TRANSACTION

12:24PM  21      AT SOME POINT IN 2015 WHERE INVESTORS IN THERANOS SOLD THEIR

12:24PM  22      STOCK AT $14.75 A SHARE; CORRECT?

12:24PM  23      A.  CORRECT.

12:24PM  24      Q.  AND THAT BUYERS BOUGHT AT THAT PRICE; CORRECT?

12:24PM  25      A.  AGAIN, THERE'S A COMMISSION.  SO I DON'T KNOW WHAT THE

12:24PM  1    PRICE WAS ON EITHER SIDE, BUT THERE WAS A DIFFERENCE.

12:24PM  2    Q.   FAIR ENOUGH.

12:24PM  3         THERE MIGHT BE A MARGINAL DIFFERENCE FROM THE 14.75 PRICE;

12:24PM  4    RIGHT?

12:24PM  5    A.   RIGHT.

12:24PM  6    Q.   AND THAT'S THE KIND OF INFORMATION THAT YOU WERE SEEKING

12:25PM  7    FROM HIM.  SO IF I WENT OUT TO GO AND TRY TO SELL MY SHARES ON

12:25PM  8    THESE MARKETS, WHAT COULD I GET FROM THEM; RIGHT?

12:25PM  9    A.   RIGHT.

12:25PM 10    Q.   AND YOU WOULD AGREE WITH ME THAT IF YOU SOLD YOUR SHARES

12:25PM 11    AT $14.75 A SHARE, THAT YOUR MILLION DOLLAR INVESTMENT IN

12:25PM 12    THERANOS WOULD HAVE TURNED INTO -- YOU'RE PROBABLY BETTER AT

12:25PM 13    THE MATH THAN I AM -- BUT SOMEWHERE BETWEEN $20 AND

12:25PM 14    $25 MILLION?

12:25PM 15    A.   HOW IS THAT RELEVANT?

12:25PM 16    Q.   WELL, DO YOU AGREE WITH ME?

12:25PM 17    A.   YES.

12:25PM 18    Q.   THE MATH IS GENERALLY RIGHT; RIGHT?  WE CAN AGREE ON THE

12:25PM 19    MATH?

12:25PM 20    A.   OKAY.

12:25PM 21         THE COURT:  YOU CAN ASK ANOTHER QUESTION.

12:25PM 22    BY MR. DOWNEY:

12:25PM 23    Q.   LET ME ASK YOU TO GO TO THE EMAIL ABOVE THAT.

12:25PM 24         YOU RESPOND AND YOU SAY YOU GOT INFORMATION FROM ANOTHER

12:25PM 25    INDIVIDUAL AT SHARESPOST; CORRECT?  THAT'S GENO?

12:25PM 1    A.   CORRECT.

12:25PM 2    Q.   AND THAT HE TOLD YOU THAT CURRENT TRANSACTIONS WERE

12:25PM 3    SELLING IN THE $17 TO $19 PRICE RANGE; CORRECT?

12:26PM 4    A.   CORRECT.

12:26PM 5    Q.   AND THEN IF YOU GO TO THE EMAIL ABOVE THAT HE SAID TO YOU

12:26PM 6    THAT HE HAD RETURNED FROM A LONG VACATION AND THAT HE WOULD BE

12:26PM 7    ABLE TO DISCUSS WITH YOU; CORRECT?

12:26PM 8    A.   CORRECT.

12:26PM 9    Q.   AND THEN YOU EMAILED HIM BACK AND TOLD HIM THAT YOU NEED

12:26PM 10   ACCURATE INFORMATION; RIGHT?

12:26PM 11   A.   YES.

12:26PM 12   Q.   AND THEN IN THE LAST SENTENCE OF THAT YOU ASKED IS THE

12:26PM 13   MARKET LIQUID ENOUGH TO ABSORB $10 MILLION WITHOUT LOWERING MY

12:26PM 14   PRICE.

12:26PM 15       DO YOU SEE THAT?

12:26PM 16   A.   YES.

12:26PM 17   Q.   AND IS THAT, IS THAT QUESTION BY YOU AS TO WHETHER YOU

12:26PM 18   COULD SELL THE FIRST $10 MILLION OF YOUR SHARES WITHOUT IT

12:26PM 19   RESULTING IN THAT $14.75 PRICE BEING REDUCED?

12:26PM 20   A.   I DON'T HAVE ENOUGH INFORMATION TO ANSWER THAT QUESTION.

12:26PM 21   Q.   OKAY.  WELL, I'M JUST ASKING IN THIS EMAIL YOU PREPARED

12:27PM 22   HERE, WHAT IS -- WHAT DO YOU MEAN BY IS THE MARKET LIQUID

12:27PM 23   ENOUGH TO ABSORB $10 MILLION WITHOUT LOWERING MY PRICE?

12:27PM 24   A.   IT WAS JUST AN EXPLORATORY QUESTION TO SEE HOW LIQUID THE

12:27PM 25   MARKET WAS.

12:27PM  1    Q.   OKAY.  AND DID YOU GET INFORMATION AS TO WHAT WOULD HAPPEN

12:27PM  2    TO THE PRICE IF YOU SOLD $10 MILLION OR TRIED TO SELL

12:27PM  3    $10 MILLION AT $14.75 A SHARE?

12:27PM  4    A.   I DON'T RECALL.

12:27PM  5    Q.   OKAY.  NOW, DURING THIS WINDOW BOTH PRIOR TO YOUR 2013

12:27PM  6    INVESTMENT AND AFTER YOUR 2013 INVESTMENT, AM I RIGHT THAT YOU

12:27PM  7    WERE HUNGRY FOR INFORMATION ABOUT THERANOS; IS THAT RIGHT?

12:27PM  8    A.   I WAS SEEKING INFORMATION.

12:27PM  9    Q.   RIGHT.  AND YOU WANTED TO KNOW ANY INFORMATION YOU COULD

12:27PM  10   ABOUT THERANOS; IS THAT RIGHT?

12:27PM  11   A.   I WAS SEEKING INFORMATION.

12:27PM  12   Q.   OKAY.  SO AM I RIGHT THAT IF THERE WERE NEWSPAPER ARTICLES

12:27PM  13   OR ONLINE MAGAZINE ARTICLES OR SO FORTH, YOU READ THOSE?

12:27PM  14   A.   I READ SOME OF THEM.

12:27PM  15   Q.   OKAY.  WHY DID YOU ONLY READ SOME OF THEM WHEN YOU WERE

12:28PM  16   EAGER FOR INFORMATION ABOUT THERANOS?

12:28PM  17   A.   BECAUSE THERE WAS A TREMENDOUS VOLUME OF INFORMATION ABOUT

12:28PM  18   THERANOS.

12:28PM  19   Q.   OKAY.

12:28PM  20   A.   AND IT WOULD HAVE BEEN DIFFICULT TO READ EVERY PIECE OF

12:28PM  21   INFORMATION THAT WAS PUBLISHED.

12:28PM  22   Q.   OKAY.  WELL, YOU KNEW THAT THERANOS HAD ALSO PUT UP A

12:28PM  23   WEBSITE; CORRECT?

12:28PM  24   A.   CORRECT.

12:28PM  25   Q.   AND AM I RIGHT THAT AS AN INVESTOR IN THE COMPANY THAT WAS

12:28PM 1    EAGER TO UNDERSTAND THE COMPANY, YOU REVIEWED THAT WEBSITE?

12:28PM 2    A.   YES.

12:28PM 3    Q.   FROM TOP TO BOTTOM?

12:28PM 4    A.   I CAN'T SAY FROM TOP TO BOTTOM, BUT I REVIEWED THE

12:28PM 5    WEBSITE.

12:28PM 6    Q.   OKAY.  AND YOU KNEW THAT WALGREENS -- YOU KNEW AT SOME

12:28PM 7    POINT THAT WALGREENS WAS THE PARTNER WITH WHOM WALGREENS --

12:28PM 8    WELL, THERANOS WAS LAUNCHING TESTING SERVICES; RIGHT?

12:28PM 9    A.   RIGHT.

12:28PM 10   Q.   AND DID YOU REVIEW WALGREENS'S ANNOUNCEMENT ABOUT THEIR

12:28PM 11   PARTNERSHIP WITH THERANOS?

12:28PM 12   A.   I DON'T RECALL.

12:28PM 13   Q.   OKAY.  DID YOU REVIEW THE WALGREENS WEBSITE WITH RESPECT

12:29PM 14   TO THE PORTIONS OF THE WALGREENS WEBSITE THAT TALKED ABOUT THE

12:29PM 15   THERANOS SERVICES OFFERED IN THEIR STORES?

12:29PM 16   A.   I DON'T RECALL.

12:29PM 17   Q.   OKAY.  WHEN THERANOS AND WALGREENS MADE AN ANNOUNCEMENT OF

12:29PM 18   THEIR JOINT PROJECT OF OFFERING BLOOD TESTING SERVICES, DID YOU

12:29PM 19   SEE IF THEY HAD ISSUED TOGETHER A PRESS RELEASE?

12:29PM 20   A.   I READ THE PUBLICITY AT THE TIME, BUT I DON'T RECALL IF IT

12:29PM 21   WAS JOINED OR IF IT WAS FROM THERANOS.

12:29PM 22   Q.   OKAY.  WHATEVER THE ANNOUNCEMENTS WERE OF IT, YOU'RE

12:29PM 23   CONFIDENT THAT YOU READ IT; CORRECT?

12:29PM 24   A.   YES.

12:29PM 25   Q.   OKAY.  NOW, I WANT TO ASK YOU, AS A FINAL SUBJECT, ABOUT

12:29PM   1   SOME COMMUNICATIONS THAT YOU HAD WITH THE PROSECUTION TEAM IN

12:30PM   2   THIS MATTER BEYOND THE ONES THAT WE TALKED ABOUT EARLIER.

12:30PM   3        FIRST OF ALL, WILL YOU TELL US, HOW MANY TIMES HAVE YOU

12:30PM   4   MET WITH REPRESENTATIVES OF THE GOVERNMENT IN CONNECTION WITH

12:30PM   5   YOUR TESTIMONY HERE TODAY?

12:30PM   6   A.   I'M SORRY, I -- HOW MANY TIMES HAVE I MET SINCE?

12:30PM   7   Q.   WELL, HOW MANY TIMES -- AT SOME POINT YOU BEGAN MEETING

12:30PM   8   WITH LAWYERS AND AGENTS FROM THE GOVERNMENT; CORRECT?

