1

2                    UNITED STATES DISTRICT COURT

3                  NORTHERN DISTRICT OF CALIFORNIA

4                        SAN JOSE DIVISION

5

   UNITED STATES OF AMERICA,          )   CR-18-00258-EJD
6                                      )
                     PLAINTIFF,        )   SAN JOSE, CALIFORNIA
7                                      )
           VS.                         )   VOLUME 33
8                                      )
   ELIZABETH A. HOLMES,                )   NOVEMBER 16, 2021
9                                      )
                     DEFENDANT.        )   PAGES 6302 - 6573
10   _____   )   **SEALED PAGES 6566 - 6573**

11

12                TRANSCRIPT OF TRIAL PROCEEDINGS
              BEFORE THE HONORABLE EDWARD J. DAVILA
13                UNITED STATES DISTRICT JUDGE

14   A P P E A R A N C E S:

15   FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                            BY:  JOHN C. BOSTIC
16                               JEFFREY B. SCHENK
                            150 ALMADEN BOULEVARD, SUITE 900
17                          SAN JOSE, CALIFORNIA 95113

18                          BY:  ROBERT S. LEACH
                                 KELLY VOLKAR
19                          1301 CLAY STREET, SUITE 340S
                            OAKLAND, CALIFORNIA 94612
20
         (APPEARANCES CONTINUED ON THE NEXT PAGE.)
21

22   OFFICIAL COURT REPORTERS:
                            IRENE L. RODRIGUEZ, CSR, RMR, CRR
23                          CERTIFICATE NUMBER 8074
                            LEE-ANNE SHORTRIDGE, CSR, CRR
24                          CERTIFICATE NUMBER 9595

25        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
              TRANSCRIPT PRODUCED WITH COMPUTER

1

2     A P P E A R A N C E S: (CONT'D)

3     FOR DEFENDANT HOLMES:    WILLIAMS & CONNOLLY LLP
                               BY:  KEVIN M. DOWNEY
4                                   LANCE A. WADE
                                    KATHERINE TREFZ
5                                   PATRICK LOOBY
                                    SEEMA ROPER
6                                   RICHARD CLEARY
                                    J.R. FLEURMONT
7                              725 TWELFTH STREET, N.W.
                               WASHINGTON, D.C. 20005
8
                               LAW OFFICE OF JOHN D. CLINE
9                              BY:  JOHN D. CLINE
                               ONE EMBARCADERO CENTER, SUITE 500
10                             SAN FRANCISCO, CALIFORNIA 94111

11

12    ALSO PRESENT:            FEDERAL BUREAU OF INVESTIGATION
                               BY:  ADELAIDA HERNANDEZ
13
                               OFFICE OF THE U.S. ATTORNEY
14                             BY:  LAKISHA HOLLIMAN, PARALEGAL
                                    MADDI WACHS, PARALEGAL
15
                               WILLIAMS & CONNOLLY
16                             BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL

17                             TBC
                               BY:  BRIAN BENNETT, TECHNICIAN
18

19

20

21

22

23

24

25

1

2                        <u>INDEX OF PROCEEDINGS</u>

3        GOVERNMENT'S:

4        **SO-HAN (DANISE) SPIVEY**
         DIRECT EXAM BY MR. LEACH                P. 6355
5        CROSS-EXAM BY MR. WADE                  P. 6364

6

7        **BRIAN GROSSMAN**
         DIRECT EXAM BY MR. LEACH                P. 6374
8        CROSS-EXAM BY MR. WADE                  P. 6462

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXHIBITS

|  |  | IDENT. | EVIDENCE |
|---|---|---|---|

GOVERNMENT'S:

| | EVIDENCE |
|---|---|
| 5454 | 6358 |
| 1396 | 6371 |
| 1404 | 6387 |
| 4077 | 6410 |
| 1443 | 6430 |
| 5441 | 6444 |
| 1482 | 6453 |
| 1505 | 6458 |
| 1506 | 6459 |
| 4052 | 6500 |
| 1434 | 6509 |
| 1422 | 6511 |
| 1360 | 6521 |
| 4036 | 6536 |

DEFENDANT'S:

| | EVIDENCE |
|---|---|
| 7353 | 6484 |
| 7354 | 6486 |
| 7358 | 6490 |
| 7376 | 6514 |
| 14025 | 6523 |
| 7378 | 6529 |
| 14021 | 6541 |
| 7390 | 6544 |

```
 1    SAN JOSE, CALIFORNIA                      NOVEMBER 16, 2021
 2                        P R O C E E D I N G S
 3         (COURT CONVENED AT 8:17 A.M.)
 4         (JURY OUT AT 8:17 A.M.)
 5              THE COURT:  LET'S GO ON THE RECORD IN THE HOLMES
 6    MATTER.  ALL COUNSEL ARE PRESENT AND MS. HOLMES IS PRESENT.
 7         WE'RE OUTSIDE OF THE PRESENCE OF THE JURY THIS MORNING.
 8    WE WERE GOING TO TAKE UP -- I THINK THERE WAS A MATTER, THE
 9    MOTION FILED BY THE DEFENSE.
10         I JUST WANTED TO TOUCH BASE.  LAST WEEK WE -- WHEN WE LEFT
11    COUNSEL, I THINK YOU WERE GOING TO HAVE SOME DISCUSSION ABOUT
12    SOME IDENTIFICATION OF DECISIONS MADE BY 4:00 P.M. LAST WEEK.
13         IS THAT SOMETHING THAT I SHOULD KNOW ABOUT, OR CAN I JUST
14    KNOW, HAVE YOU HAD THAT DISCUSSION?  I THINK THIS --
15              MR. DOWNEY:  YOUR HONOR, ARE YOU REFERRING TO
16    YESTERDAY?
17              THE COURT:  NO.  I THINK IT WAS LAST WEEK THERE WAS
18    A DISCUSSION ABOUT THE LIS, AND IS THAT SOMETHING THAT WE
19    SHOULD TALK ABOUT THIS MORNING?
20              MR. SCHENK:  I'M NOT SURE THERE'S AN ISSUE THAT
21    NEEDS THE COURT'S ATTENTION.  THE DEFENSE DID SEND US A LETTER
22    BY 4:00 P.M.  THE LETTER INDICATED THAT THEY DID NOT BELIEVE
23    THAT THE DOOR WAS OPEN FOR THE GOVERNMENT TO INTRODUCE FACTS
24    REGARDING THE LIS DATABASE, AND THEY ALSO MAINTAIN THEIR
25    ABILITY TO MAKE ANY ARGUMENTS, IF I'M SUMMARIZING THEIR
```

08:18AM  1      POSITION CORRECTLY.

08:18AM  2              THE COURT:  OKAY.

08:18AM  3              MR. SCHENK:  I DON'T KNOW -- THE POINT THE

08:18AM  4      GOVERNMENT WAS MAKING WAS THAT WE DON'T KNOW WHETHER THE

08:18AM  5      DEFENSE IS GOING TO PUT A CASE ON OR NOT, AND WHEN WE ARE IN

08:18AM  6      THAT POSITION, WHAT WE ARE FACED WITH IS ASKING THE COURT, HAS

08:18AM  7      THE DOOR BEEN OPENED SO THAT WE CAN PUT IN THE FACTS AS WE SEE

08:18AM  8      THEM WITH REGARD TO LIS?

08:18AM  9          BECAUSE THE CURRENT STATE OF THE RECORD IS A LITTLE BIT

08:18AM  10     UNCLEAR ON WHAT ARGUMENTS THE DEFENSE CAN MAKE BASED UPON THE

08:19AM  11     FACTS THAT HAVE BEEN INTRODUCED.  FOR INSTANCE, THE

08:19AM  12     CAPABILITIES OF LIS IS IN THE RECORD.

08:19AM  13         SO FROM THAT THE DEFENSE MIGHT ARGUE, IF THEY PUT ON NO

08:19AM  14     CASE, THEY MIGHT ARGUE IN CLOSING THAT THE GOVERNMENT FAILED TO

08:19AM  15     GET VERY IMPORTANT EVIDENCE.

08:19AM  16         FROM THE GOVERNMENT'S PERSPECTIVE, IT WOULD BE UNFAIR TO

08:19AM  17     HAVE THAT ARGUMENT BASED UPON THIS RECORD WITHOUT THE

08:19AM  18     GOVERNMENT IN ITS CASE-IN-CHIEF GETTING TO INTRODUCE ADDITIONAL

08:19AM  19     EVIDENCE REGARDING LIS TO CONFRONT THAT TYPE OF ARGUMENT.

08:19AM  20         THAT'S WHAT THE GOVERNMENT WAS GETTING AT BY RAISING THIS

08:19AM  21     TO THE COURT'S ATTENTION LAST WEEK BY ASKING FOR SOME NOTICE

08:19AM  22     REGARDING HOW THE DEFENSE VIEWS THE STATE OF THE EVIDENCE.

08:19AM  23         AND WHAT WE DETERMINED IS THAT THE DEFENSE DOESN'T BELIEVE

08:19AM  24     THAT THE DOOR IS OPEN, WHICH WE TAKE TO MEAN THAT THEY WILL NOT

08:19AM  25     MAKE THAT ARGUMENT BECAUSE IT CAN'T BE -- BOTH CAN'T EXIST.

08:19AM 1    THE DOOR CAN'T BE CLOSED AND ALSO THE DEFENSE GETS TO ARGUE

08:20AM 2    MISSING EVIDENCE HERE.  THAT WOULD BE UNFAIR.

08:20AM 3        AND WE'RE FINE WITH THE RECORD AS IT IS ON THAT ISSUE,

08:20AM 4    UNLESS SORT OF HEARING THAT THE COURT HAS FURTHER GUIDANCE FOR

08:20AM 5    THE PARTIES.

08:20AM 6            THE COURT:  AND THIS IS WHAT I WANTED TO TOUCH ON.

08:20AM 7        I THINK THERE WAS SOME DISCUSSION ABOUT THIS, AND I

08:20AM 8    THOUGHT, MR. WADE, YOUR TEAM HAD SAID WE'RE GOING TO LOOK AT

08:20AM 9    THIS AND MAKE A DECISION OR GIVE SOME INFORMATION.

08:20AM 10       SO --

08:20AM 11           MR. WADE:  YOUR HONOR, IF I MIGHT, WE DID SEND A

08:20AM 12   LETTER TO THE COUNSEL.

08:20AM 13       IF I MIGHT PASS THAT UP, ALONG WITH --

08:20AM 14           THE COURT:  SURE.

08:20AM 15           MR. WADE:  -- THERE'S AN EXCERPT OF THE PORTION OF

08:20AM 16   DOCKET 798 WHICH, OF COURSE, IS THE COURT'S MOTION IN LIMINE

08:20AM 17   RULING THAT RELATES TO THE LIS ISSUE.

08:20AM 18       I'M SURE THE COURT HAS A DOG-EARED COPY OF 798 THAT IT

08:20AM 19   KEEPS UP ON THE BENCH, BUT I HAVE JUST COPIED THE RELEVANT

08:20AM 20   PORTIONS THERE.

08:20AM 21       YOU'LL SEE, YOUR HONOR, WHAT WE DID IN THE LETTER IS WE

08:20AM 22   TOOK MR. SCHENK'S INQUIRY TO BE AN INQUIRY AS TO WHETHER WE

08:21AM 23   WISHED TO TELL HIM WHAT DEFENSES WE WANT TO PRESENT BEFORE HIS

08:21AM 24   CASE CLOSES.  WE DECLINED THE INVITATION.

08:21AM 25       WE RESERVE OUR RIGHT TO OFFER ANY DEFENSE.

08:21AM  1      WE DID NOTE IN THE COURT'S ORDER, AS MR. SCHENK SUGGESTED,

08:21AM  2   WE DID NOTE THAT WE DON'T BELIEVE THAT WE HAVE OPENED THE DOOR.

08:21AM  3   THE COURT'S ORDER SPECIFICALLY DISCUSSED ISSUES THAT WE COULD

08:21AM  4   ADDRESS WITH RESPECT TO LIS, AND IT ADDRESSED -- IT NOTED THE

08:21AM  5   CONCEPT THAT IF WE, THAT IF WE ARGUE THAT THE LIS DATABASE IS

08:21AM  6   UNAVAILABLE BECAUSE OF THE GOVERNMENT'S FAILURE TO OBTAIN IT,

08:21AM  7   THAT THAT COULD OPEN THE DOOR.

08:21AM  8      I THINK THE COURT ALSO NOTED IN THE ORDER THAT IF WE

08:21AM  9   SOUGHT A JURY INSTRUCTION THAT RELATED TO SPOLIATION -- I

08:22AM 10   ALWAYS HAVE TROUBLE WITH THAT WORD, YOUR HONOR -- AND WE

08:22AM 11   PRESENTLY DON'T INTEND TO OFFER THAT, BUT, OF COURSE, WE'LL SEE

08:22AM 12   WHERE WE ARE AFTER THE GOVERNMENT RESTS AND WHAT DEFENSE WE

08:22AM 13   NEED TO PROVE.

08:22AM 14      THE GOVERNMENT HAS A REBUTTAL CASE IF WE END UP OPENING

08:22AM 15   THAT DOOR IN THE DEFENSE CASE, AND AS ALWAYS, IT HAS THE

08:22AM 16   ABILITY TO ADDRESS WHATEVER DEFENSES WE MIGHT RAISE IN ITS

08:22AM 17   REBUTTAL.

08:22AM 18          THE COURT:  OKAY.  WELL, ONE OF THE OBSERVATIONS,

08:22AM 19   LET ME JUST SAY, IS THERE'S BEEN MENTION OF THE LIS THROUGH

08:22AM 20   CROSS-EXAMINATION, AND TWO OR THREE WITNESSES WERE ASKED ABOUT

08:22AM 21   IT, THE LAB DIRECTORS AND THE EXISTENCE OF IT, AND IT WAS, I'LL

08:22AM 22   USE THE WORD INTERESTING, TO LISTEN TO THOSE QUESTIONS AS TO

08:22AM 23   THE RELEVANCY OF THE TOPICS AND RAISING THE LIS, WHICH CAUSED

08:23AM 24   ME, PARDON ME, SOME QUESTION ABOUT WHETHER OR NOT THAT IS GOING

08:23AM 25   TO BE AN ISSUE IN THE CASE.

08:23AM  1         AND I UNDERSTAND WE'RE TREADING LIGHTLY BECAUSE I'M NOT

08:23AM  2    ASKING THE DEFENSE TO REVEAL WHAT THEIR DEFENSE IS IN ADVANCE.

08:23AM  3    I'M NOT DOING THAT.  NEITHER IS THE GOVERNMENT.

08:23AM  4         BUT THERE IS THIS ISSUE.  IT'S BEEN PROBED BY YOU, WHICH,

08:23AM  5    TO THE GOVERNMENT, PERHAPS SUGGESTS THAT, WELL, WHAT DO WE NEED

08:23AM  6    TO DO ABOUT IT?  IF WE SIT ON OUR HANDS ABOUT IT AND THEN THIS

08:23AM  7    BECOMES AN ISSUE, THEN IT'S PART OF THE REBUTTAL CASE.  I

08:23AM  8    UNDERSTAND THAT'S HOW THE SYSTEM WORKS AND THEY CAN PUT THAT

08:23AM  9    ON.

08:23AM  10        THE OTHER REASON FOR ME TO MAKE INQUIRY ON THIS IS THE

08:23AM  11   TIMING OF THINGS.  IF THE LIS COMES IN, IT COULD OPEN THE DOOR

08:23AM  12   TO -- IF YOUR TEAM IS GOING TO ARGUE THAT THE GOVERNMENT

08:23AM  13   DESTROYED IT AND IT'S THEIR FAULT, OR SOMEHOW THE JURY SHOULD

08:23AM  14   LOOK AT THAT, THEN THAT OPENS THE DOOR TO SIGNIFICANT OTHER

08:24AM  15   ISSUES ABOUT RESPONSIBILITY FOR THAT.

08:24AM  16        AND YOU KNOW WHAT THE HISTORY IS.  YOU KNOW WHAT THE

08:24AM  17   EVIDENCE IS AND THAT, AND WHAT TESTIMONY IS LIKELY TO COME IN

08:24AM  18   FRONT OF ALL OF THAT.

08:24AM  19        SO MY THOUGHT IN DOCKET 798 WAS THE LIS IS NOT GOING TO BE

08:24AM  20   RELEVANT IN THE CASE, BUT THAT'S WHAT THE COURT'S THOUGHT WAS

08:24AM  21   AFTER LOOKING AT YOUR MOTIONS.

08:24AM  22        BUT IT COULD COME IN.  AND, OF COURSE, IF THE DOOR IS

08:24AM  23   OPENED, THEN IT IS PART OF THE CASE AND THE JURY IS ENTITLED TO

08:24AM  24   HEAR BOTH SIDES OF IT.

08:24AM  25        SO YOU'RE KIND OF DRIVING THIS, MR. WADE.  YOU'RE KIND OF

08:24AM 1    DRIVING THIS.  BUT, YOU KNOW, YOU'RE IN THE DRIVER'S SEAT ON

08:24AM 2    THIS, BUT QUERY AS TO, YOU KNOW, ARE YOU ON THE FREEWAY YET?

08:24AM 3              MR. WADE:  I'M NOT EVEN SURE WE'VE TURNED ONTO THE

08:25AM 4    ENTRY RAMP, YOUR HONOR.

08:25AM 5         OF COURSE THE LIS IS IN THE CASE.  AS WE NOTED AT THE

08:25AM 6    OUTSET IN THE MOTIONS PRACTICE, THE LIS IS THE CENTRAL HUB OF

08:25AM 7    INFORMATION WITHIN THE CASE.

08:25AM 8         THE GOVERNMENT CALLED WITNESS AND THEY ASKED A LOT OF

08:25AM 9    QUESTIONS RELATING TO RESULTS.  THEY ASKED DR. DAS, FOR

08:25AM 10   EXAMPLE, ABOUT DIFFERENT THINGS HE DID WHEN HE CAME INTO THE

08:25AM 11   COMPANY.  ALL OF THAT RELATED TO DATA WITHIN THE LIS.

08:25AM 12        AND OF COURSE THE COURT IN ITS ORDER IN 798 DIDN'T

08:25AM 13   PRECLUDE US FROM QUESTIONING ON LIS.  THE LINE THAT WE TOOK THE

08:25AM 14   COURT TO BE DRAWING THERE, AND WHICH WE'VE SOUGHT TO BE MINDFUL

08:25AM 15   OF AS WE'VE ASKED QUESTIONS, IS WHETHER WE ARGUE OR WHETHER WE

08:25AM 16   SEEK EVIDENCE RELATING TO THE LIS BEING UNAVAILABLE BECAUSE OF

08:25AM 17   THE GOVERNMENT'S FAILURE TO OBTAIN IT.

08:25AM 18        AND I DON'T BELIEVE THAT WE'VE ASKED ANY QUESTIONS WITH

08:25AM 19   RESPECT TO THE GOVERNMENT'S FAILURE TO OBTAIN IT.  I DON'T

08:26AM 20   BELIEVE AT THIS POINT THAT WE'VE ASKED ANY QUESTIONS -- YOU

08:26AM 21   KNOW, AN AGENT HASN'T TESTIFIED, FOR EXAMPLE, THERE'S BEEN NO

08:26AM 22   INQUIRY ABOUT THE GOVERNMENT'S FAILURE TO OBTAIN IT.

08:26AM 23        BUT WE DID RAISE THIS VERY ISSUE IN 798 ABOUT PRESERVING

08:26AM 24   OUR ABILITY TO MAKE ARGUMENTS ABOUT THE GOVERNMENT'S FAILURE TO

08:26AM 25   MEET ITS BURDEN.

08:26AM 1      THE COURT:  WELL, HOW IS THAT DIFFERENT FROM THE

08:26AM 2   GOVERNMENT'S FAILURE TO MAINTAIN IT, TO MAINTAIN THE EVIDENCE

08:26AM 3   AND MAINTAIN IT?

08:26AM 4      THIS IS THE -- YOU KNOW, THIS IS THE ISSUE HERE, AND IF

08:26AM 5   THERE'S -- IF THERE'S SOME OPAQUENESS ABOUT THIS, THEN THE

08:26AM 6   GOVERNMENT IS JUST GOING TO HAVE TO DO WHAT THEY NEED TO DO IN

08:26AM 7   THEIR CASE-IN-CHIEF I SUPPOSE.

08:26AM 8      MR. WADE:  WELL, YOUR HONOR, OF COURSE, CONSIDERED

08:26AM 9   THIS AT LENGTH WITH LENGTHY BRIEFING AND ARGUMENT IN THE MOTION

08:26AM 10   IN LIMINE STAGE.

08:26AM 11      AND YOU'LL RECALL AT 58 OF THE COURT'S ORDER, IT DECLINED

08:27AM 12   TO PRECLUDE MS. HOLMES FROM RAISING THE LACK OF STATISTICAL OR

08:27AM 13   SCIENTIFIC EVIDENCE AS A DEFENSE, FROM CHARACTERIZING THAT

08:27AM 14   MISSING EVIDENCE AS CRITICAL TO THE GOVERNMENT'S CASE, OR FROM

08:27AM 15   ARGUING ABOUT THE STATISTICAL INSIGNIFICANCE OF INDIVIDUAL

08:27AM 16   PATIENT OR PHYSICIAN TESTIMONY.

08:27AM 17      SO TO THE EXTENT THAT THE GOVERNMENT WAS SEEKING TO

08:27AM 18   EXCLUDE THAT, THE COURT SAID NO.

08:27AM 19      THE COURT ALSO SAID IN THAT ORDER THAT THERE IS NO

08:27AM 20   EVIDENCE TYING ANY OF THE UNAVAILABILITY OF LIS TO MS. HOLMES,

08:27AM 21   AND SO THE GOVERNMENT COULDN'T GO INTO THAT UNLESS WE OPENED

08:27AM 22   THE DOOR TO THE -- BY BLAMING THE GOVERNMENT FOR THE FAILURE TO

08:27AM 23   OBTAIN OR PRESERVE THE EVIDENCE.

08:27AM 24      AND I DON'T BELIEVE YET WE'VE DONE THAT, SO I DON'T THINK

08:27AM 25   THE DOOR HAS BEEN OPENED IN THE GOVERNMENT'S CASE.

08:27AM 1      THIS IS SOMETHING THAT WE CAN DISCUSS AS THE DEFENSE CASE,

08:28AM 2  IF THERE IS ONE, MOVES FORWARD.  BUT I DON'T SEE ANYTHING THAT

08:28AM 3  WE'VE DONE TO DATE AS CHANGING THE STATUS QUO.

08:28AM 4      THE LIS IS THE CENTRAL HUB OF ALL OF THE DATA AND ALL OF

08:28AM 5  THE PATIENT INFORMATION, AND THAT'S JUST A FACT OF THE CASE.

08:28AM 6  BUT WE HAVEN'T ARGUED ABOUT THE GOVERNMENT'S FAILURE TO

08:28AM 7  PRESERVE IT IN ANY WAY TO MY KNOWLEDGE.

08:28AM 8      IF WE HAVE, I WELCOME, YOU KNOW, THE REFERENCES IN THE

08:28AM 9  TRANSCRIPT.  WE CAN CONSIDER IT AND COME BACK AND, YOU KNOW,

08:28AM 10 ADDRESS THE SIGNIFICANCE OF IT WITH THE COURT IN LIGHT OF THE

08:28AM 11 ORDER.

08:28AM 12      OF COURSE, YOU KNOW, IF THE COURT WANTS TO REVISIT ITS

08:28AM 13 ORDER AND THE GOVERNMENT WANTS TO GO INTO THAT, WE CAN

08:28AM 14 ENTERTAIN THAT, TOO.  IT WAS MY UNDERSTANDING THEY DIDN'T

08:28AM 15 INTEND TO CALL WITNESSES ON THAT IN THEIR CASE-IN-CHIEF.

08:28AM 16      THE COURT:  WELL, IT SOUNDS TO ME LIKE -- AND YOU

08:28AM 17 DON'T HAVE TO CORRECT ME -- BUT IT SOUNDS TO ME LIKE THE LIS IS

08:28AM 18 IMPORTANT TO THE DEFENSE AND IT SOUNDS LIKE IF THERE WAS

08:29AM 19 NOTHING ELSE, IF THE CASE ENDED NOW AND WE ARGUED TOMORROW, YOU

08:29AM 20 WOULD BE PREPARED TO ARGUE THAT THE GOVERNMENT HASN'T PROVEN

08:29AM 21 THE CASE BECAUSE THE LIS THAT YOU EXAMINED ON IS THE REPOSITORY

08:29AM 22 OF ALL THE INFORMATION, AND YOU HAVE NO INFORMATION FROM THE

08:29AM 23 GOVERNMENT AS TO THAT INFORMATION.

08:29AM 24      IT SOUNDS LIKE THAT'S THE ARGUMENT THAT YOU'RE GOING TO

08:29AM 25 MAKE.  I'M NOT ASKING YOU TO REVEAL OR NOT, BUT I'M JUST

08:29AM   1   TELLING YOU, GENERALLY IT SOUNDS LIKE YOU'RE PREPARED TO MAKE

08:29AM   2   THAT ARGUMENT.

08:29AM   3           MR. WADE:  WE, OF COURSE, ARE PREPARED TO ARGUE THE

08:29AM   4   EVIDENCE IN THE CASE.

08:29AM   5       WE HAVEN'T MADE ANY SPECIFIC -- WE'VE GOT SOME ROAD TO

08:29AM   6   COVER HERE --

08:29AM   7           THE COURT:  SURE.

08:29AM   8           MR. WADE:  -- USING THE FREEWAY METAPHOR.

08:29AM   9           THE COURT:  SURE.

08:29AM  10           MR. WADE:  AND WE DON'T KNOW IF THERE'S A DEFENSE

08:29AM  11   CASE AND, IF THERE IS, WHAT THE CONTOURS OF THAT MIGHT BE.

08:29AM  12       SO WE'RE STILL IN THE GOVERNMENT'S CASE.

08:29AM  13       I UNDERSTOOD THE LITIGATION OF THIS ISSUE.  I THINK WE

08:29AM  14   STILL UNDERSTAND THE LITIGATION OF THIS ISSUE AS RELATING TO

08:29AM  15   WHAT IS FAIR GAME WITHIN THE GOVERNMENT'S CASE-IN-CHIEF.

08:30AM  16       I DON'T THINK -- WHO WAS RESPONSIBLE FOR NOT GETTING THE

08:30AM  17   LIS OR NOT PRESERVING THE LIS, THE COURT KNOWS THERE COULD BE

08:30AM  18   A 10 DAY TRIAL, PROBABLY, ON THAT ISSUE, AND 10 OR 15

08:30AM  19   WITNESSES.

08:30AM  20       WE HAVEN'T SOUGHT TO BURDEN THE COURT WITH THOSE ISSUES,

08:30AM  21   BUT WE HAVE PRESENTED ISSUES WITH RESPECT TO THE SIGNIFICANCE

08:30AM  22   OF THE ROLE THAT THE LIS PLAYED WITHIN THE LAB, THE ROLE -- THE

08:30AM  23   GOVERNMENT'S WITNESSES, DR. DAS IN PARTICULAR, BROUGHT THAT

08:30AM  24   ISSUE INTO THE CASE BASED UPON THE -- THEIR EXAMINATION OF THE

08:30AM  25   WITNESS.

08:30AM 1          MR. SCHENK:  ON THAT LAST POINT, I DISAGREE.

08:30AM 2   DR. DAS, HIS TESTIMONY, MY RECOLLECTION IS, WAS THAT HE DIDN'T

08:30AM 3   GATHER THE INFORMATION THAT HE ENDED UP REVIEWING TO REACH HIS

08:30AM 4   CONCLUSIONS.

08:30AM 5          OTHER PEOPLE AT THERANOS GATHERED INFORMATION, AND HE

08:30AM 6   WASN'T SURE WHERE THAT INFORMATION CAME FROM.

08:31AM 7          SO FOR THE DEFENSE TO SUGGEST THAT THE GOVERNMENT'S DIRECT

08:31AM 8   OR THE GOVERNMENT'S CHOICE OF WITNESSES IN THIS CASE HAS

08:31AM 9   INJECTED OR CAUSED LIS TO BE AN ISSUE IS DISINGENUOUS.  IT'S

08:31AM 10  NOT TRUE.

08:31AM 11         AND ALL THE GOVERNMENT IS CONCERNED ABOUT IS BEING PUT IN

08:31AM 12  A POSITION WHERE THE DEFENSE DOES NOT PUT ON A CASE.  OF COURSE

08:31AM 13  IF THEY PUT ON A CASE, WE HAVE REBUTTAL AND WE HAVE AN

08:31AM 14  OPPORTUNITY TO COME BACK TO THE COURT AND SAY, CAN WE HAVE

08:31AM 15  DIRECTION NOW, YOUR HONOR, ON WHETHER THE DOOR IS OPEN?

08:31AM 16         THERE IS NO ISSUE AT THAT POINT.  THEN WE ALL KNOW, AND

08:31AM 17  THE GOVERNMENT IS IN A POSITION WHERE IT COULD CALL NEW

08:31AM 18  WITNESSES ON LIS.

08:31AM 19         THE GOVERNMENT'S CONCERN IS THAT AT THIS STAGE, ONE, WE

08:31AM 20  DON'T KNOW IF THE DEFENSE IS GOING TO PUT ON A CASE, AND TWO,

08:31AM 21  WE DON'T KNOW IF, BASED UPON THE RECORD THAT THE DEFENSE HAS

08:31AM 22  ELICITED THROUGH CROSS, THEY INTEND TO MAKE ARGUMENTS

08:31AM 23  SUGGESTING LIS IS MISSING.

08:31AM 24         AND WHEN THE GOVERNMENT BEARS THE BURDEN OF PROOF, IT'S

08:31AM 25  IMPLICIT IN THAT ARGUMENT THAT THE MISSING EVIDENCE SHOULD BE

08:32AM  1    HELD AGAINST THE GOVERNMENT.  IT IS IMPLICIT IN THAT ARGUMENT

08:32AM  2    THAT THE JURY SHOULD FAULT THE GOVERNMENT FOR THIS EVIDENCE TO

08:32AM  3    BE LACKING.

08:32AM  4        AND ALL WE'RE ASKING FOR IS, BASED UPON THE CURRENT STATE

08:32AM  5    OF THE RECORD, IS THE DOOR OPEN AND SHOULD WE TELL THE COMPLETE

08:32AM  6    STORY ABOUT LIS?

08:32AM  7        IF THE ANSWER IS NO, THAT'S FINE.  I'M NOT ASKING FOR THE

08:32AM  8    COURT TO FIND THAT THE DOOR HAS BEEN OPENED.

08:32AM  9        BUT I GUESS WHAT I'M ASKING IS THAT IF THE DOOR ISN'T

08:32AM  10   OPEN, WHEN WE OBJECT TO THIS ARGUMENT IN CLOSING, THAT

08:32AM  11   OBJECTION SHOULD BE SUSTAINED.

08:32AM  12       THE DEFENSE SHOULDN'T BE ABLE TO HAVE IT BOTH WAYS.  THAT

08:32AM  13   REALLY IS THE SUM OF IT.

08:32AM  14         THE COURT:  I THINK THAT'S WHAT I UNDERSTAND FROM

08:32AM  15   LAST WEEK'S CONVERSATION.

08:32AM  16       AND I WAS APPRECIATIVE OF, MR. WADE, YOUR TEAM SAYING

08:32AM  17   WE'LL LET THEM KNOW BY 4:00 O'CLOCK, WE'LL MAKE THAT DECISION

08:32AM  18   AT 4:00 O'CLOCK.

08:32AM  19       I THINK THE GOVERNMENT ASKED, WELL, YOU KNOW, WE'RE

08:32AM  20   PROBABLY GOING TO FINISH OUR CASE MID NEXT WEEK AND SO WE'VE

08:32AM  21   HAD THIS ENGAGEMENT OF RECIPROCITY ABOUT WITNESSES, AND MAYBE

08:33AM  22   THEY CAN LET US KNOW SO WE CAN PREPARE, AND I THINK YOU SAID

08:33AM  23   WE'LL BE IN COMMUNICATION BY 4:00 P.M., WHICH WOULD INCLUDE

08:33AM  24   THIS LIS ISSUE.

08:33AM  25         MR. WADE:  WE DID, YOUR HONOR.  WE DID EXCHANGE

08:33AM 1  WITNESSES EVEN AS WE AGREED TO BEFORE THE CASE BEGAN.

08:33AM 2              THE COURT:  SURE.

08:33AM 3              MR. WADE:  OF COURSE WE'RE NOT SAYING WE'RE

08:33AM 4  PRESENTING A DEFENSE CASE BY --

08:33AM 5              THE COURT:  RIGHT.

08:33AM 6              MR. WADE:  -- GIVING THEM A SENSE OF THE WITNESSES.

08:33AM 7       I DON'T THINK IT WAS ANYONE'S UNDERSTANDING THAT WE WERE,

08:33AM 8  YOU KNOW, COMMITTING TO THAT BEFORE THE GOVERNMENT RESTS ITS

08:33AM 9  CASE, BUT WE DID PROVIDE WITNESSES.

08:33AM 10      AND, YOUR HONOR, I DON'T THINK I'VE EVER BEEN ASKED TO

08:33AM 11 RULE IN OR OUT A DEFENSE BEFORE THE GOVERNMENT CASE CLOSED, AND

08:33AM 12 I KNOW --

08:33AM 13             THE COURT:  I'M NOT ASKING.

08:33AM 14             MR. WADE:  -- THE COURT IS NOT ASKING THAT.

08:33AM 15      I'M JUST VERY MINDFUL OF THE COURT'S ORDER ON THIS ISSUE,

08:33AM 16 WHICH WAS AFTER CONSIDERED BRIEFING, WHICH WAS THE COURT

08:33AM 17 DECLINES TO PRECLUDE HOLMES FROM RAISING THE LACK OF

08:34AM 18 STATISTICAL OR SCIENTIFIC EVIDENCE AS A DEFENSE, FROM

08:34AM 19 CHARACTERIZING THAT MISSING EVIDENCE AS CRITICAL TO THE

08:34AM 20 GOVERNMENT'S CASE, OR FROM ARGUING ABOUT THE STATISTICAL

08:34AM 21 INSIGNIFICANCE OF INDIVIDUAL PATIENT OR PHYSICIAN TESTIMONY.

08:34AM 22      THAT'S WHAT THE COURT CONTEMPLATED IN ITS ORDER.  I DON'T

08:34AM 23 THINK -- WE TAKE THAT ORDER SERIOUSLY, AS I KNOW THE COURT

08:34AM 24 DOES, AND I KNOW THE GOVERNMENT DOES.

08:34AM 25      AS TO BLAMING THE GOVERNMENT FOR THE LIS OR SEEKING A

08:34AM 1    DESTRUCTION OF EVIDENCE INSTRUCTION OF SOME SORT, THAT'S A

08:34AM 2    TOTALLY DIFFERENT ISSUE, AND IT MAY BE THAT -- I WOULD IMAGINE

08:34AM 3    IF WE WERE TO SEEK SUCH AN INSTRUCTION BASED UPON THE EVIDENCE

08:34AM 4    WE HAVE ELICITED DURING THE GOVERNMENT'S CASE, THAT THE COURT

08:34AM 5    PROBABLY WOULDN'T PERMIT US TO OFFER THAT INSTRUCTION, BECAUSE

08:34AM 6    I DON'T THINK THERE HAS YET BEEN EVIDENCE OF THE GOVERNMENT'S

08:34AM 7    DESTRUCTION OF THE EVIDENCE OR NEGLIGENT FAILURE TO GET THE

08:35AM 8    EVIDENCE.  I KNOW THERE ARE A COUPLE OF NINTH CIRCUIT

08:35AM 9    INSTRUCTIONS ON THAT.

08:35AM 10        AND SO --

08:35AM 11            THE COURT:  WELL, NOT IN THE EVIDENCE, BUT CERTAINLY

08:35AM 12   IN THE MOTIONS THAT HAVE PRECLUDED -- OR EXCUSE ME, THAT HAVE

08:35AM 13   COME UP EARLIER IN THE TRIAL.  YOUR TEAM HAS MADE THAT

08:35AM 14   ALLEGATION, AND WE HAD SOME, WE HAD SOME MOTION PRACTICE ON

08:35AM 15   THAT.

08:35AM 16        AND I THINK THAT'S THE GOVERNMENT'S CONCERN, AND THAT'S --

08:35AM 17   FROM A TRIAL MANAGEMENT POSITION, THAT'S MY CONCERN, TOO.

08:35AM 18        IF WE NEED TO DO THAT LITIGATION, WE'LL DO IT.  WE'LL DO

08:35AM 19   IT.

08:35AM 20        BUT WHETHER OR NOT IT BECOMES AN ISSUE IN THIS CASE IS

08:35AM 21   SOMETHING THAT I'M JUST TRYING TO PROBE RIGHT NOW.

08:35AM 22        AND YOU KNOW WHAT THE EVIDENCE IS.  YOU KNOW WHAT THAT

08:35AM 23   EVIDENCE IS GOING TO LOOK LIKE, WE ALL DO, ABOUT THE LIS.  WE

08:35AM 24   HAD MOTIONS ON THAT, AND YOU HAD THE COURT'S OPINION ON THAT,

08:35AM 25   AND THE COURT HAD EXPRESSED ITS OPINION.  SO I THINK YOU KNOW

```
08:35AM   1      WHAT IS COMING.

08:35AM   2              MR. WADE:  WE DO, YOUR HONOR.

08:35AM   3         AND AGAIN, LIKE I SAID, I DON'T WANT TO -- I DON'T KNOW

08:36AM   4    THAT WE WOULD OFFER, I DON'T KNOW THAT WE WOULD OFFER ANY KIND

08:36AM   5    OF INSTRUCTION OF THAT NATURE AT THIS POINT.

08:36AM   6         AND AS I SAID, BASED ON THE PRIOR LITIGATION, BASED ON THE

08:36AM   7    RECORD EVIDENCE TO DATE, MY GUESS IS -- AND I HATE TO GUESS HOW

08:36AM   8    THE COURT IS GOING TO RULE -- BUT IF WE SOUGHT SUCH AN

08:36AM   9    INSTRUCTION BASED ON THE EVIDENCE THAT HAS BEEN ELICITED SO

08:36AM  10    FAR, YOU WOULDN'T LET US OFFER IT BECAUSE I DON'T THINK THERE

08:36AM  11    IS ANY EVIDENCE THAT GOES TO THAT AT THIS POINT.

08:36AM  12         THAT'S KIND OF MY POINT.  AND SO -- NOW, OF COURSE IF WE

08:36AM  13    CHOOSE TO GO INTO THAT IN OUR DEFENSE CASE, THEN THE GOVERNMENT

08:36AM  14    HAS THAT REBUTTAL CASE THAT THEY'RE FOCUSSED ON AND THEY COULD

08:36AM  15    GO INTO THAT.

08:36AM  16         BUT I THINK IT'S A LITTLE PREMATURE.  MAYBE WE CAN HAVE

08:36AM  17    THIS DISCUSSION, YOU KNOW, A LITTLE BIT LATER IN THE WEEK OR

08:36AM  18    EARLY NEXT WEEK --

08:36AM  19              THE COURT:  SURE.

08:36AM  20              MR. WADE:  -- YOU KNOW, AS IT RELATES TO HOW WE'RE

08:36AM  21    GOING TO PROCEED IN THIS.

08:36AM  22         WE'RE MINDFUL OF THE SCHEDULE, YOUR HONOR, AND, YOU KNOW,

08:36AM  23    ARE WORKING TO TRY TO CONTINUE TO MOVE FORWARD.

08:37AM  24              THE COURT:  WELL, THANK YOU.

08:37AM  25         I JUST WANTED TO RAISE THIS BECAUSE I THINK FROM THE
```

08:37AM 1    GOVERNMENT'S SIDE THEIR CONCERN IS IF WE, IF WE DO NOTHING ON

08:37AM 2    THIS, BUT YET THE ARGUMENT IS THAT THEY HAVEN'T PROVEN THEIR

08:37AM 3    CASE BECAUSE THE LIS IS THERE AND THEY DIDN'T PUT IT ON, THEY

08:37AM 4    HAD ACCESS TO THE LIS, OR SOMETHING LIKE THAT.

08:37AM 5         AND MR. SCHENK SAYS, WELL, AT A MINIMUM, YOU NEED TO STOP

08:37AM 6    THAT ARGUMENT BECAUSE.  I THINK THAT'S WHAT I HEARD HIM SAY.

08:37AM 7         YOU KNOW, THAT MAY BE AN ISSUE.  IT MIGHT BE AN ISSUE AS

08:37AM 8    TO HOW DOES THE LIS COME INTO THE CASE AND WHAT IS IT?

08:37AM 9         THERE'S BEEN EVIDENCE IN ABOUT THE EXISTENCE OF A LIS.

08:37AM 10        AND I'M CONCERNED THAT IF THE DOOR IS NOT OPENED, THE

08:37AM 11   LIGHT IS CERTAINLY COMING THROUGH THE CRACK IN THE DOOR.  SO WE

08:37AM 12   NEED TO BE MINDFUL OF THAT.

08:37AM 13            MR. WADE:  WELL, IF THAT'S THE CONCERN -- I WANT TO

08:37AM 14   BE VERY CLEAR, YOUR HONOR.  THE DEFENSE BELIEVES THAT IT CAN

08:37AM 15   ARGUE THE EVIDENCE IN THE CASE, OKAY?

08:37AM 16            THE COURT:  SURE.

08:37AM 17            MR. WADE:  SO IF THE GOVERNMENT FEELS THAT IT NEEDS

08:37AM 18   TO CALL WITNESSES TO MEET THAT EVIDENCE, IT SHOULD CALL THE

08:38AM 19   WITNESSES.  THAT'S OUR POSITION, BECAUSE WE'RE NOT GOING TO

08:38AM 20   LIMIT OUR ABILITY TO ARGUE THE EVIDENCE THAT HAS BEEN ELICITED

08:38AM 21   AT THIS POINT.

08:38AM 22        YOU KNOW, WITH RESPECT TO THE COURT, WE'RE MINDFUL OF THE

08:38AM 23   TIME, AND WITH RESPECT TO THE GOVERNMENT, WE'RE JUST NOT GOING

08:38AM 24   TO DO THAT.

08:38AM 25        SO I THINK THERE HAS BEEN SOME EVIDENCE WITH RESPECT TO

08:38AM  1    LIS.  I THINK WE'VE BEEN MINDFUL OF THE LINE THAT THE COURT

08:38AM  2    DREW IN ITS ORDER, BUT I THINK WE HAVE THE RIGHT TO ARGUE THE

08:38AM  3    EVIDENCE THAT HAS BEEN ELICITED.

08:38AM  4         AND IF THE GOVERNMENT WANTS TO CALL WITNESSES AND THINKS

08:38AM  5    THAT IT NEEDS TO -- THAT SOME LINE HAS BEEN CROSSED, IT SHOULD

08:38AM  6    SAY WHO IT WANTS TO CALL AND WE SHOULD ADDRESS WHETHER THAT IS

08:38AM  7    ADMISSIBLE UNDER 401 OR 403.

08:38AM  8              THE COURT:  OKAY.  I THINK THOSE LAST COMMENTS ARE

08:38AM  9    VERY INFORMATIVE.

08:38AM  10        ALL RIGHT.  WELL, LET'S MOVE ON TO THE MOTION THAT WE HAVE

08:38AM  11   THIS MORNING.  THANK YOU.

08:38AM  12        ANYTHING ELSE, MR. SCHENK?

08:38AM  13             MR. SCHENK:  NO.  THANK YOU.

08:38AM  14             THE COURT:  ALL RIGHT.  LET'S SEE.  THIS IS

08:39AM  15   DOCUMENT 1140, I THINK, MS. HOLMES'S RENEWED MOTION TO ADMIT.

08:39AM  16             MR. DOWNEY:  GOOD MORNING, YOUR HONOR.

08:39AM  17        I HAVE ASKED ONE OF OUR YOUNG COLLEAGUES, MR. CLEARY, TO

08:39AM  18   ADDRESS THIS MOTION WITH YOU.

08:39AM  19             THE COURT:  YES.

08:39AM  20             MR. DOWNEY:  AND HE HASN'T BEEN HERE BEFORE AND SO I

08:39AM  21   JUST WANTED TO INTRODUCE THE COURT TO RICHARD CLEARY.  HE'S

08:39AM  22   BEEN ADMITTED PRO HAC FOR SOME TIME AND HAS BEEN WORKING ON THE

08:39AM  23   MATTER.

08:39AM  24             THE COURT:  GREAT, THANK YOU.  WE'RE ALWAYS HAPPY TO

08:39AM  25   HAVE NEW COUNSEL APPEAR.

08:39AM  1          GOOD MORNING, MR. CLEARY.

08:39AM  2              MR. CLEARY:  GOOD MORNING, YOUR HONOR.

08:39AM  3              THE COURT:  I THINK YOU ROSE TO YOUR FEET YESTERDAY

08:39AM  4      JUST AS THE MENTION OF THIS MOTION.

08:39AM  5          (LAUGHTER.)

08:39AM  6              MR. CLEARY:  YES.  I'M ALMOST AS ENTHUSIASTIC AS THE

08:39AM  7      CUSTOMERS APPEAR TO BE IN THESE REPORTS.

08:39AM  8              THE COURT:  ALL RIGHT.  WELL, WE WON'T NEED A

08:39AM  9      PHLEBOTOMIST TO TELL US ABOUT YOUR ENTHUSIASM.

08:39AM 10              MR. CLEARY:  THAT'S RIGHT, YOUR HONOR.

08:39AM 11          TO BEGIN, WE VIEW THESE REPORTS AS VERY IMPORTANT EVIDENCE

08:39AM 12      IN THIS CASE.  THEY'RE POWERFUL EVIDENCE OF MS. HOLMES'S INTENT

08:40AM 13      AND HER KNOWLEDGE.

08:40AM 14          MR. EDLIN LAID A FOUNDATION FOR THEIR ADMISSION SUBJECT TO

08:40AM 15      THE GOVERNMENT'S OBJECTION, WHICH WAS SUSTAINED BY THE COURT.

08:40AM 16          WE UNDERSTOOD THAT THE COURT HAD EXPRESSED AN OPENNESS TO

08:40AM 17      REVISITING THIS ISSUE.  THAT WOULD BE AT TRANSCRIPT PAGE 4263.

08:40AM 18          FOR FOUR REASONS, WE BELIEVE THAT THIS EVIDENCE IS

08:40AM 19      RELEVANT TO CORE ISSUES IN THIS CASE, INCLUDING THREE SEPARATE

08:40AM 20      ISSUES IDENTIFIED IN THE INDICTMENT.

08:40AM 21          SO THE FIRST IS WALGREENS, THE WALGREENS ALLEGATIONS IN

08:40AM 22      PARAGRAPH 12(D).

08:40AM 23          THE SECOND IS THE ACCURACY AND RELIABILITY ALLEGATIONS IN

08:40AM 24      PARAGRAPH 16.

08:40AM 25          THE THIRD ARE ALLEGATIONS CONCERNING PRICE AND THE ROLE OF

08:40AM 1    PRICE AND THE REPRESENTATIONS THAT WERE ALLEGEDLY MADE BY

08:40AM 2    MS. HOLMES TO CUSTOMERS.

08:40AM 3        AND THEN THE FOURTH, THIS IS CRITICAL CONTEXT FOR

08:41AM 4    MS. HOLMES'S VISION AND HER UNDERSTANDING THAT THE THERANOS

08:41AM 5    BUSINESS WAS WORKING.

08:41AM 6        SO I'M HAPPY TO TAKE THOSE IN TURN.

08:41AM 7            THE COURT:  ALL RIGHT.  THAT'S FINE.

08:41AM 8            MR. CLEARY:  FIRST WITH WALGREENS, THE ALLEGATION IN

08:41AM 9    THE INDICTMENT GOES TO THE STATUS AND PROSPECTS OF THE

08:41AM 10   RELATIONSHIP DURING THE CONSPIRACY PERIOD; SPECIFICALLY,

08:41AM 11   WHETHER REPRESENTATIONS WERE MADE THAT THE RELATIONSHIP WITH

08:41AM 12   WALGREENS WAS EXPANDING OR WHETHER -- WHEN ALLEGEDLY THE

08:41AM 13   RELATIONSHIP WAS STALLING.

08:41AM 14       SO THESE ARE STATEMENTS ABOUT THE BUSINESS PERFORMANCE.

08:41AM 15   THEY ARE NOT STATEMENTS ABOUT THE TECHNOLOGY ITSELF.

08:41AM 16       AND THESE REPORTS GIVE INSIGHT INTO THE MARKETPLACE

08:41AM 17   RESPONSE TO THIS INNOVATIVE PARTNERSHIP.  THESE ARE

08:41AM 18   ENTHUSIASTIC RESPONSES.  THEY GIVE A SENSE OF THE MARKET

08:41AM 19   POSITION.  THEY EXPLAIN THE COMPETITIVE ADVANTAGES THAT MIGHT

08:41AM 20   EXIST.

08:42AM 21       AND TO BE CLEAR, WE ARE OFFERING THIS EVIDENCE FOR THE

08:42AM 22   NONHEARSAY PURPOSE OF ITS INTENT -- OF MS. HOLMES'S INTENT, ITS

08:42AM 23   EFFECT ON HER STATE OF MIND.

08:42AM 24       WE ARE NOT OFFERING THEM FOR THE TRUTH OF THE MATTER

08:42AM 25   ASSERTED.

08:42AM   1            THE COURT:  AND JUST SO I'M CLEAR -- PARDON ME,

08:42AM   2    MR. CLEARY.

08:42AM   3            MR. CLEARY:  SURE.

08:42AM   4            THE COURT:  YOU'RE ASKING THAT ALL OF THE CUSTOMER,

08:42AM   5    ALL OF THE CUSTOMER SURVEYS BE ADMITTED AS IS, WITHOUT ANY

08:42AM   6    REDACTIONS, WITHOUT ANY CHANGES, ANYTHING LIKE THAT; IS THAT

08:42AM   7    CORRECT?

08:42AM   8            MR. CLEARY:  THAT'S CORRECT, YOUR HONOR.  AND I'M

08:42AM   9    HAPPY TO DISCUSS THE REDACTION ISSUE.

08:42AM  10        WE BELIEVE THAT REDACTIONS WOULD BE INAPPROPRIATE BECAUSE

08:42AM  11    ALL OF THE SURVEY RESPONSES ARE RELEVANT TO DIFFERENT

08:42AM  12    ALLEGATIONS IN THE CASE.

08:42AM  13        MR. JHAVERI TALKED ABOUT PATIENT EXPERIENCE AND TALKED

08:42AM  14    ABOUT HOW IT WAS ESSENTIAL TO THE WALGREENS/THERANOS

08:42AM  15    PARTNERSHIP, AND ALL OF THESE GO TO THAT PATIENT EXPERIENCE IN

08:42AM  16    ONE WAY OR ANOTHER.

08:42AM  17        SO --

08:42AM  18            THE COURT:  HE DID.  HE TALKED ABOUT -- HE WAS

08:43AM  19    ASKED, I THINK BY ONE OF YOUR COLLEAGUES, WHETHER OR NOT THERE

08:43AM  20    WAS POSITIVE CUSTOMER INFORMATION, AND I THINK HIS TESTIMONY

08:43AM  21    WAS THAT THERE WAS GENERALLY POSITIVE CUSTOMER REACTION TO

08:43AM  22    THERANOS IN WALGREENS AND THEIR EXPERIENCE.

08:43AM  23            MR. CLEARY:  SO, YES, YOUR HONOR.

08:43AM  24        BUT THIS IS NOT CUMULATIVE WITH THAT TESTIMONY FOR A

08:43AM  25    COUPLE OF REASONS.

08:43AM 1       FIRST, THESE ARE REPORTS THAT WENT DIRECTLY TO MS. HOLMES.

08:43AM 2  THEY SPAN -- THEY BEGIN IN THE FALL OF 2014.  THEY CONTINUE IN

08:43AM 3  REALLY THE -- THE FIRST ONE IS REALLY FROM FALL OF 2014, AND

08:43AM 4  THE REMAINING NINE ARE FROM SUMMER OF 2015.

08:43AM 5       AND BECAUSE THEY GO TO MS. HOLMES, THEY'RE DIRECTLY

08:43AM 6  RELEVANT TO HER INTENT, AND THEREFORE, NOT CUMULATIVE WITH

08:43AM 7  OTHER POSITIVE FEEDBACK THAT WALGREENS MAY HAVE OBTAINED.  THEY

08:44AM 8  GO TO MS. HOLMES, NOT TO WALGREENS.

08:44AM 9       AND MR. JHAVERI, ON PAGE 3587 OF THE TRANSCRIPT, SPEAKS

08:44AM 10 ABOUT THE ENTIRE SERVICE WAS TO CREATE A NEW PATIENT

08:44AM 11 EXPERIENCE, ONE THAT IS EFFICIENT, ONE THAT IS LESS PAINFUL,

08:44AM 12 ONE THAT IS LESS COST.

08:44AM 13      AND WHEN MS. HOLMES RECEIVES THESE REPORTS, THESE REPORTS

08:44AM 14 SUPPORT A REASONABLE BELIEF THAT NOT ONLY IS THE RELATIONSHIP

08:44AM 15 WITH WALGREENS, LIKE, WORKING, IT IS THRIVING, AND IT'S

08:44AM 16 POWERFUL EVIDENCE FOR THAT REASON.

08:44AM 17      SO THAT'S PARAGRAPH 12(D).

08:44AM 18      NOW, LET'S MOVE TO PARAGRAPH 16, WHICH IS THE ACCURACY AND

08:44AM 19 RELIABILITY ALLEGATIONS.  I THINK THERE ARE FOUR DIFFERENT

08:44AM 20 CATEGORIES OF TESTIMONIALS IN THESE REPORTS THAT ARE RELEVANT

08:44AM 21 TO THOSE ALLEGATIONS.

08:44AM 22      THE FIRST ARE THE COMPARISONS BETWEEN LABS.  SO YOUR HONOR

08:45AM 23 WILL RECALL THE TESTIMONIAL BY THE DOCTOR WHO COMPARED HIS LAB

08:45AM 24 RESULT WITH LAB RESULTS -- HIS LAB RESULT FROM THERANOS WITH

08:45AM 25 LAB RESULTS FROM STANFORD.

6326

08:45AM 1    THE SECOND ARE REPEAT CUSTOMERS WHO GENERALLY GIVE THESE

08:45AM 2  GLOWING REVIEWS.  YOU WOULD EXPECT REPEAT CUSTOMERS NOT TO GIVE

08:45AM 3  GLOWING REVIEWS IF THEY HAD SOME REASON TO DOUBT THE SOUNDNESS

08:45AM 4  OF THE RESULTS THAT THEY RECEIVED.

08:45AM 5    AND I WILL SAY THAT, AS YOUR HONOR KNOWS, THE DEFENSE DOES

08:45AM 6  NOT CONCEDE THAT INDIVIDUAL ANECDOTES ARE, IN FACT, PROBATIVE

08:45AM 7  OF ACCURACY AND RELIABILITY.

08:45AM 8    BUT ONCE THE GOVERNMENT HAS PUT ANECDOTES INTO THE CASE,

08:45AM 9  WE BELIEVE THAT WE CAN PRESENT ANECDOTES OF OUR OWN AS THEY

08:45AM 10  RELATE TO MS. HOLMES'S UNDERSTANDING OF THE PERFORMANCE OF THE

08:45AM 11  TECHNOLOGY.

08:45AM 12    YOU ALSO HAVE CUSTOMERS WHO ARE REFERRED BY OTHER

08:46AM 13  CUSTOMERS.  SO I THINK THAT'S A FAIR INFERENCE THAT A CUSTOMER

08:46AM 14  WOULD NOT REFER, IN ONE CASE, A PATIENT.  THERE'S AN M.P., FOR

08:46AM 15  EXAMPLE, WHO WAS A REGULAR PATIENT -- A REGULAR CUSTOMER OF

08:46AM 16  THERANOS WHO REFERRED ANOTHER CUSTOMER TO THERANOS.  THAT

08:46AM 17  CUSTOMER HAD A GOOD EXPERIENCE AND EXPLAINED THE SOURCE OF THE

08:46AM 18  REFERRAL.

08:46AM 19    YOU ALSO HAD FAMILY MEMBERS, LIKE, YOU KNOW, PARENTS

08:46AM 20  BRINGING THEIR CHILDREN BACK, FOR EXAMPLE.

08:46AM 21    AND THEN LAST YOU HAVE SOME -- AN INTERESTING COMMENT

08:46AM 22  ABOUT THE POTENTIAL FOR PRE-ANALYTIC ERROR.  YOUR HONOR WILL

08:46AM 23  CALL THAT DR. ROSENDORFF DISCUSSED THIS ISSUE.

08:46AM 24    SO IN THIS CASE, FOR EXAMPLE, THERE IS AN ANECDOTE BY A

08:46AM 25  PHLEBOTOMIST ABOUT HOW SHE MESSED UP THE LABELS ON THE TUBES OF

08:46AM 1    THE -- CONTAINING BLOOD THAT WOULD NEED TO BE SENT FOR

08:47AM 2    PROCESSING AT THE THERANOS FACILITY.

08:47AM 3        WELL, THAT'S AN EXAMPLE OF HUMAN ERROR AT THE PRE-ANALYTIC

08:47AM 4    PHASE THAT WOULD NOT RELATE TO THERANOS TECHNOLOGY AND ITS

08:47AM 5    PERFORMANCE, AND, THEREFORE, GIVES REASON TO BELIEVE THAT

08:47AM 6    THERE'S A POTENTIAL FOR THIS ERROR THAT HAS NOTHING TO DO WITH

08:47AM 7    THERANOS TECHNOLOGY.

08:47AM 8        SO THE THIRD IS THE PRICE.  AND I APPRECIATE THE

08:47AM 9    GOVERNMENT'S REPRESENTATION, AT LEAST AS I UNDERSTAND IT, IN

08:47AM 10   THEIR PLEADING THAT THEY'RE NOT ALLEGING FALSITY OF PRICE.

08:47AM 11       BUT THE INDICTMENT DOES ALLEGE IN PARAGRAPHS 15, 16, AND

08:47AM 12   17 THAT PRICE -- REPRESENTATIONS AS TO PRICE WERE PART OF THE

08:47AM 13   ALLEGED SCHEME TO DEFRAUD.

08:47AM 14       PARAGRAPH 17 IN PARTICULAR SAYS THE PRICE WAS USED TO

08:47AM 15   INDUCE CUSTOMERS TO PURCHASE THERANOS BLOOD TESTS.  PRICE IS IN

08:47AM 16   THE CASE.

08:48AM 17       YOUR HONOR WILL REMEMBER THE TESTIMONY OF B.G. AND THE

08:48AM 18   TESTIMONY OF MR. JHAVERI.

08:48AM 19       WE BELIEVE THAT WE ARE ENTITLED TO PUT ON EVIDENCE SHOWING

08:48AM 20   THAT THERE WAS A BASIC GOOD FAITH BELIEF AND GOOD FAITH REASON

08:48AM 21   FOR THESE PRICES.

08:48AM 22       AND THEN FINALLY, WE BELIEVE THAT THIS IS CRITICAL CONTEXT

08:48AM 23   FOR MS. HOLMES'S VISION AND HER UNDERSTANDING THAT THE THERANOS

08:48AM 24   BUSINESS WAS WORKING, HER UNDERSTANDING OF WHAT PATIENTS,

08:48AM 25   CUSTOMERS WANTED IN THE MARKET, AND WHAT THEY VALUED.

08:48AM 1    YOUR HONOR WILL RECALL THAT MR. MOSLEY DISCUSSED THE

08:48AM 2    IMPORTANCE OF VISION, INCLUDING THE VISION WITH RESPECT TO

08:48AM 3    WALGREENS'S DECISION IN MAKING THE DECISION TO INVEST, AND WE

08:48AM 4    BELIEVE THIS EVIDENCE IS CONSISTENT WITH THAT.

08:48AM 5    AND THEN I'LL GIVE MR. BOSTIC AN OPPORTUNITY TO SPEAK, BUT

08:48AM 6    I JUST WANTED TO ADDRESS BRIEFLY THE 403 ARGUMENT THAT THE

08:48AM 7    GOVERNMENT MADE.

08:49AM 8    WE BELIEVE THAT THE REPORTS THAT WE SEEK TO ADMIT AND THE

08:49AM 9    CUSTOMER SERVICE SPREADSHEETS THAT THE GOVERNMENT PREVIOUSLY

08:49AM 10   SOUGHT TO ADMIT AND THAT WERE EXCLUDED ARE FUNDAMENTALLY

08:49AM 11   DIFFERENT.

08:49AM 12   THESE REPORTS WERE SENT TO MS. HOLMES.  THE CUSTOMER

08:49AM 13   SERVICE SPREADSHEETS WERE NOT SENT TO MS. HOLMES.  THESE

08:49AM 14   REPORTS ARE RELEVANT TO MS. HOLMES'S INTENT AND HER KNOWLEDGE

08:49AM 15   AND HER STATE OF MIND.  THE SPREADSHEETS ARE NOT RELEVANT TO

08:49AM 16   THOSE ISSUES.

08:49AM 17   FURTHERMORE, AS THE COURT WILL RECALL, IN ITS RULING AT

08:49AM 18   ECF 798 THAT WE'VE BEEN DISCUSSING THIS MORNING, THE COURT

08:49AM 19   RULED THAT THE CONTENTS OF THE SPREADSHEETS THEMSELVES COULD

08:49AM 20   NOT BE ADMITTED, AND THE GOVERNMENT HAS NEVER PROFFERED A BASIS

08:49AM 21   CONNECTING THOSE DOCUMENTS TO MS. HOLMES.

08:49AM 22   THE COURT:  THANK YOU.  SO LET ME ASK YOU, IT SEEMS

08:49AM 23   LIKE, MR. CLEARY, THAT THE VALUE OR THE REASON THAT YOU WOULD

08:49AM 24   LIKE, YOUR TEAM WOULD LIKE THESE IN, ALL OF THESE SURVEYS IN,

08:50AM 25   IS BECAUSE THEY SHOW MS. HOLMES'S STATE OF MIND.

08:50AM   1        YOU'RE NOT OFFERING THEM FOR THE TRUTH OF THE MATTER

08:50AM   2    ASSERTED, WHETHER OR NOT SOMEBODY ENJOYED THEIR VISIT OR NOT,

08:50AM   3    BUT YOU'RE SAYING THAT THESE THEN WOULD ALLOW YOU TO ARGUE THAT

08:50AM   4    MS. HOLMES'S STATE OF MIND AT THE TIME IN QUESTION INFORMED HER

08:50AM   5    THAT, OR THESE DOCUMENTS INFORMED HER THAT THINGS WERE GOING

08:50AM   6    WELL AT WALGREENS, AND THAT'S HER STATE OF MIND SUCH THAT THE

08:50AM   7    JURY CAN CONSIDER THAT AS SHE ENGAGED WITH INVESTORS DURING

08:50AM   8    THIS TIME PERIOD.

08:50AM   9        IS THAT, IS THAT THE PURPOSE FOR THESE?

08:50AM  10           MR. CLEARY:  YOUR HONOR IS ABSOLUTELY RIGHT THAT WE

08:50AM  11    SEEK TO ADMIT THESE ONLY FOR THE NONHEARSAY PURPOSE, NONHEARSAY

08:50AM  12    PURPOSE OF THEIR EFFECT ON MS. HOLMES'S STATE OF MIND.

08:50AM  13        WE BELIEVE THAT THESE REPORTS ARE RELEVANT FOR HER STATE

08:50AM  14    OF MIND IN THE PARAGRAPH 12 ALLEGATIONS AS SHE ALLEGEDLY MADE

08:51AM  15    CERTAIN REPRESENTATIONS ABOUT THE WALGREENS RELATIONSHIP TO

08:51AM  16    INVESTORS.

08:51AM  17        WE BELIEVE THAT THEY'RE RELEVANT TO THE OTHER PARAGRAPHS

08:51AM  18    IDENTIFIED IN THE INDICTMENT AS WELL.

08:51AM  19           THE COURT:  OKAY.  ALL RIGHT.

08:51AM  20        IN LOOKING AT THESE, I HAD ASKED PREVIOUSLY WHEN WE WERE

08:51AM  21    DISCUSSING THESE IF THE DEFENSE WISHED TO PARSE OUT -- I THINK

08:51AM  22    I USED THE PHRASE PARSE -- TO PARSE OUT ANY OF THESE SURVEYS

08:51AM  23    THAT WOULD SPEAK TO TEST RESULTS.

08:51AM  24        AND THAT'S WHY MY THRESHOLD QUESTION THIS MORNING WAS, YOU

08:51AM  25    WANT ALL OF THESE IN, NOT ANY PARSE OF THEM?

6330

08:51AM 1      WHEN I LOOK AT THESE, I WAS TRYING TO FIND WHETHER ANY OF

08:51AM 2  THESE HAD RESULTS JUST TO SEE, AND MY REVIEW OF THE RECORDS

08:51AM 3  DIDN'T COME UP WITH ANY.

08:51AM 4      I DID SEE AN INDIVIDUAL WHO SAID THAT THEY CAN'T -- THIS

08:52AM 5  WAS IN THE TWO PATIENTS ON JULY 4TH AND JULY 6TH OF 2015, AND

08:52AM 6  THEIR RESPONSES WERE "I CAN'T WAIT TO GET THE RESULTS."

08:52AM 7          MR. BOSTIC:  UH-HUH.

08:52AM 8          THE COURT:  THOSE WERE THE ONLY -- AND, AGAIN, I

08:52AM 9  DIDN'T DO AS THOROUGH A JOB AS YOU DID WITH YOUR ENTHUSIASM,

08:52AM 10  BUT THOSE WERE THE ONLY RESULTS THAT I COULD FIND THAT TALK

08:52AM 11  ABOUT RESULTS, AND THEY SEEM TO TALK ABOUT A FUTURE EVENT.

08:52AM 12  "CAN'T WAIT TO GET THE APP."  APPARENTLY THERE WAS AN APP THAT

08:52AM 13  WAS CREATED AND THE PATIENTS, FOR EASE OF CUSTOMER SERVICE --

08:52AM 14  THERE'S AN APP FOR EVERYTHING.  THERE WAS AN APP.  THEY PUT IN

08:52AM 15  WHATEVER THEIR INFORMATION WAS, AND IT SOUNDS LIKE THEY WOULD

08:52AM 16  GET THEIR TEST RESULTS BACK THROUGH THIS APP ON THEIR MOBILE

08:52AM 17  DEVICE OR WHATEVER, AND THEY WERE VERY EXCITED ABOUT THAT.

08:52AM 18      BUT THOSE WERE THE ONLY REFERENCES THAT I COULD FIND THAT

08:52AM 19  ACTUALLY SPEAK TO RESULTS.

08:52AM 20      AND, OF COURSE, THEY'RE NOT TEST RESULTS.  IT'S

08:53AM 21  ANTICIPATION OF RECEIVING.

08:53AM 22      SO THAT'S SOMETHING THAT I WAS -- AGAIN, THIS GETS TO --

08:53AM 23  THE ISSUE, AS I TALKED ABOUT PREVIOUSLY, WAS THE TECHNOLOGY,

08:53AM 24  THE TECHNOLOGY BEING THE RESULTS AND HOW THAT IS AN ISSUE IN

08:53AM 25  THE CASE.

6331

08:53AM   1          THE MAJORITY OF THE COMMENTS, A SIGNIFICANT MAJORITY OF

08:53AM   2     THE COMMENTS, AS YOU KNOW, TALK ABOUT PRICING.  THEY ALL TALK

08:53AM   3     ABOUT PRICING.  AND THEY SEEM TO SAY THAT ONE OF THE DRAWS OF

08:53AM   4     THE TECHNOLOGY OF THE WALGREENS RELATIONSHIP WAS MANY OF THE

08:53AM   5     PATIENTS, THE CUSTOMERS, HAD NO INSURANCE, AND THEY WERE, THEY

08:53AM   6     WERE VERY HAPPY THAT THEY COULD FIND AFFORDABLE TESTING, AND

08:53AM   7     THEY EXPRESSED THAT IN THEIR COMMENTS.

08:53AM   8          THAT WAS A CONCURRENT THEME THROUGHOUT.  THEY WERE -- WHAT

08:54AM   9     WE LEARNED FROM READING THE -- AND I THINK THESE ALL HAVE SOME

08:54AM  10     QUESTIONS ABOUT YOU -- IT SEEMS LIKE THESE WERE ALL THE

08:54AM  11     PHLEBOTOMIST COMMENTS.  I COULDN'T DISCERN WHICH WERE APPS AND

08:54AM  12     WHICH WERE PHLEBOTOMISTS, OTHER THAN THE PRELIMINARY PAGES THAT

08:54AM  13     HAVE THE GRAPHS AND THINGS THAT TALK ABOUT CUSTOMER SERVICE.

08:54AM  14     MY SENSE IS THAT THOSE ARE CUSTOMERS WHO RESPONDED THROUGH AN

08:54AM  15     APP.

08:54AM  16          THE WRITINGS, THE LITTLE COMMENTS, THOSE ARE ALL, MY SENSE

08:54AM  17     IS, COMMENTS FROM THE PHLEBOTOMISTS WHO WERE EMPLOYEES OF THE

08:54AM  18     COMPANY, NOT OF WALGREENS, BUT OF YOUR CLIENT'S COMPANY, AND SO

08:54AM  19     THEY WERE MAKING THOSE NOTES.  MANY OF THE NOTES HAVE SIMILAR

08:54AM  20     COMMENTS AND OBSERVATIONS.

08:54AM  21          BUT IT APPEARS, IT APPEARS THAT THE MAJORITY OF THOSE

08:54AM  22     COMMENTS RELATE TO PRICING AND THE RELIEF OF FINDING AFFORDABLE

08:54AM  23     TESTING THROUGH WALGREENS, THROUGH YOUR CLIENT'S COMPANY.

08:54AM  24          WHAT WE ALSO LEARNED IN LOOKING AT THAT IS THAT THERE WAS

08:54AM  25     A MENTION OF GIFT CARDS.  AND IT SEEMS LIKE DOCTORS GAVE $100

6332

08:55AM 1   GIFT CARDS TO INDIVIDUALS TO USE AT WALGREENS TO OBTAIN TESTING

08:55AM 2   THROUGH YOUR CLIENT'S COMPANY.  MAYBE THAT WAS PART OF THE

08:55AM 3   BUSINESS PLAN.  I DON'T KNOW.  BUT IT SEEMS LIKE THAT APPEARED

08:55AM 4   THROUGHOUT.

08:55AM 5       THERE WERE MANY REFERENCES TO "THE DOCTOR GAVE ME A GIFT

08:55AM 6   CARD SO I COULD GET THE TESTING DONE."  I DON'T KNOW WHAT THAT

08:55AM 7   IS RELEVANT TO OTHER THAN THAT'S A FAVORABLE COMMENT, I

08:55AM 8   SUPPOSE, OF THE EXPERIENCE.

08:55AM 9       AND THAT WOULD -- THAT WAS A CONCERN THAT I HAD PREVIOUSLY

08:55AM 10  ALSO.

08:55AM 11      THE OTHER THING THAT WAS -- I THINK WAS THE GENESIS OF THE

08:55AM 12  ARGUMENT HERE WAS MR. EDLIN TESTIFIED THAT THESE SURVEYS WERE

08:55AM 13  SHARED, AND HE USED THE WORD "SHARED," THEY WERE SHARED WITH

08:55AM 14  HIM, HE RECEIVED THEM.

08:55AM 15      AND I THINK YOUR CLIENT, THEY WERE SHARED WITH YOUR

08:56AM 16  CLIENT.

08:56AM 17      HE DID NOT TESTIFY, AND I HAVEN'T HEARD ANY WITNESS

08:56AM 18  TESTIFY, THAT THESE WERE ACTUALLY READ BY YOUR CLIENT.

08:56AM 19      WE KNOW AT LEAST FROM THE TESTIMONY THAT THEY WERE SENT TO

08:56AM 20  HER, BUT I'M CURIOUS WHETHER OR NOT THERE NEEDS TO BE SOME

08:56AM 21  FOUNDATIONAL EVIDENCE THAT SHE READ THEM, YOU KNOW?  JUST

08:56AM 22  BECAUSE IT WAS SENT DOESN'T MEAN IT WAS READ AND DOESN'T MEAN

08:56AM 23  THAT IT HAD THAT EFFECT.

08:56AM 24      SO I'M JUST CURIOUS WHETHER OR NOT THERE'S A FOUNDATIONAL

08:56AM 25  GAP HERE THAT NEEDS TO -- BUT LET ME TURN TO MR. BOSTIC.

6333

08:56AM 1      MR. BOSTIC?

08:56AM 2         MR. BOSTIC:  THANK YOU, YOUR HONOR.  WOULD THE COURT

08:56AM 3 MIND IF I REMOVED MY MASK?

08:56AM 4         THE COURT:  THANK YOU.

08:56AM 5         MR. BOSTIC:  MOSTLY FOR THE COURT REPORTER'S SAKE.

08:56AM 6      SO, FIRST OF ALL, JUST TO BE CLEAR ABOUT WHAT WE'RE

08:56AM 7 TALKING ABOUT HERE, I THINK FOCUS NEEDS TO BE KEPT ON THE SCOPE

08:56AM 8 OF THE DEFENSE'S REQUEST AND HOW MUCH EVIDENCE THEY'RE SEEKING

08:56AM 9 TO ADMIT IN THIS CASE.

08:56AM 10      THESE PATIENT STATEMENTS CONSTITUTE A MOUNTAIN OF HEARSAY

08:57AM 11 STATEMENTS.  THEY'RE ALL OUT OF COURT STATEMENTS BY

08:57AM 12 NONTESTIFYING WITNESSES.  THEY ARE GENERALLY FAVORABLE TO

08:57AM 13 THERANOS.  THEY'RE POSITIVE ABOUT THE EXPERIENCE THAT THE

08:57AM 14 PATIENTS AND CUSTOMERS HAD WITH THERANOS, BUT OTHERWISE THEY'RE

08:57AM 15 REALLY NOT RELEVANT TO THE ISSUES IN THE CASE, AND THAT'S WHY

08:57AM 16 THEY SHOULD BE EXCLUDED.

08:57AM 17      I THINK THE, YOU KNOW, THE POTENTIAL IMPACT OF THIS KIND

08:57AM 18 OF EVIDENCE ON THE JURY OR THE WAY THE DEFENSE MIGHT USE IT IS

08:57AM 19 TO BALANCE OUT THE SCALES AS IT WERE BETWEEN, YOU KNOW, THE

08:57AM 20 NEGATIVE EVIDENCE THAT THE JURY HAS HEARD ABOUT PROBLEMS WITH

08:57AM 21 THE THERANOS ASSAYS, INCORRECT AND QUESTIONABLE PATIENT

08:57AM 22 RESULTS, INFORMATION WITHHELD WITH PATIENTS AND DOCTORS.

08:57AM 23      I THINK THIS EVIDENCE, YOU KNOW, COULD BE PLACED ON THE

08:57AM 24 OTHER SIDE OF A SCALE AND THE DEFENSE COULD SEEK TO SHOW, WELL,

08:57AM 25 THERE WERE ALSO POSITIVE REPORTS COMING IN ABOUT THERANOS.

6334

08:58AM 1          BUT THAT EVIDENCE DOESN'T REALLY BELONG ON THE OTHER SIDE

08:58AM 2     OF THE SCALE WEIGHED AGAINST THE EVIDENCE THAT ACTUALLY GOES TO

08:58AM 3     THE ISSUES HERE, AND THOSE ISSUES ARE THE ACCURACY AND

08:58AM 4     RELIABILITY OF THE TESTS AND MS. HOLMES'S KNOWLEDGE OF THE

08:58AM 5     ACCURACY AND RELIABILITY.

08:58AM 6          THE COURT PREVIOUSLY RULED, CORRECTLY IN THE GOVERNMENT'S

08:58AM 7     VIEW, THAT THIS EVIDENCE WAS NOT ADMISSIBLE.

08:58AM 8          TO THE EXTENT THAT THE COURT WAS OPEN TO THE ISSUE BEING

08:58AM 9     RAISED AGAIN, WE UNDERSTOOD THAT TO MEAN TO THE EXTENT THE

08:58AM 10    RECORD WAS DEVELOPED FURTHER IN A WAY THAT SUPPORTED THE

08:58AM 11    ADMISSION OF THIS EVIDENCE, OR TO THE EXTENT THAT THE DEFENSE

08:58AM 12    TOOK THE COURT'S SUGGESTION TO TRY TO IDENTIFY INDIVIDUAL

08:58AM 13    STATEMENTS AMONG THIS MOUNTAIN OF HEARSAY THAT WERE ACTUALLY

08:58AM 14    RELEVANT SOMEHOW TO AN ISSUE IN DISPUTE IN THE CASE, AND

08:58AM 15    NEITHER OF THOSE THINGS HAVE HAPPENED.

08:58AM 16         SO WE THINK THE SAME RULING SHOULD APPLY TO THE MOTION FOR

08:58AM 17    RECONSIDERATION.

08:58AM 18         THE COURT HIT ON SOME TIMING ISSUES WITH RESPECT TO THESE

08:59AM 19    PATIENT STATEMENTS, AND I THINK THAT'S IMPORTANT TO FOCUS ON

08:59AM 20    ALSO.  THESE STATEMENTS ARE INADMISSIBLE FOR TIMING REASONS,

08:59AM 21    TWO DIFFERENT KINDS OF TIMING PROBLEMS.

08:59AM 22         ONE IS THE STAGE IN THE PROCESS AT WHICH THESE CUSTOMER

08:59AM 23    REPORTS WERE COLLECTED, AND THE COURT NOTED THAT MANY OF THEM

08:59AM 24    WERE COLLECTED BY PHLEBOTOMISTS AT THE TIME OF THE SAMPLE DRAW.

08:59AM 25    THAT WOULD HAVE BEEN BEFORE THE PATIENTS RECEIVED THEIR

08:59AM   1    RESULTS.

08:59AM   2        BY DEFINITION THEN, THOSE PATIENT STATEMENTS CAN'T HAVE

08:59AM   3    ANYTHING TO DO WITH THE ACCURACY OR INACCURACY OF THE RESULTS

08:59AM   4    THAT HAVEN'T EVEN BEEN CREATED YET, MUCH LESS PROVIDED TO THE

08:59AM   5    PATIENTS.

08:59AM   6        I SHOULD ALSO SAY, THOUGH, THAT EVEN AFTER A PATIENT

08:59AM   7    RECEIVES A RESULT, I THINK THE EVIDENCE IN THE CASE HAS SHOWN

08:59AM   8    THAT IT'S NOT ALWAYS CLEAR WHETHER A RESULT IS ACCURATE OR NOT.

08:59AM   9        DR. ROSENDORFF TESTIFIED ABOUT HOW TO IDENTIFY INACCURATE

09:00AM  10    RESULTS, AND I THINK THAT'S MADE CLEAR THAT A PATIENT LOOKING

09:00AM  11    AT A SHEET OF RESULTS CANNOT BE COUNTED ON TO SAY, HERE'S AN

09:00AM  12    INACCURATE ONE, I'M THEREFORE NOT GOING TO GIVE THERANOS A

09:00AM  13    POSITIVE REVIEW WHEN I FILL OUT THIS SURVEY.

09:00AM  14        SO THE SURVEY COMMENTS EXPRESSING FAVORABLE EXPERIENCES BY

09:00AM  15    PATIENTS, AGAIN, REALLY JUST DON'T GO TO THE ACCURACY OF THE

09:00AM  16    RESULTS, AND THAT MAKES THEM UNLIKE THE INDIVIDUAL ACCOUNTS

09:00AM  17    THAT THE GOVERNMENT HAS SUBMITTED, WHICH ACTUALLY DO CONSTITUTE

09:00AM  18    PROOF OF INACCURATE OR UNRELIABLE PATIENT RESULTS SENT OUT BY

09:00AM  19    THERANOS.

09:00AM  20        SO THAT'S ONE TIMING ISSUE.

09:00AM  21        THE OTHER TIMING ISSUE RELATES TO WHEN THESE BATCHES OF

09:00AM  22    PATIENT STATEMENTS WERE ACTUALLY SENT TO MS. HOLMES.  IF I'M

09:00AM  23    READING THEM CORRECTLY, THE MANY BATCHES OF REPORTS THAT THE

09:00AM  24    DEFENSE SEEKS TO ADMIT WERE SENT TO THE DEFENDANT MOSTLY IN

09:01AM  25    2015.  I THINK THERE WAS ONE THAT WAS SENT TO HER IN EARLY

09:01AM   1   OCTOBER 2014, ONE INITIAL BATCH.

09:01AM   2         TO THE EXTENT THAT THE DEFENSE IS TRYING TO USE THIS AS

09:01AM   3   EVIDENCE OF MS. HOLMES'S MENTAL STATE ON THE INVESTOR SIDE OF

09:01AM   4   THE CASE, THAT REALLY MATTERS BECAUSE THE MAJORITY OF THE

09:01AM   5   INVESTMENTS CHARGED IN THE INDICTMENT OCCURRED BEFORE

09:01AM   6   OCTOBER 2014.  SO THERE ARE NO PATIENT REPORTS THAT THE DEFENSE

09:01AM   7   IS TRYING TO ADMIT DURING THE TIME PERIOD WHEN THE MAJORITY OF

09:01AM   8   THE INVESTMENTS WERE TAKING PLACE.

09:01AM   9         THERE ARE TWO INVESTMENTS THAT TOOK PLACE THAT ARE CHARGED

09:01AM  10   IN THE INDICTMENT IN LATE OCTOBER 2014.

09:01AM  11         SO ARGUABLY, YOU KNOW, IF THE SUBSTANCE WERE DIFFERENT,

09:01AM  12   THE CONTENT OF THAT FIRST BATCH MIGHT BE RELEVANT TO HER MENTAL

09:01AM  13   STATE AS TO THOSE INVESTMENTS.

09:01AM  14         BUT THE 2015 REPORTS CAN'T HAVE ANYTHING TO DO WITH WHAT

09:01AM  15   SHE WAS THINKING WHEN SHE ENCOURAGED AND ACCEPTED THOSE

09:02AM  16   INVESTMENTS THAT ARE CHARGED IN THE INDICTMENT.

09:02AM  17         I'D LIKE TO BRIEFLY JUST GO THROUGH THE CATEGORIES FOR

09:02AM  18   WHICH THE DEFENSE SAID THAT THIS EVIDENCE WOULD BE ADMISSIBLE.

09:02AM  19         FIRST, ON THE TOPIC OF WALGREENS, THIS EVIDENCE MISSES THE

09:02AM  20   POINT, AND I THINK THAT'S THE THEME HERE.

09:02AM  21         I THINK IT WAS CLEAR FROM MR. JHAVERI'S TESTIMONY THAT

09:02AM  22   WALGREENS EXECUTIVES HAD CONCERNS ABOUT THERANOS'S PERFORMANCE,

09:02AM  23   SPECIFICALLY WHEN IT CAME TO THE COMPANY'S RELIANCE ON

09:02AM  24   VENIPUNCTURE AND THE COMPANY'S FAILURE TO DELIVER ON ITS

09:02AM  25   PROMISE TO CONDUCT ITS TESTS USING THIS REVOLUTIONARY

09:02AM 1    FINGERSTICK TECHNOLOGY.

09:02AM 2        THE INDICTMENT, BY THE WAY, DOES NOT SAY ANYTHING ABOUT

09:02AM 3    CUSTOMER DISSATISFACTION.  IT SPECIFICALLY SAYS WALGREENS

09:02AM 4    EXECUTIVES HAD CONCERNS ABOUT THERANOS'S PERFORMANCE, AND

09:02AM 5    THAT'S WHAT THE EVIDENCE AT TRIAL HAS SHOWN.

09:02AM 6        THIS EVIDENCE DOESN'T COUNTER THAT OR RELATE TO IT IN ANY

09:02AM 7    WAY.

09:03AM 8        THE COURT NOTED THAT MR. JHAVERI WAS AWARE, OR THAT

09:03AM 9    WALGREENS GENERALLY WAS AWARE OF POSITIVE CUSTOMER FEEDBACK

09:03AM 10   FROM THERANOS.

09:03AM 11       SO THIS EVIDENCE HAS NOTHING TO DO WITH WALGREENS'S

09:03AM 12   DISSATISFACTION.  THAT MEANS IT WOULD HAVE GIVEN MS. HOLMES NO

09:03AM 13   REASON TO SUSPECT THAT ONCE WALGREENS FOUND OUT ABOUT THESE

09:03AM 14   POSITIVE CUSTOMER STATEMENTS, THE RELATIONSHIP WOULD HAVE

09:03AM 15   TURNED AROUND.

09:03AM 16       SHE UNDERSTOOD AT THE TIME THAT THIS DID NOT ADDRESS

09:03AM 17   WALGREENS'S CONCERNS, WHICH AGAIN RELATED TO THE COMPANY'S

09:03AM 18   RELIANCE ON VENIPUNCTURE AND THE ABILITY TO DO ALL OF ITS

09:03AM 19   TESTING BY FINGERSTICK.

09:03AM 20       SO IN THAT SENSE IT'S NOT ABOUT WHETHER THESE POSITIVE

09:03AM 21   RESULTS ARE CUMULATIVE OR NOT.  IT'S ABOUT THE FACT THAT

09:03AM 22   THEY'RE SIMPLY NOT RELEVANT TO WALGREENS'S CONCERNS AS SHOWN IN

09:03AM 23   THE RECORD.

09:03AM 24       WHEN IT COMES TO THE ACCURACY OF THE TESTS, FIRST OF ALL,

09:03AM 25   IF THE DEFENSE IS SEEKING TO USE THIS AS ACTUAL EVIDENCE OF

6338

09:04AM 1    WHETHER THE TESTS WERE ACCURATE OR NOT, THAT'S A HEARSAY USE.

09:04AM 2         AND I DON'T THINK THE DEFENSE IS SEEKING TO USE THEM THAT

09:04AM 3    WAY, BUT THERE'S STILL DANGER THAT THEY COULD CREATE CONFUSION

09:04AM 4    ON THE PART OF THE JURY AND THAT THE JURY MIGHT VIEW THEM AS

09:04AM 5    EVIDENCE OF THE ACCURACY OR INACCURACY OF THE TESTS.

09:04AM 6         THESE REPORTS AREN'T CAPABLE OF SPEAKING TO THAT FACT.

09:04AM 7         AND THAT GOES FOR THE SUBCATEGORIES THAT THE DEFENSE

09:04AM 8    MENTIONED ALSO.

09:04AM 9         THE FACT THAT THERE WERE REPEAT CUSTOMERS, CUSTOMERS CAME

09:04AM 10   BACK OR REFERRED OTHERS, CAN'T SPEAK TO THE ACCURACY OF THE

09:04AM 11   TESTS BECAUSE PATIENTS DIDN'T ALWAYS KNOW WHETHER THEY WERE

09:04AM 12   GETTING ACCURATE TEST RESULTS OR NOT.

09:04AM 13        SO THE FACT THAT THEY MIGHT HAVE COME BACK MIGHT SUGGEST

09:04AM 14   THAT THEY DIDN'T HAVE ANY SUBJECTIVE CONCERNS ABOUT ACCURACY,

09:04AM 15   BUT IT HAS NOTHING TO DO WITH THE ACTUAL ACCURACY OF THE TESTS.

09:04AM 16        AND MS. HOLMES HAD BETTER SOURCES OF INFORMATION BECAUSE

09:04AM 17   SHE HAD LAB PERSONNEL WHO WERE TELLING HER, WE HAVE PROBLEMS

09:04AM 18   WITH THE TESTS.  ACCURACY PROBLEMS WERE BEING RAISED TO HER AND

09:05AM 19   SHE WAS BEING KEPT IN THE LOOP ON THOSE.

09:05AM 20        THAT'S HOW SHE KNEW ABOUT THE ACCURACY PROBLEMS WITH

09:05AM 21   THERANOS'S TESTS, NOT FROM READING EXPERIENCE RATINGS FROM

09:05AM 22   SURVEYS OF WALGREENS'S PATIENTS.

09:05AM 23        SO AGAIN, IT'S JUST --

09:05AM 24             THE COURT:  MS. VOLKAR TELLS US IN THE PLEADING THAT

09:05AM 25   WAS SUBMITTED FOR YOUR TEAM THAT THERE WAS A CONCURRENT EMAIL

6339

09:05AM  1    EXCHANGE WITH MR. BALWANI ABOUT ACCURACY, ABOUT PROBLEMS AT THE

09:05AM  2    LAB AT THIS TIME PERIOD.

09:05AM  3           MR. BOSTIC:  YES, YOUR HONOR, THAT'S EXACTLY THE

09:05AM  4    POINT.

09:05AM  5       THE CONVERSATION -- THE CONVERSATIONS ABOUT THE ACCURACY

09:05AM  6    OF THE THERANOS'S TESTS THAT MS. HOLMES WAS INVOLVED IN WERE

09:05AM  7    SEPARATE FROM THIS INFORMATION.  THIS WAS NOT PART OF THAT

09:05AM  8    ANALYSIS.

09:05AM  9       AND THERE HASN'T BEEN ANY SUGGESTION IN THE RECORD THAT

09:05AM  10   CUSTOMER EXPERIENCE SCORES SOMEHOW RELATE TO THE ACCURACY OF

09:05AM  11   TESTS.  NONE OF THE LAB DIRECTORS HAVE SAID, FOR EXAMPLE, THAT

09:05AM  12   THEY RELY ON SURVEY RESULTS TO DETERMINE WHETHER THEIR LAB IS

09:05AM  13   FUNCTIONING CORRECTLY OR NOT, OR WHETHER A GIVEN ASSAY IS

09:06AM  14   RELIABLE, NOR WOULD WE EXPECT THEM TO.  THIS IS JUST NOT THAT

09:06AM  15   KIND OF EVIDENCE, AND THAT'S THE POINT.

09:06AM  16      THE DEFENSE POINTS TO A COUPLE EXAMPLES.  APPARENTLY THERE

09:06AM  17   MAY BE AN EXAMPLE OR TWO WHERE A PATIENT COMPARES THERANOS LAB

09:06AM  18   RESULTS TO A THIRD PARTY LAB.

09:06AM  19      BUT, AGAIN, THERE'S BEEN NO EFFORT TO PARSE OUT THOSE

09:06AM  20   POTENTIALLY RELEVANT STATEMENTS FROM THE WHOLE.  AND THE

09:06AM  21   EXISTENCE OF THOSE, YOU KNOW, REALLY MINORITY OF EXAMPLES THAT

09:06AM  22   MIGHT RELATE TO SOME KIND OF OBJECTIVE COMPARISON DON'T MAKE

09:06AM  23   THE ENTIRE BATCH ADMISSIBLE.

09:06AM  24      I'LL ALSO POINT OUT JUST ON THE TOPIC OF REPEAT CUSTOMERS,

09:06AM  25   ON THE FACE OF THE DOCUMENTS, THE MAJORITY OF THE COMMENTS DO

6340

09:06AM   1      COME FROM FIRST-TIME USERS.  THE COMMENTS ARE EXPLICIT IN THAT

09:06AM   2      RESPECT, SO I THINK EVE THAT WOULD BE A MINORITY HERE.

09:06AM   3          FINALLY, WHEN IT COMES TO PRICE, PRICE IS MENTIONED IN THE

09:06AM   4      INDICTMENT, BUT IT'S NOT A DISPUTED ISSUE IN THE CASE.  THERE'S

09:07AM   5      EVIDENCE IN THE CASE ALREADY THAT THE THERANOS PRICES WERE LOW.

09:07AM   6      PEOPLE LIKED LOW PRICES.  THAT'S NOT A CONTROVERSIAL POINT

09:07AM   7      EITHER.

09:07AM   8          SO THE FACT THAT INDIVIDUAL PATIENTS SENT IN COMMENTS

09:07AM   9      PRAISING THE PRICES IS NOT RELEVANT TO ANY QUESTION BEFORE THE

09:07AM  10      JURY.

09:07AM  11          AND ALTHOUGH THE INDICTMENT MENTIONS PRICE, THE GOVERNMENT

09:07AM  12      HAS NOT INTRODUCED EVIDENCE AND DOESN'T INTEND TO ARGUE THAT

09:07AM  13      ANY REPRESENTATIONS ABOUT PRICES WERE DISHONEST TO PATIENTS; IN

09:07AM  14      OTHER WORDS, THAT THERANOS WASN'T CHARGING THE LOW PRICES THAT

09:07AM  15      IT WAS ADVERTISING OR SOMETHING IN THAT RESPECT.

09:07AM  16          SO THERE'S NO NEED TO INTRODUCE EVIDENCE THAT PATIENTS

09:07AM  17      APPRECIATED LO9W PRICES.  THAT'S BESIDE THE POINT OF THE

09:07AM  18      PATIENT SCHEME AND THE INVESTOR SCHEME.

09:07AM  19          AND REALLY FINALLY, ON MS. HOLMES'S VISION AND HER OVERALL

09:07AM  20      UNDERSTANDING OF HOW WELL THE BUSINESS WAS GOING, I THINK,

09:07AM  21      AGAIN, IT'S -- MS. HOLMES HAD BETTER INFORMATION AND ACTUAL

09:08AM  22      RELEVANT INFORMATION WHEN IT CAME TO THE PERFORMANCE OF THE

09:08AM  23      TECHNOLOGY AND THE STATE OF THE BUSINESS WITH WALGREENS.

09:08AM  24          SHE WAS IN CONVERSATIONS WITH LAB STAFF.  SHE WAS IN

09:08AM  25      CONVERSATIONS WITH WALGREENS EXECUTIVES.

09:08AM 1      THIS IS NOT THE EVIDENCE THAT WOULD HAVE INFORMED HER

09:08AM 2   UNDERSTANDING THERE.

09:08AM 3      THE REAL POTENTIAL IMPACT OF THIS EVIDENCE ON THE JURY IS

09:08AM 4   TO SHOW THERE WERE FAVORABLE REPORTS ABOUT THERANOS, BUT THAT'S

09:08AM 5   A HEARSAY PURPOSE AND AN IRRELEVANT ONE.

09:08AM 6      IF THE TEST FOR ADMISSIBILITY HERE IS -- ESPECIALLY IN THE

09:08AM 7   2015 TIME PERIOD, IS THAT ANYTHING THAT WENT TO MS. HOLMES OR

09:08AM 8   ANYTHING THAT SHE WAS AWARE OF IS ADMISSIBLE FOR HER MENTAL

09:08AM 9   STATE, THAT WOULD ALSO INCLUDE THINGS THAT THE DEFENSE HAS

09:08AM 10   SOUGHT TO EXCLUDE, LIKE "THE WALL STREET JOURNAL" ARTICLE IN

09:08AM 11   OCTOBER OF 2015.

09:08AM 12      IF THIS POSITIVE INFORMATION ABOUT THERANOS IS ADMISSIBLE

09:08AM 13   JUST BECAUSE MS. HOLMES SAW IT, THEN IS NEGATIVE INFORMATION,

09:08AM 14   LIKE "THE WALL STREET JOURNAL" ARTICLE, ALSO ADMISSIBLE,

09:09AM 15   BECAUSE THAT WOULD HAVE INFORMED HER UNDERSTANDING OF HOW

09:09AM 16   THINGS WERE GOING?

09:09AM 17      I'M NOT RAISING THAT TO SAY THAT IT ALL SHOULD COME IN.

09:09AM 18   I'M SAYING THAT I THINK THE COURT KNOWS HOW TO DRAW THE PROPER

09:09AM 19   LINE THERE.

09:09AM 20         THE COURT:  ALL RIGHT.  THANK YOU.

09:09AM 21      MR. CLEARY?

09:09AM 22         MR. CLEARY:  YOUR HONOR, IF I MAY, THERE ARE A

09:09AM 23   NUMBER OF THINGS TO RESPOND TO HERE.

09:09AM 24      SO FIRST, IN THE PLEADING AND AGAIN HERE THE GOVERNMENT

09:09AM 25   HAS SUGGESTED THAT WE MAY SEEK TO ADMIT THIS, OR ASK THAT THIS

6342

09:09AM 1     BE ADMITTED FOR A HEARSAY PURPOSE.

09:09AM 2          THAT'S NOT TRUE.  THIS IS SOLELY NONHEARSAY AS THE

09:09AM 3     COURT -- A NONHEARSAY PURPOSE AS THE COURT EXPRESSED EARLIER.

09:09AM 4          THE POINT THAT THERE MAY BE AN ISSUE UNDER 403 WITH

09:09AM 5     RESPECT TO A BALANCING OF THE SCALES, WE BELIEVE THAT IT WOULD

09:09AM 6     BE VERY MISLEADING TO THE JURY AND UNFAIRLY PREJUDICIAL TO OUR

09:09AM 7     CASE TO EXCLUDE THIS EVIDENCE BECAUSE -- THIS EVIDENCE WHICH

09:09AM 8     WENT TO MS. HOLMES BECAUSE THERE IS OTHER EVIDENCE IN THE CASE

09:10AM 9     THAT DID NOT GO TO MS. HOLMES.

09:10AM 10         IN FACT, AS THE COURT KNOWS, ONE OF THE STARTING POINTS

09:10AM 11    FOR ANY FULL AND FAIR ASSESSMENT OF MS. HOLMES'S STATE OF MIND

09:10AM 12    IS THE INFORMATION THAT WAS SENT TO HER, THE INFORMATION THAT

09:10AM 13    WAS TRANSMITTED TO HER, THE INFORMATION THAT SHE HAD AVAILABLE.

09:10AM 14         AND FOR THAT REASON, THE FACT THAT CERTAIN CUSTOMER

09:10AM 15    SERVICE SPREADSHEETS WERE NOT SHARED WITH HER, BUT THESE

09:10AM 16    REPORTS WERE, JUST MAKES THE REPORTS THAT MUCH MORE PROBATIVE.

09:10AM 17         AND TO THE COURT'S EARLIER QUESTION, MY UNDERSTANDING --

09:10AM 18    CONCERNING WHETHER THERE WOULD NEED TO BE A SPONSORING WITNESS

09:10AM 19    FOR THESE DOCUMENTS, WE BELIEVE, CONSISTENT WITH THE COURT'S

09:10AM 20    RULING, THAT MR. EDLIN AUTHENTICATED THESE, HE LAID A

09:10AM 21    FOUNDATION FOR THEM.  AND WE WOULD COMMIT TO ADMITTING THESE

09:10AM 22    THROUGH A WITNESS, BUT WE DON'T BELIEVE THAT SOMEONE WITH

09:11AM 23    KNOWLEDGE OF THE REPORTS WOULD BE NEEDED TO TESTIFY.

09:11AM 24         IN THIS CASE A NUMBER OF EMAILS HAVE BEEN ADMITTED THAT

09:11AM 25    WENT TO MS. HOLMES WITHOUT ANY TESTIMONY AS TO WHETHER

09:11AM 1    MS. HOLMES ACTUALLY READ THE EMAILS.

09:11AM 2              THE COURT:  WELL, MANY OF THOSE HAD RESPONSES FROM

09:11AM 3    HER.

09:11AM 4              MR. CLEARY:  SO IN THE CASE --

09:11AM 5              THE COURT:  SO THEY WERE SELF-AUTHENTICATING IN THAT

09:11AM 6    REGARD.

09:11AM 7              MR. CLEARY:  IN THE CASE OF EMAILS WITH THE

09:11AM 8    RESPONSES IN WHICH MS. HOLMES RESPONDED, THAT IS THE INFERENCE.

09:11AM 9    FOR OTHER EMAILS WHERE SHE WAS CC'D OR WHERE SHE WAS THE

09:11AM 10   RECIPIENT, THE INFERENCE IS THAT THIS IS RELEVANT BECAUSE IT

09:11AM 11   WAS SHARED WITH HER AND IS THEREFORE RELEVANT TO HER STATE OF

09:11AM 12   MIND.

09:11AM 13       THERE ARE A COUPLE OF POINTS ABOUT TIMING.

09:11AM 14       THE -- I'LL TAKE THEM IN REVERSE ORDER.

09:11AM 15       THE INDICTMENT CHARGES A CONSPIRACY UNDER COUNT ONE AND A

09:11AM 16   SCHEME TO DEFRAUD UNDER COUNTS THREE THROUGH EIGHT THROUGH

09:12AM 17   2015.

09:12AM 18       THE GOVERNMENT HAS NOT DISCLAIMED THAT TIME PERIOD.  WE'RE

09:12AM 19   ENTITLED TO PUT ON EVIDENCE RELATING TO MS. HOLMES'S INTENT

09:12AM 20   DURING THAT TIME PERIOD.

09:12AM 21       SEPARATELY, THE GOVERNMENT HAS HAD SUCCESSFULLY ADMITTED

09:12AM 22   CERTAIN EVIDENCE THAT ACTUALLY POST-DATES THESE REPORTS AND IS

09:12AM 23   PRESUMABLY RELEVANT TO THE INVESTOR COUNTS.  THAT WOULD BE,

09:12AM 24   JUST TO TAKE A COUPLE OF EXAMPLES, THE "MAD MONEY" CLIP THAT

09:12AM 25   THE COURT WILL RECALL FROM OCTOBER OF 2015, AND THEN "THE TODAY

09:12AM 1      SHOW" CLIP FROM 2016.

09:12AM 2          WITH RESPECT TO TIMING, I THINK THAT THE TIMING OF THE

09:12AM 3      RETURN OF THE REPORTS, THE CUSTOMER TESTIMONIALS AND FEEDBACK,

09:12AM 4      IT IS CERTAINLY TRUE THAT FOR MANY THEY WERE FILLED OUT BEFORE

09:12AM 5      ANY THERANOS RESULT WAS TRANSMITTED TO THE INDIVIDUAL CUSTOMER

09:13AM 6      OR -- IN THE CASE WHERE THE PHLEBOTOMIST WAS MAKING AN ENTRY

09:13AM 7      BEFORE THE CUSTOMER HAD HAD A CHANCE TO REVIEW THE RESULT.

09:13AM 8          BUT I DO THINK THAT IT IS A FAIR INFERENCE THAT, FOR

09:13AM 9      REPEAT VISITORS, FOR VISITORS WHO WERE REFERRED BY FAMILY AND

09:13AM 10     FRIENDS WHO WERE PRIOR CUSTOMERS, FOR VISITORS WHO MADE EXPRESS

09:13AM 11     COMPARISONS BETWEEN THEIR EXPERIENCES AT THESE DIFFERENT LABS,

09:13AM 12     ALL OF THAT SUPPORTS THE INFERENCE THAT THEY BELIEVED THAT THE

09:13AM 13     RESULTS THAT THEY HAD RECEIVED WERE SOUND.

09:13AM 14         AND IN THIS CASE WE HAVE HEARD LAY OPINION TESTIMONY ABOUT

09:13AM 15     THE ACCURACY OR INACCURACY OF THE RESULTS.

09:13AM 16         MS. B.G. EXPLICITLY TESTIFIED TO THAT.  AND -- SO WE

09:13AM 17     BELIEVE THAT --

09:13AM 18             THE COURT:  BUT NONE OF THESE DO -- NONE OF THESE

09:13AM 19     SPEAK TO THE RESULTS.

09:13AM 20         THEY SPEAK TO -- THE REFERRALS, THE MAJORITY, IF NOT ALL,

09:14AM 21     OF THE REFERRALS ARE BASED ON EITHER CONVENIENCE, BUT THE

09:14AM 22     MAJORITY OF THOSE ARE BASED ON PRICING, AT LEAST FROM MY REVIEW

09:14AM 23     OF THIS.  THEY'RE GOING TO TELL THEIR FAMILY, THEY'RE GOING TO

09:14AM 24     TELL THEIR FRIENDS, FINALLY THERE'S A LOW COST AVAILABILITY FOR

09:14AM 25     TESTING FOR THEIR MEDICAL NEEDS.  THAT SEEMS TO BE THE

6345

09:14AM  1    CONCURRENT THEME THROUGHOUT ALL OF THAT.

09:14AM  2         AS I SAID EARLIER, I DID NOT SEE, AND I INVITE YOU TO

09:14AM  3    POINT ME, PLEASE, TO ANYONE SAYING "MY TEST RESULTS WERE GREAT"

09:14AM  4    OR ANYTHING ABOUT THE RESULTS.  IT'S ABOUT THE EXPERIENCE.

09:14AM  5         AND, YOU KNOW, A LOT OF IT IS, WHICH I SUPPOSE GOES TO

09:14AM  6    RELIABILITY, I SUPPOSE, YOU KNOW, IT'S THE PHLEBOTOMIST GIVING

09:14AM  7    THEIR COMMENTS, THEIR INTERPRETATION OF THE COMMENTS OF THEIR

09:14AM  8    PATIENTS AND THEY'RE POSITIVE AND, YOU KNOW, THEY ENJOYED THE

09:14AM  9    EXPERIENCE, ALL OF THAT.

09:14AM 10         BUT I DON'T SEE ANY REALLY RESULTS, AS I SAID.  I DIDN'T

09:15AM 11    SEE ANY OF THOSE.  TWO PEOPLE I POINT OUT WHO ARE EAGER TO GET

09:15AM 12    THEIR RESULTS, THOSE ARE -- THAT'S WHAT I FOUND.  IF YOU HAVE

09:15AM 13    OTHERS, I'M HAPPY TO HEAR ABOUT THEM.

09:15AM 14         ONE PERSON, I THINK THIS IS JUNE 9, 2015, SAID, "I CAME IN

09:15AM 15    BECAUSE I SAW" -- I'M QUOTING HERE -- "ELIZABETH ON T.V.,"

09:15AM 16    THAT'S WHAT THE PATIENT SAID, "SO I CAME IN AFTER HAVING SEEN

09:15AM 17    HER ON T.V.  THAT'S WHY I'M HERE."

09:15AM 18         AND ON JUNE 26TH, I THINK I POINT OUT ANOTHER PATIENT SAID

09:15AM 19    "I CAME IN FOR A PREGNANCY TEST," AND THAT'S VERY CLOSE IN TIME

09:15AM 20    TO B.G.'S TEST.  I THINK SHE WAS IN MAY, WAS IT?  OR PERHAPS

09:15AM 21    JULY.  I CAN'T RECALL.

09:15AM 22         SO THE RESULTS IS SOMETHING THAT I'M LOOKING AT HERE.  IT

09:15AM 23    SEEMS LIKE THESE ARE CUSTOMER REVIEWS THAT ARE POSITIVE ABOUT

09:15AM 24    THE EXPERIENCE, AND THEY ALL ARE.  THERE'S A FEW CRITICISMS

09:16AM 25    ABOUT WAITING IN LINES AND BATHROOMS BEING UNCLEAN AND THOSE

09:16AM  1    KINDS OF THINGS, BUT THE MAJORITY OF THEM ARE POSITIVE.

09:16AM  2        AND YOU WANT THEM TO COME IN TO SHOW, NOT FOR THE TRUTH OF

09:16AM  3    THE MATTER ASSERTED THAT THEY HAD A POSITIVE EXPERIENCE, BUT

09:16AM  4    RATHER TO SHOW THAT YOUR CLIENT SOMEHOW READ ALL OF THESE

09:16AM  5    DOCUMENTS, CONSUMED THE INFORMATION IN THEM, AND THAT THAT

09:16AM  6    INFORMED HER AS TO HER STATE OF MIND THAT THINGS WERE GOING

09:16AM  7    WELL AT WALGREENS AND DURING THE RELATIONSHIP.

09:16AM  8            MR. CLEARY:  YOUR HONOR, A COUPLE OF THINGS.

09:16AM  9        SO WE ARE SEEKING TO ADMIT THESE BECAUSE THEY WERE SHARED

09:16AM 10    WITH MS. HOLMES.  THEY WERE TRANSMITTED TO HER.

09:16AM 11        I DON'T WANT TO LOSE SIGHT OF PARAGRAPH 12(D) WITH RESPECT

09:16AM 12    TO WALGREENS.  YOUR HONOR IS CERTAINLY RIGHT THAT THE VAST

09:16AM 13    MAJORITY OF THE EXPLICIT TESTIMONIALS HAVE TO DO WITH FACETS OF

09:16AM 14    THE EXPERIENCE AND DO NOT EXPRESSLY MENTION THE BLOOD TEST

09:17AM 15    RESULTS.

09:17AM 16        THERE ARE EXAMPLES OF COMMENTARY ON THE BLOOD TEST RESULT

09:17AM 17    ITSELF.  JUST TO READ ONE, THIS IS DOCKET NUMBER 1142-4.  "I'VE

09:17AM 18    HAD SOME OTHER ROUTINE BLOOD TESTS DONE AT YOUR LAB AND

09:17AM 19    CROSS-CHECKED THEM WITH STANFORD, THEY WERE ALL CONGRUENT."

09:17AM 20        BUT TO YOUR HONOR -- YOUR HONOR IS ABSOLUTELY CORRECT THAT

09:17AM 21    MANY OF THESE RELATE TO PRICE.  MANY RELATE TO OTHER FEATURES

09:17AM 22    OF THE CUSTOMER EXPERIENCE, ACCESSIBILITY, THE ABILITY TO TRACK

09:17AM 23    AND MONITOR TESTS OVER TIME, WHICH IS SOMETHING THAT WE'VE

09:17AM 24    HEARD ABOUT.  THAT WAS ONE OF THE REAL VISIONS OF MS. HOLMES

09:17AM 25    AND OF THE COMPANY.

09:17AM  1      AND ALL OF THESE DIFFERENT FEATURES -- ANOTHER ASPECT

09:17AM  2  ACTUALLY WOULD BE THE ENTHUSIASM ASSOCIATED WITH RECEIVING A

09:17AM  3  FINGERSTICK TEST, BUT ALSO THE WILLINGNESS OF CUSTOMERS TO SAY

09:18AM  4  VERY POSITIVE THINGS AFTER RECEIVING A VENOUS BLOOD DRAW.

09:18AM  5      THERE ARE A NUMBER OF ACCOUNTS IN HERE THAT SAY THAT THE

09:18AM  6  CUSTOMER RECEIVED A VENOUS BLOOD DRAW AND, FOR A VARIETY OF

09:18AM  7  REASONS, EXPECTS TO COME BACK TO THERANOS.

09:18AM  8      THIS BRINGS ME TO THE WALGREENS ALLEGATION, AND I THINK

09:18AM  9  THAT THE GOVERNMENT HAS NARROWED THAT ALLEGATION SUBSTANTIALLY.

09:18AM 10  IT DOES NOT JUST RELATE TO THE SUBJECTIVE OPINIONS OF WALGREENS

09:18AM 11  EXECUTIVES.  IN THE CASE OF ONE EXECUTIVE, MR. JHAVERI, HE HAD

09:18AM 12  VERY LIMITED CONTACT WITH MS. HOLMES.

09:18AM 13      THE ALLEGATION ITSELF, AND JUST READING FROM PARAGRAPH

09:18AM 14  12(D) OF THE INDICTMENT, IS THAT MS. HOLMES ALLEGEDLY

09:18AM 15  REPRESENTED TO INVESTORS THAT THERANOS PRESENTLY HAD AN

09:18AM 16  EXPANDING PARTNERSHIP WITH WALGREENS, THAT IS, THAT THERANOS

09:19AM 17  WOULD SOON DRAMATICALLY INCREASE THE NUMBER OF WELLNESS CENTERS

09:19AM 18  WITHIN WALGREENS STORES, WHEN, IN TRUTH, HOLMES AND BALWANI

09:19AM 19  KNEW BY LATE 2014 THAT THERANOS'S RETAIL WALGREENS ROLLOUT HAD

09:19AM 20  STALLED BECAUSE OF SEVERAL ISSUES, INCLUDING THAT WALGREENS

09:19AM 21  EXECUTIVES HAD CONCERNS WITH THERANOS'S PERFORMANCE.

09:19AM 22      SO I JUST WANT THE RECORD TO BE CLEAR ABOUT THE NATURE OF

09:19AM 23  THAT ALLEGATION AND OUR ABILITY TO MEET THAT ALLEGATION.

09:19AM 24      JUST A FEW OTHER THINGS.  AS THE COURT KNOWS, WE WOULD BE

09:19AM 25  HAPPY TO CONSENT TO A LIMITING INSTRUCTION INFORMING THE JURY

09:19AM 1      OF THE PURPOSE FOR WHICH THESE DOCUMENTS ARE ADMITTED.

09:19AM 2          THERE WERE A NUMBER OF ARGUMENTS THAT MR. BOSTIC MADE

09:19AM 3      CONCERNING HIS VIEW THAT MS. HOLMES HAD BETTER SOURCES OF

09:19AM 4      INFORMATION.

09:19AM 5          THAT'S A FACT ARGUMENT THAT THE GOVERNMENT CAN CERTAINLY

09:19AM 6      MAKE IN CLOSING.  IT GOES TO WEIGHT.  IN MY VIEW IT DOES NOT GO

09:20AM 7      TO ADMISSIBILITY.

09:20AM 8          AGAIN, I APPRECIATE THE GOVERNMENT'S COMMENTS CONCERNING

09:20AM 9      PRICE, BUT I RESPECTFULLY DISAGREE.  PRICE IS VERY MUCH AT

09:20AM 10     ISSUE IN THIS CASE BECAUSE THE GOVERNMENT HAS ALLEGED THAT

09:20AM 11     THERE WAS A SCHEME TO DEFRAUD COMMITTED BY WAY OF

09:20AM 12     REPRESENTATIONS AS TO PRICE AMONG OTHER THINGS.

09:20AM 13         THAT'S PART OF THE CASE.  THERE'S BEEN TESTIMONY ABOUT

09:20AM 14     PRICE, AND THE GOVERNMENT CAN CHARACTERIZE THE NATURE OF THOSE

09:20AM 15     REPRESENTATIONS, BUT WE'RE ABLE TO PUT ON EVIDENCE OF OUR OWN

09:20AM 16     AS TO THE GOOD FAITH REASONS FOR THE THERANOS PRICE AND THE WAY

09:20AM 17     IT FIT INTO THE THERANOS BUSINESS MODEL.

09:20AM 18         I DON'T WANT TO TAKE UP ANY MORE OF THE COURT'S TIME.  I

09:20AM 19     THINK THE COURT IS AWARE OF OUR POSITIONS, AND I'M HAPPY TO

09:20AM 20     RESPOND TO ANY MORE SPECIFIC QUESTIONS THAT YOU MIGHT HAVE.

09:20AM 21             THE COURT:  WELL, THANK YOU.

09:20AM 22         MR. BOSTIC, MR. CLEARLY GETS THE LAST WORD, BUT ANYTHING

09:21AM 23     YOU WANT TO SAY?

09:21AM 24             MR. BOSTIC:  A FINAL POINT.

09:21AM 25         IMAGINE THAT THE GOVERNMENT WAS SEEKING TO ADMIT HUNDREDS

6349

09:21AM  1    OF PAGES OF CUSTOMER REPORTS THAT WERE GENERALLY NEGATIVE ABOUT

09:21AM  2    THERANOS, RELATING TO THINGS LIKE DISTANCE BETWEEN A CUSTOMER'S

09:21AM  3    HOME AND A STORE, THE AMOUNT OF TIME THAT THEY HAD TO WAIT IN

09:21AM  4    LINE, HOW CLEAN THE FACILITIES WERE, HOW FRIENDLY PEOPLE WERE,

09:21AM  5    A LOT OF NEGATIVE INFORMATION ON THOSE ANCILLARY UNRELATED

09:21AM  6    POINTS.

09:21AM  7         THE DEFENSE WOULD BE MAKING THE SAME ARGUMENTS THAT I AM

09:21AM  8    MAKING HERE TODAY, AND THEY WOULD BE RIGHT TO DO SO.

09:21AM  9         CUSTOMER FEEDBACK ON THESE ISSUES IS NOT RELEVANT TO THE

09:21AM  10   CASE, REGARDLESS OF WHETHER IT'S FAVORABLE OR NOT.  THE FACT

09:21AM  11   THAT IT'S FAVORABLE RAISES 403 CONCERNS WITH THE GOVERNMENT,

09:21AM  12   AND IT'S INADMISSIBLE FOR THE REASONS THAT I'VE DESCRIBED.

09:21AM  13         THE COURT:  THANK YOU.

09:21AM  14        MR. CLEARY, THE LAST WORD.

09:21AM  15         MR. CLEARY:  THIS IS POWERFUL EVIDENCE OF

09:21AM  16   MS. HOLMES'S STATE OF MIND.  WE BELIEVE THAT IT SHOULD BE

09:21AM  17   ADMITTED, AND WE BELIEVE THAT EXCLUDING IT FOR THE REASONS THAT

09:21AM  18   THE GOVERNMENT INVITES THE COURT TO DO SO WOULD SERIOUSLY

09:22AM  19   MISLEAD THE JURY AS TO THE INFORMATION SENT AND SHARED TO

09:22AM  20   MS. HOLMES ABOUT CRITICAL ALLEGATIONS IN THE CASE AND WOULD

09:22AM  21   UNFAIRLY PREJUDICE OUR DEFENSE.

09:22AM  22         THE COURT:  THANK YOU VERY MUCH.  THANK YOU.

09:22AM  23        AND THANK YOU FOR YOUR PLEADINGS AND THE ARGUMENT THIS

09:22AM  24   MORNING.

09:22AM  25         MR. CLEARY, I DON'T SEE ANYTHING THAT CAUSES ME TO DISTURB

09:22AM   1    THE COURT'S PREVIOUS RULING IN THIS MATTER.  I UNDERSTAND YOUR

09:22AM   2    VIEW AND YOUR TEAM'S VIEW THAT THIS IS CRITICALLY IMPORTANT TO

09:22AM   3    SHOW YOUR CLIENT'S STATE OF MIND AS TO THE NEGOTIATION THAT SHE

09:22AM   4    HAD, AND THIS WOULD BETTER INFORM HER OF THE INFORMATION RATHER

09:22AM   5    THAN THE INFORMATION THAT SHE RECEIVED FROM WALGREENS, ET

09:22AM   6    CETERA.  I KNOW YOU COMMENTED ON THAT'S A FACT ISSUE AND THAT'S

09:22AM   7    AN ISSUE THAT THE JURY COULD WRESTLE WITH IF THIS INFORMATION

09:22AM   8    IS ADMITTED.

09:22AM   9        BUT AS A THRESHOLD ISSUE, I JUST DON'T SEE THAT IT'S

09:22AM  10    RELEVANT TO THE ISSUES IN THE INDICTMENT, NOTWITHSTANDING THE

09:22AM  11    FACT THAT PRICE IS MENTIONED.  THIS IS NOT A PRICING CASE,

09:22AM  12    QUOTE-UNQUOTE.

09:22AM  13        IT'S NOT A -- THE ALLEGATIONS ARE NOT SPECIFIC THAT ONE

09:23AM  14    PRICE WAS PROMISED AND A DIFFERENT PRICE WAS OBTAINED.  IT'S

09:23AM  15    NOT BAIT AND SWITCH.

09:23AM  16        PRICE IS PERHAPS AN ANCILLARY PART OF THE CASE, AND I

09:23AM  17    APPRECIATE THAT.

09:23AM  18        BUT THE REAL ISSUES IN THE CASE I THINK ARE CONTAINED IN

09:23AM  19    12(D), WHICH TALK ABOUT THE ACCURACY OF THE TEST RESULTS.

09:23AM  20    THAT'S REALLY WHAT THE FOCUS OF THE PROSECUTION IS.

09:23AM  21        I DON'T HEAR THE GOVERNMENT SAYING THAT THEY'RE GOING TO

09:23AM  22    ARGUE THAT PRICING IN ANY WAY, THE FALSITY OF PRICING WAS AN

09:23AM  23    ISSUE.

09:23AM  24        I JUST DON'T SEE ANYTHING THAT CAUSES ME TO DISTURB THE

09:23AM  25    COURT'S PREVIOUS RULING ON THIS MATTER, AND I'M GOING TO

09:23AM   1        RESPECTFULLY DECLINE YOUR INVITATION TO CHANGE THAT POSITION.

09:23AM   2        I AM INFORMED WHEN I LOOK AT THE TIMING AND THE RANGES OF

09:23AM   3        THIS INFORMATION, I THINK THAT'S IMPORTANT ALSO.  THAT WAS

09:23AM   4        POINTED OUT DURING OUR DISCUSSION.  I JUST DON'T SEE THE

09:23AM   5        RELEVANCE OF THIS.

09:23AM   6        AND EVEN UNDER A 403 ANALYSIS, I DO THINK THAT THIS

09:24AM   7        INFORMATION, THE PROBATIVE VALUE IS OUTWEIGHED BY ANY

09:24AM   8        PREJUDICIAL VALUE, AS WELL AS ANY TIME CONSUMPTION THAT IS

09:24AM   9        GOING TO BE REQUIRED TO LOOK THROUGH THESE DOCUMENTS FOR THAT

09:24AM  10        PROBATIVE, MINIMAL, MINIMAL PROBATIVE VALUE.

09:24AM  11        SO I'M GOING TO RESPECTFULLY DECLINE YOUR INVITATION TO

09:24AM  12        DISTURB THE COURT'S PREVIOUS RULING ON THESE MATTERS.  THESE

09:24AM  13        WILL CONTINUE TO BE EXCLUDED.

09:24AM  14        SO THANK YOU VERY MUCH.

09:24AM  15        THANK YOU, MR. CLEARY.

09:24AM  16        THANK YOU, MR. BOSTIC.

09:24AM  17             MR. BOSTIC:  THANK YOU, YOUR HONOR.

09:24AM  18             THE COURT:  I APPRECIATE IT.

09:24AM  19        ANYTHING ELSE BEFORE WE BRING IN THE JURY?

09:24AM  20             MR. BOSTIC:  YOUR HONOR, I'M NOT SURE WHETHER THE

09:24AM  21        COURT WANTED TO DO THIS IN THE JURY'S PRESENCE OR NOT, BUT I

09:24AM  22        UNDERSTAND FROM THE DEFENSE THAT THEY HAD NO OBJECTION TO

09:24AM  23        EXCUSING MR. EISENMAN.

09:24AM  24        WE SO INFORMED HIM, AND I BELIEVE HE HAS TRAVELLED OUT OF

09:24AM  25        TOWN.  WE JUST WANTED TO PUT THAT ON THE RECORD.

09:24AM  1          THE COURT:  YES.  THANK YOU.

09:24AM  2      IS THAT CORRECT, MR. DOWNEY?

09:24AM  3          MR. DOWNEY:  YOUR HONOR, I THINK THE SIMPLEST, MOST

09:25AM  4  SUCCINCT STATEMENT IS THAT WE DON'T OBJECT TO HIS EXCUSAL.  I

09:25AM  5  WOULDN'T WANT THE COURT TO TAKE THAT AS AN INDICATION THAT WE

09:25AM  6  DIDN'T CONTINUE TO HAVE SOME OF THE CONCERNS AFTER WE'VE HAD

09:25AM  7  THE OPPORTUNITY TO REVIEW.

09:25AM  8      BUT FOR PURPOSES OF WHERE WE ARE, WE DON'T OBJECT TO HIS

09:25AM  9  EXCUSAL.

09:25AM  10          THE COURT:  ALL RIGHT.  THANK YOU THEN.  HE IS

09:25AM  11  EXCUSED.  I WILL MENTION THAT IN FRONT OF THE PRESENCE OF THE

09:25AM  12  JURY.  I THINK THAT'S APPROPRIATE.

09:25AM  13      AND YOU OTHERWISE HAVE A WITNESS, THE GOVERNMENT HAS

09:25AM  14  ANOTHER WITNESS?

09:25AM  15          MR. BOSTIC:  YES, YOUR HONOR, WE DO.

09:25AM  16          THE COURT:  OKAY.

09:25AM  17          MR. BOSTIC:  AND THE LAST ISSUE RELATED TO

09:25AM  18  MR. EISENMAN.  THE GOVERNMENT HAS POSSESSION CURRENTLY OF THE

09:25AM  19  ORIGINAL NOTES THAT WERE SUBPOENAED BY THE DEFENSE.

09:25AM  20      I UNDERSTAND FROM CONVERSATIONS WITH MR. DOWNEY THAT HE'S

09:25AM  21  FINE WITH THE GOVERNMENT SENDING THOSE BACK TO MR. EISENMAN.  I

09:25AM  22  WANTED TO MAKE SURE THAT WAS OKAY WITH THE COURT.

09:25AM  23          THE COURT:  THAT'S FINE.  YOU'LL DO THAT.  AND YOU

09:25AM  24  HAVE THE MECHANISMS AND THE KNOWLEDGE AND THE ABILITY TO GET

09:25AM  25  THOSE BACK TO HIM UNDISTURBED?

6353

09:25AM 1    MR. BOSTIC:  I THINK WE CAN HANDLE THAT, YES, YOUR

09:25AM 2  HONOR.

09:25AM 3    THE COURT:  OKAY.

09:25AM 4   THAT'S OKAY WITH YOU, MR. DOWNEY?

09:25AM 5    MR. DOWNEY:  THAT'S FINE.

09:25AM 6    THE COURT:  ALL RIGHT.  WE'LL TAKE OUR BREAK NOW.

09:25AM 7   YOU CAN -- MR. DOWNEY, IF YOU WOULD NOTIFY MS. DIBBLE AS

09:26AM 8  TO YOUR SUGGESTED BREAKS, THAT WOULD BE HELPFUL.

09:26AM 9    MR. DOWNEY:  WE'LL DO THAT, YOUR HONOR.  THANK YOU.

09:26AM 10    THE COURT:  YOU'RE WELCOME.

09:26AM 11   (RECESS FROM 9:26 A.M. UNTIL 9:39 A.M.)

09:39AM 12   (JURY IN AT 9:39 A.M.)

09:42AM 13    THE COURT:  ALL RIGHT.  WE'RE ON THE RECORD IN THE

09:42AM 14  HOLMES MATTER.  ALL COUNSEL ARE PRESENT.  MS. HOLMES IS

09:42AM 15  PRESENT.

09:42AM 16   OUR JURY IS PRESENT.  GOOD MORNING, LADIES AND GENTLEMEN.

09:42AM 17  I APOLOGIZE FOR THE DELAY.  I NEEDED TO GET SOME ASSISTANCE AND

09:42AM 18  DISCUSS SOME THINGS WITH THE LAWYERS.

09:42AM 19   SO WE'RE GETTING STARTED NOW.  LET ME ASK THAT QUESTION

09:42AM 20  AGAIN.  DURING OUR BREAK, DID ANY MEMBER OF THE JURY HAVE CAUSE

09:42AM 21  OR COME ACROSS ANY INFORMATION, CONVERSATION, READ, OR LISTEN

09:42AM 22  TO ANYTHING THAT HAD ANYTHING TO DO WITH THIS CASE?

09:42AM 23   I SEE NO HANDS.

09:42AM 24   THANK YOU AGAIN.  THANK YOU VERY MUCH, LADIES AND

09:42AM 25  GENTLEMEN.

09:42AM  1    SCHEDULING, I THINK WE'RE GOING TO END AT 4:00 TODAY.  I

09:42AM  2    THINK TODAY IS A 4:00 O'CLOCK DAY.

09:42AM  3        TOMORROW WE'LL END AT 3:30.  WE'LL START AT 9:00.  THAT'S

09:42AM  4    OUR SCHEDULE SO FAR.

09:42AM  5        SO LET ME ASK A QUESTION REGARDING THE LAST WITNESS,

09:43AM  6    MR. EISENMAN, IS HE EXCUSED?  MAY THAT WITNESS BE EXCUSED?

09:43AM  7            MR. BOSTIC:  YES, YOUR HONOR.  THANK YOU.

09:43AM  8            MR. DOWNEY:  HE MAY, YOUR HONOR.

09:43AM  9            THE COURT:  ALL RIGHT.  THANK YOU.

09:43AM  10       DOES THE GOVERNMENT HAVE A WITNESS TO CALL?

09:43AM  11           MR. LEACH:  THE UNITED STATES RECALLS SO-HAN SPIVEY.

09:43AM  12           THE COURT:  GOOD MORNING, MS. SPIVEY.  IF YOU WOULD

09:43AM  13   COME AND FACE OUR COURTROOM DEPUTY WHILE YOU RAISE YOUR RIGHT

09:43AM  14   HAND, SHE HAS A QUESTION FOR YOU.

09:43AM  15           THE CLERK:  GOOD MORNING.

09:43AM  16       **(GOVERNMENT'S WITNESS, SO-HAN SPIVEY, WAS SWORN.)**

09:43AM  17           THE WITNESS:  YES.

09:43AM  18           THE CLERK:  THANK YOU.  PLEASE HAVE A SEAT.

09:43AM  19           THE COURT:  PLEASE HAVE A SEAT.  I'LL INVITE YOU TO

09:43AM  20   MAKE YOURSELF COMFORTABLE AGAIN.  FEEL FREE TO ADJUST THE CHAIR

09:43AM  21   AND THE MICROPHONE.

09:43AM  22       I'LL ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE MICROPHONE.

09:43AM  23       IF YOU HAVE BEEN VACCINATED, I THINK -- IF YOU HAVE BEEN,

09:44AM  24   YOU MAY REMOVE YOUR MASK IF YOU WISH.

09:44AM  25       BUT WOULD YOU PLEASE STATE YOUR NAME AND THEN SPELL IT,

09:44AM   1        PLEASE.

09:44AM   2                THE WITNESS:  SO-HAN SPIVEY.  S-O-H-A-N,

09:44AM   3        S-P-I-V-E-Y.

09:44AM   4                THE COURT:  THANK YOU.

09:44AM   5            COUNSEL.

09:44AM   6                MR. LEACH:  THANK YOU, YOUR HONOR.

09:44AM   7                        **DIRECT EXAMINATION**

09:44AM   8        BY MR. LEACH:

09:44AM   9        Q.   WELCOME BACK, MS. SPIVEY.  YOU PREVIOUSLY TESTIFIED IN

09:44AM  10        THIS CASE, DO YOU RECALL THAT?

09:44AM  11        A.   YES.

09:44AM  12        Q.   AND YOU SERVED AS THE CONTROLLER FOR THERANOS FOR A NUMBER

09:44AM  13        OF YEARS, 2010 UP THROUGH 2016 OR '17?

09:44AM  14        A.   FROM 2006.

09:44AM  15        Q.   OKAY.  I HAVE ONE BRIEF TOPIC I WANTED TO COVER WITH YOU,

09:44AM  16        MS. SPIVEY.

09:44AM  17            MAY I APPROACH THE WITNESS, YOUR HONOR?

09:44AM  18                THE COURT:  YES.

09:45AM  19        BY MR. LEACH:

09:45AM  20        Q.   (HANDING.)

09:45AM  21            MS. SPIVEY, I'VE PLACED BEFORE YOU WHAT HAS BEEN MARKED AS

09:45AM  22        EXHIBIT 5454.

09:45AM  23            DO YOU HAVE THAT IN FRONT OF YOU?

09:45AM  24        A.   YES.

09:45AM  25        Q.   DOES THIS APPEAR TO BE AN EMAIL FROM YOU TO

09:45AM  1       ELIZABETH HOLMES AND SUNNY BALWANI DATED JULY 25TH, 2015?

09:45AM  2       A.   YES.

09:45AM  3       Q.   AND DOES THIS RELATE TO A COMPANY CALLED HORIZON MEDIA?

09:45AM  4       A.   YES.

09:45AM  5       Q.   AND DOES IT RELATE TO POTENTIAL ADVERTISING IN MEDIA THAT

09:45AM  6       THERANOS WAS CONTEMPLATING PURCHASING?

09:45AM  7       A.   YES.

09:45AM  8       Q.   AND WERE YOU SENDING THIS TO MS. HOLMES AND MR. BALWANI TO

09:45AM  9       OBTAIN THEIR APPROVAL FOR CERTAIN PAYMENTS SUGGESTED IN THIS

09:45AM 10       EMAIL?

09:45AM 11       A.   YES.

09:45AM 12             MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5454 INTO

09:45AM 13       EVIDENCE.

09:45AM 14             MR. WADE:  802, YOUR HONOR.

09:45AM 15             THE COURT:  IS THIS A FOUR-PAGE, A FOUR-PAGE

09:46AM 16       DOCUMENT?

09:46AM 17             MR. LEACH:  IT'S A FIVE-PAGE DOCUMENT, YOUR HONOR.

09:46AM 18             THE COURT:  THIS IS OFFERED, MR. LEACH, FOR?

09:46AM 19             MR. LEACH:  A BUSINESS RECORD.

09:46AM 20             THE COURT:  OKAY.  DO YOU WANT TO LAY A FOUNDATION?

09:46AM 21             MR. LEACH:  SURE.

09:46AM 22       Q.   MS. SPIVEY, DID YOU, IN THE ORDINARY COURSE OF BUSINESS,

09:46AM 23       DID YOU OBTAIN APPROVALS FROM MS. HOLMES AND MR. BALWANI FOR

09:46AM 24       EXPENSES OVER A CERTAIN THRESHOLD?

09:46AM 25       A.   YES.

09:46AM    1    Q.   AND WHAT WAS THAT THRESHOLD?

09:46AM    2    A.   SO FOR SUNNY -- SO ALL OF THE EXPENSES WOULD GO THROUGH

09:46AM    3    THE APPROVAL OF EITHER SUNNY BALWANI OR ELIZABETH HOLMES.

09:46AM    4    Q.   OKAY.  SO WHATEVER THE DOLLAR VALUE?

09:47AM    5    A.   YES.

09:47AM    6    Q.   AND DO THE EXPENSES IN HERE RELATE TO THE DOLLAR VALUE IN

09:47AM    7    THE MANY MILLIONS OF DOLLARS?

09:47AM    8    A.   YES.

09:47AM    9    Q.   AND DID YOU SEND THIS EMAIL IN THE ORDINARY COURSE OF

09:47AM   10    BUSINESS?

09:47AM   11    A.   YES.

09:47AM   12    Q.   AND IS THE INFORMATION IN EXHIBIT 5454 PREPARED AT OR

09:47AM   13    AROUND THE TIME BASED ON INFORMATION FROM PEOPLE WITH

09:47AM   14    KNOWLEDGE?

09:47AM   15    A.   YES.

09:47AM   16    Q.   AND WAS IT YOUR PRACTICE TO KEEP AND RETAIN THE EMAILS

09:47AM   17    THAT YOU WOULD SEND TO MS. HOLMES AND MR. BALWANI RESPECTING

09:47AM   18    CERTAIN APPROVALS FOR CERTAIN EXPENSES?

09:47AM   19    A.   WHAT DO YOU MEAN?

09:47AM   20    Q.   WOULD YOU RETAIN EMAILS IN THE COURSE OF YOUR BUSINESS TO

09:47AM   21    MAKE SURE THAT YOU HAD A RECORD OF WHAT MS. HOLMES OR

09:47AM   22    MR. BALWANI WERE APPROVING FOR EXPENSES?

09:47AM   23    A.   YES.

09:47AM   24    Q.   AND WOULD -- AFTER OBTAINING THE APPROVAL, WOULD THOSE

09:47AM   25    EXPENSES BE ENTERED INTO THE GENERAL LEDGER?

09:47AM 1    A.   YES.

09:47AM 2    Q.   AND IN THE EMAIL THERE'S TWO ATTACHMENTS.  WERE YOU

09:48AM 3    SENDING THESE ATTACHMENTS SO THAT MR. BALWANI AND MS. HOLMES

09:48AM 4    WOULD KNOW WHAT YOU WERE SEEKING APPROVAL OF?

09:48AM 5    A.   YES.

09:48AM 6         MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5454.

09:48AM 7         MR. WADE:  SAME OBJECTION.

09:48AM 8         THE COURT:  ALL RIGHT.  THANK YOU.  THIS IS

09:48AM 9    ADMITTED, 803(6), IT IS ADMITTED AS A BUSINESS RECORD, AND IT

09:48AM 10   MAY BE PUBLISHED.

09:48AM 11        (GOVERNMENT'S EXHIBIT 5454 WAS RECEIVED IN EVIDENCE.)

09:48AM 12        MR. LEACH:  THANK YOU, YOUR HONOR.

09:48AM 13   Q.   MS. SPIVEY, I'D LIKE TO DRAW YOUR ATTENTION TO THE EMAIL

09:48AM 14   AT THE BOTTOM OF THE CHAIN.  THIS APPEARS -- THE BOTTOM EMAIL

09:48AM 15   APPEARS TO BE FROM CARISA BIANCHI.

09:48AM 16        ARE YOU FAMILIAR WITH HER?

09:48AM 17   A.   YES.

09:48AM 18   Q.   AND WHO IS SHE?

09:48AM 19   A.   SHE IS THE HEAD OF THE MARKETING DEPARTMENT.

09:48AM 20   Q.   AND THE SUBJECT IS HORIZON MEDIA.  WHAT IS HORIZON MEDIA?

09:49AM 21   A.   THAT'S THE COMPANY THAT HANDLES A MAJORITY OF THE

09:49AM 22   MARKETING AND ADVERTISING ACTIVITIES FOR THE COMPANY.

09:49AM 23   Q.   AND WHEN YOU SAY MARKETING AND ADVERTISING ACTIVITIES,

09:49AM 24   DOES THAT INCLUDE TELEVISION ADVERTISEMENTS?

09:49AM 25   A.   YES.

09:49AM 1    Q.   AND DOES IT INCLUDE PRINTED MEDIA ADVERTISEMENTS?

09:49AM 2    A.   YES.

09:49AM 3    Q.   AND IN THIS EMAIL, AT THE BOTTOM MS. BIANCHI IS WRITING

09:49AM 4    "HI SUNNY,

09:49AM 5        "HERE IS THE DETAILED LIST OF WHAT IS INCLUDED IN THE

09:49AM 6    PHOENIX MEDIA PLAN FOR 3TH," I THINK SHE MEANT 3RD, "AND 4TH

09:49AM 7    QUARTER.  ALL INVOICES REFLECT DATES THROUGH END OF YEAR."

09:49AM 8        DO YOU SEE THAT LANGUAGE?

09:49AM 9    A.   YES.

09:49AM 10   Q.   AND THE 3RD AND 4TH QUARTER, THAT WOULD BE OF 2015?

09:49AM 11   A.   YES.

09:49AM 12   Q.   IN NUMBER 2 -- WELL, IN NUMBER 1, DO YOU SEE WHERE THERE

09:49AM 13   ARE SOME EXPENSES RELATING TO OOH/CINEMA, PEOPLE MAGAZINE

09:49AM 14   COVER, AZ REPUBLIC, DIGITAL/MOBILE ACTIVITY?

09:50AM 15       DO YOU SEE THAT LAID OUT IN NUMBER 1?

09:50AM 16   A.   YES.

09:50AM 17   Q.   AND AZ REPUBLIC, IS THAT THE ARIZONA REPUBLIC?

09:50AM 18   A.   I BELIEVE SO.

09:50AM 19   Q.   THAT'S THE NEWSPAPER IN ARIZONA?

09:50AM 20   A.   I THINK SO.

09:50AM 21   Q.   IN NUMBER 2 IT SAYS, "WIRE FUNDS DUE 7/31 -- $1,126,661."

09:50AM 22       DO YOU SEE THAT?

09:50AM 23   A.   YES.

09:50AM 24   Q.   AND BENEATH THAT IS THERE THE WORDS 3Q AND 4Q, T.V. AND

09:50AM 25   ANOTHER NUMBER IN THE 800,000?

09:50AM   1      A.   YES.

09:50AM   2      Q.   AND BENEATH THAT DO YOU SEE WHERE IT SAYS, "I WILL HAVE

09:50AM   3      THE 3Q AND 4Q BUYS READY FOR YOUR AND ELIZABETH'S REVIEW NEXT

09:50AM   4      TUESDAY"?

09:50AM   5      A.   YES.

09:50AM   6      Q.   AND DOES THAT RELATE TO POTENTIAL MEDIA EXPENSES FOR THE

09:50AM   7      3RD AND 4TH QUARTER OF 2015?

09:50AM   8      A.   YES.

09:50AM   9           MR. WADE:  YOUR HONOR, 602.  602.

09:50AM   10          THE COURT:  CAN YOU LAY A FOUNDATION FOR HER

09:51AM   11     KNOWLEDGE?

09:51AM   12     BY MR. LEACH:

09:51AM   13     Q.   YOU ULTIMATELY REVIEWED AND FORWARD THIS EMAIL TO

09:51AM   14     MS. HOLMES AND MR. BALWANI; IS THAT CORRECT?

09:51AM   15     A.   YES.

09:51AM   16     Q.   SO WHEN YOU'RE SENDING THIS TO MS. HOLMES AND MR. BALWANI,

09:51AM   17     WAS IT IMPORTANT FOR YOU TO HAVE A GENERAL UNDERSTANDING OF

09:51AM   18     WHAT YOU WERE SEEKING APPROVAL FOR?

09:51AM   19     A.   YES.

09:51AM   20          THE COURT:  AND DID SHE --

09:51AM   21     BY MR. LEACH:

09:51AM   22     Q.   WHEN YOU'RE EMAILING MS. HOLMES AND MR. BALWANI, "I WILL

09:51AM   23     HAVE THE 3Q AND 4Q BUYS READY FOR YOUR AND ELIZABETH'S REVIEW

09:51AM   24     NEXT TUESDAY," WHAT DID YOU UNDERSTAND MS. BIANCHI TO MEAN BY

09:51AM   25     THAT?

09:51AM  1    A.   SHE IS SEEKING APPROVAL FROM ELIZABETH HOLMES AND

09:51AM  2    SUNNY BALWANI FOR THE T.V. SPEND FOR 3Q AND 4Q.

09:52AM  3    Q.   THANK YOU.  LET'S LOOK AT PAGE 2, PLEASE.

09:52AM  4         THE COURT:  I'LL ALLOW THAT.

09:52AM  5         MR. LEACH:  THANK YOU, YOUR HONOR.

09:52AM  6    Q.   DO YOU SEE WHERE IT SAYS "3Q AND 4Q RADIO ($282,570).

09:52AM  7         "I WILL HAVE THE 3Q AND 4Q BUYS READY FOR YOUR AND

09:52AM  8    ELIZABETH'S REVIEW NEXT TUESDAY."

09:52AM  9         DO YOU SEE THAT LANGUAGE?

09:52AM  10   A.   YES.

09:52AM  11   Q.   AND DID YOU UNDERSTAND THIS TO BE MS. BIANCHI SEEKING

09:52AM  12   APPROVAL FOR RADIO ADVERTISEMENTS IN THE SECOND HALF OF 2015?

09:52AM  13   A.   YES.

09:52AM  14   Q.   THE LAST ENTRY UNDER 2 IS "SEPTEMBER DJ AND T.V. HOST

09:52AM  15   ON-AIR SEGMENTS $24,920.

09:52AM  16        "FINALIZING TIMING AND DETAILS, TARGETING FOR SEPTEMBER.

09:52AM  17        "ATTACHING PROPOSED DJ COPY POINTS."

09:52AM  18        DO YOU SEE THAT?

09:52AM  19   A.   YES.

09:53AM  20   Q.   AND ARE THOSE COPY POINTS ONE OF THE ATTACHMENTS TO THE

09:53AM  21   EMAIL THAT YOU FORWARDED TO MS. HOLMES AND MR. BALWANI?

09:53AM  22   A.   I AM NOT SURE.

09:53AM  23   Q.   LET ME DRAW YOUR ATTENTION TO THE --

09:53AM  24        IF WE CAN ZOOM OUT, PLEASE, MS. HOLLIMAN, AND GO BACK TO

09:53AM  25   PAGE 1, PLEASE.

SPIVEY DIRECT BY MR. LEACH                                             6362

09:53AM  1          IF WE CAN ZOOM IN ON THE TOP HALF OF THIS PARAGRAPH, DO

09:53AM  2   YOU SEE THE MIDDLE EMAIL, MS. SPIVEY, WHERE CARISA EMAILS YOU,

09:53AM  3   "HI DANISE,

09:53AM  4          "PER MY EARLIER EMAIL, HERE IS THE RECAP I SENT TO

09:53AM  5   ELIZABETH AND SUNNY EARLIER TODAY WHICH RECAPS ALL MEDIA

09:54AM  6   ACTIVITY, WIRE DATES AND AMOUNTS."

09:54AM  7          DO YOU SEE THAT LANGUAGE?

09:54AM  8   A.   YES.

09:54AM  9   Q.   AND THEN ABOVE YOU WRITE TO MS. HOLMES AND MR. BALWANI,

09:54AM  10  "HI SUNNY/ELIZABETH,

09:54AM  11         "CARISA GAVE MORE DETAILS ABOUT THE WIRE REQUEST.  DO YOU

09:54AM  12  WANT ME TO SUBMIT A WIRE FOR MONDAY DELIVERY?"

09:54AM  13         DO YOU SEE THAT?

09:54AM  14  A.   YES.

09:54AM  15  Q.   AND DO YOU SEE THERE ARE TWO ATTACHMENTS IN THE SUBJECT

09:54AM  16  MATTER EMAIL PX OOH AND DJ COPY POINTS?

09:54AM  17  A.   YES.

09:54AM  18  Q.   AND WERE THOSE MATERIALS THAT YOU WERE SEEKING TO HAVE

09:54AM  19  MS. HOLMES AND MR. BALWANI APPROVE?

09:54AM  20  A.   YES.

09:54AM  21  Q.   AND YOU BELIEVED THOSE TO BE THE ATTACHMENTS TO THE EMAIL?

09:54AM  22  A.   YES.

09:54AM  23  Q.   IF WE CAN ZOOM OUT AGAIN, MS. HOLLIMAN.

09:54AM  24         I WANT TO DRAW YOUR ATTENTION BACK TO THE BOTTOM OF THE

09:54AM  25  EMAIL, MS. SPIVEY, THERE'S A NUMBER "WIRE FUNDS DUE 7/31 --

09:54AM 1      $1,126,661."

09:55AM 2          DO YOU SEE THAT NUMBER?

09:55AM 3      A.   YES.

09:55AM 4      Q.   KEEP THAT NUMBER IN MIND.  AND I'D LIKE TO DRAW YOUR

09:55AM 5      ATTENTION TO WHAT IS EXHIBIT 5248.

09:55AM 6          AND PERMISSION TO DISPLAY, YOUR HONOR?

09:55AM 7              THE COURT:  YES.

09:55AM 8      BY MR. LEACH:

09:55AM 9      Q.   MS. SPIVEY, DO YOU SEE THE NAME -- DOES THIS APPEAR TO BE

09:55AM 10     A RECORD OF A WIRE TRANSFER?

09:55AM 11     A.   YES.

09:55AM 12     Q.   AND DO YOU SEE THE NAME HORIZON MEDIA, INC. DOWN AT THE

09:55AM 13     BOTTOM?

09:55AM 14     A.   YES.

09:55AM 15     Q.   AND DO THEY APPEAR TO BE THE BENEFICIARY OF THIS

09:55AM 16     PARTICULAR WIRE?

09:55AM 17     A.   YES.

09:55AM 18     Q.   AND IF I COULD DRAW YOUR ATTENTION TO THE MIDDLE PORTION

09:55AM 19     OF THE PAGE THERE'S AN AMOUNT OF $1,126,661.

09:55AM 20         DO YOU SEE THAT?

09:55AM 21     A.   YES.

09:55AM 22     Q.   AND WAS THAT THE SAME DOLLAR AMOUNT THAT YOU WERE SEEKING

09:55AM 23     APPROVAL OF FROM MS. HOLMES AND MR. BALWANI?

09:55AM 24     A.   YES.

09:55AM 25     Q.   AND BASED ON THESE TWO DOCUMENTS, ARE YOU SATISFIED THAT

09:56AM  1    YOU ULTIMATELY OBTAINED AN APPROVAL IN ONE FORM OR ANOTHER?

09:56AM  2    A.   YES.

09:56AM  3    Q.   I ALSO DRAW YOUR ATTENTION TO THE DATE TO THE RIGHT OF THE

09:56AM  4    LINE OMAD.

09:56AM  5         DO YOU SEE 20150803?

09:56AM  6    A.   YES.

09:56AM  7    Q.   AND THAT'S A WEEK OR SO AFTER THE JULY 25TH EMAIL THAT WE

09:56AM  8    LOOKED AT IN EXHIBIT 5454?

09:56AM  9    A.   CORRECT.

09:56AM  10             MR. LEACH:  MAY I HAVE A MOMENT, YOUR HONOR?

09:56AM  11             THE COURT:  YES.

09:56AM  12        (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

09:56AM  13             MR. LEACH:  I HAVE NO FURTHER QUESTIONS.

09:56AM  14        THANK YOU, MS. SPIVEY.

09:56AM  15             THE COURT:  CROSS?

09:56AM  16                         **CROSS-EXAMINATION**

09:56AM  17    BY MR. WADE:

09:57AM  18    Q.   GOOD MORNING, MS. SPIVEY.

09:57AM  19         MY NAME IS LANCE WADE, AND I REPRESENT MS. HOLMES.

09:57AM  20         I'M GOING TO ASK YOU A FEW QUESTIONS THIS MORNING, OKAY?

09:57AM  21    A.   SURE.

09:57AM  22    Q.   IT'S NICE TO SEE YOU AGAIN.

09:57AM  23         IF I COULD PULL UP EXHIBIT 5454, AND JUST BLOW UP THE

09:57AM  24    BOTTOM EMAIL.

09:57AM  25         YOU'VE TESTIFIED THAT THIS EMAIL RELATES TO SOME MEDIA

09:57AM  1    ACTIVITY OF HORIZON MEDIA; CORRECT?

09:57AM  2    A.   YES.

09:57AM  3    Q.   DID YOU HAVE ANY ROLE WITH RESPECT TO MEDIA CONTENT OR THE

09:57AM  4    PREPARATION OF ANY ADVERTISING FOR THE COMPANY?

09:57AM  5    A.   NO.

09:57AM  6    Q.   OKAY.  AND WAS THAT MS. BIANCHI AND OTHERS WHO WERE

09:58AM  7    INVOLVED IN THOSE EFFORTS?

09:58AM  8    A.   YES.

09:58AM  9    Q.   AND WHEN THERE IS APPROVAL OF THIS SOUGHT, DO YOU FOCUS ON

09:58AM  10   THE CONTENT OF THE APPROVAL, OR DO YOU JUST MAKE SURE THERE'S

09:58AM  11   ENOUGH INFORMATION NECESSARY FOR THE EXPENSE TO BE APPROVED?

09:58AM  12   A.   YEAH, I FOCUS ON WHAT'S -- WELL, INFORMATION THAT

09:58AM  13   SUNNY BALWANI AND ELIZABETH HOLMES NEEDS IN ORDER TO APPROVE

09:58AM  14   THE PAYMENT.

09:58AM  15   Q.   RIGHT.  SO IN THIS CASE FOR ADVERTISING, FOR EXAMPLE, YOU

09:58AM  16   WEREN'T FOCUSSED ON WHAT THE ADVERTISING WOULD SAY, FOR

09:58AM  17   EXAMPLE?

09:58AM  18   A.   CORRECT.

09:58AM  19   Q.   OKAY.  AND YOU DIDN'T PLAY ANY ROLE IN THAT ADVERTISING;

09:58AM  20   CORRECT?

09:58AM  21   A.   CORRECT.

09:58AM  22   Q.   AND IF WE LOOK AT THE BOTTOM -- IF WE LOOK AT ITEM 2, AND

09:59AM  23   CAN WE BRING UP THE TOP OF THE NEXT PAGE AS WELL SO WE CAN SEE

09:59AM  24   THE FULL ITEM.

09:59AM  25        AND I'D LIKE TO JUST ASK YOU A COUPLE OF QUESTIONS ABOUT

09:59AM   1    ITEM 2.  DO YOU SEE IN THE FIRST HEADING UNDER ITEM 2 IT SAYS,

09:59AM   2    "3Q AND 4Q T.V. ($819,171)."

09:59AM   3        DO YOU SEE THAT?

09:59AM   4    A.   YES.

09:59AM   5    Q.   AND IT NOTES THAT THE BUYS WOULD BE READY FOR REVIEW IN

09:59AM   6    THE FUTURE; CORRECT?

09:59AM   7    A.   YES.

09:59AM   8    Q.   SO AS YOU UNDERSTOOD IT AT THIS TIME THERE HAD BEEN

10:00AM   9    NOTHING CONCRETE FINALIZED IN TERMS OF WHAT WOULD BE BOUGHT;

10:00AM   10   RIGHT?

10:00AM   11   A.   BASED ON THIS EMAIL, YES.

10:00AM   12   Q.   YES, THIS WAS SOME KIND OF FUTURE ACTIVITY?

10:00AM   13   A.   YES.

10:00AM   14   Q.   AND DID YOU PLAY ANY ROLE IN THAT FUTURE ACTIVITY AT ALL?

10:00AM   15   A.   NO.

10:00AM   16   Q.   OKAY.  AND WITH RESPECT TO THE SECOND ITEM, ARE THE

10:00AM   17   ANSWERS THE SAME FOR THAT, FUTURE ACTIVITY THAT YOU DIDN'T PLAY

10:00AM   18   A ROLE IN?

10:00AM   19   A.   YES.

10:00AM   20   Q.   OKAY.  AND IF WE LOOK AT THE THIRD ITEM THERE IT SAYS,

10:00AM   21   "FINALIZING TIMING AND DETAILS."

10:00AM   22        DO YOU SEE THAT?

10:00AM   23   A.   YES.

10:00AM   24   Q.   AND SO YOU UNDERSTOOD THAT THE DETAILS WEREN'T YET

10:00AM   25   FINALIZED; CORRECT?

10:00AM  1    A.   CORRECT.

10:00AM  2    Q.   AND YOU DIDN'T PLAY ANY ROLES IN THE DETAILS AFTER THIS

10:00AM  3    EMAIL, DID YOU?

10:00AM  4    A.   NO.

10:00AM  5    Q.   OKAY.  AND IT NOTES TARGETING FOR SEPTEMBER.  THAT'S A

10:00AM  6    COUPLE OF MONTHS IN THE FUTURE AFTER JULY; CORRECT?

10:00AM  7    A.   CORRECT.

10:00AM  8    Q.   AND YOU DON'T KNOW WHAT ULTIMATELY HAPPENED WITH RESPECT

10:01AM  9    TO ANY OF THIS, DO YOU?

10:01AM  10   A.   NO.

10:01AM  11   Q.   DO YOU KNOW WHETHER THESE ADS EVER -- THAT ARE IDENTIFIED

10:01AM  12   IN ITEM 2 WERE EVER RAN?

10:01AM  13   A.   I DON'T KNOW.

10:01AM  14   Q.   OKAY.  IT SAYS, "ATTACHING PROPOSED DJ COPY POINTS."

10:01AM  15        DO YOU SEE THAT THERE?

10:01AM  16   A.   YES.

10:01AM  17   Q.   AND THERE WAS AN ATTACHMENT TO THE EMAIL.  MR. LEACH NOTED

10:01AM  18   THAT; CORRECT?

10:01AM  19   A.   YES.

10:01AM  20   Q.   BUT YOU DIDN'T PLAY ANY ROLE IN FINALIZING THE PROPOSED

10:01AM  21   TALKING POINTS, DID YOU?

10:01AM  22   A.   NO.

10:01AM  23   Q.   OKAY.  LET'S TURN TO PAGE 4 OF THE EXHIBIT, AND LET'S BLOW

10:01AM  24   UP THE FIRST SECTION THERE.

10:01AM  25        AND THIS HERE TALKS ABOUT "SMALLER SAMPLES.  SMALLER

10:02AM   1    NEEDLES.  A BETTER EXPERIENCE."

10:02AM   2         DO YOU SEE THAT?

10:02AM   3    A.   YES.

10:02AM   4    Q.   AND YOU HAD SEEN PROMOTIONS FROM THE COMPANY ALONG THOSE

10:02AM   5    LINES PREVIOUSLY I TAKE IT?

10:02AM   6    A.   SOMETHING LIKE THAT.

10:02AM   7    Q.   DO YOU SEE THE NEXT LINE IT SAYS, "MANY OF THERANOS TESTS

10:02AM   8    REQUIRE ONLY A FEW DROPS OF BLOOD."

10:02AM   9         DO YOU SEE THAT?

10:02AM   10   A.   YES.

10:02AM   11   Q.   AND YOU UNDERSTOOD THAT TO BE THE MICRO-SAMPLE THAT THE

10:02AM   12   COMPANY WOULD USE FOR SMALL SAMPLE TESTING?

10:02AM   13   A.   YES.

10:02AM   14   Q.   OKAY.  SOMETIMES REFERRED TO AS THE NANOTAINER; IS THAT

10:02AM   15   RIGHT?

10:02AM   16   A.   CORRECT.

10:02AM   17   Q.   OKAY.  AND THEN IT SAYS, "ALL OF OUR TESTS, INCLUDING

10:02AM   18   VENOUS DRAWS, REQUIRE SMALLER SAMPLES THAN TRADITIONAL LABS."

10:02AM   19        RIGHT?

10:02AM   20   A.   YES.

10:02AM   21   Q.   AND SO -- AND YOU UNDERSTOOD THAT AT THIS TIME THAT THE

10:02AM   22   VENOUS DRAWS WOULD SOMETIMES BE USED IN THERANOS LABS?

10:02AM   23   A.   YOU MEAN BASED ON THIS DOCUMENT?

10:03AM   24   Q.   YEAH.

10:03AM   25   A.   YES.

SPIVEY CROSS BY MR. WADE

10:03AM 1    Q.   AND THAT THEY TRIED TO USE A SMALLER SAMPLE VENOUS DRAW

10:03AM 2    WHEN THEY DID THAT?

10:03AM 3    A.   YES.

10:03AM 4    Q.   OKAY.  AND, IN FACT, IN THE NEXT LINE THERE IT ACTUALLY

10:03AM 5    TALKS ABOUT THE SMALLEST VENOUS DRAW SAMPLE POSSIBLE.

10:03AM 6        DO YOU SEE THAT?

10:03AM 7    A.   YES.

10:03AM 8    Q.   AND HOW THERANOS TESTS MEAN LESS BLOOD.

10:03AM 9        DO YOU SEE THAT?

10:03AM 10   A.   YES.

10:03AM 11   Q.   OKAY.  AND YOU UNDERSTOOD THAT AT THE TIME; RIGHT?

10:03AM 12   A.   YES.

10:03AM 13   Q.   OKAY.  LET'S GO TO -- IF WE CAN BOLD BACK OUT AND LOOK AT

10:03AM 14   THE SECOND SENTENCE.

10:03AM 15       YOU UNDERSTOOD THAT THESE PROPOSED TALKING POINTS ALSO --

10:03AM 16   AND AGAIN, THESE WERE -- THIS WAS SOMETHING THAT MS. HOLMES

10:03AM 17   APPROVED; CORRECT?  I BELIEVE THAT WAS YOUR TESTIMONY,

10:03AM 18   MS. HOLMES APPROVED THIS OR MR. BALWANI?

10:03AM 19   A.   THEY APPROVED THE WIRE.

10:04AM 20   Q.   THEY APPROVED THE WIRE.

10:04AM 21       AND YOU HAD SENT THEM THIS INFORMATION; RIGHT?

10:04AM 22   A.   YES.

10:04AM 23   Q.   AND INCLUDING THIS INFORMATION ABOUT THE VENOUS TESTING;

10:04AM 24   RIGHT?

10:04AM 25   A.   RIGHT.

10:04AM  1    Q.    OKAY.  AND THERE'S ALSO AN EMPHASIS HERE ON AFFORDABLE

10:04AM  2    PRICING.

10:04AM  3          DO YOU SEE THAT?

10:04AM  4    A.    YES.

10:04AM  5    Q.    AND YOU UNDERSTOOD THAT THAT WAS THE FOCUS OF THE

10:04AM  6    COMPANY'S ADVERTISING AT THE TIME; RIGHT?

10:04AM  7    A.    WHAT DOES THAT MEAN?

10:04AM  8    Q.    YOU REMEMBER THE COMPANY WAS FOCUSSED ON TRYING TO PROVIDE

10:04AM  9    ITS SERVICES AT LOW PRICES?

10:04AM  10   A.    YES.

10:04AM  11   Q.    AND IF WE GO TO THE NEXT HEADING YOU SEE THE THERANOS

10:04AM  12   EXPERIENCE.

10:04AM  13         AND THE COMPANY WAS VERY FOCUSSED OF TRYING TO PROVIDE A

10:04AM  14   VERY GOOD EXPERIENCE TO ITS CUSTOMERS, WAS IT NOT?

10:04AM  15   A.    YES.

10:04AM  16   Q.    OKAY.  AND THERE'S ALSO DISCUSSION WITHIN THIS DOCUMENT

10:05AM  17   ABOUT CONVENIENT LOCATION AND HOURS; RIGHT?

10:05AM  18   A.    YES.

10:05AM  19   Q.    AND HOW TO GO -- THERE'S SOME DISCUSSION AT THE BOTTOM OF

10:05AM  20   HOW TO GET SERVICES WORKING WITH THE PHYSICIAN.

10:05AM  21         DO YOU SEE THAT?

10:05AM  22   A.    YES.

10:05AM  23   Q.    OKAY.  I'D LIKE TO SHOW YOU ONE OTHER DOCUMENT FROM THE

10:05AM  24   GOVERNMENT THAT I CAN HAND UP.

10:05AM  25         MAY I APPROACH, YOUR HONOR?

| | | |
|---|---|---|
| 10:05AM | 1 | THE COURT:  YES. |
| 10:05AM | 2 | BY MR. WADE: |
| 10:05AM | 3 | Q.   (HANDING.) |
| 10:05AM | 4 | AND DO YOU RECALL WHEN YOU TESTIFIED PREVIOUSLY THAT YOU |
| 10:06AM | 5 | TALKED ABOUT HOW SOMETIMES AT MR. BALWANI'S REQUEST YOU WOULD |
| 10:06AM | 6 | PREPARE BALANCE SHEETS FOR HIM? |
| 10:06AM | 7 | A.   YES. |
| 10:06AM | 8 | Q.   AND YOU WOULD FREQUENTLY EMAIL THOSE TO HIM WHEN HE WOULD |
| 10:06AM | 9 | MAKE REQUESTS? |
| 10:06AM | 10 | A.   YES. |
| 10:06AM | 11 | Q.   AND IS THIS ONE OF THOSE OCCASIONS WHERE YOU DID THAT? |
| 10:06AM | 12 | A.   YES. |
| 10:06AM | 13 | Q.   AND WHEN I SAY "THIS," THIS IS EXHIBIT 1396; CORRECT? |
| 10:06AM | 14 | A.   YES. |
| 10:06AM | 15 | MR. WADE:  I MOVE THE ADMISSION OF 1396. |
| 10:06AM | 16 | MR. LEACH:  NO OBJECTION. |
| 10:06AM | 17 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 10:06AM | 18 | (GOVERNMENT'S EXHIBIT 1396 WAS RECEIVED IN EVIDENCE.) |
| 10:06AM | 19 | BY MR. WADE: |
| 10:06AM | 20 | Q.   AND THE TIME PERIOD FOR THIS PARTICULAR BALANCE SHEET IS |
| 10:06AM | 21 | JANUARY 8TH, 2014; CORRECT? |
| 10:06AM | 22 | A.   CORRECT. |
| 10:06AM | 23 | Q.   AND IF WE GO TO THE NEXT PAGE, YOU UNDERSTOOD THIS TO BE A |
| 10:07AM | 24 | TRUE AND CORRECT BALANCE SHEET AS OF THAT DATE? |
| 10:07AM | 25 | A.   FROM THIS EMAIL IT SEEMS LIKE WE'RE MAKING SOME |

10:07AM 1    ASSUMPTIONS, SO I'M NOT SURE IF THAT WAS AN ACCURATE NUMBER AT

10:07AM 2    THAT TIME.

10:07AM 3    Q.   OKAY.  WELL, LET'S LOOK BACK AT THAT EMAIL.

10:07AM 4         IN THE REQUEST MR. BALWANI ASKED FOR A BALANCE SHEET,

10:07AM 5    ASSUMING THE EQUITY TRANSACTION DOLLARS IS IN AND THE

10:07AM 6    $75 MILLION FROM WAG BY THEN.

10:07AM 7         DO YOU SEE THAT?

10:08AM 8    A.   YES.

10:08AM 9    Q.   AND DO YOU RECALL THAT THOSE WERE PAYMENTS THAT CAME IN

10:08AM 10   LATE IN THE PRIOR YEAR AND HE WAS ASKING HERE WHETHER THEY HAD

10:08AM 11   BEEN ENTERED INTO THE BOOKS?

10:08AM 12   A.   I AM NOT SURE.

10:08AM 13   Q.   YOU DON'T RECALL AS YOU SIT HERE?

10:08AM 14   A.   I DON'T RECALL WHEN THE MONEY WAS IN AND WHAT THIS

10:08AM 15   ASSUMPTION WAS MADE BY, WHAT THAT MEANS.

10:08AM 16   Q.   OKAY.  WHATEVER IT WAS DURING THIS TIME PERIOD, WHEN HE

10:08AM 17   ASKED YOU FOR THE BALANCE SHEET, YOU DID YOUR BEST TO PROVIDE

10:08AM 18   THE MOST ACCURATE BALANCE SHEET THAT YOU COULD AT THE TIME

10:08AM 19   BASED UPON THE STATE OF THE BOOKS AND SENT IT BACK TO

10:08AM 20   MR. BALWANI?

10:08AM 21   A.   YES.

10:08AM 22   Q.   OKAY.

10:08AM 23        NO FURTHER QUESTIONS, YOUR HONOR.

10:08AM 24            THE COURT:  MR. LEACH?

10:08AM 25            MR. LEACH:  NOTHING FURTHER, YOUR HONOR.

SPIVEY CROSS BY MR. WADE

| | | |
|---|---|---|
| 10:08AM | 1 | THE COURT:  MAY THIS WITNESS BE EXCUSED? |
| 10:08AM | 2 | MR. LEACH:  YES, YOUR HONOR. |
| 10:08AM | 3 | MR. WADE:  SHE MAY. |
| 10:08AM | 4 | THE COURT:  THANK YOU, MS. SPIVEY.  YOU MAY GO. |
| 10:08AM | 5 | YOU'RE EXCUSED. |
| 10:09AM | 6 | DOES THE GOVERNMENT HAVE ANOTHER WITNESS TO CALL? |
| 10:09AM | 7 | MR. LEACH:  YES, YOUR HONOR. |
| 10:09AM | 8 | THE GOVERNMENT CALLS BRIAN GROSSMAN. |
| 10:09AM | 9 | THE COURT:  SIR, IF YOU COULD JUST STAND THERE FOR |
| 10:09AM | 10 | JUST A MOMENT. |
| 10:09AM | 11 | THE CLERK:  EXCUSE ME. |
| 10:09AM | 12 | THE COURT:  AND IF YOU WOULD RAISE YOUR RIGHT HAND |
| 10:09AM | 13 | IN A MOMENT WHILE YOU FACE OUR COURTROOM DEPUTY, SHE WILL HAVE |
| 10:09AM | 14 | A QUESTION FOR YOU. |
| 10:09AM | 15 | THE CLERK:  GOOD MORNING. |
| 10:09AM | 16 | **(GOVERNMENT'S WITNESS, BRIAN GROSSMAN, WAS SWORN.)** |
| 10:09AM | 17 | THE WITNESS:  I DO. |
| 10:09AM | 18 | THE CLERK:  THANK YOU.  PLEASE HAVE A SEAT. |
| 10:09AM | 19 | THE COURT:  PLEASE HAVE A SEAT HERE, SIR.  I'LL |
| 10:09AM | 20 | INVITE YOU TO MAKE YOURSELF COMFORTABLE.  FEEL FREE TO ADJUST |
| 10:09AM | 21 | THE CHAIR AND MICROPHONE AS YOU NEED. |
| 10:09AM | 22 | I'LL ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE MICROPHONE. |
| 10:09AM | 23 | WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME |
| 10:10AM | 24 | AND THEN SPELL IT, PLEASE. |
| 10:10AM | 25 | THE WITNESS:  BRIAN GROSSMAN, B-R-I-A-N, |

10:10AM   1    G-R-O-S-S-M-A-N.

10:10AM   2            THE COURT:  THANK YOU.

10:10AM   3        COUNSEL.

10:10AM   4            MR. LEACH:  THANK YOU, YOUR HONOR.

10:10AM   5                    **DIRECT EXAMINATION**

10:10AM   6    BY MR. LEACH:

10:10AM   7    Q.   MR. GROSSMAN, I UNDERSTAND YOU'RE FULLY VACCINATED AND ARE

10:10AM   8    COMFORTABLE TESTIFYING WITHOUT A MASK.

10:10AM   9    A.   YES, I AM.

10:10AM  10    Q.   OKAY.  WHERE DO YOU WORK, SIR?

10:10AM  11    A.   I WORK AT A FIRM CALLED PFM HEALTH SCIENCES.

10:10AM  12    Q.   WHAT IS PFM HEALTH SCIENCES?

10:10AM  13    A.   WE ARE AN S.E.C. REGISTERED INVESTMENT ADVISOR.  WE HAVE

10:10AM  14    TWO PRINCIPAL STRATEGIES.  WE HAVE A HEDGE FUND STRATEGY AND A

10:10AM  15    GROWTH EQUITY STRATEGY THAT WE MANAGE.

10:10AM  16    Q.   WHEN YOU SAY AN S.E.C. REGISTERED INVESTMENT ADVISOR, WHAT

10:10AM  17    DO YOU MEAN?

10:10AM  18    A.   WE ARE AN INVESTMENT FIRM THAT REGISTERS WITH THE S.E.C.,

10:10AM  19    FILES REGULATORY UPDATES, HOLDINGS.  WE'RE A REGULATED ENTITY.

10:11AM  20    Q.   IF YOU'RE COMFORTABLE AND WOULD LIKE SOME WATER, LET ME

10:11AM  21    GIVE YOU THE OPPORTUNITY TO POUR THAT.

10:11AM  22        ARE YOU COMFORTABLE NOW?

10:11AM  23    A.   YES.

10:11AM  24    Q.   AND WHAT DO YOU DO FOR PFM?

10:11AM  25    A.   I AM THE MANAGING PARTNER FOR THE FIRM.  I AM THE

10:11AM 1    PORTFOLIO MANAGER FOR BOTH STRATEGIES AND THE CHIEF INVESTMENT

10:11AM 2    OFFICER.

10:11AM 3    Q.   WHEN YOU SAY THE CHIEF INVESTMENT OFFICER, WHAT ARE SOME

10:11AM 4    OF YOUR RESPONSIBILITIES?

10:11AM 5    A.   PORTFOLIO MANAGEMENT, RISK MANAGEMENT ARE THE TWO MAIN

10:11AM 6    ONES.

10:11AM 7    Q.   OKAY.  IN OR ABOUT FEBRUARY OF 2014, DID PFM INVEST IN A

10:11AM 8    COMPANY CALLED THERANOS?

10:11AM 9    A.   WE DID.

10:11AM 10   Q.   AND WERE YOU INVOLVED IN MAKING THAT INVESTMENT DECISION?

10:11AM 11   A.   I WAS.

10:11AM 12   Q.   WE'LL COME BACK TO THAT.  BUT FOR NOW COULD YOU BRIEFLY

10:12AM 13   DESCRIBE YOUR EDUCATIONAL BACKGROUND?

10:12AM 14   A.   YES.  I GRADUATED FROM THE UNIVERSITY OF PENNSYLVANIA IN

10:12AM 15   1996.

10:12AM 16        I JOINED JP MORGAN ASSET MANAGEMENT IN SUMMER OF 1996 AND

10:12AM 17   WORKED THERE FOR FIVE YEARS.  THE FIRST TWO I WAS A -- I WORKED

10:12AM 18   IN THE EQUITY PORTFOLIO MANAGEMENT GROUP, AND THE LAST THREE I

10:12AM 19   WAS PROMOTED TO BE A RESEARCH ANALYST COVERING THE HEALTH CARE

10:12AM 20   SECTOR.

10:12AM 21        IN THE MIDDLE OF 2001 I LEFT JP MORGAN TO JOIN A FIRM

10:12AM 22   CALLED PEQUOT CAPITAL, THEY WERE A HEDGE FUND BASED IN

10:12AM 23   CONNECTICUT, NEW YORK, AND MY ROLE AT THAT POINT WAS TO COVER

10:12AM 24   THE BIOTECHNOLOGY SECTOR.  I DID THAT AT PEQUOT FOR A FEW

10:12AM 25   MONTHS.

GROSSMAN DIRECT BY MR. LEACH                                      6376

10:12AM   1              PEQUOT THEN SPLIT INTO TWO FIRMS.  THE FIRM THAT LEFT AND

10:12AM   2     SPLIT OUT AND SPUN OUT OF PEQUOT WAS A FIRM CALLED ANDOR

10:13AM   3     CAPITAL.  I JOINED -- I WAS PART OF THE GROUP THAT LEFT PEQUOT

10:13AM   4     AND JOINED ANDOR.  THAT WAS IN 2001.

10:13AM   5              FROM NOVEMBER OF 2001 UNTIL THE MIDDLE OF 2004 I WAS THE

10:13AM   6     BIOTECH ANALYST AT ANDOR CAPITAL MANAGEMENT.

10:13AM   7              AND THEN ANDOR HAD A SIMILAR SPLIT IN THE MIDDLE OF 2004,

10:13AM   8     AND AT THAT POINT MYSELF AND A FEW OF THE OTHER -- MY

10:13AM   9     COLLEAGUES STARTED OUR CURRENT FIRM, PFM.

10:13AM  10     Q.   SO YOU'VE HAD OVER 20 YEARS EXPERIENCE COVERING THE

10:13AM  11     BIOTECH SECTOR EITHER AS ANALYST OR AN INVESTOR?

10:13AM  12     A.   THAT IS CORRECT.

10:13AM  13     Q.   OKAY.  AND PFM IS AN INVESTMENT PARTNERSHIP?

10:13AM  14     A.   WE ARE -- YES, WE ARE A, WE ARE A PARTNERSHIP.  WE ARE NOT

10:13AM  15     A C CORP, AND SO WE HAVE, WE HAVE PARTNERS AND THEN WE HAVE

10:14AM  16     NON-PARTNERED EMPLOYEES.

10:14AM  17     Q.   OKAY.  DO YOU INVEST JUST FOR YOURSELF OR DO YOU INVEST

10:14AM  18     FOR CLIENTS?  WHAT DO YOU DO?

10:14AM  19     A.   THE PRINCIPAL CAPITAL BASE, THE VAST MAJORITY OF THAT IS

10:14AM  20     NON-EMPLOYEE CAPITAL.

10:14AM  21     Q.   SO INDIVIDUALS WHO INVEST IN YOUR FUND?

10:14AM  22     A.   THAT'S CORRECT.

10:14AM  23     Q.   OKAY.  DO YOU ALSO MAKE INVESTMENTS ON BEHALF OF PENSION

10:14AM  24     FUNDS?

10:14AM  25     A.   YES, WE DO.  WE HAVE A BROAD RANGE OF DIFFERENT INVESTORS

10:14AM  1    IN OUR FUNDS.

10:14AM  2    Q.   AND ARE THOSE PENSION FUNDS PRIVATE COMPANIES?  PUBLIC

10:14AM  3    COMPANIES?  STATES?  WHAT ARE THEY?

10:14AM  4    A.   THEY REPRESENT BOTH.

10:14AM  5    Q.   I'D LIKE TO DRAW YOUR ATTENTION, PLEASE, TO THE TIME

10:14AM  6    PERIOD DECEMBER OF 2013.  IN OR AROUND THAT TIME, DID YOU MEET

10:14AM  7    WITH INDIVIDUALS FROM THERANOS ABOUT A POSSIBLE INVESTMENT IN

10:15AM  8    THE COMPANY?

10:15AM  9    A.   YES.

10:15AM  10   Q.   OKAY.  WHO DID YOU MEET WITH?

10:15AM  11   A.   WE MET WITH MS. HOLMES AND MR. BALWANI.

10:15AM  12   Q.   AND WAS IT JUST YOU ON BEHALF OF PFM OR WAS THERE SOMEBODY

10:15AM  13   ELSE?

10:15AM  14   A.   IN THAT FIRST MEETING IT WAS MYSELF AND MY PARTNER,

10:15AM  15   CHRIS JAMES.

10:15AM  16   Q.   WHERE DID YOU MEET WITH MS. HOLMES AND MR. BALWANI?

10:15AM  17   A.   WE MET AT THEIR OFFICES ON CALIFORNIA AVENUE IN PALO ALTO.

10:15AM  18   Q.   APPROXIMATELY HOW LONG DID YOU MEET WITH THEM FOR?

10:15AM  19   A.   I BELIEVE IT WAS ROUGHLY AN HOUR MEETING.

10:15AM  20   Q.   OKAY.  WERE YOU SHOWN ANY DOCUMENTS IN THIS HOUR LONG

10:15AM  21   MEETING?

10:15AM  22   A.   I BELIEVE THERE WAS A LAPTOP WITH A PRESENTATION IN THAT

10:15AM  23   MEETING.

10:15AM  24   Q.   OKAY.  DESCRIBE FOR US WHAT HAPPENED, YOUR EXPERIENCE IN

10:15AM  25   GOING TO THERANOS AND RECEIVING INFORMATION FROM MS. HOLMES AND

10:15AM  1    MR. BALWANI.

10:15AM  2    A.   WELL, WE SCHEDULED THE MEETING FOR MID-DECEMBER.  I

10:16AM  3    REMEMBER DRIVING DOWN FROM SAN FRANCISCO WHERE OUR OFFICES ARE

10:16AM  4    WITH MY PARTNER.

10:16AM  5         I REMEMBER ARRIVING AT THE COMPANY'S HEADQUARTERS AND

10:16AM  6    GOING THROUGH THE LOBBY WHERE THEY HAD SECURITY, AND WE HAD TO

10:16AM  7    SIGN SOME DOCUMENTS THAT I WAS A LITTLE SURPRISED THAT WE HAD

10:16AM  8    TO SIGN DOCUMENTS TO GET INTO THE BUILDING.

10:16AM  9         THEN WE WERE USHERED THROUGH AN AREA THAT WAS A LOBBY AREA

10:16AM  10   WITH SOME EQUIPMENT, KIND OF A DEMONSTRATION AREA, BACK THROUGH

10:16AM  11   A KITCHEN, PASSED A WHOLE BUNCH OF PEOPLE WORKING, AND INTO A

10:16AM  12   CONFERENCE ROOM IN THE BACK OF THE BUILDING, AND THAT'S WHERE

10:16AM  13   WE MET WITH MS. HOLMES AND MR. BALWANI.

10:16AM  14   Q.   YOU MENTIONED THE LEVEL OF SECURITY GETTING IN THERANOS.

10:16AM  15   WAS IT UNUSUALLY HIGH IN YOUR EXPERIENCE?

10:16AM  16   A.   IT WAS A LITTLE UNUSUAL.  WE HAD -- I DON'T REMEMBER -- I

10:17AM  17   DON'T RECALL THAT FOR EITHER A PUBLIC OR PRIVATE COMPANY,

10:17AM  18   BUT -- SO I DO REMEMBER THAT ASPECT OF IT.

10:17AM  19   Q.   OKAY.  AND YOU MET WITH MS. HOLMES AND MR. BALWANI IN THIS

10:17AM  20   DECEMBER 2013 MEETING?

10:17AM  21   A.   YES.

10:17AM  22   Q.   OKAY.  TAKE A MOMENT AND DESCRIBE FOR US THE SUBSTANCE OF

10:17AM  23   WHAT WAS SAID.

10:17AM  24   A.   OKAY.  WELL, THE MEETING STARTED OUT, AND THE FIRST THING

10:17AM  25   WE TALKED ABOUT WAS THE TECHNOLOGY.  WE KNEW WHAT WAS PUBLICLY

GROSSMAN DIRECT BY MR. LEACH

10:17AM    1    AVAILABLE, WHAT HAD BEEN PUBLICLY DISCLOSED ABOUT THE COMPANY

10:17AM    2    AT THAT POINT.  WE KNEW THAT THEY HAD A PARTNERSHIP WITH

10:17AM    3    WALGREENS THAT HAD BEEN ANNOUNCED I THINK IN SEPTEMBER OF 2013.

10:17AM    4    BUT BEYOND THAT WE REALLY KNEW NOTHING ABOUT THERANOS.

10:17AM    5         SO THIS WAS OUR FIRST OPPORTUNITY TO REALLY HEAR THEIR

10:17AM    6    STORY AND UNDERSTAND WHAT THEIR, WHAT THEIR BUSINESS, THEIR

10:18AM    7    BUSINESS WAS.

10:18AM    8         THE FIRST THING WE TALKED ABOUT WAS THE TECHNOLOGY, AND

10:18AM    9    THEY TOLD US THAT THEY COULD DO ALL -- OVER A THOUSAND CPT

10:18AM   10    CODES WITH THEIR TECHNOLOGY.  THAT WAS A PRETTY PROFOUND

10:18AM   11    STATEMENT.

10:18AM   12         SO THEY THEN EXPLAINED HOW IT HAD TAKEN THEM TEN YEARS TO

10:18AM   13    GET TO THAT POINT, AND OVER THAT TEN YEAR PERIOD OF TIME THEY

10:18AM   14    DESCRIBED HOW THEY HAD WORKED WITH BOTH THE MILITARY, THE

10:18AM   15    DEPARTMENT OF DEFENSE, AND PHARMACEUTICAL COMPANIES DOING

10:18AM   16    CLINICAL TRIAL RESEARCH.

10:18AM   17         ON THE DEPARTMENT OF DEFENSE, THEY TOLD US THAT THE

10:18AM   18    TECHNOLOGY HAD BEEN USED IN THE BATTLEFIELD ON MEDEVACS, FOR

10:18AM   19    EXAMPLE, AND THAT GETTING DIAGNOSTIC INFORMATION TO MEDICAL

10:19AM   20    PERSONNEL IN THE -- IN THAT SETTING WAS A MATTER OF LIFE AND

10:19AM   21    DEATH.  AND THEY EMPHASIZED HOW THEIR TECHNOLOGY HAD BEEN ABLE

10:19AM   22    TO DO THAT IN THOSE DIFFICULT CONDITIONS.

10:19AM   23         ON THE PHARMACEUTICAL SIDE, THEY TALKED ABOUT THE

10:19AM   24    PARTNERSHIPS THAT THEY HAD WITH A VARIETY OF DIFFERENT

10:19AM   25    PHARMACEUTICAL COMPANIES, AND THEY SAID OVER THE YEARS THEY HAD

10:19AM 1    BEEN ASKED TO DO A VARIETY OF DIFFERENT TESTS.  THE IDEA WAS

10:19AM 2    THAT YOU COULD GIVE SOMEONE A REAL -- A TEST IN THEIR HOUSE

10:19AM 3    WITHIN 20, 30 MINUTES FOR AN EXPERIMENTAL DRUG, AND IT WAS

10:19AM 4    THE -- IT WAS THOSE RELATIONSHIPS WHICH OPENED THEIR EYES TO

10:19AM 5    THE FACT THAT THERE WERE REALLY WERE NO LIMITATIONS TO THE

10:19AM 6    TECHNOLOGY.

10:19AM 7        SO THAT'S WHAT KIND OF STARTED THEIR THINKING ABOUT A

10:19AM 8    RETAIL-LIKE STRATEGY WITH SOMEONE LIKE WALGREENS.

10:20AM 9        THEY THEN DESCRIBED HOW THE TECHNOLOGY WAS ACTUALLY BETTER

10:20AM 10   THAN CONVENTIONAL LABORATORY EQUIPMENT, WHICH SUFFERED FROM A

10:20AM 11   HUGE AMOUNT OF VARIABILITY.

10:20AM 12       AND VARIABILITY WAS DUE TO HUMANS, INTERACTING WITH BIG

10:20AM 13   VENOUS DRAWS, SAMPLES THAT WERE TAKEN CONVENTIONALLY, AND THEN

10:20AM 14   MANIPULATING THOSE SAMPLES IN A LABORATORY ENVIRONMENT.  IT

10:20AM 15   CREATED -- IT INTRODUCED A SIGNIFICANT AMOUNT OF VARIABILITY.

10:20AM 16       AND THEY EXPLAINED THAT THEIR TECHNOLOGY ELIMINATED THE

10:20AM 17   HUMAN ASPECT OF THAT, AND AS A RESULT IT HAD DRAMATICALLY LESS

10:20AM 18   VARIABILITY FROM TEST TO TEST, FROM MACHINE TO MACHINE.

10:20AM 19       I THINK IN THAT MEETING THEY TALKED ABOUT A NUMBER THAT

10:20AM 20   WAS LESS THAN 5 PERCENT, AND THEY COMPARED THAT TO SOMETHING

10:20AM 21   LIKE HIGH DENSITY -- HDL, WHICH IS THE GOOD CHOLESTEROL, SO

10:20AM 22   HIGH DENSITY LIPID PROTEIN, AND THEY EXPLAINED THAT THAT TEST,

10:21AM 23   WHICH IS PROBABLY A TEST THAT EVERYONE IN THIS COURTROOM HAS

10:21AM 24   HAD, YOU CAN SEE VARIABILITY OF UPWARDS OF 30 PERCENT OR MORE

10:21AM 25   FROM THE SAME MACHINE IN THE SAME LAB.

10:21AM 1     SO THEY REALLY EMPHASIZED HOW NOT ONLY WAS THIS A MORE

10:21AM 2   CONVENIENT TECHNOLOGY, BUT, YOU KNOW, IT HAD VERY, VERY

10:21AM 3   SIGNIFICANT ADVANTAGES IN TERMS OF THE RELIABILITY AND

10:21AM 4   REPRODUCIBILITY.

10:21AM 5     WE CIRCLED BACK TO THE TECHNOLOGY AT THAT POINT AND SAID

10:21AM 6   THAT WE WANTED TO COME BACK TO UNDERSTAND AND -- COME BACK TO

10:21AM 7   THE OPENING STATEMENTS IN THAT MEETING AND UNDERSTAND IF THERE

10:21AM 8   WERE ANY LIMITATIONS.

10:21AM 9     AND, AGAIN, THEY WERE VERY CLEAR.  MS. HOLMES WAS ACTUALLY

10:21AM 10   VERY CLEAR THAT THEY COULD MATCH EVERY TEST ON THE LABCORP AND

10:21AM 11   QUEST MENU OF TESTS.

10:21AM 12     THOSE WERE THE TWO LABORATORIES THAT ARE PROBABLY MOST

10:21AM 13   WELL-KNOWN IN THE CLINICAL DIAGNOSTIC SPACE AS BEING

10:22AM 14   INDEPENDENT, WHAT WE REFER TO AS REFERENCE LABORATORIES.

10:22AM 15     BUT SHE DID HIGHLIGHT THAT THERE WAS ONE LIMITATION THAT

10:22AM 16   THEY HAD WITH THE TECHNOLOGY AT FIRST, WHICH WAS AROUND

10:22AM 17   CULTURES, AND CULTURES, BY THAT SHE WAS REFERRING TO THE IDEA

10:22AM 18   OF HOW YOU GROW A LITTLE MICROORGANISMS AND IDENTIFY THOSE, AND

10:22AM 19   IT'S SOMETHING THAT HAPPENS ALL THE TIME IN HOSPITALS.

10:22AM 20     SHE DESCRIBED A TECHNOLOGY THAT THEY HAD DEVELOPED

10:22AM 21   INTERNALLY TO DO THAT TYPE OF TESTING ON THEIR PROPRIETARY

10:22AM 22   EQUIPMENT.  IT INVOLVED A DIFFERENT TYPE OF NUCLEIC ACID

10:22AM 23   AMPLIFICATION THAT WAS MUCH FASTER, MEANINGFULLY FASTER THAN

10:22AM 24   ANYTHING THAT WAS AVAILABLE AT THAT POINT IN TIME.

10:22AM 25     SO WE TALKED ABOUT THIS NUCLEIC ACID AMPLIFICATION

10:22AM   1    TECHNOLOGY.

10:22AM   2         FROM THERE --

10:22AM   3    Q.   MR. GROSSMAN, LET ME PAUSE YOU BRIEFLY BECAUSE --

10:23AM   4    A.   YEAH.

10:23AM   5    Q.   -- BECAUSE I WANT TO BREAK DOWN SOME OF THE ELEMENTS OF

10:23AM   6    YOUR ANSWER AND I DON'T MEAN TO INTERRUPT YOU.

10:23AM   7         YOU STARTED WITH THE REFERENCE TO THE NUMBER OF CPT CODES

10:23AM   8    THAT THERANOS COULD PERFORM.

10:23AM   9         DO YOU RECALL THAT?

10:23AM   10   A.   YES.

10:23AM   11   Q.   AND WHAT WAS THE NUMBER THAT YOU RECALL MS. HOLMES AND

10:23AM   12   MR. BALWANI PROVIDING YOU?

10:23AM   13   A.   IT WAS OVER A THOUSAND.

10:23AM   14   Q.   OKAY.  AND WAS THAT IMPRESSIVE TO YOU?

10:23AM   15   A.   VERY.

10:23AM   16   Q.   OKAY.  WHY WAS THAT IMPRESSIVE TO YOU?

10:23AM   17   A.   WELL, THIS WAS A COMPANY THAT WE REALLY HAD NEVER HEARD

10:23AM   18   OF, AND TO BE ABLE TO MATCH THE ENTIRE MENU OF TESTS, A

10:23AM   19   THOUSAND CPT CODES, WAS A REALLY BIG STATEMENT ABOUT HOW MUCH

10:23AM   20   THEY HAD ACCOMPLISHED, WHERE THE TECHNOLOGY WAS AT THAT POINT

10:23AM   21   IN TIME.

10:23AM   22        AND THEN IT WAS KIND OF ALSO SUPPORTED BY HOW IT HAD BEEN

10:23AM   23   USED IN BOTH THE MILITARY AND IN THE PHARMACEUTICAL CLINICAL

10:24AM   24   TRIAL SETTING.

10:24AM   25   Q.   OKAY.  YOU TALKED A LITTLE BIT ABOUT THE MILITARY

10:24AM  1    APPLICATIONS THAT WERE DESCRIBED TO YOU IN THIS MEETING, AND I

10:24AM  2    THINK I HEARD YOU SAY YOU WERE TOLD IT WAS BEING USED IN THE

10:24AM  3    BATTLEFIELD.

10:24AM  4    A.   CORRECT.

10:24AM  5    Q.   AND IT WAS BEING USED ON MEDEVAC HELICOPTERS?

10:24AM  6    A.   CORRECT.

10:24AM  7    Q.   AND WAS THAT IMPRESSIVE TO YOU?

10:24AM  8    A.   I MEAN, WHAT, WHAT -- YES.  WHAT BETTER APPLICATION FOR A

10:24AM  9    TECHNOLOGY LIKE THIS THAN IN A MILITARY SETTING UNDER HARSH

10:24AM  10   CONDITIONS LIKE ONE WOULD EXPECT IN A PLACE LIKE AFGHANISTAN OR

10:24AM  11   IRAQ.

10:24AM  12   Q.   YOU ALSO DESCRIBED WORK THAT THE COMPANY HAD BEEN DOING

10:24AM  13   WITH PHARMACEUTICAL COMPANIES.

10:24AM  14        DO YOU RECALL THAT?

10:24AM  15   A.   I DO, YES.

10:24AM  16   Q.   AND DID MS. HOLMES OR MR. BALWANI GIVE YOU A SENSE OF HOW

10:24AM  17   LARGE AND ROBUST THAT BUSINESS WAS?

10:24AM  18   A.   I DON'T RECALL SPECIFICALLY, ONLY THAT THAT HAD BEEN A BIG

10:24AM  19   PART OF WHAT HAD SUSTAINED, ALONG WITH THE MILITARY, THE

10:24AM  20   COMPANY OVER THE TEN YEARS THAT THEY WERE, THEY WERE IN STEALTH

10:25AM  21   MODE.

10:25AM  22   Q.   DID EITHER OF THEM MAKE REFERENCE TO HISTORICAL REVENUE

10:25AM  23   NUMBERS ABOUT THE WORK WITH PHARMA AND THE MILITARY?

10:25AM  24   A.   TOWARDS THE END OF THE MEETING THEY TALKED ABOUT HOW THEY

10:25AM  25   HAD -- I WANT TO SAY SOMETHING, A LITTLE OVER 200 MILLION OF

10:25AM  1    REVENUES FROM THE DEPARTMENT OF DEFENSE, MOSTLY FROM THE

10:25AM  2    DEPARTMENT OF DEFENSE, THAT HAD SUSTAINED THE COMPANY THROUGH

10:25AM  3    THIS PERIOD, THIS PERIOD THAT THEY WERE BUILDING THEIR MENU OF

10:25AM  4    TESTS FOR THE RETAIL SETTING.

10:25AM  5    Q.   AND WAS THAT IMPRESSIVE TO YOU?

10:25AM  6    A.   YEAH, IT WAS VERY IMPRESSIVE, YES.

10:25AM  7    Q.   I THINK I ALSO HEARD YOU SAY THAT THEY TALKED ABOUT THE

10:25AM  8    LACK OF VARIABILITY FROM MACHINE TO MACHINE AND HOW THAT

10:25AM  9    ELIMINATED ERROR IN TRADITIONAL LABS.

10:25AM  10   A.   CORRECT.

10:25AM  11   Q.   AND WAS THAT IMPRESSIVE TO YOU?

10:25AM  12   A.   VERY.

10:25AM  13   Q.   AND WHY WAS THAT?

10:25AM  14   A.   WELL, WE KNEW THAT IN THE CONVENTIONAL LABORATORY

10:26AM  15   ENVIRONMENT THERE WERE MANY DIFFERENT TYPES OF EQUIPMENT, AND

10:26AM  16   HUMANS HAD -- HUMAN LAB TECHNICIANS HAD A BIG ROLE AND OFTEN

10:26AM  17   ONLY HAD A NARROW JOB WITHIN THE LABORATORY TO WORK ONE PIECE

10:26AM  18   OF EQUIPMENT.

10:26AM  19        AND SO, YOU KNOW, THAT IS THE WAY THAT THE INDUSTRY HAD

10:26AM  20   BEEN FOR THE LAST 30, 40 YEARS.  SO THE IDEA THAT YOU COULD

10:26AM  21   ELIMINATE THE HUMAN PART OF THE LABORATORY INDUSTRY HAD

10:26AM  22   PROFOUND IMPLICATIONS FOR THE ECONOMICS OF THAT INDUSTRY, THE

10:26AM  23   PROFITABILITY, THE COSTS.

10:26AM  24        SO THAT WAS, THAT WAS A VERY KIND OF IMPORTANT PART OF

10:26AM  25   THAT MEETING.

10:26AM 1    Q.   WHO DID MOST OF THE TALKING IN THIS DECEMBER 2013 MEETING?

10:26AM 2    A.   MS. HOLMES.

10:26AM 3    Q.   AT ANY POINT DID MS. HOLMES OR MR. BALWANI DISAGREE WITH

10:27AM 4    EACH OTHER ABOUT INFORMATION THAT WAS BEING PROVIDED TO YOU?

10:27AM 5    A.   NO.

10:27AM 6    Q.   WAS THERE ANY DISCUSSION OF THE WALGREENS RELATIONSHIP IN

10:27AM 7    THIS DECEMBER 2013 MEETING?

10:27AM 8    A.   YES, THERE WAS.

10:27AM 9         WE -- THEY TALKED -- THEY TOLD US THAT WALGREENS HAD 8100

10:27AM 10   STORES.  THEY WOULD BE COMMERCIALLY ROLLING THIS TECHNOLOGY OUT

10:27AM 11   IN ALL OF THE WALGREENS STORES, AND THAT AT THAT POINT IN TIME

10:27AM 12   THEY WERE ACTUALLY USING THE PROPRIETARY TECHNOLOGY, TESTING

10:27AM 13   HUMAN SAMPLES, AND BILLING FOR THOSE TESTS, BEING REIMBURSED,

10:27AM 14   TO USE A TERM WE USE A LOT, AN INVESTMENT TERM THAT WE USE.

10:27AM 15        SO THAT WAS -- THEY WERE USING THE TECHNOLOGY ON ACTUAL

10:27AM 16   HUMANS AT THAT POINT IN TIME, OR NOT HUMANS, BUT HUMAN SAMPLES.

10:27AM 17   Q.   AND WAS THAT IMPRESSIVE TO YOU?

10:28AM 18   A.   VERY.

10:28AM 19   Q.   AT THE CONCLUSION OF THIS DECEMBER 2013 MEETING WITH

10:28AM 20   MS. HOLMES AND MR. BALWANI, WERE YOU INTERESTED IN PURSUING A

10:28AM 21   POSSIBLE INVESTMENT IN THERANOS?

10:28AM 22   A.   WE WERE INTERESTED IN LEARNING MORE ABOUT THE COMPANY,

10:28AM 23   YES.

10:28AM 24   Q.   OKAY.

10:28AM 25        MAY I APPROACH THE WITNESS, YOUR HONOR?

10:28AM  1              THE COURT:  YES.

10:28AM  2    BY MR. LEACH:

10:28AM  3    Q.   (HANDING.)

10:28AM  4         MR. GROSSMAN, I'VE PLACED BEFORE YOU A BINDER OF DOCUMENTS

10:28AM  5    AND I'D LIKE TO DRAW YOUR ATTENTION TO WHAT HAS BEEN MARKED AS

10:28AM  6    TRIAL EXHIBIT 1404.

10:28AM  7              THE COURT:  DOES THE DEFENSE HAVE A COPY OF YOUR

10:28AM  8    BINDER?

10:28AM  9              MR. LEACH:  YOUR HONOR, I BELIEVE THE DEFENSE DOES,

10:28AM 10    BUT I NEGLECTED TO TENDER THE BINDER TO THE COURT.

10:29AM 11              THE COURT:  THANK YOU.

10:29AM 12              MR. LEACH:  (HANDING.)

10:29AM 13         THANK YOU, YOUR HONOR.

10:29AM 14    Q.   DO YOU HAVE 1404 IN FRONT OF YOU, SIR?

10:29AM 15    A.   I DO.

10:29AM 16    Q.   IS THIS A TRUE AND CORRECT COPY OF AN EMAIL EXCHANGE AMONG

10:29AM 17    YOU, SUNNY BALWANI, CHRIS JAMES, AND ELIZABETH HOLMES?

10:29AM 18    A.   IF I COULD JUST TAKE A MINUTE TO REVIEW IT?

10:29AM 19    Q.   PLEASE.

10:29AM 20    A.   THANK YOU.

10:29AM 21         (PAUSE IN PROCEEDINGS.)

10:29AM 22              THE WITNESS:  OKAY.

10:29AM 23    BY MR. LEACH:

10:29AM 24    Q.   IS THIS A TRUE AND CORRECT COPY OF AN EMAIL INVOLVING YOU,

10:29AM 25    MR. BALWANI, CHRIS JAMES, AND ELIZABETH HOLMES IN OR ABOUT

10:30AM  1    JANUARY 7TH, 2014?

10:30AM  2    A.   YES.

10:30AM  3    Q.   AND DO YOU SEE THE SUBJECT LINE "DUE DILIGENCE QUESTIONS"?

10:30AM  4    A.   YES.

10:30AM  5    Q.   OKAY.  AND IS THIS EMAIL -- DOES THIS EMAIL EXCHANGE

10:30AM  6    INCLUDE DUE DILIGENCE QUESTIONS THAT YOU SENT TO MS. HOLMES AND

10:30AM  7    MR. BALWANI TO BETTER UNDERSTAND THE THERANOS OPPORTUNITY?

10:30AM  8    A.   YES.

10:30AM  9         MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 1404 INTO

10:30AM  10   EVIDENCE.

10:30AM  11        MR. WADE:  NO OBJECTION.

10:30AM  12        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:30AM  13        (GOVERNMENT'S EXHIBIT 1404 WAS RECEIVED IN EVIDENCE.)

10:30AM  14   BY MR. LEACH:

10:30AM  15   Q.   MR. GROSSMAN, I'D LIKE TO DRAW YOUR ATTENTION TO THE

10:30AM  16   BOTTOM EMAIL ON PAGE 1.

10:30AM  17        DO YOU SEE YOUR NAME ON THE FROM LINE?

10:30AM  18   A.   YES.

10:30AM  19   Q.   AND YOU MENTIONED CHRIS JAMES.  HE WAS YOUR PARTNER AT THE

10:30AM  20   TIME?

10:30AM  21   A.   YES.

10:30AM  22   Q.   AND THE SUBJECT OF THIS IS DUE DILIGENCE QUESTIONS.

10:30AM  23        DO YOU SEE THAT?

10:31AM  24   A.   YES.

10:31AM  25   Q.   AND IN THE PARAGRAPH YOU WROTE, "ELIZABETH AND SUNNY.

GROSSMAN DIRECT BY MR. LEACH

10:31AM 1        "I HOPE YOU BOTH HAD AN ENJOYABLE FINISH TO WHAT WAS

10:31AM 2   OBVIOUSLY A TREMENDOUSLY SUCCESSFUL YEAR FOR THE COMPANY."

10:31AM 3        FURTHER ON YOU SAY, "BELOW IS OUR LIST OF DUE DILIGENCE

10:31AM 4   QUESTIONS.  WE WERE HOPING TO START THE PROCESS AS SOON AS

10:31AM 5   POSSIBLE."

10:31AM 6        WHY WERE YOU SENDING THESE QUESTIONS TO MS. HOLMES AND

10:31AM 7   MR. BALWANI?

10:31AM 8   A.   WELL, AFTER OUR FIRST MEETING, WE DIGESTED THAT THE -- THE

10:31AM 9   MATERIAL THAT THE, THE INFORMATION THE COMPANY PROVIDED US, AND

10:31AM 10  WE AS A GROUP CAME UP WITH QUESTIONS THAT WE WANTED TO

10:31AM 11  UNDERSTAND, OR WE WANTED ANSWERS TO THAT WE WANTED TO BETTER

10:31AM 12  UNDERSTAND THE BUSINESS.

10:31AM 13       SO THIS IS -- THIS IS THE RESULT OF THAT EFFORT TO PUT

10:31AM 14  TOGETHER A MORE COMPREHENSIVE LIST OF QUESTIONS SO THAT THE

10:31AM 15  NEXT TIME WE MET WITH THEM IT WOULD BE A PRODUCTIVE MEETING AND

10:31AM 16  THEY WOULD KNOW WHAT ISSUES WE WANTED TO ADDRESS BEFORE WE GOT

10:32AM 17  TO THE -- BEFORE THE MEETING STARTED.

10:32AM 18  Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO PAGE 2.  AND UP AT

10:32AM 19  THE TOP --

10:32AM 20       IF YOU CAN ZOOM IN ON THE TOP HALF, MS. HOLLIMAN?

10:32AM 21       YOU WROTE, "DEAL TEAM, BRIAN GROSSMAN, PORTFOLIO

10:32AM 22  MANAGER/HEAD OF HEALTH CARE TEAM."

10:32AM 23       DO YOU SEE THAT?

10:32AM 24  A.   YES.

10:32AM 25  Q.   AND THERE ARE SOME OTHERS LISTED BELOW YOU?

10:32AM  1    A.   YES.

10:32AM  2    Q.   AND CAN YOU EXPLAIN WHO THESE OTHER FOLKS ARE?

10:32AM  3    A.   ALEX RABODZEY WAS ONE OF OUR BIOTECH ANALYSTS AT THAT

10:32AM  4    POINT AND HE HAD DONE SOME WORK FOR US IN THE DIAGNOSTIC SPACE

10:32AM  5    AND SO HE WAS GOING TO, HE WAS GOING TO BE PART OF THE

10:32AM  6    ANALYSIS, PART OF THE DUE DILIGENCE TEAM.

10:32AM  7         VIVEK KHANNA WAS OUR HEALTH CARE SERVICES.  HEALTH CARE IS

10:32AM  8    A BROAD TERM THAT REFERS TO BUSINESSES THAT ARE INVOLVED IN THE

10:32AM  9    DELIVERY OF HEALTH CARE, SO HOSPITALS, INSURANCE COMPANIES,

10:32AM 10    LABORATORIES, DIALYSIS COMPANIES.  SO THERE'S QUITE AN ECLECTIC

10:33AM 11    GROUP OF BUSINESSES THAT FALL UNDER THAT HEADING.

10:33AM 12         BUT HE'S BEEN COVERING THE HEALTH CARE SPACE, INCLUDING

10:33AM 13    THE REFERENCE LABORATORIES, FOR AT THAT POINT I THINK MORE THAN

10:33AM 14    25 YEARS.

10:33AM 15         AND THEN SRI BALASURYAN WAS OUR JUNIOR ANALYST WHO WORKED

10:33AM 16    WITH VIVEK.  HIS JOB WAS MORE ANALYTIC SUPPORT.  HE DID A LOT

10:33AM 17    OF THE MODELING AND WAS AVAILABLE TO HELP VIVEK, AND ACTUALLY

10:33AM 18    HE WORKED WITH ANOTHER ANALYST AS WELL.

10:33AM 19         SO THOSE WERE THE INDIVIDUALS LISTED THERE AT THE TOP OF

10:33AM 20    THIS EMAIL.

10:33AM 21    Q.   OKAY.  YOU MENTIONED MODELING.  WHAT DID YOU MEAN BY THAT?

10:33AM 22    A.   WHEN WE INVEST IN COMPANIES, WE LIKE TO UNDERSTAND

10:33AM 23    QUALITATIVELY WHAT THEY DO, WHAT IS INTERESTING ABOUT THE

10:33AM 24    BUSINESS.

10:33AM 25         BUT WE ALWAYS MAKE AN EFFORT TO TRANSLATE THAT INTO AN

10:33AM 1    ACTUAL FORECAST FOR THE BUSINESS.  WE DO THAT FOR EVERYTHING --

10:33AM 2    EVERY INVESTMENT THAT WE MAKE.

10:34AM 3         SO AS ANALYST AT OUR FIRM, THERE'S A LOT OF ANALYTIC LABOR

10:34AM 4    THAT GOES INTO BUILDING THOSE MODELS, SO FOR OUR SENIOR PEOPLE

10:34AM 5    OVER THE YEARS WE'VE USED -- WE'VE HIRED JUNIOR ANALYSTS TO

10:34AM 6    HELP WITH THE MODEL BUILDING AND UPDATING MODELS EVERY TIME WE

10:34AM 7    REPORT.  SO IT'S SOMETHING NOW THAT WE'VE BEEN DOING FOR OVER A

10:34AM 8    DECADE.

10:34AM 9    Q.   BENEATH THE DEAL TEAM THAT YOU'VE LISTED HERE, THERE'S AN

10:34AM 10   OUTLINE:  TECHNOLOGY, INTELLECTUAL PROPERTY AND BARRIERS TO

10:34AM 11   ENTRY, WALGREENS'S PARTNERSHIP AND COMMERCIAL STRATEGY, AND SO

10:34AM 12   ON.

10:34AM 13        DO YOU SEE THAT?

10:34AM 14   A.   YES.

10:34AM 15   Q.   AND IS THIS AN OUTLINE OF THE QUESTIONS THAT YOU WERE

10:34AM 16   PROPOSING TO MS. HOLMES AND MR. BALWANI TO BETTER UNDERSTAND

10:34AM 17   THE THERANOS OPPORTUNITY?

10:34AM 18   A.   YES.

10:34AM 19   Q.   I'D LIKE TO BETTER LOOK AT SOME OF YOUR QUESTIONS THAT YOU

10:34AM 20   PUT TO MS. HOLMES AND MR. BALWANI.

10:34AM 21        LET'S START WITH NUMBER 1, TECHNOLOGY.

10:34AM 22        DO YOU SEE THAT ON THE SCREEN?

10:34AM 23   A.   YES.

10:34AM 24   Q.   AND THE VERY FIRST QUESTION, "HOW DOES YOUR ACCURACY AND

10:34AM 25   SPEED STACK UP AGAINST TRADITIONAL TESTS."

10:35AM  1          DO YOU SEE THAT?

10:35AM  2     A.   YES.

10:35AM  3     Q.   AND WHY WERE YOU ASKING THAT?

10:35AM  4     A.   WELL, IT WAS, IT WAS A FUNDAMENTAL PART OF UNDERSTANDING

10:35AM  5     WHAT THEIR TECHNOLOGY WAS CAPABLE OF DOING, AND WHAT THEIR

10:35AM  6     COMPETITIVE ADVANTAGE -- WHAT COMPETITIVE ADVANTAGE THAT THEY

10:35AM  7     HAD AGAINST THE CONVENTIONAL LABORATORY EQUIPMENT.

10:35AM  8     Q.   AND OVER THE COURSE OF YOUR DECISION MAKING PROCESS, DID

10:35AM  9     MS. HOLMES AND MR. BALWANI MAKE STATEMENTS TO YOU RESPONSIVE TO

10:35AM 10     THIS QUESTION?

10:35AM 11     A.   YES.

10:35AM 12     Q.   AND WHAT DID THEY TELL YOU?

10:35AM 13     A.   THEY TOLD US MULTIPLE TIMES OVER --

10:35AM 14          MR. WADE:  YOUR HONOR, OBJECTION, JUST TO THE

10:35AM 15     COMPOUND QUESTION.

10:35AM 16          THE COURT:  COMPOUND QUESTION?  DO YOU WANT TO BREAK

10:35AM 17     IT --

10:35AM 18          MR. WADE:  TWO PEOPLE ARE REFERENCED IN THE QUESTION

10:35AM 19     AND THE ANSWER.

10:35AM 20          THE COURT:  OKAY.  SURE.

10:35AM 21     BY MR. LEACH:

10:35AM 22     Q.   SITTING HERE TODAY, MR. GROSSMAN, HOW MANY MEETINGS DID

10:35AM 23     YOU HAVE WITH MS. HOLMES?

10:35AM 24     A.   I BELIEVE WE HAD TWO MEETINGS WITH MS. HOLMES.

10:35AM 25     Q.   SO THE FIRST ONE IN DECEMBER OF 2013?

10:35AM   1     A.   YES.

10:35AM   2     Q.   AND A SECOND ONE AT SOME POINT SUBSEQUENT TO PROPOSING

10:36AM   3     THESE QUESTIONS?

10:36AM   4     A.   YES.

10:36AM   5     Q.   AND DID YOU ALSO HAVE ADDITIONAL -- AND WAS MR. BALWANI

10:36AM   6     THERE FOR THE SECOND MEETING?

10:36AM   7     A.   YES.

10:36AM   8     Q.   WITH MS. HOLMES?

10:36AM   9     A.   YES.

10:36AM   10    Q.   AND DID YOU ALSO HAVE FOLLOW-UP CONVERSATIONS WITH

10:36AM   11    MR. BALWANI?

10:36AM   12    A.   YES.

10:36AM   13    Q.   OKAY.  SITING HERE TODAY, ARE YOU ABLE TO DISSECT EVERY

10:36AM   14    SINGLE CONVERSATION AS TO WHO SAID WHAT IN EACH ONE?

10:36AM   15    A.   NO.

10:36AM   16    Q.   DO YOU RECALL -- WHAT DO YOU RECALL MS. HOLMES TELLING YOU

10:36AM   17    ABOUT "HOW DOES YOUR ACCURACY AND SPEED STACK UP AGAINST

10:36AM   18    TRADITIONAL TESTS"?

10:36AM   19    A.   I RECALL FROM OUR FIRST MEETING THAT THEY TOLD US FROM AN

10:36AM   20    ACCURACY STANDPOINT THEIR MACHINES WERE MORE ACCURATE, HAD LESS

10:36AM   21    VARIABILITY THAN CONVENTIONAL LAB EQUIPMENT BOTH INSIDE OF A

10:36AM   22    LAB, TWO DIFFERENT MACHINES SIDE BY SIDE, DIFFERENT RESULTS,

10:36AM   23    AND THEN INTRA LAB VARIABILITY, OR THE RESULTS BETWEEN

10:36AM   24    DIFFERENT LABS USING THE SAME TYPE OF EQUIPMENT.

10:37AM   25         AND AGAIN, THAT GOES BACK TO THE FACT THAT THEY DIDN'T

10:37AM 1    HAVE THE HUMAN INTERACTION AND EVERYTHING WAS MINIATURIZED

10:37AM 2    INSIDE OF THE SAMPLE PROCESSING UNIT.

10:37AM 3        IN TERMS OF SPEED, THEY TOLD US THAT THEY COULD HAVE

10:37AM 4    RESULTS FOR THE RETAIL SETTING WITHIN FOUR HOURS.  THEY COULD

10:37AM 5    GUARANTEE TEST RESULTS WITHIN FOUR HOURS.  THAT HAD IMPORTANT

10:37AM 6    IMPLICATIONS FOR HOW PHYSICIANS INTERACT -- AND THEY EXPLAINED

10:37AM 7    HOW THAT HAD IMPORTANT IMPLICATIONS FOR HOW PHYSICIANS INTERACT

10:37AM 8    WITH THEIR PATIENTS.

10:37AM 9        YOU COULD ACTUALLY HAVE YOUR LAB WORK DONE THE SAME DAY

10:37AM 10   YOU VISIT YOUR PHYSICIAN, WHICH WAS A PARADIGM SHIFT IN TERMS

10:37AM 11   OF PRODUCTIVITY FOR PHYSICIAN PRACTICES.

10:37AM 12       AND SO -- AND THEN WHEN THE TECHNOLOGY WAS USING THE

10:37AM 13   NUCLEIC ACID AMPLIFICATION TECHNOLOGY ON THEIR PROPRIETARY

10:37AM 14   SYSTEMS IN A HOSPITAL SETTING, THEY COULD IDENTIFY A VIRAL OR A

10:37AM 15   BACTERIAL PATHOGEN IN I BELIEVE IT WAS LESS THAN AN HOUR, AND

10:38AM 16   THAT COMPARED TO A DAY OR TWO USING CONVENTIONAL CULTURED

10:38AM 17   TECHNOLOGIES THAT WERE PROCESSES.

10:38AM 18       SO, SO, YOU KNOW, THOSE WERE STATEMENTS THAT I RECALL FROM

10:38AM 19   BOTH OF THOSE FIRST TWO MEETINGS.

10:38AM 20   Q.   THANK YOU.  THE NEXT BULLET IS, "WHAT ARE THE KEY TESTS

10:38AM 21   FROM A COMMERCIAL STANDPOINT AND HOW DOES ACCURACY AND SPEED

10:38AM 22   COMPARE SPECIFICALLY ON THOSE."

10:38AM 23       DO YOU SEE THAT QUESTION?

10:38AM 24   A.   YES.

10:38AM 25   Q.   AND WHY WERE YOU ASKING ABOUT THAT?

10:38AM 1    A.   WELL, WE, WE WERE VERY FOCUSSED ON UNDERSTANDING HOW THIS

10:38AM 2    TECHNOLOGY WAS, WAS BEING USED IN THE COMMERCIAL SETTING, IN

10:38AM 3    THE RETAIL COMMERCIAL SETTING, AND SO WE WANTED TO BE VERY

10:38AM 4    CLEAR, WE WANTED TO BE CRYSTAL CLEAR ABOUT WHAT THE TECHNOLOGY

10:38AM 5    CAPABILITIES WERE AT THAT POINT IN TIME IN A REAL WORLD RETAIL

10:39AM 6    SETTING.

10:39AM 7    Q.   AND WHY WAS IT IMPORTANT FOR YOU TO KNOW AT THE TIME IN

10:39AM 8    THE REAL WORLD RETAIL SETTING?  WHY WAS THAT IMPORTANT TO YOU?

10:39AM 9    A.   BECAUSE OUR INVESTMENT WAS BASED ON -- I MEAN, I THINK AT

10:39AM 10   A -- SO, NUMBER ONE, WE, WE -- THAT WAS A CRITICAL PART OF OUR

10:39AM 11   INVESTMENT, UNDERSTANDING HOW THIS TECHNOLOGY WAS ACTUALLY

10:39AM 12   BEING USED AT THAT POINT IN TIME IN A RETAIL ENVIRONMENT AND

10:39AM 13   WHAT, IF ANY, LIMITATIONS THERE WERE.

10:39AM 14        BUT FROM A BIGGER PICTURE PERSPECTIVE, WE WANTED TO

10:39AM 15   UNDERSTAND WHETHER THERE WAS DEVELOPMENT, TECHNOLOGICAL RISKS

10:39AM 16   OR WHETHER WE WERE INVESTING IN A COMPANY THAT ALREADY PASSED

10:39AM 17   THAT REALLY PROOF OF IMPORTANT CONCEPTS, AND THE RISKS WERE

10:39AM 18   REALLY COMMERCIAL ROLLOUT AND BUSINESS STRATEGY.

10:39AM 19   Q.   AND LET ME DRAW YOUR ATTENTION TO THE FOURTH BULLET.

10:39AM 20        DO YOU SEE WHERE IT SAYS, "WHAT ARE THE LIMITATIONS TO THE

10:40AM 21   TECHNOLOGY?  WHAT TESTS ARE NOT FEASIBLE?  ARE THERE

10:40AM 22   TRADITIONAL ANALYTIC APPROACHES THAT ARE NOT WELL SUITED TO

10:40AM 23   THERANOS'S PLATFORM?"

10:40AM 24        WHY WERE YOU ASKING ABOUT THAT?

10:40AM 25   A.   WE JUST WANTED TO ASK THE SAME QUESTIONS AS MANY WAYS AS

10:40AM   1    WE COULD SO THERE WAS NO AMBIGUITY, THERE WAS ABSOLUTELY NO,

10:40AM   2    THERE WAS NO CONFUSION ABOUT WHAT THE TECHNOLOGY WAS CAPABLE OF

10:40AM   3    DOING.

10:40AM   4         AND SO THIS IS ANOTHER WAY OF ASKING THE SAME QUESTION

10:40AM   5    AGAIN.

10:40AM   6         THE ANSWER WAS THAT THERE WERE NO LIMITATIONS.  THERE WAS

10:40AM   7    NO METHODOLOGY THAT EXISTED IN THE ANALYTIC, THERE WAS NO

10:40AM   8    ANALYTIC TECHNIQUE THAT WAS USED IN A REFERENCE LAB THAT THEY

10:40AM   9    COULD NOT AND WERE NOT DOING ON THEIR PROPRIETARY TECHNOLOGY.

10:40AM  10         AND AGAIN, THE COMMENTS, THE CONVERSATION AROUND NUCLEIC

10:40AM  11    ACID AMPLIFICATION ALSO KIND OF CAME UP AGAIN.

10:41AM  12    Q.   AND THAT'S SOMETHING THAT MS. HOLMES TOLD YOU?

10:41AM  13    A.   YES.

10:41AM  14    Q.   LET ME LOOK FURTHER DOWN, IF WE COULD, MS. HOLMES -- OR

10:41AM  15    MS. HOLLIMAN, DOWN TO NUMBER 3, WALGREENS'S RELATIONSHIP AND

10:41AM  16    COMMERCIAL STRATEGY.

10:41AM  17         DO YOU SEE THAT HEADING?

10:41AM  18    A.   YES.

10:41AM  19    Q.   AND YOUR FIRST QUESTION, "IS THE WALGREENS'S RELATIONSHIP

10:41AM  20    EXCLUSIVE?  CAN YOU SELL ANALYZERS TO PHYSICIANS?  DOES IT MAKE

10:41AM  21    ECONOMIC SENSE TO DO THIS IN THE LONG RUN?"

10:41AM  22         WHAT DID YOU MEAN BY "ANALYZERS"?

10:41AM  23    A.   WHAT I MEANT WAS THE MINILAB, THE SAMPLE PROCESSING UNIT.

10:41AM  24    Q.   AND AT ANY POINT DID YOU SEE A MINILAB OR A SAMPLE

10:41AM  25    PROCESSING UNIT?

10:41AM   1    A.   YES.

10:41AM   2    Q.   DESCRIBE IT FOR US.

10:41AM   3    A.   I SAW A FEW DIFFERENT, I SAW A FEW DIFFERENT VERSIONS.

10:41AM   4         THE VERSION THAT WAS BEING MANUFACTURED FOR THE RETAIL

10:41AM   5    SETTING WAS THE SIZE OF A PC, LIKE, FIVE YEARS AGO, A BIG PC.

10:42AM   6    THEY'RE OBVIOUSLY -- THEY KEEP GETTING SMALLER, BUT, YOU KNOW,

10:42AM   7    MAYBE, MAYBE 2 FEET TALL BY 10 INCHES WIDE, KIND OF LIKE THAT

10:42AM   8    DIMENSION.

10:42AM   9         WE SAW THEM MAKING THOSE MACHINES AT THEIR MANUFACTURING

10:42AM   10   FACILITY IN NEWARK.

10:42AM   11        WE ALSO SAW THOSE MACHINES IN THEIR CLIA LABORATORY IN

10:42AM   12   PALO ALTO.

10:42AM   13        WE ALSO SAW A DIFFERENT VERSION OF THE MINILAB IN THE

10:42AM   14   LOBBY OF THEIR CALIFORNIA AVENUE OFFICES THAT THEY TOLD US WERE

10:42AM   15   USED IN THE CLINICAL SETTING.  THEY WERE SMALLER, AND I THINK

10:42AM   16   THE POINT OF BEING SMALLER WAS TO MAKE THEM EASIER TO PUT IN

10:42AM   17   SOMEONE'S HOME.

10:42AM   18        SO WE SAW A DIFFERENT DEVICE THAT THEY TOLD US AT THE TIME

10:43AM   19   WAS WHAT THEY USED IN THE CLINICAL TRIAL BUSINESS.

10:43AM   20   Q.   AND DID MS. HOLMES HOLD OUT THIS MINILAB DEVICE THAT YOU

10:43AM   21   WERE SHOWN ON A NUMBER OF OCCASIONS AS THE DEVICE BEING USED TO

10:43AM   22   TEST PATIENT SAMPLES?

10:43AM   23   A.   YES.

10:43AM   24   Q.   AND WAS IT RELEVANT TO YOU THAT IT WAS A SMALL DEVICE THAT

10:43AM   25   THERANOS WAS MANUFACTURING?

10:43AM 1    A.   YES.

10:43AM 2    Q.   WHY?

10:43AM 3    A.   IT HAD A FUNDAMENTAL, PROFOUND IMPACT ON THE ECONOMICS OF

10:43AM 4    THE LABORATORY INDUSTRY.  THIS ISSUE CAME UP IN OUR SECOND

10:43AM 5    MEETING WITH THE COMPANY.

10:43AM 6       WHEN THEY WERE DESCRIBING THE SAMPLE PROCESSING UNIT, THEY

10:43AM 7    WERE EMPHATIC WITH US THAT THIS WAS NOT ANOTHER POINT OF CARE

10:43AM 8    TESTING TECHNOLOGY.  THIS WAS THE ENTIRE LABORATORY SHRUNK DOWN

10:43AM 9    INTO A BOX.

10:43AM 10       THE IMPLICATION OF THAT IS A RADICAL CHANGE IN THE COST

10:43AM 11    AND THE REAL ESTATE YOU NEED TO SUPPORT A LAB OPERATION IN A,

10:44AM 12    IN ANY GIVEN AREA.

10:44AM 13       AND THE EXAMPLE THEY USED WAS THE PHOENIX MARKET.  THEY

10:44AM 14    SAID, WE CAN -- WITH OUR MINILABS, WE CAN SUPPORT THE ENTIRE

10:44AM 15    COMMERCIAL ROLLOUT OF THE PHOENIX MARKET IN 200 SQUARE FEET,

10:44AM 16    20 FEET BY 10, BECAUSE OUR SYSTEMS ARE SO MUCH SMALLER.

10:44AM 17       AND THAT HAS PROFOUND IMPLICATIONS FOR THE COST STRUCTURE

10:44AM 18    OF THIS BUSINESS.

10:44AM 19       AND YOU THINK ABOUT WHAT THAT MEANS ON A GLOBAL BASIS AS

10:44AM 20    YOU TAKE A TECHNOLOGY LIKE THIS AND YOU APPLY IT NOT JUST TO

10:44AM 21    THE U.S., BUT TO OTHER MARKETS.  YOU COMPARE THAT TO A

10:44AM 22    CONVENTIONAL REFERENCE LABORATORY -- AND I'VE TOURED

10:44AM 23    CONVENTIONAL REFERENCE LABORATORIES.  QUEST HAS A BIG FACILITY

10:44AM 24    IN NEW JERSEY JUST ACROSS FROM THE GEORGE WASHINGTON BRIDGE.

10:44AM 25    IT'S HUNDREDS OF THOUSANDS OF SQUARE FEET.  SO THAT'S BIGGER

10:44AM  1    THAN MOST REFERENCE LABORATORIES, BUT YOU NEED DRAMATICALLY

10:45AM  2    MORE SPACE BECAUSE EACH TESTING METHODOLOGY HAS BIG PIECES OF

10:45AM  3    EQUIPMENT THAT NEED LAB TECHNICIANS TO RUN THOSE, YOU NEED

10:45AM  4    CHEMICALS, REAGENTS TO RUN THOSE EXPERIMENTS.

10:45AM  5         SO IT WAS A -- IT HAD IMPORTANT, PROFOUND IMPLICATIONS FOR

10:45AM  6    THE ECONOMICS OF THE TESTING BUSINESS AND REPRESENTED TO US A

10:45AM  7    TREMENDOUS DISRUPTION TO AN INDUSTRY THAT HADN'T CHANGED IN 30,

10:45AM  8    40 YEARS.

10:45AM  9         SO, YES.

10:45AM  10   Q.   THANK YOU.  LET ME DRAW YOUR ATTENTION TO PAGE 3 OF YOUR

10:45AM  11   DUE DILIGENCE QUESTIONS.  AND THESE ARE UNDER THE HEADING

10:45AM  12   "WALGREENS RELATIONSHIP AND CUSTOMER STRATEGY."

10:45AM  13        DO YOU SEE THE QUESTIONS UP AT THE TOP, "WHAT DOES THE

10:46AM  14   WALGREENS SYSTEM COST TO PRODUCE, HOW WILL THAT CHANGE OVER

10:46AM  15   TIME, AND WHAT IS THE TRANSFER PRICING YOU HAVE AGREED TO?

10:46AM  16        "DO ANALYZERS NEED TO BE VALIDATED IN THE FIELD.  WHAT IS

10:46AM  17   THE ROLLOUT SCHEDULE FOR WALGREENS.

10:46AM  18        "WHAT IS THE CAP X FROM THE WALGREENS ROLLOUT."

10:46AM  19        WHY WERE YOU ASKING THESE TYPES OF QUESTIONS,

10:46AM  20   MR. GROSSMAN?

10:46AM  21   A.   WELL, IT WAS NOT JUST TO BETTER UNDERSTAND HOW THEY WERE

10:46AM  22   GOING TO WORK WITH WALGREENS, BUT THE STRATEGY.  YOU KNOW, DID

10:46AM  23   THEY WANT TO BE A MEDICAL DEVICE COMPANY?  DID THEY WANT TO

10:46AM  24   SELL THESE DEVICES?  THAT'S TYPICALLY WHAT COMPANIES WE SEE IN

10:46AM  25   THIS SECTOR DO.

10:46AM  1        OR DID THEY WANT TO BE A VERTICALLY INTEGRATED SERVICE

10:46AM  2   PROVIDER?  DID THEY WANT TO USE THEIR OWN EQUIPMENT JUST FOR

10:46AM  3   THEMSELVES AND THEIR OWN, AND IN THEIR OWN LABORATORY.

10:46AM  4        SO WE WERE REALLY TRYING TO UNDERSTAND THE BUSINESS

10:46AM  5   STRATEGY HERE AND HOW THEY THOUGHT ABOUT THE LONG-TERM

10:46AM  6   OPPORTUNITY WITH THIS DISRUPTIVE TECHNOLOGY.

10:47AM  7   Q.   LET ME NEXT DRAW YOUR ATTENTION TO PAGE 4.  AND AT

10:47AM  8   PARAGRAPH 7, ARE THERE A NUMBER OF QUESTIONS RELATED TO

10:47AM  9   FINANCIAL MODEL/PROJECTIONS?

10:47AM  10  A.   YES.

10:47AM  11  Q.   ROUGHLY SIX BULLETS DOWN YOU WROTE, "WHAT ARE GM ON THE

10:47AM  12  ANALYZERS, THE TESTS?"

10:47AM  13       DO YOU SEE THAT?

10:47AM  14  A.   YES.

10:47AM  15  Q.   AND WHAT DOES GM STAND FOR?

10:47AM  16  A.   THAT'S A SHORTHAND FOR GROSS MARGIN.  THAT'S JUST THE

10:47AM  17  SELLING PRICE OF THE DEVICE, AND THEN YOU SUBTRACT THE COST OF

10:47AM  18  MANUFACTURING THE DEVICE, AND THAT'S YOUR GROSS PROFIT.

10:47AM  19       THAT DOESN'T INCLUDE SALES, MARKETING, ADMINISTRATIVE,

10:47AM  20  OTHER EXPENSES.

10:47AM  21  Q.   WHY DID YOU WANT TO UNDERSTAND WHAT THE COST OF

10:47AM  22  MANUFACTURING THE DEVICE WAS?

10:48AM  23  A.   WELL, WE WANTED TO UNDERSTAND WHETHER THIS WAS A

10:48AM  24  SCALEABLE, VIABLE BUSINESS.

10:48AM  25       AND THE POINT THERE IS THAT THE TECHNOLOGY COULD BE

10:48AM 1    INCREDIBLE, BUT IF YOU CAN'T MANUFACTURE IT AT A COST THAT IS

10:48AM 2    AFFORDABLE, THAT IS SIMILAR TO OTHER EQUIPMENT, THEN THEY WERE

10:48AM 3    GOING TO NEED DRAMATICALLY MORE CAPITAL TO COMMERCIALIZE THE

10:48AM 4    TECHNOLOGY OR THEY MAY NEVER BE PROFITABLE, IN WHICH CASE THIS

10:48AM 5    WOULDN'T HAVE BEEN A VERY -- THAT WOULD HAVE HAD AN IMPACT

10:48AM 6    ON -- THAT WOULD HAVE IMPACTED OUR INVESTMENT DECISION.

10:48AM 7        SO, YOU KNOW, IN THIS CASE THEY WERE -- THE GOOD NEWS WAS

10:48AM 8    THAT CONVENTIONAL EQUIPMENT FROM COMPANIES LIKE CEPHEID WAS

10:48AM 9    ALREADY KIND OF -- THEY REPRESENTED TO US THAT THE COST OF

10:48AM 10   MAKING THE MINILAB WAS ALREADY ABOUT 20 PERCENT BELOW WHAT

10:48AM 11   EQUIVALENT EQUIPMENT COSTS, AND THAT THEY HAD A PLAN TO, OVER

10:49AM 12   TIME, AS THEY MADE MORE OF THE MINILABS, THEY THOUGHT THEY

10:49AM 13   COULD GET THAT COST DOWN TO 20 PERCENT.

10:49AM 14       SO AN 80 PERCENT DECLINE VERSUS WHAT EXISTING EQUIPMENT

10:49AM 15   MOLECULAR DIAGNOSTIC EQUIPMENT COSTS.

10:49AM 16       IN ADDITION TO THAT, WE WANTED TO MAKE SURE THAT THE

10:49AM 17   CAPITAL THAT THEY RAISED WOULD -- THEY WOULD HAVE ENOUGH CASH

10:49AM 18   TO BUILD AND MANUFACTURE THESE DEVICES.

10:49AM 19       AND SO, YOU KNOW, UNDERSTANDING WHAT THEY COST WAS

10:49AM 20   FUNDAMENTAL TO UNDERSTANDING WHETHER THE SALES PROJECTIONS FOR

10:49AM 21   2014 AND '15 WERE REALISTIC BASED ON THEIR ABILITY TO

10:49AM 22   MANUFACTURE MINILABS.

10:49AM 23   Q.  AND IN YOUR MEETING WITH MS. HOLMES IN DECEMBER OF 2013

10:50AM 24   AND THE MEETING WITH MS. HOLMES THAT YOU LATER HAD WITH HER

10:50AM 25   AFTER SENDING THESE QUESTIONS, DID YOU HAVE DISCUSSIONS WITH

10:50AM 1    HER AROUND THE COSTS OF THE ANALYZER?

10:50AM 2    A.   WE, WE -- THESE QUESTIONS WERE ADDRESSED OVER THE COURSE

10:50AM 3    OF OUR DUE DILIGENCE MEETINGS, YES.

10:50AM 4    Q.   OKAY.  DID MS. HOLMES OR MR. BALWANI EVER TELL YOU THAT

10:50AM 5    THE THERANOS ANALYZER WAS CURRENTLY BEING USED FOR ONLY A

10:50AM 6    HANDFUL OF TESTS IN THE CLIA LAB?

10:50AM 7              MR. WADE:  OBJECT TO THE FORM OF THE QUESTION.

10:50AM 8              THE COURT:  CAN YOU JUST PARSE THAT OUT AS TO WHICH

10:50AM 9    INDIVIDUAL?

10:50AM 10             MR. LEACH:  YES.

10:50AM 11   Q.   DID MS. HOLMES EVER TELL YOU THAT THE THERANOS ANALYZER

10:50AM 12   WAS CURRENTLY BEING USED FOR ONLY A HANDFUL OF TESTS IN THE

10:50AM 13   CLIA LAB?

10:50AM 14   A.   NO.

10:50AM 15   Q.   DID MR. BALWANI EVER TELL YOU THAT?

10:50AM 16   A.   NO.

10:50AM 17   Q.   DID MS. HOLMES EVER TELL YOU THAT THERANOS WAS USING

10:50AM 18   MODIFIED COMMERCIALLY AVAILABLE MACHINES TO PERFORM SOME OF ITS

10:50AM 19   TESTING IN THE CLIA LAB?

10:50AM 20   A.   NO.

10:50AM 21   Q.   DID MR. BALWANI EVER TELL THAT TO YOU?

10:50AM 22   A.   NO.

10:50AM 23   Q.   DID THEY EVER -- IN THE DISCUSSIONS THAT YOU HAD WITH

10:51AM 24   MS. HOLMES, DID SHE EVER DESCRIBE FOR YOU THE COSTS OF

10:51AM 25   ACQUIRING SIEMENS MACHINES TO DO TESTING?

10:51AM   1     A.   ABSOLUTELY NOT.

10:51AM   2     Q.   WOULD THAT HAVE BEEN RESPONSIVE TO QUESTIONS THAT YOU PUT

10:51AM   3     TO MS. HOLMES?

10:51AM   4     A.   YES.

10:51AM   5     Q.   AND WOULD THAT HAVE BEEN RELEVANT TO YOU?

10:51AM   6     A.   YES.

10:51AM   7     Q.   OKAY.  DID MR. BALWANI EVER TALK TO YOU ABOUT THE COST OF

10:51AM   8     ACQUIRING SIEMENS MACHINES AND HOW THAT MIGHT AFFECT GROSS

10:51AM   9     MARGIN?

10:51AM  10     A.   NO.

10:51AM  11     Q.   AND WOULD THAT HAVE BEEN RELEVANT AS YOU'RE ASSESSING THE

10:51AM  12     POTENTIAL COSTS AND PROFITABILITY OF THIS OPERATION?

10:51AM  13     A.   YES.

10:51AM  14     Q.   DID MS. HOLMES EVER TELL YOU THAT THE GM ON ANALYZERS

10:51AM  15     INCLUDED THE COST OF THIRD PARTY MACHINES?

10:51AM  16     A.   NO.

10:51AM  17     Q.   WOULD THAT HAVE BEEN RELEVANT TO YOU?

10:51AM  18     A.   YES.

10:51AM  19     Q.   AND DID MR. BALWANI EVER TELL YOU THAT THE GROSS MARGINS

10:51AM  20     ON ANALYZERS INCLUDED THE COSTS OF THIRD PARTY MACHINES?

10:52AM  21     A.   DID HE EVER TELL ME THAT?

10:52AM  22     Q.   YES.

10:52AM  23     A.   I'M SORRY.  COULD YOU REPEAT THE QUESTION?

10:52AM  24     Q.   DID MR. BALWANI EVER TELL YOU THAT THE GROSS MARGIN ON THE

10:52AM  25     ANALYZERS INCLUDED COSTS OF THIRD PARTY MACHINES?

10:52AM   1    A.   NO.

10:52AM   2    Q.   LET'S GO BACK TO PAGE 1 OF EXHIBIT 1404.

10:52AM   3         AND IF WE CAN ZOOM IN ON THE TOP, MS. HOLLIMAN.

10:52AM   4         IN THE TOP EMAIL MR. BALWANI IS WRITING TO YOU,

10:52AM   5    MR. GROSSMAN, "WE ARE CONFIRMED FOR FRIDAY AT 9:00 A.M.  SEE

10:52AM   6    YOU THEN."

10:52AM   7         DO YOU SEE THAT LANGUAGE?

10:52AM   8    A.   YES.

10:52AM   9    Q.   AND DO YOU BELIEVE THAT TO BE A REFERENCE TO A MEETING

10:52AM  10    THAT YOU HAD WITH MS. HOLMES AND MR. BALWANI LATER THAT WEEK IN

10:52AM  11    JANUARY OF 2014?

10:52AM  12    A.   YES.

10:52AM  13    Q.   WHERE WAS THAT MEETING HELD?

10:53AM  14    A.   THAT MEETING WAS ALSO HELD AT THEIR CORPORATE HEADQUARTERS

10:53AM  15    ON CALIFORNIA AVENUE IN PALO ALTO.

10:53AM  16    Q.   AND DID YOU GO THROUGH THE SAME LEVEL OF SECURITY FOR THAT

10:53AM  17    MEETING?

10:53AM  18    A.   YES, WE HAD, WE HAD -- WE BROUGHT OUR FULL INVESTMENT TEAM

10:53AM  19    WITH US, AND SO THE NEW MEMBERS WHO HAD NOT BEEN AT THE FIRST

10:53AM  20    MEETING WERE REQUIRED TO SIGN SIMILAR DOCUMENTATION BEFORE WE

10:53AM  21    WERE ADMITTED TO THE LOBBY OF THE BUILDING.

10:53AM  22    Q.   OKAY.  WHO WAS THERE FROM THE THERANOS SIDE?

10:53AM  23    A.   IT WAS -- FROM THE THERANOS SIDE IT WAS MS. HOLMES AND

10:53AM  24    MR. BALWANI.

10:53AM  25    Q.   AND WHO WAS THERE FROM THE PFM SIDE?

10:53AM   1     A.   THE PFM SIDE HAD MYSELF, BRIAN GROSSMAN; VIVEK KHANNA;

10:53AM   2     ALEX RABODZEY; SRI BALASURYAN; AND I BELIEVE MY PARTNER,

10:54AM   3     CHRIS JAMES.

10:54AM   4     Q.   AND WERE YOU SHOWN ANY DOCUMENTS IN THIS MEETING?

10:54AM   5     A.   YES.

10:54AM   6     Q.   WHAT WERE YOU SHOWN?

10:54AM   7     A.   THE COMPANY HAD A PRESENTATION ON A LAPTOP.  THEY ALSO HAD

10:54AM   8     A FINANCIAL MODEL WHICH WAS ALSO ON A LAPTOP.

10:54AM   9     Q.   WAS MS. HOLMES THERE FOR THE ENTIRETY OF THE MEETING?

10:54AM  10     A.   I DO NOT -- I DON'T BELIEVE SHE WAS.

10:54AM  11     Q.   OKAY.  TELL US WHAT HAPPENED.

10:54AM  12     A.   THE MEETING -- COULD YOU BE A LITTLE MORE SPECIFIC?

10:54AM  13     Q.   WHY DO YOU SAY SHE WASN'T THERE FOR THE WHOLE MEETING?

10:54AM  14     A.   I REMEMBER AT SOME POINT IN THE MEETING SHE STEPPED OUT OF

10:54AM  15     THAT, OF THAT MEETING.

10:54AM  16     Q.   OKAY.  AND SITTING HERE TODAY, ARE YOU ABLE TO TELL US

10:54AM  17     WHICH PARTS SHE WAS THERE FOR OR NOT THERE FOR?

10:54AM  18     A.   I BELIEVE IT WAS ROUGHLY HALFWAY THROUGH.

10:54AM  19     Q.   OKAY.  DESCRIBE -- DID MS. HOLMES TALK TO YOU IN THIS

10:55AM  20     MEETING ABOUT THE IDEA OF MINIATURIZING THE LAB?

10:55AM  21     A.   YES.

10:55AM  22     Q.   AND WHAT DID SHE SAY ON THAT POINT?

10:55AM  23     A.   THAT, THAT THIS WAS -- WE DISCUSSED THE DIFFERENCE BETWEEN

10:55AM  24     A POINT OF CARE TESTING TECHNOLOGY, LIKE A HOME PREGNANCY TEST

10:55AM  25     OR A HOME COVID TEST, AND THE MINIATURIZATION OF THE ENTIRE

GROSSMAN DIRECT BY MR. LEACH                                    6405

10:55AM  1    REFERENCE LAB INTO ONE SMALL DEVICE, AND THEY WERE VERY CLEAR

10:55AM  2    THAT THIS TECHNOLOGY WAS NOT A POINT OF CARE TEST, WAS NOT A

10:55AM  3    POINT OF CARE TESTING PLATFORM.  IT WAS A MINIATURIZED LAB.

10:55AM  4        AGAIN, THAT LED TO THE IMPLICATION ON THE COST OF

10:55AM  5    PROVIDING LABORATORY SERVICES IN A RETAIL OR IN A HOSPITAL

10:55AM  6    SETTING.

10:56AM  7    Q.   DID MS. HOLMES TALK TO YOU ABOUT WHY THEY WERE LAUNCHING

10:56AM  8    NOW AS OPPOSED TO EARLIER?

10:56AM  9    A.   YES.

10:56AM 10    Q.   WHAT DID SHE SAY?

10:56AM 11    A.   THAT WAS AT THE BEGINNING OF THIS MEETING, AND THEY TOLD

10:56AM 12    US THAT THE REASON THAT THEY HAD WAITED THIS LONG TO LAUNCH A

10:56AM 13    RETAIL PRODUCT WAS THAT THEY WANTED TO MAKE SURE THAT THEY HAD

10:56AM 14    COMPLETE COVERAGE, 100 PERCENT COVERAGE OF WHAT QUEST AND

10:56AM 15    LABCORP COULD OFFER.

10:56AM 16    Q.   AND DID SHE SAY THAT THEY HAD ACCOMPLISHED THAT AT THIS

10:56AM 17    POINT?

10:56AM 18    A.   YES.

10:56AM 19    Q.   AND DID MS. HOLMES TALK ABOUT THE VARIANCE BETWEEN

10:56AM 20    TRADITIONAL ANALYZERS?

10:56AM 21    A.   IN THIS MEETING WE ALSO DISCUSSED, AS WE DID IN THE FIRST

10:56AM 22    MEETING, THE ADVANTAGES OF THE MINILAB AND THEIR PROPRIETARY

10:56AM 23    TECHNOLOGY, THE FACT THAT BY ELIMINATING HUMAN ELEMENTS OF A

10:56AM 24    REFERENCE LABORATORY OPERATING ENVIRONMENT YOU COULD

10:56AM 25    DRAMATICALLY REDUCE THE VARIABILITY SYSTEM TO SYSTEM.

10:57AM  1          SO, YES, WE HIGHLIGHTED THAT AND WE DISCUSSED SOME OF THE

10:57AM  2   TESTS THAT WERE KNOWN TO BE PROBLEMATIC IN THE REFERENCE

10:57AM  3   LABORATORY ENVIRONMENT, AND I BELIEVE THAT THEY, THEY -- WE

10:57AM  4   DISCUSSED HOW THEIR PROPRIETARY TECHNOLOGY HAD A VARIANCE OF

10:57AM  5   LESS THAN 3 PERCENT.

10:57AM  6   Q.   DID MS. HOLMES MAKE STATEMENTS ABOUT THE COST OF THE

10:57AM  7   DEVICE?

10:57AM  8   A.   I BELIEVE IN THIS MEETING WE ALSO DISCUSSED THE COST OF

10:57AM  9   THE DEVICE SAMPLE PROCESSING UNIT BEING ALREADY LESS THAN WHAT

10:57AM  10  A SYSTEM FROM CEPHEID OR ILLUMINA, WHICH WERE TWO OTHER

10:57AM  11  COMPANIES THAT MAKE DIAGNOSTIC EQUIPMENT, WHAT THOSE SYSTEMS

10:57AM  12  COST, AND I BELIEVE THEY SAID THEY ALREADY WERE 15 OR

10:57AM  13  20 PERCENT LESS THAN -- THE COST WAS ALREADY 15 OR 20 PERCENT

10:57AM  14  LESS THAN WHAT THOSE SYSTEMS WERE SELLING FOR.

10:58AM  15          MR. WADE:  YOUR HONOR, MOVE TO STRIKE THE ANSWER AS

10:58AM  16  NONRESPONSIVE TO THE QUESTION.

10:58AM  17          THE COURT:  OVERRULED.  THE ANSWER CAN REMAIN.

10:58AM  18  BY MR. LEACH:

10:58AM  19  Q.   DID MS. HOLMES ALSO MAKE STATEMENTS ABOUT THE SPEED WITH

10:58AM  20  WHICH THERANOS COULD TEST BLOOD?

10:58AM  21  A.   YES.  THAT THIS IS -- THEY DESCRIBED HOW IN THE RETAIL

10:58AM  22  SETTING THEY COULD GUARANTEE A TEST RESULT WITHIN FOUR HOURS,

10:58AM  23  AND IN THE HOSPITAL SETTING HOW THEY COULD GET AN ANSWER IN

10:58AM  24  LESS THAN AN HOUR.

10:58AM  25          MR. LEACH:  YOUR HONOR, I'M ABOUT TO MOVE INTO

10:58AM   1    ANOTHER DOCUMENT.  I'M NOT SURE WHAT TIME WE HAD PLANNED ON OUR

10:58AM   2    BREAK, BUT WE'RE GETTING CLOSE TO 11:00.

10:58AM   3            THE COURT:  WE WERE PLANNING ON 11:00 O'CLOCK.

10:58AM   4    SHOULD WE DO THAT NOW?

10:59AM   5        LET'S TAKE OUR MORNING BREAK.  30 MINUTES, LADIES AND

10:59AM   6    GENTLEMEN.

10:59AM   7            THIRTY MINUTES, SIR, AND THEN YOU'LL RETURN TO THE STAND.

10:59AM   8            THE WITNESS:  OKAY.

10:59AM   9            THE COURT:  AND WE'LL HAVE OUR BREAK.

10:59AM  10            MR. LEACH:  THANK YOU.

10:59AM  11        (JURY OUT AT 10:59 A.M.)

11:35AM  12        (RECESS FROM 10:59 A.M. UNTIL 11:35 A.M.)

11:35AM  13            THE COURT:  PLEASE BE SEATED.  WE'RE BACK ON THE

11:35AM  14    RECORD.  ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.

11:35AM  15        MR. LEACH, DO YOU WANT TO CONTINUE WITH YOUR EXAMINATION?

11:36AM  16            MR. LEACH:  YES, YOUR HONOR.  THANK YOU.

11:36AM  17    Q.  MR. GROSSMAN, WHEN WE BROKE WE WERE TALKING ABOUT A

11:36AM  18    MEETING THAT YOU HAD WITH MS. HOLMES AND MR. BALWANI IN EARLY

11:36AM  19    JANUARY 2014.

11:36AM  20        DO YOU RECALL THAT TOPIC?

11:36AM  21    A.  YES.

11:36AM  22    Q.  IN YOUR MEETING WITH MS. HOLMES AND MR. BALWANI, DID

11:36AM  23    MS. HOLMES MAKE STATEMENTS TO YOU ABOUT THE SIZE OF THE

11:36AM  24    THERANOS EQUIPMENT COMPARED TO OTHER LABORATORIES?

11:36AM  25    A.  YES.

11:36AM  1    Q.   WHAT DID SHE TELL YOU?

11:36AM  2    A.   I'M SORRY, CAN YOU RESTATE THE QUESTION AGAIN.

11:36AM  3    Q.   DID MS. HOLMES MAKE STATEMENTS TO YOU ABOUT THE

11:36AM  4    COMPARATIVE SIZE OF THE THERANOS LAB OR ANALYZER COMPARED TO

11:36AM  5    TRADITIONAL LABORATORY EQUIPMENT?

11:36AM  6    A.   YES.

11:36AM  7    Q.   WHAT DID SHE SAY TO YOU ABOUT THAT?

11:36AM  8    A.   THEY WERE -- THEIR PROPRIETARY EQUIPMENT WAS MUCH SMALLER

11:36AM  9    THAN CONVENTIONAL LABORATORY ANALYTIC INSTRUMENTS.

11:37AM 10    Q.   AND WAS THAT ATTRACTIVE TO YOU?

11:37AM 11    A.   YES.

11:37AM 12    Q.   HOW SO?

11:37AM 13    A.   IT, ON ONE LEVEL, SPOKE TO THE TECHNOLOGICAL

11:37AM 14    ACCOMPLISHMENTS THE COMPANY HAD ACHIEVED AT THAT POINT.

11:37AM 15         BUT FROM A BUSINESS PERSPECTIVE, IT HAD PROFOUND

11:37AM 16    IMPLICATIONS FOR THE COSTS, THE PRODUCTIVITY, THE ECONOMICS OF

11:37AM 17    PROVIDING LABORATORY SERVICES, WHETHER IT WAS A RETAIL LAB

11:37AM 18    SETTING OR A HOSPITAL LABORATORY SETTING.

11:37AM 19    Q.   LET ME MOVE FORWARD IN TIME, PLEASE, AND DRAW YOUR

11:37AM 20    ATTENTION TO WHAT HAS BEEN MARKED AS TRIAL EXHIBIT 4077.

11:37AM 21         IT SHOULD BE IN YOUR BINDER.

11:38AM 22         LET ME DRAW YOUR ATTENTION TO THE FIRST TWO PAGES OF

11:38AM 23    EXHIBIT 4077.

11:38AM 24         DO YOU RECOGNIZE THIS?

11:38AM 25    A.   I'M JUST REVIEWING THIS.

11:38AM   1              (PAUSE IN PROCEEDINGS.)

11:38AM   2                   THE WITNESS:  YEAH.  YES.

11:38AM   3       BY MR. LEACH:

11:38AM   4       Q.   IS THIS AN EMAIL EXCHANGE BETWEEN YOU AND SUNNY BALWANI

11:38AM   5       FOLLOWING THE EARLY JANUARY 2014 MEETING WITH MS. HOLMES AND

11:38AM   6       MR. BALWANI AT THERANOS?

11:38AM   7       A.   I BELIEVE IT IS.

11:38AM   8       Q.   OKAY.

11:38AM   9       A.   YES.

11:38AM  10       Q.   AND THERE'S ATTACHMENTS TO THIS EMAIL.  ARE YOU FAMILIAR

11:38AM  11       WITH THE -- AND IT'S QUITE LENGTHY, BUT IF YOU COULD JUST

11:39AM  12       PERUSE IT AND LET ME KNOW IF YOU'RE GENERALLY FAMILIAR WITH IT.

11:39AM  13       A.   YES.

11:39AM  14       Q.   WHAT IS THE ATTACHMENT?

11:39AM  15       A.   THIS WAS THE PRESENTATION, CORPORATE PRESENTATION THAT

11:39AM  16       THEY SENT US.

11:39AM  17              IT ALSO INCLUDED ANALYTIC MEASUREMENT, DATA TABLES FROM

11:39AM  18       DIFFERENT TESTS THAT WE HAD ASKED THEM FOR ON THEIR PROPRIETARY

11:39AM  19       TECHNOLOGY.

11:39AM  20       Q.   AND IS THIS POWERPOINT CONSISTENT WITH SLIDES THAT YOU SAW

11:39AM  21       AT THERANOS IN DECEMBER AND JANUARY?

11:39AM  22       A.   I BELIEVE IT IS, YES.

11:39AM  23       Q.   OKAY.  AND IS THIS PART OF THE INFORMATION THAT YOU RELIED

11:39AM  24       ON IN DECIDING WHETHER OR NOT TO INVEST IN THERANOS?

11:39AM  25       A.   YES.

11:39AM  1          MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 4077 INTO

11:39AM  2   EVIDENCE.

11:39AM  3          MR. WADE:  NO OBJECTION, YOUR HONOR.

11:40AM  4          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:40AM  5       (GOVERNMENT'S EXHIBIT 4077 WAS RECEIVED IN EVIDENCE.)

11:40AM  6          MR. LEACH:  LET ME START WITH PAGE 2, IF WE COULD,

11:40AM  7   MS. HOLLIMAN.

11:40AM  8   Q.   AND I'LL DRAW YOUR ATTENTION TO THE BOTTOM HALF,

11:40AM  9   MR. GROSSMAN.

11:40AM  10       DO YOU SEE THE DATE OF JANUARY 10TH, 2014?

11:40AM  11  A.   YES.

11:40AM  12  Q.   AND THIS IS AN EMAIL FROM YOU TO SUNNY BALWANI?

11:40AM  13  A.   YES.

11:40AM  14  Q.   YOU WROTE, "THANKS AGAIN FOR THE TIME YOU SPENT WITH OUR

11:40AM  15  TEAM WALKING US THROUGH THE THERANOS STORY."

11:40AM  16       IS THAT A REFERENCE TO YOUR SECOND MEETING AT THERANOS

11:40AM  17  WITH MEMBERS OF YOUR TEAM?

11:40AM  18  A.   YES.

11:40AM  19  Q.   OKAY.  YOU SAID, "WE WILL LIKELY NEED A FEW DAYS TO

11:40AM  20  PROCESS EVERYTHING WE LEARNED TODAY.  ONE THING THAT WOULD BE

11:40AM  21  ESPECIALLY HELPFUL TO OUR DUE DILIGENCE PROCESS IS HAVING

11:41AM  22  ACCESS TO THE FINANCIAL MODEL WE VIEWED WITH YOU TODAY."

11:41AM  23       DO YOU SEE THAT LANGUAGE?

11:41AM  24  A.   YES.

11:41AM  25  Q.   AND WHAT WERE YOU REFERRING TO?

11:41AM   1    A.   IN OUR MEETING THEY SHARED A FINANCIAL FORECAST, A

11:41AM   2    FINANCIAL MODEL WITH US, A DETAILED FINANCIAL MODEL WITH US,

11:41AM   3    AND I'M ASKING FOR AN ELECTRONIC COPY OF THE MODEL THAT THEY

11:41AM   4    REVIEWED AT THAT MEETING ON JANUARY 10TH.

11:41AM   5    Q.   OKAY.  AT SOME POINT DID YOU GET A COPY OF THAT FINANCIAL

11:41AM   6    MODEL?

11:41AM   7    A.   YES.

11:41AM   8    Q.   AND DID YOU USE THAT AS PART OF THE BASIS TO PREPARE YOUR

11:41AM   9    OWN FINANCIAL MODEL WITH PROJECTIONS ABOUT WHAT THERANOS WOULD

11:41AM  10    ACHIEVE IN THE YEARS TO COME?

11:41AM  11    A.   YES.

11:41AM  12    Q.   WAS THAT AN IMPORTANT BUILDING BLOCK FOR YOUR MODEL?

11:41AM  13    A.   YES.

11:41AM  14    Q.   OKAY.  LET'S GO TO PAGE 1, PLEASE.

11:41AM  15         AND I DRAW YOUR ATTENTION TO THE TOP PORTION OF THE EMAIL

11:41AM  16    ALL OF THE WAY DOWN TO P.S.

11:42AM  17         DO YOU SEE MR. BALWANI'S NAME AT THE TOP, MR. GROSSMAN, IN

11:42AM  18    THE FROM LINE?

11:42AM  19    A.   YES.

11:42AM  20    Q.   AND DO YOU SEE WHERE HE WROTE, "BRIAN.

11:42AM  21         "ATTACHED PLEASE FIND A PDF WHICH IS A VERY CONFIDENTIAL

11:42AM  22    SLIDE DECK OF DISCUSSIONS WE HAD.  IT ALSO INCLUDES A VERY

11:42AM  23    DETAILED SECTION ON DATA WHICH ALEX HAD REQUESTED, INCLUDING

11:42AM  24    THE NUCLEIC ACID APPLICATION ASSAYS.  THIS SLIDE DECK DOES NOT

11:42AM  25    INCLUDE ANY REFERENCE TO SAFEWAY."

11:42AM  1          DO YOU SEE THAT?

11:42AM  2     A.   YES.

11:42AM  3     Q.   AND ALEX, HE WAS A MEMBER OF YOUR TEAM?

11:42AM  4     A.   YES.  THAT'S ALEX RABODZEY.

11:42AM  5     Q.   OKAY.  AND HAD YOU REQUESTED THAT MR. BALWANI PROVIDE IN

11:42AM  6     WRITTEN FORMAT SOME OF THE INFORMATION THAT YOU HAD GONE OVER

11:42AM  7     WITH HE AND MS. HOLMES IN THE PRIOR MEETINGS?

11:42AM  8     A.   YES.

11:42AM  9     Q.   LET'S LOOK AT THE SLIDE DECK, PLEASE.

11:42AM  10         JUST TO ORIENT US, PLEASE GO TO PAGE 3, PLEASE,

11:43AM  11    MS. HOLLIMAN.

11:43AM  12         IS THIS THE COVER PAGE OF THE SLIDE DECK THAT YOU

11:43AM  13    RECEIVED, MR. GROSSMAN?

11:43AM  14    A.   YES.

11:43AM  15    Q.   LET'S NOW GO TO PAGE 67 IF WE COULD.

11:43AM  16         DO YOU SEE THE SLIDE ENTITLED "OVERVIEW:  THERANOS

11:43AM  17    SYSTEMS," MR. GROSSMAN?

11:43AM  18    A.   YES.

11:43AM  19    Q.   AND IS THIS A FAIR DEPICTION OF WHAT YOU UNDERSTOOD THE

11:43AM  20    THERANOS SYSTEMS TO BE?

11:43AM  21    A.   YES.

11:43AM  22    Q.   TO THE LEFT SIDE OF THE SCREEN THERE'S THE WORDS "THERANOS

11:43AM  23    ANALYZERS," AND THERE ARE IMAGES OF TWO DEVICES.

11:43AM  24         DO YOU SEE THOSE?

11:43AM  25    A.   YES.

11:43AM 1    Q.   HOW DO THOSE COMPARE TO THE DEVICES YOU SAW IN YOUR TRIPS

11:43AM 2    TO THERANOS?

11:44AM 3    A.   THEY LOOK -- THOSE DEVICES LOOK VERY SIMILAR TO THE

11:44AM 4    DEVICES WE SAW WHEN WE VISITED THEIR CORPORATE HEADQUARTERS.

11:44AM 5    Q.   OKAY.  AT ANY POINT IN TIME DID MS. HOLMES TELL YOU THAT

11:44AM 6    THEY WERE USING THIRD PARTY MACHINES TO DO ITS TESTING?

11:44AM 7    A.   NO.

11:44AM 8    Q.   DID THEY EVER SHOW YOU AN IMAGE OF A SIEMENS DEVICE?

11:44AM 9    A.   NO.

11:44AM 10   Q.   TO THE RIGHT THERE'S THE WORDS "CARTRIDGES."

11:44AM 11        WHAT DID YOU UNDERSTAND CARTRIDGES TO BE?

11:44AM 12   A.   CARTRIDGES WERE THE CONSUMABLE, WERE THE ACTUAL TESTS.

11:44AM 13   THEY COULD PUT, I BELIEVE, UP TO 70 TESTS ON ONE CARTRIDGE, AND

11:44AM 14   THOSE CARTRIDGES WERE THEN LOADED INTO THE ANALYZER, THE SAMPLE

11:44AM 15   PROCESSING UNIT, AND THE SAMPLE PROCESSING UNIT WOULD THEN RUN

11:44AM 16   THE EXPERIMENTS ON THOSE SAMPLES.

11:44AM 17   Q.   WHERE DID YOU GET THE INFORMATION THAT THERANOS COULD PUT

11:45AM 18   70 TESTS ON A CARTRIDGE?

11:45AM 19   A.   THAT WAS PART OF OUR DUE DILIGENCE PROCESS.  I BELIEVE THE

11:45AM 20   SECOND MEETING WITH THE COMPANY, WE DISCUSSED THAT TOWARDS THE

11:45AM 21   BEGINNING OF THE MEETING.

11:45AM 22        AND THEN THAT ISSUE OF WHAT WE REFER TO AS MULTIPLEXING,

11:45AM 23   THE ABILITY TO TEST FOR MULTIPLE THINGS AT THE SAME TIME CAME

11:45AM 24   UP OVER THE COURSE OF OUR DUE DILIGENCE AS IT WAS A DRAMATIC

11:45AM 25   IMPROVEMENT ON WHAT COMPANIES THAT WERE OFFERING EQUIPMENT IN

11:45AM   1     THIS SPACE WERE CAPABLE OF DOING.

11:45AM   2     Q.   AND THE 70 TESTS ON ONE CARTRIDGE, YOU BELIEVED THAT WAS

11:45AM   3     SOMETHING THAT THERANOS WAS CURRENTLY DOING?

11:45AM   4     A.   YES.

11:45AM   5     Q.   WITH ITS SAMPLE PROCESSING UNIT?

11:45AM   6     A.   YES.

11:45AM   7     Q.   LET'S LOOK AT PAGE 66.

11:46AM   8          DO YOU SEE THE HEADING "PRODUCTS," MR. GROSSMAN?

11:46AM   9     A.   YES.

11:46AM   10    Q.   AND DOES THIS SUMMARIZE WHAT YOU UNDERSTOOD THERANOS'S

11:46AM   11    PRODUCTS TO BE?

11:46AM   12    A.   YES.

11:46AM   13    Q.   THE FIRST LINE SAYS, "DEVICE.  MINILAB AND 4S FOR

11:46AM   14    AUTOMATED PROCESSING."

11:46AM   15         DO YOU SEE THAT?

11:46AM   16    A.   YES.

11:46AM   17    Q.   AND WHAT DID YOU UNDERSTAND THE 4S TO BE?

11:46AM   18    A.   I DON'T REMEMBER.

11:46AM   19    Q.   AND WHAT DID YOU UNDERSTAND MINILAB TO BE?

11:46AM   20    A.   MINILAB REFERRED TO THE SAMPLE PROCESSING UNIT, THE

11:46AM   21    LABORATORY DOWN INTO A SINGLE DEVICE.

11:47AM   22    Q.   IN ANY OF THE WRITTEN MATERIALS THAT YOU'VE REVIEWED, DID

11:47AM   23    YOU SEE ANYTHING SUGGESTING THE DEVICE INCLUDED THIRD PARTY

11:47AM   24    MACHINES FROM SIEMENS OR SOME OTHER MANUFACTURER?

11:47AM   25    A.   NO.

11:47AM 1    Q.   WOULD THAT HAVE BEEN A RED FLAG FOR YOU?

11:47AM 2    A.   YES.

11:47AM 3    Q.   WHY IS THAT?

11:47AM 4    A.   IT WOULD HAVE RAISED A WHOLE SERIES OF QUESTIONS ABOUT

11:47AM 5    WHAT THE TECHNOLOGY WAS CAPABLE OF DOING.  IT WOULD HAVE LED TO

11:47AM 6    A SERIES OF QUESTIONS ON THE BUSINESS, HOW -- WHAT MACHINES ARE

11:47AM 7    YOU USING, WHAT SETTINGS, WHAT TYPES OF ANALYTIC EXPERIMENTS DO

11:47AM 8    YOU NEED THIRD PARTY MACHINES TO PERFORM AND WHY?

11:47AM 9        THAT WOULD HAVE LED TO A WHOLE SERIES OF QUESTIONS AROUND

11:47AM 10   THE TECHNICAL LIMITATIONS AROUND THE PLATFORM.

11:47AM 11       IT ALSO WOULD HAVE HAD IMPLICATIONS FOR THE COST STRUCTURE

11:47AM 12   OF THE BUSINESS, THE SIZE OF THE LABORATORIES THAT THEY WOULD

11:47AM 13   NEED AS THEY ROLLED THIS OUT GEOGRAPHICALLY TO DIFFERENT URBAN

11:47AM 14   AREAS.

11:47AM 15       IT WOULD HAVE IMPACTED THEIR ABILITY TO REPLACE HOSPITALS,

11:48AM 16   THE LABORATORIES WITHIN HOSPITALS, AND IT WOULD HAVE -- IT

11:48AM 17   WOULD HAVE OBVIOUSLY HAD AN IMPACT ON THE CASH BURN OF THE

11:48AM 18   BUSINESS, WHERE CASH FLOW, THE CASH THAT WAS SITTING ON THE

11:48AM 19   BALANCE SHEET WOULD GO, WHERE IT WOULD BE SPENT.

11:48AM 20       OUR, OUR UNDERSTANDING FROM THE FINANCIAL MODEL THEY SENT

11:48AM 21   US, ALL OF THE CAPITAL SPENDING WAS FOCUSSED ON MANUFACTURING

11:48AM 22   MINILABS AND MAKING ADDITIONAL INVESTMENTS IN PRODUCTION LINES

11:48AM 23   FOR EXPANDED MINILAB PRODUCTION.

11:48AM 24   Q.   BENEATH THAT FIRST LINE DEVICE IT SAYS, "CARTRIDGE.

11:48AM 25       "AUTOMATED CONSUMABLES FOR 75 PLUS ASSAYS SIMULTANEOUSLY

11:48AM 1    ACROSS ALL SAMPLE TYPES (BLOOD, URINE, TISSUE, ET CETERA)."

11:49AM 2        DO YOU SEE THAT?

11:49AM 3    A.   YES.

11:49AM 4    Q.   IS THAT CONSISTENT WITH STATEMENTS MS. HOLMES MADE TO YOU

11:49AM 5    IN YOUR MEETINGS WITH HER IN DECEMBER OR JANUARY?

11:49AM 6    A.   YES.

11:49AM 7    Q.   AND BENEATH THAT IT SAYS, "BLOOD COLLECTION DEVICES.

11:49AM 8        "AUTOMATED SAMPLE COLLECTION FOR MICRO-SAMPLE VOLUMES

11:49AM 9    CUSTOMIZED FOR PEDIATRICS, PHLEBOTOMY, AND FULL RANGE OF

11:49AM 10   COLLECTION PROCEDURES."

11:49AM 11       DO YOU SEE THAT?

11:49AM 12   A.   YES.

11:49AM 13   Q.   AND ARE YOU FAMILIAR WITH THE TERM "NANOTAINER"?

11:49AM 14   A.   YES.

11:49AM 15   Q.   AND WHAT IS THE NANOTAINER?

11:49AM 16   A.   THE NANOTAINER WAS THE COLLECTION DEVICE THEY USED TO

11:49AM 17   CAPTURE DROPLETS OF BLOOD AFTER YOUR FINGER HAD BEEN PRICKED,

11:49AM 18   AND THEN THOSE NANOTAINERS COULD THEN TRANSPORT THE SAMPLE TO A

11:49AM 19   LOCATION WHERE IT COULD BE ANALYZED.

11:49AM 20   Q.   BENEATH THAT IT SAYS, "ASSAYS.

11:49AM 21       "CHEMISTRIES, 800 PLUS TEST MENU AND TPS LIBRARY."

11:50AM 22       DO YOU SEE THAT LANGUAGE?

11:50AM 23   A.   YES.

11:50AM 24   Q.   AND IS THAT CONSISTENT WITH THE STATEMENTS THAT MS. HOLMES

11:50AM 25   MADE TO YOU IN YOUR DECEMBER AND JANUARY MEETINGS?

11:50AM  1    A.   YES.

11:50AM  2    Q.   LET'S GO BACK IN THIS DOCUMENT TO PAGE 8.

11:50AM  3         IF WE CAN ZOOM IN ON THE SUBSTANCE, MS. HOLLIMAN.

11:50AM  4         MR. GROSSMAN, DO YOU SEE THE HEADING "PRESS" ON THIS?

11:50AM  5    A.   YES.

11:50AM  6    Q.   AND DO YOU SEE A REFERENCE IN "THE WALL STREET JOURNAL,"

11:50AM  7    "ELIZABETH HOLMES:  THE BREAKTHROUGH OF INSTANT DIAGNOSIS"?

11:50AM  8    A.   YES.

11:50AM  9    Q.   IS THIS MATERIAL THAT YOU REVIEWED PRIOR TO PFM'S

11:50AM  10   INVESTMENT?

11:50AM  11   A.   YES.

11:50AM  12   Q.   AND WAS THIS RELEVANT INFORMATION TO YOUR INVESTMENT

11:50AM  13   DECISION?

11:50AM  14   A.   YES.

11:50AM  15   Q.   OKAY.  LET'S, PLEASE, LOOK AT PAGE 9, MS. HOLLIMAN.

11:51AM  16        DO YOU SEE WHAT APPEARS TO BE A PRESS RELEASE TITLED

11:51AM  17   "THERANOS SELECTS WALGREENS AS A LONG-TERM PARTNER THROUGH

11:51AM  18   WHICH TO OFFER ITS NEW CLINICAL LABORATORY SERVICE.

11:51AM  19        "WITH FIRST LOCATION LAUNCHING THIS MONTH IN

11:51AM  20   SILICON VALLEY, CONSUMERS CAN NOW COMPLETE ANY

11:51AM  21   CLINICIAN-DIRECTED LAB TEST WITH AS LITTLE AS A FEW DROPS OF

11:51AM  22   BLOOD AND RESULTS AVAILABLE IN A MATTER OF HOURS."

11:51AM  23        WITH YOU FAMILIAR WITH THIS LANGUAGE?

11:51AM  24   A.   YES.

11:51AM  25   Q.   AND WERE YOU FAMILIAR WITH THIS AT THE TIME OF PFM'S

11:51AM 1    INVESTMENT?

11:51AM 2    A.   YES.

11:51AM 3    Q.   AND WAS THIS IMPORTANT INFORMATION TO YOU?

11:51AM 4    A.   YES.

11:51AM 5    Q.   AND WHY WAS THAT?

11:51AM 6    A.   THIS WAS CRITICAL.  IT REPRESENTED A TRANSITION FOR THIS

11:51AM 7    BUSINESS FROM BEING A RISKY EARLY STAGE COMPANY TO BEING A

11:52AM 8    COMMERCIAL BUSINESS, AND IT CHANGED THE NATURE OF THE

11:52AM 9    INVESTMENT AND THE RISKS OF THE INVESTMENT.

11:52AM 10       IT ALSO REPRESENTED A POWERFUL EXTERNAL VALIDATION TO THE

11:52AM 11   TECHNOLOGY, A COMPANY LIKE WALGREENS, ONE OF THE LARGEST

11:52AM 12   NATIONAL PHARMACY CHAINS, PARTNERING WITH THEM.

11:52AM 13       IT ALSO HIGHLIGHTED THAT THIS TECHNOLOGY WAS, WAS

11:52AM 14   AVAILABLE OR SOON TO BE AVAILABLE.  I DIDN'T READ THE WHOLE

11:52AM 15   ARTICLE, BUT, YOU KNOW, IT REPRESENTED, YOU KNOW, THE BEGINNING

11:52AM 16   OF THE COMMERCIAL ERA FOR THIS COMPANY.

11:52AM 17   Q.   OKAY.  YOU SAY YOU DIDN'T REVIEW THE WHOLE ARTICLE, AND I

11:52AM 18   SAW YOU LOOKING AT THE SCREEN, AND I UNDERSTAND YOU TO BE

11:52AM 19   SAYING THAT YOU DIDN'T READ THE WHOLE THING RIGHT NOW.

11:52AM 20   A.   THAT'S RIGHT.

11:53AM 21   Q.   BUT BACK AT THE TIME, YOU'RE CONFIDENT THAT YOU REVIEWED

11:53AM 22   IT IN FULL?

11:53AM 23   A.   YES.

11:53AM 24   Q.   OKAY.  LET'S GO TO PAGE 17, PLEASE.

11:53AM 25       DO YOU SEE A SLIDE TITLED, "SAME TESTS, A WHOLE NEW

11:53AM  1    APPROACH"?

11:53AM  2    A.   YES.

11:53AM  3    Q.   AND DO YOU SEE AN IMAGE OF THE NANOTAINER ON KIND OF THE

11:53AM  4    RIGHT SIDE IN THE MIDDLE THERE?

11:53AM  5    A.   YES, I DO.

11:53AM  6    Q.   OKAY.  AND THIS READS, "THERANOS RUNS ANY TEST AVAILABLE

11:53AM  7    IN CENTRAL LABORATORIES, AND PROCESSES ALL SAMPLE TYPES."

11:53AM  8        IS THAT CONSISTENT WITH INFORMATION THAT MS. HOLMES

11:53AM  9    PROVIDED YOU IN YOUR JANUARY AND DECEMBER MEETINGS?

11:53AM  10   A.   YES.

11:53AM  11   Q.   AND WAS THAT IMPORTANT TO YOU?

11:53AM  12   A.   YES.

11:53AM  13   Q.   IN THE THIRD LINE IT SAYS, "THERANOS PROVIDES THE HIGHEST

11:53AM  14   LEVEL OF OVERSIGHT, AUTOMATION, AND STANDARDIZATION IN OUR PRE-

11:53AM  15   AND POST-ANALYTIC PROCESSES, ENSURING THE HIGHEST LEVELS OF

11:53AM  16   ACCURACY AND PRECISION."

11:54AM  17       WAS THAT RELEVANT INFORMATION TO YOU?

11:54AM  18   A.   YES, IT WAS.

11:54AM  19   Q.   AND WAS IT CONSISTENT WITH ORAL STATEMENTS THAT MS. HOLMES

11:54AM  20   MADE TO YOU?

11:54AM  21   A.   YES, IT WAS.

11:54AM  22   Q.   LET ME DRAW YOUR ATTENTION TO PAGE 19.

11:54AM  23       DO YOU SEE THE HEADING, "FASTER RESULTS.  FASTER ANSWERS"?

11:54AM  24   A.   YES.

11:54AM  25   Q.   AND WAS THE SPEED WITH WHICH THERANOS COULD PRODUCE

11:54AM  1    RESULTS IMPORTANT TO YOU?

11:54AM  2    A.   YES.

11:54AM  3    Q.   AND WHY WAS THAT?

11:54AM  4    A.   IT WAS PART OF WHY THIS COMPANY WAS CAPABLE OF

11:54AM  5    SIGNIFICANTLY IMPACTING THE LABORATORY RETAIL INDUSTRY.  THE

11:54AM  6    ABILITY TO GET YOUR TEST BACK THAT QUICKLY ON THE SAME DAY WAS

11:54AM  7    A SIGNIFICANT IMPROVEMENT FOR THE TYPICAL CONSUMER.

11:54AM  8        IT ALSO HAD IMPLICATIONS FOR HOW PHYSICIAN OFFICES WERE

11:55AM  9    ORIENTED.  THE ABILITY TO SEE THE PATIENT AND HAVE THE LAB WORK

11:55AM  10   DONE IN THE SAME DAY AVOIDED A SECOND OFFICE VISIT.

11:55AM  11       SO FOR ALL OF THOSE REASONS THIS WAS, YOU KNOW, THIS WAS

11:55AM  12   AN IMPORTANT ASPECT OF THE COMMERCIAL OFFERING.

11:55AM  13   Q.   LET'S GO FORWARD TO PAGE 21, PLEASE.

11:55AM  14       DO YOU SEE THE HEADING "A NEW STANDARD IN QUALITY.

11:55AM  15       "THE HIGHEST LEVELS OF ACCURACY"?

11:55AM  16   A.   YES.

11:55AM  17   Q.   AND DO YOU SEE IN THE MIDDLE THERE'S A LESS THAN

11:55AM  18   10 PERCENT COEFFICIENT OF VARIATION FOR VITAMIN D?

11:55AM  19   A.   YES.

11:55AM  20   Q.   AND DID YOU ASK QUESTIONS OF MS. HOLMES ABOUT THE ACCURACY

11:55AM  21   OF THERANOS'S TESTS?

11:55AM  22   A.   YES.

11:55AM  23   Q.   AND WHAT WAS THE SUBSTANCE OF WHAT SHE SAID TO YOU?

11:55AM  24   A.   IN THE FIRST MEETING WE HAD WITH THE COMPANY, THEY

11:56AM  25   DESCRIBED THAT THEIR TECHNOLOGY, BECAUSE IT DID NOT HAVE THE

11:56AM  1    HUMAN ELEMENTS, THE POTENTIAL FOR HUMANS TO INTRODUCE

11:56AM  2    VARIABILITY IN ERRORS INTO THE ANALYTIC PROCESSES IN

11:56AM  3    LABORATORIES, BY LIMITING IT, IT HAD DRAMATICALLY LESS

11:56AM  4    VARIABILITY.

11:56AM  5         WE TALKED ABOUT SOME OF THE TYPICAL TESTS THAT ARE

11:56AM  6    DIFFICULT FOR TRADITIONAL LABORATORIES TO RUN.

11:56AM  7         ONE OF THEM WAS VITAMIN D.  ANOTHER ONE WE DISCUSSED WAS

11:56AM  8    HDL.

11:56AM  9         AND IN BOTH CASES I THINK WE, WE -- IN BOTH CASES THE

11:56AM  10   PERCENTAGE OF THE COEFFICIENT OF VARIATION WAS SIGNIFICANTLY

11:56AM  11   HIGHER.  I WANT TO -- I BELIEVE SOMETHING ON THE ORDER OF 25 TO

11:56AM  12   30 PERCENT, OR HIGHER, FOR THOSE TESTS USING CONVENTIONAL

11:56AM  13   EQUIPMENT.

11:56AM  14   Q.   LET'S PLEASE NOW LOOK AT PAGE 33.

11:57AM  15        DO YOU SEE THE HEADING "COMMERCIAL"?

11:57AM  16   A.   YES.

11:57AM  17   Q.   AND THERE'S A NUMBER OF KEY DEPLOYMENTS LISTED HERE.

11:57AM  18        DO YOU SEE THAT?

11:57AM  19   A.   YES.

11:57AM  20   Q.   AND THERE'S REFERENCES DOWN AT THE BOTTOM TO DOD AND

11:57AM  21   PHARMA?

11:57AM  22   A.   YES.

11:57AM  23   Q.   AND I THINK YOU TESTIFIED EARLIER MS. HOLMES MADE

11:57AM  24   REPRESENTATIONS TO YOU ABOUT THE DOD RELATIONSHIP IN THAT FIRST

11:57AM  25   MEETING IN DECEMBER OF 2013.

GROSSMAN DIRECT BY MR. LEACH

11:57AM 1    A.   YES.

11:57AM 2    Q.   AND SHE ALSO MADE REPRESENTATIONS TO YOU ABOUT THE DOLLAR

11:57AM 3    AMOUNT OF THE PHARMA BUSINESS?

11:57AM 4    A.   YES.

11:57AM 5    Q.   OKAY.  LET ME NEXT DRAW YOUR ATTENTION TO PAGE 51.

11:58AM 6         DO YOU SEE THE HEADING, "NEW POSSIBILITY IS IN LAB"?

11:58AM 7    A.   YES.

11:58AM 8    Q.   AND TO THE LEFT THERE'S A BOX WITH THE TITLE, "ROUTINE,

11:58AM 9    SPECIALTY, AND ESOTERIC TESTING."

11:58AM 10        DO YOU SEE THAT?

11:58AM 11   A.   YES.

11:58AM 12   Q.   AND DO YOU SEE THE REFERENCE, "ALL 1,000 PLUS CURRENTLY

11:58AM 13   RUN TESTS/CPT CODES ARE AVAILABLE THROUGH THERANOS."

11:58AM 14        DO YOU SEE THAT?

11:58AM 15   A.   YES, I DO.

11:58AM 16   Q.   AND IS THAT CONSISTENT WITH INFORMATION THAT YOU RECEIVED

11:58AM 17   FROM MS. HOLMES IN THE MEETING IN DECEMBER OF 2013?

11:58AM 18   A.   YES.

11:58AM 19   Q.   DOWN AT THE BOTTOM IT SAYS, "WITH CLIA CERTIFICATION,

11:58AM 20   THERANOS IS A NATIONALLY ACCREDITED PROVIDER."

11:58AM 21        DO YOU SEE THAT LANGUAGE?

11:58AM 22   A.   I DO.

11:58AM 23   Q.   OKAY.  IF YOU COULD NOW TURN TO PAGE 62 AND 63.

11:58AM 24        MAYBE WE CAN SPLIT THE SCREEN, MS. HOLLIMAN.

11:59AM 25        MR. GROSSMAN, ON THE -- ON PAGE 62, WHICH IS DISPLAYED ON

11:59AM 1    THE LEFT SIDE OF THE SCREEN, IT SAYS, "THERANOS'S CLIA QUALITY

11:59AM 2    STANDARDS."

11:59AM 3        DO YOU SEE THAT?

11:59AM 4    A.  I DO.

11:59AM 5    Q.  AND THERE'S A LIST OF PERSONNEL QUALIFICATIONS AND

11:59AM 6    RESPONSIBILITIES, QUALITY CONTROL, SPECIMEN INTEGRITY AND

11:59AM 7    RECORDKEEPING, PROFICIENCY TESTING, QUALITY ASSESSMENT.

11:59AM 8        DO YOU SEE THAT LANGUAGE?

11:59AM 9    A.  I DO.

11:59AM 10   Q.  AND WHAT DID MS. HOLMES TELL YOU ABOUT THERANOS'S

11:59AM 11   PROFICIENCY TESTING?

11:59AM 12   A.  THEY TOLD US THAT, THEY TOLD US THAT THEIR, THEIR -- THE

11:59AM 13   REGULATORY AUTHORITY, OR THE REGULATORY RULES FOR THEIR

12:00PM 14   LABORATORY FELL UNDER THE CLIA LAWS, AND UNDER CLIA THEY HAD A

12:00PM 15   PROCESS THEY HAD TO, THEY HAD TO RUN IN ORDER FOR THEIR

12:00PM 16   PROPRIETARY TECHNOLOGY TO BE COMMERCIALLY AVAILABLE.

12:00PM 17       THEY WERE SENT SAMPLES THAT THEY HAD TO MEASURE, AND THEY

12:00PM 18   HAD TO REPORT THOSE MEASUREMENTS BACK TO AN INDEPENDENT

12:00PM 19   ORGANIZATION.

12:00PM 20       AND THEY TOLD US THAT THEY HAD BEEN -- THEY TOLD US THAT

12:00PM 21   THEY COULD REPEATEDLY AND RELIABLY MEET THOSE STANDARDS FOR ALL

12:00PM 22   OF THEIR COMMERCIALLY AVAILABLE TESTS ON THEIR PROPRIETARY

12:00PM 23   TECHNOLOGY.

12:00PM 24   Q.  DID MS. HOLMES TELL YOU ANYTHING ABOUT SOMETHING CALLED

12:00PM 25   ALTERNATIVE ASSESSMENT OF PROFICIENCY?

12:00PM 1    A.   WE DID, I BELIEVE, DISCUSS ALTERNATIVE -- CAN YOU PLEASE

12:01PM 2    RESTATE THE QUESTION?

12:01PM 3    Q.   ALTERNATIVE ASSESSMENT OF PROFICIENCY, OR AAP?

12:01PM 4    A.   YES, I BELIEVE WE DID DISCUSS AAP AND HOW THAT APPLIED TO

12:01PM 5    PROFICIENCY TESTING.

12:01PM 6    Q.   AND WHAT DID MS. HOLMES TELL YOU ABOUT THAT?

12:01PM 7    A.   I DON'T HAVE -- I BELIEVE THEY, I BELIEVE THEY -- I

12:01PM 8    BELIEVE WE DISCUSSED HOW THAT WAS APPLIED AS THEY DEVELOPED NEW

12:01PM 9    ASSAYS FOR THEIR PLATFORM.

12:01PM 10        FOR EXAMPLE, A NEW FLU TEST IF THERE WAS A FLU STRAIN THAT

12:01PM 11   WAS CIRCULATING THAT WAS NEW TO THE WORLD, THEY WOULD DEVELOP

12:01PM 12   THE TEST, VALIDATE THE TEST, AND THEN BRING IT UP IN THE CLIA

12:01PM 13   LAB.

12:01PM 14        AND AS PART OF THAT DISCUSSION, I BELIEVE WE TALKED ABOUT

12:01PM 15   THOSE ALTERNATIVE PROTOCOLS.

12:01PM 16   Q.   THE DISCUSSION YOU HAD ABOUT BLINDED SAMPLES AND THERANOS

12:01PM 17   GOING THROUGH TRADITIONAL PROFICIENCY TESTING, DID YOU BELIEVE

12:02PM 18   THAT APPLIED TO THERANOS'S MINILAB?

12:02PM 19   A.   YES.

12:02PM 20   Q.   LET ME DRAW YOUR ATTENTION TO PAGE 64.

12:02PM 21        FORGIVE ME, MR. GROSSMAN.  BEFORE WE GO TO 64, I HAVE ONE

12:02PM 22   MORE QUESTION ON 63.

12:02PM 23        THERE'S A STATEMENT IN 63 THAT SAYS, "THERANOS MAINTAINS

12:02PM 24   CLIA ACCREDITATION AS A HIGH COMPLEXITY LAB AND HAS PASSED ALL

12:02PM 25   AUDITS WITHOUT A SINGLE DEFICIENCY TO MAINTAIN THIS STATUS."

12:02PM  1          DO YOU SEE THAT LANGUAGE?

12:02PM  2     A.   YES.

12:02PM  3     Q.   AND WAS THAT IMPORTANT TO YOU?

12:02PM  4     A.   YES, VERY IMPORTANT.

12:02PM  5     Q.   AND WHY WAS THAT?

12:02PM  6     A.   IT JUST SPOKE TO THE FACT THAT THEY WERE ABLE TO MEET THIS

12:03PM  7     STANDARD OF ACCREDITATION UNDER THE CLIA LAWS FOR ALL OF THEIR

12:03PM  8     TESTS, AND IT ALSO MEANT THAT THEY WERE ABLE TO BILL MEDICARE

12:03PM  9     AND MEDICAID FOR LAB SERVICES FOR SAMPLES THAT THEY WERE

12:03PM  10    PROCESSING.

12:03PM  11    Q.   AND DID YOU BELIEVE THIS ACCREDITATION TO SPEAK TO USE OF

12:03PM  12    THE MINILAB IN THE CLIA LAB?

12:03PM  13    A.   YES.

12:03PM  14    Q.   NOW LET'S PLEASE GO TO PAGE 64.

12:03PM  15         DO YOU SEE THE HEADING "VALIDATION OF THERANOS"?

12:03PM  16    A.   YES.

12:03PM  17    Q.   AND DO YOU SEE THE FIRST LINE, "THERANOS HAS BEEN

12:03PM  18    COMPREHENSIVELY VALIDATED OVER THE COURSE OF THE LAST SEVEN

12:03PM  19    YEARS BY TEN OF THE FIFTEEN LARGEST PHARMACEUTICAL COMPANIES,

12:03PM  20    WITH HUNDREDS OF THOUSANDS OF ASSAYS PROCESSED."

12:03PM  21         WAS THAT RELEVANT TO YOU?

12:03PM  22    A.   YES, IT WAS.

12:03PM  23    Q.   HOW SO?

12:04PM  24    A.   IT WAS A VALIDATION OF THE TECHNOLOGY.  THOSE

12:04PM  25    ORGANIZATIONS, MANY OF WHOM WE KNEW WELL AS INVESTORS IN THIS

12:04PM   1    SPACE, ARE HIGHLY DEMANDING ORGANIZATIONS AND USING A

12:04PM   2    TECHNOLOGY LIKE THIS ON SOMETHING AS IMPORTANT AS A CLINICAL

12:04PM   3    TRIAL PROGRAM WOULD ONLY -- YOU COULD ONLY DO THAT IF YOU HAD

12:04PM   4    ENORMOUS CONFIDENCE IN THE ANALYTIC ACCURACY OF THE TECHNOLOGY

12:04PM   5    THAT WAS BEING USED.

12:04PM   6         FOR THOSE COMPANIES, CLINICAL TRIALS ON NEW EXPERIMENTAL

12:04PM   7    MEDICINES ARE THE LIFEBLOOD OF THOSE BUSINESSES.  WITHOUT

12:04PM   8    APPROVAL, WITHOUT SUCCESSFUL CLINICAL RESULTS, PHASE THREE

12:04PM   9    TRIAL RESULTS, THOSE ORGANIZATIONS CAN'T GROW.

12:04PM   10        SO THIS IS THE MOST IMPORTANT PART OF THEIR BUSINESS.

12:04PM   11        SO USING A TECHNOLOGY LIKE THIS IN THEIR SETTING IS A HUGE

12:04PM   12   VALIDATION ON THE CAPABILITIES AND ANALYTIC ACCURACY OF THIS

12:05PM   13   TECHNOLOGY.

12:05PM   14   Q.   DID MS. HOLMES EVER TELL YOU THAT THERANOS HAD ZERO

12:05PM   15   REVENUE FROM PHARMACEUTICAL COMPANIES IN 2013?

12:05PM   16   A.   NO.

12:05PM   17   Q.   WOULD THAT HAVE BEEN RELEVANT TO YOU?

12:05PM   18   A.   YES.

12:05PM   19   Q.   WHY?

12:05PM   20   A.   IT WOULD HAVE LED TO A SERIES OF QUESTIONS AROUND WHY

12:05PM   21   THERE WAS NO REVENUE.  SO, YES, IT WOULD HAVE BEEN, IT WOULD

12:05PM   22   HAVE BEEN RELEVANT TO US.

12:05PM   23   Q.   OKAY.  LET ME NEXT DRAW YOUR ATTENTION TO PAGE 69.

12:05PM   24        DO YOU SEE THE HEADING "EXCERPTS FROM THERANOS'S TEST

12:05PM   25   MENU"?

12:05PM  1    A.   YES.

12:05PM  2    Q.   AND THERE'S AN ASTERISK, "105 TESTS SHOWN, ANOTHER 20 PLUS

12:05PM  3    PAGES SHOW ALL AVAILABLE TESTS WITH THERANOS."

12:06PM  4         DO YOU SEE THAT LANGUAGE?

12:06PM  5    A.   YES.

12:06PM  6    Q.   AND DID YOU BELIEVE THIS TO BE A LISTING OF THE TESTS THAT

12:06PM  7    THERANOS WAS CURRENTLY ABLE TO PERFORM WITH ITS MINILAB?

12:06PM  8    A.   YES.

12:06PM  9    Q.   AND WAS THAT SIGNIFICANT TO YOU?

12:06PM  10   A.   YES, IT WAS.

12:06PM  11   Q.   LAST, LET ME DRAW YOUR ATTENTION TO PAGE 95.

12:06PM  12        DO YOU SEE THE HEADING "THERANOS:  COST SAVINGS"?

12:06PM  13   A.   YES.

12:06PM  14   Q.   AND DO YOU SEE THE FIRST BULLET, "THERANOS'S INITIAL PRICE

12:06PM  15   POINTS ARE 50 PERCENT BELOW MEDICARE REIMBURSEMENT AMOUNTS FOR

12:06PM  16   ALL CURRENTLY RUN TESTS/CPT CODES."

12:06PM  17        WAS THAT RELEVANT INFORMATION TO YOU?

12:06PM  18   A.   YES.

12:06PM  19   Q.   EXPLAIN WHY, PLEASE.

12:06PM  20   A.   IT SPOKE TO THE UNIT ECONOMICS, THE COST ADVANTAGE THAT

12:06PM  21   THEY HAD AGAINST TRADITIONAL LABORATORY EQUIPMENT AND

12:06PM  22   TRADITIONAL LABORATORY OPERATIONS, THE FACT THAT THEY COULD,

12:06PM  23   THEY COULD BILL AT 50 PERCENT OF THE MEDICARE REIMBURSEMENT AND

12:07PM  24   THEY WERE PROFITABLE DOING THAT WAS AN IMPORTANT PART, NOT THE

12:07PM  25   ONLY, BUT AN IMPORTANT PART OF THE COMPETITIVE ADVANTAGE THAT

12:07PM   1    THIS COMPANY HAD AS A RESULT OF THEIR PROPRIETARY TECHNOLOGY.

12:07PM   2    Q.   AND IS THIS BULLET HERE CONSISTENT WITH STATEMENTS

12:07PM   3    MS. HOLMES MADE TO YOU IN THE DECEMBER 2013 AND JANUARY 2014

12:07PM   4    MEETING?

12:07PM   5    A.   YES.

12:07PM   6    Q.   OKAY.  AND AT ANY POINT IN TIME DID YOU THINK THERANOS WAS

12:07PM   7    USING LOW COST TESTS AS SOME FORM OF LOSS LEADER?

12:07PM   8    A.   I DON'T RECALL IF THEY WERE USING THIS AS A LOSS LEADER.

12:07PM   9    Q.   FURTHER DOWN THERE'S A BULLET, "THE UNPRECEDENTED LACK OF

12:07PM  10    VARIATION FROM SYSTEM TO SYSTEM YIELDS HIGHER INTEGRITY DATA."

12:07PM  11         DO YOU SEE THAT LANGUAGE?

12:07PM  12    A.   YES.

12:07PM  13    Q.   AND WHAT DID YOU UNDERSTAND THAT TO MEAN?

12:07PM  14    A.   THIS WAS CONSISTENT WITH THE COMMENTS THAT THEY MADE, THAT

12:08PM  15    MS. HOLMES MADE TO US IN THE FIRST MEETING ABOUT THE LACK OF

12:08PM  16    HUMAN INVOLVEMENT IN THE ANALYTIC OPERATIONS OF THE LABORATORY.

12:08PM  17         ELIMINATING THAT REDUCED MANY OF THE ERRORS THAT HAPPENED

12:08PM  18    IN TRADITIONAL LABORATORIES, AND STANDARDIZING -- AND ALLOWED

12:08PM  19    YOU TO STANDARDIZE THE ANALYTIC PROCESSES WITHIN THE MINILAB SO

12:08PM  20    THAT MUCH OF THE VARIATION THAT EXISTED IN THE TRADITIONAL

12:08PM  21    LABORATORY ENVIRONMENT WAS ELIMINATED, AND THAT'S WHY THEIR

12:08PM  22    TECHNOLOGY HAD SUCH LOW LEVELS OF VARIABILITY COMPARED TO

12:08PM  23    CONVENTIONAL EQUIPMENT.

12:08PM  24    Q.   IS THAT LACK OF VARIABILITY LOST SOMEHOW IF YOU'RE USING

12:08PM  25    CONVENTIONAL EQUIPMENT?

12:08PM   1    A.   IF YOU USED CONVENTIONAL EQUIPMENT, YOU WOULD HAVE ALL OF

12:08PM   2    THE SAME ISSUES THAT TRADITIONAL THIRD PARTY REFERENCE LABS

12:09PM   3    HAVE, BIG MACHINES, LAB TECHS FOR EACH MACHINE, AND THROUGHOUT

12:09PM   4    THAT PROCESS MISTAKES AND VARIATION CAN BE CREATED AT MULTIPLE

12:09PM   5    POINTS IN TIME.

12:09PM   6    Q.   AFTER RECEIVING THIS POWERPOINT FROM MR. BALWANI AROUND

12:09PM   7    JANUARY 17TH, DID YOU CONTINUE TO HAVE EMAIL AND PHONE

12:09PM   8    CONVERSATIONS WITH MR. BALWANI ABOUT A POTENTIAL INVESTMENT?

12:09PM   9    A.   YES.

12:09PM  10    Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO WHAT HAS BEEN MARKED

12:09PM  11    AS EXHIBIT 1443.

12:09PM  12        DO YOU RECOGNIZE THIS DOCUMENT?

12:09PM  13    A.   I DON'T HAVE A DOCUMENT ON MY SCREEN.

12:09PM  14    Q.   LET'S USE THE BINDER.

12:09PM  15    A.   OKAY.

12:09PM  16    Q.   WE CAN'T DISPLAY IT UNTIL IT'S IN EVIDENCE.

12:09PM  17    A.   OH, SORRY.

12:09PM  18    Q.   SO IF WE CAN LOOK AT THE HARD COPY AT 1443.

12:10PM  19    A.   CAN YOU JUST GIVE ME A MOMENT TO REVIEW THIS?

12:10PM  20    Q.   PLEASE, TAKE YOUR TIME.

12:10PM  21        (PAUSE IN PROCEEDINGS.)

12:10PM  22            THE WITNESS:  YES, I AM FAMILIAR WITH THIS.

12:10PM  23    BY MR. LEACH:

12:10PM  24    Q.   OKAY.  AND IS THIS AN EMAIL WITH ADDITIONAL QUESTIONS AND

12:10PM  25    REQUESTS FOR INFORMATION THAT YOU SENT TO MR. BALWANI IN OR

12:10PM 1    AROUND THE JANUARY 20TH, 2014 TIME PERIOD?

12:10PM 2    A.   YES.

12:10PM 3         MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 1443 INTO

12:10PM 4    EVIDENCE.

12:10PM 5         MR. WADE:  NO OBJECTION, YOUR HONOR.

12:10PM 6         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:11PM 7         (GOVERNMENT'S EXHIBIT 1443 WAS RECEIVED IN EVIDENCE.)

12:11PM 8    BY MR. LEACH:

12:11PM 9    Q.   LET ME DRAW YOUR ATTENTION, MR. GROSSMAN, TO THE EMAIL ON

12:11PM 10   THE BOTTOM PART OF PAGE 1.

12:11PM 11        DO YOU SEE WHERE YOU WROTE, "HERE ARE A FEW OF THE TOPICS

12:11PM 12   FOR TOMORROW"?

12:11PM 13   A.   YES.

12:11PM 14   Q.   AND IS THAT A REFERENCE TO A PHONE CONVERSATION THAT YOU

12:11PM 15   WERE SCHEDULED TO HAVE WITH MR. BALWANI?

12:11PM 16   A.   YES, I BELIEVE IT WAS.

12:11PM 17   Q.   OKAY.  THE FIRST PARAGRAPH RELATES TO COMPETITION.

12:11PM 18        I WANT TO FOCUS ON THE SECOND PARAGRAPH WHERE YOU WROTE,

12:11PM 19   "WE WANT TO REVISIT THE FDA APPROVAL PROCESS FOR ASSAYS AND

12:11PM 20   ANALYZER."

12:11PM 21        WHAT DID YOU MEAN BY "ANALYZER"?

12:11PM 22   A.   ANALYZER WAS REFERRING TO THE MINILAB, THE SAMPLE

12:11PM 23   PROCESSING UNIT.

12:11PM 24   Q.   "MORE DETAIL ON HOW YOU INTEND TO PROCEED.  WHAT THE FDA

12:12PM 25   HAS SAID.  THE NATURE OF THE FDA COMMUNICATIONS.  WILL THE

12:12PM  1    ANALYZER BE AN FDA APPROVED DEVICE?"

12:12PM  2         WHY WERE YOU ASKING THAT?

12:12PM  3    A.   WE WANTED TO UNDERSTAND THEIR BUSINESS STRATEGY, WHETHER

12:12PM  4    THEY INTEND TO -- WHETHER THEY INTENDED TO SELL ANALYZERS TO

12:12PM  5    THIRD PARTIES OR WHETHER THEY WERE GOING TO USE ANALYZERS IN A

12:12PM  6    CLIA ENVIRONMENT AND OPERATE AS A LAB AND A MEDICAL DEVICE

12:12PM  7    COMPANY, SO WE REALLY WANTED TO UNDERSTAND THE BUSINESS

12:12PM  8    STRATEGY.

12:12PM  9         BUT BEYOND THAT, THEY HAD TOLD US THAT AN IMPORTANT PART

12:12PM  10   OF THEIR EXTERNAL VALIDATION WAS SEEKING FDA APPROVAL FOR ALL

12:12PM  11   OF THEIR TESTS, THE MINILAB AND THE NANOTAINERS, AND THAT WOULD

12:12PM  12   BE THE ULTIMATE PROOF TO THE MARKET, CONSUMERS, EXPERTS IN THE

12:12PM  13   LAB INDUSTRY, OTHER HEALTH CARE WORKERS THAT THIS TECHNOLOGY

12:12PM  14   WAS AS GOOD -- ACTUALLY BETTER THAN WHAT TRADITIONAL

12:13PM  15   LABORATORIES USE.

12:13PM  16        THE REASON IT WAS BETTER IS THAT TRADITIONAL LABORATORIES

12:13PM  17   DON'T OFTEN RECEIVE FDA APPROVAL FOR TESTS THAT THEY RUN.  THEY

12:13PM  18   OPERATE IN A BIT OF A GREY AREA, AND A REGULATORY GREY AREA.

12:13PM  19        BUT IN A CLIA ENVIRONMENT THEY'RE ALLOWED TO DO THAT.

12:13PM  20        SO THIS WAS -- THE COMPANY HAD EXPLAINED TO US THAT IN

12:13PM  21   ADDITION TO HAVING A HIGH PERFORMANCE, HIGHLY PERFORMING CLIA

12:13PM  22   LAB ENVIRONMENT WHERE THEY WERE RUNNING THEIR OWN PROPRIETARY

12:13PM  23   TECHNOLOGY, THEY, IN ADDITION TO THAT, WERE GOING TO SEEK FDA

12:13PM  24   APPROVAL FOR ALL OF THEIR TESTS.

12:13PM  25        SO WE WANTED TO UNDERSTAND WHERE THAT PROCESS WAS BECAUSE

12:13PM  1   AS AN INVESTOR, FDA APPROVAL WOULD BE A REALLY SIGNIFICANT

12:13PM  2   VALUE DRIVER FOR THE INVESTMENT OVER TIME.

12:13PM  3   Q.   FURTHER DOWN IN THIS EMAIL YOU WROTE TO MR. BALWANI, "WE

12:14PM  4   WANT TO BETTER UNDERSTAND THE MANUFACTURING RAMP OF ANALYZERS.

12:14PM  5   CAN THEY MAKE THEM AT HIGHER VOLUME WITHOUT SACRIFICING PRODUCT

12:14PM  6   QUALITY?  WHERE DO THEY MAKE THEM?  WE'D LIKE TO SEE THAT PART

12:14PM  7   OF THE OPERATION IF POSSIBLE.  WHY DID THEY DECIDE TO MAKE THE

12:14PM  8   ANALYZERS VERSUS OUTSOURCE THEM?"

12:14PM  9        WHAT WERE YOU GETTING AT THERE?

12:14PM 10   A.   THERE WERE A FEW DIFFERENT THINGS THAT WE WERE FOCUSSED ON

12:14PM 11   HERE.

12:14PM 12        FIRST OF ALL, MOST PEOPLE IN THE MEDICAL DEVICE INDUSTRY,

12:14PM 13   CLINICAL DIAGNOSTICS INDUSTRY, THEY OUTSOURCE MANUFACTURING.

12:14PM 14   THEY'RE JUST LIKE YOUR IPHONE.  IF YOU HAVE AN APPLE IPHONE,

12:14PM 15   IT'S NOT MADE BY APPLE, IT'S MADE BY THIRD PARTIES.

12:14PM 16        THE SAME IS TRUE IN THE MEDICAL DEVICE INDUSTRY.

12:14PM 17        SO OUR FIRST MEETING WITH THE COMPANY, ELIZABETH TOLD US

12:14PM 18   THAT THEY WERE VERTICALLY INTEGRATING FROM A MANUFACTURER

12:14PM 19   STANDPOINT, MEANING THAT THEY MADE THEIR OWN ANALYZERS AS

12:14PM 20   OPPOSED TO USING THIRD PARTIES.

12:15PM 21        SO WE WANTED TO UNDERSTAND WHY THEY WERE DOING THAT AND

12:15PM 22   MAKE SURE THAT THEY WEREN'T, AS A RESULT OF NOT USING THIRD

12:15PM 23   PARTIES, THEY WOULD BE UNABLE TO MEET DEMAND FOR THEIR SERVICE

12:15PM 24   IN THE MARKETPLACE, AND NOT HAVE ENOUGH MINILABS TO PROCESS THE

12:15PM 25   TESTS.

GROSSMAN DIRECT BY MR. LEACH                                    6433

12:15PM   1        SO WE WANTED TO MAKE SURE THAT, NUMBER ONE, THEY HAD THEIR

12:15PM   2    ARMS AROUND THE MANUFACTURING OF THESE DEVICES SINCE THEY WERE

12:15PM   3    DOING IT THEMSELVES, WHICH WAS UNUSUAL FOR COMPANIES IN THE

12:15PM   4    DIAGNOSTIC SPACE.

12:15PM   5        NUMBER TWO, AS PART OF OUR DUE DILIGENCE PROCESS, WE

12:15PM   6    WANTED TO SEE THE FACILITY.  WE, WE, WE -- THAT IS -- IT WAS AN

12:15PM   7    IMPORTANT -- MEETING THE DEMAND ON THE HOSPITAL SIDE, ON THE

12:15PM   8    RETAIL SIDE, WE HAD TO FEEL COMFORTABLE THAT THEY HAD THE

12:15PM   9    ABILITY TO ACTUALLY MAKE THESE DEVICES.

12:15PM  10        AND THEN OBVIOUSLY YOU CAN'T, IN THE PROCESS OF SCALING

12:15PM  11    THE MANUFACTURING PROCESS, YOU CAN'T COMPROMISE QUALITY.  SO

12:16PM  12    THE DEVICE -- THEY, THEY -- IT'S ONE THING TO MAKE A DEVICE,

12:16PM  13    YOU KNOW, 10 DEVICES, BUT CAN YOU MAKE 200 DEVICES?  AND ARE

12:16PM  14    THOSE 200 DEVICES GOING TO WORK THE WAY THAT 1 OR 2 DEVICE

12:16PM  15    PROTOTYPE WOULD HAVE PERFORMED?

12:16PM  16        SO WE REALLY WANTED TO MAKE SURE THAT THIS COMPANY COULD

12:16PM  17    ACTUALLY MAKE THESE THINGS, THESE MINILABS.

12:16PM  18        AND IT WAS ALSO PART OF THE FINANCIAL FORECAST IN THE

12:16PM  19    FINANCIAL MODEL, THE CASH THAT WAS GOING TOWARDS PRODUCING

12:16PM  20    MINILABS.  WE WANTED TO MAKE SURE THAT THEY REALLY COULD MAKE

12:16PM  21    THE REQUIRED NUMBER OF MINILABS THAT WAS IN THE FORECAST.

12:16PM  22        SO FOR ALL OF THOSE REASONS WE WANTED TO, WE REALLY WANTED

12:16PM  23    TO, WE WANTED TO CIRCLE BACK TO THIS ISSUE, AND WE DIDN'T WANT

12:16PM  24    ANY MISUNDERSTANDING OR AMBIGUITY AROUND THEIR ABILITY TO

12:16PM  25    PRODUCE THEIR OWN SAMPLE PROCESSING UNITS.

12:16PM 1    Q.   SO IN YOUR INITIAL MEETING IN DECEMBER, MS. HOLMES TOLD

12:17PM 2    YOU THEY WERE VERTICALLY INTEGRATED?

12:17PM 3    A.   YES.

12:17PM 4    Q.   MEANING WE MAKE ALL OF OUR DEVICES?

12:17PM 5    A.   YES.

12:17PM 6    Q.   AND THIS IS YOU FOLLOWING UP ON STATEMENTS LIKE THAT AND

12:17PM 7    OTHER STATEMENTS THAT YOU HAD RECEIVED?

12:17PM 8    A.   YES.

12:17PM 9    Q.   OKAY.  AFTER THIS EMAIL TO MR. BALWANI, DID HE DESCRIBE

12:17PM 10   FOR YOU ANYTHING ABOUT THE MANUFACTURING RAMP UP OR ANALYZERS

12:17PM 11   VERSUS OUTSOURCING THEM?  DID HE RESPOND TO THESE QUESTIONS

12:17PM 12   HERE?

12:17PM 13   A.   YES, HE DID.

12:17PM 14   Q.   WHAT DID HE TELL YOU?

12:17PM 15   A.   HE WAS, HE WAS VERY CONFIDENT THAT THEY WOULD HAVE NO

12:17PM 16   ISSUES MANUFACTURING MINILABS TO MEET THE SALES FORECAST FOR

12:17PM 17   BOTH 2014 AND 2015.

12:17PM 18        IN FACT, HE SAID THAT THEY WOULDN'T EVEN NEED TO REACH

12:17PM 19   PEAK CAPACITY, PRODUCTION CAPACITY TO MEET THEIR FORECAST.  SO

12:17PM 20   THEY HAD SLACK.  THEY HAD EXCESS CAPACITY IN THEIR

12:17PM 21   MANUFACTURING PROCESS IN ORDER TO DELIVER ON THE FINANCIAL

12:17PM 22   FORECAST THAT THEY SENT US.

12:18PM 23        AND IT WASN'T JUST THE RETAIL SETTING.  THEY ALSO HAD TO

12:18PM 24   MAKE THESE DEVICES FOR THE HOSPITAL VISITS.  SO IT WAS BOTH OF

12:18PM 25   THOSE BUSINESSES AND UNDERSTANDING THE PRODUCTIVITY AND

12:18PM   1    THROUGHPUT OF THE SYSTEMS WAS PARTS OF THAT ANALYSIS.

12:18PM   2    Q.   DID HE SAY ANYTHING TO THE EFFECT OF, WE'RE USING MACHINES

12:18PM   3    MANUFACTURED BY OTHERS TO DO MOST OF THE TESTING IN OUR LAB?

12:18PM   4    A.   NO, NO, HE DID NOT.

12:18PM   5    Q.   DID MR. BALWANI MAKE STATEMENTS TO YOU ABOUT THERANOS'S --

12:18PM   6    WHAT IT TOOK TO MAINTAIN A PARTICULAR MINILAB?

12:18PM   7    A.   YES, HE DID.

12:18PM   8    Q.   WHAT DID HE TELL YOU?

12:18PM   9    A.   WE TALKED ABOUT HOW THEY HAD ENGINEERED THESE DEVICES SO

12:18PM  10    THAT THEY HAD INTELLIGENCE EXISTING CONVENTIONAL ANALYTICS

12:18PM  11    INSTRUMENTS THINGS DON'T HAVE, THINGS LIKE WIRELESS SENSORS

12:18PM  12    THAT WOULD PROVIDE REALTIME FEEDBACK TO THERANOS IF A MACHINE

12:19PM  13    WAS NOT PROPERLY CALIBRATED, IF IT WAS PERFORMING POORLY, IF IT

12:19PM  14    WAS CLOGGED, AND THOSE -- AND SO THAT CAPABILITY WOULD ENABLE

12:19PM  15    THEM TO SERVICE THESE MACHINES FOR EFFICIENTLY AT LOWER COST

12:19PM  16    THAN EXISTING LAB INFRASTRUCTURE, AGAIN, SPEAKING TO THE

12:19PM  17    COMPETITIVE ADVANTAGE THIS COMPANY HAD AS RESULT OF THEIR CORE

12:19PM  18    TECHNOLOGY.

12:19PM  19        HE ALSO EXPLAINED THAT BASED ON USING THESE DEVICES IN

12:19PM  20    AFGHANISTAN, THEY KNEW THAT THE SYSTEM DIDN'T FUNCTION AT

12:19PM  21    TEMPERATURES OVER 120 DEGREES FAHRENHEIT, AND THAT WAS AN

12:19PM  22    EXAMPLE OF HOW, IF A SYSTEM IS EXPOSED TO AN EXTREME

12:19PM  23    TEMPERATURE LIKE THAT, THEY WOULD HAVE -- THEY WOULD BE ALERTED

12:19PM  24    TO THAT EXPOSURE AND THEY WOULD BE ABLE TO TAKE THAT MACHINE

12:19PM  25    OFFLINE OR PUT IT IN A DIFFERENT ENVIRONMENT.

12:19PM   1    Q.   AT SOME POINT DURING YOUR ANALYSIS OF THE THERANOS

12:20PM   2    INVESTMENT, DID YOU ASK MR. BALWANI IF YOU COULD SPEAK TO

12:20PM   3    REPRESENTATIVES OF WALGREENS?

12:20PM   4    A.   YES.

12:20PM   5    Q.   WHAT DID HE TELL YOU?

12:20PM   6    A.   HE SAID HE WAS VERY UNCOMFORTABLE WITH THAT AND HE SAID

12:20PM   7    THEY WEREN'T WILLING TO DO THAT.

12:20PM   8         HE, HE, HE REFERENCED SOMETHING TO THE EFFECT THAT IT

12:20PM   9    WOULD BE A STRANGE CONVERSATION.  THEY HAVE A GREAT

12:20PM  10    RELATIONSHIP.  THEY DIDN'T -- THAT COULD SEEM -- IT WOULDN'T

12:20PM  11    LOOK GOOD.  HE HAD A SERIES OF RESPONSES ALONG THOSE LINES.

12:20PM  12    Q.   DID YOU ALSO ASK MR. BALWANI IF YOU COULD SPEAK WITH

12:20PM  13    UNITED HEALTH CARE?

12:20PM  14    A.   YES, WE DID.

12:20PM  15    Q.   AND WHY WERE YOU INTERESTED IN SPEAKING WITH UNITED HEALTH

12:20PM  16    CARE?

12:20PM  17    A.   SO IN -- TOWARDS THE BEGINNING OF OUR SECOND MEETING WITH

12:20PM  18    THE COMPANY, THEY DETAILED THE COMMERCIAL CONTRACTS THEY HAD

12:21PM  19    WITH IMPORTANT INSURANCE COMPANIES.

12:21PM  20         THE FIRST WAS THE BLUE CROSS AND BLUE SHIELD ORGANIZATION,

12:21PM  21    WHICH EVERY STATE HAS A NOT FOR PROFIT HEALTH INSURANCE

12:21PM  22    COMPANY, AND IN CALIFORNIA WE HAVE TWO, BUT THAT'S THE ONLY

12:21PM  23    STATE THAT HAS TWO.

12:21PM  24         THEY'RE TYPICALLY THE LARGEST INSURER IN EACH STATE.  THEY

12:21PM  25    ARE THE LARGEST INSURER IN EACH STATE, AND THEY HAVE A NATIONAL

1   ORGANIZATION THAT CAN EVALUATE TECHNOLOGY.

2       SO THEY TOLD US THEY HAD A CONTRACT WITH THE PARENT BLUE

3   CROSS AND BLUE CROSS -- I'M SORRY.  AND THEY HAD ACCESS TO THE

4   MEMBER STATE BLUE'S PLANS.

5       THEY ALSO TOLD US IN THAT MEETING THAT THEY HAD A NATIONAL

6   CONTRACT WITH UNITED HEALTH CARE.  THAT WAS VERY SIGNIFICANT TO

7   US BECAUSE UNITED HEALTH CARE IS, IN OUR VIEW, THE SMARTEST,

8   MOST SOPHISTICATED NATIONAL HEALTH INSURANCE COMPANY.

9       UNLIKE THE BLUES PLANS, THEY'RE A FOR PROFIT HEALTH

10  COMPANY.  SO WE KNOW THESE COMPANIES VERY WELL IN THE HEALTH

11  CARE SPACE AND WE HIGHLY VALUE THEIR ABILITY TO VET TECHNOLOGY

12  AND NEW COMPANIES.

13      THE FACT THAT -- SO IN THAT MEETING THE COMPANY TOLD US

14  THAT THEY HAD A CONTRACT WITH UNITED HEALTH CARE.  THAT WAS

15  SIGNIFICANT NOT JUST BECAUSE UNITED WAS A VERY SMART, WELL

16  RESPECTED ORGANIZATION, UNITED HAD A CONTRACT WITH I BELIEVE

17  LABCORP AT THE TIME.

18      SO THEY EXPLAINED THAT -- SO IT WAS VERY UNUSUAL THAT THEY

19  HAD A CONTRACT IF THEY ALREADY HAD ANOTHER CONTRACT WITH

20  ANOTHER THIRD PARTY.

21      THEY EXPLAINED TO US, BECAUSE THE TECHNOLOGY WAS SO

22  DIFFERENT AND SO TRANSFORMATIVE AND SUCH A HUGE ADVANCEMENT FOR

23  PATIENTS, THAT THEY WERE ABLE TO CONTRACT DIRECTLY WITH UNITED

24  HEALTH CARE AND THEY HAD ACCESS TO UNITED'S, I THINK AT THE

25  TIME THEY HAD ROUGHLY 30 MILLION COVERED LIVES.

12:23PM  1          SO AS A RESULT OF THAT, WE WANTED TO SPEAK TO SOMEONE AT

12:23PM  2     UNITED THAT DID THE TECHNICAL DUE DILIGENCE.  WE WANTED TO

12:23PM  3     UNDERSTAND THEIR VIEW OF THE COMPANY AND THE TECHNOLOGY AND,

12:23PM  4     JUST AS IMPORTANT, HOW THEY SAW THIS, THIS TESTING METHODOLOGY

12:23PM  5     BEING USED BY THEIR BENEFICIARIES IN THE DIFFERENT MARKETS THAT

12:23PM  6     THEY OPERATED.

12:23PM  7     Q.   OKAY.  AND WHEN YOU MADE THIS REQUEST OF MR. BALWANI, WHAT

12:23PM  8     DID HE TELL YOU?

12:23PM  9     A.   HE SAID -- SIMILAR TO WALGREENS.  HE SAID NO, WE WILL NOT

12:23PM  10    ALLOW YOU TO SPEAK TO UNITED HEALTH CARE.  WE'RE UNCOMFORTABLE

12:23PM  11    WITH THAT.  IT WOULD, AGAIN, LOOK BADLY ON US, THERANOS, IF

12:23PM  12    INVESTORS ARE ASKING TO SPEAK TO SOMEONE AT THE COMPANY.

12:23PM  13         SO SIMILAR, A VERY SIMILAR ANSWER TO WHAT -- HOW HE

12:23PM  14    RESPONDED TO THE WALGREENS, THE WALGREENS REQUEST.

12:24PM  15    Q.   AT SOME POINT IN JANUARY OF 2014 DID YOU SPEAK WITH

12:24PM  16    SOMEBODY NAMED CHANNING ROBERTSON?

12:24PM  17    A.   YES.

12:24PM  18    Q.   WHO IS CHANNING ROBERTSON?

12:24PM  19    A.   HE'S A STANFORD PROFESSOR WHO, WHO HELPED MS. HOLMES START

12:24PM  20    THE COMPANY TEN YEARS BEFORE OUR DUE DILIGENCE PROCESS.

12:24PM  21    Q.   WHY DID YOU WANT TO SPEAK WITH MR. ROBERTSON?

12:24PM  22    A.   HE WAS AN IMPORTANT FOUNDING MEMBER OF THE COMPANY.  HE

12:24PM  23    WAS ON THE BOARD, THE ORIGINAL BOARD.  I BELIEVE HE WAS ON THE

12:24PM  24    ORIGINAL BOARD WITH MS. HOLMES, AND HE WAS A WELL RESPECTED

12:24PM  25    SCIENTIST IN THE LOCAL COMMUNITY THAT HAD BEEN INVOLVED WITH

12:24PM  1    OTHER SUCCESSFUL HEALTH CARE STARTUPS THAT, AS INVESTORS IN THE

12:25PM  2    HEALTH CARE INDUSTRY, WE KNEW.  WE KNEW THOSE STARTUPS.

12:25PM  3         SO WE -- HE WAS SOMEONE THAT WE WANTED TO SPEAK TO.

12:25PM  4    Q.   AND DID YOU RELY IN PART ON THE INFORMATION THAT

12:25PM  5    MR. ROBERTSON PROVIDED YOU?

12:25PM  6    A.   YES.

12:25PM  7    Q.   OKAY.  DID MR. ROBERTSON MAKE STATEMENTS TO YOU ABOUT THE

12:25PM  8    RISKS THAT HE SAW RELATING TO THERANOS?

12:25PM  9    A.   YES.

12:25PM 10    Q.   AND WHAT DID HE TELL YOU?

12:25PM 11    A.   HE TOLD ME THAT THE RISK THAT -- THE TWO PRINCIPAL RISKS

12:25PM 12    THAT HE SAW FOR THE BUSINESS, OR THE PRINCIPAL RISK HE SAW FOR

12:25PM 13    THE BUSINESS WAS THE CONSUMER EXPERIENCE, AND THAT THIS

12:25PM 14    COMPANY, THIS TECHNOLOGY HAD LONG PASSED THE POINT OF TECHNICAL

12:25PM 15    RISK OR REGULATORY RISK.

12:25PM 16         HE DID NOT SEE ANY TECHNICAL RISK AT ALL IN, IN THEIR CORE

12:25PM 17    TECHNOLOGY AND WHAT THEY COULD DO USING THEIR PROPRIETARY

12:25PM 18    FINGERSTICK TECHNOLOGY AND THEIR SAMPLE PROCESSING UNITS.  THAT

12:25PM 19    WAS HIS PERSPECTIVE ON THE RISKS OF THE BUSINESS.

12:26PM 20    Q.   AND DID HE MAKE STATEMENTS TO YOU ABOUT THERANOS'S USE OF

12:26PM 21    ITS DEVICE COMPARED TO OTHER COMPANIES OR OTHER COMPETITORS?

12:26PM 22    A.   HE DID.  WE HAD, I BELIEVE, TWO CONVERSATIONS.  IN THE

12:26PM 23    FIRST CONVERSATION HE DESCRIBED THE PHILOSOPHICAL DIFFERENCE

12:26PM 24    THAT THERANOS HAD ABOUT TESTING COMPARED TO THE CONVENTIONAL

12:26PM 25    LABORATORY INDUSTRY.

12:26PM  1          THE CONVENTIONAL LAB INDUSTRY HAD A DECENTRALIZED NETWORK

12:26PM  2     OF SUPPLIERS.  THEY BOUGHT THIRD PARTY EQUIPMENT, THEY HAD TO

12:26PM  3     HIRE TECHNICIANS TO RUN THAT EQUIPMENT, THEY WERE INEFFICIENT,

12:26PM  4     THEY REALLY DIDN'T FOCUS ON THE PATIENT, THEY DIDN'T KEEP TRACK

12:26PM  5     OF THEIR DATA.  IT WAS AN OUTDATED, INEFFICIENT, ANTIQUATED

12:26PM  6     BUSINESS MODEL.

12:26PM  7          HE COMPARED THAT TO THERANOS WHERE EVERYTHING WAS

12:26PM  8     CENTRALIZED, AND IT WAS A PATIENT SPECIFIC, PATIENT FOCUSSED

12:27PM  9     BUSINESS WHERE YOU AS A CONSUMER NOT ONLY HAD A RADICALLY

12:27PM 10     DIFFERENT EXPERIENCE, IT WAS CHEAPER, EASY TO ACCESS, OPEN UP

12:27PM 11     TESTING TO POPULATIONS THAT STRUGGLED WITH FEAR OF NEEDLES,

12:27PM 12     VENOUS ACCESS, A WHOLE SERIES OF ISSUES.

12:27PM 13          BUT IT ALSO ENABLED THE CONSUMER TO KEEP THEIR DATA OVER

12:27PM 14     TIME, AND SO HE WAS -- AND THEN BEYOND THAT, HE JUST TALKED

12:27PM 15     ABOUT THE TECHNICAL CAPABILITIES, THE TECHNOLOGY WITHIN THE

12:27PM 16     MINILAB.

12:27PM 17          HE DESCRIBED THE PROCESS OF LOOKING IT OVER AND THE

12:27PM 18     TECHNOLOGY THAT WAS IN IT, THE OPTICS, THE CHEMISTRIES, THE

12:27PM 19     TINY PLASTIC CHANNELS WHERE FLUIDS ARE EXCHANGED, WHICH IS

12:27PM 20     CALLED MICROFLUIDICS.

12:27PM 21          HIS VIEW WAS THAT EVEN IF A COMPETITOR OPENED THE BOX, IT

12:28PM 22     WOULD TAKE THEM YEARS, IF THEY COULD AT ALL, TO CREATE A

12:28PM 23     SIMILAR TYPE OF TECHNOLOGY, REINFORCING THE COMPETITIVE

12:28PM 24     ADVANTAGE THAT THE COMPANY HAD DESCRIBED TO US OVER THE COURSE

12:28PM 25     OF OUR DUE DILIGENCE.

12:28PM 1    Q.   AND DID THE NUMBER OF ASSAYS OR PARTICULAR ASSAYS COME UP

12:28PM 2    IN YOUR CONVERSATIONS WITH MR. ROBERTSON?

12:28PM 3    A.   YEAH.   WE TALKED ABOUT THE UNDERLYING TECHNOLOGY, AND HE

12:28PM 4    DESCRIBED HOW THERE WERE ROUGHLY 300 DIFFERENT TYPES OF THINGS

12:28PM 5    THAT ONE HAD TO MEASURE IN ORDER TO MATCH THE FULL MENU THAT A

12:28PM 6    REFERENCE LABORATORY LIKE A QUEST OR A LABCORP, WHAT THEY

12:28PM 7    OFFER.

12:28PM 8        AND HE DESCRIBED THE PROCESS OVER THE PRECEDING TEN YEARS

12:28PM 9    OF GOING TEST BY TEST AND TRYING TO FIGURE OUT HOW TO MEASURE

12:28PM 10   THAT THING AT DRAMATICALLY LESS VOLUMES, MICROLITERS AS OPPOSED

12:29PM 11   TO MILLILITERS, AND THERE WAS NOTHING THAT THEY COULDN'T DO.

12:29PM 12   THERE WAS NOTHING THE TECHNOLOGY COULDN'T DO.

12:29PM 13       THERE WERE THINGS THAT WERE EASIER, BUT THEY HADN'T FOUND

12:29PM 14   A SINGLE ANALYTIC TECHNIQUE THAT THEY WERE NOT ABLE TO MEASURE.

12:29PM 15   Q.   CURRENTLY MEASURE?

12:29PM 16   A.   CURRENTLY MEASURE, CORRECT.

12:29PM 17   Q.   I THINK YOU TESTIFIED EARLIER THAT AT SOME POINT YOU

12:29PM 18   VISITED THE THERANOS MANUFACTURING FACILITY.

12:29PM 19   A.   YES.

12:29PM 20   Q.   AND WHO WAS THERE FOR THAT?

12:29PM 21   A.   FROM THE PFM SIDE IT WAS MYSELF AND MR. KHANNA, I BELIEVE

12:29PM 22   MR. KHANNA.

12:29PM 23       FROM -- MR. KHANNA -- WE MAY HAVE HAD ONE OTHER PERSON

12:29PM 24   FROM THE PFM SIDE.

12:29PM 25       FROM THE THERANOS SIDE, MR. BALWANI MET US AT THE

12:29PM  1    FACILITY, THE MANUFACTURING FACILITY IN NEWARK, CALIFORNIA,

12:30PM  2    WHICH IS IN THE EAST BAY.

12:30PM  3    Q.   OKAY.  AND WHAT DID YOU OBSERVE ON THIS TOUR OF THE

12:30PM  4    MANUFACTURING FACILITY?

12:30PM  5    A.   WE SAW, WE SAW THEM MAKING MINILABS FROM THE MICRO

12:30PM  6    MACHINING OF SPECIFIC PARTS, BOTH PLASTIC AND METAL, AND THEY

12:30PM  7    DESCRIBED FOR US HOW THAT PROCESS WAS EVOLVING FROM THOUSANDS

12:30PM  8    OF DIFFERENT LITTLE PARTS.  AND THEN WITH THEIR PROPRIETARY

12:30PM  9    MANUFACTURING TECHNIQUES THEY WERE SIMPLIFYING THE PROCESS.

12:30PM 10    THEY WERE MAKING THEIR OWN PARTS SO THAT THEY COULD REDUCE THE

12:30PM 11    NUMBER OF PIECES THAT GO INTO A MINILAB.

12:30PM 12         WE -- SO WE SAW THOSE -- THE BIG EQUIPMENT THAT MACHINED

12:30PM 13    THOSE PARTS.

12:30PM 14         WE THEN TRANSFERRED -- WE THEN MOVED TO THE PART OF THE

12:30PM 15    FACTORY FLOOR WHERE THEY WERE ASSEMBLING MINILABS, AND THEN WE

12:30PM 16    FINISHED OUR TOUR IN THE DISTRIBUTION PART OF THE MANUFACTURING

12:31PM 17    FACILITY WHERE THEY WERE PACKAGING AND SHIPPING MATERIALS.

12:31PM 18    Q.   AT ANY POINT DURING THIS TOUR OF THE MANUFACTURING

12:31PM 19    FACILITY, DID YOU SEE ANY THIRD PARTY BLOOD TESTING MACHINES?

12:31PM 20    A.   NO.

12:31PM 21    Q.   DID MR. BALWANI HIGHLIGHT ANY THIRD PARTY BLOOD TESTING

12:31PM 22    MACHINES TO YOU?

12:31PM 23    A.   NO.

12:31PM 24    Q.   DID YOU ALSO CONDUCT A TOUR OF THE THERANOS CALIFORNIA

12:31PM 25    CLIA LAB?

GROSSMAN DIRECT BY MR. LEACH

12:31PM 1    A.    YES.

12:31PM 2    Q.    WHAT DID -- WHO WAS THERE FOR THAT?

12:31PM 3    A.    I BELIEVE IT WAS MR. BALWANI, ALTHOUGH I DON'T

12:31PM 4    SPECIFICALLY REMEMBER.

12:31PM 5         IT WAS MYSELF, AND I BELIEVE IT WAS MR. KHANNA, ALTHOUGH

12:31PM 6    I'M NOT -- I DON'T, I DON'T -- I BELIEVE HE WAS WITH ME AS

12:31PM 7    WELL.

12:31PM 8    Q.    WHAT DID YOU OBSERVE ON THIS TOUR OF THE THERANOS CLIA

12:31PM 9    LAB?

12:31PM 10   A.    WE OBSERVED A LABORATORY SETTING WITH METAL RACKS THAT

12:32PM 11   CONTAINED MINILABS THAT WERE ACTIVELY PROCESSING SAMPLES.

12:32PM 12   Q.    DID YOU SEE ANY SIEMENS MACHINES?

12:32PM 13   A.    NO.

12:32PM 14   Q.    DID YOU SEE ANY OTHER THIRD PARTY BLOOD TESTING MACHINES?

12:32PM 15   A.    NO.

12:32PM 16   Q.    LET ME PLEASE DRAW YOUR ATTENTION TO WHAT HAS BEEN MARKED

12:32PM 17   AS EXHIBIT 5441.

12:32PM 18        DO YOU HAVE THAT IN FRONT OF YOU, SIR?

12:32PM 19   A.    YES.

12:32PM 20   Q.    IS THE FIRST PAGE OF EXHIBIT 5441 AN EMAIL FROM YOU TO

12:32PM 21   SOMEONE NAMED ADAM CLAMMER?

12:32PM 22   A.    YES.

12:33PM 23   Q.    AND WHO IS MR. CLAMMER?

12:33PM 24   A.    HE IS A PERSONAL FRIEND OF MY PARTNER AT THE TIME,

12:33PM 25   CHRIS JAMES, AND HE'S ALSO AN INVESTOR.  HE WAS AN INVESTOR BY

12:33PM   1     PROFESSION IN THE PRIVATE EQUITY SPACE AND HAD INVESTED IN

12:33PM   2     HEALTH CARE COMPANIES DURING HIS CAREER.

12:33PM   3     Q.   THERE IS AN ATTACHMENT TO THIS EMAIL ENTITLED

12:33PM   4     THERANOS_V12.XLSX.

12:33PM   5          DO YOU KNOW WHAT THE ATTACHMENT IS?

12:33PM   6     A.   YES.

12:33PM   7     Q.   AND WHAT IS IT?

12:33PM   8     A.   IT IS A FINANCIAL MODEL.

12:33PM   9     Q.   AND DID YOU -- DID PFM PREPARE THIS IN THE ORDINARY COURSE

12:33PM  10     OF ITS BUSINESS?

12:33PM  11     A.   YES.

12:33PM  12     Q.   AND WAS THIS PART OF YOUR EFFORT TO UNDERSTAND SOME OF THE

12:33PM  13     FINANCIAL METRICS AROUND A POSSIBLE INVESTMENT?

12:33PM  14     A.   YES.

12:33PM  15               MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5441.  5441.

12:34PM  16               MR. WADE:  NO OBJECTION.

12:34PM  17               THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:34PM  18          (GOVERNMENT'S EXHIBIT 5441 WAS RECEIVED IN EVIDENCE.)

12:34PM  19               MR. LEACH:  IF WE CAN ZOOM IN, MS. HOLLIMAN, ON THE

12:34PM  20     TOP.

12:34PM  21     Q.   DO YOU SEE YOUR NAME IN THE FROM LINE, MR. GROSSMAN?

12:34PM  22     A.   YES.

12:34PM  23     Q.   AND DO YOU SEE IT SAYS, "CELL D113 ON PFM, REV MODEL IS

12:34PM  24     SCENARIO.  1, 2, 3 FOR THE BEAR, BASE, BULL."

12:34PM  25          WHAT DOES THAT MEAN?

12:34PM  1    A.   SO, FIRST OF ALL, THIS IS AN EXCEL MODEL AND IN EXCEL

12:34PM  2    MODELS YOU CAN CREATE SCENARIOS WHERE, IF YOU JUST CHANGE ONE

12:34PM  3    CELL, THERE ARE A WHOLE SERIES OF ASSUMPTIONS THAT WILL CHANGE.

12:34PM  4    SO IT'S A GREAT WAY OF PRESENTING DIFFERENT IMAGES OF A

12:34PM  5    BUSINESS.

12:35PM  6         IN THIS CASE WE HAD BUILT THREE SCENARIOS TO CAPTURE WHAT

12:35PM  7    WE THOUGHT THE FINANCIAL OUTLOOK FOR THERANOS WAS, BEAR BEING

12:35PM  8    THE LOWEST, BASE BEING THE -- USING BEAR REFERS TO KIND OF BEAR

12:35PM  9    MARKET OR A BAD OUTCOME; BASE BEING KIND OF OUR CENTRAL CASE,

12:35PM  10   AND THEN BULL BEING THE UP SIDE, POSITIVE CASE, BULL STANDING

12:35PM  11   FOR BULL MARKET.

12:35PM  12   Q.   AND THE MODEL THAT PFM PREPARED, WAS THAT BASED IN PART ON

12:35PM  13   FINANCIAL INFORMATION THAT YOU RECEIVED FROM THERANOS?

12:35PM  14   A.   YES.

12:35PM  15   Q.   AND IS THAT INFORMATION INCLUDED ON SOME OF THE SLIDES OF

12:35PM  16   THE EXCEL SPREADSHEET THAT IS ATTACHED TO THIS EXHIBIT?

12:36PM  17   A.   I'D HAVE TO REVIEW THE SPREADSHEET.  I DON'T KNOW.

12:36PM  18   Q.   LET ME --

12:36PM  19   A.   THE MODEL HAD DIFFERENT TABS IN IT, SO I DON'T KNOW WHAT

12:36PM  20   IS IN THIS BINDER.

12:36PM  21   Q.   WELL, LET ME DRAW YOUR ATTENTION, PLEASE, TO PAGE 44.

12:36PM  22   A.   I'VE GOT YOU.

12:36PM  23   Q.   DO YOU SEE THE LOGO FOR THERANOS IN THE TOP UPPER

12:36PM  24   LEFT-HAND CORNER?

12:36PM  25   A.   YES.

12:36PM 1    Q.   AND DO YOU REMEMBER THIS TO BE A MODEL THAT YOU RECEIVED

12:36PM 2    FROM THERANOS?

12:36PM 3    A.   YES.

12:36PM 4    Q.   AND IF YOU CONTINUE LOOKING IN THE HARD COPY TO PAGE 52,

12:36PM 5    CAN YOU TELL US IF THESE ARE ALSO INPUTS IN DATA THAT YOU

12:37PM 6    RECEIVED FROM THERANOS?

12:37PM 7    A.   IT'S KIND OF SMALL.

12:37PM 8    Q.   WE CAN DO IT ONE BY ONE THEN.  I DON'T WANT TO TEST

12:37PM 9    YOUR --

12:37PM 10   A.   I MEAN, MY EYESIGHT ISN'T WHAT IT USED TO BE.

12:37PM 11        (LAUGHTER.)

12:37PM 12          THE WITNESS:  BUT I BELIEVE THIS IS THE FINANCIAL

12:37PM 13   MODEL THAT THE COMPANY PROVIDED US.

12:37PM 14   BY MR. LEACH:

12:37PM 15   Q.   WELL, THIS SHOULDN'T BE AN EYESIGHT TEST, AND WE CAN GO

12:37PM 16   THROUGH THIS ONE BY ONE, MR. GROSSMAN.

12:37PM 17        WE'RE ON PAGE 4, WHICH IS ON THE SCREEN.

12:37PM 18   A.   YEP.

12:37PM 19   Q.   ARE YOU SATISFIED THAT THIS IS INFORMATION FROM THERANOS?

12:37PM 20   A.   YES.

12:37PM 21   Q.   OKAY.  THERE'S A ROW AT THE TOP, 2014 DEVICE COST PLUS

12:37PM 22   INSTALLATION/CONFIG PLUS TRAINING.

12:37PM 23        WHAT DID YOU UNDERSTAND THAT TO BE?

12:37PM 24   A.   THAT WAS THEIR COST OF PRODUCING MINILABS IN 2014.

12:37PM 25   Q.   AND THE COST THAT THEY WERE GIVING YOU WAS WHAT?

12:38PM 1    A.   $70,000.

12:38PM 2    Q.   AND THEN BENEATH THAT IT SAYS 2015 PLUS DEVICE COST, PLUS

12:38PM 3    INSTALLATION/CONFIG.

12:38PM 4         IS THAT A REFERENCE TO THE MINILAB DEVICE COST FOR 2015?

12:38PM 5    A.   YES.

12:38PM 6    Q.   AND WAS THIS THERANOS TELLING YOU THAT THE COST WAS GOING

12:38PM 7    TO GO DOWN FROM $70,000 TO $50,000?

12:38PM 8    A.   YES.

12:38PM 9    Q.   BENEATH THAT THERE ARE SOME LINES FOR DEPRECIATIONS, PP&E,

12:38PM 10   DEVICE INSTALLATIONS.

12:38PM 11        WHAT DID YOU UNDERSTAND THOSE TO REFER TO?

12:38PM 12   A.   THIS WAS THE ASSUMPTION THE COMPANY WAS USING TO

12:38PM 13   DEPRECIATE THEIR CAPITAL SPENDING.

12:38PM 14        SO STANDARD ACCOUNTING PRACTICES FOR BUSINESSES LIKE THIS

12:38PM 15   WHEN THEY PURCHASE CAPITAL EQUIPMENT, WHETHER IT'S -- OR

12:38PM 16   MANUFACTURE CAPITAL EQUIPMENT, EITHER ONE, YOU WILL -- IT WILL

12:39PM 17   GO AS AN ASSET ON THE BALANCE SHEET, AND THEN OVER TIME THE

12:39PM 18   ACCOUNTING STANDARDS ALLOW YOU TO DEPRECIATE THAT ASSET UNDER

12:39PM 19   DIFFERENT SCHEDULES.

12:39PM 20        IN THIS CASE THEY -- THEY'RE USING WHAT IS REFERRED TO AS

12:39PM 21   STRAIGHT LINE DEPRECIATION, THAT'S THE SL, AND THAT'S JUST A

12:39PM 22   LINEAR DEPRECIATION.

12:39PM 23        THERE ARE OTHER ACCELERATED DEPRECIATION SCHEDULES WHICH

12:39PM 24   COMPANIES OFTEN USE, BUT IN THIS CASE THE ASSUMPTION WAS A

12:39PM 25   STRAIGHT LINE DEPRECIATION.

12:39PM 1     Q.   AT ANY POINT IN TIME DID THERANOS PROVIDE YOU WITH DEVICE

12:39PM 2     COSTS OR DEPRECIATION INFORMATION FOR THIRD PARTY MACHINES MADE

12:39PM 3     BY OTHERS?

12:39PM 4     A.   NO.

12:39PM 5     Q.   DID THEY, FOR EXAMPLE, SPELL OUT FOR YOU IN THEIR MODEL

12:39PM 6     WHAT THE DEPRECIATION FOR A SIEMENS MACHINE WOULD BE?

12:39PM 7     A.   NO.

12:39PM 8     Q.   WAS THAT INFORMATION THAT WOULD HAVE BEEN RELEVANT TO YOU

12:40PM 9     IN ASSESSING THE ECONOMICS FOR THIS TRANSACTION?

12:40PM 10    A.   YES.

12:40PM 11    Q.   LET ME DRAW YOUR ATTENTION TO THE NEXT PAGE, PAGE 45.

12:40PM 12         AND IF WE CAN ZOOM IN ON THE LEFT HALF OF THIS,

12:40PM 13    MS. HOLLIMAN.

12:40PM 14         THE COURT:  BEFORE YOU ASK A QUESTION, LET'S LET OUR

12:40PM 15    JURY STAND UP AND STRETCH FOR JUST A MOMENT.

12:40PM 16         MR. LEACH:  THANK YOU, YOUR HONOR.

12:40PM 17         THE COURT:  THE NUMBERS LOOK INTIMIDATING HERE.  SO

12:40PM 18    PLEASE STAND UP AND STRETCH, FOLKS.

12:41PM 19         (STRETCHING.)

12:41PM 20         MR. LEACH:  MAY I CONTINUE, YOUR HONOR?

12:41PM 21         THE COURT:  YES.  THANK YOU VERY MUCH.

12:41PM 22    BY MR. LEACH:

12:41PM 23    Q.   MR. GROSSMAN, THE NUMBERS ON THIS PAGE ARE A LITTLE HARD

12:41PM 24    TO SEE.  MY ONLY QUESTION IS, IS THIS INFORMATION THAT YOU

12:41PM 25    BELIEVE CAME FROM THERANOS?

12:41PM  1    A.    YES, I DO.

12:41PM  2    Q.    AND IF WE CAN NOW TURN TO PAGE 47, AND IF WE CAN ZOOM IN

12:41PM  3    ON THE SUBSTANCE OF THE SLIDE, MS. HOLLIMAN.

12:41PM  4          DO YOU SEE THE HEADING "THERANOS PROJECTED STATEMENT OF

12:41PM  5    INCOME" IN THE TOP LEFT CORNER, MR. GROSSMAN?

12:42PM  6    A.    YES.

12:42PM  7    Q.    AND DO YOU BELIEVE THIS TO BE INFORMATION THAT THERANOS

12:42PM  8    PROVIDED TO YOU IN CONNECTION WITH A POSSIBLE INVESTMENT?

12:42PM  9    A.    YES.

12:42PM  10   Q.    AND DID YOU USE THE INFORMATION ON THIS SLIDE AS A BASIS

12:42PM  11   FOR HOW TO BUILD YOUR OWN REVENUE MODEL?

12:42PM  12   A.    YES.

12:42PM  13   Q.    IF WE CAN NOW GO TO PAGE 48, MS. HOLLIMAN.

12:42PM  14         ZOOM IN ON THE SUBSTANCE.

12:42PM  15         IS THIS A CONTINUATION OF THE PROJECTED STATEMENT OF

12:42PM  16   INCOME THAT THERANOS PROVIDED TO YOU, MR. GROSSMAN?

12:42PM  17   A.    YES, IT IS.

12:42PM  18   Q.    OKAY.  LET ME DRAW YOUR ATTENTION TO THE COLUMN TO THE FAR

12:42PM  19   RIGHT FOR THE PERIOD ENDING 12/30/2014.

12:43PM  20         DO YOU SEE THAT?

12:43PM  21   A.    YES.

12:43PM  22   Q.    AND WHAT WAS THE REVENUE THAT THERANOS WAS PROJECTING FROM

12:43PM  23   LAB SERVICES FROM U.S. RETAIL PARTNERS?

12:43PM  24   A.    $109 MILLION.

12:43PM  25   Q.    AND WHAT WAS THE REVENUE THERANOS WAS PROJECTING TO YOU

GROSSMAN DIRECT BY MR. LEACH

12:43PM 1    FOR LAB SERVICES REVENUE FROM PHYSICIAN OFFICES?

12:43PM 2    A.   $72 MILLION.

12:43PM 3    Q.   AND WHAT WAS THE REVENUE THAT WAS BEING PROJECTED FOR

12:43PM 4    PHARMACEUTICAL SERVICES?

12:43PM 5    A.   $30 MILLION.

12:43PM 6    Q.   AND DO YOU SEE THE TOTAL OF 261 MILLION IN REVENUES BY THE

12:43PM 7    END OF 2014?

12:43PM 8    A.   YES.

12:43PM 9    Q.   WAS THAT ATTRACTIVE TO YOU?

12:43PM 10   A.   YES.

12:43PM 11   Q.   HOW SO?

12:43PM 12   A.   IT WAS A, IT WAS A STRONG, IMPRESSIVE GROWTH IN REVENUES

12:43PM 13   AS THE COMPANY COMMERCIALIZED THEIR TECHNOLOGY BOTH WITH

12:44PM 14   WALGREENS BUT ALSO THE NON-WALGREENS PART OF THE BUSINESS AS

12:44PM 15   WELL.

12:44PM 16   Q.   AND THEN TO THE RIGHT, ARE THERE PROJECTED REVENUE FOR THE

12:44PM 17   PERIOD ENDING 12/30/2015?

12:44PM 18   A.   YES.

12:44PM 19   Q.   AND WAS THERANOS PROJECTING 750 MILLION IN LAB SERVICES

12:44PM 20   FROM U.S. RETAIL PHARMACIES?

12:44PM 21   A.   YES.

12:44PM 22   Q.   AND WAS THERANOS TELLING YOU THAT IT EXPECTED 120 MILLION

12:44PM 23   FROM PHARMACEUTICAL COMPANIES BY THE END OF 2015?

12:44PM 24   A.   YES.

12:44PM 25   Q.   AND WHAT WAS THE TOTAL REVENUE THAT THERANOS WAS TELLING

12:44PM  1    YOU IT EXPECTED TO ACHIEVE BY THE END OF 2015?

12:44PM  2    A.   $1,608,000,000.

12:45PM  3    Q.   AND WAS THAT ATTRACTIVE TO YOU?

12:45PM  4    A.   YES.

12:45PM  5    Q.   AND IS IT FAIR, MR. GROSSMAN, THAT FOR PAGES WITH THE

12:45PM  6    THERANOS LOGO, LIKE WE SEE IN THE TOP LEFT HAND OF THE SCREEN,

12:45PM  7    THAT THAT IS INFORMATION COMING FROM THERANOS?

12:45PM  8    A.   YES.

12:45PM  9    Q.   AT SOME POINT IN TIME DID YOU GO TO A WALGREENS TO GET

12:45PM  10   YOUR BLOOD TESTED?

12:45PM  11   A.   YES, I DID.

12:45PM  12   Q.   TELL US ABOUT THAT EXPERIENCE.

12:45PM  13   A.   I WENT TO THE PALO ALTO STORE THAT WAS OFFERING THERANOS

12:45PM  14   SERVICES -- I DID NOT TELL THE COMPANY I WAS GOING -- AND I HAD

12:45PM  15   MY BLOOD DRAWN WITH A VENOUS DRAW, NOT A FINGERSTICK, AND MY

12:45PM  16   LAB RESULTS WERE, WERE -- AND I LEFT WITHIN A FEW MINUTES AND

12:45PM  17   THAT WAS MY EXPERIENCE.

12:45PM  18   Q.   OKAY.  AND DID YOU HAVE QUESTIONS FOR MR. BALWANI ABOUT

12:45PM  19   YOUR EXPERIENCE?

12:45PM  20   A.   YES.

12:45PM  21   Q.   AND TELL US ABOUT THAT, PLEASE.

12:45PM  22   A.   WELL, I ASKED HIM WHY I DIDN'T RECEIVE A FINGERSTICK AND

12:46PM  23   WHY IT WAS A VENOUS DRAW, AND I ALSO ASKED HIM WHY IT TOOK

12:46PM  24   LONGER THAN FOUR HOURS TO GET MY TEST RESULTS BACK.

12:46PM  25   Q.   AND WHAT DID HE TELL YOU?

12:46PM  1      A.   HE TOLD ME THAT THE TEST -- ONE OF THE TESTS THAT MY

12:46PM  2      PHYSICIAN HAD ORDERED WAS A HIGHLY UNUSUAL TEST, THAT THEY WERE

12:46PM  3      NOT AT THAT POINT IN TIME OFFERING ON FINGERSTICK.

12:46PM  4           BUT -- AND THEN IN ADDITION TO THAT, HE SAID THAT THERE

12:46PM  5      WAS SOME TYPE OF LAB FAILURE THAT SHOULD HAVE BEEN RELEASED TO

12:46PM  6      MY PHYSICIAN, THAT THEY INVESTIGATED.

12:46PM  7           IN OTHER WORDS, THERE WAS ONE TEST THAT WAS -- THAT HELD

12:46PM  8      THE PROCESS UP.  THEY SHOULD HAVE REPORTED OUT THE RESULTS

12:47PM  9      WITHIN FOUR HOURS.

12:47PM  10          I BELIEVE HE THANKED ME FOR HIGHLIGHTING THIS PROCESS

12:47PM  11     ISSUE, AND THEY HAVE ADDRESSED IT, AND FIXED IT GOING FORWARD.

12:47PM  12          SOMETHING TO THAT EFFECT.

12:47PM  13     Q.   LET ME DRAW YOUR ATTENTION TO WHAT HAS BEEN MARKED AS

12:47PM  14     EXHIBIT 1482.

12:47PM  15     A.   OKAY.

12:47PM  16     Q.   IS THIS AN EMAIL EXCHANGE BETWEEN YOU AND MR. BALWANI

12:47PM  17     RELATING IN PART TO THE TESTS THAT YOU WERE ORDERING THROUGH

12:47PM  18     WALGREENS?

12:47PM  19     A.   IF YOU COULD JUST GIVE ME A MINUTE TO REVIEW THIS?

12:47PM  20     Q.   PLEASE.

12:47PM  21          (PAUSE IN PROCEEDINGS.)

12:47PM  22              THE WITNESS:  YES, OKAY.

12:48PM  23     BY MR. LEACH:

12:48PM  24     Q.   YES, IT IS AN EXCHANGE BETWEEN YOU AND MR. BALWANI

12:48PM  25     RELATING TO YOUR TESTS AT WALGREENS?

12:48PM  1    A.   YES.

12:48PM  2              MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 1482.

12:48PM  3              MR. WADE:  NO OBJECTION, YOUR HONOR.

12:48PM  4              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:48PM  5         (GOVERNMENT'S EXHIBIT 1482 WAS RECEIVED IN EVIDENCE.)

12:48PM  6    BY MR. LEACH:

12:48PM  7    Q.   LET ME DRAW YOUR ATTENTION, MR. GROSSMAN, TO PAGE 2.

12:48PM  8    LET'S WORK OUR WAY UP FROM THE SECOND EMAIL FROM THE BOTTOM.

12:48PM  9         DO YOU SEE WHERE YOU QUOTE, "SUNNY, JUST TO CONFIRM WE

12:48PM 10    WOULD STILL LIKE TO SEE THE NEWARK AND THE THERANOS CLIA LAB."

12:49PM 11         DO YOU SEE THAT?

12:49PM 12    A.   YES, I DO.

12:49PM 13    Q.   IS THAT A REFERENCE TO THE TOUR THAT YOU ENDED UP TAKING?

12:49PM 14    A.   YES.

12:49PM 15    Q.   MR. BALWANI RESPONDS IN THE NEXT EMAIL, "I AM WORKING ON

12:49PM 16    BOTH.  NEWARK HAS A LOT OF OPEN DEVICES AND EQUIPMENT SO WE ARE

12:49PM 17    MOVING THEM ASIDE BUT WE CAN VISIT NEWARK FRIDAY MORNING."

12:49PM 18         DO YOU SEE THAT LANGUAGE?

12:49PM 19    A.   YES.

12:49PM 20    Q.   AND WHAT DID YOU UNDERSTAND THAT TO MEAN?

12:49PM 21    A.   I DON'T, I DON'T KNOW WHAT -- I MEAN, I THINK WHAT I

12:49PM 22    UNDERSTOOD IS THAT WE HAD AN APPOINTMENT FOR 11:00 O'CLOCK ON

12:49PM 23    FRIDAY MORNING TO TOUR THE NEWARK LAB.  I'M NOT SURE ABOUT THE

12:49PM 24    BEGINNING OF THAT.

12:49PM 25    Q.   OKAY.  YOU WROTE BACK IN THE NEXT EMAIL, "OK THANKS.  IS

12:49PM   1    THERE A WAY WE CAN SEE A PART OF THE LAB WITHOUT COMPROMISING

12:49PM   2    THE PATENT PENDING OR UNFILLED PARTS OF IT?  THIS IS MORE OF A

12:49PM   3    PERFUNCTORY EXERCISE TO MAKE SURE THERE IS ACTUALLY A LAB

12:49PM   4    THERE."

12:49PM   5         WHAT WERE YOU GETTING AT THERE?

12:50PM   6    A.   WELL, HE WAS RESISTING OUR VISIT TO THE LAB ON THE GROUNDS

12:50PM   7    THAT THEY HAD IMPORTANT UNPATENTED INFORMATION, ROBOTICS THAT

12:50PM   8    THEY WERE USING, AND BY SHOWING US THE LAB, THEY WOULD

12:50PM   9    COMPROMISE THEIR INTELLECTUAL PROPERTY, THEIR ABILITY TO GET

12:50PM   10   PATENTS ISSUED ON THOSE, ON THOSE PROPRIETARY AUTOMATION

12:50PM   11   TECHNIQUES USING THEIR OWN PROPRIETARY TECHNOLOGY.

12:50PM   12        SO HE WAS RESISTING OUR LAB TOUR ON THOSE GROUNDS, OR HE

12:50PM   13   WAS RESISTING OUR VIEW OF THE CLIA LAB ON THOSE GROUNDS, AND I

12:50PM   14   BELIEVE HE WAS REFERRING SPECIFICALLY TO THE WHOLE BOTTOM FLOOR

12:50PM   15   OF THEIR CORPORATE HEADQUARTERS WHERE THIS AUTOMATION WAS

12:50PM   16   DEPLOYED, AND SO HE WAS NOT WILLING TO LET US SEE THAT PART OF

12:51PM   17   THE CLIA LAB.

12:51PM   18        SO THEN I'M ASKING, IS THERE A WAY THAT WE CAN SEE A PART

12:51PM   19   OF THE LAB THAT DOESN'T HAVE THIS PROPRIETARY PATENT PENDING

12:51PM   20   AUTOMATION SO THAT WE CAN MAKE SURE THAT YOU ACTUALLY ARE USING

12:51PM   21   YOUR OWN PROPRIETARY TECHNOLOGY IN A CLIA LAB ENVIRONMENT?

12:51PM   22   Q.   AT THIS POINT IN TIME, HAD YOU SIGNED A CONFIDENTIALITY

12:51PM   23   AGREEMENT?

12:51PM   24   A.   YES.

12:51PM   25   Q.   AND WERE YOU PREPARED TO GIVE THERANOS WHATEVER ASSURANCES

12:51PM   1    OF CONFIDENTIALITY THEY NEEDED IN THE COURSE OF MAKING YOUR

12:51PM   2    INVESTMENT DECISION?

12:51PM   3    A.   YES.

12:51PM   4    Q.   LET'S GO TO PAGE 1.  IF I COULD DRAW YOUR ATTENTION TO THE

12:51PM   5    BOTTOM PORTION.

12:51PM   6         MR. BALWANI IS WRITING, "ON YOUR TESTS.  THERE WAS A

12:52PM   7    CONTROL THAT FAILED ON ONE OF THE ASSAYS AND THE LAB RERAN THE

12:52PM   8    SAMPLE AND THEY WERE HOLDING BACK RESULTS FOR ALL OF THE OTHER

12:52PM   9    TESTS UNTIL THE ENTIRE ORDER WAS COMPLETE."

12:52PM   10        DO YOU SEE THAT LANGUAGE?

12:52PM   11   A.   YES, I DO.

12:52PM   12   Q.   AND DO YOU BELIEVE THIS TO BE A REFERENCE TO THE TESTS

12:52PM   13   THAT YOU ORDERED THROUGH A WALGREENS?

12:52PM   14   A.   YES.

12:52PM   15   Q.   AT ANY POINT DID MR. BALWANI TELL YOU THAT SOME OF YOUR

12:52PM   16   TESTS WERE RUN ON A THIRD PARTY MACHINE?

12:52PM   17   A.   NO, HE DID NOT.

12:52PM   18   Q.   WOULD THAT HAVE BEEN RELEVANT TO YOU?

12:52PM   19   A.   YES.

12:52PM   20   Q.   I'D LIKE TO SHOW YOU WHAT IS IN EVIDENCE AS EXHIBIT 1491.

12:52PM   21        PERMISSION TO DISPLAY, YOUR HONOR?

12:52PM   22             THE COURT:  YES.

12:52PM   23   BY MR. LEACH:

12:52PM   24   Q.   LET ME DRAW YOUR ATTENTION TO -- DO YOU HAVE 1491 IN FRONT

12:52PM   25   OF YOU, MR. GROSSMAN?

12:52PM   1     A.   I DO.

12:52PM   2     Q.   AND THIS IS AN EMAIL THAT YOU'RE NOT ON; IS THAT CORRECT?

12:52PM   3     A.   CAN YOU ASK THE QUESTION AGAIN?

12:53PM   4     Q.   THIS IS AN EMAIL THAT YOU WERE NOT ON A NOT A PARTY TO?

12:53PM   5     A.   YES, CORRECT.

12:53PM   6     Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO PAGE 2.

12:53PM   7          DO YOU SEE AT THE BOTTOM WHERE SOMEONE NAMED MAX FOSQUE IS

12:53PM   8     WRITING, "PLEASE FOLLOW UP ON WHY BRIAN GROSSMAN HAS NOT BEEN

12:53PM   9     RELEASED YET, HE WAS PENDING AN LDAQ AS OF LAST NIGHT.  THIS IS

12:53PM   10    CRITICAL TO GET OUT ASAP."

12:53PM   11         DO YOU SEE THAT LANGUAGE?

12:53PM   12    A.   YES.

12:53PM   13    Q.   OKAY.  AND THEN IF WE LOOK -- AND THIS IS AROUND THE TIME

12:54PM   14    WHERE YOU WERE CONSIDERING AN INVESTMENT IN THERANOS,

12:54PM   15    JANUARY 28TH?

12:54PM   16    A.   YES.

12:54PM   17    Q.   OKAY.  UP AT THE TOP, MR. FOSQUE WRITES AGAIN, "HI

12:54PM   18    ADAM/MARK,

12:54PM   19         THIS PATIENT (BRIAN GROSSMAN) IS A VIP, WOULD YOU MIND

12:54PM   20    LOOKING INTO THE SLOW DOWN HERE?"

12:54PM   21         DO YOU SEE THAT LANGUAGE?

12:54PM   22    A.   YES, I DO.

12:54PM   23    Q.   AND IF WE GO DOWN TO PAGE 1 UP AT THE TOP, THIS IS ON THE

12:54PM   24    IMMULITE; CORRECT?

12:54PM   25         DO YOU SEE WHERE MR. FOSQUE IS WRITING, "GREAT, THANKS FOR

12:54PM  1    THE UPDATE.  PLEASE LET US KNOW THE OUTCOME.

12:54PM  2         "THIS IS ON THE IMMULITE; CORRECT?"

12:54PM  3         DO YOU SEE THAT LANGUAGE?

12:54PM  4    A.   YES.

12:54PM  5    Q.   AND SOMEONE NAMED MARK PANDORI RESPONDS YES?

12:54PM  6    A.   YES.

12:54PM  7    Q.   AND DO YOU KNOW WHETHER THE IMMULITE IS A THIRD PARTY

12:55PM  8    MACHINE MADE BY SOMEONE OTHER THAN THERANOS?

12:55PM  9    A.   I DON'T KNOW WHAT THAT'S REFERRING TO.

12:55PM  10   Q.   OKAY.  BUT AT NO POINT DID MR. BALWANI TELL YOU THAT A

12:55PM  11   PORTION OF YOUR TEST WAS RUN ON A THIRD PARTY MACHINE?

12:55PM  12   A.   NO, HE DID NOT.

12:55PM  13   Q.   WOULD THAT HAVE BEEN A RED FLAG TO YOU?

12:55PM  14   A.   YES.

12:55PM  15   Q.   LET ME DRAW YOUR ATTENTION TO EXHIBIT 1505.

12:55PM  16        ARE YOU FAMILIAR WITH THIS DOCUMENT?

12:55PM  17   A.   YES.

12:55PM  18   Q.   WHAT IS IT?

12:55PM  19   A.   CAN I MAYBE JUST TAKE A MINUTE TO LOOK THROUGH IT?

12:55PM  20   Q.   SURE.

12:55PM  21        (PAUSE IN PROCEEDINGS.)

12:55PM  22            THE WITNESS:  OKAY.  THIS IS -- UM, I AM FAMILIAR

12:56PM  23   WITH THIS.

12:56PM  24   BY MR. LEACH:

12:56PM  25   Q.   OKAY.  WHAT IS IT?

12:56PM  1    A.   THIS IS THE SERIES C-2 STOCK PURCHASE AGREEMENT.

12:56PM  2    Q.   AND IS THIS THE AGREEMENT BY WHICH PFM MADE AN INVESTMENT

12:56PM  3    INTO THERANOS?

12:56PM  4    A.   YES.

12:56PM  5              MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 1505.

12:56PM  6              MR. WADE:  NO OBJECTION.

12:56PM  7              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:57PM  8         (GOVERNMENT'S EXHIBIT 1505 WAS RECEIVED IN EVIDENCE.)

12:57PM  9    BY MR. LEACH:

12:57PM  10   Q.   MR. GROSSMAN, DO YOU SEE THE TITLE, THERANOS, INC. SERIES

12:57PM  11   C-2 PREFERRED STOCK PURCHASE AGREEMENT AT THE TOP?

12:57PM  12   A.   YES.

12:57PM  13   Q.   AND IS THIS A DOCUMENT THAT YOU AND YOUR TEAM REVIEWED IN

12:57PM  14   CONNECTION WITH THE THERANOS INVESTMENT?

12:57PM  15   A.   YES.

12:57PM  16   Q.   AND IF I COULD PLEASE DRAW YOUR ATTENTION TO PAGE 6.

12:57PM  17        DO YOU SEE IN SECTION 4 THERE ARE A NUMBER OF

12:57PM  18   REPRESENTATIONS AND WARRANTIES OF THE INVESTORS?

12:57PM  19   A.   YES.

12:57PM  20   Q.   AND THE INVESTORS IS A REFERENCE TO YOUR FUNDS?

12:57PM  21   A.   YES.

12:57PM  22   Q.   AND IS IF WE LOOK AT PAGE 7, THERE'S A NUMBER OF

12:57PM  23   REPRESENTATIONS RELATING TO THE INVESTORS EXPERIENCE, THE

12:57PM  24   NATURE OF THE INVESTMENT, ACCESS TO DATA, AND THE ACCREDITED

12:58PM  25   NATURE OF THE INVESTOR.

12:58PM  1          DO YOU SEE THOSE PARAGRAPHS?

12:58PM  2     A.   I'M NOT A LEGAL EXPERT BUT, YES, I DO SEE THOSE.

12:58PM  3     Q.   WELL, YOU ENDED UP SIGNING THE STOCK PURCHASE AGREEMENT;

12:58PM  4     IS THAT FAIR?

12:58PM  5     A.   YES.

12:58PM  6     Q.   AND WERE YOU SATISFIED THAT THE REPRESENTATIONS MADE BY

12:58PM  7     PFM AT THE TIME OF THE STOCK PURCHASE AGREEMENT WERE TRUE AND

12:58PM  8     CORRECT?

12:58PM  9     A.   I MEAN, TO THE BEST OF MY MEMORY, YES.

12:58PM  10    Q.   OKAY.  PLEASE LOOK AT EXHIBIT 1506.

12:58PM  11         ARE YOU FAMILIAR WITH THIS DOCUMENT?

12:58PM  12    A.   YES.

12:58PM  13    Q.   WHAT IS THIS?

12:58PM  14    A.   THIS IS THE MASTER SIGNATURE PAGE.

12:58PM  15    Q.   OKAY.  FOR THE INVESTMENT THAT YOU AND YOUR FUNDS

12:58PM  16    ULTIMATELY MAKE?

12:58PM  17    A.   YES.

12:59PM  18             MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 1506.

12:59PM  19             MR. WADE:  NO OBJECTION.

12:59PM  20             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:59PM  21        (GOVERNMENT'S EXHIBIT 1506 WAS RECEIVED IN EVIDENCE.)

12:59PM  22             MR. LEACH:  IF WE CAN ZOOM IN, MS. HOLLIMAN, ON THE

12:59PM  23    PORTION WHERE THERE IS FIRST SOME HANDWRITING, IT SAYS, "I

12:59PM  24    ACKNOWLEDGE AND AGREE," AND ZOOM IN ON THE NEXT THREE -- THERE

12:59PM  25    YOU GO.

12:59PM 1   Q.   MR. GROSSMAN, THERE ARE THREE DIFFERENT ENTITIES ON THIS,

12:59PM 2   PARTNER INVESTMENT, LP; PFM HEALTHCARE MASTER FUND, LP; AND

12:59PM 3   PFM HEALTHCARE PRINCIPALS FUND, LP.

12:59PM 4       CAN YOU JUST EXPLAIN WHAT THOSE ARE?

12:59PM 5   A.   YES.  I'M GOING TO START WITH PFM HEALTHCARE MASTER FUND

12:59PM 6   LP.  THAT IS THE ENTITY THAT REPRESENTS OUR HEDGE FUND THAT IS

12:59PM 7   AVAILABLE TO INSTITUTIONAL CLIENTS, PENSION PLANS, FOUNDATIONS,

01:00PM 8   ENDOWMENTS, HIGH NET WORTH INDIVIDUALS.

01:00PM 9       PFM HEALTHCARE PRINCIPAL FUNDS IS WHAT WE CALLED OUR

01:00PM 10  FRIENDS AND FAMILY FUND.  IT'S A DIFFERENT LEGAL STRUCTURE, AND

01:00PM 11  AS A RESULT PEOPLE, INDIVIDUALS WITH LOWER INCOME AND WEALTH

01:00PM 12  LEVELS WERE ABLE TO INVEST IN THE PRINCIPALS FUND WHO WERE

01:00PM 13  NOT -- WHO WOULDN'T BE ABLE TO INVEST IN OUR PFM HEALTHCARE

01:00PM 14  MASTER FUND.

01:00PM 15      SO THAT'S WHAT WE REFERRED TO AS OUR FRIENDS AND FAMILY

01:00PM 16  FUND.

01:00PM 17      PARTNER INVESTMENTS IS AN ENTITY THAT WE FORMED, THAT WE

01:00PM 18  USED TO COINVEST IN DEALS, IN PRIVATE DEALS.  AND WHAT I MEAN

01:00PM 19  BY COINVEST IS WE AGGREGATE INVESTMENT INTEREST FROM OUR

01:01PM 20  EXISTING INVESTORS AND POTENTIALLY NON -- OTHER INDIVIDUALS OR

01:01PM 21  ENTITIES THAT AREN'T INVESTED WITH PFM, WE AGGREGATE THAT TO

01:01PM 22  PARTNER INVESTMENTS AND WE MAKE ONE INVESTMENT INTO A COMPANY

01:01PM 23  ALONGSIDE OUR HEDGE FUND, OUR TWO HEDGE FUNDS.

01:01PM 24      SO IT IS AS OPPOSED TO HAVING 10 OR 15 INDIVIDUALS INVEST

01:01PM 25  SEPARATELY.

01:01PM   1    Q.   AND SO DOES THIS REFLECT THAT PARTNER INVESTMENTS, LP, THE

01:01PM   2    COINVESTMENT VEHICLE, INVESTED APPROXIMATELY $55.5 MILLION IN

01:01PM   3    THERANOS?

01:01PM   4    A.   YES, IT DOES.

01:01PM   5    Q.   AND DOES THIS REFLECT THAT THE -- YOUR INVESTMENT FUND,

01:01PM   6    THE HEDGE FUND, INVESTED APPROXIMATELY 38.3 MILLION IN

01:01PM   7    THERANOS?

01:01PM   8    A.   OUR INSTITUTIONAL HEDGE FUND, YES.

01:01PM   9    Q.   AND DOES THIS REFLECT THAT THE FRIENDS AND FAMILY VEHICLE,

01:02PM  10    PFM HEALTHCARE PRINCIPALS FUND, LP, INVESTED ABOUT $2.3 MILLION

01:02PM  11    IN THERANOS?

01:02PM  12    A.   YES.

01:02PM  13    Q.   LET ME NEXT PLEASE DRAW YOUR ATTENTION TO WHAT IS IN

01:02PM  14    EVIDENCE AS EXHIBIT 4345.

01:02PM  15         PERMISSION TO DISPLAY, YOUR HONOR?

01:02PM  16              THE COURT:  YES.

01:02PM  17              MR. LEACH:  GO TO PAGE 1.  IT'S 4845.  EXCUSE ME.

01:02PM  18    Q.   DOES THIS APPEAR TO BE A, A WIRE INFORMATION RELATING TO

01:02PM  19    PFM, MR. GROSSMAN?

01:02PM  20    A.   YES.

01:02PM  21    Q.   AND UNDER BASIC INFORMATION, THERE'S AN AMOUNT

01:03PM  22    $38,336,632, THAT'S THE INVESTMENT OF THE INSTITUTIONAL HEDGE

01:03PM  23    FUND THAT YOU MANAGE?

01:03PM  24    A.   YES.

01:03PM  25              MR. LEACH:  MAY I HAVE A MOMENT, YOUR HONOR?

01:03PM 1          THE COURT:  YES.

01:03PM 2          (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

01:03PM 3          MR. LEACH:  I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

01:03PM 4     THANK YOU.  THANK YOU, MR. GROSSMAN.

01:03PM 5          THE COURT:  CROSS-EXAMINATION?

01:03PM 6          MR. WADE:  I DO, YOUR HONOR.  MAYBE A STRETCH BREAK?

01:03PM 7          THE COURT:  SURE.  FOLKS, IF YOU FEEL LIKE STANDING

01:03PM 8     AND STRETCHING, YOU CAN DO THAT DURING THIS EXCHANGE.

01:03PM 9          (STRETCHING.)

01:05PM 10          THE COURT:  MR. WADE.

01:05PM 11          MR. WADE:  THANK YOU, YOUR HONOR.

01:06PM 12                    **CROSS-EXAMINATION**

01:06PM 13     BY MR. WADE:

01:06PM 14     Q.   GOOD AFTERNOON, MR. GROSSMAN.

01:06PM 15     A.   GOOD AFTERNOON.

01:06PM 16     Q.   MY NAME IS LANCE WADE.  I REPRESENT ELIZABETH HOLMES.

01:06PM 17          I'M GOING TO ASK YOU A FEW QUESTIONS HERE THIS AFTERNOON.

01:06PM 18     A.   OKAY.

01:06PM 19     Q.   OKAY.  I'D LIKE TO START JUST BY PROVIDING A LITTLE

01:06PM 20     FRAMEWORK DURING THE PERIOD IN WHICH PFM WAS CONSIDERING THE

01:06PM 21     INVESTMENT IN THERANOS.

01:06PM 22          ACTUALLY, YOUR HONOR, MAY I APPROACH?

01:06PM 23          THE COURT:  YES.

01:06PM 24     BY MR. WADE:

01:06PM 25     Q.   (HANDING.)

01:06PM  1        BUT BEFORE I DO THAT, I'M GOING TO HAND YOU A COUPLE OF

01:06PM  2   BINDERS, AND THEY WILL HAVE NUMERICAL TABS.  AS I CALL YOUR

01:06PM  3   ATTENTION TO PARTICULAR DOCUMENTS, YOU CAN REFERENCE THEM IN

01:06PM  4   THESE BINDERS.  OKAY?

01:07PM  5        NOW, SIR, DO YOU RECALL THAT YOU FIRST LEARNED ABOUT

01:07PM  6   THERANOS AND THE FACT THAT IT MIGHT BE A POSSIBLE INVESTMENT ON

01:07PM  7   NOVEMBER 1ST OF 2013?

01:07PM  8   A.   I DO.

01:07PM  9   Q.   OKAY.  AND I'M GOING TO PUT UP, WITH THE COURT'S

01:07PM 10   PERMISSION, A CALENDAR DEMONSTRATIVE JUST SO THAT WE CAN MARK

01:07PM 11   THESE DATES.  OKAY?

01:07PM 12        AND I BELIEVE YOU JUST TESTIFIED ON DIRECT TESTIMONY THAT

01:08PM 13   THE INVESTMENT DECISION THAT YOU MADE WAS MADE IN, WAS IT

01:08PM 14   FEBRUARY 5TH, 4TH OR 5TH OF 2014?

01:08PM 15   A.   I BELIEVE THAT'S RIGHT.

01:08PM 16   Q.   OKAY.  LET ME MARK THAT HERE ON THE DEMONSTRATIVE.

01:08PM 17        AND ON DECEMBER 12TH OF 2013, YOU HAD YOUR INITIAL MEETING

01:08PM 18   WITH MS. HOLMES AND MR. BALWANI; CORRECT?

01:08PM 19   A.   YES.

01:08PM 20   Q.   AND THAT LASTED ABOUT AN HOUR?

01:08PM 21   A.   I BELIEVE THAT'S RIGHT.

01:08PM 22   Q.   OKAY.  AND THEN I BELIEVE YOU TESTIFIED THAT THERE WAS A

01:09PM 23   SECOND MEETING ON JANUARY 10TH OF 2013; CORRECT?

01:09PM 24   A.   I BELIEVE THAT'S RIGHT.

01:09PM 25   Q.   AND I THINK YOU, YOU TESTIFIED MS. HOLMES WAS THERE FOR

01:09PM  1    ABOUT HALF OF THE MEETING; IS THAT RIGHT?

01:09PM  2    A.   YES.

01:09PM  3    Q.   AND WAS THAT ABOUT AN HOUR?

01:09PM  4    A.   I BELIEVE IT WAS LONGER THAN THAT.

01:09PM  5    Q.   MAYBE AN HOUR AND A HALF?

01:09PM  6    A.   YES.

01:09PM  7    Q.   OKAY.  NOW, YOU ALSO TESTIFIED ABOUT A SLIDE DECK THAT THE

01:09PM  8    COMPANY SENT YOU AT SOME POINT; RIGHT?

01:09PM  9    A.   YES.

01:09PM  10   Q.   AND THAT WAS SENT AT YOUR REQUEST; RIGHT?

01:09PM  11   A.   YES.

01:09PM  12   Q.   THERE HAD BEEN SOME SLIDES THAT WERE SHOWN IN A MEETING

01:09PM  13   AND YOU ASKED TO RECEIVE THOSE MATERIALS; CORRECT?

01:09PM  14   A.   YES.

01:09PM  15   Q.   OKAY.  AND IT WAS NOT JUST THE SLIDE -- AND THERE WERE

01:10PM  16   SOME OTHER PHONE CALLS WITH MR. BALWANI; CORRECT?

01:10PM  17   A.   YES.

01:10PM  18   Q.   OKAY.  BUT YOU -- YOU AS AN INSTITUTION, PFM -- DID MORE

01:10PM  19   THAN JUST HAVE THOSE MEETINGS AND LOOK AT THOSE MATERIALS;

01:10PM  20   RIGHT?

01:10PM  21   A.   YES.

01:10PM  22   Q.   YOU WENT THROUGH A PRETTY EXTENSIVE PROCESS BY WHICH YOU

01:10PM  23   CONSIDERED THE INVESTMENT; CORRECT?

01:10PM  24   A.   YES.

01:10PM  25   Q.   WOULD YOU SAY THAT YOU SPENT HUNDREDS OF HOURS

01:10PM   1    COLLECTIVELY AS A GROUP?

01:10PM   2    A.   I DON'T KNOW.

01:10PM   3    Q.   OKAY.  DO YOU HAVE ANY ESTIMATE ON THE NUMBER OF HOURS?

01:10PM   4    A.   I DON'T.

01:10PM   5    Q.   OKAY.  BUT THERE WERE, THERE WERE FOUR MEMBERS OF THE

01:10PM   6    TEAM, SOMETIMES FIVE WHO WERE INVOLVED IN THIS?

01:10PM   7    A.   YES.

01:10PM   8    Q.   THAT WAS YOU AND MR. JAMES, RIGHT, WERE IN THE INITIAL

01:10PM   9    MEETING?

01:10PM   10   A.   YES.

01:10PM   11   Q.   AND THEN THERE WERE THREE ANALYSTS; RIGHT?

01:10PM   12   A.   YES.

01:10PM   13   Q.   AND THEN IN ADDITION TO THAT, YOU ALSO CALLED IN, OR

01:10PM   14   CALLED UPON A VARIETY OF OUTSIDE EXPERTS FOR THEIR VIEWS ON THE

01:11PM   15   COMPANY; CORRECT?

01:11PM   16   A.   YES.

01:11PM   17   Q.   REGULATORY ADVISORS; RIGHT?

01:11PM   18   A.   I BELIEVE SO, YES.

01:11PM   19   Q.   SOMEONE WITH SOME LAB BACKGROUND IN THE FINANCE SECTOR,

01:11PM   20   MR. CLAMMER; RIGHT?

01:11PM   21   A.   YES.

01:11PM   22   Q.   AND A REGULATORY LAWYER, I BELIEVE, AT SOME POINT; RIGHT?

01:11PM   23   A.   I DON'T REMEMBER SPECIFICALLY.

01:11PM   24   Q.   OKAY.  BUT YOU'RE A PRETTY SOPHISTICATED OPERATION.  IS

01:11PM   25   THAT A FAIR CHARACTERIZATION?

01:11PM  1    A.   I DON'T -- I'M NOT SURE HOW TO ANSWER YOUR QUESTION.

01:11PM  2         IF YOU'RE ASSUMING -- IF THE QUESTION IS, ARE WE AN

01:11PM  3    ACCREDITED S.E.C. REGISTERED ADVISOR WITH INSTITUTIONAL FUNDS,

01:11PM  4    YES, WE ARE.

01:11PM  5    Q.   AND I DIDN'T MEAN FOR IT TO BE A TRICK QUESTION.

01:12PM  6         YOU'VE MADE A LOT OF INVESTMENTS IN YOUR CAREER; CORRECT?

01:12PM  7    A.   YES.

01:12PM  8    Q.   AND YOU GO THROUGH A PROCESS BY WHICH YOU CONSIDER WHETHER

01:12PM  9    TO MAKE AN INVESTMENT OR WHETHER TO PASS ON IT; RIGHT?

01:12PM  10   A.   YES.

01:12PM  11   Q.   AND THIS IS AN INVESTMENT THAT YOU CONSIDERED AND YOU

01:12PM  12   EITHER COULD HAVE MOVED FORWARD OR YOU COULD HAVE PASSED AT ANY

01:12PM  13   POINT; RIGHT?

01:12PM  14   A.   YES.

01:12PM  15   Q.   OKAY.  AFTER THAT MEETING HERE IN JANUARY OF 2010, YOUR

01:12PM  16   WORK WAS NOT COMPLETE; RIGHT?

01:12PM  17   A.   YES, THAT'S CORRECT.

01:12PM  18   Q.   OKAY.  BUT AFTER THAT POINT, IT WAS MORE THAN A YEAR UNTIL

01:12PM  19   YOU EVER SPOKE WITH MS. HOLMES AGAIN; CORRECT?

01:12PM  20   A.   I DON'T RECALL.

01:12PM  21   Q.   OKAY.  DO YOU RECALL SPEAKING WITH HER AGAIN PRIOR TO

01:13PM  22   FEBRUARY 4TH OR 5TH?

01:13PM  23   A.   I DON'T RECALL.

01:13PM  24   Q.   OKAY.  BUT AS YOU SIT HERE TODAY, YOU DON'T HAVE ANY

01:13PM  25   INDICATIONS THAT THERE WERE ANY INTERACTIONS WITH MS. HOLMES

01:13PM  1    AFTER YOU LEFT THAT MEETING ON JANUARY 10TH, 2014; CORRECT?

01:13PM  2    A.   IF THE QUESTION -- I'M -- I DON'T RECALL WHETHER I

01:13PM  3    INTERACTED WITH HER AFTER THE JANUARY 10TH MEETING.

01:13PM  4    Q.   OKAY.  DO YOU RECALL PREVIOUSLY MAKING STATEMENTS THAT YOU

01:13PM  5    DIDN'T INTERACT WITH HER AGAIN UNTIL LATE 2015?

01:13PM  6    A.   I DON'T.

01:13PM  7    Q.   OKAY.  AND AT THE TIME THAT YOU LEFT THAT MEETING IN

01:13PM  8    JANUARY, THERE WAS A LOT OF WORK THAT YOU WANTED TO DO AS AN

01:13PM  9    INSTITUTION BEFORE YOU WERE GOING TO MAKE AN INVESTMENT

01:13PM 10    DECISION; IS THAT FAIR?

01:13PM 11    A.   THERE WAS WORK THAT WE NEEDED TO DO, YES.

01:13PM 12    Q.   YOU WANTED TO DO ADDITIONAL RESEARCH AND DUE DILIGENCE SO

01:14PM 13    THAT YOU COULD BE FULLY INFORMED BEFORE YOU COULD MAKE YOUR

01:14PM 14    ASSESSMENT ON WHETHER TO INVEST IN THERANOS; RIGHT?

01:14PM 15    A.   YES.

01:14PM 16    Q.   OKAY.  AND THIS WAS IN SOME WAYS JUST THE START OF THE

01:14PM 17    PROCESS; CORRECT?

01:14PM 18    A.   I DON'T QUITE UNDERSTAND THE QUESTION.

01:14PM 19    Q.   WELL, YOUR INITIAL MEETINGS WITH THE BUSINESS IN WHICH YOU

01:14PM 20    MIGHT INVEST ARE SORT OF THE BEGINNING OF THE PROCESS, AND THEN

01:14PM 21    YOUR FUND GOES THROUGH ITS OWN SORT OF BOTTOM UP PROCESS BEFORE

01:14PM 22    IT MAKES AN INVESTMENT DECISION; RIGHT?

01:14PM 23    A.   NOT ALWAYS.

01:14PM 24    Q.   WELL, DO YOU RECALL TESTIFYING IN THIS CASE THAT THIS --

01:14PM 25    DO YOU RECALL TESTIFYING PREVIOUSLY WITH RESPECT TO THESE FACTS

01:14PM    1    THAT THAT JANUARY 10TH MEETING WAS JUST REALLY THE START OF THE

01:14PM    2    INVESTMENT ANALYSIS PROCESS FOR PFM?

01:14PM    3    A.   I DON'T RECALL SPECIFICALLY, BUT WE -- BUT IF THE

01:14PM    4    QUESTION -- IF THE QUESTION IS, DID WE DO SUBSEQUENT ANALYSIS,

01:15PM    5    THE ANSWER IS YES.

01:15PM    6    Q.   OKAY.  AND THAT WASN'T THE QUESTION, BUT I'LL TAKE THE

01:15PM    7    ANSWER.  OKAY?

01:15PM    8    A.   ALL RIGHT.

01:15PM    9    Q.   AND WE'LL GO INTO SOME DETAIL ON WHAT YOU CONSIDERED AS

01:15PM   10    YOU WENT THROUGH THAT INVESTMENT DECISION.

01:15PM   11        AT THE TIME THAT YOU FIRST LEARNED OF THERANOS IN

01:15PM   12    NOVEMBER 1ST OF 2013, DO YOU RECALL HOW MANY WALGREENS

01:15PM   13    LOCATIONS THERANOS WAS OPERATING OUT OF?

01:15PM   14    A.   I BELIEVE IT WAS AT THAT POINT ZERO.

01:15PM   15    Q.   OKAY.  AND, AND WITHIN ABOUT A WEEK OR SO, THEY HAD

01:15PM   16    ACTUALLY OPENED UP TO ONE LOCATION IN PALO ALTO; CORRECT?

01:15PM   17    A.   I BELIEVE THAT'S RIGHT.

01:15PM   18    Q.   OKAY.  AND THEN BY THE TIME YOU COMPLETED YOUR INVESTMENT

01:16PM   19    DECISION, DO YOU KNOW HOW MANY LOCATIONS THERANOS WAS OPERATING

01:16PM   20    OUT OF?

01:16PM   21    A.   I DON'T REMEMBER SPECIFICALLY.

01:16PM   22    Q.   DO YOU RECALL IT BEING THREE?

01:16PM   23    A.   I THINK IT WAS -- I DON'T, I DON'T REMEMBER.

01:16PM   24    Q.   FEWER THAN FIVE?

01:16PM   25    A.   I -- AS OF FEBRUARY 5TH, WHAT WAS THE NUMBER?

01:16PM 1    Q.    YEAH.

01:16PM 2    A.    YEAH, I DON'T REMEMBER.

01:16PM 3    Q.    OKAY.  WE'LL SEE IF WE CAN REFRESH YOU AS WE GO THROUGH

01:16PM 4    YOUR TESTIMONY TODAY.

01:16PM 5          YOU RECALLED LEARNING DURING THE PROCESS THAT -- WELL, IN

01:16PM 6    ANY EVENT, YOU RECALL IT WAS VERY EARLY IN THE ROLLOUT OF THE

01:16PM 7    WALGREENS RELATIONSHIP; IS THAT FAIR?

01:16PM 8    A.    YES.

01:16PM 9    Q.    OKAY.  AND THERE HAD BEEN SOME TALK OF THE 8200 LOCATIONS

01:16PM 10   NATIONWIDE; RIGHT?

01:16PM 11   A.    I BELIEVE IT WAS 8100, BUT, YES.

01:16PM 12   Q.    OKAY.  8100?

01:16PM 13   A.    YES.

01:16PM 14   Q.    BUT THEY WERE IN, A HANDFUL IN THE PERIOD THAT YOU WERE

01:17PM 15   CONSIDERING THE INVESTMENT; CORRECT?

01:17PM 16   A.    YES.

01:17PM 17   Q.    OKAY.  AND YOU RECALL THAT LEARNING DURING THIS PROCESS

01:17PM 18   THERE WAS A TWO PHASE ROLLOUT THAT WAS GOING TO HAPPEN AT

01:17PM 19   THERANOS?

01:17PM 20   A.    YES.

01:17PM 21   Q.    AND PHASE I WAS GOING TO BE THE PERIOD WHERE THEY WERE

01:17PM 22   GOING TO OPERATE WITHIN A -- I THINK YOU REFERRED TO IT IN YOUR

01:17PM 23   DOCUMENTS AS A HUB AND SPOKE MODEL; IS THAT RIGHT?

01:17PM 24   A.    YES.

01:17PM 25   Q.    WHERE THEY WOULD BASICALLY RUN A CENTRAL LABORATORY;

01:17PM   1     RIGHT?

01:17PM   2     A.   YES.

01:17PM   3     Q.   AND PHASE II WAS GOING TO BE THE POINT WHERE THE DEVICES

01:17PM   4     WERE DEPLOYED OUT INTO THE PHYSICAL LOCATIONS AT WALGREENS

01:17PM   5     LOCATIONS; CORRECT?

01:17PM   6     A.   YES.

01:17PM   7     Q.   AND AS YOU WERE LEARNING ABOUT THIS PROCESS FROM THE

01:17PM   8     COMPANY, YOU DISCUSSED AT DIFFERENT TIMES PHASE I AND PHASE II

01:18PM   9     OF THEIR BUSINESS PLAN; RIGHT?

01:18PM   10    A.   YES.

01:18PM   11    Q.   NOW, I WANT TO -- YOU MENTIONED THAT YOU'RE AN S.E.C.

01:18PM   12    REGISTERED INVESTMENT ADVISOR, AND I THINK YOU ALSO USED THE

01:18PM   13    WORD HEDGE FUND.

01:18PM   14         IS IT -- MR. LEACH SHOWED YOU THE THREE ENTITIES THAT

01:18PM   15    INVESTED IN THERANOS.  DO YOU RECALL THAT JUST A MINUTE AGO?

01:18PM   16    A.   YES, I DO.

01:18PM   17    Q.   OKAY.  WHY DON'T WE --

01:18PM   18         WITH THE COURT'S PERMISSION, I'LL PULL UP 1506, WHICH I

01:18PM   19    THINK IS IN EVIDENCE.

01:18PM   20              THE COURT:  YES.

01:18PM   21    BY MR. WADE:

01:18PM   22    Q.   AND JUST SO WE UNDERSTAND, WHICH ONE OF THESE, OR ARE

01:18PM   23    MULTIPLE OF THESE ENTITIES CONSIDERED HEDGE FUNDS?

01:19PM   24    A.   THE MIDDLE ENTITY AND THE BOTTOM ENTITY ARE CONSIDERED

01:19PM   25    HEDGE FUNDS.

01:19PM 1    Q.   OKAY.  AND WHY -- WHAT MAKES THEM A HEDGE FUND VERSUS

01:19PM 2    THE -- BY COMPARISON TO THE TOP ENTITIES, FOR EXAMPLE?

01:19PM 3    A.   WHAT MAKES THEM A HEDGE FUND?

01:19PM 4    Q.   WHY IS IT CONSIDERED A HEDGE FUND IN THE INVESTMENT WORLD?

01:19PM 5    A.   THEY'RE GOVERNED BY DIFFERENT REGULATORY REGIMES.  I'M NOT

01:19PM 6    A HEDGE FUND LEGAL EXPERT, BUT AS A HEDGE FUND YOU ARE LIMITED

01:19PM 7    IN WHAT YOU CAN SELL THE WAY YOU MARKET THE FUND, AND AS A

01:19PM 8    RESULT YOU DON'T -- YOU'RE NOT ALLOWED TO MARKET THE, THE

01:19PM 9    INVESTMENT PRODUCT TO THE GENERAL PUBLIC.

01:19PM 10        THERE ARE OTHER DIFFERENCES BETWEEN MUTUAL FUNDS AND HEDGE

01:19PM 11   FUNDS, ONE OBVIOUS ONE BEING IS THAT HEDGE FUNDS CAN HEDGE.

01:20PM 12   Q.   OKAY.  THE, THE -- AND THE -- IS IT FAIR TO SAY THE

01:20PM 13   PRINCIPAL HEALTH CARE FUND WITHIN PFM IS SOMETHING THAT YOU

01:20PM 14   WERE IN CHARGE OF DURING THIS PERIOD?

01:20PM 15   A.   CAN YOU BE A LITTLE MORE SPECIFIC WHAT YOU'RE REFERRING

01:20PM 16   TO?

01:20PM 17   Q.   WHAT WAS THE LARGEST HEALTH CARE FUND AT PFM IN THIS TIME

01:20PM 18   PERIOD?

01:20PM 19   A.   THE LARGEST HEALTH CARE FUND WAS THE HEALTH CARE MASTER

01:20PM 20   FUND.

01:20PM 21   Q.   OKAY.  AND WERE YOU THE PORTFOLIO MANAGER OF THE HEALTH

01:20PM 22   CARE MASTER FUND?

01:20PM 23   A.   YES.

01:20PM 24   Q.   OKAY.  AND THAT'S THE, THAT'S THE MIDDLE ENTITY HERE ON

01:20PM 25   THIS EXHIBIT 1506; CORRECT?

01:20PM   1    A.   YES.

01:20PM   2    Q.   OKAY.  AND THAT'S, THAT'S -- AND ARE YOU THE PERSON,

01:20PM   3    THEREFORE, THAT HAS THE ULTIMATE AUTHORITY TO MAKE THE

01:20PM   4    INVESTMENT DECISIONS WITH RESPECT TO THAT FUND?

01:20PM   5    A.   YES.

01:20PM   6    Q.   OKAY.  AND JUST SO WE ALL UNDERSTAND SORT OF HOW THIS

01:21PM   7    WORKS, YOU MENTIONED THAT THERE WERE VARIOUS, I THINK YOU SAID,

01:21PM   8    FAMILY OFFICES AND INSTITUTIONAL INVESTORS AND HIGH NET WORTH

01:21PM   9    INDIVIDUALS WHO CHOOSE TO PLACE MONEY INTO THAT FUND; IS THAT

01:21PM  10    RIGHT?

01:21PM  11    A.   THAT IS RIGHT.

01:21PM  12    Q.   AND AT THAT POINT, ALL OF THE INVESTMENT DECISIONS ARE

01:21PM  13    MADE BY YOU; IS THAT CORRECT?

01:21PM  14    A.   I HAVE -- YEAH, YES.

01:21PM  15    Q.   IN OTHER WORDS --

01:21PM  16    A.   WELL, LET ME JUST -- I JUST WANT TO MAKE SURE THAT I AGREE

01:21PM  17    WITH THE ASSUMPTION IN YOUR QUESTION.

01:21PM  18         I DON'T MAKE EVERY INVESTMENT DECISION, BUT I HAVE THE

01:21PM  19    FINAL INVESTMENT DECISION FOR THE PORTFOLIO.

01:21PM  20    Q.   FAIR ENOUGH.

01:21PM  21         AND I GUESS THE POINT I'M TRYING TO MAKE IS THAT WHEN

01:21PM  22    SOMEONE GIVES MONEY TO YOU AS A HEDGE FUND, THEY NO LONGER HAVE

01:21PM  23    CONTROL OVER HOW YOU INVEST THE MONEY.  THE DECISION IS YOURS,

01:22PM  24    NOT THE FAMILY OFFICE THAT GAVE YOU THE MONEY; CORRECT?

01:22PM  25    A.   UNTIL THEY REQUEST IT BACK, YES.

01:22PM   1        Q.   FAIR ENOUGH.

01:22PM   2             AND WITH RESPECT TO THE FUND ON THE BOTTOM, THE PRINCIPAL

01:22PM   3        HEALTH CARE, OR THE PFM HEALTHCARE PRINCIPALS FUND, LP, WHO

01:22PM   4        MAKES DECISIONS FOR THAT FUND?

01:22PM   5        A.   THE GOVERNANCE FOR THAT FUND IS THE SAME AS THE GOVERNANCE

01:22PM   6        FOR THE PFM HEALTHCARE MASTER FUND.

01:22PM   7        Q.   OKAY.  SO YOU HAVE THE ULTIMATE DECISION MAKING AUTHORITY

01:22PM   8        FOR THAT FUND AS WELL?

01:22PM   9        A.   YES.

01:22PM   10       Q.   SO WHEN PEOPLE PUT MONEY INTO THAT FUND, THEY'RE

01:22PM   11       ENTRUSTING YOU TO MAKE THE INVESTMENT DECISION; IS THAT FAIR?

01:22PM   12       A.   YES.

01:22PM   13       Q.   OKAY.  AND THEN THE FIRST FUND IS PARTNER INVESTMENT

01:23PM   14       FUNDS -- I'M SORRY, PARTNER INVESTMENTS, LP.

01:23PM   15            DO YOU SEE THAT?

01:23PM   16       A.   YES.

01:23PM   17       Q.   AND IN THAT FUND, DO THE INDIVIDUALS RETAIN CONTROL TO

01:23PM   18       MAKE INVESTMENT DECISIONS?

01:23PM   19       A.   COULD YOU BE A LITTLE MORE SPECIFIC?

01:23PM   20       Q.   WELL, LET'S USE THERANOS, FOR EXAMPLE.

01:23PM   21            SO THE PEOPLE WHO INVESTED -- I ASSUME THE 55.5 MILLION IS

01:23PM   22       MADE UP OF A NUMBER OF DIFFERENT INVESTORS; IS THAT FAIR?

01:23PM   23       A.   YES.

01:23PM   24       Q.   AND DID THOSE INDIVIDUAL INVESTORS HAVE THE ABILITY TO

01:23PM   25       MAKE THE DECISION TO INVEST IN THERANOS?

01:23PM  1      A.   YES.

01:23PM  2      Q.   OKAY.  AND DID THEY DO THAT BASED UPON ANALYSIS AND

01:23PM  3      INFORMATION THAT WAS PROVIDED BY YOU AND YOUR TEAM?

01:23PM  4      A.   I, I CAN'T REALLY ANSWER THAT QUESTION.  I'M NOT SURE WHAT

01:23PM  5      THE BASIS FOR THOSE INDIVIDUALS MAKING DECISIONS WERE.  I

01:23PM  6      DON'T, I DON'T KNOW.

01:23PM  7      Q.   FAIR ENOUGH.

01:23PM  8           WE'LL GO THROUGH SOME OF THE MATERIALS THAT THEY WERE

01:23PM  9      GIVEN.

01:23PM 10           DO YOU RECALL THAT YOU PREPARED AN ANALYSIS THAT WAS GIVEN

01:23PM 11      TO SOME OF THE PEOPLE WHO INVESTED IN THAT FUND?

01:24PM 12      A.   YES.

01:24PM 13      Q.   OKAY.  AND DO YOU HAVE REASON TO BELIEVE THAT SOME OF THE

01:24PM 14      PEOPLE WHO INVESTED IN THAT FUND MADE THE DECISIONS BASED UPON

01:24PM 15      THAT ANALYSIS?

01:24PM 16      A.   IT'S POSSIBLE.

01:24PM 17      Q.   OKAY.  NOW, AS SOMEONE WHO MAKES THESE INVESTMENT

01:24PM 18      DECISIONS, I'M SURE YOU UNDERSTAND, YOU KNOW, RISKS ARE COMMON

01:24PM 19      IN INVESTMENTS; IS THAT FAIR?

01:24PM 20      A.   YES.

01:24PM 21      Q.   OKAY.  AND ONE OF THE THINGS THAT YOU DO IS ASSESS THE

01:24PM 22      RISKS AND THE REWARDS AND DECIDE WHETHER OR NOT IT'S WORTH

01:24PM 23      PROCEEDING WITH AN INVESTMENT; IS THAT FAIR?

01:24PM 24      A.   YES.

01:24PM 25      Q.   OKAY.  AND I -- AND WOULD YOU SAY YOU'VE MADE TENS OF

01:24PM   1    THOUSANDS OF INVESTMENTS DECISIONS IN YOUR CAREER?

01:24PM   2    A.   I DON'T KNOW.

01:24PM   3    Q.   A LOT?

01:24PM   4    A.   YEAH, I DON'T -- WHAT'S "A LOT"?

01:25PM   5    Q.   HAVE YOU MADE MORE THAN A HUNDRED INVESTMENT DECISIONS IN

01:25PM   6    YOUR CAREER?

01:25PM   7    A.   YES.

01:25PM   8    Q.   OKAY.  AND SOMETIMES YOU WIN AND SOMETIMES YOU LOSE;

01:25PM   9    RIGHT?

01:25PM  10    A.   YES.

01:25PM  11    Q.   OKAY.  AND IS IT FAIR TO SAY THAT GENERALLY THE MORE RISK

01:25PM  12    THAT YOU TAKE, THE GREATER THE REWARD?  IS THAT SORT OF A

01:25PM  13    COMMON THOUGHT WITH AN INVESTMENT PHILOSOPHY?

01:25PM  14    A.   YES.

01:25PM  15    Q.   AND WHEN, WHEN -- JUST SO WE'RE CLEAR, WHEN YOU'RE MAKING

01:25PM  16    THESE INVESTMENT DECISIONS, YOU'RE NOT DOING THIS BASED UPON

01:25PM  17    JUST GUT FEEL; RIGHT?

01:25PM  18    A.   UM, NO.

01:25PM  19    Q.   YOU GO THROUGH A PRETTY EXTENSIVE PROCESS OF ANALYSIS

01:25PM  20    BEFORE YOU MAKE A DECISION TO INVEST OTHER PEOPLE'S MONEY;

01:26PM  21    RIGHT?

01:26PM  22    A.   YES.

01:26PM  23    Q.   AND YOU WANT TO DO YOUR RESEARCH AND BE CAUTIOUS TO MAKE

01:26PM  24    SURE YOU'RE MAKING A SOUND AND PRUDENT INVESTMENT DECISION;

01:26PM  25    CORRECT?

01:26PM  1    A.   YES.

01:26PM  2    Q.   OKAY.  AND IN THE HEALTH CARE SPACE IN PARTICULAR, YOU

01:26PM  3    HAVE A FAIR AMOUNT OF EXPERTISE; RIGHT?

01:26PM  4    A.   I MEAN, IF, IF YOU'RE ASKING DO I HAVE EXPERIENCE AS A

01:26PM  5    HEALTH CARE INVESTOR, YES.

01:26PM  6    Q.   HOW MUCH EXPERIENCE DO YOU HAVE AS A HEALTH CARE INVESTOR?

01:26PM  7    A.   I'VE BEEN INVESTING IN THE SPACE SINCE THE LATE '90S.

01:26PM  8    Q.   OKAY.  SO MORE THAN 20 YEARS OF EXPERIENCE IN INVESTING IN

01:26PM  9    HEALTH CARE COMPANIES; IS THAT FAIR?

01:26PM  10   A.   YES.

01:26PM  11   Q.   AND DOES THAT INCLUDE A WIDE VARIETY OF HEALTH CARE

01:26PM  12   COMPANIES?

01:26PM  13   A.   YES.

01:26PM  14   Q.   GIVE US JUST A SENSE OF THE RANGE OF DIFFERENT COMPANIES

01:26PM  15   THAT YOU HAVE EXPERIENCE INVESTING IN IN THE HEALTH CARE SPACE.

01:27PM  16   A.   FROM THE LARGEST COMPANIES LIKE UNITED HEALTH CARE, LIKE

01:27PM  17   PFIZER, TO, YOU KNOW, SMALL SERIES A SEED INVESTMENTS, THE

01:27PM  18   WHOLE CONTINUUM.

01:27PM  19   Q.   OKAY.  AND PFM IN PARTICULAR IN THE HEALTH CARE SPACE

01:27PM  20   INVESTS PREDOMINANTLY IN PUBLIC MARKET SECURITIES; IS THAT

01:27PM  21   RIGHT?

01:27PM  22   A.   MAYBE YOU COULD BE A LITTLE MORE SPECIFIC.  WHAT DO YOU

01:27PM  23   MEAN BY "PREDOMINANTLY"?

01:27PM  24   Q.   WHAT PERCENTAGE OF PFM -- IN THIS TIME PERIOD ROUGHLY,

01:27PM  25   WHAT PERCENTAGE OF PFM'S INVESTMENTS WERE IN PUBLICLY TRADED

01:27PM   1    SECURITIES?

01:27PM   2    A.   I DON'T, I DON'T KNOW OFF THE TOP OF MY HEAD.

01:27PM   3    Q.   DO YOU HAVE AN ESTIMATE?

01:27PM   4    A.   I DON'T.

01:27PM   5    Q.   OKAY.  YOU WERE THE PORTFOLIO MANAGER AT THE TIME; RIGHT?

01:27PM   6    A.   YES.

01:27PM   7    Q.   OKAY.

01:27PM   8    A.   I WAS ONE OF -- THERE WAS ANOTHER PORTFOLIO MANAGER AT PFM

01:28PM   9    AS WELL.

01:28PM  10    Q.   IS THAT MR. JAMES?

01:28PM  11    A.   YES.

01:28PM  12    Q.   BUT YOU WERE THE PORTFOLIO MANAGER OF THE HEALTH CARE

01:28PM  13    INVESTMENT FUND; CORRECT?

01:28PM  14    A.   YEP.

01:28PM  15    Q.   AND HE GENERALLY DEFERRED TO YOU ON THE HEALTH CARE

01:28PM  16    INVESTMENTS; IS THAT FAIR?

01:28PM  17    A.   YES.

01:28PM  18    Q.   OKAY.  AND JUST SO WE UNDERSTAND HOW YOUR MODEL WORKS, IF

01:28PM  19    SOMEONE ENTRUSTS YOU WITH THEIR MONEY, YOU'RE COMPENSATED BASED

01:28PM  20    UPON A PERCENTAGE OF THE ASSETS UNDER MANAGEMENT; RIGHT?

01:28PM  21    A.   NO.

01:28PM  22    Q.   OKAY.  WHY DON'T YOU TELL US HOW YOU'RE COMPENSATED.

01:28PM  23    A.   IT IS A FUNCTION OF -- IT'S THE NET PROFITABILITY OF THE

01:28PM  24    BUSINESS AFTER EXPENSES.

01:28PM  25    Q.   OKAY.  AND SO YOU HAVE TO MAKE PROFIT TO -- IN ORDER TO BE

01:28PM  1    PAID?

01:28PM  2    A.   THE BUSINESS HAS TO HAVE PROFITS IN ORDER FOR PARTNERS TO

01:28PM  3    BE COMPENSATED, YES.

01:28PM  4    Q.   RIGHT.  BUT MY QUESTION IS HOW THE BUSINESS MAKES MONEY,

01:29PM  5    NOT NECESSARILY HOW YOU PERSONALLY MAKE MONEY.

01:29PM  6    A.   OH, SORRY.

01:29PM  7    Q.   I WASN'T CLEAR.

01:29PM  8    A.   SORRY.

01:29PM  9    Q.   I APOLOGIZE.

01:29PM  10        THE BUSINESS MAKES MONEY BASED UPON A PERCENTAGE OF THE

01:29PM  11   MONEY THAT THEY'RE MANAGING FOR A PARTICULAR INVESTOR; CORRECT?

01:29PM  12   A.   NO.

01:29PM  13   Q.   OKAY.  WHY DON'T YOU EXPLAIN IT TO US?

01:29PM  14   A.   THE BUSINESS MAKES MONEY WHEN THE REVENUES -- THE

01:29PM  15   CUMULATIVE REVENUES IN ANY GIVEN YEAR ARE IN EXCESS OF OUR

01:29PM  16   CUMULATIVE EXPENSES.

01:29PM  17   Q.   OKAY.

01:29PM  18   A.   LIKE ANY BUSINESS.

01:29PM  19   Q.   ARE YOU -- LET ME TRY A THIRD TIME.  MAYBE WE'LL GET IT

01:29PM  20   THIS TIME.

01:29PM  21        YOU'RE COMPENSATED BY YOUR INVESTORS; CORRECT?

01:29PM  22   A.   IF THE QUESTION IS, DO OUR INVESTORS PAY FEES, YES, THEY

01:29PM  23   DO PAY FEES.

01:29PM  24   Q.   OKAY.  WHY DON'T YOU EXPLAIN THE FEES THAT THEY PAID TO

01:29PM  25   PFM?

GROSSMAN CROSS BY MR. WADE

01:29PM  1    A.   INVESTORS PAY A MANAGEMENT FEE, WHICH IS A PERCENTAGE OF

01:29PM  2    THEIR ASSETS.  IT CAN BE ANYWHERE FROM 0 TO 2 PERCENT.

01:30PM  3         AND THEN IN ADDITION TO THAT, THEY PAY PERFORMANCE FEES,

01:30PM  4    WHICH ARE A FUNCTION OF HOW THE FUND PERFORMS IN ANY GIVEN

01:30PM  5    YEAR.

01:30PM  6    Q.   OKAY.  SO THERE'S A, THERE'S A SMALL AMOUNT THAT YOU MAKE

01:30PM  7    REGARDLESS OF WHETHER THE INVESTMENT GOES UP OR DOWN; IS THAT

01:30PM  8    FAIR?

01:30PM  9    A.   CAN YOU BE A LITTLE MORE CLEAR ABOUT WHAT "MAKE" MEANS?

01:30PM  10   Q.   IN FEES?

01:30PM  11   A.   YEAH, WE HAVE REVENUES, YES.

01:30PM  12   Q.   OKAY.  AND THEN THERE'S SOME WHERE YOU ONLY GENERATE

01:30PM  13   ADDITIONAL FEES IF YOU PERFORM WELL ON THE INVESTMENT; IS THAT

01:30PM  14   FAIR?

01:30PM  15   A.   NO.

01:30PM  16   Q.   OKAY.  WHY DON'T YOU EXPLAIN WHAT I GOT WRONG THEN.

01:30PM  17   A.   IT'S NOT AT THE INVESTMENT, IT'S AT THE FUND LEVEL.

01:30PM  18   Q.   OKAY.  AT THE FUND LEVEL?

01:30PM  19   A.   CORRECT.

01:30PM  20   Q.   OKAY.  SO IF THEY HAVE AN INVESTMENT IN A FUND, IT'S BASED

01:30PM  21   UPON THE PERFORMANCE IN THAT FUND; IS THAT RIGHT?

01:30PM  22   A.   CORRECT.

01:30PM  23   Q.   AND IF YOU DO WELL WITH THEIR INVESTMENT WITHIN THAT FUND,

01:30PM  24   THEN YOU RECEIVE MORE MONEY; RIGHT?

01:30PM  25   A.   THE FIRM EARNS MORE REVENUES.

01:30PM  1    Q.   OKAY.  THE -- WHEN YOU'RE OUT MARKETING YOUR SERVICES, THE

01:31PM  2    PERFORMANCE IN TERMS OF RETURN ON INVESTMENTS IS A SIGNIFICANT

01:31PM  3    THING THAT YOU MARKET TO PEOPLE WHO ARE CONSIDERING INVESTMENT

01:31PM  4    IN A PFM FUND; IS THAT FAIR?

01:31PM  5    A.   UM, IT'S HARD FOR ME TO ANSWER WHAT OTHER PEOPLE THINK ARE

01:31PM  6    SIGNIFICANT, SO I -- I'M NOT SURE HOW TO ANSWER THAT QUESTION.

01:31PM  7    Q.   OKAY.  IS YOUR HISTORICAL INVESTMENT PERFORMANCE SOMETHING

01:31PM  8    THAT YOU FREQUENTLY INCLUDE WITHIN YOUR PROMOTIONAL MATERIALS

01:31PM  9    THAT YOU GIVE TO PEOPLE --

01:31PM  10   A.   YES.

01:31PM  11   Q.   -- WHO ARE CONSIDERING INVESTMENTS IN YOUR FUNDS?

01:31PM  12   A.   YES.

01:31PM  13          MR. WADE:  OKAY.  YOUR HONOR, MAYBE NOW WOULD BE A

01:31PM  14   GOOD TIME FOR OUR 1:30 BREAK AND SEE IF WE CAN RESET WHEN WE

01:31PM  15   COME BACK.

01:31PM  16          THE COURT:  I THINK THAT'S A GOOD IDEA.

01:31PM  17       LET'S TAKE OUR BREAK, LADIES AND GENTLEMEN, 30 MINUTES,

01:31PM  18   PLEASE, 30 MINUTES.

01:32PM  19       (RECESS FROM 1:32 P.M. UNTIL 2:04 P.M.)

02:04PM  20          THE COURT:  ALL RIGHT.  THANK YOU.  WE'RE BACK ON

02:04PM  21   THE RECORD.  PLEASE BE SEATED.

02:04PM  22       ALL COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT.  OUR JURY

02:04PM  23   IS PRESENT.

02:04PM  24       MR. WADE.

02:04PM  25          MR. WADE:  THANK YOU, YOUR HONOR.

02:04PM 1    Q.   MR. GROSSMAN, I'D LIKE TO ASK JUST A COUPLE OF QUESTIONS

02:04PM 2    ABOUT THE DUE DILIGENCE TEAM THAT, OR ANALYST TEAM THAT WORKED

02:04PM 3    ON THE INVESTMENT.  OKAY?

02:04PM 4    A.   OKAY.

02:04PM 5    Q.   AND YOU MENTIONED MR. KHANNA.  HAD HE -- AT THE TIME HE

02:04PM 6    WAS WORKING ON THIS INVESTMENT, HAD HE BEEN AT PFM FOR A

02:04PM 7    SIGNIFICANT PERIOD OF TIME?

02:04PM 8    A.   I BELIEVE HE JOINED IN 2013.

02:05PM 9    Q.   OKAY.  SO HAD HE BEEN THERE FOR A REASONABLY SHORT PERIOD

02:05PM 10   OF TIME?

02:05PM 11   A.   YES.

02:05PM 12   Q.   BUT HE HAD SIGNIFICANT EXPERIENCE IN THE HEALTH CARE FIELD

02:05PM 13   PRIOR TO JOINING PFM?

02:05PM 14   A.   YES.

02:05PM 15   Q.   ABOUT 20 YEARS OF EXPERIENCE WITH RESPECT TO HEALTH CARE

02:05PM 16   COMPANIES; IS THAT RIGHT?

02:05PM 17   A.   OR MORE, YEAH.

02:05PM 18   Q.   OKAY.  AND I THINK YOU MENTIONED ALEX RABODZEY.  AM I

02:05PM 19   PRONOUNCING THAT CORRECTLY?

02:05PM 20   A.   YEP.

02:05PM 21   Q.   AND DR. RABODZEY HAD SOME TECHNICAL TRAINING; IS THAT

02:05PM 22   RIGHT?

02:05PM 23   A.   HE DID.

02:05PM 24   Q.   AND HE, HE, HE GOT A BACHELOR'S DEGREE FROM THE MOSCOW

02:05PM 25   INSTITUTE OF PHYSICS AND TECHNOLOGY; IS THAT RIGHT?

02:05PM  1    A.   YES.

02:05PM  2    Q.   AND THEN HE WENT ON TO GET A PH.D. IN BIOENGINEERING FROM

02:05PM  3    MASSACHUSETTS INSTITUTE OF TECHNOLOGY?

02:06PM  4    A.   YES.

02:06PM  5    Q.   AND IS IT FAIR TO SAY THAT HE SERVED ON SOME OF THE

02:06PM  6    TECHNICAL ISSUES AS SORT OF A SUBJECT MATTER EXPERT FOR YOU ON

02:06PM  7    THIS INVESTMENT?

02:06PM  8    A.   YES.

02:06PM  9    Q.   A SMART FELLOW.  IS THAT FAIR?

02:06PM  10   A.   MORE OF A SCIENCE BACKGROUND THAN MR. KHANNA.

02:06PM  11   Q.   UH-HUH.  AND THEN YOU MENTIONED IS IT SRI BALASURYAN?

02:06PM  12   A.   YES.

02:06PM  13   Q.   AND HE WAS, AND HE WAS THE GUY, HE WAS THE JUNIOR ANALYST

02:06PM  14   YOU REFERRED TO?

02:06PM  15   A.   YES.

02:06PM  16   Q.   AND WAS HE THE PERSON WHO DID SORT OF THE TECHNICAL

02:06PM  17   SPREADSHEET WORK AROUND BUILDING THE MODEL AND THE LIKE?

02:06PM  18   A.   HE CERTAINLY DID SOME OF IT, AND ALSO -- YOU KNOW, OLD

02:06PM  19   GUYS LIKE ME CAN'T DO POWERPOINT, AND SO HE DID ALL OF THE

02:06PM  20   CHARTS AND PRESENTATIONS.  SO HE DID THAT TYPE OF WORK FOR US.

02:07PM  21   Q.   GREAT.  AND THE -- I NOW WANT TO SHIFT AND FOCUS JUST

02:07PM  22   BRIEFLY, IF I CAN, ON THIS PERIOD IN HERE BETWEEN NOVEMBER 1ST

02:07PM  23   AND THAT FIRST MEETING THAT YOU HAD AT THERANOS, AND I HAVE

02:07PM  24   SOME QUESTIONS ON THAT PERIOD.  OKAY?

02:07PM  25   A.   OKAY.

02:07PM   1    Q.   DO YOU RECALL THAT IN THE FIRST INSTANCE, ACTUALLY

02:07PM   2    THERANOS DID NOT SOLICIT PFM FOR AN INVESTMENT, DID IT?

02:07PM   3    A.   NO.

02:07PM   4    Q.   PFM WAS ACTUALLY INTRODUCED BY ANOTHER HEDGE FUND; IS THAT

02:07PM   5    RIGHT?

02:07PM   6    A.   I, I DON'T, I DON'T RECALL EXACTLY HOW THE INTRODUCTION

02:07PM   7    WAS MADE.

02:07PM   8    Q.   OKAY.  DO YOU KNOW MR. LAFFONT?

02:07PM   9    A.   I KNOW WHO HE IS.

02:07PM  10    Q.   AND WHO IS HE?

02:07PM  11    A.   HE'S A -- HE RUNS -- HE'S ANOTHER -- HE'S AN INVESTOR WHO

02:07PM  12    WORKS AT A -- WHO RUNS -- HE WORKS AT ANOTHER HEDGE FUND.

02:08PM  13    Q.   AND IS THAT COATUE?

02:08PM  14    A.   IT'S COATUE.

02:08PM  15    Q.   COATUE.

02:08PM  16         AND DO YOU RECALL THAT HE WAS A PERSON WHO INTRODUCED YOUR

02:08PM  17    PARTNER, MR. JAMES, TO THE THERANOS INVESTMENT?

02:08PM  18    A.   THAT IS MY MEMORY, YES.

02:08PM  19    Q.   OKAY.  AND THEN ONCE MR. JAMES LEARNED ABOUT THIS

02:08PM  20    POTENTIAL OPPORTUNITY, DO YOU RECALL THAT HE KIND OF PASSED IT

02:08PM  21    ON TO YOUR GROUP TO SEE IF YOU KNEW ANYTHING ABOUT THE COMPANY?

02:08PM  22    A.   YES.

02:08PM  23    Q.   LET'S TAKE A LOOK IN YOUR BOOK AT EXHIBIT 7353.

02:08PM  24              THE COURT:  WHICH VOLUME WILL THAT BE?

02:08PM  25              MR. WADE:  THAT WILL BE IN VOLUME 1.

02:09PM    1    Q.   DO YOU HAVE THAT IN FRONT OF YOU, MR. GROSSMAN?

02:09PM    2    A.   I DO.

02:09PM    3    Q.   AND DO YOU RECOGNIZE THIS TO BE AN EMAIL ON NOVEMBER 1ST

02:09PM    4    THAT INVOLVES YOU AND SOME OTHER EMPLOYEES OF PFM RELATING TO

02:09PM    5    THERANOS?

02:09PM    6    A.   YES, I DO.

02:09PM    7             MR. WADE:  MOVE THE ADMISSION OF 7353.

02:09PM    8             MR. LEACH:  NO OBJECTION, YOUR HONOR.

02:09PM    9             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:09PM   10        (DEFENDANT'S EXHIBIT 7353 WAS RECEIVED IN EVIDENCE.)

02:09PM   11             MR. WADE:  AND IF WE CAN BLOW UP THE BOTTOM.

02:09PM   12    Q.   THIS IS AN EMAIL FROM MR. LAFFONT TO MR. JAMES ON

02:09PM   13    NOVEMBER 1ST.

02:09PM   14        DO YOU SEE THAT?

02:09PM   15    A.   YEP.

02:09PM   16    Q.   AND WE TALKED ABOUT HOW NOVEMBER 1ST WAS THE DATE WHEN YOU

02:09PM   17    FIRST LEARNED ABOUT THERANOS BEFORE THE BREAK.

02:09PM   18        DO YOU RECALL THAT?

02:09PM   19    A.   YES.

02:09PM   20    Q.   AND WAS THIS THE EMAIL BY WHICH YOU FIRST LEARNED ABOUT

02:09PM   21    IT?

02:09PM   22    A.   I BELIEVE SO, YES.

02:09PM   23    Q.   OKAY.  YOU DON'T RECALL KNOWING ANYTHING ABOUT THE COMPANY

02:10PM   24    PRIOR TO THAT?

02:10PM   25    A.   I DON'T REMEMBER ACTUALLY BEFORE THAT, NO.

02:10PM  1   Q.   HAD YOU MET MS. HOLMES PRIOR TO THAT?

02:10PM  2   A.   NO.

02:10PM  3   Q.   OKAY.  IT ASKS -- MR. LAFFONT, YOU SEE, ASKS MR. JAMES TO

02:10PM  4   LET HIM KNOW IF HE'S INTERESTED IN THE INVESTMENT AND POINTS

02:10PM  5   OUT THE WEBSITE.

02:10PM  6        DO YOU SEE THAT?

02:10PM  7   A.   WELL, I'M NOT SURE IF HE SAYS ANYTHING ABOUT THE

02:10PM  8   INVESTMENT, BUT IT SAYS "LET ME KNOW ASAP IF THIS PRIVATE

02:10PM  9   COMPANY IS OF INTEREST TO YOU."

02:10PM 10   Q.   FAIR ENOUGH.

02:10PM 11   A.   SO, YEAH.

02:10PM 12   Q.   AND WHEN IT WAS FORWARDED TO YOU, DID YOU INFER THAT THIS

02:10PM 13   WAS A POSSIBLE INVESTMENT OPPORTUNITY?

02:10PM 14   A.   I MEAN, SORT OF.  I MEAN, PRIVATE COMPANIES ARE ALWAYS

02:10PM 15   RAISING MONEY, BUT I WOULD SAY THERE WAS MORE -- I'M SORRY, I

02:10PM 16   DIDN'T ANSWER YOUR QUESTION.

02:11PM 17        THE QUESTION IS -- COULD YOU REPEAT THE QUESTION?

02:11PM 18   Q.   DID YOU -- WHEN THIS WAS SENT TO YOU, DID YOU UNDERSTAND

02:11PM 19   THAT THIS WAS BEING SENT TO YOU AS A POSSIBLE INVESTMENT

02:11PM 20   OPPORTUNITY?

02:11PM 21   A.   ACTUALLY, AT THE TIME, NO.  NO.

02:11PM 22   Q.   OKAY.  AND -- BUT DO YOU RECALL THAT YOU FORWARDED IT TO

02:11PM 23   SOME MEMBERS OF YOUR TEAM TO ASK IF THEY KNEW ANYTHING ABOUT

02:11PM 24   THE COMPANY?

02:11PM 25   A.   YES.

02:11PM  1    Q.   AND THESE ARE SOME OF THE FOLKS WHOSE NAMES WE'VE BEEN

02:11PM  2    TALKING ABOUT HERE, MR. KHANNA AND MR. RABODZEY.

02:11PM  3         DO YOU SEE THAT?

02:11PM  4    A.   YEP.  I DO, YES.

02:11PM  5    Q.   AND YOU WERE JUST SEEING IF ANYONE HAD ANY INTEL ON THIS

02:11PM  6    COMPANY; IS THAT FAIR?

02:11PM  7    A.   YES.

02:11PM  8    Q.   DO YOU RECALL WHETHER AT THIS TIME YOU TOOK A LOOK AT THE

02:11PM  9    WEBSITE AND DID A LITTLE INTERNET RESEARCH OR ANYTHING ABOUT

02:11PM  10   THE COMPANY?

02:11PM  11   A.   I BELIEVE I DID, YES.

02:11PM  12   Q.   OKAY.  AND, IN FACT, IF WE LOOK AT -- IF YOU LOOK AT THE

02:11PM  13   NEXT DOCUMENT IN YOUR BOOK AT 7354, DO YOU SEE YOU RESPOND TO

02:12PM  14   MR. JAMES?

02:12PM  15   A.   OKAY.  YES.

02:12PM  16   Q.   YOU RECOGNIZE THIS EMAIL TO BE A RESPONSE TO MR. JAMES'S

02:12PM  17   INITIAL EMAIL, JUST A DIFFERENT EMAIL CHAIN?

02:12PM  18   A.   YES, I DO.

02:12PM  19             MR. WADE:  MOVE THE ADMISSION OF 7354.

02:12PM  20             MR. LEACH:  NO OBJECTION, YOUR HONOR.

02:12PM  21             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:12PM  22        (DEFENDANT'S EXHIBIT 7354 WAS RECEIVED IN EVIDENCE.)

02:12PM  23   BY MR. WADE:

02:12PM  24   Q.   AND DO YOU SEE THERE, I THINK WE SAW THE RESPONSE FROM

02:12PM  25   MR. JAMES BEFORE, WOWSY.

02:12PM 1          DO YOU SEE THAT?

02:12PM 2     A.   YES, I DO.

02:12PM 3     Q.   AND IF WE LOOK UP BELOW, YOU NOTE ACTUALLY THAT IT WAS

02:12PM 4     PRETTY COOL, BUT YOU HAD NEVER HEARD OF IT BEFORE; RIGHT?

02:12PM 5     A.   YES.

02:12PM 6     Q.   AND WHEN YOU SAID IT WAS PRETTY COOL, WAS THAT BECAUSE YOU

02:12PM 7     HAD DONE A LITTLE POKING AROUND?

02:12PM 8     A.   I DON'T REMEMBER, BUT YES, LIKELY.

02:13PM 9     Q.   AND DO YOU RECALL HAVING ANY CONVERSATIONS WITH MR. JAMES

02:13PM 10    ABOUT THE COMPANY AND WHETHER THIS WAS AN OPPORTUNITY THAT

02:13PM 11    SHOULD BE CONSIDERED?

02:13PM 12    A.   I DON'T RECALL HAVING -- I DON'T RECALL DISCUSSING WITH

02:13PM 13    HIM ABOUT AN INVESTMENT IN THE COMPANY AT THIS POINT.  IT WAS

02:13PM 14    MORE, DO YOU KNOW ANYTHING ABOUT THIS COMPANY?

02:13PM 15    Q.   OKAY.

02:13PM 16    A.   SO --

02:13PM 17    Q.   AND WHEN YOU SAY "PRETTY COOL," DO YOU REMEMBER WHAT

02:13PM 18    MATERIALS YOU REVIEWED OR INFORMATION YOU REVIEWED DURING THIS

02:13PM 19    TIME PERIOD THAT CAUSED YOU TO FORM THE INITIAL IMPRESSION?

02:13PM 20    A.   I DON'T REMEMBER SPECIFICALLY, BUT MOST LIKELY IT WAS

02:13PM 21    WHATEVER WAS ON THE WEB PAGE, YOU KNOW, AT THAT TIME, THE

02:13PM 22    FINGERSTICK, THE MAIN WEB TEMPLATE THEY HAD AND, YOU KNOW, THE

02:13PM 23    FINGERSTICK, ALL OF THE -- MUCH OF THE SAME STUFF THAT WAS IN

02:13PM 24    SOME OF THE MATERIALS THAT THEY SENT US.

02:13PM 25    Q.   OKAY.  SOME SIMILAR GRAPHICS AND THINGS?

02:13PM  1    A.   YEAH.

02:13PM  2    Q.   AND DID YOU -- DO YOU RECALL TAKING A LOOK AT THEIR

02:14PM  3    LOCATIONS OR ANYWHERE YOU MIGHT GO TO GET A TEST --

02:14PM  4    A.   I DON'T, NO.

02:14PM  5    Q.   DO YOU RECALL THAT YOU TOOK A LOOK AT THE TESTING MENU

02:14PM  6    DURING THIS TIME PERIOD?

02:14PM  7    A.   I DON'T.

02:14PM  8    Q.   OKAY.  HAD YOU INVESTED IN LAB COMPANIES BEFORE THERANOS?

02:14PM  9    A.   YES.

02:14PM  10   Q.   OKAY.  SO YOU HAD SOME FAMILIARITY WITH TESTING MENUS AND

02:14PM  11   THE LIKE?

02:14PM  12   A.   UM, YES.

02:14PM  13   Q.   WHICH COMPANIES HAD YOU INVESTED IN?

02:14PM  14   A.   QUEST, LABCORP.  THERE WERE A FEW OTHER COMPANIES IN THE

02:14PM  15   LABORATORY INDUSTRY THAT HAVE BEEN ACQUIRED OVER THE YEARS.

02:14PM  16        THEN ALSO COMPANIES THAT MAKE DIAGNOSTIC ANALYTIC

02:14PM  17   INSTRUMENTS, MOLECULAR TESTING PLATFORMS.

02:14PM  18        SO ALL OF THOSE TYPES OF BUSINESSES WE'VE SEEN AS PART OF

02:15PM  19   OUR NORMAL INVESTMENT ACTIVITIES.

02:15PM  20   Q.   OKAY.  AND YOU RECALL AT SOME POINT THAT THERE WAS A

02:15PM  21   DECISION MADE TO PURSUE THIS FURTHER?

02:15PM  22   A.   YES.

02:15PM  23   Q.   AND DO YOU RECALL THAT THAT WAS DONE BY MR. JAMES

02:15PM  24   EXPRESSING AN INTEREST IN BEING CONNECTED WITH AN INVESTMENT

02:15PM  25   OPPORTUNITY?  WERE YOU AWARE OF THAT?

02:15PM  1    A.   I ACTUALLY DON'T REMEMBER THAT, BUT -- SO I DON'T REMEMBER

02:15PM  2    THE SPECIFICS OF HOW WE ENDED UP CONNECTED TO THEM.

02:15PM  3    Q.   OKAY.  DO YOU KNOW A GENTLEMAN BY THE NAME OF BOB COHEN?

02:15PM  4    A.   NEVER HEARD OF HIM.

02:15PM  5    Q.   OKAY.  BUT IN ANY EVENT, AT SOME POINT YOU OBVIOUSLY WENT

02:15PM  6    TO THE MEETING THAT YOU'VE TESTIFIED ABOUT PREVIOUSLY.

02:15PM  7    A.   YEP.

02:15PM  8    Q.   AND DO YOU RECALL IN THE MEANTIME SOME MEMBERS OF YOUR

02:15PM  9    TEAM MADE A FEW INQUIRIES ABOUT THERANOS?

02:16PM  10   A.   YES.

02:16PM  11   Q.   IN THAT TIME PERIOD THAT I POINTED TO BEFORE THAT MEETING?

02:16PM  12   DO YOU RECALL THAT?

02:16PM  13   A.   YES.

02:16PM  14   Q.   AND LET'S TAKE A LOOK AT 7358.

02:16PM  15        DO YOU HAVE THAT DOCUMENT IN FRONT OF YOU?

02:16PM  16   A.   YEAH, I DO.  COULD I JUST TAKE A MINUTE TO READ THROUGH

02:16PM  17   IT?

02:16PM  18   Q.   SURE.  LET ME KNOW WHEN YOU'RE READY.

02:16PM  19        (PAUSE IN PROCEEDINGS.)

02:16PM  20           THE WITNESS:  OKAY.  YEP.

02:16PM  21   BY MR. WADE:

02:16PM  22   Q.   AND DO YOU RECOGNIZE THIS TO BE AN EMAIL CHAIN WITH YOUR

02:17PM  23   ANALYST TEAM ABOUT SOME RESEARCH THAT THEY HAD GATHERED ON

02:17PM  24   THERANOS?

02:17PM  25   A.   I DO.

02:17PM  1          MR. WADE:  MOVE THE ADMISSION OF 7358.

02:17PM  2          MR. LEACH:  NO OBJECTION, YOUR HONOR.

02:17PM  3          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:17PM  4      (DEFENDANT'S EXHIBIT 7358 WAS RECEIVED IN EVIDENCE.)

02:17PM  5   BY MR. WADE:

02:17PM  6   Q.   AND IF WE LOOK AT THE BOTTOM ON NOVEMBER 18TH, DO YOU SEE

02:17PM  7   IN THE SUBJECT MATTER THERE YOU POSED THE QUESTION TO YOUR

02:17PM  8   ANALYST, "IS THIS SOMETHING WE SHOULD WORK UP ON THE PRIVATE

02:17PM  9   SIDE?"

02:17PM  10      DO YOU SEE THAT?

02:17PM  11  A.   I DO, YES.

02:17PM  12  Q.   AND WHAT DID YOU MEAN BY THAT?

02:17PM  13  A.   I MEAN IS IT SOMETHING THAT WE SHOULD DEDICATE RESOURCES

02:17PM  14  TO AND LEARN MORE ABOUT THE BUSINESS.

02:17PM  15  Q.   OKAY.  SO WORK UP, YOU MEAN SORT OF START THAT RESEARCH

02:17PM  16  PROCESS WHERE YOU INFORM YOURSELVES AS TO WHETHER OR NOT TO

02:17PM  17  MAKE THE INVESTMENT DECISION?

02:17PM  18  A.   I THINK THAT'S WHAT -- I MEAN, THAT'S GENERALLY WHAT I

02:17PM  19  MEAN BY THAT.

02:17PM  20  Q.   OKAY.  AND DO YOU RECALL WHAT HAPPENED BETWEEN

02:18PM  21  NOVEMBER 1ST AND NOVEMBER 18TH THAT PROMPTED YOU TO START THAT

02:18PM  22  PROCESS OR EXPLORE THAT PROCESS?

02:18PM  23  A.   I DON'T, NO.

02:18PM  24  Q.   OKAY.  LET'S TAKE A LOOK UP THE CHAIN.

02:18PM  25      DO YOU SEE THAT MR. KHANNA NOTES THAT HE GOT VERY GOOD

02:18PM  1    FEEDBACK FROM WAG?

02:18PM  2        DO YOU SEE THAT?

02:18PM  3    A.   I DO, YES.

02:18PM  4    Q.   AND YOU UNDERSTAND WAG THERE TO BE WALGREENS?

02:18PM  5    A.   YES.

02:18PM  6    Q.   AND WAS IT YOUR UNDERSTANDING THAT MR. KHANNA HAD REACHED

02:18PM  7    OUT TO SOMEONE AT WALGREENS TO SEE WHAT THEY COULD TELL HIM

02:18PM  8    ABOUT THERANOS?

02:18PM  9    A.   I, I DON'T KNOW WHAT HE WAS REFERRING TO HERE.

02:18PM  10   Q.   OKAY.  BUT IN ANY EVENT, YOU RECEIVED THE EMAIL; RIGHT?

02:18PM  11   A.   YES.

02:18PM  12   Q.   AND YOU UNDERSTOOD THAT HE HAD HEARD SOME POSITIVE NEWS

02:18PM  13   ABOUT THE COMPANY IN CONNECTION WITH THE WORK THAT THEY WERE

02:18PM  14   DOING WITH THERANOS; IS THAT FAIR?

02:18PM  15   A.   WELL, YES, AND THERE HAD BEEN PUBLIC PRESS RELEASES FROM

02:18PM  16   BOTH WALGREENS AND THERANOS, SO ONE DIDN'T HAVE TO LOOK VERY

02:19PM  17   FAR TO FIND POSITIVE INFORMATION.

02:19PM  18       SO I DON'T -- SO THERE WAS, THERE WAS A LOT OF -- YOU

02:19PM  19   KNOW, THERE WERE THINGS THAT ONE COULD EASILY FIND AT THAT

02:19PM  20   POINT ON BOTH COMPANIES.

02:19PM  21   Q.   AND JUST SO WE'RE CLEAR, WALGREENS WAS A COMPANY THAT YOU

02:19PM  22   WERE VERY FAMILIAR WITH AT THIS TIME; IS THAT RIGHT?

02:19PM  23   A.   YES.

02:19PM  24   Q.   YOU HAD INVESTED IN WALGREENS AT DIFFERENT POINTS IN TIME;

02:19PM  25   IS THAT RIGHT?

02:19PM  1    A.   YES.

02:19PM  2    Q.   AND WHEN A FUND LIKE YOURS INVESTS IN WALGREENS, IT

02:19PM  3    GENERALLY GETS ANALYST REPORTS AND PERFORMS RESEARCH; IS THAT

02:19PM  4    FAIR?

02:19PM  5    A.   YES.

02:19PM  6    Q.   AND SO YOU HAD SORT OF A BASE LEVEL UNDERSTANDING ABOUT

02:19PM  7    WALGREENS AND HOW IT OPERATED?

02:19PM  8    A.   YES.

02:19PM  9    Q.   AND WERE YOU GENERALLY IMPRESSED BY THE COMPANY?

02:19PM  10   A.   OUR VIEWS OF COMPANIES CHANGE ALL THE TIME, SO IT'S HARD

02:19PM  11   FOR ME TO KNOW EXACTLY WHAT WE WERE THINKING AT THAT POINT IN

02:19PM  12   TIME.

02:19PM  13        BUT THE RETAIL PHARMACY BUSINESS IS A TOUGH BUSINESS AND

02:20PM  14   HAS BEEN FOR YEARS, AND SO I THINK WE, WE'VE GENERALLY BEEN

02:20PM  15   SKEPTICAL OVER THE YEARS ABOUT THEIR ABILITY TO SURVIVE IN A

02:20PM  16   WORLD WITH AMAZON AND OTHER COMPETITIVE PRESSURES.

02:20PM  17        BUT WALGREENS IS A GREAT FRANCHISE, A GREAT BUSINESS, AND

02:20PM  18   SO, YOU KNOW, FROM TIME TO TIME WE COULD BE POSITIVE, WE COULD

02:20PM  19   BE NEGATIVE.  IT JUST SORT OF DEPENDED.

02:20PM  20        I DON'T BELIEVE WE HAD ANY PARTICULAR POINT OF VIEW ON

02:20PM  21   WALGREENS AT THIS POINT, BUT THAT'S JUST SORT OF A GENERAL

02:20PM  22   MEMORY OF THAT POINT IN TIME.

02:20PM  23   Q.   AND YOU RECOGNIZED THEM AT THE TIME TO BE A WELL

02:20PM  24   EXPERIENCED RETAILER; CORRECT?

02:20PM  25   A.   YES.

02:20PM  1     Q.   AND A VERY WELL ESTABLISHED BRAND?

02:20PM  2     A.   YES.

02:20PM  3     Q.   AND THEY HAD A SIGNIFICANT NATIONAL FOOTPRINT; RIGHT?

02:20PM  4     A.   YES.

02:20PM  5     Q.   AND SIGNIFICANT EXPERIENCE IN RETAIL OPERATIONS?

02:20PM  6     A.   YES.

02:20PM  7     Q.   AND SO WHEN YOU STARTED EXPLORING THIS CONNECTION BETWEEN

02:21PM  8     THERANOS AND WALGREENS, YOU SORT OF -- DID YOU SEE THAT AS A

02:21PM  9     POSITIVE?

02:21PM  10    A.   A POTENTIAL POSITIVE, YES.

02:21PM  11    Q.   TELL US WHY YOU THOUGHT IT WAS POSITIVE.

02:21PM  12    A.   WELL, IT WAS, IT WAS A NEW REVENUE SOURCE FOR A BUSINESS

02:21PM  13    THAT, AS I SAID BEFORE, WAS -- YOU KNOW, HAD SOME STRUCTURAL

02:21PM  14    PRESSURES, AND SO GETTING INTO THE REFERENCE LABORATORY SPACE

02:21PM  15    WAS, WAS INTERESTING.

02:21PM  16         AND I MEAN, I DON'T WANT TO -- THIS IS A LONG TIME AGO,

02:21PM  17    BUT WE WEREN'T -- I DON'T THINK WE REALLY WERE INVOLVED MUCH.

02:21PM  18    WE DIDN'T THINK ANYTHING AT THAT TIME.  I DON'T BELIEVE WE HAD

02:21PM  19    A POSITION IN WALGREENS.  SO, YOU KNOW, IT WAS SOMETHING THAT

02:21PM  20    JUST WASN'T THAT INTERESTING TO US.

02:22PM  21         AND THIS WAS SOMETHING THAT WAS INTERESTING.  ALL OF A

02:22PM  22    SUDDEN WALGREENS WAS -- MAYBE THERE WAS SOMETHING INTERESTING

02:22PM  23    ABOUT THE BUSINESS.

02:22PM  24         SO I THINK THAT WAS KIND OF THE GENESIS OF THIS EMAIL,

02:22PM  25    SHOULD WE TRY TO UNDERSTAND THIS?

02:22PM 1          AND IT ALSO HAD IMPLICATIONS FOR OTHER COMPANIES IN THE

02:22PM 2     SPACE, SO WE WANTED TO KIND OF UNDERSTAND WHAT THIS COULD MEAN

02:22PM 3     FOR THE REFERENCE LAB INDUSTRY, DIAGNOSTIC EQUIPMENT.

02:22PM 4          SO I THINK WE WERE CURIOUS ABOUT THIS PARTNERSHIP.

02:22PM 5     Q.   AND YOU WERE CURIOUS BECAUSE IT PRESENTED SOME

02:22PM 6     INTERESTING -- AN INTERESTING DEVELOPMENT FOR WALGREENS; RIGHT?

02:22PM 7     A.   POTENTIALLY.

02:22PM 8     Q.   BUT IT WAS ALSO A SIGNIFICANT FACTOR RELATING TO A

02:22PM 9     POTENTIAL INVESTMENT IN THERANOS, WAS IT NOT?

02:22PM 10    A.   YES, I GUESS.  I SUPPOSE.

02:22PM 11    Q.   I MEAN, ULTIMATELY THE ABILITY TO STAND UP A RETAIL

02:22PM 12    OPERATION, IT'S GOOD TO HAVE A VERY WELL ESTABLISHED RETAIL

02:22PM 13    PARTNER WORKING WITH YOU; CORRECT?

02:22PM 14    A.   CAN YOU REPHRASE THE QUESTION OR ASK THE QUESTION AGAIN?

02:23PM 15    I'M SORRY.

02:23PM 16    Q.   WELL, YOU CAME TO LEARN THAT THERANOS WAS GOING TO OPERATE

02:23PM 17    COMMERCIALLY THROUGH A RETAIL ESTABLISHMENT; RIGHT?

02:23PM 18    A.   YES.

02:23PM 19    Q.   AND, AND FOR A YOUNG COMPANY LIKE THERANOS TO DO THAT, DID

02:23PM 20    YOU VIEWS IT AS A POSITIVE FACTOR THAT THEY WERE PARTNERED WITH

02:23PM 21    A COMPANY LIKE WALGREENS?

02:23PM 22    A.   UH, I DID.

02:23PM 23    Q.   IN FACT, DO YOU RECALL COMING TO THE VIEW OF IF IT WERE

02:23PM 24    NOT FOR WALGREENS, YOU PROBABLY WOULDN'T HAVE EVEN CONSIDERED

02:23PM 25    THIS INVESTMENT OPPORTUNITY; IS THAT FAIR?

02:23PM  1    A.   UH, I DON'T REMEMBER SPECIFICALLY THINKING THAT OR

02:23PM  2    DISCUSSING THAT.  SO IT'S HARD FOR ME TO ANSWER THAT.

02:23PM  3         BUT WALGREENS WAS CERTAINLY IMPORTANT.

02:23PM  4    Q.   THE -- IF WE CAN WORK OUR WAY UP THE CHAIN TO THE NEXT

02:23PM  5    EMAIL.

02:23PM  6         DO YOU SEE -- YOU ASK WHAT, YOU ASK WHAT THE GOOD FEEDBACK

02:24PM  7    MEANT; RIGHT?

02:24PM  8         AND THEN YOU ALSO NOTE, "WHAT DOES IT MEAN FOR LH/DGX

02:24PM  9    LONGER TERM?"

02:24PM  10        DO YOU SEE THAT?

02:24PM  11   A.   YES, I DO.

02:24PM  12   Q.   AND WHAT DOES THAT REFER TO?

02:24PM  13   A.   WELL, I THINK I'M RESPONDING TO MY COLLEAGUE, VIVEK'S

02:24PM  14   EMAIL, HE SAYS, "GOOD FEEDBACK FROM WAG," SO I'M ASKING HIM TO

02:24PM  15   SORT OF ELABORATE ON THAT.  HE'S NOT ALWAYS THE MOST -- HE

02:24PM  16   DOESN'T ALWAYS OFFER UP A LOT OF INFORMATION.  HE TENDS TO BE

02:24PM  17   VERY KIND OF DIRECT IN EMAIL.

02:24PM  18        SO I'M ASKING FOR MORE INFORMATION.  AND THE ANSWER TO

02:24PM  19   YOUR SECOND QUESTION IS LH AND DGX ARE THE STOCK SYMBOLS FOR

02:24PM  20   QUEST -- WELL, LABCORP OF AMERICA, WHICH IS LH, AND THEN

02:24PM  21   QUEST DIAGNOSTICS.  BOTH OF THOSE ARE THE PUBLICLY TRADED

02:25PM  22   REFERENCE LABORATORY COMPANIES.

02:25PM  23   Q.   WHICH YOU HAD INVESTED IN PREVIOUSLY?

02:25PM  24   A.   WE HAD AT DIFFERENT POINTS, YES.

02:25PM  25   Q.   OKAY.  AND SO YOU'RE JUST KIND OF GETTING INTO HOW THIS

02:25PM 1    FITS WITHIN THE LAB SPACE; IS THAT FAIR?

02:25PM 2    A.   YES.

02:25PM 3    Q.   AND YOU'RE TRYING TO PULL INFORMATION OUT OF MAYBE A

02:25PM 4    RELUCTANT MR. KHANNA, AND HE ACTUALLY COMPLIES.  LET'S TAKE A

02:25PM 5    LOOK AT HIS RESPONSE.

02:25PM 6         AND THIS IS -- DO YOU KNOW WHAT HE'S INCLUDING WITHIN THIS

02:25PM 7    EMAIL?  DO YOU RECOGNIZE THIS FORM OF INFORMATION?

02:25PM 8    A.   I DO.

02:25PM 9    Q.   AND WHAT IS THE FORM OF INFORMATION?

02:25PM 10   A.   WELL, YOU MEAN -- THIS IS AN EMAIL THAT HE'S --

02:25PM 11   Q.   RIGHT.  I MEANT -- I'M SORRY, MR. GROSSMAN.  I WAS

02:25PM 12   REFERRING TO THE PORTION THAT IS EXCERPTED THERE.

02:25PM 13        DO YOU UNDERSTAND THAT TO BE HIS TEXT, OR IS HE CUTTING

02:25PM 14   AND PASTING SOMETHING FROM SOMEWHERE ELSE, IF YOU KNOW?

02:25PM 15   A.   I DO KNOW.  HE'S CUTTING AND PASTING IT FROM SOMEWHERE

02:26PM 16   ELSE.

02:26PM 17   Q.   AND WHAT IS HE CUTTING AND PASTING FROM THERE?

02:26PM 18   A.   THIS IS ANOTHER EMAIL THAT WE RECEIVED, I DON'T KNOW IF IT

02:26PM 19   WAS THAT DAY, BUT LIKELY THAT DAY OR CONTEMPORANEOUS WITH THIS

02:26PM 20   EMAIL CHAIN FROM SOMEONE ELSE.

02:26PM 21   Q.   AND WHO IS THAT OTHER PERSON?

02:26PM 22   A.   FROM WHAT I REMEMBER, THIS IS AN INDIVIDUAL NAMED

02:26PM 23   JAY SCHNEIDER.

02:26PM 24   Q.   OKAY.  AND WHO IS HE?

02:26PM 25   A.   JAY SCHNEIDER IS WHAT YOU WOULD CALL AN INSTITUTIONAL

02:26PM   1    EQUITY SALESPERSON.

02:26PM   2    Q.   OKAY.

02:26PM   3    A.   HE WORKS FOR A COMPANY CALLED COWEN, C-O-W-E-N.

02:26PM   4    Q.   OKAY.

02:26PM   5    A.   THEY'RE A BROKER DEALER.  THEY'RE WHAT MOST PEOPLE WOULD

02:26PM   6    CALL A BOUTIQUE INVESTMENT BANK.  THEY HAVE -- THEY SERVICE AND

02:26PM   7    FOCUS ON THE HEALTH CARE AND TECHNOLOGY SECTORS.  THEY HAVE

02:26PM   8    INVESTMENT BANKING OPERATIONS IN THOSE AREAS.  THEY HAVE SALES

02:26PM   9    AND TRADING OPERATIONS.

02:26PM  10        THEY DON'T HAVE A RETAIL -- THEY DON'T OFFER RETAIL

02:27PM  11    BROKERAGE ACCOUNTS, SO THEIR BUSINESS IS FOCUSSED ON

02:27PM  12    INSTITUTIONAL CLIENTS LIKE OUR FIRM AND COMPANIES IN THIS

02:27PM  13    SECTOR THAT ARE LOOKING TO -- OR THAT NEED BANKING ADVICE OR

02:27PM  14    BANKING SERVICES.

02:27PM  15    Q.   OKAY.  AND DID YOU CONSIDER THIS TO BE VALUABLE

02:27PM  16    INFORMATION AT THE TIME?

02:27PM  17    A.   YES.

02:27PM  18    Q.   OKAY.  AND BECAUSE HE WAS A RESPECTED SOURCE?

02:27PM  19    A.   THAT'S DEBATABLE.  BUT MR. RHYEE WAS AN ANALYST AT COWEN.

02:27PM  20    HE'S A VERY NICE GUY.  WE DIDN'T ALWAYS AGREE WITH HIS VIEWS.

02:27PM  21        BUT IN THIS CASE HE HAD JUST BEEN MARKETING WITH THE

02:27PM  22    COMPANY, SO HE HAD JUST SPENT -- WHAT THE FIRST LINE IS

02:27PM  23    REFERRING TO IS HE REMAINS BULLISH POST MARKETING WITH THE IR

02:27PM  24    TEAM.

02:27PM  25        I'M SORRY, THIS IS ALL THE VERNACULAR OF OUR BUSINESS.

02:27PM   1          SO IR REFERS TO INVESTOR RELATIONS.  SO CHARLES, THE

02:28PM   2   ANALYST, WAS TAKING THE INVESTOR RELATIONS TEAM FROM WALGREENS

02:28PM   3   AROUND TO MEET WITH INVESTORS.

02:28PM   4          SO INVESTOR RELATIONS IS ACTUALLY A PRETTY IMPORTANT ROLE.

02:28PM   5   IT TENDS TO BE KIND OF A VICE PRESIDENT TYPE ROLE WITHIN

02:28PM   6   COMPANIES LIKE WALGREENS.  THEY'RE THE INTERFACE BETWEEN

02:28PM   7   INVESTORS LIKE US, MUTUAL FUNDS LIKE FIDELITY OR OTHER LARGE

02:28PM   8   INSTITUTIONAL ASSET MANAGERS AND THE COMPANY.

02:28PM   9          SO THEY OFTEN ARE THE -- IT'S HARD, ESPECIALLY FOR LARGER

02:28PM   10  COMPANIES, TO GET ACCESS TO THE CEO, THE CFO.  AND SO THE

02:28PM   11  INVESTOR RELATIONS TEAM, THEY'RE KIND OF A LIAISON AND THEY ARE

02:28PM   12  ABLE TO ANSWER QUESTIONS AND THEY KNOW WHAT THEY CAN DISCLOSE

02:28PM   13  AND CAN'T DISCLOSE PUBLICLY AND WHAT IS IN THE PUBLIC DOMAIN

02:28PM   14  AND WHAT ISN'T IN THE PUBLIC DOMAIN.

02:28PM   15         AND IN THIS CASE CHARLES RHYEE, HE HAD BEEN TRAVELLING

02:28PM   16  WITH THE IR TEAM, AND SO THEY HAD MADE STATEMENTS TO INVESTORS

02:29PM   17  OVER THE COURSE OF, I DON'T KNOW IF IT WAS A DAY OR A COUPLE OF

02:29PM   18  DAYS, ABOUT THERANOS.

02:29PM   19         AND SO JAY SCHNEIDER, WHO IS THE INSTITUTIONAL PERSON AT

02:29PM   20  COWEN, IS PARAPHRASING FROM CHARLES RHYEE THE COMMENTS THAT

02:29PM   21  WALGREENS WAS MAKING TO OTHER INVESTORS ABOUT THIS PARTNERSHIP

02:29PM   22  AND THIS TECHNOLOGY, AND SO THAT'S WHAT THIS IS REFERRING TO.

02:29PM   23  Q.   AND THAT -- BECAUSE OF THAT, BECAUSE IT WAS ACTUALLY

02:29PM   24  COMING FROM WALGREENS, THAT WAS SIGNIFICANT INTEL FOR YOU?

02:29PM   25  A.   WELL, IT'S -- I MEAN, IT'S ALSO -- THEY WERE POSITIVE, AND

02:29PM  1    CHARLES HIMSELF IS POSITIVE, TOO.  SO THEY BOTH SEEM TO BE

02:29PM  2    EXCITED ABOUT THIS PARTNERSHIP.

02:29PM  3         AND THEN THERE ARE SPECIFIC COMMENTS HERE ABOUT, YOU KNOW,

02:29PM  4    SOME OF THE TECHNOLOGICAL CAPABILITIES THAT, YOU KNOW, OF

02:29PM  5    THERANOS.

02:29PM  6    Q.   AND IF WE JUST LOOK QUICKLY AT YOUR RESPONSE, YOU NOTED

02:30PM  7    THAT IT WAS QUITE AN ENDORSEMENT AT THE TIME; CORRECT?

02:30PM  8    A.   YES.

02:30PM  9    Q.   AND THE -- IN ADDITION TO THAT, DO YOU RECALL THAT THERE

02:30PM  10   WAS SOME OUTREACH DONE TO LABCORP ITSELF?

02:30PM  11   A.   I DON'T RECALL SPECIFICALLY.

02:30PM  12   Q.   LET'S TAKE A LOOK AT, TAKE A LOOK AT 7359 AND JUST READ IT

02:30PM  13   TO YOURSELF FOR A SECOND.  LET ME KNOW ONCE YOU'VE HAD A CHANCE

02:30PM  14   TO DO THAT.

02:30PM  15   A.   OKAY.  YEP.

02:30PM  16   Q.   DOES THAT REFRESH YOUR RECOLLECTION THAT MR. KHANNA WAS

02:30PM  17   REACHING OUT TO LABCORP TO GET SOME INTEL AS WELL?

02:31PM  18   A.   YES.

02:31PM  19   Q.   OKAY.  AND IF I CAN BRING YOU NEXT TO EXHIBIT 4052.

02:31PM  20   A.   BINDER 1?

02:31PM  21   Q.   IT SHOULD BE, YES.

02:31PM  22   A.   51?

02:31PM  23   Q.   4052.

02:31PM  24   A.   OKAY.

02:31PM  25   Q.   AND DO YOU RECOGNIZE THIS TO BE AN EMAIL WHERE MR. KHANNA

02:31PM  1    IS RELAYING SOME INTELLIGENCE THAT HE HAD GATHERED RELATING TO

02:31PM  2    THERANOS?

02:32PM  3    A.   I'M SORRY, COULD YOU ASK THE QUESTION AGAIN?

02:32PM  4    Q.   SURE.

02:32PM  5         DO YOU RECOGNIZE THIS TO BE AN EMAIL WHERE MR. KHANNA WAS

02:32PM  6    RELAYING TO YOU SOME MARKET INTELLIGENCE THAT HE HAD GATHERED

02:32PM  7    AS A RESULT OF HIS RESEARCH?

02:32PM  8    A.   YES.

02:32PM  9    Q.   OKAY.

02:32PM  10        MOVE THE ADMISSION OF 4052.

02:32PM  11             MR. LEACH:  NO OBJECTION, YOUR HONOR.

02:32PM  12             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:32PM  13        (GOVERNMENT'S EXHIBIT 4052 WAS RECEIVED IN EVIDENCE.)

02:32PM  14    BY MR. WADE:

02:32PM  15    Q.   AND ON THE BOTTOM OF THIS EMAIL, IF WE CAN START THERE, DO

02:32PM  16    YOU SEE THAT IT'S DECEMBER 9TH, 2013?  AND YOU NOTE THAT YOU

02:32PM  17    WERE ACTUALLY GOING TO GO HAVE THAT MEETING THAT YOU TESTIFIED

02:32PM  18    ABOUT.

02:32PM  19        DO YOU SEE THAT?

02:32PM  20    A.   I DO, YES.

02:32PM  21    Q.   AND YOU WERE ASKING MR. KHANNA IF HE PICKED UP ANY

02:32PM  22    INFORMATION THAT WOULD BE HELPFUL TO YOU IN ADVANCE OF THAT

02:32PM  23    MEETING; RIGHT?

02:32PM  24    A.   YES.

02:32PM  25    Q.   AND LET'S LOOK AT HIS RESPONSE.

02:33PM   1          HE GIVES YOU LABCORP'S VIEW; RIGHT?

02:33PM   2     A.   YES.

02:33PM   3     Q.   AND THAT WAS NEGATIVE?  IS THAT A FAIR CHARACTERIZATION?

02:33PM   4     A.   YES.

02:33PM   5     Q.   THEY TOLD YOU -- THEY TOLD HIM THE TECHNOLOGY DIDN'T WORK;

02:33PM   6     RIGHT?

02:33PM   7     A.   YES.

02:33PM   8     Q.   AND THEY TOLD HIM THAT THERE WAS A LIMITED MENU BY

02:33PM   9     COMPARISON TO THEIR ROBUST OFFERING; CORRECT?

02:33PM   10    A.   YES.

02:33PM   11    Q.   AND ESSENTIALLY ASPECTS OF THEIR MODEL WOULDN'T WORK.

02:33PM   12         DO YOU SEE THAT?

02:33PM   13    A.   YES.

02:33PM   14    Q.   WALGREENS HAD A LITTLE BIT DIFFERENT REACTION; IS THAT

02:33PM   15    FAIR?

02:33PM   16    A.   ACCORDING TO THIS EMAIL, THEY THINK IT IS VERY EXCITING

02:33PM   17    AND WILL LIKELY BUNDLE WITH THEIR EXISTING PAYOR CONTRACTS.

02:33PM   18    Q.   YEAH.  AND WHAT DO YOU UNDERSTAND THAT TO MEAN?

02:33PM   19    A.   I'M NOT SURE WHO "THEY" IS REFERRING TO.  WAG IS

02:34PM   20    DEFINITELY REFERRING TO WALGREENS.

02:34PM   21         "THEY THINK IT IS VERY EXCITING."  I'M ASSUMING HE'S

02:34PM   22    REFERRING TO THERANOS AND THEIR TECHNOLOGY.

02:34PM   23         "BUNDLE WITH EXISTING PAYOR CONTRACTS," WHAT HE'S

02:34PM   24    REFERRING TO THERE IS THE ABILITY TO OFFER THIS LAB SERVICE AS

02:34PM   25    PART OF EXISTING CONTRACTS THEY HAVE WITH COMPANIES LIKE UNITED

02:34PM  1    HEALTH CARE, ANTHEM, CIGNA, BLUE SHIELD OF CALIFORNIA WHERE

02:34PM  2    THEY ALREADY HAVE A PHARMACY CONTRACT FOR DISPENSING BRAND

02:34PM  3    PHARMACEUTICALS, GENERIC PHARMACEUTICALS, AND SO THEY CAN FOLD

02:34PM  4    THIS -- HE'S SUGGESTING THAT THEY MAY BE ABLE TO FOLD LAB

02:34PM  5    SERVICES INTO THOSE EXISTING CONTRACTS.

02:34PM  6    Q.   AND THAT WOULD BE A SIGNIFICANT BENEFIT FOR BOTH WALGREENS

02:34PM  7    AND THERANOS; CORRECT?

02:34PM  8    A.   IT COULD BE.

02:34PM  9    Q.   OKAY.  AND SO THIS WAS INFORMATION THAT YOU HAD IN ADVANCE

02:34PM  10   OF THAT MEETING THAT YOU ATTENDED WITH MS. HOLMES AND

02:35PM  11   MR. BALWANI?

02:35PM  12   A.   YES.

02:35PM  13   Q.   CORRECT?

02:35PM  14        AND I THINK YOU ALSO TESTIFIED YOU HAD READ SOME OF THE

02:35PM  15   PRESS RELEASES THAT WALGREENS HAD PUT OUT; RIGHT?

02:35PM  16   A.   YES.

02:35PM  17   Q.   AND THOSE WERE SIGNIFICANT TO YOU IN TERMS OF GATHERING

02:35PM  18   INTELLIGENCE AND YOUR INVESTMENT DECISION; IS THAT FAIR?

02:35PM  19   A.   YES.

02:35PM  20   Q.   AND YOU KNOW THAT A COMPANY LIKE WALGREENS -- OR YOU

02:35PM  21   ASSUME A COMPANY LIKE WALGREENS IS NOT GOING TO ENTER INTO A

02:35PM  22   BUSINESS RELATIONSHIP WITHOUT DOING DUE DILIGENCE AND THE LIKE;

02:35PM  23   CORRECT?

02:35PM  24   A.   YES.

02:35PM  25   Q.   AND, AND THAT THEY'RE NOT GOING TO DO IT WITHOUT DOING

02:35PM  1    THEIR OWN VETTING OF THE TECHNOLOGY AND THE PEOPLE AT THERANOS;

02:35PM  2    IS THAT RIGHT?

02:35PM  3    A.   YES.

02:35PM  4    Q.   AND WAS THAT SIGNIFICANT FOR YOU IN TERMS OF YOUR

02:35PM  5    INVESTMENT DECISION IN THERANOS?

02:35PM  6    A.   YES.

02:35PM  7    Q.   THE -- IF WE GO TO -- I WANT TO SHIFT TO THE -- ASK YOU

02:35PM  8    SOME QUESTIONS ABOUT THE NOVEMBER 13TH MEETING -- I'M SORRY,

02:36PM  9    THE DECEMBER 13TH, 2013, MEETING.

02:36PM 10        BUT BEFORE I DO THAT, I WANT TO ASK YOU A COUPLE QUESTIONS

02:36PM 11    ABOUT SORT OF CONFIDENTIALITY AT THERANOS IF I COULD.

02:36PM 12    A.   YEAH, OKAY.

02:36PM 13    Q.   DO YOU RECALL ON YOUR DIRECT TESTIMONY YOU TALKED ABOUT

02:36PM 14    THAT THERANOS TOOK CONFIDENTIALITY VERY SERIOUSLY; IS THAT

02:36PM 15    RIGHT?

02:36PM 16    A.   WELL, AND ALSO SECURITY.

02:36PM 17    Q.   AND PHYSICAL SECURITY?

02:36PM 18    A.   PHYSICAL SECURITY.

02:36PM 19    Q.   AND I BELIEVE -- DO YOU RECALL THAT THERANOS WAS NOT

02:36PM 20    COMFORTABLE SHARING INFORMATION OR HAVING THEIR INFORMATION

02:36PM 21    SHARED WITH OTHERS WITHOUT A CONFIDENTIAL DISCLOSURE AGREEMENT

02:36PM 22    BEING SIGNED PRIOR TO THE DISCLOSURE?

02:36PM 23    A.   YES.

02:36PM 24    Q.   AND DO YOU RECALL THAT BEING IMPORTANT TO THERANOS AT THE

02:36PM 25    TIME THAT THEY WERE -- YOU WERE INTERACTING WITH THEM IN YOUR

02:37PM   1     INVESTMENT DECISION?

02:37PM   2     A.   YES.

02:37PM   3     Q.   AND SO, FOR EXAMPLE, WHEN YOU BROUGHT CERTAIN CONSULTANTS

02:37PM   4     IN TO PROVIDE SERVICES, THEY INSISTED THAT YOU HAVE THEM SIGN A

02:37PM   5     CONFIDENTIAL DISCLOSURE AGREEMENT BEFORE THEY COULD REVIEW

02:37PM   6     THERANOS INFORMATION; CORRECT?

02:37PM   7     A.   YES.

02:37PM   8     Q.   AND THAT EVEN INCLUDED MEMBERS OF YOUR TEAM?

02:37PM   9     CONFIDENTIAL, HIGHLY CONFIDENTIAL INFORMATION WOULDN'T BE

02:37PM   10    SHARED WITH YOUR TEAM UNTIL A CONFIDENTIAL DISCLOSURE AGREEMENT

02:37PM   11    WAS SIGNED; RIGHT?

02:37PM   12    A.   I MEAN, I'M NOT A LEGAL EXPERT SO I DON'T KNOW EXACTLY

02:37PM   13    WHAT WAS IN THOSE DOCUMENTS THAT WE SIGNED, BUT IN GENERAL THEY

02:37PM   14    WERE VERY PROTECTIVE OF THEIR, THEIR INFORMATION.

02:37PM   15    Q.   AND THAT'S WHY THEY -- YOU UNDERSTOOD THAT'S WHY THEY

02:37PM   16    WANTED THOSE AGREEMENTS SIGNED; IS THAT RIGHT?

02:37PM   17    A.   I'M, I'M NOT SURE WHY THEY WERE SO SPECIFIC ON EVERYONE

02:37PM   18    SIGNING THOSE, BUT -- SO I DON'T KNOW.  IT'S HARD FOR ME TO

02:38PM   19    KNOW EXACTLY WHY THEY WANTED -- WHY THAT WAS SO IMPORTANT TO

02:38PM   20    THEM.

02:38PM   21    Q.   FAIR ENOUGH.

02:38PM   22         YOU DON'T KNOW WHY THEY WERE SPECIFIC, BUT YOU DO KNOW

02:38PM   23    THAT BEFORE THEY WERE SHARING CONFIDENTIAL INFORMATION, THEY

02:38PM   24    ASKED THAT THE DOCUMENT BE SIGNED FIRST; CORRECT?

02:38PM   25    A.   YES.

02:38PM   1    Q.   OKAY.  AND IN CONNECTION WITH THAT MEETING ON

02:38PM   2    DECEMBER 13TH, 2013, I BELIEVE YOU SAID THAT WAS IN PALO ALTO

02:38PM   3    AT THE THERANOS HEADQUARTERS; IS THAT RIGHT?

02:38PM   4    A.   YES.

02:38PM   5    Q.   AND THIS WAS THE INTRODUCTORY MEETING BETWEEN PFM AND

02:38PM   6    THERANOS; CORRECT?

02:38PM   7    A.   YEP.

02:38PM   8    Q.   YOU DIDN'T DO -- YOU DID A LITTLE INITIAL RESEARCH THAT

02:38PM   9    WE'VE SEEN HERE BEFORE THE MEETING; CORRECT?

02:38PM  10    A.   YES.

02:38PM  11    Q.   BUT YOU DIDN'T DO ANY SORT OF, YOU KNOW, ROBUST VETTING OR

02:39PM  12    RESEARCH IN ADVANCE OF THAT?

02:39PM  13    A.   THAT'S CORRECT.

02:39PM  14    Q.   IT WAS SORT OF A LITTLE BIT OF A GETTING TO KNOW YOU

02:39PM  15    MEETING; IS THAT FAIR?

02:39PM  16    A.   YEAH.

02:39PM  17    Q.   AND DO YOU RECALL THAT IN ADDITION TO THERANOS TALKING A

02:39PM  18    LITTLE BIT ABOUT ITSELF, THEY ASKED QUESTIONS ABOUT PFM AND

02:39PM  19    YOUR INVESTMENT PHILOSOPHY.

02:39PM  20        DO YOU RECALL THAT?

02:39PM  21    A.   I DON'T SPECIFICALLY REMEMBER THAT, BUT, YES, THAT'S

02:39PM  22    NORM -- THAT WOULD BE TYPICAL IN A FIRST MEETING LIKE THAT.

02:39PM  23    Q.   AND WITHOUT INTENDING ANY OFFENSE, YOU UNDERSTAND THAT

02:39PM  24    THERE ARE SOME COMPANIES WHO HAVE SOME HESITANCE ABOUT HEDGE

02:39PM  25    FUND INVESTORS FOR REASONS WITHOUT GETTING TO KNOW THEM; IS

02:39PM  1    THAT FAIR?

02:39PM  2    A.   I DON'T KNOW.  I DON'T KNOW WHY THERE'S A BIG DIFFERENCE

02:39PM  3    BETWEEN A HEDGE FUND AND A MUTUAL FUND IF YOU'RE A PRIVATE

02:39PM  4    COMPANY.

02:39PM  5    Q.   OKAY.  BUT YOU UNDERSTOOD IN THIS CASE THAT THERANOS WAS

02:39PM  6    LOOKING FOR LONGER TERM INVESTORS; RIGHT?

02:40PM  7    A.   I GUESS, YEAH.  THEY WANTED FIRMS THAT COULD PARTNER WITH

02:40PM  8    THEM FOR -- YEAH, FOR THE JOURNEY FROM BEING, YOU KNOW, AS THEY

02:40PM  9    GROW OR GREW AND COMMERCIALIZED.

02:40PM  10   Q.   AND SO DO YOU RECALL THEM ASKING QUESTIONS THAT WENT TO,

02:40PM  11   YOU KNOW, WHETHER PFM AS A HEDGE FUND WAS INTERESTED IN MORE OF

02:40PM  12   A LONGER TERM RELATIONSHIP WITH THE COMPANY?

02:40PM  13   A.   I DO REMEMBER THAT.

02:40PM  14   Q.   AND, IN FACT, PFM SPECIFICALLY HAS STRUCTURES WITHIN ITS

02:40PM  15   ORGANIZATION TO PERMIT LONGER TERM INVESTMENT IN COMPANIES BY

02:40PM  16   INVESTING IN SIDE POCKETS; RIGHT?

02:40PM  17   A.   THAT'S CORRECT.

02:40PM  18   Q.   AND THAT IS WHERE PFM PUTS MORE ILLIQUID INVESTMENTS SO

02:40PM  19   THAT -- AND IT KEEPS THE MORE LIQUID INVESTMENTS IN THE MAIN

02:40PM  20   FUNDS.

02:40PM  21        IS THAT FAIR?

02:40PM  22   A.   YEAH, WE SEPARATE THE PRIVATE INVESTMENTS FROM THE PUBLIC

02:41PM  23   INVESTMENTS.  SO WE HAVE A LIQUID SECURITIES PORTFOLIO, AND WE

02:41PM  24   HAVE AN ILLIQUID SECURITIES PORTFOLIO.

02:41PM  25        SO, YES, WE DO SEPARATE THOSE.

02:41PM  1    Q.   OKAY.  AND DO YOU RECALL PFM COMMUNICATING TO THERANOS IN

02:41PM  2    THIS MEETING THAT IT WAS INTERESTED IN A, OR MAYBE AFTER THE

02:41PM  3    MEETING, THAT IT WAS INTERESTED IN EXPLORING THE POTENTIAL

02:41PM  4    LONGER TERM INVESTMENT RELATIONSHIP WITH THE COMPANY?

02:41PM  5    A.   I'M NOT EXACTLY SURE HOW WE PHRASED IT, BUT, YEAH, WE

02:41PM  6    WERE -- BASED ON THE REPRESENTATIONS FROM THAT FIRST MEETING,

02:41PM  7    WHAT THEY TOLD US THEY WERE CAPABLE OF DOING, WE WERE VERY

02:41PM  8    INTERESTED IN LEARNING MORE ABOUT THE COMPANY.

02:41PM  9    Q.   AND THIS MEETING, WHICH I THINK YOU SAID WAS ABOUT AN HOUR

02:41PM  10   LONG; IS THAT RIGHT?

02:41PM  11   A.   I DON'T I DON'T REMEMBER EXACTLY, BUT --

02:41PM  12   Q.   IT DIDN'T DELVE INTO A LOT OF SPECIFICS; CORRECT?

02:41PM  13   A.   IF THE QUESTION IS RELATIVE TO SUBSEQUENT MEETINGS THAT WE

02:42PM  14   HAD WITH THE COMPANY, IT WAS MORE HIGH LEVEL THAN THE

02:42PM  15   SUBSEQUENT MEETINGS.

02:42PM  16        BUT WE WENT THROUGH THE WHOLE BUSINESS.

02:42PM  17   Q.   AT A HIGH LEVEL.  BUT YOU RECALL THAT YOU HADN'T YET

02:42PM  18   SIGNED THE CONFIDENTIAL DISCLOSURE AGREEMENT AT THAT MEETING,

02:42PM  19   AND SO THEY WERE A LITTLE HESITANT TO SHARE WITH YOU THE MORE

02:42PM  20   SENSITIVE INFORMATION.

02:42PM  21        DO YOU RECALL THAT?

02:42PM  22   A.   I DON'T RECALL THAT ACTUALLY.  SORRY.

02:42PM  23   Q.   LET ME SEE, LET ME SEE IF I CAN REFRESH YOUR RECOLLECTION.

02:42PM  24        IF YOU TAKE A LOOK IN YOUR BOOK AT EXHIBIT 1422.

02:42PM  25             THE COURT:  IS THIS IN VOLUME 2?

02:42PM  1            MR. WADE:  1422 SHOULD BE IN VOLUME 1, YOUR HONOR.

02:42PM  2            THE WITNESS:  1422?

02:42PM  3            MR. WADE:  CORRECT.

02:43PM  4        DO YOU HAVE A COPY OF THAT?

02:43PM  5            THE WITNESS:  I DON'T THINK I HAVE THAT.

02:43PM  6            THE COURT:  IT'S NOT IN MY 1.

02:43PM  7            THE WITNESS:  I MEAN, IT'S GETTING LATE IN THE DAY,

02:43PM  8     BUT I THINK MY EYES ARE STILL WORKING.

02:43PM  9     BY MR. WADE:

02:43PM  10    Q.  WELL, GIVE ME A SECOND HERE AND I'LL SEE IF I CAN HELP THE

02:43PM  11    COURT AND THE WITNESS.

02:43PM  12        WHILE WE'RE DOING THAT, WHY DON'T WE START BY LOOKING AT

02:43PM  13    EXHIBIT 14 -- WHILE I'M LOOKING FOR THE RIGHT EXHIBIT THAT I

02:43PM  14    WAS POINTING TO YOU FIRST -- MY APOLOGIES -- WHY DON'T YOU TAKE

02:43PM  15    A MINUTE TO LOOK AT EXHIBIT 1434.

02:43PM  16        DO YOU HAVE THAT ONE?

02:43PM  17    A.  YES.

02:43PM  18    Q.  OKAY.  TAKE A MINUTE TO FAMILIARIZE YOURSELF WITH THAT,

02:43PM  19    AND I'M PARTICULARLY FOCUSSED ON THE ATTACHMENTS TO THAT JUST

02:43PM  20    SO --

02:43PM  21            MR. DOWNEY:  YOUR HONOR, WILL YOU JUST EXCUSE ME FOR

02:43PM  22    ONE SECOND?

02:43PM  23            THE COURT:  SURE.

02:43PM  24        (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

02:44PM  25            MR. WADE:  THE COURT'S INDULGENCE FOR JUST ONE

02:44PM  1    MOMENT?

02:44PM  2            THE COURT:  SURE.

02:44PM  3        (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

02:44PM  4    BY MR. WADE:

02:44PM  5    Q.  DO YOU HAVE 1434 IN FRONT OF YOU?

02:44PM  6    A.  YES.

02:44PM  7    Q.  AND DO YOU RECALL THE COVER EMAIL WAS AN EMAIL THAT, OR A

02:44PM  8    COPY OF AN EMAIL THAT MR. LEACH HAD ASKED YOU SOME QUESTIONS

02:44PM  9    ABOUT?

02:44PM  10       DO YOU RECALL THAT?

02:44PM  11   A.  I DON'T, BUT -- NO, I'M SORRY.

02:44PM  12   Q.  OKAY.  YOU SEE THAT ATTACHED TO THIS -- YOU SEE THIS IS AN

02:44PM  13   EMAIL FROM MR. BALWANI TO YOU?

02:44PM  14   A.  YES.

02:44PM  15   Q.  AND YOU SEE ATTACHED TO THIS EMAIL ARE CONFIDENTIAL

02:44PM  16   DISCLOSURE AGREEMENTS THAT ARE SIGNED BY VARIOUS PFM EMPLOYEES?

02:45PM  17   A.  YES.

02:45PM  18           MR. WADE:  MOVE THE ADMISSION OF 1434.

02:45PM  19           MR. LEACH:  NO OBJECTION, YOUR HONOR.

02:45PM  20           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:45PM  21       (GOVERNMENT'S EXHIBIT 1434 WAS RECEIVED IN EVIDENCE.)

02:45PM  22   BY MR. WADE:

02:45PM  23   Q.  AND LET'S JUST FOCUS ON THE DATE.  WE'LL COME BACK TO THE

02:45PM  24   SUBSTANCE OF THE EMAIL LATER.  BUT YOU SEE THIS IS AN EMAIL

02:45PM  25   FROM MR. BALWANI TO YOU ON JANUARY 7TH, 2014?

02:45PM 1          DO YOU SEE THAT?

02:45PM 2     A.   IT'S NOT JANUARY 7TH.

02:45PM 3     Q.   JANUARY 17TH, 2014?

02:45PM 4     A.   YES.

02:45PM 5     Q.   IS THAT CORRECT?

02:45PM 6     A.   YES.

02:45PM 7     Q.   AND THIS WAS FOLLOWING UP ON THE MEETING, THE SECOND

02:45PM 8     MEETING THAT YOU HAD AT THERANOS; CORRECT?

02:45PM 9     A.   I BELIEVE THAT IS CORRECT, YES.

02:45PM 10    Q.   OKAY.  AND IF YOU JUST TURN YOUR ATTENTION TO THE

02:46PM 11    ATTACHMENT WHICH IS AT PAGE 5 OF THE EXHIBIT.

02:46PM 12    A.   OKAY.

02:46PM 13    Q.   DO YOU RECOGNIZE THAT TO BE A CONFIDENTIAL DISCLOSURE

02:46PM 14    AGREEMENT THAT YOU SIGNED ON 1-10-2014?

02:46PM 15    A.   YES.

02:46PM 16    Q.   AND THAT'S YOUR SIGNATURE DOWN THERE ON THE BOTTOM?

02:46PM 17    A.   YES.

02:46PM 18    Q.   OKAY.  AND LET ME, LET ME NOW TRY TO BRING YOU TO 1422,

02:46PM 19    WHICH I THINK MIGHT BE, JUST TO REALLY MAKE LIFE DIFFICULT FOR

02:46PM 20    YOU, IS GOING TO BE IN THE GOVERNMENT'S BINDER.

02:46PM 21    A.   OKAY.

02:46PM 22    Q.   IF YOU COULD?

02:46PM 23    A.   SAME NUMBER?

02:46PM 24    Q.   YES, 1422.

02:46PM 25    A.   OKAY.

02:46PM   1    Q.   AND DO YOU HAVE THAT DOCUMENT IN FRONT OF YOU?

02:46PM   2    A.   I DO.

02:46PM   3    Q.   AND DO YOU RECOGNIZE THAT TO BE AN EMAIL BETWEEN YOU AND

02:46PM   4    MR. BALWANI ALSO ON JANUARY 13TH, 2014?

02:47PM   5    A.   WOULD YOU JUST GIVE ME A MINUTE TO REVIEW IT?

02:47PM   6         (PAUSE IN PROCEEDINGS.)

02:47PM   7              THE WITNESS:  OKAY.  YES.

02:47PM   8              MR. WADE:  MOVE THE ADMISSION OF 1422.

02:47PM   9              MR. LEACH:  NO OBJECTION, YOUR HONOR.

02:47PM  10              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:47PM  11         (GOVERNMENT'S EXHIBIT 1422 WAS RECEIVED IN EVIDENCE.)

02:47PM  12    BY MR. WADE:

02:47PM  13    Q.   AND LET ME FOCUS ON THE BOTTOM EMAIL, THE FIRST COUPLE OF

02:47PM  14    PARAGRAPHS THERE.

02:47PM  15         DO YOU SEE THAT'S AN EMAIL FROM YOU TO MR. BALWANI?

02:47PM  16         DO YOU SEE THAT?

02:47PM  17    A.   YES, I DO.

02:47PM  18    Q.   AND IF I JUST LOOK AT THAT VERY FIRST PARAGRAPH, I'M

02:47PM  19    SORRY, THE PARAGRAPH THAT STARTS WITH THE WORD "FIRST."

02:47PM  20         DO YOU SEE THERE IT SAYS, "FIRST, WE TAKE COMPLIANCE

02:48PM  21    EXTREMELY SERIOUSLY.  AS SUCH WE'D LIKE TO UNDERSTAND WHAT WE

02:48PM  22    ACTUALLY SIGNED WHEN WE REGISTERED FOR OUR ON SITE MEETING.  IS

02:48PM  23    IT POSSIBLE FOR OUR GENERAL COUNCIL, KIMBERLY SUMME, TO REVIEW

02:48PM  24    THAT DOCUMENT?"

02:48PM  25         DO YOU SEE THAT?

GROSSMAN CROSS BY MR. WADE                                    6512

02:48PM  1    A.    YES.

02:48PM  2    Q.    AND DOES THAT REFRESH YOUR RECOLLECTION THAT IT WAS IN

02:48PM  3    THAT SECOND MEETING THAT YOU SIGNED THE CONFIDENTIAL DISCLOSURE

02:48PM  4    AGREEMENT WITH THERANOS?

02:48PM  5    A.    YES.

02:48PM  6    Q.    OKAY.  YOU CAN SET THAT BOOK ASIDE.

02:48PM  7          DO YOU -- LET ME ASK YOU A COUPLE OF THINGS ABOUT THE

02:48PM  8    GENERAL TOPICS THAT CAME UP IN THAT FIRST MEETING ON

02:49PM  9    DECEMBER 13TH, 2013.

02:49PM 10          SO I'M BACK TO THE DECEMBER 13TH, 2013 MEETING.

02:49PM 11    A.    OKAY.

02:49PM 12    Q.    OKAY.  DO YOU RECALL THAT THERE WAS DISCUSSION ABOUT --

02:49PM 13    WELL, LET ME STRIKE THAT.

02:49PM 14          THE WALGREENS LAUNCH WAS PUBLIC AT THAT POINT; CORRECT?

02:49PM 15    A.    YES.

02:49PM 16    Q.    AND YOU RECALL THAT THERE WAS SOME DISCUSSION ABOUT THE

02:49PM 17    WALGREENS RELATIONSHIP AND THAT LAUNCH?

02:49PM 18    A.    YES.

02:49PM 19    Q.    AND THE TWO PHASES TO THAT LAUNCH, DO YOU RECALL THAT

02:49PM 20    COMING UP IN THAT MEETING?

02:49PM 21    A.    YES.

02:49PM 22    Q.    AND DO YOU RECALL THE COMPANY TELLING YOU THAT GIVEN THE

02:49PM 23    PRESSURE OF THAT INITIAL COMMERCIAL LAUNCH, THAT THEY WERE

02:49PM 24    GOING TO BE PAUSING THEIR WORK ON MILITARY AND PHARMA PROJECTS

02:49PM 25    AND PUT THOSE ON HOLD?

02:50PM 1          DO YOU RECALL THAT?

02:50PM 2     A.   YES.

02:50PM 3     Q.   OKAY.  BECAUSE THE COMMERCIAL ROLLOUT WAS A BIG

02:50PM 4     UNDERTAKING; CORRECT?

02:50PM 5     A.   YES.

02:50PM 6     Q.   AND THEY WANTED TO FOCUS THEIR BEST ASSETS ON THAT

02:50PM 7     PROJECT.

02:50PM 8          IS THAT YOUR UNDERSTANDING?

02:50PM 9     A.   THAT AND THE HOSPITAL BUSINESS.

02:50PM 10    Q.   OKAY.

02:50PM 11    A.   AND THE PHYSICIAN BUSINESS.

02:50PM 12    Q.   AND, IN FACT, NOT LONG LATER THEY ANNOUNCED A DEAL WITH

02:50PM 13    INTERMOUNTAIN; IS THAT RIGHT?

02:50PM 14    A.   I DON'T REMEMBER SPECIFICALLY WHEN THEY ANNOUNCED THAT

02:50PM 15    DEAL, BUT --

02:50PM 16    Q.   OKAY.  AND I THINK YOU TESTIFIED ON DIRECT THAT THERE MAY

02:50PM 17    HAVE BEEN A FEW SLIDES THAT WERE SHOWN IN THAT MEETING; IS THAT

02:50PM 18    RIGHT?

02:50PM 19    A.   I BELIEVE SO.  YEAH.

02:50PM 20    Q.   BUT AS YOU SIT HERE TODAY, CAN YOU REMEMBER WHICH SLIDES

02:50PM 21    WERE SHOWN IN THAT MEETING?

02:50PM 22    A.   I DON'T, I DON'T REMEMBER SPECIFICALLY WHICH SLIDES WERE

02:50PM 23    SHOWN.

02:50PM 24    Q.   OKAY.  AND IS IT FAIR TO SAY THAT THIS WAS GENERALLY --

02:51PM 25    THIS WAS A RAPPORT BUILDING EXERCISE IN PART AS WELL?

02:51PM 1    A.   THAT WAS A PART OF THE MEETING, YES.

02:51PM 2    Q.   AND IT WAS A -- DO YOU RECALL IT BEING A POSITIVE MEETING?

02:51PM 3    A.   YES.

02:51PM 4    Q.   OKAY.  AND THE -- AND DO YOU RECALL COMING OUT OF THE

02:51PM 5    MEETING AND BEING INTERESTED IN EXPLORING THE INVESTMENT MORE?

02:51PM 6    A.   YES.

02:51PM 7    Q.   OKAY.  LET'S FOCUS ON SOME OF THE EVENTS AFTER THAT

02:51PM 8    MEETING, SO BETWEEN DECEMBER 12TH AND THE SECOND MEETING, AND

02:51PM 9    SOME OF THE WORK THAT YOU ALL AT PFM WERE DOING.  OKAY?

02:51PM 10   A.   OKAY.

02:51PM 11   Q.   LET'S GO TO 7376.

02:52PM 12        DO YOU HAVE, DO YOU HAVE THAT DOCUMENT IN FRONT OF YOU?

02:52PM 13   A.   I DO.

02:52PM 14   Q.   AND DO YOU RECOGNIZE THAT TO BE ANOTHER REPORT FROM

02:52PM 15   MR. KHANNA ON MATTERS RELATING TO THERANOS AND WALGREENS?

02:52PM 16   A.   I DO.

02:52PM 17            MR. WADE:  MOVE THE ADMISSION OF 7376.

02:52PM 18            MR. LEACH:  NO OBJECTION, YOUR HONOR.

02:52PM 19            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:52PM 20        (DEFENDANT'S EXHIBIT 7376 WAS RECEIVED IN EVIDENCE.)

02:52PM 21   BY MR. WADE:

02:52PM 22   Q.   AND DO YOU SEE THERE IT SAYS "THERANOS - COMMENTS ON THE

02:52PM 23   WAG CALL"?

02:52PM 24   A.   I DO.

02:52PM 25   Q.   DO YOU KNOW WHAT WAG CALL REFERS TO THERE?

GROSSMAN CROSS BY MR. WADE                                      6515

02:52PM   1    A.    I BELIEVE IT REFERS TO THE WALGREENS EARNINGS CALL.

02:53PM   2    Q.    AND THE WALGREENS EARNINGS CALL IS A CALL WHERE THE SENIOR

02:53PM   3    MANAGEMENT OF THE COMPANY GOES ON A TELEPHONE CALL; IS THAT

02:53PM   4    RIGHT?

02:53PM   5    A.    YEAH, FOUR TIMES A YEAR IN THE U.S.

02:53PM   6    Q.    WHY DON'T YOU DESCRIBE FOR US WHAT HAPPENS IN THAT CALL.

02:53PM   7    A.    YEAH.  FOUR TIMES A YEAR, QUARTERLY, THE S.E.C. REQUIRES

02:53PM   8    COMPANIES IN THE U.S. THAT ARE PUBLICLY LISTED, SO ON A STOCK

02:53PM   9    EXCHANGE, THEY'VE GONE THROUGH THE IPO PROCESS, TO HAVE -- TO

02:53PM   10   REPORT QUARTERLY RESULTS, FILE THAT WITH THE S.E.C.

02:53PM   11        AND ABOVE AND BEYOND THAT, MANY, MOST LARGE COMPANIES HOST

02:53PM   12   AN EARNINGS CALL.  THEY'LL ISSUE A PRESS RELEASE.  THEY DON'T

02:53PM   13   HAVE TO DO THAT, BUT THEY HAVE TO FILE WHAT IS CALLED FORM 10Q

02:53PM   14   WITH THE S.E.C., WHICH IS AN UPDATE OF THEIR BUSINESS.

02:53PM   15        BUT IN ADDITION TO THAT, ALMOST EVERY COMPANY, LARGE

02:53PM   16   COMPANY, MAJOR COMPANY, THEY HOLD A QUARTERLY CONFERENCE CALL.

02:54PM   17   THEY'LL ISSUE A PRESS RELEASE THAT INFORMS INVESTORS ON HOW THE

02:54PM   18   BUSINESS PERFORMED OVER THAT THREE MONTH PERIOD.

02:54PM   19        AND THEN FOR THE CONFERENCE CALLS, THEY'LL OFTEN GIVE

02:54PM   20   INVESTORS AN OPPORTUNITY TO ASK QUESTIONS.  ALMOST ALWAYS IT'S

02:54PM   21   SELL-SIDE ANALYSTS, NOT PEOPLE LIKE US.  SO THAT'S THE TYPICAL

02:54PM   22   PROCESS.

02:54PM   23        SO THIS IS THE WALGREENS HOLDS AND EARNINGS CALL.

02:54PM   24        THEIR QUARTERLY CALENDAR IS DIFFERENT FROM THE VAST

02:54PM   25   MAJORITY OF COMPANIES.  I BELIEVE THEY'RE ON AN AUGUST FISCAL

02:54PM   1    YEAR, OR THEY WERE AT THIS POINT.  SO THIS WAS THEIR -- WHAT --

02:54PM   2    IT WOULD HAVE BEEN THEIR FISCAL Q1, I THINK, THEIR FISCAL FIRST

02:54PM   3    QUARTER CALL IN LATE DECEMBER.

02:54PM   4    Q.   AND DO YOU RECALL THAT THIS WOULD BE, THIS WOULD PROBABLY

02:54PM   5    BE THE FIRST CALL AFTER THE LAUNCH WITH THERANOS?

02:55PM   6    A.   YES.

02:55PM   7    Q.   OKAY.  AND MR. KHANNA -- AND IN MORE LAYMAN'S TERMS, IT'S

02:55PM   8    A CALL IN WHICH INFORMATION IS PROVIDED, QUESTIONS ARE ASKED,

02:55PM   9    AND YOU GET, YOU GET TO LEARN WHAT IS GOING ON AT THE COMPANY.

02:55PM  10        IS THAT FAIR?

02:55PM  11    A.   YES.

02:55PM  12    Q.   AND SOMETIMES IT'S GENERAL, BUT OFTENTIMES IT GETS VERY

02:55PM  13    SPECIFIC ON FINANCIAL PERFORMANCE AND BUSINESS METRICS AND THE

02:55PM  14    LIKE.

02:55PM  15        IS THAT FAIR?

02:55PM  16    A.   YES.

02:55PM  17    Q.   OKAY.  AND MR. KHANNA WATCHED OUT OR LISTENED IN ON THE

02:55PM  18    WALGREENS CALL, IT WOULD APPEAR?

02:55PM  19    A.   YES.

02:55PM  20    Q.   AND IS THAT SOMETHING -- DID HE USUALLY LISTEN IN ON

02:55PM  21    WALGREENS CALLS GIVEN THE SIGNIFICANCE OF THE COMPANY IN THE

02:55PM  22    HEALTH CARE SPACE?

02:55PM  23    A.   YEAH, HE LISTENS TO A LOT -- YES, ALL OF THE MAJOR

02:55PM  24    COMPANIES HE'S RESPONSIBLE FOR COVERING, HE LISTENS TO THOSE

02:55PM  25    CONFERENCE CALLS.

02:55PM 1    Q.   AND WALGREENS WAS ONE OF THEM?

02:56PM 2    A.   YES.

02:56PM 3    Q.   AND BECAUSE YOU ALL WERE EXPLORING A POSSIBLE INVESTMENT

02:56PM 4    WITH THERANOS, HE PROVIDED THIS REPORT?

02:56PM 5    A.   YES.

02:56PM 6    Q.   AND THAT REPORT IS GENERALLY THAT WALGREENS WAS VERY

02:56PM 7    POSITIVE ON THERANOS; CORRECT?

02:56PM 8    A.   I MEAN, I'M JUST READING FROM WHAT HE WROTE.  SO "WE ARE

02:56PM 9    VERY POSITIVE ON THERANOS."

02:56PM 10        YEAH, I THINK HE'S ATTEMPTING TO PARAPHRASE FROM THE

02:56PM 11   WALGREENS CONFERENCE CALL.

02:56PM 12   Q.   FAIR ENOUGH.  BUT IS IT, IS IT FAIR TO SAY THAT THIS IS

02:56PM 13   A -- THIS IS A POSITIVE REPORT THAT IS COMING OUT OF THE

02:56PM 14   THERANOS -- OR THE WALGREENS ANALYST CALL WITH RESPECT TO

02:56PM 15   THERANOS?

02:56PM 16   A.   YES.

02:56PM 17   Q.   AND WAS THAT MEANINGFUL INFORMATION TO YOU WHEN YOU WERE

02:56PM 18   MAKING THE INVESTMENT DECISION?

02:56PM 19   A.   YES, YES.

02:56PM 20   Q.   AND IF WE CAN LOOK, AND I APOLOGIZE TO THE COURT AND

02:56PM 21   COUNSEL, I'M GOING TO PUT UP AN EXHIBIT THAT IS ALREADY IN

02:56PM 22   EVIDENCE.

02:56PM 23        I FAILED TO BRING A COPY OF THIS.  IF WE CAN LOOK QUICKLY

02:57PM 24   AT 12510.

02:57PM 25   A.   BINDER 2?

02:57PM   1    Q.   WE'LL BRING IT UP ON THE SCREEN.   IT'S IN EVIDENCE.

02:57PM   2         AND I TAKE IT YOU'VE SEEN A FEW TRANSCRIPTS OF ANALYST

02:57PM   3    CALLS IN YOUR DAY.

02:57PM   4    A.   YES.

02:57PM   5    Q.   AND DO YOU RECOGNIZE THIS TO BE A TRANSCRIPT OF THAT CALL

02:57PM   6    IN DECEMBER OF 2013?

02:57PM   7    A.   YES.

02:57PM   8    Q.   AND I JUST WANT TO NOTE A COUPLE OF QUICK THINGS HERE.

02:57PM   9         DO YOU SEE ON THE SECOND PAGE IN THE MIDDLE WALGREENS AND

02:57PM  10    THERANOS?

02:57PM  11         DO YOU SEE THAT?

02:57PM  12         THIS WAS SOMETHING THAT WAS RAISED BY THE CEO IN HIS

02:58PM  13    OPENING COMMENTS ON THE COMPANY; IS THAT RIGHT?

02:58PM  14    A.   IT APPEARS TO BE, YES.

02:58PM  15    Q.   AND GENERALLY -- IS IT FAIR TO SAY THAT GENERALLY THE CEO,

02:58PM  16    YOU KNOW, INCLUDES SOMETHING IN KIND OF THE OPENING COMMENT

02:58PM  17    THAT THE COMPANY CONSIDERS IT TO BE, YOU KNOW, AN IMPORTANT

02:58PM  18    INITIATIVE FOR THE COMPANY?

02:58PM  19    A.   YES.

02:58PM  20    Q.   AND DO YOU KNOW -- LET'S TAKE A LOOK AT EXHIBIT 12, OR

02:58PM  21    PAGE 12.   IF WE CAN BLOW UP THE Q AND A STARTING WITH THE NEXT

02:58PM  22    ONE DOWN, RIGHT THERE (INDICATING).

02:58PM  23         DO YOU KNOW WHO RICKY GOLDWASSER IS?

02:58PM  24    A.   I DO.

02:58PM  25    Q.   AND IS RICKY A RESPECTED ANALYST WHO COVERS STOCKS?

02:59PM  1    A.   YES.

02:59PM  2    Q.   OKAY.  AND DO YOU KNOW WHO WADE MIQUELON IS?

02:59PM  3    A.   YES.

02:59PM  4    Q.   HE'S THE CFO OF WALGREENS AT THIS POINT IN TIME?

02:59PM  5    A.   YES.

02:59PM  6    Q.   AND DO YOU SEE HERE THAT HE GIVES A REPORT ON THE THERANOS

02:59PM  7    RELATIONSHIP?

02:59PM  8         DO YOU SEE THAT?

02:59PM  9    A.   DO YOU MIND IF I JUST READ THIS?

02:59PM  10   Q.   SURE.  YEAH.  TAKE A MOMENT.

02:59PM  11        (PAUSE IN PROCEEDINGS.)

02:59PM  12             THE WITNESS:  OKAY.

03:00PM  13   BY MR. WADE:

03:00PM  14   Q.   OKAY.  AND IS IT FAIR TO SAY THAT MR. MIQUELON IS GIVING A

03:00PM  15   PRETTY POSITIVE REVIEW OF THERANOS ON THIS CALL?

03:00PM  16   A.   YES.

03:00PM  17   Q.   AND DO YOU RECALL LEARNING THAT AT THE TIME THAT YOU WERE

03:00PM  18   CONSIDERING THE THERANOS INVESTMENT, THAT SENIOR LEADERSHIP OF

03:00PM  19   WALGREENS WAS POSITIVE ON THE THERANOS RELATIONSHIP?

03:00PM  20   A.   YES.

03:00PM  21   Q.   AND DO YOU SEE IN THE BOTTOM OF THE FIRST PARAGRAPH UNDER

03:00PM  22   MR. MIQUELON'S COMMENTS, HE SAYS, "WE'LL KEEP LEARNING AND

03:00PM  23   PERFECTING THE PATIENT EXPERIENCE WHICH IS REALLY THE" CASE --

03:00PM  24   "THE KEY THING."

03:00PM  25        DO YOU SEE THAT?

03:00PM 1      A.   I DO.

03:00PM 2      Q.   AND DID YOU RECOGNIZE, GIVEN YOUR EXPERIENCE WITH

03:00PM 3      RETAILERS, THAT BEFORE YOU'RE GOING TO ROLL OUT A CONCEPT LIKE

03:00PM 4      THE THERANOS CONCEPT, THAT YOU WANTED TO MAKE SURE THAT YOU

03:00PM 5      NAILED THE PATIENT EXPERIENCE BEFORE YOU TOOK IT NATIONWIDE?

03:01PM 6      A.   I MEAN, I'M NOT -- CAN YOU REPHRASE -- CAN YOU ASK THE

03:01PM 7      QUESTION AGAIN?  I'M SORRY.

03:01PM 8      Q.   SURE.  YOU RECOGNIZED THAT, WHEN YOU WERE CONSIDERING THE

03:01PM 9      THERANOS RETAIL SERVICES, THAT PATIENT EXPERIENCE WAS

03:01PM 10     IMPORTANT; CORRECT?

03:01PM 11     A.   YES, I AGREE WITH THAT.

03:01PM 12     Q.   AND DID YOU RECOGNIZE ALSO THAT IT WAS IMPORTANT TO

03:01PM 13     PERFECT THAT PATIENT EXPERIENCE BEFORE YOU EXPAND WIDELY?

03:01PM 14     A.   THAT SEEMS LIKE A REASONABLE BUSINESS PRINCIPLE.

03:01PM 15     Q.   OKAY.  LET'S LOOK NEXT AT 125 -- OH, I'M SORRY.  LET'S

03:01PM 16     LOOK NEXT AT 1360.

03:02PM 17          AND THAT MAY BE IN THE GOVERNMENT BINDER IF IT'S NOT IN

03:02PM 18     YOUR BINDER.

03:02PM 19     A.   OKAY.  I'VE GOT THE EXHIBIT.

03:02PM 20     Q.   AND DO YOU RECOGNIZE THIS TO BE AN EMAIL FOLLOWING UP ON

03:02PM 21     THAT FIRST MEETING THAT YOU HAD AT THERANOS?

03:02PM 22     A.   LET ME JUST READ IT.

03:02PM 23     Q.   SURE.  I APOLOGIZE.  IT'S SMALL FONT.

03:02PM 24     A.   IT'S TINY.  JEEZ.

03:02PM 25     Q.   DO YOU NEED SOME GLASSES?

GROSSMAN CROSS BY MR. WADE

03:02PM 1    A.   NO, NOT YET.

03:03PM 2         (PAUSE IN PROCEEDINGS.)

03:03PM 3              THE WITNESS:   OKAY.

03:03PM 4    BY MR. WADE:

03:03PM 5    Q.   DO YOU RECOGNIZE THIS TO BE AN EMAIL FOLLOWING UP ON THAT

03:03PM 6    INITIAL MEETING THAT YOU HAD AT THERANOS?

03:03PM 7    A.   YES.

03:03PM 8              MR. WADE:   I WOULD MOVE THE ADMISSION OF 1360.

03:03PM 9              MR. LEACH:   NO OBJECTION.

03:03PM 10             THE COURT:   IT'S ADMITTED.   IT MAY BE PUBLISHED.

03:03PM 11        (GOVERNMENT'S EXHIBIT 1360 WAS RECEIVED IN EVIDENCE.)

03:03PM 12   BY MR. WADE:

03:03PM 13   Q.   FORTUNATELY, WE CAN NOW ZOOM THIS DOCUMENT.   IF WE CAN

03:03PM 14   BLOW IT UP?

03:03PM 15   A.   I'M GOING TO BE BLIND BY THE END OF THIS.

03:04PM 16   Q.   DO YOU SEE AT THE BOTTOM MR. JAMES FOLLOWS UP ON THAT

03:04PM 17   MEETING AND HE SAYS HE IS JUST CHECKING TO SEE IF WE CAN MOVE

03:04PM 18   THE PROCESS FORWARD.

03:04PM 19        DO YOU SEE THAT?

03:04PM 20   A.   YES, YES.

03:04PM 21   Q.   AND COMING OUT OF THAT MEETING, THERANOS WASN'T, YOU KNOW,

03:04PM 22   BANGING ON YOUR DOOR TRYING TO DEMAND AN INVESTMENT.   YOU JUST

03:04PM 23   HAD THE MEETING AND YOU MOVED ON; RIGHT?

03:04PM 24   A.   THEY WERE NOT BANGING DOWN OUR DOOR, I AGREE WITH THAT.

03:04PM 25   Q.   RIGHT.   AND MR. JAMES WAS THE ONE WHO ACTUALLY CIRCLED

03:04PM  1    BACK TO THE INVESTMENT; CORRECT?

03:04PM  2    A.   YES, THAT APPEARS TO BE TRUE.

03:04PM  3    Q.   AND HE NOTES THERE, DO YOU SEE AT THE END, "WE HAVE SHOWN

03:04PM  4    TO BE GREAT LONG-TERM," AND THEN HE CUTS OFF PARTNERS, I THINK.

03:04PM  5         DO YOU RECALL THAT BEING AN ISSUE OF CONCERN TO THERANOS

03:04PM  6    AT THE TIME?

03:04PM  7    A.   I DON'T.

03:04PM  8    Q.   OKAY.  DO YOU HAVE ANY RECOLLECTION AS TO WHY MR. JAMES

03:04PM  9    WAS PROVIDING THOSE ASSURANCES?

03:04PM  10   A.   I HAVE NO IDEA.

03:05PM  11   Q.   OKAY.  AND THEN DO YOU SEE THAT MS. HOLMES RESPONDS AND

03:05PM  12   SHE THANKS, SHE THANKS MR. JAMES FOR THE NOTE AND SAYS THAT

03:05PM  13   THEY WILL BE IN TOUCH TO FOLLOW UP; RIGHT?

03:05PM  14   A.   I'M SORRY.  THE QUESTION IS WHAT?

03:05PM  15   Q.   THERE WAS AN AGREEMENT -- MS. HOLMES EXPRESSED AN INTEREST

03:05PM  16   IN RESPONSE TO MR. JAMES'S EMAIL --

03:05PM  17   A.   YES.

03:05PM  18   Q.   -- AND SAID LET'S CONTINUE OUR DISCUSSIONS; CORRECT?

03:05PM  19   A.   YES.

03:05PM  20   Q.   AND INTERNALLY IN RESPONSE TO THIS, DO YOU RECALL YOU KIND

03:05PM  21   OF ACTIVATED YOUR ANALYST TEAM TO START TO DIG IN IN A LITTLE

03:05PM  22   MORE DEPTH COMING OUT OF THAT DECEMBER MEETING?

03:05PM  23   A.   I BELIEVE THAT IS, THAT IS RIGHT.

03:05PM  24   Q.   AND DO YOU RECALL DR. RABODZEY IN PARTICULAR STARTED

03:05PM  25   DIGGING IN?

03:06PM  1    A.   YES.

03:06PM  2    Q.   DO YOU RECALL ON I THINK IT WAS CHRISTMAS EVE HE DROVE UP

03:06PM  3    TO THE WALGREENS IN PALO ALTO?

03:06PM  4         DO YOU RECALL THAT?

03:06PM  5    A.   I DON'T RECALL THAT.

03:06PM  6    Q.   ALL RIGHT.  WELL, LET'S TAKE A LOOK.  LET'S TAKE A LOOK AT

03:06PM  7    14025, WHICH I THINK IS IN YOUR SECOND BINDER.

03:06PM  8         AS YOU'RE GATHERING IT, THIS ISN'T AN EMAIL -- PLEASE DO

03:06PM  9    GATHER IT, BUT THIS ISN'T AN EMAIL ON THE CHRISTMAS VISIT TO

03:07PM  10   WALGREENS.  THIS EMAIL ACTUALLY REFERS -- THIS IS A DISCUSSION

03:07PM  11   WHERE YOU AND MR. JAMES TALK ABOUT CONTINUING TO EXPLORE THE

03:07PM  12   WALGREENS INVESTMENT; IS THAT RIGHT?

03:07PM  13   A.   YES.

03:07PM  14   Q.   AND DO YOU SEE --

03:07PM  15        MOVE THE ADMISSION OF 14025.

03:07PM  16            MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:07PM  17            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:07PM  18        (DEFENDANT'S EXHIBIT 14025 WAS RECEIVED IN EVIDENCE.)

03:07PM  19   BY MR. WADE:

03:07PM  20   Q.   DO YOU SEE IN THE MIDDLE -- THIS IS A RESPONSE TO THE

03:07PM  21   EMAIL THAT CAME FROM MS. HOLMES WHERE YOU AND MR. JAMES TALK

03:07PM  22   ABOUT PULLING TOGETHER A DUE DILIGENCE TEAM AND PULLING

03:07PM  23   TOGETHER A LIST OF QUESTIONS AND STARTING TO THINK ABOUT THE

03:07PM  24   SIZE OF THE INVESTMENT; CORRECT?

03:07PM  25   A.   YES.

03:07PM  1    Q.   AND THERE'S SOME DISCUSSION ABOUT THE POTENTIAL SIZE OF

03:08PM  2    THE INVESTMENT.

03:08PM  3         DO YOU SEE THAT THERE?

03:08PM  4    A.   YES.

03:08PM  5    Q.   AND YOU SAY "20 AT LEAST."

03:08PM  6         I TAKE IT THAT'S 20 MILLION?

03:08PM  7    A.   YES.

03:08PM  8    Q.   BUT YOU HAD NOT MADE ANY INVESTMENT DECISIONS AT THIS

03:08PM  9    POINT; CORRECT?

03:08PM  10   A.   THAT'S CORRECT.

03:08PM  11   Q.   YOU WERE JUST STARTING THIS DILIGENCE PROCESS; RIGHT?

03:08PM  12   A.   YES.

03:08PM  13   Q.   AND UP AT THE TOP, IF WE LOOK AT THE TOP TWO EMAILS, YOU

03:08PM  14   TALK ABOUT WANTING TO GET SOME ADDITIONAL INFORMATION FROM THE

03:08PM  15   COMPANY SO THAT YOU CAN DIG IN MORE; RIGHT?

03:08PM  16   A.   YES.

03:08PM  17   Q.   AND ULTIMATELY -- AND YOU TALK ABOUT PREPARING A LIST OF

03:08PM  18   QUESTIONS SO THAT YOU CAN HAVE ADDITIONAL DISCUSSIONS WITH THE

03:08PM  19   COMPANY; RIGHT?

03:08PM  20   A.   I'M SORRY, WHICH -- THE QUESTION TO ME IS WHAT?

03:08PM  21   Q.   YOU TALK ABOUT ADDITIONAL -- YOU TALK ABOUT PREPARING A

03:08PM  22   LIST OF QUESTIONS TO HELP FACILITATE A DISCUSSION WITH THE

03:09PM  23   COMPANY.

03:09PM  24   A.   I THINK THAT'S ACTUALLY CHRIS EMAILING ME.

03:09PM  25   Q.   OKAY.  BUT YOU AND MR. JAMES ARE HAVING THE DIALOGUE ABOUT

03:09PM  1    TRYING TO GET INFORMATION AND PREPARE A LIST OF QUESTIONS;

03:09PM  2    RIGHT?

03:09PM  3    A.   YES.

03:09PM  4    Q.   AND TO PULL TOGETHER A DUE DILIGENCE TEAM; CORRECT?

03:09PM  5    A.   YES.

03:09PM  6    Q.   AND THAT'S A STANDARD APPROACH THAT YOU WOULD, YOU WOULD

03:09PM  7    TAKE AT PFM BEFORE MAKING A MAJOR INVESTMENT; IS THAT FAIR?

03:09PM  8    A.   YES.

03:09PM  9    Q.   OKAY.  AND THE DUE DILIGENCE TEAM IS THE TEAM OF ANALYSTS

03:09PM  10   WE'VE TALKED ABOUT BEFORE; RIGHT?

03:09PM  11   A.   YES.

03:09PM  12   Q.   AND, AND PART OF THE STANDARD DUE DILIGENCE PROCESS IS

03:09PM  13   PREPARING THOSE LISTS OF QUESTIONS ALONG THE LINES THAT

03:09PM  14   MR. LEACH WAS READING TO YOU EARLIER; CORRECT?

03:09PM  15   A.   YES.

03:09PM  16   Q.   THERE WASN'T ANYTHING SPECIAL ABOUT THE THERANOS

03:09PM  17   INVESTMENT WITH RESPECT TO THOSE QUESTIONS; CORRECT?

03:09PM  18   A.   WELL, THE QUESTIONS WERE SPECIFIC TO THE THERANOS

03:09PM  19   INVESTMENT.

03:09PM  20   Q.   FAIR ENOUGH.

03:09PM  21        BUT IS IT FAIR TO SAY THAT WHENEVER YOU CONSIDER A MAJOR

03:10PM  22   INVESTMENT, YOU PREPARE A LIST OF DUE DILIGENCE QUESTIONS;

03:10PM  23   CORRECT?

03:10PM  24   A.   YES.

03:10PM  25   Q.   AND YOU SEND IT OVER TO THE OTHER SIDE, AND YOU WAIT TO

03:10PM   1    GET A RESPONSE; RIGHT?

03:10PM   2    A.   IT DOESN'T ALWAYS WORK LIKE THAT, BUT THAT'S CERTAINLY A

03:10PM   3    REASONABLE APPROACH.

03:10PM   4    Q.   RIGHT.  AND THAT'S, THAT'S WHAT YOU WERE EXPECTING IN THIS

03:10PM   5    CASE; RIGHT?

03:10PM   6    A.   WELL, WE HAD A LOT OF QUESTIONS TO GO THROUGH, SO WE

03:10PM   7    WANTED TO MAKE SURE THAT IT WAS A PRODUCTIVE MEETING.

03:10PM   8        WITHOUT FRAMING THE ISSUES THAT WE HAD, THAT WE WANTED TO

03:10PM   9    DISCUSS, SOMETIMES A MEETING, EVEN IF IT'S AN HOUR AND A HALF

03:10PM  10    OR TWO HOURS, CAN BE UNPRODUCTIVE.

03:10PM  11    Q.   SO YOU FELT IT WAS USEFUL TO PROVIDE THAT LIST IN

03:10PM  12    ADVANCE --

03:10PM  13    A.   YES.

03:10PM  14    Q.   -- SO GOING INTO THAT MEETING YOU WOULD HAVE A SENSE FOR

03:10PM  15    WHAT EXACTLY IT WAS THAT WOULD BE FOCUSSED ON?

03:10PM  16    A.   SO THEY WOULD HAVE A SENSE OF WHAT WE WANTED TO FOCUS ON.

03:10PM  17    Q.   SO THEY COULD PREPARE TO ANSWER YOUR QUESTIONS; RIGHT?

03:10PM  18    A.   YES.

03:10PM  19    Q.   AND THERE WERE A COUPLE OF INSTANCES WHERE YOU ASKED TO

03:10PM  20    GET ACCESS TO INFORMATION, THE CONTRACTS.

03:10PM  21        DO YOU RECALL THAT?

03:11PM  22    A.   YES.

03:11PM  23    Q.   AND THEY TOLD -- OR THEY ASKED -- LET ME STRIKE THAT.

03:11PM  24        YOU ASKED TO TALK TO SOME OF THE PEOPLE WITH WHOM THEY HAD

03:11PM  25    BUSINESS RELATIONSHIPS?

03:11PM  1    A.   SORT OF, YES.

03:11PM  2    Q.   YOU ASKED TO SPEAK TO UNITED HEALTH ABOUT THERANOS;

03:11PM  3    CORRECT?

03:11PM  4    A.   WE WANTED TO SPEAK TO THE PEOPLE WHO DID THE TECHNICAL DUE

03:11PM  5    DILIGENCE ON THERANOS'S TECHNOLOGY.

03:11PM  6         WE WANTED TO SPEAK TO PEOPLE WHO WERE INVOLVED IN THE

03:11PM  7    BUSINESS DEVELOPMENT DECISION TO PARTNER, CONTRACT WITH THOSE

03:11PM  8    TYPES OF ACTIVITIES.

03:11PM  9    Q.   I UNDERSTAND.

03:11PM  10        BUT MY QUESTION WAS THAT YOU ASKED TO SPEAK SPECIFICALLY

03:11PM  11   TO UNITED HEALTH; RIGHT?

03:11PM  12   A.   YES.

03:11PM  13   Q.   AND YOU ASKED SPECIFICALLY TO SPEAK WITH WALGREENS;

03:11PM  14   CORRECT?

03:11PM  15   A.   YES.

03:11PM  16   Q.   AND THEY TOLD YOU THAT THEY WERE NOT COMFORTABLE WITH YOU

03:11PM  17   DOING THAT; RIGHT?

03:11PM  18   A.   THAT IS CORRECT.

03:11PM  19   Q.   AND YOU AT THAT POINT COULD WALK AWAY FROM THE INVESTMENT

03:11PM  20   IF THAT WAS NOT SATISFACTORY TO YOU; CORRECT?

03:11PM  21   A.   CORRECT.

03:11PM  22   Q.   AND YOU CHOSE NOT TO; CORRECT?

03:11PM  23   A.   THAT'S CORRECT.

03:11PM  24   Q.   THE -- BUT YOU DID GATHER A LOT OF INFORMATION FROM OTHER

03:12PM  25   SOURCES, INCLUDING THE COMPANY; RIGHT?

03:12PM  1     A.   YES.

03:12PM  2     Q.   AND IN THE DAYS TO FOLLOW, YOU GATHERED INFORMATION ABOUT

03:12PM  3     THE REGULATORY ENVIRONMENT; RIGHT?

03:12PM  4     A.   WELL, WE JUST -- IT FORCED US TO RELY ON THE

03:12PM  5     REPRESENTATIONS THAT THEY MADE TO US.  SO IT JUST -- BY NOT

03:12PM  6     LETTING US TO TALK TO THOSE PEOPLE, WE HAD TO RELY ON WHAT THEY

03:12PM  7     TOLD US IN THE DUE DILIGENCE MEETINGS.

03:12PM  8     Q.   RIGHT.  BUT MY QUESTION WAS WHETHER YOU GATHERED OTHER

03:12PM  9     INFORMATION IN RESPONSE; RIGHT?

03:12PM  10    A.   YES, WE DID.

03:12PM  11    Q.   AND YOU WENT ABOUT A PROCESS TO GATHER THAT INFORMATION

03:12PM  12    WITH THIS TEAM; RIGHT?

03:12PM  13    A.   YES.

03:12PM  14    Q.   AND SOME OF THAT WORK HAPPENED IN ADVANCE OF THE NEXT

03:12PM  15    MEETING; CORRECT?

03:12PM  16    A.   WHAT SPECIFICALLY ARE YOU REFERRING TO?  WHICH MEETING?

03:12PM  17    Q.   FAIR POINT.

03:12PM  18         SOME OF THE DUE DILIGENCE WORK YOU DID HAPPENED BETWEEN

03:12PM  19    THESE TWO MEETINGS THAT WE WERE TALKING ABOUT; RIGHT?

03:13PM  20    A.   THE DECEMBER 13TH AND THE JANUARY 10TH?

03:13PM  21    Q.   YEAH.

03:13PM  22    A.   I, I, I DON'T RECALL SPECIFICALLY WHAT HAPPENED IN BETWEEN

03:13PM  23    THE FIRST AND SECOND VERSUS THE SECOND AND THE THIRD.  SO

03:13PM  24    THAT'S -- BUT WE WERE WORKING THROUGH THAT PERIOD, ESPECIALLY

03:13PM  25    ONCE THE NEW YEAR STARTED.

03:13PM   1         THINGS GET SLOW AT THE END OF THE YEAR, RIGHT?  IT'S THE

03:13PM   2    HOLIDAYS.  PEOPLE NEED A BREAK.

03:13PM   3         SO I THINK WE KIND OF GAVE EVERYONE A LITTLE VACATION AT

03:13PM   4    THE END OF THE YEAR.

03:13PM   5    Q.   FAIR ENOUGH.

03:13PM   6         LET'S TAKE A LOOK AT EXHIBIT 7378, AND WE'LL SEE IF YOU

03:14PM   7    CAN GIVE DR. RABODZEY AS MUCH OF A BREAK AS SOME OF THE OTHER

03:14PM   8    FOLKS.

03:14PM   9    A.   OKAY.

03:14PM   10   Q.   AND THIS IS AN EMAIL ON CHRISTMAS EVE OF 2013 THAT -- IN

03:14PM   11   WHICH DR. RABODZEY EMAILS WITH YOU AND MR. KHANNA ABOUT GOING

03:14PM   12   UP TO THE PALO ALTO WALGREENS; CORRECT?

03:14PM   13   A.   YES.

03:14PM   14        MR. WADE:  MOVE THE ADMISSION OF 7378.

03:14PM   15        MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:14PM   16        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:14PM   17        (DEFENDANT'S EXHIBIT 7378 WAS RECEIVED IN EVIDENCE.)

03:14PM   18   BY MR. WADE:

03:14PM   19   Q.   IF YOU LOOK AT THAT EMAIL -- WELL, LET'S START IN THE

03:14PM   20   EMAIL BELOW THIS ON THE BOTTOM.

03:14PM   21        THIS GIVES YOU THE GREEN LIGHT TO MOVE FORWARD ON THE DUE

03:14PM   22   DILIGENCE; CORRECT?  THIS GIVES YOUR TEAM THE GREEN LIGHT?

03:15PM   23   A.   YES.

03:15PM   24   Q.   AND THIS IS SORT OF THE FORMAL KICK OFF OF A MORE FORMAL

03:15PM   25   DUE DILIGENCE PROCESS?

03:15PM  1     A.    IT APPEARS TO BE, YES.

03:15PM  2     Q.    AND IT LOOKS LIKE, IF YOU GO UP THE CHAIN, DR. RABODZEY

03:15PM  3     WITHIN A COUPLE OF HOURS IS ON HIS WAY TO THE WALGREENS IN

03:15PM  4     PALO ALTO; RIGHT?

03:15PM  5     A.    YES.

03:15PM  6     Q.    AND HE'S GOING UP THERE --

03:15PM  7     A.    HE LIVES IN PALO ALTO.

03:15PM  8     Q.    HE LIVES IN PALO ALTO?

03:15PM  9     A.    YEAH, IT'S NOT THAT FAR FROM --

03:15PM  10    Q.    THE RECORD WILL NOTE THAT HE WAS DOING IT ON HIS WAY HOME

03:15PM  11    ON CHRISTMAS EVE?

03:15PM  12    A.    HE WAS -- I BELIEVE HE WAS AT HOME AND JUST WENT --

03:15PM  13    PROBABLY HAD TO GO TO THE DRUG STORE.

03:15PM  14    Q.    OKAY.  BUT HE WAS ACTUALLY -- HE SAID HE'S GOING TO SEE IF

03:15PM  15    HE CAN GET A LITTLE INTEL; RIGHT?

03:15PM  16    A.    YEAH, HE'S LOOKING FOR INFORMATION ON THE SYSTEM, AND IT

03:16PM  17    LOOKS LIKE HE HAD SOME QUESTIONS, OR A LIST OF QUESTIONS.

03:16PM  18    Q.    AND ULTIMATELY -- AND HE ACTUALLY NOTES IN THIS EMAIL THAT

03:16PM  19    HE WAS GOING TO GET THE TEST, BUT HE COULDN'T GET THE TEST

03:16PM  20    BECAUSE I GUESS THEY WEREN'T DOING THEM ON CHRISTMAS EVE;

03:16PM  21    RIGHT?

03:16PM  22    A.    I GUESS NOT.

03:16PM  23    Q.    BUT HE HAD A CHANCE TO TALK TO SOMEONE THERE AND GOT SOME

03:16PM  24    FEEDBACK FROM HOW THE SYSTEM WORKED WHEN HE WENT TO THE

03:16PM  25    WALGREENS; RIGHT?

03:16PM  1     A.   YES.

03:16PM  2     Q.   AND AGAIN, THIS IS YOUR EFFORT TO TRY TO GATHER INTEL THAT

03:16PM  3     IS INDEPENDENT OF YOUR INTERACTIONS WITH THE COMPANY; RIGHT?

03:16PM  4     A.   YES.

03:16PM  5     Q.   AND MR. RABODZEY DIDN'T NOTIFY ANYBODY AT THE COMPANY THAT

03:16PM  6     HE WAS GOING, RIGHT, TO YOUR KNOWLEDGE?

03:16PM  7     A.   NO.

03:16PM  8     Q.   AND ALTHOUGH HE DIDN'T GET A TEST ON THIS OCCASION, DO YOU

03:16PM  9     RECALL THAT HE DID GET A TEST SUBSEQUENTLY?

03:16PM  10    A.   I DO RECALL THAT HE GOT A TEST SUBSEQUENTLY.

03:16PM  11    Q.   AND HE GOT A FINGERSTICK TEST; RIGHT?

03:16PM  12    A.   I BELIEVE THAT HE DID.

03:17PM  13    Q.   AND WE'LL LOOK AT SOME DOCUMENTS LATER.

03:17PM  14         BUT DO YOU RECALL THAT WERE THERE SOME DELAYS IN GETTING

03:17PM  15    THAT TEST; IS THAT RIGHT?

03:17PM  16    A.   I DON'T RECALL SPECIFICALLY.

03:17PM  17    Q.   OKAY.  AND YOU GOT A TEST AS WELL; CORRECT?

03:17PM  18    A.   YES.

03:17PM  19    Q.   AND YOUR TEST WAS A VENOUS DRAW; RIGHT?

03:17PM  20    A.   YES.

03:17PM  21    Q.   AND YOU UNDERSTOOD THAT THERANOS WAS PERFORMING VENOUS

03:17PM  22    DRAWS IN THIS TIME PERIOD; RIGHT?

03:17PM  23    A.   YES.

03:17PM  24    Q.   AND WHAT WAS YOUR UNDERSTANDING OF THE MACHINERY ON WHICH

03:17PM  25    THEY WERE PERFORMING VENOUS DRAWS?

03:17PM 1    A.    MY UNDERSTANDING IS THAT THEY WERE PERFORMING VENOUS DRAWS

03:17PM 2    ON THEIR PROPRIETARY TECHNOLOGY.

03:17PM 3    Q.    WELL, YOU UNDERSTOOD THAT THE BASIS -- THE FRAME OF THEIR

03:17PM 4    PROPRIETARY TECHNOLOGY WAS FINGERSTICK BASED TECHNOLOGY; RIGHT?

03:17PM 5    A.    THAT WAS ONE WAY TO ACQUIRE THE SAMPLE, BUT NOT THE ONLY

03:17PM 6    WAY TO ACQUIRE THE SAMPLE.

03:17PM 7    Q.    OKAY.  DID YOU EVER SPECIFICALLY ASK THE QUESTION OF

03:17PM 8    WHETHER THE VENOUS DRAWS WERE PERFORMED ON COMMERCIAL

03:17PM 9    ANALYZERS?

03:17PM 10   A.    I DON'T RECALL.

03:17PM 11   Q.    OKAY.  AND SO WE'RE CLEAR, THE FACT THAT THEY WERE

03:18PM 12   PERFORMING VENOUS DRAWS WAS NOT A SECRET IN THIS PROCESS;

03:18PM 13   RIGHT?

03:18PM 14   A.    NO.

03:18PM 15   Q.    AND, IN FACT, IT WAS IN THE WALGREENS PRESS RELEASES;

03:18PM 16   RIGHT?

03:18PM 17   A.    WE COULD REVIEW THAT IF YOU WOULD LIKE.  I DON'T HAVE

03:18PM 18   THAT.  I DON'T REMEMBER.  I DON'T HAVE THAT DOCUMENT.

03:18PM 19   Q.    WELL, WHY DON'T YOU TAKE A LOOK AT 1113.

03:18PM 20        ACTUALLY, I THINK THIS ONE IS IN EVIDENCE.  WE CAN PUT IT

03:18PM 21   RIGHT UP ON THE SCREEN.

03:18PM 22        AND DO YOU SEE ON THE BOTTOM THERE IT SAYS, "THE SAMPLES

03:18PM 23   ARE EITHER TAKEN FROM A TINY FINGERSTICK OR A MICRO-SAMPLE

03:18PM 24   TAKEN FROM TRADITIONAL METHODS, ELIMINATING THE NEED FOR LARGER

03:19PM 25   NEEDLES AND NUMEROUS VIALS OF BLOOD."

03:19PM  1          DO YOU SEE THAT?

03:19PM  2     A.   YES, I DO.

03:19PM  3     Q.   AND YOU UNDERSTOOD THE TRADITIONAL METHOD WAS VENOUS;

03:19PM  4     CORRECT?

03:19PM  5     A.   NO, I DON'T THINK THAT'S CORRECT.

03:19PM  6     Q.   YOU DIDN'T UNDERSTAND WHAT TRADITIONAL METHOD TO BE VENOUS

03:19PM  7     METHOD THERE?

03:19PM  8     A.   MY UNDERSTANDING OF THAT IS MICRO-SAMPLE TAKEN FROM

03:19PM  9     TRADITIONAL METHODS MEANS THAT YOU'RE TAKING MUCH LESS BLOOD

03:19PM 10     THAN IS TRADITIONALLY TAKEN USING VENOUS DRAW.  AND IF YOU TAKE

03:19PM 11     MUCH LESS BLOOD USING VENOUS DRAW, YOU CAN'T USE IT ON

03:19PM 12     CONVENTIONAL EQUIPMENT.

03:19PM 13     Q.   WELL, DID YOU ACTUALLY UNDERSTAND THAT THERANOS COULD TAKE

03:19PM 14     MUCH LESS BLOOD BY VENOUS DRAW AND USE IT ON COMMERCIAL

03:19PM 15     EQUIPMENT?

03:19PM 16     A.   I WOULD FIND THAT VERY TROUBLESOME BECAUSE THAT EQUIPMENT

03:19PM 17     IS FDA APPROVED TO BE USED WITH THE COLLECTION DEVICES THAT ARE

03:19PM 18     IN THE MARKET, THE LARGER VENOUS DRAWS.

03:19PM 19          SO I WOULD BE CONCERNED THAT IF SOMEONE WAS USING A

03:19PM 20     MICRO-SAMPLE TAKEN FROM TRADITIONAL METHODS AND USING THAT ON

03:19PM 21     CONVENTIONAL LAB EQUIPMENT, THAT WOULD BE CONCERNING TO ME.

03:20PM 22          THAT'S NOT HOW IT WAS APPROVED.

03:20PM 23     Q.   WELL, DID YOU HAVE -- I BELIEVE YOU TESTIFIED THAT YOU

03:20PM 24     READ THIS PRESS RELEASE; CORRECT?

03:20PM 25     A.   YES.

03:20PM  1    Q.   AND DID YOU ASK ANYONE ABOUT ANY OF THIS LANGUAGE WHEN YOU

03:20PM  2    WERE DOING YOUR DUE DILIGENCE?

03:20PM  3    A.   I DON'T RECALL SPECIFICALLY.

03:20PM  4    Q.   OKAY.  AND DO YOU RECALL HAVING DISCUSSIONS WITH THEM

03:20PM  5    ABOUT HOW THEY PERFORM THEIR VENOUS TESTING AT ALL?

03:20PM  6    A.   I, I DON'T RECALL SPECIFICALLY.  I DON'T RECALL.

03:20PM  7    Q.   BUT YOU KNEW THAT THEY WERE DOING VENOUS TESTING; RIGHT?

03:20PM  8    A.   YES.

03:20PM  9    Q.   OKAY.  AND THE -- DO YOU RECALL WHETHER YOUR VENOUS TEST

03:20PM  10   USED THE BUTTERFLY NEEDLE?

03:20PM  11   A.   I DON'T.

03:20PM  12   Q.   YOU DON'T RECALL?

03:20PM  13   A.   I DON'T.

03:20PM  14   Q.   DO YOU KNOW WHAT A BUTTERFLY NEEDLE IS?

03:21PM  15   A.   I BELIEVE IT'S A SMALLER NEEDLE.

03:21PM  16   Q.   UH-HUH.  AND YOU KNOW IT'S SOMETIMES USED IN PEDIATRIC

03:21PM  17   APPLICATIONS AND THE LIKE?

03:21PM  18   A.   YES.

03:21PM  19   Q.   AND YOU KNOW THAT OFTENTIMES THE AMOUNT OF BLOOD THAT

03:21PM  20   COMES OUT OF A BUTTERFLY NEEDLE IS SMALLER THAN THE MULTIPLE

03:21PM  21   VIALS OF BLOOD THAT COME OUT OF A TRADITIONAL NEEDLE?

03:21PM  22   A.   YES.

03:21PM  23   Q.   OKAY.  AND DO YOU UNDERSTAND THAT THE AMOUNT OF BLOOD THAT

03:21PM  24   COMES OUT OF A BUTTERFLY NEEDLE IS FREQUENTLY RUN ON COMMERCIAL

03:21PM  25   DEVICES?

03:21PM   1    A.   I DON'T KNOW THAT.

03:21PM   2    Q.   OKAY.  YOU DON'T KNOW THAT ONE WAY OR THE OTHER?

03:21PM   3    A.   I DON'T KNOW IF THOSE ARE APPROVED, IF THOSE DEVICES ARE

03:21PM   4    APPROVED TO BE RUN SPECIFICALLY ON A BUTTERFLY, A BUTTERFLY

03:21PM   5    COLLECTION DEVICE.

03:21PM   6    Q.   RIGHT.

03:21PM   7    A.   I WOULD HOPE -- IF I WERE THE LAB OPERATING THAT, I WOULD

03:21PM   8    HOPE THAT THEY WERE.

03:21PM   9    Q.   AND YOU UNDERSTAND THAT THIS IS A CLIA LAB; RIGHT?

03:21PM  10    A.   WHICH LAB ARE YOU REFERRING TO?

03:21PM  11    Q.   THE THERANOS LAB.

03:21PM  12    A.   YES.

03:21PM  13    Q.   AND THEY HAD TO MEET ALL OF THE REGULATORY REQUIREMENTS;

03:21PM  14    RIGHT?

03:21PM  15    A.   CORRECT.

03:21PM  16    Q.   OKAY.  LET'S TAKE A LOOK -- AND DO YOU UNDERSTAND THAT

03:22PM  17    SAME LANGUAGE IS IN THE NOVEMBER WALGREENS PRESS RELEASE AS

03:22PM  18    WELL?

03:22PM  19    A.   I DON'T, I DON'T RECALL THAT DOCUMENT, SO I DON'T HAVE --

03:22PM  20    I DON'T REMEMBER THAT DOCUMENT.

03:22PM  21    Q.   OKAY.  WELL, LET'S TAKE A LOOK AT 4036.

03:22PM  22    A.   OKAY.  I'VE GOT IT.

03:23PM  23    Q.   AND DO YOU RECOGNIZE THAT TO BE A PRESS RELEASE RELATING

03:23PM  24    TO THE WALGREENS EXPANSION INTO THE PHOENIX MARKET?

03:23PM  25    A.   I DO.

03:23PM 1          MR. WADE:  MOVE THE ADMISSION OF 4036.

03:23PM 2          MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:23PM 3          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:23PM 4     (GOVERNMENT'S EXHIBIT 4036 WAS RECEIVED IN EVIDENCE.)

03:23PM 5     BY MR. WADE:

03:23PM 6     Q.   AND, AGAIN, THE DATE HERE IS NOVEMBER 13TH, 2013.

03:23PM 7          DO YOU SEE THAT?

03:23PM 8          AND THIS IS THERANOS AND WALGREENS JOINT RELEASE; CORRECT?

03:23PM 9     A.   YES.

03:23PM 10    Q.   AND LET'S LOOK AT THE SECOND PARAGRAPH.

03:23PM 11         DO YOU SEE THERE IN THE SECOND LINE IT SAYS, "LAB TESTING

03:24PM 12    FROM A BLOOD SAMPLE AS SMALL AS A FEW DROPS"?

03:24PM 13    A.   YES.

03:24PM 14    Q.   IT DOESN'T SAY, ONLY A FEW DROPS, OR EVERY TEST IS ON A

03:24PM 15    FEW DROPS; RIGHT?

03:24PM 16    A.   YES.

03:24PM 17    Q.   AND IT THEN TALKS ABOUT THE MICRO-SAMPLES COLLECTED BY

03:24PM 18    CERTIFIED PHLEBOTOMISTS; CORRECT?

03:24PM 19    A.   IT SAYS THAT, YES.

03:24PM 20    Q.   AND THEN IT TALKS ABOUT IT CAN BE TAKEN FROM A FINGERSTICK

03:24PM 21    OR TRADITIONAL METHODS; RIGHT?

03:24PM 22    A.   YES.

03:24PM 23    Q.   AND THEN IT SAYS, "ELIMINATING THE NEED FOR LARGER

03:24PM 24    NEEDLES;" RIGHT?

03:24PM 25    A.   YES.

03:24PM  1    Q.   AND THAT'S BECAUSE THEY WERE USING BUTTERFLY NEEDLES;

03:24PM  2    CORRECT?

03:24PM  3                 MR. LEACH:   OBJECTION.   FOUNDATION.

03:24PM  4                 THE COURT:   SUSTAINED.

03:24PM  5    BY MR. WADE:

03:24PM  6    Q.   DO YOU RECALL SEEING A PICTURE IN THE SLIDE DECK THAT

03:24PM  7    MR. LEACH SHOWED YOU OF THE USE OF A BUTTERFLY NEEDLE AS A

03:24PM  8    THERANOS METHOD?

03:24PM  9    A.   I DON'T.

03:24PM  10   Q.   OKAY.   WE'LL GO THROUGH IT IN A BIT.

03:25PM  11        LET'S LOOK AT EXHIBIT 1400, WHICH I BELIEVE IS IN THE

03:25PM  12   GOVERNMENT'S BINDER.

03:25PM  13   A.   OKAY.

03:25PM  14   Q.   AND THIS WAS -- THIS IS THAT LIST OF QUESTIONS THAT

03:25PM  15   MR. LEACH -- THIS IS IN EVIDENCE, I BELIEVE.

03:25PM  16                 MR. LEACH:   I THINK IT'S 1404.

03:25PM  17                 MR. WADE:   LET'S PUT UP 1404.   IT INCLUDES THE CHAIN

03:26PM  18   IN 1400.

03:26PM  19   Q.   THIS IS THE LIST THAT MR. LEACH WAS ASKING YOU ABOUT;

03:26PM  20   CORRECT?

03:26PM  21   A.   I BELIEVE THAT'S CORRECT, YES.

03:26PM  22   Q.   AND IT HAS DIFFERENT CATEGORIES OF ITEMS THAT YOU WANT TO

03:26PM  23   EXPLORE?

03:26PM  24   A.   YES.

03:26PM  25   Q.   AND IS IT FAIR THAT THE CATEGORIES RELATE TO RISKS THAT

03:26PM 1    YOU WANT TO ASSESS IN CONSIDERING YOUR INVESTMENT?

03:26PM 2    A.   SOME OF THEM RELATE TO RISKS.

03:26PM 3    Q.   YOU WANTED TO ASSESS THE TECHNOLOGY RISK; IS THAT FAIR?

03:26PM 4    A.   YEAH.

03:26PM 5    Q.   AND YOU WANTED TO INVESTIGATE THE INTELLECTUAL PROPERTY

03:26PM 6    RISK; RIGHT?

03:26PM 7    A.   WELL, IT'S -- I SUPPOSE.  BUT IT'S ALSO A STRENGTH, RIGHT?

03:26PM 8    Q.   IT'S A STRENGTH IF THE INTELLECTUAL PROPERTY IS STRONG;

03:26PM 9    RIGHT?

03:26PM 10   A.   SO IT'S NOT ALL RISKS.  SOME OF THESE ARE RISKS AND SOME

03:26PM 11   OF THESE ARE JUST UNDERSTANDING THE NATURE OF THE BUSINESS SO

03:26PM 12   THAT WE CAN MAKE A MORE INFORMED INVESTMENT DECISION.

03:26PM 13   Q.   RIGHT.  AND, AND YOU SAID ABOUT EXPLORING ALL OF THOSE

03:27PM 14   THINGS, AND THAT'S WHY YOU LISTED THESE SEVEN CATEGORIES OF

03:27PM 15   QUESTIONS THAT YOU SENT TO THE TEAM; CORRECT?

03:27PM 16   A.   WELL, WE LISTED THESE JUST TO MAKE IT EASIER FOR THEM TO

03:27PM 17   PROCESS.  I THINK WE HAD OVER 60 QUESTIONS.  SO TRYING TO

03:27PM 18   ORGANIZE THEM SO THEY COULD PROCESS THEM.

03:27PM 19   Q.   RIGHT.  AND THESE QUESTIONS WERE COMING IN FROM -- YOU

03:27PM 20   ASKED ALL OF THE MEMBERS OF YOUR TEAM TO PROVIDE INPUT INTO ALL

03:27PM 21   OF THESE QUESTIONS; CORRECT?

03:27PM 22   A.   THAT'S CORRECT.

03:27PM 23   Q.   AND THIS WAS THE AMALGAMATION OF ALL OF THOSE DIFFERENT

03:27PM 24   INPUTS; RIGHT?

03:27PM 25   A.   YES.

03:27PM  1    Q.   AND JUST SO WE'RE CLEAR, THERE'S NO -- THE PHARMACEUTICAL

03:27PM  2    PARTNERSHIPS ARE NOT MENTIONED THERE; CORRECT?

03:27PM  3    A.   THAT'S CORRECT.

03:27PM  4    Q.   AND THE, THE DEPARTMENT OF DEFENSE PROJECTS ARE NOT

03:27PM  5    MENTIONED THERE; CORRECT?

03:27PM  6    A.   THAT'S CORRECT.

03:28PM  7    Q.   AND THIS IS WHAT YOU WERE FOCUSSED ON HEADING INTO THAT

03:28PM  8    MEETING; RIGHT?

03:28PM  9    A.   YES.

03:28PM 10    Q.   AND IT WAS, HOW MANY WOULD YOU SAY, 60 QUESTIONS OR SO?

03:28PM 11    A.   I -- THAT'S MY GENERAL MEMORY.

03:28PM 12    Q.   A LOT OF QUESTIONS THOUGH; RIGHT?

03:28PM 13         AND SOME OF THESE YOU COULD DISCUSS FOR SOME TIME; RIGHT?

03:28PM 14    A.   YES.

03:28PM 15    Q.   AND YOU DISCUSSED THESE -- IN TERMS OF MS. HOLMES, YOU

03:28PM 16    DISCUSSED THOSE FOR ABOUT AN HOUR AT THAT MEETING WITH HER IN

03:28PM 17    JANUARY AT THE THERANOS FACILITY; RIGHT?

03:28PM 18    A.   I DON'T REMEMBER THE ORDER OF QUESTIONS, BUT, YES, SOME OF

03:28PM 19    THOSE.

03:28PM 20    Q.   BUT SHE WAS PRESENT I THINK YOU SAID FOR ABOUT AN HOUR,

03:28PM 21    HOUR AND A HALF AT THAT MEETING?

03:28PM 22    A.   YES.

03:28PM 23    Q.   OKAY.  AND AS YOU WERE PREPARING FOR THIS, YOU ALSO

03:28PM 24    CONTINUED TO DO OTHER WORK OUTSIDE OF YOUR COMMUNICATIONS WITH

03:29PM 25    THE COMPANY; RIGHT?

03:29PM  1      A.   YES.

03:29PM  2      Q.   AND YOU WERE CONTINUING TO GATHER INTELLIGENCE

03:29PM  3      INDEPENDENTLY?

03:29PM  4      A.   YES.

03:29PM  5      Q.   RIGHT?

03:29PM  6           AND DO YOU RECALL THAT IN THIS PERIOD YOU ALSO STARTED TO

03:29PM  7      GATHER MARKET INTELLIGENCE SO THAT YOU COULD CONSTRUCT A MODEL?

03:29PM  8      A.   YES.

03:29PM  9      Q.   AND IF YOU LOOK AT 14021.

03:30PM  10     A.   OKAY.

03:30PM  11     Q.   DO YOU HAVE THAT IN FRONT OF YOU?

03:30PM  12     A.   I DO.

03:30PM  13     Q.   AND WHAT DO YOU RECOGNIZE THAT DOCUMENT TO BE?

03:30PM  14     A.   COULD I HAVE A MINUTE JUST TO READ THROUGH IT?

03:30PM  15     Q.   SURE.

03:30PM  16          (PAUSE IN PROCEEDINGS.)

03:30PM  17              THE WITNESS:   OKAY.

03:30PM  18     BY MR. WADE:

03:30PM  19     Q.   AS YOU'RE READING, MAYBE I CAN HELP YOU, DO YOU RECOGNIZE

03:30PM  20     THIS TO BE EARLY DISCUSSIONS ABOUT MARKET DATA THAT WOULD FEED

03:30PM  21     INTO A MODEL?

03:30PM  22     A.   YES.

03:30PM  23              MR. WADE:   MOVE THE ADMISSION OF 14021.

03:30PM  24              MR. LEACH:   NO OBJECTION, YOUR HONOR.

03:30PM  25              THE COURT:   IT'S ADMITTED.   IT MAY BE PUBLISHED.

03:30PM    1              (DEFENDANT'S EXHIBIT 14021 WAS RECEIVED IN EVIDENCE.)

03:31PM    2       BY MR. WADE:

03:31PM    3       Q.   AND THIS IS AN EMAIL CHAIN WITH YOU AND MR. KHANNA IN

03:31PM    4       JANUARY OF 2014; CORRECT?

03:31PM    5       A.   YES.

03:31PM    6       Q.   AND YOU ALL WERE WORKING TOWARDS BUILDING A MODEL EVEN

03:31PM    7       BEFORE THAT SECOND MEETING WITH THERANOS; CORRECT?

03:31PM    8       A.   I DON'T KNOW WHETHER WE WERE BUILDING A MODEL.  I, I

03:31PM    9       ACTUALLY DON'T THINK THAT WE WERE, BUT I THINK THIS IS MORE

03:31PM   10       TRYING TO UNDERSTAND THE SIZE OF THE MARKET.

03:31PM   11       Q.   AND MR. LEACH ASKED YOU SOME QUESTIONS ABOUT THE THERANOS

03:31PM   12       MODEL.

03:31PM   13              DO YOU RECALL THAT?

03:31PM   14       A.   I DO.

03:31PM   15       Q.   AND DO YOU RECALL YOUR MODEL ACTUALLY HAS A DIFFERENT

03:31PM   16       PHILOSOPHY IN TERMS OF HOW IT APPROACHED THE VALUATION FROM

03:31PM   17       THERANOS'S; CORRECT?

03:31PM   18       A.   UM, I JUST WANT TO MAKE SURE I ANSWER YOUR QUESTION.

03:31PM   19              WHAT -- I DON'T -- I DON'T -- I'M HAVING A HARD TIME

03:31PM   20       ANSWERING BECAUSE I'M NOT EXACTLY CLEAR WHAT I'M COMPARING IT

03:32PM   21       TO.

03:32PM   22       Q.   OKAY.  WELL, DO YOU UNDERSTAND THAT, SEPARATE AND APART

03:32PM   23       FROM THE THERANOS MODEL THAT MR. BALWANI SENT YOU, YOU ACTUALLY

03:32PM   24       DEVELOPED YOUR OWN PROPRIETARY MODEL; RIGHT?

03:32PM   25       A.   NO, NOT REALLY.

03:32PM  1          I MEAN, CAN I EXPLAIN?

03:32PM  2     Q.   WELL, LET ME ASK THIS, DO YOU RECALL GIVING TESTIMONY

03:32PM  3     BEFORE IN A DEPOSITION THAT YOU BUILT YOUR OWN PROPRIETARY

03:32PM  4     MODEL?

03:32PM  5               MR. LEACH:  OBJECTION, YOUR HONOR.  HEARSAY.

03:32PM  6               THE COURT:  SUSTAINED.

03:32PM  7               MR. WADE:  OKAY.

03:32PM  8               THE COURT:  SO YOU CAN ASK ANOTHER QUESTION.

03:32PM  9               MR. WADE:  YEAH, I'LL ASK ANOTHER QUESTION.  SURE.

03:32PM  10              THE COURT:  THAT'S HOW IT GOES.

03:32PM  11    BY MR. WADE:

03:32PM  12    Q.   DO YOU RECALL BUILDING YOUR OWN PROPRIETARY MODEL WITHIN

03:32PM  13    PFM TO PLACE A VALUATION ON THERANOS?

03:32PM  14    A.   YES.

03:32PM  15    Q.   OKAY.  AND IS THAT SOMETHING THAT YOU DO FREQUENTLY FOR

03:33PM  16    MAJOR INVESTMENTS?

03:33PM  17    A.   YES.

03:33PM  18    Q.   OKAY.  THE -- IN ADVANCE OF THIS MEETING IN JANUARY, DO

03:33PM  19    YOU RECALL ENCOURAGING DR. RABODZEY TO GO INTO THE MEETING AND

03:33PM  20    REALLY DRILL FOR INFORMATION TO MAKE SURE THAT HE UNDERSTOOD

03:33PM  21    EVERYTHING?

03:33PM  22    A.   I DON'T SPECIFICALLY REMEMBER.

03:33PM  23    Q.   BUT YOU RECALL HE WAS KIND OF YOUR TECHNICAL GUY ON THE

03:33PM  24    TEAM; RIGHT?

03:33PM  25    A.   HE WAS -- I WANTED -- HIS DOMAIN EXPERTISE, HIS SUBJECT

03:33PM   1     MATTER EXPERTISE WAS IN DATA ANALYSIS, BIO STATISTICS, THE

03:33PM   2     STATISTICAL CALCULATIONS WITHIN THE FIELD OF BIO -- BIOLOGY.

03:34PM   3          AND SO HIS -- HE WAS -- HIS SKILL SET WAS WELL MATCHED TO

03:34PM   4     ANALYZING THE DATA THAT THEY HAD, THEIR PROPRIETARY, THEIR

03:34PM   5     PROPRIETARY DATA ON THEIR PROPRIETARY TECHNOLOGY.

03:34PM   6     Q.   SO YOU WANTED HIM TO FOCUS ON THE DATA?

03:34PM   7     A.   YES.

03:34PM   8     Q.   RIGHT?

03:34PM   9          AND THE TESTING MENU?

03:34PM   10    A.   YES.

03:34PM   11    Q.   DID YOU WANT HIM TO FOCUS ON THAT?

03:34PM   12    A.   I BELIEVE THOSE WERE THE AREAS THAT WE WANTED HIM TO FOCUS

03:34PM   13    ON, YES.

03:34PM   14    Q.   AND ALSO THE SCIENCE AND REGULATORY ISSUES AS WELL?

03:34PM   15    A.   YES.

03:34PM   16    Q.   AND LET'S, LET'S --

03:34PM   17    A.   HE WASN'T THE ONLY ONE FOCUSSED ON REGULATORY, BUT THAT

03:34PM   18    WAS CERTAINLY WITHIN THE REALM OF THE TYPES OF THINGS THAT HE

03:34PM   19    WAS LOOKING AT.

03:34PM   20    Q.   AND CAN YOU LOOK AT EXHIBIT 7390, PLEASE.

03:35PM   21    A.   OKAY.

03:35PM   22    Q.   AND DO YOU RECOGNIZE THIS TO BE AN EMAIL WHERE YOU WERE

03:35PM   23    GIVING SOME DIRECTION TO MR. -- DR. RABODZEY IN ADVANCE OF THAT

03:35PM   24    THERANOS MEETING?

03:35PM   25    A.   YES.

03:35PM  1                MR. WADE:  MOVE THE ADMISSION OF 7390.

03:35PM  2                MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:35PM  3                THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:35PM  4           (DEFENDANT'S EXHIBIT 7390 WAS RECEIVED IN EVIDENCE.)

03:35PM  5                MR. WADE:  AND IF WE CAN JUST FOCUS ON THE TOP TWO

03:35PM  6      EMAILS.

03:35PM  7      Q.   THERE'S A LOGISTICAL COMPONENT WHERE YOU WERE JUST NOTING

03:35PM  8      THAT YOU WERE GOING TO MEET AT THE FACILITY; RIGHT?

03:35PM  9      A.   YES.

03:35PM  10     Q.   AND I TAKE IT THAT -- WE'VE LEARNED THAT HE LIVED IN

03:35PM  11     PALO ALTO AT THE TIME; RIGHT?

03:35PM  12     A.   YES.

03:35PM  13     Q.   AND THEN YOU ENCOURAGE HIM TO BRING YOUR A GAME.  YOU SAY,

03:35PM  14     "U ARE THE TECHNICAL EXPERT, NEED U TO BE REALLY BE SKEPTICAL

03:36PM  15     (BUT NOT AN A HOLE)"?  RIGHT?

03:36PM  16     A.   YES.

03:36PM  17     Q.   AND THAT WAS SORT OF THE MISSION THAT YOU SENT HIM DURING

03:36PM  18     THE DUE DILIGENCE PROCESS; IS THAT FAIR?

03:36PM  19     A.   YES.

03:36PM  20     Q.   AND DID HE FULFILL THE MISSION IN YOUR MIND?

03:36PM  21     A.   YES.

03:36PM  22     Q.   AND WHEN HE WENT INTO THAT MEETING AT THERANOS, DO YOU

03:36PM  23     RECOGNIZE THAT ABOUT HALF OF THE MEETING WAS ACTUALLY SPENT

03:36PM  24     WITH HIM AND MR. BALWANI GOING OVER DETAILED DATA?

03:36PM  25     A.   I DON'T RECALL THAT.

03:36PM  1    Q.   DO YOU RECALL A SIGNIFICANT PART WAS SPENT ON THAT?

03:36PM  2    A.   I DON'T RECALL IT WAS A SIGNIFICANT PART OF THE MEETING.

03:36PM  3    Q.   AND DO YOU RECALL YOU LEARNED -- WE TALKED ABOUT THE CPT

03:36PM  4    CODES.

03:36PM  5         DO YOU RECALL YOUR TESTIMONY ON THAT?

03:36PM  6    A.   YES.

03:36PM  7    Q.   AND THERE'S A DIFFERENCE BETWEEN A CPT CODE AND AN ASSAY;

03:37PM  8    RIGHT?

03:37PM  9    A.   YES.

03:37PM  10   Q.   AND SOMETIMES ONE ASSAY CAN BE A PART OF MANY DIFFERENT

03:37PM  11   CPT CODES; CORRECT?

03:37PM  12   A.   I BELIEVE THAT IS TRUE.

03:37PM  13   Q.   BECAUSE A CPT CODE RELATES TO BILLING; RIGHT?

03:37PM  14   A.   CORRECT.

03:37PM  15   Q.   AND IT'S USED IN THE HEALTH CARE INDUSTRY USUALLY RELATING

03:37PM  16   TO REIMBURSEMENT FROM HEALTH INSURANCE COMPANIES OR MEDICARE

03:37PM  17   AND MEDICAID; CORRECT?

03:37PM  18   A.   YEAH, IT RELATES TO -- THERE ARE CODES THAT ARE USED FOR

03:37PM  19   MEDICAL INVENTION, SURGICAL INTERVENTION, AND DIAGNOSTIC

03:37PM  20   INVENTIONS, AND THEY'RE GOVERNED BY THE AMERICAN MEDICAL

03:37PM  21   ASSOCIATION AND, YES, THEY'RE USED AS BILLING CODES FOR THE

03:37PM  22   GOVERNMENT.

03:37PM  23   Q.   RIGHT.  AND SO WHEN YOU MENTIONED, FOR EXAMPLE, A THOUSAND

03:37PM  24   CPT CODES, THAT'S NOT A THOUSAND ASSAYS, THAT'S A THOUSAND

03:37PM  25   DIFFERENT BILLING NUMBERS; RIGHT?

03:37PM  1    A.   WELL, I DIDN'T MENTION THAT.  MS. HOLMES MENTIONED THAT.

03:37PM  2    Q.   NO.  WHEN YOU TALKED ABOUT IT, I MEANT IN YOUR DIRECT

03:38PM  3    TESTIMONY; RIGHT?  YOU RECALL TALKING ABOUT CPT CODES WITH

03:38PM  4    MR. LEACH?

03:38PM  5    A.   I DO.  I DON'T REMEMBER SPECIFICALLY WHAT HE WAS ASKING,

03:38PM  6    BUT, YES.

03:38PM  7    Q.   OKAY.  AND IN THIS MEETING, DO YOU RECALL THAT -- BEING

03:38PM  8    INFORMED THAT THERANOS'S ANALYSIS WAS THAT 96 PERCENT OF THE

03:38PM  9    TESTING VOLUME WAS COVERED BY 70 ASSAYS?

03:38PM 10    A.   I DON'T RECALL THAT.

03:38PM 11    Q.   UM, DO YOU RECALL THAT THERANOS DISCUSSED THAT THEY HAD 70

03:38PM 12    SMALL SAMPLE ASSAYS THAT THEY WERE USING IN THEIR ROLLOUT AT

03:38PM 13    THAT POINT?

03:38PM 14    A.   I DON'T SPECIFICALLY RECALL THAT.

03:39PM 15    Q.   AND DO YOU RECALL THAT THERE WAS DISCUSSION WITHIN THIS

03:39PM 16    MEETING ABOUT HOW THEY HAD JUST OVER 200 ASSAYS THAT THEY WERE

03:39PM 17    OFFERING IN THE CLIA LAB?

03:39PM 18    A.   I, I DON'T REMEMBER SPECIFICALLY.

03:39PM 19         BUT I DO REMEMBER THAT THEY SAID THAT THEY COULD COVER

03:39PM 20    99.9 PERCENT OF THE TESTS THAT WERE DONE IN A REFERENCE LAB

03:39PM 21    SETTING.

03:39PM 22    Q.   WELL, WE'LL COME BACK TO THE PERCENTAGES.

03:39PM 23         BUT YOU RECALL THAT -- DO YOU RECALL A DISCUSSION ABOUT

03:39PM 24    THE FACT THAT TO GET FROM 96 PERCENT TO 99 PERCENT REQUIRED A

03:39PM 25    LOT OF ADDITIONAL ASSAYS AND THAT THE CORE ASSAYS, THE CORE 70

03:39PM  1    ASSAYS WOULD COVER 96 PERCENT OF THE TEST ACQUISITIONS BASED

03:39PM  2    UPON THERANOS'S DATA ANALYSIS?

03:39PM  3    A.   I DON'T RECALL THAT.

03:39PM  4    Q.   DO YOU RECALL WHEN YOU CAME OUT OF THAT MEETING, DO YOU

03:40PM  5    RECALL BEING IN A DEBRIEF MEETING WITH YOUR ANALYST TEAM ABOUT

03:40PM  6    THE THERANOS MEETING?

03:40PM  7    A.   I DON'T REMEMBER.

03:40PM  8    Q.   OKAY.  DO YOU RECALL -- BUT YOU INTERACTED WITH THE

03:40PM  9    MEMBERS OF THE ANALYST TEAM AFTER THE MEETING; RIGHT?

03:40PM  10   A.   YES.

03:40PM  11   Q.   AND DO YOU RECALL WHETHER DR. RABODZEY INFORMED YOU OF HIS

03:40PM  12   UNDERSTANDING THAT THERE WERE 70 SMALL SAMPLE ASSAYS THAT

03:40PM  13   THERANOS WAS USING AT THAT TIME?

03:40PM  14   A.   I DON'T, I DON'T RECALL.

03:40PM  15   Q.   DO YOU RECALL LEARNING AT SOME POINT THAT HE WAS OF THE

03:40PM  16   UNDERSTANDING THAT THERANOS WAS USING 70 SMALL SAMPLE ASSAYS AT

03:40PM  17   THAT TIME?

03:40PM  18   A.   I DON'T REMEMBER.

03:40PM  19   Q.   OKAY.  DO YOU RECALL WHETHER -- I THINK YOU TALKED ABOUT

03:41PM  20   YOUR WEBSITE REVIEW WHEN YOU FIRST LEARNED OF THE THERANOS

03:41PM  21   INVESTMENT.

03:41PM  22        DO YOU RECALL THAT?

03:41PM  23   A.   I MEAN, VAGUELY.

03:41PM  24   Q.   OKAY.  DO YOU KNOW WHETHER AFTER, WHEN YOU WERE MORE

03:41PM  25   SERIOUSLY CONSIDERING THE INVESTMENT, WHETHER YOU WENT BACK TO

03:41PM    1    THAT THERANOS WEBSITE AT ALL?

03:41PM    2    A.   I DON'T REMEMBER.

03:41PM    3    Q.   OKAY.  DO YOU RECALL WHETHER YOU EVER LEARNED THAT THERE

03:41PM    4    WERE 213 ASSAYS LISTED ON THE THERANOS WEBSITE AT THAT TIME?

03:41PM    5    A.   NO.

03:41PM    6    Q.   OKAY.  DO YOU RECALL EVER SEEKING A CURRENT TEST MENU

03:41PM    7    DURING THIS POINT IN TIME?

03:41PM    8    A.   YES, I DO RECALL THAT.

03:41PM    9    Q.   AND DO YOU RECALL GETTING THE TEST MENU THAT IDENTIFIED

03:41PM   10    213 ASSAYS?

03:41PM   11    A.   NO.

03:41PM   12    Q.   DO YOU REMEMBER DURING THIS MEETING THERE WAS DISCUSSION

03:42PM   13    OF THAT 8100 GOAL, THAT THEY WERE GOING TO ROLL OUT TO 8100

03:42PM   14    WALGREENS LOCATIONS; RIGHT?

03:42PM   15    A.   I DO REMEMBER.  THAT WAS ONE OF THE FIRST THINGS THAT THEY

03:42PM   16    TALKED ABOUT, THE SPEED OF THE ROLLOUT.

03:42PM   17    Q.   RIGHT.  AND THAT THAT THAT WAS -- EXECUTION ON THAT WAS A

03:42PM   18    SIGNIFICANT ISSUE FOR THE BUSINESS AT THAT TIME; RIGHT?

03:42PM   19    A.   JUST TO BE CLEAR, THOUGH, WHAT MEETING ARE YOU REFERRING

03:42PM   20    TO AT THIS POINT?

03:42PM   21    Q.   I'M REFERRING TO THE JANUARY MEETING WITH DR. RABODZEY AND

03:42PM   22    THE -- AND YOUR OTHER ANALYSTS.

03:42PM   23    A.   SO THIS WAS THE -- YEAH, OKAY, THE JANUARY 10TH.

03:42PM   24    Q.   THE JANUARY 10TH MEETING.

03:42PM   25    A.   YEAH, YES.

03:42PM  1    Q.   AND DO YOU RECALL THAT THERE WAS DISCUSSION OF THE 8100

03:42PM  2    LOCATIONS?

03:42PM  3    A.   I DO.

03:42PM  4    Q.   AND AT THAT TIME YOU KNEW THAT THEY WERE ONLY IN A FEW;

03:42PM  5    RIGHT?

03:42PM  6    A.   YES.

03:42PM  7    Q.   DID YOU KNOW WHAT RETAIL EXPERIENCE THERANOS MANAGEMENT

03:43PM  8    HAD AT THAT TIME?

03:43PM  9    A.   I DID NOT.

03:43PM  10   Q.   DID YOU KNOW WHETHER ANY OF THE SENIOR MANAGEMENT HAD ANY

03:43PM  11   RETAIL MANAGEMENT?

03:43PM  12   A.   I DON'T RECALL.

03:43PM  13   Q.   OKAY.  YOU TALKED ABOUT -- I THINK YOU TALKED ABOUT THE --

03:43PM  14   HOW THE ANALYZERS -- THE VARIATION WITHIN ANALYZERS BEING THE

03:43PM  15   TOPIC THAT CAME UP.

03:43PM  16        DO YOU RECALL THAT?

03:43PM  17   A.   YES.

03:43PM  18   Q.   AND DO YOU RECALL THAT COMING UP SPECIFICALLY IN

03:43PM  19   CONNECTION WITH THE DISTRIBUTED ANALYZERS WILL NOT HAVE

03:43PM  20   VARIATION?

03:43PM  21   A.   I -- IT CAME UP AT MULTIPLE POINTS.  I DON'T -- I'M TRYING

03:43PM  22   TO THINK OF THE CONTEXT YOU'RE PUTTING THIS QUESTION IN.

03:43PM  23        MAYBE YOU CAN BE A LITTLE MORE SPECIFIC.

03:43PM  24   Q.   WELL, LET ME ASK IT THIS WAY, I BELIEVE YOU'VE TESTIFIED

03:44PM  25   THAT THERE WAS A PHASE I AND A PHASE II THAT WAS UNDER

03:44PM 1    DISCUSSION IN YOUR MEETINGS WITH THERANOS; CORRECT?

03:44PM 2    A.   YES.

03:44PM 3    Q.   AND YOU UNDERSTOOD THAT PHASE II WAS WHEN THERE WOULD BE

03:44PM 4    DISTRIBUTED ANALYZERS; RIGHT?

03:44PM 5    A.   WELL, THIS IS REFERRING TO THE RETAIL ROLLOUT.

03:44PM 6    Q.   RIGHT.

03:44PM 7    A.   THIS HAS NOTHING TO DO WITH THE HOSPITAL, THE PHYSICIAN

03:44PM 8    OFFICE BUSINESS, THE CLINICAL TRIAL BUSINESS.  THIS IS THE

03:44PM 9    RETAIL ROLLOUT, YEAH.

03:44PM 10   Q.   THIS IS THE PHASE II OF THE RETAIL ROLLOUT WHERE THEY WERE

03:44PM 11   GOING TO DISTRIBUTE ANALYZERS; RIGHT?

03:44PM 12   A.   YEAH.

03:44PM 13   Q.   AND YOU RECALL HAVING DISCUSSIONS WITH THERANOS IN THESE

03:44PM 14   MEETINGS; RIGHT?

03:44PM 15   A.   WE -- I DEFINITELY REMEMBER DISCUSSING THE PHASES OF THE

03:44PM 16   RETAIL ROLLOUT, YES.

03:44PM 17   Q.   RIGHT.  AND YOU UNDERSTOOD THAT IN THOSE MEETINGS THERE

03:44PM 18   WAS SOME DISCUSSION ABOUT REGULATORY ISSUES RELATING TO THAT;

03:44PM 19   RIGHT?

03:44PM 20   A.   I, I DON'T REMEMBER SPECIFICALLY WHAT REGULATORY ISSUES

03:44PM 21   YOU'RE HIGHLIGHTING, BUT REGULATORY IS OFTEN A TOPIC IN

03:45PM 22   MEETINGS LIKE THIS.

03:45PM 23   Q.   OKAY.  DO YOU RECALL IT BEING A TOPIC IN THIS MEETING AS

03:45PM 24   OPPOSED TO MEETINGS LIKE THIS?

03:45PM 25   A.   I DON'T.

03:45PM 1    Q.   OKAY.  BUT YOU DO RECALL LEARNING --

03:45PM 2    A.   WELL, ACTUALLY, I'M SORRY.

03:45PM 3         SO YOU'RE ASKING SPECIFICALLY ABOUT THE REGULATORY RISK

03:45PM 4    AROUND PHASE II?

03:45PM 5    Q.   YEAH.

03:45PM 6    A.   IS THAT THE QUESTION?

03:45PM 7    Q.   YEAH.

03:45PM 8    A.   YEAH, I DON'T REMEMBER SPECIFICALLY WHAT WE DISCUSSED

03:45PM 9    AROUND THE REGULATORY RISK OF PHASE II.

03:45PM 10   Q.   DO YOU RECALL AT THAT TIME PERIOD THAT THERANOS WAS TAKING

03:45PM 11   THE POSITION THAT THEY WERE NOT GOING TO ROLL OUT TO PHASE II

03:45PM 12   UNTIL THEY GOT FDA APPROVAL?

03:45PM 13        DO YOU RECALL THAT?

03:45PM 14   A.   THAT WAS NOT MY RECOLLECTION.

03:45PM 15   Q.   OKAY.  DO YOU RECALL LEARNING THAT SOMETIME AFTER THE

03:45PM 16   MEETING?

03:45PM 17   A.   I DON'T REMEMBER SPECIFICALLY WHEN THAT ISSUE CAME UP, BUT

03:45PM 18   I DO RECALL THAT IN 2014 THEY HAD NO PLANS TO DISTRIBUTE THE

03:45PM 19   MINILABS IN THE WALGREENS RETAIL SETTING, THAT IT WAS A HUB AND

03:46PM 20   SPOKE MODEL.  THAT WAS MY MEMORY OF THAT CONVERSATION.

03:46PM 21   Q.   ALSO KNOWN AS MORE OF A CENTRAL LAB MODEL; RIGHT?

03:46PM 22   A.   THOSE ARE YOUR WORDS.  I THINK OF IT AS A HUB AND SPOKE.

03:46PM 23   Q.   OKAY.  BUT THE IDEA IS THAT THE LAB EQUIPMENT IS IN ONE

03:46PM 24   LOCATION, AND THE SAMPLES COME TO THAT ONE LOCATION; CORRECT?

03:46PM 25   A.   CORRECT.

03:46PM 1      Q.   OKAY.  AND WHEN YOU WERE DOING YOUR ANALYSIS AND BUILDING

03:46PM 2      YOUR MODEL, YOU WERE DOING IT UNDER THE ASSUMPTION THAT IT

03:46PM 3      WOULD ONLY BE IN THAT PHASE I; CORRECT?

03:46PM 4      A.   OUR MODEL WAS BASED ON PHASE I, YES.

03:46PM 5      Q.   OKAY.  AND PHASE II, IF IT HAPPENED IN THE FUTURE, WOULD

03:46PM 6      BE UP SIDE; CORRECT?

03:46PM 7      A.   YES.

03:46PM 8      Q.   AND IN PHASE I, YOU UNDERSTOOD THAT AT THIS POINT IN

03:46PM 9      PHASE I THERANOS WAS JUST GETTING UP AND GOING IN THOSE HANDFUL

03:46PM 10     OF LOCATIONS; RIGHT?

03:46PM 11     A.   YES.

03:47PM 12     Q.   THEY WERE JUST STARTING THEIR OPERATIONS?

03:47PM 13     A.   YES.

03:47PM 14     Q.   OKAY.  AND THAT THERE WAS STILL A LEARNING PROCESS THAT

03:47PM 15     THEY WERE GOING THROUGH.

03:47PM 16          DO YOU RECALL?

03:47PM 17     A.   I DO.

03:47PM 18     Q.   OKAY.  AND THAT YOU'RE AWARE THAT AS COMPANIES GO THROUGH

03:47PM 19     A LEARNING PROCESS, SOMETIMES THEY CHANGE THEIR APPROACH TO

03:47PM 20     THINGS; RIGHT?

03:47PM 21     A.   YES.

03:47PM 22     Q.   OKAY.  AND, UM, THAT'S A NATURAL PART OF BUSINESS

03:47PM 23     SOMETIMES; ISN'T IT?

03:47PM 24     A.   YES, IT IS.

03:47PM 25     Q.   OKAY.  AND AS AN INVESTOR WHO INVESTS IN THE COMPANY, YOU

03:47PM  1    UNDERSTAND THAT SOMETIMES A COMPANY MAY CHANGE ITS APPROACH TO

03:47PM  2    SOMETHING, AND YOU MAY AGREE WITH IT OR DISAGREE WITH IT, BUT

03:47PM  3    ULTIMATELY THAT'S NOT YOUR CALL; RIGHT?

03:47PM  4    A.   YES.

03:47PM  5    Q.   AND YOU'VE SAID THAT THE FOCUS WAS ON PHASE I AND YOUR

03:47PM  6    MODEL WAS FOCUSSED ON PHASE I.

03:47PM  7         DO YOU RECALL LEARNING AT SOME POINT THAT ONE OF THE

03:48PM  8    ISSUES RELATING TO PHASE II WAS A REGULATORY ISSUE, AND THAT A

03:48PM  9    REGULATORY ISSUE NEEDED TO BE ADDRESSED BEFORE PHASE II COULD

03:48PM 10    COMMENCE?

03:48PM 11    A.   I DON'T REMEMBER SPECIFICALLY.

03:48PM 12    Q.   OKAY.  DO YOU RECALL IN THIS MEETING THERE WAS SOME

03:48PM 13    DISCUSSION ABOUT THE PRIOR ROUND OF FUNDRAISING THE COMPANY HAD

03:48PM 14    DONE?

03:48PM 15    A.   I DO.

03:48PM 16    Q.   AND DO YOU RECALL THAT THE VALUATION THAT THE COMPANY HAD

03:48PM 17    AT THAT TIME WAS $15 A SHARE?

03:48PM 18         DO YOU RECALL THAT?

03:48PM 19    A.   THAT WAS NOT MY RECOLLECTION.

03:48PM 20         THEY TOLD US THE VALUE WAS $17 A SHARE.

03:48PM 21    Q.   $17 A SHARE FOR -- IS WHAT THEY WERE OFFERING YOU IN YOUR

03:48PM 22    ROUND; RIGHT?

03:48PM 23    A.   C-2, YES.  THE C-2 ROUND.

03:48PM 24         THEY TOLD US THAT THE C-1 ROUND, WHICH HAD CLOSED I

03:49PM 25    THINK -- WELL, THEY TOLD US IT HAD CLOSED A WEEK OR SO, A

03:49PM  1    MONTH -- WITHIN A MONTH OF OUR FIRST MEETING.

03:49PM  2         THEY TOLD US THE C-1 ROUND HAD CLOSED AT 15 AND THEY WERE

03:49PM  3    RAISING THE PRICE OF THE C-2 BASED ON HOW WELL THE C-1 ROLLOUT

03:49PM  4    WAS GOING, AND THEY RAISED IT TWICE SINCE THE WALGREENS

03:49PM  5    PARTNERSHIP WAS ANNOUNCED IN SEPTEMBER.

03:49PM  6    Q.   I THINK WE'RE TALKING ABOUT THE SAME THING.  YOU

03:49PM  7    UNDERSTOOD THAT C-1 WAS BEING OFFERED, THE MOST RECENT C-1

03:49PM  8    OFFERING WAS AT $15 A SHARE?

03:49PM  9    A.   YES.

03:49PM  10   Q.   OKAY.  AND DID YOU ALSO UNDERSTAND THAT ONE OF THERANOS'S

03:49PM  11   COMMERCIAL PARTNERS CONVERTED EQUITY AT THAT POINT AT THAT

03:49PM  12   PRICE?

03:49PM  13   A.   I, I DID NOT.

03:49PM  14   Q.   OKAY.

03:49PM  15   A.   WELL, I SHOULD SAY I DON'T REMEMBER.

03:49PM  16   Q.   OKAY.  DO YOU RECALL WALGREENS MAKING AN EQUITY CONVERSION

03:49PM  17   AT THAT PRICE IN THAT TIMEFRAME?

03:49PM  18            MR. LEACH:  OBJECTION, YOUR HONOR.  ASKED AND

03:49PM  19   ANSWERED.

03:49PM  20            THE COURT:  WELL, IT WAS, BUT I'LL ALLOW HIM TO

03:49PM  21   ANSWER.

03:49PM  22         YOU CAN ASK YOUR QUESTION AGAIN.

03:50PM  23   BY MR. WADE:

03:50PM  24   Q.   DO YOU RECALL -- I BELIEVE YOU SAID YOU DIDN'T RECALL

03:50PM  25   LEARNING THAT, AND I WAS WONDERING IF THE FACT THAT IT WAS

03:50PM 1     WALGREENS, WHETHER THAT WOULD REFRESH YOUR RECOLLECTION.

03:50PM 2     A.   NO.

03:50PM 3     Q.   OKAY.  AND WHEN YOU CAME OUT OF THIS, THIS MEETING, YOU

03:50PM 4     HAD NOT YET MADE AN INVESTMENT DECISION; RIGHT?

03:50PM 5     A.   THAT'S CORRECT.

03:50PM 6     Q.   AND YOU CONTINUED IN YOUR DUE DILIGENCE PROCESS

03:50PM 7     THEREAFTER; CORRECT?

03:50PM 8     A.   YES.

03:50PM 9     Q.   AND ONE OF THE THINGS THAT YOU WANTED TO DO COMING OUT OF

03:50PM 10    THAT WAS GET ADDITIONAL INFORMATION FROM THE COMPANY THAT WOULD

03:50PM 11    HELP AID YOUR DUE DILIGENCE PROCESS; IS THAT RIGHT?

03:50PM 12    A.   YES.

03:50PM 13    Q.   AND SPECIFICALLY THERE WAS THE FINANCIAL MODEL THAT

03:50PM 14    MR. LEACH REFERRED TO.  HAD THAT BEEN DISPLAYED IN THE MEETING?

03:51PM 15    A.   YES.

03:51PM 16    Q.   AND THAT WAS AN EXCEL SPREADSHEET; RIGHT?

03:51PM 17    A.   I ACTUALLY DON'T KNOW WHAT IT WAS.  IT WAS ON THE LAPTOP.

03:51PM 18    Q.   OKAY.

03:51PM 19    A.   IT WAS A PRESENTATION ON A LAPTOP.

03:51PM 20    Q.   BUT IN ANY EVENT, YOU ASKED -- YOU CAME OUT OF THE MEETING

03:51PM 21    AND YOU ASKED THEM FOR A COPY OF THAT SPREADSHEET; RIGHT?

03:51PM 22    A.   YES.

03:51PM 23    Q.   AND THEY GAVE IT TO YOU; RIGHT?

03:51PM 24    A.   THEY DID GIVE IT TO US, YES.

03:51PM 25    Q.   AND YOU UNDERSTAND THAT A MODEL IS A PROJECTION OF FUTURE

03:51PM 1    POTENTIAL GROWTH OF A COMPANY; RIGHT?

03:51PM 2    A.   YES.

03:51PM 3    Q.   AND THAT SOMETIMES MODELS ARE ACCURATE AND SOMETIMES

03:51PM 4    THEY'RE INACCURATE; RIGHT?

03:51PM 5    A.   YES.

03:51PM 6    Q.   BUT YOU ALSO UNDERSTOOD THAT TO DO A MODEL, THERE ARE A

03:51PM 7    LOT OF FACTUAL ASSUMPTIONS THAT YOU NEED TO BUILD INTO THE

03:51PM 8    MODEL THAT GET TO THE ULTIMATE VALUATION OR ULTIMATE

03:51PM 9    PROJECTIONS; RIGHT?

03:51PM 10   A.   IF IT'S A COMPLICATED COMPANY, THERE ARE OFTEN MANY

03:52PM 11   ASSUMPTIONS.

03:52PM 12        IF IT'S A SIMPLE SINGLE PRODUCT COMPANY, THERE ARE OFTEN

03:52PM 13   VERY FEW ASSUMPTIONS.

03:52PM 14        SO IT JUST DEPENDS ON THE NATURE OF THE BUSINESS THAT

03:52PM 15   WE'RE LOOKING AT.

03:52PM 16   Q.   AND YOU ASKED TO SEE FROM THERANOS THEIR PROJECTIONS WITH

03:52PM 17   THE DATA THAT INCLUDED ALL OF THE UNDERLYING ASSUMPTIONS;

03:52PM 18   RIGHT?

03:52PM 19   A.   WE WANTED TO UNDERSTAND THE MODEL THAT THEY SHOWED US, THE

03:52PM 20   FINANCIAL FORECAST THAT THEY SHARED WITH US AND, MORE

03:52PM 21   IMPORTANTLY, HOW THEY GOT THERE.

03:52PM 22        WHAT WERE THE ASSUMPTIONS UNDERPINNING THOSE FINANCIAL

03:52PM 23   FORECASTS THAT THEY SHARED WITH US?

03:52PM 24   Q.   RIGHT.  AND DO YOU RECALL THAT ALL OF THOSE ASSUMPTIONS

03:52PM 25   WERE INCLUDED IN THE MATERIALS THAT THEY SHARED WITH YOU AFTER

03:52PM  1    THE MEETING?

03:52PM  2    A.   YES, I THINK THEY PROVIDED THAT MATERIAL TO US AFTER THAT

03:52PM  3    MEETING.

03:52PM  4    Q.   FAIR ENOUGH.

03:52PM  5         AND THEN ONE OF THE THINGS THAT DR. RABODZEY WANTED AS

03:52PM  6    WELL IS HE WANTED TO LOOK AT THE TESTING DATA; RIGHT?

03:52PM  7    A.   YES.

03:53PM  8    Q.   AND HE -- THERE HAD BEEN SOME TESTING DATA, MAYBE WE CAN

03:53PM  9    AGREE, THAT WAS SHOWN IN THE MEETING; RIGHT?

03:53PM  10   A.   YES.

03:53PM  11   Q.   AND THERE WERE SOME SLIDES THAT DEPICTED THE PERFORMANCE

03:53PM  12   OF CERTAIN ASSAYS ON CHARTS; RIGHT?

03:53PM  13   A.   YES.

03:53PM  14   Q.   AND DID YOU HAVE ENOUGH FAMILIARITY WITH THE CHARTS TO

03:53PM  15   UNDERSTAND THAT DATA?

03:53PM  16   A.   I DON'T -- MY MEMORY OF THAT MEETING IS THAT WE SPENT VERY

03:53PM  17   LITTLE TIME ON THAT DATA, AND THAT'S WHY WE ASKED FOR IT IN

03:53PM  18   FOLLOWUP SO THAT WE COULD REVIEW THAT MORE CAREFULLY WITH MORE

03:53PM  19   TIME.

03:53PM  20        SO THE ANSWER TO YOUR QUESTION IS -- I THINK THE ANSWER TO

03:53PM  21   YOUR QUESTION IS -- ACTUALLY, I DON'T KNOW WHAT THE ANSWER TO

03:53PM  22   YOUR QUESTION IS.  IS IT YES OR NO?  I DON'T KNOW.

03:53PM  23   Q.   I THINK THE ANSWER TO THE QUESTION IS THAT YOU DON'T

03:53PM  24   REMEMBER HOW MUCH TIME YOU SPENT GOING OVER THE DATA IN THE

03:53PM  25   MEETING.  IS THAT RIGHT?

03:53PM   1    A.   YES.

03:53PM   2    Q.   OKAY.  BUT YOU DO RECALL THAT A LOT OF DATA WAS PROVIDED

03:53PM   3    AFTER THE MEETING; RIGHT?

03:53PM   4    A.   YES.

03:53PM   5    Q.   AND IN THAT SLIDE DECK THAT MR. LEACH SHOWED YOU AND YOU

03:54PM   6    WENT THROUGH SOME OF THE SLIDES, DO YOU RECALL THAT THERE WAS

03:54PM   7    MAYBE ABOUT 150 PAGES OF DATA WITHIN, WITHIN THE MATERIALS THAT

03:54PM   8    WERE PROVIDED TO YOU?

03:54PM   9    A.   THAT, THAT SOUNDS REASONABLE.  I DON'T KNOW EXACTLY.

03:54PM  10    Q.   AND, AND WE'LL GO OVER IT.  I'M NOT GOING TO START IT AT

03:54PM  11    3:54 WHEN THIS JURY LEAVES.  WE CAN PICK UP ON THAT TOMORROW.

03:54PM  12         BUT ONE OF THE REASONS THAT DR. RABODZEY WANTED IT IS THAT

03:54PM  13    HE WANTED TO ASSESS, HE WANTED TO ASSESS THE ACCURACY AND

03:54PM  14    PERFORMANCE OF THERANOS'S ASSAYS; CORRECT?

03:54PM  15    A.   WELL, WE WANTED HIM TO ASSESS, TO ANALYZE THAT, YES.

03:54PM  16    Q.   MAYBE HE DIDN'T WANT TO DO IT, BUT YOU MADE MR. RABODZEY

03:54PM  17    DO IT; IS THAT FAIR?

03:54PM  18    A.   WELL, AT FIRST HE DIDN'T, YEAH.

03:54PM  19    Q.   OKAY.  AND YOU WANTED HIM TO TAKE ALL OF THAT TECHNICAL

03:54PM  20    DATA AND LOOK AT IT AND GET A READ ON THE PERFORMANCE OF THE

03:54PM  21    THERANOS TESTS; RIGHT?

03:54PM  22    A.   YES.

03:54PM  23    Q.   AND ONE OF THE THINGS THAT YOU, YOU TASKED HIM WITH OR

03:55PM  24    THAT HE VOLUNTEERED FOR WAS TO DO THAT AND TO LOOK AT OTHER

03:55PM  25    ASSAYS AND SEE HOW THERANOS PERFORMED VIS-A-VIS OTHER ASSAYS?

03:55PM 1    A.   I DON'T RECALL GIVING SPECIFIC INSTRUCTIONS ON OTHER

03:55PM 2    NON-THERANOS ASSAYS.

03:55PM 3    Q.   OKAY.  BUT YOU DO RECALL ASKING HIM TO REVIEW AND DRILL

03:55PM 4    DOWN THE DATA?

03:55PM 5    A.   YES.

03:55PM 6    Q.   AND DO YOU RECALL SENDING YOUR ANALYSTS OFF TO LOOK AT THE

03:55PM 7    REGULATORY ISSUES IN GREATER DETAIL?

03:55PM 8    A.   YES.

03:55PM 9    Q.   AND DO YOU RECALL THAT, IN CONNECTION WITH THAT, THEY

03:55PM 10   RETAINED EXPERTS FROM A CONSULTING FIRM TO CONSULT WITH ON

03:55PM 11   THAT?

03:56PM 12   A.   YES.

03:56PM 13   Q.   OKAY.  AND YOU ULTIMATELY GOT THE FEEDBACK ON THOSE

03:56PM 14   ISSUES, AND WE CAN TALK ABOUT THAT TOMORROW AS WELL.

03:56PM 15       DO YOU RECALL THAT WHEN YOU CAME OUT OF THAT SECOND

03:56PM 16   MEETING AND YOU STARTED TO DRILL IN ON THESE ISSUES -- IF I

03:56PM 17   COULD HAVE THE ELMO.  THANK YOU.

03:56PM 18       IN THIS PERIOD BETWEEN JANUARY 10TH AND YOUR INVESTMENT

03:56PM 19   DECISION, DO YOU RECALL THAT THERE WERE, THERE WERE ACTUALLY A

03:56PM 20   LOT OF ISSUES THAT AROSE THAT GAVE YOU CONCERN WITH RESPECT TO

03:56PM 21   WHETHER OR NOT YOU SHOULD INVEST IN THERANOS?

03:56PM 22   A.   I DON'T REMEMBER SPECIFICALLY, BUT -- SO I SUPPOSE -- I

03:57PM 23   GUESS THE ANSWER TO YOUR QUESTION IS THAT THERE WERE, THERE

03:57PM 24   WERE OPEN ITEMS ON THE DUE DILIGENCE LIST THAT WE NEEDED TO

03:57PM 25   COMPLETE.

6560

| | | |
|---|---|---|
| 03:57PM | 1 | SO, YES, WE HAD NOT FINISHED OUR WORK. |
| 03:57PM | 2 | Q.   OKAY.  AND YOU CONTINUED TO DRILL IN ON THE MATERIALS AS |
| 03:57PM | 3 | YOU WENT THROUGH IN THAT PERIOD FOLLOWING THAT; RIGHT? |
| 03:57PM | 4 | A.   YES. |
| 03:57PM | 5 | MR. WADE:  YOUR HONOR, THAT IS SORT OF EMBARKING |
| 03:57PM | 6 | UPON A NEW SECTION THAT PROBABLY DOESN'T MAKE SENSE WITH THREE |
| 03:57PM | 7 | MINUTES LEFT. |
| 03:57PM | 8 | THE COURT:  LET'S TAKE OUR EVENING RECESS NOW, |
| 03:57PM | 9 | LADIES AND GENTLEMEN. |
| 03:57PM | 10 | LET ME REMIND YOU OF THE ADMONITION AGAIN, PLEASE.  DO NOT |
| 03:57PM | 11 | DO ANY RESEARCH, DO NOT FORM ANY OPINION, DO NOT READ, LISTEN, |
| 03:57PM | 12 | OR DISCUSS ANYTHING TO DO WITH THIS CASE. |
| 03:57PM | 13 | I'LL ASK YOU IF THAT HAPPENED TOMORROW MORNING AGAIN. |
| 03:57PM | 14 | LET ME REMIND YOU OF OUR SCHEDULE.  TOMORROW WE'LL START |
| 03:57PM | 15 | AT 9:00 O'CLOCK. |
| 03:57PM | 16 | SO I'LL ASK YOU TO RETURN, SIR, SUCH THAT YOU CAN CONTINUE |
| 03:58PM | 17 | YOUR EXAMINATION AT 9:00 A.M. |
| 03:58PM | 18 | LADIES AND GENTLEMEN, WE WILL BE TAKING A BREAK TOMORROW. |
| 03:58PM | 19 | PLEASE RECALL -- I THINK IT'S FOR AN HOUR AND IT WILL PROBABLY |
| 03:58PM | 20 | BE SOME TIME BETWEEN 10:30 AND 11:50, SOMETHING LIKE THAT, BUT |
| 03:58PM | 21 | WE WILL NEED TO TAKE THAT BREAK. |
| 03:58PM | 22 | AND THEN TOMORROW WE END AT 3:30.  3:30 IS THE END OF OUR |
| 03:58PM | 23 | DAY TOMORROW. |
| 03:58PM | 24 | AND I'LL KEEP YOU APPRISED OF ANY OTHER CHANGES IN |
| 03:58PM | 25 | SCHEDULES. |

6561

03:58PM  1    I THINK THE OTHER ONE I HAVE A NOTE OF IS ON THE 29TH OF

03:58PM  2  NOVEMBER WE START AT 10:00 A.M., I BELIEVE.  I THINK I HAVE A

03:58PM  3  NOTE TO THAT EFFECT, BUT WE CAN UPDATE THAT AS WE MOVE ALONG.

03:58PM  4    SO THANK YOU VERY MUCH.  HAVE A GOOD EVENING.

03:58PM  5    THANK YOU, SIR.  YOU CAN STAND DOWN.  AND WE'LL SEE YOU

03:58PM  6  TOMORROW MORNING.

03:59PM  7    (JURY OUT AT 3:59 P.M.)

03:59PM  8    MR. WADE:  YOU CAN LEAVE ALL OF THE MATERIALS RIGHT

03:59PM  9  THERE, SIR.

03:59PM  10    THE COURT:  PLEASE BE SEATED.  THANK YOU.

03:59PM  11    SIR, YOU CAN LEAVE.  THANK YOU.

03:59PM  12    ALL RIGHT.  THANK YOU.  THE RECORD SHOULD REFLECT THAT OUR

03:59PM  13  JURY HAS LEFT FOR THE DAY.  OUR WITNESS HAS LEFT FOR THE DAY.

03:59PM  14    ALL COUNSEL REMAIN AND MS. HOLMES REMAINS.

03:59PM  15    MR. DOWNEY, DID YOU WANT TO TALK ABOUT SOMETHING?

03:59PM  16    MR. DOWNEY:  I DID IN PART WANT TO TOUCH ON A SEALED

03:59PM  17  PROCEEDING WE HAD EARLIER IN THE CASE.  I DON'T KNOW IF YOU

03:59PM  18  WANT TO DO THAT NOW OR IN SOME OTHER FORUM.

04:00PM  19    THE COURT:  OKAY.  WELL, LET'S DO THAT IN -- IS THIS

04:00PM  20  REGARDING A SEALED MATTER THAT WE --

04:00PM  21    MR. DOWNEY:  A SEALED MATTER THAT WE DEALT WITH IN

04:00PM  22  CAMERA EARLIER IN THE TRIAL.

04:00PM  23    THE COURT:  MAYBE WE CAN DO THAT.  WE'LL GO IN

04:00PM  24  CAMERA AGAIN IF IT TOUCHES ON THAT.

04:00PM  25    WOULD THIS INVOLVE MR. SCHENK THEN?

```
04:00PM   1              MR. DOWNEY:  I THINK IT WILL INVOLVE MR. SCHENK.  I
04:00PM   2    ALSO THINK IT WILL BE QUITE BRIEF.
04:00PM   3              THE COURT:  ALL RIGHT.  DO YOU HAVE TIME,
04:00PM   4    MR. SCHENK?
04:00PM   5              MR. SCHENK:  YES, YOUR HONOR.
04:00PM   6              MR. DOWNEY:  AND I'VE ALERTED MR. SCHENK OF THE
04:00PM   7    ISSUE.
04:00PM   8              THE COURT:  ANYTHING ELSE?
04:00PM   9              MR. DOWNEY:  NOTHING FROM THE DEFENSE, YOUR HONOR.
04:00PM  10              THE COURT:  OKAY.  ANYTHING FROM THE GOVERNMENT
04:00PM  11    BEFORE WE BREAK?
04:00PM  12              MR. LEACH:  ONLY, YOUR HONOR, IF WE CAN PLEASE GET
04:00PM  13    AN ESTIMATE OF THE REMAINDER OF THE CROSS FOR MR. GROSSMAN.
04:00PM  14        I THINK THE GOVERNMENT'S DIRECT WAS APPROXIMATELY 2 HOURS
04:00PM  15    AND 15 MINUTES, AND I THINK WE HAVE ALREADY EXCEEDED THAT IN
04:00PM  16    THE CROSS-EXAMINATION, AND IN THE INTEREST OF BEING ABLE TO
04:00PM  17    MANAGE THE REMAINING WITNESSES, I WAS JUST HOPING IF WE COULD
04:00PM  18    GET A TIME ESTIMATE.
04:00PM  19              THE COURT:  ALL RIGHT.
04:00PM  20              MR. WADE:  I'LL GO THROUGH MY MATERIALS.  I'LL GIVE
04:01PM  21    MR. LEACH AN EMAIL UPDATE ON THAT.
04:01PM  22              THE COURT:  WHAT CAN YOU TELL ME RIGHT NOW?
04:01PM  23              MR. WADE:  VERY LITTLE, YOUR HONOR.
04:01PM  24        I, OF COURSE, WANT TO BE ACCURATE.
04:01PM  25              THE COURT:  AND I WANT TO KNOW A LOT.  THAT'S A
```

04:01PM 1       PITY.

04:01PM 2               (LAUGHTER.)

04:01PM 3                       THE COURT:  I DO WANT TO -- I NOTE THAT THERE HAVE

04:01PM 4       BEEN MANY QUESTIONS -- AND I'M NOT INTERFERING WITH YOUR

04:01PM 5       DEFENSE -- BUT THERE ARE MANY QUESTIONS THAT HAVE BEEN ASKED

04:01PM 6       AND ANSWERED ON DIRECT, AND I RECOGNIZE MUCH OF THAT IS

04:01PM 7       FOUNDATIONAL FROM YOUR PERSPECTIVE, AND I RESPECT THAT.

04:01PM 8           BUT SOME OF THE MATERIAL HERE, I JUST DON'T -- I'M NOT

04:01PM 9       ASKING YOU TO REVEAL WHAT YOUR DEFENSE IS, BUT YOU NEED TO DO

04:01PM 10      WHAT YOU HAVE TO DO.  THERE ARE TWO BINDERS HERE THAT ARE ABOUT

04:01PM 11      THREE INCHES THICK WITH MATERIALS.

04:01PM 12          SO WILL YOU FINISH WITH THIS WITNESS THIS WEEK?  LET'S

04:01PM 13      START THERE.

04:01PM 14                      MR. WADE:  I BELIEVE I WILL FINISH WITH THIS WITNESS

04:02PM 15      TOMORROW, AND IT MAY WELL BE ANOTHER WITNESS IS NECESSARY.

04:02PM 16          I'LL ADVISE MR. LEACH MORE PRECISELY TO THAT.

04:02PM 17                      THE COURT:  OKAY.

04:02PM 18                      MR. WADE:  BUT OFTENTIMES THE INQUIRY OF COUNSEL IS

04:02PM 19      WHETHER THEY SHOULD HAVE A WITNESS READY.  MY GUESS, AS WE SIT

04:02PM 20      HERE TODAY, IS THAT THEY SHOULD HAVE ANOTHER WITNESS READY.

04:02PM 21      THEY MAY GET TO ANOTHER WITNESS TOMORROW.

04:02PM 22                      THE COURT:  OKAY.  WHAT WE'VE EXPERIENCED IN THE

04:02PM 23      TRIAL IS CROSS-EXAMINATION FINISHING ABOUT A QUARTER TILL OR

04:02PM 24      ABOUT THE TIME WE'RE GOING TO CLOSE WITH 30 MINUTES LEFT TO

04:02PM 25      CLOSE FOR THE DAY.

6564

04:02PM 1        I DON'T KNOW, CAN YOU TELL ME, IS THAT THE SITUATION WE'LL

04:02PM 2    BE IN TOMORROW?

04:02PM 3           MR. WADE:  IT'S CERTAINLY NOT BY DESIGN THAT WE

04:02PM 4    WOULD DO THAT, YOUR HONOR.

04:02PM 5        I DON'T KNOW IF MR. LEACH ANTICIPATES A REDIRECT THAT IS

04:02PM 6    LENGTHY OR NOT, BUT IT'S HARD FOR ME TO BE MORE PRECISE THAN I

04:02PM 7    HAVE BEEN APART FROM, YOU KNOW, WE'LL TRY TO FINISH WITH THE

04:02PM 8    WITNESS TOMORROW.

04:02PM 9           THE COURT:  WELL, WE KNOW WE FINISH TOMORROW AT

04:02PM 10   3:30, AND WE'VE GOT THIS HOUR BREAK.

04:02PM 11          MR. WADE:  I WAS TRYING TO THINK THROUGH -- AS THE

04:03PM 12   COURT WAS RAISING THE BREAK AND THE EARLY START, I WAS TRYING

04:03PM 13   TO THINK THROUGH EXACTLY HOW LONG IT WILL BE.

04:03PM 14       SO I TAKE IT WE HAVE ABOUT AN HOUR AND A HALF IN THE

04:03PM 15   MORNING, AND THEN WE'LL HAVE THREE AND A HALF HOURS IN THE

04:03PM 16   AFTERNOON.

04:03PM 17       WE SHOULD, WE SHOULD EASILY BE ABLE TO FINISH THE WITNESS

04:03PM 18   BY THEN.

04:03PM 19          THE COURT:  AND WHEN YOU SAY THAT, WHEN YOU SAY

04:03PM 20   "WE," IS THAT THE ROYAL WE OR IS THAT YOU?

04:03PM 21          MR. WADE:  THE ROYAL WE IN THIS CASE, AND I'LL REFER

04:03PM 22   TO MYSELF AND MR. LEACH.

04:03PM 23       SO I THINK THERE SHOULD BE MORE THAN ENOUGH TIME.

04:03PM 24          THE COURT:  OKAY.

04:03PM 25          MR. LEACH:  WE'LL HAVE ADDITIONAL WITNESSES READY

04:03PM  1   FOR TOMORROW, YOUR HONOR.

04:03PM  2            THE COURT:  OKAY.  GREAT.

04:03PM  3        ALL RIGHT.  WHY DON'T I SEE, MR. DOWNEY, YOU AND

04:03PM  4   MR. SCHENK, AND WE'LL HAVE OUR REPORTER MEET YOU IN CHAMBERS.

04:03PM  5        MS. DIBBLE WILL ESCORT YOU BACK IN JUST A MOMENT.  THANK

04:03PM  6   YOU.

04:03PM  7            (SEALED PROCEEDINGS HELD IN CAMERA.)

         8

         9

        10

        11

        12

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

1

2

3                        CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8     UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9     CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10    HEREBY CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16         _____
           IRENE RODRIGUEZ, CSR, CRR
           CERTIFICATE NUMBER 8076
17

18

19         _____
           LEE-ANNE SHORTRIDGE, CSR, CRR
           CERTIFICATE NUMBER 9595
20

21         DATED:  NOVEMBER 16, 2021

22

23

24

25