UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR-18-00258-EJD |
| | ) | |
| PLAINTIFF, | ) | SAN JOSE, CALIFORNIA |
| | ) | |
| VS. | ) | VOLUME 34 |
| | ) | |
| ELIZABETH A. HOLMES, | ) | NOVEMBER 17, 2021 |
| | ) | |
| DEFENDANT. | ) | PAGES 6574 - 6779 |
| _____ | ) | |


TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE EDWARD J. DAVILA
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                       BY:  JOHN C. BOSTIC
                            JEFFREY B. SCHENK
                       150 ALMADEN BOULEVARD, SUITE 900
                       SAN JOSE, CALIFORNIA 95113

                       BY:  ROBERT S. LEACH
                            KELLY VOLKAR
                       1301 CLAY STREET, SUITE 340S
                       OAKLAND, CALIFORNIA 94612

       (APPEARANCES CONTINUED ON THE NEXT PAGE.)


OFFICIAL COURT REPORTERS:
                            IRENE L. RODRIGUEZ, CSR, RMR, CRR
                            CERTIFICATE NUMBER 8074
                            LEE-ANNE SHORTRIDGE, CSR, CRR
                            CERTIFICATE NUMBER 9595

       PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
           TRANSCRIPT PRODUCED WITH COMPUTER

```
 1         A P P E A R A N C E S: (CONT'D)

 2

 3    FOR DEFENDANT HOLMES:    WILLIAMS & CONNOLLY LLP
                               BY:  KEVIN M. DOWNEY
 4                                  LANCE A. WADE
                                    KATHERINE TREFZ
 5                                  SEEMA ROPER
                                    J.R. FLEURMONT
 6                                  RICHARD CLEARY
                                    PATRICK LOOBY
 7                               725 TWELFTH STREET, N.W.
                               WASHINGTON, D.C. 20005
 8
                               LAW OFFICE OF JOHN D. CLINE
 9                             BY:  JOHN D. CLINE
                               ONE EMBARCADERO CENTER, SUITE 500
10                             SAN FRANCISCO, CALIFORNIA 94111

11

12    ALSO PRESENT:            FEDERAL BUREAU OF INVESTIGATION
                               BY:  ADELAIDA HERNANDEZ
12

13                             OFFICE OF THE U.S. ATTORNEY
                               BY:  LAKISHA HOLLIMAN, PARALEGAL
14                                  MADDI WACHS, PARALEGAL

15                             WILLIAMS & CONNOLLY
                               BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL
16
                               TBC
17                             BY:  BRIAN BENNETT, TECHNICIAN

18

19

20

21

22

23

24

25
```

1

INDEX OF PROCEEDINGS

2

GOVERNMENT'S:

3

4   **BRIAN GROSSMAN**
CROSS-EXAM BY MR. WADE (RES.)          P. 6583
5   REDIRECT EXAM BY MR. LEACH            P. 6735

6

7   **ERIN TOMPKINS**
DIRECT EXAM BY MR. BOSTIC              P. 6747
8   CROSS-EXAM BY MS. TREFZ              P. 6762

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          INDEX OF EXHIBITS

2
                                         IDENT.      EVIDENCE

3        GOVERNMENT'S:

4        1454                                        6622
         1477                                        6650
5        4093                                        6669
         4088                                        6688
6        4089                                        6690
         4090                                        6697
7        5483                                        6752
         5484                                        6760
8

9

10       DEFENDANT'S:

11       7391                                        6600
         14002                                       6608
12       7399                                        6627
         7400                                        6632
13       7403                                        6638
         14001                                       6644
14       14073                                       6653
         14073 (WITHDRAWN)                           6654
15       7398                                        6658
         14072                                       6660
16       13720A                                      6664
         14057                                       6699
17       14054                                       6701
         14055                                       6703
18       14029                                       6705
         7411                                        6708
19       13822                                       6719

20

21

22

23

24

25

6578

| | 1 | SAN JOSE, CALIFORNIA                    NOVEMBER 17, 2021 |
| 08:35AM | 2 | P R O C E E D I N G S |
| 08:35AM | 3 | (COURT CONVENED AT 8:35 A.M.) |
| 08:35AM | 4 | (JURY OUT AT 8:35 A.M.) |
| 08:35AM | 5 | THE COURT:  LET'S GO ON THE RECORD IN THE HOLMES |
| 08:35AM | 6 | MATTER.  ALL COUNSEL ARE PRESENT AND MS. HOLMES IS PRESENT. |
| 08:35AM | 7 | WE ARE OUTSIDE OF THE PRESENCE OF THE JURY. |
| 08:36AM | 8 | GOOD MORNING. |
| 08:36AM | 9 | COUNSEL, I THINK 1146 WAS FILED, DOCKET 1146, AND I THINK, |
| 08:36AM | 10 | COUNSEL, YOU WANT TO SPEAK TO THAT FOR JUST A MOMENT. |
| 08:36AM | 11 | MR. CLINE:  YES, FOR JUST A MOMENT.  AND I'M GOING |
| 08:36AM | 12 | TO HAND COURTESY COPIES TO MS. KRATZMANN. |
| 08:36AM | 13 | THE COURT:  OH, THANK YOU. |
| 08:36AM | 14 | MR. CLINE:  (HANDING.) |
| 08:36AM | 15 | THIS HAS TO DO WITH MR. PARLOFF'S TESTIMONY.  HE WON'T BE |
| 08:36AM | 16 | TESTIFYING UNTIL TOMORROW, AND SO I THINK MR. BOSTIC AND I |
| 08:36AM | 17 | AGREE THAT WE CAN DEFER DISCUSSION OF THIS MOTION UNTIL |
| 08:36AM | 18 | TOMORROW MORNING, BUT I WANTED TO TELL THE COURT -- UPDATE YOU |
| 08:36AM | 19 | ON WHERE WE ARE. |
| 08:36AM | 20 | THE COURT:  WELL, THERE WAS SOME PROMISING LANGUAGE |
| 08:36AM | 21 | IN THIS THAT SUGGESTED THAT YOU WERE MEETING AND CONFERRING AND |
| 08:36AM | 22 | WORKING ON AGREEMENT. |
| 08:36AM | 23 | MR. CLINE:  WE HAVE HAD THE MOST PRODUCTIVE |
| 08:36AM | 24 | DISCUSSION HERE THAT YOU CAN IMAGINE.  IT'S BEEN GREAT. |
| 08:36AM | 25 | THE COURT:  WELL, WHY DON'T I JUST GO BACK THEN. |

08:36AM 1          (LAUGHTER.)

08:36AM 2              MR. CLINE:  WE'RE NOT QUITE AT THAT POINT, BUT WE'RE

08:36AM 3      CLOSE.  WE'RE CLOSE.

08:36AM 4          THERE WERE FOUR DESIGNATED CLIPS THAT OUR MOTION ADDRESS.

08:37AM 5      NUMBER ONE WE'RE GOING TO BE ABLE TO AGREE ON.  WE'RE STILL

08:37AM 6      TALKING ABOUT IT, BUT YOU DON'T NEED TO WORRY ABOUT THAT.

08:37AM 7              NUMBER TWO IS STILL AT ISSUE.

08:37AM 8              THE COURT:  OKAY.

08:37AM 9              MR. CLINE:  AND WE'LL WANT TO DISCUSS THAT TOMORROW

08:37AM 10     MORNING.

08:37AM 11         NUMBER THREE THE GOVERNMENT HAS NO OBJECTION, SO THAT ONE

08:37AM 12     IS RESOLVED.

08:37AM 13         AND NUMBER FOUR IS STILL AT ISSUE.

08:37AM 14             THE COURT:  OKAY.

08:37AM 15             MR. CLINE:  NUMBER FOUR THERE'S A TRANSCRIPT FOR IT.

08:37AM 16     IT'S EXHIBIT 3 TO MY DECLARATION.

08:37AM 17         FOR NUMBER TWO THERE IS NOT A TRANSCRIPT.  WE'VE HANDED UP

08:37AM 18     A --

08:37AM 19             THE COURT:  THAT'S THE --

08:37AM 20             MR. CLINE:  IT'S ON THE MEMORY STICK.

08:37AM 21             THE COURT:  I SEE.  OKAY.

08:37AM 22         SO I CAN LOOK AT THAT.  ALL RIGHT.

08:37AM 23         AND THESE ARE -- THESE DESIGNATIONS APPEAR ON PAGE 2 OF

08:37AM 24     YOUR MOTION, I BELIEVE, UP AT THE TOP.

08:37AM 25             MR. CLINE:  YES.

```
08:37AM   1              THE COURT:  RIGHT.  GOT IT.  OKAY.  THANK YOU.

08:37AM   2              MR. CLINE:  SO THAT'S WHERE WE ARE, AND THAT'S ALL

08:37AM   3     WE NEEDED FROM THE COURT AND WE JUST WANTED TO UPDATE YOU.

08:38AM   4              THE COURT:  OKAY.  WELL, THANK YOU VERY MUCH.

08:38AM   5          AND YOU'RE GOING TO CONTINUE TO TALK, OR DO YOU THINK YOUR

08:38AM   6     CONVERSATION IS EXHAUSTED SUCH THAT WE WILL HAVE TO RESOLVE

08:38AM   7     THIS TOMORROW MORNING?

08:38AM   8              MR. CLINE:  I THINK FOR DESIGNATIONS TWO AND FOUR

08:38AM   9     WE'RE GOING TO HAVE TO TALK IN THE MORNING.

08:38AM  10              THE COURT:  OKAY.

08:38AM  11              MR. CLINE:  ONE WE WILL AGREE ON, SO WE WON'T NEED

08:38AM  12     TO WORRY ABOUT THAT.

08:38AM  13              MR. BOSTIC:  AGREED, YOUR HONOR.

08:38AM  14          THE PARTIES WILL KEEP IN TOUCH ON THESE ISSUES, BUT I

08:38AM  15     THINK WE JUST SEE THE DESIGNATED CLIPS THAT MR. CLINE MENTIONED

08:38AM  16     DIFFERENTLY, SO WE WILL NEED THE COURT'S INPUT ON THAT.

08:38AM  17              THE COURT:  GREAT.

08:38AM  18              MR. BOSTIC:  I'M HAPPY TO DISCUSS THAT TOMORROW

08:38AM  19     MORNING.

08:38AM  20          I THINK THIS WITNESS WILL LIKELY TESTIFY TOMORROW MORNING

08:38AM  21     OR MIDDAY TOMORROW.

08:38AM  22              THE COURT:  OKAY.  THAT SOUNDS GOOD.

08:38AM  23          OKAY.  THANK YOU.  THANK YOU FOR THAT.  I'LL LOOK AT

08:38AM  24     THESE.

08:38AM  25          YOU KNOW, TODAY WE HAVE -- I THINK WE END AT 3:30 TODAY.
```

08:38AM  1      I KNOW I'M PRESSING IT, BUT MAYBE WE COULD USE THE

08:38AM  2  AFTERNOON TO DISCUSS, PERHAPS NOT THIS, I'LL NEED TO LOOK AT

08:38AM  3  THINGS, BUT IF THERE'S ANYTHING ELSE THAT WE NEED TO DISCUSS,

08:39AM  4  YOU KNOW, I'M -- I WOULD JUST AS SOON USE AS MUCH COURT TIME

08:39AM  5  THAT WE HAVE AVAILABLE TO KEEP THINGS GOING FORWARD.

08:39AM  6      SO WE'LL LOOK AT THE END OF THE DAY AND SEE HOW THAT

08:39AM  7  LOOKS.

08:39AM  8      AND WE HAVE A BREAK TODAY, I THINK IT'S FROM ABOUT 10:40

08:39AM  9  TO ABOUT 11:50 THAT WE'LL NEED TO --

08:39AM 10           MR. CLINE:  RIGHT.

08:39AM 11           THE COURT:  RIGHT.  AND THEN WE GO UNTIL 3:30.  SO

08:39AM 12  IT'S KIND OF AN ABBREVIATED DAY.

08:39AM 13           MR. CLINE:  OKAY.  THANK YOU.

08:39AM 14           THE COURT:  MR. CLEARY IS NOT HERE TODAY, IS HE?

08:39AM 15      I DON'T SEE HIM IN THE AUDIENCE.  I WANTED TO -- YOU KNOW,

08:39AM 16  I NEGLECTED YESTERDAY TO THANK HIM FOR HIS THOROUGH

08:39AM 17  PRESENTATION.  I THOUGHT HE DID A FINE JOB, MORE THAN FINE, I

08:39AM 18  THOUGHT HE DID AN EXCELLENT JOB ADVOCATING HIS INTEREST.  HE

08:39AM 19  RESPONDED TO MY QUESTIONS AND TO MR. BOSTIC'S COMMENTS, AND I

08:40AM 20  DIDN'T GET A CHANCE TO THANK HIM AND RECOGNIZE HIM FOR HIS

08:40AM 21  PRESENTATION.  I WAS HOPING I COULD DO THAT TODAY.  BUT IN HIS

08:40AM 22  ABSENCE, COULD I ASK COUNSEL TO SHARE WITH HIM MY THOUGHTS?

08:40AM 23           MR. CLINE:  CERTAINLY, YOUR HONOR.

08:40AM 24      AND MORE THAN THAT, I'M GOING TO GET THIS PORTION OF THE

08:40AM 25  TRANSCRIPT AND MAKE SURE HE PUTS IT ON HIS WEBSITE.

| | | |
|---|---|---|
| 08:40AM | 1 | (LAUGHTER.) |
| 08:40AM | 2 | THE COURT:  SOUNDS GOOD.  OKAY. |
| 08:40AM | 3 | (LAUGHTER.) |
| 08:40AM | 4 | THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.  THANK |
| 08:40AM | 5 | YOU. |
| 08:40AM | 6 | MR. CLINE:  THANK YOU. |
| 08:40AM | 7 | THE CLERK:  COURT IS IN RECESS. |
| 08:40AM | 8 | (RECESS FROM 8:40 A.M. UNTIL 9:06 A.M.) |
| 09:06AM | 9 | (JURY IN AT 9:06 A.M.) |
| 09:06AM | 10 | THE COURT:  GOOD MORNING.  WE'RE BACK ON THE RECORD |
| 09:06AM | 11 | IN THE HOLMES MATTER.  ALL COUNSEL ARE PRESENT.  MS. HOLMES IS |
| 09:06AM | 12 | PRESENT. |
| 09:06AM | 13 | OUR JURY IS PRESENT.  GOOD MORNING, LADIES AND GENTLEMEN. |
| 09:06AM | 14 | WE'LL RESUME EVIDENCE IN JUST A MOMENT. |
| 09:06AM | 15 | LET ME ASK YOU THE QUESTION AGAIN.  DURING THE BREAK, DID |
| 09:06AM | 16 | ANY OF YOU COME ACROSS, DISCUSS, READ, OR LISTEN TO ANYTHING TO |
| 09:06AM | 17 | DO WITH THIS CASE DURING THE BREAK?  IF SO, PLEASE SHOW ME YOUR |
| 09:06AM | 18 | HAND. |
| 09:06AM | 19 | I SEE NO HANDS. |
| 09:06AM | 20 | GREAT.  THANK YOU VERY MUCH. |
| 09:06AM | 21 | LET'S CONTINUE WITH THE WITNESS THEN.  IF WE CAN BRING THE |
| 09:06AM | 22 | WITNESS IN. |
| 09:06AM | 23 | GOOD MORNING, MR. WADE. |
| 09:06AM | 24 | MR. WADE:  GOOD MORNING, YOUR HONOR. |
| 09:06AM | 25 | THE COURT:  AND MR. GROSSMAN, GOOD MORNING. |

09:06AM 1          THE WITNESS:  GOOD MORNING.

09:07AM 2          THE COURT:  PLEASE GO AHEAD AND HAVE A SEAT AGAIN

09:07AM 3    AND MAKE YOURSELF COMFORTABLE.

09:07AM 4        WHEN YOU ARE COMFORTABLE, AGAIN, WOULD YOU PLEASE STATE

09:07AM 5    YOUR NAME.

09:07AM 6          THE WITNESS:  BRIAN GROSSMAN.

09:07AM 7          **(GOVERNMENT'S WITNESS, BRIAN GROSSMAN, WAS PREVIOUSLY**

09:07AM 8    **SWORN.)**

09:07AM 9          THE COURT:  MR. WADE.

09:07AM 10          MR. WADE:  THANK YOU, YOUR HONOR.

09:07AM 11                    **CROSS-EXAMINATION**

09:07AM 12    Q.  GOOD MORNING.

09:07AM 13    A.  GOOD MORNING.

09:07AM 14    Q.  YOU RECALL YESTERDAY WE HAD SOME DISCUSSION ABOUT THE

09:07AM 15    JANUARY 10TH, 2014 MEETING THAT YOU HAD AT THERANOS?

09:07AM 16    A.  YES.

09:07AM 17    Q.  AND I JUST WANT TO ASK A COUPLE OF QUICK QUESTIONS ABOUT

09:07AM 18    THAT AND THEN MOVE ON ON SOME OF THE ITEMS THAT FOLLOWED OUT OF

09:07AM 19    THAT MEETING.

09:07AM 20        DO YOU RECALL THAT IT WAS -- ON BEHALF OF THERANOS, THAT

09:07AM 21    IT WAS MR. BALWANI WHO SORT OF DROVE THAT MEETING?

09:07AM 22    A.  I RECALL THAT BOTH MS. HOLMES AND MR. BALWANI SPOKE IN

09:07AM 23    THAT MEETING, AND THAT MS. HOLMES EXITED THE MEETING AT SOME

09:08AM 24    POINT ROUGHLY HALFWAY THROUGH.

09:08AM 25    Q.  RIGHT.  AND DO YOU RECALL THAT DURING PART OF THE

09:08AM 1    DISCUSSION THAT YOU WERE THERE THAT MR. BALWANI WAS SORT OF

09:08AM 2    DRIVING THE DISCUSSION ON SOME OF THE DETAILS THAT YOU WERE

09:08AM 3    FOCUSSED ON?

09:08AM 4    A.   I DON'T RECALL.

09:08AM 5    Q.   IF YOU LOOK TO YOUR LEFT, THERE'S A BINDER IN FRONT OF YOU

09:08AM 6    THAT SHOULD BE OPEN TO EXHIBIT 11049.

09:08AM 7         DO YOU SEE THAT?

09:08AM 8    A.   I DO.

09:08AM 9    Q.   AND IF YOU COULD DO ME A FAVOR AND JUST READ THE LAST LINE

09:08AM 10   ON THE LAST PARAGRAPH, OR THE LAST SENTENCE IN THE LAST

09:08AM 11   PARAGRAPH -- SECOND TO THE LAST SENTENCE IN THAT PARAGRAPH ON

09:08AM 12   THE FIRST PAGE.

09:08AM 13           THE COURT:  TO HIMSELF?  OUT LOUD?

09:08AM 14   BY MR. WADE:

09:08AM 15   Q.   TO YOURSELF, AND LET ME KNOW WHEN YOU'RE FINISHED.

09:09AM 16   A.   OKAY.

09:09AM 17   Q.   DOES THAT, READING THAT PORTION, THE PORTION OF THAT

09:09AM 18   DOCUMENT REFRESH YOUR RECOLLECTION THAT IT WAS MR. BALWANI WHO

09:09AM 19   DROVE THAT MEETING ON BEHALF OF THERANOS?

09:09AM 20   A.   WELL, THESE ARE NOT MY NOTES, SO I DON'T --

09:09AM 21   Q.   AND WE DON'T WANT YOU TO READ THE NOTES.

09:09AM 22        AND YOU RECALL THAT AT DIFFERENT POINTS DURING THIS

09:09AM 23   INVESTIGATION THAT YOU HAD MEETINGS WITH THE GOVERNMENT;

09:09AM 24   CORRECT?

09:09AM 25   A.   YES.

09:09AM   1      Q.   AND THEY ASKED YOU QUESTIONS, AND YOU GAVE THEM ANSWERS.

09:09AM   2           DO YOU RECALL THAT?

09:09AM   3      A.   I DO, YES.

09:09AM   4      Q.   AND YOU RECALL THAT THERE WERE DIFFERENT LAWYERS FROM THE

09:09AM   5      GOVERNMENT WHO WERE THERE WHO WERE TAKING NOTES?

09:09AM   6      A.   YES.

09:09AM   7      Q.   OKAY.  MY QUESTION IS WHETHER SIMPLY READING THE NOTE IN

09:09AM   8      FRONT OF YOU REFRESHES YOUR RECOLLECTION AS TO WHETHER IT WAS

09:09AM   9      MR. BALWANI WHO DROVE THAT MEETING ON BEHALF OF THERANOS?

09:10AM  10      A.   WELL, MR. WADE, AS I SAID BEFORE, IN THE SECOND HALF OF

09:10AM  11      THE MEETING, HE DEFINITELY DROVE THE MEETING BECAUSE HE WAS THE

09:10AM  12      ONLY ONE IN THE MEETING.

09:10AM  13      Q.   OKAY.

09:10AM  14      A.   IN THE FIRST PART OF THE MEETING, I WOULD SAY -- I DON'T

09:10AM  15      HAVE A SPECIFIC MEMORY OF WHO DROVE WHAT, WHO SAID WHAT, BUT

09:10AM  16      BOTH MS. HOLMES AND MR. BALWANI WERE SPEAKING IN THE FIRST PART

09:10AM  17      OF THE MEETING.

09:10AM  18      Q.   FAIR ENOUGH.

09:10AM  19           DO YOU RECALL YESTERDAY THAT I ASKED YOU SOME QUESTIONS

09:10AM  20      ABOUT WHETHER THE BULK OF THE MEETING WAS ACTUALLY TAKEN UP BY

09:10AM  21      AN INTERACTION WITH MR. BALWANI AND DR. RABODZEY?

09:10AM  22           DO YOU RECALL THAT?

09:10AM  23      A.   YES.

09:10AM  24      Q.   AND THAT WAS NOT -- YOU DIDN'T HAVE THAT RECOLLECTION.  IS

09:10AM  25      THAT FAIR?

| | | |
|---|---|---|
| 09:10AM | 1 | A.   THAT'S FAIR. |
| 09:10AM | 2 | Q.   OKAY.  I'D LIKE TO SEE IF I COULD REFRESH YOUR |
| 09:10AM | 3 | RECOLLECTION. |
| 09:10AM | 4 | MAY I APPROACH, YOUR HONOR? |
| 09:10AM | 5 | THE COURT:  YES. |
| 09:11AM | 6 | BY MR. WADE: |
| 09:11AM | 7 | Q.   AND I'M SHOWING YOU EXHIBIT 11483, WHICH IS A TRANSCRIPT |
| 09:11AM | 8 | EXCERPT.  IF YOU COULD JUST LOOK AT THE HIGHLIGHTED PORTION |
| 09:11AM | 9 | WHICH STARTS AT PAGE 256. |
| 09:11AM | 10 | AND I BELIEVE I'VE TENDERED THIS TO THE COURT AND TO |
| 09:11AM | 11 | COUNSEL FOR THE RECORD. |
| 09:11AM | 12 | IF YOU COULD READ 256, STARTING AT LINE 13, AND READING TO |
| 09:11AM | 13 | 257 THROUGH LINE 4 TO YOURSELF, AND LET ME KNOW WHEN YOU'RE |
| 09:11AM | 14 | DONE. |
| 09:11AM | 15 | A.   MAYBE IF I COULD JUST TAKE A MINUTE TO SORT OF REFRESH |
| 09:11AM | 16 | MYSELF OR REVIEW THIS A LITTLE, IF YOU DON'T MIND.  THANK YOU. |
| 09:11AM | 17 | Q.   SURE.  LET ME KNOW WHEN YOU'VE HAD A CHANCE.  I'M FOCUSSED |
| 09:12AM | 18 | ON THOSE PORTIONS THAT I'VE IDENTIFIED. |
| 09:12AM | 19 | A.   SO MAYBE YOU CAN JUST EXPLAIN WHAT THIS DOCUMENT IS. |
| 09:12AM | 20 | THE COURT:  IF YOU COULD JUST, SIR, JUST DRAW YOUR |
| 09:12AM | 21 | ATTENTION TO THE AREAS THAT MR. WADE SUGGESTED YOU READ. |
| 09:12AM | 22 | THE WITNESS:  OKAY. |
| 09:12AM | 23 | THE COURT:  AND THEN HE'LL ASK YOU -- |
| 09:12AM | 24 | MR. LEACH:  MAY I ASK THAT THE WITNESS ALSO BE |
| 09:12AM | 25 | DIRECTED TO THE FIRST PAGE SO HE HAS AN UNDERSTANDING, |

09:12AM 1     YOUR HONOR?

09:12AM 2              MR. WADE:  THAT'S FAIR ENOUGH, I THINK.

09:12AM 3     Q.   MR. GROSSMAN, IF YOU COULD JUST LOOK AT 11483 AT THE FIRST

09:12AM 4     PAGE.

09:12AM 5          DO YOU SEE THAT?

09:12AM 6     A.   YES.

09:12AM 7     Q.   AND DO YOU SEE LINE 16?

09:12AM 8     A.   YES.

09:12AM 9     Q.   AND I WANT YOU TO JUST READ THAT TO YOURSELF.  OKAY?

09:12AM 10    A.   OKAY.

09:12AM 11    Q.   AND THEN IF YOU COULD GO TO 256, LINE 13, TO 257, LINE 4,

09:12AM 12    AND READ THAT TO YOURSELF?

09:13AM 13    A.   OKAY.

09:13AM 14    Q.   AND MY QUESTION TO YOU IS WHETHER READING THAT EXCERPT

09:13AM 15    REFRESHES YOUR RECOLLECTION THAT THE MAJORITY OF THE TIME IN

09:13AM 16    THE MEETING WAS SPENT WITH MR. BALWANI AND DR. RABODZEY

09:13AM 17    REVIEWING THE TECHNICAL DATA?

09:13AM 18    A.   NO, IT DOES NOT.

09:13AM 19    Q.   OKAY.  AND WITH RESPECT TO THAT MEETING, DO YOU RECALL

09:13AM 20    YESTERDAY I ALSO ASKED YOU ABOUT WHETHER YOU ADVISED THAT

09:14AM 21    96 PERCENT OF TEST REQUISITIONS WERE COVERED BY 70 ASSAYS.

09:14AM 22         DO YOU RECALL THAT?

09:14AM 23    A.   YES.

09:14AM 24    Q.   AND I THINK YOU SAID YOU DIDN'T RECALL WHETHER THAT CAME

09:14AM 25    UP OR NOT.

09:14AM  1          IS THAT FAIR?

09:14AM  2     A.   I'M NOT SURE THAT THAT -- I DON'T REMEMBER SPECIFICALLY

09:14AM  3     WHAT I SAID.

09:14AM  4     Q.   OKAY.  DO YOU RECALL WHETHER IN THAT MEETING YOU WERE

09:14AM  5     ADVISED BY SOMEONE AT THERANOS THAT 96 PERCENT OF TEST

09:14AM  6     REQUISITIONS FELL INTO 70 ASSAYS BASED UPON THEIR ESTIMATES OF

09:14AM  7     DATA?

09:14AM  8     A.   I DO REMEMBER THAT THE NUMBER 96 PERCENT CAME UP, BUT IT

09:14AM  9     WAS NOT IN THE CONTEXT THAT YOU WERE DESCRIBING.

09:14AM 10     Q.   OKAY.  LET ME SEE IF I CAN REFRESH YOUR RECOLLECTION.

09:14AM 11     A.   OKAY.

09:14AM 12          MR. WADE:  MAY I APPROACH, YOUR HONOR?

09:14AM 13          THE COURT:  YES.

09:14AM 14          MR. WADE:  (HANDING.)

09:14AM 15     Q.   AND I'M GOING TO HAND YOU WHAT IS MARKED AS 3162.  AND I'D

09:15AM 16     JUST LIKE TO -- I'LL CALL YOUR ATTENTION TO PAGE 2 OF THE

09:15AM 17     NOTES.  I'VE HIGHLIGHTED AN EXCERPT FOR YOU THERE JUST TO MAKE

09:15AM 18     IT EASY.

09:15AM 19          DO YOU SEE THAT?

09:15AM 20     A.   YES, I DO.

09:15AM 21     Q.   AND DOES THAT REFRESH YOUR RECOLLECTION THAT YOU WERE

09:15AM 22     ADVISED THAT 96 PERCENT OF ALL TEST REQUISITIONS FALL WITHIN 70

09:15AM 23     ASSAYS?

09:15AM 24     A.   WELL, AGAIN, MR. WADE, I KNOW THAT -- I KNOW WHAT YOU'RE

09:15AM 25     ASSUMING IN YOUR QUESTION, BUT I THINK YOU HAVE A

09:15AM  1    MISUNDERSTANDING OF WHAT THIS SECTION IS REFERRING TO.

09:15AM  2    Q.   I'M JUST ASKING IF IT REFRESHES YOUR RECOLLECTION AS TO

09:15AM  3    WHETHER 96 PERCENT -- WE WANT TO BE CAREFUL NOT TO READ THE

09:15AM  4    DOCUMENT.  I'M JUST ASKING YOU TO READ IT TO YOURSELF.  OKAY?

09:15AM  5    A.   YEAH.

09:15AM  6    Q.   AND I'M ASKING IF LOOKING AT THE HIGHLIGHTED PORTION OF

09:15AM  7    THE NOTES REFRESH YOUR RECOLLECTION THAT YOU WERE ADVISED THAT

09:15AM  8    96 PERCENT OF ALL TEST REQUISITIONS FALL WITHIN 90 -- WITHIN 70

09:16AM  9    ASSAYS?

09:16AM  10   A.   THIS SECTION OF THE NOTES IS REFERRING TO SOMETHING

09:16AM  11   COMPLETELY DIFFERENT.

09:16AM  12   Q.   I'M NOT ASKING YOU TO GO THROUGH THE NOTES.

09:16AM  13   A.   WELL, I'D LIKE TO ANSWER YOUR QUESTION, BUT I WOULD NEED

09:16AM  14   TO EXPLAIN MY ANSWER.

09:16AM  15   Q.   BUT I HOPE YOU UNDERSTAND, I'M TRYING TO, TO BE RESPECTFUL

09:16AM  16   OF THE RULES OF THE COURT WHEN I ASK THIS QUESTION.  I'M NOT

09:16AM  17   MEANING TO BE RUDE.

09:16AM  18   A.   THIS WAS A CONVERSATION ABOUT THE HOSPITAL ACQUIRED

09:16AM  19   INFECTION.  SO HOSPITALS ARE REQUIRED UNDER THE LAW TO TEST FOR

09:16AM  20   ANY POTENTIAL INFECTION, AND AS PART OF THAT, THEY, THEY

09:16AM  21   TYPICALLY SEND THOSE SAMPLES OUT TO OTHER HOSPITALS, AND THAT

09:16AM  22   PROCESS CAN BE TWO TO THREE DAYS BEFORE THEY GET THOSE ANSWERS

09:16AM  23   BACK.

09:16AM  24       NOW, THIS WAS 10 PERCENT OF ALL OF WHAT MEDICARE SPENT ON

09:16AM  25   TESTING, HOSPITAL ACQUIRED INFECTIONS ON THE LAW.

09:16AM  1        SO THE POINT WAS THERANOS'S NEW PROPRIETARY TECHNOLOGY

09:17AM  2   USING NUCLEIC ACID -- THIS GOES BACK TO OUR FIRST MEETING WHEN

09:17AM  3   THE COMPANY --

09:17AM  4   Q.   IF I COULD JUST INTERRUPT YOU FOR A SECOND.

09:17AM  5        IF I COULD MOVE TO STRIKE THE ANSWER AND THEN I'LL REASK

09:17AM  6   MY QUESTION.

09:17AM  7             THE COURT:  WELL, I'LL ALLOW THIS TO REMAIN AND STOP

09:17AM  8   THE ANSWER THERE, AND THEN HE'S GOING TO ASK THE QUESTION.

09:17AM  9             THE WITNESS:  OKAY.  THANK YOU.

09:17AM  10  BY MR. WADE:

09:17AM  11  Q.   I DON'T MEAN TO BE RUDE.  I'M JUST ASKING IF READING THAT

09:17AM  12  HIGHLIGHTED PORTION REFRESHES YOUR RECOLLECTION THAT YOU WERE

09:17AM  13  ADVISED THAT 96 PERCENT OF TEST REQUISITIONS FALL WITHIN 70

09:17AM  14  ASSAYS?

09:17AM  15  A.   NO, IT DOES NOT.

09:17AM  16  Q.   OKAY.

09:17AM  17       YOUR HONOR, MAY I APPROACH?

09:17AM  18             THE COURT:  YES.

09:17AM  19  BY MR. WADE:

09:17AM  20  Q.   I'M GOING TO SHOW YOU A DOCUMENT THAT IS MARKED AS

09:17AM  21  EXHIBIT 1415.

09:18AM  22       AND, AGAIN, I'D JUST ASK THAT YOU READ THESE NOTES TO

09:18AM  23  YOURSELF.

09:18AM  24       DO YOU SEE THAT THERE ARE TWO EXCERPTS THAT ARE

09:18AM  25  HIGHLIGHTED, ONE IN GREEN AND ONE IN ORANGE?

09:18AM  1    A.   YES, I DO.

09:18AM  2    Q.   OKAY.  AND IF YOU COULD JUST READ THE PART IN GREEN, AND

09:18AM  3    THEN I HAVE A QUESTION FOR YOU.

09:18AM  4    A.   SINCE THESE ARE NOT MY NOTES, IF YOU DON'T MIND, I'D LIKE

09:18AM  5    TO REVIEW THEM.

09:18AM  6    Q.   YOU'RE WELCOME TO REVIEW THEM TO YOURSELF, AND THEN I WANT

09:18AM  7    TO ASK YOU A QUESTION IF YOU'VE READ THE GREEN PORTION INTO

09:18AM  8    THEM.

09:18AM  9         (PAUSE IN PROCEEDINGS.)

09:18AM  10          THE WITNESS:  OKAY.

09:19AM  11   BY MR. WADE:

09:19AM  12   Q.   OKAY.  HAVE YOU HAD A CHANCE TO READ THE GREEN PORTION,

09:19AM  13   SIR?

09:19AM  14   A.   YOU MEAN THE YELLOW PART?

09:19AM  15   Q.   SURE.  FLUORESCENT GREEN, MAYBE YELLOW?

09:19AM  16   A.   I'M A LITTLE COLOR BLIND.

09:19AM  17   Q.   IT'S NOT ORANGE?

09:19AM  18   A.   YES.

09:19AM  19   Q.   DOES THAT REFRESH YOUR RECOLLECTION THAT DURING THIS

09:19AM  20   MEETING, YOU AND OTHERS AT PFM WERE ADVISED THAT 96 PERCENT OF

09:19AM  21   TESTS FALL INTO 70 ASSAYS?

09:19AM  22   A.   MR. WADE, THIS IS CONSISTENT WITH EXACTLY WHAT I JUST

09:19AM  23   DESCRIBED.

09:19AM  24   Q.   SIR, I'M SORRY.

09:19AM  25   A.   THE LINE ABOVE THAT, HOSPITAL ACQUIRED INFECTIONS ASSAYS

```
09:19AM   1    PANEL 2014 WERE DESCRIBING --

09:19AM   2    Q.  IF I COULD --

09:19AM   3              THE COURT:  MR. GROSSMAN, WE HAVE TO SPEAK ONE AT A

09:19AM   4    TIME.

09:19AM   5         WE HAVE THE BEST COURT REPORTER IN THE BUILDING.

09:19AM   6              THE WITNESS:  I'M SORRY.

09:19AM   7              THE COURT:  BUT EVEN WITH ALL OF HER SKILLS AND

09:19AM   8    ABILITY, IT'S DIFFICULT FOR HER TO CAPTURE THREE PEOPLE TALKING

09:19AM   9    AT THE SAME TIME.

09:20AM  10              THE WITNESS:  I UNDERSTAND.

09:20AM  11              THE COURT:  SO THAT'S HOW WE PROCESS HERE.

09:20AM  12         SO THE QUESTION IS, JUST READING THAT, IF YOU CAN ANSWER

09:20AM  13    THE QUESTION, JUST READING THOSE SIX WORDS, IF THAT REFRESHES

09:20AM  14    YOUR RECOLLECTION?

09:20AM  15         IS THAT YOUR QUESTION?

09:20AM  16              MR. WADE:  THAT IS MY QUESTION.

09:20AM  17    Q.  DOES IT REFRESH YOUR RECOLLECTION THAT PFM WAS ADVISED IN

09:20AM  18    THIS MEETING THAT 96 PERCENT OF TESTS FALL IN 70 ASSAYS?

09:20AM  19    A.  I WOULD LIKE -- I CAN'T ANSWER THAT QUESTION WITHOUT

09:20AM  20    EXPLAINING THAT ANSWER.

09:20AM  21         THE LINE DIRECTLY ABOVE THAT, HOSPITAL ACQUIRED INFECTIONS

09:20AM  22    2014, THOSE 70 ASSAYS ARE THE HOSPITAL ACQUIRED INFECTION PANEL

09:20AM  23    THAT THEY'RE TALKING ABOUT.

09:20AM  24              THE COURT:  SIR, SIR, IF IT REFRESHES YOUR

09:20AM  25    RECOLLECTION, IT DOES.
```

09:20AM   1          IF IT DOESN'T, IT DOESN'T.

09:20AM   2               THE WITNESS:  IT DOES, YES.

09:20AM   3     BY MR. WADE:

09:20AM   4     Q.   IT REFRESHED YOUR RECOLLECTION?  YES?

09:20AM   5     A.   YES.

09:20AM   6     Q.   OKAY.

09:20AM   7     A.   IT REFRESHED MY RECOLLECTION ABOUT WHAT THAT SPECIFIC 70

09:21AM   8     ASSAYS ARE REFERRING TO.

09:21AM   9     Q.   OKAY.

09:21AM   10    A.   WHICH WAS THE HOSPITAL ACQUIRED INFECTION ASSAY PANEL THAT

09:21AM   11    THEY WERE ROLLING OUT IN 2014.

09:21AM   12    Q.   OKAY.

09:21AM   13    A.   NOT THE RETAIL TEST MENU.

09:21AM   14    Q.   OKAY.  AND DO YOU RECALL BEING ADVISED DURING THIS MEETING

09:21AM   15    THAT THERANOS ACTUALLY TOLD YOU THAT THEY HAD 70 SMALL SAMPLE

09:21AM   16    ASSAYS THAT THEY WERE PREPARED TO ROLL OUT IN THEIR COMMERCIAL

09:21AM   17    ENVIRONMENT?

09:21AM   18         DO YOU RECALL THAT?

09:21AM   19    A.   MR. WADE, WE TALKED AGAIN ABOUT 70 ASSAYS IN THE HOSPITAL

09:21AM   20    ACQUIRED INFECTION MARKET.  THAT'S MY MEMORY OF THAT

09:21AM   21    CONVERSATION.

09:21AM   22    Q.   I UNDERSTAND.  I'M JUST WANTING -- AND MY QUESTION, MY

09:21AM   23    QUESTION IS WHETHER YOU ALSO RECALL IN THAT MEETING THAT YOU

09:21AM   24    WERE ADVISED THAT -- BY THERANOS THAT THEY HAD 70 SMALL SAMPLE

09:21AM   25    ASSAYS THAT WERE READY TO ROLL OUT IN THE COMMERCIAL SETTING?

09:21AM 1    A.   I THINK THEIR CARTRIDGES HAD 70 ASSAYS, SO ALL OF THEIR

09:22AM 2    CARTRIDGES HAD 70 ASSAYS.

09:22AM 3    Q.   OKAY.  LET ME TRY IT ONE MORE TIME.

09:22AM 4    A.   SO, YES, THE ANSWER IS ALL OF THEIR CARTRIDGES HAD 70

09:22AM 5    ASSAYS.

09:22AM 6         SO IF THE QUESTION IS, DID THEY TELL US THAT THEY WERE

09:22AM 7    ROLLING OUT CARTRIDGES THAT HAD 70 ASSAYS, THE ANSWER IS, YES,

09:22AM 8    THEY DID.

09:22AM 9    Q.   OKAY.  MY QUESTION -- AND IF YOU CAN CAN'T ANSWER IT, YOU

09:22AM 10   CAN'T ANSWER IT.  I'LL TRY ONE MORE TIME.

09:22AM 11   A.   OKAY.

09:22AM 12   Q.   -- IS WHETHER THERANOS SPECIFICALLY TOLD YOU IN THAT

09:22AM 13   MEETING THAT THEY HAD 70 SMALL SAMPLE ASSAYS THAT IT WAS

09:22AM 14   WORKING TO ROLL OUT IN THE COMMERCIAL SETTING.

09:22AM 15        DO YOU RECALL THAT, SIR?

09:22AM 16   A.   I DON'T RECALL THAT SPECIFIC STATEMENT.

09:22AM 17   Q.   OKAY.  AND REVIEWING THAT ORANGE EXCERPT ON THESE NOTES

09:22AM 18   DOES NOT REFRESH YOUR RECOLLECTION AS TO THAT POINT; CORRECT?

09:22AM 19            MR. LEACH:  OBJECTION, YOUR HONOR.  ASKED AND

09:22AM 20   ANSWERED.

09:22AM 21            MR. WADE:  I DIDN'T GET TO THE ORANGE EXCERPT I

09:22AM 22   DON'T THINK.

09:22AM 23            THE COURT:  I THINK IT'S TIME TO MOVE ON.  YOU CAN

09:22AM 24   ASK ANOTHER QUESTION.

09:22AM 25            MR. WADE:  OKAY.

09:22AM   1   Q.   THE -- COMING OUT OF THAT MEETING, I BELIEVE YOU TESTIFIED

09:23AM   2   YESTERDAY THAT YOU HAD INTERACTIONS WITH MEMBERS OF YOUR TEAM;

09:23AM   3   CORRECT?

09:23AM   4   A.   YES.

09:23AM   5   Q.   OKAY.  AND DURING THOSE INTERACTIONS, DO YOU RECALL

09:23AM   6   INITIALLY YOU EXCHANGED EMAIL THOUGHTS IN ADVANCE OF A HEALTH

09:23AM   7   CARE CONFERENCE THAT YOU WERE GOING TO BE GOING TO?

09:23AM   8   A.   YES, THAT WOULD BE VERY TYPICAL AT THAT TIME OF THE YEAR.

09:23AM   9   Q.   OKAY.  IF YOU COULD TAKE A LOOK AT EXHIBIT 7391.

09:24AM  10   A.   OKAY.

09:24AM  11   Q.   DO YOU HAVE THAT IN FRONT OF YOU?

09:24AM  12   A.   I DO.

09:24AM  13   Q.   AND DO YOU RECOGNIZE THIS TO BE AN EMAIL EXCHANGE BETWEEN

09:24AM  14   YOU AND THE PFM TEAM DEBRIEFING ON THAT MEETING THAT YOU HAD AT

09:24AM  15   THERANOS?

09:24AM  16   A.   YES, I DO.

09:24AM  17   Q.   OKAY.

09:24AM  18        MOVE THE ADMISSION OF 7391.

09:24AM  19             MR. LEACH:  802, YOUR HONOR.

09:24AM  20             THE COURT:  MR. WADE?

09:24AM  21             MR. WADE:  I WAS HOPING TO SPEED THINGS ALONG, BUT I

09:24AM  22   CAN LAY SOME FOUNDATION.

09:24AM  23   Q.   DO YOU -- OFTENTIMES WHEN YOU INTERACT WITH, WHEN YOU

09:24AM  24   INTERACT WITH MEMBERS OF YOUR TEAM TO EXCHANGE INFORMATION IN

09:25AM  25   CONNECTION WITH INVESTMENT DECISIONS, DO YOU DO THAT VIA

09:25AM 1    ELECTRONIC MAIL?

09:25AM 2    A.   IT JUST DEPENDS.  SOMETIMES, YES.

09:25AM 3    Q.   YEAH.  BECAUSE SOMETIMES YOU TRAVEL; CORRECT?

09:25AM 4    A.   YES.

09:25AM 5    Q.   AND SOMETIMES YOUR COLLEAGUES TRAVEL; RIGHT?

09:25AM 6    A.   OR PEOPLE HAVE MEETINGS.  THEY'RE BUSY.  THERE'S JUST --

09:25AM 7    YOU KNOW, SO, YES, FOR ALL OF THOSE REASONS.

09:25AM 8    Q.   AND SOMETIMES THERE'S A NEED TO SHARE INFORMATION AMONG

09:25AM 9    THE GROUP ELECTRONICALLY; RIGHT?

09:25AM 10   A.   SURE.

09:25AM 11   Q.   AND, IN FACT, SOMETIMES THE EMAILS THAT YOU HAVE, YOU

09:25AM 12   ACTUALLY SAVE IN A FOLDER FOR PARTICULAR INVESTMENTS THAT

09:25AM 13   YOU'RE WORKING ON; RIGHT?

09:25AM 14   A.   I'M NOT SURE ABOUT -- I DON'T -- MAYBE YOU COULD BE A

09:25AM 15   LITTLE MORE SPECIFIC.

09:25AM 16   Q.   I CAN BE MORE SPECIFIC WITH OTHER DOCUMENTS WHERE I'VE

09:25AM 17   SEEN THAT.

09:25AM 18   A.   OKAY.

09:25AM 19   Q.   BUT WHEN YOU'RE EMAILING ON THIS WITH YOUR TEAM, DO YOU

09:25AM 20   ALWAYS WORK TO PROVIDE THE BEST INFORMATION POSSIBLE?

09:26AM 21   A.   DO I ALWAYS PROVIDE?

09:26AM 22   Q.   YEAH.  YOU TRY TO BE TRUTHFUL AND PROVIDE WHATEVER

09:26AM 23   INFORMATION YOU'VE RECEIVED IN AN ACCURATE MANNER; IS THAT

09:26AM 24   FAIR?

09:26AM 25   A.   YES.

09:26AM 1   Q.   AND DO YOU TRY TO MAKE SURE THAT EVERYONE ON YOUR TEAM IS

09:26AM 2   FULLY INFORMED ABOUT THE INFORMATION THAT YOU GATHER?

09:26AM 3   A.   I MEAN, YOU CAN'T MAKE THEM READ THE EMAILS, BUT YOU HOPE

09:26AM 4   THAT THEY DO.

09:26AM 5   Q.   BUT THAT'S THE PURPOSE IN SENDING THE EMAIL IS TO SHARE

09:26AM 6   INFORMATION SO THAT THAT INFORMATION CAN BE CONSIDERED IN

09:26AM 7   CONNECTION WITH INVESTMENT DECISIONS; IS THAT RIGHT?

09:26AM 8   A.   I MEAN, I -- IT'S A LITTLE -- THAT'S A LITTLE TOO SPECIFIC

09:26AM 9   FOR YES, NO.  IT MAY OR MAY NOT BE RELATED TO AN INVESTMENT

09:26AM 10  DECISION.  IT MAY BE RELATED TO OTHER ISSUES THAT ARE RELEVANT

09:26AM 11  TO WHAT WE'RE TRYING TO ACCOMPLISH ON A GIVEN DAY-TO-DAY BASIS.

09:26AM 12  Q.   OKAY.  IS 7391 AN EMAIL IN WHICH YOU'RE SHARING

09:26AM 13  INFORMATION RELATING TO AN INVESTMENT DECISION?

09:26AM 14  A.   IF YOU DON'T MIND, I CAN MAYBE READ IT.

09:26AM 15  Q.   SURE.

09:26AM 16  A.   OKAY.

09:26AM 17       (PAUSE IN PROCEEDINGS.)

09:27AM 18           MR. WADE:  THE COURT'S INDULGENCE FOR A MOMENT?

09:27AM 19           THE COURT:  SURE.

09:27AM 20       (DISCUSSION AMONGST COUNSEL OFF THE RECORD.)

09:28AM 21           THE WITNESS:  OKAY.

09:28AM 22  BY MR. WADE:

09:28AM 23  Q.   AND DO YOU RECALL THAT THIS WAS AN EMAIL THAT WAS SENT

09:28AM 24  WITH THE TEAM OF PEOPLE AT PFM THAT WAS INVOLVED IN THE

09:28AM 25  THERANOS INVESTMENT DECISION?

09:28AM 1    A.   YES.

09:28AM 2    Q.   AND DO YOU RECALL THAT THIS IS INFORMATION THAT WAS BEING

09:28AM 3    PROVIDED AND ITEMS THAT WERE BEING DISCUSSED TO HELP THE TEAM

09:28AM 4    FIGURE OUT A WORKFLOW ON HOW IT WAS GOING TO GO ABOUT GETTING

09:28AM 5    ADDITIONAL INFORMATION ON THE INVESTMENT DECISION?

09:28AM 6    A.   YOU'RE SORT OF PUTTING WORDS IN MY MOUTH.

09:28AM 7         I THINK THIS EMAIL IS SORT OF LAYING OUT SOME OF OUR VIEWS

09:28AM 8    THAT AT THAT POINT, HAVING MET WITH THE COMPANY TWICE AND WE

09:28AM 9    HAD -- AND THIS WAS A BIG INDUSTRY CONFERENCE IN THE SECOND

09:28AM 10   WEEK OF JANUARY, SO MANY OF THE COMPANIES THAT WOULD BE

09:29AM 11   COMPETING WITH, WITH THERANOS ON THE LABORATORY SIDE WOULD BE

09:29AM 12   THERE, AND MANY OF THE COMPANIES THAT MAKE DIAGNOSTIC

09:29AM 13   EQUIPMENT, ANALYTIC INSTRUMENTS, MOLECULAR DIAGNOSTIC EQUIPMENT

09:29AM 14   WOULD ALSO BE AT THIS MEETING, COMPANIES LIKE CEPHEID WHO

09:29AM 15   COMPETES IN THE HOSPITAL ACQUIRED INFECTION SPACE.

09:29AM 16        SO FOR ALL OF THOSE REASONS, WE -- AND THERE WAS ACTUALLY

09:29AM 17   ALSO NOT FOR PROFIT HOSPITAL PANEL, SO WE WOULD HAVE A CHANCE

09:29AM 18   TO TALK TO SOME OF THE BLUES, FOR EXAMPLE, THE BLUES INSURANCE

09:29AM 19   PLANS.

09:29AM 20        SO I THINK THIS IS -- AND FOR ALL OF THOSE REASONS, IT WAS

09:29AM 21   A GOOD OPPORTUNITY TO JUST LEARN ABOUT THIS SPACE AND THIS

09:29AM 22   BUSINESS AND HOW IT WOULD AFFECT ALL OF THOSE DIFFERENT

09:29AM 23   COMPANIES.

09:29AM 24   Q.   AND TO SHARE INFORMATION IN CONNECTION WITH THAT WITH YOUR

09:29AM 25   TEAM SO EVERYONE WOULD GO IN THINKING ABOUT SOME ISSUES THAT

09:29AM   1    YOU SHOULD DISCUSS AT THAT CONFERENCE?

09:29AM   2    A.   WELL, WE HAD PROBABLY 100 MEETINGS THAT WEEK, SO IT WAS A

09:29AM   3    VERY BUSY WEEK AND YOU DON'T WANT THOSE OPPORTUNITIES -- WHEN

09:30AM   4    YOU MEET WITH COMPANIES, YOU DON'T WANT TO FORGET TO ASK

09:30AM   5    QUESTIONS.

09:30AM   6         SO A LOT OF PREPARING FOR THIS WEEK WAS JUST MAKING SURE

09:30AM   7    THAT EVERYONE, YOU KNOW, HAD A LIST OF QUESTIONS TO ASK THE

09:30AM   8    DIFFERENT COMPANIES THAT WE WOULD INTERACT WITH OVER THOSE FOUR

09:30AM   9    OR FIVE DAYS.

09:30AM   10   Q.   OKAY.  AND THAT WAS THE PURPOSE OF THIS EMAIL?

09:30AM   11   A.   YES.

09:30AM   12   Q.   AND IT WAS SPECIFIC BECAUSE YOU WERE IN THE PROCESS OF

09:30AM   13   CONSIDERING AN INVESTMENT IN THERANOS; CORRECT?

09:30AM   14   A.   WE WERE DOING DUE DILIGENCE, YES.  WE WERE DOING DUE

09:30AM   15   DILIGENCE ON THE COMPANY AT THAT POINT.

09:30AM   16   Q.   AND I TAKE IT PFM TAKES STEP TO PRESERVE ITS ELECTRONIC

09:30AM   17   EMAIL IN A SAFE AND SECURE MANNER?

09:30AM   18   A.   I'M NOT IN CHARGE OF THE COMPLIANCE OR THE REGULATORY PART

09:30AM   19   OF OUR BUSINESS, BUT WE CERTAINLY DO EVERYTHING THAT WE'RE

09:30AM   20   REQUIRED UNDER THE LAW BY THE S.E.C. AS FAR AS RECORDKEEPING

09:30AM   21   AND DOCUMENT RETENTION.

09:31AM   22             MR. WADE:  OKAY.  I OFFER EXHIBIT 7391.

09:31AM   23             MR. LEACH:  YOUR HONOR, THERE'S 802 WITH RESPECT TO

09:31AM   24   THE LAST PAGE, BUT I HAVE NO OBJECTION TO THIS COMING IN FOR

09:31AM   25   STATE OF MIND OR FOR SOME OTHER PURPOSE.

09:31AM   1          THE COURT:  THE LAST PAGE, THE LAST EMAIL?

09:31AM   2          MR. LEACH:  YES, YOUR HONOR.

09:31AM   3          THE WITNESS:  SO WOULD YOU LIKE ME TO READ THE LAST

09:31AM   4     PAGE?

09:31AM   5          THE COURT:  NO.  JUST A SECOND.  THANK YOU.

09:31AM   6          MR. WADE:  NO.

09:31AM   7       (PAUSE IN PROCEEDINGS.)

09:32AM   8          THE COURT:  MR. WADE, ANY OBJECTION TO THIS LAST

09:32AM   9     PORTION, THE LAST EMAIL, THE JANUARY 10TH EMAIL BEING ADMITTED

09:32AM   10    NOT FOR THE TRUTH OF THE MATTER ASSERTED, BUT RATHER AS TO THE

09:32AM   11    STATE OF MIND OF THIS WITNESS?

09:32AM   12         MR. WADE:  I HAVE NO OBJECTION TO THAT.

09:32AM   13         THE COURT:  ALL RIGHT.  THANK YOU.  THIS WILL BE

09:32AM   14    ADMITTED.  7391 IS ADMITTED.

09:32AM   15      LADIES AND GENTLEMEN, THIS WILL BE PUBLISHED IN JUST A

09:32AM   16    MOMENT.  THE LAST EMAIL, FRIDAY, JANUARY 10, 2014, 4:37 P.M.,

09:32AM   17    THE CONTENTS OF THAT IS ADMITTED NOT FOR THE TRUTH OF THE

09:32AM   18    MATTERS ASSERTED IN THAT EMAIL, BUT ONLY AS TO THE ISSUE OF THE

09:32AM   19    STATE OF MIND OF THIS WITNESS.

09:32AM   20      SO IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:32AM   21      (DEFENDANT'S EXHIBIT 7391 WAS RECEIVED IN EVIDENCE.)

09:32AM   22         MR. WADE:  THANK YOU, YOUR HONOR.

09:32AM   23      IF WE CAN START WITH THAT LAST EMAIL THAT THE COURT JUST

09:32AM   24    REFERRED TO FOR A LIMITED PURPOSE.

09:32AM   25    Q.  DO YOU SEE THAT IN THIS EMAIL MR. RABODZEY -- DR. RABODZEY

09:33AM   1    IS PROVIDING HIS TAKE COMING OUT OF THAT MEETING AT THERANOS?

09:33AM   2    A.   YES.

09:33AM   3    Q.   AND YOU SEE THAT HE NOTES THERE FOR YOU AND OTHERS ON THE

09:33AM   4    TEAM THAT HE THINKS THE TECHNOLOGY SOUNDS VERY GOOD, BUT HE

09:33AM   5    WANTS TO BOUNCE SOME OF THIS OFF OTHERS IN THE INDUSTRY.

09:33AM   6         DO YOU SEE THAT?

09:33AM   7    A.   I SEE THAT LINE THAT IS HIGHLIGHTED IN YELLOW.

09:33AM   8    Q.   AND HE -- BUT HE ALSO, OF COURSE, NOTES THAT HE'S NOT

09:33AM   9    GOING TO VIOLATE THE CBA THERE; CORRECT?

09:33AM   10   A.   THAT'S CORRECT.

09:33AM   11   Q.   I JUST WANT TO BE FAIR TO DR. RABODZEY.

09:33AM   12        AND PART OF THIS WAS SO THAT AS YOU WENT INTO THIS

09:33AM   13   CONFERENCE, YOU COULD TRY TO VET SOME OF THE ISSUES WITH

09:33AM   14   THERANOS IN AN APPROPRIATE WAY WITH OTHERS IN THE INDUSTRY:

09:33AM   15   RIGHT?

09:33AM   16   A.   THAT'S CORRECT.

09:33AM   17   Q.   AND IS THAT A NORMAL TYPE OF PROCESS THAT YOU WOULD GO

09:33AM   18   THROUGH AS PART OF YOUR DUE DILIGENCE IF A CONFERENCE HAPPENS

09:34AM   19   TO BE OCCURRING?

09:34AM   20   A.   YES.

09:34AM   21   Q.   AND DO YOU SEE THERE THAT HE'S NOT CONVINCED ON THE IP AND

09:34AM   22   COMPETITION?

09:34AM   23        AND DO YOU RECALL DR. RABODZEY EXPRESSING SOME CONCERNS IN

09:34AM   24   THAT REGARD AT THIS TIME?

09:34AM   25   A.   I DON'T RECALL SPECIFICALLY, BUT I DO SEE THAT HE WROTE "I

09:34AM 1    AM NOT CONVINCED ON IP AND COMPETITION" AFTER HIS FIRST MEETING

09:34AM 2    WITH THE COMPANY.

09:34AM 3    Q.   AND DO YOU RECALL THAT YOU ASKED HIM SUBSEQUENTLY WHETHER

09:34AM 4    IP LAWYERS SHOULD BE RETAINED TO REVIEW THE INTELLECTUAL

09:34AM 5    PROPERTY OF THE COMPANY?

09:34AM 6    A.   I DON'T REMEMBER SPECIFICALLY.

09:34AM 7    Q.   OKAY.  DO YOU RECALL WHETHER YOU RETAINED IP LAWYERS TO DO

09:34AM 8    THAT?

09:34AM 9    A.   I DON'T RECALL.

09:34AM 10       I KNOW THAT WE ASKED -- WE HAD FOLLOW-UP CONVERSATIONS

09:34AM 11   WITH THE COMPANY ON THEIR IP, THEIR IP STRATEGY, THE

09:34AM 12   COMPETITIVE BARRIERS, WHAT PREVENTED OTHER COMPANIES FROM

09:34AM 13   PURSUING A BUSINESS LIKE THIS, COPYING THE MINILAB.  WE HAD ALL

09:35AM 14   OF THOSE TYPES OF CONVERSATIONS.

09:35AM 15       I DON'T RECALL SPECIFICALLY WHETHER WE RETAINED AN IP

09:35AM 16   FIRM.

09:35AM 17   Q.   AND THE COMPETITIVE BARRIERS WAS AN ISSUE, OR THE RESPONSE

09:35AM 18   FROM COMPETITION IS AN ISSUE THAT YOU WERE DISCUSSING ACTIVELY

09:35AM 19   WITHIN THE COMPANY; RIGHT?

09:35AM 20   A.   ANY INVESTMENT THAT WE MAKE, WE WOULD WANT TO UNDERSTAND

09:35AM 21   BARRIERS TO ENTRY AND COMPETITION.

09:35AM 22   Q.   RIGHT.

09:35AM 23   A.   IT'S A STANDARD PART OF A DUE DILIGENCE PROCESS FOR ANY

09:35AM 24   INVESTMENT WE WOULD MAKE.

09:35AM 25   Q.   AND IF YOU LOOK A COUPLE OF LINES DOWN, YOU SEE IT NOTES

09:35AM  1    THAT "THEIR PROJECTIONS ARE A BIT AGGRESSIVE FOR SPEED OF RAMP

09:35AM  2    IN 2015 AND BEYOND BUT WITH EXCELLENT EXECUTION ARE DOABLE AND

09:35AM  3    CAN BE EXCEEDED."

09:35AM  4        DO YOU SEE THAT?

09:35AM  5    A.   MR. WADE, MAYBE I CAN READ THE FULL DOCUMENT IF WE'RE

09:35AM  6    GOING TO GO THROUGH IT.  IS THAT OKAY?

09:35AM  7    Q.   I THOUGHT YOU DID.

09:35AM  8    A.   NO.  I WAS WAITING FOR THE JUDGE TO RULE.

09:35AM  9    Q.   I'M SORRY.

09:36AM  10       (PAUSE IN PROCEEDINGS.)

09:36AM  11            THE WITNESS:  OKAY.

09:36AM  12   BY MR. WADE:

09:36AM  13   Q.   AND MY QUESTION WAS JUST WITH THAT HIGHLIGHTED SENTENCE

09:36AM  14   ABOUT THE PROJECTIONS.  DO YOU RECALL RECOGNIZING THAT THE

09:36AM  15   GROWTH OF THE COMPANY AND THE PROJECTIONS WAS A STEEP RAMP AND

09:36AM  16   THAT EXECUTION WAS A RISK GOING INTO THIS INVESTMENT?

09:36AM  17   A.   AFTER OUR FIRST MEETING, THAT WAS -- APPEARS TO BE

09:36AM  18   MR. RABODZEY'S POINT OF VIEW, YES.

09:36AM  19   Q.   AND DID YOU SHARE THAT VIEW?

09:36AM  20   A.   DID HE SHARE THAT VIEW?

09:36AM  21   Q.   DID YOU SHARE THAT VIEW?

09:36AM  22   A.   I DON'T RECALL SPECIFICALLY WHAT I WAS THINKING ON

09:36AM  23   WHATEVER DAY THIS IS, JANUARY 12TH.

09:37AM  24       I, I -- SO I DON'T -- I'M NOT SURE.

09:37AM  25   Q.   WELL, DURING THE DUE DILIGENCE PROCESS, DO YOU RECALL

09:37AM  1    COMING TO THE RECOGNITION THAT EXECUTION BY THE COMPANY WAS ONE

09:37AM  2    OF THE RISKS THAT WOULD BE FACED?

09:37AM  3    A.   EXECUTION WAS A RISK FOR SURE.  JUST LIKE ANY COMMERCIAL

09:37AM  4    COMPANY THAT WAS ROLLING OUT A TECHNOLOGY OR A DRUG OR A

09:37AM  5    MEDICAL DEVICE OR A NEW HEALTH CARE SERVICE, EXECUTION WOULD

09:37AM  6    ALWAYS BE AN ISSUE WE WOULD FOCUS ON.

09:37AM  7         IN THIS CASE THEY HAD DETAILED PROJECTIONS FROM WALGREENS

09:37AM  8    THAT -- AND ACTUALLY IN THIS MEETING THEY HAD TOLD US THAT THEY

09:37AM  9    HAD UPPED THOSE NUMBERS TWICE BASED ON HOW WELL THINGS WERE

09:37AM 10    GOING.

09:37AM 11         SO I THINK WE WALKED AWAY FROM THAT MEETING FEELING LIKE

09:37AM 12    THEY HAD A REALLY GOOD, THEY HAD A REALLY GOOD SENSE OF HOW THE

09:37AM 13    ROLLOUT WAS GOING AND WHAT THE 2014 PROJECTIONS IN PARTICULAR

09:37AM 14    WOULD LOOK LIKE.

09:37AM 15    Q.   WELL, YOU SAID WE WALKED AWAY FROM THAT MEETING, BUT

09:37AM 16    DR. RABODZEY WALKED AWAY FROM THIS MEETING ADVISED THAT

09:38AM 17    EXECUTION IS A POTENTIAL RISK; RIGHT?

09:38AM 18    A.   HE APPEARS TO HAVE HAD QUESTIONS ON EXECUTION.

09:38AM 19    Q.   OKAY.

09:38AM 20    A.   WHICH I THINK IS A VERY REASONABLE THING TO FOCUS ON IN

09:38AM 21    THE DUE DILIGENCE PROCESS.

09:38AM 22    Q.   AND HE ALSO NOTES ON THE BOTTOM THAT HE ALSO WANTS TO LOOK

09:38AM 23    AT THE TECHNICAL DATA IN MORE DETAIL; RIGHT?

09:38AM 24    A.   YES.

09:38AM 25    Q.   OKAY.  LET'S GO TO THE FIRST PAGE OF THE DOCUMENT.

09:38AM   1        ON THE BOTTOM, AGAIN, YOU JUST NOTE -- YOU ASK FOR

09:38AM   2   PEOPLE'S INPUTS AND SUGGEST YOU SHOULD HAVE A MEETING LATER ON;

09:38AM   3   RIGHT?

09:38AM   4   A.   YES.

09:38AM   5   Q.   AND DO YOU RECALL YOU HAD MEETINGS AT PFM TO DISCUSS THE

09:38AM   6   INVESTMENT?

09:38AM   7   A.   I DON'T SPECIFICALLY RECALL THAT WEEK.

09:38AM   8   Q.   OKAY.

09:38AM   9   A.   A MEETING THAT WEEK.

09:38AM  10   Q.   OKAY.

09:38AM  11   A.   WE HAD A LOT OF MEETINGS THAT WEEK.

09:38AM  12   Q.   OKAY.  AND WHEN -- DO YOU SEE THE REFERENCE TO JPM?  WAS

09:38AM  13   THIS A JP MORGAN CONFERENCE?

09:38AM  14   A.   YES.  THERE'S THE -- EVERY JANUARY IN SAN FRANCISCO, I

09:39AM  15   THINK IT'S THE THIRD BIGGEST TRADE SHOW OF THE YEAR FOR THE

09:39AM  16   CITY, IT'S A HEALTH CARE FOCUSSED INVESTMENT CONFERENCE.  IT

09:39AM  17   TAKES PLACE AT THE WESTIN ST. FRANCIS, AND IT'S BEEN GOING ON I

09:39AM  18   THINK FOR 30-PLUS YEARS.

09:39AM  19        AND SO JP MORGAN JUST REFERS TO THAT.  THAT'S WHAT JPM IS

09:39AM  20   REFERRING TO, THIS INDUSTRY TRADE SHOW OR INDUSTRY INVESTMENT

09:39AM  21   CONFERENCE.

09:39AM  22   Q.   AND WHEN YOU TESTIFIED BEFORE ABOUT HOW THIS WOULD BE A

09:39AM  23   PROCESS YOU WOULD GO ABOUT VETTING THIS INVESTMENT IN A

09:39AM  24   CONFIDENTIALITY APPROPRIATE WAY, THAT'S WHAT YOU WERE REFERRING

09:39AM  25   TO WAS THE JP MORGAN CONFERENCE IN SAN FRANCISCO?

09:39AM  1    A.   ARE YOU REFERRING TO THE PREVIOUS EMAIL?

09:39AM  2    Q.   I THINK IT WAS STILL THIS EMAIL, BUT IT FEELS LIKE IT WAS

09:39AM  3    A WHILE AGO.

09:39AM  4    A.   WE WOULD CERTAINLY WANT TO BE RESPECTFUL OF THE

09:39AM  5    CONFIDENTIALITY OF THE COMPANY AND THE TECHNOLOGY, THE

09:39AM  6    BUSINESS, ALL OF THE ASPECTS OF THE BUSINESS THAT THEY DID NOT

09:39AM  7    WANT US TO SHARE WITH OTHER PEOPLE.

09:40AM  8    Q.   OKAY.  AND IF WE JUST GO UP THE CHAIN QUICKLY, DO YOU SEE

09:40AM  9    THAT'S AN EMAIL WHERE MR. KHANNA PROVIDES SOME OF HIS THOUGHTS?

09:40AM  10        DO YOU SEE THAT?

09:40AM  11   A.   YES, I DO.

09:40AM  12   Q.   AND IF YOU JUST LOOK UNDER RISKS, YOU NOTE IN THAT FIRST

09:40AM  13   BULLET THAT HE TALKS ABOUT EXECUTION BEING A RISK AS WELL;

09:40AM  14   CORRECT?

09:40AM  15   A.   YES.

09:40AM  16   Q.   AND AGAIN, ACTUALLY IF YOU LOOK AT THE LAST PORTION OF HIS

09:40AM  17   EMAIL, THE LAST LINE THERE, HE SAYS, THIS IS ONE OF THE MOST

09:40AM  18   INTERESTING COMPANIES HE'S MET, BUT IT ALL COMES DOWN TO

09:40AM  19   EXECUTION; RIGHT?

09:40AM  20   A.   YES.

09:40AM  21   Q.   AND AS THE DUE DILIGENCE PROCESS WENT FORWARD, I THINK YOU

09:40AM  22   RECALL THERE WAS SOME VETTING THAT WAS DONE BY PFM ON

09:40AM  23   REGULATORY ISSUES.

09:41AM  24        DO YOU RECALL THAT?

09:41AM  25   A.   YES.

09:41AM  1    Q.   CAN YOU LOOK AT EXHIBIT 14002?

09:41AM  2    A.   14002?

09:41AM  3              THE COURT:  THIS IS IN VOLUME 2?

09:41AM  4              MR. WADE:  THIS IS IN VOLUME 2, CORRECT.

09:41AM  5              THE WITNESS:  OKAY.  SORRY.  YEP.

09:41AM  6              MR. WADE:  IN FACT, IF I MAY APPROACH, YOUR HONOR, I

09:41AM  7    HAVE MY TRUSTY STICKY NOTE.

09:41AM  8              THE COURT:  SURE.

09:41AM  9    BY MR. WADE:

09:41AM 10    Q.   (HANDING.)

09:41AM 11         THIS SHOULD TELL YOU WHAT EXHIBIT.

09:41AM 12    A.   OKAY.  THANK YOU.

09:41AM 13    Q.   AND IS THIS AN EMAIL -- IS 14002 AN EMAIL IN WHICH

09:41AM 14    DR. RABODZEY IS REPORTING TO YOU ON SOME OF THE RESEARCH HE WAS

09:41AM 15    DOING ON THE REGULATORY ISSUES?

09:42AM 16    A.   YES.

09:42AM 17    Q.   AND HE ALSO ADVISED MR. KHANNA AS WELL?

09:42AM 18    A.   YES, HE'S ALSO ON THIS EMAIL, YES.

09:42AM 19    Q.   AND WAS THIS EMAIL FOR THE PURPOSE OF KEEPING, KEEPING THE

09:42AM 20    TEAM INFORMED ABOUT WHAT HE WAS LEARNING ABOUT ISSUES RELATED

09:42AM 21    TO THE THERANOS INVESTMENT?

09:42AM 22    A.   I BELIEVE THAT THAT'S -- I BELIEVE THAT'S RIGHT.

09:42AM 23              MR. WADE:  OFFER 14002, YOUR HONOR.

09:42AM 24              MR. LEACH:  NO OBJECTION, YOUR HONOR.

09:42AM 25              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:42AM   1            (DEFENDANT'S EXHIBIT 14002 WAS RECEIVED IN EVIDENCE.)

09:42AM   2       BY MR. WADE:

09:42AM   3       Q.   AND THIS EMAIL NOTES THAT HE CHECKED WITH NSTG.

09:42AM   4            DO YOU SEE THAT?

09:42AM   5       A.   I DO, YES.

09:42AM   6       Q.   AND DO YOU KNOW WHAT NSTG IS?

09:43AM   7       A.   IT'S A COMPANY IN THE MOLECULAR DIAGNOSTICS SPACE.

09:43AM   8       Q.   AND --

09:43AM   9       A.   A MEDICAL DEVICE COMPANY.

09:43AM  10       Q.   IT'S A MEDICAL DEVICE COMPANY?

09:43AM  11       A.   YES.

09:43AM  12       Q.   AND IS IT A COMPANY IN WHICH YOU HAD AN INVESTMENT OR

09:43AM  13       SOMETHING?

09:43AM  14       A.   NO, I DON'T BELIEVE WE DID, NO.

09:43AM  15       Q.   BUT IN ANY EVENT, IT LOOKS LIKE TO GATHER SOME

09:43AM  16       INTELLIGENCE, DR. RABODZEY REACHED OUT TO THAT COMPANY TO VET

09:43AM  17       SOME OF THE REGULATORY ISSUES.

09:43AM  18            DO YOU SEE THAT?

09:43AM  19       A.   YEAH.  WE MAY HAVE HAD A MEETING WITH NSTG THAT HAD

09:43AM  20       NOTHING TO DO WITH THERANOS, SO I'M NOT SURE THAT HE REACHED

09:43AM  21       OUT SPECIFICALLY BECAUSE OF THERANOS.

09:43AM  22            BUT WE TYPICALLY HAVE MANY, MANY MEETINGS THAT WEEK, SO IT

09:43AM  23       WOULD BE A COMPANY THAT HE WOULD POTENTIALLY MEET WITH.

09:43AM  24       Q.   AND, AND DO YOU SEE IN THE SECOND PORTION OF THAT EMAIL HE

09:43AM  25       SAYS, "THEY DID CONFIRM THAT A DEVICE USED FOR TESTING OUTSIDE

09:43AM 1    OF A CLIA LAB HAS TO BE FDA CLEARED.  THIS WOULD APPLY TO

09:44AM 2    THERANOS IF AND WHEN THEY DECIDE TO MOVE THE DEVICE OUT OF THE

09:44AM 3    CLIA LAB."

09:44AM 4        DO YOU SEE THAT?

09:44AM 5    A.   YES, I DO.

09:44AM 6    Q.   AND DO YOU RECALL THAT YOU RECOGNIZED AT THE TIME THAT

09:44AM 7    THERE WAS AT LEAST A VIEW, I THINK -- LET ME STRIKE THAT.

09:44AM 8        DO YOU RECALL THAT THERE WAS SOME GREY AREA ON SOME OF THE

09:44AM 9    REGULATORY ISSUES THAT YOU TALKED ABOUT WITH MR. LEACH

09:44AM 10   YESTERDAY?

09:44AM 11   A.   I'M SORRY, MR. WADE, I DON'T SPECIFICALLY REMEMBER WHAT

09:44AM 12   YOU'RE REFERRING TO.

09:44AM 13   Q.   OKAY.  I THINK MR. LEACH WAS ASKING YOU SOME QUESTIONS

09:44AM 14   ABOUT REGULATORY ISSUES THAT PFM WAS CONSIDERING RELATING TO

09:44AM 15   THE THERANOS INVESTMENT, AND THERE WAS SOME GREY AREAS TO HOW

09:44AM 16   THE CLIA REGULATIONS APPLIED VERSUS FDA REGULATIONS.

09:44AM 17       DO YOU RECALL THAT?

09:44AM 18   A.   THE REGULATORY -- WHO HAS REGULATORY OVERSIGHT FOR THE

09:44AM 19   LABORATORIES, YES.

09:44AM 20   Q.   AND I THINK THAT WAS A LITTLE BIT OF AN UNCERTAIN AREA.

09:44AM 21       DO YOU RECALL THAT?

09:44AM 22   A.   YES.

09:44AM 23   Q.   OKAY.  AND DO YOU RECALL LEARNING IN THIS PERIOD THAT

09:44AM 24   THERE WAS AT LEAST A VIEW EXPRESSED BY, BY THIS COMPANY THAT TO

09:45AM 25   DISTRIBUTE THE DEVICE, THERE WOULD HAVE TO BE FDA APPROVAL.

09:45AM  1        DO YOU SEE THAT?

09:45AM  2   A.   WELL, THEY TOLD US THAT THEY HAD NO PLANS TO DISTRIBUTE

09:45AM  3   THE DEVICE THE WAY A TYPICAL MEDICAL DEVICE COMPANY WORKS.

09:45AM  4        THEY HAD NO PLANS TO SELL ANY OF THEIR DEVICES TO THIRD

09:45AM  5   PARTIES.

09:45AM  6        SO I GUESS I WANT TO ANSWER YOUR QUESTION, BUT IF YOU'RE

09:45AM  7   ASKING ME DID THEY PLAN ON SELLING, DISTRIBUTING THESE DEVICES

09:45AM  8   OUTSIDE OF THEIR OWN CLIA LABS, OUR UNDERSTANDING FROM OUR DUE

09:45AM  9   DILIGENCE WAS THAT THEY HAD NO INTENTION OF DOING THAT.

09:45AM  10  Q.   OKAY.  LET ME BE SLIGHTLY MORE PRECISE.

09:45AM  11       DO YOU SEE WHERE IT SAYS "THE DEVICE USED FOR TESTING

09:45AM  12  OUTSIDE OF THE CLIA LAB HAS TO BE FDA CLEARED"?

09:45AM  13       DO YOU SEE THAT?

09:45AM  14  A.   A DEVICE.

09:45AM  15  Q.   YEAH.  AND DO YOU RECALL THAT PHASE II OF THERANOS WAS TO

09:46AM  16  DISTRIBUTE THE DEVICES OUT TO AREAS OUTSIDE OF THE CLIA LAB?

09:46AM  17  A.   YES, PHASE II, I BELIEVE, WAS DEPLOYING SAMPLE PROCESSING

09:46AM  18  UNITS IN RETAIL SETTINGS, YES.

09:46AM  19  Q.   RIGHT.  AND DO YOU RECALL LEARNING THAT THERE WAS A VIEW

09:46AM  20  THAT FDA CLEARANCE WOULD BE REQUIRED BEFORE THAT COULD HAPPEN?

09:46AM  21  A.   MY MEMORY OF THAT WAS WE WERE NOT SURE WHETHER FDA

09:46AM  22  CLEARANCE WOULD BE REQUIRED.

09:46AM  23       THE COMPANY TOLD US THAT IF THE ANALYSIS WAS DONE

09:46AM  24  CENTRALLY IN A CLIA LABORATORY, THAT IT WAS NOT CLEAR THAT THEY

09:46AM  25  NEEDED FDA APPROVAL TO DISTRIBUTE THE DEVICES IN A RETAIL

09:46AM 1    SETTING, UNLIKE A CONVENTIONAL PIECE OF ANALYTIC

09:46AM 2    INSTRUMENTATION OR A CONVENTIONAL LABORATORY MEDICAL DEVICE

09:46AM 3    WHERE YOU RUN THE SAMPLE AND ANALYZE THE SAMPLE IN THE SAME

09:47AM 4    PLACE, THAT WOULD MOST LIKELY REQUIRE FDA APPROVAL.

09:47AM 5         BUT IF YOU WERE JUST PROCESSING -- IF YOU WERE RUNNING THE

09:47AM 6    SAMPLE AND THEN PROCESSING THAT INFORMATION IN ANOTHER

09:47AM 7    LOCATION, THAT DID NOT, IN THERANOS'S VIEW, RUN AFOUL OF ANY

09:47AM 8    FDA APPROVAL REQUIREMENTS FOR THAT SETTING.

09:47AM 9    Q.   RIGHT.  THIS, I BELIEVE, WAS THE GREY AREA THAT YOU WERE

09:47AM 10   DISCUSSING WITH MR. LEACH; CORRECT?

09:47AM 11   A.   THE GREY AREA WAS MORE JUST GENERAL OVERSIGHT OF THE

09:47AM 12   LABORATORY INDUSTRY, IS IT AN FDA OR IS IT SOME OTHER

09:47AM 13   ORGANIZATION?

09:47AM 14        AND THE FDA ACTUALLY HAS JURISDICTION, BUT THEY, THEY

09:47AM 15   DEFER TO ANOTHER, ANOTHER ORGANIZATION TO MAINTAIN THE

09:47AM 16   STANDARDS, THE CLIA STANDARDS.

09:47AM 17        SO THAT'S THE REGULATORY GREY AREA THAT WE WERE, I BELIEVE

09:47AM 18   WE WERE REFERRING TO YESTERDAY.

09:47AM 19   Q.   OKAY.  AND DO YOU RECALL THAT WHEN YOU WERE VETTING THE

09:48AM 20   INVESTMENT, THAT YOU WERE DOING SOME ADDITIONAL RESEARCH TO

09:48AM 21   UNDERSTAND HOW THE REGULATIONS MIGHT BE APPLIED?

09:48AM 22        DO YOU RECALL THAT?

09:48AM 23   A.   I DO, YES.

09:48AM 24   Q.   OKAY.  AND DO YOU RECALL THAT AS PART OF THAT, THERE WAS

09:48AM 25   AN EFFORT TO REACH OUT AND GET OTHERS' VIEWPOINTS ON THAT?

09:48AM   1          DO YOU RECALL THAT?

09:48AM   2     A.   THAT WOULD CERTAINLY BE SOMETHING THAT WE WOULD WANT.

09:48AM   3     Q.   OKAY.  AND DO YOU RECALL THAT THERANOS TOLD YOU THAT THEY

09:48AM   4     WERE GOING TO SEEK FDA APPROVAL OF THEIR DEVICES AND THEIR

09:48AM   5     ASSAYS?

09:48AM   6          DO YOU RECALL THAT?

09:48AM   7     A.   YES.

09:48AM   8     Q.   AND DO YOU RECALL LEARNING THAT THERE WERE VIEWS OF PEOPLE

09:48AM   9     IN THE INDUSTRY THAT THAT MAY ACTUALLY BE REQUIRED BEFORE THE

09:48AM   10    DEVICE COULD BE USED IN A DEPLOYED SETTING?

09:48AM   11         DO YOU RECALL LEARNING THAT?

09:48AM   12    A.   WELL, WHAT WE LEARNED WAS THAT IF YOU PLANNED TO SELL A

09:48AM   13    MEDICAL DEVICE, IF YOU PLANNED TO SELL A PIECE OF DIAGNOSTIC

09:48AM   14    EQUIPMENT, YOU NEEDED FDA APPROVAL TO SELL THAT IN A SETTING

09:48AM   15    THAT WASN'T A CLIA LAB.

09:48AM   16         THAT'S I THINK WHAT THIS EMAIL IS SPEAKING TO.

09:48AM   17    Q.   WELL, DOESN'T THE SECOND SENTENCE -- THE SECOND SENTENCE

09:49AM   18    OF THE FIRST PARAGRAPH SAY, "THIS WOULD APPLY TO THERANOS IF

09:49AM   19    AND WHEN THEY DECIDE TO MOVE THE DEVICE OUT OF THE CLIA LAB."

09:49AM   20         THAT'S WHAT THAT SAYS; RIGHT?

09:49AM   21    A.    IT POTENTIALLY COULD.  BUT WE REALLY WEREN'T -- BASED ON

09:49AM   22    WHAT THE COMPANY TOLD US ABOUT THE REGULATORY STRATEGY THAT

09:49AM   23    THEY HAD WITH PHASE II, IT WASN'T CLEAR WHETHER THEY NEEDED FDA

09:49AM   24    APPROVAL OR NOT.

09:49AM   25         BUT IN THIS PARTICULAR CASE, NANOSTRING, THEIR PRODUCTS

09:49AM   1    RECEIVE FDA APPROVAL AND AS A RESULT THEY DO SELL THEIR

09:49AM   2    DEVICES, AND THAT'S A PART OF WHAT ALLOWS THEM TO OPERATE IN

09:49AM   3    THE MARKETPLACE.

09:49AM   4         SO I THINK THAT SENTENCE, THE FIRST SENTENCE IS REFERRING

09:49AM   5    TO NANOSTRING AND THEIR BUSINESS, WHICH WAS A VERY DIFFERENT

09:49AM   6    BUSINESS THAN THERANOS, A VERY DIFFERENT BUSINESS MODEL.

09:49AM   7         AND MR. RABODZEY IS DOING HIS JOB, HE'S HIGHLIGHTING

09:49AM   8    SOMETHING THAT WE NEED TO EXPLORE, AND WE ASKED QUESTIONS

09:49AM   9    AROUND THIS IN FOLLOW-UP DUE DILIGENCE MEETINGS.

09:49AM  10         SO THIS WAS, I THINK, A GOOD EXAMPLE OF THE KIND OF WORK

09:50AM  11    WE TRY TO DO WHEN WE'RE IN THE EARLY PART OF A DUE DILIGENCE

09:50AM  12    PROCESS WITH A NEW INVESTMENT IDEA.

09:50AM  13    Q.   FAIR ENOUGH.

09:50AM  14         AND YOU WERE STILL IN THE EARLY PART OF THIS AT THIS

09:50AM  15    POINT; CORRECT?

09:50AM  16    A.   YEAH.  I THINK THIS IS A WEEK AFTER, LESS THAN A WEEK

09:50AM  17    AFTER THE SECOND MEETING WE HAD WITH THE COMPANY.

09:50AM  18    Q.   OKAY.  IF I COULD GO BRIEFLY TO 1422, WHICH I BELIEVE IS

09:50AM  19    IN EVIDENCE.

09:50AM  20         AND IF WE CAN BLOW UP THE BOTTOM.

09:50AM  21         DO YOU SEE HERE -- WE TALKED ABOUT THIS EMAIL IN

09:50AM  22    CONNECTION WITH THE CDA YESTERDAY.

09:51AM  23         DO YOU RECALL THAT?

09:51AM  24    A.   YES.

09:51AM  25    Q.   AND YOU JUST NOTE THAT THAT SENTENCE IN THE FOLLOWING

09:51AM   1        PARAGRAPH, WHICH I DON'T THINK WE TALKED ABOUT YESTERDAY, THAT

09:51AM   2        TALKS ABOUT "THE WAG ENDORSEMENT SPEAKS TO THE STRENGTH AND

09:51AM   3        ROBUSTNESS OF THE TECHNOLOGY PLATFORM."

09:51AM   4             DO YOU SEE THAT?

09:51AM   5        A.   I DO, YES.

09:51AM   6        Q.   AND THAT WAS YOUR BELIEF AT THE TIME; CORRECT?

09:51AM   7        A.   THAT WAS OUR IMPRESSION, YES.

09:51AM   8        Q.   AND YOU TALKED ABOUT HOW YOU MIGHT WANT TO HAVE A CALL OR

09:51AM   9        AN ADDITIONAL MEETING TO DISCUSS FURTHER ISSUES AS YOU WERE

09:51AM   10       CONSIDERING THE INVESTMENT; CORRECT?

09:51AM   11       A.   YES.

09:51AM   12       Q.   AND YOU DID HAVE OTHER INTERACTIONS WITH MR. BALWANI;

09:51AM   13       CORRECT?

09:51AM   14       A.   YES, THAT'S CORRECT.

09:51AM   15       Q.   AND I THINK THIS IS -- IF WE CAN GO UP TO HIS RESPONSE.

09:51AM   16            THIS IS A RECOGNITION THAT HE'S GOING TO PROVIDE YOU ALL

09:52AM   17       OF THE DOCUMENTS THAT YOU REQUESTED; CORRECT?

09:52AM   18       A.   THAT IS CORRECT.

09:52AM   19       Q.   OKAY.  IF WE CAN GO TO 4077, WHICH I BELIEVE IS ALSO IN

09:52AM   20       EVIDENCE, THAT'S THE SLIDE DECK.  I'M NOT GOING TO GO THROUGH

09:52AM   21       THE SLIDE DECK AT THIS -- I'LL COME BACK TO THE SLIDE DECK, BUT

09:52AM   22       I JUST HAVE A COUPLE OF QUESTIONS ABOUT THE EMAIL.

09:52AM   23            FEEL FREE TO PULL IT UP IF YOU WANT TO READ THE DOCUMENT.

09:52AM   24            BUT THE -- IF WE CAN LOOK AT THE EMAIL, DO YOU RECALL --

09:52AM   25       IF WE FOCUS ON THE BULLET POINTS DOWN BELOW.

09:52AM   1          AND JUST SO WE'RE CLEAR, WE'LL COME BACK TO IT, BUT THE

09:52AM   2   TOP EMAIL IS AN EMAIL IN WHICH HE'S TELLING YOU THAT HE'S

09:53AM   3   GIVING YOU THE DATA THAT YOU REQUESTED, THE SLIDE DECK;

09:53AM   4   CORRECT?

09:53AM   5   A.   I BELIEVE THAT'S RIGHT, YES.

09:53AM   6   Q.   OKAY.  AND IN THE BOTTOM EMAIL HE GIVES YOU SOME UPDATE ON

09:53AM   7   SOME OTHER INVESTMENTS; RIGHT?

09:53AM   8   A.   THAT APPEARS TO BE THE CASE, YEAH.

09:53AM   9          I HAVEN'T READ ALL OF THE BULLET POINTS, BUT, YES.

09:53AM  10   Q.   OKAY.  AND THE FIRST ONE NOTES THAT, "AT THE CONFERENCE,

09:53AM  11   THE INTERMOUNTAIN HEALTH SYSTEMS ANNOUNCED A STRATEGIC

09:53AM  12   PARTNERSHIP WITH THERANOS."

09:53AM  13          DO YOU SEE THAT?

09:53AM  14   A.   I DO, YES.

09:53AM  15   Q.   AND WHAT IS INTERMOUNTAIN HEALTH SYSTEMS?

09:53AM  16   A.   THEY'RE WHAT IS KNOWN AS AN INTEGRATED DELIVERY NETWORK,

09:53AM  17   AND A WELL RESPECTED ONE.  THEY OPERATE IN UTAH.  THEY OWN

09:53AM  18   HOSPITALS, AND PHYSICIANS -- THEY EMPLOY PHYSICIANS AND THEY

09:53AM  19   OWN HOSPITALS, AND THEY OWN SOME OF THE OTHER FACILITIES AROUND

09:53AM  20   OTHER ALTERNATIVE SITE FACILITIES, EMERGENCY CARE CLINICS AND

09:53AM  21   DIALYSIS CENTERS AND THOSE TYPES OF THINGS.  SO THAT'S WHY

09:54AM  22   THEY'RE CALLED AN INTEGRATED DELIVERY NETWORK.

09:54AM  23          THEY ALSO OFTEN TAKE RISKS.  SO UNLIKE A HOSPITAL, THEY --

09:54AM  24   SOMETIMES THEY ACTUALLY ACT AS AN INSURANCE COMPANY FOR THEIR

09:54AM  25   OWN -- USING THEIR OWN ASSETS, HOSPITAL ASSETS TO TAKE CARE OF

09:54AM   1    THOSE PATIENTS.

09:54AM   2        SO THEY'RE ONE OF THE MORE, THEY'RE ONE OF THE MORE

09:54AM   3    RESPECTED, FORWARD LOOKING ORGANIZATIONS, HOSPITAL

09:54AM   4    ORGANIZATIONS.

09:54AM   5    Q.   AND AT THE TIME THAT YOU -- YOU WERE AT THE CONFERENCE

09:54AM   6    THAT IS BEING REFERRED TO HERE; CORRECT?

09:54AM   7    A.   THIS IS, AGAIN, REFERRING TO THE JP MORGAN CONFERENCE.

09:54AM   8    Q.   AND DO YOU RECALL LEARNING, INDEPENDENT FROM MR. BALWANI'S

09:54AM   9    UPDATE, ABOUT THE ANNOUNCEMENT OF THE STRATEGIC PARTNERSHIP?

09:54AM  10    A.   I DON'T REMEMBER SPECIFICALLY WHEN I LEARNED OF IT, BUT I

09:54AM  11    WOULD HAVE LIKELY SEEN SOME PRESS RELEASE THAT WEEK.

09:54AM  12    Q.   AND WAS THIS A POSITIVE FACTOR IN TERMS OF YOUR INVESTMENT

09:54AM  13    DECISION?

09:54AM  14    A.   IT WAS A POSITIVE FACTOR, YES.

09:54AM  15    Q.   OKAY.  AND THEN BELOW HE ALSO NOTES SOME ADDITIONAL

09:55AM  16    INFORMATION THAT CAME OUT AT THAT CONFERENCE FROM WALGREENS.

09:55AM  17        DO YOU SEE THAT?

09:55AM  18    A.   I DO.

09:55AM  19    Q.   AND IN PARTICULAR -- AND DO YOU RECALL WALGREENS, WOULD

09:55AM  20    THEY GENERALLY ATTEND THIS LARGE HEALTH CARE CONFERENCE AS

09:55AM  21    WELL?

09:55AM  22    A.   USUALLY THEY DO, YES.

09:55AM  23    Q.   AND YOU NOTE THAT THERE ARE SOME COMMENTS ATTRIBUTED TO,

09:55AM  24    IS THAT GREG WASSON?  DO YOU UNDERSTAND THAT TO BE GREG WASSON?

09:55AM  25    A.   IT SAYS CEO, SO THAT WOULD BE MY ASSUMPTION, YEAH, IN

09:55AM 1    BRACKETS.

09:55AM 2    Q.   OKAY.  AND IT TALKS ABOUT AT THE TIME HOW THEY HAD

09:55AM 3    LAUNCHED THE PALO ALTO LOCATION AND ARE BEGINNING THE ROLLOUT

09:55AM 4    IN PHOENIX.

09:55AM 5        DO YOU SEE THAT?

09:55AM 6    A.   I DO, YES.

09:55AM 7    Q.   AND THEN IT SAYS, "ONCE WE'VE DONE THAT SUCCESSFULLY YOU

09:55AM 8    WILL SEE A MORE RAPID NATIONAL ROLL OUT."

09:55AM 9        DO YOU SEE THAT?

09:55AM 10   A.   I DO.

09:55AM 11   Q.   AND HE SAYS THAT "THEY HAVE INCREDIBLE, INCREDIBLE

09:55AM 12   TECHNOLOGY."

09:56AM 13       RIGHT?

09:56AM 14       AND THEN IT READS, "WE ARE NOT GOING TO COMMENT ON

09:56AM 15   GUIDANCE IN TERMS OF REVENUE.  ONCE WE HAVE ROLLED OUT IN OTHER

09:56AM 16   STATES WE WILL BE ABLE TO TALK MORE ABOUT IT."

09:56AM 17       DO YOU SEE THAT?

09:56AM 18   A.   I DO.

09:56AM 19   Q.   AND DID YOU VIEW THAT EXPRESSION OR ENDORSEMENT OF THE

09:56AM 20   TECHNOLOGY BY MR. WASSON TO BE A POSITIVE FACTOR IN TERMS OF

09:56AM 21   YOUR INVESTMENT DECISION?

09:56AM 22   A.   I DID.

09:56AM 23   Q.   AND THEN IF YOU GO TO THE SECOND PAGE THERE ARE NOTES THAT

09:56AM 24   REFER TO WADE, THE CFO.

09:56AM 25       DO YOU SEE THAT?

09:56AM  1    A.   I DO.

09:56AM  2    Q.   AND DID YOU UNDERSTAND THAT TO BE WADE MIQUELON?

09:56AM  3    A.   YES.

09:56AM  4    Q.   AND DO YOU SEE THE INFORMATION, HE TALKS THERE A LITTLE

09:56AM  5    BIT ABOUT HOW THIS WORKS?

09:56AM  6         DO YOU SEE THAT?

09:57AM  7    A.   I DO.

09:57AM  8    Q.   AND HOW THE RELATIONSHIP WAS GOING TO WORK?

09:57AM  9    A.   YES, I DO.

09:57AM  10   Q.   OKAY.  AND, AGAIN, THIS WAS ANOTHER SORT OF FACTOR IN

09:57AM  11   FAVOR OF YOUR INVESTMENT DECISION; IS THAT FAIR?

09:57AM  12   A.   IT WAS CONSISTENT WITH WHAT WALGREENS HAD ALREADY PUBLICLY

09:57AM  13   SAID.

09:57AM  14   Q.   OKAY.

09:57AM  15   A.   SO, YES, IN THAT SENSE.  IT DID NOT CHANGE FROM WHAT THEY

09:57AM  16   HAD ALREADY SAID.

09:57AM  17   Q.   IF WE CAN GO BRIEFLY TO 1443, WHICH I BELIEVE IS IN

09:57AM  18   EVIDENCE.

09:58AM  19        AND THIS IS AN EMAIL THAT YOU DISCUSSED WITH MR. LEACH ON

09:58AM  20   DIRECT.

09:58AM  21        DO YOU SEE THAT?

09:58AM  22   A.   YES.

09:58AM  23   Q.   AND I THINK A MINUTE AGO YOU TALKED ABOUT THESE REGULATORY

09:58AM  24   ISSUES AND HOW YOU WANTED TO GET SOME ADDITIONAL INFORMATION ON

09:58AM  25   THAT AND HAD ADDITIONAL QUESTIONS; CORRECT?

09:58AM  1    A.   YES.

09:58AM  2    Q.   AND IS THIS THE EMAIL THAT REFLECTS THOSE QUESTIONS, OR

09:58AM  3    SOME OF THOSE QUESTIONS?

09:58AM  4    A.   IT WAS AN EMAIL THAT REFLECTED SOME OF THOSE QUESTIONS.  I

09:58AM  5    BELIEVE WE HAD OTHER -- THERE WERE OTHER POINTS IN THE DUE

09:58AM  6    DILIGENCE PROCESS WHERE WE DISCUSSED ISSUES AROUND IP AND

09:58AM  7    COMPETITION AND BARRIERS TO ENTRY.

09:58AM  8         BUT, YES, THAT'S CERTAINLY PART OF THIS EMAIL.

09:58AM  9    Q.   AND HE NOTES, "HERE ARE A FEW TOPICS FOR TOMORROW."

09:58AM  10        DO YOU SEE THAT?

09:58AM  11   A.   I DO.

09:58AM  12   Q.   AND DO YOU RECALL THAT YOU WERE GOING TO HAVE ANOTHER

09:59AM  13   MEETING WITH MR. BALWANI?

09:59AM  14   A.   YES.

09:59AM  15   Q.   AND IF WE LOOK UP AT THE TOP EMAIL, HE ACTUALLY NOTES HE

09:59AM  16   WOULD BE HAPPY TO TALK ABOUT THE ISSUES THAT YOU RAISED IN THE

09:59AM  17   MEETING AND HE WOULD GIVE YOU THE USB KEY WITH THE MODEL THAT

09:59AM  18   YOU'VE REQUESTED; RIGHT?

09:59AM  19   A.   YES.

09:59AM  20   Q.   AND DO YOU RECALL THAT?

09:59AM  21   A.   WELL, YEAH, I CAN -- YES.

09:59AM  22   Q.   AND DO YOU RECALL THAT IN THAT MEETING THERE WAS

09:59AM  23   ADDITIONAL DISCUSSION ABOUT, THERE WAS ADDITIONAL DISCUSSION

09:59AM  24   ABOUT THE REGULATORY PROCESS?

09:59AM  25   A.   ARE YOU REFERRING TO THE MEETING THAT HAPPENED SUBSEQUENT

09:59AM   1    TO THIS EMAIL?

09:59AM   2    Q.   FAIR ENOUGH.

09:59AM   3         DO YOU RECALL THAT THERE ACTUALLY WAS A MEETING WITH

09:59AM   4    MR. BALWANI THE NEXT DAY, JANUARY 21ST?

09:59AM   5    A.   I -- I'M NOT SURE WHAT -- I KNOW WE HAD ADDITIONAL

10:00AM   6    MEETINGS, CONVERSATIONS WITH MR. BALWANI AFTER MONDAY,

10:00AM   7    JANUARY 20TH.  I'M NOT SURE SPECIFICALLY WHAT MEETING YOU'RE

10:00AM   8    REFERRING TO.

10:00AM   9    Q.   DO YOU RECALL HAVING A MEETING WITH HIM ON THE 21ST?

10:00AM   10   A.   I'M SORRY, I DON'T RECALL THE SPECIFIC DATES.  BUT I KNOW

10:00AM   11   WE HAD A THIRD MEETING WITH MR. BALWANI, WHICH I BELIEVE WAS A

10:00AM   12   TELEPHONE CALL.

10:00AM   13   Q.   OH, YOU BELIEVE IT WAS A TELEPHONE CALL?

10:00AM   14   A.   I THINK IT WAS.  ACTUALLY, I DON'T KNOW -- I'M PRETTY

10:00AM   15   SURE.

10:00AM   16   Q.   OKAY.

10:00AM   17   A.   THAT'S MY MEMORY.

10:00AM   18   Q.   AND DO YOU RECALL THAT YOU WERE GIVEN AN OPPORTUNITY TO

10:00AM   19   ASK ADDITIONAL QUESTIONS?

10:00AM   20   A.   YES.

10:00AM   21   Q.   AND MS. HOLMES DID NOT PARTICIPATE IN THAT MEETING;

10:00AM   22   CORRECT?

10:00AM   23   A.   THAT IS CORRECT.

10:00AM   24   Q.   AND THE -- DO YOU RECALL THAT ONE OF THE TOPICS THAT YOU

10:00AM   25   ASKED ADDITIONAL QUESTIONS ABOUT WAS, OR ONE OF THE SUBJECT

| | | |
|---|---|---|
| 10:00AM | 1 | MATTER AREAS WERE REGULATORY ISSUES? |
| 10:01AM | 2 | DO YOU RECALL DISCUSSING THAT? |
| 10:01AM | 3 | A.   I RECALL DISCUSSING COMPETITION AND INTELLECTUAL PROPERTY |
| 10:01AM | 4 | AT, IF NOT THAT MEETING, AT SOME FUTURE MEETING. |
| 10:01AM | 5 | Q.   AND DO YOU RECALL THAT THE PHASE I, PHASE II PROCESS WAS |
| 10:01AM | 6 | ALSO A PART OF THAT DISCUSSION? |
| 10:01AM | 7 | A.   YES. |
| 10:01AM | 8 | Q.   BECAUSE THE REGULATORY ISSUES WOULD APPLY DIFFERENTLY IN |
| 10:01AM | 9 | THE DIFFERENT PHASES; RIGHT? |
| 10:01AM | 10 | A.   WELL, OUR INVESTMENT CASE WAS REALLY NOT BASED ON PHASE I |
| 10:01AM | 11 | OR PHASE II.  IT WAS BASED ON THE TECHNOLOGICAL COMPETITIVE |
| 10:01AM | 12 | ADVANTAGES THAT THEY HAD BECAUSE OF THE MINILAB, BECAUSE OF THE |
| 10:01AM | 13 | CONSUMER ADVANTAGE, BECAUSE OF ALL OF THE THINGS THAT THEY TOLD |
| 10:01AM | 14 | US IN OUR FIRST FEW MEETINGS. |
| 10:01AM | 15 | BUT WE DID WANT TO UNDERSTAND THE REGULATORY RISK AND |
| 10:01AM | 16 | STRATEGY AS IT RELATED TO BOTH THE FDA AND CLIA LABS. |
| 10:02AM | 17 | SO THOSE WERE QUESTIONS THAT CAME UP OVER THE COURSE OF |
| 10:02AM | 18 | OUR DUE DILIGENCE. |
| 10:02AM | 19 | Q.   AND DO YOU RECALL DURING THAT, DURING THAT MEETING THAT |
| 10:02AM | 20 | YOU WERE ALSO ADVISED THAT THERANOS OFFERED A TOTAL OF 250 |
| 10:02AM | 21 | TESTS IN ITS CLIA LAB AND THAT THEY REPRESENTED 99 PERCENT OF |
| 10:02AM | 22 | THE VOLUME? |
| 10:02AM | 23 | A.   I DO REMEMBER THAT, YES. |
| 10:02AM | 24 | Q.   OKAY.  AND DO YOU RECALL THAT THE ADDITIONAL TESTS BEYOND |
| 10:02AM | 25 | THOSE 250 THAT WEREN'T YET CERTIFIED FOR THEIR LAB, THAT THEY |

10:02AM   1    HAD RELATIONSHIPS WHERE THEY COULD SEND THOSE OUT TO A

10:02AM   2    REFERENCE LAB IF NEEDED?

10:02AM   3    A.   MR. WADE, WE NEVER DISCUSSED ANYTHING ABOUT A REFERENCE

10:02AM   4    LAB IN THAT MEETING.

10:02AM   5    Q.   OKAY.  DO YOU RECALL LEARNING THAT AT SOME POINT DURING

10:02AM   6    THE DUE DILIGENCE PROCESS?

10:02AM   7    A.   NO.

10:02AM   8    Q.   OKAY.  THE -- IF WE CAN GO TO 1454.

10:03AM   9         AND I UNDERSTAND THE GOVERNMENT STIPULATES TO THE

10:03AM  10    ADMISSION OF THAT DOCUMENT.  WE CAN JUST PUT IT ON THE SCREEN

10:03AM  11    IF IT'S EASIER THAN GOING THROUGH THE BINDER.

10:03AM  12              MR. LEACH:  JUST ONE MOMENT, YOUR HONOR.

10:03AM  13              THE COURT:  SURE.

10:03AM  14         (PAUSE IN PROCEEDINGS.)

10:03AM  15              MR. LEACH:  NO OBJECTION, YOUR HONOR.  THAT'S FINE.

10:03AM  16              MR. WADE:  MAY WE PUBLISH?

10:03AM  17              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:03AM  18         (GOVERNMENT'S EXHIBIT 1454 WAS RECEIVED IN EVIDENCE.)

10:03AM  19    BY MR. WADE:

10:03AM  20    Q.   AND THIS IS, THIS IS AN EMAIL SHORTLY AFTER THAT CALL THAT

10:03AM  21    YOU HAD WITH MR. BALWANI; RIGHT?

10:03AM  22    A.   LET ME JUST TAKE A MINUTE TO READ IT.

10:03AM  23    Q.   SURE.

10:03AM  24    A.   THANK YOU.

10:03AM  25         (PAUSE IN PROCEEDINGS.)

10:03AM 1          THE WITNESS:  OKAY.

10:04AM 2     BY MR. WADE:

10:04AM 3     Q.   OKAY.  AND DO YOU RECALL THAT THIS WAS AN EMAIL THAT CAME

10:04AM 4     OUT OF THAT -- OR THAT YOU SENT SHORTLY AFTER THAT CALL WITH

10:04AM 5     MR. BALWANI?

10:04AM 6     A.   WELL, THIS IS AN EMAIL THAT HE SENT TO ME.

10:04AM 7     Q.   RIGHT, IN RESPONSE TO AN EMAIL THAT YOU SENT FOLLOWING UP

10:04AM 8     ON THAT MEETING?

10:04AM 9     A.   YES.

10:04AM 10    Q.   IS THAT FAIR?

10:04AM 11    A.   YES.

10:04AM 12    Q.   AND THE PURPOSE OF THIS WAS JUST TO GET PERMISSION FROM

10:04AM 13    THERANOS SO THAT YOU COULD RETAIN SOME REGULATORY CONSULTANTS

10:04AM 14    TO LOOK INTO SOME OF THESE REGULATORY ISSUES; RIGHT?

10:05AM 15    A.   THE CONSULTANTS THAT WE WANTED TO USE WERE MUCH BROADER

10:05AM 16    THAN REGULATORY CONSULTANTS ACTUALLY.  THEY WERE BUSINESS

10:05AM 17    CONSULTANTS WHO WERE EXPERTS IN THE LAB INDUSTRY AND WHO HAD

10:05AM 18    EXPERIENCE OPERATING AND INVESTING IN THE LABORATORY SPACE.

10:05AM 19    Q.   OKAY.  FAIR ENOUGH.

10:05AM 20         LET'S ACTUALLY LOOK AT HIS RESPONSE.  YOU WANTED TO GET

10:05AM 21    SOMEONE -- WAS THAT CLAMMER, ADAM CLAMMER WHO YOU WANTED TO GET

10:05AM 22    INPUT FROM?

10:05AM 23    A.   HE WAS ONE OF THOSE INDIVIDUALS.

10:05AM 24    Q.   OKAY.  AND THERE WERE OTHER PEOPLE WHO YOU WANTED TO GET

10:05AM 25    INPUT FROM?

10:05AM   1    A.   YES.

10:05AM   2    Q.   AND WHO DID YOU WANT TO GET INPUT FROM?

10:05AM   3    A.   THERE WAS ANOTHER INDIVIDUAL, I DON'T REMEMBER HIS NAME,

10:05AM   4    BUT HE WAS AN OPERATE -- HE HAD OPERATED LABORATORIES OVER HIS

10:05AM   5    CAREER.  HE WAS A -- HE WAS AT THE TIME, I BELIEVE, AN EMPLOYEE

10:05AM   6    OF A PRIVATE EQUITY FIRM THAT HAD MADE LABORATORY INVESTMENTS,

10:05AM   7    SO HE HAD DIRECT OPERATING EXPERIENCE IN THE INDUSTRY.  SO HE

10:05AM   8    WAS SOMEONE WHO WE THOUGHT WOULD BE AN EXCELLENT REFERENCE AS

10:06AM   9    WE, AS WE FINISHED OUR DUE DILIGENCE PROCESS.

10:06AM   10   Q.   AND DID YOU RETAIN HIM AND GET HIS GUIDANCE?

10:06AM   11   A.   MR. BALWANI WAS UNWILLING TO GRANT HIM ACCESS BECAUSE WE

10:06AM   12   WEREN'T ABLE TO DISCUSS ANY -- AS YOU CAN SEE IN THIS EMAIL, WE

10:06AM   13   COULDN'T TALK TO HIM ABOUT ANY OF THE ISSUES WE WANTED HIS

10:06AM   14   INPUT ON.

10:06AM   15        SO WE, WE -- WE WEREN'T -- WE ENDED UP NOT, WE ENDED UP

10:06AM   16   NOT WORKING WITH THAT INDIVIDUAL SINCE -- AND SO, WHICH WAS --

10:06AM   17   JUST MEANT THAT WE HAD TO, AGAIN, KIND OF RELY ON THE

10:06AM   18   REPRESENTATIONS THAT THE COMPANY HAD MADE TO US ABOUT THE

10:06AM   19   TECHNOLOGY, THE WALGREENS RELATIONSHIPS, THE HOSPITAL ACQUIRED

10:06AM   20   INFECTION BUSINESS, THE PHYSICIAN OFFICE BUSINESS, ALL OF THE

10:06AM   21   DIFFERENT ASPECTS OF THE FORECAST.

10:07AM   22   Q.   OKAY.  BUT YOU DO RECALL THAT THERE WERE QUESTIONS THAT

10:07AM   23   YOU HAD WITH MR. BALWANI ABOUT -- OVER A PERIOD OF TIME ABOUT

10:07AM   24   WHICH CONSULTANTS YOU COULD RETAIN?

10:07AM   25        DO YOU RECALL THAT?

10:07AM  1    A.   YES.

10:07AM  2    Q.   AND THERE WERE QUESTIONS ABOUT WHAT KIND OF INFORMATION

10:07AM  3    YOU COULD SHARE WITH THEM; RIGHT?

10:07AM  4    A.   YES.

10:07AM  5    Q.   BECAUSE THERE WAS SOME CONFIDENTIAL INFORMATION THAT

10:07AM  6    MR. BALWANI DIDN'T WANT SHARED WITH CERTAIN PEOPLE IN THE

10:07AM  7    INDUSTRY; RIGHT?

10:07AM  8    A.   HE DIDN'T WANT TO SHARE IT WITH -- I'M NOT SURE IT WAS

10:07AM  9    SPECIFIC TO JUST THE INDUSTRY.  BUT, YES, THERE WAS A WHOLE

10:07AM  10   BUNCH OF -- MUCH OF THE IMPORTANT PART OF THE STORY WE WERE NOT

10:07AM  11   ABLE TO SHARE WITH INDIVIDUALS THAT WEREN'T -- THAT THE COMPANY

10:07AM  12   HADN'T AGREED TO, HADN'T ALLOWED -- THAT DIDN'T APPROVE OUR

10:07AM  13   SPEAKING TO THEM ABOUT THE BUSINESS AND ALL OF THE OTHER ISSUES

10:07AM  14   THAT WE WERE FOCUSSED ON.

10:07AM  15   Q.   WELL, YOU ULTIMATELY RETAINED A NUMBER OF DIFFERENT

10:07AM  16   EXPERTS TO ADVISE YOU ON THESE ISSUES; RIGHT?

10:07AM  17   A.   WE SPOKE TO SUBJECT MATTER EXPERTS, BUT MORE AT A HIGH

10:08AM  18   LEVEL, NOT REFERENCING THERANOS SPECIFICALLY.

10:08AM  19        SO KIND OF -- THE CONCEPT IS KIND OF SORT OF BACKGROUND

10:08AM  20   INFORMATION, ALL RIGHT, EXPLAIN TO US HOW THE REGULATION OF A

10:08AM  21   LAB WORKS, EXPLAIN TO US HOW A PHYSICIAN ORDERS LAB TESTS.

10:08AM  22        WHAT WE WEREN'T ABLE TO DO IS TO GIVE THEM THE THERANOS

10:08AM  23   BUSINESS SPECIFICALLY AND HAVE THEM COMMENT ON WHETHER THAT

10:08AM  24   WAS -- OFFER THEIR PERSPECTIVE AND THEIR COMMENTS ON THE

10:08AM  25   SPECIFICS OF THERANOS'S BUSINESS.

10:08AM  1    Q.   OKAY.  I THINK MY INITIAL QUESTION RELATED TO REGULATORY

10:08AM  2    CONSULTANTS.

10:08AM  3    A.   YES.

10:08AM  4    Q.   AND YOU ASKED TO RETAIN THOSE REGULATORY CONSULTANTS;

10:08AM  5    RIGHT?

10:08AM  6    A.   WELL, MR. WADE, I THINK YOU ASKED ME ABOUT THE TWO

10:08AM  7    INDIVIDUALS AND WHETHER THEY WERE REGULATORY CONSULTANTS, AND

10:08AM  8    MY ANSWER IS THEY ARE NOT REGULATORY CONSULTANTS, THEY'RE BROAD

10:09AM  9    INDUSTRY EXPERTS IN THE LAB SPACE.

10:09AM  10        SO I'M HAPPY TO ANSWER YOUR QUESTION, BUT MAYBE YOU CAN

10:09AM  11   REPHRASE IT SO I CAN GIVE YOU THE ANSWER YOU'RE LOOKING FOR.

10:09AM  12   Q.   WELL, WHY DON'T WE GO TO 7399.

10:09AM  13        DO YOU HAVE THAT EMAIL IN FRONT OF YOU?

10:09AM  14   A.   YES, I DO NOW.  SORRY.

10:09AM  15   Q.   AND IS THIS AN EMAIL FROM DR. RABODZEY TO YOU AND OTHER

10:09AM  16   ANALYSTS WORKING ON THE TEAM WITH RESPECT TO THE THERANOS

10:09AM  17   INVESTMENT?

10:10AM  18   A.   MAYBE I COULD JUST REVIEW IT FOR A SEC.  THANK YOU.

10:10AM  19        (PAUSE IN PROCEEDINGS.)

10:10AM  20            THE WITNESS:  OKAY.

10:11AM  21   BY MR. WADE:

10:11AM  22   Q.   AND DO YOU RECOGNIZE THIS TO BE AN EMAIL IN WHICH

10:11AM  23   DR. RABODZEY IS CONVEYING INFORMATION THAT HE GATHERED AS HE

10:11AM  24   WAS DOING RESEARCH RELATED TO THE THERANOS INVESTMENT?

10:11AM  25   A.   YES.

GROSSMAN CROSS BY MR. WADE (RES.)

10:11AM   1          MR. WADE:  MOVE THE ADMISSION OF 7399.

10:11AM   2          MR. LEACH:  NO OBJECTION, YOUR HONOR.

10:11AM   3          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:11AM   4      (DEFENDANT'S EXHIBIT 7399 WAS RECEIVED IN EVIDENCE.)

10:11AM   5   BY MR. WADE:

10:11AM   6   Q.   AND THIS IS JANUARY 21ST, 2014.

10:11AM   7        DO YOU SEE THAT?

10:11AM   8   A.   I DO.

10:11AM   9   Q.   AND DR. RABODZEY NOTES THAT HE READ THE CLIA LAB

10:11AM  10   REQUIREMENTS.

10:11AM  11        DO YOU SEE THAT?

10:11AM  12   A.   I DO.

10:11AM  13   Q.   AND THAT THERANOS SEEMS TO BE CORRECT THAT CLIA

10:11AM  14   CERTIFICATION DOES MEAN THAT THEIR TESTS MEET A CERTAIN LEVEL

10:11AM  15   OF ACCURACY.

10:12AM  16        DO YOU SEE THAT?

10:12AM  17   A.   I DO.

10:12AM  18   Q.   AND DID YOU UNDERSTAND THAT TO BE THAT BECAUSE THERANOS

10:12AM  19   HAD TO VALIDATE ITS TESTS BEFORE IT COULD OFFER THOSE TESTS IN

10:12AM  20   THE CLIA LAB?

10:12AM  21   A.   THAT IS THE PROCESS OF GETTING -- OF QUALIFYING FOR A CLIA

10:12AM  22   CERTIFICATION, YES.

10:12AM  23   Q.   OKAY.  AND DO YOU KNOW IF THAT'S WHAT DR. RABODZEY IS

10:12AM  24   REFERRING TO THERE?

10:12AM  25   A.   I BELIEVE THAT IS WHAT HE IS REFERRING TO, YES.

10:12AM 1    Q.   OKAY.  AND THEN HE NOTES IN THE SECOND LINE, "THIS MAY OR

10:12AM 2    MAY NOT BE SUFFICIENT TO MEET THE FDA CRITERIA, BUT I HAVE NO

10:12AM 3    REASON TO BELIEVE IT WON'T."

10:12AM 4         DO YOU SEE THAT?

10:12AM 5    A.   I DO SEE THAT.

10:12AM 6    Q.   AND HE NOTES THAT HE'S GOING TO RETAIN TWO CONSULTANTS

10:12AM 7    FROM GPG.

10:12AM 8         DO YOU SEE THAT?

10:12AM 9    A.   I DO.

10:12AM 10   Q.   AND DO YOU KNOW WHAT THAT REFERS TO?

10:12AM 11   A.   I BELIEVE HE MADE A TYPO.  I BELIEVE HE'S REFERRING TO

10:12AM 12   GLG, NOT GPG.

10:12AM 13   Q.   OKAY.

10:12AM 14   A.   GLG IS A -- THEY'RE AN ORGANIZATION THAT PROVIDES

10:13AM 15   INVESTMENT FIRMS LIKE OURS EXPERTS IN DIFFERENT SUBJECT MATTER

10:13AM 16   AREAS.  SO YOU COULD FIND SOMEONE WHO IS THE WORLD LEADER IN,

10:13AM 17   YOU KNOW, THE REPRODUCTIVE SYSTEM OF MICE, AND THEY WOULD FIND

10:13AM 18   THAT FOR YOU, AND THAT MAY BE SOMETHING THAT IS INTERESTING IN

10:13AM 19   THE CONTEXT OF A NEW DRUG.

10:13AM 20        AND SO WE USE THEM TO FIND, WE USE THEM TO FIND VERY

10:13AM 21   SPECIFIC CONSULTANTS.

10:13AM 22   Q.   AND HERE HE NOTES THAT HE'S WORKING TO GET TWO

10:13AM 23   CONSULTANTS, ONE WHO DEVELOPED LAB TESTS IN THE PAST AND CAN

10:13AM 24   HELP EVALUATE THE TECHNOLOGY, AND ANOTHER PERSON WHO

10:13AM 25   UNDERSTANDS THE CLIA AND FDA REGULATIONS TO EVALUATE THE

10:13AM 1    REQUIREMENTS THAT THERANOS HAD TO MEET TO GET CLIA

10:13AM 2    CERTIFICATION; CORRECT?

10:13AM 3    A.   YES.

10:13AM 4    Q.   OKAY.  AND LET'S GO TO THE NEXT PARAGRAPH.

10:14AM 5         HE ALSO CONVEYS HIS VIEW ON THE PHASE II STRATEGY.

10:14AM 6         DO YOU SEE THAT?

10:14AM 7    A.   YES.

10:14AM 8    Q.   AND HE NOTES THAT, "I WOULD STICK TO THE VIEW SHARED BY

10:14AM 9    THE LAWYERS WE SPOKE WITH THAT THE FDA WILL WANT TO REGULATE

10:14AM 10   TESTING AND WILL NOT BUY INTO THIS IDEA OF CLOUD DATA, SO THEY

10:14AM 11   WILL HAVE TO GET THE DEVICE APPROVED BY THE FDA AND/OR THEY MAY

10:14AM 12   NEED TO GET SOME FORM OF CLIA CLEARANCE FOR THOSE WAG LOCATIONS

10:14AM 13   WHERE SYSTEMS ARE DEPLOYED."

10:14AM 14        DO YOU SEE THAT?

10:14AM 15   A.   I DO.

10:14AM 16   Q.   AND DO YOU RECALL LEARNING THAT DURING THE DUE DILIGENCE

10:14AM 17   PROCESS, THAT THAT WAS THE VIEW THAT DR. RABODZEY HAD COME TO?

10:14AM 18   A.   THAT'S ACTUALLY NOT HIS VIEW.  THAT'S THE VIEW OF THE

10:14AM 19   LAWYERS HE SPOKE TO.

10:14AM 20   Q.   OKAY.  DO YOU RECALL -- DID YOU RETAIN COUNSEL TO GET

10:14AM 21   THEIR TAKE ON THE REGULATORY ISSUES?

10:14AM 22   A.   I DON'T SPECIFICALLY REMEMBER WHICH LAWYERS HE'S REFERRING

10:14AM 23   TO, BUT, YOU KNOW, LAWYERS ARE OFTEN VERY CONSERVATIVE WHEN IT

10:15AM 24   COMES TO REGULATORY POLICY.

10:15AM 25        SO WE WOULD -- IN MANY INVESTMENTS, WE WOULD WANT

10:15AM  1    PERSPECTIVE OR ADVICE IN TERMS OF HOW TO THINK ABOUT REGULATORY

10:15AM  2    ISSUES AT A HIGH LEVEL, AND I THINK THAT'S -- I DON'T REMEMBER

10:15AM  3    WHICH FIRM WE USED IN THIS PARTICULAR CASE, BUT, YOU KNOW, THAT

10:15AM  4    WOULD BE FAIRLY NORMAL IN THE COURSE OF OUR INVESTMENT RESEARCH

10:15AM  5    ACTIVITIES.

10:15AM  6    Q.   OKAY.  AND IF YOU GO DOWN A COUPLE MORE SENTENCES, HE

10:15AM  7    NOTES THERE, "I WOULD THINK THIS IS NOT A BIG DEAL, BUT MAY BE

10:15AM  8    A BIT OF DELAY FOR THAT PHASE ONLY, STILL, THEY CAN WORK AROUND

10:15AM  9    THESE OBSTACLES QUICKLY AND CAPTURE VOLUME THROUGH THEIR HUB

10:15AM  10   AND SPOKE MODEL."

10:15AM  11        DO YOU SEE THAT?

10:15AM  12   A.   I DO.

10:15AM  13   Q.   AND SO THIS IS ESSENTIALLY A RISK THAT IT MAY BE AWHILE

10:15AM  14   BEFORE THERANOS WOULD BE ABLE TO DEPLOY ITS DEVICE; CORRECT?

10:16AM  15   A.   IF YOU'RE REFERRING TO DEPLOYING DEVICES IN WALGREENS

10:16AM  16   LOCATIONS, THAT IS I BELIEVE WHAT HE'S REFERRING TO HERE, YES.

10:16AM  17   Q.   OKAY.

10:16AM  18   A.   BUT THAT WASN'T WHAT OUR MODEL OR OUR INVESTMENT CASE WAS

10:16AM  19   BASED OFF OF.  IT WAS AN UP SIDE SCENARIO IF SOMETHING LIKE

10:16AM  20   THAT PLAYED OUT.

10:16AM  21   Q.   FAIR ENOUGH.

10:16AM  22   A.   SO, YES.

10:16AM  23   Q.   BUT YOU RECALL THE DISCUSSION OF THE PHASE I AND PHASE II,

10:16AM  24   AND THIS IS SAYING THAT THE PHASE II MIGHT TAKE SOME TIME;

10:16AM  25   RIGHT?

10:16AM 1    A.   WELL, I THINK IT'S SAYING THAT THERE IS -- THERE MAY BE A

10:16AM 2    BIT OF A DELAY BASED ON -- THAT APPEARS TO BE MR. RABODZEY'S

10:16AM 3    POINT OF VIEW -- BEFORE WE RAISE THESE ISSUES WITH THE COMPANY

10:16AM 4    AND GOT THEIR PERSPECTIVE ON THESE, ON THESE HIGHER LEVEL

10:16AM 5    REGULATORY QUESTIONS AROUND NOT THE INITIAL ROLLOUT, BUT THE

10:16AM 6    LONGER TERM ABILITY TO PUT THESE DEVICES IN STORES LIKE A

10:17AM 7    WALGREENS.

10:17AM 8    Q.   WELL, DO YOU RECALL THIS WAS ACTUALLY, I BELIEVE, JUST

10:17AM 9    AFTER THAT MEETING THAT YOU HAD WITH MR. BALWANI TO DISCUSS

10:17AM 10   THOSE ISSUES?

10:17AM 11   A.   I CAN'T SEE THE DATE.  THE 21ST OF JANUARY.  SO THAT WOULD

10:17AM 12   HAVE BEEN AFTER, I BELIEVE, OUR SECOND OR THIRD MEETING WITH

10:17AM 13   THE COMPANY.

10:17AM 14   Q.   AND, IN FACT, IF YOU NOTE DOWN IN THE LAST LINE IN THE

10:17AM 15   EMAIL, IF WE CAN ZOOM BACK OUT AND JUST GET THE LAST PIECE, IT

10:17AM 16   SAYS, "OVERALL, I THINK EVERYTHING THEY SAID MAKES SENSE AND I

10:17AM 17   HAD NO PROBLEMS WITH THAT, AND I AM VERY MUCH IMPRESSED WITH

10:17AM 18   THEIR LEVEL OF PREPAREDNESS AND PLANNING."

10:17AM 19        DO YOU SEE THAT?

10:17AM 20   A.   I DO.

10:17AM 21   Q.   OKAY.  AND DO YOU RECALL, DID YOU SHARE THAT VIEW COMING

10:17AM 22   OUT OF THAT CALL WITH MR. BALWANI?

10:17AM 23   A.   I DON'T SPECIFICALLY REMEMBER ON THAT ONE ISSUE AFTER THAT

10:17AM 24   CALL WHAT MY PERSPECTIVE WAS.  BUT, I MEAN THEY HAD VERY GOOD

10:18AM 25   ANSWERS FOR ALL OF THE ISSUES THAT WE RAISED ON THE REGULATORY

10:18AM 1    STRATEGY.

10:18AM 2         AND THEY TALKED ABOUT THE INTERACTIONS THAT THEY WOULD

10:18AM 3    HAVE WITH PEOPLE LIKE KATHLEEN SEBELIUS AND OTHER IMPORTANT

10:18AM 4    PEOPLE ON THE REGULATORY SIDE, IN ADDITION TO THE BOARD MEMBERS

10:18AM 5    THEY HAD THAT HAD EXTENSIVE GOVERNMENT EXPERIENCE.

10:18AM 6         SO THEY WERE VERY CONFIDENT THAT THEY HAD A SOUND

10:18AM 7    REGULATORY STRATEGY GOING FORWARD.

10:18AM 8         BUT, AGAIN, FROM OUR PURPOSES, WE WERE FOCUSSED ON PHASE I

10:18AM 9    OF THE ROLLOUT, THE HUB AND SPOKE ROLLOUT OF THE TECHNOLOGY

10:18AM 10   INITIALLY IN THE PHOENIX MARKET.

10:18AM 11   Q.   BUT YOU NEVERTHELESS CONTINUED TO DO YOUR DUE DILIGENCE

10:18AM 12   PROCESS; CORRECT?

10:18AM 13   A.   YES.

10:18AM 14   Q.   AND LET'S LOOK AT EXHIBIT 7400, WHICH I BELIEVE THE

10:19AM 15   GOVERNMENT HAS STIPULATED TO.

10:19AM 16         MR. LEACH:  CORRECT, YOUR HONOR.

10:19AM 17         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:19AM 18   (DEFENDANT'S EXHIBIT 7400 WAS RECEIVED IN EVIDENCE.)

10:19AM 19         MR. WADE:  IF WE CAN BRING THAT UP.

10:19AM 20   Q.   DOES THIS DOCUMENT RELATE TO THE RETENTION OF THAT

10:19AM 21   CONSULTANT WHO IS SPECIALIZED IN LAB DEVELOPED TESTS?

10:19AM 22   A.   I WANT TO BE -- THIS IS -- THIS APPEARS TO BE AN

10:19AM 23   INDIVIDUAL WHO IS AN INDUSTRY EXPERT, BUT I'M NOT SURE IT'S THE

10:19AM 24   SAME CONSULTANT -- ARE YOU REFERRING TO THE PREVIOUS EMAIL?

10:19AM 25   Q.   WELL, LET'S BLOW UP THE EMAIL AND SEE IF YOU RECALL THE

10:19AM 1    RETENTION OF THIS PERSON TO DISCUSS THESE ISSUES.

10:20AM 2          IN PARTICULAR, IF YOU LOOK AT THE SCREENING QUESTIONS

10:20AM 3    RELATING TO HIS RETENTION, IT SAYS, "ARE YOU FAMILIAR WITH AND

10:20AM 4    ABLE TO DISCUSS THE REQUIREMENTS THAT ARE NEEDED FOR

10:20AM 5    LABORATORY-DEVELOPED TESTS TO BE CLIA CERTIFIED?  PLEASE

10:20AM 6    BRIEFLY ELABORATE."

10:20AM 7          HE WRITES, "I WROTE THE CLIA MANUAL FOR USERS OF IVD TESTS

10:20AM 8    AND QUITE FAMILIAR WITH ITS REGULATIONS."

10:20AM 9          DO YOU SEE THAT?

10:20AM 10   A.   YES, I DO.

10:20AM 11   Q.   AND HE INDICATES HIS EXPERIENCE IN GUIDING CLIENTS THROUGH

10:20AM 12   THE PROCESS?

10:20AM 13   A.   YES.

10:20AM 14   Q.   OKAY.  AND DO YOU RECALL GETTING REPORTS FROM YOUR TEAM ON

10:20AM 15   THIS?

10:20AM 16   A.   WELL, I BELIEVE I ACTUALLY SPOKE TO THE INDIVIDUAL.

10:20AM 17   Q.   SO YOU HAD A CALL IN WHICH YOU WERE ABLE TO ASK QUESTIONS

10:20AM 18   AND GET ADDITIONAL INFORMATION?

10:20AM 19   A.   YES.

10:20AM 20   Q.   ON THE REGULATORY ENVIRONMENT?

10:20AM 21   A.   THE STANDARD TYPE OF THINGS WE WOULD DO FOR AN INVESTMENT,

10:20AM 22   YES.

10:20AM 23   Q.   FAIR ENOUGH.

10:20AM 24          IN THE -- DO YOU RECALL THAT YOU ACTUALLY ALSO SOUGHT OUT

10:21AM 25   A DOCTOR WHO HAD REFERRED PATIENTS TO A THERANOS WELLNESS

10:21AM   1    CENTER TO GET INFORMATION FROM THE DOCTOR ON THE EXPERIENCE

10:21AM   2    THAT THE DOCTOR HAD?

10:21AM   3    A.   AS PART OF OUR DUE DILIGENCE, I BELIEVE WE TRIED TO FIND

10:21AM   4    PHYSICIANS THAT WERE INTERESTED IN USING THE SERVICE OR HAD

10:21AM   5    USED IT.  SO, YES, THAT WOULD BE VERY CONSISTENT WITH HOW WE

10:21AM   6    APPROACHED OUR DUE DILIGENCE PROCESS.

10:21AM   7    Q.   AND IF YOU CAN JUST TAKE A LOOK -- DO YOU RECALL ACTUALLY

10:21AM   8    DOING THAT IN THIS PROCESS?

10:21AM   9    A.   I DO RECALL THAT, YES.

10:21AM   10   Q.   OKAY.  THAT, THAT THROUGH A FIRM YOU WERE ABLE TO LOCATE A

10:21AM   11   DOCTOR WHO YOU COULD TALK TO ABOUT THE EXPERIENCE HE HAD WITH

10:21AM   12   THERANOS?

10:21AM   13   A.   I BELIEVE, YEAH, I BELIEVE THAT -- MY MEMORY IS THAT THERE

10:21AM   14   WERE -- I WASN'T THE ONLY ONE THAT DID THAT.  THAT WE HAD --

10:21AM   15   SO, YES.  AGAIN, THAT'S KIND OF STANDARD OPERATING PROCEDURE

10:21AM   16   FOR WHAT WE WOULD DO IN AN INVESTMENT LIKE THIS.

10:22AM   17       WE WOULD WANT TO SPEAK TO REGULATORY CONSULTANTS, WE WOULD

10:22AM   18   WANT TO SPEAK TO PHYSICIANS, WE WOULD WANT TO UNDERSTAND THE

10:22AM   19   BUSINESS STRATEGY.

10:22AM   20       AND SO, YES, WE DID SPEAK TO PHYSICIANS.

10:22AM   21   Q.   AND DO YOU RECALL SPECIFIC CONVERSATIONS THAT YOU HAD WITH

10:22AM   22   PHYSICIANS ABOUT THERANOS?

10:22AM   23   A.   GENERAL MEMORY.

10:22AM   24   Q.   AND WHAT DO YOU RECALL LEARNING FROM THAT PROCESS?

10:22AM   25   A.   IF THE TECHNOLOGY --

10:22AM  1              MR. LEACH:  YOUR HONOR --

10:22AM  2              THE WITNESS:  -- WAS --

10:22AM  3              THE COURT:  EXCUSE ME, MR. GROSSMAN.  PARDON ME.

10:22AM  4              MR. LEACH:  I WANT TO RAISE A HEARSAY ISSUE.  I

10:22AM  5    DON'T MIND THIS COMING IN FOR STATE OF MIND OF THE WITNESS, BUT

10:22AM  6    I DON'T THINK IT SHOULD BE OFFERED FOR THE TRUTH.

10:22AM  7              MR. WADE:  STATE OF MIND IS FINE, YOUR HONOR.

10:22AM  8    THAT'S WHAT IT'S BEING SOUGHT FOR.

10:22AM  9              THE COURT:  LADIES AND GENTLEMEN, I'LL LET

10:22AM 10    MR. GROSSMAN FINISH HIS ANSWER, AND WHAT HE SPEAKS TO IS NOT

10:22AM 11    OFFERED FOR THE TRUTH OF THE MATTER ASSERTED.

10:22AM 12         AGAIN, IT'S OFFERED FOR THE STATE OF MIND OF THIS WITNESS?

10:22AM 13              MR. WADE:  YES.

10:22AM 14              THE COURT:  ALL RIGHT.  IT RELATES TO THE STATE OF

10:22AM 15    MIND OF THIS WITNESS ONLY.  NOT FOR THE TRUTH.

10:23AM 16         SO I'M SORRY TO INTERRUPT YOU, MR. GROSSMAN.

10:23AM 17         YOU CAN FINISH.

10:23AM 18              THE WITNESS:  I'M SORRY, I INTERRUPTED YOU.

10:23AM 19         SO MY GENERAL MEMORY OF THOSE PHYSICIAN INTERACTIONS, IF

10:23AM 20    THE TECHNOLOGY WAS ABLE TO DO WHAT THE COMPANY TOLD US IT COULD

10:23AM 21    DO, IF IT COULD MATCH THE FULL MENU OF LABCORP AND QUEST TESTS,

10:23AM 22    YOU KNOW, IF THEY COULD, WITH A VENOUS PUNCTURE, TAKE

10:23AM 23    DRAMATICALLY LESS VOLUME, IF THEY COULD GET THE ANSWERS BACK IN

10:23AM 24    FOUR HOURS, IF A PATIENT COULD KEEP TRACK OF THEIR DATA OVER

10:23AM 25    TIME ON AN APP, IF THEY COULD SEE THE PHYSICIAN THE SAME DAY

10:23AM 1    THAT THEY GOT THEIR LAB WORK, ALL OF THOSE WERE VERY ATTRACTIVE

10:23AM 2    FEATURES TO THE PHYSICIANS THAT WE SPOKE TO AND THEY WOULD BE

10:23AM 3    INTERESTED IN USING A SERVICE LIKE THIS.

10:23AM 4        THAT WAS THE GENERAL MEMORY OF THOSE CONVERSATIONS.

10:24AM 5    BY MR. WADE:

10:24AM 6    Q.   AND DO YOU RECALL ACTUALLY SPEAKING WITH PHYSICIANS WHO

10:24AM 7    HAD ACTUALLY USED THE SERVICE OR HAD PATIENTS WHO USED THE

10:24AM 8    SERVICE?

10:24AM 9    A.   I BELIEVE WE DID SPEAK TO PHYSICIANS WHO HAD EITHER USED

10:24AM 10   IT OR HAD REFERRED PATIENTS TO IT.

10:24AM 11   Q.   AND WHAT DID, DID YOU LEARN AS A RESULT OF THOSE SPECIFIC

10:24AM 12   CONVERSATIONS WITH RESPECT TO THE PHYSICIANS WHO HAD USED THE

10:24AM 13   SERVICE?

10:24AM 14   A.   I, I DON'T RECALL SPECIFICALLY WHAT THOSE PHYSICIANS SAID.

10:24AM 15       AGAIN, I WASN'T THE ONLY ONE HAVING THOSE CONVERSATIONS,

10:24AM 16   DOING THAT TYPE OF DUE DILIGENCE.

10:24AM 17   Q.   OKAY.  I UNDERSTAND YOU DON'T RECALL SPECIFICALLY.

10:24AM 18       DO YOU RECALL GENERALLY WHETHER IT WAS POSITIVE OR

10:24AM 19   NEGATIVE?

10:24AM 20   A.   THE CONCEPTS, THE REACTION TO THE CONCEPT WAS WHAT WAS

10:24AM 21   POSITIVE.

10:24AM 22   Q.   RIGHT.  I WAS TRYING TO ASK A SLIGHTLY MORE SPECIFIC

10:24AM 23   QUESTION.

10:24AM 24       DO YOU RECALL WHETHER YOU LEARNED FROM THE PHYSICIANS WHO

10:24AM 25   HAD ACTUALLY USED THE SERVICE THAT THEY HAD A POSITIVE

10:24AM   1    EXPERIENCE?

10:24AM   2    A.   I DON'T, I DON'T RECALL SPECIFICALLY.

10:24AM   3    Q.   OKAY.  AND IF I CAN DRAW YOUR ATTENTION TO 14 -- I'M

10:25AM   4    SORRY, 7403, WHICH I BELIEVE IS IN VOLUME 1.

10:25AM   5    A.   OKAY.

10:25AM   6    Q.   OKAY.  AND DO YOU RECALL YESTERDAY WE TALKED ABOUT THE

10:25AM   7    SLIDE DECK OF DATA AND OTHER ITEMS THAT YOU WERE SENT BY

10:25AM   8    THERANOS; RIGHT?

10:25AM   9    A.   YES.

10:25AM  10    Q.   AND ONE OF THE REASONS THAT WAS SENT WAS BECAUSE

10:25AM  11    DR. RABODZEY WANTED TO REVIEW THE TECHNICAL DATA MORE CLOSELY;

10:25AM  12    CORRECT?

10:25AM  13    A.   WELL, WE WANTED HIM TO REVIEW THE TECHNICAL DATA.

10:25AM  14    Q.   FAIR ENOUGH.  I FORGOT THAT.

10:25AM  15         AND DOES THIS EMAIL RELATE TO HIS REVIEW OF THAT DATA?

10:25AM  16    A.   IF I COULD JUST HAVE A MINUTE TO REVIEW IT?

10:26AM  17    Q.   SURE.

10:26AM  18         (PAUSE IN PROCEEDINGS.)

10:26AM  19             THE WITNESS:  OKAY.

10:26AM  20    BY MR. WADE:

10:26AM  21    Q.   AND DO YOU RECALL THAT THIS EMAIL IS A REPORT FROM HIM ON

10:26AM  22    HIS REVIEW OF THAT DATA AND RELATED ANALYSIS?

10:26AM  23    A.   YES.

10:26AM  24             MR. WADE:  I MOVE THE ADMISSION OF 7403.

10:26AM  25             MR. LEACH:  NO OBJECTION, YOUR HONOR.

10:26AM 1          THE COURT:  THIS IS THE MULTIPAGE -- IS THE EMAIL

10:26AM 2    WITH THE ATTACHMENT?

10:26AM 3          MR. WADE:  CORRECT.

10:26AM 4          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:26AM 5          (DEFENDANT'S EXHIBIT 7403 WAS RECEIVED IN EVIDENCE.)

10:26AM 6          MR. WADE:  AND IF WE CAN JUST BLOW THIS UP.

10:27AM 7    Q.   DR. RABODZEY HERE IS PROVIDING A REPORT.

10:27AM 8         HE NOTES -- THIS IS JANUARY 24TH, 2014; CORRECT?

10:27AM 9    A.   JANUARY 24TH, YES.

10:27AM 10   Q.   AND HE NOTES, "HERE ARE THE REFERENCE DOCUMENTS FOR OUR

10:27AM 11   DISCUSSION TODAY."

10:27AM 12        AND IT WAS A LONG TIME AGO.  DO YOU RECALL A DISCUSSION ON

10:27AM 13   THE TOPICS IN THIS EMAIL?

10:27AM 14   A.   I DON'T SPECIFICALLY RECALL THE DISCUSSION, NO.

10:27AM 15   Q.   OKAY.  BUT DO YOU RECALL LEARNING -- DR. RABODZEY -- DO

10:27AM 16   YOU RECALL LEARNING THAT HE DID SOME ANALYSIS WHERE HE WAS

10:27AM 17   COMPARING SOME OF THE THERANOS DATA TO OTHER DATA FOR SIMILAR

10:27AM 18   TESTS?

10:27AM 19   A.   I, I'M NOT -- I DON'T REMEMBER SPECIFICALLY WHAT HE --

10:27AM 20   WHAT ANALYSES HE DID.

10:27AM 21   Q.   OKAY.  WE'LL JUST WALK THROUGH IT AND TAKE A LOOK.

10:27AM 22        HE -- IF YOU LOOK AT LINE 2, YOU SEE THAT HE MENTIONS A

10:28AM 23   PARVOVIRUS IG ASSAY WITH 4 PERCENT CV.

10:28AM 24        DO YOU SEE THAT?

10:28AM 25   A.   I DO SEE THAT, YES.

10:28AM  1    Q.   AND, IN FACT, I THINK HE ATTACHED THE VALIDATION REPORT

10:28AM  2    FOR THAT ASSAY.

10:28AM  3         DO YOU RECALL THAT?

10:28AM  4    A.   I DON'T RECALL THAT, BUT IT SAYS SEE PAGE 143.

10:28AM  5    Q.   OKAY.  AND HE COMPARES THE CV TO THE THERANOS ASSAY AT 15

10:28AM  6    TO 20 PERCENT.

10:28AM  7         DO YOU SEE THAT?

10:28AM  8    A.   I DO.

10:28AM  9    Q.   AND HE SAYS THAT'S PAGE 143 OF THEIR PRESENTATION?

10:28AM  10   A.   YES, I SEE THAT.

10:28AM  11   Q.   AND YOU UNDERSTOOD THAT WAS THAT SLIDE DECK THAT

10:28AM  12   MR. LEACH, PART OF THE SLIDE DECK THAT MR. LEACH SHOWED YOU

10:29AM  13   YESTERDAY?

10:29AM  14   A.   YES.

10:29AM  15   Q.   AND HE THEN ALSO COMPARES, IN ITEM 3, THE R SQUARED FOR

10:29AM  16   SOME COMMONLY USED TESTS.

10:29AM  17        AND HE NOTES THAT MOST OF THEM ARE GREATER THAN

10:29AM  18   95 PERCENT, BUT THERANOS IS SOMETIMES UNDER 95 PERCENT.

10:29AM  19        DO YOU SEE THAT?

10:29AM  20   A.   YES.

10:29AM  21   Q.   AND, AGAIN, THAT WAS JUST BASED UPON HIS ABILITY TO REVIEW

10:29AM  22   THE DATA PROVIDED BY THERANOS; RIGHT?

10:29AM  23   A.   YES.

10:29AM  24   Q.   AND HE SAYS THERE, "BASICALLY, MY CONCERN IS THAT THEIR

10:29AM  25   METHODOLOGY IS STILL RAW."

GROSSMAN CROSS BY MR. WADE (RES.)

10:29AM 1          DO YOU SEE THAT?

10:29AM 2     A.   YES.

10:29AM 3     Q.   AND THAT, "THEY MAY BE PUSHING THE LIMITS HERE."

10:29AM 4          DO YOU SEE THAT?

10:29AM 5     A.   I DO.

10:29AM 6     Q.   AND HE SAYS, "I DO NOT THINK IT'S A DEAL BREAKER AS LONG

10:29AM 7     AS THEY CAN GET CLIA AND FDA APPROVAL ON THEIR TESTS AND CAN

10:29AM 8     MAINTAIN CERTIFICATION IN THE FUTURE."

10:30AM 9          DO YOU SEE THAT?

10:30AM 10    A.   I DO SEE THAT.

10:30AM 11    Q.   AND SO IF YOU LOOK DOWN BELOW, HE ALSO NOTES THERE IS A

10:30AM 12    GOOD EXAMPLE OF WHAT HE IS REFERRING TO ON PAGE 137 OF THEIR

10:30AM 13    ASSAY.

10:30AM 14         DO YOU SEE THAT?

10:30AM 15         AND HE COMPARES THE R SQUARED AT .91 TO OTHER R SQUARES

10:30AM 16    THAT ARE AT .992.

10:30AM 17         DO YOU SEE THAT?

10:30AM 18    A.   YES.

10:30AM 19    Q.   AND YOU UNDERSTAND THAT CLOSER TO 1, THE HIGHER NUMBER WAS

10:30AM 20    BETTER THAN THE LOWER NUMBER; IS THAT RIGHT?  THE .992 IS THE

10:30AM 21    BETTER NUMBER; RIGHT?

10:30AM 22    A.   I'M NOT EXACTLY SURE WHAT TEST THAT IS REFERRING TO, BUT

10:30AM 23    THERE ARE NO HARD AND FAST RULES WHEN IT COMES TO THESE TYPES

10:30AM 24    OF TESTS AND GETTING CLIA CERTIFICATION.

10:30AM 25         SO IN GENERAL, A HIGHER NUMBER IS BETTER, BUT EACH TEST IS

10:30AM 1      DIFFERENT.

10:30AM 2      Q.   RIGHT.  AND YOU UNDERSTOOD AT THE TIME THAT DR. RABODZEY

10:31AM 3      IS SORT OF DOING HIS JOB TO USE --

10:31AM 4      A.   YEP.

10:31AM 5      Q.   -- YOUR TERMS; RIGHT?

10:31AM 6           AND HE WENT INTO THAT DATA; CORRECT?

10:31AM 7      A.   YES.

10:31AM 8      Q.   AND HE COMPARED IT TO OTHER DATA AND EXPRESSED SOME

10:31AM 9      CONCERN THAT THE METHODOLOGY MAY STILL BE RAW AND THEY MAY BE

10:31AM 10     TESTING THEIR LIMITS A LITTLE BIT.

10:31AM 11          DO YOU SEE THAT?

10:31AM 12     A.   I DO SEE THAT, YES.

10:31AM 13     Q.   AND YOU KNEW THAT IN ADVANCE OF MAKING THE INVESTMENT

10:31AM 14     DECISION; CORRECT?

10:31AM 15     A.   AT THIS POINT IN TIME ON JANUARY 24TH, THAT WAS HIS -- HE

10:31AM 16     WAS DOING EXACTLY WHAT WE ASKED HIM TO DO, WHICH WAS ANALYZE

10:31AM 17     THE DATA WITH A SKEPTICAL POINT OF VIEW AND REPORT BACK HIS

10:31AM 18     CONCLUSIONS.

10:31AM 19          AND AS HE SAID, IT'S NOT A DEAL BREAKER.

10:31AM 20          THE COMPANY HAD ALREADY TOLD US THAT THEY HAD CLIA

10:31AM 21     CERTIFICATION FOR ALL OF THEIR TESTS AND THEY HAD BEEN ABLE TO

10:31AM 22     REPEATEDLY MEET THOSE FOR PROFICIENCY TESTING IN THEIR CLIA

10:32AM 23     LAB.

10:32AM 24          AND SO THEY WERE VERY COMFORTABLE THAT IF THERE WERE ONE

10:32AM 25     OR TWO TESTS THAT LOOKED LIKE THEY HAD A LOW R SQUARED, THAT

10:32AM 1    WAS PERFECTLY ACCEPTABLE WITHIN THE RULES FOR HOW THESE TYPES

10:32AM 2    OF TESTS WORK.

10:32AM 3         THERE WAS NO HARD RULE THAT YOU HAD TO BE A CERTAIN

10:32AM 4    NUMBER.

10:32AM 5         AND IT'S ACTUALLY JUST MATH.  YOU'RE DIVIDING THE VARIANCE

10:32AM 6    OF THE STANDARD DEVIATION OF THESE TESTS BY THE MEAN.

10:32AM 7         SO IF YOU HAVE A SMALL REFERENCE RANGE, LET'S SAY A NORMAL

10:32AM 8    RANGE IS 10 TO 15, THAT'S GOING TO HAVE A LOW COEFFICIENT OF

10:32AM 9    VARIATION.

10:32AM 10        BUT IF THE RANGE IS 10 TO 10,000 AND PEOPLE HAVE VERY

10:32AM 11   DIFFERENT READINGS, YOU'RE GOING TO HAVE A MUCH HIGHER

10:32AM 12   COEFFICIENT OF VARIATION, AND THAT'S PERFECTLY ACCEPTABLE UNDER

10:32AM 13   THE RULES FOR PROFICIENCY TESTING.

10:32AM 14        SO THIS IS, THIS IS A GOOD EXAMPLE OF MR. RABODZEY DOING

10:32AM 15   HIS JOB.

10:32AM 16   Q.   RIGHT.  AND GATHERING THE INFORMATION SO THAT YOU COULD

10:32AM 17   MAKE A FULLY INFORMED DECISION; CORRECT?

10:32AM 18   A.   CORRECT.

10:32AM 19   Q.   AND ONE OF THE OTHER THINGS THAT YOU VETTED IN CONNECTION

10:33AM 20   WITH THIS PROCESS WAS THE PATIENT EXPERIENCE; CORRECT?

10:33AM 21   A.   THAT IS CORRECT.

10:33AM 22   Q.   AND AT DIFFERENT TIMES, DIFFERENT PEOPLE WENT AND HAD

10:33AM 23   THEIR TEST TAKEN AT WALGREENS; RIGHT?

10:33AM 24   A.   THAT'S CORRECT.

10:33AM 25   Q.   UNANNOUNCED; RIGHT?

10:33AM  1   A.   I BELIEVE THEY WERE ALL UNANNOUNCED, YEAH.

10:33AM  2   Q.   YEAH.  LET'S LOOK AT 14001, WHICH WOULD BE IN VOLUME 2.

10:33AM  3   A.   OKAY.  I HAVE IT.

10:33AM  4   Q.   OKAY.  AND DO YOU RECOGNIZE THIS DOCUMENT TO BE A REPORT

10:33AM  5   ON DR. RABODZEY'S VISIT TO THE WALGREENS, THE THERANOS TESTING

10:34AM  6   CENTER AT THE WALGREENS LOCATION IN PALO ALTO?

10:34AM  7   A.   MR. WADE, IF I COULD HAVE A MINUTE TO REVIEW IT?

10:34AM  8   Q.   SURE.

10:34AM  9   A.   THANKS.

10:34AM  10       (PAUSE IN PROCEEDINGS.)

10:34AM  11            THE WITNESS:  OKAY.

10:35AM  12   BY MR. WADE:

10:35AM  13   Q.   DO YOU RECOGNIZE THIS TO BE AN EMAIL REPORT FROM

10:35AM  14   DR. RABODZEY ON HIS VISIT TO THE WALGREENS LOCATION?

10:35AM  15   A.   I DO.

10:35AM  16            MR. WADE:  I MOVE THE ADMISSION OF 14001.

10:35AM  17            MR. LEACH:  YOUR HONOR, 802, BUT I DON'T OBJECT TO

10:35AM  18   THIS COMING IN FOR STATE OF MIND CONSISTENT WITH THE OTHER

10:35AM  19   DOCUMENTS.

10:35AM  20            MR. WADE:  NO PROBLEM WITH THAT, YOUR HONOR.

10:35AM  21            THE COURT:  SO THIS SHOULD BE ENTERED THEN,

10:35AM  22   MR. WADE, NOT FOR THE TRUTH OF ANYTHING ASSERTED IN THIS EMAIL,

10:35AM  23   BUT ONLY AS TO THE STATE OF MIND OF THIS WITNESS?

10:35AM  24            MR. WADE:  YES.

10:35AM  25            THE COURT:  ALL RIGHT.  IT'S ADMITTED WITH THAT

10:35AM   1    LIMITATION.

10:35AM   2         LADIES AND GENTLEMEN, THIS IS NOT ADMITTED FOR THE TRUTH

10:35AM   3    OF THE MATTER OF ANYTHING ASSERTED IN THE EMAIL.  IT ONLY GOES

10:35AM   4    TO THE STATE OF MIND OF MR. GROSSMAN AS TO THIS ISSUE.

10:35AM   5         (DEFENDANT'S EXHIBIT 14001 WAS RECEIVED IN EVIDENCE.)

10:35AM   6         THE COURT:  AND BEFORE YOU BEGIN YOUR EXAMINATION,

10:35AM   7    WE'RE GOING TO HAVE TO BREAK.  I THINK I TOLD YOU WE'RE

10:35AM   8    BREAKING AT ABOUT 10:35, 10:40 THIS MORNING.  AND THIS WILL BE

10:36AM   9    ABOUT AN HOUR BREAK.

10:36AM   10        MR. WADE:  SHOULD WE DO THAT RIGHT NOW, YOUR HONOR?

10:36AM   11        THE COURT:  I THINK SO.  IF YOU'RE GOING TO GO

10:36AM   12   THROUGH THIS, I DON'T WANT TO BREAK UP YOUR QUESTIONS, NOR

10:36AM   13   MR. GROSSMAN'S ANSWERS IN THE NEXT THREE OR FOUR MINUTES.

10:36AM   14        MR. WADE:  NO PROBLEM, YOUR HONOR.  LET'S BREAK.

10:36AM   15        THE COURT:  SO LET'S BREAK NOW.

10:36AM   16        THE WITNESS:  OKAY.

10:36AM   17        THE COURT:  SO, LADIES AND GENTLEMEN, IT WILL

10:36AM   18   PROBABLY BE ABOUT AN HOUR.  THAT'S THE LENGTH OF THIS BREAK.

10:36AM   19        SO WE'LL SEE YOU ALL BACK IN ABOUT AN HOUR.

10:36AM   20        THANK YOU.

10:36AM   21        (JURY OUT AT 10:36 A.M.)

10:36AM   22        MR. WADE:  YOU CAN GO.

10:37AM   23        (RECESS FROM 10:37 A.M. UNTIL 11:53 A.M.)

11:54AM   24        THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

11:54AM   25        PLEASE BE SEATED.  WE'RE BACK ON THE RECORD.  ALL PARTIES

11:54AM  1      PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.

11:54AM  2          OUR JURY IS PRESENT.  THANK YOU, LADIES AND GENTLEMEN, FOR

11:54AM  3      THE BREAK.

11:54AM  4          MR. WADE, IF YOU WOULD LIKE TO CONTINUE.

11:54AM  5              MR. WADE:  PLEASE, YOUR HONOR.

11:54AM  6      Q.   GOOD AFTERNOON, MR. GROSSMAN.

11:54AM  7      A.   GOOD AFTERNOON.

11:54AM  8      Q.   I'D LIKE TO TURN BACK TO EXHIBIT 14001, WHICH IS IN

11:54AM  9      EVIDENCE.  AND I BELIEVE YOU MAY RECALL BEFORE THE BREAK WE

11:54AM  10     WERE TALKING ABOUT DR. RABODZEY GIVING A REPORT ON THE PATIENT

11:54AM  11     EXPERIENCE HE HAD AT WALGREENS.

11:54AM  12         DO YOU RECALL THAT?

11:54AM  13     A.   YES, I DO.

11:54AM  14     Q.   OKAY.  AND I JUST WANT TO -- IF I CAN FOCUS INITIALLY JUST

11:54AM  15     ON THE TOP.

11:54AM  16         DO YOU RECALL THAT HE NOTED THAT IT TOOK ABOUT 31 MINUTES

11:54AM  17     FOR HIM TO DO THE TEST?

11:55AM  18         AND HE THEN GAVE A PRETTY DETAILED REPORT OF HIS

11:55AM  19     EXPERIENCE; RIGHT?

11:55AM  20     A.   THAT IS -- YES.

11:55AM  21     Q.   AND PART OF THE REASON THAT HE WAS GIVING A DETAILED

11:55AM  22     REPORT IS THAT YOU WANTED TO CONSIDER THIS INFORMATION IN

11:55AM  23     CONNECTION WITH YOUR INVESTMENT DECISION.

11:55AM  24         IS THAT FAIR?

11:55AM  25     A.   I THINK HE WAS GIVING US A DETAILED REPORT ON HIS

GROSSMAN CROSS BY MR. WADE (RES.)

11:55AM  1    EXPERIENCE.  IT WAS -- SO, YES.

11:55AM  2    Q.   OKAY.  AND IF YOU GO ABOUT HALFWAY DOWN, YOU SEE THAT HE

11:55AM  3    REPORTS ON THE MOST FREQUENT TEST THAT REQUIRES VENOUS DRAW IS

11:55AM  4    SODIUM, WHICH IS DONE PRE-SURGERY.

11:55AM  5        DO YOU SEE THAT?

11:55AM  6    A.   I DO.

11:55AM  7    Q.   AND DO YOU RECALL THAT ONE OF THE THINGS THAT DR. RABODZEY

11:55AM  8    TRIED TO DO IS JUST GET AS MUCH INFORMATION AS HE COULD ABOUT

11:55AM  9    THIS PROCESS AND CONVEY THAT TO THE TEAM?

11:55AM 10    A.   I'M SORRY.  COULD YOU ASK THE QUESTION AGAIN?

11:55AM 11    Q.   YEAH.

11:55AM 12        DO YOU RECALL THAT DR. RABODZEY AS HE WAS EMAILING --

11:56AM 13    INTERACTING WITH PEOPLE AT WALGREENS, WAS TRYING TO GET

11:56AM 14    WHATEVER INFORMATION ABOUT THE PROCESS HE COULD SO THAT HE

11:56AM 15    COULD RELAY THAT TO THE TEAM?

11:56AM 16    A.   I DON'T KNOW SPECIFICALLY WHAT HE DID WHILE HE WAS AT

11:56AM 17    WALGREENS OR WHO HE SPOKE TO, SO I --

11:56AM 18    Q.   YOU RECALL THIS REPORT ON THE VENOUS DRAWS COMING UP?

11:56AM 19    A.   I, I RECALL THIS.  NOW THAT I'M LOOKING AT THIS EMAIL, I

11:56AM 20    DO REMEMBER THAT HE WENT TO WALGREENS AND SENT AN EMAIL.

11:56AM 21    Q.   OKAY.

11:56AM 22    A.   YES.

11:56AM 23    Q.   AND I THINK WE TALKED YESTERDAY ABOUT VENOUS DRAWS.

11:56AM 24        DO YOU RECALL THAT?

11:56AM 25    A.   YES.

11:56AM  1    Q.   AND YOU WERE AWARE THAT THERANOS WAS DOING VENOUS DRAWS IN

11:56AM  2    THIS PERIOD; CORRECT?

11:56AM  3    A.   THEY WERE DOING VENOUS DRAWS, BUT THEY WERE STILL USING

11:56AM  4    THE PROPRIETARY TECHNOLOGY ON THOSE VENOUS DRAWS, YES, THAT'S

11:56AM  5    CORRECT.

11:56AM  6    Q.   THE -- AND HOW IS IT, SIR, THAT YOU KNOW THAT THEY WERE

11:57AM  7    DOING THE -- USING THE PROPRIETARY TECHNOLOGY?  I BELIEVE

11:57AM  8    YESTERDAY YOU TESTIFIED THAT YOU DIDN'T REMEMBER DISCUSSING

11:57AM  9    THAT WITH THERANOS.

11:57AM  10   A.   THAT IS NOT MY MEMORY OF WHAT QUESTION YOU ASKED ME, BUT

11:57AM  11   MS. HOLMES ACTUALLY TOLD ME THAT.

11:57AM  12   Q.   THAT'S WHAT SHE TOLD YOU?

11:57AM  13   A.   YES.

11:57AM  14   Q.   AND IN WHICH MEETING WAS THAT?

11:57AM  15   A.   IT WAS A MEETING IN I BELIEVE IT WAS 2000 -- IT MAY HAVE

11:57AM  16   BEEN 2015, 2016 WHEN SHE --

11:57AM  17   Q.   OKAY.  SO WE'RE LIMITING OUR DISCUSSION HERE TO THE

11:57AM  18   INVESTMENT PERIOD.  OKAY?

11:57AM  19   A.   OKAY.

11:57AM  20   Q.   AND YESTERDAY WE ASKED QUESTIONS ABOUT THE PERIOD DURING

11:57AM  21   THE INVESTMENT.

11:57AM  22        AND I BELIEVE YOUR TESTIMONY WAS THAT YOU DIDN'T RECALL

11:57AM  23   HAVING ANY DISCUSSIONS ABOUT WHAT TECHNOLOGY WAS USED FOR

11:57AM  24   VENOUS DRAWS.

11:57AM  25   A.   WELL, I THINK WHAT I, WHAT I, WHAT I TESTIFIED TO WAS THAT

11:58AM 1    WHEN THEY DID A VENOUS DRAW, IT WAS ON THE WORLD'S SMALLEST

11:58AM 2    VENOUS DRAW, DRAMATICALLY LESS BLOOD, AND YOU WOULDN'T USE THAT

11:58AM 3    ON CONVENTIONAL LAB EQUIPMENT.

11:58AM 4        SO OUR ASSUMPTION ALL THROUGH THE DUE DILIGENCE PROCESS

11:58AM 5    WAS THAT EVEN WHEN THERE WAS A VENOUS DRAW, IT WAS STILL RUN ON

11:58AM 6    THERANOS PROPRIETARY ANALYZERS.

11:58AM 7    Q.   OKAY.  AND I JUST WANT TO MAKE CLEAR, THAT WAS AN

11:58AM 8    ASSUMPTION THAT YOU HAD IN THIS PROCESS, AND I BELIEVE YOUR

11:58AM 9    TESTIMONY YESTERDAY WAS THAT YOU DON'T RECALL HAVING A

11:58AM 10   DISCUSSION WITH THAT -- ABOUT THAT WITH THERANOS; IS THAT

11:58AM 11   CORRECT?

11:58AM 12   A.   I DON'T SPECIFICALLY RECALL THAT.  I DON'T SPECIFICALLY

11:58AM 13   RECALL THAT.  SO, YES, I DON'T SPECIFICALLY RECALL IN WHICH

11:58AM 14   MEETING OVER THE COURSE OF THIS DUE DILIGENCE PROCESS WE

11:58AM 15   ADDRESSED THAT SPECIFIC QUESTION.

11:58AM 16       BUT WE CERTAINLY ASKED MANY TIMES WHAT THE TECHNOLOGY

11:59AM 17   COULD DO, AND WHAT THE LIMITATIONS WERE.

11:59AM 18   Q.   RIGHT.  AND YOU UNDERSTOOD THE TECHNOLOGY PROCESSED

11:59AM 19   MICRO-SAMPLES; RIGHT?

11:59AM 20   A.   I UNDERSTOOD THE TECHNOLOGY SAMPLE TO BE WHAT?

11:59AM 21   Q.   THE TECHNOLOGY USED WAS A NANOTAINER; CORRECT?

11:59AM 22   A.   THAT WAS THE COLLECTION DEVICE THEY USED FOR DROPS OF

11:59AM 23   BLOOD, YES.

11:59AM 24   Q.   YEAH.  AND I BELIEVE YOUR TESTIMONY, BUT I WANT TO MAKE

11:59AM 25   SURE THAT I UNDERSTAND IT, YESTERDAY WAS YOU DON'T RECALL THE

11:59AM 1   TYPE OF VENOUS DRAW YOU PERSONALLY RECEIVED WHEN YOU WENT TO

11:59AM 2   WALGREENS IN PALO ALTO; IS THAT CORRECT?

11:59AM 3   A.   THAT'S CORRECT, I DO NOT.

11:59AM 4   Q.   I TAKE IT YOU DON'T RECALL IT BEING A VENOUS DRAW INTO A

11:59AM 5   SMALL NANOTAINER; CORRECT?

11:59AM 6   A.   I DON'T RECALL.

11:59AM 7   Q.   DO YOU THINK THAT IS SOMETHING THAT YOU WOULD HAVE

11:59AM 8   REMEMBERED?

11:59AM 9   A.   I DON'T REMEMBER.

11:59AM 10  Q.   OKAY.

11:59AM 11  A.   I DON'T REMEMBER.

11:59AM 12  Q.   IF YOU GO DOWN TO "OVERALL, I THINK THERE ARE QUITE A FEW

12:00PM 13  THINGS THEY CAN IMPROVE AND THE PROCESS WAS NOT COMPLICATED."

12:00PM 14       DO YOU SEE THAT?

12:00PM 15  A.   I DO.

12:00PM 16  Q.   AND DO YOU RECALL GENERALLY DR. RABODZEY'S REPORT THAT AT

12:00PM 17  THIS POINT THE PATIENT EXPERIENCE WAS FAR FROM PERFECT?

12:00PM 18  A.   AT -- I MEAN, I BELIEVE THIS WAS THE FIRST, THE FIRST PART

12:00PM 19  OF THE DAY ON A WEEKEND.  YES, THAT'S -- THAT WAS -- IT TOOK

12:00PM 20  30-SOMETHING MINUTES.

12:00PM 21       SO, YES, THAT WAS -- THERE WAS ROOM TO IMPROVE THE

12:00PM 22  PROCESS.

12:00PM 23  Q.   OKAY.  AND DO YOU RECALL THEN TAKING SOME OF THE QUESTIONS

12:00PM 24  THAT YOU HAD ABOUT VENOUS DRAWS AND RELAYING THEM TO

12:01PM 25  MR. BALWANI?

12:01PM 1     A.   MAYBE YOU COULD BE A LITTLE MORE SPECIFIC.

12:01PM 2     Q.   WHY DON'T WE TAKE A LOOK AT 1477, WHICH I BELIEVE IS IN

12:01PM 3     THE GOVERNMENT BINDER.

12:01PM 4     A.   OKAY.

12:01PM 5     Q.   AND DO YOU UNDERSTAND THIS TO BE AN INTERACTION THAT YOU

12:01PM 6     HAD WITH -- AN EMAIL THAT YOU HAD WITH MR. BALWANI IN LATE

12:01PM 7     JANUARY OF 2014 ON SOME OPEN DUE DILIGENCE ITEMS?

12:01PM 8     A.   I'M JUST GOING TO REVIEW IT FOR A SECOND.

12:02PM 9          OH, OKAY.

12:02PM 10    Q.   AND DO YOU RECALL THAT THIS WAS AN EMAIL WITH MR. BALWANI

12:02PM 11    IN LATE JANUARY 2014 WITH RESPECT TO SOME OPEN DUE DILIGENCE

12:02PM 12    ITEMS?

12:02PM 13    A.   I DO.

12:02PM 14             MR. WADE:  I MOVE THE ADMISSION OF 1477.

12:02PM 15             MR. LEACH:  NO OBJECTION, YOUR HONOR.

12:02PM 16             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:02PM 17         (GOVERNMENT'S EXHIBIT 1477 WAS RECEIVED IN EVIDENCE.)

12:02PM 18    BY MR. WADE:

12:02PM 19    Q.   AND I'D LIKE TO JUST CALL YOUR ATTENTION DOWN TO THE

12:02PM 20    BOTTOM PARAGRAPH THERE STARTING WITH "HOW DO THEY DEAL."

12:02PM 21         DO YOU SEE THAT?

12:02PM 22    A.   I DO.

12:02PM 23    Q.   AND IT NOTES -- YOU'RE POSING TO THE QUESTION TO HIM, "HOW

12:02PM 24    DO THEY DEAL WITH THE VENOUS DRAW ISSUE.  I HAD TESTS DONE

12:02PM 25    TODAY IN THE" -- IS THAT PALO ALTO WALGREENS?

12:02PM 1     A.   YES.

12:02PM 2     Q.   OKAY.

12:03PM 3          -- "AND HAD TO GET A VENOUS DRAW."

12:03PM 4          YOU WEREN'T OFFERED A FINGERSTICK.  AND THEN YOU HAD SOME

12:03PM 5     QUESTIONS RELATING TO HOW THAT WOULD IMPACT WHETHER OR NOT A

12:03PM 6     PHLEBOTOMIST WAS NEEDED; CORRECT?

12:03PM 7     A.   YES.

12:03PM 8     Q.   AND DO YOU RECALL THAT YOU THEN HAD A CONVERSATION WITH

12:03PM 9     MR. BALWANI ABOUT THAT?

12:03PM 10    A.   YES.

12:03PM 11    Q.   AND DO YOU RECALL THAT MR. BALWANI TOLD YOU THAT FOR SOME

12:03PM 12    TESTS THEY WERE STILL USING VENOUS DRAWS; CORRECT?

12:03PM 13    A.   HE SAID THAT 1 PERCENT OF PATIENTS WOULD REQUIRE A VENOUS

12:03PM 14    DRAW, YES, AND IT WOULD BE SIX MONTHS BEFORE THEY WOULD ADDRESS

12:03PM 15    THAT.

12:03PM 16    Q.   WELL, ACTUALLY, YOU RECALL THE CONVERSATION SPECIFICALLY?

12:03PM 17    A.   YES.

12:03PM 18    Q.   OKAY.  LET ME TAKE THIS ONE STEP AT A TIME.

12:03PM 19         DO YOU RECALL, FIRST OF ALL, THAT HE SAID THAT THEY WERE

12:03PM 20    STILL DOING VENOUS DRAWS, OR THEY WERE USING VENOUS DRAWS AT

12:03PM 21    THE WALGREENS LOCATIONS; RIGHT?

12:03PM 22    A.   YES.

12:03PM 23    Q.   AND THERE WAS A QUESTION ABOUT HOW THAT WAS GOING TO WORK

12:03PM 24    GOING FORWARD; CORRECT?

12:04PM 25    A.   YES.

12:04PM 1    Q.   AND HE TOLD YOU THAT IN -- HE TOLD YOU THAT THE GOAL WAS

12:04PM 2    WITHIN SIX MONTHS TO DRAMATICALLY REDUCE THE PERCENTAGE;

12:04PM 3    CORRECT?

12:04PM 4    A.   THAT'S CORRECT.

12:04PM 5    Q.   AND THAT THE GOAL WAS TO REDUCE IT TO 2 PERCENT VENOUS

12:04PM 6    DRAWS WITHIN SIX MONTHS; CORRECT?

12:04PM 7    A.   I BELIEVE HE SAID THAT THEY WERE AT 99 OR 98 PERCENT, AND

12:04PM 8    THEY HAD A PLAN WITHIN A FEW MONTHS TO GET TO 100 PERCENT.

12:04PM 9    Q.   WELL, ISN'T IT TRUE, SIR, THAT HE ACTUALLY SAID THAT

12:04PM 10   WITHIN SIX MONTHS THE GOAL WAS TO GET THE BLOOD DRAW UNDER

12:04PM 11   2 PERCENT?

12:04PM 12   A.   I MEAN, I DON'T REMEMBER SPECIFICALLY WHAT HE SAID.  MY

12:04PM 13   GENERAL MEMORY IS THAT THE NUMBER WAS 98 OR 99 PERCENT, AND HE

12:05PM 14   HAD A PLAN WITHIN A FEW MONTHS TO GET THAT NUMBER DOWN TO WHERE

12:05PM 15   1 OUT OF EVERY 100, OR LESS, OF PEOPLE THAT WOULD WALK INTO A

12:05PM 16   WALGREENS WOULD REQUIRE A VENOUS DRAW.

12:05PM 17   Q.   RIGHT.  BUT MY QUESTION IS A SPECIFIC ONE, AND IF YOU

12:05PM 18   DON'T RECALL, YOU DON'T RECALL.

12:05PM 19       BUT DO YOU REMEMBER HIM SAYING THAT IT WAS GOING TO TAKE

12:05PM 20   SIX MONTHS TO TRY TO GET THAT DOWN TO 2 PERCENT?

12:05PM 21   A.   WELL, I -- WE HAD MULTIPLE MEETINGS OVER THIS COURSE OF

12:05PM 22   THE DUE DILIGENCE.

12:05PM 23       SO I DON'T REMEMBER SPECIFICALLY WHAT MEETING YOU'RE

12:05PM 24   REFERRING TO, BUT I DO REMEMBER THAT THOSE NUMBERS I JUST --

12:05PM 25   THE ANSWER I JUST GAVE IS MY MEMORY OF HIS RESPONSE TO THIS

12:05PM  1      PARTICULAR QUESTION.

12:05PM  2      Q.   AND IF WE CAN GO NEXT TO 14073, WHICH I BELIEVE --

12:06PM  3      A.   THE GOVERNMENT ONE?

12:06PM  4      Q.   I BELIEVE THE GOVERNMENT HAS STIPULATED TO THIS.

12:06PM  5           MR. LEACH:  ONE MOMENT, YOUR HONOR.

12:06PM  6      (PAUSE IN PROCEEDINGS.)

12:06PM  7           MR. LEACH:  NO OBJECTION, YOUR HONOR.

12:06PM  8           THE COURT:  THIS IS ADMITTED.  IT MAY BE PUBLISHED.

12:06PM  9      (DEFENDANT'S EXHIBIT 14073 WAS RECEIVED IN EVIDENCE.)

12:06PM 10           MR. WADE:  ACTUALLY, IF WE CAN NOT PUBLISH IT FOR

12:06PM 11      JUST A MOMENT.  LET ME ASK SOME QUESTIONS.

12:06PM 12      Q.   DO YOU RECALL THAT IN CONNECTION WITH YOUR DUE DILIGENCE

12:06PM 13      PROCESS THAT YOU ACTUALLY -- ONE OF THE THINGS YOU DID WAS THAT

12:06PM 14      YOU INTERACTED WITH YOUR OWN PERSONAL DOCTOR ABOUT THE

12:06PM 15      EXPERIENCE AND WHAT YOUR DOCTOR THOUGHT ABOUT THE EXPERIENCE?

12:06PM 16      A.   I DID HAVE A, A FRIEND OF MINE WHO WAS A PHYSICIAN ORDER

12:07PM 17      SOME TESTS FOR ME, YES.

12:07PM 18      Q.   OKAY.  ARE YOU COMFORTABLE WITH US PUBLISHING THIS EMAIL,

12:07PM 19      OR WOULD YOU PREFER THAT WE NOT?

12:07PM 20      A.   I WOULD PREFER NOT.

12:07PM 21      Q.   OKAY.  OKAY.  LET ME JUST ASK YOU SOME QUESTIONS ABOUT IT

12:07PM 22      IN THAT CASE.

12:07PM 23           DO YOU RECALL THAT -- YOU TALKED WITH THIS FRIEND WHO WAS

12:07PM 24      A PHYSICIAN AFTER YOU GOT THE BLOOD TEST RESULTS BACK; IS THAT

12:07PM 25      RIGHT?

12:07PM   1    A.   I DON'T REMEMBER SPECIFICALLY.

12:07PM   2    Q.   OKAY.  DO YOU RECALL YOUR BLOOD TESTS BEING GENERALLY

12:07PM   3    CONSISTENT WITH OTHER BLOOD TESTS YOU HAD PREVIOUSLY RECEIVED?

12:07PM   4    A.   I DON'T REMEMBER.

12:07PM   5    Q.   AND DO YOU RECALL WHETHER THE DOCTOR WHO YOU INTERACTED

12:07PM   6    WITH WAS GENERALLY FAVORABLE ABOUT THE THERANOS CONCEPT?

12:07PM   7    A.   I DON'T REMEMBER.

12:07PM   8    Q.   OKAY.  I WANT TO SWITCH TOPICS FOR A SECOND.

12:08PM   9         THE COURT:  LET ME JUST -- JUST BASED ON

12:08PM  10    MR. GROSSMAN'S WISHES, THIS HAS BEEN INTRODUCED BY STIPULATION,

12:08PM  11    BUT YOU'LL NEED TO REDACT THIS INFORMATION IN THE MIDDLE.

12:08PM  12         MR. WADE:  IT'S ACTUALLY ALL REDACTED, YOUR HONOR.

12:08PM  13      AND IF THE GOVERNMENT CONSENTS, GIVEN THE WITNESS'S

12:08PM  14    PREFERENCE, I'LL WITHDRAW IT FROM EVIDENCE AND -- JUST GIVEN

12:08PM  15    THE WITNESS'S PREFERENCE.

12:08PM  16         THE COURT:  ALL RIGHT.  ANY OBJECTION TO THAT?

12:08PM  17         MR. LEACH:  I DON'T OBJECT TO IT BEING WITHDRAWN,

12:08PM  18    YOUR HONOR.

12:08PM  19      I MAY HAVE QUESTIONS ON REDIRECT ABOUT SOME OF THE

12:08PM  20    SUBSTANCE, BUT I THINK WE CAN DO THAT WITHOUT PUBLISHING IT.

12:08PM  21         THE COURT:  ALL RIGHT.  THANK YOU.  THEN THIS

12:08PM  22    EXHIBIT 14073 IS WITHDRAWN WITH CONSENT OF THE PARTIES.

12:08PM  23      (DEFENDANT'S EXHIBIT 14073 WAS WITHDRAWN.)

12:08PM  24         MR. WADE:  THANK YOU, YOUR HONOR.

12:08PM  25    Q.   DO YOU RECALL YESTERDAY YOU TALKED A LITTLE BIT ABOUT

12:08PM  1    DR. ROBERTSON?

12:08PM  2    A.   YES.

12:08PM  3    Q.   OR MAYBE PROFESSOR CHANNING ROBERTSON, JUST SO WE'RE ALL

12:09PM  4    ON THE SAME PAGE.

12:09PM  5        DO YOU RECALL THAT?

12:09PM  6    A.   YES, I DO.

12:09PM  7    Q.   AND DR. ROBERTSON, YOU UNDERSTOOD HE WAS ON THE FACULTY AT

12:09PM  8    STANFORD FOR MANY DECADES?

12:09PM  9    A.   I DID.

12:09PM  10   Q.   AND A PROFESSOR OF CHEMICAL ENGINEERING OVER THERE?

12:09PM  11   A.   YES.

12:09PM  12   Q.   AND THAT HE WAS GENERALLY, I THINK YOU SAID, A VERY

12:09PM  13   WELL-THOUGHT OF GUY WITHIN THE LOCAL SCIENTIFIC COMMUNITY?

12:09PM  14   A.   YES.

12:09PM  15   Q.   AND I DON'T WANT TO GO THROUGH -- YOU TESTIFIED YESTERDAY,

12:09PM  16   AND I DON'T WANT TO RE-PLOW THE SAME GROUND.  I JUST HAVE A

12:09PM  17   COUPLE OF SPECIFIC QUESTIONS.

12:09PM  18        DO YOU RECALL THAT WHEN YOU TALKED WITH HIM ABOUT

12:09PM  19   THERANOS, YOU ALSO ASKED HIM SOME QUESTIONS ABOUT MS. HOLMES

12:10PM  20   PERSONALLY?

12:10PM  21   A.   YES.

12:10PM  22   Q.   AND DO YOU RECALL HIM TELLING YOU THAT IN HIS OVER

12:10PM  23   50 YEARS AT STANFORD, HE NEVER ENCOUNTERED ANYTHING LIKE HER?

12:10PM  24   A.   I VAGUELY REMEMBER SOMETHING TO THAT EFFECT, YES.

12:10PM  25   Q.   AND THAT HE HAD A HIGH DEGREE OF CONFIDENCE IN HER AND THE

12:10PM  1    MANAGEMENT TEAM AT THERANOS?

12:10PM  2    A.   YES.

12:10PM  3    Q.   AND I THINK YOU TALKED ABOUT HIM IDENTIFYING PATIENT

12:10PM  4    EXPERIENCE AS ONE OF THE RISKS THAT HE IDENTIFIED; RIGHT?

12:10PM  5    A.   YES.

12:10PM  6    Q.   AND HE ALSO SAW A POTENTIAL RISK WITH RESPECT TO SCALING;

12:10PM  7    IS THAT RIGHT?

12:10PM  8    A.   I BELIEVE THAT'S RIGHT, YES.

12:10PM  9    Q.   AND THE PROFESSOR -- ONE OF THE WAYS YOU GOT TO KNOW

12:10PM  10   PROFESSOR ROBERTSON WAS BECAUSE HE WAS ACTUALLY FRIENDLY WITH

12:11PM  11   YOUR FATHER-IN-LAW; IS THAT RIGHT?

12:11PM  12   A.   THEY WERE NEIGHBORS.

12:11PM  13   Q.   NEIGHBORS IN HOUSE OR IN OFFICES AT STANFORD?

12:11PM  14   A.   IN -- ON THEIR STREET.

12:11PM  15   Q.   ON THEIR STREET.  OKAY.

12:11PM  16   A.   YEAH.

12:11PM  17   Q.   AND YOUR FATHER IS A -- YOUR FATHER-IN-LAW IS A VERY

12:11PM  18   DISTINGUISHED PROFESSOR OF POLITICAL SCIENCE AND A FELLOW AT

12:11PM  19   THE HOOVER INSTITUTE AT STANFORD; CORRECT?

12:11PM  20   A.   HE USED TO BE.

12:11PM  21   Q.   HE USED TO BE.  HE'S RETIRED?

12:11PM  22   A.   UH-HUH.

12:11PM  23   Q.   OKAY.  AND IF WE CAN GO TO EXHIBIT 7398.

12:12PM  24        DO YOU RECALL THAT IT WAS -- IS THIS AN EMAIL WHERE YOUR

12:12PM  25   FATHER-IN-LAW WAS PROVIDING INFORMATION AND HELPING FACILITATE

12:12PM 1    AN INTRODUCTION TO PROFESSOR ROBERTSON?

12:12PM 2    A.   YES, IT IS.

12:12PM 3    Q.   OKAY.

12:12PM 4         MOVE TO ADMIT 7398.

12:12PM 5             MR. LEACH:  NO OBJECTION, YOUR HONOR.

12:12PM 6             THE COURT:  WHAT'S THE RELEVANCE OF THIS?

12:12PM 7             MR. WADE:  THE RELEVANCE IS THAT --

12:12PM 8             THE COURT:  HE JUST ANSWERED THE QUESTION THAT THERE

12:12PM 9    WAS THE INTRODUCTION.

12:12PM 10        AND WHY IS THIS NECESSARY?

12:12PM 11            MR. WADE:  I HAVE SOME SPECIFIC QUESTIONS ABOUT

12:12PM 12   INFORMATION THAT IS REFERRED TO IN THE EMAIL.

12:12PM 13        (PAUSE IN PROCEEDINGS.)

12:13PM 14            MR. WADE:  I CAN TRY TO ASK QUESTIONS WITHOUT

12:13PM 15   ADMITTING THE EMAIL IF THERE'S SOME CONCERN THE COURT

12:13PM 16   IDENTIFIES.

12:13PM 17   Q.   JUST SO WE'RE -- YOUR FATHER-IN-LAW ENDED UP INVESTING IN

12:13PM 18   THERANOS AS WELL; IS THAT CORRECT?

12:13PM 19   A.   YES, HE DID.

12:13PM 20   Q.   THROUGH PFM; RIGHT?

12:13PM 21   A.   THROUGH PFM, YES.

12:13PM 22            THE COURT:  IS THAT IT?

12:13PM 23            MR. WADE:  I MEAN, I THINK I'VE LAID THE --

12:13PM 24            THE COURT:  THERE'S A PHONE NUMBER HERE.  I ASSUME

12:13PM 25   YOU'RE GOING TO REDACT THAT.

GROSSMAN CROSS BY MR. WADE (RES.)

12:13PM  1          MR. WADE:  YES.

12:13PM  2          THE COURT:  ALL RIGHT.  WITH THAT REDACTION, IT'S

12:13PM  3     ADMITTED, AND IT MAY BE PUBLISHED.

12:13PM  4          MR. WADE:  THANK YOU, YOUR HONOR.

12:13PM  5          (DEFENDANT'S EXHIBIT 7398 WAS RECEIVED IN EVIDENCE.)

12:13PM  6     BY MR. WADE:

12:13PM  7     Q.   AND IN THIS EMAIL, YOU SEE WHERE YOUR FATHER-IN-LAW

12:13PM  8     MENTIONS THAT PROFESSOR ROBERTSON HEADED BIO X AT STANFORD?

12:14PM  9     A.   I DO SEE THAT, YES.

12:14PM 10     Q.   AND DO YOU KNOW WHAT BIO X WAS?

12:14PM 11     A.   I DON'T RECALL.

12:14PM 12     Q.   OKAY.  DID YOU RECALL WHETHER YOU DID ANY RESEARCH INTO

12:14PM 13     WHAT IT WAS?

12:14PM 14     A.   NO.

12:14PM 15     Q.   AND I THINK YOU HAD TESTIFIED THAT YOU HAD ACTUALLY

12:14PM 16     ENCOUNTERED PROFESSOR ROBERTSON WITH RESPECT TO SOME COMPANIES

12:14PM 17     SORT OF INDEPENDENTLY AS WELL, SOME COMPANIES THAT YOU HAD

12:14PM 18     WORKED WITH?

12:14PM 19     A.   WELL, I THINK WHAT I TESTIFIED WAS THAT HE HAD BEEN

12:14PM 20     INVOLVED IN HELPING TO START AND ADVISE COMPANIES IN THE HEALTH

12:14PM 21     CARE SECTOR, BIOTECHNOLOGY SECTOR FOR MANY YEARS.

12:14PM 22     Q.   OKAY.  AND THIS CONVERSATION -- DO YOU RECALL THAT THIS

12:14PM 23     CONVERSATION OCCURRED ABOUT A WEEK AFTER YOUR FATHER-IN-LAW

12:14PM 24     INTRODUCED YOU TO PROFESSOR ROBERTSON?

12:14PM 25     A.   I DON'T RECALL THE SPECIFIC DATE.

12:14PM  1    Q.   JUST TO REFRESH YOUR RECOLLECTION, IF YOU COULD TAKE A

12:14PM  2    LOOK AT EXHIBIT 783, WHICH I THINK IS IN YOUR BINDER.  IT MIGHT

12:15PM  3    BE IN THE GOVERNMENT BINDERS ACTUALLY.

12:15PM  4            THE CLERK:  COUNSEL, EXHIBIT 783?

12:15PM  5            MR. WADE:  783, WHICH IS NOT IN EVIDENCE.

12:15PM  6    Q.   AND I REALLY JUST WANT YOU TO LOOK AT THE TOP HEADING OF

12:15PM  7    THE PAGE.

12:15PM  8    A.   OKAY.  I SEE 783, YES.

12:15PM  9    Q.   AND DOES THAT REFRESH YOUR RECOLLECTION THAT YOUR FIRST

12:15PM 10    CONVERSATION WITH PROFESSOR ROBERTSON WAS ON JANUARY 25TH,

12:15PM 11    2013?

12:15PM 12    A.   YES, IT DOES.

12:15PM 13    Q.   OKAY.  AND YOU THINK IT WAS ON THAT DATE?

12:15PM 14    A.   I MEAN, I -- I'M NOT ALWAYS GREAT AT REMEMBERING EXACTLY

12:15PM 15    WHAT DATE IT IS, BUT IT PROBABLY IS PRETTY CLOSE.

12:15PM 16    Q.   OKAY.  FAIR ENOUGH.

12:15PM 17            AND YOU REPORTED OUT ON THIS CONVERSATION TO SOME OF THE

12:16PM 18    MEMBERS OF YOUR TEAM.

12:16PM 19            DO YOU RECALL THAT?

12:16PM 20    A.   I DON'T RECALL, NO.

12:16PM 21    Q.   OKAY.  I'D LIKE TO TURN YOUR ATTENTION TO 14072, WHICH I

12:16PM 22    BELIEVE THE GOVERNMENT HAS STIPULATED TO.

12:16PM 23            MR. LEACH:  THAT'S CORRECT, YOUR HONOR.

12:16PM 24        (PAUSE IN PROCEEDINGS.)

12:16PM 25            THE COURT:  THIS IS ADMITTED.  IT MAY BE PUBLISHED.

12:16PM 1        (DEFENDANT'S EXHIBIT 14072 WAS RECEIVED IN EVIDENCE.)

12:16PM 2            THE WITNESS:  OKAY.

12:16PM 3    BY MR. WADE:

12:16PM 4    Q.   OKAY.  AND THIS IS AN EMAIL FROM YOU TO MR. JAMES ON THE

12:17PM 5    26TH OF JANUARY, 2014; CORRECT?

12:17PM 6    A.   YES.

12:17PM 7    Q.   AND THAT'S ABOUT TEN DAYS BEFORE THE INVESTMENT DECISION;

12:17PM 8    CORRECT?

12:17PM 9    A.   YES.

12:17PM 10   Q.   AND IN HERE YOU TALK ABOUT SOME SCHEDULING MATTERS

12:17PM 11   RELATING TO A PRESENTATION THAT WAS GOING TO BE GIVEN AT PFM

12:17PM 12   RELATING TO THERANOS; RIGHT?

12:17PM 13   A.   YES, THAT APPEARS TO BE THE CASE.

12:17PM 14   Q.   AND THEN I WANT TO JUST FOCUS ON THAT SECOND PARAGRAPH.

12:17PM 15   YOU NOTE, "VALUATION AND TERMS ASIDE, WHICH ARE OBVIOUSLY TOUGH

12:17PM 16   TO SWALLOW."

12:17PM 17       AND LET ME JUST PAUSE THERE FOR A SECOND.  YOU RECALL YOU

12:18PM 18   WERE HAVING SOME UNCERTAINTY AS TO WHETHER YOU WERE COMFORTABLE

12:18PM 19   PAYING THE AMOUNT THAT THERANOS WAS ASKING, THAT $17 A SHARE?

12:18PM 20   A.   UM, YES.

12:18PM 21   Q.   AND YOU WERE GOING THROUGH THE ANALYTICS TO SEE WHETHER IT

12:18PM 22   WAS WORTH THE INVESTMENT; IS THAT FAIR?

12:18PM 23   A.   YES.

12:18PM 24   Q.   OKAY.  AND THEN YOU SAY WHILE THAT'S TOUGH TO SWALLOW,

12:18PM 25   YOU'RE FEELING EVEN BETTER ABOUT THAT NOW.  "I HAD A MIND

12:18PM   1      BLOWING CALL YESTERDAY WITH ELIZABETH'S PROFESSOR WHO HELPED

12:18PM   2      HER START THIS.  WAS THE ORIGINAL BOARD MEMBER."

12:18PM   3           RIGHT?

12:18PM   4      A.   YES.

12:18PM   5      Q.   AND IS THAT A FAIR DESCRIPTION OF HOW YOU FELT ABOUT THE

12:18PM   6      CONVERSATION, IT WAS A MIND BLOWING CONVERSATION?

12:18PM   7      A.   IT WAS A POSITIVE CALL.

12:18PM   8      Q.   AND YOU THEN GO ON IN THIS EMAIL TO TALK ABOUT THE

12:18PM   9      RELEVANT COMP GROUP TO USE.

12:19PM  10           DO YOU SEE THAT?

12:19PM  11      A.   I DO SEE THAT.

12:19PM  12      Q.   AND WHAT DO YOU MEAN BY "THE RELEVANT COMP GROUP" IN THAT

12:19PM  13      EMAIL?

12:19PM  14      A.   WE'RE TRYING TO FIND OPEN ENDED, BEST OF BREED, DISRUPTIVE

12:19PM  15      COMPANIES AS A WAY TO THINK ABOUT HOW THE PUBLIC MARKET WILL

12:19PM  16      VALUE A COMPANY THAT HAS THIS TYPE OF TECHNOLOGY THAT IS THIS

12:19PM  17      OPEN ENDED THAT HAS REALLY A GLOBAL OPPORTUNITY.

12:19PM  18           AND SO THAT WAS THE, THAT WAS THE IDEA BEHIND THAT

12:19PM  19      STATEMENT.

12:19PM  20      Q.   OKAY.  AND YOU'RE INTERACTING WITH MR. JAMES, WHO WAS

12:19PM  21      ANOTHER SENIOR PRINCIPAL WITHIN PFM; CORRECT?

12:19PM  22      A.   YES.

12:19PM  23      Q.   AND IS IT FAIR TO SAY THAT YOU TWO WERE KIND OF THE SENIOR

12:19PM  24      PEOPLE AT PFM AT THIS TIME?

12:19PM  25      A.   YES.

12:19PM 1    Q.   AND YOU'RE TALKING ABOUT WHICH GROUP OF COMPARATOR

12:19PM 2    COMPANIES TO USE HERE.

12:20PM 3         AND, AND THE -- THERE ARE THREE COMPANIES IDENTIFIED

12:20PM 4    THERE.

12:20PM 5         AND ARE THOSE TICKER SYMBOLS?

12:20PM 6    A.   THOSE ARE TICKER SYMBOLS, THAT'S RIGHT.

12:20PM 7    Q.   AND COULD YOU TELL US WHICH COMPANIES THOSE ARE?

12:20PM 8    A.   THE FIRST ONE IS GOOGLE; THE SECOND ONE IS FACEBOOK; AND

12:20PM 9    THEN THE THIRD ONE, ILMN, IS A COMPANY CALLED ILLUMINA.

12:20PM 10   Q.   OKAY.  AND THOSE WERE VERY SUCCESSFUL COMPANIES WITHIN

12:20PM 11   SILICON VALLEY; IS THAT CORRECT?

12:20PM 12   A.   THEY WERE OPEN ENDED, DISRUPTIVE, BEST OF BREED

12:20PM 13   BUSINESSES.

12:20PM 14   Q.   AND YOU HEARD THEM REFERRED TO AS UNICORNS?

12:20PM 15   A.   I DON'T KNOW IF THEY WERE ALL REFERRED TO AS UNICORNS.  I

12:20PM 16   DON'T THINK THEY WERE.

12:20PM 17   Q.   AND PART OF THE REASON THAT YOU WERE LOOKING AT THIS IS IN

12:20PM 18   CONNECTION WITH TRYING TO FIND THE APPROPRIATE VALUATION FOR

12:20PM 19   THE COMPANY; IS THAT RIGHT?

12:20PM 20   A.   NO.

12:20PM 21   Q.   OKAY.  YOU'RE USING IT TO TRY TO MODEL OUT HOW THERANOS

12:21PM 22   MIGHT COMPARE IN VALUE TO THESE SIMILAR COMPANIES?

12:21PM 23   A.   WE'RE TRYING TO UNDERSTAND HOW PUBLIC MARKET INVESTORS,

12:21PM 24   WHEN THEY HEAR THIS INCREDIBLE OPEN ENDED STORY, WHAT THE

12:21PM 25   TECHNOLOGY COULD DO, THE GLOBAL NATURE OF IT, HOW MUCH BETTER

12:21PM 1    IT IS FROM A CONSUMER EXPERIENCE, WE WERE TRYING TO GET A SENSE

12:21PM 2    OF HOW OTHER INVESTORS WOULD REACT TO A REAL OPEN ENDED,

12:21PM 3    DISRUPTIVE BUSINESS LIKE THIS.

12:21PM 4    Q.   OKAY.  AND YOU -- AND AS PART OF THAT, YOU DID A FINANCIAL

12:21PM 5    ANALYSIS RELATING TO THE PERFORMANCE OF THOSE COMPANIES AND THE

12:21PM 6    VALUATION OF THOSE COMPANIES OVER TIME?

12:21PM 7    A.   I BELIEVE WE LOOKED AT THE REVENUES FROM THOSE BUSINESSES.

12:21PM 8    Q.   AND THAT WAS IN CONNECTION WITH SOME OF THE FINANCIAL

12:22PM 9    MODELING THAT YOU DID THAT YOU TALKED ABOUT YESTERDAY; IS THAT

12:22PM 10   RIGHT?

12:22PM 11   A.   THAT IS CORRECT.

12:22PM 12   Q.   AND THERE WAS -- YOU ALSO LOOKED AT THE INFORMATION THAT

12:22PM 13   THERANOS PROVIDED YOU WITH RESPECT TO ITS MODEL; RIGHT?

12:22PM 14   A.   YES.

12:22PM 15   Q.   AND THEY GAVE YOU THE ELECTRONIC FILE SO THAT YOU COULD

12:22PM 16   HAVE ALL OF THE DATA THAT WENT INTO THEIR MODEL; IS THAT RIGHT?

12:22PM 17   A.   THAT IS RIGHT.

12:22PM 18   Q.   AND MR. LEACH ASKED YOU SOME QUESTIONS ABOUT THAT

12:22PM 19   YESTERDAY, BUT I'LL CONFESS THAT THE FONT WAS SO SMALL, I

12:22PM 20   COULDN'T, I COULDN'T SEE IT.

12:22PM 21       SO I'VE GOTTEN, WITH THE GOVERNMENT'S STIPULATION, THE

12:22PM 22   ELECTRONIC FILE AND I'LL PUT THE SPREADSHEET UP.  IT MIGHT BE A

12:22PM 23   LITTLE EASIER TO READ.

12:22PM 24       YOUR HONOR, WITH STIPULATION FROM THE GOVERNMENT, I WOULD

12:22PM 25   MOVE THE ADMISSION OF EXHIBIT 13720A.

GROSSMAN CROSS BY MR. WADE (RES.)

12:23PM  1    MR. LEACH:  NO OBJECTION, YOUR HONOR.

12:23PM  2    THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

12:23PM  3    (DEFENDANT'S EXHIBIT 13720A WAS RECEIVED IN EVIDENCE.)

12:23PM  4  BY MR. WADE:

12:23PM  5  Q.   DO YOU RECOGNIZE THIS TO BE THE MODEL THAT WAS PROVIDED TO

12:23PM  6  YOU BY THERANOS?

12:23PM  7  A.   YES.

12:23PM  8  Q.   OKAY.  AND JUST SO WE'RE CLEAR, IN TERMS OF THE ITEMS THAT

12:23PM  9  I'VE JUST MENTIONED, THERE ARE -- YOU UNDERSTAND THAT THE MODEL

12:23PM  10  IS BASED UPON DIFFERENT ASSUMPTIONS; CORRECT?

12:23PM  11  A.   THE PROJECTIONS WERE BASED ON DIFFERENT ASSUMPTIONS.

12:23PM  12  Q.   RIGHT.  WHEN YOU'RE MODELING FUTURE PERFORMANCE, YOU'RE

12:23PM  13  DOING IT BASED UPON CERTAIN ASSUMPTIONS; RIGHT?

12:23PM  14  A.   YES.

12:23PM  15  Q.   AND THERANOS INCLUDED IN THE MODEL THAT THEY SENT YOU ALL

12:23PM  16  OF THE ASSUMPTIONS HERE WITH RESPECT TO WHAT WENT INTO THEIR

12:23PM  17  MODEL; CORRECT?

12:23PM  18  A.   THAT IS CORRECT.

12:24PM  19  Q.   AND SO THAT GAVE YOU THE ABILITY TO ASK QUESTIONS ABOUT

12:24PM  20  ANY OF THE ASSUMPTIONS IF YOU WEREN'T CLEAR ON WHY THEY WERE

12:24PM  21  USING PARTICULAR ASSUMPTIONS; RIGHT?

12:24PM  22  A.   THAT WOULD GIVE US THE ABILITY TO DO THAT, YES.

12:24PM  23  Q.   AND, IN FACT, YOU DID ASK THEM SOME QUESTIONS ABOUT THEIR

12:24PM  24  ASSUMPTIONS; RIGHT?

12:24PM  25  A.   WE DID ASK THE QUESTIONS, YES.

12:24PM  1    Q.   AND THEY ALSO -- SOME OF THIS DATA YOU CONSIDERED IN

12:24PM  2    CONNECTION WITH PREPARATION OF YOUR OWN MODEL; IS THAT RIGHT?

12:24PM  3    A.   YES.

12:24PM  4    Q.   BUT YOU ALSO WENT OUT AND GOT SIGNIFICANT ADDITIONAL DATA

12:24PM  5    THAT YOU FACTORED INTO YOUR PROPRIETARY ANALYSIS; RIGHT?

12:24PM  6    A.   YES.

12:24PM  7    Q.   OKAY.  AND MR. LEACH ASKED YOU SOME QUESTIONS ABOUT, I

12:24PM  8    THINK IT WAS ON THIS SHEET HERE, RELATING TO THE MINILAB COSTS

12:24PM  9    OR THE MINILAB PRODUCTION COSTS.

12:25PM 10        MAYBE IT WAS -- DO YOU RECALL THAT?

12:25PM 11    A.   YES, I DO.

12:25PM 12    Q.   AND I JUST WANT TO ASK SOME OTHER -- SOME QUESTIONS

12:25PM 13    RELATED TO THAT.

12:25PM 14        DO YOU SEE I HAVE UP THE SUMMARY CASH FLOW STATEMENT TAB

12:25PM 15    OF THE SPREADSHEET?

12:25PM 16    A.   I DO, YES.

12:25PM 17    Q.   AND DO YOU SEE IT TALKS ABOUT DIFFERENT CAPITAL

12:25PM 18    EXPENDITURES?

12:25PM 19    A.   I DO.

12:25PM 20    Q.   AND DID YOU HAVE ANY DISCUSSION WITH MR. BALWANI ABOUT THE

12:25PM 21    LINES OF PRODUCTION CAPITAL EXPENDITURES?

12:25PM 22    A.   I BELIEVE WE TALKED ABOUT THAT, YES.

12:25PM 23    Q.   AND YOU HAD ACTUALLY -- I THINK YESTERDAY YOU SAID YOU

12:25PM 24    WENT AND LOOKED AT THEIR PRODUCTION FACILITY.

12:25PM 25        DO YOU RECALL THAT?

12:25PM  1    A.   I DO RECALL SAYING THAT YESTERDAY.

12:25PM  2    Q.   AND THAT, AND THAT MR. BALWANI SAID THAT THEY ALREADY HAD

12:25PM  3    THE CAPABILITY TO PRODUCE A PRETTY HIGH VOLUME OF MINILABS

12:26PM  4    WITHIN THAT FACILITY?

12:26PM  5    A.   WELL, HE -- I BELIEVE WHAT HE TOLD US WAS THAT THERE WOULD

12:26PM  6    BE NO PROBLEM PRODUCING MINILABS TO MEET THE NEEDS OF BOTH THE

12:26PM  7    RETAIL ROLLOUT --

12:26PM  8    Q.   OKAY.

12:26PM  9    A.   -- AND THE HOSPITAL ROLLOUT.

12:26PM  10   Q.   OKAY.  AND DID YOU ASK HIM WHETHER THE LINES OF PRODUCTION

12:26PM  11   AND CAPITAL EXPENDITURE INCLUDED ANYTHING RELATING TO ANY

12:26PM  12   COMMERCIAL DEVICES?

12:26PM  13   A.   WE DID NOT.

12:26PM  14   Q.   AND SOMEWHAT RELATED TO THIS, IN ALL OF THAT DATA THAT

12:26PM  15   DR. RABODZEY WAS REVIEWING --

12:26PM  16   A.   THAT WOULD BE A SEPARATE ITEM ON A CAPITAL EXPENDITURE.

12:26PM  17   YOU WOULD NOT PUT OTHER PRODUCTION LINES.  YOU WOULD NOT PUT

12:26PM  18   THIRD PARTY EQUIPMENT IN THE LINES OF PRODUCTION.  THAT WOULD

12:26PM  19   BE -- UNDER ACCOUNTING PRINCIPLES, THAT WOULD BE A SEPARATE

12:26PM  20   LINE ITEM.

12:26PM  21        LINES OF PRODUCTION RELATE TO INCREASING THE MANUFACTURING

12:27PM  22   FACILITY THAT IS MAKING THE MINILABS.

12:27PM  23             THE COURT:  DOES THIS ASSIST YOUR PREVIOUS QUESTION?

12:27PM  24             MR. WADE:  THERE WAS NOT A PREVIOUS QUESTION FOR

12:27PM  25   THAT ANSWER, SO JUST MOVE TO STRIKE THAT ANSWER.

12:27PM  1          THE COURT:  MY QUESTION WAS, DOES THIS ASSIST YOUR

12:27PM  2   PREVIOUS QUESTION?

12:27PM  3          MR. WADE:  IT DOESN'T.

12:27PM  4          THE COURT:  ALL RIGHT.  THANK YOU.

12:27PM  5          MR. LEACH:  I THINK IT'S RESPONSIVE, YOUR HONOR.  HE

12:27PM  6   SHOULD BE ALLOWED TO ANSWER.

12:27PM  7          THE COURT:  WELL, HE DID RESPOND TO THE PREVIOUS

12:27PM  8   QUESTION IN THE MIDDLE OF YOUR CURRENT QUESTION, AND I'LL ALLOW

12:27PM  9   IT TO REMAIN FOR EXPLANATION OF THE BOX.  YOU CAN RETURN TO IT

12:27PM 10   IF YOU WISH.

12:27PM 11       BUT LET'S FINISH WITH YOUR PREVIOUS QUESTION.

12:27PM 12          MR. WADE:  BEFORE I FORGET IT.

12:27PM 13   Q.   THAT DATA COMPARED THERANOS'S ASSAYS ON FINGERSTICK TO A

12:27PM 14   PREDICATE ASSAY.

12:27PM 15       DO YOU RECALL THAT?

12:27PM 16   A.   CAN YOU BE A LITTLE MORE SPECIFIC?

12:27PM 17   Q.   YEAH.  SORT OF THE CORE OF THE PURPOSE OF THE DATA THAT

12:27PM 18   THERANOS WAS PROVIDING YOU WAS TO SHOW HOW THE PERFORMANCE OF

12:28PM 19   ITS FINGERSTICK ASSAYS COMPARED TO THE PERFORMANCE OF

12:28PM 20   TRADITIONAL VENOUS ASSAYS?

12:28PM 21   A.   ARE WE TALKING ABOUT THE PRESENTATION THAT MR. -- THAT

12:28PM 22   DR. RABODZEY REVIEWED?

12:28PM 23   Q.   YEAH.

12:28PM 24   A.   OKAY.  YES, THAT'S MY GENERAL UNDERSTANDING.

12:28PM 25   Q.   YOU UNDERSTAND THAT THE BASIC PREMISE WAS ON AN

12:28PM 1    ASSAY-BY-ASSAY BASIS THAT WAS SHOWING YOU HOW THERANOS'S ASSAYS

12:28PM 2    PERFORM TO PREDICATE FDA APPROVED ASSAYS; RIGHT?

12:28PM 3    A.   I DON'T REMEMBER.  I DON'T REMEMBER SPECIFICALLY WHAT THAT

12:28PM 4    WAS MEASURING.

12:28PM 5    Q.   OKAY.  DID YOU KNOW IT WAS COMPARING FINGERSTICK ASSAYS TO

12:28PM 6    TRADITIONAL ASSAYS?

12:28PM 7    A.   WELL, I JUST -- DR. RABODZEY WAS THE ONE THAT REVIEWED

12:28PM 8    THAT DATA FOR US, SO I DON'T WANT TO SPEAK FOR HIM IN TERMS OF

12:28PM 9    WHAT HE WAS REVIEWING.

12:28PM 10       WE ASKED FOR DATA ON THE ACCURACY OF THEIR PROPRIETARY

12:28PM 11   TECHNOLOGY, AND THAT'S WHAT WE ASSUMED THEY GAVE US.

12:28PM 12   Q.   OKAY.  FAIR ENOUGH.

12:28PM 13       DO YOU SEE ON THE SUMMARY CASH FLOW STATEMENT TAB OF

12:29PM 14   EXHIBIT 13720A THIS BREAKS OUT DIFFERENT CASH FLOW FOR

12:29PM 15   DIFFERENT PERIODS.

12:29PM 16       DO YOU SEE THAT?

12:29PM 17   A.   I DO SEE THAT.

12:29PM 18   Q.   AND YOU SEE THERE'S NO CASH FLOW IDENTIFIED IN 2014 AND

12:29PM 19   '15 RELATING TO WALGREENS; CORRECT?

12:29PM 20   A.   THAT IS CORRECT.

12:29PM 21   Q.   AND I JUST WANT TO GO TO THE BALANCE SHEET TAB OF THE SAME

12:29PM 22   EXHIBIT.

12:29PM 23       DO YOU SEE THAT?

12:29PM 24   A.   I DO SEE THE BALANCE SHEET TAB, YES.

12:29PM 25   Q.   OKAY.  AND YOU'LL FORGIVE ME FOR ASKING SOME OF THESE

12:29PM 1    QUESTIONS, BUT I JUST NEED TO MAKE SURE THE RECORD IS CLEAR.

12:29PM 2    A.   YEP, I SEE THAT.

12:29PM 3    Q.   OKAY.  AND DO YOU SEE THAT THERE'S DEFERRED REVENUE THERE

12:29PM 4    IN THE AMOUNT OF ABOUT $184 MILLION?

12:29PM 5    A.   I DO SEE THAT.

12:29PM 6    Q.   OKAY.  THE -- IF I CAN, I'D LIKE TO FLIP TO YOUR MODEL IN

12:30PM 7    A SECOND, BUT DO YOU SEE THAT THIS HAS MACRO -- THIS MODEL,

12:30PM 8    WHICH IS 13720A, HAS A MACRO ASSUMPTIONS TAB, A THERANOS MARKET

12:30PM 9    ASSUMPTIONS TAB, PRO FORMA INCOME STATEMENT TAB, SUMMARY CASH

12:30PM 10   FLOW STATEMENT TAB, AND A BALANCE SHEET TAB?

12:30PM 11   A.   I DO SEE THAT, YES.

12:30PM 12   Q.   OKAY.

12:30PM 13        YOUR HONOR, I'D LIKE TO MOVE THE ADMISSION OF 4093 WITH

12:30PM 14   STIPULATION FROM THE GOVERNMENT.

12:30PM 15             MR. LEACH:  THAT'S CORRECT, YOUR HONOR.

12:30PM 16             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:30PM 17        (GOVERNMENT'S EXHIBIT 4093 WAS RECEIVED IN EVIDENCE.)

12:31PM 18   BY MR. WADE:

12:31PM 19   Q.   AND DO YOU RECOGNIZE THIS SPREADSHEET TO BE THE PFM MODEL?

12:31PM 20   A.   IT LOOK LIKE A MODEL THAT WE WOULD -- A FORMAT OF A PFM

12:31PM 21   MODEL, YES.

12:31PM 22   Q.   OKAY.  AND YOU UNDERSTAND, THOUGH, JUST CALLING YOUR

12:31PM 23   ATTENTION TO THE TABS DOWN BELOW, YOU HAVE -- IF I SCROLL OVER

12:31PM 24   HERE, DO YOU SEE THOSE BLUE TABS THERE?  THOSE ARE, THOSE ARE

12:31PM 25   IMPORTED FROM THE THERANOS MODEL; CORRECT?

12:31PM  1    A.   I BELIEVE THAT'S THE CASE, YES.

12:31PM  2    Q.   AND THEN THE ORANGE TABS HERE, WHICH INCLUDE HIGH GROWTH

12:31PM  3    COMPS, OUTPUTS, CHARTS, CENSUS DATA, AND CENSUS DATA (2), ARE

12:31PM  4    ADDITIONAL INPUTS THAT YOUR TEAM ADDED; IS THAT RIGHT?

12:32PM  5    A.   THAT IS RIGHT.

12:32PM  6    Q.   AND I'M NOT GOING TO GO THROUGH THESE IN DETAIL, BUT YOU

12:32PM  7    SEE THESE HAVE SPECIFIC DATA RELATING TO POPULATION IN

12:32PM  8    DIFFERENT METROPOLITAN MARKETS.

12:32PM  9         DO YOU SEE THAT?

12:32PM 10    A.   YES.

12:32PM 11    Q.   AND SOME INFORMATION RELATING TO MARKET SHARE.

12:32PM 12         DO YOU SEE THAT?

12:32PM 13    A.   YES.

12:32PM 14    Q.   AND SOME OUT -- SOME HIGH GROWTH COMPS.

12:32PM 15         DO YOU SEE THAT TAB COMPARED SOME OF THOSE COMPANIES THAT

12:32PM 16    WE WERE TALKING ABOUT PREVIOUSLY?

12:32PM 17    A.   YES.

12:32PM 18    Q.   AND IN ADDITION TO THOSE COMPANIES, THERE ARE A FEW OTHER

12:32PM 19    COMPARATIVE COMPANIES THAT WERE ADDED INTO THIS ANALYSIS;

12:32PM 20    CORRECT?

12:32PM 21    A.   YES.

12:32PM 22    Q.   AND CAN YOU IDENTIFY THE ADDITIONAL COMPANIES THAT WERE

12:33PM 23    ADDED TO THIS ANALYSIS?

12:33PM 24    A.   THIS INCLUDED INTUITIVE SURGICAL, SALESFORCE.COM, TESLA,

12:33PM 25    FACEBOOK, SPLUNK, TWITTER.

12:33PM   1    Q.   OKAY.  AND THOSE WERE ALL VERY SUCCESSFUL SILICON VALLEY

12:33PM   2    BASED TECHNOLOGY COMPANIES AT THE TIME; IS THAT FAIR?

12:33PM   3    A.   THEY WERE OPEN ENDED, DISRUPTIVE PLATFORM COMPANIES THAT

12:33PM   4    HAD RECENTLY MOVED INTO THE PUBLIC MARKETS.

12:33PM   5    Q.   OKAY.  WHEN I GO OVER TO THE GREEN TABS HERE, THOSE WERE

12:33PM   6    ALSO TABS CREATED BY PFM; CORRECT?

12:33PM   7    A.   I CAN'T SEE THEM, BUT I BELIEVE SO.

12:33PM   8    Q.   OH, I'M SORRY.  CAN YOU SEE THESE DOWN HERE (INDICATING)?

12:33PM   9    A.   MAYBE YOU COULD CLICK.

12:34PM   10            MR. WADE:  MAY I APPROACH, YOUR HONOR?

12:34PM   11            THE COURT:  SURE.

12:34PM   12   BY MR. WADE:

12:34PM   13   Q.   (HANDING.)

12:34PM   14        ARE YOU ABLE TO READ THESE WHEN I HOLD THE MOUSE ON THEM?

12:34PM   15   A.   MAYBE IF YOU CLICK.

12:34PM   16   Q.   OKAY.

12:34PM   17   A.   THERE YOU GO.

12:34PM   18   Q.   THIS IS A PFM REVENUE MODEL-BOTTOMS UP.

12:34PM   19        DO YOU SEE THAT?

12:34PM   20   A.   YES.

12:34PM   21   Q.   AND DO YOU SEE UP AT THE TOP THERE, THERE'S A NOTE THAT

12:34PM   22   SAYS BEAR CASE, BASE CASE, AND BULL CASE?

12:34PM   23   A.   I DO.

12:34PM   24   Q.   AND YOU TALKED A LITTLE BIT ABOUT THIS IN YOUR DIRECT

12:34PM   25   TESTIMONY; CORRECT?

12:34PM 1     A.   YES.

12:34PM 2     Q.   AND THESE ARE DIFFERENT SCENARIOS; RIGHT?

12:34PM 3     A.   YES.

12:34PM 4     Q.   AND THE BASE CASE IS CONSIDERED SORT OF THE MEDIAN

12:34PM 5     SCENARIO IN THE MODEL; IS THAT RIGHT?

12:34PM 6     A.   IT'S OUR KIND OF AVERAGE -- WHAT WE THINK IS MOST LIKELY

12:35PM 7     TO HAPPEN.

12:35PM 8     Q.   OKAY.  AND I'D LIKE TO GO TO THE VALUATION TAB.  THIS IS

12:35PM 9     A -- THIS IS AN ANALYSIS THAT YOUR TEAM DID; CORRECT?

12:35PM 10    A.   YES.

12:35PM 11    Q.   AND HERE YOU WERE PROJECTING REVENUES FOR THE COMPANY

12:35PM 12    WITHIN THE MODEL; RIGHT?

12:35PM 13    A.   YES.

12:35PM 14    Q.   AND THE REVENUE THAT YOU PROJECTED FOR 2014 WAS

12:35PM 15    $249 MILLION; RIGHT?

12:35PM 16    A.   YES.

12:35PM 17    Q.   AND THEN YOU PROJECTED $1.558 BILLION FOR 2015; CORRECT?

12:35PM 18    A.   YES.

12:35PM 19    Q.   AND YOU WERE AWARE AT THE TIME THAT IN 2013 THE COMPANY

12:35PM 20    HAD 20 -- ABOUT $25 MILLION IN REVENUE; RIGHT?

12:35PM 21    A.   I BELIEVE THAT'S ROUGHLY RIGHT, YES.

12:36PM 22    Q.   SO YOU WERE PROJECTING FROM -- AND YOU WERE DOING THIS AT

12:36PM 23    THE BEGINNING OF 2014; CORRECT?

12:36PM 24    A.   THAT'S CORRECT.

12:36PM 25    Q.   AND SO YOU WERE PROJECTING GROWTH FROM 25 MILLION TO 250

12:36PM   1    MILLION; CORRECT?

12:36PM   2    A.   YES.

12:36PM   3    Q.   AND THEN FROM 249 TO 1.56 BILLION; RIGHT?

12:36PM   4    A.   YES.

12:36PM   5    Q.   AND THAT -- EVEN THAT LAST PIECE IS, GOING FROM 2014 TO

12:36PM   6    2015, WAS 525 PERCENT GROWTH; CORRECT?

12:36PM   7    A.   THAT IS CORRECT.

12:36PM   8    Q.   OKAY.  AND WERE YOU AWARE OF ANY OTHER COMPANY THAT HAD

12:36PM   9    THAT SORT OF REVENUE GROWTH WITHIN A TWO YEAR PERIOD?

12:36PM  10    A.   THERE HAVE BEEN EXAMPLES OF COMPANIES WHO HAVE HAD THAT

12:36PM  11    KIND OF REVENUE GROWTH.

12:36PM  12         THEY TEND TO BE OPEN ENDED, IMPORTANT TECHNOLOGIES, NEW

12:36PM  13    PRODUCT.

12:36PM  14         SO, YES, THERE ARE EXAMPLES.

12:37PM  15    Q.   WELL, CAN YOU IDENTIFY ANY?

12:37PM  16    A.   WELL, I CAN GIVE YOU A RECENT EXAMPLE, LIKE A MODERNA,

12:37PM  17    RIGHT.

12:37PM  18    Q.   OKAY.

12:37PM  19    A.   THAT COMES UP WITH A REALLY IMPORTANT NEW VACCINE, AND YOU

12:37PM  20    CAN SEE REVENUES RAMP DRAMATICALLY.

12:37PM  21         SO, YES, THERE ARE EXAMPLES OF COMPANIES.

12:37PM  22         THEY TEND TO BE REALLY IMPORTANT OPEN ENDED TECHNOLOGY,

12:37PM  23    VERY DISRUPTIVE, THAT HAVE A BIG IMPACT ON SOCIETY, BIG IMPACT

12:37PM  24    ON THE HEALTH CARE SPACE.

12:37PM  25    Q.   OKAY.  AND AS PART OF THIS ANALYSIS, THE GOAL WAS TO DO A

12:37PM   1    NET PRESENT VALUATION OF THE COMPANY; CORRECT?

12:37PM   2    A.   YES.

12:37PM   3    Q.   AND YOU DID THAT; CORRECT?

12:37PM   4    A.   IT WAS ONE WAY.  THERE ARE DIFFERENT WAYS OF VALUING HIGH

12:37PM   5    GROWTH COMPANIES LIKE A THERANOS, AND SO WE WANTED TO MAKE SURE

12:37PM   6    THAT WE LOOKED AT THESE A FEW DIFFERENT WAYS.  ONE OF THEM WAS

12:37PM   7    USING A DISCOUNTED CASH FLOW MODEL.

12:37PM   8    Q.   AND THAT'S WHAT THIS IS; CORRECT?

12:38PM   9    A.   THAT'S WHAT THIS IS, THAT'S CORRECT.

12:38PM  10    Q.   A DISCOUNTED CASH FLOW MODEL IS SORT OF A STANDARD MODEL

12:38PM  11    THAT IS USED TO VALUE COMPANIES; IS THAT FAIR?

12:38PM  12    A.   IT IS A STANDARD MODEL USED TO VALUE COMPANIES, YES.

12:38PM  13    Q.   BUT AS YOU KNOW, THERE ARE A VARIETY OF OTHER MODELS, SOME

12:38PM  14    OF WHICH ARE MORE CONSERVATIVE AND SOME THAT ARE LESS

12:38PM  15    CONSERVATIVE; IS THAT FAIR?

12:38PM  16    A.   I'M SORRY, COULD YOU ASK THAT ONE MORE TIME?

12:38PM  17    Q.   SURE.  THERE ARE A VARIETY OF MODELS THAT COULD BE USED;

12:38PM  18    RIGHT?

12:38PM  19    A.   A VARIETY -- I DON'T QUITE UNDERSTAND THE QUESTION.

12:38PM  20    Q.   WHY DON'T WE JUST GO BACK TO YOUR MODEL.

12:38PM  21         BASED ON THE MODEL, YOU VALUED THERANOS AT $20.3 BILLION;

12:38PM  22    CORRECT?

12:38PM  23    A.   THAT'S THE TOTAL VALUE IN THIS, IN THIS MODEL, AND THAT'S,

12:38PM  24    THAT'S THE U.S., THAT'S JUST THE U.S. -- THAT'S THE U.S.

12:38PM  25    OPPORTUNITY, YES.

12:38PM 1          IT DOESN'T INCLUDE ANYTHING FROM ANY OTHER PART OF THE

12:38PM 2    WORLD.

12:39PM 3          BUT, YES, THAT IS THE OUTPUT OF THIS PARTICULAR

12:39PM 4    SPREADSHEET.

12:39PM 5    Q.   RIGHT.  AND THERANOS, BASED UPON -- I THINK WE TALKED

12:39PM 6    ABOUT YESTERDAY, BASED UPON THE C-1 VALUATION SOLD AT $15 A

12:39PM 7    SHARE; RIGHT?

12:39PM 8    A.   YES.

12:39PM 9    Q.   AND THE VALUATION BASED UPON THAT WAS ABOUT 7 BILLION; IS

12:39PM 10   THAT CORRECT?

12:39PM 11   A.   YES.

12:39PM 12   Q.   AND THEN THE VALUATION BASED UPON THE C-2 ROUND WAS

12:39PM 13   9 BILLION; CORRECT?

12:39PM 14   A.   CORRECT.

12:39PM 15   Q.   OKAY.  AND IN PREPARING THIS VALUATION, YOU ALSO PROJECTED

12:39PM 16   REVENUE, CORRECT, RELATING TO THE RETAIL EFFORTS?

12:39PM 17          DO YOU RECALL THAT?

12:39PM 18   A.   WE, WE CERTAINLY WOULD HAVE PROJECTED REVENUE FOR THE

12:39PM 19   RETAIL OPERATION, YES.

12:40PM 20   Q.   OKAY.  AND THE -- DO YOU RECALL THAT THE REVENUE NUMBERS

12:40PM 21   THAT PFM PROJECTED FOR 2014, FOR EXAMPLE, WERE SIGNIFICANTLY

12:40PM 22   HIGHER THAN THE NUMBERS THAT THERANOS GAVE YOU?

12:40PM 23   A.   THAT'S NOT MY MEMORY.

12:40PM 24   Q.   OKAY.  LET'S TAKE A LOOK.

12:40PM 25          LET'S FIRST GO TO THE PFM REVENUE MODEL-BOTTOMS UP.

12:40PM  1          AND IF WE CAN SCROLL -- DO YOU SEE THE RETAIL REVENUE --

12:41PM  2     I'M IN THE PFM REVENUE MODEL-BOTTOMS UP TAB.

12:41PM  3          DO YOU SEE THAT?

12:41PM  4     A.  I DO SEE THAT.

12:41PM  5     Q.  IN ROW 19 FOR 2014, DO YOU SEE THE NUMBERS LISTED THERE ON

12:41PM  6     A QUARTERLY BASIS?

12:41PM  7     A.  I DO SEE THOSE, YES.

12:41PM  8     Q.  AND THE FIRST ONE IS THIS $887,500.

12:41PM  9          DO YOU SEE THAT?

12:41PM 10     A.  I DO SEE THAT.

12:41PM 11     Q.  AND THEN ABOUT 4.4 MILLION.

12:42PM 12          DO YOU SEE THAT?

12:42PM 13     A.  I DO SEE THAT.

12:42PM 14     Q.  AND THEN ABOUT 21.4 MILLION AND 70 MILLION FOR THE FOURTH

12:42PM 15     QUARTER.

12:42PM 16          DO YOU SEE THAT?

12:42PM 17     A.  I DO SEE THAT.

12:42PM 18     Q.  OKAY.  LET'S, LET'S GO BACK TO THE THERANOS PERIOD.

12:42PM 19          LET'S GO BACK TO THE OTHER SPREADSHEET.

12:42PM 20          AS WE'RE DOING THIS, DO YOU RECALL THAT YOU CAME UP WITH

12:42PM 21     YOUR REVENUE NUMBERS AND YOUR MODELING NUMBERS TOTALLY

12:43PM 22     INDEPENDENT FROM THERANOS; RIGHT?

12:43PM 23     A.  NO.

12:43PM 24     Q.  WELL, YOU ADDED SUBSTANTIAL ADDITIONAL DATA; RIGHT?

12:43PM 25     A.  WE DID ADD ADDITIONAL DATA TO OUR MODEL, YES.

12:43PM   1   Q.   AND YOU WERE AWARE AT THE TIME THAT THE MODELS WERE BASED

12:43PM   2   UPON, WERE BASED UPON THE -- AN ASSUMPTION OF A NUMBER OF

12:43PM   3   PATIENTS WITHIN STORES; RIGHT?

12:43PM   4   A.   THERE WERE A BUNCH OF ASSUMPTIONS THAT WENT INTO THE

12:43PM   5   MODEL.

12:43PM   6   Q.   RIGHT?

12:43PM   7   A.   YES.

12:43PM   8   Q.   AND A SIGNIFICANT ONE WAS THE NUMBER OF PATIENTS PER STORE

12:43PM   9   PER DAY; RIGHT?

12:43PM   10   A.   THAT WAS AN ASSUMPTION IN THE MODEL.

12:43PM   11   Q.   AND THERANOS TOLD YOU THAT IN THEIR MODEL THEY PROJECTED

12:43PM   12   25 PATIENTS PER STORE; RIGHT?

12:43PM   13   A.   I DON'T REMEMBER SPECIFICALLY WHAT THEY TOLD US.

12:43PM   14   Q.   OKAY.  WELL, LET'S TAKE A LOOK.

12:44PM   15        DO YOU SEE UP HERE IN EXHIBIT 13720A IT IDENTIFIES 25

12:44PM   16   PATIENTS PER STORE AT WALGREENS THERE?

12:44PM   17   A.   YES.

12:44PM   18   Q.   AND DO YOU ALSO RECALL THAT AT THE TIME MR. BALWANI GAVE

12:44PM   19   THIS, THAT THERE WERE ACTUALLY ONLY 10 TO 15 PATIENTS PER STORE

12:44PM   20   THAT WERE COMING INTO THE FEW LOCATIONS; RIGHT?

12:44PM   21   A.   I DON'T REMEMBER SPECIFICALLY.

12:44PM   22        WHAT DAY ARE YOU REFERRING TO?

12:44PM   23   Q.   WELL, DO YOU RECALL DURING THE DUE DILIGENCE PERIOD

12:44PM   24   LEARNING THAT BREAK EVEN FOR THE STORES WAS 15 PATIENTS A

12:44PM   25   STORE?

12:44PM 1    A.   I DO REMEMBER TALKING ABOUT BREAK EVEN.

12:44PM 2         I DON'T REMEMBER THE SPECIFICS OF WHAT THE ACTUAL NUMBERS

12:44PM 3    WERE, BUT, YES, I DO REMEMBER GOING THROUGH THE ECONOMICS FROM

12:44PM 4    THE WALGREENS PERSPECTIVE.

12:44PM 5    Q.   OKAY.  AND YOU RECALL HIM TELLING YOU THAT WHAT THEY WERE

12:44PM 6    MODELING WAS ACTUALLY ABOVE THE 15 PERCENT, OR THE 15 PATIENTS

12:44PM 7    PER STORE; RIGHT?

12:45PM 8    A.   WELL, I DON'T REMEMBER EXACTLY THE 15, BUT, YEAH, I DO

12:45PM 9    REMEMBER -- WHAT I REMEMBER WAS THAT HE FELT LIKE THESE NUMBERS

12:45PM 10   WERE VERY CONSERVATIVE BASED ON THE PATIENT FLOW THAT THEY WERE

12:45PM 11   SEEING IN SOME OF THE FIRST STORES THAT THEY HAD OPENED.

12:45PM 12        BUT I DON'T REMEMBER SPECIFICALLY WHAT CONVERSATION I HAD

12:45PM 13   WITH HIM AT A GIVEN POINT IN TIME ON THIS PARTICULAR VERSION OF

12:45PM 14   THE MODEL.

12:45PM 15   Q.   OKAY.  AND DO YOU REMEMBER THAT IN MANY LOCATIONS WHERE

12:45PM 16   YOU WERE MODELING, THAT YOU WERE PROJECTING 80 OR 90 PATIENTS

12:45PM 17   PER STORE PER DAY?

12:45PM 18   A.   I DON'T BELIEVE THAT'S HOW OUR MODEL WORKS, BUT WE -- SO I

12:45PM 19   DON'T REMEMBER THAT.

12:45PM 20   Q.   OKAY.  WELL, LET'S LOOK -- LET'S LOOK BACK AT YOUR MODEL.

12:45PM 21   LET'S LOOK AT THE STORE BUILD.  AND LET'S GO DOWN HERE.

12:46PM 22        AND DO YOU SEE HERE WHERE THERE ARE PATIENTS PER STORE

12:46PM 23   DATA?

12:46PM 24   A.   I DO SEE THAT, YES.

12:46PM 25   Q.   AND DO YOU SEE THAT MANY OF THEM ARE AS HIGH AS 80 OR 90

12:46PM   1    PATIENTS PER STORE IN SOME MARKETS?

12:46PM   2    A.   YES.  WELL, I ACTUALLY DON'T SEE -- MAYBE YOU COULD SHOW

12:46PM   3    ME WHERE.

12:46PM   4        I DON'T SEE THAT, SO I'M SORRY.  MAYBE YOU COULD POINT TO

12:46PM   5    WHERE THE --

12:46PM   6    Q.   DO YOU SEE HERE IN LOS ANGELES IT'S -- YOU INCLUDE

12:46PM   7    PROJECTIONS OF AS HIGH AS 90 TO 92 PATIENTS PER STORE.

12:47PM   8        DO YOU SEE THAT?

12:47PM   9    A.   THAT'S IN 2017.

12:47PM   10   Q.   YES.

12:47PM   11   A.   I THINK YOU WERE ASKING ME ABOUT 2014.

12:47PM   12   Q.   WELL, I BELIEVE THE THERANOS MODEL WAS AT 25; IS THAT

12:47PM   13   RIGHT?

12:47PM   14   A.   I'M SORRY, COULD YOU ASK THE QUESTION AGAIN?

12:47PM   15   Q.   THE THERANOS MODEL WAS 25 ACROSS THE BOARD, WAS IT NOT?

12:47PM   16   A.   IN 2014.

12:47PM   17   Q.   AND INTO '15?

12:47PM   18   A.   I DON'T RECALL.  MAYBE WE CAN LOOK AT THE MODEL FOR '15.

12:47PM   19   I DON'T REMEMBER WHAT THE ASSUMPTION THEY HAD WAS FOR 2015.

12:47PM   20   Q.   AND DO YOU RECALL MEMBERS OF YOUR TEAM EXPRESSING CONCERN

12:47PM   21   ABOUT THE PROJECTIONS ON PATIENTS PER STORE?

12:47PM   22   A.   I REMEMBER THAT WE DID THINK VERY HARD ABOUT THIS

12:47PM   23   PARTICULAR ASSUMPTION, ESPECIALLY IN THE CONTEXT OF OUR 2017

12:47PM   24   AND '18 MODEL.  WE WANTED TO MAKE SURE THAT THE MARKETS THEY

12:47PM   25   HAD TOLD US THEY WOULD ROLL OUT INTO, THERE WERE ENOUGH STORES

12:47PM  1    TO SUPPORT THE REVENUES ESTIMATES THAT WE HAD IN 2017 AND '18,

12:48PM  2    ESPECIALLY IN 2018, SO YEAR FIVE OF THE COMMERCIAL LAUNCH.

12:48PM  3         IT KIND OF LED INTO A LARGER DISCUSSION AROUND HOW MANY

12:48PM  4    EXTRA RETAIL PARTNERS DID THEY NEED?

12:48PM  5         SO THIS ANALYSIS WAS REALLY MORE TO SANITY CHECK OUR

12:48PM  6    ESTIMATES OF HOW MUCH SHARE THIS COMPANY WOULD TAKE WITH ALL OF

12:48PM  7    THE ADVANTAGES THAT THEY HAD IN THESE GEOGRAPHIC MARKETS THAT

12:48PM  8    THEY TOLD US THAT THEY WERE GOING TO ROLL OUT INTO.

12:48PM  9         AND THEN BACKING INTO WHETHER OR NOT THEY WOULD NEED

12:48PM  10   ADDITIONAL PARTNERS, LIKE A CVS OR A RITE AID OR OTHER GROCERY

12:48PM  11   STORE CHAINS.  THAT WAS THE POINT OF THIS ANALYSIS.

12:48PM  12        THIS ISN'T ACTUALLY WHAT DROVE OUR ACTUAL, WHAT WE CALL

12:48PM  13   POINT ESTIMATES, THE ESTIMATE WE HAD FOR A PARTICULAR QUARTER

12:48PM  14   IN 2014 OR '15 OR OUR MODEL IN 2016, '17, OR '18.

12:48PM  15   Q.   OKAY.  BUT THIS WAS ALL -- THE ANALYSIS THAT YOU JUST

12:48PM  16   DESCRIBED IS ALL ANALYSIS THAT YOU AT PFM DID ON YOUR OWN;

12:48PM  17   RIGHT?

12:48PM  18   A.   AND IT WAS IN CONJUNCTION WITH OUR ESTIMATES FOR 2017 AND

12:48PM  19   '18, NOT RELATIVE TO WHAT THE COMPANY GAVE US FOR THE 2014 TO

12:48PM  20   2015 PROJECTIONS.

12:48PM  21   Q.   OKAY.

12:48PM  22   A.   AND WHICH OUR NUMBERS WERE LOWER -- OUR OVERALL REVENUE

12:49PM  23   NUMBERS FOR THERANOS FOR BOTH '14 AND '15 ON THE BASE CASE WERE

12:49PM  24   LOWER THAN WHAT THERANOS'S MODEL TOTAL REVENUES HAD FOR BOTH

12:49PM  25   YEARS.

12:49PM  1       SO, YES, THAT WAS -- THAT MODEL WAS VERY IMPORTANT TO HOW

12:49PM  2  WE BUILT THIS MODEL.  IT WAS VERY IMPORTANT TO HOW WE THOUGHT

12:49PM  3  ABOUT 2014 AND 2015, AND IT REFLECTED THE INFORMATION THAT THEY

12:49PM  4  HAD BECAUSE OF THE WALGREENS RELATIONSHIP.

12:49PM  5  Q.   AND ULTIMATELY YOU CAME TO -- WHATEVER ANALYSIS YOU CAME

12:49PM  6  TO IN DOING THIS WITH YOUR TEAM, YOU WERE COMFORTABLE WITH THE

12:49PM  7  VALUATION THAT YOU, THAT YOU COMMUNICATED TO YOUR INVESTORS;

12:49PM  8  CORRECT?

12:49PM  9  A.   IN AN ANALYSIS LIKE THIS, YOU WANT TO MAKE SURE THAT ON

12:49PM 10  YOUR BASE CASE ASSUMPTIONS, YOU CAN JUSTIFY A SUBSTANTIALLY

12:49PM 11  HIGHER PRICE FOR THE ASSET, FOR THE COMPANY, AND THAT WAS THE

12:50PM 12  POINT OF THIS EXERCISE.

12:50PM 13       AND, YES, WE FELT LIKE WE COULD MORE THAN JUSTIFY

12:50PM 14  INVESTING AT $9 BILLION BASED ON THE MODEL THE COMPANY HAD

12:50PM 15  GIVEN US FOR 2014 AND 2015, AND THEN THE ASSUMPTIONS THAT WE

12:50PM 16  HAD FOR HOW MUCH SHARE OF THE MARKETS THAT THEY WERE GOING TO

12:50PM 17  TARGET, NEW YORK CITY, L.A., THE OTHER MAJOR METROPOLITAN

12:50PM 18  AREAS, WHAT SHARE OF THOSE MARKETS THAT A COMPANY WITH THIS

12:50PM 19  TYPE OF TECHNOLOGY WOULD BE ABLE TO, WOULD BE ABLE TO ACHIEVE.

12:50PM 20  Q.   AND PART OF THAT WAS THE NUMBER OF STORES THAT YOU COULD

12:50PM 21  GROW TO, CORRECT, THE RATE OF EXPANSION?

12:50PM 22  A.   WELL, IT WAS -- THEY HAD A SUBSTANTIAL ADVANTAGE AGAINST

12:50PM 23  EXISTING LAB COMPANIES.  LAB -- QUEST HAS 2,000 OR SO STORES

12:50PM 24  THAT YOU CAN GET YOUR BLOOD DRAWN.  WALGREENS HAD OVER 8,000

12:50PM 25  LOCATIONS.

12:50PM 1          SO THEY HAD A LOT OF ADVANTAGES WHEN IT CAME TO

12:50PM 2    CONVENIENCE.

12:50PM 3          BUT WE WANTED TO MAKE SURE THAT WE UNDERSTOOD THEIR

12:51PM 4    COMMERCIAL STRATEGY, ESPECIALLY WHEN IT CAME TO PARTNERING WITH

12:51PM 5    ADDITIONAL RETAILERS SO THAT THEY WOULD HAVE ENOUGH

12:51PM 6    DISTRIBUTION, ENOUGH ACCESS POINTS TO DELIVER ON THE FINANCIAL

12:51PM 7    FORECAST THAT WE HAD FOR 2017 AND 2018.

12:51PM 8    Q.   RIGHT.  AND JUST SO WE'RE CLEAR, THEY HAD THREE STORES AT

12:51PM 9    THE TIME THAT YOU WERE DOING THIS ANALYSIS; RIGHT?

12:51PM 10   A.   AT THE FIRST MONTH OF THE LAUNCH, YES.  IN JANUARY OF

12:51PM 11   2014, YES.

12:51PM 12   Q.   AND PART OF YOUR ANALYSIS HERE WAS TO PROJECT THE NUMBER

12:51PM 13   OF STORES THAT THEY WERE GOING TO OPEN DURING PARTICULAR

12:51PM 14   PERIODS OF TIME IN DIFFERENT MARKETS; CORRECT?

12:51PM 15   A.   WELL, THEY GAVE US A VERY SPECIFIC BY-THE-MONTH FORECAST

12:51PM 16   FOR WALGREENS STORES, AND ALSO SAFEWAY STORES.

12:51PM 17   Q.   RIGHT.

12:51PM 18   A.   AND SO THAT WAS -- SO WE USED THEIR FORECAST TO BUILD OUR

12:51PM 19   MODEL IN 2014 AND 2015.  I BELIEVE WE MAY HAVE USED, I BELIEVE

12:51PM 20   WE MAY HAVE USED LOWER -- WELL, ANYWAY, YEAH, WE HAD DIFFERENT

12:52PM 21   ASSUMPTIONS AS WE KIND OF WENT OUT BEYOND -- THEY GAVE US A

12:52PM 22   MODEL THAT WENT TO 2015, A VERY DETAILED MODEL.

12:52PM 23          BUT WHEN IT CAME TO OUR MODEL BEYOND 2015, WHICH BUILT OFF

12:52PM 24   OF ASSUMPTIONS AND THE INFORMATION THAT THEY PROVIDED US, WE

12:52PM 25   USED OUR OWN ASSUMPTIONS THAT WERE DIFFERENT IN SOME CASES

12:52PM  1    FROM -- OVER TIME.

12:52PM  2    Q.   AND YOU TALKED ABOUT THE ASSUMPTIONS FOR STORES IN 2014.

12:52PM  3         ISN'T IT TRUE THAT YOU ACTUALLY -- YOU PROJECTED ABOUT

12:52PM  4    1500 MORE STORES WOULD BE OPEN THAN THERANOS HAD IN ITS MODEL?

12:52PM  5    A.   I DON'T BELIEVE THAT'S TRUE, BUT -- SO, NO, I DON'T

12:52PM  6    BELIEVE THAT'S TRUE.

12:52PM  7    Q.   WELL, LET'S TAKE A LOOK.

12:52PM  8         IF YOU LOOK AT THE NUMBER OF STORES IN RETAIL HERE, AND WE

12:53PM  9    GO TO COLUMN G FOR '15.

12:53PM  10        DO YOU SEE COLUMN G HERE?

12:53PM  11   A.   I DO SEE COLUMN G, YES.

12:53PM  12   Q.   AND YOU SEE THE NUMBER OF STORES IN RETAIL?

12:53PM  13   A.   I DO SEE THAT, YES.

12:53PM  14   Q.   DO YOU SEE THAT?

12:53PM  15        AND SO THIS IS THE PART WHERE IT GETS QUITE DANGEROUS.

12:53PM  16        AND DO YOU SEE THAT THAT EQUALS 4685 STORES?

12:53PM  17   A.   THAT -- I DO SEE 4685, YES.

12:53PM  18   Q.   AND THAT'S FOR 2015; CORRECT?

12:53PM  19   A.   THAT'S FOR 2018, '17, '16, '15, '14.  THEY'RE ALL THE SAME

12:54PM  20   NUMBER.

12:54PM  21        SO IF THAT'S YOUR QUESTION, YES.

12:54PM  22        WE WERE LOOKING AT -- WE WANTED TO -- THIS ISN'T HOW WE

12:54PM  23   DROVE THE MODEL.  THE MODEL WAS DRIVEN BASED ON THE PERCENTAGE

12:54PM  24   OF THOSE -- WE LOOKED AT THE POPULATION OF EACH MARKET, AND

12:54PM  25   THEN WE FORECAST THE PERCENTAGE OF THE TESTS DONE IN THOSE

12:54PM  1    MARKETS.  THAT'S WHAT DROVE THE REVENUE FORECASTS.

12:54PM  2         THIS WAS JUST A SANITY CHECK.

12:54PM  3         AGAIN, AS I SAID BEFORE, THIS WAS REALLY DONE TO LOOK TO

12:54PM  4    SEE WHETHER THE ESTIMATES THAT WE HAD FOR 2017 AND 2018 WERE

12:54PM  5    REALISTIC AND WHETHER THEY NEEDED MORE RETAIL PARTNERS.

12:54PM  6         THIS DIDN'T ACTUALLY DRIVE ANY REVENUE ASSUMPTIONS IN ANY

12:54PM  7    OF OUR MODELS IN ANY QUARTER IN ANY YEAR.

12:54PM  8         SO, AGAIN, THIS WAS A SECONDARY ANALYSIS THAT WE DID TO

12:54PM  9    MAKE SURE THAT WALGREENS -- TO SEE HOW FAR THEY COULD GO WITH

12:54PM 10    WALGREENS AND WHETHER THEY NEEDED OTHER ADDITIONAL PARTNERS.

12:54PM 11         AND YOU CAN SEE THE NUMBER OF STORES IN 2018 IS THE SAME

12:54PM 12    AS '17, '16, '15, AND WE WANTED TO SEE WHAT THE THROUGHPUT WAS

12:54PM 13    JUST WITH WALGREENS AND SAFEWAYS AS THEY RAMPED OVER THIS

12:54PM 14    PERIOD OF TIME AND JUST MAKE SURE THAT IT WAS A NUMBER THAT

12:55PM 15    WASN'T UNREALISTIC BASED ON OUR UNDERSTANDING OF THROUGHPUT IN

12:55PM 16    THOSE ORGANIZATIONS.

12:55PM 17         AND IF IT WAS, THAT WOULD LEAD TO FOLLOW-ON CONVERSATIONS,

12:55PM 18    WELL, WHAT OTHER RETAIL PARTNERS DO YOU NEED FOR A MARKET LIKE

12:55PM 19    LOS ANGELES?  AND MAYBE THE ANSWER IS RITE AID WOULD BE A GREAT

12:55PM 20    ADDITIONAL PARTNER TO HAVE FOR THAT MARKET.

12:55PM 21         SO THAT'S WHAT THIS ANALYSIS WAS REFERRING TO.

12:55PM 22    Q.  AND THE ANALYSIS, I BELIEVE YOU JUST TESTIFIED ABOUT 90 TO

12:55PM 23    120 SECONDS AGO THAT YOU BUILT THE ANALYSIS OFF OF THE NUMBER

12:55PM 24    OF STORES THAT THERANOS USED IN ITS MODEL FOR 2014 TO 2015.

12:55PM 25         THAT WAS YOUR TESTIMONY, WAS IT NOT?

12:55PM   1    A.   THAT WAS THE MODEL THAT THEY SENT US.

12:55PM   2    Q.   YOUR TESTIMONY WAS THAT YOU BUILT YOUR MODEL OFF OF THAT;

12:55PM   3    CORRECT?

12:55PM   4    A.   WE, WE USED -- WE RELIED HEAVILY ON THE MODEL THAT THEY

12:55PM   5    PROVIDED.

12:55PM   6    Q.   I'M NOT ASKING ABOUT WHAT YOU RELIED ON.  I'M ASKING YOU

12:55PM   7    THAT YOU JUST TESTIFIED THAT YOU USED THE SAME NUMBER OF STORES

12:55PM   8    FROM THE THERANOS MODEL AND YOUR MODEL?

12:56PM   9         DID YOU JUST TESTIFY TO THAT?

12:56PM  10    A.   I, I -- MR. WADE, I'M -- I -- I'M SORRY.  I DIDN'T MEAN TO

12:56PM  11    CONFUSE YOU OR MISLEAD YOU IN MY ANSWER.

12:56PM  12         THE MODEL REALLY HAS TWO STAGES.  IN 2014 AND 2015, WE

12:56PM  13    RELIED HEAVILY ON THE THERANOS ASSUMPTIONS.  WE DIDN'T TAKE

12:56PM  14    THEM WORD FOR WORD, NUMBER FOR NUMBER, BUT WE RELIED ON THOSE.

12:56PM  15         AND THEN IN '16, '17 AND '18, WE HAD NO THERANOS

12:56PM  16    ASSUMPTION, SO WE HAD TO HAVE OUR OWN.

12:56PM  17         THE PERCENTAGE OF EACH MARKET THAT THESE -- I BELIEVE THE

12:56PM  18    MODEL WAS DRIVEN BY THE PERCENTAGE OF EACH ONE OF THESE

12:56PM  19    METROPOLITAN AREAS, THE TESTS THAT WERE DONE IN THOSE AREAS IN

12:56PM  20    EACH OF THOSE YEARS.

12:56PM  21    Q.   WELL, LET ME TAKE THOSE ONE AT A TIME.

12:56PM  22         THE PERCENTAGE OF PATIENTS IN A MARKET IS A TOTALLY

12:56PM  23    DIFFERENT ANALYSIS FROM THE ANALYSIS THERANOS DID; CORRECT?

12:56PM  24    A.   WELL, I'M NOT SURE WHAT ANALYSIS THERANOS DID.  THE

12:57PM  25    THERANOS MODEL WAS DRIVEN BY PATIENTS PER STORE THAT HAD A

12:57PM 1    WHOLE SERIES OF ASSUMPTIONS.

12:57PM 2    Q.   RIGHT.  RIGHT.  THERE WAS NO ANALYSIS BASED UPON THE

12:57PM 3    POPULATION IN THE AREA AND AN ASSUMPTION OF ORDER OR ANYTHING

12:57PM 4    OF THE KIND THAT YOU JUST DISCUSSED; RIGHT?

12:57PM 5    A.   THAT IS CORRECT.

12:57PM 6    Q.   AND THERE WAS NOTHING LIKE THAT IN THE THERANOS MODEL;

12:57PM 7    RIGHT?

12:57PM 8    A.   THAT'S CORRECT.

12:57PM 9    Q.   AND SO WHAT YOU JUST DESCRIBED AS TO YOUR MODELING WAS

12:57PM 10   COMPLETELY DIFFERENT METHODOLOGY THAN THE THERANOS MODEL;

12:57PM 11   RIGHT?

12:57PM 12   A.   IT WAS A DIFFERENT METHODOLOGY, YES.

12:57PM 13   Q.   OKAY.  AND TO THE EXTENT THAT YOU LOOKED AT THE NUMBER OF

12:57PM 14   RETAIL STORES IN 2015 AS SOME SORT OF SANITY CHECK OR THE LIKE,

12:57PM 15   YOU CAME UP WITH 4685 STORES; IS THAT RIGHT?

12:57PM 16   A.   NO.

12:57PM 17   Q.   IT, IT -- I USED THE SPREADSHEET.  ISN'T THAT WHAT THOSE

12:57PM 18   STORES IDENTIFY IN THAT COLUMN?

12:57PM 19   A.   THOSE ARE THE NUMBER OF WALGREENS AND SAFEWAY STORES IN

12:57PM 20   THE 18 METROPOLITAN AREA THAT OUR MODEL USED TO FORECAST

12:58PM 21   REVENUES, THE TOTAL NUMBER OF STORES.

12:58PM 22   Q.   RIGHT.  SO THE ASSUMPTION WOULD BE THAT THEY'RE ACTUALLY

12:58PM 23   OPERATING OUT OF THE STORES; IS THAT RIGHT?

12:58PM 24   A.   THAT WAS NOT OUR ASSUMPTION.

12:58PM 25   Q.   OKAY.  AND YOU'RE AWARE THAT THERANOS, THERANOS'S

12:58PM   1        PROJECTION AT THE TIME WAS 3100 STORES?

12:58PM   2        A.   I BELIEVE THAT'S RIGHT.

12:58PM   3        Q.   OKAY.

12:58PM   4        A.   BY THE END OF 2015.

12:58PM   5        Q.   CORRECT.

12:58PM   6             AND I THINK YOU DID TESTIFY THAT THERE WAS SOME CONCERN

12:58PM   7   EXPRESSED BY YOUR TEAM, OR SOME DISCUSSION WITHIN THE TEAM,

12:58PM   8   ABOUT SOME OF THE ASSUMPTIONS IN THE MODEL.

12:58PM   9             DO YOU RECALL THAT?

12:58PM  10        A.   I DON'T RECALL ALL OF THE BACK AND FORTH, BUT WE DID HAVE

12:58PM  11   A COLLABORATIVE EFFORT AROUND THE MODEL AND THE ASSUMPTIONS

12:59PM  12   THAT WENT INTO IT.

12:59PM  13        Q.   OKAY.  AND THERE WAS SOME DISCUSSION AND DEBATE ABOUT

12:59PM  14   THAT; IS THAT FAIR?

12:59PM  15        A.   THAT WOULD BE TYPICAL OF ANY INVESTMENT, YES.

12:59PM  16        Q.   OKAY.  AND DO YOU RECALL THAT THERE WAS ALSO SOME DEBATE

12:59PM  17   INTERNALLY ABOUT THE ACCURACY OF THERANOS'S TESTS?

12:59PM  18        A.   I DO RECALL THAT, YES.

12:59PM  19        Q.   AND IN THE DAYS LEADING UP TO THE INVESTMENT IN JANUARY OF

12:59PM  20   2000 -- IN LATE JANUARY OF 2014, SOME MEMBERS OF THE TEAM

12:59PM  21   EXPRESSED, YOU KNOW, SOME CONCERNS BASED UPON THE DATA ANALYSIS

12:59PM  22   OF THE ACCURACY OF THE TESTS; RIGHT?

12:59PM  23        A.   I BELIEVE THERE WERE QUESTIONS AROUND THE ACCURACY, YES.

12:59PM  24        Q.   AND LET'S LOOK AT 4088.

01:00PM  25        A.   OKAY.

01:00PM  1    Q.   AND 4088 IS AN EMAIL BETWEEN YOU AND MR. CLAMMER; CORRECT?

01:00PM  2    A.   YES.

01:00PM  3    Q.   AND IN THAT EMAIL -- AND MR. CLAMMER ENDED UP INVESTING IN

01:00PM  4    THERANOS THROUGH PFM; CORRECT?

01:00PM  5    A.   I BELIEVE THAT'S CORRECT.

01:00PM  6    Q.   AND IN THAT -- IN THIS EMAIL YOU'RE, YOU'RE IDENTIFYING

01:00PM  7    FOR HIM THAT THERE WAS THAT DEBATE WITH RESPECT TO ACCURACY;

01:00PM  8    CORRECT?

01:00PM  9    A.   YES.

01:01PM  10             MR. WADE:  MOVE THE ADMISSION OF 4088.

01:01PM  11             MR. LEACH:  NO OBJECTION, YOUR HONOR.

01:01PM  12             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:01PM  13         (GOVERNMENT'S EXHIBIT 4088 WAS RECEIVED IN EVIDENCE.)

01:01PM  14             MR. WADE:  IF WE CAN JUST FOCUS ON THE TOP EMAIL.

01:01PM  15    Q.   AND AGAIN, MR. CLAMMER WAS AN EXPERIENCED EXECUTIVE AND

01:01PM  16    INVESTOR?

01:01PM  17    A.   NOT AN EXECUTIVE.  AN INVESTOR IN THIS INDUSTRY DURING HIS

01:01PM  18    CAREER AS AN INVESTOR.

01:01PM  19    Q.   AND HE ENDED UP COMING UNDER A CDA SO HE COULD RECEIVE

01:01PM  20    INFORMATION RELATING TO THERANOS?

01:01PM  21    A.   I BELIEVE BY THE END OF THE PROCESS, YEAH, HE WAS.

01:01PM  22    Q.   OKAY.  AND HE WOULD PROVIDE INPUT TO YOU; RIGHT?

01:01PM  23    A.   HE WAS -- YEAH, HE, HE WAS, HE WAS NOT INVOLVED VERY MUCH

01:01PM  24    IN, IN THE ANALYSIS.

01:01PM  25    Q.   OKAY.  BUT HERE YOU'RE IDENTIFYING FOR HIM THE DEBATE

01:02PM   1    INTERNALLY ABOUT THE ACCURACY; CORRECT?

01:02PM   2    A.   YES.

01:02PM   3    Q.   AND IF WE GO BACK TO OUR CALENDAR DEMONSTRATIVE HERE ON

01:02PM   4    THE ELMO, THIS IS, THIS IS, RIGHT HERE, ABOUT A WEEK BEFORE YOU

01:02PM   5    MAKE THE INVESTMENT DECISION; CORRECT?

01:02PM   6    A.   YES.

01:02PM   7    Q.   AND DO YOU RECALL IN THAT WEEK THERE WERE SOME OTHER

01:02PM   8    CONCERNS THAT CAME UP AS EXPRESSED BY THE DUE DILIGENCE TEAM?

01:02PM   9    A.   I DON'T RECALL SPECIFICALLY.  I KNOW WE HAD A NUMBER OF

01:02PM  10    ITEMS THAT WE WANTED TO GET THROUGH THAT LAST WEEK.

01:02PM  11    Q.   LET'S TAKE A LOOK AT 4089.

01:03PM  12         DO YOU HAVE THAT IN FRONT OF YOU?

01:03PM  13    A.   I DO, YEAH.

01:03PM  14    Q.   AND IS THIS AN EMAIL IN WHICH DR. RABODZEY IS PROVIDING A

01:03PM  15    THERANOS TECHNICAL AND REGULATORY ASSESSMENT TO THE ANALYST

01:03PM  16    TEAM?

01:03PM  17    A.   MAYBE I COULD HAVE A MINUTE TO REVIEW IT.

01:03PM  18    Q.   SURE.

01:03PM  19    A.   OKAY.

01:03PM  20         (PAUSE IN PROCEEDINGS.)

01:03PM  21             THE WITNESS:  OKAY.  SORRY.  IT'S A LONG EMAIL.

01:05PM  22    BY MR. WADE:

01:05PM  23    Q.   AND MY QUESTION, MR. GROSSMAN, WAS, IS THIS A THERANOS

01:05PM  24    TECHNICAL AND REGULATORY ASSESSMENT THAT WAS PROVIDED TO THE

01:05PM  25    ANALYST TEAM BY DR. RABODZEY?

01:05PM  1    A.   IT IS AN ANALYSIS OF SOME OF THE TEST MATERIAL FROM

01:05PM  2    THERANOS, YES.

01:05PM  3              MR. WADE:  I WOULD MOVE THE ADMISSION OF 4089.

01:05PM  4              MR. LEACH:  NO OBJECTION, YOUR HONOR.

01:05PM  5              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:05PM  6         (GOVERNMENT'S EXHIBIT 4089 WAS RECEIVED IN EVIDENCE.)

01:06PM  7    BY MR. WADE:

01:06PM  8    Q.   AND JUST LOOKING AT THE TOP OF THE EMAIL, DR. RABODZEY

01:06PM  9    NOTES THAT HE WANTED TO FOLLOW UP ON SOME OF THE DISCUSSIONS

01:06PM  10   AND SPEND MORE TIME UNDERSTANDING THE RISKS WE HAVE TO ACCOUNT

01:06PM  11   FOR.

01:06PM  12        DO YOU SEE THAT?

01:06PM  13   A.   I DO, YES.

01:06PM  14   Q.   AND HE GOES THROUGH A PRETTY DETAILED DISCUSSION OF SOME

01:06PM  15   CALLS HE HAD WITH RESPECT TO CONSULTANTS ON DIFFERENT

01:06PM  16   REGULATORY ITEMS; CORRECT?

01:06PM  17   A.   THAT IS CORRECT.

01:06PM  18   Q.   AND THEN IF YOU LOOK AT THE PARAGRAPH STARTING WITH "IN

01:06PM  19   FACT," IN THE MIDDLE OF THAT DISCUSSION.  HE NOTES AT THE END,

01:07PM  20   AT THIS POINT MANY OF THERANOS TESTS WOULD NOT QUALIFY UNDER

01:07PM  21   ONE OR TWO OR BOTH FDA REQUIREMENTS.

01:07PM  22        DO YOU SEE THAT?

01:07PM  23   A.   I DO SEE THAT.

01:07PM  24   Q.   AND THAT AGAIN RELATES TO THAT R SQUARED DATA; RIGHT?

01:07PM  25   A.   YES.

01:07PM   1    Q.   AND THE --

01:07PM   2    A.   WELL, THAT'S MR. RABODZEY'S, MR. RABODZEY'S PERSPECTIVE AT

01:07PM   3    THAT POINT IN TIME, YES.

01:07PM   4    Q.   AND IF YOU GO DOWN TO -- AND THAT WAS THE DATA THAT

01:07PM   5    THERANOS PROVIDED TO PFM; CORRECT?

01:07PM   6    A.   I'M NOT SURE WHAT DATA HE'S ANALYZING HERE.

01:07PM   7    Q.   OKAY.  IF YOU GO TO THE NEXT BULLET POINT, HE TALKS

01:08PM   8    ABOUT -- I'M SORRY.  IF WE CAN JUST GRAB THE LAST SENTENCE OF

01:08PM   9    THAT BULLET STARTING WITH "IN COMPARISON TO."

01:08PM  10         DO YOU SEE THERE IT SAYS, "IN COMPARISON TO THAT, THERANOS

01:08PM  11    USED 32 SAMPLES TO VALIDATE," SOME OF ITS ASSAYS.

01:08PM  12         AND HE'S COMPARING THE RESULTS OF SOME OF THE THERANOS

01:08PM  13    DATA TO OTHER DATA THAT HE REVIEWED.

01:08PM  14         DO YOU SEE THAT?

01:08PM  15    A.   I DO SEE THAT.

01:08PM  16    Q.   AND HE WAS SUGGESTING THAT IT COMPARED UNFAVORABLY;

01:08PM  17    CORRECT?

01:08PM  18    A.   I THINK HE'S SAYING BOTH ARE GOOD NUMBERS.

01:09PM  19         SO I'M NOT SURE I AGREE WITH YOUR CONCLUSION THERE.

01:09PM  20    Q.   OKAY.  WELL, LET'S LOOK AT HIS CONCLUSION DOWN BELOW.  LET

01:09PM  21    ME DIGEST IT IN A SIMPLE WAY.  LET'S LOOK AT -- HE HAS THREE

01:09PM  22    NUMBERED PARAGRAPHS THERE.

01:09PM  23         DO YOU SEE THAT?

01:09PM  24    A.   I DO, YES.

01:09PM  25    Q.   AND HE IDENTIFIES SOME RISKS.

01:09PM  1           IS THAT FAIR?

01:09PM  2       A.  YES.

01:09PM  3       Q.  HE SAYS, "THE FDA COULD CHOOSE TO SEND CEASE AND DESIST

01:09PM  4       ORDER TO THERANOS ANY TIME BECAUSE THEIR TESTS ARE NOT FDA

01:09PM  5       CLEARED."

01:09PM  6           DO YOU SEE THAT?

01:09PM  7       A.  I DO.

01:09PM  8       Q.  HE SAYS, "HISTORICALLY, THE FDA DID NOT DO THIS, SO

01:09PM  9       THERANOS IS CORRECT THAT SUCH AN AGGRESSIVE SCENARIO IS

01:09PM 10       UNLIKELY IN THE NEAR FUTURE."

01:09PM 11           DO YOU SEE THAT?

01:09PM 12       A.  I DO SEE THAT.

01:09PM 13       Q.  HE THEN SAYS, "CLIA DOES NOT GUARANTEE THE COMPANY THAT

01:09PM 14       THE FDA WILL NOT GO AFTER THEM, BUT THERE ARE EXAMPLES OF LARGE

01:09PM 15       CLIA LABS OPERATING WITHOUT FDA APPROVAL."

01:09PM 16           DO YOU SEE THAT?

01:09PM 17       A.  I DO SEE THAT.

01:09PM 18       Q.  AND THEN HE NOTES THAT THERE'S A RISK, IF YOU GO ON TO THE

01:10PM 19       SECOND PAGE AT THE TOP.

01:10PM 20           DO YOU SEE IT SAYS, "BASED ON THE DATA I HAVE SEEN SO FAR

01:10PM 21       I DO NOT BELIEVE THERANOS HAS ADEQUATE DATA FOR FDA APPROVAL

01:10PM 22       FOR MANY OF ITS TESTS TODAY (THEY ARE CLEARLY WORKING ON

01:10PM 23       THAT)."

01:10PM 24           DO YOU SEE THAT?

01:10PM 25       A.  I DO SEE THAT, YES.

01:10PM  1     Q.   OKAY.  AND YOU RECOGNIZED THAT RISK AT THE TIME THAT YOU

01:10PM  2     WERE MAKING THIS DECISION?

01:10PM  3     A.   MR. RABODZEY IS DOING HIS JOB.  HE'S ANALYZING THE DATA

01:10PM  4     AND HE'S PROVIDING HIS RISK ASSESSMENT BASED ON THE DATA THEY

01:10PM  5     PROVIDED US, WHICH WAS NOT ALL OF THE DATA THAT THEY HAD, AND

01:10PM  6     WAS NOT THE DATA THAT WAS -- WE DIDN'T REVIEW THEIR FDA

01:11PM  7     FILINGS, SO WE DON'T KNOW WHAT ADDITIONAL DATA SETS THEY HAVE.

01:11PM  8     WE JUST ASKED FOR A SAMPLE OF DATA ON THEIR TECHNOLOGY.

01:11PM  9          SO BASED ON THAT, THIS IS HIS RISK ASSESSMENT.

01:11PM  10    Q.   OKAY.  THAT IS WHAT YOU WERE ASKING HIM TO DO IS TO ASSESS

01:11PM  11    THE RISK SO YOU KNEW THE RISK YOU WERE TAKING WHEN YOU MADE THE

01:11PM  12    INVESTMENT; RIGHT?

01:11PM  13    A.   THAT'S CORRECT.

01:11PM  14    Q.   ALL RIGHT.  LET'S LOOK AT THE CONCLUSION.  AND I WANT TO

01:11PM  15    LOOK IN PARTICULAR AT THE LAST SENTENCE OF THAT FIRST

01:11PM  16    PARAGRAPH.

01:11PM  17         HE SAYS, "WE ALSO HAVE TO ASSUME THAT THERE IS A

01:11PM  18    POSSIBILITY THAT THEY WILL NEVER BE ABLE TO GET CERTAIN TESTS

01:11PM  19    APPROVED BY THE FDA AND THEY WILL REMAIN VENOUS BLOOD DRAW

01:11PM  20    TESTS (WHICH THEY MENTIONED)."

01:11PM  21         DO YOU SEE THAT?

01:11PM  22    A.   YES.

01:11PM  23    Q.   AND YOU UNDERSTOOD THAT WAS --

01:11PM  24    A.   I'M SORRY, COULD YOU REPEAT THE LAST PART?

01:11PM  25    Q.   YOU UNDERSTOOD WHAT HE WAS COMMUNICATING TO YOU AT THE

01:11PM  1    TIME?

01:11PM  2    A.   WELL, THIS IS HIS RISK ASSESSMENT.  WELL, THIS IS HIS --

01:12PM  3    WELL, MR. RABODZEY IS PROVIDING US HIS PERSPECTIVE ON THE RISKS

01:12PM  4    AROUND FDA APPROVAL.

01:12PM  5    Q.   AND THAT THEY MAY NOT GET APPROVAL AND THAT SOME OF THEIR

01:12PM  6    TESTS MAY REMAIN VENOUS BLOOD DRAW TESTS, WHICH THERANOS TOLD

01:12PM  7    YOU; RIGHT?

01:12PM  8    A.   THEY DID NOT TELL US THEIR TESTS WOULD REMAIN VENOUS BLOOD

01:12PM  9    DRAW TESTS, NO, THAT'S NOT WHAT THEY TOLD US.

01:12PM  10   Q.   ISN'T THAT WHAT DR. RABODZEY WROTE RIGHT THERE?

01:12PM  11   A.   WELL, I THINK WE MAY BE TALKING ABOUT DIFFERENT THINGS.

01:12PM  12        THE COMPANY TOLD US THAT THEY WOULD, IN A SHORT PERIOD OF

01:12PM  13   TIME, BE DOING ALMOST ALL FINGERSTICK USING THE PROPRIETARY

01:12PM  14   TECHNOLOGY.

01:12PM  15        THIS IS REFERRING TO THE RISKS -- ALL COMPANIES THAT ARE

01:12PM  16   GOING THROUGH AN FDA APPROVAL PROCESS HAVE RISKS.  WE CAN PICK

01:12PM  17   UP THE PAPER EVERY WEEK AND READ ABOUT COMPANIES THAT HAVE

01:12PM  18   SETBACKS FROM A REGULATORY STANDPOINT.  IT'S JUST PART OF THIS

01:13PM  19   INDUSTRY.

01:13PM  20        SO HE'S DOING HIS JOB TO IDENTIFY THE POTENTIAL RISKS

01:13PM  21   ASSOCIATED WITH SEEKING FDA APPROVAL.

01:13PM  22        BUT THEY WERE ABLE TO OPERATE THEIR CLIA LABORATORY, THEY

01:13PM  23   WERE ABLE TO PROVIDE A GREAT RETAIL PRODUCT, DIFFERENTIATED

01:13PM  24   RETAIL PRODUCT, WITHOUT GETTING FDA APPROVAL.

01:13PM  25        SO THIS WAS AN IMPORTANT PART OF UNDERSTANDING LONGER TERM

01:13PM   1    HOW THEY WOULD EVENTUALLY SECURE FDA APPROVAL FOR ALL OF THEIR

01:13PM   2    TESTS, WHICH IS SOMETHING THEY TOLD US THAT THEY WERE GOING TO

01:13PM   3    DO.

01:13PM   4         BUT IT REALLY WASN'T FUNDAMENTAL TO THE MODEL, THE

01:13PM   5    BUSINESS THAT WE WERE INVESTING IN AT THAT POINT IN TIME.

01:13PM   6         BUT IT WAS SOMETHING THAT WAS IMPORTANT TO THE COMPANY, SO

01:13PM   7    WE WANTED TO UNDERSTAND WHAT THE PROCESS FOR GETTING FDA

01:13PM   8    APPROVAL WAS.

01:13PM   9    Q.   WELL, DOESN'T IT SAY RIGHT HERE, SIR, THAT THERANOS TOLD

01:13PM   10   YOU CERTAIN OF ITS TESTS MAY RETAIN VENOUS BLOOD DRAW TESTS?

01:13PM   11        ISN'T THAT WHAT THAT SENTENCE SAYS RIGHT THERE?

01:13PM   12   A.   I BELIEVE THIS IS MR. RABODZEY COMMUNICATING TO US.

01:13PM   13   NOT -- I DON'T BELIEVE THIS IS A THERANOS EMAIL TO PFM.

01:14PM   14   Q.   NO.  HE'S SAYING WE HAVE TO ASSUME THAT THERE IS A

01:14PM   15   POSSIBILITY THAT THEY WILL NEVER BE ABLE -- "THEY" MEANING

01:14PM   16   THERANOS; RIGHT?

01:14PM   17   A.   YES, THAT'S WHO HE IS REFERRING TO.

01:14PM   18   Q.   "WILL NEVER BE ABLE TO GET CERTAIN TESTS APPROVED BY THE

01:14PM   19   FDA AND THEY WILL REMAIN VENOUS BLOOD DRAW TESTS (WHICH THEY

01:14PM   20   MENTIONED)."

01:14PM   21   A.   THEY DID MENTION TO US THAT A SMALL PERCENTAGE OF TESTS

01:14PM   22   WERE VENOUS BLOOD DRAW AT THE TIME OF OUR DUE DILIGENCE, THAT

01:14PM   23   IS TRUE.

01:14PM   24   Q.   LET'S GO TO THE NEXT PARAGRAPH AND LOOK AT THE BOTTOM

01:14PM   25   SENTENCE STARTING WITH "BASICALLY."

01:14PM  1      IT SAYS, "BASICALLY, I WOULD ASSUME 10 TO 25 PERCENT

01:14PM  2  CHANCE OF A MAJOR DELAY OR PROBLEMS WITH GETTING ALL TESTS ON

01:14PM  3  THE MARKET THROUGH FDA."

01:14PM  4      DO YOU SEE THAT?

01:14PM  5  A.   I SEE THAT.

01:14PM  6  Q.   AND IT SAYS, "OBVIOUSLY, IF EVERYTHING GOES WELL, THIS

01:14PM  7  WILL BE A HUGE SUCCESS, SO I DON'T WANT US TO BE TOO

01:15PM  8  CONSERVATIVE HERE, BUT WANT TO MAKE SURE WE UNDERSTAND THE

01:15PM  9  RISKS INVOLVED SINCE THIS MAY AFFECT SIZING DECISIONS."

01:15PM 10      DO YOU SEE THAT?

01:15PM 11  A.   I DO SEE THAT.

01:15PM 12  Q.   LET'S NEXT TURN TO 4090.

01:15PM 13  A.   OKAY.

01:15PM 14  Q.   AND DO YOU RECOGNIZE THIS TO BE ANOTHER EMAIL IN WHICH

01:15PM 15  INFORMATION IS BEING CONVEYED AS PART OF THE DUE DILIGENCE

01:15PM 16  PROCESS RELATING TO THERANOS?

01:15PM 17  A.   IF I COULD HAVE A MINUTE TO JUST GO THROUGH THIS EMAIL

01:15PM 18  CHAIN?  THANK YOU.

01:15PM 19  Q.   SURE.  IF IT HELPS, I'M GOING TO START WITH THE SECOND TO

01:15PM 20  LAST EMAIL ON THE SECOND PAGE.

01:16PM 21      (PAUSE IN PROCEEDINGS.)

01:16PM 22          THE WITNESS:  OKAY.  SORRY.  IT'S A LONG CHAIN.

01:16PM 23  BY MR. WADE:

01:16PM 24  Q.   OKAY.  DID I ACCURATELY DESCRIBE THIS AS AN EMAIL THAT

01:17PM 25  CONVEYS ADDITIONAL INFORMATION RELATING TO THE DUE DILIGENCE

01:17PM  1    PROCESS WITH RESPECT TO YOUR THERANOS INVESTMENT?

01:17PM  2    A.   YES.

01:17PM  3              MR. WADE:  MOVE THE ADMISSION OF EXHIBIT 4090.

01:17PM  4              MR. LEACH:  NO OBJECTION, YOUR HONOR.

01:17PM  5              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:17PM  6         (GOVERNMENT'S EXHIBIT 4090 WAS RECEIVED IN EVIDENCE.)

01:17PM  7              MR. WADE:   IF WE CAN GO TO THE SECOND PAGE AND LOOK

01:17PM  8    AT THE SECOND TO THE LAST EMAIL.

01:17PM  9    Q.   DO YOU SEE HERE THAT MR. KHANNA IS CONVEYING TO YOU

01:17PM  10   THAT -- SOME INTEL THAT HE GOT WITH RESPECT TO THERANOS?

01:17PM  11   A.   YES, HE IS.

01:17PM  12   Q.   AND WHAT DO YOU RECALL HIM CONVEYING?

01:17PM  13   A.   WELL, BASED ON THIS EMAIL, HE SAID THAT HE CHECKED WITH

01:18PM  14   BLUE CROSS AND BLUE SHIELD OF ILLINOIS, THAT'S WHAT THAT --

01:18PM  15   THOSE SYMBOLS STAND FOR, BCBSIL.

01:18PM  16   Q.   UH-HUH.

01:18PM  17   A.   AGAIN, WE TALKED ABOUT THIS YESTERDAY, EACH STATE HAS A

01:18PM  18   NOT FOR PROFIT HEALTH INSURANCE COMPANY UNDER THE BLUE CROSS OR

01:18PM  19   BLUE SHIELD NAME, AND SO THIS IS THE ILLINOIS BLUE CROSS AND

01:18PM  20   BLUE SHIELD.

01:18PM  21        IT'S NOT A PUBLIC COMPANY SO THIS IS A CONTACT THAT HE HAS

01:18PM  22   FROM THIS NOT FOR PROFIT ORGANIZATION IN ILLINOIS.

01:18PM  23        AND THE FEEDBACK WAS THAT THEY HAD EVALUATED THERANOS'S

01:18PM  24   SERVICES AND THEY CONCLUDED THAT IT DOES NOT WORK -- I'M JUST

01:18PM  25   READING FROM THE EMAIL -- THEY HAVE NO CONTRACT WITH THERANOS

01:18PM  1    AND THEY DID EXTENSIVE DILIGENCE ON THE MACHINE AND CAME TO

01:18PM  2    THIS CONCLUSION.

01:18PM  3    Q.   OKAY.  SO YOU LEARNED THROUGH YOUR DUE DILIGENCE PROCESS

01:19PM  4    THAT THIS BLUE CROSS BLUE SHIELD ENTITY HAD LOOKED AT THE

01:19PM  5    TECHNOLOGY AND COME TO THE VIEW THAT IT DIDN'T WORK; RIGHT?

01:19PM  6    A.   WE -- YES.

01:19PM  7    Q.   DO YOU RECALL THAT?

01:19PM  8    A.   THAT WAS THE INFORMATION THAT WE HAD FROM VIVEK KHANNA'S

01:19PM  9    CONTACT AT BLUE CROSS BLUE SHIELD ILLINOIS.

01:19PM  10   Q.   OKAY.  AND AGAIN, THIS IS ABOUT A WEEK BEFORE YOU'RE

01:19PM  11   MAKING THE INVESTMENT DECISION; RIGHT?

01:19PM  12   A.   YES.

01:19PM  13   Q.   AND LET'S GO, LET'S GO NEXT TO 14057.

01:20PM  14   A.   OKAY.

01:20PM  15   Q.   DO YOU HAVE THAT IN FRONT OF YOU?

01:20PM  16   A.   I DO.

01:20PM  17   Q.   AND DO YOU RECOGNIZE THAT EMAIL?

01:20PM  18   A.   I DO, YES.

01:20PM  19   Q.   AND DO YOU RECOGNIZE THIS TO BE A COMMUNICATION RELATING

01:20PM  20   TO YOUR OWN TEST AT THERANOS?

01:20PM  21   A.   YES.

01:20PM  22   Q.   OKAY.  AND --

01:20PM  23   A.   WELL, THE TOP EMAIL IS.  THE REST OF THE EMAIL CHAIN IS

01:20PM  24   NOT RELATED TO THAT.

01:20PM  25   Q.   RIGHT.  THIS -- YOU OBTAINED INFORMATION FROM THE COMPANY

01:20PM 1    ABOUT YOUR TEST; CORRECT?

01:20PM 2    A.   YES.

01:20PM 3    Q.   AND THEN YOU CONVEYED IT TO YOUR TEAM; RIGHT?

01:21PM 4    A.   YES.

01:21PM 5            MR. WADE:  MOVE THE ADMISSION OF 14057.

01:21PM 6            MR. LEACH:  NO OBJECTION, YOUR HONOR.

01:21PM 7            THE COURT:  IT'S ADMITTED.

01:21PM 8        (DEFENDANT'S EXHIBIT 14057 WAS RECEIVED IN EVIDENCE.)

01:21PM 9    BY MR. WADE:

01:21PM 10   Q.   AND IN THIS EMAIL, DO YOU RECALL THAT THERE WAS ACTUALLY A

01:21PM 11   DELAY THAT RESULTED FROM YOU GETTING YOUR TEST RESULTS BACK

01:21PM 12   FROM THE COMPANY?

01:21PM 13   A.   YES, I DO.

01:21PM 14   Q.   AND THAT THE RESULTS GOT HUNG UP FOR SEVERAL DAYS; IS THAT

01:21PM 15   RIGHT?

01:21PM 16   A.   I DON'T, I DON'T RECALL IF IT WAS SEVERAL DAYS, BUT I DO

01:21PM 17   RECALL THAT IT WAS NOT FOUR HOURS.

01:21PM 18   Q.   YEAH.  IT WAS LONGER THAN EXPECTED.  IS THAT FAIR?

01:21PM 19   A.   YES.

01:21PM 20   Q.   OKAY.  AND DO YOU RECALL LEARNING THAT THAT WAS BECAUSE A

01:21PM 21   CONTROL HAD FAILED ON ONE OF THE ASSAYS THAT YOU HAD TESTED?

01:21PM 22   A.   I BELIEVE THAT, YEAH, WE -- I THINK WE COVERED THAT

01:21PM 23   YESTERDAY, YES.

01:21PM 24   Q.   AND THAT, THAT IS WHAT HELD UP THE RESULT; IS THAT RIGHT?

01:21PM 25   A.   YES.

01:21PM 1    Q.   AND IF I JUST LOOK AT YOUR EMAIL AT THE TOP, YOU

01:21PM 2    RECOGNIZED, AND YOUR TEAM RECOGNIZED, THAT THIS IS THE REAL

01:22PM 3    WORLD AND THINGS LIKE THIS CAN HAPPEN IN THE PATIENT

01:22PM 4    EXPERIENCE; CORRECT?

01:22PM 5    A.   I -- I'M NOT SURE WHAT I WAS REFERRING TO THERE.  I GUESS

01:22PM 6    IT -- OKAY.  YES.  YES.  YEAH.

01:22PM 7    Q.   AND, AGAIN, THIS IS IN THAT WINDOW JUST ABOUT A WEEK

01:22PM 8    BEFORE YOUR INVESTMENT DECISION; CORRECT?

01:22PM 9    A.   YES.

01:22PM 10   Q.   OKAY.  AND LET'S GO TO 14054.

01:23PM 11        DO YOU HAVE THAT?

01:23PM 12   A.   I DO.

01:23PM 13   Q.   AND IS THAT ANOTHER REPORT ON A DILIGENCE CALL THAT

01:23PM 14   DR. RABODZEY HAD?

01:23PM 15   A.   IT APPEARS TO BE, YES.

01:23PM 16        MR. WADE:  MOVE THE ADMISSION OF 14054.

01:23PM 17        MR. LEACH:  YOUR HONOR, 802.  I DON'T MIND THIS

01:23PM 18   COMING IN FOR STATE OF MIND.

01:23PM 19        MR. WADE:  THAT'S FINE.

01:23PM 20        THE COURT:  STATE OF MIND OF THIS WITNESS?

01:23PM 21        MR. WADE:  YES.

01:23PM 22        THE COURT:  IN REGARDS TO THE INVESTMENT DECISION?

01:23PM 23        MR. WADE:  YES.

01:23PM 24        THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, THIS

01:23PM 25   IS ADMITTED NOT FOR THE TRUTH OF THE MATTER ASSERTED IN THE

01:23PM 1    DOCUMENT, BUT ONLY AS TO THE ISSUE OF THE STATE OF MIND OF

01:23PM 2    MR. GROSSMAN IN REGARDS TO THE INVESTMENT DECISION.

01:23PM 3        AND IT MAY BE PUBLISHED.

01:23PM 4            MR. WADE:  THANK YOU, YOUR HONOR.

01:23PM 5        (DEFENDANT'S EXHIBIT 14054 WAS RECEIVED IN EVIDENCE.)

01:23PM 6    BY MR. WADE:

01:23PM 7    Q.  AND THIS IS ON THE -- THIS IS THE NEXT DAY, THIS IS ON THE

01:23PM 8    29TH OF JANUARY; CORRECT?

01:23PM 9    A.  YES.

01:23PM 10   Q.  AND DR. RABODZEY REPORTS ON A CALL THAT HE HAD WITH A

01:24PM 11   SCIENTIST WHO DEVELOPS LAB DEVELOPED TESTS.

01:24PM 12       DO YOU SEE THAT?

01:24PM 13   A.  I DO.

01:24PM 14   Q.  AND HE SAYS THAT THAT SCIENTIST'S VIEW WAS THAT CLIA

01:24PM 15   APPROVAL IS ENOUGH FOR AS LONG AS YOU HAVE MACHINES INSIDE OF

01:24PM 16   THE CLIA LAB.  THERE IS NO NEED FOR FDA APPROVAL.

01:24PM 17       DO YOU SEE THAT?

01:24PM 18   A.  I DO.

01:24PM 19   Q.  AND THEN HE SAID THAT IF YOU WANT TO PUT A MACHINE IN A

01:24PM 20   WALGREENS LOCATION, IT HAD TO BE FDA CLEARED.

01:24PM 21       DO YOU SEE THAT?

01:24PM 22   A.  I DO SEE THAT.

01:24PM 23   Q.  OKAY.  AND HE -- THIS PERSON ALSO EXPRESSED THE VIEW, IF

01:24PM 24   YOU LOOK AT THE "ADDITIONALLY" SENTENCE THERE.

01:24PM 25       "HE DID BELIEVE THAT WHILE MINIATURIZING" -- LH, IS THAT

01:24PM 1      LABCORP?

01:24PM 2      A.   LH IS REFERRING TO LABCORP.

01:24PM 3      Q.   OKAY.

01:24PM 4           -- "LABCORP TEST MENU IS POSSIBLE, IT WILL BE VERY HARD TO

01:24PM 5      DO ON SOME TESTS AND ACCURACY WILL DETERIORATE (BUT WE ALREADY

01:25PM 6      KNOW THAT)."

01:25PM 7           DO YOU SEE THAT?

01:25PM 8      A.   I SEE THAT.

01:25PM 9      Q.   AND IF YOU LOOK AT THE NEXT, IT SAYS, "OVERALL, I THINK

01:25PM 10     ACROSS THE 3 REGULATORY/SCIENCE CALLS I FEEL THAT THERE IS

01:25PM 11     SMALL RISK TO IMPLEMENTATION IF THE FDA CHOOSES TO EXERCISE

01:25PM 12     THEIR AUTHORITY, BUT THIS WOULD BE UNUSUAL.  SO, I WOULD STICK

01:25PM 13     TO MY LOW 10 TO 20 PERCENT CHANCE THAT THE IMPLEMENTATION GETS

01:25PM 14     DERAILED BY THE FDA DEMANDING MORE REGULATION AND A DECENT

01:25PM 15     CHANCE THAT SOME OF THE TESTS MAY NOT PASS THE FDA 501K

01:25PM 16     REVIEW."

01:25PM 17          DO YOU SEE THAT?

01:25PM 18     A.   I DO SEE THAT.

01:25PM 19     Q.   AND THIS IS, AGAIN, DR. RABODZEY DOING HIS JOB ABOUT A

01:25PM 20     WEEK OUT FROM THE INVESTMENT; IS THAT FAIR?

01:25PM 21     A.   AND I CONTINUE -- AND HE CONTINUES TO BELIEVE THAT THIS IS

01:26PM 22     AN ACCEPTABLE RISK FOR A PRIVATE INVESTMENT AS LONG AS WE

01:26PM 23     BELIEVE UP SIDE OF THE BASE CASE SCENARIO.

01:26PM 24     Q.   I WAS CORRECT IN MY QUESTION; IS THAT RIGHT?

01:26PM 25     A.   YES.

01:26PM  1     Q.   LET'S GO TO 14055.

01:26PM  2          DO YOU RECOGNIZE THIS TO BE ANOTHER EMAIL RELATING TO THE

01:26PM  3     THERANOS DUE DILIGENCE PROCESS RELATING TO DR. RABODZEY'S

01:27PM  4     PATIENT EXPERIENCE DUE DILIGENCE?

01:27PM  5     A.   YES.

01:27PM  6               MR. WADE:  MOVE THE ADMISSION OF 14055.

01:27PM  7               MR. LEACH:  NO OBJECTION, YOUR HONOR.

01:27PM  8               THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:27PM  9          (DEFENDANT'S EXHIBIT 14055 WAS RECEIVED IN EVIDENCE.)

01:27PM  10    BY MR. WADE:

01:27PM  11    Q.   AND THIS EMAIL -- DO YOU RECALL THAT DR. RABODZEY WENT IN

01:27PM  12    AND GOT HIS BLOOD TESTED AT WALGREENS?

01:27PM  13         I BELIEVE YOU TESTIFIED TO THAT.

01:27PM  14    A.   YES.

01:27PM  15    Q.   AND THERE WAS A DELAY IN GETTING THE TEST RESULTS.

01:27PM  16         DO YOU RECALL THAT?

01:27PM  17    A.   I RECALL THAT NOW, YES.

01:27PM  18    Q.   AND DO YOU RECALL THAT BEING AS A RESULT OF THE EMR SYSTEM

01:27PM  19    NOT FUNCTIONING PROPERLY YET?

01:27PM  20    A.   I WOULD NEED TO READ THIS TO REFRESH MY MEMORY OF THAT.

01:27PM  21    Q.   WELL, DO YOU RECALL THAT IT WAS AN ISSUE RELATING TO THE

01:27PM  22    ELECTRONIC CONNECTIVITY BETWEEN THE PHARMACY AND HIS DOCTOR'S

01:28PM  23    OFFICE?

01:28PM  24    A.   IT, IT -- IN READING THIS, IT SEEMS THAT THEY DIDN'T HAVE

01:28PM  25    THE RIGHT FAX NUMBER, BUT MAYBE I'M MISSING SOMETHING.

01:28PM   1    Q.   WELL, THAT THEY DIDN'T HAVE -- THEY WEREN'T YET CONNECTED

01:28PM   2    ON ELECTRONIC MEDICAL RECORDS; IS THAT RIGHT?  IF YOU LOOK AT

01:28PM   3    THE SECOND PARAGRAPH OF THE FIRST EMAIL?

01:28PM   4    A.   WELL, IT SOUNDS LIKE THEY SENT THE RESULTS TO A FAX

01:28PM   5    NUMBER, BUT THERE WAS A SECONDARY FAX NUMBER BASED ON THE

01:28PM   6    EMAIL.

01:28PM   7        BUT I DON'T KNOW EXACTLY WHAT MR. BLICKMAN FROM THERANOS

01:28PM   8    WAS -- I DON'T, I DON'T -- SO I'M NOT SURE.

01:28PM   9    Q.   WELL, LET ME, LET ME JUST FOCUS YOU ON THE SENTENCE ON THE

01:28PM  10    SCREEN.

01:28PM  11        YOU RECOGNIZE AT THE TIME THAT THAT WALGREENS LOCATION WAS

01:28PM  12    NOT CONNECTED VIA ELECTRONIC MEDICAL RECORDS TO DR. RABODZEY'S

01:29PM  13    MEDICAL PRACTICE?

01:29PM  14    A.   IT'S HARD FOR ME TO ANSWER THAT QUESTION.  THEY MAY HAVE

01:29PM  15    BEEN AND THE PHYSICIAN MAY HAVE STILL WANTED THE FAX BECAUSE

01:29PM  16    THAT'S HOW THEY RECEIVED IT.  IT'S HARD FOR ME TO REALLY ANSWER

01:29PM  17    THAT.  I DON'T KNOW.

01:29PM  18    Q.   OKAY.  LET'S TAKE A QUICK LOOK AT 14029.

01:29PM  19    A.   OKAY.

01:29PM  20    Q.   AND IS THIS ANOTHER EMAIL RELATING TO DR. RABODZEY'S TEST

01:29PM  21    RESULTS AS PART OF THAT DUE DILIGENCE PROCESS?

01:29PM  22    A.   YES, IT APPEARS TO BE.

01:29PM  23             MR. WADE:  MOVE THE ADMISSION OF 14029.

01:30PM  24             MR. LEACH:  802, YOUR HONOR.

01:30PM  25             MR. WADE:  I CAN OFFER IT FOR A LIMITED PURPOSE,

01:30PM  1      YOUR HONOR, TO KEEP THINGS MOVING.

01:30PM  2                  THE COURT:  WHAT LIMITED PURPOSE?

01:30PM  3                  MR. WADE:  THE STATE OF MIND OF THE INVESTOR.

01:30PM  4                  THE COURT:  DOES THIS RELATE TO YOUR LAST QUESTION

01:30PM  5      ABOUT THE FAX MACHINE?

01:30PM  6                  MR. WADE:  I BELIEVE THE SECOND EMAIL IN THE CHAIN

01:30PM  7      REFLECTS THE STATE OF MIND WITH RESPECT TO A TIMING ISSUE, AND

01:30PM  8      THEN THE TOP EMAIL WOULD BE RELEVANT TO THE STATE OF MIND WITH

01:30PM  9      RESPECT TO PERFORMANCE OF THE TEST.

01:31PM 10                  THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, THIS

01:31PM 11      WILL BE ADMITTED NOT FOR THE TRUTH OF ANYTHING ASSERTED IN THE

01:31PM 12      EMAILS, BUT ONLY AS TO ANY ISSUE AND THE STATE OF MIND OF

01:31PM 13      MR. GROSSMAN AS TO ANY DECISION AS TO INVESTMENT.

01:31PM 14          AND IT MAY BE PUBLISHED.

01:31PM 15          (DEFENDANT'S EXHIBIT 14029 WAS RECEIVED IN EVIDENCE.)

01:31PM 16      BY MR. WADE:

01:31PM 17      Q.   OKAY.  AND IT'S A SIMILAR EMAIL -- SAME EMAIL FROM

01:31PM 18      MR. BLICKMAN DOWN BELOW.  AND YOU NOTED IT TOOK A LONG TIME?

01:31PM 19      A.   YES.

01:31PM 20      Q.   AND YOU RECOGNIZED THAT AT THE TIME?

01:31PM 21      A.   YES.

01:31PM 22      Q.   BUT YOU ALSO LEARNED THAT, FROM MR. RABODZEY'S POINT OF

01:31PM 23      VIEW, THE RESULTS WERE CONSISTENT WITH PREVIOUS TESTS; RIGHT?

01:31PM 24      A.   THAT IS -- YES, THAT IS WHAT MR. RABODZEY COMMUNICATED TO

01:31PM 25      ALL OF US ON THE DUE DILIGENCE TEAM.

01:31PM 1    Q.   OKAY.  AND DO YOU RECALL THAT, IN PART, AS SOME OF THESE

01:32PM 2    CONCERNS WERE COMING TO LIGHT IN THIS WINDOW, THAT ONE OF THE

01:32PM 3    THINGS THAT YOU DID IS YOU PLACED A SECOND CALL TO

01:32PM 4    DR. ROBERTSON?

01:32PM 5    A.   I DO BELIEVE I SPOKE TO HIM AGAIN BEFORE THE INVESTMENT.

01:32PM 6    Q.   AND DO YOU RECALL THAT YOU WANTED TO MAKE SURE, IN LIGHT

01:32PM 7    OF SOME OF THESE CONCERNS, THAT YOU WERE, YOU WERE COMFORTABLE

01:32PM 8    WITH HIS VIEWS WITH RESPECT TO THE TECHNOLOGY; RIGHT?

01:32PM 9    A.   THAT'S A LONG QUESTION.  MAYBE YOU COULD TRY TO -- COULD

01:32PM 10   YOU ASK THAT ONE MORE TIME?

01:32PM 11   Q.   WELL, LET ME ASK THIS, DO YOU RECALL THAT YOU CALLED HIM

01:32PM 12   AND JUST POINT-BLANK SAID, DOES THE TECHNOLOGY WORK?  AND HE

01:32PM 13   SAID YES?

01:32PM 14   A.   I BELIEVE WE TALKED ABOUT THE TECHNOLOGY IN THAT SECOND

01:32PM 15   CONVERSATION, YES.

01:32PM 16   Q.   AND DO YOU RECALL WHAT HE CONVEYED TO YOU ABOUT THE

01:33PM 17   TECHNOLOGY IN THAT SECOND CONVERSATION?

01:33PM 18   A.   I -- WHAT I REMEMBER WASN'T REALLY ANY DIFFERENT FROM THE

01:33PM 19   FIRST CONVERSATION.

01:33PM 20   Q.   IT WAS CONSISTENT WITH THAT AND THAT HE WAS COMFORTABLE

01:33PM 21   WITH THE TECHNOLOGY --

01:33PM 22   A.   YES.

01:33PM 23   Q.   -- AND THAT GAVE YOU ASSURANCE?

01:33PM 24        BUT YOU, YOU WENT BACK TO HIM LATE IN THE DUE DILIGENCE

01:33PM 25   PROCESS FOR A SECOND CALL AFTER SOME OF THESE ISSUES CAME UP;

01:33PM  1    IS THAT RIGHT?

01:33PM  2    A.   I DON'T -- I MEAN, WE WERE -- OFTEN IN AN INVESTMENT LIKE

01:33PM  3    THIS WHERE THERE'S A DEADLINE, THERE'S A LOT OF WORK THAT GETS

01:33PM  4    DONE IN THE LAST DAY, TWO, THREE DAYS.

01:33PM  5         WE HAD A NUMBER OF ITEMS THAT WE HAD TO GET THROUGH, AND

01:33PM  6    AS PART OF OUR DUE DILIGENCE PROCESS, IT INCLUDED CIRCLING BACK

01:33PM  7    TO MR. ROBERTSON, IN ADDITION TO OTHER ITEMS THAT WE HAD, OPEN

01:33PM  8    ITEMS THAT WE HAD.

01:33PM  9    Q.   OKAY.

01:33PM 10    A.   SORT OF A NORMAL PART OF A PROCESS LIKE THIS.

01:34PM 11    Q.   OKAY.  AND AS YOU PUSHED THIS FORWARD, DO YOU RECALL THAT

01:34PM 12    YOUR TEAM PREPARED, YOUR ANALYST TEAM PREPARED A POWERPOINT FOR

01:34PM 13    THE PEOPLE WITHIN PFM WHO WERE CONSIDERING AN INVESTMENT?

01:34PM 14    A.   YES, I DO REMEMBER THAT.

01:34PM 15    Q.   AND LET'S LOOK AT 7411.

01:34PM 16         DO YOU HAVE THAT IN FRONT OF YOU?

01:34PM 17    A.   I DO.

01:34PM 18    Q.   AND IS THIS THE POWERPOINT THAT YOU GAVE, OR THAT WAS

01:34PM 19    GIVEN TO THE PEOPLE WHO MIGHT BE INTERESTED IN INVESTING IN

01:34PM 20    THERANOS?

01:34PM 21    A.   THIS WAS THE POWERPOINT THAT AT THAT POINT IN TIME WE

01:35PM 22    PRODUCED.

01:35PM 23         I'M NOT SURE HOW IT WAS DISTRIBUTED OR SHARED, BUT THIS IS

01:35PM 24    A DOCUMENT THAT INTERNALLY WE PRODUCED AT OUR FIRM.

01:35PM 25    Q.   AND DO YOU RECALL WHETHER YOU WERE PRESENT FOR THE

GROSSMAN CROSS BY MR. WADE (RES.)

01:35PM  1    PRESENTATION TO POTENTIAL -- PEOPLE WHO WERE INTERESTED IN

01:35PM  2    POTENTIALLY INVESTING?

01:35PM  3    A.  I DON'T -- I DO RECALL.  I WAS NOT PRESENT.  I WAS NOT IN

01:35PM  4    SAN FRANCISCO THE DAY OF THIS PRESENTATION.

01:35PM  5    Q.  OKAY.  BUT YOU RECEIVED A COPY OF THE FINAL PRESENTATION?

01:35PM  6    A.  MY MEMORY IS THAT WE HAD MULTIPLE ITERATIONS OF THIS, SO I

01:35PM  7    DO -- I WOULD HAVE EXPECTED IT WOULD BE UNUSUAL IF I DIDN'T GET

01:35PM  8    A COPY OF THIS.

01:35PM  9        BUT I DON'T REMEMBER SPECIFICALLY.

01:35PM  10   Q.  OKAY.

01:35PM  11       I THINK WITH STIPULATION FROM THE GOVERNMENT, I MOVE THE

01:35PM  12   ADMISSION OF 7411.

01:35PM  13           MR. LEACH:  THAT'S CORRECT, YOUR HONOR.

01:35PM  14           THE COURT:  ARE THERE ANY REDACTIONS THAT WILL BE

01:35PM  15   MADE TO THIS?

01:36PM  16           MR. WADE:  IS THE COURT PARTICULARLY FOCUSSED ON --

01:36PM  17           THE COURT:  THERE'S -- THE BATES NUMBERS IN THE

01:36PM  18   RIGHT-HAND CORNER SEEM TO HAVE SOME IDENTIFIERS.

01:36PM  19           MR. WADE:  THE COURT'S INDULGENCE FOR A MOMENT.

01:36PM  20       (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

01:37PM  21           MR. WADE:  WE WILL REDACT THOSE.

01:37PM  22   Q.  AND WHILE WE ARE WORKING TO DO THAT, AND BEFORE WE

01:37PM  23   PUBLISH --

01:37PM  24           THE COURT:  THANK YOU.

01:37PM  25       (DEFENDANT'S EXHIBIT 7411 WAS RECEIVED IN EVIDENCE.)

01:37PM  1      BY MR. WADE:

01:37PM  2      Q.   -- LET ME JUST ASK A COUPLE OF QUESTIONS TO REMEMBER WHERE

01:37PM  3      WE STARTED ON CROSS-EXAMINATION.

01:37PM  4           THERE ARE A GROUP OF PEOPLE WITHIN PFM WHO HAVE THE

01:37PM  5      DECISION TO INVEST THROUGH PFM IN SOME OF THESE INVESTMENTS;

01:37PM  6      CORRECT?

01:37PM  7      A.   THERE'S -- I'M SORRY.  COULD YOU REPEAT THE QUESTION?

01:37PM  8      Q.   YEAH.  DO YOU RECALL THAT ONE OF YOUR FUNDS ALLOWS CERTAIN

01:37PM  9      SENIOR MEMBERS OF YOUR FIRM TO INVEST ALONGSIDE THE HEDGE FUND?

01:37PM  10     A.   YES.

01:37PM  11     Q.   AND SOMETIMES WHEN YOU DO THAT, DO YOU GIVE A PRESENTATION

01:37PM  12     OF THE INTERNAL ANALYSIS TO THOSE PEOPLE WHO ARE CONSIDERING

01:37PM  13     THAT SIDECAR INVESTMENT?

01:37PM  14     A.   WE WOULD PREPARE AN ANALYSIS.  WE MAY OR MAY NOT DO A

01:37PM  15     PRESENTATION.

01:37PM  16     Q.   OKAY.  AND IS THE IDEA THAT YOU'LL GIVE THEM AN OVERVIEW

01:38PM  17     OF THE INVESTMENT AND ASSESSMENT OF THE RISKS AND HOW THE FIRM

01:38PM  18     SEES THE INVESTMENT AT THE TIME?

01:38PM  19     A.   YES.

01:38PM  20     Q.   AND THEN ULTIMATELY THE DECISION IN THAT CASE IS UP TO THE

01:38PM  21     INDIVIDUALS AS TO WHETHER OR NOT THEY WISH TO INVEST?

01:38PM  22     A.   YES.

01:38PM  23     Q.   AND I TAKE IT THOSE INDIVIDUALS CAN CONSIDER WHATEVER

01:38PM  24     INFORMATION THEY WANT; RIGHT?

01:38PM  25     A.   YES.

01:38PM   1    Q.   BUT DO YOU DO YOUR BEST TO FULLY INFORM THEM OF THE

01:38PM   2    RELEVANT INFORMATION WHEN YOU GIVE PRESENTATIONS?

01:38PM   3    A.   YES.

01:38PM   4    Q.   OKAY.

01:38PM   5         IF WE CAN PUBLISH THAT AND FOCUS ON -- THIS IS DATED

01:38PM   6    JANUARY 30TH, 2014.  DO YOU SEE THAT, THE EMAIL THAT TRANSMITS

01:38PM   7    THIS?

01:38PM   8    A.   I DO.  SORRY.  YES.

01:38PM   9    Q.   AND IF WE JUST GO TO THE FIRST PAGE OF THE POWERPOINT.

01:39PM  10         DO YOU SEE THERE THERE'S A THERANOS LOGO; RIGHT?

01:39PM  11    A.   I DO.

01:39PM  12    Q.   AND DID YOU SEEK PERMISSION FROM THERANOS TO USE THEIR

01:39PM  13    LOGO?

01:39PM  14    A.   I DON'T RECALL.

01:39PM  15    Q.   WERE YOU TRYING TO CREATE THE IMPRESSION WITH THE PEOPLE

01:39PM  16    THAT THIS WAS INFORMATION THAT WAS BEING CONVEYED BY THERANOS?

01:39PM  17    A.   I, I, I DON'T BELIEVE THAT WAS WHAT WE WERE TRYING TO

01:39PM  18    CONVEY, BUT I DID NOT PREPARE THIS SLIDE, SO I DON'T -- I CAN'T

01:39PM  19    SPEAK FOR THE THOUGHT PROCESS BEHIND IT.

01:39PM  20    Q.   LET'S GO TO, LET'S GO TO THE NEXT PAGE, AND THE NEXT PAGE.

01:39PM  21         THIS -- THAT WAS JUST A TRANSITION PAGE.

01:39PM  22         THIS MARKET OVERVIEW, THIS IS THAT ANALYSIS FROM YOUR

01:39PM  23    MODEL THAT WE WERE LOOKING AT EARLIER; IS THAT RIGHT?

01:39PM  24    A.   YES.

01:39PM  25    Q.   AND THIS WAS AN INDEPENDENT ANALYSIS THAT YOUR TEAM HAD

01:40PM   1    DONE AS PART OF YOUR MODELING?

01:40PM   2    A.    THESE FIGURES I BELIEVE WERE LESS THAN THE MARKET FIGURES

01:40PM   3    THE COMPANY HAD SHARED WITH US.

01:40PM   4    Q.    OKAY.

01:40PM   5    A.    SO, YES, I THINK WE, WE BELIEVE WE ARRIVED AT THESE MARKET

01:40PM   6    SIZES INDEPENDENTLY.

01:40PM   7    Q.    AND DO YOU RECALL WHAT YOU WERE PROJECTING THERANOS'S

01:40PM   8    MARKET SHARE TO BE AT?

01:40PM   9    A.    IN WHICH PART OF THE BUSINESS?

01:40PM   10   Q.    WELL, IN THE TOTAL U.S. LAB MARKET?

01:40PM   11   A.    IN THE TOTAL U.S. LAB MARKET.

01:40PM   12         WE DIDN'T, WE DIDN'T MODEL THE COMPANY BASED ON A TOPS

01:40PM   13   DOWN VIEW OF THE WHOLE U.S. LAB MARKET.

01:40PM   14         SO, I'M SORRY, I CAN'T REALLY ANSWER THE QUESTION THE WAY

01:40PM   15   YOU WANT.

01:40PM   16   Q.    WELL, I'M JUST WONDERING IF YOU RECALL.  DO YOU RECALL

01:41PM   17   THAT WHEN YOU DID YOUR MODELING THAT YOU PROJECTED THAT

01:41PM   18   THERANOS WOULD HAVE 19 PERCENT OF THE U.S. LAB MARKET BY 2017?

01:41PM   19   A.    WE HAD DIFFERENT SCENARIOS, SO I THINK IT DEPENDED ON

01:41PM   20   WHICH SCENARIO YOU'RE REFERRING TO.

01:41PM   21   Q.    I'M JUST -- DO YOU RECALL GENERALLY WHAT PERCENTAGE OF THE

01:41PM   22   U.S. MARKET YOU RECALL THEM OBTAINING IN YOUR FINANCIAL

01:41PM   23   MODELING, BASE CASE?

01:41PM   24   A.    I DON'T REMEMBER SPECIFICALLY THE THREE SCENARIOS, BUT I

01:41PM   25   DO KNOW THAT WE LOOKED AT -- THAT'S EXACTLY HOW WE LOOKED AT

01:41PM  1    IT.  WE SAID, WITH A TECHNOLOGY LIKE THIS THAT WAS EASIER TO

01:41PM  2    USE, WAS CHEAPER FOR THE CONSUMER, MORE CONVENIENT, ALL OF THE

01:41PM  3    GREAT ASPECTS OF FINGERSTICK TECHNOLOGY, WHAT SHARE OF EACH ONE

01:41PM  4    OF THESE METROPOLITAN AREAS WOULD THIS TECHNOLOGY, WHAT SHARE

01:41PM  5    OF THE MARKET WOULD THEY HAVE OVER THE NEXT COUPLE YEARS.

01:41PM  6    Q.  AND IF WE JUST -- LET'S JUST JUMP QUICKLY, WHILE WE'RE ON

01:41PM  7    THIS POINT, TO PAGE 8.

01:42PM  8        DO YOU SEE HERE A 19 PERCENT MARKET PENETRATION BY 2017?

01:42PM  9    A.  YES.

01:42PM  10   Q.  OKAY.  AND IF WE CAN JUMP BACK TO WHERE WE WERE IN THE

01:42PM  11   LAST SLIDE WITH THE PIE CHARTS.

01:42PM  12   A.  WELL, I'M SORRY, THAT'S OF THOSE 18 MARKETS.

01:42PM  13   Q.  OKAY.  OF THE 18 MARKETS THAT THEY WERE GOING TO BE IN.

01:42PM  14   OKAY.

01:42PM  15       AND IF WE CAN GO TO THE NEXT SLIDE.

01:42PM  16       HERE YOU PROVIDED THE BUSINESS REVIEW.  THIS IS JUST A

01:42PM  17   QUICK OVERVIEW OF THE COMPANY; RIGHT?

01:42PM  18   A.  YES.

01:42PM  19   Q.  AND DO YOU SEE IN THE THIRD BULLET YOU NOTE A MODEST

01:43PM  20   NUMBER OF CURRENT TESTS REQUIRE VENOUS BLOOD DRAW.

01:43PM  21       DO YOU SEE THAT?

01:43PM  22   A.  I DO.

01:43PM  23   Q.  AND THAT THEY WILL BE TRANSITIONED IN THE COMING MONTHS?

01:43PM  24   A.  YES.

01:43PM  25   Q.  OKAY.  AND IF YOU GO TO THE NEXT SLIDE, THIS IDENTIFIES

01:43PM  1    ALL OF THE RISKS.  IS THAT FAIR?

01:43PM  2    A.   WELL, I WANT TO ANSWER YOUR QUESTION.  I THINK THIS IS

01:43PM  3    REALLY MORE DESCRIBING THE SCENARIOS, NOT -- IT'S NOT A RISK.

01:43PM  4    IT'S NOT A -- IT'S NOT A PAGE IN THE PRESENTATION THAT JUST

01:43PM  5    ADDRESSES RISK.

01:43PM  6    Q.   OKAY.  WELL, DID YOU WANT INVESTORS TO KNOW ABOUT THE

01:43PM  7    REGULATORY RISKS THAT DR. RABODZEY IDENTIFIED?

01:43PM  8    A.   I MEAN, I -- THE GOAL WAS TO GIVE INVESTORS A PICTURE OF

01:44PM  9    WHAT WE THOUGHT THE BUSINESS WAS -- WHAT WE THOUGHT OF THE

01:44PM 10    BUSINESS AND WHAT THE DIFFERENT SCENARIOS WERE.

01:44PM 11    Q.   RIGHT.  MY QUESTION IS -- WAS SLIGHTLY DIFFERENT.

01:44PM 12        DID YOU WANT THEM TO KNOW ABOUT THE RISKS THAT WERE

01:44PM 13    IDENTIFIED DURING THE DUE DILIGENCE PROCESS?

01:44PM 14    A.   YES, SURE.

01:44PM 15    Q.   OKAY.  DO YOU BELIEVE THAT YOU FULLY INFORMED THEM OF ALL

01:44PM 16    OF THOSE RISKS THAT YOU IDENTIFIED IN THIS PRESENTATION?

01:44PM 17    A.   YES.

01:44PM 18    Q.   OKAY.  DO YOU SEE ANYWHERE HERE WHERE YOU DISCUSS THE

01:44PM 19    ACCURACY CONCERNS THAT WERE EXPRESSED BY DR. RABODZEY?

01:44PM 20    A.   WE -- I DON'T -- WELL, MAYBE I CAN REVIEW THIS.

01:44PM 21        (PAUSE IN PROCEEDINGS.)

01:44PM 22            THE WITNESS:  YEAH, I DON'T THINK THAT WAS -- THAT

01:45PM 23    WAS NOT A RISK THAT WE FELT WAS A MAJOR RISK AT THIS POINT IN

01:45PM 24    THE INVESTMENT GIVEN THAT THEY WERE OPERATING THEIR CLIA LAB

01:45PM 25    AND HAD SUCCESSFULLY PASSED PROFICIENCY TESTING REQUIREMENTS

01:45PM   1    FOR ALL OF THEIR MENU OF TESTS.

01:45PM   2         AS IT RELATES TO ACCURACY, I THINK THAT WAS MUCH MORE OF

01:45PM   3    AN FDA APPROVAL ISSUE, WHICH REALLY WAS ABOUT THE UP SIDE

01:45PM   4    SCENARIO LONGER TERM.  I DO THINK WE TALKED ABOUT THE FDA MAY

01:45PM   5    REGULATE TESTING MORE AGGRESSIVELY.  SO I MEAN, I THINK WE DO

01:45PM   6    HIGHLIGHT THAT.

01:45PM   7         AND THIS WAS A DOCUMENT THAT WAS PART OF A CONVERSATION, A

01:45PM   8    PRESENTATION.

01:45PM   9         SO THOSE TYPES OF QUESTIONS AND ANSWERS WOULD HAVE BEEN

01:45PM   10   VERY TYPICAL WITHIN THE MEETING ITSELF.

01:45PM   11   BY MR. WADE:

01:45PM   12   Q.   OKAY.  DID YOU FEEL IT WAS APPROPRIATE TO COMMUNICATE TO

01:45PM   13   YOUR INVESTORS SORT OF THE LIMITED EXPERIENCE THAT THERANOS HAD

01:45PM   14   OPERATING IN THE RETAIL ENVIRONMENT GIVEN I THINK YOU SAID IT

01:45PM   15   WAS A TOUGH ENVIRONMENT?

01:45PM   16   A.   THE INDUSTRY CAN BE HARD AS A RETAIL PHARMACY.  THAT'S A

01:46PM   17   DIFFICULT BUSINESS TO OPERATE OVER TIME.

01:46PM   18        BUT AS IT RELATES TO THERANOS, I THINK WE, WE TRIED TO --

01:46PM   19   I DON'T -- I GUESS THE ANSWER TO YOUR QUESTION IS I'M NOT SURE

01:46PM   20   EXACTLY WHAT WE DISCUSSED IN THIS MEETING.  I WASN'T AT THIS

01:46PM   21   MEETING, SO --

01:46PM   22   Q.   OKAY.  BUT YOU WORKED -- THE TEAM WORKED ON THIS TOGETHER;

01:46PM   23   RIGHT?

01:46PM   24   A.   YES, THIS WAS A COLLABORATIVE EFFORT.

01:46PM   25   Q.   OKAY.  AND I ASSUME YOU WANTED TO TRY AND INFORM THEM OF

01:46PM   1    ALL OF THE RISKS THAT YOU IDENTIFIED; IS THAT RIGHT?

01:46PM   2    A.   I THINK THERE'S AN EFFORT TO SUMMARIZE THE INVESTMENT,

01:46PM   3    BOTH THE POSITIVES AND THE NEGATIVES.  I DON'T THINK A MEETING

01:46PM   4    LIKE THIS WE HAVE TIME TO GO THROUGH EVERY PIECE OF DUE

01:46PM   5    DILIGENCE, ALL OF THE DIFFERENT PEOPLE WE TALKED TO.

01:46PM   6         SO THE GOAL OF A MEETING LIKE THIS IS TO ACTUALLY GIVE

01:46PM   7    THEM AN OVERVIEW, A HIGH LEVEL SUMMARY OF THE INVESTMENT

01:46PM   8    OPPORTUNITY, THE POSITIVES, THE NEGATIVES.  THAT'S REALLY THE

01:46PM   9    GOAL OF A MEETING AND DOCUMENT LIKE THIS.

01:46PM  10         IT'S NOT, IT'S NOT SUPPOSED TO BE A DETAILED REVIEW OF

01:47PM  11    EVERY SINGLE PIECE OF DUE DILIGENCE THAT WE DID.

01:47PM  12    Q.   FAIR ENOUGH.

01:47PM  13         IN AN HOUR LONG MEETING, YOU CAN'T COVER EVERYTHING;

01:47PM  14    CORRECT?

01:47PM  15    A.   YES.

01:47PM  16    Q.   AND IT'S UP TO THE INVESTORS ON AN INDIVIDUAL BASIS TO

01:47PM  17    FOLLOW UP IF THEY HAVE QUESTIONS; RIGHT?

01:47PM  18    A.   CORRECT.

01:47PM  19    Q.   OKAY.  LET'S GO TO THE NEXT SLIDE.  THE NEXT SLIDE.

01:47PM  20    SORRY.

01:47PM  21         IN THIS YOU WERE CONVEYING TO THEM -- YOU WERE CONVEYING

01:47PM  22    TO THE POTENTIAL INTERNAL INVESTORS THE FINANCIAL MODELING IN

01:47PM  23    THE BASE CASE; CORRECT?

01:47PM  24    A.   THAT'S CORRECT.

01:47PM  25    Q.   AND WERE YOU COMFORTABLE INCLUDING THESE NUMBERS WITHOUT

01:47PM 1    INDICATING THAT THEY ONLY HAD $25 MILLION IN REVENUE IN 2013?

01:47PM 2    A.   THIS WAS A FORECAST OF FUTURE REVENUE GROWTH, SO WE

01:47PM 3    WEREN'T -- 2013 WASN'T REALLY RELEVANT TO THE OUTLOOK OVER THE

01:48PM 4    NEXT COUPLE OF YEARS.

01:48PM 5    Q.   RIGHT.  BUT YOU WERE GOING -- THERANOS -- YOU HAD

01:48PM 6    PROJECTED THERANOS GOING FROM 25 MILLION TO 249 MILLION.

01:48PM 7    THAT'S -- YOU ARE THE FINANCE GUY, BUT THAT'S SEVERAL HUNDRED

01:48PM 8    PERCENT RETURN; RIGHT?  APPROACHING A THOUSAND PERCENT RETURN?

01:48PM 9    A.   YES, THAT SEEMS LIKE MAYBE AN ACCURATE CALCULATION.

01:48PM 10   Q.   OKAY.  YOU DIDN'T THINK THAT WAS -- REQUIRED DISCLOSURE IN

01:48PM 11   THIS?

01:48PM 12   A.   WELL, I THINK THE THING THAT I THINK WE IMPRESSED UPON

01:48PM 13   OUR, OUR -- IN THIS PRESENTATION WAS THAT THESE NUMBERS WERE

01:48PM 14   LOWER THAN THE COMPANY'S FORECASTS, AND WE HAD THOROUGHLY

01:48PM 15   VETTED THEIR FORECASTS AND HAD DONE AN EXTENSIVE AMOUNT OF DUE

01:48PM 16   DILIGENCE ON THE COMPANY, THE TECHNOLOGY, AND ALL OF THE

01:48PM 17   DIFFERENT PIECES OF THIS BUSINESS THAT WE FELT WERE IMPORTANT

01:48PM 18   TO UNDERSTAND IN BUILDING A MODEL LIKE THIS.

01:48PM 19   Q.   OKAY.  AND IF WE GO TO THE NEXT PAGE.  I'M SORRY, IF WE

01:49PM 20   CAN GO TO THE NEXT PAGE.

01:49PM 21       THIS IS THE BULL CASE, AND THIS IS THE -- THIS IS THE

01:49PM 22   OPTIMISTIC SCENARIO; CORRECT?

01:49PM 23   A.   YES.

01:49PM 24   Q.   AND SO, AGAIN, YOU GAVE THEM THE THREE CASES, AND THEY CAN

01:49PM 25   SORT OF ASSESS THE RISK HOWEVER THEY WISH TO ASSESS IT.

01:49PM   1        FAIR ENOUGH?

01:49PM   2   A.   YES.

01:49PM   3   Q.   OKAY.  LET'S GO TO THE NEXT SLIDE.

01:49PM   4        AND HERE YOU PROVIDE THEM THE COMPARISON TO OTHER HIGH

01:49PM   5   GROWTH COMPANIES SO THAT THEY HAVE THAT INFORMATION IN

01:49PM   6   CONNECTION WITH THEIR ANALYSIS; RIGHT?

01:49PM   7   A.   HOW THE PUBLIC MARKET VALUES OTHER OPEN ENDED DISRUPTIVE

01:49PM   8   COMPANIES, YES.

01:49PM   9   Q.   AND YOU FELT LIKE THIS WAS AN APPROPRIATE PEER GROUP BASED

01:50PM  10   UPON YOUR DISCUSSIONS WITH MR. JAMES AND OTHERS?

01:50PM  11   A.   YES.

01:50PM  12   Q.   OKAY.  LET'S GO TO THE NEXT SLIDE.

01:50PM  13        AND YOU CONVEYED TO THE INTERNAL PFM PEOPLE CONSIDER AN

01:50PM  14   INVESTMENT $20.3 BILLION VALUATION THAT YOU CAME UP WITH;

01:50PM  15   CORRECT?

01:50PM  16   A.   AGAIN, I WASN'T IN THIS MEETING, SO I'M NOT EXACTLY SURE

01:50PM  17   HOW THIS WAS CONVEYED.  BUT IT'S CERTAINLY PART OF THE

01:50PM  18   PRESENTATION.

01:50PM  19   Q.   OKAY.

01:50PM  20   A.   AND THE DOCUMENT.

01:50PM  21   Q.   AND I DON'T SEE ANYWHERE IN THE SLIDE WHERE YOU MENTION

01:50PM  22   THAT THEY WERE ONLY IN THREE STORES AT THE TIME OF THE

01:50PM  23   INVESTMENT.

01:50PM  24        DO YOU KNOW WHETHER THAT WAS CONVEYED IN THE MEETING?

01:50PM  25   A.   I DON'T.

01:50PM  1    Q.   OKAY.  IN ADDITION -- SO THIS WAS AN INTERNAL DOCUMENT.

01:50PM  2         WOULD YOU SEND THIS DOCUMENT TO PEOPLE OUTSIDE OF THE FIRM

01:50PM  3    WHO WERE CONSIDERING INVESTMENT AS WELL?

01:51PM  4    A.   I, I, I WASN'T INVOLVED IN THAT, SO I'M NOT SURE.

01:51PM  5    Q.   OKAY.  AND IN ADDITION TO THAT, THERE WERE SOME ONE OFF

01:51PM  6    CALLS THAT YOU MADE TO PEOPLE WHO MIGHT BE INTERESTED IN

01:51PM  7    INVESTING THROUGH THE PARTNERS VEHICLE; IS THAT RIGHT?

01:51PM  8    A.   THAT WOULDN'T BE UNUSUAL IN A SITUATION LIKE THIS.  I

01:51PM  9    DON'T RECALL SPECIFICALLY THE CALLS THAT I MADE.

01:51PM 10    Q.   CAN YOU TAKE A LOOK AT 13822.

01:51PM 11    A.   OKAY.

01:51PM 12    Q.   AND DO YOU RECALL DISCUSSIONS WITH MR. GREER ABOUT AN

01:52PM 13    INVESTMENT?

01:52PM 14    A.   I DON'T RECALL, BUT OBVIOUSLY THIS EMAIL HELPS TO REFRESH

01:52PM 15    MY MEMORY.

01:52PM 16    Q.   AND WAS HE SOMEONE OUTSIDE OF THE FIRM?  OR WHAT WAS HIS

01:52PM 17    RELATIONSHIP?  HOW WAS HE GOING TO INVEST?

01:52PM 18    A.   HE WAS AN INVESTOR IN OUR HEDGE FUND.

01:52PM 19    Q.   OKAY.  SO WAS THIS LIKE A SIDECAR INVESTMENT THAT HE WAS

01:52PM 20    GOING TO DO?

01:52PM 21    A.   THIS WOULD BE A COINVESTMENT OPPORTUNITY, ABOVE AND BEYOND

01:52PM 22    THE INVESTMENT HE WOULD MAKE THROUGH HIS ALLOCATION TO OUR

01:52PM 23    HEDGE FUND.

01:52PM 24    Q.   OKAY.  AND SO YOU WERE CONVEYING SOME OF THE RISKS TO HIM

01:52PM 25    IN CONNECTION WITH THE INVESTMENT?

01:52PM   1    A.   I BELIEVE I WAS -- WE WERE EMAILING ABOUT THE BUSINESS,

01:52PM   2    YES.

01:52PM   3                MR. WADE:  OKAY.  MOVE EXHIBIT 13822.

01:52PM   4                MR. LEACH:  NO OBJECTION, YOUR HONOR.

01:52PM   5                THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:52PM   6        (DEFENDANT'S EXHIBIT 13822 WAS RECEIVED IN EVIDENCE.)

01:53PM   7    BY MR. WADE:

01:53PM   8    Q.   AND DO YOU SEE IN THIS EMAIL MR. GREER ASKS ABOUT THE

01:53PM   9    VALUATION IN THE SECOND TO THE TOP EMAIL AND ASKS IF IT'S

01:53PM  10    $20 BILLION?

01:53PM  11        DO YOU SEE THAT?

01:53PM  12        AND WHETHER IT'S OFF THE FINANCING, DO YOU KNOW WHAT HE

01:53PM  13    MEANS THERE?

01:53PM  14    A.   HE'S ASKING IS THE VALUATION -- HE'S ASKING A QUESTION

01:53PM  15    RELATED TO WHETHER THE VALUE IS 20 BILLION BEFORE OR AFTER

01:53PM  16    INVESTING.

01:53PM  17    Q.   THE VALUATION BASED UPON THE OFFERING PRICE WOULD HAVE

01:53PM  18    BEEN ABOUT 9 BILLION; RIGHT?

01:53PM  19    A.   YEAH.  I THINK MR. GREER WAS CONFUSED BETWEEN THE VALUE WE

01:53PM  20    HAD ON THE COMPANY ON THE U.S. OPERATIONS AND THE ACTUAL

01:53PM  21    VALUATION THAT WE WERE INVESTING IN.

01:53PM  22    Q.   OKAY.  AND YOU CLARIFIED THAT IT WAS A DISCOUNTED CASH

01:54PM  23    FLOW VALUATION?

01:54PM  24    A.   CORRECT.

01:54PM  25    Q.   AND THAT IT WAS VALUED OFF GOING PUBLIC OFF THOSE COMPS;

01:54PM   1    RIGHT?

01:54PM   2    A.   WELL, WHAT I SAID WAS THAT THAT'S THE INTRINSIC VALUE,

01:54PM   3    THAT'S THE VALUE OF THIS BUSINESS, THE U.S. PART OF THE

01:54PM   4    BUSINESS THAT WE SEE.

01:54PM   5         BUT IF THIS COMPANY GOES PUBLIC, THE -- IT WILL LIKELY NOT

01:54PM   6    BE VALUED OFF OF A DCF VALUE.  IT WILL LIKELY BE VALUED THE WAY

01:54PM   7    THAT THE PUBLIC MARKET GETS EXCITED ABOUT OTHER OPEN ENDED,

01:54PM   8    DISRUPTED BUSINESSES, AND THOSE ARE SOME EXAMPLES THAT I PUT IN

01:54PM   9    THIS EMAIL THAT HE WOULD LIKELY KNOW AND RELATE TO.

01:54PM  10    Q.   AND THAT WOULD EVEN BE A HIGHER VALUATION THAN 20 BILLION?

01:54PM  11    A.   IT DEPENDS.

01:54PM  12    Q.   OKAY.  DID -- I DIDN'T SEE YOU TELL MR. GREER, OR ANY OF

01:54PM  13    THE PEOPLE IN THE PRESENTATION, THAT THERANOS HAD TOLD YOU THAT

01:55PM  14    THEY INTENDED TO GO PUBLIC IN THE NEAR TERM.

01:55PM  15         DID YOU THINK THAT WAS SIGNIFICANT INFORMATION TO CONVEY

01:55PM  16    TO INVESTORS?

01:55PM  17    A.   THAT'S NOT WHAT THEY TOLD US.

01:55PM  18    Q.   DIDN'T THEY TELL YOU THAT YOU WERE LOOKING FOR LONG-TERM

01:55PM  19    INVESTMENT AND THAT'S WHAT MR. JAMES COMMUNICATED BACK?

01:55PM  20    A.   YES, THEY DID.

01:55PM  21    Q.   AND THE -- LET ME GO TO ANOTHER EMAIL FROM MR. GREER AT

01:55PM  22    14074.

01:55PM  23         THE COURT:  BEFORE WE DO THAT, LET'S TAKE OUR

01:55PM  24    AFTERNOON BREAK NOW, PLEASE.  WE'LL TAKE 30 MINUTES, LADIES AND

01:55PM  25    GENTLEMEN, 30 MINUTES.

01:55PM    1          SIR, YOU CAN STAND DOWN.

01:55PM    2          PERHAPS THAT EMAIL WILL BE THERE WHEN YOU COME BACK.

01:55PM    3          WE'LL TAKE A BREAK OF 30 MINUTES, PLEASE.

01:56PM    4          (JURY OUT AT 1:56 P.M.)

01:56PM    5              THE COURT:  PLEASE BE SEATED.  THANK YOU.

01:56PM    6          SIR, YOU CAN STAND DOWN.

01:56PM    7          ALL RIGHT.  THE RECORD SHOULD REFLECT THAT THE JURY HAS

01:56PM    8   LEFT FOR THE AFTERNOON BREAK.  THE WITNESS HAS LEFT THE

01:56PM    9   COURTROOM.

01:56PM   10          I JUST WANT TO POINT OUT SOME STATISTICS HERE.  THE

01:56PM   11   GOVERNMENT'S DIRECT EXAMINATION OF THIS WITNESS WAS 1 HOUR AND

01:56PM   12   30 MINUTES.

01:56PM   13          TO DATE THE CROSS-EXAMINATION HAS EXCEEDED 6 HOURS.

01:56PM   14          I THINK MY ESTIMATE YESTERDAY WAS WE PROBABLY WON'T FINISH

01:56PM   15   THIS WITNESS UNTIL FRIDAY IS COMING TO FRUITION, AND THAT COULD

01:57PM   16   PLAY HAVOC WITH OUR TRIAL SCHEDULE, BUT THAT'S ENTIRELY IN YOUR

01:57PM   17   HANDS.

01:57PM   18          WE'LL TAKE OUR BREAK.  THANK YOU.

01:57PM   19              THE CLERK:  COURT IS IN RECESS.

01:57PM   20          (RECESS FROM 1:57 P.M. UNTIL 2:32 P.M.)

02:32PM   21          (JURY IN AT 2:32 P.M.)

02:32PM   22              THE COURT:  PLEASE BE SEATED.  WE ARE BACK ON THE

02:32PM   23   RECORD.  ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.

02:32PM   24          MR. WADE, YOU'D LIKE TO CONTINUE.

02:32PM   25              MR. WADE:  THANK YOU, YOUR HONOR.

02:32PM   1      Q.   MR. GROSSMAN, JUST A COUPLE MORE QUESTIONS ABOUT THE FOLKS

02:32PM   2      YOU WERE INTERACTING WITH AS PEOPLE WHO WERE POTENTIALLY

02:32PM   3      JOINING THE THERANOS INVESTMENT.

02:32PM   4           THE SLIDE PRESENTATION THAT WE LOOKED AT AT EXHIBIT 7411,

02:32PM   5      WAS THAT SHARED WITH PEOPLE, WITH CLIENTS, IN ADDITION TO

02:32PM   6      PEOPLE INSIDE THE FIRM?

02:32PM   7      A.   I DON'T RECALL.

02:32PM   8      Q.   OKAY.  SO, FOR EXAMPLE, THERE WERE A NUMBER OF OTHER

02:33PM   9      PEOPLE WHO DID INVESTMENTS IN THERANOS THROUGH THE PARTNERS

02:33PM   10     VEHICLE; IS THAT RIGHT?

02:33PM   11     A.   THERE WERE OTHER INDIVIDUALS THAT INVESTED THROUGH PARTNER

02:33PM   12     INVESTMENTS, THAT IS CORRECT.

02:33PM   13     Q.   OKAY.  AND, FOR EXAMPLE, LIKE STANLEY DRUCKENMILLER

02:33PM   14     INVESTED THROUGH THE PARTNERS INTO THERANOS; CORRECT?

02:33PM   15     A.   THROUGH PARTNER INVESTMENTS, THAT IS CORRECT.

02:33PM   16     Q.   AND WOULD HE HAVE RECEIVED THE PRESENTATION, OR WHAT LEVEL

02:33PM   17     OF INFORMATION WOULD HE HAVE BEEN PROVIDED IN CONNECTION WITH

02:33PM   18     HIS INVESTMENT DECISION?

02:33PM   19     A.   I DON'T KNOW.

02:33PM   20     Q.   OKAY.  DID YOU VIEW THERE AS BEING ANY RESTRICTIONS AS A

02:33PM   21     RESULT OF THE CDA ON SHARING INFORMATION WITH THOSE OUTSIDE

02:33PM   22     INVESTORS?

02:33PM   23     A.   WE WOULD -- EVERYONE AT OUR FIRM IS, IS TAUGHT THE

02:34PM   24     IMPORTANCE OF COMPLIANCE, CONFIDENTIALITY, SO I WOULD HOPE THAT

02:34PM   25     ALL OF OUR EMPLOYEES WOULD HONOR ALL OF THE AGREEMENTS THAT WE

02:34PM  1    HAVE WITH ALL OF THE DIFFERENT COMPANIES WE INTERACT WITH.

02:34PM  2    Q.   OKAY.  AND DO YOU RECALL THAT IN ADDITION TO SOME OF THE

02:34PM  3    INTERNAL PEOPLE -- LET ME STRIKE THAT.

02:34PM  4         YOU RECALL AS A RESULT OF THAT PRESENTATION MANY INTERNAL

02:34PM  5    PEOPLE AT PFM DECIDED TO INVEST IN THERANOS?

02:34PM  6    A.   I DO RECALL THAT THERE WERE INTERNAL PEOPLE THAT INVESTED

02:34PM  7    IN THERANOS.

02:34PM  8    Q.   OKAY.  AND DO YOU RECALL THAT THERE WERE ALSO SOME OF THE

02:34PM  9    FRIENDS AND FAMILY OF THE FIRM WHO INVESTED AS WELL?

02:34PM 10    A.   YES, I KNOW -- I DO BELIEVE THAT WE HAD FRIENDS AND FAMILY

02:34PM 11    WHO INVESTED AS WELL.

02:34PM 12    Q.   AND DID THOSE PEOPLE DO THAT BASED UPON YOUR GENERAL

02:34PM 13    RECOMMENDATION, OR WERE YOU -- DO YOU RECALL IF YOU PROVIDED

02:34PM 14    THEM SPECIFIC INFORMATION ABOUT THERANOS, IF YOU RECALL?

02:34PM 15    A.   I DON'T RECALL.

02:34PM 16    Q.   OKAY.  AND IF I CAN ASK YOU A COUPLE OF QUESTIONS, IF I

02:35PM 17    COULD TURN YOUR ATTENTION -- I THINK I SET YOUR BINDER TO

02:35PM 18    EXHIBIT 4077.

02:35PM 19    A.   OKAY.

02:35PM 20    Q.   DO YOU SEE THAT?

02:35PM 21         AND THIS IS THE, THIS IS THE SLIDE PRESENTATION THAT

02:35PM 22    MR. LEACH SPENT SOME TIME WITH YOU ON DIRECT TESTIMONY.

02:35PM 23         DO YOU RECALL THAT?

02:35PM 24    A.   YES.

02:35PM 25    Q.   AND YOU NOTE HERE THERE ARE ABOUT 267 SLIDES; RIGHT?

02:35PM   1     A.   I DON'T REMEMBER THE NUMBER, BUT I ASSUME THAT'S RIGHT.

02:35PM   2     Q.   IF YOU WOULD JUST LOOK AT THE LAST PAGE, DO YOU SEE THE

02:35PM   3     LAST PAGE NUMBER IS 269?

02:35PM   4     A.   YEP.

02:36PM   5     Q.   AND ABOUT 150 PAGES OF THIS ARE THE DATA.  IS THAT FAIR?

02:36PM   6     IF YOU LOOK AT AROUND PAGE 100, YOU SEE THE CLINICAL DATA

02:36PM   7     STARTS AROUND PAGE 99 OR 100?

02:36PM   8     A.   YES.

02:36PM   9     Q.   AND IS IT FAIR TO SAY THAT THOSE 267 SLIDES WERE NOT GONE

02:36PM  10     THROUGH SORT OF SLIDE BY SLIDE AT ANY OF THE MEETINGS THAT YOU

02:36PM  11     HAD AT THERANOS; CORRECT?

02:36PM  12     A.   I DON'T, I DON'T RECALL GOING THROUGH EVERY SINGLE SLIDE

02:36PM  13     WITH THE COMPANY.

02:36PM  14     Q.   THEY WERE JUST SORT OF BROUGHT UP, YOU KNOW, WITH RESPECT

02:36PM  15     TO DIFFERENT POINTS THAT WERE UNDER DISCUSSION?

02:36PM  16     A.   WELL, I WANT TO ANSWER YOUR QUESTION.

02:37PM  17          SO THE MEETINGS WE HAD WITH THE COMPANY WERE -- AFTER THE

02:37PM  18     FIRST MEETING WE HAD SPECIFIC QUESTIONS THAT WE WANTED TO

02:37PM  19     ADDRESS.

02:37PM  20          THE COMPANY SENT US THIS PRESENTATION SO THAT WE COULD

02:37PM  21     REVIEW ON OUR OWN THE MATERIAL IN HERE.

02:37PM  22     Q.   FAIR ENOUGH.  YOU HAD THIS -- I DIDN'T MEAN TO SUGGEST

02:37PM  23     OTHERWISE.

02:37PM  24          YOU HAD THIS SLIDE DECK AND YOU COULD GO THROUGH THE WHOLE

02:37PM  25     THING; CORRECT?

02:37PM   1     A.   YES.

02:37PM   2     Q.   AND I'M JUST TRYING TO SUGGEST THAT IN THE MEETINGS YOU

02:37PM   3     HAD, YOU DIDN'T GO THROUGH THE WHOLE THING AND TALK ABOUT EACH

02:37PM   4     AND EVERY ITEM IN THE MEETING; CORRECT?

02:37PM   5     A.   WHICH MEETINGS ARE YOU REFERRING TO?

02:37PM   6     Q.   THE TWO MEETINGS IN -- THE ONE IN DECEMBER OF 2013 AND THE

02:37PM   7     FIRST MEETING IN JANUARY OF 2014.

02:37PM   8     A.   OKAY.  YES, WE DID NOT GO THROUGH EVERY SLIDE IN THESE TWO

02:37PM   9     MEETINGS.

02:37PM  10     Q.   OKAY.  AND I TAKE IT, GIVEN THE PASSAGE OF TIME, IT WOULD

02:37PM  11     BE IMPOSSIBLE FOR YOU TO GO THROUGH AND PICK OUT WHICH SLIDES

02:37PM  12     YOU WENT THROUGH DURING THOSE MEETINGS.  IS THAT FAIR?

02:37PM  13     A.   I DON'T REMEMBER WHICH SLIDES WE WENT THROUGH.

02:37PM  14     Q.   OKAY.  AND WITH -- CAN I ASK YOU A COUPLE OF QUESTIONS

02:38PM  15     ABOUT THE SLIDES IN PARTICULAR.

02:38PM  16          IF YOU CAN TAKE A LOOK AT PAGE 4, AND WE'LL TRY TO PULL

02:38PM  17     THESE UP ON THE SCREEN IF THAT'S EASIER FOR YOU.

02:38PM  18          DO YOU SEE THE SLIDE THERE THAT SAYS, "GOODBYE, BIG BAD

02:38PM  19     NEEDLE"?

02:38PM  20     A.   I DO.

02:38PM  21     Q.   AND YOU'VE SEEN SOME VERSION OF THIS SLIDE MAYBE ON OTHER

02:38PM  22     PROMOTIONAL MATERIALS RELATING TO THERANOS?

02:38PM  23     A.   YES.

02:38PM  24     Q.   IT'S HARD NOT TO REMEMBER A CUTE KID LIKE THAT; RIGHT?

02:38PM  25     A.   YES.

02:38PM 1    Q.   IF WE CAN GO FROM THERE TO PAGE 48 WHICH I BELIEVE IS A

02:38PM 2    SLIDE THAT MR. LEACH ASKED YOU ABOUT.

02:38PM 3         DO YOU RECALL THAT?

02:38PM 4    A.   I THINK THAT'S SLIDE 46.

02:38PM 5    Q.   WELL, LET'S ASK ABOUT SLIDE 48.  DO YOU SEE SLIDE 48?

02:39PM 6    MAYBE MR. LEACH DIDN'T ASK YOU ABOUT THAT.

02:39PM 7         DO YOU HAVE THAT ONE IN FRONT OF YOU?

02:39PM 8    A.   YES.

02:39PM 9    Q.   AND I'M FOCUSSED -- THERE'S SOME CONFUSION IN THESE SLIDE

02:39PM 10   DECKS.  I'M FOCUSSING ON THE NUMBERING IN THE BOTTOM IN CASE

02:39PM 11   YOU WANT TO LOOK ON YOUR OWN.

02:39PM 12        AND THIS TALKS ABOUT THE TRANSFORMATION OF THE CLINICAL

02:39PM 13   CARE; CORRECT?

02:39PM 14   A.   YES.

02:39PM 15   Q.   AND IT TALKS ABOUT THE LAB OF TODAY WITH A BIG NEEDLE

02:39PM 16   THERE ON THE LEFT; RIGHT?

02:39PM 17   A.   IT'S A NEEDLE, YES.

02:39PM 18   Q.   YES.  AND THE FINGERSTICK.

02:39PM 19        DO YOU SEE THAT?

02:39PM 20   A.   YES.

02:39PM 21   Q.   AND LET'S GO TO, LET'S GO TO THE NEXT SLIDE.

02:39PM 22        AND DO YOU SEE HERE THEY TALK ABOUT ANOTHER TRANSFORMATION

02:39PM 23   WHERE THEY GO FROM THAT BIG NEEDLE ON THE LEFT TO THAT SMALL

02:39PM 24   BUTTERFLY NEEDLE ON THE RIGHT?

02:39PM 25   A.   YES.

02:39PM   1      Q.   DO YOU SEE THAT?

02:39PM   2      A.   I DO.

02:39PM   3      Q.   OKAY.  AND DO YOU SEE, DO YOU SEE THAT TUBE OF BLOOD

02:40PM   4      THAT'S HOOKED ON TO THAT DEVICE THERE?

02:40PM   5      A.   I DO.

02:40PM   6      Q.   AND THAT'S NOT ONE OF THOSE LITTLE -- THAT'S NOT ONE OF

02:40PM   7      THOSE LITTLE NANOTAINERS, IS IT?

02:40PM   8      A.   NO.

02:40PM   9      Q.   OKAY.  AND IF WE CAN GO -- DO YOU RECALL, WHEN YOU WERE

02:40PM  10      TALKING ABOUT THESE SLIDES IN THE MEETING, WHETHER THERE WAS

02:40PM  11      ANY EFFORT TO DIFFERENTIATE WHICH SLIDES RELATED TO PHASE I OF

02:40PM  12      THERANOS'S BUSINESS MODEL AND WHICH SLIDES RELATED TO PHASE II,

02:40PM  13      OR IF THEY RELATED TO BOTH?

02:40PM  14      A.   I DON'T.

02:40PM  15      Q.   OKAY.  AND DO YOU RECALL RECOGNIZING AT THE TIME THAT YOU

02:40PM  16      REVIEWED THESE MATERIALS -- DID YOU ACTUALLY -- DO YOU THINK

02:40PM  17      YOU REVIEWED THESE SLIDES AT SOME POINT?

02:40PM  18      A.   AT THE TIME, YES.

02:40PM  19      Q.   OKAY.  AND DO YOU RECALL RECOGNIZING THAT MANY OF THEM ARE

02:40PM  20      SORT OF ASPIRATIONAL IN NATURE?

02:40PM  21      A.   NO.

02:40PM  22      Q.   OKAY.  LET'S TAKE A LOOK AT PAGE 11.

02:41PM  23           AND JUST THERE, FOR EXAMPLE, YOU SEE -- DID YOU RECOGNIZE

02:41PM  24      THIS TO BE SORT OF A MOCK-UP OF AN ADVERTISEMENT?

02:41PM  25      A.   I SUPPOSE.

GROSSMAN CROSS BY MR. WADE (RES.)

02:41PM 1    Q.   AND YOU KNEW AT THE TIME THAT THERANOS WASN'T SOON GOING

02:41PM 2    TO BE NATIONWIDE; RIGHT?  THAT IT WAS GOING TO TAKE A WHILE FOR

02:41PM 3    THEM TO UNROLL?

02:41PM 4    A.   WE HAD A ROLLOUT FORECAST FROM THE COMPANY, SO WE KNEW

02:41PM 5    THAT THEY WOULD BE ROLLING OUT ACROSS DIFFERENT REGIONS OVER

02:41PM 6    2014 AND '15, AND, YES, THEY WOULD ROLL OUT NATIONWIDE.

02:41PM 7    Q.   AND IF YOU GO TO PAGE 16 OF THE EXHIBIT, YOU SEE THIS

02:42PM 8    SLIDE TALKS ABOUT THERANOS'S PROXIMITY TO CONSUMERS.

02:42PM 9        YOU SEE THAT; RIGHT?

02:42PM 10   A.   I DO.

02:42PM 11   Q.   AND THIS WAS PART OF MS. HOLMES'S VISION THAT THEY TALKED

02:42PM 12   ABOUT; RIGHT?

02:42PM 13   A.   I'M NOT SURE IT'S A PART OF HER VISION.  IT SEEMS TO BE A

02:42PM 14   SLIDE THAT'S DESCRIBING THEIR PATIENT SERVICE CENTERS AND

02:42PM 15   ACCESS.

02:42PM 16   Q.   RIGHT.  AND YOU RECOGNIZE THAT THEIR GOAL THERE WAS TO

02:42PM 17   BE -- HAVE GREATER THAN 90 PERCENT WITHIN A FEW MILES OF

02:42PM 18   PEOPLE; RIGHT?

02:42PM 19   A.   I'M SORRY, MAYBE YOU CAN ASK THE QUESTION AGAIN.

02:42PM 20   Q.   WELL, YOU SEE THIS CHART REFLECTS THAT THERANOS'S GOAL IS

02:42PM 21   TO HAVE GREATER THAN 95 PERCENT OF PATIENTS WITHIN A MILE OR

02:42PM 22   ONE TO FIVE MILES OF A TESTING LOCATION.

02:43PM 23       DO YOU SEE THAT?

02:43PM 24   A.   I SEE ON THE SLIDE THAT THERANOS HAS GREATER THAN

02:43PM 25   95 PERCENT, AND IT APPEARS TO RELATE TO WALGREENS AND OTHER

02:43PM  1    RETAIL PHARMACIES.

02:43PM  2    Q.   RIGHT.  BUT YOU KNEW AT THE TIME THAT YOU WERE LOOKING AND

02:43PM  3    YOU GOT THESE SLIDES THAT THEY DIDN'T HAVE THAT KIND OF

02:43PM  4    FOOTPRINT OUT THERE IN THE FIELD; RIGHT?

02:43PM  5    A.   WE KNEW AS OF JANUARY 2014 THEY WERE NOT -- THIS

02:43PM  6    TECHNOLOGY HAD NOT BEEN ROLLED OUT NATIONALLY TO WALGREENS, ALL

02:43PM  7    WALGREENS AND OTHER RETAIL PHARMACIES, YES.

02:43PM  8    Q.   ALL RIGHT.  AND IF WE CAN GO TO 19 OF THE EXHIBIT.

02:43PM  9         THIS TALKS ABOUT "FASTER RESULTS.  FASTER ANSWERS."

02:43PM  10        DO YOU SEE THAT IN FOUR HOURS OR LESS?

02:43PM  11   A.   I DO.

02:43PM  12   Q.   AND YOU KNEW THAT RESULTS WERE NOT ALWAYS PROVIDED IN FOUR

02:43PM  13   HOURS OR LESS; RIGHT?

02:43PM  14   A.   WELL, FROM MY OWN TEST I KNEW THAT IT WASN'T, BUT THIS IS

02:44PM  15   WHAT THEY TOLD US THE TECHNOLOGY WAS CAPABLE OF DOING IN THE

02:44PM  16   RETAIL SETTING.

02:44PM  17   Q.   RIGHT.  BUT YOU KNEW THAT -- YOU HAD PERSONAL EXPERIENCE

02:44PM  18   BEFORE THE INVESTMENT DECISION THAT IT TOOK MORE THAN FOUR

02:44PM  19   HOURS; CORRECT?

02:44PM  20   A.   YES.

02:44PM  21   Q.   BUT YOU ALSO KNEW THAT THEY WERE PERFORMING TESTS IN

02:44PM  22   ARIZONA; CORRECT?

02:44PM  23   A.   YES.

02:44PM  24   Q.   AND THAT AT THE TIME THAT YOU MADE THE INVESTMENT

02:44PM  25   DECISION, THEY WERE, THEY WERE TRANSPORTING THOSE SPECIMENS TO

02:44PM 1    CALIFORNIA FOR TESTING; RIGHT?

02:44PM 2    A.   YES.

02:44PM 3    Q.   SO YOU KNEW AT THE TIME THAT THEY WEREN'T DOING TESTS, ALL

02:44PM 4    OF THEIR TESTS IN FOUR HOURS OR LESS?

02:44PM 5    A.   AS OF JANUARY 2014, YES.

02:44PM 6    Q.   OKAY.  AND IF WE CAN GO TO PAGE 26.

02:44PM 7         DO YOU KNOW WHAT THIS IS?

02:44PM 8    A.   I BELIEVE IT IS ONE OF THE COLLECTION DEVICES.

02:45PM 9    Q.   OKAY.  AND YOU DIDN'T USE ONE OF THESE WHEN YOU GOT YOUR

02:45PM 10   TESTING; CORRECT?

02:45PM 11   A.   THAT'S CORRECT.

02:45PM 12   Q.   OKAY.  AND LET'S GO TO PAGE 27.

02:45PM 13        THIS TALKS ABOUT THE SEAMLESS INTEGRATION WITH PHYSICIAN

02:45PM 14   PRACTICES.

02:45PM 15        DO YOU SEE THAT?

02:45PM 16   A.   I DO SEE THAT.

02:45PM 17   Q.   AND THAT WAS AT -- YOU KNEW THIS WAS ASPIRATIONAL AT THE

02:45PM 18   TIME; RIGHT?

02:45PM 19   A.   NO.

02:45PM 20   Q.   WELL, YOU KNEW DR. RABODZEY'S PRACTICE WAS NOT SEAMLESSLY

02:45PM 21   INTEGRATED WITH THERANOS AT THE TIME THAT YOU MADE YOUR

02:45PM 22   INVESTMENT DECISION; RIGHT?

02:45PM 23   A.   DR. RABODZEY'S -- I DON'T KNOW HOW DR. RABODZEY'S

02:45PM 24   PRACTICE, PHYSICIAN PRACTICE WAS INTEGRATED WITH THE LABORATORY

02:45PM 25   OR THE RETAIL PHARMACY THAT PERFORMED HIS TEST.

02:45PM 1    Q.   WELL, YOU RECALL THAT THEY -- THERE WAS THE EMAIL THAT YOU

02:45PM 2    REVIEWED ABOUT HIM RECEIVING FAX RESULTS?

02:45PM 3    A.   I DON'T BELIEVE HE RECEIVED THE FAX RESULTS.

02:45PM 4    Q.   OKAY.

02:46PM 5    A.   I THINK IT WAS HIS PHYSICIAN.

02:46PM 6    Q.   HIS PHYSICIAN RECEIVED?

02:46PM 7    A.   CORRECT.

02:46PM 8    Q.   SO THE PHYSICIAN PRACTICES WAS NOT SEAMLESSLY INTEGRATED

02:46PM 9    AT THE TIME; RIGHT?

02:46PM 10   A.   WELL, I GUESS -- SORRY, I GUESS I'M ANSWERING THE WRONG --

02:46PM 11   A DIFFERENT QUESTION.

02:46PM 12       I DON'T KNOW HOW DR. RABODZEY'S PRACTICE PHYSICIAN OFFICE

02:46PM 13   WAS ELECTRONICALLY CONNECTED TO THAT WALGREENS LOCATION.

02:46PM 14   Q.   ISN'T IT FAIR TO SAY THAT YOU KNEW THAT THIS WAS A

02:46PM 15   WORK-IN-PROCESS AT THE TIME AND THAT YOU MADE THE INVESTMENT

02:46PM 16   DECISION THAT THIS WAS ASPIRATIONAL AS WELL?

02:46PM 17   A.   AT THE TIME OF THE INVESTMENT THEY TOLD US I BELIEVE THEY

02:46PM 18   HAD ELECTRONIC CONNECTIONS TO MANY OF THE LARGEST ELECTRONIC

02:46PM 19   MEDICAL RECORD PROVIDERS, BUT I DON'T REMEMBER SPECIFICALLY

02:46PM 20   WHAT NUMBER THAT WAS, BUT IT WAS A FOCUS OF THEIR SOFTWARE

02:46PM 21   DEVELOPMENT ACTIVITIES.

02:46PM 22       AND THAT'S A MARKET THAT IS VERY CONCENTRATED AT THE TOP

02:47PM 23   IN TERMS OF PHYSICIAN OFFICE SOFTWARE, SO IT SHOULDN'T TAKE

02:47PM 24   LONG TO ELECTRONICALLY CONNECT TO THE MAJORITY OF PHYSICIAN

02:47PM 25   PRACTICES, ESPECIALLY LARGER PHYSICIAN GROUPS.

02:47PM 1    Q.   OKAY.  AND IF I CAN CALL YOUR ATTENTION TO PAGE 34 OF THE

02:47PM 2    EXHIBIT.

02:47PM 3         YOU RECOGNIZE THAT THE DESCRIPTION OF THE NATIONAL RETAIL

02:47PM 4    FOOTPRINT THROUGHOUT THE UNITED STATES WAS AT THIS TIME

02:47PM 5    ASPIRATIONAL; CORRECT?

02:47PM 6    A.   THEY HAD NOT YET ROLLED IT OUT NATIONALLY, CORRECT.

02:47PM 7    Q.   AND THE SAME FOR THE NEXT SLIDE?

02:47PM 8    A.   YES, THEY HAD NOT YET, THEY HAD NOT YET -- WELL, IF THE

02:48PM 9    QUESTION IS WAS THIS ASPIRATIONAL, THE ANSWER IS NO.

02:48PM 10   Q.   WELL, YOU UNDERSTOOD THAT THEY WEREN'T IN 8100 WALGREENS

02:48PM 11   LOCATIONS AT THE TIME THAT YOU MADE THE INVESTMENT DECISION;

02:48PM 12   RIGHT?

02:48PM 13   A.   WE DID UNDERSTAND THAT, YES.

02:48PM 14   Q.   AND IF WE GO TO SLIDE 5 -- EXHIBIT PAGE 53.

02:48PM 15        DO YOU RECALL WITH RESPECT TO SOME OF THESE DEPLOYMENTS

02:48PM 16   THAT THOSE WERE DISCLOSED TO YOU AS PHASES III AND IV OF THEIR

02:48PM 17   ROLLOUT PLAN?

02:48PM 18   A.   I DON'T RECALL PHASES III AND IV.

02:48PM 19   Q.   OKAY.  YOU DON'T RECALL BEING TOLD THAT THE ER AND SOME OF

02:48PM 20   THE PEDIATRIC APPLICATIONS WERE PHASES III AND IV IN THAT

02:48PM 21   MEETING?

02:48PM 22   A.   NO.

02:48PM 23   Q.   DO YOU RECALL TAKING ANY NOTES TO THAT EFFECT?

02:48PM 24   A.   I DON'T RECALL SPECIFICALLY THAT PART OF -- WHICH MEETING

02:49PM 25   ARE YOU REFERRING TO?

02:49PM  1      Q.   I BELIEVE IT WAS THE SECOND MEETING.

02:49PM  2           DO YOU RECALL THAT?

02:49PM  3      A.   I DON'T RECALL THAT.

02:49PM  4      Q.   OKAY.  THE -- IF YOU CAN GO TO SLIDES, SLIDES -- PAGE 66

02:49PM  5      AND THEN 67.

02:49PM  6           MR. LEACH ASKED YOU ABOUT SOME OF THESE SLIDES; RIGHT?

02:49PM  7      A.   YES.

02:49PM  8      Q.   AND YOU WERE AWARE AT THE TIME THAT YOU MADE YOUR

02:49PM  9      INVESTMENT DECISION AS A RESULT OF YOUR TOUR THAT THERE WAS

02:49PM 10      SOME OF THEIR TECHNOLOGY THAT WAS PATENT PENDING OR TRADE

02:49PM 11      SECRET WITHIN THEIR LAB AND THAT THEY TOLD YOU THAT THEY

02:49PM 12      WOULDN'T SHOW IT TO YOU; CORRECT?

02:49PM 13      A.   THAT'S WHAT THEY TOLD US.  I DON'T KNOW WHETHER THERE WAS

02:49PM 14      OR THERE WASN'T.

02:49PM 15      Q.   RIGHT.  BUT THAT'S WHAT THEY TOLD YOU AT THE TIME; RIGHT?

02:49PM 16      A.   YES.

02:49PM 17      Q.   OKAY.  AND SO YOU, YOU RECOGNIZE THAT, YOU KNOW, SOME OF

02:50PM 18      THESE DIFFERENT SLIDES WERE NOT NECESSARILY THE PRESENT

02:50PM 19      STATEMENT OF WHAT THE COMPANY COULD DO BUT WERE RATHER THE GOAL

02:50PM 20      OF WHAT IT HOPED TO DO ONCE IT WAS FULLY OPERATIONAL; RIGHT?

02:50PM 21      A.   NO.

02:50PM 22      Q.   YOU DIDN'T RECOGNIZE THAT WITH RESPECT TO SOME OF THESE

02:50PM 23      SLIDES THAT WE JUST LOOKED AT?

02:50PM 24           MR. LEACH:  OBJECTION.  ASKED AND ANSWERED.

02:50PM 25           THE COURT:  SUSTAINED.

02:50PM   1      BY MR. WADE:

02:50PM   2      Q.   THE -- YOU TALKED ABOUT YOUR CONNECTIONS TO WALGREENS.

02:50PM   3           DO YOU RECALL THAT?

02:50PM   4      A.   YES.

02:50PM   5      Q.   AND THE FACT THAT YOU HAD BEEN AN INVESTOR IN WALGREENS

02:50PM   6      OVER A PERIOD OF TIME?

02:50PM   7      A.   WE HAD -- OVER THE COURSE OF THE LAST 15 OR SO YEARS,

02:50PM   8      THERE HAD BEEN PERIODS OF TIME WHERE WE HAD INVESTED IN

02:51PM   9      WALGREENS, YES.

02:51PM  10      Q.   AND WAS PART OF THE REASON WHY YOU WERE INTERESTED IN

02:51PM  11      INVESTING IN THERANOS, A DESIRE TO GET INFORMATION THAT WOULD

02:51PM  12      HELP INFORM YOUR INVESTMENT DECISIONS IN WALGREENS?

02:51PM  13      A.   NO.

02:51PM  14      Q.   DO YOU RECALL THAT ALMOST IMMEDIATELY AFTER THE CLOSING

02:51PM  15      YOU STARTED TRADING WALGREENS STOCK?

02:51PM  16               MR. LEACH:   OBJECTION.   401, 403.

02:51PM  17               THE COURT:   SUSTAINED.

02:51PM  18               MR. WADE:   THE COURT'S INDULGENCE FOR A SECOND.

02:51PM  19          (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

02:51PM  20               MR. WADE:   NO FURTHER QUESTIONS, YOUR HONOR.

02:51PM  21               THE COURT:   REDIRECT?

02:51PM  22               MR. LEACH:   YES, YOUR HONOR, BRIEFLY.

02:51PM  23      ///

02:51PM  24      ///

02:52PM  25      ///

02:52PM  1                        **REDIRECT EXAMINATION**

02:52PM  2    BY MR. LEACH:

02:52PM  3    Q.    GOOD AFTERNOON, MR. GROSSMAN.

02:52PM  4    A.    GOOD AFTERNOON.

02:52PM  5    Q.    YOU WERE ASKED A NUMBER OF QUESTIONS ON CROSS-EXAMINATION

02:52PM  6    ABOUT VENOUS DRAWS AT THERANOS?

02:52PM  7    A.    YES.

02:52PM  8    Q.    AND WHAT DID THERANOS TELL YOU ABOUT THE EXTENT OF VENOUS

02:52PM  9    DRAWS?

02:52PM  10   A.    THEY TOLD US FROM THE VERY BEGINNING THAT IT WAS A TINY

02:52PM  11   FRACTION OF THE TESTS IN THE VERY BEGINNING OF THE ROLLOUT.  IT

02:52PM  12   WAS LESS THAN 1 PERCENT, 1 PERCENT, 2 PERCENT, AND THAT THEY

02:52PM  13   HAD A PLAN TO VERY QUICKLY BRING THAT NUMBER BACK DOWN TO WHERE

02:52PM  14   IT WAS SOMETHING, YOU KNOW, VERY, YOU KNOW, WELL BELOW

02:52PM  15   1 PERCENT OF PEOPLE THAT WOULD WALK IN AND WOULD HAVE TO

02:52PM  16   REQUIRE A VENOUS DRAW.

02:53PM  17   Q.    WERE YOU EVER TOLD IT WAS IN THE NEIGHBORHOOD OF

02:53PM  18   40 PERCENT?

02:53PM  19   A.    NEVER.

02:53PM  20   Q.    WAS THE FACT THAT IT WAS LIMITED TO 1 TO 2 PERCENT OR A

02:53PM  21   SMALL NUMBER REASSURING TO YOU?

02:53PM  22   A.    YES.

02:53PM  23   Q.    HOW SO?

02:53PM  24   A.    WELL, IT, IT WAS PART OF THE CORE TECHNOLOGICAL ADVANTAGE

02:53PM  25   THIS COMPANY HAD COMPARED TO THE EXISTING LABORATORY

02:53PM 1    INFRASTRUCTURE AND SERVICE OFFERINGS AND WAS A BIG PART OF WHY

02:53PM 2    WE FELT THIS WOULD TAKE A SIGNIFICANT SHARE OF THE MARKET, EACH

02:53PM 3    OF THE MARKETS THAT THIS PRODUCT WAS INTRODUCED INTO FOR THE

02:53PM 4    OBVIOUS REASONS, CHEAPER, MUCH MORE CONVENIENT, IT COULD --

02:53PM 5    MUCH LESS INVASIVE, OPENED UP TESTING OPPORTUNITIES FOR PEOPLE

02:53PM 6    THAT WERE AFRAID OF NEEDLES, AND THEN POPULATIONS THAT REALLY

02:53PM 7    STRUGGLE WITH, YOU KNOW, HAVING A GOOD VEIN TO ACCESS.

02:53PM 8         SO FOR ALL OF THOSE REASONS, THAT WAS A REALLY IMPORTANT

02:54PM 9    PART OF OUR UNDERSTANDING OF THE BUSINESS AND THE COMPANY AT

02:54PM 10   THE TIME THAT WE INVESTED.

02:54PM 11   Q.   YOU WERE ALSO ASKED A NUMBER OF QUESTIONS ABOUT THE MODEL

02:54PM 12   THAT PFM PUT TOGETHER.

02:54PM 13        DO YOU RECALL THOSE QUESTIONS?

02:54PM 14   A.   YES.

02:54PM 15   Q.   AND BEFORE PUTTING TOGETHER PFM'S MODEL, IT RECEIVED

02:54PM 16   PROJECTED INCOME FORECASTS FROM THERANOS?

02:54PM 17   A.   YES.

02:54PM 18   Q.   AND DID YOU RELY ON THOSE INCOME PROJECTIONS FROM

02:54PM 19   THERANOS?

02:54PM 20   A.   WE, WE USED THOSE AS INPUT TO BUILD OUR MODEL FOR 2014 AND

02:54PM 21   2015.

02:54PM 22        WE DIDN'T USE EXACTLY THEIR FORECAST, BUT IT WAS AN

02:54PM 23   IMPORTANT PART OF UNDERSTANDING THE MARGIN STRUCTURE OF THE

02:54PM 24   BUSINESS, THE CASH FLOW, CHARACTERISTICS OF THE BUSINESS, AND

02:54PM 25   THEIR ABILITY TO OBVIOUSLY MAKE ENOUGH EQUIPMENT, MINILABS, TO

02:54PM  1    MEET THE REVENUE FORECAST THAT THEY PROVIDED US.

02:54PM  2    Q.   AND WHO WAS IN A BETTER POSITION TO UNDERSTAND THERANOS'S

02:54PM  3    PROJECTED REVENUE FOR 2014 AND 2015, YOU OR THE COMPANY?

02:54PM  4    A.   THE COMPANY.

02:55PM  5    Q.   OKAY.  YOU WERE SHOWN EXHIBIT 7411.

02:55PM  6         AND I DON'T KNOW, MS. HOLLIMAN, IF WE CAN BRING THAT UP.

02:55PM  7    7411.

02:55PM  8    A.   OKAY.

02:55PM  9              MR. LEACH:  MS. HOLLIMAN -- OR, MS. KRATZMANN, MAY I

02:55PM  10   USE THE ELMO?

02:55PM  11   Q.   MR. GROSSMAN, DO YOU RECALL BEING ASKED QUESTIONS ABOUT

02:55PM  12   THIS POWERPOINT PRESENTATION THAT WAS PROVIDED TO SOME PFM

02:56PM  13   INVESTORS?

02:56PM  14   A.   ON CROSS-EXAMINATION?

02:56PM  15   Q.   YES.

02:56PM  16   A.   YES.

02:56PM  17   Q.   OKAY.  AND I THINK YOU TESTIFIED THAT YOU DIDN'T ATTEND

02:56PM  18   THIS MEETING?

02:56PM  19   A.   NO.  THAT'S CORRECT, I DID NOT ATTEND THIS MEETING.

02:56PM  20   Q.   OKAY.  AND I WANT TO DISPLAY FOR YOU PAGE 7 OF THE

02:56PM  21   POWERPOINT.

02:56PM  22        YOUR HONOR, I'M SORRY.  I MADE SOME NOTES ON MY COPY.  I

02:56PM  23   DON'T MEAN TO DISPLAY THOSE.

02:56PM  24        IN FACT, I CAN USE PAGE 6.

02:56PM  25        DO YOU SEE WHERE IT SAYS KEY FINANCIALS -- PFM BEAR CASE?

02:56PM 1    A.   YES.

02:56PM 2    Q.   AND WHAT IS THE BEAR CASE?

02:56PM 3    A.   THAT REFLECTED OUR LOW -- THE LOW FORECASTS, THE LOWER

02:57PM 4    FORECASTS OF THE THREE SCENARIOS THAT WE CONSTRUCTED FOR THE

02:57PM 5    BUSINESS OVER THIS FIVE YEAR PERIOD OF TIME.

02:57PM 6    Q.   SO THIS IS THE CASE IF THINGS GO BADLY?

02:57PM 7    A.   THIS WAS THE CASE IF THINGS GO SLOWER THAN WE EXPECTED ON

02:57PM 8    THE COMMERCIAL ROLLOUT.

02:57PM 9    Q.   OKAY.  AND YOUR ESTIMATED INCOME FOR THERANOS'S REVENUE

02:57PM 10   FOR 2014 IS 249 MILLION?

02:57PM 11   A.   MILLION.

02:57PM 12   Q.   AND THAT'S SLIGHTLY LESS THAN THE 261 MILLION THAT

02:57PM 13   THERANOS HAD PROVIDED YOU?

02:57PM 14   A.   YES, THAT'S CORRECT.

02:57PM 15   Q.   OKAY.  AND YOUR BEAR CASE FOR 2015 IS 1.4 MILLION, OR

02:57PM 16   1.4 BILLION?

02:57PM 17   A.   YES.

02:57PM 18   Q.   AND THAT'S SLIGHTLY LESS THAN THE 1.6 BILLION THAT

02:57PM 19   THERANOS WAS FORECASTING TO YOU?

02:57PM 20   A.   I BELIEVE IT WAS AROUND 15 PERCENT OR MORE BELOW THE

02:57PM 21   COMPANY'S FORECAST, YES.

02:57PM 22   Q.   OKAY.  HAVE YOU EVER SEEN A COMPANY MISS ITS REVENUE

02:57PM 23   PROJECTIONS BY OVER A BILLION DOLLARS?

02:57PM 24   A.   IT'S UNUSUAL.

02:57PM 25   Q.   WAS THAT A RISK THAT YOU THOUGHT YOU WERE TAKING WITH THIS

02:58PM   1    INVESTMENT?

02:58PM   2    A.   NOT IN THE, IN THE 2014 AND '15 PERIOD, NO.

02:58PM   3    Q.   YOU WERE ALSO ASKED SOME QUESTIONS ABOUT THE ASSUMPTIONS

02:58PM   4    THAT THERANOS PROVIDED YOU WITH RESPECT TO ITS REVENUE

02:58PM   5    PROJECTIONS AND ITS, ITS NET INCOME AND COST CONSIDERATIONS.

02:58PM   6         DO YOU RECALL THAT?

02:58PM   7    A.   YES.

02:58PM   8    Q.   AND I THINK YOU DESCRIBED IT AS VERY DETAILED?

02:58PM   9    A.   YES.

02:58PM   10   Q.   THE ASSUMPTIONS THAT THERANOS WAS PROVIDING YOU?

02:58PM   11   A.   YES.

02:58PM   12   Q.   DID YOU SEE ANY ASSUMPTIONS IN THAT VERY DETAILED MODEL

02:58PM   13   RELATING TO THE USE OF THIRD PARTY MACHINES?

02:58PM   14   A.   NO.

02:58PM   15   Q.   DID YOU SEE ANYTHING IN THAT VERY DETAILED MODEL ABOUT THE

02:58PM   16   USE OF SIEMENS MACHINES?

02:58PM   17   A.   NO.

02:58PM   18   Q.   DID YOU GO THROUGH THOSE ASSUMPTIONS WITH A FINE TOOTH

02:58PM   19   COMB TRYING TO UNDERSTAND EVERY INPUT OF COST THAT WAS GOING

02:58PM   20   INTO THIS COMPANY?

02:58PM   21   A.   YES.

02:58PM   22   Q.   YOU WERE ALSO ASKED SOME QUESTIONS ABOUT INTERMOUNTAIN.

02:59PM   23        DO YOU RECALL THOSE QUESTIONS?

02:59PM   24   A.   I DO.

02:59PM   25   Q.   DO YOU KNOW WHETHER THERANOS EVER RECOGNIZED ANY REVENUE

02:59PM  1    FROM INTERMOUNTAIN?

02:59PM  2    A.   I DON'T KNOW.

02:59PM  3    Q.   AND DO YOU KNOW WHETHER THERANOS EVER RECOGNIZED A SINGLE

02:59PM  4    DOLLAR OF REVENUE FROM HOSPITALS?

02:59PM  5    A.   I DON'T KNOW IF THEY DID.

02:59PM  6    Q.   YOU WERE ASKED SOME QUESTIONS ABOUT YOUR INITIAL MEETING

02:59PM  7    IN DECEMBER OF 2013 WITH MS. HOLMES.

02:59PM  8        DO YOU RECALL BEING ASKED SOME QUESTIONS ABOUT THAT ON

02:59PM  9    CROSS-EXAMINATION?

02:59PM  10   A.   I DO.

02:59PM  11   Q.   AND I THINK YOU DESCRIBED THIS AS A POSITIVE RAPPORT BUILD

02:59PM  12   MEETING?

02:59PM  13   A.   WELL, IT WAS AN INTRODUCTORY MEETING.  SO, YES, IT WAS A

02:59PM  14   POSITIVE MEETING.

02:59PM  15   Q.   DID YOU RELY ON THE STATEMENTS FROM MS. HOLMES IN THAT

02:59PM  16   MEETING?

02:59PM  17   A.   WE DID RELY ON STATEMENTS FROM MS. HOLMES IN THAT MEETING.

02:59PM  18   Q.   DID YOU ACCORD THE STATEMENTS IN THAT MEETING ANY LESSER

02:59PM  19   WEIGHT THAN INFORMATION THAT YOU LEARNED LATER ON IN YOUR

02:59PM  20   INVESTMENT PROCESS?

02:59PM  21   A.   NO.

02:59PM  22   Q.   OKAY.  WHEN MS. HOLMES TOLD YOU THAT THE THERANOS DEVICE

02:59PM  23   WAS ON MEDEVAC HELICOPTERS, DID YOU RELY ON THAT INFORMATION?

03:00PM  24   A.   YES.

03:00PM  25   Q.   WAS THAT IMPORTANT TO YOU?

03:00PM  1    A.   YES.

03:00PM  2    Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO EXHIBIT 7391.

03:00PM  3         MS. HOLLIMAN -- OR, MS. KRATZMANN, I'LL DISPLAY THAT.

03:00PM  4              THE CLERK:  OH.

03:00PM  5    BY MR. LEACH:

03:00PM  6    Q.   DO YOU RECALL BEING ASKED QUESTIONS ABOUT 7391,

03:00PM  7    MR. GROSSMAN?

03:00PM  8    A.   I DO RECALL, YES.

03:00PM  9    Q.   OKAY.  AND THIS IS AN EMAIL FROM MR. KHANNA AFTER THE

03:00PM 10    JANUARY 10TH MEETING LAYING OUT SOME OF HIS THOUGHTS ABOUT

03:00PM 11    THERANOS?

03:00PM 12    A.   YES, THAT'S CORRECT.

03:00PM 13    Q.   IN THE THIRD BULLET UNDER THOUGHTS IT SAYS, "GREAT

03:01PM 14    PARTNERS WAG, SAFEWAY, DOD (STILL TO BE SIZED)."

03:01PM 15    A.   YES.

03:01PM 16    Q.   AND IS THAT A REFLECTION OF A POSITIVE THAT THERANOS IS

03:01PM 17    STILL DOING WORK WITH DOD?

03:01PM 18    A.   YES, IT WAS A BIG VALIDATION OF THE TECHNOLOGY THAT THE

03:01PM 19    DEPARTMENT OF DEFENSE WOULD USE THIS ON ACTUAL SOLDIERS AND OF

03:01PM 20    ALL PLACES AND IN THE TYPE OF AN ENVIRONMENT THAT, HOSTILE

03:01PM 21    ENVIRONMENT THAT YOU WOULD SEE IN BATTLEFIELD CONDITIONS AT

03:01PM 22    THAT POINT IN TIME.

03:01PM 23         AND SO THAT WAS AN IMPORTANT, AN IMPORTANT SUPPORT FOR THE

03:01PM 24    TECHNOLOGY AS IT EXISTED AT THAT POINT IN TIME, THE WORK THAT

03:01PM 25    IT HAD DONE OVER THE TEN YEARS TO DEVELOP IT TO THE POINT THAT

03:01PM   1    IT WAS CAPABLE OF OFFERING ABROAD RETAIL MENU EVERYTHING THAT

03:01PM   2    QUEST OR LABCORP COULD DO.

03:02PM   3    Q.   IN THE NEXT BULLET IT SAYS, IN THE SECOND SENTENCE, "THEY

03:02PM   4    CITE MOORE'S LAW AS DRIVING DOWN COGS -- WE NEED TO GET

03:02PM   5    COMFORTABLE WITH THIS TRAJECTORY."

03:02PM   6         DO YOU SEE THAT?

03:02PM   7         IN THE THIRD BULLET WHERE IT STARTS, "PRICING AT

03:02PM   8    50 PERCENT."

03:02PM   9    A.   YES.

03:02PM   10   Q.   THEY CITE MOORE'S LAW?

03:02PM   11   A.   YES.

03:02PM   12   Q.   AND IS THAT A REFERENCE TO INTEL AND SEMICONDUCTORS?

03:02PM   13   A.   YEAH.  IT'S THE WELL-KNOWN RELATIONSHIP BETWEEN PRODUCTION

03:02PM   14   VOLUME AND THE COST OF PRODUCING SEMICONDUCTOR CHIPS.

03:02PM   15        AND THIS IS A REFERENCE, SPECIFIC FOR THERANOS, IF YOU'RE

03:02PM   16   GOING TO BE OFFERING DISCOUNTED PRICING, THE ONLY WAY THAT

03:02PM   17   WOULD BE ECONOMICALLY VIABLE, IS IF YOU COULD CONTINUE TO DRIVE

03:02PM   18   DOWN THE COST OF THE MINILAB SO THAT IT COULD BE -- IT COULD

03:02PM   19   REACH THE PROFITABILITY TARGETS THAT THEY HAD PRESENTED IN THAT

03:02PM   20   MEETING THAT PRECEDED THIS EMAIL.

03:02PM   21        SO IT SPOKE TO HOW IMPORTANT IT WAS TO BE ABLE TO DELIVER

03:03PM   22   NOT JUST ENOUGH MINILABS, BUT TO BE ABLE TO MAKE THEM AT A COST

03:03PM   23   THAT WOULD ENABLE THEM TO HAVE THIS REALLY POWERFUL

03:03PM   24   DIFFERENTIATED PRICING MODEL TO THE RETAIL CUSTOMER.

03:03PM   25   Q.   AND IN THIS DISCUSSION OF THE COST OF THE MINILAB AND

03:03PM  1    BRINGING THEM DOWN CONSISTENT WITH MOORE'S LAW, WAS THERE ANY

03:03PM  2    DISCUSSION OF THIRD PARTY DEVICES OR THE NEED TO ACQUIRE

03:03PM  3    SIEMENS MACHINES?

03:03PM  4    A.   NO, AND THERE WOULD BE NO WAY TO COST DOWN THIRD PARTY

03:03PM  5    MACHINES.

03:03PM  6         SO, NO, THERE WAS NO DISCUSSION OF THAT, AND IT WASN'T --

03:03PM  7    IT WOULDN'T REALLY MAKE ANY SENSE IN THE CONTEXT OF THAT

03:03PM  8    CONCEPT DRIVING DOWN THE COST OF THEIR EQUIPMENT, THEIR

03:03PM  9    PROPRIETARY TECHNOLOGY WITH THAT PRICING STRUCTURE.

03:03PM  10   Q.   FURTHER DOWN THERE'S, IN THE CONCLUSION, A -- THE LAST

03:03PM  11   BULLET, "THIS IS ONE OF THE MOST INTERESTING COMPANIES I HAVE

03:03PM  12   MET AND IT ALL COMES DOWN TO EXECUTION."

03:03PM  13        WHAT DID YOU UNDERSTAND "EXECUTION" TO MEAN?

03:04PM  14   A.   I THINK MY COLLEAGUE IS EXPLAINING, OR HIS POINT OF VIEW

03:04PM  15   IS THAT THE TECHNOLOGY HAS ALREADY PASSED THE POINT OF, OR LONG

03:04PM  16   PAST THE PROOF OF CONCEPT POINT, THAT THIS WAS A COMPANY THAT

03:04PM  17   OVER THE LAST TEN-PLUS YEARS HAS MADE INCREDIBLE STRIDES TO

03:04PM  18   BUILD THE TECHNOLOGY CAPABILITIES THAT THEY HAD AT THAT POINT.

03:04PM  19        AND FROM HERE THE RISKS WERE REALLY FOCUSSED -- THE RISK

03:04PM  20   TO THE BUSINESS, THE RISK TO THE COMPANY GOING FORWARD WAS

03:04PM  21   REALLY AROUND EXECUTION, AND SO I THINK THAT WAS MR. KHANNA'S

03:04PM  22   VIEW AT THAT POINT IN TIME AFTER THAT FIRST MEETING.

03:04PM  23   Q.   DID YOU THINK THERE WAS RISK AROUND THE MINILAB WORKING IN

03:04PM  24   THE CLIA LAB?

03:04PM  25   A.   WE DID NOT THINK THERE WAS -- THAT WAS A RISK TO THE

03:04PM   1    COMPANY, NO.

03:04PM   2    Q.   YOU WERE ALSO SHOWN EXHIBIT 4089, A LENGTHY EMAIL FROM

03:05PM   3    DR. RABODZEY ABOUT FDA APPROVAL.

03:05PM   4         DO YOU RECALL THAT EXHIBIT?

03:05PM   5    A.   WE LOOKED AT A LOT OF MR. RABODZEY EXHIBITS, SO I DON'T

03:05PM   6    REMEMBER SPECIFICALLY WHICH ONE THAT WAS.

03:05PM   7    Q.   OKAY.  WHY WAS RISK RELATING TO FDA APPROVAL NOT A CONCERN

03:05PM   8    TO YOU?

03:05PM   9    A.   THE, THE BUSINESS THAT WE WERE INVESTING IN WAS REALLY A

03:05PM  10    HUB AND SPOKE MODEL USING THESE MINILABS TO BUILD SMALL

03:05PM  11    LABORATORIES.  THE EXAMPLE IN THE PHOENIX MARKET, 200 SQUARE

03:05PM  12    FEET, THEY COULD SUPPORT THAT WHOLE OPERATION WITH THE

03:05PM  13    MINILABS.

03:05PM  14         SO ROLLING THOSE OUT TO DIFFERENT URBAN AREAS IN THE U.S.,

03:05PM  15    LEVERAGING WALGREENS'S RETAIL FOOTPRINT, SAFEWAY'S RETAIL

03:05PM  16    FOOTPRINT WAS THE WAY WE BUILT THE MODEL AND WAS THE BASIS FOR

03:05PM  17    THE INVESTMENTS THAT WE MADE.

03:05PM  18         THE UP SIDE OF BEING ABLE TO DELIVER THESE, DEPLOY THESE

03:05PM  19    INTO A WALGREENS RETAIL SETTING OR ANOTHER RETAILER WAS, WAS AN

03:06PM  20    UP SIDE SCENARIO ABOVE AND BEYOND, YOU KNOW, HOW WE THOUGHT

03:06PM  21    ABOUT OUR, OUR TRANSLATING THESE CONCEPTS, THESE

03:06PM  22    REPRESENTATIONS, THESE STATEMENTS FROM THE COMPANY INTO AN

03:06PM  23    ACTUAL FINANCIAL FORECAST.

03:06PM  24    Q.   SO DID YOU VIEW THE FACT THAT THERANOS HAD CLIA

03:06PM  25    CERTIFICATION FOR ALL OF ITS TESTS AS MITIGATING THAT FDA RISK?

GROSSMAN REDIRECT BY MR. LEACH

03:06PM 1     A.   IT WAS A HUGE ENDORSEMENT OF WHERE THE TECHNOLOGY WAS AT

03:06PM 2     THAT POINT IN TIME.

03:06PM 3          THE FACT THAT THEY TOLD US THAT THEY COULD, AND THEY WERE

03:06PM 4     ABLE TO GET -- MEET CLIA STANDARDS FOR ALL OF THE MENU OF TESTS

03:06PM 5     THAT THEY OFFERED WAS A HUGE STATEMENT THAT SPOKE TO THE

03:06PM 6     QUALITY OF THE UNDERLYING TECHNOLOGY.

03:06PM 7          IT WAS ALSO CONSISTENT WITH WHAT THEY TOLD US ABOUT HOW

03:06PM 8     THEIR MINILABS HAD LESS VARIATION COMPARED TO OTHER

03:06PM 9     CONVENTIONAL ANALYTIC INSTRUMENTS THAT WERE SOLD INTO CUSTOMERS

03:06PM 10    OR COMPETITORS LIKE A LABCORP OR A QUEST DIAGNOSTIC.

03:07PM 11         SO YES FOR ALL OF THOSE REASONS.

03:07PM 12    Q.   AND MR. WADE ASKED YOU A NUMBER OF QUESTIONS ABOUT OTHER

03:07PM 13    RISKS ASSOCIATED WITH THE THERANOS INVESTMENT AND INVESTMENTS

03:07PM 14    IN GENERAL.

03:07PM 15         DID YOU THINK ONE OF THE RISKS HERE WAS THAT THE FOUNDER

03:07PM 16    AND CEO OF THE COMPANY WAS NOT BEING TRUTHFUL WITH YOU?

03:07PM 17    A.   WE DID NOT THINK THAT WAS ONE OF THE RISKS, NO.

03:07PM 18              MR. LEACH:  MAY I HAVE A MOMENT, YOUR HONOR?

03:07PM 19              THE COURT:  YES.

03:07PM 20         (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

03:07PM 21              MR. LEACH:  NOTHING FURTHER, YOUR HONOR.

03:07PM 22         THANK YOU.

03:07PM 23         THANK YOU, MR. GROSSMAN.

03:07PM 24              MR. WADE:  NOTHING FURTHER, YOUR HONOR.

03:07PM 25         THE WITNESS MAY BE RELEASED.

6746

```
03:07PM   1                    THE COURT:  MAY THIS WITNESS BE EXCUSED?

03:07PM   2                    MR. LEACH:  YES, YOUR HONOR.

03:07PM   3                    THE COURT:  SIR, YOU'RE EXCUSED.

03:07PM   4                    THE WITNESS:  THANK YOU.

03:07PM   5                    THE COURT:  THANK YOU.  YOU CAN JUST LEAVE ALL OF

03:07PM   6     THAT THERE.

03:08PM   7               MR. LEACH, DOES THE GOVERNMENT HAVE ANOTHER WITNESS TO

03:08PM   8     CALL THIS AFTERNOON?

03:08PM   9                    MR. BOSTIC:  WE DO, YOUR HONOR.

03:08PM  10                    THE COURT:  MR. BOSTIC?

03:08PM  11          IS HE HERE?

03:08PM  12                    MR. BOSTIC:  SHE IS HERE.

03:08PM  13                    THE COURT:  SHE IS HERE.  THANK YOU.

03:08PM  14                    MR. BOSTIC:  THE UNITED STATES CALLS ERIN TOMPKINS.

03:08PM  15                    THE COURT:  GOOD AFTERNOON.

03:08PM  16                    THE WITNESS:  GOOD AFTERNOON.

03:08PM  17                    THE COURT:  THERE'S A BIT OF A CONGESTION, BUT AS

03:08PM  18     SOON AS THESE BODIES CLEAR OUT, I'LL ASK YOU TO STAND AND FACE

03:08PM  19     OUR COURTROOM DEPUTY.

03:09PM  20          THANK YOU, ADRIANA.

03:09PM  21          IF YOU COULD FACE OUR COURTROOM DEPUTY WHILE YOU RAISE

03:09PM  22     YOUR RIGHT HAND, SHE HAS A QUESTION FOR YOU.

03:09PM  23               **(GOVERNMENT'S WITNESS, ERIN TOMPKINS, WAS SWORN.)**

03:09PM  24                    THE WITNESS:  YES.

03:09PM  25                    THE COURT:  I'LL INVITE YOU TO HAVE A SEAT HERE.
```

03:09PM  1    FEEL FREE TO ADJUST THE CHAIR AND THE MICROPHONE AS YOU NEED.

03:09PM  2        I'LL ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE MICROPHONE.

03:09PM  3        WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

03:09PM  4    AND THEN SPELL IT, PLEASE.

03:09PM  5            THE WITNESS:  YES.  MY NAME IS ERIN TOMPKINS.

03:09PM  6    E-R-I-N, T-O-M-P-K-I-N-S.

03:09PM  7            THE COURT:  THANK YOU.  COUNSEL.

03:09PM  8            MR. BOSTIC:  THANK YOU, YOUR HONOR.

03:09PM  9                        **DIRECT EXAMINATION**

03:10PM 10    BY MR. BOSTIC:

03:10PM 11    Q.   GOOD AFTERNOON, MS. TOMPKINS.

03:10PM 12    A.   GOOD AFTERNOON, SIR.

03:10PM 13    Q.   MS. TOMPKINS, IF YOU ARE FULLY VACCINATED AND COMFORTABLE

03:10PM 14    TO DO SO, I UNDERSTAND THE COURT WILL ALLOW YOU TO TESTIFY

03:10PM 15    WITHOUT A MASK.

03:10PM 16    A.   THANK YOU.

03:10PM 17    Q.   THANK YOU.  I'LL DO THE SAME.

03:10PM 18        LET ME START BY ASKING, WAS THERE A TIME WHEN YOU RECEIVED

03:10PM 19    BLOOD TEST SERVICES FROM A COMPANY CALLED THERANOS?

03:10PM 20    A.   YES.

03:10PM 21    Q.   AND I WANT TO ASK YOU SOME QUESTIONS ABOUT THAT, BUT FIRST

03:10PM 22    LET ME ASK ABOUT YOUR BACKGROUND.

03:10PM 23        WHERE DO YOU CURRENTLY LIVE?

03:10PM 24    A.   MY PERMANENT ADDRESS IS IN ARIZONA.  I'M CURRENTLY STAYING

03:10PM 25    IN NEW MEXICO.

03:10PM   1    Q.   WHERE WERE YOU LIVING IN 2015?

03:10PM   2    A.   CENTRAL PHOENIX.

03:10PM   3    Q.   WERE YOU EMPLOYED AT THAT TIME?

03:10PM   4    A.   YES.

03:10PM   5    Q.   WHAT WAS YOUR JOB AT THAT TIME IN PHOENIX IN 2015?

03:10PM   6    A.   I HAD THREE ESSENTIALLY.  I WAS MUSIC DIRECTOR OF A SMALL

03:10PM   7    METHODIST CONGREGATION; I SPENT ONE SEMESTER AS A PERFORMING

03:10PM   8    ARTIST IN THE CHILDREN'S PROGRAM AT ARIZONA OPERA; AND I ALSO

03:10PM   9    TAUGHT PRIVATE VOICE LESSONS.

03:10PM  10    Q.   DID THERE COME A TIME WHEN YOU HEARD ABOUT A COMPANY

03:11PM  11    CALLED THERANOS FOR THE FIRST TIME?

03:11PM  12    A.   I BELIEVE THE FIRST TIME WAS -- I THINK THE FIRST TIME WAS

03:11PM  13    WHEN I SAW THE ARTICLE IN "FORBES" MAGAZINE IN APPROXIMATELY

03:11PM  14    2013, IF THAT SOUNDS ABOUT RIGHT, AND THEN GREW MORE INTERESTED

03:11PM  15    WHEN I WAS SEEING SOMETHING ON SOCIAL MEDIA PROMOTING IT.

03:11PM  16    Q.   IN ADDITION TO SEEING THAT ARTICLE IN -- YOU BELIEVE IT

03:11PM  17    WAS "FORBES" MAGAZINE?

03:11PM  18    A.   UH-HUH.

03:11PM  19    Q.   DID YOU LOOK AT SOME OF THE CONTENT OF THAT ARTICLE AND

03:11PM  20    LEARN ABOUT SOME OF THE BASIC FACTS AROUND THE COMPANY?

03:11PM  21    A.   I KIND OF SKIMMED IT.  BASICALLY I REMEMBER HAVING A BRIEF

03:11PM  22    CONVERSATION WITH MY FATHER ABOUT IT.

03:11PM  23    Q.   OVER THE FOLLOWING MONTHS, DID YOU LEARN MORE FACTS ABOUT

03:11PM  24    THE COMPANY?

03:11PM  25    A.   WELL, WHAT I GLEANED FROM WHAT I READ ON FACEBOOK, WHICH

03:11PM  1   WAS PRIMARILY A RECOMMENDATION FROM A FRIEND OF MINE WHO RUNS A

03:11PM  2   DAY RESOURCE CENTER, THAT -- ONE OF HER BIGGEST PRIORITIES WAS

03:12PM  3   FINDING AFFORDABLE HEALTH CARE OPTIONS FOR PEOPLE WHO ARE

03:12PM  4   WITHOUT COVERAGE AND/OR WHO ARE HOMELESS AND NEED TO GET SOME

03:12PM  5   BLOOD WORK DONE AND THINGS LIKE THAT, AND SHE WAS A BIG, BIG

03:12PM  6   SUPPORTER OF THERANOS, AND SO I THOUGHT I WOULD LOOK INTO IT.

03:12PM  7   Q.   FOCUSSING ON THE TIME PERIOD BEFORE YOU ACTUALLY WENT TO

03:12PM  8   THERANOS, WHAT DID YOU UNDERSTAND ABOUT THE SERVICE THAT THE

03:12PM  9   COMPANY OFFERED, ANYTHING THAT MADE IT DIFFERENT?

03:12PM 10   A.   WHAT DID I UNDERSTAND?

03:12PM 11        MY PERCEPTION WAS THAT THE NATURE OF A BLOOD DRAW REQUIRED

03:12PM 12   NOT EVEN AN ENTIRE VIAL, JUST A TINY LITTLE CAPSULE'S WORTH OF

03:12PM 13   BLOOD, IT COULD BE LIKE A PIN PRICK, AND THAT ANALYSIS WOULD

03:12PM 14   THEN GIVE THE SAME AMOUNT OF INFORMATION AS IF YOU HAD AN

03:12PM 15   ENTIRE VIAL OF BLOOD DRAWN.

03:12PM 16        THAT WAS THE IMPRESSION I HAD OF WHAT MADE THE TECHNOLOGY

03:12PM 17   SO ADVANCED AND DIFFERENT FROM EVERYTHING ELSE THAT WE HAD BEEN

03:12PM 18   EXPERIENCING IN PREVIOUS YEARS.

03:12PM 19        DOES THAT MAKE SENSE?

03:12PM 20   Q.   AND WAS THAT ABILITY TO OBTAIN BLOOD TEST RESULTS FROM A

03:12PM 21   TINY SAMPLE FROM A FINGERSTICK APPEALING TO YOU AS A POTENTIAL

03:13PM 22   CUSTOMER?

03:13PM 23   A.   OH, SURE.

03:13PM 24   Q.   AT SOME POINT IN MID 2015, DID YOU MAKE THE DECISION TO

03:13PM 25   GET SOME BLOOD TEST WORK DONE?

03:13PM 1    A.   YES.

03:13PM 2    Q.   AND DID YOU ORDER THAT BLOOD TEST WORK YOURSELF OR THROUGH

03:13PM 3    YOUR PHYSICIAN?

03:13PM 4    A.   THROUGH MY PHYSICIAN, YES.

03:13PM 5    Q.   AND WHAT IS YOUR PHYSICIAN'S NAME, OR WHAT WAS YOUR

03:13PM 6    PHYSICIAN'S NAME AT THAT TIME?

03:13PM 7    A.   DR. GERALD ASIN.

03:13PM 8    Q.   AND IS THAT LAST NAME A-S-I-N?

03:13PM 9    A.   YES.

03:13PM 10   Q.   HOW DID YOU DECIDE WHICH LAB TO GO TO FOR YOUR BLOOD TEST

03:13PM 11   IN MID 2015?

03:13PM 12   A.   I REQUESTED THERANOS BECAUSE I WAS INTERESTED IN THAT

03:13PM 13   PROCESS.

03:13PM 14   Q.   WERE YOU INSURED AT THE TIME?

03:13PM 15   A.   NO.   THIS WAS AN OUT-OF-POCKET VISIT AND THE COST OF THAT

03:13PM 16   BLOOD WORK WAS PART OF THE -- THAT WAS PART OF THE DECISION

03:13PM 17   MAKING.

03:13PM 18   Q.   I SEE.   YOU UNDERSTOOD THERANOS'S PRICES TO BE LOWER THAN

03:14PM 19   COMPETING LABS?

03:14PM 20   A.   UH-HUH.

03:14PM 21          THE COURT:   IS THAT YES?   WAS THAT YES?

03:14PM 22          THE WITNESS:   YES.

03:14PM 23          MR. BOSTIC:   SORRY.

03:14PM 24   Q.   WE JUST NEED AN AUDIBLE YES FOR THE RECORD.

03:14PM 25   A.   YES, I UNDERSTOOD THEM TO BE LOWER PRICING THAN OTHER

03:14PM   1    OPTIONS.

03:14PM   2    Q.   WHEN YOU DECIDED TO GO TO THERANOS FOR BLOOD TESTING, WERE

03:14PM   3    YOU COUNTING ON THE LAB'S ABILITY TO RETURN ACCURATE RESULTS

03:14PM   4    FOR YOUR BLOOD TESTS?

03:14PM   5    A.   ABSOLUTELY.

03:14PM   6    Q.   YOU MENTIONED THAT COST WAS A FACTOR IN CHOOSING WHERE TO

03:14PM   7    GO.

03:14PM   8        BETWEEN COST AND ACCURACY, WHICH OF THOSE WAS MORE

03:14PM   9    IMPORTANT TO YOU AT THE TIME THAT YOU WERE GETTING BLOOD

03:14PM  10    TESTING DONE?

03:14PM  11    A.   WELL, I THINK ACCURACY IS THE MOST IMPORTANT ANY TIME

03:14PM  12    YOU'RE HAVING A MEDICAL PROCEDURE, BUT COST WAS A VERY, VERY

03:14PM  13    CLOSE SECOND FOR ME AT THE TIME.

03:14PM  14    Q.   AS A PATIENT, IN YOUR VIEW, IS THERE ANY BENEFIT TO YOU IN

03:14PM  15    BLOOD TEST RESULTS THAT ARE NOT ACCURATE OR RELIABLE?

03:14PM  16    A.   I CAN'T IMAGINE ONE, NO.

03:15PM  17    Q.   AFTER CHOOSING THERANOS AS THE LAB, DO YOU REMEMBER WHERE

03:15PM  18    YOU WENT TO HAVE YOUR BLOOD DRAWN?

03:15PM  19    A.   I BELIEVE IT WAS INSIDE OF A WALGREENS.

03:15PM  20    Q.   AND YOU MENTIONED THAT YOU WERE NOT INSURED.  AT THE TIME,

03:15PM  21    DO YOU RECALL HOW YOU PAID FOR YOUR THERANOS BLOOD TEST?

03:15PM  22    A.   EITHER CASH OR CARD, BANK CARD PROBABLY.

03:15PM  23    Q.   YOUR PERSONAL FUNDS?

03:15PM  24    A.   YES.

03:15PM  25            MR. BOSTIC:  YOUR HONOR, I WOULD MOVE TO ADMIT

03:15PM  1    EXHIBIT 5483, WHICH I'M HANDING UP A COPY TO THE COURT NOW.

03:15PM  2         (HANDING.)

03:15PM  3         THESE ARE RELEVANT PAGES TO AN EXHIBIT WHICH I BELIEVE THE

03:15PM  4    DEFENSE HAS STIPULATED.

03:15PM  5              MS. TREFZ:  NO OBJECTION.

03:15PM  6              MR. BOSTIC:  MAY I APPROACH, YOUR HONOR?

03:15PM  7              THE COURT:  YES.

03:15PM  8    BY MR. BOSTIC:

03:15PM  9    Q.   (HANDING.)

03:15PM  10   A.   THANK YOU.  EXCUSE ME.

03:15PM  11             THE COURT:  ARE THERE ANY REDACTIONS THAT NEED TO BE

03:15PM  12   CONDUCTED ON THIS FORM?

03:15PM  13             MR. BOSTIC:  YOUR HONOR, THE EXHIBIT THAT WE'RE

03:15PM  14   MOVING INTO EVIDENCE MATCHES WHAT THE COURT HAS.  IT'S ALREADY

03:16PM  15   BEEN REDACTED, AND I UNDERSTAND THAT THE WITNESS IS COMFORTABLE

03:16PM  16   WITH THE LEVEL OF REDACTIONS ON THIS DOCUMENT.

03:16PM  17             THE COURT:  ALL RIGHT.  THANK YOU.

03:16PM  18        THERE'S PHONE NUMBERS THERE.

03:16PM  19             MR. BOSTIC:  IS THAT IN THE UPPER RIGHT, YOUR HONOR?

03:16PM  20             THE COURT:  YES.

03:16PM  21             MR. BOSTIC:  THOSE ARE OFFICE PHONE NUMBERS THAT I

03:16PM  22   UNDERSTAND ARE PUBLIC.

03:16PM  23             THE COURT:  ALL RIGHT.  THANK YOU.  IT'S ADMITTED,

03:16PM  24   AND IT MAY BE PUBLISHED.

03:16PM  25        (GOVERNMENT'S EXHIBIT 5483 WAS RECEIVED IN EVIDENCE.)

03:16PM   1          MR. BOSTIC:  MS. HOLLIMAN, LET'S BRING UP EXHIBIT

03:16PM   2    5483.

03:16PM   3    Q.   MS. TOMPKINS, DO YOU SEE IN FRONT OF YOU EXHIBIT 5483?

03:16PM   4    A.   YES.

03:16PM   5    Q.   AND ARE THESE YOUR TEST RESULTS, OR AN EXCERPT OF YOUR

03:16PM   6    TEST RESULTS FROM THERANOS IN 2015?

03:16PM   7    A.   THEY APPEAR TO BE, YES.

03:16PM   8    Q.   AND DO YOU SEE YOUR NAME AT THE TOP, TOMPKINS, COMMA,

03:16PM   9    ERIN?

03:16PM  10    A.   YES, I DO.

03:16PM  11    Q.   AND IS THAT YOUR PHYSICIAN'S NAME TO THE RIGHT OF THAT,

03:16PM  12    GERALD ASIN?

03:16PM  13    A.   YES, IT IS.

03:16PM  14    Q.   UNDERNEATH THAT IN A BLACK BAR THAT MAKES IT ESPECIALLY

03:16PM  15    DIFFICULT TO READ, THERE'S A LINE THAT SAYS VISIT.

03:17PM  16          DO YOU SEE THAT?

03:17PM  17    A.   YES, JUST BARELY.

03:17PM  18    Q.   AND DO YOU SEE AN ADDRESS THERE, THERANOS SERVICE CENTER

03:17PM  19    ON NORTH 16TH STREET IN PHOENIX, ARIZONA?

03:17PM  20    A.   YES.

03:17PM  21    Q.   AND THE VISIT DATE LOOKS LIKE MAY 8TH, 2015.  IS THAT

03:17PM  22    CONSISTENT WITH YOUR MEMORY?

03:17PM  23    A.   THAT LOOKS LIKE THAT'S WHAT IS ON THERE, BUT IT'S VERY

03:17PM  24    HARD FOR ME TO READ.

03:17PM  25          BUT I KNOW THAT IT WAS IN THE FIRST WEEKISH OF MAY, YEAH.

03:17PM   1      THAT'S PRETTY CONSISTENT.

03:17PM   2      Q.   AND AT THE TOP OF THIS PAGE, DO YOU SEE AT THE VERY TOP

03:17PM   3      THERE'S A LINE THAT READS THERANOS FACT SERVER?

03:17PM   4           DO YOU SEE THAT AT THE TOP OF THE PAGE?

03:17PM   5      A.   YES.  NOT AT THE TOP OF THE IMAGE ON THE SCREEN, BUT AT

03:17PM   6      THE TOP OF THE PAGE THAT I'M HOLDING.  THERE IT IS.

03:17PM   7      Q.   MS. HOLLIMAN, LET'S SEE IF WE CAN ZOOM OUT AND SEE IF WE

03:18PM   8      CAN CAPTURE THE INFORMATION AT THE TOP OF THE PAGE.

03:18PM   9           DO YOU SEE IT INDICATES THERE THERANOS FAX SERVER, AND DO

03:18PM  10      YOU SEE A TIME STAMP INDICATING THAT IT WAS SENT MAY 11TH,

03:18PM  11      2015?

03:18PM  12      A.   UH-HUH, I DO.

03:18PM  13      Q.   AND FINALLY, JUST LOOKING AT YOUR PHYSICIAN'S CONTACT

03:18PM  14      INFORMATION, DO YOU SEE THAT HIS FAX NUMBER BEGINS WITH A 480

03:18PM  15      AREA CODE?

03:18PM  16      A.   YES.

03:18PM  17      Q.   AND DO YOU HAVE AN UNDERSTANDING OF WHAT AREA THAT AREA

03:18PM  18      CODE REFERS TO?

03:18PM  19      A.   YES.  THAT'S IN SCOTTSDALE, AND THE PHONE NUMBER, THE

03:18PM  20      OFFICE PHONE NUMBER HERE IS CORRECT.  I DON'T HAVE THE FAX

03:18PM  21      MEMORIZED BUT, YEAH.

03:18PM  22      Q.   UNDERSTOOD.  WAS YOUR DOCTOR'S OFFICE AT THAT TIME IN

03:18PM  23      SCOTTSDALE, ARIZONA?

03:18PM  24      A.   YES, THAT'S STONECREEK MEDICAL ASSOCIATES.

03:18PM  25      Q.   LOOKING AT THE TOP RIGHT CORNER OF THE PAGE, THERE'S

03:18PM 1      INFORMATION FOR THERANOS.

03:18PM 2          DO YOU SEE THAT?

03:18PM 3      A.   UH-HUH.

03:18PM 4      Q.   AND THERE'S A FAX NUMBER WITH A 650 AREA CODE.

03:18PM 5          DO YOU SEE THAT?

03:18PM 6      A.   UH-HUH.

03:18PM 7      Q.   DO YOU UNDERSTAND --

03:18PM 8              THE COURT:  I'M SORRY.  IS THAT YES?

03:18PM 9              THE WITNESS:  YES.

03:18PM 10             MR. BOSTIC:  THANK YOU, YOUR HONOR.

03:18PM 11     Q.   DO YOU UNDERSTAND THE 650 AREA CODE TO CORRESPOND TO PART

03:19PM 12     OF THE BAY AREA IN CALIFORNIA?

03:19PM 13     A.   YES.

03:19PM 14     Q.   AND LET'S LOOK AT THE RESULTS THEMSELVES.  DO YOU SEE

03:19PM 15     ABOUT A THIRD OF THE WAY DOWN THE PAGE THERE'S A SECTION

03:19PM 16     LABELLED SUMMARY OF ABNORMAL RESULTS?

03:19PM 17     A.   A THIRD OF THE WAY DOWN, YES, THE FIRST LIST.

03:19PM 18     Q.   YES, EXACTLY.

03:19PM 19         AND WE'VE REDACTED THE NONRELEVANT PORTIONS HERE, BUT DO

03:19PM 20     YOU SEE A LINE FOR A TEST FOR HIV 1 PLUS 2 ANTIBODIES?

03:19PM 21     A.   YES.

03:19PM 22     Q.   AND DO YOU SEE THE RESULT THERE IS LISTED THERE AS

03:19PM 23     REACTIVE?

03:19PM 24     A.   YES.

03:19PM 25     Q.   AND IT'S FLAGGED AS REACTIVE.

03:19PM  1        DO YOU SEE THAT?

03:19PM  2    A.   I DO, YES.

03:19PM  3    Q.   DO YOU REMEMBER RECEIVING THESE RESULTS IN MAY 2015?

03:19PM  4    A.   I DO.

03:19PM  5    Q.   LET'S LOOK AT THE NEXT PAGE, WHICH IS PAGE 2 OF

03:19PM  6    EXHIBIT 5483.  AND LET'S ZOOM IN ON THE BOX IN THE MIDDLE OF

03:20PM  7    THE PAGE LABELLED HIV 1, 2 ANTIBODY SCREEN.

03:20PM  8        MS. TOMPKINS, DO YOU SEE A BREAKDOWN OF SOME ADDITIONAL

03:20PM  9    HIV RELATED RESULTS FROM YOUR THERANOS TEST?

03:20PM  10   A.   YES.

03:20PM  11   Q.   AND YOU'LL SEE AGAIN THAT THE HIV 1 PLUS 2 ANTIBODY TEST

03:20PM  12   IS MARKED AS REACTIVE.

03:20PM  13       DO YOU SEE THAT?

03:20PM  14   A.   YES.

03:20PM  15   Q.   AND THAT THE OTHERS FOR HIV 1 ANTIBODY, HIV 2 ANTIBODY,

03:20PM  16   AND HIV 1 RNA ARE MARKED AS NON-REACTIVE OR NOT DETECTED.

03:20PM  17       DO YOU SEE THAT?

03:20PM  18   A.   YES.

03:20PM  19   Q.   PRIOR TO 2015, WERE YOU EVER AT ANY TIME DIAGNOSED WITH

03:20PM  20   HIV OR AIDS?

03:20PM  21   A.   NO.

03:20PM  22   Q.   AT ANY TIME SINCE 2015 HAVE YOU BEEN DIAGNOSED WITH HIV OR

03:20PM  23   AIDS?

03:21PM  24   A.   NO.

03:21PM  25   Q.   TO YOUR KNOWLEDGE, HAVE YOU EVER HAD ANY SYMPTOMS OF HIV

03:21PM 1    OR AIDS?

03:21PM 2    A.    NO.

03:21PM 3    Q.    HAVE YOU EVER RECEIVED TREATMENT FOR HIV OR AIDS?

03:21PM 4    A.    NO.

03:21PM 5    Q.    I'D LIKE TO DRAW YOUR ATTENTION TO SOME LANGUAGE ON PAGE 3

03:21PM 6    OF THE EXHIBIT.

03:21PM 7    A.    PAGE 3?

03:21PM 8    Q.    PAGE 3 OF THE EXHIBIT, AT THE BOTTOM OF THE PAGE THERE'S A

03:21PM 9    SECTION MARKED LAB NOTES.

03:21PM 10       DO YOU SEE THAT?

03:21PM 11   A.    YES.

03:21PM 12   Q.    AND IT READS THERE, "HIV ANTIBODIES WERE NOT CONFIRMED AND

03:21PM 13   HIV-1 RNA WAS NOT DETECTED.  NO LABORATORY EVIDENCE OF HIV-1

03:21PM 14   INFECTION.  FOLLOW-UP TESTING FOR HIV-2 SHOULD BE PERFORMED IF

03:21PM 15   CLINICALLY INDICATED."

03:21PM 16       DO YOU SEE THAT?

03:21PM 17   A.    YES.

03:21PM 18   Q.    BASED ON YOUR MEDICAL HISTORY, ARE YOU AWARE OF ANY REASON

03:21PM 19   WHY HIV ANTIBODIES WOULD BE PRESENT IN YOUR BLOOD?

03:22PM 20   A.    NO.

03:22PM 21   Q.    FOLLOWING YOUR RECEIPT OF THESE RESULTS, DID YOU TAKE ANY

03:22PM 22   STEPS TO CONFIRM THESE RESULTS OR GET A SECOND OPINION?

03:22PM 23   A.    FOLLOWING MY -- I'M SORRY, CAN YOU SAY THAT AGAIN, PLEASE.

03:22PM 24   Q.    AFTER YOU GOT THESE RESULTS, DID YOU TAKE ANY STEPS TO TRY

03:22PM 25   TO VERIFY WHAT WAS REALLY HAPPENING?

03:22PM  1    A.   YES.  I MADE A DIRECT CALL TO THE NUMBER FOR THERANOS AND

03:22PM  2    ASKED IF I COULD SPEAK WITH SOMEONE WORKING IN A LAB WHO COULD

03:22PM  3    EXPLAIN TO ME HOW THIS IS POSSIBLE.

03:22PM  4    Q.   AND HOW SOON AFTER RECEIVING THESE RESULTS DID YOU CALL

03:22PM  5    THE COMPANY?

03:22PM  6    A.   FROM THE DAY -- IT WAS EITHER ON THE DAY THAT I RECEIVED

03:22PM  7    THEM OR THE FOLLOWING DAY.

03:22PM  8    Q.   SO I UNDERSTAND WE'RE TALKING ABOUT MAY 2015?

03:22PM  9    A.   UH-HUH.

03:22PM  10   Q.   WHAT, IF ANYTHING, DO YOU REMEMBER ABOUT THAT CONVERSATION

03:22PM  11   WITH SOMEONE AT THE COMPANY?

03:22PM  12   A.   I REMEMBER ASKING IF I COULD BE TRANSFERRED TO SOMEONE WHO

03:22PM  13   WORKS WITH THE LAB EQUIPMENT WHO MIGHT BE ABLE TO HAVE A MORE

03:22PM  14   IN-DEPTH CONVERSATION WITH ME ABOUT HOW THIS IS POSSIBLE.

03:23PM  15        SHE SAID SHE WAS A CUSTOMER SERVICE REPRESENTATIVE AND SHE

03:23PM  16   COULDN'T TRANSFER ME, AND THAT WAS ABOUT IT.

03:23PM  17        I DON'T RECALL IF I ATTEMPTED TO CALL THEM BACK AGAIN, BUT

03:23PM  18   I WAS QUITE EMOTIONAL AT THE TIME.

03:23PM  19   Q.   AT ANY TIME TO YOUR KNOWLEDGE DID YOU SPEAK TO A SCIENTIST

03:23PM  20   OR A MEDICAL PROFESSIONAL --

03:23PM  21   A.   NO.

03:23PM  22   Q.   -- ASSOCIATED WITH THERANOS?

03:23PM  23   A.   NO.

03:23PM  24   Q.   TO YOUR KNOWLEDGE, DID YOU GET A CALL BACK FROM THE

03:23PM  25   COMPANY TO PROVIDE MORE INFORMATION ABOUT YOUR TEST RESULTS?

03:23PM 1    A.  NOT THAT I RECALL, NO.

03:23PM 2    Q.  AT SOME POINT AFTER THESE TEST RESULTS, DID YOU GET

03:23PM 3    ADDITIONAL EXAMINATION OR ANOTHER TEST TO TRY TO CONFIRM

03:23PM 4    WHETHER THESE RESULTS WERE ACCURATE OR NOT?

03:23PM 5    A.  YES.  IT TOOK ME A LITTLE LONGER THAN I LIKED, BUT WITHIN

03:23PM 6    THE NEXT THREE MONTHS I WAS ABLE TO GO INTO THE WOMEN'S CLINIC

03:23PM 7    AND GET SOME SCREENING DONE.  THAT CAME BACK NEGATIVE.  THEY

03:23PM 8    SAID EVERYTHING WAS FINE.

03:23PM 9         THEN I WENT, LIKE, I DON'T KNOW, THREE YEARS LATER AND HAD

03:24PM 10   IT DONE AGAIN.

03:24PM 11   Q.  AND DID YOU HAVE ANOTHER TEST DONE IN AUGUST OF THIS YEAR,

03:24PM 12   WHICH INCLUDED AN HIV SCREEN?

03:24PM 13   A.  YES, THAT IS THE MOST RECENT ONE.

03:24PM 14        MR. BOSTIC:  MAY I APPROACH, YOUR HONOR?

03:24PM 15        THE COURT:  YES.

03:24PM 16   BY MR. BOSTIC:

03:24PM 17   Q.  (HANDING.)

03:24PM 18        MS. TOMPKINS, I'VE PUT IN FRONT OF YOU WHAT IS MARKED

03:24PM 19   5484.

03:24PM 20        DO YOU HAVE THAT?

03:24PM 21   A.  YES.

03:24PM 22   Q.  AND IS THIS A REPORT WITH YOUR HIV TEST RESULTS FROM

03:24PM 23   AUGUST OF THIS YEAR?

03:24PM 24   A.  YES.

03:24PM 25        MR. BOSTIC:  YOUR HONOR, I WOULD MOVE TO ADMIT

03:24PM  1    EXHIBIT 5484 AT THIS TIME, AND I WILL BE REDACTING THE DATE OF

03:24PM  2    BIRTH AT THE TOP OF THE PAGE.

03:24PM  3              MS. TREFZ:  NO OBJECTION.

03:24PM  4              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED WITH

03:25PM  5    THE REDACTION.

03:25PM  6         (GOVERNMENT'S EXHIBIT 5484 WAS RECEIVED IN EVIDENCE.)

03:25PM  7    BY MR. BOSTIC:

03:25PM  8    Q.  MS. TOMPKINS, ARE YOU SEEING YOUR AUGUST HIV RESULTS IN

03:25PM  9    FRONT OF YOU?

03:25PM  10             THE COURT:  EXCUSE ME.  THE MONITORS ARE NOT

03:25PM  11   WORKING.  I DON'T SEE --

03:25PM  12             THE CLERK:  LET ME DO A QUICK RESET, YOUR HONOR.

03:25PM  13             THE COURT:  PARDON ME, MR. BOSTIC.

03:25PM  14             MR. BOSTIC:  OF COURSE, YOUR HONOR.

03:26PM  15        (PAUSE IN PROCEEDINGS.)

03:26PM  16             THE COURT:  ALL RIGHT.  IT LOOKS LIKE IT'S JUST ONE

03:26PM  17   OF OUR MONITORS ON THE EAST SIDE.

03:26PM  18        DOES THE JURY HAVE A VIEW OF THIS?

03:26PM  19             JUROR:  (NODS HEAD UP AND DOWN.)

03:26PM  20             THE COURT:  ALL RIGHT.  THANK YOU.  WE'LL PROCEED.

03:26PM  21        THERE IS ONE MONITOR UP IN THE PUBLIC AREA, AND THAT'S

03:26PM  22   WHAT WE'LL HAVE TO USE FOR NOW.

03:26PM  23        SO YOU CAN CONTINUE, MR. BOSTIC.

03:26PM  24             MS. TREFZ:  I'M SORRY.

03:26PM  25             THE COURT:  MS. TREFZ IS GOING TO SIT AT A TABLE

03:26PM   1    HERE THAT HAS THE MONITOR THAT DISPLAYS THE EXHIBIT.

03:26PM   2        YOU HAVE THE EXHIBIT THOUGH?

03:26PM   3            MS. TREFZ:  I DO, BUT I WILL SIT HERE.

03:26PM   4            THE COURT:  THAT'S FINE.

03:26PM   5        MR. BOSTIC.

03:26PM   6            MR. BOSTIC:  THANK YOU, YOUR HONOR.

03:26PM   7    Q.   MS. TOMPKINS, ON THE FORM IN FRONT OF YOU, FIRST AT THE

03:26PM   8    TOP IT IS LABELLED CONTRA COSTA HEALTH SERVICES.

03:26PM   9        IS THAT THE LAB THAT YOU WENT TO FOR YOUR AUGUST 2021 HIV

03:27PM   10   TEST?

03:27PM   11   A.   YES.

03:27PM   12   Q.   AND, MS. HOLLIMAN, LET'S ZOOM IN ON THE RESULTS WHERE THE

03:27PM   13   BOX IS CHECKED NEXT TO NEGATIVE.

03:27PM   14       AND, MS. TOMPKINS, DO YOU SEE THAT YOUR RESULT FOR THIS

03:27PM   15   TEST CAME BACK NEGATIVE AND IT READS, "EVIDENCE OF HIV ANTIGEN

03:27PM   16   OR ANTIBODY WERE NOT DETECTED."

03:27PM   17       DO YOU SEE THAT?

03:27PM   18   A.   I DO, YES.

03:27PM   19            MR. BOSTIC:  MAY I HAVE A MOMENT, YOUR HONOR?

03:27PM   20            THE COURT:  YES.

03:27PM   21       (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

03:27PM   22            MR. BOSTIC:  NO FURTHER QUESTIONS.

03:27PM   23       THANK YOU, MS. TOMPKINS.

03:27PM   24            THE COURT:  MS. TREFZ?

03:27PM   25            MS. TREFZ:  I DO.  I'M ALSO MINDFUL OF THE TIME.  I

```
03:27PM   1    THINK IT WILL TAKE MORE THAN THREE MINUTES.  I'M HAPPY TO

03:27PM   2    START.

03:27PM   3              THE COURT:  WELL, WHY DON'T YOU START?  WHY DON'T

03:27PM   4    YOU INTRODUCE YOURSELF AND LET'S GET STARTED.

03:27PM   5              MS. TREFZ:  OKAY.  I'M HAPPY TO DO THAT.

03:28PM   6                         CROSS-EXAMINATION

03:28PM   7    BY MS. TREFZ:

03:28PM   8    Q.  GOOD AFTERNOON, MS. TOMPKINS.

03:28PM   9    A.  GOOD AFTERNOON.

03:28PM  10    Q.  MY NAME IS KATIE TREFZ, AND I REPRESENT MS. HOLMES.  I'M

03:28PM  11    JUST GOING TO ASK YOU A FEW QUESTIONS.

03:28PM  12         BECAUSE OF THE TIME, I APOLOGIZE, BUT IT PROBABLY WILL

03:28PM  13    TAKE UNTIL TOMORROW, BUT IT WON'T BE SUPER LONG.

03:28PM  14    A.  OKAY.

03:28PM  15    Q.  DO YOU RECALL HOW MUCH YOUR HIV TEST COST FROM THERANOS?

03:28PM  16    A.  OFF THE TOP OF MY HEAD?  NO.

03:28PM  17         I REMEMBER IT BEING OF LOWER COST AND I REMEMBER RECEIVING

03:28PM  18    A REFUND CHECK IN THE MAIL APPROXIMATELY TWO YEARS LATER MAYBE,

03:28PM  19    SOMETHING LIKE THAT.

03:29PM  20    Q.  OKAY.  I THINK YOU MENTIONED ON DIRECT THAT COST WAS AN

03:29PM  21    IMPORTANT DRIVER FOR YOU IN GOING TO THERANOS; IS THAT CORRECT?

03:29PM  22    A.  UH-HUH, ONE OF THEM.

03:29PM  23    Q.  YOU DISCUSSED THE RESULTS THAT YOU GOT WITH YOUR DOCTOR;

03:29PM  24    CORRECT?

03:29PM  25    A.  UH-HUH.
```

03:29PM   1            THE COURT:  YES?

03:29PM   2            THE WITNESS:  YES.  BAD HABIT.  I APOLOGIZE.

03:29PM   3    BY MS. TREFZ:

03:29PM   4    Q.   I FEEL YOU.

03:29PM   5        LOOKING -- WHEN YOU DISCUSSED YOUR TEST RESULT WITH YOUR

03:29PM   6    DOCTOR, WHAT DID HE TELL YOU ABOUT WHAT IT MEANT?

03:29PM   7    A.   HE SAID HE --

03:29PM   8            MR. BOSTIC:  OBJECTION.  THIS IS HEARSAY.  ALSO TO

03:29PM   9    THE EXTENT THAT IT CALLS FOR DOCTOR-PATIENT CONFIDENTIALITY.

03:29PM  10            THE COURT:  THERE MIGHT BE SOME PRIVILEGE ISSUES

03:29PM  11    INVOLVED IN THAT, AND WE'LL HAVE TO SEE WHETHER OR NOT

03:29PM  12    MS. TOMPKINS WISHES TO DISCLOSE THAT.

03:29PM  13        AND WE'LL DO THAT TOMORROW, LADIES AND GENTLEMEN.

03:29PM  14        MS. TOMPKINS, WE'RE ENDING TODAY AT 3:30.  I WANTED TO GET

03:30PM  15    MS. TREFZ STARTED TO CAPTURE AS EVIDENCE AS WE COULD.

03:30PM  16        SO I'LL HAVE TO ASK YOU TO RETURN TOMORROW AT 9:00 A.M.,

03:30PM  17    PLEASE, OR BE READY FOR TESTIMONY AT 9:00 A.M.

03:30PM  18        LADIES AND GENTLEMEN, WE'LL TAKE A RECESS NOW, EVENING

03:30PM  19    RECESS.  PLEASE AGAIN REMEMBER THE ADMONISHMENT.  DO NOT LISTEN

03:30PM  20    TO, READ, OR COME UPON ANY INFORMATION, DISCUSSION, OR

03:30PM  21    OTHERWISE ON SOCIAL MEDIA.  DO NOT DO ANY INVESTIGATION.

03:30PM  22        AND TOMORROW I WILL -- ABOUT THIS CASE, AND TOMORROW I'LL

03:30PM  23    ASK YOU WHETHER OR NOT ANY OF THOSE THINGS HAVE OCCURRED.

03:30PM  24        HAVE A GOOD EVENING.  THANK YOU.  WE'LL SEE YOU TOMORROW.

03:30PM  25        AND YOU CAN -- MS. TOMPKINS, YOU CAN STAND DOWN, AND WE'LL

03:30PM  1    SEE YOU BACK TOMORROW AT 9:00 O'CLOCK.

03:30PM  2              THE WITNESS:  OKAY.  THANK YOU, SIR.

03:30PM  3              THE COURT:  YOU'RE WELCOME.

03:31PM  4         (JURY OUT AT 3:31 P.M.)

03:31PM  5              MS. TREFZ:  THOSE ARE THE EXHIBITS THAT YOU'RE

03:31PM  6    SUPPOSED TO LEAVE.

03:31PM  7              THE COURT:  JUST LEAVE THOSE EXHIBITS UP THERE,

03:31PM  8    MS. TOMPKINS.  THANK YOU.

03:31PM  9              THE WITNESS:  NO.  I APOLOGIZE.

03:31PM  10             THE COURT:  AND PLEASE BE SEATED, LADIES AND

03:31PM  11   GENTLEMEN.  THANK YOU.

03:31PM  12        OH, AND, MS. TOMPKINS, YOU CAN -- THE RECORD SHOULD

03:31PM  13   REFLECT THAT THE JURY HAS LEFT FOR THE RECESS AND THE WITNESS

03:31PM  14   HAS LEFT THE COURTROOM.  ALL COUNSEL AND MS. HOLMES ARE

03:31PM  15   PRESENT.

03:31PM  16        ANYTHING BEFORE WE BREAK, COUNSEL?

03:31PM  17             MR. SCHENK:  NO, YOUR HONOR.

03:31PM  18             MR. DOWNEY:  I UNDERSTAND THAT YOUR HONOR IS GOING

03:31PM  19   TO TAKE THE PARLOFF MATTERS UP TOMORROW MORNING, AND MR. CLINE

03:31PM  20   WILL BE HERE AND AVAILABLE TO DO THAT.

03:31PM  21             THE COURT:  THAT'S FINE.  THAT'S FINE.

03:31PM  22             MS. TREFZ:  YOUR HONOR, I WOULD JUST LIKE, ON THIS

03:31PM  23   LAST OBJECTION, I WOULD LIKE -- WE CAN TALK ABOUT IT TOMORROW

03:32PM  24   MORNING, I'M HAPPY TO, OR WE CAN TALK ABOUT IT NOW, BUT I WOULD

03:32PM  25   LIKE TO KNOW THE BOUNDARIES OF WHAT WE'RE ALLOWED TO ASK ABOUT

03:32PM 1    IN PARTICULAR, BECAUSE WE WERE -- IT HAS BEEN DISCLOSED TO US

03:32PM 2    WHAT THE DOCTOR TOLD THE PATIENT AND WE BELIEVE IT'S HIGHLY

03:32PM 3    RELEVANT.

03:32PM 4        SO I'M HAPPY TO DISCUSS THAT NOW OR LATER.  I DEFER TO THE

03:32PM 5    COURT.

03:32PM 6            THE COURT:  WHY DON'T YOU WALK UP HERE, AND WE'LL

03:32PM 7    TALK ABOUT IT NOW.  I'D LIKE TO TAKE ADVANTAGE OF AS MUCH TIME

03:32PM 8    AS WE HAVE SO WE DON'T RUN INTO ANY OTHER UNTOWARD DELAYS IN

03:32PM 9    THE CASE.

03:32PM 10           MS. TREFZ:  SO WITH RESPECT TO THIS PARTICULAR

03:32PM 11   ISSUE, THERE IS AN ISSUE THAT GOES TO WHETHER THE TEST ACTUALLY

03:32PM 12   WAS ACCURATE OR NOT.

03:32PM 13           THE COURT:  WHICH TEST?

03:32PM 14           MS. TREFZ:  THE HIV TEST THAT WE'RE TALKING ABOUT.

03:32PM 15           THE COURT:  YOUR CLIENT'S TEST OR THE SUBSEQUENT

03:32PM 16   TEST?

03:33PM 17           MS. TREFZ:  THE TEST --

03:33PM 18           THE COURT:  FROM YOUR CLIENT'S COMPANY?

03:33PM 19           MS. TREFZ:  FROM THERANOS, YES.

03:33PM 20           THE COURT:  YES.

03:33PM 21           MS. TREFZ:  IN PARTICULAR, HIV IS A REFLEX TEST

03:33PM 22   PURSUANT TO A CBC ALGORITHM, AND WE BELIEVE THIS WAS

03:33PM 23   COMMUNICATED TO THE PATIENT, AND WE ALSO BELIEVE THAT IT WAS

03:33PM 24   COMMUNICATED TO THE PATIENT THAT THERE WAS NO INDICATION --

03:33PM 25   THERE WAS NO BELIEF THAT SHE WAS HIV POSITIVE AS A RESULT OF

6766

03:33PM 1    THIS PARTICULAR TEST.

03:33PM 2              THE COURT:  FROM THIS --

03:33PM 3              MS. TREFZ:  I'M SORRY.

03:33PM 4              THE COURT:  THIS INFORMATION COMES FROM HER DOCTOR

03:33PM 5    TO HER?

03:33PM 6              MS. TREFZ:  FROM HER DOCTOR TO HER.

03:33PM 7         BUT IT'S BEEN DISCLOSED TO US AS PART OF DISCOVERY, AND WE

03:33PM 8    THINK IT'S HIGHLY RELEVANT TO THE MATTERS HERE, IN PART BECAUSE

03:33PM 9    WE BELIEVE THAT THE CONFIDENTIALITY HAS ALREADY BEEN BROKEN AND

03:33PM 10   THAT IT'S BEEN DISCLOSED TO US.

03:33PM 11        AND WE THINK IT'S IMPORTANT THAT THE JURY UNDERSTAND THAT

03:33PM 12   THE PATIENT WAS TOLD AT THE TIME THAT THIS WAS NOT A POSITIVE

03:34PM 13   TEST RESULT.

03:34PM 14             THE COURT:  TOLD AT THE TIME?

03:34PM 15             MS. TREFZ:  SHE RECEIVED THE RESULT AROUND MAY OF

03:34PM 16   2015, THAT SHE WAS TOLD AT THE TIME BY HER DOCTOR THAT IT WAS

03:34PM 17   NOT AN INDICATION OF A POSITIVE TEST RESULT.

03:34PM 18             THE COURT:  OKAY.  SO SHE TOOK THE TEST, SHE GOT THE

03:34PM 19   RESULTS, SHE CALLED HER DOCTOR, AND THEN HER DOCTOR THEN TELLS

03:34PM 20   HER THIS INFORMATION?

03:34PM 21             MS. TREFZ:  THAT IS WHAT WE WOULD LIKE TO ELICIT.

03:34PM 22   WE BELIEVE THAT THAT IS THE CASE BASED ON THE -- OUR

03:34PM 23   UNDERSTANDING OF THE DISCOVERY THAT HAS BEEN PRODUCED TO US IN

03:34PM 24   THIS CASE, AND SO I DON'T BELIEVE THE OBJECTION IS WELL TAKEN.

03:34PM 25             THE COURT:  OKAY.  ALL RIGHT.

03:34PM   1           MR. BOSTIC?

03:34PM   2                MR. BOSTIC:  YOUR HONOR, A FEW POINTS.

03:34PM   3           FIRST, WHEN IT COMES TO THE OBJECTION TO THE

03:34PM   4   DOCTOR-PATIENT CONFIDENTIALITY, TO THE EXTENT THAT

03:34PM   5   CONFIDENTIALITY HAS BEEN WAIVED AS TO THE SPECIFIC STATEMENT

03:34PM   6   THAT MS. TREFZ IS REFERENCING, I THINK THE OBJECTION WAS STILL

03:35PM   7   NECESSARY BECAUSE THE QUESTION WAS MUCH MORE OPEN ENDED.  THE

03:35PM   8   QUESTION WAS, WHAT DID YOUR DOCTOR TELL YOU?

03:35PM   9           AND I THINK -- I DON'T KNOW WHAT THAT CALLS FOR.  I DON'T

03:35PM  10   KNOW WHAT OTHER CONTENT MIGHT BE THERE.

03:35PM  11           BUT I DIDN'T WANT THE WITNESS TO INADVERTENTLY OR TO FEEL

03:35PM  12   THAT SHE WAS OBLIGATED TO PROVIDE INFORMATION BEYOND I THINK

03:35PM  13   WHAT MS. TREFZ IS ASKING ABOUT.

03:35PM  14           EVEN AS TO THE STATEMENT THAT MS. TREFZ IS REFERENCING,

03:35PM  15   THOUGH, I DO HAVE HEARSAY CONCERNS STILL, AND I ALSO HAVE

03:35PM  16   RELEVANCE CONCERNS BECAUSE I'M NOT SURE OF THE RELEVANCE OF

03:35PM  17   WHAT THIS PATIENT'S PHYSICIAN TOLD HER ABOUT THE RESULTS.

03:35PM  18           SEPARATELY, JUST FACTUALLY, AND I SHOULD HAVE STARTED

03:35PM  19   HERE, MY UNDERSTANDING OF THE FACT IS SLIGHTLY DIFFERENT FROM

03:35PM  20   MS. TREFZ'S ALSO, AND MAY BE I SHOULD GO BACK AND WE SHOULD

03:35PM  21   BOTH REVIEW THE 302'S.

03:35PM  22           BUT MY UNDERSTANDING IS THAT HER DOCTOR EXPRESSED SOME

03:35PM  23   DOUBT ABOUT WHETHER THAT TEST RESULT COULD BE ACCURATE.  HE WAS

03:36PM  24   IN DISBELIEF, IN OTHER WORDS, THAT MS. TOMPKINS COULD ACTUALLY

03:36PM  25   HAVE HIV ANTIBODIES IN HER BLOOD, SO HE EXPRESSED SKEPTICISM OR

03:36PM  1     DISBELIEF AS TO THE ACCURACY OF THE RESULTS.

03:36PM  2          I DON'T UNDERSTAND THAT TO BE THE SAME AS HIM SAYING,

03:36PM  3     "THESE RESULTS ARE ACCURATE AND THEY DO NOT CONNOTE AN HIV

03:36PM  4     INFECTION," WHICH COULD POTENTIALLY BE RELEVANT.

03:36PM  5          BUT EVEN THERE I WOULD QUESTION THE RELEVANCE BECAUSE,

03:36PM  6     FIRST OF ALL, THAT'S -- THAT WOULD BE A HEARSAY OUT-OF-COURT

03:36PM  7     OPINION ABOUT THE TEST ACCURACY COMING INTO EVIDENCE HERE,

03:36PM  8     WHICH WOULD NOT BE PROPER.

03:36PM  9          AND IF IT'S SOLELY FOR THE WITNESS'S STATE OF MIND, I

03:36PM 10     DON'T THINK THAT'S RELEVANT GIVEN THAT THE COURT HAS EXCLUDED,

03:36PM 11     YOU KNOW, VICTIM IMPACT INFORMATION.

03:36PM 12          IF WE WERE TRYING TO PRESENT EVIDENCE OF PAIN AND

03:36PM 13     SUFFERING OR TRAUMA THAT SHE WENT THROUGH AS A RESULT OF

03:36PM 14     RECEIVING THIS RESULT, THEN IT MIGHT BE RELEVANT THAT HER

03:37PM 15     DOCTOR GAVE HER SOME INFORMATION TO MITIGATE THAT.

03:37PM 16          BUT BECAUSE THAT IS NOT WHAT THE CASE IS ABOUT, I'M NOT

03:37PM 17     SURE WHY IT'S NECESSARY.

03:37PM 18               THE COURT:  THANK YOU.  WELL, SHE DID TESTIFY -- I

03:37PM 19     THINK -- WHAT DID SHE SAY?  SHE WAS UPSET, SHOCKED, SURPRISED.

03:37PM 20               MS. TREFZ:  YES, SHE SAID SHE WAS EMOTIONAL.

03:37PM 21               THE COURT:  YES.  AND MR. BOSTIC DID NOT FOLLOW UP

03:37PM 22     ON THAT.

03:37PM 23               MS. TREFZ:  I AGREE.

03:37PM 24               THE COURT:  AND I THINK THAT THE QUESTION DID NOT

03:37PM 25     CALL FOR THAT TYPE OF A RESPONSE.  IT WAS -- THE QUESTION

6769

03:37PM 1    CALLED FOR A DIFFERENT CALL.

03:37PM 2         SO THAT WAS PURELY VOLUNTARY ON HER PART THAT SHE SAID

03:37PM 3    THAT.  THERE WAS NO FOLLOWUP ON IT AT ALL.

03:37PM 4         I SAY THAT BECAUSE I THINK MR. BOSTIC'S POINT ABOUT IT

03:37PM 5    COULD, IT COULD ALLOW HER, AND I MIGHT ALLOW HER TO THEN TALK A

03:37PM 6    LITTLE BIT MORE ABOUT THAT IF WE GET INTO WHAT THE DOCTOR SAID.

03:37PM 7         BUT IS IT YOUR -- YOU JUST WANT TO GET IN THE FACT THAT --

03:37PM 8    IT SOUNDS LIKE YOU WANT TO GET SOME SCIENTIFIC EVIDENCE IN.

03:37PM 9              MS. TREFZ:  I BELIEVE THAT THIS DOCTOR IS GOING TO

03:37PM 10   TESTIFY AS WELL, THAT IS MY UNDERSTANDING, AND, YOU KNOW, WE

03:38PM 11   WOULD OBVIOUSLY HAVE A PROBLEM IF HE WAS NOT GOING TO TESTIFY

03:38PM 12   AS WELL.

03:38PM 13        SO SOME OF THIS INFORMATION I'M HAPPY TO GET IN THROUGH

03:38PM 14   THE DOCTOR, BUT WHAT I DON'T WANT TO BE THE CASE IS TO BE

03:38PM 15   PRECLUDED FROM CROSS-EXAMINING EITHER HER OR THE DOCTOR ON KIND

03:38PM 16   OF WHAT THEY SAID AT THE TIME IF IT'S INCONSISTENT WITH WHAT

03:38PM 17   WAS SAID NOW.

03:38PM 18        AND THAT'S -- I WAS TRYING TO EXPLORE THAT SO WE DON'T

03:38PM 19   HAVE TO CALL SOMEBODY BACK IN ORDER TO DO THAT.

03:38PM 20        I FULLY TAKE THE POINT THAT THE QUESTION WAS BROADER.  I'M

03:38PM 21   HAPPY TO NARROW IT SPECIFICALLY.

03:38PM 22        I DO THINK I CAN TRY TO COME AT IT ANOTHER WAY, AND MAYBE

03:38PM 23   WE'LL GET THERE IN A WAY THAT DOESN'T CAUSE MR. -- WHATEVER --

03:38PM 24   THE CONCERN THAT MR. BOSTIC HAS TO COME TO FRUITION.

03:38PM 25        BUT I DO BELIEVE THAT WE SHOULD BE ABLE TO EXPLORE THE

03:38PM 1    UNDERSTANDING OF THE DOCTOR AT THE TIME AND WHETHER THAT WAS

03:39PM 2    COMMUNICATED TO THE PATIENT AT THE TIME BECAUSE WE'RE NOW MANY

03:39PM 3    YEARS LATER, OF COURSE, AND WE'RE IN A TRIAL, AND, YOU KNOW,

03:39PM 4    THERE'S A LOT OF ATTENTION ON WHETHER A RESULT IS ACCURATE OR

03:39PM 5    NOT IN A DIFFERENT KIND OF SETTING.

03:39PM 6         BUT WE DO HAVE EVIDENCE FROM THE TIME PERIOD THAT, YOU

03:39PM 7    KNOW, THAT AT LEAST THE DOCTOR DID NOT BELIEVE THAT THIS WAS A

03:39PM 8    POSITIVE, OR DID NOT BELIEVE THAT THIS PATIENT HAD A

03:39PM 9    POSITIVE -- WAS HIV POSITIVE AND THAT THE DOCTOR, YOU KNOW,

03:39PM 10   INDICATED ON THE -- OR INDICATED THAT THE REPORT ITSELF WAS

03:39PM 11   PERHAPS CONFUSING.

03:39PM 12        BUT THE REPORT ITSELF SAYS AT THE END IN THE PART THAT

03:39PM 13   MR. BOSTIC IDENTIFIED ON DIRECT, IT SAYS, YOU KNOW, THERE'S NO

03:39PM 14   EVIDENCE OF HIV, THERE'S NO LABORATORY EVIDENCE OF HIV

03:40PM 15   INFECTION.

03:40PM 16        AND WE BELIEVE THAT THE -- THAT PART OF THE CONFUSION HERE

03:40PM 17   COMES FROM HOW THIS INFORMATION WAS PRESENTED IN THE LAB REPORT

03:40PM 18   AND IS LESS ABOUT KIND OF THE OVERALL ACCURACY OF THE TEST.

03:40PM 19        THIS WAS RUN ON AN FDA APPROVED DEVICE, AND AN FDA

03:40PM 20   APPROVED METHOD.

03:40PM 21        SO I THINK THERE ARE A NUMBER OF DIFFERENT ISSUES THAT

03:40PM 22   POTENTIALLY COME INTO THIS PARTICULAR PATIENT, AND I WOULD --

03:40PM 23   AND THIS PARTICULAR RESULT, AND I WOULD LIKE JUST THE LEEWAY TO

03:40PM 24   EXPLORE THE KIND OF UNDERSTANDING OF WHAT THIS TEST RESULT

03:40PM 25   MEANT AND WHAT WAS COMMUNICATED AT THE TIME.

| | | |
|---|---|---|
| 03:40PM | 1 | THE COURT:  WELL, SHE TESTIFIED WHAT IT MEANT TO HER |
| 03:40PM | 2 | WAS THAT SHE HAD HIV. |
| 03:40PM | 3 | AND IF YOU'RE GOING TO GET INTO SCIENTIFIC EVIDENCE OF |
| 03:40PM | 4 | THIS AS TO WHAT THE DOCTOR'S OPINION IS, IT MIGHT BE BETTER TO |
| 03:40PM | 5 | WAIT FOR HIM OR HER TO TESTIFY ABOUT WHAT HE TOLD HER. |
| 03:40PM | 6 | SHE CAN TESTIFY ABOUT -- WITH THAT LIMITED SCOPE OF, DID |
| 03:41PM | 7 | YOU TALK TO YOUR DOCTOR ABOUT THIS TEST AND WHAT WAS THE |
| 03:41PM | 8 | DISCUSSION ABOUT THE TEST? |
| 03:41PM | 9 | I THINK THAT'S WHAT MR. BOSTIC IS REFERRING TO. |
| 03:41PM | 10 | MS. TREFZ:  AND I'M HAPPY TO LIMIT MY, MY |
| 03:41PM | 11 | QUESTIONING WITH HER TO THE TEST ITSELF. |
| 03:41PM | 12 | BUT I DO THINK IT'S RELEVANT FOR THE JURY TO HEAR, NOW |
| 03:41PM | 13 | THAT THEY'VE HEARD THAT SHE THOUGHT IT MEANT THAT IT WAS -- |
| 03:41PM | 14 | THAT SHE -- THAT IT MEANT THAT SHE MIGHT HAVE BEEN HIV |
| 03:41PM | 15 | POSITIVE, TO HEAR THAT SHE WAS TOLD BASICALLY IMMEDIATELY THAT, |
| 03:41PM | 16 | IN FACT, THAT'S NOT WHAT THE DOCTOR BELIEVED. |
| 03:41PM | 17 | MR. BOSTIC:  SO, YOUR HONOR, I DON'T THINK SHE |
| 03:41PM | 18 | TESTIFIED TO THAT. |
| 03:41PM | 19 | I DON'T REMEMBER HER SAYING THAT SHE BELIEVED THAT SHE WAS |
| 03:41PM | 20 | HIV POSITIVE. |
| 03:41PM | 21 | AND WHEN IT COMES TO THE ACCURACY OF THE TEST, THIS IS AN |
| 03:41PM | 22 | HIV ANTIBODY TEST.  THE THERANOS TEST DOES INCLUDE THE LANGUAGE |
| 03:41PM | 23 | THAT I HIGHLIGHTED FOR THAT PURPOSE BECAUSE I DIDN'T WANT THERE |
| 03:41PM | 24 | TO BE ANY CONFUSION ABOUT WHETHER THIS -- WHETHER THERANOS WAS |
| 03:41PM | 25 | TELLING HER THAT SHE HAD THE VIRUS ITSELF PRESENT IN HER |

03:42PM 1    BLOODSTREAM.

03:42PM 2        THE TEST THAT CAME BACK POSITIVE WAS AN HIV ANTIBODY TEST,

03:42PM 3    AND THAT'S WHY IT'S RELEVANT THAT SHE HAD NEVER BEEN DIAGNOSED

03:42PM 4    WITH THE ILLNESS, SHE'D NEVER HAD SYMPTOMS, SHE'D NEVER BEEN

03:42PM 5    TREATED.

03:42PM 6        THOSE FACTS SHOULD PRECLUDE HIV ANTIBODIES FROM BEING

03:42PM 7    PRESENT IN HER BLOODSTREAM, AND THE FACT THAT SHE HAS TESTED

03:42PM 8    SUBSEQUENTLY NEGATIVE FOR THOSE SAME ANTIBODIES, THAT'S THE

03:42PM 9    EVIDENCE THAT THE THERANOS PROVIDED TEST WAS INACCURATE.

03:42PM 10       TO THE EXTENT THAT HER DOCTOR HAD CONCERNS ABOUT THE

03:42PM 11   ACCURACY OF THE TEST AT THE TIME, THAT IS INADMISSIBLE HEARSAY.

03:42PM 12   THAT'S WHY I DIDN'T ASK ABOUT IT.

03:42PM 13       I WOULD NOT TRY TO GET IN THAT DOCTOR'S OPINION OF THE

03:42PM 14   ACCURACY OF THE RESULTS THROUGH THIS WITNESS.

03:42PM 15       I JUST WANT TO BE CLEAR THAT WE ARE NOT CERTAIN AS OF THIS

03:42PM 16   POINT WHETHER THE DOCTOR WILL, IN FACT, TESTIFY.

03:42PM 17       WE'RE, AS THE COURT KNOWS, WE'RE SEEKING TO STREAMLINE THE

03:42PM 18   CASE AS MUCH AS WE CAN.  IN LIGHT OF DELAYS TODAY, WE WERE

03:43PM 19   THANKFUL TO GET MS. TOMPKINS'S DIRECT DONE.

03:43PM 20       DR. ASIN HAS COMMITMENTS LATER IN THE WEEK THAT MIGHT MAKE

03:43PM 21   HIM UNAVAILABLE, AND AS I SAID, WE'RE CONSTANTLY EVALUATING OUR

03:43PM 22   WITNESS LIST TO DETERMINE WHICH WITNESSES ARE TRULY NECESSARY.

03:43PM 23       SO I THINK THE CONVERSATION SHOULD BE CABINED TO WHAT IS

03:43PM 24   ADMISSIBLE THROUGH THIS WITNESS, AND I STILL DON'T SEE A BASIS

03:43PM 25   FOR GETTING IN OUT-OF-COURT STATEMENTS WHICH SOUNDS LIKE THEY

03:43PM 1    WOULD BE COMING IN FOR THEIR TRUTH.

03:43PM 2         THE COURT:  IS IT, IS IT -- WHAT I UNDERSTAND THE

03:43PM 3    DOCTOR -- WHEN SHE CALLED HER PHYSICIAN, HER PHYSICIAN

03:43PM 4    EXPRESSED SURPRISE AT A TEST RESULT, THAT HOW COULD THAT BE?  I

03:43PM 5    DON'T KNOW HOW LONG THEY'VE HAD THEIR RELATIONSHIP,

03:43PM 6    PHYSICIAN-PATIENT RELATIONSHIP.  IT SOUNDS LIKE HE WOULD --

03:43PM 7    BASED ON HIS KNOWLEDGE OF HER HEALTH, THAT'S WHAT HIS

03:43PM 8    EXPRESSION OF SURPRISE WAS.

03:43PM 9       NOW, IT SOUNDS LIKE THAT, THROUGH HER CONVERSATION WITH

03:44PM 10   THE DOCTOR ABOUT THEIR DISCUSSION ABOUT THAT, YOU SHOULD BE

03:44PM 11   ABLE TO FLUSH THAT OUT, IT SOUNDS LIKE.  AND IT SOUNDS LIKE

03:44PM 12   MAYBE -- AND YOU HAVE THE 302'S -- DID THEY HAVE A DISCUSSION

03:44PM 13   ABOUT ANTIBODY VERSUS HIV AND IS THAT -- WELL, IS THAT WHAT

03:44PM 14   YOU'RE GOING TO EXPLORE?

03:44PM 15        MS. TREFZ:  YEAH.  ONE OF THE THINGS I'D LIKE TO

03:44PM 16   EXPLORE IS HOW DETAILED THAT DISCUSSION WAS AND WHETHER THE

03:44PM 17   MULTI-STEP PROCESS WAS EXPLAINED TO HER, ESPECIALLY IF WE'RE

03:44PM 18   NOT GOING TO HAVE, IF WE MAY NOT HAVE THE DOCTOR, WHICH IS,

03:44PM 19   FRANKLY, A SURPRISE TO US, AND WE WOULD WANT TO CONSIDER

03:44PM 20   WHETHER WE NEED TO STRIKE THE TESTIMONY OF THE WITNESS AS

03:44PM 21   PARTICULARLY PREJUDICIAL, BECAUSE JUST A TEST COMING IN, IT IS

03:44PM 22   NOT PROOF OF INACCURACY FOR YOU TO GET A REACTIVE TEST ON AN

03:44PM 23   INITIAL SCREEN AND THEN NOT GET REACTIVE TESTS LATER ON IN YOUR

03:45PM 24   TESTING.  THAT IS NOT PROOF OF INACCURACY, AND THERE WILL BE NO

03:45PM 25   SCIENTIFIC TESTIMONY WITHOUT THIS DOCTOR ABOUT WHETHER IT IS

03:45PM 1    PROOF OF INACCURACY.

03:45PM 2        I MEAN, THE REPRESENTATION THAT MR. BOSTIC JUST MADE ABOUT

03:45PM 3    HOW ALL OF THESE DIFFERENT QUESTIONS ABOUT, YOU KNOW, HAVE YOU

03:45PM 4    EVER TESTED POSITIVE BEFORE AND DO YOU KNOW ANYTHING ABOUT

03:45PM 5    WHETHER YOU WOULD HAVE A CONDITION THAT MIGHT LEAD TO THAT IS

03:45PM 6    KIND OF, IT BECOMES ESPECIALLY PREJUDICIAL BECAUSE IT'S NOT

03:45PM 7    CLEAR THAT SHE HAS THE FOUNDATION TO KNOW THAT WITHOUT THE

03:45PM 8    DOCTOR EXPERT TESTIFYING.

03:45PM 9        YOU KNOW, WITH ALL OF THE PATIENT --

03:45PM 10            THE COURT:  WELL, SHE'S SAID SHE'S NEVER TESTED FOR

03:45PM 11   ANY OF THESE BEFORE, WHICH I SUPPOSE PRESUMES THAT SHE'S BEEN

03:45PM 12   TESTED FOR OTHER THINGS BEFORE, BUT SHE'S NEVER HAD A TEST LIKE

03:45PM 13   THIS.

03:45PM 14       BUT YOU HAVE THE 302, AND THAT SHOULD --

03:45PM 15            MS. TREFZ:  YES.

03:45PM 16            THE COURT:  -- REVEAL WHAT THE DISCUSSION WAS WITH

03:45PM 17   THE DOCTOR.

03:46PM 18            MS. TREFZ:  WELL, IT REVEALS AT LEAST WHAT THE

03:46PM 19   GOVERNMENT ASKED AND WHAT WAS EXPLORED AND WHAT WAS ELICITED IN

03:46PM 20   THE GOVERNMENT'S INTERVIEW FROM THE DOCTOR.

03:46PM 21       I THINK I'M A LITTLE WORRIED THAT WE'RE TALKING PAST EACH

03:46PM 22   OTHER A LITTLE BIT BECAUSE BASED ON THE 302, THAT'S WHY I WANT

03:46PM 23   TO EXPLORE WITH THE WITNESS WHAT WAS DISCUSSED.

03:46PM 24       BUT I WAS JUST HIGHLIGHTING A SEPARATE ISSUE THAT WAS

03:46PM 25   IDENTIFIED IF DR. ASIN DOES NOT COME TO TESTIFY.  THAT'S A

03:46PM 1    PROBLEM FOR US BECAUSE, YOU KNOW, THERE'S A LOT OF -- WE

03:46PM 2    HAVEN'T HAD A LOT OF TESTIMONY AT ALL ABOUT HIV TESTING IN THIS

03:46PM 3    CASE, ASIDE FROM THE TESTIMONY THAT ON THE THERANOS TEST, THAT

03:46PM 4    THERANOS RAN IT ON FDA APPROVED DEVICES, AND AN FDA APPROVED

03:46PM 5    METHOD, AND WITHOUT SCIENTIFIC TESTIMONY ABOUT THE TEST AT ALL,

03:46PM 6    I MEAN, IT WOULD BE HIGHLY PREJUDICIAL TO JUST HAVE A PATIENT

03:46PM 7    SAY, "HERE'S A TEST RESULT, AND I GOT ANOTHER TEST RESULT LATER

03:47PM 8    THAT DIDN'T MATCH THIS" WITHOUT A SCIENTIFIC FOUNDATION TO BE

03:47PM 9    ABLE TO TELL THAT THOSE THINGS ACTUALLY ARE INCONSISTENT WITH

03:47PM 10   EACH OTHER.

03:47PM 11        YOU KNOW, THE TWO TESTS -- JUST TO BE CLEAR, THESE TWO

03:47PM 12   TESTS THAT WERE PRESENTED JUST NOW ARE RUN ON DIFFERENT METHODS

03:47PM 13   BASED ON MY RESEARCH.

03:47PM 14        AND SO --

03:47PM 15            THE COURT:  WELL, MAYBE YOU SHOULD TESTIFY.

03:47PM 16            MS. TREFZ:  YOUR HONOR, IF I COULD.

03:47PM 17        I'M JUST FLAGGING THAT PARTICULAR ISSUE.  I BELIEVE WE

03:47PM 18   SHOULD BE ABLE TO GET INTO THIS QUESTION WITH THIS WITNESS, AND

03:47PM 19   IF DR. ASIN DOESN'T TESTIFY, THEN, YOU KNOW, WE MAY HAVE A

03:47PM 20   MOTION RELATED TO THIS WITNESS'S TESTIMONY.

03:47PM 21            MR. BOSTIC:  SO, YOUR HONOR, CONFLICTING OR

03:47PM 22   INCONSISTENT TEST RESULTS HAS BEEN COMPETENT EVIDENCE AS TO

03:47PM 23   TEST ACCURACY THROUGHOUT THE CASE.  I THINK THAT'S BEEN THE

03:47PM 24   GOVERNMENT'S UNDERSTANDING AND THE COURT'S APPROACH IN MAKING

03:47PM 25   ADMISSIBILITY DECISIONS.

6776

```
03:47PM   1        I DISAGREE THAT EXPERT TESTIMONY IS NECESSARY FOR THE JURY
03:48PM   2   TO UNDERSTAND THAT A TEST THAT SAYS POSITIVE AT ONE TIME AND
03:48PM   3   ANOTHER TEST THAT SAYS NEGATIVE AT ANOTHER TIME CANNOT BOTH BE
03:48PM   4   CORRECT.  ONE MUST BE INCORRECT.
03:48PM   5        I THINK THAT IS PROBATIVE EVIDENCE OF THE INACCURACY OF
03:48PM   6   THE THERANOS RESULT IN THE CONTEXT OF THE WITNESS'S TESTIMONY.
03:48PM   7             THE COURT:  WELL, IF THAT'S THE EVIDENCE, IT'S A
03:48PM   8   JURY DECISION AS TO WHICH ONE THEY BELIEVE IS ACCURATE THEN,
03:48PM   9   RIGHT?  MAYBE THEY'LL DISBELIEVE THE CONTRA COSTA.  ISN'T THAT
03:48PM  10   WHAT YOU'RE ASKING ULTIMATELY THE JURY TO DO?
03:48PM  11             MS. TREFZ:  I DON'T THINK THAT THAT'S FAIR TO ASK
03:48PM  12   THEM TO DO.
03:48PM  13        I ALSO DISAGREE THAT A TEST THAT -- YOU KNOW, THAT TWO
03:48PM  14   TESTS RUN ON DIFFERENT METHODS CANNOT BOTH BE ACCURATE.  THIS
03:48PM  15   IS THE PROBLEM WITH NOT HAVING A DEEP SCIENTIFIC UNDERSTANDING
03:48PM  16   IN A SCIENTIFIC CASE ABOUT KIND OF ALL OF THE TESTING ISSUES
03:48PM  17   THAT ARE IN THE CASE.  THAT'S WHY WE HAVE BEEN PRESSING FOR THE
03:49PM  18   DOCTORS TO COME WITH THE PATIENTS.
03:49PM  19        I BELIEVE WE LITIGATED ISSUES AROUND THIS PREVIOUSLY.
03:49PM  20        THIS DOCTOR HAS ALWAYS BEEN ON THE LIST, SO THIS WAS NEVER
03:49PM  21   A CONCERN OF OURS.
03:49PM  22        BUT I DON'T THINK THAT TWO TESTS THAT ARE RUN POTENTIALLY
03:49PM  23   ON DIFFERENT METHODS -- I BELIEVE THEY ARE, BUT THAT'S NOT
03:49PM  24   EVIDENCE IN THE CASE -- BUT TWO TESTS THAT ARE RUN ON DIFFERENT
03:49PM  25   METHODS IS INHERENTLY INCONSISTENT.
```

03:49PM  1          AND I THINK IT WOULD BE HIGHLY MISLEADING TO ALLOW THAT TO

03:49PM  2     BE THE EVIDENCE OF, OF INACCURACY IN THE CASE.

03:49PM  3          SO ALL I'M SAYING, YOUR HONOR, IS THAT, YOU KNOW, WE

03:49PM  4     STRONGLY BELIEVE THAT IF THERE'S GOING TO BE -- THAT IF A

03:49PM  5     PATIENT IS GOING TO COME IN AND TESTIFY ABOUT THEIR INACCURATE,

03:49PM  6     ALLEGEDLY INACCURATE TEST, THEN WE CERTAINLY SHOULD GET TO

03:49PM  7     EXPLORE WITH THAT PATIENT ALL OF THE POTENTIAL SCIENTIFIC -- IF

03:50PM  8     THERE'S NOT GOING TO BE A DOCTOR, WE SHOULD GET TO EXPLORE THE

03:50PM  9     DEPTHS OF THAT PATIENT'S KNOWLEDGE AS TO WHAT THE TEST RESULTS

03:50PM 10     MEAN, INCLUDING WHAT THE DOCTOR TOLD HER.

03:50PM 11          THE COURT:  WELL, I THINK THAT'S FAIR GAME.  I THINK

03:50PM 12     MR. BOSTIC SAID THAT NARROWING DOWN OF WHAT THEIR CONVERSATION

03:50PM 13     WAS.  I DON'T THINK HE HAS --

03:50PM 14          DID YOU SAY YOU DIDN'T HAVE ANY PROBLEM WITH THAT,

03:50PM 15     MR. BOSTIC?

03:50PM 16          MR. BOSTIC:  I'M SORRY TO BE DIFFICULT, YOUR HONOR.

03:50PM 17          I STILL DON'T SEE THE RELEVANCE OF IT BECAUSE IT GOES

03:50PM 18     TO -- THE TWO PURPOSES I CAN THINK OF ARE EITHER THE JURY NEEDS

03:50PM 19     TO KNOW WHAT THIS DOCTOR BELIEVED OR CONCLUDED ABOUT THE TEST

03:50PM 20     RESULTS, THAT'S HEARSAY.  THAT'S AN OUT-OF-COURT STATEMENT

03:50PM 21     COMING IN FOR ITS TRUTH.  THAT'S NUMBER ONE.

03:50PM 22          OR NUMBER TWO, THE JURY NEEDS TO KNOW HOW ALL OF THE

03:50PM 23     INFORMATION AVAILABLE TO THE PATIENT AND HOW THE PATIENT FELT

03:50PM 24     AND WHAT THE PATIENT'S UNDERSTANDING WAS, AND I DON'T THINK

03:50PM 25     THAT'S RELEVANT EITHER IN A CASE WHERE THE COURT HAS RULED THAT

03:51PM  1        PATIENT IMPACT AND EMOTIONAL DISTRESS AND THINGS LIKE THAT ARE

03:51PM  2        NOT AT ISSUE AND WHERE THE GOVERNMENT DIDN'T DELVE INTO THAT ON

03:51PM  3        DIRECT.

03:51PM  4             SO I'M JUST NOT SEEING THE CONNECTION AS TO WHAT MATTER AT

03:51PM  5        ISSUE THIS MAKES MORE OR LESS LIKELY UNDER 401.

03:51PM  6             THE COURT:  WELL, I COULD SEE IF -- AND MS. TREFZ

03:51PM  7        WANTS TO EXPLORE THIS CONVERSATION WITH THE DOCTOR.  YOU TALKED

03:51PM  8        TO YOUR DOCTOR AND YOUR DOCTOR SAID, AND I THINK WHAT THE

03:51PM  9        DOCTOR IS GOING TO SAY IS, HOW IS THAT POSSIBLE OR SOMETHING

03:51PM 10        LIKE THAT, HE'S GOING TO EXPRESS HIS SURPRISE ABOUT THAT.

03:51PM 11             AND HE'LL GET -- THAT'S WHAT YOU WANT TO ASK THIS WITNESS.

03:51PM 12             MS. TREFZ:  AND THEN I WANT TO BE ABLE TO EXPLORE

03:51PM 13        WHETHER SHE WAS TOLD ABOUT A PARTICULAR -- THE PARTICULAR, YOU

03:51PM 14        KNOW, PARAMETERS OF THIS KIND OF TESTING, WHICH IS UNIQUE

03:51PM 15        COMPARED TO OTHER TESTS THAT WE HAVE SEEN SO FAR IN THE CASE IN

03:52PM 16        THAT THEY'RE YOU DO NOT DIAGNOSE SOMEBODY WITH HIV FROM THE,

03:52PM 17        FROM THE -- JUST THE SCREENING TEST.  IT IS, IT IS A WHOLE

03:52PM 18        PROCESS.

03:52PM 19             THE COURT:  SO THAT -- I THINK THAT GOES --

03:52PM 20        CERTAINLY SHE CAN'T TESTIFY ABOUT THAT.  THAT'S BEYOND HER

03:52PM 21        EXPERTISE.

03:52PM 22             YOU WOULD GET THAT THROUGH AS TO WHAT HER DOCTOR TOLD HER

03:52PM 23        I PRESUME.  IS THAT WHAT YOU'RE SAYING?

03:52PM 24             MS. TREFZ:  YES, AND WE BELIEVE IT'S IMPORTANT,

03:52PM 25        ESPECIALLY IF THE DOCTOR IS NOT GOING TO COME, WE NEED TO BE

6779

03:52PM  1    ABLE TO PROBE, WE NEED TO MEET THE ALLEGATIONS OF ACCURACY HERE

03:52PM  2    WITH, YOU KNOW, MEANINGFUL ABILITY TO CROSS-EXAMINE AND -- BUT

03:52PM  3    I BELIEVE THAT THAT'S PART OF IT.

03:52PM  4              THE COURT:  OKAY.

03:52PM  5              MR. BOSTIC:  SO, YOUR HONOR, THE LACK OF A WITNESS

03:52PM  6    WHO CAN TESTIFY COMPETENTLY TO A SUBJECT DOESN'T MAKE IT OKAY

03:52PM  7    TO EXPLORE THAT SUBJECT WITH A WITNESS WHO IS NOT COMPETENT TO

03:52PM  8    TESTIFY ABOUT IT AND WHO LACKS FOUNDATION.

03:52PM  9              THE COURT:  ALL RIGHT.  OKAY.  ALL RIGHT.  THANK

03:52PM  10   YOU.

03:52PM  11             THE CLERK:  COURT IS ADJOURNED.

03:52PM  12        (COURT ADJOURNED AT 3:52 P.M.)

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

1

2

3                    CERTIFICATE OF REPORTERS

4

5

6

7         WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11        THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15
     _____
16   IRENE RODRIGUEZ, CSR, CRR
     CERTIFICATE NUMBER 8076
17

18
     _____
19   LEE-ANNE SHORTRIDGE, CSR, CRR
     CERTIFICATE NUMBER 9595
20

21        DATED:  NOVEMBER 17, 2021

22

23

24

25