1

2                  UNITED STATES DISTRICT COURT

3                NORTHERN DISTRICT OF CALIFORNIA

4                      SAN JOSE DIVISION

5

     UNITED STATES OF AMERICA,        )   CR-18-00258-EJD
6                                     )
                     PLAINTIFF,       )   SAN JOSE, CALIFORNIA
7                                     )
            VS.                       )   VOLUME 35
8                                     )
     ELIZABETH A. HOLMES,             )   NOVEMBER 18, 2021
9                                     )
                     DEFENDANT.       )   PAGES 6780 - 7013
10   _____  )

11

12                TRANSCRIPT OF TRIAL PROCEEDINGS
             BEFORE THE HONORABLE EDWARD J. DAVILA
13                UNITED STATES DISTRICT JUDGE

     A P P E A R A N C E S:
14

15   FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                           BY:  JOHN C. BOSTIC
16                              JEFFREY B. SCHENK
                           150 ALMADEN BOULEVARD, SUITE 900
17                         SAN JOSE, CALIFORNIA 95113

18                         BY:  ROBERT S. LEACH
                               KELLY VOLKAR
19                         1301 CLAY STREET, SUITE 340S
                           OAKLAND, CALIFORNIA 94612
20
          (APPEARANCES CONTINUED ON THE NEXT PAGE.)

21

22   OFFICIAL COURT REPORTERS:
                           IRENE L. RODRIGUEZ, CSR, RMR, CRR
23                         CERTIFICATE NUMBER 8074
                           LEE-ANNE SHORTRIDGE, CSR, CRR
24                         CERTIFICATE NUMBER 9595

          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25             TRANSCRIPT PRODUCED WITH COMPUTER

```
 1        A P P E A R A N C E S:  (CONT'D)

 2

 3     FOR DEFENDANT HOLMES:   WILLIAMS & CONNOLLY LLP
                               BY:  KEVIN M. DOWNEY
 4                                  LANCE A. WADE
                                    KATHERINE TREFZ
 5                                  SEEMA ROPER
                                    AMY SAHARIA
 6                                  J.R. FLEURMONT
                                    RICHARD CLEARY
 7                                  PATRICK LOOBY
                               725 TWELFTH STREET, N.W.
 8                             WASHINGTON, D.C. 20005

 9                             LAW OFFICE OF JOHN D. CLINE
                               BY:  JOHN D. CLINE
10                             ONE EMBARCADERO CENTER, SUITE 500
                               SAN FRANCISCO, CALIFORNIA 94111
11

12     ALSO PRESENT:          FEDERAL BUREAU OF INVESTIGATION
                               BY:  ADELAIDA HERNANDEZ
13
                               OFFICE OF THE U.S. ATTORNEY
14                             BY:  LAKISHA HOLLIMAN, PARALEGAL
                                    MADDI WACHS, PARALEGAL
15
                               WILLIAMS & CONNOLLY
16                             BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL

17                             TBC
                               BY:  BRIAN BENNETT, TECHNICIAN
18

19     FOR ROGER PARLOFF:     JOSHUA KOLTUN

20

21

22

23

24

25
```

6782

1

                        INDEX OF PROCEEDINGS

2

3          GOVERNMENT'S:

4

5          **ERIN TOMPKINS**
           CROSS-EXAM BY MS. TREFZ (RES.)          P. 6819
6

7          **MARK BURNES**
           DIRECT EXAM BY MR. SCHENK               P. 6832
8          CROSS-EXAM BY MS. TREFZ                 P. 6859
           REDIRECT EXAM BY MR. SCHENK             P. 6880
9

10         **MEHRL ELLSWORTH**
           DIRECT EXAM BY MR. SCHENK               P. 6886
11

12         **ROGER PARLOFF**
           DIRECT EXAM BY MR. BOSTIC               P. 6894
13         CROSS-EXAM BY MR. CLINE                 P. 6970

14

15

16

17

18

19

20

21

22

23

24

25

1                    <u>INDEX OF EXHIBITS</u>

2
                                    IDENT.      EVIDENCE
3        <u>GOVERNMENT'S:</u>

4        4938                                     6837
         4415                                     6845
5        5485                                     6900
         5487                                     6908
6        3404                                     6910
         5473A                                    6916
7        5474AB2                                  6919
         5475A                                    6926
8        5477A                                    6927
         5478A2                                   6930
9        5486                                     6934
         1752                                     6941
10       5480A                                    6943
         5473B2                                   6947
11       5473C                                    6950
         5473D2                                   6952
12       5488                                     6958
         5481A, 5481B, AND 5481D                  6964
13       5481C                                    6967

14

15       <u>DEFENDANT'S:</u>

16       12692, PAGE 7                            6827
         1647A                                    6981
17       1657A                                    6981
         1719A                                    6982
18

19

20

21

22

23

24

25

```
1    SAN JOSE, CALIFORNIA                    NOVEMBER 18, 2021

2                      P R O C E E D I N G S

07:47AM   3

08:07AM   4        (COURT CONVENED AT 8:07 A.M.)

08:07AM   5        (JURY OUT AT 8:07 A.M.)

08:07AM   6            THE COURT:  WE ARE ON THE RECORD IN THE HOLMES

08:07AM   7    MATTER OUTSIDE OF THE PRESENCE OF THE JURY.

08:07AM   8        ALL COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT.

08:07AM   9        MR. CLINE, GOOD MORNING.

08:07AM  10            MR. CLINE:  GOOD MORNING, YOUR HONOR.

08:07AM  11            THE COURT:  AND, MR. BOSTIC, GOOD MORNING.

08:07AM  12            MR. BOSTIC:  GOOD MORNING, YOUR HONOR.

08:07AM  13            THE COURT:  FIRST OF ALL, TELL ME ABOUT YOUR

08:07AM  14    CONTINUED COOPERATIVE DISCUSSIONS OVER THE LAST DAY.

08:07AM  15            MR. CLINE:  WE MADE FURTHER PROGRESS.

08:07AM  16            THE COURT:  GREAT.

08:07AM  17            MR. CLINE:  DESIGNATION ONE IS RESOLVED.  WE'VE

08:07AM  18    COMPROMISED ON THAT ONE.  SO IT'S DESIGNATIONS TWO AND FOUR

08:07AM  19    THAT REMAIN.

08:07AM  20            THE COURT:  OKAY.

08:07AM  21            MR. CLINE:  FOR DESIGNATION TWO, WITH YOUR HONOR'S

08:07AM  22    PERMISSION, I'M GOING TO ASK MR. LOOBY TO ADDRESS IT.  THAT ONE

08:07AM  23    IS NOT IN THE TRANSCRIPT AND HE HAS LISTENED TO THE RECORDING

08:07AM  24    MORE RECENTLY THAN I HAVE AND IS LESS LIKELY TO GET IT WRONG.

08:07AM  25        AND THEN ON FOUR, I'M HAPPY TO TAKE THAT.
```

08:08AM 1          THE COURT:  THAT'S FINE.  IS THIS THE DESIGNATION

08:08AM 2     REGARDING THE --

08:08AM 3          MR. CLINE:  THE BRINGING -- MAY I TAKE THIS OFF?

08:08AM 4          THE COURT:  PLEASE.  PLEASE.

08:08AM 5          MR. CLINE:  SORRY.  THE BRINGING UP OF THE TESTS.

08:08AM 6       AND IT FALLS BETWEEN TWO GOVERNMENT DESIGNATED PORTIONS,

08:08AM 7     AND WE'RE JUST ASKING THEM TO PLAY THE WHOLE THING.

08:08AM 8          MR. BOSTIC:  THAT'S NUMBER FOUR.

08:08AM 9          MR. CLINE:  THAT'S NUMBER FOUR.

08:08AM 10         THE COURT:  WHICH EXHIBIT IS THIS, 1648 OR 2580?

08:08AM 11         MR. CLINE:  THIS IS 2580, AND IT'S DOCUMENT 1146-4.

08:08AM 12         THE COURT:  AND I HAVE IT IN YOUR SUBMISSIONS.

08:08AM 13    THANK YOU FOR DOING THE COLOR CODING HERE.

08:08AM 14         MR. CLINE:  I WISH I COULD CLAIM CREDIT, YOUR HONOR,

08:09AM 15    BUT THAT WAS SOMEONE ELSE.

08:09AM 16         THE COURT:  WELL, THEY DID AN EXCELLENT JOB HERE.

08:09AM 17       IT TOOK LIKE PAGE 17 OF THE TRANSCRIPT, LINE 22, THROUGH

08:09AM 18    PAGE 18 -- 19, PARDON ME, LINE 17 IS WHAT YOU'RE ASKING TO BE

08:09AM 19    INCLUDED.

08:09AM 20       IS THAT RIGHT?

08:09AM 21         MR. CLINE:  YES.

08:09AM 22         THE COURT:  MR. BOSTIC, IS THAT YOUR UNDERSTANDING?

08:09AM 23         MR. BOSTIC:  WAS THIS FILED AS 1146-4?

08:09AM 24         MR. CLINE:  YES.

08:09AM 25         MR. BOSTIC:  I THOUGHT THE DEFENSE WAS SEEKING TO

6786

08:09AM 1    INCLUDE -- APOLOGIES, YES, BEGINNING ON PAGE 17 AS NUMBERED IN

08:09AM 2    THE PDF.

08:09AM 3              THE COURT:  I'M SORRY.  THE DOCUMENT 17.

08:09AM 4              MR. BOSTIC:  MY FAULT.

08:09AM 5         AGREED, YOUR HONOR.

08:09AM 6              MR. CLINE:  WE THINK THIS IS UNDER 106 PRIMARILY.

08:09AM 7    THEY'RE HAVING A DISCUSSION HERE ABOUT TESTING AND WHAT TESTING

08:09AM 8    IS AVAILABLE AND WHERE IT'S AVAILABLE.

08:09AM 9         I THINK TO PUT THAT DISCUSSION IN CONTEXT AND MAKE IT

08:09AM 10   COMPLETE, TO USE THE LANGUAGE OF THE RULE, WE OUGHT TO INCLUDE

08:10AM 11   THAT MIDDLE PORTION.  THIS ON EXACTLY THE SAME TOPIC, AND IN IT

08:10AM 12   MS. HOLMES IS TALKING ABOUT THE PROCESS OF BRINGING UP TESTS,

08:10AM 13   MOVING THEM FROM THE R&D LAB -- I DON'T KNOW IF SHE USES THAT

08:10AM 14   TERM, BUT THAT'S THE PROCESS THAT SHE'S DESCRIBING -- OVER TO

08:10AM 15   THE CLIA LAB AND THEN VALIDATING THEM FOR USE IN THE CLINICAL

08:10AM 16   SETTING.

08:10AM 17             THE COURT:  AND JUST TO BE CLEAR, THESE ARE THE

08:10AM 18   PORTIONS OF THE INTERVIEW FROM MR. PARLOFF WITH MS. HOLMES.

08:10AM 19             MR. CLINE:  THAT'S RIGHT.

08:10AM 20             THE COURT:  AND YOU TELL ME ABOUT IT'S IMPORTANT FOR

08:10AM 21   THE CONTEXT OF THESE THINGS.

08:10AM 22        WE'VE HEARD THAT WORD BEFORE IN REGARDS TO THIS INTERVIEW,

08:10AM 23   HAVEN'T WE?  I THINK THE GOVERNMENT SUGGESTED CONTEXT WAS

08:10AM 24   IMPORTANT.

08:10AM 25             MR. CLINE:  SOMETIMES CONTEXT IS AND SOMETIMES IT'S

08:10AM 1    NOT.  IT DEPENDS A LOT ON THE CONTEXT.

08:10AM 2        (LAUGHTER.)

08:10AM 3          THE COURT:  IT DEPENDS ON THE CONTEXT.

08:10AM 4          MR. CLINE:  IN THIS SETTING WE'RE TALKING ABOUT THE

08:11AM 5    CONTEXT IN THE SENSE OF RULE 106, AND I THINK IT IS IMPORTANT

08:11AM 6    TO INCLUDE THAT.

08:11AM 7          THE COURT:  HOW DOES THE GREEN PORTION, HOW IS THAT

08:11AM 8    IMPORTANT TO CONTINUE THE CONVERSATION IN THE YELLOW PORTION,

08:11AM 9    PARDON ME?

08:11AM 10         MR. CLINE:  WELL, IT'S IMPORTANT BECAUSE MS. HOLMES

08:11AM 11    IS EXPLAINING SORT OF THE PROCESS BY WHICH TESTS ARE MOVED

08:11AM 12    FROM -- UP INTO THE CLIA LAB.  SHE'S TALKING ABOUT THE

08:11AM 13    VALIDATION REPORT PROCESS AND HOW A TEST IS MOVED UP FROM THE

08:11AM 14    R&D PROCESS TO THE CLIA LAB AND PUT ON THE MACHINE.

08:11AM 15     AND THAT'S BASICALLY THE SUBJECT.  IT'S SORT OF LIKE A LOT

08:11AM 16    OF THESE EXCERPTS, IT'S KIND OF A RAMBLING CONVERSATION, BUT

08:11AM 17    IT'S I THINK VERY MUCH GERMANE TO WHAT THEY'RE TALKING ABOUT.

08:11AM 18    THEY'RE TALKING ABOUT HAVING A REFERENCE LAB AND WHAT SORTS OF

08:11AM 19    TESTS ARE AVAILABLE, AND SHE'S CONTINUING TO DESCRIBE THAT

08:11AM 20    PROCESS.

08:11AM 21     AND THEN THEY PICK UP THE CONVERSATION AGAIN OVER ON

08:11AM 22    PAGE 19 OF THE TRANSCRIPT, AND MR. PARLOFF IS ASKING ABOUT

08:12AM 23    VENIPUNCTURE AND USING YOUR SYSTEM AND SO ON.

08:12AM 24     AND MS. HOLMES HAS BEEN JUST EXPLAINING HOW TESTS ARE

08:12AM 25    BROUGHT UP ON THE THERANOS SYSTEM.

08:12AM  1          THE COURT:  SO LET ME -- AND I'LL HEAR FROM

08:12AM  2    MR. BOSTIC HERE.

08:12AM  3          LET ME SAY I'VE LOOKED AT THIS, AND MAYBE I'M BEING TOO

08:12AM  4    CRITICAL OR SOMETHING, BUT I LOOKED AT THIS AND I THOUGHT, IS

08:12AM  5    THIS -- DOES THIS IN ANY WAY RELATE TO THE LIS DISCUSSION?  AND

08:12AM  6    IS THIS, IS THIS AN ENTRE TO LIS IN THIS CASE, THAT IS THE --

08:12AM  7    WE -- ONE OF THE TESTS -- WE HAVE A LOT OF TESTS AND WE

08:12AM  8    VALIDATED ON OUR SYSTEMS A LONG TIME AGO.

08:12AM  9          DOES THIS IMPLICATE THAT AT ALL?

08:12AM  10          MR. CLINE:  TO MY MIND, NO.  AND, IN FACT, YOUR

08:12AM  11    QUESTION IS THE FIRST TIME THAT I'VE EVER ASSOCIATED THIS WITH

08:12AM  12    LIS.

08:12AM  13          I DON'T THINK THAT'S WHAT SHE'D TALKING ABOUT.

08:12AM  14          THE COURT:  MY -- I'M SORRY TO CUT YOU OFF,

08:12AM  15    MR. CLINE, BUT WE'VE HAD -- THE LIS HAS BEEN A TOPIC OF

08:13AM  16    DISCUSSION HERE, AND CONCERN.

08:13AM  17          AND I LOOK AT THIS, AND MAYBE THAT'S WHY I'M LOOKING AT

08:13AM  18    THIS WITH A DISCERNING EYE, IS THIS SOMETHING THAT WOULD ALLOW

08:13AM  19    THEN A DISCUSSION OF LIS?

08:13AM  20          MR. CLINE:  I DON'T THINK SO AT ALL.  I THINK THIS

08:13AM  21    IS BASICALLY THE PROCESS THAT WAS TALKED ABOUT WITH

08:13AM  22    DR. ROSENDORFF, WITH DR. GANGAKHEDKAR, WITH -- ALL OF THE LAB

08:13AM  23    PEOPLE HAVE SORT OF DESCRIBED THIS PROCESS OF BRINGING UP TESTS

08:13AM  24    ON TO THE MACHINE, AND THAT'S WHAT MS. HOLMES IS DOING.

08:13AM  25          THE LIS REALLY DOESN'T TOUCH THIS AT ALL AS FAR AS I'M

| | | |
|---|---|---|
| 08:13AM | 1 | CONCERNED. |
| 08:13AM | 2 | THE COURT:  OKAY.  ALL RIGHT.  THANK YOU. |
| 08:13AM | 3 | MR. BOSTIC? |
| 08:13AM | 4 | MR. BOSTIC:  THANK YOU, YOUR HONOR. |
| 08:13AM | 5 | FIRST OF ALL, I AGREE WITH MR. CLINE THAT THIS SPECIFIC |
| 08:13AM | 6 | LANGUAGE DOES NOT IMPLICATE THE LIS.  THAT'S NOT THE SOURCE OF |
| 08:13AM | 7 | THE GOVERNMENT'S CONCERN HERE.  THIS JUST IS NOT ADMISSIBLE |
| 08:13AM | 8 | UNDER THE HEARSAY RULES, AND 106 DOESN'T CHANGE THAT. |
| 08:13AM | 9 | FIRST OF ALL, THE FACT THAT THIS IS A SEGMENT THAT IS IN |
| 08:13AM | 10 | BETWEEN TWO SEGMENTS THAT THE GOVERNMENT HAS DESIGNATED |
| 08:14AM | 11 | SHOULDN'T BEAR A LOT OF WEIGHT, OR SHOULDN'T CARRY A LOT OF |
| 08:14AM | 12 | WEIGHT FOR THE COURT. |
| 08:14AM | 13 | AS MR. CLINE NOTED, THESE CONVERSATIONS WERE SOMEWHAT |
| 08:14AM | 14 | RAMBLING AT TIMES.  THEY DID KIND OF HEAD IN DIFFERENT |
| 08:14AM | 15 | DIRECTIONS ORGANICALLY AND THERE WERE DETOURS AND ASIDES, AND |
| 08:14AM | 16 | THIS IS NOT A CRITICISM OF THE DEFENDANT. |
| 08:14AM | 17 | BUT THE PORTION THAT IS NOT INCLUDED IN THE GOVERNMENT'S |
| 08:14AM | 18 | DESIGNATIONS DOESN'T REALLY BEAR A STRONG RELATIONSHIP TO THE |
| 08:14AM | 19 | PORTIONS THAT ARE DESIGNATED BY THE GOVERNMENT.  THIS WAS A -- |
| 08:14AM | 20 | THIS WAS AN ASIDE.  THIS WAS SOME INFORMATION PROVIDED BY |
| 08:14AM | 21 | MS. HOLMES ON A DIFFERENT TOPIC FROM THE ADJOINING PORTIONS OF |
| 08:14AM | 22 | THE CONVERSATION, AND THOSE TWO PORTIONS OF THE CONVERSATION |
| 08:14AM | 23 | ARE DIFFERENT FROM EACH OTHER. |
| 08:14AM | 24 | THE REASON THAT THE GOVERNMENT IS OPPOSING, AND THE REASON |
| 08:14AM | 25 | THAT THE COURT SHOULD NOT ADMIT THIS, IS THAT THIS IS HEARSAY, |

08:14AM  1     AND IT'S ACTUALLY MULTIPLE LAYERS OF HEARSAY.

08:14AM  2         IN THE GREEN PORTION, THE COURT CAN SEE THAT MS. HOLMES IS

08:15AM  3     TALKING ABOUT VALIDATION REPORTS THAT SHE SAID SHE'S GOING TO

08:15AM  4     PROVIDE TO MR. PARLOFF.  SHE'S CHARACTERIZING THE CONTENT AND

08:15AM  5     THE SIGNIFICANCE OF THOSE VALIDATION REPORTS.

08:15AM  6         SO, YOU KNOW, NOT ONLY IS THIS REFERENCING A DOCUMENT AND

08:15AM  7     THE CONTENTS AND MEANING OF THE DOCUMENT, BUT THIS IS GIVING

08:15AM  8     MS. HOLMES'S VIEW OF THAT DOCUMENT, AND THAT'S AN OUT-OF-COURT

08:15AM  9     STATEMENT THAT IT SEEMS THE DEFENSE IS SEEKING TO ADMIT SO THAT

08:15AM  10    THE JURY CAN RELY ON MS. HOLMES'S REPRESENTATIONS ABOUT THE

08:15AM  11    ROBUSTNESS, THE THOROUGHNESS, AND THE IMPRESSIVENESS OF

08:15AM  12    THERANOS'S PREVIOUS VALIDATION ACTIVITY.

08:15AM  13        SO THAT CAN'T COME IN FOR ITS TRUTH OBVIOUSLY.  THIS

08:15AM  14    CANNOT COME IN FOR THE PURPOSE OF THE JURY MAKING CONCLUSIONS

08:15AM  15    ABOUT HOW GOOD A JOB THERANOS DID INVALIDATING ITS TESTS.

08:16AM  16        ALTERNATIVELY, IF THE DEFENSE IS SEEKING TO ADMIT THIS TO

08:16AM  17    SHOW MS. HOLMES'S BELIEF OR HER OPINIONS ABOUT HOW GOOD A JOB

08:16AM  18    THERANOS DID VALIDATING ITS TESTS, IT ALSO CAN'T COME IN FOR

08:16AM  19    THE SAME REASON.

08:16AM  20        IF MS. HOLMES WANTS THE JURY TO KNOW, YOU KNOW, IN HER

08:16AM  21    WORDS HOW SHE FELT ABOUT THE WORK THAT THERANOS HAD DONE, SHE

08:16AM  22    NEEDS TO TAKE THE STAND AND TESTIFY.  THAT NEEDS TO BE TESTED

08:16AM  23    BY CROSS-EXAMINATION.

08:16AM  24        THE FACT THAT THERE HAPPENS TO BE A RECORDING OF HER

08:16AM  25    PROVIDING HER VIEWS ON THESE THINGS YEARS AGO DOESN'T CREATE AN

08:16AM 1     END RUN AROUND THOSE BASIC HEARSAY RULES.

08:16AM 2              THE COURT:  THAT'S AN INTERESTING QUESTION,

08:16AM 3     THRESHOLD QUESTION, ISN'T IT, WHERE -- AND WE KNOW WHAT ORTEGA,

08:16AM 4     THE ORTEGA CASE, THE NINTH CIRCUIT ORTEGA CASE TALKS ABOUT, THE

08:16AM 5     INABILITY OF THE DEFENDANT TO GET EXCULPATORY STATEMENTS IN ON

08:16AM 6     CROSS-EXAMINATION.

08:17AM 7         I LOOK AT THIS AND I WONDER, IS THE SAME THEORY -- DOES

08:17AM 8     THAT THEORY APPLY HERE?

08:17AM 9         I UNDERSTAND YOU'RE NOT OFFERING THESE FOR THE TRUTH OF

08:17AM 10    THE MATTER ASSERTED IN THE STATEMENT, BUT ISN'T THERE SOME

08:17AM 11    INHERENT TRUTHFUL RELIANCE THAT YOU'RE ASKING THE JURY TO, THE

08:17AM 12    JURY TO ASSUME REGARDING THE STATEMENTS AND --

08:17AM 13             MR. CLINE:  NO.

08:17AM 14             THE COURT:  AND DON'T THESE STATEMENTS THEN GO TO A

08:17AM 15    DEFENSE, I THINK YOU TALKED ABOUT, TO MEET THE CHALLENGE OF THE

08:17AM 16    INDICTMENT?

08:17AM 17        ISN'T THAT, ISN'T THAT -- AREN'T THESE A CHALLENGE TO ONE

08:17AM 18    OF THE ELEMENTS OF THE OFFENSE?

08:17AM 19             MR. CLINE:  THE SHORT ANSWER IS NO, BUT LET ME

08:17AM 20    EXPLAIN.

08:17AM 21             THE COURT:  OKAY.

08:17AM 22             MR. CLINE:  THIS SECTION IS BEING OFFERED FOR TWO

08:17AM 23    NONHEARSAY PURPOSES, AND WE'RE FINE IF THE COURT INSTRUCTS THE

08:17AM 24    JURY TO THAT EFFECT.

08:18AM 25        THE NONHEARSAY PURPOSES IS ONE OF COMPLETENESS, AND IN THE

6792

08:18AM 1    LOPEZ CASE, THE NINTH CIRCUIT SAYS THAT WHAT WOULD OTHERWISE BE

08:18AM 2    HEARSAY IF IT IS OFFERED UNDER 106 AND COMES IN UNDER 106 AND

08:18AM 3    IS NECESSARY TO COMPLETE A STATEMENT, IT'S NONHEARSAY.  SO THIS

08:18AM 4    IS NONHEARSAY FOR THAT REASON.

08:18AM 5         IT IS ALSO NONHEARSAY BECAUSE IT SHOWS MS. HOLMES'S STATE

08:18AM 6    OF MIND.

08:18AM 7                    THE COURT:  AS TO WHAT?

08:18AM 8                    MR. CLINE:  I'M SORRY?

08:18AM 9                    THE COURT:  A STATE OF MIND AS TO WHAT?

08:18AM 10                    MR. CLINE:  AS TO THE CONDITION -- THE CIRCUMSTANCES

08:18AM 11   UNDER WHICH THESE TESTS ARE BEING BROUGHT UP.

08:18AM 12                    THE COURT:  AND WHAT IS THE RELEVANCE OF THAT?  I'M

08:18AM 13   SORRY.

08:18AM 14                    MR. CLINE:  THE RELEVANCE OF THAT IS THAT SHE'S NOT

08:18AM 15   TRYING TO DECEIVE MR. PARLOFF.  SHE'S NOT TRYING TO DECEIVE

08:18AM 16   INVESTORS.  SHE'S DESCRIBING THIS PROCESS BY WHICH --

08:18AM 17                    THE COURT:  SO ONE OF THE COUNTS -- AND I'M SORRY TO

08:18AM 18   INTERRUPT YOU, BUT I'LL LOSE IT IF I DON'T CONTINUE, MR. CLINE.

08:18AM 19                    MR. CLINE:  SURE.

08:18AM 20                    THE COURT:  ISN'T THE THRESHOLD -- ONE OF THE

08:18AM 21   THRESHOLD COUNTS IS FRAUD.

08:18AM 22                    MR. CLINE:  UH-HUH.

08:18AM 23                    THE COURT:  AND YOU JUST TOLD ME THAT THIS WOULD GO

08:18AM 24   AS TO -- THIS WOULD SHOW THAT SHE DOESN'T HAVE THE INTENT TO

08:18AM 25   DEFRAUD.

08:19AM 1          MR. CLINE:  RIGHT.

08:19AM 2          THE COURT:  ISN'T THAT A DIRECT CHALLENGE TO THE

08:19AM 3   ELEMENT OF THE OFFENSE AND DOES THAT REQUIRED TESTIMONY?

08:19AM 4          MR. CLINE:  WELL, IT IS, IT IS RELEVANT EVIDENCE.

08:19AM 5      IT IS RELEVANT, THOUGH, FOR A NONHEARSAY PURPOSE TO SHOW

08:19AM 6   HER STATE OF MIND.

08:19AM 7      AND HERE'S WHAT I MEAN.  WE WOULD, WE WOULD NOT BE ARGUING

08:19AM 8   BASED ON THIS STATEMENT THAT WHAT MS. HOLMES IS SAYING HERE IS

08:19AM 9   CORRECT.  SHE COULD BE TOTALLY MISTAKEN ABOUT EVERYTHING SHE IS

08:19AM 10  SAYING AND THIS WOULD BE JUST AS ADMISSIBLE FOR THE SAME

08:19AM 11  REASON.

08:19AM 12     AND THE REASON IS TO SHOW HER STATE OF MIND, THAT SHE IS

08:19AM 13  INFORMING MR. PARLOFF, SHE'S NOT TRYING TO DECEIVE HIM, SHE'S

08:19AM 14  DESCRIBING TO HIM IN THE CONTEXT OF THIS WHOLE CONVERSATION HOW

08:19AM 15  TESTS ARE BROUGHT UP FROM THIS SORT OF R&D STAGE UP INTO THE

08:19AM 16  CLIA LAB AND THEN MADE AVAILABLE TO PATIENTS.

08:19AM 17     SO IT'S -- SHE COULD BE TOTALLY WRONG ABOUT THAT AND THIS

08:19AM 18  WOULD STILL BE RELEVANT FOR EXACTLY THE SAME REASONS, TO SHOW

08:20AM 19  HER STATE OF MIND, AND ALSO FOR COMPLETENESS.

08:20AM 20         THE COURT:  WELL, WE'LL TALK ABOUT COMPLETENESS IN

08:20AM 21  JUST A MOMENT.

08:20AM 22     I DO SEE THAT THERE'S A BIT OF A TRANSITION BETWEEN THE

08:20AM 23  PRIOR -- BETWEEN THE YELLOW AND THE GREEN, LET ME PUT IT THAT

08:20AM 24  WAY.  IT SEEMS TO BE A DIFFERENT CONTEXT, TO USE THAT WORD

08:20AM 25  AGAIN.

08:20AM  1          BUT ISN'T, ISN'T PART OF THE ALLEGATIONS IN THE SCHEME TO

08:20AM  2     DEFRAUD AN ALLEGATION THAT THE DEFENDANT USED -- I THINK IT'S

08:20AM  3     PARAGRAPH 15, ISN'T IT?  A SCHEME TO DEFRAUD THROUGH

08:20AM  4     ADVERTISEMENTS AND MARKETING MATERIALS?

08:20AM  5          MR. CLINE:  WELL, THERE IS THAT ALLEGATION.

08:20AM  6       I THINK THE ALLEGATION THAT IS PROBABLY MORE RELEVANT

08:20AM  7     HERE, I THINK IT'S IN PARAGRAPH 12, THAT SHE USED THE MEDIA TO

08:20AM  8     DISSEMINATE FALSE INFORMATION AND TO DECEIVE PEOPLE.

08:20AM  9       AND I THINK THE GOVERNMENT'S THEORY IS THAT SHE'S

08:21AM 10     DECEIVING MR. PARLOFF, AND SHE'S DECEIVING MR. PARLOFF FOR THE

08:21AM 11     PURPOSE OF HAVING HIM ACT AS AN UNWITTING CONDUIT FOR THE

08:21AM 12     INFORMATION.  I THINK THAT'S THE THEORY.

08:21AM 13          THE COURT:  RIGHT.

08:21AM 14          MR. CLINE:  WHAT WE WANT TO SHOW IS THAT THAT GOES

08:21AM 15     TO HER STATE OF MIND, HER INTENT TO DEFRAUD, AND THE FACT THAT

08:21AM 16     SHE'S DISCLOSING TO MR. PARLOFF THE PROCESS BY WHICH TESTS ARE

08:21AM 17     BROUGHT UP NEGATES THAT STATE OF MIND, AND IT NEGATES THAT

08:21AM 18     STATE OF MIND WHETHER WHAT SHE'S SAYING IS ACCURATE OR NOT.

08:21AM 19          THE COURT:  MR. BOSTIC?

08:21AM 20          MR. BOSTIC:  I DON'T SEE IT THAT WAY, YOUR HONOR.

08:21AM 21       I THINK THAT THE MAJORITY OF THE PORTION HIGHLIGHTED IN

08:21AM 22     GREEN IS TALKING ABOUT THE COMPANY'S HISTORICAL WORK, AND I

08:21AM 23     THINK IT'S MS. HOLMES PRESENTING, FRANKLY, A FAVORABLE VIEW ON

08:21AM 24     THE COMPANY'S ACHIEVEMENTS TO DATE.  IT'S MS. HOLMES SAYING,

08:21AM 25     WE'RE GOING TO SEND YOU THESE REPORTS, YOU'RE GOING TO BE

08:21AM 1    IMPRESSED BECAUSE THEY'LL SHOW -- AND, FOR EXAMPLE, THE

08:21AM 2    PHARMACEUTICAL STUDIES AS WELL WILL SHOW THAT THE COMPANY HAD

08:22AM 3    THESE CAPABILITIES TO PERFORM REALLY SOPHISTICATED ESOTERIC

08:22AM 4    TESTS ON SYSTEMS THAT WERE RUNNING IN PEOPLE'S HOMES.

08:22AM 5        THERE WERE A LOT OF FACTUAL REPRESENTATIONS ABOUT THE

08:22AM 6    PROGRESS THAT THE COMPANY HAD MADE, ITS VALIDATION WORK.

08:22AM 7        SO IF THAT'S NOT COMING IN FOR ITS TRUTH, AND IF IT'S NOT

08:22AM 8    COMING IN TO SHOW THAT MS. HOLMES BELIEVED THAT, BECAUSE THAT'S

08:22AM 9    NOT -- THAT'S NOT AN ACCEPTABLE NONHEARSAY PURPOSE BY THE WAY.

08:22AM 10   THE DEFENDANT CANNOT INTRODUCE HER OWN STATEMENTS OF HER

08:22AM 11   CONTEMPORANEOUS BELIEF AS I UNDERSTAND THE LAW.  SO THAT'S NOT

08:22AM 12   A PERMISSIBLE PURPOSE.

08:22AM 13       I DON'T SEE WHY THIS IS PERMISSIBLE.  IT DOESN'T TEND TO

08:22AM 14   NEGATE AN ALLEGATION OF A SPECIFIC FALSE STATEMENT IN THIS

08:22AM 15   CASE.

08:22AM 16       I DON'T THINK THERE IS ANY ALLEGATION THAT MS. HOLMES AT

08:22AM 17   SOME OTHER POINT SAID THE OPPOSITE OF WHAT IS IN THE

08:22AM 18   HIGHLIGHTED PORTION IN GREEN.

08:23AM 19           MR. CLINE:  IF YOU'RE CONCENTRATING THERE -- I DON'T

08:23AM 20   MEAN TO INTERRUPT YOU.

08:23AM 21           THE COURT:  NO.  I WAS JUST READING AGAIN.

08:23AM 22           MR. CLINE:  ALL RIGHT.  BUT IF YOU LOOK AT WHERE

08:23AM 23   THIS PICKS UP ON PAGE 17 OF THE TRANSCRIPT, MS. HOLMES IS IN

08:23AM 24   THE MIDDLE OF AN ANSWER.

08:23AM 25       HE'S ASKED HER SOME QUESTIONS, AND SHE'S GIVING A

08:23AM  1     DESCRIPTION OF, OF TESTING AND GETTING MORE TESTS UP.

08:23AM  2         AND THE GREEN PORTION IS JUST A CONTINUATION OF THAT

08:23AM  3     ANSWER.  SHE, SHE SAYS, I MEAN, AS A COMPANY OBVIOUSLY OUR

08:23AM  4     BUSINESS AND WHAT WE DO HERE IN 1701 EVERY DAY IS WORK TO GET

08:23AM  5     MORE AND MORE AND MORE TESTS RUNNING ON CAPILLARY SAMPLES.

08:23AM  6         AND THEN SHE GOES ON.  SO SHE IS CONTINUING HER ANSWER,

08:23AM  7     WHICH IS -- NOW, THIS IS THE COMPLETENESS POINT.  THIS IS ALL

08:23AM  8     ESSENTIALLY ONE ANSWER, ONE DESCRIPTION THAT SHE'S OFFERING IN

08:23AM  9     RESPONSE TO HIS QUESTION.

08:23AM  10        SO I THINK FOR COMPLETENESS PURPOSES, IT'S JUST VERY

08:24AM  11    DIFFICULT TO TAKE THAT OUT AND ALLOW A PARTIAL ANSWER TO STAND

08:24AM  12    AS IF THAT WERE THE WHOLE EVERYTHING THAT SHE HAD SAID IN

08:24AM  13    RESPONSE TO MR. PARLOFF'S QUESTIONS ON THIS POINT.

08:24AM  14        ON THE STATE OF MIND, AGAIN, SHE IS GIVING MR. PARLOFF A

08:24AM  15    DESCRIPTION OF WHAT GOES ON, A FULSOME DESCRIPTION.  SHE IS NOT

08:24AM  16    TRYING TO DECEIVE HIM.  SHE IS DESCRIBING THE PROCESS.

08:24AM  17        IF SHE GETS IT WRONG, IF SHE GETS IT RIGHT, IT DOESN'T

08:24AM  18    MAKE ANY DIFFERENCE FOR THESE PURPOSES.

08:24AM  19        THE POINT IS, AND THIS GOES TO HER STATE OF MIND, SHE IS

08:24AM  20    DESCRIBING TO HIM WHAT -- THE PROCESS.  SHE'S ANSWERING HIS

08:24AM  21    QUESTIONS.  SHE'S GIVING HIM DETAIL IN RESPONSE TO HIS

08:24AM  22    QUESTIONS.

08:24AM  23        SO BOTH FOR COMPLETENESS PURPOSES AND FOR STATE OF MIND,

08:24AM  24    NOT FOR THE TRUTH PURPOSES, WE THINK THIS IS ADMISSIBLE.

08:24AM  25             THE COURT:  SO THE ORIGINAL QUESTION IS ON PAGE 15,

08:24AM 1      ISN'T IT, LINE 24.

08:25AM 2           "OKAY.  NOW, I THOUGHT ALL OF YOUR TESTS WERE SORT OF

08:25AM 3      CONSIDERED LAB DEVELOPED TESTS?"

08:25AM 4           IS THAT THE ORIGINAL QUESTION?

08:25AM 5           AND THEN WHAT WE SEE IN THE FOLLOWING TRANSCRIPT ARE

08:25AM 6      MS. HOLMES'S ANSWERS AND EVERY FEW LINES THERE'S MR. PARLOFF

08:25AM 7      SAYING UH-HUH, AND MS. HOLMES CONTINUES WITH THE ANSWER.

08:25AM 8           AND THEN IT CARRIES OVER.

08:25AM 9           AND THAT WAS HIS ORIGINAL QUESTION ON PAGE 15, AND

08:25AM 10     MS. HOLMES CONTINUED TO PERHAPS ANSWER THE QUESTION AS YOU

08:25AM 11     SUGGEST.

08:25AM 12          HIS NEXT QUESTION WAS FOUND ON PAGE 19 AT LINE 20, I

08:25AM 13     THINK.

08:25AM 14          AND SHE CONTINUES THROUGH PAGE 17.  AND IT -- I SUPPOSE

08:25AM 15     YOU COULD LOOK AT IT AND SAY, WELL, SHE DOES MORE THAN ANSWER

08:25AM 16     THAT QUESTION ON PAGE 15, AND THEN SHE GOES IN TO KEEP TALKING

08:26AM 17     ABOUT OTHER MATTERS.

08:26AM 18          I UNDERSTAND THE 106 ISSUE, BUT SHE ANSWERS THE QUESTION

08:26AM 19     WELL BEFORE PAGE 17 AND 18.

08:26AM 20               MR. CLINE:  BUT WHAT SHE IS DOING IS THEN GIVING

08:26AM 21     HIM -- IT'S NOT AN -- IT'S NOT LIKE SHE GOES OFF IN SOME OTHER

08:26AM 22     DIRECTION AND STARTS TALKING ABOUT WHAT SHE HAD FOR DINNER.

08:26AM 23          SHE'S DESCRIBING THE PROCESS OF GETTING THESE TESTS UP AND

08:26AM 24     RUNNING, WHICH IS WHAT HE ASKED ABOUT.  HE ASKED ABOUT LAB

08:26AM 25     DEVELOPED TESTS, AND SHE'S GIVING HIM A FULSOME ANSWER TO THAT

08:26AM 1     QUESTION.

08:26AM 2          AND I DON'T THINK IT IS FAIR, TO USE ANOTHER ONE OF 106'S

08:26AM 3     TERMS, TO CUT OFF THE ANSWER SORT OF MIDSTREAM AND THEN PICK UP

08:26AM 4     AGAIN AFTER SHE'S FINISHED ANSWERING WITH ANOTHER QUESTION FROM

08:26AM 5     MR. PARLOFF.

08:27AM 6          THE COURT:  WELL, SHE DOES -- SHE TALKS ABOUT LAB

08:27AM 7     TESTS, AND THEN SHE TALKS ABOUT COSTS AND PRICE TAG AND

08:27AM 8     PRICING, AND SHE TALKS ABOUT HER MISSION AND MISSION ACCESS AND

08:27AM 9     PRICING OF DIFFERENT TESTS.

08:27AM 10         SO THERE'S A LOT OF TOPICS BEING DISCUSSED HERE THAT WOULD

08:27AM 11    SEEM TO BE IN EXCESS OF THE -- I THOUGHT YOUR TESTS WERE SORT

08:27AM 12    OF CONSIDERED LAB DEVELOPED TESTS.  I DON'T KNOW WHAT PRICING

08:27AM 13    HAS TO DO WITH THAT.

08:27AM 14         DO YOU SEE WHAT I'M TALKING ABOUT THERE?

08:27AM 15         SO THAT'S EVIDENCE OF, AS I THINK YOU SUGGESTED, IT SOUNDS

08:27AM 16    LIKE THESE CONVERSATIONS, SOME OF THEM WERE OVER MEALS.  IT

08:27AM 17    SOUNDS LIKE -- I RECALL HEARING SOMETHING ABOUT --

08:27AM 18              MR. CLINE:  YES.

08:27AM 19         THE COURT:  -- DINNER OR SOMETHING.

08:27AM 20              MR. CLINE:  THIS, I BELIEVE, IS NOT ONE OF THOSE.

08:27AM 21              MR. BOSTIC:  I DON'T BELIEVE SO.  AT LEAST THIS ONE

08:27AM 22    IS NOT AT A RESTAURANT.

08:27AM 23         THE COURT:  RIGHT.  RIGHT.  I SAY THAT BECAUSE THIS

08:27AM 24    IS THE NATURE OF -- THIS WAS A MANY DAY CONVERSATION, I THINK,

08:27AM 25    WASN'T IT?  IT WAS A CONTINUED CONVERSATION?  NOT JUST THIS,

08:28AM  1    BUT I MEAN THE ENTIRETY OF THE CONVERSATION.

08:28AM  2              MR. CLINE:  IT DID.  IT COVERED A COUPLE OF MONTHS.

08:28AM  3              MR. BOSTIC:  AND FAR LESS STRUCTURED THAN THE

08:28AM  4    CONVERSATIONS WE'VE BEEN HAVING WITH WITNESSES IN THIS CASE,

08:28AM  5    YOUR HONOR, WHERE THERE'S A CLEAR QUESTION AND ANSWER AND THE

08:28AM  6    ANSWER NEEDS TO BE RESPONSIVE TO THE QUESTION.

08:28AM  7        THIS WAS FAR MORE ORGANIC.  SO I THINK THE COURT IS

08:28AM  8    CORRECT THAT THE CONTENT NEEDS TO CONTROL FOR 106 PURPOSES, AND

08:28AM  9    THE QUESTION FOR 106 IS, WOULD IT BE UNFAIR TO EXCLUDE THIS

08:28AM  10   PORTION OF HEARSAY FROM THE CLIPS THAT THE GOVERNMENT IS

08:28AM  11   PLAYING?  AND I DON'T SEE THE UNFAIRNESS HERE.

08:28AM  12       THE CLIPS THAT THE GOVERNMENT IS PLAYING ALREADY INCLUDE

08:28AM  13   MS. HOLMES'S STATEMENT THAT THE COMPANY IS WORKING EVERY DAY IN

08:28AM  14   1701 TO GET MORE AND MORE AND MORE TESTS RUNNING ON CAPILLARY

08:28AM  15   SAMPLES.

08:28AM  16       SO THERE'S NO FALSE IMPRESSION CREATED HERE THAT

08:28AM  17   MS. HOLMES IS HIDING THE FACT THAT WORK IS ONGOING.

08:28AM  18       THE PORTION IN GREEN IS REALLY, IT'S LIKE A FLASHBACK IN A

08:28AM  19   MOVIE.  IT IS A STEPPING AWAY FROM THE THREAD OF THE

08:29AM  20   CONVERSATION FOR A MOMENT TO TALK ABOUT THE HISTORICAL

08:29AM  21   ACTIVITIES OF THE COMPANY AND MAKES SOME FACTUAL

08:29AM  22   CHARACTERIZATIONS THERE, AND THAT'S WHY IT'S NOT ADMISSIBLE OR

08:29AM  23   NECESSARY UNDER RULE 106.

08:29AM  24             MR. CLINE:  BUT IT'S NOT REALLY A FLASHBACK IN A

08:29AM  25   MOVIE.  SHE SAYS IN THE FIRST PART OF HER ANSWER, WHICH THE

08:29AM 1    GOVERNMENT PLANS TO PLAY ON 17, "I MEAN, AS A COMPANY,

08:29AM 2    OBVIOUSLY OUR BUSINESS AND WHAT WE DO HERE IN 1701 EVERY DAY IS

08:29AM 3    WORK TO GET MORE AND MORE TESTS RUNNING ON CAPILLARY SAMPLES."

08:29AM 4        BUT THEN SHE GOES ON TO EXPLAIN THAT PROCESS TO HIM.

08:29AM 5        AGAIN, WHETHER SHE'S RIGHT OR WRONG IN EXPLAINING THE

08:29AM 6    PROCESS, HER STATE OF MIND IS THAT SHE WANTS HIM TO UNDERSTAND

08:29AM 7    WHAT IS GOING ON HERE.  SHE'S NOT TRYING TO DECEIVE HIM OR PULL

08:29AM 8    THE WOOL OVER HIS EYES.  SHE'S DESCRIBING THE PROCESS, WHICH

08:29AM 9    AGAIN, I THINK GOES BOTH TO COMPLETENESS AND TO THE NONHEARSAY

08:29AM 10   PURPOSE FOR THIS.

08:30AM 11       (PAUSE IN PROCEEDINGS.)

08:30AM 12       THE COURT:  I CAPTURE YOUR POINT, BUT I THINK SOME

08:30AM 13   OF THIS IS NOT NECESSARY FOR THAT, SOME OF THE GREEN.  IT -- I

08:30AM 14   DON'T MEAN TO SIT HERE AS AN EDITOR, BUT I DON'T THINK THIS

08:30AM 15   REALLY ANSWERS THE QUESTION THAT MR. PARLOFF PUT ON.

08:30AM 16       I'M LOOKING AT PAGE 18, AND IN LINE 11 THAT ANSWER THAT

08:30AM 17   CONTINUES.

08:30AM 18       I COULD SEE HOW AN ARGUMENT COULD BE MADE FOR LINE 22,

08:30AM 19   PAGE 17, THROUGH LINE 9 ON PAGE 18.

08:30AM 20       MR. CLINE:  WELL, WHAT I'LL SAY, YOUR HONOR, IS THAT

08:30AM 21   WE WILL TAKE AS MUCH OF THIS AS WE CAN GET, BUT WE BELIEVE THE

08:31AM 22   WHOLE THING OUGHT TO COME IN.

08:31AM 23       THE COURT:  SURE.  I UNDERSTAND.

08:31AM 24       MR. BOSTIC:  AND, YOUR HONOR, AS TO THE PORTION ON

08:31AM 25   18, I THINK THE COURT SAID 18 THROUGH LINE 9?

6801

08:31AM  1          THE COURT:  YES, YES.

08:31AM  2          MR. BOSTIC:  THAT INCLUDES -- SO, AGAIN, I THINK THE

08:31AM  3   PROBLEM THERE IS HISTORICAL REPRESENTATIONS ABOUT THINGS THAT

08:31AM  4   THE COMPANY HAS ACHIEVED, YOU KNOW, "AND WE HAVE A LOT OF TESTS

08:31AM  5   THAT WE HAVE VALIDATED ON OUR SYSTEMS A LONG TIME AGO."  I'M

08:31AM  6   NOT SURE WHY THAT IS RESPONSIVE TO THE CONVERSATION, WHY THAT

08:31AM  7   IS REQUIRED UNDER 106 OR WHETHER THERE WOULD BE -- OR WHAT

08:31AM  8   APPROPRIATE NONHEARSAY PURPOSE THERE WOULD BE FOR SOMETHING

08:31AM  9   LIKE THAT.

08:31AM 10          MR. CLINE:  WHICH I THINK, IN RESPONSE TO

08:31AM 11   MR. BOSTIC'S COMMENT, I THINK IS WHY THE REST OF THAT PAGE IS

08:31AM 12   ALSO NECESSARY, BECAUSE SHE GOES ON TO DESCRIBE WHAT THE

08:31AM 13   PROCESS IS FOR GETTING THESE TESTS UP AND RUNNING.

08:32AM 14      (PAUSE IN PROCEEDINGS.)

08:32AM 15          THE COURT:  ALL RIGHT.  THANK YOU.

08:32AM 16   DO YOU WANT TO HAVE MR. LOOBY SPEAK ON THIS OTHER TOPIC

08:32AM 17   NOW?

08:32AM 18          MR. CLINE:  THAT'S FINE, YOUR HONOR.

08:32AM 19          THE COURT:  OKAY.  LET'S DO THAT.

08:32AM 20   WHAT IS THE SCHEDULE ABOUT -- I HESITATE TO EVEN ASK.

08:32AM 21   WHAT IS OUR SCHEDULE WITH -- WE HAVE A WITNESS ON NOW,

08:32AM 22   MS. TOMPKINS.  SHE'S ON CROSS.

08:32AM 23   AND THEN YOU HAVE ANOTHER, IS IT ANOTHER WITNESS WHO WILL

08:32AM 24   TESTIFY, A BRIEF WITNESS?

08:32AM 25          MR. BOSTIC:  OUR NEXT WITNESS IS A SIMILARLY BRIEF

08:32AM 1    WITNESS, YES, YOUR HONOR.

08:32AM 2              THE COURT:  OKAY.

08:32AM 3              MR. BOSTIC:  WE HAVE WITNESSES PLANNED FOR TODAY,

08:33AM 4    YES.

08:33AM 5              THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

08:33AM 6              MR. CLINE:  I'M HAPPY TO HAVE MR. LOOBY COME UP.

08:33AM 7              THE COURT:  WELL, THAT'S WHY YOU'RE STILL HERE.  LET

08:33AM 8    ME JUST TELL YOU MY THOUGHTS AND THEN WE'LL MOVE TO MR. LOOBY.

08:33AM 9              MR. CLINE:  SURE.

08:33AM 10             THE COURT:  THANK YOU FOR THE COMMENTS THIS MORNING.

08:33AM 11        I DO SEE THAT UNDER COMPLETENESS, AND I'M GOING TO --

08:33AM 12   CANDIDLY, I'M GOING TO -- I HAVE SOME DOUBTS ABOUT IT, BUT THIS

08:33AM 13   IS A CRIMINAL CASE AND I UNDERSTAND THE IMPORTANCE OF THIS TO

08:33AM 14   YOUR ARGUMENT.  I DO THINK IT STRETCHES THINGS A BIT UNDER 106,

08:33AM 15   BUT I'LL GIVE YOU THE BENEFIT OF THE DOUBT, YOUR TEAM,

08:33AM 16   MR. CLINE, IN THAT REGARD, BUT I DO SEE SOME LIMITATIONS TO

08:33AM 17   THIS.

08:33AM 18        I'LL ALLOW LINE 22 -- THIS IS PAGE 17 OF THE DOCUMENT,

08:33AM 19   LINE 22, DOWN TO PAGE 18, LINE 22 ENDING AT THE WORD "TESTS."

08:34AM 20        DO YOU SEE THAT?

08:34AM 21             MR. CLINE:  YES, YOUR HONOR.

08:34AM 22             THE COURT:  EVERYTHING ELSE, INCLUDING PAGE 19, AND

08:34AM 23   EVERYTHING ELSE ON PAGE 18 WILL NOT BE PERMITTED.  I DON'T

08:34AM 24   THINK THAT'S CONTEXTUALLY RELEVANT FOR 106.

08:34AM 25        I'LL ALLOW THIS UNDER 106.

6803

08:34AM 1        AND IT IS OFFERED NOT FOR THE TRUTH OF ANYTHING ASSERTED

08:34AM 2   HERE, BUT ONLY TO THE STATE OF MIND OF MS. HOLMES AS TO THE

08:34AM 3   ISSUES OF -- MR. CLINE?

08:34AM 4        MR. CLINE:  AS TO THE ISSUES OF -- WELL, HER STATE

08:34AM 5   OF MIND REALLY GOES TO WHETHER SHE'S INTENDING TO DECEIVE

08:34AM 6   ANYBODY, BUT IT GOES TO HER STATE OF MIND AS TO THE PROCESS OF

08:34AM 7   BRINGING UP TESTS.

08:34AM 8        THE COURT:  IS THAT RELATED TO INTENT?

08:34AM 9        MR. CLINE:  YES.

08:34AM 10       THE COURT:  MAY I TELL THE JURY THAT?

08:34AM 11       MR. CLINE:  YES.

08:34AM 12       THE COURT:  ALL RIGHT.  THANK YOU.

08:35AM 13  I'LL OTHERWISE SUSTAIN THE OBJECTION.

08:35AM 14       MR. CLINE:  ALL RIGHT.  WELL, I THINK WHILE I'M

08:35AM 15  BATTING 500 AT LEAST, I WILL SIT DOWN AND LET MR. LOOBY TALK.

08:35AM 16  BEFORE I FORGET, I THINK MS. TREFZ HAD ONE OTHER ISSUE SHE

08:35AM 17  WANTS TO BRING UP WITH YOU BEFORE YOU --

08:35AM 18       THE COURT:  OKAY.  SURE.  THANK YOU.

08:35AM 19  MR. BOSTIC, YOU'RE STAYING ON THE PITCHER'S MOUND, AND WE

08:35AM 20  HAVE A NEW BATTER.

08:35AM 21       MR. BOSTIC:  I'LL STAY HERE, YOUR HONOR.  I GET THAT

08:35AM 22  REFERENCE.

08:35AM 23  (LAUGHTER.)

08:35AM 24       MR. LOOBY:  GOOD MORNING, YOUR HONOR.

08:35AM 25  SO THIS IS DEFENSE DESIGNATION TWO.

08:35AM 1           THE COURT:  YES.

08:35AM 2           MR. LOOBY:  AND THIS IS THE EXCHANGE BETWEEN

08:35AM 3   MR. PARLOFF AND MS. HOLMES ABOUT THE COMPANY'S -- THE DIFFERENT

08:35AM 4   TYPES OF IP THAT THE COMPANY HOLDS AND WHETHER OR NOT IT'S

08:35AM 5   STRICTLY PATENTS OR WHETHER OR NOT IT INCLUDES TRADE SECRET

08:35AM 6   PROTECTED PRACTICES.

08:35AM 7       AND MS. HOLMES'S ANSWER IS THAT IT'S BOTH, AND THEN

08:35AM 8   THERE'S A LITTLE BIT OF ELABORATION, BUT THERE'S ABOUT A MINUTE

08:36AM 9   AND CHANGE EXCHANGE.

08:36AM 10          THE COURT:  NOW, THIS IS ONE WE DON'T HAVE A

08:36AM 11  TRANSCRIPT; IS THAT RIGHT?

08:36AM 12          MR. LOOBY:  THAT'S RIGHT, THAT'S RIGHT.

08:36AM 13      THE GOVERNMENT HAD TRANSCRIBED CERTAIN PORTIONS THAT WE

08:36AM 14  WERE ABLE TO MARKUP IN TRANSCRIPTS, BUT NOT OTHER PORTIONS.  SO

08:36AM 15  THIS -- WE HAVE THE AUDIOTAPE THAT WE SUBMITTED TO THE COURT.

08:36AM 16      THERE IS NONHEARSAY PURPOSES, AND THEN THERE IS A 106

08:36AM 17  PURPOSE.  I THINK EITHER ONE OF THEM IS SUFFICIENT TO ADMIT

08:36AM 18  THIS PORTION OF THE TAPE.

08:36AM 19      THE NONHEARSAY PURPOSE IS IT'S RELEVANT TO MS. HOLMES'S

08:36AM 20  KNOWLEDGE AND STATE OF MIND AS TO WHAT TYPES OF IP PROTECTION

08:36AM 21  THE COMPANY HELD.

08:36AM 22      THAT'S TRUE WHETHER OR NOT ANY OF THE UNDERLYING PRACTICES

08:36AM 23  ARE, IN FACT, TRADE SECRETS, WHICH WOULD BE THE TRUTH OF THE

08:36AM 24  MATTER ASSERTED IN THE STATEMENT.  WE HAVE TRADE SECRETS.

08:36AM 25      WE'RE NOT ADMITTING IT FOR THAT PURPOSE.  WE'RE PROPOSING

08:36AM 1     TO ADMIT IT TO SHOW THAT MS. HOLMES WAS AWARE OF AND UNDERSTOOD

08:36AM 2     THAT THERE WERE TRADE SECRET PRACTICES, SHE BELIEVED IT TO BE

08:37AM 3     TRUE IN -- OR AT LEAST REPRESENTED THAT TO MR. PARLOFF IN THE

08:37AM 4     SPRING OF 2014.

08:37AM 5          AND THE REASON WHY THAT IS RELEVANT TO THE CASE IS

08:37AM 6     TWO-FOLD, ONE OF WHICH IS THAT MR. PARLOFF'S ARTICLE REPRESENTS

08:37AM 7     THAT THE COMPANY DOES HOLD TRADE SECRETS, AND SO IT'S PART OF,

08:37AM 8     KIND OF PART OF THE EXCHANGE THAT DOES MAKE IT INTO THE

08:37AM 9     ARTICLE.

08:37AM 10         BUT IT ALSO -- WE EXPECT THE GOVERNMENT TO ARGUE THAT THE

08:37AM 11    COMPANY'S INVOCATION OF TRADE SECRETS AT OTHER POINTS IN TIME

08:37AM 12    WERE, WERE PART OF THE SCHEME TO DEFRAUD.

08:37AM 13         AND SO THE IDEA THAT MS. HOLMES IS AWARE OF TRADE SECRETS

08:37AM 14    AND IS TALKING ABOUT TRADE SECRETS PUBLICLY AND WITH

08:37AM 15    MR. PARLOFF WITH THE IDEA THAT IT WOULD BE RELAYED TO OTHER

08:37AM 16    PEOPLE IS EVIDENCE THAT THIS BELIEF EXISTED IN EARLY 2014.

08:37AM 17              THE COURT:  WELL, WHAT SHE'S -- THANK YOU.

08:37AM 18         WHAT SHE SAYS IN THE TAPE, I THINK -- I DON'T HAVE A

08:38AM 19    TRANSCRIPT OF IT, I LISTENED TO IT SEVERAL TIMES -- SHE

08:38AM 20    EXPRESSES HER BELIEF IN THE PATENT SYSTEM AND THE IMPORTANCE OF

08:38AM 21    THE PATENT SYSTEM.

08:38AM 22         AND I THINK SHE SAID SOMETHING ABOUT, YES, WE DO HAVE

08:38AM 23    PATENTS, IT'S IMPORTANT, BUT WE ALSO FEEL THAT WE COULD

08:38AM 24    PROTECT -- OUTSIDE OF THE PATENT SYSTEM, WE CAN PROTECT OUR

08:38AM 25    TRADE SECRETS INTERNALLY, AND SHE EXPRESSES SOME STRONG BELIEF

08:38AM 1    IN THAT.

08:38AM 2         IS THAT WHAT YOU WANT TO GET IN HERE, THAT PIECE?

08:38AM 3         MR. LOOBY:  YES.  AND THEN THE CLIP ENDS WITH "AND

08:38AM 4    THE COMPANY IS ALWAYS CONTINUALLY INNOVATING" BECAUSE IT'S A

08:38AM 5    DISCUSSION ABOUT WHAT TYPES OF IP DO THEY HAVE, AND WHICH WE

08:38AM 6    HAVE PATENTS THAT ARE KIND OF ON THE RECORD, AND WE HAVE TRADE

08:38AM 7    SECRETS THAT ARE AN ADDITIONAL LAYER OF SUPPORT KIND OF AROUND

08:38AM 8    THAT.

08:38AM 9         THE COURT:  SO WHY IS THAT IMPORTANT?  I JUST -- SO

08:38AM 10   WHAT?

08:38AM 11        MR. LOOBY:  THE SO WHAT, YOUR HONOR, IS THAT WHEN

08:38AM 12   THE COMPANY IS TALKING ABOUT TRADE SECRET PROTECTIONS IN 2015,

08:39AM 13   WE EXPECT THE GOVERNMENT TO ARGUE THAT THOSE INVOCATIONS OF

08:39AM 14   THAT IP PROTECTION ARE IN BAD FAITH.  IN FACT, THEY HAVE

08:39AM 15   ALLEGED THAT IN THEIR 404(B) NOTICE.

08:39AM 16        THIS EXCHANGE WITH MR. PARLOFF IS WELL BEFORE ANY WHIFF OF

08:39AM 17   THAT LATER CONTROVERSY ARISES.  IT IS EVIDENCE THAT MS. HOLMES

08:39AM 18   BELIEVED THAT THERE WERE TRADE SECRETS PROTECTIONS GENERALLY AT

08:39AM 19   THAT TIME, AND IT MAKES IT MORE PROBATIVE AND IT UNDERMINES THE

08:39AM 20   GOVERNMENT'S INFERENCE THAT THEY WOULD HAVE THE JURY DRAW THAT

08:39AM 21   THOSE LATER INVOCATION OF TRADE SECRETS IS ESSENTIALLY MADE UP.

08:39AM 22        WELL, THEY'D BEEN TALKING ABOUT TRADE SECRETS FOR A LONG

08:39AM 23   TIME.  IT'S BEEN MS. HOLMES ON THE RECORD WITH A REPORTER IN AN

08:39AM 24   INTERVIEW FOR A PROFILE.  "WE HAVE TRADE SECRET PROTECTIONS AND

08:39AM 25   WE BELIEVE IN PROTECTING OUR IP THROUGH THAT MECHANISM."

08:39AM 1              THE COURT:  OKAY.

08:39AM 2         MR. BOSTIC?

08:39AM 3              MR. BOSTIC:  SO I THINK THE CONCERN HERE,

08:40AM 4    YOUR HONOR, IS AGAIN A HEARSAY ONE.  THE HEARSAY RULE DOES NOT

08:40AM 5    ALLOW A PARTY TO INTRODUCE ITS OWN STATEMENTS AS EVIDENCE OF

08:40AM 6    THAT PARTY'S BELIEF.

08:40AM 7         AND I THINK JUST ON THE FACE OF THIS CLIP, THIS PORTION --

08:40AM 8    AND BASED ON DEFENSE COUNSEL'S DESCRIPTION, IT'S CLEAR THAT

08:40AM 9    THAT'S WHAT THIS IS.  THIS IS A STATEMENT BY MS. HOLMES ABOUT

08:40AM 10   HER BELIEF AT THE TIME, OR AT LEAST HER PURPORTED BELIEF ABOUT

08:40AM 11   THE STATE OF THE COMPANY'S IP PROTECTION, THE -- I SUPPOSE THE

08:40AM 12   VALIDITY OF THE COMPANY'S TRADE SECRECY PRACTICES, AND HER

08:40AM 13   STATEMENT AT THAT TIME CAN'T BE INTRODUCED BY HER TO SHOW THAT

08:40AM 14   THAT'S WHAT SHE BELIEVED.  THAT CONFLICTS WITH THE HEARSAY

08:40AM 15   RULE.

08:40AM 16        IT'S COMPOUNDED IN THIS CASE BY THE FACT THAT THIS DEALS

08:40AM 17   WITH A LEGAL ISSUE AND THE VALIDITY OR NONVALIDITY OF A TRADE

08:40AM 18   SECRET, THE EXISTENCE OR NONEXISTENCE OF A TRADE SECRET IS A

08:41AM 19   LEGAL QUESTION.

08:41AM 20        SO I THINK THAT THAT'S JUST ANOTHER COMPOUNDING FACTOR

08:41AM 21   THAT MAKES THIS MORE PROBLEMATIC TO LET IN AN OUT-OF-COURT

08:41AM 22   HEARSAY STATEMENT FROM THE DEFENDANT ABOUT THE EXISTENCE OF THE

08:41AM 23   COMPANY'S TRADE SECRET IP AT THE TIME.

08:41AM 24              MR. LOOBY:  RIGHT.  AND MS. HOLMES'S OUT-OF-COURT

08:41AM 25   STATEMENTS ARE SUBJECT TO THE SAME HEARSAY RESTRICTIONS AS ANY

08:41AM 1   OTHER OUT-OF-COURT STATEMENT.

08:41AM 2       WE ARE NOT OFFERING IT FOR THE TRUTH ABOUT WHETHER OR NOT

08:41AM 3   THESE TRADE -- THESE PRACTICES WERE TRADE SECRETS OR WHETHER OR

08:41AM 4   NOT THE COMPANY ACTUALLY HAD TRADE SECRET PROTECTIONS OR THAT

08:41AM 5   MS. HOLMES UNDERSTOOD THEM TO BE THAT WAY.

08:41AM 6       IT'S A DISCLOSURE THAT THE COMPANY DOES KEEP THESE TYPES

08:41AM 7   OF IP, OR AT LEAST THAT WAS ITS POSITION AT THE TIME, AND

08:41AM 8   THAT'S RELEVANT TO MS. HOLMES'S KNOWLEDGE ABOUT KIND OF WHAT IP

08:41AM 9   WAS AT ISSUE, WHICH --

08:41AM 10          THE COURT:  ISN'T THAT IN EVIDENCE ALREADY?  DIDN'T

08:41AM 11  CERTAIN WITNESSES TESTIFY THAT THERE WERE TRADE SECRET

08:42AM 12  PROTECTIONS AT THE COMPANY?

08:42AM 13          MR. LOOBY:  OFF THE TOP OF MY HEAD, I CAN'T RECALL

08:42AM 14  EXACTLY.

08:42AM 15      I KNOW THAT IT'S IN MR. PARLOFF'S ARTICLE, WHICH IS IN

08:42AM 16  EVIDENCE, WHICH LEADS ME TO THE 106 REASON, WHICH IF IT WAS

08:42AM 17  ADMITTED UNDER 106, THERE WOULDN'T BE A HEARSAY ISSUES.

08:42AM 18          THE COURT:  SHOULD WE ADMIT IT UNDER THAT SAME

08:42AM 19  THEORY, THE SECOND ARTICLE?

08:42AM 20          MR. LOOBY:  NO, YOUR HONOR.  THIS WOULD BE CONTEXT

08:42AM 21  TO THE CONVERSATIONS THAT THE GOVERNMENT HAS PROPOSED TO PLAY

08:42AM 22  WHICH CENTER AROUND, PRINCIPALLY AROUND THE 2014 REPORTING THAT

08:42AM 23  LEADS TO THE JUNE 2014 ARTICLE, WHICH THE ARTICLE, OF COURSE,

08:42AM 24  IS IN EVIDENCE AND SAYS THAT THERE ARE TRADE SECRET

08:42AM 25  PROTECTIONS.

08:42AM 1      SO THIS IS PROVIDING CONTEXT TO KIND OF HOW THAT, HOW THAT

08:42AM 2    REPRESENTATION WOUND UP IN THE ARTICLE, AND IT ALSO PROVIDES

08:42AM 3    CONTEXT TO OTHER CLIPS THAT THE GOVERNMENT WOULD PLAY AND ABOUT

08:42AM 4    KIND OF WHAT, WHAT WOULD BE ON THE RECORD AND WHAT WOULD BE OFF

08:43AM 5    THE RECORD IN TERMS OF THE PUBLIC DESCRIPTION OF THE COMPANY'S

08:43AM 6    TECHNOLOGIES.

08:43AM 7      SO THE IDEA THAT THERE ARE TRADE SECRET ISSUES IS KIND OF

08:43AM 8    HANGING OVER A LOT OF THE EXCHANGES BETWEEN MR. PARLOFF AND

08:43AM 9    MS. HOLMES THAT THE JURY WILL HEAR TODAY.

08:43AM 10     SO UNDER RULE 106, THIS IS, THIS COMES IN FOR CONTEXT OF

08:43AM 11   TABLE SETTING OF -- THEY HAD DISCUSSED EARLY ON IN THEIR

08:43AM 12   EXCHANGES, YEAH, WE HAVE TRADE SECRETS.

08:43AM 13     SO THEN LATER WHEN THEY'RE TALKING ABOUT, WELL, HOW SHOULD

08:43AM 14   WE DESCRIBE THIS OR THAT IN THE ARTICLE, IT'S AGAINST THE

08:43AM 15   BACKDROP OF WHAT WE DO CONSIDER ASPECTS OF OUR TECHNOLOGY AND

08:43AM 16   PROCESSES TO BE TRADE SECRET PROTECTION PROTECTED, AND WE'RE

08:43AM 17   HAVING THAT CONVERSATION IN THAT CONTEXT.

08:43AM 18     SO WE SUBMIT THAT IT'S KIND OF A 106 CONTEXT RATIONALE.

08:43AM 19          THE COURT:  AND IT'S NOT HEARSAY.

08:43AM 20          MR. LOOBY:  AND THEN THE HEARSAY QUESTION WOULD BE,

08:43AM 21   WOULD BE MOOT AT THAT POINT?

08:43AM 22     BUT WE ALSO WOULD NOT BE OFFERING IT FOR THE TRUTH OF THE

08:44AM 23   MATTER ASSERTED.  AND SO EVEN IF IT CAME IN FOR 106, I MEAN, WE

08:44AM 24   WOULDN'T BE ARGUING THAT, AND WE WOULDN'T BE OFFERING IT THAT

08:44AM 25   WAY ANYWAY.

08:44AM 1    SO IF THE COURT WANTED TO INSTRUCT THAT THAT QUESTION AND

08:44AM 2  ANSWER, EVEN IF IT CAME IN UNDER RULE 106, WAS TO BE CONSIDERED

08:44AM 3  FOR A LIMITED PURPOSE --

08:44AM 4          THE COURT:  AND THAT LIMITED PURPOSE WOULD BE?

08:44AM 5          MR. LOOBY:  THAT WOULD BE MS. HOLMES'S KNOWLEDGE

08:44AM 6  ABOUT THE COMPANY'S IP PORTFOLIO, WHAT TYPES OF IP THE COMPANY

08:44AM 7  HELD IN JUNE OR MAY OF 2014.

08:44AM 8          THE COURT:  WHAT TYPES?  I DON'T THINK IT'S THAT

08:44AM 9  DESCRIPTIVE, IS IT?

08:44AM 10          MR. LOOBY:  WELL, IT'S DIFFERENT CATEGORIES.  IT'S

08:44AM 11  PATENT AND TRADE SECRET.

08:44AM 12          THE COURT:  SHE SAYS, WE BELIEVE IN THE PATENT

08:44AM 13  SYSTEM.

08:44AM 14          MR. LOOBY:  RIGHT.

08:44AM 15          THE COURT:  AND WE HAVE PATENTS.

08:44AM 16          MR. LOOBY:  YES.

08:44AM 17          THE COURT:  AND THEN SHE SAYS BUT WE ALSO OUTSIDE OF

08:44AM 18  THAT, I DON'T REMEMBER IF SHE USED THE PHRASE INTERNALLY, BUT

08:45AM 19  WE HAVE TRADE SECRET PROTECTION.

08:45AM 20          MR. LOOBY:  RIGHT.

08:45AM 21          THE COURT:  AND THAT'S REALLY THE PORTION YOU WANT,

08:45AM 22  THOSE TWO STATEMENTS I WOULD THINK.

08:45AM 23          MR. LOOBY:  CORRECT.  AND I THINK THE TAPE ONLY

08:45AM 24  CONTINUES FOR A SHORT WHILE AFTER WHERE SHE MAKES THE

08:45AM 25  STATEMENT, AND, OF COURSE, WE CONTINUE INNOVATING.

08:45AM 1       BUT IT'S REALLY THE PORTIONS THAT YOUR HONOR RECALLS THAT

08:45AM 2   WE'RE TALKING ABOUT.

08:45AM 3           MR. BOSTIC:  I'M NOT SURE I SEE THE 106 CONNECTION.

08:45AM 4       USUALLY WITH 106 IT'S EASIER, OR THERE'S A MORE CONCRETE

08:45AM 5   CONNECTION BETWEEN THE PORTION THAT A PARTY IS SEEKING TO ADD

08:45AM 6   AND ANOTHER PORTION THAT WOULD CREATE AN UNFAIR IMPRESSION --

08:45AM 7           THE COURT:  CONTEXT.  CONTEXT, MR. BOSTIC.

08:45AM 8           MR. BOSTIC:  CONTEXT.

08:45AM 9       I'M TRYING TO GET THROUGH THIS WHOLE ARGUMENT WITHOUT

08:45AM 10  USING THAT WORD.

08:45AM 11          (LAUGHTER.)

08:45AM 12          MR. BOSTIC:  BUT I DON'T SEE, I DON'T SEE OTHER

08:45AM 13  CONTENT IN THE GOVERNMENT'S IDENTIFIED CLIPS THAT WOULD CREATE

08:45AM 14  AN UNBALANCED OR MISLEADING IMPRESSION WERE IT NOT FOR GIVING

08:46AM 15  MS. HOLMES A CHANCE TO JUSTIFY WITHHOLDING INFORMATION, YOU

08:46AM 16  KNOW, THROUGH HER STATEMENT AT THE TIME ABOUT HER BELIEF THAT

08:46AM 17  THE COMPANY HAD TRADE SECRET PROTECTION.

08:46AM 18      I THINK -- AND I THINK TO THE EXTENT IT WOULD HAVE THAT

08:46AM 19  FUNCTION, I THINK THEN IT IS IN VIOLATION OF THE HEARSAY RULES

08:46AM 20  IF IT'S SERVING THAT PURPOSE TO FILL IN THAT GAP FOR THE JURY

08:46AM 21  AND TELL THEM EITHER WHAT THE STATE OF THERANOS'S IP PORTFOLIO

08:46AM 22  WAS AT THE TIME OR WHAT MS. HOLMES BELIEVED ABOUT IT.  I THINK

08:46AM 23  THOSE ARE BOTH IMPROPER HEARSAY PURPOSES.

08:46AM 24          MR. LOOBY:  JUST ONE FINAL WORD.

08:46AM 25          THE COURT:  SURE.

08:46AM 1          MR. LOOBY:  WHICH IS IF WE ZOOM OUT A LITTLE BIT,

08:46AM 2     WHAT THE GOVERNMENT IS GOING TO DO TODAY IS PLAY A CERTAIN

08:46AM 3     SERIES OF CLIPS AND EXCHANGES WITH MR. PARLOFF AND MS. HOLMES,

08:46AM 4     AND THEY'RE GOING TO THEN ARGUE TO THE JURY THAT THESE ARE

08:46AM 5     EITHER MISLEADING OR THEY HAVE OMISSIONS IN THEM.

08:47AM 6        THE CONTEXT THAT THIS IS BEING DISCUSSED ABOUT THE

08:47AM 7     TECHNOLOGY AGAINST THE BACKDROP OF A DISCLOSURE THAT THE

08:47AM 8     COMPANY MAINTAINS TRADE SECRETS AND TAKES THAT SERIOUSLY I

08:47AM 9     THINK IS IMPORTANT AND NECESSARY TO NOT HAVE THE ISOLATED CLIPS

08:47AM 10    BE MISLEADING IN THAT REGARD.

08:47AM 11         THE COURT:  I SEE.  OKAY.  ALL RIGHT.  THANK YOU.

08:47AM 12       I THINK THE 106 CONNECTION HERE, AS I SEE IT, IS A LITTLE

08:47AM 13    TENUOUS, MR. LOOBY.  I'M JUST NOT, I'M NOT -- I UNDERSTAND THE

08:47AM 14    REASON THAT YOU WANT IT IN, TO CAPTURE THE TRADE SECRET IN THE

08:47AM 15    PATENT AND MR. HOLMES BELIEF IN BOTH OF THOSE, AND HER OVERT

08:47AM 16    ASSERTION THAT THE COMPANY DOES OTHER THINGS TO PROTECT ITS

08:47AM 17    TRADE SECRETS AND THE VALUE FOR THAT IN YOUR CASE.

08:47AM 18       I DO NOT THINK IT MEETS THE 106 AND I DO THINK IT'S

08:47AM 19    IMPROPER HEARSAY, AT LEAST AS IT'S PRESENTED TODAY.

08:48AM 20       LET'S SEE WHEN THE TAPE IS PLAYED AND SEE WHAT -- I'M

08:48AM 21    PAUSING BECAUSE I DON'T WANT TO USE THE WORD CONTEXT, BUT LET'S

08:48AM 22    SEE WHAT DEVELOPS IN RELATION TO THAT AND SEE WHERE IT TAKES

08:48AM 23    US.  THEY MAY DECIDE NOT TO PLAY THE TAPE.

08:48AM 24         MR. LOOBY:  THAT WOULD BE A SURPRISE.

08:48AM 25         THE COURT:  ALL RIGHT.

08:48AM 1          MS. TREFZ, YOU WANTED TO SAY SOMETHING?

08:48AM 2              MS. TREFZ:  VERY BRIEFLY, YOUR HONOR.

08:48AM 3          GOOD MORNING, YOUR HONOR.

08:48AM 4              THE COURT:  GOOD MORNING.

08:48AM 5          AND MR. BOSTIC REMAINS ON THE MOUND.

08:48AM 6              MS. TREFZ:  HE IS.  AND I AM A NEW BATTER.

08:48AM 7              MR. BOSTIC:  IS THREE ON ONE ALLOWED IN SPORTS,

08:48AM 8      YOUR HONOR?

08:48AM 9              MS. TREFZ:  IT DEPENDS ON WHAT SPORT.

08:48AM 10         JUST BRIEFLY, YOUR HONOR.

08:48AM 11         THIS IS WITH RESPECT TO DR. ASIN WHO IS THE DOCTOR OF THE

08:48AM 12     WITNESS ON THE STAND.  I THINK THERE IS STILL A QUESTION AS TO

08:48AM 13     WHETHER THE GOVERNMENT WILL CALL HIM.  LAST NIGHT THEY TOLD US

08:48AM 14     THAT THEY WERE NOT SURE.

08:48AM 15         I DID JUST WANT TO FLAG FOR THE COURT THAT WE HAD SOUGHT

08:49AM 16     AND RECEIVED FROM JUDGE COUSINS A SUBPOENA FOR RECORDS RELATED

08:49AM 17     TO THIS PATIENT.

08:49AM 18         I UNDERSTAND FROM THE CORRESPONDENCE WITH THE DOCTOR LAST

08:49AM 19     NIGHT THAT HE IS OR WILL BE HERE AT THE COURTHOUSE TODAY AND

08:49AM 20     WOULD BE ABLE TO PRODUCE THOSE DOCUMENTS, AND BECAUSE THEY'RE

08:49AM 21     PRODUCIBLE TO THE COURT, I JUST WANTED TO FLAG THAT WE WOULD

08:49AM 22     LIKE TO BE ABLE TO TENDER THEM TO THE COURT AND JUST ASK THAT

08:49AM 23     HE BE REQUESTED TO STAY WHILE WE REVIEW THEM AS THEY RELATE TO

08:49AM 24     THIS PARTICULAR WITNESS.

08:49AM 25             THE COURT:  OKAY.

6814

08:49AM   1          MR. BOSTIC:  DR. ASIN IS MR. LEACH'S WITNESS.  IF I

08:49AM   2    MIGHT CALL ON HIM OR CONFER WITH HIM?

08:49AM   3          THE COURT:  SURE.  THIS IS CALLED A PITCHING CHANGE,

08:49AM   4    MR. BOSTIC.

08:49AM   5       (LAUGHTER.)

08:49AM   6          MR. LEACH:  THANK YOU, YOUR HONOR.

08:49AM   7     I'M GOING TO PITCH HIT.  WE'RE HAPPY TO WORK OUT THE

08:49AM   8    DOCUMENTS WITH DR. ASIN.  WE INTERFERED WITH HIS PRACTICE THIS

08:50AM   9    WEEK ON A NUMBER OF DAYS, SO I WOULD HATE TO HAVE HIM STAY

08:50AM  10    LONGER THAN REQUIRED BECAUSE WE'RE HAPPY TO GET THE DOCUMENTS

08:50AM  11    TO THE DEFENSE, AND I DON'T THINK THERE WOULD BE AN ISSUE

08:50AM  12    THERE.

08:50AM  13          THE COURT:  OKAY.  ALL RIGHT.

08:50AM  14          MS. TREFZ:  WE WOULD LIKE TO TENDER THEM TO THE

08:50AM  15    COURT SO THAT WE COULD REVIEW THEM.

08:50AM  16          THE COURT:  SHOULD WE DO THAT WITH GREAT FLOURISH OR

08:50AM  17    CAN WE HAVE HIM COME IN SOME TIME WHEN WE ARE OUTSIDE OF THE

08:50AM  18    PRESENCE OF THE JURY.

08:50AM  19          MS. TREFZ:  THAT'S WHY I WAS RAISING IT NOW.

08:50AM  20          MR. LEACH:  I THINK IT BE MORE APPROPRIATE TO DO IT

08:50AM  21    OUTSIDE OF THE PRESENCE OF THE JURY.

08:50AM  22          THE COURT:  WELL, LET'S DO THAT.  OKAY.  THANK YOU.

08:50AM  23     THEN DO WE NEED TO TALK ABOUT THE DOCTOR ANYMORE,

08:50AM  24    POTENTIAL TESTIMONY OR ANYTHING LIKE THAT?  IS THAT ALL

08:50AM  25    RESOLVED?

08:50AM  1          MS. TREFZ:  I THINK THE COURT IS AWARE OF OUR

08:50AM  2    POSITION THAT WE STATED YESTERDAY.  I DON'T WANT TO REHASH

08:50AM  3    THOSE ARGUMENTS.

08:50AM  4          THE COURT:  SURE.  OKAY.

08:50AM  5          MS. TREFZ:  BUT I UNDERSTAND THE GOVERNMENT IS NOT

08:50AM  6    SURE IF THEY'RE GOING TO CALL HIM.  YOU KNOW, WE HAVE A

08:50AM  7    SUBPOENA THAT WE CAN SERVE ON HIM, AND WE CAN CALL HIM IF OUR

08:50AM  8    CASE BEGINS TODAY --

08:51AM  9          THE COURT:  YEAH.

08:51AM  10         MS. TREFZ:  -- IF THEY CHOOSE NOT TO, AND IF WE

08:51AM  11   CHOOSE TO PUT ON A CASE.

08:51AM  12      SO I JUST, I JUST -- I DON'T THINK IT'S NECESSARY TO

08:51AM  13   RESOLVE.  THE GOVERNMENT SAID IT WASN'T SURE WHETHER IT WAS

08:51AM  14   GOING TO CALL HIM STILL, AND SO WE WILL HAVE WAIT TO SEE.

08:51AM  15         THE COURT:  OKAY.  SO IS IT -- MS. TOMPKINS IS IT?

08:51AM  16         MR. LEACH:  YES.

08:51AM  17         MS. TREFZ:  CORRECT.

08:51AM  18         THE COURT:  SHE IS ON THE STAND NOW.  YOU HAVE HER

08:51AM  19   ON CROSS.  I'LL DRAW YOUR ATTENTION TO 789 FED.2D 1315 IN

08:51AM  20   REGARDS TO QUESTIONS REGARDING THE PHYSICIAN.

08:51AM  21      LET ME JUST SAY, YOU CAN ASK HER ABOUT -- UNDER THE

08:51AM  22   EXCEPTION SHE CAN SAY WHAT SHE TOLD THE PHYSICIAN, BUT SHE

08:51AM  23   CAN'T TELL YOU WHAT THE PHYSICIAN TOLD HER.

08:51AM  24      YOU UNDERSTAND THAT?

08:51AM  25         MS. TREFZ:  I UNDERSTAND THE COURT'S RULING.  I

08:51AM  1   BELIEVE THAT I HAVE HAD THE CHANCE TO REFRAME MY QUESTIONS SO

08:51AM  2   THAT THEY WILL BE IN COMPLIANCE, BUT WE WILL SEE I SUPPOSE.

08:51AM  3            THE COURT:  GREAT.  OKAY.

08:51AM  4        ANYTHING FURTHER?

08:51AM  5            MS. TREFZ:  THANK YOU, YOUR HONOR.

08:51AM  6            MR. LEACH:  NO, YOUR HONOR.  THANK YOU, YOUR HONOR.

08:51AM  7            THE COURT:  OKAY.  THANK YOU.  WE MIGHT GET STARTED

08:51AM  8   ON TIME TODAY.

08:51AM  9            MR. LEACH:  WONDERFUL.

08:51AM  10           THE COURT:  GREAT.  THANK YOU.

08:52AM  11      (RECESS FROM 8:52 A.M. UNTIL 9:06 A.M.)

09:06AM  12      (JURY OUT AT 9:06 A.M.)

09:06AM  13           THE COURT:  PLEASE BE SEATED.  THANK YOU FOR YOUR

09:06AM  14  COURTESY.

09:06AM  15      WE'RE BACK ON THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT

09:06AM  16  ARE PRESENT ONCE AGAIN.

09:06AM  17      WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.

09:06AM  18      MR. LEACH, DO YOU HAVE A COMMENT ABOUT THE RECORDS, I

09:06AM  19  THINK?

09:06AM  20           MR. LEACH:  I DO, YOUR HONOR.

09:06AM  21      I'M ADVISED BY THE DEFENSE THAT THEY HAVE SUBPOENAED

09:06AM  22  CERTAIN RECORDS FROM DR. ASIN AND WANTED THEM RETURNED TO THE

09:06AM  23  CLERK.

09:06AM  24      HE'S HERE IN THE COURTROOM AND PREPARED TO DO THAT RIGHT

09:06AM  25  NOW.

09:06AM 1          THE COURT:  ALL RIGHT.  THANK YOU.

09:06AM 2       DR. ASIN, ARE YOU HERE, SIR?

09:06AM 3       YES.  THANK YOU.  COME FORWARD.

09:06AM 4       LET ME ASK YOU TO STATE YOUR NAME AND THEN SPELL IT,

09:06AM 5   PLEASE.

09:06AM 6          THE WITNESS:  GERALD ASIN, A-S-I-N.

09:06AM 7          THE COURT:  THANK YOU.  AND YOU'VE BROUGHT SOME --

09:06AM 8   IT LOOKS LIKE YOU HAVE A MANILA FOLDER OF RECORDS.

09:07AM 9          THE WITNESS:  CORRECT.

09:07AM 10          THE COURT:  AND THOSE ARE HERE PURSUANT TO A

09:07AM 11   SUBPOENA THAT YOU RECEIVED FROM THE DEFENSE?

09:07AM 12          THE WITNESS:  YES.

09:07AM 13          THE COURT:  ALL RIGHT.  WOULD YOU LIKE TO LODGE

09:07AM 14   THOSE WITH THE COURT AT THIS TIME?

09:07AM 15          THE WITNESS:  SURE.

09:07AM 16          THE COURT:  YOU CAN HAND THEM AROUND THE GLASS THERE

09:07AM 17   AND OUR COURTROOM DEPUTY WILL RECEIVE THOSE.  WE'LL KEEP THEM

09:07AM 18   HERE UNDER PROTECTION, AND WE'LL RETURN THEM TO YOU WHEN THEY

09:07AM 19   HAVE CONCLUDED THEIR SERVICE TO THIS CASE.

09:07AM 20       IS THAT ALL RIGHT WITH YOU?

09:07AM 21          THE WITNESS:  YES, SIR.

09:07AM 22       (HANDING.)

09:07AM 23          THE COURT:  ALL RIGHT.  ANYTHING FURTHER, MR. LEACH?

09:07AM 24          MR. LEACH:  NO, YOUR HONOR.

09:07AM 25          THE COURT:  ALL RIGHT.

6818

09:07AM  1          THANK YOU, SIR.  ALL RIGHT.  THANK YOU.

09:07AM  2              THE CLERK:  COURT IS IN RECESS.

09:07AM  3          (RECESS FROM 9:07 A.M. UNTIL 9:15 A.M.)

09:15AM  4          (JURY IN AT 9:15 A.M.)

09:15AM  5              THE COURT:  THANK YOU.  GOOD MORNING.

09:15AM  6      WE ARE ON THE RECORD IN THE HOLMES MATTER.  ALL COUNSEL

09:15AM  7  ARE PRESENT, MS. HOLMES IS PRESENT.  OUR JURY IS PRESENT.

09:15AM  8          GOOD MORNING, LADIES AND GENTLEMEN.

09:15AM  9          BEFORE WE START, LET ME ASK YOU THAT QUESTION AGAIN, AND I

09:15AM 10  APPRECIATE YOUR PATIENCE WITH ME ASKING THIS QUESTION.  DURING

09:15AM 11  THE BREAK, DID ANY OF YOU HAVE CAUSE TO COME ACROSS ANY

09:15AM 12  INFORMATION, SPEAK TO ANYONE OR DO ANY INVESTIGATION ABOUT

09:15AM 13  ANYTHING TO DO WITH THIS CASE?  IF SO, PLEASE RAISE YOUR HAND.

09:15AM 14          AGAIN, I SEE NO HANDS.

09:15AM 15          THANK YOU VERY MUCH, LADIES AND GENTLEMEN.

09:15AM 16          MS. TOMPKINS IS ON THE STAND; IS THAT RIGHT?

09:15AM 17              MR. BOSTIC:  YES, YOUR HONOR.

09:15AM 18              THE COURT:  LET'S ASK HER TO COME IN.

09:15AM 19          AND THEN, MS. TREFZ, YOU WANT TO CONTINUE YOUR

09:15AM 20  CROSS-EXAMINATION?

09:15AM 21              MS. TREFZ:  I DO, YOUR HONOR.  THANK YOU.

09:15AM 22              THE COURT:  GOOD MORNING.

09:15AM 23              THE WITNESS:  GOOD MORNING.

09:15AM 24              THE COURT:  PLEASE TAKE THE SEAT AGAIN IF YOU WOULD,

09:15AM 25  AND AGAIN, MAKE YOURSELF COMFORTABLE.  ADJUST THE CHAIR AND

6819

| | | |
|---|---|---|
| 09:15AM | 1 | MICROPHONE AS YOU NEED.  YOU MAY REMOVE YOUR MASK IF YOU WISH. |
| 09:15AM | 2 | THE WITNESS:  OKAY.  THANK YOU. |
| 09:15AM | 3 | THE COURT:  YOU'RE WELCOME. |
| 09:15AM | 4 | WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE JUST STATE YOUR |
| 09:15AM | 5 | NAME AGAIN, PLEASE. |
| 09:15AM | 6 | THE WITNESS:  MY NAME IS ERIN TOMPKINS. |
| 09:16AM | 7 | THE COURT:  THANK YOU. |
| 09:16AM | 8 | COUNSEL? |
| 09:16AM | 9 | **(GOVERNMENT'S WITNESS, ERIN TOMPKINS, WAS PREVIOUSLY** |
| 09:16AM | 10 | **SWORN.)** |
| 09:16AM | 11 | BY MS. TREFZ: |
| 09:16AM | 12 | Q.  GOOD MORNING, MS. TOMPKINS. |
| 09:16AM | 13 | A.  GOOD MORNING. |
| 09:16AM | 14 | Q.  I JUST HAVE A FEW MORE QUESTIONS FOR YOU TODAY. |
| 09:16AM | 15 | IF WE CAN BRING UP EXHIBIT 5484, WHICH IS AN EXHIBIT, AND |
| 09:16AM | 16 | PLEASE MAKE SURE THAT THE BIRTH DATE IS REDACTED. |
| 09:16AM | 17 | THANK YOU. |
| 09:16AM | 18 | MS. TOMPKINS, DO YOU REMEMBER DISCUSSING THIS TEST WITH |
| 09:16AM | 19 | THE GOVERNMENT YESTERDAY? |
| 09:16AM | 20 | A.  YES. |
| 09:16AM | 21 | Q.  THIS WAS A TEST FROM THIS SUMMER; CORRECT? |
| 09:16AM | 22 | A.  CORRECT. |
| 09:16AM | 23 | Q.  AND WAS THIS A TEST THAT THE GOVERNMENT ASKED YOU TO GET? |
| 09:16AM | 24 | A.  NO. |
| 09:16AM | 25 | Q.  DID -- |

09:16AM  1    A.   I --

09:16AM  2    Q.   GO AHEAD.

09:16AM  3    A.   NO.  I WAS LOOKING FOR ANOTHER TEST TO BRING INTO

09:16AM  4    EVIDENCE, SO --

09:16AM  5    Q.   ANOTHER TEST TO BRING INTO EVIDENCE?

09:16AM  6    A.   UH-HUH.

09:16AM  7    Q.   DID THEY GIVE YOU RECOMMENDATIONS AS TO POTENTIAL PLACES

09:16AM  8    TO GO GET SUCH A TEST?

09:16AM  9    A.   I DID GET HELP FROM ONE OF THE MEMBERS OF THE GROUP IN

09:17AM  10   JUST FINDING LOCATIONS IN THE AREA WHERE I WASN'T FAR IN

09:17AM  11   NORTHERN CALIFORNIA.  AT THE TIME, I DIDN'T KNOW THE AREA.

09:17AM  12   Q.   THAT WAS AGENT HERNANDEZ; IS THAT CORRECT?

09:17AM  13   A.   YES.

09:17AM  14   Q.   OKAY.  DID THEY GIVE YOU -- DID THE GOVERNMENT GIVE YOU

09:17AM  15   RECOMMENDATIONS OF WHAT KIND OF TEST TO GET IN TERMS OF WHETHER

09:17AM  16   IT NEEDED TO BE A PARTICULAR -- RUN ON A PARTICULAR TYPE OF

09:17AM  17   DEVICE OR DRAWN OR TAKEN IN A PARTICULAR METHOD?

09:17AM  18   A.   NO.

09:17AM  19   Q.   AND WHAT METHOD WAS THIS TEST TAKEN BY?

09:17AM  20   A.   THIS IS A SWAB IN THE INSIDE OF THE CHEEK.

09:17AM  21   Q.   YOUR THERANOS TEST IN 2015, WAS THAT TAKEN BY A VEIN DRAW?

09:17AM  22   A.   YES.

09:17AM  23   Q.   OKAY.  I WANTED TO -- WE CAN TAKE THAT EXHIBIT DOWN.

09:17AM  24        IF WE CAN BRING UP 5483.  IF WE CAN GO TO THE PAGE WITH

09:18AM  25   THE FOUR HIV RESULTS, WHICH I THINK IS A COUPLE PAGES IN.

09:18AM   1       THIS -- THANK YOU.  ONE MORE BACK.

09:18AM   2            IF YOU CAN BLOW UP FOR ME, MR. BENNETT, JUST THE HIV

09:18AM   3       PORTION OF THAT.

09:18AM   4            MS. TOMPKINS, DID YOU END UP LEARNING THROUGH ANY

09:18AM   5       CONVERSATIONS WITH EITHER THERANOS OR ANOTHER SOURCE, DID YOU

09:18AM   6       END UP LEARNING ABOUT THE REASON FOR THE FOUR DIFFERENT TESTS?

09:18AM   7       A.   NO.

09:18AM   8       Q.   DID YOU END UP LEARNING ABOUT THE PROCESS OF HIV TESTING?

09:18AM   9       A.   I ATTEMPTED TO GET SOME EDUCATION FROM THERANOS, BUT WAS

09:18AM  10       NOT PROVIDED WITH THAT.

09:18AM  11       Q.   DID YOU HAPPEN TO LEARN ABOUT -- DID THERANOS TELL YOU

09:18AM  12       ABOUT THE CDC ALGORITHM FOR HIV TESTING?

09:19AM  13       A.   NO.

09:19AM  14       Q.   AND LET ME SEE IF I CAN JUST REFRESH YOU A LITTLE BIT.

09:19AM  15            I THINK THAT YOU, I THINK THAT YOU TESTIFIED YESTERDAY

09:19AM  16       THAT YOU HAD A FIRST PHONE CALL WHEN YOU CALLED INTO THERANOS;

09:19AM  17       CORRECT?

09:19AM  18       A.   UH-HUH.

09:19AM  19       Q.   AND I BELIEVE YOU RECALLED THAT THERE WAS -- IT WAS A

09:19AM  20       FEMALE, YOU SAID SHE, A FEMALE CUSTOMER SERVICE REPRESENTATIVE?

09:19AM  21       A.   UH-HUH.

09:19AM  22            THE COURT:  IS THAT YES, MS. TOMPKINS?

09:19AM  23            THE WITNESS:  YES.

09:19AM  24       BY MS. TREFZ:

09:19AM  25       Q.   THANK YOU.  I MAKE THAT MISTAKE AS WELL.

09:19AM 1          WOULD IT REFRESH YOUR RECOLLECTION IF I SAID IT WAS -- WAS

09:19AM 2     IT LAUREN TSUGAWA?

09:19AM 3     A.   I DON'T REMEMBER WITH WHOM I WAS SPEAKING.

09:19AM 4     Q.   THAT'S FINE.  DID YOU ASK HER -- DO YOU RECALL WHETHER YOU

09:19AM 5     ASKED HER FOR A CALL BACK TO EXPLAIN WHY YOU TESTED NONREACTIVE

09:19AM 6     FOR HIV 1 AND 2, NOT DETECTED FOR HIV 1 RNA, BUT NONREACTIVE

09:20AM 7     FOR HIV 1 AND 2?

09:20AM 8     A.   I BELIEVE I DID ASK FOR A CALL BACK.  I WAS HOPING TO GET

09:20AM 9     A FOLLOW-UP CONVERSATION ON WHY THIS WOULD HAPPEN.

09:20AM 10    Q.   AND DO YOU RECALL WHETHER YOU HAD ANOTHER CONVERSATION

09:20AM 11    WITH THERANOS?

09:20AM 12    A.   I DON'T.

09:20AM 13    Q.   YOU DON'T RECALL ONE WAY OR THE OTHER?

09:20AM 14    A.   HUH-UH.

09:20AM 15         THE COURT:  IS THAT NO?  I'M SORRY, MS. TOMPKINS.

09:20AM 16         THE WITNESS:  NO, I DO NOT RECALL.

09:20AM 17         MS. TREFZ:  THANK YOU, YOUR HONOR.

09:20AM 18    Q.   LET ME SEE IF I CAN JUST REFRESH YOUR RECOLLECTION.

09:20AM 19         MAY I APPROACH, YOUR HONOR?

09:20AM 20         THE COURT:  YES.

09:20AM 21    BY MS. TREFZ:

09:20AM 22    Q.   (HANDING.)

09:20AM 23         MS. TOMPKINS, I'VE HANDED YOU WHAT HAS BEEN MARKED AS

09:20AM 24    EXHIBIT 14259.  THIS IS NOT A DOCUMENT THAT YOU ARE ON, BUT I

09:20AM 25    WONDERED IF YOU COULD READ THE DOCUMENT.  IT'S AN EMAIL CHAIN,

09:21AM    1        AND IF YOU CAN READ THE DOCUMENT FROM THE BOTTOM UP AND THEN

09:21AM    2        SEE IF IT REFRESHES -- AND THEN I WILL ASK YOU WHETHER IT

09:21AM    3        REFRESHES YOUR RECOLLECTION.

09:21AM    4            PLEASE DON'T READ ANY PART OF IT OUT LOUD TO THE COURT

09:21AM    5        BECAUSE WE HAVE TO DO VERY SPECIFIC QUESTIONS ON THIS ISSUE.

09:21AM    6        A.   OKAY.

09:21AM    7            (PAUSE IN PROCEEDINGS.)

09:22AM    8                THE WITNESS:  OKAY.

09:22AM    9        BY MS. TREFZ:

09:22AM   10        Q.   SO THEN I'M GOING TO ASK YOU SOME VERY SPECIFIC QUESTIONS,

09:22AM   11        SO, AGAIN, YOU WON'T READ FROM THE DOCUMENT.

09:22AM   12        A.   UH-HUH.

09:22AM   13        Q.   DOES THIS REFRESH YOUR RECOLLECTION THAT YOU -- THAT YOU

09:22AM   14        SPOKE WITH AN INDIVIDUAL NAMED DAN FLOREY FROM THERANOS?

09:22AM   15        A.   THE NAME?  NO.  BUT IT DOES REFRESH THAT THERE WAS A

09:22AM   16        SECOND CONVERSATION.

09:22AM   17        Q.   AND WHAT DO YOU RECALL ABOUT THAT SECOND CONVERSATION?

09:23AM   18        A.   VERY LITTLE.

09:23AM   19        Q.   DOES THIS REFRESH YOUR RECOLLECTION THAT MR. FLOREY WALKED

09:23AM   20        YOU THROUGH THE CDC RECOMMENDATIONS ON TESTING FOR HIV?

09:23AM   21        A.   THE SPECIFICS OF THAT BRIEF CONVERSATION ARE VERY VAGUE TO

09:23AM   22        ME.  I'M OBVIOUSLY JUST RECALLING THAT I HAD IT.

09:23AM   23        Q.   IT WAS A LONG TIME AGO?

09:23AM   24        A.   IT WAS A LONG TIME AGO, YES.

09:23AM   25        Q.   I CAN -- I HAVE ANOTHER DOCUMENT THAT MAY HELP WHETHER

09:23AM  1    YOU -- THAT MAY HELP REFRESH OR MAY NOT.  BUT LET ME TRY ONE

09:23AM  2    MORE, UNLESS YOU'RE STILL THINKING ABOUT THE PRIOR QUESTION?

09:24AM  3    A.   IT'S OKAY.  WE CAN MOVE FORWARD FROM THIS.

09:24AM  4    Q.   OKAY.

09:24AM  5         MAY I APPROACH, YOUR HONOR?

09:24AM  6              THE COURT:  YES.

09:24AM  7    BY MS. TREFZ:

09:24AM  8    Q.   (HANDING.)

09:24AM  9         AND, MS. TOMPKINS, FOR THE RECORD, I'VE HANDED YOU WHAT

09:24AM  10   HAS BEEN MARKED EXHIBIT 12692.  AND, AGAIN, THIS IS GOING TO BE

09:24AM  11   ANOTHER CIRCUMSTANCE WHERE I'M GOING TO JUST POINT YOU TO A

09:24AM  12   PARTICULAR PART.  YOU'RE WELCOME TO LOOK AT WHATEVER YOU NEED

09:24AM  13   IN THE DOCUMENT.  YOU'RE JUST GOING TO READ IT TO YOURSELF, AND

09:24AM  14   THEN WE'LL ASK QUESTIONS TO SEE IF IT REFRESHES YOU.

09:24AM  15        IF I CAN GET YOU TO TURN TO PAGE 7 OF THE DOCUMENT.

09:24AM  16   A.   OKAY.

09:24AM  17   Q.   AND IF YOU CAN -- DO YOU SEE THERE'S A BOX ON THERE,

09:24AM  18   BOX 1, PAGE 7?

09:25AM  19   A.   UH-HUH, YES.

09:25AM  20   Q.   AND IF YOU COULD TAKE A -- READ THROUGH THAT AND THEN,

09:25AM  21   ONCE YOU'RE FINISHED, LET ME KNOW.

09:25AM  22   A.   I DON'T KNOW WHAT P24 AG IS.

09:25AM  23   Q.   THERE'S NO NEED TO READ THE DOCUMENT.  THE SIMPLE QUESTION

09:25AM  24   IS, DOES THIS REFRESH YOUR RECOLLECTION AS TO WHETHER OR NOT

09:25AM  25   YOU WERE TOLD ABOUT THE CDC ALGORITHM FOR HIV TESTING?

09:25AM 1    A.   I DON'T RECOGNIZE THE CONTENTS OF BOX NUMBER 1.

09:25AM 2    Q.   OKAY.  DO YOU -- DOES IT REFRESH YOUR RECOLLECTION ABOUT

09:25AM 3    ANYTHING, LEARNING ANYTHING ABOUT THE CDC ALGORITHM FOR HIV

09:25AM 4    TESTING?

09:25AM 5    A.   WHAT IT REMINDS ME IS THE SAME -- EXCUSE ME.  IT HAS THE

09:26AM 6    SAME NUMBERS AS MY TEST, BUT I DO NOT --

09:26AM 7         (PAUSE IN PROCEEDINGS.)

09:26AM 8              THE WITNESS:  I BELIEVE IN THE CONVERSATION WE

09:26AM 9    SIMPLY DISCUSSED THE COMPONENTS.

09:26AM 10        I DON'T NECESSARILY UNDERSTAND WHAT THIS ALL REPRESENTS.

09:26AM 11   BY MS. TREFZ:

09:26AM 12   Q.   YOU'RE NOT A DOCTOR; RIGHT?

09:26AM 13   A.   CORRECT.

09:26AM 14   Q.   WHAT DO YOU RECALL ABOUT THE COMPONENTS THAT YOU

09:26AM 15   MENTIONED?

09:26AM 16   A.   1, 2, 1 PLUS 2, ACTIVE RNA.  THOSE WERE THE COMPONENTS

09:26AM 17   THAT APPEARED IN MY RESULT.

09:26AM 18   Q.   DID YOU -- SORRY.  DID YOU HAVE AN UNDERSTANDING AS TO

09:26AM 19   WHETHER THE HIV 1 PLUS 2 AB WAS A SCREENING TEST?  EXCUSE ME.

09:27AM 20   OR -- AND THE ADDITIONAL TESTS WERE CONFIRMATORY TESTS?

09:27AM 21   A.   NO.  THAT WAS PART OF WHAT WAS CONFUSING.  THE MORE I

09:27AM 22   LOOKED AT IT, I COULDN'T SEE WHY ALL OF THE INDIVIDUAL

09:27AM 23   COMPONENTS WOULD BE NEGATIVE, BUT ONE OF THE COMBINATION WOULD

09:27AM 24   BE POSITIVE.

09:27AM 25   Q.   AND DID YOU END UP ASKING DR. ASIN FOR ADVICE ON THAT

09:27AM 1    QUESTION?

09:27AM 2    A.   I DON'T RECALL.

09:27AM 3    Q.   AND I JUST WANTED TO HIGHLIGHT HERE.  SO HERE IT SAYS HIV

09:27AM 4    1 PLUS 2 AB AS REACTIVE.

09:27AM 5        AND IF WE CAN BRING BACK UP 5484 FOR A SECOND AND JUST

09:27AM 6    HIGHLIGHT THE NEGATIVE THERE.

09:27AM 7    A.   UH-HUH.

09:27AM 8    Q.   AND JUST TO BE CLEAR, THE, THE -- 5483, YOUR TEST FROM

09:28AM 9    THERANOS, THE FIRST LEVEL, OR THE HIV 1 PLUS 2 AB WAS REACTIVE,

09:28AM 10   AND THIS TEST SAYS NEGATIVE; CORRECT?

09:28AM 11   A.   CORRECT.

09:28AM 12           MS. TREFZ:  YOUR HONOR, I WOULD LIKE TO SEEK TO

09:28AM 13   ADMIT EXHIBIT 12692, WHICH IS A PUBLIC RECORD.

09:28AM 14       AND FOR THE BENEFIT OF COUNSEL AND THE COURT, I WOULD JUST

09:28AM 15   NOTE THAT THE ONLY PART THAT I AM INTERESTED IN DISPLAYING IS

09:28AM 16   NUMBER 7, PAGE 7.

09:28AM 17           MR. BOSTIC:  YOUR HONOR, I WOULD OBJECT UNDER 401,

09:28AM 18   702, AND AUTHENTICATION.

09:29AM 19           THE COURT:  ARE YOU ASKING FOR JUST PAGE 7 TO BE

09:29AM 20   INTRODUCED?

09:29AM 21           MS. TREFZ:  I AM, YOUR HONOR.

09:29AM 22       AND I BELIEVE THIS SHOULD BE A SELF-AUTHENTICATING

09:29AM 23   DOCUMENT.  IT'S FROM THE CDC'S WEBSITE.

09:29AM 24           THE COURT:  AND UNDER 401, THIS WITNESS CAN'T SAY

09:29AM 25   ANYTHING ABOUT THIS.  YOU'VE ALREADY EXAMINED HER ON THAT.

6827

09:29AM 1         MS. TREFZ:  I UNDERSTAND.  BUT IN LIGHT OF POTENTIAL

09:29AM 2   ADDITIONAL EVENTS, I BELIEVE THAT IT IS RELEVANT TO

09:29AM 3   UNDERSTANDING THE ACCURACY AND --

09:29AM 4         THE COURT:  OKAY.  I'LL ADMIT IT.  PAGE 7 IS

09:29AM 5   ADMITTED.

09:29AM 6         MS. TREFZ:  THANK YOU.

09:29AM 7         THE COURT:  AND IT CAN BE PUBLISHED.

09:29AM 8    (DEFENDANT'S EXHIBIT 12692, PAGE 7, WAS RECEIVED IN

09:29AM 9   EVIDENCE.)

09:29AM 10         MS. TREFZ:  IF WE CAN PUBLISH PAGE 7.  THANK YOU.

09:29AM 11  Q.   AND, MS. TOMPKINS, DO YOU SEE HERE -- IS THIS PAGE 7 OF

09:29AM 12  THE DOCUMENT THAT I HAD HANDED YOU THAT WE WERE JUST --

09:30AM 13  A.   BOX 1 AT THE TOP, PAGE 7, YES.

09:30AM 14  Q.   THANK YOU.

09:30AM 15    AND DO YOU SEE AT THE TOP IT SAYS RECOMMENDED LABORATORY

09:30AM 16  HIV TESTING ALGORITHM FOR SERUM OR PLASMA SPECIMENS?

09:30AM 17  A.   OKAY.  YES, I SEE THAT.

09:30AM 18  Q.   THANK YOU.

09:30AM 19    AND DO YOU SEE THAT THE FIRST LEVEL IS HIV 1/2

09:30AM 20  ANTIGEN/ANTIBODY COMBINATION IMMUNOASSAY?

09:30AM 21  A.   UH-HUH.

09:30AM 22         THE COURT:  IS THAT YES?

09:30AM 23         THE WITNESS:  YES, I DO.

09:30AM 24  BY MS. TREFZ:

09:30AM 25  Q.   AND DO YOU HAVE AN UNDERSTANDING AS TO WHETHER THAT WAS

6828

```
09:30AM   1      THE HIV 1 PLUS 2 AB THAT YOU SAW IN YOUR THERANOS TEST RESULT?

09:30AM   2              MR. BOSTIC:  OBJECTION.  FOUNDATION.

09:30AM   3              THE COURT:  SUSTAINED.

09:31AM   4      BY MS. TREFZ:

09:31AM   5      Q.   AND DO YOU SEE THAT THERE'S AN ARROW POINTING TO A PLUS

09:31AM   6      SIGN THERE ON THE PAGE?

09:31AM   7      A.   I DO, YES.

09:31AM   8      Q.   AND DO YOU SEE THAT IF THE ARROW, THAT IF THERE'S AN ARROW

09:31AM   9      POINTING FROM THE PLUS SIDE TO A FURTHER IDENTIFICATION HIV 1,

09:31AM  10      HIV 2, ANTIBODY DIFFERENTIATION IMMUNOASSAY?

09:31AM  11      A.   I DO SEE THAT, YES.

09:31AM  12      Q.   AND WE ALREADY DISCUSSED YOU DON'T KNOW THE MEANING OF

09:31AM  13      THESE PARTICULAR STEPS; CORRECT?

09:31AM  14      A.   CORRECT.

09:31AM  15      Q.   AND DO YOU SEE THAT THERE ARE VARIOUS POTENTIAL OPTIONS,

09:31AM  16      ARROWS COMING OUT FROM THAT STEP?

09:31AM  17      A.   YES.

09:31AM  18      Q.   AND DO YOU SEE ON THE PLUS -- ON THE BOTTOM OF THE BOX ON

09:31AM  19      THE LEFT IT INDICATES -- THE PLUS SIGN INDICATES A REACTIVE

09:31AM  20      TEST RESULT AND THE NEGATIVE INDICATES A NONREACTIVE TEST

09:32AM  21      RESULT?

09:32AM  22      A.   I DO SEE THAT, YES.

09:32AM  23      Q.   AND THEN IF WE GO OVER TO THE RIGHT-HAND SIDE, DO YOU SEE

09:32AM  24      THAT IT SAYS HIV-1 NEGATIVE OR INDETERMINATE, AND HIV-2

09:32AM  25      NEGATIVE?
```

| | | |
|---|---|---|
| 09:32AM | 1 | A.   YES. |
| 09:32AM | 2 | Q.   AND DO YOU ALSO SEE THAT IF THAT HAPPENS, THEN THERE'S AN |
| 09:32AM | 3 | ARROW POINTING DOWN TO HIV 1 NAT? |
| 09:32AM | 4 | A.   I DO SEE THAT, YES. |
| 09:32AM | 5 | Q.   AND DO YOU SEE THAT ON THE RIGHT-HAND SIDE THERE'S AN |
| 09:32AM | 6 | ARROW POINTING DOWN THAT SAYS HIV 1 NAT NEGATIVE?  AND -- |
| 09:32AM | 7 | DO YOU SEE THAT?  I'M SORRY. |
| 09:32AM | 8 | A.   YES, I SEE THAT. |
| 09:32AM | 9 | Q.   AND DO YOU SEE THAT IT SAYS UNDER THAT, NEGATIVE FOR HIV? |
| 09:32AM | 10 | A.   YES. |
| 09:32AM | 11 | Q.   AND IS THAT THE END OF THE BOX? |
| 09:33AM | 12 | A.   YES. |
| 09:33AM | 13 | Q.   AND IF WE CAN COME OUT OF THE BOX AND COME DOWN TO -- AND |
| 09:33AM | 14 | JUST SHOW THERE ARE A BUNCH OF NUMBERS ON THE BOTTOM. |
| 09:33AM | 15 | DO YOU SEE THAT NUMBER 1 SAYS, "LABORATORIES SHOULD |
| 09:33AM | 16 | CONDUCT INITIAL TESTING FOR HIV WITH AN FDA-APPROVED |
| 09:33AM | 17 | ANTIGEN/ANTIBODY COMBINATION IMMUNOASSAY THAT DETECTS HIV-1 AND |
| 09:33AM | 18 | HIV-2 ANTIBODIES AND HIV-1 P24 ANTIGEN TO SCREEN FOR |
| 09:33AM | 19 | ESTABLISHED INFECTION WITH HIV-1 OR HIV-2 AND FOR ACUTE HIV-1 |
| 09:33AM | 20 | INFECTION." |
| 09:33AM | 21 | AND DO YOU SEE THAT SECTION? |
| 09:33AM | 22 | A.   I DO SEE THAT, YES. |
| 09:33AM | 23 | Q.   AND DO YOU SEE THAT "NO FURTHER TESTING IS REQUIRED FOR |
| 09:33AM | 24 | SPECIMENS THAT ARE NONREACTIVE TO THE INITIAL IMMUNOASSAY"? |
| 09:34AM | 25 | DO YOU SEE THAT IT SAYS THAT? |

09:34AM  1     A.   YES.

09:34AM  2     Q.   AND THEN DO YOU SEE IN NUMBER 2 IT SAYS, "SPECIMENS WITH A

09:34AM  3     REACTIVE ANTIGEN/ANTIBODY COMBINATION IMMUNOASSAY RESULT (OR

09:34AM  4     REPEATEDLY REACTIVE, IF REPEAT TESTING IS RECOMMENDED BY THE

09:34AM  5     MANUFACTURER OR REQUIRED BY REGULATORY AUTHORITIES) SHOULD BE

09:34AM  6     TESTED," WITH FURTHER STEPS.

09:34AM  7          DO YOU SEE THAT?

09:34AM  8     A.   "SHOULD BE TESTED WITH" -- I'M CONTINUING THE SENTENCE

09:34AM  9     WHERE SHE STOPPED.  IT SAYS, "SHOULD BE TESTED WITH AN

09:34AM  10    FDA-APPROVED ANTIBODY IMMUNOASSAY THAT DIFFERENTIATES HIV-1

09:34AM  11    ANTIBODIES FROM HIV-2 ANTIBODIES."

09:34AM  12    Q.   THANK YOU.

09:34AM  13         AND THAT'S -- THOSE ARE ALL OF THE QUESTIONS THAT I HAVE

09:34AM  14    ON THAT PARTICULAR DOCUMENT.

09:35AM  15         GIVE ME JUST A SECOND AND I MAY BE DONE.

09:35AM  16         DO YOU KNOW, FROM YOUR PHONE CALL WITH THERANOS, WHETHER

09:35AM  17    HIV TESTING AT THERANOS WAS RUN ON FDA CLEARED COMMERCIALLY

09:35AM  18    AVAILABLE TESTS, METHODS?

09:35AM  19    A.   BASED ON THE CONVERSATION, I WOULD SAY I ASSUMED ALL OF

09:35AM  20    THE EQUIPMENT WAS FDA APPROVED.

09:35AM  21    Q.   OKAY.

09:35AM  22         NO FURTHER QUESTIONS, YOUR HONOR.

09:35AM  23              MR. BOSTIC:  NO FURTHER QUESTIONS, YOUR HONOR.

09:35AM  24    THANK YOU.

09:35AM  25              THE COURT:  MAY THIS WITNESS BE EXCUSED?

| | | |
|---|---|---|
| 09:35AM | 1 | MR. BOSTIC:  YES, YOUR HONOR. |
| 09:35AM | 2 | MS. TREFZ:  YES, YOUR HONOR. |
| 09:35AM | 3 | THE COURT:  YOU'RE EXCUSED. |
| 09:35AM | 4 | THE WITNESS:  THANK YOU VERY MUCH. |
| 09:35AM | 5 | THE COURT:  YOU CAN LEAVE.  YES.  THANK YOU. |
| 09:36AM | 6 | DOES THE GOVERNMENT HAVE ANOTHER WITNESS TO CALL? |
| 09:36AM | 7 | MR. SCHENK:  YES, YOUR HONOR. |
| 09:36AM | 8 | THE UNITED STATES CALLS MARK BURNES. |
| 09:36AM | 9 | THE COURT:  I'M SORRY? |
| 09:36AM | 10 | MR. SCHENK:  MARK BURNES. |
| 09:36AM | 11 | THE COURT:  GOOD MORNING, SIR.  IF YOU WOULD PLEASE |
| 09:36AM | 12 | COME FORWARD.  I'LL INVITE YOU TO STAND IN FRONT OF OUR |
| 09:36AM | 13 | COURTROOM DEPUTY. |
| 09:36AM | 14 | AND WHEN YOU DO, IF YOU WOULD RAISE YOUR RIGHT HAND, SHE |
| 09:36AM | 15 | HAS A QUESTION FOR YOU. |
| 09:36AM | 16 | THE WITNESS:  GOOD MORNING. |
| 09:36AM | 17 | **(GOVERNMENT'S WITNESS, MARK BURNES, WAS SWORN.)** |
| 09:36AM | 18 | THE WITNESS:  I DO, YES. |
| 09:36AM | 19 | THE COURT:  THANK YOU, SIR.  PLEASE HAVE A SEAT |
| 09:36AM | 20 | HERE.  MAKE YOURSELF COMFORTABLE. |
| 09:36AM | 21 | PLEASE ADJUST THAT CHAIR AND MICROPHONE AS YOU NEED. |
| 09:37AM | 22 | I'LL ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE MICROPHONE. |
| 09:37AM | 23 | WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME |
| 09:37AM | 24 | AND THEN SPELL IT, PLEASE. |
| 09:37AM | 25 | THE WITNESS:  DR. MARK BURNES.  M-A-R-K, |

09:37AM  1      B-U-R-N-E-S.

09:37AM  2                 THE COURT:  THANK YOU.  COUNSEL.

09:37AM  3                       **DIRECT EXAMINATION**

09:37AM  4      BY MR. SCHENK:

09:37AM  5      Q.   GOOD MORNING, DR. BURNES.

09:37AM  6           I UNDERSTAND THAT YOU'RE GOING TO TESTIFY TODAY WITH A

09:37AM  7      MASK ON.  NOTICE NEXT TO THE WIPES ON THE WITNESS STAND, THERE

09:37AM  8      IS A BOX WITH CLEAR MASKS.

09:37AM  9           YOUR HONOR, MAY I APPROACH?

09:37AM  10                 THE COURT:  YES, THANK YOU.

09:37AM  11          MR. SCHENK IS GOING TO GET THAT FOR YOU.  SO WE'LL ASK

09:37AM  12     YOU, SIR, TO CHANGE YOUR MASK TO THIS CLEAR MASK, IF YOU WOULD,

09:38AM  13     PLEASE.

09:38AM  14          AND FOR THE RECORD, WE HAVE CLEAR MASKS AVAILABLE IN THE

09:38AM  15     COURT HERE, AND DR. BURNES HAS AFFIXED HIS CLEAR MASK WITH

09:38AM  16     THAT.

09:38AM  17          MR. DOWNEY, ANY OBJECTION TO THIS?

09:38AM  18                 MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

09:38AM  19                 THE COURT:  ALL RIGHT.  THANK YOU.

09:38AM  20                 MR. SCHENK:  MAY I, YOUR HONOR?

09:38AM  21                 THE COURT:  YES.

09:38AM  22     BY MR. SCHENK:

09:38AM  23     Q.   DR. BURNES, WHAT TYPE OF MEDICINE DO YOU PRACTICE?

09:38AM  24     A.   INTERNAL MEDICINE.

09:38AM  25     Q.   AND DO YOU HAVE A PRACTICE OF YOUR OWN?

09:38AM  1    A.   YES.

09:38AM  2    Q.   AND WHERE IS THAT PRACTICE LOCATED?

09:38AM  3    A.   GOODYEAR, ARIZONA.

09:38AM  4    Q.   AND WOULD YOU BRIEFLY DESCRIBE YOUR EDUCATIONAL BACKGROUND

09:38AM  5    TO THE JURY?

09:38AM  6    A.   UNDERGRADUATE WAS ACTUALLY HERE IN SANTA CLARA.  I

09:38AM  7    GRADUATED IN 1978.

09:38AM  8         THEN I WENT TO POST GRADUATE SCHOOL AT THE UNIVERSITY OF

09:39AM  9    ARIZONA IN ABOUT THE 1984 TIMEFRAME.

09:39AM 10         THEN I WENT TO ST. LOUIS UNIVERSITY IN ST. LOUIS, MISSOURI

09:39AM 11    MEDICAL SCHOOL FROM 1985/'86 UNTIL I GRADUATED IN 1989.

09:39AM 12         THEN RESIDENCY HERE -- NOT HERE -- IN PHOENIX, ARIZONA IN

09:39AM 13    INTERNAL MEDICINE, AND COMPLETED THAT IN 1992.

09:39AM 14    Q.   AND AFTER YOUR RESIDENCY, DID YOU OPEN YOUR PRACTICE?

09:39AM 15    A.   YES.

09:39AM 16    Q.   AND YOU'VE BEEN WORKING AT THAT PRACTICE EVER SINCE?

09:39AM 17    A.   YES.

09:39AM 18    Q.   AS PART OF YOUR PRACTICE, HAVE YOU BECOME FAMILIAR WITH A

09:39AM 19    BLOOD TEST THAT IS KNOWN AS A PSA TEST?

09:39AM 20    A.   YES.

09:39AM 21    Q.   AND WHAT DOES PSA STAND FOR?

09:39AM 22    A.   PROSTATE SPECIFIC ANTIGEN.

09:39AM 23    Q.   AND WHAT DOES THE PSA TEST TEST FOR?

09:39AM 24    A.   IT'S AN INDICATOR TO SUGGEST SUSPICION FOR POSSIBLE

09:39AM 25    PROSTATE CANCER.

09:39AM  1    Q.   IN THE COURSE OF YOUR PRACTICE, HAVE YOU HAD EXPERIENCE

09:40AM  2    INTERPRETING PSA TEST RESULTS?

09:40AM  3    A.   YES.

09:40AM  4    Q.   AND DO YOU HAVE AN ESTIMATE OF THE NUMBER OF TIMES OR THE

09:40AM  5    NUMBER OF TESTS THAT YOU'VE INTERPRETED?

09:40AM  6    A.   OVER 10,000.

09:40AM  7    Q.   AND YOU SAID THAT IT'S AN INDICATOR FOR THE POSSIBLE

09:40AM  8    PRESENCE OF PROSTATE CANCER; IS THAT RIGHT?

09:40AM  9    A.   YES.

09:40AM  10   Q.   AND DO YOU HAVE AN ESTIMATE OF THE NUMBER OF PATIENTS

09:40AM  11   YOU'VE TREATED FOLLOWING A POSITIVE OR A POSSIBLE INDICATION OF

09:40AM  12   PROSTATE CANCER?

09:40AM  13   A.   ROUGHLY, OVER THE LAST 30 YEARS, ABOUT 200 PATIENTS WITH

09:40AM  14   PROSTATE CANCER.

09:40AM  15   Q.   DID YOU RECEIVE TRAINING IN MEDICAL SCHOOL ON THE PSA

09:40AM  16   TEST?

09:40AM  17   A.   YES.

09:40AM  18   Q.   AND WOULD YOU JUST BRIEFLY DESCRIBE FOR US WHAT THAT

09:40AM  19   INVOLVED?

09:40AM  20   A.   IT'S PART OF THE STANDARD COURSES TO EDUCATE YOU ON THE

09:41AM  21   INTERPRETATION OF TESTS, AS WELL AS THEIR LIMITATIONS.

09:41AM  22          MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS

09:41AM  23   DR. BURNES AS AN EXPERT IN THE AREA OF DIAGNOSING PROSTATE

09:41AM  24   CANCER, THE BLOOD TEST FOR PSA, AND INTERPRETING PSA TEST

09:41AM  25   RESULTS.

09:41AM   1                    MS. TREFZ:  NO OBJECTION, YOUR HONOR.

09:41AM   2                    THE COURT:  ALL RIGHT.  THANK YOU.

09:41AM   3          THIS WITNESS MAY TESTIFY, LADIES AND GENTLEMEN, BECAUSE OF

09:41AM   4    HIS BACKGROUND, EXPERIENCE, AND EDUCATION AS AN EXPERT ON THESE

09:41AM   5    AREAS.  YOU'LL BE INFORMED IN THE FINAL INSTRUCTIONS AS TO HOW

09:41AM   6    YOU MAY TREAT THIS TESTIMONY.

09:41AM   7          THANK YOU.

09:41AM   8                    MR. SCHENK:  THANK YOU, YOUR HONOR.

09:41AM   9    Q.   DR. BURNES, THROUGHOUT YOUR TIME RUNNING THIS PRACTICE IN

09:41AM   10   ARIZONA, DID YOU BECOME FAMILIAR WITH A BLOOD TESTING COMPANY

09:41AM   11   KNOWN AS THERANOS?

09:41AM   12   A.   YES.

09:41AM   13   Q.   DID YOU HAVE A PATIENT BY THE NAME OF MEHRL ELLSWORTH?

09:41AM   14   A.   YES.

09:41AM   15   Q.   AND IS THAT M-E-R-H-L, AND THE LAST NAME

09:41AM   16   E-L-L-S-W-O-R-T-H?

09:41AM   17   A.   YES, I BELIEVE THAT'S PRETTY CLOSE.  THAT'S HIS NAME.

09:42AM   18   Q.   THANK YOU.

09:42AM   19          WAS THERE A TIME WHEN YOU SUGGESTED TO -- IS IT

09:42AM   20   DR. ELLSWORTH?

09:42AM   21   A.   YES.  HE'S A RETIRED DENTIST.

09:42AM   22   Q.   WAS THERE A TIME WHEN YOU SUGGESTED TO DR. ELLSWORTH THAT

09:42AM   23   HE HAVE A PSA BLOOD TEST?

09:42AM   24   A.    IT WAS NOT MY SUGGESTION AT THAT PARTICULAR TIME.  WE

09:42AM   25   ROUTINELY PERFORM EXAMS SUCH AS THAT ON PHYSICALS ABOUT ONCE

09:42AM 1     EVERY YEAR OR TWO.

09:42AM 2         I DON'T KNOW IF YOU WANT ME TO GO INTO THE SPECIFICS OF

09:42AM 3     THE LAB TESTING QUESTION, BUT IT WAS NOT -- IT WAS ORIGINATED

09:42AM 4     BY HIS CHURCH ACTUALLY, THEIR REQUEST.

09:42AM 5     Q.   I SEE.  DR. ELLSWORTH'S CHURCH ASKED HIM TO GET A PSA TEST

09:42AM 6     AND YOU ADVISED HIM WHERE TO GO?

09:42AM 7     A.   YES.

09:42AM 8     Q.   AND WHERE DID YOU ADVISE DR. ELLSWORTH TO GO FOR THE TEST?

09:42AM 9     A.   HE WAS GOING TO BE OUT OF THE COUNTRY FOR TWO YEARS AND

09:42AM 10    THEY REQUIRE IT AS PART OF THE SERVICE FOR MISSIONARY WORK TO

09:43AM 11    OBTAIN THE TEST JUST BEFORE HE DEPARTED, AND IT WAS OUT OF THE

09:43AM 12    NORMAL SEQUENCE, SO I SENT HIM TO THERANOS BECAUSE IT WOULD BE

09:43AM 13    LESS EXPENSIVE FOR HIM TO GET THE TEST DONE.

09:43AM 14    Q.   YOU SAID IT WAS OUT OF SEQUENCE.  WHAT DO YOU MEAN BY

09:43AM 15    THAT?

09:43AM 16    A.   NORMALLY WE DO THOSE EVERY YEAR OR TWO WITH PHYSICALS.  IT

09:43AM 17    WAS -- BUT WE WERE DOING A SPECIFIC TEST FOR HIM AS PART OF

09:43AM 18    HIS -- THAT WAS REQUIRED BY HIS MISSIONARY WORK AS I RECALL.

09:43AM 19    Q.   YOU SAID YOU USUALLY DO "THOSE."  WERE YOU REFERRING TO

09:43AM 20    PSA TESTS?

09:43AM 21    A.   YES, ALONG WITH THE OTHER TESTS WE DO ANNUALLY, OR TWICE A

09:43AM 22    YEAR, OR ABOUT ONCE EVERY TWO YEARS.

09:43AM 23    Q.   THANK YOU.

09:43AM 24        YOUR HONOR, MAY I APPROACH?

09:43AM 25            THE COURT:  YES.

09:43AM   1    BY MR. SCHENK:

09:43AM   2    Q.   (HANDING.)

09:43AM   3        DR. BURNES, I'VE HANDED YOU A BINDER, AND IF YOU'LL OPEN

09:43AM   4    UP THE BINDER TO THE SECOND TAB IN THE BINDER.  IT'S

09:44AM   5    EXHIBIT 4938.

09:44AM   6        YOUR HONOR, THE GOVERNMENT OFFERS 4938 PURSUANT TO

09:44AM   7    STIPULATION.

09:44AM   8            MS. TREFZ:  THAT'S CORRECT, YOUR HONOR.

09:44AM   9            THE COURT:  IT'S RECEIVED, ADMITTED, AND IT MAY BE

09:44AM   10   PUBLISHED.

09:44AM   11       (GOVERNMENT'S EXHIBIT 4938 WAS RECEIVED IN EVIDENCE.)

09:44AM   12           THE WITNESS:  OKAY.  I'M AT THAT SECTION NOW.

09:44AM   13           THE COURT:  IT MAY BE PUBLISHED.

09:44AM   14       THIS IS A MULTIPAGE DOCUMENT?

09:44AM   15           MR. SCHENK:  YES, YOUR HONOR.  THANK YOU.

09:44AM   16       IF WE CAN START ON PAGE 7 OF THIS EXHIBIT.

09:44AM   17   Q.   DR. BURNES, THE EXHIBIT WILL ALSO DISPLAY ON THE SCREEN IN

09:44AM   18   FRONT OF YOU.  IF THAT'S EASIER TO --

09:44AM   19   A.   NO.  THE LIGHTING IN HERE IS PRETTY GOOD.

09:44AM   20   Q.   OKAY.  JUST LET ME KNOW IF YOU'RE HAVING DIFFICULTY SEEING

09:44AM   21   ONE OF THE TWO AND WE'LL DO WHAT WE CAN.

09:44AM   22   A.   OKAY.  I'M ON PAGE 7.

09:44AM   23   Q.   ON PAGE 7 -- FIRST OF ALL, DO YOU RECOGNIZE THIS DOCUMENT?

09:44AM   24   A.   YES.

09:44AM   25   Q.   AND WHAT IS THIS?

09:44AM   1      A.   THIS IS A LAB RESULT FROM THERANOS.

09:44AM   2      Q.   FOR WHICH PATIENT?

09:44AM   3      A.   ELLSWORTH, MEHRL.

09:44AM   4      Q.   OKAY.  AND ON THE VERY TOP THERE'S A FAX HEADER.

09:45AM   5           DO YOU SEE THAT?

09:45AM   6      A.   YES.

09:45AM   7      Q.   IT SAYS MAY 16, 2015.

09:45AM   8           DO YOU SEE THAT?

09:45AM   9      A.   YES.

09:45AM   10     Q.   IS IT YOUR ROUTINE PRACTICE AT YOUR MEDICAL PRACTICE TO

09:45AM   11     RECEIVE LAB RESULTS FROM THE LAB VIA FAX?

09:45AM   12     A.   YES.

09:45AM   13     Q.   AND DO YOU KNOW WHETHER THIS LAB RESULT WAS FAXED TO YOUR

09:45AM   14     OFFICE?

09:45AM   15     A.   YES.

09:45AM   16     Q.   AND YOUR LAB OFFICE WAS LOCATED IN ARIZONA; IS THAT RIGHT?

09:45AM   17     A.   YES.

09:45AM   18     Q.   IF WE COULD NOW GO DOWN.

09:45AM   19           DO YOU SEE VISIT DATE?

09:45AM   20     A.   I APOLOGIZE.

09:45AM   21           YES, UH-HUH.

09:45AM   22     Q.   AND WHAT IS THE VISIT DATE?

09:45AM   23     A.   I'M SORRY, I NEED MY PHONE TO GET MY LIGHT OUT HERE.

09:46AM   24     Q.   YOUR HONOR, I BROUGHT A FLASHLIGHT.  MAY I APPROACH?

09:46AM   25              THE COURT:  YES.

09:46AM 1    BY MR. SCHENK:

09:46AM 2    Q.   (HANDING.)

09:46AM 3    A.   THE VISIT DATE WAS MAY 14TH, 2015.

09:46AM 4    Q.   OKAY.  AND A LITTLE BIT BELOW THAT WE SEE A TEST SCORE.

09:46AM 5    IT SAYS FOR THE PROSTATE SPECIFIC ANTIGEN TOTAL, AND THEN THE

09:46AM 6    RESULT.

09:46AM 7         DO YOU SEE THE RESULT?

09:46AM 8    A.   YES.

09:46AM 9    Q.   AND WHAT IS THE RESULT?

09:46AM 10   A.   26.1.

09:46AM 11   Q.   AND IN YOUR EXPERIENCE, WHAT DOES THAT MEAN?  WHAT DOES

09:46AM 12   THE SCORE INFORM THE PHYSICIAN WHEN THE PHYSICIAN LOOKS AT A

09:46AM 13   PSA SCORE?

09:46AM 14   A.   PART OF IT IS THE TOTAL VALUE OF IT, HOW IMPORTANT IT

09:46AM 15   MIGHT BE.  BUT MOSTLY WE TRACK DATA POINTS OVER TIME WITH

09:46AM 16   PATIENTS, AND WHAT WE'RE LOOKING FOR IS A SIGNIFICANT RISE FROM

09:47AM 17   ONE YEAR TO THE NEXT.

09:47AM 18   Q.   EXPLAIN --

09:47AM 19   A.   THAT WOULD INVOKE US TO LOOK AT THIS MORE CLOSELY IN THE

09:47AM 20   UPCOMING YEAR.

09:47AM 21   Q.   HELP ME TO UNDERSTAND THAT.  YOU SAID SOME OF IT IS THE

09:47AM 22   TOTAL SCORE AND SOME OF IT IS THE RISE?

09:47AM 23   A.   IT HAS OCCURRED A COUPLE TIMES WHERE A BRAND NEW PATIENT

09:47AM 24   HASN'T SEEN A DOCTOR FOR A NUMBER OF YEARS WOULD COME IN AND WE

09:47AM 25   DRAW A TEST AND IT WOULD BE QUITE HIGH, SO I HAVE NO REFERENCE

09:47AM  1    VALUE FOR THE RATE OF RISE.

09:47AM  2         SO IF IT WAS IN THE NORMAL RANGE, AS ON THE SLIDE OF

09:47AM  3    LESSON 4, THEN I WOULDN'T BE TOO SUSPICIOUS.  IF IT WAS QUITE

09:47AM  4    HIGH AND HAD NO PREVIOUS TRACKING, THEN I'M NOT SURE -- IT

09:47AM  5    WOULD BE A LITTLE MORE DIFFICULT TO DECIDE WHERE TO GO FROM

09:47AM  6    THERE.

09:47AM  7    Q.   I SEE.  SO YOU MIGHT NOT WANT TO LOOK AT ONE INDIVIDUAL

09:47AM  8    PSA RESULT, YOU WANT TO LOOK AT A COLLECTION OF THEM OR A

09:47AM  9    TREND?

09:47AM  10   A.   THAT IS OUR PREFERENCE.

09:47AM  11   Q.   YOU ALSO SAID SOMETHING ABOUT THE NUMBER 4.  WHAT DID YOU

09:47AM  12   MEAN BY THAT?

09:47AM  13   A.   YOU'LL SEE ON THE LAB DOCUMENTS MOST LAB TESTS, STANDARD

09:48AM  14   RANGE THAT IS IDENTIFIED AS NORMAL FOR A PSA IS LESS 4 AND --

09:48AM  15   OH, THEY'LL HAVE A STANDARD RANGE OF ABOUT 4-NANOGRAMS PER

09:48AM  16   DECILITER.  IF THE TEST IS ABOVE THAT, IF THE RESULT IS ABOVE

09:48AM  17   THAT 4, IT WILL BE FLAGGED AS HIGH, BUT WE DON'T USUALLY PAY

09:48AM  18   ATTENTION TO THAT.

09:48AM  19        WHAT WE USUALLY PAY ATTENTION TO IS THE RATE OF RISE OVER

09:48AM  20   TIME.  SO A PSA WOULD NORMALLY RISE SLOWLY FOR MOST MALE

09:48AM  21   PATIENTS OVER THE YEARS, AND IF WE SEE A DOUBLING AND TRIPLING,

09:48AM  22   THEN THAT MAKES US LOOK INTO IT FURTHER.

09:48AM  23        THAT'S HOW WE USUALLY USE IT.  WE DON'T USUALLY USE AN

09:48AM  24   ISOLATED NUMBER BY ITSELF.

09:48AM  25   Q.   WHEN YOU SAW THAT DR. ELLSWORTH'S SCORE WAS A 26, DO YOU

BURNES DIRECT BY MR. SCHENK

09:49AM   1    KNOW HOW THAT COMPARED TO PRIOR PSA SCORES FOR DR. ELLSWORTH?

09:49AM   2    A.   IT WAS MARKEDLY HIGHER.

09:49AM   3    Q.   I'M SORRY, IT WAS WHAT?

09:49AM   4    A.   IT WAS MARKEDLY HIGHER.

09:49AM   5    Q.   OKAY.  SO USING THAT SORT OF TREND ANALYSIS THAT YOU'VE

09:49AM   6    DESCRIBED TO US, WHAT INFORMATION DOES THIS SCORE THEN PROVIDE?

09:49AM   7    A.   IT REQUIRED US TO VALIDATE IF THAT WAS A CORRECT VALUE.

09:49AM   8    Q.   AND HOW DO YOU DO THAT?

09:49AM   9    A.   FIRST IS SIMPLY TO REPEAT THE TEST.

09:49AM  10    Q.   OKAY.  COULD WE GO DOWN?  TOWARDS THE BOTTOM OF THIS

09:49AM  11    DOCUMENT THERE'S SOME HANDWRITING ON IT.

09:49AM  12         DO YOU SEE THAT?

09:49AM  13    A.   YES.

09:49AM  14    Q.   COULD YOU READ -- FIRST, IS THAT YOUR HANDWRITING?

09:49AM  15    A.   THE PART I WILL BE READING, YES.

09:49AM  16    Q.   COULD YOU READ THAT?

09:49AM  17    A.   "VERY SIGNIFICANT RISE, RECHECK, MAYBE LAB ERROR."

09:50AM  18    Q.   AND THEN TO THE RIGHT OF THAT THERE'S A STAMP.

09:50AM  19         DO YOU SEE THAT?

09:50AM  20    A.   YES.

09:50AM  21    Q.   AND COULD YOU EXPLAIN THE STAMP TO THE JURY?

09:50AM  22    A.   IT'S A STANDARD STAMP THAT WE USE WHEN WE RECEIVE OUTSIDE

09:50AM  23    LAB RESULTS.  THE FIRST PART IS INITIALLED BY THE MEDICAL

09:50AM  24    ASSISTANT USUALLY WHO INITIALS IT AND THE DATE THAT WE RECEIVED

09:50AM  25    IT.

09:50AM   1        AND THEN THE NEXT IS MY INITIAL WHEN I SAW IT AND REVIEWED

09:50AM   2   IT, AND THEN IF IT'S A NORMAL VALUE, I MIGHT JUST WRITE NORMAL

09:50AM   3   OR WHATEVER.

09:50AM   4        AND THE LAST PART IS NOTIFICATION.  SO EITHER -- AND

09:50AM   5   WHOEVER INITIALS THAT, EITHER MY MEDICAL ASSISTANT FOR THE

09:50AM   6   NORMAL VALUES, OR MYSELF IF IT'S ABNORMAL, THEN I'LL DIRECTLY

09:50AM   7   CONTACT THE PATIENT AND DISCUSS IT WITH THEM.

09:50AM   8        AND THAT LAST ONE IS THE SIGNIFICANT OR INITIAL SHOWING

09:50AM   9   THE DATE THAT I NOTIFIED THE PATIENT.

09:50AM  10   Q.   ALL RIGHT.  IF YOU'LL NOW TURN TO PAGE 6 IN THIS EXHIBIT,

09:51AM  11   EXHIBIT 4938, PAGE 6.

09:51AM  12        DO YOU RECOGNIZE THIS DOCUMENT?

09:51AM  13   A.   YES.

09:51AM  14   Q.   AND WHAT IS THIS?

09:51AM  15   A.   THIS IS ANOTHER LAB TEST FROM THERANOS.

09:51AM  16   Q.   OKAY.  LET'S LOOK AT THE -- AGAIN, IS THERE A FAX HEADER

09:51AM  17   AT THE TOP?

09:51AM  18   A.   YES.

09:51AM  19   Q.   WAS THIS DOCUMENT FAXED TO YOUR OFFICE JUST LIKE THE LAST

09:51AM  20   ONE?

09:51AM  21   A.   YES.

09:51AM  22   Q.   WHAT IS THE VISIT DATE?

09:51AM  23        DO YOU SEE THAT?

09:51AM  24   A.   VISIT DATE IS MAY 18TH, 2015.

09:51AM  25   Q.   SO IS THAT FOUR DAYS AFTER THE 26, THE SCORE OF 26 THAT WE

09:51AM 1     JUST SAW?

09:51AM 2     A.   YES.

09:51AM 3     Q.   AND NOW, WHAT IS THE SCORE ON THIS ONE?  DO YOU SEE IN THE

09:51AM 4     SECOND BOX THERE'S SOMETHING CALLED PSA TOTAL?

09:51AM 5     A.   THE SCORE IS 1.71.

09:51AM 6     Q.   IF WE COULD ZOOM OUT AND ZOOM IN ON PSA TOTAL.  THANK YOU.

09:52AM 7          SO THE FIRST TEST THAT WE SAW WAS A 26.

09:52AM 8          IS THAT RIGHT?

09:52AM 9     A.   YES.

09:52AM 10    Q.   AND NOW WE HAVE A SCORE OF 1.71.  HELP ME UNDERSTAND WHAT

09:52AM 11    THAT INFORMATION IS PROVIDING YOU.  WHAT ARE YOU LEARNING?

09:52AM 12    A.   THAT VALUE IS MORE CONSISTENT AS THE TRACKING WE EXPECTED

09:52AM 13    FOR DR. ELLSWORTH BASED ON PREVIOUS TESTS.

09:52AM 14    Q.   OKAY.  BELOW THAT BOX THERE IS SOME HANDWRITING.

09:52AM 15         DO YOU SEE THAT?

09:52AM 16    A.   YES.

09:52AM 17    Q.   IS THIS ALSO YOUR HANDWRITING?

09:52AM 18    A.   YES.

09:52AM 19    Q.   COULD YOU READ THAT TO THE JURY?

09:52AM 20    A.   IT SAYS, "MAY 19, 2015, D/W," WHICH MEANS DISCUSSED WITH,

09:52AM 21    "THERANOS, CLEARLY SOME FORM OF LAB ERROR OCCURRED AND WILL

09:53AM 22    WORK WITH THEM TO MAKE THIS RIGHT FOR PATIENT.  MOST LIKELY

09:53AM 23    TESTING IS IN ERROR FROM MAY 14TH."

09:53AM 24    Q.   AND JUST TO COMPLETE IT, IT LOOKS LIKE ABOUT THE THIRD

09:53AM 25    LINE OF YOUR NOTES WHERE YOU READ, "MAKE THIS RIGHT FOR

09:53AM 1      PATIENT," DOES IT THEN CONTINUE "AND CONFIRM ACCURACY"?

09:53AM 2      A.   YES.  I'M SORRY I DIDN'T SEE THAT.

09:53AM 3           "RIGHT FOR PATIENT AND CONFIRM ACCURACY."

09:53AM 4      Q.   OKAY.  SO IN HERE YOU WROTE "DISCUSS WITH THERANOS."

09:53AM 5           WHAT DOES THAT MEAN?

09:53AM 6      A.   WE CALLED -- I CONTACTED THEIR ORGANIZATION AND I ENDED UP

09:53AM 7      TALKING TO I BELIEVE IT WAS A REGIONAL LAB DIRECTOR ABOUT THE

09:54AM 8      ISSUE.

09:54AM 9      Q.   AND WHAT DO YOU RECALL FROM THAT CONVERSATION?

09:54AM 10          FIRST, DO YOU RECALL THE NAME OF THE PERSON YOU SPOKE

09:54AM 11     WITH?

09:54AM 12     A.   NO.

09:54AM 13     Q.   AND WHAT DO YOU RECALL FROM THE CONVERSATION?

09:54AM 14     A.   WE HAD A DISCUSSION ABOUT THE FACT THAT WE HAD TWO WIDELY

09:54AM 15     VARIANT VALUES AND WE WANTED TO GET THIS SQUARED AWAY FOR THE

09:54AM 16     PATIENT BEFORE HE LEFT FOR TWO YEARS.

09:54AM 17          SO I ASKED THAT THEY WOULD REPEAT THE TEST A THIRD TIME,

09:54AM 18     AND I'D FEEL A LITTLE BIT MORE COMFORTABLE IF THE THIRD TEST

09:54AM 19     WAS IN AN EXPECTED RANGE.

09:54AM 20          AND THEN I ASKED -- SINCE IT SEEMED TO BE A LAB ERROR OR A

09:54AM 21     DISCREPANCY WITH THEIR LAB, I ASKED IF THEY WOULD ASSUME THE

09:54AM 22     COST FOR REPEAT TESTING AS OPPOSED TO THE PATIENT PAYING FOR IT

09:54AM 23     AGAIN.

09:54AM 24          AND THEY AGREED TO THAT.

09:54AM 25     Q.   OKAY.  IF WE PAUSE FOR A MOMENT ON THIS EXHIBIT, 4938, AND

09:54AM  1    I'M GOING TO ASK YOU TO TURN TO THE FIRST EXHIBIT IN YOUR

09:54AM  2    BINDER, THAT'S 4415?

09:54AM  3    A.   SAME SECTION OR THE FIRST SECTION?

09:55AM  4    Q.   THE FIRST TAB AT THE VERY BEGINNING OF THE BINDER.

09:55AM  5    A.   OKAY.

09:55AM  6    Q.   AND YOU'RE NOT ON THIS EMAIL.

09:55AM  7         YOUR HONOR, THE GOVERNMENT OFFERS 4415 AS -- UNDER 803.

09:55AM  8    THE COURT HEARD PRIOR 803(6) TESTIMONY FROM DR. ROSENDORFF ON

09:55AM  9    SEPTEMBER 24TH, FROM MS. CHEUNG ON SEPTEMBER 14TH AND 15TH,

09:55AM  10   DR. DAS LAST WEEK ON NOVEMBER 10TH, AND FROM MR. EDLIN ON

09:55AM  11   OCTOBER 19TH, AIL PROVIDING THE FOUNDATION FOR THIS.

09:55AM  12        MS. TREFZ:  OBJECTION.  802.  I BELIEVE, DATE-WISE,

09:55AM  13   THIS IS -- I BELIEVE DATE-WISE THIS IS NOT COVERED BY ANY OF

09:55AM  14   THOSE PRIOR DISCUSSIONS.

09:56AM  15        THE COURT:  MR. SCHENK, YOU'RE SUGGESTING THAT THE

09:56AM  16   PREVIOUS TESTIMONY THAT YOU INDICATED PROVIDES AMPLE FOUNDATION

09:56AM  17   FOR THIS DOCUMENT?

09:56AM  18        MR. SCHENK:  YES, YOUR HONOR.

09:56AM  19        THE COURT:  THANK YOU.

09:56AM  20   I'LL OVERRULE THE OBJECTION AND ADMIT THE DOCUMENT.  THE

09:56AM  21   TOTALITY OF THE PAGES OF THE DOCUMENT ARE ADMITTED.

09:56AM  22        MR. SCHENK:  THANK YOU, YOUR HONOR.

09:56AM  23        THE COURT:  THEY MAY BE PUBLISHED.

09:56AM  24   (GOVERNMENT'S EXHIBIT 4415 WAS RECEIVED IN EVIDENCE.)

09:56AM  25        MR. SCHENK:  IF NOW WE CAN BRING UP EXHIBIT 4415,

09:56AM   1    STARTING ON PAGE 8.

09:56AM   2          THE WITNESS:  IS THAT THE SECOND SECTION?

09:56AM   3    BY MR. SCHENK:

09:56AM   4    Q.   IT'S STILL THE VERY FIRST TAB IN THE BINDER, 4415, AND

09:56AM   5    I'LL BE READING FROM PAGE 8, THE BOTTOM EMAIL FROM MS. AGUIRRE.

09:56AM   6          IF WE CAN BLOW THAT UP.

09:56AM   7          ON MAY 19TH, 2015, MS. AGUIRRE WRITES TO AN EMAIL GROUP

09:57AM   8    CALLED LAB RERUNS AND A COUPLE OTHER EMPLOYEES.

09:57AM   9          "GOOD MORNING,

09:57AM  10          "DR. MARK BURNES CALLED TO SAY THAT THE RESULTS FOR THE

09:57AM  11    PSA, TOTAL WERE VERY HIGH ON 5/14 SO HE HAD HIS PATIENT COME

09:57AM  12    BACK TO TEST AGAIN AND THE RESULTS FOR THE PSA, TOTAL WERE

09:57AM  13    NORMAL ON 5/18."

09:57AM  14          IF WE CAN TURN THE PAGE.

09:57AM  15          LET ME FIRST ASK, DR. BURNES, IS THAT WHAT WE JUST

09:57AM  16    REVIEWED?  YOU SAID THAT YOU CALLED, YOUR PATIENT,

09:57AM  17    DR. ELLSWORTH, HAD VERY HIGH RESULTS ON MAY 14TH AND NORMAL

09:57AM  18    FOUR DAYS LATER ON MAY 18TH?

09:57AM  19    A.   YES.

09:57AM  20    Q.   IF WE COULD NOW TURN TO THE NEXT PAGE, PAGE 9, 4415,

09:57AM  21    PAGE 9.

09:57AM  22          AT THE VERY TOP THIS CONTINUES.  "BECAUSE OF THIS, HE IS

09:58AM  23    NOT CONVINCED THAT THE RESULTS FOR 5/14 BELONG TO HIS PATIENT,"

09:58AM  24    AND ON THE VERSION ON THE SCREEN THE NAME IS REDACTED BUT THE

09:58AM  25    JURY NOW KNOWS IT'S DR. ELLSWORTH, "AND COULD POSSIBLY BELONG

09:58AM 1    TO ANOTHER PATIENT.

09:58AM 2        "HE WANTS TO BE ASSURED THAT THE RESULTS FROM 5/18 ARE

09:58AM 3    CORRECT FOR HIS PATIENT SO HE IS REQUESTING A RERUN OF THE PSA,

09:58AM 4    TOTAL FOR 5/14 IF POSSIBLE BUT DEFINITELY A RERUN FOR THE PSA,

09:58AM 5    TOTAL FROM 5/18."

09:58AM 6        I'LL PAUSE.  DR. BURNES, IS THAT YOUR RECOLLECTION THAT

09:58AM 7    YOU HAD A CONCERN ABOUT THE ACCURACY AND WANTED TO HAVE THE

09:58AM 8    TEST RUN AGAIN?

09:58AM 9    A.   YES.

09:58AM 10   Q.   THE EMAIL CONTINUES, "HE," THAT'S YOU, DR. BURNES, "ALSO

09:58AM 11   WOULD LIKE THE PATIENT TO BE REIMBURSED FOR THE TEST ON 5/14/15

09:58AM 12   SINCE HE THINKS IT'S INCORRECT.

09:58AM 13       "HE REQUESTED A CALL FROM LAB SUPERVISOR AFTER THE RERUN

09:58AM 14   RESULTS ARE BACK."

09:59AM 15       AND THERE'S A CALL BACK NUMBER PROVIDED.

09:59AM 16       AND IF WE NOW GO FURTHER UP IN THE EMAIL ON PAGE 7.

09:59AM 17   A.   SO TWO PAGES FORWARD?

09:59AM 18   Q.   YES, SIR.  THERE'S AN EMAIL FROM DANIEL YOUNG TO A GROUP

09:59AM 19   OF INDIVIDUALS AND THE LAB RERUN GROUP.

09:59AM 20       AND IT READS, "IT LOOKS LIKE ON 5/15, THE ORIGINAL SAMPLE

09:59AM 21   WAS RERUN CONFIRMING THE HIGH RESULT (29 AND 26)," IS THAT

09:59AM 22   NANOGRAMS PER MILLILITER?

09:59AM 23   A.   YES.

09:59AM 24   Q.   "RESPECTIVELY."

09:59AM 25       "TINA -- I SEE THREE RESULTS FOR 5/19.  TWO LOW, AND 1

09:59AM    1    HIGH.  DO YOU KNOW WHAT IS GOING ON HERE?"

09:59AM    2        DID I READ THIS CORRECTLY?

09:59AM    3    A.   I DON'T UNDERSTAND THIS EMAIL.  I'M UNFAMILIAR WITH IT.

09:59AM    4    Q.   I APPRECIATE THAT.  I'M JUST WONDERING IF I READ IT

10:00AM    5    ACCURATELY.

10:00AM    6    A.   YES, YOU DID.

10:00AM    7    Q.   THANK YOU.  IF YOU'LL NOW TURN TO PAGE 4 OF THIS EMAIL, A

10:00AM    8    FEW PAGES AHEAD.

10:00AM    9        THERE'S ANOTHER EMAIL FROM DANIEL YOUNG, ALSO ON MAY 19TH,

10:00AM   10    2015, AND IT READS, "PLEASE SEND REPORT WITH UPDATED RESULT.

10:00AM   11        "CHRISTIAN DOES NOT DO THOSE CALLS ANYMORE.  DAN FLOREY

10:00AM   12    HELPS WITH THESE NOW.

10:00AM   13        "DAN - WE DON'T KNOW WHY THE FIRST SAMPLE CAME BACK SO

10:00AM   14    HIGH.  IT WAS ACTUALLY RERUN, AND CONFIRMED HIGH ORIGINALLY.  A

10:00AM   15    SAMPLE MIXUP IS POSSIBLE AS THE DOCTOR SUGGESTED, BUT HARD TO

10:00AM   16    CONFIRM AT THIS POINT."

10:00AM   17        DR. BURNES, DID YOU SUGGEST TO THERANOS THAT YOU THOUGHT

10:00AM   18    ONE EXPLANATION FOR THE VERY HIGH RESULT FOR DR. ELLSWORTH WAS

10:00AM   19    THAT THERE WAS A SAMPLE MIXUP, THAT YOU RECEIVED RESULTS THAT

10:00AM   20    BELONGED TO A DIFFERENT PATIENT?

10:01AM   21    A.   I DON'T RECALL THAT WAS THE REASON.  I SIMPLY THOUGHT IT

10:01AM   22    WAS AN INACCURATE TEST.

10:01AM   23    Q.   YOUR MEMORY IS THAT -- YOUR CONCERN WAS THAT IT WAS AN

10:01AM   24    INACCURATE TEST AND NOT A SAMPLE MIXUP?  IS THAT WHAT YOU'RE

10:01AM   25    SAYING?

10:01AM  1    A.   I WAS LEANING TOWARDS THAT.

10:01AM  2    Q.   OKAY.  IF WE COULD NOW GO AHEAD ONE PAGE TO PAGE 3 AND

10:01AM  3    START AT THE BOTTOM.

10:01AM  4         THERE'S AN EMAIL FROM DAN FLOREY AND HE WRITES, "DANIEL

10:01AM  5    AND TEAM.

10:01AM  6         "THIS PATIENT VISITED FOR A THIRD TIME LAST WEEK, AND

10:01AM  7    AGAIN THE PSA CAME BACK ELEVATED.  CAN YOU PLEAD REVIEW THE

10:01AM  8    CASE?  THE DOCTOR WOULD LIKE A CALL ASAP PER THE SALES REP."

10:01AM  9         DR. BURNES, YOU -- WE REVIEWED TWO LAB REPORTS, BOTH FROM

10:01AM 10    MID-MAY 2015.

10:01AM 11         DO YOU RECALL THAT?

10:01AM 12    A.   YES.

10:01AM 13    Q.   AND DID YOU ASK DR. ELLSWORTH TO GO GET A THIRD TEST AFTER

10:01AM 14    THE SECOND?

10:01AM 15    A.   YES.

10:01AM 16    Q.   THE EMAIL CONTINUES BELOW THE PART THAT IS UP FOR THE

10:02AM 17    JURY, THERE ARE TWO LINES HERE AND THEN WE'LL CONTINUE TO THE

10:02AM 18    TOP OF THE NEXT PAGE.  THESE TWO LINES READ 5/14, AND THEN

10:02AM 19    THERE'S AN I.D. NUMBER, 26.1; 5/18, PSA 1.71.

10:02AM 20         DR. BURNES, WERE THOSE THE TWO PSA, TOTAL SCORES THAT WE

10:02AM 21    JUST REVIEWED?

10:02AM 22    A.   YES.

10:02AM 23    Q.   AND NOW IF WE'LL GO TO THE TOP OF PAGE 4 AND CAPTURE THE

10:02AM 24    END OF THIS EMAIL.  THE TOP OF PAGE 4.

10:02AM 25         THE VERY TOP OF THIS EMAIL SHOWS THE THIRD TEST RESULT,

10:02AM  1      JUNE 11, A PSA SCORE OF 22.8.

10:02AM  2          DR. BURNES, DO YOU RECALL A THIRD THERANOS PSA TEST FOR

10:02AM  3      DR. ELLSWORTH THAT RETURNED A VALUE OF 22.8?

10:03AM  4      A.   YES.

10:03AM  5      Q.   NOW, IF WE GO BACK IN THE EMAIL, LET'S START AT THE VERY

10:03AM  6      BOTTOM OF PAGE 2 AND JUST CAPTURE WHO SENT THE EMAIL, BUT WE'LL

10:03AM  7      READ AT THE TOP OF PAGE 3, THE VERY BOTTOM OF PAGE 2.

10:03AM  8          MR. BALWANI, SUNNY BALWANI, WRITES AN EMAIL JUNE 15, 2015.

10:03AM  9      NOW TURN THE PAGE TO PAGE 3 TO CAPTURE THE TEXT.

10:03AM 10          MR. BALWANI WRITES, "TINA.  CAN YOU INVESTIGATE THIS.

10:03AM 11          "DANIEL.  I DO NOT BELIEVE SAMPLE MIXUP IS POSSIBLE BY A

10:03AM 12      REMOTE SHOT IN OUR SYSTEM BUT SINCE THE MOST RECENT VISIT IS ON

10:03AM 13      6/11 AND SHOULD HAVE THE SAMPLE IN OUR LABS, WE SHOULD BE ABLE

10:03AM 14      TO CHECK THE LABEL ON SAMPLE ACROSS THE ENTIRE SYSTEMS.  WE

10:03AM 15      SHOULD START BY RERUNNING THE SAMPLE TO START AND THE WORK

10:03AM 16      BACKWARDS FROM THERE.

10:04AM 17          "TINA.  CAN YOU PLEASE OWN THIS AND UPDATE ME IN REALTIME.

10:04AM 18          MAX.  CAN U FREE UP YOUR TIME AND START TRACKING THIS

10:04AM 19      SAMPLE AND MAKE SURE EVERYTHING CHECKS OUT THERE.  HAVE SOMEONE

10:04AM 20      PHYSICALLY LOOK AT LABELS TO MAKE SURE LABELS MATCH WITH WHAT

10:04AM 21      WAS DRAWN AT PSC AND THE ONE PRINTED IN LAB, IF PRINTED IN LAB.

10:04AM 22      PLEASE UPDATE IN REAL TIME."

10:04AM 23          NOW, DR. BURNES, IF YOU WILL TURN TO PAGE 2, THERE'S AN

10:04AM 24      EMAIL FROM DANIEL YOUNG.

10:04AM 25          MR. YOUNG WRITES, "THE MOST RECENT SAMPLE WAS FLAGGED FOR

10:04AM  1    HEMOLYSIS AND CLOTTING.  THIS SAMPLE WAS USED FOR THE PSA

10:04AM  2    RESULT.

10:04AM  3         "PSA FROM VISITS 1 AND 3 WERE RUN ON EDISON.  VISIT 2 WAS

10:04AM  4    RUN IN PHOENIX.

10:05AM  5         "THIS IS LOOKING LIKE EITHER A SAMPLE INTEGRITY ISSUE, OR

10:05AM  6    SOME OTHER INTERFERANT IN THE PATIENT SAMPLE AFFECTED THE PSA

10:05AM  7    TEST ON EDISON."

10:05AM  8         DR. BURNES, WHEN YOU WERE RECEIVING TEST RESULTS FROM

10:05AM  9    THERANOS, DID YOU KNOW ON WHAT DEVICE THERANOS WAS RUNNING THE

10:05AM  10   TESTS?

10:05AM  11   A.   I WAS TOLD IT WAS A DEVICE IN SCOTTSDALE USUALLY.

10:05AM  12   Q.   YOU WERE TOLD BY WHOM?

10:05AM  13   A.   THE REPRESENTATIVE FROM THERANOS.

10:05AM  14   Q.   AND YOU USED THE WORD "USUALLY."  WHAT DO YOU MEAN BY

10:05AM  15   THAT?

10:05AM  16   A.   AS FAR AS I KNOW, THEY HAD TESTING SITES IN SCOTTSDALE

10:05AM  17   WHERE THEY SENT THE LABS FROM THE WALGREENS.

10:05AM  18   Q.   SO IT WAS YOUR UNDERSTANDING THAT THE RESULTS THAT YOU

10:05AM  19   WERE REVIEWING FOR DR. ELLSWORTH'S TESTS WERE RUN IN ARIZONA?

10:05AM  20   A.   I ASSUMED THAT.

10:05AM  21   Q.   AND NOW IF WE CAN TURN TO THE FIRST PAGE OF THIS

10:06AM  22   EXHIBIT 4415, PAGE 1.

10:06AM  23        WE'LL START AT THE BOTTOM.

10:06AM  24        MR. BALWANI WRITES, "IF IT IS THEN WE SHOULD EXPLAIN THIS

10:06AM  25   TO THE DOC."

10:06AM   1          IF WE MOVE UP ONE EMAIL, MR. FLOREY WRITES, "SUNNY.

10:06AM   2          "DANIEL AND I WERE ABLE TO CONNECT WITH DR. BURNES.  THE

10:06AM   3   CALL WAS POSITIVE AND THE DOCTOR CALLED OUR PLAN TO REDRAW THE

10:06AM   4   GUEST AFTER HE RETURNS FROM VACATION IN TWO WEEKS 'SOLID.'

10:06AM   5   DANIEL DISCUSSED THE SPECIMEN INTEGRITY ISSUES WITH HIM, WHICH

10:06AM   6   SATISFIED HIM.  HE WAS TALKATIVE, SHARED THAT HE LIKES OUR COST

10:06AM   7   AND REALLY APPRECIATES THAT WE SET OUT TO TAKE A SMALLER AMOUNT

10:06AM   8   OF BLOOD THAN LABCORP, WHO HE HAS USED FOR 20 PLUS YEARS.

10:06AM   9   BASED ON THE GOOD THINGS HE SAID ABOUT OUR SALES REP (JESSICA)

10:06AM   10  I EXPECT THAT WHEN WE WRAP THIS CASE UP IN A COUPLE OF WEEKS IT

10:06AM   11  WILL REALLY STRENGTHEN THE RELATIONSHIP."

10:06AM   12         DR. BURNES, DOES THIS PARAGRAPH SUMMARIZE A CONVERSATION

10:07AM   13  THAT YOU RECALL HAVING WITH SOMEONE FROM THERANOS?

10:07AM   14  A.   I DON'T RECALL EXACTLY, BUT THE TONE OF IT WAS LIKE THIS.

10:07AM   15  IT WAS VERY POSITIVE AND THEY WERE PLEASANT.

10:07AM   16  Q.   GREAT.  AND IF WE CAN GO TO THE VERY TOP OF THE EMAIL.

10:07AM   17         DR. BURNES, DO YOU SEE AT THE VERY TOP WHERE SOMEONE NAMED

10:07AM   18  SUNNY BALWANI FORWARDS THIS EMAIL CHAIN TO ELIZABETH HOLMES ON

10:07AM   19  JUNE 15TH, 2015?

10:07AM   20  A.   YES.

10:07AM   21  Q.   IF WE CAN NOW GO BACK TO THE PREVIOUS EXHIBIT, WHICH IS

10:07AM   22  4938, AND WE'LL START ON PAGE 5.

10:07AM   23         DR. BURNES, DO YOU RECOGNIZE THIS DOCUMENT?

10:07AM   24  A.   YES.

10:07AM   25  Q.   AND WHAT IS THIS?

10:07AM  1    A.    IT'S ANOTHER LAB RESULT FROM THERANOS.

10:07AM  2    Q.    AND DO YOU SEE THE VISIT DATE?

10:08AM  3    A.    THE VISIT DATE IS JUNE 11TH, 2015.

10:08AM  4    Q.    DR. BURNES, IS THIS THE THIRD THERANOS TEST RESULT, THE

10:08AM  5    THIRD IN TIME?

10:08AM  6    A.    YES.

10:08AM  7    Q.    AND WHAT WAS THE PSA TOTAL STORE THIS TIME?

10:08AM  8    A.    22.8.

10:08AM  9    Q.    SO AM I RIGHT THE FIRST WAS 26, AND THEN 1.7, AND NOW

10:08AM 10    WE'RE SEEING A SCORE OF 22?

10:08AM 11    A.    YES.

10:08AM 12    Q.    WHEN YOU RECEIVED THIS RESULT, DID YOU REACH OUT TO

10:08AM 13    THERANOS AS WE SAW IN THAT EMAIL CHAIN AND HAVE A CONVERSATION?

10:08AM 14    A.    YES.

10:08AM 15    Q.    AFTER YOU RECEIVED THIS RESULT, WHAT WAS THE NEXT STEP

10:08AM 16    THAT YOU THOUGHT WAS APPROPRIATE TO TAKE?

10:08AM 17    A.    WELL, I WAS BECOMING MORE CONCERNED ABOUT THE TEST, SO I

10:09AM 18    ACTUALLY ASKED TO TALK TO THEIR NATIONAL LAB DIRECTOR, WHICH

10:09AM 19    THEY DIRECTLY AND KINDLY DID.

10:09AM 20    Q.    AND WHAT DO YOU RECALL ABOUT THAT CONVERSATION?

10:09AM 21    A.    BASICALLY I WAS EXPRESSING SOME LACK OF CONFIDENCE ON THE

10:09AM 22    RESULTS WITH THIS -- THE NEW TESTING, THE WAY IT WAS BEING

10:09AM 23    DONE, AND I ASKED, TO RESOLVE, FOR THE PATIENT TO DO A FOURTH

10:09AM 24    PSA THE TRADITIONAL WAY, AND IF THEY WOULD PAY FOR THE LAB, AND

10:09AM 25    THEY AGREED TO THAT.

10:09AM  1    Q.   AND WHAT DO YOU MEAN "THE TRADITIONAL WAY"?

10:09AM  2    A.   YOU KNOW, SENDING IT OUT TO A -- IF THEY CAN DO IT IN

10:09AM  3    HOUSE OR SEND IT TO LABCORP, THE TRADITIONAL WAYS PSA'S WERE

10:09AM  4    DONE, NOT THE FINGER POKE.

10:09AM  5    Q.   NOT THE?

10:09AM  6    A.   NOT THE FINGERSTICK.  I WANTED IT TO BE DONE BY WHATEVER

10:09AM  7    TRADITIONAL WAY IT WAS NORMALLY DONE.

10:09AM  8    Q.   I SEE.  AND IF WE CAN GO TO THE BOTTOM OF THIS DOCUMENT.

10:10AM  9         THIS VERSION OF THE LAB TEST HAS A SECTION CALLED

10:10AM 10    PERFORMING SITE.

10:10AM 11         DO YOU SEE THAT?

10:10AM 12         SORT OF IN THE BOTTOM, THE BOTTOM LEFT.

10:10AM 13    A.   OH, YEP, I SEE IT NOW.

10:10AM 14         SO IT SAYS, "NEWARK - 7373 GATEWAY BOULEVARD, NEWARK

10:10AM 15    CALIFORNIA."

10:10AM 16    Q.   NOW, IF WE CAN TURN TO PAGE 4 -- I'M SORRY, PAGE 4, ONE

10:10AM 17    PAGE PRIOR.

10:10AM 18         DO YOU RECOGNIZE THIS DOCUMENT?

10:10AM 19    A.   YES.

10:10AM 20    Q.   WHAT IS THIS?

10:10AM 21    A.   IT'S A LAB RESULT FROM THERANOS.

10:10AM 22    Q.   DO YOU SEE THE VISIT DATE?

10:10AM 23    A.   THE VISIT DATE IS JUNE 30TH, 2015.

10:11AM 24    Q.   DR. BURNES, IS THIS NOW THE FOURTH THERANOS PSA TEST FOR

10:11AM 25    MR. -- FOR DR. ELLSWORTH?

10:11AM   1      A.   YES.

10:11AM   2      Q.   AND WHAT IS THE PSA TOTAL SCORE THIS TIME?

10:11AM   3      A.   OH, OKAY.  BEAR WITH ME.  I'M STRUGGLING.  I HAVE A VERY

10:11AM   4   NARROW FOCUS OF VISION.

10:11AM   5           I SEE THE PSA TOTAL INTERPRETIVE DATA, PSA ANTIGEN TOTAL.

10:11AM   6      Q.   DR. BURNES, IT'S ON THE SCREEN IN FRONT OF YOU IF IT'S

10:11AM   7   EASIER.  IT'S HIGHLIGHTED.

10:11AM   8      A.   OH.  0.9 I BELIEVE.

10:12AM   9      Q.   DID YOU SAY 0.9?

10:12AM  10      A.   I SHOULD BE ABLE TO SEE IT ON HERE.  LET ME GET THE

10:12AM  11   RIGHT -- I APOLOGIZE FOR STRUGGLING WITH THIS.

10:12AM  12      Q.   NO APOLOGY NEEDED.

10:12AM  13           YOUR HONOR, MAY I APPROACH?

10:12AM  14               THE COURT:  YES.

10:12AM  15               THE WITNESS:  YES, I SEE THE PSA TOTAL THERE.

10:12AM  16           OH, I'M LOOKING DOWN HERE.  OKAY.

10:12AM  17   BY MR. SCHENK:

10:12AM  18      Q.   (INDICATING.)

10:12AM  19      A.   0.95.

10:12AM  20      Q.   THANK YOU.

10:12AM  21           AND THEN AT THE BOTTOM AGAIN WE SEE A KEY WITH A TEST

10:12AM  22   PROCESSED LOCATION.

10:12AM  23           DO YOU SEE THAT?  WAS THE TEST PROCESSED AT THERANOS

10:13AM  24   LABORATORIES IN SCOTTSDALE, ARIZONA?

10:13AM  25      A.   YES.

10:13AM  1    Q.   SO THE FOURTH DRAW IS ONE THAT YOU DESCRIBED AS WANTING TO

10:13AM  2    BE PERFORMED THROUGH TRADITIONAL METHODS; IS THAT RIGHT?

10:13AM  3    A.   YES.

10:13AM  4    Q.   NOW THAT YOU RECEIVED THIS FOURTH RESULT, HOW DID YOU FEEL

10:13AM  5    ABOUT THE STATE OF DR. ELLSWORTH'S HEALTH?

10:13AM  6    A.   I FELT MORE REASSURED THAT THAT WAS THE CORRECT VALUE.

10:13AM  7    Q.   OKAY.  I WANT TO SHOW YOU JUST A COUPLE OTHER DOCUMENTS.

10:13AM  8         IF YOU'LL NOW TURN TO PAGE 3.  PAGE 3 APPEARS TO BE

10:13AM  9    ANOTHER -- ARE YOU THERE?

10:13AM  10   A.   YES.

10:13AM  11   Q.   -- ANOTHER THERANOS LAB TEST THAT WAS FAXED TO YOUR OFFICE

10:13AM  12   NOW IN MARCH OF 2016.

10:13AM  13        DO YOU SEE THAT?

10:13AM  14   A.   I SEE MARCH 29TH, 2016.

10:14AM  15   Q.   AND IT SAYS IN THE CAPTION THAT "THIS REPORT CONTAINS

10:14AM  16   CORRECTED RESULTS."

10:14AM  17        DO YOU SEE THAT?

10:14AM  18   A.   WHERE WOULD I BE LOOKING AT?

10:14AM  19   Q.   JUST TO THE RIGHT OF THE WORD "THEY."

10:14AM  20   A.   YES, OKAY, I SEE THAT.

10:14AM  21   Q.   AND THEN IF WE GO INTO THE BOX THAT IS LABELLED PROSTATE

10:14AM  22   SPECIFIC ANTIGEN TOTAL, THE SCORE NOW READS "VOID 26.2."

10:14AM  23        DO YOU SEE THAT?

10:14AM  24   A.   YES.

10:14AM  25   Q.   AND BELOW THAT "PROSTATE SPECIFIC ANTIGEN TOTAL AS

10:14AM  1    PREVIOUSLY REPORTED IS VOIDED AND THIS RESULT SHOULD NOT BE

10:14AM  2    USED OUT OF AN ABUNDANCE OF CAUTION.  REDRAW IS RECOMMENDED AS

10:14AM  3    CLINICALLY INDICATED."

10:15AM  4         WHAT INFORMATION DID YOU UNDERSTAND WAS BEING COMMUNICATED

10:15AM  5    TO YOU THROUGH THIS DOCUMENT?

10:15AM  6    A.   FORMAL DOCUMENTATION THAT THAT LAB TEST ON MAY 14TH, 2015,

10:15AM  7    ABOUT NINE MONTHS BEFORE, WAS INVALID.

10:15AM  8    Q.   AT THE BOTTOM OF THIS DOCUMENT THERE'S A KEY, AND THE

10:15AM  9    FIRST ENTRY INFORMS THAT THE TEST WAS PROCESSED AT THERANOS

10:15AM  10   LABORATORIES IN NEWARK, CALIFORNIA.

10:15AM  11        DO YOU SEE THAT?

10:15AM  12   A.   I SEE INTERPRETIVE -- OH, I SEE IT.

10:15AM  13        SO TEST PROCESSED AT THERANOS LABORATORY, 7373 GATEWAY

10:15AM  14   BOULEVARD, NEWARK, CALIFORNIA.

10:15AM  15   Q.   AND IF YOU'LL TURN TO PAGE 2 IN THE EXHIBIT.

10:16AM  16        DR. BURNES, IS THIS A REPORT VOIDING THE THIRD TEST, THE

10:16AM  17   TEST THAT PRODUCED A 22.8 PSA SCORE?

10:16AM  18   A.   YES.

10:16AM  19   Q.   AND WAS THIS ALSO SENT TO YOU IN MARCH OF 2016?

10:16AM  20   A.   YES, MARCH 29TH, 2016.

10:16AM  21   Q.   THANK YOU.

10:16AM  22        AND THEN ONE FINAL PAGE.  IF YOU'LL TURN TO PAGE 8 OF THIS

10:16AM  23   EXHIBIT.

10:16AM  24        DR. BURNES, DID DR. ELLSWORTH GO TO LABCORP IN 2017 AND

10:16AM  25   GET A PSA TEST?

10:16AM  1    A.   YES.

10:16AM  2    Q.   AND WAS THE PSA SCORE THAT TIME A 2.0?

10:17AM  3    A.   YES.

10:17AM  4    Q.   IF I CAN ASK YOU TO TURN FINALLY TO PAGE 7, THAT WAS THE

10:17AM  5    FIRST THERANOS TEST RESULT, THE 26.1.

10:17AM  6         ARE YOU THERE?

10:17AM  7    A.   YES.

10:17AM  8    Q.   DR. BURNES, DO YOU HAVE AN OPINION ON THE ACCURACY OF THIS

10:17AM  9    TEST?

10:17AM  10   A.   WHICH TEST?

10:17AM  11   Q.   THE ONE THAT WAS SENT TO YOUR OFFICE ON MARCH 16TH, THE

10:17AM  12   VISIT DATE WAS -- I'M SORRY, WAS SENT TO YOUR OFFICE ON

10:17AM  13   MAY 16TH, 2015, THE VISIT DATE WAS MAY 14TH, 2015, AND THE

10:17AM  14   SCORE WAS A 26.1.

10:17AM  15        IT'S ON PAGE 7.

10:17AM  16   A.   I UNDERSTAND NOW.

10:17AM  17   Q.   DO YOU HAVE AN OPINION ON THE ACCURACY OF THIS TEST?

10:17AM  18   A.   YES.  I BELIEVE THAT TEST WAS INVALID.

10:17AM  19   Q.   AND WHY DO YOU SAY THAT?

10:17AM  20   A.   IT WAS NOT CONSISTENT WITH THE PATTERN THAT WE HAVE BEEN

10:17AM  21   SEEING OR THE EXPECTED RESULT, AND THE FACT THAT THE REPEAT

10:18AM  22   TEST, THE FOURTH TEST IN 2015 WAS CLOSE TO THE EXPECTED RESULT,

10:18AM  23   AND THIS FOLLOW-UP TEST WHEN THE PATIENT RETURNED FROM THE

10:18AM  24   MISSIONARY WORK WAS WHERE IT SHOULD BE.

10:18AM  25   Q.   THANK YOU.

10:18AM   1          YOUR HONOR, MAY I HAVE A MOMENT?

10:18AM   2               THE COURT:  YES.

10:18AM   3          (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

10:18AM   4               MR. SCHENK:  THANK YOU, YOUR HONOR.

10:18AM   5          NO FURTHER QUESTIONS.

10:18AM   6               THE COURT:  CROSS-EXAMINATION?

10:18AM   7               MS. TREFZ:  YES, YOUR HONOR.

10:18AM   8                        **CROSS-EXAMINATION**

10:18AM   9     BY MS. TREFZ:

10:18AM   10    Q.   GOOD MORNING, DR. BURNES.

10:18AM   11    A.   GOOD MORNING.

10:18AM   12    Q.   MY NAME IS KATIE TREFZ AND I REPRESENT MS. HOLMES, AND I

10:19AM   13    HAVE SOME QUESTIONS FOR YOU.

10:19AM   14         I WANT TO START WITH UNDERSTANDING HOW YOU WERE INTRODUCED

10:19AM   15    TO THERANOS.  IN PARTICULAR, WHEN THERANOS FIRST STARTED

10:19AM   16    OFFERING BLOOD TESTING, IS IT FAIR TO SAY THAT YOU WERE

10:19AM   17    EXCITED?

10:19AM   18    A.   I WAS VERY MUCH INTERESTED IN THIS WAY OF TESTING.

10:19AM   19    Q.   AND IS ONE OF THE REASONS WHY YOU WERE INTERESTED IN THE

10:19AM   20    THERANOS SERVICE THAT THERANOS CHARGED APPROXIMATELY EIGHT

10:19AM   21    TIMES LESS THAN OTHER LABORATORIES?

10:19AM   22    A.   YES.

10:19AM   23    Q.   AND DO YOU RECALL THAT THERANOS PUBLISHED THEIR PRICES ON

10:19AM   24    THE INTERNET?

10:19AM   25    A.   I DON'T RECALL SEEING IT ON THE INTERNET, BUT I DO RECALL

10:19AM   1    SEEING THE PRICES ON THE -- SOMEWHERE ON DOCUMENTATION THAT WAS

10:19AM   2    PROVIDED TO THE OFFICE.

10:20AM   3    Q.   OKAY.  AND DID YOU UNDERSTAND THAT THERANOS CHARGED THE

10:20AM   4    SAME FOR INSURED AND UNINSURED PATIENTS?

10:20AM   5    A.   NO, I DIDN'T KNOW THAT ASPECT.

10:20AM   6    Q.   OKAY.  THERE WAS A THERANOS WALGREENS PATIENT SERVICE

10:20AM   7    CENTER DOWN THE STREET FROM YOUR PRACTICE; RIGHT?

10:20AM   8    A.   YES.

10:20AM   9    Q.   AND DID THIS LOCATION ADD TO THE CONVENIENCE OF THERANOS

10:20AM   10   TESTING FOR YOU?

10:20AM   11   A.   YES.

10:20AM   12   Q.   AND DID YOU ALSO LIKE THE GOAL OF TAKING LESS BLOOD?

10:20AM   13   A.   YES.

10:20AM   14   Q.   AND IS IT FAIR TO SAY THAT YOU HOPED THAT THERANOS WOULD

10:20AM   15   SUCCEED?

10:20AM   16   A.   VERY MUCH SO.

10:20AM   17   Q.   I THINK WE ESTABLISHED ALREADY ON DIRECT THAT YOU'RE IN

10:20AM   18   PRIVATE PRACTICE; CORRECT?

10:20AM   19   A.   YES.

10:20AM   20   Q.   AND YOUR PRACTICE IS INTERNAL MEDICINE?

10:20AM   21   A.   YES.

10:20AM   22   Q.   IS IT FAIR TO SAY THAT AROUND TWO-THIRDS OF THE TIME THAT

10:21AM   23   YOU'RE EXAMINING PATIENTS, YOU'RE DOING WELLNESS EXAMS?

10:21AM   24   A.   YES.

10:21AM   25   Q.   AND DO THOSE OFTEN COME WITH BLOOD TESTS?

10:21AM 1     A.   YES.

10:21AM 2     Q.   AND YOU CURRENTLY HAVE WHAT IS CALLED A CONCIERGE

10:21AM 3     PRACTICE; RIGHT?

10:21AM 4     A.   YES.

10:21AM 5     Q.   AND CAN YOU EXPLAIN WHAT THAT IS?

10:21AM 6     A.   IT'S A --

10:21AM 7               MR. SCHENK:  OBJECTION.  RELEVANCE.

10:21AM 8               THE WITNESS:  OH.

10:21AM 9               THE COURT:  COUNSEL, WHAT IS THE RELEVANCE OF THIS?

10:21AM 10              MS. TREFZ:  I WOULD LIKE TO ESTABLISH THE SCOPE OF

10:21AM 11    THE BLOOD TESTS THAT HE ORDERS.  SO IT'S JUST FOUNDATIONAL TO

10:21AM 12    UNDERSTANDING THE CONTEXT OF HIS PRACTICE.

10:21AM 13              THE COURT:  AT THE TIME OF THE TEST?

10:21AM 14              MS. TREFZ:  THAT WAS GOING TO BE MY NEXT QUESTION,

10:21AM 15    BUT I, I --

10:21AM 16              THE COURT:  MAYBE -- IS IT -- ARE YOU TRYING TO

10:21AM 17    DETERMINE WHETHER OR NOT HIS PRACTICE WAS CONCIERGE AT THE TIME

10:21AM 18    OF THE TEST?

10:21AM 19              MS. TREFZ:  I WAS GOING TO ASK THAT AFTER HE DEFINED

10:21AM 20    IT, BUT YES.

10:21AM 21              THE COURT:  WHY DON'T WE.

10:21AM 22              MS. TREFZ:  I'M HAPPY TO DO IT IN THAT WAY,

10:21AM 23    YOUR HONOR.

10:21AM 24    Q.   WAS YOUR PRACTICE A CONCIERGE PRACTICE IN 2015?

10:22AM 25    A.   THAT WAS A TERM THAT COULD BE APPLIED, YES.

BURNES CROSS BY MS. TREFZ

10:22AM  1    Q.   AND COULD YOU EXPLAIN WHAT THAT TERM MEANS?

10:22AM  2    A.   ABOUT 5 PERCENT OF INTERNS PRACTICE THIS WAY CURRENTLY

10:22AM  3    WHERE WE OFFER A FORM OF PRACTICE, WE'RE DOING CARE FOR THE

10:22AM  4    PATIENT ABOVE AND BEYOND WHAT IS NORMALLY COVERED BY THE

10:22AM  5    INSURANCE.  AND THE PRIMARY PIECE OF THIS IS A FEE WE CHARGE

10:22AM  6    FOR AN ANNUAL WELLNESS EXAM.

10:22AM  7    Q.   AND ABOUT HOW MANY PATIENTS WERE IN YOUR CONCIERGE

10:22AM  8    PRACTICE AS OF 2015?

10:22AM  9    A.   ABOUT 180.

10:22AM  10   Q.   OKAY.  DID YOU SEND MANY OF THOSE PATIENTS TO THERANOS FOR

10:22AM  11   TESTING?

10:22AM  12   A.   COULD YOU DEFINE "MANY" THERE?

10:22AM  13   Q.   DID YOU SEND ABOUT A QUARTER TO A THIRD OF THOSE PATIENTS

10:22AM  14   TO THERANOS FOR TESTING?

10:22AM  15   A.   A BETTER WAY OF ANSWERING IT, I MIGHT TRY, WOULD BE THAT

10:22AM  16   THE MAJORITY OF MY LABS WERE SENT TO THE CLEVELAND CLINIC AT

10:23AM  17   THAT TIME -- MOST OF MY LAB WORK WAS DONE AT THE CLEVELAND

10:23AM  18   CLINIC AT THAT TIME, SO MOST OF THE LAB WORK I PERFORMED ON MY

10:23AM  19   PATIENCE ON AN ANNUAL BASIS WAS FOR THE WELLNESS EXAM, AND THAT

10:23AM  20   WAS SENT TO THE CLEVELAND CLINIC IN OHIO.

10:23AM  21       I WOULD ESTIMATE ABOUT 10 PERCENT OF THE LABS AT THAT TIME

10:23AM  22   I WOULD SEND OUT TO THERANOS.

10:23AM  23   Q.   AND JUST SO --

10:23AM  24   A.   AND SO THE TOTAL NUMBER OF LABS I WOULD DO PER YEAR.

10:23AM  25   Q.   OKAY.  SO JUST IN TERMS OF WHAT WE'RE DISTINGUISHING THE

10:23AM  1    DIFFERENCE BETWEEN MY QUESTION AND YOUR ANSWER IS THAT I WAS

10:23AM  2    ASKING ABOUT PATIENTS AND YOU WERE TALKING ABOUT NUMBER OF

10:23AM  3    TESTS, RIGHT, THE NUMBER OF LAB TESTS?

10:23AM  4    A.   OKAY.

10:23AM  5    Q.   WHICH IS FINE.  I JUST WANTED TO MAKE SURE THAT I WAS

10:23AM  6    UNDERSTANDING THE DIFFERENCE.

10:23AM  7         IS IT FAIR THAT --

10:23AM  8    A.   COULD YOU RESTATE THAT?  I'M NOT SURE WHAT THE POINT IS.

10:23AM  9    Q.   SURE.  MY QUESTION WAS, DID YOU SEND ABOUT A QUARTER TO A

10:23AM  10   THIRD OF YOUR PATIENTS TO THERANOS FOR TESTING?

10:23AM  11        AND I UNDERSTOOD YOUR RESPONSE, BUT YOU'LL CORRECT ME IF I

10:24AM  12   MISUNDERSTOOD, I UNDERSTOOD YOUR RESPONSE TO MEAN THAT, THAT

10:24AM  13   REGARDLESS OF THE NUMBER OF PATIENTS, THE MAJORITY OF YOUR LAB

10:24AM  14   TESTING WAS DONE AT CLEVELAND CLINIC.

10:24AM  15   A.   YES.  A BETTER WAY TO PROBABLY STATE IT IS BECAUSE WE

10:24AM  16   AUTOMATICALLY DID THESE TESTS ONCE A YEAR FOR ALL OF THE

10:24AM  17   PATIENTS OVER AGE 50.

10:24AM  18        IF LABS OCCURRED OUTSIDE OF THAT ANNUAL WINDOW, SO THE

10:24AM  19   TOTAL LABS THROUGHOUT THE YEAR WOULD PROBABLY BE 10 PERCENT TO

10:24AM  20   THERANOS, BUT IF ISSUES CAME UP OUTSIDE OF THE ANNUAL PHYSICAL

10:24AM  21   LABS, PROBABLY IT WOULD BE FAIR TO SAY ABOUT A QUARTER TO A

10:24AM  22   THIRD WOULD HAVE BEEN THERANOS.

10:24AM  23   Q.   OKAY.  THANK YOU.

10:24AM  24        ARE YOU ABLE TO QUANTIFY THE NUMBER OF TESTS THAT WOULD

10:24AM  25   BE?

10:24AM  1    A.   I'M SORRY, I DON'T RECALL.

10:24AM  2    Q.   THAT'S OKAY.

10:24AM  3         IS IT TRUE THAT PATIENTS OF YOURS HAD TESTS AT THERANOS

10:25AM  4    FOR APPROXIMATELY A YEAR BEFORE MR. ELLSWORTH'S TEST THAT WAS

10:25AM  5    THE SUBJECT OF YOUR DIRECT EXAMINATION?

10:25AM  6    A.   YES, I BELIEVE THAT IS TRUE.

10:25AM  7    Q.   AND WITH THE EXCEPTION OF DR. ELLSWORTH'S PSA TEST, DID,

10:25AM  8    DID YOU HAVE ANY ISSUE WITH THERANOS'S TESTS UP TO 2015?

10:25AM  9    A.   NO.

10:25AM 10    Q.   YOU TESTIFIED ON DIRECT THAT YOU BROUGHT THE ISSUE THAT

10:25AM 11    YOU IDENTIFIED TO THERANOS'S ATTENTION; CORRECT?

10:25AM 12    A.   YES.

10:25AM 13    Q.   AND BASED ON YOUR INTERACTIONS WITH THERANOS, DID YOU

10:25AM 14    UNDERSTAND THAT THERANOS HAD OR WAS IN THE PROCESS OF

10:25AM 15    INVESTIGATING THE ISSUE?

10:25AM 16    A.   YES.

10:25AM 17    Q.   DID, DID THE THERANOS PERSONNEL THAT YOU SPOKE WITH

10:25AM 18    INDICATE AN INTEREST IN MAKING THE SITUATION RIGHT?

10:26AM 19    A.   YES.

10:26AM 20    Q.   AND DID THEY EXPRESS AN INTEREST IN UNDERSTANDING WHAT HAD

10:26AM 21    HAPPENED WITH THE TESTS?

10:26AM 22    A.   YES.

10:26AM 23    Q.   I'D LIKE TO BRING UP, IF WE CAN, EXHIBIT 4415, WHICH YOU

10:26AM 24    DISCUSSED WITH THE GOVERNMENT.  SO IF YOU CAN -- 4415 I THINK

10:26AM 25    IS THE FIRST TAB IN THE BINDER THAT YOU HAD FROM THE

| | | |
|---|---|---|
| 10:26AM | 1 | GOVERNMENT. |
| 10:26AM | 2 | A.   OKAY. |
| 10:26AM | 3 | Q.   OKAY.  I WANTED TO JUST FOCUS ON THE TOP EMAIL HERE FROM |
| 10:26AM | 4 | MR. BALWANI TO MS. HOLMES. |
| 10:26AM | 5 | IS THE DATE OF THE EMAIL JUNE 15TH, 2015? |
| 10:26AM | 6 | A.   EXCUSE ME, WHICH PAGE ARE WE LOOKING AT? |
| 10:26AM | 7 | Q.   I'M SORRY.  WE'RE LOOKING AT PAGE 1. |
| 10:26AM | 8 | A.   OKAY. |
| 10:26AM | 9 | Q.   AND THE VERY TOP -- THE EMAIL AT THE VERY TOP. |
| 10:26AM | 10 | A.   OKAY. |
| 10:26AM | 11 | Q.   IS THE DATE ON THE EMAIL JUNE 15TH, 2015? |
| 10:27AM | 12 | A.   YES. |
| 10:27AM | 13 | Q.   AND DO YOU RECALL WHETHER THAT WAS AFTER THE JUNE 11TH, |
| 10:27AM | 14 | 2015 TEST THAT YOU RECEIVED FROM THERANOS? |
| 10:27AM | 15 | A.   THE SPECIFIC ORDER I DON'T -- I'M NOT SURE HOW TO ANSWER |
| 10:27AM | 16 | THAT QUESTION TO BE HONEST. |
| 10:27AM | 17 | Q.   OKAY.  THAT'S FINE. |
| 10:27AM | 18 | WHY DON'T WE BRING UP, IF WE CAN, 4438, PAGE 5. |
| 10:27AM | 19 | AND MY QUESTION FIRST, MR. BENNETT, IS DO WE HAVE THE SAME |
| 10:27AM | 20 | REDACTIONS THAT THE GOVERNMENT HAD? |
| 10:27AM | 21 | MR. BENNETT:  A LITTLE MORE REDACTION. |
| 10:27AM | 22 | MS. TREFZ:  A LITTLE MORE.  OKAY.  THAT'S FINE. |
| 10:27AM | 23 | IF WE CAN GO TO 4938. |
| 10:28AM | 24 | THE COURT:  4938? |
| 10:28AM | 25 | MS. TREFZ:  YES.  THANK YOU. |

10:28AM  1              THE WITNESS:  PAGE 5?

10:28AM  2              MS. TREFZ:  PAGE 5, YES.

10:28AM  3          IF WE CAN JUST HIGHLIGHT THE VISIT DATE ON THAT RESULT.

10:28AM  4     Q.   JUST FOR THE SAKE OF CLARITY, IS IT FAIR TO SAY THAT THE

10:28AM  5     EMAIL FROM MR. BALWANI TO MS. HOLMES ON JUNE 15TH, 2015 IS

10:28AM  6     AFTER THE JUNE 11TH VISIT DATE REFLECTED ON 4438?

10:28AM  7     A.   YES.

10:28AM  8     Q.   4938?

10:28AM  9     A.   YES.  SORRY.

10:28AM  10    Q.   AND YOU DON'T HAVE ANY UNDERSTANDING ABOUT WHAT MS. HOLMES

10:28AM  11    KNEW ABOUT DR. ELLSWORTH'S TESTS PRIOR TO THIS DATE; CORRECT?

10:28AM  12    A.   COULD YOU RESTATE THE QUESTION?

10:28AM  13    Q.   YOU DON'T HAVE ANY PERSONAL KNOWLEDGE OF WHAT MS. -- OF

10:29AM  14    WHAT MS. HOLMES MAY OR MAY NOT HAVE KNOWN ABOUT DR. BURNES'S

10:29AM  15    TEST RESULTS?

10:29AM  16    A.   NO.

10:29AM  17    Q.   OKAY.  THANK YOU.

10:29AM  18         IF WE CAN STAY ON 4938 FOR A MOMENT.  I WANT TO GO TO --

10:29AM  19    LET'S START WITH THE PAGE 7 PLEASE, MR. BENNETT.

10:29AM  20         AND I WANT TO JUST HIGHLIGHT AT THE TOP HERE, DO YOU

10:29AM  21    RECALL MR. SCHENK POINTED YOU --

10:29AM  22         EVEN FURTHER UP, PLEASE.  THANK YOU.

10:29AM  23         DO YOU RECALL THAT MR. SCHENK POINTED YOU TO THE FAX

10:29AM  24    HEADER ON THIS PAGE?

10:29AM  25    A.   YES.

10:29AM   1    Q.   AND OVER ON THE RIGHT-HAND SIDE IS THERE A FAX NUMBER

10:29AM   2    LISTED FOR THERANOS?

10:30AM   3    A.   ON PAGE 3?  WHERE IS IT IN RELATIONSHIP TO THAT?

10:30AM   4    Q.   DOWN BELOW.

10:30AM   5    A.   AND IS THAT THE NUMBER 866?

10:30AM   6    Q.   YES.  AND WHAT IS THE AREA CODE?

10:30AM   7    A.   I'M SORRY.  LET ME READ THAT.

10:30AM   8    Q.   IN PARTICULAR I'M LOOKING AT THE FAX NUMBER TO THE RIGHT

10:30AM   9    OF THE LAB.

10:30AM  10    A.   LOOKING AT THE NUMBER THAT SAYS LAB, AND IS IT ABOVE OR

10:30AM  11    BELOW IT?  OH, HERE IT IS.  I FOUND IT.

10:30AM  12         SO IT SAYS FAX.  IT SAYS (650) 852-9594.

10:30AM  13    Q.   AND DO YOU KNOW WHETHER THE 650 AREA CODE, IS THAT AN AREA

10:31AM  14    CODE IN ARIZONA?

10:31AM  15    A.   I DO NOT KNOW.

10:31AM  16    Q.   OKAY.  AND DO YOU SEE LISTED ABOVE 13 -- DO YOU SEE THE

10:31AM  17    ADDRESS OF THE THERANOS LAB LISTED ABOVE?

10:31AM  18    A.   WHERE IT SAYS 1365 NORTH SCOTTSDALE?

10:31AM  19    Q.   YES.  DO YOU SEE THE ADDRESS LISTED THERE?

10:31AM  20         AND IS THAT THE ADDRESS LISTED AS SCOTTSDALE, ARIZONA?

10:31AM  21    A.   YES.

10:31AM  22    Q.   AND IS THERE A FAX SERVER NUMBER ON THE TOP OF THE --

10:31AM  23    LISTED ON THE TOP OF THE FAX HERE, KIND OF AN ORIGINATING

10:31AM  24    NUMBER?

10:31AM  25    A.   I SEE FAX SERVER AND NUMBER -- I SEE PAGE 2 OF 3.  I'M NOT

10:31AM  1    SURE WHERE THE NUMBER IS AT.

10:31AM  2    Q.   AND DO YOU KNOW WHETHER THE 650 NUMBER IS A NORTHERN

10:31AM  3    CALIFORNIA NUMBER?

10:31AM  4    A.   I DO NOT KNOW.

10:31AM  5    Q.   OKAY.  I'D JUST LIKE TO GO FORWARD TO PAGE 6.

10:32AM  6         IF YOU CAN GO TO THE TOP AGAIN.

10:32AM  7         I'D JUST LIKE TO NOTE THERE'S NO -- DO YOU SEE WHETHER

10:32AM  8    THERE'S ANY ORIGINATION NUMBER FROM THE FAX SERVER AT THERANOS?

10:32AM  9    A.   I'M AT THE TOP, AND I SEE A THING THAT SAYS THERANOS FAX

10:32AM 10    SERVER, A DASH AND A GREATER SIGN, AND THEN I SEE A THING THAT

10:32AM 11    SAYS IT LOOKS LIKE GE 2/3 -- OR, NO, IT'S PAGE.

10:32AM 12    Q.   DO YOU SEE -- I'M SORRY.

10:32AM 13    A.   MY COPY IS MISSING THE FIRST PART OF THE PAGE, I THINK.

10:32AM 14    Q.   DO YOU SEE AN ORIGINATION NUMBER ON THE TOP OF THIS FAX?

10:32AM 15    A.   WHERE WOULD THAT BE LOCATED IN RELATIONSHIP TO THE WORD

10:33AM 16    FAX SERVER?

10:33AM 17    Q.   I DON'T SEE ONE.  THAT'S WHY I'M ASKING.

10:33AM 18    A.   OKAY.  I DON'T SEE ONE EITHER.

10:33AM 19    Q.   BUT THERE'S A FAX NUMBER ON THE RIGHT-HAND SIDE IN THE

10:33AM 20    SAME PLACE THAT THERE WAS BEFORE; CORRECT?

10:33AM 21    A.   YES.

10:33AM 22    Q.   OKAY.  HAVE YOU -- OVER THE COURSE OF YOUR CAREER, HAVE

10:33AM 23    YOU PRIMARILY USED OTHER LAB COMPANIES OTHER THAN THERANOS?

10:33AM 24    A.   BESIDES CLEVELAND CLINIC, I HAVE USED LABCORP AND

10:33AM 25    OCCASIONALLY SONORA QUEST.

10:33AM  1    Q.   AND HAVE YOU HAD ANY OTHER TESTING ISSUES WITH THOSE OTHER

10:33AM  2    LABS?

10:33AM  3    A.   YES.

10:33AM  4            MR. SCHENK:  YOUR HONOR, OBJECTION.  RELEVANCE.

10:33AM  5            THE COURT:  SUSTAINED.

10:33AM  6            MS. TREFZ:  MAY I EXPLAIN, OR NO?

10:34AM  7            THE COURT:  CAN YOU ASK ANOTHER QUESTION?

10:34AM  8            MS. TREFZ:  OKAY.

10:34AM  9    Q.   HAVE YOU EVER HAD AN ISSUE WITH ANOTHER LAB WHERE YOUR

10:34AM 10    PATIENT'S LABS WERE SWITCHED WITH ANOTHER PATIENT'S LABS?

10:34AM 11            MR. SCHENK:  OBJECTION.  RELEVANCE.

10:34AM 12            THE COURT:  I'LL ALLOW THAT.

10:34AM 13        YOU CAN ANSWER THAT QUESTION, SIR.

10:34AM 14            THE WITNESS:  YES.

10:34AM 15    BY MS. TREFZ:

10:34AM 16    Q.   AND OVER THE COURSE OF YOUR CAREER -- I THINK YOU

10:34AM 17    TESTIFIED OVER THE COURSE OF YOUR CAREER IN PRIVATE PRACTICE

10:34AM 18    YOU'VE, YOU'VE REVIEWED OVER 10,000 PSA RESULTS; IS THAT

10:34AM 19    CORRECT?

10:34AM 20    A.   YES.

10:34AM 21    Q.   AND DO YOU, DO YOU HAVE A SENSE OF -- OR ARE YOU AWARE OF

10:34AM 22    RESEARCH THAT HAS SHOWN THAT THERE ARE LAB ERRORS THAT

10:34AM 23    OCCASIONALLY OCCUR AT LABORATORIES?

10:34AM 24    A.   I HAVEN'T SEEN THE RESEARCH, BUT COMMON SENSE WOULD

10:35AM 25    DICTATE THAT OCCASIONALLY ERRORS CAN OCCUR.

10:35AM 1    Q.   AND WHAT IS YOUR UNDERSTANDING OF THE LIKELIHOOD OF OR

10:35AM 2    THE -- WHAT IS YOUR UNDERSTANDING OF THE FREQUENCY OF LAB

10:35AM 3    ORDERS WITH RESPECT TO -- OF LAB ERRORS WITH RESPECT TO PSA

10:35AM 4    TESTS OVERALL IN THE -- IN YOUR EXPERIENCE?

10:35AM 5    A.   THE RESULT ITSELF, RARE.

10:35AM 6    Q.   AND ARE YOU AWARE OF RESEARCH THAT'S SHOWN THAT THE RATE

10:35AM 7    OF LAB ERRORS CAN VARY FROM .1 TO 3 PERCENT?

10:35AM 8    A.   I HAVE NOT SEEN THAT.

10:35AM 9    Q.   OKAY.

10:35AM 10   A.   MY PERSONAL --

10:35AM 11   Q.   GO AHEAD.

10:35AM 12   A.   IF I COULD SPEAK TO THAT?  I'M ALWAYS LOOKING FOR POSSIBLE

10:35AM 13   LAB ERRORS FOR UNEXPECTED RESULTS, AND THEY HAVE OCCURRED, BUT

10:36AM 14   THEY'RE VERY RARE.

10:36AM 15   Q.   OKAY.  ARE YOU AWARE OF THE VARIOUS REASONS THAT AN

10:36AM 16   INACCURATE RESULT CAN BE PRODUCED?

10:36AM 17   A.   YES.

10:36AM 18   Q.   AND CAN YOU -- IS IT FAIR TO SAY THAT PREANALYTICAL

10:36AM 19   PROCESSES, SUCH AS SAMPLE INTEGRITY ISSUES, COULD BE A SOURCE

10:36AM 20   OF LAB ERROR?

10:36AM 21   A.   YES.

10:36AM 22   Q.   AND IS IT FAIR TO SAY THAT ANALYTICAL ISSUES, SUCH AS

10:36AM 23   ERRORS IN THE REAGENT, COULD BE A SOURCE OF LAB ERROR?

10:36AM 24   A.   YES.

10:36AM 25   Q.   AND ARE YOU AWARE THAT SOMETIMES MANUFACTURERS OF

10:36AM  1    COMMERCIALLY AVAILABLE REAGENTS AND EQUIPMENT ISSUE NOTICES

10:36AM  2    INDICATING POTENTIAL ERRORS IN THEIR TESTS?

10:36AM  3    A.   YES.

10:36AM  4    Q.   AND ARE YOU AWARE THAT SOMETIMES THERE ARE ERRORS IN

10:36AM  5    REPORTING?

10:36AM  6    A.   YES.

10:36AM  7    Q.   THE PSA TEST IS -- DO YOU UNDERSTAND THE METHOD BY WHICH

10:36AM  8    IT'S TRADITIONALLY RUN IN TERMS OF THE TYPE OF CHEMISTRY THAT

10:37AM  9    IS APPLIED?

10:37AM  10   A.   NO.  IF I DID ONCE, NO, I DON'T REMEMBER IT.

10:37AM  11   Q.   IF I -- LET ME SEE IF I CAN JUST REFRESH YOU, AND IF NOT,

10:37AM  12   THEN WE'LL MOVE ON.

10:37AM  13       DO YOU RECALL WHETHER PSA IS OFTEN MEASURED BY

10:37AM  14   IMMUNOASSAY?

10:37AM  15   A.   NO, I DON'T RECALL.

10:37AM  16   Q.   OKAY.  AND ARE YOU AWARE -- DO YOU KNOW WHAT IMMUNOASSAY

10:37AM  17   IS?

10:37AM  18   A.   YES.

10:37AM  19   Q.   AND ARE YOU AWARE OF -- THAT THERE CAN BE INHERENT

10:37AM  20   EXPECTED IMPRECISION IN ASSAYS?

10:37AM  21   A.   YES.

10:37AM  22   Q.   AND DOES THAT INCLUDE IN IMMUNOASSAYS?

10:37AM  23   A.   YES.

10:37AM  24   Q.   AND BASED ON YOUR EXPERIENCE REVIEWING TEST RESULTS,

10:37AM  25   INCLUDING PSA TEST RESULTS, DO YOU HAVE AN UNDERSTANDING THAT

10:38AM   1    DIFFERENT APPROACHES TO MEASUREMENT CAN LEAD TO DIFFERENT

10:38AM   2    RESULTS SOMETIMES?

10:38AM   3    A.   YES.

10:38AM   4    Q.   AND, IN FACT, HARMONIZATION OF RESULTS FROM DIFFERENT

10:38AM   5    CLINICAL LABORATORY MEASUREMENT IS AN IMPORTANT CHALLENGE IN

10:38AM   6    THE FIELD OF LAB SCIENCES, ISN'T IT?

10:38AM   7    A.   COULD YOU RESTATE THE QUESTION?

10:38AM   8    Q.   SURE.  HARMONIZATION OF RESULTS FROM DIFFERENT CLINICAL

10:38AM   9    LABORATORY MEASUREMENT PROCEDURES IS AN IMPORTANT CHALLENGE IN

10:38AM   10   THE FIELD OF LAB TESTING; IS THAT CORRECT?

10:38AM   11   A.   COULD YOU -- I'M HAVING TROUBLE UNDERSTANDING WHAT YOU

10:38AM   12   MEAN BY "HARMONIZATION."  CAN YOU USE A DIFFERENT WORD?

10:38AM   13   Q.   SURE.

10:38AM   14        WE MENTIONED A MINUTE AGO THAT DIFFERENT METHODS CAN

10:38AM   15   SOMETIMES LEAD TO DIFFERENT RESULTS; RIGHT?

10:38AM   16   A.   YES.

10:38AM   17   Q.   AND ARE YOU AWARE OF EFFORTS TO TRY TO MAKE DIFFERENT

10:38AM   18   METHODS -- OR UNDERSTAND THE RELATIONSHIP OF DIFFERENT METHODS

10:38AM   19   SO THAT THEY CAN BE COMPARED?

10:39AM   20   A.   YES.

10:39AM   21   Q.   AND IS THAT AN IMPORTANT, IN YOUR UNDERSTANDING, SUBJECT

10:39AM   22   OF RESEARCH IN THE FIELD OF LAB TESTING?

10:39AM   23   A.   COULD YOU RESTATE THAT QUESTION?

10:39AM   24   Q.   SURE.  IS THIS EFFORT TO UNDERSTAND THE RELATIONSHIP

10:39AM   25   BETWEEN DIFFERENT METHODS, IS THAT AN IMPORTANT AREA OF

10:39AM   1    RESEARCH IN THE FIELD OF LAB TESTING?

10:39AM   2              MR. SCHENK:  OBJECTION.  BEYOND THE AREA IN WHICH HE

10:39AM   3    WAS DESIGNATED AN EXPERT FOR OPINION PURPOSES.

10:39AM   4              THE COURT:  I THINK WE'RE A LITTLE BEYOND THAT.

10:39AM   5    IT'S INTERPRETING THE RESULTS, AND THIS MIGHT GO TO THE

10:39AM   6    SCIENTIFIC ANALYSIS.

10:39AM   7         CAN YOU REPHRASE THAT QUESTION A LITTLE MORE?

10:39AM   8              MS. TREFZ:  OKAY.

10:39AM   9    Q.  YOU ALREADY STATED THAT YOU WERE AWARE THAT DIFFERENT

10:39AM  10    METHODS CAN LEAD TO DIFFERENT RESULTS ON THE SAME ASSAY, OR THE

10:40AM  11    SAME -- EXCUSE ME.  LET ME TRY AGAIN.

10:40AM  12         YOU ALREADY STATED THAT YOU'RE AWARE THAT DIFFERENT

10:40AM  13    METHODS CAN LEAD TO A DIFFERENT RESULT ON THE SAME SAMPLE;

10:40AM  14    CORRECT?

10:40AM  15    A.  YES, BUT THEY SHOULD BE VERY SMALL VARIATIONS.  THEY

10:40AM  16    SHOULD HAVE STANDARDS OF THE NORMAL RANGE ATTACHED TO EACH

10:40AM  17    RESULT.

10:40AM  18    Q.  A REFERENCE RANGE ATTACHED?

10:40AM  19    A.  A REFERENCE RANGE, YES.

10:40AM  20    Q.  AND HAVE YOU TRIED TO COMPARE DIFFERENT -- WE CAN USE THE

10:40AM  21    EXAMPLE OF PSA TESTS.  HAVE YOU TRIED TO COMPARE DIFFERENT PSA

10:40AM  22    TESTS TO EACH OTHER TO UNDERSTAND WHETHER THE RESULTS FROM

10:40AM  23    DIFFERENT LABORATORIES ARE COMPARABLE OR NOT?

10:40AM  24    A.  I HAVE NEVER APPROACHED IT FROM THAT POINT OF VIEW.  I

10:40AM  25    TRUSTED THAT THE LABS ARE VALID AND THE RESULTS, BASED ON THE

10:40AM  1    REFERENCE RANGES STATED BY THE LAB.

10:41AM  2    Q.   OKAY.

10:41AM  3    A.   IF IT WAS WITHIN NORMAL RANGE OR OUTSIDE OF THE NORMAL

10:41AM  4    RANGE.

10:41AM  5         I JUST DON'T UNDERSTAND THE POINT WE'RE TRYING TO MAKE

10:41AM  6    HERE.

10:41AM  7    Q.   WELL, I BELIEVE YOU ANSWERED THE QUESTION, WHICH IS YOU

10:41AM  8    BELIEVE THAT THERE SHOULD BE A SMALL DIFFERENCE AND THAT THERE

10:41AM  9    SHOULD BE A REFERENCE RANGE?

10:41AM  10   A.   A SLIGHT DIFFERENCE, YES.

10:41AM  11   Q.   LET ME -- JUST FOR THE PURPOSES OF POTENTIALLY CLARIFYING

10:41AM  12   FOR ALL OF US WHERE I'M GOING WITH THIS, LET ME HAND UP, IF I

10:41AM  13   CAN, A COUPLE OF EXHIBITS.  THEY'RE JUST GOING TO BE USED TO

10:41AM  14   REFRESH YOUR RECOLLECTION, IF THEY DO.

10:42AM  15        MAY I APPROACH, YOUR HONOR?

10:42AM  16            THE COURT:  YES.

10:42AM  17   BY MS. TREFZ:

10:42AM  18   Q.   (HANDING.)

10:42AM  19        DR. BURNES, I'VE HANDED YOU WHAT I'VE MARKED FOR

10:42AM  20   IDENTIFICATION PURPOSES AS EXHIBITS 13689, 13690, AND 13691.

10:42AM  21        AND WHAT I WOULD LIKE TO ASK IS WHETHER YOU CAN TAKE A

10:42AM  22   LOOK IN PARTICULAR AT 13691.  THE OTHER TWO EXHIBITS ARE

10:43AM  23   PROVIDED FOR CONTEXT.

10:43AM  24   A.   WHAT PAGE IS THAT?

10:43AM  25   Q.   IT'S THE LAST ONE.

10:43AM  1    A.   OH, I SEE.

10:43AM  2    Q.   THE OTHER TWO EXHIBITS ARE PROVIDED FOR CONTEXT JUST SO

10:43AM  3    THAT YOU UNDERSTAND.

10:43AM  4    A.   WHERE IS THE REFERENCE NUMBER I'M LOOKING FOR ON THE PAGE?

10:43AM  5    Q.   13691.  IT'S AT THE TOP RIGHT.

10:43AM  6         AND IT'S A GREY -- THIS PARTICULAR EXHIBIT IS A ONE PAGE

10:43AM  7    EXHIBIT, IT'S PRIMARILY GREY, AND IT HAS A WHITE BOX.

10:43AM  8    A.   OH, YOU'RE TALKING ABOUT THIS ONE (INDICATING)?

10:43AM  9    Q.   YES, THAT IS THE ONE THAT I'M PARTICULARLY INTERESTED IN.

10:43AM 10    HOWEVER, I'VE PROVIDED THE OTHER TWO, WHICH ARE -- THESE ARE

10:43AM 11    ALL FROM THE SAME WEBSITE BASICALLY.

10:43AM 12         AND IF YOU CAN TAKE A READ OF THE 13691, AND I'M GOING TO

10:44AM 13    ASK YOU A QUESTION ABOUT -- RELATED TO WHETHER IT REFRESHES

10:44AM 14    YOUR RECOLLECTION ON A PARTICULAR ISSUE IN JUST A MOMENT.

10:44AM 15    A.   OKAY.  THIS PAGE STATES PROSTHETIC --

10:44AM 16    Q.   I'M SORRY, DON'T -- BECAUSE WE'RE JUST USING IT FOR THIS

10:44AM 17    PURPOSE OF REFRESHING YOUR RECOLLECTION, DON'T READ IT OUT

10:44AM 18    LOUD.  JUST READ IT TO YOURSELF.

10:44AM 19         (PAUSE IN PROCEEDINGS.)

10:45AM 20            THE WITNESS:  I'VE FINISHED.

10:45AM 21    BY MS. TREFZ:

10:45AM 22    Q.   AND MY QUESTION HERE IS, DOES THIS DOCUMENT REFRESH YOUR

10:45AM 23    RECOLLECTION THAT PSA RESULTS ARE DIFFERENT -- FREQUENTLY

10:45AM 24    DIFFERENT AMONG DIFFERENT MEASUREMENT PROCEDURES?

10:46AM 25    A.   THEY CAN BE SLIGHTLY DIFFERENT.

10:46AM  1    Q.   AND DO YOU UNDERSTAND THAT HARMONIZATION OF RESULTS IS

10:46AM  2    CHALLENGING BECAUSE OF HOW THOSE PROCEDURES -- BECAUSE OF HOW

10:46AM  3    PSA IS FREQUENTLY MEASURED?

10:46AM  4    A.   I WOULD APPRECIATE IT IF YOU WOULD USE A DIFFERENT WORD

10:46AM  5    THAN "HARMONIZATION."  I'M NOT SURE WHAT YOU MEAN BY THAT.  IS

10:46AM  6    THAT CONSISTENT?

10:46AM  7    Q.   WHAT I MEAN BY IT IS BRINGING THOSE TWO METHODS IN, YOU

10:46AM  8    KNOW, UNDERSTANDING THE RELATIONSHIP BETWEEN THEM.  I WAS USING

10:46AM  9    THE LANGUAGE OF THE EXHIBIT FOR THAT PURPOSE, BUT --

10:46AM  10   A.   OKAY.  PLEASE RESTATE THE QUESTION.

10:46AM  11   Q.   SURE.  DO YOU UNDERSTAND THAT HARMONIZATION OF PSA RESULTS

10:46AM  12   IS PARTICULARLY CHALLENGING BECAUSE THE WAY THAT IT'S MEASURED

10:46AM  13   IS DIFFERENT IN DIFFERENT METHODS?

10:47AM  14   A.   NO, NOT APPRECIABLY.

10:47AM  15   Q.   OKAY.  I, I --

10:47AM  16   A.   MIGHT I EXPLAIN A LITTLE BIT?  I DON'T WANT TO GO INTO TOO

10:47AM  17   MUCH.

10:47AM  18   Q.   SURE, GO AHEAD.

10:47AM  19   A.   BUT FROM DIFFERENT LABS, THEY EXPECT SLIGHTLY DIFFERENT

10:47AM  20   VALUES FOR THE SAME TESTS, BUT THEY SHOULD BE PRETTY CLOSE TO

10:47AM  21   EACH OTHER.  AND WHEN I'M TALKING ABOUT CLOSE, WITHIN ABOUT 5

10:47AM  22   TO 10 PERCENT OF THE VALUES.

10:47AM  23        SO I WOULD NOT BE SURPRISED TO SEE SLIGHT VARIATION.

10:47AM  24        FOR EXAMPLE, IF I DID A TEST SEPARATE FROM, COMPLETELY

10:47AM  25   SEPARATE FROM THE PSA, SAY LIKE A SODIUM TEST, LIKE IT'S FROM

10:47AM 1   THE SAME SAMPLE, FROM THE SAME PATIENT, TO TWO DIFFERENT LABS,

10:47AM 2   ONE LAB MAY COME BACK AT 135 AND ONE MAY COME BACK AT 137, AND

10:47AM 3   THAT WOULD BE AN EXPECTED VARIATION.

10:47AM 4        BUT I WOULD NOT EXPECT IT TO BE 135 FOR ONE AND 120 WAY

10:48AM 5   OUT OF RANGE ON THE SAME PATIENT.

10:48AM 6        I WOULD EXPECT SOME VARIATION, BUT WITHIN REASON.

10:48AM 7   Q.   OKAY.  AND IS IT FAIR TO SAY THAT THE RANGE OF VARIATION

10:48AM 8   YOU WOULD EXPECT IS DIFFERENT FOR DIFFERENT ANALYTES THAT ARE

10:48AM 9   BEING MEASURED?

10:48AM 10  A.   YES.

10:48AM 11  Q.   AND YOU MENTIONED -- AND DO YOU HAVE AN UNDERSTANDING AS

10:48AM 12  TO WHETHER -- STRIKE THAT.

10:48AM 13       JUST TO UNDERSTAND PSA TESTS GENERALLY FOR ANOTHER MINUTE,

10:48AM 14  ARE -- I THINK YOU TESTIFIED THAT IN THIS PARTICULAR

10:48AM 15  CIRCUMSTANCE THE PATIENT WAS REQUESTED TO, REQUESTED TO HAVE

10:48AM 16  THIS TEST BECAUSE -- BY HIS CHURCH; CORRECT?

10:48AM 17  A.   YES.

10:48AM 18  Q.   IN FACT, WITH PSA TESTS, ISN'T, ISN'T IT THE CASE THAT

10:49AM 19  THERE'S ACTUALLY GUIDANCE THAT SUGGESTS THAT SOMETIMES THE

10:49AM 20  BENEFITS OF DOING A PSA TEST CAN BE -- CAN OUTWEIGH -- OR

10:49AM 21  SORRY.

10:49AM 22       THE RISKS OF DOING THE PSA TESTS CAN OUTWEIGH THE

10:49AM 23  BENEFITS?

10:49AM 24            MR. SCHENK:  OBJECTION.  RELEVANCE.

10:49AM 25            THE COURT:  SUSTAINED.

BURNES CROSS BY MS. TREFZ                                    6878

10:49AM   1                    MS. TREFZ:  MAY I --

10:49AM   2                    THE COURT:  WELL, THE RISK OF THE TEST AND WHY, THE

10:49AM   3        PURPOSE OF THE TEST BEING IS NOT REALLY AT ISSUE.

10:49AM   4                    MS. TREFZ:  WELL, HE'S BEEN OFFERED AS AN EXPERT ON

10:49AM   5        PSA TESTS, AND THERE'S BEEN OTHER TESTIMONY IN THE CASE ABOUT

10:49AM   6        PSA TESTS, SO I THOUGHT THIS WOULD BE AN OPPORTUNITY TO

10:49AM   7        EXPLORE.

10:49AM   8                    THE COURT:  HE'S AN EXPERT IN INTERPRETING PSA TEST

10:49AM   9        RESULTS AND BLOOD TESTS FOR PSA AND DIAGNOSING PROSTATE CANCER.

10:49AM   10            DOES YOUR QUESTION RELATE TO EITHER OF THOSE THREE?

10:49AM   11                   MS. TREFZ:  IT RELATES TO WHEN YOU RECOMMEND A PSA

10:50AM   12       TEST AND HOW --

10:50AM   13                   THE COURT:  WHY DON'T YOU ASK HIM THAT?

10:50AM   14                   MS. TREFZ:  OKAY.

10:50AM   15       Q.   DR. BURNES, IS IT FAIR TO SAY THAT YOU DON'T ALWAYS

10:50AM   16       RECOMMEND A PSA TEST FOR EVERY -- FOR EVERYONE ABOVE -- FOR

10:50AM   17       EVERY MALE ABOVE 50?

10:50AM   18       A.   NO.  I DO RECOMMEND IT.

10:50AM   19       Q.   YOU DO?

10:50AM   20       A.   UNLESS THERE'S SPECIAL CIRCUMSTANCES.  THE DEFAULT WOULD

10:50AM   21       BE FOR MALES OVER 50 I WOULD DO IT ABOUT EVERY YEAR, YEAR AND A

10:50AM   22       HALF.

10:50AM   23       Q.   AND ARE YOU AWARE OF THE -- ARE YOU FAMILIAR WITH THE

10:50AM   24       AMERICAN COLLEGE OF PHYSICIANS?

10:50AM   25       A.   YES.

BURNES CROSS BY MS. TREFZ

10:50AM 1   Q.   AND YOU WERE PREVIOUSLY ACP CERTIFIED; IS THAT RIGHT?

10:50AM 2   A.   I USED TO BE.

10:50AM 3   Q.   AND IN APRIL 2013, ACP RELEASED A NEW PROSTATE CANCER

10:51AM 4   SCREENING GUIDANCE.

10:51AM 5        ARE YOU AWARE OF THAT?

10:51AM 6   A.   YES.

10:51AM 7   Q.   AND ISN'T IT THE CASE THAT THE GUIDANCE WAS THAT MEN

10:51AM 8   BETWEEN THE AGES OF 50 AND 69 SHOULD DISCUSS THE LIMITED

10:51AM 9   BENEFITS AND SUBSTANTIAL HARMS OF THE PROSTATE SPECIFIC ANTIGEN

10:51AM 10  TEST WITH THEIR DOCTOR BEFORE UNDERGOING SCREENING FOR PROSTATE

10:51AM 11  CANCER?

10:51AM 12          MR. SCHENK:  OBJECTION.  RELEVANCE.

10:51AM 13          THE COURT:  IT HAS SOME RELEVANCE, SO I'LL ALLOW HIM

10:51AM 14  TO ANSWER THE QUESTION.

10:51AM 15       DID YOU UNDERSTAND THE QUESTION, DOCTOR?

10:51AM 16          THE WITNESS:  NO.  I WAS GOING TO ASK HER TO REPEAT

10:51AM 17  IT.

10:51AM 18          THE COURT:  SURE.  LET'S DO THAT.

10:51AM 19          MS. TREFZ:  SURE.

10:51AM 20  Q.   YOU MENTIONED THAT YOU RECALLED THAT ACP RELEASED PROSTATE

10:51AM 21  CANCER SCREENING GUIDANCE IN APRIL OF 2013.

10:51AM 22  A.   YES.

10:51AM 23  Q.   AND ISN'T IT THE CASE THAT THE FIRST LINE OF THAT GUIDANCE

10:51AM 24  IS THAT MEN BETWEEN THE AGES OF 50 AND 69 SHOULD DISCUSS THE

10:51AM 25  LIMITED BENEFITS AND SUBSTANTIAL HARMS OF THE PROSTATE SPECIFIC

10:52AM  1    ANTIGEN TEST WITH THEIR DOCTOR BEFORE UNDERGOING SCREENING FOR

10:52AM  2    PROSTATE CANCER?

10:52AM  3    A.   I AGREE WITH THE DISCUSSION WITH THE PATIENTS, BUT I

10:52AM  4    DISAGREE WITH THE RECOMMENDATION.

10:52AM  5    Q.   OKAY.  YOU DISAGREE WITH THE RECOMMENDATION, BUT YOU DON'T

10:52AM  6    DISAGREE THAT THAT WAS THE RECOMMENDATION; IS THAT CORRECT?

10:52AM  7    A.   THAT'S CORRECT.

10:52AM  8    Q.   OKAY.  DID YOU -- DID PATIENTS OF YOURS GO TO THERANOS

10:52AM  9    AFTER THE INCIDENT WITH DR. ELLSWORTH?

10:52AM  10   A.   POSSIBLY.  I DON'T RECALL.

10:52AM  11   Q.   OKAY.  YOU DON'T RECALL ONE WAY OR THE OTHER?

10:52AM  12   A.   NO, I DON'T RECALL.

10:52AM  13   Q.   OKAY.  AND DID THE GOVERNMENT ASK YOU AT ANY POINT FOR THE

10:52AM  14   FULL LIST OF PATIENTS OF YOURS THAT, THAT WERE TESTED AT

10:52AM  15   THERANOS?

10:52AM  16   A.   NO.

10:52AM  17            MS. TREFZ:  NO FURTHER QUESTIONS, YOUR HONOR.

10:53AM  18            THE COURT:  MR. SCHENK?

10:53AM  19            MR. SCHENK:  I DO, YOUR HONOR.

10:53AM  20                    **REDIRECT EXAMINATION**

10:53AM  21   BY MR. SCHENK:

10:53AM  22   Q.   DR. BURNES, I JUST WANTED TO FOLLOW UP ON A COUPLE OF

10:53AM  23   QUESTIONS THAT YOU WERE JUST ASKED.

10:53AM  24        THE FIRST AREA IS YOU READ SOME GUIDANCE ABOUT THE RISKS

10:53AM  25   OF THE PSA TEST.

10:53AM 1        DO YOU RECALL THAT?

10:53AM 2    A.   YES.

10:53AM 3    Q.   IS ONE OF THE RISKS THAT SOMEONE GETS A PSA TEST, IT IS

10:53AM 4    HIGH, HIGH IS INACCURATE, AND THEN THEY TAKE SOME MEDICAL STEP,

10:53AM 5    THEY INTERVENE SURGICALLY OR SOME OTHER WAY?

10:53AM 6    A.   THAT IS CORRECT.

10:53AM 7    Q.   SO THE TEST THAT I -- AND IF WE CAN BRING IT UP, ON

10:53AM 8    PAGE -- IT'S EXHIBIT 4938, PAGE 7.

10:54AM 9        IT'S ALSO ON THE SCREEN IF THAT'S EASIER FOR YOU.

10:54AM 10       THIS IS THE MAY 14TH, 2015 TEST THAT DR. ELLSWORTH GOT.

10:54AM 11       DO YOU RECALL THIS?

10:54AM 12   A.   YES.

10:54AM 13   Q.   SO THERANOS INFORMED YOU THAT DR. ELLSWORTH HAD A PSA

10:54AM 14   SCORE OF OVER 26; IS THAT RIGHT?

10:54AM 15   A.   YES.

10:54AM 16   Q.   AND IS THE GUIDANCE THAT YOU WERE JUST PROVIDED WARNING

10:54AM 17   DOCTORS FROM DOING PSA TESTS BECAUSE SOMETIMES YOU MIGHT GET AN

10:54AM 18   ERRONEOUS TEST RESULT LIKE THIS, AND A DOCTOR MIGHT TAKE SOME

10:54AM 19   UNNECESSARY MEDICAL INTERVENTION AS A RESULT OF THAT?

10:54AM 20   A.   YES, IF THEY'RE NOT PAYING ATTENTION.

10:54AM 21   Q.   PAYING ATTENTION TO WHAT?

10:54AM 22   A.   REALLY IT'S THE TREND.  I WANT TO KEEP MY EXPLANATION

10:54AM 23   SHORT, BUT IT'S NOT THE TOTAL RESULT THAT IS SO IMPORTANT

10:55AM 24   USUALLY.  IT'S THE RATE OF CHANGE.  SO YOU REALLY IDEALLY WANT

10:55AM 25   TO HAVE TRACKING WITH PATIENTS ABOUT EVERY YEAR, YEAR AND A

10:55AM  1    HALF OVER AGE 50, UNLESS THEY HAVE A HIGHER RISK DUE TO A

10:55AM  2    FAMILY HISTORY, THEN WE START CHECKING IT EARLIER.

10:55AM  3         AND THE PSA SHOULD GENERALLY SLOWLY RISE AS THE PROSTATE

10:55AM  4    SLOWLY ENLARGES OVER THE YEARS, BECAUSE BASICALLY DEBRIS THAT

10:55AM  5    IS EMITTED FROM THE PROSTATE INTO THE BLOOD, WHICH WE MEASURE,

10:55AM  6    AND IT WILL SLOWLY RISE BECAUSE OF THE GROWTH OF THE GLAND.

10:55AM  7         BUT IF YOU HAVE A METABOLICALLY ACTIVE PROCESS, SUCH AS

10:55AM  8    CANCER, IT WILL GENERATE MORE DEBRIS, AND THAT'S THE THEORY

10:55AM  9    ABOUT WHEN IT'S DEPOSITED IN THE BLOOD.

10:55AM 10         AND THAT RISES HOW WE USE THE USEFUL MEASURE THAT ALLOWS

10:55AM 11    US TO PICK UP PROSTATE CANCER YEARS BEFORE WE CAN FEEL IT ON

10:55AM 12    EXAM OR BY DIAGNOSTIC IMAGING.

10:55AM 13         SO THERE'S A VALID RISK THAT IF YOU'RE NOT PAYING CLOSE

10:55AM 14    ATTENTION TO YOUR PATIENTS, THAT IF YOU GET A TEST RESULT AND

10:55AM 15    IT'S HIGH, YOU MIGHT UNNECESSARILY SEND A PATIENT FOR A BIOPSY,

10:56AM 16    A PROCEDURE THAT HAS MORE RISK TO IT THAN SIMPLY DRAWING BLOOD,

10:56AM 17    AND THIS IS TRUE.

10:56AM 18         BUT THAT'S WHY -- BUT PSA'S ARE GENERALLY NEVER URGENT.

10:56AM 19    IF I THINK THE RESULT IS CONCERNING BECAUSE OF A CHANGE, I'LL

10:56AM 20    REPEAT IT IN TWO OR THREE MONTHS.  IF IT'S A VERY SIGNIFICANT

10:56AM 21    CONCERN, THEN I'LL SEND PEOPLE OFF TO A UROLOGIST FIRST.

10:56AM 22         OR IT CAN ALSO BE AN ERROR -- WELL, MAYBE NOT ERROR, BUT

10:56AM 23    INTERPRETED IMPROPERLY BECAUSE IT CAN BE ELEVATED DUE TO

10:56AM 24    INFLAMMATION OF THE PROSTATE GLAND, WHICH IS CALLED

10:56AM 25    PROSTATITIS, AND THAT WILL INCREASE THE VALUE AS WELL.

10:56AM   1          SO, AGAIN, COMING BACK TO THE FACT THAT IT IS NOT URGENT,

10:56AM   2    WE JUST LIKE TO PICK IT UP YEARS BEFORE IT'S TOO LATE TO DO

10:56AM   3    SOMETHING ABOUT IT.  WE HAVE TIME, OVER THE COURSE OF THE YEAR

10:56AM   4    OR TWO MONITORING PSA'S, TO DECIDE AT WHAT POINT IN TIME YOU'RE

10:56AM   5    GOING TO SEND PEOPLE FOR MORE INTERVENTION.

10:56AM   6          DR. ELLSWORTH'S SITUATION WAS DIFFERENT BECAUSE HE WAS --

10:57AM   7    IT WAS VERY UNUSUAL BECAUSE HE WAS GOING TO BE LEAVING THE

10:57AM   8    COUNTRY FOR TWO YEARS, SO WE WOULD LIKE -- IF THERE WAS AN

10:57AM   9    ISSUE, WE WOULD LIKE TO HAVE CLARIFIED IT.

10:57AM  10          THAT'S THE ONLY REASON FOR THE -- I WOULD HAVE REPEATED

10:57AM  11    THE TEST ANYWAY, BUT I WOULD HAVE HAD A LITTLE MORE TIME.  I

10:57AM  12    WOULDN'T TAKE ANY ACTION UNTIL I FELT MORE ASSURED THAT WAS A

10:57AM  13    VALID RESULT THAT WOULD WARRANT MORE INTERVENTION.

10:57AM  14    Q.   I SEE.

10:57AM  15    A.   THERE WAS NEVER ANY URGENCY FOR PSA.

10:57AM  16    Q.   FORGIVE ME.

10:57AM  17          I ALSO WANT TO ASK YOU A QUESTION ABOUT THE REFERENCE

10:57AM  18    RANGE.  YOU WERE ASKED SOME QUESTIONS ABOUT HARMONIZATION,

10:57AM  19    ABOUT TESTS AT ONE LAB BEING COMPARED TO TESTS AT ANOTHER LAB.

10:57AM  20          DO YOU REMEMBER THOSE QUESTIONS?

10:57AM  21    A.   YES.

10:57AM  22    Q.   ON THIS DOCUMENT, THERANOS PROVIDES A REFERENCE RANGE.

10:57AM  23          DO YOU SEE THAT?

10:57AM  24    A.   LESS THAN 4.0.

10:57AM  25    Q.   SO WHAT DOES A SCORE OF 26 MEAN IN LIGHT OF THAT REFERENCE

10:57AM   1    RANGE?

10:58AM   2    A.   IT WAS, IT WAS ABNORMAL.

10:58AM   3         BUT TO BE A LITTLE BIT MORE PRECISE, IN MY PRACTICE HOW I

10:58AM   4    INTERPRET IT, IT'S THE RATE OF RISE.

10:58AM   5         I'VE HAD PATIENTS WHO HAVE HAD PSA'S OF 18 THAT HAVE

10:58AM   6    SLOWLY RISEN OVER THE YEARS THAT YOU MIGHT -- THAT I BIOPSIED

10:58AM   7    THAT WERE MARKEDLY ELEVATED AND IT TURNED OUT IT WAS NEGATIVE.

10:58AM   8         I'VE HAD PATIENTS THAT I HAVE DIAGNOSED WITH PSA OF 2.5 AS

10:58AM   9    CANCER, BUT HIS VALUE HAD BEEN PRETTY STABLE AT LIKE 0.5, 0.6,

10:58AM  10    0.5, AND THEN THE FOLLOWING YEAR IT HAD A FIVE-FOLD RISE FROM

10:58AM  11    .5 TO 2.5.

10:58AM  12         BUT EVEN THOUGH THAT IS LESS THAN THE -- OR WITHIN THE

10:58AM  13    NORMAL RANGE BY THE LAB STANDARDS, IT'S THE RATE OF RISE IS

10:59AM  14    MORE IMPORTANT, AND THAT'S NEVER BEEN CHANGED ON THE LAB.  THE

10:59AM  15    RATE OF RISE IS WHERE YOU GET SUSPICIOUS.

10:59AM  16    Q.   THANK YOU.

10:59AM  17         NO FURTHER QUESTIONS.

10:59AM  18              MS. TREFZ:  NO FURTHER QUESTIONS.

10:59AM  19              THE COURT:  MAY THIS WITNESS BE EXCUSED?

10:59AM  20              MS. TREFZ:  HE MAY.

10:59AM  21              THE COURT:  THANK YOU.  YOU CAN LEAVE THE DOCUMENTS

10:59AM  22    THERE.  THANK YOU.  AND FEEL FREE TO TAKE THE MASK WITH YOU.

10:59AM  23              THE WITNESS:  OH, THANK YOU.

10:59AM  24              THE COURT:  DOES THE GOVERNMENT HAVE ANOTHER

10:59AM  25    WITNESS?

| | | |
|---|---|---|
| 10:59AM | 1 | MR. SCHENK:  WE DO, YOUR HONOR. |
| 10:59AM | 2 | THE COURT:  IS THIS WITNESS -- WILL THIS BE A BRIEF |
| 10:59AM | 3 | WITNESS AS WELL? |
| 10:59AM | 4 | MR. SCHENK:  YES, YOUR HONOR. |
| 10:59AM | 5 | THE COURT:  ALL RIGHT.  THANK YOU.  I SEE THIS IS |
| 10:59AM | 6 | THE TOP OF THE HOUR.  SHOULD WE TAKE OUR BREAK NOW?  IS THIS A |
| 10:59AM | 7 | GOOD TIME FOR OUR BREAK?  LET'S DO THAT. |
| 10:59AM | 8 | MR. SCHENK:  YES. |
| 10:59AM | 9 | THE COURT:  LET'S TAKE A 30 MINUTE BREAK NOW, LADIES |
| 10:59AM | 10 | AND GENTLEMEN, AND THEN WE'LL TAKE OUR NEXT WITNESS. |
| 11:01AM | 11 | (RECESS FROM 11:01 A.M. UNTIL 11:38 A.M.) |
| 11:38AM | 12 | THE COURT:  THANK YOU.  WE'RE BACK ON THE RECORD. |
| 11:38AM | 13 | ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN. |
| 11:38AM | 14 | DOES THE GOVERNMENT HAVE A WITNESS? |
| 11:38AM | 15 | MR. SCHENK:  YES, YOUR HONOR. |
| 11:38AM | 16 | THE UNITED STATES CALLS MEHRL ELLSWORTH. |
| 11:38AM | 17 | THE COURT:  GOOD MORNING, SIR.  IF YOU WOULD COME |
| 11:38AM | 18 | FORWARD AND FACE OUR COURTROOM DEPUTY. |
| 11:38AM | 19 | IF YOU WOULD RAISE YOUR RIGHT HAND, SHE HAS A QUESTION FOR |
| 11:38AM | 20 | YOU. |
| 11:38AM | 21 | THE WITNESS:  GOOD MORNING. |
| 11:38AM | 22 | THE CLERK:  GOOD MORNING. |
| 11:38AM | 23 | **(GOVERNMENT'S WITNESS, MEHRL ELLSWORTH, WAS SWORN.)** |
| 11:38AM | 24 | THE WITNESS:  YES. |
| 11:38AM | 25 | THE COURT:  I'LL INVITE YOU TO HAVE A SEAT UP HERE, |

11:38AM  1      SIR.

11:38AM  2          MAKE YOURSELF COMFORTABLE.  FEEL FREE TO ADJUST THAT CHAIR

11:38AM  3      AND MICROPHONE AS YOU NEED.

11:38AM  4          I'LL ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE MICROPHONE.

11:38AM  5          WHEN YOU ARE COMFORTABLE, I'D LIKE YOU TO STATE YOUR NAME

11:38AM  6      AND SPELL IT, PLEASE.

11:38AM  7          LET ME ASK YOU, HAVE YOU BEEN VACCINATED, SIR?

11:38AM  8          THE WITNESS:  YES, AND INCLUDING THE BOOSTER.

11:39AM  9          (LAUGHTER.)

11:39AM  10         THE WITNESS:  THREE OF THEM.

11:39AM  11         THE COURT:  THREE OF THEM.

11:39AM  12         WELL, IF YOU WOULD LIKE TO TAKE YOUR MASK OFF WHILE YOU

11:39AM  13     TESTIFY, YOU MAY DO SO.

11:39AM  14         THE WITNESS:  I WOULD PREFER THAT.

11:39AM  15         THE COURT:  GREAT.

11:39AM  16         AND MR. SCHENK WILL DO THAT AS WELL.

11:39AM  17         WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

11:39AM  18     AND THEN SPELL IT, PLEAS.

11:39AM  19         THE WITNESS:  MEHRL K. ELLSWORTH.  M-E-H-R-L, K,

11:39AM  20     ELLSWORTH, E-L-L-S-W-O-R-T-H.

11:39AM  21         THE COURT:  THANK YOU.  COUNSEL.

11:39AM  22                        **DIRECT EXAMINATION**

11:39AM  23     BY MR. SCHENK:

11:39AM  24     Q.  GOOD MORNING, DR. ELLSWORTH.

11:39AM  25         I'D LIKE TO ASK YOU SOME QUESTIONS, AND WE'RE GOING TO

11:39AM   1    FOCUS ON THE MAY, JUNE 2015 TIMEFRAME IF THAT'S OKAY.

11:39AM   2         AT THAT TIME WHERE DID YOU RESIDE?

11:39AM   3    A.   I LIVED IN LITCHFIELD PARK, ARIZONA.

11:39AM   4    Q.   AND WERE YOU EMPLOYED AT THE TIME?

11:39AM   5    A.   IN 2018?

11:39AM   6    Q.   2015.

11:39AM   7    A.   YES.

11:39AM   8    Q.   AND WHAT WERE YOU DOING?

11:39AM   9    A.   I WAS A DENTIST.

11:40AM   10   Q.   AND WERE YOU GETTING READY TO TAKE AN INTERNATIONAL TRIP

11:40AM   11   THAT SUMMER?

11:40AM   12   A.   YES.

11:40AM   13   Q.   BEFORE YOU TOOK THE TRIP, DID YOU GET A BLOOD TEST THROUGH

11:40AM   14   A COMPANY CALLED THERANOS?

11:40AM   15   A.   YES.

11:40AM   16   Q.   DID YOUR PHYSICIAN GIVE YOU INFORMATION ABOUT THE BLOOD

11:40AM   17   TEST AND WHERE TO GO?

11:40AM   18   A.   YES.  HE DIRECTED ME TO GO TO A WALGREENS, WHICH WAS

11:40AM   19   ACTUALLY BETWEEN HIS MEDICAL OFFICE AND MY DENTAL OFFICE.  WE

11:40AM   20   WERE ABOUT A MILE AND THREE-QUARTERS APART.

11:40AM   21   Q.   AND WHAT IS THE NAME OF YOUR PHYSICIAN?

11:40AM   22   A.   DR. MARK BURNES.

11:40AM   23   Q.   WAS THE BLOOD TEST THAT YOU GOT BEFORE THIS INTERNATIONAL

11:40AM   24   TRIP DIFFERENT THAN YOUR ANNUAL PHYSICAL BLOOD TEST?

11:40AM   25   A.   WAS IT DIFFERENT?  HOW IT WAS ADMINISTERED?

11:40AM  1    Q.   NO, I'M SORRY.  THAT WAS UNCLEAR.

11:40AM  2         WAS IT NOT AT THE SAME SCHEDULE?

11:40AM  3    A.   CORRECT, CORRECT.  IT WAS STEPPED UP A LITTLE FASTER

11:41AM  4    BECAUSE OF THE REQUIREMENTS OF MY CHURCH.

11:41AM  5    Q.   OKAY.  AND WHAT DO YOU MEAN BY THAT?

11:41AM  6    A.   I HAD VOLUNTEERED AS A HUMANITARIAN DIRECTOR FOR

11:41AM  7    THAILAND-MYANMAR.  ANYWAY, I WAS ASKED TO SERVE WHAT WE TERM A

11:41AM  8    MISSION FOR THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS,

11:41AM  9    AND I WAS A VOLUNTEER, AND THEY PUT YOU THROUGH A FINE TOOTH

11:41AM  10   COMB BEFORE YOU GO OUT OF THE COUNTRY BECAUSE THEY TAKE CARE OF

11:41AM  11   ALL MEDICAL EXPENSES WHEN YOU DO THAT.

11:41AM  12   Q.   AND SO YOU HAD TO HAVE A BLOOD TEST BEFORE YOU LEFT?

11:41AM  13   A.   YES.

11:41AM  14   Q.   AND AMONG THE TESTS, WAS PSA ONE OF THE TESTS?

11:41AM  15   A.   NORMALLY IT WAS FROM THE CLEVELAND LABS, YES.

11:41AM  16   Q.   AND HOW ABOUT ON THIS OCCASION BEFORE YOUR INTERNATIONAL

11:41AM  17   TRIP?  WAS A PSA TEST DONE?

11:41AM  18   A.   IT WAS EXCLUDED WITHIN THE 365 DAYTIME PERIOD BECAUSE I

11:41AM  19   PUSHED IT UP A LITTLE EARLIER, AND THEN THE FOREMAN FROM OUR

11:42AM  20   CHURCH REQUIRED THAT I NEEDED TO HAVE THE PSA.

11:42AM  21   Q.   YOU SAID IT WAS EXCLUDED.  I WONDER WHAT YOU MEAN BY THAT.

11:42AM  22   A.   IT WAS EXCLUDED BECAUSE -- IT WASN'T BEING PAID FOR,

11:42AM  23   BECAUSE IF YOU DO IT SOONER THAN 365 DAYS, MEDICARE THAT I WAS

11:42AM  24   UNDER, I GUESS, DIDN'T COVER IT.

11:42AM  25   Q.   I SEE.  SO INSURANCE WOULDN'T PAY FOR THE PSA TEST, SO YOU

11:42AM   1    HAD TO PAY FOR IT?

11:42AM   2    A.   YES.

11:42AM   3    Q.   AND WAS THAT ONE OF THE REASONS THAT YOU CHOSE TO GO TO

11:42AM   4    THERANOS?

11:42AM   5    A.   YES, BUT MAINLY ON THE ADVICE OF MY PHYSICIAN.

11:42AM   6    Q.   WHEN YOU GOT A BLOOD TEST AT THERANOS, DID YOU EXPECT THE

11:42AM   7    RESULTS TO BE ACCURATE?

11:42AM   8    A.   YES.

11:42AM   9    Q.   AND WAS ACCURACY IMPORTANT TO YOU?

11:42AM   10   A.   YES.

11:42AM   11   Q.   IT MIGHT BE OBVIOUS, BUT WHY?

11:42AM   12   A.   I HAVE A DEGREE IN MICROBIOLOGY AND A MINOR IN CHEMISTRY,

11:42AM   13   AND I WORKED IN SCIENCE ALL OF MY LIFE, AND ACCURACY WITH MY

11:42AM   14   LAB RESULTS WAS IMPORTANT.

11:42AM   15   Q.   DO BLOOD TESTS HAVE ANY VALUE OTHER THAN IF THEY ARE

11:42AM   16   ACCURATE?  CAN YOU USE THEM FOR SOMETHING ELSE?

11:42AM   17   A.   ARE BLOOD TESTS --

11:43AM   18        THE COURT:  MAYBE YOU SHOULD ASK THAT QUESTION A

11:43AM   19   DIFFERENT WAY.

11:43AM   20   BY MR. SCHENK:

11:43AM   21   Q.   WHY DON'T WE TURN TO THE DOCUMENTS?

11:43AM   22   A.   OKAY.

11:43AM   23   Q.   IF YOU WOULD LOOK AT -- THERE'S A BINDER IN FRONT OF YOU.

11:43AM   24   4938 IS THE EXHIBIT NUMBER.  IF YOU WOULD TURN TO PAGE 7.

11:43AM   25   A.   SEVEN.

11:43AM   1          MR. SCHENK:  AND THIS HAS BEEN ADMITTED, YOUR HONOR.

11:43AM   2          THE COURT:  YES.

11:43AM   3          THE WITNESS:  OKAY.

11:43AM   4     BY MR. SCHENK:

11:43AM   5     Q.   AND IT'S ON THE SCREEN IF THAT EASIER.

11:43AM   6          DR. ELLSWORTH, IT LOOKS LIKE WE'RE LOOKING AT A BLOOD TEST

11:43AM   7     THAT HAPPENED FOLLOWING A VISIT ON MAY 14TH, 2015.

11:43AM   8          DO YOU RECALL THAT?

11:43AM   9     A.   YES, I DO.

11:43AM  10     Q.   AND WHERE DID YOU GO TO GET THIS BLOOD TEST?

11:43AM  11     A.   I WENT TO THE WALGREENS ON LITCHFIELD PARK ROAD.

11:43AM  12     Q.   IS THAT IN ARIZONA?

11:43AM  13     A.   YES, ACTUALLY IN LITCHFIELD PARK.  IT SAYS GOODYEAR, BUT

11:43AM  14     IT'S JUST ACROSS THE STREET FROM MY RESIDENCE.

11:44AM  15     Q.   OKAY.  HOW DID YOU PAY FOR THE TEST RESULT?

11:44AM  16     A.   I PAID WITH A CREDIT CARD.

11:44AM  17     Q.   USING YOUR OWN PERSONAL FUNDS?

11:44AM  18     A.   YES.

11:44AM  19     Q.   DO YOU REMEMBER THE METHOD OF BLOOD DRAW FOR THIS

11:44AM  20     PARTICULAR TEST?

11:44AM  21     A.   IT WAS A FINGER PRICK.

11:44AM  22     Q.   AND IT LOOKED LIKE THE BLOOD TEST CAME BACK AS A 26.

11:44AM  23          DO YOU SEE THAT?

11:44AM  24     A.   I SEE, YES, 26.1.

11:44AM  25     Q.   AND WAS 26 DIFFERENT THAN PRIOR PSA TEST RESULTS THAT YOU

11:44AM  1    RECEIVED?

11:44AM  2    A.   YES, I HAD NEVER EXCEEDED A 2.

11:44AM  3    Q.   IF YOU WILL NOW TURN ONE PAGE FORWARD TO PAGE 6.

11:44AM  4         IT LOOKS LIKE ON PAGE 6 WE'RE LOOKING AT A BLOOD TEST

11:44AM  5    RESULT FROM MAY 18TH, 2015, AT THERANOS.

11:44AM  6         IS THAT RIGHT?

11:44AM  7    A.   CORRECT.

11:44AM  8    Q.   DID YOU GO TO THE SAME WALGREENS FOR THIS?

11:44AM  9    A.   YES.

11:44AM  10   Q.   DID YOU ALSO RECEIVE A FINGERSTICK TO DRAW YOUR BLOOD?

11:44AM  11   A.   YES.

11:44AM  12   Q.   AND HOW ABOUT THE PAYMENT?  HOW DID YOU PAY FOR THIS ONE?

11:45AM  13   A.   AGAIN, MY CREDIT CARD.  IT WAS JUST EASIER AND QUICKER.

11:45AM  14   Q.   CREDIT CARD DRAWN ON YOUR PERSONAL FUNDS?

11:45AM  15   A.   YES, PERSONAL FUNDS.

11:45AM  16   Q.   OKAY.  IF I COULD ASK YOU TO TURN TO PAGE 5.

11:45AM  17        ON PAGE 5 IT LOOKS LIKE THERE'S A VISIT DATE OF JUNE 11,

11:45AM  18   2015.

11:45AM  19        IS THIS A THIRD BLOOD TEST THROUGH THERANOS?

11:45AM  20   A.   YES, IT IS.

11:45AM  21   Q.   AND WHERE DID YOU GO FOR THIS TEST?

11:45AM  22   A.   TO THE SAME LOCATION IN GOODYEAR.

11:45AM  23   Q.   WALGREENS?

11:45AM  24   A.   WALGREENS, YES.

11:45AM  25   Q.   AND WHAT WAS THE FORM OF BLOOD DRAW?

11:45AM  1     A.   FINGER PRICK.

11:45AM  2     Q.   AND HOW ABOUT PAYMENT?  DO YOU REMEMBER HOW YOU PAID?

11:45AM  3     A.   AGAIN, WITH MY PERSONAL CREDIT CARD.

11:45AM  4     Q.   ALL RIGHT.  IF YOU'LL NOW TURN TO PAGE 4, IT LOOKS LIKE

11:46AM  5     THIS ONE IS A BLOOD TEST RESULT ON JUNE 30TH, 2015.

11:46AM  6          IS THIS THE FOURTH THERANOS BLOOD TEST?

11:46AM  7     A.   YES.

11:46AM  8     Q.   DO YOU REMEMBER WHERE THE BLOOD DRAW WAS FOR THIS ONE?

11:46AM  9     A.   A PHLEBOTOMIST WAS DIRECTED BY THERANOS TO COME TO MY

11:46AM 10     OFFICE AND DO A VENOUS BLOOD DRAW.

11:46AM 11     Q.   THIS ONE WAS BY VEIN, COMPARED TO THE OTHERS?

11:46AM 12     A.   CORRECT.

11:46AM 13     Q.   HOW ABOUT PAYMENT?  DID YOU PAY FOR THIS ONE?

11:46AM 14     A.   THERE WAS NO PAYMENT ASKED OR REQUESTED.  IT WAS JUST

11:46AM 15     BEING DONE AS A COURTESY, I SUPPOSE.

11:46AM 16     Q.   SO YOU PAID OUT OF POCKET FOR THE FIRST THREE TESTS, BUT

11:46AM 17     YOU PAID NOTHING FOR THIS FOURTH TEST?

11:46AM 18     A.   CORRECT.

11:46AM 19     Q.   THANK YOU.

11:46AM 20          MR. SCHENK:  YOUR HONOR, MAY I HAVE A MOMENT?

11:46AM 21          THE COURT:  YES.

11:47AM 22     (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

11:47AM 23          MR. SCHENK:  THANK YOU, YOUR HONOR.

11:47AM 24     NO FURTHER QUESTIONS.

11:47AM 25          MS. TREFZ:  WE HAVE NO QUESTIONS, YOUR HONOR.

| | | |
|---|---|---|
| 11:47AM | 1 | THE COURT:  MAY THIS WITNESS BE EXCUSED? |
| 11:47AM | 2 | MR. SCHENK:  YES, YOUR HONOR. |
| 11:47AM | 3 | THE COURT:  YOU'RE EXCUSED. |
| 11:47AM | 4 | DOES THE GOVERNMENT HAVE ANOTHER WITNESS? |
| 11:47AM | 5 | MR. BOSTIC:  YES, YOUR HONOR.  THE UNITED STATES |
| 11:47AM | 6 | CALLS ROGER PARLOFF. |
| 11:48AM | 7 | THE COURT:  SIR, IF YOU WOULD COME FORWARD, PLEASE. |
| 11:48AM | 8 | IF YOU WOULD FACE OUR COURTROOM DEPUTY HERE WHILE YOU RAISE |
| 11:48AM | 9 | YOUR RIGHT HAND, SHE HAS A QUESTION FOR YOU. |
| 11:48AM | 10 | **(GOVERNMENT'S WITNESS, ROGER PARLOFF, WAS SWORN.)** |
| 11:48AM | 11 | THE WITNESS:  YES. |
| 11:48AM | 12 | THE COURT:  PLEASE HAVE A SEAT HERE, SIR, AND MAKE |
| 11:48AM | 13 | YOURSELF COMFORTABLE. |
| 11:48AM | 14 | PLEASE FEEL FREE TO ADJUST THE CHAIR AND MICROPHONE AS YOU |
| 11:48AM | 15 | NEED. |
| 11:48AM | 16 | WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME |
| 11:48AM | 17 | AND THEN SPELL IT, PLEASE. |
| 11:48AM | 18 | THE WITNESS:  ROGER PARLOFF.  P-A-R-L-O-F-F, AS IN |
| 11:48AM | 19 | FRANK. |
| 11:48AM | 20 | THE COURT:  THANK YOU. |
| 11:48AM | 21 | COUNSEL. |
| 11:48AM | 22 | MR. BOSTIC:  THANK YOU, YOUR HONOR. |
| 11:48AM | 23 | /// |
| 11:48AM | 24 | /// |
| 11:48AM | 25 | /// |

**DIRECT EXAMINATION**

BY MR. BOSTIC:

Q.   GOOD MORNING, MR. PARLOFF.

A.   GOOD MORNING.

Q.   IF YOU ARE VACCINATED AND COMFORTABLE TESTIFYING WITHOUT A

MASK, THE COURT WILL ALLOW YOU TO DO SO.

A.   OKAY.

Q.   MR. PARLOFF, WHAT IS YOUR OCCUPATION?

A.   I'M A JOURNALIST, REPORTER.

Q.   AND CAN YOU GIVE US A BRIEF OVERVIEW OF YOUR EDUCATION,

PLEASE.

A.   I GRADUATED FROM HARVARD IN '77 AND FROM YALE LAW SCHOOL

IN '82.

Q.   AND DID YOU EVER PRACTICE AS A LAWYER DURING YOUR CAREER?

A.   YEAH, ABOUT FIVE YEARS.

Q.   GIVE US A BRIEF SUMMARY OF YOUR CAREER AS A JOURNALIST,

PLEASE.

A.   IN 1988 I BECAME A FULL-TIME JOURNALIST.  I WORKED WITH

THE AMERICAN LAWYER PUBLICATION FOR -- OR COMPANY FOR ABOUT

12 YEARS.  I WROTE A BOOK WHILE I WAS THERE, WHICH WAS

PUBLISHED BY LITTLE BROWN, ABOUT A DEATH PENALTY CASE.

     I SWITCHED PUBLICATIONS IN 2000, AND THAT PUBLICATION

FOLDED, AND THEN I FREELANCED FOR A COUPLE OF YEARS.

     AND IN 2004 I WENT ON STAFF AT "FORTUNE" AS BASICALLY

THEIR MAIN LEGAL CORRESPONDENT.

11:50AM  1        AND THEN I WAS THERE FOR ANOTHER 12 YEARS THROUGH THE END

11:50AM  2    OF 2016.

11:50AM  3        SINCE THEN I'VE BEEN FREELANCING MAINLY FOR A PUBLICATION

11:50AM  4    CALLED "YAHOO FINANCE," BUT ALSO I HAVE PUBLISHED IN OTHER

11:50AM  5    PLACES LIKE "PROPUBLICA" AND "NEW YORK TIMES" AND THE ONLINE

11:50AM  6    VERSIONS OF "THE NEW YORKER" AND "NEW YORK" AND A PUBLICATION

11:50AM  7    CALLED "AIR MAIL."

11:50AM  8        RECENTLY I TOOK A CONTRACT POSITION WITH -- I'M A SENIOR

11:50AM  9    EDITOR AT A PUBLICATION CALLED "LAWFARE," L-A-W-F-A-R-E.

11:50AM  10   Q.   YOU MENTIONED THAT YOU WORKED FOR "FORTUNE" MAGAZINE IN

11:51AM  11   2014; IS THAT CORRECT?

11:51AM  12   A.   THAT'S RIGHT.

11:51AM  13   Q.   AND FOR A NUMBER OF YEARS BEFORE AND AFTER 2014?

11:51AM  14   A.   YEAH.

11:51AM  15   Q.   IN CONNECTION WITH YOUR EMPLOYMENT AT "FORTUNE," DID YOU

11:51AM  16   HAVE OCCASION TO WRITE AN ARTICLE ABOUT DEFENDANT

11:51AM  17   ELIZABETH HOLMES AND HER COMPANY THERANOS?

11:51AM  18   A.   YES.

11:51AM  19   Q.   WHAT KIND OF ARTICLE WAS THAT?  WAS IT A PROFILE?  WAS IT

11:51AM  20   INVESTIGATIVE REPORTING?  HOW WOULD YOU CHARACTERIZE IT?

11:51AM  21   A.    IT WAS A PROFILE OF BOTH HER AND HER COMPANY.

11:51AM  22   Q.   WHEN YOU WOULD WRITE PROFILES IN CONNECTION WITH YOUR JOB

11:51AM  23   AT "FORTUNE," WOULD YOU STRIVE TO MAKE SURE THE ARTICLE THAT

11:51AM  24   YOU CREATED ACCURATELY REFLECTED THE INFORMATION THAT YOU

11:51AM  25   RECEIVED FROM YOUR SUBJECTS?

11:51AM  1    A.   YES.

11:51AM  2    Q.   HOW DO YOU ACCOMPLISH THAT?  CAN YOU TELL US ABOUT YOUR

11:51AM  3    APPROACH TO THAT KIND OF ARTICLE?

11:51AM  4    A.   WELL, WITH A PROFILE I TRIED TO GET AS MUCH TIME WITH THE

11:52AM  5    SUBJECT AS POSSIBLE.  I LIKE TO TAPE AS MUCH AS POSSIBLE, AND I

11:52AM  6    ALSO LIKE TO SPEAK TO PEOPLE WHO KNOW THE SUBJECT WELL, KNOW

11:52AM  7    THE PERSON WELL, AND GET THE BIG CHUNK OF TIME WITH THE PERSON

11:52AM  8    TO DESCRIBE THEIR BIOGRAPHY AND HOW THEY GOT INTO WHAT THEY'RE

11:52AM  9    DOING AND SO ON.

11:52AM  10   Q.   YOU MENTIONED TAPING.

11:52AM  11        IS IT PART OF YOUR NORMAL PRACTICE TO RECORD SOME

11:52AM  12   INTERVIEWS WITH SUBJECTS THAT YOU'RE PROFILING?

11:52AM  13   A.   YES.

11:52AM  14   Q.   WHEN YOU DO THAT, DO YOU GET THEIR CONSENT TO RECORD?

11:52AM  15   A.   YES.

11:52AM  16   Q.   HOW ABOUT FOR CONVERSATIONS YOU HAVE WITH THEM THAT AREN'T

11:52AM  17   AUDIO RECORDED?  HOW DO YOU KEEP TRACK OF THOSE?

11:52AM  18   A.   I TAKE NOTES.  I USUALLY TAKE THEM IN A SPIRAL NOTEBOOK,

11:52AM  19   AND I USE SOMETHING CALLED SPEED WRITING, WHICH IS A VERY

11:53AM  20   SIMPLE FORM OF SHORTHAND.

11:53AM  21        AND THEN -- WELL --

11:53AM  22   Q.   I DIDN'T MEAN TO INTERRUPT.

11:53AM  23   A.   AND THEN IF IT'S AN ARTICLE FOR THE WEB AND IT'S GOING TO

11:53AM  24   GO UP QUICKLY, THAT MIGHT BE ALL I DO.

11:53AM  25        IF IT'S GOING TO BE A FEATURE ARTICLE OR SOMETHING WHERE

PARLOFF DIRECT BY MR. BOSTIC

11:53AM  1    TIME IS GOING TO ELAPSE, I WOULD TRANSCRIBE THE NOTES FROM THE

11:53AM  2    SPIRAL NOTEBOOK INTO A COMPUTER FILE.

11:53AM  3    Q.   IN CONNECTION WITH THE ARTICLE THAT YOU WROTE ABOUT

11:53AM  4    MS. HOLMES AND THERANOS, DID YOU HAVE OCCASION TO INTERVIEW

11:53AM  5    MS. HOLMES?

11:53AM  6    A.   YES.

11:53AM  7    Q.   DID YOU SPEAK TO HER ON A NUMBER OF OCCASIONS?

11:53AM  8    A.   YES.

11:53AM  9    Q.   CAN YOU ESTIMATE FOR US HOW MANY HOURS OF DISCUSSIONS YOU

11:53AM  10   HAD WITH MS. HOLMES IN CONNECTION WITH YOUR WRITING FOR

11:53AM  11   "FORTUNE"?

11:54AM  12   A.   YEAH.  FOR THE -- WELL, FOR THE FIRST ARTICLE, WHICH --

11:54AM  13   AND THE ONLY MAGAZINE ARTICLE, WHICH CAME OUT IN JUNE OF 2014,

11:54AM  14   I HAD ABOUT TEN HOURS OF TAPES.

11:54AM  15       AND SO THEN I WOULD ESTIMATE, MAYBE BALLPARK, ANOTHER TWO,

11:54AM  16   TWO AND A HALF, THREE HOURS OF INTERVIEWS THAT WEREN'T TAPED.

11:54AM  17       AND THEN AFTER THAT ARTICLE, I CONTINUED TO SPEAK TO HER

11:54AM  18   FROM TIME TO TIME.

11:54AM  19   Q.   YOU MENTIONED THAT SOME OF YOUR CONVERSATIONS WITH

11:54AM  20   MS. HOLMES WERE AUDIO RECORDED, OTHERS WERE NOT.

11:54AM  21       FOR THE CONVERSATIONS THAT WERE NOT AUDIO RECORDED, DID

11:54AM  22   YOU TAKE CONTEMPORANEOUS NOTES OF SOME OF THOSE CONVERSATIONS?

11:54AM  23   A.   YES.  MOST.  SOME, NOT ALL.

11:54AM  24   Q.   AND WERE THERE, FINALLY, SOME CONVERSATIONS THAT YOU HAD

11:54AM  25   WITH MS. HOLMES WHERE AUDIO RECORDING AND NOTE-TAKING JUST

11:55AM   1    WEREN'T POSSIBLE OR YOU CHOSE NOT TO?

11:55AM   2    A.    THAT'S RIGHT.

11:55AM   3    Q.    CAN YOU TELL US ABOUT HOW YOU INITIALLY WERE PUT IN

11:55AM   4    CONTACT WITH MS. HOLMES?

11:55AM   5    A.    WELL, IT WAS THROUGH THE, THE LAW FIRM OF BOIES,

11:55AM   6    SCHILLER & FLEXNER, THE LAW OFFICE OF DAVID BOIES.

11:55AM   7          INITIALLY THE DIRECTOR OF COMMUNICATIONS OF THAT LAW FIRM

11:55AM   8    CALLED ME IN MARCH OF 2014 AND HAD SUGGESTED THAT I MIGHT WANT

11:55AM   9    TO WRITE AN ARTICLE ABOUT A LAWSUIT THAT THERANOS HAD JUST WON,

11:55AM  10    A PATENT RELATED LAWSUIT.

11:56AM  11          AND I HADN'T BEEN FOLLOWING IT IN NEWSLETTERS AND THOUGHT

11:56AM  12    IT MIGHT BE INTERESTING, BUT -- AND SO -- EXCUSE ME.

11:56AM  13          WE HAD SOME INITIAL BACK AND FORTH, AND THE WORD COMING

11:56AM  14    BACK TO ME FROM THE FIRM WAS THAT BOIES WOULD BE -- BOIES HAD

11:56AM  15    REPRESENTED THERANOS, DAVID BOIES, A VERY EMINENT LAWYER.

11:56AM  16          AND THE WORD COMING BACK TO ME WAS THAT HE WOULD BE HAPPY

11:56AM  17    TO COOPERATE WITH SUCH AN ARTICLE, BUT THE REAL STORY WAS THIS

11:56AM  18    REMARKABLE COMPANY AND ITS REMARKABLE FOUNDER AND CEO,

11:56AM  19    ELIZABETH HOLMES.

11:56AM  20    Q.    DID YOU, PARTIALLY IN RESPONSE TO THAT, SWITCH YOUR FOCUS

11:56AM  21    AND START MOVING TOWARDS WRITING A PROFILE OF MS. HOLMES AND

11:57AM  22    THE COMPANY?

11:57AM  23    A.    YES, ALMOST IMMEDIATELY.

11:57AM  24              MR. BOSTIC:  MAY I APPROACH, YOUR HONOR?

11:57AM  25              THE COURT:  YES.

11:57AM  1    BY MR. BOSTIC:

11:57AM  2    Q.   (HANDING.)

11:57AM  3         MR. PARLOFF, I'VE HANDED YOU A BINDER, AND FROM TIME TO

11:57AM  4    TIME I'LL ASK YOU TO TURN TO TABS.

11:57AM  5         LET'S START WITH EXHIBIT 1776.

11:57AM  6         YOUR HONOR, THIS IS IN EVIDENCE.  MAY WE PUBLISH?

11:57AM  7              THE COURT:  YES.

11:57AM  8    BY MR. BOSTIC:

11:57AM  9    Q.   MR. PARLOFF, IS EXHIBIT 1776 A COPY OF AN ARTICLE YOU

11:57AM 10    WROTE ABOUT MS. HOLMES AND THERANOS?

11:57AM 11    A.   YES.

11:57AM 12    Q.   AND WAS THIS ARTICLE PUBLISHED ON OR AROUND JUNE 12TH,

11:57AM 13    2014?

11:57AM 14    A.   YES.

11:57AM 15    Q.   AND THE TITLE AT THE TOP READS, "THIS CEO'S OUT FOR

11:57AM 16    BLOOD."

11:57AM 17         IS THAT THE TITLE OF THE ARTICLE?

11:57AM 18    A.   I REMEMBER THAT -- YEAH, UH-HUH.

11:57AM 19    Q.   I'LL ASK YOU TO TURN NOW IN YOUR BINDER TO TAB 5485,

11:58AM 20    PLEASE.

11:58AM 21    A.   INCIDENTALLY, I THINK THE TITLE WAS DIFFERENT IN THE

11:58AM 22    MAGAZINE, BUT I CAN'T REMEMBER WHAT IT WAS.

11:58AM 23    Q.   UNDERSTOOD.  OKAY.  THANK YOU.

11:58AM 24    A.   5480?

11:58AM 25    Q.   5485.

11:58AM  1    A.   YEAH, UH-HUH.

11:58AM  2    Q.   DO YOU HAVE THAT IN FRONT OF YOU?

11:58AM  3    A.   YEAH.

11:58AM  4    Q.   AND IS 5485 AN EMAIL EXCHANGE BETWEEN YOU AND MS. HOLMES

11:58AM  5    IN CONNECTION WITH YOU PREPARING THIS ARTICLE?

11:58AM  6    A.   YES.  DO I BEGIN FROM THE BOTTOM?

11:58AM  7    Q.   TAKE A MOMENT TO REVIEW.  IT'S A PAGE AND A LITTLE BIT

11:58AM  8    MORE.

11:58AM  9         I'LL ASK YOU ABOUT THE SUBSTANCE, BUT FOR NOW MY ONLY

11:59AM  10   QUESTION IS, DO YOU RECOGNIZE THIS AS AN EMAIL BETWEEN YOU AND

11:59AM  11   MS. HOLMES?

11:59AM  12   A.   YEAH.  YES.

11:59AM  13        MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT MOVES TO

11:59AM  14   ADMIT 5485.  I BELIEVE THE DEFENSE HAS STIPULATED.

11:59AM  15        MR. CLINE:  NO OBJECTION.

11:59AM  16        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:59AM  17        (GOVERNMENT'S EXHIBIT 5485 WAS RECEIVED IN EVIDENCE.)

11:59AM  18   BY MR. BOSTIC:

11:59AM  19   Q.   MR. PARLOFF, FEEL FREE TO POUR YOURSELF A CUP OF WATER IF

11:59AM  20   YOU WOULD LIKE.

11:59AM  21   A.   THANK YOU.

11:59AM  22        COULD I EXPLAIN?  I HAVE A SEASONAL ALLERGY AND THE

11:59AM  23   SYMPTOM IS A DRY COUGH.  IT HAPPENS EVERY NOVEMBER.

11:59AM  24        I HAVE THREE VACCINES AND I'M FEELING FINE.

11:59AM  25        (LAUGHTER.)

11:59AM   1          MR. BOSTIC:  I NEVER THOUGHT WE'D NEED TO EXPLAIN A

11:59AM   2   COUGH.

11:59AM   3          THE COURT:  WE APPRECIATE THAT, SIR, AND WELCOME TO

11:59AM   4   CALIFORNIA IN THE FALL.

11:59AM   5   BY MR. BOSTIC:

11:59AM   6   Q.   MR. PARLOFF, ON THE SCREEN IN FRONT OF YOU NOW, YOU SHOULD

11:59AM   7   SEE EXHIBIT 5485, THE EMAIL CHAIN THAT WE WERE JUST TALKING

11:59AM   8   ABOUT.

11:59AM   9          DO YOU SEE THAT?

11:59AM  10   A.   YEAH.

11:59AM  11   Q.   AND LET'S ZOOM IN, MS. HOLLIMAN, ON THE BOTTOM EMAIL

11:59AM  12   MESSAGE IF WE CAN.

11:59AM  13          MR. PARLOFF, DO YOU SEE AN EMAIL FROM YOU TO MS. HOLMES ON

12:00PM  14   APRIL 2ND, 2014?

12:00PM  15   A.   YES.

12:00PM  16   Q.   YOU WRITE, "GREAT SPEAKING WITH YOU JUST NOW, ELIZABETH.

12:00PM  17   HERE'S MY CONTACT INFORMATION."

12:00PM  18          AND YOU TALK ABOUT SOME TRAVEL PLANS THAT ARE COMING UP?

12:00PM  19   A.   YES.

12:00PM  20   Q.   IS THAT RIGHT?

12:00PM  21          WAS THIS AROUND THE TIME WHEN YOU FIRST GOT INTO CONTACT

12:00PM  22   WITH MS. HOLMES?

12:00PM  23   A.   YES.

12:00PM  24   Q.   YOU PROVIDE A LIST BELOW.

12:00PM  25          IS THAT A LIST OF TASKS OR APPROACHES THAT YOU WERE

12:00PM  1    THINKING OF TAKING TO PREPARE AND RESEARCH YOUR ARTICLE?

12:00PM  2    A.   YES.

12:00PM  3    Q.   NUMBER 1 ON THAT LIST ASKS FOR A GOOD CHUNK OF TIME JUST

12:00PM  4    TO WALK THROUGH THE CHRONOLOGY OF MS. HOLMES'S LIFE, HER

12:00PM  5    DECISION TO FOUND THE COMPANY, AND THE KEY INVENTIONS AND

12:00PM  6    LANDMARKS ALONG THE WAY.

12:00PM  7         DO YOU SEE THAT?

12:00PM  8    A.   YES.

12:00PM  9    Q.   AND NUMBER 2 EXPRESSES YOUR INTEREST IN A CHANCE TO SEE

12:00PM  10   MS. HOLMES IN ACTION AT WORK, MAYBE SHADOWING HER FOR A PORTION

12:00PM  11   OF A DAY.

12:00PM  12        DO YOU SEE THAT?

12:00PM  13   A.   YES.

12:00PM  14   Q.   AND LET'S GO UP IN THIS EMAIL CHAIN AND ZOOM IN ON THE TOP

12:01PM  15   PART, THE TWO TOP MESSAGES.

12:01PM  16        FIRST, IN THE BOTTOM OF THIS SELECTION, DO YOU SEE ANOTHER

12:01PM  17   EMAIL FROM YOU THE FOLLOWING DAY TALKING ABOUT, AGAIN, AN

12:01PM  18   UPCOMING TRAVEL TO MEET WITH MS. HOLMES?

12:01PM  19   A.   YEAH.

12:01PM  20   Q.   AND DID YOU, IN FACT, MEET IN PERSON WITH MS. HOLMES THE

12:01PM  21   WEEK AFTER THIS EMAIL?

12:01PM  22   A.   YES.

12:01PM  23   Q.   IN THAT SAME EMAIL YOU EXPRESS INTEREST IN HAVING THE

12:01PM  24   EXPERIENCE OF GETTING YOUR BLOOD TESTED USING THE THERANOS

12:01PM  25   METHOD.

12:01PM  1            IS THAT SOMETHING THAT YOU WANTED AT THAT TIME?

12:01PM  2      A.    YES.

12:01PM  3      Q.    AND WAS THAT ALL IN CONNECTION WITH YOUR RESEARCH FOR THE

12:01PM  4      ARTICLE?

12:01PM  5      A.    YES.

12:01PM  6      Q.    AND MS. HOLMES IN THE TOP MESSAGE CONFIRMS THAT THE

12:01PM  7      COMPANY WILL BE ABLE TO GET YOU A PRESCRIPTION.

12:02PM  8            DO YOU SEE THAT?

12:02PM  9      A.    YES.

12:02PM  10     Q.    AND WHEN YOU WENT TO CALIFORNIA TO MEET WITH MS. HOLMES,

12:02PM  11     WHERE DID THE MEETING TAKE PLACE?

12:02PM  12     A.    AT THEIR HEADQUARTERS AT THAT TIME WHICH WAS, WHICH I

12:02PM  13     THINK IT WAS SOUTH CALIFORNIA AVENUE.  IT WAS NOT THEIR FINAL

12:02PM  14     HEADQUARTERS.

12:02PM  15     Q.    AND WAS THAT IN PALO ALTO?

12:02PM  16     A.    YEAH.

12:02PM  17     Q.    DID YOU INTERVIEW MS. HOLMES IN CONNECTION WITH THAT FIRST

12:02PM  18     MEETING?

12:02PM  19     A.    YES.

12:02PM  20     Q.    DID YOU ALSO HAVE A TOUR OF THE THERANOS HEADQUARTERS AT

12:02PM  21     THAT TIME?

12:02PM  22     A.    YES.

12:02PM  23     Q.    AND WHAT DO YOU REMEMBER SEEING ON THAT TOUR?

12:02PM  24     A.    AFTER YOU GOT THROUGH THE RECEPTION, THERE WAS A LARGE

12:02PM  25     OPEN PLAN ROOM WITH A LOT OF DESKS.

12:02PM    1          TOWARDS THE BACK THERE WAS -- EXCUSE ME, THERE WAS A ROW

12:02PM    2    OF OFFICES ALONG THE PERIMETER, AT LEAST ONE PERIMETER.

12:02PM    3          I BELIEVE ELIZABETH'S OFFICE WAS ON THE LEFT.

12:03PM    4          THERE WERE THEN LABS.  YOU WOULD BUZZ THROUGH WITH A BADGE

12:03PM    5    OR A CARD TO GET INTO THE LAB, AND THEN TO GET FROM ONE LAB TO

12:03PM    6    ANOTHER LAB.

12:03PM    7          I THINK THE PLACE HAD AT LEAST TWO LEVELS, POSSIBLY THREE.

12:03PM    8    I REMEMBER A DOWNSTAIRS.  THERE WAS A -- I THINK THERE WAS A

12:03PM    9    CONFERENCE ROOM THAT USED TO BE THE OFFICE OF MARK ZUCKERBERG

12:03PM   10    WHEN FACEBOOK WAS IN THE BUILDING.

12:03PM   11          I DON'T REMEMBER IF THERE WAS A SECOND FLOOR AS WELL.

12:03PM   12    Q.   DO YOU REMEMBER -- WELL, LET ME ASK FIRST, WHILE YOU TOOK

12:03PM   13    THAT TOUR, WAS MS. HOLMES PRESENT WITH YOU?

12:03PM   14    A.   YES.

12:03PM   15    Q.   DURING THE ENTIRE TOUR?

12:03PM   16    A.   I THINK SO.

12:03PM   17    Q.   DO YOU RECALL WHETHER YOU SAW THE CLINICAL LAB WHERE

12:03PM   18    THERANOS ACTUALLY PERFORMED ITS PATIENT TESTING ON THAT TOUR?

12:04PM   19    A.   I DID NOT SEE THE COMMERCIAL LAB.  I SAW AN R&D LAB.

12:04PM   20    Q.   DO YOU REMEMBER SEEING BLOOD ANALYZERS IN THE R&D LAB?

12:04PM   21    A.   YES.

12:04PM   22    Q.   WHAT DID THEY LOOK LIKE?

12:04PM   23    A.   TO ME THEY LOOKED LIKE LARGE -- WELL, THEY LOOKED LIKE IF

12:04PM   24    YOU HAVE A DESKTOP COMPUTER, LIKE A DELL DESKTOP, THE TOWER OF

12:04PM   25    A DESKTOP COMPUTER, MAYBE TWO FEET HIGH, AND MAYBE 8 INCHES TO

12:04PM   1    A FOOT WIDE, SOMETHING LIKE THAT.

12:04PM   2    Q.   AROUND THE TIME OF THAT FIRST MEETING, WERE YOU HAVING

12:04PM   3    CONVERSATIONS WITH MS. HOLMES, FOR EXAMPLE, DURING THE TOUR

12:04PM   4    ABOUT WHAT THE THERANOS TECHNOLOGY WAS?

12:04PM   5    A.   DURING THE TOUR -- I THINK WE SPOKE MORE ABOUT THAT IN A

12:05PM   6    CONFERENCE ROOM AS I REMEMBER IT.  I CAN'T REMEMBER DURING THE

12:05PM   7    TOUR ITSELF HOW MUCH, YOU KNOW, SHE SHOWED THEM TO ME.  THEY

12:05PM   8    WERE NOT IN OPERATION AT THAT TIME.

12:05PM   9    Q.   OKAY.  SO I WON'T ASK YOU TO PLACE IT IN THE BUILDING.

12:05PM  10         BUT WHAT DO YOU RECALL, AT A HIGH LEVEL, MS. HOLMES

12:05PM  11    TELLING YOU ABOUT WHAT THE COMPANY WAS DOING, WHAT ITS

12:05PM  12    TECHNOLOGY WAS?

12:05PM  13    A.   WELL, THE -- I MEAN, THE KEY ADVANCE WAS THAT THEY COULD

12:05PM  14    DO A TREMENDOUS NUMBER OF BLOOD TESTS WITH A FINGERSTICK

12:05PM  15    INSTEAD OF VENIPUNCTURE, AND THEY HAD MINIATURIZED THE WHOLE

12:05PM  16    LAB PROCESS AND COULD DO -- SO A VERY SMALL QUANTITY OF BLOOD

12:05PM  17    WOULD BE TAKEN, YOU KNOW, IN A NANOTAINER, SOMETHING ABOUT THE

12:05PM  18    SIZE OF A FUSE, AND THEN YOU COULD ANALYZE THAT AND GET VERY

12:06PM  19    QUICK RESULTS.

12:06PM  20    Q.   AND IN THOSE INITIAL CONVERSATIONS WITH MS. HOLMES, WAS

12:06PM  21    THERE A KEY SCIENTIFIC ADVANCE OR PIECE OF TECHNOLOGY THAT SHE

12:06PM  22    WAS HOLDING OUT AS MAKING IT POSSIBLE TO DO THAT KIND OF

12:06PM  23    TESTING?

12:06PM  24    A.   WELL, I MEAN THE, THE SPECIFICS OF HOW THIS WAS DONE WAS

12:06PM  25    ALL A TRADE SECRET, PROBABLY MULTIPLE TRADE SECRETS.

12:06PM  1          IN GENERAL, SHE WAS SOMEHOW MINIATURIZING THE PROCESS AND

12:06PM  2   ABLE TO RUN ALL OF THESE TESTS IN THIS VERY TINY DEVICE, HIGHLY

12:06PM  3   AUTOMATED AS YOU WOULD PUT THE NANOTAINER INTO A CARTRIDGE.  I

12:06PM  4   DID NOT SEE THIS DONE AT THIS TIME, BUT SHE DESCRIBED IT.

12:07PM  5          AND THEN THE CARTRIDGE WOULD GO INTO THE DEVICE, AND THIS

12:07PM  6   WOULD -- IT WOULD BE AUTOMATED AND THAT WOULD PROTECT AGAINST

12:07PM  7   HUMAN ERROR, AND THAT WOULD IMPROVE THE ACCURACY OF RESULTS.

12:07PM  8   Q.   THAT'S HOW MS. HOLMES EXPLAINED IT TO YOU?

12:07PM  9   A.   YES.

12:07PM 10   Q.   BESIDES THE PALO ALTO HEADQUARTERS, DID YOU ALSO GET A

12:07PM 11   TOUR OF THEIR MANUFACTURING FACILITIES?

12:07PM 12   A.   YEAH.  YES.

12:07PM 13   Q.   WHAT DO YOU REMEMBER ABOUT THAT?

12:07PM 14   A.   IT WAS IN NEWARK, CALIFORNIA ACROSS A BODY OF WATER, I

12:07PM 15   THINK THE SOUTH BAY.

12:07PM 16          AND I THINK IT MIGHT HAVE BEEN A NEW FACILITY.  IT WAS, IT

12:07PM 17   WAS LARGE.  IT HAD A LOT OF OPEN SPACE AT THAT POINT.  IT MIGHT

12:07PM 18   HAVE BEEN -- IT WAS NOT A BUZZING FACTORY, YOU KNOW, NO

12:07PM 19   ASSEMBLY LINES OR ANYTHING, BUT IT MAY HAVE BEEN TOO NEW FOR

12:07PM 20   THAT.  I CAN'T REALLY REMEMBER.

12:07PM 21          THEY WERE GETTING -- THEY SEEMED TO BE GETTING SET UP

12:08PM 22   STILL.

12:08PM 23   Q.   AND ON THAT SAME VISIT, WE SAW IN YOUR EMAIL THAT YOU

12:08PM 24   EXPRESSED SOME INTEREST ABOUT EXPERIENCING THE THERANOS TEST.

12:08PM 25          DID YOU HAVE THAT OPPORTUNITY?

12:08PM  1    A.    YES.

12:08PM  2    Q.    AND WHAT DO YOU REMEMBER ABOUT THAT?

12:08PM  3    A.    I WENT TO THE WALGREENS AT DOWNTOWN PALO ALTO, AND THIS

12:08PM  4    WAS NOT -- THIS WAS ARRANGED BY THEM.  IT WAS NOT A SURPRISE.

12:08PM  5         AND THERE WAS A LITTLE WING OF THE WALGREENS THAT WAS SET

12:08PM  6    ASIDE AS A THERANOS WELLNESS CENTER, AND YOU WENT IN THERE AND

12:08PM  7    IT WAS A -- THERE WAS SORT OF A SOOTHING ENVIRONMENT, THERE WAS

12:08PM  8    AN LE -- A HIGH DEFINITION T.V. WITH SOMETHING SOOTHING ON IT,

12:08PM  9    I THINK AN AQUARIUM, OR SOMETHING LIKE THAT.

12:09PM 10         AND THERE WAS A PHLEBOTOMIST WHO -- SHE HAD SOMETHING TO

12:09PM 11    WARM THE FINGER, I THINK, AND THEN SHE MASSAGED IT, AND THEN

12:09PM 12    SHE PUT A SMALL LANCET AND PRICKED THE FINGER.  IT WAS VERY

12:09PM 13    GOOD.  IT WAS VERY PAINLESS.

12:09PM 14         AND THEN THERE WAS A WICKING DEVICE, EITHER -- EXCUSE

12:09PM 15    ME -- GLASS OR PLASTIC, THAT YOU PUT AGAINST THE WOUND OR THE

12:09PM 16    FINGERSTICK, AND IT WICKED THE BLOOD UP INTO THE NANOTAINER,

12:09PM 17    AND THEN SOMEHOW YOU SNAPPED THE NANOTAINER OFF.

12:09PM 18    Q.    AND THAT'S WHAT YOU EXPERIENCED DURING THAT VISIT?

12:09PM 19    A.    YEAH.  YES.

12:09PM 20    Q.    YOU MENTIONED THAT THE COMPANY ARRANGED THAT VISIT.  IN

12:10PM 21    OTHER WORDS, YOU JUST DIDN'T DO A COLD WALK IN?

12:10PM 22    A.    THAT'S RIGHT.

12:10PM 23    Q.    BESIDES THE THINGS THAT YOU WERE ABLE TO SEE, DID

12:10PM 24    MS. HOLMES ALSO PROVIDE YOU WITH WRITTEN MATERIALS ABOUT

12:10PM 25    THERANOS?

12:10PM   1    A.   YES.

12:10PM   2    Q.   CAN YOU TURN TO TAB 5487, PLEASE, IN YOUR BINDER.

12:10PM   3    A.   YEAH.

12:10PM   4         MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5487.

12:10PM   5    I BELIEVE THE DEFENSE HAS STIPULATED.

12:10PM   6         MR. CLINE:  NO OBJECTION.

12:10PM   7         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:10PM   8    (GOVERNMENT'S EXHIBIT 5487 WAS RECEIVED IN EVIDENCE.)

12:10PM   9         MR. BOSTIC:  MS. HOLLIMAN, LET'S GO TO PAGE 3 OF

12:10PM  10    THIS EXHIBIT.

12:10PM  11         THE WITNESS:  54?

12:10PM  12    BY MR. BOSTIC:

12:10PM  13    Q.   5487.  AND IT'S ABOUT TO BE ON YOUR SCREEN IF THAT'S

12:10PM  14    EASIER.

12:10PM  15    A.   OKAY.  UH-HUH.

12:10PM  16    Q.   WHILE WE'RE WAITING FOR THE DOCUMENT TO COME UP ON THE

12:11PM  17    SCREEN, MR. PARLOFF, IS THIS AN EMAIL DATED MAY 26TH, 2014, TO

12:11PM  18    YOU FROM CHRISTIAN HOLMES?

12:11PM  19    A.   YES.

12:11PM  20    Q.   OKAY.  AND IF WE GO TO PAGE 3 OF THIS EXHIBIT, AND LET'S

12:11PM  21    ZOOM IN ON THE TEXT OF THAT EMAIL IN THE MIDDLE.

12:11PM  22         AND THE EMAIL FROM CHRISTIAN READS, "ROGER,

12:11PM  23         "I HOPE THIS FINDS YOU WELL.  ATTACHED TO THIS EMAIL IS A

12:11PM  24    PRESENTATION DECK WITH DETAILED CLINICAL BACKGROUND."

12:11PM  25         DO YOU SEE THAT?

12:11PM   1    A.   YES.

12:11PM   2    Q.   AND THEN AT THE BOTTOM OF THE SELECTION IT READS, "ALL

12:11PM   3    DOCUMENTS CAN BE ACCESSED WITH THE FOLLOWING CREDENTIALS:"

12:11PM   4         WERE THE MATERIALS THAT THERANOS SENT YOU ENCRYPTED?

12:11PM   5    A.   YES.

12:11PM   6    Q.   DO YOU HAVE ACCESS TO THE ELECTRONIC NATIVE VERSIONS OF

12:12PM   7    THOSE DOCUMENTS TODAY?

12:12PM   8    A.   NO.

12:12PM   9    Q.   I'LL ASK YOU TO TURN TO TAB 3404 THEN IN YOUR BINDER.

12:12PM  10    IT'S 3404.

12:12PM  11    A.   YES.

12:12PM  12    Q.   AND ARE YOU LOOKING AT A SLIDE PRESENTATION WHERE THE

12:12PM  13    FRONT PAGE READS THERANOS?

12:12PM  14    A.   YES.

12:12PM  15    Q.   AND I'LL DRAW YOUR ATTENTION TO THE LOWER RIGHT CORNER OF

12:12PM  16    EACH PAGE WHERE THERE'S A BATES NUMBER BEGINNING WITH YOUR LAST

12:12PM  17    NAME.

12:12PM  18         DO YOU SEE THAT?

12:12PM  19    A.   YES.

12:12PM  20    Q.   IS THIS A PRESENTATION THAT YOU RECEIVED FROM THERANOS

12:12PM  21    WHILE YOU WERE PREPARING TO WRITE YOUR JUNE 2014 ARTICLE?

12:12PM  22    A.   YES.

12:12PM  23              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT MOVES TO

12:12PM  24    ADMIT 3404.

12:12PM  25              MR. CLINE:  NO OBJECTION.

12:12PM 1        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:12PM 2        (GOVERNMENT'S EXHIBIT 3404 WAS RECEIVED IN EVIDENCE.)

12:12PM 3   BY MR. BOSTIC:

12:12PM 4   Q.   AND LET'S LOOK FOR A MOMENT AT THE FIRST PAGE.

12:13PM 5        MR. PARLOFF, THIS IS THE PRESENTATION THAT THERANOS SENT

12:13PM 6   YOU?

12:13PM 7   A.   YES.  I RECEIVED IT IN HARD COPY WHILE I WAS THERE, AND

12:13PM 8   THEN I GOT A VERSION -- A DIGITAL VERSION AS WELL.

12:13PM 9   Q.   AND WAS THIS PRESENTATION JUST EMAILED TO YOU WITHOUT

12:13PM 10  EXPLANATION, OR WAS IT ACTUALLY PRESENTED TO YOU AT SOME POINT?

12:13PM 11       DO YOU REMEMBER?

12:13PM 12  A.   NO.  SHE WENT THROUGH THE HARD COPY.

12:13PM 13       I'M A LITTLE -- SHE WENT THROUGH THE HARD COPY I THINK THE

12:13PM 14  DAY I GOT THERE, APRIL 7TH.

12:13PM 15       I WAS A LITTLE CONFUSED BECAUSE THE EMAIL YOU SENT WAS

12:13PM 16  FROM MAY 26TH, AND I THOUGHT I GOT A DIGITAL VERSION OF THIS BY

12:13PM 17  APRIL 9TH.

12:13PM 18       MAYBE THEY SENT IT AGAIN.  I DON'T KNOW.

12:14PM 19  Q.   I SEE.  IN ANY EVENT, AS TO EXHIBIT 3404, DO YOU HAVE A

12:14PM 20  RECOLLECTION OF REVIEWING THIS PRESENTATION WITH MS. HOLMES?

12:14PM 21  A.   YES.  SHE WALKED ME THROUGH SOME OF THE KEY PAGES OF THIS

12:14PM 22  EXHIBIT.

12:14PM 23  Q.   OKAY.  I'LL COME BACK TO A COUPLE OF THESE PAGES

12:14PM 24  THROUGHOUT OUR CONVERSATION TODAY.

12:14PM 25       BUT LET'S LOOK BRIEFLY AT PAGE 13 OF THIS EXHIBIT.

12:14PM 1        DO YOU SEE A SLIDE THAT'S TITLED "REINVENTING THE PATIENT

12:14PM 2    EXPERIENCE"?

12:14PM 3    A.   YES.

12:14PM 4    Q.   AND BELOW THAT IT SAYS, "ALL THE SAME TESTS.  ONE TINY

12:14PM 5    SAMPLE."

12:14PM 6    A.   YES.

12:14PM 7    Q.   AND THERE'S SOME IMAGES THERE OF BLOOD BEING COLLECTED

12:14PM 8    FROM A FINGERTIP; IS THAT CORRECT?

12:14PM 9    A.   YES.

12:14PM 10   Q.   AND IS THAT MORE OR LESS HOW YOUR SAMPLE WAS DRAWN AT

12:14PM 11   WALGREENS?

12:14PM 12   A.   YES.

12:14PM 13   Q.   LET'S LOOK AT PAGE 4, PLEASE.

12:14PM 14       AND WAS THIS THE BLOOD CONTAINER THAT YOUR BLOOD WAS

12:15PM 15   COLLECTED INTO, OR DOES THIS RESEMBLE IT?

12:15PM 16   A.   YES.

12:15PM 17   Q.   AND WHAT DID MS. HOLMES TELL YOU ABOUT THIS CONTAINER OR

12:15PM 18   THIS SAMPLE SIZE?

12:15PM 19   A.   UM, I THINK IT WAS -- WELL, IT WAS ABOUT A THOUSAND -- SHE

12:15PM 20   SAID IT WAS ABOUT A THOUSANDTH THE SIZE OF WHAT A NORMAL BLOOD

12:15PM 21   DRAW MIGHT TAKE.

12:15PM 22       I THINK IT WAS TENS OF MICROLITERS.  I CAN'T REMEMBER HOW

12:15PM 23   TO DESCRIBE THE LARGER TEST TUBES.

12:15PM 24   Q.   LET'S LOOK AT THE NEXT PAGE.  THAT'S PAGE 5.

12:15PM 25       DO YOU RECALL MS. HOLMES GIVING YOU ANY EXPLANATION ABOUT

12:15PM  1    THIS IMAGE OR A SIMILAR ONE?

12:15PM  2    A.   YES.   APPROXIMATELY WHAT I JUST SAID, THAT IT WAS A TINY

12:16PM  3    PERCENTAGE OF THE NORMAL DRAW.

12:16PM  4    Q.   I'D LIKE TO GO THROUGH SOME OF THE SUBJECTS THAT YOU

12:16PM  5    DISCUSSED WITH MS. HOLMES.

12:16PM  6         LET'S START WITH CONVERSATIONS YOU HAD WITH HER ABOUT THE

12:16PM  7    RANGE OF TESTS THAT THERANOS COULD PERFORM.

12:16PM  8         IS THAT ALL RIGHT?

12:16PM  9    A.   YEAH.

12:16PM  10   Q.   DURING YOUR CONVERSATIONS WITH MS. HOLMES, DID SHE MAKE

12:16PM  11   STATEMENTS ABOUT THE RANGE OF TESTS THAT THE THERANOS ANALYZER

12:16PM  12   COULD PERFORM?

12:16PM  13   A.   YES, SHE DID.

12:16PM  14   Q.   DID THAT TOPIC COME UP MULTIPLE TIMES?

12:16PM  15   A.   YES, THROUGHOUT MY REPORTING, YES.

12:16PM  16   Q.   FIRST LET'S TAKE A LOOK AT -- WHILE WE'RE STILL AT 3404,

12:16PM  17   BACK TO PAGE 13 OF THAT PRESENTATION.

12:16PM  18        AND WE NOTED THAT THERE'S A LINE HERE THAT SAYS, "ALL THE

12:16PM  19   SAME TESTS.   ONE TINY SAMPLE."

12:16PM  20        DO YOU SEE THAT?

12:16PM  21   A.   YES.

12:16PM  22   Q.   LET'S LOOK ALSO AT PAGE 14.

12:17PM  23        AND DO YOU SEE HERE A SLIDE TITLED "1/1,000TH THE SIZE OF

12:17PM  24   A TYPICAL BLOOD DRAW"?

12:17PM  25   A.   YES.

12:17PM  1     Q.   AND THE FIRST LINE UNDERNEATH THAT READS, "THERANOS RUNS

12:17PM  2     ANY TEST AVAILABLE IN CENTRAL LABORATORIES, AND PROCESSES ALL

12:17PM  3     SAMPLE TYPES."

12:17PM  4          DO YOU SEE THAT?

12:17PM  5     A.   YES.

12:17PM  6     Q.   AND WAS THAT CONSISTENT WITH EXPLANATIONS THAT MS. HOLMES

12:17PM  7     GAVE YOU DURING THIS TIME PERIOD?

12:17PM  8     A.   YES.  I MEAN, IT WAS MORE THAN 1200 TESTS -- WELL, IT WAS

12:17PM  9     MORE THAN 200 TESTS, YEAH.

12:17PM  10    Q.   UM, WERE SOME OF YOUR CONVERSATIONS ON THIS TOPIC WITH

12:17PM  11    MS. HOLMES RECORDED?

12:17PM  12    A.   YES.

12:17PM  13    Q.   DID YOU HAVE ONE SUCH CONVERSATION WITH MS. HOLMES ON OR

12:17PM  14    AROUND MAY 12TH, 2014?

12:17PM  15    A.   YES.

12:17PM  16    Q.   AROUND THAT TIME PERIOD, HAD YOU BEEN LOOKING INTO WHAT

12:17PM  17    TESTS WERE OFFERED BY CONVENTIONAL LABS TO GET AN IDEA --

12:18PM  18    A.   YES.  AFTER I GOT BACK TO NEW YORK -- WHEN I WENT OUT

12:18PM  19    THERE I HAD NEVER SEEN A LAB.

12:18PM  20         WHEN I GOT BACK, I ARRANGED TO VISIT A CONVENTIONAL LAB TO

12:18PM  21    GET A CONTRAST, AND YEAH.

12:18PM  22    Q.   AND WHICH CONVENTIONAL LAB DID YOU VISIT?

12:18PM  23    A.   WELL, I AGREED NOT TO IDENTIFY THE LAB.

12:18PM  24    Q.   THE MAY 12TH CONVERSATION THAT YOU HAD WITH MS. HOLMES,

12:18PM  25    DID YOU CREATE A RECORDING OF THAT CONVERSATION?

12:18PM  1    A.   YES.

12:18PM  2    Q.   CAN YOU TELL US A LITTLE BIT ABOUT YOUR METHOD FOR

12:18PM  3    RECORDING AND PRESERVING THE RECORDINGS.

12:18PM  4    A.   I USED A SMALL HANDHELD DEVICE, IT'S MAYBE FOUR OR FIVE

12:18PM  5    INCHES LONG, AND MAYBE AN INCH WIDE, IF THAT, AND IT'S SOLID

12:18PM  6    STATE.

12:18PM  7         IT HAS BASICALLY A BUILT-IN -- IT'S ALMOST LIKE A BUILT-IN

12:19PM  8    THUMB DRIVE SO THAT AFTER YOU TAPE, YOU PULL THE LEVER AND THE

12:19PM  9    THUMB DRIVE EXTENDS FROM THE TAPE RECORDER AND YOU STICK IT

12:19PM 10    RIGHT INTO THE USB PORT OF YOUR COMPUTER AND THEN DRAG THE FILE

12:19PM 11    FROM THE DIGITAL RECORDING DEVICE INTO THE COMPUTER.

12:19PM 12    Q.   AND WAS THAT YOUR PRACTICE WITH THE RECORDINGS THAT YOU

12:19PM 13    MADE OF YOUR CONVERSATIONS WITH MS. HOLMES?

12:19PM 14    A.   YES.

12:19PM 15    Q.   HOW WERE THE FILES NAMED OR ORGANIZED?

12:19PM 16    A.   THE DEVICE AUTOMATICALLY GAVE IT A FILE NAME, WHICH WAS

12:19PM 17    THE YEAR, THE MONTH AND DATE, AND THEN ANOTHER NUMBER, WHICH

12:19PM 18    WAS THE NUMBER OF TIMES I HAD -- THE NUMBER OF RECORDINGS FOR

12:20PM 19    THAT DATE.

12:20PM 20         AND THEN WHEN I DRAGGED IT INTO MY COMPUTER, I WOULD ADD

12:20PM 21    THE NAME OF THE INDIVIDUAL THAT WAS BEING RECORDED.

12:20PM 22    Q.   AND THEN WAS IT YOUR PRACTICE TO RETAIN THOSE DIGITAL

12:20PM 23    RECORDINGS ON YOUR COMPUTER GOING FORWARD?

12:20PM 24    A.   YES.

12:20PM 25    Q.   AND DID YOU PROVIDE YOUR RECORDINGS OF CONVERSATIONS WITH

12:20PM  1      MS. HOLMES TO THE GOVERNMENT IN RESPONSE TO A SUBPOENA?

12:20PM  2      A.   YES.

12:20PM  3           MR. BOSTIC:  YOUR HONOR, AT THIS TIME THE GOVERNMENT

12:20PM  4      WOULD LIKE TO OFFER EXHIBIT 5473A, WHICH IS A CLIP FROM THE

12:20PM  5      RECORDING THAT WE HAVE BEEN DISCUSSING.

12:20PM  6           I UNDERSTAND THE DEFENSE MAY STIPULATE.

12:20PM  7           MR. CLINE:  NO OBJECTION.  ONE NOTE.  AS I

12:20PM  8      UNDERSTAND IT FROM MR. BOSTIC, THERE'S GOING TO BE A SCROLLING

12:20PM  9      TRANSCRIPT WITH THESE TAPES.

12:20PM 10           WE DON'T OBJECT TO THAT AS LONG AS IT'S NOT PART OF THE

12:21PM 11      ACTUAL EXHIBIT.  I DON'T KNOW IF YOUR HONOR WANTS TO GIVE AN

12:21PM 12      INSTRUCTION ON THAT, BUT IN ANY EVENT, WE DON'T OBJECT TO THE

12:21PM 13      AUDIO AND WE DON'T OBJECT TO THE SCROLLING OF THE TRANSCRIPT,

12:21PM 14      AS LONG AS THE TRANSCRIPT IS REMOVED.

12:21PM 15           THE COURT:  UNDERSTOOD.

12:21PM 16           MR. BOSTIC:  AND TO CLARIFY, YOUR HONOR, THAT WILL

12:21PM 17      ONLY BE THE CASE, ACCOMPANYING SUBTITLES, FOR ONE OF THE

12:21PM 18      EXHIBITS WHERE THERE WAS SOME BACKGROUND NOISE.  THE REST WILL

12:21PM 19      BE AUDIO ONLY.

12:21PM 20           THE COURT:  SO IS THIS AUDIO ONLY?

12:21PM 21           MR. BOSTIC:  THIS IS AUDIO ONLY.

12:21PM 22           MR. CLINE:  FORGIVE ME.  I JUST WANT TO INQUIRE.

12:21PM 23      IT'S JUST ONE THAT HAS THE TRANSCRIPT, NONE OF THE OTHERS?

12:21PM 24           MR. BOSTIC:  CORRECT.

12:21PM 25           MR. CLINE:  UNDERSTOOD.  THANK YOU.

12:21PM  1          THE COURT:  SO THERE'S NO TRANSCRIPT THAT YOU'RE

12:21PM  2     GOING TO SEEK TO PROVIDE FOR THIS?

12:21PM  3          MR. BOSTIC:  NOT FOR THIS EXHIBIT, YOUR HONOR.  I

12:21PM  4     WILL NOTE THAT BEFORE IT IS PRESENTED.

12:21PM  5          THE COURT:  THANK YOU.  AND WHAT IS THE LENGTH OF

12:21PM  6     THIS CLIP?

12:21PM  7          MR. BOSTIC:  THIS CLIP IS APPROXIMATELY TWO MINUTES

12:21PM  8     LONG.

12:21PM  9          THE COURT:  TWO MINUTES LONG, OKAY.

12:21PM  10         LADIES AND GENTLEMEN, YOU'RE ABOUT TO LISTEN TO AN AUDIO

12:21PM  11    RECORDING, AS MR. BOSTIC AND MR. CLINE HAVE INDICATED.  PLEASE

12:21PM  12    LISTEN CLOSELY.  YOU WILL NOT HAVE A TRANSCRIPT OF THIS, SO

12:21PM  13    PLEASE LISTEN CLOSELY.

12:22PM  14         COUNSEL, YOU AGREE THAT THE COURT REPORTER NEED NOT REPORT

12:22PM  15    THE CONTENTS OF THIS RECORDING?

12:22PM  16         MR. BOSTIC:  YES, YOUR HONOR, NO OBJECTION.

12:22PM  17         MR. CLINE:  THAT'S FINE.

12:22PM  18         THE COURT:  ALL RIGHT.  THANK YOU.

12:22PM  19    BY MR. BOSTIC:

12:22PM  20    Q.  SO BEFORE WE PRESS PLAY ON EXHIBIT 5473A, MR. PARLOFF, YOU

12:22PM  21    TESTIFIED JUST NOW THAT YOU HAD CONVERSATIONS WITH MS. HOLMES

12:22PM  22    ABOUT THE RANGE OF TESTS THAT COULD BE PERFORMED ON THE

12:22PM  23    THERANOS DEVICE; CORRECT?

12:22PM  24    A.  YES.

12:22PM  25         MR. BOSTIC:  MS. HOLLIMAN, LET'S PLAY 5473A, PLEASE.

12:24PM 1          (AUDIO RECORDING PLAYED OFF THE RECORD.)

12:24PM 2     BY MR. BOSTIC:

12:24PM 3     Q.   MR. PARLOFF, WAS THAT AUDIO SOMETHING THAT YOU RECOGNIZE

12:25PM 4     AS YOUR CONVERSATION WITH MS. HOLMES ON MAY 12TH, 2014?

12:25PM 5     A.   YEAH.  I'M NOT POSITIVE OF THE DATE, BUT THEREABOUTS.

12:25PM 6     Q.   IF THE FILE NAME FOR THAT RECORDING HAD THAT DATE IN THE

12:25PM 7     FILE NAME --

12:25PM 8     A.   YES, YES.

12:25PM 9     Q.   -- WOULD IT INDICATE THAT IT WAS FROM THAT DATE?

12:25PM 10    A.   THAT'S RIGHT.

12:25PM 11         THE COURT:  MR. BOSTIC, WE'VE JUST PLAYED THAT.  I'M

12:25PM 12    NOT SURE THAT I FORMALLY ADMITTED THE DOCUMENT PER YOUR

12:25PM 13    AGREEMENT.

12:25PM 14        BUT IT IS ADMITTED, AND IT WAS PLAYED.  THANK YOU.

12:25PM 15         MR. BOSTIC:  THANK YOU, YOUR HONOR.

12:25PM 16    (GOVERNMENT'S EXHIBIT 5473A WAS RECEIVED IN EVIDENCE.)

12:25PM 17    BY MR. BOSTIC:

12:25PM 18    Q.   SO, MR. PARLOFF, YOU'VE HEARD MS. HOLMES'S RESPONSE TO

12:25PM 19    YOUR QUESTION ABOUT WHETHER THERANOS COULD PERFORM ALL OF THE

12:25PM 20    TESTS THAT QUEST COULD.

12:25PM 21        LET ME ASK YOU, BEFORE YOU WROTE YOUR ARTICLE IN JUNE OF

12:25PM 22    2014, DID MS. HOLMES EVER TELL YOU THAT THE RANGE OF TESTS THAT

12:25PM 23    THE THERANOS DEVICE COULD PERFORM WAS ACTUALLY MUCH MORE

12:25PM 24    LIMITED THAN THE HUNDREDS OF TESTS THAT QUEST COULD DO?

12:25PM 25    A.   NO.

12:25PM  1    Q.   DID YOU CONTINUE AFTER THAT DATE TO HAVE DISCUSSIONS WITH

12:26PM  2    MS. HOLMES ABOUT THE NUMBER OF TESTS THAT THE ANALYZER COULD DO

12:26PM  3    IN CONNECTION WITH A NUMBER OF CPT CODES?

12:26PM  4    A.   YES.

12:26PM  5    Q.   AND DID MS. HOLMES PROVIDE AN EXPLANATION TO YOU ABOUT

12:26PM  6    WHAT A CPT CODE WAS?

12:26PM  7    A.   I THINK SHE DID.

12:26PM  8    Q.   WHAT DO YOU RECALL HER SAYING ABOUT THAT, IF YOU REMEMBER?

12:26PM  9    A.   IT'S A CODE THAT I THINK THE AMERICAN MEDICAL ASSOCIATION

12:26PM 10    ASSIGNS TO MEDICAL PROCEDURES, INCLUDING DIAGNOSTIC TESTS, SO

12:26PM 11    THAT WHEN YOU APPLY FOR REIMBURSEMENT FROM AN INSURANCE

12:26PM 12    COMPANY, THEY USE THESE CODES TO INDICATE WHAT THE PROCEDURE

12:27PM 13    WAS.

12:27PM 14    Q.   AND DID YOU RECORD A CONVERSATION WITH MS. HOLMES ON

12:27PM 15    MAY 21ST, 2014 WHERE THIS TOPIC WAS DISCUSSED?

12:27PM 16    A.   YES.

12:27PM 17              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS AT

12:27PM 18    THIS TIME EXHIBIT 5474AB2.  AND I APOLOGIZE FOR THE CRYPTIC

12:27PM 19    EXHIBIT NAMES.

12:27PM 20              THE COURT:  AND THIS IS THE RECORDING?

12:27PM 21              MR. BOSTIC:  IT IS, YOUR HONOR.  THIS IS A CLIP THAT

12:27PM 22    IS APPROXIMATELY SIX MINUTES LONG THAT WE'VE JUST REFERENCED.

12:27PM 23              MR. CLINE:  NO OBJECTION.

12:27PM 24              THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, THIS

12:27PM 25    IS ADMITTED.

12:27PM  1      LADIES AND GENTLEMEN, YOU'RE ABOUT TO HEAR ANOTHER TAPE,

12:27PM  2    AS MR. BOSTIC INDICATED.  YOU WILL NOT HAVE A TRANSCRIPT OF THE

12:27PM  3    RECORDING.  PLEASE LISTEN CLOSELY.

12:27PM  4         THE EXHIBIT IS NOW ADMITTED, AND IT MAY NOW BE PLAYED.

12:27PM  5         (GOVERNMENT'S EXHIBIT 5474AB2 WAS RECEIVED IN EVIDENCE.)

12:28PM  6         (AUDIO RECORDING PLAYED OFF THE RECORD.)

12:34PM  7    BY MR. BOSTIC:

12:34PM  8    Q.   DID YOU HEAR MS. HOLMES SAY IN THAT CLIP THAT THERANOS HAD

12:34PM  9    THE ABILITY TO PERFORM MORE THAN THE 200 TESTS THAT WERE THEN

12:34PM  10   LISTED ON THE WEBSITE?

12:34PM  11   A.   YES.

12:34PM  12   Q.   AND DURING THAT TIME PERIOD -- AND THIS WAS BEFORE YOU

12:34PM  13   WROTE THE JUNE 2014 ARTICLE; CORRECT?

12:34PM  14   A.   YES.

12:34PM  15   Q.   DURING THAT TIME PERIOD, DID MS. HOLMES TELL YOU ANYTHING

12:34PM  16   ABOUT THE COMPANY'S RELIANCE ON THIRD PARTY DEVICES, OR WAS ALL

12:34PM  17   OF YOUR DISCUSSION FOCUSSED ON THE THERANOS DEVICE?

12:34PM  18   A.   THE THERANOS DEVICE.

12:34PM  19   Q.   THERE WAS A POINT IN THAT CLIP WHERE YOU ASKED ABOUT

12:34PM  20   VACUTAINER USE.

12:34PM  21        DO YOU REMEMBER THAT?

12:34PM  22   A.   YES.

12:34PM  23   Q.   AND YOU PREFACED THAT QUESTION BY SAYING, NOT TO BELABOR

12:34PM  24   THIS, OR SOMETHING TO THAT EFFECT.

12:34PM  25        HAD YOU HAD PREVIOUS CONVERSATIONS WITH MS. HOLMES ABOUT

12:34PM  1    USE OF VACUTAINER FOR CERTAIN DRAWS?

12:34PM  2    A.   YES.  WELL, THERE WERE ALREADY REPORTS AT THAT POINT OF

12:35PM  3    PEOPLE WHO WOULD GO TO THE WELLNESS CENTER HOPING -- PATIENTS

12:35PM  4    HOPING TO GET THE FINGERSTICK, AND THEY WOULD BE DISAPPOINTED

12:35PM  5    BECAUSE THEY WOULD HAVE TO BE TOLD THAT THEY WOULD HAVE TO DO

12:35PM  6    VENIPUNCTURE.

12:35PM  7         SO I WAS ASKING HER ABOUT WHY THAT WAS.

12:35PM  8         AND IN THAT CONTEXT SHE HAD SOME ANSWERS TO THAT.

12:35PM  9         BUT THERE WERE CERTAIN SITUATIONS WHERE SHE WOULD DO

12:35PM  10   VENIPUNCTURE.  ONE WAS SHE SAID SOMETIMES DOCTORS WANTED TO DO

12:35PM  11   THE TEST IN THEIR LAB AND JUST SEND IT TO THERANOS BECAUSE THE

12:35PM  12   PRICE WAS LOWER.

12:35PM  13        SO SHE SAID WHEN THEY DID THAT, THEY COULD STILL PROCESS

12:35PM  14   THAT BLOOD, BUT THEY WOULD ASK THE DOCTOR TO SEND IT TO THEM IN

12:36PM  15   THEIR SMALLEST VACUTAINER, WHICH I THINK MEANS A SMALL TEST

12:36PM  16   TUBE, THE TYPE OF TEST TUBE USED FOR THESE BLOOD -- FOR BLOOD

12:36PM  17   DRAWS BECAUSE THEY ONLY NEEDED THESE MICRO SAMPLES GIVEN THEIR

12:36PM  18   SYSTEM, GIVEN THEIR MINIATURIZED SYSTEM.

12:36PM  19   Q.   CAN I ASK YOU A QUESTION ABOUT THE ANSWER THAT MS. HOLMES

12:36PM  20   GAVE IN THE CLIP THAT WE JUST LISTENED TO?  DO YOU REMEMBER THE

12:36PM  21   ANSWER SHE GAVE TALKED ABOUT THE CONFIGURATION OF SOMETHING SHE

12:36PM  22   CALLED CARTRIDGES?

12:36PM  23   A.   YES.

12:36PM  24   Q.   HAD YOU HAD CONVERSATIONS WITH MS. HOLMES WHERE SHE

12:36PM  25   EXPLAINED TO YOU WHAT CARTRIDGE MEANT IN THE CONTEXT OF

12:36PM  1    TESTING?

12:36PM  2    A.   YEAH.  EXCUSE ME.  THE NANOTAINER WOULD BE PLACED INTO A

12:36PM  3    CARTRIDGE, IF YOU REMEMBER LIKE BETA MAX MACHINES AND THE VCR,

12:37PM  4    YOU WOULD -- THE CARTRIDGE WOULD BE LIKE THE BETA MAX

12:37PM  5    CARTRIDGE, BUT YOU WOULD PUT A NANOTAINER IN THERE AND THEN YOU

12:37PM  6    WOULD FEED IT INTO THE MACHINE.

12:37PM  7        AND THAT I WAS SAYING WAS PART OF THE AUTOMATION THAT

12:37PM  8    WOULD -- THAT WAS SUPPOSED TO MAKE IT MORE RELIABLE, LESS PRONE

12:37PM  9    TO HUMAN ERROR.

12:37PM  10        AND SO SHE SEEMED TO BE SAYING THAT -- WELL, AS I

12:37PM  11   UNDERSTOOD IT, THAT EVEN WITH THE VACUTAINER, THERE WAS A WAY

12:37PM  12   TO SOMEHOW GET IT OR GET A PORTION OF IT INTO THIS CARTRIDGE

12:37PM  13   AND USE IT IN HER DEVICE.

12:37PM  14   Q.   AND BASED ON WHAT MS. HOLMES HAD TOLD YOU, WOULD THAT MEAN

12:37PM  15   ANALYZING THE SAMPLE STILL IN A THERANOS CREATED ANALYZER?

12:37PM  16   A.   YES, UH-HUH.

12:37PM  17            MR. CLINE:  YOUR HONOR, I'M GOING TO OBJECT NOW TO

12:37PM  18   SORT OF INTERPRETING WHAT WAS SAID.  MS. HOLMES'S WORDS ARE

12:37PM  19   CERTAINLY FAIR GAME, NOT THE INTERPRETATION.

12:37PM  20            THE COURT:  UNDERSTOOD.

12:37PM  21        DO YOU WANT TO ASK QUESTIONS AS TO -- IS THIS RELATING TO

12:38PM  22   HOW IT WAS DESCRIBED TO HIM FROM MS. HOLMES?

12:38PM  23            MR. BOSTIC:  CORRECT, YOUR HONOR.

12:38PM  24            THE COURT:  RIGHT.  OKAY.

12:38PM  25   BY MR. BOSTIC:

12:38PM  1   Q.   LET ME SEE IF I CAN CLARIFY THIS, MR. PARLOFF.

12:38PM  2        WHEN MS. HOLMES DISCUSSED CARTRIDGES WITH YOU, WERE THOSE

12:38PM  3   CARTRIDGES SOMETHING THAT SHE SAID WERE SPECIFIC TO THE

12:38PM  4   THERANOS ANALYZER, OR DID SHE SAY THEY WERE ALSO USED WITH

12:38PM  5   THIRD PARTY DEVICES?

12:38PM  6   A.   NO.  SPECIFIC TO THE THERANOS ANALYZER.

12:38PM  7   Q.   LET'S GO BACK TO EXHIBIT 3404.  IF WE COULD DISPLAY THAT,

12:38PM  8   MS. HOLLIMAN.  AND IF WE CAN LOOK AT PAGE 16.

12:38PM  9        MR. PARLOFF, DO YOU SEE ON PAGE 16 AN EXCERPT FROM THE

12:38PM  10  THERANOS TEST MENU?

12:38PM  11  A.   YES.

12:38PM  12  Q.   AND THIS WAS PART OF THE PRESENTATION THAT YOU WENT

12:38PM  13  THROUGH WITH MS. HOLMES?

12:38PM  14  A.   YES.

12:39PM  15  Q.   LET'S LOOK AT THE FOLLOWING PAGE, PAGE 17.

12:39PM  16       IT LOOKS LIKE HERE BEGINS AN ALPHABETICAL LIST OF

12:39PM  17  THERANOS'S TEST MENU; IS THAT CORRECT?

12:39PM  18  A.   YES.

12:39PM  19  Q.   AND LET'S LOOK AT THE FOLLOWING PAGE, PAGE 18.

12:39PM  20       WHEN YOU WERE TALKING ABOUT THE TESTS THAT WERE ON THE

12:39PM  21  WEBSITE, WERE THESE SOME OF THE TESTS THAT WERE INCLUDED?  WERE

12:39PM  22  YOU TALKING ABOUT THE THERANOS TEST MENU AT THE TIME?

12:39PM  23  A.   YES.

12:39PM  24  Q.   ON THIS PAGE, PAGE 18, LET'S ZOOM IN, IF WE CAN, ON THE

12:39PM  25  LEFT SIDE ON THE ENTRY FOR CBC, OR COMPLETE BLOOD COUNT.

PARLOFF DIRECT BY MR. BOSTIC

12:40PM  1    MR. PARLOFF, DO YOU SEE THAT THIS LIST INCLUDES CBC AUTO

12:40PM  2    DIFF WITH REFLEX AND ALSO CBC WITH NO DIFF?

12:40PM  3    A.   YES, YES.

12:40PM  4    Q.   DID MS. HOLMES EVER TELL YOU THAT THE THERANOS BUILT

12:40PM  5    ANALYZER DIDN'T HAVE THE PARTS NECESSARY TO RUN A CBC TEST?

12:40PM  6    A.   NO.

12:40PM  7    Q.   I WANT TO LOOK BRIEFLY AT YOUR ARTICLE, WHICH IS

12:40PM  8    EXHIBIT 1776.

12:40PM  9    MS. HOLLIMAN, LET'S BRING THAT UP.  IF WE CAN GO TO PAGE 5

12:40PM  10   OF THE EXHIBIT.  ZOOM IN ON THE BOTTOM PARAGRAPH, PLEASE.

12:40PM  11   MR. PARLOFF, IS THIS TEXT FROM YOUR JUNE 2014 ARTICLE IN

12:41PM  12   "FORTUNE"?

12:41PM  13   A.   YES.

12:41PM  14   Q.   AND IT READS HERE, "THERANOS RUNS WHAT'S CALLED A

12:41PM  15   HIGH-COMPLEXITY LABORATORY, CERTIFIED BY THE FEDERAL CENTERS

12:41PM  16   FOR MEDICARE AND MEDICAID SERVICES."

12:41PM  17   THE NEXT SENTENCE SAYS, "IT CURRENTLY OFFERS MORE THAN

12:41PM  18   200 -- AND IS RAMPING UP TO OFFER MORE THAN 1,000 -- OF THE

12:41PM  19   MOST COMMONLY ORDERED BLOOD DIAGNOSTIC TESTS ALL WITHOUT THE

12:41PM  20   NEED FOR A SYRINGE."

12:41PM  21   DO YOU SEE THAT?

12:41PM  22   A.   YES.

12:41PM  23   Q.   IS THAT CONSISTENT WITH WHAT MS. HOLMES TOLD YOU DURING

12:41PM  24   YOUR CONVERSATIONS WITH HER?

12:41PM  25   A.   YES.

12:41PM 1    Q.   LET'S LOOK AT THE FOLLOWING PAGE CONTINUING ON THAT SAME

12:41PM 2    ARTICLE.  THE FOLLOWING TEXT AT THE TOP OF THE PAGE READS,

12:41PM 3    "THERANOS'S TESTS CAN BE PERFORMED ON JUST A FEW DROPS OF

12:41PM 4    BLOOD, OR ABOUT 1/100TH TO 1/1,000TH OF THE AMOUNT THAT WOULD

12:41PM 5    ORDINARILY BE REQUIRED - AN EXTRAORDINARILY POTENTIAL BOON TO

12:41PM 6    FREQUENTLY TESTED HOSPITAL PATIENTS OR" PATIENTS IN OTHER

12:42PM 7    CATEGORIES.

12:42PM 8        DO YOU SEE THAT?

12:42PM 9    A.   YES.

12:42PM 10   Q.   WAS THAT CONSISTENT WITH WHAT MS. HOLMES TOLD YOU DURING

12:42PM 11   YOUR CONVERSATIONS?

12:42PM 12   A.   YES.

12:42PM 13   Q.   I WANT TO TALK NEXT ABOUT DISCUSSIONS THAT YOU HAD WITH

12:42PM 14   MS. HOLMES ABOUT THE ACCURACY OR PRECISION ABOUT THE THERANOS

12:42PM 15   TESTS.

12:42PM 16       DO YOU RECALL DISCUSSIONS ABOUT THAT TOPIC?

12:42PM 17   A.   YES.

12:42PM 18   Q.   LET'S GO TO EXHIBIT 3404, BACK TO THE PRESENTATION, AND

12:42PM 19   LET'S LOOK AT PAGE 20.

12:42PM 20   A.   I'M SORRY, WHICH EXHIBIT?

12:42PM 21   Q.   THIS IS 3404, AND IT WILL BE UP ON THE SCREEN.

12:42PM 22       DO YOU SEE A SLIDE IN THIS PRESENTATION THAT YOU RECEIVED

12:42PM 23   THAT READS, "A NEW STANDARD IN QUALITY"?

12:42PM 24   A.   YES.

12:42PM 25   Q.   AND UNDERNEATH THAT THERE'S TEXT IN GREEN THAT SAYS, "THE

12:42PM  1    HIGHEST LEVELS OF ACCURACY."

12:42PM  2         DO YOU SEE THAT?

12:42PM  3    A.   YES.

12:42PM  4    Q.   AND THE EXPLANATION BELOW THAT GRAPHIC ABOUT A LOW

12:42PM  5    COEFFICIENT OF VARIATION READS, "BY SYSTEMATICALLY CONTROLLING

12:43PM  6    AND STANDARDIZING OUR PROCESSES, THERANOS OFFERS TESTS WITH THE

12:43PM  7    HIGHEST LEVELS OF ACCURACY."

12:43PM  8         DO YOU SEE THAT?

12:43PM  9    A.   YES.

12:43PM  10   Q.   AND WAS THAT CONSISTENT WITH REPRESENTATIONS THAT

12:43PM  11   MS. HOLMES MADE TO YOU DURING YOUR CONVERSATIONS?

12:43PM  12   A.   YES.

12:43PM  13   Q.   DID YOU HAVE A CONVERSATION WITH MS. HOLMES ON APRIL 8TH,

12:43PM  14   2014 THAT YOU RECORDED?

12:43PM  15   A.   YES.

12:43PM  16   Q.   AND WAS THIS TOPIC DISCUSSED DURING THAT CONVERSATION?

12:43PM  17   A.   I WOULD ASSUME SO.

12:43PM  18        MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

12:43PM  19   EXHIBIT 5475A, WHICH IS, AS THE DEFENSE NOTES, A CLIP FROM

12:43PM  20   APRIL 8TH, 2014, APPROXIMATELY TWO MINUTES LONG.

12:43PM  21        MR. CLINE:  NO OBJECTION.

12:43PM  22        THE COURT:  IT'S ADMITTED, AND IT MAY BE PLAYED.

12:43PM  23        LADIES AND GENTLEMEN, THIS IS ANOTHER RECORDING.  THERE

12:43PM  24   WILL NOT BE A TRANSCRIPT, SO PLEASE LISTEN CLOSELY TO THIS

12:43PM  25   RECORDING.

12:44PM  1         IT'S ADMITTED, AND IT MAY BE PLAYED NOW.

12:44PM  2         (GOVERNMENT'S EXHIBIT 5475A WAS RECEIVED IN EVIDENCE.)

12:46PM  3    BY MR. BOSTIC:

12:46PM  4    Q.   I THINK THAT LAST WORD WAS GOING TO BE ANALYSIS IT SOUNDED

12:46PM  5    LIKE; IS THAT CORRECT?

12:46PM  6    A.   YEAH, UH-HUH.

12:46PM  7    Q.   WE JUST HEARD MS. HOLMES MAKE SOME STATEMENTS ABOUT THE

12:46PM  8    RELATIONSHIP BETWEEN AUTOMATION AND ACCURACY.

12:46PM  9         DO YOU RECALL THAT DISCUSSION?

12:46PM 10    A.   YEAH.

12:46PM 11    Q.   DID MS. HOLMES, IN YOUR CONVERSATIONS WITH HER, EVER TELL

12:46PM 12    YOU ABOUT THE MANUAL OR NONAUTOMATIC STEPS THAT HAD TO BE

12:46PM 13    PERFORMED WHEN RUNNING A BLOOD SAMPLE ON THE THERANOS ANALYZER?

12:46PM 14    A.   NO.

12:46PM 15    Q.   FOR EXAMPLE, WERE YOU TOLD THAT SAMPLES FREQUENTLY OR

12:46PM 16    ALWAYS HAD TO BE DILUTED USING A DIFFERENT DEVICE BEFORE THEY

12:46PM 17    WERE PLACED INTO THE THERANOS ANALYZER?

12:47PM 18    A.   NO.

12:47PM 19    Q.   DID MS. HOLMES EVER TELL YOU ABOUT ANY ACCURACY PROBLEMS

12:47PM 20    OR RELIABILITY PROBLEMS EXPERIENCED IN CONNECTION WITH THE

12:47PM 21    THERANOS ANALYZER?

12:47PM 22    A.   NO.

12:47PM 23    Q.   SO FAR WE'VE BEEN LISTENING TO CONVERSATIONS BETWEEN YOU

12:47PM 24    AND MS. HOLMES IN 2014.

12:47PM 25         DID YOU CONTINUE TO HAVE DISCUSSIONS WITH MS. HOLMES IN

12:47PM   1    2015?

12:47PM   2    A.   YES.

12:47PM   3    Q.   SO THIS WOULD HAVE BEEN AFTER YOUR JUNE 2014 ARTICLE, OF

12:47PM   4    COURSE?

12:47PM   5    A.   YES.

12:47PM   6    Q.   GENERALLY SPEAKING, WHAT WAS THE PURPOSE OF CONTINUED

12:47PM   7    CONVERSATIONS IN 2015?

12:47PM   8    A.   WELL, THERE WERE OTHER THINGS GOING ON WITH HER COMPANY,

12:47PM   9    MULTIPLE OTHER THINGS THAT I WAS INTERESTED IN, AND I WAS

12:47PM  10    CONTINUING TO FOLLOW THE COMPANY.

12:47PM  11    Q.   AND IN 2015, DID YOU CONTINUE TO HAVE CONVERSATIONS WITH

12:47PM  12    MS. HOLMES ABOUT THE QUALITY OR ACCURACY OF THE THERANOS

12:47PM  13    RESULTS?

12:47PM  14    A.   I THINK SO.

12:48PM  15    Q.   DID YOU HAVE A CONVERSATION WITH MS. HOLMES IN EARLY

12:48PM  16    FEBRUARY 2015?

12:48PM  17    A.   YES.

12:48PM  18          MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

12:48PM  19    EXHIBIT 5477A, WHICH IS APPROXIMATELY 40 SECONDS LONG.

12:48PM  20          MR. CLINE:  NO OBJECTION.

12:48PM  21          THE COURT:  AND THERE'S NO TRANSCRIPT.

12:48PM  22          MR. BOSTIC:  CORRECT, THERE'S NO TRANSCRIPT.

12:48PM  23          THE COURT:  IT'S ADMITTED.

12:48PM  24      (GOVERNMENT'S EXHIBIT 5477A WAS RECEIVED IN EVIDENCE.)

12:48PM  25          THE COURT:  LADIES AND GENTLEMEN, YOU WILL BE

12:48PM  1    HEARING IN JUST A MOMENT THIS TAPE, THIS VIDEO, PARDON ME, AND

12:48PM  2    PLEASE LISTEN CLOSELY.  THERE'S NO TRANSCRIPT THAT FOLLOWS IT.

12:48PM  3    IT MAY BE PLAYED NOW.

12:48PM  4        (AUDIO RECORDING PLAYED OFF THE RECORD.)

12:49PM  5    BY MR. BOSTIC:

12:49PM  6    Q.   MR. PARLOFF, DO YOU RECOGNIZE THAT AUDIO AS A RECORDING OF

12:49PM  7    A CONVERSATION THAT YOU HAD WITH MS. HOLMES IN FEBRUARY OF

12:49PM  8    2015?

12:49PM  9    A.   YES.

12:49PM  10   Q.   DID THE DEFENDANT TELL YOU THAT, A COUPLE MONTHS BEFORE

12:49PM  11   THAT CONVERSATION, THERANOS'S PATHOLOGIST LAB DIRECTOR HAD LEFT

12:49PM  12   THE COMPANY AFTER REPEATEDLY RAISING CONCERNS ABOUT THE

12:49PM  13   ACCURACY OF THE THERANOS TESTS?

12:49PM  14   A.   NO.

12:49PM  15   Q.   DID YOU ALSO HAVE CONVERSATIONS WITH MS. HOLMES ABOUT THE

12:49PM  16   USE OF THERANOS TECHNOLOGY BY THE U.S. MILITARY?

12:49PM  17   A.   YES.

12:49PM  18   Q.   WAS THAT A TOPIC THAT CAME UP MULTIPLE TIMES?

12:50PM  19   A.   YES.

12:50PM  20   Q.   DO YOU RECALL IN EARLY APRIL 2014 MEETING WITH MS. HOLMES

12:50PM  21   AT A RESTAURANT?

12:50PM  22   A.   YES.

12:50PM  23   Q.   AND DID THE TOPIC OF MILITARY INVOLVEMENT COME UP AT THAT

12:50PM  24   TIME?

12:50PM  25   A.   YES.

12:50PM   1          MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

12:50PM   2     EXHIBIT 5478A INTO EVIDENCE, AND PERMISSION TO PUBLISH, OR

12:50PM   3     REQUEST PERMISSION TO PUBLISH A VERSION OF THAT AUDIO CLIP WITH

12:50PM   4     ACCOMPANYING SUBTITLES.

12:50PM   5          MR. CLINE:  NO OBJECTION.  I HAVE IT ON MY LITTLE

12:50PM   6     CHART HERE, BUT IT'S 5478A2.  I'M NOT SURE WHETHER THAT MAKES

12:50PM   7     ANY DIFFERENCE.

12:50PM   8          MR. BOSTIC:  I THINK WE'RE TALKING ABOUT THE SAME

12:50PM   9     CLIP.

12:50PM   10          MR. CLINE:  ALL RIGHT.

12:50PM   11          MR. BOSTIC:  A2 FOR THE RECORD, YOUR HONOR.  THANK

12:50PM   12     YOU.

12:50PM   13          THE COURT:  ALL RIGHT.

12:50PM   14          MR. CLINE:  NO OBJECTION.

12:50PM   15      BUT THE SUBTITLES ARE HERE JUST TO AID THE JURY AND WILL

12:50PM   16     NOT BE OFFERED.

12:50PM   17          MR. BOSTIC:  I'M NOT OFFERING THE SUBTITLES,

12:51PM   18     YOUR HONOR.

12:51PM   19          THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, IT IS

12:51PM   20     ADMITTED.

12:51PM   21      I'M SORRY, THE LENGTH OF THIS IS?

12:51PM   22          MR. BOSTIC:  THIS ONE IS APPROXIMATELY THREE MINUTES

12:51PM   23     LONG.

12:51PM   24          THE COURT:  THANK YOU.  IT'S ADMITTED, AND IT MAY BE

12:51PM   25     PLAYED.

12:51PM   1            (GOVERNMENT'S EXHIBIT 5478A2 WAS RECEIVED IN EVIDENCE.)

12:51PM   2                 THE COURT:  LADIES AND GENTLEMEN, YOU'RE ABOUT TO

12:51PM   3       HEAR ANOTHER CLIP, APPROXIMATELY THREE MINUTES LONG.  I'M

12:51PM   4       INFORMED THERE'S A SUBTITLE.

12:51PM   5            WILL THAT BE SHOWN ON OUR MONITORS THEN?

12:51PM   6                 MR. BOSTIC:  IT WILL BE, YOUR HONOR, ON THE BOTTOM

12:51PM   7       OF THE SCREEN.

12:51PM   8                 THE COURT:  ALL RIGHT.  THANK YOU.  THAT WILL HAVE A

12:51PM   9       CONCURRENT TRANSCRIPT.

12:51PM  10            WHAT IS IN EVIDENCE, LADIES AND GENTLEMEN, IS THE

12:51PM  11       RECORDING, NOT THE TRANSCRIPT.

12:51PM  12            SO WHAT YOU HEAR, WHAT YOU HEAR IS WHAT IS IN EVIDENCE.

12:51PM  13            IF YOU WHAT YOU HEAR IS DIFFERENT THAN THE TRANSCRIPT, IF

12:51PM  14       YOU'RE READING THE TRANSCRIPT, WHAT YOU HEAR IS WHAT IS IN

12:51PM  15       EVIDENCE, NOT WHAT IS IN THE TRANSCRIPT.

12:51PM  16            THE TRANSCRIPT IS ONLY PROVIDED AS AN AID TO YOU AS YOU

12:51PM  17       LISTEN.

12:51PM  18            BUT, PLEASE, THE AUDIO PORTION OF THIS RECORDING IS WHAT

12:51PM  19       CONTROLS, NOT THE TRANSCRIPT.

12:51PM  20            WITH THAT, IT'S ADMITTED, AND IT MAY BE PLAYED.

12:52PM  21                 MR. BOSTIC:  THANK YOU, YOUR HONOR.

12:52PM  22            (AUDIO RECORDING PLAYED OFF THE RECORD.)

12:55PM  23       BY MR. BOSTIC:

12:55PM  24       Q.   OKAY.  MR. PARLOFF, WERE YOU ABLE TO HEAR THE AUDIO IN

12:55PM  25       THAT CLIP?

12:55PM  1    A.    YEAH, YES.

12:55PM  2    Q.    AND THAT CLIP BEGAN WITH A CONVERSATION ABOUT WORK FOR

12:55PM  3    PHARMACEUTICAL COMPANIES AND FOREIGN GOVERNMENTS.

12:55PM  4          DO YOU RECALL THAT?

12:55PM  5    A.    YES.

12:55PM  6    Q.    AND AT THE END YOU ASKED A QUESTION ABOUT WHETHER THE

12:55PM  7    DEVICES IN THERANOS'S CENTRAL LAB COULD BE PLACED OUT IN THE

12:55PM  8    FIELD WHEN, I THINK SHE SAID WHEN WE WERE FIGHTING IN IRAQ.

12:55PM  9          DO YOU RECALL THAT?

12:55PM  10   A.    YES.

12:55PM  11   Q.    AND HER ANSWER WAS THAT YES, THAT COULD BE DONE?

12:55PM  12   A.    YEAH.

12:55PM  13   Q.    AND THAT CONVERSATION WAS IN A PUBLIC PLACE; IS THAT

12:55PM  14   CORRECT?

12:55PM  15   A.    YES.

12:55PM  16   Q.    AND AS WITH ALL OF THE RECORDED CONVERSATIONS, DID

12:55PM  17   MS. HOLMES KNOW THAT YOU WERE RECORDING THAT CONVERSATION?

12:55PM  18   A.    YES.

12:55PM  19   Q.    BEFORE YOU PUBLISHED YOUR JUNE 2014 ARTICLE IN "FORTUNE,"

12:55PM  20   DID THAT TOPIC COME UP AGAIN IN A DIFFERENT SETTING?

12:56PM  21   A.    YES.

12:56PM  22   Q.    AND WHAT ELSE DO YOU RECALL THE DEFENDANT SAYING ABOUT

12:56PM  23   WHETHER THE THERANOS TECHNOLOGY WAS BEING USED BY THE MILITARY?

12:56PM  24   A.    AT SOME POINT SHE DID SAY THAT, AND I WAS NOT SUPPOSED TO

12:56PM  25   USE THIS IN THE PIECE, IT WAS VERY SENSITIVE, THAT IT HAD BEEN

12:56PM 1     USED IN THE MILITARY -- BY THE MILITARY IN AFGHANISTAN.

12:56PM 2     Q.   DID SHE GO INTO DETAIL ABOUT THAT OR DID SHE LEAVE IT AT

12:56PM 3     THAT LEVEL?

12:56PM 4     A.   AT THAT LEVEL.

12:56PM 5     Q.   AND BEFORE THE ARTICLE WAS PUBLISHED, SIMILARLY, DID

12:56PM 6     DEFENDANT TELL YOU ANYTHING ABOUT WHETHER YOU COULD BE GIVEN

12:56PM 7     INFORMATION ABOUT SPECIFIC DEPLOYMENTS OF THE THERANOS

12:56PM 8     TECHNOLOGY BY THE MILITARY?

12:56PM 9     A.   SHE SAID, NO, I COULD NOT BE.

12:56PM 10    Q.   IN WHAT CONTEXT DID THAT COME UP, IF YOU RECALL?

12:57PM 11    A.   WELL, I WANTED TO INTERVIEW GENERAL MATTIS AND SHE WAS

12:57PM 12    GOING TO MAKE AN INTRODUCTION AND SHE WAS GOING TO MAKE THAT

12:57PM 13    HAPPEN, BUT SHE TOLD ME THAT GENERAL MATTIS COULD NOT DISCUSS

12:57PM 14    ACTUAL DEPLOYMENTS IN AFGHANISTAN, AND THAT I SHOULD NOT EVEN

12:57PM 15    ASK HIM ABOUT THEM.

12:57PM 16    Q.   I'D LIKE TO LOOK AT SOME LANGUAGE IN YOUR ARTICLE AGAIN,

12:57PM 17    AND THAT'S EXHIBIT 1776.

12:57PM 18         MS. HOLLIMAN, CAN WE BRING THAT UP.  AND LET'S GO TO

12:57PM 19    PAGE 10 IN THE ARTICLE AND ZOOM IN ON THE TOP PARAGRAPH,

12:57PM 20    PLEASE.

12:57PM 21         SO, MR. PARLOFF, HERE IN THE ARTICLE THIS BEGINS WITH A

12:58PM 22    QUOTE FROM SOMEBODY FROM UCSF MEDICAL CENTER; IS THAT CORRECT?

12:58PM 23    A.   YEAH, YES.

12:58PM 24    Q.   AND THE SECOND SENTENCE HAS YOU WRITE, "THIS MAKES IT

12:58PM 25    POSSIBLE TO IMAGINE ONE DAY PLACING HOLMES'S LABS RIGHT BY THE

12:58PM   1    OPERATING ROOMS IN HOSPITALS OR IN MILITARY EVACUATION

12:58PM   2    HELICOPTERS OR ON SHIPS AND SUBMARINES."

12:58PM   3         AND THEN IT GOES ON.

12:58PM   4         DO YOU SEE THAT?

12:58PM   5    A.   YES.

12:58PM   6    Q.   AND IN THE ARTICLE, MILITARY USE OF THE DEVICE IS

12:58PM   7    MENTIONED AS SOMETHING THAT CAN BE IMAGINED; IS THAT CORRECT?

12:58PM   8    A.   THAT'S RIGHT.

12:58PM   9    Q.   IF MS. HOLMES HAD TOLD YOU THAT THE DEVICE WAS ACTUALLY

12:58PM  10    BEING USED IN AFGHANISTAN, WHY DID YOU WRITE IT THIS WAY IN THE

12:58PM  11    ARTICLE IN TERMS OF WHAT MIGHT HAPPEN IN THE FUTURE?

12:58PM  12    A.   SHE -- IT HAD TO BE COMPLETELY OFF THE RECORD.  IT WAS

12:58PM  13    SOME SORT OF VERY HIGHLY SENSITIVE SECRET INFORMATION, SO I WAS

12:58PM  14    NOT -- SHE DID NOT WANT ME TO PUBLISH THAT.  THIS WAS OBVIOUSLY

12:59PM  15    HYPOTHETICAL, AND THERE WAS NOTHING WRONG WITH THAT.

12:59PM  16    Q.   AND JUST TO BE CLEAR, DID MS. HOLMES DESCRIBE IT TO YOU AS

12:59PM  17    A HYPOTHETICAL, OR DID YOU CHOOSE TO WRITE IT IN A HYPOTHETICAL

12:59PM  18    WAY TO COMPLY WITH HER WISHES?

12:59PM  19    A.   I CHOSE TO WRITE IT IN A HYPOTHETICAL WAY.

12:59PM  20    Q.   LET'S SHIFT GEARS AND TALK ABOUT DISCUSSIONS THAT YOU HAD

12:59PM  21    WITH MS. HOLMES ABOUT THE COMPANY'S WORK WITH PHARMACEUTICAL

12:59PM  22    COMPANIES.

12:59PM  23         DO YOU RECALL THAT COMING UP?

12:59PM  24    A.   YES.

12:59PM  25    Q.   IN CONNECTION WITH THAT TOPIC, DID MS. HOLMES PROVIDE YOU

12:59PM   1     WITH WRITTEN MATERIALS?

12:59PM   2     A.   YES.

12:59PM   3     Q.   I'D LIKE YOU TO LOOK AT TAB 5486 IN YOUR BINDER.

12:59PM   4          YOUR HONOR, THE GOVERNMENT OFFERS 5486 PURSUANT TO

12:59PM   5     STIPULATION.

12:59PM   6               MR. CLINE:  NO OBJECTION.

12:59PM   7               THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:59PM   8          (GOVERNMENT'S EXHIBIT 5486 WAS RECEIVED IN EVIDENCE.)

01:00PM   9               MR. BOSTIC:  AND LET'S START BY ZOOMING IN ON THE

01:00PM  10     TOP PART CAPTURING THE HEADING AND THE MESSAGE FROM MS. HOLMES.

01:00PM  11     Q.   MR. PARLOFF, DO YOU SEE AN EMAIL FROM MS. HOLMES TO YOU ON

01:00PM  12     JUNE 1ST, 2014?

01:00PM  13     A.   YES.

01:00PM  14     Q.   AND SHE REFERENCES IN HER EMAIL, "PLEASE SEE ADDITIONAL

01:00PM  15     FOLLOW UP FROM OUR CALLS BELOW."

01:00PM  16          DO YOU SEE THAT?

01:00PM  17     A.   YES.

01:00PM  18     Q.   AND DURING THIS TIME PERIOD, WERE YOU IN REGULAR CONTACT

01:00PM  19     WITH MS. HOLMES GAINING MORE INFORMATION FROM HER?

01:00PM  20     A.   YES.

01:00PM  21     Q.   LET'S ZOOM IN -- ACTUALLY ZOOM OUT AND THEN BACK IN ON THE

01:00PM  22     MIDDLE OF THE PAGE.

01:00PM  23          THERE'S A TOPIC THAT SAYS, "PHARMACEUTICAL COMPANY WORK."

01:00PM  24          THANK YOU, MS. HOLLIMAN.

01:00PM  25          DO YOU SEE THE SECOND TO THE TOP ENTRY THERE SAYS, "TOPIC:

01:01PM   1    PHARMACEUTICAL COMPANY WORK."

01:01PM   2         AND THEN MS. HOLMES WRITES, "I'VE ATTACHED CONFIDENTIAL

01:01PM   3    REPORTS GENERATED IN SOME OF OUR EARLY PHARMACEUTICAL

01:01PM   4    PROGRAMS."

01:01PM   5         DO YOU SEE THAT?

01:01PM   6    A.   YES.

01:01PM   7    Q.   AND DO YOU RECALL RECEIVING DOCUMENTS FROM MS. HOLMES

01:01PM   8    RELATING TO WORK THE COMPANY HAD PURPORTEDLY DONE FOR

01:01PM   9    PHARMACEUTICAL COMPANIES?

01:01PM   10   A.   YES.

01:01PM   11   Q.   AND LET'S ZOOM IN AT THE TOP OF PAGE 1 AND LOOK AT THOSE

01:01PM   12   ATTACHMENT NAMES.

01:01PM   13        FIRST OF ALL, WHAT IS YOUR RECOLLECTION OF HOW IT CAME TO

01:01PM   14   BE THAT MS. HOLMES WAS SENDING YOU THIS INFORMATION?  DO YOU

01:01PM   15   HAVE A MEMORY OF ASKING FOR IT, OR WAS THERE ANOTHER

01:01PM   16   CIRCUMSTANCE?

01:01PM   17   A.   I THINK I DID ASK FOR IT.  SHE HAD MENTIONED -- I BELIEVE

01:01PM   18   SHE MENTIONED THESE, THAT SHE HAD DONE SOME OF -- THAT SHE HAD

01:01PM   19   SOME VALIDATION STUDIES THAT WERE PERFORMED WITH SOME OF THE

01:02PM   20   PHARMACEUTICAL COMPANIES, AND I BELIEVE I ASKED FOR THEM, YOU

01:02PM   21   KNOW, AND YEAH.

01:02PM   22   Q.   THE ATTACHMENTS TO THIS EMAIL, LIKE THE PRESENTATION, WERE

01:02PM   23   ALSO PASSWORD PROTECTED; IS THAT CORRECT?

01:02PM   24   A.   THAT'S RIGHT.

01:02PM   25   Q.   ARE YOU ABLE TO ACCESS THE ELECTRONIC VERSIONS OF THESE

01:02PM   1      DOCUMENTS TODAY?

01:02PM   2      A.   NOT ANYMORE, NO.

01:02PM   3      Q.   OKAY.  LET'S SEE IF WE CAN FIND COPIES OF THEM ELSEWHERE.

01:02PM   4           FIRST, I WANT TO JUST DRAW YOUR ATTENTION TO TWO OF THESE

01:02PM   5      FILES.  DO YOU SEE THAT THE THIRD ONE DOWN IS TITLED, "PFIZER

01:02PM   6      THERANOS SYSTEM VALIDATION FINAL REPORT - CONFIDENTIAL"?

01:02PM   7      A.   YES.

01:02PM   8      Q.   AND THE LAST ONE, THE FIFTH ONE, IS TITLED, "THERANOS

01:02PM   9      MULTIPLEXED PANEL VALIDATION REPORT SCHERING-PLOUGH -

01:02PM   10     CONFIDENTIAL"?

01:02PM   11     A.   YES.

01:02PM   12     Q.   AND KEEP THAT FINAL DOCUMENT IN MIND, AND LET'S BRING UP

01:03PM   13     1753.

01:03PM   14          AND THIS IS ADMITTED, YOUR HONOR.  MAY WE PUBLISH?

01:03PM   15               THE COURT:  YES.

01:03PM   16     BY MR. BOSTIC:

01:03PM   17     Q.   MR. PARLOFF, DO YOU SEE --

01:03PM   18          LET'S ZOOM IN ON THE TOP PART OF THIS EMAIL.

01:03PM   19          DO YOU SEE AN EMAIL ON YOUR SCREEN FROM MS. HOLMES TO

01:03PM   20     DANIEL EDLIN ON JUNE 1ST, 2014?

01:03PM   21     A.   YES.

01:03PM   22     Q.   AND THE SUBJECT LINE IN THE EMAIL IS "RE: ROGER PARLOFF -

01:03PM   23     AGGREGATED ACTION ITEMS."

01:03PM   24          DO YOU SEE THAT?

01:03PM   25     A.   UH-HUH, YES.

01:03PM  1    Q.   AND MS. HOLMES ATTACHES A FILE TO THIS EMAIL, PFIZER

01:03PM  2    THERANOS SYSTEM VALIDATION FINAL REPORT.PDF?

01:03PM  3    A.   UH-HUH, YES.

01:03PM  4    Q.   AND LET'S LOOK AT THE ATTACHMENT, AND THAT'S GOING TO BE

01:03PM  5    IN -- I'M SORRY, ON PAGE 7 OF THIS EXHIBIT.

01:04PM  6         MR. PARLOFF, DO YOU RECOGNIZE THE DOCUMENT ON YOUR SCREEN

01:04PM  7    NOW?

01:04PM  8    A.   YES.

01:04PM  9    Q.   AND WAS THIS THE REPORT, OR ONE OF THE REPORTS THAT

01:04PM  10   MS. HOLMES SENT TO YOU WHEN YOU WERE PREPARING YOUR ARTICLE ON

01:04PM  11   THE COMPANY?

01:04PM  12   A.   YES.

01:04PM  13   Q.   I'LL DRAW YOUR ATTENTION TO THE TWO LOGOS AT THE TOP OF

01:04PM  14   THAT PAGE.

01:04PM  15        DO YOU SEE THE PFIZER LOGO ON THE LEFT SIDE?

01:04PM  16   A.   YES.

01:04PM  17   Q.   AND THE THERANOS LOGO ON THE RIGHT?

01:04PM  18   A.   YES.

01:04PM  19   Q.   DID MS. HOLMES TELL YOU THAT THERANOS HAD GENERATED THE

01:04PM  20   CONTENT OF THIS REPORT?

01:04PM  21   A.   NO.

01:04PM  22   Q.   LET'S GO TO PAGE 32 OF THIS EXHIBIT.  LET'S ZOOM IN ON THE

01:04PM  23   TOP THIRD OF THE PAGE.

01:04PM  24        DO YOU SEE ON PAGE 32 THERE ARE SOME CONCLUSIONS MAKING

01:05PM  25   STATEMENTS ABOUT THE PERFORMANCE OF THE THERANOS SYSTEM?

01:05PM  1    A.   YES.

01:05PM  2    Q.   DID MS. HOLMES EVER TELL YOU THAT THESE CONCLUSIONS WERE

01:05PM  3    NOT THE CONCLUSIONS OF PFIZER?

01:05PM  4    A.   NO.

01:05PM  5    Q.   OKAY.  LET'S GO BACK JUST FOR A MOMENT TO 5486.

01:05PM  6         AND WHEN WE GET THERE LET'S ZOOM IN ON THE TOP HEADER AND

01:05PM  7    THE ATTACHMENTS AGAIN.

01:05PM  8         AND NOW, MR. PARLOFF, WE PREVIOUSLY NOTED THE BOTTOM

01:05PM  9    ATTACHMENT, "THERANOS MULTIPLEXED PANEL VALIDATION REPORT

01:05PM  10   SCHERING-PLOUGH - CONFIDENTIAL"?

01:05PM  11   A.   YES.

01:05PM  12   Q.   AND CAN YOU PLEASE TURN IN YOUR BINDER TO EXHIBIT 1752?

01:06PM  13   A.   YES.

01:06PM  14   Q.   DO YOU SEE AT 1752 ANOTHER EMAIL FROM MS. HOLMES TO

01:06PM  15   DANIEL EDLIN ON JUNE 1ST, 2014?

01:06PM  16   A.   YES.

01:06PM  17   Q.   AND IS THE SUBJECT LINE OF THIS EMAIL THE SAME AS THE LAST

01:06PM  18   ONE WE LOOKED AT, OR THE SAME AS 1753, WHICH IS "ROGER PARLOFF

01:06PM  19   AGGREGATED ACTION ITEMS"?

01:06PM  20   A.   ACTUALLY -- I'M SORRY, WHERE ARE WE?

01:06PM  21   Q.   I'M SORRY.  WE'RE AT 1752, WHICH SHOULD BE THE FIRST

01:06PM  22   EXHIBIT IN YOUR BINDER.

01:06PM  23   A.   UH-HUH.

01:06PM  24   Q.   AND WE'RE JUST ON THE FIRST PAGE.

01:06PM  25        IT'S NOT ON THE SCREEN.

01:06PM  1    A.   OH, IT'S NOT.  I SEE.

01:06PM  2    Q.   I'M SORRY FOR THE CONFUSION.

01:06PM  3         MS. HOLLIMAN, WE CAN -- ACTUALLY, LET'S LEAVE THAT UP.

01:06PM  4    I'M SORRY.  LET'S LEAVE THAT UP.

01:07PM  5         AND, MR. PARLOFF, I'LL ASK YOU TO JUST LOOK AT THE PAPER

01:07PM  6    COPY FOR A MOMENT.

01:07PM  7    A.   OH, OKAY.

01:07PM  8    Q.   SO YOU'RE LOOKING AT 1752?  WE HAVE --

01:07PM  9    A.   YES, THE TOP, JUNE 1ST.

01:07PM  10   Q.   AND WE HAVE 5486 UP ON THE SCREEN.

01:07PM  11        MR. PARLOFF, DO YOU SEE THAT WE HAVE THIS EMAIL FROM

01:07PM  12   MS. HOLMES TO MR. EDLIN WITH YOUR NAME IN THE SUBJECT LINE AS

01:07PM  13   AN ATTACHMENT?

01:07PM  14   A.   YES.

01:07PM  15   Q.   AND IS THAT ATTACHMENT NAMED SIMILARLY TO THE

01:07PM  16   ATTACHMENT --

01:07PM  17   A.   OH, YES, YES.

01:07PM  18   Q.   -- IN THE EMAIL THAT IS ON YOUR SCREEN?

01:07PM  19   A.   YEAH.

01:07PM  20        MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 1752.

01:07PM  21        MR. CLINE:  YOUR HONOR, WE OBJECT TO THE EMAIL AS

01:07PM  22   HEARSAY.  THERE'S AN ATTACHMENT TO THIS EMAIL, AND IF

01:07PM  23   MR. PARLOFF CAN IDENTIFY THAT AS WHAT HE RECEIVED, WE WON'T

01:07PM  24   OBJECT TO THE ATTACHMENT.

01:07PM  25        MR. BOSTIC:  YOUR HONOR, THIS ISN'T HEARSAY.  THIS

01:08PM   1    IS AN EMAIL FROM THE DEFENDANT TO AN EMPLOYEE.

01:08PM   2        IF THE DEFENSE'S CONCERNS ARE WITH THE CONTENT OF THE

01:08PM   3    MESSAGES BELOW, WE CAN REDACT THAT.

01:08PM   4        BUT I'LL NOTE THAT THEY'RE ALREADY IN EVIDENCE FROM 1753.

01:08PM   5        THE ONLY NEW CONTENT HERE IS THE EMAIL FROM MS. HOLMES

01:08PM   6    ATTACHING THE DOCUMENT.

01:08PM   7             THE COURT:  I DO SEE IT'S AN EMAIL FROM YOUR CLIENT,

01:08PM   8    MR. CLINE.

01:08PM   9        DO YOU WISH SOMETHING REDACTED FROM THIS?

01:08PM   10            MR. CLINE:  THERE ARE SEVERAL ITEMS IN THIS, AND YOU

01:08PM   11   CAN SEE THE EMAILS FROM, FROM MS. HOLMES, IT LOOKS LIKE THERE

01:08PM   12   ARE ONE, TWO, THREE, THREE OF THOSE.  I'M JUST LOOKING THROUGH

01:08PM   13   THE DOCUMENT HERE.

01:08PM   14       I THINK THERE ARE THREE THERE ON THE FIRST PAGE.  NO

01:08PM   15   OBJECTION TO THOSE.

01:08PM   16       AND AGAIN, AS TO THE ATTACHMENT, IF MR. PARLOFF CAN

01:09PM   17   IDENTIFY IT AS WHAT HE GOT, NO OBJECTION TO THAT.

01:09PM   18            THE COURT:  ALL RIGHT.  DO YOU WANT TO LAY A

01:09PM   19   FOUNDATION FOR THAT AFTER YOU --

01:09PM   20            MR. BOSTIC:  I CAN IF THE COURT WOULD LIKE,

01:09PM   21   YOUR HONOR.  BUT I WILL JUST NOTE THAT THIS CONTENT, I BELIEVE,

01:09PM   22   IS IDENTICAL TO THE CONTENT THAT IS ALREADY IN THE RECORD IN

01:09PM   23   1753.

01:09PM   24            THE COURT:  ALL RIGHT.  THANK YOU.

01:09PM   25        ALL RIGHT.  THANK YOU, MR. CLINE.

01:09PM  1          I'LL OVERRULE THE OBJECTION.  THIS IS ADMITTED.

01:09PM  2          AND YOU'LL LAY A FOUNDATION AS TO THE ATTACHMENT AS A

01:09PM  3     PRELIMINARY MATTER.

01:09PM  4               MR. BOSTIC:  YES, YOUR HONOR.  THANK YOU.

01:09PM  5               THE COURT:  THANK YOU.

01:09PM  6          (GOVERNMENT'S EXHIBIT 1752 WAS RECEIVED IN EVIDENCE.)

01:09PM  7               MR. BOSTIC:  MAY WE PUBLISH?

01:09PM  8               THE COURT:  YES.

01:09PM  9     BY MR. BOSTIC:

01:09PM 10     Q.   LET'S BRING UP 1752.

01:09PM 11          MR. PARLOFF, YOU'LL RECALL A MINUTE AGO WE LOOKED AT AN

01:09PM 12     EMAIL FROM MS. HOLMES TO MR. EDLIN SENDING HIM THE PFIZER

01:09PM 13     VALIDATION REPORT.

01:09PM 14          DO YOU RECALL THAT?

01:09PM 15     A.   YES.

01:09PM 16     Q.   AND NOW WE'RE LOOKING AT AN EMAIL FROM MS. HOLMES TO

01:09PM 17     MR. EDLIN AT THAT SAME TIME SENDING THE SCHERING-PLOUGH

01:10PM 18     VALIDATION REPORT; IS THAT CORRECT?

01:10PM 19     A.   YES.

01:10PM 20     Q.   LET'S GO TO PAGE 7 OF THIS EXHIBIT.

01:10PM 21          ON PAGE 7 OF THE EXHIBIT, DO YOU SEE THE SCHERING-PLOUGH

01:10PM 22     REPORT THAT MS. HOLMES PROVIDED YOU ON THIS SAME DATE,

01:10PM 23     JUNE 1ST, 2014?

01:10PM 24     A.   YES.

01:10PM 25     Q.   AND AGAIN, I'LL DRAW YOUR ATTENTION TO THE WORDS AND THE

01:10PM   1    LOGOS AT THE TOP OF THE PAGE.

01:10PM   2         DO YOU SEE THE SCHERING-PLOUGH LOGO ON THE UPPER LEFT?

01:10PM   3    A.   YES.

01:10PM   4    Q.   AND THE THERANOS IN THE UPPER RIGHT?

01:10PM   5    A.   YES.

01:10PM   6    Q.   AND DID MS. HOLMES EVER TELL YOU THAT THERANOS CREATED

01:10PM   7    THIS DOCUMENT?

01:10PM   8    A.   NO.

01:10PM   9    Q.   LET'S TURN TO PAGE 24 OF THE EXHIBIT.  LET'S ZOOM IN ON

01:10PM   10   THE TEXT.

01:10PM   11        MR. PARLOFF, DO YOU SEE UNDER CONCLUSIONS THERE ARE SOME

01:10PM   12   FAVORABLE CONCLUSIONS, IN OTHER WORDS, SOME PRAISE ABOUT

01:11PM   13   THERANOS'S PERFORMANCE?

01:11PM   14   A.   YES.

01:11PM   15   Q.   DID MS. HOLMES EVER TELL YOU THAT THIS PRAISE WAS

01:11PM   16   GENERATED BY THERANOS ITSELF?

01:11PM   17   A.   NO.

01:11PM   18   Q.   BEFORE YOU PUBLISHED YOUR ARTICLE IN JUNE 2014, DID

01:11PM   19   MS. HOLMES TELL YOU WHETHER THERANOS WAS STILL ACTIVELY

01:11PM   20   INVOLVED IN WORK WITH PHARMACEUTICAL COMPANIES?

01:11PM   21   A.   YES.

01:11PM   22   Q.   AND WHAT DID SHE SAY ABOUT THAT?

01:11PM   23   A.   SHE SAID THEY WERE.

01:11PM   24   Q.   AND WAS THAT UP THROUGH THE PRESENT DAY IN 2014?

01:11PM   25   A.   YES.

01:11PM 1    Q.   LET'S TALK NEXT ABOUT CONVERSATIONS THAT YOU HAD WITH

01:11PM 2    MS. HOLMES ABOUT THE DEVICE ITSELF AND THE USE OF VENIPUNCTURE

01:11PM 3    BY THE COMPANY.

01:11PM 4         DO YOU HAVE THOSE CONVERSATIONS IN MIND?

01:11PM 5    A.   YES.

01:11PM 6    Q.   WAS THAT A TOPIC THAT CAME UP IN MULTIPLE DISCUSSIONS WITH

01:12PM 7    MS. HOLMES?

01:12PM 8    A.   YES.

01:12PM 9    Q.   AND IN YOUR DISCUSSIONS WITH MS. HOLMES, DID YOU ASK HER

01:12PM 10   QUESTIONS ABOUT WHAT DEVICES THERANOS USED TO RUN TESTS ON

01:12PM 11   PATIENT SAMPLES?

01:12PM 12   A.   YES.

01:12PM 13   Q.   DID YOU HAVE A CONVERSATION WITH MS. HOLMES ON APRIL 10TH,

01:12PM 14   2014 WHERE THAT TOPIC MIGHT HAVE COME UP?

01:12PM 15   A.   YES.

01:12PM 16        MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

01:12PM 17   EXHIBIT 5480A AT THIS TIME.  IT'S APPROXIMATELY A MINUTE AND

01:12PM 18   40 SECONDS LONG.

01:12PM 19        MR. CLINE:  NO OBJECTION.

01:12PM 20        THE COURT:  IT'S ADMITTED.  IT WILL BE PLAYED.

01:12PM 21   LADIES AND GENTLEMEN, PLEASE LISTEN CLOSELY.  THERE'S NO

01:12PM 22   TRANSCRIPT FOR THIS AUDIO RECORDING.  IT'S ADMITTED, AND IT NOW

01:12PM 23   MAY BE PLAYED.

01:12PM 24        (GOVERNMENT'S EXHIBIT 5480A WAS RECEIVED IN EVIDENCE.)

01:13PM 25        (AUDIO RECORDING PLAYED OFF THE RECORD.)

01:14PM  1    BY MR. BOSTIC:

01:14PM  2    Q.    MR. PARLOFF, DID YOU HEAR MS. HOLMES TALK ABOUT LARGE

01:14PM  3    MACHINES AT OTHER LABS, WHICH WERE VERY BIG AND WHICH TAKE UP A

01:14PM  4    HUGE FOOTPRINT?

01:14PM  5    A.    YES.

01:14PM  6    Q.    DID THE DEFENDANT EVER TELL YOU THAT THERANOS ALSO HAD

01:14PM  7    LARGE CONVENTIONAL MACHINES BECAUSE ITS SMALL ANALYZER COULDN'T

01:15PM  8    RUN MOST OF THE TESTS IT WAS OFFERING?

01:15PM  9    A.    NO.

01:15PM  10   Q.    IN THAT CLIP, YOU TALK ABOUT THE USE OF DEVICES AND THEN

01:15PM  11   YOU ASK, "CAN I SAY THAT?"

01:15PM  12        DO YOU RECALL ASKING THAT?

01:15PM  13   A.    YES.

01:15PM  14   Q.    AND WHY DO YOU ASK MS. HOLMES WHAT YOU COULD SAY?

01:15PM  15   A.    SHE WAS VERY CONCERNED ABOUT TRADE SECRETS AND PROTECTING

01:15PM  16   HER INTELLECTUAL PROPERTY, WHICH I THOUGHT WAS A VERY

01:15PM  17   LEGITIMATE CONCERN.

01:15PM  18        AND SO I WAS LETTING HER SPEAK FREELY ABOUT WHAT HER

01:15PM  19   DEVICES COULD DO, AND THEN I WOULD COME BACK TO HER LATER AND

01:15PM  20   TELL HER WHAT PARTS I WANTED TO USE, AND I WOULD SEE IF IT WAS

01:15PM  21   OKAY IN TERMS OF PROTECTING HER INTELLECTUAL PROPERTY.

01:15PM  22   Q.    SO, IN OTHER WORDS, YOU HAD AGREED WITH MS. HOLMES THAT

01:15PM  23   SHE COULD GIVE YOU INFORMATION, BUT THAT YOU WOULD CHECK WITH

01:15PM  24   HER BEFORE DISCLOSING THAT INFORMATION?

01:16PM  25   A.    YEAH.  I WAS GETTING IT ON BACKGROUND OR -- AND WOULD --

01:16PM   1   YEAH, AND WOULD GET HER APPROVAL BEFORE -- SO THAT I DIDN'T

01:16PM   2   COMPROMISE HER INTELLECTUAL PROPERTY RIGHTS.

01:16PM   3   Q.   IS THAT SOMETHING THAT IS A PRACTICE OF YOURS WHEN IT

01:16PM   4   COMES TO DISCUSSING POTENTIALLY SENSITIVE TOPICS WITH SUBJECTS?

01:16PM   5   A.   YES.

01:16PM   6   Q.   WHY DO YOU DO IT THAT WAY INSTEAD OF JUST HAVING THE

01:16PM   7   SUBJECT SENSOR THEMSELVES AND ONLY TELL YOU THINGS THAT THEY

01:16PM   8   WANT IN THE ARTICLE?

01:16PM   9   A.   FIRST, I WOULD RATHER GET THE MOST INFORMATION I CAN SO

01:16PM   10   THAT I GET THE BIG PICTURE.

01:16PM   11       AND IF PEOPLE ARE TOO COWED BY WORRYING ABOUT DOTTING

01:17PM   12   EVERY T AND -- I MEAN DOTTING EVERY I AND CROSSING EVERY T,

01:17PM   13   THEN THEY'RE RELUCTANT TO SPEAK.

01:17PM   14       I SHOULD SAY THIS WAS NOT -- WELL, OKAY.  YEAH.

01:17PM   15   Q.   LET'S GO TO YOUR ARTICLE FOR A MOMENT, HAVING LISTENED TO

01:17PM   16   THAT CLIP.  SO LET'S GO BACK TO 1776, AND PAGE 9 IN THE

01:17PM   17   EXHIBIT.

01:17PM   18   A.   PAGE?

01:17PM   19   Q.   PAGE 9.  IT WILL SHOW UP ON THE SCREEN.  WHATEVER IS

01:17PM   20   EASIER.

01:17PM   21       AND LET'S LOOK TOWARDS THE BOTTOM, THE SECOND TO THE LAST

01:17PM   22   PARAGRAPH THAT STARTS, "IMPORTANTLY."

01:17PM   23       IN THE ARTICLE YOU WRITE, "IMPORTANTLY, IT'S NOT JUST THE

01:17PM   24   BLOOD DRAWS THAT ARE TINY.  IT'S ALSO THE ANALYTICAL SYSTEMS

01:17PM   25   THERANOS USES TO PERFORM THE TESTS."

01:18PM  1            DO YOU SEE THAT?

01:18PM  2       A.   YES.

01:18PM  3       Q.   AND YOU WRITE "THEY," THE ANALYTICAL SYSTEMS, "TAKE UP A

01:18PM  4       SMALL FRACTION OF THE FOOTPRINT REQUIRED BY A CONVENTIONAL LAB

01:18PM  5       TODAY."

01:18PM  6            IS THAT WHAT YOU WROTE?

01:18PM  7       A.   YES.

01:18PM  8       Q.   AND WAS THAT CONSISTENT WITH THE INFORMATION GIVEN TO YOU

01:18PM  9       BY MS. HOLMES?

01:18PM  10      A.   YES.

01:18PM  11      Q.   DID THE DEFENDANT EVER COMPARE THERANOS TO QUEST IN TERMS

01:18PM  12      OF BUYING TESTS FROM THIRD PARTIES?

01:18PM  13      A.   YES.  SO SHE COMPARED IT TO ALL OTHER LABS, YEAH.

01:18PM  14      Q.   AND WHAT DID SHE SAY ABOUT THAT?  WAS THERANOS THE SAME IN

01:18PM  15      THAT WAY OR DIFFERENT?

01:18PM  16      A.   DIFFERENT.  OTHER LABS BUY THEIR TESTS, WE MAKE ALL OF

01:18PM  17      OURS.

01:18PM  18      Q.   YOU SPECIFICALLY REMEMBER MS. HOLMES SAYING THAT?

01:18PM  19      A.   YES.

01:18PM  20      Q.   AND DID SHE SAY THAT TO YOU BEFORE THE JUNE 2014 ARTICLE?

01:18PM  21      A.   YES.

01:19PM  22           SHE SAID OTHER COMPANIES BUY THEIR TESTS FROM THIRD

01:19PM  23      PARTIES, WE MAKE ALL OF OURS.

01:19PM  24      Q.   AND AGAIN, AT THAT POINT, OR AT ANY POINT IN 2014, DID

01:19PM  25      MS. HOLMES DISCLOSE TO YOU THAT THERANOS WAS BUYING AND USING

01:19PM   1    ANALYZERS FROM THIRD PARTIES?

01:19PM   2    A.   NO.

01:19PM   3    Q.   IN YOUR CONVERSATIONS WITH MS. HOLMES, DID THE TOPIC OF

01:19PM   4    VEIN DRAWS CONTINUE TO COME UP?

01:19PM   5    A.   THE TOPIC OF?

01:19PM   6    Q.   OF VEIN DRAWS CONTINUE TO COME UP?

01:19PM   7    A.   YES.

01:19PM   8    Q.   AND DID YOU ASK MS. HOLMES QUESTIONS ABOUT WHY THERANOS

01:19PM   9    PERFORMED VENIPUNCTURE IN SOME CASES?

01:19PM  10    A.   YES.

01:19PM  11           MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

01:19PM  12    EXHIBIT 5473B2, WHICH IS A CLIP LABELLED MAY 12TH, 2014, AND

01:19PM  13    IT'S APPROXIMATELY FIVE MINUTES LONG.

01:19PM  14           MR. CLINE:  NO OBJECTION.

01:20PM  15           THE COURT:  ALL RIGHT.  THANK YOU.  IT'S ADMITTED,

01:20PM  16    AND IT WILL BE PLAYED.

01:20PM  17        (GOVERNMENT'S EXHIBIT 5473B2 WAS RECEIVED IN EVIDENCE.)

01:20PM  18           THE COURT:  AGAIN, LADIES AND GENTLEMEN, YOU WILL

01:20PM  19    NOT HAVE A TRANSCRIPT OF THIS SO PLEASE LISTEN CLOSELY.  THE

01:20PM  20    RECORDING IS IN EVIDENCE, AND IT MAY NOW BE PLAYED.

01:20PM  21        (AUDIO RECORDING PLAYED OFF THE RECORD.)

01:25PM  22    BY MR. BOSTIC:

01:25PM  23    Q.   OKAY.  MR. PARLOFF, DID YOU HEAR THE DISCUSSION ABOUT THE

01:25PM  24    OCCASIONS WHEN THERANOS WOULD CONDUCT VENIPUNCTURE?

01:25PM  25    A.   YES.

01:25PM 1     Q.   AND MS. HOLMES MENTIONED A FEW REASONS.  SHE MENTIONED

01:25PM 2     SCALING, SHE MENTIONED VEIN DRAWN SAMPLES COLLECTED BY DOCTORS

01:25PM 3     AND SENT IN, SHE MENTIONED THE GOAL OF SHOWING CORRELATION

01:25PM 4     BETWEEN DIFFERENT KINDS OF SAMPLES.

01:25PM 5          DO YOU RECALL THAT DISCUSSION?

01:25PM 6     A.   YEAH.

01:25PM 7     Q.   YOU ASKED MS. HOLMES WHETHER IT WAS A MATTER OF THE

01:25PM 8     PLATFORM NOT BEING ABLE TO RUN A CERTAIN TEST; IS THAT CORRECT?

01:25PM 9     A.   YES.

01:25PM 10    Q.   AND SHE ANSWERED AGAIN IN TERMS OF VOLUME; IS THAT RIGHT?

01:25PM 11    A.   YES.

01:25PM 12    Q.   AT ANY POINT IN 2014, DID MS. HOLMES TELL YOU THAT

01:25PM 13    THERANOS NEEDED TO USE VENIPUNCTURE BECAUSE THERE WERE MANY

01:25PM 14    TESTS THAT ITS OWN TECHNOLOGY SIMPLY COULDN'T DO?

01:25PM 15    A.   NO.

01:26PM 16    Q.   AT SOME POINT BEFORE YOU WROTE YOUR ARTICLE IN JUNE OF

01:26PM 17    2014, DID YOU ASK MS. HOLMES ABOUT VISITING A FUNCTIONING

01:26PM 18    ARIZONA LAB BELONGING TO THERANOS?

01:26PM 19    A.   YES.

01:26PM 20    Q.   WHAT DID MS. HOLMES SAY ABOUT THAT, IF YOU RECALL?

01:26PM 21    A.   WELL, I WAS MISTAKEN.  THE ARIZONA LAB WAS NOT OPERATIONAL

01:26PM 22    YET.

01:26PM 23         AND THEN WE SPOKE ABOUT -- I ASKED IF I COULD SEE THE

01:26PM 24    CALIFORNIA LAB, AND SHE SAID THAT, IN ESSENCE, I ALREADY HAD.

01:26PM 25    I MEAN, THAT IN ESSENCE I THINK SHE SAID, YEAH, YOU'VE SEEN IT.

01:26PM   1    IT'S JUST A BANK OF THOSE DEVICES I SHOWED YOU, MEANING THE

01:27PM   2    SMALL -- HER DEVICES, THE PROPRIETARY DEVICES ABOUT THE SIZE OF

01:27PM   3    THE COMPUTER TOWER.

01:27PM   4    Q.   SO LET ME ASK YOU, WHEN YOU ASKED TO SEE THE LAB -- YOU

01:27PM   5    PREVIOUSLY TESTIFIED THAT YOU HAD SEEN, IN FACT, THE R&D LAB?

01:27PM   6    A.   I HAD SEEN THE R&D.  I WAS ASKING TO SEE THE COMMERCIAL

01:27PM   7    LAB.

01:27PM   8    Q.   THE LAB WHERE PATIENT SAMPLES ARE ACTUALLY TESTED?

01:27PM   9    A.   THAT'S RIGHT.

01:27PM  10         IN FACT, WHAT SHE SAID WAS --

01:27PM  11              MR. CLINE:  FORGIVE ME, YOUR HONOR.  I APOLOGIZE FOR

01:27PM  12    INTERRUPTING.

01:27PM  13         I THINK WE HAVE A RECORDING OF THIS CONVERSATION WHICH I

01:27PM  14    IMAGINE THAT MR. BOSTIC IS ABOUT TO PLAY.  MAYBE WE CAN HAVE

01:27PM  15    MS. HOLMES'S ACTUAL WORDS INSTEAD OF MR. PARLOFF'S --

01:27PM  16              THE COURT:  WELL, THIS IS HIS WITNESS, AND THE

01:27PM  17    WITNESS CAN SAY WHAT HE RECALLS, AND THEN, OF COURSE, THE AUDIO

01:27PM  18    WILL TELL US WHAT WAS RECORDED.

01:27PM  19         SO YOU CAN CONTINUE.

01:27PM  20              MR. BOSTIC:  THANK YOU, YOUR HONOR.

01:27PM  21    Q.   MR. PARLOFF, LET ME JUST MAKE SURE THAT IT'S CLEAR WHAT

01:28PM  22    YOU HAD PREVIOUSLY SEEN.

01:28PM  23         YOU MENTIONED THAT MS. HOLMES SAID IT'S A BANK OF THE

01:28PM  24    KINDS OF DEVICES YOU HAD PREVIOUSLY SEEN?

01:28PM  25    A.   UH-HUH, YEAH.

01:28PM  1    Q.   AND DESCRIBE FOR US JUST FOR THE RECORD WHAT YOU HAD SEEN

01:28PM  2    IN THE PAST.

01:28PM  3    A.   SHE HAD SHOWN ME THIS R&D LAB AT HER HEADQUARTERS, AND I

01:28PM  4    MEAN, IT WAS SEVEN YEARS AGO, BUT I WOULD SAY MAYBE TEN OF

01:28PM  5    THESE DEVICES, MAYBE SLIGHTLY LESS, ON SHELVES OR WORK BENCHES.

01:28PM  6    THEY WERE NOT IN OPERATION WHILE I WAS THERE, BUT YEAH, THEY

01:28PM  7    ALL LOOKED PRETTY MUCH IDENTICAL.

01:28PM  8         MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

01:28PM  9    EXHIBIT 5473C.  THIS IS A RECORDING OF WHICH THE DEFENSE IS

01:28PM 10    AWARE FROM MAY 12TH, 2014.

01:28PM 11         IT'S APPROXIMATELY TEN MINUTES LONG -- OR EXCUSE ME, TWO

01:28PM 12    MINUTES LONG.

01:28PM 13         MR. CLINE:  NO OBJECTION.

01:28PM 14         THE COURT:  IT'S ADMITTED, AND IT WILL BE PLAYED.

01:28PM 15    (GOVERNMENT'S EXHIBIT 5473C WAS RECEIVED IN EVIDENCE.)

01:28PM 16         THE COURT:  AGAIN, LADIES AND GENTLEMEN, THERE'S NO

01:29PM 17    TRANSCRIPT, SO PLEASE DO LISTEN CLOSELY.  IT CAN BE PLAYED.

01:29PM 18         (AUDIO RECORDING PLAYED OFF THE RECORD.)

01:31PM 19    BY MR. BOSTIC:

01:31PM 20    Q.   MR. PARLOFF, DID YOU HEAR MS. HOLMES DESCRIBE THE LAB FOR

01:31PM 21    YOU AS A BANK OF THE SMALL THERANOS ANALYZERS THAT YOU HAD SEEN

01:31PM 22    BEFORE?

01:31PM 23    A.   YES.

01:31PM 24    Q.   DURING THAT DESCRIPTION, OR AT ANY POINT BEFORE YOUR

01:31PM 25    JUNE 2014 ARTICLE, DID SHE TELL YOU THAT THE LAB ALSO INCLUDED

01:31PM   1    LARGE COMMERCIALLY AVAILABLE THIRD PARTY DEVICES?

01:31PM   2    A.   NO.

01:31PM   3              MR. BOSTIC:  YOUR HONOR, I HAVE SOME MORE MATERIAL

01:31PM   4    WITH THIS WITNESS, BUT I'M NOT SURE IF THE COURT WANTED TO TAKE

01:31PM   5    A BREAK AT 1:30 OR AT ANOTHER TIME.

01:31PM   6              THE COURT:  LET'S BREAK NOW.  WE'LL TAKE OUR

01:31PM   7    AFTERNOON BREAK.

01:31PM   8         LADIES AND GENTLEMEN, THIS IS 30 MINUTES, 30 MINUTES.

01:31PM   9    WE'LL TAKE A 30 MINUTE BREAK.

01:31PM  10         YOU CAN STAND DOWN, SIR.  AND WE'LL RESUME AGAIN IN

01:31PM  11    30 MINUTES.

01:32PM  12         (RECESS FROM 1:32 P.M. UNTIL 2:13 P.M.)

02:13PM  13              THE COURT:  PLEASE BE SEATED.  WE'RE BACK ON THE

02:13PM  14    RECORD.

02:13PM  15         ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.

02:13PM  16         OUR JURY IS PRESENT.  MR. PARLOFF IS ON THE STAND.

02:13PM  17         MR. BOSTIC, YOU'D LIKE TO CONTINUE?

02:13PM  18              MR. BOSTIC:  THANK YOU, YOUR HONOR.

02:13PM  19         FOR THE RECORD, CAN I CONFIRM WITH THE COURT THAT 1752 WAS

02:13PM  20    ADMITTED INTO EVIDENCE?

02:14PM  21              THE COURT:  YES, OVER OBJECTION, YES.

02:14PM  22              MR. BOSTIC:  THANK YOU, YOUR HONOR.

02:14PM  23    Q.   MR. PARLOFF, I'D LIKE TO CONTINUE OUR CONVERSATION ABOUT

02:14PM  24    DISCUSSIONS YOU HAD WITH MS. HOLMES ABOUT WHAT THE THERANOS

02:14PM  25    ANALYZER COULD DO.

02:14PM   1           DO YOU RECALL THOSE DISCUSSIONS GENERALLY?

02:14PM   2   A.   YES.

02:14PM   3   Q.   BEFORE YOU PUBLISHED YOUR ARTICLE IN "FORTUNE" IN JUNE OF

02:14PM   4   2014, DID YOU HAVE DISCUSSIONS WITH THE DEFENDANT ABOUT WHETHER

02:14PM   5   THERANOS WAS USING A SINGLE DEVICE FOR ITS TESTS OR MULTIPLE

02:14PM   6   DEVICES?

02:14PM   7   A.   YES.

02:14PM   8   Q.   OKAY.  AND WAS THAT A TOPIC THAT CAME UP MULTIPLE TIMES?

02:14PM   9   A.   YES.

02:14PM   10  Q.   AND DID YOU HAVE A CONVERSATION WITH MS. HOLMES ON

02:14PM   11  MAY 12TH THAT INCLUDED SOME DISCUSSION ON THAT TOPIC?

02:14PM   12  A.   THAT SOUNDS RIGHT.

02:14PM   13           MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

02:14PM   14  EXHIBIT 5473D2.

02:14PM   15       THIS WAS A CLIP THAT THE DEFENSE IS AWARE OF FROM

02:15PM   16  MAY 12TH, 2014.  IT'S APPROXIMATELY TWO MINUTES LONG.

02:15PM   17           MR. CLINE:  NO OBJECTION.

02:15PM   18           THE COURT:  ALL RIGHT.  IT'S ADMITTED, AND IT WILL

02:15PM   19  BE PLAYED.

02:15PM   20       AGAIN, LADIES AND GENTLEMEN, PLEASE PAY ATTENTION.

02:15PM   21  THERE'S NO TRANSCRIPT FOR THIS TAPE.

02:15PM   22       AND IT MAY BE PLAYED NOW.

02:15PM   23       (GOVERNMENT'S EXHIBIT 5473D2 WAS RECEIVED IN EVIDENCE.)

02:15PM   24           MR. BOSTIC:  THANK YOU.  MS. HOLLIMAN -- MY

02:15PM   25  APOLOGIES.  BEFORE WE PRESS PLAY ON THAT.

02:15PM  1    Q.   MR. PARLOFF, DO YOU RECALL MS. HOLMES GIVING YOU DIRECTION

02:15PM  2    OR INPUT ABOUT WHETHER TO DESCRIBE THE THERANOS ANALYZER AS A

02:15PM  3    DEVICE OR MULTIPLE DEVICES?

02:15PM  4    A.   YES.

02:15PM  5    Q.   OKAY.

02:15PM  6    A.   AND GENERALLY, SHE WANTED ME TO USE THE PLURAL.

02:15PM  7    Q.   ALL RIGHT.

02:15PM  8         LET'S LISTEN TO EXHIBIT 5473D2 NOW.

02:15PM  9         (AUDIO RECORDING PLAYED OFF THE RECORD.)

02:18PM  10   BY MR. BOSTIC:

02:18PM  11   Q.   MR. PARLOFF, DID YOU HEAR THE DEFENDANT REFERENCE THE FACT

02:18PM  12   THAT WE HAVE A SINGLE DEVICE THAT CAN PERFORM ANY TEST AND THAT

02:18PM  13   BEING A BIG DEAL?

02:18PM  14   A.   YEAH.

02:18PM  15   Q.   WAS THAT THE ONLY TIME IN YOUR CONVERSATIONS WITH

02:18PM  16   MS. HOLMES THAT SHE MADE THAT CLAIM, OR WAS THAT GENERALLY

02:18PM  17   CONSISTENT WITH WHAT SHE TOLD YOU ABOUT WHAT THE ANALYZER COULD

02:18PM  18   DO?

02:18PM  19   A.   THAT WAS CONSISTENT.

02:18PM  20   Q.   DID YOU EVER ASK MS. HOLMES DIRECTLY WHETHER THERANOS HAD

02:18PM  21   THIRD PARTY ANALYZERS FROM COMPANIES LIKE SIEMENS?

02:18PM  22   A.   YES.

02:18PM  23   Q.   AND WHAT DID YOU ASK HER ABOUT THAT?

02:18PM  24   A.   I ASKED TWO QUESTIONS.  ONE RELATED TO WAS SHE -- DID SHE

02:18PM  25   EVER USE THEM WHEN SHE COULDN'T SIMPLY DO HER OWN TESTS, I

02:19PM 1      MEAN, SHE COULDN'T DO THE TEST ON HER OWN PLATFORM, AND ALSO

02:19PM 2      DID SHE USE THEM -- BECAUSE SHE HAD MENTIONED WHEN SHE DID HAVE

02:19PM 3      TO DO VENIPUNCTURE, IT SOMETIMES HAD SOMETHING TO DO WITH

02:19PM 4      SCALING.  I DIDN'T UNDERSTAND THE WHOLE ANSWER, BUT IT HAD

02:19PM 5      SOMETHING TO DO WITH SCALING.

02:19PM 6          SO IT CROSSED MY MIND, WAS SHE USING THESE LARGE --

02:19PM 7      BECAUSE THESE, THESE LARGE THIRD PARTY ANALYZERS TO SCALE, TO

02:19PM 8      GET UP TO SCALE BECAUSE, BECAUSE THEY ARE LARGE AND HAVE -- CAN

02:19PM 9      DO ENORMOUS VOLUME.

02:19PM 10         SO I ASKED -- AND YOU NEED TO KNOW ONE OTHER THING, YOU

02:19PM 11     MAY KNOW IT ALREADY, BUT THESE THIRD PARTY MACHINES ARE

02:19PM 12     MANUFACTURED BY COMPANIES LIKE SIEMENS, WHICH IS A GERMAN

02:19PM 13     COMPANY, AND BECKMAN COULTER, AND OLYMPUS.

02:20PM 14         SO THE QUESTION I ASKED WAS, JUST TO BE CLEAR, YOU DON'T

02:20PM 15     KEEP A SIEMENS ANALYZER, FOR INSTANCE, ON HAND FOR OVERFLOW, DO

02:20PM 16     YOU?

02:20PM 17         AND SHE SAID, HUH-UH, OR HUM-UM.  IT WAS A NONVERBAL

02:20PM 18     RESPONSE, BUT IT MEANT CORRECT, WE DON'T DO THAT.

02:20PM 19         AND THEN I ASKED A SECOND QUESTION WHICH WAS RELATED, BUT

02:20PM 20     SLIGHTLY DIFFERENT.  AND IT'S NOT A MATTER OF, FOR INSTANCE,

02:20PM 21     WHEN WE CAN'T DO THE TEST ON OUR OWN PLATFORM, WE NEED TO DO IT

02:20PM 22     ON A SIEMENS ANALYZER.

02:20PM 23         AND SHE SAID, HUH-UH, MEANING CORRECT, WE DON'T DO THAT.

02:21PM 24     SO --

02:21PM 25     Q.   FINISH YOUR ANSWER.

02:21PM   1      A.   SO THOSE WERE DIRECT QUESTIONS AND DIRECT ANSWERS, AND

02:21PM   2      THEY SORT OF REINFORCED THE ANSWERS SHE HAD GIVEN ME BEFORE

02:21PM   3      ABOUT THAT ISSUE AND WHEN SHE SAID --

02:21PM   4               MR. CLINE:  EXCUSE ME, YOUR HONOR.  I OBJECT.  WE'VE

02:21PM   5      HAD THE QUESTION AND THE ANSWER, AND NOW --

02:21PM   6               THE COURT:  YOU CAN ASK ANOTHER QUESTION,

02:21PM   7      MR. BOSTIC.

02:21PM   8               MR. BOSTIC:  THANK YOU.

02:21PM   9      Q.   MR. PARLOFF, LET ME ASK YOU, THE EXCHANGE THAT YOU JUST

02:21PM   10     REFERRED TO, WAS THAT DURING ONE OF THE CONVERSATIONS THAT YOU

02:21PM   11     WERE AUDIO RECORDING, OR WAS THAT DURING ONE OF THE

02:21PM   12     CONVERSATIONS THAT YOU REFERENCED EARLIER WHERE THERE WAS NO

02:21PM   13     AUDIO RECORDING?

02:21PM   14     A.   THERE WAS NO AUDIO RECORDING, BUT I HAD NOTES.

02:21PM   15     Q.   OKAY.  AND WAS THAT CONVERSATION WHERE YOU ASKED

02:21PM   16     MS. HOLMES THOSE DIRECT QUESTIONS AND GOT NEGATIVE ANSWERS IN

02:21PM   17     RESPONSE, WAS THAT EXCHANGE BEFORE YOU WROTE YOUR JUNE 2014

02:21PM   18     ARTICLE IN "FORTUNE"?

02:21PM   19     A.   YES.

02:21PM   20     Q.   LET ME SHOW YOU ONE LINE IN THAT ARTICLE, SO LET ME GO

02:22PM   21     BACK TO 1776.

02:22PM   22          MS. HOLLIMAN, IF YOU COULD PULL THAT UP AND GO TO PAGE 11,

02:22PM   23     PLEASE.

02:22PM   24          ABOUT A THIRD OF THE WAY OR 40 PERCENT OF THE WAY DOWN,

02:22PM   25     THERE'S A PARAGRAPH THAT BEGINS, "THERANOS, WHICH DOES NOT."

02:22PM   1          MR. PARLOFF, DO YOU SEE IN YOUR ARTICLE YOU WROTE

02:22PM   2    "THERANOS, WHICH DOES NOT BUY ANY ANALYZERS FROM THIRD PARTIES,

02:22PM   3    IS THEREFORE IN A UNIQUE POSITION"?

02:22PM   4          DO YOU RECALL WRITING THAT?

02:22PM   5    A.   YES.

02:22PM   6    Q.   AND IS THAT CONSISTENT WITH WHAT MS. HOLMES TOLD YOU,

02:22PM   7    INCLUDING THE STATEMENT THAT YOU'VE JUST RECOUNTED?

02:22PM   8    A.   YES.

02:22PM   9    Q.   WE CAN TAKE THAT DOWN.  THANK YOU, MS. HOLLIMAN.

02:22PM  10          IN YOUR CONVERSATIONS WITH MS. HOLMES ABOUT THE THERANOS

02:23PM  11    DEVICES, DID SHE REGULARLY USE THE PHRASE ANALYTICAL SYSTEMS?

02:23PM  12    A.   YES.

02:23PM  13    Q.   AND DID YOU EVER GET AN EXPLANATION FROM HER AS TO WHAT

02:23PM  14    SHE MEANT BY THAT?

02:23PM  15    A.   I NEVER UNDERSTOOD WHY SHE PREFERRED THAT TO DEVICE OR

02:23PM  16    ANALYZER.  I NEVER UNDERSTOOD THE DISTINCTION.

02:23PM  17    Q.   LET'S LISTEN TO A CLIP.  THIS IS EXHIBIT 5474C.

02:23PM  18          YOUR HONOR, I WOULD OFFER THAT EXHIBIT AT THIS TIME.  THIS

02:23PM  19    IS A CLIP DATED MAY 21ST, 2014, AND IT'S APPROXIMATELY

02:23PM  20    30 SECONDS LONG.

02:23PM  21              MR. CLINE:  MAY I HAVE A MOMENT, YOUR HONOR?

02:23PM  22              THE COURT:  YES.

02:23PM  23          (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

02:23PM  24              THE COURT:  IT'S 5474C?

02:23PM  25              MR. BOSTIC:  5474C.

02:24PM   1               THE COURT:  THANK YOU.

02:24PM   2               MR. CLINE:  MAY I CONSULT WITH COUNSEL?

02:24PM   3               THE COURT:  YES.

02:24PM   4          (DISCUSSION AMONGST COUNSEL OFF THE RECORD.)

02:24PM   5               MR. BOSTIC:  WE'LL MOVE ON FROM THAT ONE AT THIS

02:24PM   6     TIME.

02:24PM   7     Q.   MR. PARLOFF, DO YOU RECALL ASKING MS. HOLMES ABOUT THE

02:24PM   8     TERM "EDISON" AT SOME POINT?

02:24PM   9     A.   YES.

02:24PM  10     Q.   AND DO YOU RECALL WHAT MS. HOLMES TOLD YOU, IF ANYTHING,

02:24PM  11     ABOUT WHAT THAT TERM MEANT AT THERANOS?

02:24PM  12     A.   I'M PRETTY SURE SHE BROUGHT IT UP.  I DON'T THINK I ASKED

02:24PM  13     ABOUT IT.

02:24PM  14          IT WAS A TERM THAT THEY NO LONGER, NO LONGER USED, BUT IT

02:24PM  15     WAS THE TERM FOR THE -- SORT OF THE PROGENITOR OF THE DEVICES I

02:25PM  16     WAS SEEING.  IT WAS THE FIRST ITERATION.  I WAS SEEING LATER

02:25PM  17     ITERATIONS.

02:25PM  18     Q.   MS. HOLMES TOLD YOU THAT THE EDISON DEVICE WAS NO LONGER

02:25PM  19     IN USE AT THERANOS?

02:25PM  20     A.   WELL, THE NAME WAS NO LONGER IN USE.  I MEAN, WHAT WAS IN

02:25PM  21     USE WAS A SUBSEQUENT ITERATION.

02:25PM  22     Q.   I'LL ASK YOU TO TURN TO EXHIBIT 5488 IN YOUR BINDER,

02:25PM  23     PLEASE.

02:25PM  24          YOUR HONOR, I OFFER 5488.  I BELIEVE THE DEFENSE HAS

02:25PM  25     STIPULATED.

02:25PM   1            MR. CLINE:  NO OBJECTION.

02:25PM   2            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:25PM   3            (GOVERNMENT'S EXHIBIT 5488 WAS RECEIVED IN EVIDENCE.)

02:25PM   4   BY MR. BOSTIC:

02:25PM   5   Q.   AND LET'S ZOOM IN ON THE MIDDLE OF THE PAGE, PLEASE, THE

02:25PM   6   MIDDLE THIRD.  LET'S SEE IF WE CAN CAPTURE --

02:25PM   7            FIRST OF ALL, MR. PARLOFF, DO YOU SEE THAT THIS IS AN

02:26PM   8   EMAIL MESSAGE FROM YOU -- I'M SORRY, FROM MS. HOLMES TO YOU ON

02:26PM   9   JUNE 6TH, 2014?

02:26PM  10   A.   YES.

02:26PM  11   Q.   AND LET'S LOOK AT THE FIRST PART OF THE TEXT OF THAT EMAIL

02:26PM  12   MESSAGE.

02:26PM  13            FIRST OF ALL, CAN YOU TELL ME GENERALLY ABOUT THE PURPOSE

02:26PM  14   OF THIS COMMUNICATION?  AT THIS TIME IN EARLY JUNE 2014, WHY

02:26PM  15   WERE YOU EMAILING BACK AND FORTH WITH MS. HOLMES WITH THIS

02:26PM  16   SUBJECT LINE, ADDITIONAL FOLLOWUP ITEMS?

02:26PM  17   A.   WE WERE GETTING PRETTY CLOSE TO PUBLICATION.  I MIGHT HAVE

02:26PM  18   HAD A DRAFT.  I PROBABLY HAD A DRAFT.  I KNEW -- SO I WAS

02:26PM  19   ASKING ABOUT WHETHER IT WAS OKAY TO INCLUDE CERTAIN THINGS OR

02:26PM  20   WERE THEY -- THAT WE HAD DISCUSSED ON BACKGROUND.

02:27PM  21   Q.   IN CONNECTION WITH THAT PURPOSE, DID MS. HOLMES PROVIDE

02:27PM  22   YOU WITH SOME INFORMATION ABOUT THIS TOPIC, "HOW TO DESCRIBE

02:27PM  23   THE ANALYTICAL SYSTEMS"?

02:27PM  24   A.   YES.

02:27PM  25   Q.   AND THIS EMAIL FROM MS. HOLMES READS, "AS YOU KNOW, WE

02:27PM  1    WANT TO GENERALLY KEEP THE FOCUS OFF THE HARDWARE.  A WAY TO DO

02:27PM  2    THIS IF YOU'RE REFERRING TO IT, THE AUTOMATION IN OUR LAB IS TO

02:27PM  3    USE THE WORD ANALYZERS, WHICH IS LIKELY THE BEST WORD TO USE

02:27PM  4    BESIDE ANALYTICAL SYSTEMS (RATHER THAN THE WORD DEVICE)."

02:27PM  5         DO YOU SEE THAT?

02:27PM  6    A.   YES.

02:27PM  7    Q.   AND SHE SAYS, "AS YOU KNOW, ANALYTICAL SYSTEMS IS HOW WE

02:27PM  8    DESCRIBE THEM."

02:27PM  9         DO YOU SEE THAT?

02:27PM  10   A.   YES.

02:27PM  11   Q.   AND THEN IN THE NEXT LINE DOWN SHE TALKS ABOUT REFERENCING

02:27PM  12   THE FDA FILING INITIATIVE AND REGISTRATION OF THE ANALYZER ON

02:27PM  13   THE FDA WEBSITE.

02:27PM  14        DO YOU SEE THAT?

02:27PM  15   A.   YES.

02:27PM  16   Q.   AND THEN SHE SAYS, "IN THAT CONTEXT, IT IS OK TO SAY THE

02:28PM  17   ANALYTICAL SYSTEMS ARE ABOUT THE SIZE OF A DESKTOP COMPUTER

02:28PM  18   (FOR REFERENCE OFF THE RECORD, THIS IS THE SIZE OF THE SYSTEM

02:28PM  19   WE'RE STANDARDIZING AROUND FOR OUR NEXT WAVE OF PRODUCTION) IF

02:28PM  20   CONTRASTING THE SIZE OF OUR LABORATORY FACILITY NEXT TO

02:28PM  21   CONVENTIONAL LABORATORY FACILITIES."

02:28PM  22        DO YOU SEE THAT?

02:28PM  23   A.   YES.

02:28PM  24   Q.   AND SO YOU MENTIONED THIS WAS GETTING PRETTY CLOSE TO THE

02:28PM  25   TIME THAT THE ARTICLE WAS GOING TO BE PUBLISHED?

02:28PM    1    A.   YES.

02:28PM    2    Q.   AS THE CLOCK WAS WINDING DOWN, DID MS. HOLMES DISCLOSE TO

02:28PM    3    YOU AT THIS POINT THAT THERANOS WAS RELYING ON LARGER ANALYZERS

02:28PM    4    FOR MOST OR MANY OF ITS TESTS?

02:28PM    5    A.   NO.

02:28PM    6    Q.   LET'S GO TO PAGE 2 OF THIS EXHIBIT AND ZOOM IN AT THE TOP

02:28PM    7    OF THE PAGE UNDER THE TOPIC VENIPUNCTURE.

02:28PM    8         AND, MR. PARLOFF, DO YOU SEE THAT MS. HOLMES ALSO PROVIDES

02:29PM    9    SOME INFORMATION ON THIS TOPIC?

02:29PM   10    A.   YES.

02:29PM   11    Q.   SHE SAYS HERE, "WE'RE SCALING OUR INFRASTRUCTURE AND

02:29PM   12    WORKING TO MAKE IT POSSIBLE TO ELIMINATE THE NEED TO HAVE BLOOD

02:29PM   13    DRAWN FROM BIG TUBES OR THROUGH VENIPUNCTURE FOR EVERYONE."

02:29PM   14         DO YOU SEE THAT?

02:29PM   15    A.   YES.

02:29PM   16    Q.   SHE TALKS ABOUT CONSTANTLY UPDATING THE INFRASTRUCTURE

02:29PM   17    BASED ON THE TESTS WE ANTICIPATE TO BE RUN IN A GIVEN

02:29PM   18    GEOGRAPHY.

02:29PM   19         DO YOU SEE THAT?

02:29PM   20    A.   YES.

02:29PM   21    Q.   BUT SHE SAYS, "BASED ON THE COMBINATION OF TESTS THAT ARE

02:29PM   22    ORDERED WE'LL OCCASIONALLY RUN THEM THROUGH VENIPUNCTURE, WITH

02:29PM   23    MUCH SMALLER SAMPLE SIZES AS TO WHAT WAS TRADITIONALLY

02:29PM   24    COLLECTED."

02:29PM   25         DO YOU SEE THAT?

02:29PM  1    A.   YES.

02:29PM  2    Q.   AND WAS THAT CONSISTENT WITH WHAT MS. HOLMES HAD BEEN

02:29PM  3    TELLING YOU ABOUT THE COMPANY'S USE OF VENIPUNCTURE?

02:29PM  4    A.   YES.

02:29PM  5    Q.   AT THE BOTTOM OF THIS PAGE, IF WE CAN JUST ZOOM IN ON THE

02:29PM  6    BOTTOM THIRD OR SO.

02:29PM  7         MS. HOLMES INCLUDES SOME FAVORABLE PATIENT QUOTES; IS THAT

02:30PM  8    CORRECT?

02:30PM  9    A.   YES.

02:30PM  10   Q.   DID MS. HOLMES EVER DISCLOSE TO YOU ANY PATIENT COMPLAINTS

02:30PM  11   OR COMMUNICATIONS FROM DOCTORS ABOUT QUESTIONABLE RESULTS?

02:30PM  12   A.   NO.

02:30PM  13   Q.   OKAY.  WE CAN TAKE THAT DOWN.  THANK YOU, MS. HOLLIMAN.

02:30PM  14        YOU PUBLISHED YOUR ARTICLE, OR "FORTUNE" PUBLISHED YOUR

02:30PM  15   ARTICLE IN JUNE OF 2014?

02:30PM  16   A.   YES.

02:30PM  17   Q.   AND DID YOU CONTINUE TO COMMUNICATE WITH MS. HOLMES AFTER

02:30PM  18   THAT?

02:30PM  19   A.   YES.

02:30PM  20   Q.   AND DID YOU TALK TO HER ABOUT THE ARTICLE THAT YOU HAD

02:30PM  21   WRITTEN?

02:30PM  22   A.   YES.

02:30PM  23   Q.   DID SHE PROVIDE YOU WITH ANY REACTIONS OR FEEDBACK TO THE

02:30PM  24   ARTICLE THAT YOU HAD WRITTEN FOR "FORTUNE"?

02:30PM  25   A.   YES.

02:30PM   1    Q.   AND WHAT DID SHE SAY?

02:30PM   2    A.   I DON'T KNOW THE WORDS, BUT SHE PHRASED IT EFFUSIVELY, AND

02:30PM   3    I BELIEVE SHE, SHE LINKED TO IT ON HER WEBSITE.

02:30PM   4    Q.   AND AT ANY POINT DID MS. HOLMES COMPLAIN ABOUT ANY OF THE

02:31PM   5    CONTENT IN THE ARTICLE?

02:31PM   6    A.   NO.

02:31PM   7    Q.   AT ANY POINT AFTER THE ARTICLE WAS PUBLISHED, DID

02:31PM   8    MS. HOLMES CONTACT YOU TO ASK FOR A CORRECTION OF ANY OF THE

02:31PM   9    FACTS IN THE ARTICLE?

02:31PM   10   A.   NO.

02:31PM   11   Q.   DID YOU HAVE A CONVERSATION WITH MS. HOLMES IN MAY OF 2015

02:31PM   12   ABOUT 11 MONTHS AFTER THE ARTICLE WAS PUBLISHED?

02:31PM   13   A.   YES.

02:31PM   14   Q.   AND WHAT WAS THE IMPETUS FOR THAT CONVERSATION?

02:31PM   15   A.   I WAS WRITING A STORY FOR THE WEB ABOUT SOMETHING SHE WAS

02:31PM   16   DOING IN ARIZONA.  IT HAD TO DO WITH STATE LEGISLATION.

02:31PM   17   Q.   AND WAS THAT CONVERSATION IN MAY OF 2015 ABOUT THE

02:31PM   18   ACTIVITIES OF THE COMPANY AND THE CAPABILITIES OF ITS

02:31PM   19   TECHNOLOGY?

02:31PM   20   A.   WELL, IT WAS, IT WAS REALLY ABOUT THE LEGISLATIVE STUFF.

02:31PM   21        BUT SHE, SHE DID BRING UP AS AN ASIDE THAT THERE WAS

02:32PM   22   SOMETHING NEW THAT THEY HAD STARTED DOING THIS YEAR, MEANING

02:32PM   23   2015, AND THAT WAS THAT THEY HAD BEGUN USING THIRD PARTY

02:32PM   24   MACHINES TO DO ESOTERIC TESTS, SHE CALLED THEM ESOTERIC TESTS.

02:32PM   25        AND SHE DEFINED ESOTERIC TESTS AS TESTS THAT WERE SELDOM

02:32PM  1    ORDERED OR HIGHLY COMPLEX, AND THEY WOULD DO THOSE WITH A THIRD

02:32PM  2    PARTY MACHINE AND BY VENIPUNCTURE BECAUSE -- IN ESSENCE TO

02:32PM  3    OFFER ONE STOP SHOPPING SO THAT PEOPLE WOULD -- THEY WOULDN'T

02:32PM  4    HAVE TO REFER THOSE OUT TO A SPECIALTY LAB.

02:32PM  5    Q.    SO A COUPLE OF FOLLOW-UP QUESTIONS ABOUT THAT.

02:32PM  6          FIRST OF ALL, WAS THIS CONVERSATION IN MAY OF 2015 THE

02:33PM  7    FIRST TIME THAT MS. HOLMES HAD MENTIONED THE COMPANY'S USE OF

02:33PM  8    THIRD PARTY BLOOD ANALYZERS AS FAR AS YOU RECALL?

02:33PM  9    A.    YES.

02:33PM  10   Q.    IN DESCRIBING THE COMPANY'S USE OF THIRD PARTY ANALYZERS

02:33PM  11   AT THAT TIME, DID SHE LIMIT THE USE TO THOSE ESOTERIC TESTS, IN

02:33PM  12   OTHER WORDS, THE RARELY ORDERED OR ESPECIALLY COMPLEX TESTS?

02:33PM  13   A.    I ONLY REMEMBER HER SAYING THAT THEY USED THEM FOR

02:33PM  14   ESOTERIC TESTS.

02:33PM  15   Q.    AND FINALLY, WHEN MS. HOLMES DESCRIBED THE USE OF THIRD

02:33PM  16   PARTY DEVICES, DID SHE DESCRIBE IT AS SOMETHING THAT HAD

02:33PM  17   STARTED RECENTLY?  WAS THIS A NEW DEVELOPMENT?

02:33PM  18   A.    THIS YEAR, MEANING 2015.

02:33PM  19   Q.    DID MS. HOLMES TELL YOU DURING THAT CONVERSATION THAT

02:33PM  20   THERANOS HAD BEEN USING THIRD PARTY DEVICES FOR MANY OF ITS

02:33PM  21   TESTS SINCE IT FIRST LAUNCHED IN SEPTEMBER OF 2013?

02:33PM  22   A.    NO.

02:33PM  23   Q.    DID YOU HAVE ANOTHER CONVERSATION WITH MS. HOLMES ON

02:34PM  24   SIMILAR TOPICS IN EARLY JULY OF 2015?

02:34PM  25   A.    YES.

02:34PM 1    Q.   AND WAS THAT CONVERSATION RECORDED?

02:34PM 2    A.   YES.

02:34PM 3         MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS THREE

02:34PM 4    EXHIBITS AT THIS TIME THAT WE WOULD LIKE TO PLAY IN SEQUENCE.

02:34PM 5    THESE WILL BE EXHIBITS 5481A, 5481B -- EXCUSE ME.  5481A IS

02:34PM 6    FIRST.

02:34PM 7         5481D IS NEXT IN ORDER.

02:34PM 8         THEN 5481B COMES AFTER THAT.

02:34PM 9         THESE ARE ALL A CONTIGUOUS PORTION OF AUDIO FROM A

02:34PM 10   RECORDING DATED JULY 1ST, 2015, AND THE TOTAL IS APPROXIMATELY

02:34PM 11   SIX MINUTES.

02:34PM 12        MR. CLINE:  NO OBJECTION.

02:34PM 13        THE COURT:  ALL RIGHT.  EACH OF THEM ARE ADMITTED.

02:35PM 14   THEY MAY BE PLAYED.

02:35PM 15        AGAIN, LADIES AND GENTLEMEN, THERE IS NO TRANSCRIPT, SO

02:35PM 16   PLEASE DO LISTEN CLOSELY AS THESE ARE PLAYED.

02:35PM 17        AND THEY MAY BE PLAYED NOW.

02:35PM 18        (GOVERNMENT'S EXHIBITS 5481A, 5481B, AND 5481D WERE

02:35PM 19   RECEIVED IN EVIDENCE.)

02:35PM 20        MR. BOSTIC:  THANK YOU.

02:35PM 21        MS. HOLLIMAN, LET'S PLAY 5481A, THEN D, THEN B.

02:35PM 22        (AUDIO RECORDING PLAYED OFF THE RECORD.)

02:40PM 23   BY MR. BOSTIC:

02:40PM 24   Q.   MR. PARLOFF, DID YOU HEAR SOME CONVERSATIONS ABOUT THE

02:40PM 25   REFERENCE LAB THAT YOU MENTIONED EARLIER?

02:40PM 1      A.   YES.

02:40PM 2      Q.   AND DID YOU ALSO HEAR MS. HOLMES PROVIDE YOU WITH SOME

02:40PM 3      MORE INFORMATION ABOUT THE COMPANY'S USE OF VENIPUNCTURE?

02:40PM 4      A.   YES.

02:40PM 5      Q.   AND IN CONNECTION WITH THAT, MS. HOLMES SAID THAT THE

02:40PM 6      COMPANY DOES SOMETIMES -- OR EXCUSE ME, DOES RUN TRADITIONAL

02:40PM 7      VENIPUNCTURE SOMETIMES ON TRADITIONAL REFERENCE EQUIPMENT.

02:40PM 8          DID YOU HEAR THAT?

02:40PM 9      A.   YES.

02:40PM 10     Q.   AND DID YOU HEAR MS. HOLMES SAY THAT WHEN THAT HAPPENS,

02:40PM 11     IT'S A LOT LESS SAMPLE, TOO, BECAUSE THERE'S ONLY A FEW TESTS

02:41PM 12     THAT WILL ACTUALLY RUN ON THE VENIPUNCTURE.

02:41PM 13         DO YOU RECALL THAT?

02:41PM 14     A.   YEAH.

02:41PM 15     Q.   DID MS. HOLMES EVER TELL YOU THAT APPROXIMATELY 40 PERCENT

02:41PM 16     OF THERANOS PATIENTS AT WALGREENS HAD NEEDED TO HAVE

02:41PM 17     VENIPUNCTURE BECAUSE OF TESTS THAT THE COMPANY COULDN'T RUN ON

02:41PM 18     FINGERSTICK?

02:41PM 19     A.   NO.

02:41PM 20     Q.   AROUND THIS TIME, AND THIS IS EARLY JULY 2015, DID YOU

02:41PM 21     HAVE A SECOND DEMONSTRATION OF THERANOS TECHNOLOGY?

02:41PM 22     A.   YES.

02:41PM 23     Q.   TELL US ABOUT THAT.  WHERE WAS THAT?

02:41PM 24     A.   THAT WAS IN THE OFFICES OF THE LAW FIRM BOIES,

02:41PM 25     SCHILLER & FLEXNER, AND I WAS WRITING A STORY ABOUT AN FDA --

PARLOFF DIRECT BY MR. BOSTIC

02:41PM  1    TWO FDA APPROVALS RELATING TO A SINGLE TEST.  THAT MIGHT NOT BE

02:42PM  2    THE EXACT PROPER WORD "APPROVAL."

02:42PM  3         I MEAN, ONE WAS A CLEARANCE AND ONE WAS A, YOU KNOW,

02:42PM  4    WAIVER, BUT SUCCESSES RELATING TO ONE TEST.

02:42PM  5         AND SO THEY WERE GOING TO -- AND ONE OF THEM RELATED TO

02:42PM  6    HOW SIMPLE THE MACHINE WAS.  SO I WAS GOING TO HAVE SAMPLES

02:42PM  7    TAKEN OF MY BLOOD, AND I WOULD SEE -- THIS TIME I WOULD SEE THE

02:42PM  8    MACHINE BEING USED.  I HADN'T SEEN IT 13 MONTHS OR 15 MONTHS

02:42PM  9    EARLIER WHEN I -- WHEN MY FIRST STORY WAS DONE.  SO THAT WAS

02:42PM 10    PART OF IT.

02:42PM 11         AND IN ADDITION, ONE OF THE TESTS WAS GOING TO BE FOR THE

02:42PM 12    EBOLA VIRUS, THE VERY LETHAL HEMORRHAGIC FEVER THAT HAD BROKEN

02:43PM 13    OUT IN WEST AFRICA AT THE TIME.  SHE WAS TRYING TO DEVELOP A

02:43PM 14    TEST FOR THAT AND TRYING TO GET AN EMERGENCY USE AUTHORIZATION.

02:43PM 15         SO I WAS EXCITED ABOUT THAT STORY.

02:43PM 16         SO SHE WAS GIVING ME THESE TWO TESTS.

02:43PM 17    Q.   AND YOU HAD THE DRAWS FOR THOSE TESTS PERFORMED IN THE LAW

02:43PM 18    FIRM OFFICE IN NEW YORK?

02:43PM 19    A.   YES.

02:43PM 20    Q.   AND DID YOU SEE A THERANOS DEVICE THERE IN THE ROOM?

02:43PM 21    A.   TWO THERANOS DEVICES.  ONE FOR EACH -- ONE FOR THE

02:43PM 22    POTASSIUM AND ONE FOR THE EBOLA.

02:43PM 23    Q.   DOES ANYTHING STAND OUT IN YOUR MIND ABOUT THAT PROCESS

02:43PM 24    OTHER THAN WHAT WE'VE TALKED ABOUT IN THE NUMBER OF DEVICES?

02:43PM 25    A.   I WAS A LITTLE SURPRISED THAT THEY NEEDED TWO MACHINES

02:43PM 1    BECAUSE I THOUGHT, YOU KNOW, ONE COULD DO EVERYTHING, BUT --

02:43PM 2    AND THEN -- BUT, NO, THE MACHINE TOOK -- WAS TAKING -- BOTH

02:44PM 3    MACHINES WERE TAKING A LONG TIME, AND SO I DIDN'T STAY FOR THE

02:44PM 4    RESULT.  I LEFT AND RECEIVED THE RESULTS, YOU KNOW, LATER THAT

02:44PM 5    EVENING.

02:44PM 6    Q.   AND DID THAT DEMONSTRATION HAPPEN ON THE DAY OF THE CALL

02:44PM 7    ON THIS JULY 1ST, 2015 DAY, IF YOU RECALL?

02:44PM 8    A.   I DON'T RECALL.

02:44PM 9    Q.   LET'S LISTEN TO A CLIP.  THIS WILL BE EXHIBIT 5481C.  THIS

02:44PM 10   IS A CLIP DATED JULY 1ST, 2015.

02:44PM 11        IT'S APPROXIMATELY TWO AND A HALF -- OR TWO MINUTES LONG,

02:44PM 12   SORRY, THREE MINUTES LONG.

02:44PM 13            MR. CLINE:  NO OBJECTION.

02:44PM 14            THE COURT:  IT'S ADMITTED.  IT MAY BE PLAYED.

02:44PM 15        AGAIN, LADIES AND GENTLEMEN, PLEASE PAY ATTENTION TO THE

02:44PM 16   TAPE AS IT'S PLAYED.

02:44PM 17        (GOVERNMENT'S EXHIBIT 5481C WAS RECEIVED IN EVIDENCE.)

02:44PM 18        (AUDIO RECORDING PLAYED OFF THE RECORD.)

02:47PM 19   BY MR. BOSTIC:

02:47PM 20   Q.   MR. PARLOFF, THE TWO DEVICES THAT YOU SAW IN THE ROOM AT

02:47PM 21   THE LAW FIRM IN CONNECTION WITH THAT DEMONSTRATION, DID

02:47PM 22   MS. HOLMES EVER TELL YOU THAT THOSE WERE DIFFERENT FROM THE

02:47PM 23   THERANOS ANALYZERS THAT WERE BEING USED TO TEST PATIENT

02:47PM 24   SAMPLES?

02:47PM 25   A.   NO.

02:47PM   1    Q.   DID MS. HOLMES EVER TELL YOU THAT THE THERANOS ANALYZER

02:48PM   2    THAT WAS BEING USED TO TEST PATIENT SAMPLES COULD NOT DO DNA

02:48PM   3    ANALYSIS FOR A TEST LIKE EBOLA OR CLINICAL CHEMISTRY?

02:48PM   4    A.   NO.

02:48PM   5    Q.   IN OCTOBER OF 2015, ARE YOU AWARE THAT A

02:48PM   6    "WALL STREET JOURNAL" ARTICLE WAS PUBLISHED WITH CLAIMS

02:48PM   7    UNFAVORABLE TO THERANOS?

02:48PM   8    A.   YES.

02:48PM   9    Q.   I DON'T WANT TO GET INTO THE CONTENT OF THAT ARTICLE, BUT

02:48PM   10   I AM WONDERING IF YOU HAD ADDITIONAL COMMUNICATIONS WITH

02:48PM   11   MS. HOLMES AFTER THAT ARTICLE CAME OUT?

02:48PM   12   A.   YES.

02:48PM   13   Q.   AND WHAT WAS THE PURPOSE OF THOSE COMMUNICATIONS?

02:48PM   14   A.   I CALLED HER THE DAY THE ARTICLE CAME OUT, WHICH I THINK

02:48PM   15   WAS OCTOBER 15TH.

02:48PM   16        SHE GOT BACK TO ME A COUPLE DAYS LATER.  I THINK IT WAS

02:49PM   17   THE 17TH.

02:49PM   18        AND THE THING I WAS MOST -- I ASKED HER ABOUT EVERYTHING

02:49PM   19   IN THE ARTICLE I IMAGINE, BUT -- WELL, ACTUALLY BY THEN I ASKED

02:49PM   20   HER ABOUT SEVERAL THINGS.  THERE HAD BEEN OTHER DEVELOPMENTS

02:49PM   21   EVEN TWO DAYS LATER.

02:49PM   22        BUT I WENT BACK TO THE ORIGINAL ARTICLE.  THE THING THAT I

02:49PM   23   WAS MOST INTERESTED IN ASKING HER ABOUT WAS THERE WAS A

02:49PM   24   STATEMENT IN THE ORIGINAL "WALL STREET JOURNAL" ARTICLE ABOUT

02:49PM   25   HOW MANY TESTS THEY COULD REALLY DO AS OF DECEMBER 2014.

02:49PM   1                    THE COURT:  MR. CLINE.

02:49PM   2                    MR. CLINE:  IF WHAT HE'S DESCRIBING IS HIS QUESTION

02:49PM   3       TO MS. HOLMES, THEN NO OBJECTION.

02:49PM   4            I DO OBJECT TO JUST A DESCRIPTION OF "THE

02:50PM   5       WALL STREET JOURNAL" ARTICLE.

02:50PM   6                    THE COURT:  DOES THIS FORM A BASIS -- IF YOU WANT TO

02:50PM   7       LAY A FOUNDATION FOR THAT.

02:50PM   8                    MR. BOSTIC:  YES, YOUR HONOR.  THAT'S WHERE WE'RE

02:50PM   9       HEADING.

02:50PM  10       Q.   SO, MR. PARLOFF, JUST TO BREAK THIS DOWN JUST A LITTLE

02:50PM  11       BIT, AM I CORRECT THAT ONE OF THE REASONS FOR REACHING OUT TO

02:50PM  12       MS. HOLMES ABOUT THE ARTICLE WAS TO GET HER REACTION TO SOME OF

02:50PM  13       THE STATEMENTS THAT WERE IN THAT "WALL STREET JOURNAL" ARTICLE?

02:50PM  14       A.   YES.

02:50PM  15       Q.   AND DID ONE OF THOSE STATEMENTS IN "THE

02:50PM  16       WALL STREET JOURNAL" ARTICLE RELATE TO THE NUMBER OF TESTS THAT

02:50PM  17       THE THERANOS ANALYZER COULD PERFORM?

02:50PM  18       A.   YES.

02:50PM  19       Q.   AND WHAT DID YOU ASK MS. HOLMES ABOUT THAT TOPIC?

02:50PM  20       A.   I ASKED, HOW MANY TESTS COULD YOU DO ON YOUR PROPRIETARY

02:50PM  21       DEVICE AS OF DECEMBER 2014, WHICH WAS THE DATE REFERENCED IN

02:51PM  22       "THE WALL STREET JOURNAL" ARTICLE.  THEY HAD A NUMBER IN THERE.

02:51PM  23            AND SHE RESPONDED 50, 60, MAYBE 70.  WE CAN GET YOU THAT

02:51PM  24       NUMBER.

02:51PM  25       Q.   TWO QUESTIONS ON THAT.

02:51PM  1            FIRST, WAS THIS THE FIRST TIME THAT YOU HAD HEARD FROM

02:51PM  2     MS. HOLMES THAT THE THERANOS ANALYZER COULD ONLY DO 50, 60, OR

02:51PM  3     70 TESTS, AS OPPOSED TO 200 OR A THOUSAND THAT YOU HAD

02:51PM  4     DISCUSSED WITH HER EARLIER?

02:51PM  5     A.    YES.

02:51PM  6     Q.    AND IN CONNECTION WITH THAT CONVERSATION, DID MS. HOLMES

02:51PM  7     EVER TELL YOU THAT, IN FACT, THE THERANOS ANALYZER USED FOR

02:51PM  8     PATIENT TESTING COULD NEVER DO MORE THAN A DOZEN TESTS?

02:51PM  9     A.    NO.

02:51PM 10            MR. BOSTIC:  CAN I HAVE A MOMENT, YOUR HONOR?

02:51PM 11            THE COURT:  YES.

02:51PM 12        (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

02:52PM 13            MR. BOSTIC:  NO FURTHER QUESTIONS.

02:52PM 14        THANK YOU, YOUR HONOR.

02:52PM 15            THE COURT:  MR. CLINE?

02:52PM 16                         **CROSS-EXAMINATION**

02:52PM 17     BY MR. CLINE:

02:52PM 18     Q.    MR. PARLOFF, GOOD AFTERNOON.

02:52PM 19     A.    GOOD AFTERNOON.

02:52PM 20     Q.    I AM GOING TO -- I REPRESENT MS. HOLMES.  MY NAME IS

02:52PM 21     JOHN CLINE.  I HAVE SOME AREAS I WANT TO ASK YOU ABOUT.

02:53PM 22        BUT FIRST I'M GOING TO ASK YOU SOME QUESTIONS ABOUT YOUR

02:53PM 23     BACKGROUND.

02:53PM 24        AND BEFORE I EVEN DO THAT, I'M GOING TO HAND OUT NOTEBOOKS

02:53PM 25     BECAUSE THAT'S SOMETHING THAT WE DO WITH EVERY WITNESS IN THIS

02:53PM   1    CASE.

02:53PM   2         MAY I APPROACH?

02:53PM   3              THE COURT:  YES.

02:53PM   4    BY MR. CLINE:

02:53PM   5    Q.   (HANDING.)

02:53PM   6         YOU DON'T NEED TO PAY ATTENTION TO THAT FOR NOW.  I MAY

02:53PM   7    CALL ATTENTION TO IT FROM TIME TO TIME, BUT JUST PUT IT ASIDE

02:53PM   8    FOR NOW.

02:53PM   9         YOU PASSED ON DIRECT VERY QUICKLY OVER YOUR EDUCATIONAL

02:53PM  10    BACKGROUND, BUT I WANTED TO TOUCH ON THAT A LITTLE BIT.

02:53PM  11         YOU HAVE YOUR UNDERGRADUATE DEGREE FROM HARVARD; RIGHT?

02:53PM  12    A.   YEAH.

02:53PM  13    Q.   AND THAT'S A COLLEGE UP IN THE NORTHEAST SOMEWHERE; RIGHT?

02:53PM  14    A.   YES.

02:53PM  15    Q.   ALL RIGHT.  AND THEN YOU WENT TO LAW SCHOOL; RIGHT?

02:54PM  16    A.   YES.

02:54PM  17    Q.   AND YOU WENT TO YALE LAW SCHOOL; RIGHT?

02:54PM  18    A.   YES.

02:54PM  19    Q.   AND YOU GOT A JD, A JURIS DOCTORATE DEGREE FROM YALE?

02:54PM  20    A.   YES.

02:54PM  21    Q.   AND AFTER THAT, YOU WERE A LAW CLERK FOR A UNITED STATES

02:54PM  22    DISTRICT JUDGE, SORT OF LIKE JUDGE DAVILA; RIGHT?

02:54PM  23    A.   YES.

02:54PM  24    Q.   AND THAT WAS IN TEXAS?

02:54PM  25    A.   YES.

02:54PM   1      Q.   AND THAT JUDGE WAS JUDGE JUSTICE; RIGHT?

02:54PM   2      A.   THAT'S RIGHT.

02:54PM   3      Q.   AND THEN YOU PRACTICED LAW FOR A WHILE; RIGHT?

02:54PM   4      A.   YES.

02:54PM   5      Q.   ABOUT FIVE YEARS?

02:54PM   6      A.   YES.

02:54PM   7      Q.   YOU WERE A PROSECUTOR FOR A WHILE?

02:54PM   8      A.   YES.

02:54PM   9      Q.   AND THEN YOU WERE A DEFENSE LAWYER FOR A WHILE?

02:54PM   10     A.   YES.

02:54PM   11     Q.   THEN YOU TAUGHT LAW; RIGHT?

02:54PM   12     A.   YES.

02:54PM   13     Q.   AT HOFSTRA SCHOOL?

02:54PM   14     A.   YEAH.

02:54PM   15     Q.   AND HAVING SEEN ALL SIDES OF THE LAW, YOU QUIT?

02:54PM   16     A.   YES.

02:54PM   17     Q.   AND BECAME A JOURNALIST?

02:54PM   18     A.   YES.

02:54PM   19     Q.   AND YOU WERE A JOURNALIST, I THINK YOU SAID, STARTING IN

02:55PM   20     19 --

02:55PM   21     A.   '88.

02:55PM   22     Q.   -- 88.  SO BY APRIL OF 2014, YOU HAD BEEN A JOURNALIST

02:55PM   23     FOR, WHAT, 26 YEARS?

02:55PM   24     A.   I'LL TAKE YOUR WORD FOR IT.

02:55PM   25     Q.   SOMETHING LIKE THAT?

02:55PM   1    A.   UH-HUH.

02:55PM   2    Q.   AND IS IT FAIR TO SAY THAT BY APRIL OF 2014, YOU HAD HAD

02:55PM   3    MANY YEARS OF EXPERIENCE ASKING QUESTIONS BOTH AS A LAWYER AND

02:55PM   4    THEN AS A JOURNALIST?

02:55PM   5    A.   I SUPPOSE, YES.

02:55PM   6    Q.   NOW, I WANT TO TOUCH AGAIN ON HOW YOU SORT OF GOT STARTED

02:55PM   7    ON THE THERANOS PROCESS.

02:55PM   8         I'M GOING TO FOCUS FOR A WHILE ON THE JUNE 2014

02:55PM   9    "FORTUNE" ARTICLE --

02:55PM  10    A.   YES.

02:55PM  11    Q.   -- AND THE PROCESS THAT LED TO THAT ARTICLE.

02:55PM  12         SOMETIME IN EARLY 2014, YOU HEARD ABOUT A CASE INVOLVING

02:55PM  13    THERANOS; RIGHT?

02:55PM  14    A.   YES.

02:55PM  15    Q.   AND IF I HEARD YOU RIGHT ON DIRECT, IT'S BECAUSE YOU GOT A

02:56PM  16    CALL FROM A PUBLICITY PERSON AT MR. BOIES'S LAW FIRM?

02:56PM  17    A.   WELL, NO.  I HEARD ABOUT THE CASE FROM READING NEWSLETTERS

02:56PM  18    AND WAS SORT OF FOLLOWING THE CASE JUST OUT OF CURIOSITY.

02:56PM  19         AND THEN I GOT A CALL FROM THE BOIES FIRM AFTER IT

02:56PM  20    SETTLED, YOU KNOW.

02:56PM  21    Q.   ALL RIGHT.  AND THE CALL FROM THE BOIES FIRM WAS SORT OF

02:56PM  22    REACHING OUT TO SEE IF THIS WAS SOMETHING THAT YOU MIGHT HAVE

02:56PM  23    AN INTEREST IN?

02:56PM  24    A.   YEAH.

02:56PM  25    Q.   AND YOU HAD BEEN COVERING LAW AND LAWYERS FOR YEARS AT

02:56PM   1    THAT POINT?

02:56PM   2    A.   YES.

02:56PM   3    Q.   AND YOU CERTAINLY WERE FAMILIAR WITH MR. BOIES; RIGHT?

02:56PM   4    A.   YES.

02:56PM   5    Q.   ONE OF -- AS OF 2014, APRIL OF 2014, ONE OF THE PREEMINENT

02:56PM   6    LAWYERS IN AMERICA; IS THAT FAIR?

02:57PM   7    A.   YES.

02:57PM   8    Q.   A FAMED TRIAL LAWYER; RIGHT?

02:57PM   9    A.   YES.

02:57PM   10   Q.   ALSO A WELL RESPECTED ADVISOR TO COMPANIES ALL OVER THE

02:57PM   11   COUNTRY; RIGHT?

02:57PM   12   A.   YES.

02:57PM   13   Q.   AND YOU FOUND IT INTERESTING THAT MR. BOIES, WHO WAS SO

02:57PM   14   EMINENT IN THE PROFESSION, WAS REPRESENTING A COMPANY THAT YOU

02:57PM   15   HAD NEVER HEARD OF; RIGHT?

02:57PM   16   A.   EXACTLY, YES.

02:57PM   17   Q.   THAT BEING THERANOS?

02:57PM   18   A.   YES.

02:57PM   19   Q.   AND SO YOU THOUGHT YOU MIGHT WRITE AN ARTICLE ABOUT

02:57PM   20   MR. BOIES AND THIS CASE THAT HE HAD JUST WON FOR THERANOS;

02:57PM   21   RIGHT?

02:57PM   22   A.   YES, I WAS CONSIDERING THAT, YEAH.

02:57PM   23   Q.   AND THEN YOU SORT OF -- DID YOU TALK TO MR. BOIES ABOUT

02:57PM   24   THAT, OR WAS IT JUST WITH PEOPLE AT HIS FIRM?  YOU SAID THE

02:57PM   25   ANSWER CAME BACK.  WHAT WAS THE PROCESS THERE?

02:57PM  1    A.   I BELIEVE I DID SPEAK TO HIM BY PHONE WHILE I WAS TRYING

02:58PM  2    TO DECIDE WHETHER TO DO THIS STORY.

02:58PM  3    Q.   ALL RIGHT.  AND WHEN YOU SPOKE WITH MR. BOIES, HE WAS

02:58PM  4    HAPPY TO TALK WITH YOU, BUT HE SAID THE REAL STORY HERE WAS

02:58PM  5    THERANOS AND MS. HOLMES; RIGHT?

02:58PM  6    A.   YES.

02:58PM  7    Q.   AND YOU WERE PERSUADED THAT WAS A REAL STORY; RIGHT?

02:58PM  8    A.   YES.

02:58PM  9    Q.   AND YOU PITCHED IT TO "FORTUNE"; RIGHT?

02:58PM  10   A.   YES.

02:58PM  11   Q.   AND "FORTUNE" SAID, HAVE AT IT?

02:58PM  12   A.   YES.

02:58PM  13   Q.   NOW, YOU MET WITH MR. BOIES AT THE END OF MARCH OF 2014;

02:58PM  14   RIGHT?

02:58PM  15   A.   YES.

02:58PM  16   Q.   MARCH 30TH, 2014.  DOES THAT SOUND ABOUT RIGHT?

02:58PM  17   A.   YES.

02:58PM  18   Q.   AND HE -- YOU TALKED WITH HIM ABOUT THE LAWSUIT THAT HE

02:59PM  19   HAD JUST TRIED FOR THERANOS; RIGHT?

02:59PM  20   A.   WELL, I THINK I'M GOING TO INVOKE REPORTER PRIVILEGE AT

02:59PM  21   ABOUT THIS POINT.

02:59PM  22        MR. COLTON:  YOUR HONOR --

02:59PM  23        THE COURT:  SIR, HAVE A SEAT FOR JUST A MOMENT.  I

02:59PM  24   WANT TO ASK THIS LAWYER SOME QUESTIONS.

02:59PM  25        MR. CLINE, DO YOU WISH TO CONTINUE WITH THIS LINE OR CAN

02:59PM 1      YOU MOVE TO ANOTHER TOPIC?

02:59PM 2              MR. CLINE:  I'D LIKE TO CONTINUE BRIEFLY WITH THIS.

02:59PM 3      THIS IS INFORMATION THAT WAS PROVIDED TO THE GOVERNMENT IN AN

02:59PM 4      INTERVIEW, SO I DON'T THINK THERE'S ANY REPORTER'S PRIVILEGE

02:59PM 5      THAT CAN BE ASSERTED HERE.

02:59PM 6              THE COURT:  WELL, CAN YOU MOVE TO A DIFFERENT TOPIC?

02:59PM 7      CAN I GET YOU OUT OF YOUR ORDER HERE?  I'M TRYING TO SEE IF YOU

02:59PM 8      CAN KEEP YOUR EXAMINATION GOING.  I DON'T WANT TO INTERRUPT THE

02:59PM 9      FLOW, BUT IT MAY BE THAT WE'LL HAVE TO HAVE A HEARING OUTSIDE

02:59PM 10     OF THE PRESENCE OF THE JURY.

02:59PM 11             MR. CLINE:  ALL RIGHT.  YES.

02:59PM 12             THE COURT:  OKAY.

03:00PM 13             MR. CLINE:  LET'S FLAG THAT.  IT MAY COME UP AGAIN

03:00PM 14     AND WE'LL HAVE TO TALK ABOUT IT.

03:00PM 15             THE COURT:  SURE.

03:00PM 16     BY MR. CLINE:

03:00PM 17     Q.  TELL ME IF YOU CAN ANSWER THIS OR IF IT CAUSES YOU A

03:00PM 18     PRIVILEGE PROBLEM.

03:00PM 19         DID MR. BOIES TELL YOU THAT THERANOS HAD BEEN IN STEALTH

03:00PM 20     MODE, BUT WAS NOW READY TO START TO GO PUBLIC?

03:00PM 21             MR. BOSTIC:  OBJECTION, YOUR HONOR.  HEARSAY AND

03:00PM 22     401.

03:00PM 23             MR. CLINE:  THIS IS GOING TO MR. PARLOFF'S STATE OF

03:00PM 24     MIND HERE AS HE BEGINS THIS PROCESS.

03:00PM 25             THE COURT:  I'LL ALLOW THAT QUESTION.

03:00PM   1        SO, SIR, DID YOU UNDERSTAND THE QUESTION?

03:00PM   2              THE WITNESS:  YES, AND I THINK I'VE ANSWERED THIS

03:00PM   3    PUBLICLY ELSEWHERE.  YES, YES.

03:00PM   4    BY MR. CLINE:

03:00PM   5    Q.  ALL RIGHT.  THAT'S FINE.

03:00PM   6        AND IS IT FAIR TO SAY THAT MR. BOIES WAS ENTHUSIASTIC

03:01PM   7    ABOUT BOTH MS. HOLMES AND THERANOS?

03:01PM   8    A.  YES.  I THINK I'VE SAID THAT ELSEWHERE.

03:01PM   9    Q.  ALL RIGHT.  AND MR. BOIES THEN PUT YOU IN TOUCH WITH

03:01PM  10    MS. HOLMES?

03:01PM  11    A.  YES, HIS OFFICE.  HIS OFFICE.

03:01PM  12    Q.  HIS OFFICE PUT YOU IN TOUCH WITH MS. HOLMES?

03:01PM  13    A.  YEAH.

03:01PM  14    Q.  ALL RIGHT.  NOW, YOU FIRST MET WITH MS. HOLMES ON APRIL

03:01PM  15    THE 7TH, 2014?

03:01PM  16    A.  YES.

03:01PM  17    Q.  YOU HAD TALKED WITH HER ON THE PHONE BEFORE THAT AND YOU

03:01PM  18    MADE SOME LOGISTICAL ARRANGEMENTS, BUT THIS WAS THE FIRST

03:01PM  19    MEETING?

03:01PM  20    A.  THAT'S RIGHT.

03:01PM  21    Q.  NOW, I'M GOING TO TALK A LITTLE BIT ABOUT YOUR

03:01PM  22    CONVERSATIONS WITH MS. HOLMES, BUT I WANT TO TALK ABOUT A

03:01PM  23    COUPLE OF SORT OF OTHER BACKGROUND THINGS FIRST.

03:01PM  24        I THINK YOU TESTIFIED ON DIRECT THAT THERE WAS A, A

03:01PM  25    CONCERN ABOUT TRADE SECRETS?

03:01PM  1     A.   YES.

03:01PM  2     Q.   AND MY QUESTION, AND WE HEARD IT A FEW TIMES ON THE

03:01PM  3     RECORDINGS, IS THAT SOMETHING THAT CAME UP REPEATEDLY IN YOUR

03:02PM  4     DISCUSSIONS WITH --

03:02PM  5     A.   YES.

03:02PM  6     Q.   AND YOU UNDERSTOOD THAT THERE WERE, OR YOU UNDERSTOOD AT

03:02PM  7     THE TIME THAT THERE WERE LIMITS ON WHAT YOU COULD BE TOLD AND

03:02PM  8     WHAT THERANOS WOULD BE COMFORTABLE WITH YOU PUBLISHING BECAUSE

03:02PM  9     OF INTELLECTUAL PROPERTY CONCERNS?

03:02PM  10    A.   THAT'S RIGHT.

03:02PM  11    Q.   AND I ALSO NOTICED THAT DURING THE CLIPS WE PLAYED THAT

03:02PM  12    THINGS WOULD BE ON THE RECORD AND THEN OFF THE RECORD.  DID YOU

03:02PM  13    NOTICE THAT AS WELL?

03:02PM  14    A.   YES.

03:02PM  15    Q.   AND DURING YOUR CONVERSATIONS WITH MS. HOLMES, DID YOU

03:02PM  16    TALK ABOUT GROUND RULES, ON THE RECORD, OFF THE RECORD?

03:02PM  17    A.   I DON'T RECALL.

03:02PM  18    Q.   IS THAT SOMETHING YOU NORMALLY DO WITH PEOPLE YOU TALK

03:02PM  19    WITH?

03:02PM  20    A.   WELL, NORMALLY YOU'RE ON THE RECORD UNLESS YOU SAY OFF THE

03:02PM  21    RECORD.

03:02PM  22    Q.   AND WHEN SOMEONE SAYS -- NOT SOMEONE.  WHEN MS. HOLMES

03:02PM  23    SAYS OFF THE RECORD, WHAT DID YOU UNDERSTAND THAT TO MEAN?

03:02PM  24    A.   WELL, IT ACTUALLY -- IT MEANT DIFFERENT THINGS IN

03:03PM  25    DIFFERENT CONTEXTS.

03:03PM  1           SOMETIMES IT WAS I WAS NEVER SUPPOSED TO USE IT.

03:03PM  2      SOMETIMES IT WAS SORT OF IN AN EMBARGO, DON'T USE IT NOW, MAYBE

03:03PM  3      AT ONE TIME WE CAN USE IT.

03:03PM  4           SO I GUESS I WOULD HAVE TO LOOK AT THE PARTICULAR CONTEXT.

03:03PM  5      Q.   ALL RIGHT.  TELL ME IF THIS IS A FAIR SUMMARY OF THAT.

03:03PM  6           WHEN -- DURING THESE CONVERSATIONS THAT YOU WERE HAVING

03:03PM  7      WITH HER IN APRIL, MAY, AND EARLY JUNE OF 2014 LEADING UP TO

03:03PM  8      THE "FORTUNE" ARTICLE, DID YOU UNDERSTAND THAT SOMETHING THAT

03:03PM  9      WAS OFF THE RECORD DURING THOSE CONVERSATIONS WAS NOT TO BE

03:03PM 10      USED IN THE ARTICLE?

03:03PM 11      A.   YES.

03:03PM 12      Q.   ALL RIGHT.  NOW, BETWEEN THAT FIRST MEETING WITH

03:03PM 13      MS. HOLMES ON APRIL THE 7TH AND THE PUBLICATION OF YOUR ARTICLE

03:04PM 14      IN JUNE, YOU HAD A NUMBER OF CONVERSATIONS WITH MS. HOLMES.

03:04PM 15           FAIR?

03:04PM 16      A.   YES.

03:04PM 17      Q.   AND SOME OF THOSE WERE RECORDED; RIGHT?

03:04PM 18      A.   YES.

03:04PM 19      Q.   AND I THINK ON DIRECT YOU PUT A NUMBER ON THAT, TEN HOURS

03:04PM 20      OR SOMETHING --

03:04PM 21      A.   IT SEEMED LIKE TEN HOURS.  I TRIED TO COMPUTE IT, BUT IT

03:04PM 22      SEEMED LIKE TEN HOURS.

03:04PM 23      Q.   ALL RIGHT.  AND THERE WERE ALSO DISCUSSIONS THAT WERE NOT

03:04PM 24      RECORDED; RIGHT?

03:04PM 25      A.   THAT'S RIGHT.

03:04PM  1    Q.   AND I THINK, IF I HEARD YOU RIGHT, YOU ESTIMATED THOSE AT

03:04PM  2    MAYBE ANOTHER THREE HOURS OR SO?

03:04PM  3    A.   YEAH, TWO TO THREE HOURS.

03:04PM  4    Q.   ALL RIGHT.

03:04PM  5    A.   THE BALLPARK, YOU KNOW.

03:04PM  6    Q.   NOW, WE'VE HEARD SOME OF THE RECORDED CONVERSATIONS,

03:04PM  7    PROBABLY, I DON'T KNOW, 20 OR 30 MINUTES WORTH ON DIRECT;

03:04PM  8    RIGHT?

03:04PM  9    A.   YEAH.

03:04PM  10   Q.   OKAY.  AND I'VE GOT A FEW OTHER PORTIONS THAT I'M GOING TO

03:04PM  11   PLAY FOR YOU.

03:05PM  12        AND OTHER THAN ASKING YOU AT THE END IF THAT WAS YOU AND

03:05PM  13   MS. HOLMES TALKING, I'M NOT GOING TO ASK YOU ANY QUESTIONS

03:05PM  14   ABOUT THEM, I'M JUST GOING TO PLAY THEM.

03:05PM  15        SO I THINK WITH COUNSEL'S PERMISSION I'M GOING TO PLAY

03:05PM  16   WHAT I'M GOING TO CALL EXHIBIT 1647A, WHICH IS A PORTION OF THE

03:05PM  17   APRIL 7TH, 2014, CONVERSATION.

03:05PM  18             MR. BOSTIC:  IS THIS ONE THAT WE DISCUSSED?

03:05PM  19             MR. CLINE:  YES.

03:05PM  20             MR. BOSTIC:  NO OBJECTION, YOUR HONOR.

03:05PM  21             THE COURT:  THE DATE AGAIN WAS?  THE DATE AGAIN IS?

03:05PM  22             MR. CLINE:  I'M SORRY?

03:05PM  23             THE COURT:  THE DATE AGAIN?

03:05PM  24             MR. CLINE:  APRIL 7TH, 2014.

03:05PM  25             THE COURT:  ALL RIGHT.  AND THIS IS HOW LONG?

03:05PM  1                  MR. CLINE:  THIS IS A LITTLE LESS THAN A MINUTE.

03:05PM  2                  THE COURT:  ALL RIGHT.  ALL RIGHT.  THAT'S ADMITTED,

03:05PM  3       AND IT MAY BE PLAYED.

03:05PM  4             AGAIN, LADIES AND GENTLEMEN, THERE'S NO TRANSCRIPT.

03:05PM  5                  MR. CLINE:  THERE'S NO TRANSCRIPT.

03:05PM  6                  THE COURT:  SO PLEASE DO PAY ATTENTION TO THE AUDIO.

03:05PM  7             AND IT MAY BE PLAYED NOW.

03:05PM  8             (DEFENDANT'S EXHIBIT 1647A WAS RECEIVED IN EVIDENCE.)

03:05PM  9             (AUDIO RECORDING PLAYED OFF THE RECORD.)

03:06PM  10      BY MR. CLINE:

03:06PM  11      Q.   ALL RIGHT.  THAT WAS YOU AND MS. HOLMES TALKING; RIGHT?

03:06PM  12      A.   YES.

03:06PM  13      Q.   SO THE NEXT PORTION IS FROM APRIL THE 10TH, 2014, AND THIS

03:06PM  14      IS EXHIBIT 1657A.

03:07PM  15                  MR. BOSTIC:  NO OBJECTION.

03:07PM  16                  THE COURT:  THIS IS PLAYED -- THIS MAY BE PLAYED.

03:07PM  17      IT'S ADMITTED, AND IT MAY BE PLAYED.

03:07PM  18             PLEASE LISTEN CAREFULLY TO THE AUDIO.  THERE IS NO

03:07PM  19      TRANSCRIPT OF THIS AS WELL.

03:07PM  20             (DEFENDANT'S EXHIBIT 1657A WAS RECEIVED IN EVIDENCE.)

03:07PM  21                  MR. CLINE:  RIGHT.  AND THIS IS ABOUT 45 SECONDS OR

03:07PM  22      SO.

03:07PM  23                  THE COURT:  ALL RIGHT.  THANK YOU.  AND THAT CAN BE

03:07PM  24      PLAYED NOW.

03:07PM  25             (AUDIO RECORDING PLAYED OFF THE RECORD.)

03:08PM   1      BY MR. CLINE:

03:08PM   2      Q.   ALL RIGHT.  AND THAT WAS YOU AND MS. HOLMES; RIGHT?

03:08PM   3      A.   YES.

03:08PM   4      Q.   AND THEN THE THIRD CLIP I'M GOING TO PLAY, AND THE LAST

03:08PM   5      ONE, IS FROM THE MAY 12TH, 2014 CONVERSATION.

03:08PM   6           THIS WILL BE EXHIBIT 1719A.  AND THIS IS ABOUT A LITTLE

03:08PM   7      OVER A MINUTE.

03:08PM   8           YOUR HONOR, IS THAT LAST ONE ADMITTED?

03:08PM   9                THE COURT:  IT WAS, YES.

03:08PM   10               MR. CLINE:  ALL RIGHT.  THANK YOU.

03:08PM   11          I'LL ASK THAT THIS ONE BE ADMITTED AS WELL.

03:08PM   12               MR. BOSTIC:  NO OBJECTION.

03:08PM   13               THE COURT:  1719A WILL BE ADMITTED.

03:08PM   14          PAY ATTENTION TO THIS AUDIO AS IT'S PLAYED.

03:08PM   15          (DEFENDANT'S EXHIBIT 1719A WAS RECEIVED IN EVIDENCE.)

03:08PM   16          (AUDIO RECORDING PLAYED OFF THE RECORD.)

03:10PM   17     BY MR. CLINE:

03:10PM   18     Q.   AGAIN, YOU AND MS. HOLMES?

03:10PM   19     A.   YES.

03:10PM   20     Q.   ALL RIGHT.

03:10PM   21          THAT'S THE END OF OUR CLIPS, YOUR HONOR.

03:10PM   22               THE COURT:  OKAY.

03:10PM   23     BY MR. CLINE:

03:10PM   24     Q.   NOW, I'M GOING TO COME BACK TO YOUR CONVERSATIONS WITH

03:10PM   25     MS. HOLMES, BUT I WANTED TO ASK YOU ABOUT SOME OTHER

03:10PM   1      INVESTIGATIVE STEPS THAT YOU TOOK FOR THE JUNE 2014 ARTICLE.

03:10PM   2          I'M GOING TO TRY NOT TO GET INTO ANY PRIVILEGE CONCERNS,

03:10PM   3      BUT I'M SURE IF I DO, I'M SURE YOU'LL TELL ME.

03:10PM   4          ONE THING YOU DID WAS READ THE TRANSCRIPT OF THAT TRIAL

03:10PM   5      THAT MR. BOIES HAD JUST HAD; RIGHT?

03:10PM   6      A.   YES.

03:10PM   7      Q.   AND THAT WAS -- IT WAS A PATENT TRIAL; RIGHT?

03:10PM   8      A.   YES.

03:10PM   9      Q.   IT WAS ABOUT THERANOS'S INTELLECTUAL PROPERTY; RIGHT?

03:10PM  10      A.   YES.

03:10PM  11      Q.   AND YOU GLEANED A FAIR AMOUNT OF INFORMATION ABOUT

03:10PM  12      THERANOS'S INTELLECTUAL PROPERTY JUST FROM READING THE

03:10PM  13      TRANSCRIPT OF THE TRIAL; CORRECT?

03:10PM  14      A.   YES, AND I READ -- I READ THAT EVEN BEFORE WHEN I --

03:11PM  15      BEFORE I HAD DECIDED TO FOCUS MORE ON THE COMPANY, I WAS

03:11PM  16      STILL -- I WAS WONDERING, SHOULD I WRITE ABOUT THE LAWSUIT.

03:11PM  17          BUT YOU'RE RIGHT, IT HAD A LOT OF INFORMATION ABOUT THE

03:11PM  18      COMPANY.

03:11PM  19      Q.   ALL RIGHT.  YOU DID SOME INTERNET RESEARCH OF YOUR OWN

03:11PM  20      ABOUT THINGS LIKE REGULATIONS AND THAT SORT OF THING; RIGHT?

03:11PM  21      A.   YES.

03:11PM  22      Q.   YOU HAD RESEARCHERS AT "FORTUNE" WHO WERE HELPING YOU;

03:11PM  23      CORRECT?

03:11PM  24      A.   I DON'T REMEMBER THAT.  I MEAN --

03:11PM  25      Q.   LET ME SEE --

03:11PM   1    A.   OH, OH.

03:11PM   2    Q.   YOU WERE ABOUT TO SAY SOMETHING AND I INTERRUPTED YOU.

03:11PM   3    WHAT WAS IT?

03:11PM   4    A.   THERE WAS -- WELL, ACTUALLY I THINK MAYBE THIS GETS INTO

03:11PM   5    REPORTER PROCESS AND I DON'T THINK IT'S BEEN PUBLISHED, SO

03:11PM   6    MAYBE I SHOULD INVOKE PRIVILEGE.

03:11PM   7    Q.   OKAY.  YOU INTERVIEWED PEOPLE IN ADDITION TO MS. HOLMES;

03:12PM   8    RIGHT?

03:12PM   9    A.   YES.

03:12PM  10    Q.   MS. HOLMES SUGGESTED SOME OF THE PEOPLE THAT YOU TALK

03:12PM  11    WITH; CORRECT?

03:12PM  12    A.   YES.

03:12PM  13    Q.   AND OTHERS THAT YOU FOUND ON YOUR OWN; RIGHT?

03:12PM  14    A.   YES.

03:12PM  15    Q.   AND I WANT TO GO THROUGH SOME OF THE PEOPLE THAT YOU

03:12PM  16    INTERVIEWED.

03:12PM  17         MR. BOIES WAS ONE; RIGHT?

03:12PM  18    A.   I CAN'T REMEMBER IF HE'S QUOTED IN THE PIECE.  DO YOU

03:12PM  19    KNOW?

03:12PM  20    Q.   I THINK HE'S NAMED IN THE PIECE AS A SOURCE OF

03:12PM  21    INFORMATION.

03:12PM  22             THE COURT:  SIR, DO YOU WANT TO LOOK AT THE PIECE?

03:12PM  23    DO YOU WANT TO REVIEW THIS FOR A MOMENT?

03:12PM  24    BY MR. CLINE:

03:12PM  25    Q.   YOU'RE WELCOME TO IF YOU WANT.  IT IS TAB 1749 IN THAT

03:12PM  1    BOOK THAT I'VE HANDED YOU.  SO TAKE YOUR TIME AND LOOK THROUGH

03:12PM  2    IT AND MAKE YOURSELF COMFORTABLE.

03:12PM  3              THE COURT:  DO YOU HAVE A DIRECTION TO A PAGE

03:13PM  4    NUMBER?

03:13PM  5    BY MR. CLINE:

03:13PM  6    Q.   TAKE A LOOK, MR. PARLOFF, IF YOU'RE WITH ME, AT PAGE 6.

03:13PM  7    A.   YES.

03:13PM  8    Q.   DOWN AT THE BOTTOM OF THE RIGHT-HAND COLUMN.

03:13PM  9    A.   YEAH, YEAH.  LET ME READ THAT.

03:13PM 10        (PAUSE IN PROCEEDINGS.)

03:14PM 11              THE WITNESS:  YEAH, IT DOES, IT DOES PARAPHRASE HIM

03:14PM 12    SPEAKING.  YEAH, I DID INTERVIEW HIM.

03:14PM 13    BY MR. CLINE:

03:14PM 14    Q.   ALL RIGHT.  SO MR. BOIES WAS ONE OF THE PEOPLE YOU

03:14PM 15    INTERVIEWED; IS THAT RIGHT?

03:14PM 16    A.   YEAH.  YES.

03:14PM 17    Q.   AND YOU INTERVIEWED DR. CHANNING ROBERTSON; RIGHT?

03:14PM 18    A.   YEAH.

03:14PM 19    Q.   AND DR. ROBERTSON, HE TESTIFIED --

03:14PM 20    A.   YES.

03:14PM 21    Q.   -- IN THE TRIAL YOU WERE THINKING ABOUT; RIGHT?

03:14PM 22    A.   YES.

03:14PM 23    Q.   AND YOU READ HIS TESTIMONY; RIGHT?

03:14PM 24    A.   YES.

03:14PM 25    Q.   BUT YOU ALSO SAT DOWN AND INTERVIEWED HIM; RIGHT?

03:14PM  1    A.    YES.

03:14PM  2    Q.    AND YOU ALSO UNDERSTOOD THAT HE WAS OR HAD BEEN A

03:14PM  3    PROFESSOR AT STANFORD?

03:14PM  4    A.    YES.

03:14PM  5    Q.    AND THAT HE HAD BEEN KIND OF A MENTOR AND ADVISOR TO

03:14PM  6    MS. HOLMES OVER THE YEARS?

03:14PM  7    A.    YES.

03:14PM  8    Q.    YOU TALKED TO RICHARD KOVACEVICH, THE CEO OF WELLS FARGO

03:14PM  9    AND A BOARD MEMBER OF THERANOS; RIGHT?

03:15PM  10   A.    I DON'T KNOW IF HE'S QUOTED.

03:15PM  11   Q.    I DON'T KNOW, EITHER.   BUT I CAN TELL YOU, AND I CAN TELL

03:15PM  12   THE COURT FOR LATER CONSIDERATION IF NECESSARY, THAT HE WAS ON

03:15PM  13   A LIST OF NAMES THAT YOU PROVIDED TO THE GOVERNMENT WHEN YOU

03:15PM  14   FIRST SAT DOWN WITH THEM OF PEOPLE YOU HAD INTERVIEWED.

03:15PM  15   A.    WELL, I'M GOING TO INVOKE THE REPORTER PRIVILEGE.

03:15PM  16   Q.    WOULD IT EASE YOUR MIND IF I WERE TO SHOW YOU THE

03:15PM  17   MEMORANDUM OF THAT INTERVIEW WHERE YOU TOLD THE GOVERNMENT

03:15PM  18   THESE NAMES?

03:15PM  19   A.    NO.

03:15PM  20   Q.    IT WOULDN'T HELP?

03:15PM  21   A.    NO, BECAUSE I DON'T REALLY KNOW -- I'M NOT A MEDIA LAWYER.

03:15PM  22   I DON'T REALLY KNOW THE LIMITATION -- I DON'T WANT TO WAIVE THE

03:15PM  23   PRIVILEGE FOR OTHERS.

03:15PM  24   Q.    DO YOU HAVE A MEDIA LAWYER HERE WITH YOU?

03:15PM  25   A.    YES.

03:15PM   1                THE COURT:  THAT'S MY QUESTION FOR YOU, SIR.

03:15PM   2           DO YOU HAVE COUNSEL FOR YOU HERE, MR. PARLOFF?

03:16PM   3                THE WITNESS:  YES.

03:16PM   4                THE COURT:  AND DO YOU WISH TO TAKE A BREAK AND

03:16PM   5      CONSULT WITH YOUR COUNSEL?

03:16PM   6                THE WITNESS:  YES.

03:16PM   7                THE COURT:  ALL RIGHT.  LET'S DO THAT.  LET'S DO

03:16PM   8      THAT.

03:16PM   9                MR. CLINE:  THAT'S FINE.

03:16PM  10                THE COURT:  LADIES AND GENTLEMEN, WE'LL TAKE ABOUT A

03:16PM  11      15 MINUTE BREAK, A 15 TO 20 MINUTE BREAK HERE, AND SO WE'LL BE

03:16PM  12      IN RECESS.

03:16PM  13           PLEASE, SIR, GO RIGHT AHEAD AND CONSULT WITH YOUR COUNSEL.

03:16PM  14           (JURY OUT AT 3:16 P.M.)

03:16PM  15                THE COURT:  PLEASE BE SEATED.  THE RECORD SHOULD

03:16PM  16      REFLECT THAT THE JURY IS OUT.

03:16PM  17           BEFORE YOU LEAVE, MR. CLINE, I'LL INVITE ANY INTERESTED

03:16PM  18      PARTY -- IF THERE'S GOING TO BE SOME DISCUSSION ABOUT THIS,

03:16PM  19      WE'LL DO THIS OUTSIDE OF THE PRESENCE OF THE JURY, AND IF YOU

03:17PM  20      COULD NOTIFY COUNSEL ABOUT THAT.

03:17PM  21                MR. CLINE:  I WILL.

03:17PM  22                THE COURT:  AND WE CAN JUST GET AN IDEA OF WHEN AND

03:17PM  23      IF THAT IS NECESSARY.

03:17PM  24                MR. CLINE:  ALL RIGHT.  MOSTLY I'M JUST TRYING TO

03:17PM  25      GET THE NAMES, AND I'M HOPEFUL WE CAN DO THAT.

03:17PM  1          THE COURT:  SURE.  AND THE GOVERNMENT IS WILLING TO

03:17PM  2  HELP YOU ON THAT, TOO, IF YOU NEED THEIR ASSISTANCE.

03:17PM  3          MR. CLINE:  I'M SURE THEY ARE.

03:17PM  4          THE COURT:  ALL RIGHT.  WE'LL BE IN RECESS.  THANK

03:17PM  5  YOU.

03:17PM  6          THE CLERK:  COURT.  COURT IS IN RECESS.

03:17PM  7      (RECESS FROM 3:17 P.M. UNTIL 3:32 P.M.)

03:32PM  8      (JURY IN AT 3:32 P.M.)

03:32PM  9          THE COURT:  ALL RIGHT.  THANK YOU.

03:32PM 10      WE'RE BACK ON THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT

03:32PM 11  ARE PRESENT ONCE AGAIN.

03:32PM 12      PLEASE BE SEATED.  THANK YOU.

03:32PM 13      LET ME INQUIRE OF THE WITNESS.

03:32PM 14      MR. PARLOFF, DID YOU HAVE AN OPPORTUNITY TO CONSULT WITH

03:32PM 15  YOUR COUNSEL?

03:32PM 16          THE WITNESS:  YES.  THANKS.

03:32PM 17          THE COURT:  ALL RIGHT.  YOU'RE WELCOME.

03:32PM 18      ARE YOU READY TO PROCEED AT LEAST WITH THE EXAMINATION?

03:32PM 19          THE WITNESS:  YES.  THANK YOU, YOUR HONOR.

03:32PM 20          THE COURT:  ALL RIGHT.  THANK YOU.

03:32PM 21  BY MR. CLINE:

03:32PM 22  Q.  MR. PARLOFF, I THINK WHEN WE BROKE I HAD ASKED YOU IF YOU

03:33PM 23  SPOKE WITH RICHARD KOVACEVICH, THE CEO OF WELLS FARGO AND A

03:33PM 24  BOARD MEMBER OF THERANOS?

03:33PM 25  A.  YES.

03:33PM   1    Q.   YOU DID SPEAK WITH HIM?

03:33PM   2    A.   YES.

03:33PM   3    Q.   WILLIAM PERRY, THE FORMER SECRETARY OF DEFENSE --

03:33PM   4    A.   YES.

03:33PM   5    Q.   -- OF THE UNITED STATES AND ANOTHER BOARD MEMBER; RIGHT?

03:33PM   6    A.   YES.

03:33PM   7    Q.   PAUSE ONE SECOND AFTER MY QUESTION BEFORE YOU ANSWER IT.

03:33PM   8    A.   OH, SORRY.

03:33PM   9    Q.   GENERAL JAMES MATTIS, FORMER SITCOM COMMANDER AND BOARD

03:33PM  10    MEMBER; RIGHT?

03:33PM  11    A.   YES.

03:33PM  12    Q.   GEORGE SHULTZ, FORMER SECRETARY OF STATE, AND OTHER THINGS

03:33PM  13    AS WELL, AND ALSO A BOARD MEMBER; RIGHT?

03:33PM  14    A.   YES.

03:33PM  15    Q.   HENRY KISSINGER, FORMER SECRETARY OF STATE, BOARD MEMBER,

03:33PM  16    FORMER NATIONAL SECURITY ADVISOR OF THE UNITED STATES, YOU

03:33PM  17    SPOKE WITH HIM?

03:33PM  18    A.   YES.

03:33PM  19    Q.   AND GREG WASSON, CEO OF WALGREENS?

03:33PM  20    A.   YES.

03:33PM  21    Q.   MARK LARET, THE CEO OF UCSF MEDICAL CENTER; RIGHT?

03:34PM  22    A.   YES.

03:34PM  23    Q.   AND TO GO BACK TO MR. WASSON FOR A SECOND, YOU UNDERSTOOD

03:34PM  24    THAT THERANOS HAD A PARTNERSHIP WITH WALGREENS; RIGHT?

03:34PM  25    A.   YES.

03:34PM   1    Q.   THAT'S BACK WHERE YOU GOT YOUR FIRST FINGER PRICK; RIGHT?

03:34PM   2    A.   YES.

03:34PM   3    Q.   MARK LARET, CEO OF UCSF MEDICAL CENTER; RIGHT?

03:34PM   4    A.   YES.

03:34PM   5    Q.   AND YOU UNDERSTOOD THAT THERANOS HAD SOME SORT OF A

03:34PM   6    RELATIONSHIP OR POTENTIAL RELATIONSHIP WITH UCSF MEDICAL

03:34PM   7    CENTER; CORRECT?

03:34PM   8    A.   YES, THE ARTICLE SAYS THAT.

03:34PM   9    Q.   LLOYD DEAN FROM DIGNITY HEALTH?

03:34PM   10   A.   YES.

03:34PM   11   Q.   AND AGAIN, YOU UNDERSTOOD THAT THERANOS HAD A RELATIONSHIP

03:34PM   12   WITH DIGNITY HEALTH?

03:34PM   13   A.   YEAH, YES.

03:34PM   14   Q.   SCOTT SEROTA OF BLUE CROSS, BLUE SHIELD?

03:34PM   15   A.   IT WAS WORKING TO CREATE -- IT WAS IN TALKS, YEAH.

03:34PM   16   Q.   YES.  WORKING ON CREATING A RELATIONSHIP?

03:34PM   17   A.   YEAH.

03:34PM   18   Q.   WITH SEVERAL HOSPITALS; RIGHT?

03:34PM   19   A.   YES.

03:35PM   20   Q.   ALL RIGHT.  SCOTT SEROTA OF BLUE CROSS BLUE SHIELD, YOU

03:35PM   21   TALKED WITH HIM?

03:35PM   22   A.   YES.

03:35PM   23   Q.   DR. DAVID HELFET, YOU TALKED WITH HIM; RIGHT?

03:35PM   24   A.   YES.

03:35PM   25   Q.   NOW, DR. HELFET AT THE TIME YOU SPOKE WITH HIM WAS THE

03:35PM 1    CHIEF OF ORTHOPEDIC SURGERY AT THE HOSPITAL FOR SPECIAL SURGERY

03:35PM 2    IN MANHATTAN; RIGHT?

03:35PM 3    A.   YES.

03:35PM 4    Q.   AND THE COMPANY HAD PROVIDED VALIDATION STUDIES TO

03:35PM 5    DR. HELFET; CORRECT?

03:35PM 6    A.   YES.

03:35PM 7    Q.   AND YOU SPOKE WITH DR. HELFET ABOUT THOSE VALIDATION

03:35PM 8    STUDIES; CORRECT?

03:35PM 9    A.   YES, I REFER TO THAT IN THE ARTICLE.

03:35PM 10   Q.   YOU DO.

03:35PM 11   A.   YEAH.

03:35PM 12   Q.   AND HE GAVE A POSITIVE ASSESSMENT; CORRECT?

03:35PM 13   A.   RIGHT.

03:35PM 14   Q.   YOU SPOKE WITH MS. HOLMES'S PARENTS, CHRIS AND NOEL;

03:35PM 15   RIGHT?

03:35PM 16   A.   YES.

03:35PM 17   Q.   NOW, YOU TESTIFIED ON DIRECT THAT YOU TOURED, I THINK YOU

03:36PM 18   SAID, A COMMERCIAL LABORATORY; RIGHT?

03:36PM 19   A.   YES.

03:36PM 20   Q.   AND THEN WHEN MR. BOSTIC ASKED YOU WHICH ONE, YOU SAID IT

03:36PM 21   WAS CONFIDENTIAL; RIGHT?

03:36PM 22   A.   YES.

03:36PM 23   Q.   AND THEN ABOUT 30 SECONDS LATER ON A CLIP WE HEARD IT WAS

03:36PM 24   QUEST; RIGHT?

03:36PM 25   A.   THE CLIP SAID WHAT IT SAID.

03:36PM  1    Q.   YES.  TO MS. HOLMES; RIGHT?

03:36PM  2    A.   YEAH.

03:36PM  3    Q.   AND YOU ALSO TOLD THE GOVERNMENT THAT; RIGHT?

03:36PM  4    A.   I CAN'T RECALL, BUT I'LL TAKE YOUR WORD FOR IT.

03:36PM  5    Q.   ALL RIGHT.  SO CAN WE JUST CALL IT QUEST?

03:36PM  6    A.   WELL, IT SLIPPED OUT WHEN I SPOKE TO ELIZABETH, AND I

03:36PM  7    GUESS IT'S OUT NOW.

03:36PM  8         (LAUGHTER.)

03:36PM  9    BY MR. CLINE:

03:36PM  10   Q.   ALL RIGHT.  SO YOU TOURED QUEST?

03:36PM  11   A.   YEAH.

03:36PM  12   Q.   ALL RIGHT.  I KNEW WE WOULD GET THERE.

03:36PM  13        NOW, THIS WAS A QUESTION THAT YOU MAY NOT WANT TO ANSWER,

03:36PM  14   SO LISTEN CAREFULLY.

03:37PM  15        SOME OF THE QUESTIONS THAT YOU ASKED MS. HOLMES ABOUT THE

03:37PM  16   THERANOS TECHNOLOGY CAME FROM THERANOS'S COMPETITORS?

03:37PM  17   A.   YEAH, I DON'T -- I DID RESEARCH AND I HEARD VARIOUS

03:37PM  18   CRITICISMS, AND I, I ASKED HER TO ADDRESS THOSE QUESTIONS AND

03:37PM  19   CRITICISMS.

03:37PM  20   Q.   ALL RIGHT.  AND CAN WE GO SO FAR AS TO SAY THAT SOME OF

03:37PM  21   THOSE CRITICISMS THAT YOU HEARD, YOU HEARD FROM THERANOS'S

03:37PM  22   COMPETITORS?

03:37PM  23   A.   UM, UM, I THINK I'LL SAY NO.

03:38PM  24             THE COURT:  MR. PARLOFF, THE RECORD SHOULD REFLECT

03:38PM  25   THAT YOU PAUSED FOR A MOMENT TO REFLECT ON THAT.

03:38PM  1          LET ME JUST SAY THAT YOU DO HAVE COUNSEL HERE.  IF AT ANY

03:38PM  2  TIME DURING ANY OF THE QUESTIONS BY MR. CLINE OR MR. BOSTIC OR

03:38PM  3  ANYONE ELSE --

03:38PM  4          THE WITNESS:  YEAH.

03:38PM  5          THE COURT:  -- IF YOU WISH TO CONSULT WITH YOUR

03:38PM  6  COUNSEL BEFORE YOU ANSWER, PLEASE LET ME KNOW AND I'LL, OF

03:38PM  7  COURSE, PROVIDE YOU THAT OPPORTUNITY.

03:38PM  8      AND DON'T BE SHY ABOUT THAT.  THAT'S FINE.

03:38PM  9          THE WITNESS:  I DON'T WANT TO START ANOTHER PAUSE.

03:38PM 10          THE COURT:  NO.  IF IT'S IMPORTANT TO YOU, IT'S

03:38PM 11  IMPORTANT TO US, INCLUDING MR. CLINE.  HE DOESN'T WANT TO

03:38PM 12  INVADE ANY PRIVILEGE UNNECESSARILY.

03:38PM 13          THE WITNESS:  WELL, I'D LIKE TO VERY QUICKLY CONSULT

03:38PM 14  WITH HIM.

03:38PM 15          THE COURT:  SURE.

03:38PM 16      DO YOU HAVE ANY OTHER QUESTIONS FOR EFFICIENCY?

03:38PM 17          MR. CLINE:  IF HE CAN JUST GO TALK QUICKLY TO HIS

03:38PM 18  COUNSEL, WE DON'T EVEN NEED TO TAKE A BREAK.

03:38PM 19          THE COURT:  OKAY.  I SEE A YOUNG MAN STANDING THERE.

03:38PM 20      SIR, MAY I KNOW YOUR NAME?

03:38PM 21          MR. KOLTUN:  YOU SAID YOUNG MAN, BUT I THINK YOU

03:39PM 22  MEANT ME.

03:39PM 23      (LAUGHTER.)

03:39PM 24          THE COURT:  I KNOW I CONFUSED YOU WHEN I SAID YOUNG

03:39PM 25  MAN, BUT NONETHELESS I'M REFERRING TO YOU, SIR.  COULD YOU

03:39PM  1    STATE YOUR NAME, PLEASE?

03:39PM  2              MR. KOLTUN:  JOSHUA KOLTUN.  MY APPEARANCE HAS BEEN

03:39PM  3    MADE IN PAPERS BEFORE THE COURT.

03:39PM  4         I WONDER IF I COULD TALK BRIEFLY WITH MR. CLINE TO SEE IF

03:39PM  5    I CAN HELP SPEED THINGS UP A LITTLE BIT.

03:39PM  6              THE COURT:  I'M ALWAYS TO OFFER LAWYERS AN

03:39PM  7    OPPORTUNITY TO DISCUSS TO HELP THINGS, YES.

03:39PM  8         WE'LL TAKE A STANDING BREAK HERE.

03:39PM  9         IS THAT ALL RIGHT?

03:39PM  10             MR. CLINE:  A STANDING BREAK WOULD BE PERFECT.

03:39PM  11        (PAUSE IN PROCEEDINGS.)

03:42PM  12             THE COURT:  ALL RIGHT.  THANK YOU.  WE ARE BACK ON

03:42PM  13   THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT AGAIN.

03:43PM  14        OUR JURY IS PRESENT.  MS. HOLMES IS PRESENT.

03:43PM  15        MR. PARLOFF HAS RESUMED THE STAND.

03:43PM  16        SIR, YOU'VE HAD AN OPPORTUNITY TO DISCUSS THINGS WITH YOUR

03:43PM  17   ATTORNEY?

03:43PM  18             THE WITNESS:  YES.

03:43PM  19             THE COURT:  ALL RIGHT.  AND AGAIN, IF AT ANY TIME

03:43PM  20   YOU FEEL THAT YOU NEED TO DO THAT, PLEASE LET ME KNOW AND, OF

03:43PM  21   COURSE, YOU'LL HAVE THE OPPORTUNITY.

03:43PM  22             THE WITNESS:  THANK YOU, YOUR HONOR.

03:43PM  23             THE COURT:  YOU'RE WELCOME.

03:43PM  24   BY MR. CLINE:

03:43PM  25   Q.   MR. PARLOFF, YOU HAD HEARD CRITICISMS OF THERANOS;

03:43PM  1    CORRECT?

03:43PM  2    A.   YES.

03:43PM  3    Q.   AND SOME OF THOSE CRITICISMS CAME FROM THERANOS'S

03:43PM  4    COMPETITORS; CORRECT?

03:43PM  5    A.   YES.

03:43PM  6    Q.   AND YOU THEN PUT SOME OF THOSE CRITICISMS TO MS. HOLMES IN

03:43PM  7    YOUR DISCUSSIONS WITH HER; CORRECT?

03:43PM  8    A.   I ASKED HER TO COMMENT ON THOSE CRITICISMS.

03:43PM  9    Q.   YES.  NOW, I'VE RUN THROUGH A LIST OF PEOPLE THAT YOU

03:43PM  10   SPOKE TO FOR THE ARTICLE; CORRECT?

03:43PM  11   A.   YES.

03:43PM  12   Q.   YOU SPOKE TO OTHER PEOPLE AS WELL; RIGHT?

03:43PM  13   A.   YES.

03:43PM  14   Q.   SOME OF THE PEOPLE THAT YOU SPOKE WITH YOU QUOTED IN THE

03:43PM  15   ARTICLE; CORRECT?

03:43PM  16   A.   YES.

03:43PM  17   Q.   AND THIS GOES WITHOUT SAYING, I SUPPOSE, BUT THE QUOTES IN

03:44PM  18   THE ARTICLE ARE ACCURATE?  THEY'RE WHAT THOSE PEOPLE TOLD YOU;

03:44PM  19   RIGHT?

03:44PM  20   A.   YES.

03:44PM  21   Q.   ALL RIGHT.  NOW, I'M GOING TO TURN BACK TO THE

03:44PM  22   CONVERSATIONS WITH MS. HOLMES.

03:44PM  23       WE'VE, WE'VE NOTED THAT SOME OF THOSE CONVERSATIONS WERE

03:44PM  24   RECORDED AND WE'VE HEARD SOME OF THOSE.

03:44PM  25       SOME OF THE CONVERSATIONS WERE UNRECORDED?

03:44PM   1    A.   THAT'S RIGHT.

03:44PM   2    Q.   AND FOR SOME OF THOSE CONVERSATIONS, YOU TOOK NOTES;

03:44PM   3    RIGHT?

03:44PM   4    A.   YES.

03:44PM   5    Q.   AND IF I UNDERSTOOD YOU ON DIRECT, YOU HAD A SPIRAL

03:44PM   6    NOTEBOOK; CORRECT?

03:44PM   7    A.   YES.

03:44PM   8    Q.   AND YOU'VE GOT SOME KIND OF A SHORTHAND THAT YOU USE;

03:44PM   9    RIGHT?

03:44PM  10    A.   YES.

03:44PM  11    Q.   AND SO WHEN YOU'RE TALKING WITH SOMEONE ON THE PHONE OR IN

03:44PM  12    PERSON, YOU HAVE YOUR SPIRAL NOTEBOOK THERE AND YOU'RE TAKING

03:44PM  13    NOTES; RIGHT?

03:44PM  14    A.   USUALLY, YES.

03:44PM  15    Q.   ALL RIGHT.  AND DID YOU DO THAT WHEN YOU WERE RECORDING IT

03:45PM  16    AS WELL OR DO YOU NOT BOTHER TO TAKE NOTES?

03:45PM  17    A.   I USUALLY DO AS A BACKUP.

03:45PM  18    Q.   ALL RIGHT.  BUT WE'RE GOING TO FOCUS ON THE UNRECORDED

03:45PM  19    CONVERSATIONS HERE.

03:45PM  20         SO LET'S SAY THAT YOU'RE HAVING A PHONE CALL WITH

03:45PM  21    MS. HOLMES, AND YOU GET OFF THE CALL, AND YOU'VE GOT NOTES IN

03:45PM  22    THIS SHORTHAND; RIGHT?

03:45PM  23    A.   UH-HUH, YES.

03:45PM  24    Q.   AND DO THE NOTES INCLUDE THE QUESTIONS THAT YOU'RE ASKING?

03:45PM  25    IN OTHER WORDS, ARE YOU WRITING WHILE YOU'RE TALKING, OR DO YOU

03:45PM 1      GO BACK AND FILL THAT IN LATER?

03:45PM 2      A.   TYPICALLY THEY INCLUDE THE QUESTION WHILE I'M, WHILE I'M

03:45PM 3      TALKING.  IT CAN BE ABBREVIATED.  LIKE YOU SAY, IT'S DIFFICULT.

03:45PM 4           BUT IF THERE'S SOME DOUBT ABOUT IT OR IF IT'S PARTICULARLY

03:45PM 5      IMPORTANT, ONE, I WOULD GO BACK AFTER THE FACT AND FILL IT IN

03:46PM 6      AS SOON AS I -- YOU KNOW, TO MAKE IT -- OFTEN THE, OFTEN THE

03:46PM 7      VERBATIM QUALITY OF THE QUESTION IS NOT AS IMPORTANT AS --

03:46PM 8      SINCE YOU'RE NOT GOING TO QUOTE YOURSELF.

03:46PM 9           BUT SOMETIMES IT IS, AND IN THAT CASE I WOULD GO BACK AS

03:46PM 10     SOON AS POSSIBLE AND WRITE IT OUT AS ACCURATELY AS POSSIBLE.

03:46PM 11     Q.   ALL RIGHT.  SO WE'RE TALKING ABOUT A HYPOTHETICAL PHONE

03:46PM 12     CALL WITH MS. HOLMES DURING THIS 2014 INVESTIGATION THAT YOU'RE

03:46PM 13     DOING?

03:46PM 14     A.   YEAH.

03:46PM 15     Q.   OR RESEARCH THAT YOU'RE DOING?

03:46PM 16     A.   YEAH.

03:46PM 17     Q.   AND SO YOU GET OFF THE PHONE.  YOU'VE GOT THESE NOTES,

03:46PM 18     HANDWRITTEN NOTES, AND THEY FIND THEIR WAY THEN INTO A DOCUMENT

03:46PM 19     THAT RESIDES ON YOUR COMPUTER; RIGHT?

03:46PM 20     A.   YES.

03:46PM 21     Q.   AND TELL US ABOUT THAT PROCESS.

03:46PM 22     A.   SO TYPICALLY IF I'M NOT GOING TO WRITE THE ARTICLE

03:46PM 23     IMMEDIATELY, I WOULD TRANSCRIBE THEM AS SOON AS POSSIBLE.  IT

03:47PM 24     COULD BE IMMEDIATELY, BUT IT COULD BE A COUPLE DAYS.

03:47PM 25     Q.   ALL RIGHT.  AND WHEN YOU SAY "TRANSCRIBE THEM," THE NOTES

03:47PM  1    ARE IN THIS SHORTHAND; RIGHT?

03:47PM  2    A.   YEAH.  PUT THEM INTO ENGLISH WORDS.

03:47PM  3    Q.   ALL RIGHT.  SO WHAT ENDS UP IN YOUR COMPUTER, I TAKE IT,

03:47PM  4    IS NOT A VERBATIM RECITATION OF WHAT WAS SAID.

03:47PM  5         IS THAT FAIR?

03:47PM  6    A.   IT IS SUPPOSED TO BE A VERBATIM RECITATION OF WHAT HOLMES

03:47PM  7    SAID.

03:47PM  8    Q.   LIKE A TRANSCRIPT, IN OTHER WORDS?

03:47PM  9    A.   WELL, AS BEST I CAN DO.

03:47PM  10   Q.   ALL RIGHT.

03:47PM  11   A.   YEAH, I MEAN, I'M NOT, I'M NOT A, YOU KNOW, A SKILLED

03:47PM  12   COURT REPORTER.  I DO THE BEST I CAN WITH MY, YOU KNOW, MY

03:48PM  13   SHORTHAND -- MY SPEED WRITING.

03:48PM  14   Q.   ALL RIGHT.  SO AT THAT POINT WE HAVE A DOCUMENT ON YOUR

03:48PM  15   COMPUTER AND WE ALSO HAVE HANDWRITTEN NOTES; RIGHT?

03:48PM  16   A.   YEAH.

03:48PM  17   Q.   ALL RIGHT.  SO WHAT DO YOU DO THEN WITH THE HANDWRITTEN

03:48PM  18   NOTES?

03:48PM  19   A.   AFTER 12 MONTHS, I THROW THEM OUT IN ACCORDANCE WITH

03:48PM  20   "FORTUNE"'S POLICY.

03:48PM  21        AT SOME POINT -- IT MIGHT BE 14 MONTHS.  AT SOME POINT IT

03:48PM  22   CHANGED FROM 12 TO 14 OR 14 TO 12.  I CAN'T REMEMBER NOW.

03:48PM  23        BUT YOU WERE SUPPOSED TO THROW THEM OUT, AND YOU SORT OF

03:48PM  24   HAD TO BECAUSE THERE WAS JUST NO SPACE TO KEEP ALL OF THESE

03:48PM  25   NOTES.  IT WASN'T JUST ONE, ONE ARTICLE.  IT WAS ALL --

03:48PM  1    EVERYTHING YOU WERE WORKING ON.

03:48PM  2    Q.   ALL RIGHT.  SO THE, THE SHORT OF IT IS, THE HANDWRITTEN

03:48PM  3    NOTES THAT YOU TOOK DURING YOUR CONVERSATION WITH MS. HOLMES

03:49PM  4    ARE DESTROYED?

03:49PM  5    A.   THEY'RE THROWN OUT, YEAH.

03:49PM  6    Q.   ALL RIGHT.  AND WHAT WE HAVE LEFT IS THE COMPUTER DOCUMENT

03:49PM  7    THAT YOU HAVE PRODUCED?

03:49PM  8    A.   THAT'S RIGHT.

03:49PM  9    Q.   NOW, THE SET OF -- THE COMPUTER DOCUMENT THAT WE HAVE

03:49PM  10   RECEIVED THAT REFLECTS YOUR CONVERSATIONS WITH MS. HOLMES -- BY

03:49PM  11   THE WAY, IT'S AT TAB 1646 IN YOUR BOOK.  YOU DON'T NEED TO LOOK

03:49PM  12   AT THIS NOW, BUT IF YOU NEED TO, THAT'S WHERE YOU CAN FIND IT.

03:49PM  13   ALL RIGHT?

03:49PM  14       THAT DOCUMENT INCLUDES BOTH RECORDED AND UNRECORDED CALLS;

03:49PM  15   RIGHT?

03:49PM  16   A.   YES.

03:49PM  17   Q.   ALL RIGHT.  AND TELL US HOW YOU CREATED THAT DOCUMENT AS

03:49PM  18   YOU WERE GOING ALONG?  IN OTHER WORDS, DID YOU KEEP IT UP TO

03:50PM  19   DATE?  DID YOU DO IT IN SEQUENCE?

03:50PM  20   A.   UM, YES.  I LIKE TO BE ABLE TO DO A KEY WORD SEARCH OF ALL

03:50PM  21   OF MY CONVERSATIONS WITH ONE PERSON RATHER THAN GOING INTO

03:50PM  22   DIFFERENT FILES.

03:50PM  23       SO I TRIED TO ADD EACH NEW CONVERSATION ON TOP OF -- I

03:50PM  24   MEAN, AFTER THE PREVIOUS ONE.  IT GETS -- YEAH.

03:50PM  25   Q.   WOULD YOU SOMETIMES GO BACK AND FILL THINGS IN THAT YOU

03:50PM 1    HAD NOT TRANSCRIBED?

03:50PM 2    A.   WELL, WHAT I WOULD SOMETIMES DO IS THAT I WOULD TRANSCRIBE

03:51PM 3    MY SPEED WRITING NOTES, AND IF I HAD THE TAPE, TOO, THEN LATER

03:51PM 4    I WOULD GO BACK AND FILL IN THE -- AND MAKE IT MORE ACCURATE

03:51PM 5    WITH THE TAPE RECORDER.

03:51PM 6    Q.   ALL RIGHT.  BUT, OF COURSE, IF YOU DIDN'T HAVE A

03:51PM 7    RECORDING, YOU WEREN'T ABLE TO MAKE IT MORE ACCURATE?

03:51PM 8    A.   RIGHT.

03:51PM 9    Q.   ALL RIGHT.  I WANT TO TURN NOW TO A SPECIFIC CONVERSATION

03:51PM 10   THAT YOU TESTIFIED ABOUT ON DIRECT.

03:51PM 11   A.   YES.

03:51PM 12   Q.   YOU TESTIFIED ON DIRECT THAT YOU ASKED MS. HOLMES AT ONE

03:51PM 13   POINT ABOUT THERANOS'S USE OF SIEMENS MACHINES.

03:51PM 14      DO YOU REMEMBER THAT?

03:51PM 15   A.   YES.

03:51PM 16   Q.   AND YOU TESTIFIED, I THINK, THAT THIS HAPPENED IN A

03:51PM 17   TELEPHONE CONVERSATION ON MAY 14TH, 2014?

03:51PM 18   A.   YES.

03:51PM 19   Q.   AND YOU TESTIFIED THAT YOU ASKED MS. HOLMES QUESTIONS TO

03:51PM 20   THE EFFECT OF YOU DON'T KEEP A SPARE SIEMENS ANALYZER FOR

03:52PM 21   OVERFLOW, AND NOT A MATTER OF WE CAN'T DO SUCH AND SUCH A TEST

03:52PM 22   ON OUR PLATFORM, SO WE'LL NEED TO DO THAT ON SIEMENS ANALYZERS;

03:52PM 23   RIGHT?

03:52PM 24   A.   RIGHT.

03:52PM 25   Q.   AND THOSE WERE LEADING QUESTIONS; RIGHT?

03:52PM  1          A LEADING QUESTION -- AND I KNOW YOU KNOW THIS, BUT I'M

03:52PM  2   GOING TO EXPLAIN IT FOR THE RECORD -- IS A QUESTION THAT

03:52PM  3   SUGGESTS THE ANSWER THAT YOU'RE LOOKING FOR; RIGHT.

03:52PM  4   A.   YEAH.

03:52PM  5   Q.   LIKE THE QUESTION THAT I JUST ASKED YOU?

03:52PM  6   A.   IT WAS -- YEAH.  YEAH.  IT WAS PHRASED THAT WAY NOT FOR

03:52PM  7   THE REASONS THAT YOU'RE PHRASING YOUR QUESTIONS THAT WAY.

03:52PM  8   Q.   WHY AM I PHRASING MY QUESTIONS THAT WAY?

03:52PM  9   A.   SO I WON'T GO OFF ON A TANGENT.

03:52PM 10          I WOULD HAVE BEEN HAPPY TO HEAR HER GO OFF ON, YOU KNOW,

03:52PM 11   GIVE ME -- SHE WAS, SHE WAS FREE TO -- YOU KNOW, IF THE ANSWER

03:52PM 12   WAS, WAS, OH, YEAH, WE DO, I WOULD HAVE BEEN HAPPY TO HAVE 30

03:53PM 13   MORE QUESTIONS, OH, YOU DO?

03:53PM 14   Q.   MR. PARLOFF, LET ME STOP YOU.

03:53PM 15          I'M GOING TO MOVE TO STRIKE.

03:53PM 16              THE COURT:  WELL, THAT IS WHAT HAPPENS.

03:53PM 17          (LAUGHTER.)

03:53PM 18              MR. CLINE:  YOU KNOW, YOU ALWAYS ASK LEADING

03:53PM 19   QUESTIONS, RIGHT.

03:53PM 20              MR. BOSTIC:  I WAS --

03:53PM 21              THE COURT:  I'LL ALLOW THE ANSWER.  YOU CAN ASK

03:53PM 22   ANOTHER QUESTION.

03:53PM 23              MR. CLINE:  ALL RIGHT.

03:53PM 24   Q.   THE TWO QUESTIONS THAT YOU PUT TO MS. HOLMES WERE LEADING

03:53PM 25   QUESTIONS; RIGHT?

03:53PM 1    A.   YES, BUT ONLY BECAUSE I, I DIDN'T WANT TO -- I THOUGHT IT

03:53PM 2    WAS ALREADY OBVIOUS AND I DIDN'T WANT TO OFFEND HER.

03:53PM 3         I WOULD SAY, LOOK, YOU'RE NOT SAYING THIS, ARE YOU?  I

03:53PM 4    JUST WANT TO BE CLEAR.

03:53PM 5    Q.   ALL RIGHT.

03:53PM 6    A.   I WAS NOT, YOU KNOW -- I JUST -- I THOUGHT IT WAS ALREADY

03:53PM 7    OBVIOUS, BUT I DIDN'T WANT TO LET SOMETHING LIKE THAT SLIP BY.

03:53PM 8    Q.   OKAY.  AND HER ANSWERS, I THINK YOU TESTIFIED, WERE A

03:53PM 9    VERBAL AGREEMENT, SUCH AS UH-HUH?

03:54PM 10   A.   UH-HUH.

03:54PM 11   Q.   LIKE THAT?

03:54PM 12   A.   UH-HUH, MEANING CORRECT.

03:54PM 13   Q.   SO I'M GOING TO ASK YOU SOME MORE QUESTIONS ABOUT THIS,

03:54PM 14   BUT I THINK FOR SHORTHAND, I WANT TO REFER TO THIS AS THE

03:54PM 15   SIEMENS CONVERSATION.

03:54PM 16   A.   OKAY.

03:54PM 17   Q.   OKAY.  AND AGAIN, THERE'S NO RECORDING OF THIS; RIGHT?

03:54PM 18   A.   RIGHT.

03:54PM 19   Q.   AND NO HANDWRITTEN NOTE OF THIS?

03:54PM 20   A.   NOT ANYMORE.

03:54PM 21   Q.   THE RECORD IS YOUR COMPUTER FILE; RIGHT?

03:54PM 22   A.   YES.

03:54PM 23   Q.   AND DOES THAT STILL EXIST, BY THE WAY?

03:54PM 24   A.   YES.

03:54PM 25   Q.   ALL RIGHT.  SO TAKE A LOOK AT 1646 IN YOUR BOOK, OR TAB

03:54PM   1    1646, AND GO TO PAGE 85 DOWN AT THE BOTTOM OF THE PAGE.

03:55PM   2    A.   OH.  SORRY.

03:55PM   3         THERE'S TWO -- THE PAGE NUMBERS OF THE TRIAL EXHIBIT,

03:55PM   4    THERE'S TWO SETS OF PAGE NUMBERS.

03:55PM   5              MR. CLINE:  MAY I APPROACH?

03:55PM   6              THE COURT:  YES.

03:55PM   7              MR. CLINE:  LET ME SHOW YOU WHAT I'M LOOKING AT

03:55PM   8    (INDICATING).

03:55PM   9              THE WITNESS:  OKAY.

03:55PM  10    BY MR. CLINE:

03:55PM  11    Q.   NOW, ARE YOU WITH ME ON PAGE 85?

03:55PM  12    A.   YES.

03:55PM  13    Q.   AND DO YOU SEE THAT THE -- WHAT I'VE CALLED THE SIEMENS

03:56PM  14    CONVERSATION COVERS ABOUT FOUR LINES THERE, MAYBE A THIRD OF

03:56PM  15    THE WAY DOWN THE PAGE?

03:56PM  16    A.   YES.

03:56PM  17    Q.   ALL RIGHT.

03:56PM  18         NOW, THE "FORTUNE" ARTICLE WAS PUBLISHED IN JUNE OF 2014?

03:56PM  19    A.   YES.

03:56PM  20    Q.   ALL RIGHT.  AND I WANT TO FAST FORWARD NOW TO

03:56PM  21    OCTOBER 2015, ABOUT 16 MONTHS OR SO LATER.

03:56PM  22    A.   YES.

03:56PM  23    Q.   I THINK YOU WERE ASKED ON DIRECT ABOUT "THE

03:56PM  24    WALL STREET JOURNAL" ARTICLE THAT CAME OUT.

03:56PM  25    A.   YEAH.

03:56PM  1    Q.   AND THAT WAS OCTOBER 15TH, 2015; RIGHT?

03:56PM  2    A.   RIGHT.

03:56PM  3    Q.   AND YOU READ IT IMMEDIATELY WHEN IT CAME OUT; RIGHT?

03:56PM  4    A.   YES.

03:56PM  5    Q.   AND ONE OF THE ISSUES THAT "THE WALL STREET JOURNAL"

03:57PM  6    ARTICLE RAISED, I DON'T WANT TO GET INTO THE SUBSTANCE, BUT ONE

03:57PM  7    OF THE ISSUES INVOLVED THE USE OF SIEMENS ANALYZERS; RIGHT?

03:57PM  8    A.   UM, YES.

03:57PM  9    Q.   AND, IN FACT, YOU, YOU WROTE AN ARTICLE YOURSELF THAT

03:57PM  10   AFTERNOON SORT OF HIGHLIGHTING SOME OF THE KEY POINTS IN "THE

03:57PM  11   WALL STREET JOURNAL" ARTICLE; RIGHT?

03:57PM  12   A.   YEAH.

03:57PM  13   Q.   AND THE FIRST KEY POINT THAT YOU NOTED INVOLVED SIEMENS

03:57PM  14   ANALYZERS; RIGHT?

03:57PM  15   A.   YEAH.

03:57PM  16   Q.   OKAY.  AND WHEN YOU READ "THE WALL STREET JOURNAL"

03:57PM  17   ARTICLE, YOU BEGAN RECONSTRUCTING YOUR INTERACTIONS WITH

03:57PM  18   MS. HOLMES LEADING UP TO YOUR JUNE 2014 ARTICLE.

03:57PM  19        IS THAT FAIR?

03:57PM  20   A.   I DID TRY TO FIGURE OUT WHAT HAD HAPPENED.

03:57PM  21   Q.   RIGHT.  AND IN THE COURSE OF THAT RECONSTRUCTION, YOU READ

03:57PM  22   THROUGH YOUR COMPUTER DOCUMENT; RIGHT?

03:57PM  23   A.   I DIDN'T AT THAT TIME.

03:57PM  24   Q.   DIDN'T YOU GO THROUGH YOUR COMPUTER DOCUMENT AND ACTUALLY

03:58PM  25   BOLD CERTAIN THINGS THAT YOU THOUGHT MIGHT BE IMPORTANT?

PARLOFF CROSS BY MR. CLINE

03:58PM 1    A.   I BOLDED CERTAIN THINGS -- WELL, I BOLDED CERTAIN THINGS

03:58PM 2    AS I WAS WRITING BECAUSE I THOUGHT THIS WOULD BE A GOOD QUOTE

03:58PM 3    AND SO ON.

03:58PM 4         WHAT I DID AFTER -- AT SOME POINT EVENTUALLY AFTER "THE

03:58PM 5    WALL STREET JOURNAL" ARTICLES CAME OUT IS THAT I DID KEY WORD

03:58PM 6    SEARCHES.  I LOOKED FOR CERTAIN WORDS AND NUMBERS TO TRY TO

03:58PM 7    FIGURE OUT WHAT HAD HAPPENED.

03:58PM 8         AND I ALSO BOLD FACED AT THAT POINT SOME PASSAGES THAT I

03:58PM 9    FOUND.

03:58PM 10   Q.   ALL RIGHT.  AND I WANT TO NOW FAST FORWARD AGAIN UNTIL

03:59PM 11   YOUR FIRST INTERACTION WITH THE GOVERNMENT.

03:59PM 12        SO NOW THIS IS THE END OF 2015 AND NOW WE'RE FAST

03:59PM 13   FORWARDING TO APRIL OF 2018; RIGHT?

03:59PM 14   A.   YEAH.  YES.

03:59PM 15   Q.   AND IN EARLY APRIL OF 2018 YOU GOT A CALL FROM THE U.S.

03:59PM 16   ATTORNEY'S OFFICE HERE IN SAN FRANCISCO; RIGHT?

03:59PM 17   A.   YES.

03:59PM 18   Q.   AND WAS THAT MR. BOSTIC WHO CALLED YOU?

03:59PM 19   A.   NO.

03:59PM 20   Q.   SOMEONE FROM THE OFFICE CALLED YOU?

03:59PM 21   A.   YES.

03:59PM 22   Q.   AND TOLD YOU THAT THEY WERE INVESTIGATING MS. HOLMES AND

03:59PM 23   THERANOS; RIGHT?

03:59PM 24   A.   YES.

03:59PM 25   Q.   AND YOU AGREED TO MEET WITH THE GOVERNMENT; RIGHT?

03:59PM  1      A.   YES.

03:59PM  2      Q.   AND AT SOME POINT AROUND THE TIME OF THAT MEETING, YOU GOT

03:59PM  3      A GRAND JURY SUBPOENA FOR DOCUMENTS; RIGHT?

03:59PM  4      A.   OH.  I -- THAT WAS WRITTEN AT THE MEETING AFTER I TURNED

04:00PM  5      OVER THE DOCUMENTS.

04:00PM  6           I, I WAS NOT REPRESENTED BY COUNSEL.  I WAS -- I WAS

04:00PM  7      WILLING TO TURN OVER THE -- MY TAPES AND NOTES OF INTERVIEWS

04:00PM  8      WITH ELIZABETH AND WITH THE CODEFENDANT, BUT NOT OTHER BY AND

04:00PM  9      LARGE -- NOT OTHER ITEMS, NOT OTHER, NOT OTHER FILES.

04:01PM  10          AND I WAS TRYING TO PROTECT THEM.  AND I ASKED --

04:01PM  11     BASICALLY I WAS SAYING IF YOU WILL SUBPOENA THESE DOCUMENTS, I

04:01PM  12     WILL NOT PROTEST THEM.

04:01PM  13     Q.   ALL RIGHT.

04:01PM  14     A.   AND SO THEY WENT AFTER THE FACT AND TRIED TO SUBPOENA THE

04:01PM  15     DOCUMENTS THAT I WAS WILLING TO TURN OVER.

04:01PM  16     Q.   ALL RIGHT.  SO ONE OF THE DOCUMENTS THAT YOU'VE PRODUCED

04:01PM  17     IN THAT PROCESS WAS THE COMPUTER DOCUMENT WITH THE NOTES OF

04:01PM  18     YOUR INTERVIEWS, OR INTERACTIONS WITH MS. HOLMES; RIGHT?

04:01PM  19     A.   YEAH.

04:01PM  20     Q.   NOW, THAT FIRST MEETING WITH THE GOVERNMENT WAS APRIL 12TH

04:01PM  21     OF 2018.

04:01PM  22          DO YOU REMEMBER THAT?

04:01PM  23     A.   THAT COULD BE.

04:01PM  24     Q.   AND THAT WAS IN NEW YORK?

04:01PM  25     A.   YES.

04:01PM  1    Q.   AND MR. BOSTIC WAS THERE; RIGHT?

04:01PM  2    A.   YES.

04:01PM  3    Q.   AND AN FBI AGENT WAS THERE; RIGHT?

04:01PM  4    A.   YES.

04:01PM  5    Q.   AND THEY, THEY -- YOU GAVE THEM THE COMPUTER DOCUMENT;

04:02PM  6    RIGHT?

04:02PM  7    A.   YES.

04:02PM  8    Q.   AND THEY, THEY ASKED YOU IN THAT MEETING ABOUT THE, THE

04:02PM  9    PORTION, THE FOUR LINES CONTAINING THE SIEMENS CONVERSATION;

04:02PM  10   RIGHT?

04:02PM  11   A.   WELL, I DON'T -- NO, THEY DIDN'T READ ANYTHING.  I, I

04:02PM  12   ALSO, I HIGHLIGHTED CERTAIN THINGS FOR THEM THAT I THOUGHT

04:02PM  13   MIGHT BE RELEVANT.

04:02PM  14          MR. CLINE:  MAY I APPROACH, YOUR HONOR?

04:02PM  15          THE COURT:  YES.

04:02PM  16          THE WITNESS:  SO I THINK I READ THEM THAT -- OR,

04:02PM  17   YEAH, I THINK I READ THEM THAT.

04:02PM  18   BY MR. CLINE:

04:02PM  19   Q.   I'M SORRY.  YOU THINK YOU DID WHAT?

04:02PM  20   A.   I THINK I READ THEM THAT PORTION OF MY NOTES.

04:03PM  21   Q.   ALL RIGHT.  SO YOU READ IT TO THEM AND THEY ASKED YOU

04:03PM  22   ABOUT THEM; RIGHT?

04:03PM  23   A.   YEAH.

04:03PM  24   Q.   AND YOU TOLD THEM THAT BACK IN LATE 2015 YOU HAD FORGOTTEN

04:03PM  25   ABOUT THAT EXCHANGE; RIGHT?

04:03PM   1    A.    THAT'S RIGHT.

04:03PM   2    Q.    AND YOU SAID THAT YOU HAD ONLY RECALLED THAT EXCHANGE IN

04:03PM   3    FEBRUARY OF 2018; RIGHT?

04:03PM   4    A.    THAT COULD BE.

04:03PM   5    Q.    WOULD IT HELP YOU TO TAKE A LOOK AT THE MEMORANDUM OF THE

04:03PM   6    INTERVIEW?

04:03PM   7    A.    OKAY.

04:03PM   8           MR. CLINE:  MAY I APPROACH?

04:03PM   9           THE COURT:  YES.

04:03PM  10    BY MR. CLINE:

04:03PM  11    Q.    (HANDING.)

04:04PM  12    A.    UM, I, I --

04:04PM  13           THE COURT:  WAIT FOR HIS QUESTION.  HE'LL ASK YOU

04:04PM  14    ANOTHER QUESTION.

04:04PM  15           THE WITNESS:  OKAY.

04:04PM  16    BY MR. CLINE:

04:04PM  17    Q.    SO MY QUESTION IS ONLY THIS:  DID YOU TELL THE GOVERNMENT,

04:04PM  18    MR. BOSTIC AND AGENT SCUSSEL WHO WAS THERE, THAT YOU RECALLED

04:04PM  19    THE INTERACTION WITH MS. HOLMES IN FEBRUARY OF 2018?

04:04PM  20    A.    I'M SURPRISED TO READ THAT, BECAUSE I THOUGHT I LEARNED IT

04:04PM  21    A FEW MONTHS -- A COUPLE MONTHS EARLIER, LIKE IN AROUND -- IT

04:04PM  22    WAS LATE 2017 WHEN I WAS GOING THROUGH THE NOTES AND STUMBLED

04:04PM  23    ACROSS IT.

04:04PM  24    Q.    ALL RIGHT.  BUT YOU DON'T HAVE ANY REASON TO DOUBT THAT

04:04PM  25    THAT'S WHAT YOU TOLD THEM; CORRECT?

04:04PM  1      A.   NO.

04:04PM  2               THE COURT:  MR. CLINE, DO YOU HAVE ADDITIONAL

04:04PM  3      QUESTIONS?

04:04PM  4               MR. CLINE:  I HAVE A FEW, YES.

04:04PM  5          SHOULD WE CALL IT A DAY?

04:04PM  6               THE COURT:  I'VE TOLD THE JURY THAT WE WOULD END AT

04:05PM  7      4:00 O'CLOCK AND IT'S A LITTLE PAST 4:00 NOW.

04:05PM  8          LADIES AND GENTLEMEN, WE'LL TAKE OUR EVENING RECESS NOW.

04:05PM  9      WE'LL RESUME AT 9:00 O'CLOCK TOMORROW MORNING, PLEASE,

04:05PM  10     9:00 O'CLOCK TOMORROW MORNING.

04:05PM  11         PLEASE REMEMBER THE ADMONISHMENT.  DO NOT READ, DO ANY

04:05PM  12     INVESTIGATION, LISTEN TO OR TALK TO ANYONE ABOUT THIS CASE OR

04:05PM  13     ANYTHING TO DO WITH IT.

04:05PM  14         HAVE A GOOD EVENING.  WE'LL SEE YOU TOMORROW MORNING.

04:05PM  15         YOU CAN STAND DOWN, SIR.

04:05PM  16              THE WITNESS:  OH.  DO I JUST LEAVE THESE

04:05PM  17     (INDICATING)?

04:05PM  18              THE COURT:  YEAH, JUST LEAVE THEM THERE.

04:05PM  19         (JURY OUT AT 4:05 P.M.)

04:05PM  20              THE COURT:  THANK YOU.  PLEASE BE SEATED.

04:05PM  21         THE RECORD SHOULD REFLECT THAT THE JURY HAS LEFT THE ROOM.

04:05PM  22         YOU CAN STAND DOWN, SIR.

04:05PM  23         BEFORE WE BREAK, MR. CLINE, IN REGARDS TO ANY OTHER ISSUE

04:05PM  24     REGARDING MR. PARLOFF OR ANY PRIVILEGE OR ISSUE, I WOULD

04:06PM  25     ENCOURAGE YOU TO SPEAK WITH HIS ATTORNEY, MR. PARLOFF'S COUNSEL

04:06PM 1       TODAY, NOW, OR ANY TIME PRIOR TO YOUR RESUMPTION OF YOUR

04:06PM 2       EXAMINATION.

04:06PM 3            THAT MIGHT BE HELPFUL.

04:06PM 4                MR. CLINE:  I THINK I'M PROBABLY DONE WITH THAT

04:06PM 5       AREA, THE AREAS THAT WOULD IMPLICATE THAT.  BUT I'LL THINK

04:06PM 6       ABOUT THAT, AND I'VE GOT MR. KOLTUN'S NUMBER AND I'LL GIVE HIM

04:06PM 7       A CALL IF NECESSARY.

04:06PM 8                THE COURT:  ALL RIGHT.  THANK YOU.

04:06PM 9            DO YOU ANTICIPATE THAT WE'LL HAVE NEED TO DISCUSS ANYTHING

04:06PM 10      ON THIS TOPIC WITH THIS WITNESS OUTSIDE OF THE PRESENCE OF THE

04:06PM 11      JURY?

04:06PM 12               MR. CLINE:  I DON'T THINK SO.

04:06PM 13               THE COURT:  YOU THINK ALL OF THAT HAS BEEN RESOLVED

04:06PM 14      YOU BELIEVE?

04:06PM 15               MR. CLINE:  I THINK SO.

04:06PM 16               THE COURT:  ALL RIGHT.  GREAT.

04:06PM 17           ANYTHING ELSE BEFORE WE BREAK?

04:06PM 18               MR. SCHENK:  YOUR HONOR, JUST ONE ISSUE.

04:06PM 19           IF THE DEFENSE DECIDES TO PUT ON A CASE, WE RAISED WITH

04:06PM 20      THE COURT A WEEK OR A WEEK AND A HALF AGO THE QUESTION OF

04:06PM 21      JENCKS.

04:06PM 22           MY RECOLLECTION IS THAT ON THE THIRD DAY OF THE MOTION IN

04:06PM 23      LIMINE HEARING, THE COURT FOUND MOOT, OR FOUND UNNECESSARY TO

04:07PM 24      RULE ON THE GOVERNMENT'S REQUEST BECAUSE THAT MORNING, OR MAYBE

04:07PM 25      THE DAY PRIOR, I DON'T RECALL, THE DEFENSE PROVIDED SOME JENCKS

7011

04:07PM  1    TO THE GOVERNMENT.

04:07PM  2         I WANT TO ASK THE COURT TO ACTUALLY ISSUE AN ORDER TO SAY

04:07PM  3    THAT THE DEFENSE MUST PROVIDE JENCKS TO US.  WE HAVE RECEIVED

04:07PM  4    VERY LITTLE.  IT MIGHT BE EVERYTHING, BUT I WANT TO MAKE SURE

04:07PM  5    THAT THE DEFENSE IS ON NOTICE THAT THEY HAVE THAT JENCKS

04:07PM  6    OBLIGATION.

04:07PM  7         THE COURT:  ALL RIGHT.  THANK YOU.

04:07PM  8         WELL, LET ME, LET ME JUST REAFFIRM THE COURT'S PREVIOUS

04:07PM  9    ORDER REGARDING JENCKS MATERIAL.

04:07PM  10        IT, IT REMAINS IN EFFECT AND IN PLACE, AND I'LL ASK THE

04:07PM  11   DEFENSE TO PLEASE REVIEW YOUR DOCUMENTS, YOUR FILES, EVERYTHING

04:07PM  12   THAT YOU HAVE, AND TO PLEASE DISCLOSE ANY JENCKS MATERIAL THAT

04:07PM  13   YOU THINK IS APPROPRIATE, UNDERSTANDING THE LAW THAT YOU'RE

04:07PM  14   REQUIRED TO PROVIDE.  I WOULD ASK YOU TO DO THAT OVERNIGHT.

04:07PM  15        IF YOU CAN LOOK AT YOUR FILES AND SEE WHERE THAT IS, AND

04:07PM  16   AT LEAST CONTACT THE GOVERNMENT AND LET THEM KNOW WHAT YOU WISH

04:08PM  17   TO PROVIDE AND WHAT YOU'RE GOING TO PROVIDE, OR WHETHER YOU

04:08PM  18   HAVE NOTHING TO PROVIDE.  JUST LET THEM KNOW WHERE YOU ARE AT.

04:08PM  19        MR. DOWNEY.

04:08PM  20        MR. DOWNEY:  YOUR HONOR, I JUST WANTED TO SAY FOR

04:08PM  21   THE COURT'S ASSURANCE, THAT EXERCISE HAS ALREADY BEEN

04:08PM  22   UNDERTAKEN, AND WHAT WE HAVE AFTER REVIEW OF THE ELECTRONIC

04:08PM  23   FILES AND OTHER FILES HAS BEEN PROVIDED TO THE GOVERNMENT.

04:08PM  24        THE COURT:  OKAY.

04:08PM  25        MR. SCHENK:  THANK YOU VERY MUCH.

7012

```
04:08PM   1              THE COURT:  ALL RIGHT.  THANK YOU.  HAVE A GOOD

04:08PM   2    EVENING.  WE'LL SEE YOU TOMORROW.

04:08PM   3              THERE'S NO NEED FOR AN 8:00 O'CLOCK MEETING THEN TOMORROW,

04:08PM   4    IS THERE?

04:08PM   5              MR. LEACH:  YOUR HONOR, I APOLOGIZE TO DO THIS

04:08PM   6    PIECEMEAL.  I DON'T THINK WE NEED TO MEET AT 8:00, BUT I DO

04:08PM   7    ANTICIPATE, IF THE DEFENSE BEGINS ITS CASE TOMORROW, THEIR

04:08PM   8    FIRST WITNESS, AS I UNDERSTAND IT, IS A PARALEGAL FROM THE

04:08PM   9    WILLIAMS & CONNOLLY LAW FIRM WHO IS GOING TO SERVE AS A SUMMARY

04:08PM  10    WITNESS.

04:08PM  11              LAST NIGHT WE WERE PROVIDED FOR THE FIRST TIME SOME

04:08PM  12    SUMMARY EXHIBITS.  WE'RE STILL GOING THROUGH THEM.  BUT I THINK

04:09PM  13    THERE ARE AT LEAST ONE OR TWO WHERE WE MIGHT HAVE AN ISSUE THAT

04:09PM  14    WE WOULD LIKE TO RAISE WITH THE COURT.

04:09PM  15              THE COURT:  SURE.

04:09PM  16              MR. LEACH:  I DON'T THINK WE NEED TO MEET AT 8:00

04:09PM  17    FOR THAT, BUT IF WE CAN MEET AT 8:30, THE GOVERNMENT WOULD

04:09PM  18    APPRECIATE IT.

04:09PM  19              THE COURT:  WELL, THAT'S FINE.  I'M HERE.  LET ME

04:09PM  20    KNOW.  JUST GIVE ME AN ALERT AND LET ME KNOW WHAT YOU NEED.

04:09PM  21              MR. LEACH:  ALL RIGHT.  THANK YOU.

04:09PM  22              THE COURT:  ALL RIGHT.  THANKS.  HAVE A GOOD

04:09PM  23    EVENING.

04:09PM  24              MR. DOWNEY:  THANK YOU.

04:09PM  25              MR. LEACH:  THANK YOU.
```

04:09PM  1                    THE CLERK:   COURT IS ADJOURNED.

04:09PM  2                (COURT ADJOURNED AT 4:09 P.M.)

         3

         4

         5

         6

         7

         8

         9

        10

        11

        12

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

1

2

3                          CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8     UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9     CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10    HEREBY CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16    _____
      IRENE RODRIGUEZ, CSR, CRR
      CERTIFICATE NUMBER 8076
17

18
      _____
19    LEE-ANNE SHORTRIDGE, CSR, CRR
      CERTIFICATE NUMBER 9595
20

21         DATED:  NOVEMBER 18, 2021

22

23

24

25