1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                        SAN JOSE DIVISION

5

    UNITED STATES OF AMERICA,        )   CR-18-00258-EJD
6                                     )
                    PLAINTIFF,        )   SAN JOSE, CALIFORNIA
7                                     )
              VS.                     )   VOLUME 39
8                                     )
    ELIZABETH A. HOLMES,             )   NOVEMBER 29, 2021
9                                     )
                    DEFENDANT.        )   PAGES 7682 - 7921
10   _____  )

11

12                TRANSCRIPT OF TRIAL PROCEEDINGS
              BEFORE THE HONORABLE EDWARD J. DAVILA
13                UNITED STATES DISTRICT JUDGE

    A P P E A R A N C E S:
14

15   FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                           BY:  JOHN C. BOSTIC
16                              JEFFREY B. SCHENK
                           150 ALMADEN BOULEVARD, SUITE 900
17                         SAN JOSE, CALIFORNIA 95113

                           BY:  ROBERT S. LEACH
18                              KELLY VOLKAR
                           1301 CLAY STREET, SUITE 340S
19                         OAKLAND, CALIFORNIA 94612

20        (APPEARANCES CONTINUED ON THE NEXT PAGE.)

21

    OFFICIAL COURT REPORTERS:
22                            IRENE L. RODRIGUEZ, CSR, RMR, CRR
                              CERTIFICATE NUMBER 8074
23                            LEE-ANNE SHORTRIDGE, CSR, CRR
                              CERTIFICATE NUMBER 9595
24
         PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25            TRANSCRIPT PRODUCED WITH COMPUTER

7683

```
 1        A P P E A R A N C E S: (CONT'D)

 2

 3     FOR DEFENDANT HOLMES:   WILLIAMS & CONNOLLY LLP
                               BY:  KEVIN M. DOWNEY
 4                                  LANCE A. WADE
                                    KATHERINE TREFZ
 5                                  AMY SAHARIA
                                    ANDREW LEMENS
 6                                  SEEMA ROPER
                                    J.R. FLEURMONT
 7                                  RICHARD CLEARY
                                    PATRICK LOOBY
 8                             725 TWELFTH STREET, N.W.
                               WASHINGTON, D.C. 20005
 9
                               LAW OFFICE OF JOHN D. CLINE
10                             BY:  JOHN D. CLINE
                               ONE EMBARCADERO CENTER, SUITE 500
11                             SAN FRANCISCO, CALIFORNIA 94111

12

13     ALSO PRESENT:           FEDERAL BUREAU OF INVESTIGATION
                               BY:  ADELAIDA HERNANDEZ

14                             OFFICE OF THE U.S. ATTORNEY
                               BY:  LAKISHA HOLLIMAN, PARALEGAL
15                                  MADDI WACHS, PARALEGAL

16                             WILLIAMS & CONNOLLY
                               BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL
17
                               TBC
18                             BY:  BRIAN BENNETT, TECHNICIAN

19

20

21

22

23

24

25
```

1

2
<u>INDEX OF PROCEEDINGS</u>

3
DEFENDANT'S:

4
**ELIZABETH HOLMES**

5
DIRECT EXAM BY MR. DOWNEY (RES.)          P. 7758

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXHIBITS

```
                                        IDENT.      EVIDENCE

     GOVERNMENT'S:


     5387E                                            7835
     5387F                                            7861



     DEFENDANT'S:

     7469                                             7759
     7514                                             7762
     7623                                             7764
     13862 AND 13863                                  7766
     14207                                            7767
     14208                                            7768
     7129                                             7782
     7228                                             7799
     7282                                             7810
     7363                                             7812
     7368                                             7814
     7421                                             7823
     7434                                             7828
     1667                                             7830
     7734                                             7852
     7731                                             7857
     7534                                             7869
     7517                                             7873
     13288                                            7887
     10677                                            7896
     7673A, PAGE 52                                   7897
     7680                                             7899
     7719, LIMITED PURPOSE                            7903
     7718, LIMITED PURPOSE                            7904
     7695, LIMITED PURPOSE                            7906
     7717, LIMITED PURPOSE                            7908
     15027                                            7910
     15035                                            7916
```

|     |     |
| --- | --- |
| | 1 |  SAN JOSE, CALIFORNIA                    NOVEMBER 29, 2021 |

```
            1    SAN JOSE, CALIFORNIA                    NOVEMBER 29, 2021

09:04AM     2                    P R O C E E D I N G S

09:04AM     3         (COURT CONVENED AT 9:04 A.M.)

09:04AM     4         (JURY OUT AT 9:04 A.M.)

09:04AM     5             THE COURT:  I HOPE EVERYONE HAD A GOOD HOLIDAY.

09:04AM     6    WELCOME BACK.

09:04AM     7         WE'RE ON THE RECORD IN THE HOLMES MATTER.  ALL COUNSEL ARE

09:04AM     8    PRESENT.  MS. HOLMES IS PRESENT.

09:04AM     9         WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.

09:04AM    10         WE'RE HERE TO TAKE UP A COUPLE OF MATTERS REGARDING

09:04AM    11    FILINGS.

09:04AM    12         LET ME FIRST INDICATE, PROBABLY COUNSEL ARE AWARE, THAT

09:04AM    13    WE'RE HAVING ANOTHER TECHNICAL PROBLEM TODAY.  I'M INFORMED

09:05AM    14    THAT THE JURY MONITORS ARE NOT OPERATIONAL AT THE MOMENT AND

09:05AM    15    THERE'S WORK BEING DONE BEHIND THE SCENES TO MAKE THOSE

09:05AM    16    AVAILABLE.

09:05AM    17         SO HOPEFULLY THAT WILL GET RESOLVED.

09:05AM    18         LET'S TAKE UP A COUPLE OF MATTERS THAT WERE FILED BY THE

09:05AM    19    DEFENSE LAST WEEK I BELIEVE.  AND THESE ARE DOCKET 1165, WHICH

09:05AM    20    IS MS. HOLMES'S RENEWED MOTION TO ADMIT EXHIBIT 14259, AND

09:05AM    21    DOCKET 1163, WHICH IS MS. HOLMES'S MOTION TO ADMIT PRIOR

09:05AM    22    TESTIMONY OF SUNNY BALWANI.

09:05AM    23         AND I HAVE READ 1166, WHICH IS THE GOVERNMENT'S OPPOSITION

09:05AM    24    TO ADMIT PRIOR TESTIMONY.

09:06AM    25         AND WE'LL TALK ABOUT THOSE THIS MORNING.
```

09:06AM   1        BEFORE WE MOVE INTO THOSE, ARE THERE ANY OTHER THRESHOLD

09:06AM   2    ISSUES THAT COUNSEL WANT TO RAISE ABOUT ANYTHING?  IF NOT,

09:06AM   3    WE'LL, WE'LL -- LET'S DISCUSS THESE THEN.

09:06AM   4        LET'S TAKE UP THE PRIOR TESTIMONY OF MR. BALWANI, WHICH IS

09:06AM   5    1163.  THAT ONE I HAVE OPPOSITION ON FROM THE GOVERNMENT.

09:06AM   6        GOOD MORNING.  AND WHO APPEARS TO ADVANCE THE MOTION ON

09:06AM   7    MS. HOLMES'S BEHALF?

09:06AM   8            MR. FLEURMONT:  GOOD MORNING, YOUR HONOR.

09:06AM   9    J.R. FLEURMONT ON BEHALF OF MS. HOLMES.  SHE IS PRESENT.

09:06AM  10            THE COURT:  GOOD MORNING.  IT'S NICE TO SEE YOU

09:06AM  11    AGAIN.

09:06AM  12        AND WHO APPEARS ON BEHALF OF THE GOVERNMENT?

09:06AM  13            MS. VOLKAR:  GOOD MORNING.  KELLY VOLKAR FOR THE

09:06AM  14    UNITED STATES.

09:06AM  15            THE COURT:  GOOD MORNING.  THANK YOU.  IT'S NICE TO

09:07AM  16    SEE YOU AS WELL.

09:07AM  17        COUNSEL, IF YOU WOULD LIKE TO TAKE YOUR MASKS OFF, YOU CAN

09:07AM  18    TAKE YOUR MASKS OFF.  THAT MIGHT BE BENEFICIAL FOR OUR COURT

09:07AM  19    REPORTERS.

09:07AM  20            MS. VOLKAR:  THANK YOU, YOUR HONOR.

09:07AM  21            MR. FLEURMONT:  THANK YOU, YOUR HONOR.

09:07AM  22            THE COURT:  I GUESS THE ISSUE I HAVE, MR. FLEURMONT,

09:07AM  23    IS THE TIMING OF THESE, THE MOTION VIS-A-VIS YOUR CLIENT'S

09:07AM  24    TESTIMONY AND WHERE THIS MIGHT FIT IN, THAT IS, YOUR TWO

09:07AM  25    MOTIONS, WHERE THIS EVIDENCE MIGHT FIT IN AND THE TIMELINE OF

09:07AM 1    THAT, IF YOU KNOW THAT, IF YOU'RE ABLE TO ANSWER THAT.

09:07AM 2         MR. FLEURMONT:  YES, YOUR HONOR.

09:07AM 3    I THINK I UNDERSTAND THE COURT'S QUESTION TO BE, IF THE

09:07AM 4    MOTION WERE GRANTED, WHERE THE TESTIMONY WOULD FIT IN OR WHERE

09:07AM 5    THE EXHIBIT WOULD FIT IN.

09:07AM 6         THE COURT:  RIGHT.  RIGHT.

09:07AM 7         MR. FLEURMONT:  WELL, YOUR HONOR, I CAN SAY THAT I

09:07AM 8    THINK I WOULD HAVE TO DISCUSS IT WITH MY TEAM EXACTLY WHEN WE

09:07AM 9    WOULD WANT TO ADMIT THIS TESTIMONY AND WHEN WE WOULD WANT TO

09:07AM 10    ADMIT THIS EXHIBIT.

09:07AM 11         THE COURT:  SURE.

09:07AM 12         MR. FLEURMONT:  AND I THINK THAT'S ALL I CAN SAY

09:07AM 13    ABOUT THAT POINT.

09:07AM 14         THE COURT:  I ASK THAT FOR SELFISH REASONS, BECAUSE

09:07AM 15    YOUR ANSWER WILL INFORM NECESSITY AS TO WHEN YOU GET AN ANSWER

09:08AM 16    FROM ME.

09:08AM 17         MR. FLEURMONT:  UNDERSTOOD.

09:08AM 18    IF I COULD, AFTER THE ARGUMENTS, CONFER WITH THE

09:08AM 19    HIGHER-UPS, I THINK I CAN SEE IF I COULD DO BETTER THAN WHAT

09:08AM 20    I'M DOING RIGHT NOW.

09:08AM 21         THE COURT:  WELL, YOU'RE DOING FINE.  THAT'S

09:08AM 22    GENEROUS FOR YOU TO CALL THEM YOUR HIGHER-UPS.  THEY'RE YOUR

09:08AM 23    COLLEAGUES.

09:08AM 24         MR. FLEURMONT:  FAIR ENOUGH.

09:08AM 25         THE COURT:  SO WHAT SHOULD I KNOW ABOUT THIS?

09:08AM 1     MR. FLEURMONT:  SURE.  STARTING WITH THE MOTION TO

09:08AM 2  ADMIT PRIOR TESTIMONY OF SUNNY BALWANI, WE SUBMIT IT SHOULD BE

09:08AM 3  GRANTED UNDER 804.  THERE ARE TWO PROVISIONS AT PLAY HERE,

09:08AM 4  804(B), WHICH IS A STATEMENT AGAINST INTEREST, AND 804(B)(1),

09:08AM 5  WHICH IS TESTIMONY.

09:08AM 6     SO THE COURT KNOWS, THE FIRST ISSUE OR THE FIRST QUESTION

09:08AM 7  UNDER AN --

09:08AM 8         THE COURT:  THAT'S EASIER.

09:08AM 9         MR. FLEURMONT:  AS THE COURT KNOWS, THE FIRST

09:08AM 10  QUESTION UNDER THE 804 RULE ANALYSIS IS WHERE THE DECLARANT IS

09:08AM 11  UNAVAILABLE, SO I'D LIKE TO BRIEFLY START THERE.

09:09AM 12     UNDER RULE 804(A)(1), THE DECLARANT IS UNAVAILABLE IF THE

09:09AM 13  COURT FINDS THAT A PRIVILEGE APPLIES.

09:09AM 14     IN THIS CASE WE HAVE A SWORN DECLARATION FROM LANCE WADE

09:09AM 15  EXPLAINING THAT HE REACHED OUT TO MR. BALWANI'S ATTORNEY AND

09:09AM 16  ASKED ABOUT AVAILABILITY AND WAS TOLD, THROUGH THE PROFFER OF

09:09AM 17  THE ATTORNEY, THAT MR. BALWANI, IF CALLED IN THIS CASE, WOULD

09:09AM 18  EXERCISE HIS RIGHT UNDER THE FIFTH AMENDMENT NOT TO ANSWER ANY

09:09AM 19  RELEVANT QUESTION.

09:09AM 20     WE ALSO HAVE A PRIOR DEPOSITION IN THIS CASE THAT THE

09:09AM 21  COURT IS VERY FAMILIAR WITH, BECAUSE I UNDERSTAND THE COURT

09:09AM 22  PRESIDED OVER THE S.E.C. CASE IN WHICH MR. BALWANI, THROUGH HIS

09:09AM 23  COUNSEL, INVOKED THE FIFTH AMENDMENT UNDER A RELEVANT QUESTION.

09:09AM 24     AND OF COURSE WE HAVE SEVERAL PROCEEDINGS IN THIS CASE

09:09AM 25  WHERE THE COURT HAS HAD THE BENEFIT OF SEEING THE GOVERNMENT'S

09:09AM  1      THEORY OF THE DEFENSE AGAINST MR. BALWANI THROUGH RECENT MOTION

09:09AM  2      IN LIMINES FILED IN THE BALWANI CASE THAT EXPLAIN THEIR THEORY

09:09AM  3      OF CULPABILITY.  THAT GIVES THE COURT THE SPECIAL INFORMATION

09:09AM  4      OR SPECIAL UNDERSTANDING OF THIS CASE, WHICH WOULD ALLOW THE

09:09AM  5      COURT TO FIND THAT HE IS UNAVAILABLE BECAUSE HE WOULD INVOKE

09:09AM  6      HIS FIFTH AMENDMENT RIGHT.

09:09AM  7          SO WE BELIEVE HE'S UNAVAILABLE FOR THOSE REASONS.

09:10AM  8          IF THERE ARE NO QUESTIONS ON UNAVAILABILITY, I CAN MOVE TO

09:10AM  9      THE FIRST EXCEPTION.

09:10AM  10             THE COURT:  WELL, I DO HAVE SOME.

09:10AM  11         DO WE NEED TO -- IS THERE SUFFICIENT -- IS THERE A

09:10AM  12     SUFFICIENT SHOWING FOR UNAVAILABILITY NOW?

09:10AM  13         NOW, OF COURSE, EVERYONE KNOWS I SEVERED THE CASES FOR THE

09:10AM  14     REASONS INDICATED IN THE COURT'S ORDER.

09:10AM  15             MR. FLEURMONT:  CORRECT.

09:10AM  16             THE COURT:  HE HAS A TRIAL, HE, MR. BALWANI, HAS A

09:10AM  17     TRIAL PENDING NEXT MONTH -- EXCUSE ME, IN JANUARY.

09:10AM  18             MR. FLEURMONT:  UH-HUH.

09:10AM  19             THE COURT:  BUT DO I NEED TO KNOW -- I UNDERSTAND

09:10AM  20     THAT MR. WADE REACHED OUT TO HIM, BUT DO I NEED TO HAVE EITHER

09:10AM  21     HIS COUNSEL, MR. COOPERSMITH, OR MR. BALWANI COME INTO COURT

09:10AM  22     AND INDICATE TO ME, PERHAPS OUTSIDE OF THE PRESENCE OF THE

09:10AM  23     JURY, BUT NONETHELESS INFORM THE COURT THAT IF CALLED TO

09:10AM  24     TESTIFY, HE WOULD INVOKE HIS PRIVILEGE?  DO I NEED TO DO THAT?

09:10AM  25     IS THAT A THRESHOLD THAT NEEDS TO BE MET?

09:11AM  1          MR. FLEURMONT:  NO, YOUR HONOR, YOU DON'T NEED TO

09:11AM  2      TAKE THAT STEP.  THAT'S NOT A REQUIREMENT UNDER (THE LAW.

09:11AM  3          THE GOVERNMENT IS CORRECT THAT TYPICALLY THE COURT SHOULD

09:11AM  4      UNDERSTAND OR HAVE THE DEFENDANT ENTER THE -- THE PERSON IN

09:11AM  5      RESPONSE TO SPECIFIC QUESTIONS.

09:11AM  6          BUT THERE'S AN EXCEPTION TO THAT RULE, AS I'M SURE THE

09:11AM  7      COURT IS VERY FAMILIAR WITH, AND THE COURT IS IN A POSITION TO

09:11AM  8      SAY THAT THE DEFENDANT, OR THE DECLARANT I SHOULD SAY, WOULD

09:11AM  9      RESPOND TO ANY QUESTION WITH AN INVOCATION OF THE FIFTH

09:11AM  10     AMENDMENT, AND BASED ON THE FACTS AND CIRCUMSTANCES OF THIS

09:11AM  11     CASE, WE BELIEVE THE COURT HAS EVERYTHING THAT IT NEEDS TO MAKE

09:11AM  12     THAT DETERMINATION NOW.

09:11AM  13         THE COURT:  THANK YOU.

09:11AM  14     AND THE SECOND PART OF THAT IS, DO I NEED TO KNOW WHAT

09:11AM  15     QUESTIONS WOULD BE POSED?  IN YOUR MOTION, YOU HAVE SAID IN

09:11AM  16     YOUR EXHIBITS A THROUGH C, I THINK THEY ARE --

09:11AM  17         MR. FLEURMONT:  CORRECT.

09:11AM  18         THE COURT:  -- YOU SAID THIS IS WHAT WE WANT TO --

09:11AM  19         MR. FLEURMONT:  ADMIT.

09:11AM  20         THE COURT:  -- INTRODUCE AND ADMIT IN FRONT OF THE

09:11AM  21     JURY.

09:11AM  22     AND I SEE THE -- I GUESS WHAT I'M SAYING IS THAT I SEE THE

09:11AM  23     ANSWERS, BUT I DON'T SEE THE QUESTIONS.

09:11AM  24     DO I NEED TO KNOW THE QUESTIONS THAT WOULD BE POSED TO THE

09:12AM  25     WITNESS BEFORE THE COURT CAN THEN DECIDE THAT, YES, THERE WOULD

7692

09:12AM  1   BE A PROPER INVOCATION OF PRIVILEGE?  DON'T I NEED TO KNOW WHAT

09:12AM  2   THOSE QUESTIONS WOULD BE?

09:12AM  3            MR. FLEURMONT:  NO, YOUR HONOR, FOR TWO REASONS.

09:12AM  4       GENERALLY THE COURT DOES NOT NEED TO KNOW THE QUESTIONS IF

09:12AM  5   THERE'S SUFFICIENT INFORMATION TO FIND THAT IN RESPONSE TO ANY

09:12AM  6   QUESTION, THE PERSON, THE DECLARANT WOULD INVOKE THE FIFTH

09:12AM  7   AMENDMENT, AND THAT IS THE CASE HERE.

09:12AM  8       BUT SECOND, JUST SEEING THE CONTEXT OF THIS CASE AND IN

09:12AM  9   THE DEPOSITION PORTIONS THAT WE PROVIDED, THERE'S QUESTIONS

09:12AM  10  THERE AND THERE ARE ANSWERS THERE.  WE THINK THE QUESTIONS ARE

09:12AM  11  VERY CLEAR.

09:12AM  12      AS THE COURT KNOWS, THERE ARE FOUR CATEGORIES OF

09:12AM  13  INFORMATION THAT WE WOULD SEEK TO ADMIT.  THE FIRST IS RELATED

09:12AM  14  TO RESPONSIBILITY IN THE CLIA LAB; THE SECOND IS HIS ROLE IN

09:12AM  15  THE NULL PROTOCOL; THE THIRD IS HIS RESPONSIBILITY OF THE

09:12AM  16  FINANCIAL PROJECTIONS, OR THE FINANCIAL MODEL I SHOULD SAY; AND

09:12AM  17  THE FOURTH HAS TO DO WITH HIS ROLE AND RESPONSIBILITY IN THE

09:12AM  18  SAFEWAY AND THE WALGREENS RELATIONSHIP.

09:12AM  19      SO JUST TO REITERATE, GENERALLY THE COURT DOES NOT NEED TO

09:13AM  20  DO THAT, BUT IN THIS CASE THE COURT DOES NOT NEED TO DO THAT

09:13AM  21  BECAUSE WE UNDERSTAND EXACTLY THE ISSUES IT WOULD RAISE.

09:13AM  22            THE COURT:  OKAY.  AND WE'LL GET INTO THE (B)(3)

09:13AM  23  ANALYSIS AS WELL.

09:13AM  24            MR. FLEURMONT:  YES.

09:13AM  25            THE COURT:  I THINK I HAVE SOME QUESTIONS UNDER THAT

7693

09:13AM  1    ANALYSIS AS WELL.

09:13AM  2         SO AS TO UNAVAILABILITY, YOU'RE SAYING THAT HE'S

09:13AM  3    UNAVAILABLE BECAUSE HE'S A CODEFENDANT IN THIS CASE.

09:13AM  4         THE COURT IS AWARE OF THE ISSUES SURROUNDING AND THE COURT

09:13AM  5    SHOULD FIND HIM UNAVAILABLE FOR PURPOSES OF ADMISSION OF THE

09:13AM  6    STATEMENTS?

09:13AM  7              MR. FLEURMONT:  YES, FOR THOSE REASONS, BUT ALSO WE

09:13AM  8    HAVE A DECLARATION, AND IT'S A SWORN DECLARATION UNDER PERJURY,

09:13AM  9    FROM MR. WADE BECAUSE OF THE PRIOR CONDUCT IN THE S.E.C. CASE

09:13AM 10    AND THE LAST DEPOSITION, AND THE COURT PRESIDED OVER THAT CASE

09:13AM 11    AS WELL.

09:13AM 12         SO IT'S NOT JUST -- AND THE CASE LAW SAYS THAT IF A COURT

09:13AM 13    HAS SPECIAL FAMILIARITY WITH THE CASE, IT CAN MAKE A

09:13AM 14    DETERMINATION.

09:13AM 15         BUT IN THIS CASE YOU HAVE FAMILIARITY WITH BOTH CASES, THE

09:13AM 16    S.E.C. CASE AND THE CRIMINAL OFFENSE.

09:13AM 17              THE COURT:  SO NO OFFENSE TO MR. WADE, HE PUT

09:13AM 18    HIMSELF AT PERIL OF THE RISK OF PERJURY BY FINDING AND SIGNING

09:13AM 19    THE DECLARATION AND SUBMITTING IT TO THE COURT.

09:14AM 20         BUT IF THE COURT WERE TO HAVE MR. COOPERSMITH COME IN AND

09:14AM 21    INFORM US, THAT IS, INFORM ALL OF US WHAT HIS INTENTION WOULD

09:14AM 22    BE, I'M SURE MR. WADE WOULD NOT TAKE ANY SLIGHT AT THAT.

09:14AM 23              MR. FLEURMONT:  YOUR HONOR, I DON'T MEAN TO IMPLY

09:14AM 24    THAT WE WOULD TAKE A SLIGHT AT THAT.  IF THE COURT FEELS THAT

09:14AM 25    THAT'S WHAT THE COURT NEEDS TO DO, WE WOULDN'T OPPOSE THAT.

7694

09:14AM 1      WE'RE JUST SAYING THAT THERE'S NO REASON TO DO THAT BASED

09:14AM 2  ON THE CIRCUMSTANCES OF THIS CASE.

09:14AM 3           THE COURT:  OKAY.  OKAY.

09:14AM 4           MR. FLEURMONT:  OKAY.  ALL RIGHT.

09:14AM 5      NEXT I'LL MOVE TO THE FIRST EXCEPTION I WANT TO DISCUSS

09:14AM 6  TODAY, 804(B)(3), WHICH IS A STATEMENT AGAINST INTEREST.

09:14AM 7      SO 804(B)(3) DEFINES A STATEMENT OF INTEREST AS ONE,

09:14AM 8  QUOTE, A REASONABLE PERSON IN THE DECLARANT'S POSITION WOULD

09:14AM 9  HAVE MADE ONLY IF THE PERSON BELIEVED IT TO BE TRUE BECAUSE,

09:14AM 10 WHEN MADE, IT HAD SO GREAT A TENDENCY TO DISPOSE A DECLARANT TO

09:14AM 11 CIVIL OR CRIMINAL LIABILITY.  SUCH STATEMENTS ARE ADMISSIBLE IN

09:14AM 12 A CRIMINAL CASE IF SUPPORTED BY CORROBORATING CIRCUMSTANCES.

09:15AM 13     THE NINTH CIRCUIT HAS FURTHER EXPLAINED THAT WHETHER A

09:15AM 14 STATEMENT IS, IN FACT, AGAINST INTEREST MUST BE DETERMINED FROM

09:15AM 15 THE CIRCUMSTANCES OF EACH CASE AND CAN ONLY BE DETERMINED BY

09:15AM 16 VIEWING IT IN CONTEXT.  THAT'S UNITED STATES VERSUS PAGUIO,

09:15AM 17 P-A-G-U-I-O.

09:15AM 18     WHEN VIEWED IN CONTEXT OF THIS CASE, WE BELIEVE THE FOUR

09:15AM 19 CATEGORIES OF INFORMATION THAT WE DISCUSS ARE STATEMENTS

09:15AM 20 AGAINST INTEREST FOR THREE REASONS:

09:15AM 21     FIRST, MR. BALWANI WAS DEPOSED IN THE S.E.C. INVESTIGATION

09:15AM 22 AND EXPOSED TO AN INVESTIGATION FOR CIVIL DAMAGES.  THAT GOES

09:15AM 23 TO WHETHER THE DECLARANT BELIEVED THAT THERE WOULD BE A CIVIL

09:15AM 24 PENALTY.

09:15AM 25     THERANOS HAD RECEIVED FOUR SUBPOENAS FROM THE S.E.C.

09:15AM  1    REQUESTING DOCUMENTS CONCERNING MANY OF THE ISSUES WE'RE

09:15AM  2    DISCUSSING TODAY, SO THE ISSUE ABOUT HIS CONTROL OVER THE LAB,

09:15AM  3    THE FINANCIALS, AS WELL AS THE WALGREENS AND SAFEWAY

09:15AM  4    RELATIONSHIP.

09:15AM  5         IT'S CLEAR AT THE TIME OF THE DEPOSITION THAT MR. BALWANI

09:15AM  6    WAS A TARGET OF THE ENFORCEMENT ACTION.

09:15AM  7         I SHOULD SAY THAT THESE DEPOSITIONS TOOK PLACE ON

09:15AM  8    AUGUST 9TH, 2017, AUGUST 10TH, 2017, AND SEPTEMBER 7TH, 2017.

09:16AM  9              THE COURT:  AND THE TIME IN THIS CASE WAS?

09:16AM  10              MR. FLEURMONT:  JANUARY 11TH, 2016, YOUR HONOR, SO

09:16AM  11   WELL OVER A YEAR BEFORE THAT.

09:16AM  12        OKAY.  AS THE CEO OF THE COMPANY, THERE IS NO QUESTION

09:16AM  13   THAT A REASONABLE PERSON IN HIS POSITION GOING INTO THIS S.E.C.

09:16AM  14   DEPOSITION FACING CIVIL ENFORCEMENT ACTION WITH CIVIL PENALTIES

09:16AM  15   WOULD BELIEVE, AND AFTER REVIEWING THE SUBPOENAS -- AT THAT

09:16AM  16   POINT THERE WERE FIVE -- LET ME MAKE SURE I HAVE THIS RIGHT.

09:16AM  17   AT THAT POINT THERE WERE FOUR SUBPOENAS FROM THE S.E.C. AND TWO

09:16AM  18   FROM THE DOJ, ALL RELATING TO THE CATEGORIES OF INFORMATION

09:16AM  19   THAT WE SEEK TO ADMIT.

09:16AM  20        A REASONABLE PERSON IN THAT POSITION WOULD BELIEVE THAT

09:16AM  21   THE STATEMENTS RELATED TO THOSE REQUESTS COULD PUT THEM IN

09:16AM  22   CIVIL LIABILITY.  SO THAT'S THE FIRST REASON.

09:16AM  23        THE SECOND REASON IS RELATED.  SO DURING THE TIME THAT

09:16AM  24   MR. BALWANI WAS DEPOSED, HE WAS ALSO FACING GRAND JURY

09:16AM  25   INVESTIGATION.

7696

09:16AM  1          THE FIRST -- YOUR HONOR, LET ME JUST CORRECT SOMETHING I

09:16AM  2     JUST SAID.  SO THE FIRST GRAND JURY SUBPOENA WAS ISSUED

09:16AM  3     JANUARY 11TH, 2016.

09:17AM  4          THE COURT ASKED ABOUT THE INDICTMENT, WHICH WAS IN

09:17AM  5     JANUARY -- IT WAS 2018, JUNE 2018, BELIEVE.  SO I JUST WANT TO

09:17AM  6     CORRECT THAT.

09:17AM  7              THE COURT:  RIGHT.  RIGHT.

09:17AM  8              MR. FLEURMONT:  OKAY.  SO AS I WAS SAYING, THE

09:17AM  9     SECOND REASON RELATED TO THE INVESTIGATION BY THE DOJ.

09:17AM  10    THERANOS HAD RECEIVED TWO SUBPOENAS FROM THE GRAND JURY BEFORE

09:17AM  11    MR. BALWANI WAS DEPOSED.

09:17AM  12         THE THIRD GRAND JURY SUBPOENA WAS ACTUALLY ISSUED THE DAY

09:17AM  13    BEFORE HIS LAST DAY OF DEPOSITION TESTIMONY.

09:17AM  14         THE GRAND JURY SUBPOENA COVERED MANY OF THE TOPICS ON

09:17AM  15    WHICH HE WAS QUESTIONED DURING THE DEPOSITION, AND INDEED, THE

09:17AM  16    S.E.C. SUBPOENAS, TWO OF THEM THAT WERE ISSUED AFTER THE GRAND

09:17AM  17    JURY SUBPOENA CONTAINED A PROVISION THAT SAID THAT THE S.E.C.

09:17AM  18    WOULD -- COULD SHARE THE INFORMATION WITH THE DOJ, WHICH IS

09:17AM  19    EXACTLY WHAT HAPPENED IN THIS CASE.  THAT'S AT EXHIBIT G AND H

09:17AM  20    TO THE DECLARATION OF AMY SAHARIA.

09:18AM  21         SO FACED WITH THE GRAND JURY SUBPOENAS AND EXPLANATION, WE

09:18AM  22    BELIEVE THAT A REASONABLE PERSON WOULD NOT TAKE OWNERSHIP OVER

09:18AM  23    THE CATEGORIES THAT MR. BALWANI DID KNOWING THAT HE WAS FACED

09:18AM  24    ALSO WITH CRIMINAL LIABILITY AS WELL.  SO THAT'S THE SECOND

09:18AM  25    REASON.

09:18AM   1          THE THIRD IS THE NATURE OF MR. BALWANI'S STATEMENTS.

09:18AM   2          THESE ARE NOT JUST STATEMENTS ABOUT SOME PARTICIPATION

09:18AM   3   WITH SOME OF THE AREAS THAT WE'RE TALKING ABOUT.  HE DESCRIBES

09:18AM   4   A LEADERSHIP ROLE IN THEM.

09:18AM   5          AS THE NINTH CIRCUIT HAS EXPLAINED, LEADERSHIP AND ALLEGED

09:18AM   6   WRONGDOING CAN BE PARTICULARLY INCULPATORY AND THAT'S THE

09:18AM   7   PAGUIO CASE.

09:18AM   8              THE COURT:  SO DO WE NEED TO LOOK AT THE STATEMENTS

09:18AM   9   TO SEE WHETHER OR NOT THERE'S A DISTINCTION BETWEEN EXCULPATORY

09:18AM  10   AND INCULPATORY?  DO WE NEED TO LOOK AT THAT?

09:18AM  11              MR. FLEURMONT:  SO THERE'S NOT A SIMPLE YES OR NO

09:18AM  12   ANSWER TO THAT, YOUR HONOR.

09:18AM  13          SO TYPICALLY IT REALLY DEPENDS ON THE STATEMENT.

09:18AM  14          SO, FOR EXAMPLE, IN THE PAGUIO CASE, THAT CASE INVOLVED --

09:19AM  15   IT WAS -- THE DEFENDANT WAS CHARGED WITH MISSTATEMENTS IN A

09:19AM  16   LOAN APPLICATION, BUT IT WAS A FATHER WHO ACTUALLY SUBMITTED

09:19AM  17   THE APPLICATION, THE FATHER THAT SUBMITTED THE W-2'S THAT WERE

09:19AM  18   FALSIFIED, AND IT WAS THE FATHER THAT SIGNED THE APPLICATION.

09:19AM  19          SO THE DEFENDANT WAS CHARGED, AND IN HIS SECOND TRIAL, THE

09:19AM  20   FATHER WAS A FUGITIVE SO HE WAS UNAVAILABLE, BUT HE SAID TO THE

09:19AM  21   DEFENDANT, THE DEFENDANT'S ATTORNEY, THAT THE SCHEME WAS MINE.

09:19AM  22   MY SON HAD NOTHING TO DO WITH IT.

09:19AM  23          AND IN THAT CASE THE ISSUE WAS NOT, THE SCHEME WAS MINE.

09:19AM  24   THE ISSUE WAS, MY SON HAD NOTHING TO DO WITH IT.

09:19AM  25          AND THE COURT HELD THAT WHEN SOMEONE TAKES SOLE

09:19AM  1    RESPONSIBILITY OVER A CERTAIN ISSUE, THAT CAN BE INCULPATORY AS

09:19AM  2    WELL, EVEN THOUGH IT'S INCULPATORY AS TO SOMEONE ELSE.

09:19AM  3              THE COURT:  IN THAT CASE, I THINK THE INITIAL TRIAL

09:19AM  4    JUDGE PARSED OUT THE SENTENCE, RIGHT, AND ONLY ALLOWED PART OF

09:19AM  5    IT.

09:19AM  6              MR. FLEURMONT:  RIGHT, AND HE WAS REVERSED,

09:19AM  7    YOUR HONOR.

09:19AM  8              THE COURT:  THANK YOU FOR TELLING ME THAT.

09:19AM  9         (LAUGHTER.)

09:19AM  10             MR. FLEURMONT:  WELL, BUT THAT WAS --

09:19AM  11             THE COURT:  HE WAS REVERSED.  AND WHAT THE APPELLATE

09:19AM  12   COURT SAID WAS IN THAT INSTANCE THE ENTIRETY OF THE STATEMENT

09:20AM  13   WAS INFORMATIVE AND IT SHOULDN'T HAVE BEEN PARSED OUT.

09:20AM  14             MR. FLEURMONT:  CORRECT, YOUR HONOR.  SO THAT'S WHAT

09:20AM  15   I'M SAYING.  IT'S NOT REALLY A YES OR NO ANSWER.  YOU REALLY

09:20AM  16   HAVE TO LOOK AT THE STATEMENT.

09:20AM  17        THE STATEMENT THAT WE HAVE HERE, AND I SHOULD SAY, I KNOW

09:20AM  18   THE GOVERNMENT HAS MADE A POINT THAT SOME OF THE STATEMENTS

09:20AM  19   HAVE EXTRANEOUS INFORMATION.

09:20AM  20        OUR APPROACH WAS TO, WHENEVER THERE WAS AN INCULPATORY

09:20AM  21   STATEMENT, WE INCLUDED THE FIRST QUESTION AND THE FULL ANSWER,

09:20AM  22   AND AS YOU HAVE SEEN, THERE WERE OTHER REDACTIONS AND DIFFERENT

09:20AM  23   QUESTIONS AND ANSWERS.  SO WE JUST WANTED TO INCLUDE THE FULL

09:20AM  24   QUESTION AND ANSWER.

09:20AM  25             THE COURT:  BUT THERE WERE SOME OTHER ISSUES THAT

7699

09:20AM 1    THE COURT TOUCHED ON IN THAT CASE, IT WAS THE RELATIONSHIP, THE

09:20AM 2    LOVE RELATIONSHIP, IF YOU WILL, AND DIDN'T THE COURT LOOK AT TO

09:20AM 3    DISCERN WHETHER OR NOT THAT SHOULD BE CONSIDERED?

09:20AM 4           MR. FLEURMONT:  YES, YOUR HONOR.

09:20AM 5       BUT I PUSH BACK A LITTLE BIT BECAUSE IT WASN'T THE LOVE

09:20AM 6    RELATIONSHIP, IT WAS THE FAMILY RELATIONSHIP.  IN THAT CASE IT

09:20AM 7    WAS THE FATHER AND THE SON.

09:20AM 8           THE COURT:  OKAY.  SOMETIMES THE FATHERS LOVE SONS.

09:20AM 9           MR. FLEURMONT:  SOMETIMES THEY DON'T.

09:20AM 10          THE COURT:  YEAH, YEAH.

09:20AM 11          MR. FLEURMONT:  IN THE GADSON CASE THAT THE

09:20AM 12   GOVERNMENT CITES, THAT WAS THE RELATIONSHIP BETWEEN THE TWO

09:21AM 13   BOTHERS AND THE COURT LOOKED THERE FOR A FAMILY RELATIONSHIP.

09:21AM 14      AND THE REASON THE COURT WAS LOOKING AT THE RELATIONSHIP

09:21AM 15   IN BOTH OF THOSE CASES -- BECAUSE AS YOU KNOW, WHEN AN ELEMENT

09:21AM 16   UNDER THIS ANALYSIS IS COOPERATION, AND IN THE PAGUIO CASE THE

09:21AM 17   COURT SAID THERE IS A LOT OF CORROBORATION HERE, WE HAVE THE

09:21AM 18   LOAN OFFICER, WE HAVE THE ACCOUNTANT, WE HAVE THE ESCROW AGENT

09:21AM 19   ALL SAYING THAT IT WAS THE FATHER WHO SUBMITTED THIS

09:21AM 20   APPLICATION.

09:21AM 21      BUT ON THE OTHER HAND, WE HAVE THE FACT THAT IT'S THE

09:21AM 22   FATHER.  THE COURT SAID BECAUSE OF THE CORROBORATION, THAT WAS

09:21AM 23   SUFFICIENT FOR A FINDING THAT THE STATEMENT WAS ADMISSIBLE.

09:21AM 24      SO IN THOSE CASES, YES, THE FAMILY RELATIONSHIP IS

09:21AM 25   RELEVANT.

7700

09:21AM   1          BUT THAT JUST GOES TO CORROBORATION.  THE COURT IS STILL

09:21AM   2     REQUIRED TO LOOK AT CORROBORATION TO SEE IF THE STATEMENTS ARE

09:21AM   3     INDEED RELIABLE.

09:21AM   4          THE COURT:  OKAY.

09:21AM   5          MR. FLEURMONT:  BUT AS I WAS SAYING ABOUT THE PAGUIO

09:21AM   6     CASE ORIGINALLY, THERE THE QUESTION WAS ABOUT PARSING OUT THE

09:21AM   7     DIFFERENT STATEMENTS.

09:21AM   8          SO HERE IF YOU LOOK AT THE FULL QUESTION AND ANSWER, IT'S

09:21AM   9     VERY CLEAR WHICH STATEMENTS ARE INCULPATORY.

09:22AM  10          THE FACT THAT SOME STATEMENTS MAY BE EXCULPATORY, I DON'T

09:22AM  11     THINK THERE'S MANY IN THERE, BUT THE ONE STATEMENT AT ISSUE

09:22AM  12     THAT I THINK THE GOVERNMENT IS POINTING AT IS THE NULL PROTOCOL

09:22AM  13     SAYING SHE DID NOT KNOW ABOUT IT.

09:22AM  14          BUT IN THAT CASE IT'S JUST THE TWO OF THEM.

09:22AM  15          SO IT WOULD BE DIFFERENT IF THERE WAS -- IT WOULD BE

09:22AM  16     DIFFERENT IF THERE WAS A STATEMENT IN WHICH HE TOOK NO

09:22AM  17     RESPONSIBILITY FOR THE STATEMENT AND JUST PUSHES IT ON SOMEBODY

09:22AM  18     ELSE.  IN THAT CASE, YES, YOUR HONOR, WE WOULD SAY THAT

09:22AM  19     STATEMENT WOULD NOT COME IN.

09:22AM  20          BUT THAT'S NOT WHAT WE HAVE HERE.

09:22AM  21          THE COURT:  SO SOME OF THE STATEMENTS I'M LOOKING

09:22AM  22     AT, LET'S SEE, I THINK IT'S ON PAGE 4 OF YOUR MOTION AT

09:22AM  23     LINE 15.

09:22AM  24          I THINK YOU START THE BULLET POINTS OF THE --

09:22AM  25          MR. FLEURMONT:  SURE.

7701

09:22AM   1          THE COURT:  -- OF THE STATEMENTS.

09:22AM   2      AND I SUPPOSE IN THE COURSE OF OUR CONVERSATION,

09:22AM   3  MS. VOLKAR WILL HELP US WITH THOSE AND WE'LL GO THROUGH THESE

09:23AM   4  TO SEE -- ARE THESE -- SOME OF THESE, CANDIDLY, I HAD SOME

09:23AM   5  QUESTIONS WHETHER OR NOT THEY WERE MORE EXCULPATORY, OR

09:23AM   6  ACTUALLY SOME OF THEM ACTUALLY JUST LOOKED LIKE STATEMENTS OF

09:23AM   7  FACT, LIKE A FACT WITNESS.

09:23AM   8          MR. FLEURMONT:  OKAY.

09:23AM   9          THE COURT:  AND THERE'S NO BASIS TO ADMIT THEM OTHER

09:23AM   10  THAN AS A FACT WITNESS.  SO THAT'S SOME OF THE ISSUES THAT I

09:23AM   11  HAD.

09:23AM   12      MR. BALWANI'S PRIOR TESTIMONY ABOUT HIS ROLE IN THE

09:23AM   13  SAFEWAY RELATIONSHIP, THE WALGREENS RELATIONSHIP, HE WAS

09:23AM   14  RESPONSIBLE FOR THE CLIA LAB.

09:23AM   15      BUT WE KNOW THAT HE DIDN'T TELL THEM WHAT TO DO.  I THINK

09:23AM   16  THAT'S -- YOU KNOW, HE SAID YES, THEY DID WHAT THEY WERE GOING

09:23AM   17  TO DO, BUT I COULDN'T TELL THEM WHAT TO DO, ET CETERA.

09:23AM   18      MS. VOLKAR WILL HELP US IN A MOMENT WITH THOSE

09:23AM   19  DISTINCTIONS.

09:23AM   20          MR. FLEURMONT:  SURE.

09:23AM   21          THE COURT:  BUT THAT'S SOMETHING THAT I'M FOCUSSED

09:23AM   22  ON IN LOOKING AT IT.

09:23AM   23          MR. FLEURMONT:  UNDERSTOOD.

09:23AM   24          THE COURT:  OKAY.

09:23AM   25          MR. FLEURMONT:  BUT I'M PREPARED TO ANSWER THOSE

09:24AM 1    QUESTIONS, YOUR HONOR.

09:24AM 2        I'M SORRY.  LET ME JUST GET BACK ON TRACK.  WE'VE

09:24AM 3    DISCUSSED CORROBORATION.

09:24AM 4        SO IN TERMS OF EACH CATEGORY OF STATEMENT, WE HAVE

09:24AM 5    EVIDENCE IN THE TRIAL RECORD THAT IT'S CORROBORATED BY

09:24AM 6    TESTIMONY OF CERTAIN WITNESSES, AND THAT GOES TO THE

09:24AM 7    CORROBORATION THAT WE JUST DISCUSSED, FOR EXAMPLE, THAT

09:24AM 8    HAPPENED IN PAGUIO.

09:24AM 9        AND THEN WE'LL -- AS THE COURT SAYS, WE CAN TALK ABOUT

09:24AM 10   EACH STATEMENT AND ABOUT EXACTLY WHAT IT SAYS.

09:24AM 11       OKAY.  I'D LIKE TO MOVE TO THE NEXT EXCEPTION.  OKAY.

09:24AM 12       SO THIS EXCEPTION IS UNDER 804(B)(1), WHICH PROVIDES THAT

09:24AM 13   PRIOR TESTIMONY FROM AN UNAVAILABLE WITNESS IS ADMISSIBLE WHEN

09:24AM 14   GIVEN AT A LAWFUL DEPOSITION AND IF OFFERED AGAINST A PARTY WHO

09:24AM 15   HAD AN OPPORTUNITY AND SIMILAR MOTIVE TO DEVELOP THAT TESTIMONY

09:24AM 16   BY DIRECT, CROSS, OR REDIRECT.

09:24AM 17       SO THE FIRST QUESTION IS WHETHER THE S.E.C. AND THE DOJ

09:24AM 18   ARE THE SAME PARTY.

09:24AM 19       WE SUBMIT THEY ARE IN THIS CASE, YOUR HONOR.  IT WAS --

09:24AM 20   ALTHOUGH IT WAS THE S.E.C. WHO DEPOSED MR. BALWANI, BECAUSE OF

09:25AM 21   THE COORDINATION BETWEEN THE UNITED STATES AND THE S.E.C., WE

09:25AM 22   BELIEVE THAT FOR THE PURPOSES OF THIS RULE THAT THEY'RE THE

09:25AM 23   SAME PARTY.

09:25AM 24       AND ADMITTEDLY, THERE'S NOT MUCH CASE LAW IN THE

09:25AM 25   NINTH CIRCUIT ON THIS ISSUE, BUT WHAT THE CASES THAT WE HAVE

09:25AM  1    REVIEWED SAY OR GUIDE THE COURT IS THAT WHAT THE COURT IS

09:25AM  2    REALLY LOOKING FOR IS COORDINATION BETWEEN THE TWO PARTIES,

09:25AM  3    BOTH COORDINATION OF LAW AND COORDINATION IN FACT.

09:25AM  4        SO I'D LIKE TO START WITH COORDINATION IN FACT IN THIS

09:25AM  5    CASE.

09:25AM  6        IN THIS CASE THE S.E.C. AND THE DOJ HAVE INVESTIGATED THIS

09:25AM  7    CASE JOINTLY.  THE S.E.C. AND THE DOJ HAVE JOINTLY INTERVIEWED

09:25AM  8    OVER 50 WITNESSES.  THE DOJ RECEIVED ACCESS TO THE

09:25AM  9    INVESTIGATIVE AND NONPUBLIC FILES RELATED TO THERANOS.  THE

09:25AM 10    GOVERNMENT HAS REVIEWED MILLIONS OF PAGES OF THE S.E.C.

09:25AM 11        AND LASTLY, AS I MADE A POINT OF BEFORE, THERE WAS A

09:25AM 12    PROVISION IN THE S.E.C. SUBPOENAS THAT SAY THAT THEY COULD

09:25AM 13    SHARE THE INFORMATION WITH THE DOJ, WHICH IS EXACTLY WHAT

09:25AM 14    HAPPENED IN THIS CASE.

09:25AM 15        THAT'S COORDINATION IN FACT.  THAT SEPARATES THIS CASE

09:26AM 16    FROM SOME OF THE OTHER CASES THAT, BOTH THE DEFENSE SIDE AND

09:26AM 17    THE GOVERNMENT SIDE, THE BAKER CASE, B-A-K-E-R, THE MARTOVA

09:26AM 18    CASE, M-A-R-T-O-V-A.

09:26AM 19        COORDINATION IN LAW.  SO THE NINTH CIRCUIT HAS RECOGNIZED

09:26AM 20    THAT FEDERAL SECURITIES LAWS AUTHORIZE THE S.E.C. TO TRANSMIT

09:26AM 21    EVIDENCE THAT IS GATHERED TO THE UNITED STATES ATTORNEY'S

09:26AM 22    OFFICE TO FACILITATE CRIMINAL INVESTIGATION FOR THE

09:26AM 23    UNITED STATES ATTORNEY.

09:26AM 24        THAT MAKES SENSE, RIGHT?  BECAUSE THE S.E.C. DOESN'T HAVE

09:26AM 25    CRIMINAL ENFORCEMENT ACTION, SO AS THEY GATHER FACTS THAT

09:26AM  1    RELATE TO A CRIMINAL INVESTIGATION, THEY TYPICALLY WILL SEND

09:26AM  2    THOSE FACTS TO THE UNITED STATES ATTORNEY'S OFFICE TO ENFORCE

09:26AM  3    THEM CRIMINALLY.  SO THEY BOTH HAVE A ROLE IN THE CRIMINAL

09:26AM  4    ENFORCEMENT OF ALLEGED FACTS THAT SUPPORT A CRIMINAL ACTION.

09:26AM  5         OKAY.  BASED ON THAT COORDINATION, WE BELIEVE THE FACTS OF

09:26AM  6    THIS CASE MAKE CLEAR THAT THE S.E.C. AND THE DOJ ARE THE SAME

09:26AM  7    PARTY FOR THE PURPOSES OF THE RULE.

09:26AM  8         THE COURT:  WAS THE -- AT THE DEPOSITION, THE S.E.C.

09:27AM  9    DEPOSITIONS, WAS THERE A UNITED STATES ATTORNEY REPRESENTING

09:27AM 10    DOJ OR THE PROSECUTION PRESENT?

09:27AM 11         MR. FLEURMONT:  YOUR HONOR, WE DON'T BELIEVE SO.

09:27AM 12         I HAVE REVIEWED THE TRANSCRIPTS, AND I TOOK ANOTHER LOOK

09:27AM 13    AT THEM LAST NIGHT AND I ACTUALLY LOOKED AT THE COVER PAGE TO

09:27AM 14    LOOK AT THAT EXACT QUESTION.  THEIR APPEARANCES WEREN'T THERE.

09:27AM 15         AND ALSO IN THE GOVERNMENT'S BRIEF, IT MAKES A VERY

09:27AM 16    LIMITED STATEMENT SAYING THAT, ONE, IT PHYSICALLY WASN'T

09:27AM 17    PRESENT THERE; AND, TWO, IT DID NOT HAVE ANY INPUT INTO THE

09:27AM 18    QUESTIONS, WHICH WE KNOW IS A VERY LIMITED STATEMENT.  IT

09:27AM 19    DOESN'T SAY ANYTHING ABOUT BEING INVOLVED WITH THE STRATEGY,

09:27AM 20    BEING INVOLVED IN THE TOPICS OF WHAT IS GOING ON, AND, YOU

09:27AM 21    KNOW --

09:27AM 22         THE COURT:  THAT WAS MY QUESTION:  IS THERE ANY

09:27AM 23    EVIDENCE, ANYTHING IN THE RECORD THAT SUGGESTS THAT THE

09:27AM 24    GOVERNMENT PROVIDED QUESTIONS, GAVE STRATEGY TO THE S.E.C.?

09:27AM 25         WE KNOW THAT IN THE COURSE OF, OF COURSE, DOJ

7705

09:27AM 1    INVESTIGATIONS AND ANCILLARY S.E.C. INVESTIGATIONS, SOMETIMES

09:27AM 2    THOSE ARE CONCURRENT, AND THEY JUST HAPPEN OF FACT, IT'S A

09:28AM 3    CONCURRENCE THAT HAPPENS, AND SOMETIMES THERE'S A SHARING OF

09:28AM 4    INFORMATION, SOMETIMES THERE'S NOT.

09:28AM 5         SOMETIMES THE INFORMATION SHARED IS, CAN WE TALK TO YOU?

09:28AM 6         NO, I'M GOING TO BE IN A DEPOSITION.

09:28AM 7         OKAY.  WELL, GET BACK TO ME WHEN YOU'RE DONE.

09:28AM 8         SOMETIMES IT'S RICHER AND DEEPER THAN THAT.  WOULD YOU

09:28AM 9    MIND ASKING THE WITNESS THESE QUESTIONS?  THAT WOULD BE

09:28AM 10   HELPFUL.

09:28AM 11        THAT'S WHAT I'M TRYING TO DISCERN WHERE THAT IS HERE.

09:28AM 12        FIRST OF ALL, WE KNOW THERE WAS NO, AT LEAST FROM WHAT I

09:28AM 13   UNDERSTAND, THERE WAS NO -- NONE OF THE ATTORNEYS INVOLVED IN

09:28AM 14   THIS PROSECUTION WERE AT THAT DEPOSITION IN THIS COURTHOUSE IS

09:28AM 15   MY UNDERSTANDING.

09:28AM 16        MR. FLEURMONT:  THAT'S OUR -- THAT'S OUR

09:28AM 17   UNDERSTANDING.  THE GOVERNMENT REPRESENTED THAT'S THE CASE AND

09:28AM 18   WE TAKE THEM AT THEIR REPRESENTATION.

09:28AM 19        THE COURT:  AND I DON'T SEE ANY EVIDENCE THAT

09:28AM 20   SUGGESTS THAT THEY PROVIDED QUESTIONS TO THE S.E.C. TO GUIDE

09:28AM 21   THEIR INVESTIGATION.

09:28AM 22        AND AS YOU POINTED OUT, THE S.E.C. INVESTIGATION, THEIR

09:28AM 23   DEPOSITION WAS AT LEAST A YEAR, PERHAPS MORE, EARLIER THAN THE

09:29AM 24   ULTIMATE INDICTMENT.

09:29AM 25        MR. FLEURMONT:  CORRECT, YOUR HONOR.  BUT IT WAS

09:29AM 1      OVER A YEAR AND A HALF AFTER THE GRAND JURY SUBPOENA.

09:29AM 2          SO THE GRAND JURY -- THE CRIMINAL INVESTIGATION WAS WELL

09:29AM 3      UNDERWAY AT THE TIME OF THE DEPOSITION, ALTHOUGH THE COURT IS

09:29AM 4      CORRECT THAT THE FORMAL INDICTMENT DID NOT HAPPEN UNTIL LATER.

09:29AM 5              THE COURT:  AND IS THERE ALSO AN ISSUE ABOUT SIMILAR

09:29AM 6      MOTIVE?

09:29AM 7              MR. FLEURMONT:  YES, YES, YOUR HONOR, THERE IS.

09:29AM 8          SO -- WHICH IS KIND OF THE LAST ISSUE THAT RELATES TO THIS

09:29AM 9      PROVISION.

09:29AM 10         OKAY.  SO THE NINTH CIRCUIT HAS EXPLAINED THAT THE

09:29AM 11     QUESTION OF WHETHER A PARTY HAS A SIMILAR MOTIVE IS, QUOTE,

09:29AM 12     "INHERENTLY A FACTUAL INQUIRY BASED ON THE SIMILARITY OF THE

09:29AM 13     UNDERLYING ISSUES AND ON THE CONTEXT OF THE QUESTIONS."

09:29AM 14         IDENTICAL -- I'M SORRY.  THAT IS UNITED STATES V. DUENAS,

09:29AM 15     D-U-E-N-E-S, AT 691 F.3D 1089, NINTH CIRCUIT, 2012.

09:30AM 16             THE COURT:  IS DUENAS THE CASE IN GUAM?

09:30AM 17             MR. FLEURMONT:  YOUR HONOR, I STUDIED EVERYTHING

09:30AM 18     ABOUT THAT CASE EXCEPT FOR EXACTLY WHERE IT WAS, SO I DON'T

09:30AM 19     HAVE THE ANSWER TO THAT QUESTION.

09:30AM 20             THE COURT:  IS THAT THE CASE IN GUAM WHERE THERE WAS

09:30AM 21     AN INVESTIGATION OF STOLEN PROPERTY AND METHAMPHETAMINE?

09:30AM 22             MR. FLEURMONT:  YES, YES, YES, YOUR HONOR.  THAT IS

09:30AM 23     A DRUG CASE.  I KNOW THAT MUCH.

09:30AM 24             THE COURT:  AND THE ISSUE WAS THE -- I THINK THE

09:30AM 25     JUDGE, THE COURT WAS CRITICAL OF THE INVESTIGATION IN THAT

09:30AM   1   CASE.  IT SEEMED LIKE DURING THE SEARCH, ITEMS WERE PUT OUT ON

09:30AM   2   THE FRONT LAWN, THE PRESS WAS GIVEN ACCESS TO THE GROUNDS, THEY

09:30AM   3   WERE GIVEN TREATMENT, THERE WAS REALLY A DEARTH OF RECORD OF

09:30AM   4   WHO WAS IN CHARGE IN THE INVESTIGATION.

09:30AM   5        AND THEN MR. DUENAS WANTED TO TALK TO A COLLEAGUE OF HIS,

09:30AM   6   FORMER FRIEND OF HIS, WHO WAS PART OF LAW ENFORCEMENT, AND

09:30AM   7   THAT'S REALLY WHERE THE ISSUE WAS, THAT CONVERSATION BETWEEN

09:30AM   8   MR. DUENAS AND THE LAW ENFORCEMENT OFFICER.

09:30AM   9        MR. FLEURMONT:  THAT'S CORRECT.

09:31AM  10   SO THE LAW ENFORCEMENT OFFICER TESTIFIED AT A SUPPRESSION

09:31AM  11   HEARING.  BETWEEN THE SUPPRESSION HEARING AND THE ACTUAL TRIAL,

09:31AM  12   UNFORTUNATELY HE DIED, AND SO THE GOVERNMENT WANTED TO USE SOME

09:31AM  13   OF THE STATEMENTS THAT HE OBTAINED FROM MR. DUENAS IN THE

09:31AM  14   TRIAL.

09:31AM  15        THE COURT:  HE WAS KILLED BY A DRUNK DRIVER AS I

09:31AM  16   RECALL.

09:31AM  17        MR. FLEURMONT:  YES, THAT'S RIGHT.

09:31AM  18        THE COURT:  AND THEN THE QUESTION OF WHETHER OR NOT

09:31AM  19   THAT TESTIMONY WOULD BE ADMISSIBLE AT THE SUBSEQUENT EVENT, AND

09:31AM  20   THE ISSUE WAS ABOUT, IS TRIAL THE SAME AS SUPPRESSION?  IS THAT

09:31AM  21   WHAT IT WAS?

09:31AM  22        MR. FLEURMONT:  EXACTLY, YOUR HONOR.  SO THE COURT

09:31AM  23   HELD THAT THE STATEMENTS -- FIRST OFF, THE NINTH CIRCUIT SAID

09:31AM  24   THE LOWER COURT DID NOT DO THE APPROPRIATE ANALYSIS.  THE

09:31AM  25   APPROPRIATE ANALYSIS THERE IS WHETHER --

7708

09:31AM   1                    THE COURT:  ARE YOU TELLING ME HE GOT REVERSED

09:31AM   2      AGAIN?

09:31AM   3                    MR. FLEURMONT:  WE CHOOSE OUR CASES WISELY.

09:31AM   4           SO THE COURT SAYS THE ANALYSIS IS THIS:  WHETHER THE

09:31AM   5      FUNDAMENTAL OBJECTIVE WAS THE SAME IN BOTH PROCEEDINGS, AND IN

09:31AM   6      THE SUPPRESSION IN DUENAS, THE SUPPRESSION HEARING, THE

09:31AM   7      FUNDAMENTAL OBJECTION WAS TWO-FOLD BY THE DEFENSE ATTORNEY:

09:32AM   8      ONE TO SEE IF THE STATEMENT WAS VOLUNTARY; AND, TWO, TO REVIEW

09:32AM   9      THE PROTOCOL TO SEE IF THE STATEMENT WAS APPROPRIATE UNDER

09:32AM  10      MIRANDA.

09:32AM  11           THE DEFENSE ATTORNEY DIDN'T ACTUALLY GO INTO THE SUBSTANCE

09:32AM  12      OF THE STATEMENT AND DIDN'T REALLY PROBE THE STATEMENT FOR

09:32AM  13      THINGS THAT A DEFENSE ATTORNEY WOULD PROBE, WHERE DID IT

09:32AM  14      HAPPEN?  WAS IT RELIABLE?

09:32AM  15           SO ALTHOUGH THE COURT ALLOWED THE STATEMENT IN, THE LOWER

09:32AM  16      COURT ALLOWED THE STATEMENT IN, THE NINTH CIRCUIT SAID, NO, THE

09:32AM  17      OBJECTIVES WERE DIFFERENT.

09:32AM  18           AND SO THAT'S THE ANALYSIS THAT WE'RE ASKING FOR THE COURT

09:32AM  19      TO APPLY HERE, TO SEE IF THE FUNDAMENTAL OBJECTIVE BETWEEN THE

09:32AM  20      S.E.C. AND THE DOJ WERE SIMILAR IN BOTH PROCEEDINGS.

09:32AM  21           AND HERE THE MOTIVATIONS WE BELIEVE WERE.  SO -- AND THAT

09:32AM  22      WAS -- THE FUNDAMENTAL OBJECTIVE WAS DEVELOP INCRIMINATING

09:32AM  23      EVIDENCE AGAINST MR. BALWANI AND MS. HOLMES.

09:32AM  24           THE UNDERLYING ISSUES IN THE S.E.C. ACTION ARE THE SAME IN

09:32AM  25      THIS CASE.  MR. BALWANI AND MS. HOLMES WERE TARGETS OF BOTH

09:32AM  1    INVESTIGATIONS.

09:32AM  2         THIS IS CRITICAL.  THIS POINT IS CRITICAL.  THE S.E.C. AND

09:32AM  3    THE DOJ WERE INVESTIGATING THE SAME UNDERLYING CONDUCT.

09:33AM  4         IF YOU LOOK AT THE S.E.C. COMPLAINT, THIS IS AT

09:33AM  5    PARAGRAPH 91B OF THE COMPLAINT, THIS IS HOW THEY DESCRIBE THE

09:33AM  6    SECOND CLAIM, THAT MS. HOLMES AND MR. BALWANI EMPLOYED A SCHEME

09:33AM  7    TO DEFRAUD, TO, QUOTE, OBTAIN MONEY OR PROPERTY BY MEANS OF

09:33AM  8    UNTRUE STATEMENTS OF MATERIAL FACT.

09:33AM  9         AND THROUGHOUT THE COMPLAINT, THE S.E.C. COMPLAINT, THE

09:33AM 10    ALLEGATIONS RELATED TO THE ALLEGED FACT THAT THE RETAIL

09:33AM 11    PARTNERSHIP RELATIONSHIP STALLED, WHICH WAS THE EXACT SAME WORD

09:33AM 12    USED IN PARAGRAPH 12 OF THE INDICTMENT IN THIS CASE; IT

09:33AM 13    DISCUSSES ALLEGED MISSTATEMENTS ABOUT THERANOS TECHNOLOGY; AND

09:33AM 14    ALSO MISREPRESENTATIONS CONCERNING FINANCIAL NUMBERS.

09:33AM 15         YOU CAN LINE UP PARAGRAPH 12 OF THE INDICTMENT WITH THE

09:33AM 16    COMPLAINT IN THE S.E.C. AND THE VEN DIAGRAM IS PRETTY MUCH ONE.

09:33AM 17         AND THAT'S IMPORTANT IN THIS CASE.  THE GOVERNMENT HAS

09:33AM 18    REPRESENTED IN ITS OPPOSITION THAT, QUOTE, CRITICALLY THE

09:33AM 19    S.E.C. FOCUSSED ON SECURITIES FRAUD, WHEREAS THE INDICTMENT

09:33AM 20    ALSO ALLEGES A CONSPIRACY TO DEFRAUD PATIENTS.

09:33AM 21         THAT TOTALLY IGNORES THE FIRST CONSPIRACY, WHICH WE SUBMIT

09:34AM 22    THERE'S A LOT OF OVERLAP.

09:34AM 23         SO THAT GOES TO THE ELEMENT OF THE SIMILARITY OF THE

09:34AM 24    UNDERLYING ISSUES.

09:34AM 25         THE SECOND ELEMENT IS THE CONTEXT OF THE QUESTIONING.

09:34AM 1          IN THIS CASE, AS THE COURT PROBABLY NOTICED FROM THE

09:34AM 2     DEPOSITION CLIPS THAT WE PROVIDED, THESE ARE LEADING QUESTIONS

09:34AM 3     ABOUT STATEMENTS MADE BY MR. BALWANI.

09:34AM 4          THEY'RE ALSO LEADING QUESTIONS ABOUT INFORMATION KNOWN BY

09:34AM 5     MS. HOLMES.  ON THE FINANCIAL MODEL ISSUE, THE S.E.C. ATTORNEYS

09:34AM 6     SAID, WELL, MS. HOLMES KNEW ABOUT THE ASSUMPTIONS.  MS. HOLMES

09:34AM 7     KNEW ABOUT THE FINANCIAL MODEL.  WHAT DID SHE EVER HAVE?  DID

09:34AM 8     SHE EVER ACTUALLY HAVE THE FINANCIAL MODEL?

09:34AM 9          AND HE SAID NO.

09:34AM 10         SO THE TYPES OF QUESTIONING ALSO SUPPORTS THAT THERE WAS A

09:34AM 11    FUNDAMENTAL OBJECTIVE FOR THIS.

09:34AM 12         SO IF I COULD QUICKLY JUST TALK ABOUT THE S.E.C. VERSUS

09:34AM 13    JASPER CASE, WHICH WAS AN OPTIONS BACKDATING CASE.  IN THAT

09:34AM 14    CASE, THE COURT AND THE NINTH CIRCUIT DID FIND THAT THERE WAS

09:34AM 15    NOT A SIMILAR MOTIVE, AND THE COURT SAID --

09:34AM 16              THE COURT:  THAT THERE WAS NOT A SIMILAR MOTIVE?

09:34AM 17              MR. FLEURMONT:  THERE WAS NOT A SIMILAR MOTIVE

09:35AM 18    BETWEEN THE S.E.C. AND THE DOJ.

09:35AM 19         AND IN THAT CASE, THE COURTS SAY THAT THERE ARE INHERENTLY

09:35AM 20    DIFFERENT MOTIVES INVOLVED IN AN EARLIER INVESTIGATION IN WHICH

09:35AM 21    OPEN-ENDED QUESTIONS ARE TYPICALLY ASKED WITHOUT EXPECTATION

09:35AM 22    THAT THE WITNESS WILL BE NEEDED AT TRIAL.

09:35AM 23         THAT IS NOTHING LIKE THE DEPOSITION THAT OCCURRED IN THIS

09:35AM 24    CASE.  MR. BALWANI WAS A TARGET.  THERE WERE NOT OPEN-ENDED

09:35AM 25    QUESTIONS.  AND THE QUESTIONS THAT WERE ASKED WERE, AS YOU CAN

09:35AM 1    SEE IN THE COMPLAINT, AIMED AT FINDING ABOUT WHETHER THERE WERE

09:35AM 2    MISSTATEMENTS, AIMED AT THE CATEGORIES THAT WE CITED IN OUR

09:35AM 3    BRIEF.

09:35AM 4            THE COURT:  ALL RIGHT.  THANK YOU.

09:35AM 5        LET ME TURN TO YOUR COLLEAGUE OPPOSITE, MS. VOLKAR.

09:35AM 6        MS. VOLKAR, DO YOU HAVE ANYTHING TO SAY OR CAN YOU HELP US

09:35AM 7    ON SOME OF THESE ISSUES?

09:35AM 8            MS. VOLKAR:  ABSOLUTELY, YOUR HONOR.  THANK YOU.

09:35AM 9        FIRST I WANT TO START WITH THE TIMELINE BECAUSE I DO THINK

09:35AM 10   THAT IS REALLY CRITICAL, ESPECIALLY WHERE MY COLLEAGUE JUST

09:35AM 11   ENDED IN TALKING ABOUT THE S.E.C. VERSUS JASPER CASE.

09:35AM 12       IN THIS CASE, IN 2016 THERE WERE CONCURRENT INVESTIGATIONS

09:35AM 13   ONGOING, INCLUDING BY THE S.E.C., INCLUDING BY THE GRAND JURY

09:36AM 14   SUBPOENAS, BUT THERE WERE NO CRIMINAL OR, AS FAR AS I KNOW,

09:36AM 15   CIVIL ENFORCEMENT CHARGES BY THE S.E.C. AT THAT TIME.

09:36AM 16       THEN THE INVESTIGATIVE TESTIMONY BY MR. BALWANI THAT'S AT

09:36AM 17   ISSUE HERE OCCURS IN AUGUST AND SEPTEMBER OF 2017.

09:36AM 18       THE FIRST TIME ANY ENFORCEMENT PROCEEDINGS ARE BROUGHT IS

09:36AM 19   MARCH 2018 WHEN THE S.E.C. FILES ITS COMPLAINT.  AND, OF COURSE

09:36AM 20   YOUR HONOR IS VERY FAMILIAR WITH THAT CASE.  IT IS PENDING

09:36AM 21   BEFORE YOU.

09:36AM 22       BUT THAT COMPLAINT WAS NOT FILED UNTIL MARCH OF 2018, AND

09:36AM 23   THAT CHANGES WHAT S.E.C. VERSUS JASPER TALKS ABOUT, THE S.E.C.

09:36AM 24   PROCEEDINGS FROM THE INVESTIGATORY STAGE TO THE ENFORCEMENT

09:36AM 25   ACTION STAGE.  SO THAT'S THE S.E.C.

09:36AM 1        NOW, FOR THE DOJ'S PART, THE CRIMINAL INDICTMENT IN THIS

09:36AM 2   CASE WAS ENTERED BY THE -- OR ISSUED BY THE GRAND JURY I

09:36AM 3   BELIEVE JUNE 2018.  SO AGAIN, CRITICALLY AFTER THE TESTIMONY IN

09:37AM 4   THIS CASE.

09:37AM 5        AND AS THE DEFENSE POINTED OUT IN THEIR MOTION, WHEN

09:37AM 6   MR. BALWANI WAS BROUGHT BACK IN 2019, HE OF COURSE INVOKED HIS

09:37AM 7   FIFTH AMENDMENT RIGHTS BECAUSE NOW HE WAS UNDER THESE

09:37AM 8   ENFORCEMENT PROCEEDINGS, BOTH THE S.E.C. ENFORCEMENT PROCEEDING

09:37AM 9   AND THE CRIMINAL INDICTMENT BY THE DOJ.

09:37AM 10        SO I THINK THAT TIMELINE IS VERY CRITICAL.

09:37AM 11        AND THEN WITH THAT IN MIND, I WANTED TO TALK ABOUT HOW ALL

09:37AM 12   THE CATEGORIES OF STATEMENTS THAT THEY'RE SEEKING TO ADMIT IN

09:37AM 13   THE TESTIMONY REALLY FALL INTO THREE BUCKETS WHICH AT THE END

09:37AM 14   OF THE DAY MAKE NONE OF THEM ADMISSIBLE.

09:37AM 15        AND THOSE THREE BUCKETS ARE -- MOST OF THEM ARE NOT

09:37AM 16   NECESSARILY SELF-INCULPATORY BECAUSE THEY'RE SHARING BLAME OR

09:37AM 17   DEFLECTING BLAME, AND THE NINTH CIRCUIT HAS TOLD US THAT THOSE

09:37AM 18   ARE NOT THE TYPE OF STATEMENTS THAT 804(B)(3) INTENDS TO

09:37AM 19   PERMIT.

09:37AM 20        THEY ARE ALSO NOT CORROBORATED OR UNTRUSTWORTHY, AND I'LL

09:37AM 21   COME BACK TO THAT IN JUST A MOMENT.

09:37AM 22        AND THEN TO THE EXTENT THAT ANY OF THEM ARE CORROBORATED,

09:37AM 23   THEY'RE REALLY CUMULATIVE AND THEY'RE FACT WITNESS TESTIMONY,

09:38AM 24   AS YOUR HONOR POINTED OUT, THAT ESSENTIALLY IS JUST ANOTHER WAY

09:38AM 25   OF TRYING TO REINFORCE TESTIMONY OF PRIOR WITNESSES WITHOUT

09:38AM  1    CALLING THE PERSON HERE TO TALK ABOUT IT.

09:38AM  2        NOW, ONE EXAMPLE, OR ONE VERY CLEAR EXAMPLE THAT I THINK

09:38AM  3    HIGHLIGHTS THE ISSUES IN WHAT DEFENSE IS TRYING TO SEEK TO

09:38AM  4    ADMIT HERE IS EXHIBIT C, DOCKET 1163-4.  THE TWO PAGES THAT

09:38AM  5    THEY WANT TO ADMIT ARE ALL ABOUT WHO RAN THE LAB.  THAT'S THEIR

09:38AM  6    CATEGORY.

09:38AM  7        AND THE QUESTION FROM THE S.E.C. IS, WHO AT THERANOS MADE

09:38AM  8    THE DETERMINATION OF WHAT DEVICE TO USE FOR PATIENT TESTING IN

09:38AM  9    THE CLIA LAB?  THAT WOULD BE AN IMPORTANT QUESTION, I THINK, IN

09:38AM  10   OUR CASE WHERE WE HAVE THE PATIENT CONSPIRACY.

09:38AM  11       MR. BALWANI DOES NOT SAY, IT WAS ME, I DID IT, MS. HOLMES

09:38AM  12   HAD NOTHING TO DO WITH IT.

09:38AM  13       IF THAT WAS THE STATEMENT WE WERE LOOKING AT, WE WOULD BE

09:38AM  14   HAVING A VERY DIFFERENT CONVERSATION.

09:38AM  15       WHAT HE SAYS IN SUBSTANCES IN HIS ANSWER WAS IT WAS THE

09:39AM  16   LAB DIRECTOR AND THE SCIENTISTS AND THE ENGINEERS MADE ALL OF

09:39AM  17   THE TECHNICAL DECISIONS, AND THE TSPU WAS MODIFIED, AND WHETHER

09:39AM  18   OR NOT IT WAS USED, THAT WAS UP TO THE LAB DIRECTOR.

09:39AM  19       AND WAS THAT TRUE THROUGHOUT YOUR TIME AT THERANOS?

09:39AM  20       YES.

09:39AM  21       THERE'S NOTHING IN THIS STATEMENT THAT SAYS ANYTHING OTHER

09:39AM  22   THAN WHAT THE DEFENSE HAS BEEN PRESENTING IN THIS CASE THUS

09:39AM  23   FAR, WHICH IS IT WAS THE LAB DIRECTOR WHO WAS INVOLVED IN

09:39AM  24   PATIENT TESTING.

09:39AM  25       SO AS FAR AS 804(B)(3) GOES, THERE'S NOTHING IN EXHIBIT C

09:39AM   1    THAT MOVES INTO THE REALM THAT 804(B)(3) IS MEANT TO COVER.

09:39AM   2            THE COURT:  MS. VOLKAR, LET ME ALSO INTERRUPT YOU

09:39AM   3    FOR JUST A MOMENT TO SUGGEST THAT AS I READ THROUGH THIS, I WAS

09:39AM   4    REMINDED OF ALL OLD FRIEND, FEDERAL RULE OF EVIDENCE 106, AND

09:39AM   5    WHETHER OR NOT THAT WAS GOING TO COME INTO PLAY HERE AS TO ANY

09:39AM   6    OF THESE STATEMENTS.

09:39AM   7            AND, YOU KNOW, COUNSEL, FEEL FREE TO RAISE THAT ISSUE.

09:39AM   8            I NOTE THE EXHIBITS, THEY'RE REDACTED.  AND I LOOKED AT

09:40AM   9    THAT AND THOUGHT, WELL, WE'VE BEEN THROUGH THIS BEFORE, AND

09:40AM  10    SOMETIMES THE REDACTIONS ARE UNREDACTED TO PROVIDE CONTEXT I

09:40AM  11    THINK IS HOW WE'VE CALLED IT THROUGHOUT THIS TRIAL.

09:40AM  12            SO I'M BEARING THAT IN MIND, TOO.

09:40AM  13            SO PLEASE CONTINUE.  THANK YOU.

09:40AM  14            MS. TREFZ:  YES.  THANK YOU, YOUR HONOR.

09:40AM  15            I DO WANT TO, FOR THE RECORD, STATE THAT WE RECEIVED THIS

09:40AM  16    MOTION SHORTLY BEFORE THE THANKSGIVING HOLIDAY.  WE WERE NOT

09:40AM  17    GIVEN ANY ADVANCE WARNING BY DEFENSE COUNSEL, NOR WERE WE GIVEN

09:40AM  18    ANY INDICATION OF WHAT PORTIONS THEY WERE GOING TO SEEK TO

09:40AM  19    ADMIT SUCH THAT WE COULD GIVE OUR RULE 106 SUGGESTIONS.

09:40AM  20            SO BASED ON HOW THE COURT RULES, WE WOULD ASK THE

09:40AM  21    OPPORTUNITY TO DO THAT.  AND CANDIDLY, THERE'S A LOT GOING ON

09:40AM  22    DURING THE TRIAL, BUT, OF COURSE, IF YOUR HONOR IS INCLINED TO

09:40AM  23    ADMIT ANY PORTIONS, WE WOULD LIKE THE OPPORTUNITY TO REVIEW FOR

09:40AM  24    106 PURPOSES.

09:40AM  25            THE COURT:  SURE.  AND THIS CIRCLES BACK TO MY

09:40AM 1    INITIAL QUESTION ABOUT TIMING OF WHERE WE ARE, AND YOU NEED TO

09:40AM 2    TALK TO YOUR COLLEAGUES ABOUT THAT AS YOU SAID, RIGHT?

09:41AM 3         MS. VOLKAR:  YOUR HONOR, WITHOUT GOING TOO FAR WITH

09:41AM 4    MS. HOLMES ON THE STAND, I'M NOT ENTIRELY CLEAR WHY THE MOTION

09:41AM 5    HAD TO BE HEARD TODAY, BUT I BELIEVE MY -- I'M SURE MY

09:41AM 6    COLLEAGUES HAD GOOD REASON FOR IT.

09:41AM 7       NOW, THE OTHER PART THAT I WANT TO MENTION IS REALLY THE

09:41AM 8    CASES.  AND I THINK WE HAVE PRETTY GOOD NINTH CIRCUIT -- OR

09:41AM 9    INDICATION FROM THE NINTH CIRCUIT OF WHERE WE SHOULD LAND, OR

09:41AM 10   WHERE THE COURT SHOULD LAND IN THIS CASE.

09:41AM 11      AND ALTHOUGH MY COLLEAGUES, I RESPECT THEM FOR LOOKING FOR

09:41AM 12   CASES WHERE THE COURT WAS REVERSED OR OVERTURNED, IN DOING SO,

09:41AM 13   THEY OVERLOOKED OR PUSHED TO THE SIDE CASES THAT ARE MUCH MORE

09:41AM 14   FACTUALLY SIMILAR TO WHAT WE HAVE HERE.

09:41AM 15      AND ENDING WHERE MY COLLEAGUE BEGAN, WITH S.E.C. V.

09:41AM 16   JASPER, I THINK THAT'S A RIGHT ON POINT EXAMPLE OF WHAT I MEAN.

09:41AM 17      SO IN S.E.C. V. JASPER, WE HAVE ALMOST THE EXACT SAME

09:41AM 18   SCENARIO AS WE DO HERE WHERE THERE WAS AN S.E.C. INVESTIGATORY

09:42AM 19   PROCEEDING AND THEN THERE WAS THE S.E.C. ENFORCEMENT ACTION.

09:42AM 20      AND THIS WAS A CASE WHERE THE DEFENSE WANTED TO USE

09:42AM 21   TESTIMONY GATHERED DURING THE S.E.C.'S INVESTIGATORY FUNCTION

09:42AM 22   AGAINST THE S.E.C. IN THE ENFORCEMENT ACTION THAT IT HAD AT

09:42AM 23   TRIAL LATER IN THE SAME CASE.

09:42AM 24      SO THIS WAS, AS I SAID, AS FAR AS I COULD TELL, PRETTY

09:42AM 25   MUCH ON ALL FOURS WITH WHAT WE HAVE HERE BUT FOR WE'RE NOT THE

09:42AM 1    S.E.C.

09:42AM 2         WE'RE APPEARING BEFORE YOUR HONOR ON BEHALF OF THE DOJ, SO

09:42AM 3    WE'RE ONE STEP REMOVED.  IN FACT, AS I ARGUED IN MY BRIEF, I

09:42AM 4    THINK THE S.E.C. AND THE DOJ ARE NOT PROPERLY CONSIDERED TO BE

09:42AM 5    THE SAME PARTY, AND THAT COULD BE A THRESHOLD ISSUE.

09:42AM 6         BUT EVEN IF YOUR HONOR WANTS TO DO, AS MANY COURTS HAVE,

09:42AM 7    AND SKIP THAT QUESTION, MOVING TO THE SIMILAR MOTIVE, I DON'T

09:42AM 8    SEE HOW THIS CASE IS DIFFERENT AND NOT ON ALL FOURS WITH

09:42AM 9    S.E.C. V. JASPER WHERE THE COURT SAID THAT THE INVESTIGATORY

09:43AM 10   TESTIMONY COULD NOT BE USED AGAINST THE S.E.C. IN THE LATER

09:43AM 11   ENFORCEMENT ACTION, AND WE ASK THAT THE S.E.C. TESTIMONY NOT BE

09:43AM 12   PERMITTED TO BE USED AGAINST THE DOJ IN ITS CRIMINAL ACTION

09:43AM 13   WITHOUT THE BENEFIT OF CROSS-EXAMINATION.

09:43AM 14        SO THAT'S 804(B)(1).

09:43AM 15        AND THEN JUST TO CIRCLE BACK TO 804(B)(3), THERE IS THE

09:43AM 16   GADSON CASE, AND ALTHOUGH MY COLLEAGUE IS CORRECT THAT THE

09:43AM 17   CASES WITH LOVE AND RELATIONSHIPS FREQUENTLY ARE FAMILY

09:43AM 18   RELATIONSHIPS, I THINK THAT THE UNDERLYING POINT THAT THE COURT

09:43AM 19   IS MAKING CAN BE APPLICABLE TO A ROMANTIC RELATIONSHIP,

09:43AM 20   PARTICULARLY A ROMANTIC RELATIONSHIP THAT SPANNED MORE THAN A

09:43AM 21   DECADE.

09:43AM 22        AND THE DEFENDANTS TALK IN THEIR TEXT MESSAGES ABOUT HOW

09:43AM 23   WE'VE HAD A RELATIONSHIP FOR LONGER THAN MOST MARRIAGES SURVIVE

09:43AM 24   AND ISN'T THAT REALLY WONDERFUL?

09:43AM 25        AND THEY CLEARLY HAVE THIS LOVING RELATIONSHIP, AND MAYBE

09:43AM  1    THERE WERE NON-LOVING PARTS OF IT, I'M NOT GETTING INTO THAT

09:43AM  2    RIGHT NOW, BUT THEY DID HAVE A LOVING RELATIONSHIP TO WHERE

09:44AM  3    LESS THAN A YEAR -- OR, I'M SORRY, APPROXIMATELY A YEAR BEFORE

09:44AM  4    MR. BALWANI IS GIVING THIS TESTIMONY BEFORE THE S.E.C., HE IS

09:44AM  5    SAYING THAT I WANT, I WANT TO, YOU KNOW, DEVOTE MYSELF TO YOU,

09:44AM  6    I WANT TO HELP YOU IN ANY WAY, SHAPE, OR FORM THAT I CAN.

09:44AM  7        NOW, IF THE COURT IS NOT -- DOESN'T FEEL THAT THE RECORD

09:44AM  8    IS SUFFICIENTLY DEVELOPED TO QUESTION THE TRUSTWORTHINESS OF

09:44AM  9    THE STATEMENTS BASED ON LOVE, WE CAN ALSO JUST LOOK AT THE

09:44AM  10   FACTS, AND THE FACTS DON'T NECESSARILY CORROBORATE WHAT I WOULD

09:44AM  11   ASSUME ARE THE KEY PIECES THAT THE DEFENSE COUNSEL WANT IN.

09:44AM  12       AND WHAT DO I MEAN BY THAT?  THERE ARE TWO INSTANCES WHERE

09:44AM  13   MR. BALWANI ACTUALLY SAYS THAT MS. HOLMES WASN'T INVOLVED, AND

09:44AM  14   I BELIEVE MY COUNSEL CORRECTLY IDENTIFIED THEM.  SHE WASN'T

09:44AM  15   INVOLVED IN THE FINANCIAL MODELS, AND SHE WASN'T AWARE OF THE

09:44AM  16   NULL PROTOCOL.

09:44AM  17       THOSE ARE THE ONLY TWO TIMES THAT I COULD FIND WHERE HE

09:44AM  18   DIRECTLY SAYS THAT, AND AS MY COLLEAGUE WAS TALKING ABOUT THE

09:44AM  19   PAGUIO CASE, THAT'S THE CRITICAL SECOND HALF OF THE SENTENCE

09:45AM  20   THAT THE COURT SAID, IT WAS ME AND NOT MY SON.

09:45AM  21       SO WHEN WE'RE JUST LOOKING AT THESE TWO INSTANCES OF

09:45AM  22   PRESUMABLY BALWANI SAYING IT WAS ME AND NOT MS. HOLMES, AND

09:45AM  23   THEN LET'S LOOK AT WHAT EVIDENCE THERE IS TO CORROBORATE THAT

09:45AM  24   OTHER THAN THE LOVE OR LOVING RELATIONSHIP THAT MIGHT HAVE LED

09:45AM  25   HIM TO SAY THAT.

7718

09:45AM 1     IF WE LOOK AT THE EVIDENCE IN THE TRIAL ON THE NULL

09:45AM 2  PROTOCOL, WE HAVE DANIEL EDLIN SAYING, YEAH, I KNEW WHAT THE

09:45AM 3  NULL PROTOCOL WAS, LET ME EXPLAIN IT FOR YOU, EVEN THOUGH

09:45AM 4  MR. BALWANI SAID ONLY THE ENGINEERS CAN UNDERSTAND THIS

09:45AM 5  CONCEPT, SO THE IMPLICATION BEING THERE'S NO WAY MS. HOLMES

09:45AM 6  COULD HAVE UNDERSTOOD THIS CONCEPT.

09:45AM 7     AND THEN THE SECOND THING IS WE HAVE TRIAL TRANSCRIPTS IN

09:45AM 8  THIS CASE THAT ARE FORWARDED FROM MR. BALWANI TO MS. HOLMES, OR

09:45AM 9  FROM MR. EDLIN TO MS. HOLMES DISCUSSING WHETHER OR NOT THEY

09:45AM 10  SHOULD USE THE NULL PROTOCOL DURING SPECIFIC DEMOS OR

09:45AM 11  DEMONSTRATIONS.

09:45AM 12     THE COURT:  THAT WAS -- I WAS CURIOUS ABOUT THAT AND

09:45AM 13  I WANTED TO ASK ABOUT THAT.  I HAVEN'T PORED THROUGH THE

09:46AM 14  TRANSCRIPT TO THAT POINT, BUT IT DID STICK IN MY MIND AND MY

09:46AM 15  NOTES SEEM TO SUGGEST THAT DURING MR. EDLIN'S I BELIEVE

09:46AM 16  TESTIMONY, HE SPOKE ABOUT THE NULL PROTOCOL AND I THINK HE

09:46AM 17  SPOKE SPECIFICALLY ABOUT A VIP VISIT AND WHETHER OR NOT, I

09:46AM 18  THINK IT WAS WHETHER, THEY WERE GOING TO AND HOW THEY WERE

09:46AM 19  GOING TO INVOKE THE NULL PROTOCOL FOR THAT VISIT.

09:46AM 20     AND I CAN'T REMEMBER EXACTLY WHETHER OR NOT THAT WENT UP

09:46AM 21  THE CHAIN SUCH THAT IT WAS CONNECTED TO MS. HOLMES OR TO

09:46AM 22  MR. BALWANI.  PERHAPS YOU KNOW THAT ANSWER THIS MORNING.  I'M

09:46AM 23  HAPPY TO HEAR IF YOU DO.

09:46AM 24     MS. VOLKAR:  I DO, YOUR HONOR.

09:46AM 25     I CAN THINK OF TWO DOCUMENTS, AND WITH THE COURT'S

7719

09:46AM  1    INDULGENCE I CAN COME UP WITH THE TRIAL EXHIBIT NUMBERS FOR

09:46AM  2    THOSE DOCUMENTS.  I APOLOGIZE, I DON'T HAVE THEM RIGHT IN FRONT

09:46AM  3    OF ME.

09:46AM  4        BUT I'M THINKING OF TWO DOCUMENTS, BOTH FROM MR. EDLIN,

09:46AM  5    AND AT LEAST IN ONE HE'S DISCUSSING THE DOCUMENT IN THE PORTION

09:46AM  6    OF THE TRANSCRIPT THAT I CITED FOR THE COURT.

09:46AM  7        THE COURT:  RIGHT.

09:47AM  8        MS. VOLKAR:  THE FIRST ONE IS A DISCUSSION AMONG

09:47AM  9    EDLIN AND I BELIEVE SOFTWARE ENGINEERS, SO ENGINEERS AT THE

09:47AM  10   COMPANY, ABOUT WHETHER TO USE THE DEMO APP OR THE NULL PROTOCOL

09:47AM  11   AND WHICH DEVICE TO USE, THE 4.0 OR THE 3S, ET CETERA.

09:47AM  12       AND I BELIEVE IT'S DANIEL YOUNG RESPONDS AND SAYS THAT ONE

09:47AM  13   OF THE OPTIONS IS NOT AVAILABLE, AND MR. BALWANI IS ON THE

09:47AM  14   CHAIN THE ENTIRE TIME, I BELIEVE, AND HE FORWARDS THAT CHAIN TO

09:47AM  15   MS. HOLMES AND SAYS VERY FRUSTRATING.

09:47AM  16       NOW, AS WE KNOW, UNLESS MS. HOLMES TESTIFIES TO IT, WE

09:47AM  17   DON'T KNOW WHETHER SHE FULLY UNDERSTOOD THE CONTEXT OF THAT OR

09:47AM  18   WHAT HAVE YOU, BUT SHE AT LEAST WAS BEING LOOPED IN BY

09:47AM  19   MR. BALWANI INTO THE DISCUSSION.

09:47AM  20       SIMILARLY, THERE'S A SECOND DOCUMENT WHERE MR. EDLIN, IF

09:47AM  21   MY MEMORY SERVES, IS SENDING IT DIRECTLY TO MS. HOLMES AND

09:47AM  22   MR. BALWANI AND TALKING ABOUT HERE ARE THE DIFFERENT OPTIONS

09:47AM  23   THAT WE CAN USE, INCLUDING THE NULL PROTOCOL AND ONE OF THE

09:47AM  24   DEVICES, AND I BELIEVE MS. HOLMES RESPONDS TO THE SUGGESTION OF

09:48AM  25   USE THE 3.0 OR SOMETHING LIKE THAT.

09:48AM 1        NOW, AGAIN, IS THAT SHOWING THAT SHE HAS A DETAILED

09:48AM 2    KNOWLEDGE OF THE NULL PROTOCOL?  I'M NOT SURE.

09:48AM 3        BUT, AGAIN, WHEN IT COMES TO WHETHER THERE'S CORROBORATION

09:48AM 4    FOR MR. BALWANI'S TESTIMONY, MR. EDLIN DID NOT SAY ON

09:48AM 5    CROSS-EXAMINATION THAT MS. HOLMES DID NOT KNOW WHAT THE NULL

09:48AM 6    PROTOCOL WAS.  THAT WAS AT LEAST THE INDICATION THAT I GOT FROM

09:48AM 7    THE BRIEFING, AND WHEN I LOOKED AT THAT CITE, THAT'S NOT THERE.

09:48AM 8        AND, IN FACT, IT'S THE OPPOSITE.  MR. EDLIN TALKS ABOUT

09:48AM 9    WHAT THE NULL PROTOCOL IS, EVEN THOUGH HE'S NOT AN ENGINEER,

09:48AM 10   AND HE'S ON A NUMBER OF THESE DOCUMENTS THAT ARE SHARED WITH

09:48AM 11   MS. HOLMES.

09:48AM 12       I THINK IT'S AT LEAST A FAIR INFERENCE THAT MS. HOLMES

09:48AM 13   MIGHT HAVE KNOWN WHAT THE NULL PROTOCOL WAS, AND EVEN IF WE

09:48AM 14   DON'T HAVE TO GET INTO THAT REALM, THERE'S CERTAINLY NO

09:48AM 15   CORROBORATION YET IN THE EVIDENCE THAT SHE DID NOT KNOW WHAT

09:48AM 16   THE NULL PROTOCOL WAS, AND THIS TESTIMONY WOULD BE THE FIRST,

09:48AM 17   AND AS FAR AS I'M AWARE THE ONLY, SUCH TESTIMONY OR EVIDENCE IN

09:48AM 18   THE CASE TO BRING IN THAT PIECE.

09:48AM 19       NOW, I WANT TO GO TO THE SECOND POINT, WHICH IS -- IF IT'S

09:49AM 20   OKAY, YOUR HONOR?

09:49AM 21            THE COURT:  YES.

09:49AM 22            MS. VOLKAR:  -- WHICH IS THE FINANCIAL MODELS, AND

09:49AM 23   THAT'S ANOTHER INSTANCE WHERE I BELIEVE IT'S AT THE END OF

09:49AM 24   EXHIBIT B IF MY MEMORY IS SERVING.  IT IS.

09:49AM 25       THE VERY LAST PAGE OF EXHIBIT B WHERE HE EXPLICITLY -- THE

09:49AM 1    S.E.C. IS ASKING MR. BALWANI WHETHER OR NOT MS. HOLMES HAD

09:49AM 2    KNOWLEDGE OF THE FINANCIAL MODELS, AND HIS LAST ANSWER IS, TO

09:49AM 3    THE BEST OF MY KNOWLEDGE NO.

09:49AM 4        NOW, AGAIN, I'M PUTTING THESE CATEGORIES OF STATEMENTS

09:49AM 5    INTO THE PAGUIO LAND, WHICH IS THE NOT ME -- OR IT WAS ME, NOT

09:49AM 6    MY SON.

09:49AM 7        NOW, HERE HE SAYS, TO THE BEST OF MY KNOWLEDGE, NO, SHE

09:49AM 8    DID NOT EDIT THE MODEL OR SHE WAS NOT FAMILIAR WITH THE MODEL.

09:49AM 9        BUT WE ALSO HAVE IN -- WE ALSO HAVE IN EVIDENCE, I BELIEVE

09:49AM 10   IT'S IN THE PART THAT WAS ADMITTED, THE TEXT MESSAGES WHERE

09:49AM 11   RIGHT BEFORE THE 2013 INVESTMENTS AND THE 2013 PERIOD WHEN

09:49AM 12   THEY'RE TALKING TO POTENTIAL INVESTORS, BALWANI IS --

09:50AM 13   MR. BALWANI IS IN INDIA, AND HE'S TEXTING MS. HOLMES PRESUMABLY

09:50AM 14   TO SAY I CAN'T BE THERE FOR THIS PHONE CALL OR I CAN'T BE THERE

09:50AM 15   FOR THIS MEETING, AND HE SAYS, CAN YOU GET COMFORTABLE WITH THE

09:50AM 16   FINANCIAL MODEL OR DO YOU WANT ME TO COVER IT WITH PRESUMABLY

09:50AM 17   AN INVESTOR LATER IN TIME?

09:50AM 18       AND SHE RESPONDS, I CAN GET COMFORTABLE WITH IT.

09:50AM 19       NOW, ALTHOUGH THAT MAY AGAIN NOT DIRECTLY CONTRADICT WHAT

09:50AM 20   IS HERE, IT'S CERTAINLY NOT CORROBORATING IT.

09:50AM 21       AND I GO BACK TO IT LEAVES OPEN ROOM FOR MULTIPLE

09:50AM 22   INFERENCES, AND THIS PIECE WOULD BE THE FIRST PIECE OF EVIDENCE

09:50AM 23   TO BRING IN SOMETHING DIFFERENT THAT IS NOT NECESSARILY

09:50AM 24   DIRECTLY CORROBORATED BY ANYTHING IN THE RECORD.

09:50AM 25       AND THAT'S WHERE I GO TO IT DOES MATTER THE

09:50AM  1      TRUSTWORTHINESS OF THESE STATEMENTS IF WE'RE TALKING ABOUT

09:50AM  2      804(B)(3), AND THE KEY POINTS THAT THEY WOULD WANT TO BRING IN

09:50AM  3      FROM THIS TESTIMONY THAT SAYS NO, NOT MS. HOLMES, THERE'S NOT A

09:50AM  4      SUFFICIENT INDICATION OF TRUSTWORTHINESS.

09:50AM  5          AND A LOT OF THE OTHER STATEMENTS, IT WAS THE LAB

09:51AM  6      DIRECTOR, MS. HOLMES HAD THE CLOSER RELATIONSHIP WITH

09:51AM  7      STEVE BURD AND SAFEWAY, I WAS INVOLVED WITH WALGREENS, BUT WE

09:51AM  8      WERE BOTH INVOLVED AT THE START, A LOT OF THOSE STATEMENTS HAVE

09:51AM  9      BEEN BROUGHT IN THROUGH OTHER FACT WITNESSES AND DON'T REALLY

09:51AM  10     MOVE THE BALL FORWARD AND THAT'S WHY WE MADE THE CUMULATIVE

09:51AM  11     ARGUMENT.

09:51AM  12         BUT I REALLY WANTED TO FOCUS THE COURT ON WHAT I THINK ARE

09:51AM  13     THE KEY DECISION POINTS HERE, AND I THINK THOSE TWO ARE IT, AND

09:51AM  14     I THINK THEY DON'T HAVE THE SUFFICIENT INDICIA OF

09:51AM  15     TRUSTWORTHINESS FOR 804(B)(3).

09:51AM  16             THE COURT:  OKAY.  THANK YOU.

09:51AM  17             MR. FLEURMONT:  SURE, YOUR HONOR.  A COUPLE OF

09:51AM  18     POINTS.

09:51AM  19         I THINK I SHOULD START WITH KIND OF EXPLAINING WHAT -- MY

09:51AM  20     UNDERSTANDING OF WHAT CORROBORATION MEANS.  CORROBORATION DOES

09:51AM  21     NOT MEAN YOU HAVE ANOTHER WITNESS OR ANOTHER DOCUMENT THAT SAYS

09:51AM  22     EXACTLY WHAT THE PERSON SAYS.

09:51AM  23         CORROBORATION MEANS THAT THERE ARE EXHIBITS OR EVIDENCE

09:51AM  24     THAT SUPPORT THAT WHAT THE PERSON SAID IS RELIABLE.

09:51AM  25         IN THE PAGUIO CASE THERE WAS NOT -- THERE WAS

7723

09:51AM 1   CORROBORATION IN THAT CASE, BUT IT WASN'T THAT THE LOAN

09:51AM 2   OFFICERS OR THE ESCROW AGENT OR THE ACCOUNTANT SAYS THIS MAN

09:52AM 3   TOLD ME IT WAS ONLY HIS SCHEME.  IT WAS, NO, I ONLY SAW HIM DO

09:52AM 4   THIS, I NEVER SAW HIS SON.

09:52AM 5       SO CORROBORATION DOES NOT MEAN THAT THERE WAS EVIDENCE OR

09:52AM 6   AN EXHIBIT THAT SAYS EXACTLY WHAT THE PERSON SAYS.  SO I JUST

09:52AM 7   WANT TO START THERE.

09:52AM 8       IN TERMS OF THE CORROBORATION THAT WE DO HAVE IN THIS

09:52AM 9   CASE, FIRST MY COLLEAGUE MENTIONED THAT SHE BELIEVED THAT SOME

09:52AM 10  OF THE EVIDENCE IS CUMULATIVE OF SOME OF HIS STATEMENTS.

09:52AM 11      WELL, IT CANNOT BE THAT THE EVIDENCE IS CUMULATIVE OF THE

09:52AM 12  STATEMENTS AND THEN THERE IS ALSO NO CORROBORATION.  EITHER THE

09:52AM 13  CORROBORATION IS SUPPORTED SUCH THAT THE PROVISION APPLIES OR

09:52AM 14  THERE'S NOTHING IN THE RECORD THAT SUPPORTS IT.

09:52AM 15          THE COURT:  SO YOUR ARGUMENT IS THAT, WELL, IF IT'S

09:52AM 16  IN, AS MS. VOLKAR SUGGESTS, THEN WHAT'S THE HARM OF BRINGING IT

09:52AM 17  IN AGAIN I THINK IS THE CUMULATIVE ARGUMENT.

09:52AM 18          MR. FLEURMONT:  NOT QUITE, YOUR HONOR.  THE ARGUMENT

09:52AM 19  IS THAT IF IT'S IN, THEN IT'S CORROBORATED, NOT THAT THERE'S NO

09:52AM 20  HARM.  IF IT'S IN, IT'S CORROBORATED, AND THEREFORE THE

09:52AM 21  EXCEPTION APPLIES.

09:52AM 22      SO THAT'S ON THE CUMULATIVE POINT.

09:52AM 23      AND ON THE -- IF I CAN, I WOULD LIKE TO DISCUSS THE

09:52AM 24  PORTIONS OF THE DEPOSITIONS THAT WE PUT IN.

09:52AM 25          THE COURT:  SURE.

09:53AM 1          MR. FLEURMONT:  OKAY.  ON THE LAB.

09:53AM 2      SO I FEEL LIKE THE FRAMEWORK HAS BEEN -- I THINK THE

09:53AM 3  QUESTION THAT WE'RE ALL TALKING ABOUT IS, ARE THERE STATEMENTS

09:53AM 4  THAT SAID, ONE, I HAD RESPONSIBILITY FOR THIS PARTICULAR

09:53AM 5  PORTION; AND, TWO, ARE THERE ALSO STATEMENTS -- WELL, THREE

09:53AM 6  STATEMENTS.  ONE IS A STATEMENT THAT SAYS I TOOK

09:53AM 7  RESPONSIBILITY; TWO, IS THERE A STATEMENT THAT SAYS I TOOK

09:53AM 8  RESPONSIBILITY AND SHE DIDN'T; AND THREE ARE THE STATEMENTS

09:53AM 9  THAT SAY SOMEONE ELSE TOOK RESPONSIBILITY.

09:53AM 10     WE ARGUE THAT THE FIRST TWO CATEGORIES OF STATEMENTS ARE

09:53AM 11 CLEARLY ADMISSIBLE, AND WE AGREE THAT THE THIRD, SOMEONE ELSE

09:53AM 12 TOOK RESPONSIBILITY, WOULD NOT.

09:53AM 13     IN TERMS OF THE CLIA LAB, THE STATEMENTS THAT WE POINTED

09:53AM 14 OUT ARE ALL STATEMENTS WHERE HE SAYS THESE PEOPLE REPORTED TO

09:53AM 15 ME, EVEN IF THERE WAS A DECISION MADE BY THE LAB DIRECTOR.

09:53AM 16 FROM A BUSINESS PERSPECTIVE, FOR A BUSINESS MODEL, I WAS THE

09:53AM 17 PERSON THAT THEY HAD TO REPORT TO.

09:53AM 18     SO ALTHOUGH HE MENTIONS PARTICULAR INSTANCES IN WHICH

09:53AM 19 THERE WAS A LAB DIRECTOR'S DECISION, HE ULTIMATELY CLAIMS

09:53AM 20 RESPONSIBILITY OVER THE LAB BY SAYING THAT THEY REPORTED TO

09:53AM 21 HIM.

09:53AM 22     AND I CAN POINT THE COURT TO PLACES IN THE DEPOSITION THAT

09:54AM 23 WE HAVE THAT.

09:54AM 24          THE COURT:  AND SO THIS RELATES TO THE WHETHER OR

09:54AM 25 NOT THE STATEMENT IS EXCULPATORY OR NOT?

7725

09:54AM 1          MR. FLEURMONT:  I THINK THAT'S WHERE MY COLLEAGUE IS

09:54AM 2    GOING, WHETHER OR NOT IT'S SUFFICIENT -- NOT REALLY

09:54AM 3    EXCULPATORY, BUT SUFFICIENTLY --

09:54AM 4          THE COURT:  OR INCULPATORY.

09:54AM 5          MR. FLEURMONT:  -- INCULPATORY SUCH THAT THE

09:54AM 6    PROVISION WOULD APPLY.

09:54AM 7          THE COURT:  RIGHT.  THAT'S WHERE WE'RE LOOKING AT.

09:54AM 8    THAT'S WHAT I HAVE TO SEE, RIGHT?

09:54AM 9          MR. FLEURMONT:  YES, YOUR HONOR.

09:54AM 10         THE COURT:  TO DISCERN WHETHER OR NOT, DOES IT

09:54AM 11   REALLY INVOKE A FIFTH AMENDMENT PRIVILEGE OR IS IT REALLY, AS

09:54AM 12   MS. VOLKAR SAID, AND I MADE REFERENCE TO EARLIER, IS IT JUST

09:54AM 13   FACT TESTIMONY?

09:54AM 14         MR. FLEURMONT:  CORRECT, YOUR HONOR.

09:54AM 15      AND I JUST WANTED TO SEPARATE TWO CONCEPTS.  YOU'RE

09:54AM 16   CORRECT THAT AN INCULPATORY STATEMENT WOULD INVOKE THE FIFTH

09:54AM 17   AMENDMENT PRIVILEGE, BUT THAT'S A SEPARATE ANALYSIS THAT IS MET

09:54AM 18   FOR THE REASONS I SAID.

09:54AM 19      WHAT WE'RE TALKING ABOUT HERE ARE THE STATEMENTS BEING

09:54AM 20   WOULD THEY EXPOSE HIM TO CRIMINAL OR CIVIL LIABILITY SUCH THAT

09:54AM 21   THEY'RE ADMISSIBLE UNDER PROVISION 804(B)(3)?

09:55AM 22      SO IF I COULD JUST POINT THE COURT TO FIRST -- IF I COULD

09:55AM 23   USE THE ELMO, IT'S PROBABLY BEST.  I'M NOT SURE IF IT WORKS

09:55AM 24   RIGHT NOW.

09:55AM 25         THE COURT:  I DON'T KNOW EITHER.

```
09:55AM   1              THE CLERK:  JUST ONE MOMENT, COUNSEL.

09:55AM   2         (PAUSE IN PROCEEDINGS.)

09:55AM   3              MR. FLEURMONT:  SO WHAT I HAVE IS EXHIBIT A THAT IS

09:55AM   4    DOCKET 1163-2 AT PAGE 6.  I'M JUST GOING TO PUT THIS ON THE

09:55AM   5    ELMO.

09:55AM   6         (DISCUSSION OFF THE RECORD.)

09:55AM   7              THE COURT:  I SEE.  ALL RIGHT.  THANK YOU.

09:55AM   8         SO I UNDERSTAND THAT THEY'RE WORKING ON OUR SYSTEM, SO THE

09:56AM   9    AUDIENCE IS NOT GOING TO BE ABLE TO SEE THIS AS WELL.

09:56AM  10              MR. FLEURMONT:  OKAY.  CAN THE COURT SEE IT?

09:56AM  11              THE COURT:  I CAN, YES.  THANK YOU.  THAT'S THE MOST

09:56AM  12    IMPORTANT THING YOU SAID, RIGHT?

09:56AM  13              MR. FLEURMONT:  OKAY.  AND SO WHAT WE'RE LOOKING AT

09:56AM  14    HERE IS A QUESTION AND ANSWER RELATED TO THE FINANCIAL MODEL.

09:56AM  15         AND AS I'VE MENTIONED BEFORE, WE'VE INCLUDED, WHENEVER

09:56AM  16    THERE WAS AN INCULPATORY STATEMENT, THE FULL QUESTION AND

09:56AM  17    ANSWER.

09:56AM  18         SO THE QUESTION STARTS, WHAT WERE YOUR RESPONSIBILITIES

09:56AM  19    WITH RESPECT TO THE COMPANY'S FINANCIALS WHEN YOU EARLY ON IN

09:56AM  20    THAT PRESIDENT AND CEO THE ROLE?

09:56AM  21         AND HE DISCUSSES HIS RESPONSIBILITIES ABOUT FINANCIAL

09:56AM  22    INFORMATION, BUT THE KEY STATEMENT TOWARDS THE BOTTOM IS THAT

09:56AM  23    HE HELPED -- I'M SORRY, THAT HE STARTED BUILDING A FINANCIAL

09:56AM  24    MODEL WITH HELP INITIALLY.

09:56AM  25         BUT THEN HE SAYS THAT, I OWNED.
```

09:56AM   1          AND THEN THE S.E.C. ATTORNEY ASKS, BY SAYING YOU OWNED,

09:56AM   2    YOU MEAN YOU WERE RESPONSIBLE FOR THE COMPANY'S FINANCIAL

09:56AM   3    PROJECTIONS THAT YOU JUST DESCRIBED?

09:56AM   4          AND HE SAYS, THE FINANCIAL MODEL.

09:57AM   5          AND WE'VE HEARD A LOT OF TESTIMONY FROM MR. GROSSMAN AND

09:57AM   6    OTHERS ABOUT THE FINANCIAL MODEL.  AND SO HE WAS SAYING THAT HE

09:57AM   7    OWNED THE FINANCIAL MODEL.

09:57AM   8          THE OTHER STATEMENTS THAT WE PUT IN RELATE TO IF ANYONE

09:57AM   9    HAD ANY INPUT IN THAT MODEL, IF ANYONE HAD ANY EDITS IN THAT

09:57AM   10   MODEL, AND HE ALWAYS COMES BACK AND SAYS, YOU KNOW, IT'S MY

09:57AM   11   FINANCIAL MODEL, I OWN THE MODEL.

09:57AM   12         AND SO THAT'S THE REASON THAT WE PUT THAT STATEMENT IN.

09:57AM   13              THE COURT:  SO HOW DOES THAT COMPLY WITH 804(B)(3)?

09:57AM   14   WHAT IS IT ABOUT THAT THAT GIVES IT THAT CHARACTERISTIC?

09:57AM   15              MR. FLEURMONT:  OF AN INCULPATORY STATEMENT?

09:57AM   16              THE COURT:  RIGHT.  OR ADVERSE TO HIS PENAL

09:57AM   17   INTEREST?

09:57AM   18              MR. FLEURMONT:  WELL, FOR A FEW REASONS, YOUR HONOR.

09:57AM   19         ONE, IN THE -- SEVERAL OF THE SUBPOENAS ISSUED TO THERANOS

09:57AM   20   HAD QUESTIONS ABOUT FINANCIAL, THE QUESTIONS ABOUT THE

09:57AM   21   FINANCIAL MODEL.

09:57AM   22         AND, YOU KNOW, IT'S A CASE ABOUT -- THE S.E.C. CASE IS

09:57AM   23   ABOUT CIVIL ENFORCEMENT.  THE FINANCIALS ARE OBVIOUSLY A BIG

09:57AM   24   PART OF THE COMPANY.  HE WAS THE CEO AND HE WAS RESPONSIBLE FOR

09:57AM   25   IT.

7728

| | | |
|---|---|---|
| 09:57AM | 1 | AND SOMEONE IN THAT POSITION REASONABLY WOULD NOT SAY THAT |
| 09:58AM | 2 | THEY OWNED THE FINANCIALS AND THE FINANCIAL MODEL WITHOUT |
| 09:58AM | 3 | UNDERSTANDING THEY WERE SUBJECT TO CIVIL LIABILITY. |
| 09:58AM | 4 | AND THAT'S BORNE OUT BY THE ALLEGATIONS BOTH IN THE |
| 09:58AM | 5 | COMPLAINT AND IN THIS CASE IN THE INDICTMENT. |
| 09:58AM | 6 | THE COURT:  WELL, WHAT RELATIONSHIP DOES THAT HAVE, |
| 09:58AM | 7 | HIS ANSWER HAVE TO THIS CASE? |
| 09:58AM | 8 | MR. FLEURMONT:  YOUR HONOR, THE ALLEGATIONS ARE THAT |
| 09:58AM | 9 | THERANOS HAS MISREPRESENTED THEIR FINANCIAL NUMBERS, AND WE'VE |
| 09:58AM | 10 | HEARD TESTIMONY THAT THE FINANCIAL MODEL, HOW IT WAS IMPORTANT |
| 09:58AM | 11 | TO OTHER PEOPLE.  YOU HEARD TESTIMONY ABOUT THE ASSUMPTIONS IN |
| 09:58AM | 12 | THE FINANCIAL MODEL AND HOW THAT DROVE THE VALUATION OF |
| 09:58AM | 13 | THERANOS.  THAT WAS ALL CONTROLLED BY MR. BALWANI. |
| 09:58AM | 14 | THE COURT:  OKAY.  THAT'S ONE THING I WANT TO ASK |
| 09:58AM | 15 | ABOUT AND WHETHER WE NEED TO DRILL DOWN TO MODEL AS OPPOSED |
| 09:58AM | 16 | TO -- |
| 09:58AM | 17 | MR. FLEURMONT:  PROJECTIONS. |
| 09:58AM | 18 | THE COURT:  -- STATEMENTS AND PROJECTIONS AND |
| 09:58AM | 19 | THINGS.  I THINK THEY'RE TWO DIFFERENT THINGS.  MAYBE NOT.  BUT |
| 09:58AM | 20 | YOU'LL HELP ME WITH THAT. |
| 09:58AM | 21 | MR. FLEURMONT:  SURE, YOUR HONOR. |
| 09:58AM | 22 | WELL, IN THE MODEL, INHERENT IN THE MODEL ARE FOUND |
| 09:58AM | 23 | STATEMENTS AND SOME OTHER PROJECTIONS, AND THE QUESTION OF, YOU |
| 09:58AM | 24 | KNOW, WHO RECEIVED THE MODEL, IF IT WAS IMPORTANT TO THEM, WHAT |
| 09:59AM | 25 | WAS IN THE MODEL ALL RELATES -- I THINK IT'S ONE OF THE CORE |

09:59AM 1    ALLEGATIONS OF THE GOVERNMENT'S CASE -- ALL RELATES TO THE

09:59AM 2    MODEL AND THAT'S SOMETHING THAT MR. BALWANI SAID THAT HE DID.

09:59AM 3              THE COURT:  CAN I TURN TO YOUR COLLEAGUE OPPOSITE

09:59AM 4    WHILE WE'RE ON THIS SO WE DON'T LOSE IT?

09:59AM 5              MR. FLEURMONT:  SURE.

09:59AM 6              THE COURT:  MS. VOLKAR.

09:59AM 7              MS. VOLKAR:  THANK YOU.

09:59AM 8         I THINK THAT IS THE KEY ISSUE, THE MODEL VERSUS

09:59AM 9    PROJECTIONS.  AND I WOULD ACTUALLY ARGUE THAT THAT'S PART OF

09:59AM 10   WHAT TAKES THIS STATEMENT THAT MY COLLEAGUE JUST POINTED US TO

09:59AM 11   AND MOVES US TO THE LAND THAT GADSON WAS TALKING ABOUT, THE

09:59AM 12   NINTH CIRCUIT CASE GADSON, WHERE THE PERSON IS DEFLECTING OR

09:59AM 13   SHARING BLAME, AND IT'S NOT NECESSARILY A TRUE INCULPATORY

09:59AM 14   STATEMENT.

09:59AM 15        WHAT DO I MEAN BY THAT?  HE SAYS, I OWNED THE MODEL THAT

09:59AM 16   HE SAYS HE BUILT WITH SAFEWAY AND WALGREENS, SO HE'S STILL NOT

09:59AM 17   TAKING FULL OWNERSHIP.  HE'S SHARING BLAME FOR THIS MODEL,

09:59AM 18   ASSUMING THAT THE MODEL IS SOMETHING AT ISSUE IN THE CASE,

09:59AM 19   WHICH I'M GOING TO CIRCLE BACK TO IN JUST A MOMENT.

09:59AM 20        AND THEN WHEN THE S.E.C. TRIES TO BRING IT BACK TO

09:59AM 21   PROJECTS, HE SAYS -- HE CORRECTS THEM AND HE SAYS FINANCIAL

09:59AM 22   MODEL.  AND THEN THE NEXT PAGE, PAGE 7 OF EXHIBIT A THAT WE

10:00AM 23   WERE JUST LOOKING AT IS TALKING ABOUT, OKAY, WELL, WHO DECIDED

10:00AM 24   TO CALL IT PROJECTIONS?

10:00AM 25        BECAUSE AT THE TOP OF THE SHEET, AND WHAT WE HAVE HEARD A

7730

10:00AM 1    LOT OF TESTIMONY FROM THE INVESTOR VICTIMS ABOUT WAS SEEING A

10:00AM 2    PAGE -- A DOCUMENT THAT HAD FINANCIAL PROJECTS AT THE TOP OF

10:00AM 3    IT, AND THEY BELIEVED THEY WERE PROJECTIONS.

10:00AM 4        AND WE'VE HEARD A LOT ON CROSS-EXAMINATION ABOUT IN THE

10:00AM 5    STOCK PURCHASE AGREEMENT, YOU SEE HOW IT SAYS PROJECTIONS ARE

10:00AM 6    INHERENTLY SPECULATIVE, ET CETERA.

10:00AM 7        A LOT OF THE TESTIMONY IN THIS CASE HAS BEEN ABOUT

10:00AM 8    PROJECTIONS, NOT ABOUT A MODEL.

10:00AM 9        SO HERE IN THE KEY QUESTION, WHO LABELLED IT PROJECTIONS?

10:00AM 10        MR. BALWANI NEVER SAYS, I DID.

10:00AM 11        HE SAYS THAT THERE WERE A LOT OF PEOPLE THAT EDITED THIS

10:00AM 12   DOCUMENT.  DANISE YAM WAS IN CHARGE OF THE FINANCES; BDT EDITED

10:00AM 13   IT A LOT; THEY CLEANED UP A LOT OF TYPOS.

10:00AM 14        HE DOESN'T SAY HERE WHAT WOULD BE SORT OF THE CRITICAL

10:00AM 15   ANSWER THAT I MADE THE, I MADE THE DECISION TO MAKE FINANCIAL

10:00AM 16   PROJECTIONS AND MS. HOLMES DIDN'T HAVE ANYTHING TO DO WITH

10:01AM 17   THAT.

10:01AM 18        HE'S TALKING ABOUT OWNING A FINANCIAL MODEL AND WHY HE

10:01AM 19   THOUGHT THAT CERTAIN ASSUMPTIONS WERE IMPORTANT FOR THE MODEL.

10:01AM 20        SO THIS IS STILL A DEFLECTING OR A SHARING OF BLAME

10:01AM 21   SITUATION THAT GADSON TALKS ABOUT.

10:01AM 22        AND I DO THINK THAT THE MODEL VERSUS PROJECTIONS MATTER

10:01AM 23   BECAUSE A FINANCIAL MODEL -- AND THE S.E.C. PICKED UP ON THIS

10:01AM 24   LOOKING FOR INVESTMENT FRAUD -- A FINANCIAL MODEL IS TALKING

10:01AM 25   ABOUT, THIS IS WHAT THE BUSINESS COULD LIKE, COULD BE LIKE IF

10:01AM  1    CERTAIN ASSUMPTIONS ARE MET AND YOU CAN, YOU CAN ESSENTIALLY

10:01AM  2    ADD DIFFERENT THINGS INTO IT TO SAY THAT THERE ARE THIS MANY

10:01AM  3    PATIENTS THAT COME INTO A LAB.

10:01AM  4        MR. BALWANI TALKS ABOUT SOME OF THAT IN HIS INVESTIGATIVE

10:01AM  5    TESTIMONY.

10:01AM  6        WHEREAS PROJECTIONS, AND ESPECIALLY WHEN PROJECTIONS ARE

10:01AM  7    BEING PRESENTED TO INVESTORS, AND WE HEARD INVESTORS TESTIFY

10:01AM  8    ABOUT THIS, THIS IS WHAT WE EXPECT THE COMPANY WILL BE ABLE TO

10:01AM  9    MAKE IN TERMS OF REVENUE, AND WE'VE HEARD SEVERAL INVESTORS

10:01AM  10   TALK ABOUT HOW BEING CASH FLOW POSITIVE OR CASH FLOW NEUTRAL IN

10:01AM  11   THE EARLIER YEARS WAS IMPORTANT TO THEM BECAUSE IT MEANT THAT

10:02AM  12   THIS COMPANY WASN'T JUST A STARTUP THAT WAS STILL STRUGGLING

10:02AM  13   FOR CASH.  IT WASN'T A COMPANY THAT NEEDED CAPITAL IN ORDER TO

10:02AM  14   SURVIVE.

10:02AM  15       THIS WAS A COMPANY THAT WAS PROJECTING REVENUES AND INCOME

10:02AM  16   OF ALMOST A BILLION DOLLARS IN A YEAR FROM THEN AND PROJECTING

10:02AM  17   REVENUES OF -- I'M WORRIED I'M GOING TO MESS UP THE NUMBER --

10:02AM  18   BUT SEVERAL HUNDRED MILLION DOLLARS BY THE END OF 2014 WHEN IT

10:02AM  19   WAS PRESENTED TO RDV IN OCTOBER OF 2014, AND THEY THOUGHT THAT

10:02AM  20   THAT MEANT THAT THE COMPANY COULD HIT THOSE PROJECTIONS.

10:02AM  21       SO --

10:02AM  22       THE COURT:  WERE FINANCIAL MODELS EVER USED?  IS

10:02AM  23   THERE EVIDENCE THAT FINANCIAL MODELS WERE USED TO -- IN

10:02AM  24   CONVERSATIONS WITH INVESTORS?  WAS IT FINANCIAL MODELS THAT

10:02AM  25   WERE SENT?  WAS IT PROJECTIONS?  WAS IT SOMETHING ELSE?

7732

10:02AM 1           MS. VOLKAR:  I WOULD SAY FOR THE LARGE PART IT WAS

10:02AM 2    PROJECTIONS, AND THE EXHIBIT THAT I HAVE IN MIND WAS

10:02AM 3    PROJECTIONS, THE ONE THAT TALKS ABOUT THE PROJECTED REVENUE FOR

10:02AM 4    2014, 2015.

10:02AM 5           MY COLLEAGUE DID SAY BRIAN GROSSMAN DID TALK ABOUT A

10:03AM 6    FINANCIAL MODEL, AND HE ACTUALLY SPECIFICALLY TALKED ABOUT

10:03AM 7    HAVING A SPREADSHEET WORKING WITH MR. BALWANI, TALKING ABOUT

10:03AM 8    VARIOUS ASSUMPTIONS, AND PFM BUILT THEIR OWN MODEL BASED ON

10:03AM 9    INFORMATION THAT THEY GOT FROM MR. BALWANI, BUT MR. GROSSMAN

10:03AM 10   HAS ALREADY TESTIFIED TO THAT.

10:03AM 11          SO I GUESS THAT GOES BACK TO, WOULD THIS INFORMATION BE

10:03AM 12   CORROBORATED OR CONSISTENT WITH THAT?

10:03AM 13          I DON'T THINK THAT THIS TESTIMONY PER SE IS INCONSISTENT.

10:03AM 14          BUT I DO GO BACK TO THE INHERENT UNTRUSTWORTHINESS NOT

10:03AM 15   NECESSARILY BECAUSE OF LACK OF CORROBORATION, BUT POINTING THE

10:03AM 16   FINGER AND DEFLECTING THE BLAME, AND IT'S NOT NECESSARILY

10:03AM 17   MR. BALWANI SAYING IT WAS ALL ME WHO BUILT THIS.

10:03AM 18          AND THAT IS STILL CONSISTENT -- YOU KNOW, MR. GROSSMAN

10:03AM 19   ALSO SAID THAT THEY WORKED WITH HIM IN TERMS OF PUTTING THE

10:03AM 20   MODELS TOGETHER.

10:03AM 21          BUT I WANT TO NOT LOSE SIGHT OF THE FACT THAT THE

10:04AM 22   PROJECTIONS IS WHAT MOST INVESTORS TALKED ABOUT AND WHAT MOST

10:04AM 23   INVESTORS WERE RELYING UPON, AND HE SPECIFICALLY DISCLAIMS

10:04AM 24   HAVING ANY ROLE IN LABELLING THE PROJECTIONS.

10:04AM 25          THE COURT:  MR. GROSSMAN SOUGHT FINANCIAL

10:04AM   1      INFORMATION FROM MR. BALWANI AND RECEIVED THAT, AND THEN DID

10:04AM   2      HIS FIRM -- HIS FIRM DID THEIR OWN FINANCIAL ANALYSIS BEFORE

10:04AM   3      THEY MADE THEIR INVESTMENT DECISION.

10:04AM   4            MS. VOLKAR:  THAT'S MY UNDERSTANDING OF HIS

10:04AM   5      TESTIMONY, YOUR HONOR, YES.

10:04AM   6            THE COURT:  OKAY.  THANK YOU.

10:04AM   7         MR. FLEURMONT?

10:04AM   8            MR. FLEURMONT:  SURE, YOUR HONOR.

10:04AM   9         ON THE MODEL, HE'S ASKED ABOUT THE FINANCIAL MODEL, HE

10:04AM  10      SAYS HE OWNS IT AT EXHIBIT B AT PAGE 5.  SO THIS IS DOCKET

10:04AM  11      1163-3.  HE ASKS IF ANYONE ELSE -- EXCUSE ME.  HE ASKS IF

10:04AM  12      ANYONE ELSE FROM THERANOS IS WORKING ON THE MODEL AND HE SAYS

10:04AM  13      HE DOESN'T THINK SO.

10:04AM  14         HE ASKS IF ANYONE ELSE HAD DIRECT ACCESS TO THE MODEL, HE

10:04AM  15      DIDN'T THINK ANYONE MODIFIED IT.

10:04AM  16         SO I THINK IT'S CLEAR FROM THE PORTIONS THAT WE POINTED

10:04AM  17      OUT THAT HE WAS IN CONTROL AND HE PERSONALLY HAD ACCESS TO THE

10:05AM  18      MODEL.

10:05AM  19         AS I SAID BEFORE, WE INCLUDED THE FULL QUESTION AND

10:05AM  20      ANSWER.

10:05AM  21         IF THE COURT HAS ISSUE WITH SOME OF THE FACTS, WE CAN

10:05AM  22      REVISIT SOME OF THE KIND OF BACKGROUND FACTS OR THE CONTEXT

10:05AM  23      AROUND IT.

10:05AM  24         BUT WE JUST WANT TO MAKE SURE THAT THE COURT HAD THE FULL

10:05AM  25      CONTEXT OF THE QUESTION AND THE ANSWER.

10:05AM  1              THE COURT:  OKAY.

10:05AM  2              MS. VOLKAR:  AND, YOUR HONOR, IF I MAY ON THAT

10:05AM  3     POINT?

10:05AM  4         SO WHEN MY COLLEAGUE SWITCHED TO EXHIBIT B IN THE LAST

10:05AM  5     PAGE, THAT WAS THE ONE THAT I WAS REFERRING TO BEFORE THAT

10:05AM  6     DOESN'T HAVE ANY CORROBORATION.  SO I JUST WANT TO BE CLEAR

10:05AM  7     ABOUT THAT.  WE WERE TALKING ABOUT EXHIBIT A AND THOSE

10:05AM  8     PORTIONS.

10:05AM  9              THE COURT:  RIGHT.

10:05AM 10              MS. VOLKAR:  AND THE MODEL VERSUS PROJECTIONS.

10:05AM 11         WHEN WE SWITCH TO PAGE 6 OF EXHIBIT B, THAT'S THE PORTION

10:05AM 12     THAT I WAS SAYING DOES NOT HAVE ANY CORROBORATION.

10:05AM 13         IN FACT, IN THE TEXT MESSAGES, THERE'S MR. BALWANI SHARING

10:05AM 14     THE MODEL WITH MS. HOLMES.

10:05AM 15         SO I JUST WANTED TO MAKE SURE THAT I WAS CLEAR ON THE

10:05AM 16     RECORD.

10:05AM 17              THE COURT:  OKAY.

10:05AM 18         MR. FLEURMONT?

10:05AM 19              MR. FLEURMONT:  JUST ON THAT POINT, WE DIDN'T

10:05AM 20     INCLUDE THIS PORTION OF THE DEPOSITION BECAUSE WE DIDN'T THINK

10:05AM 21     IT FELL INTO THE REQUIREMENTS OF 804(B)(3).

10:06AM 22         BUT THERE'S -- HE'S ASKED ABOUT THAT QUESTION, AND THERE'S

10:06AM 23     A BACK AND FORTH, AND WHAT HE SAYS IS THAT I THOUGHT THAT I

10:06AM 24     WOULD NOT BE AVAILABLE FOR THIS INTERVIEW, AND IT TURNS OUT

10:06AM 25     THAT I WAS AVAILABLE FOR THE INTERVIEW.

10:06AM 1          SO IT'S NOT INCLUDED BECAUSE WE DON'T THINK IT FALLS UNDER

10:06AM 2     WHAT THEY MEANT HERE.

10:06AM 3              MS. VOLKAR:  YOUR HONOR, JUST ONE POINT I FORGOT TO

10:06AM 4     MAKE EARLIER AND I WANT TO MAKE SURE IT'S ON THE RECORD.

10:06AM 5          I DO THINK THE UNAVAILABILITY IS A THRESHOLD.  I'M NOT

10:06AM 6     SAYING IT'S A THRESHOLD THAT THE OTHER SIDE CAN'T OVERCOME,

10:06AM 7     THEY CERTAINLY CAN.

10:06AM 8          BUT IF YOU LOOK AT THE CASE LAW, IT IS CLEAR THAT THERE

10:06AM 9     SHOULD BE A SUBPOENA OR THE DEFENSE SHOULD CALL THE PERSON TO

10:06AM 10    TESTIFY, AND THE COURT SHOULD NOT SPECULATE WHETHER OR NOT THE

10:06AM 11    PERSON WOULD INVOKE THE FIFTH AMENDMENT.

10:06AM 12         AND I WOULD AGAIN GO BACK TO MY FIRST EXAMPLE.  I THINK

10:06AM 13    THERE ARE SOME QUESTIONS WHERE IT'S AT LEAST FEASIBLE THAT

10:06AM 14    MR. BALWANI WOULD NOT PLEAD THE FIFTH.  FOR EXAMPLE, IF THE

10:06AM 15    QUESTION WAS, IS THE LAB DIRECTOR THE PERSON RESPONSIBLE FOR

10:06AM 16    ALL PATIENT TESTING IN THE CLIA LAB?  HE MAY VERY WELL ANSWER

10:06AM 17    YES.

10:06AM 18         AND EARLIER WE HEARD, WELL, HE SAID HE'S THE BUSINESS

10:06AM 19    PERSON ON TOP OF THAT.

10:07AM 20         WELL, MS. HOLMES WAS THE BUSINESS PERSON WHO HE DIRECTLY

10:07AM 21    REPORTED TO, SO, OF COURSE, THERE WAS A CHAIN OF COMMAND, AND I

10:07AM 22    DO THINK THOSE DISTINCTIONS MATTER SO I WANTED TO RAISE THAT

10:07AM 23    UNAVAILABILITY IS A THRESHOLD.

10:07AM 24              THE COURT:  I THINK THAT'S RIGHT, AND I THINK YOU

10:07AM 25    AGREED WITH THAT AS WELL.

10:07AM 1      AND I'M CURIOUS, THE REMEDY FOR THAT, SHOULD WE -- AS I

10:07AM 2  SAID EARLIER, SHOULD WE ASK YOU TO PRESENT THE QUESTIONS

10:07AM 3  THAT -- AT LEAST SOME THRESHOLD QUESTIONS SUCH THAT -- LET ME

10:07AM 4  JUST THROW A HYPOTHETICAL OUT.

10:07AM 5      LET'S ASSUME THAT CODEFENDANT'S COUNSEL, FOR SOME REASON,

10:07AM 6  HAS AN INTEREST IN THIS CASE AND IS ATTENDING THIS CASE.  IS IT

10:07AM 7  POSSIBLE THAT WE COULD REACH OUT TO THE AUDIENCE AND BRING HIS

10:07AM 8  COUNSEL FORWARD?  IS IT APPROPRIATE TO DO THAT AND SAY, TELL US

10:07AM 9  WHAT YOUR CLIENT WOULD SAY?  TELL US WHAT YOUR CLIENT WOULD DO.

10:07AM 10      SOMEONE MIGHT BE BENDING DOWN AND TYING THEIR SHOES RIGHT

10:07AM 11  NOW IN THE AUDIENCE.

10:08AM 12          MR. FLEURMONT:  YOUR HONOR, I WANT TO RESPOND TO

10:08AM 13  YOUR QUESTION DIRECTLY.  YOU DON'T NEED TO DO THAT IN THIS CASE

10:08AM 14  BECAUSE OF THE INFORMATION THAT WE HAVE HERE.

10:08AM 15      TO MY COLLEAGUE'S SUGGESTION THAT THERE WERE CERTAIN

10:08AM 16  QUESTIONS THAT HE MIGHT ANSWER TO, I WOULD JUST POINT THE COURT

10:08AM 17  TO HIS LATEST DEPOSITION AT EXHIBIT D, AND ON PAGE 4 THERE'S A

10:08AM 18  QUESTION AND ANSWER.

10:08AM 19      MR. BALWANI, YOU JOINED THERANOS IN 2009?

10:08AM 20      ANSWER TO THAT QUESTION:  I INSTRUCT MR. BALWANI NOT TO

10:08AM 21  ANSWER THAT QUESTION BASED UPON FIFTH AMENDMENT RIGHTS.

10:08AM 22      THE QUESTION IS, DID YOU EVEN JOIN AT A CERTAIN TIME

10:08AM 23  PERIOD, AND THAT QUESTION WASN'T EVEN ANSWERED.  AND BASED ON

10:08AM 24  THAT AND BASED ON THE COURT'S FAMILIARITY WITH THE CASE, AND

10:08AM 25  BASED ON THE DECLARATION THAT WE HAVE FROM MR. WADE, THAT'S ALL

10:08AM  1    THE COURT NEEDS.

10:08AM  2        WE'RE NOT OPPOSED TO GETTING A DECLARATION FROM

10:08AM  3    MR. COOPERSMITH.  WE JUST DON'T FEEL LIKE IT'S NECESSARY IN

10:08AM  4    THIS CASE, BUT WE'RE NOT OPPOSED TO IT.

10:08AM  5            THE COURT:  OKAY.

10:08AM  6        MS. VOLKAR, SHOULD WE HAIL MR. COOPERSMITH FORWARD AND ASK

10:08AM  7    HIM SOME QUESTIONS?  IS THIS THE RIGHT TIME TO DO THAT, OR

10:08AM  8    SHOULD THAT BE DONE AT A DIFFERENT TIME?

10:09AM  9            MS. VOLKAR:  YOUR HONOR, JUST LOOKING AT THE TIME,

10:09AM 10    THE GOVERNMENT'S POSITION WOULD BE THAT WE SHOULD MOVE FORWARD

10:09AM 11    WITH THE EVIDENCE.

10:09AM 12        WE WANT TO BE RESPECTFUL OF THE JURY'S TIME, AND WE'RE NOT

10:09AM 13    SURE IF THE JURY IS HERE, BUT WE KNOW IT'S A POSSIBILITY, AND I

10:09AM 14    THINK THERE IS STILL OTHER ISSUES TO BE ARGUED FROM MS. HOLMES.

10:09AM 15        THAT BEING SAID, I DO THINK IT'S APPROPRIATE.  MY

10:09AM 16    UNDERSTANDING IS THAT MR. COOPERSMITH OR REPRESENTATIVES FROM

10:09AM 17    MR. BALWANI HAVE ATTENDED LARGE PORTIONS, IF NOT ALL, OF THIS

10:09AM 18    TRIAL, AND I DO THINK IT WOULD NOT NECESSARILY BE A BIG BURDEN,

10:09AM 19    IF THE DEFENSE IS ACTUALLY SERIOUS ABOUT CALLING MR. BALWANI,

10:09AM 20    TO DO SO AND HAVE HIS COUNSEL REPRESENT TO THE COURT WHAT HAS

10:09AM 21    BEEN REPRESENTED.

10:09AM 22        AND AGAIN, I GO BACK TO NOT ANY DISBELIEF OF MR. WADE'S

10:09AM 23    DECLARATION.

10:09AM 24            THE COURT:  OH, RIGHT.

10:09AM 25            MS. VOLKAR:  THAT'S NOT WHERE THIS IS COMING FROM.

7738

10:09AM  1      I'M READING THE CASE LAW, AND I HAVEN'T FOUND A CASE WHERE

10:09AM  2   THAT HASN'T BEEN THE PROCEEDING, WHERE IT HASN'T BEEN THE

10:09AM  3   DEFENSE CALLING A WITNESS AND SUBPOENAING THE WITNESS, AND WE

10:09AM  4   HAVE NEITHER OF THOSE IN THIS CASE.

10:09AM  5           THE COURT:  IT MAKES FOR A FULSOME RECORD WHERE THAT

10:10AM  6   HAS ACTUALLY OCCURRED AND THAT HAS HAPPENED.

10:10AM  7      AND YOUR SUGGESTION IS THAT, WELL, WE'RE GETTING CLOSE TO

10:10AM  8   SUMMONING THE JURY IN.  PERHAPS YOU'VE HEARD MR. COOPERSMITH

10:10AM  9   ANSWER A QUESTION BEFORE, AND IT MIGHT BE -- IT MIGHT TAKE SOME

10:10AM  10  TIME, BUT --

10:10AM  11          MS. VOLKAR:  I'M HONESTLY NOT SURE ABOUT THAT,

10:10AM  12  YOUR HONOR.

10:10AM  13     I AM JUST THOUGHTFUL OF THE TIME.

10:10AM  14     AND ALSO IF IT WERE, FOR EXAMPLE, THE NORMAL COURSE OF THE

10:10AM  15  TRIAL, JUST ME PLAYING IT OUT IN A HYPOTHETICAL, MS. HOLMES CAN

10:10AM  16  WRAP UP HER TESTIMONY AND THE DEFENSE COULD STAND UP AND SAY,

10:10AM  17  THE DEFENSE WOULD LIKE TO CALL MR. BALWANI.

10:10AM  18     NOW, I ALSO UNDERSTAND IF THEY WANT TO DO IT OUTSIDE OF

10:10AM  19  THE PRESENCE OF THE JURY, THAT SEEMS TO BE SUPPORTED BY THE

10:10AM  20  CASE LAW AS WELL.

10:10AM  21     BUT MY POINT IS THAT THERE IS TIME TO MAKE THE ACTUAL

10:10AM  22  RECORD AT LEAST THAT I'VE SEEN THAT IS TYPICALLY BEFORE THE

10:10AM  23  NINTH CIRCUIT.

10:10AM  24          THE COURT:  OKAY.  THANK YOU.

10:10AM  25     AND WE STILL -- IT'S ABOUT TEN AFTER 10:00 NOW.  WE

10:10AM   1       PROMISED OUR JURY WE WOULD START AT 10:30.  I DON'T KNOW IF --

10:10AM   2       ARE THEY HERE?

10:11AM   3            (DISCUSSION OFF THE RECORD.)

10:11AM   4            THE COURT:  RIGHT.  I'M INFORMED THAT OUR JURY IS

10:11AM   5       HERE NOW, SO THEY'RE READY TO GO.  REGRETTABLY OUR EQUIPMENT

10:11AM   6       ISN'T.

10:11AM   7            SO I'D LIKE TO FINISH OUR DISCUSSION -- I DON'T WANT TO

10:11AM   8       PRECLUDE ANYONE FROM PRESENTING ANYTHING THEY FEEL IS

10:11AM   9       NECESSARY.

10:11AM  10            MR. FLEURMONT:  SURE.

10:11AM  11            THE COURT:  BECAUSE I WANT TO TALK A LITTLE BIT

10:11AM  12       ABOUT THE OTHER MOTION.

10:11AM  13            I DON'T THINK, MS. VOLKAR, YOUR TEAM HAS HAD OCCASION TO

10:11AM  14       FILE ANY OBJECTION TO THAT YET.

10:11AM  15            MS. VOLKAR:  WE DID NOT HAVE TIME, YOUR HONOR.

10:11AM  16            MY COLLEAGUE, MR. BOSTIC, WHO IS RESPONSIBLE FOR THE

10:11AM  17       RELEVANT WITNESS, WILL BE ADDRESSING THAT MOTION, AND WE'RE

10:11AM  18       HAPPY TO DO THAT NOW, OR IF THERE IS ANY FURTHER DISCUSSION ON

10:11AM  19       THIS THAT WOULD BE HELPFUL.

10:11AM  20            THE COURT:  ALL RIGHT.  WELL, LET ME GIVE -- LET ME

10:11AM  21       TURN TO THE DEFENSE.

10:11AM  22            MR. FLEURMONT:  JUST A COUPLE OF POINTS.  I WANT TO

10:11AM  23       BE RESPECTFUL OF THE JURY'S TIME.  I'LL BE QUICK.

10:11AM  24            FIRST, ON CALLING MR. BALWANI TO HAVE HIM INVOKE THE FIFTH

10:11AM  25       AMENDMENT, THE CASE LAW MAKES CLEAR AND IT IS CLEARLY

7740

```
10:11AM   1        ESTABLISHED THAT THE DEFENSE IS NOT PERMITTED TO CALL A WITNESS

10:12AM   2        JUST FOR THE PURPOSE OF HAVING THEM INVOKE.

10:12AM   3               THE COURT:  RIGHT, RIGHT.

10:12AM   4               MR. FLEURMONT:  SO WE THINK THAT'S NOT THE

10:12AM   5        APPROPRIATE COURSE OF ACTION.

10:12AM   6        IF I COULD JUST -- IN TERMS OF THE STATEMENT OR THE

10:12AM   7        PORTIONS THAT WE SEEK TO ADMIT DURING DEPOSITION, I CAN JUST

10:12AM   8        POINT THE COURT.

10:12AM   9        SO IN EXHIBIT A WE HAVE THE STATEMENT RELATED TO A

10:12AM  10        LEADERSHIP ROLE OF THE CONTRACT NEGOTIATIONS WITH WALGREENS AND

10:12AM  11        SAFEWAY, PARTICULAR AT PAGE 4.

10:12AM  12        IN EXHIBIT A, WE HAVE STATEMENTS RELATED TO THE FINANCIAL

10:12AM  13        MODEL AT PAGES 6 TO 7.

10:12AM  14        EXHIBIT A, WE HAVE STATEMENTS RELATED TO THE CLIA LAB AND

10:12AM  15        HOW THE LAB DIRECTORS REPORTED TO HIM, MR. BALWANI, PAGES 9

10:12AM  16        THROUGH 10.

10:12AM  17        IN EXHIBIT A, WE HAVE STATEMENTS ABOUT THE NULL PROTOCOL

10:12AM  18        AT PAGES 10.

10:12AM  19        IN EXHIBIT B WE HAVE STATEMENTS ABOUT THE FINANCIAL MODEL

10:12AM  20        THAT NO ONE ELSE EDITED, PAGES 3 TO 6.

10:13AM  21        AND EXHIBIT C -- THIS IS THE LAST ONE -- THERE ARE

10:13AM  22        STATEMENTS ABOUT THE CLIA LAB AND THAT HE TOOK AN ACTIVE ROLE

10:13AM  23        IN THE CLIA LAB AT PAGES 3 TO 4.

10:13AM  24        AND I PROVIDE THOSE EXCERPTS SO THE COURT CAN TAKE A LOOK

10:13AM  25        AND SEE ABOUT THE STATEMENTS HE MAKES ABOUT A LEADERSHIP ROLE
```

10:13AM   1    AND TAKE RESPONSIBILITY ABOUT CERTAIN OF THOSE TOPICS.

10:13AM   2         AND THOSE ARE THE STATEMENTS, THOSE ARE THE STATEMENTS

10:13AM   3    THAT WE'RE FOCUSSED ON.  THE STATEMENTS AROUND PROVIDE CONTEXT,

10:13AM   4    BUT WE'RE FOCUSSED ON THOSE STATEMENTS.

10:13AM   5         WE SUBMIT THAT WE SHOULD NOT REDACT THE CONTEXT AROUND

10:13AM   6    THEM BECAUSE THEY DON'T HAVE MUCH EVIDENTIARY VALUE, AND THE

10:13AM   7    JURY NEEDS TO UNDERSTAND WHAT THE STATEMENTS MEAN IN CONTEXT.

10:13AM   8         BUT THOSE ARE THE STATEMENTS.

10:13AM   9              THE COURT:  OKAY.  GETTING BACK TO THE THRESHOLD

10:13AM  10    ISSUE, THE UNAVAILABILITY, THAT'S YOUR BURDEN, RIGHT?

10:13AM  11              MR. FLEURMONT:  YES, YOUR HONOR, I BELIEVE THAT'S

10:13AM  12    CORRECT.

10:13AM  13              THE COURT:  IT'S YOUR BURDEN TO SHOW THAT THE

10:13AM  14    WITNESS WAS UNAVAILABLE?

10:13AM  15              MR. FLEURMONT:  YES.

10:13AM  16              THE COURT:  AND TO THAT EXTENT, AS WE WERE TALKING

10:13AM  17    ABOUT, WHAT DO YOU DO TO FULFILL THAT BURDEN?  DO YOU CALL THE

10:13AM  18    WITNESS AND HAVE HE OR SHE, HE IN THIS CASE, TESTIFY?

10:14AM  19         I DON'T THINK THAT'S NECESSARY AS YOU POINT OUT.  I THINK

10:14AM  20    MS. VOLKAR RECOGNIZES THAT.

10:14AM  21         BUT I THINK WHAT MS. VOLKAR SUGGESTS AND WHAT I'M PROBING

10:14AM  22    IS MAYBE WE NEED MORE THAN A DECLARATION SAYING, "I TALKED TO

10:14AM  23    THE LAWYER, THE LAWYER TOLD ME HE'LL TAKE THE FIFTH."

10:14AM  24         YOU'VE PROBABLY BEEN IN CASES, TOO, WHERE THE LAWYER IS

10:14AM  25    CALLED FORWARD AND YOU SAY, LOOK, WE WANT TO ASK YOUR CLIENT

10:14AM 1    THESE QUESTIONS, WE WANT TO ASK THESE QUESTIONS, MAYBE NOT THE

10:14AM 2    SPECIFIC QUESTIONS, BUT WE'D LIKE TO ASK YOUR CLIENT QUESTIONS

10:14AM 3    ABOUT A CLIA LAB, ABOUT HIS PREPARATION OF FINANCIAL MODELS.

10:14AM 4    WE'D LIKE TO ASK HIM A QUESTION ABOUT WHAT HE WAS RESPONSIBLE

10:14AM 5    FOR.  WHEN CAN HE BE AVAILABLE?

10:14AM 6        MR. FLEURMONT:  YOUR HONOR, UNDER THE NINTH CIRCUIT,

10:14AM 7    WE DON'T BELIEVE THAT'S NECESSARY.  BUT WE UNDERSTAND IF THAT'S

10:14AM 8    THE DIRECTION THAT THE COURT WANTS US TO TAKE, WE CAN MOVE

10:14AM 9    APPROPRIATELY.

10:14AM 10        THE COURT:  OKAY.  ALL RIGHT.

10:14AM 11       MS. VOLKAR, ANYTHING FURTHER?

10:14AM 12        MS. VOLKAR:  JUST THE CATEGORY OF STATEMENTS THAT MY

10:14AM 13   COLLEAGUE MENTIONED, WE THINK WE ADEQUATELY RESPOND TO THEM ON

10:15AM 14   PAGES 3 TO 4 OF OUR BRIEF.

10:15AM 15       AND I JUST WANT TO REITERATE ONE OF THE POINTS DRIVING THE

10:15AM 16   NINTH CIRCUIT'S DECISION IN S.E.C. VERSUS JASPER, WHICH IS

10:15AM 17   GIVEN THE CATEGORY OF STATEMENTS AND THE PERSON'S INVOLVEMENT

10:15AM 18   IN THE CASE, IT'S UNFAIR TO PRESENT THIS TYPE OF TESTIMONY

10:15AM 19   WITHOUT GIVING THE GOVERNMENT THE OPPORTUNITY TO CROSS-EXAMINE.

10:15AM 20       SO I THINK ALL OF THAT IS COVERED IN MY BRIEF, BUT I

10:15AM 21   WANTED TO END ON THAT POINT.

10:15AM 22        THE COURT:  OKAY.  GREAT.

10:15AM 23        MR. FLEURMONT:  YOUR HONOR, I'M SORRY, JUST ON THAT

10:15AM 24   JASPER CASE.

10:15AM 25       IN THAT CASE, THE FACTS OF THAT CASE ARE VERY IMPORTANT TO

10:15AM  1    THE POINT THAT MS. VOLKAR JUST MADE.

10:15AM  2         THE PERSON WAS AVAILABLE IN A PRIOR PROCEEDING AND A

10:15AM  3    DEPOSITION -- THE DECLARANT WAS AVAILABLE IN A PRIOR

10:15AM  4    PROCEEDING, AND THEN A DEPOSITION OCCURRED IN WHICH THE PERSON

10:15AM  5    TOOK THE FIFTH, AND IT WAS THAT.

10:15AM  6         SO THE PROPONENT WANTED THE INFORMATION FROM THE FIRST

10:15AM  7    PROCEEDING, BUT OBVIOUSLY THE OPPONENT WAS NOT ABLE TO

10:15AM  8    CROSS-EXAMINE THE PERSON.

10:15AM  9         SO THAT IS A LITTLE DIFFERENT THAN WHAT WE HAVE HERE.

10:15AM  10        THE PORTIONS THAT WE SEEK TO ADMIT, WE'RE DOING AN

10:15AM  11   INVESTIGATION AND A DEPOSITION OF THE S.E.C. IN WHICH THEY WERE

10:16AM  12   THE PEOPLE WHO ASKED THE QUESTIONS AND THEY WERE LEADING

10:16AM  13   QUESTIONS AS THE COURT KNOWS.

10:16AM  14        SO I DON'T WANT TO PROLONG THIS, BUT I JUST WANTED TO

10:16AM  15   RESPOND.

10:16AM  16             THE COURT:  NO.  THAT'S FINE.

10:16AM  17        MS. VOLKAR?

10:16AM  18             MS. VOLKAR:  AS WE SAID, I DON'T THINK THIS IS IN

10:16AM  19   DISPUTE, BUT NO ONE ON OUR PROSECUTION TEAM WAS THERE, AND SO I

10:16AM  20   THINK THAT IS WHERE IT COMES TO A POINT WHERE IT REALLY DOES

10:16AM  21   MATTER THAT THE DOJ WAS NOT INVOLVED IN THE QUESTIONS THAT WERE

10:16AM  22   ASKED, SO THE DOJ, AND SPECIFICALLY THE U.S. ATTORNEY'S OFFICE,

10:16AM  23   DID NOT GET THE OPPORTUNITY TO ASK QUESTIONS OR FOLLOW-UP

10:16AM  24   QUESTIONS, AND AS I SAID IN THE BRIEF, PARTICULARLY ABOUT THE

10:16AM  25   PATIENT SIDE FOR EXAMPLE.

10:16AM  1           THE COURT:  OKAY.  THANK YOU.

10:16AM  2        ARE YOU HANDLING THE NEXT MOTION AS WELL?

10:16AM  3           MR. FLEURMONT:  I AM, YOUR HONOR.

10:16AM  4           THE COURT:  OKAY.  AND MR. BOSTIC -- THANK YOU,

10:16AM  5    MS. VOLKAR.

10:16AM  6           MS. VOLKAR:  THANK YOU.

10:16AM  7           THE COURT:  I THOUGHT, MR. FLEURMONT, YOU WOULD HAVE

10:16AM  8    AN OPPORTUNITY IN THIS BREAK TO CHAT WITH YOUR TEAM ABOUT THE

10:16AM  9    TIMING QUESTION, BUT YOU'LL HAVE AN OPPORTUNITY TO DO THAT I

10:16AM  10   THINK.

10:16AM  11          MR. FLEURMONT:  YES, YOUR HONOR.

10:16AM  12          THE COURT:  SO WHAT ABOUT THIS?  THIS IS A RENEWED

10:17AM  13   MOTION TO ADMIT SOME DOCUMENTS.

10:17AM  14          MR. FLEURMONT:  THAT'S CORRECT, RENEWED MOTION TO

10:17AM  15   ADMIT EXHIBIT TX 14259, A MAY 2015 EMAIL ABOUT THE TEST RESULTS

10:17AM  16   OF E.T. PATIENT IN COUNT TEN.

10:17AM  17       AS THE COURT RECALLS, WE ATTEMPTED TO INTRODUCE THIS

10:17AM  18   DOCUMENT THROUGH OUR SUMMARY WITNESS.  THE GOVERNMENT OBJECTED.

10:17AM  19   THE COURT SUSTAINED THE OBJECTION.

10:17AM  20       AT THE TIME WE WERE IN THE PRESENCE OF THE JURY AND WE

10:17AM  21   SAID AND WE EXPLAINED THAT WE WOULD LIKE TO DRAW THE COURT'S

10:17AM  22   ATTENTION TO A SIMILAR EXHIBIT THAT WAS ADMITTED AND MAKE A

10:17AM  23   COMPARISON OUTSIDE OF THE PRESENCE OF THE JURY.

10:17AM  24       THAT'S AT TRANSCRIPT 71 -- PAGE 7160 OF THE TRIAL

10:17AM  25   TRANSCRIPT, THAT'S 7160, NOVEMBER 19TH, '21, WHERE WE EXPLAINED

10:17AM 1     WE WOULD LIKE AN OPPORTUNITY TO DRAW A COMPARISON.

10:17AM 2         SO WE WANTED TO PUT BOTH DOCUMENTS IN FRONT OF THE COURT

10:17AM 3     AND ALLOW YOU TO REVIEW BOTH DOCUMENTS, THE SECOND ONE BEING TX

10:18AM 4     4415, AND TO EXPLAIN IN WRITING WHY WE THINK THAT THE COURT'S

10:18AM 5     RULING ON TX 4415 SIMILARLY APPLIES TO TX 14259.

10:18AM 6         I DON'T WANT TO TAKE TOO MUCH TIME BECAUSE I KNOW THE

10:18AM 7     JURY'S TIME IS PRECIOUS.  I WOULD JUST SAY IN COMPARISON OF THE

10:18AM 8     TWO EXHIBITS, IT'S CLEAR THAT THEY'RE FROM THE SAME TIMEFRAME.

10:18AM 9     ONE WAS SENT WITHIN A MONTH OF THE OTHER, AND BOTH CONTAIN THE

10:18AM 10    SAME DISTRIBUTION GROUP.  THAT'S LAB ESCALATE.

10:18AM 11        AND THEY CONTAINING OVERLAPPING RECIPIENTS, AND THAT'S

10:18AM 12    MR. BALWANI AND DAN FLOREY, AND FUNDAMENTALLY, BOTH EMAILS

10:18AM 13    PROVIDE CONTEXT OR AN EXPLANATION FOR THE UNDERLYING RESULTS

10:18AM 14    THAT THE EMAILS DISCUSS.

10:18AM 15        IN THE CASE OF EXHIBIT 4415, THAT'S THE RESULTS OF M.E.,

10:18AM 16    AND IN THE CASE OF TX 14259, RESULTS OF E.T.

10:18AM 17        THE GOVERNMENT, WHEN WE MOVED -- WE OBJECTED WHEN THE

10:19AM 18    GOVERNMENT ATTEMPTED TO ADMIT TX 4415, THAT WAS THROUGH

10:19AM 19    DR. BURNES, WHO HAD NOT SEEN THE DOCUMENT AND NEVER READ IT AND

10:19AM 20    DIDN'T KNOW ANYTHING ABOUT IT.

10:19AM 21        THE GOVERNMENT SAID THAT PRIOR FOUNDATION HAD BEEN LAID

10:19AM 22    THROUGH DR. DAS, DR. ROSENDORFF, MS. CHEUNG, AND I BELIEVE

10:19AM 23    MR. EDLIN THAT WOULD ALLOW THE DOCUMENT TO COME IN.

10:19AM 24        AND THE GOVERNMENT HEARD THE EXPERT AND WE REVIEWED THE

10:19AM 25    TRANSCRIPTS.  IN THAT TRANSCRIPT THERE ARE CERTAIN TESTIMONY

10:19AM   1    ABOUT CERTAIN EMAIL GROUPS AND THERE'S TESTIMONY ABOUT CERTAIN

10:19AM   2    EMAILS.

10:19AM   3              THE COURT:  THIS IS 803(6).

10:19AM   4              MR. FLEURMONT:  803(6) WAS THE PROVISION THAT THE

10:19AM   5    COURT ALLOWED.

10:19AM   6              THE COURT:  RIGHT.  I THINK THE COURT FOUND THERE

10:19AM   7    WAS FOUNDATION FOR A BUSINESS RECORD, IF YOU WILL.

10:19AM   8              MR. FLEURMONT:  CORRECT, YOUR HONOR, THROUGH THE

10:19AM   9    PRIOR TESTIMONY OF THE PEOPLE THAT I JUST MENTIONED, EVEN

10:19AM  10    THOUGH THE WITNESS ON THE STAND HAD NEVER SEEN THE DOCUMENT

10:19AM  11    BEFORE.

10:19AM  12              THE COURT:  RIGHT.

10:19AM  13              MR. FLEURMONT:  SO WE SUBMIT THE SITUATIONS ARE

10:19AM  14    ANALOGOUS.  WE HAVE A DOCUMENT WITH -- I'M NOT GOING TO REPEAT.

10:19AM  15    I DON'T WANT TO WASTE THE COURT'S TIME.

10:20AM  16              THE COURT:  YOU'RE NOT WASTING MY TIME.  THIS IS

10:20AM  17    IMPORTANT.

10:20AM  18              MR. FLEURMONT:  OKAY.  SO THE SITUATIONS ARE

10:20AM  19    ANALOGOUS.  IT'S -- THE DOCUMENT IS CLOSE IN TIME ABOUT

10:20AM  20    RESULTS OF SOMEONE WHO HAS AN ACCOUNT IN THIS CASE WITH THE

10:20AM  21    SAME LAB GROUPS DESCRIBING SOME OF THE SAME THINGS, WHICH IS

10:20AM  22    KIND OF AN EXPLANATION OF WHAT IS GOING ON.

10:20AM  23         WE THINK THAT IT'S PARTICULARLY IMPORTANT IN THIS EXHIBIT.

10:20AM  24    AS THE COURT KNOWS, THIS IS A VERY IMPORTANT EXHIBIT BECAUSE

10:20AM  25    THE PATIENT COUNT E.T. DID NOT HAVE A DOCTOR COME IN TO EXPLAIN

10:20AM 1    HER TEST RESULTS, AND THIS DOCUMENT PROVIDES SOME CONTEXT AND

10:20AM 2    EXPLANATION FOR THOSE RESULTS THAT WE DO NOT HAVE IN THIS CASE

10:20AM 3    BECAUSE WE WERE NOT PROVIDED AN OPPORTUNITY TO CROSS-EXAMINE

10:20AM 4    THE DOCTORS PRESUMABLY, BECAUSE AS THE EMAIL SHOWS, THE DOCTOR

10:20AM 5    AGREED WITH THERANOS OR UNDERSTOOD THERANOS'S PROTOCOL TO BE

10:20AM 6    MORE PRECISE.

10:20AM 7         SO WE'RE JUST -- WE JUST WANTED TO PUT THIS INFORMATION IN

10:20AM 8    FRONT OF THE COURT AS WE SAID WE WOULD WHEN WE FIRST TRIED TO

10:20AM 9    ADMIT THE EXHIBIT AND GIVE THE COURT AN OPPORTUNITY TO REVIEW

10:20AM 10   BOTH EXHIBITS AND UNDERSTAND EXACTLY THE POINTS THAT WE WANTED

10:21AM 11   TO MAKE.

10:21AM 12         THE COURT:  OKAY.  THANK YOU.

10:21AM 13         SO, MR. BOSTIC, HASN'T THE FOUNDATION BEEN LAID, AND WHAT

10:21AM 14   IS THE HARM IN ALLOWING THESE TO COME IN?

10:21AM 15         MR. BOSTIC:  YES, YOUR HONOR.

10:21AM 16         I THINK THERE ARE SOME DIFFERENCES BETWEEN THESE TWO

10:21AM 17   EXHIBITS, BOTH IN THE SUBSTANCE AND THE CONTENT OF THE EXHIBITS

10:21AM 18   THEMSELVES, BUT ALSO HOW THE PARTIES INTEND TO USE THEM, AND I

10:21AM 19   THINK ILLUSTRATED BY THE COMMENTS OF DEFENSE COUNSEL JUST NOW.

10:21AM 20         SO FIRST, EXHIBIT 4415, WHICH WAS ADMITTED, WAS ADMITTED

10:21AM 21   WITH DR. BURNES ON THE STAND.  ALTHOUGH HE WAS NOT A PARTY TO

10:21AM 22   THAT EMAIL, THE EMAIL INCLUDED A REFERENCE TO AND A DESCRIPTION

10:21AM 23   OF A CONVERSATION THAT HE WAS A PART OF.

10:21AM 24         IN CONTRAST, 14259, WHICH THE DEFENSE IS SEEKING TO ADMIT

10:21AM 25   NOW, WAS DISCUSSED WITH MS. TOMPKINS ON THE STAND, BUT WAS NOT

10:21AM 1    MOVED INTO EVIDENCE, AND I DON'T BELIEVE THE DEFENSE OFFERED IT

10:21AM 2    INTO EVIDENCE WHEN SHE WAS ON THE STAND.

10:21AM 3        14259 DISCUSSES CONVERSATIONS WITH MS. TOMPKINS, BUT ALSO

10:22AM 4    WITH DR. ASIN, WHO IS NOT A TESTIFYING WITNESS IN THIS CASE.

10:22AM 5        SO THAT'S THE DIFFERENCE THERE IN TERMS OF THE CONTENT OF

10:22AM 6    THOSE EXHIBITS AND THE NEXUS BETWEEN ACTUALLY WHAT IS HAPPENING

10:22AM 7    AT TRIAL AND WHETHER THERE'S A WITNESS COMPETENT TO TESTIFY

10:22AM 8    ABOUT THE CONTENT OF THOSE EXHIBITS.

10:22AM 9        MAYBE MORE IMPORTANTLY, THOUGH, WHEN IT COMES TO THE

10:22AM 10   RELEVANCE OF THESE TWO EXHIBITS, THERE IS A DIFFERENCE, AND

10:22AM 11   THAT'S THAT 4415 INCLUDES INTERNAL DISCUSSION ABOUT THE

10:22AM 12   POSSIBLE REASONS FOR THE ERRONEOUS THERANOS LAB RESULT.

10:22AM 13       THERE'S A DISCUSSION OF POTENTIAL HEMOLYSIS OR SAMPLE

10:22AM 14   INTEGRITY ISSUES.  THERE'S A DISCUSSION ABOUT A POSSIBLE MIXUP

10:22AM 15   BETWEEN TWO SAMPLES.

10:22AM 16       SO THAT BASIS, THE BASIS FOR THAT KIND OF CONTENT AS A

10:22AM 17   BUSINESS RECORD HAD BEEN LAID PREVIOUSLY IN THE TRIAL.  THE

10:22AM 18   COURT HAS SEEN AND THE JURY HAS SEEN NUMEROUS EXAMPLES OF

10:23AM 19   INSTANCES WHERE BAD TEST RESULTS CAME IN AND THERE WAS AN

10:23AM 20   INTERNAL DISCUSSION AT THERANOS ABOUT WHAT THE POSSIBLE CAUSE

10:23AM 21   OR EXPLANATION MIGHT BE.

10:23AM 22       TO MY EYES, 14259 CONTAINS NONE OF THAT.  IT DOESN'T SERVE

10:23AM 23   THE SAME PURPOSE INTERNALLY AT THERANOS.  INSTEAD, IT SEEMS TO

10:23AM 24   RELATE SOLELY TO THE SUBSTANCE OF THESE COMMUNICATIONS BETWEEN

10:23AM 25   THERANOS CUSTOMER SERVICE PERSONNEL AND DR. ASIN AND

10:23AM   1   ERIN TOMPKINS, THE PATIENT.

10:23AM   2        THAT'S WHAT MAKES ONE USEFUL FOR THE JURY AND RELEVANT TO

10:23AM   3   THIS CASE AS A BUSINESS RECORD AND THE OTHER ONE NOT.  I THINK

10:23AM   4   THAT'S WHY THE COURT'S DECISION ON THESE TWO EXHIBITS WAS RIGHT

10:23AM   5   IN THE FIRST INSTANCE.

10:23AM   6        I THINK WHEN IT COMES TO THE DESCRIPTION IN 14259 OF

10:23AM   7   THERANOS'S CONVERSATION WITH DR. ASIN, I THINK THAT MAKES 14259

10:23AM   8   ESPECIALLY CONCERNING FROM A HEARSAY STANDPOINT.

10:24AM   9        EVEN IF IT WERE ADMISSIBLE AS A RECORD OF A CONVERSATION

10:24AM  10   WITH MS. TOMPKINS, WHO TESTIFIED, IT IS CONCERNING THAT IT ALSO

10:24AM  11   INCLUDES A LINE PURPORTING TO EXPRESS A VIEW THAT DR. ASIN

10:24AM  12   CONVEYED DURING A CONVERSATION THAT WAS, OF COURSE, HEARSAY, A

10:24AM  13   CONVERSATION THAT WAS NOT HAD BY A TESTIFYING WITNESS, AND THE

10:24AM  14   COMMENTS BY MR. FLEURMONT ILLUSTRATE THE PROBLEMS WITH THAT.

10:24AM  15        I THINK THE DEFENSE WANTS TO GET THIS IN AS A SUBSTITUTE

10:24AM  16   FOR DR. ASIN TAKING THE STAND BECAUSE THEY WANT THE JURY TO

10:24AM  17   KNOW HOW DR. ASIN VIEWED THESE TEST RESULTS.

10:24AM  18        NOW, THERE ARE A COUPLE OF PROBLEMS WITH THAT.  FIRST, THE

10:24AM  19   LANGUAGE IN THE EMAIL IS ACTUALLY VAGUE ON THAT POINT.  I THINK

10:24AM  20   IT SAYS THAT THE DOCTOR UNDERSTOOD THEIR PROCESS AND WAS FINE

10:24AM  21   WITH IT.

10:24AM  22        THAT'S A SECONDHAND REPORT OF AN OUT-OF-COURT

10:24AM  23   CONVERSATION.  I'M NOT SURE WHAT SIGNIFICANCE THAT CARRIES OR

10:24AM  24   WHAT IT ACTUALLY MEANS.

10:25AM  25        EVEN IF IT WERE A RELIABLE INDICATOR OF HOW THE DOCTOR

10:25AM 1       FELT ABOUT THAT TEST RESULT, WELL, THEN THAT'S A HEARSAY

10:25AM 2       STATEMENT THAT'S COMING IN AS AN OPINION OF A NONTESTIFYING

10:25AM 3       WITNESS WHO HASN'T BEEN QUALIFIED TO GIVE AN EXPERT OPINION ON

10:25AM 4       THAT TOPIC.

10:25AM 5            SO I THINK THAT LINE IN THAT EMAIL IS OF SPECIAL CONCERN,

10:25AM 6       AND I THINK THE EXACT PURPOSE FOR WHICH THE DEFENSE TRIES TO

10:25AM 7       ADMIT IT SHOWS WHY IT CAN'T COME IN.

10:25AM 8            AND THEN THE FINAL POINT IS A MINOR ONE, WHICH IS THE 4415

10:25AM 9       ALSO INCLUDED MS. HOLMES ON THAT EMAIL, SO IT WAS ADMISSIBLE,

10:25AM 10      IF FOR NOTHING ELSE, TO SHOW NOTICE TO HER.

10:25AM 11           THE SAME IS NOT TRUE FOR 14259.

10:25AM 12                THE COURT:  THANK YOU.

10:25AM 13           I WAS WONDERING ABOUT YOUR COMMENTS ABOUT DR. ASIN ON THIS

10:25AM 14      EMAIL, AND THE THOUGHT OCCURRED TO ME, WELL, DO WE REDACT THAT?

10:25AM 15      CAN WE DO THAT?  IS THAT SOMETHING THAT WE CAN DO?

10:25AM 16           IF IT'S ADMITTED FOUNDATIONALLY, DOES THE WHOLE THING HAVE

10:26AM 17      TO COME IN OR CAN THE COURT LOOK AT IT AND SAY, BUT NOT FOR

10:26AM 18      THAT PURPOSE?

10:26AM 19           THAT'S A QUESTION FOR BOTH OF YOU, BUT IT'S YOUR TURN,

10:26AM 20      MR. FLEURMONT.

10:26AM 21                MR. FLEURMONT:  SURE, YOUR HONOR.

10:26AM 22           FIRST, WE BELIEVE A FOUNDATION HAS BEEN LAID.  IT'S

10:26AM 23      ADMISSIBLE AS A BUSINESS RECORD.

10:26AM 24           AND WE THINK THAT TYPICALLY IF THERE'S -- IF A DOCUMENT

10:26AM 25      COMES IN THROUGH BUSINESS RECORDS AND THERE'S SOMETHING THAT

10:26AM 1    THE COURT THINKS, UNDER 403, SHOULD NOT BE INCLUDED, THE

10:26AM 2    TYPICAL PROTOCOL IS TO REDACT IT.

10:26AM 3         WE DON'T THINK THAT THIS STATEMENT FALLS UNDER THAT.

10:26AM 4         I CAN READ YOU THE EXACT STATEMENT, "DR. ASIN COMPLETELY

10:26AM 5    UNDERSTOOD OUR TESTING PROTOCOL AND HAD NO ISSUES."

10:26AM 6         THAT'S NOT AN EXPERT STATEMENT.  IT'S JUST A STATEMENT OF

10:26AM 7    FACT THAT THEY UNDERSTOOD WHAT THE PROTOCOL WAS.

10:26AM 8         I THINK I BELIEVE HIS ISSUE IS -- ONE OF HIS ISSUES IS

10:26AM 9    THAT IT'S MORE OF A SPECIALIZED EXPERT STATEMENT, AND WE DON'T

10:26AM 10   THINK THAT'S THE CASE.

10:26AM 11        IN TERMS OF MR. BOSTIC'S COMMENTS ABOUT NOT HAVING A

10:27AM 12   TESTIFYING WITNESS, I THINK WE ALL KNOW WHY DR. ASIN WASN'T

10:27AM 13   CALLED IN THIS CASE.

10:27AM 14        BUT ALSO, THE EMAIL TALKS ABOUT NOT JUST WHAT DR. ASIN

10:27AM 15   SAYS, BUT THE INFORMATION THAT WAS RELAYED TO E.T.

10:27AM 16        MR. BOSTIC JUST EXPLAINED THAT 4415, THAT INFORMATION THAT

10:27AM 17   WAS RELAYED TO DR. BURNES AND SO IN THAT CASE THERE'S ANOTHER

10:27AM 18   SIMILARITY BETWEEN THE TWO DOCUMENTS.

10:27AM 19             THE COURT:  OKAY.

10:27AM 20        MR. BOSTIC?

10:27AM 21             MR. BOSTIC:  SO, YOUR HONOR, ON THE STATEMENT ABOUT

10:27AM 22   DR. ASIN, I'M NOT SURE WHAT THE VALUE OR THE SIGNIFICANCE OF

10:27AM 23   THAT STATEMENT IS IF IT'S NOT PRESENTED BY THE DEFENSE TO THE

10:27AM 24   JURY IN AN EFFORT TO CONVEY THE IMPRESSION THAT THE DOCTOR WAS

10:27AM 25   OKAY WITH THE THERANOS TEST RESULTS OR THAT HE SOMEHOW BLESSED

10:27AM 1    THEM OR THAT HE DIDN'T VIEW THEM AS INACCURATE.

10:27AM 2         AND JUST SO IT'S CLEAR FOR THE RECORD, MY UNDERSTANDING

10:27AM 3    FROM CONVERSATIONS WITH DR. ASIN IS THAT HE DOES VIEW THE

10:27AM 4    THERANOS RESULT AS AN INACCURATE RESULT.  IT INDICATED THE

10:28AM 5    PRESENCE OF HIV ANTIBODIES IN A PATIENT'S BLOODSTREAM WHERE

10:28AM 6    THERE WAS NO REASON FOR THOSE ANTIBODIES TO EXIST AND WHERE A

10:28AM 7    SUBSEQUENT TEST INDICATED THEY WERE NOT PRESENT.

10:28AM 8         SO I DON'T BELIEVE THERE'S ANYTHING THAT WOULD BE IN

10:28AM 9    DR. ASIN'S TESTIMONY THAT WOULD BE INCONSISTENT WITH WHAT HAS

10:28AM 10   BEEN PRESENTED TO THE JURY.

10:28AM 11        THAT ASIDE THOUGH, A HEARSAY STATEMENT IS NOT A WAY TO

10:28AM 12   CORRECT THE RECORD EVEN IF THE RECORD WERE IMBALANCED AS IT

10:28AM 13   STANDS TODAY.

10:28AM 14             THE COURT:  OKAY.

10:28AM 15             MR. FLEURMONT:  WE'RE NOT TRYING TO CORRECT THE

10:28AM 16   RECORD.

10:28AM 17        WE'RE TRYING TO ADMIT A DOCUMENT THAT WE BELIEVE IS

10:28AM 18   ADMISSIBLE UNDER 803(6) BECAUSE OF THE COURT'S PAST RULING.

10:28AM 19        THERE'S SEVERAL PARALLELS TO THIS DOCUMENT, 4415.  I'VE

10:28AM 20   HEARD SOME DISTINCTIONS, BUT WE BELIEVE THOSE DISTINCTIONS

10:28AM 21   DON'T MAKE A DIFFERENCE WHEN IT COMES TO THE ADMISSIBILITY OF

10:28AM 22   THIS DOCUMENT.

10:28AM 23             THE COURT:  ALL RIGHT.  THANK YOU.  THANK YOU VERY

10:28AM 24   MUCH.

10:28AM 25             MR. FLEURMONT:  THANK YOU.

10:28AM 1          THE COURT:  NOW I NEED TO ASK THE DEFENSE ABOUT

10:28AM 2    TIMING TO THE EXTENT THAT YOU CAN INFORM ME.  SHOULD WE TAKE A

10:28AM 3    BREAK AND LET ME CHECK UP AND SEE HOW WE'RE DOING ON THE

10:29AM 4    MONITORS, AND THEN MAYBE I'LL COME BACK AND WE CAN HAVE ANOTHER

10:29AM 5    DISCUSSION BEFORE WE BRING THE JURY IN.

10:29AM 6          OKAY.  WE'LL BE IN RECESS.  THANK YOU.

10:29AM 7          THE CLERK:  COURT IS IN RECESS.

10:29AM 8    (RECESS FROM 10:29 A.M. UNTIL 11:11 A.M.)

11:12AM 9          THE COURT:  THANK YOU.  PLEASE BE SEATED.  WE'RE

11:12AM 10   BACK ON THE RECORD.

11:12AM 11         ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.  WE

11:12AM 12   ARE OUTSIDE OF THE PRESENCE OF THE JURY.

11:12AM 13         I JUST WANTED TO ASK COUNSEL ABOUT TIMING FOR TODAY.

11:12AM 14   WE'LL GET STARTED HERE IN ABOUT FIVE MINUTES.

11:12AM 15         MR. DOWNEY?

11:12AM 16         MR. DOWNEY:  YOUR HONOR, I EXPECT THAT MS. HOLMES'S

11:12AM 17   DIRECT EXAMINATION WILL CONCLUDE TODAY.  I'VE SPOKEN TO

11:12AM 18   MR. LEACH.  OBVIOUSLY I HAVEN'T CONCLUDED THE DIRECT

11:12AM 19   EXAMINATION --

11:12AM 20         THE COURT:  SURE.

11:12AM 21         MR. DOWNEY:  -- BUT HE THOUGHT CROSS-EXAMINATION WAS

11:12AM 22   GOING TO GO AT LEAST SUBSTANTIALLY INTO TOMORROW, AND PERHAPS

11:12AM 23   CONSUME TOMORROW.

11:12AM 24         SO IT LOOKS LIKE PERHAPS THERE WOULD BE EITHER REDIRECT AT

11:12AM 25   THE END OF THE DAY TOMORROW, OR IF THERE'S A TAIL TO

1   CROSS-EXAMINATION, THAT MIGHT HAPPEN ON THE FIRST DAY OF COURT

2   NEXT WEEK, WHICH I THINK IS TUESDAY.

3          THE COURT:  RIGHT.  ALL RIGHT.  THANK YOU FOR THAT.

4     I ASK THAT QUESTION PRIMARILY TO GET AN UNDERSTANDING OF

5   WHEN YOU SHOULD -- WHEN YOU WANT AN ORDER, A DECISION BASED ON

6   THIS MORNING'S MOTIONS, AND WHETHER OR NOT THAT IMPACTS YOUR

7   CASE, I EXPECT IT DOES, AND THE PRESENTATION OF YOUR EVIDENCE.

8          THE COURT:  MR. DOWNEY:  YOUR HONOR, I THINK IT DOES.

9     I THINK IDEALLY IF WE COULD BE IN A POSITION TO READ THAT,

10  IF THE COURT WERE TO GRANT AT LEAST PART OF THE RELIEF WE'RE

11  ASKING FOR, IF WE CAN DO IT AT THE CONCLUSION OF MS. HOLMES'S

12  TESTIMONY, THAT MIGHT BE SOMETHING THAT WE WOULD CHOOSE TO DO.

13    I DON'T THINK THAT REALISTICALLY WOULD BE TOMORROW.  SO

14  MONDAY OR TUESDAY OF NEXT WEEK IS WHEN I WOULD EXPECT.

15         THE COURT:  I SEE.  CONCLUSION OF HER TESTIMONY,

16  INCLUDING CROSS YOU MEAN?

17         MR. DOWNEY:  INCLUDING CROSS-EXAMINATION, YES.

18         THE COURT:  ALL RIGHT.

19         MR. DOWNEY:  AND ANY REDIRECT OR RECROSS?

20         THE COURT:  SURE.  I ALSO WANTED TO ASK THE

21  GOVERNMENT ABOUT, I WAS TALKING ABOUT -- I KNOW MS. VOLKAR IS

22  STILL HERE, I WAS ASKING ABOUT A 106 OPPORTUNITY, I THINK

23  MS. VOLKAR SAID SHE WOULD APPRECIATE A 106 -- OR EXCUSE ME, AN

24  OPPORTUNITY TO REVIEW SOME TRANSCRIPTS.  AND I DON'T KNOW WHAT

25  THE GOVERNMENT'S POSITION IS ON THAT.

7755

11:14AM  1              MR. BOSTIC, IS THAT SOMETHING THAT YOU WANT TO TALK TO

11:14AM  2       MS. VOLKAR ABOUT, OR IS THERE STILL A DESIRE TO REVIEW ANY

11:14AM  3       RECORD FOR THAT PURPOSE?

11:14AM  4              MR. BOSTIC:  YES, YOUR HONOR, I THINK THERE WOULD

11:14AM  5       BE.

11:14AM  6          I THINK THE GOVERNMENT'S CENTRAL POSITION IS THAT THE

11:14AM  7       OFFERED MATERIAL IS NOT ADMISSIBLE, OF COURSE.

11:14AM  8              THE COURT:  SURE.

11:14AM  9              MR. BOSTIC:  BUT IF THE COURT IS INCLINED TO ADMIT

11:14AM  10      ANY, YES, I UNDERSTAND WE WOULD LIKE A BRIEF OPPORTUNITY TO GO

11:14AM  11      THROUGH AND MAKE ANY 106 DESIGNATIONS.

11:14AM  12             THE COURT:  WELL, I THINK JUST TO PROVIDE BOTH SIDES

11:14AM  13      AN OPPORTUNITY TO HAVE A FULL PRESENTATION, I WOULD BE INCLINED

11:14AM  14      TO DO THAT.  I JUST WANT TO FIGURE OUT THE TIMING OF THAT.

11:14AM  15          AND I'M NOT SUGGESTING I'M GRANTING/DENYING, BUT I JUST

11:14AM  16      WANT TO GIVE THE PARTIES AN OPPORTUNITY TO DO WHAT YOU NEED TO

11:14AM  17      DO TO RESPOND TO THE COURT.

11:15AM  18          SO LET'S -- LET ME TELL YOU, I'M NOT GOING TO GET AN ORDER

11:15AM  19      OUT TODAY.

11:15AM  20             MR. DOWNEY:  YES.

11:15AM  21             THE COURT:  BUT LET'S REVISIT THINGS TOMORROW

11:15AM  22      MORNING AND SEE WHERE WE ARE, AND MAYBE THAT GIVES YOUR TEAM,

11:15AM  23      MR. BOSTIC, AN OPPORTUNITY TO REVIEW AS WELL.

11:15AM  24          SO LET'S TOUCH BASE TOMORROW MORNING THEN ON THIS.

11:15AM  25          IS THAT ALL RIGHT?

7756

| | | |
|---|---|---|
| 11:15AM | 1 | MR. DOWNEY:  THAT'S FINE. |
| 11:15AM | 2 | MR. BOSTIC:  UNDERSTOOD. |
| 11:15AM | 3 | MR. DOWNEY:  WE'LL TALK IN THE INTERIM. |
| 11:15AM | 4 | THE COURT:  THAT SOUNDS GOOD. |
| 11:15AM | 5 | ANYTHING ELSE BEFORE WE BRING THE JURY IN? |
| 11:15AM | 6 | MR. DOWNEY:  NOTHING FROM US, YOUR HONOR. |
| 11:15AM | 7 | THE COURT:  OKAY.  ALL RIGHT.  THANK YOU. |
| 11:15AM | 8 | LET'S BRING THEM IN. |
| 11:15AM | 9 | MR. DOWNEY:  YOUR HONOR, I THOUGHT WE MIGHT BREAK |
| 11:15AM | 10 | AROUND 1:15. |
| 11:15AM | 11 | THE COURT:  THAT SOUNDS GOOD. |
| 11:15AM | 12 | MR. DOWNEY, ARE WE STAYING WITH VOLUME 3? |
| 11:15AM | 13 | MR. DOWNEY:  YOU ARE, YOUR HONOR, AND BECAUSE OF THE |
| 11:15AM | 14 | SMALL -- |
| 11:15AM | 15 | THE COURT:  YES. |
| 11:17AM | 16 | (PAUSE IN PROCEEDINGS.) |
| 11:17AM | 17 | (JURY IN AT 11:17 A.M.) |
| 11:17AM | 18 | THE COURT:  ALL RIGHT.  THANK YOU.  PLEASE BE |
| 11:17AM | 19 | SEATED.  THANK YOU. |
| 11:17AM | 20 | WE ARE BACK ON THE RECORD IN THE HOLMES MATTER.  ALL |
| 11:17AM | 21 | COUNSEL AND MS. HOLMES ARE PRESENT. |
| 11:17AM | 22 | OUR JURY IS PRESENT.  GOOD MORNING, LADIES AND GENTLEMEN. |
| 11:17AM | 23 | IT'S NICE TO SEE YOU ALL AGAIN.  I HOPE YOU ALL HAD A GOOD |
| 11:18AM | 24 | HOLIDAY, ENJOYED TIME WITH FAMILY AND FRIENDS, AND THAT YOU'RE |
| 11:18AM | 25 | ALL HEALTHY.  IT'S GOOD TO SEE YOU HERE. |

11:18AM  1       LET ME ASK THAT QUESTION AGAIN.  DURING OUR BREAK, DURING

11:18AM  2  THE BREAK IN THE PROCEEDINGS, DID ANY OF YOU HAVE CAUSE TO HAVE

11:18AM  3  BROUGHT TO YOUR ATTENTION ANY MEDIA, ANY READING, DISCUSSION,

11:18AM  4  OR ANY REVIEW OR KNOWLEDGE ABOUT ANYTHING TO DO WITH THIS CASE?

11:18AM  5       IF SO, PLEASE RAISE YOUR HAND.

11:18AM  6       I SEE NO HANDS.  THANK YOU VERY MUCH FOR YOUR CONTINUED

11:18AM  7  FIDELITY TO THE ADMONITION.  I APPRECIATE THAT, AS DO COUNSEL

11:18AM  8  HERE.

11:18AM  9       WE ARE -- I THINK WE'RE GOING UNTIL 4:00 TODAY.  I

11:18AM  10  APOLOGIZE FOR THE LATE START.  I KNOW THIS WILL SURPRISE YOU

11:18AM  11  AND SHOCK YOU, BUT WE HAD SOME MECHANICAL PROBLEMS WITH YOUR

11:18AM  12  SCREENS.  AND I THINK THERE IS SOME TAPE DOWN THAT IS ON THE

11:18AM  13  FLOOR.  I'M TOLD THAT THE I.T. PEOPLE DID A BYPASS THAT WILL

11:19AM  14  WORK FOR OUR PURPOSES TODAY.

11:19AM  15       AFTER TODAY, THIS EVENING THEY WILL CORRECT THE PROBLEM.

11:19AM  16  AGAIN, I APOLOGIZE FOR THESE CONTINUED DISRUPTIONS, BUT I THINK

11:19AM  17  WE CAN GO FORWARD.

11:19AM  18       MS. HOLMES, MAY I ASK YOU TO RESUME THE STAND, PLEASE.

11:19AM  19       (PAUSE IN PROCEEDINGS.)

11:19AM  20          THE COURT:  THANK YOU.  MAKE YOURSELF COMFORTABLE

11:19AM  21  AGAIN.

11:19AM  22          THE WITNESS:  THANK YOU.

11:19AM  23          THE COURT:  YOU'RE WELCOME.

11:19AM  24       WHEN YOU ARE COMFORTABLE, WOULD YOU JUST STATE YOUR NAME,

11:19AM  25  PLEASE.

11:19AM  1          THE WITNESS:  YES.  MY NAME IS ELIZABETH HOLMES.

11:19AM  2          THE COURT:  THANK YOU.  I'LL REMIND YOU THAT YOU ARE

11:19AM  3  STILL UNDER OATH.

11:19AM  4          THE WITNESS:  THANK YOU.

11:19AM  5      **(DEFENDANT'S WITNESS, ELIZABETH HOLMES, WAS PREVIOUSLY**

11:19AM  6  **SWORN.)**

11:19AM  7          THE COURT:  AND YOU CAN REMOVE YOUR MASK IF YOU

11:19AM  8  WISH.

11:19AM  9          THE WITNESS:  THANK YOU.

11:19AM 10          THE COURT:  YOU'RE WELCOME.

11:19AM 11      MR. DOWNEY.

11:19AM 12              **DIRECT EXAMINATION (RESUMED)**

11:19AM 13  BY MR. DOWNEY:

11:19AM 14  Q.   GOOD MORNING, MS. HOLMES.

11:19AM 15  A.   GOOD MORNING.

11:19AM 16  Q.   DO YOU RECALL LAST WEEK DURING YOUR TESTIMONY WE WERE

11:19AM 17  TALKING ABOUT SOME OF THE INDIVIDUALS FROM WALGREENS WITH WHOM

11:20AM 18  YOU INTERACTED ON BEHALF OF THERANOS?

11:20AM 19  A.   I DO.

11:20AM 20  Q.   AND ONE OF THOSE INDIVIDUALS WAS DR. JAY ROSAN?

11:20AM 21  A.   YES.

11:20AM 22  Q.   AND DID YOU STAY IN TOUCH WITH DR. ROSAN THROUGHOUT THE

11:20AM 23  PERIOD WHEN THERANOS AND WALGREENS WERE WORKING IN PARTNERSHIP?

11:20AM 24  A.   YES.

11:20AM 25  Q.   I'D LIKE TO ASK YOU TO LOOK AT AN EXHIBIT THAT IS MARKED

| | | |
|---|---|---|
| 11:20AM | 1 | 7469, AND I'VE PLACED NEAR YOU A VOLUME OF EXHIBITS THAT'S |
| 11:20AM | 2 | MARKED 4, WHICH IS A THINNER BINDER THAN THE BINDER THAT YOU |
| 11:20AM | 3 | WERE LOOKING AT LAST WEEK, AND THE DOCUMENT SHOULD BE IN THAT |
| 11:20AM | 4 | BINDER. |
| 11:20AM | 5 | A.   GREAT.  GOT IT. |
| 11:21AM | 6 | Q.   AND IS THIS AN EMAIL THAT DR. ROSAN SENT TO YOU IN 2014 |
| 11:21AM | 7 | RELATED TO WALGREENS, THERANOS SERVICE CENTERS AT WALGREENS? |
| 11:21AM | 8 | A.   YES. |
| 11:21AM | 9 | MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF |
| 11:21AM | 10 | 7469. |
| 11:21AM | 11 | MR. LEACH:  YOUR HONOR, I DON'T HAVE THIS IN MY |
| 11:21AM | 12 | BINDER. |
| 11:21AM | 13 | THE COURT:  OH.  IT'S IN VOLUME 4. |
| 11:21AM | 14 | MR. LEACH:  I'VE NOT BEEN PROVIDED WITH VOLUME 4. |
| 11:21AM | 15 | THE COURT:  OH.  THAT WILL BE CORRECTED. |
| 11:21AM | 16 | MR. DOWNEY:  I'M TERRIBLY SORRY. |
| 11:21AM | 17 | THE COURT:  YES, THAT WILL BE CORRECTED. |
| 11:22AM | 18 | (PAUSE IN PROCEEDINGS.) |
| 11:22AM | 19 | MR. LEACH:  HEARSAY, YOUR HONOR. |
| 11:22AM | 20 | THE COURT:  IS THIS CC'D TO MS. HOLMES? |
| 11:22AM | 21 | MR. DOWNEY:  SHE'S AN ADDRESSEE ON THE TO LINE. |
| 11:22AM | 22 | THE COURT:  YES, I SEE THAT. |
| 11:22AM | 23 | ALL RIGHT.  I'LL OVERRULE THE OBJECTION.  IT'S ADMITTED. |
| 11:22AM | 24 | (DEFENDANT'S EXHIBIT 7469 WAS RECEIVED IN EVIDENCE.) |
| 11:22AM | 25 | MR. DOWNEY:  CAN WE DISPLAY 7469. |

| | | |
|---|---|---|
| 11:22AM | 1 | Q.   DO YOU SEE AT THE TOP THIS IS THE FORWARDING OF AN EMAIL |
| 11:22AM | 2 | FROM DR. ROSAN TO YOU AND MR. BALWANI IN AUGUST OF 2014? |
| 11:22AM | 3 | A.   YES. |
| 11:22AM | 4 | Q.   AND IF YOU LOOK AT THE BOTTOM EMAIL, DO YOU SEE THAT HE |
| 11:22AM | 5 | HAS FORWARDED A REPORT? |
| 11:22AM | 6 | A.   I DO. |
| 11:22AM | 7 | Q.   AND IF YOU LOOK AT THE FIRST LINE OF THE EMAIL THAT'S BEEN |
| 11:23AM | 8 | FORWARDED, DO YOU SEE WHERE IT SAYS, "DR. J, WANTED TO LET YOU |
| 11:23AM | 9 | KNOW I DID SOME RECENT BLOOD WORK AT THERANOS AND I'M A |
| 11:23AM | 10 | BELIEVER." |
| 11:23AM | 11 | A.   YES. |
| 11:23AM | 12 | Q.   AND THEN IN THE LAST SENTENCE OF THAT PARAGRAPH, SHE GOES |
| 11:23AM | 13 | ON TO SAY, "I TOLD MY DOCTOR I REFUSE TO GO TO QUEST AND SHE |
| 11:23AM | 14 | HAS TO ACCEPT THESE RESULTS FROM THERANOS.  WE'LL BE PROMOTING |
| 11:23AM | 15 | THERANOS WHENEVER WE CAN." |
| 11:23AM | 16 | DO YOU SEE THAT? |
| 11:23AM | 17 | A.   I DO. |
| 11:23AM | 18 | Q.   NOW, THIS BOTTOM EMAIL IS FROM LISA MAKI, M-A-K-I? |
| 11:23AM | 19 | A.   YES. |
| 11:23AM | 20 | Q.   IS THAT SOMEONE THAT YOU KNEW? |
| 11:23AM | 21 | A.   NO. |
| 11:23AM | 22 | Q.   LET'S LOOK AT DR. ROSAN'S EMAIL ON TOP.  DO YOU SEE THAT |
| 11:23AM | 23 | HE SAYS, "THOUGHT YOU MIGHT WANT TO READ THIS TESTIMONIAL FROM |
| 11:23AM | 24 | A CEO THAT WE RESPECT"? |
| 11:23AM | 25 | A.   I DO. |

7761

11:23AM  1    Q.   IS -- DID YOU GET FEEDBACK FROM DR. ROSAN DURING THE

11:24AM  2    COURSE OF THE WALGREENS PARTNERSHIP AS TO OTHER POSITIVE

11:24AM  3    EXPERIENCES THAT PATIENTS WERE HAVING AT THERANOS SERVICE

11:24AM  4    CENTERS?

11:24AM  5    A.   I DID.

11:24AM  6    Q.   OKAY.  NOW, I BELIEVE A NUMBER OF TIMES DURING YOUR

11:24AM  7    TESTIMONY TO DATE YOU'VE TALKED ABOUT THE CONCEPT OF ACCESS FOR

11:24AM  8    PATIENTS.  I WANT TO ASK YOU WHAT THAT MEANS.

11:24AM  9         WHAT WAS THERANOS TRYING TO DO BY PROVIDING GREATER

11:24AM 10    ACCESS?

11:24AM 11    A.   IT MEANS THAT PEOPLE HAVE A FUNDAMENTAL RIGHT TO THEIR OWN

11:24AM 12    HEALTH INFORMATION AND MAKING IT EASIER FOR PEOPLE TO GET THAT

11:24AM 13    INFORMATION THROUGH CONVENIENCE OF LOCATIONS, THROUGH SMALLER

11:24AM 14    SAMPLES, THROUGH COST, THROUGH OWNERSHIP OF THEIR DATA, HAD THE

11:24AM 15    POTENTIAL TO CHANGE THE WAY THAT PEOPLE ENGAGED WITH THEIR OWN

11:24AM 16    HEALTH INFORMATION.

11:24AM 17    Q.   AND WAS ONE OF THE POPULATIONS TO WHOM -- WELL, WHAT ARE

11:24AM 18    SOME OF THE POPULATIONS TO WHOM THERANOS WANTED TO INCREASE

11:25AM 19    ACCESS?

11:25AM 20    A.   WE WANTED TO HELP PEOPLE WHO WERE SCARED OF NEEDLES.  THAT

11:25AM 21    INCLUDED CHILDREN, IT INCLUDED ELDERLY PERSONS OR CANCER

11:25AM 22    PATIENTS WHO HAD A REALLY DIFFICULT TIME GETTING BLOOD TESTS

11:25AM 23    AND WOULD OFTEN BE REALLY BRUISED FROM HAVING TO DO REPEATED

11:25AM 24    BLOOD TESTS.  SOMETIMES YOU SEE THAT WITH WOMEN WHO UNDERGO

11:25AM 25    FERTILITY TREATMENT WHO ARE GETTING BLOOD DRAWN ALL OF THE TIME

| | | |
|---|---|---|
| 11:25AM | 1 | AND THEY HAVE TO WEAR LONG SLEEVES SO THAT THEY CAN COVER UP |
| 11:25AM | 2 | THE BRUISES. |
| 11:25AM | 3 | Q.   AND DID YOU GET REPORTS DURING THE COURSE OF THE |
| 11:25AM | 4 | WALGREENS/THERANOS PARTNERSHIP THAT THERANOS WAS HAVING SUCCESS |
| 11:25AM | 5 | IN EXPANDING THAT KIND OF ACCESS? |
| 11:25AM | 6 | A.   YES. |
| 11:25AM | 7 | Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 7514, WHICH IS ALSO IN |
| 11:25AM | 8 | VOLUME 4. |
| 11:26AM | 9 | A.   OKAY. |
| 11:26AM | 10 | Q.   WHO IS ELENA SCHEER? |
| 11:26AM | 11 | A.   ELENA SCHEER WORKED IN CUSTOMER SERVICE FOR THERANOS. |
| 11:26AM | 12 | Q.   AND IS 7514 AN EMAIL THAT SHE SENT YOU ABOUT SOME FEEDBACK |
| 11:26AM | 13 | ON SOMETHING THAT HAD HAPPENED IN CONNECTION WITH A THERANOS |
| 11:26AM | 14 | SERVICE CENTER? |
| 11:26AM | 15 | A.   YES. |
| 11:26AM | 16 | MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF |
| 11:26AM | 17 | 7514. |
| 11:26AM | 18 | MR. LEACH:  NO OBJECTION, YOUR HONOR. |
| 11:26AM | 19 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 11:26AM | 20 | (DEFENDANT'S EXHIBIT 7514 WAS RECEIVED IN EVIDENCE.) |
| 11:26AM | 21 | BY MR. DOWNEY: |
| 11:26AM | 22 | Q.   AND I JUST WANT TO ASK YOU, WITHOUT GOING THROUGH THIS |
| 11:26AM | 23 | EMAIL, IS THIS A REPORT THAT YOU RECEIVED ON A PATIENT WHO GOT |
| 11:26AM | 24 | GREATER ACCESS AS A RESULT OF THE FINGERSTICK METHOD OR THE |
| 11:26AM | 25 | SMALL SAMPLE METHOD THERANOS WAS USING? |

11:26AM  1    A.   IT IS.

11:26AM  2    Q.   AND DID YOU OCCASIONALLY OR ON OCCASION GET REPORTS OF

11:27AM  3    THIS KIND DURING THE TIME THAT YOU WERE THE CEO OF THERANOS?

11:27AM  4    A.   I DID.

11:27AM  5    Q.   DID YOU ALSO GET REPORTS DURING THAT PERIOD THAT PATIENTS

11:27AM  6    GOING TO THERANOS SERVICE CENTERS IN WALGREENS WERE FINDING

11:27AM  7    THAT THE TEST RESULTS THAT THEY GOT WERE MORE ACCURATE THAN THE

11:27AM  8    TEST RESULTS THAT WERE PROVIDED BY SOME OTHER CLINICAL BLOOD

11:27AM  9    TESTING SERVICES?

11:27AM  10   A.   I DID.

11:27AM  11   Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 7623.  THAT SHOULD ALSO

11:27AM  12   BE IN THAT SAME VOLUME.

11:27AM  13   A.   OKAY.

11:27AM  14   Q.   I WANT TO ASK YOU TO LOOK JUST AT THE BOTTOM EMAIL, AND MY

11:27AM  15   QUESTION FOR YOU WITH REGARD TO THIS DOCUMENT IS SIMPLY WHETHER

11:28AM  16   THE ANECDOTE RECOUNTED IN THIS EMAIL IS SOMETHING THAT YOU

11:28AM  17   BECAME FAMILIAR WITH DURING THE COURSE OF YOUR TIME AS THE CEO

11:28AM  18   AT THERANOS?

11:28AM  19   A.   IT IS.

11:28AM  20   Q.   AND HOW DID YOU COME TO LEARN THIS ANECDOTE?

11:28AM  21   A.   I WAS TOLD ABOUT THIS BY OUR FIELD REPRESENTATIVES AND

11:28AM  22   PEOPLE WHO WERE GATHERING FEEDBACK FROM PEOPLE IN THE FIELD,

11:28AM  23   RYAN KARPEL ON THIS EMAIL.

11:28AM  24   Q.   OKAY.  AND DID YOU RECEIVE, RECALL RECEIVING AT LEAST ONE

11:28AM  25   REPORT WHERE A THERANOS TEST HAD DETECTED A CONDITION WITH

11:28AM 1    REGARD TO A PATIENT THAT HAD BEEN MISSED BY BLOOD TESTS OFFERED

11:28AM 2    BY OTHER BLOOD TESTING SERVICES?

11:28AM 3    A.   YES.

11:28AM 4    Q.   AND TELL US WHAT YOU RECALL LEARNING IN THAT INSTANCE.

11:28AM 5    A.   IN THIS SPECIFIC INSTANCE?

11:28AM 6    Q.   YES.

11:28AM 7    A.   THIS IS A PATIENT WHO HAD BEEN CHRONICALLY DOING THYROID

11:29AM 8    TESTING AND HAD NOT DISCOVERED AN ISSUE WITH I THINK IT WAS HER

11:29AM 9    PITUITARY GLAND, AND UPON GETTING A SERIES OF LAB DATA BACK

11:29AM 10   FROM THERANOS AND LOOKING AT THE WAY THAT WE PRESENT THAT DATA

11:29AM 11   IN THE APP THAT SHE HAD ACCESS TO, SHE AND HER PHYSICIAN WERE

11:29AM 12   ABLE TO DISCOVER A MEDICAL ISSUE THAT SHE HAD NOT SEEN BEFORE

11:29AM 13   AND SHE WAS REALLY EXCITED ABOUT THE SERVICE BASED ON THOSE

11:29AM 14   RESULTS.

11:29AM 15   Q.   OKAY.  AND WAS THIS THE ONLY INCIDENT OF THIS KIND THAT

11:29AM 16   YOU RECALL?

11:29AM 17   A.   NO.

11:29AM 18   Q.   DO YOU RECALL OTHER INCIDENTS WHERE PATIENTS REPORTED

11:29AM 19   DETECTED CONDITIONS THAT OTHER BLOOD TESTING SERVICES HAD BEEN

11:29AM 20   UNABLE TO DETECT?

11:29AM 21   A.   I DO.

11:29AM 22           MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT 7623.

11:29AM 23           MR. LEACH:  NO OBJECTION, YOUR HONOR.

11:29AM 24           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:29AM 25           (DEFENDANT'S EXHIBIT 7623 WAS RECEIVED IN EVIDENCE.)

11:30AM   1    BY MR. DOWNEY:

11:30AM   2    Q.   DO YOU SEE THIS IS AN EMAIL THAT RECOUNTS WHAT OCCURRED

11:30AM   3    WITH REGARD TO THE PARTICULAR PATIENT THAT WE HAVE BEEN

11:30AM   4    DISCUSSING?

11:30AM   5    A.   YES.

11:30AM   6    Q.   AND DO YOU SEE THAT ABOUT FIVE LINES DOWN INTO THE THIRD

11:30AM   7    PARAGRAPH THE REPORT IS THAT SHE, REFERRING TO THE PATIENT,

11:30AM   8    "HAS BEEN FRUSTRATED WITH HAVING SYMPTOMS WITH NO RESOLUTION OR

11:30AM   9    DIAGNOSIS AS TO WHAT THE ROOT CAUSE WAS."

11:30AM  10         DO YOU SEE THAT?

11:30AM  11    A.   YES, I DO.

11:30AM  12    Q.   AND SHE TOOK THE INFORMATION THAT SHE HAD GATHERED FROM

11:30AM  13    HER THERANOS RESULT AND ENCOURAGED HER PRIMARY CARE DOCTOR TO

11:30AM  14    ORDER AN ULTRASOUND.

11:30AM  15         DO YOU SEE THAT?

11:30AM  16    A.   YES.

11:30AM  17    Q.   AND DO YOU SEE THAT THE DOCTOR, UPON PERFORMING THE

11:30AM  18    ULTRASOUND, DISCOVERED SHE HAD A TUMOR IN HER PITUITARY GLAND

11:31AM  19    AND TWO MORE IN HER BRAIN?

11:31AM  20    A.   YES.

11:31AM  21    Q.   AND THEN DO YOU SEE THAT THIS EMAIL GOES ON TO REPORT THAT

11:31AM  22    SHE FELT STRONGLY THAT HAD SHE NOT BEEN ABLE TO GET HER BLOOD

11:31AM  23    TEST RESULTS AND BE PROACTIVE, HER PRIMARY CARE DOCTOR WOULD

11:31AM  24    NOT HAVE ORDERED AN ULTRASOUND?

11:31AM  25    A.   I DO.

11:31AM 1    Q.   AND DO YOU SEE THAT SHE, IN THE LAST SENTENCE, REPORTED

11:31AM 2    SHE WOULD NEVER GO TO ANOTHER COMPANY?

11:31AM 3    A.   YES.

11:31AM 4    Q.   LET ME ASK YOU IN THE ADDRESS OF THIS EMAIL IN THE

11:31AM 5    BEGINNING, WHO IS -- IF YOU WOULD JUST BLOW UP THE ADDRESS

11:31AM 6    BLOCK THERE.

11:31AM 7         WHO IS BRANDI LUZANIA?

11:31AM 8    A.   BRANDI WAS ONE OF OUR CERTIFIED PHLEBOTOMIST WHO WOULD

11:31AM 9    SERVE PATIENTS IN OUR WELLNESS CENTERS.

11:32AM 10   Q.   NOW, MS. HOLMES, I JUST WANT TO TURN TO ONE MATTER WITH

11:32AM 11   RESPECT TO AN EXHIBIT THAT HAD BEEN CONDITIONALLY ADMITTED BY

11:32AM 12   YOUR HONOR PREVIOUSLY.

11:32AM 13        YOUR HONOR, WE HAD, THROUGH ANOTHER WITNESS, PROVISIONALLY

11:32AM 14   ADMITTED 13862 AND 13863.

11:32AM 15        SO IF YOU WOULD LOOK AT THOSE, MS. HOLMES.

11:32AM 16   A.   OKAY.

11:32AM 17   Q.   DO THESE REFLECT CALENDAR ENTRIES FROM YOUR CALENDAR WHILE

11:32AM 18   YOU WERE THE CEO OF THERANOS?

11:32AM 19   A.   YES.

11:32AM 20        MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT 13862 AND

11:32AM 21   13863.

11:33AM 22        MR. LEACH:  NO OBJECTION, YOUR HONOR.

11:33AM 23        THE COURT:  THEY'RE ADMITTED.  THEY MAY BE

11:33AM 24   PUBLISHED.

11:33AM 25        (DEFENDANT'S EXHIBITS 13862 AND 13863 WERE RECEIVED IN

| | | |
|---|---|---|
| 11:33AM | 1 | EVIDENCE.) |
| 11:33AM | 2 | BY MR. DOWNEY: |
| 11:33AM | 3 | Q.   DURING THE COURSE OF YOUR TIME AT THERANOS, DID YOU ALSO |
| 11:33AM | 4 | HAVE OCCASIONS TO REVIEW PORTIONS OF THE WALGREENS WEBSITE THAT |
| 11:33AM | 5 | DISCUSSED THERANOS'S SERVICES IN WALGREENS STORES? |
| 11:33AM | 6 | A.   I DID. |
| 11:33AM | 7 | Q.   LET ME ASK YOU TO LOOK AT 14207, WHICH SHOULD BE IN |
| 11:33AM | 8 | VOLUME 4 OF WHAT IS WITH YOU. |
| 11:33AM | 9 | A.   OKAY. |
| 11:33AM | 10 | Q.   DO YOU HAVE THAT? |
| 11:33AM | 11 | A.   I DO. |
| 11:33AM | 12 | Q.   IS 14207 PART OF THE WALGREENS WEBSITE THAT RAN DURING THE |
| 11:33AM | 13 | TIME THAT THERANOS SERVICE CENTERS WERE BEING OFFERED IN |
| 11:33AM | 14 | WALGREENS STORES? |
| 11:33AM | 15 | A.   YES. |
| 11:33AM | 16 | Q.   AND DO YOU SEE THAT THE DATE IN THE UPPER RIGHT-HAND |
| 11:33AM | 17 | CORNER APPEARS TO BE OCTOBER 9TH, 2014? |
| 11:34AM | 18 | A.   YES. |
| 11:34AM | 19 | MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF |
| 11:34AM | 20 | 14207. |
| 11:34AM | 21 | MR. LEACH:  NO OBJECTION, YOUR HONOR. |
| 11:34AM | 22 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 11:34AM | 23 | (DEFENDANT'S EXHIBIT 14207 WAS RECEIVED IN EVIDENCE.) |
| 11:34AM | 24 | BY MR. DOWNEY: |
| 11:34AM | 25 | Q.   AND DID YOU ALSO ON OCCASION REVIEW PORTIONS OF THE |

7768

11:34AM 1    THERANOS WEBSITE IN CONNECTION WITH SERVICES AT WALGREENS?

11:34AM 2    A.   I DID.

11:34AM 3    Q.   IF YOU WOULD TAKE A MINUTE TO TURN TO THE NEXT EXHIBIT,

11:34AM 4    WHICH IS 14208.

11:34AM 5    A.   YES.

11:34AM 6    Q.   IS THIS A PORTION OF THE THERANOS WEBSITE THAT RAN DURING

11:34AM 7    THE TIME THAT THERANOS SERVICE CENTERS WERE OPERATING IN

11:34AM 8    WALGREENS STORES?

11:34AM 9    A.   IT IS.

11:34AM 10   Q.   AND DO YOU SEE IN THE UPPER RIGHT-HAND CORNER IT APPEARS

11:34AM 11   TO INDICATE THE DATE IS AUGUST 19TH, 2014?

11:34AM 12   A.   YES.

11:34AM 13           MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

11:35AM 14   14208.

11:35AM 15           MR. LEACH:  NO OBJECTION, YOUR HONOR.

11:35AM 16           THE COURT:  IT'S ADMITTED.

11:35AM 17       (DEFENDANT'S EXHIBIT 14208 WAS RECEIVED IN EVIDENCE.)

11:35AM 18   BY MR. DOWNEY:

11:35AM 19   Q.   WHEN WE LEFT OFF ON FRIDAY, WE WERE TALKING ABOUT

11:35AM 20   THERANOS'S WORK WITH VARIOUS PARTS OF THE DEPARTMENT OF

11:35AM 21   DEFENSE.

11:35AM 22       DO YOU RECALL THAT?

11:35AM 23   A.   I DO.

11:35AM 24   Q.   DURING THE COURSE OF THE TIME YOU WERE AT THERANOS, DID

11:35AM 25   THERANOS WORK WITH THE UNITED STATES CENTRAL COMMAND?

```
11:35AM    1      A.   YES.

11:35AM    2      Q.   AND IS THAT SOMETIMES ABBREVIATED AS CENTCOM?

11:35AM    3      A.   IT IS.

11:35AM    4      Q.   DID THERANOS ENTER INTO AN AGREEMENT WITH CENTCOM?

11:35AM    5      A.   WE DID, YES.

11:35AM    6      Q.   LET ME ASK YOU TO LOOK AT A DOCUMENT THAT IS ALREADY IN

11:35AM    7      EVIDENCE, AND I'LL PUT ON THE SCREEN, WHICH IS EXHIBIT 10457.

11:35AM    8      THAT ALSO SHOULD BE IN VOLUME 3 OF THE MATERIALS.

11:36AM    9          IF YOU WOULD JUST TAKE A MOMENT TO LOOK THROUGH THE

11:36AM   10      DOCUMENTS AND ITS ATTACHMENTS.

11:36AM   11      A.   VOLUME 3.  I'M SORRY, THE NUMBER WAS?

11:36AM   12      Q.   104 --

11:36AM   13      A.   GOT IT -- 57.  OKAY.

11:36AM   14      Q.   AND IF YOU LOOK AT THE -- HAVE YOU HAD A CHANCE TO LOOK

11:36AM   15      THROUGH THAT?

11:36AM   16      A.   YEAH, BRIEFLY.

11:36AM   17      Q.   IF YOU LOOK AT THE EMAIL THAT IS THE FIRST PAGE OF THE

11:36AM   18      EXHIBIT, DO YOU SEE THAT THAT'S -- IT'S DATED DECEMBER 3RD,

11:36AM   19      2012?

11:36AM   20      A.   YES.

11:36AM   21      Q.   WAS IT AROUND NOVEMBER OR DECEMBER OF 2012 WHEN THERANOS

11:36AM   22      ENTERED INTO AN AGREEMENT WITH CENTCOM?

11:37AM   23      A.   IT WAS.

11:37AM   24      Q.   HOW LONG PRIOR TO DECEMBER 2012 HAD THERANOS BEEN TALKING

11:37AM   25      TO CENTCOM ABOUT THE PROSPECT OF ENTER INTO AN AGREEMENT?
```

7770

11:37AM  1      A.    ABOUT A YEAR AND A HALF.

11:37AM  2      Q.    AND WAS THAT THE RESULT OF THE INTRODUCTION THAT

11:37AM  3   GENERAL MATTIS HAD MADE TO CENTCOM?

11:37AM  4      A.    IT WAS.

11:37AM  5      Q.    AND WAS THIS AGREEMENT THE CULMINATION OF THOSE

11:37AM  6   DISCUSSIONS OVER THE COURSE OF A YEAR AND A HALF?

11:37AM  7      A.    YES.

11:37AM  8      Q.    LET ME ASK YOU TO LOOK AT PAGE 3 OF THE DOCUMENT.

11:37AM  9            AND DO YOU SEE THAT THERE'S A TITLE ON THE TOP THAT SAYS

11:37AM 10   "U.S. ARMY MEDICAL RESEARCH AND MATERIEL COMMAND."

11:37AM 11            CAN YOU EXPLAIN WHAT THAT IS AND WHAT IT HAS TO DO WITH

11:38AM 12   CENTCOM?

11:38AM 13      A.    MY UNDERSTANDING IS THAT THIS IS THE GROUP WITHIN THE

11:38AM 14   MILITARY THAT WAS RESPONSIBLE FOR THE IRB APPROVAL, WHICH IS

11:38AM 15   THE INSTITUTIONAL REVIEW BOARD THAT IS LISTED HERE, WHICH IS

11:38AM 16   ONE OF THE APPROVALS THAT WE NEEDED TO BE ABLE TO DO A STUDY IN

11:38AM 17   WHICH WE WERE TESTING HUMAN SAMPLES.

11:38AM 18      Q.    OKAY.  AND WHEN YOU ULTIMATELY WERE ABLE TO AGREE ON A

11:38AM 19   STUDY, WHAT WAS THE, WHAT WAS THE STUDY THAT WAS TO BE

11:38AM 20   PERFORMED?

11:38AM 21      A.    THE STUDY THAT WAS TO BE PERFORMED WAS TO SHIP OUR SYSTEMS

11:38AM 22   TO AFGHANISTAN WHERE THEY WOULD BE TESTED AGAINST TRADITIONAL

11:38AM 23   REFERENCE METHODS TO EVALUATE THEIR USE IN SETTINGS IN

11:38AM 24   AFGHANISTAN AND OTHER REMOTE PLACES.

11:38AM 25      Q.    AND IN THE PERIOD THAT WAS FROM THE MIDDLE OF 2011 UNTIL

| | | |
|---|---|---|
| 11:38AM | 1 | THE END OF 2012 WHEN YOU WERE DISCUSSING THE POSSIBILITY OF |
| 11:39AM | 2 | THIS, WHAT WAS HAPPENING DURING THOSE MONTHS PRIOR TO ACTUAL |
| 11:39AM | 3 | ENTRY OF AN AGREEMENT? |
| 11:39AM | 4 | A.   THERE WAS A LOT OF WORK IN FIGURING OUT HOW TO GET THE |
| 11:39AM | 5 | RIGHT APPROVALS TO DO A STUDY LIKE THIS; UNDERSTANDING THE |
| 11:39AM | 6 | RELEVANT REGULATORY RESTRICTIONS THAT WE NEEDED TO WORK THROUGH |
| 11:39AM | 7 | WITH CENTCOM; UNDERSTANDING THE TEST LIST THAT THEY ACTUALLY |
| 11:39AM | 8 | WANTED US TO DEVELOP FOR THEM, WE HAD A NUMBER OF CHANGES TO |
| 11:39AM | 9 | THAT OVER TIME; UNDERSTANDING HOW THIS WORK MIGHT BE COMBINED |
| 11:39AM | 10 | WITH OR OTHERWISE INTERFACE WITH OTHER CONVERSATIONS WE WERE |
| 11:39AM | 11 | HAVING WITHIN DOD; HOW TO CONTRACT WITH THEM, WHETHER WE NEEDED |
| 11:39AM | 12 | TO CONTRACT THROUGH A SUBCONTRACTOR. |
| 11:39AM | 13 |      THERE WAS A WHOLE SERIES OF WORK STREAMS THAT HAD TO BE |
| 11:39AM | 14 | DEALT WITH. |
| 11:39AM | 15 | Q.   OKAY.  AND IF YOU LOOK AT PAGE 4, THERE'S A SECTION HERE |
| 11:40AM | 16 | THAT IS LISTED AS STUDY FACILITIES. |
| 11:40AM | 17 |      DO YOU SEE THAT? |
| 11:40AM | 18 | A.   I DO. |
| 11:40AM | 19 | Q.   AND UNDER THAT IT SAYS -- IT ASKS FOR A LIST OF LOCATIONS |
| 11:40AM | 20 | WHERE STUDY PROCEDURES WILL BE PERFORMED. |
| 11:40AM | 21 |      DO YOU SEE THAT? |
| 11:40AM | 22 | A.   YES. |
| 11:40AM | 23 | Q.   AND THE LOCATION FOR THIS STUDY WAS TO BE THE COMBINED |
| 11:40AM | 24 | JOINT THEATRE HOSPITAL AT BAGRAM AIR FORCE BASE IN AFGHANISTAN? |
| 11:40AM | 25 | A.   YES. |

7772

11:40AM 1    Q.   AND AFTER THE EXECUTION -- WELL, LET ME DIRECT YOUR

11:40AM 2    ATTENTION TO ACTUALLY ONE OTHER PORTION OF THE -- OF THIS

11:40AM 3    DOCUMENT.

11:40AM 4        IF WE CAN LOOK AT PAGE 8 OF THE EXHIBIT.

11:40AM 5        DO YOU SEE THE SECTION THERE THAT IS LABELLED 4 AND IT

11:40AM 6    SAYS BACKGROUND AND SIGNIFICANCE?

11:40AM 7    A.   YES.

11:40AM 8    Q.   AND DID YOU UNDERSTAND THAT THIS WAS A PROVISION IN THE

11:40AM 9    AGREEMENT THAT SUMMARIZED WHY THIS STUDY WAS TO BE PERFORMED

11:41AM 10   BETWEEN THERANOS AND THE DEPARTMENT OF DEFENSE?

11:41AM 11   A.   I DID.

11:41AM 12   Q.   AND IF YOU LOOK AT THE LAST PARAGRAPH, DO YOU SEE THAT

11:41AM 13   WHERE IT BEGINS "SUGGESTED AREAS OF USE"?

11:41AM 14   A.   I DO.

11:41AM 15   Q.   AND IT LISTS A VARIETY OF PLACES WHERE POTENTIAL USE FOR

11:41AM 16   THE THERANOS DEVICES IS SET FORTH.

11:41AM 17       DO YOU SEE THAT?

11:41AM 18   A.   YES.

11:41AM 19   Q.   AND THERE'S A LIST OF ROLE III FACILITIES IN ROMAN

11:41AM 20   NUMBERS?

11:41AM 21   A.   YES.

11:41AM 22   Q.   DO YOU KNOW WHAT THAT REFERS TO?

11:41AM 23   A.   I THINK THAT IS THE SAME KIND OF BASE AS THE BAGRAM

11:41AM 24   AIR FORCE BASE WHERE MEDICAL CARE IS BEING PROVIDED TO PEOPLE

11:41AM 25   IN FIELD.

7773

11:41AM  1    Q.   AND THEN DO YOU SEE THAT ANOTHER SUGGESTED AREA IS MEDEVAC

11:42AM  2    PLATFORMS?

11:42AM  3    A.   YES.

11:42AM  4    Q.   AND DO YOU SEE THEN THAT THERE'S A REFERENCE TO ANOTHER

11:42AM  5    USE BEING IN CONNECTION WITH SOF UNITS?

11:42AM  6         DO YOU SEE THAT?

11:42AM  7    A.   I DO.

11:42AM  8    Q.   AND DO YOU SEE THE REFERENCE TO MORTUARY AFFAIRS AFTER

11:42AM  9    THAT?

11:42AM 10    A.   YES.

11:42AM 11    Q.   I'M REFERRING TO USE IN CONNECTION -- FOR IDENTIFICATION

11:42AM 12    IN CONNECTION WITH DECEASED PERSONNEL?

11:42AM 13    A.   YES.

11:42AM 14    Q.   AND THEN DO YOU SEE THAT THE NEXT PARAGRAPH OF THE

11:42AM 15    BACKGROUND SECTION TALKS ABOUT THE POTENTIAL THAT MIGHT BE

11:42AM 16    REALIZED FROM THE THERANOS SYSTEM IF DEPLOYED IN THOSE

11:42AM 17    CIRCUMSTANCES?

11:42AM 18    A.   I DO.

11:42AM 19    Q.   NOW, THIS WAS EXECUTED IN LATE 2012; CORRECT?

11:42AM 20    A.   YES.

11:42AM 21    Q.   AND YOU MENTIONED THE REGULATORY PROCESSES AND OTHER

11:43AM 22    THINGS THAT TOOK PLACE PRIOR TO THE AGREEMENT BEING SIGNED.

11:43AM 23         WHAT HAPPENED AFTER THE AGREEMENT WAS SIGNED WITH RESPECT

11:43AM 24    TO THIS STUDY?

11:43AM 25    A.   THEN WE NEEDED TO START THE CUSTOMIZATION WORK FOR DOD.

11:43AM 1          WE INVESTED IN BUILDING A CUSTOM DEVICE THAT COULD MEET

11:43AM 2     THESE GOALS OF BEING ABLE TO BE USED IN VERY REMOTE AREAS OR

11:43AM 3     ULTIMATELY ON MEDEVAC.

11:43AM 4          WE INVESTED IN DEVELOPING THE CHEMISTRIES AND THE TESTS

11:43AM 5     THAT WERE OF VALUE FOR TRIAGE IN THESE SITUATIONS, A WHOLE NEW

11:43AM 6     SOFTWARE SUITE.  THERE WAS VIBRATION CONFIGURATIONS THAT NEEDED

11:43AM 7     TO BE DONE FOR THE DEVICE; BIO SAFETY CONFIGURATIONS TO MAKE IT

11:43AM 8     ACT LIKE A BIO PORTAL ALMOST, A HEPA FILTER TYPE SYSTEM THAT

11:43AM 9     WAS BUILT IN, AND ALL OF THE ENGINEERING AND SCIENTIFIC WORK

11:44AM 10    THAT WENT INTO CREATING IT.

11:44AM 11    Q.   AT ANY TIME DURING THE PROCESS OF ENGAGING WITH CENTCOM,

11:44AM 12    DID PERSONNEL FROM CENTCOM VISIT THERANOS?

11:44AM 13    A.   YES.

11:44AM 14    Q.   AND DID THEY, DURING THE COURSE OF THAT VISIT, LOOK AT

11:44AM 15    THERANOS TECHNOLOGY?

11:44AM 16    A.   THEY DID.

11:44AM 17    Q.   AND DURING THE COURSE OF THE RELATIONSHIP, DID THERANOS

11:44AM 18    SEND DEVICES SO THAT CENTCOM COULD EVALUATE THEIR USEFULNESS IN

11:44AM 19    CONNECTION WITH POTENTIAL DEPLOYMENT?

11:44AM 20    A.   WE SENT DEVICES ONCE WE HAD BUILT THE SECURITY SOFTWARE

11:44AM 21    AND MADE THE CHANGES TO THE DEVICE FOR THAT TO THEIR AIR FORCE

11:44AM 22    BASE IN FLORIDA.

11:44AM 23    Q.   OKAY.  NOW, DID YOU CONTINUE THROUGHOUT 2013 WORKING ON A

11:44AM 24    DEPLOYMENT IN CONNECTION WITH THE USE OF THE THERANOS DEVICES

11:44AM 25    IN THE CONFLICT IN AFGHANISTAN?

11:44AM 1    A.   WE DID.  WE CONTINUED INVESTING A TREMENDOUS AMOUNT IN IT.

11:44AM 2    Q.   AND WHEN YOU SAY "INVESTING A TREMENDOUS AMOUNT," WHAT

11:44AM 3    KIND OF DOLLAR FIGURE ARE YOU REFERRING TO?

11:45AM 4    A.   TENS OF MILLIONS OF DOLLARS.

11:45AM 5    Q.   AND WHAT IN PARTICULAR WERE YOU WORKING TO DEVELOP AS A

11:45AM 6    RESULT OF THAT INVESTMENT?

11:45AM 7    A.   THE DEVICE THAT WOULD BE SPECIFIC TO DOD REQUIREMENTS FOR

11:45AM 8    SIZE, FOR PORTABILITY, FOR USE IN REMOTE AREAS, FOR USE ON

11:45AM 9    FLIGHT AND ALL OF THE TESTS THAT WERE MOST MEANINGFUL TO BE

11:45AM 10    ABLE TO BE USED IN THAT SETTING, ALL OF THE SOFTWARE THAT WOULD

11:45AM 11    BE USED BY PEOPLE IN THOSE SETTINGS, AND THEN THE

11:45AM 12    CONFIGURATIONS FOR THOSE ENVIRONMENTS WHICH WERE VERY DIFFERENT

11:45AM 13    THAN A RETAIL STORE.

11:45AM 14    Q.   AND WERE YOU STILL WORKING ON THAT PROJECT AS OF THE END

11:45AM 15    OF 2013?

11:45AM 16    A.   WE WERE.

11:45AM 17    Q.   AND DID YOU CONTINUE TO WORK ON THAT PROJECT UNTIL WELL

11:45AM 18    INTO 2014?

11:45AM 19    A.   YES.

11:45AM 20    Q.   DID THERANOS EVER HAVE A DEVICE TESTED WITHIN AFGHANISTAN?

11:46AM 21    A.   NO.

11:46AM 22    Q.   WAS -- WHY NOT?

11:46AM 23    A.   WE WEREN'T ABLE TO FINISH THE WORK IN TIME BASED ON THE

11:46AM 24    TIMELINES IN THE CONTRACT.

11:46AM 25    Q.   OKAY.  WHAT OTHER ACTIVITIES WAS THERANOS UNDERTAKING IN

11:46AM 1    2013 AND '14?

11:46AM 2    A.   WE WERE LAUNCHING OUR SERVICES AT RETAIL.

11:46AM 3    Q.   WERE YOU DISAPPOINTED THAT THE TESTS NEVER WERE COMPLETED?

11:46AM 4    A.   VERY MUCH SO, BUT I CONTINUED TO BELIEVE THAT WE WOULD SEE

11:46AM 5    IT THROUGH.

11:46AM 6    Q.   NOW, LET'S TALK ABOUT ANY RELATIONSHIP BETWEEN THERANOS

11:46AM 7    AND THE UNITED STATES SPECIAL OPERATIONS COMMAND.

11:46AM 8        ARE YOU FAMILIAR WITH THAT?

11:46AM 9    A.   I AM, YES.

11:46AM 10   Q.   AND IS THE SPECIAL OPERATIONS COMMAND SOMETIMES

11:46AM 11   ABBREVIATED SOCOM?

11:46AM 12   A.   IT IS.

11:46AM 13   Q.   AND THAT'S SEPARATE FROM CENTCOM?

11:46AM 14   A.   YES.

11:46AM 15   Q.   AND DID THERANOS DEVELOP A RELATIONSHIP WITH SOCOM?

11:47AM 16   A.   WE DID.

11:47AM 17   Q.   WHEN DID THERANOS BEGIN TO TRY TO WORK WITH SOCOM?

11:47AM 18   A.   IN 2012 AS WELL, I THINK.

11:47AM 19   Q.   AND DID THERANOS ULTIMATELY ENTER INTO AN AGREEMENT WITH

11:47AM 20   SOCOM AS WELL?

11:47AM 21   A.   YES.

11:47AM 22   Q.   OKAY.  WERE THE TIMELINES FOR THAT PROJECT PUSHED BACK?

11:47AM 23   A.   YES.

11:47AM 24   Q.   AND WHY WAS THAT?

11:47AM 25   A.   AGAIN, WE NEEDED THE TIME TO REALLY DEVELOP THIS NEW

11:47AM 1    DEVICE THE RIGHT WAY, AND ALSO ACCOMMODATE A DIFFERENT TEST

11:47AM 2    MENU THAT THEY HAD REQUESTED FOR USE IN THEIR SETTINGS.

11:47AM 3    Q.   DID THE DEVICE THAT YOU WERE DEVELOPING TO USE IN

11:47AM 4    CONNECTION WITH THESE MILITARY PROGRAMS, DID IT HAVE A NAME?

11:47AM 5    A.   IT DID.

11:47AM 6    Q.   AND WHAT WAS ITS NAME?

11:47AM 7    A.   WE CALLED IT THE 4S DEVICE.

11:47AM 8    Q.   DID THERANOS EVER DELIVERED A 4S DEVICE TO SOCOM?

11:47AM 9    A.   YES.

11:47AM 10   Q.   AND WHAT DID THERANOS DELIVER TO SOCOM?

11:47AM 11   A.   WE SHIPPED I THINK TWO OR MORE 4S DEVICES TO A SOCOM

11:48AM 12   FACILITY.

11:48AM 13   Q.   HOW MANY PERSONNEL AT THERANOS WERE INVOLVED IN WORKING ON

11:48AM 14   THE DEVELOPMENT OF THIS MILITARY SPECIFIC SET OF DEVICES?

11:48AM 15   A.   DOZENS OF ENGINEERS AND SCIENTISTS.

11:48AM 16   Q.   NOW, DO YOU RECALL DURING THE COURSE OF THE CASE THERE'S

11:48AM 17   BEEN TESTIMONY ABOUT STATEMENTS THAT YOU MADE REGARDING

11:48AM 18   THERANOS DEVICES ON MEDEVACS?

11:48AM 19   A.   I DO.

11:48AM 20   Q.   DO YOU RECALL THAT TESTIMONY?

11:48AM 21   A.   YES.

11:48AM 22   Q.   AND WERE THERANOS DEVICES USED FOR CLINICAL CARE ON

11:48AM 23   MEDEVACS?

11:48AM 24   A.   NO.

11:48AM 25   Q.   DID YOU TELL ANYONE THAT?

11:48AM 1    A.   I DON'T THINK I DID.

11:48AM 2    Q.   DID YOU TALK ABOUT THERANOS AND MEDEVACS AND A PROGRAM AT

11:48AM 3    THERANOS INVOLVING MEDEVACS?

11:49AM 4    A.   YES.

11:49AM 5    Q.   AND WHAT DO YOU RECALL YOU WERE TRYING TO CONVEY?

11:49AM 6    A.   I WAS TRYING TO CONVEY THAT WE WERE DOING A LOT OF WORK ON

11:49AM 7    DEVELOPING THIS NEW DEVICE FOR USE ON MEDEVACS AND IN REMOTE

11:49AM 8    AREAS.

11:49AM 9        IT WAS SOMETHING THAT I WAS INCREDIBLY PROUD OF THE WORK

11:49AM 10   THE TEAM WAS DOING AND INCREDIBLY EXCITED ABOUT BECAUSE WE HAD

11:49AM 11   CONTRACTS TO DO THIS AND WERE WORKING WITH ORGANIZATIONS IN THE

11:49AM 12   MILITARY TO BE ABLE TO TEST THE TECHNOLOGY TO ULTIMATELY

11:49AM 13   POTENTIALLY USE IT IN THESE SETTINGS.

11:49AM 14   Q.   DID YOU TALK IN THOSE CONVERSATIONS ABOUT POTENTIAL

11:49AM 15   APPLICATIONS FOR THERANOS'S DEVICE, HOW IT MIGHT BE USED IF IT

11:49AM 16   WERE CAPABLE OF BEING DEPLOYED?

11:49AM 17   A.   DEFINITELY.

11:49AM 18   Q.   AND WAS THAT SOMETHING THAT YOU FREQUENTLY SPOKE ABOUT?

11:49AM 19   A.   I SPOKE ABOUT IT ON OCCASION.

11:49AM 20       BUT WE ALSO WOULD TALK ABOUT THE FACT THAT WE WERE

11:50AM 21   GENERALLY PRIORITIZING OUR RETAIL INITIATIVES OVER ANYTHING

11:50AM 22   ELSE AT THAT POINT.

11:50AM 23   Q.   LET ME TURN TO THE SUBJECT OF DEMONSTRATIONS OF THERANOS'S

11:50AM 24   TECHNOLOGY.

11:50AM 25       DO YOU RECALL SOME DISCUSSION OF THAT DURING THE COURSE OF

7779

11:50AM 1    THE CASE?

11:50AM 2    A.   I DO.

11:50AM 3    Q.   AND DID THERANOS PROVIDE DEMONSTRATIONS TO OUTSIDERS OF

11:50AM 4    ITS TECHNOLOGY DURING THE TIME THAT YOU WERE THERE?

11:50AM 5    A.   YES.

11:50AM 6    Q.   AND WHY DID THERANOS CONDUCT THOSE DEMONSTRATIONS?

11:50AM 7    A.   WE CONDUCTED DEMONSTRATIONS TO SHOW PEOPLE DIFFERENT

11:50AM 8    ASPECTS OF OUR INVENTIONS AND TECHNOLOGY BASED ON WHAT WE WERE

11:50AM 9    TALKING WITH THEM ABOUT AND WHAT THEY WERE INTERESTED IN.

11:50AM 10   Q.   AND WHEN DID YOU START CONDUCTING THOSE DEMONSTRATIONS?

11:50AM 11   A.   PROBABLY AT THE BEGINNING OF THE COMPANY WHEN WE FIRST

11:50AM 12   STARTED.

11:50AM 13   Q.   AND OVER WHAT PERIOD OF TIME DID YOU CONTINUE TO OFFER

11:50AM 14   DEMONSTRATIONS OF THERANOS'S TECHNOLOGY?

11:50AM 15   A.   THROUGHOUT THE COMPANY'S LIFETIME.

11:51AM 16   Q.   HOW MANY DEMONSTRATIONS OF THERANOS'S TECHNOLOGY WERE YOU

11:51AM 17   PERSONALLY INVOLVED IN DURING THE COURSE OF YOUR TIME AT

11:51AM 18   THERANOS?

11:51AM 19   A.   PROBABLY HUNDREDS.

11:51AM 20   Q.   NOW, YOU TALKED ABOUT THE APPLICATIONS THAT THE PERSON

11:51AM 21   RECEIVING THE DEMONSTRATION MIGHT BE INTERESTED IN.

11:51AM 22       WHAT DO YOU MEAN BY THAT?  WERE DIFFERENT AUDIENCES

11:51AM 23   INTERESTED IN DIFFERENT ASPECTS OF THERANOS'S TECHNOLOGY?

11:51AM 24   A.   YES, THEY WERE.

11:51AM 25   Q.   AND DID YOU TRY TO CUSTOMIZE DEVICES, CUSTOMIZE

11:51AM   1    PRESENTATIONS TO ACCOMMODATE THAT?

11:51AM   2    A.   WE DID.   IN SOME CIRCUMSTANCES PEOPLE MIGHT BE INTERESTED

11:51AM   3    IN SEEING THE PROCESS THAT WE WERE PLANNING OR RUNNING AT

11:51AM   4    RETAIL, AND WE WOULD TRY TO REPLICATE OR MIMIC THAT IN OUR

11:51AM   5    BUILDING.

11:51AM   6        IN SOME CASES, LIKE IN THE CASE OF THE MILITARY, THERE

11:51AM   7    WERE QUESTIONS ABOUT HOW YOU COULD TAKE A DEVICE IN FIELD OR TO

11:51AM   8    A REMOTE LOCATION AND WE WOULD FOCUS ON THE DEVICE.

11:52AM   9        IN SOME CASES THERE WERE QUESTIONS ABOUT WHETHER AN

11:52AM  10    UNTRAINED PERSON COULD FIGURE OUT HOW TO USE THE DEVICE, AND WE

11:52AM  11    WOULD FOCUS ON THE TOUCHSCREEN AND HOW TO DO THE COLLECTION

11:52AM  12    PROCESS, FOR EXAMPLE.

11:52AM  13    Q.   OKAY.   NOW, LET'S TALK ABOUT THE LOCATION OF THESE

11:52AM  14    DEMONSTRATIONS THAT YOU DID.

11:52AM  15        DID YOU ALWAYS DO THE DEMONSTRATIONS IN THERANOS'S OFFICE?

11:52AM  16    A.   NO.

11:52AM  17    Q.   WOULD YOU TAKE THEM OUT ON THE ROAD TO USE IN OTHER

11:52AM  18    PEOPLE'S OFFICES?

11:52AM  19    A.   YES.

11:52AM  20    Q.   AND DID THAT INCLUDE DEMONSTRATIONS OF THE 3.0 SERIES

11:52AM  21    DEVICE?

11:52AM  22    A.   IT DID.

11:52AM  23    Q.   AND WAS THE 3.0 SERIES OF DEVICE THE DEVICE THAT YOU

11:52AM  24    PERSONALLY DEMONSTRATED BETWEEN 2006 AND 2011 OR SO?

11:52AM  25    A.   YES.

11:52AM 1    Q.   WHEN YOU CONDUCTED THOSE DEVICES AT REMOTE LOCATIONS, DID

11:53AM 2    YOU ALWAYS REPORT THE RESULTS OF THE DEMONSTRATION TO THE

11:53AM 3    PERSON WHO WAS INVOLVED IN RECEIVING IT?

11:53AM 4    A.   YES.

11:53AM 5    Q.   AND DID YOU HAVE MEETINGS IN CONNECTION WITH VARIOUS

11:53AM 6    PHARMACEUTICAL PARTNERS OVER A PERIOD OF TIME?

11:53AM 7    A.   WE DID, YES.

11:53AM 8    Q.   AND DID YOU TAKE THE DEVICE WITH YOU ALSO ON SOME

11:53AM 9    OCCASIONS SIMPLY FOR PEOPLE TO LOOK AT?

11:53AM 10   A.   YES.

11:53AM 11   Q.   AND THE TYPES OF PEOPLE WHO WERE RECEIVING DEMONSTRATIONS,

11:53AM 12   GIVE US AN IDEA OF WHO YOU MIGHT DEMONSTRATE THE TECHNOLOGY TO.

11:53AM 13   A.   WE WOULD DEMONSTRATE IT TO HOSPITAL SYSTEMS OR HEALTH

11:53AM 14   SYSTEMS THAT WE WERE MEETING WITH; TO PEOPLE WHO MIGHT BECOME

11:53AM 15   ADVISORS TO THERANOS; TO PARTNERS OR POTENTIAL PARTNERS; TO

11:53AM 16   INVESTORS OR POTENTIAL INVESTORS; TO PEOPLE WHO WE WANTED TO

11:53AM 17   GET INVOLVED WITH WORKING WITH THE COMPANY IN SOME WAY OR WERE

11:53AM 18   OTHERWISE INTERESTED IN WORKING WITH.

11:54AM 19   Q.   AND YOU BROUGHT A DEVICE TO YOUR MEETING WITH

11:54AM 20   JOHNS HOPKINS DURING THE WALGREENS DUE DILIGENCE PROCESS?

11:54AM 21   A.   YES.

11:54AM 22   Q.   AND DID YOU BRING A DEVICE TO UCSF IN CONNECTION WITH THE

11:54AM 23   SAFEWAY DILIGENCE PROCESS?

11:54AM 24   A.   I DID.

11:54AM 25   Q.   IN ADDITION TO CONDUCTING DEMONSTRATIONS, DID THERANOS

7782

11:54AM  1    SOMETIMES GIVE ITS TECHNOLOGY TO VARIOUS PEOPLE FOR THEM TO

11:54AM  2    RETAIN AND EXAMINE?

11:54AM  3    A.   YES.

11:54AM  4    Q.   DO YOU RECALL WHETHER ONE OF THOSE INSTITUTIONS WAS

11:54AM  5    WALGREENS?

11:54AM  6    A.   IT WAS.

11:54AM  7    Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 7129.

11:54AM  8    A.   IS THIS 3 OR?

11:54AM  9    Q.   VOLUME 4.

11:54AM  10   A.   VOLUME 4.  OKAY.

11:55AM  11   Q.   WAS RENAAT VANDENHOOFF AN EXECUTIVE AT WALGREENS WITH WHOM

11:55AM  12   YOU DEALT?

11:55AM  13   A.   YES.

11:55AM  14   Q.   IS THIS AN EMAIL ABOUT THE AGREEMENT BETWEEN WALGREENS AND

11:55AM  15   THERANOS FROM 2010?

11:55AM  16   A.   IT IS.

11:55AM  17          MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

11:55AM  18   7129.

11:55AM  19          MR. LEACH:  NO OBJECTION, YOUR HONOR.

11:55AM  20          THE COURT:  IT'S ADMITTED.

11:55AM  21      (DEFENDANT'S EXHIBIT 7129 WAS RECEIVED IN EVIDENCE.)

11:55AM  22   BY MR. DOWNEY:

11:55AM  23   Q.   AND DO YOU SEE IN THE FIRST TWO SENTENCES MR. VANDENHOOFF

11:55AM  24   ASKS MR. BALWANI AND YOURSELF IF WALGREENS COULD HAVE A FEW

11:56AM  25   DEVICES FOR DEMOS THE WEEK BEFORE SO WE CAN DO A FEW TESTS.

| 11:56AM | 1 | DO YOU SEE THAT? |
|---|---|---|

11:56AM  1    DO YOU SEE THAT?

11:56AM  2    A.   I DO.

11:56AM  3    Q.   AND WAS THIS IN CONNECTION WITH SOMETHING THAT WALGREENS

11:56AM  4    WAS DOING WITHOUT THERANOS, IF YOU KNOW?

11:56AM  5    A.   YES.

11:56AM  6    Q.   AND IF YOU LOOK AT THE SECOND SENTENCE, MR. VANDENHOOFF

11:56AM  7    SAYS, "I ASSUME WE WON'T HAVE THE MULTI-BAY DEVICES YET SO WE

11:56AM  8    WILL STILL BE LIMITED HOW MANY WE CAN DO AT ONE TIME."

11:56AM  9    DO YOU SEE THAT?

11:56AM  10   A.   YES.

11:56AM  11   Q.   AND WHAT DEVICES DID YOU SEND TO WALGREENS IN RESPONSE TO

11:56AM  12   THIS REQUEST?

11:56AM  13   A.   WE SENT 3 SERIES DEVICES.

11:56AM  14   Q.   WHY DID YOU SEND 3 SERIES DEVICES AT THIS TIME?

11:56AM  15   A.   BECAUSE THOSE WERE THE DEVICES THAT WE HAD BEEN USING IN

11:56AM  16   OUR PROGRAMS WITH PHARMACEUTICAL COMPANIES AND OTHERS.

11:56AM  17   Q.   OKAY.  WHEN YOU SEE -- WHEN MR. VANDENHOOFF SAYS HE

11:56AM  18   ASSUMES THAT YOU WON'T HAVE THE MULTI-BAY DEVICES, IS THAT

11:57AM  19   SOMETHING THAT YOU HAD COMMUNICATED WITH INDIVIDUALS AT

11:57AM  20   WALGREENS?

11:57AM  21   A.   IT IS.

11:57AM  22   Q.   NOW, I WANT TO FOCUS ON THE PERIOD BETWEEN 2011 AND 2016

11:57AM  23   AND THE DEMONSTRATIONS THAT YOU AND OTHERS AT THERANOS

11:57AM  24   CONDUCTED DURING THAT PERIOD.

11:57AM  25   WHO WAS INVOLVED IN PREPARING AND CONDUCTING

11:57AM 1    DEMONSTRATIONS AT THERANOS?

11:57AM 2    A.   OUR SCIENTISTS AND ENGINEERS FROM THE VARIOUS TECHNICAL

11:57AM 3    TEAMS, AND OUR PROJECT AND PRODUCT MANAGERS.

11:57AM 4    Q.   DID THAT INCLUDE MR. EDLIN?

11:57AM 5    A.   IT DID.

11:57AM 6    Q.   AND WAS DR. YOUNG INVOLVED AS WELL?

11:57AM 7    A.   HE WAS.

11:57AM 8    Q.   WHO ROLE DID HE PLAY?

11:57AM 9    A.   DR. YOUNG OVERSAW THE DEMO PROCESS AND THE REVIEW OF

11:57AM 10   RESULTS BEFORE THEY WERE RELEASED.

11:57AM 11   Q.   OKAY.  NOW, WERE YOU AT EVERY DEMONSTRATION THAT THERANOS

11:58AM 12   CONDUCTED?

11:58AM 13   A.   NO.

11:58AM 14   Q.   WERE YOU AT MANY OF THEM?

11:58AM 15   A.   I WAS.

11:58AM 16   Q.   AND WERE THE DEMONSTRATIONS CONDUCTED ACCORDING TO AN

11:58AM 17   IDENTICAL PROCESS?

11:58AM 18   A.   NO.

11:58AM 19   Q.   HOW DID THEY VARY?

11:58AM 20   A.   THEY VARIED BASED ON THE DISCUSSION WE WERE HAVING AND THE

11:58AM 21   PURPOSE OF THE DEMONSTRATION, WHAT SOMEONE WANTED TO SEE.

11:58AM 22        SO WE WOULD CUSTOMIZE THAT BASED ON GENERALLY THEIR

11:58AM 23   REQUESTS.

11:58AM 24   Q.   WELL, IN SOME INSTANCES WOULD PEOPLE SAY, I'D LIKE TO HAVE

11:58AM 25   MY BLOOD DRAWN AND HAVE IT READ?

11:58AM 1   A.   EXACTLY.

11:58AM 2   Q.   WERE THERE OTHER INSTANCES WHEN PEOPLE WEREN'T INTERESTED

11:58AM 3   IN DOING THAT?

11:58AM 4   A.   YES, THERE WERE OTHER INSTANCES WHERE PEOPLE ACTUALLY DID

11:58AM 5   NOT WANT TO GIVE BLOOD OR DO A FINGERSTICK, BUT THEY WANTED TO

11:58AM 6   UNDERSTAND, FOR EXAMPLE, HOW THE DEVICES WORKED AND WHAT IT

11:58AM 7   WOULD BE LIKE FOR SOMEONE TO USE THE DEVICE.

11:58AM 8   Q.   OKAY.  AND CAN YOU EXPLAIN IF THE -- IF THERE WAS NOT AN

11:59AM 9   ACTUAL BLOOD SAMPLE DRAWN, WHAT WOULD THAT PROCESS LOOK LIKE TO

11:59AM 10  SOMEONE RECEIVING A DEMONSTRATION?

11:59AM 11  A.   IF NO SAMPLE WAS DRAWN, THE DEVICE WOULD BE CONFIGURED TO

11:59AM 12  BE ABLE TO RECEIVE A CARTRIDGE, EVEN THOUGH THERE WASN'T A

11:59AM 13  SAMPLE IN THE CARTRIDGE, SO THAT WE COULD SHOW THE TOUCHSCREEN

11:59AM 14  WITH ALL OF THE INPUTS THAT A PERSON COULD PUT IN ABOUT THEIR

11:59AM 15  HEALTH OR OTHER INFORMATION THAT COULD BE THEN INTEGRATED IN

11:59AM 16  THE APP.

11:59AM 17  Q.   AND WHAT WOULD HAPPEN IF YOU, IN THE ORDINARY COURSE IF

11:59AM 18  YOU PUT A CARTRIDGE IN WITH NO BLOOD SAMPLE IN IT?

11:59AM 19  A.   THE MACHINE WOULD REJECT IT.

11:59AM 20  Q.   AND WOULD YOU BE ABLE TO RUN THE PROCESS OF THE MACHINE

11:59AM 21  WORKING ITS WAY THROUGH TO THE END OF THE TEST?

11:59AM 22  A.   NO.

11:59AM 23  Q.   AND I THINK YOU MENTIONED A PROTOCOL WOULD ALLOW FOR THAT?

11:59AM 24  A.   YES.

11:59AM 25  Q.   DO YOU NOW UNDERSTAND THAT THAT'S WHAT HAS BEEN REFERRED

7786

12:00PM   1    TO AS THE NULL PROTOCOL?

12:00PM   2    A.   I UNDERSTAND THAT NOW.

12:00PM   3    Q.   DID YOU UNDERSTAND THAT -- DID YOU HEAR THAT TERM AT THE

12:00PM   4    TIME?

12:00PM   5    A.   I DID.

12:00PM   6    Q.   DID YOU HAVE ANY CONCERN AT THE TIME THAT THIS METHOD OF

12:00PM   7    DEMONSTRATION WAS MISLEADING?

12:00PM   8    A.   NOT AT ALL.

12:00PM   9    Q.   DID ANYONE AT THERANOS EVER EXPRESS A CONCERN TO YOU THAT

12:00PM   10   THEY THOUGHT YOU WERE MISLEADING PEOPLE BY CONDUCTING

12:00PM   11   DEMONSTRATIONS IN THIS WAY?

12:00PM   12   A.   NOT AT ALL.

12:00PM   13   Q.   NOW, WE'VE TALKED ABOUT THE FACT THAT IN YOUR RELATIONSHIP

12:00PM   14   WITH WALGREENS, THERE WAS A PHASE I AND A PHASE II.

12:00PM   15        DO YOU RECALL THAT DISCUSSION?

12:00PM   16   A.   I DO.

12:00PM   17   Q.   AND IN PHASE I, THE SAMPLES THAT WERE DRAWN FROM PATIENTS

12:00PM   18   WOULD BE TESTED IN THE CENTRAL LABORATORY AT THERANOS; IS THAT

12:00PM   19   RIGHT?

12:00PM   20   A.   YES.

12:00PM   21   Q.   AND COULD YOU -- IF CONDUCTING A DEMONSTRATION IN

12:00PM   22   THERANOS'S HEADQUARTERS, COULD YOU REPLICATE THE PHASE I

12:00PM   23   PROCESS FOR SOMEONE RECEIVING THE DEMONSTRATION?

12:01PM   24   A.   WE DID, YES.

12:01PM   25   Q.   AND TELL US HOW YOU WENT ABOUT DOING THAT.

12:01PM 1    A.   WE PHYSICALLY CONSTRUCTED WELLNESS CENTERS INSIDE OF

12:01PM 2    THERANOS WHERE PEOPLE COULD COME INTO A ROOM THAT WAS DESIGNED

12:01PM 3    TO LOOK LIKE A WALGREENS SERVICE CENTER, HAVE A PHLEBOTOMIST

12:01PM 4    CHECK THEM IN, DO A COLLECTION OF THE FINGERSTICK JUST LIKE YOU

12:01PM 5    WOULD DO IN THE STORE, AND HAVE THOSE SAMPLES TRANSPORTED TO

12:01PM 6    OUR LAB.

12:01PM 7    Q.   OKAY.  AND PHASE II OF THE RELATIONSHIP WAS TO BE A

12:01PM 8    SITUATION WHERE THE TESTING WOULD ACTUALLY BE PERFORMED IN THE

12:01PM 9    STORE; IS THAT RIGHT?

12:01PM 10   A.   YES.

12:01PM 11   Q.   AND WERE YOU ALSO ABLE TO DEMONSTRATE TO PEOPLE RECEIVING

12:01PM 12   DEMONSTRATIONS HOW THAT PROCESS WOULD WORK?

12:01PM 13   A.   WE DID.

12:01PM 14   Q.   AND COULD YOU EXPLAIN HOW THAT WOULD WORK?

12:01PM 15   A.   YES.  IN THAT CASE YOU HAVE THE DEVICE RIGHT WHERE THE

12:01PM 16   PATIENT IS, AND YOU CAN DO A FINGERSTICK AND PUT THE SAMPLE

12:01PM 17   DIRECTLY INTO A CARTRIDGE AND RUN THAT CARTRIDGE ON THE DEVICE

12:02PM 18   RIGHT THERE ON THE SPOT.

12:02PM 19   Q.   AND WOULD THAT REPORT RESULTS?

12:02PM 20   A.   IT DID.

12:02PM 21   Q.   AND IN SOME INSTANCES, WOULD THOSE RESULTS BE REPORTED ON

12:02PM 22   A THERANOS APPLICATION IF THE PERSON RECEIVING THE

12:02PM 23   DEMONSTRATION HAD DOWNLOADED THAT APPLICATION?

12:02PM 24   A.   THEY COULD BE, OR ON THE TOUCHSCREEN OF THE DEVICE

12:02PM 25   THEMSELVES.

7788

12:02PM   1    Q.   OKAY.  NOW, YOU MENTIONED THAT DR. YOUNG WAS THE PERSON

12:02PM   2    RESPONSIBLE FOR REVIEWING THE RESULTS; IS THAT RIGHT?

12:02PM   3    A.   HE WAS.

12:02PM   4    Q.   AND WAS DR. YOUNG THE HEAD OF RESEARCH AND DEVELOPMENT AT

12:02PM   5    THE COMPANY AT THAT TIME?

12:02PM   6    A.   YES.

12:02PM   7    Q.   WHY WAS THE CLIA LAB NOT TYPICALLY INVOLVED IN

12:02PM   8    DEMONSTRATIONS?

12:02PM   9    A.   MUCH OF THE DEMONSTRATIONS WERE BEFORE THE CLIA LAB WAS

12:02PM  10    OPERATIONAL AT RETAIL.

12:02PM  11         BUT THEN OTHERWISE THE DEMONSTRATIONS WERE GENERALLY TO

12:02PM  12    SHOW TECHNOLOGY OR OTHERWISE NEW THINGS THAT THE COMPANY WAS

12:03PM  13    WORKING ON.

12:03PM  14         SO WE HAD A SEPARATE PROCESS FOR TECHNOLOGY DEMONSTRATIONS

12:03PM  15    AS OPPOSED TO A PHYSICIAN ORDERING A LAB TEST FOR A PATIENT.

12:03PM  16    Q.   OKAY.  LET ME ASK YOU TO LOOK AT EXHIBIT 966, WHICH IS

12:03PM  17    ALREADY IN EVIDENCE.

12:03PM  18    A.   OKAY.

12:03PM  19    Q.   AND THAT WOULD BE IN VOLUME 3 OF YOUR -- AND I WANT TO

12:03PM  20    DIRECT YOUR ATTENTION TO PAGE 3 OF THIS EXHIBIT.

12:03PM  21    A.   OKAY.

12:03PM  22    Q.   AND DO YOU SEE AT THE TOP THAT THIS IS LABELLED "THERANOS

12:03PM  23    TEST REPORT TECHNOLOGY DEMONSTRATION"?

12:03PM  24    A.   I DO.

12:03PM  25    Q.   AND DO YOU SEE THAT UNDER ORDERING M.D., THERE'S AN

12:03PM 1      INDICATION TECHNOLOGY DEMONSTRATION?

12:03PM 2      A.   YES.

12:03PM 3      Q.   IN YOUR EXPERIENCE, WERE THE REPORTS RELATED TO THESE

12:03PM 4      RESULTS GENERALLY LABELLED ALONG THOSE LINES?

12:03PM 5      A.   THEY WERE.

12:03PM 6      Q.   WERE THERE INSTANCES WHERE THE CLIA LAB GOT INVOLVED WITH

12:04PM 7      THE DEMONSTRATIONS THAT WERE BEING PERFORMED?

12:04PM 8      A.   YES.

12:04PM 9      Q.   AND WHAT CIRCUMSTANCES WOULD LEAD TO THAT?

12:04PM 10     A.   GENERALLY CIRCUMSTANCES WHERE A PATIENT MIGHT SHOW UP AT A

12:04PM 11     WALGREENS WITH THE PHYSICIAN ORDER OR OTHERWISE DOING TESTING

12:04PM 12     THROUGH THE WALGREENS LOCATIONS.

12:04PM 13     Q.   WE SAW OR HEARD SOME TESTIMONY DURING THE GOVERNMENT'S

12:04PM 14     CASE RELATED TO, TO CHANGING RESULTS OR MAKING EDITS TO

12:04PM 15     RESULTS.

12:04PM 16          DO YOU RECALL THAT?

12:04PM 17     A.   I DO.

12:04PM 18     Q.   AND SOMETIMES THERE WERE INSTANCES WHERE YOU WERE PART OF

12:04PM 19     THOSE EMAIL DISCUSSIONS.

12:04PM 20          DO YOU RECALL THAT?

12:04PM 21     A.   I DO.

12:04PM 22     Q.   WHY WERE RESULTS CHANGED OR MODIFIED FROM THE TESTS RUN

12:04PM 23     DURING DEMONSTRATIONS?

12:04PM 24     A.   MY UNDERSTANDING IS THAT THERE'S A PROCESS FOR THE PEOPLE

12:04PM 25     WHO ARE OVERSEEING THE RESULTS TO MAKE SURE THAT THE RESULTS

12:04PM   1        ARE CORRECT.

12:05PM   2             SOMETIMES ADJUSTMENTS NEED TO BE MADE TO A REFERENCE

12:05PM   3        RANGE, OR IF THERE'S CONCERN ABOUT A RESULT, MY UNDERSTANDING

12:05PM   4        IS THAT THAT RESULT SHOULD NOT BE RELEASED.

12:05PM   5             AND DR. YOUNG IN THE R&D CONTEXT, OR THE CLINICAL

12:05PM   6        LABORATORY, HAD RULES OF HOW TO DO THAT PROPERLY.

12:05PM   7    Q.   AND DID YOU UNDERSTAND THAT DR. YOUNG, OR SOMEONE ACTING

12:05PM   8        IN HIS PLACE, APPROVED THE RESULTS OF EVERY DEMONSTRATION?

12:05PM   9    A.   I DID.

12:05PM  10    Q.   IS IT YOUR UNDERSTANDING THAT ON SOME OCCASIONS, ANOTHER

12:05PM  11        SCIENTIST WOULD FILL IN IN OVERSEEING THE DEMONSTRATION IF

12:05PM  12        DR. YOUNG WAS NOT AVAILABLE?

12:05PM  13    A.   YES.

12:05PM  14    Q.   DID YOU EVER OVERRULE ANY MEMBER OF THE R&D TEAM OR ANY

12:05PM  15        SCIENTIST AS TO WHAT THE RESULTS OF A DEMONSTRATION SHOULD BE?

12:05PM  16    A.   NO.

12:05PM  17    Q.   WAS THERE EVER ANY INSTANCE WHERE YOU DIRECTED THE

12:06PM  18        SCIENTIFIC TEAM TO ENTER RESULTS THAT YOU THOUGHT WERE CONTRARY

12:06PM  19        TO WHAT THEY THOUGHT THE APPROPRIATE RESULT WAS?

12:06PM  20    A.   NO.

12:06PM  21    Q.   NOW, AFTER 2016, DID THE COMPANY CONTINUE TO CONDUCT

12:06PM  22        DEMONSTRATIONS?

12:06PM  23    A.   YES.

12:06PM  24    Q.   AND DID THAT --

12:06PM  25             MR. LEACH:  OBJECTION.  RELEVANCE.  RELEVANCE.

12:06PM   1                    THE COURT:  MR. DOWNEY?

12:06PM   2                    MR. DOWNEY:  I JUST HAVE TWO QUESTIONS, YOUR HONOR.

12:06PM   3       THEY RELATE TO A CHANGE IN THE PROCESS AND THAT'S IT.

12:06PM   4                    THE COURT:  I'LL ALLOW IT.

12:06PM   5       BY MR. DOWNEY:

12:06PM   6       Q.   AND DID THE PROCESS OF CONDUCTING DEMONSTRATIONS CHANGE AT

12:06PM   7       ALL DURING THAT PERIOD?

12:06PM   8       A.   YES.

12:06PM   9       Q.   AND IN WHAT WAY DID THE PROCESS CHANGE?

12:06PM  10       A.   IT CHANGED IN THAT WE OPENED UP THE DEVICE TO ACTUALLY SEE

12:06PM  11       THE INSIDE OF THE DEVICE WORKING.

12:06PM  12       Q.   NOW, WHEN WE SPOKE A WEEK AGO, WE TALKED ABOUT

12:07PM  13       CONVERSATIONS THAT YOU HAD WITH VARIOUS INVESTORS.

12:07PM  14            DO YOU RECALL THAT?

12:07PM  15       A.   I DO.

12:07PM  16       Q.   AND DO YOU RECALL THAT SOME OF YOUR TESTIMONY RELATED TO

12:07PM  17       THE INTELLECTUAL PROPERTY THAT THERANOS HAD DEVELOPED?

12:07PM  18       A.   YES.

12:07PM  19       Q.   AND DO YOU RECALL THAT YOU TESTIFIED THAT SOME INVESTORS

12:07PM  20       HAD LOOKED VERY CAREFULLY AT THE PATENTS THAT THERANOS HAD FOR

12:07PM  21       ITS TECHNOLOGY?

12:07PM  22       A.   YES.

12:07PM  23       Q.   DID THAT OCCUR THROUGHOUT THE TIME THAT YOU WERE AT

12:07PM  24       THERANOS?

12:07PM  25       A.   IT DID.

7792

12:07PM  1    Q.   AND DID THERANOS ITSELF AT ANY TIME EVER TRY TO VALUE ITS

12:07PM  2    INTELLECTUAL PROPERTY AND MAKE A DETERMINATION OF HOW MUCH THAT

12:07PM  3    INTELLECTUAL PROPERTY WAS WORTH?

12:07PM  4    A.   YES.

12:07PM  5    Q.   WHEN DO YOU RECALL THAT OCCURRING?

12:07PM  6    A.   SOME ANALYSIS WAS DONE BY OUR BOARD AROUND 2010 AND AGAIN

12:08PM  7    LATER IN 2017.

12:08PM  8    Q.   OKAY.  AND TELL US WHAT PROCESS YOU UNDERSTAND WAS

12:08PM  9    UNDERTAKEN IN 2010.

12:08PM  10   A.   OUR CHAIRMAN HAD EXPERIENCE WORKING WITH MEDICAL DEVICE

12:08PM  11   COMPANIES THAT WERE VERY PATENT HEAVY, AND HE HAD PREVIOUSLY

12:08PM  12   HAD WILSON SONSINI DO AN ANALYSIS OF OUR PATENT PORTFOLIO AND

12:08PM  13   ITS STRENGTHS AND CAME UP WITH A NUMBER THAT HE THOUGHT WAS

12:08PM  14   REPRESENTATIVE OF THE VALUE OF THAT IP.

12:08PM  15   Q.   AND THIS WAS A VALUATION AS OF 2010?

12:08PM  16   A.   YES.

12:08PM  17   Q.   AND WAS THAT AROUND THE TIME THAT YOU WERE HAVING

12:08PM  18   CONVERSATIONS WITH WALGREENS AND SAFEWAY?

12:08PM  19   A.   IT WAS.

12:08PM  20   Q.   AND WHAT VALUE WAS ATTRIBUTED TO THERANOS'S PATENT

12:08PM  21   PORTFOLIO AT THAT TIME AS OF 2010?

12:08PM  22   A.   OVER A BILLION DOLLARS.

12:08PM  23   Q.   AND DID YOU -- DID THERANOS CONTINUE TO TRY TO ASSESS THE

12:08PM  24   VALUE OF ITS PATENT PORTFOLIO AS IT WENT THROUGH THE PERIOD

12:09PM  25   FOLLOWING 2010?

12:09PM  1    A.   WE DID.

12:09PM  2    Q.   AND YOU MENTIONED THERE WAS A SUBSEQUENT VALUATION OF

12:09PM  3    THERANOS'S PATENT IN 2017.

12:09PM  4    A.   YES.

12:09PM  5    Q.   WHY WAS THAT UNDERTAKEN?

12:09PM  6            MR. LEACH:   YOUR HONOR, OBJECTION.  RELEVANCE.  403.

12:09PM  7            THE COURT:   I'M NOT CERTAIN OF THE RELEVANCE OF THE

12:09PM  8    2017 VALUATION.

12:09PM  9            MR. DOWNEY:   WELL, YOUR HONOR, I THINK THERE ARE

12:09PM  10   OPPORTUNITIES FOR -- I'M RELUCTANT TO DISCUSS IT NOW, BUT MAYBE

12:09PM  11   WE CAN --

12:09PM  12           THE COURT:   SURE.  OF COURSE.  MAYBE YOU CAN MOVE TO

12:09PM  13   ANOTHER TOPIC.

12:09PM  14           MR. DOWNEY:   MAYBE I CAN MOVE TO ANOTHER TOPIC AND

12:09PM  15   WE CAN RETURN TO IT.  I THINK IT WOULD REQUIRE A LITTLE MORE

12:09PM  16   DISCUSSION THAN WOULD BE APPROPRIATE AT THIS TIME.

12:09PM  17           THE COURT:   THAT WOULD BE HELPFUL.  PARDON ME FOR

12:09PM  18   INTERRUPTING YOUR EXAMINATION, BUT LET'S PASS THIS TOPIC AND

12:09PM  19   MOVE ON TO SOMETHING ELSE.

12:09PM  20           MR. DOWNEY:   OKAY.  FAIR ENOUGH, YOUR HONOR.

12:09PM  21   Q.   LET'S TALK ABOUT THE CLINICAL LABORATORY AT THERANOS.

12:09PM  22   A.   YES.

12:09PM  23   Q.   DURING WHAT PERIOD DID THERANOS OPERATE A CLINICAL BLOOD

12:10PM  24   TESTING LABORATORY?

12:10PM  25   A.   FROM 2011 TO 2016.

12:10PM  1    Q.   AND AS PART OF THE PROCESS OF OFFERING CLINICAL BLOOD

12:10PM  2    TESTING SERVICES, ARE LABS SOMETIMES REQUIRED TO BE CERTIFIED

12:10PM  3    BY THE CENTER FOR MEDICARE AND MEDICAID SERVICES?

12:10PM  4    A.   YES.

12:10PM  5    Q.   AND DID THERANOS MAKE EFFORTS TO BECOME CERTIFIED BY THE

12:10PM  6    CENTER FOR MEDICAID AND MEDICARE SERVICES?

12:10PM  7    A.   WE DID.

12:10PM  8    Q.   AND CENTER FOR MEDICAID AND MEDICARE SERVICES IS

12:10PM  9    ABBREVIATED AS CMS?

12:10PM  10   A.   YES.

12:10PM  11   Q.   AND THAT'S WHAT WE'VE BEEN HEARING ABOUT DURING THE COURSE

12:10PM  12   OF THE CASE?

12:10PM  13   A.   IT IS.

12:10PM  14   Q.   AND WHY DID THERANOS -- WHEN DID THERANOS SEEK THAT

12:10PM  15   CERTIFICATION?

12:10PM  16   A.   WE SOUGHT THE CERTIFICATION IN 2011.

12:10PM  17   Q.   NOW, I THINK YOU PREVIOUSLY TESTIFIED THAT THE AGREEMENT

12:10PM  18   TO PERFORM TESTING OF BLOOD SAMPLES WITH WALGREENS DIDN'T TAKE

12:11PM  19   PLACE UNTIL 2012.  IS THAT RIGHT?

12:11PM  20   A.   YES.

12:11PM  21   Q.   AND WHY WAS THERANOS OPENING A CLINICAL LABORATORY IN 2011

12:11PM  22   IF THE BLOOD TESTS WERE GOING TO BE RUN IN WALGREENS STORES AT

12:11PM  23   THAT TIME?

12:11PM  24   A.   WE UNDERSTOOD WE NEEDED TO DO THAT AS PART OF THE

12:11PM  25   REGULATORY PROCESS, AND WE ALSO UNDERSTOOD THAT THERE WERE

12:11PM  1    GOING TO BE SOME TESTS THAT WERE NOT ORDERED THAT FREQUENTLY

12:11PM  2    THAT WE WOULD NEED A TRADITIONAL LAB TO BE ABLE TO RUN.

12:11PM  3    Q.    OKAY.   NOW, DID THE, DID THE DECISION TO CONDUCT THE BLOOD

12:11PM  4    TESTING AT THERANOS CHANGE THE SCOPE OF WHAT WAS REQUIRED TO

12:11PM  5    BUILD A CLINICAL LABORATORY AND DEVELOP A CLINICAL LABORATORY

12:11PM  6    AT THERANOS?

12:11PM  7    A.    VERY MUCH.

12:11PM  8    Q.    AND HOW DID IT CHANGE THAT?

12:11PM  9    A.    IT MEANT THAT NOW WE NEEDED A CENTRAL LAB FACILITY THAT

12:11PM  10   WAS GOING TO HANDLE ALL OF THE SAMPLES THAT WERE COMING FROM

12:12PM  11   THE STORES, AND THAT ALL OF THESE SAMPLES WOULD BE COMING IN AT

12:12PM  12   THE SAME TIME, AS OPPOSED TO IN A RETAIL STORE WITH A DEVICE

12:12PM  13   WHERE ONE PATIENT AT A TIME WAS PLACING A SAMPLE INTO THE

12:12PM  14   DEVICE, RUNNING IT, AND THEN YOU WOULD GET THE NEXT PATIENT.

12:12PM  15   Q.    OKAY.   AND WAS A PROCESS UNDERTAKEN TO EXPAND THE SCOPE OF

12:12PM  16   THE CLINICAL LABORATORY BETWEEN 2011 AND THE TIME THAT THE

12:12PM  17   CLINICAL LAB BEGAN ANALYZING SAMPLES FROM WALGREENS?

12:12PM  18   A.    IT WAS, YES.

12:12PM  19   Q.    WERE YOU INVOLVED IN OVERSEEING THE CLINICAL LABORATORY ON

12:12PM  20   A DAY-TO-DAY BASIS?

12:12PM  21   A.    NO.

12:12PM  22   Q.    WHO WAS RESPONSIBLE FOR THE OPERATIONAL MANAGEMENT OF THE

12:12PM  23   LAB?

12:12PM  24   A.    SUNNY BALWANI.

12:12PM  25   Q.    AND WHEN I SAY "OPERATIONAL MANAGEMENT," DO YOU UNDERSTAND

7796

12:12PM   1   THAT I MEAN NOT SCIENTIFIC, BUT THINGS LIKE PERSONNEL AND

12:12PM   2   EXPENDITURE AND MANAGEMENT OF DAY-TO-DAY ACTIVITIES?

12:13PM   3   A.   I DO.   WE CALL IT SORT OF THE BUSINESS PARTS OF IT.

12:13PM   4   Q.   OKAY.   AND WHO WAS RESPONSIBLE FOR THE CLINICAL SCIENTIFIC

12:13PM   5   DECISION MAKING IN THE CLINICAL LAB?

12:13PM   6   A.   THE LABORATORY DIRECTOR AND LABORATORY LEADERSHIP.

12:13PM   7   Q.   OKAY.   NOW, WHEN THE CLINICAL LAB WAS FIRST SET UP, DID

12:13PM   8   YOU HAVE SOME INVOLVEMENT WITH THAT?

12:13PM   9   A.   I DID.

12:13PM  10   Q.   AND WHAT INVOLVEMENT DID YOU HAVE?

12:13PM  11   A.   I WORKED WITH OUR REGULATORY LAWYERS TO TRY TO FIND THE

12:13PM  12   BEST LAB EXPERT IN THE SPACE TO HELP US SET UP THE LAB THE

12:13PM  13   RIGHT WAY AND PUT THE SYSTEMS IN PLACE, THE QUALITY SYSTEM AND

12:13PM  14   ALL OF THE PROCEDURES TO BE ABLE TO RUN THE LAB IN THE BEST WAY

12:13PM  15   POSSIBLE.

12:13PM  16   Q.   WERE YOU ABLE TO FIND SOMEONE TO HELP YOU?

12:13PM  17   A.   YES.

12:13PM  18   Q.   AND WHO DID HE -- WHO WAS THAT?

12:13PM  19   A.   THAT WAS I THINK DR. JERRY HURST.

12:14PM  20   Q.   AND DID MR. HURST THEN WORK TO SET UP A LAB TO YOUR

12:14PM  21   UNDERSTANDING THAT FIT THE DESCRIPTION OF WHAT YOU WERE

12:14PM  22   SEEKING?

12:14PM  23   A.   HE DID.

12:14PM  24   Q.   AS PART OF THAT PROCESS, DO YOU UNDERSTAND THAT THERANOS

12:14PM  25   DEVELOPED POLICIES AND PROCEDURES FOR THE RUNNING OF THE

12:14PM 1    LABORATORY?

12:14PM 2    A.   YES.

12:14PM 3    Q.   AND AS PART OF THAT PROCESS, DID THERANOS HIRE LAB

12:14PM 4    PERSONNEL WHO HAD EXPERTISE IN OPERATING A CLINICAL LAB?

12:14PM 5    A.   YES.

12:14PM 6    Q.   AND AS PART OF THAT PROCESS, DID THERANOS UNDERTAKE STEPS

12:14PM 7    TO PREPARE TO BE ABLE TO DEAL WITH INSPECTIONS AND EVALUATIONS

12:14PM 8    BY REGULATORY AUTHORITIES?

12:14PM 9    A.   WE DID.

12:14PM 10   Q.   AND WERE ALL OF THOSE THINGS ACTIONS THAT DR. HURST WAS

12:14PM 11   INVOLVED IN?

12:14PM 12   A.   YES.

12:14PM 13   Q.   NOW, AM I RIGHT THAT THERANOS WAS ULTIMATELY ABLE TO

12:14PM 14   OBTAIN A CERTIFICATION IN CONNECTION WITH ITS CLINICAL LAB?

12:14PM 15   A.   YES.

12:14PM 16   Q.   AND THAT'S REFERRED TO AS A CLIA CERTIFICATION?

12:15PM 17   A.   IT IS.

12:15PM 18   Q.   AND ARE THERE DIFFERENT LEVELS OF CLIA CERTIFICATION?

12:15PM 19   A.   YES.

12:15PM 20   Q.   AND CAN YOU EXPLAIN YOUR UNDERSTANDING OF WHAT THOSE

12:15PM 21   DIFFERENT LEVELS ARE?

12:15PM 22   A.   I'M FAMILIAR WITH TWO.  ONE IS A MODERATE COMPLEXITY

12:15PM 23   LABORATORY, AND ONE IS A HIGH COMPLEXITY LABORATORY.

12:15PM 24       OUR LABORATORY IN CALIFORNIA WAS A HIGH COMPLEXITY

12:15PM 25   LABORATORY.

12:15PM 1   Q.   AND WHAT DID YOU UNDERSTANDING BEING A HIGH COMPLEXITY

12:15PM 2   LABORATORY MEANT?

12:15PM 3   A.   IT MEANT THAT THERE WERE HIGHER STANDARDS THAT WE HAD TO

12:15PM 4   ACHIEVE IN THE OPERATION OF OUR LABORATORY, AND IT MEANT THAT

12:15PM 5   THE LABORATORY WAS ABLE TO DEVELOP ITS OWN TESTS, WHICH WE

12:15PM 6   CALLED LDT'S, OR LABORATORY DEVELOPED TESTS.

12:15PM 7   Q.   NOW AFTER -- AND DID YOU SAY THAT THE LABORATORY ACTUALLY

12:15PM 8   OFFICIALLY OPENED IN 2011?

12:15PM 9   A.   YES, WE WERE CERTIFIED IN 2011.

12:15PM 10   Q.   OKAY.  WELL, LET'S TALK ABOUT THAT PROCESS OF

12:16PM 11   CERTIFICATION.

12:16PM 12       AROUND THE TIME THAT THE LAB WAS CERTIFIED, DID -- WAS

12:16PM 13   THERE AN INSPECTION DONE BY CMS OF THE LAB?

12:16PM 14   A.   YES.

12:16PM 15   Q.   AND DID YOU RECEIVE REPORTS OF THE RESULTS OF THAT

12:16PM 16   INSPECTION?

12:16PM 17   A.   YES.

12:16PM 18   Q.   AND WHAT DO YOU RECALL ABOUT THE RESULTS OF THAT

12:16PM 19   INSPECTION?

12:16PM 20   A.   I RECALL THAT THERE WERE NO DEFICIENCIES IDENTIFIED.

12:16PM 21   Q.   ALL RIGHT.  LET ME ASK YOU TO LOOK AT EXHIBIT 7728.

12:16PM 22   THAT'S IN VOLUME 3.

12:16PM 23   A.   OKAY.

12:16PM 24   Q.   I'M SORRY, DID I SAY 7728?

12:16PM 25   A.   YEAH.

7799

| | | |
|---|---|---|
| 12:16PM | 1 | Q.   IT'S 7728. |
| 12:17PM | 2 | A.   7728. |
| 12:17PM | 3 | I'VE GOT 7282. |
| 12:17PM | 4 | Q.   IN VOLUME 3, DO YOU HAVE -- |
| 12:17PM | 5 | A.   OH, I FOUND IT.  OKAY. |
| 12:17PM | 6 | Q.   ALL RIGHT.  WHO WAS ARNOLD GELB? |
| 12:17PM | 7 | A.   DR. GELB WAS OUR FIRST LABORATORY DIRECTOR. |
| 12:17PM | 8 | Q.   AND IS 7228 AN EMAIL FROM DR. GELB TO YOU ABOUT THE CLIA |
| 12:17PM | 9 | LAB AT THERANOS? |
| 12:17PM | 10 | A.   IT IS. |
| 12:17PM | 11 | MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF |
| 12:17PM | 12 | 7228. |
| 12:17PM | 13 | MR. LEACH:  NO OBJECTION, YOUR HONOR. |
| 12:17PM | 14 | THE COURT:  IT'S ADMITTED. |
| 12:17PM | 15 | (DEFENDANT'S EXHIBIT 7228 WAS RECEIVED IN EVIDENCE.) |
| 12:18PM | 16 | BY MR. DOWNEY: |
| 12:18PM | 17 | Q.   ALL RIGHT.  DO YOU SEE THIS IS AN EMAIL WHERE DR. GELB IS |
| 12:18PM | 18 | FORWARDING YOU A REPORT IN JANUARY OF 2012? |
| 12:18PM | 19 | A.   I DO. |
| 12:18PM | 20 | Q.   AND IN THE FIRST BULLET POINT OF THE EMAIL, IT SAYS, "THE |
| 12:18PM | 21 | REPORT SHOW'S NO DEFICIENCIES BY VIRTUE OF THE FACT IT SAYS WE |
| 12:18PM | 22 | ARE IN COMPLIANCE AND NO DEFICIENCIES ARE LISTED." |
| 12:18PM | 23 | DO YOU SEE THAT? |
| 12:18PM | 24 | A.   I DO. |
| 12:18PM | 25 | Q.   AND DID THIS FOLLOW AN INSPECTION THAT WAS CONDUCTED BY |

| | | |
|---|---|---|
| 12:18PM | 1 | CMS IN LATE 2011? |
| 12:18PM | 2 | A.   YES. |
| 12:18PM | 3 | Q.   LET ME ASK YOU TO LOOK AT PAGE 2 OF THIS DOCUMENT.  IF YOU |
| 12:18PM | 4 | COULD JUST BLOW UP THE TOP HALF OF THE DOCUMENT. |
| 12:18PM | 5 | AND DO YOU SEE THAT THIS IS A FORM THAT IS -- THAT IT HAS |
| 12:18PM | 6 | ON THE HEADER THAT IT'S FROM THE DEPARTMENT OF HEALTH AND HUMAN |
| 12:18PM | 7 | SERVICES, CENTERS FOR MEDICARE AND MEDICAID SERVICES? |
| 12:18PM | 8 | A.   YES. |
| 12:18PM | 9 | Q.   AND THEN DO YOU SEE THAT THERE'S AN INDICATION IN THE |
| 12:19PM | 10 | LEFT-HAND COLUMN THAT DEFICIENCIES -- THERE'S A PLACE FOR |
| 12:19PM | 11 | DEFICIENCIES TO BE NOTED? |
| 12:19PM | 12 | A.   I DO. |
| 12:19PM | 13 | Q.   AND DO YOU SEE THE INITIAL COMMENTS THAT ARE CONTAINED |
| 12:19PM | 14 | UNDER THAT COLUMN? |
| 12:19PM | 15 | A.   YES. |
| 12:19PM | 16 | Q.   AND DO YOU SEE THAT NO DEFICIENCIES WERE IDENTIFIED IN THE |
| 12:19PM | 17 | LAB BY CMS AS OF THAT DATE? |
| 12:19PM | 18 | A.   YES. |
| 12:19PM | 19 | Q.   AND WHAT DID YOU UNDERSTAND WITH RESPECT TO THERANOS'S |
| 12:19PM | 20 | CLIA LAB AT THE BEGINNING OF 2012 AFTER RECEIVING THIS |
| 12:19PM | 21 | DOCUMENT? |
| 12:19PM | 22 | A.   I UNDERSTOOD THAT THE POLICIES AND PROCEDURES IN THE |
| 12:19PM | 23 | SYSTEM, THE QUALITY SYSTEM THAT WE PUT IN PLACE FOR THE |
| 12:19PM | 24 | LABORATORY WAS GOOD. |
| 12:19PM | 25 | Q.   YOU MENTIONED THAT MR. HURST HAD ASSISTED YOU -- OR |

12:19PM 1    DR. HURST HAD ASSISTED YOU IN ESTABLISHING SOME OF THOSE

12:19PM 2    PROCEDURES; IS THAT RIGHT?

12:19PM 3    A.   HE DID.

12:19PM 4    Q.   AND WAS DR. GELB ALSO INVOLVED IN PROMULGATING SOME OF THE

12:20PM 5    PROCEDURES?

12:20PM 6    A.   YES.

12:20PM 7    Q.   DO YOU KNOW HOW MANY STANDARD OPERATING PROCEDURES WERE

12:20PM 8    PUT IN PLACE IN THE CLIA LABORATORY DURING THIS PERIOD?

12:20PM 9    A.   I DON'T KNOW EXACTLY, BUT MY IMPRESSION WAS HUNDREDS.

12:20PM 10   Q.   WERE YOU AWARE OF ALL OF THE TOPICS THAT THOSE VARIOUS

12:20PM 11   PROCEDURES COVERED?

12:20PM 12   A.   NO.

12:20PM 13   Q.   DID YOU HAVE ANY ROLE IN REVIEWING OR APPROVING STANDARD

12:20PM 14   OPERATING PROCEDURES FOR HOW THE LAB WAS TO WORK?

12:20PM 15   A.   I DID NOT.

12:20PM 16   Q.   WHO DID?

12:20PM 17   A.   DR. HURST, DR. GELB, THE LABORATORY EXPERTS THAT DR. GELB

12:20PM 18   WAS HIRING FOR THE CLIA LAB; AND AS TO TESTS THAT MIGHT BE

12:20PM 19   DEVELOPED BY THERANOS ITSELF, DR. YOUNG AND OTHER SCIENTISTS

12:20PM 20   FROM R&D.

12:20PM 21   Q.   AND WHAT UNDERSTANDING DID YOU HAVE ABOUT THE STANDARD

12:20PM 22   OPERATING PROCEDURES?

12:20PM 23   A.   THAT I HAD SOMEONE IN DR. HURST WHO UNDERSTOOD WHAT A BEST

12:21PM 24   IN CLASS PROCEDURE WAS AND THAT HE WAS WORKING WITH DR. GELB TO

12:21PM 25   MAKE SURE THAT WE HAD THOSE PROCEDURES IN PLACE.

12:21PM   1    Q.   OKAY.  LET'S TALK ABOUT THE PERSONNEL THAT WERE HIRED INTO

12:21PM   2    THE CLIA LABORATORY IN 2012 AND 2013.

12:21PM   3         FIRST OF ALL, JUST AS TO PERSONNEL IN THE LAB, DID YOU

12:21PM   4    HAVE AN UNDERSTANDING AS TO WHO WAS RESPONSIBLE WITHIN THE LAB

12:21PM   5    FOR ASSURING THAT THE RESULTS THAT THE LAB GENERATED WERE

12:21PM   6    ACCURATE AND RELIABLE?

12:21PM   7    A.   I DID.

12:21PM   8    Q.   WHO DID YOU UNDERSTAND THAT WAS?

12:21PM   9    A.   ULTIMATELY THE LAB DIRECTOR.

12:21PM   10   Q.   BUT DID YOU HAVE AN UNDERSTANDING THAT THERE WERE OTHER

12:21PM   11   PERSONNEL WHO WORKED IN THE LAB AS WELL?

12:21PM   12   A.   I DID.

12:21PM   13   Q.   AND DID YOU UNDERSTAND THE ROLE THAT SOME OF THEM PLAYED?

12:21PM   14   A.   YES.  I UNDERSTOOD THE LAB DIRECTOR COULD DELEGATE

12:22PM   15   RESPONSIBILITY, AND I UNDERSTOOD THAT YOU COULD PUT A HIGHLY

12:22PM   16   QUALIFIED TEAM IN PLACE AROUND THE LAB DIRECTOR OF GENERAL

12:22PM   17   SUPERVISORS, TECHNICAL SUPERVISORS, AND CLINICAL LAB SCIENTISTS

12:22PM   18   WHO COULD DO THE SAME.

12:22PM   19   Q.   AND DR. ROSENDORFF WAS THE LAB DIRECTOR AT THE TIME THAT

12:22PM   20   THERANOS SERVICES IN WALGREENS STORES WERE LAUNCHED?

12:22PM   21   A.   HE WAS.

12:22PM   22   Q.   WE'LL TALK ABOUT HIM IN A MOMENT.

12:22PM   23         DID YOU HAVE AN UNDERSTANDING OF WHAT KIND OF PEOPLE WERE

12:22PM   24   HIRED TO WORK IN THE CLINICAL LAB AT THE TIME OF THE WALGREENS

12:22PM   25   LAUNCH ALONGSIDE DR. ROSENDORFF?

12:22PM 1    A.    I DID.

12:22PM 2    Q.    AND DID YOU HAVE AN UNDERSTANDING AS TO THEIR

12:22PM 3    QUALIFICATIONS?

12:22PM 4    A.    GENERALLY.

12:22PM 5    Q.    AND WHAT DID YOU UNDERSTAND?

12:22PM 6    A.    I UNDERSTOOD THAT THESE ROLES OF TECHNICAL SUPERVISOR,

12:22PM 7    GENERAL SUPERVISOR, AND CLINICAL LAB SCIENTIST WERE ROLES THAT

12:22PM 8    YOU HAD TO BE LICENSED BY THE STATE FOR, THAT YOU HAD TO HAVE A

12:22PM 9    LOT OF EXPERIENCE IN THE CLINICAL LABORATORY TO GET THOSE

12:22PM 10   CERTIFICATIONS, AND THAT DR. ROSENDORFF WAS HIRING TO FILL

12:23PM 11   THOSE ROLES AND HAVING MULTIPLE PEOPLE IN THE ORGANIZATION WHO

12:23PM 12   COULD FILL EACH OF THOSE ROLES, AND THAT ALSO HE WAS BRINGING

12:23PM 13   IN A QUALIFIED QUALITY CONTROL MANAGER WHO HIMSELF HAD BEEN A

12:23PM 14   CAP INSPECTOR BEFORE.

12:23PM 15   Q.    DO YOU ACTUALLY RECALL THE PROCESS OF HIRING

12:23PM 16   DR. ROSENDORFF TO SERVE AS THE LAB DIRECTOR?

12:23PM 17   A.    I REMEMBER MEETING HIM.

12:23PM 18   Q.    AND WHAT WERE YOUR PERCEPTIONS OF HIM WHEN YOU FIRST MET

12:23PM 19   HIM?

12:23PM 20   A.    I WAS REALLY EXCITED TO MEET HIM.  I THOUGHT IT WAS

12:23PM 21   WONDERFUL THAT HE HAD WORKED IN A CHILDREN'S HOSPITAL WITH

12:23PM 22   SMALL SAMPLES BEFORE.  HE SEEMED TO BE A REALLY QUALIFIED

12:23PM 23   DOCTOR, AND HAD THIS ADDITIONAL LABORATORY EXPERIENCE IN A

12:23PM 24   CHILDREN'S HOSPITAL IN PENNSYLVANIA AND SEEMED TO HAVE PERFECT

12:23PM 25   EXPERTISE FOR WHAT WE WANTED TO DO.

12:23PM 1    Q.   WHEN HE WAS HIRED, WAS HE HIRED TO SERVE FULL TIME OR PART

12:24PM 2    TIME AS THE LAB DIRECTOR?

12:24PM 3    A.   FULL TIME.

12:24PM 4    Q.   YOU MENTIONED THAT, ALONG WITH DR. ROSENDORFF, A QUALITY

12:24PM 5    CONTROL PERSON WAS HIRED IN CONNECTION WITH THE CLIA LAB.

12:24PM 6    A.   YES.

12:24PM 7    Q.   AND WHO WAS THAT?

12:24PM 8    A.   LANGLY GEE.

12:24PM 9    Q.   AND WHAT WAS MR. GEE'S BACKGROUND BEFORE HE JOINED

12:24PM 10   THERANOS?

12:24PM 11   A.   HE HAD WORKED AT OTHER CLINICAL LABORATORIES AND HELPED

12:24PM 12   BUILD AND OVERSEE THEIR QUALITY SYSTEMS, AND HE HAD ALSO SERVED

12:24PM 13   AS A CAP INSPECTOR, WHICH IS ONE OF THE BODIES THAT INSPECTS

12:24PM 14   CLIA LABORATORIES.

12:24PM 15   Q.   WHAT DOES CAP STAND FOR?

12:24PM 16   A.   COLLEGE OF AMERICAN PATHOLOGISTS.

12:24PM 17   Q.   AND WHEN HE WAS HIRED AT THERANOS, WHO AT THERANOS DID HE

12:24PM 18   REPORT TO?

12:24PM 19   A.   HE REPORTED TO DR. ROSENDORFF.

12:24PM 20   Q.   AND DID YOU INTERACT REGULARLY WITH MR. GEE RELATING TO

12:24PM 21   HIS WORK?

12:24PM 22   A.   I DID NOT.

12:25PM 23   Q.   WHAT UNDERSTANDING DID YOU HAVE ABOUT THE QUALITY CONTROL

12:25PM 24   PROGRAM AT THERANOS BEGINNING IN 2013 AND 2015?

12:25PM 25   A.   I UNDERSTOOD THAT MR. GEE WAS MAINTAINING OR OVERSEEING

12:25PM 1    THAT PROGRAM ACCORDING TO THE PROCEDURES THAT WE'D SET UP, THAT

12:25PM 2    HE WOULD REVIEW DATA AND TRY TO CREATE AN ENVIRONMENT IN WHICH

12:25PM 3    WE COULD IDENTIFY AND TRIAGE ISSUES, FIX THEM SO THAT THEY

12:25PM 4    WOULDN'T RECUR, AND THAT LABORATORY LEADERSHIP WAS ACTIVELY

12:25PM 5    INVOLVED IN THAT.

12:25PM 6    Q.   WE'VE HEARD THE TERM DURING THE COURSE OF THIS TRIAL

12:25PM 7    "PROFICIENCY TESTING."

12:25PM 8        DO YOU RECALL HEARING TESTIMONY ABOUT THAT SUBJECT?

12:25PM 9    A.   I DO.

12:25PM 10   Q.   AND WHILE YOU WERE AT THERANOS, DID YOU HAVE AN

12:25PM 11   UNDERSTANDING OF WHAT PROFICIENCY TESTING WAS?

12:25PM 12   A.   GENERALLY, YES.

12:25PM 13   Q.   AND WHAT DID YOU UNDERSTAND?

12:25PM 14   A.   I UNDERSTOOD THAT IT WAS A SET OF TESTS THAT NEEDED TO BE

12:25PM 15   RUN BY CLIA LABORATORIES TO COMPARE COMMERCIALLY AVAILABLE

12:25PM 16   MACHINES TO HOW THEY WERE PERFORMING AGAINST OTHER MACHINES OF

12:26PM 17   THE EXACT SAME TYPE.

12:26PM 18   Q.   AND DID -- TO YOUR KNOWLEDGE, DID THERANOS HAVE IN PLACE

12:26PM 19   STANDARD OPERATING PROCEDURES RELATED TO PROFICIENCY TESTING?

12:26PM 20   A.   YES.

12:26PM 21   Q.   DID YOU BECOME AWARE THAT THERANOS HAD SOME UNIQUE

12:26PM 22   PROCESSES WITH REGARD TO ITS PROFICIENCY TESTING PROGRAM?

12:26PM 23   A.   I DID.

12:26PM 24   Q.   AND IN WHAT WAY WERE -- WAS THERANOS'S PROGRAM UNIQUE?

12:26PM 25   A.   I LEARNED THAT PROFICIENCY TESTING WAS SPECIFIC TO

12:26PM  1    COMMERCIALLY AVAILABLE MACHINES WHERE YOU COULD TEST THE

12:26PM  2    MACHINE AGAINST THE EXACT SAME MACHINE RUN SOMEWHERE ELSE, AND

12:26PM  3    THAT IF YOU WERE TO DEVELOP A TEST OR A SYSTEM FOR WHICH THERE

12:26PM  4    WAS NO EXACT SAME COMMERCIALLY AVAILABLE MACHINE TO COMPARE IT

12:26PM  5    TO, YOU NEEDED TO FOLLOW A PROCESS CALLED AAP, WHICH WAS FOR

12:26PM  6    LABORATORY DEVELOPED TESTS.

12:26PM  7    Q.   AND WERE -- WAS DR. ROSENDORFF INVOLVED IN THE, TO YOUR

12:27PM  8    KNOWLEDGE, IN THE PROCESS OF COMING UP WITH STANDARD OPERATING

12:27PM  9    PROCEDURES FOR AAP?

12:27PM  10   A.   YES.

12:27PM  11   Q.   AND WAS DR. YOUNG INVOLVED IN THAT PROCESS?

12:27PM  12   A.   YES.

12:27PM  13   Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 12478, WHICH IS ALREADY

12:27PM  14   IN EVIDENCE.

12:27PM  15        IF YOU LOOK AT THIS EMAIL IN THE -- TOWARDS THE BOTTOM OF

12:27PM  16   THE PAGE.  IT'S AN EMAIL FROM DR. YOUNG TO DR. ROSENDORFF, AND

12:27PM  17   YOU AND MR. BALWANI ARE COPIED.

12:27PM  18        DO YOU SEE THAT?

12:27PM  19   A.   I DO.

12:27PM  20   Q.   AND THERE UNDERNEATH THAT, DO YOU SEE IN THE SECOND

12:27PM  21   PARAGRAPH THAT DR. YOUNG SAYS, "FOR OUR LDT'S, ALL OF WHICH ARE

12:28PM  22   CLIA REGULATED AT THE MOMENT, WE NEED SOP'S FOR PT."

12:28PM  23        DO YOU SEE THAT?

12:28PM  24   A.   I DO.

12:28PM  25   Q.   SO WAS DR. YOUNG INDICATING THAT HE NEEDED TO DEVELOP

12:28PM 1     STANDARD OPERATING PROCEDURES FOR ITS PROFICIENCY TESTING ON

12:28PM 2     ITS OWN DEVICES?

12:28PM 3     A.   YES.

12:28PM 4     Q.   AND DR. YOUNG IN THE NEXT SENTENCE GOES ON TO SAY,

12:28PM 5     "HOWEVER, THERE ARE SEVERAL FACTORS THAT PREVENT US FROM

12:28PM 6     ENROLLING IN THE TRADITIONAL PT PROGRAMS."

12:28PM 7          DO YOU SEE THAT?

12:28PM 8     A.   I DO.

12:28PM 9     Q.   AND HE GOES ON TO IDENTIFY SOME OF THOSE FACTORS.

12:28PM 10         DO YOU SEE THAT?

12:28PM 11    A.   YES.

12:28PM 12    Q.   AND DID YOU FORM AN UNDERSTANDING OF WHY THERANOS COULD

12:28PM 13    NOT HAVE TRADITIONAL PT PROGRAMS?

12:28PM 14    A.   I DID.

12:28PM 15    Q.   AND IS IT WHAT YOU DESCRIBED BEFORE RELATED TO THE, TO THE

12:28PM 16    SMALL SAMPLE SIZE AND THE FACT THAT THERE WEREN'T TESTS TO

12:28PM 17    WHICH THERANOS COULD COMPARE?

12:28PM 18    A.   YES, THAT OUR ANALYZERS AND ANALYST METHODS WERE

12:29PM 19    PROPRIETARY AND THERE WAS NOT, AS DR. YOUNG DESCRIBES HERE, A

12:29PM 20    PEER GROUP.

12:29PM 21    Q.   BUT EVEN THOUGHT THAT FORM OF PROFICIENCY TESTING WAS NOT

12:29PM 22    SEEN AS POSSIBLE, DID DR. YOUNG PROPOSE HOW TO DO PROFICIENCY

12:29PM 23    TESTING?

12:29PM 24    A.   YES.

12:29PM 25    Q.   AND IF YOU'LL LOOK AT THE NEXT PARAGRAPH, WHICH IS

12:29PM   1    LABELLED PROPOSAL.

12:29PM   2         AND DO YOU SEE IN THE FIRST SENTENCE HE SAYS THAT, "WE

12:29PM   3    MUST INITIATE AN ALTERNATIVE ASSESSMENT PROCEDURE, AAP"?

12:29PM   4    A.   I DO.

12:29PM   5    Q.   AND THEN HE GOES ON TO DESCRIBE HOW THAT AAP WOULD WORK IN

12:29PM   6    THE BALANCE OF THE PARAGRAPH?

12:29PM   7    A.   YES.

12:29PM   8    Q.   AND IF YOU GO UP TO THE TOP EMAIL FROM -- DO YOU SEE ON

12:29PM   9    THE TOP THERE'S AN EMAIL RESPONDING TO THIS FROM

12:30PM  10    DR. ROSENDORFF?

12:30PM  11    A.   I DO.

12:30PM  12    Q.   AND DR. ROSENDORFF WRITES, "DANIEL:  THANKS.

12:30PM  13         "I'LL WRITE UP THE SOP AND INCORPORATE WHAT WE HAVE

12:30PM  14    DISCUSSED."

12:30PM  15    A.   YES.

12:30PM  16    Q.   AND DID YOU UNDERSTAND THAT DR. ROSENDORFF HAD DEVELOPED

12:30PM  17    STANDARD OPERATING PROCEDURES FOR PROFICIENCY TESTING BASED ON

12:30PM  18    DR. YOUNG'S RECOMMENDATION?

12:30PM  19    A.   YES.

12:30PM  20    Q.   AND DID YOU EXPECT THAT DR. ROSENDORFF WAS IMPLEMENTING

12:30PM  21    THAT PROGRAM THROUGHOUT 2013 AND 2014?

12:30PM  22    A.   I DID.

12:30PM  23    Q.   DID YOU HAVE AN UNDERSTANDING OF HOW THERANOS WAS

12:30PM  24    PERFORMING IN ITS PROFICIENCY TESTING?

12:30PM  25    A.   I DID.

12:30PM 1      Q.   AND WHAT UNDERSTANDING DID YOU HAVE?

12:30PM 2      A.   THAT WE WERE PERFORMING EXTREMELY WELL.

12:30PM 3      Q.   OKAY.  NOW, AT SOME POINT IN -- EARLY IN THE LIFE OF THE

12:31PM 4      CLIA LAB, DID CMS CONDUCT ANOTHER INSPECTION OF THERANOS'S

12:31PM 5      CLINICAL LAB?

12:31PM 6      A.   THEY DID.

12:31PM 7      Q.   SO I THINK WE LOOKED A MOMENT AGO THAT THERANOS HAD OPENED

12:31PM 8      THE LAB IN 2011; CORRECT?

12:31PM 9      A.   YES.

12:31PM 10     Q.   AND AN INSPECTION WAS DONE THEN?

12:31PM 11     A.   YES.

12:31PM 12     Q.   AND THEN IN 2013 THERANOS LAUNCHED ITS TESTING SERVICES AT

12:31PM 13     WALGREENS; CORRECT?

12:31PM 14     A.   YES.

12:31PM 15     Q.   AND A CLINICAL, A CMS INSPECTION WAS CONDUCTED SHORTLY

12:31PM 16     AFTER THAT?

12:31PM 17     A.   YES.

12:31PM 18     Q.   IN ADDITION TO CMS, DID SOME STATE REGULATORS ALSO INSPECT

12:31PM 19     THERANOS'S CLIA LAB IN 2013?

12:31PM 20     A.   YES.

12:31PM 21     Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 7282 IN VOLUME 3.

12:31PM 22     A.   OKAY.

12:31PM 23     Q.   IS 7282 AN EMAIL FROM MR. BALWANI TO CLINICAL LAB STAFF AT

12:32PM 24     THERANOS IN APRIL OF 2013?

12:32PM 25     A.   YES.

7810

12:32PM  1           MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

12:32PM  2    7282.

12:32PM  3           MR. LEACH:  NO OBJECTION, YOUR HONOR.

12:32PM  4           THE COURT:  IT'S ADMITTED.

12:32PM  5        (DEFENDANT'S EXHIBIT 7282 WAS RECEIVED IN EVIDENCE.)

12:32PM  6    BY MR. DOWNEY:

12:32PM  7    Q.   IF WE JUST LOOK AT THE FIRST PARAGRAPH, DO YOU SEE THAT

12:32PM  8    MR. BALWANI REPORTS, "CONGRATULATIONS TO ALL OF YOU FOR THE

12:32PM  9    NEW YORK INSPECTION TODAY.  JOB WELL DONE.  I HOPE YOU ALL FEEL

12:32PM  10   GOOD ABOUT THIS AND FOUND THIS TO BE AN EDUCATIONAL EXPERIENCE.

12:32PM  11   OUR COMMITMENT AS A COMPANY IS TO RAISE OUR OWN STANDARDS EVEN

12:32PM  12   MORE AND HAVE THE BEST LAB IN THE WORLD WITH HIGHEST QUALITY

12:32PM  13   AND SAFETY," AND HE GOES ON FROM THERE.

12:33PM  14        DO YOU SEE THAT?

12:33PM  15   A.   I DO.

12:33PM  16   Q.   AND WHAT WAS MR. BALWANI -- WHAT WAS YOUR UNDERSTANDING OF

12:33PM  17   WHAT MR. BALWANI WAS REPORTING ON HERE?

12:33PM  18   A.   HE'S CONGRATULATING THE TEAM ON THE NEW YORK INSPECTION

12:33PM  19   BECAUSE THE NEW YORK INSPECTION STANDARDS WERE SOME OF THE MOST

12:33PM  20   DIFFICULT, AND HE'S SAYING THAT OUR COMMITMENT AS A COMPANY IS

12:33PM  21   TO RAISE OUR OWN STANDARDS TO TRY TO BUILD THE BEST LAB IN THE

12:33PM  22   WORLD.

12:33PM  23   Q.   NOW, THERANOS'S LAB WAS LOCATED IN CALIFORNIA?

12:33PM  24   A.   WE WERE.

12:33PM  25   Q.   AND WHY WOULD A STATE INSPECTOR FROM NEW YORK INSPECT

12:33PM  1    THERANOS'S LAB?

12:33PM  2    A.    WE WERE FILING FOR CERTIFICATION IN ALL 50 STATES IN

12:33PM  3    ANTICIPATION OF A NATIONAL ROLLOUT, AND NEW YORK WAS A SPECIAL

12:33PM  4    STATE BECAUSE IT HAS THE HIGHEST STANDARDS, OR THE MOST

12:33PM  5    DIFFICULT STANDARDS TO MEET, AND WE WANTED TO GET THAT

12:33PM  6    CERTIFICATION.

12:33PM  7    Q.    DID YOU EXPECT THAT THE STATES IN WHICH THERANOS SOUGHT A

12:34PM  8    LICENSE WOULD ALSO INSPECT THERANOS'S CLINICAL LAB?

12:34PM  9    A.    YES.

12:34PM  10   Q.    NOW, SHORTLY -- WELL, LATER IN 2013 DID CMS AGAIN INSPECT

12:34PM  11   THERANOS'S CLINICAL LAB?

12:34PM  12   A.    THEY DID.

12:34PM  13   Q.    AND WAS THAT THE SECOND INSPECTION THAT THEY HAD DONE?

12:34PM  14   A.    YES.

12:34PM  15   Q.    DID YOU HAVE AN UNDERSTANDING OF HOW OFTEN CMS TYPICALLY

12:34PM  16   PERFORMS INSPECTIONS OF HIGH COMPLEXITY LABS?

12:34PM  17   A.    I DID.

12:34PM  18   Q.    AND WHAT -- HOW OFTEN?

12:34PM  19   A.    EVERY TWO YEARS.

12:34PM  20   Q.    IN CONNECTION WITH THE INSPECTION IN 2013, WERE YOU

12:34PM  21   INVOLVED IN PREPARATION FOR THAT?

12:34PM  22   A.    I WAS.

12:34PM  23   Q.    WHAT WAS YOUR INVOLVEMENT IN PREPARATION FOR THAT

12:34PM  24   INSPECTION?

12:34PM  25   A.    TRYING TO HELP MAKE SURE ALL OF THE RIGHT RESOURCES WERE

| | | |
|---|---|---|
| 12:34PM | 1 | DEDICATED TO THE INSPECTION, MAKE SURE THAT DR. HURST AND OTHER |
| 12:34PM | 2 | EXPERTS WERE AVAILABLE FOR THE TEAM, AND THAT WE WERE SET UP AS |
| 12:34PM | 3 | BEST AS POSSIBLE FOR THE INSPECTION. |
| 12:35PM | 4 | Q.   LET ME ASK YOU TO LOOK AT 7363. |
| 12:35PM | 5 | A.   YES. |
| 12:35PM | 6 | Q.   IS EXHIBIT 7363 AN EMAIL SENT TO YOU BY SURAJ SAKSENA IN |
| 12:35PM | 7 | PREPARATION FOR THE 2013 CLIA AUDIT? |
| 12:35PM | 8 | A.   YES. |
| 12:35PM | 9 | MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF |
| 12:35PM | 10 | 7363. |
| 12:35PM | 11 | MR. LEACH:  NO OBJECTION, YOUR HONOR. |
| 12:35PM | 12 | THE COURT:  IT'S ADMITTED. |
| 12:35PM | 13 | (DEFENDANT'S EXHIBIT 7363 WAS RECEIVED IN EVIDENCE.) |
| 12:35PM | 14 | BY MR. DOWNEY: |
| 12:35PM | 15 | Q.   WHO WAS SURAJ SAKSENA? |
| 12:35PM | 16 | A.   DR. SAKSENA WAS A SCIENTIST WHO HAD WORKED IN R&D AND THEN |
| 12:35PM | 17 | MOVED TO THE CLIA LAB AND WAS THE INDIVIDUAL THAT SUNNY |
| 12:36PM | 18 | SUGGESTED SHOULD ULTIMATELY BECOME ONE OF THE LEADERS IN THE |
| 12:36PM | 19 | LABORATORY. |
| 12:36PM | 20 | Q.   AND IN CONNECTION WITH THIS EMAIL, HE GIVES YOU A LIST OF |
| 12:36PM | 21 | DIFFERENT TASKS. |
| 12:36PM | 22 | DO YOU SEE THAT? |
| 12:36PM | 23 | A.   YES. |
| 12:36PM | 24 | Q.   AND WHAT IS THE PURPOSE OF HIM GIVING YOU THIS LIST OF |
| 12:36PM | 25 | COMPLETED TESTS? |

12:36PM  1      A.   HE WAS CONVEYING TO US READINESS FOR THE INSPECTION.

12:36PM  2      Q.   NOW, I WANT TO LOOK AT THE FIRST BULLET POINT WHERE IT

12:36PM  3      SAYS "SOP'S FOR THE 4 LDT ASSAYS HAVE BEEN REVIEWED AND

12:36PM  4      SIGNED."

12:36PM  5           DO YOU SEE THAT?

12:36PM  6      A.   I DO.

12:36PM  7      Q.   AND WHAT ARE -- WHAT -- SOP'S REFERS TO THE STANDARD

12:36PM  8      OPERATING PROCEDURES?

12:36PM  9      A.   YES.

12:36PM  10     Q.   AND WHEN HE REFERS TO 4 LDT ASSAYS, WHAT DID YOU

12:36PM  11     UNDERSTAND THAT TO REFER TO?

12:36PM  12     A.   FOUR OF THE PROPRIETARY TESTS THAT THERANOS HAD DEVELOPED

12:36PM  13     AND VALIDATED IN ITS CLIA LAB.

12:37PM  14     Q.   AND WHY WAS IT NECESSARY FOR THE STANDARD OPERATING

12:37PM  15     PROCEDURES FOR THOSE ASSAYS TO BE READY IN CONNECTION WITH THE

12:37PM  16     2013 CMS AUDIT?

12:37PM  17     A.   SO THAT WE COULD REVIEW WITH THE INSPECTORS, THE TEAMS

12:37PM  18     COULD REVIEW WITH THE INSPECTORS THE OPERATING PROCEDURES FOR

12:37PM  19     THOSE LABORATORY DEVELOPED TESTS.

12:37PM  20     Q.   NOW, IN CONNECTION WITH THAT 2013 CMS AUDIT, DID YOU

12:37PM  21     INSTRUCT ANY THERANOS PERSONNEL TO HIDE ANY ASPECT OF THE

12:37PM  22     OPERATIONS IN THE THERANOS CLINICAL LABS?

12:37PM  23     A.   ABSOLUTELY NOT.

12:37PM  24     Q.   DID YOU UNDERSTAND THAT THE INSPECTORS WOULD BE MADE AWARE

12:37PM  25     OF ALL OF THE INFORMATION THAT THEY NEEDED TO APPROPRIATELY

| | | |
|---|---|---|
| 12:37PM | 1 | CONCLUDE THEIR DUTIES? |
| 12:37PM | 2 | A.   OF COURSE. |
| 12:37PM | 3 | Q.   AND DID YOU, AT THE CONCLUSION OF THE INSPECTION, RECEIVE |
| 12:37PM | 4 | A REPORT FROM DR. YOUNG AS TO HIS NOTES ON WHAT HAD HAPPENED |
| 12:37PM | 5 | DURING THE COURSE OF THAT INSPECTION? |
| 12:37PM | 6 | A.   I DID. |
| 12:37PM | 7 | Q.   LET ME ASK YOU TO LOOK AT 7368, WHICH IS IN THE LARGER |
| 12:38PM | 8 | VOLUME 3. |
| 12:38PM | 9 | A.   OKAY. |
| 12:38PM | 10 | Q.   AND IF YOU WOULD JUST TAKE A MOMENT TO LOOK THROUGH THAT. |
| 12:38PM | 11 | A.   OKAY. |
| 12:38PM | 12 | Q.   IS THIS AN EMAIL THAT DR. YOUNG SENT TO YOU ABOUT THE CMS |
| 12:38PM | 13 | INSPECTION IN DECEMBER OF 2013? |
| 12:38PM | 14 | A.   IT IS. |
| 12:38PM | 15 |         MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF |
| 12:38PM | 16 | 7368. |
| 12:38PM | 17 |         MR. LEACH:  NO OBJECTION, YOUR HONOR. |
| 12:38PM | 18 |         THE COURT:  IT'S ADMITTED. |
| 12:38PM | 19 |     (DEFENDANT'S EXHIBIT 7368 WAS RECEIVED IN EVIDENCE.) |
| 12:38PM | 20 | BY MR. DOWNEY: |
| 12:38PM | 21 | Q.   SO IF YOU GO TO THE FIRST PAGE, DO YOU SEE THIS IS AN |
| 12:39PM | 22 | EMAIL TO YOU FROM DR. YOUNG? |
| 12:39PM | 23 | A.   I DO. |
| 12:39PM | 24 | Q.   AND THEN HE SAYS IN THE FIRST PARAGRAPH, "HERE ARE MY |
| 12:39PM | 25 | NOTES FROM THE AUDIT YESTERDAY"? |

12:39PM  1    A.   YES.

12:39PM  2    Q.   AND THEN IF YOU CONTINUE THROUGH THE DOCUMENT TO PAGE 2 OF

12:39PM  3    THE ATTACHMENT.

12:39PM  4    A.   YES.

12:39PM  5    Q.   I'M SORRY, REALLY PAGE 1 OF THE ATTACHMENT, PAGE 2 OF THE

12:39PM  6    DOCUMENT.

12:39PM  7    A.   OKAY.

12:39PM  8    Q.   COULD WE HIGHLIGHT THE SUBJECT -- THE SENTENCE THAT IS

12:39PM  9    LABELLED "TESTS."

12:39PM 10         AND DO YOU SEE THAT DR. YOUNG REPORTS THERE "THE AUDITOR

12:40PM 11    ASKED IF WE HAVE ANY NEW TESTS OFFERED SINCE THE LAST AUDIT"?

12:40PM 12    A.   YES.

12:40PM 13    Q.   AND YOU UNDERSTOOD WHEN YOU WERE RECEIVING THIS THAT THIS

12:40PM 14    WAS THE PERSONNEL FROM CMS THAT WAS ASKING THE QUESTION?

12:40PM 15    A.   YES.

12:40PM 16    Q.   AND THEN HE SAYS IN THE NEXT SUBPARAGRAPH, "ADAM SAID

12:40PM 17    YES."

12:40PM 18         DO YOU SEE THAT?

12:40PM 19    A.   YES.

12:40PM 20    Q.   AND WAS THAT A REFERENCE TO DR. ROSENDORFF?

12:40PM 21    A.   IT IS.

12:40PM 22    Q.   AND THEN HE GOES ON TO SAY, "ADAM SAID YES AND SPOKE ABOUT

12:40PM 23    ALL LDT'S (GC, CYTO, ELISA)."

12:40PM 24         IN THAT INSTANCE, WHAT ARE LDT'S WITH THOSE ABBREVIATIONS

12:40PM 25    THEREAFTER REFERRING TO?

12:40PM 1    A.   THESE ARE PROPRIETARY TESTS THAT THERANOS DEVELOPED AND

12:40PM 2    VALIDATED IN ITS LABORATORY FOR THREE GROUPS OF TESTS OR

12:40PM 3    METHODS, GENERAL CHEMISTRY, CYTOMETRY, AND ELISA.

12:40PM 4    Q.   OKAY.  SO WERE THOSE, THOSE ASSAYS OR DEVICES THAT ARE --

12:41PM 5    THERE'S A REFERENCE TO THERE?

12:41PM 6    A.   THESE ARE ASSAY METHODS.

12:41PM 7    Q.   OKAY.  AND UNDER THAT THERE'S ANOTHER ENTRY AND IT SAYS,

12:41PM 8    "MENTIONED EDISON 3.5."

12:41PM 9        AND THAT'S THE DEVICE THAT YOU HAD BEGUN TO USE IN THE

12:41PM 10   CLINICAL LAB IN CONNECTION WITH WALGREENS; IS THAT RIGHT?

12:41PM 11   A.   IT IS.

12:41PM 12   Q.   AND THEN HE GOES ON TO SAY, "FLOW CYTOMETER, ADVIA, AND

12:41PM 13   NORMANDY LAB."

12:41PM 14       DO YOU SEE THAT?

12:41PM 15   A.   I DO.

12:41PM 16   Q.   AND WHAT DOES THAT REFER TO?

12:41PM 17   A.   THAT REFERS TO THE MODIFICATIONS WE HAD MADE TO

12:41PM 18   TRADITIONAL COMMERCIALLY AVAILABLE MACHINES TO BE ABLE TO RUN

12:41PM 19   OUR PROPRIETARY SMALL SAMPLE CHEMISTRIES ON THOSE MACHINES.

12:41PM 20   Q.   AND ARE THESE THE MACHINES THAT YOU HAD DESCRIBED LAST

12:41PM 21   WEEK AS INVOLVING A TRADE SECRET THAT THERANOS HAD -- RELATED

12:41PM 22   TO TECHNOLOGY THERANOS DEVELOPED IN CONNECTION WITH THE LAUNCH?

12:41PM 23   A.   THEY ARE.

12:41PM 24   Q.   AND IN THIS INSTANCE THEY APPEAR TO BE BEING DISCLOSED TO

12:42PM 25   THE CMS AUDITOR.

12:42PM  1          WAS THAT YOUR UNDERSTANDING OF WHAT HAPPENED?

12:42PM  2     A.   YES.

12:42PM  3     Q.   AND WHY WAS THERANOS COMFORTABLE COMMUNICATING TO THE

12:42PM  4     AUDITOR THAT THESE METHODS HAD EXISTED?

12:42PM  5     A.   BECAUSE, AGAIN, THIS IS A GOVERNMENT REGULATOR.  THEY HAD

12:42PM  6     METHODS IN PLACE TO BE ABLE TO PROTECT TRADE SECRETS, AND WE

12:42PM  7     COULD MAKE THESE DISCLOSURES AND STILL MAINTAIN THE PROTECTION

12:42PM  8     OF OUR TRADE SECRETS.

12:42PM  9     Q.   OKAY.  DID YOU UNDERSTAND AS A RESULT OF THIS REPORT THAT

12:42PM  10    ALL OF THE TECHNOLOGIES THAT THERANOS WAS USING IN ITS CLIA LAB

12:42PM  11    HAD BEEN DISCLOSED TO CMS IN 2013?

12:42PM  12    A.   YES.

12:42PM  13    Q.   LET ME ASK YOU TO LOOK AT THE NEXT PAGE OF THE EXHIBIT

12:42PM  14    UNDER NUMBER 11, WHICH IS LDT VALIDATION.

12:43PM  15    A.   OKAY.

12:43PM  16    Q.   AND DO YOU SEE IT ASKS, UNDER LDT VALIDATION, "AUDITOR

12:43PM  17    ASKED TO SEE A REPRESENTATIVE LDT VALIDATION REPORT"?

12:43PM  18         DO YOU SEE THAT?

12:43PM  19    A.   I DO.

12:43PM  20    Q.   AND WHAT IS THAT A REFERENCE TO?

12:43PM  21    A.   IT'S A REFERENCE TO SHOWING THE AUDITOR ONE OF THE

12:43PM  22    VALIDATION REPORTS FOR A PROPRIETARY TEST IN THE CLIA LAB.

12:43PM  23    Q.   AND THEN DR. YOUNG GOES ON TO REPORT THAT "SHE PICKED

12:43PM  24    CREATININE AS AN EXAMPLE."

12:43PM  25         DO YOU SEE THAT?

12:43PM 1    A.   YES.

12:43PM 2    Q.   AND DO YOU KNOW WHAT DEVICE THAT WAS RUN ON AT THIS TIME

12:43PM 3    IN THE CLINICAL LAB?

12:43PM 4    A.   YES.

12:43PM 5    Q.   WHAT DEVICE?

12:43PM 6    A.   THE MODIFIED ADVIA MACHINE.

12:43PM 7    Q.   OKAY.  AND THEN DR. YOUNG GOES ON FROM THERE TO SAY, "THIS

12:43PM 8    REPORT DID NOT APPEAR TO BE THE LATEST WITH THE LINEARITY

12:44PM 9    DATA."

12:44PM 10       DO YOU SEE THAT?

12:44PM 11   A.   I DO.

12:44PM 12   Q.   AND HE'S SUGGESTING AN ACTION THAT IT BE UPDATED TO MAKE

12:44PM 13   SURE THE LATEST DATA GETS INTO THESE REPORTS; IS THAT RIGHT?

12:44PM 14   A.   YES.

12:44PM 15   Q.   OKAY.  SEPARATE FROM THIS DOCUMENT, DID YOU ALSO

12:44PM 16   UNDERSTAND FROM THE CONVERSATIONS THAT YOU HAD WITH DR. YOUNG

12:44PM 17   THAT THESE TESTS AND DEVICES WERE DISCLOSED TO CMS AS PART OF

12:44PM 18   THEIR INSPECTION IN 2013?

12:44PM 19   A.   I DID.

12:44PM 20   Q.   OVER THE COURSE OF THE TIME THAT THERANOS OPERATED SERVICE

12:44PM 21   CENTERS IN WALGREENS STORES, DID YOU COME TO UNDERSTAND HOW

12:44PM 22   MANY TESTS HAD BEEN OFFERED TO PATIENTS?

12:44PM 23   A.   I DID.

12:44PM 24   Q.   WHAT WAS YOUR UNDERSTANDING IN THAT REGARD?

12:44PM 25   A.   NUMBERS BETWEEN 8 AND 12 MILLION TESTS.

7819

12:44PM   1    Q.   AND DID YOU UNDERSTAND --

12:44PM   2         MR. LEACH:  YOUR HONOR, OBJECTION.  VAGUE AS TO

12:45PM   3    TIME.

12:45PM   4         THE COURT:  WHY DON'T YOU LAY A BETTER FOUNDATION AS

12:45PM   5    TO THE TIME.

12:45PM   6    BY MR. DOWNEY:

12:45PM   7    Q.   DID YOU LEARN IN 2016, AS A RESULT OF THE CMS INSPECTION

12:45PM   8    AND OTHER DEVELOPMENTS AT THERANOS, HOW MANY TESTS HAD BEEN

12:45PM   9    PERFORMED AT THERANOS SERVICE CENTERS IN WALGREENS STORES?

12:45PM   10   A.   I DID.

12:45PM   11   Q.   AND WHAT DID YOU UNDERSTAND IN THAT REGARD?

12:45PM   12   A.   I UNDERSTOOD BETWEEN 8 TO 12 MILLION TESTS HAD BEEN

12:45PM   13   PERFORMED THROUGH THERANOS STORES.

12:45PM   14   Q.   AND OVER THE COURSE OF TIME BETWEEN 2013 AND 2015, DID YOU

12:45PM   15   HAVE AN UNDERSTANDING OF HOW MANY TESTS WERE BEING PERFORMED

12:45PM   16   WITHIN THE LAB?

12:45PM   17   A.   YES.

12:45PM   18        MR. LEACH:  OBJECTION, YOUR HONOR.  VAGUE AS TO "THE

12:45PM   19   LAB."  THERE ARE MULTIPLE LABS HERE.

12:45PM   20        MR. DOWNEY:  THE CLINICAL LAB.

12:45PM   21        MR. LEACH:  YOUR HONOR, OBJECTION.  IT'S STILL

12:45PM   22   VAGUE.

12:45PM   23        THE COURT:  WHY DON'T YOU NARROW DOWN THE SITE OF

12:45PM   24   THE LAB IF YOU CAN.

12:45PM   25        MR. DOWNEY:  YEAH.

7820

```
12:45PM   1    Q.   HOW MANY -- DID YOU HAVE AN UNDERSTANDING -- IF YOU

12:46PM   2    DIDN'T, THAT'S FINE, TOO.  DID YOU HAVE AN UNDERSTANDING HOW

12:46PM   3    MANY TESTS WERE BEING OFFERED IN THE PERIOD WHEN THE LAB WAS

12:46PM   4    OPERATING BETWEEN 2013 AND 2015?

12:46PM   5    A.   YES.

12:46PM   6              MR. LEACH:  OBJECTION, YOUR HONOR.

12:46PM   7              THE COURT:  WHAT LAB ARE YOU REFERRING TO?

12:46PM   8              MR. DOWNEY:  THE CLINICAL LAB.

12:46PM   9              THE COURT:  AT?

12:46PM  10              MR. DOWNEY:  AT THERANOS, YES.

12:46PM  11              THE COURT:  OKAY.  THANK YOU.

12:46PM  12              THE WITNESS:  YES.

12:46PM  13    BY MR. DOWNEY:

12:46PM  14    Q.   AND WHAT WAS THAT UNDERSTANDING?

12:46PM  15    A.   BETWEEN 8 TO 12 MILLION TESTS.

12:46PM  16    Q.   OKAY.  WERE THERE TIMES WHEN YOU LEARNED THAT

12:46PM  17    DR. ROSENDORFF HAD DECIDED TO STOP OFFERING PARTICULAR TESTS?

12:46PM  18    A.   YES.

12:46PM  19    Q.   DID YOU INTERFERE WITH DECISIONS THAT HE MADE IN THAT

12:46PM  20    REGARD?

12:46PM  21    A.   NO.

12:46PM  22    Q.   WHY NOT?

12:46PM  23    A.   BECAUSE HE HAD THE EXPERTISE TO MAKE THOSE DECISIONS.

12:46PM  24    Q.   TO YOUR KNOWLEDGE, WERE ANY TESTS OFFERED IN THE CLIA

12:46PM  25    LABORATORY WITHOUT THE APPROVAL OF THE PERSON SERVING AS
```

12:46PM   1      LABORATORY DIRECTOR AT THE TIME?

12:46PM   2      A.   NO.

12:47PM   3      Q.   TO YOUR KNOWLEDGE, DID MR. BALWANI EVER LEARN ABOUT

12:47PM   4      CIRCUMSTANCES WHERE A TEST WAS BEING OFFERED WITHOUT THE

12:47PM   5      APPROVAL OF THE LABORATORY DIRECTOR?

12:47PM   6      A.   NO.

12:47PM   7      Q.   DID YOU EVER OVERRULE DR. ROSENDORFF, OR ANY OTHER LAB

12:47PM   8      DIRECTOR FOR THAT MATTER, AS TO WHETHER PATIENTS SHOULD GET THE

12:47PM   9      RESULTS OF A PARTICULAR TEST?

12:47PM  10      A.   NO.

12:47PM  11      Q.   TO YOUR KNOWLEDGE, DID MR. BALWANI?

12:47PM  12      A.   NO.

12:47PM  13      Q.   NOW, YOU RECALL THAT AT THE -- EARLIER IN THE TRIAL

12:47PM  14      ERIKA CHEUNG TESTIFIED.

12:47PM  15           DO YOU REMEMBER THAT?

12:47PM  16      A.   I DO.

12:47PM  17      Q.   DO YOU RECALL EVER HAVING ANY COMMUNICATIONS WITH

12:47PM  18      MS. CHEUNG WHILE SHE WAS WORKING AT THERANOS?

12:47PM  19      A.   NO.

12:47PM  20      Q.   DO YOU RECALL EVER HEARING ABOUT ANY CONCERNS THAT SHE HAD

12:47PM  21      PRIOR TO THE TIME THAT SHE LEFT THERANOS?

12:48PM  22      A.   NO.

12:48PM  23      Q.   DO YOU RECALL THAT MS. CHEUNG SO TESTIFIED ABOUT CONCERNS

12:48PM  24      THAT WERE COMMUNICATED TO HER BY ANOTHER THERANOS EMPLOYEE

12:48PM  25      NAMED TYLER SHULTZ?

12:48PM  1    A.   I DO.

12:48PM  2    Q.   AND DID MR. SHULTZ WORK AT THERANOS?

12:48PM  3    A.   HE DID.

12:48PM  4    Q.   DID YOU KNOW TYLER SHULTZ DURING THE TIME PERIOD WHILE HE

12:48PM  5    WAS WORKING AT THERANOS?

12:48PM  6    A.   YES.

12:48PM  7    Q.   AND HOW DID YOU COME TO KNOW TYLER SHULTZ?

12:48PM  8    A.   HE WAS MR. SHULTZ'S GRANDSON AND GEORGE WAS ON OUR BOARD.

12:48PM  9    Q.   DID YOU LEARN AT SOME POINT THAT TYLER SHULTZ WAS RAISING

12:48PM  10   QUESTIONS TO DR. YOUNG AND OTHERS ABOUT THERANOS'S TESTS?

12:48PM  11   A.   I DID.

12:48PM  12   Q.   WHAT DID YOU DO IN RESPONSE?

12:48PM  13   A.   I ASKED DR. YOUNG AND OUR SCIENTISTS TO LOOK INTO HIS

12:48PM  14   CONCERNS SERIOUSLY AND EVALUATE EACH OF THE CONCERNS THAT HE

12:48PM  15   HAD RAISED.

12:48PM  16   Q.   AND DO YOU RECALL LEARNING THAT DR. YOUNG MET WITH

12:49PM  17   MR. SHULTZ?

12:49PM  18   A.   YES.

12:49PM  19   Q.   AND LET ME ASK YOU TO LOOK AT EXHIBIT 7421.

12:49PM  20   A.   OKAY.

12:49PM  21   Q.   JUST TAKE A MOMENT TO REVIEW THAT EMAIL.

12:49PM  22   A.   OKAY.

12:49PM  23   Q.   IS THIS AN EMAIL EXCHANGE ON WHICH YOU APPEAR ON THE TOP

12:49PM  24   EMAIL RELATED TO CONCERNS THAT MR. SHULTZ HAD RAISED?

12:49PM  25   A.   IT IS.

| | | |
|---|---|---|
| 12:49PM | 1 | MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF |
| 12:49PM | 2 | 7421. |
| 12:49PM | 3 | MR. LEACH:  801, 802, YOUR HONOR. |
| 12:50PM | 4 | THE COURT:  THE ENTIRETY OF THIS DOCUMENT, THIS |
| 12:50PM | 5 | CHAIN? |
| 12:50PM | 6 | MR. DOWNEY:  YES, YOUR HONOR. |
| 12:50PM | 7 | THE COURT:  IS THIS AN 803(6) EMAIL? |
| 12:50PM | 8 | MR. DOWNEY:  IT IS AN 803(6) EMAIL, AMONGST OTHER |
| 12:50PM | 9 | REASONS WHY IT WOULD COME IN. |
| 12:50PM | 10 | THE COURT:  I'LL OVERRULE THE OBJECTION.  IT'S |
| 12:50PM | 11 | ADMITTED. |
| 12:50PM | 12 | (DEFENDANT'S EXHIBIT 7421 WAS RECEIVED IN EVIDENCE.) |
| 12:50PM | 13 | BY MR. DOWNEY: |
| 12:50PM | 14 | Q.  LET'S LOOK AT THE TOP OF 7421. |
| 12:51PM | 15 | DO YOU SEE THAT THIS IS AN EMAIL EXCHANGE WITH SEVERAL |
| 12:51PM | 16 | EMAILS BENEATH IT, BUT IT'S BETWEEN YOURSELF AND MR. BALWANI |
| 12:51PM | 17 | AND DR. YOUNG? |
| 12:51PM | 18 | A.  IT IS. |
| 12:51PM | 19 | Q.  OKAY.  LET ME ASK YOU TO GO TO THE BOTTOM OF PAGE 2 OF |
| 12:51PM | 20 | THE -- YES, THAT EMAIL.  AND THEN THAT CARRIES OVER ON THE NEXT |
| 12:51PM | 21 | PAGE. |
| 12:51PM | 22 | BUT LET'S LOOK AT, LET'S LOOK AT THE TOP FIRST.  IS THIS |
| 12:51PM | 23 | EMAIL A REPORT BY DR. YOUNG TO YOU AND MR. BALWANI ABOUT A |
| 12:51PM | 24 | MEETING THAT HE HAD WITH MR. TYLER -- MR. TYLER SHULTZ? |
| 12:51PM | 25 | A.  YES. |

12:51PM  1    Q.   AND WAS THAT THE MEETING THAT YOU HAD REQUESTED DR. YOUNG

12:51PM  2    TO HAVE TO UNDERSTAND WHAT MR. SHULTZ'S CONCERNS WERE?

12:52PM  3    A.   YES.

12:52PM  4    Q.   IF YOU GO TO THE BODY OF THE EMAIL, DR. YOUNG REPORTS AT

12:52PM  5    THE TOP THAT HE'S UPDATING YOU ABOUT THE MEETING.

12:52PM  6         DO YOU SEE THAT?

12:52PM  7    A.   YES.

12:52PM  8    Q.   AND THEN IN THE SECOND PARAGRAPH HE GOES ON TO SAY THAT,

12:52PM  9    "I EXPLAINED OUR CALCULATION METHODS AND HE WAS SLOW TO

12:52PM 10    UNDERSTAND.  I'M GOING TO FOLLOW-UP AGAIN WITH HIM, AS HE DOES

12:52PM 11    NOT UNDERSTAND THE REASONING BEHIND RUNNING REPLICATES."

12:52PM 12         DO YOU SEE THAT?

12:52PM 13    A.   I DO.

12:52PM 14    Q.   AND DO YOU SEE THAT HE GOES ON IN THE NEXT PARAGRAPH TO

12:52PM 15    DESCRIBE A DIFFERENT QUESTION THAT MR. SHULTZ HAD RAISED IN HIS

12:52PM 16    RESPONSE TO THAT QUESTION?

12:52PM 17    A.   YES.

12:52PM 18    Q.   AND THEN IF YOU LOOK AT THE LAST SENTENCE OF DR. YOUNG'S

12:52PM 19    EMAIL ON PAGE 3, HE SAYS, "I AM REVIEWING HOW WE COMPARE TO

12:52PM 20    THIS PREDICATE AND THEN MEET WITH HIM AGAIN."

12:53PM 21    A.   YES.

12:53PM 22    Q.   OKAY.  AND THEN IF WE GO BACK TO THE HEADER OF THIS

12:53PM 23    PARTICULAR EMAIL, DO YOU SEE THAT THAT WAS SENT ON AROUND

12:53PM 24    FEBRUARY 21ST IN THE MORNING?  I'M SORRY, FEBRUARY 20TH, AT

12:53PM 25    LEAST WITH AN A.M. STAMP?

12:53PM  1      A.   YES.  THE ONE WE HAVE ON THE SCREEN OR THE --

12:53PM  2      Q.   I'M SORRY.  IT'S A P.M.

12:53PM  3      A.   YES, YES.

12:53PM  4      Q.   YES.  ALL RIGHT.  LET ME GO TO THE MIDDLE OF PAGE 1 NOW.

12:53PM  5      AND IF WE CAN BLOW UP FROM THE MIDDLE OF THAT TO THE BOTTOM OF

12:54PM  6      THAT PAGE OF THE EMAIL FROM DR. YOUNG.

12:54PM  7           ALL RIGHT.  AND DO YOU SEE THAT DR. YOUNG REPORTS ON A

12:54PM  8      FOLLOW-UP DISCUSSION THAT HE HAD WITH MR. SHULTZ?

12:54PM  9      A.   YES.

12:54PM  10     Q.   DO YOU SEE THAT?

12:54PM  11          DO YOU SEE THAT HE REPORTS, "HE ACKNOWLEDGED NOW

12:54PM  12     UNDERSTANDING THE CALCULATIONS, SO THE ISSUE IS CLOSED"?

12:54PM  13     A.   I DO.

12:54PM  14     Q.   AND DO YOU SEE IN THE SECOND PARAGRAPH HE GOES ON AND

12:54PM  15     REPORTS THAT HE REVIEWED THE APPROACH OF MEETING REQUIREMENTS

12:54PM  16     AND THAT MR. SHULTZ WAS IMPRESSED, ACCORDING TO DR. YOUNG?

12:54PM  17     A.   YES.

12:54PM  18     Q.   AND THEN IF YOU GO TO THE FOURTH BULLET POINT, ABOUT

12:54PM  19     HALFWAY DOWN THROUGH THAT BULLET POINT, DO YOU SEE THAT

12:54PM  20     DR. YOUNG REPORTED THAT, "OUR OBJECTIVE IS TO OUTPERFORM OTHER

12:54PM  21     LAB SERVICES PROVIDING THESE TESTS IN NATIONAL WAY BY

12:55PM  22     MAINTAINING CONTROL AND MONITORING THE ENTIRE PROCESS.  "HE,"

12:55PM  23     REFERRING TO MR. SHULTZ, "EXPRESSED UNDERSTANDING THE POWER OF

12:55PM  24     THIS APPROACH, SUCH AS THE ABILITY TO TREND RESULTS OVER TIME."

12:55PM  25     A.   YES.

7826

12:55PM 1    Q.   AND THEN DO YOU SEE HE GOES ON TO REPORT ABOUT HIS

12:55PM 2    CONVERSATION AND MR. SHULTZ'S RESPONSE DURING THIS SECOND

12:55PM 3    MEETING?

12:55PM 4    A.   YES.

12:55PM 5    Q.   AND DO YOU SEE THAT IN THE SIXTH BULLET POINT, HE REPORTS

12:55PM 6    THAT MR. SHULTZ HAD RAISED PROFICIENCY TESTING.

12:55PM 7        DO YOU SEE THAT?

12:55PM 8    A.   I DO.

12:55PM 9    Q.   AND HE HAD RAISED SOME QUESTIONS ABOUT HOW PROFICIENCY

12:55PM 10   TESTING SHOULD BE DONE.

12:55PM 11       DO YOU SEE THAT?

12:55PM 12   A.   YES.

12:55PM 13   Q.   AND THEN DR. YOUNG REPORTS THAT, "BY THE WAY, THIS GOES

12:56PM 14   AGAINST OUR CLIA STANDARD OPERATING PROCEDURES AS I NOTED IN

12:56PM 15   THE OTHER EMAIL."

12:56PM 16       AND HE GOES ON IN THE LAST SENTENCE BEFORE THE BULLET

12:56PM 17   POINT TO SAY THAT HE HAD EXPLAINED THE PROFICIENCY TESTING

12:56PM 18   POLICY TO MR. SHULTZ.

12:56PM 19       DO YOU SEE THAT?

12:56PM 20   A.   YES.

12:56PM 21   Q.   OKAY.  AND THEN IF YOU GO -- WHAT DID YOU UNDERSTAND AS TO

12:56PM 22   MR. SHULTZ'S CONCERNS AS A RESULT OF THESE TWO EMAILS FROM

12:56PM 23   DR. YOUNG?

12:56PM 24   A.   I UNDERSTOOD THAT MR. SHULTZ HAD BEEN CONFUSED ABOUT

12:56PM 25   CERTAIN ISSUES AND THAT DR. YOUNG WAS ABLE TO ADEQUATELY GET

7827

12:56PM  1    INTO THOSE CONCERNS WITH HIM AND ALLAY HIS CONCERNS.

12:56PM  2    Q.   AND IF YOU LOOK AT PAGE 1 OF THE EMAIL, YOU SEE THAT

12:57PM  3    THERE'S AN EMAIL FROM YOU -- I'M SORRY, THE ONE RIGHT BELOW

12:57PM  4    THAT.  RIGHT, RIGHT THERE.

12:57PM  5         AND YOU ASK, "DID HE UNDERSTAND THE PT POINT?"

12:57PM  6         AND THAT'S THE COMMENT ON PROFICIENCY TESTING?

12:57PM  7    A.   YES.

12:57PM  8    Q.   AND RIGHT ABOVE THAT, DO YOU SEE THERE'S A RESPONSE FROM

12:57PM  9    DR. YOUNG?

12:57PM  10   A.   YES.

12:57PM  11   Q.   AND HE SAYS, "YES, HE WAS AGAIN HAPPY TO UNDERSTAND THAT

12:57PM  12   THERE WAS A SOLID PLAN AND PROCESS IN PLACE (OTHER THAN WHAT HE

12:57PM  13   UNDERSTOOD BEFOREHAND)."

12:57PM  14   A.   I SEE THAT.

12:57PM  15   Q.   OKAY.  NOW, AFTER DR. YOUNG REPORTED TO YOU IN THIS VEIN,

12:58PM  16   DID MR. SHULTZ SUBSEQUENTLY RAISE CONCERNS WITH YOU AGAIN ABOUT

12:58PM  17   TESTING AT THERANOS?

12:58PM  18   A.   HE DID.

12:58PM  19   Q.   AND LET ME ASK YOU TO LOOK AT 7434.

12:58PM  20   A.   OKAY.

12:58PM  21   Q.   AND DO YOU SEE THAT THAT'S AN EMAIL FROM MR. SHULTZ TO YOU

12:58PM  22   DISCUSSING THE EARLIER MEETINGS HE HAD HAD WITH DR. YOUNG AND

12:58PM  23   RAISING SOME CONCERNS?

12:58PM  24   A.   YES.

12:58PM  25   Q.   AND YOU THEN RESPONDED TO THAT EMAIL?

| | | |
|---|---|---|
| 12:58PM | 1 | A.   YES. |
| 12:58PM | 2 | MR. DOWNEY:  YOUR HONOR, I'D LIKE TO MOVE THE |
| 12:58PM | 3 | ADMISSION OF 7434. |
| 12:58PM | 4 | MR. LEACH:  NO OBJECTION, YOUR HONOR. |
| 12:58PM | 5 | THE COURT:  IT'S ADMITTED. |
| 12:58PM | 6 | (DEFENDANT'S EXHIBIT 7434 WAS RECEIVED IN EVIDENCE.) |
| 12:58PM | 7 | BY MR. DOWNEY: |
| 12:58PM | 8 | Q.   SO IF WE LOOK AT THE BOTTOM OF PAGE 1, WITHOUT GOING |
| 12:58PM | 9 | THROUGH THE EMAIL, DO YOU SEE MR. SHULTZ SENT YOU AN EMAIL AND |
| 12:58PM | 10 | HE TALKS ABOUT HIS MEETINGS WITH DR. YOUNG, AND HE THEN GOES ON |
| 12:59PM | 11 | TO ADDRESS WHETHER HE THOUGHT THAT MR. YOUNG'S EXPLANATION WAS |
| 12:59PM | 12 | SUFFICIENT. |
| 12:59PM | 13 | DO YOU SEE THAT? |
| 12:59PM | 14 | A.   YES. |
| 12:59PM | 15 | Q.   AND THAT WAS ON APRIL 11TH AROUND 3:38. |
| 12:59PM | 16 | DO YOU SEE THAT? |
| 12:59PM | 17 | A.   I DO. |
| 12:59PM | 18 | Q.   AND THEN YOU RESPOND AT ABOUT TWO HOURS LATER. |
| 12:59PM | 19 | DO YOU SEE THAT? |
| 12:59PM | 20 | A.   YES. |
| 12:59PM | 21 | Q.   AND YOU WROTE THAT, "TYLER: |
| 12:59PM | 22 | "THESE ARE VERY, VERY SERIOUS COMMENTS AND ALLEGATIONS |
| 12:59PM | 23 | YOU'RE MAKING.  I'M GOING TO HAVE THE TEAMS GO THROUGH THIS |
| 12:59PM | 24 | LINE BY LINE SO IT WILL TAKE SOME TIME BEFORE I GET BACK TO YOU |
| 12:59PM | 25 | ON THIS." |

7829

```
12:59PM    1          DO YOU SEE THAT?

12:59PM    2     A.   I DO.

12:59PM    3     Q.   AND DID YOU THEN ASK THE TEAMS TO GO THROUGH MR. SHULTZ'S

12:59PM    4     CONCERNS?

12:59PM    5     A.   I DID.

12:59PM    6     Q.   OKAY.  AND WHO DID YOU ASK TO DO THAT?

12:59PM    7     A.   I ASKED DR. YOUNG TO LEAD THAT WORK.

12:59PM    8     Q.   OKAY.  AND DID YOU, DID YOU SEND THE COMMENTS THAT

01:00PM    9     MR. SHULTZ HAD MADE TO DR. YOUNG?

01:00PM   10     A.   I DID.

01:00PM   11     Q.   LET ME ASK YOU TO LOOK AT 1667.

01:00PM   12          IS THIS AN EMAIL BETWEEN YOU AND DR. YOUNG DISCUSSING THE

01:00PM   13     CONCERNS THAT MR. SHULTZ RAISED?

01:00PM   14     A.   I'M SORRY.  WHICH BINDER IS IT IN?

01:00PM   15     Q.   1667 SHOULD BE IN THE THIRD VOLUME.

01:00PM   16     A.   OKAY.

01:00PM   17     Q.   DO YOU HAVE THAT?

01:00PM   18     A.   I'VE GOT IT, YEP.

01:00PM   19     Q.   OKAY.

01:01PM   20     A.   OKAY.

01:01PM   21     Q.   MY QUESTION TO YOU WAS, AFTER YOU HAVE A MOMENT TO LOOK AT

01:01PM   22     IT, IS WHETHER THIS IS AN EMAIL EXCHANGE BETWEEN YOU AND

01:01PM   23     DR. YOUNG DISCUSSING THE CONCERNS THAT MR. SHULTZ RAISED IN

01:01PM   24     APRIL OF 2014?

01:01PM   25     A.   IT IS.
```

7830

01:01PM  1              MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

01:01PM  2     1667.

01:01PM  3              MR. LEACH:  NO OBJECTION, YOUR HONOR.

01:01PM  4              THE COURT:  IT'S ADMITTED.

01:01PM  5         (DEFENDANT'S EXHIBIT 1667 WAS RECEIVED IN EVIDENCE.)

01:01PM  6     BY MR. DOWNEY:

01:01PM  7     Q.   AND IF YOU LOOK AT THE VERY TOP HERE, YOU CAN SEE THAT

01:01PM  8     THIS IS ANOTHER SERIES OF EXCHANGES ABOUT MR. YOUNG'S

01:01PM  9     CONCERNS -- OR MR. SHULTZ'S CONCERNS BETWEEN YOURSELF,

01:01PM  10    DR. YOUNG, AND MR. BALWANI?

01:01PM  11    A.   YES.

01:01PM  12    Q.   AND THEN IF YOU LOOK AT THE BOTTOM OF THE PAGE, DO YOU SEE

01:01PM  13    THAT THERE'S AN EMAIL FROM YOU TO DR. YOUNG AND YOU ARE SAYING

01:01PM  14    TO HIM, "TAKE A LOOK AT THIS.  LET ME KNOW WHERE ALL THIS DATA

01:01PM  15    IS FROM/WHAT THE DATA IS, WHETHER YOU HAD EXCHANGES WITH HIM IN

01:02PM  16    WHICH HE FORWARDED MARKETING ARTICLES, AND ALSO COMMENTS LINE

01:02PM  17    BY LINE ON THE BELOW."

01:02PM  18         AND IF YOU LOOK BELOW, YOU SEEM TO HAVE FORWARDED

01:02PM  19    MR. SHULTZ'S EMAIL TO DR. YOUNG; IS THAT RIGHT?

01:02PM  20    A.   I DID.

01:02PM  21    Q.   AND DID DR. YOUNG THEN RESPOND AND ADDRESS THE CONCERNS

01:02PM  22    THAT MR. SHULTZ WAS RAISING?

01:02PM  23    A.   HE DID.

01:02PM  24    Q.   LET'S LOOK AT THE NEXT EMAIL UP.

01:02PM  25         DO YOU SEE THAT DR. YOUNG SAYS "MY COMMENTS ARE IN RED.

01:02PM 1    PLEASE LET ME KNOW IF YOU HAVE ANY FURTHER THOUGHTS OR WANT TO

01:02PM 2    DISCUSS ANY OF THIS."

01:02PM 3        DO YOU SEE THAT?

01:02PM 4    A.   YES.

01:02PM 5    Q.   AND THEN IF YOU GO UP TO THE TOP OF THE PAGE, DO YOU SEE

01:02PM 6    THAT DR. YOUNG AGAIN EMAILS AND HE SAYS, "I WANTED TO MENTION

01:02PM 7    AGAIN THAT TYLER'S CONCERN ABOUT PT WAS RAISED RIGHT AFTER WE

01:03PM 8    LEARNED THAT CLIA HAD SPLIT THE ACTUAL PT SAMPLE THEY HAD

01:03PM 9    RECEIVED."

01:03PM 10       AND THEN HE GOES ON TO SAY, "AS I HAD EXPLAINED TO TYLER,

01:03PM 11   THIS WAS THE WRONG THING TO DO."

01:03PM 12       DO YOU SEE THAT?

01:03PM 13   A.   I DO.

01:03PM 14   Q.   AND DID YOU UNDERSTAND THAT DR. YOUNG WAS SATISFIED THAT

01:03PM 15   HE HAD ADDRESSED THE CONCERNS THAT MR. SHULTZ HAD RAISED AS TO

01:03PM 16   PROFICIENCY TESTING?

01:03PM 17   A.   I DID.

01:03PM 18   Q.   AND WERE YOU SATISFIED TO ACCEPT DR. YOUNG'S EXPLANATION?

01:03PM 19   A.   I WAS.

01:03PM 20   Q.   AND WHY WERE YOU WILLING TO ACCEPT DR. YOUNG'S

01:03PM 21   EXPLANATION?

01:03PM 22   A.   BECAUSE I UNDERSTOOD THAT HE HAD STUDIED THE REGULATIONS,

01:03PM 23   WORKED WITH OUR REGULATORY PERSONS TO MAKE SURE THIS WAS

01:03PM 24   UNDERSTOOD PROPERLY, WORKED WITH DR. ROSENDORFF AND LABORATORY

01:03PM 25   LEADERSHIP, AND THAT THEY WERE ALL ALIGNED ON DR. YOUNG'S

7832

01:04PM  1    EXPLANATION.

01:04PM  2    Q.   OKAY.  LET'S TURN BACK FOR A MOMENT TO DISCUSSING

01:04PM  3    DR. ROSENDORFF.

01:04PM  4         DO YOU RECALL THE TESTIMONY EARLIER IN THE CASE THAT

01:04PM  5    DR. ROSENDORFF DEPARTED IN NOVEMBER OF 2014?

01:04PM  6    A.   I DO.

01:04PM  7    Q.   AND DURING THE PERIOD THAT HE WAS SERVING AS THE LAB

01:04PM  8    DIRECTOR, HOW OFTEN DID YOU INTERACT ONE ON ONE WITH

01:04PM  9    DR. ROSENDORFF?

01:04PM  10   A.   ON OCCASION.  WHENEVER HE WANTED OR NEEDED TO MEET WITH

01:04PM  11   ME.

01:04PM  12   Q.   TO WHOM DID DR. ROSENDORFF DIRECTLY REPORT?

01:04PM  13   A.   TO SUNNY BALWANI.

01:04PM  14   Q.   DID YOU HAVE A CHANCE ON SOME OCCASIONS TO OBSERVE THE

01:04PM  15   WORKING RELATIONSHIP BETWEEN MR. BALWANI AND DR. ROSENDORFF?

01:04PM  16   A.   I DID.

01:04PM  17   Q.   WHAT DID YOU OBSERVE?

01:04PM  18   A.   THAT THERE WAS FRUSTRATION IN THAT RELATIONSHIP.

01:04PM  19   Q.   DID YOU ALSO HAVE OCCASION TO INTERACT IN THE RELATIONSHIP

01:05PM  20   BETWEEN -- OR TO OBSERVE INTERACTIONS BETWEEN DR. ROSENDORFF

01:05PM  21   AND DR. YOUNG?

01:05PM  22   A.   I DID.

01:05PM  23   Q.   AND WHAT WERE YOUR OBSERVATIONS AS TO THE NATURE OF THAT

01:05PM  24   RELATIONSHIP?

01:05PM  25   A.   THAT THEY WOULD OFTEN DISAGREE BEFORE COMING TO A DECISION

01:05PM  1    TOGETHER.

01:05PM  2    Q.    OKAY.  DID THERE COME A TIME WHEN DR. ROSENDORFF TOLD YOU

01:05PM  3    THAT HE WAS GOING TO LEAVE THERANOS?

01:05PM  4    A.    YES.

01:05PM  5    Q.    AND WHEN WAS THAT?

01:05PM  6    A.    AT THE END OF 2014.

01:05PM  7    Q.    WHAT DO YOU RECALL ABOUT HIM TELLING YOU HE WAS GOING TO

01:05PM  8    LEAVE THERANOS?

01:05PM  9    A.    THAT HE HAD ANOTHER JOB THAT HE WANTED TO TAKE AND THAT HE

01:05PM  10   WANTED TO TRANSITION OUT AS FAST AS HE COULD TO BE ABLE TO

01:05PM  11   START AT THAT NEW COMPANY.

01:05PM  12   Q.    AND DID HE TELL THAT TO BOTH YOU AND MR. BALWANI?

01:05PM  13   A.    YES.

01:05PM  14   Q.    HOW DID MR. BALWANI REACT TO DR. ROSENDORFF'S STATEMENT

01:05PM  15   THAT HE INTENDED TO RESIGN?

01:06PM  16   A.    HE ASKED US TO GIVE HIM THE THREE MONTHS THAT HAD BEEN

01:06PM  17   AGREED UPON IN HIS EMPLOYMENT CONTRACT BEFORE LEAVING.

01:06PM  18   Q.    AND DID DR. ROSENDORFF CONTINUE TO SERVE AS THE CLINICAL

01:06PM  19   LABORATORY DIRECTOR AFTER HE GAVE THAT NOTICE THAT HE INTENDED

01:06PM  20   TO LEAVE?

01:06PM  21   A.    HE DID.

01:06PM  22   Q.    AND WHAT, IF ANY, OBSERVATIONS DID YOU HAVE OF HIS

01:06PM  23   BEHAVIOR AFTER HE HAD GIVEN NOTICE THAT HE HAD INTENDED TO

01:06PM  24   DEPART?

01:06PM  25   A.    IT WAS VERY DIFFERENT THAN HOW HE HAD BEHAVED BEFOREHAND,

01:06PM  1    AND HE WAS INCREASINGLY AGITATED IN ASKING TO BE ABLE TO LEAVE.

01:06PM  2    Q.   AND DO YOU RECALL THAT DURING THE COURSE OF THE TRIAL

01:06PM  3    DR. ROSENDORFF TESTIFIED THAT HE HAD SENT YOU AN EMAIL THAT HE

01:06PM  4    WAS UNCOMFORTABLE IN HIS ROLE AS LABORATORY DIRECTOR?

01:06PM  5    A.   I DO.

01:06PM  6    Q.   WHAT WAS YOUR REACTION TO RECEIVING THAT EMAIL?

01:06PM  7    A.   I WAS REALLY TAKEN ABACK BECAUSE HE HAD NOT RAISED WITH ME

01:07PM  8    THE CONCERNS THAT HE WAS IDENTIFYING IN THAT EMAIL, AND I HAD

01:07PM  9    TRIED TO MAKE IT REALLY CLEAR TO HIM THAT ANYTHING THAT HE

01:07PM  10   NEEDED TO DO OR NEEDED IN TERMS OF RESOURCES OR OTHERWISE TO BE

01:07PM  11   ABLE TO RUN THE LAB IN THE BEST WAY POSSIBLE I WANTED TO MAKE

01:07PM  12   AVAILABLE FOR HIM.

01:07PM  13   Q.   DID DR. ROSENDORFF EVER TELL YOU THAT HIS RESIGNATION WAS

01:07PM  14   RELATED TO THERANOS REFUSING TO IMPLEMENT PROFICIENCY TESTING

01:07PM  15   FOR ITS PROPRIETARY TESTS?

01:07PM  16   A.   NO.

01:07PM  17   Q.   DID DR. ROSENDORFF EVER TELL YOU THAT HIS RESIGNATION WAS

01:07PM  18   RELATED TO HIM BEING DENIED RESOURCES THAT HE NEEDED TO RUN THE

01:07PM  19   CLINICAL LABORATORY?

01:07PM  20   A.   NO.

01:07PM  21   Q.   WERE YOU, AS THE CEO OF THE COMPANY, WERE YOU PREPARED FOR

01:07PM  22   DR. ROSENDORFF'S DEPARTURE AT THE TIME THAT HE DEPARTED?

01:07PM  23   A.   NO.

01:07PM  24   Q.   HOW DID THE COMPANY REACT TO THE DEPARTURE OF

01:08PM  25   DR. ROSENDORFF?

01:08PM  1    A.   WE WENT BACK TO DR. HURST AND ASKED HIM TO GET INVOLVED

01:08PM  2    WITH THE COMPANY AGAIN.   SUNNY BALWANI SAID THAT HE WAS GOING

01:08PM  3    TO START SPENDING A VERY SIGNIFICANT AMOUNT OF HIS TIME AT

01:08PM  4    NEWARK TO DIG INTO WHAT ISSUES EXISTED AND TO FIX THEM GOING

01:08PM  5    FORWARD.

01:08PM  6    Q.   AND DID MR. BALWANI SUBSEQUENTLY REPORT TO YOU THAT HE WAS

01:08PM  7    SPENDING TIME IN THE CLIA LAB AND DIGGING INTO ISSUES?

01:08PM  8    A.   HE WAS, YES.

01:08PM  9              MR. DOWNEY:  YOUR HONOR, IN CONNECTION WITH

01:08PM  10   EXHIBIT 5387, THIS IS THE TEXT MESSAGES THAT WE'VE ADMITTED BIT

01:08PM  11   BY BIT.  THIS WOULD BE 5387E.

01:08PM  12   Q.   I'LL JUST ASK YOU TO LOOK AT THAT IN THE THIRD VOLUME OF

01:09PM  13   THE BINDER THAT YOU HAVE, MS. HOLMES.

01:09PM  14   A.   OKAY.

01:09PM  15   Q.   OKAY.  IS THIS A SERIES OF TEXT MESSAGES BETWEEN YOU AND

01:09PM  16   MR. BALWANI IN NOVEMBER OF 2014?

01:09PM  17   A.   YES.

01:09PM  18              MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

01:09PM  19   5387E.

01:09PM  20              MR. LEACH:  NO OBJECTION, YOUR HONOR.

01:09PM  21              THE COURT:  IT'S ADMITTED.

01:09PM  22       (GOVERNMENT'S EXHIBIT 5387E WAS RECEIVED IN EVIDENCE.)

01:09PM  23              MR. DOWNEY:  AND IF YOU WOULD JUST DISPLAY THIS.

01:09PM  24   Q.   NOW, DR. ROSENDORFF LEFT AROUND NOVEMBER 20TH OR SO.

01:09PM  25         DO YOU RECALL THAT?

7836

01:09PM   1    A.   YES.

01:09PM   2    Q.   AND DO YOU SEE THAT THIS IS A TEXT FROM MR. BALWANI TO YOU

01:09PM   3    ON NOVEMBER 25TH?

01:09PM   4    A.   YES.

01:09PM   5    Q.   AND DO YOU SEE THAT HE'S "HEADING OUT TO NEWARK.  LOVE"?

01:10PM   6    A.   YES.

01:10PM   7    Q.   AND IN THE NEXT EMAIL, NEXT TEXT HE REPORTS, "I'M ON MY

01:10PM   8    WAY TO NEWARK.  OFFICE IS YOURS"?

01:10PM   9    A.   YES.

01:10PM  10    Q.   AND THE NEWARK FACILITY, WAS THAT THE FACILITY THAT HAD

01:10PM  11    THE CLINICAL LAB?

01:10PM  12    A.   IT WAS.

01:10PM  13    Q.   AND THAT WAS SEPARATE FROM THERANOS'S HEADQUARTERS?

01:10PM  14    A.   YES.

01:10PM  15    Q.   AND TO THIS POINT, MR. BALWANI HAD LARGELY WORKED IN

01:10PM  16    THERANOS'S HEADQUARTERS OR HAD HE WORKED IN BOTH LOCATIONS?

01:10PM  17    A.   HE WORKED IN BOTH LOCATIONS, BUT HE WAS MOSTLY IN

01:10PM  18    THERANOS'S HEADQUARTERS.

01:10PM  19    Q.   OKAY.  AND AFTER MR. BALWANI SPENT TIME AT THE LAB IN

01:10PM  20    NEWARK, DO YOU RECALL RECEIVING REPORTS FROM HIM AS TO HIS

01:10PM  21    PERCEPTION OF WHAT THE CONDITION OF THE LAB WAS?

01:10PM  22    A.   YES.

01:10PM  23    Q.   LET ME ASK YOU TO LOOK AT 5387B, WHICH IS ALREADY IN

01:11PM  24    EVIDENCE.

01:11PM  25         ALL RIGHT.  IF WE CAN JUST BLOW THIS UP SO IT'S A LITTLE

01:11PM   1    MORE VISIBLE.  ALL RIGHT.

01:11PM   2         DO YOU SEE THAT HE REPORTS, "NORMANDY LAB IS A F'ING

01:11PM   3    DISASTER ZONE.  GLAD I CAME HERE.  WILL WORK ON FIXING THIS."

01:11PM   4         DO YOU SEE THAT?

01:11PM   5    A.   YES.

01:11PM   6    Q.   AND THEN A FEW LINES DOWN HE SAYS, "IN NORMANDY.  WILL

01:11PM   7    CALL WHEN I LEAVE."

01:11PM   8         DO YOU SEE THAT?

01:11PM   9    A.   YES.

01:11PM  10    Q.   AND THEN HE GOES DOWN TOWARDS THE BOTTOM AND SAYS, "WE

01:11PM  11    BUILT SOFTWARE TO REMOVE HUMAN ERROR AND HUMAN JUDGEMENT.  ALL

01:11PM  12    DAY I SAW THESE PEOPLE USE THEIR JUDGMENTS TO WORK AROUND OUR

01:11PM  13    PROCESSES."

01:11PM  14         DO YOU SEE THAT?

01:11PM  15    A.   YES.

01:11PM  16    Q.   AND DID, IN ADDITION TO THESE TEXTS, DID MR. BALWANI ALSO

01:11PM  17    REPORT TO YOU ORALLY ON HIS OBSERVATIONS OF THE LAB AT THAT

01:12PM  18    TIME?

01:12PM  19    A.   HE DID.

01:12PM  20    Q.   AND WHAT WAS HIS REPORT?

01:12PM  21    A.   HIS REPORT WAS THAT HE FELT THE LABORATORY WAS POORLY

01:12PM  22    MANAGED AND THAT HE WAS MAKING SURE THAT IT WOULD BE PROPERLY

01:12PM  23    MANAGED AND PEOPLE WOULD FOLLOW THE PROCEDURES THAT WE HAD IN

01:12PM  24    PLACE.

01:12PM  25    Q.   DID THERANOS SUBSEQUENTLY HIRE A LABORATORY DIRECTOR TO

01:12PM 1    REPLACE DR. ROSENDORFF?

01:12PM 2    A.   WE DID.

01:12PM 3    Q.   AND WHO WAS THAT?

01:12PM 4    A.   WE HIRED DR. SAWYER AND DR. DHAWAN.

01:12PM 5    Q.   AND DID YOU HAVE CONVERSATIONS ABOUT DR. DHAWAN AND

01:12PM 6    DR. SAWYER WITH MR. BALWANI?

01:12PM 7    A.   I DID.

01:12PM 8    Q.   AND WHAT DID HE TELL YOU ABOUT DR. DHAWAN AND DR. SAWYER?

01:12PM 9    A.   HE SAID THAT THEY WOULD BE SERVING TEMPORARILY BECAUSE WE

01:12PM 10   HAD A CANDIDATE INTERNALLY WHO WOULD TAKE OVER THE LAB DIRECTOR

01:12PM 11   POSITION FORMALLY AS SOON AS HIS CERTIFICATIONS WERE ISSUED.

01:13PM 12   Q.   AND WHO WAS THAT?

01:13PM 13   A.   DR. SAKSENA.

01:13PM 14   Q.   AND DID HE OFFER REFLECTIONS ON DR. SAKSENA'S

01:13PM 15   QUALIFICATIONS TO SERVE AS LAB DIRECTOR?

01:13PM 16   A.   HE DID.

01:13PM 17   Q.   WHAT DID HE SAY?

01:13PM 18   A.   HE SAID THAT DR. SAKSENA WAS QUALIFIED, AND THAT HE HAD

01:13PM 19   NOW SEVERAL YEARS OF WORKING IN THE CLIA LAB AND NEEDED

01:13PM 20   PAPERWORK TO BE ABLE TO OFFICIALLY ASSUME THE ROLE, BUT THAT HE

01:13PM 21   WAS ALREADY ACTING EFFECTIVELY IN THAT CAPACITY.

01:13PM 22   Q.   AND DID YOU UNDERSTAND THAT DR. SAWYER WORKED WITH

01:13PM 23   JERRY HURST, WHO WAS YOUR CONSULTANT?

01:13PM 24   A.   I DID.

01:13PM 25   Q.   AND HOW -- WHAT WERE YOUR EXPECTATIONS AS TO HOW LONG

01:13PM 1      DR. DHAWAN AND DR. SAWYER WOULD SERVE IN THEIR ROLES WHEN THEY

01:13PM 2      WERE HIRED AS LABORATORY DIRECTOR?

01:13PM 3      A.   A VERY SHORT PERIOD OF TIME.

01:13PM 4      Q.   DID YOU PLAY ANY ROLE IN THEIR SELECTION AS LABORATORY

01:13PM 5      DIRECTOR?

01:13PM 6      A.   I DID NOT.

01:13PM 7      Q.   LET ME ASK YOU LAST ABOUT THE DECISION TO -- MADE WITHIN

01:14PM 8      THE CLIA LABORATORY TO REMOVE CERTAIN TESTS FROM BEING TESTED

01:14PM 9      ON THE THERANOS 3.5 DEVICES.

01:14PM 10         DO YOU RECALL THAT TESTIMONY?

01:14PM 11     A.   I DO.

01:14PM 12     Q.   SO WAS THERE A PERIOD DURING THE OPERATION OF THE CLINICAL

01:14PM 13     LAB WHERE TESTS WOULD BE EVALUATED ON THE 3.5 DEVICES?

01:14PM 14     A.   YES.

01:14PM 15     Q.   AND OVER TIME WERE SOME OF THOSE TESTS REMOVED FROM BEING

01:14PM 16     ANALYZED ON THE 3.5 DEVICES AND ANALYZED USING A DIFFERENT

01:14PM 17     ANALYZER?

01:14PM 18     A.   YES.

01:14PM 19     Q.   DID YOU OCCASIONALLY RECEIVE INPUT OR GUIDANCE FROM

01:14PM 20     SCIENTISTS AS TO THE PERFORMANCE OF THOSE TESTS IN THE CLINICAL

01:14PM 21     LAB?

01:14PM 22     A.   I RECEIVED COMMENTARY ABOUT IT, YES.

01:14PM 23     Q.   OKAY.  AND DID THAT INCLUDE FROM DR. YOUNG?

01:14PM 24     A.   YES.

01:14PM 25     Q.   AND DR. PANGARKAR?

01:14PM 1      A.   IT DID.

01:14PM 2      Q.   AND DR. SIVARAMAN?

01:15PM 3      A.   YES.

01:15PM 4      Q.   AND DR. PATEL?

01:15PM 5      A.   YES.

01:15PM 6      Q.   AND DR. SAKSENA?

01:15PM 7      A.   YES.

01:15PM 8      Q.   AND DID YOU VIEW IT AS APPROPRIATE FOR THEM TO ADVISE ON

01:15PM 9      WHAT SHOULD BE DONE WITH RESPECT TO THE 3.5 DEVICE, THE TESTS

01:15PM 10     BEING OPERATED ON IT?

01:15PM 11     A.   I DID.

01:15PM 12     Q.   DID ANY OF THESE SCIENTISTS EXPRESS ANY CONCERNS TO YOU

01:15PM 13     THAT THERANOS'S TESTS WEREN'T SUFFICIENTLY RELIABLE TO OFFER IT

01:15PM 14     TO PATIENTS?

01:15PM 15     A.   NO.

01:15PM 16     Q.   DID THEY EXPRESS ANY CONCERN THAT THERANOS'S TESTS WERE

01:15PM 17     NOT SUFFICIENTLY ACCURATE TO BE OFFERED TO PATIENTS?

01:15PM 18     A.   NO.

01:15PM 19     Q.   WERE YOU INVOLVED IN THE DECISION TO REMOVE TESTS FROM THE

01:15PM 20     3.5 SERIES DEVICE?

01:15PM 21     A.   I DID NOT MAKE THAT DECISION.

01:15PM 22     Q.   AND DO YOU KNOW WHY THAT DECISION WAS MADE?

01:15PM 23     A.   I DON'T IN ALL CASES.  I KNEW GENERALLY THAT THE

01:15PM 24     LABORATORY LEADERSHIP WAS EVALUATING THE TESTS AND MAKING

01:15PM 25     DECISIONS ABOUT WHAT TESTS WERE LIVE AND WHAT PLATFORM AT ANY

7841

01:15PM  1    GIVEN POINT IN TIME.

01:16PM  2              MR. DOWNEY:  YOUR HONOR, THIS MIGHT BE A GOOD TIME

01:16PM  3    FOR OUR BREAK IF IT SUITS THE COURT.

01:16PM  4              THE COURT:  ALL RIGHT.  WE'LL TAKE A BREAK NOW.

01:16PM  5    WILL 30 MINUTES DO, MR. DOWNEY?

01:16PM  6              MR. DOWNEY:  THAT WILL BE FINE.  THANK YOU,

01:16PM  7    YOUR HONOR.

01:16PM  8              THE COURT:  LET'S TAKE 30 MINUTES NOW, LADIES AND

01:16PM  9    GENTLEMEN, 30 MINUTES.

01:16PM  10       (RECESS FROM 1:16 P.M. UNTIL 1:56 P.M.)

01:56PM  11             THE COURT:  THANK YOU.  WE'RE BACK ON THE RECORD.

01:56PM  12   ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.

01:57PM  13        MR. DOWNEY, YOU'D LIKE TO CONTINUE?

01:57PM  14             MR. DOWNEY:  YES, SIR.

01:57PM  15   Q.   MS. HOLMES, EARLIER TODAY, DO YOU RECALL TALKING ABOUT THE

01:57PM  16   2011 AND 2013 CMS AUDITS AT THERANOS?

01:57PM  17   A.   I DO.

01:57PM  18   Q.   DID CMS PERFORM ANOTHER INSPECTION OF THERANOS IN THE FALL

01:57PM  19   OF 2015?

01:57PM  20   A.   YES.

01:57PM  21   Q.   DID THERANOS EXPECT THAT THERE WOULD BE AN INSPECTION

01:57PM  22   THEN?

01:57PM  23   A.   WE KNEW GENERALLY THAT THERE WAS A TWO YEAR INSPECTION

01:57PM  24   COMING UP.

01:57PM  25   Q.   DID THERANOS TAKE STEPS TO PREPARE FOR THAT INSPECTION IN

01:57PM  1    2015?

01:57PM  2    A.   YES.

01:57PM  3    Q.   WHAT, TO YOUR KNOWLEDGE, DID THERANOS DO?

01:57PM  4    A.   WE ASKED DR. HURST TO COME IN AND MAKE SURE THAT WE WERE

01:57PM  5    READY FOR THE INSPECTION AND WORK WITH OUR TEAMS ON CONDUCTING

01:57PM  6    MOCK AUDITS.

01:57PM  7    Q.   PRIOR TO THE TIME OF THE INSPECTION, DID MR. BALWANI

01:57PM  8    COMMUNICATE TO YOU WHAT HE EXPECTED THE RESULTS OF THE

01:58PM  9    INSPECTION WOULD BE?

01:58PM  10   A.   HE DID.

01:58PM  11   Q.   WHAT DID HE SAY?

01:58PM  12   A.   THAT THE LAB WAS IN GREAT SHAPE AND THAT THERE WAS -- THE

01:58PM  13   AUDIT SHOULD GO VERY WELL.

01:58PM  14   Q.   NOW, DID AN INSPECTION OF THERANOS COMMENCE AFTER ALL OF

01:58PM  15   THOSE PREPARATIONS?

01:58PM  16   A.   YES.

01:58PM  17   Q.   AND WERE YOU INVOLVED IN INTERACTING WITH PERSONNEL FROM

01:58PM  18   CMS DURING THAT INSPECTION?

01:58PM  19   A.   I WAS.

01:58PM  20   Q.   AND WHAT DO YOU RECALL ABOUT THAT INSPECTION?

01:58PM  21   A.   THAT INSPECTORS HAD COME TO VISIT THERANOS SOMETIME I

01:58PM  22   THINK IN SEPTEMBER OF 2015 AND THAT OUR TEAM HAD EXPRESSED THAT

01:58PM  23   THERE WERE CONCERNS, SO I SAT IN THE BACK OF THE ROOM DURING

01:58PM  24   THE SECOND PART OF THAT INSPECTION, WHICH WAS LATER IN NOVEMBER

01:58PM  25   OF 2015, TO TRY TO OBSERVE IT.

7843

01:58PM  1    Q.   OKAY.  LET'S TAKE IT IN STAGES.

01:58PM  2         DID YOU PARTICIPATE WHEN -- AT ALL IN INTERACTIONS WITH

01:59PM  3    CMS WHEN THE INSPECTION WAS CONDUCTED IN SEPTEMBER?

01:59PM  4    A.   I DID NOT.

01:59PM  5    Q.   DID YOU RECEIVE REPORTS ABOUT HOW THAT INSPECTION HAD

01:59PM  6    GONE?

01:59PM  7    A.   I DID.

01:59PM  8    Q.   WHAT DID YOU LEARN AS A RESULT OF THE REPORTS?

01:59PM  9    A.   THAT IT WAS NOT AS WE HAD EXPECTED AND THAT THE

01:59PM  10   INVESTIGATORS SEEMED TO BE IDENTIFYING A NUMBER OF ISSUES THAT

01:59PM  11   WERE UNEXPECTED.

01:59PM  12   Q.   AND YOU SAY THAT WAS IN SEPTEMBER OF 2015?

01:59PM  13   A.   YES.

01:59PM  14   Q.   WAS IT ABOUT A MONTH AFTER THAT INSPECTION THAT THERANOS

01:59PM  15   BEGAN TO RECEIVE CONSIDERABLE NEGATIVE MEDIA COVERAGE?

01:59PM  16   A.   YES.

01:59PM  17   Q.   AND WHAT DO YOU RECALL HAPPENING IN THAT REGARD?

01:59PM  18   A.   AN ARTICLE WAS PUBLISHED THAT WAS VERY NEGATIVE ABOUT

01:59PM  19   THERANOS, AND CONTINUED ARTICLES WERE PUBLISHED IMMEDIATELY

01:59PM  20   FOLLOWING IT THAT WERE ATTRACTING A LOT OF ATTENTION.

02:00PM  21   Q.   PRIOR TO THE TIME THERANOS -- PRIOR TO THE TIME THE

02:00PM  22   ARTICLE ABOUT THERANOS WAS PUBLISHED, DID THERANOS KNOW THERE

02:00PM  23   WAS GOING TO BE AN ARTICLE THAT WOULD RUN?

02:00PM  24   A.   YES.

02:00PM  25   Q.   AND HOW DID THERANOS RESPOND TO THE KNOWLEDGE THAT THE

02:00PM 1    ARTICLE WAS GOING TO RUN?

02:00PM 2    A.   WE BEGAN INTERACTING WITH THE PUBLISHER OVER THE COURSE OF

02:00PM 3    SEVERAL MONTHS.

02:00PM 4    Q.   AND DID YOU DEVELOP CONCERNS ABOUT WHAT YOU UNDERSTOOD

02:00PM 5    WOULD BE REPORTED?

02:00PM 6    A.   YES.

02:00PM 7    Q.   AND HOW DID YOU REACT -- WHAT CONCERNS SPECIFICALLY DID

02:00PM 8    YOU DEVELOP?

02:00PM 9    A.   PRIMARILY THAT WE UNDERSTOOD THAT TRADE SECRETS THAT WE

02:00PM 10   HAD BEEN TRYING TO PROTECT HAD BEEN DISCLOSED AND COULD BE

02:00PM 11   DISCLOSED THROUGH THIS PIECE.

02:00PM 12   Q.   AND DID YOU TAKE STEPS TO REACT IN RESPONSE TO THAT?

02:00PM 13   A.   YES.

02:00PM 14   Q.   AND WOULD YOU CHARACTERIZE THE STEPS THAT YOU TOOK IN

02:00PM 15   RESPONSE AS AGGRESSIVE?

02:00PM 16   A.   YES.

02:00PM 17   Q.   SITTING HERE TODAY, WOULD YOU HAVE HANDLED THE RESPONSE TO

02:01PM 18   THAT DIFFERENTLY?

02:01PM 19   A.   VERY MUCH SO.

02:01PM 20   Q.   AND HOW SO?

02:01PM 21   A.   I THINK WE WERE TOO AGGRESSIVE.  I THINK WE WERE SO

02:01PM 22   FOCUSSED ON TRYING TO PROTECT THESE INVENTIONS AND TRADE

02:01PM 23   SECRETS THAT WE LOST SIGHT OF THE BIG PICTURE, AND IN TRYING TO

02:01PM 24   PROTECT THE TRADE SECRETS CREATED ALL SORTS OF IMPRESSIONS

02:01PM 25   ABOUT THERANOS THAT WERE INCORRECT.

02:01PM 1    Q.   DID YOU -- YOU MENTIONED THAT THERE HAD BEEN A CMS

02:01PM 2    INSPECTION IN SEPTEMBER?

02:01PM 3    A.   YES.

02:01PM 4    Q.   AND THEN DID THE ARTICLE RUN IN OCTOBER?

02:01PM 5    A.   YES.

02:01PM 6    Q.   AND THEN WAS THE FOLLOWUP TO THE CMS INSPECTION IN

02:01PM 7    NOVEMBER?

02:01PM 8    A.   YES.

02:01PM 9    Q.   AND I THINK YOU TESTIFIED THAT YOU DID PARTICIPATE DURING

02:01PM 10   SOME OF THE MEETINGS THAT TOOK PLACE WITH CMS PERSONNEL DURING

02:01PM 11   THAT NOVEMBER PORTION OF THE INSPECTION?

02:01PM 12   A.   I DID.

02:01PM 13   Q.   AND WAS YOUR ROLE PRINCIPALLY TO OBSERVE OR WERE YOU

02:02PM 14   INTERACTING WITH THE INSPECTORS?

02:02PM 15   A.   I WAS OBSERVING.

02:02PM 16   Q.   AND WHAT DO YOU RECALL OBSERVING DURING THE COURSE OF THAT

02:02PM 17   INSPECTION?

02:02PM 18   A.   I REMEMBER OUR TEAM BEING UNABLE TO PRODUCE DOCUMENTS THAT

02:02PM 19   THE INSPECTORS WERE ASKING FOR AND BEING SURPRISED AND

02:02PM 20   FRUSTRATED THAT WE WERE NOT ABLE TO SHOW THE DOCUMENTATION THAT

02:02PM 21   WAS BEING DISCUSSED.

02:02PM 22   Q.   AND DID YOU -- DID THERANOS GET FEEDBACK FROM THE

02:02PM 23   INSPECTORS DURING THE COURSE OF THAT NOVEMBER INSPECTION OR

02:02PM 24   SHORTLY AFTER?

02:02PM 25   A.   YES.

02:02PM  1    Q.   AND DID YOU COME TO LEARN WHAT THAT FEEDBACK WAS?

02:02PM  2    A.   I DID.

02:02PM  3    Q.   AND WHAT DID YOU LEARN THE FEEDBACK WAS?

02:02PM  4    A.   THAT THE INSPECTORS HAD CONCERNS, AND THEY HAD CONCERNS

02:02PM  5    ABOUT OUR DOCUMENTATION, OR LACK OF DOCUMENTATION; THEY HAD

02:02PM  6    CONCERNS ABOUT SOME OF THE PEOPLE IN OUR LABORATORY.

02:02PM  7    Q.   AND HOW DID WHAT YOU UNDERSTOOD ABOUT THEIR FEEDBACK

02:02PM  8    COMPARE TO WHAT MR. BALWANI HAD TOLD YOU IN SEPTEMBER AS TO HIS

02:03PM  9    EXPECTATIONS?

02:03PM  10   A.   IT WAS COMPLETELY DIFFERENT.

02:03PM  11   Q.   LET'S TALK FOR A LITTLE BIT ABOUT MR. BALWANI'S ROLE AT

02:03PM  12   THERANOS.

02:03PM  13        WHEN DID MR. BALWANI START WORKING AT THERANOS?

02:03PM  14   A.   IN 2009.

02:03PM  15   Q.   AND WHEN DID MR. BALWANI LEAVE THERANOS?

02:03PM  16   A.   IN 2016.

02:03PM  17   Q.   NOW, YOU RECALL DURING THE COURSE OF THE GOVERNMENT'S CASE

02:03PM  18   THAT THEY ASKED SOME WITNESSES, INCLUDING MR. EDLIN, IF YOU

02:03PM  19   WERE IN A ROMANTIC RELATIONSHIP WITH MR. BALWANI.

02:03PM  20        DO YOU RECALL THAT?

02:03PM  21   A.   I DO.

02:03PM  22   Q.   AND DO YOU RECALL THAT SEPARATE WITNESSES WERE ASKED

02:03PM  23   WHETHER MR. BALWANI DEFERRED TO YOU IN CERTAIN CONTEXTS?

02:03PM  24        DO YOU RECALL THAT?

02:03PM  25   A.   YES.

02:03PM  1    Q.   WAS IT YOUR EXPERIENCE THAT MR. BALWANI DEFERRED TO YOU IN

02:03PM  2    ALL CONTEXTS?

02:03PM  3    A.   NO.

02:03PM  4    Q.   WHEN DID YOU FIRST MEET MR. BALWANI?

02:04PM  5    A.   RIGHT AFTER I GRADUATED HIGH SCHOOL.

02:04PM  6    Q.   AND WHERE DID YOU MEET HIM?

02:04PM  7    A.   IN CHINA.

02:04PM  8    Q.   HOW OLD WERE YOU AT THE TIME?

02:04PM  9    A.   I WAS 18.

02:04PM  10   Q.   AND HOW OLD WAS HE?

02:04PM  11   A.   HE WAS 38.

02:04PM  12   Q.   WHAT DID YOU UNDERSTAND ABOUT MR. BALWANI'S BACKGROUND

02:04PM  13   WHEN YOU MET HIM?

02:04PM  14   A.   I UNDERSTOOD THAT HE HAD BEEN A REALLY SUCCESSFUL BUSINESS

02:04PM  15   PERSON, THAT HE HAD WORKED WITH BILL GATES IN THE EARLY DAYS OF

02:04PM  16   MICROSOFT, BUILT A SUCCESSFUL COMPANY WHICH HE SOLD TO BIG

02:04PM  17   COMPANIES.

02:04PM  18   Q.   AND DID YOU INTERACT WITH HIM SOME DURING THE COURSE OF

02:04PM  19   THAT SUMMER AFTER YOUR SENIOR YEAR IN HIGH SCHOOL?

02:04PM  20   A.   I DID.

02:04PM  21   Q.   TELL US WHAT THOSE INTERACTIONS WERE LIKE.

02:04PM  22   A.   I TALKED TO HIM ABOUT WANTING TO START A COMPANY, A

02:04PM  23   COMPANY THAT I TRIED TO BUILD IN HIGH SCHOOL, AND ASKED FOR HIS

02:04PM  24   ADVICE.

02:04PM  25   Q.   AND AFTER THAT SUMMER, DID YOU START YOUR FRESHMAN YEAR AT

02:04PM  1    STANFORD?

02:04PM  2    A.   I DID.

02:04PM  3    Q.   AND DURING THE COURSE OF THE -- YOUR FRESHMAN YEAR AT

02:05PM  4    STANFORD, DID YOU HAVE ANY OCCASION TO BE IN CONTACT WITH

02:05PM  5    MR. BALWANI?

02:05PM  6    A.   YES.

02:05PM  7    Q.   WAS -- WAS THAT BY EMAIL OR BY SOME OTHER MEANS?

02:05PM  8    A.   YES, HE WOULD EMAIL ME OVER THE COURSE OF THE YEAR.

02:05PM  9    Q.   OKAY.  NOW, WE SPOKE AT THE OUTSET OF YOUR TESTIMONY ABOUT

02:05PM  10   YOUR TIME AT STANFORD AND YOUR WORK WITH DR. ROBERTSON.

02:05PM  11        DO YOU RECALL THAT?

02:05PM  12   A.   I DO.

02:05PM  13   Q.   AND I ASKED YOU, WHEN YOU TESTIFIED THAT YOU LEFT STANFORD

02:05PM  14   DURING YOUR SOPHOMORE YEAR, WHETHER PURSUIT OF YOUR BUSINESS

02:05PM  15   WAS THE REASON THAT YOU LEFT STANFORD.

02:05PM  16        DO YOU RECALL?

02:05PM  17   A.   I DO.

02:05PM  18   Q.   AND DO YOU RECALL THAT YOU SAID THAT THAT WAS ONE OF THE

02:05PM  19   REASONS?

02:05PM  20   A.   YES.

02:05PM  21   Q.   AND WHAT WERE THE OTHER REASONS THAT YOU HAD DEPARTED

02:05PM  22   STANFORD?

02:05PM  23   A.   I WAS RAPED WHEN I WAS AT STANFORD, AND I DECIDED TO LEAVE

02:05PM  24   TO POUR MYSELF INTO BUILDING THERANOS.

02:06PM  25   Q.   AND CAN YOU TELL US WHAT EXPERIENCE -- WHAT EFFECT THAT

02:06PM 1   EXPERIENCE THAT YOU SUFFERED THERE HAD ON YOUR ATTITUDE TOWARDS

02:06PM 2   BEING A CONTINUED STUDENT AT STANFORD?

02:06PM 3   A.   YES.  I, I WASN'T GOING TO CLASS, AND I WAS QUESTIONING

02:06PM 4   WHAT -- HOW I WAS GOING TO BE ABLE TO PROCESS THAT EXPERIENCE

02:06PM 5   AND WHAT I WANTED TO DO WITH MY LIFE, AND I DECIDED THAT I WAS

02:06PM 6   GOING TO BUILD A LIFE BY BUILDING THIS COMPANY.

02:06PM 7   Q.   OKAY.  AROUND THE TIME THAT YOU WERE DEPARTING FROM

02:06PM 8   STANFORD, DID YOU COME INTO CLOSER CONTACT WITH MR. BALWANI?

02:06PM 9   A.   I DID.

02:06PM 10   Q.   AND DURING THAT PERIOD, DID YOU SPEAK WITH MR. BALWANI

02:07PM 11   ABOUT YOUR ASPIRATIONS TO BUILD A BUSINESS OUT OF THE PATENT

02:07PM 12   APPLICATION THAT YOU FILED?

02:07PM 13   A.   I DID.

02:07PM 14   Q.   AND DID HE OFFER ASSISTANCE TO YOU IN CONNECTION WITH

02:07PM 15   THAT?

02:07PM 16   A.   YES.

02:07PM 17   Q.   AND AT SOME POINT DURING THE COURSE OF THOSE CONVERSATIONS

02:07PM 18   WITH HIM, DID YOU FORM AN INTIMATE RELATIONSHIP WITH

02:07PM 19   MR. BALWANI?

02:07PM 20   A.   I DID.

02:07PM 21   Q.   AND DID YOU DISCUSS THE TRAUMA THAT YOU'D EXPERIENCED AT

02:07PM 22   STANFORD AS PART OF YOUR INTERACTIONS WITH MR. BALWANI?

02:07PM 23   A.   YES.

02:07PM 24   Q.   AND DO YOU RECALL WHAT MR. BALWANI SAID IN REACTION TO

02:07PM 25   THAT?

02:07PM  1     A.   YES.

02:07PM  2     Q.   AND WHAT DID HE SAY?

02:07PM  3     A.   HE SAID THAT I WAS SAFE NOW THAT I HAD MET HIM.

02:07PM  4     Q.   AT SOME POINT AFTER YOU AND MR. BALWANI BECAME INVOLVED

02:07PM  5     WITH EACH OTHER, DID YOU LIVE WITH MR. BALWANI?

02:07PM  6     A.   I DID.

02:07PM  7     Q.   AND WHEN WAS THAT?

02:07PM  8     A.   STARTING IN 2005 THROUGH 2016.

02:08PM  9     Q.   NOW, YOU TESTIFIED THAT MR. BALWANI BEGAN WORKING AT

02:08PM 10     THERANOS IN 2009.

02:08PM 11     A.   YES.

02:08PM 12     Q.   SO THAT WAS SOME PERIOD OF YEARS AFTER YOU AND HE HAD

02:08PM 13     BECOME INVOLVED?

02:08PM 14     A.   YES.

02:08PM 15     Q.   BUT DURING THE PERIOD PRIOR TO HIS WORK AT THERANOS, DID

02:08PM 16     YOU HAVE CONVERSATIONS ABOUT THE DEVELOPMENT OF THE BUSINESS AT

02:08PM 17     THERANOS?

02:08PM 18     A.   YES.

02:08PM 19     Q.   AND DID HE GIVE YOU HIS REFLECTIONS ON WHETHER HE THOUGHT

02:08PM 20     YOU HAD THE TALENTS TO SUCCEED AS THE EXECUTIVE IN A COMPANY

02:08PM 21     LIKE THERANOS THAT YOU WERE TRYING TO BUILD AND DEVELOP?

02:08PM 22     A.   HE DID.

02:08PM 23     Q.   WHAT DID HE TELL YOU?

02:08PM 24     A.   HE TOLD ME THAT I DIDN'T KNOW WHAT I WAS DOING IN

02:08PM 25     BUSINESS, THAT MY CONVICTIONS WERE WRONG, THAT HE WAS

02:09PM 1    ASTONISHED AT MY MEDIOCRITY, AND THAT IF I FOLLOWED MY

02:09PM 2    INSTINCTS I WAS GOING TO FAIL, AND THAT I NEEDED TO KILL THE

02:09PM 3    PERSON THAT I WAS TO BECOME WHAT HE WOULD CALL A NEW ELIZABETH

02:09PM 4    WHO COULD BE A SUCCESSFUL ENTREPRENEUR.

02:09PM 5    Q.   AND DID HE OFFER THOSE REFLECTIONS TO YOU ORALLY?

02:09PM 6    A.   YES.

02:09PM 7    Q.   AND SOMETIMES IN WRITING?

02:09PM 8    A.   YES.

02:09PM 9    Q.   AND AMONG WHAT HE SAID TO YOU, DID HE TELL YOU HOW YOU

02:09PM 10   SHOULD SPEND YOUR TIME TO BECOME A SUCCESSFUL EXECUTIVE?

02:09PM 11   A.   HE DID.  HE WAS VERY DESCRIPTIVE.

02:09PM 12   Q.   AND WHAT DID HE SAY HOW YOU SHOULD SPEND YOUR TIME?

02:09PM 13   A.   HE SAID IF I WANTED TO BE A GOOD ENTREPRENEUR, I NEEDED TO

02:09PM 14   SPEND ALL OF MY TIME ON THE BUSINESS, AND THAT I SHOULD ONLY BE

02:09PM 15   SPENDING TIME WITH PEOPLE WHO COULD HELP THE BUSINESS TO BE

02:09PM 16   SUCCESSFUL; THAT I NEEDED TO BE WORKING SEVEN DAYS A WEEK, I

02:10PM 17   NEEDED TO BE IN THE OFFICE SEVEN DAYS A WEEK; AND I NEEDED TO

02:10PM 18   BE ONLY DOING THINGS THAT COULD CONTRIBUTE TO MAKING THE

02:10PM 19   COMPANY SUCCESSFUL, WHICH MEANT NOT SLEEPING VERY MUCH, EATING

02:10PM 20   ONLY FOODS THAT WOULD MAKE ME PURE OR ABLE TO HAVE THE MOST

02:10PM 21   ENERGY POSSIBLE FOR THE COMPANY; HAVING A VERY DISCIPLINED AND

02:10PM 22   INTENSE LIFESTYLE.

02:10PM 23   Q.   AND ON SOME OCCASIONS DID HE PROVIDE YOU WITH WRITTEN

02:10PM 24   MATERIALS SO THAT YOU WOULD BE ABLE TO UNDERSTAND WHAT HE WAS

02:10PM 25   TELLING YOU WOULD MAKE YOU SUCCESSFUL?

7852

```
02:10PM   1       A.   HE DID.

02:10PM   2       Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 7734.  THAT SHOULD BE IN

02:10PM   3       THE SMALLER THINNER NOTEBOOK.

02:11PM   4       A.   OKAY.

02:11PM   5       Q.   DO YOU RECOGNIZE THE -- DO YOU SEE THAT IT'S A HANDWRITTEN

02:11PM   6       DOCUMENT?

02:11PM   7       A.   I DO.

02:11PM   8       Q.   DO YOU RECOGNIZE THE HANDWRITING THAT IS REFLECTED IN

02:11PM   9       EXHIBIT 7734?

02:11PM  10       A.   YES.

02:11PM  11       Q.   WHOSE HANDWRITING IS IT?

02:11PM  12       A.   IT'S SUNNY'S.

02:11PM  13       Q.   IS THIS A SET OF NOTES THAT MR. BALWANI GAVE YOU AT SOME

02:11PM  14       POINT IN THE PERIOD BETWEEN 2005 AND 2009?

02:11PM  15       A.   YES.

02:11PM  16            MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

02:11PM  17       7734.

02:11PM  18            MR. LEACH:  NO OBJECTION, YOUR HONOR.

02:11PM  19            THE COURT:  IT'S ADMITTED.

02:11PM  20         (DEFENDANT'S EXHIBIT 7734 WAS RECEIVED IN EVIDENCE.)

02:11PM  21       BY MR. DOWNEY:

02:11PM  22       Q.   I WANT TO DIRECT YOUR ATTENTION FIRST TO THE TOP OF

02:11PM  23       PAGE 1.

02:11PM  24         DO YOU SEE THAT THE -- IN THESE NOTES IT'S LABELLED

02:12PM  25       "NON-NEGOTIABLES (PEOPLE)".
```

02:12PM   1          DO YOU SEE THAT?

02:12PM   2   A.   I DO.

02:12PM   3   Q.   AND HE BEGINS BY SAYING, EVERY MORNING.  I WILL FORCE

02:12PM   4   MYSELF OUT OF BED AND SPEND 30 MINUTES TO WRITE WHAT I WANT

02:12PM   5   FROM MY DAY.

02:12PM   6          DO YOU SEE THAT?

02:12PM   7   A.   YES.

02:12PM   8   Q.   AND THEN IN THE BOTTOM RIGHT THERE'S A LITTLE BIT OF A

02:12PM   9   QUADRANT.

02:12PM  10          DO YOU SEE THAT?

02:12PM  11   A.   YES.

02:12PM  12   Q.   AND CAN YOU EXPLAIN WHAT THAT -- WHAT YOU UNDERSTOOD THAT

02:12PM  13   MEANT?

02:12PM  14   A.   THIS WAS SUNNY DESCRIBING WHERE A GOOD LEADER SHOULD SPEND

02:12PM  15   THEIR TIME, AND HE'S SAYING THAT THE BEST LEADERS ALWAYS SPEND

02:12PM  16   THEIR TIME IN WHAT HE LABELLED QUADRANT 2, WHICH IS ON

02:12PM  17   IMPORTANT BUT NOT URGENT THINGS, MEANING FOCUSSING ON THE

02:12PM  18   VISION AND THE BIG PICTURE.

02:13PM  19   Q.   AND IF YOU GO TO THE NEXT PARAGRAPH, IT BEGINS, "I WILL

02:13PM  20   NEVER MEET WITH ANYONE FOR MORE THAN 5 MINUTES UNLESS I HAVE

02:13PM  21   WRITTEN DOWN WHY."

02:13PM  22          DO YOU SEE THAT?

02:13PM  23   A.   YES.

02:13PM  24   Q.   AND THEN IN THE LAST SENTENCE HE SAYS, "MY FOCUS IS ON HOW

02:13PM  25   THEY WILL SERVE THE COMPANY MORE."

02:13PM 1          DO YOU SEE THAT?

02:13PM 2     A.   YES.

02:13PM 3     Q.   AND WHAT DID YOU UNDERSTAND MR. BALWANI TO BE

02:13PM 4     COMMUNICATING HERE?

02:13PM 5     A.   HE WAS REACTING TO WHAT I WAS DESCRIBING ABOUT MEETINGS I

02:13PM 6     WAS HAVING WITH PEOPLE IN THE COMPANY, AND HE WAS SAYING THAT I

02:13PM 7     WAS SPENDING TOO MUCH TIME ON IT, AND THAT I WASN'T FOCUSSED

02:13PM 8     ENOUGH, AND THAT I SHOULD NOT BE ENGAGING WITH PEOPLE IN DETAIL

02:13PM 9     LIKE THAT, BUT RATHER DOING VERY RAPID MEETINGS AND ONLY

02:13PM 10    FOCUSSING ON SPECIFIC ACTION ITEMS OR GOALS IN THOSE

02:13PM 11    INTERACTIONS.

02:13PM 12    Q.   OKAY.  IF YOU GO TO THE THIRD PARAGRAPH, HE BEGINS BY

02:13PM 13    SAYING, "I WILL ALWAYS GIVE CRISP, CLEAN GOALS AND FEEDBACK TO

02:14PM 14    MY SUBORDINATES."

02:14PM 15    A.   YES.

02:14PM 16    Q.   AND WHAT DID YOU UNDERSTAND HIM TO BE COMMUNICATING HERE?

02:14PM 17    A.   AGAIN, THAT I NEEDED TO BE MORE FOCUSSED IN MY

02:14PM 18    COMMUNICATION; THAT I NEEDED TO BE CRISP AND CLEAR ABOUT WHAT

02:14PM 19    PEOPLE'S GOALS WERE; AND BE VERY POINTED IN FEEDBACK TO PEOPLE.

02:14PM 20    Q.   NOW, YOU TESTIFIED A FEW MINUTES AGO THAT MR. BALWANI

02:14PM 21    THOUGHT THAT YOU HAD SOME CHARACTERISTICS THAT MIGHT PRESENT A

02:14PM 22    PROBLEM FOR YOU IN SUCCEEDING AS AN EXECUTIVE.

02:14PM 23         DID HE GIVE YOU ADVICE AS TO HOW TO OVERCOME, OR DID HE

02:14PM 24    TELL YOU HOW TO OVERCOME THOSE CHARACTERISTICS AND BE

02:14PM 25    SUCCESSFUL?

7855

| | | |
|---|---|---|
| 02:14PM | 1 | A.   HE DID.  HE TOLD ME THAT HE COULD TEACH ME HOW TO OVERCOME |
| 02:14PM | 2 | MY LIMITATIONS. |
| 02:14PM | 3 | Q.   LET'S LOOK AT PAGE 2 OF THE DOCUMENT. |
| 02:15PM | 4 | DO YOU SEE THAT THIS PAGE IS LABELLED "PURSUIT OF SUCCESS |
| 02:15PM | 5 | IN BUSINESS"? |
| 02:15PM | 6 | A.   YES. |
| 02:15PM | 7 | Q.   AND IF YOU GO DOWN TO THE MIDDLE OF THE -- ALMOST HALFWAY |
| 02:15PM | 8 | DOWN, DO YOU SEE THAT THERE'S A SENTENCE THAT BEGINS, "EVEN |
| 02:15PM | 9 | PEOPLE"? |
| 02:15PM | 10 | A.   I DO. |
| 02:15PM | 11 | Q.   DO YOU SEE, "EVEN PEOPLE WHO SUCCEED DON'T REFLECT ON |
| 02:15PM | 12 | THEIR SUCCESS IN BUSINESS AND FINANCE AND ATTRIBUTE THIS TO |
| 02:15PM | 13 | THEIR GUT OR HUNCH." |
| 02:15PM | 14 | DO YOU SEE THAT? |
| 02:15PM | 15 | A.   YES. |
| 02:15PM | 16 | Q.   AND THEN A LITTLE DOWN FROM THERE, HE ASKS A QUESTION |
| 02:15PM | 17 | ALMOST AT THE BOTTOM OF THE PAGE.  DO YOU SEE AT THE BOTTOM OF |
| 02:16PM | 18 | PAGE 2 OF THE EXHIBIT, DIRECTING YOUR ATTENTION TO WHERE IT |
| 02:16PM | 19 | BEGINS, "SO, WHAT ABOUT PEOPLE WHO DON'T HAVE THE NATURAL |
| 02:16PM | 20 | INSTINCT FOR BUSINESS"? |
| 02:16PM | 21 | DO YOU SEE THAT? |
| 02:16PM | 22 | A.   I DO. |
| 02:16PM | 23 | Q.   AND WHAT WAS THIS PARAGRAPH ADDRESSING? |
| 02:16PM | 24 | A.   HE WAS TALKING ABOUT ME AND THE IDEA THAT EVEN IF I DIDN'T |
| 02:16PM | 25 | HAVE A NATURAL INSTINCT FOR BUSINESS, THAT I COULD BE TAUGHT TO |

02:16PM  1    OVERCOME THAT THROUGH A FORMULA FOR SUCCESS IN BUSINESS THAT HE

02:16PM  2    TOLD ME ABOUT AND SAID THAT HE WOULD TEACH ME.

02:16PM  3    Q.    OKAY.  LET'S GO TO THE NEXT PAGE.

02:16PM  4         AND THEN DO YOU SEE THE NEXT PAGE BEGINS, "THE SINGLE MOST

02:16PM  5    IMPORTANT INGREDIENT TO THIS SECRET SAUCE IS DISCIPLINE."

02:16PM  6         DO YOU SEE THAT?

02:16PM  7    A.    YES.

02:16PM  8    Q.    AND THEN HE GOES ON TO TALK ABOUT SELF DISCOVERY.

02:17PM  9         DO YOU SEE THAT?

02:17PM  10   A.    YES.

02:17PM  11   Q.    AND WHAT DID YOU UNDERSTAND HIM TO BE COMMUNICATING IN

02:17PM  12   THIS PAGE OF THE NOTES?

02:17PM  13   A.    HE'S TALKING ABOUT LIVING A DISCIPLINED LIFE, SOME OF THE

02:17PM  14   TENETS THAT I WAS TALKING ABOUT AROUND THE WAY YOU BEHAVE, THE

02:17PM  15   WAY YOU SLEEP, THE WAY YOU WORK, AND THIS IDEA THAT WRITING AND

02:17PM  16   WRITING OUT THESE TENETS ON A REGULAR BASIS WAS A KEY TO

02:17PM  17   SUCCESS.

02:17PM  18   Q.    AND DID MR. BALWANI PRESCRIBE FOR YOU A PARTICULAR

02:17PM  19   SCHEDULE THAT YOU SHOULD KEEP TO IN ORDER TO SUCCEED IN

02:17PM  20   BUSINESS?

02:17PM  21   A.    HE DID.

02:17PM  22   Q.    AND LET ME ASK YOU TO LOOK AT EXHIBIT 7731.

02:18PM  23        ARE THESE NOTES MADE IN YOUR HANDWRITING?

02:18PM  24   A.    YES.

02:18PM  25   Q.    AND ARE THEY MADE AT SOME POINT BETWEEN 2005 AND 2009?

7857

02:18PM  1    A.   YES.

02:18PM  2              MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

02:18PM  3    7731.

02:18PM  4              MR. LEACH:  NO OBJECTION, YOUR HONOR.

02:18PM  5              THE COURT:  IT'S ADMITTED.

02:18PM  6         (DEFENDANT'S EXHIBIT 7731 WAS RECEIVED IN EVIDENCE.)

02:18PM  7              MR. DOWNEY:  IF YOU COULD JUST BLOW THAT UP ON THE

02:18PM  8    SCREEN.

02:18PM  9    Q.   I'M JUST SHOWING YOU THE TOP HALF OF THIS DOCUMENT WITH

02:18PM  10   TIMES.

02:18PM  11        WHAT IS THIS DOCUMENT?

02:18PM  12   A.   THIS IS MY SCHEDULE FOR HOW I WOULD WORK EVERY DAY AND GET

02:18PM  13   READY TO GO INTO THE OFFICE WITH SOME OF THE KEY TENETS ABOUT

02:18PM  14   HOW I WOULD BE OR WHAT I WOULD FOCUS ON.

02:19PM  15   Q.   AND IF YOU GO TO THE, TO THE VERY BOTTOM OF THE FIRST HALF

02:19PM  16   OF THIS, DO YOU SEE THAT -- YOU CAN BLOW THAT UP AGAIN,

02:19PM  17   MR. BENNETT.

02:19PM  18        DO YOU SEE THAT THERE'S A REFERENCE TO LUNCH AND DINNER?

02:19PM  19   A.   YES.

02:19PM  20   Q.   AND WHY IS THAT THERE?

02:19PM  21   A.   THIS WAS PART OF FOCUSSING ONLY ON FOODS THAT COULD GIVE

02:19PM  22   ME THE MOST ENERGY TO BE THE BEST ENTREPRENEUR AND THE MOST

02:19PM  23   SUCCESSFUL THAT I COULD BE WORKING ALL OF THE TIME.

02:19PM  24   Q.   AND THEN IF YOU GO TO THE SECOND HALF OF THE PAGE.

02:19PM  25        CAN YOU EXPLAIN WHAT THIS IS?

02:19PM 1    A.   THIS IS ME WRITING OUT THOSE TENETS THAT I WOULD PROVIDE

02:19PM 2    CRISP AND CONCISE FEEDBACK, THAT I WOULD BE SUPER DISCIPLINED

02:20PM 3    ABOUT BEING ON TIME AT MEETINGS, AND BEING IN THE OFFICE, THAT

02:20PM 4    I WOULD BE FOCUSSED ONLY ON BUSINESS AND NOT GET DISTRACTED BY

02:20PM 5    OTHER AREAS, THAT I WOULD WRITE OUT IN THE MORNINGS TO KEEP ME

02:20PM 6    FOCUSSED ON THESE THINGS.

02:20PM 7    Q.   OKAY.  IF YOU SEE THE VERY TOP OF THE PORTION THAT IS

02:20PM 8    HIGHLIGHTED -- I DON'T THINK WE CAN SEE THAT ON THE SCREEN,

02:20PM 9    MR. BENNETT.

02:20PM 10       IF WE CAN JUST HIGHLIGHT THAT PORTION JUST BELOW THERE,

02:20PM 11   JUST A LINE BELOW THERE.

02:20PM 12       DO YOU SEE AFTER THE DIET THERE'S A "I DO EVERYTHING I SAY

02:20PM 13   WORD FOR WORD"?

02:20PM 14   A.   YES.

02:20PM 15   Q.   AND DO YOU SEE THAT THE NEXT ENTRY, OR TWO ENTRIES DOWN,

02:20PM 16   SAYS "I SHOW NO EXCITEMENT"?

02:20PM 17   A.   YES.

02:20PM 18   Q.   "CALM, DIRECT, POINTED, NONEMOTIONAL."

02:20PM 19       IS THAT SOMETHING THAT MR. BALWANI TOLD YOU WOULD BE

02:21PM 20   HELPFUL TO YOU IN YOUR WORK?

02:21PM 21   A.   YES.

02:21PM 22   Q.   AND HAD HE MENTIONED TO YOU THAT HE OBSERVED YOU SHOWING

02:21PM 23   EXCITEMENT ON SOME CIRCUMSTANCES?

02:21PM 24   A.   HE DID.  HE FELT LIKE I CAME ACROSS AS A LITTLE GIRL AND

02:21PM 25   THAT I NEEDED TO BE MORE SERIOUS AND POINTED AND NOT BE GIDDY

02:21PM  1    IN MY INTERACTIONS.

02:21PM  2    Q.   NOW, ARE THE TENETS THAT ARE SET FORTH IN EXHIBIT 7731 AND

02:21PM  3    THE PRIOR SET OF NOTES, 7734, ARE THEY TENETS THAT YOU OBSERVED

02:21PM  4    MR. BALWANI AS LIVING BY?

02:21PM  5    A.   NO.

02:21PM  6    Q.   DID YOU BELIEVE THAT IF YOU LIVED BY THESE TENETS, THEY

02:21PM  7    WOULD HELP YOU BE SUCCESSFUL AS AN EXECUTIVE?

02:21PM  8    A.   I DID.

02:21PM  9    Q.   DID YOU IMPLEMENT WHAT MR. BALWANI TOLD YOU WOULD LEAD TO

02:21PM  10   SUCCESS IN YOUR EFFORTS TO MAKE THERANOS A SUCCESSFUL COMPANY?

02:21PM  11   A.   I TRIED TO.

02:22PM  12   Q.   WERE THERE SITUATIONS WHERE YOU WERE UNSUCCESSFUL IN

02:22PM  13   COMPLYING WITH THE SCHEDULE AND THE OTHER TENETS THAT ARE SET

02:22PM  14   FORTH IN THESE TWO DOCUMENTS?

02:22PM  15   A.   YES.

02:22PM  16   Q.   AND HOW WOULD MR. BALWANI RESPOND TO THAT?

02:22PM  17   A.   HE WOULD GET VERY ANGRY WITH ME AND WOULD YELL AT ME ABOUT

02:22PM  18   THE FACT THAT HE WAS SO DISAPPOINTED IN MY MEDIOCRITY AND THE

02:22PM  19   FACT THAT HE WAS TRYING AND TRYING TO TEACH ME HOW TO BE BETTER

02:22PM  20   AND I WASN'T LISTENING TO HIM AND THAT I WAS NEVER GOING TO BE

02:22PM  21   SUCCESSFUL.

02:22PM  22   Q.   AND IF -- WERE THERE TIMES AFTER THOSE YELLING INCIDENTS

02:23PM  23   WHERE HE WOULD TAKE FURTHER STEPS TO TRY TO HELP YOU COMPLY

02:23PM  24   WITH WHAT HE HAD TOLD YOU TO DO?

02:23PM  25   A.   YES.  HE WOULD GET VERY ANGRY WITH ME, AND THEN HE WOULD

02:23PM 1    SOMETIMES COME UPSTAIRS TO OUR BEDROOM AND HE WOULD FORCE ME TO

02:23PM 2    HAVE SEX WITH HIM WHEN I DIDN'T WANT TO BECAUSE HE WOULD SAY

02:23PM 3    THAT HE WANTED ME TO KNOW THAT HE STILL LOVED ME.

02:23PM 4    Q.   AND, MS. HOLMES, WAS THAT BEHAVIOR BEHAVIOR THAT PERSISTED

02:23PM 5    THROUGHOUT THE COURSE OF YOUR RELATIONSHIP?

02:23PM 6    A.   YES.

02:23PM 7    Q.   SO WAS THAT BETWEEN 2005 AND 2016?

02:23PM 8    A.   YES.

02:23PM 9    Q.   AT THE OUTSET OF YOUR TESTIMONY A WEEK AGO FRIDAY, I HAD

02:24PM 10   ASKED YOU ABOUT YOUR FAMILY GROWING UP.

02:24PM 11        DO YOU RECALL THAT?

02:24PM 12   A.   I DO.

02:24PM 13   Q.   AND YOU SAID THAT YOU HAD A CLOSE FAMILY?

02:24PM 14   A.   I DO.

02:24PM 15   Q.   HOW DID YOUR RELATIONSHIP WITH YOUR FAMILY DEVELOP AFTER

02:24PM 16   YOU BECAME INVOLVED WITH MR. BALWANI?

02:24PM 17   A.   I SAW THEM LESS THAN I HAD EVER SEEN THEM BEFORE, AND I

02:24PM 18   SPOKE TO THEM LESS THAN I HAD EVER TALKED TO THEM BEFORE.

02:24PM 19   Q.   AND WHY WAS THAT?

02:24PM 20   A.   BECAUSE I WAS TRYING TO FOCUS ALL OF MY TIME ON THE

02:24PM 21   COMPANY AND ONLY DOING THINGS THAT WERE DIRECTLY RELEVANT TO

02:24PM 22   THE STRATEGY OF THE COMPANY, AND SUNNY WOULD GET VERY UPSET IF

02:24PM 23   I WAS WITH MY FAMILY BECAUSE HE SAID IT WAS A DISTRACTION TO

02:24PM 24   THE BUSINESS.

02:24PM 25   Q.   AND WOULD HE SOMETIMES COMPLAIN THAT YOU WERE NEGLECTING

02:24PM 1    FOCUS ON HIM AND WHAT HE WAS ADVISING YOU IN RESPONSE TO YOUR

02:24PM 2    SPENDING TIME WITH YOUR FAMILY?

02:24PM 3    A.   YES.

02:24PM 4    Q.   LET ME ASK YOU TO LOOK AT A SERIES OF TEXT EXCHANGES.

02:25PM 5         I SHOULD ASK YOU, DID THAT PATTERN WITH RESPECT TO YOUR

02:25PM 6    SPENDING TIME WITH YOUR FAMILY, DID THAT CONTINUE THROUGHOUT

02:25PM 7    THE COURSE OF THE RELATIONSHIP?

02:25PM 8    A.   IT DID.

02:25PM 9    Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 5387F.

02:25PM 10        YOUR HONOR, THIS IS JUST ANOTHER PORTION OF 5387.

02:25PM 11   A.   SORRY.  IT'S IN THE THIRD BINDER?

02:25PM 12   Q.   IT SHOULD BE IN THE FOURTH BINDER, MS. HOLMES.

02:25PM 13   A.   OKAY.

02:25PM 14   Q.   IT SHOULD BE ABOUT THE FOURTH DOCUMENT.

02:25PM 15   A.   OKAY.  I SEE IT.

02:25PM 16   Q.   IS THIS A SERIES OF TEXT EXCHANGES BETWEEN YOU AND

02:26PM 17   MR. BALWANI IN NOVEMBER OF 2013?

02:26PM 18   A.   IT IS.

02:26PM 19          MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT 5387 F.

02:26PM 20          MR. LEACH:  NO OBJECTION, YOUR HONOR.

02:26PM 21          THE COURT:  IT'S ADMITTED.

02:26PM 22      (GOVERNMENT'S EXHIBIT 5387F WAS RECEIVED IN EVIDENCE.)

02:26PM 23   BY MR. DOWNEY:

02:26PM 24   Q.   ALL RIGHT.  AND DO YOU SEE THAT AT THE TOP HERE, THE

02:26PM 25   CONVERSATION BEGINS ABOUT YOUR FAMILY AND YOUR FAMILY WAS

02:26PM  1    BEING, QUOTE-UNQUOTE, HERE?

02:26PM  2         DO YOU SEE THAT?

02:26PM  3    A.   YES.

02:26PM  4    Q.   AND THEN IF WE GO TO THE NEXT PAGE, THERE'S A SERIES OF

02:26PM  5    ADDITIONAL TEXTS FROM MR. BALWANI ON THAT SUBJECT.

02:26PM  6         DO YOU SEE THAT THE DATE OF THIS IS NOVEMBER 30TH, 2013?

02:26PM  7    A.   YES.

02:26PM  8    Q.   AND DO YOU SEE THAT THAT WAS JUST -- DO YOU RECALL THAT

02:27PM  9    THAT WAS JUST A VERY SHORT TIME AFTER THE LAUNCH OF SERVICES TO

02:27PM  10   THE PUBLIC IN THERANOS SERVICE CENTERS IN WALGREENS STORES?

02:27PM  11   A.   IT WAS.

02:27PM  12   Q.   AND CAN YOU EXPLAIN WHAT IS HAPPENING DURING THE COURSE OF

02:27PM  13   THESE TEXT EXCHANGES WITH MR. BALWANI IN 2013?

02:27PM  14   A.   HE'S ANGRY WITH ME BECAUSE HE FEELS LIKE WHEN MY FAMILY

02:27PM  15   CAME FOR THANKSGIVING THAT I WAS NOT PAYING ATTENTION TO HIM

02:27PM  16   AND THAT I WAS DISTANT FROM HIM AND THAT HE DOESN'T WANT TO

02:27PM  17   ENGAGE WITH ME ANYMORE BECAUSE HE FEELS LIKE I HAVEN'T CHANGED

02:27PM  18   AND NOW HE'S EXHAUSTED AND HE'S NOT OKAY WITH IT.

02:27PM  19   Q.   AND DO YOU RECALL AFTER THIS EXCHANGE IN 2013 ANYTHING

02:27PM  20   THAT HAPPENED WITH RESPECT TO MR. BALWANI?

02:27PM  21   A.   I DO.

02:27PM  22   Q.   AND WHAT IS THAT?

02:27PM  23   A.   THIS IS ONE OF THE NIGHTS WHERE HE CAME UPSTAIRS AND DID

02:28PM  24   THINGS TO ME THAT I DIDN'T WANT AND HE HURT ME.

02:28PM  25   Q.   NOW, WE'VE HEARD TESTIMONY FROM SEVERAL WITNESSES WHO HAVE

02:28PM  1    TESTIFIED TO OBSERVING THE TWO OF YOU WHILE YOU WERE IN THE

02:28PM  2    OFFICE TOGETHER.

02:28PM  3         DO YOU RECALL HEARING SOME OF THAT TESTIMONY?

02:28PM  4    A.   I DO.

02:28PM  5    Q.   AND YOU'VE TESTIFIED TODAY THAT MR. BALWANI WOULD

02:28PM  6    FREQUENTLY CRITICIZE YOU AND MAKE COMMENTS ON VARIOUS FAILINGS

02:28PM  7    IN YOUR WORK AS AN EXECUTIVE?

02:28PM  8    A.   HE DID.

02:28PM  9    Q.   WHERE WOULD THOSE EXCHANGES TYPICALLY TAKE PLACE?

02:29PM  10   A.   AT HOME AFTER WE WOULD COME HOME FROM WORK.

02:29PM  11   Q.   AND YOU TESTIFIED THAT YOU WOULD -- MR. BALWANI HAD SAID

02:29PM  12   TO YOU THAT ONE OF THE PROCESSES YOU SHOULD ENGAGE IN IS TO

02:29PM  13   KILL THE OLD ELIZABETH.

02:29PM  14        DID I UNDERSTAND THAT CORRECTLY?

02:29PM  15   A.   YES.

02:29PM  16   Q.   AND WHAT DID YOU UNDERSTAND THAT TO MEAN?

02:29PM  17   A.   THAT MEANT THAT WHO I WAS WAS NEVER GOING TO BE A PERSON

02:29PM  18   THAT COULD SUCCEED IN LIFE OR IN BUSINESS, AND I NEEDED TO KILL

02:29PM  19   THAT PERSON AND BECOME A NEW ELIZABETH WHO WOULD EMBODY THESE

02:29PM  20   TENETS AND HAVE A CHANCE AT ACHIEVING MY VISION.

02:29PM  21   Q.   DID MR. BALWANI MAKE COMMENTS ALONG THOSE LINES EVEN WHEN

02:29PM  22   YOU WERE SERVING AS THE CEO OF THERANOS?

02:29PM  23   A.   HE DID.

02:29PM  24   Q.   LET ME ASK YOU TO LOOK AT, WITHIN 5387, AT THE PAGE

02:30PM  25   NUMBERED 63 ON THE BATES LABELS --

02:30PM   1     A.   YES.

02:30PM   2     Q.   -- ON THE RIGHT-HAND COLUMN.  WE'LL DRAW IT UP.

02:30PM   3          DO YOU SEE THE TEXT FROM YOU THERE THAT SAYS, "MY NEW LIFE

02:30PM   4     AS OF THIS NIGHT AND FOREVER MORE"?

02:30PM   5     A.   YES.

02:30PM   6     Q.   AND THEN YOU LIST A VARIETY OF CHARACTERISTICS THAT YOU'LL

02:30PM   7     TRY TO EMBODY AFTER THAT?

02:30PM   8     A.   YES.

02:30PM   9     Q.   AND IS THAT SOMETHING THAT YOU SENT TO MR. BALWANI IN

02:30PM   10    REACTION TO CONVERSATIONS THAT YOU AND HE WERE HAVING?

02:30PM   11    A.   YES.

02:30PM   12    Q.   AND DO YOU SEE UNDERNEATH THAT YOU WRITE, ABOUT TEN

02:30PM   13    MINUTES AFTER YOU SENT THE TEXT, "NO RESPONSE?"

02:30PM   14    A.   YES.

02:30PM   15    Q.   AND THEN MR. BALWANI RESPONDS AT 2:46, "AWESOME.  U R

02:31PM   16    LISTENING AND PAYING ATTENTION."

02:31PM   17         DO YOU SEE THAT?

02:31PM   18    A.   I DO.

02:31PM   19    Q.   AND WERE EXCHANGES OF THIS KIND, ORALLY OR AT HOME, COMMON

02:31PM   20    WHEN MR. BALWANI WAS DISAPPOINTED WITH SOMETHING RELATED TO

02:31PM   21    WHAT WAS GOING ON AT WORK?

02:31PM   22    A.   YES.

02:31PM   23    Q.   NOW, WE ALSO HEARD TESTIMONY THAT PEOPLE DID NOT SEE YOU

02:31PM   24    DISAGREE DURING THE COURSE OF MEETINGS WHILE YOU WERE AT WORK.

02:31PM   25         DO YOU RECALL SOME INSTANCES WHERE YOU DISAGREED AT

02:31PM  1    MEETINGS AND WORK AND MR. BALWANI REACTED?

02:31PM  2    A.   I DO.

02:31PM  3    Q.   LET ME ASK YOU TO LOOK AT THE PAGES THAT ARE BATES

02:31PM  4    LABELLED 63 AND 64.

02:31PM  5    A.   OKAY.

02:32PM  6    Q.   AND IS THIS A TEXT FROM YOU TO MR. BALWANI ON NOVEMBER

02:32PM  7    THE 8TH, 2014?

02:32PM  8    A.   YES.

02:32PM  9    Q.   AND THEN IF YOU LOOK AT THE ENTIRE BODY OF TEXTS

02:32PM  10   THEREAFTER, IF YOU GO DOWN, AND JUST CONCLUDING WITH THE TEXT

02:32PM  11   THAT SAYS, "ARE YOU LEAVING BECAUSE OF US FIGHTING?"

02:32PM  12        CAN YOU EXPLAIN TO US WHAT IS GOING ON IN THIS EXCHANGE?

02:32PM  13   A.   SUNNY IS MAD AT ME BECAUSE HE FELT LIKE I INTERRUPTED HIM

02:32PM  14   IN FRONT OF OTHER PEOPLE IN A MEETING, AND I WAS SAYING TO HIM

02:32PM  15   THAT HE WAS MAKING FACES AT ME THAT WERE REALLY VISIBLE TO

02:32PM  16   PEOPLE, WHICH WAS CREATING A VERY STRANGE DYNAMIC IN THE

02:32PM  17   MEETING AND THAT THE ONLY TIME -- THE ONLY REASON I DID THAT

02:32PM  18   WAS BECAUSE I WAS TRYING TO SMOOTH OVER THE SITUATION WITH THE

02:32PM  19   FACES THAT HE WAS MAKING AT ME, AND HE'S WALKING OUT OF THE

02:32PM  20   OFFICE.

02:32PM  21   Q.   AND WOULD MR. BALWANI ALSO ON OCCASION CRITICIZE YOU FOR

02:33PM  22   YOUR PERFORMANCE IN MEETINGS WHILE THE MEETING WAS ONGOING?

02:33PM  23   A.   YES.

02:33PM  24   Q.   WOULD HE SOMETIMES DO THAT BY TEXT?

02:33PM  25   A.   YES.

7866

```
02:33PM   1      Q.   LET'S LOOK AT BATES LABEL 148 IN THE SAME EXHIBIT.

02:33PM   2           DO YOU SEE THAT HE SAYS "YOU ARE SPEAKING WITH EVERYONE IN

02:33PM   3      YOUR GIDDY VOICE - EXCESSIVE USE OF 'AWESOME'"?

02:33PM   4      A.   YES.

02:33PM   5      Q.   AND YOU RESPOND "THANK YOU THANK YOU"?

02:33PM   6      A.   YES.

02:33PM   7      Q.   AND THEN "FOREVER."

02:33PM   8           DO YOU SEE THAT?

02:33PM   9      A.   YES.

02:33PM   10     Q.   AND LET'S LOOK NEXT AT 246.

02:34PM   11          AND DO YOU SEE THIS IS A TEXT FROM HIM TO YOU IN JUNE OF

02:34PM   12     2015?

02:34PM   13     A.   I DO.

02:34PM   14     Q.   AND DO YOU SEE HE SAYS, "U R RAMBLING NOW.  LET'S STAY

02:34PM   15     FOCUSSED"?

02:34PM   16     A.   YES.

02:34PM   17     Q.   NOW, AT THE TIME IN 2014, 2015, THERANOS WAS CERTAINLY

02:34PM   18     ENJOYING A LOT OF SUCCESS AS A COMPANY.

02:34PM   19          IS THAT FAIR TO SAY?

02:34PM   20     A.   WE WERE.

02:34PM   21     Q.   AND THERE WERE POSITIVE FEEDBACK ABOUT THE COMPANY COMING

02:34PM   22     FROM A NUMBER OF SOURCES?

02:34PM   23     A.   YES.

02:34PM   24     Q.   WAS MR. BALWANI'S REACTION TO THAT THAT YOU WERE

02:34PM   25     RESPONSIBLE FOR THERANOS'S SUCCESS OR SOMETHING ELSE?
```

02:34PM 1    A.   IT WAS THAT HE WAS, THAT HE HAD BUILT ME INTO WHO I WAS.

02:35PM 2    Q.   LET ME ASK YOU TO LOOK AT THE BATES LABEL 207?

02:35PM 3    A.   OKAY.

02:35PM 4    Q.   DO YOU RECALL BEING INVITED TO HARVARD UNIVERSITY TO GIVE

02:35PM 5    A TALK ABOUT WOMEN IN ENGINEERING?

02:35PM 6    A.   I DO.

02:35PM 7    Q.   AND ARE THESE TEXTS THAT YOU SENT AROUND THE TIME OF THAT

02:35PM 8    PRESENTATION?

02:35PM 9    A.   YES.

02:35PM 10   Q.   AND WERE YOU GIVING -- TELLING HIM HOW PLEASED YOU WERE

02:35PM 11   THAT YOU WERE GETTING -- THERE WAS INTEREST IN WOMEN IN

02:35PM 12   ENGINEERING IN CONNECTION WITH THE PRESENTATION THAT YOU WERE

02:35PM 13   GIVING?

02:35PM 14   A.   YES, I WAS TALKING ABOUT ALL OF THESE GIRLS COMING UP TO

02:36PM 15   ME AND SAYING THAT THEY WERE INSPIRED.

02:36PM 16   Q.   AND DO YOU SEE HIS COMMENT AT 11:06 AND HE'S SAYING "I

02:36PM 17   HAVE MOLDED YOU"?

02:36PM 18   A.   YES.

02:36PM 19   Q.   AND WHAT DID YOU UNDERSTAND THAT WOULD MEAN?

02:36PM 20   A.   THAT HE MOLDED ME, THAT HE BUILT ME INTO WHO I WAS, AND

02:36PM 21   THAT IF PEOPLE WERE INSPIRED BY ME, IT WAS BECAUSE OF THAT.

02:36PM 22   Q.   AND IF YOU SEE BELOW IN THE BOTTOM FOUR TEXTS, YOU RESPOND

02:36PM 23   WITH SOME TEXTS THAT SEEM FAIRLY LOVING.

02:36PM 24        DO YOU SEE THAT?

02:36PM 25   A.   YES.

02:36PM   1    Q.    AND CAN YOU EXPLAIN THOSE RESPONSES?

02:36PM   2    A.    THAT HE WAS HAPPY WITH ME.  HE SAID, "U R MY MADIBA NOW,"

02:36PM   3    AND THAT MEANT THAT I COULD BE HIS, THAT I HAD SATISFIED HIS

02:36PM   4    GOALS FOR ME.

02:36PM   5    Q.    LET ME ASK YOU TO LOOK BACK AT 87 TO 88, THOSE BATES

02:37PM   6    LABELS.

02:37PM   7    A.    OKAY.

02:37PM   8    Q.    ALL RIGHT.  AND DO YOU SEE THIS IS A TEXT FROM MR. BALWANI

02:37PM   9    TO YOU IN DECEMBER OF 2014?

02:37PM  10    A.    YES.

02:37PM  11    Q.    AND DO YOU SEE THAT HE SENDS YOU A LOVING MESSAGE ABOUT

02:37PM  12    ADMIRING YOU AND YOUR WISDOM AND STRENGTH?

02:37PM  13    A.    YES.

02:37PM  14    Q.    LET'S LOOK AT YOUR RESPONSE.

02:37PM  15          AND YOU SAY, "YOU KNOW WHAT THESE THINGS COMING FROM YOU

02:37PM  16    MEAN TO ME.  WHAT YOU SAY TO ME EQUALS MY CONFIDENCE."

02:37PM  17          DO YOU SEE THAT?

02:37PM  18    A.    YES.

02:37PM  19    Q.    AND THEN HE OFFERS SOME RESPONSES.

02:37PM  20          AND DO YOU SEE AT THE BOTTOM, "I MEAN WHAT I TEXTED YOU

02:37PM  21    LITERALLY."

02:37PM  22          DO YOU SEE THAT?

02:37PM  23    A.    YES.

02:37PM  24    Q.    AND WHAT WERE YOU REFERRING TO THERE?

02:38PM  25    A.    THAT HOW HE FELT ABOUT ME WAS MY CONFIDENCE.

7869

02:38PM  1    Q.   NOW, YOU TESTIFIED A FEW MOMENTS AGO THAT THERE WOULD BE

02:38PM  2    INSTANCES WHERE MR. BALWANI WOULD ACTUALLY VERBALLY BERATE YOU?

02:38PM  3    A.   YES.

02:38PM  4    Q.   AND WERE THERE OCCASIONS ON WHICH YOU WOULD SOMETIMES

02:38PM  5    WRITE DOWN YOUR THOUGHTS AFTER SOME OF THOSE INCIDENTS?

02:38PM  6    A.   YES.

02:38PM  7    Q.   AND WHERE WOULD YOU TYPICALLY DO THAT?

02:38PM  8    A.   ON MY IPHONE IN MY NOTES.

02:38PM  9    Q.   AND I'LL ASK YOU TO LOOK AT EXHIBIT 7534.

02:38PM  10   A.   IN THE FOURTH BINDER?

02:38PM  11   Q.   YES.

02:38PM  12   A.   OKAY.  OKAY.

02:39PM  13        YES.

02:39PM  14   Q.   ARE THESE NOTES FROM YOUR IPHONE FROM AROUND APRIL OF

02:39PM  15   2015?

02:39PM  16   A.   YES.

02:39PM  17   Q.   AND DO THEY RELATE TO AN INTERACTION THAT YOU HAD HAD WITH

02:39PM  18   MR. BALWANI?

02:39PM  19   A.   YES.

02:39PM  20        MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

02:39PM  21   7534.

02:39PM  22        MR. LEACH:  NO OBJECTION, YOUR HONOR.

02:39PM  23        THE COURT:  IT'S ADMITTED.

02:39PM  24   (DEFENDANT'S EXHIBIT 7534 WAS RECEIVED IN EVIDENCE.)

02:39PM  25   BY MR. DOWNEY:

02:39PM 1   Q.   I'LL ASK YOU TO TAKE A MOMENT TO LOOK AT THAT AND ASK YOU

02:39PM 2   IF YOU CAN RECALL THE INCIDENT THAT LED YOU TO TAKE THESE

02:39PM 3   NOTES.

02:40PM 4   A.   YES, I CAN.

02:40PM 5   Q.   TELL US WHAT HAPPENED.

02:40PM 6   A.   THAT SUNNY FELT THAT THE WAY I WAS RUNNING R&D WAS A

02:40PM 7   DISASTER AND HE WAS GIVING ME FEEDBACK ON WHAT HE EXPECTED FROM

02:40PM 8   ME.

02:40PM 9   Q.   LET'S JUST LOOK AT THE FIRST SERIES OF STATEMENTS IN THERE

02:40PM 10  BEGINNING WITH, "I EXPECT," DOWN TO "CONVINCED NEVER."

02:40PM 11       ALL RIGHT.  AND DO YOU SEE THAT HE HAS A SERIES OF

02:40PM 12  COMMENTS HERE ABOUT EXPECTING THINGS AND EXPECTING EXCELLENCE,

02:40PM 13  ET CETERA.

02:40PM 14       WHEN YOU WERE WRITING THESE NOTES, WHAT WERE YOU

02:40PM 15  RECORDING?

02:40PM 16  A.   I WAS RECORDING WHAT HE WAS SAYING SO THAT HE WOULD SEE

02:40PM 17  THAT I WAS LISTENING TO HIM.

02:40PM 18  Q.   AND IF YOU GO ABOUT HALFWAY DOWN, BEGINNING WITH THE

02:40PM 19  PARAGRAPH THAT BEGINS "FOCUS."

02:41PM 20       DO YOU SEE THAT IT READS, "NOT PRIDE IN MULTI TASK.  NO

02:41PM 21  MIND.  PRESENT.  WOMEN BATTLE DRESS LIKE MEN.  SAME TRAINING.

02:41PM 22  TOUGHEN UP.  BECOME MASCULINE IN BATTLE.  MASCULINE GAME.

02:41PM 23  BUSINESS MASCULINE GAME."

02:41PM 24       DO YOU SEE THAT?

02:41PM 25  A.   YES.

02:41PM 1    Q.   AND WHAT WAS THAT RECORDING?

02:41PM 2    A.   AGAIN, THAT SUNNY FELT THAT I WAS TOO FEMININE, THAT I WAS

02:41PM 3    LIKE A LITTLE GIRL, AND THAT I NEEDED TO BE MORE LIKE A MAN IF

02:41PM 4    I WANTED TO BE IN BUSINESS.

02:41PM 5    Q.   AND IF YOU GO UNDER "COMMAND," WHERE IT BEGINS, "I'M SO

02:41PM 6    SICK."

02:41PM 7    A.   YES.

02:41PM 8    Q.   AND DO YOU SEE WHERE IT SAYS, "I'M SO SICK AND TIRED"?

02:41PM 9    A.   YES.

02:41PM 10   Q.   AND THE FIRST SENTENCE READS, "I'M SO SICK AND TIRED OF

02:41PM 11   THIS MEDIOCRITY YOU CREATE.  IT'S ASTONISHING.  YOU'LL NEVER

02:42PM 12   HOLD ANYBODY RESPONSIBLE FOR ANY ACTIONS.  YOU'LL NEVER DO

02:42PM 13   THAT.  I DON'T WANT TO WORK WITH YOU ANYMORE."

02:42PM 14       DO YOU SEE THAT?

02:42PM 15   A.   YES.

02:42PM 16   Q.   AND WHAT WERE YOU RECORDING THERE?

02:42PM 17   A.   WHAT SUNNY WAS SAYING TO ME, THAT HE WAS ASTONISHED BY MY

02:42PM 18   MEDIOCRITY AND THAT HE WAS EXHAUSTED WORKING WITH ME BECAUSE I

02:42PM 19   COULDN'T BE SUCCESSFUL.  I WAS A MONKEY THAT WAS TRYING TO FLY

02:42PM 20   A SPACESHIP.

02:42PM 21   Q.   OKAY.  AND IF YOU GO DOWN TO THE BOTTOM FOUR SENTENCES

02:42PM 22   BEGINNING WITH "I DON'T ENJOY."

02:42PM 23       DO YOU SEE THAT?

02:42PM 24   A.   I DO.

02:42PM 25   Q.   AND HE SAYS, "I DON'T ENJOY BEING IN A COMPANY THAT'S NOT

02:42PM 1      GOING TO WIN.  I DON'T HAVE THE FAITH."

02:42PM 2           DO YOU SEE IT GOES ON FROM THERE?

02:42PM 3      A.   YES.

02:43PM 4      Q.   AND ARE THESE ALSO COMMENTS THAT MR. BALWANI MADE TO YOU?

02:43PM 5      A.   YES.

02:43PM 6      Q.   DO YOU SEE IN THE SECOND PARAGRAPH HE SAYS, "BIGGEST

02:43PM 7      FAILURE OF MY LIFE.  REGRET COMING.  STAYED BECAUSE I LOVE

02:43PM 8      YOU."

02:43PM 9           DO YOU SEE THAT?

02:43PM 10     A.   YES.

02:43PM 11     Q.   CAN YOU EXPLAIN WHAT MR. BALWANI WAS COMMUNICATING THERE?

02:43PM 12     A.   THAT HE HAD BEEN TELLING ME WHAT TO DO AND HOW TO BECOME

02:43PM 13     THE SUCCESSFUL PERSON BECAUSE HE LOVED ME, BUT THAT HE WAS

02:43PM 14     INCREDIBLY ANGRY WITH ME BECAUSE I WASN'T EVER ABLE TO BECOME

02:43PM 15     THAT.

02:43PM 16     Q.   NOW, I ASKED YOU A MOMENT AGO IN CONNECTION WITH THESE

02:43PM 17     NOTES ABOUT BEING VERBALLY BERATED AND RECORDING IT IN IPHONE

02:44PM 18     NOTES.

02:44PM 19          I WANT TO ASK YOU, IF I MIGHT, JUST FOR A MOMENT ABOUT THE

02:44PM 20     INCIDENTS THAT YOU HAD DESCRIBED WITH MR. BALWANI OF FORCED

02:44PM 21     INTERCOURSE.

02:44PM 22          DID YOU SOMETIMES TAKE IPHONE NOTES IN THE WAKE OF SOME OF

02:44PM 23     THOSE INCIDENTS?

02:44PM 24     A.   I DID.

02:44PM 25     Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 7517.

02:44PM 1    A.   OKAY.

02:44PM 2    Q.   IS THIS ANOTHER SET OF NOTES THAT YOU RECORDED AFTER AN

02:44PM 3    INCIDENT WITH MR. BALWANI?

02:44PM 4    A.   YES.

02:44PM 5         MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

02:44PM 6    7517.

02:44PM 7         MR. LEACH:  NO OBJECTION, YOUR HONOR.

02:45PM 8         THE COURT:  IT'S ADMITTED.

02:45PM 9         (DEFENDANT'S EXHIBIT 7517 WAS RECEIVED IN EVIDENCE.)

02:45PM 10   BY MR. DOWNEY:

02:45PM 11   Q.   AND WE SHOW THE DATE HERE AS BEING FEBRUARY 11TH, 2015.

02:45PM 12        DO YOU SEE THAT?

02:45PM 13   A.   I DO.

02:45PM 14   Q.   AND I WANT TO JUST FOCUS ON THE FIRST THREE LINES OF THIS

02:45PM 15   IPHONE NOTE AND ASK YOU TO REVIEW THOSE AND ASK YOU IF YOU CAN

02:45PM 16   DESCRIBE WHAT YOU WERE REACTING TO AND WRITING HERE.

02:45PM 17   A.   I'M REACTING TO ONE OF THOSE INCIDENTS WITH MR. BALWANI

02:45PM 18   AND I'M WRITING ABOUT THE FACT THAT I COULDN'T MOVE AND I

02:45PM 19   COULDN'T SIT UP AND THAT I WAS LYING THERE SWOLLEN AND THAT I

02:45PM 20   COULDN'T UNDERSTAND WHY I WAS HURTING MYSELF, WHY I WASN'T

02:45PM 21   LEAVING.

02:45PM 22   Q.   NOW, IF YOU LOOK BACK AT 53 -- IF YOU NOTICE ON THESE

02:46PM 23   DOCUMENTS, THESE DOCUMENTS APPEAR TO BE CREATED ON

02:46PM 24   FEBRUARY 11TH OF 2015 UP AND THROUGH FEBRUARY 13TH OF 2015.

02:46PM 25        DO YOU SEE THAT?

02:46PM  1    A.   I DO.

02:46PM  2    Q.   LET'S LOOK BACK AT EXHIBIT 5387F AT BATES LABEL 121.

02:46PM  3         IF WE CAN JUST BLOW THAT UP SO THERE'S A BETTER VIEW ON

02:46PM  4    THE SCREEN.

02:46PM  5         IS THE TOP TEXT FROM YOU TO MR. BALWANI IN THAT TIMEFRAME?

02:46PM  6    A.   YES.

02:46PM  7    Q.   AND DO YOU SEE YOU WRITE TO HIM, "I'M SORRY I WASN'T

02:46PM  8    STRONGER FOR YOU THIS MORNING.  THAT IS MY RESPONSIBILITY AND

02:46PM  9    MY ROLE.  I WILL NEVER LET THAT HAPPEN AGAIN."

02:46PM 10         DO YOU SEE THAT?

02:46PM 11    A.   I DO.

02:46PM 12    Q.   AND THEN HE RESPONDS, "I AM STRONG ENOUGH FOR ME AND U AND

02:47PM 13    THEN SOME.  I DON'T NEED U TO BE STRONG FOR ME."

02:47PM 14         DO YOU SEE THAT?

02:47PM 15    A.   YES.

02:47PM 16    Q.   AND THEN THE NEXT LINE YOU SAY, "I HAVE THE PRIVILEGE OF

02:47PM 17    BEING ABLE TO CALM YOU AS A MOTHER ENERGY."

02:47PM 18         DO YOU SEE THAT?

02:47PM 19    A.   YES.

02:47PM 20    Q.   AND WHEN YOU REFER THERE TO "AS A MOTHER ENERGY," WHAT IS

02:47PM 21    THAT A REFERENCE TO?

02:47PM 22    A.   THAT I THOUGHT MY ROLE WAS TO CALM HIM WHEN HE WAS ANGRY

02:47PM 23    AND THAT I HADN'T BEEN ABLE TO DO THAT, THAT I HADN'T BEEN ABLE

02:47PM 24    TO TAKE IT.

02:47PM 25    Q.   AND THEN IF YOU LOOK AT THE BOTTOM -- SECOND TO THE BOTTOM

02:47PM 1    TEXT, YOU SAY, "MY JOB IS TO LOVE YOU WHEN YOU'RE STRESSED."

02:47PM 2       DO YOU SEE THAT?

02:47PM 3    A.   YES.

02:47PM 4    Q.   AND MR. BALWANI RESPONDS, "I KNOW."

02:47PM 5       DO YOU SEE THAT?

02:47PM 6    A.   YES.

02:47PM 7    Q.   AND WAS THIS AN EXCHANGE THAT IS TYPICAL OF WHAT WOULD

02:47PM 8    HAPPEN IN THE WAKE OF THESE INCIDENTS?

02:47PM 9    A.   YES.

02:47PM 10    Q.   AND THIS IS FROM FEBRUARY OF 2015?

02:48PM 11    A.   YES.

02:48PM 12    Q.   AND HAD THESE INCIDENTS BEEN OCCURRING THROUGHOUT THE

02:48PM 13    RELATIONSHIP?

02:48PM 14    A.   YES.

02:48PM 15    Q.   NOW, YOU MENTIONED THAT WHEN YOU MET HIM WHEN YOU WERE AN

02:48PM 16    18 YEAR OLD, YOU THOUGHT THAT HE WAS AN IMPRESSIVE EXECUTIVE.

02:48PM 17       DURING THE TIME PERIOD THAT WE'RE CONCERNED WITH, THE

02:48PM 18    PERIOD FROM 2010 TO 2016, HOW DID YOU PERCEIVE MR. BALWANI'S

02:48PM 19    CAPABILITIES AS A BUSINESS PERSON AND WHAT EFFECT DID YOUR

02:48PM 20    RELATIONSHIP HAVE ON THAT?

02:48PM 21    A.   HE HAD TAUGHT ME EVERYTHING THAT I THOUGHT I KNEW ABOUT

02:48PM 22    BUSINESS, AND I THOUGHT HE WAS THE BEST BUSINESS PERSON THAT I

02:48PM 23    KNEW.

02:48PM 24       AND I THINK THAT I DIDN'T QUESTION HIM IN THE WAY THAT I

02:49PM 25    OTHERWISE WOULD HAVE.

02:49PM  1     Q.   DID THAT REMAIN YOUR VIEW UNTIL 2016?

02:49PM  2     A.   IT DID.

02:49PM  3     Q.   DID THAT VIEW CHANGE IN 2016?

02:49PM  4     A.   IT DID.

02:49PM  5     Q.   WHAT HAPPENED TO CHANGE THAT VIEW?

02:49PM  6     A.   THE CMS INSPECTION.  I HAD GONE INTO THAT INSPECTION

02:49PM  7     THINKING THAT WE HAD ONE OF THE BEST LABS IN THE WORLD, AND THE

02:49PM  8     FINDINGS FROM THOSE INSPECTIONS WERE SO FUNDAMENTALLY DIFFERENT

02:49PM  9     FROM WHAT I BELIEVED THAT IT COULDN'T BE THE CASE THAT OUR

02:49PM 10     OPERATIONS WERE RUNNING LIKE ONE OF THE BEST COMPANIES IN THE

02:49PM 11     WORLD.

02:49PM 12     Q.   WELL, HOW DID YOU RESPOND TO LEARNING THAT CMS WAS

02:49PM 13     CRITICAL OF THE COMPANY'S LAB OPERATIONS?

02:49PM 14     A.   BY BRINGING IN AS MANY EXPERTS AS I COULD, HIRING TWO NEW

02:50PM 15     LAB DIRECTORS AND BRINGING IN A NUMBER OF LABORATORY EXPERTS TO

02:50PM 16     LOOK AT THE FINDINGS AND TRY TO UNDERSTAND THEM AND TRY TO FIX

02:50PM 17     THEM.

02:50PM 18     Q.   AND HOW DID MR. BALWANI RESPOND TO THOSE CHANGES WITHIN

02:50PM 19     THE COMPANY?

02:50PM 20     A.   HE DIDN'T LIKE THEM.

02:50PM 21     Q.   WAS THERE A PERIOD AFTER YOU LEARNED OF THE CMS VIEW OF

02:50PM 22     THE THERANOS LAB WHERE YOU WERE STILL SUPPORTIVE OF MR. BALWANI

02:50PM 23     AND SUPPORTIVE OF THE WORK THAT HAD BEEN DONE IN THE LAB?

02:50PM 24     A.   I -- FOR SOME TIME, YES.

02:50PM 25     Q.   AND MR. BALWANI ULTIMATELY LEFT THE COMPANY IN MAY OF

02:50PM   1    2016; IS THAT RIGHT?

02:50PM   2    A.   HE DID.

02:50PM   3    Q.   AND TELL US WHAT HAPPENED IN THE -- WITH YOUR PERCEPTION

02:50PM   4    OF MR. BALWANI BETWEEN THE INITIAL RESPONSE AND THE TIME THAT

02:50PM   5    HE LEFT THE COMPANY AS TO YOUR VIEW OF HIM AS A CAPABLE

02:50PM   6    EXECUTIVE.

02:50PM   7    A.   HE WASN'T WHO I THOUGHT HE WAS, AND I REALIZED THAT IF I

02:51PM   8    WAS GOING TO FIX THE ISSUES AND ALLOW THE COMPANY TO SEE

02:51PM   9    THROUGH ITS POTENTIAL, I HAD TO DO THAT WITHOUT HIM IN THE

02:51PM   10   COMPANY.

02:51PM   11   Q.   DID YOU CONTINUE YOUR PERSONAL RELATIONSHIP WITH

02:51PM   12   MR. BALWANI AFTER HE LEFT THE COMPANY?

02:51PM   13   A.   NO.

02:51PM   14   Q.   WERE YOU LIVING WITH HIM IN 2016?

02:51PM   15   A.   YES.

02:51PM   16   Q.   DID YOU MOVE OUT OF THAT LIVING ARRANGEMENT?

02:51PM   17   A.   I DID.

02:51PM   18   Q.   AND WHEN DID YOU DO THAT?

02:51PM   19   A.   IN MAY OF 2016.

02:51PM   20   Q.   DID ANYONE HELP YOU WITH THAT?

02:51PM   21   A.   YES.

02:51PM   22   Q.   WHO HELPED YOU?

02:51PM   23   A.   MY BROTHER.

02:51PM   24   Q.   DID YOU TELL MR. BALWANI IN ADVANCE THAT YOU WERE MOVING

02:51PM   25   OUT?

02:51PM 1     A.   NO.

02:51PM 2     Q.   WHERE WAS MR. BALWANI WHEN YOU MOVED OUT OF THE HOME THAT

02:51PM 3     YOU SHARED?

02:51PM 4     A.   HE WAS IN, I THINK, THAILAND.

02:51PM 5     Q.   AT SOME POINT DID YOU MAKE HIM AWARE WHILE HE WAS IN

02:52PM 6     THAILAND THAT YOU HAD MOVED OUT?

02:52PM 7     A.   YES.

02:52PM 8     Q.   HOW DID HE REACT?

02:52PM 9     A.   HE SAID HE WAS GETTING ON A PLANE TO COME BACK.

02:52PM 10    Q.   AND AFTER THAT PERIOD OF TIME IN LATE MAY AND EARLY

02:52PM 11    JUNE 2000 -- DID YOU HAVE A RELATIONSHIP OF ANY KIND WITH

02:52PM 12    MR. BALWANI?

02:52PM 13    A.   NO.

02:52PM 14    Q.   I WANT TO TALK ABOUT THE FINDINGS IN THE LAB AND THE

02:52PM 15    RESPONSE WITH SOME MORE SPECIFICITY IN A MOMENT, BUT WITH

02:52PM 16    RESPECT TO THE TESTIMONY THAT YOU'VE JUST GIVEN, YOU HAD A

02:52PM 17    PROFESSION RELATIONSHIP WITH MR. BALWANI FOR ALMOST SEVEN

02:52PM 18    YEARS; RIGHT?

02:52PM 19    A.   I DID.

02:52PM 20    Q.   AND YOU HAD A PERSONAL RELATIONSHIP WITH HIM FOR 13 YEARS?

02:52PM 21    A.   YES, ABOUT THAT.

02:52PM 22    Q.   ARE YOU SAYING THAT MR. BALWANI FORCED YOU TO MAKE THE

02:52PM 23    STATEMENTS TO INVESTORS THAT YOU MADE DURING THE COURSE OF THIS

02:52PM 24    CASE?

02:52PM 25    A.   NO.

7879

02:52PM   1    Q.   ARE YOU SAYING THAT HE FORCED YOU TO MAKE CERTAIN

02:53PM   2    STATEMENTS TO JOURNALISTS THAT WE'VE HEARD ABOUT DURING THE

02:53PM   3    COURSE OF THE CASE?

02:53PM   4    A.   NO.

02:53PM   5    Q.   ARE YOU SAYING THAT HE CONTROLLED YOUR INTERACTIONS WITH,

02:53PM   6    FOR EXAMPLE, WALGREENS AND SAFEWAY EXECUTIVES?

02:53PM   7    A.   NO.

02:53PM   8    Q.   ARE YOU SAYING THAT HE CONTROLLED YOUR INTERACTIONS WITH

02:53PM   9    MEMBERS OF THE THERANOS BOARD IN THE PERIOD BETWEEN 2010 AND

02:53PM   10   2016?

02:53PM   11   A.   NO.

02:53PM   12   Q.   WHAT IMPACT, IF ANY, DID YOUR PERSONAL RELATIONSHIP WITH

02:53PM   13   MR. BALWANI HAVE ON YOUR WORK AT THERANOS IN YOUR VIEW?

02:53PM   14   A.   I DON'T KNOW.  HE IMPACTED EVERYTHING ABOUT WHO I WAS, AND

02:53PM   15   I DON'T FULLY UNDERSTAND THAT.

02:53PM   16   Q.   DID YOU HAVE CONFIDENCE IN HIM IN THE AREAS FOR WHICH HE

02:53PM   17   WAS RESPONSIBLE DURING THAT PERIOD?

02:53PM   18   A.   COMPLETELY.

02:53PM   19   Q.   DID YOU OFTEN OVERRULE HIM IN THE AREAS FOR WHICH HE WAS

02:54PM   20   RESPONSIBLE?

02:54PM   21   A.   NO.

02:54PM   22   Q.   LET'S TALK ABOUT THE FINDINGS OF CMS AND YOUR RESPONSE TO

02:54PM   23   THEM IN THE FALL OF 2015 THROUGH THE FIRST HALF OF 2016.

02:54PM   24        YOU MENTIONED THAT YOU HIRED TWO LAB DIRECTORS?

02:54PM   25   A.   I DID.

02:54PM 1    Q.   AND WHAT WAS THE -- WHAT HAPPENED TO THE REPORTING

02:54PM 2    STRUCTURE FOR LAB DIRECTORS AT THERANOS AT THAT POINT?

02:54PM 3    A.   I HAD THEM REPORT TO ME DIRECTLY.

02:54PM 4    Q.   WHY DID YOU DO THAT?

02:54PM 5    A.   BECAUSE I WANTED TO MAKE SURE THAT WE FIXED WHATEVER

02:54PM 6    ISSUES EXISTED IN THE LABORATORY SO THAT THE COMPANY COULD MOVE

02:54PM 7    FORWARD.

02:54PM 8    Q.   AT SOME POINT DID YOU HIRE DR. DAS AS ANOTHER LABORATORY

02:54PM 9    DIRECTOR?

02:54PM 10   A.   I DID.

02:55PM 11   Q.   AND WAS THE COMPANY CONTINUING TO INTERACT WITH CMS ABOUT

02:55PM 12   ITS INSPECTION?

02:55PM 13   A.   YES.

02:55PM 14   Q.   AND DID THE COMPANY EXPECT THAT AT SOME POINT IT WOULD

02:55PM 15   RECEIVE A REPORT FROM CMS OF WHAT CMS'S CONCLUSIONS WERE?

02:55PM 16   A.   YES.

02:55PM 17   Q.   AND DID YOU DISCUSS ALL OF THOSE ISSUES WITH DR. DAS AND

02:55PM 18   THE OTHER LABORATORY DIRECTORS THAT YOU HIRED?

02:55PM 19   A.   I DID.

02:55PM 20   Q.   AND AT SOME POINT, DID CMS ISSUE A REPORT ON ITS

02:55PM 21   CONCLUSIONS ABOUT THERANOS?

02:55PM 22   A.   YES.

02:55PM 23   Q.   DID YOU DISCUSS THAT REPORT WITH DR. DAS AND WITH THE

02:55PM 24   OTHER CLINICIANS AND SCIENTISTS AT THE COMPANY?

02:55PM 25   A.   I DID.

02:55PM 1    Q.   AND WAS DR. DAS HIMSELF ALSO TRYING TO EVALUATE THE

02:55PM 2    PERFORMANCE OF THE LAB AT THAT TIME?

02:55PM 3    A.   HE WAS.

02:55PM 4    Q.   AND DO YOU RECALL THAT DR. DAS TESTIFIED THAT THERE WAS A

02:55PM 5    MEETING IN MARCH OF 2016 RELATED TO CMS'S CONCLUSIONS WITH

02:56PM 6    REGARD TO -- OR TENTATIVE CONCLUSIONS WITH REGARD TO THERANOS'S

02:56PM 7    LAB?

02:56PM 8    A.   YES.

02:56PM 9    Q.   WHAT -- AND DID YOU ATTEND THAT MEETING?

02:56PM 10   A.   I DID.

02:56PM 11   Q.   OTHER THAN YOURSELF AND DR. DAS, WHO WAS PRESENT AT THAT

02:56PM 12   MEETING?

02:56PM 13   A.   DR. YOUNG, DR. PANGARKAR, SEVERAL MEMBERS OF OUR

02:56PM 14   REGULATORY AND LEGAL TEAM, AND I THINK A FEW OTHER SCIENTISTS

02:56PM 15   FROM THE COMPANY.

02:56PM 16   Q.   WHAT DO YOU RECALL HAPPENING AT THAT MEETING?

02:56PM 17   A.   THAT DR. DAS MADE THE RECOMMENDATION THAT WE VOID CERTAIN

02:56PM 18   TESTS, AND WE DISCUSSED THAT, AS WELL AS SOME OF THE R&D TEAM'S

02:56PM 19   FEEDBACK ON THE PERFORMANCE OF THE TESTS.

02:56PM 20   Q.   AND WHAT WAS YOUR RESPONSE TO DR. DAS'S RECOMMENDATION

02:56PM 21   THAT THE TESTS BE VOIDED?

02:56PM 22   A.   THAT IF THAT WAS HIS RECOMMENDATION, WE SHOULD DO IT.

02:56PM 23   Q.   WERE ANY OF THE OTHER INDIVIDUALS AT THE MEETING, DID ANY

02:56PM 24   OF THE OTHER INDIVIDUALS RAISE QUESTIONS ABOUT WHAT DR. DAS HAD

02:57PM 25   RECOMMENDED?

02:57PM  1      A.   YES.

02:57PM  2      Q.   WHAT DO YOU RECALL IN THAT REGARD?

02:57PM  3      A.   THAT MEMBERS OF OUR R&D TEAM BELIEVED THAT THE TESTS

02:57PM  4      THEMSELVES WERE GOOD, BUT THAT THE OPERATIONS OF THE LAB HAD

02:57PM  5      FAILED.  QUALITY SYSTEMS HAD FAILED.

02:57PM  6      Q.   AND WHAT DID THAT SUGGEST THAT THERANOS OUGHT TO DO WITH

02:57PM  7      REGARD TO THE TEST RESULTS THAT HAD BEEN RENDERED IN ITS CLIA

02:57PM  8      LAB?

02:57PM  9      A.   THAT OUT OF AN ABUNDANCE OF CAUTION TO BE SURE THAT NO ONE

02:57PM  10     GOT A RESULT THAT WAS WRONG, WE VOID ALL OF THE RESULTS.

02:57PM  11     Q.   NOW, MR. BALWANI, IN ADDITION TO BEING AN EXECUTIVE, HE

02:57PM  12     WAS ALSO ON THE BOARD OF DIRECTORS FOR A TIME AT THERANOS; IS

02:57PM  13     THAT RIGHT?

02:57PM  14     A.   HE WAS.

02:57PM  15     Q.   AND WE SPOKE ABOUT HIS DEPARTURE AS AN EXECUTIVE.

02:57PM  16          DID HE LEAVE THE BOARD OF DIRECTORS AT THE SAME TIME?

02:57PM  17     A.   HE DID.

02:57PM  18     Q.   WERE THERE OTHER CHANGES TO THE BOARD OF DIRECTORS OF

02:58PM  19     THERANOS IN THAT FIRST PART OF 2016?

02:58PM  20     A.   YES.

02:58PM  21     Q.   WERE NEW MEMBERS RECRUITED?

02:58PM  22     A.   YES.

02:58PM  23     Q.   WHAT NEW MEMBERS WERE RECRUITED?

02:58PM  24     A.   DR. BONANNI AND DAN WARMENHOVEN, AND WE HAD A COUPLE OF

02:58PM  25     OTHER DIRECTORS WHO HAD PREVIOUSLY SERVED ON THE BOARD AS WELL.

02:58PM 1   Q.   AND WHY DID YOU RECRUIT DR. BONANNI AND MR. WARMENHOVEN?

02:58PM 2   A.   DR. BONANNI WAS THE HEAD OF OPERATIONS FOR AMGEN, WHICH IS

02:58PM 3   A MAJOR PHARMACEUTICAL COMPANY, AND HE HAD A VERY DEEP

02:58PM 4   BACKGROUND IN NOT ONLY OPERATIONS BUT ALSO QUALITY SYSTEMS,

02:58PM 5   COMPLIANCE, AND REGULATORY PROGRAMS, AND THAT WAS THE AREA OF

02:58PM 6   FOCUS FOR US AT THAT POINT IN TIME.

02:58PM 7        MR. WARMENHOVEN WAS A BOARD MEMBER OF A NUMBER OF TECH

02:58PM 8   COMPANIES AND HE HAD BEEN ON THE BOARD OF BECHTEL, WHICH WAS

02:59PM 9   ONE OF THE PRIVATE COMPANIES THAT WE RESPECTED.  RILEY BECHTEL

02:59PM 10  HAD BEEN ON OUR BOARD, AND DAN WOULD BE ABLE TO SUCCEED HIM.

02:59PM 11  Q.   AND WHAT ABOUT DR. FOEGE'S NEW ROLE?

02:59PM 12  A.   DR. FOEGE WAS ONE OF THE BEST MEDICAL EXPERTS THAT WE

02:59PM 13  KNEW.  HE HAD BEEN AWARDED THE MEDAL OF FREEDOM FOR HIS WORK IN

02:59PM 14  ERADICATING SMALL POX AND HAD RUN THE CDC, AND ONE OF OUR CORE

02:59PM 15  AREAS WAS IN INFECTIOUS DISEASES, SO HAVING HIM THERE AND

02:59PM 16  ACTIVELY ENGAGED WAS REALLY IMPORTANT AS WE TRIED TO SEE THE

02:59PM 17  COMPANY THROUGH AND REFOCUSSED.

02:59PM 18  Q.   OTHER THAN CHANGES AT THE BOARD OF DIRECTORS, WERE THERE

02:59PM 19  ALSO CHANGES AT THE EXECUTIVE LEVEL?

02:59PM 20  A.   YES.

02:59PM 21  Q.   AND WHAT WERE THOSE CHANGES?

02:59PM 22  A.   I HIRED A NEW SENIOR VICE PRESIDENT OF OPERATIONS, A NEW

02:59PM 23  HEAD SENIOR VICE PRESIDENT OF REGULATORY AND QUALITY, A CHIEF

02:59PM 24  COMPLIANCE OFFICER, A NEW HEAD OF PRODUCT, A NEW HEAD OF

02:59PM 25  COMMUNICATIONS, PUT A NEW MANAGEMENT TEAM IN PLACE.

03:00PM  1    Q.   AND AFTER THESE CHANGES WERE MADE, DID THE COMPANY DISCUSS

03:00PM  2    POTENTIAL CHANGES TO ITS BUSINESS STRATEGY?

03:00PM  3    A.   WE DID.

03:00PM  4    Q.   AND DID THE BUSINESS STRATEGY CHANGE?

03:00PM  5    A.   YES.

03:00PM  6    Q.   FOR A NUMBER OF YEARS THE COMPANY HAD BEEN INVOLVED WITH

03:00PM  7    OPERATING A CLINICAL LAB IN CONNECTION WITH RETAIL STORES; IS

03:00PM  8    THAT RIGHT?

03:00PM  9    A.   THAT'S RIGHT.

03:00PM  10   Q.   AND HOW DID THAT STRATEGY CHANGE IN 2016?

03:00PM  11   A.   WE FOCUSSED THE COMPANY ON WHAT WOULD HAVE BEEN PHASE II

03:00PM  12   OF OUR MODEL AND PLACING DEVICES IN THE FIELD IN DIFFERENT

03:00PM  13   APPLICATIONS.

03:00PM  14   Q.   NOW, LET ME ASK YOU ABOUT FDA APPROVAL.

03:00PM  15        DID THERANOS GET FDA APPROVAL FOR SOME OF ITS TECHNOLOGY

03:00PM  16   IN 2015?

03:00PM  17   A.   WE DID.

03:00PM  18   Q.   AND HAD THERANOS CONTINUED TO WORK ON ITS 4 SERIES DEVICE

03:01PM  19   AFTER THE TIME OF THE CLINICAL LAUNCH IN RETAIL STORES IN 2013?

03:01PM  20   A.   YES.

03:01PM  21   Q.   AND DID THERE COME A TIME WHEN THERANOS WAS COMFORTABLE

03:01PM  22   SUBMITTING AN APPLICATION FOR APPROVAL OF ITS 4 SERIES SYSTEM

03:01PM  23   IN ONE OF ITS ASSAYS?

03:01PM  24   A.   YES.

03:01PM  25   Q.   I'M GOING TO SHOW YOU AN EXHIBIT RELATED TO THAT, WHICH IS

03:01PM   1          EXHIBIT 13288.

03:01PM   2                  YOUR HONOR, THAT IS NOT IN YOUR NOTEBOOK BECAUSE IT IS AN

03:01PM   3          EXTREMELY LARGE EXHIBIT.

03:01PM   4                  I HAVE SHOWN IT TO MR. LEACH IN ADVANCE, AND WE'LL DISPLAY

03:01PM   5          THE PORTIONS OF IT THAT WE NEED TO DISCUSS IF IT'S ADMITTED.

03:01PM   6                  MR. LEACH:  SO LONG AS IT'S NOT COMING IN FOR THE

03:01PM   7          TRUTH, YOUR HONOR, I DON'T MIND.  IT'S OVER 500 PAGES.

03:01PM   8                  THE COURT:  WHAT IS THE DOCUMENT?

03:01PM   9                  MR. DOWNEY:  THIS IS THE SUBMISSION THAT SHE,

03:01PM  10          MS. HOLMES, JUST TESTIFIED TO.

03:01PM  11                  THE COURT:  I SEE.  ALL RIGHT.  AND DO YOU HAVE AN

03:01PM  12          IDEA OF HOW MANY PAGES THAT YOU'RE SEEKING TO ADMIT?

03:02PM  13                  MR. DOWNEY:  WELL, I WOULD JUST AS SOON I WOULD

03:02PM  14          ADMIT THE WHOLE DOCUMENT, BUT I'M ONLY GOING TO DISPLAY TODAY,

03:02PM  15          YOU KNOW, FOR PURPOSES OF TODAY'S DISCUSSION, ABOUT SIX OR

03:02PM  16          SEVEN PAGES.

03:02PM  17              SO I'M HAPPY, IF THERE ARE OBJECTIONS TO THE BALANCE OF

03:02PM  18          THE DOCUMENT, BUT I DON'T WANT TO ADMIT ONLY THE PARTS THAT I'M

03:02PM  19          DISPLAYING BECAUSE THERE'S A LARGE AMOUNT OF DATA AND SO FORTH

03:02PM  20          SUBMITTED TO SUPPORT THOSE.

03:02PM  21                  THE COURT:  SURE.  THANK YOU.

03:02PM  22              I'M JUST CURIOUS ABOUT WHAT GETS ADMITTED INTO EVIDENCE

03:02PM  23          THAT THE JURY WOULD THEN FEEL OBLIGATED TO REVIEW FOR PURPOSES

03:02PM  24          OF EVIDENTIARY VALUE IN THEIR DETERMINATION.

03:02PM  25                  MR. DOWNEY:  YEAH.  WELL, WE CAN, WE CAN ADMIT

```
03:02PM   1       THE -- I CAN DISPLAY THE PAGES, I CAN PREPARE A SHORTENED

03:02PM   2   VERSION OF THE EXHIBIT --

03:02PM   3             THE COURT:  OKAY.

03:02PM   4             MR. DOWNEY:  -- THAT HAS ONLY THE PORTIONS I WANT.

03:02PM   5       I'LL TRY TO DO THAT IN A WAY THAT DOESN'T LEAVE ANY

03:02PM   6   CONFUSION IN THE JURY'S MIND THAT SOMETHING MATERIAL HAS BEEN

03:03PM   7   OMITTED, AND I'LL SHARE THAT WITH MR. LEACH.

03:03PM   8             THE COURT:  IS THAT ALL RIGHT WITH YOU, MR. LEACH?

03:03PM   9             MR. LEACH:  THAT'S FINE, YOUR HONOR.

03:03PM  10       BUT I HAVE A HEARSAY OBJECTION.  IF IT'S COMING IN FOR THE

03:03PM  11   PURPOSE THAT THEY FILED THIS, FINE.

03:03PM  12       IF IT'S FOR SOME OTHER PURPOSE, WE WOULD OBJECT.

03:03PM  13             THE COURT:  SO IS THIS COMING IN FOR THE FACT THAT

03:03PM  14   THIS DOCUMENT WAS FILED AND PROOF OF THAT AND EVIDENCE OF THAT?

03:03PM  15             MR. DOWNEY:  IT'S COMING IN FOR EVIDENCE OF THE

03:03PM  16   FILING AND THE EFFECT THAT THAT HAD ON THIS DEFENDANT'S INTENT.

03:03PM  17             THE COURT:  I SEE.  ALL RIGHT.

03:03PM  18       SO THIS IS NOT FOR THE TRUTH --

03:03PM  19             MR. DOWNEY:  EVIDENCE OF HER INTENT.

03:03PM  20             THE COURT:  IT GOES TO EVIDENCE OF HER INTENT.

03:03PM  21             MR. DOWNEY:  YES.

03:03PM  22             THE COURT:  NOT SO MUCH FOR THE TRUTH OF THE MATTER

03:03PM  23   ASSERTED.

03:03PM  24             MR. DOWNEY:  NO.  THAT'S RIGHT.

03:03PM  25             THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, YOU'VE
```

03:03PM  1    HEARD ME SAY THIS BEFORE WITH CERTAIN EVIDENCE, BUT THESE

03:03PM  2    DOCUMENTS OR THESE PAGES ARE GOING TO BE ADMITTED.  THEY ARE

03:03PM  3    ADMITTED NOT FOR THE TRUTH OF THE MATTER ASSERTED IN THE

03:03PM  4    DOCUMENTS, BUT RATHER FOR THE EFFECT OF THE STATE OF MIND AS TO

03:03PM  5    THE INTENT OF MS. HOLMES.

03:03PM  6        AND WITH THAT QUALIFICATION, THEY ARE ADMITTED AND THEY

03:03PM  7    MAY BE PUBLISHED.

03:03PM  8            MR. DOWNEY:  YOUR HONOR, IF I MAY JUST RETRIEVE IT

03:04PM  9    AND APPROACH THE WITNESS?

03:04PM 10            THE COURT:  SURE.

03:04PM 11        DO YOU HAVE THIS, MR. LEACH?

03:04PM 12            MR. LEACH:  I'VE HAD AN OPPORTUNITY TO REVIEW A COPY

03:04PM 13    OVER THE BREAK.  CURRENTLY I DON'T HAVE ONE.

03:04PM 14            MR. DOWNEY:  LET ME JUST ASK BEFORE YOU DISPLAY

03:04PM 15    ANYTHING.

03:04PM 16    Q.  IS THIS THE HSV, THE SUBMISSION OF THERANOS?

03:04PM 17    A.  IT IS.

03:04PM 18            MR. DOWNEY:  ALL RIGHT.  YOUR HONOR, I FORMALLY,

03:04PM 19    SUBJECT TO OUR PRIOR DISCUSSION, MOVE TO ADMIT 13288.

03:04PM 20            THE COURT:  IT'S ADMITTED, AND IT CAN BE PUBLISHED,

03:04PM 21    THOSE PAGES.  THANK YOU.

03:04PM 22        (DEFENDANT'S EXHIBIT 13288 WAS RECEIVED IN EVIDENCE.)

03:05PM 23            MR. DOWNEY:  THANK YOU, YOUR HONOR.

03:05PM 24    Q.  I'LL ASK YOU TO DESCRIBE A BIT ABOUT THIS DOCUMENT SO THAT

03:05PM 25    MAYBE WE CAN MINIMIZE WHAT IS NECESSARY TO GO TO THE JURY.

03:05PM   1          IS THIS A SUBMISSION THAT THE COMPANY MADE IN NOVEMBER OF

03:05PM   2     2014 RELATED TO ITS SERIES 4.0 ANALYZER, ITS SOFTWARE ASPECTS

03:05PM   3     OF ITS TECHNOLOGY, AND THE ASSAY FOR HERPES SIMPLEX VIRUS-1?

03:05PM   4     A.   YES.   THIS IS THE FDA SUBMISSION FOR THE NANOTAINER, THE

03:05PM   5     CARTRIDGE, THE ANALYZER, THE SOFTWARE, AND THE HSV-1 ASSAY.

03:05PM   6     Q.   AND WITHIN THIS DOCUMENT, IF YOU WOULD JUST TAKE A MOMENT

03:05PM   7     TO LOOK AT IT, IS THERE A -- DOES IT HAVE THE FOLLOWING

03:06PM   8     COMPONENTS?   IS THERE A DESCRIPTION WITHIN IT OF THE TECHNOLOGY

03:06PM   9     THAT GOES INTO DETAIL ABOUT HOW THE TECHNOLOGY WORKS?

03:06PM  10     A.   THERE IS.

03:06PM  11     Q.   AND IS THIS -- WAS THERE DATA PROVIDED TO THE FDA IN

03:06PM  12     CONNECTION WITH THIS SUBMISSION ABOUT THE PERFORMANCE OF THE

03:06PM  13     SYSTEM IN CONNECTION WITH THE HSV-1 ASSAY?

03:06PM  14     A.   YES.

03:06PM  15     Q.   AND HOW MANY INDIVIDUALS AT THERANOS WORKED ON COMPILING

03:06PM  16     THE MATERIAL THAT WENT INTO FILING EXHIBIT 13288?

03:06PM  17     A.   IT WAS A HUGE EFFORT.   DOZENS OF SCIENTISTS AND ENGINEERS

03:06PM  18     AT LEAST, AS WELL AS PEOPLE THROUGHOUT THE COMPANY FROM ALMOST

03:06PM  19     EVERY GROUP.

03:06PM  20     Q.   AND WITH REGARD TO THE PRESENTATION OF DATA THAT IS SET

03:06PM  21     FORTH ABOUT THE PERFORMANCE OF THE 4 SERIES DEVICE, WAS THAT

03:06PM  22     CERTIFIED AS TRUTHFUL AND ACCURATE BY SCIENTISTS AT THERANOS?

03:07PM  23     A.   IT WAS.

03:07PM  24     Q.   LET ME ASK YOU TO LOOK AT PAGE 34.   1713.

03:07PM  25          AND IS IT DR. YOUNG WHO PROVIDES THAT CERTIFICATION?

| | | |
|---|---|---|
| 03:07PM | 1 | A.   IT IS. |
| 03:07PM | 2 | Q.   OKAY.  I WANT TO DIRECT YOUR ATTENTION TO JUST A FEW PARTS |
| 03:07PM | 3 | OF THIS TO HELP US UNDERSTAND WHAT WAS BEING PROVIDED TO THE |
| 03:07PM | 4 | FDA IN CONNECTION WITH THIS SUBMISSION. |
| 03:07PM | 5 | IF YOU LOOK FIRST AT PAGE 49, THERE'S A SECTION LABELLED |
| 03:07PM | 6 | 10.02.  AND WE'LL PUT IT UP ON THE SCREEN. |
| 03:07PM | 7 | AND DO YOU SEE THAT THIS SECTION IS LABELLED "THE THERANOS |
| 03:07PM | 8 | SYSTEM"? |
| 03:07PM | 9 | A.   I DO. |
| 03:07PM | 10 | Q.   AND THEN THERE'S A CHART, OR I SHOULD SAY A DRAWING |
| 03:08PM | 11 | UNDERNEATH THAT IS LABELLED FIGURE 10-1. |
| 03:08PM | 12 | A.   YES. |
| 03:08PM | 13 | Q.   CAN YOU EXPLAIN WHAT THIS SECTION 10.02 AND THE |
| 03:08PM | 14 | ACCOMPANYING FIGURE CONVEY? |
| 03:08PM | 15 | A.   YES.  THIS SECTION GOES THROUGH THE DESIGN OR THE |
| 03:08PM | 16 | ARCHITECTURE OF THE DESIGN AND ALL OF ITS COMPONENTS.  THE |
| 03:08PM | 17 | DIAGRAM IS SHOWING HOW IT WORKS. |
| 03:08PM | 18 | SO AT THE TOP, COLLECTING A SAMPLE FROM A SUBJECT; THAT |
| 03:08PM | 19 | SAMPLE IS PUT INTO A LITTLE NANOTAINER; ONCE THAT IS DONE, THE |
| 03:08PM | 20 | NANOTAINER IS INSERTED INTO THE CARTRIDGE, WHICH IS INSERTED |
| 03:08PM | 21 | INTO THE TSPU. |
| 03:08PM | 22 | AND HERE THIS DIAGRAM IS SHOWING THE BREAKDOWN OF STEPS IN |
| 03:08PM | 23 | THE TSPU, SO WHAT HAPPENS ON THE ACTUAL DEVICE, AND WHAT |
| 03:09PM | 24 | HAPPENS THEN IN THE SOFTWARE, THE TLAS, OR THE LAB AUTOMATION |
| 03:09PM | 25 | SYSTEM, AND IT'S SHOWING THAT THE SAMPLE PREPARATION, THE |

03:09PM  1    ADDITION OF CHEMICALS IS HAPPENED ON THE TSPU, BUT THEN ALL OF

03:09PM  2    THE ANALYSIS AND THE OVERSIGHT OF THE MACHINE IS BEING DONE

03:09PM  3    ELECTRONICALLY OR WIRELESSLY THROUGH SOFTWARE THAT SITS IN THE

03:09PM  4    CLOUD.

03:09PM  5    Q.   OKAY.  SO THIS IS BASICALLY A DESCRIPTION OF THE HARDWARE

03:09PM  6    AND THE SOFTWARE SYSTEM AND HOW THEY WORK TOGETHER?

03:09PM  7    A.   IT IS.

03:09PM  8    Q.   LET ME -- YOU CAN PUT THAT ASIDE AND LOOK INSTEAD AT

03:09PM  9    PAGE 52, WHICH IS LABELLED 10.03.

03:09PM  10       DO YOU SEE THERE'S A PHOTOGRAPH HERE OF FIGURE 10-2?

03:09PM  11   A.   I DO.

03:09PM  12   Q.   AND THEN THERE'S A LIST OF ITEMS FROM 1 TO 10 BELOW THAT.

03:10PM  13       WHAT IS THIS CONVEYING IN CONNECTION WITH APPLICATION TO

03:10PM  14   THE FDA FOR APPROVAL OF THE 4 SERIES SYSTEM ON HSV-1?

03:10PM  15   A.   THIS IS AN OVERVIEW OF THE TSPU ITSELF, AND THE

03:10PM  16   TECHNOLOGIES THAT ARE CONTAINED IN IT, LISTING FROM 1 THROUGH

03:10PM  17   10 HERE, SOME OF THOSE TECHNOLOGIES THAT WE HAVE LOOKED AT

03:10PM  18   BEFORE, THE ROBOT OR THE LIQUID HANDLING MODULE; THE LITTLE

03:10PM  19   MINIATURE CENTRIFUGE AND SONICATOR FOR PROCESSING SAMPLES; THE

03:10PM  20   MAGNET TOOL FOR PROCESSING SAMPLES; AND THEN THESE VARIOUS

03:10PM  21   DETECTORS FOR BEING ABLE TO RUN THE DIFFERENT SMALL SAMPLE

03:10PM  22   METHODS ON THE DEVICE, AS WELL AS THE THERMAL CONTROL SYSTEM

03:10PM  23   FOR HEATING AND COOLING TO BE ABLE TO REACH THE TEMPERATURES

03:10PM  24   THAT WOULD BE NEEDED FOR THIS SMALL SAMPLE CHEMISTRY TO RUN.

03:10PM  25   Q.   AND WERE THOSE COMPONENTS AMONG THE COMPONENTS IDENTIFIED

03:10PM 1     IN THE DRAWINGS AND PHOTOGRAPHS FROM 2010 THAT WE LOOKED AT

03:11PM 2     LAST WEEK?

03:11PM 3     A.   THEY ARE.

03:11PM 4     Q.   LET'S LOOK AT PAGE 54.  I JUST WANT TO LOOK AT A FEW OF

03:11PM 5     THOSE COMPONENTS.

03:11PM 6          THIS IS WHAT YOU REFERRED TO A MOMENT AGO AS THE LIQUID

03:11PM 7     HANDLING THE MODULE; IS THAT RIGHT?

03:11PM 8     A.   IT IS.

03:11PM 9     Q.   AND WHAT DOES THAT DO IN CONNECTION WITH THE TEST?

03:11PM 10    A.   THIS IS THE ROBOT THAT IS CAPABLE OF PICKING UP THE LITTLE

03:11PM 11    COMPONENTS FROM THE CARTRIDGE FOR HANDLING SMALL VOLUMES OF

03:11PM 12    FLUID.

03:11PM 13         THERE'S LITTLE TIPS THAT ATTACH TO IT THAT ALLOW YOU TO

03:11PM 14    SUCK UP VERY SMALL AMOUNTS OF LIQUID, DISPENSE THEM, MIX THEM

03:11PM 15    WITH OTHER LITTLE VOLUMES OF FLUID, AND THEN TRANSPORT THEM TO

03:11PM 16    VARIOUS PLACES IN THE DEVICE TO BE HEATED OR PROCESSED OR READ

03:11PM 17    ON ONE OF THE DETECTERS.

03:11PM 18    Q.   AND WAS THERE ALSO A CAMERA WITHIN THIS DEVICE?

03:12PM 19    A.   THERE IS.  YES, THERE WAS.

03:12PM 20    Q.   LET ME ASK TO YOU LOOK AT PAGE 63, COMPONENT NUMBER 11.

03:12PM 21         AND THERE'S A DESCRIPTION THERE, THE MACHINE VISION

03:12PM 22    SYSTEM?

03:12PM 23    A.   YES.

03:12PM 24    Q.   AND THE FIRST SENTENCE READS, "THE TSPU IS CONFIGURED TO

03:12PM 25    INCLUDE SENSORS WITHIN THE ENCLOSURE FOR THE TLAS TO MONITOR

03:12PM 1    DEVICE STATUS AND OPERATION."

03:12PM 2         THE TLAS IS A REFERENCE TO THE SOFTWARE SYSTEM?

03:12PM 3    A.   IT IS.

03:12PM 4    Q.   AND IS THIS OTHERWISE A DESCRIPTION OF CAMERAS WITHIN THE

03:12PM 5    DEVICE?

03:12PM 6    A.   IT IS.  IT'S A DESCRIPTION OF THE CAMERAS, THE THINGS THAT

03:12PM 7    THEY CAN MONITOR AND THEN COMMUNICATE TO THE TLAS TO ENSURE

03:12PM 8    THAT THE SAMPLE IS GOOD AND THAT THE DEVICE IS PERFORMING WELL.

03:12PM 9    Q.   OKAY.  NOW, IN CONNECTION WITH RUNNING AN ASSAY ON THIS

03:13PM 10   DEVICE, ARE THERE PROTOCOLS THAT WERE SUBMITTED TO THE FDA AS

03:13PM 11   PART OF THE REQUEST FOR APPROVAL?

03:13PM 12   A.   THERE WERE.

03:13PM 13   Q.   LET ME ASK YOU TO LOOK AT PAGE 70.  IT'S BATES LABELLED

03:13PM 14   1749.

03:13PM 15        THIS IS LABELLED AS THE "PROTOCOL FOR HSV-1 ASSAY (CENTRAL

03:13PM 16   CLIA-LABORATORY MODEL)."

03:13PM 17        DO YOU SEE THAT?

03:13PM 18   A.   I DO.

03:13PM 19   Q.   AND CAN YOU DESCRIBE WHAT THIS SECTION IS DESCRIBING?

03:13PM 20   A.   YES.  THERE WERE MULTIPLE MODELS THAT WE SUBMITTED TO THE

03:13PM 21   FDA REFLECTIVE OF OUR PHASE I AND OUR PHASE II.

03:13PM 22        SO THIS IS THE PHASE I OF OUR MODEL WHERE THE SAMPLE IS

03:13PM 23   PHYSICALLY SHIPPED TO A CLIA LAB AND THEN THESE ARE THE STEPS

03:13PM 24   ASSOCIATED WITH RUNNING THAT SAMPLE ON THIS DEVICE IN A CLIA

03:14PM 25   LABORATORY.

7893

03:14PM 1    Q.   AND THEN IF YOU LOOK AT PAGE BATES LABELLED 1752, 10.07.3.

03:14PM 2         CAN YOU DESCRIBE WHAT THIS IS?

03:14PM 3    A.   YES.  THIS IS OUR PHASE II OR FIELD MODEL WHERE WE WERE

03:14PM 4    DESCRIBING WHAT THE STEPS ARE ASSOCIATED WITH A SAMPLE BEING

03:14PM 5    INSERTED INTO THE CARTRIDGE AND THEN PUT INTO THE DEVICE WHEN

03:14PM 6    THE DEVICE IS IN THE FIELD.

03:14PM 7    Q.   WERE BOTH PROTOCOLS APPROVED AS PART OF THIS APPLICATION?

03:14PM 8    A.   THEY WERE.

03:14PM 9    Q.   OKAY.  LET'S GO BACK TO 2016.

03:14PM 10        WHEN WAS THIS APPROVAL GRANTED?

03:14PM 11   A.   THIS APPROVAL WAS GRANTED IN 2015.

03:14PM 12   Q.   OKAY.  AND DID YOU VIEW THAT AS RELATING TO POSSIBLE

03:14PM 13   IMPLEMENTATION OF PHASE II?

03:15PM 14   A.   YES.

03:15PM 15   Q.   HOW LONG AFTER THAT APPROVAL DID THE CMS INSPECTION THAT

03:15PM 16   WE'VE DISCUSSED BEGIN?

03:15PM 17   A.   I THINK JUST OVER A MONTH.

03:15PM 18   Q.   OKAY.  NOW, IF WE RETURN TO 2016, WE WERE TALKING ABOUT

03:15PM 19   THE COMPANY'S CHANGE IN BUSINESS STRATEGY.

03:15PM 20        DO YOU ALSO RECALL THAT THERE WAS TESTIMONY DURING THE

03:15PM 21   COURSE OF THE CASE FROM VARIOUS INDIVIDUALS SAYING THAT THEY

03:15PM 22   THOUGHT IT WOULD BE A GOOD IDEA FOR THERANOS TO HAVE ITS

03:15PM 23   TECHNOLOGY REVIEWED BY ACADEMIC INSTITUTIONS OR PEER REVIEWED

03:15PM 24   OR LOOKED AT BY SOME OTHER THIRD PARTY?

03:15PM 25        DO YOU RECALL THAT?

03:15PM 1    A.   I DO.

03:15PM 2    Q.   AND OVER THE COURSE OF TIME, HAD THERANOS'S TECHNOLOGY

03:15PM 3    BEEN LOOKED AT BY THIRD PARTIES?

03:15PM 4    A.   YES.

03:15PM 5    Q.   HOW MANY THIRD PARTIES HAD LOOKED AT THERANOS'S TECHNOLOGY

03:15PM 6    DURING THE YEARS BETWEEN 2006 AND 2016?

03:16PM 7    A.   DOZENS.

03:16PM 8    Q.   BUT DID YOU TRY TO TAKE STEPS TO RESPOND TO ADVICE ABOUT

03:16PM 9    MAKING THERANOS MORE TRANSPARENT WITH RESPECT TO ITS

03:16PM 10   TECHNOLOGY?

03:16PM 11   A.   I DID.

03:16PM 12   Q.   AND DO YOU RECALL THAT THERE WAS TESTIMONY ABOUT AN

03:16PM 13   APPEARANCE THAT YOU MADE AT A CONFERENCE CALLED THE AACC

03:16PM 14   CONFERENCE?

03:16PM 15        DO YOU REMEMBER THAT?

03:16PM 16   A.   I DO.

03:16PM 17   Q.   AND WHAT IS THE AACC CONFERENCE?

03:16PM 18   A.   IT'S THE BIG ANNUAL CONFERENCE FOR THE AMERICAN

03:16PM 19   ASSOCIATION OF CLINICAL CHEMISTRY.

03:16PM 20   Q.   AND WERE YOU INVITED TO GIVE A PRESENTATION ABOUT

03:16PM 21   THERANOS'S TECHNOLOGY AT THAT CONFERENCE?

03:16PM 22   A.   I WAS.

03:16PM 23   Q.   AND WHEN DID THAT CONFERENCE TAKE PLACE?

03:16PM 24   A.   IN 2016.

03:16PM 25   Q.   AND WHY DID YOU CHOOSE THAT FORUM AS A FORUM WITHIN WHICH

7895

03:16PM  1    TO DISCUSS THERANOS'S TECHNOLOGY IN THE MONTHS AFTER THERE WAS

03:17PM  2    MEDIA AND REGULATORY CRITICISM?

03:17PM  3    A.   BECAUSE THERE HAD BEEN A LOT OF HOSTILE COMMENTARY ABOUT

03:17PM  4    THERANOS FROM THE LABORATORY INDUSTRY AND THIS WAS THE

03:17PM  5    LABORATORY INDUSTRY'S MAIN CONFERENCE, SO WE WANTED TO GO THERE

03:17PM  6    AND PRESENT OUR DATA DIRECTLY.

03:17PM  7    Q.   AND DID YOU, IN FACT, DO THAT?

03:17PM  8    A.   I DID.

03:17PM  9    Q.   AND DID OTHER THERANOS EMPLOYEES PARTICIPATE WITH YOU IN

03:17PM  10   GIVING THAT PRESENTATION?

03:17PM  11   A.   YES.

03:17PM  12   Q.   DO YOU REMEMBER ALL OF THE THERANOS EMPLOYEES WHO WERE

03:17PM  13   PART OF THAT PRESENTATION?

03:17PM  14   A.   IT WAS A VERY BIG TEAM WITHIN THERANOS THAT WORKED FOR

03:17PM  15   MONTHS ON THE STUDIES FOR THAT PRESENTATION AND THE ASSOCIATED

03:17PM  16   DATA.

03:17PM  17   Q.   WELL, LET ME ASK YOU TO LOOK AT EXHIBIT 10677.

03:18PM  18   A.   OKAY.  I SEE IT.  OKAY.

03:18PM  19   Q.   IS 10677 A PHOTOGRAPH OF YOU AND OTHERS FROM THERANOS AT

03:18PM  20   THE AACC CONFERENCE IN 2016?

03:18PM  21   A.   IT IS.

03:18PM  22        MR. DOWNEY:  MOVE TO ADMIT 10677.

03:18PM  23        MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:18PM  24        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:18PM  25        (DEFENDANT'S EXHIBIT 10677 WAS RECEIVED IN EVIDENCE.)

BY MR. DOWNEY:

Q.   AND IF YOU WOULD JUST LOOK.  SOME OF THESE INDIVIDUALS ARE

INDIVIDUALS WHO WORK AT THERANOS?

A.   YES.

Q.   OR WHO WORKED AT THERANOS AT THAT TIME.

     CAN YOU JUST IDENTIFY WHO THAT IS?

A.   I'M SITTING IN THE MIDDLE, AND TO MY LEFT IS DR. YOUNG,

AND THEN DR. ANEKAL, AND DR. PANGARKAR.

Q.   AND CAN YOU REMIND US WHAT DR. ANEKAL'S WORK WAS AT

THERANOS?

A.   YES.  DR. ANEKAL RAN SYSTEMS INTEGRATION AND VALIDATION

AND VERIFICATION FOR THERANOS.

Q.   AND AS OF THIS TIME, WHAT WAS DR. PANGARKAR'S ROLE AT

THERANOS?

A.   DR. PANGARKAR RAN BOTH OUR IMMUNOASSAY TEAM, AS WELL AS

OUR CYTOMETRY TEAM.

Q.   AND DID DR. YOUNG REMAIN THE HEAD OF RESEARCH AND

DEVELOPMENT AT THIS TIME?

A.   YES.

Q.   AND WAS THERE INTERACTION BETWEEN THE THERANOS EMPLOYEES

AND CRITICS OF THERANOS IN THIS FORUM?

A.   YES.

Q.   AND DID THERANOS ALSO OPEN UP ITS TECHNOLOGY AND PRESENT,

BY MEANS OF A PRESENTATION, WHAT WAS INSIDE SO THAT IT COULD BE

SEEN BY THIRD PARTIES?

03:19PM 1      A.   WE DID.

03:19PM 2              MR. DOWNEY:  YOUR HONOR, I'M GOING TO SHOW

03:19PM 3      MS. HOLMES A SINGLE SLIDE FROM A LARGER POWERPOINT.  I ONLY

03:20PM 4      WANT TO ADMIT THE SINGLE SLIDE, WHICH IS 7673A, BUT IT IS PART

03:20PM 5      OF A LARGER PRESENTATION.

03:20PM 6          FOR COMPLETENESS, I'VE INCLUDED IN YOUR BINDER THE FULL

03:20PM 7      PRESENTATION, BUT I'M ONLY INTERESTED IN PAGE 52.

03:20PM 8              THE COURT:  IT'S 7673 DID YOU SAY?

03:20PM 9              MR. DOWNEY:  7673A IT'S DESIGNATED.

03:20PM 10             THE WITNESS:  WHAT BINDER IS THAT?

03:20PM 11             MR. DOWNEY:  IT SHOULD BE IN THE THINNER BINDER, THE

03:20PM 12     BINDER THAT IS LABELLED AS VOLUME 4.

03:20PM 13             THE WITNESS:  OKAY.  GOT IT.

03:20PM 14             THE COURT:  MR. LEACH?

03:20PM 15             MR. LEACH:  I'M SORRY, WHICH PAGE?

03:20PM 16             MR. DOWNEY:  IT'S PAGE 52 OF THE POWERPOINT.

03:20PM 17             MR. LEACH:  NO OBJECTION.

03:21PM 18             THE COURT:  PAGE 52 OF 7673A IS ADMITTED.

03:21PM 19         (DEFENDANT'S EXHIBIT 7673A, PAGE 52 WAS RECEIVED IN

03:21PM 20     EVIDENCE.)

03:21PM 21     BY MR. DOWNEY:

03:21PM 22     Q.   AND CAN YOU TELL US WHAT THIS DIAGRAM DEPICTS?

03:21PM 23     A.   YES.  THIS IS THE 4 SERIES MINILAB AND ALL OF THE

03:21PM 24     COMPONENTS IN IT BLOWN UP SO THAT YOU CAN SEE EACH OF THE

03:21PM 25     INDIVIDUAL COMPONENTS.

7898

03:21PM  1    Q.   OKAY.  AND IN ADDITION TO THE AACC CONFERENCE, WAS

03:21PM  2    THERANOS ALSO WORKING TO HAVE ITS TECHNOLOGY EVALUATED IN OTHER

03:21PM  3    FORUMS IN RESPONSE TO THE CRITICISMS THAT HAD BEEN RAISED?

03:21PM  4    A.   WE WERE.

03:21PM  5    Q.   AND DID THERANOS APPOINT A TECHNOLOGY ADVISORY BOARD?

03:21PM  6    A.   YES.

03:21PM  7    Q.   AND WHAT WAS THE TECHNOLOGY ADVISORY BOARD?

03:22PM  8    A.   THEY WERE MEMBERS OF THE NATIONAL ACADEMY OF ENGINEERING

03:22PM  9    AND OTHER ENGINEERING LEADERS WHO CAME TOGETHER TO HELP OVERSEE

03:22PM 10    OUR PRODUCT DEVELOPMENT EFFORTS AND THE PUBLICATION OF DATA ON

03:22PM 11    THE TECHNOLOGY.

03:22PM 12    Q.   DID DR. ROBERTSON PLAY A ROLE WITH REGARD TO THE

03:22PM 13    TECHNOLOGY ADVISORY BOARD?

03:22PM 14    A.   HE DID.

03:22PM 15    Q.   AND WHAT ROLE DID HE PLAY?

03:22PM 16    A.   HE WAS ONE OF THE CO-CHAIRS.

03:22PM 17    Q.   AND DO YOU KNOW WHAT INFORMATION WAS PRESENTED TO THE

03:22PM 18    MEMBERS OF THAT TECHNOLOGY ADVISORY BOARD?

03:22PM 19    A.   I DO.

03:22PM 20    Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 7680?

03:23PM 21    A.   OKAY.

03:23PM 22    Q.   IS THIS AN EMAIL FROM DR. ROBERTSON THAT YOU AND OTHERS

03:23PM 23    RECEIVED IN 2016 ABOUT THE TECHNOLOGY ADVISORY BOARD?

03:23PM 24    A.   IT IS.

03:23PM 25            MR. DOWNEY:  I MOVE THE ADMISSION OF 7680.

03:23PM   1            MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:23PM   2            THE COURT:  IT'S ADMITTED.

03:23PM   3            (DEFENDANT'S EXHIBIT 7680 WAS RECEIVED IN EVIDENCE.)

03:23PM   4    BY MR. DOWNEY:

03:23PM   5    Q.   DO YOU SEE IN THE FIRST SENTENCE THAT MR. ROBERTSON WAS

03:23PM   6    IDENTIFYING PEOPLE THAT HE THOUGHT WOULD BE APPROPRIATE FOR THE

03:23PM   7    TECHNOLOGY ADVISORY BOARD?

03:23PM   8    A.   I DO.

03:23PM   9    Q.   AND THEN IF YOU GO TO THE PARAGRAPH BELOW THAT, HE

03:23PM   10   DESCRIBES WHAT SHOULD BE PROVIDED TO THOSE INDIVIDUALS.

03:23PM   11        DO YOU SEE THAT?

03:23PM   12   A.   YES.

03:23PM   13   Q.   AND DO YOU SEE IN THE -- THERE'S A LIST OF FOUR ITEMS

03:24PM   14   THERE?

03:24PM   15   A.   YES.

03:24PM   16   Q.   AND DO YOU SEE THAT THE SECOND ITEM WAS "DETAILED

03:24PM   17   TECHNICAL PRESENTATIONS"?

03:24PM   18   A.   YES.

03:24PM   19   Q.   DO YOU SEE THAT?

03:24PM   20        AND THAT'S ALSO -- HE'S SUGGESTING THAT FROM DR. ANEKAL,

03:24PM   21   DR. YOUNG, AND DR. PANGARKAR?

03:24PM   22   A.   YES.

03:24PM   23   Q.   AND THEN HE SUGGESTS THAT THE RESEARCH AND DEVELOPMENT

03:24PM   24   LABS IN THE CLIA LAB BE TOURED BY THOSE INDIVIDUALS?

03:24PM   25   A.   YES.

7900

03:24PM 1    Q.   AND WAS A GROUP LIKE THIS FORMED AND CONTINUED TO PROVIDE

03:24PM 2    ADVICE TO THERANOS IN CONNECTION WITH ITS TECHNOLOGY?

03:24PM 3    A.   IT WAS.

03:24PM 4    Q.   NOW, DO YOU RECALL THAT AT THE END OF MR. EDLIN'S

03:24PM 5    TESTIMONY, HE TESTIFIED THAT HE HAD LEFT THERANOS BECAUSE HE

03:24PM 6    FELT THAT THERANOS WAS NOT GOING TO BE ABLE TO MAKE SHOWINGS TO

03:25PM 7    ANY THIRD PARTIES THAT SUBSTANTIATED ITS CLAIMS ABOUT ITS

03:25PM 8    TECHNOLOGY?

03:25PM 9    A.   I DO.

03:25PM 10   Q.   I'D LIKE TO ASK YOU, DURING THE PERIOD DURING WHICH

03:25PM 11   THERANOS WAS RESPONDING TO CRITICISM FROM THE MEDIA AND

03:25PM 12   CRITICISM FROM REGULATORS, DID THERANOS SUBMIT PAPERS TO PEER

03:25PM 13   REVIEWED PUBLICATIONS TO REVIEW ITS TECHNOLOGY AND THE

03:25PM 14   FUNCTIONALITY AND EFFECTIVENESS OF ITS TECHNOLOGY?

03:25PM 15   A.   WE DID.

03:25PM 16   Q.   AND WERE SOME OF THOSE PAPERS THE RESULT OF COLLABORATIONS

03:25PM 17   BETWEEN THERANOS AND SOME OUTSIDE THIRD PARTY?

03:25PM 18   A.   YES.

03:25PM 19   Q.   AND IN SOME CASES WERE THEY ACADEMIC INSTITUTIONS?

03:25PM 20   A.   YES.

03:25PM 21   Q.   AND IN SOME CASES WERE THEY INDUSTRY PERSONNEL?

03:25PM 22   A.   YES.

03:25PM 23   Q.   AND WERE THERE OTHER MANUSCRIPTS RELATED TO THERANOS'S

03:25PM 24   TECHNOLOGY THAT WERE SUBMITTED FOR PUBLICATION TO VARIOUS

03:26PM 25   PROFESSIONAL JOURNALS?

03:26PM  1    A.   YES.

03:26PM  2    Q.   I'D LIKE TO ASK YOU TO LOOK AT EXHIBIT 7719.

03:26PM  3    A.   OKAY.

03:26PM  4    Q.   CAN YOU TELL US WHAT 7719 IS?

03:26PM  5    A.   YES.  THIS IS A PEER REVIEWED PAPER ON THE MINILAB THAT

03:26PM  6    WAS WRITTEN FOLLOWING A NUMBER OF STUDIES SHOWING THE MINILAB'S

03:26PM  7    CAPABILITY TO PERFORM EACH OF THE DIFFERENT FOUR METHODS THAT

03:26PM  8    WE'VE TALKED ABOUT.

03:26PM  9    Q.   AND WHERE WAS THIS STUDY PUBLISHED?

03:26PM  10   A.   IT WAS PUBLISHED IN A JOURNAL CALLED "ALCHEMY."  IT'S A

03:26PM  11   BIO ENGINEERING AND MEDICINE TRANSITION JOURNAL.

03:26PM  12   Q.   AND DO YOU KNOW WHAT THIS STUDY CONCLUDED WITH REGARD TO

03:26PM  13   THERANOS TECHNOLOGY?

03:27PM  14        MR. LEACH:  YOUR HONOR, OBJECTION.  HEARSAY.  401

03:27PM  15   AND 403 BASED ON THE DATES AT THE TOP.

03:27PM  16        AND IF WE'RE GOING TO HAVE TESTIMONY ABOUT THIS, WE SHOULD

03:27PM  17   ADMIT THE DOCUMENT.

03:27PM  18        MR. DOWNEY:  WELL, I'LL MOVE TO ADMIT THE DOCUMENT.

03:27PM  19        THE COURT:  I'M SORRY?

03:27PM  20        MR. DOWNEY:  I'LL MOVE TO ADMIT THE DOCUMENT.

03:27PM  21        MR. LEACH:  401, 403, RELEVANCE.

03:27PM  22        THE COURT:  AS TO THE ADMISSION OF THE DOCUMENT?

03:27PM  23        MR. LEACH:  YES, FOR THE SUBSTANCE OF IT.

03:27PM  24        THE COURT:  IS THIS GOING TO THE ISSUE OF WHETHER OR

03:27PM  25   NOT PEER REVIEWED PAPERS WERE ADMITTED AND THAT ISSUE ONLY, AS

7902

| | |
|---|---|
| 03:27PM | 1 |
| 03:27PM | 2 |
| 03:27PM | 3 |
| 03:27PM | 4 |
| 03:27PM | 5 |
| 03:27PM | 6 |
| 03:27PM | 7 |
| 03:27PM | 8 |
| 03:28PM | 9 |
| 03:28PM | 10 |
| 03:28PM | 11 |
| 03:28PM | 12 |
| 03:28PM | 13 |
| 03:28PM | 14 |
| 03:28PM | 15 |
| 03:28PM | 16 |
| 03:28PM | 17 |
| 03:28PM | 18 |
| 03:28PM | 19 |
| 03:28PM | 20 |
| 03:28PM | 21 |
| 03:28PM | 22 |
| 03:28PM | 23 |
| 03:28PM | 24 |
| 03:28PM | 25 |

OPPOSED TO THE CONTENT?  YOU ASKED THIS WITNESS, I THINK THE

LAST QUESTION WAS, WELL, WHAT WAS THE OPINION OF THE PAPER?

MR. DOWNEY:  WELL, I THINK THE TESTIMONY THAT THIS

PAPER WAS RESPONSIVE TO IS THAT THERANOS COULD NOT PARTICIPATE

IN A PEER REVIEWED STUDY THAT WOULD SHOW THE EFFECTIVENESS OF

ITS TECHNOLOGY.  I THINK I'M DESIGNED TO -- OR ALLOWED TO REBUT

THAT.

THE COURT:  WELL, I'LL PERMIT YOU TO ADMIT THIS FOR

PURPOSES OF FOLLOWING UP ON YOUR QUESTION OF WHETHER OR NOT

PEER REVIEW WAS PROVIDED, THE PAPER WAS SUBMITTED.  I THINK

THAT WAS YOUR QUESTION.

MR. DOWNEY:  WELL, I DID ASK IF IT WAS SUBMITTED.

AND I ALSO, IN FAIRNESS, YOUR HONOR, ASKED IF IT WAS

PUBLISHED, AND MS. HOLMES DID TESTIFY THAT IT WAS PUBLISHED.

SO I DID ELICIT, WITHOUT OBJECTION, THAT TESTIMONY.

THE COURT:  RIGHT.  RIGHT.  SO THAT CAN COME IN.

I'M GOING TO SUSTAIN THE OBJECTION AS TO THE OPINION.

IT'S NOT OFFERED FOR THE TRUTH OF THE MATTER ASSERTED AT THAT

POINT, BUT TO PROVE THAT THERE WERE PEER REVIEWED DOCUMENTS

SUBMITTED.

SO IT'S ADMITTED FOR THAT LIMITED PURPOSE, LADIES AND

GENTLEMEN, NOT FOR THE TRUTH OF THE MATTER ASSERTED IN THE

PAPER.

(DEFENDANT'S EXHIBIT 7719 WAS RECEIVED IN EVIDENCE FOR A

LIMITED PURPOSE.)

7903

03:28PM   1    BY MR. DOWNEY:

03:28PM   2    Q.    AND JUST IF WE TAKE A LOOK AT 7719 FOR A MOMENT.

03:28PM   3         DO YOU SEE THIS IS THE PUBLICATION HEADED "ENGINEERING OF

03:28PM   4    A MINIATURIZED, ROBOTIC CLINICAL LABORATORY"?

03:28PM   5    A.    YES.

03:28PM   6    Q.    AND DO YOU RECOGNIZE SOME OF THE NAMES OF SOME OF THE

03:29PM   7    SCIENTISTS LISTED UNDERNEATH AS INDIVIDUALS WHO WORKED AT

03:29PM   8    THERANOS?

03:29PM   9    A.    THEY ARE.

03:29PM  10    Q.    AND WERE THERE INDIVIDUALS WHO ALSO DID NOT WORK AT

03:29PM  11    THERANOS WHO TOOK PART IN THE PUBLICATION OF THIS -- IN THE

03:29PM  12    WORK THAT LED TO THIS SUBMISSION?

03:29PM  13    A.    YES.

03:29PM  14    Q.    AND WHERE WERE THE OTHER INDIVIDUALS FROM?

03:29PM  15    A.    I BELIEVE THEY WERE COLLABORATORS WHO RAN THE STUDIES OR

03:29PM  16    HELPED US WITH THE STUDIES THAT WERE IN THIS PROGRAM.  I WOULD

03:29PM  17    NEED TO LOOK AT IT TO FIND THEM.

03:29PM  18    Q.    WE'LL DO THE FOOTNOTES LATER ON.  IT'S NOT THAT IMPORTANT,

03:29PM  19    MS. HOLMES.  I DON'T MEAN TO OPPRESS YOU, BUT IT'S WITHIN THE

03:30PM  20    DOCUMENT, SO IF WE NEED THAT, WE CAN GET TO IT.

03:30PM  21         LET ME ASK YOU NEXT TO LOOK AT EXHIBIT 7718.

03:30PM  22         CAN YOU IDENTIFY -- THAT SHOULD ALSO BE IN THE SMALLER

03:30PM  23    NOTEBOOK THAT I GAVE YOU --

03:30PM  24    A.    YEP.

03:30PM  25    Q.    -- TODAY.

7904

03:30PM 1     A.   I HAVE IT.

03:30PM 2     Q.   AND IS THIS ALSO -- WELL, CAN YOU IDENTIFY 7718?

03:30PM 3     A.   YES.  IT'S A PEER REVIEWED PUBLICATION IN "THE JOURNAL OF

03:30PM 4     VIROLOGICAL METHODS" THAT WE PUBLISHED.

03:30PM 5          MR. DOWNEY:  SUBJECT TO YOUR HONOR'S PRIOR

03:30PM 6     RESTRICTION ON THE PRIOR EXHIBIT, I MOVE TO ADMIT 7718.

03:30PM 7          MR. LEACH:  SAME OBJECTIONS, YOUR HONOR.  HEARSAY,

03:31PM 8     401, 403.

03:31PM 9          THE COURT:  ALL RIGHT.  THANK YOU.

03:31PM 10    I'LL ALLOW IT TO BE ADMITTED.  IT GOES TO THE PREVIOUS

03:31PM 11    QUESTION THAT WAS ASKED REGARDING PEER REVIEWS.

03:31PM 12    IT'S NOT OFFERED FOR THE TRUTH OF THE MATTER ASSERTED,

03:31PM 13    LADIES AND GENTLEMEN, AND IT IS OTHERWISE ADMISSIBLE UNDER A

03:31PM 14    403 ANALYSIS.  IT DOES PROVE UP THE POINT THAT THE QUESTION

03:31PM 15    ASKS, SO I'LL ALLOW IT, NOT FOR THE TRUTH OF THE MATTER

03:31PM 16    ASSERTED, BUT JUST AS TO THE ISSUE OF PEER REVIEWED DOCUMENTS

03:31PM 17    THAT WERE SUBMITTED.

03:31PM 18         (DEFENDANT'S EXHIBIT 7718 WAS RECEIVED IN EVIDENCE FOR A

03:31PM 19    LIMITED PURPOSE.)

03:31PM 20    BY MR. DOWNEY:

03:31PM 21    Q.   AND IF WE CAN JUST DISPLAY THE FIRST PAGE OF 7718.

03:31PM 22    CAN YOU EXPLAIN WHAT THIS PEER REVIEWED WORK WAS?

03:31PM 23    A.   YES.

03:31PM 24    Q.   AND WHAT WAS IT?

03:31PM 25    A.   THIS IS A PAPER ON SOME OF THE CHEMICALS THAT WE DEVELOPED

03:31PM  1    FOR USE IN OUR SMALL SAMPLE TEST METHODS.  SO WE WOULD ACTUALLY

03:31PM  2    MAKE MANY OF THE CHEMICALS THAT WOULD GO INTO THE SMALL SAMPLE

03:32PM  3    TESTS THEMSELVES IN ORDER TO REALIZE BETTER TEST PERFORMANCE,

03:32PM  4    AND THIS IS A PAPER ON A TEST FOR HSV-2 SHOWING THE PERFORMANCE

03:32PM  5    OF THESE CHEMICALS OR REAGENTS NEXT TO COMMERCIALLY AVAILABLE

03:32PM  6    CHEMICALS.

03:32PM  7    Q.   OKAY.  LET ME ASK YOU TO LOOK NEXT IN THE SAME THIN

03:32PM  8    NOTEBOOK AT 7695.

03:32PM  9    A.   OKAY.

03:32PM 10    Q.   DO YOU RECOGNIZE EXHIBIT 7695?

03:32PM 11    A.   I DO.

03:32PM 12    Q.   AND WHAT IS 7695?

03:32PM 13    A.   IT'S A PEER REVIEWED PAPER IN A JOURNAL CALLED "CUREUS"

03:32PM 14    ABOUT SOME OF OUR ALGORITHMS AND INFORMATICS USED IN OUR

03:32PM 15    SYSTEMS.

03:33PM 16             MR. DOWNEY:  YOUR HONOR, I MOVE 7695.

03:33PM 17             MR. LEACH:  SAME OBJECTIONS, YOUR HONOR.

03:33PM 18             THE COURT:  THANK YOU.  I'LL OVERRULE THE OBJECTION.

03:33PM 19        THIS IS ADMITTED NOT FOR THE TRUTH OF THE MATTER ASSERTED,

03:33PM 20    LADIES AND GENTLEMEN, BUT AS EVIDENCE OF THE PREVIOUS QUESTION

03:33PM 21    WHETHER OR NOT PEER REVIEWED PAPERS WERE SUBMITTED, AND UNDER

03:33PM 22    403 THIS IS MORE PROBATIVE OF THAT ISSUE.

03:33PM 23        SO IT'S ADMITTED.

03:33PM 24        (DEFENDANT'S EXHIBIT 7695 WAS RECEIVED IN EVIDENCE FOR A

03:33PM 25    LIMITED PURPOSE.)

7906

03:33PM 1    BY MR. DOWNEY:

03:33PM 2    Q.   IF WE CAN LOOK BRIEFLY AT THE FIRST PAGE OF THIS STUDY.

03:33PM 3    ARE THERE THERANOS SCIENTISTS LISTED IN THE AUTHOR LINE OF THIS

03:33PM 4    PAPER?

03:33PM 5    A.   YES.

03:33PM 6    Q.   AND WHAT JOURNAL WAS THIS PUBLISHED IN?

03:33PM 7    A.   "CUREUS."

03:33PM 8    Q.   AND WHAT IS "CUREUS"?

03:33PM 9    A.   IT'S AN OPEN ACCESS JOURNAL THAT PUBLISHES TECHNICAL

03:33PM 10   PAPERS.

03:34PM 11   Q.   LET ME ASK YOU TO LOOK NEXT AT -- WELL, LET ME ASK YOU, IN

03:34PM 12   CONNECTION WITH SOME OTHER WORK THAT THERANOS WAS DOING TO

03:34PM 13   DEMONSTRATE ITS TECHNOLOGY, DID THERANOS SUBMIT SOME PAPERS,

03:34PM 14   PREPARE PAPERS AS A RESULT OF STUDIES THAT ENDED UP NOT BEING

03:34PM 15   PUBLISHED?

03:34PM 16   A.   YES.

03:34PM 17   Q.   AND DID ONE OF THOSE PAPERS RELATE TO A COLLABORATION

03:34PM 18   BETWEEN UCSF AND THERANOS?

03:34PM 19   A.   YES.

03:34PM 20   Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 7717.

03:34PM 21   A.   OKAY.

03:34PM 22   Q.   ARE YOU ABLE TO IDENTIFY THAT?

03:34PM 23   A.   YES.

03:34PM 24   Q.   AND WHAT IS IT?

03:34PM 25   A.   THIS IS A SUBMISSION FOR PEER REVIEW FROM A STUDY THAT WAS

```
03:34PM   1        RUN BY UCSF ON THE PERFORMANCE OF THERANOS'S MINILAB COMPARED

03:34PM   2        TO UCSF'S LABORATORY AND ANOTHER LABORATORY.

03:34PM   3                    MR. DOWNEY:  OKAY.  YOUR HONOR, I MOVE THE ADMISSION

03:35PM   4        OF 7717.

03:35PM   5                    MR. LEACH:  YOUR HONOR, THIS IS FROM 2017.  WE

03:35PM   6        OBJECT ON RELEVANCE, 403, AND HEARSAY.

03:35PM   7                    THE COURT:  IS THIS -- YOU PREVIOUSLY ASKED WHETHER

03:35PM   8        PAPERS WERE SUBMITTED FOR PEER REVIEW.

03:35PM   9                    MR. DOWNEY:  YES.

03:35PM  10                    THE COURT:  AND WAS THIS SUBMITTED ALSO FOR PEER

03:35PM  11        REVIEW?

03:35PM  12                    MR. DOWNEY:  IT WAS, YES, I BELIEVE SO.

03:35PM  13                    THE COURT:  ALL RIGHT.  BUT IT SOUNDS LIKE IT WAS

03:35PM  14        REJECTED.

03:35PM  15                    MR. DOWNEY:  WELL, IT WASN'T REJECTED, BUT IT

03:35PM  16        WASN'T --

03:35PM  17                    THE COURT:  WHY DON'T YOU CLEAR THAT UP FOR ME?  I'M

03:35PM  18        NOT -- I'M SORRY.

03:35PM  19                    MR. DOWNEY:  YEAH, IT WAS NOT REJECTED.  IT WAS

03:35PM  20        JUST -- IT WAS SUBMITTED, BUT IT WAS NOT PUBLISHED IN A

03:35PM  21        PUBLICATION.

03:35PM  22                    THE COURT:  SO THERE WAS NO ACTION TAKEN ON THIS?

03:35PM  23                    MR. DOWNEY:  NO ACTION, NO.

03:35PM  24                    THE COURT:  SO THE RELEVANCE OF THIS IS?

03:35PM  25                    MR. DOWNEY:  WELL, WE WERE WILLING TO MAKE THE
```

7908

03:35PM 1    TECHNOLOGY AVAILABLE TO THE UNIVERSITY THAT ONE OF THE

03:35PM 2    INVESTORS IN THIS CASE --

03:35PM 3            THE COURT:  SO THIS IS A DOCUMENT THAT IS ANOTHER

03:35PM 4    DOCUMENT OF A PEER REVIEWED ARTICLE THAT WAS SUBMITTED?

03:36PM 5            MR. DOWNEY:  THAT'S CORRECT.

03:36PM 6            THE COURT:  FOR THAT PURPOSE ONLY?

03:36PM 7            MR. DOWNEY:  YES.

03:36PM 8            THE COURT:  I'LL ADMIT IT FOR THAT LIMITED PURPOSE,

03:36PM 9    LADIES AND GENTLEMEN.  THIS IS ANOTHER PAPER, PEER REVIEWED

03:36PM 10   PAPER THAT WAS SUBMITTED.  IT'S NOT OFFERED FOR THE TRUTH OF

03:36PM 11   ANY OF THE MATTER ASSERTED IN THE PAPER.

03:36PM 12       (DEFENDANT'S EXHIBIT 7717 WAS RECEIVED IN EVIDENCE.)

03:36PM 13   BY MR. DOWNEY:

03:36PM 14   Q.  AND IN ADDITION TO SUBMITTING MATTERS FOR A PEER REVIEW,

03:36PM 15   DID THERANOS ALSO MAKE ADDITIONAL PRESENTATIONS ABOUT ASPECTS

03:36PM 16   OF ITS TECHNOLOGY AT PROFESSIONAL CONFERENCES?

03:36PM 17   A.  YES.

03:36PM 18   Q.  AND I'D LIKE TO ASK YOU TO LOOK AT EXHIBITS 7690 AND 7693.

03:36PM 19   A.  OKAY.

03:36PM 20   Q.  AND ARE THEY DOCUMENTS WITH WHICH YOU'RE FAMILIAR?

03:36PM 21   A.  THEY ARE.

03:36PM 22   Q.  AND WHAT IS EXHIBIT 7690?

03:37PM 23   A.  IT IS A POSTER FROM A SCIENTIFIC CONFERENCE ON THE ZIKA

03:37PM 24   TEST THAT RAN ON MINILAB AS COMPARED TO TRADITIONAL METHODS.

03:37PM 25   Q.  AND WHAT IS 7693?

7909

03:37PM    1    A.    IT IS ANOTHER POSTER ON THE CHEMISTRY FOR THE SMALL SAMPLE

03:37PM    2    MEASUREMENT OF ZIKA.

03:37PM    3    Q.    OKAY.

03:37PM    4         YOUR HONOR, I MOVE THE ADMISSION OF 7690 AND 7693.

03:37PM    5            MR. LEACH:  SAME OBJECTIONS, YOUR HONOR.  HEARSAY,

03:37PM    6    RELEVANCE, 403.

03:37PM    7            THE COURT:  I THINK THERE'S A LACK OF FOUNDATION ON

03:37PM    8    THESE, SO I'LL SUSTAIN THE OBJECTION.

03:37PM    9            MR. DOWNEY:  OKAY.  ALL RIGHT.

03:37PM   10    Q.    MS. HOLMES, I WANT TO TALK ABOUT YOUR OWN OWNERSHIP OF

03:38PM   11    SHARES WHILE YOU WERE AT THERANOS IN A MINUTE, BUT BEFORE I DO

03:38PM   12    THAT, I WANT TO ASK YOU ABOUT A COUPLE OF ITEMS THAT WE

03:38PM   13    DISCUSSED LAST WEEK.

03:38PM   14         DO YOU RECALL THAT WE WERE TALKING ABOUT THE RELATIONSHIP

03:38PM   15    BETWEEN THERANOS AND SAFEWAY?

03:38PM   16    A.    I DO.

03:38PM   17    Q.    AND DO YOU RECALL THAT YOU TESTIFIED THAT AT SOME POINT

03:38PM   18    AFTER MR. BURD LEFT, YOU BECAME LESS INVOLVED WITH THAT

03:38PM   19    RELATIONSHIP?

03:38PM   20    A.    YES.

03:38PM   21    Q.    I'D LIKE TO JUST ASK YOU TO LOOK AT EXHIBIT 15027.

03:38PM   22    A.    WHICH BINDER IS THAT IN?

03:38PM   23    Q.    THAT SHOULD BE, I BELIEVE, IN THE LARGER BINDER THAT YOU

03:39PM   24    HAVE?

03:39PM   25    A.    OKAY.

7910

03:39PM   1      Q.   VOLUME 3.

03:39PM   2      A.   OKAY.

03:39PM   3      Q.   IS THIS AN EMAIL FROM MR. BALWANI TO YOU ABOUT THE SAFEWAY

03:39PM   4      RELATIONSHIP?

03:39PM   5      A.   YES.

03:39PM   6               MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

03:39PM   7      15027.

03:39PM   8               MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:39PM   9               THE COURT:  IT'S ADMITTED.

03:39PM  10          (DEFENDANT'S EXHIBIT 15027 WAS RECEIVED IN EVIDENCE.)

03:39PM  11               MR. DOWNEY:  AND IF WE CAN JUST DISPLAY THAT FOR A

03:39PM  12      MOMENT.

03:39PM  13      Q.   DO YOU SEE THAT THIS EMAIL IS DATED MARCH 13TH OF 2014?

03:39PM  14      HAD MR. BALWANI TAKEN OVER PRINCIPAL -- BEING THE PRINCIPAL

03:39PM  15      INTERFACE WITH SAFEWAY BY THIS DATE?

03:40PM  16      A.   HE HAD.

03:40PM  17      Q.   AND THERE'S A REFERENCE HERE TO BOB GORDON AT SAFEWAY.

03:40PM  18          DO YOU SEE THAT?

03:40PM  19      A.   YES.

03:40PM  20      Q.   AND DID YOU UNDERSTAND THAT BOB GORDON WAS HIS -- HAD

03:40PM  21      BECOME HIS PRIMARY CONTACT?

03:40PM  22      A.   YES.

03:40PM  23      Q.   OKAY.  WE CAN PUT THAT ASIDE.

03:40PM  24          WE SPOKE ALSO LAST WEEK ABOUT THE THERANOS BOARD OF

03:40PM  25      DIRECTORS IN 2013 AND '14, AND YOU MENTIONED

03:40PM   1    SECRETARY SHULTZ'S ROLE WITH REGARD TO THAT BOARD.

03:40PM   2    A.   YES.

03:40PM   3    Q.   AND I BELIEVE YOU TESTIFIED THAT HE WOULD COMMUNICATE WITH

03:40PM   4    YOU IN SOME INSTANCES ORALLY; IS THAT RIGHT?

03:40PM   5    A.   YES.

03:40PM   6    Q.   AND IN SOME INSTANCES WOULD HE COMMUNICATE WITH YOU BY

03:40PM   7    LETTER?

03:40PM   8    A.   YES.

03:40PM   9    Q.   I WANT TO ASK YOU TO TAKE A LOOK AT 15035.

03:41PM  10    A.   GOT IT.

03:41PM  11    Q.   AND DO YOU RECOGNIZE 15035?

03:41PM  12    A.   I DO.

03:41PM  13    Q.   AND COULD YOU TELL US WHAT 15035 IS?

03:41PM  14    A.   IT'S A LETTER FROM MR. SHULTZ ASKING ME TO MEET WITH

03:41PM  15    SOMEONE FROM JAPAN ABOUT DEPLOYING OUR SYSTEMS IN JAPAN.

03:41PM  16    Q.   OKAY.  AND I JUST WANT TO ASK IF COMMUNICATIONS FROM

03:41PM  17    MR. SHULTZ TO YOU BY LETTER WERE FREQUENT?

03:41PM  18    A.   THEY WERE.

03:41PM  19    Q.   AND WHAT SUBJECT MATTERS WOULD THEY COVER?

03:41PM  20    A.   THEY WOULD COVER TOPICS LIKE THIS WHERE MR. SHULTZ THOUGHT

03:41PM  21    THAT WE SHOULD BE FOCUSSED ON INTERNATIONAL EXPANSION,

03:41PM  22    INTERNATIONAL OPPORTUNITIES AND MEETING WITH PEOPLE FROM

03:41PM  23    DIFFERENT COUNTRIES TO BE ABLE TO PURSUE THAT.

03:41PM  24         THEY WOULD FOCUS ON OUR BOARD MEETINGS AND TOPICS HE

03:42PM  25    THOUGHT SHOULD BE COVERED IN THE BOARD MEETINGS WHERE HE

03:42PM 1    THOUGHT WE SHOULD FOCUS IN THOSE MEETINGS.

03:42PM 2         THEY WOULD BE FOCUSSED ON MEETINGS HE WAS OTHERWISE HAVING

03:42PM 3    OR TRIPS HE WAS TAKING THAT HE WOULD WANT ME TO JOIN OR PRESENT

03:42PM 4    ON, AND ON EVENTS HE WAS HOSTING WHERE HE WOULD ASK ME TO COME

03:42PM 5    AND MEET WITH CERTAIN PEOPLE.

03:42PM 6    Q.   OKAY.  LET ME TURN NOW TO TALKING ABOUT JUST ONE INVESTOR

03:42PM 7    WHO WE TOUCHED ON ONLY BRIEFLY, WHICH IS THE RDV INVESTOR.

03:42PM 8    A.   YES.

03:42PM 9    Q.   THAT WAS THE INVESTMENT VEHICLE FOR THE DEVOS FAMILY.

03:42PM 10        DO YOU RECALL THAT?

03:42PM 11   A.   I DO.

03:42PM 12   Q.   AND I BELIEVE THERE WAS TESTIMONY FROM MS. PETERSON TO THE

03:42PM 13   EFFECT OF IN YOUR FIRST CONVERSATION THAT SHE PARTICIPATED IN

03:42PM 14   WITH YOU THAT THERE WAS A DISCUSSION OF YOUR VISION FOR

03:42PM 15   THERANOS.

03:42PM 16   A.   YES.

03:42PM 17   Q.   AND WAS THERE A -- WAS THE DISCUSSION OF YOUR VISION A

03:42PM 18   SUBJECT OF CONVERSATION BETWEEN INVESTORS AND YOURSELF IN

03:43PM 19   SITUATIONS OTHER THAN WITH MS. PETERSON AND MR. TUBERGEN?

03:43PM 20   A.   YES.

03:43PM 21   Q.   AND WHAT WOULD YOU TYPICALLY -- DID YOU HAVE THINGS YOU

03:43PM 22   WOULD TYPICALLY SAY ABOUT THERANOS AND YOUR VISION FOR IT IN

03:43PM 23   THOSE MEETINGS?

03:43PM 24   A.   YES.

03:43PM 25   Q.   AND WHAT WOULD YOU TYPICALLY TALK ABOUT WITH RESPECT TO

7913

03:43PM  1    YOUR VISION FOR THERANOS WHEN YOU WERE ASKED BY POTENTIAL

03:43PM  2    INVESTORS TO DISCUSS YOUR VISION?

03:43PM  3    A.   I WOULD TALK ABOUT HOW WE COULD CHANGE PEOPLE'S ACCESS TO

03:43PM  4    TESTING, AND THAT IF PEOPLE COULD GET BETTER ACCESS TO TESTING,

03:43PM  5    WE COULD MAKE EARLY DETECTION OF DISEASE MORE OF A REALITY.

03:43PM  6         I WOULD TALK ABOUT THE COMPANY TENETS TO ACCESS, CHANGING

03:43PM  7    THE COST OF TESTING, CHANGING THE CONVENIENCE OF TESTING,

03:43PM  8    CHANGING PEOPLE'S ACCESS TO AND OWNERSHIP OF THEIR OWN HEALTH

03:43PM  9    DATA, CHANGING WHAT IT MEANT TO GET A BLOOD DRAW AND BEING ABLE

03:44PM 10    TO MAKE THAT EXPERIENCE A WONDERFUL ONE.

03:44PM 11         AND I WOULD TALK ABOUT THE TECHNOLOGIES THAT WE INVENTED

03:44PM 12    TO DO THAT, HOW IT WOULD CHANGE PEOPLE'S ACCESS TO TESTING.

03:44PM 13    Q.   AND DID YOU SOMETIMES TALK ABOUT HOW A PLAN MIGHT BE

03:44PM 14    IMPLEMENTED TO MAKE TESTING MORE ACCESSIBLE?

03:44PM 15    A.   YES.

03:44PM 16    Q.   DOES THAT INCLUDE SOME OF THE SLIDES THAT WE LOOKED AT

03:44PM 17    WHERE THERE WAS A DESCRIPTION OF THERANOS BEING WITHIN A --

03:44PM 18    SOME NUMBER OF MILES OF EVERY AMERICAN WHO MIGHT NEED BLOOD

03:44PM 19    TESTING SERVICES?

03:44PM 20    A.   IT DOES.

03:44PM 21    Q.   AND IS IT FAIR TO SAY THAT DURING THOSE CONVERSATIONS YOU

03:44PM 22    WOULD TALK A LOT ABOUT WHERE YOU THOUGHT THERANOS COULD TAKE

03:44PM 23    HEALTH CARE IN THE FUTURE?

03:44PM 24    A.   I DID.

03:44PM 25    Q.   AND DID YOU TALK ABOUT HOW THERANOS'S TECHNOLOGY MIGHT

03:44PM 1    OVER TIME DECREASE OR INCREASE AUTOMATION DURING THE PROCESS?

03:45PM 2    A.   I DID.

03:45PM 3    Q.   NOW, YOU ALSO HAVE USED A PHRASE TALKING TODAY, AND ONCE

03:45PM 4    EARLIER, CALLED THE LONGITUDINAL IMPACT OF THERANOS'S TESTING.

03:45PM 5         CAN YOU EXPLAIN WHAT THAT MEANS?

03:45PM 6    A.   YES.   WHAT I WAS TALKING ABOUT WAS THE ABILITY TO LOOK AT

03:45PM 7    LAB DATA OVER TIME AND HOW IT CHANGES, THE IDEA BEING THAT IF

03:45PM 8    YOU COULD SEE A TIME SERIES OR A TREND, YOU COULD START TO GET

03:45PM 9    INSIGHT INTO WHERE SOMEONE'S HEALTH WAS HEADED.

03:45PM 10        AND IF YOU COULD SEE THAT EARLY ENOUGH, YOU COULD DO

03:45PM 11   SOMETHING ABOUT IT.

03:45PM 12   Q.   OKAY.   LET ME ASK YOU ABOUT YOUR OWNERSHIP OF SHARES IN

03:45PM 13   THERANOS AS A COMPANY.

03:45PM 14        WHEN THERANOS WAS VALUED FOR THE OFFERING OF SHARES TO

03:46PM 15   INVESTORS IN 2014, WHAT WAS THE VALUATION ATTRIBUTED TO THE

03:46PM 16   COMPANY?

03:46PM 17   A.   $9 BILLION.

03:46PM 18   Q.   WHAT PERCENTAGE OF SHARES DID YOU OWN IN THE COMPANY AT

03:46PM 19   THAT TIME?

03:46PM 20   A.   I THINK CLOSE TO 50 PERCENT.

03:46PM 21   Q.   WHAT WAS YOUR NET WORTH ON PAPER AS A RESULT OF THAT?

03:46PM 22   A.   IT WOULD HAVE BEEN 4 AND A HALF BILLION DOLLARS.

03:46PM 23   Q.   DID YOU HAVE OPPORTUNITIES DURING THE TIME THAT YOU WERE

03:46PM 24   RUNNING THERANOS TO SELL YOUR STOCK IN THERANOS?

03:46PM 25   A.   I DID.

03:46PM  1    Q.   WERE THERE INSTANCES DATING BACK TO THE EARLY YEARS OF THE

03:46PM  2    COMPANY WHERE THAT WAS TRUE?

03:46PM  3    A.   YES.

03:46PM  4    Q.   AND CAN YOU DESCRIBE SOME OF THE INSTANCES WHERE YOU HAD

03:46PM  5    AN OPPORTUNITY TO SELL SHARES IN THE COMPANY?

03:46PM  6    A.   YES.  SOME OF OUR BOARD MEMBERS WOULD BE INTERESTED IN

03:46PM  7    BRINGING IN NEW SHAREHOLDERS OR INVESTORS AND WOULD ASK IF I

03:46PM  8    WOULD SELL SOME OF MY SHARES TO THOSE PEOPLE TO BE ABLE TO

03:47PM  9    BRING IN NEW INVESTORS.

03:47PM 10        IN CERTAIN CASES, SOME OF OUR BOARD MEMBERS WANTED TO DO

03:47PM 11    TENDER OFFERS OR BUY BACKS IN WHICH THEY WOULD SUGGEST THAT I,

03:47PM 12    AND OTHERS IN MANAGEMENT, SELL SHARES, AND DIRECTORS WOULD SELL

03:47PM 13    SHARES TO HAVE SOME LIQUIDITY IN OUR LIVES.

03:47PM 14        IN OTHER CASES THERE WERE EXTERNAL GROUPS LIKE A

03:47PM 15    SHARESPOST OR OTHER ENTITIES THAT WANTED TO BUY SHARES TO BE

03:47PM 16    ABLE TO SELL THEM TO THIRD PARTIES.

03:47PM 17    Q.   DID YOU EVER SELL A SHARE OF YOUR STOCK IN THERANOS?

03:47PM 18    A.   I DID NOT.

03:47PM 19    Q.   WHY NOT?

03:47PM 20    A.   I DID NOT WANT TO.  I BELIEVED IN THE COMPANY AND I WANTED

03:47PM 21    TO PUT EVERYTHING THAT I HAD INTO IT.

03:47PM 22    Q.   AND DO THOSE SHARES HAVE ANY VALUE NOW?

03:47PM 23    A.   NO.

03:47PM 24         MR. DOWNEY:  YOUR HONOR, I MIGHT BE FINISHED, BUT

03:47PM 25    MAY I HAVE A MOMENT TO CONSULT WITH MY COLLEAGUES?

03:48PM 1          THE COURT:  YES.

03:48PM 2       (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

03:48PM 3          MR. DOWNEY:  YOUR HONOR, JUST TWO HOUSEKEEPING

03:48PM 4   MATTERS.

03:48PM 5          THE COURT:  YES.

03:48PM 6          MR. DOWNEY:  ONE IS THAT I DON'T THINK THAT I MOVED

03:48PM 7   TO ADMIT 10535, WHICH WAS THE LETTER FROM SECRETARY SHULTZ.

03:48PM 8          THE COURT:  YOU DID NOT, NO.

03:48PM 9          MR. DOWNEY:  SO I WOULD LIKE TO MOVE TO ADMIT THAT.

03:48PM 10          MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:48PM 11          THE COURT:  THAT'S ADMITTED.

03:48PM 12       (DEFENDANT'S EXHIBIT 15035 WAS RECEIVED IN EVIDENCE.)

03:48PM 13          MR. DOWNEY:  AND THEN SECOND, YOUR HONOR, IN

03:48PM 14   CONNECTION WITH EXHIBIT 7710, I JUST WOULD --

03:49PM 15          THE COURT:  THAT HASN'T BEEN DISCUSSED.

03:49PM 16          MR. DOWNEY:  THE SUBJECT MATTER RELATED TO 7710 HAS

03:49PM 17   BEEN DISCUSSED.  I WANT TO FORMALLY MOVE ITS ADMISSION, BUT I

03:49PM 18   THINK WHEN YOUR HONOR LOOKS AT IT --

03:49PM 19          THE COURT:  MR. LEACH?

03:49PM 20          MR. LEACH:  WE OBJECT, YOUR HONOR.  401,

03:50PM 21   PARTICULARLY AS TO THE DATE; 403; HEARSAY; AND 702.

03:50PM 22          THE COURT:  MR. DOWNEY, I'M GOING TO SUSTAIN THE

03:50PM 23   OBJECTIONS.

03:50PM 24          MR. DOWNEY:  YES, YOUR HONOR.

03:50PM 25          THE COURT:  I THINK THERE'S TESTIMONY, BUT I'M GOING

7917

03:50PM   1    TO SUSTAIN THE OBJECTIONS.

03:50PM   2             MR. DOWNEY:  UNDERSTOOD, YOUR HONOR.

03:50PM   3         ALL RIGHT.  WITH THAT, YOUR HONOR, I'VE CONCLUDED THE

03:50PM   4    DIRECT EXAMINATION OF THE WITNESS.

03:50PM   5             THE COURT:  ALL RIGHT.  THANK YOU.

03:50PM   6         DO YOU WANT TO COLLECT YOUR BINDERS?

03:50PM   7             MR. DOWNEY:  I DO.  IF I MIGHT JUST --

03:50PM   8             THE COURT:  SURE.

03:51PM   9         (PAUSE IN PROCEEDINGS.)

03:51PM  10             THE COURT:  MR. LEACH, DO YOU HAVE

03:51PM  11    CROSS-EXAMINATION?

03:51PM  12             MR. LEACH:  YES, YOUR HONOR.

03:51PM  13             THE COURT:  WOULD YOU LIKE TO BEGIN THAT NOW OR

03:51PM  14    WOULD YOU LIKE --

03:51PM  15             MR. LEACH:  GIVEN THE HOUR, YOUR HONOR, AND THE

03:51PM  16    EXPECTED LENGTH, IT PROBABLY MAKES SENSE TO START TOMORROW.

03:51PM  17             THE COURT:  WELL, I THINK I SEE A LOT OF BINDERS

03:51PM  18    THERE, AND JUST OWING TO THE TRAVEL TIME TO GET THOSE BINDERS

03:51PM  19    TO THE WITNESS --

03:51PM  20         (LAUGHTER.)

03:51PM  21             THE COURT:  -- I THINK WHAT WE SHOULD DO IS TAKE OUR

03:51PM  22    AFTERNOON RECESS NOW.

03:51PM  23         LET'S DO THAT, LADIES AND GENTLEMEN.

03:51PM  24         WE'RE MEETING TOMORROW AT 9:00 O'CLOCK, COUNSEL?

03:51PM  25         9:00 O'CLOCK.  AND TOMORROW WILL BE A FULL DAY UNTIL

7918

03:51PM  1    4:00 O'CLOCK TOMORROW, PLEASE.

03:51PM  2        SO DURING THE BREAK, LADIES AND GENTLEMEN, PLEASE, I

03:51PM  3    REMIND YOU OF THE ADMONITION, DO NOT, DO NOT DO ANYTHING TO

03:52PM  4    LEARN, INVESTIGATE, DISCUSS ON SOCIAL MEDIA, ON NEWSPAPER,

03:52PM  5    RADIO, THE INTERNET, OR ANYTHING ELSE, ANYTHING TO DO WITH THIS

03:52PM  6    CASE.

03:52PM  7        DO NOT FORM ANY OPINIONS ON ANYTHING YOU HAVE HEARD.

03:52PM  8        TOMORROW I'LL ASK YOU IF ANY OF YOU HAVE SUCCUMBED TO ANY

03:52PM  9    OF THOSE.  SO HOPEFULLY YOU WON'T.  YOU'LL CONTINUE WITH YOUR

03:52PM 10    FIDELITY TO THE ADMONITION.

03:52PM 11        HAVE A GOOD EVENING.  WE'LL SEE YOU TOMORROW MORNING.

03:52PM 12    THANK YOU.

03:52PM 13        (JURY OUT AT 3:52 P.M.)

03:52PM 14            THE COURT:  PLEASE BE SEATED.  THANK YOU.

03:52PM 15        THE RECORD SHOULD REFLECT THAT OUR JURY HAS LEFT FOR THE

03:52PM 16    EVENING.  ALL COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT.

03:53PM 17        I DID WANT TO ASK A QUESTION FOLLOWING UP ON OUR

03:53PM 18    DISCUSSION THIS MORNING REGARDING I BELIEVE IT WAS DEFENSE

03:53PM 19    MOTION, I THINK IT'S IN 1163.  BUT EXHIBIT A, 1163-2,

03:53PM 20    EXHIBIT A, IT SEEMS TO ME BASED ON THE TESTIMONY THIS AFTERNOON

03:53PM 21    THAT THE -- AND I CALL YOUR ATTENTION TO PAGE 10 OF THAT

03:53PM 22    DOCUMENT -- THE -- THIS IS REGARDING THE DEFENSE REQUEST TO

03:53PM 23    INTRODUCE THE S.E.C. TRANSCRIPT.

03:53PM 24        MY THOUGHT IS THAT THIS IS MOOT AS TO THE NULL PROTOCOL

03:53PM 25    ISSUE.  MS. HOLMES TESTIFIED THIS AFTERNOON ABOUT HER KNOWLEDGE

03:53PM 1    OF IT, OR AT LEAST AROUND THE NULL PROTOCOL.

03:53PM 2         IT SEEMS TO ME THAT THIS, AT LEAST THE DEFENSE REQUEST FOR

03:53PM 3    THIS TO COME IN IS NOW MOOT.  I'LL LET YOU POSIT THAT OVER THE

03:53PM 4    EVENING IF YOU WOULD LIKE, BUT IT SEEMS TO ME THAT AT LEAST

03:54PM 5    FROM YOUR REQUEST, AND I DON'T SEE COUNSEL HERE TO ARGUE THIS.

03:54PM 6         MAYBE I SHOULD WAIT UNTIL TOMORROW MORNING.

03:54PM 7              MR. DOWNEY:  YEAH, I THINK THAT -- WE WOULD

03:54PM 8    APPRECIATE THAT IF YOU WOULD.

03:54PM 9              THE COURT:  YEAH, YOU --

03:54PM 10             MR. DOWNEY:  I UNDERSTAND YOUR HONOR'S COMMENT AND

03:54PM 11   WE'LL LOOK AT THAT TONIGHT, AND THEN MR. CLEARY WILL BE HERE IN

03:54PM 12   THE MORNING TO DISCUSS THAT.

03:54PM 13             THE COURT:  WELL, MR. FLEURMONT -- NOT MR. CLEARY.

03:54PM 14             MR. DOWNEY:  I'M SORRY, MR. FLEURMONT.

03:54PM 15             THE COURT:  RIGHT.  HE'S THE OTHER BRILLIANT LAWYER

03:54PM 16   ON YOUR TEAM, BUT HE HAS ALL OF THE KNOWLEDGE ON THIS TOPIC,

03:54PM 17   AND MAYBE WE'LL WAIT UNTIL TOMORROW TO ALLOW HIM TO ADDRESS IT.

03:54PM 18        IT SEEMS TO ME IT'S MOOT THOUGH.

03:54PM 19        MS. VOLKAR IS STANDING AND SHE'S HERE.

03:54PM 20        GOOD AFTERNOON, MS. VOLKAR.

03:54PM 21             MS. VOLKAR:  GOOD AFTERNOON, YOUR HONOR.  THANK YOU.

03:54PM 22        I AGREE IT -- I'M NOT SURE IF "MOOT" IS THE RIGHT WORD,

03:54PM 23   BUT I JUST WANT TO REITERATE MY ARGUMENT FROM THIS MORNING,

03:54PM 24   WHICH IS I THINK A LOT OF THE PORTIONS OF THE S.E.C.

03:54PM 25   INVESTIGATIVE TESTIMONY THAT THEY SEEK TO ADMIT IS CUMULATIVE

7920

03:55PM 1   AND DUPLICATIVE OF OTHER EVIDENCE IN THE CASE, AND I THINK THIS

03:55PM 2   IS ANOTHER INSTANCE OF THAT NOW THAT MS. HOLMES HAS TESTIFIED

03:55PM 3   TO THAT FACT.

03:55PM 4         SO I'M HAPPY TO ARGUE IT FURTHER TOMORROW MORNING WHEN MY

03:55PM 5   COLLEAGUE OPPOSITE IS BACK HERE, BUT I FIGURED I MIGHT AS WELL

03:55PM 6   PUT THAT ON THE RECORD SINCE YOUR HONOR NOTED IT.

03:55PM 7         THE COURT:  NO.  THAT WAS MY INQUIRY.

03:55PM 8         WE'LL HAVE SOME DISCUSSION ON THIS TOMORROW MORNING WHEN

03:55PM 9   THE JURY COMES.  MY SENSE IS THAT IT WILL BE A BRIEF

03:55PM 10  DISCUSSION.

03:55PM 11        ANYTHING ELSE?

03:55PM 12        THANK YOU, MS. VOLKAR.

03:55PM 13        MS. VOLKAR:  NO, YOUR HONOR.

03:55PM 14        MR. DOWNEY:  YOUR HONOR, I APOLOGIZE FOR THIS, BUT

03:55PM 15  MY EYESIGHT IS DECLINING AS THE TRIAL PROCEEDS AND I APPARENTLY

03:55PM 16  MISREAD THE NUMBER OF THAT LAST EXHIBIT, AND I JUST WANT TO

03:55PM 17  MAKE SURE THE RECORD IS CLEAR.

03:55PM 18        IT WAS 15035.

03:55PM 19        THE COURT:  THE SHULTZ LETTER?

03:55PM 20        MR. DOWNEY:  YES.

03:56PM 21        THE COURT:  YES.  I THINK THAT'S RIGHT.  15035 WAS

03:56PM 22  ADMITTED.

03:56PM 23        MR. DOWNEY:  OKAY.  THANK YOU.

03:56PM 24        NOT AS BAD AS I THOUGHT.

03:56PM 25        THE COURT:  RIGHT.  ANYTHING FURTHER FROM THE

03:56PM  1      GOVERNMENT?

03:56PM  2              MR. LEACH:  NO, YOUR HONOR.

03:56PM  3              THE COURT:  ALL RIGHT.  THANK YOU.

03:56PM  4          I'M INFORMED THAT WE'LL HAVE THE -- THIS ISSUE ABOUT

03:56PM  5      MONITORS FIXED THIS EVENING, TOO, SO WE DON'T HAVE TO USE THE

03:56PM  6      CABLES HERE, BUT WE'LL KEEP OUR FINGERS CROSSED.

03:56PM  7          THANK YOU.  HAVE A GOOD EVENING EVERYONE.  WE'LL SEE YOU

03:56PM  8      TOMORROW MORNING.

03:56PM  9          (COURT ADJOURNED AT 3:56 P.M.)

        10

        11

        12

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

1

2

3                       CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8     UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9     CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10    HEREBY CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15                    _____

16                    IRENE RODRIGUEZ, CSR, CRR
                      CERTIFICATE NUMBER 8076

17

18                    _____

19                    LEE-ANNE SHORTRIDGE, CSR, CRR
                      CERTIFICATE NUMBER 9595

20

21                    DATED:  NOVEMBER 29, 2021

22

23

24

25