UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR-18-00258-EJD |
| | ) | |
| PLAINTIFF, | ) | SAN JOSE, CALIFORNIA |
| | ) | |
| VS. | ) | VOLUME 40 |
| | ) | |
| ELIZABETH A. HOLMES, | ) | NOVEMBER 30, 2021 |
| | ) | |
| DEFENDANT. | ) | PAGES 7922 - 8213 |
| _____ | ) | |


TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE EDWARD J. DAVILA
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                       BY:  JOHN C. BOSTIC
                            JEFFREY B. SCHENK
                       150 ALMADEN BOULEVARD, SUITE 900
                       SAN JOSE, CALIFORNIA 95113

                       BY:  ROBERT S. LEACH
                            KELLY VOLKAR
                       1301 CLAY STREET, SUITE 340S
                       OAKLAND, CALIFORNIA 94612

     (APPEARANCES CONTINUED ON THE NEXT PAGE.)


OFFICIAL COURT REPORTERS:
                         IRENE L. RODRIGUEZ, CSR, RMR, CRR
                         CERTIFICATE NUMBER 8074
                         LEE-ANNE SHORTRIDGE, CSR, CRR
                         CERTIFICATE NUMBER 9595

          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
               TRANSCRIPT PRODUCED WITH COMPUTER

```
 1        A P P E A R A N C E S: (CONT'D)

 2

 3   FOR DEFENDANT HOLMES:   WILLIAMS & CONNOLLY LLP
                             BY:  KEVIN M. DOWNEY
 4                                LANCE A. WADE
                                  KATHERINE TREFZ
 5                                AMY SAHARIA
                                  SEEMA ROPER
 6                                J.R. FLEURMONT
                                  RICHARD CLEARY
 7                                ANDREW LEMENS
                                  PATRICK LOOBY
 8                           725 TWELFTH STREET, N.W.
                             WASHINGTON, D.C. 20005
 9
                             LAW OFFICE OF JOHN D. CLINE
10                           BY:  JOHN D. CLINE
                             ONE EMBARCADERO CENTER, SUITE 500
11                           SAN FRANCISCO, CALIFORNIA 94111

12   FOR DEFENDANT BALWANI:  ORRICK, HERRINGTON & SUTCLIFFE LLP
                             BY:  JEFFREY COOPERSMITH
13                                AMANDA MCDOWELL
                             701 FIFTH AVENUE, SUITE 5600
14                           SEATTLE, WASHINGTON 98104

15
     ALSO PRESENT:           FEDERAL BUREAU OF INVESTIGATION
16                           BY:  ADELAIDA HERNANDEZ

17                           OFFICE OF THE U.S. ATTORNEY
                             BY:  LAKISHA HOLLIMAN, PARALEGAL
18                                MADDI WACHS, PARALEGAL

19                           WILLIAMS & CONNOLLY
                             BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL
20
                             TBC
21                           BY:  BRIAN BENNETT, TECHNICIAN

22

23

24

25
```

1

2                          INDEX OF PROCEEDINGS

3      DEFENDANT'S:

4

5      **ELIZABETH HOLMES**

6      CROSS-EXAM BY MR. LEACH                    P. 7963

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

7925

1                          <u>INDEX OF EXHIBITS</u>

2
                                         IDENT.      EVIDENCE
3        <u>GOVERNMENT'S:</u>

4        1675                                        7987
         5645                                        7989
5        5704                                        8000
         5254                                        8024
6        5663                                        8090
         5541                                        8099
7        5652                                        8108
         5512                                        8112
8        3970                                        8116
         5537                                        8166
9        5538                                        8168
         5646                                        8177
10       5387G                                       8181

11

12

13       <u>DEFENDANT'S:</u>

14       14259                                       8212

15

16

17

18

19

20

21

22

23

24

25

```
1     SAN JOSE, CALIFORNIA                    NOVEMBER 30, 2021

2                          P R O C E E D I N G S

3          (COURT CONVENED AT 8:31 A.M.)

4          (JURY OUT AT 8:31 A.M.)

5               THE COURT:  WE'RE ON THE RECORD IN THE HOLMES

6     MATTER.  ALL COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT.

7     WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.

8          MR. LEACH IS NOT PRESENT.

9          OKAY.  WE'RE ON THE RECORD OUTSIDE OF THE PRESENCE OF THE

10    JURY.  WE WERE GOING TO HAVE A HEARING THIS MORNING ABOUT THE

11    DEFENSE CONTINUED MOTION 1163, DOCUMENT 1163.

12         BUT I JUST WANTED TO ASK -- MR. FLEURMONT, I SEE YOU HERE.

13    THANK YOU FOR COMING IN THIS MORNING, SIR.  I HAD CONVERSATION

14    WITH YOUR COLLEAGUES YESTERDAY, AND THEY SUGGESTED THAT WE WAIT

15    UNTIL YOU COME IN.

16         I JUST WANTED TO ASK MS. VOLKAR, IS THIS A GOOD TIME TO DO

17    THIS NOW, OR SHOULD WE WAIT?

18              MS. VOLKAR:  THANK YOU, YOUR HONOR.

19         I'M HAPPY TO -- SO THE GOVERNMENT HAS NOT HAD THE TIME TO

20    COMPLETE THE RULE 106 REVIEW.  WE HAVE STARTED IT.  IT IS ABOUT

21    1300 PAGES OF TRANSCRIPT.  SO I HAVE NOT, CANDIDLY, COMPLETED

22    IT.

23         THAT BEING SAID, I AM MORE THAN HAPPY TO PICK UP THE

24    CONVERSATION WE ENDED WITH YESTERDAY, WHICH IS WHETHER SOME

25    PARTS ARE EITHER MOOT OR CUMULATIVE, AND I THINK THAT THAT
```

08:32AM 1    WOULD ACTUALLY HELP NARROW, EVEN IF YOUR HONOR WOULD BE WILLING

08:33AM 2    TO GIVE A TENTATIVE, OR WHICH SECTIONS YOU MIGHT PERMIT OR

08:33AM 3    GRANT OR DENY, IT WOULD, OF COURSE, NARROW THE WORK FOR THE

08:33AM 4    RULE 106 PURPOSES.  SO THAT DISCUSSION COULD BE HELPFUL THIS

08:33AM 5    MORNING.

08:33AM 6        BUT I MOSTLY WANTED TO LET THE COURT KNOW THAT I DID NOT

08:33AM 7    OVERNIGHT GET ALL OF THE RULE 106 COMPLETENESS WORK DONE.

08:33AM 8            THE COURT:  ALL RIGHT.  THANK YOU FOR THAT.

08:33AM 9        THE QUESTIONS THAT WE DISCUSSED IN YOUR ABSENCE,

08:33AM 10   MR. FLEURMONT, WERE QUESTIONS THAT I HAD ABOUT THE EXHIBITS AND

08:33AM 11   THE STATEMENTS IN THE EXHIBITS.

08:33AM 12       PLEASE RECALL THAT MY CONCERNS WERE TWO.  ONE, I THINK WE

08:33AM 13   TALKED ABOUT WHETHER OR NOT UNAVAILABILITY HAS BEEN SHOWN.  WE

08:33AM 14   TALKED ABOUT YOUR COLLEAGUE'S DECLARATION.  I THINK I TOLD YOU

08:33AM 15   I WANT SOMETHING MORE THAN THAT.

08:33AM 16       SO THAT WILL GIVE YOU -- YOU CAN TAKE YOUR MASKS OFF IF

08:33AM 17   YOU'RE COMFORTABLE WITH THAT.

08:33AM 18            MS. VOLKAR:  THANK YOU, YOUR HONOR.

08:33AM 19            MR. FLEURMONT:  THANK YOU, YOUR HONOR.

08:34AM 20            THE COURT:  SO THAT WAS THE ONE QUESTION ON THE

08:34AM 21   UNAVAILABILITY.

08:34AM 22       THE OTHER QUESTION THAT IS PERHAPS MOST PRESSING IS AS TO

08:34AM 23   THE EXHIBITS AND THE STATEMENTS, PLEASE RECALL THAT I WAS

08:34AM 24   SAYING, WELL, SHOULDN'T I KNOW THE QUESTION SO I CAN KNOW WHAT

08:34AM 25   THE CONTEXT IS.

08:34AM  1        I GUESS WHAT I NEED TO KNOW IS WHAT IS, AS TO EACH OF

08:34AM  2   THESE EXHIBITS AND THE COLLOQUIES THAT ARE CONTAINED IN THEM,

08:34AM  3   WHERE IS THE -- I JUST -- I DON'T SEE, AND I NEED SOME HELP AS

08:34AM  4   TO WHAT IS THE STATEMENT AGAINST INTEREST?  I DON'T SEE IT.

08:34AM  5        I THINK WHAT I'M SEEING HERE, AND I'M GIVING YOU THE

08:34AM  6   BENEFIT SO YOU CAN HELP, WHAT I SEE IS A FACT WITNESS.  I DON'T

08:34AM  7   SEE ANY PARTICULAR PENAL OR PECUNIARY INTEREST OR A STATEMENT

08:34AM  8   AGAINST AN INTEREST.  IT JUST -- I DON'T SEE IT.  SO THAT'S

08:34AM  9   WHAT I NEED SOME HELP ON.

08:34AM  10           MR. FLEURMONT:  ABSOLUTELY, YOUR HONOR.

08:34AM  11      OKAY.  SO I THINK IT'S PROBABLY BEST IF WE JUST WALK

08:35AM  12   THROUGH EACH OF THE EXHIBITS.

08:35AM  13           THE COURT:  SURE.

08:35AM  14           MR. FLEURMONT:  AND I CAN POINT TO THE COURT

08:35AM  15   STATEMENTS AGAINST INTEREST.

08:35AM  16           THE COURT:  SURE.  THANK YOU.

08:35AM  17           MR. FLEURMONT:  SO LET'S START WITH EXHIBIT A.

08:35AM  18      OKAY.  STARTING, YOUR HONOR, WITH EXHIBIT A, THE FIRST

08:35AM  19   QUESTION AND ANSWER, THIS IS STARTING AT PAGE 3 TO PAGE 4,

08:35AM  20   RELATES TO THE WALGREENS AND SAFEWAY RELATIONSHIP.

08:35AM  21           THE COURT:  RIGHT.

08:35AM  22           MR. FLEURMONT:  IF YOU LOOK AT PAGE 4, LINES 3

08:35AM  23   AND 4.

08:35AM  24           THE COURT:  THIS IS ECF PAGE 4?

08:35AM  25           MR. FLEURMONT:  YES, YOUR HONOR.

08:35AM 1              THE COURT:  RIGHT.

08:35AM 2              MR. FLEURMONT:  "I TOOK THE LEADERSHIP ROLE THERE IN

08:35AM 3    NEGOTIATIONS AND CONTRACTS."

08:35AM 4         AND THAT'S A STATEMENT SAYING HE TOOK A LEADERSHIP ROLE IN

08:36AM 5    REGARDS TO THE SAFEWAY AND WALGREENS CONTRACTS.

08:36AM 6         AND WALGREENS, AS YOU KNOW, IS ALLEGED IN PARAGRAPH 12(D)

08:36AM 7    OF THE INDICTMENT.

08:36AM 8         OKAY.  HE CONTINUES AND HE GETS ASKED A QUESTION "WHAT

08:36AM 9    ABOUT SAFEWAY?"  THAT'S AT LINE 12.

08:36AM 10        AT LINE 13, "YES, YEAH, SAME THING ON SAFEWAY."

08:36AM 11             THE COURT:  OKAY.  HOW DOES THAT -- TELL ME ABOUT

08:36AM 12   THAT.  SO HE'S SAYING IN LINES 2 -- LET'S GO BACK.

08:36AM 13        THE START OF THIS WAS ON LINE -- PAGE 3, "YOU MENTIONED

08:36AM 14   OVER TIME YOUR RESPONSIBILITIES GREW.  CAN YOU BRIEFLY EXPLAIN

08:36AM 15   WHAT GOT ADDED TO YOUR PORTFOLIO?"  THAT'S ON PAGE ECF 3.

08:36AM 16        AND THAT GOES DOWN.  HE STARTS TALKING ABOUT HARDWARE, AND

08:37AM 17   HE LEARNED ABOUT THE BUSINESS, HE WAS ON THE ROAD MEETING WITH

08:37AM 18   THE RETAIL BUSINESS.  "AND AS THAT EVOLVED, I TOOK THE

08:37AM 19   LEADERSHIP ROLE THERE IN NEGOTIATIONS AND CONTRACTS."

08:37AM 20        AND THAT STATEMENT, I GUESS, IS WHAT YOU'RE SAYING EXPOSES

08:37AM 21   HIM TO SOME LIABILITY AGAINST HIS INTEREST BECAUSE.

08:37AM 22             MR. FLEURMONT:  BECAUSE, YOUR HONOR, AS WE MENTIONED

08:37AM 23   YESTERDAY, WHEN RECEIVING THE SUBPOENAS FROM THE S.E.C. AND THE

08:37AM 24   SUBPOENAS FROM THE GRAND JURY, THERE WERE REQUESTS IN THERE

08:37AM 25   ABOUT THE ROLE IN THE RETAIL PARTNERSHIPS.

08:37AM   1          AND THE GOVERNMENT HAS ALLEGED, AS YOU KNOW, THAT, YOU

08:37AM   2     KNOW, WALGREENS, SAFEWAY ARE BOTH INVESTORS IN THIS CASE

08:37AM   3     THROUGH MISREPRESENTATIONS MADE TO WALGREENS AND SAFEWAY.

08:37AM   4          AND HE IS SAYING THAT HE TOOK A LEADERSHIP ROLE IN

08:37AM   5     NEGOTIATIONS IN THE CONTRACTS, AND IN NEGOTIATIONS OBVIOUSLY

08:38AM   6     STATEMENTS WERE MADE.

08:38AM   7               THE COURT:  AND BECAUSE OF THAT HIS LIABILITY IS --

08:38AM   8     A JURY COULD FIND THAT HE MADE MISREPRESENTATIONS TO WALGREENS

08:38AM   9     IN THE CONTEXT OF THOSE NEGOTIATIONS AND CONTRACTS?

08:38AM  10               MR. FLEURMONT:  YES, YOUR HONOR.  HE COULD FACE

08:38AM  11     CIVIL LIABILITY UNDER THE S.E.C.

08:38AM  12               THE COURT:  I SEE.  OKAY.

08:38AM  13          AND THEN THE QUESTION IS, I GUESS PHARMACIES, DO YOU MEAN

08:38AM  14     WALGREENS PRIMARILY?

08:38AM  15          YES.

08:38AM  16          AND THEN HE TALKS ABOUT SAFEWAY.

08:38AM  17               MR. FLEURMONT:  YES, YOUR HONOR.

08:38AM  18          THAT'S WHY WE INCLUDED THE FULL CONTEXT AGENCY BECAUSE YOU

08:38AM  19     CAN SEE EXACTLY WHAT RETAIL PARTNERSHIPS HE'S DISCUSSING AND

08:38AM  20     JUST TO GIVE THE COURT FULL CONTEXT FOR THE STATEMENTS.

08:38AM  21               THE COURT:  RIGHT.  AND THEN HE SAYS HE

08:38AM  22     TOOK RESPONSES -- THIS IS ON PAGE 5.  "YOU TOOK OVER

08:38AM  23     RESPONSIBILITY FOR THE SAFEWAY RELATIONSHIP MORE SO AFTER

08:38AM  24     MR. BURD LEFT SAFEWAY?"

08:38AM  25               MR. FLEURMONT:  YES, YOUR HONOR.

08:38AM   1          THE COURT:  AND HE SAYS, "PRETTY MUCH RIGHT AFTER

08:39AM   2   THAT."

08:39AM   3          SO THAT WOULD BE AFTER THAT CONTRACT RELATIONSHIP WAS

08:39AM   4   COMPLETED; RIGHT?

08:39AM   5          MR. FLEURMONT:  I DON'T THINK SO, YOUR HONOR.  THERE

08:39AM   6   WERE DEALINGS WITH SAFEWAY AFTER MR. BURD LEFT.

08:39AM   7          THE COURT:  BUT THE CONTRACT WAS COMPLETED.  WASN'T

08:39AM   8   THERE EVIDENCE -- ISN'T THERE EVIDENCE THAT YOUR CLIENT

08:39AM   9   NEGOTIATED THE CONTRACT WITH MR. BURD?

08:39AM  10          MR. FLEURMONT:  I'D HAVE TO LOOK BACK AT THE RECORD

08:39AM  11   JUST TO CONFIRM THAT, YOUR HONOR, BUT THERE WAS EVIDENCE IN THE

08:39AM  12   TRIAL ABOUT MS. HOLMES AND MR. BURD AND THEIR DISCUSSIONS

08:39AM  13   DURING THE CONTRACT.

08:39AM  14          THE COURT:  RIGHT.  IT SOUNDS LIKE THIS COLLOQUY IS

08:39AM  15   HE'S SAYING I TOOK OVER RESPONSIBILITIES OR INCREASED MY

08:39AM  16   RESPONSIBILITIES WITH SAFEWAY AT SOME POINT IN TIME.

08:39AM  17          BUT WHAT I'M CURIOUS ABOUT, IT SEEMS AT THAT POINT IN TIME

08:39AM  18   IS SUBSEQUENT TO THE ACTUAL FORMATION OF THE CONTRACT, THE

08:39AM  19   CONSUMMATION OF THE DEAL.

08:39AM  20          AND IF THAT'S THE CASE, THEN IF THE LIABILITY IS THE

08:39AM  21   NEGOTIATION OF THE CONTRACT LIKE WE WERE TALKING ABOUT WITH

08:40AM  22   WALGREENS, THEN THIS IS POST THAT, AND IT'S NOT PARTICULARLY

08:40AM  23   RELEVANT TO HIS -- AGAINST HIS INTEREST.

08:40AM  24          MR. FLEURMONT:  WELL, THEY'RE STATEMENTS MADE AFTER

08:40AM  25   THE CONTRACT, AND THERE WAS STILL A RELATIONSHIP AFTER THE

7932

08:40AM  1    CONTRACT.  SO I DON'T -- I PUSH BACK A LITTLE BIT THAT AFTER

08:40AM  2    THE CONTRACT WAS SIGNED THAT ALL LIABILITY CEASES.

08:40AM  3            THE COURT:  ALL RIGHT.  YOU'RE SAYING THAT HIS

08:40AM  4    CONTINUED COMMUNICATIONS WITH SAFEWAY WERE -- IT'S A LITTLE ODD

08:40AM  5    BECAUSE IT'S ALMOST LIKE SAYING, WELL, IT'S AGAINST HIS

08:40AM  6    INTEREST BECAUSE, JUDGE, THAT'S EVIDENCE THAT -- YOU'RE NOT

08:40AM  7    SAYING THIS, THERE'S NO ADMISSION HERE.  LET ME BE STRAIGHT

08:40AM  8    ABOUT THIS.

08:40AM  9        BUT THAT COULD BE VIEWED BY THE JURY AS COCONSPIRATOR

08:40AM  10   CONDUCT IN THAT HE KEPT TALKING TO THEM, SAFEWAY, TO KEEP THEM

08:40AM  11   FOOLED -- I'LL JUST USE THAT WORD AS PART OF THE CRIMINAL

08:41AM  12   INTENT OF THAT -- AND HE WAS PART OF IT.

08:41AM  13        IS THAT WHAT YOU'RE SAYING?

08:41AM  14            MR. FLEURMONT:  NOT AT ALL, YOUR HONOR.

08:41AM  15        FIRST, THE PERSPECTIVE THAT WE'RE LOOKING AT HERE IS THE

08:41AM  16   PERSPECTIVE OF THE DECLARANT.  AND SO THE QUESTION IS WHETHER A

08:41AM  17   REASONABLE PERSON IN DECLARANT'S POSITION BELIEVED THAT

08:41AM  18   STATEMENTS WERE MADE THAT WERE SUBJECT TO EITHER CIVIL OR

08:41AM  19   CRIMINAL LIABILITY.  AND THEY CAN BE BOTH CIVIL OR CRIMINAL

08:41AM  20   LIABILITY.  SO WE'RE NOT JUST TALKING ABOUT WHAT A JURY WOULD

08:41AM  21   THINK IN A CRIMINAL CASE.

08:41AM  22            THE COURT:  SO HIS WORRY WOULD NOT BE IF THIS COMES

08:41AM  23   OUT, THEN I COULD BE FOUND AS A COCONSPIRATOR BECAUSE I WAS

08:41AM  24   CONTINUING THE RUSE, IF YOU WILL?

08:41AM  25            MR. FLEURMONT:  EXACTLY.  I DON'T THINK THAT THE

| | | |
|---|---|---|
| 08:41AM | 1 | CONCERN.  IT'S KIND OF AN OBJECTIVE INQUIRY ABOUT WHETHER A |
| 08:41AM | 2 | PERSON IN HIS POSITION IN AN S.E.C. DEPOSITION WHERE HE'S |
| 08:41AM | 3 | GOTTEN SUBPOENAS ABOUT THIS TOPIC WOULD SAY SOMETHING THAT |
| 08:41AM | 4 | WOULD -- HE SAID IT TRUTHFULLY. |
| 08:41AM | 5 | THE COURT:  OKAY. |
| 08:41AM | 6 | MS. VOLKAR:  YOUR HONOR, MAY I BE HEARD ABOUT THIS |
| 08:42AM | 7 | PORTION BEFORE WE MOVE ON TO THE NEXT PORTION? |
| 08:42AM | 8 | THE COURT:  YES.  LET ME LET MR. FLEURMONT FINISH |
| 08:42AM | 9 | HIS COMMENT, AND THEN WE'LL DO THIS BACK AND FORTH. |
| 08:42AM | 10 | MR. FLEURMONT, DO YOU WANT TO FINISH YOUR THOUGHT? |
| 08:42AM | 11 | MR. FLEURMONT:  THAT IS IT.  THAT IS WHAT I HAVE TO |
| 08:42AM | 12 | SAY ON THAT TOPIC. |
| 08:42AM | 13 | THE COURT:  OKAY. |
| 08:42AM | 14 | MS. VOLKAR:  THANK YOU, YOUR HONOR. |
| 08:42AM | 15 | SO JUST FOCUSSING ON PAGES 3 TO 5 BECAUSE I THOUGHT IT |
| 08:42AM | 16 | WOULD BE EASIEST TO DO IT IN CHUNKS, WHICH IS WHAT I BELIEVE |
| 08:42AM | 17 | ALSO IS WHAT MR. FLEURMONT INTENDS TO DO. |
| 08:42AM | 18 | THE COURT:  RIGHT. |
| 08:42AM | 19 | MS. VOLKAR:  SO WHAT WAS SKIPPED OVER WAS ON PAGE 3 |
| 08:42AM | 20 | THERE'S A LOT OF DISCUSSION ABOUT THE SUPPLY CHAIN AND HOW |
| 08:42AM | 21 | MR. BALWANI CAME TO LEARN MORE ABOUT THE SUPPLY CHAIN DURING |
| 08:42AM | 22 | HIS EARLIER YEARS WITH THE COMPANY. |
| 08:42AM | 23 | FIRST OF ALL, I'M NOT ENTIRELY SURE IF THAT IS DIRECTLY |
| 08:42AM | 24 | INCULPATORY.  HE'S NOT SAYING I CREATED THE DEVICE.  IT COULD |
| 08:42AM | 25 | CERTAINLY BE A PIECE IN THE PUZZLE ON THE WAY THERE.  SO I TAKE |

08:42AM   1      COUNSEL'S POINT THAT MAYBE THIS IS A PIECE IN THE PUZZLE, BUT I

08:42AM   2      REPRESENT THAT THE GOVERNMENT HAS NOT COMPLETED ITS RULE 106

08:42AM   3      REVIEW YET.  I HAVE GOTTEN THROUGH SOME PORTIONS RELATED TO

08:42AM   4      THIS SECTION.  AND LATER ON IN THE SAME TESTIMONY MR. BALWANI

08:43AM   5      TALKS ABOUT HOW MS. HOLMES HAD CREATED THE INTERNAL WORKINGS OF

08:43AM   6      THE TSPU BEFORE HE EVEN JOINED THE COMPANY AND WAS USING IT FOR

08:43AM   7      PHARMA COMPANIES.

08:43AM   8          ALSO RIGHT AFTER TALKING -- LITERALLY THE NEXT ANSWER ON

08:43AM   9      PAGE 5 TALKING ABOUT WALGREENS AND SAFEWAY, THE QUESTIONER ASKS

08:43AM   10     WHAT ABOUT OTHER PHARMACIES?

08:43AM   11         AND HE SAID, I HAD NO ROLE IN THAT, MS. HOLMES HANDLED

08:43AM   12     THOSE.

08:43AM   13         SO IN TERMS OF WHEN WE GET TO RULE 106, ONE OF THE THINGS

08:43AM   14     THAT I REALIZED VERY QUICKLY IS THAT WE CAN GET INTO

08:43AM   15     CONFRONTATION CLAUSE ISSUES WHERE HE IS SAYING I HAD THESE

08:43AM   16     RESPONSIBILITIES AND SHE HAD THOSE RESPONSIBILITIES, AND, OF

08:43AM   17     COURSE, THAT'S CONSISTENT WITH THE GOVERNMENT'S THEORY WHICH IS

08:43AM   18     THAT THEY WERE COCONSPIRATORS AND THEY BOTH HAD ROLES REVOLVING

08:43AM   19     AROUND DIFFERENT PIECES.

08:43AM   20         TO GET TO THE SPECIFIC INCULPATORY STATEMENT THAT I HEARD

08:43AM   21     MR. FLEURMONT SAY ON PAGE 4, THE "I TOOK LEADERSHIP ROLE IN THE

08:43AM   22     NEGOTIATIONS AND CONTRACTS FOR WALGREENS," THIS IS PART OF WHY

08:44AM   23     I WANTED TO POINT OUT THE SORT OF CUMULATIVE NATURE TO THE

08:44AM   24     LIMITED BENEFIT THAT THIS TESTIMONY MIGHT BRING.

08:44AM   25         THEY'RE BOTH WALGREENS WITNESSES.  MR. MIQUELON AND

08:44AM 1      MR. JHAVERI, I THINK, TESTIFIED THAT MOST OF THEIR

08:44AM 2      CONVERSATIONS WERE WITH MR. BALWANI.  THEY ALSO TESTIFIED THAT

08:44AM 3      THEY HAD SOME CONVERSATIONS WITH MS. HOLMES.

08:44AM 4          WE'LL GET TO PFM AND BRIAN GROSSMAN LATER, BUT WE'LL HAVE

08:44AM 5      THE SAME SITUATION THERE WHERE SOMETIMES SOME OF THE INVESTORS

08:44AM 6      SPOKE MORE WITH ONE OF THE COCONSPIRATORS, AND OTHER INVESTORS

08:44AM 7      LIKE SAFEWAY SPOKE WITH THE OTHER COCONSPIRATOR.  THAT'S ALL

08:44AM 8      CONSISTENT WITH THE TESTIMONY TO DATE.

08:44AM 9          AGAIN, I GET BACK TO THE POINT THAT YOUR HONOR WAS TALKING

08:44AM 10     ABOUT WITH RESPECT TO SAFEWAY.  HE'S SAYING THAT THEY BOTH HAD

08:44AM 11     THE RELATIONSHIP AND THE KEY PART OF THE RELATIONSHIP, WHEN THE

08:44AM 12     STATEMENTS WERE MADE THAT INDUCED THE POTENTIAL INVESTOR TO

08:44AM 13     RELY AND PART WITH MONEY WHEN SAFEWAY PAID THE MONEY IN THE

08:44AM 14     CONTRACT, THAT RELATIONSHIP WAS OWNED BY MS. HOLMES.

08:45AM 15         SO I DO THINK THAT YOUR HONOR IS PICKING UP ON A KEY

08:45AM 16     DISTINCTION.

08:45AM 17         MR. BALWANI IS SAYING THAT HE TOOK OVER THE RELATIONSHIP

08:45AM 18     AT A LATER PERIOD OF TIME.  THAT'S NOT NECESSARILY THE CORE

08:45AM 19     PERIOD OF TIME WHEN STATEMENTS WERE MADE THAT WOULD INDUCE AN

08:45AM 20     INVESTOR OR A POTENTIAL INVESTOR TO PART WITH MONEY.

08:45AM 21             THE COURT:  OKAY.  THANK YOU.

08:45AM 22             MR. FLEURMONT:  JUST A BRIEF RESPONSE.

08:45AM 23             THE COURT:  SURE.

08:45AM 24             MR. FLEURMONT:  I THINK THAT'S A BIT OF TWO SHIPS IN

08:45AM 25     THE NIGHT PASSING RIGHT HERE.

7936

08:45AM  1      WE'VE INCLUDED THE FULL QUESTION AND ANSWER SO THE COURT

08:45AM  2   COULD HAVE CONTEXT.  SO THE STATEMENTS ABOUT MANUFACTURING AND

08:45AM  3   PRODUCTION IN THE BEGINNING, THAT'S JUST PART OF HIS ANSWER TO

08:45AM  4   THE QUESTION, AND WE THINK IT WOULD BE INAPPROPRIATE FOR

08:45AM  5   RULE 106 DESIGNATIONS AS TO PORTIONS OF THE QUESTION AND ANSWER

08:45AM  6   THEY'RE NOT EVEN SAYING ARE INCULPATORY.  SO I JUST WANT TO

08:45AM  7   CLARIFY THAT.

08:45AM  8           THE COURT:  SURE.

08:45AM  9           MR. FLEURMONT:  AND I THINK PART OF THIS EXERCISE IS

08:45AM 10   BECAUSE THE COURT WANTS TO KNOW EXACTLY WHAT THEY THINK IS A

08:45AM 11   STATEMENT AGAINST INTEREST, AND WE'D HAVE TO REVIEW THE 106

08:45AM 12   DESIGNATIONS BASED ON -- I DON'T WANT TO PROLONG TIME BUT THE

08:46AM 13   POINT --

08:46AM 14           THE COURT:  NO, NO, NO.  I'M SMILING BECAUSE I SEE A

08:46AM 15   TENNIS MATCH HERE.  WE'RE GOING TO GO BACK AND FORTH WITH THIS,

08:46AM 16   WHICH WE'LL HAVE TO DO.  LET ME JUST -- LET ME BE SERIOUS.

08:46AM 17   IT'S AN IMPORTANT POINT TO YOUR CASE AND THE GOVERNMENT'S AS

08:46AM 18   WELL.  I DO THINK THERE ARE SOME 106 ISSUES THAT PROBABLY NEED

08:46AM 19   TO BE FLESHED OUT, AND THE TWO OF YOU ARE GOING TO HAVE TO MEET

08:46AM 20   AND CONFER AND LOOK AT THOSE, AND THEN WE'RE GOING TO HAVE

08:46AM 21   ANOTHER CONVERSATION ABOUT THAT AT SOME POINT.

08:46AM 22           MR. FLEURMONT:  ABSOLUTELY, YOUR HONOR.

08:46AM 23       I JUST WANT TO CLARIFY THAT JUST BECAUSE THERE'S A PORTION

08:46AM 24   IN A QUESTION AND AN ANSWER THAT SPEAKS TO AN ISSUE THAT WE'RE

08:46AM 25   NOT SAYING IS INCULPATORY DOES NOT MEAN THAT, ONE, THE

7937

08:46AM 1    GOVERNMENT SHOULD BE ABLE TO DESIGNATE UNDER RULE 106 OTHER,

08:46AM 2    BECAUSE THAT IS KIND OF NOT REALLY AN ISSUE, BUT ALSO PART OF

08:46AM 3    THIS EXERCISE, I BELIEVE, IS TO KIND OF FIGURE OUT WHAT WE'RE

08:46AM 4    POINTING AT.

08:46AM 5         AND IF IT BECOMES A CASE THAT THE COURT THINKS THAT WE

08:46AM 6    SHOULD JUST INCLUDE EXACTLY WHAT WE'RE SAYING IS EXCULPATORY

08:46AM 7    AND SOME LANGUAGE AROUND FOR CONTEXT, THEN THAT MIGHT BE THE

08:47AM 8    DIRECTION THAT WE GO.

08:47AM 9              THE COURT:  RIGHT.

08:47AM 10             MR. FLEURMONT:  BUT I JUST WANT TO MAKE VERY CLEAR

08:47AM 11   THAT JUST BECAUSE THERE ARE OTHER STATEMENTS ABOUT OTHER TOPICS

08:47AM 12   THAT ARE RELATED IN THE QUESTION AND ANSWER THAT WERE -- IT'S

08:47AM 13   FINE FOR THE GOVERNMENT TO DESIGNATE 106 ON THAT ISSUE, AND

08:47AM 14   ALSO THAT WE, THAT WE -- IT'S NECESSARY FOR US TO GET THAT

08:47AM 15   PORTION OF THE STATEMENT.

08:47AM 16             THE COURT:  OKAY.  IT SOUNDS LIKE WE'RE GOING TO DO

08:47AM 17   SOME MORE WORK ON THAT WITH YOUR HELP, WITH YOUR HELP.  IT

08:47AM 18   SOUNDS THAT WAY.

08:47AM 19        AND 106, THE COMPANY'S FINANCIALS AND YOUR ROLE?

08:47AM 20             MR. FLEURMONT:  YES, YOUR HONOR.  I HAVE THAT PAGE

08:47AM 21   IN MY BAG ACTUALLY.

08:48AM 22             MS. VOLKAR:  YOUR HONOR, MAY I BE HEARD BRIEFLY FOR

08:48AM 23   THE RECORD BEFORE WE MOVE ON?

08:48AM 24             THE COURT:  SURE.

08:48AM 25             MS. VOLKAR:  I RESPECTFULLY DISAGREE WITH MY

08:48AM  1    COLLEAGUE'S STATEMENT ABOUT RULE 106.

08:48AM  2        MY UNDERSTANDING OF RULE 106 IS TO MAKE A COMPLETE ANSWER

08:48AM  3    OR PICTURE SO THAT TESTIMONY WON'T BE CONFUSING TO THE JURY.

08:48AM  4        I DON'T BELIEVE THAT THEY CAN CHERRY PICK CERTAIN ANSWERS

08:48AM  5    IF THEY'RE GOING TO READ THE FULL PORTION.  EVEN IF THEY

08:48AM  6    CONCLUDED -- OR EVEN IF THEY INCLUDED THE WHOLE ANSWER SO AS TO

08:48AM  7    GIVE A FULSOME ANSWER, THAT MEANS RULE 106 APPLIES TO ANY PARTS

08:48AM  8    OF THAT ANSWER OR WHAT THEY WOULD READ OUT LOUD TO THE JURY.

08:48AM  9        SO I JUST WANTED TO MAKE SURE THE RECORD IS CLEAR FROM

08:48AM  10   THE GOVERNMENT'S POSITION ON THAT.

08:48AM  11           THE COURT:  THANK YOU.

08:48AM  12           MR. FLEURMONT:  I THINK YOU UNDERSTAND OUR POSITION

08:48AM  13   SO I WON'T BELABOR THAT.

08:48AM  14        SO ON TO PAGE 6 OF EXHIBIT A.  THE PORTION THAT WE'RE

08:49AM  15   POINTING TO AND THAT SHOWS ONE RESPONSIBILITY OVER A RELEVANT

08:49AM  16   ALLEGATION IS THE FINANCIAL MODEL, AND I'M LOOKING AT PAGE 6,

08:49AM  17   LINES 17 THROUGH 20.

08:49AM  18        AND AS YOU CAN SEE THERE, THEY'RE TALKING ABOUT THE

08:49AM  19   FINANCIAL MODEL, HOW HE BUILT IT.

08:49AM  20        AND THEN HE SAYS, HE SAYS HE OWNED THE FINANCIAL MODEL.

08:49AM  21   AND THEN THERE'S A QUESTION ABOUT "BY SAYING YOU OWNED, YOU

08:49AM  22   MEAN YOU WERE THE PERSON RESPONSIBLE FOR THE COMPANY'S

08:49AM  23   FINANCIAL PROJECTIONS AS YOU'VE JUST DESCRIBED?"

08:49AM  24        HE SAYS, "FINANCIAL MODEL.

08:49AM  25        "QUESTION:  FINANCIAL MODEL?

08:49AM 1          "ANSWER:  YES."

08:49AM 2          AND THEN ON PAGE 7, LINES 18 THROUGH 21.

08:49AM 3          "SO I WAS USING THIS AS A PLANNING TOOL AND SOME OF THE

08:50AM 4     TABS IN THE MODEL WOULD SPIT OUT AS THE END RESULTS OR, YOU

08:50AM 5     KNOW, CHANGING ANY ASSUMPTIONS IN THE MODEL," SHOWING THAT HE

08:50AM 6     WAS THE ONE USING THE MODEL AS A FINANCIAL TOOL.

08:50AM 7          WE'VE HEARD TESTIMONY ABOUT THE FINANCIAL MODEL REFERRED

08:50AM 8     TO BY MR. GROSSMAN.  THE PROJECTIONS IN THE MODEL ARE

08:50AM 9     ESSENTIALLY ONE AND THE SAME BECAUSE MANY OF THE PROJECTIONS

08:50AM 10    AND THE NUMBERS IN THE PROJECTIONS ARE ACTUALLY IN THE

08:50AM 11    FINANCIAL MODEL, AND THIS PORTION HERE SHOWS THAT HE'S A PERSON

08:50AM 12    WHO OWNS THE MODEL, HE'S A PERSON THAT WORKS WITH THE

08:50AM 13    ASSUMPTIONS, AND TAKES RESPONSIBILITY FOR THAT MODEL.

08:50AM 14         AND GOING BACK TO THE POINT I MADE EARLIER ABOUT THE

08:50AM 15    SUBPOENAS HE RECEIVED FROM THE S.E.C., THOSE ASKED ABOUT

08:50AM 16    QUESTIONS ABOUT THE COMPANY'S FINANCIALS.

08:50AM 17              THE COURT:  AND BECAUSE HE CREATED THE MODEL, THAT

08:50AM 18    EXPOSES HIM -- THAT'S AGAINST HIS INTEREST BECAUSE?

08:51AM 19              MR. FLEURMONT:  SURE.  I GUESS FOR TWO REASONS,

08:51AM 20    YOUR HONOR.

08:51AM 21         ONE, A REASONABLE PERSON WHO CREATED A FINANCIAL MODEL AND

08:51AM 22    GAVE THAT MODEL TO INVESTORS KNOWING THAT THE INVESTORS WERE

08:51AM 23    USING THE MODEL AND SOME OF THEIR DECISIONS AND WOULD NOT SAY

08:51AM 24    AND KNOWING THAT THEY'RE IN AN S.E.C. DEPOSITION FACED WITH

08:51AM 25    LIABILITY ABOUT THE FINANCES OF THE COMPANY, WOULD NOT OUTRIGHT

08:51AM 1     SAY, "I OWN THIS, THIS WAS MINE, I'M THE PERSON WHO DID THE

08:51AM 2     ASSUMPTIONS," WITHOUT KNOWING THAT THEY COULD PUT THEM AT CIVIL

08:51AM 3     LIABILITY.

08:51AM 4              THE COURT:  DO WE NEED TO LOOK AT THE RECORD TO SEE

08:51AM 5     WHETHER OR NOT THERE'S A DISTINCTION BETWEEN THE MODEL BEING

08:51AM 6     SENT TO INVESTORS AS OPPOSED TO PROJECTIONS?

08:51AM 7              MR. FLEURMONT:  I DON'T THINK SO, YOUR HONOR.

08:51AM 8         I THINK THAT BECAUSE THE MODEL HAS THE SAME -- SOME OF THE

08:51AM 9     SAME NUMBERS AS THE PROJECTIONS, THAT ESSENTIALLY, PARTICULARLY

08:51AM 10    FOR THIS PART, THEY'RE ONE AND THE SAME.

08:51AM 11        BUT HE TAKES OWNERSHIP OVER THE MODEL, AND THAT'S THE

08:52AM 12    QUESTION THAT WE'RE CONCERNED WITH HERE.

08:52AM 13             THE COURT:  SO THE MODEL IS A PREDECESSOR IN TIME TO

08:52AM 14    THE PROJECTIONS AND THEN THE PROJECTIONS ARE WHAT WAS SENT TO

08:52AM 15    THE INVESTORS BY YOUR CLIENT?  IS THAT HOW THAT WORKED?

08:52AM 16             MR. FLEURMONT:  I DON'T THINK SO, YOUR HONOR.

08:52AM 17        I THINK THAT HE'S SAYING THAT HE MADE THE MODEL VERY EARLY

08:52AM 18    ON, AND PART OF THE MODEL IS LOOKING AT THE PROJECTIONS.

08:52AM 19             THE COURT:  OKAY.

08:52AM 20             MR. FLEURMONT:  SO I DON'T THINK THAT THAT'S

08:52AM 21    ENTIRELY RIGHT.

08:52AM 22        I THINK THAT THE FOCUS IS ON THE FACT THAT THE MODEL WAS

08:52AM 23    SENT TO INVESTORS, PARTICULARLY MR. GROSSMAN, AND THE FACT THAT

08:52AM 24    MR. BALWANI IS CLAIMING OWNERSHIP OVER THAT MODEL.

08:52AM 25             THE COURT:  OKAY.

08:52AM  1          MS. VOLKAR:  THANK YOU, YOUR HONOR.

08:52AM  2      I THINK THERE ARE TWO KEY ISSUES WITH RESPECT TO

08:52AM  3  804(B)(3).  WHEN IT COMES TO THE MODEL INSTRUCTION, AND THERE'S

08:52AM  4  ONE PAGE IN A LATER EXHIBIT THAT ALSO TOUCHES ON THIS TOPIC.

08:52AM  5  SO IN MY MIND I'M GOING TO GROUP THEM TOGETHER FOR A MOMENT.

08:53AM  6      FIRST, THE MODEL VERSUS PROJECTIONS IS KEY BECAUSE THE

08:53AM  7  WORD "PROJECTIONS" MEANT SOMETHING TO THE INVESTORS.  IT WAS

08:53AM  8  PROJECTED REVENUE.  THAT WAS THE TITLE OF THE SLIDE THAT MOST

08:53AM  9  REVENUES, THAT MOST INVESTORS, RDV, MR. MOSLEY, I BELIEVE --

08:53AM  10  I'M FORGETTING THE THIRD INVESTOR THAT SPECIFICALLY TALKED

08:53AM  11  ABOUT THE SLIDE, BUT MULTIPLE INVESTORS TALKED ABOUT -- AND

08:53AM  12  I'LL PUT PFM AND MR. GROSSMAN IN A SEPARATE CATEGORY BECAUSE

08:53AM  13  THEY BUILT THEIR OWN MODEL AND THAT WAS SLIGHTLY DIFFERENT SO I

08:53AM  14  WILL COME BACK TO THAT.

08:53AM  15      BUT MOST INVESTORS SAW FINANCIAL PROJECTIONS, AND THAT

08:53AM  16  MEANT SOMETHING.  THAT WAS NOT "THIS IS A THEORETICAL WORLD

08:53AM  17  THAT COULD EXIST IF A BUNCH OF ASSUMPTIONS ARE MET."  THAT WAS,

08:53AM  18  "THIS IS WHAT WE PROJECT THE REVENUE OF THE COMPANY TO BE."

08:53AM  19      NOW, THAT DISTINCTION IS KEY, BECAUSE WHAT MR. BALWANI IS

08:53AM  20  SAYING HERE IS ACTUALLY THAT HE HAD NOTHING TO DO WITH

08:53AM  21  PROJECTIONS, AND HE'S NOT EVEN SURE WHO CHANGED THE WORD OR THE

08:54AM  22  TITLE OF THE SLIDE TO BE PROJECTIONS, RATHER HE BUILT A MODEL

08:54AM  23  THAT HAD A BUNCH OF ASSUMPTIONS, AND HE'S NOT EVEN SAYING IN

08:54AM  24  THE LINES THAT MR. FLEURMONT READ, HE'S NOT EVEN SAYING HE

08:54AM  25  HIMSELF ENTIRELY BUILT THE MODEL.  HE'S SHARING BLAME WITH

08:54AM 1    MULTIPLE INVESTORS, WALGREENS, SAFEWAY, EVEN DANISE YAM.

08:54AM 2         AND LATER HE TALKS ABOUT HOW BDT FOLKS MADE EDITS, AND

08:54AM 3    HE'S NOT SURE WHO CHANGED THE NAME AT SOME POINT TO

08:54AM 4    PROJECTIONS, BUT AGAIN, THAT IS A BIG DISTINCTION TO PEOPLE

08:54AM 5    WITH FINANCIAL BACKGROUND.

08:54AM 6         SO FIRST AND FOREMOST ON THE PENAL INTEREST, THERE'S NOT

08:54AM 7    NECESSARILY ANY DIRECT INCULPATORY STATEMENTS HERE, RATHER

08:54AM 8    THERE'S DEFLECTING AND SHARING BLAME THAT WE KNOW FROM GADSON

08:54AM 9    IS INAPPROPRIATE.

08:54AM 10         NOW, I WANT TO TALK ABOUT PFM BRIEFLY BEFORE WE MOVE --

08:54AM 11    BEFORE I MOVE TO THE SECOND POINT.

08:54AM 12         SO WITH PFM THAT ONE SPECIFIC INVESTOR, I KNOW

08:55AM 13    MR. FLEURMONT KEEPS REFERENCING THEM, BUT IT WAS ONE INVESTOR.

08:55AM 14    THEY WORKED WITH MR. BALWANI TO TAKE SOME OF THOSE BASE

08:55AM 15    ASSUMPTIONS AND BUILD THEIR OWN MODEL, WHICH AGAIN, WAS WHAT IS

08:55AM 16    THE RESPONSIBILITIES FOR THIS COMPANY.

08:55AM 17         AND THAT IS NOT WHAT IS THE COMPANY PROJECTING ITS REVENUE

08:55AM 18    TO BE.  THAT'S GIVEN THE FIELD AND THE SPACE THAT THEY'RE

08:55AM 19    ENTERING, IF WE BUILT -- AND I THINK MR. GROSSMAN TESTIFIED

08:55AM 20    ABOUT THREE DIFFERENT SCENARIOS THAT THEY BUILT OUT IN TERMS OF

08:55AM 21    WHAT POSSIBLE GROWTH THERE WAS FOR THIS COMPANY.

08:55AM 22         AND MAYBE BECAUSE I MYSELF AM NOT A FINANCIER, I'M NOT

08:55AM 23    NECESSARILY SEPARATING THE TWO VERY WELL.  BUT ONE IS HERE IS

08:55AM 24    EXPECTED PROJECTED REVENUE, MAYBE WE'LL FALL SHORT, BUT WE'RE

08:55AM 25    NOT GOING TO FALL A BILLION DOLLARS SHORT, AND HERE'S A MODEL

08:55AM 1    WHICH IS JUST ABOUT WHAT IS THE SPHERE, WHAT IS THE SPACE IN

08:55AM 2    THE MARKET THAT THIS COMPANY IS IN, AND, THEREFORE, WHAT IS THE

08:55AM 3    FULLEST POTENTIAL?  NOT WHAT DO WE EXPECT, BUT WHAT IS

08:56AM 4    POSSIBLE?  AND THAT'S KIND OF ONE OF THE KEY DIFFERENCES

08:56AM 5    BETWEEN THE TWO OF THEM.

08:56AM 6        AND PFM DID WORK WITH MR. BALWANI ON THAT.  WE HEARD

08:56AM 7    MR. GROSSMAN'S TESTIMONY ABOUT THAT.  AGAIN, I DON'T KNOW IF

08:56AM 8    THAT IS PER SE IN DISPUTE AND THERE IS ALREADY TESTIMONY ON

08:56AM 9    THAT TOPIC.

08:56AM 10       THE SECOND POINT THAT I WANTED TO MAKE THAT CAUSES MORE

08:56AM 11   CONCERN ABOUT THIS PARTICULAR TOPIC IS THAT THIS PART, AND THE

08:56AM 12   KEY PART THAT I THINK THEY WANT, I BELIEVE IT IS EXHIBIT B.  I

08:56AM 13   KNOW WE HAVE NOT GOTTEN THERE YET, BUT I BELIEVE IT'S PORTIONS

08:56AM 14   OF EXHIBIT B.  426 IS THE PART WHERE IT SAYS THAT MS. HOLMES

08:56AM 15   DIDN'T HAVE ANY KNOWLEDGE OF THE PROJECTIONS OR THE MODEL, OR

08:56AM 16   DIDN'T ADD ANY EDITS TO IT.

08:56AM 17       AND THE PART OF 804(B)(3) THAT REQUIRES TRUSTWORTHINESS OR

08:56AM 18   CORROBORATION, THAT PART IS PARTICULARLY CONCERNING TO THE

08:56AM 19   GOVERNMENT BECAUSE WE HAVE TEXT MESSAGES WHERE MR. BALWANI IS

08:56AM 20   ASKING MS. HOLMES ABOUT THE SAME PROJECTION, THE SAME MODEL,

08:57AM 21   AND THEY'RE TALKING TO EACH OTHER, AND SHE SAYS, I CAN GET

08:57AM 22   COMFORTABLE WITH IT AND I CAN ESSENTIALLY UNDERSTAND IT AND

08:57AM 23   REPEAT IT TO INVESTORS.

08:57AM 24       AND THERE'S NO TESTIMONY FROM MR. GROSSMAN.  THERE'S NO

08:57AM 25   TESTIMONY FROM ANY OTHER INVESTOR THAT MS. HOLMES DIDN'T

7944

08:57AM   1    UNDERSTAND OR KNOW HOW TO TALK ABOUT THIS MODEL.

08:57AM   2         SO THERE'S SIMPLY NOTHING TO CORROBORATE OR INDICATE

08:57AM   3    TRUSTWORTHINESS OF WHAT I WOULD IMAGINE IS THE KEY PART ABOUT

08:57AM   4    THE FINANCIAL STUFF THAT THEY WANT.

08:57AM   5         SO, AGAIN, I KNOW IT'S TWO SLIGHTLY DIFFERENT THINGS.  BUT

08:57AM   6    THERE'S THE PART WHERE IT'S FINANCIAL PROJECTIONS VERSUS MODELS

08:57AM   7    AND MR. BALWANI IS DEFLECTING BLAME THERE, NOT ACTUALLY OWNING

08:57AM   8    THAT HE IS THE ONE WHO CREATED PROJECTIONS PER SE.

08:57AM   9         HE'S TALKING ABOUT HIS PART IN CREATING A MODEL, THAT'S

08:57AM  10    NOT WHAT WAS SAID TO INVESTORS, THAT'S NOT ABOUT THE STATEMENTS

08:57AM  11    THAT WERE MADE, AND THEN THERE'S THE LATER PART WHERE IT SAYS

08:57AM  12    MS. HOLMES HAD NO KNOWLEDGE IN IT, AND THAT PART SIMPLY DOESN'T

08:57AM  13    HAVE ANY CORROBORATION.

08:57AM  14              THE COURT:  OKAY.  THANK YOU.

08:57AM  15              MR. FLEURMONT:  JUST A COUPLE OF POINTS.

08:57AM  16         ON THE FINANCIAL MODEL, THE FINANCIAL MODEL AS

08:58AM  17    MR. GROSSMAN CAME -- AS CAME OUT DURING MR. GROSSMAN'S

08:58AM  18    TESTIMONY, THAT DROVE THE VALUATION, RIGHT?  AND SO THAT WAS

08:58AM  19    SOMETHING THAT WAS IMPORTANT.

08:58AM  20         IN MR. GROSSMAN'S MODEL, THERE IS A TAB THAT HAS

08:58AM  21    MR. BALWANI'S FINANCIAL MODEL IN IT, SO IT'S PART OF HIS MODEL

08:58AM  22    AS WELL.

08:58AM  23         ON CORROBORATION, THE RULE REQUIRES CORROBORATING

08:58AM  24    CIRCUMSTANCES THAT INDICATE TRUSTWORTHINESS.

08:58AM  25         ON MS. VOLKAR'S LAST POINT, WE HAVE TESTIMONY FROM

08:58AM 1   GENERAL MATTIS THAT WHEN THE MODEL WAS DISCUSSED IN THE

08:58AM 2   MEETINGS, IT WAS DISCUSSED BY MR. BALWANI, NOT MS. HOLMES.

08:58AM 3       AND WE HAVE THAT SAME EXACT TESTIMONY IN MR. BALWANI'S

08:58AM 4   S.E.C. DEPOSITION THAT SAYS THAT WHEN HE WENT TO THE BOARD, I

08:58AM 5   BELIEVE ON THE VERY NEXT PAGE -- YES, THE VERY NEXT PAGE -- I'M

08:58AM 6   LOOKING AT PAGE 8, LINES 1 THROUGH 6 WHERE HE DISCUSSES WHEN

08:58AM 7   HE'S AT THE BOARD SHARING THE FINANCIAL MODEL WITH THE BOARD

08:59AM 8   ANY ASSUMPTIONS, NOT MS. HOLMES.

08:59AM 9       AND I THINK WE SHOULD ALSO -- I NEGLECTED TO SAY, OR I'M

08:59AM 10  NEGLECTING TO SAY THAT WHEN LOOKING FOR CORROBORATING

08:59AM 11  CIRCUMSTANCES THAT INDICATE TRUSTWORTHINESS, TYPICALLY IN CASES

08:59AM 12  WHERE YOU HAVE THE STATEMENT AGAINST INTEREST EXCEPTION, WE'RE

08:59AM 13  TALKING ABOUT STATEMENTS MADE TO OTHER WITNESSES, STATEMENTS

08:59AM 14  MADE TO LAWYERS SOMETIMES, AND STATEMENTS MADE SOMETIMES TO

08:59AM 15  POLICE OFFICERS.

08:59AM 16      THESE ARE STATEMENTS MADE IN THE SWORN TESTIMONY.

08:59AM 17      AND THERE'S ACTUALLY ANOTHER EXCEPTION ABOUT STATEMENTS

08:59AM 18  MADE AND IT DOESN'T REQUIRE CORROBORATION BECAUSE I THINK

08:59AM 19  THAT'S JUST A REFLECTION OF THE FACT THAT WHEN YOU'RE MAKING A

08:59AM 20  STATEMENT IN SWORN TESTIMONY, IT'S KIND OF PRESUMED TO BE

08:59AM 21  TRUSTWORTHY BECAUSE YOU HAVE ALL OF THE OTHER PENALTIES.

08:59AM 22      SO THAT'S ON THE CORROBORATION POINT AND THE FINANCIAL

08:59AM 23  AUDIT POINT.

08:59AM 24          THE COURT:  OKAY.  ANYTHING FURTHER ON THIS,

08:59AM 25  MS. VOLKAR?

08:59AM 1          MS. VOLKAR:  ONLY THAT 804(B)(3) AND THE

08:59AM 2     NINTH CIRCUIT IS CLEAR WHAT THE THREE REQUIREMENTS ARE, AND ONE

09:00AM 3     OF THEM IS CORROBORATION AND TRUSTWORTHINESS.  AND I DON'T

09:00AM 4     THINK IT'S AN ACCIDENT THAT A LOT OF THE CASE LAW IN THE

09:00AM 5     NINTH CIRCUIT TALKS ABOUT WHEN THERE ARE TWO COCONSPIRATORS AND

09:00AM 6     ONE WANTS TO USE, OR SOMETIMES THE GOVERNMENT WANTS TO USE, ONE

09:00AM 7     COCONSPIRATOR STATEMENT AGAINST THE OTHER, THERE'S A LARGE BODY

09:00AM 8     OF LAW ABOUT THIS, AND THERE DOES NEED TO BE TRUSTWORTHINESS

09:00AM 9     BECAUSE THERE CAN BE ULTERIOR MOTIVES WHEN IT IS TWO

09:00AM 10    COCONSPIRATORS, AND I DO THINK THAT WE HAVE TO CONSIDER THAT

09:00AM 11    HERE.

09:00AM 12         THE COURT:  OKAY.  I THINK MOST OF THE CASES ARE THE

09:00AM 13    LATTER AS YOU SAY, THE GOVERNMENT TRYING TO GET COCONSPIRATOR

09:00AM 14    STATEMENTS IN.  IT WAS KIND OF A MIRROR IMAGE OF THAT HERE.

09:00AM 15       OKAY.

09:00AM 16         MR. FLEURMONT:  SHOULD WE CONTINUE OR?

09:00AM 17         THE COURT:  WELL, IT'S ABOUT 9:00 O'CLOCK NOW.

09:00AM 18    LET'S FINISH THIS.  LET'S FINISH EXHIBIT A.  LET'S DO THAT.

09:00AM 19         MR. FLEURMONT:  WE HAVE ONE MORE PORTION,

09:00AM 20    YOUR HONOR.

09:00AM 21         THE COURT:  SURE.

09:00AM 22         MR. FLEURMONT:  SO NOW I'M LOOKING AT PAGE 9.  AND

09:00AM 23    THIS RELATES TO RESPONSIBILITY ABOUT THE CLIA LAB.

09:00AM 24       THE QUESTION AT LINES 4 THROUGH 5, DID YOU SUPERVISE

09:01AM 25    THERANOS'S CLIA LAB?

7947

09:01AM   1      AND AS I SAID BEFORE, WE INCLUDED THE ENTIRE ANSWER.  WHAT

09:01AM   2   WE'RE MOST INTERESTED IN IS LINE 10, "HOWEVER, ALL LABS REPORT

09:01AM   3   ULTIMATELY TO BUSINESS," AND THEN LINES 19 THROUGH 21, "SO ALL

09:01AM   4   OF THAT CAME TO ME, REPORTED TO ME BUT THERE WERE OTHER PEOPLE

09:01AM   5   MANAGING IT," TALKING ABOUT THE LAB DIRECTORS, "BUT THEY

09:01AM   6   REPORTED UNDER ME."

09:01AM   7      AND I THINK THAT'S ONE OF THE MORE CLEAR STATEMENTS,

09:01AM   8   YOUR HONOR, HIM TAKING RESPONSIBILITY FOR THE CLIA LAB, WHICH

09:01AM   9   WE KNOW IS AT ISSUE IN THIS CASE.

09:01AM   10      TO BE SURE, THERE ARE OTHER STATEMENTS IN HERE ABOUT THE

09:01AM   11   LAB DIRECTOR, BUT THE STATEMENT THAT WE'RE INTERESTED IN IS HIM

09:01AM   12   SAYING "ALL OF THAT CAME TO ME, THEY REPORTED TO ME."

09:01AM   13      WE THINK THAT ONE IS ONE OF THE MORE CLEAR ISSUES.

09:01AM   14           THE COURT:  19 THROUGH 21?

09:01AM   15           MR. FLEURMONT:  SO, YOUR HONOR, WE THINK THE WHOLE

09:02AM   16   THING SHOULD COME IN.  I THINK YOU UNDERSTAND MY POINT AND I'M

09:02AM   17   JUST BEING FRANK WITH, YOUR HONOR.

09:02AM   18           THE COURT:  RIGHT.

09:02AM   19           MR. FLEURMONT:  JUST TO HEAR THAT, IT DOESN'T REALLY

09:02AM   20   MAKE SENSE WITHOUT HEARING THE FULL STATEMENT.

09:02AM   21      BUT THE QUESTION FROM THE COURT WAS, WHICH PART OF THE

09:02AM   22   STATEMENT IS?

09:02AM   23           THE COURT:  I APPRECIATE YOUR CANDOR.  THANK YOU.

09:02AM   24           MR. FLEURMONT:  AND THAT'S WHAT WE'RE LOOKING FOR.

09:02AM   25           THE COURT:  RIGHT.

09:02AM 1          MS. VOLKAR:  YOUR HONOR, I'LL PREVIEW ANOTHER

09:02AM 2     RULE 106 SUGGESTION, AND POSSIBLY IT MAY BECOME A DEBATE.

09:02AM 3          EARLIER IN THE TESTIMONY HE SAYS HE'S THE PRESIDENT AND

09:02AM 4     COO AND HE REPORTED DIRECTLY TO MS. HOLMES AND THEY WERE THE

09:02AM 5     TWO BUSINESS ASPECTS OF THE COMPANY.

09:02AM 6          AND I THINK THAT THIS TESTIMONY IS ENTIRELY CONSISTENT

09:02AM 7     WITH THAT, AS WELL AS, TO BE FRANK, CONSISTENT WITH TESTIMONY

09:02AM 8     THAT WE HAVE HEARD THROUGHOUT THIS TRIAL, WHICH IS BOTH OF

09:02AM 9     THEM, BOTH DEFENDANTS, BELIEVE THE CLIA LAB DIRECTOR WAS THE

09:02AM 10    PERSON RESPONSIBLE FOR THE DECISIONS IN THE LAB.

09:02AM 11         AND THAT'S THE MAJORITY OF THIS ANSWER AND THE MAJORITY OF

09:03AM 12    THE SIMILAR ANSWER IN EXHIBIT C.

09:03AM 13         BUT THE KEY PART THAT THEY WANT IS THAT THE LAB REPORTED

09:03AM 14    TO HIM, AND HE REPORTED TO MS. HOLMES.  AND THAT'S THE RULE 106

09:03AM 15    PART THAT THEY HAVE NOT INCLUDED IN THESE EXCERPTS, BUT IS IN

09:03AM 16    THE TESTIMONY.

09:03AM 17         IT'S ALSO, TO BE FRANK, WHAT HAS COME OUT DURING THE

09:03AM 18    TESTIMONY OF THIS CASE, AND INCLUDING IN EXHIBIT -- I CITED IT

09:03AM 19    IN MY BRIEF AND I'M WORRIED I'LL MESS UP THE NUMBER -- BUT

09:03AM 20    4528, THE POWERPOINT PRESENTATION THAT THEY PRESENTED TO CMS,

09:03AM 21    DEFENSE BROUGHT THAT OUT ON CROSS OF ONE OF THE LAB DIRECTORS

09:03AM 22    THAT THE LAB REPORTED TO MR. BALWANI AND MR. BALWANI REPORTED

09:03AM 23    TO MS. HOLMES.

09:03AM 24         SO I JUST -- ONE, I DON'T THINK THAT'S IN DISPUTE IN THE

09:03AM 25    CASE; AND, TWO, IF THIS PART IS GOING TO COME IN, THEN IN

09:03AM   1    FAIRNESS, AS WE'LL GET TO THE RULE 106, IT SHOULD BE THAT HE

09:03AM   2    ALSO REPORTED TO MS. HOLMES AND TOLD HER WHAT WAS GOING ON IN

09:03AM   3    THE LAB.

09:03AM   4              THE COURT:  OKAY.

09:03AM   5              MR. FLEURMONT:  ONE LAST BRIEF POINT.

09:03AM   6        MS. VOLKAR HAS SAID A FEW TIMES THAT CERTAIN PARTS ARE

09:04AM   7    CUMULATIVE, AND THAT JUST MEANS IT'S CORROBORATED.  YOU KNOW,

09:04AM   8    JUST POINTING THAT OUT.

09:04AM   9              THE COURT:  OKAY.

09:04AM  10              MS. VOLKAR:  YOUR HONOR, MAY I RESPOND TO THAT?

09:04AM  11              THE COURT:  YEAH, SURE.

09:04AM  12              MS. VOLKAR:  I'M NOT SURE THAT I SAID THIS

09:04AM  13    YESTERDAY, AND I HOPE THAT I DID.  ONE THING THAT I TRIED TO DO

09:04AM  14    IN THE BRIEF, BUT PERHAPS FAILED TO DO, THERE ARE PORTIONS THAT

09:04AM  15    ARE CUMULATIVE, AND THOSE ARE REALLY THE PORTIONS OF WHAT

09:04AM  16    YOUR HONOR IS DEEMING FACT TESTIMONY, AND IT'S NOT THE

09:04AM  17    INCULPATORY OR AGAINST PENAL INTEREST PORTIONS OF IT, OR MAYBE

09:04AM  18    THERE'S SOME SLIGHT OVERLAP THERE.

09:04AM  19        BUT I THINK THE KEY PORTIONS THAT THEY WANT, THE PART THAT

09:04AM  20    SAYS, "AND NOT MS. HOLMES," THOSE PARTS ARE NOT CORROBORATED

09:04AM  21    AND WE'RE NOT SAYING THEY'RE CUMULATIVE.

09:04AM  22        THERE'S NO EVIDENCE TO SUPPORT THEM.  IF ANYTHING, IT'S

09:04AM  23    EVIDENCE TO THE CONTRARY.  SO THERE ARE TWO BUCKETS HERE WHEN

09:04AM  24    IT COMES TO THAT.

09:04AM  25        AND TO THE EXTENT THAT MY COMMENTS ARE CONFUSING OR HAVE

09:04AM   1    CONFLATED THEM, I JUST WANT TO BE VERY CLEAR.  THERE ARE

09:04AM   2    SEVERAL OF THE STATEMENTS THAT ARE CUMULATIVE, AND

09:05AM   3    MR. FLEURMONT WOULD CALL THAT CORROBORATED, BUT I WOULD CALL

09:05AM   4    THAT, GIVEN ALL OF THE OTHER ISSUES AND THE FACT THAT THEY'RE

09:05AM   5    NOT AGAINST PENAL INTEREST IN MOST CASES, WE THINK THAT IT'S

09:05AM   6    JUST ANOTHER REASON TO EXCLUDE THEM.

09:05AM   7        SO THAT'S THE GOVERNMENT'S POINT IN ITS BRIEF WAS EVEN IF

09:05AM   8    WE GET PAST THE HEARSAY ISSUES, THERE'S STILL A 403 ISSUE.

09:05AM   9    THOSE ARE SEPARATE REASONS TO EXCLUDE THIS.

09:05AM   10       SO I JUST WANT TO MAKE SURE THAT WE'RE NOT -- THAT I'M

09:05AM   11   BEING AS CLEAR AS I CAN BE THAT THOSE ARE TWO DIFFERENT REASONS

09:05AM   12   TO EXCLUDE SOMETIMES WHAT WE'RE TALKING ABOUT AS THE SAME

09:05AM   13   TESTIMONY.

09:05AM   14              THE COURT:  OKAY.  THANK YOU.

09:05AM   15              MR. FLEURMONT:  QUICKLY.

09:05AM   16       WE ARE INTERESTED IN STATEMENTS THAT TAKE RESPONSIBILITY

09:05AM   17   AND STATEMENTS THAT ARE INCULPATORY.

09:05AM   18       IF THOSE STATEMENTS ALSO SAY "AND NOT MS. HOLMES," THE

09:05AM   19   CASE LAW IS CLEAR THAT'S FINE.

09:05AM   20       BUT THIS IS NOT AN EXERCISE TO PUT IN STATEMENTS THAT SAY

09:05AM   21   "AND NOT MS. HOLMES."

09:05AM   22       ALL OF THE STATEMENTS WE HAVE PUT IN HAVE BEEN MR. BALWANI

09:05AM   23   TAKING RESPONSIBILITY OVER A CRITICAL ALLEGATION IN THIS CASE,

09:06AM   24   AND I'LL JUST LEAVE IT AT THAT.

09:06AM   25              THE COURT:  ALL RIGHT.  WHAT ABOUT THE NULL

7951

09:06AM  1    PROTOCOL?  DARE I GO THERE?  I ASKED YESTERDAY, IS THIS MOOT

09:06AM  2    NOW?

09:06AM  3              MR. FLEURMONT:  WITHOUT CONCEDING ANY ARGUMENTS,

09:06AM  4    WE'LL WITHDRAW THAT PORTION.

09:06AM  5              THE COURT:  ANY OBJECTION?

09:06AM  6              MS. VOLKAR:  NO OBJECTION FROM THE GOVERNMENT.

09:06AM  7    THANK YOU.

09:06AM  8              THE COURT:  WELL, LET'S CONTINUE OUR DISCUSSION ON B

09:06AM  9    AND C AT SOME OTHER TIME IF THAT'S ALL RIGHT WITH YOU, COUNSEL?

09:06AM  10             MR. FLEURMONT:  YES, YOUR HONOR.

09:06AM  11             THE COURT:  GREAT.  LET'S DO THAT THEN.

09:06AM  12        I'LL STEP DOWN AND WE'LL -- ANYTHING FURTHER ON THIS?

09:06AM  13    WE'LL FIND A TIME WHEN WE CAN CONTINUE THIS MAYBE DURING OUR

09:06AM  14    BREAK OR SOMETHING.

09:06AM  15             MR. FLEURMONT:  THAT SOUNDS GOOD, YOUR HONOR.

09:06AM  16             THE COURT:  GREAT.

09:06AM  17             MS. VOLKAR:  THANK YOU, YOUR HONOR.

09:06AM  18             THE COURT:  LET ME ASK BEFORE WE BRING THE JURY OUT,

09:06AM  19    ANYTHING WE NEED TO TALK ABOUT BEFORE THE JURY COMES OUT,

09:06AM  20    MR. LEACH?

09:06AM  21        YOU'RE PREPARED FOR CROSS-EXAMINATION?

09:06AM  22             MR. LEACH:  I AM, YOUR HONOR.  IF WE CAN HAVE MAYBE

09:06AM  23    FIVE EXTRA MINUTES TO GET THE BINDERS AND THINGS?

09:06AM  24             THE COURT:  SURE.

09:06AM  25         MR. DOWNEY?

7952

09:06AM 1          MR. DOWNEY:  I DIDN'T KNOW YESTERDAY WHAT

09:06AM 2     MR. LEACH'S EXHIBITS WILL BE.  HE DID DISCLOSE SOME EXHIBITS

09:07AM 3     WHICH IMPLICATE THE COURT'S PRIOR RULING ON WEALTH, THE MOTION

09:07AM 4     IN LIMINE ON 798.

09:07AM 5          I DON'T KNOW HIS INTENDED USE OF THEM.  I CAN IMAGINE USES

09:07AM 6     THAT GO BOTH WAYS, BUT I JUST WANTED TO SENSITIZE THE COURT TO

09:07AM 7     THAT BECAUSE I KNOW THAT THE COURT'S RULING WILL NOT

09:07AM 8     NECESSARILY BE TOP OF MIND IN THE HEAT OF THE MOMENT, AND WE

09:07AM 9     HAD A SUBSTANTIAL DISCUSSION OF IT AT THE TIME.

09:07AM 10          AMONG THE EXHIBITS HE'S DISCLOSED, FOR EXAMPLE, TRAVEL

09:07AM 11     ITINERARIES FOR BOARD MEMBERS WHERE MS. HOLMES TRAVELLED TO

09:07AM 12     WASHINGTON, D.C. WITH BOARD MEMBERS.

09:07AM 13          WHEN WE HAD THE MOTION IN LIMINE HEARING, THE MODE OF

09:07AM 14     TRAVEL, THE SPECIFIC ITINERARY WAS A SPECIFIC DISCUSSION

09:07AM 15     BETWEEN YOUR HONOR AND MR. BOSTIC AND SOMETHING THAT I OBJECTED

09:07AM 16     TO IN THAT ARGUMENT.

09:07AM 17          I THINK THAT'S EXCLUDED UNDER THE COURT'S RULINGS, SO I

09:07AM 18     JUST WANT TO SENSITIZE THE COURT TO THAT.

09:07AM 19          AND MR. LEACH CAN PERHAPS EDUCATE US AS TO HIS INTENTIONS.

09:08AM 20          THE COURT:  MR. LEACH?

09:08AM 21          MR. LEACH:  YOUR HONOR, I THINK THE FACT THAT THE

09:08AM 22     DEFENDANT HAS ACTUALLY ASSERTED HER 12.2 DEFENSE AND PUT AT

09:08AM 23     ISSUE HER LIVING CONDITIONS WITH MR. BALWANI, PUT AT ISSUE HER

09:08AM 24     AGENCY OVER WHAT SHE ATE, HER AGENCY OVER WHAT SHE WORE, YOU

09:08AM 25     KNOW, HER RELATIVE POWER WITHIN THE RELATIONSHIP, HER

7953

09:08AM  1      RELATIONSHIP WITH OTHER VERY POWERFUL PEOPLE WHO WERE THERE IN

09:08AM  2      A POSITION TO SUPPORT HER, ALL ESSENTIALLY MOOT MANY OF THE

09:08AM  3      ARGUMENTS THAT WERE MADE AT THE MOTION IN LIMINE STAGE.

09:08AM  4          THEY HAVE NOT JUST OPENED THE DOOR, THEY HAVE OPENED THE

09:08AM  5      FLOODGATES TO THAT RESPECTFULLY, AND IT IS MY INTENTION TO PUT

09:08AM  6      IN ITINERARIES WITH TRAVEL WITH BOARD MEMBERS THAT WERE PAID BY

09:08AM  7      THE COMPANY, TRIPS TO MEXICO ON JETS PAID FOR BY THE COMPANY

09:08AM  8      FOR BUSINESS PURPOSES.

09:08AM  9          MR. BALWANI AND MS. HOLMES OWNED A HOME TOGETHER THROUGH

09:08AM 10      AN LLC.  I THINK THAT'S RELEVANT TO HER RELATIVE AUTHORITY

09:09AM 11      WITHIN THE RELATIONSHIP.

09:09AM 12          I UNDERSTAND WHY SOME OF THESE MIGHT PRESENT 403 ISSUES IF

09:09AM 13      SHE'S NOT RAISING THIS, BUT SHE'S PUT THE ENTIRETY OF THEIR

09:09AM 14      RELATIONSHIP AT ISSUE.  SHE'S PUT HER RELATIVE POWER WITHIN THE

09:09AM 15      RELATIONSHIP AT ISSUE, AND THE GOVERNMENT MUST BE PERMITTED TO

09:09AM 16      COMBAT THOSE ASSERTIONS.

09:09AM 17              MR. DOWNEY:  12.2 IN THIS CONTEXT, YOUR HONOR,

09:09AM 18      RELATES TO DISCLOSURE OF POTENTIAL EXPERT TESTIMONY.  THAT IS

09:09AM 19      NOT SOMETHING THAT IS AT ISSUE YET IN THE COURSE OF THE CASE.

09:09AM 20              THE COURT:  PARDON ME FOR INTERRUPTING YOU.  I

09:09AM 21      WANTED TO ASK THAT THRESHOLD QUESTION, AND I DON'T KNOW IF

09:09AM 22      YOU'RE PREPARED TO ANSWER THAT.  AND IF YOU'RE NOT, THAT'S

09:09AM 23      FINE.

09:09AM 24          BUT IS 12.2 AN ISSUE IN THIS CASE YET?

09:09AM 25              MR. DOWNEY:  I'M NOT PREPARED TO ANSWER IT.  WE'LL

09:09AM 1    SEE WHERE WE ARE AT THE END OF MS. HOLMES'S TESTIMONY.

09:09AM 2            THE COURT:  OKAY.  SO I ASKED THAT QUESTION,

09:09AM 3    MR. LEACH, BECAUSE, OF COURSE, A PARTY, A DEFENDANT IS REQUIRED

09:09AM 4    UNDER THE RULES TO GIVE NOTICE, AND WE HAD THAT DISCUSSION OVER

09:10AM 5    THE LAST YEAR.  THAT NOTICE WAS GIVEN APPROPRIATELY ACCORDING

09:10AM 6    TO THE RULES.

09:10AM 7        BUT WHETHER OR NOT A PARTY DECIDES TO ENGAGE THAT DEFENSE

09:10AM 8    IS STILL AN ISSUE.

09:10AM 9        AND LET ME JUST ASK THE QUESTION, IS THAT, IS THAT A 12.2

09:10AM 10   DEFENSE ENGAGED BY VIRTUE OF CALLING AN EXPERT TO SPEAK TO IT?

09:10AM 11           MR. LEACH:  WELL, YOUR HONOR, I DON'T THINK IT'S

09:10AM 12   MERELY CALLING THE EXPERT.  I MEAN, THE WITNESS TESTIFIED

09:10AM 13   YESTERDAY, "BALWANI CONTROLLED WHAT I ATE."  SHE TESTIFIED

09:10AM 14   YESTERDAY, "I DON'T KNOW WHAT IMPACT THE RELATIONSHIP HAD ON

09:10AM 15   ME."  SHE TESTIFIED TO FEAR GOING HOME AND WHAT WAS GOING TO

09:10AM 16   HAPPEN.

09:10AM 17       THE GOVERNMENT MUST BE ABLE TO TEST THAT, AND WHETHER

09:10AM 18   SHE'S DOING IT IN THE GUISE OF A NOTICE EXPERT, WE'RE SIMPLY

09:11AM 19   RAISING THESE FACTS AND CLAIMING THROUGH A NUMBER OF STATEMENTS

09:11AM 20   THAT "I DIDN'T HAVE AGENCY," THAT "I WAS FEARFUL OF HIM," THAT

09:11AM 21   "I DIDN'T HAVE POWER IN THE RELATIONSHIP."

09:11AM 22       WHETHER OR NOT SHE CALLS AN EXPERT TO BOLSTER THAT -- AND

09:11AM 23   WE'VE HAD THAT CONVERSATION A NUMBER OF TIMES -- I DON'T THINK

09:11AM 24   IT MATTERS AT ALL.

09:11AM 25       SHE SAID SHE DIDN'T CONTROL WHAT SHE ATE.  THERE'S AMPLE

09:11AM  1    EVIDENCE TO SUGGEST THAT SHE DID.  THE GOVERNMENT SHOULD BE

09:11AM  2    ABLE TO CONFRONT HER WITH THAT.

09:11AM  3         THE COURT'S MOTION IN LIMINE ON THE TRAVEL I THOUGHT WAS

09:11AM  4    ANYTHING THAT THE COMPANY PAID FOR IN TERMS OF JETS, HOTELS ON

09:11AM  5    THE COMPANY DIME WAS FAIR GAME.

09:11AM  6         DANISE YAM TESTIFIED TO EXPENSES THAT WERE INCURRED THERE.

09:11AM  7         I DON'T THINK IT MATTERS WHETHER THEY CALL AN EXPERT OR

09:11AM  8    NOT.  THIS WITNESS TESTIFIED TO THOSE MATTERS ON HER DIRECT

09:11AM  9    EXAMINATION.

09:11AM  10         THE COURT:  SO TWO POINTS HERE THAT I'M CURIOUS

09:11AM  11    ABOUT.  LET ME JUST STATE THE FIRST ONE.

09:11AM  12         IF NO EXPERT IS CALLED THEN, AND IF YOU STOOD UP AND SAID,

09:11AM  13    YOUR HONOR, I WOULD LIKE TO STRIKE ALL OF THE TESTIMONY ABOUT

09:12AM  14    MR. BALWANI AND MS. HOLMES'S TESTIMONY ABOUT THAT BECAUSE IT'S

09:12AM  15    NOT RELEVANT IF THERE'S NO 12.2 -- I'M BEING HYPOTHETICAL

09:12AM  16    HERE -- I'M THINKING AHEAD, BUT THAT'S POTENTIALLY SOMETHING

09:12AM  17    THAT COULD HAPPEN.

09:12AM  18         WHAT IS THE RELEVANCE?  I'M NOT ASKING YOU TO RESPOND.

09:12AM  19    BUT WHAT IS THE RELEVANCE OF THAT TESTIMONY WITHOUT SUPPORTING

09:12AM  20    12.2 EXPERT, ET CETERA, ET CETERA?  I DON'T KNOW THE ANSWER TO

09:12AM  21    THAT, AND MAYBE WE'LL BE DISCUSSING THAT.  I DON'T KNOW.

09:12AM  22         TO YOUR POINT, AND MR. DOWNEY, TO THE GOVERNMENT'S POINT,

09:12AM  23    YOUR CLIENT HAS TESTIFIED AS TO CERTAIN THINGS ABOUT THE

09:12AM  24    RELATIONSHIP.

09:12AM  25         AND ON CROSS-EXAMINATION THE GOVERNMENT SHOULD BE ABLE TO

09:12AM  1     TEST AND PROBE THOSE, SOME OF THOSE THINGS.

09:12AM  2          AND HE SHOULD BE PERMITTED TO DO THAT.  AND I DON'T THINK

09:12AM  3     YOU'RE SAYING THAT.  THIS IS ABOUT EXPENSES SPECIFICALLY.

09:12AM  4          MR. DOWNEY:  THAT'S RIGHT, YOUR HONOR.  THERE'S NO

09:12AM  5     QUESTION, THERE'S NO QUESTION THAT HE CAN CROSS-EXAMINE AROUND

09:13AM  6     THAT.

09:13AM  7          THE COURT:  THE ORDER IN 798 AS TO THE EXTRAVAGANCE

09:13AM  8     WAS RELATED TO WHETHER OR NOT THE GOVERNMENT, IN THEIR

09:13AM  9     CASE-IN-CHIEF, COULD PUT ON EVIDENCE THAT SHE SHOPPED AT, IF

09:13AM  10    SHE DID, AT DESIGNER STORES, IF SHE ATE AT FIVE STAR

09:13AM  11    RESTAURANTS, WHATEVER THAT IS, SOMETHING THAT MIGHT CAUSE THE

09:13AM  12    JURY TO THINK THAT SHE WAS LIVING AN EXTRAVAGANT LIFESTYLE, ET

09:13AM  13    CETERA.

09:13AM  14         THE ORDER SAID, DIDN'T IT, THAT THE GOVERNMENT COULD AND

09:13AM  15    EVIDENCE COULD BE INTRODUCED THAT I THINK I SAID IN THE ORDER

09:13AM  16    THAT IT'S COMMON KNOWLEDGE THAT CEO'S OF LARGE COMPANIES LIVE A

09:13AM  17    LIFESTYLE VERY DIFFERENT THAN THE GENERAL PUBLIC AND ALL OF

09:13AM  18    OURS.

09:13AM  19         MR. DOWNEY:  SURE.

09:13AM  20         THE COURT:  I THINK THAT'S COMMON KNOWLEDGE.

09:13AM  21         INCLUDED IN THAT KNOWLEDGE IS THE FACT THAT CEO'S TRAVEL

09:13AM  22    ON PRIVATE JETS SOMETIMES.  THAT'S WHAT THEY DO.  THEY DON'T

09:14AM  23    FLY COACH.

09:14AM  24         AND IN THE ORDER I THINK THAT'S PERMITTED TO TALK ABOUT

09:14AM  25    WHAT DO NORMAL, WHAT DO NORMAL PEOPLE DO, WHATEVER THAT IS?

09:14AM  1    WHATEVER THE NORMAL LIFE OF A CEO OF A MAJOR COMPANY IS, I

09:14AM  2    DON'T KNOW WHAT THAT IS.

09:14AM  3        BUT WHAT I WAS -- AND I THINK IN RECOGNITION OF THE

09:14AM  4    DEFENSE OBJECTION THERE, IS IT RELEVANT THAT SHE SHOPPED AT,

09:14AM  5    AND THIS IS JUST -- I DON'T KNOW ANY EVIDENCE ABOUT IT, BUT IS

09:14AM  6    IT RELEVANT THAT SHE BREAKFASTED AT VAN CLEEF & ARPELS, IS IT

09:14AM  7    RELEVANT THAT SHE HAD CAVIAR FLOWN IN EVERY DAY, EVERY HOUR.

09:14AM  8        THERE'S NO EVIDENCE OF THAT, AND I'M NOT INDICATING THERE

09:14AM  9    IS, BUT I'M SUGGESTING THAT TYPE OF EXTRAVAGANCE IS SOMETHING

09:14AM  10    THAT THE JURY SHOULDN'T HEAR ABOUT BECAUSE THAT DOESN'T HAVE

09:14AM  11    RELEVANCE TO THE CASE.

09:14AM  12        BUT IF THERE ARE TRAVELS THAT ARE COMMENSURATE WITH CEO

09:15AM  13    TRAVEL, IF IT'S A BUSINESS TRAVEL, THAT'S, THAT'S KIND OF THE

09:15AM  14    WAY SILICON VALLEY OPERATES.

09:15AM  15        MR. DOWNEY:  WELL, OF COURSE, YOUR HONOR, IF IT'S

09:15AM  16    RELEVANT FOR SOME PURPOSE TO COMMENT ON A TRIP AND EVENTS ON

09:15AM  17    THE TRIP ARE RELEVANT, WE HAD SOME OF THAT WITH RESPECT TO

09:15AM  18    ANOTHER WITNESS WHO TESTIFIED DURING THE CASE, IT WASN'T -- A

09:15AM  19    MAJOR ISSUE WASN'T MADE OF IT.

09:15AM  20        THAT'S NOT WHAT THIS IS.  THIS IS THE INTRODUCTION OF

09:15AM  21    EVIDENCE ABOUT TRAVEL ON PRIVATE PLANES PURELY, PURELY FOR THE

09:15AM  22    PURPOSE PROHIBITED BY 401 AND 403.  IT DOESN'T HAVE ANY

09:15AM  23    RELEVANCE TO THE CASE.  THESE TRIPS ARE NOT RELEVANT TO

09:15AM  24    ANYTHING THAT ANYONE HAS TALKED ABOUT.  THEY'RE NOT RELEVANT TO

09:15AM  25    ANYTHING THAT MS. HOLMES HAS TALKED ABOUT.

09:15AM  1         THEY'RE ONLY BEING INTRODUCED TO SHOW THAT PRIVATE PLANE

09:15AM  2     TRAVEL WAS INCLUDED.  MR. LEACH JUST CONCEDED THEY'RE FOR

09:15AM  3     BUSINESS PURPOSES.  THEY'RE BUSINESS APPROVED TRAVEL.  WHY DOES

09:16AM  4     THE JURY NEED TO HEAR ABOUT THAT?

09:16AM  5         I THINK IN TERMS OF BRANDS, I DON'T KNOW MR. LEACH, I MUST

09:16AM  6     SAY THAT YOUR HONOR'S REFERENCE FLOWED RIGHT OVER ME.

09:16AM  7              THE COURT:  YOU DON'T SHOP THERE, MR. DOWNEY?

09:16AM  8              MR. DOWNEY:  I COULDN'T REPEAT WHAT YOU SAID.

09:16AM  9         (LAUGHTER.)

09:16AM 10              MR. DOWNEY:  BUT I, I -- YOU KNOW, I -- IT'S JUST

09:16AM 11     NOT NECESSARY.

09:16AM 12         OF COURSE HE'S ENTITLED TO CROSS-EXAMINE HER ABOUT HER

09:16AM 13     STATEMENTS AND SO FORTH AND TO EXPLORE THE TRUTH OF THEM.

09:16AM 14         BUT THIS ISN'T BEING OFFERED FOR THAT PURPOSE.  THIS IS

09:16AM 15     BEING OFFERED FOR INFLAMMATION OF THE JURY.

09:16AM 16              MR. LEACH:  NO, YOUR HONOR.  THIS IS BEING OFFERED

09:16AM 17     FOR MOTIVE.  THIS WITNESS HAS TESTIFIED I HAD A VISION, I WAS

09:16AM 18     DOING THIS, THE THRUST OF WHICH IS FOR ALTRUISTIC PURPOSES, I

09:16AM 19     DIDN'T SELL A SHARE OF STOCK.

09:16AM 20         THERE'S ANOTHER SIDE TO THAT COIN.  SHE WAS FLYING AROUND

09:16AM 21     THE WORLD MEETING WITH SOME OF THE MOST POWERFUL PEOPLE IN THE

09:16AM 22     UNITED STATES ON THE COMPANY'S DIME, AND THAT IS RELEVANT TO

09:16AM 23     HER MOTIVE.  SHE COVETED FAME.  SHE COVETED ATTENTION.  SHE

09:17AM 24     COVETED THE ABILITY TO INTERACT WITH MANY OF THESE PEOPLE.

09:17AM 25         THAT'S A VERY POWERFUL PART OF THE MOTIVE HERE, AND IT'S

09:17AM  1    SQUARELY WITHIN WHAT THE COURT HELD.

09:17AM  2         SO I -- AND THESE ARE BUSINESS TRIPS.  THESE ARE RELEVANT

09:17AM  3    TO THE ALLEGATIONS IN THE INDICTMENT.  ONE OF THEM IS A TRIP TO

09:17AM  4    MEET A POTENTIAL INVESTOR.  ONE OF THEM IS A TRIP TO ACCEPT AN

09:17AM  5    AWARD.

09:17AM  6         AT THE SAME TIME, SHE'S WRITING DOWN THAT SHE HAS -- I

09:17AM  7    DON'T WANT TO USE THE EXPLETIVE -- BUT A COMPANY NOT WORTHY OF

09:17AM  8    THAT.

09:17AM  9         ALL OF THIS GOES DIRECTLY TO HER MOTIVE AND HER STATE OF

09:17AM  10   MIND.  YES, THEY MIGHT APPEAR TO A LAYPERSON AS BEING OUTSIDE

09:17AM  11   OF THE NORMAL COURSE OF WHAT PEOPLE DO.

09:17AM  12        BUT WE SHOULDN'T SANITIZE THINGS HERE.  THIS IS PART OF

09:17AM  13   THE MOTIVE.

09:17AM  14             THE COURT:  IF, IF -- THANK YOU.

09:17AM  15        IF -- IT WOULD SEEM TO ME, MR. DOWNEY, THAT THERE MIGHT BE

09:17AM  16   SOME FINANCIAL RELEVANCE TO THE FINANCIAL STATE OF THE COMPANY

09:18AM  17   AND WHETHER OR NOT AN INDIVIDUAL WHO HAS A LEADERSHIP ROLE WITH

09:18AM  18   THE COMPANY WAS EXPENDING MONIES IN SOME MANNER.  THAT MIGHT

09:18AM  19   HAVE SOME RELEVANCE AS TO INTENT.

09:18AM  20             MR. DOWNEY:  WELL, I SUPPOSE, EXCEPT THAT THE

09:18AM  21   RELEVANCE THAT MR. LEACH JUST ARTICULATED IS EXACTLY WHAT IS

09:18AM  22   PROHIBITED UNDER NINTH CIRCUIT CASE LAW.  ONE IS NOT IN THE

09:18AM  23   POSITION OF THE GOVERNMENT ENTITLED TO SAY THAT THE ALLEGED

09:18AM  24   CONDUCT WAS UNDERTAKEN TO IMPROVE ONE'S FINANCIAL SITUATION OR

09:18AM  25   TO GAIN THE BENEFITS ASSOCIATED WITH THAT.

09:18AM 1          SO WE HAVEN'T HEARD THAT PURPOSE YET.

09:18AM 2               THE COURT:  RIGHT.

09:18AM 3               MR. LEACH:  YOUR HONOR, MR. BOSTIC IS REMINDING ME

09:18AM 4     THAT THE GOVERNMENT MAY INTRODUCE EVIDENCE THAT HOLMES ENJOYED

09:18AM 5     A LIFESTYLE AS THERANOS'S CEO THAT IS COMPARABLE TO OTHER TECH

09:18AM 6     COMPANY'S CEOS.  THIS INCLUDES TRAVEL, SALARY, CELEBRITY AND

09:19AM 7     PERKS AND OTHER BENEFITS COMMENSURATE WITH THE POSITION.

09:19AM 8          THOSE ARE EXACTLY WHAT THOSE ARE, AND I THINK YOUR HONOR

09:19AM 9     MADE A POINT THAT THE JURY SHOULD BE ABLE TO DRAW INFERENCES

09:19AM 10    FROM THE FACT THAT THEY ARE SPENDING TENS OF THOUSANDS OF

09:19AM 11    DOLLARS OF THIS RATHER THAN HIRING A LAB DIRECTOR OF THE

09:19AM 12    GREATER STATURE OF THE ONES THAT THEY HIRED IN THE RELEVANT

09:19AM 13    TIME PERIOD.

09:19AM 14         SO NOTHING HAS CHANGED IN THE COURT'S ORDER OTHER THAN

09:19AM 15    THEY'VE OPENED THE FLOODGATES ON DOES THIS WITNESS HAVE CONTROL

09:19AM 16    AND AGENCY OVER WHAT SHE DOES.

09:19AM 17              MR. DOWNEY:  I MUST SAY THAT THAT MIGHT BE THE MOST

09:19AM 18    AGGRESSIVE RUNNING OVER OF AN ORDER THAT I'VE SEEN IN RECENT

09:19AM 19    TIME.  I THINK THE POINT OF THE ORDER WAS -- EVIDENCE IS GOING

09:19AM 20    TO COME IN ABOUT CELEBRITY, EVIDENCE IS GOING TO BE RELEVANT IN

09:19AM 21    A CASE LIKE THIS, AND WE CAN'T USE THIS ARGUMENT AS A BARRIER

09:19AM 22    TO INTRODUCING THAT ARGUMENT.

09:19AM 23         BUT WHEN THE EVIDENCE IS BEING INTRODUCED EXACTLY FOR THE

09:19AM 24    REASON THAT MR. LEACH ARTICULATED THIS MORNING, WHICH IS THAT

09:19AM 25    IT'S ABOUT MOTIVE AND SO FORTH, THAT IS PROHIBITED.

7961

09:19AM   1      WE'VE HAD EVIDENCE IN THE CASE ABOUT CELEBRITY, WE'VE HAD

09:20AM   2   EVIDENCE IN THE CASE ABOUT PRIVATE TRAVEL.  I HAVEN'T OBJECTED

09:20AM   3   TO ANY OF THAT.  BUT THIS IS DIFFERENT.

09:20AM   4          THE COURT:  ANYTHING FURTHER?

09:20AM   5          MR. LEACH:  NOT ON THAT POINT, YOUR HONOR.

09:20AM   6      BUT I DO WANT TO GO BACK TO THE CLOTHING PART.  SHE'S

09:20AM   7   SAYING --

09:20AM   8          MR. DOWNEY:  SPEAK AT A HIGH LEVEL FOR MY BENEFIT.

09:20AM   9          MR. LEACH:  IT'S ABOVE MY PAY GRADE, TOO.

09:20AM   10          THE COURT:  START AT MACY'S.

09:20AM   11          MR. LEACH:  THE POINT OF THE EVIDENCE IS NOT THAT

09:20AM   12   SHE WENT TO A PARTICULAR STORE OR BOUGHT A PARTICULAR BRAND.

09:20AM   13      THE POINT IS THAT SHE'S DOING THIS WITHOUT MR. BALWANI.

09:20AM   14   THE POINT IS THAT SHE AND HER ASSISTANT ARE MAKING DECISIONS

09:20AM   15   OVER WHERE TO GO AND WHAT TO GET.

09:20AM   16          THE COURT:  YEAH.  AND THAT'S A FAIR POINT, YES, I

09:20AM   17   AGREE.

09:20AM   18      AND I THINK MR. DOWNEY WOULD, I'M NOT ASKING HIM TO, BUT I

09:20AM   19   THINK HE WOULD HAVE TO CONCEDE THAT POINT, THAT'S RIGHT.

09:20AM   20      AND BASED ON THE TESTIMONY THAT WE HEARD YESTERDAY, I

09:20AM   21   THINK THAT'S WHAT YOU'RE TALKING ABOUT FROM MS. HOLMES, YOU'RE

09:20AM   22   ENTITLED TO PROBE THAT FOR THOSE ISSUES, THOSE INDEPENDENT

09:21AM   23   ISSUES, IF YOU WILL, I'LL CALL IT THAT, AND I THINK YOU'RE

09:21AM   24   RIGHT, YOU'RE RIGHT ON THAT.

09:21AM   25      AND I THINK MR. DOWNEY HAS TOLD US THAT YOU'RE ENTITLED TO

09:21AM 1    PROBE ON THOSE THINGS.

09:21AM 2        MY SENSE IS THAT THE TERRITORIAL BORDER HERE IS

09:21AM 3    EXTRAVAGANT EXPENSES, TWO DIFFERENT THINGS, BUT PERHAPS THERE'S

09:21AM 4    CROSSOVER AND A VEN DIAGRAM ON THAT.

09:21AM 5        BUT FOR THE PURPOSE, FOR THE PURPOSE, I GUESS, IS WHAT

09:21AM 6    YOU'LL HAVE TO SPEAK TO IF YOU SEEK TO INTRODUCE THIS EVIDENCE,

09:21AM 7    AND I DON'T KNOW IF THIS WILL COME IN THIS MORNING OR SOMETIME

09:21AM 8    LATER TODAY.

09:21AM 9            MR. LEACH:  I IMAGINE IT WILL BE AFTER THE BREAK,

09:21AM 10   YOUR HONOR.

09:21AM 11           THE COURT:  THAT'S MY SENSE OF IT.

09:21AM 12       OKAY.

09:21AM 13           MR. DOWNEY:  THANK YOU, YOUR HONOR.

09:21AM 14           THE COURT:  WELL, THANK YOU FOR BRINGING IT TO MY

09:21AM 15   ATTENTION.

09:21AM 16       ANYTHING ELSE THEN?

09:21AM 17       WE'LL BREAK AT ABOUT 11:00 O'CLOCK, WE'LL TAKE A BREAK,

09:21AM 18   AND THEN AGAIN ANOTHER ONE AT ABOUT 1:30 IF THAT WORKS.

09:21AM 19           MR. LEACH:  THANK YOU, YOUR HONOR.

09:21AM 20           MR. DOWNEY:  THANK YOU, YOUR HONOR.

09:21AM 21           THE COURT:  THANK YOU.

09:21AM 22           THE CLERK:  COURT IS IN RECESS.

09:22AM 23       (RECESS FROM 9:22 A.M. UNTIL 9:33 A.M.)

09:33AM 24       (JURY IN AT 9:33 A.M.)

09:33AM 25           THE COURT:  GOOD MORNING.  WE'RE BACK ON THE RECORD

09:33AM  1      IN THE HOLMES MATTER.  ALL COUNSEL ARE PRESENT.  OUR JURY IS

09:33AM  2   PRESENT.  MS. HOLMES IS ON THE STAND.

09:33AM  3          LADIES AND GENTLEMEN, GOOD MORNING.  LET ME, BEFORE WE

09:33AM  4   BEGIN, LET ME ASK YOU THE QUESTION AGAIN.  DURING THE EVENING,

09:33AM  5   DID ANY OF YOU HAVE CAUSE TO COME ACROSS INFORMATION, SPEAK TO

09:33AM  6   ANYONE, READ, OR DISCUSS ANYTHING ABOUT THIS CASE?

09:34AM  7          IF SO, COULD YOU PLEASE RAISE YOUR HAND.

09:34AM  8          I SEE NO HANDS.

09:34AM  9          THANK YOU VERY MUCH.

09:34AM 10          MS. HOLMES, IF YOU COULD JUST STATE YOUR NAME, PLEASE.

09:34AM 11               THE WITNESS:  MY NAME IS ELIZABETH HOLMES.

09:34AM 12               THE COURT:  THANK YOU.

09:34AM 13          AND, MR. LEACH, DO YOU HAVE EXAMINATION?

09:34AM 14               MR. LEACH:  I DO, YOUR HONOR.  THANK YOU.

09:34AM 15               THE COURT:  AND YOU'RE STILL UNDER OATH, MS. HOLMES.

09:34AM 16               THE WITNESS:  THANK YOU.

09:34AM 17               THE COURT:  AND YOU CAN REMOVE YOUR MASK IF YOU

09:34AM 18   WISH.

09:34AM 19               THE WITNESS:  THANK YOU.

09:34AM 20               THE COURT:  YOU'RE WELCOME.

09:34AM 21       **(DEFENDANT'S WITNESS, ELIZABETH HOLMES, WAS PREVIOUSLY**

09:34AM 22   **SWORN.)**

09:34AM 23                         **CROSS-EXAMINATION (RESUMED)**

09:34AM 24   BY MR. LEACH:

09:34AM 25   Q.   GOOD MORNING, MS. HOLMES.

09:34AM   1      A.   GOOD MORNING.

09:34AM   2      Q.   YESTERDAY YOU TESTIFIED THAT WHEN YOU LEARNED "THE

09:34AM   3      WALL STREET JOURNAL" MIGHT BE WRITING A NEGATIVE STORY ABOUT

09:34AM   4      THERANOS IN 2015, YOUR RESPONSE WAS AGGRESSIVE.

09:34AM   5           DO YOU RECALL THAT TESTIMONY?

09:34AM   6      A.   I DO.

09:34AM   7      Q.   I'D LIKE TO EXPLORE A LITTLE BIT ABOUT WHAT THAT MEANS.

09:34AM   8      YOU LEARNED THAT JOHN CARREYROU, A REPORTER WITH "THE

09:35AM   9      WALL STREET JOURNAL," WAS WORKING ON SOME FORM OF STORY IN OR

09:35AM   10     ABOUT APRIL OF 2015; IS THAT CORRECT?

09:35AM   11     A.   YES.

09:35AM   12     Q.   AND AFTER LEARNING THIS, YOU AND MR. BALWANI TOOK STEPS TO

09:35AM   13     CONTROL MR. CARREYROU'S EXPERIENCE AT A WELLNESS CENTER IN

09:35AM   14     ARIZONA; ISN'T THAT RIGHT?

09:35AM   15     A.   I DON'T THINK SO.

09:35AM   16     Q.   WELL, LET'S LOOK AT THAT.

09:35AM   17          YOU WERE WORRIED THAT MR. CARREYROU MIGHT GO TO A WELLNESS

09:35AM   18     CENTER AND GET A VEIN DRAW, WEREN'T YOU?

09:35AM   19     A.   I DON'T REMEMBER THAT.

09:35AM   20     Q.   OKAY.

09:35AM   21          MAY I APPROACH, YOUR HONOR?

09:35AM   22              THE COURT:   YES.

09:35AM   23     BY MR. LEACH:

09:35AM   24     Q.   (HANDING.)

09:35AM   25          MR. HOLMES, I'VE PLACED BEFORE YOU A BINDER OF DOCUMENTS,

| | | |
|---|---|---|
| 09:35AM | 1 | AND I'D LIKE TO DRAW YOUR ATTENTION TO WHAT IS IN EVIDENCE AS |
| 09:35AM | 2 | 5387D. |
| 09:36AM | 3 | IF YOU COULD PLEASE GO TO PAGE 50. |
| 09:36AM | 4 | MS. HOLLIMAN, IF WE CAN DISPLAY THAT ON THE SCREEN? |
| 09:36AM | 5 | A.   GOT IT.  OKAY. |
| 09:36AM | 6 | Q.   ONE MOMENT WHILE WE PULL IT UP ON THE SCREEN. |
| 09:36AM | 7 | A.   WAS THERE A PAGE? |
| 09:36AM | 8 | Q.   PAGE 50. |
| 09:36AM | 9 | A.   OKAY. |
| 09:36AM | 10 | Q.   AND TO THE RIGHT YOU SHOULD SEE PRH 175, AND YOU ALSO |
| 09:36AM | 11 | SHOULD HAVE THAT ON YOUR SCREEN. |
| 09:36AM | 12 | MS. HOLLIMAN, IF WE COULD PLEASE EXPAND THE SUBSTANCE OF |
| 09:36AM | 13 | THE TEXT WITH THE DATE. |
| 09:37AM | 14 | DO YOU SEE WHERE YOU TEXTED, "RE YOUR EMAIL"? |
| 09:37AM | 15 | A.   I DO. |
| 09:37AM | 16 | Q.   AND THEN YOU WROTE "WSJ GUY MIGHT SHOW UP TOMORROW"? |
| 09:37AM | 17 | A.   YES. |
| 09:37AM | 18 | Q.   AND THAT'S A REFERENCE TO MR. CARREYROU, ISN'T IT? |
| 09:37AM | 19 | A.   I THINK SO. |
| 09:37AM | 20 | Q.   AND THEN YOU WROTE, "THAT IS THE THING." |
| 09:37AM | 21 | AND MR. BALWANI RESPONDS, "WE NEED TOMORROW TO TEST AND |
| 09:37AM | 22 | THEN THE TEAM CAN PUSH IT IN PRODUCTION TOMORROW NIGHT." |
| 09:37AM | 23 | DO YOU SEE THAT? |
| 09:37AM | 24 | A.   I DO. |
| 09:37AM | 25 | Q.   AND YOU WROTE, "OK. |

09:37AM 1        "COULD JUST DO FOR HIM ONLY IF HE SHOWS UP --"

09:37AM 2        AND MR. BALWANI SAYS, "HARD TO KNOW WHO HE IS AND WHAT

09:37AM 3    ORDER HE BRINGS.

09:37AM 4        "BETTER A PERFECT VENIPUNCTURE THAN BAD FINGERSTICK."

09:37AM 5        DOES THIS REFRESH YOUR RECOLLECTION THAT YOU AND

09:37AM 6    MR. BALWANI WERE TAKING STEPS TO CONTROL MR. CARREYROU'S

09:37AM 7    EXPERIENCE AT THE WELLNESS CENTER?

09:37AM 8    A.   NO.

09:37AM 9    Q.   YOU GO ON TO WRITE, "IT'S POSSIBLE HE TALKS TO DOCS FIRST

09:38AM 10   DAY AND DOES DRAW SECOND DAY."

09:38AM 11       YOU'RE TALKING ABOUT MR. CARREYROU GOING TO A DOCTOR FIRST

09:38AM 12   AND THEN GOING TO GET A DRAW ON THE SECOND DAY OF HIS VISIT IN

09:38AM 13   ARIZONA, AREN'T YOU?

09:38AM 14   A.   I THINK SO, YES.

09:38AM 15   Q.   OKAY.  "SEEMS LIKE THIS GUY IS LOOKING TO WRITE SOMETHING

09:38AM 16   NEGATIVE."

09:38AM 17       IS THAT WHAT MR. BALWANI WROTE TO YOU?

09:38AM 18   A.   YES.

09:38AM 19   Q.   AND "THAT'S WHAT HE DOES."

09:38AM 20       IS THAT ALSO A REFERENCE TO MR. CARREYROU?

09:38AM 21   A.   I THINK SO.

09:38AM 22   Q.   "EVEN THEN.  WE DON'T WHAT TESTS HE WILL DO.

09:38AM 23       "BUT WE CAN TURN IT INTO PIECE ABOUT WHAT" -- AND THEN CAN

09:38AM 24   YOU HELP US OUT WITH THAT ACRONYM THERE?

09:38AM 25   A.   I THINK IT SAYS SQL.

09:38AM 1    Q.   OKAY.  YOU THEN WROTE, "OUR OPPO GUY KNOWS HIM WELL.

09:38AM 2         "I KNOW."

09:38AM 3         THE OPPO GUY IS PETER FRITSCH, ISN'T IT?

09:38AM 4    A.   I THINK SO, YES.

09:38AM 5    Q.   AND HE WORKS WITH A COMPANY CALLED FUSIONGPS; IS THAT

09:38AM 6    CORRECT?

09:38AM 7    A.   HE DID.

09:38AM 8    Q.   AND YOU AND THERANOS ENGAGED FUSIONGPS TO DO OPPOSITION

09:39AM 9    RESEARCH ON JOHN CARREYROU WHEN YOU LEARNED HE WAS WRITING A

09:39AM 10   NEGATIVE STORY?

09:39AM 11   A.   NO.

09:39AM 12   Q.   WELL, LET'S LOOK AT THE TEXT.  I'LL DRAW YOUR ATTENTION TO

09:39AM 13   PAGE 53.

09:39AM 14        DO YOU HAVE THAT IN FRONT OF YOU, MS. HOLMES?

09:39AM 15   A.   I'M JUST LOOKING AT THE SCREEN.

09:39AM 16   Q.   OKAY.  DO YOU SEE THE TEXT AT 4-25-2015, "HAVE A

09:39AM 17   10:00 A.M. WITH FUSIONGPS"?

09:39AM 18   A.   I DO.

09:39AM 19   Q.   AND THAT IS A REFERENCE TO MR. FRITSCH?

09:39AM 20   A.   I THINK SO, YES.

09:39AM 21   Q.   AND YOU HIRED THEM AFTER LEARNING THAT MR. CARREYROU WAS

09:39AM 22   WRITING THIS STORY?

09:39AM 23   A.   I DON'T KNOW.

09:39AM 24   Q.   WELL, LET'S LOOK FURTHER.

09:39AM 25        YOU WRITE DOWN AT THE BOTTOM, "WE'LL GET KILLER PACKAGE

09:39AM   1      FOR WHEN MEET WITH CARREYROU TO TURN THIS INTO OUR STORY.

09:39AM   2           "GOOD."

09:40AM   3           DO YOU SEE THAT?

09:40AM   4      A.   I DO.

09:40AM   5      Q.   AND THAT'S A REFERENCE TO YOUR WORK WITH FUSIONGPS?

09:40AM   6      A.   I CAN'T TELL FROM THESE TEXT MESSAGES.

09:40AM   7      Q.   AFTER RETAINING FUSIONGPS YOU AND MR. BALWANI JOKED ABOUT

09:40AM   8      MR. CARREYROU'S HERITAGE; IS THAT CORRECT?

09:40AM   9      A.   COULD YOU TELL ME WHAT YOU MEAN?

09:40AM  10      Q.   DO YOU REMEMBER JOKING AT ALL ABOUT HIS HERITAGE?

09:40AM  11      A.   I DON'T.

09:40AM  12      Q.   LET'S LOOK AT PAGE 63 OF 5387D.

09:40AM  13           DO YOU SEE THE TEXT AT 4-29-2015?

09:40AM  14      A.   I DO.

09:40AM  15      Q.   AND YOU WROTE "CARREYROU IS FRENCH"?

09:40AM  16      A.   YES.

09:40AM  17      Q.   AND SUNNY BALWANI RESPONDED, "VERY FUNNY.  EXPLAIN

09:40AM  18      EVERYTHING"?

09:40AM  19      A.   YES.

09:40AM  20      Q.   "HE IS PROUD OF BEING FRENCH?"  IS THAT WHAT MR. BALWANI

09:41AM  21      WROTE?

09:41AM  22      A.   YES.

09:41AM  23      Q.   AND YOU WROTE "I KNOW.

09:41AM  24           "AND PROUD OF IT.

09:41AM  25           PROUD CYNIC."

09:41AM 1          THOSE WERE YOUR WORDS; RIGHT?

09:41AM 2     A.   YES.

09:41AM 3     Q.   AND YOU AND MR. BALWANI ATTEMPTED TO FIGURE OUT WHO

09:41AM 4     MR. CARREYROU'S SOURCES FOR HIS ARTICLE WERE, DIDN'T YOU?

09:41AM 5     A.   WE DID.

09:41AM 6     Q.   YOU EXPRESSED A NEED TO GET AHEAD OF IT; ISN'T THAT RIGHT?

09:41AM 7     A.   I'M NOT QUITE SURE WHAT YOU MEAN BY THAT, BUT WE WERE

09:41AM 8     CERTAINLY ACTIVELY ENGAGED WITH MR. CARREYROU ON HIS REPORTING.

09:41AM 9     Q.   OKAY.  YOU WANTED TO GET AHEAD OF THE STORY, DIDN'T YOU?

09:41AM 10    A.   WE WANTED TO MAKE SURE OUR TRADE SECRETS WEREN'T

09:41AM 11    DISCLOSED.

09:41AM 12    Q.   I UNDERSTAND YOUR ANSWER ABOUT TRADE SECRETS.  I'D LIKE AN

09:41AM 13    ANSWER TO MY QUESTION, PLEASE.

09:41AM 14         YOU WANTED TO GET AHEAD OF IT, DIDN'T YOU?

09:41AM 15    A.   I'M SORRY.  I DON'T QUITE KNOW WHAT YOU MEAN BY "AHEAD OF

09:41AM 16    IT."

09:41AM 17    Q.   WELL, LET'S LOOK AT YOUR TEXTS.  IF I COULD DRAW YOUR

09:41AM 18    ATTENTION TO PLEASE TO PAGE 76 --

09:42AM 19    A.   OKAY.

09:42AM 20    Q.   -- OF 5387D.

09:42AM 21         AND I DRAW YOUR ATTENTION TO THE BOTTOM EMAIL FROM

09:42AM 22    MR. BALWANI ON MAY 13TH, 2015.

09:42AM 23         DO YOU SEE WHERE HE WRITES, "I AM NARROWING THIS DOWN IN

09:42AM 24    CLIA.  DOWN TO 5 PEOPLE.  WILL NAIL THIS," AND THEN THERE'S AN

09:42AM 25    EXPLETIVE.

| | | |
|---|---|---|
| 09:42AM | 1 | DO YOU SEE THAT? |
| 09:42AM | 2 | A.   I DO. |
| 09:42AM | 3 | Q.   AND THEN IF WE CAN LOOK AT THE NEXT PAGE, PAGE 77. |
| 09:42AM | 4 | AM I RIGHT YOU RESPOND, "WHO DO U THINK. |
| 09:42AM | 5 | "NOW WE HAVE LEGAL GROUNDS." |
| 09:42AM | 6 | AND MR. BALWANI RESPONDS, "YES." |
| 09:42AM | 7 | DO YOU SEE THAT? |
| 09:42AM | 8 | A.   I DO. |
| 09:42AM | 9 | Q.   AND THAT'S A REFERENCE TO YOUR EFFORT TO FIGURE OUT WHO |
| 09:42AM | 10 | MR. CARREYROU'S SOURCES ARE, ISN'T IT? |
| 09:43AM | 11 | A.   NO.  I THINK THAT WAS REFERRING TO SUNNY'S COMMENTS ABOUT |
| 09:43AM | 12 | A GLASS DOOR POST. |
| 09:43AM | 13 | Q.   YOU SAW WHERE HE WROTE, "I'M NARROWING THIS DOWN IN CLIA, |
| 09:43AM | 14 | DOWN TO 5 PEOPLE.  WILL NAIL THIS," AND THEN THE EXPLETIVE? |
| 09:43AM | 15 | A.   I DO. |
| 09:43AM | 16 | Q.   AND YOUR REFERENCE, THAT'S TO A GLASS DOOR POST? |
| 09:43AM | 17 | A.   I THINK SO.  IF YOU COULD SWITCH BACK TO THE OTHER TEXT |
| 09:43AM | 18 | RIGHT ABOVE IT, IT WAS TALKING ABOUT GLASS DOOR. |
| 09:43AM | 19 | Q.   AND YOU'RE PAYING ATTENTION, WHATEVER THE CONTEXT OF THIS |
| 09:43AM | 20 | TEXT, YOU'RE PAYING ATTENTION TO THE GLASS DOOR REVIEWS BECAUSE |
| 09:43AM | 21 | YOU KNEW THAT WAS SOMETHING THAT MR. CARREYROU MIGHT BE LOOKING |
| 09:43AM | 22 | AT? |
| 09:43AM | 23 | A.   NO. |
| 09:43AM | 24 | Q.   LET'S LOOK FURTHER ON PAGE 77. |
| 09:43AM | 25 | DO YOU SEE WHERE IT SAYS, "IF TYLER THINKING ABT GEORGE |

09:43AM   1    FYI AT RIGHT TIME."

09:43AM   2        YOU WROTE THAT?

09:43AM   3    A.   I DID.

09:43AM   4    Q.   TYLER IS A REFERENCE TO TYLER SHULTZ?

09:43AM   5    A.   YES.

09:43AM   6    Q.   AND YOU TESTIFIED ABOUT MR. SHULTZ ON DIRECT EXAMINATION?

09:43AM   7    A.   I DID.

09:43AM   8    Q.   AND THE GEORGE IS A REFERENCE TO GEORGE SHULTZ?

09:43AM   9    A.   IT IS.

09:44AM  10    Q.   AND THIS IS YOU EXPRESSING YOU MIGHT GO TO GEORGE SHULTZ

09:44AM  11    AT SOME POINT IF THE SOURCE IS TYLER?

09:44AM  12    A.   IT COULD BE.

09:44AM  13    Q.   YOU THEN WROTE, "BUT ALSO LOTS OF LEGAL ELEMENTS HERE.

09:44AM  14        "NEED TO GET AHEAD OF ALL OF IT."

09:44AM  15        DOES THAT REFRESH YOUR MEMORY THAT YOU WERE TRYING TO GET

09:44AM  16    AHEAD OF ALL OF IT?

09:44AM  17    A.   IT DOESN'T.

09:44AM  18    Q.   READING THESE WORDS ON THE PAGE DOESN'T REFRESH YOUR

09:44AM  19    MEMORY AT ALL?

09:44AM  20    A.   I HAVE MEMORY OF THIS, BUT I DON'T KNOW EXACTLY WHAT I

09:44AM  21    MEANT BY GETTING AHEAD OF IT.

09:44AM  22    Q.   OKAY.  YOU WEREN'T WORRIED ABOUT MR. CARREYROU'S STORY?

09:44AM  23    A.   WE WERE VERY WORRIED ABOUT MR. CARREYROU'S STORY.

09:44AM  24    Q.   YOU THEN WROTE, "OUT OF ALL CHALLENGES ARE GREATEST

09:44AM  25    OPPORTUNITIES."

09:44AM 1        AND MR. BALWANI RESPONDS, "ABSOLUTELY.  THIS ONE IS FAIRLY

09:44AM 2   EASY TO GET AHEAD OF.  THIS ENTIRE EMAIL IS BASED ON TYLER,"

09:44AM 3   AND THEN WE'VE REDACTED, "AND MAYBE ADAM."

09:45AM 4        THE ADAM IS DR. ROSENDORFF; CORRECT?

09:45AM 5   A.   IT IS.

09:45AM 6   Q.   AND MR. BALWANI THEN WROTE FURTHER DOWN, "EXTREMELY

09:45AM 7   SERIOUS LEGAL IMPLICATIONS.  HE BASICALLY VIOLATED AND SHARED

09:45AM 8   OUR TRADE SECRETS DOWN TO MACHINE NAMES.

09:45AM 9        "AND ASSAYS IN WHAT DEVICE.

09:45AM 10       "IT IS TYLER, ERIKA, AND ADAM."

09:45AM 11       DO YOU SEE THAT LANGUAGE?

09:45AM 12  A.   I DO.

09:45AM 13  Q.   AND YOU AND MR. BALWANI SURMISED THAT ERIKA CHEUNG WAS ONE

09:45AM 14  OF JOHN CARREYROU'S SOURCES?

09:45AM 15  A.   YES.

09:45AM 16  Q.   AND THE ERIKA THERE IS ERIKA CHEUNG; AM I RIGHT ABOUT

09:45AM 17  THAT?

09:45AM 18  A.   IT IS, YES.

09:45AM 19  Q.   AND SO AT THIS POINT YOU KNEW WHO ERIKA CHEUNG WAS?

09:45AM 20  A.   I DID.

09:45AM 21  Q.   YOU DON'T RESPOND BY WRITING SOMETHING LIKE, WHO IS ERIKA

09:45AM 22  AND WHY WOULD MR. CARREYROU WANT TO BE TALKING TO HER?

09:45AM 23  A.   NO, I DID NOT.

09:45AM 24  Q.   AND YOU RECALL THAT MS. CHEUNG TESTIFIED IN THIS TRIAL;

09:45AM 25  CORRECT?

09:45AM  1      A.   I DO.

09:45AM  2      Q.   SHE WORKED AT THERANOS FROM 2013 TO 2014?

09:45AM  3      A.   THAT SOUNDS ABOUT RIGHT.

09:46AM  4      Q.   DO YOU RECALL HER TESTIFYING ABOUT EXAMPLES OF THERANOS

09:46AM  5      RUNNING PATIENT SAMPLES AFTER FAILING QUALITY CONTROL?

09:46AM  6      A.   I DO.

09:46AM  7      Q.   AND YOU RECALL HER TESTIFYING ABOUT HOW THERANOS'S TSPU,

09:46AM  8      THE EDISON DEVICE, WAS FAILING QUALITY CONTROL REPEATEDLY.

09:46AM  9           YOU RECALL THAT TESTIMONY?

09:46AM  10     A.   I DO.

09:46AM  11     Q.   AND YOU KNOW THAT IN 2015 AND 2016, THOSE TWO ISSUES WERE

09:46AM  12     ALSO RAISED BY CMS IN THEIR REPORT TO YOU; IS THAT CORRECT?

09:46AM  13     A.   YES.

09:46AM  14     Q.   ERIKA CHEUNG WAS RIGHT WHEN SHE WAS RAISING ISSUES ABOUT

09:46AM  15     THE 3.5, WASN'T SHE?

09:46AM  16     A.   I DON'T THINK SHE WAS RIGHT ABOUT THE SPECIFIC ISSUES THAT

09:46AM  17     SHE WAS RAISING BASED ON MY UNDERSTANDING, BUT I SURE AS HELL

09:46AM  18     WISH WE HAD TREATED HER DIFFERENTLY AND LISTENED TO HER.

09:46AM  19     Q.   YOU DON'T THINK THE CMS REPORT VINDICATES HER IN ANY WAY?

09:46AM  20     A.   I THINK IN A WAY IT DOES.

09:46AM  21     Q.   BUT THERANOS CHOSE NOT TO LISTEN TO HER AT THE TIME?

09:46AM  22     A.   MY UNDERSTANDING IS THAT WE DID LISTEN TO HER, BUT THE

09:47AM  23     TEAM BELIEVED THE SPECIFIC ISSUES SHE HAD IDENTIFIED WERE NOT

09:47AM  24     ACTUALLY CORRECTLY IDENTIFIED.

09:47AM  25     Q.   THERANOS CHOSE NOT TO LISTEN TO HER; ISN'T THAT CORRECT,

09:47AM  1    MS. HOLMES?

09:47AM  2    A.   NO.

09:47AM  3    Q.   THERANOS DIDN'T MAKE A DECISION NOT TO LISTEN TO HER?

09:47AM  4    THAT'S YOUR TESTIMONY?

09:47AM  5    A.   THAT'S NOT MY MEMORY OF IT.

09:47AM  6    Q.   OKAY.  YOU CHOSE NOT TO LISTEN TO ERIKA CHEUNG AND WHAT

09:47AM  7    SHE WAS RAISING?

09:47AM  8    A.   I DON'T THINK I THOUGHT THAT THERE WERE ISSUES AT THAT

09:47AM  9    TIME.  I THOUGHT THAT THE TEAM'S ANALYSIS WAS THAT THOSE WERE

09:47AM  10   ACTUALLY NOT ISSUES THAT SHE WAS RAISING.

09:47AM  11   Q.   YOU DIDN'T ASK MR. BALWANI AT THE TIME, WHAT IS SHE

09:47AM  12   TALKING ABOUT?

09:47AM  13   A.   I ASKED DR. YOUNG TO MAKE -- TO LOOK INTO IT, AND MY

09:47AM  14   UNDERSTANDING WAS THAT THE ISSUES THAT SHE WAS RAISING WERE NOT

09:47AM  15   ISSUES THAT DR. YOUNG AGREED WITH.

09:47AM  16   Q.   OKAY.  BUT YOU KNOW TODAY THAT MS. CHEUNG WAS RIGHT; ISN'T

09:47AM  17   THAT FAIR?

09:47AM  18   A.   YES.

09:47AM  19   Q.   AND INSTEAD OF LISTENING TO MS. CHEUNG, THERANOS CHOSE TO

09:47AM  20   RETALIATE AGAINST HER; ISN'T THAT CORRECT?

09:48AM  21   A.   NO.

09:48AM  22   Q.   THERANOS DIDN'T HIRE DAVID BOIES'S LAW FIRM TO TRACK HER

09:48AM  23   DOWN AND SERVE HER WITH LEGAL PROCESS?

09:48AM  24   A.   WE DID HIRE DAVID BOIES'S LAW FIRM TO SERVE HER WITH THE

09:48AM  25   SUBPOENA.

09:48AM  1    Q.   OKAY.  YOU CHOSE TO THREATEN HER?

09:48AM  2    A.   NO.

09:48AM  3    Q.   THERANOS CHOSE TO THREATEN HER?

09:48AM  4    A.   I DON'T THINK SO.

09:48AM  5    Q.   THERANOS CHOSE TO THREATEN HER WITH A LAWSUIT; IS THAT

09:48AM  6    FAIR?

09:48AM  7    A.   I'M NOT SURE.

09:48AM  8    Q.   WELL, LET'S LOOK.

09:48AM  9         CAN I DRAW YOUR ATTENTION TO PAGE 85 OF THE TEXTS?

09:48AM 10    A.   OKAY.

09:48AM 11    Q.   DO YOU SEE THE DATE OF JUNE 26TH, 2015?

09:48AM 12    A.   I DO.

09:48AM 13    Q.   DO YOU SEE WHERE IT SAYS, "I AM OK SENDING LETTER TO ERIKA

09:48AM 14    AS IN HEATHERS EMAIL."

09:48AM 15    A.   I DO.

09:48AM 16    Q.   AND THAT'S FROM MR. BALWANI?

09:49AM 17    A.   YES.

09:49AM 18    Q.   AND HEATHER IS A REFERENCE TO HEATHER KING, THE GENERAL

09:49AM 19    COUNSEL?

09:49AM 20    A.   IT IS.

09:49AM 21    Q.   OKAY.  I'D LIKE TO SHOW YOU WHAT IS IN EVIDENCE AS

09:49AM 22    EXHIBIT 2567.

09:49AM 23    A.   OKAY.  GOT IT.

09:49AM 24    Q.   DO YOU SEE THE DATE OF JUNE 26TH, 2015?

09:49AM 25    A.   I DO.

09:49AM   1    Q.   THAT'S THE SAME DATE OF THE TEXT THAT WE WERE JUST LOOKING

09:49AM   2    AT?

09:49AM   3    A.   I DIDN'T REMEMBER THAT, BUT I'M SURE YOU'RE RIGHT.

09:49AM   4    Q.   OKAY.  AND DO YOU SEE THE HEADING BOIES, SCHILLER &

09:49AM   5    FLEXNER AT THE TOP?

09:49AM   6    A.   I DO.

09:49AM   7    Q.   AND THAT'S DAVID BOIES'S LAW FIRM?

09:49AM   8    A.   IT IS.

09:49AM   9    Q.   ONE OF THE MOST POWERFUL LAW FIRMS IN THE WORLD?

09:49AM   10   A.   I THOUGHT THAT.

09:49AM   11   Q.   YOU THOUGHT THAT AT THE TIME?

09:50AM   12   A.   I DID.

09:50AM   13   Q.   AND THAT'S WHY YOU WERE SENDING THEM AFTER ERIKA CHEUNG?

09:50AM   14   A.   NO.

09:50AM   15   Q.   WELL, DOESN'T THIS SAY THAT "YOU'RE DIRECTED TO

09:50AM   16   IMMEDIATELY CEASE AND DESIST FROM THESE ACTIVITIES.  UNLESS

09:50AM   17   THIS IS RESOLVED, WE'LL CONSIDER ALL APPROPRIATE REMEDIES IN

09:50AM   18   FILING SUIT AGAINST YOU"?

09:50AM   19        DIDN'T THERANOS THREATEN HER WITH A LAWSUIT IN OR AROUND

09:50AM   20   JUNE OF 2015?

09:50AM   21   A.   I SEE THAT HERE.

09:50AM   22   Q.   AND YOU KNEW IT WAS HAPPENING AT THE TIME?

09:50AM   23   A.   I KNEW OUR LAWYERS WERE FOLLOWING UP WITH HER TO MAKE SURE

09:50AM   24   THAT SHE STOPPED DISCLOSING TRADE SECRET INFORMATION.

09:50AM   25   Q.   YOU KNEW IT WAS HAPPENING AT THE TIME.  THAT WAS MY

09:50AM   1    QUESTION.  IS THAT FAIR?

09:50AM   2    A.   AGAIN, I KNEW OUR LAWYERS WERE FOLLOWING UP WITH HER TO

09:50AM   3    MAKE SURE SHE STOPPED DISCLOSING TRADE SECRET INFORMATION.

09:50AM   4    Q.   YOU KEEP INJECTING THAT COMMENT OF TRADE SECRETS INTO YOUR

09:50AM   5    ANSWER, AND WE'LL GET TO THAT.

09:50AM   6         MY QUESTION IS THAT YOU WERE AWARE THAT THIS WAS HAPPENING

09:50AM   7    AT THE TIME?

09:50AM   8    A.   THAT BOIES SCHILLER WAS SENDING HER A LETTER?  YES.

09:50AM   9    Q.   WERE YOU ALSO AWARE THAT THERANOS PAID TWO PRIVATE

09:51AM  10    INVESTIGATION FIRMS NEARLY $150,000 TO AID IN THIS EFFORT TO

09:51AM  11    RETALIATE AGAINST MS. CHEUNG?

09:51AM  12    A.   I'M NOT SURE.

09:51AM  13    Q.   WELL, LET ME SEE IF I CAN REFRESH YOUR RECOLLECTION.

09:51AM  14         LET ME DRAW YOUR ATTENTION TO PAGE -- OR EXHIBIT 5482.

09:51AM  15    A.   I'M NOT SURE IF I HAVE 5482.

09:51AM  16              MR. LEACH:  MAY I APPROACH THE WITNESS, YOUR HONOR?

09:51AM  17              THE COURT:  YES.

09:51AM  18              THE WITNESS:  OH, I'M SORRY.  I DO.  SORRY.

09:51AM  19    BY MR. LEACH:

09:51AM  20    Q.   I'M NOT SURE I HAVE 5482, SO IF I CAN LOOK AT YOURS?

09:51AM  21    A.   OH, YES.  IT'S RIGHT HERE (HANDING).

09:52AM  22    Q.   MS. HOLMES, I'D LIKE TO DRAW YOUR ATTENTION TO THE FIRST

09:52AM  23    PAGE OF EXHIBIT 5482, AND I'LL RETURN THIS TO YOU IN A SECOND.

09:52AM  24    A.   OKAY.

09:52AM  25    Q.   AND THERE'S A LINE IN ROUGHLY THE MIDDLE OF THE PAGE WITH

09:52AM   1    A REFERENCE TO SOME NAMES AND SOME DOLLAR FIGURES.

09:52AM   2         AND MY QUESTION TO YOU IS, DOES THIS REFRESH YOUR

09:52AM   3    RECOLLECTION?

09:52AM   4    A.   OKAY.

09:52AM   5    Q.   (HANDING.)

09:52AM   6    A.   THANK YOU.

09:52AM   7    Q.   YOU'RE WELCOME.

09:52AM   8         HAVE YOU HAD AN OPPORTUNITY TO REVIEW THE LINE THAT I

09:53AM   9    REFERRED TO?

09:53AM  10    A.   YOU SAID THE FIRST PAGE?

09:53AM  11    Q.   FIRST PAGE?

09:53AM  12    A.   YES.

09:53AM  13    Q.   ROUGHLY HALFWAY DOWN?

09:53AM  14    A.   YES, I SEE IT.  I SEE IT.

09:53AM  15    Q.   OKAY.  DOES THIS REFRESH YOUR RECOLLECTION THAT THERANOS

09:53AM  16    PAID TWO PRIVATE INVESTIGATION FIRMS NEARLY $150,000 TO AID IN

09:53AM  17    ITS EFFORT AGAINST MS. CHEUNG?

09:53AM  18    A.   IT DOES NOT.

09:53AM  19    Q.   AFTER THE CARREYROU ARTICLE CAME OUT IN OCTOBER OF 2015,

09:53AM  20    YOU TRIED TO DISMISS ERIKA CHEUNG AS A LOW LEVEL DISGRUNTLED

09:53AM  21    EMPLOYEE; IS THAT CORRECT?

09:53AM  22    A.   WE DID.

09:53AM  23    Q.   IS THAT ANOTHER THING YOU WISH YOU HAD DONE DIFFERENTLY?

09:53AM  24    A.   100 PERCENT.  I THINK I MISHANDLED THE ENTIRE PROCESS OF

09:53AM  25    "THE WALL STREET JOURNAL" REPORTING.

09:53AM  1     Q.   YOU ALSO SURMISED THAT ONE OF MR. CARREYROU'S SOURCES WAS

09:53AM  2     TYLER SHULTZ; ISN'T THAT RIGHT?

09:53AM  3     A.   YES.

09:53AM  4     Q.   AND TYLER SHULTZ WAS THE GRANDSON OF GEORGE SHULTZ?

09:54AM  5     A.   HE WAS.

09:54AM  6     Q.   GEORGE SHULTZ WAS ONE OF YOUR MENTORS; IS THAT CORRECT?

09:54AM  7     A.   HE WAS.

09:54AM  8     Q.   HE WAS ON YOUR BOARD?

09:54AM  9     A.   YES.

09:54AM 10     Q.   YOU WERE VERY CLOSE TO HIM?

09:54AM 11     A.   I WAS.

09:54AM 12     Q.   YOU WERE ALSO VERY CLOSE WITH HIS WIFE, CHARLOTTE; ISN'T

09:54AM 13     THAT RIGHT?

09:54AM 14     A.   I, I WOULD LIKE TO THINK SO.  I KNEW HER LESS WELL.

09:54AM 15     Q.   YOU HAD WEEKLY MEETINGS AT GEORGE AND CHARLOTTE SHULTZ'S

09:54AM 16     HOUSE?

09:54AM 17     A.   I DID.

09:54AM 18     Q.   YOU WOULD MEET WITH HIM ONE ON ONE ALMOST EVERY WEEK?

09:54AM 19     A.   YES.

09:54AM 20     Q.   AND HE WOULD GIVE YOU ADVICE ON HOW TO RUN THE BUSINESS?

09:54AM 21     A.   HE DID.

09:54AM 22     Q.   YOU ATTENDED HOLIDAY PARTIES AT THE SHULTZ'S RESIDENCE;

09:54AM 23     ISN'T THAT RIGHT?

09:54AM 24     A.   I DID.

09:54AM 25     Q.   AND TYLER CAME TO WORK AT THERANOS IN 2013.

09:54AM  1          DOES THAT SOUND ABOUT RIGHT?

09:54AM  2     A.   YES.

09:54AM  3     Q.   AND HE WENT DIRECTLY TO YOU WITH PROBLEMS THAT HE WAS

09:54AM  4     OBSERVING WITH THE THERANOS DEVICE, THE EDISON 3.5; ISN'T THAT

09:54AM  5     RIGHT?

09:54AM  6     A.   HE DID.

09:54AM  7     Q.   LET ME DRAW YOUR ATTENTION TO WHAT IS IN EVIDENCE AS

09:55AM  8     EXHIBIT 7421.  THIS IS A DOCUMENT THAT MR. DOWNEY SHOWED YOU

09:55AM  9     THE OTHER DAY.  IT'S NOT IN YOUR BINDER, BUT PERHAPS WE CAN

09:55AM 10     SHOW IT ON THE SCREEN.

09:55AM 11     A.   YEAH.

09:55AM 12     Q.   MAYBE THE ELMO IS THE BEST WAY TO GO FOR THIS.

09:55AM 13          MAY I HAVE A MOMENT, YOUR HONOR?

09:55AM 14              THE COURT:  YES.

09:56AM 15          (PAUSE IN PROCEEDINGS.)

09:56AM 16              MR. LEACH:  THANK YOU, YOUR HONOR.

09:56AM 17     Q.   MS. HOLMES, ARE YOU ABLE TO SEE 7421 ON THE SCREEN?

09:56AM 18     A.   I AM.

09:56AM 19     Q.   AND THIS STARTS WITH AN EMAIL FROM DANIEL YOUNG TO YOU AND

09:57AM 20     MR. BALWANI REGARDING SYPHILIS VALIDATIONS; IS THAT CORRECT?

09:57AM 21     A.   YES.

09:57AM 22     Q.   AND GOING ON PAGE 1 LATER THAT DAY, OR LATER IN FEBRUARY,

09:57AM 23     DR. YOUNG REPORTS ON A CONVERSATION THAT HE HAD HAD WITH TYLER

09:57AM 24     REGARDING SYPHILIS; IS THAT FAIR?

09:57AM 25     A.   YES.

09:57AM 1    Q.   AND MR. DOWNEY ASKED YOU SOME QUESTIONS ABOUT SOME OF THE

09:57AM 2    BULLETS ON THIS.  I'D LIKE TO DRAW YOUR ATTENTION TO THE FIFTH

09:57AM 3    BULLET WHERE IT SAYS, "REGARDING PERFORMANCE CLAIMS, HE SEEMED

09:57AM 4    VERY SURPRISED AND I ASKED HIM WHERE HE THOUGHT WE CLAIMED

09:57AM 5    SUPERIOR PERFORMANCE OVER OTHER TESTS."

09:57AM 6        DO YOU SEE THAT LANGUAGE?

09:57AM 7    A.   I DO.

09:57AM 8    Q.   AND THEN DR. YOUNG REPORTED, "THE BEST HE" -- THAT'S A

09:57AM 9    REFERENCE TO TYLER -- "THE BEST HE COULD COME UP WITH WAS

09:58AM 10   SAYING HE THOUGHT SUPERIOR ACCURACY WAS MENTIONED IN SOME OF

09:58AM 11   THE ARTICLES THAT HAVE BEEN WRITTEN ABOUT THERANOS.  I ASKED

09:58AM 12   HIM TO FOLLOW UP AND HIGHLIGHT THESE SPECIFICALLY FOR ME."

09:58AM 13       DO YOU SEE THAT LANGUAGE?

09:58AM 14   A.   I DO.

09:58AM 15   Q.   AND YOU UNDERSTOOD THAT MR. SHULTZ, IN ADDITION TO RAISING

09:58AM 16   ISSUES ABOUT SYPHILIS AND PT, HE WAS ALSO RAISING ISSUES ABOUT

09:58AM 17   SOME OF THE PUBLIC CLAIMS THAT WERE OUT THERE ABOUT THERANOS?

09:58AM 18   A.   I DID.

09:58AM 19   Q.   FURTHER UP IN THE CHAIN, MR. BALWANI ASKED, "HOW LONG DID

09:58AM 20   YOU SPEND WITH HIM?  THIS SEEMS TO BE AN OVERKILL."

09:58AM 21       DO YOU SEE THAT LANGUAGE?

09:58AM 22   A.   I DO.

09:58AM 23   Q.   AND WHAT DID YOU UNDERSTAND "OVERKILL" TO MEAN?

09:58AM 24   A.   THAT SUNNY THOUGHT THAT DANIEL WAS SPENDING TOO MUCH TIME

09:58AM 25   WITH HIM.

09:58AM  1    Q.   TOO MUCH TIME RESPONDING TO TYLER SHULTZ'S COMPLAINTS?

09:58AM  2    A.   YES.

09:58AM  3    Q.   YOU THEN WROTE, "DID HE UNDERSTAND WITH THE PT POINT?

09:58AM  4    AGREE WITH THE BELOW."

09:58AM  5         DID I READ THAT CORRECTLY?

09:59AM  6    A.   YOU DID.

09:59AM  7    Q.   AND THAT'S A REFERENCE TO THE ISSUE WHERE THERANOS SPLIT

09:59AM  8    SOME OF THE PT SAMPLES -- THAT'S A REFERENCE TO AN EVENT IN

09:59AM  9    2014 WHEN THERANOS SPLIT SOME OF THE PT SAMPLES AND RAN THEM ON

09:59AM  10   THE EDISON DEVICE; IS THAT RIGHT?

09:59AM  11   A.   YES.  I THINK IT WAS AN EXPERIMENT, NOT ACTUAL PT SAMPLES.

09:59AM  12   Q.   I'D NEXT LIKE TO DRAW YOUR ATTENTION IN THIS CONVERSATION

09:59AM  13   ABOUT MR. SHULTZ, MS. HOLMES, TO EXHIBIT 1660.

09:59AM  14   A.   OKAY.

09:59AM  15   Q.   AND I BELIEVE 1660 IS IN EVIDENCE.

09:59AM  16        THE COURT:  YES, IT IS.

09:59AM  17        MR. LEACH:  IF WE COULD PLEASE DISPLAY THAT,

10:00AM  18   MS. HOLLIMAN.  ARE YOU ABLE TO DISPLAY THAT?  GREAT.

10:00AM  19   Q.   DO YOU SEE THIS IS AN EMAIL FROM TYLER SHULTZ TO YOU ON

10:00AM  20   APRIL 11TH, 2014, MS. HOLMES?

10:00AM  21   A.   I DO.

10:00AM  22   Q.   AND SO THIS IS AFTER THE EXCHANGE THAT WE JUST SAW IN THE

10:00AM  23   PRIOR EXHIBIT?

10:00AM  24   A.   I THINK SO.

10:00AM  25   Q.   AND MR. SHULTZ STILL HAS CONCERNS ABOUT WHAT IS GOING ON

10:00AM  1    OVER AT THERANOS; IS THAT FAIR?

10:00AM  2    A.   YES.

10:00AM  3    Q.   AND LET ME START AT THE BEGINNING OF THE EMAIL CHAIN.  IF

10:00AM  4    WE COULD PLEASE GO TO PAGE 6.

10:00AM  5         DO YOU SEE WHERE HE WROTE, "WHEN YOU HAVE TIME COULD I

10:00AM  6    POSSIBLY HAVE HALF AN HOUR TO FOLLOW UP ON OUR PREVIOUS MEETING

10:00AM  7    ABOUT RPR TEST?  I KNOW YOU ARE EXTREMELY BUSY, SO I WOULDN'T

10:00AM  8    MIND WAITING UNTIL AN EVENING AFTER THE CRAZINESS OF THE WORK

10:00AM  9    DAY DIES DOWN."

10:00AM 10         DO YOU SEE THAT LANGUAGE?

10:00AM 11    A.   I DO.

10:00AM 12    Q.   AND NOW IF WE COULD GO TO PAGE 5 -- OR EXCUSE ME, PAGE 1.

10:01AM 13         AND I DRAW YOUR ATTENTION TO THE SECOND PARAGRAPH.

10:01AM 14         DO YOU SEE WHERE HE WROTE, "WHILE I UNDERSTAND THAT

10:01AM 15    CALCULATING CV BASED ON THE MEDIANS IS RELEVANT FOR COMPARING

10:01AM 16    OUR SYSTEM TO SYSTEMS OF OUR COMPETITORS, THE FACT THAT THE CV

10:01AM 17    OF OUR CUT OFF LEVEL FOR SYPHILIS RPR DROPS FROM 43 PERCENT TO

10:01AM 18    LESS THAN 20 PERCENT BY MOVING FROM CV OF THE ENTIRE DATA SET

10:01AM 19    TO CV OF THE MEDIANS TELLS ME THAT THE SIGNIFICANT PORTION OF

10:01AM 20    OUR DATA IS JUST NOISE."

10:01AM 21         DO YOU SEE THAT LANGUAGE?

10:01AM 22    A.   I DO.

10:01AM 23    Q.   AND THAT WAS THE THRUST OF THE CONCERN THAT MR. SHULTZ WAS

10:01AM 24    RAISING ABOUT SYPHILIS?

10:01AM 25    A.   I DON'T REMEMBER THAT.  I REMEMBER IT BEING A CONCERN OF

10:01AM 1    HOW WE WERE SETTING OUR EQUIVOCAL ZONE, BUT I SEE THAT HE'S

10:01AM 2    ALSO RAISING THIS CONCERN.

10:01AM 3    Q.   OKAY.  AND IF WE GO TO THE NEXT PARAGRAPH.

10:02AM 4       DO YOU SEE WHERE HE WROTE, "IN OUR VALIDATION REPORTS,"

10:02AM 5    ROUGHLY IN THE MIDDLE, "THERE IS NEVER ANY MENTION OF HOW MANY

10:02AM 6    ATTEMPTS OF PRECISION OR COMPARABILITY TESTING IT TOOK TO GET

10:02AM 7    THE DATA THAT'S PRESENTED."

10:02AM 8       DO YOU SEE THAT LANGUAGE?

10:02AM 9    A.   I DO.

10:02AM 10   Q.   I NEXT WANT TO DRAW YOUR ATTENTION TO THE FOURTH

10:02AM 11   PARAGRAPH.  MR. SHULTZ IS WRITING, "I THEN ASKED DANIEL IF HE

10:02AM 12   THOUGHT OUR SYPHILIS TEST WAS TRULY THE MOST ACCURATE AND MOST

10:02AM 13   PRECISE SYPHILIS TEST ON THE MARKET.  HE SAID THAT THERANOS

10:02AM 14   DOES NOT CLAIM TO HAVE THE MOST ACCURATE OR PRECISE TESTS, AND

10:02AM 15   THAT IF I COULD FIND ANY MARKETING MATERIALS THAT MAKE SUCH

10:02AM 16   CLAIMS, THAT I SHOULD FORWARD THEM TO HIM."

10:02AM 17      DID I READ THAT CORRECTLY?

10:02AM 18   A.   YES.

10:02AM 19   Q.   "A QUICK GOOGLE SEARCH YIELDS A HANDFUL OF ARTICLES THAT

10:02AM 20   EXPLICITLY MAKE THESE CLAIMS.  DANIEL AGREED THAT THE AUTHORS

10:02AM 21   MAKE SWEEPING STATEMENTS ABOUT OUR ASSAYS PERFORMANCES, BUT

10:03AM 22   NOTED THAT THERANOS NEVER DIRECTLY MADE ANY OF THESE CLAIMS."

10:03AM 23      DO YOU SEE THAT LANGUAGE?

10:03AM 24   A.   I DO.

10:03AM 25   Q.   "IF WELL-ESTABLISHED INSTITUTIONS SUCH AS 'THE

10:03AM  1      WALL STREET JOURNAL' HAVE PUBLISHED MISINFORMATION ABOUT

10:03AM  2      THERANOS, IT SEEMS IT WOULD BE IN OUR BEST LONG-TERM INTEREST

10:03AM  3      TO CORRECT THIS INFORMATION IN ORDER TO UPHOLD OUR IMAGE OF

10:03AM  4      BRINGING TRANSPARENCY TO BLOOD TESTING."

10:03AM  5          DID I READ THAT CORRECTLY?

10:03AM  6      A.   YOU DID.

10:03AM  7      Q.   AND THE TIMING OF THIS IS APRIL OF 2014; CORRECT?

10:03AM  8      A.   IT IS.

10:03AM  9      Q.   SO THIS IS AFTER MR. RAGO WROTE HIS PIECE ABOUT THERANOS

10:03AM  10     IN "THE WALL STREET JOURNAL" IN SEPTEMBER OF 2013?

10:03AM  11     A.   YES.

10:03AM  12     Q.   THIS WAS AFTER YOU SAT DOWN WITH ERIC TOPOL AND TALKED TO

10:03AM  13     HIM ABOUT THERANOS'S TECHNOLOGY AND WHAT YOU THOUGHT IT COULD

10:03AM  14     DO?

10:03AM  15     A.   IT IS.

10:03AM  16     Q.   AND THIS IS AFTER THE PRESS RELEASES ABOUT THE WALGREENS

10:03AM  17     RELATIONSHIP; CORRECT?

10:03AM  18     A.   IT IS.

10:03AM  19     Q.   OKAY.  THIS IS BEFORE YOU TALKED TO ROGER PARLOFF.  AM I

10:03AM  20     RIGHT ABOUT THAT PART?

10:03AM  21     A.   I THINK -- YES.

10:04AM  22     Q.   OKAY.

10:04AM  23     A.   RIGHT AROUND THE SAME TIME.

10:04AM  24     Q.   RIGHT AROUND THE SAME TIME?

10:04AM  25     A.   YEP.

10:04AM  1    Q.   TYLER SHULTZ IS SAYING THERE'S STUFF IN THE PUBLIC DOMAIN

10:04AM  2    ABOUT ACCURACY, THERANOS IS NOT SAYING THIS, BUT MAYBE WE

10:04AM  3    SHOULD BE WORRIED ABOUT THAT.

10:04AM  4         IS THAT A FAIR SUMMARY OF HIS CONCERNS?

10:04AM  5    A.   YES.

10:04AM  6    Q.   HE THEN WROTE, "I THEN THOUGHT BACK TO OUR PREVIOUS

10:04AM  7    DISCUSSION WHEN I ASKED ABOUT OUR CLAIM OF HAVING LESS THAN

10:04AM  8    10 PERCENT CV FOR ASSAYS."

10:04AM  9         MAYBE IF WE COULD PULL THAT UP, MS. HOLLIMAN.

10:04AM 10         DO YOU SEE THAT LANGUAGE?

10:04AM 11    A.   I DO.

10:04AM 12    Q.   AND HAVING A LOW CV IS GENERALLY DESIRABLE FOR A BLOOD

10:04AM 13    TESTING COMPANY?

10:04AM 14    A.   IT IS.

10:04AM 15    Q.   "WE CHECKED THE THERANOS WEBSITE TOGETHER AND FOUND THAT

10:04AM 16    WE ONLY MAKE THIS CLAIM FOR VITAMIN D.  I CHECKED THE 2-TIP

10:04AM 17    VALIDATION DATA (WE WERE RUNNING 2-TIP PROTOCOL AT THE TIME)

10:04AM 18    AND FOUND THAT THE CV'S FOR OUR 3 LEVELS WERE 18 PERCENT,

10:05AM 19    16 PERCENT, AND 19 PERCENT WHEN CALCULATED BASED ON THE MEDIAN

10:05AM 20    OF EACH PRECISION RUN AND 23 PERCENT, 23 PERCENT, AND

10:05AM 21    25 PERCENT WHEN CALCULATED BASED ON THE ENTIRE DATA SET."

10:05AM 22         DID I READ THAT CORRECTLY?

10:05AM 23    A.   YOU DID.

10:05AM 24    Q.   "HERE ARE SCATTER PLOTS FOR THE RESULTS OF VITAMIN D

10:05AM 25    PRECISION TESTING, THEY DON'T SEEM TO MEET THE STANDARD WE

10:05AM  1    CLAIM ON OUR WEBSITE FOR VITAMIN D."

10:05AM  2        DO YOU SEE THAT?

10:05AM  3    A.   I DO.

10:05AM  4    Q.   AND THERANOS ALSO MADE CLAIMS ABOUT ITS CV FOR VITAMIN D

10:05AM  5    IN INVESTOR POWERPOINTS?

10:05AM  6    A.   WE DID.

10:05AM  7    Q.   YOU'VE SEEN SOME OF THOSE SLIDES IN THIS TRIAL, HAVEN'T

10:05AM  8    YOU, MS. HOLMES?

10:05AM  9    A.   YES.

10:05AM  10   Q.   AFTER RECEIVING THIS EMAIL FROM MR. SHULTZ, I UNDERSTAND

10:05AM  11   YOU FORWARDED THIS TO SUNNY BALWANI AND DANIEL YOUNG.  AM I

10:05AM  12   RIGHT?

10:05AM  13   A.   I DID.

10:05AM  14   Q.   AND YOU ASKED DR. YOUNG TO LOOK INTO THIS?

10:06AM  15   A.   I DID.

10:06AM  16   Q.   AND I DRAW YOUR ATTENTION TO EXHIBIT 67 -- 1675.

10:06AM  17   A.   OKAY.

10:06AM  18   Q.   IS THIS AN EMAIL EXCHANGE BETWEEN TYLER SHULTZ, YOU,

10:06AM  19   MR. BALWANI, AND DANIEL YOUNG ON OR ABOUT APRIL 15TH, 2014?

10:06AM  20   A.   IT IS.

10:06AM  21        MR. LEACH:  YOUR HONOR, I MOVE THE ADMISSION OF

10:06AM  22   EXHIBIT 1675.

10:06AM  23        MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

10:06AM  24        THE COURT:  IT'S ADMITTED.

10:06AM  25        (GOVERNMENT'S EXHIBIT 1675 WAS RECEIVED IN EVIDENCE.)

10:06AM  1    BY MR. LEACH:

10:06AM  2    Q.   LET ME DRAW YOUR ATTENTION TO THE SECOND EMAIL FROM THE

10:06AM  3    TOP, MS. HOLMES, THE ONE FROM SUNNY BALWANI AT 4:48 P.M.

10:06AM  4         DO YOU SEE THAT?

10:06AM  5    A.   I DO.

10:06AM  6    Q.   AND MR. BALWANI WROTE TO MR. SHULTZ WITH A COPY TO YOU,

10:07AM  7    "TYLER.

10:07AM  8         "WE SAW YOUR EMAIL TO ELIZABETH.

10:07AM  9         "BEFORE I GET INTO SPECIFICS, LET ME SHARE WITH YOU THAT

10:07AM  10   HAD THIS EMAIL COME FROM ANYONE ELSE IN THE COMPANY, I WOULD

10:07AM  11   HAVE ALREADY HELD THEM ACCOUNTABLE FOR THE ARROGANT AND

10:07AM  12   PATRONIZING TONE AND RECKLESS COMMENTS."

10:07AM  13        DO YOU SEE THAT LANGUAGE?

10:07AM  14   A.   I DO.

10:07AM  15   Q.   YOU REVIEWED THIS AND COMMENTED ON IT BEFORE IT WENT TO

10:07AM  16   MR. SHULTZ; ISN'T THAT CORRECT?

10:07AM  17   A.   I'M NOT SURE IF IT WAS THIS EMAIL SPECIFICALLY, BUT ON THE

10:07AM  18   SUBSTANCE OF THE TECHNICAL QUESTIONS THAT WERE IN MR. SHULTZ

10:07AM  19   EMAIL.

10:07AM  20   Q.   WELL, LET'S SEE IF I CAN REFRESH YOUR MEMORY.

10:07AM  21        MAY I APPROACH, YOUR HONOR?

10:07AM  22            THE COURT:  YES.

10:07AM  23   BY MR. LEACH:

10:07AM  24   Q.   (HANDING.)

10:07AM  25   A.   THANK YOU.

| | | |
|---|---|---|
| 10:08AM | 1 | Q.   YOU'RE WELCOME. |
| 10:08AM | 2 | MS. HOLMES, I'VE PLACED BEFORE YOU WHAT WE HAVE MARKED AS |
| 10:08AM | 3 | EXHIBIT 5645. |
| 10:08AM | 4 | DOES THIS APPEAR TO BE AN EARLIER ITERATION OF THE EMAIL |
| 10:08AM | 5 | THAT WE'RE LOOKING AT IN 1675 WITH SOME COMMENTS TO THE RIGHT? |
| 10:08AM | 6 | A.   YES. |
| 10:08AM | 7 | MR. LEACH:  YOUR HONOR, I MOVE THE ADMISSION OF |
| 10:08AM | 8 | 5645. |
| 10:08AM | 9 | MR. DOWNEY:  NO OBJECTION. |
| 10:08AM | 10 | THE COURT:  IT'S ADMITTED. |
| 10:08AM | 11 | (GOVERNMENT'S EXHIBIT 5645 WAS RECEIVED IN EVIDENCE.) |
| 10:08AM | 12 | BY MR. LEACH: |
| 10:08AM | 13 | Q.   AND DO YOU SEE UP AT THE TOP, MS. HOLMES -- |
| 10:09AM | 14 | AND IF WE COULD, MS. HOLLIMAN, ALSO GRAB THE COMMENTS TO |
| 10:09AM | 15 | THE RIGHT. |
| 10:09AM | 16 | DO YOU SEE THIS PARAGRAPH BEGINS, "BEFORE I GET INTO |
| 10:09AM | 17 | SPECIFICS, LET ME SHARE WITH YOU HAD THIS EMAIL COME FROM |
| 10:09AM | 18 | ANYONE ELSE IN THE COMPANY, I WOULD HAVE ALREADY" -- AND |
| 10:09AM | 19 | THERE'S REFERENCE TO THE ARROGANT AND INSULTING ATTITUDE. |
| 10:09AM | 20 | DO YOU SEE THAT LANGUAGE? |
| 10:09AM | 21 | A.   I DO. |
| 10:09AM | 22 | Q.   AND IS YOUR COMMENT IN THE RIGHT IN THE EH1 BOX? |
| 10:09AM | 23 | A.   IT LOOKS LIKE IT, YES. |
| 10:09AM | 24 | Q.   OKAY.  YOUR COMMENT WAS, "STRONGER - EMPHASIZE WHAT HE DID |
| 10:09AM | 25 | FIRST ESPECIALLY IN LIGHT OF MY COMMENT ON ACCURACY BELOW." |

10:09AM   1          DO YOU SEE THAT?

10:09AM   2      A.   I SEE THAT.

10:09AM   3      Q.   SO YOU'RE ENCOURAGING MR. BALWANI TO BE FORCEFUL WITH

10:09AM   4      MR. SHULTZ IN THIS EMAIL.

10:09AM   5          IS THAT FAIR?

10:09AM   6      A.   I THINK I'M TRYING TO SAY WE NEED TO EXPLAIN WHAT THE

10:10AM   7      ISSUE IS, WHAT HE DID IN THE CONTEXT OF THE EMAIL BELOW.

10:10AM   8      Q.   WELL, LET'S GO BACK TO 1565.

10:10AM   9          AND IF WE CAN ZOOM BACK IN ON THE SECOND EMAIL FROM THE

10:10AM  10      TOP.

10:10AM  11          DO YOU SEE AFTER MR. BALWANI WRITES, "I WOULD HAVE ALREADY

10:10AM  12      HELD THEM ACCOUNTABLE FOR THE ARROGANT AND PATRONIZING TONE AND

10:10AM  13      RECKLESS COMMENTS," HE WROTE, "IN YOUR CASE, I AM GIVING YOU

10:10AM  14      THE BENEFIT OF THE DOUBT THAT YOUR INTENTIONS ARE IN THE RIGHT

10:10AM  15      PLACE, AND AM TAKING THE TIME TO RESPOND, EVEN THOUGH YOUR TONE

10:10AM  16      IN THIS EMAIL ALL OF THE WAY THROUGH THE LAST PARAGRAPH IS NOT

10:10AM  17      THAT OF SOMEONE SEEKING TO UNDERSTAND, BUT RATHER SOMEONE

10:10AM  18      STANDING AT HIGHER PERCH OF MORALITY AND BUSINESS WISDOM."

10:11AM  19          DO YOU SEE THAT LANGUAGE?

10:11AM  20      A.   I DO.

10:11AM  21      Q.   AND YOU APPROVED THIS GOING OUT TO MR. SHULTZ BEFORE

10:11AM  22      MR. BALWANI SENT THIS?

10:11AM  23      A.   I KNEW IT WAS GOING OUT, YES.

10:11AM  24      Q.   FURTHER DOWN BELOW DOES MR. BALWANI INTERLINEATE RESPONSES

10:11AM  25      TO TYLER SHULTZ, CERTAIN POINTS THAT TYLER SHULTZ IS MAKING IN

10:11AM  1    HIS EMAIL?

10:11AM  2    A.   HE DOES.

10:11AM  3    Q.   AND LET'S LOOK BRIEFLY DOWN AT THAT AT THE BOTTOM.

10:11AM  4         SO DO YOU SEE THE FIRST PARAGRAPH, "HI ELIZABETH.

10:11AM  5         "IN MY MEETINGS WITH DANIEL."

10:11AM  6    A.   I DO.

10:11AM  7    Q.   AND THAT'S IN MR. SHULTZ'S EMAIL TO YOU?

10:11AM  8    A.   YES.

10:11AM  9    Q.   AND YOUR NEXT PARAGRAPH BEGINS, "YOUR BASIC UNDERSTANDING

10:11AM  10   OF STATISTICS IS STILL LOW."

10:11AM  11        THAT'S SOMETHING THAT MR. BALWANI INTERLINEATED IN HIS

10:12AM  12   RESPONSE TO MR. SHULTZ; IS THAT CORRECT?

10:12AM  13   A.   HE DID.

10:12AM  14   Q.   LET'S GO BACK UP TO THE TOP.

10:12AM  15        AND IN RESPONSE TO THE EMAIL FROM MR. BALWANI, YOU, AND

10:12AM  16   DR. YOUNG, MR. SHULTZ REPLIED, "I DO NOT EXPECT TO BE TREATED

10:12AM  17   ANY DIFFERENTLY BECAUSE OF WHO I AM RELATED TO.  THERANOS IS

10:12AM  18   CLEARLY NOT THE PLACE FOR ME.  CONSIDER THIS MY TWO WEEK

10:12AM  19   NOTICE.  IF YOU PREFER I LEAVE TODAY THAT'S FINE WITH ME TOO."

10:12AM  20        DO YOU SEE THAT LANGUAGE?

10:12AM  21   A.   I DO.

10:12AM  22   Q.   AND MR. SHULTZ LEFT SHORTLY AFTER THIS EMAIL; CORRECT?

10:12AM  23   A.   HE DID.

10:12AM  24   Q.   NOW, SITTING HERE TODAY, YOU KNOW THAT IN 2016 FOLLOWING

10:12AM  25   THE CMS INSPECTION, THERANOS VOIDED ALL OF THE VITAMIN D TESTS

10:12AM  1    THAT WERE RUN ON THE TSPU OR THE EDISON 3.5?

10:12AM  2    A.   I DO, YES.

10:12AM  3    Q.   YOU KNOW THAT SITTING HERE TODAY?

10:12AM  4    A.   I DO.

10:12AM  5    Q.   OKAY.  TYLER SHULTZ WAS RIGHT ABOUT PROBLEMS WITH THE

10:12AM  6    EDISON 3.5, WASN'T HE?

10:13AM  7    A.   I DON'T THINK THE CONCERNS HE RAISED WERE CORRECT.

10:13AM  8    Q.   HE WAS RAISING CONCERNS ABOUT VITAMIN D; ISN'T THAT RIGHT?

10:13AM  9    A.   HE DID.

10:13AM  10   Q.   AND THERANOS ULTIMATELY VOIDED ALL OF THE VITAMIN D TESTS;

10:13AM  11   ISN'T THAT CORRECT?

10:13AM  12   A.   WE DID.

10:13AM  13   Q.   AND THERANOS CHOSE NOT TO LISTEN TO HIM AT THE TIME;

10:13AM  14   CORRECT?

10:13AM  15   A.   NO.

10:13AM  16   Q.   YOU CHOSE NOT TO LISTEN TO HIM AT THE TIME?

10:13AM  17   A.   NO.

10:13AM  18   Q.   INSTEAD YOU ELECTED TO RETALIATE AGAINST MR. SHULTZ; IS

10:13AM  19   THAT RIGHT?

10:13AM  20   A.   NO.

10:13AM  21   Q.   YOU DIDN'T HIRE DAVID BOIES'S FIRM TO THREATEN A LAWSUIT

10:13AM  22   AGAINST MR. SHULTZ?

10:13AM  23   A.   WE DID HIRE DAVID BOIES'S FIRM, AND WE DID ASK

10:13AM  24   DAVID BOIES'S FIRM TO FOLLOW UP ON THE DISCLOSURE OF TRADE

10:13AM  25   SECRETS.



10:13AM  1          I SAW THE LANGUAGE IN THE LETTER THAT YOU JUST POINTED TO,

10:13AM  2   AND IT WOULDN'T SURPRISE ME IF THERE WAS A SIMILAR LETTER THAT

10:13AM  3   WENT TO MR. SHULTZ.

10:13AM  4   Q.   AND IT WOULDN'T SURPRISE YOU, SITTING HERE TODAY, THAT

10:13AM  5   DAVID BOIES'S LAW FIRM LURED TYLER SHULTZ TO HIS GRANDFATHER'S

10:13AM  6   HOUSE TO TRY TO GET HIM TO SIGN DOCUMENTS IDENTIFYING CARREYROU

10:14AM  7   SOURCES?

10:14AM  8   A.   I DON'T THINK THAT'S HOW IT HAPPENED.

10:14AM  9   Q.   DIDN'T YOU GET A CALL FROM GEORGE SHULTZ THE NIGHT THAT

10:14AM  10  THAT HAPPENED?

10:14AM  11  A.   I'M SURE I DID.

10:14AM  12  Q.   OKAY.  DIDN'T GEORGE SHULTZ CALL YOU FROM HIS HOUSE AND

10:14AM  13  TELL YOU THAT THERE WERE LAWYERS FROM BOIES SCHILLER TRYING TO

10:14AM  14  GET TYLER TO SIGN DOCUMENTS IN AN INTIMIDATING WAY?

10:14AM  15  A.   THAT'S NOT MY MEMORY OF IT.

10:14AM  16  Q.   WELL, LET'S SEE IF WE CAN REFRESH YOUR MEMORY.

10:14AM  17          MAY I APPROACH, YOUR HONOR?

10:14AM  18             THE COURT:  YES.

10:15AM  19  BY MR. LEACH:

10:15AM  20  Q.   MS. HOLMES, I'VE PLACED BEFORE YOU A DOCUMENT THAT WE'VE

10:15AM  21  MARKED AS EXHIBIT 5520.

10:15AM  22          DO YOU HAVE A GENERAL UNDERSTANDING OF WHAT IS ON THE

10:15AM  23  COVER PAGE OF 5520?

10:15AM  24  A.   I DO.

10:15AM  25  Q.   OKAY.  SO YOU UNDERSTAND THE CONTEXT FOR WHAT THIS IS?

10:15AM  1    A.   I DO.

10:15AM  2    Q.   AND IF I COULD DRAW YOUR ATTENTION TO THE THIRD PAGE, DO

10:15AM  3    YOU SEE THE BATES NUMBER IN THE BOTTOM 14159?

10:15AM  4    A.   YES.

10:15AM  5    Q.   AND DO YOU SEE THE WORD "APPEARANCES" UP AT THE TOP?

10:15AM  6    A.   I DO.

10:15AM  7    Q.   AND IF WE GO TO THE NEXT PAGE, 14160, DO YOU SEE A

10:16AM  8    REFERENCE TO YOUR NAME?

10:16AM  9    A.   I DO.

10:16AM 10    Q.   AND AN INDIVIDUAL ASSOCIATED WITH YOU?

10:16AM 11    A.   YES.

10:16AM 12    Q.   LET ME DRAW YOUR ATTENTION TO PAGE 55 OF WHAT WE'RE

10:16AM 13    LOOKING AT, AND THE BATES NUMBER IN THE BOTTOM RIGHT CORNER IS

10:16AM 14    14210.

10:16AM 15    A.   OKAY.

10:16AM 16    Q.   AND I'D LIKE FOR YOU TO READ TO YOURSELF LINE 7,

10:16AM 17    CONTINUING TO PAGE 56, LINE 15?

10:17AM 18    A.   OKAY.  I'M SORRY.  YOU WERE ASKING ABOUT 14210?

10:17AM 19    Q.   I'M SORRY.  14211?

10:17AM 20    A.   14211.  OKAY.

10:17AM 21    Q.   IF YOU COULD READ FROM LINE 7?

10:17AM 22    A.   OKAY.

10:17AM 23    Q.   TO THE NEXT PAGE AT LINE 15?

10:17AM 24    A.   OKAY.

10:18AM 25         (PAUSE IN PROCEEDINGS.)

10:18AM  1              THE WITNESS:  OKAY.

10:18AM  2     BY MR. LEACH:

10:18AM  3     Q.   DOES THIS REFRESH YOUR RECOLLECTION THAT BOIES SCHILLER

10:18AM  4     LAWYERS WENT TO GEORGE SHULTZ'S HOUSE IN AN EFFORT TO HAVE

10:18AM  5     TYLER SHULTZ SIGN AN AFFIDAVIT DISCLOSING JOHN CARREYROU

10:18AM  6     SOURCES?

10:18AM  7     A.   I KNOW THAT THAT HAPPENED, YES.

10:18AM  8     Q.   OKAY.  AND YOU KNOW THAT GEORGE SHULTZ CALLED YOU THAT

10:18AM  9     NIGHT AND SAID THAT THIS IS UNACCEPTABLE?

10:18AM  10    A.   NO.

10:18AM  11    Q.   YOU KNOW THAT GEORGE SHULTZ CALLED YOU AND SAID THAT THE

10:18AM  12    BOIES SCHILLER LAWYERS WERE ACTING IN A TOTALLY UNACCEPTABLE

10:18AM  13    WAY?

10:18AM  14    A.   I KNOW THAT I LATER FELT THAT.

10:18AM  15    Q.   HE LATER STORMED OUT OF A BOARD MEETING BECAUSE OF THAT;

10:18AM  16    ISN'T THAT RIGHT?

10:18AM  17    A.   NO.

10:18AM  18    Q.   HE LATER COMPLAINED TO YOU ABOUT THAT; ISN'T THAT RIGHT?

10:18AM  19    A.   YES.

10:18AM  20    Q.   AND DIDN'T GEORGE SHULTZ TELL YOU IT WAS ONE OF THE WORST

10:18AM  21    LITTLE THINGS HE HAD SEEN ANYBODY TRY TO DO?

10:18AM  22    A.   NO.

10:18AM  23    Q.   YOU DENY THAT HE SAID THAT?

10:18AM  24    A.   I DON'T REMEMBER THAT.

10:18AM  25    Q.   YOU CAN'T SAY ONE WAY OR THE OTHER IF HE SAID THAT?

10:19AM  1    A.   AGAIN, IT'S NOT MY MEMORY OF THE INTERACTIONS WITH HIM.

10:19AM  2    Q.   BUT YOU KNEW HE WAS ANGRY ABOUT IT?

10:19AM  3    A.   I DO.

10:19AM  4    Q.   AND YOU WROTE TO MR. BALWANI ABOUT SOME OF THESE

10:19AM  5    INTERACTIONS IN THE TEXT MESSAGES; ISN'T THAT RIGHT?

10:19AM  6    A.   I'M NOT SURE.

10:19AM  7    Q.   WELL, LET'S LOOK.

10:19AM  8         IF WE CAN GO BACK TO 5387D, AND I DRAW YOUR ATTENTION TO

10:19AM  9    PAGE 82.

10:19AM  10   A.   OKAY.

10:19AM  11   Q.   DO YOU SEE THE TEXT ON MAY 31ST, 2015 FROM MR. BALWANI,

10:19AM  12   "YOU NOT CALLING GEORGE BACK ALSO SENDS A MESSAGE THAT WE ARE

10:19AM  13   ABOUT TO SUIT."

10:20AM  14        DO YOU SEE THAT?

10:20AM  15   A.   I DO.

10:20AM  16   Q.   GEORGE IS A REFERENCE TO GEORGE SHULTZ; CORRECT?

10:20AM  17   A.   I'M NOT SURE, BUT IT COULD BE.

10:20AM  18   Q.   OKAY.  THIS IS THE GENERAL TIME PERIOD OF WHEN THE

10:20AM  19   BOIES SCHILLER LAWYERS AMBUSHED TYLER AT GEORGE SHULTZ'S HOUSE,

10:20AM  20   ISN'T IT?

10:20AM  21   A.   I DON'T THINK THEY AMBUSHED HIM, BUT, YES, THIS IS

10:20AM  22   GENERALLY THE TIME PERIOD THAT THEY MET WITH TYLER.

10:20AM  23   Q.   YOU AGREE WITH ME THAT THEY TRIED TO FORCE HIM TO SIGN

10:20AM  24   DOCUMENTS IDENTIFYING CARREYROU SOURCES; CORRECT?

10:20AM  25   A.   I KNOW THAT THEY ASKED HIM TO SIGN DOCUMENTS.  MY MEMORY

10:20AM  1    WAS THAT IT WAS AN AGREEMENT TO STOP DISCLOSING TRADE SECRETS

10:20AM  2    TO "THE JOURNAL."

10:20AM  3    Q.   OKAY.  AND YOU KNOW THAT HE ULTIMATELY AGREED NOT TO DO

10:20AM  4    THAT?

10:20AM  5    A.   I THINK THAT'S RIGHT, YEAH.

10:20AM  6    Q.   AND YOU WROTE IN RESPONSE TO MR. BALWANI'S TEXT, "EXACTLY

10:20AM  7    WAS THINKING SAME."

10:20AM  8    A.   OKAY.

10:20AM  9    Q.   DID I READ THAT CORRECTLY?

10:20AM  10   A.   YOU DID.

10:20AM  11   Q.   LET'S PLEASE LOOK AT PAGE 84.

10:21AM  12        DO YOU SEE A TEXT A FEW DAYS LATER ON JUNE 5TH, 2015,

10:21AM  13   "DON'T TALK IN THIS MEETING.  U SHD TALK TO DAVID FIRST."

10:21AM  14   A.   I DO.

10:21AM  15   Q.   AND YOU RESPOND, "GEORGE WANTS TO KNOW WHAT TYLER HAS

10:21AM  16   DONE.  WOULD YOU ASK DAVID IF I SHOULD SAY OR TELL HIM WE'LL

10:21AM  17   LET HIM KNOW," I THINK YOU MEANT LATER, "AND TEXT ME BACK."

10:21AM  18        DO YOU SEE THAT LANGUAGE?

10:21AM  19   A.   I DO.

10:21AM  20   Q.   THE REFERENCE TO GEORGE THERE IS A REFERENCE TO

10:21AM  21   GEORGE SHULTZ; CORRECT?

10:21AM  22   A.   YES.

10:21AM  23   Q.   AND THE REFERENCE TO DAVID THERE IS A REFERENCE TO

10:21AM  24   DAVID BOIES; IS THAT CORRECT?

10:21AM  25   A.   YES.

10:21AM  1    Q.   AFTER THE CARREYROU ARTICLE CAME OUT IN 2015, YOU

10:22AM  2    CONTINUED TO DISMISS TYLER SHULTZ AS A LOW LEVEL DISGRUNTLED

10:22AM  3    EMPLOYEE; IS THAT CORRECT?

10:22AM  4    A.   YES.

10:22AM  5    Q.   AND SITTING HERE TODAY, YOU KNOW THAT YOUR INTERACTIONS

10:22AM  6    WITH TYLER SHULTZ CAUSED SIGNIFICANT ANGST IN THE RELATIONSHIP

10:22AM  7    BETWEEN TYLER AND HIS GRANDFATHER?

10:22AM  8    A.   I DO.

10:22AM  9    Q.   YOU KNOW THAT TODAY?

10:22AM  10   A.   I DO.

10:22AM  11   Q.   IS THAT ANOTHER THING THAT YOU WISH YOU WOULD HAVE DONE

10:22AM  12   DIFFERENTLY?

10:22AM  13   A.   AGAIN, I COULDN'T SAY MORE STRONGLY THE WAY WE HANDLED

10:22AM  14   "THE WALL STREET JOURNAL" PROCESS WAS A DISASTER.  WE TOTALLY

10:22AM  15   MESSED IT UP.

10:22AM  16   Q.   YOU ALSO TRIED TO INTIMIDATE MR. CARREYROU; CORRECT?

10:22AM  17   A.   I DON'T THINK SO.

10:22AM  18   Q.   YOU TRIED TO QUASH THE STORY; ISN'T THAT CORRECT?

10:22AM  19   A.   WE DID.

10:22AM  20   Q.   YOU HAD DAVID BOIES GO TO "THE WALL STREET JOURNAL"'S

10:22AM  21   OFFICES AND THREATEN LITIGATION, DIDN'T YOU?

10:22AM  22   A.   I'M NOT SURE HE THREATENED LITIGATION, BUT I KNOW HE MET

10:23AM  23   WITH PEOPLE AT "THE JOURNAL."

10:23AM  24   Q.   YOU HAD DAVID BOIES WRITE LETTERS TO "THE JOURNAL"

10:23AM  25   THREATENING LITIGATION, DIDN'T YOU?

| | | |
|---|---|---|
| 10:23AM | 1 | A.   AGAIN, I DON'T KNOW IF HE WAS THREATENING LITIGATION, BUT |
| 10:23AM | 2 | I KNOW THAT HE WAS ACTIVELY MEETING WITH PEOPLE AT "THE |
| 10:23AM | 3 | JOURNAL." |
| 10:23AM | 4 | Q.   AND WRITING TO THEM? |
| 10:23AM | 5 | A.   YES. |
| 10:23AM | 6 | Q.   AND WHEN NONE OF THAT WORKED, YOU PERSONALLY WENT TO THE |
| 10:23AM | 7 | OWNER OF "THE WALL STREET JOURNAL" TO TRY TO GET HIM TO QUASH |
| 10:23AM | 8 | THE STORY; ISN'T THAT CORRECT? |
| 10:23AM | 9 | A.   I DID. |
| 10:23AM | 10 | Q.   LET'S LOOK AT THAT.  I DRAW YOUR ATTENTION TO PAGE 110 OF |
| 10:23AM | 11 | THE TEXT MESSAGES AT 5387D. |
| 10:23AM | 12 | I'M SORRY.  MAY I APPROACH, YOUR HONOR? |
| 10:23AM | 13 | THE COURT:  YES. |
| 10:24AM | 14 | BY MR. LEACH: |
| 10:24AM | 15 | Q.   (HANDING.) |
| 10:24AM | 16 | A.   THANK YOU. |
| 10:24AM | 17 | Q.   I'VE PLACED BEFORE YOU, MS. HOLMES, WHAT WE HAVE MARKED AS |
| 10:24AM | 18 | EXHIBIT 5074. |
| 10:24AM | 19 | DO YOU SEE YOUR NAME AT THE TOP OF THIS EMAIL? |
| 10:24AM | 20 | A.   I DO. |
| 10:24AM | 21 | Q.   AND DO YOU SEE RUPERT MURDOCH'S NAME IN THE TO LINE? |
| 10:24AM | 22 | A.   I DO. |
| 10:24AM | 23 | Q.   HE WAS THE OWNER OF "THE WALL STREET JOURNAL" IN SEPTEMBER |
| 10:24AM | 24 | OF 2015? |
| 10:24AM | 25 | A.   YES. |

10:24AM  1    Q.   AND WAS THIS PART OF YOUR EFFORT TO GET MR. MURDOCH TO

10:24AM  2    QUASH THE STORY THAT JOHN CARREYROU WAS WRITING?

10:24AM  3    A.   IT WAS PART OF MY EFFORT TO GET MR. MURDOCH TO MAKE SURE

10:24AM  4    THAT OUR TRADE SECRETS WERE NOT PUBLISHED.

10:25AM  5    Q.   YOU KEEP INJECTING TRADE SECRETS, AND I PROMISE WE WILL

10:25AM  6    GET TO TRADE SECRETS.

10:25AM  7         MY QUESTION WAS, YOU TESTIFIED THAT YOU ATTEMPTED TO QUASH

10:25AM  8    THE STORY.  I'M JUST TRYING TO UNDERSTAND, IS THIS PART OF THAT

10:25AM  9    EFFORT?

10:25AM  10   A.   NO.  I THINK AT THIS POINT WE WERE NOT TRYING TO QUASH IT.

10:25AM  11   Q.   YOU WERE TRYING TO QUASH IT SOMETIME LATER?

10:25AM  12   A.   ONCE WE UNDERSTOOD THAT OUR TRADE SECRETS WERE GOING TO BE

10:25AM  13   DISCLOSED.

10:25AM  14   Q.   WELL, LET'S LOOK AT WHAT YOU WROTE.

10:25AM  15        YOUR HONOR, I NEED TO DISPLAY IT ON THE ELMO.  I'M PUTTING

10:25AM  16   A POST IT OVER SOMETHING THAT I DON'T THINK IS PUBLIC.

10:25AM  17             THE COURT:  ARE YOU MOVING THIS IN?

10:25AM  18             MR. LEACH:  IF I HAVE NOT MOVED IT IN, I MOVE IT IN.

10:25AM  19             MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

10:25AM  20             THE COURT:  AND JUST TO BE CLEAR, THIS IS

10:25AM  21   EXHIBIT 5704?

10:26AM  22             MR. LEACH:  YES, YOUR HONOR.

10:26AM  23             THE COURT:  ALL RIGHT.  THANK YOU.  IT'S ADMITTED.

10:26AM  24        (GOVERNMENT'S EXHIBIT 5704 WAS RECEIVED IN EVIDENCE.)

10:26AM  25   BY MR. LEACH:

10:26AM  1    Q.   DO YOU SEE YOUR NAME AT THE TOP, MS. HOLMES?

10:26AM  2    A.   I DO.

10:26AM  3    Q.   AND DO YOU SEE MR. MURDOCH'S NAME IN THE TO LINE?

10:26AM  4    A.   YES.

10:26AM  5    Q.   AND THE DATE IS SEPTEMBER 8TH, 2015.  THAT'S ROUGHLY A

10:26AM  6    MONTH BEFORE "THE WALL STREET JOURNAL" ARTICLE COMES OUT?

10:26AM  7    A.   IT IS.

10:26AM  8    Q.   AND AT THIS POINT IN TIME, YOU KNOW THAT CMS INSPECTORS

10:26AM  9    ARE COMING TO LOOK AT THE CALIFORNIA CLIA LAB; CORRECT?

10:26AM  10   A.   I KNOW IT WAS SOMETIME IN SEPTEMBER.

10:26AM  11   Q.   OKAY.  YOU ALSO KNOW THAT THIS IS AFTER AN FDA INSPECTION

10:26AM  12   OF YOUR CLIA LAB; CORRECT?

10:26AM  13   A.   I THINK IT'S ONGOING AT THIS POINT, YEAH.

10:26AM  14   Q.   ONGOING OR AROUND THE SAME TIME?

10:26AM  15   A.   YEAH.

10:26AM  16   Q.   OKAY.  AND THIS IS AFTER TYLER SHULTZ IS -- HAD A

10:27AM  17   CONFRONTATION AT GEORGE SHULTZ'S HOUSE ABOUT SIGNING DOCUMENTS;

10:27AM  18   IS THAT CORRECT?

10:27AM  19   A.   YES.

10:27AM  20   Q.   AND YOU WROTE -- AND YOU KNEW MR. MURDOCH WAS ALSO A

10:27AM  21   SHAREHOLDER OF THERANOS AT THE TIME?

10:27AM  22   A.   HE WAS.

10:27AM  23   Q.   A SIGNIFICANT SHAREHOLDER?

10:27AM  24   A.   HE WAS.

10:27AM  25   Q.   MORE THAN $100 MILLION?

10:27AM    1    A.   YES.

10:27AM    2    Q.   YOU WROTE, "I HOPE ALL IS WONDERFUL WITH YOU AND THAT YOU

10:27AM    3    HAD A WONDERFUL LABOR DAY.  I HAVE VERY MUCH BEEN LOOKING

10:27AM    4    FORWARD TO SEEING YOU WHEN YOU ARE OUT THIS WAY AGAIN.

10:27AM    5        "FOR PURPOSE OF KEEPING YOU IN THE LOOP, I WANTED TO SHARE

10:27AM    6    THE ATTACHED DOCUMENTS WITH YOU, INCLUDING A BRIEFING DOCUMENT

10:27AM    7    THAT WAS SENT FROM DAVID TO GERARD AT WSJ TODAY IN THE HOPES

10:27AM    8    THAT GERARD MIGHT MEET WITH OUR TEAM."

10:27AM    9    A.   YES.

10:27AM   10    Q.   AND DO YOU SEE THAT?

10:27AM   11    A.   I DO.

10:27AM   12    Q.   AND DAVID IS A REFERENCE TO DAVID BOIES?

10:27AM   13    A.   YES.

10:27AM   14    Q.   AND GERARD IS A REFERENCE TO A SENIOR OFFICER WITHIN "THE

10:27AM   15    WALL STREET JOURNAL"?

10:27AM   16    A.   IT IS.

10:27AM   17    Q.   AND THEN YOU SAID, "I'VE ALSO ATTACHED THE MATERIAL THAT

10:28AM   18    THERANOS HAS SHARED WITH WSJ (RESPONSIVE TO QUESTIONS FROM

10:28AM   19    JOHN CARREYROU) SINCE THE MATERIALS I GAVE YOU IN JULY.  AS

10:28AM   20    I'VE REFLECTED ON THIS, I THOUGHT THAT WERE I IN YOUR SHOES I

10:28AM   21    WOULD WANT TO KNOW/BE IN THE LOOP ON THIS ONE, AND SINCE YOU

10:28AM   22    HAD THE PRIOR MATERIALS FROM JULY, WANTED TO GIVE YOU THE

10:28AM   23    COMPLETE SET."

10:28AM   24        DO YOU SEE THAT LANGUAGE?

10:28AM   25    A.   I DO.

10:28AM  1    Q.   OKAY.  AFTER "THE WALL STREET JOURNAL" ARTICLE BY

10:28AM  2    MR. CARREYROU CAME OUT IN OCTOBER OF 2015, YOU ALSO WROTE

10:28AM  3    MR. MURDOCH EXPRESSING YOUR DISPLEASURE; IS THAT FAIR?

10:28AM  4    A.   I'M NOT SURE, BUT I COULD HAVE.

10:28AM  5    Q.   NO REASON TO DOUBT THAT YOU DID THAT?

10:28AM  6    A.   NO REASON TO DOUBT IT.

10:28AM  7    Q.   NOW, MR. DOWNEY ASKED YOU ON DIRECT EXAMINATION HOW MANY

10:28AM  8    ASSAYS WERE OFFERED WHERE THE ANALYSIS WAS PERFORMED ON A

10:29AM  9    MINIATURIZED THERANOS DEVICE IN THE CLIA LAB.

10:29AM  10        DO YOU REMEMBER THAT QUESTION?

10:29AM  11   A.   I DO.

10:29AM  12   Q.   AND YOUR ANSWER WAS 12?

10:29AM  13   A.   YES.

10:29AM  14   Q.   IS THAT CORRECT?

10:29AM  15   A.   YES.

10:29AM  16   Q.   IS IT ALSO CORRECT THAT THAT WAS ONE OF THE CENTRAL

10:29AM  17   QUESTIONS RAISED BY "THE WALL STREET JOURNAL"?

10:29AM  18   A.   THAT WAS ONE OF THE QUESTIONS.

10:29AM  19   Q.   OKAY.  AND YOU WERE ASKED POINT-BLANK BY JIM CRAMER ON

10:29AM  20   "MAD MONEY" WHETHER IT WAS TRUE THAT IT WAS ONLY 12 OR 15 TESTS

10:29AM  21   ON YOUR DEVICE; ISN'T THAT RIGHT?

10:29AM  22   A.   I DON'T REMEMBER THE QUESTION, BUT I REMEMBER HE WAS

10:29AM  23   ASKING ME ABOUT THE CONTENT OF "THE WALL STREET JOURNAL"

10:29AM  24   ARTICLE.

10:29AM  25   Q.   WELL, LET'S PLAY THE CLIP WHICH IS IN EVIDENCE AS

| | | |
|---|---|---|
| 10:29AM | 1 | EXHIBIT 2851-3. |
| 10:29AM | 2 | THE COURT:  IS THIS THE VIDEO CLIP? |
| 10:29AM | 3 | MR. LEACH:  YES. |
| 10:29AM | 4 | THE COURT:  AND THIS IS THE VIDEO CLIP THAT WAS |
| 10:29AM | 5 | PREVIOUSLY PLAYED? |
| 10:29AM | 6 | MR. LEACH:  YES. |
| 10:29AM | 7 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 10:29AM | 8 | THERE WILL BE NO TRANSCRIPTION OF THIS AGAIN. |
| 10:30AM | 9 | MR. LEACH:  YES, YOUR HONOR. |
| 10:30AM | 10 | THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, WE'LL |
| 10:30AM | 11 | PLAY THIS CLIP. |
| 10:30AM | 12 | (VIDEO PLAYING OFF THE RECORD.) |
| 10:32AM | 13 | BY MR. LEACH: |
| 10:32AM | 14 | Q.   MS. HOLMES, THAT WAS YOU ON THAT VIDEO; CORRECT? |
| 10:32AM | 15 | A.   IT IS. |
| 10:32AM | 16 | Q.   AND YOU HEARD MR. CRAMER ASK YOU THE QUESTION HOW MANY |
| 10:32AM | 17 | TESTS COULD BE PERFORMED ON THE EDISON? |
| 10:32AM | 18 | A.   I DID. |
| 10:32AM | 19 | Q.   AND I DIDN'T HEAR THE NUMBER 12 IN THAT CLIP.  DID YOU |
| 10:32AM | 20 | HEAR IT? |
| 10:32AM | 21 | A.   I DID NOT. |
| 10:32AM | 22 | Q.   OKAY.  YOU WERE THE FOUNDER OF THERANOS; CORRECT? |
| 10:32AM | 23 | A.   I -- YES. |
| 10:32AM | 24 | Q.   YOU WERE ITS CHIEF EXECUTIVE OFFICER? |
| 10:32AM | 25 | A.   YES. |

10:32AM   1    Q.   THROUGH 2016, YOU WERE THE ONLY CHIEF EXECUTIVE OFFICER

10:32AM   2    THAT THERANOS EVER HAD; IS THAT CORRECT?

10:32AM   3    A.   I WAS.

10:32AM   4    Q.   OKAY.  AND BEFORE 2016 YOU OWNED A MAJORITY OF THE VOTING

10:33AM   5    SHARES?

10:33AM   6    A.   AT VARIOUS POINTS IN TIMES, YES.

10:33AM   7    Q.   NO ONE WAS MORE INVESTED IN THE COMPANY THAN YOU WERE; IS

10:33AM   8    THAT FAIR?

10:33AM   9    A.   I TRIED TO BE.  WE HAD A LOT OF PEOPLE WORKING REALLY

10:33AM  10    HARD.

10:33AM  11    Q.   NO ONE OWNED MORE STOCK THAN YOU; CORRECT?

10:33AM  12    A.   CORRECT.

10:33AM  13    Q.   AND YOU TAKE RESPONSIBILITY FOR THE COMPANY; IS THAT YOUR

10:33AM  14    TESTIMONY?

10:33AM  15    A.   I DO.

10:33AM  16    Q.   AND YOU AGREE WITH ME THAT ANYTHING THAT HAPPENS IN YOUR

10:33AM  17    COMPANY IS YOUR RESPONSIBILITY AT THE END OF THE DAY; ISN'T

10:33AM  18    THAT RIGHT?

10:33AM  19    A.   THAT'S HOW I FELT.

10:33AM  20    Q.   YOU COULD FIRE THE BOARD OF DIRECTORS, COULDN'T YOU?

10:33AM  21    A.   I MEAN, TECHNICALLY, YES.  THEY COULD ALSO FIRE ME.

10:33AM  22    Q.   WELL, YOU OWNED 51 PERCENT OF THE COMPANY, RIGHT,

10:33AM  23    MS. HOLMES?

10:33AM  24    A.   I DID.

10:33AM  25    Q.   AND AS THE 51 PERCENT SHAREHOLDER OF THE COMPANY, YOU

10:33AM   1   COULD OUTVOTE ANYBODY ON WHO WAS ON THE BOARD; ISN'T THAT

10:33AM   2   RIGHT?

10:33AM   3   A.   I COULD.

10:33AM   4   Q.   OKAY.  AND IF YOU DIDN'T WANT GEORGE SHULTZ THERE, YOU

10:34AM   5   COULD, THROUGH THE WORKING OF THE LEGAL DOCUMENTS, GET HIM OFF

10:34AM   6   THE BOARD; ISN'T THAT RIGHT?

10:34AM   7   A.   YES.

10:34AM   8   Q.   AND YOU COULD DO THAT FOR ANY OF THE BOARD MEMBERS AT

10:34AM   9   THERANOS?

10:34AM  10   A.   WE COULD.

10:34AM  11   Q.   YOU COULD; CORRECT?

10:34AM  12   A.   I COULD.

10:34AM  13   Q.   OKAY.  NOW, SUNNY BALWANI REPORTED TO YOU; CORRECT?

10:34AM  14   A.   HE DID.

10:34AM  15   Q.   AND HE WAS AN AT WILL EMPLOYEE; IS THAT RIGHT?

10:34AM  16   A.   YES.

10:34AM  17   Q.   YOU COULD FIRE HIM AT ANY TIME?

10:34AM  18   A.   YES.

10:34AM  19   Q.   AND YOU AGREE WITH ME THAT YOU AND MR. BALWANI WERE

10:34AM  20   MANAGING THE COMPANY TOGETHER AND MAKING DECISIONS FOR THE

10:34AM  21   COMPANY TOGETHER; ISN'T THAT RIGHT?

10:34AM  22   A.   WE DID.

10:34AM  23   Q.   IT'S YOUR TESTIMONY, IS IT NOT, THAT YOU LET HIM RUN THE

10:34AM  24   COMPANY AND RUN OPERATIONS?

10:34AM  25   A.   YES.

10:34AM  1    Q.   YOU ALSO COULD HIRE OR FIRE THE LAB DIRECTOR; ISN'T THAT

10:35AM  2    CORRECT?

10:35AM  3    A.   YES.

10:35AM  4    Q.   IF YOU WERE UNHAPPY WITH ARNOLD GELB'S PERFORMANCE, YOU

10:35AM  5    COULD FIRE HIM?

10:35AM  6    A.   CORRECT.

10:35AM  7    Q.   AND IF YOU WERE UNHAPPY WITH ADAM ROSENDORFF'S

10:35AM  8    PERFORMANCE, YOU COULD FIRE HIM?

10:35AM  9    A.   YES.

10:35AM 10    Q.   AND IF YOU WERE UNHAPPY WITH LYNETTE SAWYER'S PERFORMANCE,

10:35AM 11    YOU COULD FIRE HER?

10:35AM 12    A.   YES.

10:35AM 13    Q.   AND IF YOU WERE UNHAPPY WITH SUNIL DHAWAN'S PERFORMANCE,

10:35AM 14    YOU COULD FIRE HIM, TOO; CORRECT?

10:35AM 15    A.   CORRECT.

10:35AM 16    Q.   AND YOU WERE RESPONSIBLE AT THE END OF THE DAY FOR

10:35AM 17    ALLOCATING RESOURCES TO ALL OF THE DEPARTMENTS WITHIN THERANOS

10:35AM 18    SO THAT THEY COULD DO THEIR JOBS EFFECTIVELY; IS THAT CORRECT?

10:35AM 19    A.   ULTIMATELY, YES.  THEY CAN'T ALL REPORT TO ME, BUT YES.

10:35AM 20    Q.   OKAY.  BUT NOT EVERYBODY IN A COMPANY REPORTS DIRECTLY TO

10:35AM 21    THE CEO; RIGHT?

10:35AM 22    A.   CORRECT.

10:35AM 23    Q.   BUT ULTIMATELY ALL ROADS, AS THE CEO, LEAD TO YOU?

10:35AM 24    A.   YES.

10:35AM 25    Q.   AND IS IT FAIR THAT THE BUCK STOPS WITH YOU?

10:35AM   1     A.   I FELT THAT.

10:35AM   2     Q.   YOU COULD HIRE OR FIRE DANISE YAM IF YOU WANTED TO?

10:35AM   3     A.   YES.

10:35AM   4     Q.   AND YOU COULD HIRE OR FIRE A CFO IF YOU WANTED TO?

10:36AM   5     A.   YES.

10:36AM   6     Q.   AND FROM 2010 TO APPROXIMATELY 2016, THERANOS HAD NO CFO?

10:36AM   7     A.   CORRECT.

10:36AM   8     Q.   YOU MADE A DECISION TO HIRE CHIAT/DAY; ISN'T THAT RIGHT?

10:36AM   9     A.   YES.

10:36AM  10     Q.   AND IF YOU WERE UNHAPPY WITH ANYTHING CHIAT/DAY WAS DOING,

10:36AM  11     YOU COULD FIRE THEM, TOO; CORRECT?

10:36AM  12     A.   YES.

10:36AM  13     Q.   YOU ALSO COULD HIRE OR FIRE THE HEAD OF MARKETING; ISN'T

10:36AM  14     THAT RIGHT?

10:36AM  15     A.   YES.

10:36AM  16     Q.   IF YOU WERE UNHAPPY WITH THE DECISIONS YOUR MARKETING

10:36AM  17     DIRECTOR WAS MAKING, YOU COULD GET RID OF THE MARKETING

10:36AM  18     DIRECTOR; IS THAT FAIR?

10:36AM  19     A.   YES, YES.

10:36AM  20     Q.   YOU HAD THAT POWER?

10:36AM  21     A.   I DID.

10:36AM  22     Q.   YOU ALSO MADE THE DECISION TO HIRE BOIES SCHILLER; IS THAT

10:36AM  23     CORRECT?

10:36AM  24     A.   I DID.

10:36AM  25     Q.   AND YOU MADE THE DECISION TO HIRE THERANOS'S LEGAL TEAM?

10:36AM  1    A.   YES.

10:36AM  2    Q.   YOU BROUGHT IN HEATHER KING AS THE GENERAL COUNSEL IN

10:36AM  3    2015?

10:36AM  4    A.   I DID.

10:36AM  5    Q.   YOU MADE THAT DECISION?

10:36AM  6    A.   YES.

10:36AM  7    Q.   AND YOU'RE THE ONE WHO SIGNED SUNIL DHAWAN'S OFFER LETTER;

10:37AM  8    ISN'T THAT CORRECT?

10:37AM  9    A.   I THINK SO.

10:37AM  10   Q.   DO YOU AGREE WITH ME THAT YOU WERE GENERALLY KEPT APPRISED

10:37AM  11   OF DEVELOPMENTS IN THE PRODUCTS AREA AND IN THE CLINICAL LAB?

10:37AM  12   A.   DEFINITELY IN THE PRODUCTS AREA, AND AT A HIGH LEVEL IN

10:37AM  13   THE CLINICAL LAB.

10:37AM  14   Q.   WELL, YOU WERE ASKED THAT QUESTION BEFORE, WEREN'T YOU,

10:37AM  15   MS. HOLMES?

10:37AM  16   A.   I COULD HAVE BEEN.

10:37AM  17        MR. LEACH:  MAY I APPROACH, YOUR HONOR?

10:37AM  18        THE COURT:  YES.

10:37AM  19   BY MR. LEACH:

10:37AM  20   Q.   (HANDING.)

10:37AM  21   A.   THANK YOU.

10:37AM  22   Q.   YOU'RE WELCOME.

10:37AM  23   MS. HOLMES, THIS IS NOT THE FIRST TIME THAT YOU'VE

10:37AM  24   TESTIFIED IN MATTERS RELATING TO THERANOS; ISN'T THAT RIGHT?

10:37AM  25   A.   IT'S NOT.

10:37AM  1    Q.   YOU TESTIFIED BEFORE THE SECURITIES AND EXCHANGE

10:38AM  2    COMMISSION IN JULY OF 2017 AND AUGUST OF 2017; IS THAT CORRECT?

10:38AM  3    A.   I DID.

10:38AM  4    Q.   AND YOU PROVIDED TESTIMONY OVER THE COURSE OF THREE DAYS

10:38AM  5    IN JULY AND AUGUST OF 2017; IS THAT CORRECT?

10:38AM  6    A.   I DID.

10:38AM  7    Q.   AND OVER THE COURSE OF THOSE THREE DAYS, YOU TOOK AN OATH?

10:38AM  8    A.   YES.

10:38AM  9    Q.   AND YOU SWORE TO TELL THE TRUTH?

10:38AM  10    A.   I DID.

10:38AM  11    Q.   AND YOU TOOK THAT OATH SERIOUSLY?

10:38AM  12    A.   I DO.

10:38AM  13    Q.   THE SAME OATH THAT YOU'RE TAKING TODAY?

10:38AM  14    A.   EXACTLY.

10:38AM  15    Q.   EXACTLY THE SAME OATH.

10:38AM  16         AND YOU WERE REPRESENTED BY COUNSEL AT THAT TIME; CORRECT?

10:38AM  17    A.   I WAS.

10:38AM  18    Q.   YOU HAD SIX LAWYERS STANDING BY YOUR SIDE; IS THAT

10:38AM  19    CORRECT?

10:38AM  20    A.   SOUNDS RIGHT.

10:38AM  21    Q.   OKAY.  A GENTLEMAN NAMED STEVE NEAL FROM COOLEY GODWARD?

10:38AM  22    A.   YES.

10:38AM  23    Q.   A VERY RESPECTED TRIAL LAWYER?

10:38AM  24    A.   I THOUGHT SO.

10:38AM  25    Q.   AND A LAWYER NAMED BILL MCLUCAS, FORMER HEAD OF

10:38AM   1    ENFORCEMENT AT THE S.E.C., IN D.C.?

10:38AM   2    A.   YES.

10:38AM   3    Q.   AND A VERY RESPECTED LAWYER?

10:38AM   4    A.   YES.

10:38AM   5    Q.   AND ALL SIX OF THOSE LAWYERS WERE THERE IN THE S.E.C.

10:39AM   6    TESTIMONY GIVING YOU ADVICE?

10:39AM   7    A.   THEY WERE THERE IN THE S.E.C. TESTIMONY.

10:39AM   8    Q.   OKAY.  AND IF I COULD DRAW YOUR ATTENTION, PLEASE, TO --

10:39AM   9    I'VE PLACED BEFORE YOU A RED BINDER.  DOES THIS APPEAR TO BE A

10:39AM   10   TRANSCRIPT OF YOUR TESTIMONY BEFORE THE S.E.C.?

10:39AM   11   A.   IT IS.

10:39AM   12   Q.   OKAY.  I WANT TO DRAW YOUR ATTENTION TO THE BATES NUMBER

10:39AM   13   ENDING 5268.  IT SHOULD BE ON THE FIRST DAY.

10:39AM   14   A.   OKAY.

10:39AM   15   Q.   AND I WANT TO DRAW YOUR ATTENTION TO PAGE 58 OF THIS

10:40AM   16   TRANSCRIPT.

10:40AM   17            MR. DOWNEY:  WHAT'S THE BATES NUMBER?

10:40AM   18            MR. LEACH:  5268.

10:40AM   19            THE COURT:  AND THE PAGE NUMBER?

10:40AM   20            MR. LEACH:  48.

10:40AM   21            THE COURT:  48.  THANK YOU.

10:40AM   22            MR. LEACH:  YOUR HONOR, I SEEK PERMISSION TO READ

10:40AM   23   LINES 10 THROUGH 12 ON PAGE 48.

10:40AM   24            THE COURT:  THIS IS IN REGARDS TO THE WITNESS'S LAST

10:40AM   25   ANSWER TO YOUR QUESTION?

10:40AM   1           MR. LEACH:  YES, YOUR HONOR.

10:40AM   2           THE COURT:  YOU MAY READ THAT.

10:40AM   3      BY MR. LEACH:

10:40AM   4      Q.  MS. HOLMES, YOU WERE ASKED THE QUESTION, "WERE YOU KEPT

10:40AM   5      APPRISED OF DEVELOPMENTS IN THE PRODUCTS AREA AND IN THE

10:40AM   6      CLINICAL LAB?"

10:40AM   7           AND YOUR ANSWER WAS "GENERALLY YES."

10:40AM   8           WAS THAT CORRECT?

10:40AM   9      A.  YES.

10:40AM  10      Q.  I'D LIKE TO TALK WITH YOU A LITTLE BIT ABOUT HOW YOU WERE

10:41AM  11      COMPENSATED AT THERANOS.

10:41AM  12           AM I RIGHT THAT YOUR WAGES IN 2010 WERE ABOUT $200,000?

10:41AM  13      A.  YES.

10:41AM  14      Q.  AND YOUR WAGES IN 2011 WERE APPROXIMATELY $200,000?

10:41AM  15      A.  YES.

10:41AM  16      Q.  AND YOUR WAGES IN 2012 WERE APPROXIMATELY $200,000?

10:41AM  17      A.  YES.

10:41AM  18      Q.  YOUR WAGES IN 2013 WERE ABOUT $200,000?

10:41AM  19      A.  YES.

10:41AM  20      Q.  YOUR WAGES IN 2014 WERE ABOUT $360,000?

10:41AM  21      A.  THAT SOUNDS RIGHT.

10:41AM  22      Q.  WELL, I'D LIKE TO BE SURE.  WHY DON'T YOU LOOK IN YOUR

10:41AM  23      BINDER AT EXHIBIT 3249, PARTICULARLY PAGE 7.

10:42AM  24      A.  3249?

10:42AM  25      Q.  3249, PAGE 7.

10:42AM   1       A.   GOT IT.  OKAY.

10:42AM   2       Q.   DO YOU SEE A TABLE DOWN AT THE BOTTOM OF PAGE 7?

10:42AM   3       A.   I DO.

10:42AM   4       Q.   DO YOU RECOGNIZE THIS AS A SWORN STATEMENT THAT YOU

10:42AM   5       PROVIDED IN PRIOR LITIGATION?

10:42AM   6       A.   I DON'T, BUT I DON'T HAVE ANY REASON TO DOUBT IT.

10:42AM   7       Q.   OKAY.  WELL, LET'S LOOK AT THE LAST PAGE.  IS THAT YOUR

10:42AM   8       SIGNATURE ON PAGE 29 OF 3249?

10:43AM   9       A.   IT IS.

10:43AM  10       Q.   OKAY.  ARE YOU SATISFIED THAT THIS IS A SWORN STATEMENT

10:43AM  11       THAT YOU PROVIDED IN PRIOR LITIGATION?

10:43AM  12       A.   YEAH, I DON'T HAVE ANY REASON TO DOUBT IT.

10:43AM  13       Q.   OKAY.  DOES THIS REFRESH YOUR RECOLLECTION THAT YOUR WAGES

10:43AM  14       IN 2014 WERE $360,229.36?

10:43AM  15       A.   AGAIN, IT SOUNDS RIGHT, YES.

10:43AM  16       Q.   AND YOUR WAGES IN 2015 WERE APPROXIMATELY $390,182.80?

10:43AM  17       A.   YES.

10:43AM  18       Q.   AND AT THE END OF 2016 YOU HELD MORE THAN 250 MILLION

10:43AM  19       SHARES OF CLASS B COMMON STOCK AT THERANOS?

10:43AM  20       A.   I DID.

10:43AM  21       Q.   THAT WAS MORE THAN 51 PERCENT OF THE SHARES?

10:43AM  22       A.   I THINK SO.

10:43AM  23       Q.   YESTERDAY YOU SAID CLOSE TO 50 PERCENT.  LET'S BE CLEAR.

10:43AM  24       IT WAS ABOVE 50 PERCENT; RIGHT?

10:44AM  25       A.   IT PROBABLY WAS.

HOLMES CROSS BY MR. LEACH (RES.)                              8014

10:44AM   1    Q.   WELL, LOOK AT 3249, PAGE 7.

10:44AM   2    A.   OKAY.

10:44AM   3    Q.   WERE YOU ASKED THE QUESTION, DESCRIBE YOUR OWNERSHIP STAKE

10:44AM   4    IN THERANOS INCLUDING WITHOUT LIMITATION ANY STOCK OPTIONS?

10:44AM   5    A.   YES.

10:44AM   6    Q.   AND WAS YOUR ANSWER, "SHE HOLDS 250,658,055 SHARES OF

10:44AM   7    CLASS B COMMON STOCK, APPROXIMATELY 51 PERCENT OF THERANOS'S

10:44AM   8    OUTSTANDING SHARES"?

10:44AM   9    A.   YES.

10:44AM  10    Q.   THAT WAS YOUR ANSWER THEN?

10:44AM  11    A.   YES.

10:44AM  12    Q.   AND NO REASON TO DOUBT THAT NOW?

10:44AM  13    A.   NO REASON.

10:44AM  14    Q.   AND NO ONE AT THE COMPANY OWNED MORE THAN YOU DID?

10:44AM  15    A.   CORRECT.

10:44AM  16    Q.   AND I BELIEVE YOU TESTIFIED THAT YOU UNDERSTOOD AT LEAST

10:44AM  17    BY THE END OF 2014, OR THE LAST ROUND OF C-2 INVESTMENT, THAT

10:45AM  18    YOUR SHARES WERE VALUED AT MORE THAN $4 BILLION?

10:45AM  19    A.   I DID.

10:45AM  20    Q.   I'D LIKE TO TALK TO YOU A LITTLE BIT ABOUT WHAT I HOPE ARE

10:45AM  21    AGREEMENTS THAT WE MAY HAVE ABOUT SOME OF THE DEVICES AND SOME

10:45AM  22    TESTING AND SOME OF THE MATTERS THAT YOU TESTIFIED TO IN YOUR

10:45AM  23    DIRECT EXAMINATION.

10:45AM  24         YOU RECALL TALKING AT LENGTH WITH MR. DOWNEY ABOUT A

10:45AM  25    MINILAB; CORRECT?

HOLMES CROSS BY MR. LEACH (RES.)                                    8015

10:45AM  1     A.   I DO.

10:45AM  2     Q.   AND THAT'S PART OF THE 4 SERIES?

10:45AM  3     A.   IT IS.

10:45AM  4     Q.   THE MINILAB AND THE 4 SERIES WERE NEVER USED FOR PATIENT

10:45AM  5     TESTING; IS THAT CORRECT?

10:45AM  6     A.   THAT'S RIGHT.

10:45AM  7     Q.   THE MINILAB AND THE 4S WERE NEVER PUT IN THE CLIA LAB IN

10:45AM  8     CALIFORNIA?

10:45AM  9     A.   CORRECT.

10:45AM  10    Q.   THEY WERE NEVER PUT IN THE CLIA LAB IN ARIZONA?

10:45AM  11    A.   CORRECT.

10:45AM  12    Q.   JOHN CARREYROU'S ARTICLE CAME OUT ON OCTOBER 15TH, 2015.

10:46AM  13         AT THAT POINT IN TIME, THE FDA HAD APPROVED USE OF THE

10:46AM  14    MINILAB FOR A SINGLE ASSAY; IS THAT CORRECT?

10:46AM  15    A.   YES.

10:46AM  16    Q.   AND THAT ASSAY WAS THE HERPES ASSAY?

10:46AM  17    A.   THAT'S RIGHT.

10:46AM  18    Q.   OTHER THAN THAT ONE ASSAY, THE MINILAB AND THE 4S WERE NOT

10:46AM  19    APPROVED BY THE FDA?

10:46AM  20    A.   CORRECT.

10:46AM  21    Q.   AND THE ONLY THERANOS MANUFACTURED ANALYZER THAT WAS EVER

10:46AM  22    USED IN THE CLIA LAB IN CALIFORNIA WAS THE EDISON 3.5?

10:46AM  23    A.   THAT'S RIGHT.

10:46AM  24    Q.   AND THE EDISON 3.5 WAS LIMITED TO IMMUNOASSAYS?

10:46AM  25    A.   YES.  WELL, THAT'S HOW WE USED IT.

10:46AM  1      Q.   YOU DIDN'T USE IT FOR ANY PURPOSE OTHER THAN IMMUNOASSAYS?

10:46AM  2      A.   IN THE CLINICAL LAB.

10:46AM  3      Q.   IN THE CLINICAL LAB YOU DIDN'T USE IT FOR GENERAL

10:46AM  4      CHEMISTRY?

10:46AM  5      A.   THAT'S RIGHT.

10:46AM  6      Q.   YOU DIDN'T USE IT FOR CYTOMETRY?

10:46AM  7      A.   CORRECT.

10:46AM  8      Q.   AND YOU DID NOT USE IT FOR NUCLEIC ACID AMPLIFICATION?

10:46AM  9      A.   THAT'S RIGHT.

10:46AM  10     Q.   JUST IMMUNOASSAYS?

10:46AM  11     A.   YES.

10:46AM  12     Q.   AND THE EDISON 3.5 WAS ONLY USED FOR 12 ASSAYS IN THE

10:47AM  13     CALIFORNIA CLIA LAB BETWEEN SEPTEMBER 2013 AND JUNE OF 2015; IS

10:47AM  14     THAT CORRECT?

10:47AM  15     A.   I BELIEVE SO, THAT'S CORRECT.

10:47AM  16     Q.   AND THAT'S THE 12 NUMBER THAT YOU STARTED WITH IN YOUR

10:47AM  17     TESTIMONY?

10:47AM  18     A.   EXACTLY.

10:47AM  19     Q.   THE ONE THAT YOU DIDN'T GIVE TO JIM CRAMER WHEN HE ASKED

10:47AM  20     YOU ABOUT IT?

10:47AM  21     A.   YES.

10:47AM  22     Q.   AND BY THE TIME OF THE CMS INSPECTION IN SEPTEMBER OF

10:47AM  23     2015, THERANOS HAD STOPPED USING THE EDISON 3.5 IN THE CLIA LAB

10:47AM  24     ALTOGETHER?

10:47AM  25     A.   THAT'S RIGHT.

10:47AM   1      Q.   IT WASN'T USING IT AT ALL?

10:47AM   2      A.   YES.

10:47AM   3      Q.   SO THERANOS WASN'T USING ANY OF ITS MANUFACTURED ANALYZERS

10:47AM   4      IN THE CLIA LAB AT THE TIME THAT THE CMS INSPECTORS COME IN?

10:47AM   5      A.   CORRECT.

10:47AM   6      Q.   AFTER THE CARREYROU ARTICLE YOU WERE ASKED SOME QUESTIONS

10:47AM   7      PUBLICLY ABOUT EDISON AND EDISON 3.5.

10:47AM   8           DO YOU RECALL GETTING QUESTIONS ABOUT THOSE?

10:47AM   9      A.   GENERALLY, YES.

10:47AM   10     Q.   OKAY.  AND YOU TOLD PEOPLE IN LATE 2015 AFTER THE

10:48AM   11     CARREYROU ARTICLE CAME OUT THAT EDISON WAS A CODE NAME FOR ONE

10:48AM   12     OF THERANOS'S EARLIEST VERSIONS OF YOUR DEVICES AND YOU HAD NOT

10:48AM   13     BEEN USING EDISON FOR ANYTHING FOR A FEW YEARS.

10:48AM   14           DO YOU RECALL SAYING THAT PUBLICLY?

10:48AM   15     A.   I DO.

10:48AM   16     Q.   THAT WAS LESS THAN FORTHRIGHT, WASN'T IT?

10:48AM   17     A.   IT WAS TOO DEEP IN THE WEEDS.  IT WAS HOW I WAS THINKING

10:48AM   18     ABOUT WHAT THE EDISON WAS, BUT, OF COURSE WE WERE USING THE 3.5

10:48AM   19     IN THE CLINICAL LAB.

10:48AM   20     Q.   OKAY.  IS THAT ANOTHER THING YOU WISHED YOU HAD DONE

10:48AM   21     DIFFERENTLY?

10:48AM   22     A.   YEAH.

10:48AM   23     Q.   YOU -- SO YOU HAD BEEN USING THE EDISON 3.5 IN THE

10:48AM   24     CALIFORNIA CLIA LAB IN 2015?

10:48AM   25     A.   WE DID.

HOLMES CROSS BY MR. LEACH (RES.)                    8018

10:48AM   1    Q.   THE SAME YEAR THAT YOU GOT ASKED THAT QUESTION?

10:48AM   2    A.   YES.

10:48AM   3    Q.   AND YOU STOPPED USING THE EDISON.  YOU ONLY EVER USED IT

10:48AM   4    FOR 12 TESTS, BUT YOU WEREN'T USING IT IN SEPTEMBER OF 2015?

10:48AM   5    A.   THAT'S RIGHT.

10:49AM   6    Q.   AND THE NEWER VERSION, THE 4 SERIES, YOU NEVER USED THAT

10:49AM   7    IN THE CLIA LAB?

10:49AM   8    A.   THAT'S RIGHT.

10:49AM   9    Q.   NOW, ON TOP OF THE 12 EDISON 3.5 TESTS IN THE CALIFORNIA

10:49AM  10    CLIA LAB, THERANOS AT ITS PEAK PERFORMED AN ADDITIONAL 58

10:49AM  11    ASSAYS ON MODIFIED THIRD PARTY MACHINES LIKE THE SIEMENS ADVIA;

10:49AM  12    IS THAT CORRECT?

10:49AM  13    A.   THAT SOUNDS RIGHT.

10:49AM  14    Q.   AND FOR THOSE TESTS YOU WERE DEPENDENT ON THIRD PARTY

10:49AM  15    EQUIPMENT?

10:49AM  16    A.   YES.

10:49AM  17    Q.   YOU WERE DEPENDENT ON DEVICES FROM THE LIKES OF SIEMENS?

10:49AM  18    A.   YES.

10:49AM  19    Q.   AND YOU WERE DEPENDENT ON THE DEVICES FROM THE LIKES OF

10:49AM  20    BECKMAN COULTER?

10:49AM  21    A.   I DON'T THINK WE USED BECKMAN COULTER MACHINES, BUT WE

10:49AM  22    WERE MODIFYING THIRD PARTY MACHINES.

10:49AM  23    Q.   OKAY.  GIVE ME ANOTHER EXAMPLE OF A THIRD PARTY MACHINE

10:49AM  24    YOU MODIFIED.

10:49AM  25    A.   BECTON DICKINSON.

10:49AM 1    Q.   OKAY.  AND YOU WERE RELYING ON THOSE PRODUCTS TO DO THE

10:49AM 2    TESTING?

10:49AM 3    A.   YES.

10:49AM 4    Q.   AM I RIGHT THAT THERANOS'S OVERALL TEST MENU IN OR ABOUT

10:50AM 5    OCTOBER OF 2015 WAS SOMEWHERE IN THE NEIGHBORHOOD OF 200 TESTS?

10:50AM 6    A.   IT SOUNDS RIGHT.

10:50AM 7    Q.   SO THE MAJORITY OF THOSE 200 TESTS WERE DONE ON ORDINARY

10:50AM 8    COMMERCIAL EQUIPMENT.  CAN WE AGREE ON THAT?

10:50AM 9    A.   YES.

10:50AM 10   Q.   NOW, YOU ALSO HAD AN ARIZONA LAB?

10:50AM 11   A.   WE DID.

10:50AM 12   Q.   WHEN DID THE ARIZONA LAB OPEN?

10:50AM 13   A.   I THINK IN 2014.  MAYBE 2015.

10:50AM 14   Q.   AND THAT WAS WHAT IS CALLED A MODERATE COMPLEXITY LAB?

10:50AM 15   A.   IT WAS.

10:50AM 16   Q.   AND IT ONLY USED COMMERCIALLY AVAILABLE EQUIPMENT;

10:50AM 17   CORRECT?

10:50AM 18   A.   YES.

10:50AM 19   Q.   IT ONLY USED FDA APPROVED MACHINES USING FDA CHEMISTRIES

10:50AM 20   IN WAYS IN ACCORDANCE WITH THE FDA APPROVAL?

10:50AM 21   A.   EXACTLY.

10:50AM 22   Q.   NO MAGICAL THERANOS TECHNOLOGY IN THE ARIZONA LAB?

10:50AM 23   A.   NO.

10:50AM 24   Q.   AND YOU NEVER PUT A MINILAB IN THE ARIZONA LAB?

10:50AM 25   A.   WE DID NOT.

| | | |
|---|---|---|
| 10:50AM | 1 | Q.   YOU NEVER PUT AN EDISON 3.5 IN THE ARIZONA LAB? |
| 10:51AM | 2 | A.   THAT'S RIGHT. |
| 10:51AM | 3 | Q.   YOU NEVER USED MODIFIED SIEMENS ADVIAS IN THE CLIA LAB -- |
| 10:51AM | 4 | THE ARIZONA CLIA LAB? |
| 10:51AM | 5 | A.   CORRECT. |
| 10:51AM | 6 | Q.   YOU NEVER DID SMALL SAMPLE TESTING ON MODIFIED THIRD PARTY |
| 10:51AM | 7 | MACHINES IN THE ARIZONA LAB? |
| 10:51AM | 8 | A.   WE DID NOT. |
| 10:51AM | 9 | Q.   YOU DIDN'T DO ANYTHING IN THE ARIZONA LAB THAT ANY OTHER |
| 10:51AM | 10 | LAB PROVIDER COULD DO; ISN'T THAT FAIR? |
| 10:51AM | 11 | A.   WE INVESTED A LOT IN AUTOMATION IN THE LABORATORY THAT WE |
| 10:51AM | 12 | THOUGHT AT THE TIME WAS CUTTING EDGE, BUT IT WAS ALL |
| 10:51AM | 13 | COMMERCIALLY AVAILABLE MACHINES THAT WE WERE RUNNING. |
| 10:51AM | 14 | Q.   OKAY.  AND YOU TESTIFIED YESTERDAY TO AN 8 MILLION NUMBER |
| 10:51AM | 15 | IN TERMS OF TESTS THAT THERANOS HAD PERFORMED; IS THAT RIGHT? |
| 10:51AM | 16 | A.   I DID. |
| 10:51AM | 17 | Q.   OKAY.  YOU KNOW AT THE TIME OF JOHN CARREYROU'S ARTICLE IN |
| 10:51AM | 18 | OCTOBER OF 2015 THAT THAT NUMBER WAS 3.5 MILLION? |
| 10:52AM | 19 | A.   I DID NOT KNOW THAT, BUT I DON'T DOUBT YOU. |
| 10:52AM | 20 | Q.   WELL, LET'S SEE IF WE CAN REFRESH YOUR MEMORY. |
| 10:52AM | 21 | MAY I APPROACH, YOUR HONOR? |
| 10:52AM | 22 | THE COURT:  YES. |
| 10:52AM | 23 | BY MR. LEACH: |
| 10:52AM | 24 | Q.   (HANDING.) |
| 10:52AM | 25 | I'VE PLACED BEFORE YOU A DOCUMENT THAT WE HAVE MARKED FOR |

10:52AM  1      IDENTIFICATION PURPOSES AS EXHIBIT 5702.

10:52AM  2           DO YOU HAVE THAT IN FRONT OF YOU?

10:52AM  3      A.   I DO.

10:52AM  4      Q.   AND DO YOU SEE A HEADING AT THE TOP OF THIS MEMO?

10:52AM  5      A.   I DO.

10:52AM  6      Q.   AND DO YOU SEE A DATE OF OCTOBER 22ND, 2015?

10:52AM  7      A.   YES.

10:52AM  8      Q.   OKAY.  AND I DRAW YOUR ATTENTION TO THE THIRD PARAGRAPH

10:53AM  9      KIND OF INDENTED BELOW THE LINE, "AS WE PROVIDE THESE ANSWERS,"

10:53AM  10     AND TAKE A MOMENT TO READ THAT THIRD PARAGRAPH TO YOURSELF,

10:53AM  11     THAT FIRST LINE.

10:53AM  12     A.   OKAY.

10:53AM  13     Q.   DOES THIS REFRESH YOUR MEMORY THAT AT THE TIME OF THE

10:53AM  14     CARREYROU ARTICLE THERANOS HAD PERFORMED 3.5 MILLION TESTS?

10:53AM  15     A.   I THINK SO, YES.

10:53AM  16     Q.   SO 4.5 MILLION OF THE 8 MILLION NUMBER THAT YOU TALKED

10:53AM  17     ABOUT YESTERDAY, THAT'S DONE AFTER THE CARREYROU ARTICLE COMES

10:53AM  18     OUT?

10:53AM  19     A.   YES.

10:53AM  20     Q.   AND YOU KNOW THAT BY OCTOBER OF 2015 THERANOS WAS NOT

10:53AM  21     DOING ANY SMALL SAMPLE TESTING IN THE CALIFORNIA CLIA LAB?

10:53AM  22     A.   THAT'S RIGHT.

10:53AM  23     Q.   AND YOU KNOW THAT THE 4.5 MILLION THAT COME AFTER OCTOBER

10:54AM  24     OF 2015, THAT IS ALL RUN ON COMMERCIALLY AVAILABLE EQUIPMENT;

10:54AM  25     IS THAT RIGHT?

10:54AM   1    A.   YES.

10:54AM   2    Q.   YOU ALSO KNOW THAT 90 PERCENT OF THE TESTING WAS DONE IN

10:54AM   3    THE ARIZONA LAB?

10:54AM   4    A.   I DON'T KNOW THAT.

10:54AM   5    Q.   MAYBE AFTER A BREAK WE'LL REFRESH YOUR MEMORY ABOUT THAT

10:54AM   6    POINT.

10:54AM   7         BUT CAN WE AGREE THAT THE VAST MAJORITY OF THE TESTING WAS

10:54AM   8    DONE IN THE ARIZONA CLIA LAB?

10:54AM   9    A.   I MEAN, I DON'T HAVE ANY REASON TO DOUBT IT.  I JUST

10:54AM  10    DIDN'T KNOW THAT STAT.

10:54AM  11    Q.   YOU KNEW THAT THE ANNUAL VOLUME OF TESTS IN THE CALIFORNIA

10:54AM  12    CLIA LAB WHERE YOU WERE USING THE EDISON 3.5 AND THE MODIFIED

10:54AM  13    THIRD PARTY MACHINES WAS ONLY DOING ABOUT 800,000 ANNUAL

10:54AM  14    VOLUME?  YOU KNOW THAT?

10:54AM  15    A.   I'M NOT SURE.

10:54AM  16    Q.   WELL, YOU WERE HERE WHEN DR. DAS TESTIFIED TO THAT,

10:55AM  17    WEREN'T YOU?

10:55AM  18    A.   I WAS.  I HEARD THAT.

10:55AM  19    Q.   AND SITTING HERE TODAY, YOU DON'T HAVE ANY REASON TO DOUBT

10:55AM  20    THAT?

10:55AM  21    A.   I DON'T.

10:55AM  22    Q.   AND YOU KNOW THAT THE VAST MAJORITY OF THE 8 MILLION

10:55AM  23    NUMBER THAT YOU TESTIFIED TO YESTERDAY HAS ABSOLUTELY NOTHING

10:55AM  24    TO DO WITH THE MINILAB?

10:55AM  25    A.   YES.

| | | |
|---|---|---|
| 10:55AM | 1 | Q.   AND IT HAS ABSOLUTELY NOTHING TO DO WITH THE EDISON 3.5? |
| 10:55AM | 2 | A.   I DO. |
| 10:55AM | 3 | Q.   AND IT HAS NOTHING TO DO WITH THE TSPU? |
| 10:55AM | 4 | A.   YES. |
| 10:55AM | 5 | MR. LEACH:  YOUR HONOR, I'M ABOUT TO MOVE INTO A NEW |
| 10:55AM | 6 | TOPIC AREA.  THIS MIGHT BE A GOOD TIME FOR A BREAK. |
| 10:55AM | 7 | THE COURT:  LET'S TAKE OUR BREAK.  WE'LL TAKE A 30 |
| 10:55AM | 8 | MINUTE MORNING BREAK.  WE'LL TAKE A MORNING BREAK OF |
| 10:55AM | 9 | 30 MINUTES, PLEASE. |
| 11:33AM | 10 | (RECESS FROM 10:56 A.M. UNTIL 11:33 A.M.) |
| 11:35AM | 11 | THE COURT:  PLEASE BE SEATED.  WE'RE BACK ON THE |
| 11:35AM | 12 | RECORD.  ALL COUNSEL ARE PRESENT.  OUR JURY IS PRESENT. |
| 11:36AM | 13 | MR. LEACH, YOU'D LIKE TO CONTINUE? |
| 11:36AM | 14 | MR. LEACH:  I WOULD, YOUR HONOR.  THANK YOU. |
| 11:36AM | 15 | Q.   GOOD MORNING AGAIN, MS. HOLMES. |
| 11:36AM | 16 | A.   GOOD MORNING. |
| 11:36AM | 17 | Q.   BEFORE THE BREAK, WE WERE TALKING A LITTLE BIT ABOUT |
| 11:36AM | 18 | 90 PERCENT OF THE TESTING AND WHETHER YOU REMEMBERED THAT |
| 11:36AM | 19 | NUMBER OR NOT. |
| 11:36AM | 20 | I'D LIKE TO SHOW YOU A DOCUMENT AND SEE IF THIS REFRESHES |
| 11:36AM | 21 | YOUR RECOLLECTION. |
| 11:36AM | 22 | MAY I APPROACH, YOUR HONOR? |
| 11:36AM | 23 | THE COURT:  YES. |
| 11:36AM | 24 | BY MR. LEACH: |
| 11:36AM | 25 | Q.   (HANDING.) |

HOLMES CROSS BY MR. LEACH (RES.)                    8024

11:36AM   1        DO YOU SEE THAT THIS APPEARS TO BE A MESSAGE FROM

11:37AM   2   BROOKE BUCHANAN TO YOU ON OR ABOUT JANUARY 28TH, 2016,

11:37AM   3   MS. HOLMES?

11:37AM   4   A.   YES.

11:37AM   5   Q.   AND MS. BUCHANAN IS WRITING BACK TO AN EMAIL THAT YOU SENT

11:37AM   6   ON AT 7:41 ON THAT DATE?

11:37AM   7   A.   YES.

11:37AM   8        MR. LEACH:  I MOVE THE ADMISSION OF 5254,

11:37AM   9   YOUR HONOR.

11:37AM  10        MR. DOWNEY:  NO OBJECTION.

11:37AM  11        THE COURT:  IT'S ADMITTED.

11:37AM  12   (GOVERNMENT'S EXHIBIT 5254 WAS RECEIVED IN EVIDENCE.)

11:37AM  13   BY MR. LEACH:

11:37AM  14   Q.   MS. HOLMES, IF I COULD PLEASE DRAW YOUR ATTENTION --

11:37AM  15        MAY I USE THE ELMO, MS. KRATZMANN?

11:37AM  16        THE CLERK:  SURE.

11:37AM  17   BY MR. LEACH:

11:37AM  18   Q.   DO YOU SEE THE EMAIL AT 7:41 A.M. TO YOU FROM

11:37AM  19   BROOKE BUCHANAN?

11:37AM  20   A.   I DO.

11:37AM  21   Q.   YOU HIRED MS. BUCHANAN IN LATE 2015 TO HELP WITH MEDIA

11:38AM  22   RESPONSE?

11:38AM  23   A.   I DID.

11:38AM  24   Q.   AND YOU WROTE HERE -- LET ME ASK A BETTER QUESTION AND USE

11:38AM  25   THE MICROPHONE.

11:38AM  1           YOU WROTE HERE, "THIS WORK HERE IS INDEPENDENT OF

11:38AM  2  THERANOS'S ARIZONA LAB WHICH IS CLIA CERTIFIED AND GOOD

11:38AM  3  STANDING WHERE OVER 90 PERCENT OF ALL THERANOS SAMPLES ARE

11:38AM  4  PROCESSED."

11:38AM  5           DO YOU SEE THAT LANGUAGE?

11:38AM  6  A.   I DO.

11:38AM  7  Q.   AND DOES THIS REFRESH YOUR MEMORY THAT 90 PERCENT OF THE

11:38AM  8  TESTING WAS DONE IN THE ARIZONA LAB?

11:38AM  9  A.   IT DOES AS OF THAT TIME.

11:38AM 10  Q.   NOW, I NEED TO ASK YOU SOME QUESTIONS ABOUT YOUR

11:38AM 11  RELATIONSHIP WITH MR. BALWANI.

11:38AM 12           DO YOU RECALL TESTIFYING ABOUT THAT YESTERDAY, MS. HOLMES?

11:38AM 13  A.   I DO.

11:38AM 14  Q.   IS IT FAIR TO SAY THAT YOUR RELATIONSHIP WITH SUNNY WAS AT

11:38AM 15  TIMES LOVING AND AT TIMES NOT SO LOVING?

11:39AM 16  A.   YES.

11:39AM 17  Q.   THERE WERE TIMES WHEN HE WAS COMPLIMENTARY AND LOVING OF

11:39AM 18  YOU?

11:39AM 19  A.   THERE WERE.

11:39AM 20  Q.   AND THERE WERE TIMES WHEN HE WAS LESS SO?

11:39AM 21  A.   YES.

11:39AM 22  Q.   AND YOU WERE OFTEN COMPLIMENTARY AND LOVING TO HIM; IS

11:39AM 23  THAT RIGHT?

11:39AM 24  A.   I WAS.

11:39AM 25  Q.   AND AT TIMES IT WAS LESS SO?

11:39AM   1    A.   I WOULD GET UPSET SOMETIMES.

11:39AM   2    Q.   I'D LIKE TO LOOK AT SOME EXAMPLES OF THOSE.

11:39AM   3         MAY I APPROACH, YOUR HONOR?

11:39AM   4              THE COURT:  YES.

11:39AM   5    BY MR. LEACH:

11:39AM   6    Q.   (HANDING.)

11:39AM   7         MS. HOLMES, I'VE PLACED BEFORE YOU WHAT WAS MARKED FOR

11:39AM   8    IDENTIFICATION PURPOSES EARLIER AS EXHIBIT 5387.

11:39AM   9         YOU WERE HERE WHEN MR. OFFEN TESTIFIED ABOUT 5387?

11:40AM  10    A.   I WAS HERE WHEN MR. OFTEN TESTIFIED.  I DON'T REMEMBER

11:40AM  11    5387, BUT --

11:40AM  12    Q.   DO YOU REMEMBER HIM TESTIFYING TO THE PROCESS BY WHICH HE

11:40AM  13    IDENTIFIED TEXT MESSAGES BETWEEN YOU AND MR. BALWANI?

11:40AM  14    A.   I DO.  I DO.

11:40AM  15    Q.   OKAY.  AND DO YOU UNDERSTAND THE DOCUMENT THAT I'VE PLACED

11:40AM  16    BEFORE YOU TO BE TEXTS, IOS AND SKYPE MESSAGES, OR IOS MESSAGES

11:40AM  17    INVOLVING YOU AND MR. BALWANI?

11:40AM  18    A.   YES.

11:40AM  19    Q.   AND YOU UNDERSTAND THAT THESE MESSAGES WERE OBTAINED FROM

11:40AM  20    DEVICES THAT YOU USED WHILE YOU WERE AT THERANOS?

11:40AM  21    A.   I DO.

11:40AM  22    Q.   AND THESE DEVICES INCLUDED AN IPHONE 6S THAT YOU USED?

11:40AM  23    A.   IT INCLUDED AN IPHONE.  I DON'T KNOW WHAT IPHONE IT WAS.

11:40AM  24    Q.   OKAY.  THIS EXHIBIT IS 449 PAGES LONG.  IS THAT CORRECT?

11:40AM  25    A.   OKAY, YES.

HOLMES CROSS BY MR. LEACH (RES.)                              8027

11:40AM  1    Q.   AND DO YOU RECALL MR. OFFEN TESTIFYING THAT THERE WERE

11:40AM  2    OVER 12,000 INDIVIDUAL MESSAGES IN THIS DOCUMENT?

11:40AM  3    A.   I RECALL HIM TESTIFYING.  I DIDN'T REMEMBER THAT EXACT

11:41AM  4    NUMBER.

11:41AM  5    Q.   AND DO YOU AGREE WITH ME THAT YOU DON'T HAVE ANY REASON TO

11:41AM  6    DOUBT THAT THE NUMBER OF TEXT MESSAGES IN 5387?

11:41AM  7    A.   I DON'T.

11:41AM  8    Q.   AND YOU AGREE THAT WHATEVER THE NUMBER, 12,000, THEY SPAN

11:41AM  9    A TIME PERIOD 2011 ALL OF THE WAY THROUGH 2016?

11:41AM  10   A.   YES.

11:41AM  11   Q.   SO APPROXIMATELY FIVE YEARS OF YOUR RELATIONSHIP?

11:41AM  12   A.   YES.

11:41AM  13   Q.   AND CAN WE AGREE THAT THERE ARE MANY MESSAGES IN HERE

11:41AM  14   WHERE MR. BALWANI IS EXPRESSING LOVE AND AFFECTION TO YOU?

11:41AM  15   A.   YES.

11:41AM  16   Q.   BEFORE WE LOOK AT 5387, THERE ARE SOME ADDITIONAL MESSAGES

11:41AM  17   THAT I WANT TO GO THROUGH THAT HAVEN'T BEEN ADMITTED, BUT I'D

11:41AM  18   LIKE TO DRAW YOUR ATTENTION TO, IN YOUR BINDER, 5387D AT

11:41AM  19   PAGE 19, AND THIS IS ALREADY IN EVIDENCE, YOUR HONOR.

11:42AM  20        AND IF WE CAN DISPLAY THAT, MS. HOLLIMAN.

11:42AM  21        (PAUSE IN PROCEEDINGS.)

11:42AM  22         MR. LEACH:  MS. HOLLIMAN, CAN WE GO BACK A COUPLE OF

11:42AM  23   PAGES.  ONE MORE.  ONE MORE.  OR ONE MORE.

11:43AM  24   Q.   WELL, MS. HOLMES, LET ME -- I'LL USE 5387.

11:43AM  25        IF I COULD DRAW YOUR ATTENTION TO PAGE 19 OF 5387.

11:43AM 1    A.   THERE'S NOTHING ON MY MONITOR.  I DON'T KNOW IF IT SHOULD

11:43AM 2    BE.

11:43AM 3    Q.   IT'S NOT IN EVIDENCE YET.

11:43AM 4    A.   OH, OKAY.

11:43AM 5    Q.   SO WE'RE GOING TO USE THIS UNTIL WE GET TO --

11:43AM 6    A.   GOT IT.  OKAY.

11:43AM 7    Q.   -- UNTIL ANYTHING HAS BEEN ADMITTED OR WE HAVE PERMISSION

11:43AM 8    TO DISPLAY.

11:43AM 9    A.   PAGE 19?

11:43AM 10   Q.   YES, PLEASE.

11:43AM 11        YOUR HONOR, I'M -- YOUR HONOR, MY INTENTION IS TO MOVE TO

11:43AM 12   ADMIT A NUMBER OF ADDITIONAL PAGES FROM 5387 THAT ARE NOT

11:43AM 13   ALREADY IN EVIDENCE.  RATHER THAN DO IT ONE BY ONE, I'D SEEK

11:43AM 14   PERMISSION TO DISPLAY WHAT I INTEND TO ADMIT, AND THEN AT THE

11:43AM 15   END ADMIT IT IN ONE DOCUMENT SO WE DON'T HAVE MORE PIECES OF

11:43AM 16   PAPER THAN NECESSARY FOR THE JURY.

11:44AM 17            THE COURT:  SURE.  THAT'S FINE.

11:44AM 18            MR. DOWNEY:  YOUR HONOR, THE ONLY ISSUE IS THAT I

11:44AM 19   HAVE NOT HAD A CHANCE -- I DON'T KNOW THESE PAGES OR THESE

11:44AM 20   SEGMENTS, SO I DON'T KNOW WHAT IS COMING.

11:44AM 21            THE COURT:  I WAS GOING TO ASK IF YOU HAD SHARED

11:44AM 22   THIS WITH DEFENSE COUNSEL.

11:44AM 23            MR. LEACH:  I HAVE, YOUR HONOR.

11:44AM 24            THE COURT:  YOU HAVE?

11:44AM 25            MR. LEACH:  I HAVE, YOUR HONOR.  IT IS

11:44AM  1      CROSS-EXAMINATION, SO I DIDN'T --

11:44AM  2              THE COURT:  OKAY.  THAT'S FINE.

11:44AM  3              MR. LEACH:  AND I'M HAPPY TO WORK WITH MR. DOWNEY ON

11:44AM  4      RULE 106 COMPLETIONS.

11:44AM  5              THE COURT:  THAT'S FINE.

11:44AM  6              MR. LEACH:  MAY I DISPLAY PAGE 19.

11:44AM  7      Q.  MS. HOLMES, DO YOU SEE ON THE LEFT SIDE OF THE DOCUMENT,

11:44AM  8      THERE'S NUMBERS FOR THE PARTICULAR TEXT MESSAGES?

11:44AM  9      A.  YES.

11:44AM  10     Q.  OKAY.

11:44AM  11     A.  WAIT, SORRY.  THE RECORD?

11:44AM  12     Q.  YEAH, THERE'S A HOLMES, MACBOOKAIR_SKYPE AND THEN?

11:44AM  13     A.  OKAY, I DO.

11:45AM  14     Q.  I WANT TO DRAW YOUR ATTENTION TO THE TEXT STARTING ON 129.

11:45AM  15     A.  129.

11:45AM  16     Q.  PERFECT.  THANK YOU.

11:45AM  17         DO YOU SEE THE MESSAGE ON MAY 9TH, 2020, 12 --

11:45AM  18             THE COURT:  I'M SORRY.  WHAT IS THE DATE AGAIN?

11:45AM  19             MR. LEACH:  MAY 9TH, 2020 -- 2012.  I'M SORRY.

11:45AM  20     EXCUSE ME.

11:46AM  21     Q.  DO YOU SEE THE MESSAGE I'M TALKING ABOUT, MS. HOLMES?

11:46AM  22     A.  YES.

11:46AM  23     Q.  WOULD YOU MIND READING ME FOR THE MESSAGES DOWN FROM 129

11:46AM  24     TO MESSAGE 121?

11:46AM  25     A.  129 TO 121?

HOLMES CROSS BY MR. LEACH (RES.)                              8030

11:46AM  1    Q.   YES?

11:46AM  2    A.   YES.  I GUESS I CAN DO IT HERE.

11:46AM  3         "MISSING YOU.  THIS BUSINESS CANNOT BE BUILD BY EITHER YOU

11:46AM  4    OR I ALONE.  THAT'S WHY THE UNIVERSE BROUGHT US TOGETHER (AMONG

11:46AM  5    OTHER BILLION REASONS).  NO ONE BUT YOU AND I CAN BUILD THIS

11:46AM  6    BUSINESS.

11:46AM  7         "TOGETHER.

11:46AM  8         "I KNOW.

11:46AM  9         "WE HAVE TO WORK TOGETHER ON THE REV PIECE.

11:46AM 10         "WITHOUT, SEEMS LIKE HALF MY ENERGY IS GONE AND THE

11:46AM 11    BUILDING IS AN EMPTY SHELL.

11:46AM 12         "WITHOUT U."

11:46AM 13         AND THEN I'M NOT SURE WHAT THAT IS.

11:46AM 14         "I KNOW THE FEELING.

11:46AM 15         "YOU ARE THE COMPANY.  WE NEED REVENUE PLUS FEW SENIOR

11:46AM 16    LEVEL MANAGERS - EXPERIENCED EVEN IF THEY ONLY WORK 11 HOURS

11:46AM 17    TIMES 5."

11:46AM 18    Q.   THANK YOU.  YOU WROTE "WE HAVE TO WORK TOGETHER ON THE REV

11:47AM 19    PIECE."  IS THAT A REFERENCE TO REVENUE?

11:47AM 20    A.   I'M NOT SURE.

11:47AM 21    Q.   FURTHER DOWN BELOW, MR. BALWANI WROTE, "YOU ARE THE

11:47AM 22    COMPANY.  WE NEED REVENUE PLUS FEW SENIOR LEVEL MANAGERS."

11:47AM 23         DOES THAT HELP YOU UNDERSTAND THAT THE REV PIECE ABOVE

11:47AM 24    REFERS TO REVENUE?

11:47AM 25    A.   IT COULD.

11:47AM  1    Q.   YOU HAVE NO REASON TO DOUBT THAT SITTING HERE TODAY?

11:47AM  2    A.   WHEN I READ IT THE FIRST TIME I WAS THINKING REV LIKE

11:47AM  3    REVISIONS OF TECHNOLOGY, BUT IT TOTALLY COULD BE REVENUE.

11:47AM  4    Q.   OKAY.  LET ME NEXT DRAW YOUR ATTENTION, PLEASE, TO

11:47AM  5    PAGE 341 OF 5387.

11:47AM  6         YOUR HONOR, PERMISSION TO DISPLAY 341?

11:48AM  7              THE COURT:  YES.

11:48AM  8    BY MR. LEACH:

11:48AM  9    Q.   I WANT TO DRAW YOUR ATTENTION TO MESSAGE 4698 BEGINNING,

11:48AM  10   "ALL MY LOVE."

11:48AM  11   A.   I'M SORRY, WHAT?  I DON'T -- WHICH ONE IS IT.

11:48AM  12   Q.   PAGE 341?

11:48AM  13   A.   IT'S NOT WHAT IS ON THE SCREEN?

11:48AM  14   Q.   IT'S NOT WHAT IS ON THE SCREEN.  I THINK WE HAVE 248 ON

11:48AM  15   THE SCREEN.

11:48AM  16   A.   OKAY.

11:48AM  17   Q.   WE'RE LOOKING FOR PAGE 341.

11:48AM  18   A.   GOT IT.  YEP.

11:48AM  19   Q.   AND JUST ONE MOMENT WHILE --

11:48AM  20        MS. HOLLIMAN, IF WE CAN GO TO 341.

11:49AM  21        (PAUSE IN PROCEEDINGS.)

11:49AM  22        MS. KRATZMANN, MAY I TRY THE ELMO?

11:50AM  23        (PAUSE IN PROCEEDINGS.)

11:50AM  24              MR. LEACH:  I'M NOT SEEING ANYTHING ON MY SCREEN.

11:50AM  25              THE CLERK:  LET ME DO A QUICK RESET.

11:50AM   1    BY MR. LEACH:

11:50AM   2    Q.   ARE YOU ABLE TO SEE THAT ON THE SCREEN, MS. HOLMES?

11:50AM   3    A.   I AM.

11:50AM   4    Q.   OKAY.  AND DO YOU SEE THE MESSAGE AT 10-21-2015 STARTING

11:50AM   5    "ALL MY LOVE" FROM MR. BALWANI?

11:50AM   6    A.   I DO, YES.

11:50AM   7    Q.   AND WOULD YOU PLEASE READ FOR US DOWN TO THE BOTTOM IN THE

11:50AM   8    LAST TEXT MESSAGE ON THE PAGE.

11:50AM   9    A.   "I LOVE YOU.

11:50AM  10         "LOVE YOU.  I PRAYED FROM THE BOTTOM OF MY HEART FOR YOU.

11:50AM  11    I HAVE NEVER PRAYED WITH THIS INTENSITY IN MY LIFE FOR ANYTHING

11:51AM  12    AND ANYONE.  YOU WILL SHINE.

11:51AM  13         "WAS JUST THINKING ABOUT YOU AND MEDITATING ON MY TIGRESS.

11:51AM  14         "GOOD.

11:51AM  15         "I LOVE THIS.

11:51AM  16         "IT IS US TOGETHER.

11:51AM  17         "PERFECTION.

11:51AM  18         "AND DIVINITY.

11:51AM  19         "ON WAY TO HOTEL TO DO NYT.

11:51AM  20         "GOOD CALL WITH AZ REPUBLIC AND DEUCY.

11:51AM  21         "SMILEY FACE.

11:51AM  22         "MY NIRVANA."

11:51AM  23    Q.   AND THAT'S YOU WRITING "MY NIRVANA" AT THE END; RIGHT?

11:51AM  24    A.   IT IS.

11:51AM  25    Q.   NOW, IF WE COULD PLEASE CONTINUE ON TO THE NEXT PAGE, 342.

HOLMES CROSS BY MR. LEACH (RES.)                    8033

| 11:51AM | 1 | DO YOU SEE THERE ARE SOME ADDITIONAL TEXT MESSAGES ON |
| 11:52AM | 2 | 10-21? |
| 11:52AM | 3 | A.   I DO. |
| 11:52AM | 4 | Q.   DO YOU SEE AT THE TOP MR. BALWANI IS WRITING "U R GOD'S |
| 11:52AM | 5 | TIGRESS AND WARRIOR.  YOU ARE EXTRAORDINARY"? |
| 11:52AM | 6 | A.   I DO. |
| 11:52AM | 7 | Q.   OKAY.  WOULD YOU CONTINUE READING WITH YOUR RESPONSE ALL |
| 11:52AM | 8 | OF THE WAY DOWN TO THE MESSAGE "WORRIED ABOUT YOUR ALL |
| 11:52AM | 9 | FINGERSTICKS ON TECHNOLOGY" COMMENT? |
| 11:52AM | 10 | A.   "YOU ARE GOD'S TIGRESS AND WARRIOR.  YOU ARE |
| 11:52AM | 11 | EXTRAORDINARY. |
| 11:52AM | 12 | "COMING FROM MY TIGER MEANS THE WHOLE UNIVERSE TO ME. |
| 11:52AM | 13 | "I LOVE YOU. |
| 11:52AM | 14 | "I WORSHIP YOU.  BE YOURSELF. |
| 11:52AM | 15 | "ME AMORE. |
| 11:52AM | 16 | "ALL MY AND THE INFINITE STRENGTH OF THE UNIVERSE WITH U. |
| 11:53AM | 17 | "I LOVE YOU. |
| 11:53AM | 18 | "I LOVE YOU. |
| 11:53AM | 19 | "VERY CHOPPY. |
| 11:53AM | 20 | "YOU SEEMED AWESOME. |
| 11:53AM | 21 | "DID YOU SEE IT? |
| 11:53AM | 22 | "HOW DID PEOPLE REACT? |
| 11:53AM | 23 | "HMFR. |
| 11:53AM | 24 | "HMFR TIGER. |
| 11:53AM | 25 | "WORRIED ABOUT YOUR ALL FINGERSTICKS ON OUR TECHNOLOGY |

11:53AM  1    COMMENT.  SENT AN EMAIL.  THE WEB DOCUMENT IS FINE."

11:53AM  2    Q.   YOU CAN STOP THERE, MS. HOLMES.  THAT'S WHERE I WAS

11:53AM  3    LOOKING FOR.

11:53AM  4         THERE ARE A COUPLE OF COMMENTS I WANT TO MAKE SURE WE

11:53AM  5    UNDERSTAND.

11:53AM  6         THERE'S AN ACRONYM, HMFR.  WHAT DOES THAT MEAN?

11:53AM  7    A.   IT'S ARABIC.  IT'S A PRAYER IN ARABIC.  IN ARABIC IT'S

11:53AM  8    HADHA MIN FADLI RABBI, WHICH MEANS THIS TOO IS MY GOD'S GLORY.

11:53AM  9    Q.   AND IS THIS -- FAIR TO SAY THIS IS AN EXAMPLE OF

11:54AM 10    MR. BALWANI EXPRESSING LOVE AND AFFECTION TOWARDS YOU?

11:54AM 11    A.   IT IS.

11:54AM 12    Q.   THERE'S A COMMENT, "WORRIED ABOUT YOUR ALL FINGERSTICKS ON

11:54AM 13    OUR TECHNOLOGY" COMMENT."

11:54AM 14         DO YOU SEE THAT?

11:54AM 15    A.   YEAH.

11:54AM 16    Q.   AND YOU KNOW ON THIS DAY YOU WERE GIVING A SPEECH AT A

11:54AM 17    CONFERENCE BY "THE WALL STREET JOURNAL" WHERE YOU WERE

11:54AM 18    RESPONDING TO SOME OF THE CRITICISMS IN MR. CARREYROU'S

11:54AM 19    ARTICLE; IS THAT RIGHT?

11:54AM 20    A.   I DIDN'T KNOW IT WAS THAT DAY, BUT IT'S AROUND THAT TIME,

11:54AM 21    YES.

11:54AM 22    Q.   OKAY.  AND MR. BALWANI IS EXPRESSING CONCERN ABOUT ONE OF

11:54AM 23    THE STATEMENTS THAT YOU MADE; IS THAT FAIR?

11:54AM 24    A.   IT LOOKS LIKE IT, YES.

11:54AM 25    Q.   OKAY.  AND HE'S NOT CONCEALING ANYTHING FROM YOU THERE, IS

11:54AM  1     HE?

11:54AM  2     A.   WHAT DO YOU MEAN BY THAT?

11:54AM  3     Q.   HE'S NOT HIDING FROM YOU THE FACT THAT HE'S WORRIED ABOUT

11:54AM  4     A COMMENT THAT YOU MADE THERE?

11:54AM  5     A.   NO.

11:54AM  6     Q.   LET ME DRAW YOUR ATTENTION TO WHAT IS IN EVIDENCE AT

11:54AM  7     5387D.

11:55AM  8          BEFORE I GO THERE, LET ME DRAW YOUR ATTENTION TO PAGE 72.

11:55AM  9     A.   OF THIS DOCUMENT?

11:55AM  10    Q.   YES, PLEASE.

11:55AM  11         MS. HOLMES, ARE THESE ADDITIONAL TEXT MESSAGES BETWEEN YOU

11:55AM  12    AND MR. BALWANI IN THE NOVEMBER 27TH, 2014 TIME PERIOD?

11:56AM  13    A.   THEY ARE.

11:56AM  14    Q.   AND MR. BALWANI TALKS ABOUT, FIRST OF ALL, MESSAGE 20398,

11:56AM  15    IT SAYS, "RUPERT SAID SAME THING AS YOU AND I TALKED ABOUT ON

11:56AM  16    SEPARATE R&D BUCKET."

11:56AM  17         DO YOU SEE THAT LANGUAGE?

11:56AM  18    A.   I DO.

11:56AM  19    Q.   OKAY.  AND IN OR AROUND THIS TIME WERE YOU SEEKING A

11:56AM  20    POTENTIAL INVESTMENT FROM MR. MURDOCH?

11:56AM  21    A.   YES.

11:56AM  22    Q.   AND MR. BALWANI WRITES "AWESOME."

11:56AM  23         YOU REPLY, "I KNOW.

11:56AM  24         FURTHER DOWN YOU ASK, "QUESTION:  PROMISE HONEST ANSWER?"

11:56AM  25         DO YOU SEE THAT?

11:56AM   1    A.   I DO.

11:56AM   2    Q.   AND MR. BALWANI WRITES, "OF COURSE.  WHEN HAVE I NOT?"

11:56AM   3         DO YOU SEE THAT LANGUAGE?

11:56AM   4    A.   YES.

11:56AM   5    Q.   AND THEN YOU HAVE A SMILEY FACE?

11:56AM   6    A.   YES.

11:56AM   7    Q.   AND THEN YOU WROTE, "WHY I LOVE YOU, AMONGST ALL OTHER

11:56AM   8    REASONS.  COULDN'T STOP THINKING ABOUT YOU WHOLE TIME I WAS

11:57AM   9    THERE TODAY.

11:57AM  10         "I LOVE YOU TOO DARLING.

11:57AM  11         "WHAT'S UR QUESTION?"

11:57AM  12         YOUR QUESTION WAS, "WOULD YOU BE OK IF I SAW JESSE AND

11:57AM  13    LAURA SEPARATELY IN THE A.M. TOMORROW, HOME BY LATEST 11:15

11:57AM  14    A.M."

11:57AM  15         DO YOU SEE THAT?

11:57AM  16    A.   I DO.

11:57AM  17    Q.   AND WHO WAS LAURA?

11:57AM  18    A.   LAURA WAS A FRIEND OF MINE.

11:57AM  19    Q.   AND "WHEN YOU FINISH THE GEORGE THING," WHAT WAS THAT A

11:57AM  20    REFERENCE TO?

11:57AM  21    A.   I DON'T KNOW.  I ASSUME SOMETHING WITH GEORGE.

11:57AM  22    Q.   GEORGE SHULTZ?

11:57AM  23    A.   YES.

11:57AM  24    Q.   AND IS THIS TEXT MESSAGE EXCHANGE ANOTHER EXAMPLE OF

11:57AM  25    MR. BALWANI BEING LOVING TO YOU?

11:57AM   1    A.   I THINK IT'S ME ASKING HIM FOR PERMISSION TO SEE MY

11:57AM   2    FRIENDS.

11:57AM   3    Q.   OKAY.   IS IT REPRESENTATIVE OF MANY OTHER TEXTS IN

11:57AM   4    EXHIBIT 5387?

11:57AM   5    A.   I DON'T KNOW BECAUSE I HAVEN'T GONE THROUGH THE WHOLE

11:57AM   6    THING, BUT I WOULD OFTEN TRY TO ASK HIM IF IT WOULD BE OKAY IF

11:57AM   7    I COULD SEE A FRIEND BEFORE GOING BACK TO THE OFFICE OR GOING

11:57AM   8    TO A WORK MEETING.

11:57AM   9    Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO PAGE 129.

11:58AM  10    A.   OKAY.

11:58AM  11              MR. LEACH:   PERMISSION TO DISPLAY, YOUR HONOR?

11:58AM  12              THE COURT:   YES.

11:58AM  13    BY MR. LEACH:

11:58AM  14    Q.   DO YOU SEE THE MESSAGE AT THE TOP, "LOVE U TOO" FROM

11:58AM  15    MR. BALWANI?

11:58AM  16    A.   I DO.

11:58AM  17    Q.   AND WOULD YOU PLEASE READ FOR ME DOWN TO THE BOTTOM OF THE

11:58AM  18    PAGE STARTING WITH YOUR RESPONSE?

11:58AM  19    A.   "I LOVE YOU.

11:58AM  20         "XX.

11:58AM  21         "LET'S GO TO JAPAN TOGETHER THIS YEAR.

11:58AM  22         "OK.

11:58AM  23         "HEADING TO AIRPORT.

11:58AM  24         "LOVING YOU.

11:58AM  25         "ME TOO.

HOLMES CROSS BY MR. LEACH (RES.)                                    8038

11:58AM   1            "WAS JUST THINKING ABOUT U.

11:58AM   2            "I MISS YOU.

11:59AM   3            "ME MORE.

11:59AM   4            "CAN YOU RESPOND TO MY SLIM AND WISENBAKER EMAILS?

11:59AM   5            "CAN YOU TALK.

11:59AM   6            "WASN'T SURE WHAT YOU WERE ASKING FOR."

11:59AM   7    Q.   YOU JUST SAID CAN YOU RESPOND TO MY SLIM AND WISENBAKER

11:59AM   8    EMAIL.

11:59AM   9            "CAN YOU TALK?

11:59AM  10            "WASN'T SURE WHAT YOU WERE ASKING FOR.

11:59AM  11            "HOME.

11:59AM  12            "WILL DROP BY FOR A BIT.

11:59AM  13            "LOVING YOU.

11:59AM  14            "ON MY WAY HEADING HOME TO RECEIVE MY MOM.

11:59AM  15            "YOU EATING THERE I ASSUME?

11:59AM  16            "YES.  RAJU AND HIS FAMILY HERE ALSO JUST FYI.

12:00PM  17            "I HAVE ORDERED JANTA FOR THEM BUT SAPNA BROUGHT FOOD

12:00PM  18    ALSO.

12:00PM  19            "K.

12:00PM  20            "HERE LOVING YOU.

12:00PM  21            "ALL MY LOVE AND HUGS FOR MY QUEEN.

12:00PM  22            "GETTING ON CVS CALL.

12:00PM  23            "ABOUT TO LEAVE.  CONGRESS UNANIMOUS VOTE IN FAVOR.

12:00PM  24            "UNANIMOUS VOTE IN FAVOR OF YOU BABY.

12:00PM  25            "TAKING OFF TO COME HOME.

12:00PM   1           "OK."

12:00PM   2           IS THIS ANOTHER EXAMPLE OF MR. BALWANI BEING LOVING AND

12:00PM   3   SUPPORTING OF YOU?

12:00PM   4   A.   YES.

12:00PM   5   Q.   AND WOULD YOU AGREE WITH ME THAT THERE ARE MANY TIMES IN

12:00PM   6   THESE TEXT MESSAGES WHERE YOU ARE LOVING AND SUPPORTIVE TO HIM?

12:00PM   7   A.   I WAS.

12:00PM   8   Q.   LET ME PLEASE DRAW YOUR ATTENTION TO PAGE 208.

12:01PM   9   A.   OKAY.

12:01PM  10           MR. LEACH:   PERMISSION TO DISPLAY, YOUR HONOR?

12:01PM  11           THE COURT:   YES.

12:01PM  12   BY MR. LEACH:

12:01PM  13   Q.   IS THIS A STRING OF MESSAGES, MS. HOLMES, FROM THE

12:01PM  14   MAY 2015 TIME PERIOD?

12:01PM  15   A.   IT IS.

12:01PM  16   Q.   OKAY.  AND I THINK YOU MAY HAVE TALKED A LITTLE BIT WITH

12:01PM  17   MR. DOWNEY ABOUT SOME OF THIS, BUT DO YOU SEE WHERE IT SAYS UP

12:01PM  18   AT THE TOP, "BEING YOUR MADIBA MATTERS MORE THAN ANYTHING TO

12:01PM  19   ME"?

12:01PM  20   A.   YES.

12:01PM  21   Q.   AND FURTHER DOWN YOU WROTE -- DO YOU SEE THE MESSAGE

12:02PM  22   RELATING TO "WHAT AN AMAZING GIFT TO MEET A MAN I FALL MADLY IN

12:02PM  23   LOVE WITH"?

12:02PM  24   A.   I DO.

12:02PM  25   Q.   AND THAT'S YOU EXPRESSING LOVE AND AFFECTION TO

12:02PM   1        MR. BALWANI?

12:02PM   2    A.   YES.

12:02PM   3    Q.   FURTHER DOWN THERE'S A MESSAGE, "DID YOU GET MY TEXT A

12:02PM   4    WHILE AGO ABOUT FALLING IN LOVE W YOU?"

12:02PM   5        DO YOU SEE THAT?

12:02PM   6    A.   YES.

12:02PM   7    Q.   AND HE WRITES BACK TO YOU ABOUT HIS KIND WORDS OF

12:02PM   8    AFFECTION FOR YOU.  IS THAT FAIR?

12:02PM   9    A.   YES.

12:02PM  10    Q.   WOULD YOU AGREE WITH ME THAT THERE ARE MANY OTHER EXAMPLES

12:02PM  11    WITHIN 5387 OF YOU EXPRESSING LOVE AND AFFECTION TO

12:02PM  12    MR. BALWANI?

12:02PM  13    A.   I'M SURE THERE ARE.

12:02PM  14    Q.   OKAY.  DO YOU KNOW HOW MANY TIMES THE WORD "LOVE" APPEARS

12:02PM  15    IN 5387?

12:02PM  16    A.   NO.

12:02PM  17    Q.   WOULD IT SURPRISE YOU TO LEARN THAT THE WORD "LOVE"

12:03PM  18    APPEARS MORE THAN 594 TIMES?

12:03PM  19    A.   NO.

12:03PM  20    Q.   HAVE YOU EVER TRIED TO COUNT THEM UP?

12:03PM  21    A.   NO.

12:03PM  22    Q.   ANY REASON TO DOUBT THAT IT'S IN THE 500'S?

12:03PM  23    A.   NO.

12:03PM  24    Q.   OKAY.  WOULD IT SURPRISE YOU TO LEARN THAT THE WORD

12:03PM  25    "LOVING" IS IN THERE 105 TIMES?

12:03PM  1    A.   NO.

12:03PM  2    Q.   IS IT FAIR TO SAY THAT YOU AND MR. BALWANI HAD A SPIRITUAL

12:03PM  3    CONNECTION?

12:03PM  4    A.   I THOUGHT WE DID.

12:03PM  5    Q.   YOU BELIEVED THAT AT THE TIME?

12:03PM  6    A.   I DID.

12:03PM  7    Q.   OKAY.  CAN I ASK YOU, PLEASE, TO LOOK AT PAGE 11 TO 12 OF

12:03PM  8    5387.

12:04PM  9         DO YOU HAVE THAT IN FRONT OF YOU, MS. HOLMES?

12:04PM  10   A.   I DO, YES.

12:04PM  11   Q.   DOWN AT THE BOTTOM DO YOU SAY -- AND IS THIS A SKYPE

12:04PM  12   EXCHANGE FROM THE 2011 TIME PERIOD?

12:04PM  13   A.   YES.

12:04PM  14   Q.   AND DO YOU SEE WHERE IT SAYS, "THRU SKYPE WE R TOGETHER.

12:04PM  15   CAN'T BE APART FROM U FOR EVEN FEW HOURS"?

12:04PM  16   A.   I DO.

12:04PM  17   Q.   AND THAT'S SOMETHING THAT MR. BALWANI WROTE?

12:04PM  18   A.   YES.

12:04PM  19   Q.   YOU REPLY WITH AMAZEMENT AND THEN MR. BALWANI SAYS,

12:05PM  20   "ULTIMATE BLESSINGS."

12:05PM  21        DO YOU SEE THOSE WORDS?

12:05PM  22   A.   I DO.

12:05PM  23   Q.   AND IS THIS A SPIRITUAL CONNECTION THAT YOU FELT WITH

12:05PM  24   MR. BALWANI AT THE TIME?

12:05PM  25   A.   I THINK THE SPIRITUAL CONNECTION WAS MORE BELIEVING THAT

12:05PM 1   GOD HAD PUT HIM IN MY LIFE AT A TIME THAT IT REALLY MATTERED.

12:05PM 2   Q.   YOU AND MR. BALWANI WERE ROMANTICALLY INVOLVED FOR MORE

12:05PM 3   THAN TEN YEARS?

12:05PM 4   A.   YES.

12:05PM 5   Q.   AND YOUR RELATIONSHIP WAS ON AND OFF TO THE TIME PERIOD

12:05PM 6   PRIOR TO HIM JOINING THE COMPANY AND THEN AFTER HE JOINED THE

12:05PM 7   COMPANY?

12:05PM 8   A.   IT WAS.

12:05PM 9   Q.   ON AND OFF DURING BOTH OF THOSE PERIODS OF TIME?

12:05PM 10  A.   YES.

12:05PM 11  Q.   AND YOU LIVED TOGETHER FROM 2005 TO 2016?

12:05PM 12  A.   YES.

12:05PM 13  Q.   AND THE ROMANTIC RELATIONSHIP DIED BEFORE HE LEFT THE

12:05PM 14  COMPANY?

12:06PM 15  A.   YES.

12:06PM 16  Q.   AND YOU ENDED THE RELATIONSHIP WITH MR. BALWANI?

12:06PM 17  A.   I DID.

12:06PM 18  Q.   YOU MADE THAT CHOICE?

12:06PM 19  A.   I DID.

12:06PM 20  Q.   HOW DID IT END?

12:06PM 21  A.   WHAT PART?

12:06PM 22  Q.   THE ROMANTIC RELATIONSHIP?

12:06PM 23  A.   COULD YOU TELL ME WHAT YOU WOULD LIKE ME TO TALK ABOUT?

12:06PM 24  Q.   I'M ASKING A QUESTION.  HOW DID THE ROMANTIC RELATIONSHIP

12:06PM 25  END?

| | | |
|---|---|---|
| 12:06PM | 1 | A.   UM, I THINK WHEN I STARTED TO REALIZE THAT THIS PERSON |
| 12:06PM | 2 | THAT I HAD BELIEVED IN MORE THAN ANYTHING WASN'T WHO HE WAS TO |
| 12:06PM | 3 | ME, THEN NOTHING WAS REAL ANYMORE. |
| 12:06PM | 4 | MY WHOLE FOUNDATION FOR LIFE, WHAT I BELIEVED IN, THE |
| 12:06PM | 5 | DEVOTION TO THE COMPANY WAS BASED ON BELIEVING THAT HE WAS THIS |
| 12:07PM | 6 | PERSON THAT HE HAD CONVEYED HIMSELF TO BE TO ME, AND WHEN I |
| 12:07PM | 7 | STARTED TO REALIZE THAT, THEN I REALIZED THAT NOT ONLY WAS HE |
| 12:07PM | 8 | NOT THE PERSON WHO HE SAID HE WAS TO ME PERSONALLY, BUT ALSO |
| 12:07PM | 9 | THAT THERE WAS NO WAY I COULD SAVE OUR COMPANY IF HE WAS THERE. |
| 12:07PM | 10 | AND SO THAT WAS IT. |
| 12:07PM | 11 | Q.   I APPRECIATE THAT ANSWER, MS. HOLMES. |
| 12:07PM | 12 | YOU, YOU KNOW YOU'VE BEEN ASKED THAT QUESTION BEFORE, HOW |
| 12:07PM | 13 | DID THE RELATIONSHIP END; IS THAT CORRECT? |
| 12:07PM | 14 | A.   I'M SURE I HAVE. |
| 12:07PM | 15 | Q.   WOULD YOU PLEASE LOOK AT YOUR RED BINDER? |
| 12:07PM | 16 | A.   YEAH. |
| 12:07PM | 17 | Q.   IF I COULD DRAW YOUR ATTENTION TO THE BATES NUMBER ENDING |
| 12:07PM | 18 | 5567. |
| 12:08PM | 19 | A.   OKAY. |
| 12:08PM | 20 | Q.   EXCUSE ME.  55 -- PAGE 5568, PAGE 853? |
| 12:08PM | 21 | A.   OKAY. |
| 12:08PM | 22 | MR. LEACH:  YOUR HONOR, I SEEK PERMISSION TO READ |
| 12:08PM | 23 | FROM LINE 13 THROUGH LINE 1 ON 854. |
| 12:08PM | 24 | THE COURT:  YES. |
| 12:08PM | 25 | BY MR. LEACH: |

12:08PM   1    Q.   MS. HOLMES, WERE YOU ASKED THE FOLLOWING QUESTION AND DID

12:08PM   2    YOU GIVE THE FOLLOWING ANSWER:

12:08PM   3        "QUESTION:  HOW DID IT END?

12:08PM   4        "ANSWER:  THE PERSONAL RELATIONSHIP?

12:08PM   5        "QUESTION:  YES.

12:08PM   6        "ANSWER:  YOU KNOW, I THINK WHEN HE JOINED THE COMPANY IT

12:09PM   7    WAS -- WE HAD SPENT I THINK IT WAS FOUR OR FIVE YEARS TOGETHER

12:09PM   8    BY THAT POINT AND REALLY UNDERSTOOD THAT OUR CONNECTION WAS

12:09PM   9    ABOUT TRYING TO CREATE AND WORK TOGETHER.  IT WASN'T REALLY

12:09PM  10    ABOUT THE ROMANTIC PART.

12:09PM  11        "AND ONCE WE STARTED WORKING TOGETHER, IT WAS A VERY

12:09PM  12    INTENSE WORKING RELATIONSHIP.  AND THERE -- THE ROMANTIC PIECE

12:09PM  13    THAT WAS THERE AT THE VERY BEGINNING DIED.

12:09PM  14        "I DIDN'T THINK IT HAPPENED IN ONE MOMENT, BUT IT WAS VERY

12:09PM  15    CLEAR THAT WE WERE COLLEAGUES."

12:09PM  16        WAS THAT YOUR TESTIMONY BEFORE THE S.E.C.?

12:09PM  17    A.   IT IS.

12:09PM  18    Q.   AND WHEN YOU TESTIFIED ABOUT YOUR ROMANTIC RELATIONSHIP

12:09PM  19    WITH MR. BALWANI, AM I RIGHT YOU DIDN'T MENTION THE CMS

12:09PM  20    INSPECTION?

12:09PM  21    A.   I THINK THIS IS TALKING ABOUT WHEN HE JOINED THE COMPANY,

12:09PM  22    WHAT WAS THE TERMINATION OF THE ROMANTIC RELATIONSHIP AT THAT

12:09PM  23    POINT.

12:09PM  24    Q.   YOU WERE ASKED A NUMBER OF QUESTIONS ABOUT THE PERSONAL

12:09PM  25    RELATIONSHIP, AND YOU DID NOT MENTION CMS; IS THAT FAIR?

12:09PM   1    A.   I DON'T THINK SO.  I HAVEN'T RE-READ MY TESTIMONY, BUT I

12:10PM   2    DON'T THINK SO.

12:10PM   3    Q.   YOU'RE SAYING THAT YOU HAVEN'T RE-READ YOUR TESTIMONY IN

12:10PM   4    PREPARING FOR TODAY?

12:10PM   5    A.   I'VE LOOKED AT PORTIONS OF IT, BUT I HAVE NOT READ ALL OF

12:10PM   6    MY TESTIMONY.

12:10PM   7    Q.   OKAY.  BUT SITTING HERE TODAY, YOU DON'T HAVE A MEMORY OF

12:10PM   8    TELLING THE S.E.C. THAT CMS HAD SOMETHING TO DO WITH THE END OF

12:10PM   9    THE RELATIONSHIP?

12:10PM   10   A.   I DON'T.

12:10PM   11   Q.   WHEN YOU BROKE OFF THE RELATIONSHIP IN 2016, YOU WERE NOT

12:10PM   12   SEEING ANY MENTAL HEALTH PROFESSIONALS; IS THAT RIGHT?

12:10PM   13   A.   I WAS NOT.

12:10PM   14   Q.   OKAY.  YOU WEREN'T SEEING A PSYCHOLOGIST?

12:10PM   15   A.   NO.

12:10PM   16   Q.   YOU WEREN'T SEEING A PSYCHIATRIST?

12:10PM   17   A.   NO.

12:10PM   18   Q.   WHATEVER WAS KEEPING YOU AND MR. BALWANI TOGETHER, YOU

12:10PM   19   WERE ABLE TO MAKE A BREAK IN 2016?

12:10PM   20   A.   I DID.

12:10PM   21   Q.   AND IS IT TRUE THAT MR. BALWANI DID NOT CONCEAL FROM YOU

12:10PM   22   THE REALITY OF WHAT WAS HAPPENING AT THERANOS?

12:10PM   23   A.   WHAT DO YOU MEAN BY THAT?

12:10PM   24   Q.   PROBLEMS IN THE LAB, ISSUES WITH WALGREENS, FRUSTRATIONS

12:11PM   25   WITH THERANOS NOT HAVING A PRODUCT, HE DIDN'T CONCEAL THESE

12:11PM   1    THINGS FROM YOU, DID HE?

12:11PM   2    A.   I DIDN'T THINK HE DID.

12:11PM   3    Q.   WELL, LET'S LOOK AT A DOCUMENT THAT YOUR ATTORNEY SHOWED

12:11PM   4    YOU YESTERDAY.

12:11PM   5         IF WE COULD GO TO EXHIBIT 7534.

12:11PM   6         DO YOU HAVE THAT, MS. HOLMES?  IT WAS IN YOUR, IN YOUR

12:11PM   7    COUNSEL'S BINDER YESTERDAY.

12:11PM   8    A.   I DON'T HAVE THOSE ANYMORE.

12:11PM   9              THE COURT:  THAT WAS COLLECTED, I THINK.

12:11PM  10              THE WITNESS:  OH.

12:11PM  11              THE COURT:  AND THIS IS IN EVIDENCE.

12:12PM  12              MR. LEACH:  YEAH, PERHAPS WE CAN DISPLAY IT.  AND IF

12:12PM  13    WE CAN GO TO PAGE 3, PLEASE, MS. HOLLIMAN.

12:12PM  14    Q.   THIS IS A NOTE THAT YOU MADE TO YOURSELF IN THE APRIL 2015

12:12PM  15    TIME PERIOD, MS. HOLMES?

12:12PM  16    A.   IT IS.

12:12PM  17    Q.   OKAY.  AND YOU'RE TRYING TO RECOUNT A CONVERSATION THAT

12:12PM  18    YOU HAD HAD WITH MR. BALWANI?

12:12PM  19    A.   I'M TAKING NOTES AS HE'S TALKING TO ME.

12:12PM  20    Q.   OKAY.  INCLUDING STATEMENTS THAT HE'S MAKING TO YOU?

12:12PM  21    A.   EXACTLY.

12:12PM  22    Q.   OKAY.  AND YOU WROTE, "CONVINCED NEVER HAPPEN EVER.  NOT

12:12PM  23    THANKSGIVING NOT EVER.  PUT HIS DOLLARS ON IT."

12:12PM  24         DO YOU SEE THAT LANGUAGE?

12:12PM  25    A.   YES.

12:12PM  1    Q.   THOSE WERE WORDS THAT MR. BALWANI WAS EXPRESSING TO YOU IN

12:12PM  2    THE APRIL 2015 TIME PERIOD?

12:12PM  3    A.   YES.

12:12PM  4    Q.   AND THEN THERE'S A PARAGRAPH, "FOCUS.  CLARITY.

12:13PM  5    DIRECTION.  COMMUNICATION.  BRINGING EVERYONE TOGETHER AND

12:13PM  6    EXECUTION.  PLANS COME TO FRUITION.  GC AND ELISA AND CBC."

12:13PM  7         YOU RECOGNIZE GC AND ELISA AND CBC TO BE REFERENCE TO

12:13PM  8    ASSAYS WITHIN THE LAB?

12:13PM  9    A.   I THINK HE'S TALKING ABOUT R&D HERE.

12:13PM  10        BUT, YES, I RECOGNIZE THOSE THREE METHODS.

12:13PM  11   Q.   OKAY.  THEN YOU SEE A REFERENCE TO A PRODUCT PERSON.

12:13PM  12        DO YOU SEE THAT?

12:13PM  13   A.   I DO.

12:13PM  14   Q.   "KNOW HOW TO SHIP.  BASIC THINGS.  FLAWLESS.  ENOUGH

12:13PM  15   FOCUS."

12:13PM  16        DO YOU SEE THAT LANGUAGE?

12:13PM  17   A.   I DO.

12:13PM  18   Q.   THEN IN THE NEXT PARAGRAPH, DO YOU SEE WHERE YOU WROTE,

12:13PM  19   "NOT FOCUS ANY TIME ON NONCRITICAL PATH PLAN.  NOT TAKING

12:13PM  20   TANGENT.  NOT TRY SOLVE EVERY PROBLEM UP FRONT BEFORE PROCEED.

12:13PM  21   SOLVE ONCE DONE.  PREPARING 3 YEARS NOT WORRIES ABT."

12:14PM  22        DO YOU SEE THAT LANGUAGE?

12:14PM  23   A.   I DO.

12:14PM  24   Q.   OKAY.  THOSE ARE WORDS THAT MR. BALWANI SAID TO YOU?

12:14PM  25   A.   YES.

12:14PM   1    Q.   AND THEN THERE'S A REFERENCE, "EAH GETTING PRODUCT DONE.

12:14PM   2    SUNNY SW."

12:14PM   3         IS THAT A REFERENCE TO SOFTWARE?

12:14PM   4    A.   YES.

12:14PM   5    Q.   "RULE WORLD."

12:14PM   6         DO YOU SEE THAT?

12:14PM   7    A.   I DO.

12:14PM   8    Q.   AND THEN THE WORD "COMMAND"?

12:14PM   9    A.   YES.

12:14PM   10   Q.   AND THEN DOWN TOWARDS THE BOTTOM, DO YOU SEE WHERE HE

12:14PM   11   WROTE -- OR YOU WROTE, "SO ANGRY AT MYSELF FOR COMING.  SO

12:14PM   12   ANGRY SPENT 5 YEARS OF MY LIFE.  BIGGEST FAILURE OF MY LIFE.

12:14PM   13   REGRET COMING.  STAYED BECAUSE I LOVE YOU."

12:14PM   14        THOSE ARE WORDS THAT MR. BALWANI SAID TO YOU?

12:14PM   15   A.   YES.

12:14PM   16   Q.   "NO ONE TOLD RESPONSIBLE."  AND THEN THERE'S AN EXPLETIVE,

12:14PM   17   "MEDIOCRE QUALITY OF THIS," AND THERE'S A REFERENCE TO THE

12:15PM   18   COMPANY; CORRECT?

12:15PM   19   A.   YES.

12:15PM   20   Q.   AND THE COMPANY THERE IS THERANOS; RIGHT?

12:15PM   21   A.   YES.

12:15PM   22   Q.   AND HE'S NOT HIDING FROM YOU HIS VIEWS OF THE COMPANY

12:15PM   23   DURING THIS TIME PERIOD, IS HE?

12:15PM   24   A.   HE'S NOT.

12:15PM   25   Q.   HE'S BEING OPEN WITH YOU ABOUT PROBLEMS THAT HE'S SEEING?

12:15PM   1    A.   HE'S VERY ANGRY WITH ME BECAUSE HE FEELS LIKE I HAVE

12:15PM   2    CREATED MEDIOCRITY.

12:15PM   3    Q.   AND HE'S TELLING YOU THAT?

12:15PM   4    A.   YES.

12:15PM   5    Q.   HE'S TELLING YOU ABOUT PROBLEMS AT THERANOS?

12:15PM   6    A.   HE'S TELLING ME ABOUT PROBLEMS WITH ME.

12:15PM   7    Q.   DO YOU SEE THE REFERENCE TO "COMPANY" THERE?

12:15PM   8    A.   YES.

12:15PM   9    Q.   OKAY.  THAT'S NOT A REFERENCE TO YOU, THAT'S A REFERENCE

12:15PM  10    TO THE COMPANY, ISN'T IT?

12:15PM  11    A.   THAT IS A REFERENCE TO THE COMPANY.

12:15PM  12    Q.   OKAY.

12:15PM  13         IF WE CAN PLEASE DISPLAY WHAT IS IN EVIDENCE AT

12:15PM  14    EXHIBIT 5387D, PAGE 58 AND 59.

12:16PM  15         MS. HOLMES, DO YOU SEE THE DATE OF THESE TEXT MESSAGES

12:16PM  16    FROM APRIL 28TH, 2015?

12:16PM  17    A.   I DO.

12:16PM  18    Q.   OKAY.  SO THIS IS AFTER THE EXHIBIT THAT WE JUST LOOKED AT

12:16PM  19    WHERE MR. BALWANI IS DESCRIBING HIS VIEW OF THE COMPANY IN THE

12:16PM  20    APRIL 2015 TIME PERIOD?

12:16PM  21    A.   I THINK SO.

12:16PM  22    Q.   AND HE WROTE TO YOU, "IT IS MOST MADDENING THERE IS NO

12:16PM  23    FOCUS IN ANY CHEM TEAMS AND NO PRODUCT COMING OUT."

12:16PM  24         DO YOU SEE THAT LANGUAGE?

12:16PM  25    A.   I DO.

12:16PM   1    Q.   AND YOU WROTE BACK, "I KNOW;" CORRECT?

12:16PM   2    A.   YES.

12:16PM   3    Q.   AND YOU REPLIED, "LEADERSHIP;" CORRECT?

12:16PM   4    A.   YES.

12:16PM   5    Q.   AND THE REFERENCE TO "NO PRODUCT COMING OUT," THAT'S A

12:16PM   6    REFERENCE TO THE MINILAB OR THE TSPU?

12:16PM   7    A.   I THINK SO.

12:17PM   8    Q.   OKAY.  HE'S NOT HIDING HIS VIEW OF THAT FROM YOU HERE, IS

12:17PM   9    HE?

12:17PM  10    A.   I THINK -- I'M NOT SURE IF IT'S A REFERENCE TO THE

12:17PM  11    MINILAB.

12:17PM  12         NO, HE'S NOT HIDING HIS VIEW.

12:17PM  13    Q.   COULD WE PLEASE LOOK AT PAGE 77 TO 78.

12:17PM  14         AND WE LOOKED A LITTLE BIT AT THIS EARLIER.  DO YOU SEE

12:17PM  15    WHERE YOU WROTE "WHO DO U THINK.

12:17PM  16         "NOW WE HAVE LEGAL GROUNDS."

12:17PM  17         THIS IS IN THE MAY 2015 TIME PERIOD?

12:17PM  18    A.   YES.

12:17PM  19    Q.   THIS IS A REFERENCE TO YOUR EFFORT TO FIND OUT WHO'S ONE

12:17PM  20    OF MR. CARREYROU'S RESOURCES?

12:17PM  21    A.   I'M NOT SURE ABOUT THAT.

12:17PM  22    Q.   IS THIS ROUGHLY IN THAT TIME PERIOD?

12:17PM  23    A.   IT IS.

12:18PM  24    Q.   IF WE COULD GO DOWN, PLEASE, MS. HOLLIMAN.

12:18PM  25         AND DO YOU SEE MORE REFERENCES TO TYLER AND ERIKA AND

12:18PM   1    ADAM?

12:18PM   2    A.   I DO.

12:18PM   3    Q.   OKAY.  HE'S GIVING YOU HIS VIEWS ABOUT WHO MIGHT BE BEHIND

12:18PM   4    THE CARREYROU ARTICLE?

12:18PM   5    A.   HE IS.

12:18PM   6    Q.   OKAY.  AND IF WE CAN GO DOWN FURTHER, PLEASE.

12:18PM   7         DO YOU SEE WHERE HE WROTE, "YEAH.  AND WE WILL ALSO TAKE

12:18PM   8    LEGAL ACTION ONCE THIS IS BEHIND US.  VIOLATING TRADE SECRETS

12:18PM   9    IS NOT OK."

12:18PM   10        DO YOU SEE THAT LANGUAGE?

12:18PM   11   A.   I DO.

12:18PM   12   Q.   OKAY.  LET'S CONTINUE TO PAGE 78.  ZOOM IN ON THE TOP.

12:18PM   13        DO YOU SEE WHERE MR. BALWANI WROTE, "SECONDLY.  WE NEED A

12:19PM   14   BETTER STRATEGY FOR NORMANDY.  FOR A LONG TIME TO COME WE WILL

12:19PM   15   HAVE HYBRID SOLUTIONS."

12:19PM   16        DO YOU SEE THAT LANGUAGE?

12:19PM   17   A.   I DO.

12:19PM   18   Q.   OKAY.  AND YOU KNEW NORMANDY WAS THE PORTION OF THE

12:19PM   19   CALIFORNIA CLIA LAB WHERE THERANOS PERFORMED ITS LDT'S?

12:19PM   20   A.   I DID.

12:19PM   21   Q.   THE TESTS ON THE MODIFIED DEVICE, THE TEST ON THE SIEMENS

12:19PM   22   DEVICE?

12:19PM   23   A.   YES.

12:19PM   24   Q.   AND MR. BALWANI IS TELLING YOU HERE THAT YOU'RE GOING TO

12:19PM   25   HAVE HYBRID SOLUTIONS FOR A LONG TIME TO COME?

12:19PM 1    A.   YES.

12:19PM 2    Q.   MEANING YOU'RE NOT GOING TO BE ABLE TO RUN TESTS JUST ON

12:19PM 3    THE MINILAB, YOU'RE GOING TO HAVE A NUMBER OF DIFFERENT

12:19PM 4    SOLUTIONS FOR A LONG PERIOD OF TIME?

12:19PM 5    A.   I THINK HE'S SAYING THAT WE SHOULD HAVE THOSE SOLUTIONS

12:19PM 6    FOR A LONG PERIOD OF TIME.

12:19PM 7    Q.   HE'S SAYING YOU WILL HAVE THESE HYBRID SOLUTIONS, NOT --

12:19PM 8    A.   EXACTLY.

12:19PM 9    Q.   -- NOT ONE DEVICE THAT YOU WERE TRYING TO DO IN PHASE II?

12:19PM 10   A.   RIGHT.

12:19PM 11   Q.   OKAY.  AND HE'S SAYING THAT IS GOING TO TAKE A LONG TIME?

12:20PM 12   A.   NO.  HE'S SAYING THAT FOR A LONG TIME WE'RE GOING TO BE

12:20PM 13   DOING THIS TESTING ON THESE MODIFIED TYPE INVENTIONS IN THE

12:20PM 14   CLIA LAB.

12:20PM 15   Q.   I THINK WE'RE SAYING THE SAME THING.

12:20PM 16   A.   OKAY.

12:20PM 17   Q.   BUT YOU AGREE WITH ME HE'S BEING OPEN ABOUT THAT HERE?

12:20PM 18   A.   YES.

12:20PM 19   Q.   HE'S TELLING THAT TO YOU?

12:20PM 20   A.   YES.

12:20PM 21   Q.   HE'S NOT DECEIVING YOU ABOUT THAT?

12:20PM 22   A.   NO.

12:20PM 23   Q.   FURTHER DOWN YOU WROTE, "MOST LIKELY 2 PLUS WE NEED TO SUE

12:20PM 24   FOR DEFAMATION."

12:20PM 25        YOU WROTE, "I MEANT NORMANDY."

HOLMES CROSS BY MR. LEACH (RES.)                          8053

12:20PM  1        AND THEN "I AGREE."

12:20PM  2        AM I RIGHT YOU BOTH HERE ARE TALKING ABOUT THE HYBRID

12:20PM  3   SOLUTIONS THAT ARE GOING TO BE THERE FOR A LONG TIME TO COME

12:20PM  4   AND THE EFFORT TO FIND OUT WHO IS BEHIND THE CARREYROU ARTICLE?

12:20PM  5   A.   I'M NOT SURE I UNDERSTOOD THOSE PORTIONS OF THE PRIOR

12:20PM  6   TEXT.  I DON'T KNOW IF I FOLLOW THIS EXACTLY.

12:20PM  7   Q.   WELL, YOU UNDERSTAND "I MEANT NORMANDY" TO BE A REFERENCE

12:21PM  8   TO THE CALIFORNIA CLIA LAB?

12:21PM  9   A.   YES.

12:21PM  10  Q.   OKAY.  LET'S LOOK AT PAGE 54.

12:21PM  11       DO YOU SEE THE TEXT, "PETER (ONE OF THESE 2 GUYS) MET WITH

12:21PM  12  RON CONWAY."

12:21PM  13       DO YOU SEE THAT LANGUAGE?

12:21PM  14  A.   I DO.

12:21PM  15  Q.   AND IT GOES ON TO SAY "RON COMMENTED THAT THERE IS TOO

12:21PM  16  MUCH HYPE AROUND THERANOS AND YOU."

12:21PM  17       DO YOU SEE THAT LANGUAGE?

12:21PM  18  A.   I DO.

12:21PM  19  Q.   MR. BALWANI IS COMMUNICATING THIS TO YOU?

12:21PM  20  A.   YES.

12:21PM  21  Q.   HE'S NOT HIDING IT FROM YOU?

12:21PM  22  A.   NO.

12:21PM  23  Q.   "I AM WORRIED ABOUT OVER EXPOSURE WITHOUT SOLID SUBSTANCE

12:21PM  24  WHICH IS LACKING RIGHT NOW.  WE CAN TALK TOMORROW ABOUT OVER

12:21PM  25  EXPOSURE."

12:21PM  1          DO YOU SEE THAT LANGUAGE?

12:21PM  2   A.   YES.

12:21PM  3   Q.   HE'S NOT HIDING FROM YOU HIS VIEW THAT HE THOUGHT THERANOS

12:22PM  4   WAS OVER EXPOSURE WITHOUT SOLID SUBSTANCE?

12:22PM  5   A.   CORRECT.

12:22PM  6   Q.   IF WE COULD SCROLL DOWN A LITTLE BIT MORE, MS. HOLLIMAN.

12:22PM  7          YOU WROTE BACK AT 7:54, "THAT MEDIA IS WHY WE'RE GETTING

12:22PM  8   AMERICARE."

12:22PM  9          DO YOU SEE THAT?

12:22PM 10   A.   YES.

12:22PM 11   Q.   AND YOU'RE SAYING THE MEDIA EXPOSURE IS A REASON WHY

12:22PM 12   THERANOS MIGHT HAVE POTENTIAL BUSINESS?

12:22PM 13   A.   I'M NOT SURE.

12:22PM 14   Q.   OKAY.  YOU AREN'T TALKING ABOUT POTENTIAL UPSIDE OF THE

12:22PM 15   MEDIA STRATEGY THAT YOU AND MR. BALWANI DISAGREED ON?

12:22PM 16   A.   I COULD BE.  I'M JUST NOT SURE WHAT THIS IS REFERRING TO.

12:23PM 17   Q.   SITTING HERE TODAY, YOU DON'T HAVE AN EXPLANATION OTHER

12:23PM 18   THAN THAT?

12:23PM 19   A.   I DON'T.

12:23PM 20   Q.   FURTHER DOWN MR. BALWANI WROTE, "WE NEED FDA CLEARANCE AND

12:23PM 21   CTN CLEARANCE B."

12:23PM 22          DO YOU SEE THAT?

12:23PM 23   A.   YES.

12:23PM 24   Q.   CTN IS A REFERENCE TO THE NANOTAINER?

12:23PM 25   A.   IT IS.

12:23PM   1    Q.   THE COLLECTION -- OR WHERE THE BLOOD WAS STORED FOR USE IN

12:23PM   2    EDISONS OR MINILABS?

12:23PM   3    A.   YES.

12:23PM   4    Q.   OKAY.  AND HE'S NOT HIDING FROM YOU HIS VIEW, "WE NEED FDA

12:23PM   5    CLEARANCE AND CTN CLEARANCE" HERE, IS HE?

12:23PM   6    A.   HE'S NOT.

12:23PM   7    Q.   LET'S LOOK AT PAGE 56 TO 57.

12:23PM   8         DO YOU SEE WHERE IT SAYS, "PHENOMENAL CRAMER STORY"?

12:24PM   9    A.   YES.

12:24PM  10    Q.   OKAY.  YOU WERE ON "MAD MONEY" AND THE JIM CRAMER SHOW

12:24PM  11    SOME TIME BEFORE OCTOBER OF 2015 AND YOU WERE REFERENCING A

12:24PM  12    CONVERSATION YOU HAD WITH MR. CRAMER?

12:24PM  13    A.   I'M NOT SURE IT WAS WITH MR. CRAMER, BUT IT WAS A STORY

12:24PM  14    THAT I HEARD WHEN I WAS AT THAT INTERVIEW.

12:24PM  15    Q.   OKAY.  AND IF WE COULD SCROLL DOWN, PLEASE, MS. HOLLIMAN.

12:24PM  16         DO YOU SEE WHERE MR. BALWANI WROTE, "YOU WERE FLAWLESS IN

12:24PM  17    MAD MONEY.  JUST PERFECT.

12:24PM  18         "IF I WAS COMPETING WITH YOU I WOULD BE SCARED."

12:24PM  19         DO YOU SEE THAT LANGUAGE?

12:24PM  20    A.   I DO.

12:24PM  21    Q.   AND THEN RIGHT AFTER HE WRITES, "GOT TO GET MORE ASSAYS ON

12:24PM  22    FINGERSTICK."

12:24PM  23         DO YOU SEE THAT?

12:24PM  24    A.   YES.

12:24PM  25    Q.   AND HE'S EXPRESSING A VIEW THAT THERANOS NEEDS TO BUMP UP

12:25PM  1    THE NUMBER OF SMALL SAMPLE TESTING THAT IT'S DOING IN ITS CLIA

12:25PM  2    LAB?

12:25PM  3    A.   YES.

12:25PM  4    Q.   HE'S NOT HIDING FROM YOU THE NEED TO DO THAT, IS HE?

12:25PM  5    A.   NO.

12:25PM  6    Q.   HE THEN SAYS, "YOU CAME ACROSS AS A PURE STATESMAN."

12:25PM  7         DO YOU SEE THAT?

12:25PM  8    A.   I DO.

12:25PM  9    Q.   AND YOU REPLIED, "LOVED SEEING THIS SO MUCH.

12:25PM 10         "EXACTLY.

12:25PM 11         "THAT IS OUR KEY POINT NOW."

12:25PM 12         IS THAT WHAT YOU WROTE?

12:25PM 13    A.   YES.

12:25PM 14    Q.   LET'S LOOK AT PAGE 42 TO 44.

12:25PM 15         DO YOU SEE WHERE MR. BALWANI WROTE, "WHEN WE LAUNCH IN NY

12:25PM 16    WE CAN LAUNCH WITH CVS AND GIVE THEM ONCE WE HAVE 50 E DONE, WE

12:25PM 17    WILL BE INVINCIBLE."

12:26PM 18         DO YOU SEE THAT?

12:26PM 19    A.   I DO.

12:26PM 20    Q.   AND WHAT IS 50 E?

12:26PM 21    A.   I DON'T KNOW.

12:26PM 22    Q.   OKAY.  AND IN THIS TIME PERIOD, ARE YOU HAVING DISCUSSIONS

12:26PM 23    WITH CVS ABOUT A POTENTIAL BUSINESS RELATIONSHIP?

12:26PM 24    A.   I'M NOT SURE.  I -- I'M NOT SURE.

12:26PM 25    Q.   OKAY.  YOU RECALL AT SOME POINT HAVING A CONVERSATION WITH

12:26PM  1    CVS ABOUT A POTENTIAL RELATIONSHIP?

12:26PM  2    A.   WE DID.

12:26PM  3    Q.   OKAY.  AFTER YOU HAD A DEAL WITH WALGREENS?

12:26PM  4    A.   AND BEFORE.

12:26PM  5    Q.   AND AS THE WALGREENS RELATIONSHIP WAS -- I'LL USE MY

12:26PM  6    WORD -- SLOWING IN 2014, YOU STARTED TO TURN TO CVS IN ORDER TO

12:26PM  7    STRIKE UP A BUSINESS RELATIONSHIP WITH THEM; ISN'T THAT RIGHT?

12:26PM  8    A.   NO.

12:26PM  9    Q.   YOU DIDN'T HAVE CONVERSATIONS WITH CVS IN THE 2015 TIME

12:26PM  10   PERIOD?

12:26PM  11   A.   WE PROBABLY DID.  WE HAD CONVERSATIONS WITH THEM FROM THE

12:26PM  12   DAY WE MET THEM ALL OF THE WAY THROUGH TO THE DAY WE SHUT DOWN

12:26PM  13   OUR LAB.

12:26PM  14   Q.   EVEN AS YOU'RE WORKING ON HYBRID SOLUTIONS WITHIN THE CLIA

12:27PM  15   LAB, YOU WERE TRYING TO INDUCE CMS -- CVS INTO SOME TYPE OF

12:27PM  16   BUSINESS ARRANGEMENT?

12:27PM  17   A.   YES.

12:27PM  18   Q.   IF WE COULD SCROLL DOWN, PLEASE, TO THE BOTTOM PORTION,

12:27PM  19   MS. HOLLIMAN.

12:27PM  20        DO YOU SEE AT THE BOTTOM WHERE IT SAYS, "THE POINT ABOUT

12:27PM  21   NARROWING DOWN MENU TO HIT HIGH FS PERCENTAGE CAME LIKE A GIFT

12:27PM  22   FROM GOD"?

12:27PM  23   A.   I DO.

12:27PM  24   Q.   AND THAT'S MR. BALWANI EXPRESSING TO YOU HIS IDEA TO

12:27PM  25   INCREASE THE FINGERSTICK PERCENTAGE AT WALGREENS STORES?

12:27PM   1      A.   YES.

12:27PM   2      Q.   AND HE'S NOT HIDING FROM YOU HIS IDEAS ABOUT HOW TO DO

12:27PM   3      THAT, IS HE?

12:28PM   4      A.   NO.

12:28PM   5      Q.   HE'S BEING OPEN WITH YOU ABOUT IDEAS ON HOW TO INCREASE

12:28PM   6      THE FINGERSTICK PERCENTAGE AT WALGREENS?

12:28PM   7      A.   HE IS.

12:28PM   8      Q.   HE'S TALKING OPENLY ABOUT THIS ISSUE IN THE 2015 TIME

12:28PM   9      PERIOD WITH YOU?

12:28PM   10     A.   YES.

12:28PM   11     Q.   LET'S GO ON TO THE NEXT PAGE, PLEASE.

12:28PM   12          DO YOU SEE WHERE HE WROTE, "I WAS MEDITATING ON THIS

12:28PM   13     MEETING ALL NIGHT AND ALL DAY"?

12:28PM   14     A.   I DO.

12:28PM   15     Q.   AND YOU REPLIED TO HIM, "YOU NAILED IT"?

12:28PM   16     A.   YES.

12:28PM   17     Q.   AND MR. BALWANI SAYS, "WE MUST HIT OUR VOLUME GOALS NOW.

12:28PM   18          "WE NEED TO MAKE IT A MATTER OF LIFE AND DEATH.

12:28PM   19          "SURVIVAL.  WE MUST NOT LOSE."

12:28PM   20          THAT'S WHAT MR. BALWANI WROTE?

12:28PM   21     A.   YES.

12:28PM   22     Q.   LET'S LOOK AT PAGE 44, PLEASE.  AND IF WE CAN ZOOM IN ON

12:29PM   23     THE SUBSTANCE, MS. HOLLIMAN.

12:29PM   24          DO YOU SEE THE FIRST TEXT ON APRIL 11TH, 2015, "I HAVE

12:29PM   25     EXTREME CLARITY ON HOW WE WILL WIN AGAINST QUEST AND LABCORP"?

12:29PM  1    A.   I DO.

12:29PM  2    Q.   AND THEN HE WROTE, "EXTREME HARD WORK BUT NO SHORTCUTS ON

12:29PM  3    THIS ONE ANYWAY"?

12:29PM  4    A.   YES.

12:29PM  5    Q.   "FOR NEXT 3 YEARS 2015-16-17 DO ONLY CALIFORNIA NY AZ AND

12:29PM  6    CENTRAL PEN."

12:29PM  7         DO YOU SEE THAT LANGUAGE?

12:29PM  8    A.   I DO.

12:29PM  9    Q.   AND THAT'S LIMITING THE NATIONAL ROLLOUT OR THE NATIONAL

12:29PM  10   AMBITIONS THAT YOU HAD, AT LEAST WITH WALGREENS, IN THE 2015

12:29PM  11   TIME PERIOD?

12:29PM  12   A.   THAT WOULD HAVE.

12:29PM  13   Q.   AND YOU WROTE, "I SO AGREE."

12:29PM  14        IS THAT CORRECT?

12:29PM  15   A.   YES.

12:29PM  16   Q.   "CAN'T WAIT TO DISCUSS."

12:30PM  17        IS THAT WHAT YOU WROTE?

12:30PM  18   A.   YES.

12:30PM  19   Q.   "HAVE A LOT OF IDEAS ON THAT BTW FROM THESE LAST COUPLE

12:30PM  20   DAYS."

12:30PM  21        AND THEN YOU WROTE "EXACTLY."

12:30PM  22        AND THEN MR. BALWANI WROTE, "BUILD INCREDIBLE SOFTWARE."

12:30PM  23        DO YOU SEE THAT?

12:30PM  24   A.   I DO.

12:30PM  25   Q.   AND WHAT IS THE NEXT ACRONYM?

12:30PM   1      A.   D2C.

12:30PM   2      Q.   WHAT IS D2C?

12:30PM   3      A.   DIRECT TO CONSUMER.

12:30PM   4      Q.   "SOCRATES."  WHAT IS THAT A REFERENCE TO?

12:30PM   5      A.   IT'S A PIECE OF SOFTWARE THAT WE BUILT THAT DID DECISION

12:30PM   6      SUPPORT FOR PEOPLE TO BE ABLE TO UNDERSTAND THEIR LAB DATA.

12:30PM   7      Q.   AND THEN HE WROTE, "100 TO 200 FINGERSTICKS ON 4.1."

12:30PM   8           IS THAT A REFERENCE TO THE MINILAB AND THE 4 SERIES?

12:30PM   9      A.   YES.

12:30PM   10     Q.   "AND CAPTURE 100 PERCENT CA AND MY."

12:30PM   11          DO YOU THINK THAT'S NY?

12:30PM   12     A.   I DO.

12:30PM   13     Q.   HE'S BEING OPEN ABOUT HIS PLANS AND HIS IDEAS HERE, IS HE

12:31PM   14     NOT?

12:31PM   15     A.   YES.  I WOULDN'T CALL THIS A PLAN, BUT THIS IDEA, YES.

12:31PM   16     Q.   OKAY.  HE'S COMMUNICATING WITH YOU OPENLY ABOUT IDEAS AND

12:31PM   17     POSSIBILITIES AND WAYS TO MOVE THE BUSINESS?

12:31PM   18     A.   HE IS.

12:31PM   19     Q.   OKAY.  LET'S LOOK AT PAGES 46 AND 48.

12:31PM   20          IS THIS ANOTHER EXCHANGE BETWEEN YOU AND MR. BALWANI IN

12:31PM   21     LATE APRIL 2015?

12:31PM   22     A.   IT IS.

12:31PM   23     Q.   YOU WROTE, "WE NEED TO DECIDE AND THEN OPERATIONALIZE THE

12:31PM   24     STRATEGY WE WERE TALKING ABOUT REWORKING WITH MANY."

12:31PM   25          WHO IS THE MANY?

12:31PM  1     A.   I'M NOT SURE.

12:31PM  2     Q.   MR. BALWANI WROTE, "FS IS OUR COMPETITIVE ADVANTAGE AND

12:31PM  3     PRICE TRANSPARENCY."

12:31PM  4          FS, THAT'S A REFERENCE TO FINGERSTICK?

12:32PM  5     A.   YES.

12:32PM  6     Q.   AND THEN FURTHER DOWN YOU WROTE, "AND GET FS LIVE NMW."

12:32PM  7     WHAT IS NMW?

12:32PM  8     A.   I DON'T KNOW.

12:32PM  9     Q.   ARE YOU EXPRESSING A NEED TO GET FINGERSTICK LIVE WITHIN

12:32PM  10    THE CLIA LAB?

12:32PM  11    A.   YES.  I'M NOT SURE IF THIS IS TALKING ABOUT THE CLIA LAB,

12:32PM  12    BUT DEFINITELY GETTING FINGERSTICK LIVE.

12:32PM  13    Q.   OKAY.  LET'S GO TO PAGE 48.

12:32PM  14         DO YOU SEE WHERE YOU WROTE, "CAN WE TAKE FS LIE TOMORROW"?

12:32PM  15         DID YOU MEAN LIVE?

12:32PM  16    A.   I THINK SO.

12:32PM  17    Q.   AND THEN MR. BALWANI RESPONDS QUESTION MARK.

12:32PM  18         "U MEAN GC?"

12:33PM  19         DO YOU SEE THAT?

12:33PM  20    A.   I DO.

12:33PM  21    Q.   AND THEN MR. BALWANI RESPONDS "VERY RISKY.  WE NEED MORE

12:33PM  22    SOFTWARE TESTING."

12:33PM  23         DO YOU SEE THAT?

12:33PM  24    A.   I DO.

12:33PM  25    Q.   AND YOU REPLY "YES"?

12:33PM   1    A.   YES.

12:33PM   2    Q.   AND THEN MR. BALWANI WRITES, "CHECKING BUT VERY RISKY."

12:33PM   3         DO YOU SEE THAT?

12:33PM   4    A.   I DO.

12:33PM   5    Q.   AND MR. BALWANI IS TALKING OPENLY WITH YOU ABOUT RISKS HE

12:33PM   6    SEES HERE WITH SOMETHING THAT YOU HAD PROPOSED?

12:33PM   7    A.   HE IS.

12:33PM   8    Q.   LET'S LOOK AT PAGES 87 TO 89 OF 5387D.

12:33PM   9         DO YOU SEE WHERE MR. BALWANI ASKS THE QUESTION "BOARD

12:33PM  10    MEETING OK?"

12:33PM  11    A.   I DO.

12:33PM  12    Q.   AND YOUR RESPONSE IS "WE'LL CATCH UP"?

12:33PM  13    A.   YES.

12:33PM  14    Q.   AND DO YOU RECALL THAT THERE WAS A CONTENTIOUS BOARD

12:33PM  15    MEETING IN JULY OF 2015?

12:33PM  16    A.   I DO.

12:33PM  17    Q.   LET'S LOOK AT THE NEXT PAGE, PLEASE.

12:34PM  18         DO YOU SEE WHERE MR. BALWANI WROTE, "LOVE YOU.  BE STRONG

12:34PM  19    TODAY.  MY ADVISE.  DON'T TALK TO HEATHER ABOUT YESTERDAY

12:34PM  20    MEETING.  MAKE THIS SOMETHING ABOVE HER ROLE."

12:34PM  21         DO YOU SEE THAT?

12:34PM  22    A.   YES.

12:34PM  23    Q.   AND HEATHER THERE IS A REFERENCE TO HEATHER KING?

12:34PM  24    A.   I THINK SO.

12:34PM  25    Q.   AND THEN MR. BALWANI WROTE, "I WORKED FOR 6 YEARS DAY AND

```
12:34PM   1    NIGHT TO HELP YOU.  I AM SAD AT WHERE YOU AND I ARE.  I THOUGHT

12:34PM   2    IT WOULD BE BETTER.  I KNOW U R ANGRY IN UR WAY.  AND UPSET

12:34PM   3    WITH ME FOR NOT DOING EVERYTHING YOU WANTED ME TO DO."

12:34PM   4         DO YOU SEE THAT LANGUAGE?

12:34PM   5    A.  I DO.

12:34PM   6    Q.  AND YOU RESPOND WITH SOME QUESTION MARKS?

12:34PM   7    A.  YES.

12:34PM   8    Q.  LATER ON YOU WROTE, "IT'S JUST HARD TO TRANSITION."

12:35PM   9         DO YOU SEE THAT LANGUAGE?

12:35PM  10    A.  YES.

12:35PM  11    Q.  AND MR. BALWANI REPLIES, "I AM RESPONSIBLE FOR EVERYTHING

12:35PM  12    AT THERANOS.  ALL HAVE BEEN MY DECISIONS TOO."

12:35PM  13         DO YOU SEE THAT LANGUAGE?

12:35PM  14    A.  I DO.

12:35PM  15    Q.  OKAY.  HE'S SAYING YOUR DECISIONS ARE HIS DECISIONS, TOO.

12:35PM  16    A.  HE'S SAYING THAT ALL OF THE THERANOS DECISIONS WERE HIS

12:35PM  17    DECISIONS TOO.

12:35PM  18    Q.  OKAY.  AND THEY WERE YOUR DECISIONS TOO?

12:35PM  19    A.  YES.

12:35PM  20    Q.  BECAUSE YOU'RE THE CEO?

12:35PM  21    A.  EXACTLY.

12:35PM  22    Q.  "BUT GETTING THROUGH YESTERDAY WILL MAKE IT EASIER TO DO

12:35PM  23    SO NOW.

12:35PM  24         "I WON'T TRANSITION UNTIL U R IN A PERFECT PLACE.  U KNOW

12:35PM  25    THAT."
```

12:35PM  1          DO YOU SEE WHERE MR. BALWANI WROTE THAT?

12:35PM  2    A.   I DO.

12:35PM  3    Q.   OKAY.  AND IF WE CAN BLOW UP THE SECOND HALF OF THE PAGE,

12:35PM  4    MS. HOLLIMAN.

12:35PM  5          AND IF WE CAN GET -- CAN YOU JUST READ THIS TEXT EXCHANGE

12:35PM  6    FOR US, MS. HOLMES?

12:35PM  7    A.   "NO SUCH THING... THAT WAS THE POINT WE TALKED ABOUT.

12:36PM  8          "IT'S OK - JUST EMOTIONAL BUT AM READY.

12:36PM  9          "AND I COMPLETELY GET IT.

12:36PM  10         "ON THE CHALLENGES.

12:36PM  11         "UNFORTUNATELY U DON'T AND BRAKES MY HEART TO SEE U LIKE

12:36PM  12   THIS.

12:36PM  13         "QUESTION MARK.

12:36PM  14         "I AM NOT LEAVING UNTIL WE BREAK EVEN.  WE WILL DO THIS

12:36PM  15   TOGETHER AND I WILL BE BY YOURSELF UNTIL THEN.  CAN'T LEAVE

12:36PM  16   LIKE THIS.

12:36PM  17         "U R WRONG THAT YESTERDAYS MEETING MAKES IT EASIER.  IT

12:36PM  18   DIDN'T.

12:36PM  19         "FOR ME TO EMOTIONALLY HANDLE IT.

12:36PM  20         "THE TRANSITION.

12:36PM  21         "NO.  U R UNDERESTIMATING.

12:36PM  22         "I CAN LEAVE IT IF THAT GIVES U EMOTIONAL PEACE BUT YOU

12:36PM  23   KNOW WE HAVE TO SACRIFICE."

12:36PM  24   Q.   MR. BALWANI IS TELLING YOU HERE YOU ARE UNDERESTIMATING;

12:36PM  25   IS THAT RIGHT?

12:36PM  1    A.   HE IS.

12:36PM  2    Q.   LET'S ZOOM OUT.

12:36PM  3         AND IF WE CAN GO TO THE NEXT PAGE.

12:37PM  4         DO YOU SEE WHERE HE WROTE, "AND YES.  I DO DISLIKE THE

12:37PM  5    DIRECTION U HAVE TAKEN WITH ALL THIS PR AND ALL LEGAL WORK AND

12:37PM  6    A LOT OF OTHER THINGS BUT HOPEFULLY WE CAN TALK AND FIND

12:37PM  7    PERFECT FOCUS AND PERFECT PLAN AND EXECUTE HEADS DOWN AND BUILD

12:37PM  8    PRODUCT AND BREAK EVEN.

12:37PM  9         "I CAN LEAVE THEN."

12:37PM 10         DO YOU SEE THAT LANGUAGE?

12:37PM 11    A.   I DO.

12:37PM 12    Q.   HE'S REFERRING TO HIS DISLIKE FOR THE DIRECTION THAT YOU

12:37PM 13    TOOK ON PR AND LEGAL MATTERS; IS HE NOT?

12:37PM 14    A.   AND A LOT OF OTHER THINGS.

12:37PM 15    Q.   SO THE ANSWER TO MY QUESTION WAS YES?

12:37PM 16    A.   YES.

12:37PM 17    Q.   OKAY.  THANK YOU.

12:37PM 18         HE THEN WRITES, "THINGS ARE DIFFERENT NOW.  WE NEED TO GET

12:37PM 19    THE BUSINESS TO BREAK EVEN AND THEN I WILL LEAVE.  WE R

12:37PM 20    DIFFERENT WHEN IT COMES TO BUSINESS.  WE WILL BE HAPPIER THAT

12:37PM 21    WAY.  BUT FOR NOW, U AND I BOTH ARE ON THE SAME PAGE BECAUSE OF

12:38PM 22    YESTERDAY THAT WE NEED TO BREAK EVEN."

12:38PM 23         DO YOU SEE THAT LANGUAGE?

12:38PM 24    A.   I DO.

12:38PM 25    Q.   AND THEN WHAT WAS YOUR REPLY?

12:38PM  1    A.   "I THOUGHT THE THING WAS IF WE DID THAT THEN YOU WOULDN'T

12:38PM  2    WANT TO LEAVE."

12:38PM  3    Q.   AND THEN HE REPLIES, "STAY INTERNALLY FOCUSSED AND ONLY

12:38PM  4    MEET WITH PEOPLE WHO HAVE DEALS IN HAND.  THE PR STRATEGY IS

12:38PM  5    WRONG AND I HAVE BEEN SAYING THAT.  WE NEED TO GO ON OFFENSE

12:38PM  6    AND NOT BE DEFENSIVE."

12:38PM  7         IS THIS AGAIN MR. BALWANI DISAGREEING WITH YOU ABOUT THE

12:38PM  8    PR STRATEGY THAT YOU WERE IMPLEMENTING?

12:38PM  9    A.   YES.

12:38PM 10    Q.   LET'S GO TO THE NEXT PAGE, PLEASE.

12:38PM 11         DO YOU SEE A SERIES OF TEXTS FROM JULY 28TH, 2015,

12:39PM 12    MS. HOLMES?

12:39PM 13    A.   I DO.

12:39PM 14    Q.   AND THIS IS ROUGHLY TWO WEEKS AFTER THE EXCHANGE THAT WE

12:39PM 15    JUST LOOKED AT FOLLOWING THE CONTENTIOUS BOARD MEETING?

12:39PM 16    A.   YES.

12:39PM 17    Q.   AND MR. BALWANI WROTE TO YOU, "WE NEED TO COMMIT TO EACH

12:39PM 18    OTHER AND GET OUT OF THIS HELL SO WE CAN LIVE IN PARADISE WE

12:39PM 19    BOTH HAVE."

12:39PM 20         DO YOU SEE THAT LANGUAGE?

12:39PM 21    A.   I DO.

12:39PM 22    Q.   AND YOU WROTE BACK TO HIM, "I HAVE LITERALLY BEEN

12:39PM 23    MEDITATING ON EXACT SAME.  WHOLE TIME I WAS RUNNING WAS

12:39PM 24    THINKING OF THAT."

12:39PM 25         IS THAT WHAT YOU WROTE?

12:39PM  1    A.   YES.

12:39PM  2    Q.   AND MR. BALWANI WROTE, "WE NEED TO COMMIT TO FOCUSSING AND

12:39PM  3    GETTING IN PARADISE."

12:39PM  4         DO YOU SEE THAT LANGUAGE?

12:39PM  5    A.   I DO.

12:39PM  6    Q.   "PRODUCT COMPANY.  WINNING."

12:39PM  7         THOSE WERE YOUR WORDS; RIGHT?

12:39PM  8    A.   YES.

12:39PM  9    Q.   LET'S GO TO PAGE 8, PLEASE.

12:39PM 10         IS IT ALSO THE CASE, MS. HOLMES, THAT MR. BALWANI SPEAKS

12:40PM 11    OPENLY TO YOU ABOUT PROBLEMS HE'S SEEING IN THE CLIA LAB?

12:40PM 12    A.   YES.

12:40PM 13    Q.   LET'S LOOK AT EXAMPLES OF THOSE.

12:40PM 14         DO YOU SEE THIS TEXT EXCHANGE FROM MAY OF 2012?

12:40PM 15    A.   I DO.

12:40PM 16    Q.   DO YOU SEE WHERE -- AND THIS 2012 TIME PERIOD, THIS IS

12:40PM 17    BEFORE THERANOS IS DOING ANY LDT'S IN THE CLIA LAB; IS THAT

12:40PM 18    FAIR?

12:40PM 19    A.   IT IS.

12:40PM 20    Q.   HE WROTE, "ARNE" -- THAT'S A REFERENCE TO DR. GELB?

12:40PM 21    A.   YES.

12:40PM 22    Q.   -- "CALLED JUST NOW.  FREAKING OUT BECAUSE DIANA" -- WHO

12:40PM 23    IS DIANA?

12:40PM 24    A.   I'M NOT SURE.  I'M JUST READING IT.

12:40PM 25    Q.   IS IT DIANA DUPUY?

12:40PM  1    A.   I THINK SO.

12:40PM  2    Q.   -- "CAUGHT AN ERROR BY HOAI (AND ARNE) AND SHE BROUGHT A

12:40PM  3    HUNTER LAB CONFIDENTIAL SOP TO HIM TO TELL HIM WHY SHE WAS

12:40PM  4    RIGHT.  HE TOLD HER NEVER TO BRING ANY CONFIDENTIAL MATERIAL TO

12:41PM  5    THE BUILDING AND WAS TELLING ME HE MADE A MISTAKE IN KEEPING

12:41PM  6    HER."

12:41PM  7         DO YOU SEE THAT MESSAGE?

12:41PM  8    A.   I DO.

12:41PM  9    Q.   "HOWEVER, THE ISSUE SHE BROUGHT UP WAS A SERIOUS ONE."

12:41PM  10        DO YOU SEE THAT LANGUAGE?

12:41PM  11   A.   YES.

12:41PM  12   Q.   IS THIS AN EXAMPLE OF MR. BALWANI RAISING ISSUES THAT ARE

12:41PM  13   GOING ON IN THE CLIA LAB WITH YOU?

12:41PM  14   A.   YES.

12:41PM  15   Q.   SPEAKING OPENLY WITH YOU ABOUT THAT?

12:41PM  16   A.   YES.

12:41PM  17   Q.   HE'S NOT HIDING ANYTHING FROM YOU HERE?

12:41PM  18   A.   HE'S NOT.

12:41PM  19   Q.   AND YOU UNDERSTOOD MR. BALWANI LARGELY CAME FROM A

12:41PM  20   SOFTWARE BACKGROUND; CORRECT?

12:41PM  21   A.   I DID.

12:41PM  22   Q.   YOU KNEW HE WASN'T A PATHOLOGIST?

12:41PM  23   A.   I DID.

12:41PM  24   Q.   YOU KNEW HE WASN'T A MEDICAL DOCTOR?

12:41PM  25   A.   I DID.

12:41PM 1   Q.   OKAY.  YOU KNEW HE HAD NO EXPERIENCE RUNNING A CLINICAL

12:41PM 2   LAB; CORRECT?

12:41PM 3   A.   I DID.

12:41PM 4   Q.   YOU ADMIRED HIS BUSINESS ACUMEN FROM HIS SOFTWARE DAYS?

12:41PM 5   A.   I DID.

12:41PM 6   Q.   LET'S LOOK AT PAGES 14 TO 15, AND I DRAW YOUR ATTENTION TO

12:42PM 7   THE FIRST TEXT.

12:42PM 8       DO YOU SEE THE DATE NOVEMBER 20TH, 2013?

12:42PM 9   A.   I DO.

12:42PM 10  Q.   THIS IS A FEW MONTHS AFTER THERANOS HAS ANNOUNCED ITS

12:42PM 11  PARTNERSHIP WITH WALGREENS PUBLICLY?

12:42PM 12  A.   YES.

12:42PM 13  Q.   OKAY.  AND MR. BALWANI IS WRITING UP AT THE TOP, "BTW.

12:42PM 14  WHEN WE DO THE PATCH, CHEM8 OR CHEM14 IS THE MOST IMPORTANT AND

12:42PM 15  FIRST THING TO MONITOR."

12:42PM 16      DO YOU SEE THAT LANGUAGE?

12:42PM 17  A.   I DO.

12:42PM 18  Q.   AND THEN DOWN AT THE BOTTOM HE WROTE, "PISSING ME OFF WE

12:42PM 19  DON'T HAVE ANYONE MANAGING PSC, CTN PRODUCTION, CART

12:42PM 20  PRODUCTION, ELISA ASSAYS, TSH."

12:42PM 21      DO YOU SEE THAT LANGUAGE?

12:42PM 22  A.   I DO.

12:42PM 23  Q.   WHAT IS PSC?

12:42PM 24  A.   I THINK IT'S THE PATIENT SERVICE CENTER, OR WELLNESS

12:42PM 25  CENTERS.

12:42PM  1    Q.   AND CTN PRODUCTION, THAT'S A REFERENCE TO THE NANOTAINER

12:43PM  2    PRODUCTION?

12:43PM  3    A.   YES.

12:43PM  4    Q.   AND CART PRODUCTION, WHAT IS THAT?

12:43PM  5    A.   I'M ASSUMING IT'S CART PRODUCTION.

12:43PM  6    Q.   AND ELISA ASSAYS, THAT'S A REFERENCE TO THE IMMUNOASSAYS?

12:43PM  7    A.   YES.

12:43PM  8    Q.   AND THE TSH, THAT'S A REFERENCE TO ONE OF THE ASSAYS?

12:43PM  9    A.   EXACTLY, YES.

12:43PM  10   Q.   AND MR. BALWANI IS EXPRESSING FRUSTRATION ABOUT THE LACK

12:43PM  11   OF ANYONE MANAGING THESE ISSUES?

12:43PM  12   A.   YES, THAT'S WHAT HE'S SAYING.

12:43PM  13   Q.   HE'S SPEAKING OPENLY TO YOU ABOUT THAT?

12:43PM  14   A.   HE IS.

12:43PM  15   Q.   HE'S NOT HIDING ANYTHING FROM YOU HERE?

12:43PM  16   A.   NO.

12:43PM  17   Q.   LET'S LOOK AT THE NEXT PAGE, PAGE 15.

12:43PM  18        DO YOU SEE YOUR REPLY "I KNOW.

12:43PM  19        "RECRUITING.

12:43PM  20        "AND BETTER MANAGEMENT.

12:44PM  21        "FULL TIME JOB."

12:44PM  22   A.   YES.

12:44PM  23   Q.   YOU'RE CONCURRING WITH WHAT MR. BALWANI IS BRINGING TO

12:44PM  24   YOUR ATTENTION HERE?

12:44PM  25   A.   YES.

12:44PM   1    Q.   LET ME DRAW YOUR ATTENTION TO PAGES 23 THROUGH 25.

12:44PM   2         DO YOU SEE THE DATE NOVEMBER 19TH, 2014, MS. HOLMES?

12:44PM   3    A.   I DO, YES.

12:44PM   4    Q.   AND THIS IS RIGHT AROUND THE TIME THAT DR. ROSENDORFF IS

12:44PM   5    LEAVING THE COMPANY?

12:44PM   6    A.   YES.

12:44PM   7    Q.   AND MR. BALWANI IS WRITING TO YOU, "NEED TO FOCUS ON OPS.

12:44PM   8    GETTING HURT IN MARKET."

12:44PM   9         DO YOU SEE THAT LANGUAGE?

12:44PM   10   A.   I DO.

12:44PM   11   Q.   "CUSTOMER SERVICE SEEMS TO BE TERRIBLE.  EVERYONE

12:44PM   12   COMPLAINING."

12:44PM   13        AND YOU WRITE BACK, "YES.

12:45PM   14        "WE HAVE TO OWN THIS."

12:45PM   15        DID I READ THAT CORRECTLY?

12:45PM   16   A.   YOU DID.

12:45PM   17   Q.   "LAB, CUSTOMER SERVICE, TAT, ALL NEED DIRECTOR LEVEL

12:45PM   18   PEOPLE."

12:45PM   19        THAT'S WHAT MR. BALWANI CONVEYED TO YOU IN THIS

12:45PM   20   NOVEMBER 2014 TIME PERIOD; CORRECT?

12:45PM   21   A.   YES.

12:45PM   22   Q.   HE'S NOT HIDING THAT FROM YOU?

12:45PM   23   A.   HE'S NOT.

12:45PM   24   Q.   HE'S NOT CONCEALING THAT FROM YOU?

12:45PM   25   A.   NO.

12:45PM  1      Q.   HE'S NOT MISLEADING YOU?

12:45PM  2      A.   HE'S DEFINITELY NOT HIDING ANYTHING FROM ME IN THIS TEXT.

12:45PM  3      Q.   OKAY.  AND IF WE CAN SCROLL DOWN EVEN FURTHER, PLEASE.

12:45PM  4           DO YOU SEE WHERE HE WROTE, "WE NEED.  THE LAB AND CALL

12:45PM  5      CENTER FIXED..."

12:45PM  6           DO YOU SEE THAT LANGUAGE?

12:45PM  7      A.   I DO.

12:45PM  8      Q.   "NEED PROFESSIONALS ACROSS THE BOARD.  NEED PMS AND

12:45PM  9      ALLISON OUT ASAP.

12:46PM 10           "WASTE OF TIME IMP."

12:46PM 11           AND THEN I THINK HE CORRECTS HIMSELF "IMO."

12:46PM 12           IN MY OPINION?

12:46PM 13      A.   I THINK SO, YES.

12:46PM 14      Q.   AND YOUR RESPONSE WAS "EXACTLY"?

12:46PM 15      A.   YES.

12:46PM 16      Q.   HE WAS SPEAKING OPENLY WITH YOU ABOUT PROBLEMS?

12:46PM 17      A.   YES.

12:46PM 18      Q.   AND YOU'RE AGREEING WITH HIM?

12:46PM 19      A.   YES.

12:46PM 20      Q.   IF WE CAN GO DOWN FURTHER, PLEASE, TO PAGE 24.

12:46PM 21           DO YOU SEE WHERE MR. BALWANI -- AND THESE MESSAGES ARE

12:46PM 22      FROM NOVEMBER 19TH, 2014?

12:46PM 23      A.   YES.

12:46PM 24      Q.   AND THIS IS ROUGHLY THE SAME TIME PERIOD IN THE CONTEXT OF

12:46PM 25      THE MESSAGES THAT WE WERE JUST LOOKING AT?

12:46PM  1    A.   I THINK SO.

12:46PM  2    Q.   AND HE WROTE TO YOU, "WE NEED CALL CENTER MANAGER, NEW

12:46PM  3    CALL CENTER TEAM, GET RECURRENT CREW OUT OF DOCS FACING

12:47PM  4    COMMUNICATIONS."

12:47PM  5         DO YOU SEE THAT LANGUAGE?

12:47PM  6    A.   I DO.

12:47PM  7    Q.   HE WROTE, "FUNDAMENTALLY WE NEED TO STOP FIGHTING FIRES BY

12:47PM  8    NOT CREATING THEM."

12:47PM  9         DO YOU SEE THAT?

12:47PM  10   A.   I DO.

12:47PM  11   Q.   AND YOUR RESPONSE WAS, "YES"?

12:47PM  12   A.   YES.

12:47PM  13   Q.   "CALL CENTER, TECH SUPPORT, EVERYTHING.

12:47PM  14        "REBUILD.

12:47PM  15        "NEW LAB DIRECTORS, LAB MANAGER LIKE TRACY."

12:47PM  16        DO YOU SEE THAT LANGUAGE?

12:47PM  17   A.   I DO.

12:47PM  18   Q.   AND THE NEXT TEXT, "18C."  WHAT IS 18C A REFERENCE TO?

12:47PM  19   A.   I DON'T KNOW.

12:47PM  20   Q.   BUT YOU KNOW THAT CTN IS THE NANOTAINER?

12:47PM  21   A.   I DO.

12:47PM  22   Q.   AND TIP COATING, IS THAT A REFERENCE TO THE TIP IN THE

12:47PM  23   EITHER TECAN OR THE EDISON DEVICE?

12:47PM  24   A.   IT'S THE TIP IN THE EDISON OR THE MINILAB DEVICE, YES.

12:47PM  25   Q.   AND YOU WROTE, "FUNDAMENTALLY, WE NEED TO STOP FIGHTING

12:48PM  1      FIRES BY NOT CREATING THEM."

12:48PM  2          DID I READ THAT CORRECTLY?

12:48PM  3      A.   YES.

12:48PM  4      Q.   YOU WROTE, "NEED TO FIX ROOT CAUSE HERE"?

12:48PM  5      A.   YES.

12:48PM  6      Q.   YOU'RE AGREEING WITH MR. BALWANI?

12:48PM  7      A.   I'M REPEATING BACK TO HIM WHAT HE SAID TO ME.

12:48PM  8      Q.   OKAY.  WELL, YOUR WORDS ARE "YES" AND "EXACTLY."

12:48PM  9          AM I RIGHT?

12:48PM  10     A.   YES.

12:48PM  11     Q.   YOUR WORDS IN THE MOMENT?

12:48PM  12     A.   YES.

12:48PM  13     Q.   LET'S LOOK AT PAGE 25, PLEASE.

12:48PM  14          DO YOU SEE WHERE MR. BALWANI WROTE, "NEED CTN FIXED.  OUR

12:48PM  15     ROOT CAUSE OF ISSUES"?

12:48PM  16     A.   I DO.

12:48PM  17     Q.   AND CTN AGAIN IS A REFERENCE TO THE NANOTAINER?

12:48PM  18     A.   IT IS.

12:48PM  19     Q.   OKAY.  LET'S GO TO THE NEXT PAGE, PLEASE.

12:49PM  20          SO, MS. HOLMES, THE DATE OF THESE EMAILS OR TEXTS ARE

12:49PM  21     NOVEMBER 27TH, 2014, ROUGHLY TWO WEEKS FROM THE EXCHANGES THAT

12:49PM  22     WE JUST LOOKED AT.

12:49PM  23          AM I RIGHT ABOUT THAT?

12:49PM  24     A.   OKAY.  YES.

12:49PM  25     Q.   AND IN THIS TIME PERIOD WHERE MR. BALWANI IS RAISING

12:49PM 1    ISSUES ABOUT WHAT HE'S SEEING IN THE LAB IN THIS TIME PERIOD

12:49PM 2    WHEN DR. ROSENDORFF IS LEAVING, YOU'RE ALSO RAISING MONEY; IS

12:49PM 3    THAT CORRECT?

12:49PM 4    A.   YES.

12:49PM 5    Q.   AND WE KNOW THAT BECAUSE YOU WRITE HERE, IN RESPONSE TO

12:49PM 6    MR. BALWANI'S TEXT, "WE NEED TO LOCK ON A BILLION OR MORE NOW

12:50PM 7    SO WE HAVE LEVERAGE OVER BOTH.  AND TIME TO OPERATIONALIZE

12:50PM 8    NORMANDY AND THEN DAY."

12:50PM 9        DO YOU SEE THAT?

12:50PM 10   A.   I DO.

12:50PM 11   Q.   AND THEN HE CORRECTS HIMSELF LATER AND SAID "DDAY."

12:50PM 12       DO YOU SEE THAT?

12:50PM 13   A.   I DO.

12:50PM 14   Q.   AND YOU HAD REFERENCED D DAY INTERNALLY AS WHEN THERANOS

12:50PM 15   WOULD DO PHASE II?

12:50PM 16   A.   YES.

12:50PM 17   Q.   AND MR. BALWANI IS SAYING THE BILLION DOLLARS OR MORE

12:50PM 18   WOULD GIVE THEM TIME TO OPERATIONALIZE NORMANDY; CORRECT?

12:50PM 19   A.   UM, I THINK HE'S SAYING THAT WE ALSO NEED TIME TO

12:50PM 20   OPERATIONALIZE NORMANDY.

12:50PM 21   Q.   OKAY.  NORMANDY IS THE CLIA LAB WHERE YOU'RE DOING THE

12:50PM 22   TESTING ON THE EDISON AND THE MODIFIED SIEMENS MACHINES?

12:50PM 23   A.   EXACTLY.

12:50PM 24   Q.   AND YOU REPLY, "DRIVING HOME.

12:50PM 25       "AMAZING MEETING.

12:50PM   1        "HE IS IN."

12:50PM   2        IS THAT A REFERENCE TO RUPERT MURDOCH?

12:51PM   3   A.   I'M NOT SURE.

12:51PM   4   Q.   WELL, LET'S LOOK AT THE NEXT PAGE.

12:51PM   5        DO YOU SEE WHERE MR. BALWANI WROTE, "AWESOME.  I KNEW

12:51PM   6   ALREADY"?

12:51PM   7   A.   I DO.

12:51PM   8   Q.   DO YOU SEE WHERE HE WROTE, "WE NEED LEVERAGE ALWAYS"?

12:51PM   9   A.   I DO.

12:51PM   10  Q.   AND DO YOU SEE WHERE YOU WROTE, "RUPERT SAID SAME THING AS

12:51PM   11  YOU AND I TALKED ABOUT ON SEPARATE R&D BUCKET"?

12:51PM   12  A.   I DO.

12:51PM   13  Q.   DOES THIS REFRESH YOUR MEMORY THAT THE "HE IS IN" IS A

12:51PM   14  REFERENCE TO RUPERT MURDOCH?

12:51PM   15  A.   IT DOESN'T.

12:51PM   16  Q.   YOU AGREE WITH ME THAT THIS IS ALL IN THE CONTEXT OF A

12:51PM   17  TEXT EXCHANGE?

12:51PM   18  A.   I THINK SO, YES.

12:51PM   19  Q.   LET'S LOOK AT PAGE 38, PLEASE.

12:52PM   20       DO YOU SEE THAT THIS IS ANOTHER TEXT EXCHANGE BETWEEN YOU

12:52PM   21  AND MR. BALWANI IN THE MARCH 2015 TIME PERIOD?

12:52PM   22  A.   YES.

12:52PM   23  Q.   AND HE'S WRITING TO YOU, "I AM BLOCKING EVERYONE INVOLVED

12:52PM   24  WITH DEVICE IN SOFTWARE ALL NEXT WEEK AND I WILL ONLY DO THIS

12:52PM   25  ALSO.  NOTHING ELSE.  THIS IS THE ONLY WAY TO GET THIS DONE."

| | | |
|---|---|---|
| 12:52PM | 1 | DO YOU SEE THAT LANGUAGE? |
| 12:52PM | 2 | A.   I DO. |
| 12:52PM | 3 | Q.   AND MR. BALWANI IS NOT HIDING ANYTHING FROM YOU HERE, IS |
| 12:52PM | 4 | HE? |
| 12:52PM | 5 | A.   I DON'T KNOW WHAT HE'S TALKING ABOUT. |
| 12:52PM | 6 | Q.   OKAY.  HE'S NOT CONCEALING WITH YOU THE NEED TO GET DEVICE |
| 12:52PM | 7 | AND SOFTWARE NEXT WEEK AND TO MAKE PROGRESS ON THE PRODUCT, IS |
| 12:52PM | 8 | HE? |
| 12:52PM | 9 | A.   NO. |
| 12:52PM | 10 | Q.   OKAY.  AND IF WE CAN GO BACK, PLEASE, MS. HOLLIMAN, TO |
| 12:53PM | 11 | PAGE 23.  ONE MORE PAGE.  ONE MORE PAGE, PLEASE.  ONE MORE. |
| 12:53PM | 12 | ONE MORE.  OKAY.  ONE MORE, PLEASE. |
| 12:53PM | 13 | LET ME DRAW YOUR ATTENTION, PLEASE, TO THIS TEXT EXCHANGE |
| 12:53PM | 14 | FROM THE NOVEMBER 2013 TIME PERIOD, MS. HOLMES. |
| 12:54PM | 15 | DO YOU SEE WHERE YOU WROTE, "LET'S BUILD THE TRUE AMERICAN |
| 12:54PM | 16 | EMPIRE." |
| 12:54PM | 17 | OR EXCUSE ME, MR. BALWANI WROTE, "THEN LET'S BUILD THE |
| 12:54PM | 18 | TRUE AMERICAN EMPIRE.  A MONOPOLY.  OUR OBLIGATION TO U.S.A. |
| 12:54PM | 19 | "THAT'S WHAT WE'RE DOING." |
| 12:54PM | 20 | A.   YES. |
| 12:54PM | 21 | Q.   AND THIS IS AN EXPRESSION FOR WHAT YOU WANTED TO DO WITH |
| 12:54PM | 22 | THERANOS? |
| 12:54PM | 23 | A.   YES. |
| 12:54PM | 24 | Q.   ISN'T IT TRUE, MS. HOLMES, THAT YOU AND MR. BALWANI SPOKE |
| 12:54PM | 25 | OPENLY AT INSPECTIONS WITH GOVERNMENT REGULATORS ABOUT WHAT |

12:54PM   1    THEY WERE FINDING.

12:54PM   2    A.   YES.

12:54PM   3    Q.   LET ME DRAW YOUR ATTENTION TO PAGE 97 OF 387D.

12:55PM   4         DO YOU SEE THE DATE OF THESE TEXT EXCHANGES IS

12:55PM   5    AUGUST 28TH, 2015?

12:55PM   6    A.   I DO.

12:55PM   7    Q.   OKAY.  AND YOU RECALL THAT THE FDA CONDUCTED AN INSPECTION

12:55PM   8    OF THERANOS IN OR AROUND THAT TIME PERIOD?

12:55PM   9    A.   YES.

12:55PM   10   Q.   THAT INSPECTION WAS UNEXPECTED?

12:55PM   11   A.   YES.

12:55PM   12   Q.   THEY SHOWED UP UNANNOUNCED?

12:55PM   13   A.   THAT'S RIGHT.

12:55PM   14   Q.   THEY DIDN'T CALL BEFORE THEY CAME?

12:55PM   15   A.   THAT'S RIGHT.

12:55PM   16   Q.   THEY WERE THERE IN ARIZONA AND CALIFORNIA?

12:55PM   17   A.   YES.

12:55PM   18   Q.   AND THEY WERE ASKING QUESTIONS ABOUT PRODUCTION OF THE

12:55PM   19   NANOTAINER AND THE USE OF THE NANOTAINER IN CONNECTION WITH

12:55PM   20   YOUR LDT'S?

12:55PM   21   A.   THEY WERE ASKING QUESTIONS ABOUT OUR QUALITY SYSTEM FOR

12:55PM   22   THE NANOTAINER.

12:55PM   23   Q.   OKAY.  AND WHILE THIS WAS GOING ON, YOU WERE TEXTING BACK

12:55PM   24   AND FORTH TO MR. BALWANI ABOUT WHAT HE WAS LEARNING AND WHAT

12:55PM   25   YOU WERE LEARNING?

12:55PM  1    A.   YES.

12:55PM  2    Q.   YOU SPOKE OPENLY ABOUT THOSE THINGS?

12:55PM  3    A.   YES.

12:55PM  4    Q.   HE DIDN'T HIDE FROM YOU WHAT THE FDA WAS SAYING TO HIM;

12:56PM  5    CORRECT?

12:56PM  6    A.   I DON'T THINK SO.

12:56PM  7    Q.   AND YOU DIDN'T HIDE FROM HIM WHAT THE FDA WAS SAYING TO

12:56PM  8    YOU?

12:56PM  9    A.   I DID NOT.

12:56PM  10   Q.   OKAY.  UP AT THE TOP HE WROTE, "THEY ARE ASKING IF IN OUR

12:56PM  11   IDEAL WORLD FOR CTN 510K IF WE USED OUR LDT."

12:56PM  12        WHAT IS A 510K?

12:56PM  13   A.   AN FDA APPROVAL.

12:56PM  14   Q.   "LDT AS METHOD VERSUS PREDICATE WE WOULD LIKE THAT AND NOT

12:56PM  15   HAVE TO DO WHAT THEY HAVE ASKED US TO DO (POOL 8 CTN'S AND RUN

12:56PM  16   ON ADVIA INSTEAD OF JUST 1-2 CTN AND RUN ON CLIA AS LDT)."

12:56PM  17        DO YOU SEE THAT LANGUAGE?

12:56PM  18   A.   I DO.

12:56PM  19   Q.   AND YOU AND HE ARE SPEAKING OPENLY ABOUT WHAT THE FDA IS

12:56PM  20   ASKING FOR AND WHAT THERANOS MIGHT BE ABLE TO PROVIDE?

12:56PM  21   A.   YES.

12:56PM  22   Q.   GO TO THE TOP, MS. HOLLIMAN.

12:57PM  23        IS THIS ANOTHER TEXT IN THE CONTEXT OF THE FDA

12:57PM  24   CONVERSATION, MS. HOLMES?

12:57PM  25   A.   YES.

12:57PM   1    Q.   LET'S LOOK AT THE NEXT PAGE, PLEASE.

12:57PM   2         DO YOU SEE WHERE YOU WROTE, "WE ARE PREPARING FOR DAN TO

12:57PM   3    CALL SOMEONE HE KNOWS AT THE TOP OF FDA BECAUSE HE KNOWS HIM.

12:57PM   4    MAY RUFFLE FEATHERS BUT WE THINK HE WILL GET THAT 483 WILL BE

12:57PM   5    BAD FOR FDA ARE ALSO DRAFTING EMAIL TO ALBERTO TO LET HIM KNOW

12:57PM   6    WE'RE FOLLOWING UP WITH COUNSEL ON THIS (LEAVE DOOR OPEN FOR

12:57PM   7    DAN)."

12:58PM   8         THOSE ARE YOUR WORDS; CORRECT?

12:58PM   9    A.   YES.

12:58PM  10    Q.   DAN IS A REFERENCE TO YOUR LAWYER?

12:58PM  11    A.   I THINK SO.

12:58PM  12    Q.   A LAWYER IN WASHINGTON, D.C. THAT YOU HIRED TO INTERACT

12:58PM  13    WITH THE FDA?

12:58PM  14    A.   YES.

12:58PM  15    Q.   OKAY.  AND ALBERTO IS A REFERENCE TO ALBERTO GUTIERREZ?

12:58PM  16    A.   YES.

12:58PM  17    Q.   HE'S A SENIOR OFFICIAL WITHIN THE FDA WHO HAD A HAND IN

12:58PM  18    WHETHER THERANOS TECHNOLOGY WOULD BE FDA APPROVED?

12:58PM  19    A.   HE DID.

12:58PM  20    Q.   AND YOU'RE EXPRESSING A VIEW HERE THAT DAN CALLING AT THE

12:58PM  21    TOP OF THE FDA MIGHT RUFFLE FEATHERS?

12:58PM  22    A.   YES.

12:58PM  23    Q.   AND MR. BALWANI SAYS, "I THINK THIS IS NOW OUTRAGEOUS WHAT

12:58PM  24    THEY ARE DOING."

12:58PM  25         YOU WROTE BACK "AGREE."

12:58PM  1          THOSE ARE YOUR WORDS?

12:58PM  2     A.   YES.

12:58PM  3     Q.   AND THAT'S A REFERENCE TO THE FDA INSPECTION THAT IS GOING

12:58PM  4     ON?

12:58PM  5     A.   I THINK IT'S A REFERENCE TO THE REGULATION OF LDT'S IN A

12:58PM  6     WAY THAT WAS DIFFERENT THAN THE POLICY.

12:58PM  7     Q.   DIFFERENT FROM THE POLICY AS YOU UNDERSTOOD IT?

12:59PM  8     A.   YEAH.

12:59PM  9     Q.   DOWN AT THE BOTTOM MR. BALWANI SAYS, "WE NEED TO CHANGE

12:59PM 10     .COM PROVIDER SECTION.  IT TALKS ABOUT MICRO SAMPLES AND

12:59PM 11     REFLECT TESTING ON MICRO SAMPLES."

12:59PM 12          AND YOU WROTE BACK WITH A QUESTION, "IS THAT FROM AUDIT?"

12:59PM 13          DO YOU SEE THAT?

12:59PM 14     A.   I DO.

12:59PM 15     Q.   THAT'S A REFERENCE TO THE ONGOING FDA INSPECTION?

12:59PM 16     A.   YES.

12:59PM 17     Q.   OKAY.  AND MR. BALWANI IS EXPRESSING CONCERN HERE THAT YOU

12:59PM 18     MIGHT NEED TO CHANGE SOME OF THE LANGUAGE ON THE WEBSITE IN

12:59PM 19     LIGHT OF WHAT IS GOING ON WITH THE FDA OR POSSIBLE CONCERNS

12:59PM 20     ABOUT ITS ACCURACY?

12:59PM 21     A.   UM, HE SAYS HE'S JUST SAYING IT'S A DISASTER, IT'S NOT

12:59PM 22     FROM THE FDA AUDIT.

12:59PM 23     Q.   OKAY.  BUT HE'S NOT HIDING THAT FROM YOU HERE?

12:59PM 24     A.   NO.

12:59PM 25     Q.   HE'S SPEAKING WITH YOU OPENLY ABOUT THAT?

| | | |
|---|---|---|
| 12:59PM | 1 | A.   HE IS. |
| 12:59PM | 2 | Q.   LET'S GO TO THE NEXT PAGE, PLEASE. |
| 01:00PM | 3 | DO YOU SEE WHERE YOU WROTE, "DANIEL INCLUDED ADVIA NUMBERS |
| 01:00PM | 4 | OF TESTS RUN SINCE 2013, BUT TECHNICALLY THOSE WERE THE |
| 01:00PM | 5 | DIFFERENT LDT'S THAN THE ADVIA ONES RUN NOW.  LET ME KNOW YOUR |
| 01:00PM | 6 | THOUGHTS ON WHETHER YOU'D USE THE BIGGER NUMBER." |
| 01:00PM | 7 | DO YOU SEE THAT LANGUAGE? |
| 01:00PM | 8 | A.   YES. |
| 01:00PM | 9 | Q.   THE DANIEL THERE WAS A REFERENCE TO DANIEL YOUNG? |
| 01:00PM | 10 | A.   YES. |
| 01:00PM | 11 | Q.   HE WAS AIDING YOU IN GATHERING DOCUMENTS FOR THE FDA? |
| 01:00PM | 12 | A.   YES. |
| 01:00PM | 13 | Q.   AND YOU'RE SPEAKING HERE OPENLY WITH MR. BALWANI ABOUT HOW |
| 01:00PM | 14 | TO RESPOND TO THE FDA? |
| 01:00PM | 15 | A.   YES. |
| 01:00PM | 16 | Q.   LET'S GO TO THE NEXT PAGE, PLEASE. |
| 01:00PM | 17 | DO YOU SEE WHERE MR. BALWANI WROTE, "WE SHOULD DISCUSS |
| 01:01PM | 18 | TONIGHT TURNING CTN OFF"? |
| 01:01PM | 19 | A.   I DO. |
| 01:01PM | 20 | Q.   THAT'S A REFERENCE TO THE NANOTAINER? |
| 01:01PM | 21 | A.   YES. |
| 01:01PM | 22 | Q.   AND YOU HAD BEEN THINKING ABOUT DOING THAT, TOO? |
| 01:01PM | 23 | A.   I SEE THAT. |
| 01:01PM | 24 | Q.   DO YOU HAVE A MEMORY OF THAT? |
| 01:01PM | 25 | A.   NO. |

01:01PM   1    Q.   OKAY.  AND THE REASON YOU WANTED TO DO THAT WAS BECAUSE

01:01PM   2    THE FDA WAS SUGGESTING TO YOU THAT THE CTN NEEDED TO BE FDA

01:01PM   3    APPROVED; IS THAT CORRECT?

01:01PM   4    A.   NO.

01:01PM   5    Q.   WHAT WAS YOUR UNDERSTANDING?

01:01PM   6    A.   I UNDERSTOOD THAT WE WERE USING THE CTN AS PART OF OUR LDT

01:01PM   7    CONSISTENT WITH THE FDA'S GUIDANCE ON LDT'S, AND THAT AS SUCH

01:01PM   8    WE WOULD NOT NEED TO BE COMPLIANT WITH CERTAIN FDA QUALITY

01:01PM   9    STANDARDS UNTIL WE GOT APPROVAL, AND WE GOT DIFFERENT GUIDANCE

01:01PM  10    IN THIS INSPECTION.

01:01PM  11    Q.   AND I THINK WE'RE TALKING PAST EACH OTHER, BUT YOU'RE

01:01PM  12    EXPRESSING NOW IN THE SEPTEMBER 2015 TIME PERIOD THE NEED TO

01:02PM  13    STOP USING THE NANOTAINER BECAUSE OF FDA CONCERNS?

01:02PM  14    A.   YES.

01:02PM  15    Q.   AND YOU ULTIMATELY DID THAT?

01:02PM  16    A.   YES.

01:02PM  17    Q.   YOU ALSO SPOKE TO MR. BALWANI ABOUT WHAT WAS GOING ON

01:02PM  18    DURING THE CMS INSPECTION; ISN'T THAT CORRECT?

01:02PM  19    A.   I DID.

01:02PM  20    Q.   OKAY.  LET ME DRAW YOUR ATTENTION, PLEASE, TO 106.

01:02PM  21         DO YOU SEE THE DATE OF SEPTEMBER 22ND, 2015?

01:02PM  22    A.   I DO.

01:02PM  23    Q.   DO YOU SEE WHERE MR. BALWANI WROTE, "VERY HOSTILE SO FAR.

01:02PM  24    THEY HAVE COMPLAINTS"?

01:03PM  25    A.   I DO.

01:03PM   1    Q.   AND THAT'S A REFERENCE TO THE CMS INSPECTORS?

01:03PM   2    A.   I THINK SO.

01:03PM   3    Q.   "THEY SHOULD KNOW THE ENTIRE LAB INDUSTRY IS AND WILL BE

01:03PM   4    SEEDING EVERYONE THEY CAN TO GET AT TO FILE COMPLAINTS."

01:03PM   5         IS THAT HOW YOU RESPONDED?

01:03PM   6    A.   YES.

01:03PM   7    Q.   AND THEN YOU WROTE, "I'M SURE TYLER IS ONE THEY PROB GOT

01:03PM   8    FROM NY.  ADAM IS THE OTHER."

01:03PM   9         IS THAT A REFERENCE TO DR. ROSENDORFF?

01:03PM   10   A.   I THINK SO.

01:03PM   11   Q.   OKAY.  YOU KNEW ENOUGH IN THIS SEPTEMBER 2015 TIME PERIOD

01:03PM   12   TO THINK THAT DR. ROSENDORFF WAS ONE OF MR. CARREYROU'S SOURCES

01:03PM   13   AND A POSSIBLE REASON FOR THE CMS INSPECTION?

01:03PM   14   A.   I DID.

01:03PM   15   Q.   OKAY.  "JC HIMSELF PLAYING LITERALLY OFF LAB COMMENTS IS

01:03PM   16   LIKELY THE OTHER."

01:03PM   17        JC IS A REFERENCE TO JOHN CARREYROU; CORRECT?

01:03PM   18   A.   I THINK SO, YES.

01:03PM   19   Q.   AND THEN YOU WROTE HMFR; CORRECT?

01:03PM   20   A.   I DID.

01:04PM   21   Q.   AND THAT'S AN ACRONYM FOR A RELIGIOUS TERM THAT YOU WOULD

01:04PM   22   YOU USE WITH MR. BALWANI?

01:04PM   23   A.   IT'S AN ACRONYM FOR A PRAYER, YES.

01:04PM   24   Q.   OKAY.  EXPRESSING GRATITUDE TO GOD?

01:04PM   25   A.   YES.

HOLMES CROSS BY MR. LEACH (RES.)                    8085

01:04PM  1    Q.   AND YOU WROTE, "PRAYING LITERALLY NONSTOP"?

01:04PM  2    A.   YES.

01:04PM  3    Q.   AND THAT'S A REFERENCE TO THE CMS INSPECTION?

01:04PM  4    A.   YES.  I DON'T KNOW THAT IT'S A REFERENCE TO THE CMS

01:04PM  5    INSPECTION.  IT'S SAYING THAT I'M PRAYING.

01:04PM  6    Q.   "DO YOU WANT ME TO STEP OUT OF FDA CALL?

01:04PM  7         "NO."

01:04PM  8         DO YOU SEE THAT LANGUAGE?

01:04PM  9    A.   I DO.

01:04PM  10   Q.   IN THIS TIME PERIOD, YOU WERE ALSO DEALING WITH THE FDA?

01:04PM  11   A.   I WAS.

01:04PM  12   Q.   OKAY.  LET'S LOOK AT THE NEXT PAGE.

01:05PM  13        DO YOU SEE WHERE MR. BALWANI WROTE, "OUR VALIDATION

01:05PM  14   REPORTS ARE TERRIBLE.  REALLY PAINFUL GOING THRU THIS PROCESS.

01:05PM  15   SAME ISSUES FDA POINTED OUT."

01:05PM  16        DO YOU SEE THAT LANGUAGE?

01:05PM  17   A.   I DO.

01:05PM  18   Q.   HE'S BEING OPEN WITH YOU ABOUT WHAT CMS IS FINDING IN THIS

01:05PM  19   TIME PERIOD?

01:05PM  20   A.   YES.

01:05PM  21   Q.   HE'S NOT HIDING ANYTHING FROM YOU HERE?

01:05PM  22   A.   NO.  I'M NOT SURE IF THIS IS WHAT CMS IS FINDING OR WHAT

01:05PM  23   HE'S SAYING TO ME.

01:05PM  24   Q.   OKAY.  HE'S REPORTING TO YOU WHAT HE'S SEEING FROM CMS?

01:05PM  25   A.   I THINK HE'S REPORTING TO ME HIS OPINION.

01:05PM  1    Q.   OKAY.  AND YOU TOLD US YESTERDAY THAT AT SOME POINT IN

01:05PM  2    JANUARY OF 2016, YOU REALIZED THE GRAVITY OF THE CMS INSPECTION

01:05PM  3    AND FORCED MR. BALWANI OUT?

01:05PM  4    A.   I REALIZED THE GRAVITY OF THE CMS INSPECTION IN JANUARY,

01:05PM  5    OR AROUND JANUARY OF 2016, STARTING IN NOVEMBER OF 2015, AND

01:05PM  6    MR. BALWANI LEFT THE COMPANY IN MAY.

01:05PM  7    Q.   OKAY.  YOU PUSHED HIM OUT; ISN'T THAT FAIR?

01:06PM  8    A.   I ASKED HIM TO LEAVE, YES.

01:06PM  9    Q.   OKAY.  YOU MADE THAT CHOICE TO GET HIM OUT OF THE COMPANY?

01:06PM  10   A.   I DID.

01:06PM  11   Q.   IN 2016 AFTER GETTING THE CMS REPORT?

01:06PM  12   A.   YES.

01:06PM  13   Q.   OKAY.  AND MR. BALWANI IN THIS SEPTEMBER TIME PERIOD IS

01:06PM  14   REPORTING TO YOU HIS OPINIONS ABOUT WHAT CMS IS FINDING HERE?

01:06PM  15   A.   HE IS.

01:06PM  16   Q.   OKAY.

01:06PM  17   A.   AGAIN, I DON'T KNOW THAT THIS IS WHAT CMS IS FINDING, BUT

01:06PM  18   HE'S REPORTING TO ME HIS OPINIONS.

01:06PM  19   Q.   OKAY.  LET'S GO DOWN, PLEASE.

01:06PM  20        DO YOU SEE WHERE YOU WROTE, "WILL MAKE SURE ALL TEAMS ARE

01:06PM  21   REVIEWING REPORTS.  LET ME KNOW ANYTHING ELSE CAN DO TO

01:06PM  22   SUPPORT."

01:06PM  23        IS THAT A REFERENCE TO YOUR EXPRESSION OF WILLINGNESS TO

01:06PM  24   BRING RESOURCES TO THE CMS INSPECTION?

01:06PM  25   A.   IT IS.

01:07PM   1     Q.   AND BALWANI, MR. BALWANI WRITES BACK, "GOING BAD SO FAR.

01:07PM   2     PRAY.

01:07PM   3          "DANIEL HAS NOTHING READY.

01:07PM   4          "TOLD ME EVERYTHING IS IN THE BINDERS.

01:07PM   5          "NOT THERE."

01:07PM   6          AND WHAT WAS YOUR RESPONSE, MS. HOLMES?

01:07PM   7     A.   "PRAYING."

01:07PM   8     Q.   YOU THEN WROTE, "AT MY DESK.

01:07PM   9          "TELL ME HOW I CAN HELP."

01:07PM  10     A.   YES.

01:07PM  11     Q.   THE REFERENCE HERE IS TO THE CMS INSPECTION; CORRECT?

01:07PM  12     A.   YES.

01:07PM  13     Q.   AND DOES THIS REFRESH YOUR RECOLLECTION THAT THE EARLY ONE

01:07PM  14     IS IN RELATION TO THE CMS INSPECTION?

01:07PM  15     A.   IT DOESN'T.

01:07PM  16     Q.   OKAY.  MR. BALWANI WAS ALSO OPEN WITH YOU ABOUT WHAT WAS

01:07PM  17     HAPPENING WITH WALGREENS; ISN'T THAT RIGHT?

01:07PM  18     A.   I THINK SO.

01:07PM  19     Q.   OKAY.  LET'S LOOK AT SOME OF THAT.

01:07PM  20          IF WE CAN GO TO PAGE 39.

01:08PM  21          DO YOU SEE THE DATE OF APRIL 7TH, 2015, MS. HOLMES?

01:08PM  22     A.   I DO.

01:08PM  23     Q.   AND YOU'RE WRITING TO MR. BALWANI, "DEEP CONCERN ABOUT

01:08PM  24     SENSE WE'RE GETTING THAT TRYING TO MANIPULATE TO FAIL.  CAN

01:08PM  25     ASSURE NOT THE CASE.  FIX STORES SUCCEED.  THERANOS OFFERED

01:08PM  1    PAY."

01:08PM  2         YOU'RE TALKING ABOUT A CONVERSATION RELATING TO WALGREENS

01:08PM  3    HERE, AREN'T YOU?

01:08PM  4    A.   I'M NOT SURE.

01:08PM  5    Q.   DID YOU HAVE STORES IN ANY OTHER PLACE IN APRIL OF 2015?

01:08PM  6    A.   WE DID NOT.

01:08PM  7    Q.   OKAY.  "ANYTIME ASK DON'T RESPOND.  SIGNAGE.  LOGOS.

01:08PM  8    CAN'T FIND.  CONFUSE HCC."

01:08PM  9         YOU DIDN'T HAVE SIGNAGE AND LOGOS ANYWHERE ELSE OTHER THAN

01:09PM 10    WALGREENS STORES, DID YOU?

01:09PM 11    A.   THAT'S RIGHT.

01:09PM 12    Q.   "TEAM NOT MAKING ANY PROGRESS.  DELIBERATE FAIL.  NOT --

01:09PM 13    DON'T NEED EXCLUSIVITY AZ.

01:09PM 14         "CAN'T SPEND DOLLARS ON MARKETING DON'T BUILD OUTRIGHT.

01:09PM 15    PATIENTS COMPLAIN."

01:09PM 16         DO YOU SEE THAT?

01:09PM 17    A.   YES.

01:09PM 18    Q.   DOES THIS REFRESH YOUR RECOLLECTION THAT YOU'RE TALKING

01:09PM 19    ABOUT WALGREENS HERE WITH MR. BALWANI?

01:09PM 20    A.   NO.

01:09PM 21    Q.   LET'S LOOK AT THE NEXT PAGE, PLEASE.

01:09PM 22         DO YOU SEE THE DATE OF APRIL 9TH, 2015?

01:09PM 23    A.   I DO.

01:09PM 24    Q.   AND MR. BALWANI WRITES, "GOING THRU CVS CONTRACT.  WE

01:09PM 25    CAN'T WORK WITH WAG OR CVS.  BOTH ARE SAME."

01:09PM  1              DO YOU SEE THAT LANGUAGE?

01:09PM  2     A.   I DO.

01:09PM  3     Q.   HE'S BEING OPEN WITH YOU ABOUT HIS VIEWS OF WHAT IS

01:10PM  4     POSSIBLE WITH WALGREENS, ISN'T HE?

01:10PM  5     A.   I THINK HE'S EXPRESSING HIS FRUSTRATIONS WITH WALGREENS

01:10PM  6     AND CVS.

01:10PM  7     Q.   OKAY.  BUT HE'S NOT HIDING THAT FROM YOU HERE, IS HE?

01:10PM  8     A.   NO.

01:10PM  9     Q.   HE'S NOT CONCEALING FROM YOU WHAT IS GOING ON WITH

01:10PM  10    WALGREENS?

01:10PM  11    A.   I DON'T THINK SO.

01:10PM  12    Q.   OKAY.  LET ME NEXT DRAW YOUR ATTENTION TO EXHIBIT 5653.

01:11PM  13    A.   I DON'T THINK I HAVE THAT ONE.

01:11PM  14              MR. LEACH:  MAY I HAVE A MOMENT, YOUR HONOR?

01:11PM  15              THE COURT:  YES.

01:11PM  16         (PAUSE IN PROCEEDINGS.)

01:11PM  17              THE COURT:  IS THIS IN VOLUME 2 OF YOUR BINDERS?

01:11PM  18              MR. LEACH:  IT IS, YOUR HONOR, BUT I'M NOT PREPARED

01:11PM  19    TO USE THE REMAINDER OF THE DOCUMENTS.

01:12PM  20         (PAUSE IN PROCEEDINGS.)

01:12PM  21              MR. LEACH:  MAY I APPROACH, YOUR HONOR?

01:12PM  22              THE COURT:  YES.

01:12PM  23    BY MR. LEACH:

01:12PM  24    Q.   (HANDING.)

01:12PM  25              THERE YOU GO.

01:12PM 1      A.   THANK YOU.

01:12PM 2      Q.   YOU'RE WELCOME.

01:12PM 3           DO YOU SEE YOUR NAME AT THE TOP OF THIS EMAIL, MS. HOLMES?

01:12PM 4      A.   I DO.

01:12PM 5      Q.   AND DO YOU SEE MR. BALWANI'S NAME IN THE FROM LINE?

01:12PM 6      A.   I DO.

01:12PM 7      Q.   AND THIS IS DATED AUGUST 15TH, 2014?

01:12PM 8      A.   YES.

01:12PM 9      Q.   AND DOES THIS EMAIL RELATE TO THOUGHTS AND GOALS RELATING

01:12PM 10     TO WALGREENS?

01:12PM 11     A.   IS IT OKAY IF I READ IT REALLY FAST?

01:12PM 12     Q.   YES, PLEASE.

01:12PM 13     A.   OKAY.

01:12PM 14          (PAUSE IN PROCEEDINGS.)

01:12PM 15              THE WITNESS:  YES.

01:12PM 16              MR. LEACH:  YOUR HONOR, I MOVE THE ADMISSION OF

01:12PM 17     5663.

01:13PM 18              THE COURT:  5663?

01:13PM 19              MR. LEACH:  YES.

01:13PM 20              MR. DOWNEY:  NO OBJECTION.

01:13PM 21              THE COURT:  THAT'S ADMITTED, 5663.

01:13PM 22          (GOVERNMENT'S EXHIBIT 5663 WAS RECEIVED IN EVIDENCE.)

01:13PM 23              MR. LEACH:  I THINK THAT'S THE WRONG DOCUMENT,

01:13PM 24     MS. HOLLIMAN.

01:13PM 25              THERE WE GO.

01:13PM   1      Q.   LET ME DRAW YOUR --

01:13PM   2               THE CLERK:  EXCUSE ME.

01:13PM   3               THE COURT:  5663, NOT 5653; IS THAT CORRECT?

01:13PM   4               MR. LEACH:  I THINK WE MAY HAVE A NUMBERING ISSUE

01:13PM   5      WITH OUR ELECTRONIC COPY.

01:13PM   6           YOUR HONOR, I'LL DISPLAY IT ON THE ELMO.

01:13PM   7               THE COURT:  OKAY.

01:13PM   8               MR. LEACH:  OR MAY I USE?

01:13PM   9               THE COURT:  YES.

01:13PM  10               MR. LEACH:  AND JUST TO BE CLEAR, THE DOCUMENT I

01:13PM  11      MOVED INTO EVIDENCE IS 5663, AND MS. HOLLIMAN HAS THE COPY WITH

01:13PM  12      A DIFFERENT NUMBER THAN WE'RE DISPLAYING.

01:14PM  13               THE COURT:  OKAY.

01:14PM  14               MR. LEACH:  MS. HOLLIMAN, YOU CAN DISPLAY WHAT WE'RE

01:14PM  15      LOOKING AT.

01:14PM  16      Q.   DO YOU SEE AN EMAIL FROM NIMESH JHAVERI DATED AUGUST 15TH,

01:14PM  17      MS. HOLMES?

01:14PM  18      A.   I DO.

01:14PM  19      Q.   AND IF WE SCROLL DOWN TO THE SUBSTANCE OF MR. JHAVERI'S

01:14PM  20      EMAIL, DO YOU SEE WHERE HE'S WRITING, "IT WILL BE IMPORTANT

01:14PM  21      THAT WE DRIVE A SINGLE FOCUS TOGETHER.  THE 2 AREAS WHICH MUST

01:14PM  22      BE FOCUSSED ON ARE:"

01:14PM  23           AND THEN HE WROTE, "PATIENTS PER DAY WITH A 4 PERCENT

01:14PM  24      EXPERIENCE.

01:14PM  25           "VENOUS PERCENT IN THE 10 PERCENT RANGE."

HOLMES CROSS BY MR. LEACH (RES.)                              8092

01:14PM  1        DO YOU SEE THAT?

01:14PM  2   A.   I DO.

01:14PM  3   Q.   AND THEN MR. JHAVERI WROTE, "WE NEED TO HAVE A DOCUMENTED

01:14PM  4   DETAILED PLAN ON BOTH OR IT WILL BE DIFFICULT FOR ME TO

01:14PM  5   CONVINCE EXPANSION BEYOND AZ."

01:14PM  6        DO YOU SEE THAT LANGUAGE?

01:14PM  7   A.   I DO.

01:14PM  8   Q.   AND MR. BALWANI FORWARDS THIS TO YOU; DOESN'T HE?

01:15PM  9   A.   HE DID.

01:15PM 10   Q.   AND HE WROTE, "WE CAN DISCUSS THIS TODAY.  GIVES US HUGE

01:15PM 11   OPENING FOR WHAT WE WANT TO DO."

01:15PM 12        IF WE CAN ZOOM OUT, MS. HOLLIMAN.

01:15PM 13        DO YOU SEE THAT LANGUAGE AT THE TOP, MS. HOLMES?

01:15PM 14   A.   I DO.

01:15PM 15   Q.   AND SO MR. BALWANI IS NOT HIDING FROM YOU INFORMATION THAT

01:15PM 16   HE'S GETTING FROM WALGREENS?

01:15PM 17   A.   NO.

01:15PM 18   Q.   AND HE'S OFFERING TO DISCUSS WHAT HE'S LEARNING FROM

01:15PM 19   WALGREENS WITH YOU THAT DAY?

01:15PM 20   A.   YES.

01:15PM 21   Q.   AND HE'S EXPLAINING THAT THIS MIGHT ALSO GIVE YOU AN

01:15PM 22   OPPORTUNITY TO EXPLORE RELATIONSHIPS WITH OTHER RETAILERS;

01:15PM 23   ISN'T THAT RIGHT?  ISN'T THAT THE OPPORTUNITY THAT HE'S TALKING

01:15PM 24   ABOUT?

01:15PM 25   A.   I THINK HE'S TALKING ABOUT EXPANDING WITH WALGREENS.

01:15PM  1    Q.   OKAY.  EVEN THOUGH HE'S FORWARDING MR. JHAVERI'S

01:15PM  2    COMPLAINTS ABOUT THE PERCENTAGE OF VENOUS DRAWS WITHIN THE

01:16PM  3    STORE?

01:16PM  4    A.   I READ THIS TO SAY THAT IF WE HAD A DETAILED PLAN WITHIN

01:16PM  5    THE NEXT 30 DAYS, THEY COULD MEET WITH MANAGEMENT ABOUT

01:16PM  6    EXPANSION BEYOND ARIZONA.

01:16PM  7    Q.   OKAY.  AND YOU NEVER DID EXPAND BEYOND ARIZONA?

01:16PM  8    A.   WE DID NOT.

01:16PM  9    Q.   OKAY.  WERE THERE TIMES IN YOUR WORKING RELATIONSHIP WITH

01:16PM  10   MR. BALWANI WHERE YOU GAVE HIM DIRECTION ON WHAT TO DO?

01:16PM  11   A.   I'M SURE THERE WAS.

01:16PM  12   Q.   THERE WERE TIMES WHERE YOU TOLD HIM WHAT TO DO?

01:16PM  13   A.   I'M SURE THERE COULD HAVE BEEN.

01:16PM  14   Q.   OKAY.  WELL, LET'S LOOK AT SOME EXAMPLES.

01:16PM  15        AND HE REPORTED DIRECTLY TO YOU; CORRECT?

01:16PM  16   A.   HE DID.

01:16PM  17   Q.   HE WAS THE CHIEF OPERATING OFFICER?

01:16PM  18   A.   YES.

01:16PM  19   Q.   AND THE PRESIDENT?

01:16PM  20   A.   YES.

01:16PM  21   Q.   AND YOU WERE THE CEO?

01:16PM  22   A.   THAT'S RIGHT.

01:16PM  23   Q.   OKAY.  AND HE WAS AN AT WILL EMPLOYEE?

01:16PM  24   A.   HE WAS.

01:16PM  25   Q.   OKAY.  YOU COULD FIRE HIM AT ANY TIME?

01:16PM  1    A.   I COULD.

01:16PM  2    Q.   LET'S LOOK AT EXHIBIT 5629.

01:17PM  3    A.   I DON'T KNOW IF I HAVE THAT ONE HERE.

01:17PM  4         MR. LEACH:  I'M MOVING INTO A SLIGHTLY DIFFERENT

01:17PM  5    TOPIC, YOUR HONOR, IF NOW MIGHT BE A CONVENIENT TIME FOR A

01:17PM  6    BREAK?

01:17PM  7         THE COURT:  DOES THIS WORK FOR A BREAK, FOLKS?

01:17PM  8    MR. DOWNEY, ANY OPPOSITION TO A BREAK NOW?

01:17PM  9         MR. DOWNEY:  NO.

01:17PM  10        THE COURT:  ALL RIGHT.  LET'S TAKE A 30 MINUTE BREAK

01:17PM  11   NOW.

01:17PM  12        (RECESS FROM 1:17 P.M. UNTIL 1:56 P.M.)

01:56PM  13        THE COURT:  ALL RIGHT.  THANK YOU.  WE'RE BACK ON

01:56PM  14   THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT AGAIN.

01:56PM  15   OUR JURY IS PRESENT.

01:56PM  16   MR. LEACH, WOULD YOU LIKE TO CONTINUE?

01:56PM  17        MR. LEACH:  YES.  THANK YOU.

01:56PM  18   Q.   GOOD AFTERNOON, MS. HOLMES.

01:56PM  19   A.   GOOD AFTERNOON.

01:56PM  20   Q.   WOULD YOU AGREE WITH ME THAT THERE WERE ASPECTS OF YOUR

01:56PM  21   BUSINESS RELATIONSHIP WHERE MR. BALWANI DEFERRED TO YOU?

01:56PM  22   A.   I'M SURE THERE WERE.

01:56PM  23   Q.   YOU'RE SURE THAT THERE ARE AREAS WHERE HE DEFERRED TO YOU

01:56PM  24   ON ASPECTS OF THERANOS'S BUSINESS?

01:56PM  25   A.   YES.

01:56PM   1   Q.   AND WOULD ONE OF THOSE AREAS BE SAFEWAY?

01:57PM   2   A.   THAT'S POSSIBLE.

01:57PM   3   Q.   WELL, YOU HAD A VERY CLOSE RELATIONSHIP WITH STEVE BURD,

01:57PM   4   THE CEO OF SAFEWAY?

01:57PM   5   A.   I DID.

01:57PM   6   Q.   AND ON THE THERANOS SIDE, YOU WERE RESPONSIBLE FOR THE

01:57PM   7   SAFEWAY RELATIONSHIP AT LEAST UNTIL MR. BURD LEFT THE COMPANY

01:57PM   8   IN MAY OF 2013?

01:57PM   9   A.   YES.

01:57PM   10   Q.   AND IF THE TWO OF YOU -- IF YOU AND MR. BALWANI DISAGREED

01:57PM   11   ON A MATTER PERTAINING TO SAFEWAY PRIOR TO MAY OF 2013, IT WAS

01:57PM   12   PROBABLY YOU WHO WOULD MAKE THE ULTIMATE DECISION?

01:57PM   13   A.   POTENTIALLY.

01:57PM   14   Q.   WELL, YOU RECALL BEING ASKED THAT QUESTION BEFORE, RIGHT,

01:57PM   15   MS. HOLMES?

01:57PM   16   A.   I DON'T, BUT I'M SURE I HAVE BEEN.

01:57PM   17   Q.   OKAY.  WELL, LET ME DRAW YOUR ATTENTION TO THE RED BINDER.

01:57PM   18   A.   OKAY.

01:57PM   19   Q.   AND IF YOU COULD PLEASE LOOK AT PAGE 5270, AND I WOULD

01:58PM   20   DRAW YOUR ATTENTION TO PAGE 55 OF THE TRANSCRIPT.

01:58PM   21   A.   OKAY.

01:58PM   22        MR. LEACH:  AND, YOUR HONOR, I SEEK PERMISSION TO

01:58PM   23   READ FROM PAGE 55, LINE 20 TO PAGE 56, LINE 4.

01:58PM   24        THE COURT:  YES.

01:58PM   25   BY MR. LEACH:

01:58PM 1    Q.   MS. HOLMES, YOU WERE ASKED THE QUESTION, "SO I THINK WE

01:58PM 2    MENTIONED A NUMBER OF DIFFERENT AREAS OF THE COMPANY, BUT, FOR

01:58PM 3    INSTANCE, ON BUSINESS PARTNERSHIPS, YOU KNOW, WHO WOULD BE THE

01:58PM 4    ONE WHO WOULD MAKE THE ULTIMATE DECISION IF THE TWO OF YOU

01:58PM 5    DISAGREED?

01:59PM 6         "ANSWER:  IF IT PERTAINED TO WALGREENS, IT WAS SUNNY.

01:59PM 7         "IF IT PERTAINED TO SAFEWAY, PROBABLY ME.

01:59PM 8         "BUT IT DEPENDS ON WHAT THE ISSUE WAS.  IF IT HAD TO DO

01:59PM 9    WITH SOMETHING THAT WAS IN A FUNCTIONAL AREA THAT HE WAS

01:59PM 10   MANAGING, I WOULD DEFER TO HIM."

01:59PM 11        THAT WAS YOUR TESTIMONY BEFORE THE S.E.C.; CORRECT?

01:59PM 12   A.   YES.

01:59PM 13   Q.   AND YOU TOOK AN OATH EACH OF THE THREE DAYS YOU WERE THERE

01:59PM 14   WITH THE S.E.C.?

01:59PM 15   A.   I DID.

01:59PM 16   Q.   THE SAME ONE THAT YOU'RE TAKING TODAY?

01:59PM 17   A.   YES.

01:59PM 18   Q.   AND ISN'T IT TRUE THAT MR. BALWANI DEFERRED TO YOU ON

01:59PM 19   DEALINGS WITH THE MILITARY?

01:59PM 20   A.   I THINK PROBABLY IN MANY OF THEM, YES.

01:59PM 21   Q.   OKAY.  YOU WERE HERE WHEN MR. EDLIN TESTIFIED?

01:59PM 22   A.   YES, I WAS.

01:59PM 23   Q.   OKAY.  AND DO YOU RECALL HIM SAYING SHE WAS HIGHLY -- THAT

01:59PM 24   YOU WERE HIGHLY INVOLVED IN MATTERS WITH THE MILITARY?

01:59PM 25   A.   I DO.

01:59PM  1    Q.   AND IF HE HAD ANY FORM OF SUBSTANTIVE COMMUNICATION WITH

01:59PM  2    THE MILITARY, HE CAME TO YOU?

01:59PM  3    A.   YES.

01:59PM  4    Q.   NOT MR. BALWANI?

01:59PM  5    A.   YES.

01:59PM  6    Q.   ISN'T IT TRUE THAT MR. BALWANI DEFERRED TO YOU ON ASPECTS

02:00PM  7    OF INVENTIONS AT THERANOS?

02:00PM  8    A.   HE DID.

02:00PM  9    Q.   IF YOU THOUGHT THE MINILAB SHOULD WORK IN A PARTICULAR

02:00PM  10   WAY, YOU WEREN'T GOING TO TAKE ADVICE FROM MR. BALWANI ON THAT;

02:00PM  11   IS THAT FAIR?

02:00PM  12   A.   I WOULD TAKE HIS ADVICE, BUT HE WOULD DEFER TO ME.

02:00PM  13   Q.   FAIR ENOUGH.  HE WOULD DEFER TO YOU ON THAT ASPECT OF

02:00PM  14   THERANOS'S BUSINESS?

02:00PM  15   A.   YES.

02:00PM  16   Q.   OKAY.  HOW ABOUT WITH REGULATORY MATTERS?  ISN'T IT THE

02:00PM  17   CASE THAT YOU AND MR. BALWANI WERE JOINTLY INVOLVED IN THE

02:00PM  18   REGULATORY STRATEGY?

02:00PM  19   A.   WE WERE.

02:00PM  20   Q.   AND GENERALLY, YOU AND MR. BALWANI WOULD BE INVOLVED IN

02:00PM  21   FIRING PERSONNEL?

02:00PM  22   A.   WE COULD BE.

02:00PM  23   Q.   DO YOU HAVE THE RED BINDER THERE?

02:00PM  24   A.   I DO.

02:00PM  25   Q.   OKAY.  LET ME DRAW YOUR ATTENTION, PLEASE, TO 5269.

02:01PM    1            YOUR HONOR, I SEEK PERMISSION TO READ FROM PAGE 53,

02:01PM    2    LINE 19 TO LINE 21.

02:01PM    3            THE COURT:  YES.

02:01PM    4    BY MR. LEACH:

02:01PM    5    Q.   YOU WERE ASKED THE QUESTION, "SO GENERALLY YOU AND

02:01PM    6    MR. BALWANI WOULD BE INVOLVED IN FIRING PERSONNEL?

02:01PM    7            "ANSWER:  I THINK SO, YEAH."

02:01PM    8            THAT WAS YOUR TESTIMONY BEFORE THE S.E.C.; CORRECT?

02:01PM    9    A.   IT IS.

02:01PM   10    Q.   AND ISN'T IT TRUE THAT YOU -- OR THAT MR. BALWANI DEFERRED

02:01PM   11    TO YOU ON MARKETING MATTERS?

02:01PM   12    A.   IN CERTAIN CIRCUMSTANCES, YES.

02:01PM   13    Q.   ISN'T IT TRUE THAT ON SOME OCCASIONS MR. BALWANI

02:01PM   14    COMPLETELY DISENGAGED FROM MARKETING SO THAT YOU COULD MANAGE

02:02PM   15    IT?

02:02PM   16    A.   PROBABLY.

02:02PM   17    Q.   WELL, LET'S LOOK AT AN EXAMPLE.  IF YOU CAN LOOK IN YOUR

02:02PM   18    BINDER AT EXHIBIT 5541.  THIS MIGHT BE ONE THAT YOU DON'T HAVE.

02:02PM   19    A.   YEAH, I DON'T THINK I HAVE THAT ONE.

02:02PM   20            MR. LEACH:  MAY I APPROACH, YOUR HONOR?

02:02PM   21            THE COURT:  YES.

02:02PM   22    BY MR. LEACH:

02:02PM   23    Q.   (HANDING.)

02:02PM   24    A.   THANK YOU.

02:02PM   25    Q.   YOU'RE WELCOME.

02:02PM   1            DO YOU SEE YOUR NAME AT THE TOP OF THIS EMAIL, MS. HOLMES?

02:03PM   2       A.   I DO.

02:03PM   3       Q.   AND DO YOU SEE THAT MR. BALWANI'S NAME IS IN THE FROM

02:03PM   4       LINE?

02:03PM   5       A.   I DO.

02:03PM   6       Q.   AND THE DATE OF THIS IS MAY 21ST, 2013?

02:03PM   7       A.   YES.

02:03PM   8       Q.   AND THE SUBJECT IS CHIAT/DAY?

02:03PM   9       A.   YES.

02:03PM  10       Q.   AND CHIAT/DAY WAS YOUR MARKETING FIRM?

02:03PM  11       A.   THEY WERE.

02:03PM  12            MR. LEACH:  OKAY.  I MOVE THE ADMISSION OF

02:03PM  13       EXHIBIT 5541, YOUR HONOR.

02:03PM  14            MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

02:03PM  15            THE COURT:  IT'S ADMITTED.

02:03PM  16       (GOVERNMENT'S EXHIBIT 5541 WAS RECEIVED IN EVIDENCE.)

02:03PM  17       BY MR. LEACH:

02:03PM  18       Q.   IF I COULD DRAW YOUR ATTENTION TO THE BOTTOM EMAIL,

02:03PM  19       MS. HOLMES, DO YOU SEE THERE'S A MESSAGE FROM SUNNY BALWANI ON

02:03PM  20       MAY 21ST, 2013?

02:03PM  21       A.   I DO.

02:03PM  22       Q.   OKAY.  AND DO YOU SEE THE SECOND PARAGRAPH WHERE HE WROTE,

02:03PM  23       "I WOULD LIKE TO COMPLETELY DISENGAGE MYSELF FROM ALL THINGS

02:04PM  24       CHIAT DAY SO YOU AND THE GUYS CAN MANAGE ALL THAT IS ASKED FROM

02:04PM  25       THEM, ALL THAT IS NEEDED TO BE DELIVERED, ET CETERA, AND ALL

02:04PM   1      COMMUNICATIONS AND I CAN FOCUS ON OPERATIONS MANUFACTURING,

02:04PM   2      SUPPLY CHAIN, MATERIALS MANAGEMENT, WALGREENS, CAPSYS."

02:04PM   3          DO YOU SEE THAT LANGUAGE?

02:04PM   4      A.   I DO.

02:04PM   5      Q.   AND DID I READ THAT CORRECTLY?

02:04PM   6      A.   YOU DID.

02:04PM   7      Q.   AM I RIGHT THAT YOU HAD MANY BUSINESS MENTORS BESIDES

02:04PM   8      MR. BALWANI?

02:04PM   9      A.   I DID.

02:04PM   10     Q.   OKAY.  ONE OF THOSE BUSINESS MENTORS WAS DON LUCAS?

02:04PM   11     A.   YES.

02:04PM   12     Q.   YOU TALKED A LOT ABOUT -- IT'S DON LUCAS, SENIOR; RIGHT?

02:04PM   13     A.   YES.

02:04PM   14     Q.   THERE'S A DON LUCAS, JUNIOR?

02:04PM   15     A.   YES.

02:04PM   16     Q.   HE WAS AN INVESTOR IN THERANOS TOO, RIGHT?

02:04PM   17     A.   HE WAS.

02:04PM   18     Q.   BUT DON LUCAS WAS A BUSINESS MENTOR OF YOURS; CORRECT?

02:04PM   19     A.   HE WAS.

02:04PM   20     Q.   HE CHAIRED YOUR BOARD FOR A NUMBER OF YEARS?

02:05PM   21     A.   YES.

02:05PM   22     Q.   YOU WOULD GO TO HIM FOR BUSINESS ADVICE FREQUENTLY?

02:05PM   23     A.   I DID.

02:05PM   24     Q.   AND YOU VIEWED HIM AS VERY KNOWLEDGEABLE IN FINANCE AREAS?

02:05PM   25     A.   I DID.

02:05PM  1    Q.   AND HE WAS A VERY SUCCESSFUL ORACLE EXECUTIVE; CORRECT?

02:05PM  2    A.   HE WAS ON THE ORACLE BOARD, YES.

02:05PM  3    Q.   OKAY.  BUT HE KNEW HOW TO BUILD A BUSINESS?

02:05PM  4    A.   I THINK SO.

02:05PM  5    Q.   OKAY.  AND HE PASSED AWAY AT SOME POINT IN 2019?

02:05PM  6    A.   HE DID.

02:05PM  7    Q.   OKAY.  AND HE STEPPED DOWN FROM THERANOS ACTIVITIES AROUND

02:05PM  8    2012, 2013?

02:05PM  9    A.   2013, YEP.

02:05PM 10    Q.   YOU WERE ALSO VERY CLOSE TO CHANNING ROBERTSON; RIGHT?

02:05PM 11    A.   I WAS.

02:05PM 12    Q.   HE WAS A MENTOR TO YOURS?

02:05PM 13    A.   YES.

02:05PM 14    Q.   EXCUSE ME.  HE WAS A MENTOR TO YOU?

02:05PM 15    A.   YES.

02:05PM 16    Q.   YOU FELT LIKE YOU COULD GO TO HIM ON ANY ASPECT OF

02:05PM 17    THERANOS'S BUSINESS?

02:05PM 18    A.   I DID.

02:05PM 19    Q.   AND YOU FELT HE WAS VERY, VERY KNOWLEDGEABLE ON HOW TO

02:05PM 20    BUILD DEVICES AND HOW TO BUILD A COMPANY?

02:05PM 21    A.   I DID.

02:05PM 22    Q.   AND IF THERE WERE ISSUES ON HOW TO BUILD THE BUSINESS AND

02:06PM 23    AN ASPECT OF WHERE TO GO, YOU FELT FREE ON GOING TO HIM FOR

02:06PM 24    ADVICE AND WISDOM?

02:06PM 25    A.   I DID.

02:06PM 1    Q.   I THINK WE TALKED ABOUT GEORGE SHULTZ EARLIER.  YOU WERE

02:06PM 2    VERY CLOSE TO HIM?

02:06PM 3    A.   YES.

02:06PM 4    Q.   AND GEORGE SHULTZ WAS THE FORMER SECRETARY OF THE

02:06PM 5    TREASURY?

02:06PM 6    A.   YES.

02:06PM 7    Q.   AND HE WAS THE FORMER SECRETARY OF STATE?

02:06PM 8    A.   YES.

02:06PM 9    Q.   HE STARED DOWN THE SOVIET UNION IN THE COLD WAR?

02:06PM 10   A.   I'VE BEEN TOLD THIS.

02:06PM 11   Q.   YOU'VE BEEN TOLD THAT?

02:06PM 12   A.   YES.

02:06PM 13   Q.   AND YOU HAD GREAT RESPECT FOR HIS BUSINESS EXPERIENCE AND

02:06PM 14   HIS POLITICAL WISDOM?

02:06PM 15   A.   I DID.

02:06PM 16   Q.   AND YOU WOULD MEET WITH HIM ALMOST WEEKLY?  AM I RIGHT

02:06PM 17   ABOUT THAT?

02:06PM 18   A.   I DID.

02:06PM 19   Q.   AND YOU FELT LIKE YOU COULD GO TO HIM WITH ANY ISSUE

02:06PM 20   RELATING TO THERANOS?

02:06PM 21   A.   I DID.

02:06PM 22   Q.   OKAY.  YOU FELT IF THERE WAS SOME ASPECT OF THE BUSINESS,

02:06PM 23   BE IT FINANCE, MILITARY, YOU COULD GO TO HIM WITH QUESTIONS?

02:06PM 24   A.   I DID.

02:06PM 25   Q.   YOU WERE ALSO CLOSE TO HENRY KISSINGER; IS THAT CORRECT?

02:06PM   1    A.   I WAS.

02:06PM   2    Q.   AND HENRY KISSINGER WAS A FORMER NATIONAL SECURITY

02:07PM   3    ADVISOR?

02:07PM   4    A.   YES.

02:07PM   5    Q.   HE WAS A FORMER SECRETARY OF STATE?

02:07PM   6    A.   YES.

02:07PM   7    Q.   HE WON THE NOBEL PEACE PRIZE?

02:07PM   8    A.   HE DID.

02:07PM   9    Q.   VERY DISTINGUISHED STATESMAN; IS THAT FAIR?

02:07PM   10   A.   HE WAS.

02:07PM   11   Q.   AND HE SERVED ON OTHER BOARDS; CORRECT?

02:07PM   12   A.   YES.

02:07PM   13   Q.   AND YOU HAD TREMENDOUS RESPECT FOR HIS WISDOM AND

02:07PM   14   ABILITIES AND ABILITY TO GUIDE YOU IN RUNNING THE THERANOS

02:07PM   15   BUSINESS?

02:07PM   16   A.   I DID.

02:07PM   17   Q.   AND IF THERE WERE ANY ASPECT OF OPERATIONS AT THERANOS OR

02:07PM   18   MANAGEMENT ISSUES OR ANYTHING RELATING TO THE BUSINESS, YOU

02:07PM   19   FELT COMFORTABLE GOING TO HIM?

02:07PM   20   A.   I DID.

02:07PM   21   Q.   YOU WERE ALSO CLOSE TO WILLIAM PERRY; IS THAT CORRECT?

02:07PM   22   A.   I WAS.

02:07PM   23   Q.   WILLIAM PERRY WAS A FORMER SECRETARY OF DEFENSE?

02:07PM   24   A.   YES.

02:07PM   25   Q.   AND HE JOINED THE BOARD AT SOME POINT IN 2013?

02:07PM   1    A.   HE DID.

02:07PM   2    Q.   OKAY.  AND YOU HAD TREMENDOUS RESPECT FOR HIS ABILITY TO

02:07PM   3    GIVE YOU ADVICE AND WISDOM ABOUT HOW TO OPERATE AND MANAGE

02:08PM   4    THERANOS?

02:08PM   5    A.   I DID.

02:08PM   6    Q.   IF THERE WERE ANY ISSUE, YOU FELT YOU COULD GO TO HIM?

02:08PM   7    A.   I DID.

02:08PM   8    Q.   YOU ALSO TALKED ABOUT WILLIAM FOEGE.

02:08PM   9         DO YOU RECALL MENTIONING WILLIAM FOEGE?

02:08PM  10    A.   YES.

02:08PM  11    Q.   HE WAS A FORMER LEADER AT THE CDC?

02:08PM  12    A.   YES.

02:08PM  13    Q.   AND HE JOINED YOUR BOARD AT SOME POINT AFTER 2013?

02:08PM  14    A.   YES.

02:08PM  15    Q.   AND YOU HAD TREMENDOUS RESPECT FOR HIS ABILITIES TO GUIDE

02:08PM  16    THE THERANOS BUSINESS?

02:08PM  17    A.   I DID, YES.

02:08PM  18    Q.   AND IF THERE WERE ANY ASPECTS OF THERANOS'S OPERATIONS,

02:08PM  19    YOU FELT COMFORTABLE GOING TO HIM?

02:08PM  20    A.   YES.

02:08PM  21    Q.   YOU ALSO HAD A RELATIONSHIP WITH SAM NUNN; IS THAT

02:08PM  22    CORRECT?

02:08PM  23    A.   I DID.

02:08PM  24    Q.   AND SAM NUNN IS A FORMER SENATOR FROM GEORGIA?

02:08PM  25    A.   YES.

02:08PM  1     Q.   AND SERVED ON THE BOARD OF COCA-COLA?

02:08PM  2     A.   HE DID.

02:08PM  3     Q.   YOU HAD TREMENDOUS RESPECT FOR HIS BUSINESS ACUMEN?

02:08PM  4     A.   I DID.

02:08PM  5     Q.   YOU FELT YOU COULD GO TO FORMER SENATOR NUNN WITH ANY

02:09PM  6     QUESTION YOU HAD ABOUT HOW TO OPERATE THERANOS, RUN THE

02:09PM  7     BUSINESS, MANAGE THE FINANCES, NO RESTRICTION; IS THAT FAIR?

02:09PM  8     A.   I DID.

02:09PM  9     Q.   YOU'VE ALSO TALKED ABOUT RICHARD KOVACEVICH.

02:09PM 10          DO YOU RECALL TALKING ABOUT HIM?

02:09PM 11     A.   I DO.

02:09PM 12     Q.   AND HE WAS THE FORMER CEO OF WELLS FARGO?

02:09PM 13     A.   YES.

02:09PM 14     Q.   AND A VERY RESPECTED BUSINESSMAN?

02:09PM 15     A.   YES.

02:09PM 16     Q.   AND HE JOINED YOUR BOARD -- HE RETIRED FROM WELLS FARGO IN

02:09PM 17     OR AROUND 2009?

02:09PM 18     A.   I THINK SO.

02:09PM 19     Q.   AND HE JOINED YOUR BOARD AT SOME POINT, WAS IT AFTER 2013?

02:09PM 20     A.   2013 OR 2014.  ONE OF THOSE TWO.

02:09PM 21     Q.   OKAY.  AND YOU HAD TREMENDOUS RESPECT FOR HIS BUSINESS

02:09PM 22     ACUMEN?

02:09PM 23     A.   I DID.

02:09PM 24     Q.   YOU FELT YOU COULD GO TO HIM WITH ANY QUESTION YOU HAD

02:09PM 25     ABOUT THERANOS'S FINANCES, THERANOS'S OPERATIONS, ANY ASPECT OF

02:09PM   1     ITS BUSINESS?

02:09PM   2     A.   YES.

02:09PM   3     Q.   OKAY.  YOU ALSO FORMED A RELATIONSHIP WITH JIM MATTIS; IS

02:10PM   4     THAT FAIR?

02:10PM   5     A.   YES.

02:10PM   6     Q.   GENERAL MATTIS?

02:10PM   7     A.   YES.

02:10PM   8     Q.   WENT ON TO BECOME THE SECRETARY OF DEFENSE?

02:10PM   9     A.   HE DID.

02:10PM   10    Q.   OKAY.  HE WAS THE LEADER AT CENTCOM?

02:10PM   11    A.   YES.

02:10PM   12    Q.   AND HE JOINED YOUR BOARD IN 2013?

02:10PM   13    A.   HE DID.

02:10PM   14    Q.   AND RESIGNED AT SOME POINT IN 2016?

02:10PM   15    A.   YES.

02:10PM   16    Q.   AND YOU WOULD MEET WITH GENERAL MATTIS REGULARLY; IS THAT

02:10PM   17    RIGHT?

02:10PM   18    A.   I DID.

02:10PM   19    Q.   YOU WOULD GO TO HIS OFFICE AT STANFORD, OR HIS RESIDENCE

02:10PM   20    AT STANFORD, AND HAVE WEEKLY MEETINGS WITH HIM?

02:10PM   21    A.   I NEVER WENT TO HIS OFFICE AT STANFORD, BUT I MET WITH HIM

02:10PM   22    REGULARLY.  HE WOULD COME TO THERANOS.

02:10PM   23    Q.   OH, SO GENERAL MATTIS CAME TO YOU?

02:10PM   24    A.   HE DID.

02:10PM   25    Q.   OKAY.  AND HE GAVE YOU ADVICE ABOUT MANY MATTERS RELATING

02:10PM  1    TO THERANOS'S BUSINESS?

02:10PM  2    A.   HE DID.

02:10PM  3    Q.   HE GAVE YOU ADVICE RELATING TO HR ISSUES RELATING TO

02:10PM  4    THERANOS?

02:10PM  5    A.   ABOUT MANAGEMENT, YES.

02:10PM  6    Q.   OKAY.  AND YOU FELT FREE TO GO WITH HIM -- AND YOU HAD

02:11PM  7    RESPECT FOR HIS ACUMEN AS A LEADER?

02:11PM  8    A.   I DID.

02:11PM  9    Q.   AND YOU FELT IF THERE WAS ANY ISSUE RELATING TO THERANOS'S

02:11PM  10   OPERATIONS, ITS FINANCES, ITS BUSINESS, YOU COULD GO TO HIM FOR

02:11PM  11   ADVICE?

02:11PM  12   A.   I DID.

02:11PM  13   Q.   IS IT TRUE THAT IN JULY OF 2013 YOU AND MR. BALWANI AGREED

02:11PM  14   TO FORM A LIMITED LIABILITY COMPANY TOGETHER?

02:11PM  15   A.   I THINK SO, YES.

02:11PM  16   Q.   OKAY.

02:11PM  17        MAY I APPROACH, YOUR HONOR?

02:11PM  18             THE COURT:  YES.

02:12PM  19   BY MR. LEACH:

02:12PM  20   Q.   I'VE PLACED BEFORE YOU, MS. HOLMES, WHAT HAS BEEN MARKED

02:12PM  21   AS 5652.

02:12PM  22        DO YOU RECOGNIZE THIS AS AN OPERATING AGREEMENT FOR A

02:12PM  23   LIMITED LIABILITY COMPANY THAT YOU AND MR. BALWANI FORMED?

02:12PM  24   A.   I DO.

02:12PM  25   Q.   AND ONE OF THE PURPOSES OF THIS LIMITED LIABILITY COMPANY

02:12PM  1    WAS TO OWN THE HOME WHERE YOU AND MR. BALWANI LIVED?

02:12PM  2    A.   YES.

02:12PM  3              MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5652.

02:12PM  4              MR. DOWNEY:  NO OBJECTION, YOUR HONOR, TO THIS

02:12PM  5    EXHIBIT.  NO OBJECTION TO THIS ONE.

02:12PM  6              THE COURT:  IT'S ADMITTED.

02:12PM  7         (GOVERNMENT'S EXHIBIT 5652 WAS RECEIVED IN EVIDENCE.)

02:12PM  8              MR. LEACH:  AND MAY WE PUBLISH, YOUR HONOR?

02:12PM  9              THE COURT:  YES.

02:12PM  10   BY MR. LEACH:

02:12PM  11   Q.   DO YOU SEE THE HEADING AT THE TOP, MS. HOLMES, OPERATING

02:12PM  12   AGREEMENT OF HMFR LLC?

02:13PM  13   A.   I DO.

02:13PM  14   Q.   THAT'S THE ACRONYM THAT WE'VE SEEN IN SOME OF THE TEXT

02:13PM  15   MESSAGES THAT IS SOME FORM OF PRAYER, OR GIVING THANKS TO GOD?

02:13PM  16   A.   IT IS.

02:13PM  17   Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO PAGE 3.

02:13PM  18        IS THAT YOUR SIGNATURE?

02:13PM  19   A.   IT IS.

02:13PM  20   Q.   IS THAT MR. BALWANI'S SIGNATURE?

02:13PM  21   A.   YES.

02:13PM  22   Q.   OKAY.  YOU SIGNED THIS VOLUNTARILY?

02:13PM  23   A.   I DID.

02:13PM  24   Q.   IT WAS NOT AGAINST YOUR WILL?

02:13PM  25   A.   NO.

02:13PM   1     Q.   AND IF WE COULD GO TO -- BACK TO THE FIRST PAGE, THE TWO

02:13PM   2     MEMBERS OF THIS LIMITED LIABILITY COMPANY ARE YOU AND

02:13PM   3     MR. BALWANI.

02:13PM   4          AM I RIGHT ABOUT THAT?

02:13PM   5     A.   YES.

02:13PM   6     Q.   AND ON PAGE 4, DOES IT SPELL OUT THE RESPECTIVE MEMBERSHIP

02:13PM   7     INTERESTS, PERCENTAGE INTEREST OF THE LLC?

02:13PM   8     A.   IT DOES.

02:13PM   9     Q.   OKAY.  THERE'S A MAILING ADDRESS 227 PARK LANE, ATHERTON,

02:14PM   10    CALIFORNIA 94027.

02:14PM   11         DO YOU SEE THAT?

02:14PM   12    A.   I DO.

02:14PM   13    Q.   AND THAT'S THE HOME WHERE YOU AND MR. BALWANI LIVED?

02:14PM   14    A.   YES.

02:14PM   15    Q.   AND TO THE RIGHT IT ASSIGNS TO MR. BALWANI A 50 PERCENT

02:14PM   16    INTEREST FOR THIS LIMITED LIABILITY COMPANY?

02:14PM   17    A.   IT DOES.

02:14PM   18    Q.   IN THE MAILING ADDRESS 855 EL CAMINO REAL, SUITE 13A,

02:14PM   19    THAT'S A P.O. BOX, ISN'T IT?

02:14PM   20    A.   IT IS.

02:14PM   21    Q.   AND AM I RIGHT THAT ONE OF THE ASSETS HMFR OWNED WAS

02:14PM   22    227 PARK LANE IN ATHERTON?

02:14PM   23    A.   YES.

02:14PM   24    Q.   I'D LIKE TO DRAW YOUR ATTENTION TO WHAT HAS BEEN MARKED AS

02:14PM   25    EXHIBIT 5512.

02:15PM   1        A.   I DON'T KNOW THAT I HAVE THAT ONE.

02:15PM   2                  MR. LEACH:  MAY I APPROACH, YOUR HONOR?

02:15PM   3                  THE COURT:  YES.

02:15PM   4        BY MR. LEACH:

02:15PM   5        Q.   (HANDING.)

02:15PM   6             DO YOU RECOGNIZE THE IMAGE ON EXHIBIT 5512?

02:15PM   7        A.   I DO.

02:15PM   8        Q.   AND DO YOU RECOGNIZE THE IMAGE ON THE SECOND PAGE OF

02:15PM   9        EXHIBIT 5512?

02:15PM  10        A.   I DO.

02:15PM  11        Q.   IS THIS 227 PARK LANE, ATHERTON?

02:15PM  12        A.   IT IS.

02:15PM  13        Q.   AND THIS IS THE HOME THAT YOU AND MR. BALWANI SHARED?

02:15PM  14        A.   YES.

02:15PM  15                  MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5512.

02:15PM  16                  MR. DOWNEY:  YOUR HONOR, 403, AND CONTRARY TO ORDER

02:15PM  17        AT DOCKET 798.

02:16PM  18             (PAUSE IN PROCEEDINGS.)

02:16PM  19                  THE COURT:  THANK YOU.  I DON'T SEE THIS AS -- MAYBE

02:16PM  20        YOU COULD LAY A LITTLE MORE FOUNDATION, IF YOU WILL, AS TO THE

02:16PM  21        ISSUE THAT WAS RAISED IN 798 AND THE COURT'S RULING ON 798.

02:16PM  22                  MR. LEACH:  OKAY.

02:16PM  23        Q.   YOU WERE AN EQUAL MEMBER OF THIS LLC, MS. HOLMES; IS THAT

02:16PM  24        CORRECT?

02:16PM  25        A.   I THOUGHT I WAS.

02:16PM  1    Q.   OKAY.  YOU HAD A 50 PERCENT INTEREST IN THIS?

02:16PM  2    A.   I THOUGHT SO.

02:16PM  3    Q.   AND SO 50 PERCENT OF THE ASSETS OF THIS LLC WERE YOUR

02:16PM  4    ASSETS THAT YOU FELT YOU COULD USE HOW YOU SAW FIT?

02:16PM  5    A.   I THOUGHT SO.

02:16PM  6    Q.   AND THIS WAS THE HOME WHERE YOU AND MR. BALWANI LIVED FROM

02:17PM  7    2013 THROUGH 2016?

02:17PM  8    A.   YES.

02:17PM  9    Q.   YOU TALKED ABOUT MOVING OUT.

02:17PM 10         IS THIS THE PLACE THAT YOU MOVED OUT FROM?

02:17PM 11    A.   IT IS.

02:17PM 12    Q.   OKAY.  AND I KNOW YOU TALKED ABOUT SOME EXPERIENCES WITH

02:17PM 13    MR. BALWANI IN YOUR DIRECT TESTIMONY, BUT DID SOME OF THOSE

02:17PM 14    EVENTS OCCUR AT 227 PARK LANE IN ATHERTON?

02:17PM 15    A.   THEY DID.

02:17PM 16    Q.   OKAY.  AND YOU WOULD HAVE FOLKS FROM THERANOS COME AND

02:17PM 17    VISIT YOU FROM TIME TO TIME AT THIS ADDRESS.  IS THAT FAIR?

02:17PM 18    A.   YES.

02:17PM 19    Q.   OKAY.  FOR EXAMPLE, MR. EDLIN WAS THERE?

02:17PM 20    A.   HE WAS.

02:17PM 21    Q.   AND DO YOU RECALL TESTIMONY FROM MR. EDLIN WHEN HE WOULD

02:17PM 22    COME TO DINNER PARTIES AT YOUR HOUSE WHERE HE WOULD HAVE AN

02:17PM 23    OPPORTUNITY TO OBSERVE YOUR INTERACTIONS WITH MR. BALWANI IN A

02:17PM 24    SOCIAL SETTING?

02:17PM 25    A.   I DO.

02:17PM   1                    MR. LEACH:  YOUR HONOR, I RENEW OUR MOTION TO ADMIT

02:18PM   2    5512.

02:18PM   3                    THE COURT:  ALL RIGHT.

02:18PM   4                    MR. DOWNEY:  SAME OBJECTION, YOUR HONOR.

02:18PM   5                    THE COURT:  ALL RIGHT.  THANK YOU.

02:18PM   6         FIRST OF ALL, I DO THINK THAT THERE'S RELEVANCE TO THIS.

02:18PM   7    UNDER 403, AND REFERENCING DOCKET 798, SPECIFICALLY LINE 19 ON

02:18PM   8    PAGE 9 OF THE COURT'S PREVIOUS ORDER, I DO THINK THAT THE

02:18PM   9    PROBATIVE VALUE OF THIS, BASED ON THE FOUNDATION LAID,

02:18PM  10    OUTWEIGHS ANY PREJUDICIAL EFFECT.

02:18PM  11         AND THE REFERENCE THE PARTIES TO THOSE LINES IN THE

02:18PM  12    COURT'S ORDER.

02:18PM  13         SO IT WILL BE ADMITTED, AND IT MAY BE PUBLISHED.

02:18PM  14         (GOVERNMENT'S EXHIBIT 5512 WAS RECEIVED IN EVIDENCE.)

02:18PM  15                    MR. LEACH:  OKAY.  THANK YOU, YOUR HONOR.

02:18PM  16    Q.   MS. HOLMES, DO YOU SEE AN IMAGE ON THE SCREEN NOW?

02:18PM  17    A.   I DO.

02:18PM  18    Q.   OKAY.  AND THAT'S THE RESIDENCE THAT WE'VE BEEN TALKING

02:18PM  19    ABOUT, 227 PARK LANE IN ATHERTON?

02:18PM  20    A.   IT IS.

02:18PM  21    Q.   OKAY.  AND IF WE COULD LOOK BRIEFLY AT THE SECOND PAGE.

02:19PM  22         WERE THERE OCCASIONS WHEN AN INVESTOR NAMED KENDRA FADIL

02:19PM  23    WOULD COME TO YOUR HOUSE AND PERFORM SERVICES FOR YOU AT THIS

02:19PM  24    ADDRESS?

02:19PM  25    A.   YES.

02:19PM 1    Q.   SHE WAS A CONTRACTOR OF YOURS?

02:19PM 2    A.   YES.

02:19PM 3    Q.   AND SHE ALSO BECAME AN INVESTOR AT SOME POINT IN TIME?

02:19PM 4    A.   SHE DID.

02:19PM 5    Q.   AND SHE WOULD COME TO YOUR HOUSE AND PERFORM SERVICES, AND

02:19PM 6    IN CONNECTION WITH GETTING TO KNOW YOU, SHE EXPRESSED AN

02:19PM 7    INTEREST IN INVESTING IN THERANOS?

02:19PM 8    A.   I THINK DON LUCAS HAD GIFTED HER SOME OF HIS SHARES, AND

02:19PM 9    SHE WANTED TO BE ABLE TO BUY ADDITIONAL SHARES.

02:19PM 10   Q.   AND THAT WAS AT SOME POINT IN 2013, 2014?

02:19PM 11   A.   YES.

02:19PM 12   Q.   OKAY.  AND AT SOME POINT IN 2016, DID SHE COME TO YOU

02:19PM 13   ATTEMPTING TO SELL HER SHARES BACK TO THE COMPANY?

02:19PM 14   A.   SHE DID.

02:19PM 15   Q.   AND YOU TOLD HER NO?

02:19PM 16   A.   WE COULDN'T, YES.

02:19PM 17   Q.   YOU TOLD HER NO?

02:19PM 18   A.   YES.

02:19PM 19   Q.   IS IT TRUE -- WE CAN TAKE THIS DOWN, MS. HOLLIMAN.

02:20PM 20        IS IT TRUE, MS. HOLMES, THAT YOU WERE AWAY FROM

02:20PM 21   MR. BALWANI FOR LARGE PERIODS OF TIME IN THE 2010 TO 2015 TIME

02:20PM 22   PERIOD?

02:20PM 23   A.   YES.

02:20PM 24   Q.   YOU TRAVELLED ON BUSINESS REGULARLY; IS THAT FAIR?

02:20PM 25   A.   I DID.

02:20PM  1    Q.   AND YOU TRAVELLED WITHOUT MR. BALWANI ON MANY, IF NOT

02:20PM  2    MOST, OF THOSE OCCASIONS?

02:20PM  3    A.   CERTAINLY ON MANY.

02:20PM  4    Q.   OKAY.  IF WE LOOK AT EXHIBIT 5387, THERE WOULD BE MANY

02:20PM  5    INSTANCES OF YOU TEXTING MR. BALWANI FROM THE PLANE SAYING "I'M

02:20PM  6    ON MY WAY HOME," LOTS OF EVIDENCE IN THE TEXTS THAT YOU TWO

02:20PM  7    WERE PHYSICALLY SEPARATED FOR WEEKS OR DAYS ON END; IS THAT

02:20PM  8    FAIR?

02:20PM  9    A.   I'M SURE THERE IS, YES.

02:20PM  10   Q.   AM I RIGHT THAT YOU WERE ALSO INVOLVED IN ANOTHER ROMANTIC

02:20PM  11   RELATIONSHIP DURING THE TIME PERIOD 2010 TO 2015?

02:21PM  12   A.   NO.

02:21PM  13   Q.   DID YOU EVER TELL ANYBODY YOU WERE IN ANOTHER ROMANTIC

02:21PM  14   RELATIONSHIP DURING THAT TIME PERIOD?

02:21PM  15   A.   I'M SORRY, 2010 TO 2015?  I THINK FOR PART OF THAT.

02:21PM  16   Q.   WHICH PART OF THAT?

02:21PM  17   A.   THE BEGINNING PART.

02:21PM  18   Q.   SO THE BEGINNING PART OF 2010?

02:21PM  19   A.   YES.  YES.

02:21PM  20   Q.   OKAY.  HOW LONG DID THAT RELATIONSHIP LAST?

02:21PM  21   A.   IT DIDN'T.

02:21PM  22   Q.   OKAY.  I UNDERSTAND IT DIDN'T LAST, BUT MY QUESTION IS,

02:21PM  23   HOW LONG DID IT LAST?

02:21PM  24   A.   IT WAS NOT ACTUALLY A FORMAL RELATIONSHIP.

02:21PM  25   Q.   OKAY.  BUT YOU WERE ROMANTIC WITH SOMEBODY OTHER THAN

02:21PM  1      MR. BALWANI DURING THE TIME PERIOD 2010 TO 2015?

02:21PM  2      A.   YES.

02:21PM  3      Q.   AND IN 2016 YOU, YOU PUSHED MR. BALWANI OUT OF THE

02:22PM  4      COMPANY; IS THAT FAIR?

02:22PM  5      A.   I ASKED HIM TO LEAVE.

02:22PM  6      Q.   YOU ASKED HIM TO LEAVE?

02:22PM  7      A.   YES.

02:22PM  8      Q.   AND THE BOARD SUPPORTED THAT DECISION?

02:22PM  9      A.   YES.

02:22PM 10      Q.   I'D LIKE TO SHOW -- TALK TO YOU ABOUT SOME ADVICE THAT YOU

02:22PM 11      RECEIVED PRIOR TO THE WALGREENS LAUNCH IN SEPTEMBER OF 2013.

02:22PM 12           DO YOU HAVE THAT TIME PERIOD IN MIND?

02:22PM 13      A.   I DO.

02:22PM 14      Q.   LET ME DRAW YOUR ATTENTION TO WHAT IS IN THE BINDER AS

02:22PM 15      EXHIBIT 3970.

02:23PM 16           DO YOU SEE YOUR NAME IN THE FROM LINE OF THIS EMAIL?

02:23PM 17      A.   I'M JUST FINDING IT.

02:23PM 18           OKAY, YES.

02:23PM 19      Q.   AND DO YOU SEE YOUR NAME IN THE FROM LINE?

02:23PM 20      A.   I DO.

02:23PM 21      Q.   AND THIS APPEARS TO BE AN EMAIL TO MR. BALWANI?

02:23PM 22      A.   YES.

02:23PM 23      Q.   AND DO YOU SEE THE DATE SEPTEMBER 5TH, 2013?

02:23PM 24      A.   I DO.

02:23PM 25                MR. LEACH:  YOUR HONOR, I DON'T BELIEVE THIS IS IN

02:23PM   1    EVIDENCE, SO I MOVE THE ADMISSION OF EXHIBIT 3970.

02:23PM   2              MR. DOWNEY:  I DON'T HAVE IT AS BEING IN EVIDENCE,

02:23PM   3    BUT I HAVE NO OBJECTION.

02:23PM   4              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:23PM   5          (GOVERNMENT'S EXHIBIT 3970 WAS RECEIVED IN EVIDENCE.)

02:23PM   6    BY MR. LEACH:

02:23PM   7    Q.   LET ME DRAW YOUR ATTENTION TO THE BOTTOM EMAIL,

02:23PM   8    MS. HOLMES.

02:23PM   9         DO YOU SEE THERE'S AN EMAIL FROM YOU TO SOMEONE NAMED

02:23PM  10    KATE BEARDSLEY?

02:24PM  11    A.   I DO.

02:24PM  12    Q.   AND KATE BEARDSLEY WAS A LAWYER YOU HIRED TO REVIEW

02:24PM  13    THERANOS'S MARKETING MATERIAL?

02:24PM  14    A.   YES.

02:24PM  15    Q.   AND THE SUBJECT OF THIS IS "FORWARD DOT COM PDF."

02:24PM  16         WERE YOU FORWARDING A COPY OF WHAT WOULD HAVE BEEN

02:24PM  17    THERANOS'S WEBSITE AROUND THE TIME OF THE WALGREENS LAUNCH?

02:24PM  18    A.   YES.

02:24PM  19    Q.   I'D LIKE TO MOVE UP IN THE CHAIN AND FOCUS ON

02:24PM  20    MS. BEARDSLEY'S RESPONSE ON THURSDAY, SEPTEMBER 5TH, AT

02:24PM  21    8:58 A.M.

02:24PM  22         DO YOU SEE THAT HEADING THERE?

02:24PM  23    A.   YES.

02:24PM  24    Q.   AND SHE WROTE TO YOU, "I HAVEN'T QUITE WORKED MY WAY

02:24PM  25    THROUGH THE WHOLE WEBSITE, BUT I'M WORRIED."

02:24PM   1              DO YOU SEE THAT LANGUAGE?

02:24PM   2       A.   I DO.

02:24PM   3       Q.   AND SHE WENT ON TO WRITE, "UNLESS SOMEONE ELSE HAS WORKED

02:24PM   4       THROUGH THIS WITH YOU, THE WHOLE THING NEEDS TO BE CAREFULLY

02:24PM   5       REVIEWED."

02:24PM   6              DID I READ THAT CORRECTLY?

02:24PM   7       A.   YES.

02:24PM   8       Q.   AND THERE'S A -- "HERE ARE A FEW OF THE GENERAL ISSUES

02:25PM   9       THAT NEED TO BE DISCUSSED."

02:25PM  10              AND I WANT TO DRAW YOUR ATTENTION TO SOME OF THE BULLETS

02:25PM  11       HERE IN MS. BEARDSLEY'S EMAIL.

02:25PM  12              DO YOU SEE NUMBER 4, "THERE ARE MANY COMPARATIVE CLAIMS"?

02:25PM  13       A.   I DO.

02:25PM  14       Q.   "FOR EXAMPLE, EVERY TIME YOU SAY BETTER WITHOUT SPECIFYING

02:25PM  15       WHAT IT IS BETTER THAN, YOU ARE MAKING A COMPARATIVE CLAIM AT

02:25PM  16       LEAST TO ALL MARKET LEADERS.  YOU MUST BE ABLE TO SUBSTANTIATE

02:25PM  17       THESE CLAIMS.  I DON'T KNOW IF WE HAVE SUBSTANTIATION FOR ALL

02:25PM  18       OF THESE, BUT I AM VERY WORRIED THAT WE ARE OPENING THE DOOR TO

02:25PM  19       BIG TROUBLE FROM COMPETITORS.  ALSO, THE WORDS THAT END IN

02:25PM  20       "EST" (EG HIGHEST QUALITY) CREATE PARITY CLAIMS AT LEAST AS TO

02:25PM  21       ALL OTHER MARKET LEADERS.  WE NEED TO BE ABLE TO BE SURE THAT

02:25PM  22       WE CAN SUBSTANTIATE THOSE AS WELL."

02:25PM  23              DID I READ THAT CORRECTLY?

02:25PM  24       A.   YOU DID.

02:25PM  25       Q.   AND THIS IS ADVICE THAT YOU'RE GETTING FROM MS. BEARDSLEY

02:26PM  1    AROUND THE WALGREENS LAUNCH AROUND SEPTEMBER 10TH, SOMETIME IN

02:26PM  2    EARLY SEPTEMBER?

02:26PM  3    A.   IT IS.

02:26PM  4    Q.   AND MS. BEARDSLEY WRITES DIRECTLY TO YOU, AM I RIGHT, IN

02:26PM  5    THIS EMAIL?

02:26PM  6    A.   SHE DID.

02:26PM  7    Q.   YOU'RE PASSING THAT ON TO MR. BALWANI?

02:26PM  8    A.   YES.

02:26PM  9    Q.   LET ME NEXT DRAW YOUR ATTENTION TO EXHIBIT 3981.

02:26PM 10         AND I BELIEVE THIS IS IN EVIDENCE, YOUR HONOR, BUT IF NOT,

02:26PM 11    I MOVE IT IN.

02:26PM 12              MR. DOWNEY:  IT IS, I THINK.

02:26PM 13              THE CLERK:  IT IS.

02:26PM 14              MR. LEACH:  OKAY.  PERMISSION TO DISPLAY?

02:26PM 15              THE COURT:  YES.

02:26PM 16    BY MR. LEACH:

02:26PM 17    Q.   DO YOU HAVE 3981 IN FRONT OF YOU, MS. HOLMES?

02:26PM 18    A.   I DO.

02:26PM 19    Q.   OKAY.  AND DO YOU RECALL TESTIMONY FROM DAN EDLIN ABOUT

02:27PM 20    THIS EMAIL RELATING TO THERANOS WEBSITE COMMENTS?

02:27PM 21    A.   I DO.

02:27PM 22    Q.   LET ME START FROM THE -- ON PAGE 5, IF WE COULD.

02:27PM 23         DO YOU SEE THERE'S THE INITIAL EMAIL THAT YOU SENT TO

02:27PM 24    MS. BEARDSLEY ON SEPTEMBER 4TH?

02:27PM 25    A.   YES.

02:27PM  1    Q.   AND MS. BEARDSLEY FORWARDS YOUR EMAIL TO ROBERT DORMER AND

02:27PM  2    JAIME WOLSZON.

02:27PM  3         DO YOU SEE THAT?

02:27PM  4    A.   I DO.

02:27PM  5    Q.   AND YOU UNDERSTOOD MR. DORMER AND MS. WOLSZON TO BE

02:27PM  6    ATTORNEYS WITH HYMAN PHELPS & MCNAMARA IN WASHINGTON, D.C.?

02:27PM  7    A.   YES.

02:27PM  8    Q.   AND THEY WERE ALSO BROUGHT ON TO REVIEW YOUR WEBSITE AND

02:27PM  9    PROVIDE FEEDBACK ABOUT WHAT WAS APPROPRIATE; IS THAT FAIR?

02:27PM  10   A.   YES.

02:28PM  11   Q.   MS. BEARDSLEY WRITES, "THIS IS THE THERANOS WEBSITE THAT

02:28PM  12   NEEDS TO BE REVIEWED.  IT IS SCHEDULED TO GO LIVE TOMORROW

02:28PM  13   NIGHT, SO THERE IS SOME URGENCY.  I THINK WE WILL NEED TO GET

02:28PM  14   ON THE PHONE WITH THE CLIENT ONCE WE KNOW WHAT WE WANT TO SAY.

02:28PM  15   YOU CAN REACH ME," AND THEN THERE'S A BUSINESS NUMBER.

02:28PM  16        DO YOU SEE THAT?

02:28PM  17   A.   I DO.

02:28PM  18   Q.   OKAY.  LET ME NEXT DRAW YOUR ATTENTION TO MR. WOLSZON'S

02:28PM  19   RESPONSE, W-O-L-S-Z-O-N?

02:28PM  20        AND IF WE CAN ZOOM OUT, MS. HOLLIMAN, TO ALSO CAPTURE THE

02:28PM  21   NEXT MESSAGE IN THE CHAIN, PLEASE.

02:28PM  22        DO YOU SEE THAT JAIME WOLSZON REPLIES ON SEPTEMBER 5TH,

02:28PM  23   2013, MS. HOLMES?

02:28PM  24   A.   I DO.

02:28PM  25   Q.   AND THIS IS ULTIMATELY FORWARDED TO YOU; CORRECT?

02:29PM  1    A.   IT IS.

02:29PM  2    Q.   AND JAIME WOLSZON WRITES, "PLEASE FIND BELOW MY COMMENTS

02:29PM  3    TO THE THERANOS WEBSITE," AND DO THOSE COMMENTS CONTINUE ON TO

02:29PM  4    THE NEXT PAGE?

02:29PM  5    A.   YES.

02:29PM  6    Q.   LET'S LOOK AT THE NEXT PAGE, PLEASE.

02:29PM  7         AND I WANT TO DRAW YOUR ATTENTION TO THE TOP BULLET.

02:29PM  8         DO YOU SEE WHERE IT SAYS, "PLEASE REMOVE REFERENCES TO

02:29PM  9    'ALL' TESTS AND REPLACE WITH STATEMENTS SUCH AS 'MULTIPLE' OR

02:29PM 10    'SEVERAL.'  IT IS HIGHLY UNLIKELY THAT THE LABORATORY CAN

02:29PM 11    PERFORM EVERY CONCEIVABLE TEST, BOTH FROM A LOGISTICAL

02:29PM 12    STANDPOINT AND BECAUSE THE CLIA CERTIFICATION DESIGNATES

02:29PM 13    SPECIFIC SPECIALTIES OF TESTS THE LAB PERFORMS."

02:29PM 14         DID I READ THAT CORRECTLY?

02:29PM 15    A.   YOU DID.

02:29PM 16    Q.   AND FURTHER DOWN THERE'S A BULLET THAT SAYS, "REPLACE

02:29PM 17    'HIGHEST QUALITY' WITH 'HIGH QUALITY.'"

02:29PM 18         DO YOU SEE THAT RECOMMENDATION?

02:29PM 19    A.   I DO.

02:29PM 20    Q.   AND BENEATH THAT IT SAYS, "ENSURE SUBSTANTIATION FOR

02:30PM 21    '4 HOURS OR LESS.'"

02:30PM 22         DID I READ THAT CORRECTLY?

02:30PM 23    A.   YES.

02:30PM 24    Q.   AND IF WE CAN ZOOM OUT, MS. HOLLIMAN, AND GO DOWN TO THE

02:30PM 25    NEXT SERIES OF BULLETS.

02:30PM   1        DO YOU SEE WHERE THE ATTORNEYS AT HYMAN PHELPS ARE SAYING,

02:30PM   2   "REPLACE 'HIGHEST LEVELS OF ACCURACY' WITH 'HIGH LEVELS OF

02:30PM   3   ACCURACY,'" THE THIRD BULLET FROM THE BOTTOM?

02:30PM   4   A.   I DO.

02:30PM   5   Q.   AND IF WE CAN GO TO THE NEXT PAGE, PLEASE.

02:30PM   6        DO YOU SEE THE THIRD BULLET WHERE ONE OF THE RECOMMENDED

02:31PM   7   CHANGES WAS, "CHANGE 'MORE PRECISE' TO 'PRECISE'"?

02:31PM   8   A.   I DO.

02:31PM   9   Q.   DO YOU SEE THE BULLET FOR "ENSURE SUBSTANTIATION FOR 'IT'S

02:31PM  10   A LESS INVASIVE, AND LESS PAINFUL EXPERIENCE'"?

02:31PM  11   A.   YES.

02:31PM  12   Q.   IF WE COULD ZOOM OUT, PLEASE, MS. HOLLIMAN, AND THEN LOOK

02:31PM  13   AT THE REMAINING BULLET.

02:31PM  14        DO YOU SEE THE FOURTH FROM THE BOTTOM IT SAYS, "ENSURE

02:31PM  15   SUBSTANTIATION FOR DRAMATICALLY LOWER"?

02:31PM  16   A.   I DO.

02:31PM  17   Q.   AND THESE WERE ALL COMMENTS THAT YOU WERE RECEIVING ON THE

02:31PM  18   EVE OF LAUNCHING YOUR PUBLIC WEBSITE ABOUT THERANOS'S WALGREENS

02:31PM  19   RELATIONSHIP?

02:31PM  20   A.   THEY ARE.

02:31PM  21   Q.   AND THESE ARE GOING IN THE FIRST INSTANCE TO YOU; CORRECT?

02:31PM  22   A.   THAT'S RIGHT.

02:31PM  23   Q.   AND YOU SHARE THEM WITH CHRISTIAN HOLMES AND MR. BALWANI

02:31PM  24   AND OTHER MEMBERS OF YOUR TEAM?

02:31PM  25   A.   I THINK SO, YES.  YES, I SHARED THEM WITH CHRISTIAN AND

02:32PM  1    SUNNY, YES.

02:32PM  2    Q.   OKAY.  I'D NOW LIKE TO SHOW YOU SOME OF THE INVESTOR

02:32PM  3    POWERPOINTS THAT HAVE BEEN ADMITTED INTO EVIDENCE, AND I'D LIKE

02:32PM  4    TO START WITH EXHIBIT 4077.

02:32PM  5    A.   OKAY.

02:32PM  6    Q.   DO YOU RECALL MR. GROSSMAN TESTIFYING ABOUT EXHIBIT 4077?

02:32PM  7    A.   I DO.

02:32PM  8    Q.   OKAY.  LET ME DRAW YOUR ATTENTION, PLEASE, TO PAGE 17.

02:32PM  9         AND IF I COULD DRAW YOUR ATTENTION TO THAT LAST LANGUAGE

02:32PM 10    ON THE SLIDE, DO YOU SEE WHERE IT SAYS, "THERANOS PROVIDES THE

02:32PM 11    HIGHEST LEVEL OF OVERSIGHT, AUTOMATION, AND STANDARDIZATION IN

02:33PM 12    OUR PRE- AND POST-ANALYTIC PROCESSES, ENSURING THE HIGHEST

02:33PM 13    LEVELS OF ACCURACY AND PRECISION."

02:33PM 14         DO YOU SEE THAT LANGUAGE?

02:33PM 15    A.   I DO.

02:33PM 16    Q.   AND DID I READ THAT CORRECTLY?

02:33PM 17    A.   YOU DID.

02:33PM 18    Q.   AND THIS IS GOING TO MR. GROSSMAN IN JANUARY OF 2014?

02:33PM 19    A.   IT IS.

02:33PM 20    Q.   SO ROUGHLY THREE OR FOUR MONTHS AFTER THE WALGREENS

02:33PM 21    LAUNCH?

02:33PM 22    A.   YES.

02:33PM 23    Q.   AND THREE OR FOUR MONTHS AFTER YOU RECEIVED ADVICE FROM

02:33PM 24    THE ATTORNEYS AT HYMAN PHELPS?

02:33PM 25    A.   YES.

02:33PM   1    Q.   LET'S LOOK AT PAGE 21 OF THIS.

02:33PM   2         DO YOU SEE THE HEADING, "A NEW STANDARD IN QUALITY"?

02:33PM   3    A.   I DO.

02:33PM   4    Q.   AND DO YOU SEE BENEATH THAT THERE'S A BULLET, OR THE LINE,

02:33PM   5    "THE HIGHEST LEVELS OF ACCURACY"?

02:33PM   6    A.   I DO.

02:33PM   7    Q.   AND IN THE REMAINDER OF THE TEXT IT SAYS, "BY

02:33PM   8    SYSTEMATICALLY CONTROLLING AND STANDARDIZING OUR PROCESSES,

02:34PM   9    THERANOS OFFERS TESTS WITH THE HIGHEST LEVELS OF ACCURACY."

02:34PM   10        DO YOU SEE THAT LANGUAGE?

02:34PM   11   A.   I DO.

02:34PM   12   Q.   I READ THAT CORRECTLY?

02:34PM   13   A.   YOU DID.

02:34PM   14   Q.   AND THIS IS, AGAIN, IN JANUARY OF 2014?

02:34PM   15   A.   YES.

02:34PM   16   Q.   AFTER YOU GOT THE ADVICE FROM HYMAN & PHELPS?

02:34PM   17   A.   YES.

02:34PM   18   Q.   AND THERE'S ALSO THAT LESS THAN 10 PERCENT COEFFICIENT OF

02:34PM   19   VARIATION OF VITAMIN D.

02:34PM   20        DO YOU SEE THAT?

02:34PM   21   A.   I DO.

02:34PM   22   Q.   AND VITAMIN D WAS THE SAME ASSAY THAT MR. SHULTZ STARTS

02:34PM   23   RAISING CONCERNS ABOUT IN THE APRIL 2014 TIME PERIOD?

02:34PM   24   A.   YES.

02:34PM   25   Q.   AND LET'S LOOK NOW AT 4858.

02:35PM  1      A.   OKAY.

02:35PM  2      Q.   AND THIS IS IN EVIDENCE, SO WE CAN DISPLAY IT.

02:35PM  3           DO YOU SEE THE BATES LABEL IN THE BOTTOM RDV, MS. HOLMES?

02:35PM  4      A.   OH, SORRY.  I'M ON THE WRONG ONE.

02:35PM  5      Q.   IT'S ALSO ON THE SCREEN IF THAT'S EASIER FOR YOU.

02:35PM  6      A.   OKAY.  I DON'T HAVE A 4858.

02:35PM  7      Q.   ARE YOU COMFORTABLE?

02:35PM  8      A.   YEAH, YEAH, TOTALLY COMFORTABLE.

02:35PM  9      Q.   OKAY.  DO YOU SEE IN THE BOTTOM RIGHT-HAND CORNER THERE'S

02:35PM  10     A NUMBER RDV WITH SOME NUMBERS BY IT?

02:35PM  11     A.   I DO.

02:35PM  12     Q.   OKAY.  AND YOU WERE HERE WHEN LISA PETERSON TESTIFIED

02:35PM  13     ABOUT RDV'S INVESTMENT IN THERANOS?

02:35PM  14     A.   I WAS.

02:35PM  15     Q.   AND YOU WERE HERE WHEN SHE TESTIFIED ABOUT THIS

02:35PM  16     POWERPOINT?

02:35PM  17     A.   YES.

02:35PM  18     Q.   LET'S GO TO PAGE 5, PLEASE.

02:35PM  19           DO YOU SEE THE SLIDE, "THERANOS IS CERTIFIED AS A HIGH

02:35PM  20     COMPLEXITY CLIA LABORATORY"?

02:36PM  21     A.   I DO.

02:36PM  22     Q.   OKAY.  AND WE TALKED EARLIER ABOUT HOW THE CALIFORNIA

02:36PM  23     LABORATORY IS HIGH COMPLEXITY.

02:36PM  24           AT SOME POINT YOU ALSO HAVE AN ARIZONA LAB THAT IS

02:36PM  25     MODERATE COMPLEXITY?

02:36PM  1    A.   YES.

02:36PM  2    Q.   AND HERE YOU'RE TALKING ABOUT THE HIGH COMPLEXITY?

02:36PM  3    A.   YES.

02:36PM  4    Q.   AND YOU'RE HOLDING THIS OUT AS PART OF THE INFORMATION FOR

02:36PM  5    INVESTORS TO GET COMFORT THAT YOUR TECHNOLOGY WORKS; IS THAT

02:36PM  6    FAIR?

02:36PM  7    A.   I THINK WE WERE TRYING TO DESCRIBE WHAT A HIGH COMPLEXITY

02:36PM  8    LAB WAS HERE IN TERMS OF WHAT REQUIREMENTS WERE IN PLACE FOR

02:36PM  9    ONE.

02:36PM 10    Q.   OKAY.  AND THIS WAS PART OF THE WAY THAT YOU PERSUADED

02:36PM 11    INVESTORS THAT THERANOS'S TECHNOLOGY WAS ACCURATE; ISN'T THAT

02:36PM 12    RIGHT?

02:36PM 13    A.   IT WAS PART OF WHY I BELIEVED IN OUR TECHNOLOGY, YES.

02:36PM 14    Q.   LET'S LOOK AT PAGE 7, PLEASE.

02:36PM 15         DO YOU SEE THE SLIDE TITLED "THERANOS PROFICIENCY TESTING

02:36PM 16    AND AUDITS"?

02:37PM 17    A.   I DO.

02:37PM 18    Q.   AND I THINK YOU TALKED TO MR. DOWNEY ABOUT THE CONCEPT OF

02:37PM 19    PROFICIENCY TESTING IN YOUR DIRECT EXAMINATION.

02:37PM 20         DO YOU RECALL THAT?

02:37PM 21    A.   I DID, YES.

02:37PM 22    Q.   AND PROFICIENCY TESTING WAS WHERE YOU, IF YOU HAVE AN FDA

02:37PM 23    APPROVED MACHINE IN A LAB, YOU RUN YOUR SAMPLES, REPORT THE

02:37PM 24    RESULTS TO SOME AGENCY, AND THOSE ARE COMPARED AGAINST OTHERS

02:37PM 25    RUNNING THAT SAME DEVICE?

02:37PM 1     A.   YES.

02:37PM 2     Q.   AND YOU TOOK THE POSITION AT THERANOS THAT BECAUSE THERE

02:37PM 3     WAS NO COMPARATOR FOR THE EDISON 3.5, OR THE MODIFIED SIEMENS

02:37PM 4     TEST, THAT YOU WERE GOING TO DO SOMETHING CALLED ALTERNATIVE

02:37PM 5     ASSESSMENT OF PROFICIENCY?

02:37PM 6     A.   YES.

02:37PM 7     Q.   AND THOSE WERE CONCEPTS THAT YOU WERE FAMILIAR WITH IN

02:37PM 8     2013 AND 2014?

02:37PM 9     A.   YES.

02:37PM 10    Q.   NOW, THIS SLIDE TALKS ABOUT PROFICIENCY TESTING THAT IS

02:37PM 11    OCCURRING IN 2011, 2012, AND 2013 BEFORE THE WALGREENS LAUNCH.

02:37PM 12         DO YOU SEE THAT?

02:38PM 13    A.   I DO.

02:38PM 14    Q.   AM I RIGHT THAT ANY PROFICIENCY TESTING THAT WAS DONE AT

02:38PM 15    THERANOS IN 2011 RELATED ONLY TO THE FDA APPROVED MACHINES?

02:38PM 16    A.   YES.

02:38PM 17    Q.   OKAY.  SO THIS BULLET API HEMATOLOGY, THAT DOESN'T SAY

02:38PM 18    ANYTHING ABOUT HOW THE EDISON 3.5 OR HOW THE MODIFIED SIEMENS

02:38PM 19    TESTS ARE PERFORMING?

02:38PM 20    A.   THAT'S RIGHT.

02:38PM 21    Q.   AND THAT WOULD ALSO BE RIGHT FOR THE PROFICIENCY TESTING

02:38PM 22    IN 2012?

02:38PM 23    A.   YES.

02:38PM 24    Q.   THOSE WOULD RELATE ONLY TO FDA APPROVED MACHINES RUNNING

02:38PM 25    FDA APPROVED TESTS?

02:38PM  1    A.   YES.

02:38PM  2    Q.   THEY DON'T SAY ANYTHING AT ALL ABOUT PROFICIENCY TESTING

02:38PM  3    ON THE EDISON, OR PROFICIENCY TESTING ON THE MODIFIED SIEMENS

02:38PM  4    MACHINES?

02:38PM  5    A.   YES.

02:38PM  6    Q.   OKAY.  AND THAT WOULD BE THE SAME FOR THE 2013 PROFICIENCY

02:38PM  7    TESTING THAT IS REPORTED HERE.  THESE WOULD RELATE ONLY TO FDA

02:38PM  8    APPROVED MACHINES?

02:39PM  9    A.   I THINK SO.

02:39PM  10   Q.   IN OTHER WORDS, THEY DON'T SAY ANYTHING ABOUT PROFICIENCY

02:39PM  11   TESTING ON YOUR MINILAB, ON YOUR EDISON 3.5, OR THE MODIFIED

02:39PM  12   SIEMENS MACHINES?

02:39PM  13   A.   I THINK SO.

02:39PM  14   Q.   OKAY.  HOW ABOUT 2014, CHLAMYDIA, YOU DIDN'T TEST FOR

02:39PM  15   CHLAMYDIA ON THE EDISON?

02:39PM  16   A.   NO.

02:39PM  17   Q.   THAT'S NOT AN IMMUNOASSAY?

02:39PM  18   A.   IT IS NOT.

02:39PM  19   Q.   HOW ABOUT HEPATITIS VIRAL LOAD-B?  THAT WAS NOT SOMETHING

02:39PM  20   YOU RAN ON THE EDISON, IS IT?

02:39PM  21   A.   IT IS NOT.

02:39PM  22   Q.   OKAY.  SO EVEN THE 2014 NUMBERS HERE DON'T SAY ANYTHING

02:39PM  23   ABOUT PROFICIENCY TESTING ON THE EDISON DEVICE OR YOUR MINILAB?

02:39PM  24   A.   CORRECT.

02:39PM  25   Q.   AND YOU WERE HOLDING THIS OUT TO INVESTORS SO THAT THEY

02:39PM    1    COULD BE COMFORTABLE WITH THERANOS BECAUSE THEY HAD PASSED

02:39PM    2    PROFICIENCY TESTING IN 2011, 2012, AND 2013?

02:39PM    3    A.   YES, I WAS SHARING OUR PROFICIENCY TESTING SCORES FOR

02:40PM    4    THOSE YEARS.

02:40PM    5    Q.   AND YOU NEVER TOLD THE INVESTORS THAT THE NUMBERS ON THIS

02:40PM    6    SLIDE HAD ZERO TO DO WITH EDISON, DID YOU?

02:40PM    7    A.   WE DID NOT.  I DON'T REMEMBER EVER DISCUSSING THE NUMBERS

02:40PM    8    ON THIS SLIDE.

02:40PM    9    Q.   AND YOU NEVER TOLD AN INVESTOR THAT THE NUMBERS ON THIS

02:40PM   10    SCREENS HAVE ZERO TO DO WITH THE MODIFIED SIEMENS MACHINES?

02:40PM   11    A.   NO, I DON'T THINK WE DISCUSSED THE SLIDE.

02:40PM   12    Q.   YOU DIDN'T TALK ABOUT MODIFIED SIEMENS MACHINES WITH ANY

02:40PM   13    INVESTORS.

02:40PM   14        AM I RIGHT ABOUT THAT?

02:40PM   15    A.   I DID NOT.

02:40PM   16    Q.   LET ME NEXT ASK YOU TO LOOK AT EXHIBIT 39, OR ACTUALLY IF

02:40PM   17    WE COULD LOOK AT PAGE 28 OF THIS EXHIBIT.

02:40PM   18        IS THIS ANOTHER SLIDE THAT IS SIMILAR TO THE ONE THAT WE

02:40PM   19    SAW IN THE PFM PRESENTATION IN THE PRIOR EXHIBIT?

02:40PM   20    A.   YES.

02:40PM   21    Q.   OKAY.  AND THIS SLIDE ALSO HAS IN THAT THIRD LINE,

02:41PM   22    "THERANOS PROVIDES THE HIGHEST LEVEL OF OVERSIGHT, AUTOMATION,

02:41PM   23    AND STANDARDIZATION IN OUR PRE- AND POST-ANALYTIC PROCESSES,

02:41PM   24    ENSURING THE HIGHEST LEVELS OF ACCURACY AND PRECISION."

02:41PM   25        DID I READ THAT CORRECTLY?

02:41PM  1     A.   YOU DID.

02:41PM  2     Q.   AND THIS IS GOING TO RDV AT SOME POINT IN SEPTEMBER OR

02:41PM  3     OCTOBER OF 2014?

02:41PM  4     A.   I THINK SO.  I DON'T HAVE THE EMAIL, BUT THAT SOUNDS

02:41PM  5     RIGHT.

02:41PM  6     Q.   WELL, YOU REMEMBER THE BDT CONFERENCE IN SEPTEMBER OR

02:41PM  7     OCTOBER OF 2014?

02:41PM  8     A.   I DO.

02:41PM  9     Q.   AND YOU ASSOCIATE THAT WITH THE RDV INVESTMENT?

02:41PM  10    A.   I DO.

02:41PM  11    Q.   SO ARE YOU COMFORTABLE THAT THIS PRESENTATION IS SOMETIME

02:41PM  12    IN THE FALL OF 2014?

02:41PM  13    A.   YES.

02:41PM  14    Q.   AND MORE THAN A YEAR AFTER THE LAUNCH?

02:41PM  15    A.   YES.

02:41PM  16    Q.   AND MORE THAN A YEAR AFTER YOU GOT THE ADVICE FROM

02:41PM  17    HYMAN PHELPS ABOUT THE HIGHEST LEVELS OF ACCURACY?

02:41PM  18    A.   YES.

02:41PM  19    Q.   LET'S LOOK AT PAGE 30.

02:42PM  20         IS THIS SLIDE SIMILAR TO THE SLIDE THAT WE SAW IN THE PFM

02:42PM  21    PRESENTATION?

02:42PM  22    A.   IT IS.

02:42PM  23    Q.   AND IT ALSO INCLUDES TWICE HIGHEST LEVELS OF ACCURACY?

02:42PM  24    A.   IT DOES.

02:42PM  25    Q.   OKAY.  DAN YOUNG DIDN'T GO TO INVESTOR PRESENTATIONS; IS

02:42PM   1    THAT CORRECT?

02:42PM   2    A.   NOT GENERALLY.  HE MAY HAVE BEEN AT SOME.

02:42PM   3    Q.   YOU DON'T HAVE A SPECIFIC MEMORY OF DAN YOUNG EVER GOING

02:42PM   4    TO AN INVESTOR PRESENTATION?

02:42PM   5    A.   I DO.

02:42PM   6    Q.   WHICH ONE?

02:42PM   7    A.   WHEN WE STARTED DOING SHAREHOLDER MEETINGS, DR. YOUNG

02:42PM   8    WOULD JOIN US IN THOSE SHAREHOLDER MEETINGS.

02:42PM   9    Q.   OKAY.  THAT'S 2016?

02:42PM   10   A.   YES.

02:42PM   11   Q.   RIGHT.

02:42PM   12        LET'S FOCUS ON THE TIME PERIOD PRIOR TO OCTOBER 2015.  YOU

02:42PM   13   HAVE NO MEMORY OF DAN YOUNG EVER GOING TO AN INVESTOR

02:43PM   14   PRESENTATION?

02:43PM   15   A.   I DON'T THINK SO.

02:43PM   16   Q.   HE WASN'T THERE WHEN YOU PRESENTED TO PFM?

02:43PM   17   A.   I DON'T THINK SO.

02:43PM   18   Q.   HE WASN'T THERE WHEN YOU PRESENTED TO RDV?

02:43PM   19   A.   NO.

02:43PM   20   Q.   AND HE WASN'T THERE FOR MEETINGS THAT YOU HAD WITH BDT?

02:43PM   21   A.   I'M SORRY.  WITH?

02:43PM   22   Q.   BDT.

02:43PM   23   A.   I DON'T THINK SO.

02:43PM   24   Q.   HE WASN'T THERE FOR MEETINGS YOU HAD WITH RUPERT MURDOCH?

02:43PM   25   A.   HE WAS NOT.

02:43PM  1     Q.   HE WASN'T THERE FOR MEETINGS THAT YOU HAD WITH THE

02:43PM  2     DEVOS FAMILY?

02:43PM  3     A.   HE WAS NOT.

02:43PM  4     Q.   HIS JOB WAS TO RUN R&D.  AM I RIGHT?

02:43PM  5     A.   IT WAS, YES.

02:43PM  6     Q.   AND NOT INVESTOR RELATIONS?

02:43PM  7     A.   CORRECT.

02:43PM  8     Q.   THANK YOU, MS. HOLLIMAN.  WE CAN TAKE THAT DOWN.

02:43PM  9          AM I RIGHT IT'S YOUR TESTIMONY THAT YOU TOLD THE BOARD OF

02:44PM  10    DIRECTORS THERANOS WAS USING MODIFIED COMMERCIAL ANALYZERS TO

02:44PM  11    DO THE PHASE I TESTING?

02:44PM  12    A.   I TOLD THE BOARD OF DIRECTORS THAT WE HAD AN INVENTION

02:44PM  13    AROUND MODIFIED COMMERCIAL ANALYZERS.

02:44PM  14    Q.   OKAY.  AND YOU -- YOUR TESTIMONY IS THAT YOU TOLD THE

02:44PM  15    BOARD OF DIRECTORS THAT IN OCTOBER OF 2013?

02:44PM  16    A.   YES.

02:44PM  17    Q.   OKAY.  AND WE SAW DURING YOUR DIRECT EXAMINATION THE

02:44PM  18    MINUTES OF THAT MEETING; CORRECT?

02:44PM  19    A.   YES.

02:44PM  20    Q.   OKAY.  AND YOU POINTED TO SOME LANGUAGE ABOUT TRADE

02:44PM  21    SECRETS, BUT THERE'S NO REFERENCE IN THE MINUTES TO MODIFIED

02:44PM  22    COMMERCIAL MACHINES.

02:44PM  23         CAN WE AGREE ON THAT?

02:44PM  24    A.   I THINK THAT'S RIGHT.  I HAVEN'T REREAD THEM, BUT THAT

02:44PM  25    WOULD MAKE SENSE.

02:44PM   1    Q.   OKAY.  WE HAVE YOUR MEMORY FOR THAT POINT.  IT'S NOT

02:44PM   2    SOMETHING IN THE MINUTES?

02:44PM   3    A.   I THINK THAT'S RIGHT.

02:44PM   4    Q.   OKAY.  AND YOU WERE HERE WHEN GENERAL MATTIS TESTIFIED

02:45PM   5    THAT HE WAS UNAWARE THAT THE COMPANY WAS USING THIRD PARTY

02:45PM   6    COMMERCIAL MACHINES TO DO THIS TESTING?

02:45PM   7    A.   I WAS.

02:45PM   8    Q.   OKAY.  AND CAN WE AGREE THAT YOU HAD NO REASON TO KEEP

02:45PM   9    FROM THE -- THE BOARD OF DIRECTORS IS A -- CAN BE TRUSTED TO

02:45PM   10   KEEP SECRETS, CAN WE AGREE ON THAT?

02:45PM   11   A.   YES.

02:45PM   12   Q.   AND SO I KNOW YOU'VE MENTIONED TRADE SECRETS IN THE PAST,

02:45PM   13   BUT YOU CAN SHARE YOUR TRADE SECRETS FREELY WITH YOUR BOARD OF

02:45PM   14   DIRECTORS; CORRECT?

02:45PM   15   A.   I THINK SO.

02:45PM   16   Q.   SO THERE WAS NOTHING IN YOUR VIEW OF TRADE SECRETS THAT

02:45PM   17   GOT IN THE WAY OF YOU TELLING MEMBERS OF THE BOARD, WE'RE

02:45PM   18   MODIFYING SIEMENS MACHINES, THAT THIS IS HOPEFULLY JUST PART OF

02:45PM   19   PHASE I.

02:45PM   20        THERE WAS NOTHING IN THE WAY OF YOU TELLING THEM THAT?

02:45PM   21   A.   I UNDERSTOOD DESCRIBING THAT WE HAD THIS INVENTION THAT WE

02:45PM   22   HAD A TRADE SECRET WAS TOTALLY APPROPRIATE.

02:46PM   23   Q.   AND YOU WERE ALSO SHOWN SOME PATENT PORTFOLIOS THAT WERE

02:46PM   24   PROVIDED TO THE BOARD?

02:46PM   25   A.   YES.

02:46PM  1    Q.   OKAY.  YOU DON'T HAVE A MEMORY OF GOING THROUGH THE PATENT

02:46PM  2    PORTFOLIO WITH MEMBERS OF YOUR BOARD OF DIRECTORS, DO YOU?

02:46PM  3    A.   I DO.

02:46PM  4    Q.   YOU WENT THROUGH LINE BY LINE AND TOLD THEM THIS RELATES

02:46PM  5    TO THAT, THIS RELATES TO THIS?

02:46PM  6    A.   I WOULD GO THROUGH SECTIONS OF IT, SO WE WOULD DESCRIBE

02:46PM  7    GENERAL SECTIONS RELATED TO DIFFERENT TOPICS, LIKE IN THAT CASE

02:46PM  8    COLLECTION DEVICES ASSOCIATED WITH THE LAUNCH OR OTHER

02:46PM  9    TECHNOLOGIES THAT WERE ASSOCIATED WITH THE LAUNCH THAT WE WERE

02:46PM  10   TRYING TO PROTECT IN ANTICIPATION OF THE PUBLIC ANNOUNCEMENT.

02:46PM  11   Q.   BUT YOU AGREE WITH ME THAT THERE'S NO RECORD OF THE

02:46PM  12   SPECIFIC PORTION OF THE DOCUMENT THAT YOU WALKED THROUGH WITH

02:46PM  13   THE BOARD OF DIRECTORS IN OCTOBER OF 2013?

02:46PM  14   A.   I THINK YOU'RE RIGHT.  AGAIN, I HAVEN'T READ THOSE MINUTES

02:46PM  15   IN THEIR ENTIRETY.

02:46PM  16   Q.   OKAY.  WE HAVE YOUR MEMORY FOR THAT?

02:46PM  17   A.   YES.

02:46PM  18   Q.   AND WE HAVE GENERAL MATTIS'S MEMORY OF THAT?

02:46PM  19   A.   WE DO.

02:46PM  20   Q.   OKAY.  I'D LIKE TO DRAW YOUR ATTENTION TO -- WELL, ISN'T

02:47PM  21   IT RIGHT AFTER "THE WALL STREET JOURNAL" ARTICLE COMES OUT IN

02:47PM  22   2015, MS. HOLMES, MEMBERS OF THE BOARD ASK YOU QUESTIONS ABOUT

02:47PM  23   WHAT ARE WE TESTING AND WHAT ARE WE TESTING ON?

02:47PM  24   A.   THEY DID.

02:47PM  25   Q.   LET ME DRAW YOUR ATTENTION TO EXHIBIT 4553.

02:47PM  1     A.   OKAY.

02:47PM  2     Q.   IS THAT YOUR EMAIL ADDRESS?

02:47PM  3     A.   IT IS.

02:47PM  4     Q.   AND DO YOU SEE THE DATE SATURDAY, OCTOBER 17TH, 2015?

02:47PM  5     A.   I DO.

02:48PM  6     Q.   AND DO YOU SEE EMAIL ADDRESSES FOR A NUMBER OF YOUR BOARD

02:48PM  7     MEMBERS?

02:48PM  8     A.   I DO.

02:48PM  9          MR. LEACH:  YOUR HONOR, I MOVE THE ADMISSION OF

02:48PM  10    EXHIBIT 4553.

02:48PM  11         THE CLERK:  THAT WAS PREVIOUSLY ADMITTED.  IT'S

02:48PM  12    PREVIOUSLY ADMITTED, YOUR HONOR.

02:48PM  13         MR. LEACH:  EVEN BETTER.

02:48PM  14      THANK YOU, MS. KRATZMANN.

02:48PM  15         THE COURT:  IT LOOKS LIKE IT HAS BEEN PREVIOUSLY

02:48PM  16    ADMITTED, SO IT CAN BE PUBLISHED.

02:48PM  17    BY MR. LEACH:

02:48PM  18    Q.   LET ME DRAW YOUR ATTENTION, MS. HOLMES, TO THE BOTTOM

02:48PM  19    EMAIL.  THERE'S AN EMAIL FROM -- IS THAT MR. KOVACEVICH'S EMAIL

02:48PM  20    IN THE FROM LINE AT WELLS FARGO?

02:48PM  21    A.   IT IS.

02:48PM  22    Q.   OKAY.  AND YOU SEE THE DATE OCTOBER 16TH, 2015?

02:48PM  23    A.   I DO.

02:48PM  24    Q.   AND THIS IS AFTER MR. CARREYROU HAS COME OUT WITH HIS

02:48PM  25    ARTICLE?

02:48PM  1    A.   I THINK SO.

02:48PM  2    Q.   AND MR. KOVACEVICH IS WRITING, "THIS WAS WELL DONE.  I AM

02:49PM  3    STILL CONFUSED, HOWEVER, REGARDING MY PREVIOUS EMAIL.  AT THIS

02:49PM  4    MOMENT, HOW MANY OF OUR CUSTOMER SUBMISSIONS ARE BEING TESTED

02:49PM  5    ON LAB EQUIPMENT VERSUS EDISON?  I UNDERSTAND WHAT IS BEING

02:49PM  6    SAID THERE IS VERY LITTLE."

02:49PM  7         DO YOU SEE THAT LANGUAGE?

02:49PM  8    A.   YES.

02:49PM  9    Q.   AND IS THIS CONSISTENT WITH OTHER QUESTIONS THAT YOU

02:49PM  10   RECEIVED FROM YOUR BOARD IN THIS TIME PERIOD ABOUT WHAT EXACTLY

02:49PM  11   THERANOS WAS TESTING AND ON WHAT?

02:49PM  12   A.   IT IS.

02:49PM  13   Q.   LET'S LOOK AT YOUR RESPONSE.

02:49PM  14        CAN WE AGREE, MS. HOLMES, THAT YOU DON'T USE THE WORD

02:49PM  15   "SIEMENS" IN YOUR RESPONSE TO YOUR BOARD OF DIRECTORS HERE?

02:49PM  16   A.   I HAVEN'T READ IT YET, BUT I PROBABLY DIDN'T.

02:49PM  17   Q.   OKAY.  AND CAN WE AGREE THAT YOU DID NOT USE THE WORD

02:50PM  18   "BECTON DICKINSON" IN YOUR RESPONSE TO THE BOARD OF DIRECTORS?

02:50PM  19   A.   I'M SURE I DIDN'T.

02:50PM  20   Q.   AND YOU DO WRITE IN THAT THIRD PARAGRAPH -- I DON'T KNOW

02:50PM  21   THE PARAGRAPHS, BUT IT'S THE LINE BEGINNING DURING, "DURING THE

02:50PM  22   TIME WE ARE TRANSITIONING THE NANOTAINERS OPERATIONS, WE ARE

02:50PM  23   STILL ABLE TO USE ALL OF OUR PROPRIETARY TECHNOLOGY, INCLUDING

02:50PM  24   OUR DEVICES, WHICH WERE APPROVED FOR USE THIS SUMMER BASED ON

02:50PM  25   THE STUDIES WITH APPROXIMATELY 900 PATIENT SAMPLES."

02:50PM  1          DID I READ THAT CORRECTLY?

02:50PM  2     A.   YOU DID.

02:50PM  3     Q.   AND THEN YOU WROTE, "NOTE THE NAME EDISON WAS THE NAME OF

02:50PM  4     THE COMPANY'S VERY FIRST DEVICE (NOT OUR CURRENT SYSTEMS) -

02:50PM  5     THIS IS ONE OF MANY INCORRECT STATEMENTS BY THE FORMER EMPLOYEE

02:50PM  6     WHO COMMUNICATED THIS INFORMATION TO THE WSJ REPORTER."

02:50PM  7          DO YOU SEE THAT LANGUAGE?

02:50PM  8     A.   I DO.

02:50PM  9     Q.   AND IS THIS SIMILAR TO COMMENTS THAT YOU MADE PUBLIC ABOUT

02:50PM  10    EDISON BEING SOMETHING THAT YOU HAD USED WAY IN THE PAST?

02:51PM  11    A.   IT IS.

02:51PM  12    Q.   AND THAT WASN'T COMPLETELY FORTHRIGHT; IS THAT RIGHT?

02:51PM  13    A.   I DEFINITELY WOULDN'T SAY IT THAT WAY NOW.  WHAT I WAS

02:51PM  14    ATTEMPTING TO EXPRESS IS THAT I THOUGHT OF EDISON AS AN EARLIER

02:51PM  15    VERSION OF THE 3 SERIES.

02:51PM  16    Q.   SO THIS IS ANOTHER THING THAT YOU WISH YOU DID

02:51PM  17    DIFFERENTLY?

02:51PM  18    A.   YES.  THERE ARE MANY THINGS THAT I WISH I DID DIFFERENTLY.

02:51PM  19    Q.   INCLUDING THIS ONE?

02:51PM  20    A.   YES.

02:51PM  21    Q.   OKAY.  THANK YOU.

02:51PM  22         THANK YOU, MS. HOLLIMAN.  WE CAN TAKE THAT DOWN.

02:51PM  23         I'D LIKE TO DRAW YOUR ATTENTION, MS. HOLMES, TO SOME OF

02:51PM  24    YOUR DIRECT TESTIMONY ABOUT PHARMACEUTICAL COMPANIES.

02:51PM  25         DO YOU RECALL TESTIFYING ABOUT PHARMACEUTICAL COMPANIES?

02:52PM  1    A.   I DO.

02:52PM  2    Q.   AND I UNDERSTAND YOU'VE SEEN, THROUGH A NUMBER OF

02:52PM  3    WITNESSES, A REPORT THAT YOU SENT TO INVESTORS AND TO WALGREENS

02:52PM  4    BEARING THE PFIZER LOGO.

02:52PM  5        DO YOU RECALL TESTIMONY AROUND THAT?

02:52PM  6    A.   I DO.

02:52PM  7    Q.   AND YOUR TESTIMONY ON DIRECT EXAMINATION WAS YOU APPLIED

02:52PM  8    THAT LOGO TO THE DOCUMENT?

02:52PM  9    A.   IT WAS.

02:52PM  10   Q.   OKAY.  AND IF WE COULD PLEASE DISPLAY WHAT IS IN EVIDENCE

02:52PM  11   AS TRIAL EXHIBIT 291 AT PAGE 8.

02:52PM  12       DO YOU RECOGNIZE THIS AS THE ATTACHMENT THAT YOU SENT TO

02:52PM  13   WALGREENS IN ADVANCE OF OR IN CONNECTION WITH DISCUSSIONS ABOUT

02:52PM  14   A POTENTIAL PARTNERSHIP?

02:52PM  15   A.   I DO.

02:52PM  16   Q.   OKAY.  AND DO YOU AGREE WITH ME THAT THIS DOCUMENT IS NOT

02:53PM  17   FROM PFIZER?

02:53PM  18   A.   NO.  IT'S FROM THERANOS.

02:53PM  19   Q.   IT'S FROM THERANOS, NOT PFIZER?

02:53PM  20   A.   YES.

02:53PM  21   Q.   WE CAN AGREE ON THAT?

02:53PM  22   A.   YES.

02:53PM  23   Q.   OKAY.  AND YOU PUT THE PFIZER LOGO ON THIS?

02:53PM  24   A.   I DID.

02:53PM  25   Q.   YOU DID NOT SEEK PFIZER'S PERMISSION TO DO THAT?

02:53PM 1    A.   I DON'T KNOW.

02:53PM 2    Q.   NO ONE FROM PFIZER AUTHORIZED YOU TO DO THAT?

02:53PM 3    A.   AGAIN, I DON'T KNOW.  I CAN'T REMEMBER.  I CAN'T REMEMBER

02:53PM 4    DOING THIS.

02:53PM 5    Q.   NO ONE FROM PFIZER ORALLY TOLD YOU THAT YOU HAD PFIZER'S

02:53PM 6    PERMISSION TO PUT THE PFIZER LOGO ON A THERANOS REPORT; IS THAT

02:53PM 7    RIGHT?

02:53PM 8    A.   I DON'T KNOW.

02:53PM 9    Q.   AND NO ONE TOLD YOU IN WRITING THAT YOU HAD PERMISSION TO

02:53PM 10   PUT THE PFIZER LOGO ON THE THERANOS REPORT?

02:53PM 11   A.   I DON'T THINK SO.

02:53PM 12   Q.   BEFORE GIVING THE DOCUMENT TO WALGREENS, YOU DID NOT TELL

02:54PM 13   PFIZER YOU WERE ADDING ITS LOGO TO A DOCUMENT THAT THERANOS

02:54PM 14   PREPARED; AM I RIGHT?

02:54PM 15   A.   I DON'T KNOW.  I DON'T REMEMBER THIS PROCESS.

02:54PM 16   Q.   AND YOU NEVER TOLD WALGREENS THAT YOU PUT THE PFIZER LOGO

02:54PM 17   ON THIS?

02:54PM 18   A.   I'M SURE WE DIDN'T.

02:54PM 19   Q.   DO YOU AGREE WITH ME THAT THIS IS NOT AN INDEPENDENT DUE

02:54PM 20   DILIGENCE REPORT?

02:54PM 21   A.   I THOUGHT IT WAS.

02:54PM 22   Q.   SITTING HERE TODAY, DO YOU AGREE WITH ME THAT THIS IS NOT

02:54PM 23   AN INDEPENDENT DUE DILIGENCE REPORT?

02:54PM 24   A.   I STILL THINK IT WAS.

02:54PM 25   Q.   IT'S NOT AN INDEPENDENT DUE DILIGENCE REPORT FROM PFIZER;

02:54PM  1    IS THAT FAIR?  WILL YOU AGREE WITH ME ON THAT?

02:54PM  2    A.   IT IS WRITTEN BY THERANOS.  IT WAS FROM THE PROGRAM THAT

02:54PM  3    WE DID WITH PFIZER.

02:54PM  4    Q.   OKAY.  BUT IT'S NOT FROM PFIZER?  THAT WAS YOUR TESTIMONY

02:55PM  5    A FEW MINUTES AGO?

02:55PM  6    A.   CORRECT.  IT WAS -- I SENT IT TO WALGREENS.  THERANOS SENT

02:55PM  7    IT TO WALGREENS, NOT PFIZER.  PFIZER DID NOT SEND IT TO

02:55PM  8    WALGREENS.

02:55PM  9    Q.   NOW, THERANOS DID MORE THAN SIMPLY AFFIX THE PFIZER LOGO

02:55PM  10   TO THIS; ISN'T THAT CORRECT?

02:55PM  11   A.   I'M NOT SURE.

02:55PM  12   Q.   WELL, LET'S LOOK.  IF WE CAN COMPARE EXHIBIT 291, PAGE 8

02:55PM  13   WITH EXHIBIT 143, PAGE 3.  THESE ARE IN EVIDENCE.

02:55PM  14        (PAUSE IN PROCEEDINGS.)

02:55PM  15   BY MR. LEACH:

02:56PM  16   Q.   MS. HOLMES, DO YOU SEE ON THE SCREEN ON THE LEFT SIDE

02:56PM  17   EXHIBIT 291, PAGE 8?

02:56PM  18   A.   I DO.

02:56PM  19   Q.   AND THIS WAS WHAT WAS SENT TO WALGREENS?

02:56PM  20   A.   YES.

02:56PM  21   Q.   AND DO YOU SEE ON THE RIGHT EXHIBIT 143, PAGE 3, THIS IS

02:56PM  22   THE DOCUMENT THAT YOU HAD INITIALLY SENT TO PFIZER?

02:56PM  23   A.   YES.

02:56PM  24   Q.   AND DO YOU SEE HOW THE WORDS "PREPARED FOR

02:56PM  25   DR. AIDAN POWER" ARE ABSENT FROM EXHIBIT 291 ON PAGE 8?

02:56PM  1     A.   I DO.

02:56PM  2     Q.   AND DID YOU DELETE THOSE WORDS?

02:57PM  3     A.   I THINK SO.

02:57PM  4     Q.   YOU DIDN'T MENTION THAT IN YOUR DIRECT EXAMINATION, DID

02:57PM  5     YOU?

02:57PM  6     A.   NO, I DON'T THINK WE TALKED ABOUT THAT EXPLICITLY.

02:57PM  7     Q.   OKAY.  DO YOU AGREE WITH ME THAT EXPLICITLY STATING THAT

02:57PM  8     THIS WAS PREPARED FOR DR. AIDAN POWER MIGHT MAKE IT EASIER FOR

02:57PM  9     A READER TO DETERMINE THAT THIS WAS PREPARED BY THERANOS?

02:57PM  10    A.   IT COULD.

02:57PM  11    Q.   IS DELETING THOSE WORDS ANOTHER THING YOU WISH YOU HAD

02:57PM  12    DONE DIFFERENTLY?

02:57PM  13    A.   I DO.  I WISH I HAD HANDLED THIS DIFFERENTLY, YES.

02:57PM  14    Q.   OKAY.  LET'S LOOK AT EXHIBIT 174, WHICH IS IN EVIDENCE.  I

02:57PM  15    THINK IT'S ALSO IN YOUR BINDER, MS. HOLMES.

02:57PM  16         DO YOU RECALL TESTIMONY FROM SHANE WEBER RELATING TO THIS

02:57PM  17    EXHIBIT, MS. HOLMES?

02:57PM  18    A.   I DO.

02:57PM  19    Q.   OKAY.  DO YOU RECALL SHANE WEBER TELLING YOU PFIZER DID

02:58PM  20    NOT HAVE AT THAT TIME A FORESEEABLE USE FOR THE THERANOS

02:58PM  21    DEVICE?

02:58PM  22    A.   I DON'T.

02:58PM  23    Q.   IN THIS DOCUMENT IT SAYS, "TODAY I SPOKE WITH

02:58PM  24    ELIZABETH HOLMES, CEO, THERANOS AND EXPLAINED TO HER THAT

02:58PM  25    PFIZER DID NOT HAVE AT THIS TIME A FORESEEABLE USE FOR THE

02:58PM  1    THERANOS IMMUNOASSAY DEVICE FOR AT PATIENT SELF USE AT HOME BUT

02:58PM  2    SHE AND I AGREED TO STAY IN TOUCH EVERY SIX MONTHS."

02:58PM  3         DO YOU RECALL DR. WEBER TELLING YOU THAT YOU AGREED TO

02:58PM  4    STAY IN TOUCH EVERY SIX MONTHS?

02:58PM  5    A.   I REMEMBER GENERALLY THAT I HAD A CALL WITH PFIZER AND

02:58PM  6    THAT WE WERE GOING TO CONTINUE TALKING.

02:58PM  7    Q.   YOU ALSO TESTIFIED ABOUT INTERACTIONS THAT YOU HAD WITH

02:58PM  8    PFIZER AFTER JANUARY OF 2009.

02:58PM  9         DO YOU RECALL THAT TESTIMONY?

02:58PM  10   A.   I DO.

02:58PM  11   Q.   AND LET'S BE 100 PERCENT CLEAR.  NONE OF THOSE

02:59PM  12   INTERACTIONS WITH PFIZER RESULTED IN ANY REVENUE GENERATING

02:59PM  13   CONTRACT WITH THERANOS; CORRECT?

02:59PM  14   A.   THAT'S RIGHT.

02:59PM  15   Q.   NOTHING EVER CAME OF THAT TALK?

02:59PM  16   A.   CORRECT.

02:59PM  17   Q.   IT WAS JUST TALK?

02:59PM  18   A.   IT WAS TALK AND WORK, BUT WE DIDN'T GET REVENUE FROM IT.

02:59PM  19   Q.   YOU NEVER HAD ANOTHER AGREEMENT WITH PFIZER AFTER THE 2009

02:59PM  20   REPORT; ISN'T THAT RIGHT?

02:59PM  21   A.   THAT'S RIGHT.

02:59PM  22   Q.   PFIZER DIDN'T PAY THERANOS ANOTHER DIME AFTER JANUARY OF

02:59PM  23   2009; CORRECT?

02:59PM  24   A.   THAT'S RIGHT.

02:59PM  25   Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO EXHIBIT 1504, 15041,

02:59PM  1    WHICH I THINK WAS ADMITTED DURING YOUR DIRECT EXAMINATION.

02:59PM  2        AND IF WE COULD -- MS. HOLLIMAN, IS THERE A WAY TO BE ABLE

02:59PM  3    TO PULL THAT UP?

03:00PM  4        AND IF WE CAN ALSO DISPLAY THIS NEXT TO EXHIBIT 291,

03:00PM  5    PAGE 33.

03:00PM  6        MS. HOLMES, DO YOU SEE ON THE SCREEN ON THE LEFT

03:00PM  7    EXHIBIT 15041?

03:00PM  8    A.   I DO.

03:00PM  9    Q.   AND YOU RECALL TESTIFYING ABOUT THIS ON YOUR DIRECT

03:00PM  10   EXAMINATION?

03:00PM  11   A.   I DO.

03:00PM  12   Q.   AND I JUXTAPOSED THIS AGAINST PAGE 33 OF EXHIBIT 291.

03:00PM  13   THAT'S THE DOCUMENT THAT YOU SENT TO WALGREENS WITH THE PFIZER

03:00PM  14   LOGO ON IT?

03:00PM  15   A.   YES.

03:00PM  16   Q.   AND THIS PAGE OF EXHIBIT 291 LISTS A NUMBER OF

03:00PM  17   CONCLUSIONS.

03:00PM  18       DO YOU SEE THAT TO THE RIGHT?

03:01PM  19   A.   I DO.

03:01PM  20   Q.   FOCUSSING ON EXHIBIT 15041, THERE WERE A COUPLE NAMES,

03:01PM  21   DAVID LESTER.  DAVID LESTER WAS SOMEBODY WHO HAD WORKED AT

03:01PM  22   PFIZER?

03:01PM  23   A.   YES.

03:01PM  24   Q.   AND THEN HE CAME TO THERANOS?

03:01PM  25   A.   HE DID.

03:01PM  1    Q.   AND HE LEFT PRETTY SHORTLY AFTER COMING TO THERANOS; ISN'T

03:01PM  2    THAT RIGHT?

03:01PM  3    A.   YEAH.  I DON'T REMEMBER WHEN HE LEFT, BUT HE WASN'T THERE

03:01PM  4    VERY LONG.

03:01PM  5    Q.   A MATTER OF MONTHS MAYBE?

03:01PM  6    A.   I REMEMBER IT AS LONGER, BUT I DON'T KNOW.

03:01PM  7    Q.   NOT MORE THAN THREE OR FOUR YEARS?

03:01PM  8    A.   NO.

03:01PM  9    Q.   AND HE CERTAINLY WASN'T THERE IN 2011, 2012, 2013?

03:01PM 10    A.   HE WASN'T.

03:01PM 11    Q.   AND THINGS JUST DIDN'T WORK OUT WITH MR. LESTER?

03:01PM 12    A.   THEY DID NOT.

03:01PM 13    Q.   AND THE EMAIL -- AND WE CAN ZOOM OUT, MS. HOLLIMAN.

03:01PM 14         THE EMAIL DOWN AT THE BOTTOM FROM CRAIG LIPSET, THAT WAS

03:01PM 15    ANOTHER CONTACT THAT YOU HAD WITH PFIZER; IS THAT CORRECT?

03:02PM 16    A.   YES, HE OVERSAW OUR PROGRAM THAT WE DID WITH THEM.

03:02PM 17    Q.   OKAY.  AND YOU RECALL MR. WEBER TESTIFYING ABOUT HIS

03:02PM 18    INTERACTIONS WITH CRAIG LIPSET WHEN HE CAME TO PFIZER?

03:02PM 19    A.   I DO.

03:02PM 20    Q.   OKAY.  AND THIS EMAIL RELATES TO MODELING CAPABILITIES;

03:02PM 21    CORRECT?

03:02PM 22    A.   IT DOES.

03:02PM 23    Q.   THERANOS IN THIS TIME PERIOD WAS TRYING TO DEVELOP MODELS

03:02PM 24    TO HELP PHARMACEUTICAL COMPANIES ASSESS DRUG CONCENTRATIONS AND

03:02PM 25    IDENTIFY BIOMARKERS.

03:02PM  1          AM I SUMMARIZING IT AT A HIGH LEVEL CORRECTLY?

03:02PM  2     A.   YES.  OTHER THINGS, TOO, BUT YES.

03:02PM  3     Q.   BUT IT RELATES TO MODELING?

03:02PM  4     A.   YES.

03:02PM  5     Q.   IT'S NOT RELATED TO THE DEVICE.

03:02PM  6          IS THAT FAIR?

03:02PM  7     A.   I THINK HE'S SAYING UNLESS SAMPLES BECOME AVAILABLE.  IF

03:02PM  8     SAMPLES BECOME AVAILABLE, THEN IT WOULD.

03:02PM  9     Q.   YOU AGREE WITH ME THAT NOWHERE IN EXHIBIT 15041 DOES

03:02PM 10     MR. LIPSET SAY THAT HE AGREES WITH THE CONCLUSIONS IN

03:03PM 11     EXHIBIT 291?

03:03PM 12     A.   THAT'S RIGHT.

03:03PM 13     Q.   AND NOWHERE HERE DOES MR. LIPSET SAY THAT PFIZER HAS

03:03PM 14     VALIDATED THERANOS'S TECHNOLOGY?

03:03PM 15     A.   HE DOES NOT.

03:03PM 16     Q.   AND NOWHERE IN 15041 DOES MR. LIPSET SAY THAT PFIZER HAS

03:03PM 17     COMPREHENSIVELY VALIDATED THERANOS'S TECHNOLOGY?

03:03PM 18     A.   HE DOES NOT.

03:03PM 19     Q.   AND NOWHERE IN HERE DOES MR. LIPSET AUTHORIZE YOU TO AFFIX

03:03PM 20     THE PFIZER LOGO TO DOCUMENTS?

03:03PM 21     A.   CORRECT.

03:03PM 22     Q.   AND NOTHING EVER CAME OF THIS EMAIL EXCHANGE ABOUT

03:03PM 23     MODELING CAPABILITIES; CORRECT?

03:03PM 24     A.   ULTIMATELY, NO.

03:03PM 25     Q.   OKAY.  THERE WAS NO CONTRACT RELATING TO MODELING

03:03PM   1    CAPABILITIES?

03:03PM   2    A.    THAT'S RIGHT.

03:03PM   3    Q.    OKAY.  THERE WAS SOME TALK?

03:03PM   4    A.    YES.  WE DID SOME WORK ON THIS, AND ULTIMATELY THE DRUG

03:03PM   5    WAS DISCONTINUED.

03:03PM   6    Q.    OKAY.  AND PFIZER DIDN'T PAY MONEY TO THERANOS AS A RESULT

03:03PM   7    OF THIS EMAIL EXCHANGE, DID THEY?

03:03PM   8    A.    THEY DID NOT.

03:03PM   9    Q.    OKAY.  LET'S LOOK AT EXHIBIT 15047, WHICH I THINK YOU

03:04PM  10    COVERED WITH MR. DOWNEY.

03:04PM  11         AND IF WE CAN ALSO DISPLAY THAT SIDE-BY-SIDE WITH 291,

03:04PM  12    PAGE 33.

03:04PM  13         THIS IS AN EMAIL DATED OCTOBER 29TH, 2013.

03:04PM  14         DO YOU SEE THAT ON THE SCREEN, MS. HOLMES?

03:04PM  15    A.    I DO.

03:04PM  16    Q.    AND YOU RECALL TESTIFYING ABOUT THIS?

03:04PM  17    A.    I DO.

03:04PM  18    Q.    OKAY.  AND THIS IS AN EMAIL EXCHANGE BETWEEN YOU AND

03:04PM  19    SOMEONE NAMED HAKAN SAKUL?

03:04PM  20    A.    YES.

03:04PM  21    Q.    AND EARLIER IN THE EXCHANGE THERE'S ALSO REFERENCE TO

03:04PM  22    MORTEN SOGAARD?

03:04PM  23    A.    YES.  I DON'T KNOW IF I HAVE A COPY OF IT.

03:04PM  24         OH, I CAN SEE IT, YES.

03:04PM  25    Q.    IF YOU LOOK AT THE VERY BOTTOM.

03:04PM   1    A.   YEP, YEP.

03:04PM   2    Q.   AND THIS IS FROM OCTOBER OF 2013; CORRECT?

03:05PM   3    A.   IT IS.

03:05PM   4    Q.   AND MR. SAKUL WROTE TO YOU, "IT WAS VERY NICE TO MEET WITH

03:05PM   5    YOU AND SEEING YOU AGAIN ELIZABETH, AND LEARN ABOUT THE GREAT

03:05PM   6    PROGRESS THERANOS HAS MADE OVER THE YEARS."

03:05PM   7         DO YOU RECALL TESTIFYING ABOUT THIS EXCHANGE?

03:05PM   8    A.   I DO.

03:05PM   9    Q.   LET'S BE CLEAR ABOUT THE TIMING OF THIS EMAIL.  THIS WAS

03:05PM   10   AFTER THE SEPTEMBER 23RD, OR 2013 JOE RAGO PIECE IN "THE

03:05PM   11   WALL STREET JOURNAL"; CORRECT?

03:05PM   12   A.   IT IS.

03:05PM   13   Q.   SO THIS IS AFTER THERANOS HAS VERY PUBLICLY TOLD THE WORLD

03:05PM   14   ABOUT ITS TECHNOLOGY AND WHAT IT WAS HOPING TO DO?

03:05PM   15   A.   IT IS.

03:05PM   16   Q.   OKAY.  AND THIS IS AFTER WALGREENS HAS ISSUED A PRESS

03:05PM   17   RELEASE SAYING THAT WE HAVE A RELATIONSHIP WITH THERANOS?

03:05PM   18   A.   YES.

03:05PM   19   Q.   AND AFTER THERANOS HAD ISSUED A PRESS RELEASE SAYING WE

03:05PM   20   ARE DOING TESTING WITH WALGREENS?

03:05PM   21   A.   I THINK IT WAS THE SAME PRESS RELEASE, BUT YES.

03:06PM   22   Q.   I THINK WE'VE SEEN TWO.

03:06PM   23   A.   I'D DEFER TO YOU.

03:06PM   24   Q.   NOT MATERIAL FOR OUR DISCUSSION?

03:06PM   25   A.   YES.

03:06PM   1    Q.   THIS EMAIL COMES AFTER THAT; CORRECT?

03:06PM   2    A.   IT DOES.

03:06PM   3    Q.   SO THERE'S NEW INFORMATION OUT IN THE WORLD AND PFIZER IS

03:06PM   4    EMAILING YOU AND MEETING WITH YOU IN THIS TIME PERIOD?

03:06PM   5    A.   YES.

03:06PM   6    Q.   OKAY.  AND THIS WAS AFTER MR. RAGO HAD WRITTEN IN HIS

03:06PM   7    ARTICLE "THERANOS TECHNOLOGY ELIMINATES MULTIPLE LAB TRIPS

03:06PM   8    BECAUSE IT CAN RUN ANY COMBINATION OF TESTS AT ONCE VERY

03:06PM   9    QUICKLY ALL FROM A SINGLE MICRO SAMPLE"?

03:06PM   10       THIS IS AFTER THAT?

03:06PM   11   A.   YES.

03:06PM   12   Q.   AND THIS IS AFTER MR. RAGO HAD SAID "THERANOS'S PROCESSES

03:06PM   13   ARE FASTER, CHEAPER AND MORE ACCURATE THAN CONVENTIONAL

03:06PM   14   METHODS"?

03:06PM   15   A.   YES.  I DON'T HAVE THE ARTICLE IN FRONT OF ME, BUT I'M

03:06PM   16   ASSUMING THAT'S FROM THE ARTICLE.

03:06PM   17   Q.   THAT SOUNDS RIGHT TO YOU?

03:06PM   18   A.   IT DOES.

03:06PM   19   Q.   OKAY.  AND THAT WAS AN ARTICLE THAT YOU HAD AN OPPORTUNITY

03:06PM   20   TO REVIEW AND COMMENT ON?

03:06PM   21   A.   I DID.

03:06PM   22   Q.   YOU DON'T DISPUTE THAT?

03:06PM   23   A.   I DON'T.

03:06PM   24   Q.   NOW, NOWHERE IN EXHIBIT 15047 DO MR. SAKUL OR MR. SOGAARD

03:07PM   25   SAY PFIZER AGREES WITH THE CONCLUSIONS IN EXHIBIT 291; IS THAT

03:07PM 1    CORRECT?

03:07PM 2    A.   THAT'S RIGHT.

03:07PM 3    Q.   AND IF WE CAN ZOOM OUT, MS. HOLLIMAN.

03:07PM 4         NOWHERE IN EXHIBIT 15047 DO DR. SAKUL OR DR. SOGAARD SAY

03:07PM 5    PFIZER HAS VALIDATED THERANOS'S TECHNOLOGY?

03:07PM 6    A.   CORRECT.

03:07PM 7    Q.   AND NOWHERE IN EXHIBIT 15047 DO DR. SAKUL OR DR. SOGAARD

03:07PM 8    SAY PFIZER HAS COMPREHENSIVELY VALIDATED THERANOS'S TECHNOLOGY?

03:07PM 9    A.   I DON'T THINK SO.

03:07PM 10   Q.   AND NOWHERE IN HERE DO THOSE TWO INDIVIDUALS AUTHORIZE YOU

03:07PM 11   TO AFFIX THE PFIZER LOGO TO DOCUMENTS.

03:07PM 12        AM I RIGHT ABOUT THAT?

03:08PM 13   A.   YES.

03:08PM 14   Q.   AND NOTHING EVER CAME OF THIS EXCHANGE EITHER, DID IT?

03:08PM 15   A.   AGAIN, I THINK THERE'S ONGOING MEETINGS AND DISCUSSIONS

03:08PM 16   ABOUT CLINICAL TRIALS AT RETAIL.

03:08PM 17   Q.   MEETINGS AND DISCUSSIONS AND TALK; RIGHT?

03:08PM 18   A.   YES.

03:08PM 19   Q.   BUT PFIZER DIDN'T PAY ANY MONEY TO THERANOS AS A RESULT OF

03:08PM 20   THIS EMAIL EXCHANGE?

03:08PM 21   A.   THEY DID NOT.

03:08PM 22   Q.   OKAY.  LET'S LOOK AT EXHIBIT 15039.  AND IF WE CAN

03:08PM 23   JUXTAPOSE THEN AGAINST 291, PAGE 33.

03:08PM 24        MS. HOLMES, DO YOU SEE ON THE SCREEN AN EMAIL EXCHANGE

03:08PM 25   THAT STARTS FROM CRAIG LIPSET IN OR AROUND FEBRUARY 20TH, 2015?

03:09PM  1    A.   I DO.

03:09PM  2    Q.   OKAY.  AND I DRAW YOUR ATTENTION TO THE SUBJECT LINE

03:09PM  3    "TOUCHING BASE; OPPORTUNITIES."

03:09PM  4         DO YOU SEE THAT?

03:09PM  5    A.   I DO.

03:09PM  6    Q.   AND MR. LIPSET WRITES, "HI, ELIZABETH.  IT HAS BEEN

03:09PM  7    YEARS," ALL CAPS, "SINCE WE LAST TOUCHED BASE, BUT YOU HAVE

03:09PM  8    CLEARLY BEEN BUSY."

03:09PM  9         DO YOU SEE THAT LANGUAGE?

03:09PM 10    A.   I DO.

03:09PM 11    Q.   WAS IT TRUE THAT IT HAD BEEN YEARS SINCE YOU AND

03:09PM 12    MR. LIPSET HAD LAST TOUCHED BASE?

03:09PM 13    A.   I THINK SO.

03:09PM 14    Q.   AND LET'S BE CLEAR ON THE TIMING OF THIS EMAIL, FEBRUARY

03:09PM 15    OF 2015.

03:09PM 16         THIS WAS MORE THAN A YEAR AND A COUPLE MONTHS AFTER

03:09PM 17    THERANOS AND WALGREENS ANNOUNCED THEIR PARTNERSHIP; CORRECT?

03:09PM 18    A.   IT IS.

03:09PM 19    Q.   AND THIS WAS AFTER ROGER PARLOFF'S ARTICLE IN JUNE OF

03:09PM 20    2014?

03:09PM 21    A.   YES.

03:09PM 22    Q.   THIS IS AFTER MR. PARLOFF HAD REPORTED THAT THERANOS DID

03:10PM 23    NOT BUY COMMERCIALLY AVAILABLE ANALYZERS; CORRECT?

03:10PM 24    A.   I SAW THAT IN HIS ARTICLE, YES.

03:10PM 25    Q.   AND THIS IS AFTER THAT?

03:10PM  1    A.   IT IS.

03:10PM  2    Q.   AND THIS IS AFTER, FAIR TO SAY, A LOT OF PUBLICITY ABOUT

03:10PM  3    THERANOS?

03:10PM  4    A.   YES.

03:10PM  5    Q.   AND SO BY FEBRUARY OF 2015, THERE'S SIGNIFICANT NEW

03:10PM  6    INFORMATION OUT THERE ABOUT THERANOS?

03:10PM  7    A.   THERE IS.

03:10PM  8    Q.   AND MR. LIPSET IS REACHING OUT TO YOU IN THAT CONTEXT

03:10PM  9    SAYING IT'S BEEN YEARS SINCE YOU'VE BEEN IN TOUCH?

03:10PM  10   A.   YES.

03:10PM  11   Q.   AND IF WE CAN ZOOM OUT, MS. HOLLIMAN.

03:10PM  12        AM I RIGHT THAT NOWHERE IN EXHIBIT 15039 DOES MR. LIPSET

03:10PM  13   SAY PFIZER AGREES WITH THE CONCLUSIONS IN EXHIBIT 291?

03:10PM  14   A.   CORRECT.

03:10PM  15   Q.   AND NOWHERE IN EXHIBIT 15039 DOES MR. LIPSET SAY PFIZER

03:10PM  16   HAS VALIDATED THERANOS'S TECHNOLOGY?

03:10PM  17   A.   CORRECT.

03:10PM  18   Q.   AND NOWHERE IN HERE DOES MR. LIPSET SAY PFIZER HAS

03:11PM  19   COMPREHENSIVELY VALIDATED THERANOS'S TECHNOLOGY?

03:11PM  20   A.   YES.

03:11PM  21   Q.   AND NOWHERE IN HERE DOES MR. LIPSET AUTHORIZE YOU TO AFFIX

03:11PM  22   THE PFIZER LOGO TO DOCUMENTS?

03:11PM  23   A.   CORRECT.

03:11PM  24   Q.   OKAY.  AND NOTHING EVER CAME OF THIS EXHIBIT; ISN'T THAT

03:11PM  25   RIGHT?

03:11PM 1    A.   CORRECT.

03:11PM 2    Q.   IT WAS TALK?

03:11PM 3    A.   IT WAS WORK TOWARD SEEING IF WE COULD DO CLINICAL TRIALS

03:11PM 4    IN THE STORES, BUT WE NEVER DID THAT.

03:11PM 5    Q.   OKAY.  AND PFIZER DIDN'T PAY MONEY TO THERANOS AS A RESULT

03:11PM 6    OF THIS EXCHANGE?

03:11PM 7    A.   THEY DID NOT.

03:11PM 8    Q.   YOU ALSO TESTIFIED ABOUT SCHERING-PLOUGH.

03:11PM 9         DO YOU RECALL SOME TESTIMONY ABOUT SCHERING-PLOUGH?

03:11PM 10   A.   I DO.

03:11PM 11   Q.   OKAY.  AND IF WE COULD DISPLAY EXHIBIT 291, WHICH WE'VE

03:11PM 12   BEEN ON, PAGE 34.

03:12PM 13        AND WE CAN TAKE DOWN 15039, MS. HOLLIMAN.

03:12PM 14        DO YOU RECALL TESTIFYING, MS. HOLMES, THAT YOU WERE THE

03:12PM 15   INDIVIDUAL WHO APPLIED THE SCHERING-PLOUGH LOGO TO THIS

03:12PM 16   DOCUMENT?

03:12PM 17   A.   I DO.

03:12PM 18   Q.   OKAY.  DID YOU DO THAT AT OR AROUND THE TIME THAT YOU

03:12PM 19   APPLIED THE LOGO FOR THE PFIZER DOCUMENT?

03:12PM 20   A.   I BELIEVE SO.

03:12PM 21   Q.   OKAY.  DO YOU AGREE WITH ME THAT THIS DOCUMENT IS NOT FROM

03:12PM 22   SCHERING-PLOUGH?

03:12PM 23   A.   NO.  IT IS WRITTEN BY THERANOS.

03:12PM 24   Q.   IT'S FROM THERANOS?

03:12PM 25   A.   YES.

03:12PM   1    Q.   AND YOU DON'T HAVE A MEMORY OF SEEKING SCHERING-PLOUGH'S

03:12PM   2    PERMISSION TO DO THAT?

03:12PM   3    A.   I DON'T.

03:12PM   4    Q.   YOU DON'T HAVE A MEMORY OF SOMEONE FROM SCHERING-PLOUGH

03:12PM   5    AUTHORIZING YOU TO DO THAT?

03:12PM   6    A.   I DON'T.

03:13PM   7    Q.   YOU DON'T HAVE A MEMORY OF SOMEONE FROM SCHERING-PLOUGH

03:13PM   8    ORALLY TELLING YOU THAT YOU HAD SCHERING-PLOUGH'S PERMISSION TO

03:13PM   9    PUT THE SCHERING-PLOUGH LOGO ON THIS THERANOS REPORT?

03:13PM   10   A.   I DON'T.

03:13PM   11   Q.   AND YOU DON'T HAVE A MEMORY OF SOMEONE FROM

03:13PM   12   SCHERING-PLOUGH TELLING YOU IN WRITING THAT YOU HAD

03:13PM   13   SCHERING-PLOUGH'S PERMISSION TO APPLY THE SCHERING-PLOUGH LOGO

03:13PM   14   TO THE THERANOS REPORT; CORRECT?

03:13PM   15   A.   CORRECT.

03:13PM   16   Q.   BEFORE GIVING THE DOCUMENT TO WALGREENS, YOU DON'T HAVE A

03:13PM   17   MEMORY OF TELLING SCHERING-PLOUGH YOU WERE ADDING ITS LOGO TO A

03:13PM   18   DOCUMENT THAT YOU PREPARED?

03:13PM   19   A.   I DON'T HAVE A MEMORY.

03:13PM   20   Q.   AND YOU NEVER TOLD WALGREENS YOU PUT THE SCHERING-PLOUGH

03:13PM   21   LOGO ON THIS?

03:13PM   22   A.   I DON'T THINK SO.

03:13PM   23   Q.   AND JUST TO BE 100 PERCENT CLEAR, THERE ARE SOME WORDS IN

03:13PM   24   THIS DOCUMENT BENEATH THE LOGO, IT SAYS SCHERING-PLOUGH

03:13PM   25   CORPORATION, SCHERING-PLOUGH RESEARCH, AND THEN THERE'S SOME

03:13PM   1     ADDITIONAL LANGUAGE.

03:14PM   2         DID YOU WRITE THAT?

03:14PM   3     A.   I THINK SO.

03:14PM   4     Q.   OKAY.  AND THERANOS DID MORE THAN SIMPLY AFFIX THE

03:14PM   5     SCHERING-PLOUGH LOGO TO THIS AND ADD THOSE WORDS; ISN'T THAT

03:14PM   6     RIGHT, MS. HOLMES?

03:14PM   7     A.   YES.

03:14PM   8     Q.   LET'S LOOK AT PAGE, IF WE CAN SCROLL DOWN, MS. HOLLIMAN,

03:14PM   9     TO THE CONCLUSIONS PORTION OF THIS AND COMPARE IT WITH 259.

03:14PM  10         SO, MS. HOLLIMAN, IF WE COULD PLEASE COMPARE EXHIBIT 291

03:14PM  11     AT PAGE 51 TO 259, PAGE 19.

03:16PM  12         OKAY.  MS. HOLMES, DO YOU SEE ON THE LEFT-HAND SIDE OF THE

03:16PM  13     PAGE WE HAVE EXHIBIT 291, PAGE 51?

03:16PM  14     A.   I DO.

03:16PM  15     Q.   AND DO YOU SEE THE SCHERING-PLOUGH LOGO AT THE TOP?

03:16PM  16     A.   I DO.

03:16PM  17     Q.   THAT'S THE LOGO THAT YOU AFFIXED?

03:16PM  18     A.   YES.

03:16PM  19     Q.   OKAY.  AND TO THE RIGHT, DO YOU SEE EXHIBIT 259, PAGE 19?

03:16PM  20     A.   I DO.

03:16PM  21     Q.   AND DO YOU SEE JUST THE THERANOS LOGO IN THE UPPER LEFT?

03:16PM  22     A.   I DO.

03:16PM  23     Q.   AND THIS IS THE VERSION OF THE REPORT THAT YOU SENT TO

03:16PM  24     SCHERING-PLOUGH?

03:16PM  25     A.   YES.

03:16PM  1    Q.   259?

03:16PM  2    A.   I THINK SO.  I DON'T HAVE THEM IN FRONT OF ME, BUT I

03:16PM  3    ASSUME SO.

03:16PM  4    Q.   OKAY.  AND, MS. HOLLIMAN, IF WE COULD PLEASE ZOOM OUT.

03:16PM  5         THERE ARE SOME DIFFERENCES IN THE CONCLUSIONS PARAGRAPH OF

03:16PM  6    THIS -- OF THESE TWO DOCUMENTS.

03:16PM  7         DO YOU SEE HOW ON 291 IT SAYS, "THE THERANOS IL-6, TNF-A,

03:17PM  8    CRP ASSAY MULTIPLEX HAS BEEN SHOWN TO GIVE MORE ACCURATE AND

03:17PM  9    PRECISE RESULTS FOR THREE INDEPENDENTLY CALIBRATED CARTRIDGE

03:17PM  10   LOTS AND ALL OF THE MANY INSTRUMENTS USED THAN CURRENT 'GOLD

03:17PM  11   STANDARD' REFERENCE METHODS."

03:17PM  12        DO YOU SEE THAT LANGUAGE?

03:17PM  13   A.   I DO.

03:17PM  14   Q.   AND I PROBABLY DIDN'T READ THAT AS WELL AS I SHOULD HAVE.

03:17PM  15        BUT DO YOU SEE THAT LANGUAGE?

03:17PM  16   A.   I DO.

03:17PM  17   Q.   AND DO YOU SEE HOW THOSE WORDS, "GOLD STANDARD REFERENCE

03:17PM  18   METHODS," ARE NOT ON THE CONCLUSIONS IN THE REPORT THAT GOES TO

03:17PM  19   SCHERING-PLOUGH?

03:17PM  20   A.   YES.

03:17PM  21   Q.   DID YOU ADD THOSE WORDS?

03:17PM  22   A.   I THINK SO.

03:17PM  23   Q.   OKAY.  AND YOU DIDN'T TESTIFY TO THAT IN YOUR DIRECT

03:17PM  24   EXAMINATION; IS THAT CORRECT?

03:17PM  25   A.   I DON'T THINK SO.

03:17PM  1    Q.   IS MAKING THE CHANGE TO THE CONCLUSIONS PARAGRAPH ALSO

03:18PM  2    SOMETHING THAT YOU WISH YOU HAD DONE DIFFERENTLY?

03:18PM  3    A.   I THINK THIS WAS ACCURATELY REFLECTING THE DATA IN THE

03:18PM  4    DOCUMENT.

03:18PM  5         BUT, YES, I THINK THAT THE WAY THAT THESE REPORTS WERE

03:18PM  6    COMMUNICATED, I ABSOLUTELY WISH IT HAD BEEN BOLDED THAT THEY

03:18PM  7    WERE WRITTEN BY US.

03:18PM  8    Q.   LET'S TALK ABOUT GSK.

03:18PM  9         DO YOU RECALL TESTIFYING ABOUT GSK?

03:18PM  10   A.   I DO.

03:18PM  11   Q.   OKAY.  AND IF WE COULD LOOK AT EXHIBIT 291, PAGE 2.

03:18PM  12        IS THIS ANOTHER ONE OF THE ATTACHMENTS THAT WENT TO

03:18PM  13   WALGREENS?

03:18PM  14   A.   YES.

03:18PM  15   Q.   AND DO YOU SEE THE GLAXOSMITHKLINE LOGO IN THE TOP LEFT

03:19PM  16   PORTION OF THIS DOCUMENT?

03:19PM  17   A.   I DO.

03:19PM  18   Q.   AND DO YOU SEE THE HEADING "EXCERPTS FROM GSK METABOLIC

03:19PM  19   STUDY REPORT"?

03:19PM  20   A.   I DO.

03:19PM  21   Q.   NOW, GSK, UNLIKE SCHERING-PLOUGH AND PFIZER, GSK HAD

03:19PM  22   PROVIDED TO THERANOS AN EMAIL TITLED "THERANOS EVALUATION."

03:19PM  23        YOU RECALL SEEING THAT?

03:19PM  24   A.   I DO.

03:19PM  25   Q.   AND THAT WAS FROM SOMEONE NAMED NELSON RHODES?

03:19PM  1     A.   YES.

03:19PM  2     Q.   AND HE EMAILED YOU A WORD DOCUMENT WITH INFORMATION FROM

03:19PM  3     THAT EVALUATION?

03:19PM  4     A.   I THINK SO.

03:19PM  5     Q.   AND THE WORD DOCUMENT INCLUDED A SUMMARY OF THERANOS

03:19PM  6     SYSTEMS BY SOMETHING CALLED THE GSK METABOLIC BIOMARKER.

03:19PM  7          DOES THAT SOUND RIGHT?

03:19PM  8     A.   IT DOES.

03:19PM  9     Q.   AND YOU REVIEWED THAT DOCUMENT WHEN YOU RECEIVED IT?

03:19PM  10    A.   I'M SURE I DID.

03:19PM  11    Q.   YOU WERE PLEASED WITH THE FEEDBACK?

03:19PM  12    A.   YES.

03:19PM  13    Q.   AND SO UNLIKE PFIZER, GSK HAD PROVIDED A WRITTEN DOCUMENT

03:20PM  14    SETTING FORTH AT LEAST SOME OF ITS VIEWS?

03:20PM  15    A.   YES.

03:20PM  16    Q.   AND UNLIKE SCHERING-PLOUGH, GSK HAD PROVIDED A DOCUMENT

03:20PM  17    SETTING FORTH SOME OF ITS VIEWS?

03:20PM  18    A.   YES.

03:20PM  19    Q.   LET'S LOOK AT EXHIBIT 142, WHICH IS IN EVIDENCE.

03:20PM  20         LET ME CONFIRM, MS. KRATZMANN, IS 142 IN EVIDENCE?

03:20PM  21              THE CLERK:  142?  NO.

03:20PM  22              MR. LEACH:  IS 112 IN EVIDENCE?

03:20PM  23              THE CLERK:  THERE'S 112 AND --

03:20PM  24              MR. LEACH:  OKAY.  LET'S TRY 112.

03:21PM  25    Q.   MS. HOLMES, DO YOU SEE EXHIBIT 112 ON THE SCREEN?

03:21PM 1     A.   I DO, YES.

03:21PM 2     Q.   AND THIS IS THE EMAIL THAT WE HAVE BEEN TALKING ABOUT FROM

03:21PM 3     NELSON RHODES AT GSK?

03:21PM 4     A.   YES.

03:21PM 5     Q.   AND IF WE COULD PLEASE GO TO PAGE 2.

03:21PM 6          AND IF WE CAN SPLIT THE SCREEN, MS. HOLLIMAN, WITH

03:21PM 7     EXHIBIT 291, PAGE 2.

03:21PM 8          DO YOU SEE ON THE LEFT SCREEN THE SECOND PAGE OF

03:21PM 9     EXHIBIT 112, MS. HOLMES?

03:21PM 10    A.   I'M SORRY, WHICH ONE?

03:22PM 11    Q.   ON THE LEFT SIDE OF THE SCREEN --

03:22PM 12    A.   YES.

03:22PM 13    Q.   -- DO YOU SEE THE SECOND PAGE OF EXHIBIT 112?

03:22PM 14    A.   I DO.

03:22PM 15    Q.   OKAY.  AND TO THE RIGHT IS THE SECOND PAGE OF EXHIBIT 291

03:22PM 16    AT PAGE 2?

03:22PM 17    A.   YES.

03:22PM 18    Q.   AND 291 IS THE DOCUMENT THAT GOES TO WALGREENS?

03:22PM 19    A.   YES.

03:22PM 20    Q.   OKAY.  THERE'S A LOGO FOR GSK AT THE TOP LEFT OF 291.

03:22PM 21         DID YOU ADD THAT LOGO?

03:22PM 22    A.   I ASSUME SO.

03:22PM 23    Q.   AND DID YOU PROVIDE THE -- AND YOU PROVIDED THE DOCUMENT

03:22PM 24    IN 291 TO WALGREENS?

03:22PM 25    A.   I DID.

03:22PM   1      Q.   DID YOU RECEIVE ANY PERMISSION FROM GSK TO ADD THE LOGO?

03:22PM   2      A.   I DON'T KNOW.

03:22PM   3      Q.   AND YOU HAVE NO MEMORY OF RECEIVING ANY ORAL PERMISSION

03:22PM   4      FROM GSK TO ADD THE LOGO?

03:22PM   5      A.   I DON'T.

03:22PM   6      Q.   AND YOU HAVE NO MEMORY OF ANY WRITTEN COMMUNICATION FROM

03:23PM   7      GSK AUTHORIZING YOU TO ADD THE LOGO?

03:23PM   8      A.   I DON'T.

03:23PM   9      Q.   AND YOU DON'T HAVE A MEMORY OF TELLING ANYBODY FROM GSK

03:23PM   10     THAT YOU HAD ALTERED THE DOCUMENT IN EXHIBIT 112?

03:23PM   11     A.   I'M NOT SURE.  THERE WAS A GSK EXECUTIVE THAT CAME IN TO

03:23PM   12     WORK WITH US WHO WAS IN ACTUAL COMMUNICATION WITH THEM.

03:23PM   13     Q.   BUT YOU DON'T HAVE A MEMORY OF HIM TELLING YOU TO AFFIX

03:23PM   14     THE LOGO TO THIS AND DO WHAT YOU WILL TO IT?

03:23PM   15     A.   NO.

03:23PM   16     Q.   DID YOU TELL ANYBODY FROM GSK THAT YOU MIGHT BE PROVIDING

03:23PM   17     EXCERPTS OF A METABOLIC STUDY REPORT TO INVESTORS?

03:23PM   18     A.   WE MIGHT HAVE.

03:23PM   19     Q.   BUT YOU DON'T HAVE A MEMORY OF IT?

03:23PM   20     A.   I'M NOT SURE.

03:23PM   21     Q.   IF YOU COMPARE EXHIBIT 112 AT PAGE 2 ON THE LEFT TO 291-2

03:24PM   22     ON THE RIGHT, YOU'LL SEE THAT THE DATES ON MAY 27TH TO 28TH,

03:24PM   23     2008 ARE NOT PRESENT ON THE DOCUMENT WITH THE GSK LOGO.

03:24PM   24          DO YOU SEE THAT?

03:24PM   25     A.   I DO.

03:24PM   1     Q.   DID YOU DELETE THOSE WORDS?

03:24PM   2     A.   I DON'T KNOW.

03:24PM   3     Q.   IS THE REASON THAT THOSE WORDS ARE DELETED IS BECAUSE IT

03:24PM   4     MIGHT SUGGEST THE LIMITS OF GSK'S EVALUATION?

03:24PM   5     A.   I DON'T THINK SO.

03:24PM   6     Q.   YOU DON'T RECALL TESTIFYING ABOUT ADDING THE GSK LOGO

03:24PM   7     DURING YOUR DIRECT EXAMINATION, DO YOU?

03:24PM   8     A.   I DON'T THINK SO.

03:24PM   9     Q.   AND THERANOS DID MORE THAN SIMPLY DELETE DATES HERE.

03:24PM  10          WHY DON'T -- CAN I DRAW YOUR ATTENTION, PLEASE, TO THE

03:25PM  11     BULLETS?

03:25PM  12     A.   YES.

03:25PM  13     Q.   IF WE COULD ZOOM OUT, MS. HOLLIMAN, AND GO TO PAGE 3 OF

03:25PM  14     112.

03:25PM  15          DO YOU SEE IN 112 THERE'S A BULLET UNDER "GSK METABOLIC

03:25PM  16     BIOMARKER LAB COMMENTS" THAT SAYS, "FINGER PRICK/BLOOD DRAW

03:25PM  17     PROCEDURE WAS DIFFICULT (NEEDED LARGER LANCET AND BETTER

03:25PM  18     SYRINGE SYSTEM)."

03:25PM  19          DO YOU SEE THAT LANGUAGE?

03:25PM  20     A.   I DO.

03:25PM  21     Q.   AND THAT COMMENT IS DELETED FROM THE DOCUMENT THAT GOES TO

03:25PM  22     WALGREENS; ISN'T THAT RIGHT?

03:25PM  23     A.   I DON'T KNOW.  I HAVEN'T LOOKED AT IT, BUT -- BUT I TAKE

03:25PM  24     YOUR WORD FOR IT.

03:25PM  25     Q.   DID YOU MAKE THAT DELETION?

03:26PM   1    A.   I DON'T KNOW.

03:26PM   2    Q.   OKAY.  IF WE COULD ZOOM OUT, MS. HOLLIMAN, SO WE MIGHT --

03:26PM   3         DO YOU SEE HOW ON THE 291 UNDER "GSK METABOLIC BIOMARKER

03:26PM   4    LAB COMMENTS," THERE ARE THREE -- SIX BULLETS OR --

03:26PM   5    A.   I DO.

03:26PM   6    Q.   AND THE LAST ONE ENDS WITH "ASSAYS TOOK APPROXIMATELY ONE

03:26PM   7    HOUR."

03:26PM   8    A.   YES.

03:26PM   9    Q.   AND THE COMMENT ABOUT THE FINGER PRICK BEING DIFFICULT IS

03:26PM  10    NOT THERE; AM I RIGHT ABOUT THAT?

03:26PM  11    A.   YOU ARE.

03:26PM  12    Q.   AND YOU DON'T KNOW WHO AT THERANOS MADE THE CHANGE TO

03:26PM  13    THESE DOCUMENTS?

03:26PM  14    A.   I DON'T.

03:26PM  15    Q.   AND DID YOU EVER TELL ANYONE AT THERANOS THAT WE CAN'T

03:26PM  16    HAVE THE SLIGHTEST NEGATIVE COMMENT IN WHAT IS GOING OUT TO OUR

03:26PM  17    PARTNERS?

03:26PM  18    A.   I DON'T THINK SO.

03:26PM  19    Q.   AM I RIGHT THAT THE MEMO THAT DR. RHODES SENT YOU WAS

03:26PM  20    NEVER INTENDED FOR USE OUTSIDE OF GSK?

03:27PM  21    A.   I DON'T KNOW.

03:27PM  22    Q.   DIDN'T YOU UNDERSTAND THAT IT WAS A MEANS BY WHICH OTHER

03:27PM  23    UNITS WITHIN GSK MIGHT HAVE SOME INFORMATION ABOUT THERANOS?

03:27PM  24    A.   I THINK THAT'S WHAT THE EVALUATION WAS FOR.

03:27PM  25    Q.   OKAY.  LET'S LOOK AT THE EMAIL.

HOLMES CROSS BY MR. LEACH (RES.)                                        8161

03:27PM   1              IF WE CAN GO OUT TO 112.

03:27PM   2              DO YOU SEE THE EMAIL FROM, IS IT SUSAN DIGIAIMO?

03:27PM   3       A.    YES.

03:27PM   4       Q.    AND SHE WAS A SALESPERSON FOR THERANOS DURING THIS TIME

03:27PM   5       PERIOD?

03:27PM   6       A.    YES.

03:27PM   7       Q.    BY THE WAY, WE SAW DURING YOUR DIRECT SOME EMAILS TO HER

03:27PM   8       PERSONAL EMAIL ADDRESS.  DO YOU KNOW WHY SHE DID THAT?

03:27PM   9       A.    I THINK SHE LIKED TO MAINTAIN LOGS OF ALL OF HER CUSTOMER

03:27PM   10      RELATIONSHIPS SO THAT SHE COULD USE THEM ON AN ONGOING BASIS.

03:27PM   11      Q.    DID YOU GIVE HER AUTHORITY TO DO THAT?

03:27PM   12      A.    TO DO WHAT?

03:28PM   13      Q.    FORWARD THERANOS PROPRIETARY INFORMATION TO HER PERSONAL

03:28PM   14      EMAIL ADDRESS?

03:28PM   15      A.    I DID NOT.

03:28PM   16      Q.    SO THAT'S AN INSTANCE WHERE YOU WERE LESS CONCERNED ABOUT

03:28PM   17      TRADE SECRETS?

03:28PM   18      A.    I DON'T REMEMBER ANY TRADE SECRETS IN THAT EMAIL.

03:28PM   19      Q.    YOU WOULD FEEL COMFORTABLE JUST PUTTING ON THE WEBSITE

03:28PM   20      YOUR WORK WITH PFIZER AND YOUR WORK WITH GSK AND YOUR WORK WITH

03:28PM   21      SCHERING-PLOUGH?

03:28PM   22      A.    IT DEPENDS ON WHAT IT IS.

03:28PM   23      Q.    OKAY.  GOING BACK TO THE EMAIL, DO YOU SEE WHERE IT SAYS,

03:28PM   24      "SEE ATTACHED SUMMARY OF GSK'S EVALUATION OF OUR SYSTEMS.  I AM

03:28PM   25      FOLLOWING UP WITH REBECCA HODGE AS WELL AS DEREK AND

03:28PM  1    BOB DOBBINS IN REGARDS TO THE UP COMING AXOR STUDY AS WELL AS

03:28PM  2    ADDITIONAL OPPORTUNITIES."

03:28PM  3        YOU KNEW REBECCA HODGE AND DEREK AND BOB DOBBINS WERE GSK

03:28PM  4    EMPLOYEES?

03:28PM  5    A.   I DID.

03:28PM  6    Q.   AND YOU UNDERSTOOD THAT WHAT DR. RHODES WAS DOING WAS SO

03:28PM  7    OTHER UNITS WITHIN GSK MIGHT HAVE INFORMATION ABOUT THERANOS?

03:28PM  8    A.   YES.

03:28PM  9    Q.   AND AM I RIGHT THAT YOUR CONTRACTS WITH PFIZER AND

03:29PM  10   SCHERING-PLOUGH AND GSK PROHIBITED THERANOS FROM USING THE

03:29PM  11   PFIZER -- THE RESPECTIVE LOGOS WITHOUT THEIR WRITTEN

03:29PM  12   PERMISSION?

03:29PM  13   A.   I DON'T KNOW.

03:29PM  14   Q.   WELL, LET'S LOOK.

03:29PM  15       IF WE CAN GO TO WHAT IS IN EVIDENCE AS EXHIBIT 7753.  AND

03:29PM  16   IF WE CAN GO TO THE BATES ENDING 837, WHICH I BELIEVE IS

03:29PM  17   PAGE 117 OF THE DOCUMENT.

03:29PM  18       MS. HOLMES, DO YOU RECALL DURING MS. SPIVEY'S TESTIMONY A

03:29PM  19   NUMBER OF CONTRACTS WITH PHARMACEUTICAL COMPANIES WERE

03:29PM  20   INTRODUCED INTO EVIDENCE?

03:29PM  21   A.   I DO.

03:29PM  22   Q.   AND DURING YOUR DIRECT EXAMINATION, YOU WERE SHOWN SOME OF

03:30PM  23   THE CONTRACTS WITH YOUR PHARMACEUTICAL PARTNERS.

03:30PM  24       DO YOU RECALL TESTIFYING TO THAT?

03:30PM  25   A.   I DO.

03:30PM   1    Q.   OKAY.  I'M SHOWING YOU A PORTION OF THE PFIZER CONTRACT,

03:30PM   2    AND I DRAW YOUR ATTENTION TO THE PARAGRAPH 7.2 UNDER PUBLICITY.

03:30PM   3         DO YOU SEE WHERE IT SAYS, "NEITHER PARTY WILL USE, OR

03:30PM   4    AUTHORIZE OTHERS TO USE, THE NAME, SYMBOLS, OR MARKS OF THE

03:30PM   5    OTHER PARTY IN ANY ADVERTISING OR PUBLICITY MATERIAL OR MAKE

03:30PM   6    ANY FORM OF REPRESENTATION OR STATEMENT WITH REGARD TO THE

03:30PM   7    SERVICES WHICH WOULD KNOWINGLY CONSTITUTE AN EXPRESS OR IMPLIED

03:30PM   8    ENDORSEMENT BY THE OTHER PARTY OF ANY COMMERCIAL PRODUCT OR

03:30PM   9    SERVICE WITHOUT THAT OTHER PARTY'S PRIOR WRITTEN APPROVAL."

03:30PM  10         DO YOU SEE THAT LANGUAGE?

03:30PM  11    A.   I DO.

03:30PM  12    Q.   AND IF I UNDERSTAND YOUR TESTIMONY, BEFORE APPLYING THE

03:30PM  13    LOGO, YOU DIDN'T LOOK AT THE CONTRACT TO MAKE SURE THAT IT WAS

03:30PM  14    OKAY TO DO THAT?

03:30PM  15    A.   I DID NOT.

03:30PM  16    Q.   AND THIS WOULD BE THE TYPE OF THING THAT WOULD UPSET

03:30PM  17    THERANOS IF ONE OF THERANOS'S COUNTER PARTIES DID THIS.

03:30PM  18         IS THAT FAIR?

03:31PM  19    A.   I'M NOT SURE.  IT DEPENDS ON THE CONTEXT.

03:31PM  20    Q.   YOU WERE VERY AGGRESSIVE WITH YOUR INTELLECTUAL PROPERTY;

03:31PM  21    ISN'T THAT CORRECT?

03:31PM  22    A.   WE WERE.

03:31PM  23    Q.   YOU WERE NOT AFRAID TO SUE PEOPLE YOU THOUGHT WERE

03:31PM  24    INFRINGING PATENTS; IS THAT CORRECT?

03:31PM  25    A.   CORRECT.

03:31PM   1     Q.   YOU WERE VERY, VERY AGGRESSIVE IN ENFORCING YOUR

03:31PM   2     INTELLECTUAL PROPERTY?

03:31PM   3     A.   YES.

03:31PM   4     Q.   AND IF SOMEBODY WAS USING YOUR LOGO WITHOUT YOUR CONSENT,

03:31PM   5     YOU WOULD HAVE BEEN ANGRY ABOUT THAT?

03:31PM   6     A.   AGAIN, IT DEPENDS ON THE CONTEXT.

03:31PM   7          WE HAD PHARMA PARTNERS WHO WERE REPRESENTING OUR WORK AT

03:31PM   8     CONFERENCES WITH OUR LOGO I THINK.

03:31PM   9     Q.   LET'S LOOK AT THE SCHERING-PLOUGH AGREEMENT.

03:31PM  10          IF WE CAN GO TO PAGE 135.

03:31PM  11          AND I DRAW YOUR ATTENTION TO PARAGRAPH 7.

03:31PM  12          DO YOU SEE THE REFERENCE TO SPRI?

03:31PM  13     A.   I DO.

03:31PM  14     Q.   AND IS THAT A REFERENCE TO A SCHERING-PLOUGH ENTITY?

03:32PM  15     A.   I THINK SO.

03:32PM  16     Q.   OKAY.  AND THIS SAYS, "PROVIDER AGREES" -- PROVIDER IN

03:32PM  17     THIS IS THERANOS; RIGHT?

03:32PM  18     A.   I THINK SO.

03:32PM  19     Q.   "PROVIDER AGREES THAT IT WILL NOT, WITHOUT THE PRIOR

03:32PM  20     WRITTEN PERMISSION OF SPRI, USE INFORMATION AND DATA RECEIVED

03:32PM  21     BY IT OR GENERATED PURSUANT TO THE PROJECT FOR ANY PURPOSE

03:32PM  22     OTHER THAN IN CARRYING OUT THIS AGREEMENT.

03:32PM  23          "NEITHER PARTY MAY USE THE NAME OF THE OTHER PARTY IN ANY

03:32PM  24     PUBLICITY OR ADVERTISING NOR ISSUE A PRESS RELEASE OR OTHERWISE

03:32PM  25     PUBLICIZE OR DISCLOSE ANY INFORMATION RELATED TO THE EXISTENCE

03:32PM  1    OF THIS AGREEMENT OR THE TERMS AND CONDITIONS HEREOF, WITHOUT

03:32PM  2    THE PRIOR WRITTEN CONSENT OF THE OTHER PARTY."

03:32PM  3         DO YOU SEE THAT LANGUAGE?

03:32PM  4    A.   I DO.

03:32PM  5    Q.   AND YOU DIDN'T CONSULT WITH SCHERING-PLOUGH OR REVIEW THE

03:32PM  6    CONTRACT BEFORE APPLYING THE SCHERING-PLOUGH LOGO?

03:32PM  7    A.   I DID NOT REVIEW THE CONTRACT.

03:32PM  8    Q.   AND AM I RIGHT THAT YOU DID NOT REVIEW THE GSK CONTRACT

03:32PM  9    BEFORE DOING THAT?

03:32PM  10   A.   I DID NOT.

03:32PM  11   Q.   OKAY.  AND WOULD IT SURPRISE YOU THAT THE GSK CONTRACT

03:33PM  12   ALSO HAS LANGUAGE GOVERNING ITS USE OF TRADEMARKS?

03:33PM  13   A.   IT WOULD NOT.

03:33PM  14   Q.   LET ME DRAW YOUR ATTENTION TO --

03:33PM  15        MS. HOLLIMAN, IS 5537 IN EVIDENCE?

03:33PM  16        OR, I'M SORRY, MS. KRATZMANN?

03:33PM  17             THE CLERK:  5537?  NO.

03:33PM  18             MR. LEACH:  OKAY.  THANK YOU.

03:33PM  19        MAY I APPROACH, YOUR HONOR?

03:33PM  20             THE COURT:  YES.

03:34PM  21   BY MR. LEACH:

03:34PM  22   Q.   I'M PLACING BEFORE YOU WHAT HAS BEEN MARKED AS

03:34PM  23   EXHIBIT 5537.

03:34PM  24        DO YOU HAVE THAT IN FRONT OF YOU, MS. HOLMES?

03:34PM  25   A.   I DO, YES.

03:34PM  1    Q.   AND THIS IS AN EMAIL EXCHANGE BETWEEN -- INVOLVING YOU AND

03:34PM  2    DAN EDLIN?

03:34PM  3    A.   YES.

03:34PM  4    Q.   AND IT RELATES TO INFORMATION THAT MR. EDLIN AT YOUR

03:34PM  5    DIRECTION IS TO PROVIDE TO ROGER PARLOFF IN CONNECTION WITH HIS

03:34PM  6    REPORTING?

03:34PM  7    A.   YES.

03:34PM  8         MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5537.

03:35PM  9         (PAUSE IN PROCEEDINGS.)

03:35PM  10        MR. DOWNEY:  NO OBJECTION.

03:35PM  11        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:35PM  12        (GOVERNMENT'S EXHIBIT 5537 WAS RECEIVED IN EVIDENCE.)

03:35PM  13        MR. LEACH:  IF WE CAN ZOOM IN ON THE TOP HALF,

03:35PM  14   MS. HOLLIMAN.

03:35PM  15   Q.   DO YOU SEE THERE'S AN EMAIL FROM YOU, MS. HOLMES, TO

03:35PM  16   DAN EDLIN ON SUNDAY, JUNE 1ST, 2014?

03:35PM  17   A.   YES.

03:35PM  18   Q.   AND THE SUBJECT IS "ROGER PARLOFF - AGGREGATED ACTION

03:35PM  19   ITEMS"?

03:35PM  20   A.   YES.

03:35PM  21   Q.   AND YOU GAVE GUIDANCE TO MR. EDLIN ABOUT HOW TO -- WHAT

03:35PM  22   INFORMATION TO COMMUNICATE TO ROGER PARLOFF IN CONNECTION WITH

03:35PM  23   HIS REPORTING; IS THAT CORRECT?

03:35PM  24   A.   I DID.

03:35PM  25   Q.   AND HERE DOES IT APPEAR THAT YOU ARE FORWARDING THE -- A

03:35PM    1    VERSION OF THE DOCUMENT RELATING TO SCHERING-PLOUGH TO

03:36PM    2    DAN EDLIN FOR HIM TO PROVIDE TO ROGER PARLOFF?

03:36PM    3    A.   I DID.

03:36PM    4    Q.   OKAY.  IF WE CAN LOOK AT THE NEXT PAGE, MS. HOLLIMAN.  AND

03:36PM    5    THE NEXT ONE.  LET'S GO TO THE ATTACHMENT IF WE COULD.

03:36PM    6         AND THE VERSION THAT YOU ARE SENDING IS THE ONE WITH THE

03:36PM    7    SCHERING-PLOUGH LOGO UP AT THE TOP; CORRECT?

03:36PM    8    A.   YES.

03:36PM    9    Q.   AND THAT'S THE ONE THAT YOU APPLIED?

03:36PM   10    A.   YES.

03:36PM   11    Q.   OKAY.  AND YOU NEVER TOLD DAN EDLIN ABOUT THE APPLICATION

03:36PM   12    OF THE SCHERING-PLOUGH LOGO TO THIS; IS THAT CORRECT?

03:36PM   13    A.   I DON'T KNOW.

03:36PM   14    Q.   YOU DON'T HAVE A MEMORY OF THAT?

03:36PM   15    A.   I DON'T.

03:36PM   16    Q.   OKAY.  AND YOU DON'T HAVE A MEMORY OF INSTRUCTING

03:36PM   17    DAN EDLIN TO LET ROGER PARLOFF KNOW THAT?

03:36PM   18    A.   I DON'T.

03:36PM   19    Q.   OKAY.  LET'S LOOK AT EXHIBIT 553 --

03:37PM   20         CAN YOU ZOOM OUT, PLEASE, MS. HOLLIMAN.

03:37PM   21         IF WE COULD PLEASE LOOK AT 5538.

03:37PM   22    A.   I DON'T THINK I HAVE THAT ONE.

03:37PM   23    Q.   THAT'S BECAUSE I DIDN'T PUT IT IN YOUR BINDER.

03:37PM   24    A.   OKAY.

03:37PM   25    Q.   I'LL BRING IT UP.

03:37PM  1          MAY I APPROACH, YOUR HONOR?

03:37PM  2               THE COURT:  YES.

03:37PM  3     BY MR. LEACH:

03:37PM  4     Q.   (HANDING.)

03:37PM  5          IS THIS ANOTHER EMAIL EXCHANGE INVOLVING YOU AND MR. EDLIN

03:37PM  6     RELATING TO INFORMATION TO PROVIDE TO ROGER PARLOFF?

03:37PM  7     A.   IT IS.

03:37PM  8               MR. LEACH:  YOUR HONOR, I MOVE 5538 INTO EVIDENCE.

03:38PM  9               MR. DOWNEY:  ARE THESE ALL THE SAME ATTACHMENTS,

03:38PM  10    BOB?

03:38PM  11         YEAH, NO OBJECTION.

03:38PM  12              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:38PM  13         (GOVERNMENT'S EXHIBIT 5538 WAS RECEIVED IN EVIDENCE.)

03:38PM  14    BY MR. LEACH:

03:38PM  15    Q.   AND IF WE CAN ZOOM IN AT THE TOP.

03:38PM  16         DO YOU SEE, MS. HOLMES, YOU'RE EMAILING MR. EDLIN ON THE

03:38PM  17    SAME DAY AS THE PRIOR EXHIBIT, THIS TIME ATTACHING THE -- A

03:38PM  18    REPORT RELATING TO PFIZER?

03:38PM  19    A.   I DO.

03:38PM  20    Q.   OKAY.  AND IS THIS SIMILAR TO THE EXHIBIT THAT WE SAW

03:38PM  21    PREVIOUSLY WHERE YOU'RE PROVIDING SCHERING-PLOUGH RELATED

03:38PM  22    DOCUMENTS TO MR. EDLIN TO PROVIDE TO MR. PARLOFF?

03:38PM  23    A.   IT IS.

03:38PM  24    Q.   OKAY.  FURTHER BELOW YOU WROTE, "WHAT CAN BE DISCLOSED IS

03:38PM  25    DEVICES.

03:38PM   1          "DECENTRALIZABLE.

03:39PM   2          "WILL DECENTRALIZE.

03:39PM   3          "WILL MAINTAIN CENTRALIZED OVERSIGHT."

03:39PM   4          DO YOU SEE THAT LANGUAGE?

03:39PM   5     A.   I DO.

03:39PM   6     Q.   AND YOU RECALL SOME OF THE AUDIO CONVERSATIONS WITH

03:39PM   7     MR. PARLOFF WHERE YOU TALKED TO MR. PARLOFF ABOUT THIS IDEA

03:39PM   8     THAT YOU CAN REFER TO OUR SYSTEM AS DEVICES, BUT DON'T USE THE

03:39PM   9     WORD "DEVICE."

03:39PM  10          DO YOU RECALL THAT AUDIO?

03:39PM  11     A.   YES.

03:39PM  12     Q.   AND YOU WERE BEING VERY CAREFUL IN YOUR WORD CHOICE IN

03:39PM  13     THAT CONVERSATION.

03:39PM  14          IS THAT FAIR, MS. HOLMES?

03:39PM  15     A.   I THINK SO.

03:39PM  16     Q.   OKAY.  YOU WERE PAYING ATTENTION TO THE DIFFERENCE BETWEEN

03:39PM  17     "DEVICES" AND "DEVICE"?

03:39PM  18     A.   I THINK SO, YES.

03:39PM  19     Q.   OKAY.  AND THAT'S WHAT YOU'RE EXPRESSING HERE IN THIS

03:39PM  20     EMAIL?

03:39PM  21     A.   I'M NOT SURE WHAT I'M EXPRESSING HERE.

03:39PM  22     Q.   OKAY.  WELL, YOU'RE ALSO TALKING ABOUT WAYS TO USE THE

03:39PM  23     FUTURE TENSE TO TALK ABOUT DECENTRALIZATION OF THE LAB, AREN'T

03:39PM  24     YOU?

03:39PM  25     A.   YOU'RE REFERRING TO "WILL DECENTRALIZE"?

03:40PM  1    Q.   WELL, AREN'T ALL THREE OF THOSE WORDS A WAY TO EXPRESS THE

03:40PM  2    ABILITY TO DECENTRALIZE SOMETHING?

03:40PM  3    A.   I THINK SO.

03:40PM  4    Q.   OKAY.  AND THIS WAS GUIDANCE THAT YOU WERE GIVING TO

03:40PM  5    MR. EDLIN IN ANY CONVERSATIONS HE MIGHT HAVE WITH MR. PARLOFF?

03:40PM  6    A.   IT'S CERTAINLY RELATED TO MR. PARLOFF.  IT'S NOTES OF

03:40PM  7    SOMETHING.  I'M NOT QUITE SURE WHAT THIS IS.

03:40PM  8    Q.   OKAY.  ISN'T THIS AN EXAMPLE OF YOU BEING EXTRAORDINARILY

03:40PM  9    CAREFUL WITH THE WAY YOU PUT PHRASES IN TERMS OF FUTURE USE,

03:40PM  10   ASPIRATION, HISTORICAL USE?

03:40PM  11   A.   I DON'T KNOW.  THIS IS -- IT LOOKS LIKE NOTES OF SOMETHING

03:40PM  12   TO ME.

03:40PM  13   Q.   OKAY.  ON YOUR DIRECT -- WE CAN TAKE THIS DOWN,

03:40PM  14   MS. HOLLIMAN.

03:40PM  15       ON YOUR DIRECT EXAMINATION YOU WERE ASKED A QUESTION, "AND

03:40PM  16   AS OF DECEMBER 13TH, DECEMBER 2013, DID THERANOS NEED CAPITAL

03:41PM  17   BY THE END OF 2013?"

03:41PM  18       DO YOU RECALL THAT QUESTION BEING ASKED OF YOU?

03:41PM  19   A.   I DO.

03:41PM  20   Q.   AND YOU ANSWERED, "WE HAD RECEIVED $75 MILLION IN CAPITAL

03:41PM  21   FROM WALGREENS, SO WE DID NOT NEED CAPITAL AFTER THAT."

03:41PM  22       THAT WAS YOUR TESTIMONY?

03:41PM  23   A.   IT WAS.

03:41PM  24   Q.   OKAY.  ISN'T IT TRUE THOUGH, MS. HOLMES, THAT YOU NEEDED

03:41PM  25   CAPITAL IN SEPTEMBER OF 2013 AND AGAIN IN DECEMBER OF 2013?

03:41PM   1     A.   YES.

03:41PM   2     Q.   LET'S LOOK AT SOME OF THE EXAMPLES OF THAT.

03:41PM   3          IF WE CAN CALL UP WHAT IS IN EVIDENCE AS EXHIBIT 5172.

03:41PM   4          AND I THINK WE NEED THE NATIVE FILE FOR THIS,

03:41PM   5     MS. HOLLIMAN.

03:42PM   6          MS. HOLMES, DO YOU RECALL TESTIMONY FROM MS. SPIVEY ABOUT

03:42PM   7     CASH BALANCE SPREADSHEETS THAT SHE WOULD SHARE WITH YOU FROM

03:42PM   8     TIME TO TIME?

03:42PM   9     A.   I DO.

03:42PM  10     Q.   AND I BELIEVE YOU TESTIFIED THAT YOU PAID ATTENTION TO THE

03:42PM  11     COMPANY'S CASH POSITION OVER TIME?

03:42PM  12     A.   YES.

03:42PM  13     Q.   I WOULD LIKE -- MR. DOWNEY ASKED YOU QUESTIONS ABOUT THE

03:42PM  14     END OF DECEMBER 2013.  I'D LIKE TO FOCUS ON THE SEPTEMBER 2013

03:42PM  15     TIME PERIOD.

03:42PM  16          AND IF WE CAN MOVE TO COLUMN EN, MS. HOLLIMAN.

03:43PM  17          DO YOU SEE, MS. HOLMES, THAT THERE ARE ROWS FOR THE WEEK

03:43PM  18     BEGINNING SEPTEMBER 23RD, 2013, AND ENDING SEPTEMBER 29TH,

03:43PM  19     2013?

03:43PM  20     A.   I DO.

03:43PM  21     Q.   AND THEN DO YOU SEE A LISTING OF PARTICULAR ACCOUNTS IN

03:43PM  22     ROWS 9 THROUGH 14, FIDELITY, MORGAN STANLEY-INVESTMENT,

03:43PM  23     MORGAN STANLEY-LOC.

03:43PM  24          DO YOU SEE THOSE?

03:43PM  25     A.   I DO.

03:43PM   1    Q.   AND IN THE MORGAN STANLEY-LOC LINE, THAT LOC STANDS FOR

03:43PM   2    LINE OF CREDIT; CORRECT?

03:43PM   3    A.   YES.

03:43PM   4    Q.   AND THAT LINE OF CREDIT WAS SECURING THERANOS'S RENT

03:44PM   5    OBLIGATIONS?

03:44PM   6    A.   I'M NOT SURE.

03:44PM   7    Q.   OKAY.  IT WAS SECURING SOMETHING; IS THAT FAIR?

03:44PM   8    A.   I DON'T KNOW.

03:44PM   9    Q.   DO YOU GENERALLY HAVE A MEMORY THAT YOU WEREN'T SIMPLY

03:44PM  10    FREE TO DRAW DOWN ON THE LETTER OF CREDIT?

03:44PM  11    A.   I THINK THAT'S RIGHT.

03:44PM  12    Q.   OKAY.  SO DIPPING INTO THAT $7.5 MILLION WOULD NOT BE A

03:44PM  13    HAPPY DAY FOR THERANOS?

03:44PM  14    A.   I THINK YOU'RE RIGHT.

03:44PM  15    Q.   OKAY.  AND THIS SAYS THERE'S $5 MILLION IN A FIDELITY

03:44PM  16    ACCOUNT.

03:44PM  17         DO YOU SEE THAT?

03:44PM  18    A.   I DO.

03:44PM  19    Q.   AND 85,700,000 IN ANOTHER -- IN A MORGAN

03:44PM  20    STANLEY-INVESTMENT ACCOUNT?

03:44PM  21    A.   YES.

03:44PM  22    Q.   AND AT THIS POINT IN TIME, THERANOS'S TOTAL CASH BALANCE

03:44PM  23    IS DOWN TO APPROXIMATELY $14.46 MILLION; IS THAT CORRECT?

03:45PM  24    A.   YES.

03:45PM  25    Q.   AND IF YOU SCROLL TO THE LEFT, DO YOU SEE AT THE END OF --

03:45PM  1    IN ROW EI THERE'S A DEBIT FOR $18.5 MILLION IN LINE 22?

03:45PM  2         FURTHER DOWN, MS. HOLLIMAN.

03:45PM  3         DO YOU SEE THAT?

03:45PM  4    A.   I DO.

03:45PM  5    Q.   AND THAT 18.5 MILLION DEBIT WAS TAKEN OUT OF YOUR FIDELITY

03:45PM  6    ACCOUNT, DROPPING IT DOWN FROM $32 MILLION TO $12 MILLION IN

03:45PM  7    THAT WEEK.

03:45PM  8         DO YOU SEE THAT IN LINE 9?

03:45PM  9    A.   I DO.

03:45PM  10   Q.   AND THAT 18.5 MILLION, THAT WAS FROM BLUE CROSS BLUE

03:45PM  11   SHIELD, WASN'T IT?

03:45PM  12   A.   I THINK SO.

03:45PM  13   Q.   YOU HAD GOTTEN MONEY FROM BLUE CROSS BLUE SHIELD IN 2011

03:45PM  14   WITH THE HOPE THAT YOU WERE GOING TO FULFILL SOME CONTRACT

03:45PM  15   OBLIGATIONS TO THEM?

03:45PM  16   A.   YES.

03:45PM  17   Q.   AND AT SOME POINT IN THE SUMMER OF 2013, BLUE CROSS BLUE

03:46PM  18   SHIELD TOLD YOU THERANOS HADN'T MET ITS OBLIGATIONS, WE WANT

03:46PM  19   OUR 18.5 MILLION BACK?

03:46PM  20   A.   I THINK IT WAS WE HADN'T DEPLOYED IN THAT STATE.

03:46PM  21   Q.   OKAY.  BUT IN ANY EVENT, THEY WANTED THEIR MONEY BACK?

03:46PM  22   A.   WE REFUNDED IT TO THEM.

03:46PM  23   Q.   AND THAT'S THE 18.5 MILLION THAT WE SEE HERE?

03:46PM  24   A.   IT IS.

03:46PM  25   Q.   AND THAT PUT PRESSURE ON THE COMPANY; ISN'T THAT RIGHT?

03:46PM  1     A.   YES.

03:46PM  2     Q.   THIS WAS A MATTER OF WEEKS BEFORE THE LAUNCH WITH

03:46PM  3     WALGREENS?

03:46PM  4     A.   IT WAS.

03:46PM  5     Q.   THIS WAS WHEN YOU WERE PUSHING YOUR TEAMS VERY, VERY HARD

03:46PM  6     TO VALIDATE ASSAYS ON THE MODIFY SIEMENS MACHINES?

03:46PM  7     A.   YES.

03:46PM  8     Q.   THIS WAS IN THE TIME PERIOD WHEN YOU WERE PUSHING YOUR

03:46PM  9     TEAM TO VALIDATE ASSAYS ON THE 3.5 DEVICE?

03:46PM  10    A.   YES, WE WERE WORKING REALLY HARD ON THAT.

03:46PM  11    Q.   OKAY.  AND YOU KNEW THAT THERANOS HAD A BURN RATE IN THE

03:47PM  12    MILLIONS OF DOLLARS?

03:47PM  13    A.   I DID.

03:47PM  14    Q.   THERANOS WAS ALMOST OUT OF MONEY IN SEPTEMBER OF 2013;

03:47PM  15    ISN'T THAT CORRECT?

03:47PM  16    A.   I HAD NEVER THOUGHT OF IT LIKE THAT, NO.

03:47PM  17    Q.   OKAY.  WELL, YOU RAISED MONEY FROM INVESTORS IN SEPTEMBER

03:47PM  18    OF 2013, DIDN'T YOU?

03:47PM  19    A.   WE DID.

03:47PM  20    Q.   YOU RAISED OVER $21 MILLION FROM INVESTORS IN SEPTEMBER OF

03:47PM  21    2013; IS THAT FAIR?

03:47PM  22    A.   THAT SOUNDS RIGHT.

03:47PM  23    Q.   OKAY.  WELL, LET'S LOOK AT THE SPREADSHEETS.

03:47PM  24         DO YOU SEE IF WE MOVE -- IF WE LOOK DOWN AT THE CUSTOMER

03:47PM  25    RECEIPTS FOR THE FOLLOWING WEEK, SEPTEMBER 30TH, 2013, DO YOU

03:47PM  1     SEE THE $21 MILLION NUMBER THERE, ROW 27, COLUMN EO?

03:47PM  2     A.   I DO.

03:47PM  3     Q.   AND LET'S JUST GIVE MS. HOLLIMAN A MOMENT TO GET THERE.

03:47PM  4          DO YOU SEE $21,995,100 IN OPTION/STOCK PROCEEDS?

03:48PM  5     A.   I DO.

03:48PM  6     Q.   AND IF WE CAN GO TO, THERE'S A TAB IN THE EXCEL

03:48PM  7     SPREADSHEET TO COMERICA.  IF WE CAN CLICK ON THAT.

03:48PM  8          AND IF WE CAN GO TO THE EO COLUMN.

03:48PM  9          I THINK, MS. HOLLIMAN, IF YOU CLICK ON THIS, ON THE PLUS

03:48PM 10     SIGN UP THERE, IT WILL EXPAND IT EVEN MORE.  THERE YOU GO.

03:48PM 11          AND DO YOU SEE THAT SAME NUMBER $21,995,100 IN ROW 23 EO?

03:48PM 12     A.   I DO.

03:48PM 13     Q.   AND IF I COULD ASK MS. HOLLIMAN TO HIGHLIGHT ON THAT.

03:48PM 14          DO YOU SEE HOW IT CALLS UP A COMMENT FROM MS. YAM, OR JUST

03:49PM 15     CLICK ON THE CELL, 15 MILLION PEER?

03:49PM 16          DO YOU SEE THAT?

03:49PM 17     A.   I DO.

03:49PM 18     Q.   AND THAT'S A REFERENCE TO PEER VENTURES?

03:49PM 19     A.   IT IS.

03:49PM 20     Q.   AND PEER VENTURES WAS AN INVESTMENT FUND THAT INVESTED IN

03:49PM 21     THERANOS?

03:49PM 22     A.   YES.

03:49PM 23     Q.   AND THEY INVESTED IN 2010?

03:49PM 24     A.   YES.

03:49PM 25     Q.   AND THEY INVESTED AGAIN IN 2013?

03:49PM   1        A.    YES.

03:49PM   2        Q.    BASED IN PART ON THE PROMISE OF THE WALGREENS LAUNCH?

03:49PM   3        A.    YES.

03:49PM   4        Q.    AND THERE'S ALSO A REFERENCE TO LVG XI AND LVG IV.

03:49PM   5              DO YOU SEE THAT?

03:49PM   6        A.    I DO.

03:49PM   7        Q.    AND YOU UNDERSTAND THAT TO BE REFERENCE TO DON LUCAS,

03:49PM   8        JUNIOR'S INVESTMENT FUNDS?

03:49PM   9        A.    YES.

03:49PM   10       Q.    AND THOSE TWO FIRMS PUT IN ABOUT 21,995,000 AT OR AROUND

03:49PM   11       THE TIME YOUR CASH BALANCE HAD DROPPED TO $14 MILLION?

03:49PM   12       A.    THEY DID.

03:50PM   13       Q.    AND YOU KNEW THAT PEER VENTURES WAS AN INVESTMENT FUND RUN

03:50PM   14       BY JARED HUTCHINGS AND MARK CAMPBELL?

03:50PM   15       A.    I DID.

03:50PM   16       Q.    THEY WERE 20 SOMETHINGS, 30 SOMETHINGS IN THE INVESTMENT

03:50PM   17       BUSINESS?

03:50PM   18       A.    YOU MEAN YEARS OLD?

03:50PM   19       Q.    YES.

03:50PM   20       A.    YES, YES.

03:50PM   21       Q.    ENTREPRENEURS LIKE YOURSELF?

03:50PM   22       A.    YES.

03:50PM   23       Q.    AND YOU AND MR. BALWANI WERE EXTREMELY RELIEVED WHEN THIS

03:50PM   24       MONEY CAME IN; ISN'T THAT RIGHT?

03:50PM   25       A.    I'M SURE WE WERE HAPPY WHEN IT CAME IN.

03:50PM   1      Q.   WELL, LET'S LOOK AT EXHIBIT 5646.

03:51PM   2      A.   OKAY.

03:51PM   3           MR. LEACH:  MAY I APPROACH, YOUR HONOR?

03:51PM   4           THE COURT:  YES.

03:51PM   5      BY MR. LEACH:

03:51PM   6      Q.   (HANDING.)

03:51PM   7           DO YOU RECOGNIZE THIS DOCUMENTS, MS. HOLMES?

03:51PM   8      A.   I DON'T REMEMBER IT, BUT I SEE IT'S AN EMAIL EXCHANGE.

03:52PM   9      Q.   OKAY.  YOU HAVE NO REASON TO DOUBT THAT THIS IS A TRUE

03:52PM  10      EMAIL EXCHANGE BETWEEN YOU AND MR. BALWANI IN SEPTEMBER OF

03:52PM  11      2014?

03:52PM  12      A.   I DON'T.

03:52PM  13      Q.   AND THIS RELATES TO INVESTMENTS BY PEER AND DON LUCAS'S

03:52PM  14      FUND?

03:52PM  15      A.   IT DOES.

03:52PM  16           MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5646.

03:52PM  17           MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

03:52PM  18           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:52PM  19           (GOVERNMENT'S EXHIBIT 5646 WAS RECEIVED IN EVIDENCE.)

03:52PM  20      BY MR. LEACH:

03:52PM  21      Q.   LET ME DRAW YOUR ATTENTION TO THE BOTTOM PORTION OF THIS

03:52PM  22      EMAIL, MS. HOLMES.

03:52PM  23           DO YOU SEE AN EMAIL FROM JARED HUTCHINGS?

03:52PM  24      A.   I DO.

03:52PM  25      Q.   IT SAYS, "BY THE WAY, WE ARE PLANNING TO LET A VERY

03:52PM  1    CONTRITE MASSY INTO THIS CLOSING.  I HAVE A CALL WITH HER

03:52PM  2    TOMORROW TO CONFIRM.  LET ME KNOW IF THAT GIVES YOU PAUSE."

03:52PM  3         IS THAT A REFERENCE TO AN INVESTOR IN THE PEER VENTURES

03:52PM  4    FUND?

03:52PM  5    A.   I THINK SO, YES.

03:52PM  6    Q.   YOU WROTE BACK, "THAT IS FINE.  LET ME KNOW HOW MUCH SHE

03:52PM  7    WANTS TO BE ABLE TO COME IN FOR/WHAT TOTAL YOU'RE PLANNING FOR

03:53PM  8    THIS CLOSE AND WE'LL PLAN ACCORDINGLY."

03:53PM  9         DO YOU SEE THAT?

03:53PM  10   A.   I DO.

03:53PM  11   Q.   AND PEER VENTURES -- YOU UNDERSTOOD PEER VENTURES WOULD

03:53PM  12   RAISE MONEY FROM ITS OWN INVESTORS OR EVEN HOSPITALS FOR THE

03:53PM  13   WHOLE PURPOSE OF INVESTING IN THERANOS?

03:53PM  14   A.   I DID.

03:53PM  15   Q.   AND IF WE COULD MOVE UP THE CHAIN, PLEASE.

03:53PM  16        DO YOU SEE WHERE MR. HUTCHINGS WRITES, "OK.  I HAVE A CALL

03:53PM  17   WITH INTERMOUNTAIN THIS MORNING TO FINALIZE EVERYTHING.  IT

03:53PM  18   LOOKS LIKES WE CLOSE THE PEER WIRES TOMORROW.  I WILL SEND YOU

03:53PM  19   A FINAL CONFIRMATION ON OUR TOTAL THIS AFTERNOON.  WE SHOULD BE

03:53PM  20   READY TO CLOSE WITH YOU ON MONDAY.  LET ME KNOW IF THAT WORKS."

03:53PM  21        DID I READ THAT CORRECTLY?

03:53PM  22   A.   YOU DID.

03:53PM  23   Q.   AND YOU UNDERSTOOD THAT INTERMOUNTAIN WAS GOING TO INVEST

03:53PM  24   IN PEER TO INVEST IN THERANOS?

03:53PM  25   A.   I DID.

03:53PM   1    Q.   AND YOU FORWARDED THIS TO MR. BALWANI ON SEPTEMBER 26TH?

03:54PM   2    A.   I DID.

03:54PM   3    Q.   AND HIS RESPONSE WAS HMFR, AND THAT'S THE ACRONYM THAT

03:54PM   4    WE'VE SEEN BEFORE IN THE TEXT?

03:54PM   5    A.   IT IS.

03:54PM   6    Q.   THANKING GOD FOR THE MONEY THAT IS COMING IN NOW?

03:54PM   7    A.   I THINK IT'S THE PRAYER THAT HE WOULD RECITE ON A REGULAR

03:54PM   8    BASIS.

03:54PM   9    Q.   OKAY.  AND THAT'S A PRAYER THAT YOU WOULD RECITE ON A

03:54PM   10   REGULAR BASIS?

03:54PM   11   A.   IT IS.

03:54PM   12   Q.   BUT THERANOS'S CASH CRUNCH DIDN'T END WITH PEER AND

03:54PM   13   LUCAS'S FUND INVESTING AT THE END OF SEPTEMBER; ISN'T THAT

03:54PM   14   RIGHT?

03:54PM   15   A.   AGAIN, I DIDN'T THINK ABOUT IT THAT WAY.

03:54PM   16   Q.   OKAY.  WELL, LET'S LOOK AT THE CASH BALANCE SPREADSHEET.

03:54PM   17        THIS IS EXHIBIT 5172, MS. HOLLIMAN.

03:55PM   18        AND IF WE CAN GO BACK NEAR COLUMN EN.

03:55PM   19        DO YOU SEE THE $14 MILLION NUMBER IN THE TOTAL CASH

03:55PM   20   BALANCE FOR THE END OF SEPTEMBER, MS. HOLMES?

03:55PM   21   A.   I DO.

03:55PM   22   Q.   AND IF WE CAN SCROLL TO THE LEFT -- THE RIGHT, PLEASE.

03:55PM   23   AND STOP RIGHT THERE, MS. HOLLIMAN.

03:55PM   24        I DRAW YOUR ATTENTION TO THE TIME PERIOD -- WELL, LET ME

03:55PM   25   FIRST ASK YOU, DO YOU SEE THAT THE TOTAL CASH BALANCES GET DOWN

03:55PM 1    TO APPROXIMATELY 23 MILLION, 21 MILLION, 19 MILLION IN THE TIME

03:56PM 2    PERIOD NOVEMBER 2013 TO DECEMBER 15TH OF 2013?

03:56PM 3    A.   I DO.

03:56PM 4    Q.   AND IF WE WERE TO DEDUCT THE AMOUNT OF THE LOC PAYMENT

03:56PM 5    FROM THOSE AMOUNTS, THAT MEANS THAT THERANOS HAS IN THE

03:56PM 6    NEIGHBORHOOD OF 14 -- $12- TO $16 MILLION OF FREE CASH?

03:56PM 7    A.   SOMETHING LIKE THAT, YEAH.

03:56PM 8    Q.   OKAY.  LET'S LOOK AT SOME OF THE TEXT MESSAGES BETWEEN YOU

03:56PM 9    AND MR. BALWANI IN THIS TIME PERIOD, AND IF WE CAN GO TO

03:56PM 10   EXHIBIT 5387D, AND SPECIFICALLY PAGE 20.

03:57PM 11       AND IF WE CAN ZOOM IN ON THE SUBSTANCE?

03:57PM 12       DO YOU SEE THE DATE OF NOVEMBER 28TH, 2013, MS. HOLMES?

03:57PM 13   A.   I DO.

03:57PM 14   Q.   AND DO YOU SEE WHERE MR. BALWANI WROTE, "WE ARE AT 15M AS

03:57PM 15   OF TODAY"?

03:57PM 16   A.   I DO.

03:57PM 17   Q.   "FREE CASH," HE WROTE.

03:57PM 18       AND YOU SAY "I SAW THAT.

03:57PM 19       "DROP BY TO DISCUSS WHEN U CAN."

03:57PM 20       DO YOU SEE THAT LANGUAGE?

03:57PM 21   A.   I DO.

03:57PM 22           MR. LEACH:  YOUR HONOR, I'M ABOUT TO MOVE ON TO A

03:57PM 23   DIFFERENT TOPIC, AND I HAVE ONE HOUSEKEEPING MATTER, WHICH IS

03:57PM 24   TO MOVE INTO EVIDENCE PAGES 11, 12, 19, 72, 129, 208, 341, AND

03:57PM 25   342 OF EXHIBIT 5387.

03:57PM 1      AND WE CAN PUT THAT IN ONE DOCUMENT CALLED 5387G.

03:58PM 2           THE COURT:  G?

03:58PM 3      ANY OBJECTION?

03:58PM 4           MR. DOWNEY:  YOUR HONOR, MR. LEACH AND I HAVE

03:58PM 5  CONFERRED, AND IF THERE ARE ANY ADDITIONS AS A RESULT OF

03:58PM 6  COMPLETENESS CONCERNS, I THINK WE'LL WORK THAT OUT AND

03:58PM 7  SUPPLEMENT THE EXHIBIT.

03:58PM 8      BUT SUBJECT TO THAT, NO OBJECTION.

03:58PM 9           THE COURT:  ALL RIGHT.  THANK YOU.

03:58PM 10     THESE WILL BE ADMITTED THEN, SUBJECT TO ANY REVIEW, AND

03:58PM 11 YOU CAN BRING THAT UP WITH THE COURT AS NEEDED.

03:58PM 12     (GOVERNMENT'S EXHIBIT 5387G WAS RECEIVED IN EVIDENCE.)

03:58PM 13          THE COURT:  LET'S TAKE OUR BREAK NOW.  YOU HAVE

03:58PM 14 ADDITIONAL QUESTIONS?  LET'S TAKE OUR BREAK NOW?

03:58PM 15          MR. LEACH:  I DO, YOUR HONOR.

03:58PM 16          THE COURT:  LET'S DO THAT THEN, LADIES AND

03:58PM 17 GENTLEMEN.

03:58PM 18     WE'LL RECESS FOR THE DAY.  PLEASE RECALL THAT WE'RE NOT

03:58PM 19 GOING TO SEE EACH OTHER FOR SOME TIME, I BELIEVE.

03:58PM 20     I THINK OUR NEXT DATE TOGETHER IS THE 7TH, MS. KRATZMANN?

03:58PM 21          THE CLERK:  YES, YOUR HONOR.

03:58PM 22          THE COURT:  SO ONCE AGAIN, LADIES AND GENTLEMEN, WE

03:58PM 23 HAVE A LARGE BREAK HERE.  YOU WILL GO BACK TO YOUR REGULAR

03:58PM 24 LIVES OUTSIDE OF THE TRIAL, AND AS YOU DO THAT WITH YOUR

03:59PM 25 FAMILY, YOUR JOBS, AND YOUR SOCIAL ENGAGEMENTS, I'M GOING TO

03:59PM 1    ASK YOU AGAIN TO PLEASE, PLEASE DO NOT IN ANY WAY DO ANY

03:59PM 2    INVESTIGATION, DO NOT LISTEN TO, READ, OR IN ANY WAY TRY TO

03:59PM 3    GAIN ANY INFORMATION ABOUT ANYTHING IN THIS CASE OR ANYTHING

03:59PM 4    ABOUT IT OR ANY OF THE PARTIES INVOLVED.

03:59PM 5         PLEASE PAY FIDELITY, CONTINUED FIDELITY TO THAT

03:59PM 6    ADMONISHMENT, PLEASE.

03:59PM 7         THE SECOND THING I'LL ASK YOU TO DO IS, THE WORLD IS AWARE

03:59PM 8    OF NEW HEALTH CONCERNS, SO I'M GOING TO ASK YOU TO PLEASE,

03:59PM 9    PLEASE BE CAREFUL, CONTINUE TO BE CAREFUL WITH YOU AND YOUR

03:59PM 10   LOVED ONES.  WE WANT ALL OF US TO STAY HEALTHY, AND THAT'S MY

03:59PM 11   WISH FOR YOU AND ALL OF US HERE, AND PLEASE BE CAREFUL IN

03:59PM 12   REGARDS TO YOUR SAFETY, YOUR PERSONAL SAFETY IN THAT REGARD.

03:59PM 13        WITH THAT ADMONISHMENT, WE WILL SEE YOU -- I THINK WE'RE

03:59PM 14   GOING TO BE BACK AT 9:00 A.M., MS. KRATZMANN, AND THAT'S GOING

03:59PM 15   TO BE FOR A FULL DAY I'M HOPEFUL.

03:59PM 16        PLEASE RECALL THAT WEEK IS THE WEEK OF DECEMBER 6TH.

04:00PM 17   DECEMBER 7TH AGAIN IS OUR FIRST DAY.  THAT WILL BE A BUSY WEEK.

04:00PM 18   WE'LL BE IN SESSION THE 7TH, THE 8TH, THE 10TH.

04:00PM 19        I DON'T BELIEVE WE'RE IN SESSION ON THE 9TH, AT LEAST AS

04:00PM 20   FAR AS -- WE ARE.  I HAVE A MISDATED CALENDAR IN FRONT OF ME.

04:00PM 21        THAT'S A BUSY WEEK.  WE'RE IN SESSION ALL WEEK, AND THAT'S

04:00PM 22   TO ACCOMPLISH AS MUCH AS WE CAN DURING THIS SEASON.

04:00PM 23        SO THANK YOU VERY MUCH.  HAVE A GOOD TIME OFF.

04:00PM 24        WITH THAT ADMONISHMENT, WE'LL SEE YOU THEN.  THANK YOU.

04:00PM 25        MS. HOLMES, YOU CAN STAND DOWN.  THANK YOU.

04:00PM   1          (JURY OUT AT 4:00 P.M.)

04:00PM   2              THE COURT:  PLEASE BE SEATED.  THANK YOU.

04:00PM   3          THE RECORD SHOULD REFLECT THAT THE JURY HAS LEFT FOR OUR

04:01PM   4      BREAK.

04:01PM   5          COUNSEL, I JUST WANT TO TALK ABOUT WHAT WE SHOULD DO

04:01PM   6      ABOUT -- I GUESS THIS IS -- I WANT TO TALK ABOUT OUR CONTINUED

04:01PM   7      MOTION THAT WE HAD THIS MORNING WITH MR. FLEURMONT, BUT I DON'T

04:01PM   8      KNOW IF WE SHOULD GO FORWARD WITH THAT TODAY.

04:01PM   9          LET ME JUST ASK THE LAWYERS HERE IN THE WELL, ANYTHING

04:01PM  10      FURTHER BEFORE WE BREAK?

04:01PM  11          (DISCUSSION OFF THE RECORD.)

04:01PM  12              MR. FLEURMONT:  GOOD AFTERNOON, YOUR HONOR.

04:01PM  13              MR. LEACH:  YOUR HONOR, I EXPECT MS. HOLMES'S

04:01PM  14      TESTIMONY TO BE COMPLETE --

04:01PM  15              THE COURT:  I'M SORRY.  LET ME ASK YOU TO COME

04:01PM  16      FORWARD.

04:01PM  17              MR. LEACH:  MAY I TAKE MY MASK OFF?

04:01PM  18              THE COURT:  YEAH, SURE.

04:02PM  19              MR. LEACH:  I EXPECT MS. HOLMES'S TESTIMONY TO

04:02PM  20      COMPLETE EARLY NEXT WEEK, POSSIBLY ON MONDAY.  I DON'T KNOW HOW

04:02PM  21      MUCH REDIRECT THE DEFENSE WILL HAVE.

04:02PM  22              THE CLERK:  TUESDAY.

04:02PM  23              MR. LEACH:  TUESDAY, EXCUSE ME.

04:02PM  24          AND I DON'T KNOW WHAT ADDITIONAL WITNESSES THE DEFENSE

04:02PM  25      INTENDS TO CALL, BUT I DO THINK IT MIGHT BE THE APPROPRIATE

04:02PM  1      TIME TO START THINKING OF WHEN TO SCHEDULE THE CHARGING

04:02PM  2      CONFERENCE AND MAP AROUND THOSE DATES.

04:02PM  3              THE COURT:  SURE.  OKAY.

04:02PM  4              MR. DOWNEY:  YEAH, I CERTAINLY THINK THE DEFENSE

04:02PM  5      CASE WILL NOT LAST THE BALANCE OF NEXT WEEK AFTER MS. HOLMES'S

04:02PM  6      TESTIMONY, SO I THINK IT DOES IMPLICATE AT LEAST TWO ISSUES I

04:02PM  7      CAN THINK OF.

04:02PM  8          ONE IS THAT I AGREE WITH MR. LEACH THAT IF WE CAN FIND A

04:02PM  9      TIME TO THINK ABOUT CHARGING AND, YOU KNOW, WE PROBABLY OWE THE

04:02PM  10     COURT SOME FILINGS ON THAT, WHICH WE CAN, WE CAN GET ON FILE

04:02PM  11     EXPEDITIOUSLY IF THAT SUITS THE COURT, AND THAT WAY WE CAN KEEP

04:02PM  12     MOVING.

04:02PM  13             THE COURT:  WELL, IT DOES.  I'D LIKE TO KEEP AN EYE

04:03PM  14     ON THAT.

04:03PM  15         I KNOW YOUR ORIGINAL SUBMISSIONS WERE MONTHS AGO.

04:03PM  16             MR. DOWNEY:  RIGHT.

04:03PM  17             THE COURT:  THINGS HAVE CHANGED A BIT PERHAPS.

04:03PM  18         AND I HAVE THOSE.  I'VE USED THEM AS A WORKING COPY, BUT

04:03PM  19     CANDIDLY, I STEPPED BACK BECAUSE I ANTICIPATE THERE WILL BE

04:03PM  20     CHANGES, AND WE SHOULD DEVOTE OUR RESOURCES TOWARDS A FRESH

04:03PM  21     SET.

04:03PM  22         SO WHAT'S YOUR THOUGHTS ABOUT THAT?

04:03PM  23         AND, MR. DOWNEY, I DON'T WANT -- WHEN WE ASK THESE

04:03PM  24     QUESTIONS, OF COURSE THERE MAY BE SOME OTHER EVIDENCE THAT

04:03PM  25     YOU'RE GOING TO PUT IN THAT MIGHT CALL FOR OTHER INSTRUCTIONS.

8185

04:03PM  1          MR. DOWNEY:  SURE.  AND I THINK PART OF THE REASON

04:03PM  2     WE'RE HAVING THIS CONVERSATION IS THAT IT'S EVIDENT TO ALL OF

04:03PM  3     US IS THAT WE HAVE THREE DAYS THIS WEEK WITHOUT A JURY AND THEN

04:03PM  4     NEXT WEEK WE'RE, WE'RE BACKED UP WITH THE JURY EVERY DAY.

04:03PM  5          SO THIS IS MORE OF A SCHEDULING MATTER OBVIOUSLY.

04:03PM  6          THE COURT:  RIGHT.

04:03PM  7          MR. DOWNEY:  EVENTS CAN ALWAYS CHANGE SUBJECT TO

04:03PM  8     EVIDENCE.

04:03PM  9          THE COURT:  RIGHT.  SO WHAT ARE YOUR THOUGHTS

04:03PM  10    ABOUT -- WHAT WOULD YOU LIKE TO DO TO SOLVE THE PROBLEM?  DO

04:04PM  11    YOU WANT TO GET ME OR AUGMENT YOUR SET?  SHOULD I GET A NEW SET

04:04PM  12    FROM YOU?

04:04PM  13          MR. DOWNEY:  I THINK THAT WOULD BE WELL.  LET ME --

04:04PM  14    CAN I JUST TALK TO MS. SAHARIA?

04:04PM  15          THE COURT:  SURE.

04:04PM  16          (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

04:04PM  17          THE COURT:  AND LET ME SAY, WHILE YOU'RE DISCUSSING

04:04PM  18    THIS, I'M NOT -- I DON'T MEAN TO TASK YOU, OVER TASK YOU WITH

04:04PM  19    CREATING A WHOLE NEW SET.  BUT THERE MIGHT BE SOME AUGMENTATION

04:04PM  20    IF THAT WOULD BE EASIER FOR YOU.  THAT'S FINE, TOO.

04:04PM  21          (DISCUSSION OFF THE RECORD.)

04:04PM  22          MR. LEACH:  YOUR HONOR, THE GOVERNMENT -- I'LL WAIT

04:04PM  23    FOR MY COLLEAGUES.

04:04PM  24          (PAUSE IN PROCEEDINGS.)

04:05PM  25          MR. DOWNEY:  I THINK FROM OUR PERSPECTIVE,

04:05PM 1    YOUR HONOR, WE HAD -- WE HAD, AT THE OUTSET, AS YOU MENTIONED,

04:05PM 2    SUBMITTED SOME PROPOSED INSTRUCTIONS.  I THINK WE'VE AUGMENTED

04:05PM 3    THOSE OVER TIME IN LIGHT OF SUBSEQUENT DEVELOPMENTS.

04:05PM 4        AND I THINK WE ALSO HAVE NOTED THE OBJECTIONS WE HAVE TO

04:05PM 5    WHAT THE GOVERNMENT SUBMITTED ORIGINALLY.

04:05PM 6        IF IT WOULD BE HELPFUL -- I DON'T THINK WE'RE QUITE IN A

04:05PM 7    POSITION TO FILE THOSE, BUT WE COULD DO IT PROBABLY LATE

04:05PM 8    TOMORROW NIGHT SO YOUR HONOR COULD HAVE THEM THURSDAY MORNING

04:05PM 9    TO WORK ON IF THAT'S HELPFUL.

04:05PM 10            THE COURT:  WELL, I JUST -- I WANT TO GIVE YOU TIME

04:05PM 11   TO DO WHAT YOU NEED TO DO.

04:05PM 12       SO, MR. LEACH, WHAT IS YOUR TEAM'S POSITION?

04:05PM 13            MR. LEACH:  THURSDAY IS CERTAINLY SUFFICIENT FOR US

04:05PM 14   TO AUGMENT OUR FILINGS.  WE MAY HAVE A FEW, BUT I DON'T THINK

04:06PM 15   THE VOLUME FROM THE GOVERNMENT WILL BE SIGNIFICANT, AND I ALSO

04:06PM 16   THINK THAT WE COULD BE AVAILABLE ON FRIDAY FOR A CONFERENCE.

04:06PM 17       I REALIZE THERE MIGHT BE SOME ISSUES THAT ARE RESOLVED,

04:06PM 18   BUT THAT FRIDAY COULD BE USED PRODUCTIVELY IF THE COURT IS

04:06PM 19   AVAILABLE.

04:06PM 20            THE COURT:  SURE.

04:06PM 21            MR. DOWNEY:  WELL, I ALSO RECOGNIZE IT'S A SHORT

04:06PM 22   WINDOW FOR THE COURT, BUT FRIDAY OR MONDAY IS FINE FOR US.

04:06PM 23       I THINK THE COURT MAY BE SCHEDULED OTHERWISE ON MONDAY,

04:06PM 24   BUT I'M NOT SURE.

04:06PM 25            THE COURT:  WELL, LET'S DO THIS, WHAT I'LL DO IS

04:06PM 1    I'LL RESERVE -- I DON'T THINK WE HAVE ANYTHING ON FRIDAY, DO

04:06PM 2    WE?

04:06PM 3             THE CLERK:  THIS FRIDAY?

04:06PM 4             THE COURT:  CORRECT.

04:06PM 5             THE CLERK:  NO, YOUR HONOR.

04:06PM 6             THE COURT:  OTHER THAN RESPITE.

04:06PM 7         (LAUGHTER.)

04:06PM 8             THE COURT:  WELL, WHAT WE CAN DO IS I'LL MAKE MYSELF

04:06PM 9    AVAILABLE, AND MAYBE WE CAN HAVE JUST A HIGH LEVEL PASS AND WE

04:06PM 10   CAN SEE WHERE WE ARE ON THESE THINGS WITHOUT -- AND I'M NOT

04:06PM 11   SUGGESTING OR GUARANTEEING THAT WE'LL HAVE ANY FORMAL, FORMAL

04:07PM 12   FINALITY AS TO WHAT THEY ARE.

04:07PM 13        BUT I THINK IT WOULD BE A GOOD IDEA JUST TO GIVE A HIGH

04:07PM 14   LEVEL PASS ON WHAT WE HAVE NOW.

04:07PM 15        AND AGAIN, THINGS COULD CHANGE DEPENDING ON WHERE THE

04:07PM 16   EVIDENCE GOES AND --

04:07PM 17            MR. DOWNEY:  AND I THINK THERE ARE PROBABLY SOME

04:07PM 18   THINGS THAT WE CAN'T DO UNTIL THE EVIDENCE CLOSES, BUT, YEAH.

04:07PM 19            THE COURT:  RIGHT.  BUT I APPRECIATE THE OFFER TO

04:07PM 20   GET STARTED ON THIS.

04:07PM 21        WELL, LET'S DO THAT.  I'LL KEEP FRIDAY OPEN, AND WE CAN

04:07PM 22   HAVE A DISCUSSION ABOUT IT.  AND YOU'LL SUBMIT SOMETHING, WHAT,

04:07PM 23   CLOSE OF BUSINESS THURSDAY?  DID YOU SAY THAT?

04:07PM 24            MR. LEACH:  IF THAT'S OKAY WITH THE COURT.

04:07PM 25            MR. DOWNEY:  THAT'S FINE, YOUR HONOR.

04:07PM   1            THE COURT:  THAT GIVES US ALL NIGHT TO LOOK AT THEM.

04:07PM   2            MR. DOWNEY:  WE CAN MAKE AN EFFORT TO SUBMIT THEM

04:07PM   3    WEDNESDAY NIGHT IF THAT MAKES IT EASIER FOR YOU.

04:07PM   4            THE COURT:  IF YOU CAN.  I SEE MS. SAHARIA SAYING,

04:07PM   5    YES, THAT'S FINE.

04:07PM   6            MS. SAHARIA:  THAT'S FINE, YOUR HONOR.

04:07PM   7            THE COURT:  GREAT.  I APPRECIATE IT.  THAT'S GOOD.

04:07PM   8            MR. LEACH:  COULD WE HAVE THURSDAY MORNING?

04:07PM   9            MR. DOWNEY:  YEAH, WHEN I SAY WEDNESDAY NIGHT, I'M

04:08PM  10    NOT SURE THERE'S A BIG DIFFERENCE BETWEEN WHAT I'M TALKING

04:08PM  11    ABOUT.

04:08PM  12            THE COURT:  LET'S FIGURE OUT OUR TIME ZONE FIRST.

04:08PM  13    LET'S START THERE.

04:08PM  14        THAT'S FINE.  10:00 O'CLOCK.  WHY DON'T WE SAY 10:00

04:08PM  15    O'CLOCK ON THURSDAY.

04:08PM  16            THE CLERK:  FOR THE HEARING ON FRIDAY?

04:08PM  17            THE COURT:  NO.  THIS IS FOR YOUR SUBMISSIONS.

04:08PM  18            MR. LEACH:  YES.

04:08PM  19            THE CLERK:  WHAT TIME WOULD YOU LIKE TO START ON

04:08PM  20    FRIDAY?

04:08PM  21            THE COURT:  WE'LL START AT 9:00 O'CLOCK?  IS THAT

04:08PM  22    ALL RIGHT?  DOES THAT WORK FOR YOUR TEAMS?

04:08PM  23            MR. DOWNEY:  YES, THAT'S FINE.

04:08PM  24            THE COURT:  LET'S DO THAT.  GREAT.  THANK YOU.

04:08PM  25    THANK YOU FOR THAT.

04:08PM 1          YOU PUT YOUR MASK ON TOO QUICKLY, MR. DOWNEY.

04:08PM 2              MR. DOWNEY:  YES.  THIS IS PROBABLY ONLY MY THIRD

04:08PM 3      TRIP UP.  WE'LL SEE HOW MANY ARE LEFT.

04:08PM 4          I UNDERSTAND THAT IN CONNECTION WITH THE MATTER

04:08PM 5      MR. FLEURMONT IS GOING TO DISCUSS WITH YOU, MR. WADE SPOKE WITH

04:08PM 6      MR. COOPERSMITH AND ASKED HIM TO BE AVAILABLE IN CONNECTION

04:09PM 7      WITH STATING WHATEVER POSITION HE WOULD STATE IN RESPONSE TO

04:09PM 8      YOUR HONOR'S QUESTIONS.

04:09PM 9          SO I BELIEVE HE IS -- HE IS HERE, YES, I BELIEVE HE'S

04:09PM 10     HERE.

04:09PM 11             THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

04:09PM 12         WELL, I WANTED TO -- I SEE MS. VOLKAR HERE, TOO.

04:09PM 13         ONE OF THE THOUGHTS I HAD, I KNOW MS. VOLKAR HAD INDICATED

04:09PM 14     SHE WANTED TO REVIEW THE TRANSCRIPTS, AND I DID NOT WANT TO

04:09PM 15     ENGAGE THIS UNTIL EVERYBODY IS READY, INCLUDING AN ABILITY TO

04:09PM 16     TALK ABOUT THIS 106 ISSUE AS IT EXISTED.

04:09PM 17         BUT, MS. VOLKAR, WHAT IS YOUR THOUGHT ON TIMING?

04:09PM 18         MR. FLEURMONT, ARE YOU HERE?  YES, THANK YOU.

04:09PM 19             MS. VOLKAR:  MAY I REMOVE MY MASK, YOUR HONOR?

04:09PM 20             THE COURT:  YES, THANK YOU.

04:09PM 21         AS WELL AS MR. FLEURMONT.

04:09PM 22             MR. FLEURMONT:  THANK YOU, YOUR HONOR.

04:09PM 23             MS. VOLKAR:  TO BE CLEAR, YOUR HONOR, THE GOVERNMENT

04:09PM 24     WOULD LIKE ADDITIONAL TIME TO GO THROUGH THE TRANSCRIPT FOR THE

04:09PM 25     RULE 106 ADDITIONS.

8190

04:09PM   1      IT WOULD BE BENEFICIAL TO THE GOVERNMENT IF THE COURT WERE

04:10PM   2    ABLE TO GIVE A TENTATIVE OR SORT OF WHAT IT WAS THINKING.

04:10PM   3      AS OBVIOUSLY JUST AN EXAMPLE, I WOULD HAVE BEEN REVIEWING

04:10PM   4    WITH THE NULL PROTOCOL SECTION IN MIND, BUT I UNDERSTAND THE

04:10PM   5    DEFENSE HAS WITHDRAWN THAT SECTION.

04:10PM   6      EACH SECTION THAT IS GOING TO BE REMOVED IS LESS THAT I

04:10PM   7    WOULD LOOK FOR RULE 106 COMPLETENESS ADDITIONS TO.

04:10PM   8      SO WITH THAT, I COULD PROVIDE THE COURT AND THE DEFENSE

04:10PM   9    WITH THE RULE 106 BY THURSDAY NIGHT, I BELIEVE.

04:10PM   10      BUT IT WOULD BE HELPFUL TO KNOW WHAT THE VOLUME IS.  IF

04:10PM   11    THE VOLUME SHRINKS, I COULD GET IT TO THEM SOONER.

04:10PM   12          MR. FLEURMONT:  THURSDAY NIGHT WOULD BE FINE WITH

04:10PM   13    US, YOUR HONOR.  WE DON'T NEED A TENTATIVE RULING.

04:10PM   14      I THINK THE COURT SHOULD BE INFORMED OF ALL OF THE ISSUES

04:10PM   15    AND WE SHOULD HAVE A FULL DISCUSSION BEFORE WE HAVE A RULING,

04:10PM   16    AND IF THEY NEED UNTIL THURSDAY TO HAVE THEIR RULE 106

04:10PM   17    DESIGNATIONS, I THINK THAT'S OKAY WITH US.

04:10PM   18          THE COURT:  SO YOU WOULD LIKE US TO CONTINUE OUR

04:10PM   19    DISCUSSION THURSDAY?  IS THAT WHAT I HEAR YOU SAYING?

04:10PM   20          MS. VOLKAR:  WELL, YOUR HONOR --

04:10PM   21          THE COURT:  ARE YOU SAYING YOU WOULD LIKE THE RULING

04:11PM   22    NOW SO YOU COULD THEN LOOK?  IS THAT WHAT I HEARD YOU SAY?

04:11PM   23          MS. VOLKAR:  I GUESS THE CLEAREST POINT OF THE

04:11PM   24    GOVERNMENT'S POSITION IS THAT WE DON'T BELIEVE THE EVIDENCE IS

04:11PM   25    ADMISSIBLE, AND SO THEREFORE I WOULD RATHER NOT SPEND THE TIME

8191

04:11PM 1    ON RULE 106 --

04:11PM 2              THE COURT:  I UNDERSTAND.  I UNDERSTAND.

04:11PM 3              MS. VOLKAR:  -- TO POSSIBLY BE TOO BLUNT.

04:11PM 4         BUT THE GOVERNMENT'S POSITION IS THAT UNDER RULE 804, THIS

04:11PM 5    EVIDENCE IS NOT ADMISSIBLE.

04:11PM 6         AND ALSO, AS I HOPE I CLARIFIED THIS MORNING,

04:11PM 7    ALTERNATIVELY, MUCH OF THE TESTIMONY IS NOT ADMISSIBLE UNDER

04:11PM 8    RULE 403, EXCUSE ME, AS CUMULATIVE EVIDENCE AS WELL.

04:11PM 9         I DON'T WANT TO REHASH THAT.

04:11PM 10             THE COURT:  RIGHT.

04:11PM 11             MS. VOLKAR:  I BELIEVE THAT MATTER HAS BEEN

04:11PM 12   SUFFICIENTLY ARGUED FOR THE COURT TO RULE ON IT.

04:11PM 13        IF THE COURT WERE GOING TO GRANT AND ADMIT ANY OF THE

04:11PM 14   PORTIONS, THEN THE GOVERNMENT WAS REQUESTING TIME FOR RULE 106.

04:11PM 15             THE COURT:  OKAY.

04:11PM 16             MS. VOLKAR:  AND I DON'T KNOW THAT THE RULE 106

04:11PM 17   ADDITIONS HAVE TO HOLD UP YOUR HONOR'S RULING.

04:11PM 18        CANDIDLY, I DON'T QUITE UNDERSTAND MY COLLEAGUE'S COMMENT

04:12PM 19   THAT THE TWO RELATE TO ONE ANOTHER.

04:12PM 20        BUT I DID ALSO FLAG THIS MORNING FOR YOUR HONOR THAT IN

04:12PM 21   DOING THE RULE 106 ANALYSIS I'VE DONE THUS FAR, I HAVE REALIZED

04:12PM 22   THAT IT COULD TRIGGER ADDITIONAL ISSUES, SUCH AS CONFRONTATION

04:12PM 23   CLAUSE ISSUES.

04:12PM 24        I'M JUST PERHAPS FORECASTING WHAT I IMAGINE MY COLLEAGUES

04:12PM 25   MAY SAY, ON THE OTHER SIDE OF THE TABLE MAY SAY.

8192

04:12PM 1       SO THAT, YOUR HONOR, IS WHAT I'VE PERHAPS MUDDIED THE

04:12PM 2   WATERS WITH THIS MORNING, BUT THE GOVERNMENT'S POSITION IS THAT

04:12PM 3   NONE OF IT IS ADMISSIBLE AND I THINK WE CAN DO AWAY WITH THAT,

04:12PM 4   AND IF THE COURT FEELS DIFFERENTLY, OF COURSE --

04:12PM 5       THE COURT:  I HEAR BOTH YOUR POSITIONS ARE THE SAME,

04:12PM 6   AND IF YOU JUST RULE FOR US, JUDGE, WE'RE DONE WITH THOSE

04:12PM 7   ISSUES.  I THINK I GET THAT.  THAT'S CLEAR.

04:12PM 8       (LAUGHTER.)

04:12PM 9       THE COURT:  LET ME SAY THIS, MAYBE WE CAN HAVE A

04:12PM 10  LITTLE DISCUSSION NOW.

04:12PM 11      SOMETHING CAME UP DURING THE EXAMINATION OF MS. HOLMES

04:12PM 12  THAT I THINK I HAVE A QUESTION ABOUT THAT MAY BE SIMILAR TO THE

04:12PM 13  ISSUE IN THE NULL VOID, AND THIS REGARDS TESTIMONY FROM

04:13PM 14  MS. HOLMES ABOUT A CERTAIN ISSUE, I THINK IT WAS ABOUT

04:13PM 15  WALGREENS.

04:13PM 16      I WANT TO GET MY NOTES.  I HAVE YOUR MOTION IN MY OFFICE.

04:13PM 17  SO LET'S TAKE ABOUT A 10 MINUTE BREAK.  I'LL GO GET THAT AND

04:13PM 18  COME BACK.

04:13PM 19      AS I SAID EARLIER, IT'S THE DEFENSE BURDEN TO SHOW

04:13PM 20  UNAVAILABILITY.  SO WHATEVER YOU WANT TO DO ON THAT -- YOU

04:13PM 21  KNOW, IF YOU WANT TO DO SOMETHING ABOUT THAT THIS AFTERNOON, WE

04:13PM 22  CAN DO THAT.

04:13PM 23      MR. FLEURMONT:  YES, YOUR HONOR.

04:13PM 24      I UNDERSTAND THAT MR. COOPERSMITH IS HERE AND HE'S

04:13PM 25  AVAILABLE TO MAKE A PROFFER TO THE COURT CONSISTENT WITH --

8193

04:13PM  1          THE COURT:  OKAY.  WE'LL TAKE OUR BREAK.  WE'LL COME

04:13PM  2     BACK AND YOU'LL TELL ME WHAT YOU WOULD LIKE TO DO IN REGARD TO

04:13PM  3     MR. COOPERSMITH.

04:13PM  4          SHOULD I ORDER HIM TO STAY IN THE COURTROOM, OR IS HE

04:13PM  5     SUBJECT TO FLIGHT DO YOU THINK?

04:13PM  6          MR. FLEURMONT:  I DON'T THINK YOU NEED TO DO THAT.

04:13PM  7          THE COURT:  HE'S A TRUSTWORTHY LAD, IS HE?

04:13PM  8     (LAUGHTER.)

04:13PM  9          MR. FLEURMONT:  YEAH.

04:13PM  10          THE CLERK:  COURT IS IN RECESS.

04:35PM  11     (RECESS FROM 4:14 P.M. UNTIL 4:41 P.M.)

04:41PM  12          THE COURT:  THANK YOU.  WE'RE BACK ON THE RECORD

04:41PM  13     WITH ALL PARTIES BEING PRESENT ONCE AGAIN.

04:41PM  14          WE'RE OUTSIDE OF THE PRESENCE OF THE JURY, AND WE WANTED

04:41PM  15     TO HAVE SOME MORE DISCUSSION ON THE MOTIONS BEFORE THE COURT

04:41PM  16     REGARDING PRIOR TESTIMONY.

04:41PM  17          LET ME JUST, LET ME JUST SAY, THANK YOU FOR YOUR

04:41PM  18     ARGUMENTS.  I'VE LISTENED TO THE ARGUMENTS.

04:41PM  19          COUNSEL, YOU CAN COME FORWARD IF YOU WOULD LIKE.  THANKS.

04:41PM  20     YOU CAN TAKE YOUR MASKS OFF IF YOU WISH.

04:41PM  21          MS. VOLKAR:  THANK YOU, YOUR HONOR.

04:41PM  22          THE COURT:  LET ME -- I JUST WANT TO START WITH

04:41PM  23     EXHIBIT C.  AND THIS IS ONE WHERE I DON'T THINK I NEED ANY MORE

04:41PM  24     HELP FROM YOU ON THIS.

04:41PM  25          I THINK THERE'S BEEN EVIDENCE REGARDING THE CLIA LAB AND

8194

04:41PM  1    MR. BALWANI'S CONNECTION TO THE CLIA LAB.

04:41PM  2         I THINK DIFFERENT WITNESSES HAVE TOLD THE JURY ABOUT THEIR

04:42PM  3    OBSERVATIONS, THEIR OPINIONS, THEIR OPINIONS SUCH THAT THEY

04:42PM  4    WERE PERMITTED TO TESTIFY ON THIS.

04:42PM  5         I DO THINK THAT, UNDER 403, THIS IS CUMULATIVE.  I THINK

04:42PM  6    THERE IS SUFFICIENT, SUFFICIENT EVIDENCE IN THE RECORD NOW THAT

04:42PM  7    SUPPORTS THE FINDINGS, MR. FLEURMONT, THAT YOU SEEK TO CAPTURE

04:42PM  8    WITH 1163-4, EXHIBIT C, AND SO I'M NOT GOING TO ALLOW THIS TO

04:42PM  9    COME IN.

04:42PM 10         I THINK THERE'S PLENTY OF INFORMATION IN THE RECORD

04:42PM 11    ALREADY THAT ESTABLISHES WHAT YOU NEED TO DO.

04:42PM 12         ANYTHING FURTHER, AS I SAID, WOULD BE FOUND CUMULATIVE.

04:42PM 13         SO UNDER 403, I THINK THAT TO ALLOW THIS WOULD TAKE MORE

04:42PM 14    TIME AND WOULD POSSIBLY CONFUSE THE JURY ON THIS ISSUE.  IT

04:42PM 15    COULD OPEN UP TO OTHER ADDITIONAL EVIDENCE THAT MIGHT HAVE TO

04:42PM 16    COME IN TO SUPPORT OR DETRACT FROM IT THAT WOULD BE AN

04:42PM 17    UNNECESSARY WASTE OF TIME.

04:43PM 18         SO I'M GOING TO RESPECTFULLY DECLINE YOUR INVITATION TO

04:43PM 19    ADMIT EXHIBIT C.

04:43PM 20         SO THAT'S THE RULING ON THAT.

04:43PM 21         LET'S GO BACK TO WHERE WE WERE INITIALLY.

04:43PM 22         SO LET ME TURN BACK TO YOU, MR. FLEURMONT.  YOU HAVE THE

04:43PM 23    FLOOR.

04:43PM 24         LET'S DO THE THRESHOLD ISSUE FIRST.  WHY DON'T WE DO THAT?

04:43PM 25              MR. FLEURMONT:  YES, YOUR HONOR.

```
04:43PM   1          WE WOULD LIKE TO INVITE MR. COOPERSMITH UP SO HE COULD

04:43PM   2   PROVIDE A PROFFER TO THE COURT.

04:43PM   3              THE COURT:  ALL RIGHT.  THANK YOU.

04:43PM   4          AND, MR. COOPERSMITH, I SEE YOU HERE.  THANK YOU FOR BEING

04:43PM   5   HERE.

04:43PM   6          MR. FLEURMONT, THIS IS, AGAIN, YOUR BURDEN.  SO WHAT IS IT

04:43PM   7   YOU WOULD LIKE TO KNOW FROM MR. COOPERSMITH.

04:43PM   8          I'M NOT GOING TO -- I'M A NEUTRAL PARTY HERE, SO I JUST

04:43PM   9   NEED TO KNOW WHAT IT IS.

04:43PM  10          THERE'S A QUESTION OF UNAVAILABILITY THAT YOU HAVE

04:43PM  11   INDICATED MR. WADE HAS.  HE HAS PROVIDED A DECLARATION TO THE

04:43PM  12   COURT.  I'VE INDICATED THAT I NEED MORE WITH RESPECT TO

04:44PM  13   MR. WADE AND THAT DECLARATION.

04:44PM  14          SO WHAT IS IT YOU WOULD LIKE THE COURT TO CONSIDER IN

04:44PM  15   REGARDS TO THE ISSUE OF UNAVAILABILITY OF MR. BALWANI.

04:44PM  16              MR. FLEURMONT:  UNDERSTOOD, YOUR HONOR.

04:44PM  17          OUR FIRST QUESTION IS IF WE WERE TO CALL -- WELL, WE SEEK

04:44PM  18   TO CALL MR. BALWANI IN OUR CASE.  IS HE AVAILABLE TO TESTIFY?

04:44PM  19          SO THAT'S THE FIRST QUESTION.

04:44PM  20              THE COURT:  SO LET ME ASK THEN, YOU'VE CAUSED THE

04:44PM  21   YOUNG MAN TO COME FORWARD HERE.

04:44PM  22          MAY I KNOW YOUR NAME, SIR?

04:44PM  23              MR. COOPERSMITH:  JEFF COOPERSMITH.  I REPRESENT

04:44PM  24   MR. BALWANI.

04:44PM  25              THE COURT:  THANK YOU.  YOU CURRENTLY REPRESENT HIM?
```

04:44PM  1                    MR. COOPERSMITH:  YES, YOUR HONOR.

04:44PM  2                    THE COURT:  IN THIS LITIGATION?

04:44PM  3                    MR. COOPERSMITH:  YES, YOUR HONOR.

04:44PM  4                    THE COURT:  AND YOU'RE HERE AS HIS ATTORNEY AND YOU

04:44PM  5       CAN ANSWER ANY QUESTIONS THAT MR. FLEURMONT HAS ABOUT YOU AND

04:44PM  6       YOUR CLIENT AND HIS DESIRE TO ASK YOUR CLIENT QUESTIONS?

04:44PM  7                    MR. COOPERSMITH:  YES, YOUR HONOR.

04:44PM  8                    THE COURT:  OKAY.

04:45PM  9                    MR. FLEURMONT:  OKAY.  MR. COOPERSMITH, IF WE WERE

04:45PM  10      TO CALL MR. BALWANI IN THIS CASE, WOULD HE BE AVAILABLE TO

04:45PM  11      TESTIFY?

04:45PM  12                   MR. COOPERSMITH:  UNDER THE CIRCUMSTANCES, IF

04:45PM  13      MR. BALWANI WERE CALLED AS A WITNESS, I UNDERSTAND THAT UNDER

04:45PM  14      THE ADVICE OF COUNSEL HE WOULD ASSERT HIS FIFTH AMENDMENT

04:45PM  15      RIGHTS WITH RESPECT TO ANY SUBSTANTIVE QUESTION, INCLUDING ON

04:45PM  16      THE TOPICS THAT I UNDERSTAND THE DEFENSE IS INTERESTED IN

04:45PM  17      CALLING HIM FOR BASED ON THEIR MOTION.

04:45PM  18                   THE COURT:  ALL RIGHT.  AND YOU'VE BEEN APPRISED OF

04:45PM  19      THE CONTEXT OF THE QUESTIONS THAT WOULD BE POSED TO YOUR CLIENT

04:45PM  20      WERE HE TO BE SUBPOENAED?

04:45PM  21                   MR. COOPERSMITH:  YES, YOUR HONOR.  I'VE REVIEWED

04:45PM  22      THE PLEADINGS ON THIS ISSUE.  SO YES.

04:45PM  23                   THE COURT:  OKAY.

04:45PM  24                   MR. FLEURMONT:  MR. COOPERSMITH, IF WE WERE TO ASK

04:45PM  25      HIM QUESTIONS RELATED TO HIS ROLE IN THE CLIA LAB, WOULD HE

04:45PM 1    ANSWER THOSE QUESTIONS?

04:45PM 2           MR. COOPERSMITH:  ON ADVICE OF COUNSEL I UNDERSTAND

04:45PM 3    MR. BALWANI WOULD ASSERT HIS FIFTH AMENDMENT RIGHTS.

04:45PM 4           MR. FLEURMONT:  MR. COOPERSMITH, IF WE WERE TO ASK

04:46PM 5    HIM QUESTIONS RELATED TO HIS ROLE IN FINANCIAL MODELING, WOULD

04:46PM 6    HE ANSWER.

04:46PM 7           MR. COOPERSMITH:  AGAIN, ON ADVICE OF COUNSEL, HE

04:46PM 8    WOULD ASSERT HIS FIFTH AMENDMENT RIGHTS.

04:46PM 9           MR. FLEURMONT:  AND, MR. COOPERSMITH, IF WE WERE TO

04:46PM 10   ASK HIM QUESTIONS RELATED TO HIS ROLE IN THE WALGREENS AND

04:46PM 11   SAFEWAY RELATIONSHIPS, WOULD HE ANSWER?

04:46PM 12          MR. COOPERSMITH:  ON ADVICE OF COUNSEL, I UNDERSTAND

04:46PM 13   THAT HE WOULD ASSERT HIS FIFTH AMENDMENT RIGHTS.

04:46PM 14          THE COURT:  OKAY.  ANYTHING FURTHER, MR. FLEURMONT?

04:46PM 15          MR. FLEURMONT:  NO, YOUR HONOR.

04:46PM 16          THE COURT:  OKAY.

04:46PM 17       DO YOU WISH TO CROSS-EXAMINE MR. COOPERSMITH?

04:46PM 18       (LAUGHTER.)

04:46PM 19          MS. VOLKAR:  I RESPECTFULLY DECLINE, YOUR HONOR.

04:46PM 20          THE COURT:  ALL RIGHT.  THANK YOU, MR. COOPERSMITH.

04:46PM 21   I APPRECIATE YOUR ATTENTION TO THIS.  IT'S BEEN VERY HELPFUL TO

04:46PM 22   THE COURT.  THANK YOU.

04:46PM 23          MR. COOPERSMITH:  YOU'RE WELCOME, YOUR HONOR.  THANK

04:46PM 24   YOU.

04:46PM 25          THE COURT:  ALL RIGHT.  THANK YOU.

04:46PM 1      LET ME JUST STATE, AFTER HEARING FROM MR. BALWANI'S

04:46PM 2  ATTORNEY, THE COURT DOES FIND THEN AND MAKES A FINDING THAT

04:46PM 3  WERE MR. BALWANI TO BE CALLED TO TESTIFY IN THIS CASE -- AND

04:46PM 4  ONCE AGAIN, WE ARE OUTSIDE OF THE PRESENCE OF THE JURY NOW --

04:47PM 5  PURSUANT TO THE REPRESENTATIONS OF COUNSEL, MR. BALWANI WOULD

04:47PM 6  ASSERT HIS FIFTH AMENDMENT PRIVILEGE TO NOT ANSWER THOSE

04:47PM 7  QUESTIONS.

04:47PM 8      SO THE COURT DOES FIND HIM THEN UNAVAILABLE FOR PURPOSES

04:47PM 9  OF TESTIMONY HERE.

04:47PM 10      ALL RIGHT.  THANK YOU.

04:47PM 11      AND THANK YOU FOR DOING THAT, MR. FLEURMONT.  I APPRECIATE

04:47PM 12  IT.

04:47PM 13      SO ONE OF THE -- I MENTIONED TO YOU THAT THERE WAS SOME

04:47PM 14  TESTIMONY, AND I WAS -- LET ME JUST DRAW YOUR ATTENTION TO IT.

04:47PM 15  I THINK IT WAS IN EXHIBIT 5387D, I THINK IT WAS, BUT IT WAS

04:47PM 16  CONVERSATION REGARDING -- I THINK MS. HOLMES TESTIFIED, I'M

04:47PM 17  PARAPHRASING HERE, BUT "WE WOULD WORK TOGETHER ON A REVENUE

04:47PM 18  PIECE," I THINK IT WAS.

04:47PM 19      AND THAT TO ME SUGGESTED THAT -- I GUESS IT GOES TO THE

04:47PM 20  INCULPATION ISSUE, THAT IF THEY WORKED TOGETHER, THEN THAT

04:47PM 21  MIGHT SOMEHOW MITIGATE THE QUESTION OF WHETHER OR NOT THAT IS

04:48PM 22  INCULPATORY AS TO MR. BALWANI.

04:48PM 23      AND I DON'T HAVE THAT PIECE IN FRONT OF ME, AND I'LL

04:48PM 24  INVITE YOUR TEAMS TO FIND IT FOR ME IF YOU WOULD LIKE.

04:48PM 25      BUT THAT WAS MY GENERAL RECOLLECTION OF THAT TESTIMONY.

8199

04:48PM 1       AND I'M NOT CERTAIN I HAVE THE CITE CORRECT, BUT I DO

04:48PM 2   REMEMBER --

04:48PM 3           MR. FLEURMONT:  I REMEMBER THAT TESTIMONY,

04:48PM 4   YOUR HONOR.

04:48PM 5           THE COURT:  GREAT.

04:48PM 6           MR. FLEURMONT:  SO FROM WHAT I REMEMBER, THERE WAS A

04:48PM 7   TEXT MESSAGE AND "WE WORKED TOGETHER ON THE REV PIECE."

04:48PM 8           THE COURT:  RIGHT.

04:48PM 9           MR. FLEURMONT:  AND I WASN'T SURE -- I BELIEVE SHE

04:48PM 10  SAID "I WASN'T SURE IF THAT MEANT REVISIONS OR REVENUE."

04:48PM 11          THE COURT:  RIGHT.

04:48PM 12          MR. FLEURMONT:  WE DON'T HAVE CONTEXT FOR THAT TEXT

04:48PM 13  MESSAGE.

04:48PM 14      I'M NOT EVEN QUITE SURE WHAT IT WOULD RELATE TO IN TERMS

04:48PM 15  OF WHAT WE'RE DISCUSSING HERE.  IT COULD RELATE TO PROJECTIONS.

04:48PM 16  IT COULD RELATE TO THE WALGREENS RELATIONSHIP.

04:48PM 17      I'M NOT -- I DON'T EVEN HAVE ENOUGH CONTEXT I THINK TO

04:49PM 18  UNDERSTAND WHAT IT RELATES TO EVEN IN THIS MOTION.

04:49PM 19      SO I THINK THIS IS JUST AN EXAMPLE OF HOW THAT TEXT

04:49PM 20  MESSAGE IN ISOLATION DOESN'T CHANGE THE NEED FOR ANY OF THE

04:49PM 21  TESTIMONY HERE.

04:49PM 22          THE COURT:  OKAY.  WELL, I RECALL, I THINK MR. LEACH

04:49PM 23  DREW HER ATTENTION -- I SAY "HER," PARDON ME, I MEAN NO

04:49PM 24  DISRESPECT -- MS. HOLMES'S ATTENTION TO THAT COLLOQUY AND

04:49PM 25  TRACED IT BACK TO REVENUE, IF I RECALL CORRECTLY.

04:49PM 1      AND MR. LEACH HAS THE DOCUMENT HERE.

04:49PM 2              MS. VOLKAR:  YES, YOUR HONOR, WITH THE HELP OF MY --

04:49PM 3      WITH THE HELP OF MR. LEACH, I DO HAVE --

04:49PM 4              THE COURT:  WHAT PAGE WAS THAT ON?  MAYBE YOU CAN --

04:49PM 5              MS. VOLKAR:  PAGE 19 OF 5387, SO IT WAS JUST

04:50PM 6      ADMITTED, IT WAS JUST ADMITTED MOMENTS AGO WHEN MR. LEACH MOVED

04:50PM 7      IT INTO EVIDENCE.

04:50PM 8              THE COURT:  THANK YOU.

04:50PM 9              MS. VOLKAR:  AND TO BE -- SPECIFICALLY, MR. LEACH

04:50PM 10     ASKED MS. HOLMES ABOUT HER SKYPE MESSAGE, "WE HAVE TO WORK

04:50PM 11     TOGETHER ON THE REV PIECE," I BELIEVE MR. FLEURMONT'S -- MY

04:50PM 12     MEMORY MATCHED MR. FLEURMONT'S WITH RESPECT TO HER ANSWER,

04:50PM 13     WHICH WAS THAT SHE WASN'T SURE WHETHER IT WAS REVENUE OR

04:50PM 14     REVISIONS OR IT COULD HAVE BEEN.

04:50PM 15         AND THEN MR. LEACH POINTED OUT THAT JUST A FEW LINES DOWN,

04:50PM 16     MR. BALWANI RESPONDED, "YOU ARE THE COMPANY," REFERRING TO

04:50PM 17     MS. HOLMES, "WE NEED REVENUE PLUS A FEW SENIOR LEVEL MANAGERS

04:50PM 18     EXPERIENCED EVEN IF THEY ONLY WORK 11 HOURS."

04:50PM 19         AND MY RECOLLECTION IS THAT MR. LEACH ASKED IF SHE HAD ANY

04:50PM 20     REASON TO DOUBT THAT THEY WERE TALKING ABOUT REVENUE, AND I

04:50PM 21     THOUGHT SHE SAID THAT SHE DIDN'T HAVE A REASON TO DOUBT, OR

04:50PM 22     THERE WAS AT LEAST SOME UNCERTAINTY THERE, BUT IT WASN'T A

04:50PM 23     SOLID, NO, WE WEREN'T TALKING ABOUT REVENUE.

04:50PM 24         THAT'S MY BEST RECOLLECTION.

04:51PM 25             THE COURT:  ALL RIGHT.  THANK YOU.

8201

04:51PM 1      THIS IS WHAT I WAS REMEMBERING, AND IT CAUSED ME TO LOOK

04:51PM 2   BACK AT THE STATEMENT THAT YOU SEEK TO INTRODUCE, AND IT CAUSED

04:51PM 3   ME TO THINK THAT, WELL, IF SHE WAS IN THE REVENUE PIECE, IF

04:51PM 4   MS. HOLMES WAS IN THE REVENUE PIECE, THEN I DON'T SEE WHERE THE

04:51PM 5   INCULPATION IS.

04:51PM 6      MR. FLEURMONT:  YES.  SO I THINK THE COURT IS

04:51PM 7   ASKING, BASED ON THIS TEXT MESSAGE AND THE CONTEXT, IS THERE

04:51PM 8   LESS CORROBORATION FOR THE STATEMENT THAT WE SEEK TO ADMIT?

04:51PM 9      THE STATEMENTS WE SEEK TO ADMIT RELATE TO THE PROJECTIONS

04:51PM 10  AND THE FINANCIAL MODEL.

04:51PM 11     I DON'T THINK THERE'S ANYTHING IN THESE TEXT MESSAGES THAT

04:51PM 12  CONTRADICT HIS TESTIMONY THAT HE OWNED THE MODEL OR CONTRADICT

04:51PM 13  HIS TESTIMONY RELATED TO WALGREENS AND HIS RELATIONSHIP WITH

04:51PM 14  WALGREENS.

04:51PM 15     THE FACT THAT THEY'RE DISCUSSING REVENUE AND ARE BOTH

04:51PM 16  TALKING ABOUT REVENUE, I DON'T THINK UNDERMINES HIS STATEMENT

04:51PM 17  THAT "I OWNED THE FINANCIAL MODEL."

04:52PM 18     SHE -- MS. HOLMES MAY KNOW ABOUT REVENUE, AND I THINK A

04:52PM 19  CEO OF A COMPANY WILL KNOW ABOUT SOME REVENUE.

04:52PM 20     BUT IT DOESN'T NECESSARILY MEAN THAT THE STATEMENTS THAT

04:52PM 21  HE'S MAKING IN HIS DEPOSITION ARE UNDERMINED.

04:52PM 22     MS. VOLKAR:  THANK YOU, YOUR HONOR.

04:52PM 23     THE GOVERNMENT WOULD LIKE TO DIRECT THAT THERE ARE TWO

04:52PM 24  REQUIREMENTS AT ISSUE HERE FOR 804(B)(3).

04:52PM 25     THERE IS WHETHER OR NOT THE SUBJECT, OR THE STATEMENT

8202

04:52PM   1    TENDED TO SUBJECT THE DECLARANT TO PENAL LIABILITY OR CRIMINAL

04:52PM   2    LIABILITY.  THAT'S THE INCULPATORY STATEMENTS THAT WE HAVE

04:52PM   3    SPENT A LOT OF TIME TALKING ABOUT.

04:52PM   4         AND THEN THERE'S ALSO THE SECOND REQUIREMENT FOR

04:52PM   5    804(B)(3), THAT THERE EXIST CORROBORATING CIRCUMSTANCES THAT

04:52PM   6    CLEARLY INDICATE THE STATEMENT'S TRUSTWORTHINESS.

04:52PM   7         AND I THINK THAT YOUR HONOR FORESAW WHERE THE GOVERNMENT

04:52PM   8    WAS GOING.  I THINK THAT WHAT OUR POSITION IS HERE IS THAT

04:52PM   9    THERE ISN'T SUFFICIENT EVIDENCE TO CORROBORATE OR SHOW THE

04:53PM   10   TRUSTWORTHINESS OF THESE STATEMENTS WHEN THE TESTIMONY TO DATE

04:53PM   11   HAS BEEN PERHAPS MR. BALWANI WOULD BE THE ONE TO PRESENT THE

04:53PM   12   PROJECTIONS, THERE HAS BEEN SOME TESTIMONY THERE.

04:53PM   13        THERE HASN'T NECESSARILY BEEN ANY TESTIMONY ABOUT WHO

04:53PM   14   CREATED OR WHO OWNED THE MODELS.  THIS WOULD BE SORT OF THE

04:53PM   15   FIRST INSTANCE OF THAT.

04:53PM   16        AND WHAT WE DO HAVE ARE TEXT MESSAGES SHOWING THAT

04:53PM   17   MR. BALWANI AND MS. HOLMES TALKED ABOUT THESE MODELS, AND IT IS

04:53PM   18   AT BEST UNCLEAR WHO WAS REALLY TAKING OWNERSHIP OF IT.

04:53PM   19        SO I WANT TO FOCUS ON THE PIECE THAT DEFENSE COUNSEL IS

04:53PM   20   TALKING ABOUT, THE OWNERSHIP PIECE.  THERE ISN'T ANY

04:53PM   21   CORROBORATION OR ANYTHING TO INDICATE TRUSTWORTHINESS OF THAT

04:53PM   22   PORTION.

04:53PM   23        IN FACT, THE TEXT MESSAGES, I WOULD SAY, POINT IN BOTH

04:53PM   24   DIRECTIONS AND THE TESTIMONY WE HAVE HEARD TODAY POINTS IN BOTH

04:53PM   25   DIRECTIONS.

8203

04:53PM 1     AND THEN IN TERMS OF THE REMAINDER OF THE STATEMENT AROUND

04:53PM 2  IT, THAT MR. BALWANI WORKED WITH MULTIPLE PEOPLE TO BUILD THIS

04:53PM 3  MODEL, THAT'S WHERE I GO BACK TO THE GADSON AND THE PRONG ABOUT

04:54PM 4  INCULPATORY STATEMENTS BECAUSE GADSON SAYS IF SOMEONE IS

04:54PM 5  DEFLECTING OR SHARING BLAME, THAT'S NOT INCULPATORY.

04:54PM 6     SO I WOULD SAY THAT BETWEEN THOSE TWO PRONGS, ALL OF THE

04:54PM 7  PORTIONS ABOUT THE FINANCIAL MODEL AND PROJECTIONS ARE

04:54PM 8  INADMISSIBLE HEARSAY.

04:54PM 9           MR. FLEURMONT:  IF I COULD BRIEFLY RESPOND,

04:54PM 10 YOUR HONOR?

04:54PM 11          THE COURT:  YES, PLEASE.

04:54PM 12          MR. FLEURMONT:  BRIAN GROSSMAN TESTIFIED THAT HE

04:54PM 13 RECEIVED THE FINANCIAL MODEL FROM SUNNY, FROM MR. BALWANI,

04:54PM 14 EXCUSE ME.

04:54PM 15     AND THERE IS OTHER -- AND THAT'S AT TRANSCRIPT 6411,

04:54PM 16 NOVEMBER 16TH.

04:54PM 17     THERE'S TESTIMONY FROM GENERAL MATTIS THAT THE BOARD

04:54PM 18 RECEIVED PRESENTATIONS ABOUT THE FINANCIALS FROM MR. BALWANI.

04:54PM 19     THE RULE DOES NOT REQUIRE, AND I HAVE NOT SEEN A CASE THAT

04:54PM 20 SAYS THIS, THAT THE RULE REQUIRES A WITNESS TO SAY WHAT THE,

04:55PM 21 WHAT THE PROPONENT WANTS TO ADMIT IS -- THERE'S NO REQUIREMENT

04:55PM 22 THAT THERE'S A ONE-TO-ONE MATCH WITH THE STATEMENT THAT THE

04:55PM 23 DECLARANT WANTS TO ADMIT AND THE CORROBORATION.

04:55PM 24     WHAT THE RULE REQUIRES IS THAT CORROBORATING CIRCUMSTANCES

04:55PM 25 THAT INDICATE TRUSTWORTHINESS.

8204

04:55PM   1          AND SO THE TESTIMONY OF GENERAL MATTIS, THE TESTIMONY OF

04:55PM   2     BRIAN GROSSMAN, AND OTHER STATEMENTS BY MR. BALWANI'S SWORN

04:55PM   3     DECLARATION, EXCUSE ME, SWORN DEPOSITION SUPPORT THE STATEMENTS

04:55PM   4     THAT WE SEEK TO ADMIT.

04:55PM   5               THE COURT:  OKAY.  IT SEEMS LIKE THERE'S A -- WHAT

04:55PM   6     DO WE DO WHEN THERE'S, THERE'S AN EQUAL WEIGHT OR EQUAL

04:55PM   7     INTERPRETATION AS TO EACH?  IT COULD BE LOOKED AT THIS WAY?  IT

04:55PM   8     COULD BE LOOKED AT ANOTHER WAY?

04:55PM   9          I GUESS THAT'S FOR THE COURT TO BALANCE AND SEE, BUT

04:55PM   10    THAT'S ONE OF THE THINGS THAT THE COURT HAS TO LOOK AT, AND

04:56PM   11    THAT'S WHY WE'RE HAVING THIS CONVERSATION CANDIDLY.

04:56PM   12         YOU SHOULD UNDERSTAND THAT I'M HAVING DIFFICULTY FINDING

04:56PM   13    THAT HERE.  THAT'S WHY WE'RE DISCUSSING THIS NOW.

04:56PM   14         AND THEN I LOOK AT -- AND I DON'T MEAN TO MUDDLE THE

04:56PM   15    WATERS -- BUT ON 1163-3, ECF PAGE 6, LINE 19, THE QUESTION WAS,

04:56PM   16    "DID SHE EVER EDIT THE MODEL?"

04:56PM   17         AND MR. BALWANI TELLS US THAT, HE SAYS, "TO THE BEST OF MY

04:56PM   18    KNOWLEDGE, NO.  I HAD QUESTIONS FOR HER AND THEN I PUT A MODEL

04:56PM   19    WITH HER NAME ON IT SO SHE COULD EDIT."

04:56PM   20         THIS IS ONE OF THOSE AREAS THAT, WELL, WAIT A MINUTE, NOW

04:56PM   21    SHE'S EDITING.  I DON'T KNOW IF IT'S THE SAME MODEL.  IS IT A

04:56PM   22    DIFFERENT MODEL?

04:56PM   23         AND THEN HE SAYS, "I DON'T THINK SHE DID BECAUSE I

04:56PM   24    CONTINUED WITH MY ASSUMPTIONS.  I NEVER EVEN LOOKED AT THAT

04:56PM   25    MODEL.  SO I THINK MY ANSWER IS NO."

04:56PM 1    SO THAT -- IT JUST CREATES ANOTHER ISSUE OF, IS THAT

04:56PM 2    SUFFICIENT CORROBORATION?

04:57PM 3    YOU'RE GOING TO TELL ME YES.

04:57PM 4    MR. FLEURMONT:  I THINK SO.

04:57PM 5    THERE ARE TWO ISSUES AT PLAY HERE.  ONE, IS THERE

04:57PM 6    SUFFICIENT CORROBORATION FOR THE STATEMENT?

04:57PM 7    WE'VE INCLUDED THE STATEMENT BECAUSE IT CORROBORATES THE

04:57PM 8    FACT THAT TO HIS KNOWLEDGE HE NEVER -- TO HIS KNOWLEDGE, SHE

04:57PM 9    DID NOT EDIT THE MODEL, MS. HOLMES DID NOT EDIT THE MODEL.

04:57PM 10   AND HE SAYS AT THE END, "I THINK MY ANSWER IS NO."

04:57PM 11   THE MAIN STATEMENT THAT WE'RE SEEKING TO INTRODUCE IS

04:57PM 12   EARLIER AND -- BUT ONE IN EXHIBIT A WHERE HE SAYS HE OWNS THE

04:57PM 13   MODEL, AND THEN ALSO IN EXHIBIT B WHERE HE SAYS -- THIS IS AT

04:57PM 14   PAGE 4, LINES 8 THROUGH 9 -- "I WOULD, YOU KNOW, UPDATE THE

04:57PM 15   MODEL AND KEEP IT UPDATED."

04:57PM 16   THE COURT:  RIGHT.

04:57PM 17   MR. FLEURMONT:  HE IS A PERSON WHO IS UPDATING THIS

04:57PM 18   MODEL.

04:57PM 19   SO THE FACT THAT HE SAYS "TO THE BEST OF MY KNOWLEDGE, NO"

04:57PM 20   IN RESPONSE TO A QUESTION ABOUT MS. HOLMES EDITING THE MODEL

04:58PM 21   CORROBORATES THAT STATEMENT.

04:58PM 22   THE COURT MAY LOOK AT THIS STATEMENT AND SAY -- JUST TO BE

04:58PM 23   CLEAR, I DON'T THINK THIS IS A WHOLESALE EXERCISE.  IF THE

04:58PM 24   COURT SEES ONE QUESTION AND ANSWER THAT THEN IT DOESN'T BELIEVE

04:58PM 25   IS EITHER INCULPATORY, OR IF THE COURT SEES ONE QUESTION AND

8206

04:58PM 1    ANSWER AND IT DOESN'T BELIEVE IT'S CORROBORATED, THEN IT SHOULD

04:58PM 2    THROW OUT THE REST OF THE TRANSCRIPT.

04:58PM 3         IF THE COURT THINKS THAT THE SCALES ARE EQUAL ON THIS ONE,

04:58PM 4    I THINK THE COURT IS WELL WITHIN ITS RIGHTS TO LOOK AT THE

04:58PM 5    OTHER STATEMENTS AND SAY, WELL, THIS ONE MEETS THE RULE.

04:58PM 6              THE COURT:  OKAY.  OKAY.

04:58PM 7              MS. VOLKAR:  YOUR HONOR, I THINK THE COURT'S

04:58PM 8    QUESTIONS SHOW AND DEMONSTRATE WHY THIS -- THESE PORTIONS ARE

04:58PM 9    INADMISSIBLE, AND THE REASON IS BECAUSE WHEN THERE IS EVIDENCE

04:58PM 10   POINTING IN BOTH DIRECTIONS, THE TYPICAL ANSWER IN OUR COURT

04:58PM 11   AND LEGAL SYSTEM IS THROUGH CROSS-EXAMINATION, IS TO TEST IT

04:58PM 12   THROUGH THE ADVERSARIAL PROCESS.

04:58PM 13        AND THAT BRINGS US BACK TO THE FUNDAMENTAL PROBLEM HERE.

04:58PM 14        THE DEFENSE SEEKS TO ADMIT THESE STATEMENTS WHEN THE

04:59PM 15   GOVERNMENT, THE PROSECUTION TEAM HAS NOT HAD THE OPPORTUNITY TO

04:59PM 16   CROSS-EXAMINE MR. BALWANI.

04:59PM 17        AND I KNOW THAT WHEN WE'RE LOOKING AT THIS, WE'RE TALKING

04:59PM 18   ABOUT THOSE TWO PRONGS THAT I MENTIONED.

04:59PM 19        BUT FOR A HEARSAY EXCEPTION, THE INDICATION OF

04:59PM 20   TRUSTWORTHINESS, THAT PRONG IS INCORPORATING THE IDEA THAT IF

04:59PM 21   WE'RE GOING TO BRING IN AN OUT-OF-COURT STATEMENT THAT CAN'T

04:59PM 22   NECESSARILY -- WHERE THE DECLARANT CANNOT BE TESTED THROUGH THE

04:59PM 23   TYPICAL PROCESS OF CROSS-EXAMINATION, DO WE HAVE SUFFICIENT --

04:59PM 24   DO WE HAVE SUFFICIENT INDICATION OF TRUSTWORTHINESS THAT WE CAN

04:59PM 25   RELY ON THOSE STATEMENTS WITHOUT TESTING THEM THROUGH THE

04:59PM  1    NORMAL TRIAL PROCESS?

04:59PM  2              THE COURT:  OKAY.

04:59PM  3              MS. VOLKAR:  AND THAT'S WHERE I WOULD ARGUE,

04:59PM  4    ALTHOUGH WE'RE TALKING ABOUT CORROBORATION, WHEN WE ARE IN A

04:59PM  5    SITUATION THAT THE COURT FACES HERE WHERE THERE IS SOME

04:59PM  6    EVIDENCE THAT POINTS BOTH WAYS, THERE'S NOTHING ELSE EXPLICITLY

04:59PM  7    EVIDENT.

04:59PM  8         AND WITH RESPECT TO MY COLLEAGUE, I LISTENED TO WHAT HE

04:59PM  9    SAID ABOUT MR. GROSSMAN AND THE OTHER INVESTORS RECEIVING THE

04:59PM  10   MODEL, BUT I DIDN'T HEAR ANYTHING ABOUT WHO HAS TESTIFIED, AND

05:00PM  11   I HAVE NOT HEARD ANY TESTIMONY IN THIS CASE FROM A WITNESS TO

05:00PM  12   DATE ABOUT WHO BUILT THE MODEL OTHER THAN THIS.

05:00PM  13             THE COURT:  OKAY.  MR. FLEURMONT, ANYTHING ELSE YOU

05:00PM  14   WANT ME TO KNOW?

05:00PM  15             MR. FLEURMONT:  YES, YOUR HONOR.

05:00PM  16        BRIEFLY ON THE MODEL VERSUS PROJECTIONS DISCUSSIONS WE HAD

05:00PM  17   EARLIER, I JUST WANTED TO CLARIFY SOME THINGS.

05:00PM  18             THE COURT:  SURE.

05:00PM  19             MR. FLEURMONT:  SO THE WAY THE PROJECTIONS WERE MADE

05:00PM  20   WERE BY PLUGGING THE ASSUMPTIONS INTO THE MODEL, AND THERE ARE

05:00PM  21   DIFFERENT ASSUMPTIONS.  FOR EXAMPLE, HOW MANY STORES DO WE

05:00PM  22   THINK WILL OPEN THIS YEAR?  HOW MUCH REVENUE DO WE THINK WE'LL

05:00PM  23   GET BASED ON DIFFERENT METRICS?

05:00PM  24        ONCE THOSE METRICS WERE PUT INTO THE MODEL, THEN THAT'S

05:00PM  25   WHAT GENERATES A PROJECTION THAT IS ACTUALLY SENT TO THE

05:00PM  1      INVESTOR.

05:00PM  2           SO I JUST WANT IT TO BE CLEAR THAT THE MODEL AND THE

05:00PM  3      PROJECTION ARE ESSENTIALLY THE SAME THING FOR THAT REASON.  THE

05:00PM  4      MODEL IS WHAT IS GENERATING THE PROJECTION THAT IS SENT TO THE

05:00PM  5      INVESTORS.  SO I WANTED TO CLARIFY THAT.

05:00PM  6                THE COURT:  RIGHT.  I THINK I FOLLOW THAT.

05:00PM  7                MR. FLEURMONT:  OKAY.

05:00PM  8                THE COURT:  THE MODEL IS THE, IS THE INITIAL

05:01PM  9      DOCUMENT WHERE ALL OF THE INFORMATION IS PUT IN, AND THAT IS --

05:01PM  10     THE FINAL PRODUCT IS THE PROJECTION THAT IS SENT OUT.

05:01PM  11                MR. FLEURMONT:  OKAY.  COOL.  I JUST WANTED TO MAKE

05:01PM  12     SURE.

05:01PM  13          (LAUGHTER.)

05:01PM  14                THE COURT:  NO, IT IS COOL.

05:01PM  15                MR. FLEURMONT:  I JUST WANTED TO MAKE SURE I WAS

05:01PM  16     CLEAR ON THAT.

05:01PM  17           JUST TAKE A STEP BACK FROM THE PRIOR DISCUSSION, WHAT THE

05:01PM  18     RULE REQUIRES IS A STATEMENT AGAINST INTEREST.  THERE'S NO

05:01PM  19     REQUIREMENT IN THAT RULE FOR SIMILAR MODE OF OPPORTUNITY TO

05:01PM  20     CROSS-EXAMINE LIKE THERE IS IN 804(B)(1), AND THAT'S FOR A

05:01PM  21     REASON TYPICALLY.

05:01PM  22           AS I MENTIONED EARLIER TODAY, THESE STATEMENTS AGAINST

05:01PM  23     INTEREST ARE SAID TO ANOTHER WITNESS OR SAID TO A POLICE

05:01PM  24     OFFICER, AND THE OTHER PARTY ISN'T EVEN THERE.

05:01PM  25           THE REASON THAT THEY'RE ALLOWED TO COME IN IS BECAUSE

05:01PM 1    THEY'RE TYPICALLY RELIABLE BECAUSE THEY'RE STATEMENTS AGAINST

05:01PM 2    THE PERSON'S INTEREST.  THEY WOULDN'T MAKE THE STATEMENT IF

05:01PM 3    THEY -- THEY WOULDN'T MAKE THE STATEMENT BECAUSE IT SUBJECTS

05:01PM 4    THEM TO SOME SORT OF LIABILITY, WHETHER IT'S CIVIL OR CRIMINAL

05:02PM 5    LIABILITY.

05:02PM 6         AND WE SUBMIT, YOUR HONOR, THAT THAT'S WHAT HAPPENED HERE.

05:02PM 7         I DO THINK THAT IT'S IMPORTANT TO NOTE THAT THESE ARE

05:02PM 8    STATEMENTS MADE IN A DEPOSITION OF THE S.E.C. UNDER THE PENALTY

05:02PM 9    OF PERJURY.  THESE ARE NOT STATEMENTS MADE TO ANOTHER WITNESS,

05:02PM 10   NOT STATEMENTS MADE TO A POLICE OFFICER.

05:02PM 11        AND I'M NOT SAYING THAT THE CORROBORATION ELEMENT DOES NOT

05:02PM 12   NEED TO BE MET BECAUSE OF THAT, BUT I THINK THAT'S SOMETHING

05:02PM 13   THAT THE COURT SHOULD CONSIDER WHEN CONSIDERING IF THESE

05:02PM 14   STATEMENTS ARE TRUSTWORTHY.

05:02PM 15        THERE'S A WHOLE OTHER EXCEPTION THAT TALKS ABOUT

05:02PM 16   STATEMENTS MADE IN DEPOSITIONS FOR A REASON.  I THINK THAT'S --

05:02PM 17   YOU KNOW, YOU SWORN UNDER PERJURY, LIKE, YOU WANT TO BE HONEST.

05:02PM 18        SO THERE IS THAT POINT.

05:02PM 19        IN TERMS OF THE RULE 106 AND WHAT WE WANT TO ADMIT, GOING

05:03PM 20   BACK TO JUST WHAT I SAID EARLIER, I THINK I'VE POINTED THE

05:03PM 21   COURT TO THE PORTIONS THAT WE'RE SEEKING TO ADMIT.

05:03PM 22        IF THE COURT WAS TO FASHION A LIMITED RULING THAT JUST HAD

05:03PM 23   THOSE PORTIONS, THAT WOULD KIND OF GUIDE OUR 106 DESIGNATIONS.

05:03PM 24        THE COURT:  SURE.  OKAY.  UNDERSTOOD.  OKAY.

05:03PM 25        ALL RIGHT.  WELL, IT USED TO BE AT PERIL OF ONE'S SOUL,

05:03PM  1    REMEMBER THOSE DAYS, BUT NOW WE'VE MOVED IT TO PERILS OF

05:03PM  2    PERJURY, SO --

05:03PM  3         MS. VOLKAR:  YOUR HONOR, THE LAST THING I WANT TO

05:03PM  4    SAY ON THE CORROBORATION AND THE TRUSTWORTHINESS POINT, BECAUSE

05:03PM  5    I THINK THAT'S REALLY WHERE WE ARE FOCUSSING FOR THESE PIECES,

05:03PM  6    THIS IS APPROXIMATELY A YEAR AFTER THE PARTIES SPLIT UP, AND WE

05:03PM  7    DID HEAR TODAY AND YESTERDAY THAT THERE WAS A COMPLICATED

05:03PM  8    RELATIONSHIP BETWEEN MS. HOLMES AND MR. BALWANI.  THERE WERE

05:03PM  9    LOVING ASPECTS AND NOT LOVING ASPECTS.

05:03PM  10        BUT WE HAVEN'T YET HEARD FROM MR. BALWANI, TO BE FRANK,

05:03PM  11   AND HIS SIDE OF THE STORY, AND WE -- AS FAR AS WE CAN TELL FROM

05:03PM  12   THE TEXT MESSAGES, HE EXPRESSED A LOT OF LOVE AND DEVOTION.

05:04PM  13        AND AGAIN, WITHOUT CROSS-EXAMINATION, WE DON'T KNOW WHAT

05:04PM  14   INFLUENCE THAT WOULD HAVE HAD ON HIM IN THESE SITUATIONS.

05:04PM  15        AND WE HAVE THE NINTH CIRCUIT SAYING A MOTIVE OF LOVE IS

05:04PM  16   ANOTHER REASON TO TAKE A LITTLE BIT CLOSER LOOK AT CERTAIN

05:04PM  17   STATEMENTS.

05:04PM  18        THE COURT:  I DID.  I DID LOOK AT THAT, AND I LOOKED

05:04PM  19   AT THAT IN RELATION TO THE TIMING AND IS THIS A SITUATION WHERE

05:04PM  20   MR. BALWANI WOULD HAVE, BECAUSE OF THAT MOTIVATION, HIS

05:04PM  21   FEELINGS FOR MS. HOLMES, HE MIGHT HAVE BEEN TRYING TO PROTECT

05:04PM  22   HER IN SOME WAY, OR IN SOME WAY SHIELD HER?  THAT'S A

05:04PM  23   CONSIDERATION.

05:04PM  24        I THINK IT'S MITIGATED BECAUSE OF THE TIMING HERE, BUT I

05:04PM  25   THINK YOU'RE RIGHT TO POINT OUT THAT THERE'S SOME -- IT WAS A

05:04PM 1    COMPLEX RELATIONSHIP I THINK IS WHAT YOU SAID, AND I THINK THE

05:04PM 2    RECORD REFLECTS THAT.

05:04PM 3        SO THANK YOU FOR THAT.

05:04PM 4        OKAY.  ALL RIGHT.  THANK YOU.

05:04PM 5        LET ME TURN TO 1165, WHICH WAS THE RENEWED MOTION TO ADMIT

05:04PM 6    14259.  THIS IS REALLY ABOUT DR. ASIN IF I'M NOT MISTAKEN.

05:05PM 7            MS. VOLKAR:  IT IS, YOUR HONOR.

05:05PM 8        I WAS CURIOUS IF YOUR HONOR HAD A TENTATIVE RULING ON THE

05:05PM 9    FINANCIAL MODELS OR IF IT WAS STILL UNDER SUBMISSION.

05:05PM 10           THE COURT:  I DO, BUT WHAT I'M GOING TO DO IS GIVE

05:05PM 11   IT TO YOU PROBABLY TOMORROW BECAUSE I WANT TO LOOK, AND I'M

05:05PM 12   GOING TO COMPARE THIS AND GO THROUGH THE TRANSCRIPTS, AND I'LL

05:05PM 13   HAVE SOMETHING.

05:05PM 14       BUT MY SENSE IS THAT I DON'T THINK ALL OF IT COMES IN,

05:05PM 15   MR. FLEURMONT.  I'M GOING TO LOOK AT THIS AND SEE WHAT

05:05PM 16   PORTIONS.

05:05PM 17       SO YOU CAN STOP READING THE TRANSCRIPTS, MS. VOLKAR.

05:05PM 18       BUT I THINK I'M PROBABLY GOING TO GRANT THE MOTION AS TO

05:05PM 19   SOME PORTIONS, BUT IT'S NOT GOING TO BE A WHOLESALE GRANT.  I

05:05PM 20   THINK THERE WILL BE SOME LIMITATIONS TO IT, IF I COULD TELL YOU

05:05PM 21   THAT.

05:05PM 22           MR. FLEURMONT:  UNDERSTOOD, YOUR HONOR.

05:05PM 23           MS. VOLKAR:  THANK YOU, YOUR HONOR.  VERY HELPFUL.

05:05PM 24           THE COURT:  YOU BET.

05:05PM 25       AS TO 1165, LET ME JUST SAY THAT I'VE LOOKED AT THIS.

8212

05:05PM 1        MR. BOSTIC, I THINK YOU'RE RESPONSIBLE FOR THIS.  THANK

05:05PM 2    YOU FOR YOUR COMMENTS ON THIS.

05:05PM 3        AS TO THE MOTION TO ADMIT THIS, I'VE LOOKED THIS OVER,

05:06PM 4    CONSIDERED THE ARGUMENTS OF COUNSEL.  I'M GOING TO ALLOW IT TO

05:06PM 5    COME IN.  I DO THINK THAT THERE WAS, THERE WAS TESTIMONY ABOUT

05:06PM 6    DR. ASIN AND THE WITNESS TESTIFIED AS SHE DID ABOUT HER TEST

05:06PM 7    RESULTS.

05:06PM 8        I DID ALLOW THE GOVERNMENT TO GET IN CERTAIN EVIDENCE AND

05:06PM 9    DOCUMENTS AS I THINK THE DEFENSE POINTS OUT HERE.  I DO THINK

05:06PM 10   IT'S APPROPRIATE TO ALLOW THIS TO COME IN.  THERE IS A 401

05:06PM 11   THRESHOLD OF RELEVANCE THAT HAS BEEN MET.

05:06PM 12       UNDER 403, I DO THINK THAT PROBATIVE VALUE OUTWEIGHS ANY

05:06PM 13   PREJUDICIAL VALUE.  THE PARTIES HAVE TALKED ABOUT THAT.

05:06PM 14       SO I AM GOING TO GRANT THE MOTION AS TO THAT.  THAT WILL

05:06PM 15   BE ALLOWED TO COME IN.  SO THANK YOU.

05:06PM 16       (DEFENDANT'S EXHIBIT 14259 WAS RECEIVED IN EVIDENCE.)

05:06PM 17            THE COURT:  YES, MR. BOSTIC?

05:06PM 18            MR. BOSTIC:  IS THE COURT CONSIDERING WHETHER TO

05:06PM 19   REDACT THAT ONE LINE WHERE IT SAYS THAT DR. ASIN -- I FORGET

05:07PM 20   WHAT THE PHRASE IS, I DON'T HAVE IT IN FRONT OF ME.  BUT

05:07PM 21   DR. ASIN HAD NO PROBLEM WITH THE PROCESS.

05:07PM 22            THE COURT:  RIGHT.

05:07PM 23            MR. BOSTIC:  MY CONCERN IS THAT MIGHT BE PORTRAYED

05:07PM 24   AS THE DOCTOR HAVING NO CONCERNS ABOUT THE ACCURACY OF THE TEST

05:07PM 25   OR THAT MIGHT CAUSE CONFUSION IN THE JURY.

8213

05:07PM 1      THE COURT:  YEAH, FAIR QUESTION.

05:07PM 2        SO WHEN I -- LET ME GET THE LANGUAGE.  I THINK IT'S

05:07PM 3   PROTOCOL.  I THINK IT'S PROTOCOL.  I THOUGHT ABOUT THAT, AND IN

05:07PM 4   GRANTING THE MOTION, I THOUGHT THAT THESE LAWYERS ARE

05:07PM 5   INTELLIGENT ENOUGH TO KNOW THAT WHEN THEY MAKE THEIR ARGUMENTS,

05:07PM 6   IF THEY WISH, TO INFORM THE JURY THE DIFFERENCE BETWEEN TEST

05:07PM 7   RESULTS AND A PROTOCOL.

05:07PM 8        AND I THINK THAT -- I GUESS THAT'S MY ANSWER.

05:07PM 9        MR. BOSTIC:  THANK YOU.  I JUST WANT TO MAKE SURE

05:07PM 10   THE COURT HAD CONSIDERED IT, YOUR HONOR.  SUBMITTED.

05:07PM 11        THE COURT:  GREAT.  ALL RIGHT.  THANK YOU.

05:07PM 12     ANYTHING FURTHER?  THANK YOU VERY MUCH.  THANK YOU.

05:07PM 13     ANYTHING FURTHER BEFORE WE BREAK FOR THE DAY FROM EITHER

05:07PM 14   TEAM?

05:07PM 15        MR. BOSTIC:  NOT FROM THE GOVERNMENT, YOUR HONOR.

05:08PM 16        THE COURT:  OKAY.  SO WE'LL SEE EACH OTHER NEXT, IS

05:08PM 17   IT FRIDAY?

05:08PM 18        MR. DOWNEY:  FRIDAY AT 9:00.

05:08PM 19        THE COURT:  OKAY.  THANK YOU.

05:08PM 20        THE CLERK:  COURT IS ADJOURNED.

05:08PM 21     (COURT ADJOURNED AT 5:08 P.M.)

22

23

24

25

1

2

3                      CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8     UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9     CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10    HEREBY CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16          _____
            IRENE RODRIGUEZ, CSR, CRR
            CERTIFICATE NUMBER 8076
17

18

19          _____
            LEE-ANNE SHORTRIDGE, CSR, CRR
20          CERTIFICATE NUMBER 9595

21          DATED:  NOVEMBER 30, 2021

22

23

24

25