1

2                          UNITED STATES DISTRICT COURT

3                        NORTHERN DISTRICT OF CALIFORNIA

4                              SAN JOSE DIVISION

5

     UNITED STATES OF AMERICA,          )  CR-18-00258-EJD
6                                       )
                     PLAINTIFF,         )  SAN JOSE, CALIFORNIA
7                                       )
             VS.                        )  VOLUME 42
8                                       )
     ELIZABETH A. HOLMES,               )  DECEMBER 7, 2021
9                                       )
                     DEFENDANT.         )  PAGES 8306 - 8567
10   _____        )

11                        TRANSCRIPT OF TRIAL PROCEEDINGS
12               BEFORE THE HONORABLE EDWARD J. DAVILA
                      UNITED STATES DISTRICT JUDGE
13   A P P E A R A N C E S:

14

     FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
15                          BY:  JOHN C. BOSTIC
                                 JEFFREY B. SCHENK
16                          150 ALMADEN BOULEVARD, SUITE 900
                            SAN JOSE, CALIFORNIA 95113
17
                            BY:  ROBERT S. LEACH
18                               KELLY VOLKAR
                            1301 CLAY STREET, SUITE 340S
19                          OAKLAND, CALIFORNIA 94612

20          (APPEARANCES CONTINUED ON THE NEXT PAGE.)

21

     OFFICIAL COURT REPORTERS:
22                               IRENE L. RODRIGUEZ, CSR, RMR, CRR
                                 CERTIFICATE NUMBER 8074
23                               LEE-ANNE SHORTRIDGE, CSR, CRR
                                 CERTIFICATE NUMBER 9595
24
          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25             TRANSCRIPT PRODUCED WITH COMPUTER

1
2

A P P E A R A N C E S: (CONT'D)

3    FOR DEFENDANT HOLMES:   WILLIAMS & CONNOLLY LLP
                             BY:  KEVIN M. DOWNEY
4                                 LANCE A. WADE
                                  KATHERINE TREFZ
5                                 AMY SAHARIA
                                  SEEMA ROPER
6                                 J.R. FLEURMONT
                                  RICHARD CLEARY
7                                 PATRICK LOOBY
                             725 TWELFTH STREET, N.W.
8                            WASHINGTON, D.C. 20005

9                            LAW OFFICE OF JOHN D. CLINE
                             BY:  JOHN D. CLINE
10                           ONE EMBARCADERO CENTER, SUITE 500
                             SAN FRANCISCO, CALIFORNIA 94111
11

12   ALSO PRESENT:          FEDERAL BUREAU OF INVESTIGATION
                             BY:  ADELAIDA HERNANDEZ
13
                             OFFICE OF THE U.S. ATTORNEY
14                           BY:  LAKISHA HOLLIMAN, PARALEGAL
                                  MADDI WACHS, PARALEGAL
15
                             WILLIAMS & CONNOLLY
16                           BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL

17                           TBC
                             BY:  BRIAN BENNETT, TECHNICIAN
18

19

20

21

22

23

24

25

8308

1

<u>INDEX OF PROCEEDINGS</u>

2

DEFENDANT'S:

3

4 **ELIZABETH HOLMES**
CROSS-EXAM BY MR. LEACH (RES.)                P. 8353
5 REDIRECT EXAM BY MR. DOWNEY                   P. 8507

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      INDEX OF EXHIBITS

 2                                  IDENT.      EVIDENCE

 3        GOVERNMENT'S:

 4        5126                                    8371
          5127                                    8375
 5        5727                                    8405
          5728                                    8434
 6        5733                                    8445
          5731                                    8446
 7        5730                                    8448
          2065                                    8450
 8        5536                                    8459
          5611                                    8461
 9        5090                                    8463
          5623                                    8468
10        5609                                    8469
          5635, PAGES 6 AND 7                     8498
11

12

13        DEFENDANT'S:

14        15066                                   8524
          15058                                   8526
15        15054                                   8529
          15055                                   8530
16        14186                                   8535
          15070                                   8549
17        7439                                    8550
          15062                                   8559
18        15061                                   8561

19

20

21

22

23

24

25
```

```
 1        SAN JOSE, CALIFORNIA                    DECEMBER 7, 2021

 2                      P R O C E E D I N G S

 3           (COURT CONVENED AT 8:36 A.M.)

 4           (JURY OUT AT 8:36 A.M.)

 5               THE COURT:  WE ARE ON THE RECORD IN THE HOLMES

 6        MATTER.  ALL COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT.

 7           WE'RE OUTSIDE OF THE PRESENCE OF THE JURY, AND I THINK

 8        THERE ARE SOME MATTERS THAT THE PARTIES WANT TO DISCUSS.

 9           LET ME JUST ASK BEFORE WE GET INTO WHAT YOU FILED, I

10        BELIEVE YESTERDAY, LAST NIGHT, LET ME JUST ASK ABOUT

11        SCHEDULING.  WHERE ARE WE AS FAR AS OUR TESTIMONY?  MAYBE THAT

12        WOULD BE HELPFUL.

13           MR. LEACH, YOU'RE STILL ON CROSS.

14               MR. LEACH:  GOOD MORNING, YOUR HONOR.

15           YES, THAT'S CORRECT, I STILL HAVE ADDITIONAL

16        CROSS-EXAMINATION I EXPECT TO COMPLETE SOMETIME TODAY, POSSIBLY

17        IN TIME FOR THE REDIRECT TO COMPLETE.  WE'VE ALERTED THE

18        DEFENSE TO THAT, AND I UNDERSTAND THAT THEY HAVE ANOTHER

19        WITNESS READY TO GO.

20               THE COURT:  ALL RIGHT.

21           ANYTHING TO ADD, MR. DOWNEY?

22               MR. DOWNEY:  NO, YOUR HONOR.  WE'VE HAD THAT

23        CONVERSATION.

24               THE COURT:  OKAY.  IS THERE ANYTHING WE NEED TO DO

25        PRIOR TO START OF TESTIMONY THIS MORNING?
```

08:37AM 1          MS. VOLKAR IS EAGER TO GET TO THE LECTERN TO ANSWER THAT

08:37AM 2      QUESTION.

08:37AM 3                  MR. LEACH:  I'LL LEAVE IT TO MS. VOLKAR THEN.

08:37AM 4                  THE COURT:  GOOD MORNING.

08:37AM 5                  MS. VOLKAR:  GOOD MORNING, YOUR HONOR.  MAY I REMOVE

08:37AM 6      MY MASK?

08:37AM 7                  THE COURT:  YES, PLEASE, THANK YOU.

08:37AM 8                  MS. VOLKAR:  KELLY VOLKAR ON BEHALF OF THE UNITED

08:37AM 9      STATES.

08:37AM 10         I'M PREPARED TO ARGUE THE TWO MOTIONS THAT WERE FILED

08:37AM 11     YESTERDAY.  I KNOW ONE WAS FILED LATE LAST NIGHT, BUT I DO

08:37AM 12     THINK THAT THAT IS THE MORE URGENT ONE, AND SO I WOULD LIKE TO

08:37AM 13     START WITH THE GOVERNMENT'S MOTION TO EXCLUDE DOCUMENTS.

08:37AM 14         THE REASON I BELIEVE IT'S MORE URGENT IS BECAUSE THE

08:37AM 15     DEFENSE MAY VERY WELL SEEK TO ADMIT THOSE THROUGH MS. HOLMES

08:37AM 16     SOMETIME TODAY, AND I'M NOT SURE WHEN THAT WILL BE.

08:37AM 17         SO THAT'S THE MATTER THAT I WOULD LIKE TO TAKE UP FIRST IF

08:37AM 18     YOUR HONOR IS SO INCLINED.

08:37AM 19                 THE COURT:  OKAY.  THE OTHER IS A MOTION TO

08:37AM 20     RECONSIDER, THE DEFENSE MOTION TO RECONSIDER.  IS THAT --

08:38AM 21                 MS. VOLKAR:  THAT'S CORRECT, YOUR HONOR.

08:38AM 22                 THE COURT:  OKAY.

08:38AM 23                 MS. VOLKAR:  AT LEAST THOSE ARE THE TWO MOTIONS BOTH

08:38AM 24     NOTIFIED FOR THIS MORNING.

08:38AM 25                 THE COURT:  OKAY.  THANK YOU.

08:38AM 1          AND SO YOUR MOTION TO EXCLUDE, I BELIEVE, IS 1185?

08:38AM 2               MS. VOLKAR:  THAT'S CORRECT, YOUR HONOR.

08:38AM 3               THE COURT:  ALL RIGHT.  THANK YOU.  WHAT WOULD YOU

08:38AM 4     LIKE ME TO KNOW ABOUT THAT?

08:38AM 5               MS. VOLKAR:  SO, YOUR HONOR, MR. LEACH HAS INFORMED

08:38AM 6     THE COURT A COUPLE OF TIMES THROUGHOUT THE DEFENDANT'S

08:38AM 7     TESTIMONY THAT THE GOVERNMENT HAS RECEIVED FOR THE FIRST TIME

08:38AM 8     DURING THE DEFENDANT'S TESTIMONY SEVERAL DOCUMENTS PRODUCED

08:38AM 9     WITH A HOLMES BATES STAMP IN THE BOTTOM RIGHT-HAND CORNER AS A

08:38AM 10    PREFIX.

08:38AM 11         I THINK THE KEY POINT HERE IS THAT THERE'S BEEN A LOT OF

08:38AM 12    DISCOVERY IN THIS CASE, I BELIEVE IT'S SOMEWHERE IN THE

08:38AM 13    NEIGHBORHOOD OF 2 MILLION DOCUMENTS, THAT BOTH SIDES HAVE

08:38AM 14    PRODUCED TO ONE ANOTHER GOING INTO THIS TRIAL.

08:38AM 15         NEVERTHELESS, FOR THE FIRST TIME IN THE LAST THREE

08:38AM 16    WEEKS -- AND AGAIN, THIS IS THE THIRD TIME IN AS MANY WEEKS --

08:39AM 17    WE HAVE RECEIVED DOCUMENTS THAT HAVE NEVER BEEN PRODUCED

08:39AM 18    BEFORE, AND THEREFORE, NEVER SEEN.  THERE'S NO WAY THAT THE

08:39AM 19    GOVERNMENT COULD KNOW OF THEIR EXISTENCE AT WHAT I WOULD CALL

08:39AM 20    CRITICAL JUNCTURES IN THE CASE.

08:39AM 21         FIRST IS AFTER THE DEFENDANT TAKES THE STAND, THEY PRODUCE

08:39AM 22    SEVERAL DOCUMENTS, INCLUDING COMMUNICATIONS WITH PHARMA

08:39AM 23    COMPANIES.  THESE ARE DOCUMENTS FROM EMAILS, THERANOS EMAILS

08:39AM 24    FROM BEFORE 2010.

08:39AM 25         THEN WHEN MR. LEACH BROUGHT THAT TO THE ATTENTION OF THE

08:39AM  1    COURT, DEFENSE COUNSEL RESPONDED AND SAID WE'RE DOING OUR BEST.

08:39AM  2    THE GOVERNMENT'S CASE JUST CLOSED.  WE NEED TO LOOK AT WHAT

08:39AM  3    THEY HAVE.  WE'LL GIVE THEM EVERYTHING THIS WEEKEND.

08:39AM  4        THEY THEN PRODUCED, I BELIEVE IT WAS LATE IN THE DAY ON

08:39AM  5    SATURDAY, I THINK 20 TO 30 ADDITIONAL DOCUMENTS.

08:39AM  6        MR. LEACH RAISED THAT WITH THE COURT, HAD INTENDED TO MOVE

08:39AM  7    TO EXCLUDE, BUT THE WAY THE TRIAL SCHEDULE FELL, THE DIRECT

08:39AM  8    TESTIMONY CONTINUED, AND THERE WAS NO OPPORTUNITY TO -- THE

08:39AM  9    DOCUMENTS CAME IN BEFORE THE GOVERNMENT COULD MAKE A FORMAL

08:39AM  10   MOTION.

08:39AM  11       HERE WE ARE, AND THIS IS THUS THE LATE FILING, YESTERDAY

08:40AM  12   AFTERNOON WE SEE -- WE RECEIVED FOUR ADDITIONAL DOCUMENTS THAT,

08:40AM  13   TO THE BEST OF OUR KNOWLEDGE, WE HAVE NEVER RECEIVED BEFORE,

08:40AM  14   AND THE DEFENDANT'S STATED INTENT -- THE DEFENSE COUNSEL'S

08:40AM  15   STATED INTENTION TO INTRODUCE THESE DOCUMENTS.

08:40AM  16       AGAIN, I WANT TO DRAW AN IMPORTANT DISTINCTION BETWEEN

08:40AM  17   DOCUMENTS THAT HAVE PREVIOUSLY BEEN PRODUCED IN DISCOVERY, BUT

08:40AM  18   ARE IDENTIFIED AS AN EXHIBIT FOR THE FIRST TIME SHORTLY BEFORE

08:40AM  19   A WITNESS HAS TESTIFIED.  WE UNDERSTAND THAT THAT HAPPENS IN

08:40AM  20   TRIAL, AND BOTH SIDES HAVE DONE THAT TO A SIGNIFICANT EXTENT IN

08:40AM  21   THIS TRIAL.

08:40AM  22       BUT THE PARTIES WOULD AT LEAST HAVE KNOWN OF THE EXISTENCE

08:40AM  23   OF THOSE DOCUMENTS FOR THE MOST PART BEFORE THE TRIAL EVER

08:40AM  24   EXISTED, AND THEY'RE JUST LEARNING THAT THOSE ARE WHAT THE

08:40AM  25   PARTY INTENDS TO USE WITH THE WITNESS WHILE THEY'RE ON THE

08:40AM 1    STAND.

08:40AM 2        THIS IS AN ENTIRELY DIFFERENT CATEGORY WHERE THESE

08:40AM 3    DOCUMENTS HAVE NEVER BEEN PRODUCED TO THE GOVERNMENT BEFORE,

08:40AM 4    AND THEREFORE, THE GOVERNMENT COULD NOT HAVE ANY KNOWLEDGE OF

08:40AM 5    THEIR EXISTENCE PRIOR TO YESTERDAY.

08:41AM 6        AND AGAIN, THE REASON WHY THIS IS SO CRITICALLY IMPORTANT

08:41AM 7    IS THAT WE'VE HEARD MS. HOLMES ON THE STAND TALK ABOUT HER

08:41AM 8    VERSION.  SHE STATED THAT SHE WAS THE ONE WHO ADDED THE LOGO TO

08:41AM 9    THE PHARMACEUTICAL COMPANY DOCUMENTS.

08:41AM 10       BUT OVER THE COURSE OF THE LAST THREE WEEKS, ALL OF A

08:41AM 11   SUDDEN I THINK, IF MY COUNT IS CORRECT, FIVE NEW DOCUMENTS THAT

08:41AM 12   NEVER PREVIOUSLY WERE PRODUCED AND THEREFORE, FROM THE

08:41AM 13   GOVERNMENT'S PERSPECTIVE, COULD NOT HAVE KNOWN EXISTED, HAVE

08:41AM 14   ALL OF A SUDDEN BEEN PROVIDED, ADDING MORE CONTEXT AROUND THESE

08:41AM 15   LOGOS BEING ADDED TO THE PHARMACEUTICAL COMPANY REPORTS, AND

08:41AM 16   ANOTHER ONE WITH GSK WAS JUST GIVEN TO THE GOVERNMENT

08:41AM 17   YESTERDAY.

08:41AM 18       AND THE REASON WHY THIS IS IMPORTANT TO BRING UP NOW AND

08:41AM 19   THE REASON WHY THE GOVERNMENT IS ASKING YOUR HONOR TO EXCLUDE

08:41AM 20   THESE DOCUMENTS IS BECAUSE IF THE PRETRIAL DISCOVERY RULES --

08:41AM 21   IF RULE 16 MEANS ANYTHING, IT MEANS THAT THESE DOCUMENTS CANNOT

08:41AM 22   COME IN AT THIS POINT IN TIME.

08:41AM 23       AND THAT IS BECAUSE THE FEDERAL RULES DON'T ALLOW FOR A

08:42AM 24   TRIAL BY AMBUSH SYSTEM.  WE HAVE ACTUALLY HEARD SIMILAR

08:42AM 25   ARGUMENTS FROM THE DEFENSE RAISING RULE 16 AND THE FAIRNESS

8315

08:42AM 1    THAT IT REQUIRES AND A FAIR OPPORTUNITY FOR BOTH SIDES TO

08:42AM 2    UNDERSTAND WHAT THE FACTS IN THE CASE MAY BE.

08:42AM 3         I CAN THINK OF A FEW HYPOTHETICALS WHERE, IF THE

08:42AM 4    GOVERNMENT WERE TO FIND AN INCREDIBLY HELPFUL DOCUMENT THAT IT

08:42AM 5    HAD NEVER PRODUCED BEFORE AND GAVE IT TO THE DEFENSE AT THIS

08:42AM 6    POINT AND STAGE IN THE CASE AND TRIED TO USE IT IN THE

08:42AM 7    CROSS-EXAMINATION, I THINK THEY WOULD BE SCREAMING AT THE TOP

08:42AM 8    OF THEIR LUNGS THAT IT'S ENTIRELY UNFAIR.

08:42AM 9         AND WHILE I DON'T MEAN TO OVERSTATE THE IMPORTANCE OF

08:42AM 10   THESE DOCUMENTS, I THINK AT THE END OF THE DAY THEY COULD BE

08:42AM 11   DEALT WITH.

08:42AM 12        THE KEY ISSUE HERE IS, WHAT DOES RULE 16 MEAN?  WHY DO THE

08:42AM 13   RULES OF DISCOVERY EXIST AND GOVERN TRIALS?

08:42AM 14        AND THIS IS NOT THE FIRST TIME, BUT THE THIRD TIME, WHILE

08:42AM 15   THIS WITNESS HAS BEEN TESTIFYING, THAT NEW DOCUMENTS ARE

08:43AM 16   MATERIALIZED.

08:43AM 17        AND WE DON'T EVEN KNOW WHERE FROM, TO BE COMPLETELY FRANK.

08:43AM 18        SO I JUST WANT TO EXPRESS IN THE STRONGEST TERMS THAT THE

08:43AM 19   GOVERNMENT IS VERY CONCERNED, AND WE THINK THAT RULE 16

08:43AM 20   PROVIDES THE REMEDY HERE, WHICH IS WHEN THERE'S AN UNFAIR

08:43AM 21   SURPRISE WHEN IT COMES TO NEW DISCOVERY, THE REMEDY IS TO

08:43AM 22   EXCLUDE THOSE DOCUMENTS, AND THAT'S WHAT WE ASK YOUR HONOR TO

08:43AM 23   DO.

08:43AM 24             THE COURT:  ALL RIGHT.  THANK YOU.

08:43AM 25        IS THERE ANOTHER REMEDY THAT -- IF THE COURT FINDS THAT A

8316

08:43AM  1    REMEDY IS APPROPRIATE, IS ANOTHER REMEDY TO ALLOW A BREAK IN

08:43AM  2    THE TESTIMONY SO THAT THE OFFENDED PARTY COULD DO WHATEVER

08:43AM  3    RESEARCH THEY NEED TO DO AND ADVISE THE JURY THAT THE DEFENSE

08:43AM  4    HAS PROVIDED SOME LATE DISCOVERY AND THE GOVERNMENT IS ENTITLED

08:43AM  5    TO REVIEW IT AND WE'RE GOING TO TAKE A BREAK IN THE TRIAL TO

08:43AM  6    ALLOW THAT TO HAPPEN?

08:43AM  7            MS. VOLKAR:  NOT IN THIS INSTANCE, YOUR HONOR.

08:43AM  8         WHILE I DO THINK THAT THAT IS A REMEDY THAT COULD BE USED

08:43AM  9    FOR RULE 16, THE REASON I THINK IT'S INAPPROPRIATE HERE IS THAT

08:44AM  10   THE DEFENSE IS PROVIDING SPECIFIC DOCUMENTS THAT IT CONSIDERS

08:44AM  11   TO BE HELPFUL TO ITS CASE.

08:44AM  12        IT'S NOT PROVIDING THE GOVERNMENT WITH A "HERE'S ALL OF

08:44AM  13   THE PHARMA COMMUNICATIONS BETWEEN 2006 AND 2010 THAT WE HAVE IN

08:44AM  14   OUR POSSESSION."

08:44AM  15        I HAVE SERIOUS CONCERNS THAT THERE ARE OTHER DOCUMENTS OUT

08:44AM  16   THERE THAT PROBABLY COUNTER THESE DOCUMENTS THAT THEY'RE

08:44AM  17   PROVIDING TO US.  THEY HAVE NOT PROVIDED THOSE DOCUMENTS.  THEY

08:44AM  18   HAVE NOT PROVIDED INCULPATORY DOCUMENTS OF MS. HOLMES OR

08:44AM  19   DOCUMENTS THAT MAY CONTRADICT HER STORY.

08:44AM  20            THE COURT:  IS THERE A REVERSE BRADY SITUATION THAT

08:44AM  21   APPLIES?

08:44AM  22            MS. VOLKAR:  I APOLOGIZE, YOUR HONOR.  I'M NOT

08:44AM  23   ALLEGING THAT.

08:44AM  24        BUT I AM -- I GUESS WHAT I'M TRYING TO SAY HERE IS THAT

08:44AM  25   THE REASON THAT I DON'T THINK THAT REMEDY IS APPROPRIATE IS

08:44AM 1    BECAUSE THEY HAVE PRODUCED DOCUMENTS THAT THEY THINK ARE

08:44AM 2    HELPFUL TO THEIR SIDE.  THEY HAVE NOT PRODUCED A CATEGORY OF

08:44AM 3    DOCUMENTS THAT THEY HAVE RECENTLY UNCOVERED OR ANYTHING OF THAT

08:44AM 4    NATURE SUCH THAT IF THE GOVERNMENT WERE GIVEN MORE TIME, IT

08:45AM 5    WOULD BE ABLE TO REVIEW THIS FULL VOLUME OF DOCUMENTS AND

08:45AM 6    DETERMINE WHICH ARE USEFUL FOR ITS CASE OR WHICH ARE NOT.

08:45AM 7            THE COURT:  SURE.

08:45AM 8            MS. VOLKAR:  THESE ARE SPECIFICALLY, "HERE, HAVE

08:45AM 9    CERTAIN DOCUMENTS THAT ARE HELPFUL TO US, YOU'RE JUST LEARNING

08:45AM 10   ABOUT THEM, MAKE OF THEM WHAT YOU WILL," AND I JUST THINK THAT

08:45AM 11   THAT -- IT REALLY IS UNFAIR, AND IT REALLY IS COUNTER TO

08:45AM 12   RULE 16.

08:45AM 13           THE COURT:  WHAT DOES RULE 16 TELL US?  WHAT ADVICE

08:45AM 14   DOES IT GIVE A JUDGE THAT SHE SHOULD USE?  WHAT TOOLS DOES A

08:45AM 15   JUDGE HAVE WHEN SHE LOOKS AT A RULE 16 SITUATION AS YOU

08:45AM 16   SUGGEST?  WHAT SHOULD SHE DO?

08:45AM 17           MS. VOLKAR:  I MEAN, I THINK, AGAIN, YOUR HONOR, AT

08:45AM 18   THE END OF THE DAY, THERE -- THERE COULD BE NO DISCOVERY RULES

08:45AM 19   IN A TRIAL, AND THERE COULD BE NO DISCOVERY RULES ON A CRIMINAL

08:45AM 20   DEFENDANT.

08:45AM 21       THERE ARE CERTAINLY FAR MORE RULES AND LEGAL PRINCIPLES

08:45AM 22   GOVERNING WHAT THE GOVERNMENT IS REQUIRED TO DO IN CRIMINAL

08:45AM 23   PROCEEDINGS, AND WE DON'T DISPUTE THAT.  WE'VE DONE OUR BEST,

08:46AM 24   AND WE SUBMIT THAT WE HAVE LIVED UP TO ALL OF OUR OBLIGATIONS.

08:46AM 25       BUT RULE 16 WAS IMPLEMENTED, ENACTED, AND RULE 16(B) IN

08:46AM  1    PARTICULAR WAS ENACTED TO GOVERN WHAT THE DEFENDANT MUST

08:46AM  2    DISCLOSE, AND I WOULD PUT FORWARD THAT THE REASON WAS TO AVOID

08:46AM  3    A TRIAL BY AMBUSH.

08:46AM  4        SO TO MORE SPECIFICALLY ANSWER YOUR QUESTION, YOUR HONOR,

08:46AM  5    TYPICALLY I THINK RULE 16 IS ABOUT DISCLOSURE, AND SO THE IDEA

08:46AM  6    IS TO ALLOW FOR DELAY OR WHAT HAVE YOU.

08:46AM  7        I WOULD JUST SUBMIT THAT WHERE WE ARE IN THE TRIAL

08:46AM  8    PROCESS, THIS IS A VERY EGREGIOUS VIOLATION, I WOULD PUT

08:46AM  9    FORWARD.  IT'S NOT THE FIRST ONE, IT'S THE THIRD ONE, AND IT'S

08:46AM 10    HAPPENING IN THE DEFENDANT'S CASE-IN-CHIEF AND NOT WHILE THE

08:46AM 11    GOVERNMENT STILL HAS THE TIME TO PUT ON ADDITIONAL WITNESSES OR

08:46AM 12    OTHERWISE REACT TO IT IN ITS CASE-IN-CHIEF.

08:46AM 13        OF COURSE THERE'S REBUTTAL, BUT I JUST THINK THAT GIVEN

08:46AM 14    THE EGREGIOUS NATURE OF THIS, THE RIGHT REMEDY IS TO JUST

08:46AM 15    EXCLUDE THE DOCUMENTS OR TO PUT SIGNIFICANT LIMITATIONS ON

08:47AM 16    THEM.

08:47AM 17        AND, OF COURSE, I HAVEN'T TALKED ABOUT THE ADDITIONAL

08:47AM 18    HURDLE FOR ONE DOCUMENT, EXHIBIT 4, WHICH IS THE HEARSAY WITHIN

08:47AM 19    THE HEARSAY PROBLEM.  SO AT THE VERY LEAST, IF YOUR HONOR IS

08:47AM 20    INCLINED TO PERMIT THE DEFENSE TO GO FORWARD WITH SOME OF THE

08:47AM 21    DOCUMENTS, WE SUBMIT THAT THAT ONE AT THE VERY LEAST SHOULD BE

08:47AM 22    EXCLUDED.

08:47AM 23        THE COURT:  IS THAT THE EMAIL CHAIN WITH

08:47AM 24    GENERAL MATTIS?  IS THAT --

08:47AM 25        MS. VOLKAR:  NO, YOUR HONOR.  I BELIEVE IT'S FROM --

08:47AM  1        MS. HOLMES TESTIFIED IT'S FROM HER FORMER ASSISTANT,

08:47AM  2    CAROLYN BALKENHOL, AND IT ATTACHES THE GSK REPORT AND IT SAYS

08:47AM  3    WHAT SHE SAID TO HER.

08:47AM  4            THE COURT:  ALL RIGHT.  THANK YOU.

08:47AM  5        MR. DOWNEY, MS. VOLKAR SUGGESTS IF THE SITUATION WERE

08:47AM  6    REVERSED, IF YOU WERE RECEIVING DOCUMENTS AS YOU'VE GIVEN THEM

08:47AM  7    TO THE GOVERNMENT, THAT YOU WOULD BE OUT OF YOUR LOAFERS

08:47AM  8    SCREAMING.  IS THAT TRUE?

08:47AM  9            MR. DOWNEY:  WELL, YOUR HONOR, IT WOULD DEPEND ON

08:47AM 10    THE SITUATION.

08:47AM 11        BUT LET ME SAY TO YOU I'M VERY GLAD TO HAVE THIS CHANCE TO

08:48AM 12    TALK TO THE COURT ABOUT THESE DOCUMENTS.

08:48AM 13        THIS GOVERNMENT TEAM INVESTIGATED THIS CASE FOR THREE

08:48AM 14    YEARS.  IT'S SIX YEARS SINCE THIS INVESTIGATION BEGAN.  THEY

08:48AM 15    TURNED THERANOS UPSIDE DOWN.  THEY TURNED PFIZER UPSIDE DOWN.

08:48AM 16    THEY TURNED GSK UPSIDE DOWN.

08:48AM 17        AND NOWHERE IN ANY OF THOSE PRODUCTIONS DID WE GET, IN

08:48AM 18    RULE 16 DISCOVERY, EMAILS THAT WENT FROM MS. HOLMES'S ACCOUNT

08:48AM 19    ATTACHING COPIES OF THE REPORT AT ISSUE WITH THE LOGOS ON THEM

08:48AM 20    TO THE PHARMACEUTICAL COMPANIES.  NOWHERE.

08:48AM 21        NOW, YOUR HONOR KNOWS THAT THAT HAS BEEN AN ISSUE IN THIS

08:48AM 22    CASE SINCE THE BEGINNING.  MR. LEACH OPENED ON IT.

08:48AM 23        I WILL SAY WITH RESPECT TO GSK, IT'S A LITTLE BIT OF A

08:48AM 24    DIFFERENT CATEGORY.  IN CONNECTION WITH GSK, MR. LEACH DID NOT

08:49AM 25    OPEN ON THAT SUBJECT.

08:49AM 1         GSK HAS ACTUALLY ONLY BEEN A SUBJECT OF TESTIMONY IN THE

08:49AM 2    CASE ONCE, WHICH WAS IN MS. GANGAKHEDKAR'S TESTIMONY.  SHE WAS

08:49AM 3    ASKED ABOUT DID GSK VALIDATE THIS ASSAY THAT YOU DEVELOPED?

08:49AM 4    SHE TESTIFIED YES, AND SHE SAID SHE SAID SHE WAS PROUD OF IT.

08:49AM 5         THERE WAS NO SUGGESTION THAT THE ATTACHMENT OF LOGOS TO

08:49AM 6    THE GSK REPORT WAS INAPPROPRIATE UNTIL TUESDAY OF LAST WEEK.

08:49AM 7         SO THE DOCUMENTS THAT MS. VOLKAR IS REFERRING TO ARE

08:49AM 8    DOCUMENTS THAT ONLY BECAME RELEVANT AND APPROPRIATE FOR OUR

08:49AM 9    INTRODUCTION AS EXHIBITS ON THE CROSS-EXAMINATION OF THE

08:49AM 10   DEFENDANT.

08:49AM 11        IT'S AS SIMPLE AS THAT.

08:49AM 12        NOW, WHY WE DIDN'T GET THOSE DOCUMENTS AFTER EXTENSIVE

08:49AM 13   NEGOTIATIONS BETWEEN THE GOVERNMENT AND THESE COMPANIES, WHY

08:49AM 14   THE PRODUCTIONS FROM THOSE PARTIES ARE CURATED TO EXCLUDE THOSE

08:49AM 15   DOCUMENTS, I DON'T KNOW.  BUT IT'S CONCERNING.

08:50AM 16            THE COURT:  ANYTHING ELSE YOU WANT ME TO KNOW?

08:50AM 17            MR. DOWNEY:  NO.

08:50AM 18        WELL, YOUR HONOR, OBVIOUSLY IN CONNECTION WITH THE

08:50AM 19   DOCUMENTS SHE'S REFERRING TO, WHAT I JUST SAID IS THE REASON

08:50AM 20   THAT THEY'VE JUST BEEN PRODUCED.

08:50AM 21        THE GSK ISSUE JUST CAME UP ON THE CROSS-EXAMINATION OF

08:50AM 22   MS. HOLMES.  AS YOU KNOW, THERE'S BEEN TESTIMONY ABOUT PFIZER,

08:50AM 23   THERE'S BEEN TESTIMONY ABOUT SCHERING-PLOUGH, WE HAD WITNESSES

08:50AM 24   FROM BOTH COMPANIES.  WE HAVEN'T HAD A WITNESS FROM GSK BEFORE.

08:50AM 25        I DON'T THINK THERE'S ANY DISPUTE IN THE CASE THAT GSK

```
08:50AM   1      PREPARED THAT REPORT.  I THINK MR. LEACH'S EXAMINATION

08:50AM   2      SUGGESTS --

08:50AM   3             THE COURT:  JUST A MOMENT WHILE I ASK WHOEVER'S

08:50AM   4      DEVICE HAS THAT TO LEAVE THE COURTROOM, PLEASE.

08:50AM   5        SOMEONE HAD THEIR DEVICE -- I'M SORRY TO INTERRUPT YOUR

08:50AM   6      ARGUMENT.

08:50AM   7        WHOEVER THAT PARTY WAS, PLEASE STAND UP.

08:50AM   8        YES.  COULD YOU PLEASE GO OUTSIDE, PLEASE, AND MAKE SURE

08:50AM   9      YOUR ITEM IS SECURE.  THANK YOU VERY MUCH.

08:50AM  10             AUDIENCE MEMBER:  YES.

08:51AM  11             THE COURT:  THANK YOU VERY MUCH.

08:51AM  12        I APOLOGIZE FOR THE INTERRUPTION.

08:51AM  13             MR. DOWNEY:  THANK YOU, YOUR HONOR.

08:51AM  14        THE POINT IS SIMPLY THAT THEY HAVE BECOME RELEVANT AS A

08:51AM  15      RESULT OF THE CROSS-EXAMINATION.  BEFORE THAT TIME, OUR

08:51AM  16      INTENTION WAS NOT TO INTRODUCE THIS AS ANOTHER ISSUE THAT WE

08:51AM  17      HAD TO DEAL WITH.  THAT'S THE STANDARD OF RULE 16 FOR THE

08:51AM  18      DEFENDANTS, SO WE GAVE THEM IN ADVANCE.  I THINK THE LENGTH OF

08:51AM  19      THE EMAIL, AS YOUR HONOR SEES, IS ABOUT THAT LONG (INDICATING).

08:51AM  20        I THINK THEY HAVE WELL TALKED TO GSK FOR MANY YEARS.  THEY

08:51AM  21      KNOW WHAT THE SITUATION IS.

08:51AM  22        WHY THIS DOCUMENT DOESN'T COME IN A PRODUCTION FROM GSK

08:51AM  23      IS -- YOU KNOW, THROUGH THE GOVERNMENT TO US IS BEYOND ME.

08:51AM  24             THE COURT:  MS. VOLKAR?

08:51AM  25             MS. VOLKAR:  YOUR HONOR, MR. DOWNEY'S COMMENTS ARE
```

08:51AM 1    ACTUALLY MORE CONCERNING TO ME, DEEPLY CONCERNING, AND THAT IS

08:51AM 2    BECAUSE WHAT THE GOVERNMENT SOUGHT THROUGH VARIOUS SUBPOENAS

08:51AM 3    RELIED ON THE COMPANIES WHO WERE THE CUSTODIANS OF THE

08:51AM 4    DOCUMENTS TO PROVIDE IT TO THE GOVERNMENT.

08:51AM 5         THE GOVERNMENT EXPECTS THOSE COMPANIES TO FULFILL THEIR

08:52AM 6    DISCOVERY OBLIGATIONS AND COMPLY WITH SUBPOENAS IN GOOD FAITH.

08:52AM 7         THERE WERE MULTIPLE SUBPOENAS TO THERANOS.  THESE ARE

08:52AM 8    THERANOS DOCUMENTS.  MANY OF THOSE SUBPOENAS WERE SENT WHEN

08:52AM 9    DEFENDANT WAS STILL IN CHARGE OF THERANOS OR THE CHAIRMAN OF

08:52AM 10   THE BOARD OF THERANOS.

08:52AM 11        WHAT LAWYERS, EITHER ON THE COMPANY'S BEHALF OR HER OWN,

08:52AM 12   DETERMINED TO PRODUCE TO THE GOVERNMENT, THE GOVERNMENT CANNOT

08:52AM 13   CONTROL THAT.  THE GOVERNMENT CAN ONLY ASK FOR WHAT DOCUMENTS

08:52AM 14   IT BELIEVES EXISTED.

08:52AM 15        AND TO SAY THAT GSK, A PHARMACEUTICAL COMPANY, ONE OF THE

08:52AM 16   10 TO 15 THAT SHE CLAIMED COMPREHENSIVELY VALIDATED IT, WAS NOT

08:52AM 17   COVERED BY THOSE SUBPOENAS BECAUSE THE DEFENDANT -- OR BECAUSE

08:52AM 18   THE GOVERNMENT, PARDON ME, DID NOT IN ITS OPENING STATEMENT

08:52AM 19   TALK ABOUT IT, THAT'S DISINGENUOUS.  THAT IS REALLY, REALLY

08:52AM 20   TWISTING THE DISCOVERY STANDARD AND PROTOCOLS ON ITS HEAD.

08:52AM 21        YES, THE GOVERNMENT HAS INVESTIGATED THIS CASE FOR MANY

08:52AM 22   YEARS.  THE LAST SEVERAL YEARS THERE'S BEEN SOME DELAY BECAUSE

08:53AM 23   OF THE PANDEMIC.

08:53AM 24        BUT WE'RE TALKING ABOUT DISCOVERY PROTOCOLS WHICH THE

08:53AM 25   GOVERNMENT CAN MAKE REQUESTS.  IT HAS TO RELY ON THE GOOD FAITH

08:53AM 1    COMPLIANCE FROM THE PERSON ACTUALLY PROVIDING THOSE DOCUMENTS.

08:53AM 2        THE GOVERNMENT DOES NOT CONTAIN ANY OF THESE EMAILS.  THE

08:53AM 3    GOVERNMENT WAS NOT THE SERVER THAT HOSTED THESE EMAILS.  THAT

08:53AM 4    WAS THERANOS.

08:53AM 5        AND NOW WHETHER OR NOT GSK STILL HAD THIS IN ITS RECORDS,

08:53AM 6    IT'S AN EMAIL FROM 2009, OR WHETHER OR NOT GSK STILL MAINTAINED

08:53AM 7    THIS, CLEARLY THERANOS DID, AND CLEARLY THE DEFENDANT HAS

08:53AM 8    ACCESS TO IT.

08:53AM 9        AGAIN, WE'RE GOING BACK TO MR. DOWNEY SAID TO THIS COURT

08:53AM 10   ONCE BEFORE, "I'M NOT SITTING ON A TROVE OF DOCUMENTS THAT THE

08:53AM 11   GOVERNMENT DOESN'T KNOW ABOUT."

08:53AM 12       I NOW, STANDING BEFORE YOU, YOUR HONOR, DON'T KNOW IF

08:53AM 13   THAT'S TRUE, BECAUSE THERE'S CLEARLY TONS -- I SHOULDN'T SAY

08:53AM 14   TONS -- THERE'S CLEARLY AT LEAST 40 EMAILS THAT THEY HAVE

08:53AM 15   DISCOVERED FROM THERANOS SERVERS THAT HAVE NEVER BEEN PROVIDED

08:53AM 16   TO THE GOVERNMENT BEFORE.  AND, AGAIN, THAT IS A VIOLATION OF

08:54AM 17   RULE 16.

08:54AM 18       AND TALKING ABOUT WHAT HAS AND HASN'T BEEN AT ISSUE IN THE

08:54AM 19   TRIAL TO DATE IS VERY DIFFERENT THAN WHAT HAVE SUBPOENAS SOUGHT

08:54AM 20   FOR YEARS PRIOR TO THIS CASE SUCH THAT THE PARTIES COULD

08:54AM 21   PREPARE THE OPENING STATEMENT, COULD PREPARE THEIR QUESTIONING

08:54AM 22   OF WITNESSES.

08:54AM 23       AND THAT -- THEY'RE JUST TWO TOTALLY SEPARATE THINGS, AND

08:54AM 24   THAT IS WHY THIS IS A VIOLATION OF RULE 16.  I DO THINK IT IS

08:54AM 25   EGREGIOUS, AND I DO THINK THESE DOCUMENTS SHOULD BE EXCLUDED.

08:54AM 1          THE COURT:  THANK YOU.

08:54AM 2          SO, MS. VOLKAR, WHAT I HEAR YOU SAYING IS THAT THE

08:54AM 3   GOVERNMENT, IN PREPARATION, ISSUED SUBPOENAS, YOU ISSUED

08:54AM 4   SUBPOENAS TO THE COMPANY, THE DEFENDANT'S COMPANY.  YOU

08:54AM 5   RECEIVED BACK INFORMATION, BUT YOU DID NOT RECEIVE ANY OF THESE

08:54AM 6   DOCUMENTS IN RESPONSE TO THAT SUBPOENA?

08:54AM 7          MS. VOLKAR:  TO THE BEST OF MY KNOWLEDGE -- OF

08:54AM 8   COURSE I'M RELYING ON MY TEAM MEMBERS WHO HAVE BEEN WITH THE

08:54AM 9   CASE FOR MUCH MORE OF ITS LIFE SPAN THAN ME -- BUT TO THE BEST

08:54AM 10  OF OUR KNOWLEDGE, WE HAVE NOT SEEN THESE DOCUMENTS BEFORE

08:54AM 11  YESTERDAY.

08:54AM 12         THE COURT:  YOU HAVE NOT SEEN THESE DOCUMENTS UNTIL

08:54AM 13  JUST THE OTHER NIGHT?

08:54AM 14         MS. VOLKAR:  CORRECT, YESTERDAY.

08:54AM 15         THE COURT:  IS THAT DIFFERENT?

08:55AM 16         MR. DOWNEY:  WELL, OBVIOUSLY ALL I CAN SAY IS I

08:55AM 17  ACCEPT WHAT MS. VOLKAR SAYS, BUT AS SHE CONCEDES, AND I THINK

08:55AM 18  AS HER STATEMENT THAT THERE ARE 2 MILLION DOCUMENTS EVIDENCES,

08:55AM 19  SHE HAS NOT BEEN INVOLVED IN THE MATTER FOR A LONG TIME.

08:55AM 20         I ONLY SAY TO THE COURT THIS:  LET THE GOVERNMENT CERTIFY

08:55AM 21  TODAY THAT IT DID NOT NEGOTIATE THESE SUBPOENAS.  I DON'T

08:55AM 22  BELIEVE THAT.

08:55AM 23         THERE WAS 360-DEGREE FOCUS BY THE GOVERNMENT ON DR. WEBER.

08:55AM 24  DR. WEBER DEALT WITH THERANOS TWICE.

08:55AM 25         THERE WERE DEALINGS BETWEEN PFIZER AND THERANOS BETWEEN

08:55AM 1   2006 AND 2014, WHICH INCLUDED EVIDENCE THAT THE DOCUMENTS WITH

08:55AM 2   THE LOGOS HAD BEEN TRANSMITTED TO PFIZER AS YOU SAW ON

08:55AM 3   MS. HOLMES'S DIRECT EXAMINATION.

08:55AM 4           THE COURT:  WELL, IF THEY NEVER RECEIVED THESE --

08:55AM 5   AND I TAKE MS. VOLKAR ON HER WORD -- THEY NEVER HAD THEM, SO,

08:55AM 6   YOU KNOW, FOR YOU TO SUGGEST THAT, WELL, THEY'VE BEEN

08:55AM 7   WITHHOLDING THEM FROM US IS DISINGENUOUS AS SHE SAYS.

08:56AM 8           MR. DOWNEY:  WELL, YOUR HONOR, I COMPLETELY DISAGREE

08:56AM 9   WITH THAT.  I THINK -- IT IS NOT CREDIBLE TO ME THAT IN THE

08:56AM 10  DISCUSSIONS BETWEEN -- AND I'M NOT ACCUSING ANY PARTICULAR

08:56AM 11  LAWYER.  I'M NOT REFERENCING LAWYERS.  I DON'T KNOW WHAT

08:56AM 12  HAPPENED.

08:56AM 13          THE COURT:  RIGHT.

08:56AM 14          MR. DOWNEY:  BUT IF THE GOVERNMENT KNEW IT WAS GOING

08:56AM 15  TO MAKE A BIG DEAL OUT OF THESE LOGOS, IT SEEMS TO ME THE

08:56AM 16  LOGICAL QUESTION FOR EITHER THERANOS AND THE PHARMACEUTICAL

08:56AM 17  COMPANIES WOULD HAVE BEEN, IS THERE IN THE EMAIL COMMUNICATIONS

08:56AM 18  BETWEEN THE PHARMACEUTICAL COMPANY AND THERANOS WHICH EVIDENCES

08:56AM 19  THAT THE PHARMACEUTICAL COMPANIES WERE SENT THESE REPORTS WITH

08:56AM 20  THE LOGOS ON THEM?

08:56AM 21          THE COURT:  WELL, YOU GOT THEM.

08:56AM 22          MR. DOWNEY:  I DID GET THEM.

08:56AM 23          THE COURT:  RIGHT.  AND SO NOW WHAT I HEAR YOU

08:56AM 24  SAYING IS THAT THEY SHOULD HAVE ASKED BETTER QUESTIONS IN THEIR

08:56AM 25  SUBPOENAS.

08:56AM 1        MR. DOWNEY:  I'M NOT SAYING THAT AT ALL.

08:56AM 2        THE COURT:  OH.

08:56AM 3        MR. DOWNEY:  I'M SAYING I AM SKEPTICAL THAT AN EMAIL

08:56AM 4    FROM MS. HOLMES'S ACCOUNT, WHICH CONTAINS A TRANSMISSION, WOULD

08:57AM 5    NOT HAVE BEEN IN SOME FORM RESPONSIVE, AND I DON'T SEE A MOTIVE

08:57AM 6    FOR A PHARMACEUTICAL COMPANY NOT TO PRODUCE THAT.

08:57AM 7        THE COURT:  WELL, ALL RIGHT.  FAIR ENOUGH.

08:57AM 8      BUT HERE WE ARE.  THEY DIDN'T GET IT.  YOU DID.  AND

08:57AM 9    THEY'RE SAYING, "WE DIDN'T GET IT AND NOW WE GET IT THE NIGHT

08:57AM 10   BEFORE POTENTIAL TESTIMONY, AND THERE IS A CERTAIN UNFAIRNESS

08:57AM 11   IN THAT."

08:57AM 12       MR. DOWNEY:  WELL, THE UNFAIRNESS COMES FROM THE

08:57AM 13   FACT THAT MR. LEACH WAITED FOR THE DEFENSE CASE FOR THE FIRST

08:57AM 14   TIME TO SUGGEST THAT THERE WAS SOMETHING INAPPROPRIATE WITH

08:57AM 15   REGARD TO THE GSK LOGO.  THAT'S A NEW ISSUE.

08:57AM 16      THE OTHER DOCUMENTS THEY HAVE, RIGHT?  THIS IS ABOUT THE

08:57AM 17   GSK LOGO THAT HE IS -- THAT THEY'RE CURRENTLY COMPLAINING

08:57AM 18   ABOUT.  THAT TESTIMONY WAS ELICITED TUESDAY AFTERNOON.

08:57AM 19       THE COURT:  OKAY.

08:57AM 20       MR. DOWNEY:  AND I THINK I WON'T -- YOUR HONOR WELL

08:57AM 21   KNOWS THE STANDARDS UNDER RULE 16, SO I DON'T THINK

08:57AM 22   MS. VOLKAR'S ARTICULATION OF THEM IS CORRECT.  BUT I WON'T GO

08:57AM 23   INTO THAT BECAUSE I KNOW IT'S WELL FAMILIAR TO YOUR HONOR.

08:57AM 24       MS. VOLKAR:  WELL, I ALSO DON'T THINK THE DEFENSE'S

08:58AM 25   FORMULATION OF RULE 16 IS CORRECT, TO A SURPRISE TO NO ONE.

08:58AM  1      I KNOW THAT THEY WANT TO WITHHOLD EVERYTHING AND HAVE THE

08:58AM  2  GOVERNMENT PRODUCE EVERYTHING.  THEY ALSO DON'T BELIEVE THAT

08:58AM  3  THEY HAVE TO COMPLY WITH JENCKS.

08:58AM  4      WE STRONGLY DISAGREE WITH ALL OF THAT.  BUT REGARDLESS, WE

08:58AM  5  BELIEVE WE CAN MEET OUR BURDEN OF PROOF.  WE BELIEVE WE HAVE

08:58AM  6  PUT OUR BURDEN OF PROOF.

08:58AM  7      WHAT I'M TALKING ABOUT IS IF THE DISCOVERY RULES MEAN

08:58AM  8  ANYTHING, IT MEANS THAT TRIAL BY AMBUSH, SURPRISE DOCUMENTS

08:58AM  9  WHILE SOMEBODY IS IN THE MIDDLE OF CROSS-EXAMINATION ARE

08:58AM 10  FORBIDDEN.

08:58AM 11      AGAIN, I DON'T UNDERSTAND MR. DOWNEY'S STATEMENTS THAT THE

08:58AM 12  GOVERNMENT MUST HAVE THESE DOCUMENTS.  WE DON'T HAVE THEM, AND

08:58AM 13  WE RELIED ON PEOPLE ANSWERING OUR SUBPOENAS TO GIVE US WHAT

08:58AM 14  THEY HAVE.

08:58AM 15      SOMEHOW THEY WERE PROVIDED TO DOWNEY.

08:58AM 16      AND I'LL NOTE THAT THESE DOCUMENTS WERE NOT PRODUCED WITH

08:58AM 17  A GSK BATES NUMBER AS IF GSK PROVIDED THESE.

08:58AM 18      THESE ARE MOST LIKELY DOCUMENTS SITTING ON A THERANOS

08:58AM 19  SERVER THAT DEFENSE PRETTY CLEARLY STILL HAS ACCESS TO SOMEHOW.

08:58AM 20  I DON'T KNOW.  I DON'T KNOW ANY OF THAT.  THEY HAVEN'T PROVIDED

08:58AM 21  ANY OF THAT INFORMATION TO US.

08:58AM 22      I DON'T MEAN TO MAKE THIS A BIGGER DISCOVERY FIGHT, WHICH

08:59AM 23  REALLY, IF IT WERE GOING TO BE ONE, SHOULD HAVE HAPPENED

08:59AM 24  PRETRIAL, TO BE COMPLETELY FRANK.

08:59AM 25      WHAT I'M ASKING IS THAT IN THE MOMENT WITH WHAT WE HAVE,

08:59AM 1    THE REMEDY IS TO EXCLUDE THESE DOCUMENTS.

08:59AM 2        NOW, TO SPECIFICALLY ADDRESS MR. DOWNEY'S STATEMENTS ABOUT

08:59AM 3    GSK COMING UP FOR THE FIRST TIME DURING CROSS-EXAMINATION, THE

08:59AM 4    GOVERNMENT -- AND IT'S MY BEST RECOUNT OF THE EVIDENCE -- THE

08:59AM 5    GOVERNMENT IN ITS OPENING ARGUMENT TALKED ABOUT PLACING THE

08:59AM 6    PFIZER LOGO ON THE DOCUMENTS, AND THAT CAME UP THROUGH THE

08:59AM 7    PFIZER WITNESS.

08:59AM 8        THERE WAS ALSO THE SCHERING-PLOUGH REPORT.

08:59AM 9        MY RECOLLECTION OF THE EVIDENCE IS THAT DEFENDANT HAS

08:59AM 10   ACTUALLY RAISED THAT ISSUE MORE FREQUENTLY THAN THE GOVERNMENT

08:59AM 11   HAS BY CROSS-EXAMINING MY COUNT IS FOUR DIFFERENT WITNESSES

08:59AM 12   ABOUT IT, INCLUDING INVESTORS, SAYING "DIDN'T YOU SEE THE

08:59AM 13   THERANOS ADDRESS AND EMAIL ADDRESS AT THE BOTTOM?  WASN'T THAT

08:59AM 14   A CLEAR SIGN THAT THERANOS WROTE IT, NOT THE PHARMACY?"

08:59AM 15       THERE WERE SEVERAL DIFFERENT THEORIES ABOUT IT.

08:59AM 16       AND THEN WHEN MS. HOLMES TOOK THE STAND, SHE ADMITTED

09:00AM 17   PUTTING THE LOGOS ON THE DOCUMENTS.

09:00AM 18       SO THE DEFENDANTS, IF ANYTHING, HAVE BROUGHT THIS ISSUE UP

09:00AM 19   MORE FREQUENTLY THAN THE GOVERNMENT.

09:00AM 20       THE GOVERNMENT IN CROSS-EXAMINATION ASKED MORE QUESTIONS

09:00AM 21   ABOUT THAT TO DETERMINE THE EXTENT OF WHAT MS. HOLMES WAS

09:00AM 22   ESSENTIALLY CONCEDING THAT SHE DID WITH RESPECT TO THESE LOGOS.

09:00AM 23       I DON'T KNOW IF THE GOVERNMENT KNEW THAT SHE ADDED THE

09:00AM 24   LOGO TO GSK BEFORE TUESDAY, AND I DON'T THINK THAT WE KNEW WHAT

09:00AM 25   HER ANSWER TO THAT QUESTION WAS GOING TO BE.

09:00AM  1          WE CERTAINLY HADN'T BEEN PROVIDED THIS INFORMATION IN

09:00AM  2     DISCOVERY TO THE BEST OF MY KNOWLEDGE.

09:00AM  3          SO, AGAIN, THE POINT IS THAT REASONABLE QUESTIONS IN

09:00AM  4     CROSS-EXAMINATION TO FOLLOW UP ON POINTS THAT WERE RAISED IN

09:00AM  5     THE DIRECT IS FAIR GAME.

09:00AM  6          I'M NOT ENTIRELY SEEING THE CONNECT TO HOW THAT ALL OF A

09:00AM  7     SUDDEN OPENS DOORS TO DOCUMENTS THAT SHOULD HAVE BEEN PRODUCED

09:00AM  8     OVER THE LAST SEVERAL YEARS AND HAVEN'T BEEN PRODUCED, BUT THE

09:00AM  9     DEFENSE CLEARLY HAD IN THEIR POSSESSION.

09:00AM 10          AND I WILL JUST POINT OUT FOR WHY I'M SUSPICIOUS THAT

09:00AM 11     THERE IS MORE HANGING OUT THERE, THAT THERE'S A 70 PAGE GAP IN

09:01AM 12     THE BATES NUMBERS OF WHAT WE WERE GIVEN YESTERDAY, AND I HAVE

09:01AM 13     NO IDEA WHAT THOSE DOCUMENTS ARE, YOUR HONOR.

09:01AM 14          I HAVE A FEELING THAT THEY'RE WAITING UNTIL THE END OF

09:01AM 15     CROSS-EXAMINATION TO HAND THEM OVER AND THEN MAGICALLY USE THEM

09:01AM 16     IN REDIRECT.

09:01AM 17          LIKE, THIS IS OUR GROWING CONCERN THAT THIS IS A PATTERN,

09:01AM 18     A PATTERN THAT MR. DOWNEY SAID WEEKS AGO WAS NOT GOING TO

09:01AM 19     HAPPEN.

09:01AM 20          IT HAS HAPPENED, AND THESE DOCUMENTS SHOULD BE EXCLUDED.

09:01AM 21               THE COURT:  MR. DOWNEY?

09:01AM 22               MR. DOWNEY:  WELL, YOUR HONOR, JUST IN THE INTEREST

09:01AM 23     OF CLARITY AS TO MS. HOLMES'S TESTIMONY, SHE SAID ACTUALLY ON

09:01AM 24     TUESDAY IN CONNECTION SPECIFICALLY WITH THE GSK LOGO, SHE

09:01AM 25     DIDN'T KNOW WHEN THE LOGO HAD BEEN ADDED.  THAT WAS HER

8330

09:01AM 1    TESTIMONY.

09:01AM 2         SHE DIDN'T KNOW -- FOR EXAMPLE, IN RESPONSE TO QUESTIONS

09:01AM 3    ABOUT THE SUBJECT FOR MR. LEACH, SHE DIDN'T KNOW WHETHER GSK

09:01AM 4    KNEW THAT OR NOT.  THAT WAS HER TESTIMONY ON TUESDAY.

09:01AM 5         I DON'T THINK IT'S EXACTLY AS MS. VOLKAR JUST RECOUNTED.

09:01AM 6         BUT IN ANY EVENT, YOUR HONOR, I THINK THE STANDARD UNDER

09:01AM 7    RULE 16 IS WHEN WE KNOW WE'RE GOING TO USE SOMETHING AS AN

09:02AM 8    EXHIBIT IN CONNECTION WITH THE CASE, WE'RE OBLIGATED TO

09:02AM 9    DISCLOSE IT.

09:02AM 10        AND GSK WAS NOT AN ISSUE PRIOR TO THE TIME THE DEFENDANT

09:02AM 11   TOOK THE STAND FOR DIRECT EXAMINATION.

09:02AM 12        AND IT'S SURPRISING TO ME THAT THE GOVERNMENT, WITHOUT A

09:02AM 13   WITNESS IN ITS CASE, WOULD TRY TO IMPLY ON CROSS-EXAMINATION

09:02AM 14   THAT THERE WAS SOME IMPROPRIETY OR THAT THE DEFENSE HAD EVEN --

09:02AM 15   THE DEFENDANT HAD PREPARED THE GSK REPORT, WHICH IS, I THINK,

09:02AM 16   ALL EVIDENCE INDICATES UNTRUE.

09:02AM 17        BUT IT CAME UP ON THE CROSS-EXAMINATION.  WE'RE ENTITLED

09:02AM 18   TO SHOW THE SEQUENCE OF EVENTS AROUND ITS TRANSMISSION TO GSK.

09:02AM 19        THE COURT:  IS THAT WHAT YOUR DOCUMENTS THAT YOU

09:02AM 20   PROVIDED TO THE GOVERNMENT YOU BELIEVE DOES?  IS THAT WHY

09:02AM 21   YOU'RE ASKING?

09:02AM 22        MR. DOWNEY:  YEAH.  AND IN FAIRNESS TO MS. VOLKAR,

09:02AM 23   SHE RAISES A SEPARATE EVIDENTIARY OBJECTION.

09:02AM 24        BUT THE DOCUMENT INTERNALLY REFLECTS THAT THE DOCUMENT

09:02AM 25   WITH THE LOGOS IS BEING SENT AT MS. HOLMES'S DIRECTION.

8331

09:02AM   1          THE COURT:  AND LET'S TALK ABOUT THE EVIDENTIARY

09:02AM   2   OBJECTIONS THAT MS. VOLKAR JUST MENTIONS IN HER PLEADINGS.

09:03AM   3        DO YOU THINK YOU COULD OVERCOME THOSE?

09:03AM   4          MR. DOWNEY:  I THINK SO, BUT WE'LL SEE.

09:03AM   5          THE COURT:  MS. VOLKAR, DO YOU WANT TO BE HEARD ON

09:03AM   6   THAT?

09:03AM   7          MS. VOLKAR:  YOUR HONOR, I FIRST JUST WANT TO GET

09:03AM   8   BACK TO THE POINT, TO SAY THAT GSK WASN'T AT ISSUE IN THIS CASE

09:03AM   9   BEFORE MS. HOLMES TOOK THE STAND IS JUST NOT TRUE.

09:03AM  10        THE PHARMACEUTICAL COMPANIES AND THERANOS'S RELATIONSHIP

09:03AM  11   WITH THE PHARMACEUTICAL COMPANIES HAS BEEN -- IT'S IN THE

09:03AM  12   INDICTMENT, AND HER STATEMENTS THAT 10 OUT OF 15

09:03AM  13   COMPREHENSIVELY VALIDATED THE TECHNOLOGY HAS BEEN ONE OF THE

09:03AM  14   CORE STATEMENTS.  THE PARTIES HAVE BEEN DISCUSSING THIS FOR

09:03AM  15   YEARS.

09:03AM  16        SO TO SAY THAT THE RELATIONSHIP WITH GSK ALL OF A SUDDEN

09:03AM  17   BECAME RELEVANT TO THE DEFENSE ONCE THE DEFENDANT TESTIFIED

09:03AM  18   BECAUSE IT WAS ONE OF THE THREE REPORTS SHE SENT TO WALGREENS,

09:03AM  19   THAT'S JUST NOT TRUE, YOUR HONOR.

09:03AM  20        SO GOING TO THE EVIDENTIARY POINTS FOR EXHIBIT 4, FIRST OF

09:04AM  21   ALL, THE DOCUMENT DOES NOT PROVE THE VERSION OF THE EVENTS THAT

09:04AM  22   THE DEFENSE WANTS IT TO BECAUSE IT DOESN'T IN ANY WAY, SHAPE,

09:04AM  23   OR FORM SHOW GSK VALIDATING OR RESPONDING AND SAYING, YES, YOU

09:04AM  24   CAN USE OUR LOGO.

09:04AM  25        IT DOESN'T CHANGE MY RECOLLECTION OF THE TESTIMONY, WHICH

09:04AM 1    WAS THAT MS. HOLMES WASN'T SURE IF GSK EVER RESPONDED OR SAID

09:04AM 2    THAT THERANOS COULD PROVIDE THIS OUTSIDE OF GSK.

09:04AM 3         AND I BELIEVE THAT WAS ONE OF THE PIECES OF TESTIMONY WAS

09:04AM 4    IN THE CONTRACT, WAS THIS MEANT TO BE AN INTERNAL TO GSK ONLY

09:04AM 5    DOCUMENT AND NOT MEANT TO BE PROVIDED OUTSIDE OF GSK?

09:04AM 6         SO THIS DOES NOT ANSWER THAT.  THIS DOES NOT IN ANY WAY,

09:04AM 7    SHAPE, OR FORM GIVE GSK AUTHORIZING THE USE OF ITS LOGO OR

09:04AM 8    THERANOS SENDING IT TO OUTSIDE PARTIES.

09:04AM 9         THIS IS WHO I BELIEVE MS. HOLMES TESTIFIED HER ASSISTANT

09:04AM 10   AT THE TIME SENDING A DOCUMENT PURPORTEDLY ON DEFENDANT'S

09:04AM 11   BEHALF WITH THE GSK REPORT AND THE LOGO.

09:04AM 12        AND AGAIN, I GO BACK TO WHY I'M MAKING SUCH A BIG DEAL

09:05AM 13   ABOUT RULE 16 AND THE DISCOVERY OBLIGATIONS IS WE, THE

09:05AM 14   GOVERNMENT, DON'T KNOW IF THERE'S A DOCUMENT OUT THERE THAT

09:05AM 15   EXISTS THAT IS GSK RESPONDING TO THIS SAYING, "THANK YOU,

09:05AM 16   PLEASE KEEP THIS CONFIDENTIAL AND DON'T SHARE WITH ANYBODY."

09:05AM 17        THAT WOULD BE CRITICAL.  AND WE DON'T KNOW IF THAT

09:05AM 18   DOCUMENT EXISTS.

09:05AM 19        SO I GO BACK TO THIS BOTH, IT DOESN'T PROVE WHAT THEY

09:05AM 20   THINK IT DOES OR WHAT THEY'RE ASSERTING IT DOES, AND THEY CAN'T

09:05AM 21   GET IT IN.  IT'S HEARSAY WITHIN HEARSAY.

09:05AM 22        MS. BALKENHOL IS NOT HERE TO TESTIFY AND PUT THIS FORWARD.

09:05AM 23        IT'S NOT A BUSINESS RECORD AS WE'VE BEEN TALKING ABOUT

09:05AM 24   MANY TIMES WITH YOUR HONOR THROUGHOUT THIS CASE.  IT'S NOT EVEN

09:05AM 25   AN INTERNAL THERANOS EMAIL.  IT'S AN EMAIL FROM MS. HOLMES'S

09:05AM  1   THEN ASSISTANT TO SOMEONE AT A PHARMACEUTICAL COMPANY.

09:05AM  2        THERE'S NO WITNESS HERE TO SPONSOR IT.  THERE'S NO ONE

09:05AM  3   WITH PERSONAL KNOWLEDGE ABOUT THIS, AND IT'S ALSO PURPORTING TO

09:05AM  4   RECOUNT SOMETHING THAT THE DEFENDANT SAID.  IT'S HEARSAY WITHIN

09:05AM  5   HEARSAY, AND NO ONE CAN GET PAST THE FIRST LEVEL.

09:05AM  6        THE COURT:  THAT WAS WHEN I READ IT AND I READ

09:05AM  7   MS. VOLKAR'S OBJECTIONS, THEY SEEMED TO BE PRETTY -- ON SOLID

09:06AM  8   GROUND, MR. DOWNEY.  I DON'T KNOW IF YOU WANT TO RESPOND NOW OR

09:06AM  9   WAIT UNTIL YOU DECIDE TO SEEK ADMISSION OF THE DOCUMENT.

09:06AM  10        MR. DOWNEY:  WELL, I'LL JUST RESPOND PRELIMINARILY,

09:06AM  11   AND I WOULD ACKNOWLEDGE FOR CERTAIN EXCEPTIONS, I WOULD HAVE TO

09:06AM  12   LIKELY LAY A FOUNDATION THROUGH TESTIMONY.

09:06AM  13        BUT LET ME NOT LET THE GOVERNMENT SLIP IN ITS ALLEGATIONS

09:06AM  14   FROM THE INDICTMENT.

09:06AM  15        THE ALLEGATION OF THE INDICTMENT IS THAT THE DEFENDANT

09:06AM  16   REPRESENTED THAT THERANOS TECHNOLOGY HAD BEEN EXAMINED, USED,

09:06AM  17   AND VALIDATED BY PHARMACEUTICAL COMPANIES.

09:06AM  18        THERE'S NO DISPUTE IN THIS CASE THAT GSK EXAMINED, USED,

09:06AM  19   AND VALIDATED THERANOS'S TECHNOLOGY.

09:06AM  20        THIS LOGO ISSUE ACROSS ALL OF THESE COMPANIES IS A

09:06AM  21   SIDESHOW ISSUE TO THE ISSUE THAT IS SET FORTH IN THE

09:07AM  22   INDICTMENT.  THAT IS THE ALLEGATION OF THE INDICTMENT IN 12(H).

09:07AM  23        THERE'S NO OBVIOUS REASON WHY THERE WOULD BE -- THE

09:07AM  24   DEFENDANT WOULD BE ON THE STAND AND THE GOVERNMENT WOULD TRY TO

09:07AM  25   ELICIT TESTIMONY AS TO HOW A LOGO WAS PLACED ON THAT WHEN, WHEN

09:07AM  1    IT WAS PLACED, WHO PLACED IT, ET CETERA.

09:07AM  2        I THINK WE ALL AGREE THAT MS. GANGAKHEDKAR TESTIFIED THAT

09:07AM  3    GSK EXAMINED, USED, AND VALIDATED THE TECHNOLOGY.

09:07AM  4        SO THE NOTION THAT THIS IS CORE TO THE GOVERNMENT'S CASE,

09:07AM  5    IT IS NOT.

09:07AM  6            THE COURT:  OKAY.  MAYBE YOU KNOW YOUR CASE A LITTLE

09:07AM  7    BIT BETTER THAN MR. DOWNEY DOES?

09:07AM  8            MR. DOWNEY:  I WAS GOING BY THE INDICTMENT.

09:07AM  9            MS. VOLKAR:  I THINK SO, YOUR HONOR.

09:07AM 10        AND THE MOST OBVIOUS RESPONSE TO ME IS THAT IF THIS WAS

09:07AM 11    SUCH A SIDESHOW ISSUE, THEN WHY DID THE DEFENSE RAISE IT IN

09:07AM 12    FOUR OR FIVE DIFFERENT CROSS-EXAMINATIONS OF VARIOUS WITNESSES,

09:07AM 13    INCLUDING INVESTORS?

09:07AM 14        I BELIEVE THE RECORD WILL SUPPORT ME ON THAT.  I'M HAPPY

09:08AM 15    TO PULL CITATIONS.

09:08AM 16        AND ALSO WHY ASK MS. HOLMES ABOUT IT ON THE STAND DURING

09:08AM 17    CROSS-EXAMINATION?  TO THE BEST OF MY KNOWLEDGE, WE DON'T HAVE

09:08AM 18    A DOCUMENT WHERE MS. HOLMES IS SAYING, "I PLACED THE LOGO ON

09:08AM 19    IT."  SHE TESTIFIED TO THAT.

09:08AM 20        I'M JUST SAYING -- SO I GUESS I'LL LEAVE IT THERE, THAT

09:08AM 21    THE DEFENSE IS THE ONE WHO HAS PUT THE LOGOS VERY MUCH IN THE

09:08AM 22    CENTER OF THE CASE.

09:08AM 23            THE COURT:  ALL RIGHT.

09:08AM 24            MR. DOWNEY:  WELL, YOUR HONOR, LET ME JUST SAY, THIS

09:08AM 25    IS THE SORT OF KALEIDOSCOPE WORLD WE'RE IN WITH THIS.  THE

09:08AM 1    GOVERNMENT STARTS BY SAYING THEY DIDN'T USE OR EXAMINE YOUR

09:08AM 2    TECHNOLOGY.  WE ESTABLISH THAT THEY DID.

09:08AM 3        THEN THEY SAY, OKAY, MAYBE THEY EXAMINED AND USED YOUR

09:08AM 4    TECHNOLOGY AND VALIDATED IT, BUT YOU PUT LOGOS ON IT, AND THOSE

09:08AM 5    LOGOS WERE NOT AUTHORIZED BY THE COMPANY.

09:08AM 6        WE THEN INTRODUCED EVIDENCE IN RESPONSE TO THAT, INTEND TO

09:08AM 7    INTRODUCE EVIDENCE IN OUR CASE THAT, IN FACT, WE TOLD THEM, WE

09:08AM 8    SHOWED THEM THAT WE HAD CREATED A DOCUMENT IN THAT FORM.

09:09AM 9        THE GOVERNMENT SAYS, WELL, THERE'S AN EVIDENTIARY ISSUE,

09:09AM 10   YOU CAN'T GET THAT IN.

09:09AM 11       THAT STRIKES ME, YOUR HONOR, AS SHIFTING GROUND THAT IS

09:09AM 12   JUST DESIGNED NOT TO DEAL WITH THE ALLEGATIONS OF WHAT THE

09:09AM 13   GRAND JURY INDICTED ON, BUT ON SOME SHIFTING SANDS THAT JUST

09:09AM 14   TRY TO FIND A CONVICTION.

09:09AM 15       BUT I KNOW WE'RE AT THE --

09:09AM 16        MS. VOLKAR:  YOUR HONOR, I HATE TO PROLONG THIS

09:09AM 17   FURTHER, BUT WITH SHIFTING GROUNDS I HAVE TO RESPOND.

09:09AM 18       I DON'T THINK THE EVIDENCE HAS SHOWN THAT THE PHARMA

09:09AM 19   EXAMINED, USED, AND VALIDATED THE TECHNOLOGY.  WE'VE HAD THREE

09:09AM 20   DIFFERENT PHARMA WITNESSES TESTIFY TO THE EXACT OPPOSITE.

09:09AM 21        THE COURT:  THAT'S WHY WE HAVE 12 MEMBERS OF THE

09:09AM 22   COMMUNITY HERE TO DECIDE THAT ISSUE.

09:09AM 23       LET ME, LET ME TURN TO 1180 FOR JUST A MOMENT, AND I'M

09:09AM 24   GOING TO STEP DOWN SO WE CAN GET OUR JURY OUT.  WE'RE ABOUT TEN

09:09AM 25   MINUTES AFTER 9:00.

8336

09:09AM 1      THIS IS MS. HOLMES'S RENEWED MOTION TO ADMIT FEEDBACK

09:09AM 2   REPORTS.  AND I NOTE AT PAGE 2 OF THE DOCUMENT AT LINES, I

09:10AM 3   THINK AROUND 12 THROUGH 14, THERE IS REFERENCE TO SOME

09:10AM 4   TESTIMONY, TRANSCRIPT PAGES 8087 TO -89.  I'VE LOOKED AT THOSE

09:10AM 5   AND IT SEEMS TO ME THAT THOSE ARE MR. BALWANI'S STATEMENTS AND

09:10AM 6   MS. HOLMES WAS ASKED WHETHER OR NOT THOSE STATEMENTS REFRESHED

09:10AM 7   HER RECOLLECTION.

09:10AM 8      I DON'T KNOW HOW THOSE SUPPORT THE REINTRODUCTION OF THESE

09:10AM 9   DOCUMENTS.  I'M NOT CERTAIN I SHOULD DISTURB THE COURT'S

09:10AM 10  PREVIOUS RULING JUST BASED ON THIS.

09:10AM 11     I STILL THINK THERE'S A FOUNDATIONAL ISSUE HERE.  THE

09:10AM 12  TESTIMONY THAT I HEARD WAS THAT MS. HOLMES RECEIVED EMAILS AND

09:10AM 13  WAS APPRISED OF CERTAIN INFORMATION, BUT I DON'T RECALL

09:10AM 14  ANYTHING SPECIFIC THAT SHE LOOKED AT THE DOCUMENTS AS THEY WERE

09:10AM 15  PRESENTED OR ATTEMPTED TO BE PRESENTED, THAT IS, THE

09:10AM 16  PHLEBOTOMIST REPORTS THEMSELVES.

09:10AM 17     I THINK EMAILS AND PHLEBOTOMIST REPORTS ARE TWO DIFFERENT

09:11AM 18  THINGS.

09:11AM 19     SO I STILL DON'T THINK THERE'S A FOUNDATION FOR THAT.  SO

09:11AM 20  I'M JUST LETTING YOU KNOW THAT, MR. DOWNEY.

09:11AM 21         MR. DOWNEY:  YOUR HONOR, WE MAY BE SAYING THE SAME

09:11AM 22  THING.  I THINK THE GIST OF THE TESTIMONY WAS THAT SHE REVIEWED

09:11AM 23  WHAT IS IN THE EXHIBIT, BUT MY FRIEND MR. CLEARLY IS --

09:11AM 24         THE COURT:  ALL RIGHT.  MR. CLEARY.

09:11AM 25         MR. CLEARY:  YOUR HONOR, RICHARD CLEARY ON BEHALF OF

09:11AM   1    MS. HOLMES.

09:11AM   2        SO I THINK A COUPLE OF ITEMS TO ADDRESS THE COURT'S

09:11AM   3    CONCERNS.

09:11AM   4        ON PAGE 8578 -- EXCUSE ME, 8057 AND 8058, MS. HOLMES WAS

09:11AM   5    QUESTIONED BY THE GOVERNMENT CONCERNING THE INCREASE OF

09:11AM   6    FINGERSTICK PERCENTAGE AT WALGREENS STORES CONCERNING --

09:11AM   7    INCLUDING IN THE 2015 TIME PERIOD.

09:12AM   8        AND IN RESPONSE TO THOSE QUESTIONS, MS. HOLMES ANSWERERS

09:12AM   9    IN THE AFFIRMATIVE.

09:12AM  10        YOUR HONOR IS CORRECT WITH RESPECT TO CERTAIN TEXT

09:12AM  11    MESSAGES FAILING TO REFRESH MS. HOLMES'S RECOLLECTION.  WE CAN

09:12AM  12    GO TO THOSE PAGES AND I CAN WALK THROUGH THOSE EXCHANGES AS

09:12AM  13    WELL WITH THE COURT, BUT THESE ARE OTHER PARTS OF THE

09:12AM  14    CROSS-EXAMINATION THAT I THINK VERY CLEANLY HIT ON THESE

09:12AM  15    ISSUES.

09:12AM  16        MS. HOLMES IS ASKED, "HE'S BEING" -- THIS IS ON PAGE 8058.

09:12AM  17    "HE'S BEING OPEN WITH YOU ABOUT IDEAS ON HOW TO INCREASE THE

09:12AM  18    FINGERSTICK PERCENTAGE AT WALGREENS?

09:12AM  19        "HE IS.

09:12AM  20        "HE'S TALKING" -- AND THIS IS A QUESTION.  "HE'S TALKING

09:12AM  21    OPENLY ABOUT THIS ISSUE IN THE 2015 TIME PERIOD WITH YOU?

09:12AM  22        "ANSWER:  YES."

09:12AM  23        WITH RESPECT TO MS. HOLMES'S TESTIMONY ON DIRECT

09:12AM  24    EXAMINATION CONCERNING CUSTOMER FEEDBACK, MS. HOLMES WAS ASKED

09:13AM  25    WHETHER SHE RECEIVED CUSTOMER FEEDBACK CONCERNING THERANOS'S

8338

09:13AM 1    PERFORMANCE IN WALGREENS STORES, WHETHER SHE RECEIVED -- HOW

09:13AM 2    SHE RECEIVED THAT FEEDBACK.

09:13AM 3         SHE RECEIVED IT BY EMAIL.  THE DOCUMENTS WE SEEK TO ADMIT

09:13AM 4    WERE SENT TO HER BY EMAIL.

09:13AM 5         SHE ALSO TESTIFIED THAT SHE RECEIVED SOME OF IT IN

09:13AM 6    MEETINGS, AND SHE RECEIVED THE FEEDBACK OVER THE COURSE OF THE

09:13AM 7    WALGREENS/THERANOS PARTNERSHIP INTO 2016.

09:13AM 8         THE COURT:  AND I DON'T MEAN TO PICK NITS, BUT I

09:13AM 9    UNDERSTAND THAT.  SHE RECEIVED EMAILS.  SHE RECEIVED THAT.

09:13AM 10   THERE'S NOTHING IN THE RECORD YET THAT SAYS, "I RECEIVED THESE

09:13AM 11   DOCUMENTS VIA THAT EMAIL AND I REVIEWED THESE DOCUMENTS."

09:13AM 12        I DON'T THINK THERE'S ANYTHING IN THE RECORD THAT SAYS

09:13AM 13   THAT.

09:13AM 14        MR. CLEARY:  MS. HOLMES -- WE DID NOT PUT THE

09:13AM 15   DOCUMENTS IN FRONT OF MS. HOLMES IN LIGHT OF THE COURT'S PRIOR

09:13AM 16   RULING.

09:13AM 17        THE COURT:  RIGHT.  RIGHT.

09:13AM 18        MR. CLEARY:  MS. HOLMES DID TESTIFY TO THIS TYPE OF

09:13AM 19   EVIDENCE, EMAILS CONTAINING CUSTOMER FEEDBACK.

09:14AM 20        THE COURT:  RIGHT.

09:14AM 21        MR. CLEARY:  THAT'S WHAT THESE DOCUMENTS ARE.

09:14AM 22   THEY'RE EMAILS.

09:14AM 23        AS THE COURT WELL KNOWS, THE COURT IS VERY FAMILIAR WITH

09:14AM 24   THIS ISSUE, AND I WILL ALSO JUST SAY THIS IS NOT A MATTER THAT

09:14AM 25   WE BRING LIGHTLY TO THE COURT.  WE KNOW THE BURDENS ON THE

8339

09:14AM 1   COURT.  WE KNOW THE EXTENT OF THE COURT'S FAMILIARITY WITH

09:14AM 2   THESE ISSUES.

09:14AM 3         THE COURT:  SO THAT'S WHAT -- THANK YOU.  AND PARDON

09:14AM 4   ME, MR. CLEARY.

09:14AM 5   I'M JUST SAYING I'M NOT PICKING NITS WITH YOU, PERHAPS I

09:14AM 6   AM, BUT I THINK THERE'S STILL A FOUNDATIONAL VACUUM HERE.

09:14AM 7   WE KNOW THESE DOCUMENTS WERE SENT BY EMAIL.  SHE RECEIVED

09:14AM 8   EMAIL.  SHE REVIEWED EMAIL.

09:14AM 9   DID SHE REVIEW THESE OR NOT?  THAT'S THE VACUUM, I THINK,

09:14AM 10  AND MAYBE THAT WILL BE SOLVED, I DON'T KNOW.

09:14AM 11  BUT I JUST WANT TO LET YOU KNOW, THAT'S WHAT I'M LOOKING

09:14AM 12  AT, AND THAT'S THE LACK OF FOUNDATION THAT I SEE HERE.

09:14AM 13  THE OTHER THING I WANTED TO SUGGEST, AGAIN, ON PAGE 2 AND

09:14AM 14  RIGHT AROUND LINES 19 THROUGH THE BOTTOM OF THE PAGE, YOU SEEM

09:14AM 15  TO SUGGEST -- AND I KNOW YOU'RE NOT SUGGESTING EVERY TIME

09:15AM 16  THINGS DON'T GO YOUR WAY, IT AUTOMATICALLY RESULTS IN A FIFTH

09:15AM 17  AND SIXTH AMENDMENT VIOLATION OF YOUR CLIENT'S RIGHTS.  I KNOW

09:15AM 18  YOU'RE NOT TAKING THAT STEP AND THAT POSITION.

09:15AM 19  BUT YOU SEEM TO SUGGEST THAT UNDER HAISCHER, THE HAISCHER

09:15AM 20  CASE -- H-A-I-S-C-H-E-R -- THAT THE COURT NOT ALLOWING THESE TO

09:15AM 21  COME IN WOULD VIOLATE THE PRECEPTS OF HAISCHER, WHICH OF COURSE

09:15AM 22  SUGGEST, DOESN'T IT, WHAT YOU'RE GOING TO DO, AND PERHAPS MORE

09:15AM 23  IMPORTANTLY, WHAT YOU'RE NOT GOING TO DO VIA EXPERT TESTIMONY.

09:15AM 24        MR. CLEARY:  WELL, I WILL -- WITH RESPECT TO THE

09:15AM 25  CONTENTS OF THE HAISCHER CASE, I'LL DEFER TO MY COLLEAGUES AND

09:15AM 1    TO THE COURT'S SPECIFIC QUESTION, WHICH I BELIEVE RELATES TO

09:15AM 2    12.2.

09:15AM 3        AND I KNOW THAT THEY ARE AVAILABLE TO DISCUSS THOSE ISSUES

09:15AM 4    WITH THE COURT IF THE COURT IS SO INCLINED.

09:15AM 5        HAISCHER, FOR PURPOSES OF THIS RENEWED MOTION, IS RELEVANT

09:16AM 6    IN TWO WAYS.

09:16AM 7        FIRST, THE COURT -- THE COURT CLEARLY SAYS, AND I'M

09:16AM 8    QUOTING, "WE ARE ALSO MINDFUL, HOWEVER, THAT THE EXCLUSION OF

09:16AM 9    EVIDENCE OFFERED BY THE DEFENDANT IN A CRIMINAL PROSECUTION

09:16AM 10   UNDER RULE 403 IS AN EXTRAORDINARY REMEDY TO BE USED

09:16AM 11   SPARINGLY."

09:16AM 12       THE COURT GOES ON TO SAY, "APPLICATION OF RULE 403 MUST BE

09:16AM 13   CAUTIOUS AND SPARING."

09:16AM 14       AND THEN THE BACKSTOP IN THAT CASE, AS THE COURT RECALLS,

09:16AM 15   IS THE CONCLUSION THAT THE EXCLUSION OF CERTAIN EVIDENCE GOING

09:16AM 16   TO THE DEFENDANT'S MENTAL STATE UNDER 403 DID VIOLATE HER RIGHT

09:16AM 17   TO PRESENT A COMPLETE DEFENSE BECAUSE IT WAS CENTRAL TO HER

09:16AM 18   DEFENSE WITH RESPECT TO THE ELEMENT OF THE OFFENSE.

09:16AM 19       THE COURT:  AND IN THAT CASE, AS YOU RECALL,

09:16AM 20   MR. CLEARY, THE DEFENSE INDICATED TO THE COURT THAT THEY WERE

09:17AM 21   GOING TO PURSUE A DURESS DEFENSE.  YOU RECALL THAT?

09:17AM 22       MR. CLEARY:  YES, YOUR HONOR.

09:17AM 23       THE COURT:  AND THEN THEY CHANGED THEIR MIND

09:17AM 24   MIDSTREAM.  AT SOME POINT, THEY CHANGED AND SAID, "WELL,

09:17AM 25   ACTUALLY WE'RE NOT GOING TO PURSUE DURESS.  WE'RE NOT GOING TO

09:17AM   1        DO THAT."

09:17AM   2             AND THERE ARE CERTAIN REQUIREMENTS, THE SPECIFIC ONE I

09:17AM   3        THINK IN THAT CASE WAS FOR DURESS, A CLIENT HAS TO ADMIT THE

09:17AM   4        CONDUCT, DON'T THEY?  AND THEN DURESS GIVES AN EXCUSE FOR THE

09:17AM   5        CONDUCT.  BUT THEY DO HAVE TO ADMIT THE CONDUCT.

09:17AM   6             IN THAT CASE I THINK THEY CHANGED THEIR MIND.  THEY WERE

09:17AM   7        NOT GOING TO DO DURESS, AND THEY TRIED SOMETHING -- A DIFFERENT

09:17AM   8        DEFENSE.

09:17AM   9             IN THAT CASE, THE FACTS ARE A LITTLE DIFFERENT, TOO.

09:17AM  10        DIDN'T THAT INVOLVE A BROKEN LEG BY THE WITNESS, AND THE

09:17AM  11        DEFENDANT AND THE CODEFENDANT WAS DENYING MEDICAL ATTENTION

09:17AM  12        UNTIL THE CODEFENDANT SIGNED A DOCUMENT?  ISN'T THAT WHAT WAS

09:17AM  13        GOING ON THERE?

09:17AM  14             AND THAT WAS WHAT THE MENTAL STATE ISSUE THAT I THINK THE

09:17AM  15        NINTH CIRCUIT LOOKED AT THAT JUDGE DU HAD BEFORE HER IN NEVADA

09:17AM  16        IN THE TRIAL CASE, THEY LOOKED AT, AND THAT'S WHERE THAT

09:18AM  17        CONVERSATION COMES IN.

09:18AM  18             ISN'T THAT THE DISTINCTION HERE?

09:18AM  19             MR. CLEARY:  WE WOULD SUBMIT SO.  FIRST, HAISCHER

09:18AM  20        DID INVOLVE A BROKEN LEG AND TESTIMONY BY THE DEFENDANT AND BY

09:18AM  21        HER SISTER AS TO THAT ISSUE.

09:18AM  22             EVERY -- THE FACTS OF EVERY CASE ARE DIFFERENT.

09:18AM  23             HERE PARAGRAPH 12(D) SQUARELY PUTS AT ISSUE MS. HOLMES'S

09:18AM  24        STATEMENTS WITH RESPECT TO WALGREENS.

09:18AM  25             THE COURT:  I'M SORRY.  SAY THAT AGAIN.

8342

| | | |
|---|---|---|
| 09:18AM | 1 | MR. CLEARY:  DO YOU MIND IF I REMOVE MY MASK? |
| 09:18AM | 2 | THE COURT:  PLEASE.  NO.  THANK YOU. |
| 09:18AM | 3 | MR. CLEARY:  HERE WE HAVE I THINK THREE DIFFERENT |
| 09:18AM | 4 | LAYERS WHICH THE GOVERNMENT HAS PUT AT ISSUE:  MS. HOLMES'S |
| 09:18AM | 5 | MENTAL STATE WHEN SPEAKING ABOUT THE WALGREENS RELATIONSHIP, |
| 09:18AM | 6 | AND SPECIFICALLY THE WALGREENS ROLLOUT. |
| 09:18AM | 7 | SO FIRST WE HAVE THE INDICTMENT, PARAGRAPH 12(D), IN |
| 09:18AM | 8 | CONTRAST TO CERTAIN OTHER PARAGRAPHS OF THE DOCUMENT WHICH DO |
| 09:18AM | 9 | RELATE EXPRESSLY TO THE ACCURATE -- THE PERFORMANCE OF THERANOS |
| 09:18AM | 10 | TECHNOLOGY AND THE ACCURACY AND RELIABILITY OF THAT TECHNOLOGY |
| 09:19AM | 11 | OR ITS CAPABILITY TO CONSISTENTLY PRODUCE ACCURATE AND RELIABLE |
| 09:19AM | 12 | RESULTS. |
| 09:19AM | 13 | IN THE CASE OF 12(D), WE HAVE AN ALLEGATION THAT |
| 09:19AM | 14 | MS. HOLMES MISREPRESENTED THE CURRENT STATE AND THE FUTURE |
| 09:19AM | 15 | PROSPECTS OF THE WALGREENS RELATIONSHIP, SPECIFICALLY THE |
| 09:19AM | 16 | PROSPECTS OF A CONTINUED ROLLOUT. |
| 09:19AM | 17 | IN THE GOVERNMENT'S OPENING STATEMENT, CONSISTENT WITH |
| 09:19AM | 18 | THAT INDICTMENT ALLEGATION, THE GOVERNMENT ACCUSED MS. HOLMES |
| 09:19AM | 19 | OF LYING TO INVESTORS WITH RESPECT TO THE LIKELIHOOD OF A |
| 09:19AM | 20 | CONTINUED WALGREENS ROLLOUT.  THE GOVERNMENT EXPLAINED OR |
| 09:19AM | 21 | ALLEGED THAT THOSE STATEMENTS WERE FALSE BECAUSE WALGREENS WAS |
| 09:19AM | 22 | VERY CONCERNED ABOUT THE PROPORTION OF VENOUS TO FINGERSTICK |
| 09:19AM | 23 | DRAWS. |
| 09:19AM | 24 | AND THEN ON MS. HOLMES'S EXAMINATION AND |
| 09:19AM | 25 | CROSS-EXAMINATION, THE GOVERNMENT HAS REPEATEDLY RETURNED TO |

8343

09:19AM 1    THIS ISSUE OF THE WALGREENS ROLLOUT AND THE ROLE OF VENOUS --

09:20AM 2    THE PROPORTION OF VENOUS DRAWS IN CONNECTION WITH THAT ROLLOUT.

09:20AM 3        SO YOU HAVE QUESTIONING BY THE GOVERNMENT OF MS. HOLMES

09:20AM 4    CONCERNING AN EMAIL THAT WAS SENT BY MR. JHAVERI TO MR. BALWANI

09:20AM 5    AND IN TURN FORWARDED TO MS. HOLMES.  THAT WAS AN AUGUST 2014

09:20AM 6    EMAIL IN WHICH MR. JHAVERI COMMUNICATED WITH MR. BALWANI ABOUT

09:20AM 7    PUTTING A GAME PLAN IN PLACE OVER A CERTAIN, I BELIEVE IT WAS A

09:20AM 8    30-DAY PERIOD ON SOME PATIENT SATISFACTION ISSUE AND ON THE

09:20AM 9    VENOUS DRAW, VENOUS VERSUS FINGERSTICK DRAW ISSUE.

09:20AM 10       AND NOW THAT THESE -- NOW THAT MS. HOLMES'S MENTAL STATE

09:20AM 11   IS FULLY AT ISSUE HERE, IT'S ONE OF THE CORE ALLEGATIONS IN THE

09:20AM 12   INDICTMENT.  THIS IS CENTRAL EVIDENCE TO CORROBORATE

09:21AM 13   MS. HOLMES'S TESTIMONY THAT SHE DID NOT BELIEVE THAT THE RATE

09:21AM 14   OF FINGERSTICK -- EXCUSE ME, THE PROPORTION OF VENOUS DRAWS

09:21AM 15   WOULD SLOW DOWN OR PREVENT THE WALGREENS EXPANSION.

09:21AM 16       SO THAT'S THE WAY IT'S RELEVANT IN THIS CASE.

09:21AM 17       MS. HOLMES TESTIFIED THAT SHE HAD HEARD ABOUT THE

09:21AM 18   PROPORTION OF VENOUS DRAWS, THE NUMBER OF VENOUS DRAWS, I

09:21AM 19   BELIEVE, WAS THE EXACT PHRASING OF THE QUESTION, AND ANSWERED

09:21AM 20   THAT SHE DID NOT BELIEVE THAT THAT WOULD PREVENT OR SLOW DOWN

09:21AM 21   THE WALGREENS EXPANSION, AND THAT HER RECEIPT OF CUSTOMER

09:21AM 22   FEEDBACK INFORMED HER THAT, CONTRARY TO THE INITIAL EXPECTATION

09:21AM 23   THAT FINGERSTICK WOULD BE -- LIKE THEY'RE REALLY EXCITING, KEY

09:21AM 24   ELEMENTS OF THE CUSTOMER EXPERIENCE, THAT CUSTOMERS ACTUALLY

09:22AM 25   WERE MUCH MORE CONCERNED ABOUT PRICE THAN THEY WERE ABOUT

09:22AM  1    RECEIVING A VENOUS DRAW OR A FINGERSTICK.

09:22AM  2              THE COURT:  SHE'S ALREADY TESTIFIED TO THAT?

09:22AM  3              MR. CLEARY:  SHE HAS TESTIFIED TO THAT.

09:22AM  4        THE GOVERNMENT SUBSEQUENTLY HAS CROSS-EXAMINED HER

09:22AM  5    REGARDING THIS VERY QUESTION, AND BOTH IN ORDER TO GIVE THE

09:22AM  6    JURY A FULL SENSE OF WHY SHE BELIEVED WHAT SHE BELIEVED AND IN

09:22AM  7    ORDER TO RESPOND TO THAT CROSS-EXAMINATION, WE BELIEVE THAT

09:22AM  8    THESE REPORTS ARE ADMISSIBLE AND NECESSARY.

09:22AM  9        AND I WILL ADD, YOUR HONOR, THAT WE BELIEVE THAT THEY'RE

09:22AM 10    ALL ADMISSIBLE.

09:22AM 11        IF THE COURT DISAGREES, WE DID PROFFER ONE OF THE

09:22AM 12    EXHIBITS --

09:22AM 13              THE COURT:  7586A I THINK IS THE ONE.

09:22AM 14              MR. CLEARY:  THAT'S RIGHT.  SO WHAT WE DID IN

09:22AM 15    3586A --

09:22AM 16              THE COURT:  75.

09:22AM 17              MR. CLEARY:  EXCUSE ME, 7586A IS JUST TAKE A

09:22AM 18    SELECTION TO WINNOW DOWN THE VOLUME.

09:23AM 19        AND IN 7476, WE SELECTED A REPORT THAT DATES FROM EARLY

09:23AM 20    OCTOBER 2014, BECAUSE I KNOW THAT THE COURT HAD EXPRESSED A

09:23AM 21    CONCERN ABOUT VOLUME IN THE PAST AND WE BELIEVE THAT --

09:23AM 22    ALTHOUGH ACTUALLY THE VOLUME AND THE REGULARITY OF THESE

09:23AM 23    UPDATES ARE IMPORTANT IN UNDERSTANDING WHY MS. HOLMES DID HAVE

09:23AM 24    THE BELIEF THAT SHE TESTIFIED TO, THAT THESE WOULD RESOLVE ANY

09:23AM 25    CONCERNS ABOUT --

09:23AM  1          THE COURT:  WELL, SHE HASN'T TESTIFIED THAT SHE'S

09:23AM  2     LOOKED AT AND ACTUALLY READ ANY OF THESE, HAS SHE?

09:23AM  3          MR. CLEARY:  SHE TESTIFIED THAT SHE RECEIVED

09:23AM  4     CUSTOMER FEEDBACK AND THEN SHE REVIEWED THE FEEDBACK THAT WAS

09:23AM  5     SENT TO HER.

09:23AM  6          THE COURT:  SO SHE HASN'T TESTIFIED THAT SHE

09:23AM  7     REVIEWED ANY OF THESE DOCUMENTS.  AM I ACCURATE?

09:23AM  8          MR. CLEARY:  YOU'RE ACCURATE, YOUR HONOR.

09:23AM  9      IF THE COURT IS CONCERNED ABOUT FOUNDATION ON REDIRECT, WE

09:23AM 10     WOULD BE HAPPY TO PUT THESE DOCUMENTS IN FRONT OF HER AND SEE

09:23AM 11     IF WE CAN LAY THAT FOUNDATION.

09:23AM 12          THE COURT:  WELL, THAT'S MR. DOWNEY'S JOB.  YOU

09:24AM 13     BETTER NOT MAKE A PROMISE FOR HIM THAT HE DOESN'T KNOW ABOUT.

09:24AM 14          MR. CLEARY:  I THINK THE FOUNDATION OF THESE

09:24AM 15     DOCUMENTS WOULD BE FULLY CONSISTENT WITH THAT TESTIMONY,

09:24AM 16     YOUR HONOR.

09:24AM 17          THE COURT:  THANK YOU.

09:24AM 18       MS. VOLKAR?

09:24AM 19          MS. VOLKAR:  YOUR HONOR, IF I MAY BE HEARD?

09:24AM 20      WE HAVEN'T HEARD ANYTHING THIS MORNING THAT IS DIFFERENT

09:24AM 21     THAN WHAT WE'VE HEARD THE PRIOR TWO TIMES THAT MY COLLEAGUE,

09:24AM 22     MR. BOSTIC, WAS UP HERE ARGUING THIS EXACT SAME MOTION.

09:24AM 23     THERE'S NOTHING TO DISTURB THE COURT'S RULING.

09:24AM 24      YOUR HONOR CHARACTERIZED THE TESTIMONY THAT THEY CITED,

09:24AM 25     MR. CLEARY QUOTED IT, AND IT EXACTLY COINCIDED WITH WHAT

09:24AM  1    YOUR HONOR SAID.  THEY ASKED ABOUT WHETHER OR NOT MR. BALWANI

09:24AM  2    TOLD HER ABOUT FINGERSTICK, AND HE REPEATEDLY DID IN TEXT

09:24AM  3    MESSAGES.  THAT DOESN'T ALTER THE CORE PROBLEMS WITH ADMITTING

09:24AM  4    THIS TESTIMONY.

09:24AM  5         FIRST, THERE'S THE FOUNDATIONAL ISSUE, WHICH YOUR HONOR

09:24AM  6    HAS NOTED, AND THEY HAVE ADMITTED THAT THEY HAVEN'T SOLVED THAT

09:24AM  7    ISSUE.

09:24AM  8         NOW, MAYBE SHE CAN ON REDIRECT, BUT THAT'S ONLY THE FIRST

09:24AM  9    STEP.

09:24AM  10        THEN THERE'S THE RELEVANCE PROBLEM.  THEN THERE'S THE 403

09:25AM  11   PROBLEM.  AND THEY WANT TO JUMP OVER AND SKIP THE RELEVANCE

09:25AM  12   PROBLEMS AND TALK ABOUT 403 AND MENTAL STATE, BUT I WANT TO

09:25AM  13   PAUSE FOR A MOMENT ON THE RELEVANCE, WHICH EVEN THE EXCERPTS,

09:25AM  14   THE WINNOWED DOWN EXCERPTS SHOW IN EXACERBATING DETAIL,

09:25AM  15   90 PERCENT OF THOSE EXCERPTS THAT THEY INCLUDE ARE ALL ABOUT

09:25AM  16   PRICE.

09:25AM  17        AND YOUR HONOR'S ORDER -- AND I KNOW I QUOTED IT IN MY

09:25AM  18   BRIEF SO I WON'T REPEAT IT -- TALKED ABOUT AND ACKNOWLEDGED

09:25AM  19   THIS IS NOT A PRICING, A MISPRICED OR A LYING ABOUT HOW LOW THE

09:25AM  20   PRICES WOULD BE.  THIS IS NOT THAT TYPE OF CASE.

09:25AM  21        THE ALLEGATIONS IN THE INDICTMENT ARE THAT THERANOS WOULD

09:25AM  22   OFFER BETTER, CHEAPER, FASTER, MORE ACCURATE TESTS.  CHEAPER

09:25AM  23   WAS ONE PART OF THAT, BUT I THINK WE HAVE ALSO HEARD WITNESSES

09:25AM  24   SAY, I BELIEVE MS. GOULD, IF I'M NOT MISTAKEN, THAT IF SHE KNEW

09:25AM  25   THE TESTS WERE LESS ACCURATE, IT WOULD MATTER A LOT LESS TO HER

09:25AM 1      IF IT WAS CHEAPER.

09:25AM 2          AND WE DON'T HAVE THE OPPORTUNITY TO ASK THOSE PATIENTS

09:25AM 3      WHO AT THE MOMENT OF CARE OR WERE TELLING PHLEBOTOMISTS, "WOW,

09:26AM 4      THE PRICES ARE SO GREAT," WE DON'T HAVE THE OPPORTUNITY TO ASK

09:26AM 5      THEM, "WOULD IT MATTER TO YOU IF YOU KNEW THE TEST WAS GOING TO

09:26AM 6      BE INACCURATE THAT IT WAS CHEAPER?"

09:26AM 7          AND AGAIN, WE QUOTED MS. CHEUNG, WHO I THINK SPEAKS FOR

09:26AM 8      COMMON SENSE IN A LOT OF PEOPLE, THAT PEOPLE MIGHT LIKE THE

09:26AM 9      CHEAPER PRICES, BUT THEY ALSO EXPECT AT LEAST AS ACCURATE TEST

09:26AM 10     AS WHAT THEY WOULD GUESS ELSEWHERE, AND THAT'S THE CORE

09:26AM 11     ALLEGATIONS OF THIS CASE AND THAT'S WHY THIS IS IRRELEVANT AS

09:26AM 12     YOUR HONOR HAS FOUND TWICE BEFORE.

09:26AM 13         SO EVEN IF THEY PUT THESE DOCUMENTS BEFORE MS. HOLMES, I

09:26AM 14     WOULD ARGUE IT'S AN EXERCISE IN FUTILITY, BECAUSE EVEN IF SHE

09:26AM 15     SAYS THAT SHE'S REVIEWED THEM, WHAT IS CONTAINED IN THEM IS

09:26AM 16     IRRELEVANT TO THE ALLEGATIONS AND WHAT IS GOING ON WITH THIS

09:26AM 17     CASE.

09:26AM 18         NOW, THEY'RE TRYING TO BOOTSTRAP IT BY TYING IT TO HER

09:26AM 19     MENTAL STATE AND REFERENCE IN THE 12.2.  MR. CLEARY SAYS HER

09:26AM 20     MENTAL STATE IS NOW CLEARLY AT ISSUE.

09:26AM 21         I DON'T KNOW ABOUT THAT.  THEY HAVE NOT YET IDENTIFIED FOR

09:26AM 22     US OR FOR THE COURT THAT THEIR EXPERT IS ACTUALLY GOING TO

09:26AM 23     TESTIFY.  THEY HAVE NOT YET -- SHE SAID THAT MR. BALWANI DIDN'T

09:26AM 24     TELL ME WHAT TO SAY, MR. BALWANI DIDN'T TELL ME THIS.  AND I'M

09:27AM 25     WORRIED I'M GOING TO MISQUOTE THE TRANSCRIPT, SO I DON'T WANT

09:27AM 1    TO GO TOO FAR.

09:27AM 2        BUT AT THE END OF DISCUSSING THE ASPECTS OF THEIR

09:27AM 3    RELATIONSHIP, SHE ACTUALLY DISAVOWED A DIRECT CONNECTION TO HER

09:27AM 4    MENTAL STATE WITH RESPECT TO THAT.

09:27AM 5        AND, AGAIN, HOW THE GOVERNMENT COUNTERED THAT IN

09:27AM 6    CROSS-EXAMINATION WAS TO ASK WHAT MR. BALWANI DID TELL HER, AND

09:27AM 7    IT WAS ABOUT THE FACT THAT THE FINGERSTICK WAS TOO LOW.

09:27AM 8        SO THAT'S A RED HERRING, YOUR HONOR.

09:27AM 9        THE CORE ISSUE HERE IS THAT THE EVIDENCE IS NOT RELEVANT.

09:27AM 10       AND THE LAST ARGUMENT THAT I WANTED TO MAKE, WHICH YOUR

09:27AM 11   HONOR I THINK ALSO FOUND PERSUASIVE FROM THE LAST TIME WE

09:27AM 12   BRIEFED THIS, IS THE TIMING.

09:27AM 13       DEFENSE COUNSEL SKIPS OVER THE TIMING, AND BY GIVING A

09:27AM 14   WINNOWED VIEW OF THIS, I THINK THAT THEY ACKNOWLEDGE IT, THE

09:27AM 15   VAST MAJORITY OF THESE REPORTS SENT TO MS. HOLMES ARE IN THE

09:27AM 16   SECOND HALF OF 2015.

09:27AM 17       THEY HAVE NOT YET IDENTIFIED WHAT INVESTOR, IF ANY, THIS

09:27AM 18   ACTUALLY WENT TO HER MENTAL STATE FOR WHEN SHE DEFRAUDED THEM.

09:27AM 19   THEY HAVE NOT ACTUALLY TIED THESE REPORTS AND HER KNOWLEDGE OF

09:28AM 20   THEM TO ANY SPECIFIC EVENTS THAT IT WOULD HAVE IMPACTED HER

09:28AM 21   STATE OF MIND FOR.

09:28AM 22       RATHER, WHEN SHE'S TALKING TO RDV, WHEN SHE'S TALKING TO

09:28AM 23   RUPERT MURDOCH, THE VAST MAJORITY OF THESE REPORTS DON'T EVEN

09:28AM 24   EXIST YET.  AND SO, AGAIN, THE TIMING POINT IS ANOTHER KEY

09:28AM 25   POINT.

09:28AM  1          THE COURT:  WELL, THAT'S A SIGNIFICANCE POINT, TOO.

09:28AM  2     I RAISE THIS CONVERSATION -- AND I'M GOING TO STEP DOWN SO

09:28AM  3  WE CAN GET OUR JURY OUT HERE -- BUT I RAISED THIS BECAUSE I WAS

09:28AM  4  INTRIGUED BY THE REFERENCE TO THE HAISCHER CASE, AND IT CAUSED

09:28AM  5  ME TO THINK, WELL, IN HAISCHER THERE WAS NO EXPERT.

09:28AM  6          MR. CLEARY:  THAT'S RIGHT, YOUR HONOR.

09:28AM  7          THE COURT:  AND IN HAISCHER, I THINK THE TESTIMONY

09:28AM  8  WAS JUST FROM -- NOT JUST -- BUT IT WAS FROM THE DEFENDANT, OR

09:28AM  9  AT LEAST INFORMATION ABOUT THE DEFENDANT'S MENTAL STATE IN

09:28AM 10  REGARDS TO THE CONDUCT THAT SHE ENGAGED IN.

09:28AM 11     AND, OF COURSE, WE KNOW THE FACTS ARE DIFFERENT.  THEY'RE

09:28AM 12  MUCH MORE DRAMATIC THERE.  THERE WAS A BROKEN LEG, AS I SAID,

09:28AM 13  AND AS YOU KNOW, MR. CLEARY, SHE WAS DENIED MEDICAL ATTENTION

09:29AM 14  UNTIL SHE SIGNED THE DOCUMENT THAT WAS USED FOR THE FRAUDULENT

09:29AM 15  CONDUCT IN THAT CASE.  AND THAT WAS NOT PERMITTED TO GO TO THE

09:29AM 16  JURY.

09:29AM 17     AND THE NINTH CIRCUIT SAID THAT -- REVERSED ON THAT GROUND

09:29AM 18  AND SAID THAT COULD HAVE COMING IN, THAT SHOULD HAVE COME IN

09:29AM 19  FOR THE ISSUE OF STATE OF MIND OF THE PERSON.

09:29AM 20     A LITTLE MORE DRAMATIC THAN WHAT WE HAVE HERE, I THINK

09:29AM 21  YOU'LL CONCEDE THAT.

09:29AM 22          MR. CLEARY:  YOUR HONOR, JUST A FEW THINGS.

09:29AM 23     SO THE HAISCHER CASE, I WILL SAY THAT I CITED IT NOT WITH

09:29AM 24  THE VIEW OF TUMBLING THIS MOTION INTO A 12.2 DISCUSSION, BUT

09:29AM 25  JUST BECAUSE IT STATES THE LEGAL PROPOSITION VERY CLEARLY.

09:29AM   1          WITH RESPECT TO 403, THE APPLICATION OF 403, WHEN A

09:29AM   2     DEFENDANT SEEKS TO INTRODUCE EVIDENCE HERSELF.

09:29AM   3          SO IF I COULD JUST RESPOND TO A FEW POINTS, AND THEN WE

09:29AM   4     CAN LET THE JURY COME IN.

09:29AM   5          SO PRICE, CUSTOMER FEEDBACK, IT'S HIGHLY RELEVANT.  IT'S

09:30AM   6     IDENTIFIED AS ESSENTIAL TO THE ROLLOUT IN THE MASTER SERVICES

09:30AM   7     AGREEMENT BETWEEN THERANOS AND WALGREENS.  SO I THINK THAT IS

09:30AM   8     RELEVANT.

09:30AM   9          WALGREENS, THE TIMING, NUMEROUS QUESTIONS RELATING TO THE

09:30AM  10     2015 TIME PERIOD, AND THAT'S AN EXACT QUOTE FROM THE

09:30AM  11     GOVERNMENT.  WE HAVE APRIL 2015 TEXT MESSAGES, AND IT'S

09:30AM  12     PAGE 8093.

09:30AM  13          I'M HAPPY TO ANSWER ANY OTHER QUESTIONS THAT THE COURT

09:30AM  14     HAS.

09:30AM  15               THE COURT:  OKAY.  I DON'T HAVE ANY NOW.  THANK YOU.

09:30AM  16          ALL RIGHT.

09:30AM  17               MS. VOLKAR:  I THINK YOUR HONOR HAS HEARD EVERYTHING

09:30AM  18     THAT YOU NEEDED TO HEAR, WHICH IS THAT THE DEFENSE IS NOT

09:30AM  19     ALLEGING THIS EVIDENCE IN SUPPORT FOR HER STATE OF MIND AND

09:30AM  20     WITH RESPECT TO THE 12.2.

09:30AM  21          I THINK THAT SQUARELY PUTS TO BED ANY CONCERNS YOU HAVE

09:30AM  22     ABOUT HAISCHER.  THEY'RE NOT OFFERING THIS EVIDENCE FOR THAT

09:30AM  23     PURPOSE, SO THEREFORE, THERE'S NOTHING TO CHANGE YOUR PRIOR

09:30AM  24     RULINGS.

09:30AM  25               MR. CLEARY:  YOUR HONOR, INTENT TO DEFRAUD IS AN

8351

09:30AM  1    ESSENTIAL ELEMENT OF THE OFFENSES.  MS. HOLMES'S STATE OF MIND,

09:31AM  2    HER UNDERSTANDING, HER KNOWLEDGE AND INTENT WITH RESPECT TO THE

09:31AM  3    STATE OF THE WALGREENS RELATIONSHIP, THAT IS, I THINK, THE CORE

09:31AM  4    RELEVANCY ARGUMENT THAT WE'RE MAKING.

09:31AM  5         SO JUST WHAT SHE UNDERSTOOD THE STATE OF THE WALGREENS

09:31AM  6    RELATIONSHIP TO BE BASED ON THE INFORMATION THAT WAS

09:31AM  7    TRANSMITTED TO HER.

09:31AM  8              THE COURT:  OKAY.  WELL, WE'LL SEE IF THAT COMES

09:31AM  9    INTO EVIDENCE.  I'M SUGGESTING, AS TO THESE SPECIFIC DOCUMENTS,

09:31AM  10   IT HAS NOT.

09:31AM  11        BUT THERE HAVE BEEN TIMES THROUGHOUT THE TRIAL THAT YOUR

09:31AM  12   COLLEAGUES HAVE ADVOCATED THE ADMISSION OF SOME CERTAIN

09:31AM  13   STATEMENT, PIECE OF EVIDENCE FOR THE RELEVANT ISSUE OF STATE OF

09:31AM  14   MIND.  WE KNOW THAT.  THE RECORD SAYS THAT.

09:31AM  15        ALL RIGHT.  THANK YOU.  WE'LL TAKE ABOUT FIVE MINUTES AND

09:31AM  16   THEN WE'LL BRING OUR JURY IN.  THANK YOU.

09:31AM  17              MS. VOLKAR:  THANK YOU, YOUR HONOR.

09:31AM  18              THE CLERK:  COURT IS IN RECESS.

09:31AM  19        (RECESS FROM 9:31 A.M. UNTIL 9:44 A.M.)

09:44AM  20        (JURY IN AT 9:44 A.M.)

09:44AM  21              THE COURT:  ALL RIGHT.  THANK YOU.  GOOD MORNING.

09:44AM  22        WE ARE BACK ON THE RECORD IN THE HOLMES MATTER.  ALL

09:44AM  23   COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT.  OUR JURY IS

09:44AM  24   PRESENT.

09:44AM  25        GOOD MORNING, LADIES AND GENTLEMEN.  IT'S NICE TO SEE YOU

09:44AM 1   ALL AGAIN AFTER OUR BREAK.

09:44AM 2       WE WILL START OUR TESTIMONY IN JUST A MOMENT.  BUT BEFORE

09:44AM 3   WE DO, LET ME ASK YOU THAT QUESTION AGAIN.  DURING OUR BREAK,

09:44AM 4   HAVE ANY OF YOU HAD OCCASION TO DISCUSS, LEARN ABOUT, SEE,

09:44AM 5   WATCH, READ, OR HAVE ANYTHING TO DO WITH THIS CASE OUTSIDE OF

09:44AM 6   WHAT YOU'VE HEARD HERE?  ANYONE HAVE THAT EXPERIENCE?  IF SO,

09:44AM 7   PLEASE RAISE YOUR HAND.

09:44AM 8       I SEE NO HANDS.

09:44AM 9       THANK YOU VERY MUCH.

09:44AM 10      MS. HOLMES, IF YOU WOULD RETURN TO THE STAND, PLEASE.

09:44AM 11      MAKE YOURSELF COMFORTABLE AGAIN, MS. HOLMES.

09:44AM 12      WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR

09:44AM 13  NAME.

09:44AM 14          THE WITNESS:  MY NAME IS ELIZABETH HOLMES.

09:44AM 15          THE COURT:  THANK YOU.  AND YOU MAY REMOVE YOUR MASK

09:44AM 16  IF YOU WISH.

09:44AM 17          THE WITNESS:  THANK YOU.

09:44AM 18          THE COURT:  AND I'LL REMIND YOU, YOU'RE STILL UNDER

09:44AM 19  OATH.

09:44AM 20          JUROR:  THANK YOU.

09:44AM 21          THE COURT:  MR. LEACH.

09:44AM 22          MR. LEACH:  THANK YOU, YOUR HONOR.

09:44AM 23      **(DEFENDANT'S WITNESS, ELIZABETH HOLMES, WAS PREVIOUSLY**

09:44AM 24  **SWORN.)**

09:45AM 25  ///

**CROSS-EXAMINATION (RESUMED)**

09:45AM  2    BY MR. LEACH:

09:45AM  3    Q.   GOOD MORNING.  MS. HOLMES.

09:45AM  4    A.   GOOD MORNING.

09:45AM  5    Q.   THERANOS ANALYZERS WERE NEVER PLACED ON MEDEVACS; IS THAT

09:45AM  6    CORRECT?

09:45AM  7    A.   CORRECT.

09:45AM  8    Q.   AND THERANOS DID NOT ACTUALLY DEPLOY ITS ANALYZER ON A

09:45AM  9    MILITARY HELICOPTER; IS THAT CORRECT?

09:45AM  10   A.   NOT FOR CLINICAL USE, NO.

09:45AM  11   Q.   DO YOU RECALL TELLING THE S.E.C. YOU DID NOT DEPLOY A

09:45AM  12   THERANOS DEVICE ON HELICOPTERS?

09:45AM  13   A.   I RECALL GENERALLY TALKING TO THE S.E.C. ABOUT THAT TOPIC,

09:45AM  14   YES.

09:45AM  15   Q.   DO YOU RECALL TELLING THEM THAT YOU DID NOT DEPLOY A

09:45AM  16   THERANOS DEVICE ON HELICOPTERS?

09:45AM  17   A.   I DON'T REMEMBER THAT, BUT I KNOW THAT I TALKED TO THEM

09:45AM  18   ABOUT IT.

09:46AM  19   Q.   WELL, LET ME DRAW YOUR ATTENTION TO THE RED BINDER.

09:46AM  20        YOU RECALL GIVING TESTIMONY TO THE S.E.C.; CORRECT?

09:46AM  21   A.   I DO.

09:46AM  22   Q.   AND YOU WERE ASKED QUESTIONS OVER THE COURSE OF THREE

09:46AM  23   DAYS; RIGHT?

09:46AM  24   A.   I WAS.

09:46AM  25   Q.   AND YOU TOOK AN OATH BEFORE THE S.E.C.?

09:46AM  1    A.   I DID.

09:46AM  2    Q.   THE SAME OATH THAT YOU'RE TAKING TODAY; CORRECT?

09:46AM  3    A.   YES.

09:46AM  4    Q.   OKAY.  AND IF I COULD DRAW YOUR ATTENTION TO THE RED

09:46AM  5    BINDER, PLEASE, TO THE BATES NUMBER 5566, AND PAGE 84 -- OR

09:46AM  6    844.

09:46AM  7    A.   I'M SORRY.  5586?

09:46AM  8    Q.   5566 DOWN IN THE RIGHT-HAND CORNER.

09:47AM  9    A.   OKAY.

09:47AM  10   Q.   AND IT'S PAGE 844.

09:47AM  11   A.   OKAY.

09:47AM  12        MR. LEACH:  AND, YOUR HONOR, I ASK PERMISSION TO

09:47AM  13   READ LINES 3 THROUGH 11 ON PAGE 844.

09:47AM  14        THE COURT:  YES.

09:47AM  15   BY MR. LEACH:

09:47AM  16   Q.   MS. HOLMES, ISN'T IT CORRECT THAT YOU WERE ASKED THE

09:47AM  17   FOLLOWING QUESTIONS AND GAVE THE FOLLOWING ANSWERS:

09:47AM  18        "QUESTION:  DID YOU TELL WADE MIQUELON AT WALGREENS THAT

09:47AM  19   THERANOS HAD DEPLOYED ITS TSPU ON MILITARY HELICOPTERS?

09:47AM  20        "ANSWER:  NO.

09:47AM  21        "QUESTION:  DID YOU HEAR MR. BALWANI TELL MR. MIQUELON

09:47AM  22   THAT?

09:47AM  23        "ANSWER:  I DID NOT.

09:47AM  24        "QUESTION:  WOULD IT -- WOULD THAT HAVE BEEN TRUE ANY TIME

09:47AM  25   FROM 2010 TO 2014?

09:47AM  1        "ANSWER:  WE DID NOT DEPLOY ON HELICOPTERS.

09:47AM  2        "QUESTION:  YOU DID NOT DEPLOY ON HELICOPTERS EVER?

09:47AM  3        "ANSWER:  CORRECT."

09:47AM  4        DID I READ THAT CORRECTLY, MS. HOLMES?

09:48AM  5   A.   YOU DID.

09:48AM  6   Q.   OKAY.  AND THERANOS ANALYZERS WERE NEVER DEPLOYED ON THE

09:48AM  7   BATTLEFIELD; CORRECT?

09:48AM  8   A.   CORRECT.

09:48AM  9   Q.   THERANOS DID NOT ACTUALLY SEND ONE OF ITS ANALYZERS TO

09:48AM 10   AFGHANISTAN; IS THAT CORRECT?

09:48AM 11   A.   THAT'S RIGHT.

09:48AM 12   Q.   OKAY.  AND THERANOS DID NOT ACTUALLY SEND ONE OF ITS

09:48AM 13   ANALYZERS TO THE MIDDLE EAST; IS THAT CORRECT?

09:48AM 14   A.   CORRECT.

09:48AM 15   Q.   AND THERANOS DID NOT ACTUALLY SEND ONE OF ITS ANALYZERS TO

09:48AM 16   IRAQ; IS THAT CORRECT?

09:48AM 17   A.   WE DID NOT.

09:48AM 18   Q.   OKAY.  THERANOS ANALYZERS WERE NEVER USED FOR CLINICAL

09:48AM 19   CARE FOR SOLDIERS ABROAD; CORRECT?

09:48AM 20   A.   CORRECT.

09:48AM 21   Q.   NOW, IN THE TIME PERIOD 2013 TO 2015, YOU WERE AWARE THAT

09:48AM 22   THERANOS ANALYZERS HAD NEVER BEEN PLACED ON MEDEVACS; CORRECT?

09:48AM 23   A.   I WAS.

09:48AM 24   Q.   AND NO ONE EVER TOLD YOU THAT THERANOS ANALYZERS HAD BEEN

09:48AM 25   PLACED ON MEDEVACS?

09:48AM   1      A.   AGAIN, I THINK THERE WAS WORK DONE FOR TRANSPORT OF THE

09:49AM   2      DEVICES ON MEDEVACS, BUT THEY WERE NOT USED FOR CLINICAL CARE

09:49AM   3      ON MEDEVACS.

09:49AM   4      Q.   NO ONE EVER TOLD YOU THAT THERANOS ANALYZERS HAD ACTUALLY

09:49AM   5      BEEN PLACED ON MEDEVACS; IS THAT CORRECT?

09:49AM   6      A.   FOR CLINICAL CARE, CORRECT.

09:49AM   7      Q.   AND SUNNY BALWANI NEVER TOLD YOU THAT THERANOS ANALYZERS

09:49AM   8      HAD BEEN PLACED ON MEDEVACS; IS THAT CORRECT?

09:49AM   9      A.   AGAIN, NO FOR CLINICAL CARE.

09:49AM   10     Q.   IN THE TIME 2013 TO 2015, YOU WERE AWARE THAT THERANOS DID

09:49AM   11     NOT ACTUALLY DEPLOY ITS ANALYZER ON A HELICOPTER; CORRECT?

09:49AM   12     A.   CORRECT, FOR CLINICAL CARE.

09:49AM   13     Q.   WELL, YOU DIDN'T QUALIFY YOUR ANSWERS WITH "FOR CLINICAL

09:49AM   14     CARE" TO THE S.E.C.; ISN'T THAT RIGHT, MS. HOLMES?

09:49AM   15     A.   I THINK RIGHT AFTER THIS SECTION YOU READ, IT SAYS, "IS

09:49AM   16     THAT RIGHT"?

09:49AM   17     Q.   I'M NOT ASKING YOU TO READ FROM THE S.E.C. TESTIMONY.

09:49AM   18     A.   OH, I'M SORRY.

09:50AM   19     Q.   I AM ASKING YOU ABOUT THE QUESTIONS YOU WERE ASKED, AND

09:50AM   20     YOU SAID, "WE DID NOT DEPLOY ON HELICOPTERS."  RIGHT?

09:50AM   21     A.   I SAID CORRECT.  AND THEN, AM I ALLOWED TO READ WHAT I

09:50AM   22     SAID, OR NO?

09:50AM   23     Q.   IF YOU COULD PLEASE FOCUS ON MY QUESTION.

09:50AM   24     A.   OKAY.

09:50AM   25     Q.   AND MY QUESTION IS REALLY, NO ONE EVER TOLD YOU THAT THE

09:50AM   1    DEVICE HAD ACTUALLY BEEN DEPLOYED ON A MEDEVAC HELICOPTER; IS

09:50AM   2    THAT RIGHT?

09:50AM   3    A.   FOR CLINICAL CARE.

09:50AM   4    Q.   AND NO ONE EVER TOLD YOU -- AND SUNNY BALWANI HAD NEVER

09:50AM   5    TOLD YOU THAT THE THERANOS ANALYZER HAD BEEN DEPLOYED ON A

09:50AM   6    HELICOPTER FOR CLINICAL CARE?

09:50AM   7    A.   CORRECT.

09:50AM   8    Q.   AND IN THE TIME PERIOD OF 2013 TO 2015, YOU WERE AWARE

09:50AM   9    THAT THE THERANOS DEVICE HAD NEVER BEEN USED ON THE

09:50AM   10   BATTLEFIELD?

09:50AM   11   A.   I WAS.

09:50AM   12   Q.   AND NO ONE EVER TOLD YOU THAT THE THERANOS DEVICE HAD

09:50AM   13   ACTUALLY BEEN USED ON THE BATTLEFIELD?

09:50AM   14   A.   CORRECT.

09:50AM   15   Q.   AND SUNNY BALWANI NEVER TOLD YOU THAT THE THERANOS DEVICE

09:50AM   16   HAD ACTUALLY BEEN USED ON THE BATTLEFIELD; CORRECT?

09:50AM   17   A.   CORRECT.

09:51AM   18   Q.   AND IN THE TIME PERIOD OF 2013 TO 2015, YOU WERE AWARE

09:51AM   19   THAT THERANOS HAD NOT ACTUALLY SENT ONE OF ITS ANALYZERS TO

09:51AM   20   AFGHANISTAN; CORRECT?

09:51AM   21   A.   I WAS.

09:51AM   22   Q.   OKAY.  NO ONE EVER TOLD YOU THAT THE ANALYZER HAD ACTUALLY

09:51AM   23   BEEN SENT TO AFGHANISTAN?

09:51AM   24   A.   CORRECT.

09:51AM   25   Q.   AND SUNNY BALWANI NEVER TOLD YOU THAT THE DEVICE HAD

09:51AM  1    ACTUALLY BEEN SENT TO AFGHANISTAN?

09:51AM  2    A.   CORRECT.

09:51AM  3    Q.   AND IN THE TIME PERIOD 2013 TO 2015, YOU WERE AWARE THAT

09:51AM  4    THERANOS DID NOT ACTUALLY SEND ONE OF ITS DEVICES TO THE MIDDLE

09:51AM  5    EAST; CORRECT?

09:51AM  6    A.   CORRECT.

09:51AM  7    Q.   NO ONE EVER TOLD YOU THAT THE DEVICE HAD BEEN SENT TO THE

09:51AM  8    MIDDLE EAST; CORRECT?

09:51AM  9    A.   THAT'S RIGHT.

09:51AM  10   Q.   AND SUNNY BALWANI NEVER TOLD YOU THAT THE DEVICE HAD BEEN

09:51AM  11   SENT TO THE MIDDLE EAST; CORRECT?

09:51AM  12   A.   THAT'S RIGHT.

09:51AM  13   Q.   AND YOU WERE ALSO AWARE THAT THE DEVICE HAD NEVER BEEN

09:51AM  14   SENT TO IRAQ; CORRECT?

09:51AM  15   A.   YES.

09:51AM  16   Q.   NO ONE EVER TOLD YOU THAT THE DEVICE HAD ACTUALLY BEEN

09:52AM  17   SENT TO IRAQ?

09:52AM  18   A.   THAT'S RIGHT.

09:52AM  19   Q.   AND SUNNY BALWANI HAD NEVER ACTUALLY TOLD YOU THAT THE

09:52AM  20   DEVICE HAD BEEN SENT TO IRAQ?

09:52AM  21   A.   CORRECT.

09:52AM  22   Q.   AND IN THE TIME PERIOD 2013 TO 2015, YOU WERE AWARE THAT

09:52AM  23   THE THERANOS ANALYZERS WERE NEVER USED FOR CLINICAL CARE OF

09:52AM  24   SOLDIERS ABROAD; CORRECT?

09:52AM  25   A.   I WAS.

09:52AM   1    Q.   NO ONE EVER TOLD YOU THAT THE DEVICE WAS BEING USED FOR

09:52AM   2    CLINICAL CARE FOR SOLDIERS ABROAD; CORRECT?

09:52AM   3    A.   CORRECT.

09:52AM   4    Q.   AND SUNNY BALWANI NEVER TOLD YOU THAT THAT HAD HAPPENED,

09:52AM   5    THAT IT HAD BEEN USED FOR CLINICAL CARE FOR SOLDIERS ABROAD?

09:52AM   6    A.   THAT'S RIGHT.

09:52AM   7    Q.   OKAY.  YOU HOPED ONE DAY THAT THE MINILAB MIGHT BE USED ON

09:52AM   8    A MEDEVAC HELICOPTER TO SAVE LIVES ABROAD; CORRECT?

09:52AM   9    A.   I DID.

09:52AM  10    Q.   YOU WERE SPENDING MONEY TO TRY TO MAKE THAT HAPPEN;

09:52AM  11    CORRECT?

09:52AM  12    A.   YES.

09:52AM  13    Q.   AND THERE WAS SOME LEVEL OF INTEREST FROM THE DEPARTMENT

09:52AM  14    OF DEFENSE?

09:52AM  15    A.   YES.

09:52AM  16    Q.   THERANOS HAD AN AGREEMENT TO DO SIDE-BY-SIDE TESTING WITH

09:53AM  17    CENTCOM WITH -- HAD AN AGREEMENT WITH CENTCOM TO DO

09:53AM  18    SIDE-BY-SIDE TESTING; CORRECT?

09:53AM  19    A.   WE DID.

09:53AM  20    Q.   AND IF THAT ACTUALLY HAPPENED AND WENT WELL, YOUR HOPE WAS

09:53AM  21    SOME DAY IT MIGHT BE USED IN AFGHANISTAN TO SAVE LIVES; IS THAT

09:53AM  22    CORRECT?

09:53AM  23    A.   YES.

09:53AM  24    Q.   BUT THAT SIDE-BY-SIDE TESTING NEVER HAPPENED; CORRECT?

09:53AM  25    A.   THAT'S RIGHT.

09:53AM   1    Q.   AND WITH RESPECT TO AFRICOM, AM I RIGHT THAT AFRICOM TOOK

09:53AM   2    ONE OR TWO DEVICES TO AFRICA TO LOOK AT THERMAL STABILITY AND

09:53AM   3    THE USE FOR THE OPERATOR, BUT AGAIN, THEY WEREN'T USED FOR

09:53AM   4    PATIENT TESTING AND DIAGNOSIS?

09:53AM   5    A.   THAT'S RIGHT.

09:53AM   6    Q.   AND YOU HAVE NO KNOWLEDGE OF THERANOS RECEIVING ANY

09:53AM   7    REVENUE FROM AFRICOM?

09:53AM   8    A.   I DON'T THINK SO.

09:53AM   9    Q.   AND WITH RESPECT TO SOCOM, YOU SENT TWO DEVICES TO SOCOM

09:53AM  10    IN THE UNITED STATES; CORRECT?

09:54AM  11    A.   WE DID.

09:54AM  12    Q.   BUT YOU DON'T THINK THAT THEY ACTUALLY USED THEM IN

09:54AM  13    DEPLOYMENT; CORRECT?

09:54AM  14    A.   I DON'T KNOW WHAT THEY DID WITH THEM.

09:54AM  15    Q.   OKAY.  BUT YOUR BELIEF -- YOU DON'T THINK THAT THEY

09:54AM  16    ACTUALLY USED THEM IN DEPLOYMENT; CORRECT?

09:54AM  17    A.   AGAIN, I DON'T KNOW WHAT THEY DID WITH THEM.  IF I HAD TO

09:54AM  18    GUESS, I WOULD GUESS THAT THEY DIDN'T.

09:54AM  19    Q.   I DON'T WANT YOU TO GUESS.

09:54AM  20         BUT YOU WERE ASKED THIS QUESTION BEFORE, WEREN'T YOU,

09:54AM  21    MS. HOLMES?

09:54AM  22    A.   I PROBABLY WAS.

09:54AM  23    Q.   OKAY.  WELL, LET'S LOOK BACK AT YOUR TESTIMONY BEFORE THE

09:54AM  24    S.E.C.

09:54AM  25    A.   OKAY.

09:54AM   1     Q.   AND I DRAW YOUR ATTENTION TO PAGE 5519.

09:54AM   2     A.   OKAY.

09:54AM   3     Q.   DO YOU HAVE THAT IN FRONT OF YOU?

09:54AM   4     A.   I DO.

09:54AM   5              MR. LEACH:  YOUR HONOR, I SEEK PERMISSION TO READ

09:54AM   6     FROM PAGE 656, LINE 24 TO LINE -- PAGE 657, LINE 3.

09:55AM   7              THE COURT:  YES.

09:55AM   8     BY MR. LEACH:

09:55AM   9     Q.   MS. HOLMES, YOU WERE ASKED THE FOLLOWING QUESTION AND GAVE

09:55AM  10     THE FOLLOWING ANSWER:

09:55AM  11          "QUESTION:  WERE ANY OF THERANOS MANUFACTURED DEVICES EVER

09:55AM  12     DEPLOYED BY SOCOM?

09:55AM  13          "ANSWER:  MY MEMORY IS THAT WE SENT THEM TWO OF THEM, BUT

09:55AM  14     I DON'T THINK THEY ACTUALLY USED THEM IN ANY DEPLOYMENT."

09:55AM  15          DID I READ THAT CORRECTLY?

09:55AM  16     A.   YOU DID.

09:55AM  17     Q.   OKAY.  AND YOU'RE NOT AWARE OF ANY REVENUE FROM SOCOM;

09:55AM  18     CORRECT?

09:55AM  19     A.   I'M NOT.

09:55AM  20     Q.   YOU'RE NOT AWARE OF THERANOS EARNING ANY MONEY FROM ITS

09:55AM  21     RELATIONSHIP WITH SOCOM?

09:55AM  22     A.   I DON'T THINK SO.

09:55AM  23     Q.   YOU ARE AWARE THAT THERANOS HAD A CONTRACT RELATING TO A

09:55AM  24     BURN STUDY RUN BY DR. CHUNG; CORRECT?

09:56AM  25     A.   WE DID.

09:56AM  1    Q.   AND THAT WAS HERE IN THE UNITED STATES; CORRECT?

09:56AM  2    A.   YES.

09:56AM  3    Q.   AND THAT CONTRACT AMOUNTED TO SOMEWHERE IN THE

09:56AM  4    NEIGHBORHOOD OF $200,000?

09:56AM  5    A.   SOMETHING LIKE THAT.

09:56AM  6    Q.   OKAY.  AND YOU ADMIT THAT WITH RESPECT TO THE DOD, ASIDE

09:56AM  7    FROM THAT BURN STUDY WITH THE INSTITUTE FOR SURGICAL RESEARCH,

09:56AM  8    THERANOS DID NOT FULFILL ANY OF THE CONTRACT OPPORTUNITIES THAT

09:56AM  9    IT HAD?

09:56AM  10   A.   I THINK WE FULFILLED THE AFRICOM, AND I THINK WE SUBMITTED

09:56AM  11   AN INVOICE, BUT I DON'T THINK WE DID ANY WORK PAST THAT.

09:56AM  12   Q.   BUT YOU DIDN'T EARN ANY MONEY FROM AFRICOM; CORRECT?

09:56AM  13   A.   I DON'T THINK SO.

09:56AM  14   Q.   OKAY.  AND IN THE END, YOU WEREN'T ABLE TO DEPLOY THERANOS

09:56AM  15   SERVICES WITH THE DOD AT THE END OF THE DAY?

09:56AM  16   A.   WE DID NOT.

09:56AM  17   Q.   AND AM I RIGHT THAT YOUR TESTIMONY IS THAT YOU NEVER TOLD

09:56AM  18   INVESTORS OR POTENTIAL INVESTORS IN 2013 OR 2014 THAT ANALYZERS

09:57AM  19   THAT THERANOS MANUFACTURED WERE DEPLOYED IN THE BATTLEFIELD?

09:57AM  20   A.   I DON'T THINK I DID.

09:57AM  21   Q.   YOU NEVER TOLD INVESTORS OR POTENTIAL INVESTORS THAT?

09:57AM  22   A.   I DON'T THINK I DID.

09:57AM  23   Q.   OKAY.  AND YOU WOULDN'T HAVE TOLD POTENTIAL INVESTORS THAT

09:57AM  24   BECAUSE YOU KNEW IT WASN'T TRUE?

09:57AM  25   A.   YES.

09:57AM  1    Q.   AND YOUR TESTIMONY IS YOU NEVER TOLD INVESTORS OR

09:57AM  2    POTENTIAL INVESTORS IN 2013 OR 2014 THAT ANALYZERS THAT

09:57AM  3    THERANOS MANUFACTURED WERE DEPLOYED IN AFGHANISTAN; CORRECT?

09:57AM  4    A.   CORRECT.

09:57AM  5    Q.   YOU NEVER TOLD INVESTORS OR POTENTIAL INVESTORS THAT?

09:57AM  6    A.   CORRECT.

09:57AM  7    Q.   AND YOUR TESTIMONY IS YOU DID NOT TELL STEVE BURD,

09:57AM  8    SAFEWAY'S CEO, THAT THERANOS HAD DEPLOYED ITS TSPU ON THE

09:57AM  9    BATTLEFIELD?

09:57AM  10   A.   CORRECT.

09:57AM  11   Q.   AND YOU NEVER HEARD SUNNY BALWANI SAY SOMETHING LIKE THAT

09:58AM  12   TO MR. BURD; CORRECT?

09:58AM  13   A.   I DID NOT.

09:58AM  14   Q.   AND THAT STATEMENT WOULD NOT HAVE BEEN TRUE IN 2011;

09:58AM  15   CORRECT?

09:58AM  16   A.   IT WAS NOT.

09:58AM  17   Q.   IT WOULDN'T HAVE BEEN TRUE IN 2012 OR 2013 OR 2014;

09:58AM  18   CORRECT?

09:58AM  19   A.   THAT'S RIGHT.

09:58AM  20   Q.   OKAY.  NOW, MR. DOWNEY ASKED YOU ON DIRECT EXAMINATION IF

09:58AM  21   YOU TOLD ANYONE THAT THERANOS DEVICES WERE USED FOR CLINICAL

09:58AM  22   CARE ON MEDEVACS.  HE ASKED YOU IF YOU TOLD ANYBODY THAT, AND I

09:58AM  23   THINK YOUR ANSWER WAS "I DON'T THINK I DID;" CORRECT?

09:58AM  24   A.   YES.

09:58AM  25   Q.   YOU WERE HERE WHEN MR. BURD TESTIFIED; CORRECT?

09:58AM  1    A.   I WAS.

09:58AM  2    Q.   AND YOU RECALL STEVE BURD TESTIFYING, "SHE TOLD ME THAT

09:58AM  3    THEY HAD BEEN DOING SOME WORK FOR THE DEPARTMENT OF DEFENSE,

09:58AM  4    THAT HER DEVICE WAS IN MEDEVAC UNITS AROUND THE WORLD IN

09:58AM  5    PLACES, YOU KNOW, A LOT OF AMERICANS DIDN'T KNOW WHERE WE

09:58AM  6    WERE."

09:59AM  7         YOU HEARD HIM TESTIFY TO THAT; CORRECT?

09:59AM  8    A.   I DID.

09:59AM  9    Q.   AND YOU WERE ALSO HERE WHEN LISA PETERSON TESTIFIED;

09:59AM  10   CORRECT?

09:59AM  11   A.   I WAS.

09:59AM  12   Q.   AND YOU RECALL MS. PETERSON TESTIFYING THAT YOU SAID THAT

09:59AM  13   THERANOS WAS USING THEM ON MILITARY HELICOPTERS.  YOU WERE HERE

09:59AM  14   WHEN SHE SAID THAT; CORRECT?

09:59AM  15   A.   I WAS.

09:59AM  16   Q.   AND YOU WERE HERE WHEN BRIAN GROSSMAN TESTIFIED; CORRECT?

09:59AM  17   A.   YES.

09:59AM  18   Q.   AND YOU RECALL MR. GROSSMAN SAYING THAT MR. BALWANI AND

09:59AM  19   YOU TOLD PFM THAT THE TECHNOLOGY HAD BEEN USED IN THE

09:59AM  20   BATTLEFIELD ON MEDEVACS?  YOU WERE HERE WHEN MR. GROSSMAN

09:59AM  21   TESTIFIED TO THAT?

09:59AM  22   A.   I WAS.

09:59AM  23   Q.   AND YOU WERE ALSO HERE WHEN ROGER PARLOFF TESTIFIED;

09:59AM  24   CORRECT?

09:59AM  25   A.   I WAS.

09:59AM   1    Q.   AND YOU RECALL ROGER PARLOFF TESTIFYING THAT THE DEVICE

09:59AM   2    HAD BEEN USED IN THE MILITARY, BY THE MILITARY IN AFGHANISTAN;

09:59AM   3    CORRECT?  YOU WERE HERE WHEN HE SAID THAT?

10:00AM   4    A.   I WAS HERE DURING ROGER'S TESTIMONY, YES.

10:00AM   5    Q.   OKAY.  YOU RECALL HIM TESTIFYING THAT HE REMEMBERS YOU

10:00AM   6    TELLING HIM THAT THE DEVICE HAD BEEN USED BY THE MILITARY IN

10:00AM   7    AFGHANISTAN?

10:00AM   8    A.   MY MEMORY OF WHAT HE SAID IS A LITTLE BIT DIFFERENT THAN

10:00AM   9    THAT.

10:00AM   10   Q.   YOU WERE HERE WHEN HE WAS TALKING ABOUT STATEMENTS THAT

10:00AM   11   YOU MADE ABOUT THE MILITARY; CORRECT?

10:00AM   12   A.   YES.

10:00AM   13   Q.   OKAY.  AND YOU WERE ALSO HERE WHEN BRIAN TOLBERT

10:00AM   14   TESTIFIED; CORRECT?

10:00AM   15   A.   I WAS.

10:00AM   16   Q.   AND YOU RECALL THE RECORDING THAT MR. TOLBERT MADE OF THE

10:00AM   17   CALL THAT YOU HAD WITH SOME POTENTIAL INVESTORS AT THE END OF

10:00AM   18   2013; CORRECT?

10:00AM   19   A.   I DO.

10:00AM   20   Q.   AND YOU WERE NOT AWARE THAT MR. TOLBERT WAS RECORDING YOU

10:00AM   21   AT THE TIME; CORRECT?

10:00AM   22   A.   I WASN'T.

10:00AM   23   Q.   OKAY.  SO YOU WERE HERE FOR STEVE BURD, LISA PETERSON, AND

10:00AM   24   BRIAN GROSSMAN AND BRIAN TOLBERT, BUT YOUR TESTIMONY IS THAT

10:00AM   25   YOU DON'T THINK YOU TOLD ANYONE THAT THERANOS DEVICES WERE USED

| | | |
|---|---|---|
| 10:00AM | 1 | FOR CLINICAL CARE ON MEDEVACS; RIGHT? |
| 10:01AM | 2 | A.   AGAIN, I DON'T THINK I DID. |
| 10:01AM | 3 | Q.   AND YOU UNDERSTOOD AT THE TIME THAT IT WOULD BE WRONG TO |
| 10:01AM | 4 | TELL AN INVESTOR THAT A DEVICE WAS USED FOR CLINICAL CARE ON |
| 10:01AM | 5 | MEDEVACS? |
| 10:01AM | 6 | A.   YES. |
| 10:01AM | 7 | Q.   THAT WOULD NOT BE TRUE? |
| 10:01AM | 8 | A.   CORRECT. |
| 10:01AM | 9 | Q.   AND YOU UNDERSTOOD THAT AT THE TIME? |
| 10:01AM | 10 | A.   YES. |
| 10:01AM | 11 | Q.   OKAY.  YOU ALSO SPOKE TO AN INVESTOR NAMED CRAIG HALL; |
| 10:01AM | 12 | CORRECT? |
| 10:01AM | 13 | A.   I DID. |
| 10:01AM | 14 | Q.   OKAY.  AND YOU SPOKE TO CRAIG HALL AROUND THE TIME OF THE |
| 10:01AM | 15 | CALL WITH MR. TOLBERT THAT THE JURY HAS LISTENED TO; CORRECT? |
| 10:01AM | 16 | A.   YES. |
| 10:01AM | 17 | Q.   AND DO YOU DISPUTE TELLING CRAIG HALL THAT THERANOS |
| 10:01AM | 18 | DEVICES WERE ON MEDEVAC HELICOPTERS? |
| 10:01AM | 19 | A.   I DO. |
| 10:01AM | 20 | Q.   OKAY.  LET ME DRAW YOUR ATTENTION, PLEASE, TO -- STRIKE |
| 10:01AM | 21 | THAT. |
| 10:01AM | 22 | YOUR TESTIMONY IS THAT SIMPLY DIDN'T HAPPEN, YOU WOULD |
| 10:01AM | 23 | NEVER TELL AN INVESTOR THAT? |
| 10:01AM | 24 | A.   MY TESTIMONY IS THAT I DON'T THINK I SAID THAT.  I'M HAPPY |
| 10:02AM | 25 | TO GO INTO WHAT I THINK I SAID IF YOU WOULD LIKE ME TO DO THAT. |

HOLMES CROSS BY MR. LEACH (RES.)                                8367

10:02AM   1    Q.   I JUST WANT TO ESTABLISH THAT YOU UNDERSTOOD AT THE TIME

10:02AM   2    THAT IT WOULD BE WRONG TO TELL SOMEBODY THAT THE DEVICE WAS

10:02AM   3    ACTUALLY ON A MEDEVAC HELICOPTER.

10:02AM   4    A.   YES, OUR DEVICES WERE NOT BEING USED ON MEDEVAC

10:02AM   5    HELICOPTERS.

10:02AM   6    Q.   OKAY.  AM I RIGHT THAT FROM TIME TO TIME YOU WERE KEPT

10:02AM   7    APPRISED OF THE CAPABILITIES OF THE MINILAB?

10:02AM   8    A.   I WAS.

10:02AM   9    Q.   WE SAW A LOT OF PHOTOS AND VIDEOS DURING YOUR DIRECT

10:02AM  10    EXAMINATION OF THE INTERIOR OF THE DEVICE, OF THE MINILAB.

10:02AM  11         AND THOSE WEREN'T THINGS THAT YOU'VE LEARNED ABOUT AS A

10:02AM  12    RESULT OF THIS CASE; CORRECT?

10:02AM  13    A.   NO.

10:02AM  14    Q.   THOSE ARE THINGS THAT YOU LIVED AND BREATHED DURING YOUR

10:02AM  15    TIME OF WORK AT THERANOS?

10:02AM  16    A.   YES.

10:02AM  17    Q.   AND YOU UNDERSTOOD WHAT THE MINILAB IN 2010 WAS CAPABLE

10:02AM  18    OF, WHAT IT WAS CAPABLE OF IN 2011; IS THAT FAIR?

10:03AM  19    A.   I DID.

10:03AM  20    Q.   AND YOU UNDERSTOOD WHAT THE MINILAB WAS CAPABLE OF IN 2013

10:03AM  21    AND 2014?

10:03AM  22    A.   YES.

10:03AM  23    Q.   AND THOSE WEREN'T THINGS THAT WERE HIDDEN FROM YOU DURING

10:03AM  24    YOUR TIME AT THERANOS?

10:03AM  25    A.   NO.

10:03AM   1    Q.   YOU UNDERSTOOD THAT THE MINILAB WAS NEVER USED FOR PATIENT

10:03AM   2    TESTING?

10:03AM   3    A.   I DID.

10:03AM   4    Q.   AND YOU NEVER TOLD AN INVESTOR THAT THE MINILAB HAD

10:03AM   5    ACTUALLY BEEN USED FOR PATIENT TESTING?

10:03AM   6    A.   CORRECT.

10:03AM   7    Q.   BECAUSE YOU UNDERSTOOD THAT THAT WOULD BE NOT CORRECT?

10:03AM   8    A.   YES.

10:03AM   9    Q.   AND FOR THE 2010 TIME PERIOD, DO YOU KNOW HOW MANY TESTS

10:03AM   10   WERE ACTUALLY PUT ON THE MINILAB?

10:03AM   11   A.   I DON'T.

10:03AM   12   Q.   AM I RIGHT THAT YOU WERE FOCUSSED ON DEMONSTRATING THE

10:03AM   13   ABILITY TO ADD ADDITIONAL DETECTION SYSTEMS AND ESSENTIALLY A

10:03AM   14   PROOF OF CONCEPT FOR THE MINILAB IN THIS 2010 TIME PERIOD?

10:03AM   15   A.   YES.

10:04AM   16   Q.   YOU WERE ALSO FAMILIAR WITH THE EDISON 3.5 DEVICE IN THE

10:04AM   17   2013 TIME PERIOD; CORRECT?

10:04AM   18   A.   I WAS.

10:04AM   19   Q.   AND YOU WERE FAMILIAR WITH THE EDISON 3.5 IN THE 2014 TIME

10:04AM   20   PERIOD?

10:04AM   21   A.   YES.

10:04AM   22   Q.   AND THE SAME WOULD BE TRUE FOR THE 2015 TIME PERIOD?

10:04AM   23   A.   YES.

10:04AM   24   Q.   YOU KNEW WHAT THE EDISON 3.5 COULD DO AND WHAT IT COULDN'T

10:04AM   25   DO; CORRECT?

10:04AM  1    A.   I DID.

10:04AM  2    Q.   AND YOU UNDERSTOOD THAT THE 3.5 DEVICE WAS --

10:04AM  3         (CELL PHONE RINGING.)

10:04AM  4              THE COURT:  I'M SORRY.  I BEG YOUR PARDON.

10:04AM  5         WHOEVER HAS THAT DEVICE, PLEASE LEAVE THE COURTROOM.

10:04AM  6    PLEASE LEAVE THE COURTROOM NOW.

10:05AM  7         (PAUSE IN PROCEEDINGS.)

10:05AM  8              THE COURT:  ALL RIGHT.  THANK YOU.  I APOLOGIZE,

10:05AM  9    MR. LEACH.

10:05AM 10              MR. LEACH:  NO.  THANK YOU, YOUR HONOR.

10:05AM 11    Q.   SORRY FOR THAT INTERRUPTION, MS. HOLMES.

10:05AM 12    A.   NO.

10:05AM 13    Q.   YOU WERE FAMILIAR WITH WHAT THE 3.5 DEVICE COULD DO AND

10:05AM 14    COULDN'T DO IN THE 2015 TIME PERIOD?

10:05AM 15    A.   I WAS.

10:05AM 16    Q.   OKAY.  YOU KNEW THAT IT WAS LIMITED TO IMMUNOASSAYS?

10:05AM 17    A.   THAT'S WHAT WE WERE DOING WITH IT, YES.

10:05AM 18    Q.   OKAY.  AND YOU NEVER TOLD ANYONE THAT THE EDISON 3.5 DID

10:05AM 19    SOMETHING OTHER THAN IMMUNOASSAYS; CORRECT?

10:05AM 20    A.   IT DEPENDS ON THE CONTEXT.

10:05AM 21    Q.   WHY DOES THAT DEPEND ON THE CONTEXT?

10:05AM 22    A.   BECAUSE THE EDISON 3.5 WAS CAPABLE OF DOING GENERAL

10:05AM 23    CHEMISTRY AND ASSAYS, FOR EXAMPLE, BUT WE WEREN'T USING IT THAT

10:05AM 24    WAY IN THE CLINICAL LAB.

10:06AM 25    Q.   OKAY.  BUT YOU NEVER TOLD AN INVESTOR THAT THERANOS WAS

10:06AM  1     ACTUALLY USING THE 3.5 DEVICE FOR SOMETHING OTHER THAN

10:06AM  2     IMMUNOASSAYS?

10:06AM  3     A.   NO.

10:06AM  4     Q.   BECAUSE THAT WOULD NOT BE A CORRECT STATEMENT; RIGHT?

10:06AM  5     A.   YOU MEAN IN THE CLINICAL LAB?

10:06AM  6     Q.   CORRECT.

10:06AM  7     A.   CORRECT.

10:06AM  8     Q.   AND IT WOULD BE INCORRECT TO TELL SOMEBODY IN 2013 OR 2014

10:06AM  9     OR 2015 THAT THE EDISON 3.5 WAS BEING USED TO DO ALL OF

10:06AM 10     THERANOS'S TESTING?

10:06AM 11     A.   IN THE CLINICAL LAB?

10:06AM 12     Q.   YES.

10:06AM 13     A.   CORRECT, YEAH.

10:06AM 14     Q.   THE CLINICAL LAB IS WHERE YOU'RE ACTUALLY PERFORMING THE

10:06AM 15     SERVICE FOR PATIENTS; CORRECT?

10:06AM 16     A.   THAT'S RIGHT.

10:06AM 17     Q.   YOU CAN'T PERFORM THAT SERVICE ANY OTHER PLACE BUT THE

10:06AM 18     CLINICAL LAB; IS THAT CORRECT?

10:06AM 19     A.   EXACTLY.

10:06AM 20     Q.   OKAY.  IS IT FAIR TO SAY THAT YOU HAD A GENERAL SENSE OF

10:06AM 21     WHAT ASSAYS WERE BEING BROUGHT UP IN THE CLINICAL LAB FROM TIME

10:06AM 22     TO TIME?

10:06AM 23     A.   I DID.

10:06AM 24     Q.   LET'S EXPLORE THAT.  YOU SHOULD HAVE TWO WHITE BINDERS UP

10:06AM 25     THERE, VOLUME 3 AND VOLUME 4.

10:07AM  1    A.   OKAY.

10:07AM  2    Q.   IF YOU COULD PLEASE LOOK IN VOLUME 3 FOR EXHIBIT 5126.

10:07AM  3    A.   YES.  OKAY.

10:07AM  4    Q.   DO YOU HAVE THAT IN FRONT OF YOU?

10:07AM  5    A.   I DO.

10:07AM  6    Q.   GREAT.  DOES EXHIBIT 5126, DO YOU SEE AT THE TOP THERE'S

10:07AM  7    AN EMAIL MESSAGE FROM DANIEL YOUNG?

10:07AM  8    A.   I DO.

10:07AM  9    Q.   AND DO YOU SEE THE DATE OCTOBER 22ND, 2013?

10:07AM  10   A.   YES.

10:07AM  11   Q.   AND DO YOU SEE YOUR NAME IN THE TO LINE?

10:07AM  12   A.   I DO.

10:07AM  13   Q.   AND THE SUBJECT HERE IS CLIA UPDATES?

10:07AM  14   A.   YES.

10:07AM  15   Q.   OKAY.

10:07AM  16        YOUR HONOR, I OFFER EXHIBIT 5126.

10:07AM  17            MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

10:07AM  18            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:07AM  19        (GOVERNMENT'S EXHIBIT 5126 WAS RECEIVED IN EVIDENCE.)

10:08AM  20   BY MR. LEACH:

10:08AM  21   Q.   SO, MS. HOLMES, WE'RE LOOKING AT AN EMAIL FROM OCTOBER OF

10:08AM  22   2013.  THIS IS ABOUT A MONTH AFTER THERANOS ISSUED A PRESS

10:08AM  23   RELEASE ANNOUNCING THE WALGREENS PARTNERSHIP; IS THAT CORRECT?

10:08AM  24   A.   YES.

10:08AM  25   Q.   OKAY.  AND IF I COULD DRAW YOUR ATTENTION DOWN TO THE

10:08AM   1    BOTTOM OF THE PAGE, DO YOU SEE THERE'S AN EMAIL FROM

10:08AM   2    DANIEL YOUNG THAT CONTINUES ON TO PAGE 2?

10:08AM   3    A.   I DO.

10:08AM   4    Q.   AND IF WE COULD GO TO PAGE 2, PLEASE.

10:08AM   5         DO YOU SEE WHERE DR. YOUNG WRITES, "I WANTED TO SEND A FEW

10:08AM   6    UPDATES RELATED TO CLIA OPERATIONS TO MAKE SURE YOU ARE

10:08AM   7    UPDATED"?

10:08AM   8    A.   I DO.

10:08AM   9    Q.   OKAY.  AND FURTHER DOWN IN PARAGRAPH E, DO YOU SEE WHERE

10:08AM  10    HE WROTE, "WE DISCUSSED QC NEEDS FOR THE NEW THERANOS LDT'S."

10:09AM  11         DO YOU SEE THAT LINE?

10:09AM  12    A.   I DO.

10:09AM  13    Q.   AND LDT STANDS FOR LAB DEVELOPED TEST?

10:09AM  14    A.   YES.

10:09AM  15    Q.   AND A LAB DEVELOPED TEST IS SOMETHING THAT THERANOS

10:09AM  16    CREATES IN ITS OWN LAB AND USES EITHER ON ITS EDISON DEVICE OR

10:09AM  17    A MODIFIED THIRD PARTY DEVICE; IS THAT CORRECT?

10:09AM  18    A.   THAT'S WHAT WE DID, YES.

10:09AM  19    Q.   OKAY.  AND AN LDT IS ANOTHER WAY OF SAYING THAT IT'S NOT

10:09AM  20    APPROVED BY THE FDA YET; CORRECT?

10:09AM  21    A.   CORRECT.

10:09AM  22    Q.   AND DR. YOUNG IS TALKING TO YOU ABOUT QC NEEDS FOR THE

10:09AM  23    LDT'S.

10:09AM  24         DO YOU SEE THAT LANGUAGE?

10:09AM  25    A.   I DO, YES.

10:09AM  1    Q.   AND FURTHER DOWN THERE'S LANGUAGE FOR PROFICIENCY TESTING.

10:09AM  2         DO YOU SEE THAT?

10:09AM  3    A.   YES.

10:09AM  4    Q.   AND DO YOU SEE WHERE HE WROTE, "I HAVE NOT DISCUSSED

10:09AM  5    PROFICIENCY TESTING YET WITH CLIA FOR LDT'S"?

10:10AM  6    A.   I DO.

10:10AM  7    Q.   OKAY.  AND DR. YOUNG IN THIS TIME PERIOD, HE'S RUNNING

10:10AM  8    R&D; CORRECT?

10:10AM  9    A.   HE WAS.

10:10AM  10   Q.   HE DIDN'T HAVE A FORMAL ROLE WITHIN THE CLIA LAB; CORRECT?

10:10AM  11   A.   ONLY AS THE PERSON OVERSEEING THE LDT'S FROM THE R&D SIDE

10:10AM  12   AS THEY WERE TRANSFERRED INTO THE CLIA LAB.

10:10AM  13   Q.   OKAY.  SO HE'S ON THE R&D SIDE, IT MOVES INTO THE CLIA

10:10AM  14   LAB, BUT OVER THERE HE DOESN'T HAVE SOME FORMAL ROLE THE WAY

10:10AM  15   DR. ROSENDORFF WOULD?

10:10AM  16   A.   CORRECT.

10:10AM  17   Q.   FURTHER DOWN THERE'S A SECTION "ELECTROLYTE/ISE."

10:10AM  18        DO YOU SEE THAT AT THE BOTTOM OF PAGE 2?

10:10AM  19   A.   I DO.

10:10AM  20   Q.   AND DR. YOUNG WROTE "OUR NA, K, CL TEST RESULTS ARE STILL

10:10AM  21   NOT AS RELIABLE AS I WOULD LIKE."

10:10AM  22        DO YOU SEE THAT LANGUAGE?

10:10AM  23   A.   I DO.

10:10AM  24   Q.   AND NA IS AN ABBREVIATION FOR SODIUM?

10:10AM  25   A.   YES.

10:10AM  1    Q.   AND K IS AN ABBREVIATION FOR POTASSIUM?

10:11AM  2    A.   YES.

10:11AM  3    Q.   AND CL, IS THAT CHLORIDE?

10:11AM  4    A.   YES.

10:11AM  5    Q.   AND IF WE GO BACK TO PAGE 1, YOU WROTE BACK, "WHAT ARE THE

10:11AM  6    ISSUES?"

10:11AM  7         DO YOU SEE THAT IN THE MIDDLE OF THIS DOCUMENT?

10:11AM  8    A.   I DO.

10:11AM  9    Q.   AND THEN AT THE TOP DO YOU SEE WHERE DANIEL YOUNG WROTE,

10:11AM  10   "BASICALLY THERE HAVE BEEN RESULTS FOR WHICH ALL ISE RESULTS

10:11AM  11   ARE OUT OF RANGE.  FOR EXAMPLE, K IS HIGH, AND CL AND NA ARE

10:11AM  12   LOW RELATIVE TO THE REFERENCE RANGE."

10:11AM  13        DO YOU SEE THAT LANGUAGE?

10:11AM  14   A.   I DO.

10:11AM  15   Q.   AND IS SODIUM AN EXAMPLE OF AN ISE?

10:11AM  16   A.   I THINK SO.

10:11AM  17   Q.   AND WHAT IS AN ISE?

10:11AM  18   A.   IT IS A TEST WHICH WAS RUN WITH ELECTRODES, ESSENTIALLY,

10:11AM  19   AS THE WAY TO READ IT OUT.

10:12AM  20   Q.   OKAY.  AND YOU WERE STARTING TO RUN ISE'S ON THE MODIFIED

10:12AM  21   ADVIA MACHINES DURING THIS TIME PERIOD; IS THAT CORRECT?

10:12AM  22   A.   WE WERE.

10:12AM  23   Q.   AND THIS IS AN EXAMPLE OF DANIEL YOUNG KEEPING YOU

10:12AM  24   APPRISED OF UPDATES IN THE CLIA LAB; CORRECT?

10:12AM  25   A.   I THINK HE'S KEEPING ME APPRISED OF UPDATES WITH THE LDT'S

10:12AM   1    THAT ARE TRANSITIONING INTO THE CLIA LAB.

10:12AM   2    Q.   OKAY.  WELL, THE TITLE THIS EMAIL IS "CLIA UPDATES."

10:12AM   3    A.   SURE.  YEAH, YEAH.

10:12AM   4    Q.   CORRECT.  AND THIS IS YOU BEING KEPT APPRISED OF

10:12AM   5    DEVELOPMENTS IN THE CLIA LAB; IS THAT FAIR?

10:12AM   6    A.   YES.

10:12AM   7    Q.   LET'S LOOK AT THE NEXT DOCUMENT IN YOUR BINDER,

10:12AM   8    EXHIBIT 5127.

10:12AM   9    A.   OKAY.

10:12AM   10   Q.   DO YOU SEE DANIEL YOUNG'S NAME IN THE FROM LINE ON THIS?

10:12AM   11   A.   I DO.

10:12AM   12   Q.   AND DO YOU SEE YOUR NAME IN THE TO LINE OF THIS EMAIL?

10:12AM   13   A.   YES.

10:13AM   14   Q.   AND IS THIS DATED OCTOBER 22ND, 2013?

10:13AM   15   A.   IT IS.

10:13AM   16   Q.   AND THE SUBJECT OF THIS EMAIL IS "TESTS IN THE CLIA LAB"?

10:13AM   17   A.   YES.

10:13AM   18        MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5127.

10:13AM   19        THE COURT:  IN ITS ENTIRETY, INCLUDING THE FOLLOWING

10:13AM   20   PAGES?

10:13AM   21        MR. LEACH:  YES, YOUR HONOR.

10:13AM   22        MR. DOWNEY:  THAT'S FINE, YOUR HONOR.  NO OBJECTION.

10:13AM   23        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:13AM   24     (GOVERNMENT'S EXHIBIT 5127 WAS RECEIVED IN EVIDENCE.)

10:13AM   25   BY MR. LEACH:

10:13AM   1    Q.   MS. HOLMES, LET ME DRAW YOUR ATTENTION TO THE BOTTOM

10:13AM   2    PORTION OF THE PAGE.

10:13AM   3         ACTUALLY, IF WE COULD GO TO PAGE 3, MS. HOLLIMAN.

10:13AM   4         MS. HOLMES, DO YOU SEE THE EMAIL WHERE DANIEL YOUNG WRITES

10:14AM   5    TO YOU, "HI ELIZABETH,

10:14AM   6         "ATTACHED IS A SPREADSHEET THAT LISTS ALL TESTS THAT HAVE

10:14AM   7    BEEN PERFORMED ON SUBJECTS SINCE 9/9/2013."

10:14AM   8         DO YOU SEE THAT LANGUAGE?

10:14AM   9    A.   I DO.

10:14AM  10    Q.   AND 9/9/2013 IS ROUGHLY THE DATE THAT THERANOS ANNOUNCED

10:14AM  11    ITS PARTNERSHIP WITH WALGREENS; CORRECT?

10:14AM  12    A.   I THINK SO.

10:14AM  13    Q.   OKAY.  AND DR. YOUNG WROTE, "I ORGANIZED IT FOR NOW AS

10:14AM  14    FOLLOWS:"

10:14AM  15         AND THEN IF WE CAN GO TO PAGE 2, DOWN AT THE BOTTOM

10:14AM  16    THERE'S A CHART.

10:14AM  17         DO YOU SEE THAT, MS. HOLMES?

10:14AM  18    A.   I DO.

10:14AM  19    Q.   AND DANIEL YOUNG WROTE, "HOW DOES THIS LOOK FOR THE 'HAVE

10:14AM  20    DONE' TAB?"

10:14AM  21         DO YOU SEE THAT?

10:14AM  22    A.   I DO.

10:14AM  23    Q.   AND YOU UNDERSTOOD "HAVE DONE" TO MEAN TESTS THAT THERANOS

10:15AM  24    HAD ACTUALLY PERFORMED IN THE CLIA LAB SINCE EARLY SEPTEMBER?

10:15AM  25    A.   I THINK SO.  THAT'S HOW I READ IT NOW.

10:15AM   1     Q.   OKAY.  TO THE LEFT THERE'S A COLUMN "TEST."

10:15AM   2          DO YOU SEE THAT?

10:15AM   3     A.   I DO.

10:15AM   4     Q.   AND THEN THERE'S A COLUMN IN THE MIDDLE, "CHEMISTRY."

10:15AM   5          DO YOU SEE THAT?

10:15AM   6     A.   YES.

10:15AM   7     Q.   AND THE REFERENCE TO THERANOS WOULD MEAN A CHEMISTRY THAT

10:15AM   8     THERANOS HAD DEVELOPED?

10:15AM   9     A.   YES.

10:15AM   10    Q.   AS OPPOSED TO FDA APPROVED, WHICH WOULD BE A CHEMISTRY

10:15AM   11    THAT SOME OTHER MANUFACTURER HAD DEVELOPED?

10:15AM   12    A.   YES.

10:15AM   13    Q.   AND TO THE RIGHT THERE'S A COLUMN FOR "DEVICE."

10:15AM   14         DO YOU SEE THAT?

10:15AM   15    A.   I DO.

10:15AM   16    Q.   AND THAT LANGUAGE "FDA APPROVED" WOULD BE A DEVICE THAT

10:15AM   17    HAD BEEN NOT A THERANOS MANUFACTURED ANALYZER, BUT SOMETHING

10:15AM   18    THAT HAD BEEN APPROVED BY THE FDA?

10:15AM   19    A.   YES.

10:15AM   20    Q.   SUCH AS A SIEMENS ADVIA?

10:15AM   21    A.   YES.

10:15AM   22    Q.   FURTHER DOWN THERE'S THE ACRONYM, TSPU.

10:16AM   23         DO YOU SEE THAT?

10:16AM   24    A.   I DO.

10:16AM   25    Q.   AND THAT'S THERANOS SAMPLE PROCESSING UNIT?

10:16AM  1    A.   IT IS.

10:16AM  2    Q.   THAT'S A REFERENCE TO THE EDISON IN THIS CONTEXT, THE

10:16AM  3    EDISON 3.5?

10:16AM  4    A.   IT IS.

10:16AM  5    Q.   AND AM I READING THIS RIGHT, THAT THIS REFLECTS IN THE

10:16AM  6    OCTOBER 2013 TIME PERIOD FOUR ASSAYS ARE BEING RUN ON THE

10:16AM  7    EDISON 3.5 OR THE TSPU?

10:16AM  8    A.   THERE'S -- I THINK THERE'S THREE THAT ARE LISTED HERE.

10:16AM  9    Q.   I STAND CORRECTED.  SO THREE ASSAYS DURING THIS TIME

10:16AM 10    PERIOD?

10:16AM 11    A.   YES.

10:16AM 12    Q.   AND YOU KNEW THAT THAT GREW TO 12?

10:16AM 13    A.   I DID.

10:16AM 14    Q.   AND THAT WAS SOMETHING THAT YOU KNEW AND UNDERSTOOD AT THE

10:16AM 15    TIME?

10:16AM 16    A.   I KNEW THAT THERE WERE THREE LISTED HERE, YES.

10:16AM 17    Q.   OKAY.  BUT YOU ALSO WERE KEPT GENERALLY APPRISED OF WHAT

10:16AM 18    WAS GOING ON IN CLIA THROUGHOUT 2014 AND 2015?

10:17AM 19    A.   I WAS.

10:17AM 20    Q.   THAT WASN'T HIDDEN FROM YOU?

10:17AM 21    A.   NO.

10:17AM 22    Q.   AND YOU HAD A GENERAL SENSE AT ANY GIVEN POINT IN TIME HOW

10:17AM 23    MANY ASSAYS THAT THERANOS WAS RUNNING ON THE EDISON 3.5 IN THE

10:17AM 24    CLIA LAB?

10:17AM 25    A.   I'M NOT SURE ABOUT "ANY POINT IN TIME," BUT I WAS

10:17AM   1    DEFINITELY GIVEN UPDATES ON AN ONGOING BASIS.

10:17AM   2    Q.   OKAY.  SO IT MAY CHANGE FROM ONE MONTH HERE TO ONE MONTH

10:17AM   3    THERE, BUT OVER THE COURSE, THAT 12 NUMBER WOULDN'T SURPRISE

10:17AM   4    YOU IN 2015?

10:17AM   5    A.   I DON'T THINK IT WOULD HAVE.

10:17AM   6    Q.   LET ME DRAW YOUR ATTENTION --

10:17AM   7         MS. HOLLIMAN, CAN WE DRAW UP THE EXCEL, THE NATIVE FOR

10:17AM   8    THIS ATTACHMENT.

10:17AM   9         I WANT TO FOCUS ON THE ATTACHMENT TO THIS EMAIL,

10:17AM  10    MS. HOLMES, AND I THINK IT MAY BE EASIER TO LOOK AT THE NATIVE

10:17AM  11    ON THE SCREEN.

10:17AM  12    A.   OKAY.

10:17AM  13    Q.   DO YOU SEE DOWN AT THE BOTTOM THERE ARE TWO TABS TO THIS

10:18AM  14    EXCEL WORKBOOK, "HAVE DONE" AND "PLAN TO DO"?

10:18AM  15    A.   I DO.

10:18AM  16    Q.   OKAY.  AND ON THE "PLAN TO DO" TAB, DO YOU SEE THAT THERE

10:18AM  17    ARE SOME ROWS FOR CPT, TEST NAME, CHEMISTRY, DEVICE, METHOD,

10:18AM  18    AND MATRIX?

10:18AM  19    A.   I DO.

10:18AM  20    Q.   AND CHEMISTRY AND DEVICE, THOSE ARE THE SAME CATEGORIES

10:18AM  21    THAT WE SAW IN THE TABLE OF THE BODY OF THE EMAIL?

10:18AM  22    A.   YES.

10:18AM  23    Q.   AND METHOD REFERS TO IS THIS AN IMMUNOASSAY, IS THIS

10:18AM  24    CYTOMETRY, IS THIS NUCLEIC ACID AMPLIFICATION?  IS THAT WHAT

10:18AM  25    THAT IS GETTING AT?

10:18AM  1    A.   YES.

10:18AM  2    Q.   AND THE MATRIX, THIS IS GETTING AT WHETHER THIS IS BLOOD

10:18AM  3    VERSUS URINE VERSUS SOME OTHER TYPE OF SAMPLE?

10:18AM  4    A.   YES, AND I THINK WHAT KIND OF BLOOD.

10:18AM  5    Q.   OKAY.  AND NOW IF WE CAN GO TO THE -- AND AM I RIGHT THAT

10:19AM  6    YOU UNDERSTOOD AT THE TIME THAT THESE WERE ASSAYS THAT WERE

10:19AM  7    PLANNED FOR THE FUTURE, BUT WHICH THERANOS WASN'T ACTUALLY

10:19AM  8    DOING AT THE TIME?

10:19AM  9    A.   CORRECT.

10:19AM  10   Q.   THAT'S HOW YOU READ THIS SPREADSHEET?

10:19AM  11   A.   YES.

10:19AM  12   Q.   OKAY.  LET'S GO TO THE "HAVE DONE" TAB, PLEASE.

10:19AM  13        AND DO YOU SEE AN IMAGE ON THAT TABLE DOWN AT THE BOTTOM

10:19AM  14   ON THE "HAVE DONE," MS. HOLMES?

10:19AM  15   A.   I DO.

10:19AM  16   Q.   THE TABLE THAT IS IN THE BODY OF THE EMAIL?

10:19AM  17   A.   YES.

10:19AM  18   Q.   AND IF WE CAN GO UP TO THE TOP, MS. HOLLIMAN.

10:19AM  19        DO YOU SEE IN COLUMN A, THERE'S A SOURCE, WAGFS?

10:19AM  20   A.   I DO.

10:19AM  21   Q.   AND DOES THAT REFER TO WAG FINGERSTICK?

10:19AM  22   A.   I WOULD ASSUME SO.

10:19AM  23   Q.   AND THE TEST IN COLUMN C, CBC, IS THAT COMPLETE BLOOD

10:19AM  24   COUNT?

10:19AM  25   A.   YES.

10:19AM   1    Q.   AND AIC, CAN YOU TELL US WHAT THAT IS?

10:20AM   2    A.   I'M ASSUMING IT'S HEMOGLOBIN AIC.

10:20AM   3    Q.   AND THE VISIT DATE AND THE REPORT DATE, DOES THAT REFLECT

10:20AM   4    WHEN THE PATIENT CAME INTO A WELLNESS CENTER?

10:20AM   5    A.   I THINK THAT'S WHAT THE VISIT DATE REFLECTS, YES.

10:20AM   6    Q.   AND THE REPORT DATE, THAT'S WHEN THERANOS REPORTED RESULTS

10:20AM   7    TO EITHER THE PHYSICIAN OR THE PATIENT?  IS THAT HOW YOU READ

10:20AM   8    THIS?

10:20AM   9    A.   I'M NOT SURE.

10:20AM   10   Q.   OKAY.  TO THE RIGHT THERE'S SOME COLUMNS, AGB, HCT, RBC.

10:20AM   11   A.   YES.

10:20AM   12   Q.   ARE THOSE TYPES OF THIRD PARTY DEVICES?

10:20AM   13   A.   GENERALLY, YES.

10:20AM   14   Q.   AND IN COLUMN K, UNDER "WBC_DIFF," IS THAT WHOLE BLOOD

10:20AM   15   COUNT?

10:20AM   16   A.   I THINK IT'S WHITE CELL BLOOD COUNTS.

10:21AM   17   Q.   OKAY.  AND THE TEST IS A REFERENCE TO THE THIRD PARTY

10:21AM   18   MACHINE THAT IS BEING USED FOR THAT ASSAY?

10:21AM   19   A.   YES.

10:21AM   20   Q.   AND TO THE RIGHT, "MHC/MCHC," IS THAT ANOTHER REFERENCE TO

10:21AM   21   AN ASSAY?

10:21AM   22   A.   YES.

10:21AM   23   Q.   AND IS BECKMAN COULTER ANOTHER REFERENCE TO A THIRD PARTY

10:21AM   24   DEVICE BEING USED FOR THAT ASSAY?

10:21AM   25   A.   IT IS.

10:21AM  1    Q.   IF WE CAN SCROLL DOWN A LITTLE BIT.

10:21AM  2         AM I RIGHT TO READ THESE FIRST ROUGHLY 34 ROWS TO MEAN

10:21AM  3    THERANOS IS DOING TESTING ON THIRD PARTY DEVICES FOR CBC AND

10:21AM  4    AIC?

10:21AM  5         IS THAT HOW YOU READ THIS?

10:21AM  6    A.   YES, THAT'S HOW I READ THIS.

10:21AM  7    Q.   AND IF WE CAN SCROLL -- AND I DIDN'T TALK ABOUT DCA

10:21AM  8    VANTAGE, BUT IS THAT ANOTHER THIRD PARTY DEVICE?

10:21AM  9    A.   YES.

10:21AM  10   Q.   AND IF WE CAN SCROLL DOWN, PLEASE, MS. HOLLIMAN.  AND MOVE

10:21AM  11   UP JUST A LITTLE BIT MORE.

10:22AM  12        DO YOU SEE IN THE FAR RIGHT THERE ARE SOME NEW WORDS IN

10:22AM  13   THE COLUMN O, P_ADVIA?

10:22AM  14   A.   YES.

10:22AM  15   Q.   AND WHAT DOES P_ADVIA MEAN?

10:22AM  16   A.   SOMETHING RELATED TO THE ADVIA.

10:22AM  17   Q.   OKAY.  THAT'S DISTINGUISHED FROM THE TH_ADVIA.  IS THAT

10:22AM  18   DRAWING A DISTINCTION BETWEEN THERANOS CHEMISTRIES AND A THIRD

10:22AM  19   PARTY'S CHEMISTRIES?

10:22AM  20   A.   I'M NOT SURE.

10:22AM  21   Q.   OKAY.  AND THEN IN THE FAR RIGHT FOR VITAMIN D, THERE'S A

10:22AM  22   COLUMN FOR EDISON.

10:22AM  23        DO YOU SEE THAT?

10:22AM  24   A.   I DO.

10:22AM  25   Q.   AND THAT'S A REFERENCE TO THE EDISON 3.5?

10:22AM   1      A.   IT IS.

10:22AM   2      Q.   AND BY THIS OCTOBER OF 2013 TIME PERIOD, THREE ASSAYS ARE

10:22AM   3      BEING USED ON THE EDISON 3.5?

10:22AM   4      A.   I THINK SO.

10:22AM   5      Q.   AND DR. YOUNG IS REPORTING THIS TO YOU IN OCTOBER OF 2013?

10:22AM   6      A.   YES.  I SAW THOSE LISTED AS JUST DEMOS, SO I'M NOT SURE IF

10:23AM   7      THEY WERE UP OR NOT.  BUT I THINK THIS IS A REFERENCE TO EDISON

10:23AM   8      AS THE DEVICE FOR THEM.

10:23AM   9      Q.   OKAY.  AND THIS IS EXEMPLARY OF DR. YOUNG AND OTHERS

10:23AM  10      KEEPING YOU APPRISED OF WHAT IS GOING ON IN THE CLIA LAB;

10:23AM  11      CORRECT?

10:23AM  12      A.   YES.

10:23AM  13      Q.   AND DR. YOUNG NEVER TOLD YOU, FOR EXAMPLE, WE'RE DOING ALL

10:23AM  14      OF THE TESTING AT THERANOS ON SMALL SAMPLES; CORRECT?

10:23AM  15      A.   IN OUR CLIA LAB, NO.

10:23AM  16      Q.   AND HE NEVER TOLD YOU, IN THE CLIA LAB WE'RE DOING ALL OF

10:23AM  17      THE TESTING ON THE EDISON 3.5?

10:23AM  18      A.   NO.

10:23AM  19      Q.   AND WE'RE AGREED THAT BETWEEN 2010 AND 2014, THERANOS

10:23AM  20      BOUGHT ANALYZERS FROM THIRD PARTIES?

10:23AM  21      A.   WE DID.

10:23AM  22      Q.   AND IT BOUGHT MACHINES FROM SIEMENS?

10:23AM  23      A.   YES.

10:23AM  24      Q.   AND IT BOUGHT MACHINES FROM BECKMAN COULTER?

10:24AM  25      A.   YES.

10:24AM   1    Q.   AND IT BOUGHT MACHINES FROM DCA VANTAGE?

10:24AM   2    A.   YES.

10:24AM   3    Q.   AND THAT WASN'T HIDDEN FROM YOU?

10:24AM   4    A.   NO.

10:24AM   5    Q.   AND YOU KNEW THAT ALL OF THOSE MACHINES WERE BEING USED TO

10:24AM   6    DO SOME FORM OF PATIENT TESTING?

10:24AM   7    A.   I DON'T THINK I FOCUSSED ON ALL OF THEM, BUT THE

10:24AM   8    INFORMATION WAS AVAILABLE HERE.

10:24AM   9    Q.   IT WASN'T A SURPRISE TO YOU THAT THERANOS WAS DOING

10:24AM  10    TESTING ON THIRD PARTY MACHINES?

10:24AM  11    A.   NO.

10:24AM  12    Q.   AND YOU KNEW IN THE 2014 TIME PERIOD THAT IT WOULD BE

10:24AM  13    INCORRECT TO SAY THAT THERANOS DID NOT BUY ANALYZERS FROM THIRD

10:24AM  14    PARTIES?

10:24AM  15    A.   CORRECT.  WE BOUGHT ANALYZERS FROM THIRD PARTIES.

10:24AM  16    Q.   AND YOU KNEW IT WOULD BE INCORRECT TO TELL AN INVESTOR

10:24AM  17    THAT?

10:24AM  18    A.   YES.

10:24AM  19    Q.   YOU ALSO UNDERSTOOD IN 2014 THAT BECAUSE THERANOS WAS

10:24AM  20    USING THIRD PARTY ANALYZERS AT THE TIME, LIKE FROM SIEMENS, IT

10:25AM  21    WASN'T CURRENTLY THE CASE THAT THE FOOTPRINT IN YOUR LABORATORY

10:25AM  22    WAS A SMALL FRACTION OF THE FOOTPRINT OF A TYPICAL CENTRAL

10:25AM  23    LABORATORY?

10:25AM  24    A.   AS TO THOSE MACHINES, NO.

10:25AM  25    Q.   YOU KNEW AT THE TIME THAT YOU HAD THOSE MACHINES IN YOUR

10:25AM   1     LAB; CORRECT?

10:25AM   2     A.   YES.

10:25AM   3     Q.   AND YOU KNEW AT THE TIME THAT THE FOOTPRINT WAS ROUGHLY

10:25AM   4     THE SAME AS A TYPICAL CENTRAL LABORATORY?

10:25AM   5     A.   OF COURSE.

10:25AM   6     Q.   AND YOU HAD ASPIRATIONS OF ONE DAY USING ONLY THE MINILAB;

10:25AM   7     CORRECT?

10:25AM   8     A.   YES.

10:25AM   9     Q.   AND YOU HAD ASPIRATIONS THAT ONE DAY, BECAUSE YOU WERE

10:25AM   10    USING THE MINILAB, YOUR FOOTPRINT WOULD BE SUBSTANTIALLY LESS

10:25AM   11    THAN THE FOOTPRINT OF A TRADITIONAL LAB; RIGHT?

10:25AM   12    A.   YES, A MINILAB OUTSIDE OF THE LAB.

10:25AM   13    Q.   BUT IN 2014, YOU HADN'T ACTUALLY DONE THAT?

10:25AM   14    A.   CORRECT.

10:25AM   15    Q.   AM I RIGHT THAT YOUR TESTIMONY IS THAT IN 2014, THERANOS

10:26AM   16    COULD RUN APPROXIMATELY 30 TESTS FROM A SINGLE FINGERSTICK

10:26AM   17    BLOOD DRAW IF THE MAXIMUM AMOUNT OF BLOOD WAS EXTRACTED FROM

10:26AM   18    THE FINGER?

10:26AM   19    A.   WHAT DO YOU MEAN BY THAT?  LIKE IN THE CLINICAL LAB OR --

10:26AM   20    Q.   IN THE CLINICAL LAB.

10:26AM   21    A.   I DON'T HAVE REASON TO DOUBT THAT.

10:26AM   22         YOU SAID 2014?

10:26AM   23    Q.   LET'S FOCUS ON THE 2013 TO 2014 TIME PERIOD.

10:26AM   24    A.   YES.

10:26AM   25    Q.   AND I'M TRYING TO UNDERSTAND IF YOU KNEW THAT THERANOS

10:26AM  1    COULD RUN APPROXIMATELY 30 TESTS FROM A SINGLE STICK BLOOD IN

10:26AM  2    THE CLIA LAB.

10:26AM  3    A.   OKAY.  I THINK SOMEWHERE IN THAT TIME PERIOD IT WAS MORE

10:26AM  4    THAN THAT, BUT, YES, WE SHOULD HAVE BEEN ABLE TO RUN 30 TESTS.

10:26AM  5    Q.   WE TALKED EARLIER ABOUT THE TOTAL NUMBER OF SMALL SAMPLES

10:26AM  6    THAT YOU DID FROM FINGERSTICKS IN THE CLIA LAB, AND I THINK WE

10:26AM  7    SETTLED THAT THE NUMBER WAS ABOUT 70; CORRECT?

10:27AM  8    A.   YES.

10:27AM  9    Q.   TWELVE ON THE 3.5, AND ANOTHER 58 ON MODIFIED SIEMENS

10:27AM  10   MACHINES; CORRECT?

10:27AM  11   A.   OR OTHER MODIFIED MACHINES, YES.

10:27AM  12   Q.   THANK YOU.

10:27AM  13        AND WHAT I'M TRYING TO GET AT IS HOW MANY TESTS YOU COULD

10:27AM  14   DO FROM THAT, A SINGLE FINGERSTICK DRAW.  AND I DON'T WANT YOU

10:27AM  15   TO GUESS.  I WANT TO MAKE SURE THAT WE'RE TALKING ABOUT THE

10:27AM  16   SAME THING.

10:27AM  17   A.   OKAY.

10:27AM  18   Q.   BUT THE TOTAL NUMBER OF TESTS YOU COULD DO FROM THAT

10:27AM  19   SINGLE DRAW WAS 30; ISN'T THAT RIGHT?

10:27AM  20   A.   I'M NOT SURE.

10:27AM  21   Q.   OKAY.  DO YOU HAVE THE RED BINDER OF YOUR S.E.C.

10:27AM  22   TESTIMONY?

10:27AM  23   A.   I DO.

10:27AM  24   Q.   LET'S ME DRAW YOUR ATTENTION, PLEASE, TO PAGE 200.  IT'S

10:27AM  25   PAGE 200 OF YOUR TESTIMONY, AND IT WOULD BE BATES NUMBER ENDING

10:27AM  1      5306.

10:28AM  2      A.   OKAY.

10:28AM  3      Q.   AND I WOULD LIKE YOU TO READ TO YOURSELF LINES 24 TO 11.

10:28AM  4           MR. DOWNEY:  I'M SORRY, MR. LEACH.  WHICH PAGE?

10:28AM  5           MR. LEACH:  BATES 5306, PAGE 200, LINE 24, TO

10:28AM  6      PAGE 201, LINE 7.

10:28AM  7      Q.   HAVE YOU READ THAT TO YOURSELF, MS. HOLMES?

10:28AM  8      A.   I HAVE.

10:28AM  9      Q.   AND DOES THIS REFRESH YOUR RECOLLECTION THAT THERANOS WAS

10:28AM  10     ABLE TO RUN 30-SOMETHING TESTS ON A SINGLE FINGERSTICK DRAW OF

10:28AM  11     BLOOD SO LONG AS IT WAS THE MAXIMUM AMOUNT?

10:28AM  12     A.   YES, I THINK THIS TESTIMONY IS CORRECT.

10:28AM  13     Q.   AND THAT WAS YOUR UNDERSTANDING AT THE TIME?

10:28AM  14     A.   I ASSUME SO.  I DON'T REMEMBER.

10:28AM  15     Q.   OKAY.  YOU WERE HERE FOR LISA PETERSON'S TESTIMONY;

10:29AM  16     CORRECT?

10:29AM  17     A.   I WAS.

10:29AM  18     Q.   AND YOU REMEMBER SPEAKING TO MS. PETERSON ON THE PHONE IN

10:29AM  19     SEPTEMBER OR OCTOBER OF 2014?

10:29AM  20     A.   GENERALLY, YES.

10:29AM  21     Q.   AND YOU REMEMBER MEETING WITH MS. PETERSON IN CALIFORNIA

10:29AM  22     IN ABOUT OCTOBER OF 2014?

10:29AM  23     A.   I DO.

10:29AM  24     Q.   AND YOU WERE HERE WHEN MS. PETERSON TESTIFIED THAT SHE

10:29AM  25     LEARNED FROM CONVERSATIONS WITH YOU THAT THERANOS USES THEIR

HOLMES CROSS BY MR. LEACH (RES.)                    8388

10:29AM   1    OWN ANALYZE EQUIPMENT; CORRECT?

10:29AM   2    A.   YES.

10:29AM   3    Q.   YOU WERE HERE WHEN SHE SAID THAT?

10:29AM   4    A.   YES.

10:29AM   5    Q.   AND YOU WERE HERE WHEN MS. PETERSON TESTIFIED THAT YOU

10:29AM   6    SAID THAT THERANOS WAS USING ITS DEVICES ON MILITARY

10:29AM   7    HELICOPTERS?

10:29AM   8    A.   YES.

10:29AM   9    Q.   AM I RIGHT THAT YOU DON'T THINK YOU TOLD RDV IN LATE 2014

10:29AM  10    THAT THERANOS'S REVENUE FOR 2015 WAS PROJECTED TO BE

10:30AM  11    $990 MILLION; CORRECT?

10:30AM  12    A.   I THINK THAT WAS THE OUTPUT OF THE MODEL THAT WAS

10:30AM  13    DISCUSSED WITH THEM.

10:30AM  14    Q.   AND YOU RECALL DISCUSSING THE MODEL WITH THEM?

10:30AM  15    A.   I DON'T.  I JUST HAVE SEEN THE TESTIMONY HERE.

10:30AM  16    Q.   SO DID YOU TELL RDV, THROUGH THE MODEL OR THROUGH

10:30AM  17    CONVERSATIONS, THAT THERANOS'S REVENUE FOR 2015 WAS PROJECTED

10:30AM  18    TO BE 990 MILLION?

10:30AM  19    A.   I DON'T THINK I DID, NO.

10:30AM  20    Q.   OKAY.  AND YOU DON'T REMEMBER SUNNY BALWANI EVER MAKING

10:30AM  21    THAT STATEMENT; CORRECT?

10:30AM  22    A.   I DON'T.

10:30AM  23    Q.   AND THAT'S BECAUSE YOU DON'T HAVE A MEMORY OF THE

10:30AM  24    CONVERSATIONS WITH RDV?

10:30AM  25    A.   I REMEMBER SOME PARTS OF THAT CONVERSATION, BUT I DON'T

10:30AM   1    REMEMBER TALKING ABOUT REVENUE WITH THEM.

10:30AM   2    Q.   YOUR TESTIMONY IS THAT YOU CAN'T REMEMBER TELLING RDV THAT

10:30AM   3    THERANOS WOULD OPEN OR WAS ON THE PATH TO OPENING 900 WALGREENS

10:30AM   4    STORES IN 2015?

10:30AM   5    A.   I DON'T REMEMBER THAT.

10:31AM   6    Q.   AND YOU DON'T REMEMBER MR. BALWANI MAKING THAT STATEMENT?

10:31AM   7    A.   I DON'T.

10:31AM   8    Q.   AND YOUR TESTIMONY IS THAT YOU DON'T KNOW IF YOU TOLD RDV

10:31AM   9    IN LATE 2014 THAT THERANOS USES ITS OWN ANALYZER EQUIPMENT?

10:31AM   10   A.   I DON'T.  AND WE WERE USING OUR OWN ANALYZER EQUIPMENT, SO

10:31AM   11   I WOULDN'T BE SURPRISED IF I SAID THAT.

10:31AM   12   Q.   AND YOU DON'T KNOW IF SUNNY BALWANI SAID THAT BECAUSE YOU

10:31AM   13   DON'T RECALL THE SPECIFICS OF THE CONVERSATION?

10:31AM   14   A.   CORRECT.

10:32AM   15   Q.   AND AM I RIGHT THAT YOU CAN'T REMEMBER WHETHER YOU TOLD

10:32AM   16   RDV IN LATE 2015 THAT THE THERANOS ANALYZER WAS A SMALL

10:32AM   17   FRACTION OF THE SIZE OF THE CURRENT LAB?

10:32AM   18   A.   THAT'S SOMETHING THAT I WOULD HAVE SAID IN THE CONTEXT OF

10:32AM   19   DISCUSSING THE MINILAB, BUT I DON'T THINK WE DISCUSSED THE

10:32AM   20   CLINICAL LAB.

10:32AM   21   Q.   OKAY.  AND YOU TOLD THE S.E.C. THAT YOU DON'T REMEMBER

10:32AM   22   TELLING RDV IN LATE 2014 THAT THE THERANOS ANALYZER WAS A SMALL

10:32AM   23   FRACTION OF THE SIZE OF A CURRENT LAB?

10:32AM   24   A.   THAT MAKES SENSE.

10:32AM   25   Q.   OKAY.  LET ME DRAW YOUR ATTENTION -- THIS WILL BE IN

10:32AM   1      VOLUME 4 OF YOUR WHITE BINDERS UP THERE -- TO WHAT IS IN

10:32AM   2      EVIDENCE AS EXHIBIT 1853.

10:32AM   3      A.   OKAY.  ONE SECOND.

10:33AM   4           OKAY.

10:33AM   5      Q.   AND IT'S ON THE SCREEN IF THAT'S EASIER.

10:33AM   6      A.   YEAH.  YEAH, THAT'S FINE.

10:33AM   7      Q.   YOU WERE HERE WHEN MS. PETERSON TESTIFIED ABOUT THIS

10:33AM   8      PROJECTED STATEMENT OF INCOME THAT WAS PROVIDED TO RDV?

10:33AM   9      A.   I WAS.

10:33AM  10      Q.   AND YOU SEE THE HANDWRITTEN NOTES UP AT THE TOP, 900

10:33AM  11      LOCATIONS?

10:33AM  12      A.   I DO.

10:33AM  13      Q.   BUT YOUR TESTIMONY IS THAT YOU CAN'T REMEMBER TELLING RDV

10:33AM  14      THAT THERANOS WOULD OPEN OR WAS ON THE PATH TO OPENING 900

10:33AM  15      WALGREENS STORES BY 2015?

10:33AM  16      A.   I DON'T THINK I WOULD HAVE BEEN THE PERSON SPEAKING TO

10:33AM  17      THIS.

10:33AM  18      Q.   AND LAST WEEK WE TALKED A LITTLE BIT ABOUT EXHIBIT 5633,

10:33AM  19      AN EMAIL THAT MR. BALWANI FORWARDED TO YOU IN AUGUST OF 2014

10:33AM  20      FROM NIMESH JHAVERI.

10:33AM  21           DO YOU RECALL TESTIFYING ABOUT THAT?

10:33AM  22      A.   I DO.

10:33AM  23      Q.   AND DO YOU RECALL MR. JHAVERI SAYING THERE WAS A NEED FOR

10:34AM  24      A DETAILED PLAN ON HOW TO REDUCE THE NUMBER OF VENOUS DRAWS?

10:34AM  25      A.   I DO.

10:34AM  1    Q.   AND NONE OF THAT CAME UP IN THIS MEETING WITH MS. PETERSON

10:34AM  2    IN OCTOBER OF 2014; CORRECT?

10:34AM  3    A.   I DON'T THINK SO.

10:34AM  4    Q.   OKAY.  ON THE PROJECTED STATEMENT OF INCOME, THERE'S -- DO

10:34AM  5    YOU SEE WHERE IT PROJECTS 400 MILLION OF REVENUE FROM

10:34AM  6    PHARMACEUTICAL SERVICES?

10:34AM  7    A.   I THINK IT SAYS 40.

10:34AM  8    Q.   CORRECT.  THANK YOU.  40 MILLION?

10:34AM  9    A.   YEAH.

10:34AM  10   Q.   AND YOU CAN'T IDENTIFY A SINGLE PHARMACEUTICAL CONTRACT

10:34AM  11   ENTERED AS OF OCTOBER 2014 THAT WOULD GET ANYWHERE NEAR TO

10:34AM  12   40 MILLION; CORRECT?

10:34AM  13   A.   NO.

10:34AM  14   Q.   OKAY.  THERE'S ALSO A LINE FOR --

10:34AM  15   A.   TO BE CLEAR, I DON'T THINK THAT'S CORRECT.

10:34AM  16   Q.   YOU HAD NO REVENUE FROM PHARMACEUTICAL COMPANIES IN 2014;

10:34AM  17   CORRECT?

10:34AM  18   A.   WE DID NOT.

10:34AM  19   Q.   AND YOU HAD NO EXISTING CONTRACT IN 2014 THAT WOULD GET

10:35AM  20   YOU TO $40 MILLION?

10:35AM  21   A.   I THINK WE DID.

10:35AM  22   Q.   NAME THE PHARMACEUTICAL COMPANY THAT YOU THINK YOU COULD

10:35AM  23   HAVE DONE THAT WITH, MS. HOLMES.

10:35AM  24   A.   THE GSK BIOLOGICALS CONTRACT THAT WE HAD FROM BEFORE.

10:35AM  25   Q.   BACK IN 2010?

10:35AM  1    A.   I'M NOT SURE WHEN IT WAS SIGNED, BUT FROM A FEW YEARS

10:35AM  2    BEFORE, A COUPLE YEARS BEFORE.

10:35AM  3    Q.   AND YOU WERE HERE WHEN MS. SPIVEY TESTIFIED THAT THERANOS

10:35AM  4    DIDN'T RECOGNIZE A SINGLE DOLLAR FROM GSK; CORRECT?

10:35AM  5    A.   YES.

10:35AM  6    Q.   NOT IN 2007; CORRECT?

10:35AM  7    A.   CORRECT.

10:35AM  8    Q.   NOT IN 2008?

10:35AM  9    A.   YES.

10:35AM  10   Q.   NOT IN 2009?

10:35AM  11   A.   YES.

10:35AM  12   Q.   NOT IN 2010?

10:35AM  13   A.   YES.

10:35AM  14   Q.   NOT IN 2011?

10:35AM  15   A.   CORRECT.

10:35AM  16   Q.   NOT IN 2012?

10:35AM  17   A.   CORRECT.

10:35AM  18   Q.   AND NOT IN 2013?

10:35AM  19   A.   CORRECT.

10:35AM  20   Q.   AND THERE'S ALSO A LINE FOR LAB REVENUE SERVICES FROM

10:35AM  21   HOSPITALS.

10:35AM  22        DO YOU SEE THAT?

10:35AM  23   A.   YES.

10:35AM  24   Q.   AND AM I RIGHT THAT THERANOS NEVER RECOGNIZED ANY REVENUE

10:35AM  25   FROM HOSPITALS?

10:35AM  1    A.   I THINK WE HAD DEFERRED REVENUE THAT WAS ASSOCIATED WITH

10:36AM  2    CONTRACTS THAT COULD COVER HOSPITAL SHIPMENTS.

10:36AM  3    Q.   AND MY QUESTION WAS NOT RELATED TO DEFERRED REVENUE,

10:36AM  4    MS. HOLMES.

10:36AM  5         MY QUESTION WAS, YOU NEVER RECOGNIZED ANY REVENUE FROM

10:36AM  6    HOSPITAL SERVICES; CORRECT?

10:36AM  7    A.   I'M NOT SURE.

10:36AM  8    Q.   AND YOU NEVER PUT A MINILAB OR AN EDISON IN A HOSPITAL;

10:36AM  9    CORRECT?

10:36AM  10   A.   NOT FOR CLINICAL CARE, NO.

10:36AM  11   Q.   AND NOT TO PERFORM THE SERVICES THAT THERANOS WAS

10:36AM  12   ADVERTISING TO THE PUBLIC; CORRECT?

10:36AM  13   A.   CORRECT.

10:36AM  14   Q.   AND YOU NEVER PUT A MINILAB OR AN EDISON IN A PHYSICIAN

10:36AM  15   OFFICE FOR CLINICAL CARE; CORRECT?

10:36AM  16   A.   CORRECT.

10:36AM  17   Q.   OKAY.  TO THE RIGHT COLUMN, THERE'S A TOTAL REVENUE NUMBER

10:36AM  18   OF $990 MILLION.

10:36AM  19        DO YOU SEE THAT?

10:36AM  20   A.   YES.

10:36AM  21   Q.   AND WE CAN AGREE THAT THERANOS ACTUALLY NEVER ACHIEVED

10:36AM  22   THAT LEVEL OF REVENUE; CORRECT?

10:37AM  23   A.   WE DID NOT.

10:37AM  24   Q.   AND AM I RIGHT THAT TWO MONTHS AFTER PROVIDING THIS

10:37AM  25   REVENUE PROJECTION OF 990 MILLION TO RDV, YOU PROVIDED

```
10:37AM   1      SUBSTANTIALLY LOWER REVENUE PROJECTIONS TO ARANCA, YOUR STOCK

10:37AM   2      OPTION VALUATION FIRM?

10:37AM   3      A.   PROBABLY.

10:37AM   4      Q.   YOU WERE HERE WHEN MS. SPIVEY TESTIFIED ABOUT THAT?

10:37AM   5      A.   I WAS.  I WAS.

10:37AM   6      Q.   OKAY.  LET'S LOOK AT WHAT IS IN EVIDENCE AS EXHIBIT 5190.

10:37AM   7      A.   YES.

10:37AM   8      Q.   LET ME JUST MAKE SURE I HAVE THE RIGHT BINDER, MS. HOLMES.

10:37AM   9      ONE MOMENT.

10:37AM  10      A.   YES.

10:37AM  11      Q.   DO YOU RECALL MS. SPIVEY TESTIFYING ABOUT THIS EMAIL?

10:38AM  12      A.   I DO.

10:38AM  13      Q.   OKAY.  AND SHE WENT BY DANISE YAM AT THE TIME?

10:38AM  14      A.   SHE DID.

10:38AM  15      Q.   AND THE SUBJECT OF THIS IS 409A REPORT.

10:38AM  16           DO YOU SEE THAT?

10:38AM  17      A.   YES.

10:38AM  18      Q.   AND THE DATE IS DECEMBER 31ST, 2014.

10:38AM  19           DO YOU SEE THAT?

10:38AM  20      A.   I DO.

10:38AM  21      Q.   AND THIS IS ROUGHLY TWO OR THREE MONTHS AFTER YOUR MEETING

10:38AM  22      WITH MS. PETERSON IN CALIFORNIA ABOUT RDV?

10:38AM  23      A.   YES.

10:38AM  24      Q.   LET ME DRAW YOUR ATTENTION TO PAGE 5.

10:38AM  25           PAGE 2, MS. HOLLIMAN.
```

HOLMES CROSS BY MR. LEACH (RES.)                                    8395

10:38AM   1        AND THE HARD COPY IS IN VOLUME 2 IF YOU WANT TO SEE THAT.

10:38AM   2   A.   THANK YOU.

10:38AM   3   Q.   AND DO YOU SEE WHERE IT SAYS, "AN ARANCA REPORT, THERANOS

10:38AM   4   INC., MFV OF COMMON STOCK AS OF DECEMBER 15TH, 2014"?

10:38AM   5   A.   I DO.

10:38AM   6   Q.   AND IF I COULD FOCUS YOU ON PAGE 5.

10:39AM   7        DO YOU SEE THE BULLET UNDER 1.2 WHERE ARANCA WROTE, "WE

10:39AM   8   UNDERSTAND THIS REPORT AND ITS CONCLUSIONS WOULD BE USED BY THE

10:39AM   9   COMPANY'S BOARD OF DIRECTORS (AND AUTHORIZED BOARD COMMITTEES)

10:39AM  10   SOLELY IN CONNECTION WITH DETERMINING THE EXERCISE PRICE FOR

10:39AM  11   GRANTING OPTIONS TO ITS EMPLOYEES TO COMPLY WITH," A PROVISION

10:39AM  12   OF THE INTERNAL REVENUE CODE.

10:39AM  13        DO YOU SEE THAT?

10:39AM  14   A.   I DO.

10:39AM  15   Q.   AND DO YOU SEE IN THE SECOND BULLET THERE'S A DESCRIPTION

10:39AM  16   OF THE PARTICULAR PROVISION OF THE INTERNAL REVENUE CODE THAT

10:39AM  17   ARANCA IS TRYING TO ADDRESS WITH ITS REPORT?

10:39AM  18        DO YOU SEE THAT BULLET?

10:39AM  19   A.   I DO.

10:39AM  20   Q.   AND LET ME DRAW YOUR ATTENTION TO PAGE 31.

10:39AM  21   A.   OKAY.

10:39AM  22   Q.   DO YOU SEE THERE'S A TABLE FOR INCOME STATEMENT?

10:40AM  23   A.   I DO.

10:40AM  24   Q.   AND IT SAYS, "BASED ON THE REVENUE AND EXPENSE PROJECTIONS

10:40AM  25   BELOW IS THE ESTIMATED INCOME STATEMENT FOR THERANOS."

HOLMES CROSS BY MR. LEACH (RES.)                    8396

10:40AM  1          DO YOU SEE THAT LANGUAGE?

10:40AM  2   A.   YEP.

10:40AM  3   Q.   AND DO YOU SEE FOR DECEMBER '14 -- YOU READ THAT TO BE

10:40AM  4   2014?

10:40AM  5   A.   I DO.

10:40AM  6   Q.   OKAY.  IT HAS REVENUES OF $150,000?

10:40AM  7   A.   YES.

10:40AM  8   Q.   AND DO YOU SEE TO THE RIGHT, FOR THE END OF 2015 IT'S

10:40AM  9   PROJECTING $113 MILLION IN REVENUE?

10:40AM  10  A.   I DO.

10:40AM  11  Q.   AND, MS. HOLLIMAN, IF WE COULD DISPLAY AT THE SAME TIME

10:40AM  12  EXHIBIT 1853 AGAINST THIS PAGE OF 5190.

10:41AM  13          THANK YOU, MS. HOLLIMAN.

10:41AM  14          SO, MS. HOLMES, AM I RIGHT THAT ON 1853, THE TOTAL

10:41AM  15  PROJECTION IS $990 BILLION?

10:41AM  16  A.   MILLION.

10:41AM  17  Q.   THANK YOU.  CLOSE TO 1 BILLION, 990 MILLION.  I APPRECIATE

10:41AM  18  YOUR ATTENTION TO THE ZEROS HERE.

10:41AM  19  A.   YES.

10:41AM  20  Q.   AND FOR THE ARANCA PROJECTION IN DECEMBER, IT'S HUNDREDS

10:41AM  21  OF MILLIONS OF DOLLARS LOWER AT 113 MILLION?

10:42AM  22  A.   THAT'S RIGHT.

10:42AM  23  Q.   OKAY.  LET ME DRAW YOUR ATTENTION, PLEASE, TO WHAT IS IN

10:42AM  24  EVIDENCE AS EXHIBIT 2623.

10:42AM  25          MS. HOLMES, DO YOU SEE THIS IS AN EMAIL FROM MS. YAM, OR

10:42AM   1    MS. SPIVEY, TO YOU IN THE JULY 2015 TIME PERIOD RELATED TO THE

10:42AM   2    409A REPORTS?

10:42AM   3    A.   I DO.

10:42AM   4    Q.   AND, IN FACT, IF WE CAN LOOK AT PAGE 2, DO YOU SEE THE

10:42AM   5    EMAIL FROM MS. YAM WITH THE SUBJECT "SUNIL DHAWAN" IN THE

10:42AM   6    MIDDLE?

10:42AM   7    A.   I DO.

10:42AM   8    Q.   AND YOU UNDERSTOOD AT THE TIME THAT SUNIL DHAWAN WAS

10:43AM   9    COMING ON TO BE THE LAB DIRECTOR IN THE CLIA LAB?

10:43AM  10    A.   I DID.

10:43AM  11    Q.   OKAY.  DID YOU KNOW HE WAS DOCTOR -- OR MR. BALWANI'S

10:43AM  12    DERMATOLOGIST?

10:43AM  13    A.   I DID.

10:43AM  14    Q.   OKAY.  AND YOU UNDERSTOOD THAT, AS PART OF HIS EMPLOYMENT

10:43AM  15    AGREEMENT, THAT HE WAS GOING TO BE GRANTED OPTIONS?

10:43AM  16    A.   I THINK AT THAT POINT WE WERE GOING TO ISSUE RSU'S, NOT

10:43AM  17    GRANT OPTIONS.

10:43AM  18    Q.   OKAY.  WELL, DOESN'T IT SAY ON PAGE 3, "AS WE BRIEFLY

10:43AM  19    TOUCHED BASE LAST NIGHT, ALL OPTION GRANTS WOULD BE PENDING ON

10:43AM  20    THE 409A VALUATION."

10:43AM  21         AM I READING THAT RIGHT?

10:43AM  22    A.   YOU ARE.

10:43AM  23             THE COURT:  MR. LEACH.

10:43AM  24             MR. LEACH:  I'LL REPHRASE MY QUESTION.

10:43AM  25    Q.   AM I RIGHT THAT ON PAGE 3, MS. YAM IS WRITING, "AS WE

10:43AM  1    BRIEFLY TOUCHED BASE LAST NIGHT, ALL OPTION GRANTS WOULD BE

10:43AM  2    PENDING ON THE 409A VALUATION."

10:43AM  3        DID I READ THAT LANGUAGE CORRECTLY?

10:44AM  4    A.   YOU DID.

10:44AM  5    Q.   AND IF WE COULD GO BACK TO PAGE 2, DO YOU SEE WHERE

10:44AM  6    MS. YAM WRITES, "PLEASE SEE ATTACHED FOR THE FULL PROJECTION

10:44AM  7    MODEL.  THE QUICKEST TURN AROUND TIME IS TWO WEEKS, DEPENDING

10:44AM  8    ON HOW MUCH CHANGES TO THE ASSUMPTIONS WE ARE MAKING.  THE

10:44AM  9    ASSUMPTIONS WE HAD BEEN USING SINCE SEPTEMBER 2014 WERE AS

10:44AM  10   FOLLOWS."

10:44AM  11       DO YOU SEE THAT LANGUAGE?

10:44AM  12   A.   I DO.

10:44AM  13   Q.   AND DO YOU SEE IN THE TABLE SHE LISTS THAT THE ASSUMPTION

10:44AM  14   THAT THERANOS HAD BEEN USING SINCE SEPTEMBER OF 2014 FOR 2015

10:44AM  15   REVENUE WAS $113 MILLION?

10:44AM  16   A.   I DO.

10:44AM  17   Q.   OKAY.  AND MS. YAM IS TELLING YOU THIS AT THE TIME TO GET

10:44AM  18   GUIDANCE FROM YOU; CORRECT?

10:44AM  19   A.   YES.

10:44AM  20   Q.   IF WE CAN GO TO PAGE 1, PLEASE, MS. HOLLIMAN, AND FOCUS ON

10:45AM  21   THAT FIRST EMAIL.

10:45AM  22       MS. HOLMES, DO YOU SEE WHERE MS. YAM WROTE, "REVISED THE

10:45AM  23   REVENUE NUMBERS PER DISCUSSION AND UPDATED THE MODEL.  I WILL

10:45AM  24   SEND THIS TO ARANCA.

10:45AM  25       "WE STILL NEED TO KNOW HOW MANY OPTIONS WILL BE GRANTED AT

10:45AM  1    THE NEW VALUE (WHETHER AND HOW MANY TO INCLUDE FOR YOU AND

10:45AM  2    SB)."

10:45AM  3         DO YOU SEE THAT?

10:45AM  4    A.   I DO.

10:45AM  5    Q.   OKAY.  AND THE SB THERE IS MR. BALWANI; CORRECT?

10:45AM  6    A.   YES.

10:45AM  7    Q.   AND DOES IT APPEAR FROM THE TABLE THAT THE PROJECTED

10:45AM  8    REVENUE FOR 2015 HAS NOW GONE DOWN IN THIS JULY 2015 TIME

10:45AM  9    PERIOD FROM $113 MILLION DOWN TO $53 MILLION?

10:45AM  10   A.   YES.

10:45AM  11   Q.   AND THAT IS FOLLOWING DISCUSSIONS THAT YOU HAD WITH

10:45AM  12   MS. YAM?

10:45AM  13   A.   I DON'T KNOW.

10:45AM  14   Q.   DO YOU SEE WHERE SHE WROTE, "HI ELIZABETH,

10:46AM  15        "WE REVISED THE REVENUE NUMBERS PER DISCUSSION"?

10:46AM  16   A.   I DO.

10:46AM  17   Q.   AND SITTING HERE TODAY, YOU DON'T RECALL THE DISCUSSION?

10:46AM  18   A.   I DON'T.

10:46AM  19   Q.   AND YOU ALSO MET WITH SOMEONE NAMED BRIAN GROSSMAN;

10:46AM  20   CORRECT?

10:46AM  21   A.   YES.

10:46AM  22   Q.   AND YOU MET WITH HIM ONCE IN DECEMBER OF 2013?

10:46AM  23   A.   I DID.

10:46AM  24   Q.   AND YOU MET WITH HIM AGAIN IN JANUARY OF 2014?

10:46AM  25   A.   YES.

10:46AM 1    Q.   AND AM I RIGHT THAT YOU AND MR. BALWANI TOLD HIM THAT

10:46AM 2    THERANOS COULD DO OVER 1,000 CPT CODES WITH THERANOS'S

10:46AM 3    TECHNOLOGY?

10:46AM 4    A.   I DON'T REMEMBER THE SPECIFICS OF THAT DISCUSSION, BUT

10:46AM 5    THAT WAS A TOPIC OF DISCUSSION THAT WE WOULD FREQUENTLY HAVE.

10:46AM 6    Q.   YOU DON'T REMEMBER SAYING THAT?

10:46AM 7    A.   I DON'T.

10:46AM 8    Q.   AND YOU AND MR. BALWANI TOLD MR. GROSSMAN THAT THERANOS

10:46AM 9    WAITED TO LAUNCH ITS RETAIL PRODUCT BECAUSE IT WANTED TO MAKE

10:47AM 10   SURE THAT THERANOS HAD COMPLETE COVERAGE, 100 PERCENT COVERAGE

10:47AM 11   OF WHAT QUEST AND LABCORP COULD OFFER; CORRECT?

10:47AM 12   A.   AGAIN, I DON'T REMEMBER THE SPECIFICS OF THE DISCUSSION.

10:47AM 13   I'M NOT SURE.

10:47AM 14   Q.   DO YOU DISPUTE THAT YOU TOLD -- YOU AND MR. BALWANI TOLD

10:47AM 15   BRIAN GROSSMAN THAT -- DO YOU DISPUTE THAT YOU AND MR. BALWANI

10:47AM 16   TOLD BRIAN GROSSMAN THAT THERANOS DID A LITTLE OVER 200 MILLION

10:47AM 17   IN REVENUES, MOSTLY FROM DOD, THAT HAD SUSTAINED THERANOS PRIOR

10:47AM 18   TO THE LAUNCH?

10:47AM 19   A.   I DON'T THINK WE SAID THAT.

10:47AM 20   Q.   AND ISN'T IT TRUE THAT YOU TOLD -- YOU AND MR. BALWANI

10:47AM 21   TOLD MR. GROSSMAN THAT YOU AND THERANOS COULD SUPPORT THE

10:47AM 22   ENTIRE COMMERCIAL ROLLOUT IN THE PHOENIX MARKET IN 200 SQUARE

10:48AM 23   FEET BECAUSE YOUR SYSTEMS WERE SO MUCH SMALLER?

10:48AM 24   A.   AGAIN, I DON'T REMEMBER THE SPECIFICS OF THE CONVERSATION.

10:48AM 25   THAT COULD BE RELATED TO MINILAB DEPLOYMENT IF WE DID TALK

10:48AM  1    ABOUT SOMETHING LIKE THAT.

10:48AM  2    Q.   BUT YOU DON'T REMEMBER SAYING THAT BECAUSE YOU DON'T

10:48AM  3    REMEMBER THE SPECIFICS OF THE CONVERSATION; CORRECT?

10:48AM  4    A.   I DON'T.

10:48AM  5    Q.   AND YOU UNDERSTOOD IN THE JANUARY 2014 TIME PERIOD THAT

10:48AM  6    BRIAN GROSSMAN WAS ASKING VERY SPECIFIC QUESTIONS ABOUT THE

10:48AM  7    GROSS MARGIN FOR THE THERANOS ANALYZER; CORRECT?

10:48AM  8    A.   I DON'T THINK I HAD THAT CONVERSATION WITH HIM.

10:48AM  9    Q.   WELL, LET'S LOOK AT WHAT IS IN EVIDENCE AS EXHIBIT 1404.

10:48AM  10        WOULD YOU LIKE A HARD COPY, MS. HOLMES, OR ARE YOU

10:48AM  11   COMFORTABLE PROCEEDING ON THE SCREEN?

10:48AM  12   A.   SURE, IF YOU HAVE A HARD COPY, THAT'S GREAT.

10:49AM  13             MR. LEACH:  MAY I APPROACH, YOUR HONOR?

10:49AM  14             THE COURT:  YES.

10:49AM  15   BY MR. LEACH:

10:49AM  16   Q.   (HANDING.)

10:49AM  17   A.   THANK YOU.

10:49AM  18   Q.   YOU'RE WELCOME.

10:49AM  19        MS. HOLMES, LET ME DRAW YOUR ATTENTION, PLEASE, TO THE

10:49AM  20   BOTTOM PORTION OF THIS EMAIL.  DO YOU SEE WHERE BRIAN GROSSMAN

10:49AM  21   IS EMAILING YOU AND SUNNY BALWANI WITH A COPY TO CHRIS JAMES

10:49AM  22   WITH DUE DILIGENCE QUESTIONS?

10:49AM  23   A.   I DO.

10:49AM  24   Q.   AND THIS IS AFTER YOUR INITIAL MEETING WITH MR. GROSSMAN

10:49AM  25   IN DECEMBER OF 2013?

HOLMES CROSS BY MR. LEACH (RES.)                                    8402

10:49AM   1    A.   IT IS.

10:50AM   2    Q.   AND IF I REMEMBER YOUR TESTIMONY, YOU WERE THERE FOR SOME

10:50AM   3    PORTION OF A MEETING WITH MR. GROSSMAN IN JANUARY OF 2014.

10:50AM   4    A.   I WAS.

10:50AM   5    Q.   AND DO YOU SEE THE SUBJECT OF THIS IS "DUE DILIGENCE

10:50AM   6    QUESTIONS"?

10:50AM   7    A.   I DO.

10:50AM   8    Q.   AND IF I COULD FOCUS YOUR ATTENTION ON PAGE 4.

10:50AM   9         DO YOU SEE IN BULLET 7, THERE ARE A NUMBER OF QUESTIONS

10:50AM   10   RELATING TO FINANCIAL MODEL/PROJECTIONS?

10:50AM   11   A.   I DO.

10:50AM   12   Q.   DO YOU SEE WHERE IT SAYS, "WHAT IS THE CURRENT COST OF A

10:50AM   13   WALGREENS'S ANALYZER?"

10:50AM   14   A.   I DO.

10:50AM   15   Q.   DO YOU SEE WHERE IT SAYS, "WHAT ARE GM ON THE ANALYZER,

10:50AM   16   THE TESTS?"

10:50AM   17   A.   I DO.

10:50AM   18   Q.   AND DO YOU SEE WHERE IT SAYS, "WHAT ARE THE OTHER

10:50AM   19   SIGNIFICANT OPERATING COSTS AND HOW THEY WILL CHANGE OVER

10:50AM   20   TIME?"

10:50AM   21   A.   YES.

10:50AM   22   Q.   AND YOU ACKNOWLEDGE THAT THERANOS NEVER TOLD PFM THAT

10:51AM   23   THERANOS WAS USING THIRD PARTY MACHINES; CORRECT?

10:51AM   24   A.   NO, NOT IN THOSE WORDS.

10:51AM   25   Q.   I'M NOT SURE MY QUESTION WAS THE BEST QUESTION.

10:51AM  1        YOU NEVER TOLD PFM THAT THERANOS WAS USING THIRD PARTY

10:51AM  2    MACHINES?

10:51AM  3    A.   CORRECT.

10:51AM  4    Q.   AM I RIGHT THAT YOUR TESTIMONY IS THAT YOU DON'T THINK THE

10:51AM  5    PFM SLIDE DECK DOES A VERY GOOD JOB OF DESCRIBING THE PHASE I,

10:51AM  6    PHASE II DISTINCTION ON A STAND ALONE BASIS AS YOU TALKED ABOUT

10:51AM  7    IN YOUR DIRECT TESTIMONY?

10:51AM  8    A.   THE SLIDE DECK DOES NOT.

10:51AM  9        AND I SHOULD CLARIFY.  I THINK WE DID TALK ABOUT

10:51AM  10   COMMERCIAL ANALYZERS TO THE EXTENT THAT WE WERE TALKING ABOUT

10:51AM  11   VENOUS TESTING.

10:51AM  12   Q.   OKAY.  BUT YOU NEVER TOLD PFM THAT YOU WERE MODIFYING

10:51AM  13   THIRD PARTY MACHINES TO DO TESTING?

10:51AM  14   A.   EXACTLY, YES.

10:51AM  15   Q.   I WANT TO MAKE SURE WE WERE NOT SPEAKING OVER EACH OTHER

10:52AM  16   ON THE LAST QUESTION.

10:52AM  17   A.   YEAH.

10:52AM  18   Q.   YOU'VE SEEN, AS A RESULT OF PRIOR PROCEEDINGS AND THE

10:52AM  19   RESULT OF THE TRIAL HERE, THE POWERPOINT THAT WENT TO PFM;

10:52AM  20   CORRECT?

10:52AM  21   A.   I HAVE.

10:52AM  22   Q.   AND AM I RIGHT, SITTING HERE TODAY, YOU DON'T THINK THAT

10:52AM  23   SLIDE DECK DOES A GOOD JOB OF DESCRIBING THE PHASE I, PHASE II

10:52AM  24   DISTINCTION?

10:52AM  25   A.   I DON'T.

10:52AM   1    Q.   YOU WERE HERE FOR ROGER PARLOFF'S TESTIMONY; CORRECT?

10:52AM   2    A.   I WAS.

10:52AM   3    Q.   AND YOU RECALL MEETING WITH HIM EITHER TELEPHONICALLY OR

10:52AM   4    IN PERSON ON THE NUMEROUS OCCASIONS IN ADVANCE OF THE ARTICLE

10:52AM   5    THAT HE PUBLISHED; CORRECT?

10:52AM   6    A.   I DO.

10:52AM   7    Q.   AND YOU READ THE PARLOFF ARTICLE AFTER IT WAS PUBLISHED;

10:52AM   8    CORRECT?

10:52AM   9    A.   I DID.

10:52AM   10   Q.   OKAY.  YOU DON'T HAVE A MEMORY OF FORWARDING THE PARLOFF

10:52AM   11   ARTICLE TO INVESTORS OR POTENTIAL INVESTORS; CORRECT?

10:52AM   12   A.   I DON'T.

10:52AM   13   Q.   OKAY.  LET'S SEE IF WE CAN REFRESH YOUR MEMORY.

10:53AM   14        LET ME DRAW YOUR ATTENTION TO EXHIBIT 5727, WHICH SHOULD

10:53AM   15   BE IN VOLUME 3.

10:53AM   16   A.   ONE SECOND.  OKAY.

10:53AM   17   Q.   DO YOU SEE IN THE FROM LINE IT SAYS THERANOS?

10:53AM   18   A.   I DO.

10:53AM   19   Q.   AND THE DATE IS JUNE 12TH, 2014?

10:53AM   20   A.   YES.

10:53AM   21   Q.   AND I THINK WE'VE REDACTED A NUMBER OF THE EMAIL

10:54AM   22   ADDRESSES, BUT IN YOUR COPY, DO YOU RECOGNIZE THE EMAILS AS A

10:54AM   23   NUMBER OF THERANOS INVESTORS?

10:54AM   24   A.   I DO.

10:54AM   25   Q.   OKAY.  AND DOES THIS RELATE TO MR. PARLOFF'S ARTICLE IN

10:54AM   1    JUNE OF 2014?

10:54AM   2    A.   YES.

10:54AM   3              MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5727.

10:54AM   4              MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

10:54AM   5              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:54AM   6        (GOVERNMENT'S EXHIBIT 5727 WAS RECEIVED IN EVIDENCE.)

10:55AM   7        (PAUSE IN PROCEEDINGS.)

10:55AM   8              MR. LEACH:  YOUR HONOR, WE HAVEN'T MADE THE

10:55AM   9    REDACTIONS TO 5727 IN THE EMAIL LINE, SO WE'RE GOING TO SHOW

10:55AM  10    JUST THE BOTTOM PORTION OF PAGE 2.

10:55AM  11    Q.   MS. HOLMES, THIS IS AN EMAIL THAT THERANOS SENT ON

10:55AM  12    JUNE 12TH, 2014?

10:55AM  13    A.   IT IS.

10:55AM  14    Q.   AND IT'S WRITING, "TO OUR SHAREHOLDERS:

10:55AM  15        "LAST SEPTEMBER, WE INTRODUCED OUR PRODUCTS TO THE

10:55AM  16    CONSUMER AND CLINICAL MARKETS AFTER 10 YEARS OF INCREDIBLE WORK

10:55AM  17    AND THE DEDICATION OF SO MANY PEOPLE.

10:55AM  18        "WITH THIS EMAIL, WE'RE VERY PLEASED TO SHARE WITH YOU

10:55AM  19    THIS MONTH'S 'FORTUNE' MAGAZINE COVER STORY."

10:55AM  20        DO YOU SEE THAT LANGUAGE?

10:55AM  21    A.   I DO.

10:55AM  22    Q.   AND YOU WERE SHARING THIS WITH YOUR INVESTORS SO THEY

10:56AM  23    COULD UNDERSTAND THE CURRENT DEVELOPMENTS AT THERANOS?

10:56AM  24    A.   YES.

10:56AM  25    Q.   AND YOU ALSO REFERRED TO THE PARLOFF ARTICLE IN

10:56AM   1     POWERPOINTS THAT YOU PROVIDED TO POTENTIAL INVESTORS; ISN'T

10:56AM   2     THAT CORRECT?

10:56AM   3     A.   I'M SORRY.  COULD YOU REPEAT THE QUESTION?

10:56AM   4     Q.   YOU ALSO REFERRED TO THE PARLOFF ARTICLE IN POWERPOINTS

10:56AM   5     THAT YOU PROVIDED TO POTENTIAL INVESTORS?

10:56AM   6     A.   I THINK SO.

10:56AM   7     Q.   NOW, AM I RIGHT THAT YOU DON'T THINK YOU EVER TOLD

10:56AM   8     ROGER PARLOFF THAT YOU WERE MODIFYING COMMERCIALLY AVAILABLE

10:56AM   9     MACHINES TO CONDUCT PATIENT TESTING?

10:56AM   10    A.   CORRECT.

10:56AM   11    Q.   AND AT THE TIME, IF I UNDERSTAND YOUR TESTIMONY, YOU WERE

10:56AM   12    NOT WORRIED THAT IF PARLOFF WROTE AN ARTICLE ONLY MENTIONING

10:56AM   13    THERANOS'S MANUFACTURING DEVICES, THAT PEOPLE WOULD BE GIVEN AN

10:56AM   14    INACCURATE IMPRESSION OF HOW THERANOS WAS CONDUCTING ITS

10:56AM   15    PATIENT TESTING?

10:56AM   16    A.   I WAS NOT.

10:56AM   17    Q.   AND DO I UNDERSTAND YOUR TESTIMONY THAT TODAY YOU WISH YOU

10:57AM   18    HAD HANDLED YOUR COMMUNICATIONS WITH MR. PARLOFF DIFFERENTLY?

10:57AM   19    A.   I DO.  I THINK I COULD HAVE HANDLED THOSE COMMUNICATIONS

10:57AM   20    DIFFERENTLY.

10:57AM   21    Q.   AND THAT'S WHAT YOU TOLD THE S.E.C.; CORRECT?

10:57AM   22    A.   I DON'T REMEMBER WHAT I SAID TO THE S.E.C., BUT PROBABLY.

10:57AM   23    Q.   YOU DON'T REMEMBER TELLING THEM THAT YOU WISHED YOU HAD

10:57AM   24    HANDLED THE COMMUNICATION WITH PARLOFF DIFFERENTLY?

10:57AM   25    A.   I DON'T, BUT I'M NOT SURPRISED THAT I SAID THAT.

10:57AM 1    Q.   OKAY.  AND YOU CERTAINLY DON'T DISAGREE WITH THAT HERE

10:57AM 2    TODAY?

10:57AM 3    A.   I DON'T.

10:57AM 4    Q.   LET ME DRAW YOUR ATTENTION TO CERTAIN STATEMENTS IN THE

10:57AM 5    PARLOFF ARTICLE.

10:57AM 6         IF WE CAN PLEASE GO TO WHAT IS IN EVIDENCE AS

10:57AM 7    EXHIBIT 1776.

10:58AM 8    A.   IS THAT IN THE BINDERS OR IS IT JUST ON THE SCREEN?

10:58AM 9    Q.   IT SHOULD BE IN VOLUME 4.

10:58AM 10   A.   YES.  I'VE GOT IT.

10:59AM 11        (PAUSE IN PROCEEDINGS.)

10:59AM 12   BY MR. LEACH:

10:59AM 13   Q.   MS. HOLMES, LET ME DRAW YOUR ATTENTION TO PAGE 9 OF

10:59AM 14   EXHIBIT 1776.

10:59AM 15   A.   OKAY.

10:59AM 16   Q.   PAGE 9.

10:59AM 17        IF WE CAN ZOOM OUT, MS. HOLLIMAN.

10:59AM 18        I'D LIKE TO FOCUS ON THE PARAGRAPH BEGINNING

10:59AM 19   "IMPORTANTLY."

10:59AM 20        DO YOU SEE WHERE IT SAYS, "IMPORTANTLY, IT'S NOT JUST THE

10:59AM 21   BLOOD DRAWS THAT ARE TINY.  IT'S ALSO THE ANALYTICAL SYSTEMS

10:59AM 22   THERANOS USES TO PERFORM THE TESTS.  THEY TAKE UP A SMALL

10:59AM 23   FRACTION OF THE FOOTPRINT REQUIRED BY A CONVENTIONAL LAB

10:59AM 24   TODAY."

10:59AM 25        DO YOU SEE THAT LANGUAGE?

10:59AM  1    A.   I DO.

10:59AM  2    Q.   AND YOU AGREE WITH ME THAT THE STATEMENT -- THAT THAT

10:59AM  3    STATEMENT AS OF JULY 2014 WAS NOT TRUE AS TO THE COMMERCIALLY

10:59AM  4    AVAILABLE MACHINES THAT THERANOS WAS USING?

10:59AM  5    A.   IT WAS NOT.

10:59AM  6    Q.   AND IF I COULD DRAW YOUR ATTENTION, PLEASE, TO PAGE 11.

11:00AM  7    A.   OKAY.

11:00AM  8    Q.   IN THE THIRD PARAGRAPH THERE'S A LINE, "THERANOS, WHICH

11:00AM  9    DOES NOT BUY ANALYZERS FROM THIRD PARTIES, IS THEREFORE IN A

11:00AM  10   UNIQUE POSITION."

11:00AM  11        THAT STATEMENT, "THERANOS DOES NOT BUY ANALYZERS FROM

11:00AM  12   THIRD PARTIES," YOU AGREE WITH ME THAT WAS NOT TRUE AS OF JULY

11:00AM  13   OF 2014?

11:00AM  14   A.   CORRECT.

11:00AM  15   Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO PAGE 6 -- OR I'M

11:01AM  16   SORRY, PAGE 5.  AND I DRAW YOUR ATTENTION TO THE PARAGRAPH AT

11:01AM  17   THE BOTTOM.

11:01AM  18        DO YOU SEE WHERE IT SAYS, "THERANOS RUNS WHAT'S CALLED A

11:01AM  19   HIGH-COMPLEXITY LABORATORY"?

11:01AM  20   A.   YES.

11:01AM  21   Q.   AND THEN IN THAT SECOND SENTENCE IT SAYS, "IT CURRENTLY

11:01AM  22   OFFERS MORE THAN 200 - AND IS RAMPING UP TO OFFER MORE THAN

11:01AM  23   1,000 - OF THE MOST COMMONLY ORDERED BLOOD DIAGNOSTIC TESTS,

11:01AM  24   ALL WITHOUT THE NEED FOR A SYRINGE."

11:02AM  25        DO YOU SEE THAT LANGUAGE?

11:02AM  1      A.   I DO.

11:02AM  2      Q.   AND YOU AGREE WITH ME THAT WAS NOT A CORRECT STATEMENT AS

11:02AM  3      OF JULY 2014?

11:02AM  4      A.   I DON'T THINK IT IS NOW.

11:02AM  5      Q.   THERANOS OFFERED MANY TESTS WITH THE NEED FOR A SYRINGE;

11:02AM  6      CORRECT?

11:02AM  7      A.   NO, WE DID NOT.

11:02AM  8      Q.   WELL, THERANOS OFFERED A NUMBER OF VENOUS DRAWS RUN ON

11:02AM  9      COMMERCIALLY AVAILABLE MACHINES; CORRECT?

11:02AM  10     A.   WE DID.

11:02AM  11     Q.   AND JUST TO BE CLEAR, YOU AGREE THAT THE STATEMENT IN THE

11:02AM  12     PARLOFF ARTICLE WAS INCORRECT AT THE TIME?

11:02AM  13     A.   I BELIEVE THAT NOW.

11:02AM  14     Q.   LET ME DRAW YOUR ATTENTION TO PAGE 10, AND IF WE CAN LOOK

11:03AM  15     AT THE FIRST PARAGRAPH AT THE TOP.

11:03AM  16          DO YOU SEE THERE'S A REFERENCE TO A STATEMENT BY DR. LARET

11:03AM  17     AT UCSF, AND THEN A REFERENCE TO MILITARY EVACUATION

11:03AM  18     HELICOPTERS, MS. HOLMES?

11:03AM  19     A.   YES, I'M JUST READING IT.

11:03AM  20          I DO.

11:03AM  21     Q.   OKAY.  AND IN PARENTHESIS IT SAYS, "THE ANALYZERS LOOK

11:03AM  22     LIKE LARGE DESKTOP COMPUTER TOWERS.  HOLMES DECLINES TO EXPLAIN

11:03AM  23     HOW THEY WORK, OR EVEN ALLOW THEM TO BE PHOTOGRAPHED, CITING

11:03AM  24     THE NEED TO PROTECT TRADE SECRETS."

11:03AM  25          DO YOU SEE THAT?

11:03AM  1     A.   I DO.

11:03AM  2     Q.   WAS THAT TRUE, THAT YOU DECLINED TO HAVE THE DEVICES EVEN

11:03AM  3     PHOTOGRAPHED TO PROTECT TRADE SECRETS?

11:03AM  4     A.   I THINK SO.

11:03AM  5     Q.   AND THAT'S BECAUSE YOU KNEW THIS ARTICLE WOULD BE GOING

11:04AM  6     OUT TO A LARGE AUDIENCE?

11:04AM  7     A.   YES.

11:04AM  8     Q.   AND THAT'S TRUE BECAUSE YOU UNDERSTOOD THIS WOULD BE

11:04AM  9     PUBLIC WITH PEOPLE WHO WEREN'T BOUND BY CONFIDENTIALITY

11:04AM  10    AGREEMENTS?

11:04AM  11    A.   YES.

11:04AM  12    Q.   LET ME ASK YOU SOME QUESTIONS ABOUT SAFEWAY.

11:04AM  13         DO I UNDERSTAND YOUR TESTIMONY CORRECTLY, YOU DON'T THINK

11:04AM  14    YOU EVER TOLD INVESTORS OR POTENTIAL INVESTORS IN 2014 THAT THE

11:04AM  15    SAFEWAY CONTRACT WAS GOING WELL AND THAT THERANOS WOULD BE

11:04AM  16    ROLLING OUT TO SAFEWAY STORES IN EARLY 2015?

11:04AM  17    A.   I DON'T REMEMBER SPECIFIC CONVERSATIONS NOW.

11:04AM  18         THE COURT:  MR. LEACH, BEFORE YOU ASK YOUR NEXT

11:04AM  19    QUESTION, SHOULD WE TAKE OUR MORNING BREAK NOW?

11:04AM  20         MR. LEACH:  YES.

11:04AM  21         THE COURT:  LET'S DO THAT.  LET'S TAKE 30 MINUTES,

11:04AM  22    LADIES AND GENTLEMEN, 30 MINUTES.

11:45AM  23         (RECESS FROM 11:05 A.M. UNTIL 11:45 A.M.)

11:46AM  24         THE COURT:  THANK YOU.  WE'RE BACK ON THE RECORD.

11:46AM  25    PLEASE BE SEATED.

11:46AM   1          ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.

11:46AM   2          MR. LEACH, YOU'D LIKE TO CONTINUE?

11:46AM   3              MR. LEACH:  YES, YOUR HONOR.  THANK YOU.

11:46AM   4     Q.  GOOD MORNING AGAIN, MS. HOLMES.

11:46AM   5     A.  GOOD MORNING.

11:46AM   6     Q.  BEFORE WE BROKE I WAS ASKING SOME QUESTIONS ABOUT SAFEWAY.

11:46AM   7          DID YOU TELL INVESTORS OR POTENTIAL INVESTORS IN 2014 THAT

11:46AM   8     THE SAFEWAY CONTRACT WAS GOING WELL AND THAT THERANOS WOULD BE

11:46AM   9     ROLLING OUT TO SAFEWAY STORES IN EARLY 2015?

11:46AM   10    A.  I DON'T REMEMBER SAYING THAT SPECIFICALLY.

11:46AM   11    Q.  OKAY.  AND DID YOU EVER HEAR MR. BALWANI SAY THAT?

11:46AM   12    A.  I DON'T THINK SO.

11:46AM   13    Q.  AND WOULD THAT STATEMENT HAVE BEEN TRUE IN 2014?

11:46AM   14    A.  I THINK SO.  THAT'S WHAT WE WERE PLANNING TO DO, YES.

11:47AM   15    Q.  WELL, LET ME ASK YOU TO LOOK IN YOUR RED BINDER, PLEASE.

11:47AM   16    A.  YES.

11:47AM   17    Q.  AND IF YOU COULD PLEASE GO TO PAGE 5565.

11:47AM   18    A.  OKAY.

11:47AM   19    Q.  AND I DRAW YOUR ATTENTION TO PAGE 841, BEGINNING AT

11:47AM   20    LINE 22.

11:47AM   21    A.  YES.

11:47AM   22              MR. LEACH:  YOUR HONOR, I ASK PERMISSION TO READ

11:47AM   23    FROM LINE 22 ON PAGE 841 TO LINE 7 ON PAGE 842.

11:48AM   24              THE COURT:  YES.

11:48AM   25    BY MR. LEACH:

11:48AM  1    Q.   MS. HOLMES, YOU WERE ASKED THE FOLLOWING QUESTIONS AND

11:48AM  2    GAVE THE FOLLOWING ANSWERS:

11:48AM  3         "DID YOU TELL INVESTORS OR POTENTIAL INVESTORS IN 2014

11:48AM  4    THAT THE SAFEWAY CONTRACT WAS GOING WELL AND THAT THERANOS

11:48AM  5    WOULD BE ROLLING OUT TO SAFEWAY STORES IN EARLY 2015?

11:48AM  6         "ANSWER:  I DON'T THINK SO.

11:48AM  7         "QUESTION:  DID YOU EVER HEAR MR. BALWANI SAY THAT?

11:48AM  8         "ANSWER:  I DON'T THINK SO.

11:48AM  9         "QUESTION:  WOULD THAT STATEMENT HAVE BEEN TRUE IN 2014?

11:48AM  10        "ANSWER:  I DON'T KNOW ABOUT THE SECOND PART IN TERMS OF

11:48AM  11   WHETHER WE THOUGHT WE WOULD BE ROLLING OUT, AND I DON'T THINK

11:48AM  12   WE THOUGHT IT WAS GOING WELL."

11:48AM  13        DID I READ THAT CORRECTLY?

11:48AM  14   A.   YES, YOU DID.

11:48AM  15   Q.   LET ME DRAW YOUR ATTENTION TO WHAT IS -- SO YOUR TESTIMONY

11:48AM  16   BEFORE THE S.E.C. WAS THAT YOU DIDN'T THINK THE SAFEWAY

11:48AM  17   RELATIONSHIP WAS GOING WELL IN 2014?

11:49AM  18   A.   YES.

11:49AM  19   Q.   LET ME DISPLAY FOR YOU WHAT IS IN EVIDENCE AS

11:49AM  20   EXHIBIT 2166.

11:49AM  21   A.   JUST TO CLARIFY, I THINK THIS SAY THE CONTRACT IS GOING

11:49AM  22   WELL.

11:49AM  23   Q.   FAIR ENOUGH.

11:49AM  24        MS. HOLMES, I'M DISPLAYING ON THE SCREEN WHAT HAS THE

11:49AM  25   TITLE "RDV APPROVAL DOCUMENT."

11:49AM   1        DO YOU RECALL MS. PETERSON TESTIFYING ABOUT THIS?

11:49AM   2   A.   I DO.

11:49AM   3   Q.   OKAY.  IF WE COULD GO TO PAGE 3.

11:49AM   4        DO YOU SEE THE LINE IN THE GROWTH PLANS, IN THE SECOND

11:49AM   5   LINE WHERE IT SAYS, "THERANOS IS ALSO UNDER CONTRACT WITH

11:49AM   6   SAFEWAY FOR A NATIONAL ROLLOUT TO A SUBSTANTIAL NUMBER OF THEIR

11:49AM   7   STORES WITH PLANS TO OPEN 300 SAFEWAY LOCATIONS DURING 2015."

11:50AM   8        DO YOU SEE THAT LANGUAGE?

11:50AM   9   A.   I DO.

11:50AM  10   Q.   AND THEN IF YOU LOOK DOWN AT THE BOTTOM RIGHT.

11:50AM  11        IF YOU CAN ZOOM OUT, MS. HOLLIMAN.

11:50AM  12        DO YOU SEE THE SECTION FOR FINANCIAL NOTES?

11:50AM  13   A.   YES.

11:50AM  14   Q.   AND DO YOU SEE WHERE IT SAYS, "EVERYTHING IN THE 2015

11:50AM  15   FORECAST HAS CONTRACTS WITH PHARMACIES, PHYSICIANS, HOSPITALS,

11:50AM  16   AND PAYORS TO SUPPORT THE PROJECTED REVENUES.

11:50AM  17        "2015 ASSUMES THEY OPEN APPROXIMATELY 1200 LOCATIONS

11:50AM  18   ACROSS WALGREENS (900) AND SAFEWAY (300) RETAIL NETWORKS."

11:50AM  19        DO YOU SEE THAT LANGUAGE?

11:50AM  20   A.   I DO.

11:50AM  21   Q.   I'D LIKE TO ASK YOU SOME ADDITIONAL QUESTIONS ABOUT

11:50AM  22   JOHNS HOPKINS.

11:50AM  23        DO YOU REMEMBER TALKING ABOUT JOHNS HOPKINS IN YOUR DIRECT

11:50AM  24   EXAMINATION?

11:50AM  25   A.   I DO.

11:50AM   1    Q.   THERANOS DID NOT HIRE JOHNS HOPKINS; CORRECT?

11:50AM   2    A.   CORRECT.

11:50AM   3    Q.   WE CAN TAKE THIS DOWN.

11:50AM   4         WALGREENS WAS THE ONE WHO HIRED JOHNS HOPKINS; AM I RIGHT?

11:51AM   5    A.   YES.

11:51AM   6    Q.   AND YOU MET WITH JOHNS HOPKINS ON ONE OCCASION?

11:51AM   7    A.   WE MET WITH THEM SEVERAL TIMES.

11:51AM   8    Q.   OKAY.  YOU MET WITH THEM IN APRIL OF 2010?

11:51AM   9    A.   I DID.

11:51AM  10    Q.   AND THAT APRIL 2010 MEETING IS THE BASIS FOR THE SUMMARY

11:51AM  11    THAT YOU TALKED ABOUT IN YOUR EXAMINATION?

11:51AM  12    A.   IT IS.

11:51AM  13    Q.   THAT ONE AND ONLY MEETING?

11:51AM  14    A.   YES, AND IN ADDITION TO I THINK SOME REVIEW OF MATERIALS

11:51AM  15    THAT THEY HAD DONE PRIOR TO THE MEETING.

11:51AM  16    Q.   OKAY.  YOU SENT SOME DATA IN ADVANCE OF THAT MEETING?

11:51AM  17    A.   WE DID.

11:51AM  18    Q.   BUT YOU MET WITH THEM ON THAT ONE DAY, AND THEN THEY

11:51AM  19    PREPARED THEIR SUMMARY?

11:51AM  20    A.   EXACTLY.

11:51AM  21    Q.   OKAY.  AND ALL OF THE DATA THAT YOU GAVE TO JOHNS HOPKINS

11:51AM  22    WAS GENERATED BY THERANOS; CORRECT?

11:51AM  23    A.   I THINK SO.

11:51AM  24    Q.   CAN WE PLEASE DISPLAY WHAT IS IN EVIDENCE AS EXHIBIT 7109.

11:51AM  25         DO YOU RECALL TESTIFYING ON DIRECT EXAMINATION ABOUT THIS

| | | |
|---|---|---|
| 11:52AM | 1 | EMAIL FROM JUNE OF 2010? |
| 11:52AM | 2 | A.   I DO. |
| 11:52AM | 3 | Q.   AND IT WAS YOUR TESTIMONY THAT THIS POWERPOINT INCLUDES |
| 11:52AM | 4 | THE DATA THAT WAS PROVIDED TO HOPKINS? |
| 11:52AM | 5 | A.   YES. |
| 11:52AM | 6 | Q.   OKAY.  LET'S GO TO PAGE 4, PLEASE. |
| 11:52AM | 7 | DO YOU SEE DR. GIBBONS INCLUDED A CONFIDENTIAL INFORMATION |
| 11:52AM | 8 | NOTIFICATION IN THIS POWERPOINT? |
| 11:52AM | 9 | A.   I DO. |
| 11:52AM | 10 | Q.   OKAY.  IT SAYS, "PLEASE NOTE THAT THIS PRESENTATION IS |
| 11:52AM | 11 | STRICTLY CONFIDENTIAL AND DISCLOSES THERANOS INFORMATION NOT IN |
| 11:52AM | 12 | THE PUBLIC DOMAIN," IN ITALICS. |
| 11:52AM | 13 | DO YOU SEE THAT? |
| 11:52AM | 14 | A.   YES. |
| 11:52AM | 15 | Q.   "THE TECHNOLOGY DESCRIBED IS THE SUBJECT OF PENDING U.S. |
| 11:52AM | 16 | AND INTERNATIONAL PATENTS, WHICH THERANOS WILL ACTIVELY |
| 11:52AM | 17 | ENFORCE." |
| 11:52AM | 18 | IS THAT A CORRECT STATEMENT? |
| 11:52AM | 19 | A.   YES. |
| 11:52AM | 20 | Q.   OKAY.  "THE INFORMATION CAN ONLY BE PROVIDED TO THOSE |
| 11:53AM | 21 | COVERED BY VALIDLY EXECUTED CONFIDENTIAL DISCLOSURE AGREEMENTS |
| 11:53AM | 22 | ON A NEED-TO-KNOW BASIS." |
| 11:53AM | 23 | DO YOU SEE THAT LANGUAGE? |
| 11:53AM | 24 | A.   I DO. |
| 11:53AM | 25 | Q.   AND YOU BROUGHT A DEVICE TO HOPKINS; CORRECT? |

HOLMES CROSS BY MR. LEACH (RES.)                                    8416

11:53AM  1    A.   YES.

11:53AM  2    Q.   IT WAS NOT THE 4 SERIES YOU WERE MAKING.  IT WAS A 3

11:53AM  3    SERIES; CORRECT?

11:53AM  4    A.   CORRECT.

11:53AM  5    Q.   AND YOU PROVIDED THEM SOME DATA FROM THE 4 SERIES;

11:53AM  6    CORRECT?

11:53AM  7    A.   WE DID.

11:53AM  8    Q.   IN THIS LENGTHY POWERPOINT THAT YOU SHARED WITH HOPKINS;

11:53AM  9    RIGHT?

11:53AM  10   A.   YES.

11:53AM  11   Q.   AND YOU WERE COMFORTABLE DOING THAT BECAUSE THEY HAD A

11:53AM  12   CONFIDENTIALITY RELATIONSHIP WITH WALGREENS; CORRECT?

11:53AM  13   A.   YES.

11:53AM  14   Q.   AND YOU ASKED THEM TO SIGN DOCUMENTS BEFORE YOU SHOWED

11:53AM  15   THEM THE DEVICE AND DISPLAYED THIS POWERPOINT?

11:53AM  16   A.   I DON'T KNOW.

11:53AM  17   Q.   WOULD IT SURPRISE YOU IF YOU DIDN'T?

11:53AM  18   A.   NOT NECESSARILY IF IT WAS COVERED BY THE WALGREENS

11:53AM  19   RELATIONSHIP.

11:53AM  20   Q.   YOU WANTED TO BE CAREFUL TO PROTECT THE INFORMATION IN

11:53AM  21   HERE BECAUSE IT INVOLVED TRADE SECRETS?

11:53AM  22   A.   OR PATENTS THAT WE WERE STILL WORKING ON.

11:53AM  23   Q.   CONFIDENTIAL INFORMATION RELATING TO THERANOS, AND YOU

11:54AM  24   WANTED TO MAKE SURE IT DIDN'T GET OUT THERE?

11:54AM  25   A.   YEAH, EXACTLY.

11:54AM   1    Q.   OKAY.  AND YOU WERE COMFORTABLE SHARING THAT WITH HOPKINS?

11:54AM   2    A.   WE WERE.

11:54AM   3    Q.   OKAY.  MR. DOWNEY ALSO SHOWED YOU THE SUMMARY THAT HOPKINS

11:54AM   4    PROVIDED YOU; CORRECT?

11:54AM   5    A.   HE DID.

11:54AM   6    Q.   AND YOU ACTUALLY GOT THAT FROM WALGREENS; CORRECT?

11:54AM   7    A.   YES.

11:54AM   8    Q.   AND THAT SUMMARY INCLUDES A DISCLAIMER DOWN AT THE BOTTOM

11:54AM   9    OF THE TEXT, DOESN'T IT?

11:54AM  10    A.   I'M NOT SURE, BUT I'M SURE YOU'LL TELL ME.

11:54AM  11    Q.   DOESN'T IT HAVE A DISCLAIMER THAT THIS IS NOT AN

11:54AM  12    ENDORSEMENT BY HOPKINS?

11:54AM  13    A.   I DON'T KNOW.  I DON'T REMEMBER.

11:54AM  14    Q.   YOU DON'T REMEMBER?

11:54AM  15    A.   I DON'T.

11:54AM  16    Q.   IT'S A TWO PAGE DOCUMENT THAT YOU DON'T REMEMBER HOPKINS

11:54AM  17    SAYING "WE DON'T ENDORSE THIS"?

11:54AM  18    A.   I DON'T REMEMBER THE DISCLAIMER.

11:54AM  19    Q.   OKAY.  WELL, IN ANY EVENT, YOU DID NOT THINK THAT THE

11:54AM  20    JOHNS HOPKINS ASSESSMENT WAS VALIDATING THE DEVICE; CORRECT?

11:54AM  21    A.   I THOUGHT IT WAS VALIDATING THERANOS'S TECHNOLOGIES.

11:55AM  22    Q.   WELL, DO YOU HAVE THE RED BINDER, MS. HOLMES?

11:55AM  23    A.   I DO.

11:55AM  24    Q.   AND YOU REMEMBER THIS IS YOUR TESTIMONY BEFORE THE

11:55AM  25    SECURITIES AND EXCHANGE COMMISSION?

11:55AM 1      A.   IT IS.

11:55AM 2      Q.   AND YOU TOOK AN OATH THERE; CORRECT?

11:55AM 3      A.   I DID.

11:55AM 4      Q.   AND THIS WAS IN 2017 WHEN YOU TESTIFIED THERE?

11:55AM 5      A.   IT WAS.

11:55AM 6      Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO PAGE 839.

11:55AM 7               THE COURT:  IS THAT BATES 5564?

11:55AM 8               MR. LEACH:  YES, YOUR HONOR.  THANK YOU.

11:55AM 9           I'D SEEK PERMISSION TO READ QUESTION -- OR LINES 15

11:55AM 10     THROUGH 23 ON PAGE 839.

11:55AM 11              THE COURT:  YES.

11:55AM 12     BY MR. LEACH:

11:55AM 13     Q.   MS. HOLMES, WERE YOU ASKED THE FOLLOWING QUESTIONS AND DID

11:56AM 14     YOU GIVE THE FOLLOWING ANSWERS:

11:56AM 15          "QUESTION:  DID YOU EVER TELL INVESTORS OR PROSPECTIVE

11:56AM 16     INVESTORS THAT JOHNS HOPKINS HAD VALIDATED THERANOS'S DEVICES?

11:56AM 17          "ANSWER:  I DON'T REMEMBER USING THOSE WORDS, NO.

11:56AM 18          "QUESTION:  DID YOU EVER HEAR MR. BALWANI SAY THAT?

11:56AM 19          "ANSWER:  I DON'T THINK SO.

11:56AM 20          "QUESTION:  WOULD THAT HAVE BEEN TRUE IN 2013 AND 2014?

11:56AM 21          "ANSWER:  AS YOU KNOW, THEY'D DONE AN ASSESSMENT.  I DON'T

11:56AM 22     THINK WE THOUGHT OF IT AS VALIDATING THE DEVICE."

11:56AM 23          DID I READ THAT CORRECTLY?

11:56AM 24     A.   YOU DID.

11:56AM 25     Q.   OKAY.  YOU KNEW THAT WALGREENS NEVER OPENED MORE THAN 41

11:56AM   1    WELLNESS CENTERS; CORRECT?

11:56AM   2    A.   CORRECT.

11:56AM   3    Q.   AND LAST WEEK WE SAW AN EMAIL FROM MR. JHAVERI THAT WAS

11:56AM   4    FORWARDED TO YOU IN AUGUST OF 2014 WHERE YOU WERE ADVISED THAT

11:57AM   5    WALGREENS HAD TWO AREAS OF FOCUS THAT REQUIRED A DOCUMENTED

11:57AM   6    DETAILED PLAN AS A PREREQUISITE EXPANSION.

11:57AM   7         DO YOU RECALL LOOKING AT THAT DOCUMENT?

11:57AM   8    A.   I RECALL THE DOCUMENT.  I UNDERSTOOD IT DIFFERENTLY.

11:57AM   9    Q.   OKAY.  WELL, YOU SAW A REFERENCE IN THE DOCUMENT TO VENOUS

11:57AM   10   PERCENTAGE NEEDS TO GET UNDER 10 PERCENT; CORRECT?

11:57AM   11   A.   I DID.

11:57AM   12   Q.   OKAY.  AND LATER IN 2014, MR. BALWANI TOLD YOU THAT

11:57AM   13   THERANOS COULD NOT SCALE WITH WALGREENS; CORRECT?

11:57AM   14   A.   I DON'T REMEMBER IT LIKE THAT.

11:57AM   15   Q.   OKAY.  WELL, LET'S LOOK AT THE -- LET'S LOOK AT THE

11:57AM   16   DOCUMENT.

11:57AM   17        IF WE COULD PLEASE CALL UP EXHIBIT 5387D AND GO TO

11:57AM   18   PAGE 24.  ACTUALLY, ZOOM IN ON --

11:57AM   19        MS. HOLMES --

11:58AM   20        ACTUALLY, THAT WAS FINE, MS. HOLLIMAN.  I'M SORRY.  I

11:58AM   21   MISSPOKE.

11:58AM   22        MS. HOLMES, DO YOU SEE A SERIES OF TEXT MESSAGES BETWEEN

11:58AM   23   YOU AND MR. BALWANI IN THE NOVEMBER 19TH, 2014 TIME PERIOD ON

11:58AM   24   THE SCREEN?

11:58AM   25   A.   I DO.

11:58AM  1   Q.   OKAY.  AND THE FIRST MESSAGE SAYS, "WE NEED CALL CENTER

11:58AM  2   MANAGER, NEW CALL CENTER TEAM, GET RECURRENT CREW OUT OF DOCS

11:58AM  3   FACING COMMUNICATIONS."

11:58AM  4       DO YOU SEE THAT?

11:58AM  5   A.   I DO.

11:58AM  6   Q.   AND THEN THE THIRD TEXT READS, "FUNDAMENTALLY WE NEED TO

11:58AM  7   STOP FIGHTING FIRES BY NOT CREATING THEM."

11:58AM  8       DO YOU SEE THAT?

11:58AM  9   A.   YES.

11:58AM  10   Q.   AND FURTHER DOWN YOU WROTE SIMILAR WORDS, "FUNDAMENTALLY

11:58AM  11   WE NEED TO STOP FIGHTING FIRES BY NOT CREATING THEM."

11:58AM  12       DO YOU SEE THAT?

11:58AM  13   A.   I DO.

11:58AM  14   Q.   AND YOU WROTE, "NEED TO FIX ROOT CAUSE HERE."

11:58AM  15       DO YOU SEE THAT?

11:58AM  16   A.   I DO.

11:58AM  17   Q.   AND THEN DOWN AT THE BOTTOM, DO YOU SEE WHERE MR. BALWANI

11:58AM  18   WROTE, "WE CAN'T SCALE WITH WAG"?

11:59AM  19   A.   I DO.

11:59AM  20   Q.   W-A-G IS AN ABBREVIATION YOU WOULD USE FOR WALGREENS FROM

11:59AM  21   TIME TO TIME; CORRECT?

11:59AM  22   A.   IT IS.

11:59AM  23   Q.   AND YOU WERE ALSO TOLD IN THIS LATE 2014 TIME PERIOD THAT

11:59AM  24   WALGREENS DID NOT INTEND TO OPEN MORE PSC'S UNTIL JULY OF 2014

11:59AM  25   BECAUSE THERANOS MISSED THE INTEGRATION DEADLINE; ISN'T THAT

11:59AM 1    CORRECT?

11:59AM 2    A.   I DON'T THINK SO.

11:59AM 3    Q.   WELL, LET'S LOOK FURTHER BELOW.

11:59AM 4         IF WE CAN ZOOM OUT, MS. HOLLIMAN.

11:59AM 5         SO AFTER THE TEXT, "WE CAN'T SCALE WITH WAG," MR. BALWANI

11:59AM 6    WROTE, "THEY ARE TERRIBLE AND WE NEED SWY AND CVS."

11:59AM 7         DO YOU SEE THAT?

11:59AM 8    A.   YES.

11:59AM 9    Q.   S-W-Y WAS AN ACRONYM THAT YOU USED FROM TIME TO TIME FOR

12:00PM 10   SAFEWAY; IS THAT CORRECT?

12:00PM 11   A.   I DON'T KNOW IF THAT'S WHAT I DID, BUT THAT'S WHAT IT

12:00PM 12   MEANS HERE.

12:00PM 13   Q.   AND CVS IS AN ACRONYM FOR A WALGREENS COMPETITOR?

12:00PM 14   A.   IT IS.

12:00PM 15   Q.   AND YOU WROTE, "IT IS TIME.

12:00PM 16        "LET'S GET SWY DONE THIS WEEK.

12:00PM 17        "WE CAN DO IT."

12:00PM 18        AND THEN THERE'S A TEXT FROM MR. BALWANI, "THEY TOLD OUR

12:00PM 19   TEAM IN WAG MEETING THAT THEY DON'T INTEND TO OPEN MORE PSC'S

12:00PM 20   UNTIL JULY BECAUSE WE MISSED THEIR I.T. INTEGRATION DEADLINE."

12:00PM 21        DO YOU SEE THAT?

12:00PM 22   A.   I DO.

12:00PM 23   Q.   AND YOU RESPOND, AND THEN MR. BALWANI SAYS, "WHICH IS GOOD

12:00PM 24   BECAUSE WE CAN FOCUS ON SWY AND CVS."

12:00PM 25        DID I READ THAT LAST TEXT CORRECTLY?

12:00PM   1      A.   YOU DID.

12:00PM   2      Q.   AND THIS IS THE NOVEMBER OF 2014 TIME PERIOD; CORRECT?

12:00PM   3      A.   IT IS.

12:00PM   4      Q.   OKAY.  AND IN THIS LATE NOVEMBER, EARLY DECEMBER 2014 TIME

12:00PM   5      PERIOD, YOU'RE STILL RAISING MONEY FROM INVESTORS; CORRECT?

12:00PM   6      A.   YES.

12:00PM   7      Q.   AND THAT WOULD INCLUDE THE WALTON FAMILY?

12:01PM   8      A.   I THINK SO.

12:01PM   9      Q.   OKAY.  THAT WOULD INCLUDE RUPERT MURDOCH?

12:01PM  10      A.   YES.

12:01PM  11      Q.   YOU TALKED IN YOUR DIRECT EXAMINATION ABOUT PHASE I AND

12:01PM  12      PHASE II OF THE ROLLOUT.

12:01PM  13           DO YOU RECALL THAT TESTIMONY?

12:01PM  14      A.   I DO.

12:01PM  15      Q.   AND THE IDEA BEHIND PHASE I WAS YOU'RE GOING TO HAVE A

12:01PM  16      CENTRAL LAB TO DO ALL OF THE TESTING, AND AT SOME POINT IN TIME

12:01PM  17      AFTER THE FDA APPROVES THE DEVICE, YOU WILL PUT THE DEVICE IN

12:01PM  18      ACTUAL WALGREENS STORES.

12:01PM  19           HAVE I GOT THE THRUST OF THAT CORRECTLY?

12:01PM  20      A.   YES.

12:01PM  21      Q.   OKAY.  AND YOUR AMENDED CONTRACT WITH WALGREENS WAS IN

12:01PM  22      JUNE OR JULY OF 2012?

12:01PM  23      A.   ONE OF THEM WAS.

12:01PM  24      Q.   OKAY.  THE AMENDMENT THAT SPELLS OUT PHASE I AND PHASE II?

12:01PM  25      A.   YES.

12:01PM 1    Q.   OKAY.  SO BY JUNE OF 2012, YOU HAD THIS CONCEPT OF, WE'RE

12:02PM 2    GOING TO HAVE A CENTRAL LAB IN PHASE I WHERE ALL OF THE TESTING

12:02PM 3    IS DONE IN A CLIA LAB IN ONE SETTING, AND PHASE II IS GOING TO

12:02PM 4    BE WHERE WE PUT THE DEVICES INTO ACTUAL WALGREENS STORES?

12:02PM 5    A.   YES.

12:02PM 6    Q.   OKAY.  AND I THINK YOU TESTIFIED THAT YOUR HOPE WAS THAT

12:02PM 7    PHASE I WOULD BE SHORT?

12:02PM 8    A.   IT WAS.

12:02PM 9    Q.   OKAY.  BECAUSE YOU WANTED TO PUT MINILABS IN WALGREENS?

12:02PM 10   A.   YES.

12:02PM 11   Q.   RIGHT?  THAT WAS SOMETHING THAT YOU HAD WANTED TO DO SINCE

12:02PM 12   2010; CORRECT?

12:02PM 13   A.   YES.

12:02PM 14   Q.   THAT'S BECAUSE YOU VIEWED THE MINILAB AS THE CORE OF

12:02PM 15   THERANOS'S TECHNOLOGY?

12:02PM 16   A.   ONE OF THEM, YES.

12:02PM 17   Q.   WELL, IS IT FAIR TO SAY THAT THE MINILAB AND ALL OF THE

12:02PM 18   CHEMISTRIES AND EVERYTHING THAT WORKS IN THERE WAS MORE

12:02PM 19   IMPORTANT TO THERANOS'S FUTURE THAN ANYTHING BEING DONE IN

12:02PM 20   PHASE I?

12:02PM 21   A.   YES.

12:02PM 22   Q.   AND AM I RIGHT THAT THERANOS ACTUALLY GAVE MINILABS TO

12:02PM 23   WALGREENS AT CERTAIN POINTS?  CORRECT?

12:02PM 24   A.   WE DID.

12:03PM 25   Q.   IN FACT, YOU GAVE TWO OF THEM TO WALGREENS?

12:03PM  1     A.   AT LEAST, YES.

12:03PM  2     Q.   OKAY.  YOU SENT THE MINILAB TO CHICAGO, OR THE ILLINOIS

12:03PM  3     AREA, FOR WALGREENS EXECUTIVES TO HAVE AND TO LOOK AT AND TO

12:03PM  4     UNDERSTAND; CORRECT?

12:03PM  5     A.   YES.

12:03PM  6     Q.   AND YOU DID THAT BECAUSE YOU HAD A CONFIDENTIALITY

12:03PM  7     AGREEMENT WITH WALGREENS; CORRECT?

12:03PM  8     A.   AND OTHER REASONS, YES.

12:03PM  9     Q.   OKAY.  THEY PROMISED TO KEEP YOUR SECRETS; RIGHT?

12:03PM  10    A.   THEY DID.

12:03PM  11    Q.   AND YOU HAD PROMISED TO KEEP WALGREENS'S SECRETS?

12:03PM  12    A.   YES.

12:03PM  13    Q.   AND THAT'S BECAUSE YOU WERE PARTNERS IN THIS RELATIONSHIP?

12:03PM  14    A.   CORRECT.

12:03PM  15    Q.   AND YOU TRUSTED THEM TO HONOR THEIR AGREEMENTS?

12:03PM  16    A.   WE DID.

12:03PM  17    Q.   YOU TRUSTED THEM NOT TO REVERSE ENGINEER THE MINILAB?

12:03PM  18    A.   CORRECT.

12:03PM  19    Q.   YOU TRUSTED THEM NOT TO OPEN IT UP, LOOK AT THE

12:03PM  20    SPECTROMETER, LOOK AT THE CENTRIFUGE, AND TRY TO COME AWAY WITH

12:03PM  21    AN IDEA OF HOW TO REVERSE ENGINEER THAT; CORRECT?

12:04PM  22    A.   CORRECT.

12:04PM  23    Q.   AND THAT WOULD VIOLATE YOUR CONFIDENTIALITY AGREEMENTS IF

12:04PM  24    YOU DID THAT -- IF WALGREENS DID THAT; CORRECT?

12:04PM  25    A.   YES.

12:04PM   1            AND JUST TO BE CLEAR, THE VERSIONS THAT WE SENT THEM WERE

12:04PM   2    THE 3 SERIES VERSIONS.

12:04PM   3    Q.   OKAY.  AND YOU WERE USING 3 SERIES VERSIONS IN THE CLIA

12:04PM   4    LAB AT SOME POINT?

12:04PM   5    A.   WE WERE.

12:04PM   6    Q.   OKAY.  SO THIS WAS TECHNOLOGY THAT YOU WERE ACTUALLY

12:04PM   7    USING?

12:04PM   8    A.   YES.

12:04PM   9    Q.   OKAY.  AND YOU KNEW THAT UNDER THE AGREEMENTS, WALGREENS

12:04PM  10    COULDN'T TAKE APART THE DEVICE, COULDN'T STUDY IT, COULDN'T

12:04PM  11    REVERSE ENGINEER IT.  YOU TRUSTED THEM TO KEEP YOUR SECRETS?

12:04PM  12    A.   WE DID.

12:04PM  13    Q.   ON THIS VERY, VERY IMPORTANT PIECE OF THERANOS TECHNOLOGY?

12:04PM  14    A.   YES.

12:04PM  15            (PAUSE IN PROCEEDINGS.)

12:04PM  16            THE COURT:  JUST A SECOND.

12:04PM  17        THANK YOU, MS. KRATZMANN.

12:04PM  18        LET'S MAKE SURE THAT PEN IS WORKING.

12:05PM  19            MR. LEACH:  THANK YOU, YOUR HONOR.

12:05PM  20    Q.   AND AM I RIGHT THAT WITHOUT THOSE ASSURANCES OF

12:05PM  21    CONFIDENTIALITY FROM WALGREENS, YOU WOULD NOT HAVE BEEN

12:05PM  22    COMFORTABLE GIVING THEM -- JUST HAVING A MINILAB THERE IN

12:05PM  23    CHICAGO WHERE THEY COULD DO ANYTHING THEY WANTED WITH IT?

12:05PM  24    A.   PROBABLY NOT.

12:05PM  25    Q.   OKAY.  LET ME ASK YOU ABOUT SOME OF YOUR INTERACTIONS WITH

12:05PM  1    MS. SPIVEY.

12:05PM  2        IF I UNDERSTOOD YOUR TESTIMONY, IT'S THAT MR. BALWANI

12:05PM  3    PRIMARILY INTERFACED WITH MS. SPIVEY ON FINANCIAL OPERATIONS

12:05PM  4    AND CASH MANAGEMENT.

12:05PM  5    A.   HE DID.

12:05PM  6    Q.   OKAY.  NOW, YOU WERE HERE IN COURT WHEN MS. SPIVEY

12:05PM  7    TESTIFIED THAT SHE REPORTED TO YOU FROM THE 2008, 2009 TIME

12:05PM  8    PERIOD ALL OF THE WAY UP THROUGH 2016?

12:05PM  9    A.   YES.

12:05PM  10   Q.   OKAY.  AND YOU'RE NOT SAYING THAT YOU HAD NO INTERACTIONS

12:06PM  11   WITH MS. SPIVEY ABOUT THERANOS'S FINANCIAL CONDITION; CORRECT?

12:06PM  12   A.   CORRECT.

12:06PM  13   Q.   YOU HAD REGULAR INTERACTIONS WITH HER; CORRECT?

12:06PM  14   A.   I DID.

12:06PM  15   Q.   OKAY.  SHE WOULD PROVIDE YOU FINANCIAL STATEMENTS FROM

12:06PM  16   TIME TO TIME?

12:06PM  17   A.   MY MEMORY IS THAT SHE WOULD SEND THE CASH BALANCE ON A

12:06PM  18   REGULAR BASIS.

12:06PM  19            MR. LEACH:  MAY I APPROACH, YOUR HONOR?

12:06PM  20            THE COURT:  YES.

12:06PM  21   BY MR. LEACH:

12:06PM  22   Q.   (HANDING.)

12:06PM  23   A.   THANK YOU.

12:06PM  24   Q.   I'M PLACING BEFORE YOU, MS. HOLMES, WHAT WE'VE MARKED AS

12:06PM  25   EXHIBITS 615 AND 792.

12:06PM   1      A.   YES.

12:06PM   2      Q.   LET ME DRAW YOUR ATTENTION TO 615.

12:07PM   3           DO YOU SEE MS. YAM'S NAME AT THE TOP OF THIS EMAIL?

12:07PM   4      A.   I DO.

12:07PM   5      Q.   AND DO YOU SEE YOUR NAME IN THE TO LINE?

12:07PM   6      A.   I DO.

12:07PM   7      Q.   AND THE DATE OF THIS IS JUNE 4TH, 2012?

12:07PM   8      A.   IT IS.

12:07PM   9      Q.   AND DO YOU SEE THAT THERE'S AN ATTACHMENT "FINANCIAL

12:07PM  10      STATEMENT ANALYSIS TEMPLATE-THERANOS" PDF?

12:07PM  11      A.   I DO.

12:07PM  12           MR. LEACH:  YOUR HONOR, I MOVE THE ADMISSION OF

12:07PM  13      EXHIBIT 615.

12:07PM  14           THE CLERK:  THESE HAVE BEEN ADMITTED, YOUR HONOR.

12:07PM  15      THEY ARE ADMITTED.

12:07PM  16           MR. LEACH:  OH, I COULD HAVE SAVED A FEW SECONDS

12:07PM  17      THERE.  MY APOLOGIES, YOUR HONOR.

12:07PM  18           THE COURT:  THEY ARE IN EVIDENCE AND THEY CAN BE

12:07PM  19      PUBLISHED.

12:07PM  20           MR. LEACH:  OKAY.  LET'S DISPLAY 615.

12:07PM  21      Q.   MS. HOLMES, THIS IS AN EMAIL BETWEEN JUST YOU AND

12:08PM  22      MS. SPIVEY; CORRECT?

12:08PM  23      A.   YES.

12:08PM  24      Q.   AND IN THE ATTACHMENT, IT SAYS FS 123111.

12:08PM  25           DO YOU SEE THAT?

12:08PM  1    A.   I DO.

12:08PM  2    Q.   AND YOU UNDERSTOOD THAT TO BE A REFERENCE TO THERANOS'S

12:08PM  3    2011 FINANCIAL STATEMENTS?

12:08PM  4    A.   YES.

12:08PM  5    Q.   AND IF WE COULD PLEASE LOOK AT PAGE 3, DO YOU SEE THAT

12:08PM  6    THERE'S A BALANCE SHEET HERE?

12:08PM  7    A.   I DO.

12:08PM  8    Q.   AND YOU WERE FAMILIAR WITH BALANCE SHEETS DURING YOUR TIME

12:08PM  9    AT THERANOS; CORRECT?

12:08PM  10   A.   GENERALLY, YES.

12:08PM  11   Q.   THERANOS WAS AUDITED FOR A SMALL PERIOD OF TIME; RIGHT?

12:08PM  12   A.   WE WERE.

12:08PM  13   Q.   AND YOU HAD TO SIGN PAPERWORK IN CONNECTION WITH THAT

12:08PM  14   AUDIT; CORRECT?

12:08PM  15   A.   PROBABLY, YES.

12:08PM  16   Q.   CERTIFYING THE FINANCIAL STATEMENTS AS TRUE AND CORRECT?

12:08PM  17   A.   I DON'T REMEMBER DOING THAT, BUT I DON'T DOUBT IT.

12:08PM  18   Q.   OKAY.  AND ISN'T THIS AN EXAMPLE OF MS. SPIVEY FROM TIME

12:09PM  19   TO TIME PROVIDING YOU NOT JUST CASH FORECASTS OR CASH BALANCES,

12:09PM  20   BUT THE COMPANY'S ACTUAL FINANCIAL STATEMENTS?

12:09PM  21   A.   YES.

12:09PM  22   Q.   IF I COULD ASK YOU TO PLEASE LOOK AT EXHIBIT 792.

12:09PM  23        MS. KRATZMANN, IS 792 IN?

12:09PM  24            THE CLERK:  IT IS.

12:09PM  25            MR. LEACH:  OKAY.  AND IF WE CAN DISPLAY THIS,

12:09PM   1       PLEASE.

12:09PM   2       Q.   IF I COULD DRAW YOUR ATTENTION TO THE BOTTOM, MS. HOLMES,

12:09PM   3       DO YOU SEE YOU WROTE, "SOMETIME AGO WE MET WITH STANFORD AND

12:09PM   4       SHARED SOME FINANCIAL INFORMATION IN A TEMPLATE THEY REQUESTED

12:09PM   5       THAT YOU AND I REVIEWED TOGETHER.  I AM MEETING AGAIN WITH THEM

12:09PM   6       TOMORROW.  CAN YOU UPDATE THAT TEMPLATE FOR WHERE WE ARE

12:09PM   7       NOW/2013 AND SEND TO SUNNY AND ME AS WELL AS THE DOCUMENT WE

12:09PM   8       SHARED WITH THEM LAST YEAR."

12:09PM   9            DO YOU SEE THAT?

12:09PM  10       A.   I DO.

12:09PM  11       Q.   AND IS THIS ANOTHER EXAMPLE OF MS. SPIVEY PROVIDING TO YOU

12:10PM  12       THE FINANCIAL STATEMENTS OF THERANOS?

12:10PM  13       A.   YES.

12:10PM  14       Q.   AND YOU KNEW AT THE END OF THE DAY THAT YOU WERE

12:10PM  15       ULTIMATELY RESPONSIBLE FOR THERANOS'S FINANCIAL CONDITION AS

12:10PM  16       THE CEO?

12:10PM  17       A.   I DID.

12:10PM  18       Q.   OKAY.  AND YOUR TESTIMONY IS THAT THERE MAY HAVE BEEN

12:10PM  19       INSTANCES IN WHICH YOU OPENED A COMPUTER FILE CONTAINING ONE OF

12:10PM  20       MR. BALWANI'S FINANCIAL MODELS AND REVIEWED IT; CORRECT?

12:10PM  21       A.   I'M NOT SURE.

12:10PM  22       Q.   LET ME DRAW YOUR ATTENTION TO THE BINDER.

12:10PM  23       A.   YES.

12:10PM  24       Q.   AND IF YOU COULD LOOK, PLEASE, AT -- IT'S PAGE 524 OF THE

12:10PM  25       TESTIMONY.  THE BATES NUMBER IS ENDING 5435.

12:11PM  1    A.   OKAY.

12:11PM  2    Q.   AND I DRAW YOUR ATTENTION TO LINE 18 THROUGH 24.

12:11PM  3    A.   YES.

12:11PM  4              MR. LEACH:   PERMISSION TO READ THESE, YOUR HONOR?

12:11PM  5              THE COURT:   YES.

12:11PM  6    BY MR. LEACH:

12:11PM  7    Q.   MS. HOLMES, WERE YOU ASKED THE FOLLOWING QUESTIONS AND DID

12:11PM  8    YOU GIVE THE FOLLOWING ANSWERS:

12:11PM  9        "QUESTION:  WERE THERE OTHER INSTANCES IN WHICH YOU MIGHT

12:11PM  10   HAVE OPENED A FILE AND REVIEWED IT?

12:11PM  11       "ANSWER:  YES.

12:11PM  12       "QUESTION:  AND OTHER INSTANCES IN WHICH YOU MIGHT HAVE

12:11PM  13   OPENED A FINANCIAL MODEL THAT SUNNY BALWANI WAS WORKING ON AND

12:11PM  14   REVIEWED IT?

12:11PM  15       "ANSWER:  COULD HAVE BEEN."

12:11PM  16       DID I READ THAT CORRECTLY?

12:11PM  17   A.   YOU DID.

12:11PM  18   Q.   AND THAT WAS YOUR TESTIMONY BACK THEN?

12:11PM  19   A.   YES.

12:11PM  20   Q.   OKAY.  AND THERE WERE ALSO INSTANCES WHEN YOU TOLD

12:11PM  21   MR. BALWANI THAT YOU WOULD GET COMFORTABLE WITH THE FINANCIAL

12:11PM  22   MODEL THAT WAS BEING PROVIDED TO AN INVESTOR?

12:12PM  23   A.   THERE WAS ONE INSTANCE I'M AWARE OF IT.

12:12PM  24   Q.   OKAY.  LET ME DRAW YOUR ATTENTION, PLEASE, TO -- WELL, LET

12:12PM  25   ME ASK THE QUESTION FIRST.

12:12PM   1          YOU KNEW THAT WHEN POTENTIAL INVESTORS WERE CONSIDERING

12:12PM   2   INVESTMENTS IN THERANOS, THAT THEY WOULD OFTEN BE PROVIDED A

12:12PM   3   POWERPOINT DESCRIBING THERANOS'S BUSINESS; CORRECT?

12:12PM   4   A.   YES.

12:12PM   5   Q.   OKAY.  AND YOU ON OCCASION WOULD GO THROUGH THAT

12:12PM   6   POWERPOINT WITH INVESTORS?

12:12PM   7   A.   WE WOULD LOOK AT A SLIDE OR SOME SLIDES FROM IT.

12:12PM   8   Q.   OKAY.  BUT YOU HAD THE AUTHORITY TO EITHER SEND IT OUT OR

12:12PM   9   NOT SEND IT OUT; CORRECT?

12:12PM  10   A.   CORRECT.

12:12PM  11   Q.   AND DAN EDLIN WORKED CLOSELY WITH YOU ON THAT; CORRECT?

12:12PM  12   A.   HE DID.

12:12PM  13   Q.   HE WOULDN'T SEND SOMETHING OUT WITHOUT YOUR BLESSING;

12:12PM  14   CORRECT?

12:12PM  15   A.   I THINK HE GENERALLY TRIED TO GET MY BLESSING.

12:12PM  16   Q.   OKAY.  AND PEOPLE MAY HAVE CONTRIBUTED TO THE SLIDES, BUT

12:13PM  17   AT THE END OF THE DAY, IT'S YOUR DECISION TO SEND THEM OUT;

12:13PM  18   CORRECT, MS. HOLMES?

12:13PM  19   A.   ULTIMATELY.

12:13PM  20   Q.   IF YOU DISAGREED WITH ANYTHING IN THE SLIDES, YOU HAD THE

12:13PM  21   ABILITY TO ORDER THEM CHANGED OR NOT SENT OUT AT ALL.

12:13PM  22          IS THAT FAIR?

12:13PM  23   A.   OF COURSE.

12:13PM  24   Q.   OKAY.  WE'VE LOOKED A COUPLE OF TIMES AT -- WELL, LET ME

12:13PM  25   ASK IT THIS WAY:  AM I RIGHT THAT YOU WERE AWARE IN 2014 AND

12:13PM  1    2015 THAT THE REPORTS RELATING TO PFIZER, SCHERING-PLOUGH, AND

12:13PM  2    GSK WERE BEING INCLUDED IN INVESTOR MATERIALS?

12:13PM  3    A.   I WAS.

12:13PM  4    Q.   AND IF I COULD DRAW YOUR ATTENTION TO EXHIBIT 5728.

12:14PM  5    A.   WHICH BINDER?

12:14PM  6         I THINK I FOUND IT.

12:14PM  7              THE COURT:  3.

12:14PM  8              THE WITNESS:  YEAH.

12:14PM  9              MR. LEACH:  VOLUME 3.  MY APOLOGIES.

12:14PM  10             THE WITNESS:  GOT IT.

12:14PM  11   BY MR. LEACH:

12:14PM  12   Q.   DO YOU SEE THE THERANOS LOGO AT THE TOP OF PAGE 1 OF 5728?

12:14PM  13   A.   I DO.

12:14PM  14   Q.   AND DO YOU SEE IN THE BOTTOM A BATES NUMBER KRM_SEC?

12:14PM  15   A.   I DO.

12:14PM  16   Q.   OKAY.  AND ON PAGE 3, DO YOU SEE A DOCUMENT WITH THE

12:15PM  17   PFIZER LOGO AND THE THERANOS LOGO?

12:15PM  18   A.   I DO.

12:15PM  19   Q.   AND IF WE GO TO PAGE 38, DO YOU ALSO SEE SOME REFERENCES

12:15PM  20   TO ANOTHER PHARMACEUTICAL COMPANY?

12:15PM  21   A.   I DO.

12:15PM  22   Q.   OKAY.  AND THE BATES RANGE KRM, DO YOU HAVE ANY REASON TO

12:15PM  23   DOUBT THAT THAT IS ASSOCIATED WITH RUPERT MURDOCH?

12:15PM  24   A.   I DON'T KNOW.

12:15PM  25   Q.   YOU HAVE NO REASON TO DOUBT IT THOUGH?

12:15PM   1    A.   I DON'T, NO.

12:15PM   2    Q.   AND DOES THIS LOOK LIKE MATERIALS THAT WERE PROVIDED TO

12:15PM   3    INVESTORS?

12:15PM   4    A.   I THINK SO.

12:15PM   5              MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5728.

12:15PM   6              MR. DOWNEY:  YOUR HONOR, I HAVE TO OBJECT TO THE

12:15PM   7    FOUNDATION ON THIS ONE.

12:16PM   8              THE COURT:  COULD YOU ASK A FEW MORE QUESTIONS

12:16PM   9    REGARDING FOUNDATION?

12:16PM   10   BY MR. LEACH:

12:16PM   11   Q.   YOU RECOGNIZE THE THERANOS LOGO ON THE FIRST PAGE; RIGHT,

12:16PM   12   MS. HOLMES?

12:16PM   13   A.   I DO.

12:16PM   14   Q.   OKAY.  AND DO YOU SEE THE LINE "THERANOS CONFIDENTIAL" ON

12:16PM   15   PAGE 1 KIND OF DIAGONAL?

12:16PM   16   A.   I DO.

12:16PM   17   Q.   YOU KNOW THAT THERANOS, FROM TIME TO TIME, WOULD APPLY

12:16PM   18   THAT TO SOME OF ITS DOCUMENTS TO MAKE SURE THE READER WOULD

12:16PM   19   KNOW THAT THIS WAS CONFIDENTIAL?

12:16PM   20   A.   I DO.

12:16PM   21   Q.   DO YOU SEE THE HEADING IN THE MIDDLE OF THE FIRST PAGE OF

12:16PM   22   PAGE 1?  I DON'T WANT TO READ IT BECAUSE IT'S NOT IN EVIDENCE

12:16PM   23   YET, BUT DO YOU SEE THAT?

12:16PM   24   A.   YEAH, I DO.

12:16PM   25   Q.   AND IS THAT CONSISTENT WITH THE FORMAT THAT YOU WOULD SEE

12:16PM 1    BEING PROVIDED TO INVESTORS WHEN THEY WERE GIVEN BINDERS OF

12:16PM 2    MATERIALS?

12:16PM 3    A.   I THINK SO.

12:17PM 4           MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5728.

12:17PM 5           THE COURT:  I'LL ADMIT IT OVER OBJECTION.  IT MAY BE

12:17PM 6    PUBLISHED.

12:17PM 7        (GOVERNMENT'S EXHIBIT 5728 WAS RECEIVED IN EVIDENCE.)

12:18PM 8    BY MR. LEACH:

12:18PM 9    Q.   MS. HOLMES, JUST TO GO OVER SOME OF THE QUESTIONS THAT I

12:18PM 10   HAD WITHOUT THE BENEFIT OF THIS ON THE SCREEN, DO YOU SEE WHERE

12:18PM 11   IT SAYS "EXEMPLARY REPORTS FROM PHARMACEUTICAL PARTNERS"?

12:18PM 12   A.   I DO.

12:18PM 13   Q.   AND YOU KNOW SITTING HERE TODAY THAT THIS FORMAT WOULD BE

12:18PM 14   USED FROM TIME TO TIME IN THE INVESTOR PACKAGE THAT WOULD GO

12:18PM 15   OUT TO POTENTIAL INVESTORS?

12:18PM 16   A.   I THINK SO.

12:18PM 17   Q.   OKAY.  AND IF WE CAN GO TO PAGE 2, PLEASE.

12:18PM 18       AND IS THIS A COPY OF THE THERANOS ANGIOGENESIS STUDY

12:18PM 19   REPORT WITH THE PFIZER LOGO AND THE THERANOS LOGO ON IT?

12:18PM 20   A.   IT IS.

12:18PM 21   Q.   OKAY.  IF WE COULD PLEASE GO TO PAGE 38.

12:18PM 22       IS THIS A COPY OF A REPORT RELATING TO SCHERING-PLOUGH

12:18PM 23   WITH THE SCHERING-PLOUGH LOGO AND THE THERANOS LOGO?

12:18PM 24   A.   IT IS.

12:18PM 25   Q.   OKAY.  IF WE CAN ZOOM OUT, PLEASE, MS. HOLLIMAN.

12:19PM   1          THERE'S A BATES NUMBER IN THE BOTTOM RIGHT-HAND CORNER

12:19PM   2     KRM_SEC.

12:19PM   3          DO YOU SEE THAT?

12:19PM   4     A.   I DO.

12:19PM   5     Q.   BUT THAT PREFIX DOESN'T MEAN ANYTHING TO YOU SITTING HERE

12:19PM   6     TODAY?

12:19PM   7     A.   IT DOESN'T.

12:19PM   8     Q.   YOU DO KNOW THAT YOU PROVIDED AN INVESTOR BINDER TO

12:19PM   9     RUPERT MURDOCH; CORRECT?

12:19PM   10    A.   I DO.

12:19PM   11    Q.   AND YOU REVIEWED THAT BEFORE IT WENT OUT; CORRECT?

12:19PM   12    A.   I DON'T KNOW IF I PERSONALLY REVIEWED IT, BUT I WAS AWARE

12:19PM   13    OF IT GOING OUT.

12:19PM   14    Q.   OKAY.  WE TALKED A LITTLE BIT LAST WEEK ABOUT GSK.

12:19PM   15         DO YOU RECALL TESTIFYING ABOUT GSK?

12:19PM   16    A.   I DO.

12:19PM   17    Q.   WAS THE THERANOS DEVICE EVER USED IN A GSK CLINICAL TRIAL?

12:19PM   18    A.   JUST THE TIME WE SHIPPED THE DEVICES TO GSK FOR THE STUDY

12:19PM   19    THAT WE RAN.

12:19PM   20    Q.   OKAY.  THAT'S THE STUDY THAT WAS SUMMARIZED IN THE

12:19PM   21    DOCUMENTS THAT WE WERE LOOKING AT DURING --

12:19PM   22    A.   EXACTLY.

12:19PM   23    Q.   OKAY.  BUT THAT WASN'T A CLINICAL TRIAL; RIGHT?

12:19PM   24    A.   I WASN'T SURE EXACTLY WHAT YOU MEANT BY THAT.

12:19PM   25    Q.   OKAY.

12:19PM    1    A.    BUT IT WAS A STUDY THAT WE RAN AT GSK.

12:20PM    2    Q.    WELL, YOU UNDERSTAND WHAT A CLINICAL TRIAL IS; CORRECT?

12:20PM    3    A.    I DO.  I ASSUME YOU MEAN A DRUG TRIAL.

12:20PM    4    Q.    CORRECT.

12:20PM    5    A.    YES, IT WAS NOT USED IN A DRUG TRIAL.

12:20PM    6    Q.    OKAY.  THANK YOU.

12:20PM    7          PRIOR TO 2015, YOU UNDERSTOOD THAT THE FDA DID NOT

12:20PM    8    APPROVE -- HAD NOT APPROVED THE MINILAB FOR ANY ASSAY IN ANY

12:20PM    9    WAY, SHAPE, OR FASHION; CORRECT?

12:20PM   10    A.    CORRECT.

12:20PM   11    Q.    AND IN 2015 YOU OBTAINED AN APPROVAL FOR THE SINGLE ASSAY,

12:20PM   12    THAT WAS THE HERPES ASSAY; CORRECT?

12:20PM   13    A.    CORRECT.

12:20PM   14    Q.    AND THAT WAS IN THE MIDDLE OF 2015, SO BEFORE THAT NO FDA

12:20PM   15    APPROVAL OF THE MINILAB OR THE EDISON 3.5?

12:20PM   16    A.    THAT'S RIGHT.

12:20PM   17    Q.    AND THE FDA DID NOT REVIEW IN ANY WAY, SHAPE, OR FORM THE

12:20PM   18    OTHER LDT'S THAT THERANOS WAS PERFORMING IN ITS LAB; CORRECT?

12:20PM   19    A.    CERTAINLY NOT A 510K REVIEW.

12:21PM   20    Q.    WELL, THEY DIDN'T COME INTO YOUR LAB AND LOOK AT THE

12:21PM   21    TESTS, RIGHT, UNTIL SEPTEMBER OR AUGUST OF 2015?

12:21PM   22    A.    CORRECT.

12:21PM   23    Q.    OKAY.  I'M LOOKING AT THE PERIOD BEFORE THEN.

12:21PM   24          THE FDA DIDN'T COME IN AND SAY, WE'VE SEEN ALL OF YOUR

12:21PM   25    LDT'S, THIS IS GREAT, YOU HAVE OUR STAMP OF APPROVAL?

12:21PM 1     A.   CORRECT.

12:21PM 2     Q.   OKAY.  AND YOU ALSO KNEW WHEN YOU GOT YOUR CLIA

12:21PM 3     CERTIFICATION IN 2011 THAT YOU WEREN'T PERFORMING ANY LDT'S AT

12:21PM 4     THAT POINT IN TIME; CORRECT?

12:21PM 5     A.   CORRECT.

12:21PM 6     Q.   AND YOU WEREN'T PERFORMING ANY LDT'S IN 2012; CORRECT?

12:21PM 7     A.   CORRECT.

12:21PM 8     Q.   AND YOU TALKED ABOUT A NEW YORK INSPECTION IN EARLY -- YOU

12:21PM 9     TALKED ABOUT A NEW YORK INSPECTION DURING YOUR DIRECT

12:21PM 10    EXAMINATION.

12:21PM 11         DO YOU RECALL THAT?

12:21PM 12    A.   I DID.

12:21PM 13    Q.   AND DO YOU KNOW THAT THAT INSPECTION WAS IN EARLY 2013?

12:21PM 14    A.   I ASSUME SO.  I THINK THAT'S RIGHT.

12:21PM 15    Q.   OKAY.  WELL, LET'S LOOK AT EXHIBIT 7282.  IT SHOULD BE IN

12:22PM 16    VOLUME 3.  THIS IS IN EVIDENCE.

12:22PM 17    A.   OKAY.

12:22PM 18    Q.   AND IF WE CAN JUST FOCUS ON THE TOP PORTION, THE HEADER,

12:22PM 19    MS. HOLLIMAN.

12:22PM 20         DO YOU RECALL TESTIFYING ABOUT THIS IN DIRECT EXAMINATION?

12:22PM 21    A.   I DO.

12:22PM 22    Q.   AND IT'S MR. BALWANI GIVING CONGRATULATIONS FOR THE

12:22PM 23    NEW YORK INSPECTION?

12:22PM 24    A.   YES.

12:22PM 25    Q.   THE DATE IS APRIL 4TH, 2013; CORRECT?

12:22PM   1   A.   IT IS.

12:22PM   2   Q.   THAT'S BEFORE YOU'RE DOING ANY LDT TESTING IN THE CLIA

12:22PM   3   LAB; RIGHT?

12:22PM   4   A.   EXACTLY, YES.

12:22PM   5   Q.   OKAY.  SO THIS INSPECTION WOULD RELATE TO ORDINARY FDA

12:22PM   6   MACHINES RUNNING ORDINARY FDA APPROVED TESTS; CORRECT?

12:22PM   7   A.   AND OUR QUALITY SYSTEMS.

12:22PM   8   Q.   BUT NO LDT'S?

12:22PM   9   A.   CORRECT.

12:22PM   10  Q.   YOU'RE NOT USING THE EDISON DEVICE?

12:22PM   11  A.   CORRECT.

12:22PM   12  Q.   AND YOU'RE NOT MODIFYING SIEMENS MACHINES AT THIS POINT IN

12:22PM   13  TIME?

12:22PM   14  A.   CORRECT.

12:22PM   15  Q.   AND YOU ALSO TESTIFIED THAT THERE WAS AN INSPECTION IN

12:23PM   16  DECEMBER OF 2013; CORRECT?

12:23PM   17  A.   I DID.

12:23PM   18  Q.   AND YOU UNDERSTAND THAT WAS BY THE STATE OF CALIFORNIA;

12:23PM   19  CORRECT?

12:23PM   20  A.   I DO.

12:23PM   21  Q.   OKAY.  YOU WERE SAYING CMS IN YOUR DIRECT EXAMINATION, BUT

12:23PM   22  I JUST WANT TO BE CLEAR, IT WAS THE STATE THAT CAME IN;

12:23PM   23  CORRECT?

12:23PM   24  A.   GOT IT.  SORRY, I USE THOSE INTERCHANGEABLY.

12:23PM   25  Q.   AND AT THAT POINT IN TIME, THERANOS WAS DOING A SMALL

12:23PM 1      NUMBER OF LDT'S; CORRECT?

12:23PM 2      A.   CORRECT.

12:23PM 3      Q.   I THINK, BASED ON WHAT WE WERE LOOKING AT EARLIER, IT'S

12:23PM 4      SOMEWHERE IN THE NEIGHBORHOOD OF THREE TO FOUR?

12:23PM 5      A.   I THINK THAT'S RIGHT.

12:23PM 6      Q.   OKAY.  AND SOME OF THOSE ARE ON THE EDISON 3.5, OTHERS

12:23PM 7      MIGHT BE ON MODIFIED THIRD PARTY MACHINES?

12:23PM 8      A.   YES.

12:23PM 9      Q.   AND I THINK YOU WERE SHOWN A DOCUMENT ON YOUR DIRECT

12:23PM 10     EXAMINATION WHERE YOU GOT NOTES FROM DANIEL YOUNG REPORTING ON

12:23PM 11     THE INSPECTION.

12:23PM 12          DO YOU REMEMBER THAT?

12:23PM 13     A.   I DO.

12:23PM 14     Q.   AND THAT REPORT SAID THAT THE INSPECTORS LOOKED AT A

12:23PM 15     SINGLE VALIDATION REPORT FOR AN LDT; CORRECT?

12:24PM 16     A.   THAT'S RIGHT.

12:24PM 17     Q.   AND THAT WAS CREATININE?

12:24PM 18     A.   I DON'T REMEMBER, BUT I DON'T DOUBT YOU.

12:24PM 19     Q.   OKAY.  WELL, WE'RE NOT GOING TO CALL UP THE DOCUMENT, BUT

12:24PM 20     YOU REMEMBER ONE LDT?

12:24PM 21     A.   I REMEMBER THE REFERENCE TO AN LDT REPORT BEING REVIEWED

12:24PM 22     BY THE INSPECTOR.

12:24PM 23     Q.   OKAY.  AND THAT LDT WAS NOT AN EDISON ONE, IT WAS ONE ON

12:24PM 24     THE MODIFIED SIEMENS MACHINE; CORRECT?

12:24PM 25     A.   EXACTLY, YES.

12:24PM   1    Q.   AND YOU HAVE NO REASON TO THINK THAT THE INSPECTOR

12:24PM   2    ACTUALLY SAW AN EDISON DEVICE DURING THAT 2013 INSPECTION?

12:24PM   3    A.   I'M NOT SURE.  I REMEMBER THE REFERENCE THERE TO

12:24PM   4    DISCUSSING -- THE FACT THAT THE TEAM DISCUSSED THEM WITH THE

12:24PM   5    INSPECTORS.

12:24PM   6    Q.   OKAY.  THEY DISCUSSED THE FACT THAT THERE WERE LDT'S.  YOU

12:24PM   7    DON'T RECALL ANY REFERENCE IN THAT DOCUMENT FROM THE INSPECTOR

12:24PM   8    ACTUALLY LOOKING AND INSPECTING THE EDISON 3.5?

12:24PM   9    A.   I DON'T REMEMBER.

12:24PM  10    Q.   OKAY.  AND AT THIS POINT IN TIME, YOU'RE SCALING UP THE

12:25PM  11    NUMBER OF LDT'S AND THERE'S NO FDA APPROVAL, CMS ISN'T GOING TO

12:25PM  12    COME BACK FOR ANOTHER TWO YEARS, YOU'RE RAMPING UP ON LDT'S,

12:25PM  13    BUT THE ONLY THING, FOR LACK OF A BETTER WORD, CHECKING THAT IS

12:25PM  14    THERANOS; CORRECT?

12:25PM  15    A.   AND THE PROCESS THAT WE ENGAGED IN FOR PT AND AAP AND THE

12:25PM  16    ONGOING QUALITY SYSTEMS OVERSIGHT.

12:25PM  17    Q.   OKAY.  BUT NOBODY FROM CMS AND NOBODY FROM THE STATE AND

12:25PM  18    NOBODY FROM THE FDA IS COMING IN AND LOOKING AT THE DEVICE AS A

12:25PM  19    NEW LDT COMES ON BOARD AND SAYING, OKAY, YOU CAN GO AHEAD AND

12:25PM  20    DO THAT; CORRECT?

12:25PM  21    A.   CORRECT.

12:25PM  22    Q.   IT'S ALL THERANOS SAYING WE'VE GONE THROUGH THE PROCESS,

12:25PM  23    WE'RE READY TO TAKE THIS LIVE?

12:25PM  24    A.   CORRECT, AND ENGAGING WITH FDA AND CMS IN D.C.

12:25PM  25    Q.   OKAY.  BUT YOU TOLD CMS IN D.C. THAT YOU WERE DOING THIS.

12:25PM  1    YOU DIDN'T PROVIDE THEM THE VALIDATION REPORTS OR THE DATA OR

12:26PM  2    ANYTHING LIKE THAT?

12:26PM  3    A.   I DON'T THINK SO.

12:26PM  4    Q.   OKAY.  AND YOUR TESTIMONY IS THAT YOU DON'T RECALL

12:26PM  5    SUREKHA GANGADKHEDKAR COMING TO YOU IN SEPTEMBER OF 2013 SAYING

12:26PM  6    THAT THERANOS ISN'T READY; CORRECT?

12:26PM  7    A.   I DO NOT.

12:26PM  8    Q.   AND DO YOU DENY THAT SHE TOLD YOU -- OR YOU TOLD HER THAT

12:26PM  9    THERANOS DIDN'T HAVE MUCH OF A CHOICE, THAT YOU HAVE A PROMISE

12:26PM  10   TO DELIVER TO THE CUSTOMER?

12:26PM  11   A.   I DON'T REMEMBER SAYING THAT, BUT THAT'S SOMETHING THAT I

12:26PM  12   COULD HAVE SAID.

12:26PM  13   Q.   YOU JUST HAVE NO MEMORY OF IT?

12:26PM  14   A.   I DON'T.

12:26PM  15   Q.   AND YOU DON'T DISPUTE THAT ADAM ROSENDORFF TOLD YOU IN THE

12:26PM  16   FALL OF 2013 THAT HE WAS BEING ASKED TO VOUCH FOR RESULTS THAT

12:26PM  17   HE WAS NOT CONFIDENT IN?

12:26PM  18   A.   I REMEMBER AN EMAIL THAT -- I'M SORRY, IN NOVEMBER OF

12:26PM  19   2013?

12:26PM  20   Q.   I SAID THE FALL OF -- I MEANT TO SAY THE FALL OF 2014.

12:26PM  21   A.   THE FALL OF 2014.  I REMEMBER THAT EMAIL.

12:26PM  22   Q.   YOU REMEMBER AN EMAIL FROM DR. ROSENDORFF WHERE HE SAID, I

12:27PM  23   CAN'T VOUCH FOR THE TEST, OR I'M BEING ASKED TO VOUCH FOR

12:27PM  24   RESULTS I'M NOT CONFIDENT IN?

12:27PM  25   A.   YES, I REMEMBER THAT.

12:27PM   1    Q.   OKAY.  LET'S LOOK AT THAT.  IT'S EXHIBIT 4330.  I THINK I

12:27PM   2    HAVE IT.  IT'S IN EVIDENCE, BUT I HAVE A COPY.

12:27PM   3         IF I MAY APPROACH, YOUR HONOR?

12:27PM   4              THE COURT:  YES.

12:27PM   5    BY MR. LEACH:

12:27PM   6    Q.   (HANDING.)

12:27PM   7    A.   THANK YOU.

12:27PM   8    Q.   LET'S LOOK AT PAGE 2, MS. HOLLIMAN.  AND IF WE CAN ZOOM IN

12:27PM   9    ON THE TOP EMAIL, PLEASE.

12:27PM   10        MS. HOLMES, DO YOU SEE WHERE DR. ROSENDORFF WROTE, "I FEEL

12:28PM   11   REALLY UNCOMFORTABLE WITH WHAT IS HAPPENING RIGHT NOW IN THIS

12:28PM   12   COMPANY.  IS THERE ANY WAY YOU CAN GET SPENCER BACK ON THE CLIA

12:28PM   13   LICENSE AND TAKE ME OFF?"

12:28PM   14        YOU UNDERSTOOD SPENCER TO BE A REFERENCE TO

12:28PM   15   SPENCER HIRAKI?

12:28PM   16   A.   I DO.

12:28PM   17   Q.   HE WAS THE LAB DIRECTOR FOR A BRIEF PERIOD OF TIME IN THE

12:28PM   18   2011 TO 2013 TIME PERIOD?

12:28PM   19   A.   HE WAS.

12:28PM   20   Q.   "I AM FEELING PRESSURED TO VOUCH FOR RESULTS THAT I CANNOT

12:28PM   21   BE CONFIDENT IN, AND ALSO IN A NUMBER OF CASES WHERE I GET

12:28PM   22   QUESTIONS ABOUT ASSAYS, I DO NOT KNOW WHAT METHOD IS BEING USED

12:28PM   23   IE VACUTAINERS ALIQUOTTED INTO CTN'S, ET CETERA."

12:28PM   24        THIS WAS THE TESTIMONY THAT YOU TALKED ABOUT ON YOUR

12:28PM   25   DIRECT EXAMINATION; CORRECT?

12:28PM  1    A.   IT IS THE ONE I'M TALKING ABOUT RIGHT NOW, YES.

12:28PM  2    Q.   AND IF WE CAN START WHERE THIS DIALOGUE BEGINS ON PAGE 3,

12:28PM  3    THE SUBJECT MATTER OF THIS EMAIL IS EBOLA.

12:29PM  4         DO YOU SEE THAT?

12:29PM  5    A.   I DO.

12:29PM  6    Q.   AND DR. ROSENDORFF WROTE, "SUNNY/ELIZABETH,

12:29PM  7         "I AM HEARING THAT THERANOS INTENDS TEST SAMPLES TO RULE

12:29PM  8    OUT OR DIAGNOSE EBOLA AT 7373 GATEWAY.

12:29PM  9         "CAN YOU PLEASE CONFIRM THAT THIS IS CORRECT.  IF SO, I'M

12:29PM  10   WONDERING WHY AS LAB DIRECTOR I WAS NOT INVOLVED IN THE

12:29PM  11   DECISION AND PLANNING?"

12:29PM  12        DO YOU SEE THAT LANGUAGE?

12:29PM  13   A.   I DO.

12:29PM  14   Q.   AND IF WE GO TO PAGE 2, YOU WROTE, "THAT IS NOT CORRECT.

12:29PM  15   WHO SAID THIS?"

12:29PM  16        DO YOU SEE THAT?

12:29PM  17   A.   YES.

12:29PM  18   Q.   AND DR. ROSENDORFF REPLIES, "PERHAPS A COMPANY WIDE EMAIL

12:29PM  19   IS AN ORDER TO QUASH THIS RUMOR?"

12:29PM  20        DO YOU SEE THAT?

12:29PM  21   A.   I DO.

12:29PM  22   Q.   AND YOU WROTE BACK, "NO ONE AT ANY OF OUR OTHER SITES IS

12:29PM  23   UNDER THIS IMPRESSION FYI.  THERE ARE MANY DIFFERENT

12:29PM  24   ORGANIZATIONS IN OUR COMPANY OUTSIDE OF CLIA LAB -- SUNNY WILL

12:29PM  25   FOLLOW UP WITH GODFRED."

12:29PM  1              DO YOU SEE THAT LANGUAGE?

12:29PM  2     A.   I DO.

12:29PM  3     Q.   THERANOS WAS DOING A LOT OF WORK TO DEPLOY AN EBOLA ASSAY;

12:30PM  4     ISN'T THAT RIGHT, MS. HOLMES?

12:30PM  5     A.   WE WERE.

12:30PM  6     Q.   LET ME DRAW YOUR ATTENTION TO EXHIBIT 5733.

12:30PM  7          MAY I APPROACH, YOUR HONOR?

12:30PM  8               THE COURT:  YES.

12:30PM  9     BY MR. LEACH:

12:30PM  10    Q.   (HANDING.)

12:30PM  11    A.   THANK YOU.

12:30PM  12    Q.   DO YOU SEE YOUR NAME AT THE TOP OF THIS EMAIL, MS. HOLMES?

12:30PM  13    A.   I DO.

12:30PM  14    Q.   AND THIS APPEARS TO BE TO SOMEONE NAMED GARY ROUGHHEAD.

12:30PM  15         DO YOU SEE THAT?

12:30PM  16    A.   I DO.

12:30PM  17    Q.   AND ADMIRAL ROUGHHEAD WAS ON YOUR PARDON?

12:30PM  18    A.   HE WAS.

12:30PM  19    Q.   AND DOES THIS RELATION TO THERANOS'S EFFORTS TO

12:30PM  20    OPERATIONALIZE EBOLA?

12:31PM  21    A.   I'M JUST LOOKING AT IT.

12:31PM  22         YES.

12:31PM  23               MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5733.

12:31PM  24               MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

12:31PM  25               THE COURT:  IT'S ADMITTED.

| | | |
|---|---|---|
| 12:31PM | 1 | (GOVERNMENT'S EXHIBIT 5733 WAS RECEIVED IN EVIDENCE.) |
| 12:31PM | 2 | MR. LEACH:  MS. KRATZMANN, CAN I USE THE ELMO? |
| 12:31PM | 3 | Q.   DO YOU SEE THE DATE OF THIS IS SEPTEMBER 29TH, 2014, |
| 12:31PM | 4 | MS. HOLMES? |
| 12:31PM | 5 | A.   I DO. |
| 12:31PM | 6 | Q.   AND THAT'S ROUGHLY TWO OR THREE MONTHS BEFORE THE EMAIL |
| 12:31PM | 7 | WHERE DR. ROSENDORFF IS RAISING QUESTIONS ABOUT EBOLA? |
| 12:31PM | 8 | A.   IT IS. |
| 12:31PM | 9 | Q.   AND YOU'RE WRITING AT THE TOP HERE, "WE ARE WORKING ON |
| 12:31PM | 10 | GETTING HIM TO PALO ALTO.  HE WAS TIED UP THROUGH OCTOBER." |
| 12:32PM | 11 | I THINK THAT'S A REFERENCE TO SOMEONE DOWN ON THE BOTTOM. |
| 12:32PM | 12 | "FYI -- GATES, CDC, AND ANDY WEBER'S TEAM FROM DOD ARE ALL |
| 12:32PM | 13 | COMING OUT TO THERANOS ON WEDNESDAY TO MEET ON OPERATIONALIZING |
| 12:32PM | 14 | EBOLA." |
| 12:32PM | 15 | DID I READ THAT CORRECTLY? |
| 12:32PM | 16 | A.   YOU DID. |
| 12:32PM | 17 | Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO 5731. |
| 12:32PM | 18 | MAY I APPROACH, YOUR HONOR? |
| 12:32PM | 19 | THE COURT:  YES. |
| 12:32PM | 20 | BY MR. LEACH: |
| 12:32PM | 21 | Q.   (HANDING.) |
| 12:32PM | 22 | A.   THANK YOU. |
| 12:32PM | 23 | Q.   MS. HOLMES, DO YOU SEE YOUR NAME AT THE TOP OF THIS EMAIL? |
| 12:32PM | 24 | A.   I DO. |
| 12:32PM | 25 | Q.   AND DO YOU SEE BILL FOEGE'S NAME IN THE TO LINE? |

12:32PM  1      A.   I DO.

12:33PM  2      Q.   DR. FOEGE HAD SOME INVOLVEMENT WITH THERANOS AND ITS BOARD

12:33PM  3      AT THE TIME?

12:33PM  4      A.   HE DID.

12:33PM  5      Q.   AND THIS ALSO RELATES TO THERANOS'S EFFORTS WITH RESPECT

12:33PM  6      TO EBOLA?

12:33PM  7      A.   IT DOES.

12:33PM  8               MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5731.

12:33PM  9               MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

12:33PM 10               THE COURT:  IT'S ADMITTED.

12:33PM 11          (GOVERNMENT'S EXHIBIT 5731 WAS RECEIVED IN EVIDENCE.)

12:33PM 12      BY MR. LEACH:

12:33PM 13      Q.   MS. HOLMES, I WANT TO DRAW YOUR ATTENTION TO THE FIRST

12:33PM 14      EMAIL.

12:33PM 15          FIRST OF ALL, DO YOU SEE THE DATE OF OCTOBER 7TH, 2014?

12:33PM 16      A.   I DO.

12:33PM 17      Q.   AND SO THIS IS A WEEK OR SO AFTER THE EMAIL THAT WE JUST

12:33PM 18      SAW, AND A COUPLE OF MONTHS BEFORE DR. ROSENDORFF COMES TO YOU

12:33PM 19      WITH HIS CONCERNS?

12:33PM 20      A.   I THINK SO.

12:33PM 21      Q.   AND YOU WROTE TO DR. FOEGE, "WONDERFUL CONNECT FRIDAY.  WE

12:33PM 22      HAVE ALL OF OUR ASSAY DEVELOPMENT TEAMS ON DECK FOR BRINGING UP

12:33PM 23      THE BEST COMBINATION OF TESTS FOR AN EBOLA SOLUTION."

12:34PM 24          DID I READ THAT CORRECTLY?

12:34PM 25      A.   YOU DID.

12:34PM  1    Q.   DR. FOEGE WRITES BACK, "SORRY.  MISSED THIS.  IF A CBC CAN

12:34PM  2    BE EASILY DONE, THERE ARE TIMES WHEN IT WOULD BE USEFUL SO I

12:34PM  3    WOULD INCLUDE IT.  YOU AVOID THE CLINICIAN WANTING IT AFTER

12:34PM  4    SEEING THE INITIAL RESULTS AND HAVING TO REPEAT THE

12:34PM  5    FINGERSTICK.  THANKS, BILL."

12:34PM  6         DID I READ THAT CORRECTLY?

12:34PM  7    A.   YOU DID.

12:34PM  8    Q.   AND YOU WROTE BACK, "WE AGREE.  WE THINK IT COULD ALSO BE

12:34PM  9    USEFUL IN THE INFECTION TRIAGE AND MANAGEMENT.  WE WILL PLAN ON

12:34PM  10   INCLUDING IT IN THE STAGED DEPLOYMENTS."

12:34PM  11        DO YOU SEE THAT?

12:34PM  12   A.   I DO.

12:34PM  13   Q.   AND THIS IS YOU AND DR. FOEGE TALKING ABOUT STAGED

12:34PM  14   DEPLOYMENTS OF AN EBOLA SOLUTION; CORRECT?

12:34PM  15   A.   YES.

12:34PM  16             MR. LEACH:  MAY I APPROACH, YOUR HONOR?

12:34PM  17             THE COURT:  YES.

12:34PM  18   BY MR. LEACH:

12:34PM  19   Q.   (HANDING.)

12:34PM  20   A.   THANK YOU.

12:34PM  21   Q.   IS THIS ANOTHER EMAIL EXCHANGE BETWEEN YOU AND DR. FOEGE

12:35PM  22   RELATING TO EBOLA, MS. HOLMES?

12:35PM  23   A.   IT IS.

12:35PM  24   Q.   AND IS THIS IN THE OCTOBER 2013 TIME PERIOD?

12:35PM  25   A.   IT IS.

12:35PM  1          MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5730.

12:35PM  2          MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

12:35PM  3          THE COURT:  IT'S ADMITTED.

12:35PM  4     (GOVERNMENT'S EXHIBIT 5730 WAS RECEIVED IN EVIDENCE.)

12:35PM  5  BY MR. LEACH:

12:35PM  6  Q.   SO LET ME START WITH THE INITIAL EMAIL, MS. HOLMES.  IT

12:35PM  7  LOOKS LIKE THIS IS FROM SOMEONE NAMED GERRIT VAN ROEKEL ABOUT

12:35PM  8  THERANOS NOT GETTING WORK TO PURSUE A COLLABORATION WITH EBOLA.

12:36PM  9       AM I READING THAT CORRECTLY?

12:36PM 10  A.   NOT GETTING THE GATES FOUNDATION GRANT.

12:36PM 11  Q.   OKAY.  YOU HAD BEEN SEEKING A GRANT TO GET MONEY TO

12:36PM 12  CONDUCT EBOLA TESTING, BUT YOU WERE UNSUCCESSFUL?

12:36PM 13  A.   WE DIDN'T SEEK A GRANT.  THEY CAME TO SEE WHETHER WE

12:36PM 14  SHOULD APPLY FOR IT, AND WE DID NOT.

12:36PM 15  Q.   AND DR. FOEGE WRITES BACK, "ELIZABETH, I AM SORRY THIS

12:36PM 16  FIRST VENTURE DID NOT WORK OUT.  I WOULD ENCOURAGE YOU TO

12:36PM 17  CONTINUE ENGAGEMENT WITH THEM AND RESPOND TO THEIR INVITATION.

12:36PM 18  THERE IS NOTHING LOST IN SEEING WHAT THEY ARE DOING AND IT MAY

12:36PM 19  LEAD TO A DIFFERENT KIND OF ENGAGEMENT IN THE FUTURE.  IT WILL

12:36PM 20  CERTAINLY LEAD TO OTHER CONTACTS."

12:36PM 21       HE THEN WRITES, "CONCERNING CDC, I RECOGNIZE THAT IT IS

12:36PM 22  EASIER FOR YOU TO HAVE THE SPECIMENS IN PALO ALTO."

12:36PM 23       DO YOU SEE THAT LANGUAGE?

12:36PM 24  A.   I DO.

12:36PM 25  Q.   AND THIS IS IN RELATION TO POTENTIAL WORK ON EBOLA;

12:37PM   1    CORRECT?

12:37PM   2    A.   YES.

12:37PM   3    Q.   LAST WEEK I ASKED YOU SOME QUESTIONS ABOUT WHETHER YOU AND

12:37PM   4    MR. BALWANI DISCUSSED WHAT WOULD HAVE HAPPENED -- WHAT WOULD

12:37PM   5    HAPPEN IF JOHN CARREYROU, "THE WALL STREET JOURNAL" REPORTER,

12:37PM   6    WENT TO PHOENIX WELLNESS CENTER TO HAVE HIS BLOOD DRAWN.

12:37PM   7         DO YOU RECALL THAT TOPIC COMING UP AND GOING THROUGH SOME

12:37PM   8    MESSAGES ON THAT?

12:37PM   9    A.   I DO.

12:37PM   10   Q.   AND WE LOOKED AT SOME TEXTS WHERE YOU DISCUSSED THE

12:37PM   11   CONCEPT OF IT BEING BETTER TO HAVE A PERFECT VENIPUNCTURE THAN

12:37PM   12   A BAD FINGERSTICK.

12:37PM   13        DO YOU RECALL THAT?

12:37PM   14   A.   I DO.

12:37PM   15   Q.   AND THAT WAS IN THE APRIL 25TH, 2015 TIME PERIOD, OR IN

12:38PM   16   THE EARLY 2015 TIME PERIOD?

12:38PM   17   A.   I THINK SO.

12:38PM   18   Q.   AND PRIOR TO THAT, YOU TOOK STEPS TO CONCEAL FROM

12:38PM   19   POTENTIAL INVESTORS THERANOS'S RELIANCE ON VENOUS DRAWS; ISN'T

12:38PM   20   THAT CORRECT?

12:38PM   21   A.   NO.

12:38PM   22   Q.   LET'S LOOK AT EXHIBIT 2065, WHICH IS IN YOUR BINDER.  IT

12:38PM   23   SHOULD BE VOLUME 3.

12:38PM   24   A.   OKAY.

12:38PM   25   Q.   DO YOU SEE CHRISTIAN HOLMES'S NAME IN THE FROM LINE?

12:38PM    1    A.   I DO.

12:38PM    2    Q.   AND DO YOU SEE YOUR AND MR. BALWANI'S NAME IN THE TO LINE?

12:38PM    3    A.   I DO.

12:39PM    4    Q.   AND THE SUBJECT IS "BDT VISITORS TO WAG SATURDAY"?

12:39PM    5    A.   YES.

12:39PM    6    Q.   AND YOU WERE PURSUING -- YOU WERE HAVING DISCUSSIONS WITH

12:39PM    7    BDT ABOUT A POTENTIAL INVESTMENT IN THIS TIMEFRAME?

12:39PM    8    A.   YES.

12:39PM    9    Q.   AND BDT WAS A FUND RUN BY SOMEONE NAMED BYRON TROTT?

12:39PM   10    A.   BYRON TROTT, YES.

12:39PM   11            MR. LEACH:   YOUR HONOR, I OFFER EXHIBIT 2065.

12:39PM   12            MR. DOWNEY:   NO OBJECTION, YOUR HONOR.

12:39PM   13            THE COURT:   IT'S ADMITTED.

12:39PM   14       (GOVERNMENT'S EXHIBIT 2065 WAS RECEIVED IN EVIDENCE.)

12:39PM   15    BY MR. LEACH:

12:39PM   16    Q.   SO THIS APPEARS TO BE AN EMAIL FROM YOUR BROTHER,

12:39PM   17    CHRISTIAN HOLMES?

12:39PM   18    A.   IT IS.

12:39PM   19    Q.   HE WAS A PROJECT MANAGER?

12:39PM   20    A.   HE WAS.

12:39PM   21    Q.   DID HE REPORT TO YOU?

12:39PM   22    A.   HE DID NOT.  HE REPORTED TO SUNNY AT THIS TIME.

12:39PM   23    Q.   AND AT ANY POINT DID HE REPORT TO YOU?

12:39PM   24    A.   YES.

12:39PM   25    Q.   THE SUBJECT IS "BDT VISITORS TO WAG SATURDAY."

HOLMES CROSS BY MR. LEACH (RES.)                    8451

12:39PM  1             DO YOU SEE THAT?

12:39PM  2   A.   I DO.

12:39PM  3   Q.   AND IN THE FIRST PARAGRAPH IT SAYS -- WELL, LET'S WORK OUR

12:40PM  4   WAY UP FROM THE TOP.  IF WE CAN GO TO PAGE 2.

12:40PM  5             DO YOU SEE THE INITIAL EMAIL, MS. HOLMES, WHERE CHRISTIAN

12:40PM  6   IS WRITING, "WHERE CAN I FIND THE LIST OF NAMES YOU MENTIONED

12:40PM  7   FROM BDT WHO WOULD COME INTO WAG ON SATURDAY?"

12:40PM  8             DID I READ THAT CORRECTLY?

12:40PM  9   A.   YOU DID.

12:40PM  10  Q.   "WE WILL SEND OVER THE DIFFERENT WORK FLOWS FOR HOW WE

12:40PM  11  WILL ACCOMMODATE FINGERSTICK REGARDLESS OF WHAT'S ON THE ORDER,

12:40PM  12  AND POSSIBLE ISSUES ASSOCIATED, AS REQUESTED."

12:40PM  13            DID I READ THAT CORRECTLY?

12:40PM  14  A.   YOU DID.

12:40PM  15  Q.   OKAY.  AND THEN THERE'S A RESPONSE FROM MR. BALWANI.

12:40PM  16            AND THEN IF WE CAN GO BACK TO CHRISTIAN HOLMES'S RESPONSE

12:41PM  17  ON PAGE 1.

12:41PM  18            DO YOU SEE WHERE IT SAYS, "ALSO WANTED TO SEND ALONG OUR

12:41PM  19  THOUGHTS FOR HOW TO ACCOMPLISH THE FS IN THE SCENARIO THEIR

12:41PM  20  ORDERS PROMPT VENOUS."

12:41PM  21            DO YOU SEE THAT LANGUAGE?

12:41PM  22  A.   I DO.

12:41PM  23  Q.   AND FS IS AN ACRONYM FOR FINGERSTICK?

12:41PM  24  A.   IT IS.

12:41PM  25  Q.   "ASSUMPTIONS HERE FROM EAH ARE THAT WE MUST NOT DO VENOUS

12:41PM   1    DRAW, AND WE CANNOT TELL THEM THAT THEIR ORDER PROMPTS VENOUS

12:41PM   2    IF IT DOES."

12:41PM   3        DID I READ THAT SENTENCE CORRECTLY?

12:41PM   4    A.   YOU DID.

12:41PM   5    Q.   AND EAH IS AN ACRONYM FOR YOU; CORRECT?

12:41PM   6    A.   IT'S MY INITIALS.

12:41PM   7    Q.   THOSE ARE YOUR INITIALS?

12:41PM   8    A.   YES.

12:41PM   9    Q.   AND PEOPLE WOULD REFER TO YOU AS EAH FROM TIME TO TIME?

12:41PM  10    A.   THEY DID.

12:41PM  11    Q.   OKAY.  AND AFTER MR. HOLMES WRITES, "WE CANNOT TELL THEM

12:41PM  12    THAT THEIR ORDER PROMPTS VENOUS IF IT DOES," HE SAYS, "THE

12:41PM  13    FOLLOWING IS THE ACTION PLANNING TO ACCOMPLISH THIS."

12:41PM  14        DO YOU SEE THAT?

12:41PM  15    A.   I DO.

12:42PM  16    Q.   AND IF WE GO FURTHER BELOW, THERE ARE SOME PREP ACTIONS.

12:42PM  17        DO YOU SEE THAT?

12:42PM  18    A.   I DO.

12:42PM  19    Q.   AND IT LISTS "ANAM/ROBIN HAVE A LIST OF NAMES WHICH

12:42PM  20    INCLUDES POSSIBLE PATIENTS FROM BDT."

12:42PM  21        DO YOU SEE THAT?

12:42PM  22    A.   I DO.

12:42PM  23    Q.   AND ANAM AND ROBIN WERE THE FOLKS IN THE WELLNESS CENTER

12:42PM  24    WHO WOULD BE GREETING THE BDT INDIVIDUALS?

12:42PM  25    A.   I THINK THEY'RE PEOPLE IN THE CALL CENTER.

12:42PM   1     Q.   OKAY.  "NISHIT IS BRIEFED TO BE ABLE TO HANDLE ANY MANUAL

12:42PM   2     ACTIONS NECESSARY IN THE LAB WHEN SAMPLES ARRIVE."

12:42PM   3          NISHIT IS NISHIT DOSHI?

12:42PM   4     A.   YES.

12:42PM   5     Q.   HE WORKS IN THE CLINICAL LAB?

12:42PM   6     A.   HE DID.

12:42PM   7     Q.   OKAY.  AND THEN "CIARA WILL BE BRIEFED WITH BDT NAMES,

12:42PM   8     TOLD TO EXPECT A CALL FROM US SHOULD THERE NEED TO BE ANY

12:42PM   9     WORKFLOW CHANGES, WHICH COULD INCLUDE DRAWING EXTRA

12:42PM  10     FINGERSTICKS, OTHERWISE INSTRUCTION IS TO COLLECT THE CTN'S

12:42PM  11     REQUESTED IN THE APP BY AS FEW FINGERSTICKS AS POSSIBLE."

12:43PM  12          DO YOU SEE THAT LANGUAGE?

12:43PM  13     A.   I DO.

12:43PM  14     Q.   AND CTN IS A REFERENCE TO THE COLLECTION DEVICE?

12:43PM  15     A.   IT IS.

12:43PM  16     Q.   AND THEN IF WE CAN GO DOWN, DO YOU SEE THAT THERE ARE TWO

12:43PM  17     SCENARIOS LAID OUT ON HOW TO DEAL WITH THIS BDT VIP VISIT?

12:43PM  18     A.   I DO.

12:43PM  19     Q.   AND FOR "SCENARIO 1:  SCANNED ORDER FROM BDT VIP CONTAINS

12:43PM  20     TESTS THAT PROMPT FOR VENOUS DRAW."

12:43PM  21          DO YOU SEE THAT SCENARIO LISTED?

12:43PM  22     A.   I DO.

12:43PM  23     Q.   AND DO YOU SEE THAT THERE ARE TWO CASES FOR THIS SCENARIO,

12:43PM  24     A CASE A AND A CASE B?

12:43PM  25     A.   I DO.

12:43PM  1    Q.   AND CASE A IS "WHAT TO DO IF VENOUS IS PROMPTED DUE TO

12:43PM  2    SOME TESTS NOT BEING ON FS, BUT WOULD OTHERWISE PROMPT FS."

12:43PM  3         DO YOU SEE THAT BULLET?

12:43PM  4    A.   I DO.

12:43PM  5    Q.   AND THEN SOME NEGATIVES FOR THIS CASE ARE LISTED.  "NEED

12:43PM  6    TO EITHER TELL THE PATIENT AT THE STORE THAT WE WILL NOT RUN A

12:44PM  7    FEW TESTS, OR TELL THEM ON THE BACK END THAT WE COULD NOT RUN

12:44PM  8    CERTAIN TESTS."

12:44PM  9         IS THAT WHAT IS REFLECTED IN THE FIRST BULLET UNDER

12:44PM  10   "NEGATIVE"?

12:44PM  11   A.   IT IS.

12:44PM  12   Q.   AND DOES USE CASE B INVOLVE WHAT WOULD HAPPEN IF A VENOUS

12:44PM  13   IS PROMPTED DUE TO THE VOLUME OF TESTS, BUT TESTS INDIVIDUALLY

12:44PM  14   WOULD PROMPT A FINGERSTICK?

12:44PM  15   A.   IT DOES.

12:44PM  16   Q.   IN THAT SCENARIO, DANIEL OR MAX WILL DETERMINE WHAT

12:44PM  17   COMBINATION OF CTN'S WERE NEEDED IN ORDER TO FULFILL THE ORDER;

12:44PM  18   CORRECT?

12:44PM  19   A.   EXACTLY.

12:44PM  20   Q.   AND IN THAT SCENARIO, CIARA WOULD COLLECT THE NUMBER OF

12:44PM  21   CTN'S WITH AS FEW STICKS AS POSSIBLE; CORRECT?

12:44PM  22   A.   YES.

12:44PM  23   Q.   AND THEN IT LAYS OUT SOME NEGATIVES FOR THIS SCENARIO IF

12:44PM  24   THAT'S WHAT HAPPENS FROM THE BDT ORDER; CORRECT?

12:44PM  25   A.   YES.

HOLMES CROSS BY MR. LEACH (RES.)                    8455

12:44PM  1    Q.   AND SOME OF THE NEGATIVES ARE BDT VIP -- AND THAT'S VERY

12:44PM  2    IMPORTANT PERSON?

12:45PM  3    A.   I THINK SO, YES.

12:45PM  4    Q.   -- IS A SELF-PAY PATIENT, THEN THE RECEIPT PRINTED BY THE

12:45PM  5    APP WILL ONLY SHOW THE TESTS TRANSCRIBED, WHICH WILL NOT

12:45PM  6    INCLUDE ALL OF THE TESTS FOR THE ORDER.

12:45PM  7         WAS THAT ONE OF THE NEGATIVES LISTED FOR THIS CASE B?

12:45PM  8    A.   IT IS.

12:45PM  9    Q.   AND IF THEY NOTICE MISSING TESTS ON THE RECEIPT, THEY MAY

12:45PM 10    ASK THE WAG TECH ABOUT IT.

12:45PM 11         WAS THAT ALSO A NEGATIVE LISTED FOR THIS SCENARIO?

12:45PM 12    A.   IT IS.

12:45PM 13    Q.   AND THEN THERE'S DISCUSSION OF A WORST CASE, THEY WOULD

12:45PM 14    MAKE A CALL TO CS.

12:45PM 15         IS THAT CUSTOMER SUPPORT?

12:45PM 16    A.   I THINK SO.

12:45PM 17    Q.   OKAY.  CUSTOMER SUPPORT IN PALO ALTO?

12:45PM 18    A.   I GUESS, YES.

12:45PM 19    Q.   OKAY.  AND ANAM WOULD TELL THEM EVERYTHING IS FINE.

12:45PM 20         CIARA WILL ALSO BE ABLE TO COME OUT WITH THE DRAW ROOM

12:45PM 21    ONCE CHECK-IN IS COMPLETE AND WELCOME THEM INTO THE ROOM AND

12:45PM 22    DISTRACT FROM LOOKING AT THE RECEIPT.

12:45PM 23         DO YOU SEE THAT?

12:45PM 24    A.   I DO.

12:45PM 25    Q.   AND THEN THOSE ARE THE CASE A AND B IF THE BDT VIP ASKS

12:45PM   1      FOR TESTS THAT PROMPTED VENOUS DRAW; CORRECT?

12:46PM   2      A.   A VENOUS DRAW.  BUT IF YOU COULD COLLECT MORE CTN'S, IT

12:46PM   3      WOULD BE FINGERSTICK.

12:46PM   4      Q.   OKAY.  AND MR. HOLMES AT THE TOP IS SAYING THAT SOME OF

12:46PM   5      THE ASSUMPTIONS FOR HOW TO DEAL WITH BDT ARE YOU MUST NOT DO A

12:46PM   6      VENOUS DRAW, AND YOU CAN'T TELL THEM IF THEIR ORDER PROMPTS

12:46PM   7      VENOUS IF IT DOES.

12:46PM   8          DID I READ THAT LANGUAGE CORRECT?

12:46PM   9      A.   YES.

12:46PM   10     Q.   YOU WANTED BDT TO HAVE A GOOD EXPERIENCE IN THE WELLNESS

12:46PM   11     CENTER?

12:46PM   12     A.   YES.

12:46PM   13     Q.   YOU WANTED TO PUT YOUR BEST FOOT FORWARD WITH THEM;

12:46PM   14     CORRECT?

12:46PM   15     A.   YES.

12:46PM   16     Q.   DID BDT END UP INVESTING?

12:46PM   17     A.   NO.

12:46PM   18     Q.   YOU TESTIFIED -- I'D LIKE TO GO BACK TO THIS IDEA OF

12:46PM   19     PHASE I AND PHASE II.

12:47PM   20         PHASE I IS IN THE JUNE OR JULY 2012 WALGREENS AMENDMENTS?

12:47PM   21     THAT'S WHEN THIS IDEA OF PHASE I GETS MEMORIALIZED?

12:47PM   22     A.   IT IS.

12:47PM   23     Q.   AND YOUR HOPE WAS THAT PHASE I WOULD BE SHORT?

12:47PM   24     A.   IT WAS.

12:47PM   25     Q.   OKAY.  BECAUSE YOU WANTED TO PUT THE MINILAB IN WALGREENS

12:47PM  1    STORES AFTER THE FDA APPROVED IT?

12:47PM  2    A.   WE DID.

12:47PM  3    Q.   OKAY.  AND PHASE I STARTS IN JUNE OF 2012, JUNE OR JULY OF

12:47PM  4    2012; CORRECT?

12:47PM  5    A.   THAT'S WHEN THE IDEA CAME, YES.

12:47PM  6    Q.   OKAY.  BUT THE IDEA TO MODIFY THE SIEMENS MACHINES, THE

12:47PM  7    ADVIA'S, THAT DOESN'T COME UP UNTIL JULY OF 2013; CORRECT?

12:47PM  8    A.   YES.

12:47PM  9    Q.   OKAY.  SO TWO MONTHS BEFORE THE WALGREENS LAUNCH IS THE

12:48PM 10    FIRST TIME YOU'RE PURSUING THIS IDEA OF MODIFYING THE SIEMENS

12:48PM 11    MACHINES?

12:48PM 12    A.   YES.

12:48PM 13    Q.   AND ONE OF THE REASONS THAT YOU'RE PURSUING MODIFYING THE

12:48PM 14    SIEMENS MACHINES IS BECAUSE THE MINILAB ISN'T READY?

12:48PM 15    A.   YES, IT WASN'T VALIDATED.

12:48PM 16    Q.   IN FACT, IT NEVER GOT VALIDATED; RIGHT?

12:48PM 17    A.   IN THE CLIA LAB.

12:48PM 18    Q.   AND YOU WERE STILL HAVING DEMONSTRATIONS WITH WALGREENS IN

12:48PM 19    THE JULY 2013 TIME PERIOD WITH THE MINILAB AND THE EDISON 3.5

12:48PM 20    AND OTHER THERANOS MANUFACTURED ANALYZERS; CORRECT?

12:48PM 21    A.   WHAT DO YOU MEAN BY THAT?

12:48PM 22    Q.   YOU WERE HAVING DEMONSTRATIONS WITH THE FOLKS FROM

12:48PM 23    WALGREENS IN JULY AND AUGUST OF 2013 WITH THE MINILAB AND THE

12:48PM 24    EDISON 3.5; CORRECT?

12:48PM 25    A.   WE SHOWED THEM THOSE DEVICES.

12:48PM  1    Q.   OKAY.  AND YOU DIDN'T SHOW THEM ANY MODIFIED SIEMENS

12:49PM  2    MACHINES?

12:49PM  3    A.   NO.

12:49PM  4    Q.   OKAY.  AND AM I RIGHT IN JULY OF 2013, WALGREENS WAS

12:49PM  5    PUSHING YOU REALLY HARD TO GO LIVE AS SOON AS POSSIBLE?

12:49PM  6    A.   THEY WERE.

12:49PM  7    Q.   AM I RIGHT THAT YOU TOLD SAFEWAY IN OR AROUND JUNE OF 2013

12:49PM  8    THAT THE MINILAB OR THE DEVICE WAS WHAT WAS GOING TO BE USED IN

12:49PM  9    THE CLIA LAB?

12:49PM  10   A.   I THINK SO.

12:49PM  11   Q.   WELL, LET ME SHOW YOU WHAT HAS BEEN MARKED AS

12:49PM  12   EXHIBIT 5536.  IT SHOULD BE IN VOLUME 2.

12:50PM  13   A.   OKAY.

12:50PM  14   Q.   IS --

12:50PM  15            MR. DOWNEY:  MR. LEACH, I'M SORRY TO INTERRUPT YOU.

12:50PM  16   I DON'T THINK I HAVE THIS ONE.

12:50PM  17            MR. LEACH:  5536.

12:50PM  18            THE CLERK:  VOLUME 3.

12:50PM  19            MR. LEACH:  IN VOLUME 3.

12:50PM  20   Q.   DOES THIS APPEAR TO BE AN EMAIL FROM MR. BALWANI TO YOU

12:50PM  21   DATED JUNE 28TH, 2013?

12:50PM  22   A.   YES.

12:50PM  23   Q.   AND IS THE SUBJECT "SAFEWAY/THERANOS - MEETING"?

12:51PM  24   A.   IT IS.

12:51PM  25   Q.   AND IS HE FORWARDING YOU MINUTES OF A MEETING THAT YOU HAD

12:51PM   1    WITH BOB GORDON AND ROBERT EDWARDS AT SAFEWAY?

12:51PM   2    A.   I THINK IT'S NOTES FROM BOB GORDON.

12:51PM   3    Q.   OKAY.  AND YOU'RE BEING ASKED TO COMMENT ON THESE NOTES?

12:51PM   4    A.   YES.

12:51PM   5    Q.   OKAY.

12:51PM   6         YOUR HONOR, I OFFER EXHIBIT 5536.

12:51PM   7              MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

12:51PM   8              THE COURT:  IT'S ADMITTED.

12:51PM   9         (GOVERNMENT'S EXHIBIT 5536 WAS RECEIVED IN EVIDENCE.)

12:51PM  10    BY MR. LEACH:

12:51PM  11    Q.   LET'S LOOK AT THE BOTTOM EMAIL FIRST.

12:51PM  12         BOB GORDON WAS THE GENERAL COUNSEL OF SAFEWAY, MS. HOLMES?

12:51PM  13    A.   HE WAS.

12:51PM  14    Q.   AND HE'S WRITING TO YOU AND MR. BALWANI, "ELIZABETH AND

12:51PM  15    SUNNY,

12:51PM  16         "AS WE DISCUSSED, I AM ATTACHING MY NOTES FROM THE MEETING

12:51PM  17    ON WEDNESDAY.  PLEASE MAKE ANY SUGGESTED REVISIONS THAT ARE

12:52PM  18    NECESSARY TO MAKE THIS AN ACCURATE SUMMARY OF OUR DISCUSSIONS."

12:52PM  19         DO YOU SEE THAT LANGUAGE?

12:52PM  20    A.   I DO.

12:52PM  21    Q.   AND IF I COULD DRAW YOUR ATTENTION, PLEASE, TO PAGE 2 OF

12:52PM  22    THE DOCUMENT, IT'S THE FIRST PAGE OF THE NOTES.

12:52PM  23         IF WE COULD CAPTURE THE FIRST THREE PARAGRAPHS,

12:52PM  24    MS. HOLLIMAN.  PERFECT.

12:52PM  25         DO YOU SEE THE DATE OF JUNE 26TH, 2013, MS. HOLMES?

12:52PM    1      A.   I DO.

12:52PM    2      Q.   AND THERE'S A HEADING HERE "CENTRAL LAB MODEL.

12:52PM    3           "CONTRARY TO IMPRESSIONS THAT SOME SAFEWAY PEOPLE HAD,

12:52PM    4      THERE IS NO TECHNOLOGICAL PROBLEM WITH THE DEVICES AND NO PLAN

12:52PM    5      TO GO WITHOUT THE DEVICES IN THE STORES.  THERANOS HAS

12:52PM    6      DETERMINED THAT THE USE OF THE CENTRAL LAB MODEL PROVIDES THE

12:52PM    7      QUICKEST AND EASIEST WAY TO EXPAND GEOGRAPHICALLY."

12:53PM    8           DID I READ THAT CORRECTLY?

12:53PM    9      A.   YOU DID.

12:53PM   10      Q.   AND THAT'S WHAT MR. GORDON IS ASKING YOU IN THIS LATE

12:53PM   11      JUNE 2013 TIME PERIOD TO COMMENT ON?

12:53PM   12      A.   YES.

12:53PM   13      Q.   "THE CENTRAL LAB CONTAINS THE DEVICE; IN FACT, THE DEVICE

12:53PM   14      IS THE ONLY WAY OF OBTAINING RESULTS FROM THE NANOTAINERS.  THE

12:53PM   15      LONG-TERM PLAN IS THAT THE DEVICES WILL BE MIGRATED INTO STORES

12:53PM   16      AS DEMAND, DEMOGRAPHICS, AND MARKETING FULFILLMENT REQUIRE."

12:53PM   17           DID I READ THAT CORRECTLY?

12:53PM   18      A.   YOU DID.

12:53PM   19      Q.   AND AM I UNDERSTANDING THAT AT SOME POINT IN JULY OF 2013

12:53PM   20      YOU MAKE THE DECISION TO ATTEMPT TO MODIFY ADVIA MACHINES TO

12:53PM   21      SUPPORT SOME OF THE TESTING IN THE CLIA LAB?

12:53PM   22      A.   YES.

12:53PM   23      Q.   LET ME DRAW YOUR ATTENTION TO EXHIBIT 5611.

12:54PM   24           AND IF I COULD DRAW YOUR ATTENTION TO THE FIRST PAGE -- OR

12:54PM   25      THE SECOND PAGE OF 5611, MS. HOLMES.

12:54PM  1      A.   OKAY.

12:54PM  2      Q.   DO YOU SEE WHAT APPEARS TO BE AN EMAIL FROM YOU TO

12:54PM  3      WILLIAM WESTRICK?

12:54PM  4      A.   I DO.

12:54PM  5      Q.   OKAY.  AND DOES THE REMAINDER OF THE DOCUMENT INCLUDE

12:54PM  6      DIALOGUE INVOLVING MR. WESTRICK AND YOU, MR. BALWANI, AND THEN

12:54PM  7      DANIEL YOUNG?

12:54PM  8      A.   YES.

12:54PM  9              MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5611.

12:54PM 10              MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

12:54PM 11              THE COURT:  IT'S ADMITTED.

12:54PM 12          (GOVERNMENT'S EXHIBIT 5611 WAS RECEIVED IN EVIDENCE.)

12:54PM 13              MR. LEACH:  IF YOU COULD PLEASE GO TO PAGE 2,

12:55PM 14      MS. HOLLIMAN.

12:55PM 15      Q.   THERE'S AN EMAIL HERE FROM YOU, MS. HOLMES, TO

12:55PM 16      MR. WESTRICK WITH NO SUBJECT THAT SAYS, "WILLIAM:

12:55PM 17          "WE WANT TO PUT YOU ON POINT ON A CRITICAL PATH PROJECT.

12:55PM 18      DANIEL WILL BE CONNECTING WITH YOU (IF HE HASN'T ALREADY) ON

12:55PM 19      THE SELECTION AND PROCUREMENT OF ADDITIONAL LIQUID HANDLING

12:55PM 20      SYSTEMS FOR THIS PROJECT.  PLEASE FOCUS ON GETTING THIS DONE

12:55PM 21      ASAP.  IT IS A TOP PRIORITY."

12:55PM 22          DO YOU SEE THAT?

12:55PM 23      A.   I DO.

12:55PM 24      Q.   AND IS THIS AN EMAIL IN CONNECTION WITH YOUR DECISION TO

12:55PM 25      MODIFY THE ADVIA MACHINES?

12:55PM  1    A.   NO.

12:55PM  2    Q.   WELL, LET'S LOOK AT -- DID YOU EVER DESCRIBE HERE THE

12:55PM  3    ADVIA SOLUTION DESCRIBED AS A STOPGAP SOLUTION?

12:55PM  4    A.   I'M SORRY, WHERE IS IT?

12:55PM  5    Q.   IT'S NOT IN THIS EMAIL.  IT'S JUST A QUESTION.

12:55PM  6    A.   OH.  OH.

12:55PM  7    Q.   DID MR. WESTRICK END UP DOING WORK ON ADVIA'S IN

12:55PM  8    CONNECTION WITH MAKING MODIFICATIONS TO THE DEVICES?

12:55PM  9    A.   I'M NOT SURE.

12:55PM  10   Q.   OKAY.  DID YOU EVER HEAR THE MODIFICATIONS TO THE ADVIA'S

12:56PM  11   BEING CALLED A STOPGAP SOLUTION?

12:56PM  12   A.   IT COULD HAVE.

12:56PM  13   Q.   OKAY.  STOPGAP MEANING TO GET US TO PHASE II?

12:56PM  14   A.   YES.

12:56PM  15   Q.   LET ME DRAW YOUR ATTENTION TO EXHIBIT 5090.  THIS SHOULD

12:56PM  16   BE IN VOLUME 3.

12:56PM  17   A.   OKAY.

12:56PM  18        MR. LEACH:  MS. HOLLIMAN -- OR, MS. KRATZMANN, I

12:56PM  19   BELIEVE EXHIBIT 5090 IS IN EVIDENCE.

12:57PM  20        THE CLERK:  NO, IT IS NOT, COUNSEL.

12:57PM  21        MR. LEACH:  OKAY.  MY APOLOGIES.

12:57PM  22   Q.   DO YOU SEE YOUR NAME IN THE TO LINE, MS. HOLMES?

12:57PM  23   A.   I DO.

12:57PM  24   Q.   AND THIS IS FROM DANIEL YOUNG?

12:57PM  25   A.   YES.

12:57PM    1    Q.   OKAY.  AND DOES THIS RELATE TO A DEMONSTRATION IN THE

12:57PM    2    JULY 2013 TIME PERIOD?

12:57PM    3    A.   IT DOES.

12:57PM    4             MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5090.

12:57PM    5             MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

12:57PM    6             THE COURT:  IT'S ADMITTED.

12:57PM    7         (GOVERNMENT'S EXHIBIT 5090 WAS RECEIVED IN EVIDENCE.)

12:57PM    8    BY MR. LEACH:

12:57PM    9    Q.   DO YOU SEE THE DATE AS JULY 11TH, 2013, MS. HOLMES?

12:57PM   10    A.   I DO.

12:57PM   11    Q.   AND THIS IS A DATE OF A DEMONSTRATION FOR WALGREENS, ISN'T

12:57PM   12    IT?

12:57PM   13    A.   I DON'T KNOW.

12:57PM   14    Q.   OKAY.  YOU GAVE A PRESENTATION TO WALGREENS IN PALO ALTO

12:57PM   15    ON JUNE 11TH, 2013; CORRECT?

12:57PM   16    A.   JULY 11TH?

12:57PM   17    Q.   JULY 11TH, EXCUSE ME.

12:58PM   18    A.   I DON'T KNOW.  I KNOW WE WERE MEETING WITH THEM THAT

12:58PM   19    SUMMER.

12:58PM   20    Q.   OKAY.  AND WHEN YOU WERE MEETING WITH THEM, YOU WERE

12:58PM   21    SHOWING THEM MINILABS, 3.5'S, BUT NOT THE MODIFIED SIEMENS

12:58PM   22    MACHINES?

12:58PM   23    A.   YES.

12:58PM   24    Q.   OKAY.  AND THIS IS DANIEL YOUNG WRITING HERE, "4S IS READY

12:58PM   25    FOR CBC, USE CARTRIDGE ON TOP OF DEVICE."

12:58PM  1          DID I READ THAT CORRECTLY?

12:58PM  2    A.   YES.

12:58PM  3    Q.   4S IS THE SERIES OF THE MINILAB THAT YOU WERE CREATING FOR

12:58PM  4    THE MILITARY?

12:58PM  5    A.   IT IS.

12:58PM  6    Q.   "MINILAB WITH CARTRIDGE ON TOP WILL RUN NULL PROTOCOL."

12:58PM  7          DO YOU SEE THAT?

12:58PM  8    A.   YES.

12:58PM  9    Q.   AND YOU HEARD MR. EDLIN TESTIFYING ABOUT THE NULL

12:58PM 10    PROTOCOL?

12:58PM 11    A.   I DID.

12:58PM 12    Q.   AND I THINK YOU TESTIFIED ON YOUR DIRECT EXAMINATION THAT,

12:58PM 13    SITTING HERE TODAY, YOU'RE FAMILIAR WITH THE NULL PROTOCOL?

12:58PM 14    A.   I AM.

12:58PM 15    Q.   "SECOND MINILAB SHOULD NOT BE USED.

12:58PM 16          "IF WE HAVE ANOTHER 30 MINUTES, WE CAN MOVE THE THIRD

12:58PM 17    MINILAB IN AND RUN VIT D ON IT."

12:59PM 18          IS THAT VITAMIN D?

12:59PM 19    A.   YES.

12:59PM 20    Q.   "LET ME KNOW."

12:59PM 21          AND IF I COULD NOW DRAW YOUR ATTENTION TO EXHIBIT 905,

12:59PM 22    WHICH IS IN VOLUME 4.

12:59PM 23    A.   OKAY.

12:59PM 24              MR. LEACH:  I BELIEVE THIS IS IN EVIDENCE.

12:59PM 25              THE CLERK:  YES.

HOLMES CROSS BY MR. LEACH (RES.)                                8465

12:59PM   1          MR. LEACH:  WE CAN DISPLAY THIS, MS. HOLLIMAN.

12:59PM   2          THE WITNESS:  OKAY.

12:59PM   3    BY MR. LEACH:

12:59PM   4    Q.  DO YOU SEE THAT THERE ARE SOME DEMO -- THIS EMAIL RELATES

12:59PM   5    TO DEMO RESULTS FOR 7/11?

12:59PM   6    A.  I DO.

12:59PM   7    Q.  AND THAT'S THE DATE OF THE EMAIL THAT WE JUST LOOKED AT?

12:59PM   8    A.  YES.

12:59PM   9    Q.  OKAY.  AND IF I COULD DRAW YOUR ATTENTION TO PAGE 5, DO

01:00PM  10    YOU SEE THE EMAIL FROM DANIEL EDLIN TO YOU AND DANIEL YOUNG?

01:00PM  11    A.  I DO.

01:00PM  12    Q.  AND HE'S WRITING ABOUT THE RESULTS FROM THESE DEMOS,

01:00PM  13    INCLUDING THE FACT THAT VITAMIN D HAS BEEN REMOVED, TT4 AND TT3

01:00PM  14    HAVE BEEN REMOVED FROM ALL THYROID PANELS, AND FT4 HAS BEEN

01:00PM  15    REMOVED FROM A THYROID PANEL IN ONE PATIENT; CORRECT?

01:00PM  16    A.  YES.

01:00PM  17    Q.  AND DAN YOUNG IS PROVIDING INPUT ON WHAT TO INCLUDE ON THE

01:00PM  18    REPORTS THAT ARE EVENTUALLY GOING TO GO OUT TO THE PEOPLE

01:00PM  19    RECEIVING THE DEMOS; CORRECT?

01:00PM  20    A.  YES.

01:00PM  21    Q.  OKAY.  AND IF WE GO TO PAGE -- THE TOP OF PAGE 5, DO YOU

01:01PM  22    SEE WHERE DANIEL YOUNG IS WRITING, "I AM CONCERNED ABOUT THE

01:01PM  23    TSH VALUES F2, MF, AND M6 WHICH WERE ALL DONE ON THE THYROID

01:01PM  24    PANEL.  I DO THINK THESE ARE ALL RUNNING LOW.  TO BE

01:01PM  25    CONSERVATIVE, I WOULD REMOVE ALL OF THESE THREE RESULTS."

01:01PM  1          YOU CAN'T TELL FROM THIS EMAIL THAT THIS RELATES TO

01:01PM  2   WALGREENS; CORRECT?

01:01PM  3   A.   I DON'T THINK SO.

01:01PM  4   Q.   OKAY.  WE'LL GET TO WHETHER YOU'RE MEETING WITH WALGREENS

01:01PM  5   ON THIS DATE OR NOT.

01:01PM  6          BUT AM I RIGHT THAT YOU NEVER TOLD WALGREENS ABOUT ISSUES

01:01PM  7   THAT THERANOS WAS HAVING WITH ITS VITAMIN D ASSAY?

01:01PM  8   A.   I DON'T THINK SO.

01:01PM  9   Q.   AND YOU DIDN'T TELL WALGREENS FOLLOWING THIS DEMO THAT

01:01PM 10   THERANOS WAS HAVING ISSUES WITH THE TT4 ASSAY?

01:01PM 11   A.   I DON'T THINK SO.

01:01PM 12   Q.   AND YOU DIDN'T TELL WALGREENS THAT THERANOS WAS HAVING

01:02PM 13   ISSUES WITH THE TT3 ASSAY?

01:02PM 14   A.   I DON'T THINK SO.

01:02PM 15   Q.   AND YOU DIDN'T TELL WALGREENS THAT THERANOS WAS HAVING

01:02PM 16   ISSUES WITH THE FT4 ASSAY?

01:02PM 17   A.   I DON'T THINK SO.

01:02PM 18   Q.   THERE'S ALSO REFERENCES TO CHLORIDE AND ALKALINE PHOSPHATE

01:02PM 19   IN THIS.  YOU DIDN'T TELL WALGREENS THAT YOU WERE HAVING ISSUES

01:02PM 20   WITH THOSE ASSAYS, DID YOU?

01:02PM 21   A.   I DON'T THINK SO.

01:02PM 22   Q.   OKAY.  AND RATHER THAN TELL WALGREENS ABOUT THOSE ISSUES,

01:02PM 23   YOU ELECTED SIMPLY TO REMOVE THOSE RESULTS FROM THE REPORT;

01:02PM 24   CORRECT?

01:02PM 25   A.   I HAVEN'T READ ALL OF THIS, BUT WE WOULD HAVE FOLLOWED

01:02PM  1    DR. YOUNG'S GUIDANCE.

01:02PM  2    Q.   AND RATHER THAN HAVING A FRANK DISCUSSION WITH THEM ABOUT

01:02PM  3    ISSUES THAT YOU WERE HAVING WITH ASSAYS, YOU JUST TOOK THEM

01:02PM  4    OUT?

01:02PM  5    A.   NO.  I THINK IF DR. YOUNG WAS SAYING THERE WAS A CONCERN

01:02PM  6    ABOUT A RESULT, WE WOULD NOT REPORT THE RESULT, AND THEN THE

01:02PM  7    TEAM WOULD DO WHATEVER INVESTIGATION WAS NECESSARY TO

01:02PM  8    UNDERSTAND IF THERE WAS AN ISSUE.

01:02PM  9    Q.   OKAY.  BUT YOU NEVER TOLD WALGREENS, FOLLOWING THIS JULY

01:03PM  10   DEMO, THAT THERANOS WAS HAVING ISSUES WITH THESE ASSAYS;

01:03PM  11   CORRECT?

01:03PM  12   A.   I DON'T THINK SO.

01:03PM  13   Q.   OKAY.  LET'S LOOK AT EXHIBIT 5623.

01:03PM  14   A.   THE THIRD BINDER?

01:03PM  15   Q.   THIS IS IN VOLUME 3.

01:03PM  16        DOES THIS APPEAR TO BE AN EMAIL FROM CHRISTIAN HOLMES TO

01:03PM  17   YOU AND SUNNY BALWANI DATED JULY 11TH, 2013?

01:03PM  18   A.   YES.

01:04PM  19   Q.   AND THE SUBJECT MATTER IS "DECK FOR BOOTS MEETING

01:04PM  20   TOMORROW"?

01:04PM  21   A.   YES.

01:04PM  22   Q.   AND BOOTS IS ANOTHER NAME FOR WALGREENS?  OR BOOTS IS

01:04PM  23   AFFILIATED WITH WALGREENS?

01:04PM  24   A.   YES.

01:04PM  25             MR. LEACH:  OKAY.  YOUR HONOR, I OFFER EXHIBIT 5623.

HOLMES CROSS BY MR. LEACH (RES.)

01:04PM 1          MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

01:04PM 2          THE COURT:  IT'S ADMITTED.

01:04PM 3          (GOVERNMENT'S EXHIBIT 5623 WAS RECEIVED IN EVIDENCE.)

01:04PM 4    BY MR. LEACH:

01:04PM 5    Q.   AND DO YOU SEE THE DATE JULY 11TH, 2013, MS. HOLMES?

01:04PM 6    A.   I DO.

01:04PM 7    Q.   AND IS THIS ROUGHLY THE TIME PERIOD OF THE DEMONSTRATIONS

01:04PM 8    THAT WE JUST LOOKED AT?

01:04PM 9    A.   IT IS.

01:04PM 10   Q.   AND DOES THIS REFRESH YOUR MEMORY THAT IN THIS TIME PERIOD

01:04PM 11   WALGREENS EXECUTIVES WERE COMING THROUGH FOR DEMONSTRATIONS?

01:04PM 12   A.   AGAIN, NOT SPECIFICALLY AS TO THE DATE, BUT I KNOW THAT WE

01:04PM 13   WERE MEETING WITH THEM THAT SUMMER.

01:04PM 14   Q.   OKAY.

01:04PM 15        YOUR HONOR, WE'VE MARKED THE POWERPOINT TO THIS AS A

01:04PM 16   SEPARATE EXHIBIT, EXHIBIT 5609.

01:05PM 17        IF I COULD ASK MS. HOLMES TO LOOK AT IT.

01:05PM 18   A.   YES.

01:05PM 19        OKAY.

01:05PM 20   Q.   DO YOU SEE THE DATE JULY 11TH, 2013?

01:05PM 21   A.   I DO.

01:05PM 22   Q.   AND DO YOU SEE THE NAMES THERANOS, ALLIANCE, BOOTS, AND

01:05PM 23   WALGREENS ON THIS POWER POINT?

01:05PM 24   A.   I DO.

01:05PM 25   Q.   AND YOU WOULD HAVE BEEN PRESENTING TO WALGREENS IN THIS

01:05PM  1    TIME PERIOD ABOUT THE THERANOS RELATIONSHIP?

01:05PM  2    A.   WE WOULD HAVE BEEN MEETING WITH THEM ON OUR PARTNERSHIP.

01:05PM  3              MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5609.

01:05PM  4              MR. DOWNEY:  YOUR HONOR, NO OBJECTION FROM ME, BUT

01:05PM  5    MINE IS ACTUALLY NOT READABLE.

01:05PM  6              MR. LEACH:  IF WE CAN USE THE NATIVE ON THE SCREEN.

01:05PM  7              MR. DOWNEY:  MAYBE IT IS A NATIVE EXHIBIT.

01:05PM  8              MR. LEACH:  I THINK THE PRINTOUT CAME OUT IN A WAY

01:05PM  9    THAT IS NOT READABLE, YOUR HONOR.  BUT WE HAVE A NATIVE COPY

01:05PM  10   THAT I THINK WILL BE DISPLAYABLE.

01:06PM  11             THE COURT:  SOME OF THESE PAGES DO HAVE SOME --

01:06PM  12             MR. LEACH:  YEAH, I CAN'T EXPLAIN IT.  BUT I'VE

01:06PM  13   PERSONALLY REVIEWED THE NATIVE AND I THINK MR. DOWNEY'S CONCERN

01:06PM  14   WILL BE ALLAYED.

01:06PM  15             THE COURT:  ALL RIGHT.  THANK YOU.

01:06PM  16        AND YOU'RE GOING TO DISPLAY THE NATIVE?

01:06PM  17             MR. LEACH:  YES.

01:06PM  18             THE COURT:  IT'S ADMITTED.

01:06PM  19        (GOVERNMENT'S EXHIBIT 5609 WAS RECEIVED IN EVIDENCE.)

01:06PM  20             MR. LEACH:  MAY I HAVE ONE MOMENT, YOUR HONOR?

01:06PM  21        (DISCUSSION OFF THE RECORD.)

01:06PM  22             MR. LEACH:  WHILE MS. HOLLIMAN IS WORKING ON THAT,

01:06PM  23   IF I COULD USE THE ELMO?

01:06PM  24   Q.   MS. HOLMES, I'M DISPLAYING THE FINAL PAGE OF EXHIBIT 5609,

01:07PM  25   THE TITLE IS "OVERVIEW:  THERANOS SYSTEMS."

HOLMES CROSS BY MR. LEACH (RES.)                          8470

```
01:07PM  1          DO YOU SEE THAT ON THE SCREEN?

01:07PM  2     A.   I DO.

01:07PM  3     Q.   AND TO THE LEFT THERE'S THERANOS SYSTEMS AND IMAGES OF TWO

01:07PM  4     THINGS DESCRIBED AS THERANOS ANALYZERS.

01:07PM  5          DO YOU SEE THAT?

01:07PM  6     A.   I DO.

01:07PM  7     Q.   AND IS THAT THE 3.5 TO THE LEFT?

01:07PM  8     A.   YES.

01:07PM  9     Q.   AND WHAT IS THE ONE TO THE RIGHT?

01:07PM 10     A.   ONE OF THE MINILABS.

01:07PM 11     Q.   AND THIS IS FROM JULY OF 2013, THE TIME PERIOD WHEN YOU'RE

01:07PM 12     MODIFYING THE SIEMENS ADVIA MACHINES; CORRECT?

01:07PM 13     A.   YES.

01:07PM 14     Q.   AND AT NO POINT IN TIME DID YOU TELL WALGREENS THAT YOU

01:07PM 15     WERE MODIFYING SIEMENS MACHINES TO GO FORWARD WITH THE LAUNCH?

01:07PM 16     A.   WE DID NOT.

01:07PM 17     Q.   AND YOU DIDN'T PROVIDE THEM THE IMAGE LIKE WE HAVE HERE OF

01:07PM 18     A THERANOS ANALYZER CONSISTING OF A THIRD PARTY MODIFIED

01:07PM 19     DEVICE; CORRECT?

01:07PM 20     A.   CORRECT.

01:08PM 21     Q.   YOU ALSO HELD OUT TO WALGREENS THE FACT THAT YOU HAD A

01:08PM 22     CLIA LICENSE; CORRECT?

01:08PM 23     A.   WE DISCUSSED THAT WITH THEM.

01:08PM 24     Q.   AND THAT'S IN THE CONTRACT, THERANOS NEEDS TO GET -- BE

01:08PM 25     LICENSED BY CLIA IN ORDER TO DO THE TESTING?
```

01:08PM   1      A.   IT SOUNDS RIGHT.

01:08PM   2      Q.   AND AT THIS POINT IN TIME, JULY OF 2013, YOU HAD NOT

01:08PM   3      VALIDATED A SINGLE ASSAY FOR USE IN THE CLIA LAB USING ANY

01:08PM   4      DEVICE; CORRECT?

01:08PM   5      A.   CORRECT, YES.

01:08PM   6      Q.   AND THAT WAS ALL WORK THAT WAS STILL TO COME?

01:08PM   7      A.   YES.

01:08PM   8      Q.   OKAY.  AT SOME POINT AT OR AFTER SEPTEMBER OF 2013?

01:08PM   9      A.   AT SOME POINT AT OR AFTER JULY OF 2013.

01:08PM  10      Q.   OKAY.  YOU MENTIONED -- YOU MENTIONED SOME NAMES IN YOUR

01:08PM  11      DIRECT EXAMINATION THAT I WANTED TO ASK SOME FOLLOW-UP

01:09PM  12      QUESTIONS ABOUT.  ONE OF THEM WAS IAN GIBBONS.

01:09PM  13           DO YOU RECALL BEING ASKED SOME QUESTIONS ABOUT

01:09PM  14      IAN GIBBONS?

01:09PM  15      A.   I DO.

01:09PM  16      Q.   AND BEFORE I GET TO IAN GIBBONS, I THINK WE'VE

01:09PM  17      SUCCESSFULLY PUT THE NATIVE OF THE POWERPOINT ON THE SLIDE.  IF

01:09PM  18      I CAN WALK THROUGH SOME OF THOSE PAGES WITH YOU.

01:09PM  19           DO YOU SEE THE DATE OF JULY 11TH, 2013?

01:09PM  20      A.   I DO.

01:09PM  21      Q.   OKAY.  AND IF WE COULD PLEASE GO TO PAGE 7.

01:09PM  22           DO YOU SEE THERE'S A SLIDE TALKING ABOUT BACKGROUND ON

01:09PM  23      THERANOS, TRANSFORMING THE CLINICAL LABORATORY, CONSUMER

01:09PM  24      MARKETING?

01:09PM  25      A.   I DO.

01:09PM   1    Q.   AND THIS WAS -- YOU DON'T HAVE A MEMORY OF GIVING THIS

01:09PM   2    PRESENTATION TO WALGREENS?

01:09PM   3    A.   I DO NOT.

01:09PM   4    Q.   BUT YOU DON'T HAVE ANY REASON TO DOUBT THAT YOU DID?

01:09PM   5    A.   I THINK WE PROBABLY SPOKE TO SOME OF THE SLIDES.  WE

01:10PM   6    DIDN'T GENERALLY GO THROUGH A DECK.

01:10PM   7    Q.   OKAY.  LET'S LOOK AT PAGE 8.

01:10PM   8         DO YOU SEE WHERE IT SAYS, "TRANSFORMING THE CLINICAL LAB"?

01:10PM   9    A.   I DO.

01:10PM  10    Q.   AND TO THE RIGHT IT SAYS, "THE 5 PERCENT CV YIELDED IN

01:10PM  11    THERANOS'S ANALYSIS RESULTS FROM ELIMINATION OF PRE-ANALYTIC

01:10PM  12    ERRORS, AND PROVIDES FOR PRECISE AND ACTIONABLE INFORMATION

01:10PM  13    THAT WAS PREVIOUSLY INACCESSIBLE."

01:10PM  14         DID I READ THAT CORRECTLY?

01:10PM  15    A.   YOU DID.

01:10PM  16    Q.   AND AT THIS TIME YOU'RE STILL WORKING ON VALIDATING YOUR

01:10PM  17    ASSAYS FOR USE ON THE EDISON OR THE MODIFIED THIRD PARTY

01:10PM  18    MACHINES IN THE CLIA LAB?

01:10PM  19    A.   YES.  AS OF JULY 11TH, I'M NOT SURE THAT THE MODIFIED WORK

01:10PM  20    HAD STARTED YET.

01:10PM  21         BUT THE LDT VALIDATION HAD NOT HAPPENED YET.

01:10PM  22    Q.   OKAY.  AND IF WE COULD GO TO THE NEXT SLIDE, PLEASE.

01:10PM  23         DO YOU SEE WHERE IT SAYS, "NEW POSSIBILITIES IN LAB"?

01:11PM  24    A.   I DO.

01:11PM  25    Q.   "ALL 2000 PLUS CURRENTLY RUN TESTS/CPT CODES ARE AVAILABLE

01:11PM 1      THROUGH THERANOS."

01:11PM 2           DID I READ THAT CORRECTLY ON THE LEFT?

01:11PM 3      A.   YOU DID.

01:11PM 4      Q.   "THERANOS RUNS ANY TEST AVAILABLE IN CENTRAL

01:11PM 5      LABORATORIES."

01:11PM 6           THAT'S WHAT IS ON THIS SLIDE FOR WALGREENS IN THE JULY

01:11PM 7      2013 TIME PERIOD?

01:11PM 8      A.   IT IS.

01:11PM 9      Q.   AND IF WE COULD GO TO PAGE 12.

01:11PM 10          DO YOU SEE WHERE IT SAYS, "VALIDATION OF THERANOS"?

01:11PM 11     A.   I DO.

01:11PM 12     Q.   AND THIS IS A SLIDE RELATING TO PHARMACEUTICAL COMPANIES

01:11PM 13     THAT YOU WOULD OFTEN PROVIDE AT INVESTOR PRESENTATIONS;

01:11PM 14     CORRECT?

01:11PM 15     A.   IT'S THE SAME DECK THAT WE WOULD GENERALLY SHARE WITH

01:11PM 16     PEOPLE.

01:11PM 17     Q.   OKAY.  YOU CAN PUT THAT EXHIBIT TO THE SIDE, MS. HOLMES.

01:11PM 18     A.   OKAY.

01:11PM 19     Q.   AND I'D LIKE TO GO BACK TO IAN GIBBONS.

01:12PM 20     A.   YES.

01:12PM 21     Q.   IAN GIBBONS WAS ONE OF THE FIRST EMPLOYEES AT THERANOS?

01:12PM 22     A.   VERY EARLY.

01:12PM 23     Q.   DO YOU REMEMBER WHAT EMPLOYEE NUMBER HE WAS?

01:12PM 24     A.   OH, GOSH.  NO, BUT IT WAS 2005, I THINK.

01:12PM 25     Q.   OKAY.  AND HE LEFT THERANOS IN 2010?

01:12PM   1    A.   I DON'T THINK SO.

01:12PM   2    Q.   DID HE -- HE DIDN'T LEAVE AT ANY POINT BETWEEN 2010 AND

01:12PM   3    2013?

01:12PM   4    A.   NO.

01:12PM   5    Q.   OKAY.  HE PASSED AWAY IN 2013; CORRECT?

01:12PM   6    A.   HE DID.

01:12PM   7    Q.   OKAY.  AND YOU TESTIFIED THAT EXHIBIT 7098 WAS A

01:12PM   8    POWERPOINT THAT YOU RECEIVED FROM DR. GIBBONS ABOUT THE

01:12PM   9    CAPABILITIES OF THERANOS TECHNOLOGY.

01:12PM   10        DO YOU RECALL THAT TESTIMONY?

01:12PM   11   A.   I DO.

01:12PM   12   Q.   OKAY.  LET'S LOOK AT EXHIBIT 7098.

01:13PM   13   A.   IS THAT ONE UP HERE?

01:13PM   14   Q.   IT'S IN VOLUME 4.

01:13PM   15   A.   OKAY.  OKAY.

01:13PM   16   Q.   AND YOU TESTIFIED THAT AS A RESULT OF --

01:13PM   17        AND THIS IS IN EVIDENCE, MS. HOLLIMAN, SO WE CAN DISPLAY

01:13PM   18   THIS.

01:13PM   19        YOU TESTIFIED ON DIRECT EXAMINATION THAT AS A RESULT OF

01:13PM   20   THE PRESENTATION THAT YOU RECEIVED IN FEBRUARY OF 2010, YOU

01:13PM   21   UNDERSTOOD THAT THE 4 SERIES COULD DO ANY BLOOD TEST.

01:13PM   22        DO I HAVE THAT RIGHT?

01:13PM   23   A.   YES.

01:13PM   24   Q.   OKAY.  NOW, YOU DIDN'T HAVE A WORKING 4.0 SYSTEM AT THIS

01:13PM   25   POINT; CORRECT?

01:13PM 1      A.   ONLY PROTOTYPES.

01:13PM 2      Q.   ONLY PROTOTYPES.

01:13PM 3           SO LET'S LOOK AT PAGE 2.  OR EXCUSE ME, IT'S PAGE 3.

01:14PM 4           DR. GIBBONS WROTE HERE, "SYSTEM 4.0 WILL BE CAPABLE OF

01:14PM 5      PERFORMING ANY MEASUREMENT REQUIRED IN A DISTRIBUTED TEST

01:14PM 6      SETTING."

01:14PM 7           HE'S USING THE FUTURE TENSE THERE; CORRECT?

01:14PM 8      A.   HE DID.

01:14PM 9      Q.   AND HE WROTE, "IT IS ENVISAGED THAT SEVERAL DISTINCT

01:14PM 10     MEASUREMENT TECHNOLOGIES WILL BE INCORPORATED."

01:14PM 11          THAT'S SOMETHING THAT IS GOING TO HAPPEN IN THE FUTURE;

01:14PM 12     RIGHT?

01:14PM 13     A.   YES.

01:14PM 14     Q.   IT'S A VISION OF WHAT IS GOING TO HAPPEN IN THE FUTURE?

01:14PM 15     A.   IT'S WHAT WE WERE DOING IN THE LAB, BUT YES.

01:14PM 16     Q.   OKAY.  "THE SYSTEM WILL BE BROADLY BASED ON THE EXISTING

01:14PM 17     CARTRIDGE AND READER CONCEPTS."

01:14PM 18          THAT, AGAIN, IS THE FUTURE TENSE THAT DR. GIBBONS IS USING

01:14PM 19     THERE; CORRECT?

01:14PM 20     A.   IT IS.

01:14PM 21     Q.   AND THEN IT SAYS, "THE NUMBER OF TOTAL MEASUREMENTS PER

01:14PM 22     SAMPLE WILL BE INCREASED BY 2 TO 3-FOLD (TARGET: 15 ASSAYS?)."

01:14PM 23          AGAIN, HE'S SAYING WILL BE INCREASED, SO THAT'S THE FUTURE

01:15PM 24     TENSE; CORRECT?

01:15PM 25     A.   HE DID.

01:15PM 1    Q.   OKAY.  IF WE CAN LOOK AT THE NEXT PAGE, PLEASE.

01:15PM 2         DO YOU SEE THE SLIDE TITLED "ASSAY MENU"?

01:15PM 3    A.   I DO.

01:15PM 4    Q.   AND DO YOU SEE WHERE IT SAYS, "IN THE FIELD OF IMMUNOASSAY

01:15PM 5    WE HAVE GOOD INFORMATION AND EXPERIENCE.

01:15PM 6         "IN OTHER FIELDS, WE HAVE LESS SECURE INFORMATION."

01:15PM 7         DID I READ THAT CORRECTLY?

01:15PM 8    A.   YOU DID.

01:15PM 9    Q.   AND THE OTHER FIELDS INCLUDE TYPES OF TESTING LIKE GENERAL

01:15PM 10   CHEMISTRY AND NUCLEIC ACID AMPLIFICATION, AREAS OUTSIDE OF

01:15PM 11   IMMUNOASSAYS THAT YOU HAD SOME EXPERIENCE IN?

01:15PM 12   A.   HE'S SAYING WE HAVE LESS EXPERIENCE IN THOSE AREAS AND

01:15PM 13   OTHER AREAS.

01:15PM 14   Q.   OKAY.  LESS SECURE INFORMATION?

01:15PM 15   A.   YES.

01:15PM 16   Q.   OKAY.  AND IF WE LOOK AT PAGE 5, DO YOU SEE WHERE

01:15PM 17   DR. GIBBONS IS USING THE HEADING "CANDIDATE TECHNOLOGIES"?

01:15PM 18   A.   YES.

01:15PM 19   Q.   AND THESE ARE CANDIDATES; RIGHT?

01:16PM 20   A.   YES.

01:16PM 21   Q.   AND I BELIEVE YOU TESTIFIED THAT DR. GIBBONS WAS

01:16PM 22   SUGGESTING THAT WE REVIEW THESE AS POSSIBLE METHODS TO RUN ON

01:16PM 23   THE SYSTEM?

01:16PM 24   A.   HE DID.

01:16PM 25   Q.   OKAY.  LET'S LOOK AT PAGE 6.

HOLMES CROSS BY MR. LEACH (RES.)                                    8477

01:16PM  1            DO YOU SEE THAT THERE'S A LISTING OF GENERAL SYSTEM

01:16PM  2   REQUIREMENTS?

01:16PM  3   A.   I DO.

01:16PM  4   Q.   AND SOME OF THE THINGS LIKE SIZE AND ASSAY TIMES AND OTHER

01:16PM  5   CAPABILITIES WERE TBD?

01:16PM  6   A.   YES.

01:16PM  7   Q.   TBD MEANS TO BE DETERMINED?

01:16PM  8   A.   IT DOES.

01:16PM  9   Q.   OKAY.  AND THROUGHOUT THESE FIRST COUPLE OF SLIDES,

01:16PM 10   DR. GIBBONS IS USING THE FUTURE TENSE AND REFERENCING

01:16PM 11   CANDIDATES AND TALKING ABOUT THINGS THAT ARE YET TO BE

01:16PM 12   DETERMINED; CORRECT?

01:16PM 13   A.   YES.

01:16PM 14   Q.   OKAY.  BUT YOU UNDERSTOOD FROM THIS THAT THERANOS COULD

01:16PM 15   RUN ANY BLOOD TEST?

01:16PM 16   A.   I UNDERSTOOD THAT THIS WAS THE BEGINNING OF AFFIRMING WE

01:17PM 17   WERE CAPABLE OF DOING THAT, YES.

01:17PM 18   Q.   OKAY.  SO WHEN YOU TESTIFIED THAT AFTER REVIEWING THIS YOU

01:17PM 19   UNDERSTOOD THAT THE 4 SERIES COULD DO ANY BLOOD TESTS, WHAT YOU

01:17PM 20   MEANT IS THAT THIS WAS THE BEGINNING OF SOMETHING THAT MIGHT BE

01:17PM 21   ABLE TO DO THAT?

01:17PM 22   A.   WHEN I TESTIFIED THAT I BELIEVED THIS MEANT THAT WE COULD

01:17PM 23   DO IT, I WAS CORRECT, I BELIEVE IT MEANT THAT WE COULD DO IT.

01:17PM 24   Q.   OKAY.  YOU UNDERSTOOD THAT THIS WAS SOMETHING THAT YOU

01:17PM 25   MIGHT BE ABLE TO DO IN THE FUTURE?

01:17PM  1          IS THAT WHAT YOU'RE SAYING?

01:17PM  2     A.   I UNDERSTOOD FROM THE WORK THAT THIS TEAM OF SCIENTISTS

01:17PM  3     AND ENGINEERS AND DR. GIBBONS DID THAT WE COULD DO ANY METHOD

01:17PM  4     ON THE MINILAB THE WAY THAT WE WERE PROPOSING TO BUILD IT AND

01:17PM  5     TAKE IT FORWARD.

01:17PM  6     Q.   WASN'T THIS A PROOF OF CONCEPT?

01:17PM  7     A.   AT THIS STAGE, THE PROTOTYPES FOR SURE.

01:17PM  8     Q.   OKAY.  SO YOU HAVE A PROTOTYPE, YOU HAVE A PROOF OF

01:17PM  9     CONCEPT, YOU HAVE WILL BE'S, YOU HAVE TBD'S, YOU HAVE

01:17PM 10     CANDIDATES.  BUT IT REMAINS TO BE SEEN WHETHER YOU'RE GOING TO

01:18PM 11     MAKE IT ALL COME TOGETHER.  IS THAT A FAIR WAY OF LOOKING AT

01:18PM 12     THIS?

01:18PM 13     A.   THERE WAS STILL WORK TO BE DONE.

01:18PM 14     Q.   WELL, LET'S LOOK AT SLIDE 7.

01:18PM 15          DO YOU SEE THE HEADING "PROPOSAL FOR THE BASIS OF SYSTEM

01:18PM 16     4.0"?

01:18PM 17     A.   I DO.

01:18PM 18     Q.   OKAY.  THIS WAS A PROPOSAL; RIGHT?

01:18PM 19     A.   YES.

01:18PM 20     Q.   AND THERE'S -- THE FIRST BULLET SAYS, "REVIEW AVAILABLE

01:18PM 21     TECHNOLOGIES:  DONE."

01:18PM 22          "DEFINE REQUIREMENTS?

01:18PM 23          "FIRST PASS PROPOSAL."

01:18PM 24          AND THEN THERE'S SOMETHING CALLED AN "ENGINEERING REVIEW"

01:18PM 25     WHICH THERANOS HAS TO UNDERTAKE.

01:18PM  1        IS THAT WHAT THIS SLIDE IS CONVEYING?

01:18PM  2   A.   IT IS.

01:18PM  3   Q.   LET'S LOOK AT PAGE 9.

01:19PM  4        DO YOU SEE THE BOX "COMPARISON OF PHYSICAL TECHNOLOGIES

01:19PM  5   USED FOR ASSAYS"?

01:19PM  6   A.   I DO.

01:19PM  7   Q.   AND THERE'S A ROW FOR SOMETHING CALLED NON-SEPARATION,

01:19PM  8   IT'S THE FOURTH ROW DOWN.

01:19PM  9        DO YOU SEE THAT?

01:19PM  10  A.   I DO.

01:19PM  11  Q.   AND TO THE RIGHT IT SAYS, IN THE COLUMN, I.T./LICENSING

01:19PM  12  REQUIRED.

01:19PM  13       DO YOU SEE THAT?

01:19PM  14  A.   I DO.

01:19PM  15  Q.   AND YOU UNDERSTOOD THAT TO MEAN THAT THERE WAS STILL SOME

01:19PM  16  INTELLECTUAL PROPERTY THAT NEEDED TO BE SECURED BY THERANOS IN

01:19PM  17  ORDER TO TURN THIS PROTOTYPE INTO SOMETHING MORE WORKABLE?

01:19PM  18  A.   NO.

01:19PM  19  Q.   WELL, LET'S LOOK AT PAGE 10.

01:19PM  20       IS THIS A DESCRIPTION OF "SEPARATION OF RED CELLS AND

01:19PM  21  WASHING"?

01:19PM  22  A.   I'M JUST READING IT.

01:19PM  23       YES.

01:19PM  24  Q.   AND IS DR. GIBBONS IDENTIFYING CERTAIN SOLUTIONS TO THIS

01:20PM  25  PROBLEM IN THE THIRD BULLET?

01:20PM  1    A.   I'M JUST LOOKING AT IT.

01:20PM  2         YES.

01:20PM  3    Q.   AND THERE'S THREE POSSIBLE SOLUTIONS.  THE THIRD ONE SAYS,

01:20PM  4    "SEPARATE PLASMA AND USE A VERY LOW VOLUME MEASUREMENT

01:20PM  5    TECHNOLOGY (I.E. NANODROP).

01:20PM  6         "WILL REQUIRE REVERSE ENGINEERING AND/OR A LICENSE?"

01:20PM  7         DID I READ THAT CORRECTLY?

01:20PM  8    A.   YOU DID.

01:20PM  9    Q.   DO YOU SEE ON THIS SLIDE FOR THE "SPECIAL PROBLEM FOR

01:20PM  10   BLOOD SAMPLES," THERE ARE A COUPLE OF ELLIPSES IN THE

01:20PM  11   POWERPOINT THAT ARE NOT ANSWERED OR THAT AREN'T CLEAR WHAT

01:20PM  12   THEY'RE GETTING AT HERE?

01:20PM  13   A.   I SEE THEM.

01:20PM  14   Q.   OKAY.  HOW ABOUT PAGE 12?

01:21PM  15        DO YOU SEE HERE THERE'S A DISCUSSION OF "SEPARATION VERSUS

01:21PM  16   NON-SEPARATION TECHNOLOGIES," AND THERE ARE THREE TECHNOLOGIES

01:21PM  17   THAT ARE VERY SENSITIVE AND GENERAL, INCLUDING ONES BY SIEMENS,

01:21PM  18   DISCOVERRX, AND PACKARD?

01:21PM  19   A.   YES.

01:21PM  20   Q.   SO DR. GIBBONS IS TALKING ABOUT THE NEED FOR LICENSING A

01:21PM  21   REVERSE ENGINEERING.  THERE'S UNCLEAR ELLIPSES IN THIS.

01:21PM  22   THERE'S A DISCUSSION OF TRADEOFFS AND LIMITS.

01:21PM  23        BUT YOUR TESTIMONY IS, FROM THIS, THAT YOU THOUGHT

01:21PM  24   THERANOS COULD DO ANY BLOOD TESTS?

01:21PM  25   A.   HE'S TALKING HERE ABOUT THE FACT THAT THERE'S OTHER WAYS

01:22PM  1    TO DO IMMUNOASSAYS THAN WHAT WE'VE DONE BEFORE AND DESCRIBING

01:22PM  2    SOME OF THE OTHER IMMUNOASSAY TECHNOLOGIES THAT EXIST.

01:22PM  3    Q.   OKAY.  BUT, AGAIN, YOU VIEWED THIS AS A PROTOTYPE;

01:22PM  4    CORRECT?

01:22PM  5    A.   YES.

01:22PM  6    Q.   OKAY.  YOU DIDN'T THINK YOU COULD GO OUT AND -- WELL, YOU

01:22PM  7    DIDN'T HAVE -- YOU DIDN'T THINK THAT YOU COULD GO OUT AND SELL

01:22PM  8    YOUR PROTOTYPE IN FEBRUARY OF 2010; CORRECT?

01:22PM  9    A.   WE WEREN'T READY TO LAUNCH IT IN FEBRUARY OF 2010.

01:22PM  10   Q.   OKAY.  BUT BY MARCH OF 2010, YOU'RE READY TO TALK TO

01:22PM  11   WALGREENS AND YOU'RE READY TO TALK TO SAFEWAY?

01:22PM  12   A.   YES.

01:22PM  13   Q.   OKAY.  DR. GIBBONS PASSED AWAY IN 2013?

01:22PM  14   A.   HE DID.

01:22PM  15   Q.   DID YOU HAVE ANY REASON TO THINK THAT HIS VIEWS OF

01:22PM  16   THERANOS'S TECHNOLOGY HAD CHANGED BY THAT POINT IN TIME?

01:22PM  17   A.   I DID NOT.

01:22PM  18   Q.   OKAY.  YOU DIDN'T BEGIN TO SUSPECT THAT ROCHELLE GIBBONS

01:22PM  19   WAS ONE OF THE SOURCES FOR MR. CARREYROU?

01:23PM  20   A.   I DON'T THINK MR. CARREYROU CAME INTO OUR LIFE UNTIL TWO

01:23PM  21   YEARS LATER.

01:23PM  22   Q.   OKAY.  BUT WHEN HE DOES, YOU STARTED TO SUSPECT THAT

01:23PM  23   ROCHELLE GIBBONS WAS ONE OF THE SOURCES FOR THE CARREYROU

01:23PM  24   ARTICLE?

01:23PM  25   A.   I LEARNED THAT AT SOME POINT.

01:23PM   1     Q.   OKAY.  DID THERE COME A POINT IN TIME WHEN YOU STARTED TO

01:23PM   2     SUSPECT THAT ROCHELLE GIBBONS WAS ONE OF THE SOURCES?

01:23PM   3     A.   I DON'T KNOW IF I SUSPECTED IT.  I KNOW THAT I LEARNED

01:23PM   4     THAT SHE WAS AT SOME POINT.

01:23PM   5     Q.   OKAY.  YOU DID TELL MR. CARREYROU THAT BY 2013,

01:23PM   6     DR. GIBBONS'S WORK WAS NOT LIVING UP TO WHAT IT HAD BEEN IN THE

01:23PM   7     PAST.

01:23PM   8          IS THAT FAIR?

01:23PM   9     A.   I DON'T KNOW.

01:23PM   10    Q.   I'LL COME BACK TO THAT ONE, MS. HOLMES.

01:24PM   11         BEFORE I GET TO THAT, LET ME ASK YOU -- DID I HEAR YOU SAY

01:24PM   12    YOU LEARNED ROCHELLE GIBBONS WAS A SOURCE FOR MR. CARREYROU IN

01:24PM   13    THE 2015 TIME PERIOD?

01:24PM   14    A.   THAT'S WHAT I REMEMBER.

01:24PM   15    Q.   LET ME -- YOU TALKED IN YOUR DIRECT EXAMINATION ABOUT

01:24PM   16    PATENTS, AND I THINK YOU TALKED A LITTLE BIT ABOUT ONE OF YOUR

01:24PM   17    FIRST PATENTS, WHICH HAD SOMETHING TO DO WITH AN INGESTIBLE

01:24PM   18    PILL AND A PATCH, OR SOMETHING THAT WOULD GO ON THE ARM TO

01:24PM   19    MEASURE BLOOD.

01:24PM   20    A.   YES.

01:24PM   21    Q.   OKAY.  AND YOU WERE AWARDED A PATENT FOR THAT?

01:24PM   22    A.   I WAS.

01:24PM   23    Q.   CORRECT?

01:24PM   24         AND WE SAW THAT AT EXHIBIT 9501?

01:24PM   25    A.   I DON'T KNOW THE EXHIBIT, BUT PROBABLY.

01:24PM  1    Q.   WELL, WE CAN DISPLAY IT, AND I'LL BRING YOU A COPY.

01:25PM  2    A.   OKAY.

01:25PM  3              MR. LEACH:  MAY I APPROACH, YOUR HONOR?

01:25PM  4              THE COURT:  YES.

01:25PM  5    BY MR. LEACH:

01:25PM  6    Q.   (HANDING.)

01:25PM  7    A.   THANK YOU.

01:25PM  8    Q.   DO YOU SEE THE DATE OF NOVEMBER 6TH, 2007 ON THIS PATENT,

01:25PM  9    MS. HOLMES?

01:25PM 10    A.   I DO.

01:25PM 11    Q.   AND IF WE COULD GO TO PAGE 2, THERE'S AN ABSTRACT IN THE

01:25PM 12    FAR -- IN THE RIGHT COLUMN.

01:25PM 13    A.   OKAY.

01:25PM 14    Q.   DO YOU SEE THE HEADING "ABSTRACT"?

01:25PM 15    A.   I DO.

01:25PM 16    Q.   AND DO YOU SEE WHERE IT SAYS, "THE INVENTION RELATES TO AN

01:25PM 17    INGESTIBLE, IMPLANTABLE, OR WEARABLE MEDICAL DEVICE COMPRISING

01:25PM 18    A MICRO ARRAY WHICH COMPRISES," AND THEN IT CONTINUES.

01:25PM 19         DO YOU SEE THAT?

01:25PM 20    A.   I DO.

01:25PM 21    Q.   AND YOU GOT A PATENT FOR THIS IDEA?

01:26PM 22    A.   YES.

01:26PM 23    Q.   OKAY.  I WANT TO TALK ABOUT THE PROCESS FOR THAT.

01:26PM 24         SO TO GET THE PATENT, YOU SENT IN SOME PAPERWORK TO THE

01:26PM 25    U.S. PATENT AND TRADEMARK OFFICE?

01:26PM  1      A.    YES.

01:26PM  2      Q.    THEY DIDN'T COME TO THERANOS'S OFFICE; RIGHT?

01:26PM  3      A.    NOT FOR THIS ONE.

01:26PM  4      Q.    THEY DIDN'T REVIEW THE INGESTIBLE, IMPLANTABLE, OR

01:26PM  5      WEARABLE DEVICE IN THERANOS'S OFFICES; CORRECT?

01:26PM  6      A.    I DON'T THINK SO.

01:26PM  7      Q.    AND THEY DIDN'T TURN ON ANY DEVICE AND SEE IF IT COULD RUN

01:26PM  8      SAMPLES OR WORK THE WAY THAT IS CLAIMED IN THE PIECE OF PAPER;

01:26PM  9      CORRECT?

01:26PM 10      A.    CORRECT.

01:26PM 11      Q.    AND WHAT THEY DID DO WAS COMPARE YOUR SUBMISSION, YOUR

01:26PM 12      FILING, AGAINST SOMETHING CALLED PRIOR ART; CORRECT?

01:26PM 13      A.    YES.

01:26PM 14      Q.    THEY WERE TRYING TO SEE IF THIS WAS A NEW IDEA OR AN OLD

01:26PM 15      IDEA?

01:26PM 16      A.    YES.

01:26PM 17      Q.    OKAY.  AND HOLDING A PATENT DOES NOT NECESSARILY MEAN THE

01:26PM 18      INVENTION DESCRIBED IN THE PATENT WORKS; CORRECT?

01:26PM 19      A.    CORRECT.

01:26PM 20      Q.    FOR EXAMPLE, YOU DON'T HAVE AN INGESTIBLE PILL THAT

01:27PM 21      ENABLES YOU TO, TO MEASURE LIPIDS IN THE BLOOD; CORRECT?

01:27PM 22      A.    NOT YET.

01:27PM 23      Q.    NOT YET.

01:27PM 24            AND YOU KNEW THAT AT THE TIME?  THIS WAS AN IDEA, YOU HAVE

01:27PM 25      A PATENT, BUT THAT DOESN'T MEAN IT WORKS?

01:27PM  1    A.   CORRECT.

01:27PM  2    Q.   AND YOU DON'T HAVE AN IMPLANTABLE PATCH THAT, YET, CAN

01:27PM  3    MEASURE BLOOD; RIGHT?

01:27PM  4    A.   CORRECT.

01:27PM  5    Q.   YOU HAVE A PATENT FOR THAT?

01:27PM  6    A.   YES.

01:27PM  7    Q.   BUT IT DOESN'T QUITE WORK YET?

01:27PM  8    A.   YES.

01:27PM  9    Q.   OKAY.

01:27PM  10        YOUR HONOR, I'M ABOUT TO MOVE INTO A DIFFERENT TOPIC AREA.

01:27PM  11   I THINK IT MIGHT BE A GOOD TIME.

01:27PM  12             THE COURT:  LET'S TAKE A BREAK NOW.  LET'S TAKE

01:27PM  13   30 MINUTES, LADIES AND GENTLEMEN.  WE'LL TAKE OUR AFTERNOON

01:27PM  14   BREAK OF 30 MINUTES.

01:27PM  15             THE CLERK:  COURT IS IN RECESS.

01:27PM  16        (RECESS FROM 1:27 P.M. UNTIL 2:04 P.M.)

02:04PM  17             THE COURT:  WE'RE BACK ON THE RECORD.  ALL PARTIES

02:04PM  18   PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.

02:04PM  19        MR. LEACH, YOU'D LIKE TO CONTINUE?

02:04PM  20             MR. LEACH:  YES, YOUR HONOR.  THANK YOU.

02:04PM  21   Q.   GOOD AFTERNOON, MS. HOLMES.

02:04PM  22   A.   GOOD AFTERNOON.

02:04PM  23   Q.   BEFORE THE BREAK WE WERE TALKING ABOUT IAN GIBBONS.  I

02:04PM  24   WANTED TO SEE IF I COULD REFRESH YOUR MEMORY ON SOME ITEMS

02:04PM  25   RELATING TO HIM.

02:04PM  1        IF YOU COULD PLEASE TURN TO EXHIBIT 5720, WHICH SHOULD BE

02:04PM  2    IN VOLUME 3.

02:05PM  3    A.   OKAY.

02:05PM  4    Q.   DO YOU SEE YOUR NAME IN THE TO LINE UP AT THE TOP?

02:05PM  5    A.   I DO.

02:05PM  6    Q.   AND DO YOU SEE THE DATE OF THIS DOCUMENT?

02:05PM  7    A.   I DO.

02:05PM  8    Q.   OKAY.  I WANT TO DRAW YOUR ATTENTION TO THE BOTTOM PORTION

02:05PM  9    OF -- ARE YOU ABLE TO UNDERSTAND THE CONTEXT OF THIS FROM THE

02:05PM 10    TOP PORTION OF THE DOCUMENT?

02:05PM 11    A.   I THINK SO.

02:05PM 12    Q.   OKAY.  I WANTED TO DRAW YOUR ATTENTION TO THE BOTTOM

02:05PM 13    PORTION.  THERE'S A BOLD HEADING DOWN TOWARDS THE BOTTOM, AND

02:05PM 14    THEN THREE ADDITIONAL LINES.

02:05PM 15        DO YOU SEE THAT?

02:05PM 16    A.   I DO.

02:05PM 17    Q.   OKAY.  AND IF YOU COULD PLEASE TURN TO THE NEXT PAGE AND

02:06PM 18    READ TO YOURSELF THE FIRST TWO COMPLETE PARAGRAPHS ON THE TOP

02:06PM 19    OF PAGE 2.

02:06PM 20    A.   OKAY.

02:06PM 21        (PAUSE IN PROCEEDINGS.)

02:06PM 22            THE WITNESS:  OKAY.

02:06PM 23    BY MR. LEACH:

02:06PM 24    Q.   DOES THIS REFRESH YOUR RECOLLECTION THAT DR. GIBBONS WAS

02:06PM 25    FREQUENTLY ABSENT FROM WORK IN THE LAST FEW YEARS OF HIS LIFE?

02:06PM   1    A.   IT DOESN'T REFRESH MY RECOLLECTION.

02:06PM   2    Q.   DOES IT REFRESH YOUR RECOLLECTION THAT THERANOS TOLD "THE

02:07PM   3    WALL STREET JOURNAL" THAT IN OR AROUND OCTOBER OF 2015?

02:07PM   4    A.   NO.

02:07PM   5    Q.   DOES THIS REFRESH YOUR RECOLLECTION THAT DR. GIBBONS WAS

02:07PM   6    FREQUENTLY ABSENT FROM SCIENTIFIC MEETINGS WITH HIS OWN TEAM?

02:07PM   7    A.   NO.

02:07PM   8    Q.   DOES THIS REFRESH YOUR RECOLLECTION THAT THERANOS TOLD

02:07PM   9    "THE WALL STREET JOURNAL" THAT IN OCTOBER OF 2015?

02:07PM  10    A.   IT DOES NOT.

02:07PM  11    Q.   OKAY.  DOES THIS REFRESH YOUR RECOLLECTION THAT THERANOS

02:07PM  12    TOLD "THE WALL STREET JOURNAL," DR. GIBBONS IS NOT A CREDIBLE

02:07PM  13    SOURCE FOR INFORMATION ABOUT THERANOS'S TECHNOLOGY, BUSINESS

02:07PM  14    PLANS, AND ANY OTHER INFORMATION?

02:07PM  15    A.   I DON'T THINK THAT'S WHAT THIS SAYS.

02:07PM  16    Q.   OKAY.  THIS DOESN'T REFRESH YOUR MEMORY THAT THERANOS TOLD

02:07PM  17    "THE WALL STREET JOURNAL" IN OCTOBER OF 2015 NEITHER

02:07PM  18    DR. GIBBONS NOR ROCHELLE IS A CREDIBLE SOURCE OF INFORMATION

02:07PM  19    ABOUT THERANOS'S TECHNOLOGY?

02:07PM  20    A.   IT DOES NOT.

02:07PM  21    Q.   OKAY.  YOU CAN PUT THAT TO THE SIDE.

02:07PM  22         YOU WERE ASKED SOME QUESTIONS ABOUT EXHIBIT 7623, WHICH

02:08PM  23    SHOULD BE IN VOLUME 4.

02:08PM  24    A.   OKAY.

02:08PM  25              THE CLERK:  THAT EXHIBIT NUMBER AGAIN, PLEASE,

02:08PM    1    COUNSEL.

02:08PM    2             MR. LEACH:  7623.

02:08PM    3    Q.  THIS IS AN OCTOBER -- WELL, DOES THIS INCLUDE AN

02:08PM    4    OCTOBER 7TH, 2015 EMAIL ABOUT A PATIENT'S EXPERIENCE AT A

02:08PM    5    WALGREENS RELATING TO THYROID RESULTS?

02:08PM    6    A.  IT DOES.

02:08PM    7    Q.  AND YOU RECALL -- YOU TESTIFIED THAT YOU RECEIVED SOME

02:08PM    8    POSITIVE FEEDBACK ABOUT THIS PATIENT EXPERIENCE IN OR AROUND

02:08PM    9    OCTOBER OF 2015.

02:08PM   10    A.  YES.

02:08PM   11    Q.  OKAY.  AT THIS POINT IN TIME, OCTOBER OF 2015, THIS WAS

02:08PM   12    AFTER THE FDA INSPECTION OF THERANOS IN AUGUST?

02:09PM   13    A.  IT IS.

02:09PM   14    Q.  AND AT THIS POINT IN TIME, THERANOS WAS NOT PERFORMING ANY

02:09PM   15    TESTS IN ITS CALIFORNIA CLIA LAB FROM ITS FINGERSTICK

02:09PM   16    TECHNOLOGY; CORRECT?

02:09PM   17    A.  WE WERE NOT USING THE NANOTAINER.

02:09PM   18    Q.  OKAY.  AND SO YOU WEREN'T USING THE NANOTAINER TO TEST FOR

02:09PM   19    THYROID?

02:09PM   20    A.  I DON'T THINK SO, NO.

02:09PM   21    Q.  OKAY.  SO THIS WOULD HAVE BEEN RUN ON AN ORDINARY FDA

02:09PM   22    MACHINE?

02:09PM   23    A.  I THINK SO.

02:09PM   24    Q.  OKAY.  THIS WOULD NOT HAVE HAD ANYTHING TO DO WITH THE

02:09PM   25    EDISON?

02:09PM  1    A.   I DON'T -- YES, CORRECT.

02:09PM  2    Q.   AND IT WOULD NOT HAVE HAD ANYTHING TO DO WITH YOUR SMALL

02:09PM  3    SAMPLE TESTING?

02:09PM  4    A.   I BELIEVE THAT'S CORRECT.

02:09PM  5    Q.   AND YOU BELIEVE THAT TO BE CORRECT BASED ON THE TIMING OF

02:09PM  6    THE DATE OF THE VISIT?

02:09PM  7    A.   YES.

02:09PM  8    Q.   OKAY.  I ALSO WANTED TO DRAW YOUR ATTENTION TO 7718.

02:10PM  9    A.   OKAY.

02:10PM  10   Q.   DO YOU RECALL TESTING ABOUT -- TESTING.

02:10PM  11        DO YOU RECALL TESTIFYING ABOUT THIS ARTICLE IN "THE

02:10PM  12   JOURNAL OF VIROLOGICAL METHODS"?

02:10PM  13   A.   I DO.

02:10PM  14   Q.   AND I WANTED TO DRAW YOUR ATTENTION DOWN TO THE BOTTOM

02:10PM  15   PORTION.

02:10PM  16        DO YOU SEE THAT THERE ARE RECEIVED AND REVISED AND

02:10PM  17   ACCEPTED DATES DOWN IN THE VERY BOTTOM OF THIS DOCUMENT?

02:10PM  18   A.   I DO.

02:10PM  19   Q.   AND THE RECEIVED DATE OF EXHIBIT 7718 IS JULY 17TH, 2017;

02:10PM  20   CORRECT?

02:10PM  21   A.   YES.

02:10PM  22   Q.   SO 2017, THAT'S AFTER THE FDA INSPECTION IN AUGUST OF

02:10PM  23   2015?

02:10PM  24   A.   YES.

02:10PM  25   Q.   AND THAT'S AFTER THE CMS INSPECTION THAT STARTS IN

02:10PM  1    SEPTEMBER AND CONCLUDES AT SOME POINT IN NOVEMBER OF 2015?

02:10PM  2    A.   YES.

02:10PM  3    Q.   AND THAT'S AFTER YOU RECEIVED THE CMS REPORT?

02:10PM  4    A.   IT IS.

02:10PM  5    Q.   AND THAT'S AFTER ALL OF THE NEGATIVE PUBLICITY FROM "THE

02:11PM  6    WALL STREET JOURNAL" ARTICLE?

02:11PM  7    A.   IT IS.

02:11PM  8    Q.   AND THIS IS AFTER INVESTORS STARTED ASKING YOU QUESTIONS

02:11PM  9    ABOUT WHAT WAS HAPPENING AND WHAT WAS GOING ON WITH THE

02:11PM 10    TECHNOLOGY; CORRECT?

02:11PM 11    A.   IT IS.

02:11PM 12    Q.   OKAY.  AND THE ACCEPTED DATE OF THIS ARTICLE IS

02:11PM 13    OCTOBER 25TH, 2017.

02:11PM 14         AM I RIGHT ABOUT THAT?

02:11PM 15    A.   YES.

02:11PM 16    Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO 719, OR 7719.

02:11PM 17    A.   OKAY.

02:11PM 18         THE COURT:  DID YOU WANT THESE PUBLISHED?  THESE ARE

02:11PM 19    IN EVIDENCE.

02:11PM 20         MR. LEACH:  THESE ARE IN EVIDENCE.  I DON'T NEED TO

02:11PM 21    PUBLISH THEM.  I JUST WANT TO GO THROUGH THE DATES, YOUR HONOR.

02:11PM 22    Q.   IS THIS ANOTHER JOURNAL ARTICLE THAT YOU TESTIFIED TO ON

02:11PM 23    YOUR DIRECT EXAMINATION?

02:11PM 24    A.   IT IS.

02:11PM 25    Q.   OKAY.  AND ARE THERE DATES AT THE TOP OF 7719?

02:11PM  1      A.   YES.

02:11PM  2      Q.   AND IS THE RECEIVED DATE FOR 7719 SEPTEMBER 28TH, 2017?

02:11PM  3      A.   IT IS.

02:11PM  4      Q.   AND THAT'S ROUGHLY TWO YEARS AFTER "THE

02:12PM  5      WALL STREET JOURNAL" ARTICLE RAISING QUESTIONS ABOUT THERANOS'S

02:12PM  6      TECHNOLOGY?

02:12PM  7      A.   IT IS.

02:12PM  8      Q.   OKAY.  AND THAT'S ROUGHLY TWO YEARS AFTER SOME OF YOUR

02:12PM  9      INVESTORS STARTED ASKING SOME QUESTIONS ABOUT WHAT WAS GOING ON

02:12PM 10      WITH THE TECHNOLOGY?

02:12PM 11      A.   YES.

02:12PM 12      Q.   OKAY.  LET'S ALSO PLEASE LOOK AT 7695.

02:12PM 13      A.   OKAY.

02:12PM 14      Q.   IS THIS ANOTHER JOURNAL ARTICLE THAT YOU TESTIFIED TO ON

02:12PM 15      YOUR DIRECT EXAMINATION?

02:12PM 16      A.   IT IS.

02:12PM 17      Q.   AND DO YOU SEE THE DATES OF THIS JOURNAL ARTICLE DOWN IN

02:12PM 18      THE BOTTOM LEFT CORNER?

02:12PM 19      A.   I DO.

02:12PM 20      Q.   AND IS THE RECEIVED DATE NOVEMBER 18TH, 2017?

02:12PM 21      A.   IT IS.

02:12PM 22      Q.   AND THE PUBLISHED DATE IS DECEMBER 19TH, 2017; CORRECT?

02:12PM 23      A.   YES.

02:12PM 24      Q.   SO, AGAIN, THIS IS WELL AFTER "THE WALL STREET JOURNAL"

02:12PM 25      ARTICLE THAT RAISED SOME CRITICISMS ABOUT THERANOS?

02:13PM  1    A.   IT IS.

02:13PM  2    Q.   AND THIS IS ROUGHLY TWO YEARS AFTER SOME OF YOUR INVESTORS

02:13PM  3    STARTED ASKING QUESTIONS ABOUT YOUR TECHNOLOGY?

02:13PM  4    A.   YES.

02:13PM  5    Q.   FINALLY, 7717.  I BELIEVE YOU TESTIFIED THIS WAS SOMETHING

02:13PM  6    THAT WAS NOT ACTUALLY PUBLISHED; IS THAT CORRECT?

02:13PM  7    A.   YES.

02:13PM  8    Q.   OKAY.  AND THE DATE THAT THIS WAS SUBMITTED, IF YOU LOOK

02:13PM  9    AT PAGE 2, IS DECEMBER 20TH, 2017?

02:13PM  10   A.   YES.

02:13PM  11   Q.   AND AGAIN, THAT'S ROUGHLY TWO YEARS AFTER INVESTORS

02:13PM  12   STARTED ASKING QUESTIONS ABOUT SOME OF THE CLAIMS THERANOS HAD

02:13PM  13   BEEN MAKING?

02:13PM  14   A.   I DON'T REMEMBER IT AS ASKING QUESTIONS ABOUT THE CLAIMS,

02:13PM  15   BUT, YES, IT'S TWO YEARS AFTER THE NEGATIVE REPORTING ABOUT

02:13PM  16   THERANOS.

02:13PM  17   Q.   OKAY.  I BELIEVE YOU TESTIFIED ON DIRECT EXAMINATION THAT

02:13PM  18   YOU CAME TO THE CONCLUSION AFTER RECEIVING THE CMS REPORT THAT

02:14PM  19   MR. BALWANI WAS NOT THE BUSINESSMAN YOU THOUGHT HE WAS AND THAT

02:14PM  20   YOU MADE THE DECISION TO PUSH HIM OUT FROM THERANOS AND END

02:14PM  21   YOUR PERSONAL RELATIONSHIP WITH HIM.

02:14PM  22        IS THAT A FAIR SUMMARY?

02:14PM  23   A.   OVERALL, YES.

02:14PM  24   Q.   OKAY.  BUT IT'S TRUE, ISN'T IT, MS. HOLMES, THAT YOU WERE

02:14PM  25   TOLD IN SEPTEMBER OF 2015 WHILE THE CMS INSPECTION WAS GOING ON

02:14PM  1    THAT IT WAS GOING BADLY; CORRECT?

02:14PM  2    A.   I WAS TOLD AROUND THEN, YES.

02:14PM  3    Q.   OKAY.  YOU WERE TOLD IN SEPTEMBER OF 2015 THAT THE CMS

02:14PM  4    INSPECTORS WERE VERY HOSTILE SO FAR, THEY HAVE COMPLAINTS;

02:15PM  5    CORRECT?

02:15PM  6    A.   YES.

02:15PM  7    Q.   AND YOU WERE TOLD, OUR VALIDATION REPORTS ARE TERRIBLE,

02:15PM  8    REALLY PAINFUL GOING THROUGH THIS PROCESS, SAME ISSUES FDA

02:15PM  9    POINTED OUT.

02:15PM 10        CORRECT?

02:15PM 11    A.   YES.

02:15PM 12    Q.   YOU WERE TOLD THAT IN SEPTEMBER OF 2015?

02:15PM 13    A.   I DON'T REMEMBER EXACTLY, BUT THAT SOUNDS RIGHT.

02:15PM 14    Q.   AS THE INSPECTION IS GOING ON?

02:15PM 15    A.   I THINK SO.

02:15PM 16    Q.   OKAY.  AND YOU WERE TOLD DANIEL HAS NOTHING READY, TOLD ME

02:15PM 17    EVERYTHING IS IN BINDERS, NOT THERE.

02:15PM 18        YOU WERE TOLD THAT DURING THE INSPECTION; CORRECT?

02:15PM 19    A.   I DON'T REMEMBER THAT, BUT THAT SOUNDS LIKE A TEXT FROM

02:15PM 20    SUNNY, SO I'M ASSUMING.

02:15PM 21    Q.   OKAY.  SO NO REASON TO DOUBT THAT YOU WERE TOLD THAT IN

02:15PM 22    SEPTEMBER OF 2015 AS THE INSPECTION WAS GOING ON?

02:15PM 23    A.   I DON'T.

02:15PM 24    Q.   AND YOU WERE TOLD -- YOU KNOW THE INSPECTORS CAME BACK IN

02:15PM 25    NOVEMBER OF 2015; CORRECT?

02:15PM  1     A.   I DO.

02:15PM  2     Q.   THEY WERE THERE FOR TWO DAYS AROUND NOVEMBER 17TH AND 18TH

02:16PM  3     OF 2015?

02:16PM  4     A.   YES.

02:16PM  5     Q.   AND YOU WERE THERE FOR ONE OF THE DAYS; CORRECT?

02:16PM  6     A.   I THINK SO.

02:16PM  7     Q.   OKAY.  THE FIRST DAY YOU ACTUALLY TRAVELLED BY CORPORATE

02:16PM  8     JET TO FLORIDA TO PICK UP SOME AWARD; CORRECT?

02:16PM  9     A.   I DON'T KNOW.

02:16PM  10    Q.   OKAY.  WELL, LET'S LOOK AT 5635.

02:16PM  11    A.   WHICH BINDER?

02:16PM  12    Q.   IT SHOULD BE IN VOLUME 3.

02:17PM  13    A.   OKAY.

02:17PM  14    Q.   DO YOU SEE THE DATE AT THE TOP OF THIS EMAIL?

02:17PM  15    A.   I DO.

02:17PM  16    Q.   AND DO YOU RECOGNIZE THIS AS AN EMAIL FROM YOUR ASSISTANT

02:17PM  17    TO YOU?

02:17PM  18    A.   I DO.

02:17PM  19    Q.   AND IF YOU LOOK AT NUMBER 5, DO YOU SEE A DISCUSSION OF

02:17PM  20    SOME FLIGHT OPTIONS TO FLORIDA?

02:17PM  21    A.   I DO.

02:17PM  22    Q.   OKAY.  AND IF YOU LOOK AT PAGE 6, DO YOU SEE AN AGENDA FOR

02:17PM  23    A MEETING IN FLORIDA ON NOVEMBER 17TH?

02:17PM  24    A.   I DO.

02:17PM  25    Q.   OKAY.  DOES THIS REFRESH YOUR MEMORY THAT YOU TRAVELLED TO

02:17PM  1    FLORIDA ON OR AROUND NOVEMBER 17TH BY CORPORATE JET TO ACCEPT

02:17PM  2    AN AWARD BY SOMETHING CALLED CME GROUP?

02:17PM  3    A.   IT DOESN'T.  I GENERALLY REMEMBER GOING TO FLORIDA FOR

02:17PM  4    THAT, BUT I DIDN'T REMEMBER THE DATES.

02:17PM  5    Q.   OKAY.

02:17PM  6         WELL, YOUR HONOR, I OFFER PAGE 1 OF 5635, AND PAGES 6 AND

02:18PM  7    7 OF 5635.

02:18PM  8         (PAUSE IN PROCEEDINGS.)

02:18PM  9              MR. DOWNEY:  YOUR HONOR, I DON'T OBJECT TO IT BEING

02:18PM 10    REDACTED SO THAT THE TWO ENTRIES THAT HE'S REFERRING TO CAN BE

02:18PM 11    INTRODUCED INTO EVIDENCE.

02:18PM 12         THERE'S A LOT OF OTHER DISCUSSION OF OTHER ISSUES THAT

02:18PM 13    RAISE 403 AND 801, 802 ISSUES, ET CETERA.

02:18PM 14         BUT I DON'T -- IF HE CAN REDACT IT DOWN OR JUST DISPLAY

02:18PM 15    THE PART THAT HE'S REFERRED TO, THOSE PARTS, I HAVE NO

02:18PM 16    OBJECTION TO THEM COMING IN.

02:18PM 17              THE COURT:  MR. LEACH?

02:18PM 18              MR. LEACH:  I'M NOT 100 PERCENT CLEAR ON WHAT I

02:19PM 19    COULD DISPLAY, YOUR HONOR, BUT I'M TALKING ABOUT THE ENTIRETY

02:19PM 20    OF PAGE 6 AND PAGE 7, AND I CAN WORK WITH MR. DOWNEY TO REDACT

02:19PM 21    APPROPRIATE PORTIONS OF PAGE 1.

02:19PM 22              MR. DOWNEY:  WELL, I THOUGHT THAT HE HAD REFERRED TO

02:19PM 23    NUMBER 5 ON PAGE 1 AND TO THE BOTTOM HALF WITH A FLIGHT AGENDA

02:19PM 24    ON PAGE 6.

02:19PM 25              THE COURT:  WHY DON'T YOU -- CAN YOU GO TO -- WHY

02:19PM   1    DON'T YOU SHOW MR. DOWNEY WHAT IT IS THAT YOU'RE TALKING ABOUT

02:19PM   2    FOR A MOMENT.

02:19PM   3              MR. LEACH:  THANK YOU, YOUR HONOR.

02:19PM   4         (DISCUSSION AMONGST COUNSEL OFF THE RECORD.)

02:20PM   5              MR. DOWNEY:  YOUR HONOR, I SEE WHAT MR. LEACH IS

02:20PM   6    ATTEMPTING TO DO.

02:20PM   7         I WOULD SAY I OBJECT TO THE MATERIAL UNDER THE RECEIVED

02:20PM   8    LINE UNDER THE COURT'S PRIOR RULING AT 798, BUT I HAVE NO

02:20PM   9    OBJECTION TO THE BODY OF THAT EMAIL AND THE TOP OF PAGE 6 BEING

02:20PM  10    ADMITTED.

02:20PM  11              THE COURT:  AND PAGE 1 THERE'S NO OBJECTION?

02:20PM  12              MR. DOWNEY:  I DON'T THINK HE THINKS HE NEEDS

02:20PM  13    PAGE 1.

02:20PM  14              THE COURT:  I THOUGHT HE DID.  SORRY.

02:20PM  15              MR. LEACH:  I WOULD LIKE PAGE 1, YOUR HONOR, BUT

02:20PM  16    IT'S ONLY BULLETS NUMBER 3 AND 5, BUT I DON'T THINK I CAN

02:20PM  17    REDACT THAT ON THE FLY IN A MEANINGFUL WAY.

02:20PM  18              MR. DOWNEY:  WELL, YOUR HONOR, THAT'S THE 798 AND

02:20PM  19    403.

02:20PM  20              THE COURT:  SO WITHOUT FOUNDATION -- YOU'RE FAMILIAR

02:20PM  21    WITH THE COURT'S ORDER ON 798 ON THIS?

02:21PM  22              MR. LEACH:  YES.

02:21PM  23              THE COURT:  AND IF THERE'S INFORMATION, IF THERE'S

02:21PM  24    INFORMATION REGARDING THE LIFESTYLE OF CEO'S I THINK IS HOW

02:21PM  25    IT'S PHRASED IN 798, THAT'S THE FOUNDATION THAT NEEDS TO BE

02:21PM   1    LAID, WHETHER OR NOT THIS WAS NORMAL IN THE INDUSTRY.  LET ME

02:21PM   2    PUT IT THAT WAY.

02:21PM   3              MR. LEACH:  OKAY.  I'LL TRY TO LAY A FOUNDATION FOR

02:21PM   4    6 AND 7.

02:21PM   5    Q.   MS. HOLMES, ON PAGE 6, DO YOU SEE AN EMAIL FROM

02:21PM   6    LISA DURKIN TO YOU?

02:21PM   7    A.   I DO.

02:21PM   8    Q.   AND IS SHE LAYING OUT YOUR TRAVEL ARRANGEMENTS FOR A TRIP

02:21PM   9    TO FLORIDA TO ACCEPT SOMETHING CALLED THE CME GROUP AWARD?

02:21PM  10    A.   SHE'S MAKING SUGGESTIONS.

02:21PM  11    Q.   OKAY.  AND SHE WOULD MAKE SUGGESTIONS TO YOU FROM TIME TO

02:21PM  12    TIME ABOUT TRAVEL LOGISTICS AND HOW TO GET FROM A TO B, HOW TO

02:21PM  13    GET TO AN INVESTOR MEETING, THINGS LIKE THAT?

02:21PM  14    A.   SHE DID.

02:21PM  15    Q.   OKAY.  AND IS THIS ANYTHING OUT OF THE ORDINARY OF HOW YOU

02:22PM  16    WOULD CONDUCT BUSINESS WITH MS. DURKIN?

02:22PM  17    A.   NO.

02:22PM  18    Q.   AND IS THIS EXEMPLATIVE OF HOW YOU ON OCCASIONS WOULD MAKE

02:22PM  19    ARRANGEMENTS WITH MS. DURKIN TO FULFILL YOUR RESPONSIBILITIES

02:22PM  20    AS CEO OF THERANOS?

02:22PM  21    A.   SOMETIMES.

02:22PM  22    Q.   OKAY.  AND YOU --

02:22PM  23              WELL, YOUR HONOR, I OFFER PAGES 6 AND 7.

02:22PM  24              THE COURT:  I THINK --

02:22PM  25              MR. DOWNEY:  I DON'T THINK THAT CURES THE 798 ISSUE,

02:22PM   1      BUT THAT'S MY REMAINING OBJECTION, YOUR HONOR.

02:22PM   2           THE COURT:  ALL RIGHT.  THANK YOU.

02:22PM   3      I'M GOING TO ADMIT IT.  I DO THINK THE SPIRIT OF 798 HAS

02:22PM   4  BEEN SATISFIED.  IT WAS WHETHER OR NOT ANYTHING IS

02:22PM   5  EXTRAORDINARY FROM CEO'S, AND THE TESTIMONY LAYS THE FOUNDATION

02:22PM   6  FOR THAT.

02:22PM   7           SO IT'S ADMITTED, NOTING THE OBJECTION.

02:22PM   8           MR. LEACH:  THANK YOU, YOUR HONOR.

02:22PM   9      (GOVERNMENT'S EXHIBIT 5635, PAGES 6 AND 7, WAS RECEIVED IN

02:22PM  10  EVIDENCE.)

02:22PM  11  BY MR. LEACH:

02:22PM  12  Q.  SO, MS. HOLMES, IF WE CAN ZOOM IN ON THE TOP PORTION OF

02:22PM  13  THIS EMAIL.

02:23PM  14      DO YOU SEE THE REFERENCE TO -- OR THIS IS FROM

02:23PM  15  LISA DURKIN.  SHE WAS YOUR ASSISTANT AT THE TIME?

02:23PM  16  A.  YES.

02:23PM  17  Q.  AND THERE'S SOMEBODY NAMED PAIGE WILLIAMS COPIED ON THIS.

02:23PM  18  WHO IS THAT?

02:23PM  19  A.  SHE ALSO WORKED FOR ME.

02:23PM  20  Q.  AND THERE'S A DISCUSSION OF DIFFERENT FLIGHT OPTIONS IN

02:23PM  21  THE ATTACHMENTS.

02:23PM  22      DO YOU SEE THOSE REFERENCES THERE?

02:23PM  23  A.  I DO.

02:23PM  24  Q.  AND FROM TIME TO TIME, SHE WOULD COME TO YOU WITH

02:23PM  25  SUGGESTIONS ABOUT HOW TO TRAVEL AND GIVE YOU THE CHOICE OF

02:23PM   1    ULTIMATELY WHAT TO DO?

02:23PM   2    A.   YES.

02:23PM   3    Q.   OKAY.  AND THERE'S AN AGENDA HERE FOR NOVEMBER 17TH OF

02:23PM   4    2015.

02:23PM   5        DO YOU SEE THAT?

02:23PM   6    A.   YES.

02:23PM   7    Q.   AND YOU UNDERSTOOD THAT WAS THE FIRST DAY OF THE CMS

02:23PM   8    INSPECTION WHEN THE INSPECTORS CAME BACK?

02:23PM   9    A.   AGAIN, I DON'T REMEMBER THE DATES.

02:23PM   10   Q.   OKAY.  WELL, CAN YOU LOOK AT EXHIBIT 5387D, SPECIFICALLY

02:24PM   11   PAGE 118.

02:24PM   12   A.   I HAVE 5387.

02:24PM   13   Q.   5387D, PAGE 118.

02:24PM   14   A.   I DON'T KNOW IF I HAVE THAT.

02:24PM   15   Q.   THIS IS IN BINDER 4.  5387D, PAGE 118.

02:24PM   16   A.   I'VE GOT IT.

02:24PM   17   Q.   5387D, PAGE 118.

02:24PM   18        DO YOU SEE THE DATE OF NOVEMBER 19TH, 2015?

02:25PM   19   A.   I DO.

02:25PM   20   Q.   AND DO YOU SEE SOME REFERENCES TO GOING NOT WELL, THESE

02:25PM   21   GUYS DIDN'T KEEP MOST CALIBRATION INFORMATION, EVEN A MACHINE

02:25PM   22   FROM THREE WEEKS AGO, GOING OKAY.

02:25PM   23        DO YOU SEE THAT LANGUAGE?

02:25PM   24   A.   I DO.

02:25PM   25   Q.   AND DO YOU SEE SOME REFERENCE TO WHO IS THE BEST PERSON TO

02:25PM  1    ANSWER 1800 QUESTIONS?

02:25PM  2    A.   I DO.

02:25PM  3    Q.   AND YOU BELIEVE THAT TO BE A REFERENCE TO THE ADVIA?

02:25PM  4    A.   YES.

02:25PM  5    Q.   AND THESE ARE TEXT EXCHANGES RELATING TO THE CMS

02:25PM  6    INSPECTION; CORRECT?

02:25PM  7    A.   I THINK SO.  I'M NOT COMPLETELY SURE.

02:25PM  8    Q.   OKAY.  BUT YOU THINK SO?

02:25PM  9    A.   I THINK SO.

02:25PM  10   Q.   OKAY.  AND DOES THIS REFRESH YOUR MEMORY THAT YOU WERE

02:25PM  11   ONLY THERE FOR THE SECOND DAY OF THE CMS INSPECTION?

02:26PM  12   A.   IT DOESN'T.

02:26PM  13   Q.   OKAY.  THERE WAS -- BUT YOU WERE TOLD DURING THE CMS

02:26PM  14   INSPECTION THAT DAY TWO, OR THE SECOND PORTION, WAS NOT GOING

02:26PM  15   WELL; CORRECT?

02:26PM  16   A.   I'M SORRY, I DON'T COMPLETELY FOLLOW.

02:26PM  17   Q.   WHETHER YOU WERE THERE OR YOU WEREN'T, OR WHETHER YOU WERE

02:26PM  18   THERE FOR ONE DAY OR TWO DAYS, YOU REMEMBER BEING TOLD THAT THE

02:26PM  19   CMS INSPECTION WASN'T GOING WELL IN NOVEMBER OF 2015?

02:26PM  20   A.   I REMEMBER BEING TOLD AT SOME POINT, WHICH IS WHY I SAT IN

02:26PM  21   ON THE INSPECTION IN NOVEMBER.

02:26PM  22   Q.   OKAY.  AND AT THE CONCLUSION OF THE INSPECTION IN NOVEMBER

02:26PM  23   OF 2015, THERE WAS AN EXIT INTERVIEW WITH SOME OF THE CMS

02:26PM  24   INSPECTORS; ISN'T THAT CORRECT?

02:26PM  25   A.   THERE WAS.

02:26PM   1    Q.   AND YOU ATTENDED THAT EXIT INTERVIEW; CORRECT?

02:26PM   2    A.   I DID.

02:26PM   3    Q.   AND THAT WAS WITH SARAH BENNETT?

02:26PM   4    A.   YES.

02:26PM   5    Q.   AND GARY YAMAMOTO?

02:27PM   6    A.   YES.

02:27PM   7    Q.   AND THEY TOLD YOU IN THIS EXIT INTERVIEW THAT THEY WERE

02:27PM   8    CONTEMPLATING FINDING IMMEDIATE JEOPARDY AT THERANOS'S LAB;

02:27PM   9    CORRECT?

02:27PM  10    A.   I'M NOT SURE.

02:27PM  11    Q.   WELL, LET'S SEE IF WE CAN REFRESH YOUR MEMORY.

02:27PM  12         WOULD YOU PLEASE LOOK AT EXHIBIT 5717.

02:27PM  13    A.   YES.

02:27PM  14    Q.   DO YOU HAVE 5717 IN FRONT OF YOU?

02:27PM  15    A.   ALMOST.

02:27PM  16    Q.   OKAY.  I JUST WANT YOU TO REVIEW TO YOURSELF THE FIRST

02:28PM  17    FOUR LINES IN THE BODY UP AT THE TOP.

02:28PM  18    A.   OKAY.

02:28PM  19    Q.   AND IF I COULD DRAW YOUR ATTENTION TO THE SECOND PAGE.

02:28PM  20    A.   YES.

02:28PM  21    Q.   TAKE A MOMENT TO READ THE SECOND TO THE LAST PARAGRAPH

02:28PM  22    STARTING WITH THE SIXTH LINE FROM THE BOTTOM.  IF YOU COULD

02:28PM  23    JUST READ THAT CAREFULLY TO YOURSELF, AND THEN I WILL ASK MY

02:28PM  24    QUESTION.

02:28PM  25    A.   OKAY.

HOLMES CROSS BY MR. LEACH (RES.)                                    8502

02:29PM   1            (PAUSE IN PROCEEDINGS.)

02:29PM   2                 THE WITNESS:  OKAY.

02:29PM   3       BY MR. LEACH:

02:29PM   4       Q.   DOES THIS REFRESH YOUR MEMORY THAT AT THE END OF THE

02:29PM   5       INSPECTION IN NOVEMBER OF 2015, CMS TOLD YOU THAT THEY WERE

02:29PM   6       CONSIDERING IMMEDIATE JEOPARDY?

02:29PM   7       A.   IT DOESN'T.  I REMEMBER DISCUSSION OF POSSIBLE CITATIONS

02:29PM   8       AT THAT TIME.

02:29PM   9       Q.   OKAY.  AND YOU REMEMBER A DISCUSSION OF POSSIBLE STANDARD

02:29PM  10       LEVEL CITATIONS AND CERTAIN CONDITION LEVEL CITATIONS; CORRECT?

02:29PM  11       A.   I DON'T REMEMBER THE DESIGNATIONS.

02:29PM  12       Q.   YOU WERE URGING THEM TO FIND A LOWER CATEGORY OF

02:29PM  13       CITATIONS; ISN'T THAT CORRECT?

02:29PM  14       A.   I DON'T THINK SO.  I THINK WE WERE TALKING TO THEM ABOUT

02:29PM  15       WHAT WE BELIEVED WE'D DONE PROPERLY IN THE LAB.

02:29PM  16       Q.   OKAY.  AND YOU DON'T REMEMBER THE CMS INSPECTOR TELLING

02:29PM  17       YOU AT THAT POINT IN TIME THAT THEY WERE CONSIDERING AN

02:30PM  18       IMMEDIATE JEOPARDY FINDING?

02:30PM  19       A.   I DON'T.

02:30PM  20       Q.   YOU KNEW, BY VIRTUE OF YOUR WORK IN THE INDUSTRY, WHAT THE

02:30PM  21       CONSEQUENCES OF AN IMMEDIATE JEOPARDY FINDING WERE; CORRECT?

02:30PM  22       A.   I LEARNED THAT AT SOME POINT.

02:30PM  23       Q.   OKAY.  AND THE CMS REPORT COMES OUT IN JANUARY OF 2016?

02:30PM  24       A.   IT DID.

02:30PM  25       Q.   OKAY.  AND BY THE END OF APRIL OF 2016, YOU HAD MADE THE

02:30PM   1      DECISION TO -- THAT MR. BALWANI SHOULD LEAVE THE COMPANY;

02:30PM   2      CORRECT?

02:30PM   3      A.   YES.

02:30PM   4      Q.   AND ISN'T IT RIGHT THAT EVEN AFTER DOING THAT, YOU

02:30PM   5      CONTINUED TO MINIMIZE THE CMS FINDINGS TO LISA PETERSON?

02:30PM   6      A.   I DON'T THINK I DID.

02:30PM   7      Q.   WELL, LET ME SEE IF I CAN REFRESH YOUR MEMORY.

02:30PM   8           COULD YOU LOOK AT EXHIBIT 31 -- OR 3165.

02:31PM   9           MAY I APPROACH, YOUR HONOR?

02:31PM   10              THE COURT:   YES.

02:31PM   11     BY MR. LEACH:

02:31PM   12     Q.   (HANDING.)

02:31PM   13     A.   THANK YOU.

02:31PM   14     Q.   YOU WERE HERE WHEN MS. PETERSON TESTIFIED; CORRECT?

02:31PM   15     A.   I WAS.

02:31PM   16     Q.   AND YOU WERE HERE WHEN SHE DESCRIBED HER MEETING WITH YOU

02:31PM   17     AT THE END OF APRIL OF 2016; CORRECT?

02:31PM   18     A.   YES.

02:31PM   19     Q.   AND IF I COULD DRAW YOUR ATTENTION TO THE TOP PARAGRAPH OF

02:31PM   20     PAGE 4 OF 3165.

02:31PM   21     A.   OKAY.

02:31PM   22     Q.   TAKE A MOMENT TO READ PARAGRAPH 1 TO YOURSELF.

02:32PM   23     A.   OKAY.

02:32PM   24     Q.   DOES THIS REFRESH YOUR MEMORY THAT YOU TOLD LISA PETERSON

02:32PM   25     THAT CARREYROU'S PRIMARY SOURCES WERE TWO DISGRUNTLED LOW LEVEL

02:32PM  1    EMPLOYEES?

02:32PM  2    A.   NO.  I BELIEVE OUR COUNSEL WAS DOING A LOT OF THE TALKING

02:32PM  3    AT THIS MEETING.

02:32PM  4    Q.   WELL, DOES THIS REFRESH YOUR MEMORY THAT YOUR COUNSEL SAID

02:32PM  5    THAT?

02:32PM  6    A.   I DON'T REMEMBER HER SAYING THAT.

02:32PM  7    Q.   YOU WERE IN THE ROOM AT THE TIME?

02:32PM  8    A.   I WAS.

02:32PM  9    Q.   SO IT WAS YOU, MS. PETERSON, HEATHER KING, YOUR GENERAL

02:32PM 10    COUNSEL?

02:32PM 11    A.   YES.

02:32PM 12    Q.   DAN EDLIN WAS THERE?

02:32PM 13    A.   YES.

02:32PM 14    Q.   JERRY TUBERGEN WAS THERE?

02:32PM 15    A.   I SEE THAT HERE.

02:32PM 16    Q.   OKAY.  AND YOU DON'T HAVE A MEMORY OF YOU OR YOUR GENERAL

02:32PM 17    COUNSEL SAYING CARREYROU'S PRIMARY SOURCES WERE TWO DISGRUNTLED

02:32PM 18    LOWER LEVEL FORMER EMPLOYEES?

02:33PM 19    A.   I REMEMBER HEATHER TALKING ABOUT THIS TOPIC.

02:33PM 20    Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO PARAGRAPH 2.

02:33PM 21    A.   OKAY.

02:33PM 22    Q.   WELL, BEFORE I DRAW YOUR ATTENTION TO PARAGRAPH 2, LET ME

02:33PM 23    DRAW YOUR ATTENTION TO 3A.

02:33PM 24         DO YOU SEE THAT?

02:33PM 25    A.   I DO.

02:33PM   1    Q.   DO YOU RECALL THAT BY THIS POINT IN TIME, APRIL 28TH,

02:33PM   2    2016, SUNNY BALWANI HAD BEEN ASKED TO LEAVE THE COMPANY?

02:33PM   3    A.   YES.

02:33PM   4    Q.   AND IF I DRAW YOUR ATTENTION TO PARAGRAPH 2E, IF YOU COULD

02:33PM   5    TAKE A MOMENT TO READ THAT TO YOURSELF?

02:33PM   6    A.   YES.

02:33PM   7    Q.   DOES THIS REFRESH YOUR MEMORY THAT THERANOS TOLD

02:33PM   8    LISA PETERSON AT THIS MEETING, "THERANOS CAN'T TRIVIALIZE THE

02:34PM   9    CMS ISSUES IN THE PRESS, BUT IN REALITY THEY DON'T FEEL THE

02:34PM  10    ISSUES ARE MAJOR, AND THEY WOULD BE SHOCKED IF SANCTIONS WERE

02:34PM  11    IMPOSED"?

02:34PM  12    A.   IT DOES NOT.

02:34PM  13    Q.   YOU WERE HERE WHEN MS. PETERSON TESTIFIED ABOUT THIS

02:34PM  14    MEETING; CORRECT?

02:34PM  15    A.   I WAS.

02:34PM  16    Q.   OKAY.  AND YOU DON'T HAVE A MEMORY OF TRIVIALIZING THE CMS

02:34PM  17    INSPECTION TO HER; IS THAT WHAT YOU'RE SAYING?

02:34PM  18    A.   I DON'T THINK I DID THAT.

02:34PM  19          MR. LEACH:  YOUR HONOR, MAY I HAVE A MOMENT?

02:34PM  20          THE COURT:  YES.

02:34PM  21    (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

02:34PM  22          MR. LEACH:  THANK YOU, YOUR HONOR.

02:34PM  23    I HAVE NO FURTHER QUESTIONS.

02:34PM  24    THANK YOU, MS. HOLMES.

02:34PM  25          THE COURT:  LET ME ASK YOU ABOUT, I THINK IT'S 5365.

02:34PM   1    I WANT TO CLARIFY WHAT WAS ADMITTED THERE, WHAT YOU HAD

02:35PM   2    REDACTED.

02:35PM   3            MR. LEACH:  I THINK IT'S PAGES 6 AND 7 AND NOTHING

02:35PM   4    MORE, YOUR HONOR.

02:35PM   5            THE COURT:  I'M SORRY, THE ENTIRETY OF PAGES 6 AND

02:35PM   6    7?

02:35PM   7            MR. LEACH:  YES, WHICH I BELIEVE WERE ADMITTED OVER

02:35PM   8    THE DEFENSE OBJECTION.

02:35PM   9            THE COURT:  THAT'S RIGHT.

02:35PM   10       AND THEN PAGE 1?

02:35PM   11           MR. LEACH:  I'LL WITHDRAW PAGE 1, YOUR HONOR.  IT'S

02:35PM   12    NOT --

02:35PM   13           THE COURT:  ALL RIGHT.  PAGE 1 IS WITHDRAWN.

02:35PM   14       THE ENTIRETY OF 6 AND 7 WERE ADMITTED OVER OBJECTION.

02:35PM   15    THESE WERE NOT PUBLISHED YET.  DID YOU WANT TO PUBLISH THESE?

02:35PM   16           MR. LEACH:  NO.  I THINK THAT'S FINE.

02:35PM   17           THE COURT:  OKAY.  AND PAGES 6 AND 7 WERE ADMITTED

02:35PM   18    OVER DEFENSE OBJECTION.

02:35PM   19       ALL RIGHT.  THANK YOU.

02:36PM   20       MR. DOWNEY?

02:36PM   21           MR. DOWNEY:  YOUR HONOR, MAY I JUST HAVE A MOMENT TO

02:36PM   22    TRANSITION HERE?

02:36PM   23           THE COURT:  YES.

02:36PM   24       FOLKS, FEEL FREE TO STRETCH AND STAND IF YOU WOULD LIKE.

02:36PM   25       (STRETCHING.)

02:36PM  1        THE COURT:  MS. KRATZMANN HAS CALLED OUR

02:36PM  2   MAINTENANCE.  I THINK THE HEAT IS UP HERE A LITTLE BIT, SO

02:36PM  3   WE'RE GOING TO TRY TO GET SOME AIR CONDITIONING IN HERE.

02:37PM  4        (PAUSE IN PROCEEDINGS.)

02:37PM  5        THE COURT:  MR. DOWNEY?

02:37PM  6                   **REDIRECT EXAMINATION**

02:37PM  7   BY MR. DOWNEY:

02:37PM  8   Q.   GOOD AFTERNOON, MS. HOLMES.

02:37PM  9   A.   GOOD AFTERNOON.

02:37PM 10        MR. DOWNEY:  YOUR HONOR, MAY I APPROACH THE WITNESS?

02:37PM 11        THE COURT:  YES.

02:37PM 12   BY MR. DOWNEY:

02:37PM 13   Q.   (HANDING.)

02:37PM 14   A.   THANK YOU.

02:37PM 15   Q.   MS. HOLMES, WERE YOU TOLD HOW MANY SMALL SAMPLE TESTS

02:37PM 16   THERANOS WOULD HAVE TO DEVELOP IN ITS CLIA MINILAB TO COVER

02:37PM 17   93 PERCENT OF TESTS?

02:37PM 18   A.   I WAS.

02:37PM 19   Q.   WHAT WERE YOU TOLD?

02:37PM 20   A.   I REMEMBER JUST OVER 40 TESTS WAS ABOUT 90 PERCENT OF THE

02:37PM 21   TESTS.

02:37PM 22   Q.   HOW MANY TESTS WAS THERANOS OFFERING IN ITS CLINICAL LAB

02:38PM 23   THAT USED A SMALL SAMPLE FINGERSTICK BETWEEN 2013 AND 2015?

02:38PM 24   A.   I THINK ABOUT 70.

02:38PM 25   Q.   TO THE PATIENT WHO GETS A BLOOD TEST, DOES IT MATTER IN

02:38PM 1    THEIR EXPERIENCE WHAT DEVICE THEIR BLOOD IS BEING ANALYZED ON?

02:38PM 2    A.   NO.

02:38PM 3         MR. LEACH:  OBJECTION, YOUR HONOR.  FOUNDATION.

02:38PM 4    BY MR. DOWNEY:

02:38PM 5    Q.   WELL, DO THEY EVEN SEE --

02:38PM 6         THE COURT:  DO YOU WANT TO WITHDRAW THAT?

02:38PM 7         MR. DOWNEY:  I'LL WITHDRAW IT, YEAH.

02:38PM 8    Q.   DO THEY SEE THE ANALYZER THAT THEIR BLOOD TEST IS BEING

02:38PM 9    PERFORMED ON IN THE CENTRAL LAB?

02:38PM 10   A.   THEY DO NOT.

02:38PM 11   Q.   NOW, WHO AT THERANOS WAS RESPONSIBLE FOR VALIDATING TESTS

02:38PM 12   BEFORE THEY WERE OFFERED IN THE CLINICAL LAB?

02:38PM 13   A.   THE LABORATORY DIRECTOR.

02:38PM 14   Q.   AND DID ALL LDT'S HAVE TO BE VALIDATED BEFORE THEY WERE

02:38PM 15   OFFERED TO PATIENTS?

02:38PM 16   A.   YES.

02:38PM 17   Q.   ARE YOU AWARE OF ANY TEST BEING OFFERED IN THE CLIA LAB AT

02:39PM 18   THERANOS THAT WAS NOT VALIDATED?

02:39PM 19   A.   I AM NOT.

02:39PM 20   Q.   WAS THERE ANY INSTANCE WHERE YOU SOUGHT TO OVERRULE THE

02:39PM 21   LAB DIRECTOR OR ANY LAB PERSONNEL AS TO WHAT COULD AND COULDN'T

02:39PM 22   BE OFFERED?

02:39PM 23   A.   NO.

02:39PM 24   Q.   AND YOU TESTIFIED JUST A FEW MOMENTS AGO ABOUT THE CMS

02:39PM 25   INSPECTION IN NOVEMBER OF 2015.

02:39PM   1            DO YOU RECALL THAT?

02:39PM   2     A.   I DO.

02:39PM   3     Q.   AND WHAT DID YOU UNDERSTAND ABOUT THE PERFORMANCE OF

02:39PM   4     THERANOS'S CLINICAL LAB PRIOR TO THE FALL OF 2015?

02:39PM   5     A.   THAT IT WAS EXCELLENT.

02:39PM   6     Q.   WHAT DID MR. BALWANI TELL YOU ABOUT THE PERFORMANCE OF

02:39PM   7     THAT LAB PRIOR TO THE FALL OF 2015?

02:39PM   8     A.   THAT IT WAS ONE OF THE BEST LABS IN THE WORLD.

02:39PM   9     Q.   NOW, DID YOU UNDERSTAND IN THE PERIOD BETWEEN 2013 AND

02:39PM   10    2015 THAT ISSUES MIGHT COME UP WITH PARTICULAR TESTS?

02:39PM   11    A.   OF COURSE.

02:39PM   12    Q.   AND WHAT DID YOU UNDERSTAND ABOUT HOW THOSE ISSUES WERE

02:40PM   13    HANDLED IN THE CLINICAL LAB AT THERANOS WHEN THEY CAME UP?

02:40PM   14    A.   I UNDERSTOOD THERE WAS A TEAM OF GENERAL SUPERVISORS,

02:40PM   15    TECHNICAL SUPERVISORS, OTHER EXPERTS IN THE CLINICAL LAB WHO

02:40PM   16    WOULD WORK TO IDENTIFY ISSUES, ELEVATE THEM, DO SOME TYPE OF

02:40PM   17    ROOT CAUSE ANALYSIS TO UNDERSTAND WHAT THEY WERE, FIX THEM, AND

02:40PM   18    TAKE REMEDIAL ACTION SO THAT THE SAME ISSUE WOULD NOT HAPPEN

02:40PM   19    AGAIN.

02:40PM   20    Q.   AS BETWEEN YOU AND MR. BALWANI, WHO WAS RESPONSIBLE FOR

02:40PM   21    THE OPERATIONAL MANAGEMENT OF THE LAB?

02:40PM   22    A.   MR. BALWANI.

02:40PM   23    Q.   NOW, DO YOU RECALL DR. DAS TESTIFYING IN THIS MATTER?

02:40PM   24    A.   I DO.

02:40PM   25    Q.   AND DR. DAS BEGAN HIS WORK AT THERANOS IN THE TIME PERIOD

02:40PM  1    SHORTLY AFTER THE CMS INSPECTION THAT YOU JUST TESTIFIED ABOUT?

02:40PM  2    A.   HE DID.

02:40PM  3    Q.   DO YOU RECALL HIM PRESENTING YOU WITH THE FACT THAT HE

02:40PM  4    THOUGHT THAT ALL OF THE TESTS THAT HAD BEEN RUN ON THERANOS'S

02:41PM  5    EDISON DEVICE IN THE CLINICAL LAB SHOULD BE VOIDED?

02:41PM  6    A.   I DO.

02:41PM  7    Q.   DID YOU ACCEPT THAT DECISION?

02:41PM  8    A.   I DID.

02:41PM  9    Q.   PRIOR TO THE POINT AT WHICH MR. DAS TOLD YOU THAT, DR. DAS

02:41PM  10   TOLD YOU THAT, DID YOU EVER HAVE ANY ISSUE OR ANY SUGGESTION

02:41PM  11   THAT THERE WAS SOME TYPE OF SYSTEMIC OR REPEATED PROBLEM WITH

02:41PM  12   THERANOS'S EDISON DEVICE?

02:41PM  13   A.   NO.

02:41PM  14   Q.   I WANT TO TALK FOR A MOMENT ABOUT SOME OF THE DIFFERENT

02:41PM  15   FUNCTIONS AT THERANOS IN RESPONSE TO SOME OF WHAT MR. LEACH

02:41PM  16   COVERED WITH YOU.

02:41PM  17        DO YOU RECALL MR. LEACH SHOWING YOU SOME DOCUMENTS THAT

02:41PM  18   RELATED TO DR. ROSENDORFF'S QUESTIONS ABOUT EBOLA?

02:41PM  19   A.   I DO.

02:41PM  20   Q.   NOW, WHAT WAS DR. ROSENDORFF'S ROLE AT THERANOS WHEN HE

02:41PM  21   WAS THERE?

02:41PM  22   A.   HE WAS THE CLINICAL LAB DIRECTOR.

02:41PM  23   Q.   DID HE PLAY ANY ROLE WITH REGARD TO THE RESEARCH AND

02:42PM  24   DEVELOPMENT EFFORTS AT THERANOS?

02:42PM  25   A.   HE DID NOT.

02:42PM    1     Q.   WHERE WAS THE CLINICAL LAB OF THERANOS LOCATED WHEN YOU

02:42PM    2     RECEIVED THAT EMAIL FROM DR. ROSENDORFF IN 2014?

02:42PM    3     A.   ON GATEWAY BOULEVARD IN NEWARK, CALIFORNIA.

02:42PM    4     Q.   LET ME ASK THAT EXHIBIT 4330, WHICH WAS INTRODUCED INTO

02:42PM    5     EVIDENCE, BE BROUGHT UP.  AND I'D LIKE TO GO TO THE LAST PAGE,

02:42PM    6     PAGE 3 OF THIS EMAIL.  IF I COULD JUST HIGHLIGHT THE FIRST

02:42PM    7     SENTENCE OF THE EMAIL FROM DR. ROSENDORFF TO YOU.

02:42PM    8          DO YOU RECALL DISCUSSING THIS SENTENCE WITH MR. LEACH?

02:42PM    9     A.   I DO.

02:43PM   10     Q.   AND IS 7373 GATEWAY THE NEWARK FACILITY?

02:43PM   11     A.   IT IS.

02:43PM   12     Q.   WAS DR. ROSENDORFF ASKING YOU WHETHER THE EBOLA SAMPLES

02:43PM   13     WERE BEING TESTED AT THE NEWARK FACILITY?

02:43PM   14     A.   HE IS.

02:43PM   15     Q.   AND THEN DO YOU RECALL THAT MR. LEACH THEN SHOWED YOU SOME

02:43PM   16     DOCUMENTS ABOUT EBOLA SAMPLES?

02:43PM   17     A.   I DO.

02:43PM   18     Q.   AND DO YOU RECALL THAT THE REFERENCE IN THOSE DOCUMENTS

02:43PM   19     WAS THAT THE EBOLA SAMPLES WOULD BE STORED IN PALO ALTO?

02:43PM   20     A.   I DO.

02:43PM   21     Q.   WHAT DID YOU UNDERSTAND THAT TO BE A REFERENCE TO?

02:43PM   22     A.   THE R&D LABORATORY IN PALO ALTO.

02:43PM   23     Q.   WAS YOUR REPRESENTATION TO DR. ROSENDORFF IN NOVEMBER OF

02:43PM   24     2014 ABOUT THE EBOLA SAMPLES CORRECT?

02:43PM   25     A.   YES.

02:43PM   1    Q.   I WANT TO TALK FOR A MOMENT ABOUT THE MODIFIED DEVICES

02:44PM   2    THAT YOU DISCUSSED WITH MR. LEACH ON YOUR CROSS-EXAMINATION.

02:44PM   3         I THINK IT'S FAIR TO SAY THAT HE ASKED YOU REPEATEDLY

02:44PM   4    ABOUT WHETHER SEVERAL DIFFERENT PEOPLE WERE MADE AWARE OF

02:44PM   5    THERANOS'S USE OF THOSE MODIFIED DEVICES.

02:44PM   6         DO YOU RECALL THAT?

02:44PM   7    A.   I DO.

02:44PM   8    Q.   AND, AND HAD THERANOS MODIFIED THOSE DEVICES SO THAT IT

02:44PM   9    COULD RUN FINGERSTICK SAMPLES IN HIGH VOLUME?

02:44PM  10    A.   YES.

02:44PM  11    Q.   WHY HAD THERANOS DONE THAT AS OPPOSED TO USING ITS

02:44PM  12    THERANOS ANALYZER IN THE CLINICAL LAB?

02:44PM  13    A.   MULTIPLE REASONS, THE FIRST BEING THAT WE NEEDED A WAY TO

02:44PM  14    HANDLE POTENTIALLY TENS OF THOUSANDS OF SAMPLES COMING IN AT

02:44PM  15    THE SAME TIME, AND WE DID NOT HAVE A SCALEABLE WAY TO DO THAT

02:44PM  16    AT THAT TIME.

02:44PM  17         THE 4 SERIES ON THE ONE HAND WAS NOT VALIDATED YET FOR THE

02:45PM  18    CLINICAL LAB; AND ON THE OTHER HAND WE REALIZED THAT ALL OF THE

02:45PM  19    LOGISTICAL ISSUES WITH TRYING TO PUT DEVICES THAT WERE DESIGNED

02:45PM  20    TO HANDLE ONE SAMPLE AT A TIME IN A CLINICAL LAB DIDN'T MAKE

02:45PM  21    SENSE.

02:45PM  22    Q.   NOW, DID YOU, IN FACT, SHARE THE FACT THAT THERANOS WAS

02:45PM  23    USING THOSE DEVICES WITH ANYONE?

02:45PM  24    A.   THE MODIFIED SYSTEMS?

02:45PM  25    Q.   YES.

02:45PM  1    A.   NO.

02:45PM  2    Q.   DID YOU SHARE IT WITH THE BOARD OF DIRECTORS OF THERANOS?

02:45PM  3    A.   OH, SORRY.  YES, WE DID.

02:45PM  4    Q.   DID YOU SHARE IT WITH THE FDA?

02:45PM  5    A.   YES.

02:45PM  6    Q.   AS PART OF THEIR REGULATION OF THERANOS?

02:45PM  7    A.   YES, YES.

02:45PM  8    Q.   DID YOU SHARE IT WITH CMS DURING THEIR INSPECTION IN THE

02:45PM  9    FALL OF 2013?

02:45PM  10   A.   YES.

02:45PM  11   Q.   DO YOU RECALL THAT MR. LEACH SAID TO YOU THAT THE

02:45PM  12   INSPECTION THAT WAS CONDUCTED IN THE FALL OF 2013 WAS CONDUCTED

02:45PM  13   BY THE STATE OF CALIFORNIA?

02:45PM  14   A.   I DO.

02:45PM  15   Q.   DO YOU UNDERSTAND THAT CMS SOMETIMES CONTRACTS WITH THE

02:46PM  16   STATES TO PERFORM INSPECTIONS ON ITS BEHALF?

02:46PM  17   A.   I DO.

02:46PM  18   Q.   WAS THE INSPECTION IN THE FALL OF 2013 THAT WAS CONDUCTED

02:46PM  19   OF THERANOS'S CLIA LABORATORY ON BEHALF OF CMS?

02:46PM  20   A.   IT WAS.

02:46PM  21   Q.   OKAY.  LET ME ASK YOU NEXT ABOUT THE CASH POSITION OF

02:46PM  22   THERANOS AT VARIOUS POINTS IN TIME.

02:46PM  23       DO YOU RECALL THAT MR. LEACH SHOWED YOU A SPREADSHEET FROM

02:46PM  24   THE SECOND HALF OF 2013?

02:46PM  25   A.   I DO.

02:46PM   1    Q.   AND DO YOU RECALL THAT HE SHOWED YOU THAT THE CASH

02:46PM   2    POSITION WAS SUCH THAT THE AMOUNT OF CASH IN THE COMPANY WAS

02:46PM   3    DECREASING AND THEN THERE WAS AN INVESTMENT FROM PEER VENTURES

02:46PM   4    AND LVG?

02:46PM   5    A.   I DO.

02:46PM   6    Q.   AND THOSE INVESTORS ARE A VENTURE FIRM THAT INVESTED AND

02:46PM   7    AN ENTITY AFFILIATED WITH DON LUCAS?

02:47PM   8    A.   YES.

02:47PM   9    Q.   NOW, DON LUCAS HAD BEEN THE CHAIRMAN OF THE BOARD;

02:47PM  10    CORRECT?

02:47PM  11    A.   HE WAS.

02:47PM  12    Q.   OKAY.  NOW, PRIOR TO THAT TIME, DID THERANOS KNOW THAT IT

02:47PM  13    WAS ABOUT TO ENTER INTO AN AGREEMENT UNDER WHICH IT WOULD

02:47PM  14    RECEIVE A SUBSTANTIAL PAYMENT FROM WALGREENS?

02:47PM  15    A.   WE DID.

02:47PM  16    Q.   AND WAS A CONTRACT ASSOCIATED WITH THAT ENTERED INTO IN

02:47PM  17    CONNECTION WITH THE LAUNCH OF THERANOS SERVICE CENTERS IN

02:47PM  18    WALGREENS STORES?

02:47PM  19    A.   YES.

02:47PM  20    Q.   AND HOW MUCH WAS THERANOS TO RECEIVE UNDER THAT CONTRACT?

02:47PM  21    A.   $75 MILLION.

02:47PM  22    Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 1083, WHICH IS IN

02:47PM  23    EVIDENCE, BUT IT SHOULD BE IN YOUR NOTEBOOK IN HARD COPY AS

02:47PM  24    WELL.

02:48PM  25         DO YOU SEE THAT THIS IS AN EMAIL FROM MR. MIQUELON TO YOU

02:48PM   1        IN SEPTEMBER OF 2013?

02:48PM   2        A.   I DO.

02:48PM   3        Q.   AND THEN IF YOU GO FORWARD, DO YOU SEE THAT HE ATTACHES TO

02:48PM   4        THIS A FRAMEWORK OR TERM SHEET, PROPOSED TERM SHEET?

02:48PM   5        A.   YES.

02:48PM   6        Q.   AND DO YOU SEE -- IF YOU GO TO PAGE 3 OF THIS TERM SHEET,

02:48PM   7        DO YOU SEE PARAGRAPH 2 THERE?

02:48PM   8        A.   I DO.

02:48PM   9        Q.   AND DOES THAT SET FORTH THE ANTICIPATED PAYMENTS FROM

02:48PM  10        WALGREENS AS OF SEPTEMBER 5TH, 2013?

02:48PM  11        A.   IT DOES.

02:48PM  12        Q.   SO AT THE TIME THAT -- IN THE PERIOD WHERE MR. LEACH WAS

02:48PM  13        SHOWING YOU THE SPREADSHEET AND THE CASH POSITION, WERE YOU

02:48PM  14        EXPECTING AT THAT TIME TO BEGIN TO RECEIVE PAYMENTS IN

02:48PM  15        CONNECTION WITH THE THERANOS LAUNCH?

02:49PM  16        A.   YES.

02:49PM  17        Q.   LET ME ASK YOU ABOUT THE QUESTIONS THAT MR. LEACH ASKED

02:49PM  18        YOU ABOUT, THE FINANCIAL MODEL.

02:49PM  19             DO YOU RECALL THOSE?

02:49PM  20        A.   I DO.

02:49PM  21        Q.   AND YOU TESTIFIED THAT THE FINANCIAL MODEL WAS SOMETHING

02:49PM  22        THAT MR. BALWANI DEVELOPED; IS THAT RIGHT?

02:49PM  23        A.   IT IS.

02:49PM  24        Q.   AND DID HE MODIFY IT OVER TIME?

02:49PM  25        A.   HE DID.

02:49PM   1   Q.   DID YOU EVER MADE MODIFICATION TO IT?

02:49PM   2   A.   NO.

02:49PM   3   Q.   WHEN YOU HAD TO MAKE A -- WHEN YOU HAD TO PREPARE

02:49PM   4   MATERIALS FOR BOARD MEETINGS, WOULD THEY TYPICALLY INCLUDE

02:49PM   5   FINANCIAL PROJECTIONS TO BE SHARED WITH DIRECTORS?

02:49PM   6   A.   YES.

02:49PM   7   Q.   WHERE WOULD YOU GET THOSE FINANCIAL PROJECTIONS?

02:49PM   8   A.   FROM MR. BALWANI.

02:49PM   9   Q.   AND WOULD YOU SOMETIMES INCLUDE IN PRESENTATIONS SENT TO

02:49PM  10   OUTSIDERS, INCLUDING INVESTORS, INCLUDE FINANCIAL DATA?

02:50PM  11   A.   YES.

02:50PM  12   Q.   AND WHERE WOULD YOU GET THAT DATA?

02:50PM  13   A.   FROM MR. BALWANI.

02:50PM  14   Q.   DID YOU UNDERSTAND SOME ASPECTS OF HOW THAT MODEL WORKED?

02:50PM  15   A.   I DID.

02:50PM  16   Q.   DID YOU HAVE ENOUGH FAMILIARITY WITH IT TO MODIFY IT IF

02:50PM  17   YOU WANTED TO MODIFY IT?

02:50PM  18   A.   GENERALLY I HAD SOME FAMILIARITY WITH IT.

02:50PM  19   Q.   AND DO YOU RECALL SEEING THE TEXT IN WHICH MR. BALWANI

02:50PM  20   SAID TO YOU -- WAS HAVING AN EXCHANGE WITH YOU AND YOU WERE

02:50PM  21   TALKING BETWEEN THE TWO OF YOU ABOUT YOU GETTING COMFORTABLE

02:50PM  22   WITH THE MODEL?

02:50PM  23   A.   I DO.

02:50PM  24   Q.   CAN YOU EXPLAIN WHAT WAS GOING ON THERE?

02:50PM  25   A.   YES.

02:50PM 1       THERE WAS A MEETING THAT I WAS GOING TO DO WHEN SUNNY WAS

02:50PM 2   TRAVELLED INTERNATIONALLY, AND SUNNY NORMALLY WOULD BE THE

02:50PM 3   PERSON WHO SHARED THE MODEL THAT HE HAD, AND HE WAS SUGGESTING

02:50PM 4   THAT THE TIME OF THE MEETING WAS NOT IDEAL FOR HIS SCHEDULE.

02:51PM 5   AND I WAS TRYING TO SAY, WELL, I COULD GET MYSELF COMFORTABLE

02:51PM 6   WITH IT IF YOU DON'T WANT TO DO THIS.

02:51PM 7       I'M NOT SURE THAT THAT ACTUALLY HAPPENED.

02:51PM 8   Q.   GENERALLY IN CONNECTION WITH THE INVESTOR PRESENTATIONS,

02:51PM 9   DO YOU RECALL MR. LEACH ASKING YOU IF YOU COULD DECIDE WHETHER

02:51PM 10  A PRESENTATION WAS SENT OR NOT SENT TO INVESTORS?

02:51PM 11  A.   I DO.

02:51PM 12  Q.   AND IT'S TRUE THAT YOU COULD DECIDE THAT; RIGHT?

02:51PM 13  A.   YES.

02:51PM 14  Q.   BUT MUCH OF THE CONTENT OF THOSE PRESENTATIONS WAS

02:51PM 15  PREPARED BY OTHERS; IS THAT FAIR TO SAY?

02:51PM 16  A.   IT WAS.

02:51PM 17  Q.   FOR EXAMPLE, IF THERE WAS SCIENTIFIC CONTENT IN THE

02:51PM 18  REPORTS, WHO WOULD PREPARE THAT?

02:51PM 19  A.   IT WAS PREPARED BY OUR SCIENTISTS AND ENGINEERS.

02:51PM 20  Q.   IF THERE WERE ASSERTIONS ABOUT THE CAPABILITIES OF

02:51PM 21  TECHNOLOGY OR CERTAIN TESTS, WOULD YOU ASK THOSE SCIENTISTS OR

02:51PM 22  ENGINEERS TO REVIEW IT?

02:52PM 23  A.   YES.

02:52PM 24  Q.   OKAY.  AND WITH RESPECT TO ANY FINANCIAL REPORTS, WERE

02:52PM 25  THEY ALWAYS PREPARED BY MR. BALWANI?

02:52PM 1    A.   YES.

02:52PM 2    Q.   DO YOU RECALL THAT MR. LEACH REVIEWED WITH YOU A SERIES --

02:52PM 3    A DOCUMENT THAT RELATED TO A GROUP CALLED ARANCA?

02:52PM 4    A.   I DO.

02:52PM 5    Q.   AND DO YOU RECALL THAT HE SHOWED YOU IN CONNECTION WITH

02:52PM 6    ARANCA'S WORK THEY HAD BEEN PROVIDED WITH A REVENUE NUMBER THAT

02:52PM 7    WAS DIFFERENT THAN THE PROJECTED REVENUE NUMBER PROVIDED TO THE

02:52PM 8    INVESTOR RDV.

02:52PM 9         DO YOU RECALL THAT?

02:52PM 10   A.   YES.

02:52PM 11   Q.   AND CAN YOU TELL US WHETHER THE REVENUE NUMBERS THAT WERE

02:52PM 12   SHARED WITH RDV WERE PROVIDED TO -- THE PROJECTED REVENUE

02:52PM 13   NUMBERS THAT WERE PROVIDED TO RDV WERE PROVIDED TO THERANOS'S

02:52PM 14   BOARD OF DIRECTORS?

02:52PM 15   A.   THEY WERE.

02:52PM 16   Q.   AND AT THE SAME TIME, WERE THE ARANCA PROJECTIONS OF

02:53PM 17   REVENUE FOR THE FOLLOWING YEAR PROVIDED TO THE BOARD OF

02:53PM 18   DIRECTORS?

02:53PM 19   A.   THEY WERE.

02:53PM 20   Q.   DID YOU UNDERSTAND THAT THE ANALYSES THAT WERE BEING

02:53PM 21   PERFORMED WERE DIFFERENT BETWEEN THOSE TWO EXERCISES?

02:53PM 22   A.   I DID.

02:53PM 23   Q.   I WANT TO ASK YOU NOW ABOUT THE REPORTS THAT WENT TO

02:53PM 24   WALGREENS THAT CONTAINED A DISCUSSION ABOUT THE LOGOS

02:53PM 25   THROUGHOUT THE TRIAL.

02:53PM 1          DO YOU RECALL THAT?

02:53PM 2     A.   I DO.

02:53PM 3     Q.   AND MR. LEACH WENT THROUGH SEVERAL EMAILS THAT YOU

02:53PM 4     EXCHANGED WITH PFIZER AND ASKED YOU ABOUT THOSE.

02:53PM 5          DO YOU RECALL THAT?

02:53PM 6     A.   I DO.

02:53PM 7     Q.   I'D LIKE TO PUT BACK UP A DOCUMENT THAT IS IN EVIDENCE,

02:53PM 8     EXHIBIT 15048.

02:54PM 9          DO YOU SEE AT THE TOP OF THIS EMAIL, THIS IS AN EMAIL SENT

02:54PM 10    BY CHRISTIAN HOLMES TO SOME PEOPLE FROM PFIZER AND YOU'RE

02:54PM 11    COPIED?

02:54PM 12    A.   YES.

02:54PM 13    Q.   AND DO YOU SEE THAT DR. SAKUL IS ONE OF THE RECIPIENTS?

02:54PM 14    A.   I DO.

02:54PM 15    Q.   AND HOW LONG HAD HE BEEN INVOLVED IN THE THERANOS/PFIZER

02:54PM 16    RELATIONSHIP?

02:54PM 17    A.   I THINK BACK TO AS EARLY AS 2005.

02:54PM 18    Q.   AND THIS DOCUMENT WAS BEING SENT IN JANUARY OF 2014?

02:54PM 19    A.   YES.

02:54PM 20    Q.   OKAY.  LET'S GO TO THE NEXT PAGE OF 15048, AND LET'S GO TO

02:54PM 21    THE ATTACHMENT.

02:54PM 22         DO YOU SEE THAT THIS IS A COPY OF THE REPORT THAT HAS BEEN

02:55PM 23    THE SUBJECT OF DISCUSSION THROUGHOUT THIS TRIAL?

02:55PM 24    A.   YES.

02:55PM 25    Q.   AND DO YOU SEE THAT THIS CONTAINS BOTH THE PFIZER LOGO AND

02:55PM  1    THE THERANOS LOGO?

02:55PM  2    A.   IT DOES.

02:55PM  3    Q.   TAKE A MOMENT TO REVIEW THAT ATTACHMENT.

02:55PM  4         IS THAT THE SAME DOCUMENT THAT YOU SENT TO WALGREENS IN

02:55PM  5    2010?

02:55PM  6    A.   IT IS.

02:55PM  7    Q.   DID ANYONE FROM PFIZER HAVE ANY REACTION TO THIS, TO YOUR

02:55PM  8    KNOWLEDGE, THE FACT THAT YOU HAD ATTACHED THEIR LOGO TO THIS

02:55PM  9    DOCUMENT?

02:55PM  10   A.   NO.  I REMEMBER IT AS BEING POSITIVE, THAT THEY WERE

02:55PM  11   LOOKING AT THE PROGRAM THAT WE DID WITH THEM.

02:55PM  12   Q.   LET ME ASK YOU NEXT ABOUT -- AND BY THE WAY, AM I RIGHT

02:55PM  13   THAT THE WORK SUMMARIZED IN THIS DOCUMENT IS WORK THAT THERANOS

02:55PM  14   HAS ACTUALLY DONE?

02:55PM  15   A.   IT IS.

02:55PM  16   Q.   AND CAN YOU REMIND US WHAT THAT WORK WAS?

02:55PM  17   A.   YES.  WE RAN A STUDY OVER A COURSE OF I THINK IT WAS

02:56PM  18   MULTIPLE YEARS IN WHICH WE DEPLOYED OUR SYSTEMS TO PATIENTS'

02:56PM  19   HOMES IN RURAL AREAS, IN TENNESSEE, KENTUCKY, AND I THINK

02:56PM  20   PENNSYLVANIA, AND WERE ABLE TO DO TESTING IN THE HOME AND IN A

02:56PM  21   CLINIC AND HAVE DATA COLLECTED OVER TIME THAT COULD HELP SHOW

02:56PM  22   TRENDS IN PEOPLE'S BLOOD MARKERS THAT WE THOUGHT COULD BE

02:56PM  23   USEFUL FOR SEEING THE PROGRESSION OF DISEASE BETTER.

02:56PM  24   Q.   OKAY.  NEXT LET'S TALK ABOUT GLAXOSMITHKLINE.  IT'S

02:56PM  25   REFERRED TO AS GSK ON YOUR CROSS-EXAMINATION.

02:56PM  1    A.   YES.

02:56PM  2    Q.   AND THAT'S A PHARMACEUTICAL COMPANY WITH WHICH THERANOS

02:56PM  3    HAD A PARTNERSHIP?

02:56PM  4    A.   IT IS.

02:56PM  5    Q.   AND AT ONE POINT THERANOS -- AM I RIGHT THAT THERANOS

02:56PM  6    ASKED GSK TO EXAMINE ITS TECHNOLOGY FOR PURPOSES OF DETERMINING

02:57PM  7    WHETHER IT COULD BE VALIDATED?

02:57PM  8    A.   WE DID.

02:57PM  9    Q.   AND DID GSK UNDERTAKE THAT?

02:57PM  10   A.   THEY DID.

02:57PM  11   Q.   WHAT WERE THE CONCLUSIONS OF THAT?

02:57PM  12   A.   I REMEMBER THE CONCLUSION WAS THAT THE SCIENTISTS THERE

02:57PM  13   THOUGHT THAT OUR MINILAB ELIMINATED THE NEED FOR A LAB.

02:57PM  14   Q.   WELL, LET ME ASK YOU TO LOOK AT EXHIBIT 112.  GO TO THE

02:57PM  15   ATTACHED SUMMARY.

02:57PM  16        DID YOU SEE ON THE FIRST PAGE, THIS IS A DESCRIPTION OF

02:57PM  17   HOW THEY -- THE METHODOLOGY?

02:57PM  18   A.   YES.

02:57PM  19   Q.   IF WE GO TO THE NEXT PAGE, DO YOU SEE IN THE OVERALL

02:58PM  20   CONCLUSIONS, IS IT CORRECT THAT THEY REPORTED THAT THEY HAD A

02:58PM  21   FAVORABLE IMPRESSION OF THE TECHNOLOGY AND SYSTEM?

02:58PM  22   A.   YES.

02:58PM  23   Q.   AND THAT IT PROVIDED QUALITY DATA?

02:58PM  24   A.   YES.

02:58PM  25   Q.   NOW, MR. LEACH ASKED YOU IF -- WELL, DO YOU RECALL THAT

02:58PM   1    YOU TRANSMITTED A COPY OF THIS REPORT WHICH ALSO HAD THE GSK

02:58PM   2    LOGO ON IT AND THE THERANOS LOGO?

02:58PM   3         DO YOU RECALL THAT?

02:58PM   4    A.   I DO.

02:58PM   5    Q.   AND IF YOU LOOK BACK AT THE FIRST PAGE, WHICH WE WERE

02:58PM   6    LOOKING AT A MOMENT AGO, GO TO THE NEXT PAGE.

02:58PM   7         DO YOU SEE THAT THERE'S NO HEADER OF ANY ORGANIZATION ON

02:58PM   8    THIS DOCUMENT?

02:58PM   9    A.   I DO.

02:58PM  10    Q.   BUT WHO PREPARED THIS DOCUMENT, GSK OR THERANOS?

02:59PM  11    A.   GSK.

02:59PM  12    Q.   ALL RIGHT.  NOW, LET ME ASK YOU TO LOOK NEXT AT

02:59PM  13    EXHIBIT 291.

02:59PM  14         THIS IS ALREADY IN EVIDENCE.

02:59PM  15         DO YOU SEE THAT THIS IS AN EMAIL FROM YOU TRANSMITTING THE

02:59PM  16    DOCUMENTS TO REPRESENTATIVES OF WALGREENS?

02:59PM  17    A.   YES.

02:59PM  18    Q.   AND THEN LET'S GO TO PAGE 2.

02:59PM  19         AND DO YOU SEE THAT THIS DOCUMENT IS A COPY OF THE SAME

02:59PM  20    DOCUMENT WITH THE GSK AND THERANOS LOGOS AT THE TOP?

02:59PM  21    A.   YES.

02:59PM  22    Q.   AND I BELIEVE YOU TESTIFIED ON YOUR DIRECT EXAMINATION

02:59PM  23    THAT YOU DON'T KNOW WHEN THAT WAS DONE OR WHEN THOSE LOGOS WERE

02:59PM  24    ADDED.

02:59PM  25    A.   I DON'T.

02:59PM   1      Q.   LET ME ASK YOU IF YOU HAD DEALINGS WHEN YOU WERE AT

03:00PM   2      THERANOS WITH A REPRESENTATIVE OF GSK NAMED AIDEN FLYNN?

03:00PM   3      A.   YES.

03:00PM   4      Q.   AND WHO WAS AIDEN FLYNN?

03:00PM   5      A.   HE WAS A MEMBER OF GSK -- I THINK HE MAY HAVE WORKED WITH

03:00PM   6      GSK BIOLOGICALS.  I'M NOT SURE.  HE WAS ANOTHER MEMBER OF THE

03:00PM   7      SCIENTIFIC TEAM FROM GSK.

03:00PM   8      Q.   AND IS GSK -- WERE YOU CONTINUING, AFTER THIS REPORT WAS

03:00PM   9      PREPARED, TO SEEK WORK FROM GSK?

03:00PM   10     A.   YES.

03:00PM   11     Q.   AND DID YOU CONTINUE TO -- DID YOU HAVE CONTACT WITH

03:00PM   12     DR. FLYNN ABOUT THAT?

03:00PM   13     A.   I DID.

03:00PM   14     Q.   AND DID THERE COME A TIME WHEN YOU ASKED YOUR -- WELL, LET

03:00PM   15     ME ASK YOU TO JUST LOOK AT EXHIBIT 15066.

03:01PM   16     A.   OKAY.

03:01PM   17     Q.   AND LET ME ASK YOU, DID THERE COME A TIME WHEN YOU ASKED

03:01PM   18     YOUR ASSISTANT TO -- I'M SORRY.

03:01PM   19          DID THERE COME A TIME WHEN YOU ASKED SOMEONE ELSE AT

03:01PM   20     THERANOS TO TRANSMIT THE REPORT THAT GSK HAD PREPARED FOR

03:01PM   21     THERANOS BACK TO GSK?

03:01PM   22     A.   I DID.

03:01PM   23     Q.   AND DID YOU ASK MS. BALKENHOL TO DO THAT?

03:01PM   24     A.   I DID.

03:01PM   25     Q.   AND WAS SHE AN EMPLOYEE AT THERANOS WHO WORKED WITH

03:01PM 1    PHARMACEUTICAL COMPANIES?

03:01PM 2    A.   YES.

03:01PM 3    Q.   AND IS EXHIBIT 15066 A TRANSMISSION AS YOU UNDERSTAND IT

03:01PM 4    IN RESPONSE TO THAT QUESTION?

03:01PM 5    A.   IT IS.

03:01PM 6              MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

03:01PM 7    15066.

03:01PM 8              MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:01PM 9              THE COURT:  IT'S ADMITTED WITHOUT OBJECTION.

03:02PM 10        (DEFENDANT'S EXHIBIT 15066 WAS RECEIVED IN EVIDENCE.)

03:02PM 11   BY MR. DOWNEY:

03:02PM 12   Q.   ALL RIGHT.  DO YOU SEE IN THE COVER EMAIL, THIS IS AN

03:02PM 13   EMAIL FROM MS. BALKENHOL TO DR. FLYNN?

03:02PM 14   A.   I DO.

03:02PM 15   Q.   AND THEN IF YOU LOOK AT THE THIRD LINE, THE SECOND LINE,

03:02PM 16   YOU SEE MS. BALKENHOL WRITES, "ELIZABETH ASKED ME TO FORWARD

03:02PM 17   YOU THIS GSK REPORT, AS WELL, FOR YOUR REVIEW."

03:02PM 18        DO YOU SEE THAT?

03:02PM 19   A.   I DO.

03:02PM 20   Q.   NOW, LET'S GO TO THE NEXT PAGE OF 15066.

03:02PM 21        AND JUST TAKE A MOMENT TO REVIEW THAT.

03:02PM 22        IS THIS THE SAME DOCUMENT THAT YOU TRANSMITTED TO

03:02PM 23   WALGREENS IN APRIL OF 2010?

03:02PM 24   A.   YES.

03:02PM 25   Q.   AND IF YOU GO BACK TO THE -- DO YOU SEE IT HAS THE GSK

03:03PM   1    LOGO AND THE THERANOS LOGO ON TOP?

03:03PM   2    A.   I DO.

03:03PM   3    Q.   AND IF YOU GO BACK TO THE EMAIL ON PAGE 1, DO YOU SEE THAT

03:03PM   4    THIS IS DATED MARCH OF 2009?

03:03PM   5    A.   I DO.

03:03PM   6    Q.   AND THAT'S ABOUT A YEAR BEFORE YOU TRANSMITTED THIS TO

03:03PM   7    WALGREENS?

03:03PM   8    A.   YES.

03:03PM   9    Q.   DID DR. FLYNN OR ANYONE ELSE AT GSK CONVEY TO YOU THAT

03:03PM   10   THEY THOUGHT IT WAS INAPPROPRIATE THAT YOU HAD ATTACHED THEIR

03:03PM   11   LOGO TO THIS REPORT?

03:03PM   12   A.   NOT AT ALL.

03:03PM   13   Q.   AND THE WORK THAT WAS DONE IN CONNECTION WITH THE REPORT

03:03PM   14   WAS ACTUALLY WORK THAT THEY HAD DONE; IS THAT CORRECT?

03:03PM   15   A.   IT IS.

03:03PM   16   Q.   AND DID THEY HAVE ANY OBJECTION TO YOU PUTTING YOUR LOGO

03:03PM   17   UP THERE NEXT TO GSK?

03:03PM   18   A.   THEY DID NOT.

03:03PM   19   Q.   LET ME ASK YOU TO LOOK NEXT AT EXHIBIT 15058.

03:04PM   20   A.   OKAY.

03:04PM   21   Q.   OTHER THAN DR. FLYNN, DID YOU HAVE CONTACTS WITH OTHER

03:04PM   22   SCIENTISTS AT GSK WHO PARTICIPATED IN CLINICAL TRIALS AND OTHER

03:04PM   23   WORK THAT THERANOS WANTED TO BE A PART OF?

03:04PM   24   A.   I DID.

03:04PM   25   Q.   CAN YOU TELL US WHO THOMAS BREUER WAS?

03:04PM   1    A.   HE IS THE PHYSICIAN OR SCIENTIST THAT WAS PART OF GSK BIO.

03:04PM   2    I THINK DR. FLYNN MAY HAVE BEEN PART OF A DIFFERENT GROUP

03:04PM   3    WITHIN GSK.

03:04PM   4    Q.   AND DO YOU RECOGNIZE EXHIBIT 15058?

03:04PM   5    A.   I DO.

03:04PM   6    Q.   AND IS THAT AN EMAIL THAT IS TRANSMITTING A POWERPOINT FOR

03:04PM   7    A PRESENTATION?

03:04PM   8    A.   YES.

03:04PM   9             MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

03:05PM  10    15058.

03:05PM  11             MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:05PM  12             THE COURT:  IT'S ADMITTED.

03:05PM  13        (DEFENDANT'S EXHIBIT 15058 WAS RECEIVED IN EVIDENCE.)

03:05PM  14    BY MR. DOWNEY:

03:05PM  15    Q.   AND DO YOU SEE THIS?  THIS IS SENT FROM YOU TO DR. BREUER

03:05PM  16    IN DECEMBER OF 2009.

03:05PM  17        DO YOU SEE THAT?

03:05PM  18    A.   YES.

03:05PM  19    Q.   AND THEN IT LISTS A VARIETY OF ATTACHMENTS, AND I'M

03:05PM  20    INTERESTED FOR PRESENT PURPOSES IN LOOKING AT PAGE 6 AT BATES

03:05PM  21    LABEL 779.

03:05PM  22        AND ON PAGE 6, DO YOU SEE THAT IT'S LABELLED THERANOS AND

03:05PM  23    GSK?

03:05PM  24    A.   YES.

03:05PM  25    Q.   AND DO YOU SEE THAT THE FIRST BULLET POINT SAYS, "GSK

03:05PM  1    COMPLETED A COMPREHENSIVE VALIDATION OF THERANOS SYSTEMS IN

03:06PM  2    2008"?

03:06PM  3    A.   I DO.

03:06PM  4    Q.   AND IS THAT PART OF A POWERPOINT THAT YOU AUTHORIZED TO BE

03:06PM  5    SENT TO GSK?

03:06PM  6    A.   IT IS.

03:06PM  7    Q.   AND YOU DESCRIBED THAT VALIDATION IN THIS REPORT AS A

03:06PM  8    COMPREHENSIVE VALIDATION?

03:06PM  9    A.   I DID.

03:06PM  10   Q.   DID ANYONE FROM GSK REFLECT ANY DISAGREEMENT OR ISSUE WITH

03:06PM  11   THAT STATEMENT?

03:06PM  12   A.   NO.

03:06PM  13   Q.   AND AM I RIGHT THAT YOU CONTINUED TO HAVE A RELATIONSHIP

03:06PM  14   WITH GSK FOR A FEW MORE YEARS AFTER THIS?

03:06PM  15   A.   YES.

03:06PM  16   Q.   I WANT TO TALK IN A LITTLE BIT ABOUT GSK BIOLOGICS --

03:06PM  17   A.   YES.

03:06PM  18   Q.   -- BUT WE'LL DO THAT IN CONNECTION WITH ANOTHER SUBJECT.

03:06PM  19        I WANT TO TALK NOW ABOUT THE QUESTIONS THAT MR. LEACH

03:07PM  20   ASKED YOU THE OTHER DAY ABOUT SOME OF YOUR REACTION TO THE

03:07PM  21   QUESTIONS THAT WERE BEING RAISED IN CONNECTION WITH PREPARATION

03:07PM  22   OF A "WALL STREET JOURNAL" ARTICLE.

03:07PM  23        DO YOU RECALL THAT?

03:07PM  24   A.   I DO.

03:07PM  25   Q.   AND IN RESPONSE TO SEVERAL OF HIS QUESTIONS, YOU SAID THAT

03:07PM  1    ONE OF THE THINGS THAT YOU WERE CONCERNED ABOUT WAS THAT

03:07PM  2    THERANOS HAD TRADE SECRETS WHICH YOU THOUGHT YOU HAD TO

03:07PM  3    PROTECT?

03:07PM  4    A.   YES.

03:07PM  5    Q.   AND I WANT TO ASK YOU A FEW QUESTIONS ABOUT WHAT YOU MEANT

03:07PM  6    BY THAT.

03:07PM  7         DID THERE COME A TIME IN 2011 OR 2012 WHERE THERANOS BEGAN

03:07PM  8    TO BECOME HIGHLY CONCERNED ABOUT PROTECTING ITS TRADE SECRETS?

03:07PM  9    A.   YES.

03:07PM  10   Q.   AND WHY WAS THAT?

03:07PM  11   A.   BECAUSE WE HAD A HUGE AMOUNT OF INVENTION THAT WAS

03:08PM  12   HAPPENING IN OUR LABORATORIES.  WE HAD TEAMS OF SCIENTISTS AND

03:08PM  13   ENGINEERS THAT WERE WORKING REALLY HARD ON COMING UP WITH NEW

03:08PM  14   IDEAS FOR PATENTS AND TRADE SECRETS, AND WE NEEDED TO FIGURE

03:08PM  15   OUT HOW TO PROTECT THEM.

03:08PM  16   Q.   AND DID YOU INTERNALLY ASK FOR GUIDANCE FROM YOUR HUMAN

03:08PM  17   RESOURCES PERSONNEL AND OTHERS ABOUT HOW TO PROTECT TRADE

03:08PM  18   SECRETS OF THE COMPANY?

03:08PM  19   A.   I DID.

03:08PM  20   Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 15054.

03:08PM  21   A.   OKAY.

03:08PM  22   Q.   AND DO YOU RECOGNIZE THIS AS AN EMAIL TO ANOTHER THERANOS

03:09PM  23   EMPLOYEE ASKING THEM TO REFLECT THE TRADE SECRET POLICY IN

03:09PM  24   WRITING?

03:09PM  25   A.   YES.

03:09PM   1          MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

03:09PM   2   15054.

03:09PM   3          MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:09PM   4          THE COURT:  IT'S ADMITTED.

03:09PM   5          (DEFENDANT'S EXHIBIT 15054 WAS RECEIVED IN EVIDENCE.)

03:09PM   6   BY MR. DOWNEY:

03:09PM   7   Q.   ALL RIGHT.  DO YOU SEE THIS BOTTOM EMAIL, YOU SENT IT TO A

03:09PM   8   DAVID DOYLE IN APRIL OF 2012?

03:09PM   9   A.   YES.

03:09PM  10   Q.   AND WHO WAS DAVID DOYLE?

03:09PM  11   A.   HE WAS A COUNSEL AT THERANOS.

03:09PM  12   Q.   AND IF YOU LOOK IN THE SECOND SENTENCE, YOU WRITE -- I'M

03:09PM  13   HAVING A LITTLE TROUBLE WITH MY MONITOR, BUT I THINK IT SAYS,

03:09PM  14   "IN ESSENCE, THIS DOCUMENT SHOULD HIGHLIGHT THE EXTRA

03:09PM  15   CONFIDENTIALITY PROCEDURES (EVEN INSIDE A GIVEN TEAM) THAT NEED

03:10PM  16   TO BE IN PLACE AROUND METHODOLOGIES THAT WE WON'T PATENT THAT

03:10PM  17   SOLVE COMPLEX CHALLENGES.  PLEASE TAKE A PASS AT THIS AND SEND

03:10PM  18   IT OVER."

03:10PM  19          DO YOU SEE THAT?

03:10PM  20   A.   YES.

03:10PM  21   Q.   AND WERE THERE PARTICULAR METHODOLOGIES THAT THERANOS DID

03:10PM  22   NOT PLAN TO FILE A PATENT APPLICATION FOR?

03:10PM  23   A.   YES.

03:10PM  24   Q.   BUT DID IT OTHERWISE HOPE TO PROTECT THOSE INVENTIONS FROM

03:10PM  25   BEING COPIED BY OTHERS?

03:10PM  1    A.   VERY MUCH SO.

03:10PM  2    Q.   HOW DID YOU UNDERSTAND YOU WOULD BE ABLE TO DO THAT?

03:10PM  3    A.   BY PROTECTING THEM AS A TRADE SECRET, WHICH REQUIRED US TO

03:10PM  4    TAKE A NUMBER OF STEPS TO ENSURE THAT THERE WAS NEVER A PUBLIC

03:10PM  5    DISCLOSURE OF THOSE INVENTIONS.

03:10PM  6    Q.   LET ME ASK YOU TO LOOK NEXT AT EXHIBIT 15055.

03:10PM  7    A.   OKAY.

03:10PM  8    Q.   DO YOU RECOGNIZE EXHIBIT 15055 AS A RESPONSE FROM

03:11PM  9    MR. DOYLE TO YOU IN RESPONSE TO THE EMAIL THAT YOU HAD SENT HIM

03:11PM 10    THAT WE JUST LOOKED AT?

03:11PM 11    A.   I DO.

03:11PM 12             MR. DOWNEY:  I MOVE THE ADMISSION OF 15055.

03:11PM 13             MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:11PM 14             THE COURT:  IT'S ADMITTED.

03:11PM 15        (DEFENDANT'S EXHIBIT 15055 WAS RECEIVED IN EVIDENCE.)

03:11PM 16    BY MR. DOWNEY:

03:11PM 17    Q.   IF YOU'D LOOK, THIS IS AN EMAIL FROM MR. DOYLE TO YOU IN

03:11PM 18    MAY OF 2012?

03:11PM 19    A.   YES.

03:11PM 20    Q.   AND IN THE FIRST SENTENCE HE NOTES THAT HE'S SENDING YOU A

03:11PM 21    DRAFT.

03:11PM 22        DO YOU SEE THAT?

03:11PM 23    A.   I DO.

03:11PM 24    Q.   I'D LIKE TO DRAW YOUR ATTENTION TO THE PARAGRAPHS BELOW IN

03:11PM 25    THE DRAFT.

03:11PM   1           AND DO YOU SEE THAT HE BEGINS THIS -- AND THIS WAS

03:12PM   2   DESIGNED TO GO TO ALL EMPLOYEES?  IS THAT THE GIST OF IT?

03:12PM   3   A.   YES.

03:12PM   4   Q.   AND DO YOU SEE THAT HE SAYS THAT THE COMPANY VIGOROUSLY

03:12PM   5   PURSUES AND ENFORCES ITS PATENT PROTECTION FOR IP, WHENEVER IT

03:12PM   6   MAKES SENSE TO DO SO?

03:12PM   7   A.   YES.

03:12PM   8   Q.   BUT THEN HE GOES ON TO SAY THAT EVEN WHEN PATENTS WERE

03:12PM   9   PENDING, AND EVEN WHERE THEY MAY ULTIMATELY BE UNAVAILABLE,

03:12PM  10   TRADE SECRET LAWS PROVIDE ANOTHER CRITICAL LAYER FOR OUR IP?

03:12PM  11   A.   YES.

03:12PM  12   Q.   AND THEN HE GOES ON TO SAY THIS REMINDS ALL EMPLOYEES HOW

03:12PM  13   IT WORKS.

03:12PM  14        DO YOU SEE THAT?

03:12PM  15   A.   YES, I DO.

03:12PM  16   Q.   AND THEN IF WE GO TO THE NEXT PARAGRAPH, DO YOU SEE THAT

03:12PM  17   HE DEFINES WHAT A TRADE SECRET IS?  HE SAYS A TRADE SECRET IS

03:12PM  18   ANY INFORMATION AN OWNER MAKES REASONABLE EFFORTS TO KEEP

03:13PM  19   SECRET?

03:13PM  20   A.   YES.

03:13PM  21   Q.   AND HE SAYS IT HAS ECONOMIC VALUE BECAUSE IT'S NOT

03:13PM  22   GENERALLY KNOWN TO THE PUBLIC OR A COMPETITOR.

03:13PM  23        DO YOU SEE THAT?

03:13PM  24   A.   I DO.

03:13PM  25   Q.   ALL RIGHT.  AND THEN IF YOU GO DOWN TO THE NEXT PARAGRAPH,

03:13PM   1    DO YOU SEE THAT HE CONTINUES HIS DISCUSSION OF HOW TO PROTECT

03:13PM   2    TRADE SECRETS?

03:13PM   3    A.   YES.

03:13PM   4    Q.   AND DO YOU SEE THE SECOND SENTENCE THERE THAT BEGINS, "THE

03:13PM   5    DEFINING CHARACTERISTIC"?

03:13PM   6    A.   I DO.

03:13PM   7    Q.   AND DO YOU SEE THAT IT READS, "THE DEFINING CHARACTERISTIC

03:13PM   8    OF A TRADE SECRET, IN FACT, IS THAT IT IS NEVER," NEVER

03:13PM   9    UNDERLINED, "NEVER DISCLOSED PUBLICLY.  THAT DISTINGUISHES

03:13PM  10    THESE RIGHTS FROM PATENTS AND TRADEMARKS, WHICH MUST BE

03:13PM  11    PUBLICLY DISCLOSED TO SECURE PROTECTION."

03:13PM  12         DO YOU SEE THAT?

03:13PM  13    A.   I DO.

03:13PM  14    Q.   AND THEN IF YOU GO DOWN TO THE BULLET POINT SECTION, DO

03:14PM  15    YOU SEE THAT HE THEN LISTS A NUMBER OF THINGS THAT HAVE TO BE

03:14PM  16    DONE TO ENSURE TRADE SECRETS AREN'T DISCLOSED?

03:14PM  17    A.   YES.

03:14PM  18    Q.   AND THEN IN THE FIRST PARAGRAPH, HE TALKS ABOUT PROTECTING

03:14PM  19    THE PHYSICAL SECURITY OF THERANOS FACILITIES?

03:14PM  20    A.   YES.

03:14PM  21    Q.   AND THEN IN THE SECOND HE TALKS ABOUT ALL OF THE STEPS

03:14PM  22    THAT HAVE TO BE TAKEN TO PROTECT THERANOS'S RECORDS AND

03:14PM  23    DATABASES AND SO FORTH.

03:14PM  24         DO YOU SEE THAT?

03:14PM  25    A.   YES.

03:14PM   1    Q.   AND THEN DO YOU SEE IN THE THIRD PARAGRAPH HE SAYS, IT'S

03:14PM   2    REQUIRED THAT ALL VISITORS TO THERANOS SIGN A CONFIDENTIALITY

03:14PM   3    AGREEMENT ON THEIR OWN BEHALF, A CDA.

03:14PM   4        DO YOU SEE THAT?

03:14PM   5    A.   I DO.

03:14PM   6    Q.   AND DO YOU SEE NEXT HE SAYS THAT ALL VENDORS AND PARTNERS

03:15PM   7    HAVE TO SIGN A CDA?

03:15PM   8    A.   YES.

03:15PM   9    Q.   AND THEN HE GOES ON TO SAY THAT EMPLOYEES HAVE TO SIGN A

03:15PM  10    CDA.

03:15PM  11        DO YOU SEE THAT?

03:15PM  12    A.   I DO.

03:15PM  13    Q.   NOW, WHEN YOU ANSWERED MR. LEACH BY REFERRING TO TRADE

03:15PM  14    SECRETS AS ONE OF THE CONCERNS THAT YOU HAD WHEN YOU WERE

03:15PM  15    GETTING QUESTIONS ABOUT THERANOS'S CLIA LAB IN 2015, CAN YOU

03:15PM  16    EXPLAIN TO US WHAT YOUR CONCERN WAS?

03:15PM  17    A.   MY CONCERN WAS THAT IF THERE WAS A PUBLIC DISCLOSURE OF

03:15PM  18    THIS INFORMATION, WE WOULD LOSE THE TRADE SECRET PROTECTION

03:15PM  19    THAT WE HAD WORKED SO HARD TO SECURE AND PROTECT FOR YEARS

03:15PM  20    PRIOR TO THAT POINT.

03:15PM  21    Q.   AND WAS IT THE CASE THAT MR. LEACH ASKED YOU ABOUT

03:15PM  22    THERANOS'S PARTNERSHIP WITH WALGREENS?

03:15PM  23        DO YOU RECALL THAT?

03:16PM  24    A.   HE DID.

03:16PM  25    Q.   AND HE ASKED YOU ABOUT THE, THE 3.0 DEVICE BEING SENT TO

03:16PM  1    WALGREENS; IS THAT RIGHT?

03:16PM  2    A.   YES.

03:16PM  3    Q.   NOW, THAT HAD BEEN DONE IN 2010, HADN'T IT?

03:16PM  4    A.   IT WAS.

03:16PM  5    Q.   BUT THE INVENTION TO MODIFY THE DEVICES DIDN'T TAKE PLACE

03:16PM  6    UNTIL 2013; IS THAT RIGHT?

03:16PM  7    A.   CORRECT.

03:16PM  8    Q.   AND THAT WAS AFTER THE DATE OF THE ADVICE THAT WAS

03:16PM  9    RENDERED IN THIS MEMORANDUM FROM MR. DOYLE TO YOU; IS THAT

03:16PM  10   RIGHT?

03:16PM  11   A.   IT WAS.

03:16PM  12   Q.   AND EVEN THOUGH WALGREENS HAD A NONDISCLOSURE AGREEMENT

03:16PM  13   WITH THERANOS, DID ALL OF THEIR INDIVIDUAL EMPLOYEES SIGN

03:16PM  14   NONDISCLOSURE AGREEMENTS WITH THERANOS?

03:16PM  15   A.   NO.

03:16PM  16   Q.   NOW, DID YOU KEEP SECRET FROM THE FACT THAT -- FROM

03:17PM  17   INVESTORS THE FACT THAT THERE WERE ASPECTS OF THERANOS'S

03:17PM  18   BUSINESS THAT YOU COULDN'T DISCLOSE TO THEM BECAUSE OF A

03:17PM  19   CONCERN ABOUT TRADE SECRETS?

03:17PM  20   A.   NO.

03:17PM  21   Q.   AND DO YOU RECALL BEING ASKED ABOUT MS. PETERSON ON YOUR

03:17PM  22   CROSS-EXAMINATION?

03:17PM  23   A.   I DO.

03:17PM  24   Q.   AND MS. PETERSON WORKED FOR THE RDV ENTITY; CORRECT?

03:17PM  25   A.   YES.

03:17PM  1    Q.   AND THAT'S AN INVESTMENT VEHICLE FOR THE DEVOS FAMILY?

03:17PM  2    A.   IT IS.

03:17PM  3    Q.   AND DO YOU -- DID YOU UNDERSTAND THAT MR. MOSLEY -- DO YOU

03:17PM  4    RECALL HIM TESTIFYING?

03:17PM  5    A.   I DO.

03:17PM  6    Q.   AND DID HE ALSO HAVE A ROLE WITH REGARD TO THE DEVOS

03:17PM  7    FAMILY?

03:17PM  8    A.   HE DID.

03:17PM  9    Q.   I WANT TO ASK YOU WHAT HIS ROLE WAS.

03:17PM  10   A.   I UNDERSTOOD THAT HE WAS THEIR LAWYER AND HE WAS ADVISING

03:17PM  11   THEM ON THE INVESTMENT.

03:18PM  12   Q.   OKAY.  I'D LIKE TO ASK YOU TO LOOK AT EXHIBIT 14186.

03:18PM  13   A.   OKAY.

03:18PM  14   Q.   AND IS THIS AN EMAIL BETWEEN MR. MOSLEY AND YOURSELF

03:18PM  15   DISCUSSING NEED FOR CONFIDENTIALITY FOR TECHNOLOGY AT THERANOS?

03:18PM  16   A.   IT IS.

03:18PM  17   Q.   AND WAS THIS DURING THE PERIOD WHEN MR. MOSLEY WAS AN

03:18PM  18   INVESTOR AT THERANOS?

03:18PM  19   A.   IT IS.

03:18PM  20        MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

03:18PM  21   14186.

03:18PM  22        MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:18PM  23        THE COURT:  IT'S ADMITTED.

03:18PM  24      (DEFENDANT'S EXHIBIT 14186 WAS RECEIVED IN EVIDENCE.)

03:18PM  25   BY MR. DOWNEY:

03:18PM 1    Q.   DO YOU SEE THIS EMAIL FROM MR. MOSLEY IN DECEMBER OF 2014?

03:19PM 2    AND I'M INTERESTED HERE IN THE SECOND PARAGRAPH, AND HE REFERS

03:19PM 3    IN THE FIRST SENTENCE TO A "NEW YORKER" ARTICLE.

03:19PM 4         DO YOU SEE THAT?

03:19PM 5    A.   YES.

03:19PM 6    Q.   AND WAS THAT A PUBLICATION ABOUT THERANOS?

03:19PM 7    A.   YES.

03:19PM 8    Q.   AND THEN HE GOES ON -- IN THE SECOND SENTENCE, HE SAYS HE

03:19PM 9    SAW THE AUTHOR ON T.V. THAT MORNING.

03:19PM 10        DO YOU SEE THAT?

03:19PM 11   A.   YES.

03:19PM 12   Q.   AND THEN HE SAYS IT WAS POSITIVE, BUT THEY SPENT TOO MUCH

03:19PM 13   TIME SPECULATING AS TO WHY YOUR TECHNOLOGY -- YOUR PROCESS AND

03:19PM 14   TECHNOLOGY IS BEING KEPT CONFIDENTIAL, WHICH SHOULD BE OBVIOUS

03:19PM 15   TO ANYONE.

03:19PM 16        DO YOU SEE THAT?

03:19PM 17   A.   I DO.

03:19PM 18   Q.   AND WHAT DID YOU UNDERSTAND MR. MOSLEY TO BE COMMUNICATING

03:19PM 19   IN CONNECTION WITH THIS EMAIL?

03:19PM 20   A.   THAT OUR DECISION TO PROTECT OUR TRADE SECRET PROCESSES BY

03:19PM 21   NOT COMMUNICATING THEM AND THE DECISION TO KEEP CERTAIN ASPECTS

03:20PM 22   OF OUR TECHNOLOGY CONFIDENTIAL SHOULD BE OBVIOUS BECAUSE OF HOW

03:20PM 23   IMPORTANT IT WAS TO THE SURVIVAL AND ABILITY TO MAINTAIN A

03:20PM 24   COMPETITIVE ADVANTAGE FOR THE BUSINESS.

03:20PM 25   Q.   NOW, WERE YOU -- AS THE CEO AND FOUNDER OF THERANOS, WERE

03:20PM   1    YOU ALSO SUBJECT TO THE REQUIREMENT THAT THERANOS NOT DISCLOSE

03:20PM   2    TRADE SECRETS?

03:20PM   3    A.   I WAS.

03:20PM   4    Q.   DID YOU ACTUALLY SIGN A CONTRACT WITH THE COMPANY THAT

03:20PM   5    SAID THAT?

03:20PM   6    A.   I DID.

03:20PM   7    Q.   AND WAS THAT A CONTRACT THAT YOU REPRESENTED TO INVESTORS

03:20PM   8    THAT YOU HAD SIGNED?

03:20PM   9    A.   YES.

03:20PM   10   Q.   MR. LEACH WENT THROUGH ON HIS CROSS-EXAMINATION EARLIER

03:20PM   11   TODAY A LIST OF PARTIES TO WHOM YOU ACKNOWLEDGED YOU DID NOT

03:20PM   12   DISCLOSE THE FACT THAT THERANOS HAD MODIFIED ITS COMMERCIAL

03:21PM   13   DEVICES TO PERFORM FINGERSTICK ASSAYS.

03:21PM   14        DO YOU RECALL THAT?

03:21PM   15   A.   I DO.

03:21PM   16   Q.   AND IT INCLUDED MR. PARLOFF, FOR EXAMPLE?

03:21PM   17   A.   YES.

03:21PM   18   Q.   DO YOU RECALL THAT?

03:21PM   19        AND MR. GROSSMAN, FOR EXAMPLE?

03:21PM   20   A.   YES.

03:21PM   21   Q.   IS THERE A REASON THAT YOU DID NOT DISCLOSE THAT TO THOSE

03:21PM   22   INDIVIDUALS?

03:21PM   23   A.   IT WOULD HAVE BEEN A VIOLATION OF OUR OWN TRADE SECRET

03:21PM   24   POLICY AND MY OWN AGREEMENT TO PROTECT OUR TRADE SECRETS.

03:21PM   25   Q.   NOW, MR. LEACH ASKED YOU ON DIRECT EXAMINATION WHETHER YOU

03:21PM   1    WERE AGGRESSIVE IN PROTECTING THE COMPANY'S INTELLECTUAL

03:21PM   2    PROPERTY AND YOU SAID YES.

03:21PM   3         DO YOU RECALL THAT?

03:21PM   4    A.   I DO.

03:21PM   5    Q.   AND WHEN YOU SAID YOU WERE AGGRESSIVE IN PROTECTING THE

03:21PM   6    COMPANY'S INTELLECTUAL PROPERTY, WHAT DID YOU MEAN?

03:21PM   7    A.   I MEANT THAT WE TRIED TO TAKE EVERY STEP POSSIBLE TO

03:21PM   8    PROTECT THE INTELLECTUAL PROPERTY, AND THAT INCLUDED POLICIES

03:21PM   9    LIKE THE ONE THAT WE JUST LOOKED AT; IT INCLUDED MAKING SURE

03:22PM   10   THAT WE HAD THE RIGHT AGREEMENTS WITH EMPLOYEES; AND IT

03:22PM   11   INCLUDED TAKING THE ACTIONS THAT I UNDERSTOOD WE WERE OBLIGATED

03:22PM   12   TO TAKE TO MAINTAIN TRADE SECRET PROTECTION IF WE BECAME AWARE

03:22PM   13   THAT THERE HAD BEEN SOME BREACH OF THOSE AGREEMENTS.

03:22PM   14   Q.   AND DID YOU UNDERSTAND THAT DOING THAT WAS NECESSARY TO

03:22PM   15   PROTECT VALUE, THE VALUE OF THE COMPANY?

03:22PM   16   A.   I DID.  I UNDERSTOOD THAT IF WE DIDN'T DO IT, WE WOULD

03:22PM   17   LOSE TRADE SECRET PROTECTION AND THAT WOULD BE DEVASTATING TO

03:22PM   18   THE COMPANY.

03:22PM   19   Q.   I WANT TO TURN FROM THAT SUBJECT TO TALKING ABOUT THE

03:22PM   20   SUBJECT OF VENOUS DRAWS OF BLOOD.

03:22PM   21   A.   YES.

03:22PM   22   Q.   YOU RECALL DISCUSSING WITH MR. LEACH, ON YOUR

03:22PM   23   CROSS-EXAMINATION, DISCUSSIONS BETWEEN WALGREENS AND THERANOS

03:22PM   24   ABOUT THE PERCENTAGE OF VENOUS BLOOD?

03:22PM   25   A.   I DO.

03:22PM  1    Q.   I WANT TO TALK, FIRST OF ALL, JUST ABOUT THE DRAWING OF

03:23PM  2    VENOUS BLOOD AT THERANOS SERVICE CENTERS.

03:23PM  3         HOW WOULD -- HOW WAS VENOUS BLOOD TYPICALLY DRAWN AT A

03:23PM  4    THERANOS SERVICE CENTER IN A WALGREENS STORE?

03:23PM  5    A.   IT WAS DRAWN THROUGH WHAT WE CALLED A MICRO SAMPLE, WHICH

03:23PM  6    WAS TAKEN BY A BUTTERFLY NEEDLE INTO A SMALLER TUBE THAN WHAT

03:23PM  7    WOULD TRADITIONALLY BE USED.

03:23PM  8    Q.   AND WHY DID YOU USE THAT METHOD OF DRAWING BLOOD RATHER

03:23PM  9    THAN A TRADITIONAL VENIPUNCTURE?

03:23PM  10   A.   BECAUSE IT WAS LESS PAINFUL AND MORE HUMANE.

03:23PM  11   Q.   WERE ALL OF THE TESTS RUN ON THE MODIFIED DEVICES,

03:23PM  12   FINGERSTICK TESTS?

03:23PM  13   A.   FOR THE MOST PART.

03:23PM  14   Q.   AND WERE THE TESTS RUN ON THE EDISON DEVICE FINGERSTICK

03:23PM  15   TESTS?

03:23PM  16   A.   ALSO FOR THE MOST PART.

03:23PM  17   Q.   DID YOU TAKE STEPS AT ANY TIME TO HIDE THE FACT THAT THERE

03:24PM  18   WERE SOME VENOUS DRAWS BEING RUN AT WALGREENS SERVICE CENTER,

03:24PM  19   AT THERANOS SERVICE CENTERS AT WALGREENS STORES?

03:24PM  20   A.   NO.

03:24PM  21   Q.   DID THERANOS, IN FACT, DISCLOSE ON ITS WEBSITE THAT THERE

03:24PM  22   WERE VENOUS DRAWS AT ITS SERVICE CENTERS IN WALGREENS STORES?

03:24PM  23   A.   WE DID.

03:24PM  24   Q.   AND WAS THAT SOMETHING THAT WAS ACKNOWLEDGED PUBLICLY IN

03:24PM  25   OTHER PLACES AS WELL?

03:24PM  1     A.   YES.

03:24PM  2     Q.   MR. LEACH SHOWED YOU SOME EMAILS ABOUT A DEMONSTRATION

03:24PM  3     WHERE THERE WAS A DISCUSSION OF POTENTIAL VENOUS TESTS.

03:24PM  4          DO YOU RECALL THAT?

03:24PM  5     A.   I DO.

03:24PM  6     Q.   AND AT THE TIME THAT THAT DEMONSTRATION WAS TAKING PLACE,

03:24PM  7     IS IT ACCURATE THAT THERE WERE DISCLOSURES ABOUT VENOUS TESTING

03:24PM  8     AT THERANOS THAT EXISTED IN THE PUBLIC DOMAIN?

03:24PM  9     A.   YES.

03:24PM 10     Q.   IS IT THE CASE THAT SOMETIMES WHEN POTENTIAL PARTNERS OF

03:25PM 11     THERANOS CAME TO THE COMPANY OR WENT TO A WALGREENS STORE THEY

03:25PM 12     WANTED TO GET A FINGERSTICK EXPERIENCE?

03:25PM 13     A.   YES.

03:25PM 14     Q.   AND WOULD THE COMPANY TAKE STEPS TO TRY TO ACCOMMODATE

03:25PM 15     THEIR REQUEST THAT THEY HAVE THE FINGERSTICK EXPERIENCE IN THE

03:25PM 16     STORE?

03:25PM 17     A.   WE DID.

03:25PM 18     Q.   AND AM I RIGHT THAT ANYONE COULD WALK INTO A WALGREENS

03:25PM 19     SERVICE CENTER -- A THERANOS SERVICE CENTER AT WALGREENS AND

03:25PM 20     GET THEIR BLOOD TESTED WITHOUT THERANOS'S HELP?

03:25PM 21     A.   OF COURSE.

03:25PM 22     Q.   AND THAT HAPPENED ON OCCASIONS, DIDN'T IT?

03:25PM 23     A.   YES.

03:25PM 24     Q.   SOMEONE HAD AN INTEREST IN THERANOS, WOULD SHOW UP, AND

03:25PM 25     JUST GET A TEST; IS THAT RIGHT?

03:25PM  1      A.   YES.

03:25PM  2      Q.   ALL RIGHT.  I WANT TO NEXT ASK ABOUT THE EMAILS THAT

03:25PM  3      MR. LEACH SHOWED YOU RELATED TO TYLER SHULTZ.

03:26PM  4           DO YOU RECALL THAT DISCUSSION WITH MR. LEACH?

03:26PM  5      A.   I DO.

03:26PM  6      Q.   NOW, MR. SHULTZ, YOU HAVE NOT SEEN HIM TESTIFYING HERE; IS

03:26PM  7      THAT RIGHT?

03:26PM  8      A.   I HAVE NOT.

03:26PM  9      Q.   BUT YOU RECALL SOME DOCUMENTS BEING INTRODUCED THAT WERE

03:26PM  10     EMAILS FROM HIM?

03:26PM  11     A.   YES.

03:26PM  12     Q.   AND DO YOU RECALL THAT ONE OF THE QUESTIONS THAT MR. LEACH

03:26PM  13     ASKED YOU ON LAST TUESDAY WAS ABOUT VALIDATION OF THERANOS'S

03:26PM  14     SYPHILIS ASSAY?

03:26PM  15     A.   I DO.

03:26PM  16     Q.   AND DO YOU RECALL THAT HE ALSO ASKED YOU QUESTIONS ABOUT

03:26PM  17     MR. SHULTZ RAISING CONCERNS ABOUT MEDIA STATEMENTS THAT

03:26PM  18     THERANOS HAD MADE?

03:26PM  19     A.   I DO.

03:26PM  20     Q.   AND DO YOU ALSO RECALL THAT HE HAD ASKED YOU QUESTIONS

03:26PM  21     LAST TUESDAY ABOUT A COEFFICIENT OF VARIATION FOR A PARTICULAR

03:27PM  22     ASSAY?

03:27PM  23           DO YOU RECALL THAT?

03:27PM  24     A.   I DO.

03:27PM  25     Q.   AND IS IT FAIR TO SAY THAT IN ALL THREE OF THOSE

03:27PM   1    CATEGORIES, MR. SHULTZ WAS RAISING SOME CONCERN ABOUT

03:27PM   2    THERANOS'S WORK?

03:27PM   3    A.   HE WAS.

03:27PM   4    Q.   NOW, YOU TESTIFIED DURING YOUR DIRECT EXAMINATION THAT

03:27PM   5    MR. SHULTZ HAD FIRST RAISED THOSE QUESTIONS IN FEBRUARY OF

03:27PM   6    2014.

03:27PM   7         DO YOU REMEMBER THAT?

03:27PM   8    A.   YES.

03:27PM   9    Q.   AND I THINK WE LOOKED AT A SERIES OF EMAILS WHERE

03:27PM  10    DR. YOUNG PROVIDED ANSWERS TO MR. SHULTZ'S CONCERNS; IS THAT

03:27PM  11    RIGHT?

03:27PM  12    A.   YES.

03:27PM  13    Q.   AND THEN THE ISSUE DIED FOR A WHILE.

03:27PM  14         DO YOU RECALL THAT?

03:27PM  15    A.   I DO.

03:27PM  16    Q.   AND THEN IN APRIL, MR. SHULTZ AGAIN RAISED AN ISSUE

03:27PM  17    DIRECTLY WITH YOU.

03:27PM  18         DO YOU RECALL THAT?

03:27PM  19    A.   I DO.

03:27PM  20    Q.   AND WE LOOKED AT YOU ASKING DR. YOUNG TO GET INVOLVED AND

03:27PM  21    TRY TO UNDERSTAND THE CONCERNS THAT MR. SHULTZ WAS RAISING.

03:28PM  22         DO YOU RECALL THAT?

03:28PM  23    A.   YES.

03:28PM  24    Q.   AND DO YOU RECALL THAT DR. YOUNG DID PROVIDE EMAIL

03:28PM  25    COMMUNICATIONS TO YOU AND TO MR. BALWANI THAT ADDRESSED THE

03:28PM 1    CONCERNS THAT MR. SHULTZ WAS RAISING?

03:28PM 2    A.   I DO.

03:28PM 3    Q.   ALL RIGHT.  I WANT TO LOOK AT LOOK AT SOME OF THOSE EMAIL

03:28PM 4    COMMUNICATIONS IN LIGHT OF THE QUESTIONS THAT MR. LEACH ASKED

03:28PM 5    YOU.

03:28PM 6         LET'S LOOK AT EXHIBIT 1667, WHICH IS IN EVIDENCE.

03:28PM 7    A.   OKAY.

03:28PM 8    Q.   SO I'M INTERESTED IN THE THIRD EMAIL HERE FROM MS. HOLMES

03:28PM 9    AT 4:35 ON APRIL 11TH.

03:28PM 10        IF WE CAN JUST BLOW THAT UP.

03:28PM 11        AND DO YOU SEE THAT THIS IS YOU, IN RESPONSE TO

03:29PM 12   MR. SHULTZ'S EMAIL RAISING CONCERNS, ASKING DR. YOUNG TO TAKE A

03:29PM 13   LOOK AT IT?

03:29PM 14   A.   YES.

03:29PM 15   Q.   AND HE SAYS DID YOU -- YOU RAISE A QUESTION WITH HIM, DID

03:29PM 16   HE TALK TO -- HAD DR. YOUNG TALKED TO MR. SHULTZ TO SAY THAT

03:29PM 17   WHAT THE MEDIA REFERENCES TO THERANOS'S ACCURACY WERE, WERE

03:29PM 18   ABOUT THERANOS'S INFRASTRUCTURE AND ITS LONGITUDINAL POWER IN

03:29PM 19   THE CONTEXT OF LAB TO LAB VARIABILITY.

03:29PM 20        DO YOU SEE THAT?

03:29PM 21   A.   I DO.

03:29PM 22   Q.   NOW, MR. SHULTZ WAS RAISING A CONCERN THAT THERANOS WAS

03:29PM 23   PUBLICLY SAYING THAT ITS TESTS WERE ACCURATE AND RELIABLE, AND

03:29PM 24   IN SOME CASES MORE ACCURATE AND RELIABLE; IS THAT RIGHT?

03:29PM 25   A.   YES.

03:29PM  1    Q.   AND YOU WERE COMMENTING TO DR. YOUNG ABOUT THE QUESTIONS

03:29PM  2    THAT MR. SHULTZ RAISED ON THAT; IS THAT RIGHT?

03:29PM  3    A.   I AM.

03:29PM  4    Q.   AND YOU SAY, WELL, THOSE ARE REFERENCES TO OUR PRACTICE'S

03:30PM  5    LONGITUDINAL POWER IN THE CONTEXT OF LAB TO LAB VARIABILITY.

03:30PM  6         IS THAT WHAT IS HAPPENING HERE?

03:30PM  7    A.   YES.

03:30PM  8    Q.   AND WHEN YOU SAID THAT THOSE COMMENTS ABOUT ACCURACY AND

03:30PM  9    RELIABILITY ARE ABOUT LONGITUDINAL POWER IN THE CONTEXT OF LAB

03:30PM  10   TO LAB VARIABILITY, WHAT DID THAT MEAN?

03:30PM  11   A.   IT MEANT THAT WE WERE BUILDING A LAB AND MINILAB THAT WERE

03:30PM  12   DESIGNED TO BE STANDARDIZED AND THAT PEOPLE WOULD BE ABLE TO

03:30PM  13   GET TESTS ACROSS LOCATIONS AND SEE TRENDS IN THEIR DATA THAT

03:30PM  14   SHOULD HELP TO SHOW THEM THE ONSET AND PROGRESSION OF DISEASE

03:30PM  15   IN WAYS THAT YOU COULD NOT SEE IF YOU DIDN'T HAVE STANDARDIZED

03:30PM  16   TECHNOLOGY OR STANDARDIZED LABS LIKE WE WERE WORKING TO BUILD.

03:30PM  17   Q.   AND WHY WAS -- WHY WOULD THAT BE TRUE WITH RESPECT TO

03:30PM  18   THERANOS TECHNOLOGY IN PARTICULAR?

03:30PM  19   A.   WITH RESPECT TO MINILAB, BECAUSE WE WERE FACTORY

03:31PM  20   CALIBRATING THE DEVICES; AND WITH RESPECT TO THE LABORATORY,

03:31PM  21   BECAUSE WE WERE STANDARDIZING THE EQUIPMENT IN THE AUTOMATION

03:31PM  22   AMONGST ALL OF THE OTHER LABS WE INTENDED TO BUILD.

03:31PM  23   Q.   AND WHEN YOU OR THE COMPANY MADE STATEMENTS PUBLICLY ABOUT

03:31PM  24   ACCURACY AND RELIABILITY, IS THAT SOMETHING THAT YOU WERE

03:31PM  25   REFERRING TO?

03:31PM  1     A.   YES.

03:31PM  2     Q.   LET'S LOOK ABOVE THIS EMAIL IN THE SAME EMAIL CHAIN JUST

03:31PM  3     TO THIS APRIL 11TH EMAIL FROM DR. YOUNG, AND HE SAYS THAT HE

03:31PM  4     HAS RESPONDED AND INTERLACED HIS COMMENTS IN RESPONSE TO

03:31PM  5     MR. SHULTZ.

03:31PM  6          DO YOU SEE THAT?

03:31PM  7     A.   I DO.

03:31PM  8     Q.   AND THEN IF WE GO DOWN INTO THE BODY OF THE EMAIL, IF WE

03:31PM  9     GO TO THE TOP OF PAGE 2, WE SEE A LITTLE BIT OF THE DIALOGUE

03:31PM  10    BETWEEN MR. YOUNG -- DR. YOUNG AND MR. SHULTZ.

03:32PM  11         DO YOU SEE THAT?

03:32PM  12    A.   I DO.

03:32PM  13    Q.   AND IF YOU LOOK AT THE PARAGRAPH THAT IS AT THE TOP OF THE

03:32PM  14    SCREEN NOW BEGINNING, "CALCULATING THE MEDIAN DOES NOT IGNORE

03:32PM  15    ANY DATA."

03:32PM  16         DO YOU SEE THAT PARAGRAPH?

03:32PM  17    A.   YES.

03:32PM  18    Q.   AND DO YOU SEE THAT IN THE THIRD LINE IT BEGINS, "TYLER

03:32PM  19    STILL JUST DOES NOT GRASP THE MEANING OF THE CV"?

03:32PM  20    A.   I DO.

03:32PM  21    Q.   AND IS THIS DR. YOUNG'S RESPONSE TO THE CONCERNS THAT

03:32PM  22    MR. SHULTZ HAD RAISED ABOUT THERANOS'S CALCULATION ABOUT THE

03:32PM  23    COEFFICIENT OF VARIATION?

03:32PM  24    A.   IT IS.

03:32PM  25    Q.   AND WHAT DID YOU UNDERSTAND DR. YOUNG TO BE SAYING ABOUT

03:32PM   1    MR. SHULTZ'S CONCERNS AND THEIR VALIDITY?

03:32PM   2    A.   THAT HE WAS NOT ABLE TO GET MR. SHULTZ TO UNDERSTAND THE

03:32PM   3    CONCEPT OF COEFFICIENT OF VARIATION AND THE MATH BEHIND HOW IT

03:33PM   4    WAS CALCULATED, AND THAT MR. SHULTZ WAS CONFUSED ABOUT THAT.

03:33PM   5    Q.   AND IF YOU GO THEN TO THE MIDDLE OF PAGE 2, WHICH YOU

03:33PM   6    TALKED ABOUT, WHICH IS THE NEXT EMAIL WHICH BEGINS, "DANIEL

03:33PM   7    ALSO TOLD ME."

03:33PM   8         DO YOU SEE THAT?

03:33PM   9    A.   I DO.

03:33PM   10   Q.   AND AGAIN, THAT THE -- THIS IS RAISING ANOTHER CONCERN

03:33PM   11   ABOUT THE CV AND ABOUT SPECIFICALLY WITH REGARD TO SENSITIVITY

03:33PM   12   TESTING DONE IN CONNECTION WITH THE SYPHILIS ASSAY.

03:33PM   13        DO YOU SEE THAT?

03:33PM   14   A.   YES.

03:33PM   15   Q.   AND THEN DO YOU SEE IN THE SECOND PARAGRAPH IN THE LATER

03:33PM   16   TEXT, IS THAT DR. YOUNG'S RESPONSE?

03:33PM   17   A.   YES.

03:33PM   18   Q.   AND DR. YOUNG RESPONDS, "HE MAKES IT SOUND LIKE SOMETHING

03:34PM   19   INAPPROPRIATE IS BEING DONE, WHICH IT IS NOT.  EQUIVOCAL ZONES

03:34PM   20   ARE COMMONLY USED, AND EXPECTED IN SUCH QUALITATIVE ASSAYS.

03:34PM   21   THE APPROACH BEING USED FOR SETTING OURS WAS BASED ON COMMON

03:34PM   22   TECHNIQUES."

03:34PM   23        DO YOU SEE THAT?

03:34PM   24   A.   YES.

03:34PM   25   Q.   AND THEN IN THE SECOND PARAGRAPH, DO YOU SEE THAT HE

03:34PM  1    SAYS -- HE COMMENTS FURTHER AND SAYS THAT, "I DON'T KNOW THAT

03:34PM  2    ANY STUDY WAS SIMPLY REPEATED WITH THE ORIGINAL DATA BEING

03:34PM  3    IGNORED."

03:34PM  4         IS THAT A RESPONSE TO A CONCERN THAT MR. SHULTZ HAD

03:34PM  5    RAISED?

03:34PM  6    A.   IT IS.

03:34PM  7    Q.   OKAY.  NOW, I WANT TO NEXT GO TO THE BOTTOM OF PAGE 2.

03:34PM  8         AND I WANT TO FOCUS FIRST ON THE CONCERN THAT MR. SHULTZ

03:34PM  9    RAISES IN THE DARKER TEXT IN THE PARAGRAPH THAT BEGINS, "I THEN

03:34PM  10   ASKED."

03:34PM  11        DO YOU SEE THAT?

03:34PM  12   A.   I DO.

03:34PM  13   Q.   AND HE SAID, "I THEN ASKED DANIEL IF HE THOUGHT OUR

03:35PM  14   SYPHILIS TEST WAS TRULY THE MOST ACCURATE AND MOST PRECISE

03:35PM  15   SYPHILIS TEST ON THE MARKET.  HE SAID THAT THERANOS DOES NOT

03:35PM  16   CLAIM TO HAVE THE MOST ACCURATE OR PRECISE TESTS, AND THAT IF I

03:35PM  17   COULD FIND ANY MARKETING MATERIALS I SHOULD FORWARD THEM TO

03:35PM  18   HIM."

03:35PM  19        AND THEN MR. -- AND HE GOES ON AND INDICATES THAT HE HAS

03:35PM  20   DONE THAT, AND HE COMMENTS ON THERANOS NEVER DIRECTLY MAKING

03:35PM  21   THOSE CLAIMS.

03:35PM  22        DO YOU SEE THEN THAT DR. YOUNG RESPONDS TO THAT BY SAYING,

03:35PM  23   "I DID NOTE TO TYLER THAT THERANOS WILL HAVE A SUPERIOR PRODUCT

03:35PM  24   BY CONTROLLING/MONITORING/REDUCING VARIANCE ACROSS OUR

03:35PM  25   COUNTRY-WIDE INFRASTRUCTURE.  THIS WILL ENABLE US TO

03:35PM 1    TRACK/TREND TEST RESULTS FOR PATIENTS IN A MUCH MORE ROBUST

03:35PM 2    MANNER COMPARED TO WHAT IS AVAILABLE NOW TO PATIENTS."

03:35PM 3         DO YOU SEE THAT?

03:35PM 4    A.   I DO.

03:35PM 5    Q.   AND, AGAIN, IS THAT THIS IDEA THAT THERE'S CALIBRATION

03:35PM 6    BETWEEN INSTRUMENTS THAT ARE THERANOS INSTRUMENTS NO MATTER

03:36PM 7    WHERE THE DEVICE WAS LOCATED?

03:36PM 8    A.   IT IS.

03:36PM 9    Q.   AND THEN IF YOU GO TO THE NEXT PARAGRAPH, DO YOU SEE

03:36PM 10   MR. SHULTZ IS RAISING AN ISSUE ABOUT THE PREVIOUS DISCUSSION

03:36PM 11   RELATED TO THE CV CLAIM OF LESS THAN 10 PERCENT?

03:36PM 12   A.   I DO.

03:36PM 13   Q.   AND HE SAYS THAT THAT'S NOT ACCURATE UNDER THE MEDIAN.

03:36PM 14        DO YOU SEE THAT?

03:36PM 15   A.   YES.

03:36PM 16   Q.   AND DR. YOUNG RESPONDS AND SAYS MEDIAN IS NOT USED HERE,

03:36PM 17   AVERAGES ARE.

03:36PM 18        DO YOU SEE THAT?

03:36PM 19   A.   YES.

03:36PM 20   Q.   AND THEN MR. LEACH SHOWED YOU LAST TUESDAY A DRAFT

03:36PM 21   RESPONSE TO MR. SHULTZ THAT WAS PREPARED IN COMMUNICATIONS

03:36PM 22   BETWEEN YOU AND DR. YOUNG AND MR. BALWANI.

03:36PM 23        DO YOU RECALL THAT?

03:36PM 24   A.   I DO.

03:36PM 25   Q.   AND THERE WAS A DRAFT WHERE YOU HAD PROVIDED SOME

03:37PM  1    COMMENTS?

03:37PM  2    A.   YES.

03:37PM  3    Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 15070.

03:37PM  4    A.   OKAY.

03:37PM  5    Q.   AND IS EXHIBIT 15070 A -- RELATE TO THE COMMENTS THAT WERE

03:37PM  6    BEING EXCHANGED BETWEEN YOURSELF AND DR. YOUNG AND MR. BALWANI

03:37PM  7    RESPONDING TO MR. SHULTZ?

03:37PM  8    A.   IT DOES.

03:37PM  9         MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT 15070.

03:37PM  10        MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:37PM  11        THE COURT:  IT'S ADMITTED.

03:37PM  12    (DEFENDANT'S EXHIBIT 15070 WAS RECEIVED IN EVIDENCE.)

03:38PM  13   BY MR. DOWNEY:

03:38PM  14    Q.   AND IF YOU LOOK AT PAGE 2, THIS IS -- IF YOU LOOK AT THE

03:38PM  15    FIRST PAGE, THIS IS AN EMAIL WHERE MR. BALWANI SAYS HE'S

03:38PM  16    PROVIDING A DOCUMENT THAT -- WHERE HE HAS ADDED A RESPONSE THAT

03:38PM  17    HE'S GOING TO GIVE TO MR. SHULTZ.

03:38PM  18        DO YOU SEE THAT?

03:38PM  19    A.   YES.

03:38PM  20    Q.   AND THEN IF YOU LOOK AT THE ATTACHMENT, DO YOU SEE THE

03:38PM  21    COMMENT ON THE RIGHT-HAND SIDE, AND THIS IS THE COMMENT THAT

03:38PM  22    MR. LEACH HAD DRAWN YOUR ATTENTION TO WHERE IT SEEMS TO SPIN

03:38PM  23    OUT FROM THE FIRST SENTENCE, AND YOU SAY, "STRONGER - EMPHASIZE

03:38PM  24    WHAT HE DID FIRST ESPECIALLY IN LIGHT OF MY COMMENT ON ACCURACY

03:38PM  25    BELOW."

03:38PM   1              DO YOU SEE THAT?

03:38PM   2       A.   I DO.

03:38PM   3       Q.   NOW, YOU REFERRED THERE TO A COMMENT ON ACCURACY BELOW,

03:39PM   4       AND I WANT TO SEE IF WE CAN TAKE A LOOK AT THAT COMMENT BY

03:39PM   5       LOOKING AT EXHIBIT 7349.

03:39PM   6       A.   7439?

03:39PM   7       Q.   7439.

03:39PM   8       A.   GOT IT.  OKAY.

03:39PM   9       Q.   AND IS THIS ANOTHER VERSION WITH A LITTLE BIT OF A

03:39PM   10      DIFFERENT FORMULATION OF THESE EMAIL COMMUNICATIONS BETWEEN

03:39PM   11      YOURSELF AND DR. YOUNG AND MR. BALWANI?

03:39PM   12      A.   IT IS.

03:39PM   13      Q.   AND IF YOU LOOK THROUGH THAT DOCUMENT --

03:39PM   14           WELL, YOUR HONOR, I MOVE TO ADMIT EXHIBIT 7439 SO WE CAN

03:40PM   15      PUT IT UP.

03:40PM   16              MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:40PM   17              THE COURT:  IT'S ADMITTED.

03:40PM   18           (DEFENDANT'S EXHIBIT 7439 WAS RECEIVED IN EVIDENCE.)

03:40PM   19      BY MR. DOWNEY:

03:40PM   20      Q.   OKAY.  DO YOU SEE THAT THE FIRST PAGE IS MR. BALWANI

03:40PM   21      FORWARDING EDITS AND MR. YOUNG SAYING THAT THOSE EDITS LOOK

03:40PM   22      VERY GOOD?

03:40PM   23      A.   I DO.

03:40PM   24      Q.   AND ATTACHED ARE EDITS?

03:40PM   25      A.   YES.

03:40PM  1    Q.   BUT WHAT I WANT TO FOCUS YOU ON IS THE COMMENT THAT YOU

03:40PM  2    HAD MADE WHICH YOU WERE REFERRING TO IN THE PRIOR EXHIBIT,

03:40PM  3    WHICH IS ON PAGE 5 OF THE EXHIBIT.

03:40PM  4         AND IF YOU COULD BLOW UP THE COMMENT ON THE RIGHT-HAND

03:40PM  5    SIDE.

03:40PM  6         DO YOU SEE THAT THIS IS A COMMENT THAT YOU ENTERED ON A

03:40PM  7    SENTENCE IN THE RESPONSE TO MR. SHULTZ?

03:40PM  8    A.   YES.

03:40PM  9    Q.   AND DO YOU SEE THAT IT'S COMMENTING ABOUT THAT A LARGE

03:41PM  10   NUMBER OF OTHER ASSAYS -- DOES THAT MEAN OTHER ASSAYS FROM

03:41PM  11   OTHER COMPANIES?

03:41PM  12   A.   WHERE ARE YOU IN THE --

03:41PM  13   Q.   SORRY.  THE SENTENCE THAT BEGINS, "THE SAME APPLIES FOR AN

03:41PM  14   OVERWHELMINGLY LARGE NUMBER OF ASSAYS?

03:41PM  15   A.   YES, GOT IT.

03:41PM  16   Q.   "THE CV'S FOR THESE IS USUALLY MUCH HIGHER WHEN YOU

03:41PM  17   MEASURE IT ACROSS MULTIPLE DEVICES, DIFFERENT REAGENT LOTS AND

03:41PM  18   DIFFERENT DAYS."

03:41PM  19        DO YOU SEE THAT?

03:41PM  20   A.   I DO.

03:41PM  21   Q.   TELL US WHAT THAT IS A REFERENCE TO.

03:41PM  22   A.    IT'S TALKING ABOUT OTHER ASSAYS OR TESTS AND THE

03:41PM  23   COEFFICIENT OF VARIATION BEING MUCH HIGHER THAN WHAT'S OFTEN

03:41PM  24   REPORTED WHEN IT'S MEASURED ACROSS DIFFERENT LABS OR DIFFERENT

03:41PM  25   ANALYZERS, DIFFERENT LOTS OF REAGENTS AND DIFFERENT DAYS, THAT

03:41PM   1    YOU DON'T SEE THAT LOWER CV IN ACTUAL PERFORMANCE.

03:41PM   2    Q.   OKAY.  AND LET'S LOOK AT THE COMMENT THAT YOU MAKE IN THE

03:42PM   3    RIGHT-HAND COLUMN.

03:42PM   4         DO YOU SEE THAT YOU WRITE, "ADD PRE-ANALYTICAL ERROR AND

03:42PM   5    VARIANCE POINT - THIS IS WHAT THE" "WALL STREET JOURNAL,"

03:42PM   6    "WSJ," "WALL STREET JOURNAL," "AND EVERYONE ELSE IS TALKING

03:42PM   7    ABOUT BY THE WORD 'ACCURACY.'"

03:42PM   8         DO YOU SEE THAT?

03:42PM   9    A.   I DO.

03:42PM  10    Q.   AND IS THAT A REFERENCE TO THE ARTICLE THAT HAD RUN IN

03:42PM  11    SEPTEMBER OF 2013 ABOUT THERANOS, WRITTEN BY JOE RAGO?

03:42PM  12    A.   IT IS.

03:42PM  13    Q.   AND IN THIS SENTENCE YOU SAY THAT "THE

03:42PM  14    WALL STREET JOURNAL" IS TALKING ABOUT PRE-ANALYTICAL ERROR.

03:42PM  15         FIRST, WHAT DOES THAT MEAN?

03:42PM  16    A.   IT MEANS ALL OF THE ERRORS THAT CAN GO INTO A TEST FROM

03:42PM  17    SAMPLE COLLECTION, TRANSPORTING THE SAMPLE, ACCESSIONING THE

03:42PM  18    SAMPLE IN THE LAB BEFORE IT'S EVEN RUN ON A MACHINE.

03:42PM  19    Q.   AND DID YOU UNDERSTAND THAT THERANOS'S 4.0 SYSTEM, WHEN

03:43PM  20    IMPLEMENTED, WOULD ELIMINATE THOSE ERRORS?

03:43PM  21    A.   YES.

03:43PM  22    Q.   AND YOU THEN GO ON TO SAY, AFTER PRE-ANALYTICAL ERROR, AND

03:43PM  23    VARIANCE POINT.

03:43PM  24         WHAT WERE YOU REFERRING TO THERE?

03:43PM  25    A.   AGAIN, THE SAME POINT, THAT IF YOU COULD LOOK AT LAB DATA

03:43PM 1    OVER TIME, THERE WAS AN OPPORTUNITY TO SEE THE ONSET OF

03:43PM 2    DISEASE.

03:43PM 3         BUT TO DO THAT, YOU NEEDED TO STANDARDIZE THE DEVICES OR

03:43PM 4    THE PLATFORMS ON WHICH YOU WERE MEASURING, AND THAT WAS

03:43PM 5    SOMETHING THAT THERANOS HAD CREATED IN ITS TECHNOLOGIES, AND WE

03:43PM 6    THOUGHT WE COULD CHANGE IN THE WAY THAT PEOPLE COULD USE LAB

03:43PM 7    DATA.

03:43PM 8    Q.   AND THEN IF YOU GO TO -- YOU SAY THAT, "READ THE ARTICLES,

03:43PM 9    THEY EXPOUND ON EXACTLY THIS, THIS IS OUR WHOLE POINT AND

03:43PM 10   MISSION ON ACTIONABLE INFORMATION AND WHAT WE ALWAYS TALK ABOUT

03:43PM 11   WHEN TALKING ABOUT ACCURACY AS YOU CAN SEE FROM THE CONTEXT

03:43PM 12   AROUND ANY PERFORMANCE CLAIM, INCLUDING ON OUR WEBSITE AND IN

03:44PM 13   ARTICLES."

03:44PM 14        DO YOU SEE THAT?

03:44PM 15   A.   I DO.

03:44PM 16   Q.   WERE YOU, IN THIS COMMENT THAT YOU MADE IN APRIL OF 2014,

03:44PM 17   REFERRING TO COMMENTS ON THE THERANOS WEBSITE AS THEY THEN

03:44PM 18   EXISTED?

03:44PM 19   A.   I WAS.

03:44PM 20   Q.   AND WERE THOSE COMMENTS TO THE EFFECT THAT THERANOS'S

03:44PM 21   TECHNOLOGY WAS MORE ACCURATE AND RELIABLE THAN THOSE OF THE

03:44PM 22   TECHNOLOGY OF COMPETITORS?

03:44PM 23   A.   YES.

03:44PM 24   Q.   AND WHEN YOU SAID IN THIS DOCUMENT IN YOUR FIRST COMMENT

03:44PM 25   THAT MR. BALWANI SHOULD BE STRONGER AND SHOULD EMPHASIZE, WERE

03:44PM  1    YOU REFERRING TO THIS COMMENT ABOUT ACCURACY AND RELIABILITY IN

03:44PM  2    YOUR INTENTION IN SAYING IT?

03:44PM  3    A.   I WAS.  AND JUST LOOKING AT IT, THAT PART OF THE SENTENCE

03:44PM  4    REFERS TO WHAT IS WRITTEN THERE, WHICH IS GIVING HIM THE

03:44PM  5    BENEFIT OF THE DOUBT THAT HIS INTENTIONS ARE IN THE RIGHT

03:45PM  6    PLACE.

03:45PM  7    Q.   LET ME ASK YOU TO JUST TAKE A LOOK QUICK AT THE NEXT PAGE

03:45PM  8    OF THIS EXHIBIT.

03:45PM  9         AND REALLY I'M INTERESTED IN THE LAST PARAGRAPH HERE

03:45PM  10   BEGINNING, "I THEN THOUGHT."

03:45PM  11        DO YOU SEE THAT?

03:45PM  12   A.   I DO.

03:45PM  13   Q.   AND DO YOU SEE THE FIRST PARAGRAPH HERE BEGINNING, "I THEN

03:45PM  14   THOUGHT BACK TO OUR PREVIOUS DISCUSSION," IS THAT A REFERENCE

03:45PM  15   FROM A PARAGRAPH PREPARED BY MR. SHULTZ?

03:45PM  16   A.   YES.

03:45PM  17   Q.   AND HE SAYS, WE CHECKED THE THERANOS WEBSITE AND FOUND

03:45PM  18   THAT WE ONLY MAKE THIS CLAIM FOR VITAMIN D, BUT THEN HE GOES ON

03:45PM  19   TO SAY, BUT THE CV LEVELS WERE HIGHER THAN 10 PERCENT, AND HE

03:45PM  20   LISTS A VARIETY OF NUMBERS, WHEN CALCULATED ON THE MEDIAN OF

03:45PM  21   EACH PRECISION RUN AND HIGHER THAN 10 AGAIN WHEN CALCULATED

03:45PM  22   BASED ON THE ENTIRE DATA SET.

03:46PM  23        DO YOU SEE THAT?

03:46PM  24   A.   I DO.

03:46PM  25   Q.   AND DO YOU SEE THAT DR. YOUNG RESPONDED TO THAT?

03:46PM 1    A.   I DO.

03:46PM 2    Q.   AND DO YOU SEE THAT HIS RESPONSE IS THAT THE DATA APPEARS

03:46PM 3    TO BE FROM THE 2-TIP PRECISION DATA, INCLUDING EACH TIP VALUE.

03:46PM 4         WHY WAS THAT RELEVANT AS PART OF HIS RESPONSE?

03:46PM 5    A.   BECAUSE THAT'S AN INCORRECT WAY TO CALCULATE COEFFICIENT

03:46PM 6    OF VARIATION.

03:46PM 7    Q.   AND THEN HE SAYS, "AS NOTED SEVERAL TIMES, THE CV METRIC

03:46PM 8    ACROSS THAT DATA IS NOT HOW WE QUANTIFY OUR ASSAY SYSTEM CV.

03:46PM 9    WE HAVE REFERENCED OUR 6-TIP VITAMIN D PRECISION BELOW IN

03:46PM 10   REFERENCE TO THE TABLE SUMMARIES."

03:46PM 11        DO YOU SEE THAT?

03:46PM 12   A.   YES.

03:46PM 13   Q.   HE GOES ON TO SAY, "YOU WERE WRONG HERE, MEDIAN WAS NOT

03:46PM 14   USED HERE - AVERAGES ARE.  THIS IS WHY YOU ARE GENERATING WRONG

03:47PM 15   NUMBERS."

03:47PM 16        AND DID YOU UNDERSTAND THAT THIS WAS DR. YOUNG'S RESPONSE

03:47PM 17   TO MR. SHULTZ'S CONCERNS?

03:47PM 18   A.   I DID.

03:47PM 19   Q.   AND WAS THIS THE THIRD OR FOURTH TIME THAT DR. YOUNG AND

03:47PM 20   MR. SHULTZ HAD HAD CONVERSATIONS ON THESE SAME SUBJECTS?

03:47PM 21   A.   IT WAS.

03:47PM 22   Q.   LET ME TURN FROM TALKING ABOUT MR. SHULTZ TO TALKING FOR A

03:47PM 23   MOMENT ABOUT MS. CHEUNG.

03:47PM 24        DO YOU RECALL THAT MS. CHEUNG TESTIFIED VERY CLOSE TO THE

03:47PM 25   BEGINNING OF THE TRIAL?

HOLMES REDIRECT BY MR. DOWNEY

03:47PM 1    DO YOU RECALL THAT?

03:47PM 2    A.   I DO.

03:47PM 3    Q.   AND AM I RIGHT THAT YOU DID NOT KNOW MS. CHEUNG WHEN SHE

03:47PM 4    WORKED AT THERANOS?

03:47PM 5    A.   I DID NOT.

03:47PM 6    Q.   AND YOU DID NOT KNOW THAT SHE RAISED ANY CONCERNS ABOUT

03:47PM 7    THE QUALITY OF THERANOS TESTING WHILE SHE WAS AT THERANOS; IS

03:47PM 8    THAT RIGHT?

03:47PM 9    A.   I DID NOT.

03:47PM 10   Q.   AND IS IT RIGHT THAT YOU DID NOT LEARN THAT UNTIL A

03:48PM 11   CONSIDERABLE AMOUNT OF TIME LATER?

03:48PM 12   A.   YES.

03:48PM 13   Q.   AND YOU WERE ASKED ON CROSS-EXAMINATION ABOUT THERANOS'S

03:48PM 14   RESPONSE, DO YOU RECALL THAT, TO LEARNING THAT MS. CHEUNG WAS

03:48PM 15   TALKING TO A REPORTER FROM "THE WALL STREET JOURNAL"?

03:48PM 16   A.   I DO.

03:48PM 17   Q.   AND DO YOU RECALL THAT MR. LEACH ASKED IF YOU HAD A LAWYER

03:48PM 18   SEND A LETTER TO MS. CHEUNG.

03:48PM 19   DO YOU RECALL THAT?

03:48PM 20   A.   I DO.

03:48PM 21   Q.   NOW, I WANT TO ASK YOU, IN REGARD TO MS. CHEUNG'S TIME AT

03:48PM 22   THERANOS, IS IT ACCURATE THAT SHE SIGNED A NONDISCLOSURE

03:48PM 23   AGREEMENT AGREEING TO KEEP INFORMATION ABOUT THERANOS

03:48PM 24   CONFIDENTIAL?

03:48PM 25   A.   SHE DID.

03:48PM   1    Q.   AND WAS THAT REQUIRED OF EVERY EMPLOYEE?

03:49PM   2    A.   YES.

03:49PM   3    Q.   WHEN YOU LEARNED THAT MS. CHEUNG WAS HAVING CONVERSATIONS

03:49PM   4    ABOUT THERANOS AND WHAT YOU BELIEVED TO BE CONFIDENTIAL

03:49PM   5    INFORMATION, WAS YOUR -- WAS THE FIRST REACTION YOU HAD TO HAVE

03:49PM   6    A LAWYER SEND HER A LETTER?

03:49PM   7    A.   NO.

03:49PM   8    Q.   DID YOU ASK THAT THERANOS'S HUMAN RESOURCES DEPARTMENT

03:49PM   9    REACH OUT TO HER?

03:49PM  10    A.   I DID.

03:49PM  11    Q.   AND DID YOU UNDERSTAND THAT THEY DID THAT?

03:49PM  12    A.   YES.

03:49PM  13    Q.   HOW MANY TIMES, IN YOUR UNDERSTANDING, DID THE HEAD OF

03:49PM  14    PERSONNEL AT THERANOS REACH OUT TO MS. CHEUNG?

03:49PM  15    A.   MULTIPLE TIMES.

03:49PM  16    Q.   AND DID MS. CHEUNG RESPOND TO ANY OF THOSE CALLS?

03:49PM  17    A.   NO.

03:49PM  18    Q.   LET ME SWITCH FROM THE SUBJECT OF THE RESPONSE TO "THE

03:50PM  19    WALL STREET JOURNAL" ARTICLE IN CONNECTION WITH EMPLOYEES TO

03:50PM  20    TALK ABOUT THE BOARD OF DIRECTORS.

03:50PM  21         DO YOU RECALL THAT?

03:50PM  22    A.   YES.

03:50PM  23    Q.   AND MR. LEACH ASKED YOU ABOUT A JULY 2015 BOARD MEETING.

03:50PM  24         DO YOU RECALL THAT?

03:50PM  25    A.   I DO.

03:50PM 1    Q.   AND DO YOU RECALL THAT WHEN GENERAL MATTIS TESTIFIED, HE

03:50PM 2    GAVE SOME TESTIMONY ABOUT THAT SAME BOARD MEETING?

03:50PM 3         DO YOU RECALL THAT?

03:50PM 4    A.   I DO.

03:50PM 5    Q.   AND DO YOU RECALL THAT GENERAL MATTIS TESTIFIED THAT HE

03:50PM 6    WAS A LITTLE BIT OFFENDED THAT THERE WAS A SLIDE AS PART OF A

03:50PM 7    PRESENTATION AT THAT MEETING THAT REFERRED TO THE DUTY OF

03:50PM 8    LOYALTY.

03:50PM 9         DO YOU REMEMBER THAT TESTIMONY?

03:50PM 10   A.   I DO.

03:50PM 11   Q.   AND DO YOU RECALL THAT HE FELT THAT HE WAS SOMEONE WHO HAD

03:50PM 12   SERVED THE COUNTRY FOR A LONG TIME AND HE DIDN'T NEED TO BE

03:51PM 13   TOLD ABOUT A DUTY OF LOYALTY?

03:51PM 14        DO YOU RECALL THAT?

03:51PM 15   A.   I DO.  HE HAS.

03:51PM 16   Q.   AND DO YOU RECALL THAT HE WAS SHOWN THAT REFERENCE TO A

03:51PM 17   DUTY OF LOYALTY IN REDACTED FASHION?

03:51PM 18   A.   IN HIS TESTIMONY?

03:51PM 19   Q.   YES.

03:51PM 20   A.   YES.

03:51PM 21   Q.   I'D LIKE TO ASK YOU TO LOOK AT EXHIBIT 15062.

03:51PM 22   A.   OKAY.

03:51PM 23   Q.   IS 15062 A DECK THAT WAS PROVIDED TO DIRECTORS OF THERANOS

03:51PM 24   IN CONNECTION WITH ITS JULY 2015 MEETING?

03:51PM 25   A.   YES.

HOLMES REDIRECT BY MR. DOWNEY

03:51PM  1              MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT 15062.

03:52PM  2              MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:52PM  3              THE COURT:  IT'S ADMITTED.

03:52PM  4          (DEFENDANT'S EXHIBIT 15062 WAS RECEIVED IN EVIDENCE.)

03:52PM  5      BY MR. DOWNEY:

03:52PM  6      Q.   AND IF YOU LOOK AT THE SECOND PAGE HERE, DO YOU SEE

03:52PM  7      THERE'S AN AGENDA FOR THE BOARD OF DIRECTORS THAT IS SET FORTH

03:52PM  8      FOR A MEETING?

03:52PM  9      A.   YES.

03:52PM 10      Q.   I'D LIKE TO ASK YOU TO FLIP FORWARD IN THIS DOCUMENT TO

03:52PM 11      PAGE 12 OF THE DOCUMENTS.

03:52PM 12      A.   OKAY.

03:52PM 13      Q.   AND DO YOU SEE THAT THIS IS LABELLED "CHARTERING THE BOARD

03:52PM 14      OF COUNSELORS"?

03:52PM 15      A.   YES.

03:52PM 16      Q.   AND CAN YOU EXPLAIN WHAT WAS GOING ON HERE?

03:53PM 17      A.   WE WERE FORMALIZING AN ADVISORY BOARD TO THE COMPANY,

03:53PM 18      WHICH WE WERE CALLING THE BOARD OF COUNSELORS, AND WE WERE

03:53PM 19      TALKING ABOUT THE CORE ASPECTS OF THE BOARD OF COUNSELORS AND

03:53PM 20      THEIR AGREEMENT WITH THE COMPANY.

03:53PM 21      Q.   OKAY.  AND THE FIRST ITEM IS DUTY OF LOYALTY.

03:53PM 22          DO YOU SEE THAT?

03:53PM 23      A.   YES.

03:53PM 24      Q.   AND THEN IF YOU GO TO THE NEXT SLIDE, DO YOU SEE THAT THE

03:53PM 25      FULL DISCUSSION HERE REFLECTS DISCUSSION ABOUT THE LEGAL

03:53PM  1     REQUIREMENTS THAT ARE IMPOSED ON DIRECTORS OF A COMPANY?

03:53PM  2     A.   YES.

03:53PM  3     Q.   AND DID YOU UNDERSTAND THAT THIS WAS INFORMATION THAT YOU

03:53PM  4     WERE TO SHARE WITH THE BOARD OF DIRECTORS TO MAKE SURE THAT ALL

03:53PM  5     OF THE LEGAL RESPONSIBILITIES THAT THEY HAD WERE UNDERSTOOD?

03:53PM  6     A.   YES.

03:53PM  7     Q.   NOW, MR. LEACH ALSO ASKED YOU ABOUT GENERAL MATTIS'S

03:54PM  8     RESIGNATION FROM THERANOS IN 2016.

03:54PM  9          DO YOU RECALL THAT?

03:54PM 10     A.   I DO.

03:54PM 11     Q.   AND DID YOU HAVE AN UNDERSTANDING IN 2016 WHY

03:54PM 12     GENERAL MATTIS HAD RESIGNED?

03:54PM 13     A.   YES.

03:54PM 14     Q.   DID YOU CONTINUE TO SPEAK WITH GENERAL MATTIS AFTER HE

03:54PM 15     LEFT THE BOARD IN 2016?

03:54PM 16     A.   I DID.

03:54PM 17     Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 15061.

03:54PM 18     A.   OKAY.

03:54PM 19     Q.   AND IS EXHIBIT 15061 A SERIES OF EMAILS ABOUT THE

03:55PM 20     DEPARTURE OF GENERAL MATTIS AS A DIRECTOR?

03:55PM 21     A.   YES.

03:55PM 22               MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

03:55PM 23     15061.

03:55PM 24               MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:55PM 25               THE COURT:  IT'S ADMITTED.

03:55PM   1              (DEFENDANT'S EXHIBIT 15061 WAS RECEIVED IN EVIDENCE.)

03:55PM   2                   MR. DOWNEY:  WE'LL BRING THAT UP, YOUR HONOR.

03:55PM   3    Q.   DO YOU SEE THIS IS AN EMAIL FROM GENERAL MATTIS AND YOU'RE

03:55PM   4    COPIED ON THE EMAIL FROM DECEMBER 2016?

03:55PM   5    A.   YES.

03:55PM   6    Q.   DO YOU SEE THAT?

03:55PM   7    A.   YES, YES.

03:55PM   8    Q.   AND WAS THIS AROUND THE TIME THAT GENERAL MATTIS WAS

03:55PM   9    NOMINATED TO SERVE AS SECRETARY OF DEFENSE?

03:55PM   10   A.   IT IS.

03:55PM   11   Q.   AND DO YOU SEE THAT IN GENERAL MATTIS'S EMAIL, HE SAYS,

03:55PM   12   "DUE TO MY STATUS OF PENDING NOMINATION AND POSSIBLY GOING INTO

03:55PM   13   A CONFIRMATION PROCESS, I NEED TO RECUSE MYSELF FROM THE BOARD

03:56PM   14   MEETING.  SORRY."

03:56PM   15        DO YOU SEE THAT?

03:56PM   16   A.   I DO.

03:56PM   17   Q.   AND AFTER THE TIME OF HIS NOMINATION, DID HE CEASE

03:56PM   18   PARTICIPATING IN BOARD AFFAIRS OF THERANOS?

03:56PM   19   A.   HE DID.

03:56PM   20   Q.   NOW, YOU ALSO RECALL THAT GENERAL MATTIS TESTIFIED THAT HE

03:56PM   21   HOPED THAT THERANOS WOULD PURSUE HAVING SOME EFFORTS TO HAVE

03:56PM   22   PEER REVIEW OF WORK DONE IN CONNECTION WITH ITS TECHNOLOGY.

03:56PM   23        DO YOU RECALL THAT?

03:56PM   24   A.   I DO.

03:56PM   25   Q.   AND WAS THAT ADVICE THAT THE COMPANY TOOK TO HEART IN

03:56PM   1      2016?

03:56PM   2      A.   WE DID.

03:56PM   3      Q.   AND WERE THE STUDIES THAT MR. LEACH SHOWED YOU ON YOUR

03:56PM   4      CROSS-EXAMINATION, WERE THEY IN PART AN EFFORT TO RESPOND TO

03:56PM   5      THE ADVICE THAT YOU GOT FROM GENERAL MATTIS AND OTHERS?

03:56PM   6      A.   YES.

03:56PM   7      Q.   LET ME MOVE TO TALKING A LITTLE BIT ABOUT THE WEBSITE OF

03:57PM   8      THERANOS IN SOME OF THE EMAILS THAT YOU WERE SHOWN DURING YOUR

03:57PM   9      CROSS-EXAMINATION.

03:57PM   10          DO YOU RECALL THAT MR. LEACH SHOWED YOU EMAILS WHERE

03:57PM   11     LAWYERS WERE COMMENTING ON DRAFTS OF THE WEBSITE?

03:57PM   12     A.   I DO.

03:57PM   13     Q.   AND YOU RECALL THAT YOU HAD ASKED LAWYERS TO REVIEW THE

03:57PM   14     CONTENT OF THE WEBSITE BEFORE IT WENT LIVE?

03:57PM   15     A.   I DID.

03:57PM   16     Q.   AND WAS THAT LAWYERS FROM ONE LAW FIRM OR MORE THAN ONE

03:57PM   17     LAW FIRM?

03:57PM   18     A.   MULTIPLE LAW FIRMS.

03:57PM   19     Q.   AND WHY DID YOU WANT LAWYERS TO REVIEW THE CONTENT OF THE

03:57PM   20     WEBSITE?

03:57PM   21     A.   BECAUSE I WANTED TO MAKE SURE THAT WHAT WE WERE PUTTING UP

03:57PM   22     WAS RIGHT.

03:57PM   23     Q.   WERE THERE NONLAWYERS ALSO INVOLVED IN THE PROCESS OF

03:57PM   24     REVIEWING THERANOS'S WEBSITE?

03:57PM   25     A.   YES.   THERE WERE MULTIPLE TEAMS OF PEOPLE INVOLVED.

03:58PM  1    Q.   AND WERE THE TWO EMAILS THAT YOU WERE SHOWN BY MR. LEACH,

03:58PM  2    WERE THEY THE ONLY ADVICE THAT YOU RECEIVED IN CONNECTION WITH

03:58PM  3    THE CONTENT OF THE WEBSITE?

03:58PM  4    A.   NO.

03:58PM  5    Q.   NOW, YOU RECALL THAT CERTAIN CHANGES WERE SUGGESTED IN

03:58PM  6    THAT EMAIL?

03:58PM  7    A.   YES.

03:58PM  8    Q.   DID YOU TRACK ALL OF THOSE AND GO INTO THE WEBSITE AND

03:58PM  9    MAKE THOSE CHANGES YOURSELF?

03:58PM  10   A.   NO.

03:58PM  11   Q.   WHO WAS RESPONSIBLE FOR DOING THAT?

03:58PM  12   A.   THERE WAS A TEAM OF PROJECT MANAGERS AND OTHER PEOPLE

03:58PM  13   WITHIN THE COMPANY WHO DID THAT.

03:58PM  14   Q.   AND DID YOU RECALL THAT THE DOCUMENT REFERRED TO HAVING

03:58PM  15   CLAIMS SUBSTANTIATED ON THE WEBSITE?

03:58PM  16   A.   I DO.

03:58PM  17   Q.   AND IN OTHER WORDS, DO YOU RECALL THAT THE LAWYERS WERE

03:58PM  18   SAYING, BEFORE WE SIGN OFF ON THIS BEING RUN, WE WOULD LIKE TO

03:58PM  19   SEE SOME SUBSTANTIATION?

03:58PM  20   A.   I DO.

03:58PM  21   Q.   AND WAS THAT A COMMON PROCESS THAT YOU OBSERVED AT

03:58PM  22   THERANOS?

03:58PM  23   A.   YES.

03:58PM  24   Q.   AND DO YOU KNOW WHETHER SPECIFICALLY IN CONNECTION WITH

03:59PM  25   THE CONCERNS THAT WERE RAISED IN THAT EMAIL SUBSTANTIATION WAS

03:59PM   1    PROVIDED TO THE LAWYERS?

03:59PM   2    A.   I DO.   I KNOW THERE WAS MUCH ONGOING DISCUSSION AFTER

03:59PM   3    THAT.

03:59PM   4    Q.   AND WHO WAS IN CHARGE OF COORDINATING THE PROCESS OF ENTRY

03:59PM   5    OF CHANGES INTO THE WEBSITE BEFORE IT WENT LIVE?

03:59PM   6    A.   ONE OF OUR PROJECT MANAGERS OR A FEW OF OUR PROJECT

03:59PM   7    MANAGERS IN COMMUNICATION WITH OUR TECHNICAL TEAM, THE

03:59PM   8    REGULATORY TEAM, THE LEGAL TEAM, AND THE MARKETING TEAM.

03:59PM   9    Q.   ALL RIGHT.   NOW I WANT TO ASK YOU ABOUT SOME OF THE TEXTS

03:59PM   10   THAT MR. LEACH REVIEWED WITH YOU BETWEEN YOURSELF AND

03:59PM   11   MR. BALWANI.

03:59PM   12        DO YOU RECALL DISCUSSING THAT DURING THE COURSE OF YOUR --

03:59PM   13   A.   I DO.

03:59PM   14   Q.   -- EXAMINATION?

03:59PM   15        ONE SERIES OF TEXTS --

03:59PM   16             THE COURT:   EXCUSE ME, MR. DOWNEY.   I'M SORRY.

04:00PM   17   SHOULD WE BREAK FOR THE AFTERNOON?   IS THIS GOING TO BE --

04:00PM   18             MR. DOWNEY:   OH, IT'S LATER THAN I REALIZED IT WAS,

04:00PM   19   YOUR HONOR.

04:00PM   20             THE COURT:   NO, IT'S QUITE ALL RIGHT.   IT SOUNDS

04:00PM   21   LIKE THIS WILL BE A BIT OF A LENGTH.

04:00PM   22             MR. DOWNEY:   PROBABLY TOO LONG TO KEEP THE JURY,

04:00PM   23   YEAH.

04:00PM   24             THE COURT:   LET'S TAKE OUR EVENING RECESS, LADIES

04:00PM   25   AND GENTLEMEN.   LET'S RESUME OUR REDIRECT EXAMINATION TOMORROW

04:00PM 1     MORNING AT 9:00 A.M.

04:00PM 2          I'M GOING TO ASK YOU TO CONTINUE TO BE SUCCESSFUL IN YOUR

04:00PM 3     EFFORTS NOT TO DISCUSS, LEARN, DO ANY RESEARCH ABOUT THIS CASE,

04:00PM 4     NOR FORM ANY OPINION ABOUT IT OVERNIGHT.

04:00PM 5          I'LL ASK YOU TOMORROW MORNING AGAIN WHETHER OR NOT ANY OF

04:00PM 6     THOSE THINGS HAVE HAPPENED.

04:00PM 7          WE'LL BE IN RECESS.  TOMORROW IS A 4:00 P.M. DAY, I

04:00PM 8     BELIEVE.  I BELIEVE WE'RE GOING UNTIL 4:00 P.M. TOMORROW.

04:00PM 9          I'LL HAVE AN UPDATE.  I'M GOING TO TALK WITH THE LAWYERS

04:00PM 10    TONIGHT WHEN YOU LEAVE AND A LITTLE TOMORROW MORNING AND GIVE

04:00PM 11    YOU AN UPDATE ON SCHEDULING.  I KNOW THAT MAY BE ON YOUR MIND.

04:00PM 12         SO HAVE A GOOD EVENING AND WE'LL SEE YOU TOMORROW MORNING.

04:01PM 13    HAVE A GOOD NIGHT.

04:01PM 14         YOU MAY STAND DOWN, MS. HOLMES.

04:01PM 15         (JURY OUT AT 4:01 P.M.)

04:01PM 16            THE COURT:  PLEASE BE SEATED.  THANK YOU.

04:01PM 17         THE RECORD SHOULD REFLECT THAT OUR JURY HAS LEFT FOR THE

04:01PM 18    EVENING.

04:01PM 19         SO COUNSEL, LET ME JUST CHECK IN.  FIRST OF ALL, ON

04:01PM 20    SCHEDULE, WHAT CAN I TELL -- WHAT DO YOU THINK I COULD TELL THE

04:01PM 21    JURY NOW?  IS IT PREMATURE TO GIVE THEM AN UPDATE ON OUR

04:01PM 22    SCHEDULE?

04:01PM 23         I KNOW THAT'S A REALLY TROUBLESOME QUESTION, ISN'T IT?  IT

04:02PM 24    REQUIRES SOME THOUGHT.

04:02PM 25            MR. DOWNEY:  WELL, WITH MS. HOLMES I ONLY HAVE ABOUT

04:02PM 1    HALF AN HOUR, I WOULD SAY, AND I DON'T KNOW HOW LONG MR. LEACH

04:02PM 2    PLANS TO TAKE.

04:02PM 3                 THE COURT:  OKAY.

04:02PM 4                 MR. DOWNEY:  I IMAGINE NOT LONG ON HIS RECROSS.

04:02PM 5                 THE COURT:  THANK YOU.

04:02PM 6                 MR. LEACH:  LIMITED, YOUR HONOR.

04:02PM 7                 THE COURT:  OKAY.  AND THEN YOU MIGHT HAVE ANOTHER

04:02PM 8    WITNESS TO CALL?

04:02PM 9                 MR. DOWNEY:  WE'LL SEE WHERE WE ARE AT THE END OF

04:02PM 10   THE DEFENDANT'S TESTIMONY, BUT I WANT TO LOOK AT THE TRANSCRIPT

04:02PM 11   TONIGHT AND SEE WHERE WE ARE AS TO OTHER WITNESSES.

04:02PM 12                THE COURT:  OKAY.  OKAY.

04:02PM 13                MR. DOWNEY:  SO I MIGHT HAVE AN UPDATE ON THAT AS

04:02PM 14   SOON AS WHEN MS. HOLMES FINISHES.

04:02PM 15                THE COURT:  OKAY.  AND THEN WE STILL HAVE SOME

04:02PM 16   CONVERSATION REGARDING INSTRUCTIONS.  WE STILL NEED TO DO THAT.

04:02PM 17                MR. DOWNEY:  YES.

04:02PM 18                THE COURT:  LET'S NOT SCHEDULE SOMETHING NOW.  I

04:02PM 19   JUST WANT TO PUT IT ON YOUR RADAR.  WE NEED TO BE LOOKING AT A

04:02PM 20   SCHEDULE WHEN WE CAN COMPLETE OUR DISCUSSIONS.

04:02PM 21       MY SENSE IS THAT YOU'VE BEEN SUCCESSFULLY MEETING AND

04:02PM 22   CONFERRING REGARDING OUR LAST CONVERSATION ON FRIDAY.

04:02PM 23                MR. LEACH:  I THINK THAT'S GENERALLY FAIR,

04:02PM 24   YOUR HONOR.

04:02PM 25                MR. DOWNEY:  I THINK WE FEEL THAT WAY BECAUSE WE'RE

04:03PM  1    NOT DIRECTLY PARTICIPATING IN IT, BUT WE FEEL IT'S GOING VERY

04:03PM  2    WELL, YES.

04:03PM  3         (LAUGHTER.)

04:03PM  4         MR. LEACH:  SHARING WITH MY COLLEAGUES, YOUR HONOR,

04:03PM  5    WE SENT A FORMAT OF A DRAFT ON FRIDAY AFTER OUR HEARING.  WE

04:03PM  6    RECEIVED SOME RESPONSES ON SUNDAY, WHICH WE'RE STILL REVIEWING.

04:03PM  7         THE COURT:  SURE.

04:03PM  8         MR. LEACH:  AND A FEW OTHER FILINGS WITHIN THE LAST

04:03PM  9    COUPLE OF DAYS WHICH HAVE CAUGHT OUR ATTENTION, TOO.

04:03PM  10   BUT WE ARE -- I WOULD -- I'M NOT SURE IF I WOULD USE THE

04:03PM  11   WORD "PRODUCTIVE," BUT WE'RE EXCHANGING DRAFTS AND WE'LL HAVE

04:03PM  12   SOMETHING TO PRESENT TO THE COURT IN THE NEAR FUTURE.

04:03PM  13        THE COURT:  THANK YOU.  I'M ASKING TO KEEP US GOING.

04:03PM  14   I KNOW SCHEDULES ARE IMPORTANT THIS TIME OF YEAR.

04:03PM  15   I KNOW WE'RE UNAVAILABLE NEXT TUESDAY AND WEDNESDAY.

04:03PM  16   SO, OKAY, ANYTHING FURTHER BEFORE WE BREAK?

04:03PM  17        MR. DOWNEY:  YOUR HONOR, JUST ONE ISSUE I MIGHT TALK

04:03PM  18   TO YOU AND MR. SCHENK ABOUT THAT RELATES TO SCHEDULING.

04:03PM  19        THE COURT:  A SCHEDULING ISSUE?  SURE, OKAY.

04:04PM  20   OKAY.  THANK YOU.  WE'LL SEE YOU TOMORROW.

04:04PM  21        THE CLERK:  COURT IS ADJOURNED.

04:04PM  22        (COURT ADJOURNED AT 4:04 P.M.)

         23

         24

         25

1

2

3                    CERTIFICATE OF REPORTERS

4

5

6

7        WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11        THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16       _____
         IRENE RODRIGUEZ, CSR, CRR
17       CERTIFICATE NUMBER 8076

18       _____

19       LEE-ANNE SHORTRIDGE, CSR, CRR
         CERTIFICATE NUMBER 9595
20

21       DATED:  DECEMBER 7, 2021

22

23

24

25