1   JOHN D. CLINE (CA State Bar No. 237759)
    600 Stewart Street, Suite 400
2   Seattle, WA 98101
    Telephone: (360) 320-6435
3   Email: cline@johndclinelaw.com

4
    KEVIN M. DOWNEY (Admitted Pro Hac Vice)
5   LANCE A. WADE (Admitted Pro Hac Vice)
    AMY MASON SAHARIA (Admitted Pro Hac Vice)
6   KATHERINE TREFZ (CA State Bar No. 262770)
    WILLIAMS & CONNOLLY LLP
7   680 Maine Avenue, S.W.
    Washington, DC 20024
8   Telephone: (202) 434-5000 │ Facsimile: (202) 434-5029
    Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com
9

10  Attorneys for Defendant ELIZABETH A. HOLMES

11

12

13                      UNITED STATES DISTRICT COURT

14                    NORTHERN DISTRICT OF CALIFORNIA

15                            SAN JOSE DIVISION

16

17  UNITED STATES OF AMERICA,          )  Case No. CR-18-00258-EJD
                                       )
18              Plaintiff,             )  **MS. HOLMES' REPLY IN SUPPORT OF**
                                       )  **MOTION FOR JUDGMENT OF ACQUITTAL**
19       v.                            )
                                       )
20  ELIZABETH HOLMES and               )
    RAMESH "SUNNY" BALWANI,            )  Hon. Edward J. Davila
21                                     )
                Defendants.            )
22                                     )
                                       )
23                                     )
                                       )
24                                     )
                                       )
25  _____)

26

27

28
    MS. HOLMES' REPLY IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL
    CR-18-00258 EJD

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

**Page**

BACKGROUND ..............................................................................................................1

    A.    Factual Background .................................................................................1

    B.    Procedural Background............................................................................3

LEGAL STANDARD....................................................................................................4

ARGUMENT .................................................................................................................5

I.     The Evidence Was Insufficient To Convict Ms. Holmes for Conspiracy To Defraud Investors (Count 1). ..................................................................................................5

II.    The Evidence Was Insufficient To Convict Ms. Holmes for Wire Fraud (Counts 6-8)................8

    A.    Theranos' Proprietary Analyzer (¶ 12(A)) ............................................8

    B.    Theranos' Financial Stability (¶ 12(B)) ...............................................10

    C.    Walgreens Partnership (¶ 12(D)) ..........................................................12

    D.    Department of Defense (¶ 12(E)).........................................................13

    E.    Use of Modified and Unmodified Devices (¶ 12(G)) ........................16

    F.    Validation by Third Parties (¶ 12(H)) .................................................18

III.    The Statute of Limitations Bars Counts 1, 6-8 .......................................................20

CONCLUSION.............................................................................................................20

# TABLE OF AUTHORITIES

## CASES

**Page**

*Bryan v. United States*, 524 U.S. 184 (1998)........................................................................5

*In re American Apparel, Inc. Shareholder Litigation*, 855 F. Supp. 2d 1043 (C.D. Cal. 2012)...............11

*In re Verifone Sec. Litig.*, 784 F. Supp. 1471 (N.D. Cal. 1992)......................................11

*Jackson v. Virginia*, 443 U.S. 307 (1979)...........................................................4

*Phillips v. United States*, 356 F.2d 297 (9th Cir. 1965)............................................13

*Stirone v. United States*, 361 U.S. 212 (1960)......................................................15

*United States v. Adamson*, 291 F.3d 606 (9th Cir. 2002)...........................................15, 19

*United States v. Chambers*, 408 F.3d 237 (5th Cir. 2005)............................................15

*United States v. Espinoza-Valdez*, 889 F.3d 654 (9th Cir. 2018) ....................................6

*United States v. Finn*, 375 F.3d 1033 (10th Cir. 2004)..............................................5

*United States v. Goyal*, 629 F.3d 912 (9th Cir. 2010) ..............................................7

*United States v. Kaplan*, 836 F.3d 1199 (9th Cir. 2016) ............................................5

*United States v. Katakis*, 800 F.3d 1017 (9th Cir. 2015) ...........................................4

*United States v. Moore*, 504 F.3d 1345 (11th Cir. 2007).............................................5

*United States v. Olgado*, 2022 WL 62538 (N.D. Cal. Jan. 6, 2022)....................................4

*United States v. Richardson*, 658 F.3d 333 (3d Cir. 2011)...........................................4

*United States v. Tsinhnahijinnie*, 112 F.3d 988 (9th Cir. 1997).....................................15

*United States v. Ward*, 747 F.3d 1184 (9th Cir. 2014) .............................................15

## STATUTES & RULES

18 U.S.C. § 1343.....................................................................................8

18 U.S.C. § 1349.....................................................................................5

18 U.S.C. § 3282.....................................................................................20

Fed. R. Crim. P. 29 ................................................................................4

MS. HOLMES' REPLY IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL
CR-18-00258 EJD

The evidence is insufficient to sustain the convictions on Counts 1, 6, 7 and 8.  Because no rational juror could have found the elements of wire fraud and conspiracy to commit wire fraud beyond a reasonable doubt on this record, the Court should grant Ms. Holmes' motion for judgment of acquittal.

## BACKGROUND

### A.    Factual Background

Ms. Holmes started Theranos in 2004 with the goal of changing healthcare by improving access and lowering costs.  Ms. Holmes surrounded herself with a team of accomplished scientists and advisors in pursuit of that goal.  They performed a tremendous amount of work in the early years. Gangakhedkar, 9/21/21 Tr. 1263:5-17.  The company developed relationships with pharmaceutical companies, partnering with national companies with respect to Theranos technology, including, among others, AstraZeneca, Bristol-Meyers Squib, Celgene, GlaxoSmithKline, Merck, Novartis, Pfizer, and Schering-Plough.  TX7742; *see infra* p. 19.  Theranos employees reported to Ms. Holmes that Theranos' work with pharmaceutical companies yielded "[g]reat" and "very promising" results.  *Id.*  Theranos' contracts with these companies generated millions of dollars in revenue.  TX7753, attach. 2.

Between 2004 and 2016, Theranos developed proprietary small-sample assays and devices.  The 3-series device, known as the Edison device, was developed in the company's early years and received positive feedback.  TX15022 at 14 (June 2008 performance summary: "performance design goals have been demonstrated" and "[r]esults have been excellent").  Theranos validated small-sample chemistries on this device, deployed them in public clinical studies, and used them in the CLIA lab.  TX7694; TX15002.  In early 2010, Theranos moved its focus to its 4.0 system, also known as the miniLab, and had a breakthrough in that technology.  The Theranos R&D team informed Ms. Holmes that year that, as a result of the company's inventions for new methodologies, the "System 4.0 will be capable of performing any measurement required in a distributed test setting."  TX7098 at 2-3.  In October 2010, Theranos scientist Dr. Ian Gibbons explained that the 4.0 had "demonstrated capabilities fully equivalent to lab methods in areas where we have done assay development."  TX15004.  Dr. Gibbons further explained that Theranos' "immunoassay[s] match the best that can be done in clinical labs and work with small blood samples."  *Id.*  Theranos went on to validate hundreds of proprietary small-sample

MS. HOLMES' REPLY IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL
CR-18-00258 EJD

assays in R&D.  Gangakhedkar, 9/21/21 Tr. 1262:17-1263:4; Edlin, 10/20/21 Tr. 4266:11-13.  Theranos documented the validation of more than 300 of these proprietary assays.  *Id.*; *see, e.g*., TX9002-9003.