12:30PM   9   A.   THE FIRST PERSONAL MEETING WAS BEFORE I CAME TO SAN JOSE

12:30PM  10   FOR MY FIRST TESTIMONY.

12:30PM  11   Q.   OKAY.  AND SINCE THAT MEETING, HOW MANY OTHER MEETINGS

12:30PM  12   HAVE YOU HAD WITH THE GOVERNMENT IN CONNECTION WITH THE

12:30PM  13   THERANOS MATTERS?

12:30PM  14   A.   REALLY NONE WHERE THERE'S BEEN ANYTHING SUBSTANTIVE

12:30PM  15   DISCUSSED.

12:30PM  16   Q.   OKAY.  WELL, LET ME ASK YOU TO LOOK AT -- DO YOU

12:30PM  17   ACKNOWLEDGE THAT YOU'VE HAD SOME MEETINGS WITH THE GOVERNMENT?

12:30PM  18   A.   I ACKNOWLEDGE THAT WE HAVE -- I DON'T KNOW IF YOU WOULD

12:31PM  19   CALL THEM MEETINGS, BUT WE HAVE SEEN EACH OTHER AND BEEN

12:31PM  20   DIRECTED TO THE CONFERENCE ROOM AND -- YEAH.

12:31PM  21   Q.   WELL, WHEN YOU'VE SEEN EACH OTHER AND DIRECTED TO THE

12:31PM  22   CONFERENCE ROOM, DID YOU GO INTO THE CONFERENCE ROOM AND

12:31PM  23   DISCUSS MATTERS RELATED TO YOUR INVESTMENTS IN THERANOS?

12:31PM  24   A.   MY RECOLLECTION IS NO.

12:31PM  25   Q.   SO YOU'VE NEVER HAD A MEETING WITH THE GOVERNMENT WHERE

12:31PM    1       YOU DISCUSSED YOUR INVESTMENT WITH THERANOS?

12:31PM    2       A.   AS I MENTIONED EARLIER, I HAD A MEETING WITH THEM BEFORE

12:31PM    3       MY FIRST PROPOSED TESTIMONY.

12:31PM    4       Q.   OKAY.  AND WHERE WAS YOUR FIRST PROPOSED TESTIMONY?  YOU

12:31PM    5       MEAN DURING THE COURSE OF THIS TRIAL?

12:31PM    6       A.   WELL, IT WAS SUPPOSED TO BE HERE, THE FIRST TIME THAT I

12:31PM    7       WAS CALLED, BECAUSE WITNESSES RAN OVER.  I NEVER TESTIFIED THE

12:31PM    8       FIRST TIM THAT I WAS ASKED TO COME TO SAN JOSE.

12:32PM    9       Q.   I SEE.  YOU'RE TALKING ABOUT YOUR TESTIMONY IN THIS MATTER

12:32PM   10       IN THIS TRIAL?

12:32PM   11       A.   YES, YES.

12:32PM   12       Q.   OKAY, OKAY.

12:32PM   13            BUT OTHER THAN THAT, YOU DON'T RECALL ANY SUCH MEETINGS?

12:32PM   14       A.   NOT IN-PERSON MEETINGS.  IS THAT WHAT YOU'RE REFERRING TO?

12:32PM   15       Q.   WELL, HAD YOU HAD TELEPHONIC MEETINGS?  I THOUGHT YOU SAID

12:32PM   16       HE SAW THEM AND THEY DIRECTED YOU INTO A CONFERENCE ROOM?

12:32PM   17       A.   YEAH, THERE WERE TELEPHONIC MEETINGS.

12:32PM   18       Q.   OKAY.  HOW MANY TELEPHONIC MEETINGS DID YOU HAVE WITH THE

12:32PM   19       GOVERNMENT ABOUT YOUR INVESTMENT IN THERANOS?

12:32PM   20       A.   I DON'T RECALL.  I WOULD GUESS MAYBE TWO OR THREE.

12:32PM   21       Q.   WELL, DIDN'T YOU TESTIFY WAY BACK IN 2019 THAT YOU HAD

12:32PM   22       ALREADY MET WITH THE GOVERNMENT SIX TO TEN TIMES?

12:32PM   23       A.   I'M SORRY, I DON'T FOLLOW YOUR QUESTION.

12:32PM   24       Q.   WELL, YOU JUST TOLD ME THAT YOU MET WITH THE GOVERNMENT IN

12:32PM   25       CONNECTION WITH YOUR INVESTMENT IN THERANOS TWO OR THREE TIMES.

12:32PM  1          DO YOU REMEMBER SAYING THAT A MOMENT AGO?

12:32PM  2     A.   LET ME GO BACK.  I'M A LITTLE BIT UNCLEAR ON WHAT YOU'RE

12:33PM  3     ASKING ME.

12:33PM  4          I CAME HERE TO TESTIFY AND HAVE A MEETING.

12:33PM  5     Q.   I THINK WE'RE NOT UNDERSTANDING EACH OTHER.  I AM ASKING

12:33PM  6     YOU HOW MANY MEETINGS YOU HAVE HAD WITH THE GOVERNMENT ABOUT

12:33PM  7     YOUR INVESTMENT IN THERANOS?

12:33PM  8     A.   OKAY.  IS YOUR QUESTION ABOUT MEETINGS OVER THE TELEPHONE?

12:33PM  9     Q.   TELEPHONIC MEETINGS, IN-PERSON MEETINGS, MEETINGS WHERE

12:33PM 10     THEY DIRECTED YOU TO THE CONFERENCE ROOM?

12:33PM 11     A.   OKAY.  I DON'T RECALL THE NUMBER.

12:33PM 12     Q.   IT'S MORE THAN TEN, ISN'T IT?

12:33PM 13     A.   I CAN'T RECALL THE NUMBER.

12:33PM 14     Q.   OKAY.  YOU CAN'T SAY WHETHER IT'S MORE THAN TEN?

12:33PM 15     A.   I DON'T RECALL.

12:33PM 16     Q.   OKAY.  IS IT MORE THAN TWO?

12:33PM 17     A.   MOST LIKELY.

12:33PM 18     Q.   OKAY.  BUT YOU DON'T HAVE AN ESTIMATE OF SOMEWHERE BETWEEN

12:33PM 19     TWO AND TEN?

12:33PM 20     A.   I DON'T.

12:33PM 21     Q.   OKAY.  AND DO YOU ACKNOWLEDGE THAT YOU'VE BEEN IN REGULAR

12:33PM 22     TOUCH WITH MEMBERS OF THE PROSECUTION TEAM AND FBI AGENTS ABOUT

12:34PM 23     THERANOS?

12:34PM 24     A.   MY RECOLLECTION IS THAT IT'S NOT -- IT HAS NOT BEEN

12:34PM 25     REGULAR COMMUNICATION.  THERE HAS BEEN SOME IRREGULAR, AND AS I

12:34PM   1        MENTIONED EARLIER, I CAN'T, I CAN'T TELL YOU HOW MANY TIMES

12:34PM   2        THAT HAS BEEN.

12:34PM   3        Q.   AND WHAT DO YOU MEAN WHEN YOU SAY "IRREGULAR"?

12:34PM   4        A.   THERE HAVE BEEN SOME COMMUNICATIONS OVER A PERIOD AND,

12:34PM   5        AGAIN, EVERYTHING SORT OF RUNS TOGETHER.  IT COULD BE OVER THE

12:34PM   6        LAST ONE YEAR OR TWO YEARS.  I DON'T RECALL.

12:34PM   7             BUT THERE HAVE BEEN COMMUNICATIONS THAT HAVE BEEN OVER THE

12:34PM   8        LAST YEAR OR TWO, GIVE OR TAKE, AND I CANNOT TELL YOU HOW MANY

12:34PM   9        COMMUNICATIONS THERE HAVE BEEN.

12:34PM  10        Q.   OKAY.  AND IS IT FAIR TO SAY THAT AS A RESULT OF THOSE

12:34PM  11        COMMUNICATIONS, YOU'VE DEVELOPED A RELATIONSHIP WITH SOME OF

12:34PM  12        THE AGENTS IN THE CASE?

12:34PM  13        A.   NO, THAT'S NOT FAIR TO SAY.  I HAD NO RELATIONSHIP WITH

12:34PM  14        THE AGENTS IN THE CASE.

12:34PM  15        Q.   OKAY.  LET ME ASK YOU TO LOOK AT EXHIBIT 14109.

12:35PM  16             (PAUSE IN PROCEEDINGS.)

12:35PM  17        BY MR. DOWNEY:

12:35PM  18        Q.   DO YOU RECOGNIZE EXHIBIT 14109 AS AN EMAIL EXCHANGE

12:35PM  19        BETWEEN YOURSELF AND AGENT HERNANDEZ?

12:35PM  20        A.   YES.

12:35PM  21        Q.   AND THE SUBJECT OF THE COMMUNICATIONS RELATES TO MATTERS

12:35PM  22        RELATED TO YOUR TESTIMONY TODAY; CORRECT?

12:36PM  23        A.   YES.

12:36PM  24        Q.   AND YOU WERE SENDING HER, AS PART OF THESE COMMUNICATIONS,

12:36PM  25        YOU SENT AGENT HERNANDEZ A PERSONAL COMPUTER OF YOURS; CORRECT?

12:36PM  1    A.   I SENT A HARD DRIVE THAT WAS CORRUPTED THAT HAD

12:36PM  2    POTENTIALLY EMAILS REGARDING THERANOS THAT ALSO HAD FAMILY

12:36PM  3    PICTURES.

12:36PM  4              MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT

12:36PM  5    EXHIBIT 14109.

12:36PM  6              MR. BOSTIC:  NO OBJECTION.

12:36PM  7              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:36PM  8         (DEFENDANT'S EXHIBIT 14109 WAS RECEIVED IN EVIDENCE.)

12:36PM  9    BY MR. DOWNEY:

12:36PM  10   Q.   AND I'D DIRECT YOU TO THE LAST SENTENCE AND ASK YOU IF

12:36PM  11   THAT'S AN ACCURATE STATEMENT OF YOUR FEELING IN CONNECTION WITH

12:36PM  12   THE PROSECUTION TEAM IN THIS MATTER?

12:36PM  13   A.   IT'S A LITTLE MISLEADING.  WHAT THAT IS, IS THAT WE ARE ON

12:37PM  14   THE SAME PAGE, AND I FEEL LIKE I WAS LIED TO AND CHEATED FROM

12:37PM  15   THE COMPANY.