Ms. Holmes proactively worked with FDA to obtain approval of the 4-Series device.  TX1095; TX15030; TX15029; TX7751; TX15028; TX7380.  In doing so, she provided broad disclosures to FDA concerning the technology as well as Theranos' business model.  TX7751.  Ms. Holmes disclosed the tests Theranos ran and the methods used, the Phase-1 and Phase-2 models, and the use of modified devices in Theranos' CLIA laboratory.  *Id.*; TX15029.  Theranos submitted 4-series data for each assay method in 2013 and sought FDA approval for the 4-series system in 2014.  TX7380 at 15; TX15030 at 14; TX15028 at 13; TX13288A at 1, 34, 52.  These efforts culminated with FDA approval for Theranos' 4-series system for the HSV-1 assay in 2015.  TX13988.

Theranos also formed retail partnerships to achieve its healthcare access and cost savings goals.  Its partnership with Walgreens began in 2010.  Ms. Holmes discussed the technology with Wade Miquelon, Walgreens' CFO, and he testified that he knew Theranos had developed small-sample tests for only immunoassays as of 2010 (and hence not for the three other categories of assays).  10/12/21 Tr. 3172:7-10.  Walgreens understood that Theranos could not yet conduct all assays on a device and that it was continually developing new generations of its device.  *Id.* at 3172:7-10, 3457:2-10.  Theranos received positive feedback from Walgreens' customers, including an August 2014 survey showing that 99% of respondents were likely to return and rated the experience as 4.85 of 5 stars.  TX1884 at 5, 8.

As for Safeway, the record shows that Safeway "spent hundreds of hours on its own due diligence." TX7190.  Steve Burd, Safeway's CEO, was aware of the Phase 1 and Phase 2 model as well as Theranos' use of traditional testing methods in its "dinosaur lab." TX7250 at 1.

Throughout Theranos' lifespan, Ms. Holmes' team provided positive updates and feedback about the technology.  For example, Dr. Young, the head of R&D (whom the government elected not to call), explained to her that Theranos' proprietary tests covered 1000 CPT codes.  TX7230 at 1.  He also explained that the Theranos launch list would include 200 tests, which comprised more than 97% of test orders for blood and urine tests.  TX7314 at 1.  Ms. Holmes also learned that by August 2013 Theranos systems had achieved a CV% under 10 for Vitamin D.  TX10532 at 1, 2.  And, as stated above, she

1  knew of "completed successes" with several national and multinational pharmaceutical companies.

2  TX7742.  These are all sources for the information Ms. Holmes relayed to investors and the public.

3  Theranos disclosed that it used traditional venous testing methods in its lab.  Ms. Holmes

4  disclosed the use of traditional venous testing and commercial analyzers to FDA.  TX15029.  Theranos'

5  order form included an option for venous testing.  TX3741A.  The September and November 2013 press

6  releases disclosed traditional testing methods.  TX1113; TX4036.  Both Theranos' and Walgreens'

7  websites disclosed the use of venous testing.  TX14207; TX14208.  Several investor witnesses testified

8  that they were aware of its use as well.  Tolbert, 10/22/21 Tr. 4552:23-4553:34; Grossman, 11/16/21 Tr.

9  6531:19-20; Lucas, 11/4/21 Tr. 5535:3-9.

10  Theranos did not disclose all of its internal information publicly.  No company does.  Consistent

11  with company policy, TX15055, Theranos did not disclose its inventions regarding use of modified

12  third-party devices to keep those proprietary methods protected as trade secrets.  Theranos shared use of

13  modified devices with members of the Board and regulators, not members of the public.  TX4005 at 2-3.

14  In 2016, after CMS issued its report, systemic issues with Theranos' laboratory were brought to

15  Ms. Holmes' attention.  She hired a new laboratory director, Dr. Kingshuk Das, and hired other experts

16  and outsiders to review the lab.  Dr. Das testified that Ms. Holmes hired him and others to review and

17  improve the lab, and that Ms. Holmes was fully supportive of his efforts and gave him resources to

18  address lab issues.  11/10/21 Tr. 5932:19-20, 5933:18-20, 5944:4-6, 5997:1-3.  Dr. Das believed that Dr.

19  Rosendorff used improper Edison validation standards.  Das, 11/10/21, Tr. 5943:19-21, 5942:11-13.

20  Ms. Holmes learned that the results of those Edison tests, in Dr. Das' scientific opinion, were unreliable.

21  Theranos implemented numerous reforms, but after the Indictment in this case, Theranos shut down in

22  2018.  Ms. Holmes never sold her Theranos shares, Spivey, 9/14/21 Tr. 782:11-16, and remained

23  committed to the company and its mission until the very end.

24  **B.     Procedural Background**

25  The Third Superseding Indictment charged 12 offenses:  conspiracy to commit wire fraud against

26  investors (Count 1) and patients (Count 2), and wire fraud against investors (Counts 3-8) and patients

27  (Counts 9-12).  Dkt. 469.  Only 4 of the 12 offenses remain.  The government voluntarily dismissed

28  MS. HOLMES' REPLY IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL
CR-18-00258 EJD

Count 9.  Dkt. 1152 at 4.  The jury acquitted Ms. Holmes of the patient-related counts (Counts 2 and 10-12).  Dkt. 1235.  The jury was unable to reach a unanimous verdict on Counts 3-5, and the government has moved to dismiss those counts.[1]  Dkt. 1255.  The jury convicted Ms. Holmes of conspiracy to commit wire fraud against investors (Count 1) and three counts of wire fraud (Counts 6-8) corresponding to wires by investors in the C-2 round of fundraising in 2014.[2]  Dkt. 1235.  Count 6 related to a wire by investor PFM; Count 7 related to a wire by investor RDV; and Count 8 related to a wire by investor Daniel Mosley.

At the close of the government's case in chief, Ms. Holmes moved for judgment of acquittal under Rule 29 on every element of every count, and the Court reserved ruling on that motion.  11/19/21 Tr. 7104:17-7105:9.  At the close of all evidence, Ms. Holmes renewed her Rule 29 motion, and the Court again reserved decision.  12/8/21 Tr. 8646:13-16, 8646:22-8647:9.

## LEGAL STANDARD

"Rule 29 of the Federal Rules of Criminal Procedure requires the Court, on a defendant's motion, to 'enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction.'"  *United States v. Olgado*, 2022 WL 62538, at *2 (N.D. Cal. Jan. 6, 2022).  Under Rule 29, courts ask whether a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  Evidence is insufficient to support a verdict "where mere speculation, rather than reasonable inference, supports the government's case.  *United States v. Katakis*, 800 F.3d 1017, 1023 (9th Cir. 2015).