12:37PM  16   Q.   WELL, IS IT AN ACCURATE STATEMENT OF YOUR FEELING TOWARDS

12:37PM  17   THE PROSECUTION TEAM THAT YOU ARE A FAITHFUL PART OF THEIR

12:37PM  18   TEAM?

12:37PM  19   A.   AGAIN, THAT'S A LITTLE MISLEADING.  IF YOU'LL ALLOW ME TO

12:37PM  20   ELABORATE.

12:37PM  21   Q.   WELL, I JUST WANT TO KNOW WHETHER IT'S AN ACCURATE

12:37PM  22   STATEMENT OR NOT AN ACCURATE STATEMENT.  I'M NOT REALLY LOOKING

12:37PM  23   FOR YOU TO ELABORATE.  IF IT'S NOT AN ACCURATE STATEMENT,

12:37PM  24   THAT'S FINE.

12:37PM  25   A.   IT'S SUBJECTIVE, AND I WAS TRYING TO CLARIFY.

12:37PM  1    Q.   SO IT'S NOT AN ACCURATE STATEMENT, IS THAT WHAT YOU'RE

12:37PM  2    SAYING, OR THE WAY I'VE ASKED THE QUESTION IS NOT ACCURATE?

12:37PM  3            MR. BOSTIC:  YOUR HONOR, I'D ASK THAT THE WITNESS BE

12:37PM  4    ALLOWED TO ANSWER THE QUESTION.

12:37PM  5            THE COURT:  HE HADN'T FINISHED HIS ANSWER.

12:38PM  6            MR. DOWNEY:  I BEG YOUR PARDON.

12:38PM  7            THE WITNESS:  OKAY.  FAITHFUL IS A SUBJECTIVE

12:38PM  8    CLAUSE.  I'LL BE MORE OBJECTIVE.  I THINK THERE WAS BUSINESS

12:38PM  9    FRAUD.  I THINK THAT I WAS LIED TO AND TAKEN ADVANTAGE OF.  I

12:38PM 10    THINK THAT THERE WAS A LOT OF ABUSE THROUGH THE YEARS, AND I

12:38PM 11    WOULD DO WHAT I CAN TO TELL MY STORY, AND I KNOW THAT WE, WE

12:38PM 12    HAVE THE SAME OUTCOME, THAT JUSTICE BE SERVED.

12:38PM 13    BY MR. DOWNEY:

12:38PM 14    Q.   IN FACT, IT'S NOT JUST YOUR INVESTMENT IN THERANOS THAT

12:38PM 15    YOU'RE A FAITHFUL MEMBER OF THE TEAM WITH RESPECT TO THE

12:38PM 16    LAWYERS AND AGENTS IN THIS CASE; IS THAT RIGHT?

12:38PM 17    A.   I'M SORRY?

12:38PM 18    Q.   WELL, YOU HAVE ASKED THE AGENTS AND LAWYERS IN THIS CASE

12:38PM 19    TO INVESTIGATE OTHER INVESTMENTS YOU MADE WHERE YOU LOST MONEY

12:38PM 20    ON THE INVESTMENTS; ISN'T THAT RIGHT?

12:38PM 21            MR. BOSTIC:  YOUR HONOR, I WOULD OBJECT UNDER 401

12:38PM 22    AND 403.

12:38PM 23            THE COURT:  I WILL SUSTAIN THE OBJECTION.

12:39PM 24            MR. DOWNEY:  ALL RIGHT.  I'M HAPPY TO MAKE A

12:39PM 25    SHOWING.  I WOULD OFFER IT AS ONLY GOING TO HIS BIAS.  HE HAS

12:39PM  1      THAT TO CONDUCT --

12:39PM  2                  THE WITNESS:  I HAVE NO BIAS IN THIS CASE.

12:39PM  3                  THE COURT:  SIR, SIR, THERE'S NO QUESTION PENDING.

12:39PM  4      THAT'S STRICKEN.  THAT'S STRICKEN.

12:39PM  5                  THE WITNESS:  OKAY.

12:39PM  6          (PAUSE IN PROCEEDINGS.)

12:39PM  7                  MR. DOWNEY:  I THINK WITH THAT, YOUR HONOR, I MIGHT

12:39PM  8      BE DONE.

12:39PM  9          MAY I HAVE JUST ONE MOMENT?

12:39PM  10                 THE COURT:  SURE.  OF COURSE.

12:39PM  11         (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

12:40PM  12                 MR. DOWNEY:  YOUR HONOR, SUBJECT TO THE OTHER

12:40PM  13     DISCUSSION THAT WE HAD, THAT CONCLUDES ANY FURTHER QUESTIONS ON

12:40PM  14     THE CROSS-EXAMINATION.

12:40PM  15                 THE COURT:  ALL RIGHT.  THANK YOU.

12:40PM  16         MR. BOSTIC, ANY REDIRECT?

12:40PM  17                 MR. BOSTIC:  YES, YOUR HONOR.

12:40PM  18                         **REDIRECT EXAMINATION**

12:40PM  19     BY MR. BOSTIC:

12:40PM  20     Q.  GOOD AFTERNOON, MR. EISENMAN.

12:40PM  21     A.  GOOD AFTERNOON.

12:40PM  22     Q.  I JUST WANT TO ASK YOU A FEW QUESTIONS FOLLOWING UP ON

12:40PM  23     YOUR CONVERSATION WITH MR. DOWNEY.

12:40PM  24     A.  I'M SORRY, MR. WHO?

12:40PM  25     Q.  MR. DOWNEY, DEFENSE COUNSEL.

EISENMAN REDIRECT BY MR. BOSTIC

12:40PM  1    A.   OH, I AM SORRY.  I APOLOGIZE.

12:40PM  2    Q.   FIRST, DO YOU RECALL A CONVERSATION WITH MR. DOWNEY ABOUT

12:40PM  3    SOME OF THE PROVISIONS IN THE CONTRACT THAT YOU SIGNED WHEN YOU

12:41PM  4    INVESTED IN THERANOS?

12:41PM  5    A.   I'M SORRY, I'M -- COULD YOU ASK THE QUESTION AGAIN?

12:41PM  6    Q.   YES.  DO YOU RECALL DISCUSSING WITH MR. DOWNEY SOME OF THE

12:41PM  7    LANGUAGE IN THE CONTRACTS THAT YOU SIGNED WHEN YOU INVESTED IN

12:41PM  8    THERANOS?

12:41PM  9    A.   YES, I DO.

12:41PM 10    Q.   AND DO YOU RECALL THAT THOSE CONTRACTS HAD LANGUAGE ABOUT

12:41PM 11    PROJECTIONS BEING SPECULATIVE IN NATURE?

12:41PM 12    A.   YES.

12:41PM 13    Q.   AS AN INVESTOR IN THERANOS AND IN OTHER COMPANIES, ARE YOU

12:41PM 14    FAMILIAR WITH THE IDEA OF A COMPANY PROVIDING PROJECTIONS TO

12:41PM 15    POTENTIAL INVESTORS?

12:41PM 16    A.   YES, I AM.

12:41PM 17    Q.   DO YOU KNOW THE DIFFERENCE BETWEEN PROJECTIONS THAT ARE

12:41PM 18    FORWARD LOOKING AND PRESENT TENSE REPRESENTATIONS ABOUT WHAT

12:41PM 19    THE COMPANY CAN DO?

12:41PM 20    A.   YES.

12:41PM 21    Q.   IN YOUR CONVERSATIONS WITH MS. HOLMES, DID YOU GET BOTH OF

12:41PM 22    THOSE?  DID YOU GET BOTH FORWARD LOOKING PROJECTIONS BUT ALSO

12:41PM 23    PRESENT TENSE STATEMENTS ABOUT WHAT THE COMPANY HAD DONE AND

12:41PM 24    WAS DOING?

12:41PM 25    A.   YES, I DID.

12:41PM 1    Q.   YOU TESTIFIED ON DIRECT ABOUT INFORMATION THAT MS. HOLMES

12:42PM 2    HAD GIVEN YOU RELATING TO HOW WELL THE THERANOS TECHNOLOGY

12:42PM 3    WORKED; IS THAT CORRECT?

12:42PM 4    A.   THAT'S CORRECT.

12:42PM 5    Q.   IN THOSE CONVERSATIONS DID SHE COMPARE THE THERANOS

12:42PM 6    TECHNOLOGY TO TECHNOLOGY USED BY QUEST AND LABCORP?

12:42PM 7    A.   SHE DID.

12:42PM 8    Q.   AND WHAT DID SHE SAY IN THAT REGARD?

12:42PM 9    A.   BASICALLY THAT, THAT THOSE COMPANIES WOULD BECOME

12:42PM 10   OBSOLETE, THAT THERANOS'S TECHNOLOGY WAS A SMALLER DRAW OF

12:42PM 11   BLOOD, COULD DO MORE TESTS, AND COULD HAVE RESULTS BACK IN A

12:42PM 12   MUCH QUICKER PERIOD OF TIME.

12:42PM 13        AND ONE YEAR AFTER WE INVESTED, IN THE ANNUAL MEETING SHE

12:42PM 14   SAID THAT THE TECHNOLOGY NOT ONLY TOOK A SNAPSHOT, BUT IT

12:42PM 15   BASICALLY TOOK A MOVIE OF WHAT WAS HAPPENING IN YOUR BLOOD,

12:42PM 16   WHICH WOULD BE GOOD FOR ADVERSE DRUG REACTIONS, FOR DRUG

12:42PM 17   DOSING, AND THAT AT THAT SAME MEETING THERE WAS ALSO SOME

12:43PM 18   MENTION THAT BRISTOL MYERS HAD DONE SIX CLINICAL TRIALS WITH

12:43PM 19   THE LATEST ITERATION OF THEIR TECHNOLOGY AND THEY WERE LIKE A

12:43PM 20   747, FLAWLESS.

12:43PM 21   Q.   WHEN MS. HOLMES COMPARED THE PERFORMANCE OF THERANOS

12:43PM 22   TECHNOLOGY TO CONVENTIONAL TECHNOLOGY, WAS SHE MAKING

12:43PM 23   PROJECTIONS ABOUT WHAT WOULD BE POSSIBLE IN THE FUTURE, OR WAS

12:43PM 24   SHE TELLING YOU WHAT THE TECHNOLOGY COULD DO IN THAT MOMENT?

12:43PM 25   A.   WHAT THE TECHNOLOGY COULD DO IN THAT MOMENT.