When, as here, the court reserves decision on a motion for judgment of acquittal, "it must decide the motion on the basis of the evidence at the time the ruling was reserved."  Fed. R. Crim. P. 29(b); *see, e.g.*, *United States v. Richardson*, 658 F.3d 333, 337 (3d Cir. 2011) ("Because [defendant] moved for judgment of acquittal at the close of the government's case-in-chief, and because the District Court reserved ruling on the motion, we must confine ourselves to the evidence that existed at the time the

---

[1] Ms. Holmes respectfully requests that the Court grant the government's pending motion to dismiss Counts 3-5.

[2] By contrast, the counts on which the jury was unable to reach a unanimous verdict corresponded to wires by investors in the C-1 round of fundraising in 2013.

MS. HOLMES' REPLY IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL
CR-18-00258 EJD

1   motion was made."); *see also United States v. Moore*, 504 F.3d 1345, 1347 (11th Cir. 2007) (similar);

2   *United States v. Finn*, 375 F.3d 1033, 1039 (10th Cir. 2004) (similar).

3                                          **ARGUMENT**

4   **I.    The Evidence Was Insufficient To Convict Ms. Holmes for Conspiracy To Defraud
         Investors (Count 1)**

5

6          No rational fact finder could find that the government proved conspiracy to commit wire fraud

7   beyond a reasonable doubt.  Count 1 alleges that, between 2010 and 2015, Ms. Holmes and Mr. Balwani

8   knowingly and intentionally conspired to commit wire fraud against Theranos investors, in violation of

9   18 U.S.C. § 1349.  Dkt. 469, ¶¶ 19-20.  Conspiracy under § 1349 contains two elements: (1) an

10  agreement between Ms. Holmes and Mr. Balwani to commit wire fraud as charged in the Indictment,

11  and (2) that Ms. Holmes became a member of the alleged conspiracy knowing of at least one of its

12  objects and intending to help accomplish it.[3]  *See* Dkt. 1206 at 17.  Ms. Holmes must have possessed the

13  "requisite intent to commit the substantive crime"—here, wire fraud.  *United States v. Kaplan*, 836 F.3d

14  1199, 1212 (9th Cir. 2016).

15         As the Court instructed the jury, "[o]ne becomes a member of a conspiracy by willfully

16  participating in the unlawful plan with the intent to advance or further some object or purpose of the

17  conspiracy."  Dkt. 1206 at 18.  "As a general matter, when used in the criminal context, a willful act is

18  one undertaken with a bad purpose.  In other words, in order to establish a willful violation of a statute,

19  the Government must prove that the defendant acted with knowledge that his conduct was unlawful."

20  *Bryan v. United States*, 524 U.S. 184, 191-92 (1998) (internal quotation marks and citations omitted).

21         The government's brief does not individually address the two elements of the conspiracy offense,

22  and ignores § 1349's willfulness requirement entirely.  *See* Dkt. 1395, Gov't Opp'n to R. 29 Mot.

23  ("Opp.") at 4-6.  The evidence cited by the government does not establish the elements of conspiracy to

24  commit wire fraud:  the government cites no evidence that (1) Ms. Holmes and Mr. Balwani agreed to

25  commit wire fraud or that (2) Ms. Holmes became a member of a conspiracy with Mr. Balwani by

26  participating in a plan to commit wire fraud *knowing that her conduct was unlawful*.

27         [3] By citing the Court's jury instructions, Ms. Holmes does not intend to waive her objections to
    those instructions.

28  MS. HOLMES' REPLY IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL
    CR-18-00258 EJD

1    The government's brief principally argues that internal communications relating to company

2 matters and co-management of the company show Ms. Holmes and Mr. Balwani "working together and

3 conspiring to effectuate a scheme to defraud investors." Opp. at 4; *see also id.* at 4-6 (summarizing such

4 communications). But the fact that Ms. Holmes and Mr. Balwani communicated frequently, on a wide

5 range of company matters, proves nothing about whether they engaged in a conspiracy. Nor does the

6 government's claim that Ms. Holmes and Mr. Balwani had "joint ownership of decisions at Theranos"

7 prove a criminal conspiracy.[4] *Id.* at 6. The law is clear that "[m]ere association and activity" do not

8 establish a conspiratorial agreement. *United States v. Espinoza-Valdez*, 889 F.3d 654, 657 (9th Cir.

9 2018); *see also* Dkt. 1206 at 18. Even "knowledge, approval of, or acquiescence in the object or

10 purpose of a conspiracy, without an intention and agreement to accomplish a specific illegal objective, is

11 not sufficient" to support a conspiracy conviction. *Espinoza-Valdez*, 889 F.3d at 657. Even if Ms.

12 Holmes committed wire fraud against an investor (she did not) and even if Mr. Balwani committed wire

13 fraud against an investor, that does not prove a conspiratorial agreement between them, nor does it prove

14 that Ms. Holmes willfully joined any agreement.

15    No rational juror could find beyond a reasonable doubt that Ms. Holmes and Mr. Balwani

16 conspired to defraud Theranos investors through the false representations alleged in the Indictment. *Id.*

17 Most of the cited communications have nothing to do with investors and thus do not support an

18 inference of a conspiracy to defraud investors. *See* Opp. at 4-5. The government points to Ms. Holmes

19 and Mr. Balwani's joint participation in some meetings with alleged investors, but that mundane fact

20 does not establish that they *agreed* to commit wire fraud against those investors. Of the text messages

21 that relate to communications with investors, most relate to the terms or size of contemplated

22 investments. *See, e.g.*, TX5387D at 28. Again, those say nothing about wire fraud. Of the hundreds of

23 text messages admitted at trial, the government cites only *one* that appears to relate to the content of

24 representations to an investor in the relevant time period. TX5387D at 32 ("Are there any materials in

25

26    [4] In fact, the defense case showed that Ms. Holmes and Mr. Balwani (who was twice Ms. Holmes' age when they met) were not equals, and that Ms. Holmes' failure to act in a manner consistent

27 with Mr. Balwani's views and instructions subjected her to abuse. *See* Holmes, 11/29/21 Tr. 7859:6-7875:25; TX7731; 7734; 7534; 7517; 5387F.

28 MS. HOLMES' REPLY IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL
CR-18-00258 EJD

1  the binders you think should be removed for Murdoch/newscorp").  But, again, that message, offered

2  through an authenticating witness unable to provide context, provides no inkling that Mr. Balwani and

3  Ms. Holmes were conspiring to defraud Mr. Murdoch.  *See* Offen, 9/22/21 Tr. 1507:17-19.[5]

4          The government argues that Ms. Holmes joined an alleged conspiracy with Mr. Balwani

5  "knowing that Theranos needed financial support in order to continue operating as a company."  *Id*. at 4.

6  But it does not explain the relevance of that assertion to the elements of conspiracy.  An alleged motive,

7  in and of itself, does not prove conspiracy.  *See United States v. Goyal*, 629 F.3d 912, 919 (9th Cir.