12:43PM   1    Q.   AND DID YOU RELY ON THOSE PRESENT TENSE REPRESENTATIONS IN

12:43PM   2    DECIDING TO INVEST IN THE COMPANY IN 2013?

12:43PM   3    A.   YES, I DID.

12:43PM   4    Q.   DO YOU RECALL THAT DURING YOUR TESTIMONY WE'VE LOOKED AT

12:43PM   5    SOME TEXT FROM A NEWS ARTICLE DISCUSSING WHAT THERANOS COULD DO

12:43PM   6    AND THE CAPABILITIES OF ITS TECHNOLOGY?

12:43PM   7    A.   CAN YOU REFRESH MY MEMORY?  WHAT YEAR WAS THE ARTICLE AND

12:43PM   8    WHAT WAS THE SOURCE?

12:43PM   9    Q.   COULD I DIRECT YOU TO THE WHITE BINDER --

12:44PM   10   A.   I DON'T HAVE A WHITE ONE.  I HAVE A BLACK ONE.

12:44PM   11   Q.   I'M SORRY.  THIS IS IN EVIDENCE.  MAYBE WE CAN JUST

12:44PM   12   PUBLISH IT.  IT'S 1106 IN EVIDENCE ALREADY.

12:44PM   13            MR. DOWNEY:  YOUR HONOR, I DON'T THINK I ASKED ABOUT

12:44PM   14   THIS ON THE CROSS-EXAMINATION.

12:44PM   15            MR. BOSTIC:  YOUR HONOR, THIS IS STILL IN THE

12:44PM   16   SUBJECT OF PROJECTIONS VERSUS PRESENT TERMS STATEMENTS.

12:44PM   17            THE COURT:  I'LL ALLOW EXAMINATION ON THIS.

12:44PM   18   BY MR. BOSTIC:

12:44PM   19   Q.   IF WE CAN ZOOM IN ON THE FIRST INDENTED PARAGRAPH.

12:44PM   20      MR. EISENMAN, DO YOU RECALL READING THIS PUBLICATION OR

12:44PM   21   THIS ARTICLE BEFORE YOU DECIDED TO INVEST IN 2013?

12:44PM   22   A.   YES.

12:44PM   23   Q.   WERE YOU AWARE AT THE TIME THAT MS. HOLMES HAD REVIEWED OR

12:44PM   24   HAD THE OPPORTUNITY TO REVIEW A DRAFT OF THIS ARTICLE BEFORE IT

12:44PM   25   WAS PUBLISHED?

12:44PM   1    A.   I WAS NOT AWARE THAT SHE REVIEWED A DRAFT OF THIS ARTICLE

12:44PM   2    BEFORE IT WAS PUBLISHED.

12:44PM   3    Q.   IN THE TEXT HIGHLIGHTED ON THE SCREEN THERE, THERE'S A

12:45PM   4    LINE THAT SAYS, "THERANOS'S PROCESSES ARE FASTER, CHEAPER, AND

12:45PM   5    MORE ACCURATE THAN THE CONVENTIONAL METHODS AND REQUIRE ONLY

12:45PM   6    MICROSCOPIC BLOOD VOLUMES, NOT VIAL AFTER VIAL OF THE STUFF."

12:45PM   7         DO YOU SEE THAT LANGUAGE?

12:45PM   8    A.   I DO.

12:45PM   9    Q.   AS AN INVESTOR, DO YOU INTERPRET THAT LANGUAGE TO BE A

12:45PM  10    PROJECTION THAT MIGHT BE SPECULATIVE, OR DOES IT REFER TO THE

12:45PM  11    PRESENT TENSE CAPABILITIES OF THE TECHNOLOGY?

12:45PM  12    A.   THAT REFERS TO THE PRESENT TENSE.

12:45PM  13    Q.   OKAY.  WE CAN PUT THAT ASIDE.  THANK YOU, MS. HOLLIMAN.

12:45PM  14         THERE WAS SOME DISCUSSION DURING CROSS-EXAMINATION ABOUT

12:45PM  15    YOUR REPEATED ATTEMPTS TO GET INFORMATION FROM THE COMPANY.

12:45PM  16         DO YOU REMEMBER THAT?

12:45PM  17    A.   YES.

12:45PM  18    Q.   AND THERE WAS A DISCUSSION DURING THAT CONVERSATION AS TO

12:45PM  19    WHETHER YOU UNDERSTOOD THAT THERANOS COULDN'T GIVE YOU SPECIAL

12:45PM  20    INFORMATION NOT GIVEN TO OTHER INVESTORS.

12:45PM  21         DID YOU UNDERSTAND THAT AT THE TIME?

12:45PM  22    A.   YES.

12:45PM  23    Q.   AND IS THAT WHAT YOU WERE ASKING FOR?  WERE YOU ASKING FOR

12:45PM  24    INFORMATION TO BE EXCLUSIVELY SHARED WITH YOU AND NOT PROVIDED

12:46PM  25    TO OTHER INVESTORS?

12:46PM  1    A.   NO.

12:46PM  2    Q.   HOW ABOUT YOUR GROUP?  THERE WAS SOME REFERENCE TO OTHER

12:46PM  3    INVESTORS THAT YOU WERE ASSOCIATED WITH.

12:46PM  4         DO YOU RECALL THAT DISCUSSION?

12:46PM  5    A.   YES.

12:46PM  6    Q.   AND WERE YOU ASKING FOR INFORMATION TO BE SHARED ONLY WITH

12:46PM  7    THAT GROUP TO THE EXCLUSION OF OTHER INVESTORS?

12:46PM  8    A.   YES.

12:46PM  9    Q.   LET ME ASK THAT AGAIN.  IS WHAT YOU WANTED FOR YOUR GROUP

12:46PM  10   ONLY TO GET INFORMATION AND THAT THAT INFORMATION WOULD NOT BE

12:46PM  11   SHARED WITH OTHER INVESTORS?

12:46PM  12   A.   WHEN I REQUESTED INFORMATION MOST OF THE TIME IT WAS FOR

12:46PM  13   ME PERSONALLY.  THERE WERE A FEW INSTANCES WHEN INFORMATION WAS

12:46PM  14   REQUESTED AND IT WAS SHARED AMONG THE SMALL GROUP THAT INVESTED

12:46PM  15   TOGETHER IN 2006.

12:46PM  16   Q.   IN ASKING FOR INFORMATION FROM THE COMPANY, WERE YOU

12:46PM  17   TRYING TO PUT YOURSELF OR YOUR GROUP AT AN ADVANTAGE COMPARED

12:46PM  18   TO OTHER INVESTORS IN THE COMPANY?

12:46PM  19   A.   NO.

12:46PM  20   Q.   IF THE COMPANY HAD PROVIDED THE INFORMATION THAT YOU WERE

12:46PM  21   ASKING FOR TO ALL OF THE INVESTORS, WOULD THAT HAVE SATISFIED

12:46PM  22   YOU?

12:46PM  23   A.   YES.

12:47PM  24   Q.   MR. DOWNEY ALSO ASKED YOU ABOUT OTHER INVESTORS WHO

12:47PM  25   INVESTED IN THERANOS BETWEEN 2010 AND 2013.

12:47PM  1          DO YOU RECALL THAT DISCUSSION?

12:47PM  2     A.   YES.

12:47PM  3     Q.   DO YOU KNOW WHETHER THOSE INVESTORS WERE PROVIDED ANY

12:47PM  4     INFORMATION BY THE COMPANY IN CONNECTION WITH THEIR

12:47PM  5     INVESTMENTS?

12:47PM  6     A.   WE HEARD THAT THERE WAS MONEY -- I'M SORRY, THAT THERE WAS

12:47PM  7     INFORMATION PROVIDED TO OTHER LARGER INSTITUTIONAL INVESTORS,

12:47PM  8     AND WE CONTACTED THE COMPANY TO CONFIRM IF FINANCIAL

12:47PM  9     INFORMATION WAS SHARED, AND IF SO, IF THEY COULD SHARE IT WITH

12:47PM 10     US.

12:47PM 11          AND WE NEVER GOT AN ADEQUATE RESPONSE FROM THE COMPANY.

12:47PM 12     Q.   WERE YOU EVER GIVEN INFORMATION BY MS. HOLMES OR THE

12:47PM 13     COMPANY THAT YOU WERE TOLD HAD BEEN PROVIDED TO THOSE OTHER

12:47PM 14     INVESTORS DURING THAT 2010, 2013 TIMEFRAME?

12:48PM 15     A.   NO, WE WEREN'T.

12:48PM 16     Q.   YOU UNDERSTOOD AT THE TIME THAT YOU WERE HAVING THESE

12:48PM 17     COMMUNICATIONS WITH MS. HOLMES THAT YOU HAD NO LEGAL RIGHT TO

12:48PM 18     ADDITIONAL INFORMATION; IS THAT RIGHT?

12:48PM 19     A.   I UNDERSTOOD THAT, YES.

12:48PM 20     Q.   IF YOU UNDERSTOOD THAT AT THE TIME, WHY DID YOU KEEP

12:48PM 21     ASKING?  IF YOU WEREN'T INVOKING CONTRACTUAL OR LEGAL RIGHT,

12:48PM 22     WHY DID YOU KEEP ASKING FOR MORE INFORMATION?

12:48PM 23     A.   BECAUSE AS A PRACTICAL MATTER WE MAKE INVESTMENTS IN A LOT

12:48PM 24     OF PRIVATE COMPANIES, AND THIS WAS THE EXCEPTION, THE COMPANY

12:48PM 25     THAT WOULD NOT SPEAK TO US.

12:48PM  1      AND BECAUSE WE HAD A SIGNIFICANT INVESTMENT, IT'S LOGICAL

12:48PM  2   THAT THERE WOULD BE AT LEAST A MINIMAL AMOUNT OF COMMUNICATION,

12:48PM  3   SOME INDICATION ON HOW THE COMPANY IS DOING, OR HOW OUR

12:48PM  4   INVESTMENT IS DOING WITHOUT VIOLATING ANYTHING THAT IS

12:48PM  5   CONFIDENTIAL.

12:48PM  6      AND IF THERE IS CONFIDENTIAL INFORMATION, I HAVE SIGNED A

12:49PM  7   NONDISCLOSURE AGREEMENT ON SEVERAL OCCASIONS WHERE COMPANIES

12:49PM  8   ARE FREE TO GIVE ME THE INFORMATION THAT I REQUEST, AND I HAVE

12:49PM  9   SWORN NOT TO SHARE THAT INFORMATION WITH ANYONE.