8  2010) (rejecting "desire to meet [] revenue targets," "a company's shared motives to look good," and "a

9  general financial incentive," without more, as basis for finding of fraudulent intent (cleaned up)).  And,

10  as discussed above, the "knowledge" element is knowledge of the unlawful object of the conspiracy and

11  knowledge that one's conduct is unlawful, *see supra* p. 5—not mere knowledge of a potential motive.

12          In any event, the record contradicts the government's motive theory.  The government elicited

13  testimony from Theranos Comptroller So Han Spivey that Theranos was short on cash in early 2009—

14  before the alleged conspiracy period.  9/8/21 Tr. 633:5-16.  But Ms. Spivey also testified that Theranos'

15  cash concerns were alleviated through a loan later in 2009—again, before the alleged conspiracy period.

16  *Id*. at 634:17-20.  Theranos' agreements with Walgreens and Safeway were not signed until July 30,

17  2010 and September 20, 2010 respectively, long after the loan that addressed Theranos' cash flow.  The

18  government has not shown that Theranos needed cash in 2010, or that Theranos pursued those

19  investments to address the company's cash flow in 2009.  Nor did the evidence show that Theranos

20  needed money in 2013.  Opp. at 14.  By fall 2013, Walgreens had proposed paying Theranos $75 million

21  in rolling installments over the course of the fall.  TX1083 at 3.  Ms. Spivey testified that there was less

22  concern for the cash position in 2013 than in 2009.[6]  9/14/21 Tr. 717:4-17; 773:14-776:4.  For the

23  foregoing reasons, the evidence does not support the jury's verdict on any element of Count 1.

24

25          [5] Other text messages related to sending documents lack necessary context.  One message reads:
"Am planning on including all we sent to dst, including the Pfizer report," but no evidence specifies
26  whether the intended recipient of this information was an investor in the relevant period.  TX5387D at
16; *see also id.* at 18 (text message regarding sending "financials to DFJ even though we've never sent
27  them as an existing investor").  As a general matter, the government declined to examine Ms. Holmes
about the meaning of many of the innocuous, context-less text messages it admitted into evidence.

28          [6] Evidence admitted in the defense case showed that between January 17, 2011 and January 12,
MS. HOLMES' REPLY IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL
CR-18-00258 EJD

7

1    **II.      The Evidence Was Insufficient To Convict Ms. Holmes for Wire Fraud (Counts 6-8)**

2         No fact finder could find beyond a reasonable doubt that Ms. Holmes committed wire fraud as

3    charged in Counts 6, 7, and 8.  Those counts allege that Ms. Holmes committed wire fraud against

4    Theranos investors, in violation of 18 U.S.C. § 1343.  To convict Ms. Holmes of wire fraud, the jury was

5    required to find four elements beyond a reasonable doubt:  (1) that Ms. Holmes knowingly participated

6    in, devised, or intended to devise a scheme or plan to defraud investors in Theranos, (2) that "the

7    statements made as part of the scheme were material," (3) that Ms. Holmes "acted with the intent to

8    defraud," and (4) that Ms. Holmes used or caused to be used "an interstate wire communication to carry

9    out or attempt to carry out an essential part of the scheme."  Dkt. 1206 at 24.

10        The government failed to prove these elements beyond a reasonable doubt.  The wire fraud

11   charges center on a subset of the alleged misrepresentations in paragraph 12 of the Indictment.  Notably,

12   however, the government's opposition brief rarely quotes the Indictment allegations.  Careful

13   consideration of the Indictment allegations shows that the government did not prove its allegations

14   and/or that its arguments constructively amend and prejudicially vary the Indictment.  Ms. Holmes will

15   address the evidence related to each alleged misrepresentation in turn.

16        The government attempts to defend only some of the paragraph 12 allegations in its brief:

17   paragraphs 12(A), (B), (D), (E), (G), and (H).  The government clearly abandoned at trial its FDA-

18   related allegation.  No evidence showed that "the FDA was requiring Theranos to apply for clearance or

19   approval for its analyzer and tests."  Dkt. 469, ¶ 12(F).  Similarly, the government apparently has

20   abandoned its allegation regarding use of Theranos' null protocol during demonstrations.  Dkt. 469, ¶

21   12(C).  The only government witness to testify about the null protocol explained the legitimate purpose

22   of the protocol, and testified that Theranos was "not trying to deceive anybody in [the] demonstration

23   process."  Edlin, 10/20/21 4175:21-4176:1.

24        **A.      Theranos' Proprietary Analyzer (¶ 12(A))**

25        The government argues that the evidence concerning statements about the capability of

26   Theranos' proprietary technology supports conviction on the wire fraud counts.  Opp. at 14-19.  In

27   ─────────────────────

28   2014, Theranos received over $215 million in payments from customers.  TX10685.

1    support, the government relies heavily Erika Cheung's testimony about issues she claims occurred in the

2    CLIA laboratory during her short time at Theranos. *Id*. at 14-16. That argument highlights the

3    fundamental mismatch in the government's case. Ms. Holmes' statements to investors during the

4    relevant time period concerned the Theranos 4-series system (or miniLab) and its capabilities—not the

5    Phase 1 CLIA lab operations. Investors with whom Theranos partnered were focused on the long-term

6    goals of the company and its ability to impact health care in the future. TX1348-6 (investor call

7    explaining long-term vision); *see also, e.g.*, Peterson, 10/26/21 Tr. 4764:24-4765:6. Evidence about the

8    capabilities of the 3-series device used in the CLIA laboratory, like Ms. Cheung's cited testimony, thus

9    does not bear on the truth or falsity of Ms. Holmes' statements to investors. Ms. Cheung's only

10   testimony concerning the miniLab—that it was a device "meant to be able to process all of the different

11   types of tests" and that it was in development when she was at Theranos—is entirely consistent with Ms.

12   Holmes' statements to investors. 9/14/21 Tr. 800:2-810:14; Gangakhedkar, 9/17/21 Tr. 1181:12-14.

13   Tellingly, the government never called any witness from the hundreds of employees in Theranos' R&D

14   laboratory in 2014 or 2015 to discuss the state of the miniLab at the time of Ms. Holmes'

15   communications with RDV, Mosley, or PFM. Before those investments, Theranos had submitted to

16   FDA pre-submissions for approval for assays in each assay category. TX7380, TX15028, TX15030.

17   Within weeks of the Mosley and RDV investments, Theranos submitted a pre-submission to the FDA

18   for its 4-Series device in connection with the HSV-1 assay. TX13288A. Theranos believed that its

19   device was ready for approval, and its 4-Series device was approved for use in connection with the

20   HSV-1 assay months later. TX13988.

21         Even if Ms. Cheung's testimony were relevant to the truth or falsity of Ms. Holmes' statements,

22   it does not prove Ms. Holmes' knowledge. The government principally relies on Ms. Cheung's

23   testimony about quality control (QC) issues she observed from October 2013 to April 2014. Opp. at 14-

24   15. But Ms. Cheung did not report those (or any other) issues to Ms. Holmes. 9/15/21 Tr. 973:8-11.