12:49PM 10   Q.   AND LET'S SEE.  I'D LIKE TO TALK TO YOU NOW ABOUT A

12:49PM 11   CONVERSATION THAT YOU HAD WITH MR. BALWANI BEFORE YOUR 2013

12:49PM 12   INVESTMENT.

12:49PM 13      DO YOU RECALL THAT?

12:49PM 14   A.   YES, I DO.

12:49PM 15   Q.   FIRST OF ALL, YOU TOLD MR. DOWNEY THAT RIGHT AROUND THE

12:49PM 16   TIME PERIOD OF THE 2013 INVESTMENT YOU WERE NOT IN DIRECT

12:49PM 17   COMMUNICATION WITH MS. HOLMES; IS THAT RIGHT?

12:49PM 18   A.   THAT'S CORRECT.

12:49PM 19   Q.   HAD YOU HAD PREVIOUS CONVERSATIONS WITH MS. HOLMES ABOUT

12:49PM 20   THE STATE OF THE TECHNOLOGY AND THE THINGS THAT THE COMPANY HAD

12:49PM 21   PURPORTEDLY DONE?

12:49PM 22   A.   TO MY RECOLLECTION WE HAD QUARTERLY UPDATE CALLS FOR THE

12:49PM 23   FIRST THREE OR FOUR YEARS AND MAYBE A SHORT CALL OR TWO IN THE

12:49PM 24   INTERIM.

12:49PM 25      BUT, YOU KNOW, AGAIN, MY ONLY STRONG RECOLLECTION WERE

12:50PM  1    THOSE EARLY QUARTERLY CALLS THAT ENDED.

12:50PM  2    Q.   AND WERE THE FACTS OR THE CLAIMS THAT MS. HOLMES RELAYED

12:50PM  3    TO YOU DURING THOSE EARLIER CALLS STILL IN YOUR MIND WHEN YOU

12:50PM  4    MADE THE DECISION TO INVEST IN 2013?

12:50PM  5    A.   YES.

12:50PM  6    Q.   WERE YOU STILL RELYING ON THE CLAIMS THAT MS. HOLMES HAD

12:50PM  7    MADE IN THE PAST WHEN YOU MADE THAT DECISION?

12:50PM  8    A.   NO.  I WAS RELYING ON CURRENT INFORMATION.

12:50PM  9    Q.   AND WHAT WAS THE SOURCE OF THAT CURRENT INFORMATION?

12:50PM 10    A.   CURRENT INFORMATION WAS THE FINANCIAL PRESS, "THE

12:50PM 11    WALL STREET JOURNAL" ARTICLE THAT YOU JUST PUT UP, THERE WERE

12:50PM 12    ARTICLES IN SEVERAL CREDIBLE FINANCIAL PUBLICATIONS THAT THE

12:50PM 13    TECHNOLOGY HAD WORKED.  THERE WAS ALSO CONVERSATIONS THAT I,

12:50PM 14    THAT I HAD DURING THE LEAD UP.  FOR EXAMPLE, THERE WAS A

12:50PM 15    CONFERENCE THAT BILL FRIST GAVE THE KEYNOTE SPEECH TO IN

12:50PM 16    NASHVILLE, AND HE CLAIMED -- AND HE WAS A DIRECTOR OF THE

12:51PM 17    COMPANY, SO I'M SURE HE GOT HIS INFORMATION FROM EXECUTIVES OF

12:51PM 18    THE COMPANY.

12:51PM 19        BUT AT THE TIME HE CLAIMED THAT THE TECHNOLOGY WORKED.

12:51PM 20    YOU WOULD PUT THE BLOOD SAMPLE IN A READER, IT SENDS THE SIGNAL

12:51PM 21    UP TO THE CLOUD, AND YOU GET QUICK RESULTS IN 30 MINUTES TO

12:51PM 22    2 HOURS, AND YOU HAVE QUICK ACCURATE RESULTS.

12:51PM 23        HE ALSO SAID THAT IT HAD MILITARY APPLICATIONS.  IT WAS

12:51PM 24    BEING TESTED AND USED IN THE FIELD.  SO THERE WAS A LOT OF

12:51PM 25    INFORMATION THAT KIND OF RATIFIED A LOT OF THE POSITIVE

12:51PM  1    INVESTMENT INFORMATION THAT I HAD IN THE PAST FROM A DIRECTOR

12:51PM  2    OF THE COMPANY.

12:51PM  3         SO I TOOK, BETWEEN THE FINANCIAL PUBLICATIONS, THE SHORT

12:51PM  4    CONVERSATION I HAD WITH SUNNY BEFORE WE INVESTED, THE

12:51PM  5    INVESTMENT CONFERENCE FROM SENATOR FRIST AND OTHER SOURCES,

12:51PM  6    THAT IT WAS JUST A BARRAGE OF CREDIBLE INFORMATION THAT THEY

12:51PM  7    HAD WHAT THEY CLAIMED THAT THEY HAD AND IT WAS WORKING AND IT

12:51PM  8    WAS A HUGE MARKET.

12:51PM  9    Q.   AND WAS THAT INFORMATION THAT YOU WERE RECEIVING AT THE

12:51PM  10   TIME CONSISTENT WITH THINGS THAT MS. HOLMES HAD TOLD YOU IN THE

12:52PM  11   PAST?

12:52PM  12   A.   BECAUSE WE DIDN'T HAVE QUALITY CONVERSATIONS FOR A PERIOD

12:52PM  13   OF YEARS, I CAN ONLY SAY THAT SHE SAID THINGS IN THE DISTANT

12:52PM  14   PAST THAT BASICALLY THE TECHNOLOGY WAS WORKING, AND IT WAS

12:52PM  15   WORKING IN THE MARKETPLACE, AND THERE WERE PHARMACEUTICAL

12:52PM  16   COMPANIES THAT WERE USING IT IN TRIALS, AND IT HAD APPLICATIONS

12:52PM  17   FOR BLOOD TESTING AND BLOOD DOSING, AND IT CONNECTED THE DOTS

12:52PM  18   THAT MAYBE THE THINGS THAT SHE SAID EARLIER HERE, THERE WAS A

12:52PM  19   PERIOD OF TIME WHERE THE COMPANY WAS MAYBE KIND OF STRUGGLING

12:52PM  20   BUT IT LOOKS LIKE THEY KIND OF FOUND THEIR GAME AGAIN AND GAME

12:52PM  21   WAS BACK ON.

12:52PM  22   Q.   AND THE THINGS THAT MS. HOLMES HAD TOLD YOU EARLIER ABOUT

12:52PM  23   THE STATE OF THE TECHNOLOGY AND WHAT IT COULD DO, DID YOU

12:52PM  24   ASSUME THAT THAT INFORMATION WAS ACCURATE AT THE TIME THAT YOU

12:52PM  25   MADE YOUR 2013 INVESTMENT?

EISENMAN REDIRECT BY MR. BOSTIC

12:52PM   1    A.   YES, I DID.

12:52PM   2    Q.   THERE WAS SOME DISCUSSION WITH MR. DOWNEY ABOUT A

12:53PM   3    CONVERSATION WITH MR. BALWANI AND WHETHER HE DISCOURAGED YOUR

12:53PM   4    INVESTMENT IN 2013.

12:53PM   5         DO YOU RECALL THAT DISCUSSION?

12:53PM   6    A.   YES.

12:53PM   7    Q.   AND JUST SO THE RECORD IS CLEAR, WHAT WAS MR. BALWANI'S

12:53PM   8    ATTITUDE TOWARDS THE IDEA OF YOU INVESTING IN THERANOS IN 2013?

12:53PM   9    A.   IT WAS SURPRISINGLY POSITIVE.

12:53PM   10   Q.   AT ANY TIME DID HE ENCOURAGE YOU NOT TO INVEST OR NOT TO

12:53PM   11   INVEST IN THE COMPANY?

12:53PM   12   A.   NO, HE DIDN'T.

12:53PM   13   Q.   THERE WAS A DISCUSSION OF AN EMAIL FROM JUNE OF 2010 WHERE

12:53PM   14   MS. HOLMES TOLD YOU THAT THERANOS WAS AN EARLY STAGE LIFE

12:53PM   15   SCIENCES COMPANY THAT CARRIED IMMENSE RISK.

12:53PM   16        DO YOU RECALL SEEING THAT EMAIL?

12:53PM   17   A.   I DO.

12:53PM   18   Q.   SHE SAID IN THAT EMAIL THAT THE STATUS THERE MIGHT NOT

12:53PM   19   CHANGE FOR YEARS TO COME.

12:53PM   20        WHEN YOU MADE THE INVESTMENT IN 2013, DID YOU UNDERSTAND

12:53PM   21   THAT THAT STATUS HAD CHANGED?

12:54PM   22   A.   YES.

12:54PM   23   Q.   HOW SO?

12:54PM   24   A.   WELL, AS I MENTIONED EARLIER, WHEN I GOT THAT EMAIL, THAT

12:54PM   25   WAS NOT LOGICAL WITH ALL OF THE OTHER INFORMATION THAT HAD BEEN

12:54PM   1    PASSED BEFORE; THAT THE COMPANY WAS SUCCESSFUL, THEY WERE

12:54PM   2    GETTING CONTRACTS, THEY HAD DEMAND FOR A MILLION READERS GOING

12:54PM   3    TO 2 MILLION -- I'M SORRY, GOING TO 2 MILLION CARTRIDGES A

12:54PM   4    MONTH, THAT REVENUES WOULD BE IN THE HUNDREDS OF MILLIONS OF

12:54PM   5    DOLLARS.

12:54PM   6         SO THAT EMAIL CONTRADICTED ALL OF THE EARLIER INFORMATION

12:54PM   7    THINKING THAT THEY WERE HITTING MILESTONES AND THEY WERE MAKING

12:54PM   8    SUCCESS IN THE MARKET.

12:54PM   9         BY THE 2013 INVESTMENT, BETWEEN CONVERSATIONS AND PRESS,

12:54PM  10    IT, IT APPEARED THAT THE COMPANY HAD A PROVEN TECHNOLOGY WITH

12:54PM  11    AN EXTREMELY LARGE MARKET.

12:54PM  12         AND WHAT WAS, WHAT WAS PUT IN THE OFFERING MEMO, AND WHAT

12:54PM  13    WAS COMMUNICATED TO ME, IS THE COMPANY HAD PROVEN ITSELF.  THEY

12:55PM  14    WERE RAISING MONEY TO GROW FASTER.  THIS WAS GROWTH CAPITAL.