25   The evidence shows that any issues with respect to Theranos testing were resolved according to the lab

26   policy. Cheung, 9/17/21 Tr. at 1098:6-8. Dr. Rosendorff testified that patient samples were only run on

27

28

MS. HOLMES' REPLY IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL
CR-18-00258 EJD

1    devices that had passed QC, 9/29/21 Tr. 2173:3-13, and that if QC indicated a serious problem he would

2    have discontinued using the assay for patient testing, *id.* at 2180:15-25.

3        The other evidence the government cites is similarly insufficient.  The record rebuts the

4    government's insinuation that Ms. Holmes hid issues in the laboratory from government regulators

5    during an inspection by directing them on a path that did not include Theranos' proprietary devices.

6    Dr. Rosendorff testified inspectors "were shown whatever they wanted to see," 9/29/21 Tr. 2146:24-25,

7    and that the suggested path for the regulators included a path to the Normandy laboratory that contained

8    proprietary devices, *id*. at 2143:18-2144:6.  Similarly, the government points to the fact that Theranos

9    employed a practice of removing outlier results, but its own witness, Surekha Gangakhedkar, testified

10   that Theranos had in place an appropriate policy for excluding outliers.  Tr. 1271:14-73:8.  Dr.

11   Rosendorff testified that no tests were implemented until he signed off, that he never offered tests that he

12   thought were inaccurate and unreliable when he was serving as lab director, and that he never released a

13   lab result that he thought was inaccurate or unreliable.  9/28/21 Tr. 1990:3-15, 1991:6-10, 2009:14-15.

14   Critically, he testified that Ms. Holmes never told him to report an inaccurate result.  *Id.* at 1991:11-13.

15       **B.    Theranos' Financial Stability (¶ 12(B))**

16       The Indictment alleges that Ms. Holmes "represented to investors that Theranos was presently a

17   financially strong and stable company, including that Theranos would generate over $100 million in

18   revenues and break even in 2014, and that Theranos expected to generate approximately $1 billion in

19   revenues in 2015; when, in truth, [Ms. Holmes] knew that Theranos had and would generate only

20   modest revenues, roughly a few hundred thousand dollars or so, in 2014 and 2015."  Dkt. 469, ¶ 12(B).

21       The government first focuses on alleged statements in 2010 to Safeway about Theranos' cash

22   position in 2010 and projections for 2011.  Opp. at 21-22.  This evidence predates the Indictment

23   allegations by several years.  The government next points to alleged statements to PFM about Theranos'

24   pre-2014 revenue that likewise have nothing to do with the Indictment allegations.  *Id.*  The only

25   argument the government offers related to paragraph 12(B) concerns evidence of the 2014 financial

26   projections provided to investors.  *Id.*  This evidence is insufficient for the following reasons.

27

28

As an initial matter, the future projections were statements "couched in aspirational terms" and therefore are not actionable as misrepresentations. *See, e.g.*, *In re American Apparel, Inc. Shareholder Litigation*, 855 F. Supp. 2d 1043, 1072-73 (C.D. Cal. 2012) (securities fraud); *In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1481 (N.D. Cal. 1992) ("Professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives, who have a personal stake in the future success of the company."). Theranos' investors were aware that the projections were based on various assumptions, such as patients per store per day. Grossman, 11/17/221 Tr. 6677:1-10. Lisa Peterson (RDV) confirmed that the "projections were based on 900 stores" at a time when Theranos had 40 stores, and that Ms. Holmes had explained that the "primary risk" of meeting the projections was "the risk of being able to execute on that and grow at that rate." 10/26/21 Tr. 4761:18-4762:24; *see also* Mosley, 11/3/21 Tr. 5279:20-5280:3 (Walgreens relationship was a risk). The investors understood that Theranos' financial projections were aspirational, forward-looking projections that encompassed substantial risk and acknowledged the company's "limited financial and operating history," that the investments involved "substantial risks," and that "any projections . . . are necessarily speculative in nature, and it can be expected that some or all of the assumptions underlying the projections will not materialize or will vary significantly from actual results." *See* TX3530 at 11-12 §§ 4.4, 4.5; TX2107 at 62, §§ 4.4, 4.5; 4286 at 60, §§ 4.4, 4.5.

Separately, no rational juror could find that Ms. Holmes "*knew* that Theranos had and would generate only modest revenues, roughly a few hundred thousand dollars or so, in 2014 and 2015." The government continues to ignore the fact that Theranos received over $160 million in revenue in 2014 but recorded the money as deferred revenue. TX1853; *see also* Spivey, 9/14/21 Tr. 741:13-743:24; *id.* at 772:3-22; Peterson, 11/2/21 Tr. 5017:8-13 (acknowledging awareness of the $168 million in deferred revenue); Mosley, 11/3/21 Tr. 5275:13-5276:9 (explaining he understood Theranos had almost $169 million dollars in deferred revenue in 2014). Given this unrebutted fact, the government did not prove that Ms. Holmes "knew that Theranos had and would generate only modest revenues, roughly a few hundred thousand dollars or so, in 2014 and 2015." Dkt. 469, ¶ 12(B).

1    C.    **Walgreens Partnership (¶ 12(D))**

2         The Indictment alleges that Ms. Holmes "represented to investors that Theranos presently had an

3    expanding partnership with Walgreens, that is, Theranos would soon dramatically increase the number

4    of Wellness Centers within Walgreens stores; when, in truth, [Ms. Holmes] and [Mr. Balwani] knew, by

5    late 2014, that Theranos's retail Walgreens rollout had stalled because of several issues, including that

6    Walgreens's executives had concerns with Theranos's performance." Dkt. 469, ¶ 12(D).

7         As proof of the supposed falsity of Ms. Holmes' alleged statements, the government identifies

8    evidence that, by August 2014, "Walgreens decreased the goal for 2015 from opening 500 stores with

9    Theranos testing services available to only 200 such stores." Opp. at 20.  But an expansion from 40 to

10   200 stores (*i.e.*, a 400% increase) is a significant expansion—hardly the "stall[ing]" alleged in the

11   Indictment.  *See* Peterson, 10/26/21 Tr. 4762:11-12.  The government thus failed to prove its allegation.

12        In any event, the government cites no evidence that this modified "goal" was communicated to

13   Ms. Holmes or that she otherwise knew any statements were false.  The government points to Mr.

14   Balwani's November 11, 2014 "We can't scale with wag" text to Ms. Holmes, but that message does not

15   establish that Ms. Holmes knew that the partnership had stalled because of Walgreens' dissatisfaction.

16   In context, the message conveys Mr. Balwani's belief that Theranos should be focusing its efforts on

17   "swy" (Safeway) and "cvs"—not that Walgreens had stalled the relationship.  *See* TX5387D at 24.  The

18   government did not ask Walgreens witness Nimesh Jhaveri about this text message, or otherwise

19   establish that, by November 2014, a decision had been made not to open new locations.  To the contrary,

20   Theranos' 2013 agreement with Walgreens charted an expansion to 3,000 stores in 24 months.  *See*

21   TX1083 at 2.  In March 2014, Walgreens' internal "Program Charter" set a goal of 2,500 stores by

22   August 31, 2016.  *See* TX3755 at 2; Jhaveri, 10/14/21 Tr. 3652:8-14.  And Mr. Jhaveri testified that,

23   even after the 2015 projection was reduced, Walgreens still planned to expand to 200 stores.  10/14/21

24   Tr. 3607, 3648:25-3649:3.[7]

25

26        ───────────────
          [7] The evidence is even more lopsided considering Ms. Holmes' case.  In September 2014, Mr.
27   Jhaveri told Ms. Holmes that he knew that "we are making great progress in our partnership."  TX7471
     at 1.  And positive feedback from Walgreens customers also informed Ms. Holmes' understanding of the
28   relationship.  *E.g.*, TX1884.