12:55PM  15    Q.   AND THE EARLIER CONVERSATIONS THAT YOU HAD HAD WITH

12:55PM  16    MS. HOLMES, WAS THAT INFORMATION THAT YOU GAINED FROM HER STILL

12:55PM  17    A FACTOR IN YOUR DECISION TO INVEST IN 2013?

12:55PM  18    A.   IT WAS A MINOR FACTOR.  I THOUGHT THAT THE COMPANY HAD

12:55PM  19    MADE SIGNIFICANT PROGRESS AND IN THE 2006 TO 2010 TIMEFRAME.

12:55PM  20         AND THERE WAS ALSO INFORMATION THAT AS TIME GOES ON,

12:55PM  21    TECHNOLOGY GETS BETTER.  SO THEIR READER, I THINK THEY CALLED

12:55PM  22    IT THE EDISON, THERE WERE LATER VERSIONS JUST LIKE THE IPHONE.

12:55PM  23    THERE IS THE IPHONE 6, AND THEN THE 7, AND THEN THE 8.

12:55PM  24         SO MY UNDERSTANDING IS THAT THE TECHNOLOGY WAS PROVEN,

12:55PM  25    THEY WERE JUST PERFECTING IT.  THEY WERE MAKING IT AN EVEN

12:55PM   1    BETTER TECHNOLOGY.

12:55PM   2    Q.   YOU ALSO DISCUSSED WITH MR. DOWNEY OPPORTUNITIES THAT YOU

12:55PM   3    HAD TO SELL YOUR THERANOS STOCK.

12:55PM   4         DO YOU RECALL THAT?

12:55PM   5    A.   YES.

12:55PM   6    Q.   WHEN YOU WERE EVALUATING THOSE OPPORTUNITIES, DID YOU HAVE

12:56PM   7    THE INFORMATION THAT YOU NEEDED TO MAKE THOSE DECISIONS?

12:56PM   8    A.   NO, I DID NOT.

12:56PM   9    Q.   OKAY.

12:56PM  10         ULTIMATELY YOU DECIDED NOT TO SELL YOUR THERANOS STOCK AT

12:56PM  11    ANY POINT PRIOR TO 2016 OR 2017; CORRECT?

12:56PM  12    A.   NO.  I SERIOUSLY CONSIDERED SELLING MY STOCK WHEN

12:56PM  13    CHRIS BOIES MADE THE OFFER, BUT THEN THERE WAS A PERIOD OF TWO

12:56PM  14    OR THREE MONTHS WHERE HE WOULD NOT FOLLOW THROUGH, HE DID NOT

12:56PM  15    RESPOND TO CALLS, HE WOULD NOT RESPOND TO EMAILS, AND THEN A

12:56PM  16    FEW MONTHS AFTER THAT ALL OF THE NEGATIVE PUBLICITY HIT, AND

12:56PM  17    OBVIOUSLY THEY WERE NOT GOING TO BUY MY STOCK ONCE THE CASCADE

12:56PM  18    OF NEGATIVE PUBLICITY WAS UNLEASHED.

12:56PM  19    Q.   YOU DISCUSSED WITH MR. DOWNEY AT A COUPLE POINTS -- WHAT

12:56PM  20    YOUR STOCK MIGHT HAVE BEEN WORTH AT A COUPLE OF POINTS IF YOU

12:56PM  21    HAD SOLD IT.

12:56PM  22         DO YOU REMEMBER THAT?

12:56PM  23    A.   I DO.

12:56PM  24    Q.   AND WHAT IS YOUR UNDERSTANDING OF WHAT YOUR STOCK IN

12:56PM  25    THERANOS IS WORTH TODAY?

12:56PM 1    A.   IT'S NOT AN UNDERSTANDING, IT'S A CONCLUSION.  IT'S WORTH

12:57PM 2    ZERO.

12:57PM 3              MR. BOSTIC:  MAY I HAVE A MOMENT, YOUR HONOR?

12:57PM 4              THE COURT:  YES.

12:57PM 5         (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

12:57PM 6              MR. BOSTIC:  NO FURTHER QUESTIONS, YOUR HONOR.

12:57PM 7              MR. DOWNEY:  YOUR HONOR, I JUST HAVE ABOUT THREE

12:57PM 8    QUESTIONS FOLLOWING UP ON THAT.

12:57PM 9                        **RECROSS-EXAMINATION**

12:57PM 10   BY MR. DOWNEY:

12:57PM 11   Q.   MR. EISENMAN, JUST NOW ON THE REDIRECT EXAMINATION YOU

12:57PM 12   TALKED WITH MR. BOSTIC ABOUT SHARING INFORMATION AMONGST A

12:57PM 13   GROUP ABOUT THE THERANOS INVESTMENT.

12:57PM 14        DO YOU RECALL THAT?

12:57PM 15   A.   YES.

12:57PM 16   Q.   AND I JUST WANT TO SHOW YOU AN EXHIBIT TO SEE IF IT

12:57PM 17   IDENTIFIES SOME MEMBERS OF THAT GROUP.  OKAY?

12:57PM 18   A.   OKAY.

12:57PM 19              MR. DOWNEY:  YOUR HONOR, MAY I APPROACH THE WITNESS?

12:57PM 20              THE COURT:  YES.

12:58PM 21   BY MR. DOWNEY:

12:58PM 22   Q.   AND LOOKING AT EXHIBIT 1362, IS THIS THE EMAIL IN WHICH

12:58PM 23   YOU COMMUNICATE TO MR. BALWANI THAT YOU DO INTEND TO MAKE AN

12:58PM 24   INVESTMENT IN THERANOS IN LATE 2013?

12:58PM 25   A.   YES.

12:58PM 1          MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT 1362.

12:58PM 2          MR. BOSTIC:  NO OBJECTION.

12:58PM 3          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:58PM 4      (GOVERNMENT'S EXHIBIT 1362 WAS RECEIVED IN EVIDENCE.)

12:58PM 5   BY MR. DOWNEY:

12:58PM 6   Q.   AND I JUST WANT TO BLOW UP THE LIST OF INDIVIDUALS

12:58PM 7   UNDERNEATH THERE.

12:58PM 8        AND ALAN EISENMAN IS OF COURSE YOURSELF?

12:59PM 9   A.   CORRECT.

12:59PM 10  Q.   AND IS SHERRIE EISENMAN YOUR DAUGHTER OR YOUR WIFE?

12:59PM 11  A.   MY WIFE.

12:59PM 12  Q.   AND THEN THERE ARE TWO OTHER ENTITIES LISTED,

12:59PM 13  GORDON FAMILY TRUST AND CROFTON CAPITAL GP.  WHAT ARE THOSE?

12:59PM 14  A.   GORDON FAMILY TRUST IS A TRUST WITH MY THREE KIDS AND

12:59PM 15  THEIR NINE COUSINS.

12:59PM 16  Q.   AND WAS THAT ESTABLISHED BY THEIR GRANDFATHER?

12:59PM 17  A.   YES, IT WAS.

12:59PM 18  Q.   AND IS THAT MR. GORDON WHO WE HAD DISCUSSED A FEW MOMENTS

12:59PM 19  AGO?

12:59PM 20  A.   YES.

12:59PM 21  Q.   AND HAD YOU RECOMMENDED TO MR. GORDON THAT HE MAKE THIS

12:59PM 22  INVESTMENT?

12:59PM 23  A.   I WOULDN'T SAY I RECOMMENDED, BUT WE HAVE FAMILY MEETINGS

12:59PM 24  WHERE WE TALK ABOUT OPPORTUNITIES WE'RE LOOKING AT, AND WE

12:59PM 25  DECIDE, THE DIFFERENT ENTITIES DECIDE.

12:59PM  1    Q.   AND WHAT IS CROFTON CAPITAL GP?

12:59PM  2    A.   CROFTON CAPITAL IS A PARTNERSHIP WITH MY WIFE'S THREE

12:59PM  3    SIBLINGS.

12:59PM  4    Q.   AND IS THAT ACTUALLY THE FAMILY OFFICE OF YOUR WIFE'S

12:59PM  5    FAMILY?

12:59PM  6    A.   NO.  IT'S -- WELL, THE FAMILY OFFICE, YES.  IT'S TITLED

12:59PM  7    CROFTON CAPITAL, THAT'S CORRECT.

01:00PM  8    Q.   OKAY.  AND WHEN I SAY, "FAMILY OFFICE," I MEAN JUST THE

01:00PM  9    ENTITY FOR YOUR IN-LAW'S FAMILY THAT, AMONG OTHER THINGS, MAKES

01:00PM  10   DECISIONS AS TO HOW TO INVEST THEIR MONEY; IS THAT RIGHT?

01:00PM  11   A.   YES.

01:00PM  12   Q.   AND WHEN YOU GOT INFORMATION ABOUT THERANOS OVER TIME

01:00PM  13   BETWEEN 2016 AND 2013, WOULD YOU ALWAYS BE CAREFUL TO SHARE

01:00PM  14   THAT INFORMATION WITH PEOPLE IN THIS GROUP?

01:00PM  15   A.   I CAN'T SAY THAT WE ALWAYS SHARED, AND THEY WERE PRIVY TO

01:00PM  16   SOME OF THE SAME INFORMATION IF IT WAS COMING FROM THE COMPANY.

01:00PM  17   Q.   OKAY.  WELL, DID THEY, TO YOUR KNOWLEDGE, HAVE DIRECT

01:00PM  18   COMMUNICATIONS WITH THE COMPANY?

01:00PM  19   A.   I'M SORRY, DID THEY?

01:00PM  20   Q.   DID THEY, TO YOUR KNOWLEDGE, HAVE DIRECT COMMUNICATIONS

01:00PM  21   WITH THE COMPANY?

01:00PM  22   A.   NOT TO MY KNOWLEDGE, BUT IT'S POSSIBLE.

01:00PM  23   Q.   BUT IF YOU LEARN SOMETHING TO THE COMPANY, YOU CONVEYED IT

01:00PM  24   ON TO THEM; CORRECT?

01:00PM  25   A.   THAT'S A POSSIBILITY.

01:00PM   1   Q.   AND ANY VIEWS THAT YOU HAD OF THE COMPANY AS YOU WENT

01:00PM   2   THROUGH THE EXPERIENCE OF BEING AN INVESTOR, YOU WOULD, YOU

01:00PM   3   WOULD CONVEY TO THEM; CORRECT?