1     The government attributes the supposed change in the 2015 expansion plans to "Theranos . . . not

2     meeting Walgreens' goal of having less than 10% of patients receive venous draws."  Opp. at 20.  But

3     the Program Charter did not identify venous draws as a performance metric or risk.  *See* TX3755 at 2,

4     21.  The government principally relies on Mr. Jhaveri's testimony for the proposition that the percentage

5     of venous draws was important.  But Mr. Jhaveri was not a decisionmaker, and the government did not

6     call Walgreens decisionmakers such as Alex Gourlay.  Jhaveri, 10/14/21 Tr. 3679:18-3680:10.  As Mr.

7     Jhaveri acknowledged, he worked principally with Mr. Balwani, *id*. at 3580:17-20, and the jury could

8     not impute Mr. Balwani's knowledge to Ms. Holmes.  *See Phillips v. United States*, 356 F.2d 297, 303

9     (9th Cir. 1965).  And even assuming the evidence showed that the percentage of venous draws was

10    responsible for a decline in the rate of expansion, that would not establish the relevant Indictment

11    allegation—that Ms. Holmes falsely told investors that "Theranos presently had an expanding

12    partnership with Walgreens."  Dkt. 469, ¶ 12(D).  For these reasons, the evidence does not support a

13    conviction under Counts 6, 7, and 8 under the allegations of ¶ 12(D) of the Indictment.

14          **D.     Department of Defense (¶ 12(E))**

15          The Indictment alleges that Ms. Holmes misrepresented Theranos' work with the Department of

16    Defense (DOD) in two ways: first, that Ms. Holmes "represented to investors that Theranos presently

17    had a profitable and revenue-generating business relationship with the United States Department of

18    Defense, . . . when, in truth, [Ms. Holmes] and [Mr. Balwani] knew that Theranos had limited revenue

19    from military contracts," and, second, that she made false representations "that Theranos's technology

20    had deployed to the battlefield … when, in truth, … its technology was not deployed in the battlefield."

21    Dkt. 469, ¶ 12(E).  In its brief, the government does not defend the former allegation and thus has

22    abandoned it,[8] and focuses only on the latter.

23          In its opposition, the government maintains that Ms. Holmes "lied to investors about use of the

24    Theranos analyzer by the Department of Defense on medevac, 'in the battlefield,' or to treat soldiers in

25    Afghanistan or Iraq."  Opp. at 10.  To establish falsity, the government posits that Ms. Holmes "knew

26

27          [8] At trial, the government did not feature this allegation in its opening or closing, and evidence
       showed that Theranos received payments from the American Burn Association for work in connection
28    with the Department of Defense.  *See* Spivey, 9/14/21 Tr. 751:15-22.

1   that Theranos' proprietary analyzer was never used by the Department of Defense to clinically treat

2   patients or for anything other than minimal studies with predetermined outcomes." *Id.*; *see also id.* at 7

3   ("to treat wounded soldiers").  But this argument impermissibly diverges from the terms of the

4   Indictment.  The Indictment does not allege that Ms. Holmes falsely represented that DOD used the

5   analyzer to "clinically treat patients."  Accordingly, her knowledge that it was not so used is irrelevant.

6       The government failed to prove that Theranos technology was not, in fact, "deployed in the

7   battlefield," as alleged in the Indictment.  Dkt. 469, ¶ 12(E).  Tellingly, the government declined to call

8   any witness from the DOD.  Daniel Edlin testified that "to [his] knowledge," Theranos technology was

9   not "used by the military clinically in the *treatment* of deployed soldiers," *id.* at 4053:15-19 (emphasis

10  added), or "[on] a battlefield or a war zone for clinical use," *id.* at 4053:20-22; *see also id.* at 4050:11-14

11  (similar).  But that testimony establishes (at most) an allegation not contained in the Indictment—that

12  Theranos technology was not deployed "for clinical use" or "treatment" of soldiers.

13      The record shows that, through the Africa Combatant Command (AFRICOM), Theranos

14  technology was "deployed" in 2012 to three foreign countries—Cameroon, Uganda, and South Sudan—

15  for the purpose of assessing its potential use in that region in support of United States military personnel.

16  TX13993 at 1 ("[t]his is what we usually use when we *deploy* for most equipment" (emphasis added));

17  *see also* TX10444 (discussing potential "fielding" of device in Africa); TX13986 (reporting results of

18  testing Theranos technology at extreme temperatures for AFRICOM protocol); TX10446 ("The machine

19  traveled well and functioned well. . . . I will be preparing a full report and have several pictures of the

20  machine being used in Cameroon, Uganda, and South Sudan. . . .  My goal will be to *deploy* 3-5

21  machines to Africa to use real time at locations . . . ." (emphasis added)).

22      The government never called a Department of Defense witness familiar with Theranos' work

23  with AFRICOM, and never established that U.S. military personnel in Cameroon, Uganda, and South

24  Sudan were not present on a "battlefield."  Ms. Holmes does not bear the burden to disprove the

25  government's case, but notes that parts of these countries were engaged in armed conflict at the relevant

26  time.  *See CIA World Factbook: Uganda* (discussing 20 years of fighting between Ugandan government

27  forces and the Lord's Resistance Army); *see also* 2012 Posture Statement: Statement of General Ham

28

1   Carter Before House Armed Services Committee (Mar. 1, 2012), *available at*

2   https://www.africom.mil/Story/8832/2012-posture-statement-statement-of-general-carter (discussing

3   Uganda and South Sudan).

4          The government's argument that Ms. Holmes' representations were false because Theranos

5   technology was not used "clinically" on U.S. military personnel constructively amends and prejudicially

6   varies the Indictment.  "A constructive amendment occurs 'when the charging terms of the indictment

7   are altered, either literally or in effect, by the prosecutor or a court after the grand jury has last passed

8   upon them.'"  *United States v. Ward*, 747 F.3d 1184, 1190 (9th Cir. 2014) (citation omitted).  In this

9   case, a constructive amendment occurred because "the crime charged [in the Indictment] was

10  substantially altered at trial, so that it was impossible to know whether the grand jury would have

11  indicted for the crime actually proved."  *United States v. Adamson*, 291 F.3d 606, 615 (9th Cir. 2002).