01:01PM   4   A.   SOMETIMES YES, SOMETIMES NO.

01:01PM   5   Q.   FAIR ENOUGH.

01:01PM   6        NOTHING FURTHER, MR. EISENMAN.

01:01PM   7             MR. BOSTIC:  NOTHING FURTHER.

01:01PM   8             THE COURT:  ALL RIGHT.  THANK YOU.  IT'S 1:00 P.M.

01:01PM   9   IS THIS WITNESS EXCUSED?

01:01PM  10             MR. DOWNEY:  WELL, YOUR HONOR, NOTHING FURTHER

01:01PM  11   SUBJECT TO THE DISCUSSION WE HAD EARLIER.

01:01PM  12             THE COURT:  ALL RIGHT.  THANK YOU.

01:01PM  13        IT SOUNDS LIKE, MR. EISENMAN, YOU MIGHT BE CALLED BACK TO

01:01PM  14   TESTIFY TOMORROW.  SO I'M NOT GOING TO EXCUSE YOU AT THIS

01:01PM  15   POINT.

01:01PM  16        YOU'LL BE NOTIFIED BY THE GOVERNMENT, I THINK A

01:01PM  17   REPRESENTATIVE, AS TO WHETHER OR NOT YOU NEED TO COME BACK AND

01:01PM  18   WHEN THAT IS.

01:01PM  19             THE WITNESS:  CAN I ASK YOU A QUESTION?  IS THAT

01:01PM  20   FAIR?

01:01PM  21             THE COURT:  YES.

01:01PM  22             THE WITNESS:  IS IT POSSIBLE TO MAKE A DETERMINATION

01:01PM  23   SO I COULD POSSIBLY CATCH A FLIGHT HOME IF I'M NOT GOING TO BE

01:01PM  24   CALLED BACK?

01:01PM  25             THE COURT:  WELL, I'M NOT CERTAIN I'LL KNOW THAT,

01:01PM 1    WHEN I'LL HAVE THAT INFORMATION.  IT MIGHT NOT BE UNTIL

01:01PM 2    TOMORROW MORNING WHEN WE'LL HAVE THAT INFORMATION.

01:02PM 3              THE WITNESS:  OKAY.  THERE'S A LATE FLIGHT FROM 6:45

01:02PM 4    FROM SAN FRANCISCO, AND IT WOULD BE VERY HELPFUL IF I KNEW.

01:02PM 5              THE COURT:  YES, I APOLOGIZE.  I DON'T THINK THAT

01:02PM 6    WILL BE POSSIBLE, THAT FLIGHT WILL BE POSSIBLE.

01:02PM 7         SO WE WILL, WE WILL RESUME, LADIES AND GENTLEMEN, WE'LL

01:02PM 8    RESUME -- I THINK TOMORROW IS OUR 9:00 O'CLOCK START.  WE'LL BE

01:02PM 9    STARTING AT 9:00 A.M. TOMORROW.

01:02PM 10        SIR, I DON'T KNOW WHO YOUR CONTACT IS WITH THE GOVERNMENT

01:02PM 11   AND THE WITNESS PERSON, BUT THAT PERSON WILL LET YOU KNOW.

01:02PM 12             THE WITNESS:  OKAY.  BUT I WON'T KNOW UNTIL TONIGHT

01:02PM 13   OR TOMORROW, IS THAT WHAT YOU'RE SAYING?

01:02PM 14             THE COURT:  PROBABLY NOT TONIGHT.  I JUST DON'T

01:02PM 15   KNOW.  I NEED TO TALK TO THE LAWYERS A LITTLE BIT ABOUT SOME OF

01:02PM 16   OUR PROTOCOLS AND THINGS SO.

01:02PM 17             THE WITNESS:  OKAY.  CAN I HOLD A GLIMMER OF HOPE OR

01:02PM 18   POSSIBILITY THAT AFTER YOUR DISCUSSION?

01:02PM 19             THE COURT:  WELL, ALL THINGS ARE POSSIBLE, SIR.

01:02PM 20             THE WITNESS:  OKAY.  I'LL ACCEPT THAT.

01:02PM 21             THE COURT:  AS I SAID BEFORE, THE CHICAGO CUBS WIN

01:03PM 22   THE WORLD SERIES EVERY NOW AND THEN.  SO ALL THINGS ARE

01:03PM 23   POSSIBLE.

01:03PM 24             THE WITNESS:  OKAY.

01:03PM 25             THE COURT:  YOU CAN STAND DOWN, NOW, SIR.  THANK

6295

01:03PM  1      YOU.

01:03PM  2          AND, LADIES AND GENTLEMEN, WE'LL TAKE OUR RECESS NOW.

01:03PM  3      THANK YOU FOR YOUR PATIENCE.  WE'LL RESUME TOMORROW AT

01:03PM  4      9:00 A.M., 9:00 A.M.

01:03PM  5          PLEASE REMEMBER THE ADMONITION.  DO NOT IN ANY WAY DO ANY

01:03PM  6      INVESTIGATION, DO NOT LISTEN, READ, OR TALK ABOUT ANYTHING TO

01:03PM  7      DO WITH THIS CASE.  I'LL CHECK IN WITH YOU TOMORROW MORNING TO

01:03PM  8      SEE IF ANY OF THAT HAS OCCURRED.

01:03PM  9          HAVE A GOOD EVENING.  WE'LL SEE YOU TOMORROW.  THANK YOU.

01:03PM 10          (JURY OUT AT 1:03 P.M.)

01:04PM 11              THE COURT:  ALL RIGHT.  THE RECORD SHOULD REFLECT

01:04PM 12      THAT THE JURY HAS LEFT FOR THE DAY.

01:04PM 13          THE WITNESS HAS LEFT THE COURTROOM.

01:04PM 14          COUNSEL, WHAT WOULD YOU LIKE TO DO ABOUT THE NOTES AND

01:04PM 15      WHAT ARE YOUR THOUGHTS ABOUT THAT?

01:04PM 16          MR. BOSTIC AND MR. DOWNEY, IF YOU COULD COME FORWARD.

01:04PM 17          I GUESS THE FIRST QUESTION IS WILL HE MAKE HIS 6:45 FLIGHT

01:04PM 18      TONIGHT?

01:04PM 19          (LAUGHTER.)

01:04PM 20              MR. DOWNEY:  I DON'T KNOW.

01:04PM 21              MR. BOSTIC:  YOUR HONOR, IT MIGHT BE HELPFUL IF WE

01:04PM 22      JUST KNEW WHAT THE NEXT STEPS WERE SO WE KNEW WHAT WE WERE

01:04PM 23      WAITING FOR.

01:04PM 24              THE COURT:  YES.

01:04PM 25              MR. BOSTIC:  AS THE COURT KNOWS, THE GOVERNMENT'S

6296

01:04PM  1      INTEREST IS IN HAVING THE TRIAL MOVE FORWARD EXPEDITIOUSLY, AND

01:04PM  2      WE ALSO DON'T WANT TO SEE WITNESSES INCONVENIENCED

01:04PM  3      UNNECESSARILY, BUT I ALSO WANT ISSUES TO GET THE ATTENTION THEY

01:04PM  4      DESERVE SO.

01:04PM  5              THE COURT:  OF COURSE.  I THINK WE'RE ALL OF COMMON

01:04PM  6      PURPOSE IN THAT.

01:04PM  7          I KNOW YOU WANTED TO LOOK AT THESE NOTES AND WANTED SOME

01:04PM  8      TIME.  WE SHARED OUR THOUGHTS ABOUT THESE, WHETHER OR NOT THEY

01:05PM  9      HAVE IMPORTANCE BASED ON THE TESTIMONY.

01:05PM 10              MR. DOWNEY:  YES.

01:05PM 11              THE COURT:  BUT YOU NEED TIME TO LOOK THEM OVER.

01:05PM 12      YOU'VE LOOKED AT ABOUT HALF OF THEM I THINK YOU'VE SAID.

01:05PM 13              MR. DOWNEY:  WELL, I HAD ABOUT A HALF AN HOUR.  I

01:05PM 14      WENT THROUGH EACH OF THEM ONCE, BUT I WASN'T ABLE TO GO THROUGH

01:05PM 15      AND FIGURE OUT WHY ALL OF THE VARIATIONS EXIST, OR RESPECTFULLY

01:05PM 16      AS TO WHEN ALL OF THE VARIATIONS EXISTED.  SO I REALLY HAVEN'T

01:05PM 17      HAD A CHANCE TO REVIEW THEM.

01:05PM 18              THE COURT:  SO WHAT DO YOU THINK ABOUT TIMING ABOUT

01:05PM 19      THIS?

01:05PM 20          LET ME JUST POSE SOMETHING.

01:05PM 21              MR. DOWNEY:  YES.

01:05PM 22              THE COURT:  YOU KNOW, WE HAVE A HALF A DAY THAT YOU

01:05PM 23      HAVE AVAILABLE, AND I'LL ENCOURAGE YOU TO LOOK THROUGH THOSE

01:05PM 24      NOTES.

01:05PM 25          THIS IS REALLY YOUR TEAM'S DECISION, MR. DOWNEY --

6297

01:05PM   1                      MR. DOWNEY:  YES.

01:05PM   2                      THE COURT:  -- AS TO WHETHER OR NOT YOU FEEL YOU

01:05PM   3       NEED TO CALL HIM BACK FOR ANY POTENTIAL DISCREPANCIES OR

01:05PM   4       ANYTHING THAT WE'VE TALKED ABOUT THIS MORNING, WHAT IS THE

01:05PM   5       VALUE OF THAT.

01:05PM   6                      MR. DOWNEY:  THAT'S WHAT I -- WHAT I WOULD LIKE TO

01:05PM   7       DO, YOUR HONOR, IS TO HAVE THE OPPORTUNITY TO EXAMINE THEM,

01:05PM   8       PARTICULARLY IN LIGHT OF THE TESTIMONY THAT THE WITNESS GAVE ON

01:06PM   9       DIRECT.

01:06PM   10          IF IT SEEMS TO BE MEANINGFUL, THEN I THINK, YOU KNOW, WE

01:06PM   11      CAN LET THE COURT KNOW THAT TONIGHT.

01:06PM   12          IF IT IS NOT, THEN I'M NOT GOING TO HAUL HIM BACK

01:06PM   13      NEEDLESSLY.