12  Under the Indictment, the government had to prove beyond a reasonable doubt that Theranos technology

13  was not deployed to the battlefield.  Dkt. 469, ¶ 12(D).  It did not, so acquittal is required.  *See United*

14  *States v. Chambers*, 408 F.3d 237, 247 (5th Cir. 2005) (reversing judgment and directing dismissal for

15  insufficiency of the evidence in case of constructive amendment).  Because the government's proof at

16  trial and arguments in its brief broaden the basis for a conviction to acts beyond those charged in the

17  Indictment, they constructively amend the Indictment and cannot support a conviction.  *See Stirone v.*

18  *United States*, 361 U.S. 212, 217 (1960).

19         At a minimum, the government's arguments constitute a prejudicial variance and likewise cannot

20  support a conviction.  "A variance involves a divergence between the allegations set forth in the

21  Indictment and the proof offered at trial."  *Ward*, 747 F.3d at 1189.  "The general rule that allegations

22  and proof must correspond is based upon the obvious requirements (1) that the accused shall be

23  definitely informed as to the charges against him, so that he may be enabled to present his defense and

24  not be taken by surprise by the evidence offered at the trial; and (2) that he may be protected against

25  another prosecution for the same offense."  *United States v. Tsinhnahijinnie*, 112 F.3d 988, 991 (9th Cir.

26  1997) (citation omitted).  Here, the Indictment put Ms. Holmes on notice that she would have to defend

27  allegations related to deployment to the battlefield—not clinical treatment of soldiers.

28  MS. HOLMES' REPLY IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL
    CR-18-00258 EJD

1    What is more, the sole recordings of Ms. Holmes' communications concerning Theranos' work

2    with the DOD reveal that Ms. Holmes spoke about the *potential* application of Theranos technology on

3    Medevac helicopters and in Afghanistan, and that Theranos was "doing a lot of work" toward this goal.

4    Tolbert, 10/22/21 Tr. 4504:1-11 (call recording).  In addition, Ms. Holmes informed investors that

5    Theranos was working "with Special Operations Command in the context of missions in remote areas."

6    *Id*. at 4504:12-22; *cf*. TX5478A2 (recorded interview with Roger Parloff).  These statements were

7    consistent with Theranos' CENTCOM Letter of Engagement, which discussed potential study of use in

8    Medevac helicopters and in Afghanistan.  TX10457 at 1, 8.  The record reflects an AFRICOM protocol

9    discussing the need for application in rural areas, potential use by the military in extreme environments,

10    and support of special operation forces.  TX12251 at 3, 5; *see also* Edlin, 10/19/21 Tr. 4015:9-16; Edlin,

11    10/20.21 4132:15-4133:2, 4134:14-19, 4138:6-4141:7-25.

12    For these reasons, the government did not prove Counts 6-8 under the allegations of ¶ 12(E) of

13    the Indictment, and the government's contrary argument in its brief constructively amends the

14    Indictment and/or prejudicially varies from the Indictment.

15    **E.    Use of Modified and Unmodified Devices (¶ 12(G))**

16    The Indictment alleges that Ms. Holmes "represented to investors that Theranos conducted its

17    patients' tests using Theranos-manufactured analyzers; when, in truth, [Ms. Holmes and Mr. Balwani]

18    knew that Theranos purchased and used for patient testing third party, commercially-available

19    analyzers."  Dkt. 469, ¶ 12(G).  The evidence did not prove this allegation.

20    To begin, Theranos made no secret of its use of third-party devices.  Theranos' test menu

21    included an option for venous testing.  TX3741A at 6; Cheung, 9/17/21 Tr. 1122:15-16.  The September

22    2013 press release announcing the Theranos-Walgreens partnership disclosed that samples are "either

23    taken from a tiny finger stick or *a micro-sample taken from traditional methods*."  TX1113 at 1

24    (emphasis added).  The November 2013 press release also disclosed the use of venous draws using

25    traditional methods.  TX4036 at 1.  Theranos disclosed venous testing on its website, TX14208 at 2,  as

26

27

28

MS. HOLMES' REPLY IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL
CR-18-00258 EJD

did Walgreens, TX14207 at 3.[9]  Dr. Adam Rosendorff disclosed validation reports for small samples on the Siemens ADVIA to regulators.  9/29/21 Tr. 2136:7-23.

Investors were aware that Theranos was using venous testing.  Brian Grossman (PFM) received a venous draw from Theranos, *see* 11/17/21 Tr. 6531:19-20, and his colleagues at PFM (Count 6) were similarly aware that Theranos was conducting venous testing, *see* TX4089 at 2 ("We also have to assume that there is a possibility that they will never be able to get certain tests approved by the FDA and they will remain blood draw tests (which they mentioned).").  Lisa Peterson (RDV) and Daniel Mosley admitted to reviewing Theranos' public website.  Peterson, 10/26/21 Tr. 4753:20-22; Mosley, 11/3/21 Tr. 5358:11-16.  Mr. Mosley observed a third-party device when he visited Theranos.  11/3/21 Tr. 5263:10-5264:13.  And Ms. Holmes told Safeway CEO Steve Burd about the "dinosaur lab"—a shorthand for the CLIA laboratory using third-party devices, TX7250 at 1; *see* Rosendorff, 9/24/21 Tr. 1720:16-19.  Ms. Holmes also disclosed venous testing to journalist Roger Parloff.  TX5473B2.

As for the use of modified commercial devices, investors understood that Theranos needed to take steps to secure its intellectual property, *see, e.g.*, Mosley, Tr. 11/3/21 5260:24-62:9; and the stock purchase agreements acknowledged that investors had not necessarily received all information about the company, *see, e.g.*, TX1505 at 7, § 4.5; TX2017 at 62; 4286 at 60, § 4.5; 4303 at 2.  Theranos employees told Brian Grossman that he would not be shown certain technology within the laboratory that was a trade secret or patent protected.  11/17/21 Tr. 6733:8-16.  And the evidence shows that Theranos' modifications of third-party devices were considered trade secrets within the company.[10]  *See* Rosendorff, 10/5/21 Tr. 2635:13-15, 2663:20-23; TX13893 at 1.[11]

The government asserts that Ms. Holmes "hid" the use of third-party devices from investors because she "knew Theranos' proprietary device could not do what she claimed externally to investors,"

---

[9] The defense also introduced an exhibit showing that Ms. Holmes instructed Jeffrey Blickman to update the website to reflect the use of venous draws.  TX7365 at 1.

[10] The evidence is even more lopsided considering the defense case.  Exhibits admitted in the defense case establish that the Board of Directors was informed of the use of third-party devices; that Ms. Holmes asked that the company develop a trade secrets policy; and that Ms. Holmes was informed that "the defining characteristic of a trade secret, in fact, is that it is never disclosed publicly."  *See* TX4005 at 2-3; TX10516 at 53; TX15054; TX15055.

[11] In her case, Ms. Holmes established that Theranos disclosed the use of commercial analyzers to FDA.  TX15029 at 1, 2.