01:06PM   14                     THE COURT:  RIGHT.

01:06PM   15                     MR. DOWNEY:  AND OBVIOUSLY WE WERE SUCCESSFUL IN

01:06PM   16      OTHERWISE FINISHING HIS EXAM SO.

01:06PM   17                     THE COURT:  WELL, I APPRECIATE THAT.

01:06PM   18          AGAIN, I'M NOT MEDDLING, BUT YOU'LL LOOK AT THESE, AND YOU

01:06PM   19      WILL ASSESS THE TESTIMONY THAT HAS BEEN RECEIVED, AND YOU WILL

01:06PM   20      MAKE A VALUE JUDGMENT AS TO WHETHER OR NOT YOU NEED ANYTHING

01:06PM   21      FURTHER FROM THIS WITNESS.

01:06PM   22                     MR. DOWNEY:  THAT'S RIGHT, YOUR HONOR.

01:06PM   23                     MR. BOSTIC:  AND, YOUR HONOR, IF THE COURT IS

01:06PM   24      WILLING TO IMPOSE A DEADLINE OR THINKS A DEADLINE MIGHT BE

01:06PM   25      HELPFUL IN THAT REGARD, THE GOVERNMENT WOULD ENCOURAGE IT.

6298

01:06PM 1          THE COURT:  RIGHT.  I THINK -- THAT WAS MY NEXT

01:06PM 2    STEP, MR. DOWNEY.

01:06PM 3          MR. DOWNEY:  I THINK THAT'S FINE, YOUR HONOR.

01:06PM 4       COULD I JUST HAVE UNTIL 5:00 P.M. TO GO THROUGH THEM, AND

01:06PM 5    I'LL LET MR. BOSTIC KNOW?

01:06PM 6          THE COURT:  WELL, THAT MAKES HIS FLIGHT -- I DON'T

01:06PM 7    KNOW WHERE HE'S STAYING BUT --

01:06PM 8          MR. DOWNEY:  WELL, YOU GENTLEMEN KNOW BETTER THAN I

01:06PM 9    ABOUT WHAT TIME HE WOULD NEED TO KNOW ABOUT HIS FLIGHT.

01:07PM 10          THE COURT:  WELL, YOU HAVE NOT EXPERIENCED THE

01:07PM 11    FREEWAYS HERE I KNOW.  YOU'RE FROM A DIFFERENT PART OF THE

01:07PM 12    COUNTRY.

01:07PM 13       YOU DID EXPERIENCE HERE AT 12:10 P.M., I THINK SOMEWHERE

01:07PM 14    AROUND THERE, YOU EXPERIENCED A CALIFORNIA EARTHQUAKE.  I DON'T

01:07PM 15    KNOW IF YOU FELT IT OR NOT.

01:07PM 16          MR. DOWNEY:  ACTUALLY I DIDN'T.  BUT I'LL INVITE YOU

01:07PM 17    TO WASHINGTON IF YOU WOULD LIKE TO SEE TRAFFIC.

01:07PM 18          THE COURT:  YOU THOUGHT, NO DOUBT, THAT WAS JUST

01:07PM 19    YOUR CROSS-EXAMINATION.  IT WAS EARTH SHAKING.

01:07PM 20          MR. DOWNEY:  NO DOUBT.

01:07PM 21       (LAUGHTER.)

01:07PM 22          MR. DOWNEY:  I THINK -- WHY DON'T YOU TELL ME WHAT

01:07PM 23    TIME IT WOULD BE?

01:07PM 24          THE COURT:  WELL, I KNOW YOU NEED TO LOOK AT THIS,

01:07PM 25    MR. DOWNEY.

6299

01:07PM   1                    MR. DOWNEY:  RIGHT.

01:07PM   2                    THE COURT:  AND I APPRECIATE -- MR. BOSTIC AGREES,

01:07PM   3        YOU NEED TO GIVE IT A REVIEW TO SEE WHAT PURPOSE IT HOLDS.

01:07PM   4                    MR. DOWNEY:  IF ANY.

01:07PM   5                    THE COURT:  RIGHT, IF ANY.

01:07PM   6            AND THE WITNESS HAS EXPRESSED A DESIRE TO MAKE A 6:45

01:07PM   7        FLIGHT I THINK HE SAID.  IF HE'S IN SAN JOSE, IT'S GOING TO

01:07PM   8        TAKE HIM AT LEAST AN HOUR TO GET TO SAN FRANCISCO, DEPENDING ON

01:07PM   9        WHEN HE LEAVES.

01:07PM   10                   MR. DOWNEY:  WELL, YOUR HONOR, I UNDERSTAND HIS

01:08PM   11       TRAVEL SITUATION, AND I REGRET IT.  I DON'T WANT TO HAVE THIS

01:08PM   12       TURN ON THE WITNESS'S TRAVEL SITUATION.  THERE'S A LOT GOING ON

01:08PM   13       IN THE PROCEEDING.  AND THE JURY AND THE COURT OBVIOUSLY HAVE

01:08PM   14       DEDICATED A LOT OF TIME TO IT.

01:08PM   15           I APPRECIATE, YOU KNOW, AND WOULD LIKE TO ACCOMMODATE HIM.

01:08PM   16       AND IT SEEMS LIKE THERE'S A SCENARIO UNDER WHICH HE DOESN'T

01:08PM   17       HAVE TO COME BACK, BUT I WOULD SAY WITH AN ISSUE SUCH AS

01:08PM   18       STUDYING THE ORIGINAL OF THE DOCUMENT, I'M JUST RELUCTANT TO

01:08PM   19       COMMIT DOING SO, SO HE CAN MAKE A PLANE.

01:08PM   20                   THE COURT:  I UNDERSTAND THE BALANCE THERE.  DO YOU

01:08PM   21       THINK YOU COULD GET IT DONE BY 4:00 O'CLOCK, OR CAN YOU CHECK

01:08PM   22       IN WITH MR. BOSTIC?

01:08PM   23                   MR. DOWNEY:  WHY DON'T WE CHECK IN SORT OF AROUND

01:08PM   24       THAT TIME AND THEN WE CAN FIGURE OUT WHAT NEEDS TO BE, WHAT

01:08PM   25       NEEDS TO BE DONE, IF ANYTHING, AND MAKE A PROPOSAL.

6300

01:08PM  1              THE COURT:  OKAY.  MR. BOSTIC, WILL THAT WORK?

01:08PM  2              MR. BOSTIC:  THAT'S FINE.  THANK YOU.

01:08PM  3              THE COURT:  AND ASSUMING THE WITNESS IS EXCUSED, AND

01:08PM  4      I'LL DO THAT TOMORROW ON THE RECORD.

01:09PM  5          AND YOU HAVE ANOTHER WITNESS LINED UP?

01:09PM  6              MR. BOSTIC:  YES.

01:09PM  7              MR. DOWNEY:  AND I THINK AFTER MR. BOSTIC AND I

01:09PM  8      CHAT, MAYBE I CAN REPORT BACK TO THE DEPUTY ON WHERE WE ARE SO

01:09PM  9      THE COURT WILL BE APPRISED IN ADVANCE?  OR DO YOU WANT US TO

01:09PM  10     REPORT IN THE MORNING?

01:09PM  11             THE COURT:  NO, NO.  I'D LIKE TO KNOW TONIGHT, AND

01:09PM  12     YOU CAN LET MS. DIBBLE KNOW.  SHE'LL GIVE HER EMAIL, AND SHE'LL

01:09PM  13     BE WITH US TOMORROW AS WELL, AND SHE'LL GIVE YOU THAT, AND I

01:09PM  14     CAN BE APPRISED OF THAT.

01:09PM  15         AND IF YOU DON'T NEED THE WITNESS, WE CAN TELL HIM HE'S

01:09PM  16     EXCUSED.

01:09PM  17             MR. DOWNEY:  I THINK THAT'S THE PLAN.

01:09PM  18             THE COURT:  AND WHAT ABOUT HIS NOTES, HOW DO WE GET

01:09PM  19     HIS NOTES BACK TO HIM?

01:09PM  20             MR. DOWNEY:  WELL --

01:09PM  21             THE COURT:  THAT'S GOING TO BE PART OF YOUR

01:09PM  22     DISCUSSION.

01:09PM  23             MR. DOWNEY:  WELL, PERHAPS COULD HE PICK THEM UP AT

01:09PM  24     THE COURTHOUSE SINCE THEY'VE BEEN PRODUCED TO THE COURT?

01:09PM  25             THE COURT:  YES.  BUT IT'S KIND OF THE OPPOSITE WAY

6301

01:09PM 1    FROM THE AIRPORT THOUGH.

01:10PM 2            MR. BOSTIC:  WHY DON'T THE PARTIES MEET AND CONFER

01:10PM 3    ON THAT, YOUR HONOR.

01:10PM 4            THE COURT:  EXACTLY.  EXACTLY.

01:10PM 5        THERE'S ALSO A MONDAY NIGHT FOOTBALL GAME THAT YOU'RE

01:10PM 6    GOING TO PROBABLY TAKE YOUR TEAM TO SINCE YOU'RE IN CALIFORNIA.

01:10PM 7            MR. DOWNEY:  WELL, THEY WERE OUT LATE IN LAS VEGAS.

01:10PM 8            THE COURT:  OF COURSE.  WELL, THANK YOU FOR THE

01:10PM 9    FOLLOW UP.  AND I'LL WAIT TO HEAR ABOUT THE NOTES, AND WE'LL

01:10PM 10   SEE WHERE WE GO.

01:10PM 11       IF NOT, AT 9:00 O'CLOCK WE'LL HAVE A NEW WITNESS.

01:10PM 12           MR. BOSTIC:  UNDERSTOOD.

01:10PM 13           THE COURT:  OKAY.  GREAT.  HAVE A GOOD EVENING.

01:10PM 14           MR. DOWNEY:  THANK YOU, YOUR HONOR.

01:10PM 15           MR. BOSTIC:  THANK YOU.

01:10PM 16           (COURT ADJOURNED AT 1:10 P.M.)

17

18

19

20

21

22

23

24

25

1

2

3                      CERTIFICATE OF REPORTERS

4

5

6

7        WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11        THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16   _____
     IRENE RODRIGUEZ, CSR, CRR
     CERTIFICATE NUMBER 8076
17

18   _____

19   LEE-ANNE SHORTRIDGE, CSR, CRR
     CERTIFICATE NUMBER 9595
20

21        DATED:  NOVEMBER 15, 2021

22

23

24

25