MS. HOLMES' REPLY IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL
CR-18-00258 EJD

1   and dwells on testimony concerning the alleged shortcomings of the 3-series device.  Opp. at 13.  For

2   this argument, the government points to the testimony of Surekha Gangakhedkar and Dr. Adam

3   Rosendorff.  But Ms. Gangakhedkar left Theranos before tests were offered to patients on the 3-series

4   device, 9/17/21 Tr. 1224:25-1225:5, and Dr. Rosendorff, who signed validation reports for numerous

5   assays on the 3-series device and on modified third party devices, testified that he never offered tests

6   that he thought were inaccurate and unreliable, 9/28/21 Tr. 1990:12-15.  This argument again conflates

7   Ms. Holmes' statements to investors about the 4-series (miniLab) with the capabilities of the 3-series

8   Edison device.  As already discussed, when Ms. Holmes discussed Theranos technology with investors,

9   she was speaking about Theranos' small-sample assays and the miniLab, the next-generation device

10  with increased capabilities.  The evidence does not support a conviction under ¶ 12(G) of the Indictment.

11      **F.    Validation by Third Parties (¶ 12(H))**

12          The Indictment alleges that Ms. Holmes "represented to investors that Theranos's technology

13  had been examined, used, and validated by several national or multinational pharmaceutical companies

14  and research institutions; when, in truth, [Ms. Holmes and Mr. Balwani] knew that these pharmaceutical

15  companies and research institutions had not examined, used, or validated Theranos's technology."  Dkt.

16  469, ¶ 12(H).  At trial, the government failed to prove that this representation was false, or that Ms.

17  Holmes knew that it was false.

18          At trial, the government called witnesses from three pharmaceutical companies (Celgene, Pfizer,

19  Schering Plough) to testify about their work with Theranos.  Celgene had a small-sample assay

20  validation contract with Theranos and made the contractual milestone payment linked to completion of

21  the validation.  TX7753 at 52; TX7553 Attachment 2; Tr. 2367:1-2370:18.  Pfizer had a 2006 contract

22  with Theranos for $900,000 that included assay development and validation.  TX7753 at 114, 122-24.

23  Theranos developed and validated assays and deployed devices for a Pfizer clinical trial in 2007 and

24  2008, the contract was completed, and Pfizer never conveyed to Ms. Holmes any criticisms about the

25  technology.  *Id.*; Weber, 10/22/21 Tr. 4411:13-19, 4417:15-18, 4425:5-11; TX143, 174.  Schering

26  Plough had a contract with Theranos for validation of a multiplex assay panel, paid Theranos on this

27  contract, and conveyed no criticisms about the technology to Ms. Holmes.  Cullen, 11/2/21 Tr. 5030:16-

28  MS. HOLMES' REPLY IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL
    CR-18-00258 EJD

1    23; 5039:1-3; 5063:21-5064:1; TX188 at 2; TX7079 at 1.  The government called no witness from any

2    "research institution."  Dkt. 469, ¶ 12(H).

3         The government thus failed to prove the Indictment allegation, requiring acquittal.  Faced with

4    this evidence, the government attempts to amend or vary the Indictment allegations.  During trial, the

5    government did not focus on whether Theranos' technology was "examined, used, and validated" by

6    "several" research institutions or pharmaceutical companies; the technology clearly was.  The

7    government instead focused on a slide stating that the technology was "comprehensively validated" by

8    ten of the fifteen largest pharmaceutical companies.  *See, e.g.*, Sung, Tr. 2338:18-2339:7; Weber, Tr.

9    4399:8-10; Gov't Closing, 12/16/21 Tr. 8919:2-9.  The government asked each witness associated with

10   Count 6, 7, or 8 whether he or she believed that "Theranos has been comprehensively validated . . . by

11   10 of the 15 largest pharmaceutical companies."  Peterson, 10/26/21 Tr. 4666:21-4667:12; Mosley,

12   11/2/21 Tr. 5101:7-13; Grossman, 11/16/21 Tr. 6425:15-6426:13.  This line of questioning invited the

13   jury to convict Ms. Holmes if it found that the technology was not, in fact, "comprehensively validated"

14   by ten companies—regardless of whether the jury found that Ms. Holmes had falsely represented to

15   investors that pharmaceutical companies and research institutions had "examined, used, and validated"

16   Theranos' technology.  Dkt. 469, ¶ 12(H).  The government also alleges in its brief that Ms. Holmes

17   falsely represented that pharmaceutical companies had authored certain reports, *id.* at 9, but that

18   allegation appears nowhere in the Indictment.

19        The government's presentation at trial and arguments in its brief constructively amend the

20   Indictment.  *Adamson*, 291 F.3d at 615.  Under the Indictment, the government had to prove beyond a

21   reasonable doubt that Theranos technology was not examined, used, or validated by several

22   pharmaceutical companies and research institutions.  Dkt. 469, ¶ 12(H).  But the government now argues

23   that the jury convicted Ms. Holmes on the grounds that the technology was not "comprehensively

24   validated" (regardless of whether it was examined, used, and validated) by several pharmaceutical

25   companies and that those companies did not author certain reports.

26        At a minimum, the government's arguments constitute a prejudicial variance.  The Indictment

27   put Ms. Holmes on notice that she would have to defend allegations related to whether several

28
     MS. HOLMES' REPLY IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL
     CR-18-00258 EJD

                                          19

1  pharmaceutical companies used, examined, and validated Theranos technology, not whether ten of the

2  fifteen largest pharmaceutical companies comprehensively validated the technology or whether

3  companies authored various reports.  For the foregoing reasons, the evidence does not support Counts 6-

4  8 under paragraph 12(H) of the Indictment, and the government's arguments to the contrary

5  constructively amend and/or prejudicially vary the Indictment.

6  **III.    The Statute of Limitations Bars Counts 1, 6-8**

7         The five-year statute of limitations bars conviction under Counts 1, 6-8.  *See* 18 U.S.C. § 3282.

8  Because the Third Superseding Indictment filed on July 28, 2020 broadened and substantially amended

9  the charges (including the conspiracy alleged in Count 1), it does not toll the limitations period from the

10  initial Indictment.  *See* Dkt. 498 at 1-8; Dkt. 543 at 1-3.  And because Counts 6-8 of the TSI allege wires

11  that predate the filing of the TSI by more than 5 years, they are time-barred.[12]  In addition, because the

12  government did not prove that any alleged conspiracy to commit wire fraud existed beyond July 28,

13  2015—which was after all of the at-issue investments—Count 1 is similarly time-barred.

14                                        **CONCLUSION**

15       For the foregoing reasons, the Court should grant Ms. Holmes' motion for judgment of acquittal.

16

17  DATED: May 27, 2022

18                                              /s/ Amy Mason Saharia
                                                KEVIN DOWNEY
19                                              LANCE WADE
                                                AMY MASON SAHARIA
20                                              KATHERINE TREFZ
                                                Attorneys for Elizabeth Holmes
21

22

23

24

25

26

27       [12] Ms. Holmes recognizes that the Court has already rejected this argument, Dkt. 552 at 11-14,
     but reiterates and reincorporates it here in an abundance of caution.
28  MS. HOLMES' REPLY IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL
     CR-18-00258 EJD

1

## <u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that on May 27, 2022 a copy of this filing was delivered via ECF on all counsel

3

of record.

4

5

/s/ Amy Mason Saharia

6

AMY MASON SAHARIA

Attorney for Elizabeth Holmes

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MS. HOLMES' REPLY IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL
CR-18-00258 EJD