UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR-18-00258-EJD |
| | ) | |
| PLAINTIFF, | ) | SAN JOSE, CALIFORNIA |
| | ) | |
| VS. | ) | VOLUME 17 |
| | ) | |
| ELIZABETH A. HOLMES, | ) | OCTOBER 12, 2021 |
| | ) | |
| DEFENDANT. | ) | PAGES 3001 - 3278 |
| _____ | ) | **PAGES 3203 - 3278 SEALED** |

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE EDWARD J. DAVILA
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                       BY:  JOHN C. BOSTIC
                            JEFFREY B. SCHENK
                       150 ALMADEN BOULEVARD, SUITE 900
                       SAN JOSE, CALIFORNIA 95113

                       BY:  ROBERT S. LEACH
                            KELLY VOLKAR
                       1301 CLAY STREET, SUITE 340S
                       OAKLAND, CALIFORNIA 94612

     (APPEARANCES CONTINUED ON THE NEXT PAGE.)


OFFICIAL COURT REPORTERS:
                            IRENE L. RODRIGUEZ, CSR, RMR, CRR
                            CERTIFICATE NUMBER 8074
                            LEE-ANNE SHORTRIDGE, CSR, CRR
                            CERTIFICATE NUMBER 9595

          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
               TRANSCRIPT PRODUCED WITH COMPUTER

1     A P P E A R A N C E S: (CONT'D)

2

3     FOR DEFENDANT HOLMES:    WILLIAMS & CONNOLLY LLP
                               BY:  KEVIN M. DOWNEY
4                                   LANCE A. WADE
                                    KATHERINE TREFZ
5                                   RICHARD CLEARY
                                    PATRICK LOOBY
6                              725 TWELFTH STREET, N.W.
                               WASHINGTON, D.C. 20005
7
                               LAW OFFICE OF JOHN D. CLINE
8                              BY:  JOHN D. CLINE
                               ONE EMBARCADERO CENTER, SUITE 500
9                              SAN FRANCISCO, CALIFORNIA 94111

10
       ALSO PRESENT:           FEDERAL BUREAU OF INVESTIGATION
11                             BY:  ADELAIDA HERNANDEZ

12                             OFFICE OF THE U.S. ATTORNEY
                               BY:  LAKISHA HOLLIMAN, PARALEGAL
13                                  MADDI WACHS, PARALEGAL

14                             WILLIAMS & CONNOLLY
                               BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL
15
                               TBC
16                             BY:  BRIAN BENNETT, TECHNICIAN

17

18

19

20

21

22

23

24

25

INDEX OF PROCEEDINGS

GOVERNMENT'S:

**STEVEN BURD**
DIRECT EXAM BY MR. LEACH (RES.)            P. 3021
CROSS-EXAM BY MR. DOWNEY                   P. 3048
REDIRECT EXAM BY MR. LEACH                 P. 3145
RECROSS-EXAM BY MR. DOWNEY                 P. 3156

**WADE MIQUELON**
DIRECT EXAM BY
CROSS-EXAM BY
REDIRECT EXAM BY
RECROSS-EXAM BY

**NIMESH JHAVERI**
DIRECT EXAM BY
CROSS-EXAM BY
REDIRECT EXAM BY
RECROSS-EXAM BY

INDEX OF EXHIBITS

|  | IDENT. | EVIDENCE |
|---|---|---|
| GOVERNMENT'S: | | |
| 375 | | 3022 |
| 670, PAGES 1 & 2 | | 3029 |
| 684 | | 3032 |
| 693 | | 3035 |
| 699 | | 3036 |
| 701 | | 3037 |
| 715 | | 3039 |
| 770 | | 3042 |
| 813 | | 3044 |
| 820 | | 3046 |
| 281 | | 3058 |
| 332 | | 3083 |
| DEFENDANT'S: | | |
| 7190 | | 3073 |
| 7104 | | 3091 |
| 10537 | | 3119 |
| 7196 | | 3124 |
| 12283 | | 3128 |
| 10568 & 10569 | | 3136 |

| | |
|---|---|
| 1 | SAN JOSE, CALIFORNIA                    OCTOBER 12, 2021 |
| 08:20AM 2 | P R O C E E D I N G S |
| 08:35AM 3 | (COURT CONVENED AT 8:35 A.M.) |
| 08:35AM 4 | (JURY OUT AT 8:35 A.M.) |
| 08:35AM 5 | THE COURT:  LET'S GO ON THE RECORD IN THE HOLMES |
| 08:35AM 6 | MATTER.  LET ME JUST CAPTURE THE APPEARANCES OF THE PARTIES, |
| 08:36AM 7 | PLEASE, ONCE AGAIN. |
| 08:36AM 8 | WHO APPEARS FOR THE GOVERNMENT? |
| 08:36AM 9 | MR. LEACH:  GOOD MORNING, YOUR HONOR. |
| 08:36AM 10 | ROBERT LEACH, JEFF SCHENK, JOHN BOSTIC, AND KELLY VOLKAR |
| 08:36AM 11 | FOR THE UNITED STATES. |
| 08:36AM 12 | THE COURT:  THANK YOU.  GOOD MORNING. |
| 08:36AM 13 | AND FOR THE DEFENSE? |
| 08:36AM 14 | MR. DOWNEY:  GOOD MORNING, YOUR HONOR. |
| 08:36AM 15 | KEVIN DOWNEY, LANCE WADE, KATIE TREFZ, AND ANDREW LEMENS |
| 08:36AM 16 | FROM WILLIAMS & CONNOLLY FOR MS. HOLMES, AND OUR COCOUNSEL |
| 08:36AM 17 | JOHN CLINE IS PRESENT, AND SO IS MS. HOLMES. |
| 08:36AM 18 | THE COURT:  THANK YOU.  GOOD MORNING. |
| 08:36AM 19 | I WANTED TO TOUCH BASE ABOUT THIS WEEK'S PROCEEDINGS.  WE |
| 08:36AM 20 | HAVE ONE WITNESS ON THE STAND, AND IF I RECALL CORRECTLY ABOUT |
| 08:36AM 21 | THE TIME ESTIMATE, YOU HAVE ABOUT ANOTHER HOUR OR SO, |
| 08:36AM 22 | MR. LEACH? |
| 08:36AM 23 | MR. LEACH:  YES, THAT'S RIGHT. |
| 08:36AM 24 | THE COURT:  OKAY.  AND THEN YOUR CROSS? |
| 08:36AM 25 | MR. DOWNEY:  YOUR HONOR, I THOUGHT WE WOULD PROBABLY |

08:36AM  1    BE TO SORT OF MID TO LATE AFTERNOON, SO I ADVISED MR. LEACH TO

08:36AM  2    HAVE ANOTHER WITNESS AVAILABLE.

08:36AM  3         THE COURT:  GREAT.  OKAY.  THANK YOU.

08:36AM  4      AS FAR AS SCHEDULING, I WOULD LIKE TO GO UNTIL 3:00 TODAY

08:37AM  5    IF WE COULD.  I'LL ASK THE JURY THAT, AND PERHAPS AS WELL

08:37AM  6    TOMORROW, MAYBE 4:00 O'CLOCK TOMORROW IF WE CAN.

08:37AM  7      FRIDAY WE'LL HAVE TO END AT 1:00 O'CLOCK, 1:00 O'CLOCK ON

08:37AM  8    FRIDAY.  SO I'LL INFORM OUR JURY OF THAT SCHEDULE.

08:37AM  9      ALSO, YOU RECALL THERE WAS AN ANCILLARY MOTION REGARDING

08:37AM  10   THE QUESTIONNAIRES THAT WE HAD TALKED ABOUT, AND I INDICATED

08:37AM  11   THAT I WOULD LIKE TO MEET WITH THE JURORS AND TALK WITH THEM IN

08:37AM  12   MY CHAMBERS.

08:37AM  13      YOU HAVE HAD THE WEEKEND TO THINK ABOUT THAT PROCESS.

08:37AM  14      LET ME ASK, MR. DOWNEY, WHAT IS YOUR POSITION ABOUT

08:37AM  15   WHETHER OR NOT YOU OR A MEMBER OF YOUR TEAM WOULD LIKE TO JOIN

08:37AM  16   IN NOT THE CONVERSATION, BUT JUST TO BE PRESENT?

08:37AM  17         MR. DOWNEY:  YOUR HONOR, AS I'VE SAID LAST WEEK, I

08:37AM  18   THINK WE WOULD LIKE TO BE PRESENT.  OUR VIEW IS THAT UNDER

08:38AM  19   RULE 43 AND INDEED UNDER THE DUE PROCESS CLAUSE, IT'S AN

08:38AM  20   ELEMENT OF TRIAL FOR WHICH DEFENSE COUNSEL SHOULD BE PRESENT.

08:38AM  21         THE COURT:  OKAY.

08:38AM  22         MR. SCHENK:  GOOD MORNING, YOUR HONOR.

08:38AM  23      I'VE LOOKED AT CASES BETWEEN OUR LAST CONVERSATION AND

08:38AM  24   THIS MORNING AND I WOULD BE HAPPY TO SEND THEM TO THE COURT OR

08:38AM  25   PROVIDE THEM TO THE DEFENSE.

08:38AM  1          MY UNDERSTANDING IS THAT THERE'S NOT A TON OF CASE LAW ON

08:38AM  2     THIS ISSUE.  THERE IS NO CONSTITUTIONAL RIGHT.  I THINK THE

08:38AM  3     CASE LAW IS PRETTY CLEAR ON THAT.

08:38AM  4          UNDER THE RULES OF PROCEDURE, THOUGH, I THINK THE QUESTION

08:38AM  5     IS A LITTLE BIT LESS CLEAR.

08:38AM  6          I THINK THAT WHEN THE JURY HAS NOT YET BEEN IMPANELED, THE

08:38AM  7     CASE LAW INSTRUCTS US THAT MS. HOLMES HAS A RIGHT TO BE

08:38AM  8     PRESENT.

08:38AM  9          I DON'T, THOUGH, THINK THAT THAT RIGHT IS THE SAME ONCE

08:38AM 10     THE JURY HAS BEEN SEATED, AND TO ENTERTAIN A MOTION OR A MATTER

08:39AM 11     LIKE THIS ONE, WHICH IS ANCILLARY TO THE SPECIFIC TRIAL

08:39AM 12     PROCEEDING.  IN FACT, THE COURT COULD CERTAINLY HAVE THIS

08:39AM 13     DIALOGUE AT THE END OF THE TRIAL WITH THE JURORS TO ASK THEM

08:39AM 14     HOW THEY FEEL ABOUT THE RELEASE OF CERTAIN INFORMATION IN THEIR

08:39AM 15     QUESTIONNAIRES, AND I DON'T THINK ANYBODY WOULD BE ARGUING TO

08:39AM 16     THE COURT THAT THE DEFENDANT HAS A RIGHT TO BE PRESENT AT THAT

08:39AM 17     STAGE.

08:39AM 18          AND I'M NOT SURE THAT THE ANALYSIS CHANGES ALL THAT MUCH,

08:39AM 19     BECAUSE THE CONVERSATION IS THE SAME.  THE COURT'S CONVERSATION

08:39AM 20     WITH THESE JURORS WOULD BE IDENTICAL IF IT HAD IT TODAY OR IF

08:39AM 21     IT HAD IT POST-TRIAL, AND I THINK IT WOULD BE FINE FOR THE

08:39AM 22     COURT TO HAVE THAT CONVERSATION WITH JURORS WITHOUT THE

08:39AM 23     PRESENCE OF THE DEFENDANT, THOUGH I WANT TO ANNOUNCE FOR THE

08:39AM 24     COURT, I THINK THE CASE LAW IS A LITTLE BIT UNCLEAR OR MAYBE

08:39AM 25     LESS THAN COMPLETELY DECIDED IN THE CIRCUIT.  AND, AGAIN, I'LL

08:39AM 1    BE HAPPY TO PROVIDE THE CASES THAT I'VE LOOKED AT TO COME TO

08:39AM 2    THAT CONCLUSION.

08:39AM 3         THE COURT:  WELL, THANK YOU.  THAT WAS MY INITIAL

08:40AM 4    ANALYSIS AS WELL, AND THAT'S WHAT I WAS TALKING ABOUT LAST

08:40AM 5    WEEK, MR. DOWNEY.

08:40AM 6         I KNOW YOU TALK ABOUT DUE PROCESS, AND I'M NOT CERTAIN

08:40AM 7    I'VE SEEN IT, AND MAYBE YOU CAN EDUCATE ME IN A WAY.  THE TRIAL

08:40AM 8    HAS BEGUN AND THE JURORS ARE HERE.  THIS IS TOUCHING ON NOT AN

08:40AM 9    EVIDENTIARY MATTER THAT THE JURY WOULD RECEIVE AND OTHERWISE

08:40AM 10   CONSIDER IN THEIR DELIBERATIONS, BUT IT'S MORE FUNCTIONALLY

08:40AM 11   WITH THE COURT AND PERSONAL TO THEM AS TO QUESTIONNAIRES AND

08:40AM 12   INFORMATION THAT MIGHT OR MIGHT NOT BE RELEASED PURSUANT TO THE

08:40AM 13   SECONDARY MOTION THAT IS NOT PART OF OUR TRIAL OTHER THAN IT'S

08:40AM 14   THE MEDIA COALITION, I THINK, DESIRE'S TO GAIN INFORMATION

08:40AM 15   ABOUT OUR JURY BASED ON THE ANSWER TO THE QUESTIONNAIRES.

08:40AM 16        SO, AGAIN, I, I AM NOT CERTAIN I SEE THE DUE PROCESS, IT

08:40AM 17   RISES TO A DUE PROCESS ISSUE.  I'M HAPPY TO RECEIVE SOMETHING

08:40AM 18   FROM YOU IF YOU WOULD LIKE TO PRESENT SOMETHING TO ME, ALTHOUGH

08:41AM 19   I THOUGHT WE SHOULD GET THE ISSUE RESOLVED SOMEHOW.

08:41AM 20        I EXPRESSED TO YOU LAST WEEK MY INITIAL RETICENCE ABOUT

08:41AM 21   HAVING COUNSEL PRESENT, AND IT'S NOT LIKE I DON'T WANT COUNSEL

08:41AM 22   PRESENT, I ENJOY COUNSEL, BUT FOR THIS PURPOSE I DIDN'T WANT TO

08:41AM 23   OTHERWISE OFFER ANY INTIMIDATION FOR OUR JURY IN THIS

08:41AM 24   QUESTIONNAIRE.

08:41AM 25        I'M TRYING TO THINK IF I HAD YOU OR A REPRESENTATIVE OF

08:41AM  1    YOUR TEAM, IT WOULD BE ONE FROM EACH TEAM BACK IN MY OFFICE.  I

08:41AM  2    SUPPOSE I CAN SEAT EACH OF YOU COMFORTABLY IN THE CORNER AND

08:41AM  3    HAVE THEIR BACKS TO YOU, AND I DON'T KNOW IF ANY OF YOU WOULD

08:41AM  4    OBJECT TO THAT.

08:41AM  5         AND I DON'T MEAN TO BE FLIP, I JUST DON'T WANT THE JURORS

08:41AM  6    TO BE OTHERWISE IN DISCOMFORT SUCH THAT THEIR RESPONSES TO MY

08:41AM  7    QUESTIONS WOULD BE LESS THAN CANDID AND THEY MIGHT OTHERWISE BE

08:41AM  8    INTIMIDATED FOR THE PURPOSE.

08:42AM  9         I ALSO DON'T WANT TO IN ANY WAY AFFECT THEIR JUDGMENT.

08:42AM 10         I SEE THEM AS TWO SEPARATE ISSUES.  THEY WILL SOON BE

08:42AM 11    DELIBERATING THIS CASE AND TO HAVE CONTACT WITH COUNSEL IN THE

08:42AM 12    INTIMACY OF THE JUDGE'S CHAMBERS WHILE THE CASE IS BEING TRIED

08:42AM 13    IS SOMETHING THAT CAUSES ME CONCERN AS WELL.

08:42AM 14         I KNOW YOU WON'T BE PARTICIPANTS OF THE CONVERSATION, THAT

08:42AM 15    IS, I'M NOT GOING TO PERMIT YOU TO SPEAK TO THE JURORS.  YOU'RE

08:42AM 16    THERE TO WITNESS.

08:42AM 17         BUT, AGAIN, I'M CONCERNED A LITTLE BIT ABOUT UNTOWARD

08:42AM 18    CONTACT WITH OUR JURORS IN THAT RESPECT ALSO.

08:42AM 19         THOSE ARE THE THINGS THAT I'M THINKING ABOUT FOR YOUR

08:42AM 20    BENEFIT.  I DON'T WANT THAT TO INFLUENCE THEIR DELIBERATIVE

08:42AM 21    PROCESS IN ANY WAY.

08:42AM 22         ANYTHING YOU WOULD LIKE TO SAY, MR. DOWNEY?

08:42AM 23              MR. DOWNEY:  NO, YOUR HONOR.  I THINK REALLY ONLY

08:42AM 24    TWO POINTS.

08:42AM 25         I THINK SOME OF THE CONCERNS THAT THE COURT HAS ARE THE

08:42AM   1      SAME CONCERNS THAT DEFENSE COUNSEL SHARES.

08:43AM   2          WE'RE CONCERNED ABOUT ADDRESSING THE JURORS ON THIS MATTER

08:43AM   3      PRIOR TO DELIBERATIONS AND, RESPECTFULLY, I THINK WE WOULD BE

08:43AM   4      CONCERNED ABOUT COUNSEL HAVING A COLLOQUY WITH THEM ON THIS

08:43AM   5      SUBJECT.

08:43AM   6          BUT WE'RE ALSO CONCERNED ABOUT THE COURT HAVING A DIALOGUE

08:43AM   7      WITH THEM, NOT BECAUSE THE COURT HAS ANY IMPROPER INTENT, BUT

08:43AM   8      JUST BECAUSE THAT TYPE OF A DIALOGUE, AS I SAID LAST WEEK, IS

08:43AM   9      UNPREDICTABLE AND CAN HAVE AN INFLUENCE ON THE DELIBERATIONS

08:43AM  10      LATER THAT NONE OF US CAN SEE.

08:43AM  11          SO I'M CONCERNED ABOUT THE PROCEDURE FOR THAT REASON,

08:43AM  12      WHICH IS ONE OF THE REASONS THAT ANIMATES OUR REQUEST TO BE

08:43AM  13      PRESENT.

08:43AM  14          SO I DON'T FUNDAMENTALLY DISAGREE ABOUT THE DYNAMIC AND

08:43AM  15      IT'S AWKWARDNESS, BUT IT'S JUST A QUESTION OF HOW WE CONDUCT IT

08:43AM  16      AND THE ABILITY TO PROTECT MS. HOLMES'S RIGHTS.

08:43AM  17          I THINK THE SECOND ISSUE ON WHICH I THINK WE HAD A

08:43AM  18      DISAGREEMENT LAST WEEK, AND I DISAGREE WITH MR. SCHENK FOR THE

08:44AM  19      SAME REASON, THE JURORS ARE ONLY HERE TO PARTICIPATE IN THIS

08:44AM  20      PROCEEDING.  THEY'RE NOT HERE IN AN ANCILLARY PROCEEDING.  THEY

08:44AM  21      WERE SUMMONED FOR THIS PROCEEDING.

08:44AM  22          THE MEDIA COALITION INTERVENED IN THIS PROCEEDING.  THIS

08:44AM  23      IS NOT A MATTER THAT IS ANCILLARY TO THE TRIAL.  THIS IS PART

08:44AM  24      OF THE TRIAL, AND I THINK HAVING A DIALOGUE WITH THEM ABOUT IT

08:44AM  25      PRIOR TO THE TIME THAT THEY DELIBERATE RUNS A LOT OF RISK.

08:44AM 1          THE COURT:  WELL, IT'S NOT PART OF THE TRIAL PROCESS

08:44AM 2     IN THE SENSE THAT IT'S EVIDENTIARY.  IT'S SEPARATE.  I SEE IT

08:44AM 3     AS A SEPARATE ISSUE.

08:44AM 4          IT RELATES TO THEM, THE JURORS PERSONALLY, AS TO THEIR

08:44AM 5     PERSONAL INFORMATION AND HOW MUCH, IF ANY, WILL BE RELEASED

08:44AM 6     PURSUANT TO THE MOTION OF THE MEDIA COALITION.

08:44AM 7          IT DOESN'T HAVE ANYTHING TO DO WITH THE EVIDENCE THAT IS

08:44AM 8     COMING IN IN THIS CASE OR ANYTHING ABOUT THEIR THOUGHT PROCESS

08:44AM 9     IN THAT REGARD.  IT RELATES TO THEM PERSONALLY AS I SAID WITH

08:44AM 10    THIS PERSONAL INFORMATION.

08:44AM 11         I SEE IT -- IT'S IN THE SAME TRIAL, BUT I DO THINK IT'S A

08:44AM 12    SEPARATE ISSUE IN AND OF ITSELF.

08:45AM 13         ALL RIGHT.  WELL, AND DO YOU HAVE A -- I DIDN'T ASK YOU TO

08:45AM 14    DO THIS, BUT LET ME ASK YOU, DO YOU HAVE THOUGHTS ABOUT --

08:45AM 15    YOU'RE CONCERNED ABOUT THE CONVERSATION THAT THE COURT HAS.

08:45AM 16         DO YOU WANT TO OFFER A SCRIPT?  DO YOU HAVE A SCRIPT TO

08:45AM 17    OFFER THE COURT FOR THIS PURPOSE?

08:45AM 18              MR. DOWNEY:  I DON'T.  I'M SURE YOUR HONOR HAS A

08:45AM 19    SCRIPT IN MIND.  I'D BE HAPPY TO RECEIVE IT FROM YOU AND TO

08:45AM 20    COMMENT AND, IF THERE'S ANY CONCERN ABOUT IT, TO LET THE COURT

08:45AM 21    KNOW THAT.

08:45AM 22              THE COURT:  WELL, I APPRECIATE THAT OFFER, BUT --

08:45AM 23              MR. DOWNEY:  I DON'T REALLY HAVE IN MIND PRECISELY

08:45AM 24    THE INFORMATION THAT THE COURT WOULD LIKE TO RECEIVE FROM THE

08:45AM 25    JURORS.

3012

08:45AM 1        I RECOGNIZE THE AWKWARDNESS OF THE SITUATION NOT ONLY

08:45AM 2   BECAUSE OF THE DYNAMICS, BUT ALSO BECAUSE WE CONSENTED TO A

08:45AM 3   STATEMENT IN THE QUESTIONNAIRE THAT IT WOULD BE CONFIDENTIAL.

08:45AM 4   HOW THEY TOOK THAT, FRANKLY, I DON'T KNOW.

08:45AM 5        AND SO I'M RELUCTANT TO PRESCRIBE FOR THE COURT EXACTLY

08:46AM 6   HOW YOU CONDUCT THAT CONVERSATION.

08:46AM 7             THE COURT:  WELL, THANK YOU.

08:46AM 8        I THINK THIS IS APPROPRIATE.  IT WAS THE COURT'S

08:46AM 9   PROMISE -- LET ME SAY, WE HAD A HEARING ON THIS, IT WAS A

08:46AM 10  PUBLIC HEARING, AND I INDICATED TO THE MEDIA COALITION'S

08:46AM 11  LAWYERS, IT WAS THE COURT'S PROMISE THAT THIS WOULD BE

08:46AM 12  CONFIDENTIAL, AND NOW THE MEDIA COALITION HAS BROUGHT TO MY

08:46AM 13  ATTENTION THAT, JUDGE, YOU SHOULDN'T HAVE -- MR. ZANSBERG SAID

08:46AM 14  YOU SHOULDN'T HAVE PROMISED THAT BECAUSE, YOU KNOW, THERE'S

08:46AM 15  CERTAIN CASE LAW THAT SUGGESTS YOU SHOULDN'T HAVE DONE THAT.

08:46AM 16       SO IF ANYTHING, IT'S THE COURT TO FALL ON ITS SWORD, IF

08:46AM 17  YOU WILL, TO SAY, LADIES AND GENTLEMEN, PERHAPS I MISSPOKE, BUT

08:46AM 18  LET'S HAVE A CONVERSATION ABOUT THAT.

08:46AM 19       SO IT'S ON THE COURT TO HAVE THAT CONVERSATION, AND I'M

08:46AM 20  NOT GOING TO ASK COUNSEL TO OTHERWISE OPINE OR SPEAK TO THAT.

08:46AM 21       ALL RIGHT.  THANK YOU FOR THAT.

08:46AM 22       LET ME MOVE TO ANOTHER ISSUE, AND THIS IS THE ISSUE

08:46AM 23  THAT -- THIS INVOLVES MR. LEACH.

08:46AM 24       THANK YOU, MR. SCHENK.

08:46AM 25             MR. SCHENK:  THANK YOU.

08:46AM 1          THE COURT:  THIS IS THE QUESTION ABOUT WHETHER OR

08:46AM 2     NOT THE JURY SHOULD HEAR ABOUT MONETARY SUMS EXPENDED FOR THE

08:47AM 3     DEVELOPMENT OF SAFEWAY STORES IN ANTICIPATION OF THERANOS

08:47AM 4     MACHINES COMING IN.

08:47AM 5          WE TALKED ABOUT THIS.  I THINK THE NUMBER WAS 300 MILLION,

08:47AM 6     OR SOMETHING LIKE THAT.

08:47AM 7          MR. DOWNEY, YOU OBJECTED TO, I THINK, THE NUMBER

08:47AM 8     SPECIFICALLY, AND TALKED ABOUT ITS RELEVANCE TO THE CASE.  THIS

08:47AM 9     ISN'T PERHAPS, I THINK YOU SUGGEST, NOT THE APPROPRIATE FORUM

08:47AM 10    TO RAISE THAT NUMBER AT THIS TIME.

08:47AM 11         ANY MORE THOUGHTS -- I THINK YOU ASKED TO DISCUSS THIS IF

08:47AM 12    I'M NOT MISTAKEN, BUT MR. LEACH?

08:47AM 13         MR. LEACH:  WE DID DISCUSS IT, YOUR HONOR.  I DO

08:47AM 14    ANTICIPATE THAT IT WILL COME UP SHORTLY WITH MR. BURD.  THE

08:47AM 15    GOVERNMENT'S POSITION IS THAT THIS IS HIGHLY RELEVANT EVIDENCE

08:47AM 16    AND NOT UNDULY PREJUDICIAL.  IT'S EMBEDDED IN A NUMBER OF

08:47AM 17    EMAILS THAT MR. BURD SENDS TO MS. HOLMES.  IT SPEAKS TO THE

08:47AM 18    MATERIALITY OF THE STATEMENTS THAT WERE MADE TO MR. BURD.

08:48AM 19         IT SPEAKS TO MS. HOLMES'S STATE OF MIND TO SHOW HER

08:48AM 20    KNOWLEDGE THAT SAFEWAY WAS RELYING ON THE REPRESENTATIONS SHE

08:48AM 21    WAS MAKING.

08:48AM 22         THE NUMBER IS BIG.  IT'S AT 1.3 -- OVER 350 MILLION, AND

08:48AM 23    ANOTHER .400 MILLION.  BUT THERE ARE A LOT OF BIG NUMBERS IN

08:48AM 24    THIS CASE, AND IF THE RESPONSE TO IT IS SAFEWAY DIDN'T HAVE TO

08:48AM 25    DO THAT, THAT WAS GRATUITOUS AND THEY'VE GOT ANOTHER USE FOR

```
08:48AM   1        IT, THAT'S CERTAINLY INFORMATION THAT COULD BE DEVELOPED IN

08:48AM   2   CROSS-EXAMINATION.

08:48AM   3        BUT I DON'T SEE -- THIS IS HIGHLY RELEVANT.  I DON'T THINK

08:48AM   4   IT'S EXCLUDABLE UNDER 403 IN THE BALANCING, AND IT GOES TO HER

08:48AM   5   STATE OF MIND.  SO WE WOULD INTEND TO ELICIT IT.

08:48AM   6             THE COURT:  OKAY.  THANK YOU.

08:48AM   7             MR. DOWNEY:  YOUR HONOR, TO REMIND THE COURT,

08:48AM   8   YOUR HONOR IS RIGHT, WE'RE CONCERNED ABOUT THE NUMBER.  IT'S

08:48AM   9   ALSO AN ISSUE THAT REQUIRES A GREAT DEAL OF ADDITIONAL

08:48AM  10   EVIDENCE, AS I MENTIONED ON FRIDAY.

08:48AM  11        WE HAVE TO SHOW -- FIRST OF ALL, THERANOS INVESTED AN

08:49AM  12   ENORMOUS AMOUNT OF MONEY IN CUSTOMIZING ITS DEVICES TO BE

08:49AM  13   PLACED IN THAT SPACE.  SAFEWAY DEVELOPED THOSE SPACES KNOWING

08:49AM  14   THAT THEY HAD ALTERNATIVE USES, AND THEY USED THEM

08:49AM  15   ALTERNATIVELY TODAY.

08:49AM  16        IT'S NOT RELEVANT TO THE ISSUE, THE CENTRAL ISSUE, WHICH

08:49AM  17   IS, IS THAT MONEY OF WHICH THEY WERE DEFRAUDED?  IT'S CLEARLY

08:49AM  18   NOT.  IT'S A SIDE ISSUE UNDER WHICH BOTH PARTIES UNDERTOOK

08:49AM  19   SUBSTANTIAL EXPENSES AND SAFEWAY WAS ULTIMATELY NOT HARMED,

08:49AM  20   SOMETHING THIS WITNESS CAN'T TESTIFY TO BECAUSE THIS WITNESS

08:49AM  21   WASN'T AT SAFEWAY WHEN ALTERNATIVE USE WAS MADE OF THIS SPACE.

08:49AM  22             THE COURT:  IS IT RELEVANT TO SHOW, IF YOU WILL,

08:49AM  23   SUBSEQUENT CONDUCT OF SAFEWAY?  AND PUT ASIDE THE NUMBER FOR A

08:49AM  24   MOMENT, BUT I SUPPOSE IT SPEAKS TO A MATERIALITY, PERHAPS NOT

08:49AM  25   AS TO THE WIRE FRAUD MATERIALITY, BUT IT SEEMS TO HAVE SOME
```

3015

08:50AM   1    RELEVANCE THAT SAFEWAY, THE FACT THAT THEY EXPENDED SOME

08:50AM   2    EFFORTS -- LET'S JUST CALL IT EFFORTS WITHOUT PUTTING A DOLLAR

08:50AM   3    SIGN ON IT -- THEY EXPENDED SOME EFFORTS AS A RESULT OF THE

08:50AM   4    CONTRACTUAL RELATIONSHIP THAT THEY HAD.

08:50AM   5         AND WITHOUT THAT, ISN'T IT MISLEADING TO THE JURY TO HEAR,

08:50AM   6    WELL, THEY INVESTED MONEY AND THEN THERE'S A WHOLE -- THERE'S A

08:50AM   7    VACUUM OF, WELL, OKAY, BUT WHAT DID THEY DO?  THEY DIDN'T DO

08:50AM   8    ANYTHING ABOUT IT, THEY JUST INVESTED THIS MONEY.

08:50AM   9         THAT DOESN'T TELL THE WHOLE STORY, IF YOU WILL, FOR A 403

08:50AM   10   ANALYSIS, NOT 404.  BUT THAT TYPE OF A STORY, I THINK, THE JURY

08:50AM   11   IS ENTITLED TO HEAR.

08:50AM   12        NOW, THE QUESTION IS, SHOULD THEY HEAR IT'S 380,

08:50AM   13   $400 MILLION?  AND, MR. LEACH, I TEND TO, I TEND TO AGREE THAT

08:50AM   14   UNDER A 403 ANALYSIS, THAT MIGHT BE MORE PREJUDICIAL THAN IT IS

08:50AM   15   PROBATIVE.  IT WOULD CAUSE THE JURY THEN TO THINK ABOUT --

08:51AM   16   THEY'LL FOCUS ON, JUST BECAUSE WE'RE HUMANS AND THAT'S WHAT WE

08:51AM   17   DO, THEY FOCUS ON THE BIGGER NUMBER.

08:51AM   18        THE 55 MILLION, WHICH IS THE INVESTMENT, AND WHICH IS THE

08:51AM   19   ALLEGATIONS OF THE FRAUD ITSELF I SUPPOSE, THAT'S THE NUMBER

08:51AM   20   SAFEWAY INVESTED, AT LEAST THAT'S WHAT WE HAVE HEARD SO FAR,

08:51AM   21   THAT WOULD BE DWARFED BY THE EXPENDITURE THAT THEY MADE ON ALL

08:51AM   22   OF THEIR STORES.

08:51AM   23        AND I HAVE SOME CONCERN THAT THE JURY, NOTWITHSTANDING THE

08:51AM   24   COURT'S INSTRUCTION OTHERWISE, THEY MIGHT FOCUS ON THAT IN SOME

08:51AM   25   UNTOWARD MANNER.

3016

08:51AM 1          I'M WONDERING IF WE CAN FILTER, SANITIZE THE LANGUAGE.  I

08:51AM 2     THINK LAST WEEK I USED SUBSTANTIAL.  YOU CAN THINK OF ANY OTHER

08:51AM 3     ADJECTIVE YOU WANT I SUPPOSE.

08:51AM 4          MR. LEACH:  THERE'S TWO EXHIBITS, YOUR HONOR, WHERE

08:51AM 5     THE DOLLAR AMOUNT IS MENTIONED.  ONE OF THEM I CAN REFRAIN FROM

08:51AM 6     OFFERING.

08:51AM 7          THE SECOND ONE, I THINK IT'S EXHIBIT 770 FOR DEFENSE

08:52AM 8     COUNSEL, THERE'S A REFERENCE TO SAFEWAY IN TWO AND ONE HALF

08:52AM 9     YEARS INVESTED 400 MILLION AND MORE THAN 50,000 MAN HOURS.  I

08:52AM 10    CAN REDACT THE NUMBER BOTH FOR THE DOLLAR AMOUNT EXPENDED AND

08:52AM 11    THE NUMBER OF HOURS IF THAT'S THE COURT'S RULING.

08:52AM 12         THE COURT:  WELL, THANK YOU.

08:52AM 13         AS I SAID, IT DOES HAVE SOME RELEVANCE.  IT DOES.

08:52AM 14         I THINK, MR. DOWNEY, IF THE JURY IS NOT INFORMED THAT

08:52AM 15    SAFEWAY DID SOMETHING ABOUT IT, I THINK THAT'S NOT THE FULL

08:52AM 16    STORY BECAUSE CLEARLY SAFEWAY DID.

08:52AM 17         THE QUESTION ABOUT THE AMOUNT OF FUNDS THAT THEY EXPENDED

08:52AM 18    AND THE TENSION THAT I HAVE BETWEEN THAT AND THE ACTUAL CHARGE

08:52AM 19    IS SOMETHING THAT I'M CONCERNED ABOUT.

08:52AM 20         MR. DOWNEY:  I THINK AT THE END OF THE DAY,

08:52AM 21    YOUR HONOR, I THINK PRESENTED WITH THESE EXHIBITS WITH THAT

08:52AM 22    REDACTION, THAT'S FINE WITH US.

08:52AM 23         I DON'T WANT TO BE PUT IN THE POSITION CORRESPONDINGLY

08:53AM 24    WHERE WE HAVE A TRIAL WHERE WE SHOW ALL OF THE COSTS THAT WERE

08:53AM 25    UNDERTAKEN ON THE THERANOS SIDE WHICH DEMONSTRATES THEIR BELIEF

08:53AM 1    AND GOOD FAITH AS TO THE IMMINENCE OF THE PROJECT, HOW ANY

08:53AM 2    PURPORTED LOSS OF THOSE MONIES HAS BEEN MITIGATED AND WAS KNOWN

08:53AM 3    TO BE CAPABLE OF MITIGATION AT THE TIME THIS WAS UNDERTAKEN.

08:53AM 4         IF THE FACT IN EVIDENCE IS THAT THEY BELIEVED THAT THEY

08:53AM 5    WERE GOING TO HAVE A PARTNERSHIP WITH THERANOS AND THAT THERE

08:53AM 6    WERE GOING TO BE PATIENT SERVICE CENTERS IN THEIR STORES

08:53AM 7    WITHOUT TRYING TO QUANTIFY OR IMPLYING MORE ABOUT IT, THAT'S

08:53AM 8    FINE WITH US, YOUR HONOR.

08:53AM 9              THE COURT:  WELL, AND I DO THINK IT'S FAIR FOR THE

08:53AM 10   GOVERNMENT TO BE ABLE TO PROBE SUBSTANTIAL CHANGES TO THE

08:53AM 11   STORES.  IT SOUNDS LIKE THAT'S WHAT THEY DID.

08:53AM 12        IF THAT'S WHAT THE EVIDENCE IS, I THINK THEY'RE ENTITLED

08:53AM 13   TO, HE'S -- IF THIS WITNESS HAS KNOWLEDGE, HE WOULD BE ENTITLED

08:53AM 14   TO TESTIFY ABOUT WHAT THEY WERE GOING TO DO WITH THE ROLLOUT,

08:54AM 15   ET CETERA, ET CETERA.

08:54AM 16        I THINK HE TOLD US THEIR GAME PLAN WAS TO ALLOW FOR A

08:54AM 17   CUSTOMER TO COME IN AND DO FULL STOP SERVICE ON THEIR HEALTH

08:54AM 18   NEEDS WHILE THEY'RE SHOPPING, AND I THINK HE CAN DEVELOP THAT.

08:54AM 19              MR. DOWNEY:  YOUR HONOR, THAT'S NOT -- I DON'T HAVE

08:54AM 20   A CONCERN THAT THE PLAN AT LEAST AS OF THE TIME THAT THE

08:54AM 21   CONTRACT WAS SIGNED IN 2010 AND THEREAFTER WAS TO HAVE PATIENT

08:54AM 22   SERVICE CENTERS, THAT THE POTENTIAL THAT THOSE PATIENT SERVICE

08:54AM 23   CENTERS HAD A NUMBER OF IMPLICATIONS, THAT'S NOT SOMETHING TO

08:54AM 24   WHICH I OBJECT.

08:54AM 25              THE COURT:  ALL RIGHT.  THANK YOU.

08:54AM 1    SO, MR. LEACH, JUST TO BE CLEAR, I'M GOING TO -- THE

08:54AM 2    NUMBER -- I'M NOT GOING TO ALLOW YOU TO GET THE NUMBER IN, THE

08:54AM 3    300, 400, THAT TYPE OF THING.

08:54AM 4        BUT I WILL ALLOW YOU TO EXAMINE THE WITNESS AS TO THE

08:54AM 5    TYPES OF CHANGES THEY MADE, ANTICIPATED THINGS THAT THEY DID,

08:54AM 6    IF IT'S SUBSTANTIAL, WHATEVER THEY HAD TO DO ACROSS I DON'T

08:54AM 7    KNOW HOW MANY STORES THEY DID IT, BUT THAT WOULD BE

08:55AM 8    APPROPRIATE.

08:55AM 9        AGAIN, WE HAVE TO BE CAREFUL ABOUT DOORS.  I JUST REMIND

08:55AM 10   EVERYBODY ABOUT THAT.  OKAY.

08:55AM 11       ANYTHING FURTHER?

08:55AM 12       MR. LEACH:  JUST TO BE CLEAR, YOUR HONOR, THE NUMBER

08:55AM 13   OF STORES THAT THEY MADE RENOVATIONS TO, I CAN EXPLORE THAT

08:55AM 14   NUMBER?

08:55AM 15       THE COURT:  YES.

08:55AM 16       MR. LEACH:  IT'S JUST NOT THE TOTAL DOLLAR AMOUNT?

08:55AM 17       THE COURT:  CORRECT.

08:55AM 18       MR. LEACH:  UNDERSTOOD.  THANK YOU.

08:55AM 19       THE COURT:  ANY COMMENT ABOUT THAT, MR. DOWNEY?

08:55AM 20       MR. DOWNEY:  NO, YOUR HONOR.

08:55AM 21       THE COURT:  OKAY.

08:55AM 22       MR. DOWNEY:  YOUR HONOR, JUST ONE QUESTION.

08:55AM 23       HOWEVER THE ISSUE IS RESOLVED AROUND THE COLLOQUY WITH THE

08:55AM 24   JURORS, JUST SO WE CAN HAVE A MEANINGFUL DIALOGUE BETWEEN US AS

08:55AM 25   TO WHEN THE GOVERNMENT NEEDS TO HAVE THEIR WITNESSES PRESENT,

3019

08:55AM 1    DID YOU HAVE A TIME SLOT IN MIND?

08:55AM 2         THE COURT:  THANK YOU.  WHAT I WAS HOPING TO DO IS

08:55AM 3    TO -- I'M NOT GOING TO TELL THEM ABOUT THIS THIS MORNING BEFORE

08:55AM 4    WE START EVIDENCE.  I JUST DON'T WANT THEM TO FOCUS ON THAT

08:55AM 5    WHILE THEY'RE HEARING THIS TESTIMONY.

08:55AM 6         I MAY TELL THEM JUST BEFORE THE BREAK THAT WHAT I INTEND

08:55AM 7    TO DO IS TALK TO THEM ABOUT THE MEDIA COALITION MOTION,

08:56AM 8    ET CETERA.  I INTEND TO PROVIDE THEM WITH THEIR QUESTIONNAIRES

08:56AM 9    AT THE BREAK SO THEY CAN LOOK THOSE OVER IF THEY WISH.

08:56AM 10        IF ANY JUROR WOULD LIKE TO SPEAK WITH ME TODAY, I'M HAPPY

08:56AM 11   TO RECEIVE THAT AND WE CAN DO THAT.  THEY'LL -- AND WE'LL END

08:56AM 12   TODAY AT 3:00 HOPEFULLY, AND THEN THEY CAN STAY AFTER IF

08:56AM 13   THEY'RE WILLING TO.

08:56AM 14        IF NOT, THEN I WILL TELL THEM IF SOME OF THEM WANT TO TAKE

08:56AM 15   THE QUESTIONNAIRE HOME WITH THEM, WE'LL PROVIDE THEM AN

08:56AM 16   ENVELOPE THAT THEY CAN TAKE IT IN, AND THEN TOMORROW WE CAN

08:56AM 17   DISCUSS IT EITHER AT A BREAK OR AT SOME TIME IN THE MORNING.

08:56AM 18        WE'LL SEE WHO CHOOSES TO DO THAT, AND THEN WE'LL

08:56AM 19   INCORPORATE THAT INTO OUR TIMEFRAME.

08:56AM 20        I'D LIKE TO DO IT AT THE END OF THE DAY IF I CAN, BUT --

08:56AM 21   AND I EXPECT, I ANTICIPATE THAT PROCESS IS GOING TO TAKE

08:56AM 22   PROBABLY 90 MINUTES I'M THINKING, IF EACH JUROR WANTS TO DO

08:56AM 23   THAT, QUERY WHETHER THEY'LL WANT TO STICK AROUND FOR THAT LONG

08:57AM 24   ALL AT ONE TIME.

08:57AM 25        SO WE'LL JUST DO THE BEST THAT WE CAN.

08:57AM   1            MR. DOWNEY:  AND IS IT THE COURT'S PREMISE THAT SOME

08:57AM   2   OF THEIR ADDRESSES AND SO FORTH FOR THE JURORS, WOULD SOME OF

08:57AM   3   THE INFORMATION BE REDACTED IN ANY EVENT?

08:57AM   4            THE COURT:  THEIR ADDRESSES ARE NOT --

08:57AM   5            MR. DOWNEY:  OKAY.

08:57AM   6            THE COURT:  -- IN THE QUESTIONNAIRE.  GEOGRAPHIC

08:57AM   7   LOCATION IS, BUT NOT ADDRESSES.

08:57AM   8            MR. DOWNEY:  OKAY.

08:57AM   9            THE COURT:  YES.  AND I DON'T THINK THE COALITION --

08:57AM  10   I THINK THE COALITION'S LAWYER INDICATED, I DON'T THINK HIS

08:57AM  11   COALITION OR ANY OF THE MEMBERS WERE SEEKING ADDRESSES.  SO,

08:57AM  12   YES.

08:57AM  13            MR. DOWNEY:  THANK YOU, YOUR HONOR.

08:57AM  14            MR. LEACH:  THANK YOU, YOUR HONOR.

08:57AM  15            THE COURT:  ALL RIGHT.  THANK YOU.

08:57AM  16            THE CLERK:  COURT IS IN RECESS.

08:57AM  17       (RECESS FROM 8:57 A.M. UNTIL 9:09 A.M.)

09:09AM  18       (JURY IN AT 9:09 A.M.)

09:09AM  19            THE COURT:  GOOD MORNING EVERYONE.  WE'RE BACK ON

09:09AM  20   THE RECORD WITH OUR JURY AND ALTERNATES ARE PRESENT,

09:09AM  21   RECONSTITUTED IN THE SEATING.  THANK YOU.  GOOD MORNING,

09:09AM  22   EVERYONE.

09:09AM  23       ALL COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT.

09:09AM  24       AND MR. BURD IS ON THE STAND AGAIN.

09:09AM  25       BEFORE WE RESUME EXAMINATION, LADIES AND GENTLEMEN, LET ME

09:09AM  1    ASK YOU MEMBERS OF THE JURY AND OUR ALTERNATES, DURING THE LONG

09:09AM  2    WEEKEND, WHICH I HOPE YOU ALL ENJOYED, DID ANY OF YOU HAVE

09:09AM  3    OCCASION OR CAUSE TO COME ACROSS ANY INFORMATION OR DISCUSS

09:09AM  4    WITH ANYONE ANYTHING ABOUT THIS CASE?  DID YOU READ, HEAR,

09:09AM  5    LISTEN OR SPEAK WITH ANYONE ABOUT ANYTHING THAT INVOLVES THIS

09:09AM  6    CASE?

09:09AM  7         IF SO, WOULD YOU PLEASE RAISE YOUR HAND?

09:09AM  8         I SEE NO HANDS.

09:10AM  9         THANK YOU.

09:10AM  10        LET'S SEE, DID YOU WANT TO CONTINUE WITH YOUR DIRECT

09:10AM  11   EXAMINATION?

09:10AM  12             MR. LEACH:  I DID, YOUR HONOR.  THANK YOU.

09:10AM  13             THE COURT:  PLEASE, LET'S PROCEED.

09:10AM  14        SIR, IF YOU COULD ONCE AGAIN STATE YOUR NAME FOR THE

09:10AM  15   RECORD.

09:10AM  16             THE WITNESS:  MY NAME IS STEVE BURD, SPELLED

09:10AM  17   B-U-R-D.

09:10AM  18             THE COURT:  THANK YOU, SIR.  AND I'LL REMIND YOU,

09:10AM  19   SIR, YOU ARE STILL UNDER OATH.

09:10AM  20        **(GOVERNMENT'S WITNESS, STEVEN BURD, WAS PREVIOUSLY SWORN.)**

09:10AM  21                  **DIRECT EXAMINATION (RESUMED)**

09:10AM  22   BY MR. LEACH:

09:10AM  23   Q.   GOOD MORNING, MR. BURD.

09:10AM  24   A.   GOOD MORNING.

09:10AM  25   Q.   WHEN WE BROKE LAST WEEK WE WERE ON EXHIBIT 718 FROM

09:10AM  1    DECEMBER OF 2012, AND DO YOU RECALL TESTIFYING ABOUT STATEMENTS

09:10AM  2    THAT MS. HOLMES MADE TO YOU ABOUT THERANOS'S RELATIONSHIP WITH

09:10AM  3    THE MILITARY?

09:10AM  4    A.   YES, I HAVE IT.

09:10AM  5    Q.   OKAY.  DO YOU RECALL TESTIFYING ABOUT STATEMENTS THAT

09:11AM  6    MS. HOLMES MADE TO YOU ABOUT THERANOS'S RELATIONSHIP WITH THE

09:11AM  7    MILITARY?

09:11AM  8    A.   YES, I DO.

09:11AM  9    Q.   AND THE DATE OF THIS EMAIL, EXHIBIT 718, IS IN OR AROUND

09:11AM  10   DECEMBER OF 2012; IS THAT CORRECT?

09:11AM  11   A.   CORRECT.

09:11AM  12   Q.   I'D LIKE TO MOVE A LITTLE BACKWARD IN TIME TO AUGUST OF

09:11AM  13   2012, AND IF I COULD PLEASE DRAW YOUR ATTENTION TO WHAT WE HAVE

09:11AM  14   MARKED AS EXHIBIT 375.

09:11AM  15   A.   I HAVE IT.

09:11AM  16   Q.   OKAY.  DOES THIS APPEAR TO BE AN EMAIL FROM

09:11AM  17   ELIZABETH HOLMES TO YOU ATTACHING A POWERPOINT IN ADVANCE OF A

09:11AM  18   SAFEWAY BOARD MEETING?

09:11AM  19   A.   YES.

09:11AM  20          MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 375.

09:11AM  21          MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

09:11AM  22          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:12AM  23       (GOVERNMENT'S EXHIBIT 375 WAS RECEIVED IN EVIDENCE.)

09:12AM  24          MR. LEACH:  MS. HOLLIMAN, IF WE CAN PLEASE ZOOM IN

09:12AM  25   ON THE TOP PORTION OF THE EMAIL.

09:12AM  1          THANK YOU.

09:12AM  2     Q.   MR. BURD, DID MS. HOLMES PRESENT TO THE SAFEWAY BOARD ON

09:12AM  3     OCCASION?

09:12AM  4     A.   YES, I CAN RECALL AT LEAST TWICE WHEN SHE DID THAT.

09:12AM  5     Q.   OKAY.  AND LET ME DRAW YOUR -- ON OCCASION, DID SHE

09:12AM  6     PRESENT POWERPOINTS TO THE SAFEWAY BOARD OF DIRECTORS?

09:12AM  7     A.   ON ONE OCCASION FOR SURE.

09:12AM  8     Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO PAGE 2 OF THIS

09:12AM  9     EXHIBIT.

09:12AM 10          DO YOU SEE THE DATE AUGUST OF 2012?

09:12AM 11     A.   I DO.

09:12AM 12     Q.   OKAY.  AT A HIGH LEVEL, WHAT WAS YOUR LEVEL OF

09:13AM 13     SATISFACTION WITH THE PACE OF THE ROLLOUT IN SAFEWAY STORES FOR

09:13AM 14     THERANOS'S DEVICES AT THIS POINT IN TIME?

09:13AM 15     A.   I WOULD SAY I WAS DISAPPOINTED BECAUSE WE MET -- THE

09:13AM 16     ORIGINAL DEADLINE FOR A PILOT WAS GOING TO BE IN THE FIRST

09:13AM 17     QUARTER.  THAT DIDN'T HAPPEN.

09:13AM 18          AT THIS POINT WE'RE INTO THE THIRD QUARTER.  SO, YOU KNOW,

09:13AM 19     THE DATES JUST KEPT BEING PUSHED BACK.

09:13AM 20     Q.   AND WAS THIS A SENTIMENT SHARED BY THE SAFEWAY BOARD?

09:13AM 21     A.   I WOULD SAY ANY TIME YOU MISS A DEADLINE THEY'RE

09:13AM 22     CONCERNED, RIGHT.

09:13AM 23          BUT IT WASN'T THE BIGGEST ISSUE ON THE TABLE.

09:13AM 24     Q.   THE BIGGEST ISSUE IN TERMS OF SAFEWAY OVERALL?

09:13AM 25     A.   CORRECT.

09:13AM   1    Q.   LET ME DRAW YOUR ATTENTION TO PAGE 3.

09:13AM   2         DO YOU SEE THE HEADINGS OR THE BULLET:  SAFEWAY READINESS;

09:14AM   3    THERANOS READINESS; PACE OF ROLLOUT; AND FINANCIAL

09:14AM   4    IMPLICATIONS?

09:14AM   5    A.   YES.

09:14AM   6    Q.   AND WAS THIS A DOCUMENT THAT YOU AND MS. HOLMES WORKED ON

09:14AM   7    TOGETHER?

09:14AM   8    A.   WHEN YOU SAY "WORKED TOGETHER" THIS IS, ON THE THERANOS

09:14AM   9    PIECE, WHICH IS THIS LARGELY ABOUT.  IF I HAD DONE SOME SLIDES,

09:14AM  10    I WOULD HAVE SHOWN THEM TO HER, AND IF SHE HAD DONE SOME

09:14AM  11    SLIDES, SHE WOULD HAVE SHOWN THEM TO ME.

09:14AM  12    Q.   OKAY.  SO YOU WERE SPEAKING TO SAFEWAY'S READINESS AND SHE

09:14AM  13    WAS SPEAKING TO THERANOS'S READINESS; IS THAT FAIR?

09:14AM  14    A.   I CAN'T TELL UNTIL I GET TO THE SLIDES, BUT THE

09:14AM  15    INFORMATION ON THERANOS READINESS CAME FROM ELIZABETH.

09:14AM  16    Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO PAGE 4.

09:14AM  17         DO YOU SEE WHERE IT SAYS PREPARING SAFEWAY FOR LAUNCH?

09:14AM  18    A.   YES.

09:14AM  19    Q.   AND THE BULLETS ARE:  COMPLETE ALL CONSTRUCTION; HIRE AND

09:15AM  20    TRAIN NEW EMPLOYEES; CREATE PR BUZZ TO FACILITATE ADOPTION; AND

09:15AM  21    FINALIZE LOGISTICS.

09:15AM  22         DO YOU SEE THAT?

09:15AM  23    A.   I DO.

09:15AM  24    Q.   AND LET ME FOCUS ON THE "COMPLETED ALL CONSTRUCTION," AND

09:15AM  25    I DRAW YOUR ATTENTION TO PAGE 5.

09:15AM   1    A.   YES.

09:15AM   2    Q.   AND DO YOU SEE THE PHASE I CONSTRUCTION, 969 U.S. UNITS?

09:15AM   3    A.   I DO.

09:15AM   4    Q.   AND WHAT DOES THAT REFER TO?

09:15AM   5    A.   WE INTENDED TO PUT THE MINILAB IN 969 U.S. UNITS.

09:15AM   6    Q.   AND HAD SAFEWAY TAKEN EFFORTS TO MODIFY THOSE UNITS TO GET

09:15AM   7    THEM READY FOR THE THERANOS ROLLOUT?

09:15AM   8    A.   YES.   THE -- THIS IS JUST DEPICTING WHERE WE ARE IN THAT

09:15AM   9    PROCESS.

09:15AM   10   Q.   AND WHAT IS MEANT BY THE TWO COLUMNS PLANS COMPLETE AND

09:15AM   11   CONSTRUCTION COMPLETE?

09:15AM   12   A.   THE FIRST THING YOU HAVE TO DO IS DRAW PLANS, AND OFTEN

09:15AM   13   LOCAL APPROVALS ON THOSE.   ONCE THE PLANS ARE APPROVED AND A

09:16AM   14   PERMIT IS GRANTED, THEN YOU CAN BE IN CONSTRUCTION.

09:16AM   15   Q.   OKAY.   AND THAT WAS DONE FOR 100 PERCENT OF THE 969 U.S.

09:16AM   16   UNITS IN PHASE I?

09:16AM   17   A.   THAT'S CORRECT.

09:16AM   18   Q.   AND CONSTRUCTION WAS ACTUALLY COMPLETE AT THIS POINT IN

09:16AM   19   TIME FOR 98 PERCENT OF THE 969 U.S. UNITS?

09:16AM   20   A.   YES.

09:16AM   21   Q.   OKAY.   THERE'S A REFERENCE TO PHASE II CONSTRUCTION.   WHAT

09:16AM   22   IS THAT?

09:16AM   23   A.   WE DECIDED THAT THE VOLUME WOULD BE SUCH THAT WE SHOULD

09:16AM   24   REALLY HAVE TWO PLACES IN THE STORE, AND SO WE CREATED A SECOND

09:16AM   25   ROOM.   IT WAS 9 FEET DEEP, 5 FEET WIDE.   WE ALSO NEEDED THAT

BURD DIRECT BY MR. LEACH (RES.)

09:16AM  1    BECAUSE SAFEWAY HAD A GROWING VACCINATION BUSINESS AND WE

09:16AM  2    NEEDED TO COEXIST WITH THE LAB IN THAT SPACE.

09:16AM  3    Q.   LET ME NEXT DRAW YOUR ATTENTION, PLEASE, TO PAGE 11.

09:17AM  4         DO YOU SEE THE HEADING LAUNCH WITH HEAVY PR EFFORT?

09:17AM  5    A.   I DO.

09:17AM  6    Q.   OKAY.  IS PR AN ACRONYM FOR PUBLIC RELATIONS?

09:17AM  7    A.   YES.

09:17AM  8    Q.   AND THE FIRST BULLET SAYS, "ELIZABETH WILL MEET WITH

09:17AM  9    EDITORIAL BOARDS OF ALL LOCAL NEWSPAPERS."

09:17AM  10        DO YOU SEE THAT?

09:17AM  11   A.   I DO.

09:17AM  12   Q.   AND WHERE DID THAT IDEA COME FROM?

09:17AM  13   A.   YOU KNOW, THE -- CREATING THE LAUNCH EFFORT AND THE

09:17AM  14   MARKETING, THAT WAS LARGELY IN THERANOS'S DOMAIN.  YOU KNOW, WE

09:17AM  15   PROVIDED SOME INPUT ON THAT, BUT THAT WAS LARGELY SOMETHING

09:17AM  16   THAT THEY WOULD DO.

09:17AM  17   Q.   "A WSJ ARTICLE WILL BE RELEASED THE DAY OF OUR LAUNCH."

09:17AM  18        DO YOU KNOW WHERE THAT IDEA CAME FROM?

09:17AM  19   A.   AGAIN, IT WOULD HAVE COME FROM THERANOS.

09:17AM  20   Q.   OKAY.  LET ME DRAW YOUR ATTENTION, PLEASE, TO PAGE 12.

09:18AM  21        DO YOU SEE THE HEADING OPERATIONAL LOGISTICS?

09:18AM  22   A.   YES.

09:18AM  23   Q.   AND THEN IN THE FIRST BULLET IT SAYS, "ONE CARTRIDGE WILL

09:18AM  24   SATISFY 95 PERCENT OF ALL CPT CODES."

09:18AM  25        WHERE DID THAT INFORMATION COME FROM?

09:18AM  1    A.   THAT CAME FROM THERANOS.

09:18AM  2    Q.   DID IT COME FROM MS. HOLMES?

09:18AM  3    A.   IT DID.

09:18AM  4    Q.   AND WHAT DOES THAT MEAN, THAT ONE CARTRIDGE WILL SATISFY

09:18AM  5    95 PERCENT OF ALL CPT CODES?

09:18AM  6    A.   IT MEANS THAT THE CARTRIDGES WHICH GO INTO THE MACHINES,

09:18AM  7    THAT A SINGLE CARTRIDGE, A SINGLE CONFIGURATION WILL BE CAPABLE

09:18AM  8    OF DOING ALL CPT CODES, AND A CPT CODE IS A BILLING CODE AND IT

09:18AM  9    IDENTIFIES A SPECIFIC BLOOD TEST.

09:18AM  10   Q.   AND WAS THIS INFORMATION RELEVANT TO YOU?

09:18AM  11   A.   IT WAS GREAT NEWS.

09:18AM  12   Q.   AND WHY WAS IT GREAT NEWS?

09:18AM  13   A.   BECAUSE WE HAD TO INVENTORY THESE CARTRIDGES IN EACH OF

09:19AM  14   THOSE STORES, AND IT MEANT THAT WE COULD HAVE MOSTLY THIS ONE

09:19AM  15   CARTRIDGE THAT DID 95 PERCENT, AND THEN A FEW OTHER CARTRIDGES

09:19AM  16   THAT WOULD, YOU KNOW, GET SOME LEVEL OF VOLUME, AND THEN THE

09:19AM  17   MOST ESOTERIC OF BLOOD TESTS MIGHT GO OUTSIDE.

09:19AM  18   Q.   AND BASED ON STATEMENTS FROM MS. HOLMES, WAS IT YOUR

09:19AM  19   UNDERSTANDING THAT THIS WAS SOMETHING THAT THERANOS COULD DO IN

09:19AM  20   AUGUST OF 2012?

09:19AM  21   A.   YES.

09:19AM  22   Q.   LET ME DRAW YOUR ATTENTION TO THE NEXT PAGE, PAGE 13.

09:19AM  23        DO YOU SEE WHERE IT SAID THERANOS READINESS ON KEY TASKS?

09:19AM  24   A.   YES.

09:19AM  25   Q.   AND THERE'S A REFERENCE TO:  ON-CAMPUS FACILITY; STATUS OF

09:19AM   1    ONLINE ADJUDICATION; PRODUCTION RATE OF PROCESSING PLATFORM;

09:19AM   2    PRODUCTION RATE OF CARTRIDGES.

09:19AM   3        DO YOU SEE THOSE BULLETS?

09:19AM   4    A.   I DO.

09:19AM   5    Q.   AND WHAT DID YOU UNDERSTAND PRODUCTION RATE OF PROCESSING

09:20AM   6    PLATFORM AND PRODUCTION OF RATE OF CARTRIDGES TO MEAN?

09:20AM   7    A.   IN ORDER TO DO THE MINILAB, YOU NEEDED BOTH A MACHINE AND

09:20AM   8    YOU NEEDED CARTRIDGES TO GO IN IT.

09:20AM   9        AND SO AS YOU BUILD UP FOR A LAUNCH, YOU NEED TO HAVE

09:20AM  10    AMPLE INVENTORY SO YOUR BUSINESS DOESN'T GET DISRUPTED.

09:20AM  11    Q.   AT ANY POINT IN TIME IN THIS BOARD MEETING OR THIS

09:20AM  12    AUGUST 2012 TIME PERIOD, DID MS. HOLMES RAISE WITH YOU ANY TYPE

09:20AM  13    OF TECHNOLOGICAL ISSUE WITH THE MINILAB DEVICE THAT WAS HOLDING

09:20AM  14    UP THE ROLLOUT?

09:20AM  15    A.   I DON'T RECALL THE TIMEFRAME, BUT THE ONLY TECHNICAL ISSUE

09:20AM  16    THAT I RECALL WAS THIS EXCESS HEAT GENERATED BY STACKING ONE

09:20AM  17    UNIT ON TOP OF THE OTHER.

09:20AM  18    Q.   THANK YOU.

09:20AM  19        YOU CAN PUT THAT -- I'D LIKE TO DRAW YOUR ATTENTION TO THE

09:20AM  20    NEXT DOCUMENT, MR. BURD, WHICH IS EXHIBIT 670.  I'M ONLY

09:21AM  21    FOCUSSED ON PAGES 2 AND 3 OF 670, MR. BURD.

09:21AM  22    A.   YES.

09:21AM  23    Q.   AND DOES IT APPEAR TO BE AN EMAIL EXCHANGE BETWEEN YOU AND

09:21AM  24    MS. HOLMES DATED SEPTEMBER 12TH, 2012?

09:21AM  25    A.   YES.

09:21AM   1          MR. LEACH:  YOUR HONOR, I OFFER PAGES 2 AND 3 OF

09:21AM   2    EXHIBIT 670.

09:21AM   3          MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

09:21AM   4          THE COURT:  THEY'RE ADMITTED, AND THEY MAY BE

09:21AM   5    PUBLISHED.

09:21AM   6       (GOVERNMENT'S EXHIBIT 670, PAGES 1 AND 2 WAS RECEIVED IN

09:21AM   7    EVIDENCE.)

09:21AM   8          MR. LEACH:  MS. HOLLIMAN, IF WE CAN PLEASE FOCUS ON

09:21AM   9    THE BOTTOM EMAIL IN THE CHAIN ON THE FIRST PAGE.

09:22AM  10    Q.   DO YOU SEE YOUR EMAIL ADDRESS IN THE FROM LINE, MR. BURD?

09:22AM  11    A.   I DO.

09:22AM  12    Q.   AND THE SUBJECT OF THIS IS ON CAMPUS FACILITY PERFORMANCE?

09:22AM  13    A.   CORRECT.

09:22AM  14    Q.   AND WHAT WAS THE ON CAMPUS FACILITY?

09:22AM  15    A.   WE HAD A HEALTH CENTER ON OUR CAMPUS, YOU KNOW, FOUR OR

09:22AM  16    FIVE BUILDINGS, AND THAT SEEMED THE LOGICAL PLACE TO PUT THIS

09:22AM  17    LAB, SO WE PUT IT OVER THERE IN THAT BUILDING.  THAT ALSO

09:22AM  18    CONTAINED AN EXERCISE FACILITY.

09:22AM  19    Q.   AND WHEN YOU SAY "PUT THIS LAB," WHAT DO YOU MEAN?  WHAT

09:22AM  20    WAS --

09:22AM  21    A.   WELL, THE ORIGINAL EXPECTATION IS THAT WE WOULD PUT A

09:22AM  22    THERANOS UNIT IN THERE.  THAT WAS THE REASON FOR WANTING AN ON

09:22AM  23    CAMPUS LAB, AND SO WE WOULD GET SOME REAL EXPERIENCE BECAUSE I

09:22AM  24    WAS REQUIRING THAT ALL SAFEWAY EMPLOYEES AND FAMILIES THAT

09:22AM  25    LIVED IN A CERTAIN RADIUS, THAT'S THE LAB THAT THEY WERE TO

09:22AM   1   USE.  IF THEY USED THAT LAB, WE WOULD PAY FOR THEIR LAB COSTS.

09:23AM   2       AS IT TURNED OUT, WE DIDN'T GET -- WE DIDN'T GET A LAB

09:23AM   3   UNIT FROM THERANOS.  WE ENDED UP DRAWING BLOOD.  I BELIEVE IT

09:23AM   4   WAS MOSTLY VEIN DRAW, BUT SOME OF THAT WAS ALSO FINGERSTICK IF

09:23AM   5   THE PATIENT AGREED TO TWO DIFFERENT FORMS, AND THEN THEY LEFT

09:23AM   6   THE FACILITY TO BE, TO BE ANALYZED.

09:23AM   7   Q.   THE BLOOD WAS TAKEN FROM THE SAFEWAY FACILITY SOMEWHERE

09:23AM   8   ELSE; IS THAT RIGHT?

09:23AM   9   A.   CORRECT.

09:23AM  10   Q.   OKAY.  AND DID MS. HOLMES GIVE YOU AN EXPLANATION FOR WHY

09:23AM  11   THERE WERE VENOUS AND FINGERSTICK DRAWS?

09:23AM  12   A.   THE -- I THINK THE EXPLANATION WAS THAT THEY WANTED TO,

09:23AM  13   YOU KNOW, CONTINUE TO TEST AND CALIBRATE, YOU KNOW, THEIR

09:23AM  14   UNITS, AND YOU COULD GET BOTH THE FINGERSTICK AND YOU COULD GET

09:24AM  15   A REGULAR DRAW AND IN THEORY THOSE ALL TO TURN OUT REMARKABLY

09:24AM  16   THE SAME.

09:24AM  17   Q.   IN THIS EMAIL TO MS. HOLMES YOU WROTE, "I AM GENUINELY

09:24AM  18   CONCERNED THAT SAFEWAY'S LAB REPUTATION GETS WORSE BY THE DAY.

09:24AM  19   KEEP IN MIND, I HAVE NOW REQUIRED THAT OUR EMPLOYEES AND THEIR

09:24AM  20   NEARBY DEPENDENTS USE THIS LAB."

09:24AM  21       WHAT WERE YOU GETTING AT THERE?

09:24AM  22   A.   WELL, EVEN THOUGH IT WAS A LAB ON OUR FACILITY, I THINK

09:24AM  23   OUR EMPLOYEES KNEW THAT WE WERE NOT REALLY THE ONES OPERATING

09:24AM  24   IT, RIGHT, AND THAT THERE WAS A LAB INVOLVED.

09:24AM  25       AND I THINK WHENEVER YOU START SOMETHING NEW, YOU'RE GOING

09:24AM 1    TO HAVE SOME ROUGH SPOTS.  BUT WE CONTINUED TO HAVE ROUGH

09:24AM 2    SPOTS.  WE HAD SAMPLES WHERE TEMPERATURE WAS NOT PROPERLY

09:24AM 3    CONTROLLED, WE HAD SAMPLES THAT WERE LOST, WE HAD RESULTS THAT

09:24AM 4    DIDN'T MAKE ANY SENSE.  THOSE ARE THE KINDS OF THINGS THAT I

09:25AM 5    WAS REFERRING TO.

09:25AM 6    Q.   OKAY.  LATER ON IN THAT PARAGRAPH YOU WROTE, "THE SOONER

09:25AM 7    WE GET TO 'FINGERSTICK,' THE BETTER WE WILL BE."

09:25AM 8        WHAT DID YOU MEAN BY THAT?

09:25AM 9    A.   WELL, WHAT I MEANT WAS THAT I REALLY WANTED A FULL TEST,

09:25AM 10   AND THE REASON WE DIDN'T END UP WITH A THERANOS UNIT IN THE

09:25AM 11   BUILDING IS THAT AFTER THINKING ABOUT IT MORE, ELIZABETH

09:25AM 12   THOUGHT THERE WAS A LOT MORE RISK THAT THE TECHNOLOGY GET OUT,

09:25AM 13   YOU KNOW, PARTICULARLY TO OTHER COMPETITORS.  THERE WAS

09:25AM 14   ACTUALLY A QUEST LOCATED ABOUT 50 YARDS FROM THIS BUILDING, A

09:25AM 15   QUEST LAB.

09:25AM 16   Q.   BENEATH YOU SUGGEST SOME CHANGES IN PROCEDURES, AND THEN

09:25AM 17   IN THE PARAGRAPH AFTER 4, YOU WROTE, "WHILE MY STAFF TELLS ME

09:25AM 18   THAT THERANOS PERFORMANCE IS MUCH BETTER THAN THE FIRST THREE

09:25AM 19   MONTHS, IT IS NOWHERE CLOSE TO THAT OF QUEST.  AS YOU KNOW, THE

09:26AM 20   VAST MAJORITY OF THEIR RESULTS ARE DELIVERED THE NEXT DAY."

09:26AM 21       WHAT WERE YOU GETTING AT THERE?

09:26AM 22   A.   WELL, THE TURN TIME WASN'T VERY PREDICTABLE, AND IT

09:26AM 23   TYPICALLY WOULD RUN TWO TO FOUR DAYS, AND SOME EVEN LONGER THAN

09:26AM 24   THAT.  AND SO IT'S DIFFICULT TO COMPETE, YOU KNOW, WITH A LAB

09:26AM 25   THAT GIVES YOU RESULTS SUBSTANTIALLY FASTER.

09:26AM   1      Q.   LET ME NEXT DRAW YOUR ATTENTION TO WHAT WE'VE MARKED AS

09:26AM   2      EXHIBIT 684.

09:26AM   3          DOES THIS APPEAR TO BE ANOTHER EMAIL EXCHANGE BETWEEN YOU

09:26AM   4      AND MS. HOLMES DURING THIS SEPTEMBER 2012 TIME PERIOD?

09:26AM   5      A.   YES.

09:26AM   6              MR. LEACH:   YOUR HONOR, I OFFER EXHIBIT 684.

09:26AM   7              MR. DOWNEY:   NO OBJECTION, YOUR HONOR.

09:26AM   8              THE COURT:   IT'S ADMITTED.   IT MAY BE PUBLISHED.

09:26AM   9          (GOVERNMENT'S EXHIBIT 684 WAS RECEIVED IN EVIDENCE.)

09:26AM  10              MR. LEACH:   AND IF WE CAN PLEASE ZOOM IN ON THE

09:27AM  11      MIDDLE EMAIL, MS. HOLLIMAN, THE ONE FROM MR. BURD.   THAT'S IT.

09:27AM  12      ALL OF THE WAY DOWN IF WE COULD.   PERFECT.

09:27AM  13      Q.   DO YOU SEE YOUR NAME IN THE FROM LINE OF THIS EMAIL,

09:27AM  14      MR. BURD?

09:27AM  15      A.   I DO.

09:27AM  16      Q.   AND THIS IS TO ELIZABETH HOLMES?

09:27AM  17      A.   YES.

09:27AM  18      Q.   IN THE FIRST PARAGRAPH YOU WROTE, "I THOUGHT I WOULD SHARE

09:27AM  19      WITH YOU WHAT YOUR TEAM HAS COMMUNICATED TO BRIAN HILLE."

09:27AM  20          WHO IS BRIAN HILLE?

09:27AM  21      A.   BRIAN HILLE WAS THE HEAD OF OUR PHARMACY OPERATIONS.

09:27AM  22      Q.   YOU THEN WRITE, "IF THE SOFT LAUNCH IS LIKELY TO BE AS

09:27AM  23      LATE AS OCTOBER 29TH, I NEED TO KNOW THAT NOW SO I CAN SLOW

09:27AM  24      DOWN THE HIRING EFFORT."

09:27AM  25          WHAT WERE YOU GETTING AT THERE?

09:27AM  1    A.   THE EMPLOYEES IN THE STORE WHO WOULD BE RESPONSIBLE FOR

09:27AM  2    THE LAB WORK WOULD ACTUALLY BE EMPLOYEES OF SAFEWAY, SO WE WERE

09:28AM  3    IN THE PROCESS OF HIRING, YOU KNOW, A LOT OF FOLKS.  AND

09:28AM  4    SOMEWHERE ALONG THE LINE ELIZABETH THOUGHT IT BEST, I DIDN'T

09:28AM  5    DISAGREE, THAT WE ACTUALLY HIRE A PHLEBOTOMIST, BECAUSE THAT'S

09:28AM  6    WHAT PEOPLE WERE USED TO DEALING WITH WAS A PHLEBOTOMIST.

09:28AM  7    Q.   SO SAFEWAY WAS HIRING A NUMBER OF PHLEBOTOMISTS?

09:28AM  8    A.   WE HIRED AN OUTSIDE AGENCY TO DO THE HIRING, AND WE HIRED

09:28AM  9    BOTH PEOPLE WITH EXPERIENCE AND WE HIRED PEOPLE WITHOUT

09:28AM 10    EXPERIENCE, AND I RECALL AT ONE POINT WE HAD 26 PEOPLE HIRED

09:28AM 11    AND ANOTHER 400 POSSIBILITIES IN THE WAITING.

09:28AM 12    Q.   ALL IN ANTICIPATION OF THE LAUNCH WITH THERANOS IN SAFEWAY

09:28AM 13    STORES?

09:28AM 14    A.   CORRECT.

09:28AM 15    Q.   AND IN THE NEXT PARAGRAPH YOU WROTE, "IT ALSO LOOKS LIKE

09:28AM 16    YOUR LAB WORK IS BEING SENT TO UTAH, NOT UCSF, AND NOT BEING

09:28AM 17    DONE ON SITE.  IT IS THE ONLY WAY IT COULD POSSIBLY TAKE 3 TO

09:29AM 18    5 DAYS."

09:29AM 19         WHAT WERE YOU GETTING AT THERE?

09:29AM 20    A.   WELL, I THINK THE ORIGINAL INTENT WAS TO USE UCSF FOR SOME

09:29AM 21    OF THE ANALYSIS, YOU KNOW, PARTICULARLY THE RARER TESTS.  AND

09:29AM 22    THIS IS INFORMATION THAT I GOT UNDOUBTEDLY FROM BRIAN HILLE,

09:29AM 23    AND I DON'T KNOW HOW HE LEARNED THAT IT WAS BEING SENT TO UTAH,

09:29AM 24    BUT THAT'S WHAT HE TOLD ME.

09:29AM 25    Q.   WAS THAT SURPRISING TO YOU?

09:29AM  1    A.   YEAH, IT'S A LONG WAYS AWAY.

09:29AM  2    Q.   AND DID MS. HOLMES GIVE YOU ANY EXPLANATION FOR WHY

09:29AM  3    THERANOS WAS SENDING TESTS EITHER TO UTAH OR TO UCSF?

09:29AM  4    A.   I DON'T RECALL AN EXPLANATION.  I KNEW THEY WERE DOING

09:29AM  5    SOME WORK DOWN IN THEIR FACILITY.

09:29AM  6    Q.   DID YOU THINK IT WAS FOR THE MAJORITY OF TESTS?  FOR A

09:29AM  7    PORTION OF THE TESTS?  WHAT WAS IN YOUR MIND?

09:29AM  8    A.   I REALLY DIDN'T KNOW.

09:30AM  9    Q.   IN THE THIRD PARAGRAPH YOU WROTE, "I FIRMLY BELIEVE THERE

09:30AM 10    ARE THINGS THAT WE SHOULD BE DOING DIFFERENTLY EVEN IN THE

09:30AM 11    SHORT RUN.  I AM SURE I DON'T HAVE ALL OF THE INFORMATION YOU

09:30AM 12    HAVE, BUT GIVEN THE SMALL NUMBER OF PATIENTS, WE COULD CREATE A

09:30AM 13    MUCH BETTER SHORT TERM EXPERIENCE WITH LITTLE OR NO ADDITIONAL

09:30AM 14    EFFORT.  IT PAINS ME NOT TO DO SO."

09:30AM 15        WHAT WERE YOU GETTING AT THERE?

09:30AM 16    A.   JUST THAT THE EXECUTION WASN'T GOOD.  YOU KNOW, IN THE

09:30AM 17    SUPERMARKET BUSINESS, WHICH IS SUCH LOW MARGIN, I MEAN,

09:30AM 18    OPERATIONS REALLY HAVE TO CLICK OR YOU DON'T MAKE ANY MONEY AT

09:30AM 19    ALL.

09:30AM 20        SO WE WERE REALLY FOCUSSED ON THE OPERATING ASPECTS OF

09:30AM 21    THIS FACILITY.

09:30AM 22    Q.   FURTHER DOWN BELOW YOU WROTE, "I JUST KNOW WE CAN DO

09:30AM 23    BETTER.  PROCESS IS SOMETHING THAT WE ARE VERY GOOD AT.  SORRY

09:30AM 24    TO BURDEN YOU WITH THIS."

09:30AM 25        WHAT WERE YOU COMMUNICATING THERE?

09:30AM   1    A.   IF THERE WAS SOMETHING THAT WE COULD DO TO HELP IMPROVE

09:30AM   2    THE PROCESS, WE WERE READY TO DO IT.

09:31AM   3    Q.   DID MS. HOLMES EVER TAKE YOU UP ON THAT?

09:31AM   4    A.   NO.

09:31AM   5    Q.   LET ME DRAW YOUR ATTENTION TO WHAT HAS BEEN MARKED AS

09:31AM   6    EXHIBIT 693.

09:31AM   7         IS THIS AN EMAIL EXCHANGE -- DOES THIS APPEAR TO BE AN

09:31AM   8    EMAIL EXCHANGE BETWEEN YOU AND ELIZABETH HOLMES IN THE

09:31AM   9    OCTOBER 2012 TIME PERIOD?

09:31AM   10   A.   YES.

09:31AM   11            MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 693.

09:31AM   12            MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

09:31AM   13            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:31AM   14        (GOVERNMENT'S EXHIBIT 693 WAS RECEIVED IN EVIDENCE.)

09:31AM   15            MR. LEACH:  AND IF WE CAN PLEASE ZOOM IN ON THE TOP

09:31AM   16   HALF.

09:31AM   17        THANK YOU, MS. HOLLIMAN.

09:31AM   18   Q.   MR. BURD, THE SUBJECT OF THIS IS SIX STORE LAUNCH

09:31AM   19   SCHEDULE.

09:31AM   20        DO YOU SEE THAT?

09:31AM   21   A.   YES.

09:31AM   22   Q.   AND WHAT DOES THAT REFER TO?

09:31AM   23   A.   THAT REFERS TO TRYING TO GO FROM THE ON CAMPUS FACILITY TO

09:32AM   24   SIX STORES, AND IT'S A BIT OF A PILOT.

09:32AM   25   Q.   AND THIS WAS SOMETHING THAT YOU WERE ENDEAVORING TO DO IN

09:32AM   1    THE FOURTH QUARTER OF 2012?

09:32AM   2    A.   THAT'S WHAT IT LOOKS LIKE FROM THIS MEMO.

09:32AM   3    Q.   OKAY.  DID MS. HOLMES EVER SAY TO YOU THAT THERE WAS SOME

09:32AM   4    TYPE OF TECHNOLOGICAL ISSUE GETTING IN THE WAY OF THAT?

09:32AM   5    A.   NO.

09:32AM   6    Q.   YOU WROTE, "WHERE ARE WE ON THE SCHEDULE?  WE HAVE HIRED

09:32AM   7    26 PHLEBOTOMISTS AND HAVE SCREENED, INTERVIEWED, AND HAVE

09:32AM   8    IDENTIFIED 181 OTHERS THAT WE ARE PREPARED TO HIRE."

09:32AM   9        IS THAT A REFERENCE TO THE HIRING THAT SAFEWAY ENGAGED IN

09:32AM   10   DURING THIS TIME PERIOD?

09:32AM   11   A.   YES.

09:32AM   12   Q.   LET ME NOW DRAW YOUR ATTENTION TO EXHIBIT 699.

09:32AM   13       IS THIS AN EMAIL BETWEEN YOU AND MS. HOLMES IN NOVEMBER OF

09:32AM   14   2012?

09:32AM   15   A.   YES.

09:32AM   16            MR. LEACH:  I OFFER EXHIBIT 699, YOUR HONOR.

09:32AM   17            MR. DOWNEY:  NO OBJECTION.

09:32AM   18            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:33AM   19       (GOVERNMENT'S EXHIBIT 699 WAS RECEIVED IN EVIDENCE.)

09:33AM   20   BY MR. LEACH:

09:33AM   21   Q.   DO YOU SEE THE SUBJECT SIX STORE LAUNCH, MR. BURD?

09:33AM   22   A.   YES.

09:33AM   23   Q.   AND IS THAT A REFERENCE SIMILAR TO THE EMAIL THAT WE JUST

09:33AM   24   LOOKED AT?

09:33AM   25   A.   CORRECT.

09:33AM  1    Q.   OKAY.  YOU WROTE IN THE BOTTOM EMAIL, "IF WE DON'T PICK A

09:33AM  2    LAUNCH DATE SOON, WE CAN FORGET ABOUT LAUNCHING EVEN SIX STORES

09:33AM  3    IN 2012.  IF YOU HAVE ALREADY DECIDED IT IS NOT GOING TO HAPPEN

09:33AM  4    UNTIL NEXT YEAR, I WOULD LIKE TO KNOW.  WHILE IT WOULD BE VERY

09:33AM  5    UNFORTUNATE TO NOT LAUNCH IN Q4, BASED ON THE INFORMATION I

09:33AM  6    HAVE, IT LOOKS PRETTY REMOTE.  I FEEL LIKE A JOGGER RUNNING IN

09:33AM  7    PLACE WAITING FOR THE STOPLIGHT TO TURN GREEN."

09:33AM  8         WHAT DID YOU MEAN IN THAT LAST SENTENCE, THAT YOU FELT

09:33AM  9    LIKE A JOGGER RUNNING IN PLACE?

09:33AM  10   A.   WELL, WE WERE READY.  ON OUR END WE WERE COMPLETELY READY,

09:33AM  11   AND WE WERE JUST WAITING ON THERANOS WITH NO REAL EXPLANATION

09:33AM  12   AS TO WHY IT WAS BEING DELAYED.

09:34AM  13        SO THE JOGGER MAKES NO PROGRESS AT A STOPLIGHT.

09:34AM  14   Q.   LET ME NEXT DRAW YOUR ATTENTION TO EXHIBIT 701.

09:34AM  15        DOES THIS APPEAR TO BE ANOTHER EMAIL BETWEEN YOU AND

09:34AM  16   MS. HOLMES IN OR AROUND NOVEMBER OF 2012?

09:34AM  17   A.   YES.

09:34AM  18            MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 701 INTO

09:34AM  19   EVIDENCE.

09:34AM  20            MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

09:34AM  21            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:34AM  22        (GOVERNMENT'S EXHIBIT 701 WAS RECEIVED IN EVIDENCE.)

09:34AM  23   BY MR. LEACH:

09:34AM  24   Q.   MR. BURD, THE SUBJECT OF THIS EMAIL IS BECOMING

09:34AM  25   DISCOURAGED.

09:34AM  1          DO YOU SEE THAT LANGUAGE?

09:34AM  2    A.    I DO.

09:34AM  3    Q.    OKAY.  WERE YOU BECOMING DISCOURAGED AT THIS POINT IN

09:34AM  4    TIME?

09:34AM  5    A.    I WAS GETTING CLOSE.

09:34AM  6    Q.    YOU WROTE, "I CAN RECALL HAVING BEEN DISCOURAGED ONCE IN

09:34AM  7    THE LAST 62 YEARS.  THAT SAID, I AM GETTING CLOSE TO MY SECOND

09:35AM  8    EVENT."

09:35AM  9          WAS THAT TRUE AT THE TIME?

09:35AM 10    A.    YES.  I KNOW IT SOUNDS LIKE A BIT OF AN EXAGGERATION, BUT

09:35AM 11    I'M ONE OF THE MOST POSITIVE PEOPLE YOU'LL EVER MEET.  I DON'T

09:35AM 12    GET DISCOURAGED.

09:35AM 13    Q.    AND WHAT WAS DISCOURAGING YOU?

09:35AM 14    A.    WELL, DEADLINES WEREN'T MET, NO REAL EXPLANATION PROVIDED.

09:35AM 15    I FELT -- I FELT THAT THERE WERE OBSTACLES THAT WERE GETTING IN

09:35AM 16    THE WAY.  I DIDN'T THINK IT WAS THE BOX.  I THOUGHT THERE WERE

09:35AM 17    OTHER OBSTACLES.

09:35AM 18          AND WHEN YOU HAVE 185,000 EMPLOYEES, YOU'RE WILLING TO

09:35AM 19    DEVOTE SOME OF THOSE PEOPLE TO REMOVING THOSE OBSTACLES IF THAT

09:35AM 20    WOULD BE HELPFUL.

09:35AM 21    Q.    AND DID MS. HOLMES EVER TAKE YOU UP ON THAT?

09:35AM 22    A.    WE DID A COUPLE OF THINGS TOGETHER TO TRY TO GET THE

09:35AM 23    LOGISTICS RIGHT IN THE STORE, BUT THAT WAS A NATURAL THING.  IT

09:35AM 24    WAS GOING TO TAKE PLACE IN OUR STORES AND WE WORKED ON THAT

09:35AM 25    TOGETHER.

09:35AM  1          THERE WERE A NUMBER OF THINGS WE WORKED ON TOGETHER, BUT

09:35AM  2     WE DIDN'T REMOVE OBSTACLES TOGETHER.

09:35AM  3     Q.   LET ME NEXT DRAW YOUR ATTENTION TO EXHIBIT 715.

09:36AM  4          DOES THIS APPEAR TO BE AN EMAIL EXCHANGE BETWEEN YOU AND

09:36AM  5     MS. HOLMES IN THE DECEMBER 2012 TIME PERIOD?

09:36AM  6     A.   YES.

09:36AM  7              MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 715 INTO

09:36AM  8     EVIDENCE.

09:36AM  9              MR. DOWNEY:  NO OBJECTION.

09:36AM 10              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:36AM 11          (GOVERNMENT'S EXHIBIT 715 WAS RECEIVED IN EVIDENCE.)

09:36AM 12              MR. LEACH:  AND, MS. HOLLIMAN, IF WE COULD PLEASE

09:36AM 13     FOCUS ON THE BOTTOM EMAIL FROM MR. BURD.

09:36AM 14     Q.   LET ME DRAW YOUR ATTENTION TO THE FIRST PARAGRAPH,

09:36AM 15     MR. BURD.

09:36AM 16          DO YOU SEE WHERE YOU WROTE, "I HAVE LOTS OF DATA POINTS

09:36AM 17     FROM YOUR TEAM THAT SUGGESTS THAT SAFEWAY AND THERANOS MAY NOT

09:36AM 18     HAVE ALWAYS BEEN ON THE SAME PAGE"?

09:36AM 19     A.   YES.

09:36AM 20     Q.   AND THEN YOU PROVIDE A PARTIAL LIST OF THAT?

09:37AM 21     A.   I DO.

09:37AM 22     Q.   IN NUMBER 1 YOU WROTE, "THE ON CAMPUS LAB HAS OPERATED FOR

09:37AM 23     ALMOST A YEAR WITH A POOR PATIENT EXPERIENCE.  (THIS HAS

09:37AM 24     NOTHING TO DO WITH THE FACT THAT WE ARE DOING VEIN DRAW.)"

09:37AM 25          WAS THAT YOUR VIEW AT THE TIME?

09:37AM 1    A.   YES.

09:37AM 2    Q.   AND WAS THAT A TOPIC THAT YOU HAD DISCUSSED WITH

09:37AM 3    MS. HOLMES ON MORE THAN ONE OCCASION?

09:37AM 4    A.   YES, IT WAS.

09:37AM 5    Q.   AND NUMBER 2 YOU WROTE, "THERANOS HAS BEEN SLOW TO REACT

09:37AM 6    TO OUR CONCERNS ABOUT THE ON CAMPUS LAB AND UNWILLING TO ALLOW

09:37AM 7    US TO FIX THE PROCESS OURSELVES."

09:37AM 8         WAS THAT YOUR VIEW AT THE TIME?

09:37AM 9    A.   YES.

09:37AM 10   Q.   AND WAS THAT SOMETHING THAT YOU HAD DISCUSSED WITH

09:37AM 11   MS. HOLMES ON MORE THAN ONE OCCASION?

09:37AM 12   A.   YES.

09:37AM 13   Q.   IF WE CAN GO TO THE NEXT PAGE, MS. HOLLIMAN.

09:37AM 14        I DRAW YOUR ATTENTION TO NUMBER 4, MR. BURD.

09:37AM 15   A.   YES.

09:37AM 16   Q.   YOU WROTE, "MY REPEATED SUGGESTIONS THAT WE ENGAGE IN A

09:38AM 17   COLLABORATIVE REVIEW OF THE PATIENT EXPERIENCE HAVE YET TO

09:38AM 18   GENERATE A POSITIVE RESPONSE.  THE PATIENT EXPERIENCE HAS BEEN

09:38AM 19   DESIGNED ENTIRELY BY THERANOS.  THIS IS NOT MY ONLY EXPERIENCE,

09:38AM 20   THIS IS MY TEAM'S EXPERIENCE."

09:38AM 21        WHAT DID YOU MEAN BY THAT?

09:38AM 22   A.   THAT WE WERE NOT PART OF THAT DETAILED PROCESS.  THINK OF

09:38AM 23   IT AS THE LOGISTICS OF A PATIENT COMES IN, HOW THEY GET CHECKED

09:38AM 24   IN, WHERE THEY SIT, YOU KNOW, ALL OF THE INFORMATION BEHIND IT

09:38AM 25   SO THAT IT'S HIGHLY AUTOMATED.  YOU KNOW, OF THE TWO COMPANIES,

09:38AM  1     WE WERE THE COMPANY THAT HAD PROBABLY GIVEN MILLIONS OF

09:38AM  2     VACCINATIONS, SO WE HAD PATIENT EXPERIENCE, AND WE WANTED TO

09:38AM  3     LEND THAT EXPERIENCE TO THE PROCESS.

09:38AM  4     Q.   AND THEN DOWN AT THE BOTTOM YOU WROTE, "I AM SORRY IF THIS

09:38AM  5     SOUNDS A BIT BLUNT.  CHALK IT UP TO THE LIMITATIONS OF EMAIL."

09:39AM  6          DID YOU THINK YOU WERE BEING BLUNT HERE?

09:39AM  7     A.   I THOUGHT I WAS BEING BLUNT.

09:39AM  8     Q.   WHY WERE YOU BEING BLUNT?

09:39AM  9     A.   NOTHING ELSE HAD WORKED.

09:39AM  10    Q.   LET ME MOVE FORWARD IN TIME, MR. BURD, TO JANUARY OF 2013.

09:39AM  11    I DRAW YOUR ATTENTION TO EXHIBIT 770.

09:39AM  12         MAY I HAVE ONE MOMENT, YOUR HONOR?

09:39AM  13              THE COURT:  YES.

09:39AM  14         (PAUSE IN PROCEEDINGS.)

09:39AM  15    BY MR. LEACH:

09:39AM  16    Q.   DOES THIS APPEAR TO BE AN EMAIL EXCHANGE BETWEEN YOU AND

09:40AM  17    MS. HOLMES ON OR ABOUT JANUARY 20TH OF 2013?

09:40AM  18    A.   YES.

09:40AM  19              MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 770 INTO

09:40AM  20    EVIDENCE.

09:40AM  21              MR. DOWNEY:  SUBJECT TO THE REDACTIONS THAT COUNSEL

09:40AM  22    REPRESENTS WERE MADE, WE HAVE NO OBJECTION.

09:40AM  23              THE COURT:  ALL RIGHT.  YOU'VE MADE THOSE

09:40AM  24    REDACTIONS?

09:40AM  25              MR. LEACH:  WE HAVE, YOUR HONOR.

09:40AM 1          THE COURT:  THANK YOU.  IT IS ADMITTED AND IT MAY BE

09:40AM 2     PUBLISHED WITH THE REDACTIONS.

09:40AM 3          (GOVERNMENT'S EXHIBIT 770 WAS RECEIVED IN EVIDENCE.)

09:40AM 4     BY MR. LEACH:

09:40AM 5     Q.   LET ME DRAW YOUR ATTENTION, MR. BURD, TO THE BOTTOM

09:40AM 6     PORTION OF PAGE 1, THE EMAIL FROM YOU TO MS. HOLMES.

09:40AM 7          DO YOU SEE THE DATE OF JANUARY 19TH, 2013?

09:40AM 8     A.   I DO.

09:40AM 9     Q.   AND THE FIRST SENTENCE READS, "I CANNOT BEGIN TO TELL YOU

09:40AM 10    HOW DISAPPOINTED I AM THAT YOU REDESIGNED THE WORDMARK WITHOUT

09:40AM 11    EVER TELLING US YOU WERE DOING IT."

09:40AM 12         WHAT WERE YOU TALKING ABOUT THERE?

09:40AM 13    A.   WE HAD PREVIOUSLY DONE, IN COOPERATION WITH ELIZABETH,

09:40AM 14    SOME WORK ON THE LOGO, HOW THE WORDS WOULD APPEAR BOTH INSIDE

09:41AM 15    AND OUTSIDE OF THE STORE, HOW THEY MIGHT APPEAR ON A LETTERHEAD

09:41AM 16    AT A TIME WHEN SHE DID NOT HAVE A TEAM IN PLACE TO DO THIS, OR

09:41AM 17    OFTEN YOU WOULD DO SOMETHING LIKE THIS WITH OUTSIDE EXPERTS,

09:41AM 18    AND SO WE HAD DONE ALL OF THIS WORK.  WE ALL SEEMED TO LIKE IT.

09:41AM 19         AND REGARDLESS, IF I'M GOING TO PUT A BRAND INSIDE OF MY

09:41AM 20    STORES, I HAVE TO APPROVE THE LOOK OF THAT BRAND.  I HAVE TO

09:41AM 21    BE -- I HAVE TO APPROVE THE COLORS, I HAVE TO APPROVE

09:41AM 22    EVERYTHING ABOUT IT BECAUSE IT COULD AFFECT OUR BRAND.

09:41AM 23    Q.   AND IF WE COULD GO TO PAGE 2, AND I WANT TO FOCUS YOU ON

09:41AM 24    THE FIRST PARAGRAPH, MR. BURD, ROUGHLY IN THE MIDDLE OF THE --

09:41AM 25    IF WE CAN ZOOM IN ON THE TOP HALF THERE, MS. HOLLIMAN.

09:42AM   1          THANK YOU.

09:42AM   2          AND, MR. BURD, I WANT TO DRAW YOUR ATTENTION TO THE

09:42AM   3   LANGUAGE IN THE FIRST PARAGRAPH AT THE TOP WHERE YOU SAY, "I

09:42AM   4   DON'T MIND PASSING THE BATON TO EITHER THERANOS OR ANYONE

09:42AM   5   ELSE."

09:42AM   6   A.   CAN YOU TELL ME AGAIN WHAT YOU'RE CITING?

09:42AM   7   Q.   SURE.  WE'RE ON PAGE 2 OF EXHIBIT 770.

09:42AM   8   A.   YES.

09:42AM   9   Q.   AND I DRAW YOUR ATTENTION TO THE FIRST PARAGRAPH AT THE

09:42AM   10   TOP.

09:42AM   11   A.   YES.

09:42AM   12   Q.   AND ROUGHLY THE THIRD SENTENCE SAYS, "I DON'T MIND PASSING

09:42AM   13   THE BATON."

09:42AM   14   A.   CORRECT.

09:42AM   15   Q.   "AND WHAT I MIND IS HAVING IT RIPPED FROM MY HANDS.  I DO

09:42AM   16   NOT LIKE WASTING TIME.  THIS DOES NOT FEEL LIKE A PARTNERSHIP."

09:42AM   17          WHAT WERE YOU HAVE GETTING AT THERE?

09:42AM   18   A.   JUST AS MUCH AS THERE WERE A LOT OF EMAILS AND PHONE

09:42AM   19   CALLS, ON SOME OF THE BUSINESS ISSUES IT WASN'T AS

09:42AM   20   COLLABORATIVE AS I THOUGHT IT SHOULD BE.

09:42AM   21   Q.   AND HOW DOES THAT RELATE TO THE REDOING OF THE WORDMARK?

09:43AM   22   A.   I MEAN, IT'S THEIR BRAND AND THEY CAN DO WHAT THEY CHOOSE

09:43AM   23   AND I THOUGHT A COURTESY CALL AT A MINIMUM WOULD BE USEFUL.

09:43AM   24   Q.   AND LET ME DRAW YOUR ATTENTION TO THE THIRD PARAGRAPH

09:43AM   25   WHERE YOU SAY "I BELIEVE IN YOU.  I BELIEVE IN YOUR COMPANY.

09:43AM  1    AND I SHARE YOUR VISION.  I WANT SO MUCH TO HELP YOU CHANGE THE

09:43AM  2    WORLD.  WE ARE SO GOOD TOGETHER WHEN WE COLLABORATE.  BUT I

09:43AM  3    HAVE NEVER BEEN MORE FRUSTRATED."

09:43AM  4         WAS IT TRUE YOU HAD NEVER BEEN MORE FRUSTRATED?

09:43AM  5    A.   IT'S TRUE.

09:43AM  6    Q.   AND WHY WAS THAT?

09:43AM  7    A.   WELL, ALL OF THE MISSED DEADLINES, THE LACK OF

09:43AM  8    COLLABORATION ON KEY ISSUES.  REMEMBER, IT'S NOW BEEN ALMOST

09:43AM  9    TWO YEARS SINCE WE HAD A LAUNCH DATE SCHEDULED.

09:43AM 10    Q.   AND BESIDES THE STACKING OF THE DEVICES AND THE HEAT THAT

09:43AM 11    YOU'VE TALKED ABOUT, DID MS. HOLMES EVER ATTRIBUTE THIS TO SOME

09:43AM 12    FORM OF TECHNOLOGICAL ISSUE?

09:43AM 13    A.   NO.

09:44AM 14    Q.   LET ME MOVE FORWARD IN TIME, MR. BURD, TO MARCH OF 2013

09:44AM 15    AND DRAW YOUR ATTENTION TO WHAT WE HAVE MARKED AS EXHIBIT 813.

09:44AM 16         DOES THIS APPEAR TO BE AN EMAIL FROM BOB GORDON TO

09:44AM 17    MS. HOLMES, WITH A COPY TO YOU, ON OR ABOUT MARCH 19TH, 2013?

09:44AM 18    A.   YES.

09:44AM 19              MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 813.

09:44AM 20              MR. DOWNEY:  NO OBJECTION.

09:44AM 21              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:44AM 22         (GOVERNMENT'S EXHIBIT 813 WAS RECEIVED IN EVIDENCE.)

09:44AM 23    BY MR. LEACH:

09:44AM 24    Q.   MR. BURD, REMIND US, WHO IS BOB GORDON?

09:44AM 25    A.   BOB GORDON WAS THE GENERAL COUNSEL OF SAFEWAY.

09:44AM   1    Q.   SOMEONE YOU WORKED WITH CLOSELY?

09:44AM   2    A.   VERY CLOSELY.

09:44AM   3    Q.   AND THE SUBJECT IS THERANOS - INVOICE FOR INVENTORY

09:44AM   4    PRE-PURCHASE.

09:44AM   5         DO YOU SEE THAT?

09:44AM   6    A.   YES.

09:44AM   7    Q.   AND WHAT DOES THAT REFER TO?

09:44AM   8    A.   THERE WERE POINTS IN THE CONTRACT, POINTS OF PROGRESS, AND

09:45AM   9    WHEN THAT MILESTONE WAS REACHED, THERE WAS ADDITIONAL MONEY DUE

09:45AM  10    FROM US AND IT CAME IN THE FORM OF A PRE-PURCHASE OF INVENTORY.

09:45AM  11    Q.   SO SAFEWAY, UNDER THE CONTRACT, WAS OBLIGATED TO PAY

09:45AM  12    $25 MILLION TO PRE-PURCHASE SOME INVENTORY?

09:45AM  13    A.   YOU KNOW, IF CERTAIN CONDITIONS WERE MET.

09:45AM  14    Q.   AND WHAT WERE SOME OF THE CONDITIONS?

09:45AM  15    A.   THE CONDITIONS WOULD BE A PILOT THAT WE REGARDED AS A

09:45AM  16    SUCCESS, AND THE WAY -- WE SAID THAT WE ALONE WOULD DECIDE

09:45AM  17    WHETHER IT WAS SUCCESSFUL, AND THAT CONDITION HAD NOT BEEN MET.

09:45AM  18    Q.   AND HAD A PILOT TAKEN PLACE AT ALL AT THIS POINT?

09:45AM  19    A.   NO.

09:45AM  20    Q.   OKAY.  LET ME NEXT DRAW YOUR ATTENTION TO EXHIBIT 820.

09:46AM  21         DOES THIS APPEAR TO BE ANOTHER EMAIL RELATING TO THE

09:46AM  22    INVOICE THAT THERANOS SENT FOR THE $25 MILLION?

09:46AM  23    A.   YES.

09:46AM  24              MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 820.

09:46AM  25              MR. DOWNEY:  NO OBJECTION.

BURD DIRECT BY MR. LEACH (RES.)

| | | |
|---|---|---|
| 09:46AM | 1 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 09:46AM | 2 | (GOVERNMENT'S EXHIBIT 820 WAS RECEIVED IN EVIDENCE.) |
| 09:46AM | 3 | MR. LEACH:  IF WE CAN ZOOM IN ON THE SUBSTANCE. |
| 09:46AM | 4 | THANK YOU, MS. HOLLIMAN. |
| 09:46AM | 5 | Q.   THE SUBJECT IS TRIGGER POINT FOR THE 25 MILLION. |
| 09:46AM | 6 | WHAT IS MEANT BY TRIGGER POINT? |
| 09:46AM | 7 | A.   IT'S THE CONDITION IN THE CONTRACT THAT SAYS WHEN IT IS |
| 09:46AM | 8 | MET WE WOULD PAY $25 MILLION. |
| 09:46AM | 9 | Q.   AND YOUR VIEW AT THE TIME WAS THAT IT HAD NOT BEEN MET? |
| 09:46AM | 10 | A.   CORRECT. |
| 09:46AM | 11 | Q.   YOU WROTE, "I HAD A LONG CHAT WITH BOB GORDON EARLIER |
| 09:46AM | 12 | TODAY ABOUT THE TRIGGERING EVENT.  AS WE DISCUSSED, WE WOULD |
| 09:46AM | 13 | LIKE TO SEE THE SPU IN ACTION." |
| 09:46AM | 14 | DO YOU SEE THAT? |
| 09:46AM | 15 | A.   YES. |
| 09:46AM | 16 | Q.   AND WHAT DID YOU MEAN BY THE SPU? |
| 09:46AM | 17 | A.   THAT'S THE UNIT ITSELF, THE ANALYZER. |
| 09:47AM | 18 | Q.   AND DID THAT EVER HAPPEN? |
| 09:47AM | 19 | A.   NO. |
| 09:47AM | 20 | Q.   YOU LEAVE SAFEWAY IN MAY OF 2013.  IS THAT YOUR TESTIMONY? |
| 09:47AM | 21 | A.   CORRECT. |
| 09:47AM | 22 | Q.   TO YOUR KNOWLEDGE, DID THERANOS EVER PUT A MINILAB DEVICE |
| 09:47AM | 23 | IN A SAFEWAY STORE? |
| 09:47AM | 24 | A.   TO MY KNOWLEDGE, NO. |
| 09:47AM | 25 | Q.   TO YOUR KNOWLEDGE, DID SAFEWAY EVER SUCCESSFULLY OFFER |

| | | |
|---|---|---|
| 09:47AM | 1 | THERANOS BLOOD TESTING SERVICES TO THE PUBLIC? |
| 09:47AM | 2 | A.   NO. |
| 09:47AM | 3 | Q.   OTHER THAN THE STACKING OF THE DEVICES AND THE HEAT ISSUES |
| 09:47AM | 4 | THAT YOU'VE DESCRIBED, DID MS. HOLMES EVER ATTRIBUTE DELAYS OR |
| 09:47AM | 5 | FAILURES TO DO THAT TO SOME TYPE OF TECHNOLOGICAL ISSUE? |
| 09:47AM | 6 | A.   NO.  LET ME GO BACK TO THE PUBLIC.  I WANT TO MAKE SURE, |
| 09:47AM | 7 | WHEN I SAY THE PUBLIC, I'M THINKING OF NONEMPLOYEES OF SAFEWAY |
| 09:47AM | 8 | AND THEIR FAMILIES. |
| 09:47AM | 9 | Q.   OTHER THAN THE ON CAMPUS FACILITY THAT WE'VE TALKED ABOUT? |
| 09:48AM | 10 | A.   RIGHT. |
| 09:48AM | 11 | Q.   DID MS. HOLMES EVER SUGGEST USING MODIFIED THIRD PARTY |
| 09:48AM | 12 | MACHINES TO DO FINGERSTICK TESTING? |
| 09:48AM | 13 | A.   NO. |
| 09:48AM | 14 | Q.   WOULD THAT HAVE BEEN OF INTEREST TO YOU? |
| 09:48AM | 15 | A.   NO. |
| 09:48AM | 16 | MR. LEACH:  MAY I HAVE A MOMENT, YOUR HONOR? |
| 09:48AM | 17 | THE COURT:  YES. |
| 09:48AM | 18 | (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.) |
| 09:48AM | 19 | MR. LEACH:  THANK YOU, MR. BURD. |
| 09:48AM | 20 | I HAVE NO FURTHER QUESTIONS. |
| 09:48AM | 21 | THANK YOU, YOUR HONOR. |
| 09:48AM | 22 | THE COURT:  CROSS-EXAMINATION? |
| 09:48AM | 23 | MR. DOWNEY:  YES, YOUR HONOR. |
| 09:48AM | 24 | YOUR HONOR, MAY I HAVE A MOMENT? |
| 09:49AM | 25 | THE COURT:  YES. |

09:49AM 1          (PAUSE IN PROCEEDINGS.)

09:49AM 2               MR. DOWNEY:  YOUR HONOR, I HAVE A NOTEBOOK FOR THE

09:49AM 3  COURT AND THE WITNESS.  MAY I PASS A COPY UP AND APPROACH THE

09:49AM 4  WITNESS?

09:49AM 5               THE COURT:  PLEASE.

09:49AM 6               MR. DOWNEY:  (HANDING.)

09:49AM 7                        **CROSS-EXAMINATION**

09:49AM 8  BY MR. DOWNEY:

09:49AM 9  Q.   GOOD MORNING, MR. BURD.

09:49AM 10  A.   GOOD MORNING.

09:49AM 11  Q.   MY NAME IS KEVIN DOWNEY AND I REPRESENT MS. HOLMES.

09:49AM 12       I'M GOING TO REMOVE MY MASK, TOO, SO WE CAN HAVE THIS

09:50AM 13  CONVERSATION A LITTLE MORE COMPREHENSIBLY --

09:50AM 14  A.   GREAT.

09:50AM 15  Q.   -- FOR THE JURY.

09:50AM 16       AS I UNDERSTAND IT, YOU WERE THE CHIEF EXECUTIVE AT

09:50AM 17  SAFEWAY FOR ABOUT 20 YEARS.

09:50AM 18  A.   EXACTLY 20 YEARS.

09:50AM 19  Q.   AND I THINK YOU TESTIFIED ON DIRECT THAT SAFEWAY IS A VERY

09:50AM 20  LARGE, SUCCESSFUL ORGANIZATION; IS THAT RIGHT?

09:50AM 21  A.   CORRECT.

09:50AM 22  Q.   YOU MENTIONED $45 BILLION OR SO IN REVENUES AS OF 2010.

09:50AM 23       HOW MUCH OF THAT WOULD CONSTITUTE THE PROFIT OF SAFEWAY AT

09:50AM 24  THAT TIME?

09:50AM 25  A.   YOU KNOW, I DIDN'T COMMIT THOSE TO MEMORY, BUT WE USUALLY

09:50AM 1    HAD FREE CASH FLOW AFTER MEETING ALL EXPENSES AND AROUND A

09:50AM 2    BILLION THREE OR SOMETHING LIKE THAT.

09:50AM 3    Q.   AND PEOPLE THINK THAT BECAUSE YOU'RE THE CEO, YOU'RE THE

09:50AM 4    TOP GUY.  BUT, IN FACT, YOU HAD A BOARD OF DIRECTORS YOU HAD TO

09:50AM 5    REPORT TO; IS THAT CORRECT?

09:50AM 6    A.   THAT'S CORRECT.

09:50AM 7    Q.   AND IT WAS A VERY SOPHISTICATED BOARD?

09:50AM 8    A.   WE HAD PEOPLE WITH STRONG BUSINESS EXPERIENCE.  WE THINK

09:51AM 9    IT WAS A GOOD BOARD.

09:51AM 10   Q.   AND YOU HAD THE FORMER CHIEF EXECUTIVE OF WELLS FARGO;

09:51AM 11   CORRECT?

09:51AM 12   A.   CORRECT?

09:51AM 13   Q.   AND YOU HAD THE FORMER VICE CHAIR OF MACY'S; CORRECT?

09:51AM 14   A.   RIGHT.

09:51AM 15   Q.   AND YOU HAD THE FORMER CEO OF AT&T WIRELESS; CORRECT?

09:51AM 16   A.   CORRECT.

09:51AM 17   Q.   AND SO YOU HAD A LOT OF PEOPLE WHO HAD A LOT OF EXPERIENCE

09:51AM 18   IN BUSINESS?

09:51AM 19   A.   THAT'S CORRECT.

09:51AM 20   Q.   AND THEY WERE PEOPLE WHO WOULD ASK YOU QUESTIONS AND

09:51AM 21   COMMENT ON DECISIONS MANAGEMENT MADE IF THEY HAD AN ISSUE WITH

09:51AM 22   IT; CORRECT?

09:51AM 23   A.   CORRECT.

09:51AM 24   Q.   AND WITHIN THE COMPANY, OF COURSE YOU MENTIONED -- I THINK

09:51AM 25   YOU MENTIONED YOU HAD MORE THAN 175,000 EMPLOYEES AT THAT TIME;

09:51AM  1    CORRECT?

09:51AM  2    A.   CORRECT.

09:51AM  3    Q.   AND MANY OF THOSE ARE THE PEOPLE WE KNOW WHO WORK IN THE

09:51AM  4    STORES; CORRECT?

09:51AM  5    A.   MOST OF THEM WORK IN THE STORES.

09:51AM  6    Q.   OKAY.  BUT YOU ALSO HAVE A FUNCTION THAT YOU MIGHT CALL

09:51AM  7    THE CORPORATE FUNCTION, WHICH IS THE LAWYERS AND THE

09:51AM  8    ACCOUNTANTS AND SO FORTH?

09:51AM  9    A.   WE WOULD CALL THAT THE SUPPORT FUNCTION.

09:51AM 10    Q.   THE SUPPORT FUNCTION.

09:51AM 11         HOW MANY PEOPLE WORKED IN THE SUPPORT FUNCTION IN 2010?

09:51AM 12    A.   YOU KNOW, 2010 TO 2013 ARE KIND OF BLURRING, SO I'LL JUST

09:52AM 13    GIVE YOU ROUGH NUMBERS.

09:52AM 14    Q.   THAT'S FINE.

09:52AM 15    A.   ON CAMPUS WE HAD AROUND 3500 EMPLOYEES; AND THEN WE WERE

09:52AM 16    ORGANIZED DIVISIONALLY IN NINE DIVISIONS IN THE U.S. AND

09:52AM 17    CANADA, AND SO THEY HAD THEIR OWN SUPPORT FUNCTION.  IT MIGHT

09:52AM 18    BE ANYWHERE FROM 300 TO 700 PEOPLE.

09:52AM 19    Q.   AND YOU HAD, WORKING WITHIN THAT, A NUMBER OF PEOPLE WHO

09:52AM 20    REPORTED DIRECTLY TO YOU; CORRECT?

09:52AM 21    A.   CORRECT.

09:52AM 22    Q.   AND THAT WAS A STRONG EXECUTIVE TEAM IN YOUR VIEW?

09:52AM 23    A.   IT WAS.

09:52AM 24    Q.   OKAY.  YOU HAD A -- I THINK YOU MENTIONED YOU HAD A

09:52AM 25    GENERAL COUNSEL, MR. GORDON; CORRECT?

09:52AM    1    A.   CORRECT.

09:52AM    2    Q.   AND YOU HAD A CHIEF FINANCIAL OFFICER, ROBERT EDWARDS;

09:52AM    3    CORRECT?

09:52AM    4    A.   CORRECT.

09:52AM    5    Q.   AND YOU HAD A NUMBER OF OTHER SENIOR EXECUTIVE VICE

09:52AM    6    PRESIDENT TYPES; CORRECT?

09:52AM    7    A.   YES.

09:52AM    8    Q.   AND YOU HAD AN ENTIRE DIVISION THAT WAS DEVOTED TO HEALTH

09:52AM    9    ISSUES AT SAFEWAY; CORRECT?

09:53AM   10    A.   WE HAD A SMALL COMPANY, A STARTUP, PROBABLY NOT MORE THAN

09:53AM   11    FIVE EMPLOYEES.

09:53AM   12    Q.   AND THAT WAS CALLED SAFEWAY HEALTH?

09:53AM   13    A.   SAFEWAY HEALTH.

09:53AM   14    Q.   OKAY.  AND WHEN THE COMPANY HAD ISSUES ON WHICH IT DIDN'T

09:53AM   15    HAVE INTERNAL CAPACITY TO UNDERTAKE DECISIONS OR CONDUCT ITS

09:53AM   16    OPERATIONS, YOU WOULD GET OUTSIDE ADVISORS; CORRECT?

09:53AM   17    A.   WE WOULD.

09:53AM   18    Q.   AND SO IF YOU NEEDED LAWYERS, YOU MIGHT HIRE A LAW FIRM;

09:53AM   19    CORRECT?

09:53AM   20    A.   YES.

09:53AM   21    Q.   AND IF YOU NEEDED TO UNDERTAKE A TRANSACTION, YOU MIGHT

09:53AM   22    HIRE PEOPLE TO HELP YOU WITH THAT TRANSACTION; CORRECT?

09:53AM   23    A.   YES.

09:53AM   24    Q.   AND YOU MIGHT HIRE INVESTMENT BANKERS; CORRECT?

09:53AM   25    A.   YEAH, FOR LARGE TRANSACTIONS.  SMALL ONES WE DO OURSELVES.

09:53AM 1    Q.   AND ACQUISITION ADVISORS AND SO FORTH; CORRECT?

09:53AM 2    A.   CORRECT.

09:53AM 3    Q.   OKAY.  AND AT THIS POINT IN YOUR 17TH OR 18TH YEAR,

09:53AM 4    WHATEVER IT WAS, AS THE CHIEF EXECUTIVE, YOU HAD BECOME A

09:54AM 5    PRETTY SOPHISTICATED NEGOTIATOR; IS THAT RIGHT?

09:54AM 6    A.   I THINK I'M PRETTY GOOD AT IT.

09:54AM 7         ON THE OTHER HAND, WE HAD -- THIS WAS LARGELY A UNIONIZED

09:54AM 8    COMPANY, SO I HAD PEOPLE NEGOTIATE FOR ME.  BUT I SET THE

09:54AM 9    STRATEGY, THEY EXECUTED THE STRATEGY, AND I APPROVED THE

09:54AM 10   OUTCOME.

09:54AM 11   Q.   WELL, YOU MENTIONED EVEN BEFORE YOU CAME TO SAFEWAY YOU

09:54AM 12   HAD A BACKGROUND IN PRIVATE EQUITY; CORRECT?

09:54AM 13   A.   I WORKED FOR KOHLBERG, KRAVIS, ROBERTS & COMPANY NOT AS AN

09:54AM 14   EMPLOYEE BUT AS AN ADVISOR FOR ALMOST TEN YEARS.

09:54AM 15   Q.   AND THAT'S A LARGE PRIVATE EQUITY FIRM THAT MAKES

09:54AM 16   INVESTMENTS IN COMPANIES; CORRECT?

09:54AM 17   A.   IT IS.

09:54AM 18   Q.   AND YOUR AFFILIATION YOU SAY LASTED TEN YEARS?

09:54AM 19   A.   CLOSE TO TEN YEARS.

09:54AM 20   Q.   AND YOU WERE AROUND TRANSACTIONS IN CONNECTION WITH THEIR

09:54AM 21   WORK; CORRECT?

09:54AM 22   A.   I WAS.

09:54AM 23   Q.   AND AT SAFEWAY STORES, YOU'VE ALSO ENGAGED IN NEGOTIATIONS

09:54AM 24   RELATED TO A NUMBER OF ACQUISITIONS OF A NUMBER OF BUSINESSES;

09:54AM 25   CORRECT?

09:55AM   1    A.   YES.

09:55AM   2    Q.   AND YOU STARTED SOME BUSINESSES.  I THINK YOU MENTIONED

09:55AM   3    THAT.

09:55AM   4    A.   I STARTED SOME BUSINESSES.

09:55AM   5    Q.   AND THEN THOSE ARE THE GAS STATIONS AND SO FORTH?

09:55AM   6    A.   ACTUALLY, I HADN'T THOUGHT ABOUT THAT.  THAT WOULD BE

09:55AM   7    NUMBER SEVEN.  I STARTED SEVEN BUSINESSES.

09:55AM   8    Q.   SEVEN BUSINESSES?

09:55AM   9    A.   YES.

09:55AM   10   Q.   OKAY.  NOW, YOU FIRST LEARNED ABOUT THERANOS IN 2010 OR

09:55AM   11   LATE 2009?

09:55AM   12   A.   I REMEMBER THE MONTH.  THE YEAR IS SOMEWHERE IN THESE

09:55AM   13   BINDERS.  THE MONTH WAS MARCH.

09:55AM   14   Q.   OKAY.  AND BEFORE YOU MET WITH MS. HOLMES, I THINK YOU

09:55AM   15   MENTIONED THAT SOME OTHER EXECUTIVES OF THE COMPANY HAD MET

09:55AM   16   WITH MS. HOLMES; CORRECT?

09:55AM   17   A.   CORRECT.

09:55AM   18   Q.   AND DO YOU KNOW ON HOW MANY OCCASIONS THEY HAD MET WITH

09:55AM   19   MS. HOLMES?

09:55AM   20   A.   I BELIEVE IT WAS JUST ONE.

09:55AM   21   Q.   OKAY.  AND DO YOU RECALL WHETHER A BOARD MEMBER OF

09:55AM   22   THERANOS HAD HAD A DISCUSSION WITH A BOARD MEMBER OF SAFEWAY,

09:55AM   23   OR RATHER, WITH THE CHIEF FINANCIAL OFFICER OF SAFEWAY ABOUT

09:56AM   24   THERANOS?

09:56AM   25   A.   YES.

09:56AM    1    Q.   AND THE CHIEF FINANCIAL OFFICER, AS YOU SAID, WAS

09:56AM    2    MR. EDWARDS; CORRECT?

09:56AM    3    A.   CORRECT.

09:56AM    4    Q.   AND THE BOARD MEMBER FROM THERANOS WAS MR. DON LUCAS;

09:56AM    5    CORRECT?

09:56AM    6    A.   THAT IS CORRECT.  I BELIEVE THEY SERVED ON A BOARD

09:56AM    7    TOGETHER AND THAT'S HOW THEY KNEW ONE ANOTHER.

09:56AM    8    Q.   SO THEY HAD A PRIOR RELATIONSHIP?

09:56AM    9    A.   CORRECT.

09:56AM   10    Q.   AND DID YOU LEARN ABOUT THAT CONVERSATION BEFORE YOU

09:56AM   11    ENTERED INTO DISCUSSIONS WITH MS. HOLMES?

09:56AM   12    A.   I DID NOT KNOW ABOUT THAT CONVERSATION.  I THINK IT TOOK

09:56AM   13    PLACE AFTER I MET ELIZABETH AND HEARD THE THERANOS STORY.

09:56AM   14    Q.   AND WHEN YOU HEARD THAT MR. LUCAS WAS A BOARD MEMBER, DID

09:56AM   15    YOU RECOGNIZE WHO HE WAS?

09:56AM   16    A.   I DID.

09:56AM   17    Q.   YOU UNDERSTOOD THAT HE HAD BEEN A SUBSTANTIAL INVESTOR IN

09:56AM   18    TECHNOLOGY COMPANIES; IS THAT RIGHT?

09:56AM   19    A.   CORRECT.

09:56AM   20    Q.   AND YOU UNDERSTOOD THAT HE HAD BEEN AFFILIATED WITH SOME

09:56AM   21    OF THE SUCCESS STORIES IN TECHNOLOGY; IS THAT CORRECT?

09:57AM   22    A.   CORRECT.

09:57AM   23    Q.   ORACLE AND SO FORTH?

09:57AM   24    A.   CORRECT.

09:57AM   25    Q.   AND DID YOU LEARN DETAILS ABOUT THE BUSINESS FROM YOUR --

09:57AM   1    THE PEOPLE WHO WORKED FOR YOU PRIOR TO THE TIME THAT YOU MET

09:57AM   2    MS. HOLMES?

09:57AM   3    A.   NO.

09:57AM   4    Q.   THEY SIMPLY TOLD YOU THAT WE HAD A MEETING AND THEY WOULD

09:57AM   5    LIKE YOU TO HAVE A MEETING?

09:57AM   6    A.   WELL, THEY TOLD ME ABOUT THE MEETING.  I WOULDN'T SAY IT

09:57AM   7    WAS DETAILS.  I JUST HAD TO HEAR THAT IT WAS A MINILAB, RESULTS

09:57AM   8    IN 20, 30 MINUTES, AND I WAS IMMEDIATELY INTERESTED.

09:57AM   9    Q.   AND THEN YOU HAD THE MEETING I THINK YOU DESCRIBED ON

09:57AM  10    DIRECT; CORRECT?

09:57AM  11    A.   I'M SORRY.  SAY THAT AGAIN.

09:57AM  12    Q.   I'M SORRY.  YOU HAD THE MEETING WITH MS. HOLMES THAT YOU

09:57AM  13    DESCRIBED ON FRIDAY, WHICH I WON'T MAKE YOU REPEAT.

09:57AM  14    A.   YES.

09:57AM  15    Q.   BUT THIS WAS IN GENERAL TERMS.  THIS WAS THE MEETING WHERE

09:57AM  16    YOU WANTED TO GAIN AN IMPRESSION OF HER, LEARN ABOUT HER VISION

09:57AM  17    AND SO FORTH?

09:57AM  18    A.   CORRECT.

09:57AM  19    Q.   AND I THINK YOU TESTIFIED THAT YOU WERE IMPRESSED WITH HER

09:57AM  20    AS A RESULT OF THAT MEETING; CORRECT?

09:57AM  21    A.   YES.

09:58AM  22    Q.   YOU KNEW AT THE TIME THAT SHE WAS A VERY YOUNG

09:58AM  23    ENTREPRENEUR; CORRECT?

09:58AM  24    A.   YES.

09:58AM  25    Q.   YOU KNEW SHE WAS IN HER 20S OR SO?

09:58AM   1    A.   RIGHT.

09:58AM   2    Q.   AND OF COURSE YOU KNEW THE COMPANY WAS A STARTUP; CORRECT?

09:58AM   3    A.   I KNEW THAT.  I MEAN, IT WAS A, IT WAS -- IT HAD STILL

09:58AM   4    BEEN IN BUSINESS FOR A WHILE, BUT I WOULD CLASSIFY IT AS A

09:58AM   5    STARTUP.

09:58AM   6    Q.   IT WAS ABOUT FIVE AND A HALF YEARS OLD OR SO?

09:58AM   7    A.   YES, YES.

09:58AM   8    Q.   AND DID YOU KNOW HOW MANY EMPLOYEES THE COMPANY HAD?

09:58AM   9    A.   I DID NOT.

09:58AM   10   Q.   AND DID YOU KNOW WHETHER THE COMPANY HAD EVER BEEN PART OF

09:58AM   11   A RETAIL PARTNERSHIP BEFORE MS. HOLMES'S DISCUSSIONS WITH YOU

09:58AM   12   AND OTHERS AT SAFEWAY?

09:58AM   13   A.   YOU KNOW, SOMEWHERE ALONG THE LINE, NOT IN THAT FIRST

09:58AM   14   MEETING, I LEARNED THAT THEY HAD DISCUSSIONS WITH WALGREENS.

09:58AM   15   Q.   THAT AT THE SAME TIME THEY WERE JUST HAVING DISCUSSIONS

09:58AM   16   WITH SAFEWAY, THERANOS WAS ALSO DISCUSSING POTENTIAL RETAIL

09:58AM   17   PARTNERSHIPS WITH OTHER RETAIL COMPANIES; IS THAT WHAT YOU

09:59AM   18   MEAN?

09:59AM   19   A.   THAT'S WHAT I MEAN.

09:59AM   20   Q.   OKAY.  BUT AS OF THAT TIME, THEY HAD NOT YET RUN ANY

09:59AM   21   RETAIL OPERATIONS; CORRECT?

09:59AM   22   A.   CORRECT.

09:59AM   23   Q.   AND THEIR WORK, AS YOU UNDERSTOOD IT, HAD LARGELY BEEN IN

09:59AM   24   CONNECTION WITH WORK WITH THE PHARMACEUTICAL INDUSTRY; CORRECT?

09:59AM   25   A.   THAT'S INITIALLY WHO THEY SAID THEY HAD TESTED OUT THEIR

09:59AM 1    DEVICE WITH.

09:59AM 2    Q.   SO YOU UNDERSTOOD THAT SAFEWAY OR WALGREENS OR ONE OF THE

09:59AM 3    OTHER COMPANIES THAT THEY WERE TALKING TO, THIS WOULD BE THEIR

09:59AM 4    FIRST CONSUMER-BASED DEPLOYMENT OF TECHNOLOGY; CORRECT?

09:59AM 5    A.   CORRECT.

09:59AM 6    Q.   AND YOU UNDERSTOOD, OF COURSE, AS A RESULT THAT THEY NEVER

09:59AM 7    SCALED THIS TECHNOLOGY OR BUILT TECHNOLOGY ON A BROAD BASIS;

09:59AM 8    CORRECT?

09:59AM 9    A.   I KNEW THEY DIDN'T HAVE A LOT OF CUSTOMERS, OKAY, SO THEY

09:59AM 10   HADN'T GEARED UP FOR A LOT OF PRODUCTION.

09:59AM 11   Q.   OKAY.  BUT NEVERTHELESS, FOR THE REASONS THAT I THINK YOU

09:59AM 12   SAID ON FRIDAY, YOU WERE IMPRESSED WITH MS. HOLMES AND WITH THE

09:59AM 13   COMPANY BASED ON WHAT YOU HAD LEARNED; CORRECT?

10:00AM 14   A.   CORRECT.

10:00AM 15   Q.   AND I THINK YOU TESTIFIED THAT YOU ALMOST IMMEDIATELY WERE

10:00AM 16   INTERESTED IN PURSUING A POTENTIAL PARTNERSHIP WITH THERANOS;

10:00AM 17   CORRECT?

10:00AM 18   A.   CORRECT.

10:00AM 19   Q.   AND YOU MENTIONED THAT YOU, SHORTLY AFTER THE MEETING,

10:00AM 20   THAT YOU THOUGHT YOU SENT AN EMAIL TO MS. HOLMES.

10:00AM 21        DO YOU RECALL THAT?

10:00AM 22   A.   I BELIEVE I DID.

10:00AM 23   Q.   OKAY.  LET ME SHOW YOU IN THE BINDER THAT I'VE PLACED IN

10:00AM 24   FRONT OF YOU EXHIBIT 281.

10:00AM 25   A.   YES.

10:00AM  1    Q.   IS THAT A LETTER THAT YOU SENT TO MS. HOLMES IN 2010 AFTER

10:00AM  2    THE MEETING THAT YOU DESCRIBED ON DIRECT?

10:00AM  3    A.   CORRECT.

10:00AM  4              MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

10:00AM  5    281.

10:01AM  6              MR. LEACH:  NO OBJECTION.

10:01AM  7              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:01AM  8         (GOVERNMENT'S EXHIBIT 281 WAS RECEIVED IN EVIDENCE.)

10:01AM  9    BY MR. DOWNEY:

10:01AM  10   Q.   NOW, AM I RIGHT THAT AFTER YOU HEARD ABOUT THERANOS, THAT

10:01AM  11   YOU UNDERSTOOD THAT THIS OPPORTUNITY MIGHT BE ONE THAT HAD A

10:01AM  12   LOT OF POTENTIAL FOR SAFEWAY?

10:01AM  13   A.   CORRECT.

10:01AM  14   Q.   AND I THINK YOU SAID ON DIRECT THAT ONE OF THE POTENTIALS

10:01AM  15   WAS THAT JUST BY HAVING A NEW BUSINESS, YOU WOULD DRAW MORE

10:01AM  16   PEOPLE INTO SAFEWAY STORES; CORRECT?

10:01AM  17   A.   YES.

10:01AM  18   Q.   AND ANOTHER POSSIBILITY WAS THAT WITH RESPECT TO TESTS

10:01AM  19   THAT WERE PERFORMED IN SAFEWAY STORES, YOU MIGHT REALIZE A

10:01AM  20   LITTLE BIT OF A PROFIT ON EACH TEST THAT WAS PERFORMED;

10:01AM  21   CORRECT?

10:01AM  22   A.   CORRECT.

10:01AM  23   Q.   AND SO THAT THERANOS MIGHT BE OFFERING A TEST IN YOUR

10:01AM  24   STORE AT, SAY, $12 AND YOU MIGHT BE ABLE TO RETAIN TWO OF THOSE

10:01AM  25   DOLLARS; CORRECT?

10:01AM  1    A.   YES.  YOUR EXAMPLE, THOUGH, IS A PRETTY LOW NUMBER.  A

10:01AM  2    TYPICAL TEST WOULD BE, YOU KNOW, OVER $30.

10:02AM  3    Q.   OKAY.  AND OUT OF THAT, HOW MUCH WOULD SAFEWAY PROJECT IT

10:02AM  4    MIGHT BE ABLE TO CAPTURE?

10:02AM  5    A.   WE HAD SOMETHING IN THE CONTRACT THAT SUGGESTED THAT --

10:02AM  6    WELL, IT DIDN'T SUGGEST, IT SAID THAT WE WANTED TO MAKE $10 PER

10:02AM  7    TEST.

10:02AM  8    Q.   OKAY.  AND YOU ALSO TALKED ABOUT -- HOW MANY TESTS --

10:02AM  9    A.   CAN I CLARIFY THAT AND MAKE SURE EVERYBODY UNDERSTANDS?

10:02AM  10   Q.   YEAH.

10:02AM  11   A.   WE WANTED $10 IN REVENUE FOR DOING A TEST.  WHEN SOMEONE

10:02AM  12   COMES IN FOR A BLOOD TEST, THEY TYPICALLY HAVE THREE AND A HALF

10:02AM  13   TESTS, SO THAT WOULD BE $35.  AND THE FACILITY'S ON OUR

10:02AM  14   PROPERTY WITH OUR LABOR, THAT'S NOT THE PROFIT YOU MAKE, IT'S

10:02AM  15   THE REVENUE THAT YOU MAKE.

10:02AM  16   Q.   SO IT WOULD BE YOUR GROSS REVENUE, AND THEN OUT OF THAT

10:02AM  17   YOU WOULD REALIZE A SMALLER NUMBER AS PROFIT; CORRECT?

10:02AM  18   A.   CORRECT.

10:02AM  19   Q.   BUT IN TERMS OF THE LARGER STORE AND SO FORTH, THAT WAS

10:02AM  20   ALREADY BUILT, CORRECT, SO THIS WAS POTENTIALLY A PROFITABLE

10:02AM  21   BUSINESS?

10:02AM  22   A.   AT THE NUMBERS THAT WE WERE LOOKING AT, YES.

10:02AM  23   Q.   AND YOU ALSO MENTIONED THAT YOU MIGHT FEATURE TO OTHER

10:02AM  24   STORES A NETWORK IN WHICH THERANOS SERVICES MIGHT BE OFFERED.

10:03AM  25        COULD YOU EXPLAIN THAT?

10:03AM  1    A.   SURE.  WE HAD BUILT A NETWORK OF RETAILERS TO SELL GIFT

10:03AM  2    CARDS THAT YOU'LL SEE IN MOST SUPERMARKETS IN THE UNITED STATES

10:03AM  3    CALLED AN END CAP.

10:03AM  4         SO WE HAD THESE PARTNERSHIPS THAT EXISTED, AND WE FELT WE

10:03AM  5    COULD DO THE SAME THING FOR THERANOS BECAUSE WE WERE ONLY 1500,

10:03AM  6    1800 STORES IN THAT TIMEFRAME AND WE THOUGHT WE COULD PUT

10:03AM  7    TOGETHER A NATIONWIDE NETWORK OF OTHER RETAILERS AND WE WOULD

10:03AM  8    GET A REALLY SMALL SLIVER OF INCOME FROM THAT.

10:03AM  9    Q.   AND WOULD THAT BE DONE BY A LICENSING AGREEMENT BETWEEN

10:03AM  10   YOU AND THE OTHER STORES, OR HOW WOULD IT WORK?

10:03AM  11   A.   IT WOULD BE -- YOU KNOW, I DON'T THINK WE GOT FAR IN THAT

10:03AM  12   BUT WE ENVISIONED THAT WE WOULD PUT THAT NETWORK TOGETHER,

10:03AM  13   THERANOS WOULD APPROVE THOSE RETAILERS, AND THEN I CAN'T

10:04AM  14   RECALL, I THINK IT WAS OUR REVENUE WOULD COME FROM THE RETAILER

10:04AM  15   ITSELF, THAT SMALL BIT OF PROFIT.

10:04AM  16   Q.   AND YOU MENTIONED ON, ON -- A MOMENT AGO THAT YOU LEARNED

10:04AM  17   AT SOME POINT DURING THE COURSE OF YOUR DISCUSSIONS WITH

10:04AM  18   THERANOS THAT THEY WERE ALSO TALKING TO OTHER RETAILERS;

10:04AM  19   CORRECT?

10:04AM  20   A.   THE ONLY RETAILER I KNEW THAT THEY WERE TALKING TO WAS

10:04AM  21   WALGREENS.  AT LEAST THAT'S MY MEMORY.

10:04AM  22        I HAD INTRODUCED ELIZABETH TO PEOPLE AT PUBLIX, HY-VEE,

10:04AM  23   AND I THINK OTHER RETAILERS AT AN ANNUAL FMI CONFERENCE.

10:04AM  24   Q.   OKAY.  BUT WHATEVER -- AT THIS EARLY STAGE WHERE YOU WERE

10:04AM  25   MEETING MS. HOLMES FOR THE FIRST TIME, YOU RECOGNIZED THAT

10:04AM  1    WHATEVER RETAILER MIGHT GET AN EXCLUSIVE CONTRACT WITH

10:04AM  2    THERANOS, THAT THAT COULD BE A UNIQUELY PROFITABLE OPPORTUNITY

10:04AM  3    FOR THAT RETAILER; CORRECT?

10:04AM  4    A.   SURE.  AND THAT WAS NOT DISCUSSED AT THAT MEETING.  THAT

10:05AM  5    WAS LAID OUT IN THIS LETTER.

10:05AM  6    Q.   OKAY.  WELL, LET'S LOOK AT EXHIBIT 281 AND LET'S LOOK AT

10:05AM  7    THE FIRST PARAGRAPH.

10:05AM  8        IN THIS PARAGRAPH, YOU LAY OUT A POTENTIAL ARRANGEMENT

10:05AM  9    WHERE SAFEWAY WOULD HELP TO LAUNCH THE THERANOS BLOOD ANALYZER;

10:05AM  10   CORRECT?

10:05AM  11   A.   CORRECT.

10:05AM  12   Q.   AND IN RETURN, SAFEWAY WOULD GET THE EXCLUSIVE RIGHTS IN

10:05AM  13   ALL RETAIL FOR SOME PERIOD OF TIME; CORRECT?

10:05AM  14   A.   IT WAS CONFINED TO THE RETAIL SUPERMARKETS.

10:05AM  15   Q.   WELL, AT THIS POINT IN TIME, WERE YOU SEEKING ACTUALLY

10:05AM  16   EXCLUSIVE RIGHTS ACROSS ALL FORMS OF RETAIL?

10:05AM  17   A.   I DON'T BELIEVE SO.  I CAN READ THIS THING AGAIN.

10:05AM  18   Q.   SURE.

10:05AM  19        (PAUSE IN PROCEEDINGS.)

10:06AM  20          THE WITNESS:  WE WERE THINKING, YOU KNOW, WHETHER IT

10:06AM  21   SAYS IT HERE OR NOT, WE WERE THINKING EXCLUSIVELY ABOUT A

10:06AM  22   SUPERMARKET NETWORK.

10:06AM  23   BY MR. DOWNEY:

10:06AM  24   Q.   OKAY, SO THAT WOULD PRECLUDE RETAILERS LIKE KROGER AND

10:06AM  25   OTHERS FROM OFFERING IT IF YOU WERE ABLE TO ACHIEVE THAT TYPE

BURD CROSS BY MR. DOWNEY                                        3062

10:06AM  1    OF EXCLUSIVITY?

10:06AM  2    A.   WE WOULD TRY TO BUILD IT INITIALLY SO IT WAS RETAILERS

10:06AM  3    THAT WE DIDN'T COMPETE WITH, BUT WE LEARNED FROM THE BLACK HAWK

10:06AM  4    NETWORK THAT WE PUT TOGETHER FOR GIFT CARDS THAT WE ULTIMATELY

10:06AM  5    SOLD THEM TO EVERYBODY, EVEN THOSE WE COMPETED WITH, AND IT WAS

10:06AM  6    PROFITABLE TO DO SO.  BUT WE WOULD START WITH NONCOMPETING

10:06AM  7    RETAILERS.

10:06AM  8    Q.   OKAY.  AND SO WOULD YOU BE ABLE TO PRECLUDE, IN YOUR VIEW,

10:07AM  9    FOOD RETAILERS LIKE WAL-MART?

10:07AM  10   A.   WE WOULDN'T HAVE PICKED THEM BECAUSE WE COMPETE WITH THEM

10:07AM  11   SO BROADLY.

10:07AM  12   Q.   OKAY.  SO THEY WOULD NOT HAVE BEEN PART OF THE NETWORK?

10:07AM  13   A.   CORRECT.

10:07AM  14   Q.   SO IF YOU GOT AN EXCLUSIVE DEAL, YOU COULD PRECLUDE

10:07AM  15   WAL-MART FOR A PERIOD OF TIME FROM HOSTING THERANOS DEVICES?

10:07AM  16   A.   CORRECT.

10:07AM  17   Q.   OKAY.  AND THAT WOULD BE TRUE ALSO OF ANY OTHER RETAILER

10:07AM  18   THAT IS PART OF THE FOOD RETAIL CHAIN?

10:07AM  19   A.   YES.

10:07AM  20   Q.   OKAY.  IF YOU LOOK AT THE FIRST PARAGRAPH AFTER YOUR

10:07AM  21   INTRODUCTORY PARAGRAPH, YOU INDICATE THAT YOU WILL ARRANGE A

10:07AM  22   MEETING BETWEEN MS. HOLMES AND UCSF SO THAT IT COULD VERIFY

10:07AM  23   THAT THE BLOOD ANALYZER COULD PERFORM 85 PERCENT OF BLOOD WORK

10:07AM  24   DONE BY A STANDARD RETAIL LAB; CORRECT?

10:07AM  25   A.   CORRECT.

BURD CROSS BY MR. DOWNEY                                               3063

10:07AM   1    Q.   DID YOU ARRANGE THAT MEETING?

10:08AM   2    A.   WE DID ARRANGE A MEETING WITH UCSF WHICH INCLUDED THE CEO,

10:08AM   3    THE CHIEF MEDICAL OFFICER, AND THE HEAD OF LABS, BUT THAT

10:08AM   4    WASN'T UNTIL 2011.

10:08AM   5    Q.   WELL, DO YOU RECALL AT THE TIME OF THIS DISCUSSION WITH

10:08AM   6    MS. HOLMES THAT YOU DID ARRANGE A MEETING BETWEEN MS. HOLMES

10:08AM   7    AND PHYSICIANS AT UCSF?

10:08AM   8    A.   I DON'T QUITE UNDERSTAND THE QUESTION.

10:08AM   9    Q.   WELL, I THINK YOU JUST DESCRIBED A MEETING --

10:08AM  10    A.   ARE YOU ASKING, DID I DO THAT BEFORE 2011?

10:08AM  11    Q.   YES.

10:08AM  12    A.   I'D HAVE TO GO LOOK AT A BUNCH OF EMAILS.  I CAN'T COMMIT

10:08AM  13    ONE WAY OR THE OTHER ON THAT.

10:08AM  14    Q.   WELL, LET ME SHOW YOU ONE EMAIL TO SEE IF IT REFRESHES

10:08AM  15    YOUR RECOLLECTION.

10:08AM  16    A.   SURE.

10:08AM  17    Q.   AND THIS IS NOT FOR DISPLAY, BUT EXHIBIT 7101.  AND YOU

10:09AM  18    CAN REVIEW AS MUCH OF THIS AS YOU WOULD LIKE TO REVIEW, BUT I'M

10:09AM  19    JUST REALLY INTERESTED IN THE FIRST PARAGRAPH.

10:09AM  20         FIRST OF ALL, LET ME JUST ASK, IS KEVIN SHACHMUT ONE OF

10:09AM  21    THE EXECUTIVES WHO YOU MENTIONED WHO WORKED WITHIN SAFEWAY

10:09AM  22    HEALTH AT THIS TIME?

10:09AM  23    A.   THAT'S CORRECT.

10:09AM  24    Q.   IS IT ACCURATE THAT YOU, AS OF 2010, HAD CONTACTS AT UCSF?

10:09AM  25    A.   I HAD A LONGSTANDING RELATIONSHIP AT UCSF.

10:09AM   1          I HAVE TO READ THE COMPLETE LETTER.  CAN I DO THAT?

10:09AM   2     Q.   SURE.  OF COURSE.

10:09AM   3     A.   OKAY.

10:10AM   4          (PAUSE IN PROCEEDINGS.)

10:10AM   5               THE WITNESS:  OKAY.

10:10AM   6     BY MR. DOWNEY:

10:10AM   7     Q.   ALL RIGHT.  I ASKED YOU ABOUT MR. SHACHMUT.

10:10AM   8          IS BRAD WOLFSEN ALSO ANOTHER SAFEWAY HEALTH EXECUTIVE?

10:10AM   9     A.   HE WAS AT THE TIME.

10:10AM  10     Q.   AND YOU -- AS YOU SAID, YOU HAVE A LONGSTANDING

10:10AM  11     RELATIONSHIP WITH UCSF; IS THAT CORRECT?

10:10AM  12     A.   CORRECT.

10:10AM  13     Q.   AND IS THAT IN PART BECAUSE SAFEWAY HAS BEEN A GENEROUS

10:10AM  14     DONOR TO UCSF?

10:10AM  15     A.   SAFEWAY HAS, YES.

10:10AM  16     Q.   AND YOU PERSONALLY HAVE?

10:10AM  17     A.   I PERSONALLY HAVE.

10:10AM  18     Q.   AND SO YOU HAVE HAD GOOD RELATIONSHIPS WITHIN UCSF; IS

10:10AM  19     THAT CORRECT?

10:10AM  20     A.   CORRECT.

10:10AM  21     Q.   AND DOES THIS REFRESH YOUR RECOLLECTION THAT YOU REACHED

10:10AM  22     OUT AROUND THE TIME OF YOUR INITIAL MEETING WITH MS. HOLMES TO

10:10AM  23     ASK UCSF TO EVALUATE THERANOS'S TECHNOLOGY AND WHAT CAPACITIES

10:10AM  24     IT HAD AT THAT TIME?

10:10AM  25     A.   IT DOESN'T.  THIS LETTER STATES THAT STEVE WILL BE

10:11AM  1    REACHING OUT TO HIS CONTACTS --

10:11AM  2    Q.   YOU DON'T HAVE TO READ IT.  I'M JUST --

10:11AM  3             THE COURT:  EXCUSE ME, COUNSEL.

10:11AM  4        THE LAST PORTION IS STRICKEN, LADIES AND GENTLEMEN.  THE

10:11AM  5    PORTION ABOUT READING THE LETTER IS JUST TO REFRESH THE

10:11AM  6    WITNESS'S RECOLLECTION.

10:11AM  7             THE WITNESS:  RIGHT.

10:11AM  8    BY MR. DOWNEY:

10:11AM  9    Q.   I'M JUST ASKING YOU IF, HAVING READ IT, YOU RECALL IT OR

10:11AM 10    NOT.

10:11AM 11    A.   I DON'T BELIEVE THAT -- BY THE 24TH I HAD NOT YET REACHED

10:11AM 12    OUT TO UCSF.

10:11AM 13    Q.   DO YOU KNOW DR. SUE DESMOND-HELLMANN?

10:11AM 14    A.   SHE'S MY ALAMO NEIGHBOR.  I LIVE IN ALAMO AND SHE LIVES

10:11AM 15    NEXT DOOR.

10:11AM 16    Q.   AND DO YOU KNOW SHE'S DONE MANY THINGS, BUT AMONGST THEM

10:11AM 17    SHE'S A VERY PROMINENT EPIDEMIOLOGIST?

10:11AM 18    A.   SHE'S ACTUALLY A CANCER DOCTOR.

10:11AM 19    Q.   RIGHT.  AND SHE FOCUSES ON BIOSTATISTICS AND CANCER

10:11AM 20    RESEARCH AND SO FORTH?

10:11AM 21    A.   SHE DID THAT AT GENENTECH, AND THEN SHE SERVED AS THE

10:11AM 22    CHANCELLOR AT UCSF.

10:11AM 23    Q.   AND THEN SHE HELPED TO DEVELOP SEVERAL WELL-KNOWN AND

10:12AM 24    CRITICALLY IMPORTANT CANCER DRUGS; CORRECT?

10:12AM 25    A.   CORRECT.

10:12AM  1    Q.   AND DO YOU RECALL REACHING OUT TO DR. DESMOND-HELLMANN IN

10:12AM  2    2010 TO ASK HER TO LOOK AT THERANOS'S TECHNOLOGY AND DATA?

10:12AM  3    A.   IT WOULDN'T BE UNUSUAL FOR ME TO CALL HER OR CONTACT HER

10:12AM  4    VIA EMAIL.

10:12AM  5    Q.   AND WOULD IT ALSO BE LOGICAL FOR YOU AT THAT TIME TO HAVE

10:12AM  6    ASKED UCSF TO BE THE INSTITUTION THAT EVALUATED THE TECHNOLOGY?

10:12AM  7    A.   I WAS INTERESTED IN WHAT THEY THOUGHT OF THE TECHNOLOGY,

10:12AM  8    YES.

10:12AM  9    Q.   DO YOU KNOW THAT AT THAT TIME MS. HOLMES BROUGHT THE

10:12AM 10    THERANOS BLOOD ANALYZER AND OTHER COMPONENTS OF THERANOS

10:12AM 11    TECHNOLOGY TO UCSF?

10:12AM 12    A.   I'M NOT AWARE THAT -- I HAVE A VIVID RECOLLECTION OF A

10:12AM 13    MEETING I HAD WITH THE INDIVIDUALS I MENTIONED EARLIER.

10:12AM 14    Q.   THAT WAS IN 2011?

10:12AM 15    A.   THAT WAS IN 2011.

10:13AM 16         I DON'T RECALL.  MAYBE YOU CAN SHOW ME AN EMAIL.  I DON'T

10:13AM 17    RECALL A 2010 MEETING.

10:13AM 18    Q.   SO IF SUCH A MEETING HAPPENED, IT IS NOT SOMETHING THAT

10:13AM 19    YOU WERE PRESENT IN; CORRECT?

10:13AM 20    A.   IF IT HAPPENED, I WASN'T PRESENT OR I DON'T RECALL IT.

10:13AM 21    Q.   AND NOT SOMETHING THAT YOU WERE AWARE OF?  YOU WERE NOT

10:13AM 22    AWARE OF IT?

10:13AM 23    A.   IF IT HAPPENED, I WASN'T AWARE OF IT.

10:13AM 24    Q.   OKAY.  NOW, DID YOU, AFTER THIS ORIGINAL MEETING, THIS

10:13AM 25    MEETING THAT YOU DESCRIBED ON DIRECT, DID YOU START TO WORK ON

10:13AM  1      THE POTENTIAL STRUCTURE OF A DEAL WITH THERANOS?

10:13AM  2      A.   WE DID.  WE ALSO WORKED ON OUR DUE DILIGENCE PATH AS WELL.

10:13AM  3      Q.   WELL, I THINK -- DO YOU RECALL THAT MR. LEACH SHOWED YOU

10:13AM  4      ON DIRECT EXAMINATION A PRESENTATION THAT YOU HAD MADE TO THE

10:13AM  5      BOARD OF DIRECTORS OF SAFEWAY; CORRECT?

10:13AM  6      A.   CORRECT.

10:13AM  7      Q.   AND THAT WAS 45 DAYS LATER OR SO FORTH OR SOMETHING LIKE

10:14AM  8      THAT?

10:14AM  9      A.   I THINK IT WAS IN MAY.

10:14AM  10     Q.   IN MAY.

10:14AM  11          AND YOU TOLD THE BOARD AT THAT TIME THAT YOU WERE

10:14AM  12     EVALUATING A POTENTIAL DEAL WITH THERANOS; CORRECT?

10:14AM  13     A.   CORRECT.

10:14AM  14     Q.   AND YOU TOLD THE BOARD THAT YOU WOULD PERFORM DUE

10:14AM  15     DILIGENCE IN CONNECTION WITH THAT DEAL?

10:14AM  16     A.   CORRECT.

10:14AM  17     Q.   AND WERE YOU ASKED IN THAT MEETING ABOUT YOUR EVALUATION

10:14AM  18     OF THE REPRESENTATIONS THAT MS. HOLMES HAD MADE TO YOU

10:14AM  19     CONCERNING THE TECHNOLOGY?

10:14AM  20     A.   CAN YOU REPEAT THE QUESTION?

10:14AM  21     Q.   SURE.  DID BOARD MEMBERS ASK YOU WHAT THE CAPACITY OF THE

10:14AM  22     TECHNOLOGY WAS DURING THAT MEETING?

10:14AM  23     A.   YOU KNOW, I MADE A PRESENTATION, I REPRESENTED WHAT

10:14AM  24     THERANOS HAD REPRESENTED TO ME.  THEY ASKED QUESTIONS.  I

10:14AM  25     CERTAINLY DON'T REMEMBER WHAT THE QUESTIONS WERE.

BURD CROSS BY MR. DOWNEY

10:14AM  1    Q.   BUT THEY ASKED YOU TO UNDERTAKE DUE DILIGENCE IN

10:15AM  2    CONNECTION WITH THOSE REPRESENTATIONS; CORRECT?

10:15AM  3    A.   WE TOLD THEM THAT WE WERE GOING TO DO DUE DILIGENCE.

10:15AM  4    Q.   IN FACT, IF YOU'D LET ME SHOW YOU THE EXHIBIT THAT YOU

10:15AM  5    WERE LOOKING AT ON DIRECT, IF YOU GO BACK TO THE WHITE BINDER

10:15AM  6    THAT MR. LEACH WAS SHOWING YOU AND GO TO EXHIBIT 336, WHICH IS

10:15AM  7    ALREADY IN EVIDENCE, AND I'M GOING TO DIRECT YOU TO PAGE 7.

10:15AM  8    A.   PAGE 7?

10:15AM  9    Q.   YES, SIR.

10:15AM  10        ON PAGE 7 AT A VERY HIGH LEVEL YOU OUTLINE A POSSIBLE DEAL

10:15AM  11   WITH THERANOS, AND THE FIRST THING YOU SAY, OF COURSE, IS THAT

10:15AM  12   IT WILL BE SUBJECT TO DUE DILIGENCE; CORRECT?

10:15AM  13   A.   I SAID THAT IN AN EARLIER CHART, I BELIEVE.

10:16AM  14   Q.   OKAY.  AND THE DEAL POINTS THAT YOU COMMUNICATED ON

10:16AM  15   PAGE 7, THIS WAS NOT THE DEAL THAT WAS ACTUALLY ULTIMATELY

10:16AM  16   NEGOTIATED, IS IT?

10:16AM  17   A.   NO.  IT WAS DIFFERENT.

10:16AM  18   Q.   OKAY.  SO, FOR EXAMPLE, YOU DID NOT MAKE -- SAFEWAY DID

10:16AM  19   NOT MAKE AN EQUITY INVESTMENT IN THERANOS, DID IT?

10:16AM  20   A.   NO, IT DID NOT.

10:16AM  21   Q.   AND SAFEWAY DID NOT TAKE A BOARD SEAT AT THERANOS, DID IT?

10:16AM  22   A.   IT WAS IN THE CONTRACT THAT THEY WOULD MAKE EVERY EFFORT

10:16AM  23   TO GIVE SAFEWAY A BOARD SEAT.

10:16AM  24   Q.   BUT YOU DID NOT ULTIMATELY TAKE A BOARD SEAT?

10:16AM  25   A.   WE DID NOT.  WE DID NOT.

BURD CROSS BY MR. DOWNEY                                                3069

10:16AM   1    Q.   OKAY.  LET ME ASK YOU -- AND, OF COURSE, AT ANY TIME IF

10:16AM   2    YOU WANT TO LOOK AT OTHER PARTS OF THE DOCUMENT, DO.

10:16AM   3    A.   SURE.

10:16AM   4    Q.   BUT I WANT TO DIRECT YOUR ATTENTION TO PAGE 18 OF THE SAME

10:17AM   5    EXHIBIT, 331.

10:17AM   6         PAGE 18 IS LABELED BUSINESS RISKS.

10:17AM   7         IS THIS PART OF A PRESENTATION THAT YOU GAVE TO THE

10:17AM   8    SAFEWAY BOARD ABOUT RISKS THAT HAD TO BE EVALUATED IN

10:17AM   9    CONNECTION WITH THE POTENTIAL DEAL WITH THERANOS?

10:17AM  10    A.   YES.

10:17AM  11    Q.   AND THE FIRST RISK THAT YOU IDENTIFIED IS REGULATORY

10:17AM  12    APPROVAL; CORRECT?

10:17AM  13    A.   CORRECT.

10:17AM  14    Q.   AND YOU UNDERSTOOD THAT THERE WERE POTENTIAL REGULATORY

10:17AM  15    RISKS INVOLVING VARIOUS FEDERAL REGULATORS; CORRECT?

10:17AM  16    A.   YES.

10:17AM  17    Q.   ANOTHER RISK WAS THAT THERANOS WOULD HAVE TO OBTAIN

10:17AM  18    CERTAIN APPROVALS OR WAIVERS UNDER CLIA; CORRECT?

10:17AM  19    A.   CORRECT.

10:17AM  20    Q.   AND CLIA IS ADMINISTERED BY CMS; CORRECT?

10:18AM  21    A.   CMS, WHICH IS MEDICARE.

10:18AM  22    Q.   OKAY.  AND I THINK YOU ALSO IDENTIFIED POTENTIAL RISKS

10:18AM  23    AROUND WHETHER THIRD PARTIES WHO WERE NECESSARY TO THE DEAL

10:18AM  24    WOULD AGREE TO THE DEAL.

10:18AM  25         SO, FOR EXAMPLE, YOU RECOGNIZED INSURANCE COMPANIES WOULD

10:18AM   1    HAVE TO SUPPORT THERANOS; CORRECT?

10:18AM   2    A.   CORRECT.

10:18AM   3    Q.   AND SO A RISK WAS THAT THAT WOULD NOT HAPPEN, THERANOS

10:18AM   4    WOULD NOT BE ABLE TO PERSUADE INSURANCE COMPANIES TO REIMBURSE

10:18AM   5    PATIENTS FOR THEIR SERVICES; CORRECT?

10:18AM   6    A.   CORRECT.

10:18AM   7    Q.   AND THAT'S -- THESE RISKS EXISTED BECAUSE IT WAS ALL VERY

10:18AM   8    EARLY IN TERMS OF THE DEAL; CORRECT?

10:18AM   9    A.   THAT'S RIGHT.

10:18AM  10    Q.   AND YOU WENT ON -- IF YOU WOULD JUST FLIP TO THE NEXT

10:18AM  11    PAGE -- YOU TELL THE BOARD AT THE END OF THIS PRESENTATION THAT

10:18AM  12    YOU WILL COMPLETE DUE DILIGENCE; CORRECT?

10:18AM  13    A.   CORRECT.

10:18AM  14    Q.   AND SOME OF THE ITEMS THAT YOU IDENTIFIED ON THE PRIOR

10:19AM  15    SLIDE, OR ADDRESSED, THAT YOU WOULD REVIEW THE REGULATORY

10:19AM  16    STRATEGY AND CONFIRM THE EQUITY VALUE AND THINGS LIKE THAT;

10:19AM  17    CORRECT?

10:19AM  18    A.   CORRECT.

10:19AM  19    Q.   AND YOU ALSO INDICATED THAT YOU WOULD VALIDATE THE

10:19AM  20    TECHNOLOGY WITH A SCIENTIFIC PANEL, INCLUDING JOHNS HOPKINS AND

10:19AM  21    UCSF; CORRECT?

10:19AM  22    A.   CORRECT.

10:19AM  23    Q.   NOW, IN TERMS OF CARRYING OUT THE DUE DILIGENCE OF THE

10:19AM  24    COMPANY, IT WAS ULTIMATELY YOUR RESPONSIBILITY, BUT OBVIOUSLY

10:19AM  25    YOU DIDN'T DO EVERY ASPECT OF IT; CORRECT?

10:19AM 1    A.   THAT'S CORRECT.

10:19AM 2    Q.   YOU HAD THE ABILITY TO DECIDE WHAT GOT DONE AND WHAT

10:19AM 3    DIDN'T GET DONE, BUT YOU DIDN'T NECESSARILY CARRY ALL OF IT

10:19AM 4    OUT; CORRECT?

10:19AM 5    A.   NOT ALL OF IT PERSONALLY, NO.

10:19AM 6    Q.   AND SO, FOR EXAMPLE, WITH RESPECT TO REGULATORY ISSUES,

10:19AM 7    YOU WOULD HAVE ASSIGNED -- YOU DID ASSIGN THAT RESPONSIBILITY

10:19AM 8    TO MR. GORDON, THE GENERAL COUNSEL; CORRECT?

10:20AM 9    A.   CORRECT.

10:20AM 10   Q.   AND WITH REGARD TO ANY FINANCIAL ISSUES, YOU WOULD HAVE

10:20AM 11   ASSIGNED THAT DUE DILIGENCE TO MR. EDWARDS; CORRECT?

10:20AM 12   A.   IN ALL LIKELIHOOD.

10:20AM 13   Q.   BY THE WAY, WITH RESPECT TO FINANCIAL ISSUES, DID YOU ASK

10:20AM 14   MS. HOLMES AT ANY TIME WHEN YOU WERE DEALING WITH HER, HOW MUCH

10:20AM 15   MONEY HAVE YOU SPENT DEVELOPING THIS TECHNOLOGY?

10:20AM 16   A.   I DON'T RECALL.

10:20AM 17   Q.   DO YOU KNOW IF MR. EDWARDS MADE THAT EVALUATION AS PART OF

10:20AM 18   HIS DUE DILIGENCE?

10:20AM 19   A.   I DON'T, I DON'T KNOW.

10:20AM 20   Q.   OKAY.  BUT IN TERMS OF THE BUSINESS MODEL, YOU WOULD HAVE

10:20AM 21   HAD SOME INPUT; CORRECT?

10:20AM 22   A.   THE BUSINESS MODEL, ABSOLUTELY.

10:20AM 23   Q.   AND MAYBE EXECUTIVES.  DID EXECUTIVES FROM SAFEWAY HEALTH

10:20AM 24   ALSO WORK ON DESIGNING THAT?

10:20AM 25   A.   THEY WOULD HAVE HAD A PERIPHERAL INVOLVEMENT.

10:20AM  1    Q.   OKAY.  SO BY THE END OF THE DAY, THERE WOULD BE A FAIRLY

10:20AM  2    BIG TEAM WORKING ON EVALUATING THERANOS; CORRECT?

10:20AM  3    A.   A NUMBER OF DISCIPLINES.

10:21AM  4    Q.   AND AS WELL BECAUSE THE ISSUES WERE COMPLICATED WITH

10:21AM  5    REGULATORS, DID SAFEWAY ALSO ENGAGE OUTSIDE LAWYERS?

10:21AM  6    A.   ON THE REGULATORY ISSUE, YES.

10:21AM  7    Q.   OKAY.  SO IS IT FAIR TO SAY THAT IN THE PROCESS OF

10:21AM  8    CONSIDERING WHETHER TO DO A DEAL, SAFEWAY DID HUNDREDS OF HOURS

10:21AM  9    OF DUE DILIGENCE?

10:21AM  10   A.   AT LEAST 100.

10:21AM  11   Q.   AND YOU WOULD HAVE COMMUNICATED, LET'S SAY, WITH THERANOS

10:21AM  12   DURING THAT PERIOD ALMOST DAILY ABOUT ONE ASPECT OR ANOTHER OF

10:21AM  13   THE DEAL; CORRECT?

10:21AM  14   A.   WE WERE ON A PARALLEL PATH TO DO THE DEAL AND DO THE DUE

10:21AM  15   DILIGENCE.

10:21AM  16   Q.   OKAY.  LOOK AT, IF YOU WOULD, EXHIBIT 7190.

10:21AM  17             THE COURT:  I JUST WANT TO CORRECT YOU.  I THINK YOU

10:22AM  18   INDICATED THE EXHIBIT YOU WERE JUST DISCUSSING WAS 331, AND I

10:22AM  19   THINK IT WAS 336.

10:22AM  20             MR. DOWNEY:  I BEG YOUR PARDON, YOUR HONOR.  I DID

10:22AM  21   MISIDENTIFY IT.

10:22AM  22             THE WITNESS:  WHICH BINDER ARE WE IN?

10:22AM  23             MR. DOWNEY:  YOU CAN RETURN TO THE BLACK BINDER.

10:22AM  24             THE WITNESS:  AND GIVE ME THE EXHIBIT AGAIN.

10:22AM  25   BY MR. DOWNEY:

| | | |
|---|---|---|
| 10:22AM | 1 | Q.  THE EXHIBIT IS 7190. |
| 10:22AM | 2 | A.  I HAVE IT. |
| 10:22AM | 3 | Q.  I'LL GIVE YOU A MINUTE TO LOOK AT IT, BUT MY QUESTION AT |
| 10:22AM | 4 | THIS POINT IS, IS THIS AN EMAIL FROM YOU TO RICK JURGENS OF |
| 10:22AM | 5 | HY-VEE COPYING MS. HOLMES? |
| 10:22AM | 6 | A.  CORRECT. |
| 10:22AM | 7 | Q.  AND YOU SENT THIS IN OR AROUND JULY OF 2011; CORRECT? |
| 10:22AM | 8 | A.  CORRECT. |
| 10:22AM | 9 | MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF |
| 10:22AM | 10 | EXHIBIT 7190. |
| 10:23AM | 11 | MR. LEACH:  NO OBJECTION. |
| 10:23AM | 12 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 10:23AM | 13 | (DEFENDANT'S EXHIBIT 7190 WAS RECEIVED IN EVIDENCE.) |
| 10:23AM | 14 | BY MR. DOWNEY: |
| 10:23AM | 15 | Q.  I JUST WANT TO ASK YOU IF THE STATEMENT IN HERE IS AN |
| 10:23AM | 16 | ACCURATE CHARACTERIZATION OF THE DUE DILIGENCE THAT SAFEWAY |
| 10:23AM | 17 | PERFORMED WITH RESPECT TO THERANOS. |
| 10:23AM | 18 | FIRST OF ALL, LET ME ASK YOU, RICK JURGENS IS THE CEO OF |
| 10:23AM | 19 | ANOTHER FOOD RETAILER; CORRECT? |
| 10:23AM | 20 | A.  HE WAS AT THE TIME. |
| 10:23AM | 21 | Q.  AND HE WAS THE CEO OF HY-VEE? |
| 10:23AM | 22 | A.  CORRECT. |
| 10:23AM | 23 | Q.  AND HY-VEE WAS ONE OF THE COMPANIES THAT YOU CONSIDERED |
| 10:23AM | 24 | BRINGING INTO THE NETWORK; CORRECT? |
| 10:23AM | 25 | A.  THAT'S CORRECT. |

BURD CROSS BY MR. DOWNEY                                            3074

10:23AM   1    Q.   AND SO YOU WERE HAVING DISCUSSIONS WITH HIM ABOUT WHETHER

10:23AM   2    HY-VEE WOULD BE INTERESTED IN SUCH A DEAL; CORRECT?

10:23AM   3    A.   I ACTUALLY INTRODUCED ELIZABETH TO THEM.

10:23AM   4    Q.   OKAY.  AND YOU WERE DISCUSSING IN THIS EMAIL WHAT DUE

10:23AM   5    DILIGENCE HY-VEE SHOULD DO IN TERMS OF EVALUATING A POTENTIAL

10:23AM   6    DEAL; CORRECT?

10:23AM   7    A.   WE TALKED ABOUT SOME ELEMENTS OF THAT, SURE.

10:24AM   8    Q.   SO IN THE FIRST NUMBERED PARAGRAPH, YOU INDICATE THAT YOU

10:24AM   9    TALKED TO -- YOU INDICATE TO MR. JURGENS, "YOU SHOULD FOCUS

10:24AM  10    YOUR QUESTIONS WITH ME (SAFEWAY HAS SPENT HUNDREDS OF HOURS ON

10:24AM  11    ITS OWN DUE DILIGENCE AND HAS COMMUNICATED ALMOST DAILY WITH

10:24AM  12    ELIZABETH AND THERANOS FOR MORE THAN ONE YEAR).  THIS GIVES

10:24AM  13    ELIZABETH MORE TIME TO CONCENTRATE ON ALL THAT SHE MUST GET

10:24AM  14    DONE BEFORE SAFEWAY'S LAUNCH."

10:24AM  15         AT THE TIME THAT WAS AN ACCURATE STATEMENT?

10:24AM  16    A.   IT WAS AN ACCURATE STATEMENT, BUT IT DESERVES A LITTLE

10:24AM  17    EXPLANATION.

10:24AM  18         BECAUSE I WAS SENSITIVE TO ELIZABETH'S TIME AND WE HAD

10:24AM  19    BEEN THROUGH A GOOD DEAL OF OUR OWN DUE DILIGENCE, THEY COULD

10:24AM  20    ASK ME THE QUESTIONS THAT I PROBABLY ASKED ALREADY AND I COULD

10:24AM  21    PROVIDE THE ANSWERS SO THEY DIDN'T HAVE TO GO TO ELIZABETH.

10:24AM  22    Q.   I UNDERSTAND.  SO YOU WERE INDICATING THAT YOU THOUGHT THE

10:24AM  23    GREATEST EFFICIENCY WOULD BE FOR SAFEWAY TO PROVIDE ANY -- BE

10:25AM  24    CONTACTED FIRST ABOUT ANY DILIGENCE QUESTIONS; CORRECT?

10:25AM  25    A.   CONTACTED FIRST, YES.

10:25AM 1    Q.   BUT IT'S AN ACCURATE STATEMENT THAT SAFEWAY HAD SPENT

10:25AM 2    HUNDREDS OF HOURS ON DUE DILIGENCE ON THERANOS?

10:25AM 3    A.   IF I SAID IT IN THIS LETTER, IT'S TRUE.

10:25AM 4    Q.   AND DO YOU RECALL THAT SAFEWAY ASKED THERANOS FOR A NUMBER

10:25AM 5    OF DOCUMENTS DURING AND IN CONNECTION WITH PERFORMING DUE

10:25AM 6    DILIGENCE?

10:25AM 7    A.   WE DO -- I DO RECALL THAT, BUT I DON'T RECALL ALL OF THE

10:25AM 8    DOCUMENTS.

10:25AM 9    Q.   LET ME SHOW YOU A DOCUMENT WHICH IS IN THE BLACK NOTEBOOK,

10:25AM 10   WHICH IS EXHIBIT 10536.

10:26AM 11        NOW, THIS IS AN EMAIL THAT YOU ARE NOT A SENDER OR A

10:26AM 12   RECIPIENT.  I WANT TO ASK YOU IF THE DOCUMENTS LISTED ON HERE

10:26AM 13   ARE DOCUMENTS THAT YOU RECALL WERE PART OF THE DILIGENCE

10:26AM 14   PROCESS BETWEEN THERANOS AND SAFEWAY.

10:26AM 15   A.   IT LOOKS LIKE A NUMBER OF THEM WOULD HAVE BEEN PART OF

10:26AM 16   THAT PROCESS.

10:26AM 17   Q.   AND, FOR EXAMPLE, IT'S STANDARD AS PART OF DUE DILIGENCE,

10:26AM 18   ISN'T IT, FOR ONE COMPANY TO PROVIDE ITS CAPITALIZATION TABLE

10:26AM 19   TO THE OTHER COMPANY; CORRECT?

10:26AM 20   A.   TO ANY COMPANY LOOKING TO BUY OR INVEST IN THE COMPANY,

10:26AM 21   YES.

10:26AM 22   Q.   OKAY.  LET ME ASK YOU ABOUT A FEW ITEMS ON HERE.  DO YOU

10:26AM 23   RECALL WHETHER ANY ASSAY DEVELOPMENT REPORTS WERE SENT FROM

10:27AM 24   THERANOS TO SAFEWAY AS PART OF THE DILIGENCE PROCESS?

10:27AM 25   A.   I DON'T KNOW IF THIS IS A CORRECT DESCRIPTION, BUT WE WERE

10:27AM  1    PROVIDED WITH SOME INFORMATION REGARDING SOME WORK THAT

10:27AM  2    THERANOS HAD SAID THEY HAD DONE WITH SOME PHARMACEUTICAL

10:27AM  3    COMPANIES.

10:27AM  4    Q.   WELL, DO YOU REMEMBER RECEIVING A DEVELOPMENT REPORT ABOUT

10:27AM  5    HOW THEY HAD ACTUALLY GONE ABOUT DEVELOPING ASSAYS INTERNALLY

10:27AM  6    AT THERANOS?

10:27AM  7    A.   I DON'T RECALL.

10:27AM  8    Q.   OKAY.  BUT DO YOU RECALL RECEIVING PATENTS FROM THERANOS

10:27AM  9    THAT DETAILED THE INTELLECTUAL PROPERTY IT HAD OBTAINED?

10:27AM  10   A.   IT WOULD HAVE BEEN COMMON TO ASK FOR THEM, BUT THAT'S NOT

10:27AM  11   SOMETHING THAT I WOULD HAVE PERSONALLY REVIEWED.

10:27AM  12   Q.   WOULD THOSE ISSUES HAVE BEEN HANDLED BY MR. GORDON?

10:27AM  13   A.   THEY WOULD.

10:27AM  14   Q.   AND WITH REGARD TO ANY OF THE REPORTS THAT RELATED TO

10:28AM  15   SCIENTIFIC ISSUES, THE TECHNOLOGY OR THE DEVELOPMENT OF ASSAYS,

10:28AM  16   WHO WITHIN SAFEWAY WOULD HAVE EVALUATED THAT INFORMATION?

10:28AM  17   A.   I THINK THE FIRST LEVEL OF EVALUATION PROBABLY WOULD HAVE

10:28AM  18   BEEN KEN SHACHMUT AT SAFEWAY HEALTH; WE WOULD HAVE HAD OUR HEAD

10:28AM  19   OF PHARMACY LOOK AT THESE IN TERMS OF INTERNAL; I PERSONALLY

10:28AM  20   HAD CONVERSATIONS WITH THE LAB DIRECTORS AT JOHNS HOPKINS AND

10:28AM  21   THE LAB DIRECTOR AT UCSF.

10:28AM  22   Q.   OKAY.  LET'S TALK ABOUT -- WHO IS THE LAB DIRECTOR AT

10:28AM  23   JOHNS HOPKINS THAT YOU RECALL SPEAKING TO?

10:28AM  24   A.   YOU KNOW, WE'RE GOING BACK 11 YEARS, SO I DON'T RECALL.

10:28AM  25   I'M SURE WE CAN DO AN INTERNET SEARCH.

BURD CROSS BY MR. DOWNEY

10:28AM   1    Q.   WELL, LET ME ASK YOU A FEW NAMES BECAUSE I DON'T KNOW

10:29AM   2    EXACTLY WHO YOU ARE REFERRING TO.

10:29AM   3    A.   YEAH.

10:29AM   4    Q.   LET ME ASK YOU, DO YOU RECALL CONTACTING A PHYSICIAN NAMED

10:29AM   5    DR. JONATHAN SIMONS?

10:29AM   6    A.   I RECALL TALKING TO JONATHAN.

10:29AM   7    Q.   OKAY.  AND DR. SIMONS WAS THE CEO OF THE PROSTATE CANCER?

10:29AM   8    A.   HE WAS AT THE TIME.

10:29AM   9    Q.   AND HE'S AN ONCOLOGIST?

10:29AM  10    A.   HE'S AN ONCOLOGIST.

10:29AM  11    Q.   AND HE'S SOMEONE FOR WHOM YOU HAVE HIGH REGARD?

10:29AM  12    A.   IN THE SCIENTIFIC COMMUNITY, YES.

10:29AM  13    Q.   AND YOU SPOKE TO HIM ABOUT THE COMPANY?

10:29AM  14    A.   I DID.

10:29AM  15    Q.   AND YOU WANTED TO GET HIS IMPRESSIONS AND HIS EVALUATION

10:29AM  16    OF THERANOS AND ITS TECHNOLOGY?

10:29AM  17    A.   I ACTUALLY HAD HIM MEET ELIZABETH AS WELL.

10:29AM  18    Q.   YOU HAD DR. SIMONS MEET WITH MS. HOLMES?

10:29AM  19    A.   AND I WAS IN THE ROOM.

10:29AM  20    Q.   AND DID THAT MEETING GIVE YOU ANY SENSE OF THE CAPACITIES

10:29AM  21    OF THERANOS'S TECHNOLOGY?

10:30AM  22    A.   YOU KNOW, OBVIOUSLY JONATHAN WAS IN NO POSITION AT A

10:30AM  23    DINNER MEETING TO EVALUATE THE TECHNOLOGY.  HE THOUGHT IF

10:30AM  24    THERANOS COULD DO THIS, THAT WOULD BE A BIT OF A GAME CHANGER.

10:30AM  25    Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 7164.

10:30AM   1      A.   I HAVE IT.

10:30AM   2      Q.   THIS WAS AN EMAIL THAT WAS SENT, APPEARS TO HAVE BEEN SENT

10:30AM   3      FROM DR. SIMONS TO MS. HOLMES AND YOURSELF; CORRECT?

10:30AM   4      A.   CORRECT.

10:30AM   5              MR. DOWNEY:  I MOVE THE ADMISSION, YOUR HONOR, OF

10:30AM   6      7164.

10:31AM   7              MR. LEACH:  HEARSAY, YOUR HONOR.

10:31AM   8              THE COURT:  THERE ARE TWO DOCUMENTS HERE,

10:31AM   9      MR. DOWNEY.

10:31AM   10             MR. DOWNEY:  YOUR HONOR, I THINK IF YOU SEE --

10:31AM   11             THE COURT:  IS IT BOTH OF THEM YOU'RE SEEKING

10:31AM   12     ADMISSION OF?  THE SECOND ITEM SEEMS TO BE A TWO-PAGE LETTER.

10:31AM   13             MR. DOWNEY:  YES, YOUR HONOR.

10:31AM   14         I THINK THE WAY THE DOCUMENT WORKS IS THAT THE FIRST PAGE

10:31AM   15     IS AN EMAIL AND THE EMAIL HAS AS AN ATTACHMENT A MEMO WHICH IS

10:31AM   16     REFERENCED IF YOU SEE THAT UNDER THE SUBJECT, AND THEN THERE'S

10:31AM   17     AN ATTACHMENT OF A PDF AND WITHIN THE PDF THERE'S A COVER

10:31AM   18     LETTER TO ANOTHER LETTER WHICH, IN TURN, FORWARDS THAT LETTER.

10:32AM   19     AND THIS WAS BEING SHARED, I THINK, WITH THE RECIPIENTS OF THIS

10:32AM   20     EMAIL.

10:32AM   21             THE COURT:  AND THE SECOND LETTER, ARE YOU ASKING

10:32AM   22     THAT THIS BE ADMITTED FOR THE TRUTH OF THE MATTER ASSERTED?  I

10:32AM   23     THINK I WOULD SUSTAIN A HEARSAY OBJECTION TO THAT SECOND PAGE.

10:32AM   24             MR. DOWNEY:  WELL, AT THE VERY LEAST, YOUR HONOR,

10:32AM   25     I'M ASKING THAT IT BE ADMITTED TO THE DEFENDANT'S STATE OF

10:32AM  1    MIND.

10:32AM  2         BUT I ALSO THINK IT GOES TO THE MATERIALITY ISSUES OF --

10:32AM  3    THIS WITNESS HAS TESTIFIED ON DIRECT ABOUT THOSE ISSUES WHICH

10:32AM  4    WERE IMPORTANT TO HIM IN EVALUATING AND CONTINUING UNDER THE

10:32AM  5    DEAL.

10:32AM  6         I THINK HE'S JUST TESTIFIED ABOUT CONVERSATIONS WITH THIS

10:33AM  7    WITNESS AND HIS REQUEST.  I THINK THIS RETAINS -- CONTAINS A

10:33AM  8    CONTEMPORANEOUS REFLECTION OF WHAT THOSE REFLECTIONS WERE.

10:33AM  9              THE COURT:  I'M GOING TO SUSTAIN THE OBJECTION.

10:33AM 10              MR. DOWNEY:  MAY I ASK, YOUR HONOR, IF ANY OF THE

10:33AM 11    COMPONENTS REFRESH THE RECOLLECTION OF THE WITNESS?

10:33AM 12              THE COURT:  YOU MAY, OF COURSE.  SURE.

10:33AM 13    BY MR. DOWNEY:

10:33AM 14    Q.   LET ME ASK YOU, MR. BURD, TO LOOK AT THE THIRD PAGE OF THE

10:33AM 15    EXHIBIT.  LET ME KNOW WHEN YOU HAVE THAT IN FRONT OF YOU.

10:33AM 16    A.   I DO.

10:33AM 17    Q.   AND LET ME ASK YOU TO LOOK AT THE -- THERE'S A SHORT

10:33AM 18    PARAGRAPH AND THEN THERE'S A QUESTION, AND UNDER THAT THERE'S

10:34AM 19    AN ANSWER.

10:34AM 20         IF YOU GO TO THE SECOND SENTENCE FROM THE BOTTOM, I WANT

10:34AM 21    TO ASK --

10:34AM 22    A.   ON THE FIRST PAGE OR THE SECOND PAGE?

10:34AM 23    Q.   ON THE FIRST PAGE.

10:34AM 24    A.   OKAY.

10:34AM 25    Q.   SO DO YOU SEE THAT THERE'S A QUESTION THAT BEGINS "WHAT DO

BURD CROSS BY MR. DOWNEY                                          3080

10:34AM  1    YOU KNOW"?

10:34AM  2    A.   I'M ON THE BOTTOM OF THE FIRST PAGE.

10:34AM  3    Q.   I'M ASKING YOU TO LOOK AT THE TOP OF THE THIRD PAGE OF THE

10:34AM  4    EXHIBIT, WHICH IS A LETTER, AND I THINK I CAN --

10:34AM  5    A.   OKAY.  ALL RIGHT.  SO I'M ON THAT PAGE.

10:34AM  6    Q.   ALL RIGHT.  SO I'M ASKING YOU TO LOOK AT THE FIRST

10:34AM  7    PARAGRAPH, THE PARAGRAPH UNDER THE FIRST QUESTION THAT IS POSED

10:34AM  8    THERE.

10:34AM  9    A.   YES.

10:34AM  10   Q.   AND THE SECOND TO THE LAST SENTENCE OF THAT ANSWER THAT

10:35AM  11   BEGINS "THERE ARE."

10:35AM  12   A.   CORRECT.

10:35AM  13   Q.   IS THAT -- IS THE STATEMENT CONTAINED THEREIN CONSISTENT

10:35AM  14   WITH WHAT DR. SIMONS CONVEYED TO YOU ABOUT THE STATE OF

10:35AM  15   THERANOS'S TECHNOLOGY?

10:35AM  16   A.   IT'S NOT SOMETHING THAT I RECALL.

10:35AM  17   Q.   OKAY.  DO YOU RECALL DR. SIMONS EVER SAYING TO YOU THERE

10:35AM  18   WERE OTHER EFFORTS THAT WERE BEING MADE WHICH WERE SIMILAR

10:35AM  19   EFFORTS TO THE EFFORT THAT THERANOS WAS UNDERTAKING TO GIVE

10:35AM  20   POINT OF CARE BLOOD TESTING?

10:35AM  21   A.   I DON'T RECALL THAT.

10:35AM  22   Q.   DO YOU RECALL HIM SAYING THAT THERANOS WAS IN A SUPERIOR

10:35AM  23   POSITION TO OTHER COMPANIES BASED ON ITS PATENTS?

10:35AM  24   A.   I DON'T RECALL THAT.

10:35AM  25   Q.   OKAY.  AND DO YOU RECALL LEARNING FROM HIM THAT RELATIVE

10:36AM 1    TO OTHER BIOTECH COMPANIES IN THE SAME SPACE, HE THOUGHT THAT

10:36AM 2    THERANOS WAS IN THE LEADING POSITION?

10:36AM 3    A.   I DON'T RECALL THAT.  HE DIDN'T EVALUATE THE TECHNOLOGY.

10:36AM 4    HE WAS ASKING OTHERS ABOUT WHAT THEY KNOW OF HER.

10:36AM 5    Q.   OKAY.  I JUST WANT TO ASK YOU A QUESTION THAT IS A LITTLE

10:36AM 6    BIT OFF TOPIC, BUT I'LL JUST ASK YOU TO GO BACK TO THE EMAIL --

10:36AM 7    A.   SURE.

10:36AM 8    Q.   -- FOR A MOMENT.

10:36AM 9    A.   YES.

10:36AM 10   Q.   AND I WANT TO JUST ASK YOU TO LOOK AT THE LAST PARAGRAPH

10:36AM 11   OF THE EMAIL THAT BEGINS "ELIZABETH."

10:36AM 12   A.   YES.

10:36AM 13   Q.   AND JUST TAKE A LOOK TO LOOK AT THAT.

10:36AM 14       MY QUESTION IS, DO YOU RECALL REFERENCES TO A 3.0 OR A 4.0

10:36AM 15   IN DISCUSSING THERANOS TECHNOLOGY?

10:36AM 16   A.   I DON'T.

10:36AM 17       WHAT I RECALL FROM THE DINNER MEETING IS THAT THERE WAS A

10:37AM 18   LOT OF DISCUSSION ABOUT CANCER BECAUSE HE WAS AN ONCOLOGIST,

10:37AM 19   AND THOSE WERE SOME VISIONS THAT ELIZABETH HAD THAT SHE MIGHT

10:37AM 20   BE ABLE TO DO WITH THE ANALYZER, AND JONATHAN WAS JUST

10:37AM 21   DESCRIBING A JAR OF JELLY BEANS AND THE DIFFERENT COLORS AND HE

10:37AM 22   WAS -- THAT'S WHEN HE STARTED TALKING ABOUT CYTOKINES, BUT THEY

10:37AM 23   WERE TALKING AT A LEVEL OF DETAIL THAT WAS A LITTLE ABOVE ME.

10:37AM 24   Q.   OKAY.  SO YOU DON'T REMEMBER HEARING AT THAT DINNER

10:37AM 25   REFERENCES TO DIFFERENT VERSIONS OF THERANOS TECHNOLOGY?

10:37AM   1      A.   I DON'T.

10:37AM   2      Q.   DO YOU RECALL LEARNING THAT AT ANY TIME?

10:37AM   3      A.   I WASN'T AWARE OF ANYBODY ELSE DOING IT.

10:37AM   4      Q.   WELL, DO YOU RECALL HEARING ABOUT DIFFERENT VERSIONS LIKE

10:37AM   5      A 2.0, A 3.0, A 4.0 OF THERANOS'S TECHNOLOGY?

10:37AM   6      A.   YES.  I THINK THAT, AS I SAID DURING MY DIRECT TESTIMONY,

10:37AM   7      THERE WERE -- THE BIO SENSOR, WHATEVER THE TERM IS, THE UNIT,

10:37AM   8      IT WENT THROUGH CONSTANT CHANGE, BOTH PHYSICAL AND I SUPPOSE IT

10:38AM   9      HAD NEW CAPABILITIES AND THEREFORE YOU'D HAVE A 1, 2, 3, JUST

10:38AM  10      AS MICROSOFT DOES.

10:38AM  11      Q.   AND AT THE TIME, NOT TODAY, BUT AT THE TIME --

10:38AM  12      A.   YES.

10:38AM  13      Q.   -- DID YOU HAVE AN UNDERSTANDING OF THE DIFFERENCES

10:38AM  14      BETWEEN THOSE VERSIONS?

10:38AM  15      A.   NO.

10:38AM  16      Q.   LET ME ASK YOU TO LOOK NOW AT EXHIBIT 332.

10:39AM  17      A.   ALL RIGHT.

10:39AM  18      Q.   IS THIS AN EMAIL THAT MS. HOLMES SENT TO DR. SIMONS

10:39AM  19      COPYING YOU IN 2010?

10:39AM  20      A.   IT IS.

10:39AM  21      Q.   AND IS THIS PART OF YOUR DISCUSSIONS WITH THERANOS ABOUT

10:39AM  22      ENTERING, POTENTIALLY ENTERING A DEAL?

10:39AM  23      A.   WAS IT PART OF THE THOUGHT PROCESS?  YES.

10:39AM  24           MR. DOWNEY:  YOUR HONOR, I WOULD MOVE THE ADMISSION

10:39AM  25      OF 332.

10:39AM 1          MR. LEACH:  NO OBJECTION, YOUR HONOR.

10:39AM 2          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:39AM 3          (GOVERNMENT'S EXHIBIT 332 WAS RECEIVED IN EVIDENCE.)

10:39AM 4    BY MR. DOWNEY:

10:39AM 5    Q.   I'LL ASK YOU TO FOCUS ON THE SECOND FULL PARAGRAPH.  THE

10:39AM 6    PARAGRAPH ABOVE, I'M SORRY, THE PARAGRAPH THAT BEGINS "THERANOS

10:39AM 7    STARTED OUT."

10:40AM 8    A.   YES.

10:40AM 9    Q.   IN THAT PARAGRAPH, MS. HOLMES TOLD DR. SIMONS AND YOU THAT

10:40AM 10   THERANOS HAD BUILT A MINILAB SYSTEM THAT AUTOMATES THE PROCESS

10:40AM 11   OF RUNNING A BROAD RANGE OF ASSAYS ON ACCELERATED TIMELINES

10:40AM 12   WITH MUCH SMALLER VOLUMES OF SAMPLE; CORRECT?

10:40AM 13   A.   CORRECT.

10:40AM 14   Q.   AND IS THAT CONSISTENT WITH WHAT SHE TOLD YOU IN YOUR

10:40AM 15   MEETING IN MARCH OF 2010?

10:40AM 16   A.   CORRECT.

10:40AM 17   Q.   IN THE NEXT PARAGRAPH SHE GOES ON TO SAY, "WE HAVE HAD THE

10:40AM 18   OPPORTUNITY TO PRESENT THE VALIDATION DATA ON THE TECHNOLOGY

10:40AM 19   PLATFORM AND ON THE BROAD RANGE OF ASSAYS AT HOPKINS."

10:40AM 20          CORRECT?

10:40AM 21   A.   THAT'S WHAT IT SAYS.

10:40AM 22   Q.   AND HOPKINS YOU UNDERSTOOD TO BE A REFERENCE TO

10:41AM 23   JOHNS HOPKINS?

10:41AM 24   A.   CORRECT.

10:41AM 25   Q.   AND SHE THEN GOES ON TO IDENTIFY A VARIETY OF DOCTORS AT

10:41AM 1    HOPKINS WHO HAVE PARTICIPATED IN THAT EVALUATION; CORRECT?

10:41AM 2    A.   CORRECT.

10:41AM 3    Q.   IS THIS WHEN YOU LEARNED THAT HOPKINS HAD UNDERTAKEN AN

10:41AM 4    EVALUATION OF THERANOS'S TECHNOLOGY?

10:41AM 5    A.   I CAN'T BE CERTAIN BECAUSE I KNOW PEOPLE AT HOPKINS AND

10:41AM 6    BECAUSE ELIZABETH SAID ONE OF THEIR ANALYZERS WAS PHYSICALLY ON

10:41AM 7    THEIR PROPERTY FOR A WHILE.  SHE INVITED ME TO TALK TO SOMEONE

10:41AM 8    AT HOPKINS, AND THAT'S THE PERSON THAT I CALLED.

10:41AM 9    Q.   AND IS THAT THE LABORATORY DIRECTOR THAT YOU ARE

10:41AM 10   RECALLING?

10:41AM 11   A.   I RECALL THEM AS A LABORATORY DIRECTOR.  IT ALMOST HAD TO

10:42AM 12   BE THE LABORATORY DIRECTOR BECAUSE THAT'S WHOSE OPINION I

10:42AM 13   WANTED TO HEAR.

10:42AM 14   Q.   DID YOU TALK TO ANY OF THE INDIVIDUALS WHO ARE IDENTIFIED

10:42AM 15   IN THE EMAIL THAT IS EXHIBIT 332?

10:42AM 16   A.   I DON'T RECALL TALKING.  THE NAME KICKLER SOUNDS A LITTLE

10:42AM 17   BIT FAMILIAR BUT, YOU KNOW, I TALKED TO THE PERSON THAT SHE

10:42AM 18   DIRECTED ME TO AND ASKED HIM WHETHER THIS BOX COULD DO WHAT SHE

10:42AM 19   SAID.

10:42AM 20   Q.   AND WAS THAT THE CONVERSATION THAT YOU HAD IN 2010?

10:42AM 21   A.   THAT WOULD HAVE BEEN IN 2010, YES.

10:42AM 22   Q.   OKAY.  AND WHAT DID THAT INDIVIDUAL TELL YOU?

10:42AM 23   A.   WHAT THEY SAID WAS THAT WE DIDN'T HAVE THE BOX HERE LONG

10:42AM 24   ENOUGH TO VALIDATE IT THE WAY WE WOULD LIKE.  IN OTHER WORDS,

10:42AM 25   THE BOX WAS TAKEN BACK BY THERANOS.

10:43AM  1           AND THE LAB DIRECTOR SAID, LOOK, IF THEY CAN DO THIS, IT'S

10:43AM  2    A GAME CHANGER, BUT I CAN'T VALIDATE FOR YOU THAT THEY'VE DONE

10:43AM  3    IT.  I DIDN'T HAVE ENOUGH TIME WITH THE BOX.

10:43AM  4    Q.   SO YOU UNDERSTOOD THAT IN 2010?

10:43AM  5    A.   CORRECT.

10:43AM  6    Q.   DID YOU LEARN FROM THAT DIRECTOR WHETHER OR NOT ANY DATA

10:43AM  7    HAD BEEN SHARED BY THERANOS WITH HOPKINS?

10:43AM  8    A.   I DID NOT.

10:43AM  9    Q.   NOW, IF I MIGHT ASK YOU, HOW FAMILIAR WERE YOU WITH THE

10:43AM  10   BLOOD TESTING BUSINESS BEFORE YOU BEGAN TALKING TO THERANOS IN

10:43AM  11   2010?

10:43AM  12   A.   YOU KNOW, I WAS FAMILIAR WITH WHO THE MAJOR LAB PLAYERS

10:43AM  13   WERE OUT THERE, QUEST AND LAB CORP., AND I WAS FAMILIAR WITH

10:43AM  14   THE TESTS, CPT CODES.

10:44AM  15           I KNEW THAT THOSE TWO LABS WERE MUCH CHEAPER THAN

10:44AM  16   OUTPATIENT HOSPITAL AND OTHERS, AND I ALSO KNEW -- AND THIS

10:44AM  17   SURPRISED ME -- THAT MEDICARE, WHO OFTEN HAS THE LOWEST RATES,

10:44AM  18   HAD THE HIGHEST LAB RATES.

10:44AM  19   Q.   SO YOU KNEW A LOT ABOUT THE BUSINESS?

10:44AM  20   A.   I KNOW MORE TODAY THAN I KNEW THEN.

10:44AM  21   Q.   BUT DID YOU ACTUALLY KNOW HOW THE MEDICAL PROCESS OF BLOOD

10:44AM  22   TESTING WORKED?

10:44AM  23   A.   IF YOU MEAN HOW ONE GETS A BLOOD TEST?  YOU GET A

10:44AM  24   PRESCRIPTION FROM A DOCTOR, THEY IDENTIFY THE TEST, THE SCRIPT

10:44AM  25   IS TAKEN TO A LAB AND THEY FULFILL THE REQUEST.

10:44AM  1    Q.   I MEANT SOMETHING SLIGHTLY DIFFERENT.

10:44AM  2    A.   OKAY.

10:44AM  3    Q.   I MEANT, DID YOU UNDERSTAND THAT WHEN A LAB IS ANALYZING A

10:44AM  4    BLOOD SAMPLE WHAT THE DIFFERENT ELEMENTS OF THAT ARE?

10:45AM  5    A.   I'M NOT SURE WHAT YOU MEAN BY "ELEMENTS."

10:45AM  6    Q.   WELL, DID YOU KNOW, FOR EXAMPLE, THAT THERE ARE DIFFERENT

10:45AM  7    FORMS OF BLOOD TESTING MACHINES THAT PERFORM DIFFERENT KINDS OF

10:45AM  8    BLOOD TESTS?

10:45AM  9    A.   I WAS FAMILIAR WITH THE FACT THAT, THAT MOST FULL SCALE

10:45AM  10   LABS CAN DO MOST ANYTHING, AND THEN THERE WERE REFERENCE LABS

10:45AM  11   THAT COULD DO A BIT MORE.

10:45AM  12   Q.   OKAY.  AND YOU UNDERSTOOD THAT THOSE WERE LABS THAT

10:45AM  13   CONTAINED A SUBSTANTIAL AMOUNT OF HEAVY EQUIPMENT TO PERFORM

10:45AM  14   THAT TESTING?

10:45AM  15   A.   CORRECT.

10:45AM  16   Q.   DID YOU -- WERE YOU FAMILIAR WITH THE TERM "ASSAY" BEFORE

10:45AM  17   DISCUSSION OF THERANOS?

10:45AM  18   A.   I HADN'T HEARD THE TERM USED IN THIS WAY, BUT I UNDERSTOOD

10:45AM  19   THE TERM WHEN USED.

10:45AM  20   Q.   OKAY.  AND DID YOU COME TO LEARN THAT THERE WERE DIFFERENT

10:45AM  21   FORMS OF ASSAYS, DIFFERENT METHODS BY WHICH ASSAYS WORKED?

10:46AM  22   A.   I'M NOT SURE.

10:46AM  23        NOW, ARE YOU EQUATING AN ASSAY TO A SPECIFIC CPT CODE?

10:46AM  24   Q.   WELL, IT IS -- EFFECTIVELY I AM.

10:46AM  25   A.   OKAY.

10:46AM 1   Q.   WHAT I AM REFERRING TO AS AN ASSAY IS THE METHOD BY WHICH

10:46AM 2   A PARTICULAR LAB ANALYZES AN ANALYTE IN THE BLOOD, SO A GLUCOSE

10:46AM 3   TEST OR A SODIUM TEST, THAT THERE ARE DIFFERENT ASSAYS FOR

10:46AM 4   EACH.

10:46AM 5   A.   SURE.

10:46AM 6   Q.   AND DID YOU UNDERSTAND THAT THE METHODS BY WHICH THEY WERE

10:46AM 7   ANALYZED FELL INTO DIFFERENT CATEGORIES?  WAS THAT SOMETHING

10:46AM 8   THAT YOU --

10:46AM 9   A.   NO, IT'S NOT THE LEVEL OF DETAIL THAT I HAD.

10:46AM 10  Q.   YOU KNEW THAT SOME BLOOD TESTS WERE PRETTY COMMONLY

10:46AM 11  ORDERED; CORRECT?

10:46AM 12  A.   CORRECT.

10:46AM 13  Q.   AND ONE OF YOUR GOALS, I THINK, IN DESIGNING THIS

10:46AM 14  PARTNERSHIP WAS TO MAKE SURE THAT THERANOS COULD TEST THOSE,

10:47AM 15  PLUS OTHER TESTS?

10:47AM 16  A.   CORRECT.

10:47AM 17  Q.   IN FACT, IN STARTING THE PARTNERSHIP, IS IT TRUE THAT

10:47AM 18  SAFEWAY PROVIDED TO THERANOS ITS DATA ABOUT WHICH TESTS WERE

10:47AM 19  ORDERED WITHIN SAFEWAY AND HOW FREQUENTLY THEY WERE ORDERED?

10:47AM 20  A.   WELL, WE HAD CLAIMS DATA.  I DON'T RECALL GIVING THEM

10:47AM 21  CLAIMS DATA.

10:47AM 22      BUT WE HAD INFORMATION THAT COULD TELL US THE TOP 25

10:47AM 23  ASSAYS, AS YOU REFER TO THEM, THE TOP 50, THE TOP 100, WHAT

10:47AM 24  THOSE PRICE POINTS WERE, YOU KNOW, FOR DIFFERENT LABS.  WE MAY

10:47AM 25  HAVE PROVIDED THAT.

BURD CROSS BY MR. DOWNEY

10:47AM 1    Q.   SO WHEN YOU SAY CLAIMS DATA -- YOU, OF COURSE, PROVIDE

10:47AM 2    INSURANCE TO A NUMBER OF SAFEWAY EMPLOYEES; CORRECT?

10:47AM 3    A.   FOR THE BENEFIT OF THE JURY, ALL LARGE COMPANIES ARE

10:47AM 4    SELF-INSURED AND SO THEY PAY ALL OF THE MEDICAL BILLS, AND AN

10:47AM 5    INSURANCE COMPANY LIKE AN AETNA OR A BLUE SHIELD JUST DOES THE

10:48AM 6    MECHANICS OF PROCESSING THE CLAIM.

10:48AM 7    Q.   OKAY.  AND SO YOU, YOU RECALL GENERALLY IN SOME FORM THAT

10:48AM 8    YOU WERE ABLE TO AGGREGATE INFORMATION FROM THAT DATA AND

10:48AM 9    PROVIDE IT TO THERANOS?

10:48AM 10   A.   WE DID THAT OFTEN FOR OUR OWN ANALYSIS TO LOWER COSTS.

10:48AM 11   Q.   DO YOU RECALL PROVIDING IT TO THERANOS?

10:48AM 12   A.   I DON'T.  BUT IF THEY HAD ASKED FOR IT, I WOULD HAVE

10:48AM 13   PROVIDED IT ON AN AGGREGATED BASIS.

10:48AM 14   Q.   OKAY.  DO YOU RECALL DISCUSSIONS BETWEEN THERANOS AND

10:48AM 15   SAFEWAY AS TO WHICH TESTS WERE THE MOST COMMONLY ORDERED TESTS?

10:48AM 16   A.   I DON'T RECALL.  BUT WE KNEW WHAT THEY WERE, AND IF WE

10:48AM 17   WERE ASKED, WE PROVIDED IT.

10:48AM 18   Q.   OKAY.  NOW, DID YOU UNDERSTAND AT THE TIME THAT YOU WERE

10:48AM 19   HAVING CONVERSATIONS WITH THERANOS THAT THERANOS HAD NOT YET

10:49AM 20   DEVELOPED AN ASSAY FOR EACH BLOOD TEST THAT CAN POTENTIALLY BE

10:49AM 21   OFFERED?

10:49AM 22   A.   WE THOUGHT THAT THERANOS HAD DEVELOPED ASSAYS FOR ALMOST

10:49AM 23   ALL.  AND IF YOU GET TO PROBABLY 200 ASSAYS, YOU WOULD BE

10:49AM 24   95 PERCENT OF ALL ASSAYS, AND MAYBE AT 100 YOU WOULD BE AT

10:49AM 25   LEAST AT 75 PERCENT.

10:49AM   1    Q.   SO AT SOME POINT SAFEWAY HAD THAT UNDERSTANDING OF WHAT

10:49AM   2    THERANOS HAD DONE?

10:49AM   3    A.   WELL, WE WERE RELYING ON THE FACT THAT THEY SAID THAT THEY

10:49AM   4    COULD DO VIRTUALLY ALL ASSAY TYPES.

10:49AM   5    Q.   AND DID YOU AUTHORIZE MR. WOLFSEN AND MR. SHACHMUT TO HAVE

10:49AM   6    CONVERSATIONS WITH MS. HOLMES ABOUT THAT?

10:49AM   7    A.   THEY MADE A TRIP DOWN TO THERANOS AND SPENT A FEW HOURS.

10:49AM   8    Q.   AND I THINK YOU INDICATED IN YOUR EMAIL TO MR. JURGENS

10:50AM   9    THAT SAFEWAY WAS COMMUNICATING ALMOST DAILY WITH THERANOS.

10:50AM   10   A.   IN ONE FORM OR ANOTHER.

10:50AM   11   Q.   AND DID MR. SHACHMUT AND MR. WOLFSEN COMMUNICATE WITH

10:50AM   12   REPRESENTATIVES OF THERANOS BY EMAIL ABOUT THE POTENTIAL DEAL?

10:50AM   13   A.   THEY WERE PART OF A DUE DILIGENCE TEAM, SO I DON'T THINK

10:50AM   14   THEY WOULD HAVE BEEN TALKING ABOUT A POTENTIAL DEAL.  BUT THEY

10:50AM   15   WOULD HAVE BEEN PURSUING DIFFERENT AVENUES OF DUE DILIGENCE.

10:50AM   16   Q.   AND THEY WOULD HAVE BEEN TRYING TO UNDERSTAND WHAT

10:50AM   17   THERANOS'S CAPACITIES WERE; CORRECT?

10:50AM   18   A.   CORRECT.

10:50AM   19   Q.   AND OTHER ASPECTS OF THERANOS?

10:50AM   20   A.   RIGHT.

10:50AM   21   Q.   AND THAT WAS TRUE BOTH BEFORE THE DEAL WAS AGREED TO AND

10:50AM   22   THEN AS TIME WENT ON AND PAYMENTS WERE REQUESTED BY THERANOS;

10:50AM   23   CORRECT?

10:50AM   24   A.   CORRECT.

10:50AM   25   Q.   AND IN DOING THAT, DID YOU UNDERSTAND THAT THEY AND OTHER

BURD CROSS BY MR. DOWNEY

10:51AM 1    SAFEWAY EMPLOYEES COMMUNICATED WITH THERANOS EMPLOYEES AND

10:51AM 2    EXECUTIVES BY EMAIL?

10:51AM 3    A.   THERE WOULD BE SOME EMAILS EXCHANGED I THINK DURING THE

10:51AM 4    DUE DILIGENCE PROCESS, AND THEN ONCE WE GOT DOWN TO THE

10:51AM 5    LOGISTICS AT THE STORE LEVEL, THERE WAS A SMALL TEAM AT

10:51AM 6    THERANOS AND A SMALL TEAM AT SAFEWAY.

10:51AM 7        BUT THE VAST MAJORITY OF COMMUNICATION WAS BETWEEN EITHER

10:51AM 8    MYSELF AND BOB GORDON, ELIZABETH, AND SUNNY.

10:51AM 9    Q.   AND TO THE EXTENT THAT EMPLOYEES COMMUNICATED BY EMAIL,

10:51AM 10   WAS THERE A SYSTEM AT SAFEWAY BY WHICH THAT EMAIL WAS

10:51AM 11   PRESERVED?

10:51AM 12   A.   I CAN'T TELL YOU.

10:51AM 13   Q.   DID YOU EVER SEE A LIBRARY OF ASSAYS THAT THERANOS -- THAT

10:51AM 14   YOU UNDERSTOOD THAT THERANOS COULD PERFORM?

10:51AM 15   A.   IN ONE OF THE EXHIBITS THEY OFFERED UP ABOUT JUST AS AN

10:52AM 16   EXAMPLE OF THEIR PRICING, AND THOSE WERE SOME OF THE TOP ASSAYS

10:52AM 17   IN TERMS OF VOLUME.

10:52AM 18   Q.   AND DO YOU KNOW THAT MS. HOLMES TOLD MR. WOLFSEN BY EMAIL

10:52AM 19   THAT THERANOS WAS NOT PRESENTLY CAPABLE OF PERFORMING ALL OF

10:52AM 20   THOSE TESTS?

10:52AM 21   A.   I DON'T KNOW THAT.  I'D LIKE TO SEE THE EMAIL.

10:52AM 22   Q.   WELL, LET ME ASK YOU TO LOOK AT EXHIBIT 7104.

10:52AM 23       YOUR HONOR, 7104 IS NOT AN EMAIL ON WHICH THIS WITNESS IS

10:52AM 24   COPIED.  I DO THINK THAT THIS IS AN IMPORTANT COMMUNICATION FOR

10:53AM 25   PURPOSES OF REFLECTING THE INTENT OF MS. HOLMES BOTH IN TERMS

10:53AM 1    OF SENDING AND RECEIVING THE EMAIL.  SO I THINK IT COULD BE

10:53AM 2    ADMITTED ON THAT BASIS.

10:53AM 3         BUT ALTERNATIVELY I'LL HAVE TO CALL EITHER MR. WOLFSEN OR

10:53AM 4    MR. SHACHMUT.  SO I MOVE TO ADMIT IT.

10:53AM 5              MR. LEACH:  NO OBJECTION, YOUR HONOR.

10:53AM 6              THE COURT:  TO THE ADMISSION OF THIS EMAIL?

10:53AM 7              MR. LEACH:  CORRECT.

10:53AM 8              THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

10:53AM 9         (DEFENDANT'S EXHIBIT 7104 WAS RECEIVED IN EVIDENCE.)

10:53AM 10   BY MR. DOWNEY:

10:53AM 11   Q.  IF YOU LOOK AT THE BOTTOM OF THE EMAIL THAT STARTS ON

10:53AM 12   PAGE 1, MR. WOLFSEN WRITES TO MS. HOLMES AND SAYS HE'S RECEIVED

10:54AM 13   A REQUEST FROM PRESUMABLY SAFEWAY'S LAWYERS TO SEND THE

10:54AM 14   SELECTED ASSAYS FROM THE THERANOS ASSAY LIBRARY TO OUR OUTSIDE

10:54AM 15   COUNSEL WHO IS ASSISTING IN VARIOUS REGULATORY RESEARCH.

10:54AM 16        AND THEN HE GOES ON TO DISCUSS SOME REGULATORY ISSUES.

10:54AM 17        DO YOU SEE THAT AT THE BOTTOM OF THE FIRST PAGE?

10:54AM 18   A.  YES.

10:54AM 19   Q.  AND HE SENDS THAT EMAIL TO MS. HOLMES AND MR. SHACHMUT;

10:54AM 20   CORRECT?

10:54AM 21   A.  YES.

10:54AM 22   Q.  AND MS. HOLMES RESPONDS TO THAT AND SAYS THIS IS FINE, BUT

10:54AM 23   THAT LIST IS NOT AN ACCURATE REFLECTION OF THE TESTS WE WILL

10:54AM 24   ACTUALLY MAKE AVAILABLE IN THE STORES, THAT LIST IS THE LIBRARY

10:55AM 25   WE PROVIDE FOR OUR PHARMACEUTICAL CLIENTS' CLINICAL TRIALS.

10:55AM  1          DO YOU SEE THAT?

10:55AM  2     A.   I SEE THAT.

10:55AM  3     Q.   AND I THINK YOU MENTIONED YOU UNDERSTOOD THAT THERANOS,

10:55AM  4     PRIOR TO THE TIME THAT THEY ENTERED NEGOTIATIONS WITH SAFEWAY,

10:55AM  5     HAD BEEN PURSUING PARTNERSHIPS WITH PHARMACEUTICAL COMPANIES;

10:55AM  6     CORRECT?

10:55AM  7     A.   THAT'S WHAT WE WERE TOLD, RIGHT.

10:55AM  8     Q.   AND MS. HOLMES IS SAYING TO MR. WOLFSEN, THIS IS A LIBRARY

10:55AM  9     OF ASSAYS WE FEATURE AND CAN DEVELOP AND VALIDATE AS PART OF

10:55AM 10     OUR TRIAL WITH YOU; CORRECT?

10:55AM 11              MR. LEACH:  OBJECTION.  THAT MISSTATES WHAT THIS

10:55AM 12     SAYS, AND IT CALLS FOR SPECULATION.

10:55AM 13              MR. DOWNEY:  I'LL WITHDRAW IT, YOUR HONOR.

10:55AM 14              THE COURT:  THE QUESTION IS WITHDRAWN.

10:55AM 15     BY MR. DOWNEY:

10:55AM 16     Q.   IN ANY EVENT, MR. WOLFSEN RESPONDS TO MS. HOLMES AND SAYS,

10:55AM 17     THANK YOU FOR THE CLARIFICATION, I HAD FORGOTTEN THAT THE LIST

10:55AM 18     WAS A COMPOSITE OF CURRENT AND FUTURE TESTS.

10:56AM 19          DO YOU SEE THAT?

10:56AM 20     A.   I SEE THAT.

10:56AM 21     Q.   IS THIS AN EMAIL AND THE COMMUNICATIONS CONTAINED HEREIN,

10:56AM 22     DO YOU RECALL ANY CONVERSATION WITH MR. WOLFSEN OR MR. SHACHMUT

10:56AM 23     ABOUT THAT IN OR AROUND APRIL OF 2010?

10:56AM 24     A.   I DO NOT.

10:56AM 25          THEY WERE SENT DOWN TO DISCUSS THE WORK THAT HAD BEEN DONE

BURD CROSS BY MR. DOWNEY

10:56AM  1    WITH PHARMACEUTICAL COMPANIES, AND THOSE PRESUMABLY WERE UNITS

10:56AM  2    IN PATIENT'S HOMES THAT WERE VALIDATING SOME VERY SPECIFIC

10:56AM  3    ASPECTS OF SOME DRUG THAT THEY WERE DEVELOPING.

10:56AM  4    Q.   AND APPARENTLY THEY WERE ALSO IN TOUCH WITH SAFEWAY'S

10:56AM  5    OUTSIDE LAWYERS; CORRECT?

10:56AM  6    A.   I THINK THAT BOB GORDON WOULD HAVE BEEN FOR SURE.

10:56AM  7         BUT, AGAIN, I THINK WE'RE TALKING ABOUT APPLES AND ORANGES

10:56AM  8    HERE.  THE KIND OF TESTS THAT WERE RUN FOR PHARMACEUTICAL TO MY

10:56AM  9    KNOWLEDGE WOULDN'T BE THE SAME KIND OF TESTS YOU WOULD RUN FOR

10:57AM  10   INDIVIDUALS, AND WE WERE REPEATEDLY TOLD THAT THEY COULD DO

10:57AM  11   VIRTUALLY ALL.

10:57AM  12   Q.   WELL, THAT REMAINS -- THAT DEPENDS ON THE EMAIL, I

10:57AM  13   SUPPOSE.

10:57AM  14        BUT I WANT TO ASK YOU WHAT YOUR UNDERSTANDING OF THE

10:57AM  15   PHARMACEUTICAL BUSINESS WAS.

10:57AM  16        DID YOU UNDERSTAND THAT THEY WOULD PARTNER WITH

10:57AM  17   PHARMACEUTICAL COMPANIES IN CONNECTION WITH PARTICULAR ASSAYS?

10:57AM  18   DID YOU UNDERSTAND THAT?

10:57AM  19   A.   I UNDERSTOOD THAT THEY WERE WORKING WITH PHARMACEUTICAL

10:57AM  20   COMPANIES AND, JUST AS I SAID, THEY WERE TRYING TO EVALUATE

10:57AM  21   REALTIME HOW THOSE DRUGS WERE AFFECTING MAYBE, YOU KNOW, PARTS

10:57AM  22   OF TRADITIONAL ASSAYS I DON'T KNOW.

10:57AM  23   Q.   BUT YOU UNDERSTOOD --

10:57AM  24   A.   IT'S A DIFFERENT APPLICATION.

10:57AM  25   Q.   BUT YOU UNDERSTOOD THAT THEY WERE WORKING WITH DIFFERENT

10:57AM   1    PHARMACEUTICAL COMPANIES; CORRECT?

10:57AM   2    A.   I UNDERSTOOD THAT THAT'S WHAT THEY SAID THEY WERE DOING.

10:57AM   3    I NEVER PERSONALLY VALIDATED THAT.

10:57AM   4    Q.   OKAY.  BUT DID YOU UNDERSTAND THAT THE NATURE OF THOSE

10:57AM   5    PARTNERSHIPS WAS THAT THEY WOULD INVOLVE ONE OR TWO ASSAYS?

10:58AM   6    A.   I KNEW THAT.

10:58AM   7    Q.   LET ME ASK YOU ABOUT SOME REGULATORY ISSUES THAT WE

10:58AM   8    TOUCHED ON BEFORE.

10:58AM   9         YOUR HONOR, I THOUGHT, BECAUSE WE WILL GO UNTIL 3:00, I

10:58AM  10    THOUGHT WE MIGHT GO UNTIL 11:15 TODAY IF THAT'S -- GO UNTIL

10:58AM  11    11:15 AND HAVE A LITTLE BIT OF A LONGER BREAK.  SO LET ME JUST

10:58AM  12    COVER THIS MATTER.

10:58AM  13              THE COURT:  YOU PREVIEWED ME ASKING THE JURY IF THEY

10:58AM  14    CAN GO UNTIL 3:00.

10:58AM  15              MR. DOWNEY:  I BEG YOUR PARDON.

10:58AM  16              THE COURT:  SO THANKS FOR THAT.

10:58AM  17              MR. DOWNEY:  I'M BREAKING IT TO THEM SOFTLY.

10:58AM  18    Q.   LET ME ASK YOU ABOUT SAFEWAY'S EVALUATION OF THE LEGAL AND

10:58AM  19    REGULATORY ISSUES.

10:58AM  20         WE MENTIONED BEFORE CMS, AND THAT WAS ONE REGULATOR YOU

10:58AM  21    KNEW WOULD BE RELEVANT HERE; CORRECT?

10:58AM  22    A.   CORRECT.

10:58AM  23    Q.   AND THE FDA WAS ANOTHER; CORRECT?

10:58AM  24    A.   MAYBE THE FDA, MAYBE NOT.

10:59AM  25    Q.   THAT WAS AN OPEN QUESTION; CORRECT?

10:59AM  1    A.   CORRECT.

10:59AM  2    Q.   BUT YOU -- AND WHEN YOU ULTIMATELY ENTERED INTO AN

10:59AM  3    AGREEMENT, YOU ULTIMATELY INCLUDED A PROVISION WHICH SAID IF

10:59AM  4    THE FDA OBJECTS, WE HAVE THE RIGHT TO TERMINATE THE AGREEMENT;

10:59AM  5    CORRECT?

10:59AM  6    A.   I DON'T RECALL THAT, BUT THE DOCUMENT'S IN THESE BINDERS.

10:59AM  7    Q.   OKAY.  YOU UNDERSTOOD OVER TIME THAT THERANOS WAS WORKING

10:59AM  8    WITH BOTH OF THOSE REGULATORS; CORRECT?

10:59AM  9    A.   THEY SAID THEY WERE WORKING WITH BOTH, AND I KNEW THEY

10:59AM  10   WERE WORKING WITH CLIA, CLIA WAIVERS, BECAUSE I RECALLED THE

10:59AM  11   TIME WHEN ELIZABETH CALLED ME AND SAID THAT THEY HAD JUST BEEN

10:59AM  12   CLIA APPROVED.

10:59AM  13   Q.   RIGHT.  AT SOME POINT DURING THE RELATIONSHIP, THEIR LAB

10:59AM  14   HAD GOTTEN A CERTIFICATION FROM CLIA TO OPERATE AS A LAB?

10:59AM  15   A.   CORRECT, CORRECT.

10:59AM  16   Q.   BUT DURING THE TIME THAT YOU WERE NEGOTIATING THE

10:59AM  17   AGREEMENT IN 2010, MS. HOLMES NEVER SAID WE HAVE A CLIA

10:59AM  18   CERTIFICATION; CORRECT?

10:59AM  19   A.   NO, SHE DID NOT.  BUT SHE WAS EXPECTING TO GET ONE, AND I

11:00AM  20   BELIEVE THEY ULTIMATELY DID.

11:00AM  21   Q.   AND, IN FACT, FOR THE AGREEMENT TO GO FORWARD, THEY HAD TO

11:00AM  22   GET THAT; CORRECT?

11:00AM  23   A.   CORRECT.

11:00AM  24   Q.   AND SIMILARLY, DID YOU KNOW THAT THERANOS WAS TALKING TO

11:00AM  25   THE FDA ABOUT VARIOUS APPROVALS?

11:00AM  1    A.   I DO RECALL ELIZABETH SAYING THAT THEY WOULD PREFER TO GET

11:00AM  2    I GUESS A BIGGER GOLD STAMP OF APPROVAL WHICH THEY REGARDED AS

11:00AM  3    THE FDA.

11:00AM  4    Q.   AND DID YOU TALK TO MS. HOLMES ABOUT FDA APPROVAL IN 2010?

11:00AM  5    A.   WE MAY HAVE HAD SOME DISCUSSION.  BUT, YOU KNOW, TO

11:00AM  6    OPERATE A LAB, ALL YOU NEED IS CLIA WAIVED.

11:00AM  7    Q.   BUT YOU DIDN'T UNDERSTAND IN 2010 -- SHE NEVER TOLD YOU IN

11:01AM  8    2010 THAT THEY HAD ANY APPROVALS FROM THE FDA, DID SHE?

11:01AM  9    A.   I DON'T RECALL HER SAYING THAT.

11:01AM  10   Q.   OKAY.  AND AT THE TIME, DID YOU PERSONALLY LOOK AT THOSE

11:01AM  11   ISSUES VERY CLOSELY?

11:01AM  12   A.   IN TERMS OF CLIA AND FDA, WE WOULD HAVE RELIED ON OUTSIDE

11:01AM  13   COUNSEL.

11:01AM  14   Q.   AND THAT WOULD BE LATHAM & WATKINS?

11:01AM  15   A.   CORRECT.

11:01AM  16   Q.   AND THOSE, IN FACT, ARE THE LAWYERS WHO ARE REPRESENTING

11:01AM  17   YOU IN CONNECTION WITH YOUR APPEARANCE HERE TODAY; CORRECT?

11:01AM  18   A.   CORRECT.

11:01AM  19   Q.   AND THAT'S A VERY REPUTABLE, WELL-KNOWN LAW FIRM; CORRECT?

11:01AM  20   A.   YES.

11:01AM  21   Q.   NOW, IS THERE ANY ASPECT OF REGULATORY APPROVAL THAT YOU

11:01AM  22   RECALL RECEIVING A REPRESENTATION FROM THERANOS ABOUT THAT YOU

11:01AM  23   LATER CAME TO BELIEVE WAS UNTRUE?  DID THEY TELL YOU SOMETHING

11:02AM  24   ABOUT HAVING A REGULATORY APPROVAL THAT YOU THINK WAS FALSE?

11:02AM  25   A.   THE ONLY ONE I RECALL ELIZABETH SAYING WAS THAT THEY HAD

11:02AM 1      BEEN CLIA APPROVED.

11:02AM 2      Q.   OKAY.  BUT THAT WAS TRUE; CORRECT?

11:02AM 3      A.   AND THAT WAS TRUE.

11:02AM 4      Q.   OKAY.  AND LET ME --

11:02AM 5           THIS NEXT SUBJECT IS A LITTLE LONG, YOUR HONOR, SO IT

11:02AM 6      MIGHT BE A LOGICAL TIME FOR A BREAK.

11:02AM 7               THE COURT:  TIME FOR A BREAK?  ALL RIGHT.  WE'LL

11:02AM 8      TAKE A BREAK NOW.

11:02AM 9           SIR, YOU CAN STAND DOWN NOW IF YOU WANT TO TAKE YOUR

11:02AM 10     BREAK.

11:02AM 11              THE WITNESS:  SURE.

11:02AM 12              THE COURT:  I NEED TO TALK TO THE JURY FOR A FEW

11:02AM 13     MINUTES.  WE'LL COME BACK IN ABOUT 30 MINUTES, I THINK, ABOUT

11:02AM 14     30 MINUTES WOULD BE GOOD.

11:02AM 15          MR. DOWNEY, YOU CAN HAVE A SEAT.

11:02AM 16          LADIES AND GENTLEMEN, AS YOU'VE HEARD, I'D LIKE TO GO

11:02AM 17     UNTIL 3:00 THIS AFTERNOON, IF WE MAY, AND TOMORROW I'D LIKE TO

11:02AM 18     SEE IF WE CAN GO UNTIL 4:00 P.M.  FRIDAY WE WILL NEED TO BREAK

11:03AM 19     AT 1:00 P.M., 1:00 P.M. IN THE AFTERNOON.

11:03AM 20          ALSO, LADIES AND GENTLEMEN, BEFORE WE TAKE OUR BREAK, I DO

11:03AM 21     WANT TO INFORM YOU OF AN ACTION THAT HAS OCCURRED THAT AFFECTS

11:03AM 22     THE JURY QUESTIONNAIRES THAT YOU COMPLETED IN THE JURY

11:03AM 23     SELECTION PROCESS OF THIS CASE.

11:03AM 24          AS YOU RECALL, EACH OF YOU COMPLETED A JURY QUESTIONNAIRE

11:03AM 25     PRIOR TO YOUR COMING TO COURT TO BE QUESTIONED AS POTENTIAL

11:03AM  1    JURORS FOR THIS CASE.

11:03AM  2         THE QUESTIONNAIRE HAD TWO PAGES OF INSTRUCTIONS, AND ON

11:03AM  3    THE SECOND PAGE ABOVE MY SIGNATURE WAS THE STATEMENT THAT YOUR

11:03AM  4    ANSWERS WOULD BE CONFIDENTIAL.  YOU WERE INFORMED THAT THE

11:03AM  5    COURT WAS SENSITIVE TO YOUR PRIVACY.  YOU WERE INFORMED THAT

11:03AM  6    THE QUESTIONNAIRES WOULD BE REVIEWED BY THE LAWYERS AND THE

11:03AM  7    COURT AND THAT THEY WOULD BE KEPT WITH THE CLERK OF THE COURT

11:03AM  8    UNDER SEAL AND WOULD BE DISCLOSED, IF AT ALL, WITH NAMES AND

11:04AM  9    OTHER IDENTIFYING INFORMATION REMOVED.

11:04AM 10         NOW, I NEED TO INFORM YOU THAT ABOUT TEN DAYS AGO THE

11:04AM 11    COURT RECEIVED A MOTION FROM AN ENTITY CALLED "MEDIA COALITION"

11:04AM 12    ASKING THAT THE COURT UNSEAL THE QUESTIONNAIRES SUCH THAT THEY

11:04AM 13    MIGHT HAVE ACCESS TO THEM.

11:04AM 14         THE MEDIATION COALITION IDENTIFIES THEMSELVES AS THE

11:04AM 15    FOLLOWING:  AMERICAN BROADCASTING COMPANY, INCORPORATED DOING

11:04AM 16    BUSINESS AS ABC NEWS; THE ASSOCIATED PRESS; BLOOMBERG LP; THE

11:04AM 17    DAILY MAIL; DOW JONES & COMPANY INCORPORATED; NBC UNIVERSAL

11:04AM 18    MEDIA LLC; THE NEW YORK TIMES COMPANY; PORTFOLIO MEDIA

11:05AM 19    INCORPORATED, PUBLISHER OF LAW 360; 3 UNCANNY 4 LLC; AND THE

11:05AM 20    WASHINGTON POST COMPANY.

11:05AM 21         NOW, LAST WEEK, A FEW DAYS AGO, I HAD A HEARING ON THIS

11:05AM 22    MOTION WITH THE MEDIA COALITION ATTORNEY WHO BROUGHT THE

11:05AM 23    MOTION.  ALSO PRESENT WERE ATTORNEYS INVOLVED IN THIS CASE, AN

11:05AM 24    ATTORNEY FOR MS. HOLMES, AND THE UNITED STATES ATTORNEY'S

11:05AM 25    OFFICE PROSECUTING THIS CASE.

11:05AM  1      WE DISCUSSED THE QUESTION OF CONFIDENTIALITY OF THE

11:05AM  2   QUESTIONNAIRES AND I TOLD THE PARTIES THAT PRIOR TO ME DECIDING

11:05AM  3   WHAT, IF ANYTHING, IS TO BE RELEASED, I WOULD SPEAK TO EACH ONE

11:05AM  4   OF YOU PRIVATELY TO HEAR YOUR COMMENTS, IF ANY, ON THIS ISSUE.

11:05AM  5      NOW, WHAT I'D LIKE TO DO TODAY, LADIES AND GENTLEMEN, IS

11:05AM  6   AT THE BREAK, MS. KRATZMANN IS GOING TO PROVIDE YOU WITH COPIES

11:06AM  7   OF YOUR QUESTIONNAIRES, THE QUESTIONNAIRES THAT YOU FILLED OUT,

11:06AM  8   COPIES OF THEM.

11:06AM  9      MY THOUGHT IS THAT YOU MIGHT LIKE TO REVIEW THESE

11:06AM  10  QUESTIONNAIRES AT OUR BREAK.  AFTER WE FINISH EVIDENCE TODAY,

11:06AM  11  WHICH I SUGGESTED WOULD BE ABOUT 3:00 P.M., I WILL ASK IF ANY

11:06AM  12  OF YOU WISH TO SPEAK TO ME TODAY ABOUT YOUR QUESTIONNAIRES AND

11:06AM  13  THESE ISSUES.

11:06AM  14     IF YOU DO, WE WILL SPEAK IN MY CHAMBERS.  IF YOU WISH TO

11:06AM  15  THINK ABOUT IT OVERNIGHT, YOU MAY DO THAT AND I'LL ASK TOMORROW

11:06AM  16  IF YOU WISH TO SPEAK WITH ME, WHICH IS TO SAY THAT I WILL

11:06AM  17  PERMIT YOU TO TAKE YOUR QUESTIONNAIRE HOME WITH YOU, A COPY OF

11:06AM  18  YOUR QUESTIONNAIRE.  WE'LL PROVIDE AN ENVELOPE FOR YOU SUCH

11:06AM  19  THAT IT CAN REMAIN CONVENIENT TO YOU KEEPING IT PRIVATE, AND

11:06AM  20  THEN TOMORROW I'LL ASK YOU IF YOU WISH TO SPEAK WITH ME ABOUT

11:06AM  21  THIS.

11:06AM  22     OUR CONVERSATION WILL BE BRIEF.

11:06AM  23     NOW, I'VE TALKED TO THE LAWYERS HERE.  WE'LL MEET IN MY

11:07AM  24  CHAMBERS, IN MY OFFICE.  I'LL DO THAT ONE AT A TIME WITH EACH

11:07AM  25  OF YOU.  IT WILL BE RECORDED, SO THERE WILL BE A COURT REPORTER

11:07AM 1      PRESENT.  THE LAWYERS WILL HAVE ONE LAWYER PRESENT.  THEY WILL

11:07AM 2      NOT PARTICIPATE IN THE CONVERSATION.  THEY WILL BE THERE TO

11:07AM 3      OBSERVE ONLY.  I MAY HAVE SOME OF MY STAFF PRESENT AS WELL.

11:07AM 4          I TELL YOU THIS IN ADVANCE TO TRY TO LET YOU KNOW WHAT THE

11:07AM 5      CIRCUMSTANCES WILL BE SUCH THAT YOU WON'T BE INTIMIDATED WHEN

11:07AM 6      YOU WALK IN A ROOM AND SEE PEOPLE THERE.

11:07AM 7          MY GOAL IS NOT TO MAKE THIS INTIMIDATING AT ALL, BECAUSE

11:07AM 8      IT SHOULDN'T BE.  IT'S GOING TO BE A CONVERSATION WITH YOU AND

11:07AM 9      WITH ME, AND I HAVE SOME PREPARED QUESTIONS THAT I'M GOING TO

11:07AM 10     ASK EACH OF YOU REGARDING THIS ISSUE AND REGARDING YOUR

11:07AM 11     QUESTIONNAIRES.

11:07AM 12         SO THAT'S THE SCHEDULE FOR TODAY.

11:07AM 13         AT THE BREAK MS. KRATZMANN WILL PROVIDE YOU, AS I SAID,

11:07AM 14     WITH COPIES OF YOUR QUESTIONNAIRES IF YOU WOULD LIKE TO REVIEW

11:08AM 15     THOSE.

11:08AM 16         AGAIN, IF YOU WOULD LIKE TO SPEAK WITH ME TODAY AFTER

11:08AM 17     3:00 O'CLOCK, I'M HAPPY TO DO THAT.  IF YOU WANT TO WAIT UNTIL

11:08AM 18     TOMORROW, OF COURSE WE CAN DO THAT AS WELL.

11:08AM 19         I WILL ASK YOU, IF YOU DO LEAVE WITH YOUR QUESTIONNAIRES,

11:08AM 20     PLEASE DO NOT SHARE THEM WITH ANYONE ELSE, AND PLEASE BRING

11:08AM 21     THEM, BRING THEM WITH YOU TOMORROW BACK TO COURT AND WE'LL

11:08AM 22     COLLECT THOSE AGAIN.

11:08AM 23         ALL RIGHT.  THANK YOU.

11:08AM 24         COUNSEL, ANYTHING FURTHER?

11:08AM 25             MR. SCHENK:  NO.  THANK YOU, YOUR HONOR.

11:08AM   1          MR. DOWNEY:  NO, YOUR HONOR.

11:08AM   2          THE COURT:  ALL RIGHT.  WE'LL TAKE ABOUT A 30 MINUTE

11:08AM   3     BREAK.  THANK YOU.

11:08AM   4          (LUNCH RECESS TAKEN AT 11:08 A.M.)

        5

        6

        7

        8

        9

       10

       11

       12

       13

       14

       15

       16

       17

       18

       19

       20

       21

       22

       23

       24

       25

11:46AM   1                    **AFTERNOON SESSION**

11:46AM   2            (JURY IN AT 11:46 A.M.)

11:46AM   3                THE COURT:  WE'RE BACK ON THE RECORD.  ALL PARTIES

11:46AM   4    PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.

11:46AM   5            MR. DOWNEY, YOU WANTED TO CONTINUE?

11:46AM   6                MR. DOWNEY:  YES, SIR.

11:46AM   7                THE COURT:  YES?

11:46AM   8                MR. DOWNEY:  YES.

11:46AM   9    Q.   MR. BURD, WE WERE TALKING A LITTLE BIT THIS MORNING ABOUT

11:46AM   10   THE PROCESS OF DUE DILIGENCE BEFORE YOU ENTERED INTO AN

11:46AM   11   AGREEMENT WITH THERANOS.

11:46AM   12       I WANT TO TALK NOW ABOUT THE AGREEMENT THAT YOU ULTIMATELY

11:46AM   13   ENTERED INTO, AND YOU MIGHT FIND IT HELPFUL TO HAVE IT IN FRONT

11:46AM   14   OF YOU.  IT'S EXHIBIT 387 IN THE WHITE BINDER.

11:47AM   15                THE CLERK:  THAT WAS PREVIOUSLY ADMITTED.

11:47AM   16                MR. DOWNEY:  IT WAS.

11:47AM   17   Q.   BEFORE WE GET INTO THIS DOCUMENT, YOU HAD MENTIONED THAT

11:47AM   18   WITH RESPECT TO THIS AGREEMENT, MS. HOLMES NEGOTIATED A LOT OF

11:47AM   19   THE TERMS OF THE AGREEMENT ON HER OWN; CORRECT?

11:47AM   20   A.   YES, MEANING SHE -- MEANING WE NEVER SAT WITH A LAWYER

11:47AM   21   FROM THERANOS, WHICH IS CUSTOMARY.

11:47AM   22   Q.   AND YOU UNDERSTOOD FROM THERANOS THAT THIS WAS A BIG DEAL?

11:47AM   23   A.   I THOUGHT IT WAS, SURE.

11:47AM   24   Q.   OKAY.  LET ME DIRECT YOUR ATTENTION IN THE EXHIBIT THAT IS

11:47AM   25   IN FRONT OF YOU TO PAGE 8, AND I'M GOING TO BE LOOKING AT THE

11:47AM 1    PART OF IT THAT IS THE CARRY-OVER SECTION IN 3B WHICH CARRIES

11:48AM 2    OVER BETWEEN PAGES 8 AND 9.

11:48AM 3        DO YOU SEE THAT?

11:48AM 4    A.   YES.

11:48AM 5    Q.   NOW, YOU HAD TALKED DURING YOUR DIRECT EXAMINATION ABOUT A

11:48AM 6    PILOT PROGRAM.

11:48AM 7        DO YOU RECALL THAT?

11:48AM 8    A.   I DO.

11:48AM 9    Q.   BUT, IN FACT, THE AGREEMENT SET UP A SYSTEM UNDER WHICH

11:48AM 10   THERE WOULD BE THREE PHASES IN THE AGREEMENT; CORRECT?  THERE

11:48AM 11   WOULD BE A PRE-PILOT, A PILOT, AND THEN THERE WOULD BE A

11:48AM 12   LAUNCH.

11:48AM 13       DO YOU RECALL THAT?

11:48AM 14   A.   YES.

11:48AM 15   Q.   AND IN PARAGRAPH 3B OF THE AGREEMENT, THE OBLIGATIONS OF

11:48AM 16   THE PARTIES WERE SET FORWARD; CORRECT?

11:48AM 17   A.   CORRECT.

11:48AM 18   Q.   AND THERANOS WAS OBLIGATED UNDER THIS SECTION OF THE

11:48AM 19   AGREEMENT TO OBTAIN APPROVALS BY CLIA; CORRECT?

11:49AM 20   A.   YES.

11:49AM 21   Q.   AND THEY WERE ALSO REQUIRED TO OBTAIN APPROVALS REQUIRED

11:49AM 22   BY ANY OTHER REGULATOR OR LEGAL AUTHORITY; CORRECT?

11:49AM 23   A.   YES.

11:49AM 24   Q.   AND BEFORE THEY LAUNCHED AT SAFEWAY, THEY WERE REQUIRED TO

11:49AM 25   TAKE THEIR TECHNOLOGY AND CUSTOMIZE IT TO SAFEWAY.

11:49AM  1          DO YOU RECALL THAT?

11:49AM  2      A.   THERE IS SOME LANGUAGE IN HERE TO THAT FACT.

11:49AM  3      Q.   WELL, IT WAS A REQUIREMENT OF THE AGREEMENT, WASN'T IT?

11:49AM  4      A.   I'M LOOKING AT SECTION 3B II.

11:49AM  5          LET ME JUST READ IT FOR A SECOND.

11:49AM  6      Q.   CERTAINLY.

11:49AM  7          (PAUSE IN PROCEEDINGS.)

11:49AM  8              THE WITNESS:  YEAH, I THINK CUSTOMIZATION REFERRED

11:50AM  9      TO SORT OF INTEGRATING IT WITH THE BALANCE OF SAFEWAY SYSTEMS.

11:50AM  10     BY MR. DOWNEY:

11:50AM  11     Q.   OKAY.  AND SO SOFTWARE WOULD HAVE TO BE CREATED THAT DID

11:50AM  12     THAT?

11:50AM  13     A.   CORRECT.

11:50AM  14     Q.   AND DO YOU RECALL SUBSEQUENTLY THAT YOU ALSO WANTED TO

11:50AM  15     CUSTOMIZE THE DEVICE IN TERMS OF HOW IT APPEARED IN SAFEWAY

11:50AM  16     STORES.

11:50AM  17         DO YOU REMEMBER THAT?

11:50AM  18     A.   YES.  THERANOS WAS, YOU KNOW, GOING THROUGH SOME CHANGES

11:50AM  19     ON THEIR OWN AND SO I OFFERED UP, YOU KNOW, WHAT WOULD LOOK

11:50AM  20     GOOD FOR US.

11:50AM  21     Q.   OKAY.  AND JUST FROM A RETAIL PERSPECTIVE YOU OFFERED

11:50AM  22     THOUGHTS.

11:50AM  23     A.   RIGHT.

11:50AM  24     Q.   SO, FOR EXAMPLE, DO YOU RECALL THAT YOU SUGGESTED THAT THE

11:50AM  25     SCREEN OF THE DEVICE BE SEPARATED OUT FROM THE DEVICE?  DO YOU

| | | |
|---|---|---|
| 11:50AM | 1 | REMEMBER THAT? |
| 11:50AM | 2 | A.  IF IT'S IN -- IF IT'S IN ONE OF THE EMAILS, I'M SURE I |
| 11:50AM | 3 | DID. |
| 11:50AM | 4 | Q.  WELL, LET'S GO BACK TO THE AGREEMENT. |
| 11:50AM | 5 | SO IN ADDITION TO WHAT WE'VE ALREADY DISCUSSED, THE |
| 11:50AM | 6 | OBLIGATION WAS IMPOSED ON THERANOS BY THIS AGREEMENT TO |
| 11:50AM | 7 | NEGOTIATE WITH PAYORS WHO PAY FOR THE MEDICAL COSTS OF |
| 11:51AM | 8 | PATIENTS; CORRECT? |
| 11:51AM | 9 | A.  CORRECT. |
| 11:51AM | 10 | Q.  AND THEY HAD TO GAIN ACCEPTANCE THAT WAS SATISFACTORY TO |
| 11:51AM | 11 | SAFEWAY BEFORE THERE WAS A LAUNCH; CORRECT? |
| 11:51AM | 12 | A.  CORRECT. |
| 11:51AM | 13 | Q.  AND THAT'S TRUE SPECIFICALLY WITH REGARD TO INSURERS; |
| 11:51AM | 14 | CORRECT? |
| 11:51AM | 15 | A.  YES. |
| 11:51AM | 16 | Q.  AND THOSE OBLIGATIONS ARE COVERED IN B III AND IV; |
| 11:51AM | 17 | CORRECT? |
| 11:51AM | 18 | A.  YES. |
| 11:51AM | 19 | Q.  AND THEN THERE WAS ALSO AN OBLIGATION THAT THERANOS HAD TO |
| 11:51AM | 20 | MEET SERVICE STANDARDS SET BY SAFEWAY, INCLUDING THAT THE |
| 11:51AM | 21 | RESULTS OF TESTS BE AVAILABLE IN 30 MINUTES OR LESS; CORRECT? |
| 11:51AM | 22 | A.  YES. |
| 11:51AM | 23 | Q.  AND THEN THERE WERE SOME OTHER PROVISION ABOUT THERANOS |
| 11:51AM | 24 | REPLACING DEVICES THAT MALFUNCTIONED. |
| 11:52AM | 25 | AND THEN SAFEWAY OBTAINED -- STRIKE THAT. |

11:52AM  1          SAFEWAY WAS OBLIGATED TO HELP THERANOS IN GAINING

11:52AM  2   GOVERNMENT APPROVAL; CORRECT?

11:52AM  3   A.   CORRECT.

11:52AM  4   Q.   AND IT WAS OBLIGATED TO ASSIST THERANOS IN CONNECTION WITH

11:52AM  5   A MARKETING STRATEGY; CORRECT?

11:52AM  6   A.   YES.

11:52AM  7   Q.   AND THEN REMODELING OF THE STORE WOULD BE SAFEWAY'S

11:52AM  8   OBLIGATION, NOT THERANOS'S; CORRECT?

11:52AM  9   A.   THAT'S CORRECT.

11:52AM 10   Q.   AND ALL OF THIS WAS BEFORE THE PILOT PROGRAM LAUNCHED;

11:52AM 11   CORRECT?

11:52AM 12   A.   CORRECT.

11:52AM 13   Q.   OKAY.  SO ALL OF THESE TASKS HAD TO BE COMPLETED TO EACH

11:52AM 14   PARTY'S SATISFACTION IF IT WAS AN OBLIGATION OF THE OTHER PARTY

11:52AM 15   BEFORE THERE COULD EVER BE A PILOT LAUNCH AT SAFEWAY; CORRECT?

11:52AM 16   A.   CORRECT.

11:52AM 17   Q.   AND IF IT WERE TO PASS THAT THERANOS DID NOT MEET ONE OF

11:52AM 18   THOSE OBLIGATIONS OR MORE THAN ONE OF THOSE OBLIGATIONS,

11:53AM 19   SAFEWAY HAD THE RIGHT TO TERMINATE THE AGREEMENT; CORRECT?

11:53AM 20   A.   IT'S NOT SOMETHING THAT I RECALL, BUT I WOULD, I WOULD

11:53AM 21   HAVE BEEN DISAPPOINTED IF GENERAL COUNSEL DIDN'T HAVE IT IN

11:53AM 22   HERE.

11:53AM 23   Q.   OKAY.  AND AFTER THE PRE-PILOT PERIOD WAS COMPLETED TO THE

11:53AM 24   SATISFACTION OF SAFEWAY, A PILOT PROGRAM COULD ACTUALLY LAUNCH;

11:53AM 25   CORRECT?

BURD CROSS BY MR. DOWNEY                                          3107

11:53AM   1     A.   CORRECT.

11:53AM   2     Q.   AND THAT'S DETAILED IN PARAGRAPH C ON PAGE 9; CORRECT?

11:53AM   3     A.   YES.

11:53AM   4     Q.   AND THE EXPECTATION OF THE PARTIES WAS THAT THE PILOT

11:53AM   5     PROGRAM WOULD LAST ABOUT 90 DAYS; CORRECT?

11:53AM   6     A.   YES.

11:53AM   7     Q.   AND ALSO THAT THE PILOT PROGRAM WOULD RUN CONCURRENTLY

11:53AM   8     WITH THE PILOT PROGRAM THAT WALGREENS WOULD RUN; CORRECT?

11:53AM   9     A.   YES.

11:54AM  10     Q.   AND AGAIN, AS WITH THE PRE-PILOT PERIOD, THE PILOT PERIOD

11:54AM  11     HAD TO BE COMPLETED TO SAFEWAY'S SATISFACTION; CORRECT?

11:54AM  12     A.   CORRECT.

11:54AM  13     Q.   AND AGAIN, IF SAFEWAY DID NOT -- IF SAFEWAY WERE

11:54AM  14     UNSATISFIED WITH THERANOS'S PERFORMANCE, IT COULD TERMINATE THE

11:54AM  15     AGREEMENT; CORRECT?

11:54AM  16     A.   CORRECT.

11:54AM  17     Q.   AND IF THE AGREEMENT WAS TERMINATED, THERANOS WAS

11:54AM  18     OBLIGATED TO RETURN ANY MONIES PAID BY SAFEWAY TO DATE;

11:54AM  19     CORRECT?

11:54AM  20     A.   I'D HAVE TO -- I'D HAVE TO READ THIS AND GIVE YOU AN

11:54AM  21     ANSWER ON THAT.

11:54AM  22     Q.   OKAY.  BUT DO YOU RECALL GENERALLY TRYING TO NEGOTIATE AN

11:54AM  23     AGREEMENT --

11:54AM  24     A.   CORRECT.

11:54AM  25     Q.   -- THAT PROVIDED FINANCIAL PROTECTION FOR SAFEWAY?

11:54AM  1    A.   RIGHT.

11:54AM  2    Q.   AND YOU HAD MENTIONED THIS MORNING THAT YOU WERE CONCERNED

11:54AM  3    TO ACHIEVE EXCLUSIVITY IN CONNECTION WITH THE FOOD RETAIL

11:54AM  4    MARKET; CORRECT?

11:54AM  5    A.   YES.

11:55AM  6    Q.   AND DO YOU RECALL THAT YOU WERE SUCCESSFUL IN THAT REGARD

11:55AM  7    AND THAT YOU DID OBTAIN A COMMITMENT FROM THERANOS THAT YOU

11:55AM  8    COULD BE THE -- THAT SAFEWAY COULD BE THE EXCLUSIVE FOOD

11:55AM  9    RETAILER TO LAUNCH FOR A PERIOD?

11:55AM  10    A.   YES.

11:55AM  11    Q.   AND IF YOU LOOK AT PARAGRAPH 5 ON PAGE 11, DOES THAT

11:55AM  12    REFLECT THAT PROVISION?

11:55AM  13    A.   I THINK THAT 5 JUST REFERS TO HOW MUCH OF THE INSURANCE

11:55AM  14    MARKET SHE HAS TO HAVE PRICING ARRANGEMENT WITH BEFORE THE

11:55AM  15    PROGRAM WOULD LAUNCH.

11:55AM  16    Q.   I'M SORRY.  I MAY HAVE DIRECTED YOU TO THE WRONG PLACE.

11:55AM  17         I'M LOOKING AT PAGE 11, B 5.  I THINK THAT'S EXCERPTED ON

11:56AM  18    YOUR SCREEN IF THAT'S HELPFUL AS WELL.

11:56AM  19         MY QUESTION WAS, THIS PROVISION PROVIDED THAT SAFEWAY

11:56AM  20    WOULD HAVE THE EXCLUSIVE RIGHT TO DEPLOY THERANOS IN THE FOOD

11:56AM  21    RETAIL CHANNEL; CORRECT?

11:56AM  22    A.   LET ME JUST FINISH THIS.

11:56AM  23         (PAUSE IN PROCEEDINGS.)

11:56AM  24             THE WITNESS:  CORRECT.

11:56AM  25    BY MR. DOWNEY:

11:56AM 1   Q.   NOW, THERE WERE OTHER FOOD RETAILERS AT THAT TIME WHO WERE

11:56AM 2   LARGER FOOD RETAILERS; CORRECT?

11:56AM 3   A.   WAL-MART WAS LARGER, KROGER WAS LARGER.

11:56AM 4   Q.   SAFEWAY ABOUT A THIRD?

11:56AM 5   A.   A THIRD.

11:56AM 6   Q.   AND ALSO UNDER THE AGREEMENT, DID -- SO THEY WOULD BE

11:56AM 7   PRECLUDED UNDER THE AGREEMENT FROM LAUNCHING THERANOS SYSTEMS?

11:56AM 8   A.   WE GAVE THE LIST OF ONES WE CONSIDERED TO BE THE PLAYERS,

11:56AM 9   AND IT'S IN THE DOCUMENT SOMEWHERE, BUT WE WOULD NOT HAVE PUT

11:57AM 10  WAL-MART ON THE LIST AND WE WOULD PROBABLY EXCLUDE KROGER.

11:57AM 11  BUT, AGAIN, IT'S IN THE DOCUMENT.

11:57AM 12  Q.   OKAY.  AND WE'VE BEEN TALKING ALSO ABOUT YOUR RIGHT TO

11:57AM 13  TERMINATE, AND I JUST WANT TO GIVE YOU AN ABILITY TO LOOK AT

11:57AM 14  THAT PROVISION AS WELL.  THAT'S ON PAGE 19.

11:57AM 15  A.   YES.

11:57AM 16  Q.   SECTION 26B.

11:57AM 17  A.   I HAVE IT.

11:57AM 18  Q.   OKAY.  AND PARAGRAPH 26B PROVIDES "IN THE EVENT THAT

11:57AM 19  SAFEWAY DETERMINES IN ITS SOLE DISCRETION THAT THE PILOT OF THE

11:57AM 20  PROGRAM HAS BEEN UNSUCCESSFUL, SAFEWAY HAS THE RIGHT TO

11:57AM 21  TERMINATE THIS AGREEMENT WITHOUT CAUSE ON THIRTY (30) CALENDAR

11:57AM 22  DAYS' PRIOR WRITTEN NOTICE TO THERANOS.  UPON ANY SUCH

11:58AM 23  TERMINATION, THERANOS SHALL PROMPTLY RETURN ALL PREPAYMENT

11:58AM 24  AMOUNTS ATTRIBUTABLE TO UNDELIVERED INVENTORY UNDER SECTION 10

11:58AM 25  ABOVE."

11:58AM  1          DO YOU SEE THAT?

11:58AM  2     A.   YES.

11:58AM  3     Q.   AND THE REFERENCE TO INVENTORY REFERS TO THE FACT THAT

11:58AM  4     PAYMENTS UNDER THE CONTRACT WERE BEING MADE AS PAYMENTS TO

11:58AM  5     PREPAY FOR CARTRIDGES THAT WERE PART OF THE THERANOS SYSTEMS?

11:58AM  6     A.   CORRECT.

11:58AM  7     Q.   OKAY.  SO ANY PAYMENTS MADE FOR THAT, THERANOS WOULD HAVE

11:58AM  8     AN OBLIGATION TO PREPAY; CORRECT?

11:58AM  9     A.   CORRECT.

11:58AM 10     Q.   AND IT WAS ALSO THE CASE UNDER PARAGRAPH 2 THAT IF THE FDA

11:58AM 11     TOOK ADVERSE ACTION AGAINST THERANOS, THAT SAFEWAY WOULD HAVE

11:58AM 12     THE RIGHT TO TERMINATE THE AGREEMENT; CORRECT?

11:58AM 13     A.   CORRECT.

11:58AM 14     Q.   WAS THAT A RISK THAT YOU BECAME AWARE OF DURING YOUR

11:58AM 15     EVALUATION OF THE DEAL?

11:59AM 16     A.   MY UNDERSTANDING AT THE TIME WAS THAT CLIA APPROVAL WAS

11:59AM 17     SUFFICIENT AND THEY DIDN'T NECESSARILY NEED FDA APPROVAL.

11:59AM 18          ELIZABETH POSITIONED THAT AS MORE OF A BULLETPROOF TYPE OF

11:59AM 19     APPROVAL.

11:59AM 20     Q.   BUT THE AGREEMENT CONTEMPLATED THE POSSIBILITY THAT THE

11:59AM 21     FDA MIGHT TAKE THE OPPOSITE POSITION; CORRECT?

11:59AM 22     A.   SURE.

11:59AM 23     Q.   AND THE RIGHTS AS TO WHO WOULD HAVE THE ABILITY TO

11:59AM 24     TERMINATE THE AGREEMENT DID NOT LIE WITH THERANOS, DID THEY?

11:59AM 25     THEY LAID WITH SAFEWAY; CORRECT?

BURD CROSS BY MR. DOWNEY                                          3111

11:59AM   1    A.   YES.

11:59AM   2    Q.   AND INDEED, AS WE TALKED ABOUT THIS MORNING, THERANOS WAS

11:59AM   3    A RELATIVELY YOUNG COMPANY; CORRECT?

11:59AM   4    A.   CORRECT.

11:59AM   5    Q.   AND I ASSUME YOU HAD SOME UNCERTAINTY AS TO WHETHER THEY

11:59AM   6    WOULD HAVE THE ABILITY TO REPAY IF SAFEWAY UNDERTOOK TO

11:59AM   7    TERMINATE THE CONTRACT; CORRECT?

12:00PM   8    A.   WE INITIALLY GOT A LETTER OF CREDIT SUPPORTING THE MONEY

12:00PM   9    WE PUT UP AND THAT GAVE US SOME COMFORT.

12:00PM  10    Q.   SO IF THERE WAS A TERMINATION OF THE AGREEMENT THAT

12:00PM  11    THERANOS ITSELF WAS UNABLE TO PAY, SAFEWAY WOULD STILL BE

12:00PM  12    REPAID UNDER THAT LETTER OF CREDIT; CORRECT?

12:00PM  13    A.   RIGHT.

12:00PM  14    Q.   AND IN CONNECTION WITH THE EXECUTION OF THE SAFEWAY

12:00PM  15    AGREEMENT, SAFEWAY MADE A COMMITMENT TO BUY ABOUT $10 MILLION

12:00PM  16    WORTH OF CARTRIDGES; IS THAT RIGHT?

12:00PM  17    A.   I DON'T SEE 10 MILLION CARTRIDGES.  I SEE $10 MILLION.

12:00PM  18         BUT MAYBE YOU CAN REFER ME TO A SECTION.

12:00PM  19    Q.   YES.  IT'S PARAGRAPH 10.

12:01PM  20    A.   PARAGRAPH 10.

12:01PM  21    Q.   AND IT'S LABELLED AS INVENTORY PRE-PURCHASES.  PAGE 12.

12:01PM  22    A.   PAGE 12.

12:01PM  23    Q.   AND IT'S REFERRING TO INITIAL PRE-PURCHASE?

12:01PM  24    A.   AND THIS WAS SIGNED 11 YEARS AGO.

12:01PM  25    Q.   I UNDERSTAND.

12:01PM   1    A.    A.   OKAY.

12:01PM   2          SO IT WAS $10 MILLION FOR APPROXIMATELY 715,000 UNITS.

12:01PM   3    Q.    OKAY.   AND THAT WAS THE PAYMENT THAT WAS MADE IN

12:01PM   4    CONNECTION WITH THE AGREEMENT WHEN YOU SIGNED IT; CORRECT?

12:01PM   5    A.    CORRECT.

12:01PM   6    Q.    AND THE PROTECTIONS THAT SAFEWAY HAD WERE IF THE AGREEMENT

12:01PM   7    DIDN'T WORK OUT, IT COULD TERMINATE IT; CORRECT?

12:01PM   8    A.    CORRECT.

12:01PM   9    Q.    AND THERE WAS SOME SECURITY, THERANOS AGREED TO REPAY

12:01PM  10    THAT; CORRECT?

12:02PM  11    A.    RIGHT.

12:02PM  12    Q.    AND IF THERANOS DID NOT REPAY IT, THERE WAS FINANCING THAT

12:02PM  13    ENSURED THE PAYMENT WOULD BE MADE TO SAFEWAY?

12:02PM  14    A.    CORRECT.

12:02PM  15    Q.    AND IN EXCHANGE FOR THAT DEAL, SAFEWAY GOT THE EXCLUSIVITY

12:02PM  16    THAT YOU TALKED ABOUT AT THE OUTSET; CORRECT?

12:02PM  17    A.    YES.

12:02PM  18    Q.    AND IF THE DEAL WERE TO WORK OUT, THE VARIOUS PROFIT

12:02PM  19    ADVANTAGES THAT SAFEWAY MIGHT ACHIEVE WOULD FLOW TO IT DURING

12:02PM  20    THAT EXCLUSIVITY PERIOD; CORRECT?

12:02PM  21    A.    CORRECT.

12:02PM  22    Q.    AND THIS BEING DRAFTED BY LAWYERS, IT CONTAINED A CLAUSE

12:02PM  23    REFERRED TO AS AN INTEGRATION CLAUSE.

12:02PM  24          IS THAT A TERM THAT YOU'RE FAMILIAR WITH?

12:02PM  25    A.    NOT REFERRING TO IT AS A CLAUSE.   INTEGRATION CLAUSE IS AT

BURD CROSS BY MR. DOWNEY

12:02PM 1    THE INTEGRATION OF THE SOFTWARE.

12:03PM 2    Q.   WELL, LET ME ASK YOU TO LOOK AT PARAGRAPH 22 OF THE

12:03PM 3    AGREEMENT.  I'M SORRY, PAGE 22 OF THE AGREEMENT.

12:03PM 4    A.   OKAY.

12:03PM 5    Q.   IT'S JUST PARAGRAPH I.  IT'S THE ONLY PARAGRAPH ON THAT

12:03PM 6    PAGE.

12:03PM 7        AND IT SPECIFIES THAT EACH PARTY AGREES THAT THIS

12:03PM 8    AGREEMENT, INCLUDING ITS SCHEDULES, EMBODIES THE ENTIRE

12:03PM 9    UNDERSTANDING BETWEEN THE PARTIES AND SUPERSEDES AND REPLACES

12:03PM 10   ANY AND ALL PRIOR UNDERSTANDINGS, ARRANGEMENTS, AND AGREEMENTS,

12:03PM 11   WHETHER ORAL OR IN WRITING RELATING TO IT.

12:03PM 12       YOU'VE SEEN PARAGRAPHS LIKE THAT BEFORE?

12:03PM 13   A.   I DON'T RECALL SEEING IT, AND SO I'M REALLY NOT FAMILIAR

12:03PM 14   WITH THE INTEGRATION CLAUSE.

12:03PM 15       I LIKE THE LANGUAGE OF THIS AGREEMENT, YOU KNOW, BUT IT'S

12:03PM 16   NOT A TERM THAT I HAVE USED BEFORE.

12:04PM 17   Q.   OKAY.  BUT FOR WHATEVER REASON, IT'S INCLUDED IN THE

12:04PM 18   AGREEMENT?

12:04PM 19   A.   SURE.

12:04PM 20   Q.   OKAY.  NOW, LET ME RETURN FOR JUST ONE MOMENT TO THE

12:04PM 21   SUBJECT OF THE REGULATORY RISKS AND THE PATH THAT WENT FORWARD

12:04PM 22   FROM THE SIGNING OF THE AGREEMENT UNTIL THE TIME PERIOD THAT

12:04PM 23   YOU TALKED ABOUT IN EARLY 2013.

12:04PM 24       FIRST OF ALL, LET ME SAY, YOU REPEATEDLY REFERRED TO

12:04PM 25   TALKING ABOUT A LAUNCH AT A SPECIFIED TIME, BUT THERE WERE NO

12:04PM  1    PARTICULAR DEADLINES IN THIS AGREEMENT, WERE THERE?

12:04PM  2    A.    NO.    THERE WAS -- I THINK WE MAY HAVE LISTED AN

12:04PM  3    EXPECTATION.  BUT, YOU KNOW, WE KNEW WE WERE DEALING WITH

12:04PM  4    TECHNOLOGY AND IT'S SOMETIMES DIFFICULT TO NAIL THAT DOWN.

12:04PM  5        IF WE WERE GOING TO OPEN A GROCERY STORE, WE WOULD GIVE

12:05PM  6    YOU A SPECIFIC DAY.

12:05PM  7    Q.    BECAUSE THAT'S SOMETHING THAT YOU'VE BEEN DOING FOR A LONG

12:05PM  8    TIME?

12:05PM  9    A.    CORRECT.

12:05PM  10   Q.    OKAY.  AND YOU UNDERSTOOD THAT THE DELAYS THAT OCCURRED IN

12:05PM  11   THE PARTIES' ABILITY TO LAUNCH WERE DELAYS IN THE DEVELOPMENT

12:05PM  12   OF THE TECHNOLOGY AT THE TIME?

12:05PM  13   A.    I DID NOT.

12:05PM  14   Q.    WELL, I THOUGHT I ASKED YOU WHY YOU DIDN'T INCLUDE

12:05PM  15   DEADLINES IN THE AGREEMENT AND YOU SAID IT WAS BECAUSE OF THE

12:05PM  16   TECHNOLOGY.

12:05PM  17   A.    JUST THE IDEA OF GETTING EVERY INSURANCE COMPANY IN THE

12:05PM  18   COUNTRY TO BUY INTO YOUR PRICE SCHEDULE, THAT'S A BIG EXERCISE

12:05PM  19   IN ITS OWN, AND THEN WRITE SOFTWARE TO INTEGRATE IT WITH

12:05PM  20   SAFEWAY, THAT'S A BIG EXERCISE, LAUNCHING, MARKETING, ALL OF

12:05PM  21   THAT STUFF.

12:05PM  22       I WAS NEVER TOLD THERE WAS A TECHNOLOGY PROBLEM WITH THE

12:05PM  23   BOX ITSELF.

12:05PM  24   Q.    BUT YOU UNDERSTOOD THAT THE TECHNOLOGY HAD NOT BEEN SCALED

12:05PM  25   TO A LARGE DEGREE?

12:05PM 1    A.   WHEN I THINK OF SCALE, I THINK OF THE ABILITY TO PRODUCE,

12:06PM 2    YOU KNOW, SAY A THOUSAND OF THESE BOXES PER DAY AND A

12:06PM 3    PRODUCTION PLAN, YOU KNOW, MAYBE HUNDREDS OF THOUSANDS OF

12:06PM 4    CARTRIDGES.

12:06PM 5         THEY DID BUY A PLANT IN FREMONT, AND I ASSUMED IT WAS FOR

12:06PM 6    THAT PURPOSE.

12:06PM 7    Q.   AND YOU TOURED AT SOME POINT THE MANUFACTURING FACILITY?

12:06PM 8    A.   I DID NOT TOUR.  I DID NOT GET TO SEE THE FREMONT

12:06PM 9    FACILITY.

12:06PM 10   Q.   BUT YOU TOURED THE RESEARCH LAB?

12:06PM 11   A.   I TOURED PART OF THE RESEARCH LAB AND THE OFFICE OF THE

12:06PM 12   COMPANY.

12:06PM 13   Q.   OKAY.  BUT TO RETURN TO THE AGREEMENT, IT DIDN'T SAY WE

12:06PM 14   HAVE TO LAUNCH BY A PARTICULAR DAY, DID IT?

12:06PM 15   A.   IT DIDN'T SAY THAT, BUT THE AGREEMENT SPELLED OUT THAT

12:06PM 16   THEY CAN DO ALMOST ALL, YOU KNOW, ASSAYS.

12:06PM 17   Q.   AND THERE WAS NO DEADLINE IN CONNECTION WITH THE AGREEMENT

12:06PM 18   IS MY QUESTION TO YOU.

12:06PM 19   A.   NO DEADLINE BECAUSE ALL OF THE OTHER PUZZLE PIECES NEEDED

12:06PM 20   TO GET DONE.

12:06PM 21   Q.   OKAY.  AND YOU, YOU -- SO THE PARTIES HAD AN EXPECTATION

12:06PM 22   THAT THERE MIGHT BE A LAUNCH AS EARLY AS 2011; CORRECT?

12:07PM 23   A.   I THINK THAT WAS SUPPOSED TO BE THE PILOT.

12:07PM 24   Q.   OKAY.  BUT DO YOU KNOW WHEN -- DO YOU RECALL WHEN THE

12:07PM 25   REGULATORY APPROVAL FROM CLIA WAS OBTAINED?

12:07PM 1    A.   I JUST RECALL WHERE I WAS WHEN I GOT THE CELL CALL.

12:07PM 2    Q.   BUT YOU DON'T RECALL THE DATE IN 2011?

12:07PM 3    A.   NO.

12:07PM 4    Q.   AND YOU DON'T RECALL THAT THE DATE WAS WELL AFTER THE DATE

12:07PM 5    THAT YOU HAD PROJECTED THE PILOT PERIOD TO BEGIN?

12:07PM 6    A.   IT WAS AFTER, AND I THINK IT'S JUST ONE OF THE

12:07PM 7    UNCERTAINTIES.

12:07PM 8    Q.   OKAY.  AND ALSO DO YOU KNOW WHEN THE NEGOTIATIONS WITH THE

12:07PM 9    INSURERS WERE CONCLUDED?

12:07PM 10   A.   I DON'T KNOW WHEN THEY WERE CONCLUDED.  I REMEMBER GETTING

12:07PM 11   A PROGRESS REPORT ALONG THE WAY, BUT I DON'T RECALL A MOMENT

12:07PM 12   WHERE SOMEONE SAID, WE'RE DONE.

12:07PM 13   Q.   OKAY.  NOW, WE SAW IN THE AGREEMENT THAT WALGREENS ALSO

12:08PM 14   HAD OBTAINED EXCLUSIVITY RIGHTS IN A DIFFERENT CHANNEL FROM THE

12:08PM 15   CHANNEL THAT SAFEWAY HAD OBTAINED; CORRECT?

12:08PM 16   A.   WELL, THE ONLY COMPANY THEY TALKED ABOUT WAS WALGREENS

12:08PM 17   AND, YOU KNOW, THEY'RE SMART ENOUGH TO ASK FOR AN EXCLUSIVE IN

12:08PM 18   THEIR CHANNEL.

12:08PM 19   Q.   AND YOU UNDERSTOOD THAT WALGREENS AND SAFEWAY WERE BOTH

12:08PM 20   WORKING WITH THERANOS AT THE SAME TIME?

12:08PM 21   A.   I DID.

12:08PM 22   Q.   AND I THINK WE TALKED ABOUT A MOMENT AGO YOU UNDERSTOOD

12:08PM 23   THAT THE LAUNCHES OF, OF THERANOS WOULD BE ANNOUNCED IN

12:08PM 24   CONNECTION WITH BOTH STORES AT THE SAME TIME; CORRECT?

12:08PM 25   A.   THAT WAS THE AGREEMENT.

12:08PM   1    Q.   NOW, DID THERE COME A TIME IN EARLY 2012 WHERE YOU LEARNED

12:08PM   2    FROM MS. HOLMES THAT WALGREENS WAS UNWILLING TO LAUNCH UNDER

12:08PM   3    THE MODEL WHERE DEVICES WOULD BE PLACED IN STORES?  IS THAT

12:09PM   4    SOMETHING THAT YOU LEARNED FROM HER?

12:09PM   5    A.   I DIDN'T LEARN IT IN CONNECTION WITH WAL-MART.

12:09PM   6         I LEARNED IT IN CONNECTION WITH CONVERSATIONS THAT I HAD

12:09PM   7    WITH ELIZABETH WHERE THEY WERE NOW SUGGESTING THAT THE

12:09PM   8    PROCESSING ITSELF WOULDN'T TAKE PLACE IN THE STORE.

12:09PM   9         WE TALKED ABOUT A COURIER NETWORK.  I OFFERED TO GIVE HER

12:09PM  10    SOME HELP ON HOW TO BUILD THAT.

12:09PM  11         BUT IT WAS DESCRIBED AS AN EFFICIENT WAY TO START AND, YOU

12:09PM  12    KNOW, UPON REFLECTION, IT WASN'T WHERE WE STARTED, BUT THEY

12:09PM  13    THOUGHT THAT THAT WAS WHAT THE CURRENT SITUATION CALLED FOR.

12:09PM  14    Q.   BUT DID YOU HAVE ANY VISIBILITY ON WHAT THE POSITION OF

12:09PM  15    WALGREENS WAS WITH RESPECT TO THAT?

12:09PM  16    A.   NO.

12:09PM  17    Q.   BUT YOU DID LEARN THAT THERANOS SAID TO INITIATE THE

12:09PM  18    PROGRAM WE ARE ACTUALLY GOING TO DEVELOP A LABORATORY AT OUR

12:09PM  19    MAIN HEADQUARTERS; RIGHT?

12:10PM  20    A.   THEY WOULD BE DOING THE PROCESSING THERE, CORRECT.

12:10PM  21    Q.   OKAY.  AND YOU REFERENCED A COURIER SERVICE.  BLOOD

12:10PM  22    SAMPLES WOULDN'T BE PROCESSED IN THE STORE, THEY WOULD COME

12:10PM  23    BACK TO THAT CENTRAL FACILITY; CORRECT?

12:10PM  24    A.   THAT'S CORRECT.

12:10PM  25    Q.   AND OF COURSE WHEN THAT WAS DONE, PRESUMABLY THERE HAD TO

12:10PM  1    BE CHANGES TO THE SOFTWARE AND OTHER CHANGES THAT WOULD

12:10PM  2    ACCOMMODATE THAT TYPE OF AN ALTERATION IN THE AGREEMENT?

12:10PM  3    A.   WELL, THERE WAS NEVER AN ALTERATION IN THE AGREEMENT.

12:10PM  4    BUT, YOU KNOW, YOU POINTED OUT THE INTEGRATION PARAGRAPH.  IT

12:10PM  5    SAYS WE HAVE TO PUT IT IN WRITING IF IT'S GOING TO BE TRUE.

12:10PM  6    Q.   YOU'RE SAYING THERE'S NO AMENDMENT TO THE --

12:10PM  7    A.   CORRECT.

12:10PM  8    Q.   ALL RIGHT.  BUT SAFEWAY HAD ITS TERMINATION RIGHTS THE

12:10PM  9    ENTIRE TIME?

12:10PM  10   A.   CORRECT.

12:10PM  11   Q.   AND IN RESPONSE TO ANY OF THIS INFORMATION COULD HAVE

12:10PM  12   TERMINATED THE AGREEMENT; CORRECT?

12:10PM  13   A.   CORRECT.

12:10PM  14   Q.   I WANT TO SHOW YOU AN EMAIL FROM 2012 IF I MIGHT.  IT'S

12:10PM  15   EXHIBIT 10537.

12:11PM  16   A.   IN THE WHITE BOOK OR THE BLACK?

12:11PM  17   Q.   NO, IT SHOULD BE IN THE BLACK.

12:11PM  18   A.   10357?

12:11PM  19   Q.   I BEG YOUR PARDON, 10537.

12:11PM  20        AND THIS WILL BE ON YOUR SCREEN AS WELL AS IN THE BOOK.

12:11PM  21            THE CLERK:  I DON'T BELIEVE THIS HAS BEEN ADMITTED

12:11PM  22   INTO EVIDENCE.

12:11PM  23            MR. DOWNEY:  I BEG YOUR PARDON.

12:11PM  24   Q.   LET ME ASK YOU IF THIS IS -- JUST TO LOOK INITIALLY AT THE

12:11PM  25   GENERAL NATURE OF THE EMAIL AND ASK YOU IF THIS IS AN EMAIL

12:11PM   1    EXCHANGE BETWEEN YOU AND MS. HOLMES IN 2012.

12:12PM   2    A.   IT SURE LOOKS THAT WAY.

12:12PM   3    Q.   AND THIS RELATES TO THE SAFEWAY-THERANOS RELATIONSHIP;

12:12PM   4    CORRECT?

12:12PM   5    A.   YES.

12:12PM   6         MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

12:12PM   7    10537.

12:12PM   8         MR. LEACH:  NO OBJECTION, YOUR HONOR.

12:12PM   9         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:12PM  10         (DEFENDANT'S EXHIBIT 10537 WAS RECEIVED IN EVIDENCE.)

12:12PM  11    BY MR. DOWNEY:

12:12PM  12    Q.   ON THE BOTTOM OF THE EMAIL YOU'LL SEE THAT THERE IS AN

12:12PM  13    EMAIL FROM YOU TO MS. HOLMES IN JANUARY 2012.

12:12PM  14         DO YOU SEE THAT?

12:12PM  15    A.   YES.

12:12PM  16    Q.   AND YOU INDICATE IN THE FIRST SENTENCE, "WHILE I AM

12:12PM  17    COMMITTED TO GETTING THE GROCERY NETWORK UNDER CONTRACT WITHIN

12:12PM  18    TWO AND A ONE HALF MONTHS OF SAFEWAY'S LAUNCH, I AM VERY

12:12PM  19    CONCERNED ABOUT ALLOWING NETWORK PARTNERS OR ANYONE ELSE TO

12:12PM  20    LAUNCH WITH A MERE FINGER STICK."

12:13PM  21         DO YOU SEE THAT?

12:13PM  22    A.   I DO.

12:13PM  23    Q.   AND IN YOUR COMMENTS ABOUT A GROCERY NETWORK THERE, YOU'RE

12:13PM  24    REFERRING TO GETTING PARTNERS WHO YOU HAD MADE PART OF A

12:13PM  25    GROCERY NETWORK, YOU WERE TALKING ABOUT THE TIMING OF THEIR

12:13PM  1    LAUNCH; CORRECT?

12:13PM  2    A.   CORRECT.

12:13PM  3    Q.   BUT YOU EXPRESSED THAT YOU WERE VERY CONCERNED ABOUT

12:13PM  4    EITHER THE PARTNERS OR ANYONE ELSE LAUNCHING WITH WHAT YOU

12:13PM  5    TERMED "A MERE FINGER STICK;" CORRECT?

12:13PM  6    A.   CORRECT.

12:13PM  7    Q.   AND "A MERE FINGER STICK" REFERS TO A MODEL UNDER WHICH

12:13PM  8    THE BLOOD WAS COLLECTED AT A RETAIL STORE AND THEN THE BLOOD

12:13PM  9    WAS SENT BACK TO THERANOS FOR ANALYSIS IN THEIR CENTRAL LAB;

12:13PM  10   CORRECT?

12:13PM  11   A.   CORRECT.

12:13PM  12   Q.   AND THAT'S THE PROCESS THAT WE WERE TALKING ABOUT A MOMENT

12:13PM  13   AGO; CORRECT?

12:13PM  14   A.   CORRECT.

12:13PM  15   Q.   AND YOU SUGGESTED THAT MODEL WOULD SEVERELY COMPROMISE AND

12:14PM  16   PERMANENTLY DAMAGE THE BRAND WE ARE TRYING TO CREATE; CORRECT?

12:14PM  17   A.   IT CERTAINLY WASN'T THE ORIGINAL BRAND THAT WE TALKED

12:14PM  18   ABOUT.

12:14PM  19   Q.   RIGHT.  THE ORIGINAL PLAN WAS THAT YOU WOULD PLACE THE

12:14PM  20   ANALYZERS IN THE STORE; CORRECT?

12:14PM  21   A.   CORRECT.

12:14PM  22   Q.   BUT MS. HOLMES HAD PROVIDED INFORMATION TO YOU IN JANUARY

12:14PM  23   OF 2012 THAT SAID THERANOS WAS NO LONGER IN A POSITION TO DO

12:14PM  24   THAT; CORRECT?

12:14PM  25   A.   THAT'S WHY WE -- THAT'S CORRECT.  THAT'S WHY SHE OFFERED

BURD CROSS BY MR. DOWNEY

12:14PM 1    THE COURIER NETWORK, BUT I EXPECTED -- I ANTICIPATED THAT WOULD

12:14PM 2    BE SHORT TERM.

12:14PM 3    Q.   AND YOU, YOU HAD A VARIETY OF CONCERNS THAT YOU EXPRESSED

12:14PM 4    TO HER IN JANUARY OF 2012 ABOUT THAT MODEL; CORRECT?

12:14PM 5    A.   CORRECT.

12:14PM 6    Q.   AND FIRST AMONG THEM WAS THAT THE EXPERIENCE THAT PEOPLE

12:14PM 7    MIGHT HAVE BETWEEN LOCATIONS MIGHT BE VERY INCONSISTENT;

12:15PM 8    CORRECT?

12:15PM 9    A.   NO.  THAT, PLUS THE ORIGINAL PROMISE HAS GONE AWAY.

12:15PM 10   Q.   WELL, AND, IN FACT, YOU SAY IN NUMBER 2 THAT YOU WOULD NOT

12:15PM 11   BE ABLE TO HAVE A SCIENTIFIC STANDARD WHERE BLOOD WOULD BE

12:15PM 12   BEING ANALYZED AS FRESH BLOOD; CORRECT?

12:15PM 13   A.   CORRECT.

12:15PM 14   Q.   AND THAT WAS A CONCERN THAT YOU HAD.

12:15PM 15       AND YOU LAY OUT A VARIETY OF OTHER CONCERNS IN THIS

12:15PM 16   JANUARY 2012 AGREEMENT; CORRECT?

12:15PM 17   A.   CORRECT.

12:15PM 18   Q.   BUT MS. HOLMES TOLD YOU AT THIS POINT THAT THIS WAS THE

12:15PM 19   MODEL THAT THERANOS WAS GOING TO PURSUE WITH WALGREENS;

12:15PM 20   CORRECT?

12:15PM 21   A.   I DON'T RECALL IF SHE SAID WALGREENS, BUT SHE SAID WE'VE

12:15PM 22   DECIDED AT THERANOS THAT THIS IS THE BEST WAY FOR US TO START

12:15PM 23   THIS COMPANY.

12:15PM 24   Q.   DID YOU UNDERSTAND THAT THAT WAS MOTIVATED BY SAFEWAY --

12:15PM 25   BY WALGREENS' POSITION AS TO THE LEGAL REQUIREMENTS BEING

12:15PM   1      IMPOSED BY FDA?

12:15PM   2      A.   I DID NOT.

12:15PM   3      Q.   ALL RIGHT.  YOU MENTIONED THAT AT SOME LATER POINT THERE

12:16PM   4      WAS AN AGREEMENT, AND I DON'T MEAN THE AGREEMENT WAS AMENDED,

12:16PM   5      BUT THERE WAS AN INFORMAL AGREEMENT BETWEEN YOU AND MS. HOLMES

12:16PM   6      THAT THERE WOULD BE A TYPE OF PILOT RUN IN THE ON CAMPUS

12:16PM   7      FACILITY AT SAFEWAY; CORRECT?

12:16PM   8      A.   I'M NOT SURE WE USED THE WORD "PILOT," BUT THAT WE WOULD

12:16PM   9      PUT ONE OF THEIR ANALYZERS ON PROPERTY AND WE WOULD SUBMIT TO

12:16PM  10      DOING SOME VOLUME AND WE COULD TEST OUT VIRTUALLY EVERY ASPECT

12:16PM  11      OF THE OFFERING.

12:16PM  12      Q.   AND YOU TESTIFIED ON DIRECT EXAMINATION ABOUT A NUMBER OF

12:17PM  13      EMAILS THAT YOU EXCHANGED WITH MS. HOLMES ABOUT YOUR CRITICISMS

12:17PM  14      OF HOW THAT WAS RUNNING; CORRECT?

12:17PM  15      A.   CORRECT.

12:17PM  16      Q.   BUT YOU KNEW AT THE OUTSET OF THAT PROGRAM THAT THAT

12:17PM  17      PROGRAM WOULD RUN UNDER THIS MODEL WHERE BLOOD WOULD BE TAKEN

12:17PM  18      FROM A SAFEWAY LOCATION BACK TO THERANOS; CORRECT?  IS THAT

12:17PM  19      RIGHT OR NOT?

12:17PM  20      A.   NO.

12:17PM  21      Q.   YOU THOUGHT THE TESTING WOULD TAKE PLACE IN THE STORES?

12:17PM  22      A.   I CAN EXPLAIN.

12:17PM  23      Q.   LET ME ASK YOU, DID YOU KNOW THAT THE BLOOD WOULD BE TAKEN

12:17PM  24      FROM THE STORES TO A CENTRAL LAB AT THERANOS FOR ANALYSIS?  DID

12:17PM  25      YOU KNOW THAT?

12:17PM 1      A.    WHAT TIMEFRAME?

12:17PM 2      Q.    WHEN THE CAMPUS PROJECT WAS BEING DISCUSSED BETWEEN YOU

12:17PM 3      AND MS. HOLMES.

12:17PM 4      A.    WHEN THE CAMPUS PROJECT WAS BEING DISCUSSED, WE WERE GOING

12:17PM 5      TO GET A BOX.

12:17PM 6            NOW, THE BOX NEVER ARRIVED AND WE STARTED WITH A CONCEPT

12:17PM 7      SIMILAR TO WHAT YOU DESCRIBED, BUT THE BLOOD WOULD BE DRAWN AND

12:18PM 8      THEN IT WOULD GO TO THERANOS.

12:18PM 9      Q.    OKAY.  AND YOU KNEW THAT'S HOW THE STORE WAS OPERATING;

12:18PM 10     CORRECT?

12:18PM 11     A.    HOW WHAT STORE?

12:18PM 12     Q.    HOW THE STORE WAS OPERATING AND THE CAMPUS?

12:18PM 13     A.    THE CAMPUS.  I KNEW ALMOST EVERYTHING ABOUT HOW IT WAS

12:18PM 14     OPERATING.

12:18PM 15     Q.    WE LOOKED IN THE AGREEMENT ABOUT THE OBLIGATION THAT

12:18PM 16     SAFEWAY HAD TO ASSIST THERANOS WITH MARKETING.

12:18PM 17           DO YOU RECALL THAT?

12:18PM 18     A.    I'M SURE THERE'S SOME OFFERING TO HELP THEM.

12:18PM 19     Q.    AND THAT'S AN AREA OF ISSUE.

12:18PM 20           YOU JUST RECALL HAVING DISCUSSIONS ABOUT MARKETING WITH

12:19PM 21     MS. HOLMES; CORRECT?

12:19PM 22     A.    CORRECT.

12:19PM 23     Q.    AND THAT WAS A CONVERSATION THAT YOU HAD WITH HER OVER A

12:19PM 24     LONG PERIOD OF TIME; CORRECT?

12:19PM 25     A.    YES.

12:19PM  1    Q.   I'M GOING TO SHOW YOU AN EMAIL FROM JULY OF 2011, WHICH IS

12:19PM  2    EXHIBIT 7196, AND MY QUESTION WOULD SIMPLY BE AT THE OUTSET IF

12:19PM  3    THIS IS AN EMAIL BETWEEN YOU AND MS. HOLMES IN THAT TIME

12:19PM  4    PERIOD?

12:19PM  5    A.   YES.

12:19PM  6    Q.   AND IF YOU LOOK AT YOUR EMAIL, WE CAN --

12:19PM  7         MAY WE DISPLAY THAT, YOUR HONOR?

12:19PM  8              THE CLERK:   IT'S NOT BEEN ADMITTED, COUNSEL.

12:19PM  9              MR. DOWNEY:   I'M SORRY.   I MOVE FOR ITS ADMISSION.

12:19PM  10             MR. LEACH:   NO OBJECTION.

12:19PM  11             THE COURT:   IT'S ADMITTED.   IT MAY BE PUBLISHED.

12:19PM  12        (DEFENDANT'S EXHIBIT 7196 WAS RECEIVED IN EVIDENCE.)

12:20PM  13   BY MR. DOWNEY:

12:20PM  14   Q.   I WANT TO FOCUS ON YOUR EMAIL AT THE BOTTOM, THE EMAIL

12:20PM  15   THAT YOU SENT AT 9:13 P.M.

12:20PM  16        YOUR ADDRESS IS AT THE BOTTOM, BUT I THINK THE EMAIL

12:20PM  17   ITSELF IS CONTAINED AT THE TOP OF THE NEXT PAGE.

12:20PM  18        DO YOU SEE THAT?

12:20PM  19   A.   THE DISCUSSION ABOUT PRE-LAUNCH?

12:20PM  20   Q.   RIGHT.

12:20PM  21        (PAUSE IN PROCEEDINGS.)

12:20PM  22   BY MR. DOWNEY:

12:20PM  23   Q.   AND YOU WERE PUSHING MS. HOLMES IN THIS EMAIL TO FOCUS ON

12:20PM  24   BRANDING AND MARKETING; CORRECT?

12:20PM  25   A.   CORRECT.

BURD CROSS BY MR. DOWNEY

12:20PM 1    Q.   AND THE GIST OF THIS EMAIL WAS THAT YOU WERE SAYING THAT

12:20PM 2    THERE'S A LOT OF WORK TO GET DONE TO DO MARKETING AND YOU

12:21PM 3    HADN'T GOTTEN IT DONE; CORRECT?

12:21PM 4    A.   CORRECT.

12:21PM 5    Q.   OKAY.  LET'S LOOK AT HER EMAIL --

12:21PM 6    A.   LET ME RESTATE.  THERE'S A LOT OF MARKETING WORK TO BE

12:21PM 7    DONE.  WE WERE NOT SAYING IT WAS OUR RESPONSIBILITY AND WE DID

12:21PM 8    NOT GET IT DONE.

12:21PM 9         SO YOU USED THE TERM -- I THOUGHT YOU IMPLIED THAT SAFEWAY

12:21PM 10   FAILED IN ITS MISSION TO IMPROVE THE MARKETING.

12:21PM 11   Q.   NO, NO.  SAFEWAY WAS ONLY TO ASSIST THERANOS; CORRECT?

12:21PM 12   A.   CORRECT.

12:21PM 13   Q.   BUT YOU WERE SAYING TO MS. HOLMES THAT YOU, THERANOS, HAD

12:21PM 14   NOT GOTTEN DONE ALL OF THE WORK YOU NEEDED TO GET DONE TO

12:21PM 15   MARKET THE COMPANY; CORRECT?

12:21PM 16   A.   TO MARKET THE PRODUCT.

12:21PM 17   Q.   OKAY.  AND SHE RESPONDED TO THAT EMAIL IT LOOKS LIKE A

12:21PM 18   LITTLE BIT LATER, AND THAT'S IN THE MIDDLE OF THE PAGE, AND

12:21PM 19   THAT'S BLOWN UP ON THE SCREEN.

12:21PM 20        AND SHE SAYS YOU HAD SAID IN YOUR EMAIL THERE'S A LOT OF

12:21PM 21   MOUNTAINS TO MOVE.  SHE SAID, I APPRECIATE YOUR COMMENTS ON

12:22PM 22   MOVING MOUNTAINS.  AS YOU KNOW, WE ARE WORKING 24 HOURS A DAY,

12:22PM 23   7 DAYS A WEEK ON OUR END AS WELL TOWARD OUR COMMON GOALS.

12:22PM 24        AND HER SECOND PARAGRAPH SAID, "THE MOST IMPORTANT THING

12:22PM 25   FOR THERANOS TO SPEND TIME ON RIGHT NOW IS SCALING UP OUR

12:22PM   1     INFRASTRUCTURE TO ESTABLISH OUR FOOTPRINT AND GO LIVE

12:22PM   2     NATIONWIDE.  OUR PRIORITY AND OBLIGATION THROUGH LAUNCH IS THE

12:22PM   3     PRODUCT, OPERATIONS, SOFTWARE, PAYOR, PROVIDER IN PRACTICE

12:22PM   4     STRUCTURES, AND THE THOUSANDS OF ASSOCIATED DETAILS FUNDAMENTAL

12:22PM   5     TO BUILDING THIS COMPANY.  THAT'S NOT TO SAY THAT OUR MARKETING

12:22PM   6     PLAN IS ANY LESS IMPORTANT THAN ANY OF THESE, BUT WITH THE

12:22PM   7     LIMITED RESOURCES OF A GROWING COMPANY, WE CANNOT DO BOTH AT

12:22PM   8     THE SAME TIME UNTIL WE FREE UP RESOURCES TO GIVE THIS THE TIME

12:22PM   9     AND ATTENTION THAT IT IS DUE."

12:22PM  10         DO YOU SEE THAT --

12:22PM  11     A.   I DO.

12:22PM  12     Q.   -- IN HER EMAIL?

12:22PM  13         AND THEN SHE TALKED ABOUT GETTING TOGETHER TO TALK ABOUT

12:23PM  14     IT AND THE COSTS ASSOCIATED WITH IT AND GIVES SOME MORE DETAILS

12:23PM  15     AS TO WHEN YOU MIGHT HAVE A MEETING.

12:23PM  16         DO YOU SEE THAT?

12:23PM  17     A.   YES.

12:23PM  18     Q.   OKAY.  AND YOU RESPONDED TO THIS EMAIL.

12:23PM  19         YOU SAID "I COMPLETELY UNDERSTAND THE PRIORITIES."

12:23PM  20         AND THEN YOU WENT ON IN SEVERAL SENTENCES AND SAID YOU

12:23PM  21     COULD HELP WITH MARKETING IN ESSENCE?

12:23PM  22     A.   CORRECT.

12:23PM  23     Q.   ALL RIGHT.  YOU CAN TAKE THAT DOWN.

12:23PM  24         NOW, AS WE TALKED ABOUT IN CONNECTION WITH THE AGREEMENT,

12:23PM  25     THE AGREEMENT ITSELF CONTEMPLATED THAT THERE WOULD BE A

12:23PM 1    PRE-PILOT, A PILOT, AND THEN A LAUNCH; CORRECT?

12:24PM 2    A.   CORRECT.

12:24PM 3    Q.   BUT AT SOME POINT DURING THE PERIOD AFTER THE AGREEMENT

12:24PM 4    WAS SIGNED, YOU CAME UP WITH AN IDEA TO ALTER HOW THE LAUNCH

12:24PM 5    WOULD BE DONE, DIDN'T YOU?

12:24PM 6    A.   WE HAD DISCUSSIONS, BUT YOU HAVE TO GIVE ME MORE THAN

12:24PM 7    THAT.

12:24PM 8    Q.   WELL, DO YOU RECALL DEVELOPING A STRATEGY THAT YOU

12:24PM 9    REFERRED TO AS SHOCK AND AWE?

12:24PM 10   A.   THAT WAS ACTUALLY -- WE STILL WANTED THE PILOT, AND THAT

12:24PM 11   DIDN'T SAY YOU WOULDN'T DO A PILOT.  REMEMBER WE TALKED ABOUT

12:24PM 12   DOING A PILOT IN A REMOTE AREA.

12:24PM 13       VERY EARLY ON WE TALKED ABOUT KIND OF A SHOCK AND AWE.

12:24PM 14   THAT'S WHY WE PREPARED OVER 900 FACILITIES TO HAVE THIS SPACE

12:24PM 15   AVAILABLE FOR THERANOS.

12:24PM 16   Q.   AND YOU UNDERSTOOD THAT TO CHANGE THE TERMS OF THE

12:24PM 17   AGREEMENT TO HAVE THOUSANDS OF STORES -- HOW MANY STORES WOULD

12:24PM 18   LAUNCH IN A SHOCK AND AWE STRATEGY?

12:24PM 19   A.    IT COULD BE AS FEW AS A SINGLE DIVISION OR IT COULD BE 22

12:25PM 20   STATES.

12:25PM 21   Q.   AND HOW MANY WOULD BE IN 22 STATES?

12:25PM 22   A.   A LITTLE OVER 900.

12:25PM 23   Q.   AND THAT WAS NEVER DONE, WAS IT?

12:25PM 24   A.   NEVER.

12:25PM 25   Q.   AND THE AGREEMENT WAS NEVER AMENDED TO ENCOMPASS THAT?

12:25PM   1    A.   WELL, I DON'T THINK THE AGREEMENT NECESSARILY CALLED FOR

12:25PM   2    SHOCK AND AWE.

12:25PM   3    Q.   OKAY.  LET'S TALK A LITTLE BIT ABOUT THE TESTIMONY YOU

12:25PM   4    GAVE ON DIRECT, ABOUT THE EXPERIENCE THAT PATIENTS WERE HAVING

12:25PM   5    ON CAMPUS ON SAFEWAY WHEN THEY GOT THEIR BLOOD DRAWN.

12:25PM   6         AND I WANT TO DIRECT YOUR ATTENTION TO EXHIBIT 12283.

12:26PM   7    A.   ALL RIGHT.

12:26PM   8    Q.   IS THIS AN EMAIL EXCHANGE THAT YOU HAD WITH MS. HOLMES IN

12:26PM   9    SEPTEMBER OF 2012?

12:26PM   10   A.   IT APPEARS TO BE.

12:26PM   11   Q.   AND IS THIS A DISCUSSION OF PERFORMANCE AT THE LAB ON

12:26PM   12   CAMPUS AT SAFEWAY?

12:26PM   13   A.   YES.

12:26PM   14        MR. DOWNEY:  YOUR HONOR, I WOULD MOVE THE ADMISSION

12:26PM   15   OF 12283.

12:26PM   16        MR. LEACH:  NO OBJECTION, YOUR HONOR.  I THINK THIS

12:26PM   17   IS ALSO IN EVIDENCE AS EXHIBIT 670.

12:26PM   18        MR. DOWNEY:  THERE IS AT LEAST PART OF IT AS 670,

12:26PM   19   AND MAYBE ALL OF THIS.

12:27PM   20        THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

12:27PM   21     (DEFENDANT'S EXHIBIT 12283 WAS RECEIVED IN EVIDENCE.)

12:27PM   22   BY MR. DOWNEY:

12:27PM   23   Q.   I WANT TO FOCUS ON MS. HOLMES'S RESPONSE TO -- WELL, DO

12:27PM   24   YOU RECALL AT THE BOTTOM OF THIS, IN THE EMAIL THAT YOU SENT TO

12:27PM   25   MS. HOLMES, YOU RAISED A NUMBER OF CONCERNS ABOUT PERFORMANCE;

12:27PM 1    CORRECT?

12:27PM 2    A.   YES.

12:27PM 3    Q.   IN HER RESPONSE SHE SAYS, "AS YOU KNOW, WE WERE NOT EAGER

12:27PM 4    TO START THE MANDATE FOR ALL EMPLOYEES FOR THIS REASON."

12:27PM 5         DO YOU SEE THAT IN THE FIRST PARAGRAPH?

12:27PM 6    A.   I SEE THAT.

12:27PM 7    Q.   AND SHE GOES ON TO SAY, "AS YOU KNOW, WE DO NOT HAVE ALL

12:27PM 8    TESTS RUN IN OUR LAB ONSITE," REFERRING TO THE THERANOS LAB;

12:27PM 9    CORRECT?

12:28PM 10   A.   NOT NECESSARILY.  IT COULD BE THE ESOTERIC AND THE SELDOM

12:28PM 11   USED, WHICH THEY WOULD USE SOMETHING ELSE.

12:28PM 12   Q.   THOSE TESTS MIGHT GO OUT TO UCSF OR UTAH?

12:28PM 13   A.   RIGHT.

12:28PM 14   Q.   AND THEN SHE GOES ON TO DESCRIBE THE DIFFICULTIES THAT

12:28PM 15   THEY ARE HAVING, AND SHE SAYS THEY GET A LOT OF PHONE CALLS

12:28PM 16   THAT IN ESSENCE ARE ASKING WHEN WILL WE -- WHEN CAN MY PATIENT

12:28PM 17   HAVE HER RESULTS OR HIS RESULTS?

12:28PM 18   A.   YES.

12:28PM 19   Q.   AND SHE COMPLAINS THAT PERSONNEL ARE COMMUNICATING TO

12:28PM 20   PATIENTS THAT THE TESTS WILL BE AVAILABLE ON A TIMEFRAME THAT

12:28PM 21   THERANOS CAN'T MAKE THEM AVAILABLE.

12:28PM 22        DO YOU SEE THAT?

12:28PM 23   A.   I SEE THAT.

12:28PM 24   Q.   AND SHE GOES ON TO SAY, "THIS PROCESS DOES NOT TRANSLATE

12:29PM 25   TO THE THERANOS TESTING PROCESS AS YOU KNOW."

12:29PM 1          DO YOU SEE THAT?

12:29PM 2     A.   I SEE THAT.

12:29PM 3     Q.   AND DID YOU SEE THAT THAT -- DO YOU UNDERSTAND THAT AT THE

12:29PM 4     TIME TO MEAN THAT THIS IS NOT THE PROCESS WHERE THERANOS WOULD

12:29PM 5     HAVE A DEVICE ON SITE IN A STORE OR ANOTHER LOCATION AND RUN

12:29PM 6     THE TESTS THERE?

12:29PM 7     A.   THAT'S TRUE.  BUT THAT'S NOT HOW THIS ON CAMPUS FACILITY

12:29PM 8     STARTED.  IT STARTED THAT WE WERE GOING TO GET A BOX, AND THEN

12:29PM 9     THAT, FOR SECRECY REASONS, NO, NOW WE'RE GOING TO DO IT AT THE

12:29PM 10    COMPANY.

12:29PM 11          MR. DOWNEY:  WELL, I MOVE TO STRIKE THAT,

12:29PM 12    YOUR HONOR.  I JUST MOVE TO STRIKE EVERYTHING AFTER "THAT'S

12:29PM 13    TRUE."

12:29PM 14          THE COURT:  I'LL LEAVE THAT IN.  YOU CAN ASK ANOTHER

12:29PM 15    QUESTION.

12:29PM 16    BY MR. DOWNEY:

12:29PM 17    Q.   WELL, MY QUESTION IS THAT THE SENTENCE IN THE EMAIL WHERE

12:29PM 18    SHE SAYS A PROCESS THAT WAS CURRENTLY HAPPENING WAS NOT THE

12:29PM 19    THERANOS PROCESS WHERE A DEVICE WOULD BE PLACED ON SITE;

12:29PM 20    CORRECT?

12:29PM 21    A.   I AGREE WITH THAT.

12:29PM 22    Q.   AND SHE SAID WE'RE DOING THIS PROCESS TO SERVE SAFEWAY

12:30PM 23    PATIENTS, BUT IT DOES NOT MAKE SENSE FOR US, MEANING THERANOS,

12:30PM 24    TO INVEST IN A FULL SERVICE DINOSAUR LAB.

12:30PM 25          DO YOU SEE THAT?

12:30PM 1     A.   I SEE IT.  THAT WASN'T OUR PURPOSE.

12:30PM 2     Q.   AND DID YOU UNDERSTAND HER TO BE REFERRING TO THE FACT

12:30PM 3     THAT SOME RESULTS ARE DELAYED BECAUSE THEY ACTUALLY HAVE TO

12:30PM 4     SEND THEM OUT TO ANOTHER LAB?

12:30PM 5     A.   I DID.

12:30PM 6     Q.   AND THEN SHE GOES ON TO INDICATE THAT SHE WILL SEND YOU

12:30PM 7     OTHER INFORMATION THAT YOU HAD REQUESTED.

12:30PM 8          BUT YOU CONTINUED TO, I THINK, HAVE SOME CONCERNS, AND WE

12:30PM 9     SAW THAT ON DIRECT, YOU CONTINUED TO RAISE ISSUES WITH THE ON

12:30PM 10    CAMPUS FACILITY; CORRECT?

12:30PM 11    A.   WELL, I FINALLY -- I THINK WE HAD A PHONE CALL AND I SAID

12:31PM 12    THAT EITHER WE FIX IT OR LET'S GET RID OF IT, AND WE DECIDED ON

12:31PM 13    THAT CALL TO GET RID OF IT.

12:31PM 14    Q.   BUT IN -- I WANT TO SHOW YOU AN EMAIL, I BELIEVE 715.

12:31PM 15         I BELIEVE THIS IS IN EVIDENCE.

12:31PM 16              MR. LEACH:  WHICH ONE?

12:31PM 17              MR. DOWNEY:  715.

12:31PM 18              THE COURT:  DO YOU SHOW IT IN EVIDENCE?

12:31PM 19              THE WITNESS:  IS IT IN THE BLACK BINDER?

12:31PM 20    BY MR. DOWNEY:

12:31PM 21    Q.   IT SHOULD BE IN THE WHITE BOOK.  I'M SORRY.

12:32PM 22    A.   ALL RIGHT.  I HAVE IT.

12:32PM 23    Q.   AND YOU SEE AT THE BOTTOM OF THAT EMAIL YOU TALK ABOUT

12:32PM 24    SOME OF THE CONCERNS ABOUT PATIENT EXPERIENCE; CORRECT?

12:32PM 25    A.   CORRECT.

12:32PM  1    Q.   AND THEN SHE RESPONDS SAYING THAT THERANOS'S FOCUS ON

12:32PM  2    PATIENT EXPERIENCE HAS BEEN IN THE CONTEXT OF OUR ACTUAL

12:32PM  3    PRODUCT; CORRECT?

12:32PM  4    A.   CAN YOU REPEAT THAT?

12:32PM  5    Q.   YEAH.  SHE RESPONDS TO YOUR COMPLAINTS ABOUT PATIENT

12:32PM  6    EXPERIENCE BY SAYING, "AS DISCUSSED, OUR FOCUS ON PATIENT

12:32PM  7    EXPERIENCE HAS BEEN IN THE CONTEXT OF OUR ACTUAL PRODUCT."

12:33PM  8         DO YOU SEE THAT IN THE FIRST SENTENCE OF HER RESPONSE?

12:33PM  9    A.   I DO.

12:33PM 10    Q.   AND SHE GOES ON TO SAY, "WHAT WE HAVE RUNNING AT THE

12:33PM 11    HEALTH CENTER IS NOT THAT."

12:33PM 12         AND THEN SHE GOES ON TO TALK ABOUT AN INDIVIDUAL FROM

12:33PM 13    THERANOS WHO WAS PART OF A CALL AND HE WAS REALLY NOT AN EXPERT

12:33PM 14    IN PATIENT EXPERIENCE.

12:33PM 15         DO YOU SEE THAT?

12:33PM 16    A.   I DO.

12:33PM 17    Q.   AND THEN YOU GO ON TO SAY YOU WANT TO COME TO AN AGREEMENT

12:33PM 18    AS TO HOW THE ON CAMPUS FACILITY SHOULD BE RUN; RIGHT?

12:33PM 19    A.   RIGHT.

12:33PM 20    Q.   AND WAS IT AS A RESULT OF THIS EXCHANGE THAT YOU AGREED TO

12:33PM 21    SHUT DOWN THE ON CAMPUS FACILITY?

12:33PM 22    A.   I DON'T KNOW IF IT WAS THIS EXCHANGE, BUT THERE WAS AN

12:33PM 23    EXCHANGE WHERE WE HAD THIS CONVERSATION, AND I SAID IF WE CAN'T

12:33PM 24    GET IT RIGHT, LET'S SHUT IT DOWN, AND SHE AGREED.

12:33PM 25    Q.   NOW, I THINK YOU TESTIFIED ON DIRECT THAT YOU LEFT SAFEWAY

12:34PM   1    IN MAY OF 2013; IS THAT RIGHT?

12:34PM   2    A.   CORRECT.

12:34PM   3    Q.   AND YOU ANNOUNCED THAT YOU WOULD BE LEAVING IN EARLY

12:34PM   4    JANUARY OF 2013; CORRECT?

12:34PM   5    A.   I CAN'T SAY IT WAS EARLY JANUARY.  I ACTUALLY THOUGHT IT

12:34PM   6    WAS SOMETIME IN LATE DECEMBER.

12:34PM   7    Q.   DECEMBER OF 2012?

12:34PM   8    A.   CORRECT.

12:34PM   9    Q.   BUT AT SOME POINT FIVE OR SO MONTHS BEFORE THE ANNUAL

12:34PM  10    MEETING?

12:34PM  11    A.   CORRECT.

12:34PM  12    Q.   AND YOU HAD BEEN THE PERSON AT SAFEWAY WHO HAD REALLY

12:34PM  13    CHAMPIONED THE THERANOS PROJECT; CORRECT?

12:34PM  14    A.   I WAS THE -- I WAS THE WHAT YOU WOULD CALL THE SPONSOR

12:35PM  15    CHAMPION, SURE.

12:35PM  16    Q.   AND TELL US WHAT THAT MEANS.

12:35PM  17    A.   WELL, IT MEANS THAT I HOLD MYSELF PERSONALLY RESPONSIBLE

12:35PM  18    FOR GETTING THIS DEAL DONE AND EXECUTED.

12:35PM  19    Q.   NOW, IN 2012, IS IT FAIR TO SAY THAT THE STOCK PERFORMANCE

12:35PM  20    OF SAFEWAY WAS, WAS LESS SUCCESSFUL THAN IT HAD BEEN IN PRIOR

12:35PM  21    YEARS?

12:35PM  22    A.   I'D HAVE TO LOOK AT THE -- AND IT'S HARD TO DO TODAY

12:35PM  23    BECAUSE WE'RE NO LONGER A PUBLIC COMPANY, SO I CAN'T CONFIRM

12:35PM  24    THAT.

12:35PM  25    Q.   WELL, DO YOU RECALL THAT THERE WAS A SIGNIFICANT DROP IN

12:35PM  1    THE SAFEWAY STOCK PRICE IN 2012?

12:35PM  2    A.   IN 20 YEARS, THAT HAPPENED FREQUENTLY.

12:35PM  3    Q.   WELL, LET ME SHOW YOU AN EXHIBIT WHERE WE CAN JUST FOCUS

12:36PM  4    ON 2012.  IT'S EXHIBIT 10568.

12:36PM  5    A.   WHITE BOOK?

12:36PM  6    Q.   BLACK BOOK.

12:36PM  7    A.   BLACK BOOK.

12:36PM  8         OKAY.

12:36PM  9    Q.   AND I'LL ALSO GIVE YOU AND ASK YOU TO LOOK AT

12:36PM  10   EXHIBIT 10569 JUST SO YOU CAN HAVE THOSE AVAILABLE FOR -- TO

12:36PM  11   REVIEW BECAUSE THEY'RE RELATED AS I THINK YOU'LL SEE.

12:36PM  12   A.   SO THE FIRST ONE IS JUST TAKING A DAILY READ ON THE STOCK

12:37PM  13   PRICE.

12:37PM  14   Q.   WELL, LET ME HAVE A CONVERSATION WITH THE JUDGE BEFORE YOU

12:37PM  15   DESCRIBE IT.

12:37PM  16           THE WITNESS:  OKAY.

12:37PM  17           MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

12:37PM  18   10568 AND -69.

12:37PM  19           MR. LEACH:  THERE'S NOT YET A FOUNDATION LAID FOR IT

12:37PM  20   YET, YOUR HONOR.  THERE MIGHT BE.

12:37PM  21           MR. DOWNEY:  WELL, I THINK --

12:37PM  22           THE COURT:  DO YOU WANT TO LAY A FOUNDATION FOR

12:37PM  23   THIS?

12:37PM  24   BY MR. DOWNEY:

12:37PM  25   Q.   DO YOU RECALL THIS AS BLOOMBERG CHARTS TRACKING THE DAILY

12:37PM   1    PERFORMANCE OF SAFEWAY STOCK IN 2000 -- THE PERIOD BETWEEN 2010

12:37PM   2    AND 2013?

12:37PM   3    A.   IT SAYS IT'S BLOOMBERG.  IT'S NOT THE WAY THAT WE TRACK

12:37PM   4    THE STOCK.

12:37PM   5    Q.   BUT YOU RECOGNIZE THAT THAT'S WHAT THIS IS?

12:37PM   6    A.   I RECOGNIZE IT AS A DAILY KIND OF THE OPEN HIGH, LOW, AND

12:37PM   7    CLOSE.

12:37PM   8            MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

12:37PM   9    10568 AND -69.

12:37PM   10           THE COURT:  WELL, DID YOU COMMENT?  I DON'T THINK

12:37PM   11   THIS WITNESS HAS COMMENTED ON -69 YET.

12:37PM   12           THE WITNESS:  I HAVE NOT.

12:37PM   13   BY MR. DOWNEY:

12:37PM   14   Q.   WELL, DO YOU RECOGNIZE 10569?

12:38PM   15   A.   WELL, WHAT IT IS PRESUMABLY DESCRIBING -- I'M NOT

12:38PM   16   DISPUTING THAT THESE ARE THE NUMBERS.  IT'S JUST THAT I HAVE

12:38PM   17   NOT SEEN THIS EXHIBIT.

12:38PM   18       BUT AS I SAID EARLIER, YOU HAD YOUR UPS AND DOWNS OVER THE

12:38PM   19   COURSE OF, YOU KNOW, 20 YEARS.

12:38PM   20   Q.   FOR NOW I'M JUST FOCUSSED ON THE DOCUMENT.

12:38PM   21       DO YOU SEE AT THE BOTTOM OF 10568 THERE'S AN INTERNET

12:38PM   22   ADDRESS?

12:38PM   23   A.   HANG ON A SECOND.

12:38PM   24       ON THE BOTTOM OF THE VERY FIRST PAGE?

12:38PM   25   Q.   AT THE BOTTOM OF THE VERY FIRST PAGE, YES.

12:38PM  1    A.   SURE, SURE.

12:38PM  2    Q.   AND DO YOU SEE THE SAME ON THE BOTTOM OF 10569?

12:38PM  3    A.   I DO.

12:38PM  4         MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

12:38PM  5    10568 AND 10569.

12:39PM  6         THE COURT:  SIR, DO YOU HAVE ANY DOUBT ABOUT THE

12:39PM  7    RELIABILITY OF EITHER OF THESE DOCUMENTS?

12:39PM  8         THE WITNESS:  I DON'T HAVE ANY DOUBT.  IT'S JUST

12:39PM  9    THAT IT'S NOT THE WAY THAT WE RECOVERED THE INFORMATION.  IT

12:39PM  10   WAS ALWAYS AN ONLINE SOURCE, YOU KNOW, NOT OFTEN PRINTED.  BUT

12:39PM  11   IF IT COMES FROM BLOOMBERG, IT SHOULD BE ACCURATE.

12:39PM  12        THE COURT:  I'LL ADMIT IT AND IT MAY BE PUBLISHED.

12:39PM  13        (DEFENDANT'S EXHIBITS 10569 AND 10569 WERE RECEIVED IN

12:39PM  14   EVIDENCE.)

12:39PM  15        THE COURT:  THANK YOU, SIR.

12:39PM  16        THE WITNESS:  SURE.

12:39PM  17   BY MR. DOWNEY:

12:39PM  18   Q.   LET ME FOCUS ON THE PERIOD THAT STARTS IN 2012 ON 10569.

12:39PM  19   A.   I'M SORRY.  CAN YOU GIVE ME THE PAGE NUMBER?

12:40PM  20   Q.   I'M SORRY.  I'M ON 10569, WHICH IS JUST THE GRAPH.

12:40PM  21   A.   OH, OKAY.

12:40PM  22   Q.   AND FOR NOW I'M JUST LOOKING AT THE PICTURE.

12:40PM  23        AND DO YOU SEE EARLY, IF YOU LOOK AT THE BOTTOM AXIS, YOU

12:40PM  24   CAN SEE THAT THAT REFLECTS TIMES AND VARIOUS DATES IN 2010 ALL

12:40PM  25   OF THE WAY THROUGH 2013?

BURD CROSS BY MR. DOWNEY                                          3137

12:40PM  1    A.    YES.

12:40PM  2    Q.    AND IF YOU SEE ON THE GRAPH ON THE LEFT SIDE THAT IS

12:40PM  3    VERTICAL, THAT REFLECTS THE PRICE OF SAFEWAY STOCK.

12:40PM  4          DO YOU SEE THAT?

12:40PM  5    A.    I DO.

12:40PM  6    Q.    AND DO YOU SEE, IF YOU LOOK AT THE PRICE POINT FOR

12:40PM  7    JANUARY 1, 2012, YOU SEE IT APPEARS THAT THE STOCK APPEARS TO

12:40PM  8    HAVE BEEN RISING AROUND THAT DATE?  DO YOU SEE THAT?

12:40PM  9    A.    YES.

12:40PM 10    Q.    AND THEN IN A PERIOD A LITTLE BIT THEREAFTER, DO YOU SEE

12:41PM 11    THAT A VERY PRECIPITOUS DECLINE IN THE PRICE OF SAFEWAY STOCK

12:41PM 12    BEGINS?

12:41PM 13    A.    YES.

12:41PM 14    Q.    SO THAT BY MID-YEAR, THE STOCK PRICE IS CONSIDERABLY LOWER

12:41PM 15    THAN IT HAD BEEN AT THE BEGINNING OF THE YEAR; CORRECT?

12:41PM 16    A.    CORRECT.

12:41PM 17    Q.    AND IF YOU LOOK AT THE DAILY CHART, THE DAILY PRICING

12:41PM 18    TABLE THAT IS CONTAINED IN 10568, YOU WILL SEE THAT THE PRICE

12:41PM 19    OF SAFEWAY STOCK DROPPED FROM ABOUT $19 A SHARE TO ABOUT $14

12:41PM 20    PER SHARE.

12:41PM 21          DO YOU SEE THAT?  BETWEEN JANUARY 1ST AND JULY 1ST?

12:41PM 22    A.    OF 2012?

12:41PM 23    Q.    YES, SIR.

12:42PM 24    A.    I MEAN, IT CERTAINLY REFLECTS THAT ON THE GRAPH.  I'M

12:42PM 25    STILL NOT FINDING JANUARY ON THE TABLES.

BURD CROSS BY MR. DOWNEY

12:42PM 1   Q.   LET ME SEE IF I CAN GIVE YOU A HAND.

12:42PM 2        IF YOU LOOK AT --

12:42PM 3   A.   IF YOU'RE LOOKING AT 1/1/12.

12:42PM 4   Q.   DO YOU HAVE IT ON PAGE 10 OF 10568?

12:42PM 5   A.   OKAY.  AND WHAT IS THE DATE THAT YOU'RE LOOKING FOR?

12:42PM 6   Q.   AND YOU COMPARE THAT TO -- LOOK AT JANUARY 3RD, 2012.

12:42PM 7   A.   JANUARY 3RD.  YES.

12:42PM 8   Q.   DO YOU SEE THE CLOSE ON THAT DAY IS ABOUT 19.2?

12:43PM 9   A.   CORRECT.

12:43PM 10  Q.   AND THEN IF YOU FORWARD FROM THERE TO JULY 1ST, YOU WILL

12:43PM 11  SEE THAT IT WASN'T TRADED ON JULY 1ST, BUT AS OF JULY 2ND, IT'S

12:43PM 12  ABOUT 16.2, 16.3.

12:43PM 13  A.   YES.

12:43PM 14  Q.   AND THEN BY JULY 17TH, IT HAD DROPPED DOWN TO ABOUT 14 AND

12:43PM 15  A QUARTER?  CLOSER TO 14 AND A HALF AT THE CLOSE?

12:43PM 16  A.   ARE YOU SAYING JULY 13TH?

12:43PM 17  Q.   JULY 17TH?

12:43PM 18  A.   17TH.  YES.  14.6.

12:43PM 19  Q.   AND THEN IT BEGAN TO DROP AGAIN.

12:43PM 20       AND DO YOU SEE BY AUGUST 6TH THE STOCK HAD DROPPED ALL OF

12:44PM 21  THE WAY TO WHERE IT CLOSED AROUND 14.1, WHICH WAS JUST SLIGHTLY

12:44PM 22  UP FROM 13.8, AND THEN IT STABILIZED AROUND THAT POINT.

12:44PM 23       DO YOU SEE IT?

12:44PM 24  A.   IT STABILIZED FOR AWHILE.

12:44PM 25  Q.   SO BETWEEN 14 AND, OVER THE NEXT PERIOD, SOMEWHERE BETWEEN

BURD CROSS BY MR. DOWNEY

12:44PM 1    14 AND 14 AND A HALF THROUGH OCTOBER.

12:44PM 2         DO YOU SEE THAT?

12:44PM 3    A.   I SEE THAT.

12:44PM 4    Q.   AND DID YOU BELIEVE THAT THE RELATIONSHIP BETWEEN THERANOS

12:44PM 5    AND SAFEWAY HAD ANY RELATIONSHIP TO THE DROP IN THE VALUE OF

12:44PM 6    SAFEWAY STOCK?

12:44PM 7    A.   I CAN'T IMAGINE THAT I DID BECAUSE I DON'T THINK I EVER

12:45PM 8    THOUGHT THAT.

12:45PM 9    Q.   CAN I ASK YOU TO LOOK IN THE BLACK NOTEBOOK AT

12:45PM 10   EXHIBIT 13947.

12:45PM 11        YOUR HONOR, THIS IS RATHER A RECORD OF A COMMUNICATION

12:45PM 12   THAT WOULD CONTAIN A MOBILE PHONE NUMBER WHICH WE HAVE REDACTED

12:45PM 13   FOR PURPOSES OF DISPLAYING PUBLICLY OR ADMITTING AS AN EXHIBIT.

12:45PM 14   A.   DID YOU SAY 13, 13 --

12:45PM 15   Q.   -947?

12:45PM 16   A.   -- 947.

12:45PM 17             THE COURT:  13947?

12:46PM 18             MR. DOWNEY:  YES, SIR.

12:46PM 19             THE WITNESS:  I DON'T HAVE 13947.  MY LAST ONE IN

12:46PM 20   THE BINDER IS 12293 IN THE BLACK.

12:46PM 21   BY MR. DOWNEY:

12:46PM 22   Q.   ALL RIGHT.  BEAR WITH ME FOR A MOMENT.

12:46PM 23        THAT'S BECAUSE I HAVE ALL OF THE COPIES.

12:46PM 24   A.   THAT EXPLAINS IT.

12:46PM 25             MR. DOWNEY:  YOUR HONOR, IS THAT ALSO MISSING FROM

12:46PM  1      YOUR NOTEBOOK?

12:46PM  2                  THE COURT:  IT IS.

12:47PM  3                  MR. DOWNEY:  (HANDING.)

12:47PM  4          MAY I APPROACH THE WITNESS, YOUR HONOR?

12:47PM  5                  THE COURT:  YOU MAY.

12:47PM  6                  MR. DOWNEY:  (HANDING.)

12:47PM  7      Q.   MY QUESTION IS, JUST BEFORE ANYTHING ELSE, IS THIS A TEXT

12:47PM  8      MESSAGE THAT WAS EXCHANGED -- A SERIES OF TEXT MESSAGES THAT

12:47PM  9      WERE EXCHANGED BETWEEN YOU AND MS. HOLMES IN JULY OF 2012?

12:48PM  10     A.   I CAN'T SAY FOR CERTAIN BECAUSE I DON'T KNOW HOW THESE

12:48PM  11     MESSAGES WERE CAPTURED.

12:48PM  12     Q.   DO YOU KNOW IF YOU TEXTED MS. HOLMES IN 2000 -- JULY OF

12:48PM  13     2012 TO THE EFFECT THAT THE SHARE PRICE OF SAFEWAY WOULD

12:48PM  14     IMPROVE SIGNIFICANTLY IF WE LAUNCHED, CALL ME WHEN YOU CAN?

12:48PM  15                 MR. LEACH:  OBJECTION, YOUR HONOR.

12:48PM  16                 THE COURT:  SUSTAINED.  I'M NOT SURE THAT WAS A

12:48PM  17     QUESTION.

12:48PM  18         WHY DON'T YOU REPHRASE YOUR QUESTION?

12:48PM  19     BY MR. DOWNEY:

12:48PM  20     Q.   WELL, DID YOU COMMUNICATE WITH MS. HOLMES, BY TEXT OR

12:48PM  21     OTHERWISE, AND TELL HER THAT YOU THOUGHT THE STOCK PRICE OF

12:48PM  22     SAFEWAY WOULD IMPROVE IF YOU COULD ANNOUNCE A LAUNCH OF

12:48PM  23     THERANOS PRODUCT IN SAFEWAY STORES?

12:48PM  24     A.   I CAN'T SAY FOR CERTAIN.

12:48PM  25         I WOULD TELL YOU, SITTING HERE TODAY, THAT I THINK IT

12:49PM  1    WOULD HAVE MOVED THE STOCK PRICE UP HAD WE LAUNCHED.

12:49PM  2    Q.   BUT AS TO WHETHER IT HAPPENED OR NOT YOU JUST DON'T --

12:49PM  3    A.   DON'T KNOW.

12:49PM  4    Q.   -- RECALL?

12:49PM  5         LET ME ASK YOU ABOUT A FEW OF THE AREAS BRIEFLY THAT YOU

12:49PM  6    TOUCHED ON DURING THE COURSE OF YOUR DIRECT TESTIMONY.

12:49PM  7         YOU TALKED BRIEFLY ABOUT THE FACT THAT RENOVATIONS WERE

12:49PM  8    MADE IN SAFEWAY STORES TO ACCOMMODATE THERANOS BEING IN THE

12:49PM  9    STORES; CORRECT?

12:49PM  10   A.   CORRECT.

12:49PM  11   Q.   AND IF YOU WALK INTO A SAFEWAY TODAY, DO YOU KNOW WHAT IS

12:50PM  12   IN MANY OF THOSE LOCATIONS?

12:50PM  13   A.   YEAH.  I DON'T KNOW THE COUNT, BUT ONE OF THE STORES THAT

12:50PM  14   I GET PHARMACY PRESCRIPTIONS FROM HAS A QUEST LAB IN IT.

12:50PM  15   Q.   SO IN THE SPACES THAT WERE INTENDED FOR THERANOS, PERHAPS

12:50PM  16   WITH SOME MODIFICATION, THERE'S AN OPERATOR OF ONE OF ITS

12:50PM  17   COMPETITORS; CORRECT?

12:50PM  18   A.   CORRECT.

12:50PM  19   Q.   AND DO YOU KNOW HOW BLOOD IS DRAWN FROM THE PATIENTS AT

12:50PM  20   THOSE LOCATIONS?

12:50PM  21   A.   I DO.

12:50PM  22   Q.   AND HOW IS IT DRAWN?

12:50PM  23   A.   IT'S DRAWN THROUGH, TYPICALLY FOR ADULTS AT LEAST, A VEIN

12:50PM  24   IN THE ARM.

12:51PM  25             MR. DOWNEY:  YOUR HONOR, WILL YOU BEAR WITH ME FOR

12:51PM  1    ONE MOMENT?

12:51PM  2              THE COURT:  OF COURSE.

12:51PM  3         (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

12:51PM  4    BY MR. DOWNEY:

12:51PM  5    Q.   ONE LAST QUESTION, MR. BURD.  I WANT TO ASK YOU ABOUT THE

12:51PM  6    AGREEMENTS BETWEEN THERANOS AND OTHER PARTIES, NOT ITS

12:51PM  7    AGREEMENT WITH SAFEWAY.

12:51PM  8         WE'VE TALKED ABOUT THE AGREEMENT THAT THERANOS HAD REACHED

12:51PM  9    WITH WALGREENS AT SOME POINT; CORRECT?

12:51PM 10    A.   YES.

12:51PM 11    Q.   DO YOU RECALL THAT?

12:51PM 12         AND DO YOU ALSO RECALL HEARING AT SOME POINT FROM

12:52PM 13    MS. HOLMES ABOUT THE DEPARTMENT OF DEFENSE AND THERANOS HAVING

12:52PM 14    A RELATIONSHIP WITH THE DEPARTMENT OF DEFENSE AND YOU TESTIFIED

12:52PM 15    ABOUT MEDEVAC AND SO FORTH?

12:52PM 16    A.   YES.

12:52PM 17    Q.   DID MS. HOLMES TELL YOU AS PART OF ANY CONVERSATION THAT

12:52PM 18    THERANOS HAD ENTERED INTO A CONTRACT WITH THE DEPARTMENT OF

12:52PM 19    DEFENSE IN LATE 2012 TO TEST ITS DEVICES BY CENTRAL COMMAND IN

12:52PM 20    AFGHANISTAN?

12:52PM 21    A.   NO.

12:52PM 22    Q.   I WANT TO JUST SHOW YOU A DOCUMENT WHICH YOU MAY OR MAY

12:52PM 23    NOT HAVE SEEN BEFORE, SO MY QUESTION IS SIMPLY -- WILL SIMPLY

12:52PM 24    BE WHETHER YOU'VE EVER HAD OCCASION TO SEE THE DOCUMENT, AND

12:53PM 25    IT'S 10547 IN THE BLACK NOTEBOOK.

BURD CROSS BY MR. DOWNEY

12:53PM   1          IF YOU WOULD LOOK AT THE -- WELL, LET ME ASK YOU, DO YOU

12:53PM   2    RECALL EVER SEEING THIS DOCUMENT BEFORE?

12:53PM   3    A.   NO.

12:53PM   4    Q.   DID YOU KNOW DANIEL EDLIN AT THERANOS?

12:53PM   5    A.   NO.

12:53PM   6    Q.   OTHER THAN MS. HOLMES, DID YOU KNOW ANY OF THE OTHER

12:53PM   7    SENDERS OR RECIPIENTS OF THESE EMAILS, CHRISTIAN HOLMES,

12:53PM   8    DANIEL EDLIN?

12:53PM   9    A.   CHRISTIAN I MET.

12:53PM   10   Q.   AND YOU DON'T RECALL HER TELLING YOU IN DECEMBER OF 2012

12:54PM   11   THAT AN AGREEMENT HAD BEEN EXECUTED APPROVING A PROTOCOL FOR

12:54PM   12   THERANOS WITH THE DEPARTMENT OF DEFENSE?  THAT'S JUST A

12:54PM   13   QUESTION --

12:54PM   14   A.   YEAH.

12:54PM   15   Q.   THAT'S THE SPECIFIC QUESTION.

12:54PM   16   A.   I CAN TELL YOU WHAT I DO RECALL IF YOU WANT.

12:54PM   17   Q.   I'M JUST ASKING YOU ABOUT THE AGREEMENT BETWEEN THERANOS

12:54PM   18   AND THE DEPARTMENT OF DEFENSE.

12:54PM   19          YOU DON'T RECALL TALKING ABOUT ANY CONTRACT?

12:54PM   20   A.   NO.

12:54PM   21   Q.   OKAY.  AND YOU ALSO TESTIFIED THAT THE BUSINESS MADE SENSE

12:54PM   22   TO YOU BECAUSE THERE WERE, I THINK YOU SAID, ADMIRALS AND

12:54PM   23   GENERALS ON THE BOARD; CORRECT?

12:54PM   24   A.   CORRECT.

12:54PM   25   Q.   AND IS THAT A REFERENCE TO GENERAL MATTIS?

12:55PM  1    A.   THERE WERE -- THAT WAS JUST MY IMPRESSION.  IT HAD

12:55PM  2    CREDIBILITY, AND SHE SAID SHE HAD THESE BECAUSE OF THE

12:55PM  3    COMPOSITION OF HER BOARD.  THERE WERE NO NAMES MENTIONED.

12:55PM  4    Q.   I JUST WANT TO BE CERTAIN THAT I UNDERSTAND YOUR TESTIMONY

12:55PM  5    ON ONE LAST SUBJECT, WHICH IS EXHIBIT 370 WHICH YOU WERE SHOWN

12:55PM  6    AND WHICH WAS ADMITTED ON DIRECT.

12:56PM  7    A.   370?

12:56PM  8    Q.   YES, SIR.  THAT'S IN THE WHITE NOTEBOOK.

12:56PM  9    A.   I THOUGHT I HAD THE WHITE NOTEBOOK.

12:56PM  10        I HAVE IT.

12:56PM  11   Q.   OKAY.  AND I THINK YOU TESTIFIED THAT THE ITEM IN HERE

12:56PM  12   WHICH SAYS REVENUE FROM SAFEWAY NETWORK IS A PROJECTION ABOUT

12:56PM  13   REVENUE THAT SAFEWAY MIGHT RECEIVE FROM OTHER PARTNERS; IS THAT

12:56PM  14   RIGHT?

12:56PM  15   A.   I ACTUALLY SAID I WASN'T SURE IF ALL OTHER REVENUE --

12:56PM  16   REVENUE FROM SAFEWAY NETWORK, THAT WOULD CLEARLY BE THE NETWORK

12:56PM  17   THAT WE WERE GOING TO BUILD.

12:56PM  18        ALL OTHER REVENUE, WITHOUT SEEING SOME OTHER DOCUMENTS,

12:57PM  19   EITHER REFERS TO THE DIRECT WORK THAT WE DID AT OUR STORES WITH

12:57PM  20   THESE LABS, OR IT REFERS TO ALL REVENUE, ALL OTHER REVENUE THAT

12:57PM  21   THERANOS HAS.

12:57PM  22   Q.   BUT WITHOUT SEEING MORE DOCUMENTATION, YOU DON'T KNOW?

12:57PM  23   A.   CORRECT.

12:57PM  24   Q.   OKAY.

12:57PM  25        THAT'S ALL I HAVE OF THIS WITNESS ON CROSS-EXAMINATION.

12:57PM   1                THE COURT:  OKAY.

12:57PM   2           REDIRECT?

12:57PM   3                MR. LEACH:  BRIEFLY, YOUR HONOR, YES.

12:57PM   4                THE COURT:  FOLKS, FEEL FREE TO STAND AND STRETCH

12:57PM   5      FOR A MOMENT IF YOU WOULD LIKE.

12:57PM   6           YOU MAY AS WELL, SIR, WHILE WE DO A TRANSITION.

12:57PM   7           (STRETCHING.)

12:58PM   8                THE COURT:  MR. LEACH.

12:58PM   9                MR. LEACH:  THANK YOU, YOUR HONOR.

12:58PM  10                      **REDIRECT EXAMINATION**

12:58PM  11      BY MR. LEACH:

12:58PM  12      Q.   MR. BURD, I'D LIKE TO DRAW YOUR ATTENTION TO EXHIBIT 332,

12:58PM  13      WHICH IS IN THE WHITE BINDER.

12:58PM  14      A.   YES.

12:58PM  15      Q.   AND I BELIEVE IT'S IN EVIDENCE.

12:58PM  16           MR. BURD, DO YOU HAVE THE PRINT COPY OF 332 IN FRONT OF

12:59PM  17      YOU?

12:59PM  18      A.   I DO.

12:59PM  19      Q.   AND DO YOU SEE THE SECOND LINE OF THE -- OR THE FIRST LINE

12:59PM  20      OF THE SECOND PARAGRAPH, THERANOS STARTED OUT OF STANFORD

12:59PM  21      UNIVERSITY IN 2003.

12:59PM  22           DO YOU SEE THAT LANGUAGE?

12:59PM  23      A.   I DO.

12:59PM  24      Q.   AND YOU WERE ASKED A NUMBER OF QUESTIONS ON

12:59PM  25      CROSS-EXAMINATION BY MR. DOWNEY ABOUT WHETHER THERANOS WAS A

12:59PM 1   STARTUP OR WHAT YOUR UNDERSTANDING WAS.

12:59PM 2        DO YOU RECALL THOSE QUESTIONS?

12:59PM 3   A.   I DO.

12:59PM 4   Q.   AND YOU UNDERSTOOD IN 2010 THAT THERANOS HAD BEEN IN

12:59PM 5   BUSINESS FOR ROUGHLY SEVEN YEARS?

12:59PM 6   A.   CORRECT.

12:59PM 7   Q.   AND YOU UNDERSTOOD IN 2013 THAT IT HAD BEEN IN BUSINESS

12:59PM 8   FOR ABOUT TEN YEARS BY THAT PERIOD OF TIME?

12:59PM 9   A.   YES.

12:59PM 10  Q.   AND YOU ALSO TESTIFIED THAT MS. HOLMES TOLD YOU THERANOS

12:59PM 11  WAS CASH FLOW NEUTRAL.

12:59PM 12       DO YOU RECALL THAT TESTIMONY?

12:59PM 13  A.   CORRECT.

12:59PM 14  Q.   AND WAS THAT RELEVANT TO YOU?

12:59PM 15  A.   YES.

12:59PM 16  Q.   HOW SO?

12:59PM 17  A.   IT MADE US FEEL BETTER ABOUT THE COMPANY, THAT THEY WERE

12:59PM 18  NOT JUST, YOU KNOW, LOOKING FORWARD NUMBERS, THEY ACTUALLY HAD

12:59PM 19  ACHIEVED A LEVEL OF PERFORMANCE WHICH MADE THEM CASH FLOW

01:00PM 20  NEUTRAL, MEANING REVENUE AND EXPENSES WERE MATCHING.

01:00PM 21  Q.   AND DO YOU DIFFERENTIATE A BUSINESS THAT IS SEVEN TO TEN

01:00PM 22  YEARS OLD FROM A STARTUP THAT IS OPENING UP OUT OF A GARAGE ON

01:00PM 23  DAY ONE?

01:00PM 24  A.   YES.

01:00PM 25  Q.   EXPLAIN THAT FOR US, PLEASE.

01:00PM   1    A.   WELL, I THINK -- I MEAN, THERE'S NO MAGIC LINE HERE WHEN

01:00PM   2    ONE SHIFTS FROM A STARTUP TO A SMALL COMPANY, BUT IF YOU HAVE

01:00PM   3    VERY FEW REVENUE DOLLARS, I THINK YOU WOULD CONSIDER A STARTUP.

01:00PM   4        IF YOU'RE HITTING SOME STRONG REVENUE DOLLARS RELATIVE TO

01:00PM   5    YOUR SIZE AND YOU'RE MAKING MONEY, I WOULD SAY, YOU KNOW, YOU

01:00PM   6    WERE ON YOUR WAY.

01:00PM   7        SO I WOULD ALWAYS ARGUE THAT WITH THE CEO OF BLACK HAWK

01:00PM   8    NETWORK THAT HE WAS NO LONGER A STARTUP, YOU KNOW, HE WAS

01:00PM   9    GENERATING A HUNDRED MILLION IN PROFITS.

01:00PM   10       SO THIS WAS A STARTUP FOR AT LEAST SEVEN YEARS.

01:01PM   11   Q.   LET ME DRAW YOUR ATTENTION -- THANK YOU FOR THAT.

01:01PM   12       LET ME DRAW YOUR ATTENTION TO ANOTHER DOCUMENT THAT YOU

01:01PM   13   WERE EXAMINED ABOUT, AND THAT IS EXHIBIT 7104.  IT SHOULD BE IN

01:01PM   14   YOUR BLACK BINDER.

01:01PM   15   A.   I HAVE IT.

01:01PM   16   Q.   MS. KRATZMANN, MAY I USE THE ELMO.

01:01PM   17       MR. BURD, DO YOU RECALL QUESTIONS ABOUT THIS EXHIBIT

01:01PM   18   DURING YOUR CROSS-EXAMINATION?

01:01PM   19   A.   I DO.

01:01PM   20   Q.   AND YOU'RE NOT ON THIS EMAIL, RIGHT?  THIS IS NOT

01:01PM   21   SOMETHING THAT YOU SAW AT THE TIME?

01:02PM   22   A.   THAT'S CORRECT.

01:02PM   23   Q.   OKAY.  I WANTED TO DRAW YOUR ATTENTION TO THE ENTIRETY OR

01:02PM   24   THE FIRST PART OF THE EMAIL CHAIN WHERE BRAD WOLFSEN IS WRITING

01:02PM   25   TO ELIZABETH HOLMES AND KEN SHACHMUT WITH A REQUEST TO SHARE

01:02PM  1    INFORMATION WITH OUTSIDE COUNSEL.

01:02PM  2         DO YOU SEE THAT?

01:02PM  3    A.   YES.

01:02PM  4    Q.   AND REMIND US, WHO IS KEN SHACHMUT?

01:02PM  5    A.   KEN SHACHMUT WAS THE CHIEF FINANCIAL OFFICER OF SAFEWAY

01:02PM  6    HEALTH.

01:02PM  7    Q.   AND BRAD WOLFSEN, WHO WAS HE?

01:02PM  8    A.   BRAD WORKED FOR SAFEWAY HEALTH.  I DON'T RECALL HIS EXACT

01:02PM  9    RESPONSIBILITIES.

01:02PM  10   Q.   OKAY.  AND MR. WOLFSEN IS WRITING, "ELIZABETH,

01:02PM  11        "I'VE RECEIVED A REQUEST FROM OUR LAWYERS TO SEND THE

01:02PM  12   'SELECTED ASSAYS FROM THE THERANOS ASSAY LIBRARY' TO OUR

01:03PM  13   OUTSIDE COUNSEL WHO IS ASSISTING WITH THE CLIA AND STATE

01:03PM  14   REGULATIONS RESEARCH."

01:03PM  15        DO YOU SEE THAT LANGUAGE?

01:03PM  16   A.   I DO.

01:03PM  17   Q.   AND DO YOU SEE MS. HOLMES'S RESPONSE, "BRAD, THIS IS FINE,

01:03PM  18   BUT THAT LIST IS NOT AN ACCURATE REFLECTION OF THE TESTS WE

01:03PM  19   WILL ACTUALLY MAKE AVAILABLE IN THE STORES - THAT LIST IS THE

01:03PM  20   LIBRARY WE PROVIDE FOR OUR PHARMACEUTICAL CLIENTS CLINICAL

01:03PM  21   TRIALS."

01:03PM  22        DO YOU SEE THAT?

01:03PM  23   A.   YES.

01:03PM  24   Q.   AND SITTING HERE TODAY, DO YOU UNDERSTAND THAT TO MEAN THE

01:03PM  25   PHARMACEUTICAL LIST IS ACTUALLY NARROWER THAN WHAT IS GOING TO

01:03PM  1    BE OFFERED ON THE THERANOS DEVICE?

01:03PM  2    A.   YES, I BELIEVE IT'S NARROWER.

01:03PM  3    Q.   OKAY.  IF WE CAN GO NOW PLEASE TO EXHIBIT 375, PAGE 12.

01:03PM  4    A.   IN THE WHITE BINDER?

01:03PM  5    Q.   IN THE WHITE BINDER.

01:04PM  6         DO YOU RECALL THIS PORTION OF THE AUGUST 2012 BOARD

01:04PM  7    PRESENTATION -- LET ME ASK A BETTER QUESTION.

01:04PM  8         DO YOU RECALL THIS AS A PORTION OF THE POWERPOINT THAT WAS

01:04PM  9    PREPARED IN CONNECTION WITH THE AUGUST 2012 SAFEWAY BOARD

01:04PM 10    MEETING?

01:04PM 11    A.   YES.

01:04PM 12    Q.   OKAY.  AND THAT'S A BOARD MEETING THAT MS. HOLMES

01:04PM 13    ATTENDED, AT LEAST IN PART?

01:04PM 14    A.   YES, SHE DID IN PART.

01:04PM 15    Q.   AND I DRAW YOUR ATTENTION TO THE PORTION "ONE CARTRIDGE

01:04PM 16    WILL SATISFY 95 PERCENT OF ALL CPT CODES."

01:04PM 17         DO YOU SEE THAT?

01:04PM 18    A.   WHAT PAGE?

01:04PM 19    Q.   PAGE 11.  OR PAGE 12, EXCUSE ME.

01:04PM 20    A.   SORRY FOR BEING SO CASUAL.

01:04PM 21         OKAY.  YES.

01:04PM 22    Q.   AND IS THAT INFORMATION THAT YOU GOT FROM MS. HOLMES?

01:04PM 23    A.   YES, IT IS.

01:04PM 24    Q.   AND WAS THAT YOUR UNDERSTANDING OF WHAT THE THERANOS

01:05PM 25    DEVICE AND CARTRIDGE COULD DO AT THIS TIME PERIOD IN AUGUST OF

01:05PM  1    2012?

01:05PM  2    A.   YES.

01:05PM  3    Q.   YOU ALSO TESTIFIED ABOUT RECEIVING A CALL FROM MS. HOLMES

01:05PM  4    ABOUT CLIA CERTIFICATION OR CLIA APPROVAL.

01:05PM  5         DO YOU RECALL THAT?

01:05PM  6    A.   I DO.

01:05PM  7    Q.   AND THAT WAS GOOD NEWS TO YOU, WASN'T IT?

01:05PM  8    A.   IT WAS GREAT NEWS.

01:05PM  9    Q.   AND WHY WAS IT GREAT NEWS?

01:05PM  10   A.   I THOUGHT AT THE TIME IT MEANT THAT THE REGULATORY BODY

01:05PM  11   HERE WAS ACTUALLY BUYING INTO ALL OF THE ASSAYS.  I LEARNED

01:05PM  12   LATER THAT'S NOT THE CASE, BUT THAT'S WHAT I THOUGHT.

01:05PM  13   Q.   SO AT THE TIME YOU THOUGHT IT REFLECTED APPROVAL OF THE

01:05PM  14   DEVICE IN SOME FORM?

01:05PM  15   A.   CORRECT.

01:05PM  16   Q.   APPROVAL OF THE ASSAYS THAT WERE GOING TO BE RUN ON THE

01:05PM  17   DEVICE?

01:05PM  18   A.   CORRECT.

01:05PM  19   Q.   AND YOU HAVE A DIFFERENT UNDERSTANDING SITTING HERE TODAY?

01:05PM  20   A.   I DO JUST BECAUSE OF WHAT I HAVE LEARNED.

01:06PM  21   Q.   BUT AT THE TIME YOU VIEWED THAT AS GOOD NEWS?

01:06PM  22   A.   YES.

01:06PM  23   Q.   AND CMS VALIDATION OF THE DEVICE?

01:06PM  24   A.   IT WAS AN IMPORTANT MILESTONE.  BUT I, OF COURSE, THOUGHT

01:06PM  25   IT MEANT ALL OF THE CPT CODES.

01:06PM  1    Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO THE MASTER SERVICES

01:06PM  2    AGREEMENT, EXHIBIT 387.  YOU WERE ASKED SOME QUESTIONS ABOUT

01:06PM  3    THAT ON CROSS-EXAMINATION.

01:06PM  4    A.   ALL RIGHT.

01:06PM  5    Q.   AND IF WE COULD GO TO PAGE 9.

01:06PM  6    A.   YES.

01:06PM  7    Q.   YOU WERE ASKED SOME QUESTIONS ABOUT THE TIMING OF THE

01:06PM  8    SAFEWAY PRE-PILOT, THE SAFEWAY PRE-PILOT AND THE SAFEWAY LAUNCH

01:06PM  9    VIS-A-VIS WALGREENS.

01:06PM  10       DO YOU RECALL THOSE QUESTIONS?

01:06PM  11   A.   YES.

01:06PM  12   Q.   OKAY.  IN PARAGRAPH C IT SAYS, I DRAW YOUR ATTENTION TO

01:07PM  13   THE LANGUAGE, "THE PARTIES' EXPECTATION IS THAT THE PILOT WILL

01:07PM  14   LAST FOR APPROXIMATELY 90 CALENDAR DAYS, AND THAT THE PILOT OF

01:07PM  15   THE PROGRAM AT SAFEWAY WILL RUN CONCURRENTLY WITH ANY PILOT OF

01:07PM  16   THE PROGRAM CONDUCTED BY WALGREENS."

01:07PM  17       DO YOU SEE THAT LANGUAGE?

01:07PM  18   A.   YES.

01:07PM  19   Q.   AND DID YOU VIEW THAT AS AN OBLIGATION TO HAVE THEM RUN

01:07PM  20   CONCURRENTLY OR AN EXPECTATION?

01:07PM  21   A.   AN EXPECTATION.

01:07PM  22   Q.   SO IF YOU HAD SAID TO MS. HOLMES, WALGREENS SEEMS LIKE

01:07PM  23   THEY'RE WAY BEHIND US, I WANT TO GO FORWARD WITH THE PILOT, IS

01:07PM  24   THAT SOMETHING THAT YOU FELT FREE TO DO?

01:07PM  25   A.   REPEAT THAT, PLEASE.

01:07PM 1   Q.   SO IF YOU BELIEVED WALGREENS WAS TAKING TOO MUCH TIME,

01:07PM 2   THAT THEY WERE WAY BEHIND YOU, DID YOU FEEL FREE TO GO TO

01:07PM 3   MS. HOLMES AND SAY, I'D LIKE TO GO FORWARD WITH THE PILOT NOW?

01:07PM 4   A.   I THOUGHT THAT MIGHT BE A PROBLEM, THAT WE WOULD HAVE TO

01:08PM 5   GO TOGETHER.

01:08PM 6   Q.   LET ME DRAW YOUR ATTENTION TO WHERE IT SAYS "THE LAUNCH OF

01:08PM 7   THE PROGRAM WILL NOT OCCUR AT WALGREENS STORES PRIOR TO THE

01:08PM 8   LAUNCH OF THE PROGRAM AT SAFEWAY STORES."

01:08PM 9        WHAT DID THAT MEAN?

01:08PM 10  A.   NOW WE'RE BEYOND THE PILOT AND NOW IT'S LAUNCHED, AND IT

01:08PM 11  SAID IT WOULD LAUNCH SIMULTANEOUSLY.

01:08PM 12  Q.   DID IT SAY SIMULTANEOUSLY OR THAT WALGREENS WON'T GO

01:08PM 13  FIRST?

01:08PM 14  A.   IT SAYS THAT WALGREENS WON'T GO FIRST, BUT MY EXPECTATION

01:08PM 15  IS THAT IT WOULD GO AROUND THE SAME TIME.

01:08PM 16  Q.   OKAY.  YOU WANTED THEM TO GO AT THE SAME TIME?

01:08PM 17  A.   CORRECT.

01:08PM 18  Q.   AND WHY WAS THAT?

01:08PM 19  A.   WELL, WE DIDN'T WANT, YOU KNOW, WALGREENS TO HAVE AN EDGE

01:08PM 20  ON US, AND MY GUESS IS THAT THEY FELT THE SAME WAY.

01:09PM 21       SO RATHER THAN BARGAIN FROM THEM INSISTING THAT WE GO

01:09PM 22  FIRST, WE WERE CONTENT THAT WE WOULD GO AT THE SAME TIME.

01:09PM 23  Q.   IN THE DECEMBER 2012 TIME PERIOD, DID MS. HOLMES EVER

01:09PM 24  ATTRIBUTE DELAYS OF THE LAUNCH TO WALGREENS?

01:09PM 25  A.   NO.

BURD REDIRECT BY MR. LEACH

01:09PM 1    Q.   DID SHE EVER ATTRIBUTE THE DELAYS TO SOME ISSUE WITH THE

01:09PM 2    MAIN LAB OR THE DEVICE THAT YOU'D BEEN SHOWN?

01:09PM 3    A.   NO.

01:09PM 4    Q.   LET ME PLEASE DRAW YOUR ATTENTION TO WHAT IS IN EVIDENCE

01:09PM 5    AS EXHIBIT 10537.

01:09PM 6    A.   WHICH BOOK?

01:09PM 7    Q.   THE BLACK BOOK PLEASE.

01:10PM 8    A.   I HAVE IT.

01:10PM 9    Q.   AND DO YOU RECALL BEING ASKED QUESTIONS ABOUT YOUR EMAIL

01:10PM 10   WHERE YOU WROTE IN THE FIRST PARAGRAPH, "I'M VERY CONCERNED

01:10PM 11   ABOUT ALLOWING NETWORK PARTNERS OR ANYONE ELSE TO LAUNCH WITH A

01:10PM 12   MERE FINGER STICK."

01:10PM 13        DO YOU RECALL BEING ASKED QUESTIONS ABOUT THAT?

01:10PM 14   A.   YES.

01:10PM 15   Q.   AND FURTHER DOWN IN THE EMAIL YOU WROTE, "I ALSO

01:10PM 16   UNDERSTAND THAT THIS IS INTENDED AS ONLY A 'STOP GAP MEASURE.'"

01:10PM 17        DO YOU SEE THAT LANGUAGE?

01:10PM 18   A.   I DON'T.  HELP ME OUT A LITTLE BIT.

01:10PM 19   Q.   SECOND TO THE LAST PARAGRAPH ON THE BOTTOM, YOU WROTE, "I

01:10PM 20   REALIZE THAT YOU HAVE INFORMATION THAT I DON'T HAVE THAT IS

01:10PM 21   CAUSING YOU TO THINK ABOUT A POSSIBLE FINGER STICK ONLY LAUNCH.

01:10PM 22   I ALSO UNDERSTAND THAT THIS IS INTENDED AS ONLY A 'STOP GAP

01:10PM 23   MEASURE.'"

01:10PM 24        DO YOU SEE THAT?

01:10PM 25   A.   I DO.

01:10PM  1    Q.   AND WHAT DID YOU MEAN BY "STOP GAP MEASURE"?

01:10PM  2    A.   I WOULD HAVE TO READ THE WHOLE MEMO, BUT I KNEW WE DIDN'T

01:10PM  3    DO FINGERSTICK EXCLUSIVELY, YOU KNOW, IN THE ON CAMPUS LAB AND

01:11PM  4    WE WERE ANTICIPATING THAT WHEN YOU LAUNCH, YOU WOULD BE DOING

01:11PM  5    FINGERSTICK.

01:11PM  6    Q.   AND THIS EMAIL IS FROM JANUARY OF 2012?

01:11PM  7    A.   CORRECT.

01:11PM  8    Q.   BY THE DECEMBER 2012 TIME PERIOD, DID MS. HOLMES INDICATE

01:11PM  9    TO YOU THAT THERE WAS ANY ISSUE WITH PUTTING THE DEVICE IN

01:11PM  10   SAFEWAY STORES?

01:11PM  11   A.   NO.

01:11PM  12        WELL, LET ME BACK UP ONE SECOND.

01:11PM  13   Q.   PLEASE.

01:11PM  14   A.   I DON'T RECALL WHEN THIS COURIER MODEL WAS DONE, BUT THAT

01:11PM  15   WAS CONSIDERED TO BE TEMPORARY, AND THE INTENT ALL ALONG HAS

01:11PM  16   BEEN DEVICES IN THE STORES.  OTHERWISE YOU CAN'T ACCOMPLISH 20

01:11PM  17   TO 30 MINUTES.

01:11PM  18   Q.   LET ME NEXT DRAW YOUR ATTENTION TO EXHIBIT 7196, WHICH

01:12PM  19   SHOULD BE IN YOUR BLACK BINDER.

01:12PM  20   A.   I HAVE IT.

01:12PM  21        MR. LEACH:  YOUR HONOR, WITH THE COURT'S PERMISSION,

01:12PM  22   I'D LIKE TO INQUIRE ABOUT -- THIS IS IN EVIDENCE, BUT THERE'S A

01:12PM  23   MATTER THAT I WOULD LIKE TO INQUIRE ABOUT, THE TOP EMAIL.

01:12PM  24        THE COURT:  THIS WAS -- THE DEFENSE PUT THIS IN

01:12PM  25   EVIDENCE.

01:12PM   1              MR. DOWNEY:  YES.

01:12PM   2              THE COURT:  YOU CAN ASK YOUR QUESTION.

01:12PM   3              MR. LEACH:  OKAY.  THANK YOU, YOUR HONOR.

01:12PM   4              MR. DOWNEY:  YOUR HONOR, I HAD INTENDED TO REDACT

01:12PM   5    THAT AND I WONDER, CONSISTENT WITH THE PRIOR DISCUSSION --

01:12PM   6              THE COURT:  NO.  IT WAS MOVED INTO EVIDENCE BY YOU

01:12PM   7    WITHOUT OBJECTION.

01:12PM   8              MR. DOWNEY:  THAT'S FINE, YOUR HONOR.

01:12PM   9              THE COURT:  SO --

01:12PM   10             MR. LEACH:  THERE WERE ALSO NEVER QUESTIONS ABOUT

01:12PM   11   THE REASONS FOR THE TERMINATION.

01:12PM   12             THE COURT:  YOU CAN ASK YOUR QUESTION.

01:12PM   13             MR. DOWNEY:  YOUR HONOR, THE REASON THAT I DID NOT

01:13PM   14   PRESENT THE REDACTED FORM IN EITHER THE WITNESS'S NOTEBOOK AND

01:13PM   15   THE WITNESS'S AND YOURS AND THE ONE ON THE SCREEN IS BECAUSE WE

01:13PM   16   DIDN'T HAVE A RULING WHEN WE PREPARED THIS.  BUT I UNDERSTAND

01:13PM   17   THE COURT'S RULING.

01:13PM   18             THE COURT:  WELL, I'M LEFT IN A BIT OF A QUANDARY

01:13PM   19   HERE.  IT WAS ADMITTED AND OFFERED BY YOU WITHOUT ANY

01:13PM   20   REDACTIONS AS I RECALL.

01:13PM   21             MR. DOWNEY:  I UNDERSTAND.

01:13PM   22             THE COURT:  IT WAS ADMITTED WITHOUT OBJECTION.

01:13PM   23        SO IN ANY EVENT, YOU CAN ASK A QUESTION IF YOU HAVE ONE.

01:13PM   24             MR. LEACH:  OKAY.

01:13PM   25   Q.   MR. BURD, MY ONLY QUESTION WAS THERE'S A REFERENCE IN --

01:13PM  1    DO YOU RECALL BEING ASKED QUESTIONS ABOUT THIS EMAIL REGARDING

01:13PM  2    THE PLAN LAUNCH IN CONNECTION WITH MARKETING?

01:13PM  3    A.   YES.

01:13PM  4    Q.   AND THERE'S A LINE IN YOUR RESPONSE WHERE YOU QUOTE, "I

01:13PM  5    ALSO WANT TO MAXIMIZE MY RETURN ON MY $275 MILLION REMODEL

01:13PM  6    INVESTMENT."

01:13PM  7         DO YOU SEE THAT LANGUAGE?

01:13PM  8    A.   YES.

01:13PM  9    Q.   AND WHAT IS THAT A REFERENCE TO?

01:13PM  10   A.   WELL, WE MADE THE INVESTMENT AND WE NEEDED TO LAUNCH.  IF

01:14PM  11   THE BOX WORKS AS WE THOUGHT IT DOES, THEN WE WOULD GENERATE A

01:14PM  12   REVENUE STREAM AND GENERATE PROFITS.

01:14PM  13   Q.   AND THE REMODEL INVESTMENT, WHAT DO YOU MEAN BY THAT?  IS

01:14PM  14   THAT MONEY THAT YOU GAVE TO THERANOS OR MONEY THAT YOU --

01:14PM  15   A.   NO.  THIS WAS MONEY THAT WE USED TO REMODEL THE STORES.

01:14PM  16   Q.   I HAVE NO FURTHER QUESTIONS.

01:14PM  17        THANK YOU, MR. BURD.

01:14PM  18            THE COURT:  MR. DOWNEY.

01:14PM  19                     **RECROSS-EXAMINATION**

01:14PM  20   BY MR. DOWNEY

01:15PM  21   Q.   VERY BRIEFLY, MR. BURD.

01:15PM  22        YOU WERE JUST ASKED A QUESTION ABOUT A REFERENCE IN A

01:15PM  23   DOCUMENT TO A REMODEL INVESTMENT.

01:15PM  24        DO YOU RECALL THAT?

01:15PM  25   A.   YES.

BURD RECROSS BY MR. DOWNEY

01:15PM  1    Q.   AND DO YOU RECALL TESTIFYING ON DIRECT EXAMINATION THAT

01:15PM  2    QUEST STORES NOW SIT IN MANY OF THOSE LOCATIONS?

01:15PM  3    A.   I DON'T KNOW HOW MANY, BUT I WOULD BET THAT IT'S -- THEY

01:15PM  4    STARTED IN ARIZONA, BUT I DON'T KNOW HOW MANY.

01:15PM  5    Q.   OKAY.  BUT LOCATIONS OF THE STORES YOU'RE FAMILIAR WITH,

01:15PM  6    ARE THOSE THE SAME LOCATIONS?

01:15PM  7    A.   CORRECT.

01:15PM  8    Q.   I WANT TO ASK YOU ABOUT YOUR EXCHANGE WITH MS. HOLMES IN

01:15PM  9    EARLY 2012 WHEN YOU WERE TALKING ABOUT YOUR DISAPPOINTMENT WITH

01:15PM  10   GOING TO A FINGERSTICK ONLY MODEL.

01:15PM  11       DO YOU RECALL THAT?

01:15PM  12   A.   ARE YOU TALKING ON CAMPUS?

01:15PM  13   Q.   WELL, I DON'T KNOW IF THE CAMPUS PROJECT HAD BEEN

01:16PM  14   INITIATED OR NOT.

01:16PM  15       BUT YOU SENT HER AN EMAIL IN JANUARY OF 2010 EXPRESSING A

01:16PM  16   CONCERN ABOUT EITHER ANY NETWORK PARTNER OR ANY OTHER PARTNER

01:16PM  17   OR ANY OTHER -- ANYONE ELSE LAUNCHING UNDER WHAT YOU TERMED A

01:16PM  18   FINGERSTICK ONLY MODEL.

01:16PM  19       DO YOU RECALL THAT?

01:16PM  20   A.   SURE, THAT RINGS A BELL.

01:16PM  21   Q.   AND AM I RIGHT TO SAY THAT YOU SAY YOU DID NOT UNDERSTAND

01:16PM  22   THAT THAT WAS HAPPENING BECAUSE OF A REQUEST FROM WALGREENS?

01:16PM  23   A.   CORRECT.

01:16PM  24   Q.   AND YOU DID NOT UNDERSTAND IT TO BE HAPPENING BECAUSE OF A

01:16PM  25   REGULATORY REQUIREMENT?

01:16PM   1    A.   CORRECT.

01:16PM   2    Q.   WHAT DID YOU UNDERSTAND WAS THE REASON AS TO WHY THERE WAS

01:16PM   3    NOT A LAUNCH WITHOUT -- UNDER THE MODEL THAT HAD ORIGINALLY

01:16PM   4    BEEN CONTEMPLATED?

01:16PM   5    A.   SO THE ORIGINAL MODEL WAS FINGERSTICK RESULTS IN STORE.

01:16PM   6         WE KNOW THAT THERE WAS A TEMPORARY MODEL THAT WAS VEIN

01:17PM   7    DRAW PROCESSED ELSEWHERE.

01:17PM   8         SO I DIDN'T WANT, I DIDN'T WANT OTHER NETWORK PLAYERS TO

01:17PM   9    LAUNCH FINGERSTICK WHILE WE WERE DOING SOMETHING DIFFERENT.

01:17PM  10    Q.   I UNDERSTAND THAT.  MY QUESTION TO YOU IS, WHAT WAS YOUR

01:17PM  11    UNDERSTANDING AS TO WHY THERANOS WAS PROPOSING LAUNCHING A

01:17PM  12    FINGERSTICK ONLY PROCESS WITH THOSE --

01:17PM  13    A.   CAN YOU DIRECT ME TO THE EMAIL?

01:17PM  14    Q.   SURE.

01:17PM  15         PULL IT UP FOR ONE MOMENT.

01:18PM  16         (PAUSE IN PROCEEDINGS.)

01:18PM  17    BY MR. DOWNEY:

01:18PM  18    Q.   THE DOCUMENT I WAS REFERRING TO, MR. BURD, IS 10537 IN THE

01:19PM  19    WHITE NOTEBOOK.

01:19PM  20    A.   IN THE WHITE?

01:19PM  21    Q.   BUT I DON'T MEAN TO CONFINE YOU TO THAT.  THERE ARE OTHER

01:19PM  22    DOCUMENTS THAT REFERENCE FINGERSTICK ONLY AS WELL.

01:19PM  23    A.   YEAH.  YOU SAID 10357 WHAT?

01:19PM  24    Q.   10537.

01:19PM  25    A.   10537.  YOU SAID WHITE?

01:19PM  1    Q.   I'M SORRY, I BEG YOUR PARDON.  BLACK.

01:19PM  2    A.   OKAY.  GIVE ME A MOMENT AND I'LL READ THE EMAIL FROM THE

01:19PM  3    TOP DOWN.

01:19PM  4    Q.   I THINK IT ACTUALLY GOES FROM THE BOTTOM UP.

01:20PM  5    A.   YEAH, OKAY.  BUT I'LL START WITH THE -- IT'S MY EMAIL THAT

01:20PM  6    YOU'RE REFERRING TO; RIGHT?

01:20PM  7    Q.   THAT'S RIGHT.  AND I'M JUST REFERRING TO YOUR REFERENCE TO

01:20PM  8    FINGERSTICK ONLY.

01:20PM  9    A.   SURE.

01:20PM 10         (PAUSE IN PROCEEDINGS.)

01:20PM 11              THE WITNESS:  OKAY.  I DON'T HAVE THE CONTEXT.

01:20PM 12    BY MR. DOWNEY:

01:20PM 13    Q.   IF YOU SEE THE SECOND TO THE LAST PARAGRAPH, YOU SAY, "I

01:20PM 14    REALIZE THAT YOU HAVE INFORMATION THAT I DON'T HAVE THAT IS

01:20PM 15    CAUSING YOU TO THINK ABOUT A POSSIBLE FINGER STICK ONLY

01:21PM 16    LAUNCH."

01:21PM 17         DO YOU SEE THAT?

01:21PM 18    A.   I DO.

01:21PM 19    Q.   AND DOES THAT -- DID YOU HAVE A CONVERSATION BEFORE YOU

01:21PM 20    WROTE THIS EMAIL WHERE YOU LEARNED SHE WAS CONTEMPLATING THAT?

01:21PM 21    A.   WE MUST HAVE.

01:21PM 22         SO WHAT I NOW UNDERSTAND FINGERSTICK TO MEAN WHEN IT SAYS

01:21PM 23    "FINGER STICK ONLY," I DIDN'T LIKE THE IDEA OF LAUNCHING WITH A

01:21PM 24    FINGERSTICK AND THEN HAVE EVERYTHING PROCESS OFF THE STORE

01:21PM 25    PROPERTY.

01:21PM  1    Q.   OKAY.  SO, IN OTHER WORDS, THE SAMPLE WOULD BE SENT BACK

01:21PM  2    TO A LAB AT THERANOS?

01:21PM  3    A.   YES, YES.

01:21PM  4    Q.   AND MS. HOLMES TOLD YOU AT SOME POINT PRIOR TO

01:21PM  5    JANUARY 12TH THAT THERANOS WAS CONSIDERING THAT MODEL WITH SOME

01:21PM  6    PARTNER?

01:21PM  7              THE COURT:  MR. BURD, WHY DON'T YOU SPEAK IN THE

01:21PM  8    MICROPHONE THERE?  THANK YOU.

01:21PM  9              THE WITNESS:  NO, NO, I DON'T RECALL THAT.

01:22PM  10   BY MR. DOWNEY:

01:22PM  11   Q.   OKAY.  WHAT PROMPTED YOU TO WRITE THIS EMAIL?

01:22PM  12   A.   WELL, WE MUST HAVE HAD A CONVERSATION ABOUT LAUNCHING PURE

01:22PM  13   FINGERSTICK, WHICH IS DISTINGUISHING PURE FINGERSTICK FROM YOU

01:22PM  14   DRAW THE BLOOD THAT WAY, AND IN THIS CASE YOU PICK IT UP WITH A

01:22PM  15   COURIER AND YOU TAKE IT TO A CENTRAL LOCATION.

01:22PM  16        WHAT WE WANTED WAS THE ORIGINAL DESIGN AT LAUNCH, WHICH

01:22PM  17   GAVE US RESULTS IN 20, 30 MINUTES, WHICH COULD ONLY HAPPEN IF

01:22PM  18   DONE IN THE STORE.

01:22PM  19   Q.   YOU SAY IN THE SECOND SENTENCE OF THIS EMAIL, "I AM VERY

01:22PM  20   CONCERNED ABOUT ALLOWING NETWORK PARTNERS FOR ANYONE ELSE TO

01:22PM  21   LAUNCH WITH A MERE FINGER STICK."

01:22PM  22        DO YOU SEE THAT?

01:22PM  23   A.   I SEE THAT, AND, YOU KNOW, REMEMBER, I'M NOW TRYING TO

01:22PM  24   RECALL, YOU KNOW, EIGHT, NINE YEARS AGO.  BUT, YOU KNOW, IN

01:22PM  25   BUILDING THE NETWORK, WE WERE MAKING THE SAME PROMISE, YOU

01:23PM 1    KNOW, TO THE -- TO OTHER SUPERMARKETS THAT HAD BEEN MADE TO US,

01:23PM 2    AND I THINK THAT'S WHAT THIS REFERS TO, THAT THEY WOULDN'T GET

01:23PM 3    THAT PROMISE, AND IT DIDN'T LOOK LIKE WE WERE GOING TO GET THAT

01:23PM 4    EITHER.

01:23PM 5    Q.   AND IS IT FAIR TO SAY THAT IN TERMS OF WHATEVER THE

01:23PM 6    CONVERSATION THAT YOU HAD WITH MS. HOLMES THAT PROMPTED THIS

01:23PM 7    EMAIL, TODAY YOU DON'T REMEMBER IT?

01:23PM 8    A.   CORRECT.

01:23PM 9    Q.   THANK YOU, MR. BURD.

01:23PM 10              THE COURT:  MR. LEACH?

01:23PM 11              MR. LEACH:  NOTHING FURTHER, YOUR HONOR.  THANK YOU.

01:23PM 12              THE COURT:  MAY THIS WITNESS BE EXCUSED?

01:23PM 13              MR. LEACH:  HE MAY, YES.

01:23PM 14              MR. DOWNEY:  YES.

01:23PM 15              THE COURT:  SIR, YOU'RE EXCUSED.  THANK YOU.

01:23PM 16              THE WITNESS:  THANK YOU.

01:23PM 17              THE COURT:  YOU'RE WELCOME.

01:23PM 18              THE WITNESS:  I'M JUST GOING TO LEAVE THE BOOKS

01:23PM 19    THERE.

01:23PM 20              THE COURT:  JUST LEAVE IT THERE.  THEY'LL CLEAN IT

01:23PM 21    UP.

01:23PM 22              THE WITNESS:  OKAY.

01:23PM 23              THE COURT:  WE WILL TAKE OUR AFTERNOON BREAK NOW,

01:23PM 24    LADIES AND GENTLEMEN.  IS 20 MINUTES ABOUT RIGHT?  WHY DON'T WE

01:23PM 25    TAKE 30 MINUTES?  LET'S TAKE A 30 MINUTE BREAK, PLEASE.  WE'LL

01:24PM  1    COME BACK -- THE GOVERNMENT WILL HAVE A WITNESS, I THINK?

01:24PM  2            MR. SCHENK:  YES, YOUR HONOR.

01:24PM  3            THE COURT:  ALL RIGHT.  WE'LL TAKE OUR RECESS.

01:24PM  4    THANK YOU.

01:24PM  5            THE CLERK:  COURT IS IN RECESS.

01:24PM  6        (RECESS FROM 1:24 P.M. UNTIL 2:11 P.M.)

02:11PM  7            THE COURT:  THANK YOU.  WE'RE BACK ON THE RECORD.

02:11PM  8    ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT AGAIN.  OUR JURY AND

02:11PM  9    ALTERNATES ARE PRESENT.

02:11PM  10       THANK YOU FOR YOUR PATIENTS.

02:11PM  11       IN THE SPIRIT OF FULL DISCLOSURE, WE WERE GETTING MY

02:12PM  12   OFFICE READY AND THAT MEANT MOVING BOXES.  I'LL LEAVE IT AT

02:12PM  13   THAT.

02:12PM  14       DOES THE GOVERNMENT HAVE ANOTHER WITNESS?

02:12PM  15           MR. SCHENK:  YES, YOUR HONOR.

02:12PM  16       THE GOVERNMENT CALLS WADE MIQUELON.

02:12PM  17           THE COURT:  IF YOU WOULD STAND AND FACE OUR

02:12PM  18   COURTROOM DEPUTY WHILE YOU RAISE YOUR RIGHT HAND, SHE HAS A

02:12PM  19   QUESTION FOR YOU.

02:12PM  20       **(GOVERNMENT'S WITNESS, WADE MIQUELON, WAS SWORN.)**

02:12PM  21           THE WITNESS:  YES.

02:12PM  22           THE COURT:  THANK YOU.

02:12PM  23       PLEASE HAVE A SEAT HERE, SIR, AND MAKE YOURSELF

02:12PM  24   COMFORTABLE.

02:12PM  25       FEEL FREE TO ADJUST THAT CHAIR AND MICROPHONE.  I'LL

02:12PM  1    ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE MICROPHONE.

02:13PM  2        THE LAWYER WILL HAVE A QUESTION FOR YOU ABOUT YOUR MASK IN

02:13PM  3    JUST A MOMENT.  BUT, FIRST OF ALL, IF YOU COULD PLEASE STATE

02:13PM  4    YOUR NAME AND THEN SPELL IT, PLEASE.

02:13PM  5        THE WITNESS:  YES, YOUR HONOR.  MY NAME IS WADE

02:13PM  6    MIQUELON.  W-A-D-E, M-I-Q-U-E-L-O-N.

02:13PM  7        THE COURT:  THANK YOU.

02:13PM  8        COUNSEL.

02:13PM  9                      **DIRECT EXAMINATION**

02:13PM  10   BY MR. SCHENK:

02:13PM  11   Q.   GOOD AFTERNOON, MR. MIQUELON.  I SEE YOU'VE TAKEN OFF YOUR

02:13PM  12   MASK.  WITH THE COURT'S PERMISSION AND IF YOU'RE FULLY

02:13PM  13   VACCINATED, YOU CAN REMOVE YOUR MASK AND I'LL DO THE SAME.

02:13PM  14   A.   THANK YOU.

02:13PM  15        THE COURT:  THANK YOU, COUNSEL.

02:13PM  16        MR. SCHENK:  THANK YOU, YOUR HONOR.

02:13PM  17   Q.   MR. MIQUELON, WERE YOU THE CFO AT WALGREENS?

02:13PM  18   A.   YES, I WAS.

02:13PM  19   Q.   AND WHEN WERE YOU THE CFO AT WALGREENS?

02:13PM  20   A.   FROM JUNE 2016 TO AUGUST 3RD OR 4TH 2014.

02:13PM  21   Q.   DO YOU MIND PULLING THE MICROPHONE A LITTLE BIT CLOSER TO

02:13PM  22   YOUR MOUTH?

02:13PM  23   A.   FROM JUNE -- JUNE 2008 -- I APOLOGIZE -- TO AUGUST 4TH,

02:14PM  24   2014.

02:14PM  25   Q.   SO 2008 UNTIL 2014?

02:14PM 1    A.    THAT'S CORRECT.

02:14PM 2    Q.    AND WE'LL COME BACK TO THAT IN A MOMENT.

02:14PM 3          LET'S START WITH YOUR EDUCATIONAL BACKGROUND.  WHERE DID

02:14PM 4    YOU GO TO UNDERGRAD, AND IF YOU HAVE GRADUATE DEGREES?

02:14PM 5    A.    I WENT TO UNDERGRADUATE SCHOOL AT PURDUE UNIVERSITY AND I

02:14PM 6    WAS AN ENGINEER, AND I WENT TO GRADUATE SCHOOL AT WASHINGTON

02:14PM 7    UNIVERSITY AT ST. LOUIS FOR MY MBA.

02:14PM 8    Q.    FOR YOUR?

02:14PM 9    A.    MBA.

02:14PM 10   Q.    THANK YOU.  HOW ABOUT YOUR WORK HISTORY BEFORE YOU BECAME

02:14PM 11   CFO AT WALGREENS?

02:14PM 12   A.    AFTER GRADUATE SCHOOL, I SPENT 17 YEARS AT

02:14PM 13   PROCTOR & GAMBLE, THE FIRST MORE OR LESS FIVE YEARS IN

02:14PM 14   CINCINNATI, AND THE NEXT 12 YEARS I SPENT IN ASIA AND EUROPE.

02:14PM 15         AND FROM THERE I WENT TO TYSON FOODS WHERE I BECAME THE

02:14PM 16   CHIEF FINANCIAL OFFICER FOR TWO YEARS, AND AFTER TYSON FOODS I

02:14PM 17   WENT TO WALGREENS WHERE I WAS THEIR CHIEF FINANCIAL OFFICER FOR

02:15PM 18   MORE OR LESS SIX YEARS.

02:15PM 19   Q.    AND AFTER WALGREENS, HAVE YOU REMAINED EMPLOYED SINCE YOU

02:15PM 20   LEFT WALGREENS?

02:15PM 21   A.    YES.

02:15PM 22   Q.    AND WHAT HAVE YOU DONE SINCE THEN?

02:15PM 23   A.    I WAS THE CHIEF FINANCIAL OFFICER FOR THE LARGE ARTS AND

02:15PM 24   CRAFTS RETAILER, JOANN, AND I'M CURRENTLY THE CEO OF THE SAME

02:15PM 25   COMPANY.

02:15PM  1    Q.   YOU'RE CURRENTLY THE CHIEF EXECUTIVE OFFICER?

02:15PM  2    A.   YES.

02:15PM  3    Q.   OKAY.  WHILE YOU WERE THE CFO AT WALGREENS, WOULD YOU

02:15PM  4    DESCRIBE FOR THE JURY SOME OF YOUR RESPONSIBILITIES AS CFO?

02:15PM  5    A.   GENERAL OVERSIGHT FOR ALL FINANCIAL AND ACCOUNTING MATTERS

02:15PM  6    TYPICAL OF A TYPICAL CFO ROLE, FROM THE GOVERNMENT ASPECTS OF

02:15PM  7    ACCOUNTING THROUGH FINANCIAL ANALYSIS ASPECTS OF THE BUSINESS,

02:15PM  8    AS WELL AS I HAD OVERSIGHT FOR MERGERS AND ACQUISITION, WHAT WE

02:15PM  9    CALL M & A, NEW BUSINESS DEVELOPMENT, AND FOR A PERIOD OF TIME

02:15PM  10   I ALSO HAD OVERSIGHT FOR THE INTERNATIONAL EXPANSION OF THE

02:15PM  11   COMPANY.

02:15PM  12   Q.   WAS WALGREENS A PUBLICLY TRADED COMPANY WHILE YOU WERE

02:15PM  13   CFO?

02:16PM  14   A.   YES.

02:16PM  15   Q.   AND DO YOU RECALL WHAT THE TICKER SIMPLE OR THE TRADING

02:16PM  16   SYMBOL WAS?

02:16PM  17   A.   IT WAS -- AT THE TIME WHEN I JOINED IT WAS W-A-G, BUT THE

02:16PM  18   TICKER SYMBOL IS DIFFERENT NOW.

02:16PM  19   Q.   OKAY.  AND WHAT IS IT NOW, IF YOU KNOW?

02:16PM  20   A.   W-P-A.

02:16PM  21   Q.   OKAY.  THANK YOU.

02:16PM  22        HAVE YOU HEARD OF A COMPANY CALLED THERANOS?

02:16PM  23   A.   YES.

02:16PM  24   Q.   WHEN DID YOU BECOME FIRST FAMILIAR WITH THAT COMPANY?

02:16PM  25   A.   I BELIEVE IT WAS IN THE EARLY SPRING OF 2010, AROUND

02:16PM  1     MARCH.

02:16PM  2     Q.   AROUND MARCH OF 2010?

02:16PM  3     A.   CORRECT.

02:16PM  4     Q.   AND DO YOU REMEMBER THE CIRCUMSTANCES?  DID SOMEONE BRING

02:16PM  5     THE COMPANY TO YOUR ATTENTION?

02:16PM  6     A.   YES.  WE WERE LOOKING AT A LOT OF DIFFERENT LAY OUT

02:16PM  7     TECHNOLOGY COMPANIES AT WALGREENS TRYING TO SEE IF POTENTIAL

02:16PM  8     COMPANIES COULD BE A GOOD PARTNER FOR WHAT WE WANTED TO DO IN

02:16PM  9     TERMS OF EXPANDING CLINICAL OFFERINGS THROUGH LAB, AND I RECALL

02:16PM  10    DR. JAY ROSAN HAD COME TO ME WHILE WE WERE SEARCHING VARIOUS

02:16PM  11    COMPANIES AND HE WAS VERY EXCITED ABOUT THE COMPANY THAT HE

02:17PM  12    HEARD ABOUT CALLED THERANOS.

02:17PM  13    Q.   AND DR. ROSAN WAS ANOTHER EMPLOYEE AT WALGREENS?

02:17PM  14    A.   YES.  HE WAS MORE OR LESS THE MEDICAL EXPERT FOR THE NEW

02:17PM  15    BUSINESS DEVELOPMENT DIVISION OF THE COMPANY.

02:17PM  16    Q.   AND YOU DESCRIBED WALGREENS HAVING SOME INTEREST IN LABS.

02:17PM  17    COULD YOU DESCRIBE THAT FOR US?

02:17PM  18    A.   CORRECT.  EVEN THOUGH WALGREENS HAS BEEN A TRADITIONAL

02:17PM  19    PHARMACY, OVER TIME THEY'VE WORKED TO FIND OTHER HEALTH CARE

02:17PM  20    OFFERINGS THAT CAN MORE OR LESS PUSH THE HEALTH CARE CLOSER AND

02:17PM  21    CLOSER TO THE INDIVIDUAL IN THE COMMUNITY.

02:17PM  22         ONE EXAMPLE WOULD BE VACCINATIONS WHERE THEY'RE A VERY

02:17PM  23    LARGE PLAYER, AS WELL AS OTHER CLINICS AND THERE'S PRACTITIONER

02:17PM  24    SERVICES.  LAB WAS ANOTHER ADJACENCY THAT THAT WE WERE VERY

02:17PM  25    EXCITED ABOUT.

02:17PM   1    Q.   AND HOW DID THERANOS FIT INTO THIS INTEREST OF WALGREENS?

02:17PM   2    A.   THERANOS AT THE TIME -- AND THERE WAS A LOT OF, A LOT OF

02:17PM   3    COMPANIES THAT WERE LOOKING TO REALLY CHANGE THE WAY THAT

02:18PM   4    TRADITIONAL LAB HAD BEEN DONE THROUGH VARIOUS PLATFORMS, AND

02:18PM   5    THERE WAS A FAIR AMOUNT OF WORK TO TRY TO UNDERSTAND WHO THE

02:18PM   6    LEADER IN THAT SPACE MIGHT BE.

02:18PM   7         BUT AS WE GOT TO KNOW THERANOS, WE FELT THAT THEY WERE

02:18PM   8    PERHAPS THE FARTHEST ALONG AND THE MOST RELEVANT FOR WHAT THE

02:18PM   9    COMPANY WAS LOOKING TO ACHIEVE.

02:18PM  10    Q.   AND WHEN, IN THE EARLY DAYS IN 2010, YOU BEGAN TO LEARN

02:18PM  11    ABOUT THERANOS, WHAT KINDS OF THINGS DID YOU DO TO LEARN MORE

02:18PM  12    ABOUT THERANOS?

02:18PM  13    A.   AS A STARTING POINT I WAS ABLE TO GO OUT WITH

02:18PM  14    DR. JAY ROSAN AND SPEND SOME TIME AT THERANOS JUST TO LEARN

02:18PM  15    FROM ELIZABETH AND SUNNY WHAT THEY WERE DOING, WHAT THEY HAD

02:18PM  16    BEEN DOING, AND THAT WAS PROBABLY THE STARTING POINT OF THE

02:18PM  17    JOURNEY OF LEARNING.

02:18PM  18    Q.   YOU SAID GO OUT TO THERANOS.  WHAT DO YOU MEAN BY THAT?

02:18PM  19    WHERE WERE YOU AND WHERE DID YOU GO TO?

02:18PM  20    A.   I WAS BASED IN DEERFIELD, ILLINOIS, AND WE WENT TO THEIR

02:18PM  21    HEADQUARTERS AT THE TIME IN PALO ALTO.

02:18PM  22    Q.   IS THAT -- IS ILLINOIS WHERE WALGREENS IS HEADQUARTERED?

02:19PM  23    A.   CORRECT.

02:19PM  24    Q.   I THINK I PLACED A BINDER ON THE DESK IN FRONT OF YOU.  IF

02:19PM  25    YOU COULD OPEN IT UP TO TAB 278.

02:19PM  1          AT EXHIBIT 278, DO YOU RECOGNIZE THE DOCUMENTS THERE?

02:19PM  2     A.   YES.

02:19PM  3     Q.   WHAT ARE THE FIRST TWO PAGES, JUST GENERALLY?

02:19PM  4     A.   AN EMAIL MESSAGE.

02:19PM  5     Q.   DOES IT BEGIN AN EMAIL MESSAGE FROM MS. HOLMES TO YOU AND

02:19PM  6     DR. ROSAN, AN INDIVIDUAL YOU JUST REFERENCED?

02:19PM  7     A.   THAT'S CORRECT.

02:19PM  8     Q.   AND THEN IS THERE ANOTHER MESSAGE FROM YOU, AND THEN

02:19PM  9     ANOTHER MESSAGE WITHIN WALGREENS?

02:20PM 10     A.   THAT'S CORRECT.

02:20PM 11     Q.   AND HOW ABOUT THE ATTACHMENT?  DO YOU RECOGNIZE THE

02:20PM 12     ATTACHMENT?

02:20PM 13     A.   YES, I DO.

02:20PM 14     Q.   AND WHAT IS THE ATTACHMENT GENERALLY?

02:20PM 15     A.    IT WAS A PRESENTATION THAT HAD BEEN MADE TO US WHEN WE

02:20PM 16     VISITED AND SUBSEQUENTLY FORWARDED TO ME VIA EMAIL AND WHICH I

02:20PM 17     WAS SHARING WITH SOME EXECUTIVES IN THE COMPANY.

02:20PM 18     Q.   AND A PRESENTATION MADE TO YOU BY WHOM?

02:20PM 19     A.   BY THERANOS, BY MS. HOLMES AND MR. BALWANI.

02:20PM 20     Q.   THANK YOU.

02:20PM 21          YOUR HONOR, THE GOVERNMENT OFFERS 278.

02:20PM 22               MR. DOWNEY:  NO OBJECTION.

02:20PM 23               THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:20PM 24          (GOVERNMENT'S EXHIBIT 278 WAS RECEIVED IN EVIDENCE.)

02:20PM 25               MR. SCHENK:  MS. HOLLIMAN, IF WE COULD START WITH

02:20PM 1    THE EMAIL AT THE BOTTOM OF THE PAGE, PICK UP WITH THE FROM AND

02:20PM 2    TO LINES.

02:20PM 3    Q.   MR. MIQUELON, YOU CAN START ON YOUR SCREEN, WE SEE AN

02:20PM 4    EMAIL FROM MS. HOLMES TO YOU IN MARCH OF 2010.

02:20PM 5         DO YOU SEE THAT?

02:20PM 6    A.   YES.

02:20PM 7    Q.   AND IF WE COULD CARRY OVER TO THE NEXT PAGE, THE SECOND

02:20PM 8    PAGE OF THIS EXHIBIT TO CAPTURE THE TEXT OF THE EMAIL,

02:21PM 9    MS. HOLMES WRITES, "WADE.

02:21PM 10        "IT WAS GREAT TO MEET YOU.

02:21PM 11        "AS PROMISED, PLEASE FIND THE PRESENTATION WE PRESENTED

02:21PM 12   TODAY."

02:21PM 13        DO YOU SEE THAT?

02:21PM 14   A.   YES.

02:21PM 15   Q.   AND WAS THIS THE PRESENTATION THAT YOU TRAVELLED TO

02:21PM 16   PALO ALTO TO ATTEND IN PERSON?

02:21PM 17   A.   YES.

02:21PM 18   Q.   AND NOW IF WE COULD LOOK ONE EMAIL UP BACK ON THE FIRST

02:21PM 19   PAGE, THE EMAIL IN THE MIDDLE, THE EMAIL FROM YOU, IF WE COULD

02:21PM 20   CAPTURE THAT EMAIL TO THE JURY.

02:21PM 21        YOU WROTE THAT EMAIL TO AN INDIVIDUAL NAMED GREG WASSON.

02:21PM 22        DO YOU SEE THAT?

02:21PM 23   A.   YES.

02:21PM 24   Q.   AND WHO WAS MR. WASSON?

02:21PM 25   A.   MR. WASSON WAS THE CHIEF EXECUTIVE OFFICER OF WALGREENS

02:21PM  1    AND HE WAS MY BOSS AT THE TIME.

02:21PM  2    Q.   IN THE EMAIL YOU DESCRIBE TO HIM YOUR BEGINNING EFFORTS AT

02:21PM  3    DUE DILIGENCE REGARDING THERANOS; IS THAT RIGHT?

02:21PM  4    A.   YES, THAT'S CORRECT.

02:21PM  5    Q.   AND WHAT WERE YOU TRYING TO COMMUNICATE TO THE CEO AT THIS

02:21PM  6    TIME?

02:21PM  7    A.   I THINK JUST THAT A LOT OF ENTHUSIASM ABOUT THE

02:22PM  8    POSSIBILITY OF WORKING WITH THEM AND THE FACT THAT IT WAS VERY

02:22PM  9    EXCITING AND IT SEEMED TO BE THEY WERE PRETTY MUCH OUT FRONT

02:22PM  10   FOR WHAT WE WERE LOOKING FOR.

02:22PM  11   Q.   I'D LIKE TO SHOW YOU SOME SLIDES FROM THE PRESENTATION,

02:22PM  12   BUT BEFORE WE DO THAT, DESCRIBE THE SETTING.  WHERE DID YOU GO

02:22PM  13   WHEN YOU WERE IN PALO ALTO, AND I'M WONDERING WHO WAS PRESENT

02:22PM  14   IN THE ROOM?

02:22PM  15   A.   WE WENT TO THEIR HEADQUARTERS AND WE WERE IN A SMALL

02:22PM  16   CONFERENCE ROOM RIGHT OFF OF THE RECEPTION AREA, WHICH WAS THE

02:22PM  17   FOUR OF US.

02:22PM  18   Q.   AND WHO WERE THE FOUR THAT WERE PRESENT?

02:22PM  19   A.   MYSELF, DR. ROSAN, MS. HOLMES, AND MR. BALWANI.

02:22PM  20   Q.   AND WHAT WAS IN THE ROOM IF YOU REMEMBER?  WAS THERE A

02:22PM  21   SCREEN OR A LAPTOP?  WAS THERE A DEVICE?

02:22PM  22   A.   I DON'T REMEMBER IF THE PRESENTATION WAS ON A LAPTOP OR IF

02:22PM  23   THERE WERE HANDOUTS AS WELL.

02:22PM  24   Q.   OKAY.  HOW ABOUT A THERANOS DEVICE OR DEVICES?  DID YOU

02:22PM  25   SEE ANYTHING?

02:22PM  1    A.   I SAW A THERANOS DEVICE LATER, BUT MY RECOLLECTION IS THAT

02:22PM  2    IT WAS OUTSIDE OF THE ROOM AND SLIGHTLY AROUND THE CORNER.

02:23PM  3    Q.   AND WHEN YOU SAY "LATER," DO YOU MEAN LATER THAT SAME DAY?

02:23PM  4    A.   LATER THAT SAME DAY.

02:23PM  5    Q.   OKAY.  IF WE COULD NOW TURN TO THE FIRST PAGE OF THE

02:23PM  6    PRESENTATION, THAT'S THE THIRD PAGE OF THE EXHIBIT.

02:23PM  7         IS THIS THE PRESENTATION THAT MS. HOLMES AND MR. BALWANI

02:23PM  8    PRESENTED TO YOU AND DR. ROSAN THAT DAY?

02:23PM  9    A.   YES.

02:23PM  10   Q.   AND IF YOU COULD TURN TO PAGE 5 OF THE EXHIBIT.  THERE'S A

02:23PM  11   SLIDE THAT BEGINS THERANOS INCORPORATED, AND I'D LIKE TO ASK

02:23PM  12   YOU SOME QUESTIONS ABOUT A FEW OF THE BULLETS.

02:23PM  13        IT BEGINS, "THERANOS IS A SILICON VALLEY-BASED HEALTH CARE

02:23PM  14   TECHNOLOGY COMPANY FOUNDED IN 2003."

02:23PM  15        DID MS. HOLMES SAY THAT TO YOU?  DID SHE DESCRIBE TO YOU

02:23PM  16   THAT THERANOS WAS A TECHNOLOGY COMPANY THAT WAS FOUNDED IN

02:23PM  17   2003?

02:23PM  18   A.   I DON'T KNOW IF THOSE WERE THE EXACT WORDS, BUT MORE OR

02:23PM  19   LESS SHE GAVE SOME PERSPECTIVE ON THE STARTUP AND THE COMPANY

02:23PM  20   HAD BEEN AROUND FOR, YOU KNOW, EFFECTIVELY SEVEN YEARS.

02:24PM  21   Q.   AND DID THAT SORT OF DESCRIBE THE WAY THE MEETING WENT?

02:24PM  22   WERE SLIDES SHOWN AND EITHER MS. HOLMES OR MR. BALWANI TALKED

02:24PM  23   ABOUT THE SLIDES WHILE THEY WERE BEING DISPLAYED?

02:24PM  24   A.   THAT'S CORRECT.

02:24PM  25   Q.   THE FIRST BULLET READS, "THERANOS'S PROPRIETARY, PATENTED

02:24PM  1    TECHNOLOGY RUNS COMPREHENSIVE BLOOD TESTS FROM A FINGERSTICK IN

02:24PM  2    REAL-TIME AT THE POINT OF CARE, OUTSIDE OF TRADITIONAL LAB

02:24PM  3    SETTINGS."

02:24PM  4        IS THAT CONSISTENT WITH THE WAY THAT MS. HOLMES DESCRIBED

02:24PM  5    THE TECHNOLOGY TO YOU WHEN YOU WERE IN PALO ALTO?

02:24PM  6    A.   YES.

02:24PM  7    Q.   WHAT DID YOU UNDERSTAND "RUNS COMPREHENSIVE BLOOD TESTS,"

02:24PM  8    TO MEAN?

02:24PM  9    A.   MY UNDERSTANDING WAS A PRETTY BROAD RANGE OF IMMUNOASSAY

02:24PM  10   TESTS, YOU KNOW, BLOOD TESTS, THAT EXACTLY.

02:24PM  11   Q.   OKAY.  WHEN THIS CONCEPT WAS BEING DISCUSSED, DO YOU

02:24PM  12   REMEMBER IF MS. HOLMES OR MR. BALWANI OR BOTH OF THEM WERE

02:25PM  13   TALKING ABOUT IT?  DO YOU HAVE A RECOLLECTION OF WHO DID THE

02:25PM  14   SPEAKING?

02:25PM  15   A.   I THINK IT WAS VERY INTERACTIVE, SO I WOULD SAY THAT IT

02:25PM  16   WAS INTERACTIVE.

02:25PM  17   Q.   WHAT DO YOU MEAN BY "INTERACTIVE"?

02:25PM  18   A.   I MEAN WE WOULD TALK ABOUT DIFFERENT POINTS AND WE WOULD

02:25PM  19   ASK QUESTIONS AND BOTH WOULD CHIME IN.  BUT IT WOULD BE HARD TO

02:25PM  20   SAY ANYONE SAID ONE SPECIFIC LINE OR ANY ONE LINE.

02:25PM  21   Q.   OKAY.  THE BULLET CONTINUES, "FROM A FINGERSTICK IN

02:25PM  22   REAL-TIME AT THE POINT OF CARE."

02:25PM  23        WHAT DID YOU UNDERSTAND THAT TO MEAN?

02:25PM  24   A.   WELL, JUST PART OF THE VALUE PROPOSITION, WHICH OBVIOUSLY

02:25PM  25   ONE DROP OF BLOOD WOULD HAVE BENEFITS, YOU KNOW, VERSUS AN

02:25PM  1    ENTIRE VIAL.

02:25PM  2        BUT BEING ABLE TO HAVE, AGAIN, THAT DECENTRALIZED LAB, I

02:25PM  3    THINK, AKIN MOVING FROM A MAINFRAME TO A LAPTOP, BEING ABLE TO

02:25PM  4    HAVE EFFECTIVELY A DEVICE THAT COULD AT THAT POINT OF CARE BE

02:25PM  5    ABLE TO TAKE THE BLOOD AND GATHER THE RESULTS HAD A LOT OF

02:25PM  6    ADDITIONAL BENEFITS AS WELL.

02:25PM  7    Q.   AND THEN IT CONTINUES, "OUTSIDE OF TRADITIONAL LAB

02:26PM  8    SETTINGS."

02:26PM  9        WHAT DID YOU UNDERSTAND THAT TO MEAN?

02:26PM  10   A.   YOU KNOW, A TRADITIONAL LAB SETTING WOULD HAVE LARGE

02:26PM  11   MACHINES CAPABLE OF DOING SOME TESTS.  TYPICALLY YOU'RE WITH

02:26PM  12   LOOKING AT KIND OF VENA PUNCTURE, BEING ABLE TO DO THAT, THE

02:26PM  13   PATIENT MAY HAVE TO GO TO INDUSTRIAL COURT TO GET THEIR BLOOD

02:26PM  14   DRAWN, BUT THIS WOULD BE ABLE TO TAKE THE LAB TESTING AND

02:26PM  15   MOVING IT INTO THE PHARMACY WHERE IT WAS VERY CLOSE TO LOTS AND

02:26PM  16   LOTS OF PATIENTS.

02:26PM  17   Q.   SO THIS FIRST BULLET THAT WE JUST TALKED ABOUT, WAS THIS

02:26PM  18   ATTRACTIVE TO YOU AND TO WALGREENS?

02:26PM  19   A.   CERTAINLY.

02:26PM  20   Q.   WHY?

02:26PM  21   A.   AGAIN, WHEN YOU THINK ABOUT -- I THINK THE DATA SAYS 70 TO

02:26PM  22   80 PERCENT OF HEALTH CARE DECISIONS BY THE DOCTOR REQUIRES SOME

02:26PM  23   FORM OF LAB.  YOU KNOW, LAB IN MANY WAYS IS A GATEWAY TO GOOD

02:26PM  24   HEALTH.  BEING ABLE TO TEST ACCURATELY, FREQUENTLY, MAKING IT

02:26PM  25   ACCESSIBLE FOR PEOPLE, ALL OF THAT IS A WONDERFUL EXTENSION OF

02:26PM  1    HEALTH CARE.

02:26PM  2    Q.   THE THIRD BULLET ON THE SCREEN IN FRONT OF YOU READS, "OUR

02:27PM  3    CURRENT AND PAST CLIENTS INCLUDE 10 OF THE TOP 15 MAJOR

02:27PM  4    PHARMACEUTICAL COMPANIES, MID SIZED BIO-PHARMAS, PROMINENT

02:27PM  5    RESEARCH INSTITUTIONS, AND U.S. AND FOREIGN GOVERNMENT HEALTH

02:27PM  6    AND MILITARY ORGANIZATIONS."

02:27PM  7         DID YOU HEAR MS. HOLMES OR MR. BALWANI DISCUSS THIS TOPIC

02:27PM  8    WHEN YOU WERE IN PALO ALTO?

02:27PM  9    A.   YES, WE DID.

02:27PM  10   Q.   AND WHAT DO YOU RECALL ABOUT THAT?

02:27PM  11   A.   WHAT I RECALL WAS REALLY 10 OF THE 15 PHARMACEUTICAL

02:27PM  12   COMPANIES, AS WELL AS SOME DISCUSSION ON THE WORK WITH THE

02:27PM  13   MILITARY.

02:27PM  14   Q.   AND WHAT DID YOU UNDERSTAND THAT THE PHARMACEUTICAL

02:27PM  15   COMPANIES DID FOR THERANOS?

02:27PM  16   A.   MY UNDERSTANDING WAS SOMEWHAT LIMITED BECAUSE THEY SAID

02:27PM  17   THAT THEY WERE UNDER NDA AND COULDN'T SHARE A LOT.

02:27PM  18        WHAT THEY HAD SAID IS THAT THEY WERE DOING WORK FOR, AND

02:27PM  19   IN VARIOUS DEGREES, SOME CLINICAL TRIAL WORK.

02:28PM  20        EARLY ON WHEN THEY STARTED WORKING WITH THE PHARMA

02:28PM  21   COMPANIES IT WAS -- YOU KNOW, A LOT OF THE REVENUE WAS DERIVED

02:28PM  22   FROM CREATING ALGORITHMS FOR THEM.

02:28PM  23        BUT THEY HAD BEEN MORPHING INTO BEING ABLE TO DO TESTING

02:28PM  24   FOR CLINICAL WORK AND HOPED TO TAKE THAT FURTHER OVER TIME.

02:28PM  25   Q.   DID THERE COME A TIME LATER ON IN YOUR INTERACTIONS WITH

02:28PM 1    THERANOS WHEN YOU GAINED MORE INFORMATION ABOUT WHAT MS. HOLMES

02:28PM 2    SAID THE THERANOS PHARMACEUTICAL WORK INVOLVED?

02:28PM 3    A.   YES.

02:28PM 4    Q.   AND WOULD YOU DESCRIBE THAT FOR US?

02:28PM 5    A.   I BELIEVE THERE WERE THREE PAPERS THAT WERE PRODUCED FOR

02:28PM 6    US TO SEE FROM THREE DIFFERENT PHARMA COMPANIES THAT HAD

02:28PM 7    BASICALLY OUTLINED SOME OF THE WORK THAT THEY HAD DONE

02:28PM 8    TOGETHER, AS WELL AS THE FINDINGS OF THE PHARMA COMPANIES.

02:28PM 9    Q.   OKAY.  THANK YOU.  WE'LL COME BACK TO THAT IN A MOMENT.

02:28PM 10        THE FINAL BULLET ON THE SCREEN READS, "THERANOS IS

02:28PM 11   LAUNCHING THERANOS SYSTEMS TO CONSUMERS IN 2010."

02:28PM 12   A.   CORRECT.

02:28PM 13   Q.   AND WHAT DID YOU UNDERSTAND THAT TO MEAN?

02:28PM 14   A.   I DON'T KNOW THAT WE TALKED ABOUT THAT IN DETAIL.

02:29PM 15        I DO BELIEVE AT THAT TIME THERE WAS SOME DISCUSSION OF

02:29PM 16   SOME WORK THAT THEY WERE DOING WITH ANOTHER LARGE RETAILER, AND

02:29PM 17   I BELIEVE OVER THE NEXT FEW MONTHS THERE WAS A LITTLE BIT OF

02:29PM 18   LIGHT SHED ON SOME OF THAT WORK AND SOME OF THE TESTING OF

02:29PM 19   THOSE EMPLOYEES.

02:29PM 20        BUT, AGAIN, I THINK THAT -- MY UNDERSTANDING WAS THAT THAT

02:29PM 21   WAS ALLUDING TO THAT OTHER RETAILER.

02:29PM 22   Q.   AND WHICH RETAILER WAS THAT?  DO YOU REMEMBER?

02:29PM 23   A.   TO MY BELIEF, IT'S SAFEWAY.  I'M NOT SURE THAT THAT WAS

02:29PM 24   EXPLICIT, BUT THAT IS WHAT I BELIEVED TO BE TRUE.

02:29PM 25   Q.   THANK YOU.

02:29PM   1            COULD WE TURN NOW TO PAGE 7.

02:29PM   2            THIS SLIDE IS ENTITLED OVERVIEW:  THERANOS SYSTEMS, AND

02:29PM   3    UNDER THE THERANOS SYSTEMS THERE ARE THREE PICTURES.

02:29PM   4            DO YOU SEE THOSE IMAGES?

02:29PM   5    A.   YES.

02:29PM   6    Q.   AND THE FIRST IMAGE IS LABELED DEVICES.

02:29PM   7            DO YOU RECOGNIZE THAT IMAGE?

02:29PM   8    A.   YES.

02:29PM   9    Q.   AND WHAT IS THAT?

02:29PM  10    A.   THAT WAS -- I DON'T KNOW AT THAT TIME WHAT IT WAS CALLED,

02:29PM  11    BUT IT BECAME EFFECTIVELY KNOWN AS THE EDISON MACHINE.

02:30PM  12    Q.   AND WHEN YOU WERE IN PALO ALTO, DID YOU SEE THE PHOTO OR

02:30PM  13    DID YOU SEE AN ACTUAL MACHINE?

02:30PM  14    A.   I SAW AN ACTUAL MACHINE.

02:30PM  15    Q.   AND WHERE WAS THAT MACHINE LOCATED?

02:30PM  16    A.   AGAIN, I BELIEVE THAT WAS RIGHT OUTSIDE OF THE CONFERENCE

02:30PM  17    ROOM IN A SMALL, YOU KNOW, CONCLAVE OFF TO THE RIGHT.

02:30PM  18    Q.   AND THE NEXT PHOTO IS LABELLED CARTRIDGES.

02:30PM  19            DID MS. HOLMES OR MR. BALWANI EXPLAIN TO YOU HOW

02:30PM  20    CARTRIDGES PLAYED A ROLE IN THE THERANOS SYSTEMS?

02:30PM  21    A.   CORRECT.

02:30PM  22    Q.   AND WHAT DID YOU LEARN?

02:30PM  23    A.   SO IT WAS -- MY UNDERSTANDING WAS ALWAYS THAT WHAT

02:30PM  24    THERANOS WAS ACTUALLY DOING WAS, AGAIN, KIND OF AKIN TO

02:30PM  25    MAINFRAMES MOVING TO LAPTOP.  IT WASN'T CHANGING HOW LAB HAD

02:30PM  1    BEEN DONE FOR IMMUNOASSAY.  IT WAS MAKING IT MUCH MORE

02:30PM  2    EFFECTIVE.

02:30PM  3        SO ESSENTIALLY YOU WOULD HAVE A CARTRIDGE WHICH HAD

02:30PM  4    VARIOUS CHAMBERS, YOU KNOW, LET'S SAY 8 BY 8 OR 64 POTENTIAL

02:30PM  5    CHAMBERS, AND EACH ONE CAN HOLD A SPECIFIC ANTIGEN, AND IF YOU

02:30PM  6    HAD A DROP OF BLOOD THAT WAS THEN MOVED INTO THE CHAMBERS, YOU

02:31PM  7    COULD HAVE A REACTION AND IT COULD BE READ THROUGH THE OPTICS

02:31PM  8    SIMILAR TO WHAT WOULD HAPPEN ON A, YOU KNOW, VERY BIG

02:31PM  9    EXPENSIVE, YOU KNOW, INDUSTRIAL MACHINE.  BUT IT WOULD HAPPEN,

02:31PM 10    YOU KNOW, MUCH MORE EFFICIENTLY AT THE POINT OF CARE THERE.

02:31PM 11        SO THE ESSENTIAL KEY OVER TIME WOULD BE TO CREATE

02:31PM 12    CARTRIDGES THAT WERE RELEVANT TO WHAT YOU WANTED TO TEST.  SO

02:31PM 13    IF YOU WERE DOING GENERAL CHEMISTRY, YOU WOULD HAVE TO HAVE A

02:31PM 14    CARTRIDGE THAT HAS THE VARIOUS ANTIGENS OF THE VARIOUS

02:31PM 15    CHEMISTRY THAT YOU'RE TRYING TO DO.

02:31PM 16    Q.   AND DID YOU HAVE AN UNDERSTANDING OF THE RELATIONSHIP

02:31PM 17    BETWEEN THE CARTRIDGE AND THE DEVICE?

02:31PM 18    A.   CORRECT.  I GUESS I ALWAYS THOUGHT OF IT REALLY AS A

02:31PM 19    PLATFORM, THE WAY THIS TECHNOLOGY WAS DEVELOPED, AND WHAT WAS

02:31PM 20    PRETTY EXCITING I THINK IS THAT THAT DEVICE IS REALLY A

02:31PM 21    PLATFORM TO TEST EFFECTIVELY ALMOST ANYTHING AS LONG AS YOU

02:31PM 22    HAVE THE PROPER CARTRIDGE FOR THE PROPER SPECIFIC TEST.

02:31PM 23    Q.   AND DID YOU SEE THE CARTRIDGE BEING PLACED INTO THE

02:31PM 24    DEVICE?

02:31PM 25    A.   I DON'T KNOW IF I SAW IT ON THAT DAY.  I DID LATER ON, BUT

02:32PM  1    I'M NOT SURE ON THAT PARTICULAR DAY THAT I DID.

02:32PM  2    Q.   YOU CAN'T RECALL IF IT WAS THAT DAY IN 2010, BUT AT SOME

02:32PM  3    POINT?

02:32PM  4    A.   AT SOME POINT I DID, YEAH.

02:32PM  5    Q.   AND THE THIRD IMAGE ON THE TOP IS CALLED MOBILE

02:32PM  6    APPLICATIONS.

02:32PM  7         DID YOU GAIN AN UNDERSTANDING OF WHAT THAT MEANT DURING

02:32PM  8    THE MEETING?

02:32PM  9    A.   YEAH, I THINK ANOTHER EXCITING THING THAT THEY WERE DOING

02:32PM 10    REALLY WAS THE I.T. AROUND THE ENTIRE VALUE PROPOSITION.

02:32PM 11         SO TO THE EXTENT THAT YOU COULD TEST REALTIME AT THE POINT

02:32PM 12    OF CARE WITH THE DEVICE AND THE CARTRIDGE, THE DATA, THE

02:32PM 13    RESULTS, IF YOU WILL, WILL BE FED INTO THE CLOUD AND GO INTO

02:32PM 14    THEIR CENTRAL LAB IN PALO ALTO FOR, YOU KNOW, PATHOLOGISTS TO

02:32PM 15    REVIEW OR AN ALGORITHM TO REVIEW.

02:32PM 16         BUT YOU WERE EFFECTIVELY PUTTING THIS INFORMATION ON THE

02:32PM 17    WEB AND PUTTING IT OUT MORE OR LESS REALTIME.

02:32PM 18    Q.   OKAY.  AND WAS THAT ATTRACTIVE TO WALGREENS?

02:32PM 19    A.   I THINK IT'S AN ATTRACTIVE PART OF THE PROPOSITION BECAUSE

02:32PM 20    YOU DON'T HAVE TO HAVE, YOU KNOW, AN EXPERT OR A PATHOLOGIST OR

02:32PM 21    A DOCTOR WHERE THE MACHINE IS.  YOU ONLY HAVE TO HAVE IT IN A

02:33PM 22    CENTRAL LOCATION WHERE THE DATA CAN BE ANALYZED PROPERLY.

02:33PM 23    Q.   IF YOU WOULD NOW TURN TO PAGE 8.

02:33PM 24         WE SEE ANOTHER PHOTO UNDER THERANOS SYSTEMS DEVICES.

02:33PM 25         IS THIS PHOTO ALSO SIMILAR TO THE DEVICE THAT YOU SAW IN

02:33PM  1    PALO ALTO?

02:33PM  2    A.   VERY SIMILAR.

02:33PM  3    Q.   DID MS. HOLMES OR MR. BALWANI EVER TELL YOU THAT THERANOS

02:33PM  4    TESTED BLOOD ON NON-THERANOS DEVICES, ON SOME OTHER DEVICE?

02:33PM  5    A.   NOT TO MY RECOLLECTION, EXCEPT TO THE EXTENT THAT I KNOW

02:33PM  6    THAT THEY HAD DONE A LOT OF WORK TO CORRELATE THE THERANOS

02:33PM  7    EDISON DEVICE WITH CONVENTIONAL TESTING.

02:33PM  8         SO I GUESS MY UNDERSTANDING WAS THAT THEY MUST BE DOING,

02:33PM  9    YOU KNOW, THAT TESTING ON CONVENTIONAL LAB EQUIPMENT, WHETHER

02:33PM 10    IT BE IN HOUSE OR OUTSOURCED, BUT THAT THOSE CORRELATIONS WOULD

02:33PM 11    HAVE TO BE, YOU KNOW, DONE SOMEHOW.

02:33PM 12    Q.   SO DO I UNDERSTAND WHAT YOU'RE SAYING IS THAT THEY WOULD

02:34PM 13    TEST ON THE EDISON DEVICE, AND ALSO ON CONVENTIONAL DEVICES,

02:34PM 14    BUT FOR THE PURPOSES OF COMPARING THE RESULTS?

02:34PM 15    A.   RIGHT.  FOR PURPOSES OF DRAWING CORRELATIONS THAT WOULD,

02:34PM 16    YOU KNOW, DEMONSTRATE IT TO BE AS GOOD AS.

02:34PM 17    Q.   AND HOW ABOUT FOR THE WALGREENS BUSINESS PROPOSITION?  IF

02:34PM 18    WALGREENS WAS GOING TO PARTNER WITH THERANOS, DID YOU HAVE AN

02:34PM 19    UNDERSTANDING THAT THERANOS WOULD TEST BLOOD ON CONVENTIONAL

02:34PM 20    DEVICES?

02:34PM 21    A.   YES.

02:34PM 22    Q.   AND DESCRIBE THAT TO US.

02:34PM 23    A.   THE VALUE PROPOSITION WAS TO HAVE, YOU KNOW, 90,

02:34PM 24    95 PERCENT OF ALL TESTS THAT COULD BE DONE IN A CONVENTIONAL

02:34PM 25    LAB DONE ON A THERANOS DEVICE.

02:34PM   1    THERE WERE SOME DISCUSSIONS AT SOME TIME THAT IF WE HAD A

02:34PM   2    FULL LAB OFFERING AND THERE WERE OTHER, YOU KNOW, MORE OBSCURE

02:34PM   3    TESTS OR TESTS THAT WEREN'T RELEVANT TECHNOLOGY, THAT THOSE

02:34PM   4    MIGHT BE DONE THROUGH A LAB SETTING.  BUT THAT WAS, YOU KNOW,

02:34PM   5    IT WOULD BE A VERY SMALL MINORITY OF THE TOTAL.

02:34PM   6    Q.   SO THE MAJORITY WERE ON THE THERANOS DEVICE, AND AS YOU

02:34PM   7    SAID, SOME OBSCURE TESTS WOULD BE TESTED ON CONVENTIONAL

02:35PM   8    DEVICES?

02:35PM   9    A.   RIGHT.

02:35PM   10   Q.   WOULD YOU TURN TO PAGE 9.  THIS SLIDE IS ENTITLED

02:35PM   11   VALIDATION OF THERANOS SYSTEMS.  THE FIRST PARAGRAPH READS,

02:35PM   12   "THERANOS SYSTEMS HAVE BEEN COMPREHENSIVELY VALIDATED OVER THE

02:35PM   13   COURSE OF THE LAST SEVEN YEARS BY 10 OF THE 15 LARGEST

02:35PM   14   PHARMACEUTICAL COMPANIES."

02:35PM   15       DID MS. HOLMES OR MR. BALWANI EXPLAIN THAT TO YOU WHEN YOU

02:35PM   16   WERE IN PALO ALTO?

02:35PM   17   A.   AGAIN, IT WAS THE ATTESTATIONS THAT THEY HAD BEEN DOING

02:35PM   18   WORK FOR 10 OF THE 15 PHARMACEUTICAL COMPANIES.  WE GOT A

02:35PM   19   LITTLE MORE INFORMATION ON THREE OF THOSE COMPANIES.  BUT WE

02:35PM   20   DISCUSSED THAT.  AND THERE WAS A POINT IN WHICH, AGAIN, BECAUSE

02:35PM   21   THEY WERE UNDER NDA, THE LEVEL OF INFORMATION WAS DIMINISHED.

02:35PM   22   Q.   SO AT SOME POINT LATER YOU ACTUALLY RECEIVED SOME OF THESE

02:35PM   23   REPORTS; IS THAT RIGHT?

02:35PM   24   A.   I BELIEVE WE RECEIVED THREE DIFFERENT REPORTS.

02:35PM   25   Q.   OKAY.  COULD WE NOW TURN TO PAGE 17.  THIS SLIDE IS TITLED

02:36PM   1    THERANOS GENERAL CHEMISTRY TESTS.  THE FIRST BULLET READS,

02:36PM   2    "REAL-TIME, FINGER-STICK-BASED TESTS. "

02:36PM   3         WHEN YOU WERE AT THE THERANOS HEADQUARTERS, DID MS. HOLMES

02:36PM   4    OR MR. BALWANI EXPLAIN TO YOU THAT THERANOS TESTS WERE DONE BY

02:36PM   5    DRAWING BLOOD FROM A FINGERSTICK?

02:36PM   6    A.   THAT WAS MY UNDERSTANDING.

02:36PM   7    Q.   AND WHERE DID THAT UNDERSTANDING COME FROM?

02:36PM   8    A.   FROM THE DISCUSSIONS THAT I HAD WITH MR. BALWANI AND

02:36PM   9    MS. HOLMES.

02:36PM  10    Q.   OKAY.  AND THEY USED THE WORD REAL-TIME.

02:36PM  11         DID YOU HAVE AN UNDERSTANDING OF WHAT THAT MEANT?

02:36PM  12    A.   AGAIN, IT'S JUST THE FACT THAT YOU COULD TAKE BLOOD AND

02:36PM  13    ENTER IT INTO A DEVICE AND IDEALLY IN 15 MINUTES THE DEVICE

02:36PM  14    WOULD HAVE DONE THE ANALYSIS, VERSUS IF YOU WERE IN A LAB

02:36PM  15    SETTING, YOU MIGHT HAVE MULTIPLE HANDOFFS OF BLOOD VIALS

02:36PM  16    ULTIMATELY GOING TO A LAB AND THEN WAITING TO BE PROCESSED.

02:37PM  17    Q.   THE SECOND BULLET SAYS THAT "AT LESS THAN 70 PERCENT OF

02:37PM  18    THE COST OF CURRENT LAB TESTS."

02:37PM  19         WAS THERE SOME DISCUSSION ABOUT SOME COST ADVANTAGES TO

02:37PM  20    THE THERANOS SYSTEM?

02:37PM  21    A.   THERE WAS.  WE FELT THIS COULD BE MUCH MORE COST EFFECTIVE

02:37PM  22    THAN A TRADITIONAL LAB FOR A VARIETY OF REASONS.

02:37PM  23    Q.   WAS THAT ATTRACTIVE TO WALGREENS, THE COST ASPECT?

02:37PM  24    A.   I THINK ATTRACTIVE TO EVERYONE.

02:37PM  25    Q.   WHY?

02:37PM  1    A.   I THINK, YOU KNOW, THE THING THAT EXCITED ME FOR SURE SO

02:37PM  2    MUCH WAS THAT THERANOS HELD THE PROMISE OF BEING ABLE TO DO LAB

02:37PM  3    TESTING BETTER, FASTER, AND CHEAPER, ALL OF WHICH LEAD TO

02:37PM  4    BETTER OUTCOMES FOR PATIENTS.

02:37PM  5    Q.   IF YOU'LL NOW TURN PLEASE TO PAGE 27.

02:37PM  6         THIS SLIDE IS TITLED REAL-TIME FINGER-STICK-BASED TESTS

02:38PM  7    FOR LAUNCH AT WALGREENS IN 2010.

02:38PM  8         THEN THERE'S A NUMBERS 1, 2, AND 3, GENERAL CHEMISTRY

02:38PM  9    PANELS AND STANDARD BLOOD TESTS, THE SECOND IS INFLUENZA, THE

02:38PM  10   THIRD IS FERTILITY, AND THE SLIDE TALKS ABOUT LAUNCH AT

02:38PM  11   WALGREENS IN 2010.

02:38PM  12        WAS THERE DISCUSSION ABOUT LAUNCHING WITH

02:38PM  13   FINGERSTICK-BASED TESTS AT WALGREENS THAT YEAR IN 2010?

02:38PM  14   A.   THERE WERE DISCUSSIONS.  EVERYBODY WAS EXCITED ABOUT THE

02:38PM  15   PROPOSITION AND WONDERING, YOU KNOW, HOW LONG IT WOULD TAKE TO

02:38PM  16   BRING THIS TO REALITY, BUT THERE WERE SOME EARLIER DISCUSSIONS

02:38PM  17   FOR SURE.

02:38PM  18   Q.   AND WHEN YOU WERE HAVING THOSE DISCUSSIONS, DID MS. HOLMES

02:38PM  19   DRAW A DISTINCTION BETWEEN THE TESTS, THE BLOOD TESTS THAT WERE

02:38PM  20   READY IN 2010 VERSUS BLOOD TESTS THAT WOULD BE READY LATER OR

02:38PM  21   SOMETIME IN THE FUTURE?

02:38PM  22   A.   I DON'T BELIEVE SO.

02:38PM  23   Q.   WHAT DO YOU MEAN?

02:38PM  24   A.   THE -- YOU KNOW, AGAIN, EITHER ON THIS DAY OR IN THE NEXT

02:38PM  25   FEW MONTHS, THERE WAS A LOT OF DISCUSSION THAT THE COMPANY WAS

02:38PM   1      VERY ADEPT AT DOING KIND OF THE STANDARD TESTING.

02:39PM   2           BUT WE BUCKETED OVER TIME, YOU KNOW, THREE DIFFERENT

02:39PM   3      VERSIONS.  I THINK MORE OR LESS WE HAD THE TESTS THAT ARE THE

02:39PM   4      OVERWHELMING, YOU KNOW, STANDARD TESTS DONE; THERE WERE

02:39PM   5      SPECIALTY TESTS WHICH WERE A BIT MORE DIFFICULT; AND THEN WE

02:39PM   6      TALKED ABOUT SOMETHING CALLED V3, YOU KNOW, WHICH WERE TESTS

02:39PM   7      ULTIMATELY WHICH WOULD BE PREDICTIVE AND NEW TO THE WORLD, BUT

02:39PM   8      THAT DIDN'T REALLY EXIST YET.

02:39PM   9      Q.   AND WHEN YOU SAY V3, DO YOU MEAN VERSION?

02:39PM  10      A.   VERSION 3.

02:39PM  11      Q.   DID YOU HAVE AN UNDERSTANDING FROM MS. HOLMES WHAT THE

02:39PM  12      FIRST BUCKET, AS YOU DESCRIBED IT, WHAT WAS INVOLVED, OR WHAT

02:39PM  13      TYPES OF TESTS WERE INVOLVED IN THAT FIRST BUCKET?

02:39PM  14      A.   YOU KNOW, AGAIN, IT'S PRIMARY, YOU KNOW, BLOOD TESTS DONE

02:39PM  15      THROUGH IMMUNOASSAY, THE, THE ANTIGEN TESTS, WHICH NUMBER IN

02:39PM  16      THE HUNDREDS, BUT THOSE TESTS WERE EITHER READY TO GO OR WOULD

02:39PM  17      BE SHORTLY.

02:39PM  18      Q.   DID YOU LEAVE THE MEETING WITH AN UNDERSTANDING THAT THERE

02:39PM  19      WERE A NUMBER OF TESTS THAT WERE AVAILABLE IN 2010?

02:40PM  20      A.   YES, AND I DON'T KNOW HOW MANY SPECIFICALLY.  AGAIN, I

02:40PM  21      DON'T KNOW IF WE HAD A NUMBER.

02:40PM  22           WE, WE FELT THAT THEY WERE DOING A FAIRLY BROAD RANGE OF

02:40PM  23      TESTS WITH THE PHARMA COMPANIES, AS WELL AS OUR UNDERSTANDING

02:40PM  24      WAS THAT THEY WERE ALREADY DOING SOME WORK WITH THE OTHER

02:40PM  25      RETAILER IN THAT REGARD.

02:40PM  1    Q.   OKAY.  WOULD YOU NOW TURN TO PAGE 30.  THIS IS TITLED

02:40PM  2    REAL-TIME FINGER-STICK-BASED TESTS FOR LAUNCH AT WALGREENS IN

02:40PM  3    2011, AND IT INCLUDES WOMEN'S AND MEN'S HEALTH.

02:40PM  4         DURING THE MEETING, DID MS. HOLMES MAKE A DISTINCTION

02:40PM  5    BETWEEN THE TESTS THAT WOULD BE READY IN 2010 VERSUS THE TESTS

02:40PM  6    IN 2011?

02:40PM  7    A.   I RECALL SOME DIALOGUE.  I DON'T KNOW IF IT WAS THAT

02:40PM  8    MEETING OR NOT, WHETHER WE WOULD WANT TO TAKE A COUPLE OF

02:40PM  9    SPECIFIC TESTS TO GET SOME PILOT LEARNINGS, THESE TYPES OF

02:40PM  10   TESTS; OR WHETHER WE WOULD, YOU KNOW, WAIT AND DO KIND OF THE

02:41PM  11   BROADER GENERAL CHEMISTRY.

02:41PM  12        AGAIN, THIS WAS VERY EARLY DISCUSSIONS, BUT IT WAS JUST,

02:41PM  13   AGAIN, A DIALOGUE ON WHAT MIGHT BE THE NEXT BEST STEP TO BE

02:41PM  14   ABLE TO PILOT AND GET MORE INFORMATION.

02:41PM  15   Q.   DURING THE MEETING, DID YOU GET AN IMPRESSION ABOUT

02:41PM  16   MS. HOLMES'S ABILITY TO DESCRIBE TO YOU PRESENT CAPABILITIES AS

02:41PM  17   OPPOSED TO FUTURE CAPABILITIES?

02:41PM  18   A.   I DON'T KNOW IF I COULD SAY IN THAT VERY FIRST MEETING OR

02:41PM  19   NOT.  I THINK BOTH OF US WERE UNDER THE IMPRESSION, DR. ROSAN

02:41PM  20   AND I, THAT CERTAINLY THIS TECHNOLOGY WOULD WORK FOR, YOU KNOW,

02:41PM  21   A NUMBER OF TESTS AND THAT EXPANDING TESTS WAS JUST, AGAIN, A

02:41PM  22   MATTER OF JUST PERFECTING THE REAGENTS AND OTHER THINGS.  WE

02:41PM  23   CERTAINLY HAD AN UNDERSTANDING IT WORKED FOR MANY TESTS.  I

02:41PM  24   CAN'T SPECIFY HOW MANY.

02:41PM  25   Q.   YOU DIDN'T KNOW THE CURRENT NUMBER, BUT YOU UNDERSTOOD

02:42PM   1    THAT IT WAS PRESENTLY CAPABLE OF WORKING FOR SOME?

02:42PM   2    A.   RIGHT.  AND I WAS TOLD THAT ANY BLOOD, ANY BLOOD, URINE,

02:42PM   3    OTHER FLUID SAMPLE SHOULD BE ABLE TO BE WORKABLE UPON THAT

02:42PM   4    TECHNOLOGY.

02:42PM   5    Q.   I'M SORRY?

02:42PM   6    A.   ANY BLOOD, SALIVA, OR URINE, ALMOST ANY TEST SHOULD BE

02:42PM   7    ABLE TO WORK ON THAT PLATFORM.

02:42PM   8    Q.   IF YOU'LL TURN ONE PAGE NOW TO PAGE 31.

02:42PM   9         THIS SLIDE IS TITLED LAUNCH OF THERANOS SYSTEMS AT

02:42PM  10    WALGREENS AND IT READS, "THERANOS WOULD LIKE TO CEMENT A

02:42PM  11    PARTNERSHIP WITH WALGREENS BY END OF APRIL 2010 TO LAUNCH THE

02:42PM  12    GENERAL CHEMISTRY, INFLUENZA, AND FERTILITY TESTS IN Q4 2010."

02:42PM  13         DO YOU REMEMBER A DISCUSSION AROUND THIS TOPIC?

02:42PM  14    A.   VAGUELY, BUT YES.

02:42PM  15    Q.   AND THE MEETING WAS OCCURRING IN MARCH OF 2010; IS THAT

02:42PM  16    RIGHT?

02:42PM  17    A.   CORRECT.

02:43PM  18    Q.   AND SO WAS THERANOS SUGGESTING THAT YOU COULD BEGIN THE

02:43PM  19    PARTNERSHIP NEXT MONTH IN APRIL OF 2010?

02:43PM  20    A.   I THINK ON A SMALL SCALE, YES, THAT'S WHAT THEY'RE

02:43PM  21    SUGGESTING.

02:43PM  22    Q.   AND YOU SAID ON A SMALL SCALE.  IT DESCRIBES A LAUNCH WITH

02:43PM  23    CERTAIN TESTS, GENERAL CHEMISTRY, INFLUENZA AND FERTILITY.  DO

02:43PM  24    YOU REMEMBER THOSE BEING DISCUSSED?

02:43PM  25    A.   YES.

02:43PM  1      Q.   AND WHAT DO YOU RECALL ABOUT THAT?

02:43PM  2      A.   AGAIN, THAT THESE MIGHT BE SOME LOW HANGING FRUIT, SO TO

02:43PM  3      SPEAK, IN ORDER TO BE ABLE TO GET IN THE MARKET AND START TO

02:43PM  4      UNDERSTAND THINGS LIKE CONSUMER ACCEPTANCE OF LAB IN A DRUG

02:43PM  5      STORE AND OTHER LEARNINGS.

02:43PM  6      Q.   OKAY.  WOULD YOU NOW TURN TO EXHIBIT 291 IN YOUR BINDER.

02:43PM  7           THE FIRST PAGE HAS A COUPLE OF EMAILS ON IT, AND THEN

02:43PM  8      THERE ARE SOME ATTACHMENTS.  WOULD YOU JUST SPEND A MINUTE AND

02:43PM  9      FLIP THROUGH THAT AND I'M GOING TO ASK YOU IF YOU RECOGNIZE THE

02:44PM  10     ATTACHMENTS.

02:44PM  11     A.   OKAY.

02:44PM  12     Q.   DO YOU RECOGNIZE THE ATTACHMENTS?

02:44PM  13     A.   I DO.

02:44PM  14     Q.   AND WHAT ARE THE ATTACHMENTS?

02:44PM  15     A.   THESE ARE EXCERPTS FROM THE THREE PHARMA COMPANIES,

02:44PM  16     DOCUMENTS THAT WERE SHARED WITH US MORE OR LESS VALIDATING THE

02:44PM  17     WORK THAT THEY HAD DONE WITH THEM.

02:44PM  18     Q.   SO EARLIER WHEN YOU TALKED ABOUT SEEING SOME VALIDATION

02:44PM  19     REPORTS FROM PHARMACEUTICAL COMPANIES, ARE THESE THOSE REPORTS?

02:44PM  20     A.   YES.

02:44PM  21     Q.   AND THEN THE EMAIL ON THE TOP OF THE FIRST PAGE FROM

02:44PM  22     MS. HOLMES TO TWO EMPLOYEES, INCLUDING DR. ROSAN ON THIS EMAIL,

02:44PM  23     YOU'RE NOT ON THIS EMAIL; IS THAT RIGHT?

02:44PM  24     A.   I'M NOT.

02:44PM  25     Q.   BUT YOU STILL SAW THESE ATTACHMENTS AT SOME POINT?

02:45PM    1    A.   YEAH.  I RECALL DR. ROSAN SHARING THOSE WITH ME.

02:45PM    2              MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS THE

02:45PM    3    FIRST EMAIL ON THE FIRST PAGE, THE ONE FROM MS. HOLMES AND THE

02:45PM    4    ATTACHMENTS.

02:45PM    5              MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

02:45PM    6              THE COURT:  THOSE ARE ADMITTED, AND THEY MAY BE

02:45PM    7    PUBLISHED.

02:45PM    8         (GOVERNMENT'S EXHIBIT 291 WAS RECEIVED IN EVIDENCE.)

02:45PM    9    BY MR. SCHENK:

02:45PM   10    Q.   LET'S START FIRST WITH AN EMAIL FROM MS. HOLMES ON

02:45PM   11    APRIL 2010.

02:45PM   12         DO YOU SEE THAT EMAIL?

02:45PM   13    A.   YES.

02:45PM   14    Q.   AND IT READS "DR. JAY, ALEX.

02:45PM   15         "AS PER OUR DISCUSSION, PLEASE FIND THREE INDEPENDENT DUE

02:45PM   16    DILIGENCE REPORTS ON THERANOS SYSTEMS ATTACHED TO THIS EMAIL.

02:45PM   17    THESE REPORTS ARE FROM GLAXOSMITHKLINE, PFIZER, AND

02:45PM   18    SCHERING-PLOUGH AFTER THEIR OWN TECHNICAL VALIDATION AND

02:46PM   19    EXPERIENCE WITH THERANOS SYSTEMS IN THE FIELD.  PLEASE NOTE

02:46PM   20    THAT THESE DOCUMENTS ARE STRICTLY CONFIDENTIAL UNDER OUR CDA."

02:46PM   21         IN THE EMAIL, SHE WRITES "INDEPENDENT DUE DILIGENCE

02:46PM   22    REPORTS."  IS THAT CONSISTENT WITH YOUR UNDERSTANDING OF WHAT

02:46PM   23    THESE REPORTS WERE?

02:46PM   24    A.   YES.

02:46PM   25    Q.   AND SHE ALSO WRITES THAT GLAXO, PFIZER, AND

02:46PM  1    SCHERING-PLOUGH DID THIS AFTER THEIR, QUOTE, "OWN TECHNICAL

02:46PM  2    VALIDATION."

02:46PM  3         DID YOU ALSO UNDERSTAND THAT THE PHARMA COMPANIES DID

02:46PM  4    THEIR OWN TECHNICAL VALIDATIONS AND PREPARED THESE REPORTS?

02:46PM  5    A.   YES.

02:46PM  6    Q.   LET'S NOW TURN TO THE REPORTS.  I'D LIKE TO FIRST SHOW YOU

02:46PM  7    PAGE 2.

02:46PM  8         THIS ONE IS FROM GSK.  WHEN YOU WERE CFO AT WALGREENS, YOU

02:46PM  9    SAID THAT DR. JAY SHARED THESE REPORTS WITH YOU.

02:46PM 10         DO YOU RECALL THAT?

02:46PM 11    A.   YES.

02:46PM 12    Q.   AND DO YOU REMEMBER WHAT YOU MADE OF THEM WHEN YOU

02:46PM 13    RECEIVED THE REPORTS?

02:47PM 14    A.   I THOUGHT IT WAS AT LEAST A TERRIFIC PIECE OF INFORMATION

02:47PM 15    ABOUT THE VALIDITY OF WHAT THEY WERE WORKING ON TO BE ABLE TO

02:47PM 16    HAVE THREE PHARMA COMPANIES USE IT, AND MOST OF THESE COMPANIES

02:47PM 17    HAVE VERY BIG LABS AND VERY BIG R&D BUDGETS FOR LABS, AND TO BE

02:47PM 18    ABLE TO VALIDATE SOME COMPONENTS OF WHAT THEY WERE DOING.

02:47PM 19    Q.   AND DID THAT PIECE OF VALIDATION MATTER TO YOU OR MATTER

02:47PM 20    TO WALGREENS AS YOU'RE DECIDING WHETHER TO CREATE A PARTNERSHIP

02:47PM 21    WITH THERANOS?

02:47PM 22    A.   CERTAINLY AN IMPORTANT PIECE.

02:47PM 23    Q.   WHY?

02:47PM 24    A.   AGAIN, THE PHARMACY COMPANIES IN GENERAL ARE MUCH MORE

02:47PM 25    ADEPT AT THE LAB WORK THAT THEY DO BOTH FOR THE CLINICAL WORK

02:47PM 1    FOR THEIR DRUG DEVELOPMENT, AS WELL AS MANY CASES FOR THEIR LAB

02:47PM 2    WORK OUTRIGHT.

02:47PM 3        SO BEING ABLE TO HAVE, AGAIN, THEIR VALIDATION, THEIR

02:47PM 4    ANALYSIS, JUST BEING ABLE TO KNOW THAT 10 OF THE TOP 15 WERE

02:47PM 5    ACTIVELY WORKING AND THREE WOULD BE WORKING TO VALIDATE AND

02:48PM 6    PUBLISH OR AT LEAST TO CREATE A PARTNER WE THOUGHT WAS VERY

02:48PM 7    IMPORTANT.

02:48PM 8    Q.   AND IF YOU WOULD NOW TURN TO PAGE 8 IN THE DOCUMENT.  WE

02:48PM 9    SEE THE VALIDATION REPORT FROM PFIZER.

02:48PM 10       DO YOU SEE THAT?

02:48PM 11   A.   I DO.

02:48PM 12   Q.   AND DID YOU NOTICE THAT PFIZER'S LOGO WAS ON THE DOCUMENT

02:48PM 13   WHEN YOU LOOKED AT THIS INITIALLY?

02:48PM 14   A.   YES.

02:48PM 15   Q.   AND WHAT DID YOU MAKE OF THAT FACT?

02:48PM 16   A.   MY ASSUMPTION WAS JUST THAT THIS WAS EITHER WRITTEN BY

02:48PM 17   PFIZER WITH THE APPROVAL OF THERANOS TO SHARE, OR IT WAS

02:48PM 18   WRITTEN BY THERANOS WITH PFIZER'S APPROVAL THAT THEY AGREED TO

02:48PM 19   WHAT WAS WRITTEN.

02:48PM 20   Q.   I'D NOW LIKE TO DRAW YOUR ATTENTION TO PAGE 34 IN THE

02:48PM 21   DOCUMENT.

02:48PM 22       NOW WE'RE LOOKING AT THE VALIDATION REPORT FROM SCHERING

02:49PM 23   CORPORATION, SCHERING-PLOUGH.

02:49PM 24       DO YOU NOTICE THAT THE SCHERING-PLOUGH LOGO WAS ON THIS

02:49PM 25   DOCUMENT ALSO?

02:49PM   1    A.   YES.

02:49PM   2    Q.   AND IN THE SECOND LINE, IS THE WORD "INSTITUTE"

02:49PM   3    MISSPELLED?

02:49PM   4    A.   YES.

02:49PM   5    Q.   AND DID YOU NOTICE THAT AT THE TIME?

02:49PM   6    A.   NO.

02:49PM   7    Q.   COULD WE NOW TURN TO EXHIBIT 300 IN YOUR BINDER.

02:49PM   8         AFTER YOU LEFT THE THERANOS HEADQUARTERS AND WENT BACK TO

02:49PM   9    ILLINOIS, DID YOU CONTINUE TO HAVE FURTHER MEETINGS WITH

02:49PM  10    THERANOS?

02:49PM  11    A.   YES.

02:49PM  12    Q.   FOR WHAT PURPOSE?  WHAT WERE YOU -- WHAT WAS WALGREENS

02:49PM  13    CONSIDERING?

02:49PM  14    A.   LIKE I SAID BEFORE, I THINK WE THOUGHT THAT THIS WAS ONE

02:50PM  15    OF THE MOST EXCITING COMPANIES THAT WE HAD SEEN, MAYBE NOT JUST

02:50PM  16    IN LAB BUT IN GENERAL; THAT WHAT THEY WERE DOING WAS VERY

02:50PM  17    DISRUPTIVE AND COULD BE BETTER, FASTER, CHEAPER THAN WHAT HAD

02:50PM  18    BEEN DONE BEFORE; THAT IT COULD REALLY CHANGE THE GAME IN TERMS

02:50PM  19    OF PROVIDING MORE ACCESSIBLE LAB AND BETTER OUTCOMES FOR

02:50PM  20    PATIENTS, AND SO WE WERE VERY EXCITED ABOUT FORMING A

02:50PM  21    PARTNERSHIP.

02:50PM  22    Q.   AND WAS ONE OF THE NEXT STEPS YOU TOOK TO HAVE ANOTHER

02:50PM  23    MEETING, THIS TIME IN ILLINOIS, WITH MS. HOLMES AND

02:50PM  24    MR. BALWANI?

02:50PM  25    A.   YES.

02:50PM   1    Q.   AND IS EXHIBIT 300 AN EMAIL FROM YOU TO OTHER FOLKS AT

02:50PM   2    WALGREENS IN ADVANCE OF THAT MEETING?

02:50PM   3    A.   YES.

02:50PM   4            MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS

02:50PM   5    EXHIBIT 300.

02:50PM   6            MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

02:50PM   7            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:50PM   8        (GOVERNMENT'S EXHIBIT 300 WAS RECEIVED IN EVIDENCE.)

02:50PM   9    BY MR. SCHENK:

02:50PM  10    Q.   IF WE CAN START WITH YOUR EMAIL THAT BEGINS ON THE MIDDLE

02:50PM  11    OF THE PAGE AND CAPTURE THE REST OF THE SCREEN ALL OF THE WAY

02:50PM  12    DOWN.

02:51PM  13        YOU WROTE THIS APRIL 26TH, 2010, SO ABOUT A MONTH AFTER

02:51PM  14    YOUR TRIP TO THERANOS HEADQUARTERS; IS THAT RIGHT?

02:51PM  15    A.   CORRECT.

02:51PM  16    Q.   AND YOU WROTE TO SEVERAL INDIVIDUALS FROM WALGREENS.  SORT

02:51PM  17    OF GENERALLY, WHO WERE THESE INDIVIDUALS?

02:51PM  18    A.   THIS WOULD BE A COMPILATION OF, YOU KNOW, EIGHT, NINE OF

02:51PM  19    THE TOP OFFICERS IN THE COMPANY, AS WELL AS EXECUTIVES WHO

02:51PM  20    OVERSAW NEW BUSINESS DEVELOPMENT, AS WELL AS EXECUTIVES WHO

02:51PM  21    WERE FROM A HEALTH CARE BACKGROUND.

02:51PM  22    Q.   AND THE FIRST NAME WE SEE IS GREG WASSON.  WAS HE THE CEO

02:51PM  23    AT THE TIME?

02:51PM  24    A.   YES, HE WAS.

02:51PM  25    Q.   IN THE EMAIL YOU WRITE, "AS YOU KNOW, PROVIDING DIAGNOSTIC

02:51PM 1    SERVICES IN THE STORES, RETAIL CLINICS, WORK SITE HEALTH

02:51PM 2    CENTERS, HOME CARE, ET CETERA, IS IN OUR STRATEGIC DOCUMENT AND

02:51PM 3    HAS BEEN PART OF OUR BOARD DISCUSSIONS."

02:51PM 4        WHAT DID YOU MEAN BY THAT, IN OUR STRATEGIC DOCUMENT AND

02:51PM 5    HAS BEEN PART OF OUR BOARD DISCUSSIONS?

02:52PM 6    A.   WELL, LIKE ANY COMPANY, WALGREENS HAS A STRATEGY OF BOTH

02:52PM 7    OVERARCHING THEMES, AS WELL AS SPECIFIC INITIATIVES, AND WE

02:52PM 8    WERE WORKING TO KEEP MOVING AGAIN INTO ADDITIONAL SPACES IN

02:52PM 9    HEALTH CARE THAT WE THOUGHT MADE SENSE FOR THE COMPANY.

02:52PM 10       AGAIN, ONE OF THE ONES MOST PEOPLE WOULD BE FAMILIAR WITH

02:52PM 11   WOULD BE VACCINATIONS, BUT THAT MOVING INTO THE LAB SPACE AND

02:52PM 12   PROVIDING MORE ACCESSIBLE LAB FOR PATIENTS WAS ANOTHER VERY

02:52PM 13   INTERESTING OPPORTUNITY.

02:52PM 14   Q.   A SENTENCE DOWN, OR TWO SENTENCES DOWN, YOU WRITE, "ON

02:52PM 15   FRIDAY NEXT WEEK WE HAVE ASKED A COMPANY, THERANOS, WHO HAS A

02:52PM 16   NEW TECHNOLOGY (AND WE BELIEVE TO POTENTIALLY BE THE LEADER IN

02:52PM 17   THE SPACE) TO PRESENT TO OUR SENIOR TEAM."

02:52PM 18       IS THAT TRUE, DID YOU ASK THERANOS TO COME AND PRESENT?

02:52PM 19   A.   YES.

02:52PM 20   Q.   AND THEN YOU WRITE, "THE REASONS WHY WE ARE SO ENCOURAGED

02:52PM 21   ARE," AND THEN I'D LIKE TO GO THROUGH SOME OF THESE REASONS

02:52PM 22   WITH YOU.

02:52PM 23       BUT FIRST, WHERE DID YOU GET THE INFORMATION THAT YOU

02:52PM 24   WROTE IN THIS LIST?  WHERE DID THAT COME FROM?

02:53PM 25   A.   THIS LIST WAS A MIX OF THE PRESENTATION THAT I SAW, AS

02:53PM  1    WELL AS THE DISCUSSION, THE Q & A AND THE DIALOGUE THAT WE HAD

02:53PM  2    AT THE PRIOR MEETING.

02:53PM  3    Q.   SO THE PRESENTATION THAT WE LOOKED AT, THE POWERPOINT

02:53PM  4    SLIDES?

02:53PM  5    A.   CORRECT.

02:53PM  6    Q.   AND THEN THE QUESTIONS AND ANSWERS THAT YOU RECEIVED WHEN

02:53PM  7    YOU WERE AT HEADQUARTERS FOR THERANOS?

02:53PM  8    A.   CORRECT, JUST MY PERSONAL NOTES THAT I WOULD HAVE TAKEN

02:53PM  9    FROM THE MEETING.

02:53PM  10   Q.   NUMBER 1 IS "50 TO 70 PERCENT CHEAPER THAN TESTS DONE AT

02:53PM  11   NORMAL LABS WHILE ALLOWING US TO EARN A ROBUST GROSS/NET

02:53PM  12   PROFIT.

02:53PM  13        "A.  DISRUPTIVE TECHNOLOGY THAT CUTS ENTIRE INFRASTRUCTURE

02:53PM  14   OF A CLINICAL LAB, NO COURIERS, NO EXPENSIVE TESTING EQUIPMENT,

02:53PM  15   NO TEAMS OF TRAINED LAB TECHS, NO BIG BUILDINGS, PHARM TECH

02:53PM  16   LEVEL PERSON CAN RUN DEVICE?"

02:53PM  17        SO HELP ME TO UNDERSTAND WHAT YOU MEANT WHEN YOU WROTE

02:53PM  18   "DISRUPTIVE TECHNOLOGY THAT CUTS ENTIRE INFRASTRUCTURE OF A

02:54PM  19   CLINICAL LAB."

02:54PM  20   A.   I THINK THIS REALLY GOES TO PART OF THE VALUE PROPOSITION

02:54PM  21   OF, YOU KNOW, 50 TO 70 PERCENT LESS EXPENSIVE.

02:54PM  22        AGAIN, WHEN YOU THINK OF CONVENTIONAL LABS WHERE YOU HAVE

02:54PM  23   VERY EXPENSIVE MACHINES, WHERE YOU HAVE, AGAIN, REAL ESTATE TO

02:54PM  24   HOUSE THAT, WHERE YOU MIGHT HAVE RELATIONSHIPS WITH OFFICE

02:54PM  25   SPACE AND INDUSTRIAL PARKS TO COLLECT SAMPLES, WHERE YOU HAVE

02:54PM  1    COURIERS THAT HAVE TO, YOU KNOW, COURIER YOUR SAMPLES, YOU CAN

02:54PM  2    ARGUE THERE'S A LOT OF ROOM FOR EFFICIENCY AND OPPORTUNITY, AND

02:54PM  3    WE BELIEVED AT SCALE, AS I DO BELIEVE THAT SUNNY AND ELIZABETH

02:54PM  4    DID, THAT THERE WAS AN TREMENDOUS OPPORTUNITY TO REDUCE THAT

02:54PM  5    WASTE AND TO GIVE VALUE TO CUSTOMERS.

02:54PM  6    Q.   YOU THEN WROTE, "NO COURIERS."  DID YOU UNDERSTAND THAT

02:54PM  7    BLOOD TESTING THROUGH THERANOS WOULD NOT REQUIRE COURIERS TO

02:54PM  8    TRANSPORT BLOOD?

02:54PM  9    A.   CORRECT.  AND, AGAIN, I THINK TO THE EXTENT THAT YOU HAVE

02:54PM  10   AN EDISON IN FRONT OF YOU, THAT'S CORRECT.

02:55PM  11        AGAIN, TO THE EXTENT THAT YOU'RE GOING TO TAKE BLOOD

02:55PM  12   SAMPLES AND THEN SEND THEM TO AN EDISON, YOU'D HAVE SOME

02:55PM  13   COURIER PROCESS.

02:55PM  14   Q.   SURE.  AND THEN YOU WRITE "NO EXPENSIVE TESTING

02:55PM  15   EQUIPMENT."

02:55PM  16        WHAT DID YOU MEAN BY THAT?

02:55PM  17   A.   AGAIN, IT MIGHT BE SOMEWHAT ILLUSTRATIVE, BUT MY

02:55PM  18   UNDERSTANDING IS THAT CONVENTIONAL LAB WILL HAVE VERY EXPENSIVE

02:55PM  19   MACHINES, VERY LARGE MACHINES THAT HAVEN'T CHANGED MUCH IN MANY

02:55PM  20   YEARS, HUNDREDS OF THOUSANDS OF DOLLARS, IF NOT MILLIONS, AND

02:55PM  21   THAT YOU NEED SEVERAL OF THOSE TO BE ABLE TO DO A BROAD MENU OF

02:55PM  22   TESTS.

02:55PM  23        SO BEING ABLE, AGAIN, TO MOVE IT FROM MORE OF THAT

02:55PM  24   MAINFRAME TO A LAPTOP TO WHERE YOU'RE CREATING LOTS OF EDISONS

02:55PM  25   THAT ARE MORE CLOSER TO THE CUSTOMER VERSUS, AGAIN, INVESTING

02:55PM  1    IN THOSE VERY EXPENSIVE TRADITIONAL LAB TESTING MACHINES.

02:55PM  2    Q.    SO IN YOUR MIND, WAS ONE OF THE BENEFITS TO THERANOS THAT

02:55PM  3    THEY DID NOT USE THIS EXPENSIVE TRADITIONAL LAB TESTING

02:56PM  4    EQUIPMENT?

02:56PM  5    A.    CORRECT.

02:56PM  6    Q.    AND IF, IN FACT, THERANOS DID USE THIS EXPENSIVE

02:56PM  7    TRADITIONAL LAB TESTING EQUIPMENT, YOU WOULD LOSE THAT BENEFIT

02:56PM  8    THAT YOU JUST DESCRIBED TO US?

02:56PM  9    A.    CORRECT.

02:56PM  10   Q.    YOU WROTE, "NO TEAMS OF TRAINED LAB TECHS, NO BIG

02:56PM  11   BUILDINGS, AND THAT THE PHARM TECH LEVEL PERSON CAN RUN THE

02:56PM  12   DEVICE."

02:56PM  13       WHAT DID YOU MEAN BY THAT?

02:56PM  14   A.    AGAIN, IT'S -- IF YOU LOOK AT HOW A LAB IS DONE TODAY,

02:56PM  15   IT'S -- SOME OF THE LARGE LAB PLAYERS, THEY'RE NOT ONLY

02:56PM  16   INVESTING IN INFRASTRUCTURE OF LAB MACHINES, THEY'RE ALSO

02:56PM  17   INVESTING IN INFRASTRUCTURE OF COLLECTION POINTS.  AGAIN, IT

02:56PM  18   MIGHT BE AN OFFICE BUILDING, REAL ESTATE.  IT MIGHT BE IN AN

02:56PM  19   INDUSTRIAL PARK.

02:56PM  20       AND, AGAIN, WITH THE SINGLE BLOOD DROP AND THE NANOTAINER

02:56PM  21   BEING ABLE TO DO THAT AT THE POINT OF CARE, AND PERHAPS WITH

02:56PM  22   SOMEBODY WHO IS NOT A PHLEBOTOMIST WAS ALSO A BENEFIT.

02:56PM  23   Q.    AND DID YOU UNDERSTAND THAT WHEN USING THE EDISON DEVICE,

02:56PM  24   YOU DID NOT NEED A PHLEBOTOMIST TO DRAW BLOOD?

02:57PM  25   A.    CORRECT.

02:57PM 1    Q.   AND WHAT WAS A PHARMA TECH LEVEL PERSON?

02:57PM 2    A.   A PHARMA TECH WOULD BE SOMEBODY WHO IS NOT A PHARMACIST,

02:57PM 3    BUT WHO HAS HAD A FAIR AMOUNT OF TRAINING IN PHARMACY AND TO

02:57PM 4    BECOME A CERTIFIED TECHNICIAN.

02:57PM 5    Q.   BUT NOT A PHLEBOTOMIST?

02:57PM 6    A.   BUT NOT A PHLEBOTOMIST.

02:57PM 7    Q.   SO IF, IN FACT, THERANOS DREW BLOOD THROUGH A VEIN THAT

02:57PM 8    REQUIRED A PHLEBOTOMIST, YOU WOULD LOSE THAT ADVANTAGE; IS THAT

02:57PM 9    RIGHT?

02:57PM 10   A.   THAT WOULD BE TRUE.

02:57PM 11   Q.   IN NUMBER 2 YOU WRITE, "96 PERCENT OF TESTS DONE AT BIG

02:57PM 12   LABS ($52 BILLION MARKET) WILL BE ABLE TO BE DONE ON THESE

02:57PM 13   DEVICES."

02:57PM 14       WHAT DID YOU MEAN BY THAT?

02:57PM 15   A.   AGAIN, THAT WAS MY UNDERSTANDING OF THE PERCENT OF TESTS

02:57PM 16   THAT COULD BE DONE VIA WHETHER BLOOD, SALIVA, URINE, VIA THAT

02:57PM 17   IMMUNOASSAY TECHNOLOGY OF HAVING AN ANTIGEN REACT AND HAVING A,

02:58PM 18   YOU KNOW, A PROTEIN MARKER AND AN OPTIC READER BE ABLE TO

02:58PM 19   DECIDE.  SO IT WAS AN AMOUNT OF TESTING IN THEORY TO BE DONE ON

02:58PM 20   AN EDISON PLATFORM.

02:58PM 21   Q.   AND WHERE DID YOU GET THAT UNDERSTANDING?

02:58PM 22   A.   THAT WAS WITH MY DISCUSSION WITH SUNNY AND ELIZABETH.

02:58PM 23   Q.   NUMBER 3, YOU WRITE, "CONSUMER BENEFITS, A IS FINGERSTICK

02:58PM 24   VERSUS BLOOD DRAW."

02:58PM 25       WHAT DID YOU MEAN BY THAT?

02:58PM 1    A.   WELL, THERE'S A LOT OF BENEFITS FOR ONE DROP OF BLOOD

02:58PM 2    VERSUS PHLEBOTOMY FOR A LOT OF PEOPLE.  SOME PEOPLE DON'T LIKE

02:58PM 3    BLOOD, BUT THERE ARE PEOPLE WHO HAVE CHILDREN WITH SMALL VEINS

02:58PM 4    AND THERE ARE PEOPLE WITH SMALL VEINS, AND THERE MIGHT BE

02:58PM 5    PEOPLE WHO HAVE CANCER TREATMENT OR WHERE THEY HAVE HAD A LOT

02:58PM 6    OF VENA PUNCTURE DONE.

02:58PM 7         AND SO THERE'S A LOT OF LEGITIMATE REASONS FOR LESS BLOOD

02:58PM 8    TO BE VIABLE OR BETTER.

02:58PM 9    Q.   OKAY.  AND FROM YOUR DISCUSSIONS WITH MS. HOLMES, DID YOU

02:58PM 10   UNDERSTAND THAT THE THERANOS TECHNOLOGY TESTED BLOOD DRAWN FROM

02:59PM 11   A FINGERSTICK?

02:59PM 12   A.   YES.

02:59PM 13   Q.   B IS "RESULTS IN 30 MINUTES INSTEAD OF TOMORROW."

02:59PM 14        WHAT WERE YOU COMMUNICATING THERE?

02:59PM 15   A.   MY UNDERSTANDING WAS THAT ONCE YOU DREW THE BLOOD AND PUT

02:59PM 16   THE BLOOD IN THE MACHINE AND THE CARTRIDGE IN THE MACHINE, THAT

02:59PM 17   IT WOULD TAKE ABOUT 15 OR 20 MINUTES FOR THE EDISON MACHINE TO

02:59PM 18   BE ABLE TO INTERPRET THE RESULTS AND THEN THOSE RESULTS WOULD,

02:59PM 19   AGAIN, GET FED INTO THE CLOUD SOMEWHERE FOR A PATHOLOGIST OR AN

02:59PM 20   ALGORITHM OR WHATEVER TO BE ABLE TO DECIPHER THE FINAL OUTCOME.

02:59PM 21   Q.   AND DID YOU UNDERSTAND THAT THAT WAS FASTER THAN

02:59PM 22   TRADITIONAL TESTING?  YOU WROTE "INSTEAD OF TOMORROW"?

02:59PM 23   A.   YES.  IF YOU HAVE GO INTO AN INDUSTRIAL PARK AND THEY TAKE

02:59PM 24   A VIAL OF YOUR BLOOD, YOU'RE GOING TO HAVE TO, YOU KNOW, WAIT

02:59PM 25   FOR THAT VIAL TO BE SHIPPED TO A CONVENTIONAL LAB AND WAIT FOR

03:00PM  1    THAT TO BE RUN ON A TEST IN A CONVENTIONAL LAB, AND SO

03:00PM  2    EFFECTIVELY YOU'RE CUTTING OUT A LOT OF THAT TIME.

03:00PM  3    Q.   WAS THIS ASPECT OF SPEED IMPORTANT TO WALGREENS?

03:00PM  4    A.   I THINK BEING ABLE TO GIVE DOCTORS AND THEIR PATIENTS THE

03:00PM  5    DIAGNOSTIC RESULTS FASTER IS ALWAYS BETTER ON AN APPLES TO

03:00PM  6    APPLES BASIS.

03:00PM  7    Q.   AND IF IN FACT THERANOS WAS TESTING BLOOD ON CONVENTIONAL

03:00PM  8    DEVICES THAT TOOK THE LONGER TURNAROUND TIME, WOULD YOU LOSE

03:00PM  9    THE ADVANTAGE THAT YOU JUST DESCRIBED?

03:00PM  10   A.   YOU WOULD LOSE THE ADVANTAGE.

03:00PM  11   Q.   NUMBER 4 YOU WRITE, "7 YEARS IN DEVELOPMENT LED BY FUNDING

03:00PM  12   OF SILICON VALLEY EXPERTS SUCH AS LARRY ELLISON WITH STRONG

03:00PM  13   EXPERIENCED MANAGEMENT TEAM (VERY WELL FUNDED COMPANY)."

03:00PM  14        WHAT DID YOU MEAN BY THAT?

03:00PM  15   A.   JUST WHAT IT SAYS, WHICH IS OUR UNDERSTANDING IS THAT THEY

03:00PM  16   HAD HAD MR. ELLISON AND PERHAPS SOME VERY OTHER INFLUENTIAL

03:00PM  17   OTHER PEOPLE INVEST, AND I THINK THAT'S ALWAYS A GOOD SIGN WHEN

03:01PM  18   YOU HAVE PEOPLE WHO ARE IN THIS COMMUNITY OF TECHNOLOGY AND

03:01PM  19   WANT TO INVEST THEIR OWN MONEY, IT SPEAKS HIGHLY FOR THAT

03:01PM  20   COMPANY.

03:01PM  21   Q.   AND HOW ABOUT THAT THE COMPANY HAD BEEN AROUND FOR

03:01PM  22   SEVEN YEARS AT THAT TIME, DID THAT MATTER TO YOU?

03:01PM  23   A.   I DON'T KNOW IF THAT MATTERED.  IT SEEMED LIKE THEY HAD

03:01PM  24   ACCOMPLISHED A LOT IN THAT PERIOD, BUT I GUESS THE FACT THAT IT

03:01PM  25   HADN'T JUST STARTED THE DAY BEFORE IS PROBABLY IMPORTANT TO

03:01PM 1    GIVE SOME LEGITIMACY.

03:01PM 2    Q.   YOU SAY IT SEEMED LIKE THEY HAD ACCOMPLISHED A LOT DURING

03:01PM 3    THAT PERIOD OF TIME.

03:01PM 4        WHERE DID YOU GET THAT IMPRESSION?

03:01PM 5    A.   WELL, I MEAN, I WOULD SAY IF AFTER SEVEN YEARS YOU'RE

03:01PM 6    DOING CLINICAL WORK WITH 10 OF THE TOP 15 PHARMA COMPANIES,

03:01PM 7    THAT'S PRETTY IMPRESSIVE.

03:01PM 8    Q.   AND DID MS. HOLMES TELL YOU THAT?

03:01PM 9    A.   MS. HOLMES AND MR. BALWANI, YEAH.

03:01PM 10   Q.   THE LAST ITEM ON THIS PAGE IS NUMBER 1 AND IT READS, "DOES

03:01PM 11   NOT EVEN VALUE NEW TESTS SUCH AS BREAST CANCER AND PROSTATE

03:01PM 12   CANCER TESTS THEY ARE DEVELOPING."

03:02PM 13       WHAT DID YOU MEAN BY THAT?

03:02PM 14   A.   THIS WAS MORE OF THE KIND OF FUTURISTIC THINGS THAT THEY

03:02PM 15   WERE WORKING ON.  I THINK WE CALLED IT, YOU KNOW, VERSION 3.

03:02PM 16   SO IT WASN'T ANYTHING THAT THEY HAD -- SO THEY HAD ALREADY

03:02PM 17   DONE.  IT WAS MORE, AGAIN, WHEN YOU -- YOU KNOW, IF I JUST

03:02PM 18   PARSE, YOU KNOW, IF YOU THINK ABOUT A PSA TEST, GETTING A PSA

03:02PM 19   TEST FREQUENTLY AND HAVING IT VERY ACCURATE IS A BENEFIT.

03:02PM 20       IF YOU HAVE A PSA TEST DONE INFREQUENTLY AND IT'S DONE ON

03:02PM 21   TWO DIFFERENT MACHINES, THEY COULD BE CALIBRATED DIFFERENTLY

03:02PM 22   AND THE RESULT MAY NOT BE MEANINGFUL.

03:02PM 23       ON THE BREAST CANCER SIDE, THEY WERE LOOKING AT I THINK A

03:02PM 24   FEW SPECIFIC CANCERS WHERE THERE HAD BEEN NO BIOMARKER THAT HAD

03:02PM 25   BEEN EVER DISCOVERED, AND MAYBE THERE WON'T BE, BUT BY BEING

03:02PM  1    ABLE TO TEST FREQUENTLY AND ACCURATELY ACROSS MANY DIFFERENT

03:02PM  2    FACETS AND THEN RUNNING ALGORITHMS, YOU MIGHT SEE SEVERAL

03:03PM  3    MARKERS CHANGE WHICH WOULD BE PERHAPS AN INDICATION OF

03:03PM  4    PREDICTIVENESS OF FUTURE BREAST CANCER.

03:03PM  5    Q.   AND YOU WROTE "DOES NOT EVEN VALUE NEW TESTS."

03:03PM  6         WHAT DOES THAT MEAN?  DID YOU UNDERSTAND THAT NEW TESTS

03:03PM  7    WERE COMING IN THE FUTURE AS OPPOSED TO CURRENT CAPABILITIES?

03:03PM  8    A.   RIGHT.  THOSE FUTURE BASED TESTS, THOSE VERSION 3 I WOULD

03:03PM  9    SAY, AGAIN, I THINK THOSE WERE ALWAYS PRESENTED AS A

03:03PM 10    POSSIBILITY DOWN THE ROAD.  SO THAT WASN'T THE BASIS FOR OUR

03:03PM 11    PARTNERSHIP.

03:03PM 12         THE OTHER COMPONENT OF THIS IS JUST WHEN YOU LOOK AT THE

03:03PM 13    LAB SPACES, YOU KNOW, 50-, $60 BILLION OF LAB SALES AT THE TIME

03:03PM 14    I BELIEVE WAS ABOUT A BILLION TESTS DONE AT ABOUT $60 ON

03:03PM 15    AVERAGE, ALTHOUGH IT VARIES.

03:03PM 16         THERE WAS A BELIEF THAT IF YOU COULD DO THIS TYPE OF

03:03PM 17    TESTING WITH A DROP OF BLOOD ACCURATELY, YOU KNOW, CLOSER TO

03:03PM 18    THE CUSTOMER, THAT YOU WOULD ACTUALLY SEE A LOT MORE TESTING

03:03PM 19    INCUR.

03:03PM 20         MR. SCHENK:  THANK YOU, YOUR HONOR.

03:04PM 21         YOUR HONOR, I WAS GOING TO MOVE TO ANOTHER DOCUMENT.  I'M

03:04PM 22    CONSCIOUS OF THE TIME.

03:04PM 23         THE COURT:  THANK YOU.  LET'S TAKE OUR EVENING BREAK

03:04PM 24    NOW, SIR.  WE'LL BEGIN TOMORROW AT 9:00 O'CLOCK.  WE'LL BEGIN

03:04PM 25    AT 9:00 O'CLOCK, PLEASE.

03:04PM  1          LADIES AND GENTLEMEN, WE'LL TAKE OUR EVENING BREAK.  I

03:04PM  2     KNOW SOME OF YOU ARE GOING TO STAY AND SPEAK WITH ME, BUT LET

03:04PM  3     ME TELL ALL OF YOU, PLEASE, AGAIN, I'D LIKE TO ADMONISH YOU

03:04PM  4     THAT YOU DO NOT DO ANY INVESTIGATION ON YOUR OWN ABOUT ANYTHING

03:04PM  5     ABOUT THIS CASE OR ANYONE INVOLVED IN IT.

03:04PM  6          PLEASE AVOID ANY MEDIA, SOCIAL MEDIA, NEWS, NEWSPAPERS,

03:04PM  7     PERIODICALS, OR ANY OTHER NEWS ABOUT THIS CASE.

03:04PM  8          SHOULD YOU COME ACROSS THAT INADVERTENTLY, I'M GOING TO

03:04PM  9     ASK YOU TO PLEASE TURN IT OFF, CLOSE THE BOOK, TURN DOWN THE

03:04PM 10     VOLUME, AND I'LL ASK YOU TOMORROW MORNING AGAIN WHETHER OR NOT

03:04PM 11     THIS HAS HAPPENED TO ANYONE.

03:04PM 12          PLEASE HAVE A GOOD EVENING.

03:04PM 13          TOMORROW WE'LL BEGIN AT 9:00 A.M.

03:04PM 14          THOSE WHO ARE GOING TO REMAIN, MS. KRATZMANN WILL TAKE YOU

03:04PM 15     BACK TO THE JURY ROOM AND I'LL CALL YOU IN ONE AT A TIME FOR

03:04PM 16     OUR CONVERSATION.

03:04PM 17          THANK YOU VERY MUCH.

03:04PM 18          ANYTHING FURTHER BEFORE WE RECESS?

03:05PM 19               MR. SCHENK:  NO.  THANK YOU.

03:05PM 20               MR. DOWNEY:  NOTHING FURTHER.

03:05PM 21               THE COURT:  ALL RIGHT.  THANK YOU.

03:05PM 22     THANK YOU, SIR.  YOU MAY STAND DOWN.  THANK YOU.

03:05PM 23     (JURY OUT AT 3:05 P.M.)

03:05PM 24               THE COURT:  PLEASE BE SEATED.  THANK YOU.

03:05PM 25     COUNSEL, YOU'LL IDENTIFY ONE OF YOU WHO WILL COME BACK TO

03:05PM  1      CHAMBERS AND THEN JUST LET MS. KRATZMANN KNOW AND WE'LL LET YOU

03:05PM  2      KNOW WHEN WE HAVE THINGS SET UP.

03:05PM  3              MR. SCHENK:  THANK YOU.

03:06PM  4          (RECESS FROM 3:06 P.M. UNTIL 3:20 P.M.)

03:06PM  5          (SEALED PROCEEDINGS IN CHAMBERS.)

03:06PM  6      ///

03:06PM  7      ///

03:06PM  8

03:20PM  9

03:20PM  10

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

03:20PM   1       ///

03:20PM   2       ///

03:20PM   3              (THE FOLLOWING PROCEEDINGS ARE SEALED IN CHAMBERS.)

03:20PM   4              (JUROR NUMBER 1 PRESENT.)

03:20PM   5                    THE COURT:  GOOD AFTERNOON.

03:20PM   6                    JUROR:  GOOD AFTERNOON.

03:20PM   7                    THE COURT:  THANK YOU.  WE'RE ON THE RECORD AND

03:20PM   8       WE'RE IN CHAMBERS.  JUROR NUMBER 1 IS WITH US.

03:20PM   9           YOU HAVE YOUR QUESTIONNAIRE.

03:20PM  10           THANK YOU FOR BEING HERE.  I'M GOING TO REFER TO YOU AS

03:20PM  11       YOUR JUROR NUMBER, FIRST OF ALL.

03:20PM  12                    JUROR:  OKAY.

03:20PM  13                    THE COURT:  FIRST OF ALL, I WANT TO SAY WE'RE HERE

03:20PM  14       IN MY CHAMBERS AND PRESENT ARE TWO COUNSEL, MR. SCHENK,

03:20PM  15       MR. DOWNEY, THEY'RE BEHIND YOU, I JUST HAD THEM SIT THERE, AND

03:20PM  16       MY STAFF IS HERE, TWO OF MY LAW CLERKS ARE HERE, AND

03:20PM  17       MS. KRATZMANN YOU KNOW.

03:20PM  18                    JUROR:  OKAY.

03:20PM  19                    THE COURT:  THANK YOU.  LET ME FIRST ASK YOU YOUR

03:20PM  20       COMFORT LEVEL ABOUT YOUR MASK.  DO YOU WANT TO KEEP IT ON?

03:21PM  21                    JUROR:  I CAN.

03:21PM  22                    THE COURT:  SHOULD I TAKE MY MASK OFF?  WE'VE ALL

03:21PM  23       BEEN VACCINATED AND I THINK WE'RE ALL SOCIALLY DISTANCED HERE.

03:21PM  24       THANK YOU.  I'LL TAKE MY MASK OFF AND THAT MIGHT BE EASIER.

03:21PM  25                SIR, THIS MORNING I TOLD YOU AND YOUR COLLEAGUES ABOUT THE

03:21PM 1    MOTION THAT WAS FILED BY THE COALITION.

03:21PM 2        I WANT TO, FIRST OF ALL, LET YOU KNOW THAT I'M GOING TO

03:21PM 3    IDENTIFY YOU BY YOUR JUROR NUMBER THROUGH THIS CONVERSATION.

03:21PM 4    WE'RE TAKING A RECORD OF THIS THAT MAY BE RELEASED.  RIGHT NOW

03:21PM 5    THIS TRANSCRIPT IS SEALED, BUT THIS, TOO, MIGHT BE RELEASED AT

03:21PM 6    SOME POINT IN TIME.

03:21PM 7        YOU'VE COMPLETED THE QUESTIONNAIRE, AS I SAID THIS

03:21PM 8    MORNING --

03:21PM 9            JUROR:  YES.

03:21PM 10           THE COURT:  -- WITH THE UNDERSTANDING THAT THE

03:21PM 11   QUESTIONNAIRE WOULD BE KEPT CONFIDENTIAL.

03:21PM 12           JUROR:  I THINK SO, YES.

03:21PM 13           THE COURT:  YOU REMEMBER THAT.

03:21PM 14       NOW, CONSIDERING THE MOTION THAT WAS FILED BY THE MEDIA

03:21PM 15   COALITION THAT I MENTIONED EARLIER, I WANT TO ASK YOU IF YOU

03:21PM 16   HAVE ANY CONCERNS REGARDING THE COURT RELEASING ANY OF THE

03:22PM 17   INFORMATION THAT WAS CONTAINED, THAT IS CONTAINED IN YOUR

03:22PM 18   QUESTIONNAIRE.

03:22PM 19       NOW, THIS WOULD INCLUDE YOUR NAME, YOUR EMPLOYMENT, YOUR

03:22PM 20   ADDRESS, ALTHOUGH YOUR ADDRESS IS NOT IN THE QUESTIONNAIRE, BUT

03:22PM 21   YOUR CITY OR GEOGRAPHIC AREA IS --

03:22PM 22           JUROR:  UH-HUH.

03:22PM 23           THE COURT:  -- AND ANY QUESTION THAT CALLS FOR

03:22PM 24   PERSONAL INFORMATION THAT YOU WOULD NOT WANT TO BE REVEALED.

03:22PM 25       NOW, LET ME TELL YOU THE COURT MAY, I MAY BE ABLE TO ORDER

03:22PM   1    CERTAIN INFORMATION REDACTED IF THERE ARE GOOD REASONS FOR

03:22PM   2    DOING SO.

03:22PM   3        SO I'D LIKE YOU TO PLEASE BE VERY CANDID WITH ME ABOUT

03:22PM   4    YOUR FEELINGS AND CONCERNS, OR LACK OF CONCERNS, AND FEEL FREE

03:22PM   5    TO ASK ME ANY QUESTIONS ABOUT ANY OF THIS.

03:22PM   6            JUROR:  SO FAR ALL OF THE ANSWERS IN HERE, I'M NOT

03:22PM   7    CONCERNED ABOUT IT LEAKING OUT TO THE MEDIA OR WHATEVER.

03:23PM   8            THE COURT:  YOU HAVE NO CONCERNS?

03:23PM   9            JUROR:  I HAVE NO CONCERNS.

03:23PM  10            THE COURT:  SO IF THE COURT WERE TO ALLOW YOUR

03:23PM  11    INFORMATION, ALLOW THE MEDIA COALITION TO HAVE, IN ESSENCE GET

03:23PM  12    A COPY OF YOUR QUESTIONNAIRE, WOULD THAT CAUSE YOU ANY CONCERN

03:23PM  13    AT ALL ABOUT ANY OF THE INFORMATION?

03:23PM  14            JUROR:  NO, I'M NOT CONCERNED AT ALL.

03:23PM  15            THE COURT:  AND LET ME ASK YOU -- BECAUSE I'M GOING

03:23PM  16    TO ASK ALL OF YOUR COLLEAGUES THE SAME QUESTION -- SPECIFICALLY

03:23PM  17    ABOUT YOUR EMPLOYMENT, YOUR SPOUSE OR SIGNIFICANT OTHER'S

03:23PM  18    EMPLOYMENT, ANY SCHOOLS THAT ANY RELATIVE YOU HAVE ATTENDS, DO

03:23PM  19    YOU HAVE ANY CONCERNS, EITHER SECURITY CONCERNS OR OTHERWISE

03:23PM  20    ABOUT THAT?

03:23PM  21            JUROR:  I'M NOT CONCERNED ABOUT ANYTHING.

03:23PM  22            THE COURT:  OKAY.  AND YOU'VE HAD, JUST FOR THE

03:23PM  23    RECORD, YOU'VE HAD YOUR QUESTIONNAIRE AND YOU'VE REVIEWED IT.

03:23PM  24            JUROR:  I'VE REVIEWED ALL OF THEM, SO --

03:23PM  25            THE COURT:  OKAY.  ALL RIGHT.

03:23PM  1          IS THERE ANYTHING ELSE YOU WOULD LIKE ME TO KNOW ABOUT

03:23PM  2     YOUR QUESTIONNAIRE?

03:23PM  3               JUROR:  I THINK THAT'S IT.  I DON'T HAVE ANY

03:23PM  4     QUESTIONS FOR YOU AND ALL OF THE INFORMATION I'M NOT CONCERNED

03:23PM  5     ABOUT.

03:23PM  6               THE COURT:  OKAY.  ALL RIGHT.

03:23PM  7          ONE LAST QUESTION.  AS A RESULT OF THIS, CAN YOU CONTINUE

03:24PM  8     TO BE FAIR AND IMPARTIAL TO BOTH SIDES IN THIS CASE?

03:24PM  9               JUROR:  OH, YEAH, I WILL TRY MY BEST OF MY KNOWLEDGE

03:24PM 10     TO SERVE AS A JUROR.

03:24PM 11               THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

03:24PM 12               JUROR:  THANK YOU.

03:24PM 13               THE COURT:  YOU CAN JUST LEAVE YOUR QUESTIONNAIRE,

03:24PM 14     JUROR NUMBER 1.

03:24PM 15          THANK YOU.  YOU CAN GO HOME NOW AND WE'LL SEE YOU TOMORROW

03:24PM 16     MORNING.

03:24PM 17               JUROR:  OKAY.  SEE YOU GUYS.

03:25PM 18          (PAUSE IN PROCEEDINGS.)

03:25PM 19          (JUROR NUMBER 3 PRESENT.)

03:25PM 20               THE CLERK:  GO AHEAD AND HAVE A SEAT JUROR NUMBER 3.

03:25PM 21               THE COURT:  GOOD AFTERNOON.

03:25PM 22               JUROR:  GOOD AFTERNOON.

03:25PM 23               THE COURT:  FIRST OF ALL, I'M GOING TO WELCOME YOU,

03:25PM 24     AND I'M GOING TO IDENTIFY YOU, FOR THE BENEFIT OF THIS

03:25PM 25     CONVERSATION, AS JUROR NUMBER 3.

03:25PM 1      WE ARE IN CHAMBERS.  PRESENT ARE MR. DOWNEY, MR. SCHENK,

03:25PM 2   MY COURTROOM DEPUTY, OUR COURT REPORTERS, AND TWO OF MY LAW

03:25PM 3   CLERKS ARE PRESENT.

03:25PM 4      AS I SAID EARLIER TODAY, I DO WANT TO TALK TO YOU ABOUT

03:26PM 5   YOUR QUESTIONNAIRE.

03:26PM 6      FIRST OF ALL, LET ME ASK YOU YOUR COMFORT LEVEL, YOUR

03:26PM 7   DESIRE ABOUT MASKS.

03:26PM 8      DO YOU WISH --

03:26PM 9      (JUROR NUMBER 3 REMOVES MASK.)

03:26PM 10         THE COURT:  OKAY.  THE RECORD SHOULD REFLECT THAT

03:26PM 11   JUROR NUMBER 3 REMOVED HIS MASK, AND THE REST OF US WILL, TOO.

03:26PM 12      AND THANK YOU VERY MUCH, SIR.  WE ARE SOCIALLY DISTANCED

03:26PM 13   AND ALL OF US HAVE BEEN VACCINATED.

03:26PM 14      I DID WANT TO ASK YOU, AS I SAID THIS MORNING, QUESTIONS

03:26PM 15   ABOUT YOUR QUESTIONNAIRE.

03:26PM 16      WHEN YOU FILLED OUT THE QUESTIONNAIRE, THE REPRESENTATION,

03:26PM 17   AS I SAID THIS MORNING, MADE BY ME IN THE DOCUMENT WAS THAT

03:26PM 18   YOUR, YOUR RESPONSES TO THE QUESTIONS WOULD BE AND WOULD REMAIN

03:26PM 19   CONFIDENTIAL AND WOULD BE RELEASED, IF AT ALL, WITH CERTAIN

03:26PM 20   REDACTIONS ON THEM BY THE COURT.

03:26PM 21      CONSIDERING THE MOTION THAT WAS FILED BY THE MEDIA

03:26PM 22   COALITION THAT I MENTIONED THIS MORNING, I WANT TO ASK YOU IF

03:26PM 23   YOU HAVE ANY CONCERNS REGARDING THE COURT RELEASING ANY

03:26PM 24   INFORMATION CONTAINED IN YOUR QUESTIONNAIRE.

03:26PM 25      THIS WOULD INCLUDE YOUR NAME, YOUR EMPLOYMENT, ADDRESS --

03:27PM 1    ALTHOUGH WE DON'T HAVE YOUR ADDRESSES, WE HAVE YOUR GEOGRAPHIC

03:27PM 2    AREA ASKED FOR -- OR ANY QUESTION THAT CALLED FOR ANY PERSONAL

03:27PM 3    INFORMATION THAT YOU WOULD NOT WISH TO BE REVEALED, THE COURT

03:27PM 4    MAY ORDER CERTAIN INFORMATION REDACTED IF THERE ARE GOOD

03:27PM 5    REASONS FOR DOING SO.

03:27PM 6        SO I'D ASK YOU TO PLEASE BE VERY CANDID WITH ME ABOUT YOUR

03:27PM 7    FEELINGS AND CONCERNS, OR LACK OF CONCERNS, IF YOU HAVE ANY,

03:27PM 8    AND YOU SHOULD FEEL FREE TO ASK ME ANY QUESTIONS ABOUT THIS

03:27PM 9    PROCESS.

03:27PM 10        I'M LOOKING DOWN BECAUSE I HAVE A SCRIPT AND I'M ASKING

03:27PM 11   AND I'M TRYING TO STAY ON SCRIPT WITH EACH ONE OF YOU.  I WANT

03:27PM 12   TO ASK YOU ALL THE SAME GENERAL QUESTION SO WE GET UNIFORM

03:27PM 13   RESPONSES.

03:27PM 14            JUROR:  OF COURSE.

03:27PM 15            THE COURT:  SO IS THERE ANYTHING YOU WOULD LIKE ME

03:27PM 16   TO KNOW ABOUT ANY INFORMATION IN YOUR QUESTIONNAIRE THAT YOU

03:27PM 17   HAVE CONCERNS ABOUT?

03:27PM 18        AND LET ME RAISE TOPICS HERE.  WOULD YOU FEEL SAFER OR

03:27PM 19   MORE COMFORTABLE OR WOULD YOU WANT TO KEEP PRIVATE ANY

03:28PM 20   INFORMATION THAT IS CONTAINED IN YOUR QUESTIONNAIRE.

03:28PM 21        I'D ALSO LIKE TO KNOW WHAT YOUR FEELINGS ARE, IF YOU HAVE

03:28PM 22   ANY, ABOUT ANY INFORMATION THAT WOULD BE RELEASED.

03:28PM 23        LET ME JUST ASK YOU THAT QUESTION FIRST.

03:28PM 24            JUROR:  I HAVE NO QUALMS ABOUT THE MEDIA HAVING A

03:28PM 25   COPY OF THE QUESTIONNAIRE BEREFT OF SOME REDACTIONS I WOULD

03:28PM   1   LIKE TO MAKE FOR PERSONAL INFORMATION ABOUT FAMILY AND SO

03:28PM   2   FORTH.

03:28PM   3               THE COURT:  SURE.  SO TELL ME ABOUT THOSE.

03:28PM   4               JUROR:  WELL, IF I MAY, I ACTUALLY WENT THROUGH THE

03:28PM   5   QUESTIONNAIRE AND HIGHLIGHTED ITEMS THAT I WOULD LIKE TO HAVE

03:28PM   6   REDACTED IF IT'S POSSIBLE.

03:28PM   7               THE COURT:  OKAY.  CAN YOU IDENTIFY BY THE QUESTION

03:28PM   8   NUMBER?

03:28PM   9               JUROR:  ABSOLUTELY.  ABSOLUTELY.

03:28PM  10         QUESTION NUMBER 17 HISTORY OF PREVIOUS EMPLOYMENT.

03:28PM  11               THE COURT:  LET ME FIND THAT.  PARDON ME.  IT'S ON

03:28PM  12   PAGE 7, YES.

03:29PM  13               JUROR:  IT'S A REQUEST AND NOT A MANDATE.  IF

03:29PM  14   POSSIBLE.  IF NOT, THEN WE CAN LET THAT ONE SLIDE.

03:29PM  15               THE COURT:  LET ME NOTE THESE.

03:29PM  16         AND YOU HAD ANOTHER?

03:29PM  17               JUROR:  QUESTION 19 AND 20 REGARDING EDUCATION.

03:29PM  18               THE COURT:  OKAY.

03:29PM  19               JUROR:  QUESTION 22A, B, C, AND D REGARDING MY

03:29PM  20   WIFE'S EDUCATION AND -- EXCUSE ME -- THAT WOULD BE REGARDING MY

03:29PM  21   WIFE'S CURRENT PLACE OF EMPLOYMENT.

03:29PM  22         QUESTION 23 REGARDING HER EDUCATION.

03:29PM  23               THE COURT:  ALL RIGHT.

03:29PM  24               JUROR:  QUESTION 24 REGARDING MY WIFE AND HER

03:29PM  25   CURRENT POSITION.

03:29PM  1      QUESTION NUMBER 25 REGARDING THE SEX, AGE, AND EDUCATION

03:29PM  2  AND OCCUPATION OR SCHOOL OF MY DAUGHTERS.

03:29PM  3      THE COURT:  OKAY.

03:30PM  4      JUROR:  QUESTION NUMBER 27 REGARDING, IF INDICATED

03:30PM  5  YES, MAY WE PROVIDE ANY OF THE ABOVE, AND THAT WOULD BE MY

03:30PM  6  DAUGHTER BEING IN THE HEALTH INSURANCE DEPARTMENT, OR PAST

03:30PM  7  HEALTH INSURANCE.  SHE'S NO LONGER WORKING THERE.

03:30PM  8      THE COURT:  IS YOUR CONCERN ABOUT THE WRITING AS

03:30PM  9  OPPOSED TO THE CHECKED BOX?

03:30PM  10      JUROR:  THAT'S CORRECT.

03:30PM  11      THE COURT:  OKAY.

03:30PM  12      JUROR:  AND QUESTION NUMBER 29 REGARDING MY PERSONAL

03:30PM  13  HOBBIES, MAJOR INTERESTS AND SO FORTH.

03:30PM  14      THE COURT:  OKAY.

03:30PM  15      JUROR:  AND I HAD ALSO HIGHLIGHTED NUMBER 30, LIFE

03:30PM  16  EXPERIENCE.  I HAD WRITTEN IN ██████████████, AS WELL

03:30PM  17  AS THE QUESTIONS BELOW, I HAD YES, AND I PUT ████████.

03:31PM  18      THE COURT:  OKAY.

03:31PM  19      JUROR:  AND THAT IS THE EXTENT OF MY REQUEST.

03:31PM  20      THE COURT:  THANK YOU FOR THOSE.  I'D LIKE TO GO

03:31PM  21  THROUGH THOSE WITH YOU FOR JUST A MOMENT.

03:31PM  22      JUROR:  OKAY.

03:31PM  23      THE COURT:  AS I GO THROUGH THESE, MY QUESTION IS

03:31PM  24  GOING TO RELATE TO THE REASONS FOR THE REDACTIONS, YOUR REQUEST

03:31PM  25  FOR REDACTIONS AS TO WHETHER OR NOT THESE, IN YOUR MIND,

03:31PM 1    CREATES SAFETY, SECURITY ISSUES FOR YOU, EMBARRASSMENT,

03:31PM 2    INVASION OF PRIVACY.  THOSE ARE, JUST TO BE CANDID --

03:31PM 3             JUROR:  SURE.

03:31PM 4             THE COURT:  THOSE ARE THE AREAS THAT I NEED TO

03:31PM 5    CONSIDER WHEN I BALANCE THE LAW ABOUT KEEPING THINGS

03:31PM 6    CONFIDENTIAL AND WHETHER OR NOT THE LAW WILL NOT PERMIT CERTAIN

03:31PM 7    THINGS TO BE KEPT CONFIDENTIAL.

03:31PM 8             JUROR:  OKAY.

03:31PM 9             THE COURT:  SO LET'S TALK ABOUT 17.  YOU TALK THERE

03:31PM 10   ABOUT PREVIOUS EMPLOYMENT, AND WHAT ARE YOUR CONCERNS?

03:31PM 11            JUROR:  AGAIN, MY CONCERN IS JUST GENERAL PERSONAL

03:31PM 12   INFORMATION.  I AM OF THE UNDERSTANDING THAT BECAUSE I WORK FOR

03:31PM 13   THE GOVERNMENT, SOMEBODY COULD MAKE A FREEDOM OF INFORMATION

03:32PM 14   REQUEST ON MY PREVIOUS EMPLOYMENT RECORD AND IT WOULD BE

03:32PM 15   PUBLICLY AVAILABLE AND, AGAIN, I STATED EARLIER IF THAT WAS

03:32PM 16   SOMETHING THAT COULD NOT BE, I WOULD BE FINE WITH THAT.

03:32PM 17            THE COURT:  DO YOU HAVE SECURITY ISSUES OR SAFETY

03:32PM 18   REASONS?

03:32PM 19            JUROR:  NOT GENERALLY SPEAKING.  I DID HAVE A

03:32PM 20   PREVIOUS EMPLOYER WHO WAS A DOD CONTRACTOR.  I DON'T BELIEVE IF

03:32PM 21   THAT'S PUBLIC KNOWLEDGE THAT WOULD CONSTITUTE A SECURITY RISK.

03:32PM 22            THE COURT:  OKAY.  THANK YOU.

03:32PM 23       LET'S MOVE TO 19 AND 20.

03:32PM 24            JUROR:  THAT IS A PERSONAL PREFERENCE, AND I FREELY

03:32PM 25   ADMIT THAT I'M IN A POSITION OF AUTHORITY AT THE COUNTY THAT,

03:32PM 1      YOU KNOW, WITH MY LIMITED EDUCATION -- ALTHOUGH I DO HAVE A LOT

03:32PM 2      OF COLLEGE CREDIT -- IS A LITTLE BIT OF HOLD A GOOD ONE ON THAT

03:32PM 3      ONE.  I'M QUALIFIED AND I WAS EDUCATED TO DO THAT.

03:32PM 4           I DON'T HAVE MORE THAN A HIGH SCHOOL EDUCATION, BUT IT

03:32PM 5      WOULD BE SOMETHING THAN MORE THAN PERSONAL EMBARRASSMENT, HOW

03:33PM 6      DID HE GET INTO THAT?  AND ALTHOUGH I DID GET INTO THAT.

03:33PM 7                THE COURT:  PARDON ME TO DIGRESS, I WOULD THINK THAT

03:33PM 8      WOULD BE A HIGH ATTRIBUTE FOR YOU TO SHOW HOW YOU ACCOMPLISHED

03:33PM 9      THAT CAREER GOAL.

03:33PM 10               JUROR:  WELL, THANK YOU.

03:33PM 11               THE COURT:  AND YOU SAY ALL LIMITED EDUCATION, BUT

03:33PM 12     NOT ALL EDUCATION IS FROM BOOKS AS YOU KNOW.

03:33PM 13          IS THERE ANYTHING ELSE ABOUT THAT?

03:33PM 14               JUROR:  THERE IS NOT.

03:33PM 15               THE COURT:  22, THANK YOU, YES, 22.

03:33PM 16               JUROR:  THIS RELATES TO MY WIFE, AND IT WOULD BE MY

03:33PM 17     DESIRE, BECAUSE OF THE NATURE OF THE TRIAL AND THE PUBLIC

03:33PM 18     EXPOSURE OF THE TRIAL, I THINK ANYTHING THAT I CAN DO TO LIMIT

03:33PM 19     PERSONAL EXPOSURE TO MY FAMILY, MY WIFE AND MY DAUGHTERS WOULD

03:33PM 20     BE HIGHLY APPRECIATED.

03:33PM 21               THE COURT:  THIS IS, I'M LOOKING AT THE B, WHICH IS

03:33PM 22     THE IDENTIFICATION OF HER EMPLOYMENT.  IS THAT WHAT YOU WOULD

03:33PM 23     LIKE TO HAVE REDACTED?

03:34PM 24               JUROR:  IF AT ALL POSSIBLE.

03:34PM 25               THE COURT:  AND AGAIN, GETTING BACK TO CONCERNS

03:34PM  1    ABOUT SAFETY AND SECURITY, DO YOU HAVE ANY CONCERNS ABOUT THOSE

03:34PM  2    IF YOUR WIFE'S WORK IS IDENTIFIED?

03:34PM  3            JUROR:  YOUR HONOR, I WOULD BE NOT IN A POSITION TO

03:34PM  4    SPECULATE WHAT LIFE WOULD BE POST-TRIAL FOR THE MEMBERS OF THE

03:34PM  5    JURY.

03:34PM  6        I THINK JUST THE FACT THAT THESE -- THAT THE REQUEST IS

03:34PM  7    MADE FROM THE MEDIA IS INDICATIVE OF THE HIGH PROFILE NATURE OF

03:34PM  8    THE TRIAL, AND SO I'M TRYING TO FORECAST WHAT LIFE WOULD BE

03:34PM  9    LIKE IRREGARDLESS OF THE VERDICT FOR MYSELF AND MY FELLOW

03:34PM 10    JURORS AFTER THE TRIAL.

03:34PM 11        SO THIS IS MY EFFORT TO I GUESS REDUCE ANY EXPOSURE THAT

03:34PM 12    MY FAMILY MIGHT HAVE AS A REPERCUSSION OF THE TRIAL.

03:34PM 13            THE COURT:  ALL RIGHT.  THANK YOU.

03:34PM 14        LET'S SEE.  24, I THINK, WAS NEXT.  AND THAT IS RELATED TO

03:34PM 15    THE CURRENT POSITION.

03:34PM 16            JUROR:  YEAH, 24, I MEAN, HONESTLY, THAT IS

03:35PM 17    REGARDING MY PARENTS' OCCUPATION.  IF THAT WAS PUBLIC

03:35PM 18    KNOWLEDGE, IT WOULD NOT -- THAT'S SOMETHING, AGAIN, I BELIEVE

03:35PM 19    IF SOMETHING COULD FIND IT, IT WOULD NOT MAKE OR BREAK MY DAY.

03:35PM 20    IT'S JUST A GENERAL REQUEST.

03:35PM 21            THE COURT:  AND 25 WAS YOUR -- I THINK THAT RELATES

03:35PM 22    TO YOUR CHILDREN'S EDUCATION.

03:35PM 23            JUROR:  YES.  ANY INFORMATION I COULD REDACT IN

03:35PM 24    REGARDS TO MY DAUGHTERS I WOULD -- IT WOULD MEAN A LOT TO ME.

03:35PM 25            THE COURT:  DO YOU HAVE SAFETY CONCERNS?

03:35PM    1                    JUROR:  THAT WOULD BE RELATED TO SAFETY OR PUBLIC

03:35PM    2     EXPOSURE.

03:35PM    3                    THE COURT:  OKAY.  HAVE THERE BEEN CONCERNS IN THE

03:35PM    4     PAST ABOUT THE SAFETY OF YOUR DAUGHTERS IN REGARDS TO INCIDENTS

03:35PM    5     THAT MAY HAVE HAPPENED WITH THEM, NOT RELATED TO TRIALS, BUT

03:35PM    6     JUST OTHER THINGS THAT CAUSE YOU CONCERN?

03:35PM    7                    JUROR:  NO, NO, NO.

03:35PM    8                    THE COURT:  THIS IS PROPHYLACTIC AS TO KEEPING THEM

03:35PM    9     FROM ANY POTENTIAL HARM?

03:35PM   10                    JUROR:  EXACTLY.  YES.

03:36PM   11                    THE COURT:  OKAY.  27 RELATES TO THE WRITING ON THE

03:36PM   12     BOTTOM.  I THINK THAT'S WHAT YOU WROTE IN?

03:36PM   13                    JUROR:  THAT'S CORRECT.

03:36PM   14                    THE COURT:  ALL RIGHT.  AND IS THAT FOR THE SAME

03:36PM   15     REASONS?

03:36PM   16                    JUROR:  IT IS FOR THE SAME REASON, YOUR HONOR.

03:36PM   17                    THE COURT:  OKAY.  29, HOBBIES, YOU DON'T WANT

03:36PM   18     PEOPLE TO KNOW THAT YOU'RE RESTORING A 1951 FORD F3 WITH A 226

03:36PM   19     FLAT HEAD ENGINE IN IT?

03:36PM   20                    JUROR:  1954 POWER WAGON, BUT NEAR THE SAME, YES.

03:36PM   21                    THE COURT:  OKAY.  1954.

03:36PM   22                    JUROR:  HONESTLY IF THE MEDIA IS TAKING THAT MUCH

03:36PM   23     INTEREST AND WOULD LIKE TO KNOW THAT, THEY'RE WELCOME TO IT.

03:36PM   24     BUT I THINK IT WOULD BORE THEM TO DEATH, BUT GOOD ON THEM.

03:36PM   25     IT'S JUST A BUFFER BETWEEN ME AND --

03:36PM  1          THE COURT:  MAYBE YOU'D GRANT THEM AN INTERVIEW AND

03:36PM  2     SEE HOW LONG THEY WOULD STICK AROUND.

03:36PM  3          JUROR:  NO.  I THINK AT THE END OF THIS TRIAL I'LL

03:36PM  4     MOVE ON WITH LIFE.

03:36PM  5          THE COURT:  I'M TALKING ABOUT THE TRUCK RESTORATION.

03:36PM  6       ALL RIGHT.  ANYTHING ELSE?  AND THEN 30, I THINK, WAS YOUR

03:36PM  7     LAST AND THAT'S LIFE EXPERIENCE.  AND THAT RELATES TO

03:36PM  8     PERSONAL --

03:36PM  9          JUROR:  PERSONAL MEDICAL INFORMATION, YES.

03:37PM 10          THE COURT:  OKAY.

03:37PM 11       ANYTHING ELSE YOU WOULD LIKE ME TO CONSIDER?

03:37PM 12          JUROR:  NO.

03:37PM 13          THE COURT:  SO AS I SAID, THE COURT HAS -- AND I

03:37PM 14     DO -- LET ME APOLOGIZE TO YOU.  WHEN I -- YOU KNOW, I SEE RIGHT

03:37PM 15     ABOVE MY SIGNATURE THERE I TALK ABOUT THIS BEING CONFIDENTIAL,

03:37PM 16     AND THERE IT IS, AND THE MEDIA COALITION'S LAWYER TOLD ME,

03:37PM 17     WELL, JUDGE, YOU SHOULDN'T HAVE STUCK YOUR NECK OUT TOO FAR

03:37PM 18     BECAUSE I'M SHARPENING MY KNIFE.

03:37PM 19       HE DIDN'T SAY THAT.  HE WAS VERY POLITE ABOUT IT.

03:37PM 20       HE DID INDICATE THE STATE OF THE LAW, AND IT WAS CONTRARY

03:37PM 21     TO MY MODIFICATIONS, AND THAT'S WHY I'M ASKING THESE QUESTIONS

03:37PM 22     OF YOU.

03:37PM 23       SO I'LL WEIGH YOUR ANSWERS AND I HAVE TO APPLY THE LAW TO

03:37PM 24     THAT AND SEE WHAT I CAN DO ABOUT REDACTIONS, OR NOT.

03:37PM 25          JUROR:  I'M ALL TO FAMILIAR WITH FREEDOM OF

03:37PM 1    INFORMATION RIGHTS AT WORK, SO --

03:37PM 2              THE COURT:  ONE LAST QUESTION.  AS A RESULT OF OUR

03:37PM 3    CONVERSATION AND THIS INCIDENT, CAN YOU CONTINUE TO BE A FAIR

03:37PM 4    AND IMPARTIAL JUROR TO BOTH SIDES IN THIS CASE?

03:38PM 5              JUROR:  NO QUESTION.

03:38PM 6              THE COURT:  OKAY.  THANK YOU VERY MUCH.

03:38PM 7              JUROR:  OKAY.

03:38PM 8              THE COURT:  THANKS.

03:38PM 9              JUROR:  THANK YOU VERY MUCH, YOUR HONOR.

03:38PM 10             THE COURT:  YOU CAN LEAVE YOUR QUESTIONNAIRE ON THE

03:38PM 11   TABLE THERE AND WE'LL SEE YOU TOMORROW MORNING.

03:38PM 12             JUROR:  THANK YOU VERY MUCH.  I APPRECIATE YOUR

03:38PM 13   CONSIDERATION.

03:39PM 14        (PAUSE IN PROCEEDINGS.)

03:39PM 15        (JUROR NUMBER 5 PRESENT.)

03:39PM 16             THE CLERK:  JUROR NUMBER 5.

03:39PM 17             THE COURT:  WE ARE HERE ON THE RECORD, AND ALTHOUGH

03:39PM 18   THIS IS A SEALED TRANSCRIPT, PRESENT IS OUR COURTROOM DEPUTY,

03:39PM 19   MS. KRATZMANN, AND MR. SCHENK AND MR. DOWNEY ARE BEHIND YOU,

03:39PM 20   AND TWO OF MY LAW CLERKS ARE TO YOUR LEFT.

03:39PM 21        THIS IS A CONVERSATION REGARDING THE QUESTIONNAIRES AS I

03:40PM 22   MENTIONED THIS MORNING.

03:40PM 23        THE FIRST QUESTION I HAVE FOR YOU, THOUGH -- AND I'M GOING

03:40PM 24   TO FIRST IDENTIFY YOU BY YOUR JUROR NUMBER AND NOT BY YOUR

03:40PM 25   NAME -- I'D LIKE TO ASK YOU YOUR COMFORT LEVEL ABOUT KEEPING

03:40PM   1        YOUR MASK ON OR HAVING MY MASK OFF.

03:40PM   2            AS I MENTIONED DURING THE TRIAL, WE'RE ALL VACCINATED.  IF

03:40PM   3        YOU LIKE ME TO KEEP MY MASK ON, I'M HAPPY AND WILL DO SO.

03:40PM   4            IF YOU WOULD LIKE TO TAKE YOURS OFF, YOU CAN TAKE YOURS

03:40PM   5        OFF.  WHAT'S YOUR COMFORT LEVEL?

03:40PM   6                JUROR:  I'LL KEEP IT ON.  I WEAR IT LIKE 12 HOURS A

03:40PM   7        DAY.

03:40PM   8                THE COURT:  OKAY.  I TALKED TO YOU THIS MORNING

03:40PM   9        ABOUT THE MEDIA COALITION AND THE MOTION THEY FILED ASKING THE

03:40PM  10        COURT TO RELEASE CERTAIN INFORMATION NOTWITHSTANDING THE

03:40PM  11        PROMISE I MADE TO YOU IN THE QUESTIONNAIRE THAT IT WOULD REMAIN

03:40PM  12        CONFIDENTIAL.

03:40PM  13            THAT MOTION WAS FILED.  THE LAWYER FOR THE COALITION

03:40PM  14        SUPPLIED THE COURT WITH CERTAIN CASE LAW REGARDING WHETHER OR

03:40PM  15        NOT CERTAIN INFORMATION MAY BE KEPT CONFIDENTIAL.

03:40PM  16            THE REASON I'M CALLING AND HAVING THIS CONVERSATION WITH

03:41PM  17        EACH OF YOU IS TO DETERMINE WHETHER OR NOT YOU HAVE CONCERNS

03:41PM  18        REGARDING THE RELEASE OF ANY INFORMATION THAT IS CONTAINED IN

03:41PM  19        YOUR QUESTIONNAIRE.

03:41PM  20            NOW, THIS WOULD INCLUDE INFORMATION OF YOUR NAME,

03:41PM  21        EMPLOYMENT, ADDRESS, ANY QUESTION THAT CALLS FOR PERSONAL

03:41PM  22        INFORMATION THAT YOU WOULD NOT WISH TO BE REVEALED.

03:41PM  23            NOW, THE COURT MAY ORDER CERTAIN INFORMATION REDACTED IF

03:41PM  24        THERE ARE GOOD REASONS FOR DOING SO.

03:41PM  25            NOW, I'D LIKE YOU TO PLEASE BE CANDID WITH ME ABOUT YOUR

03:41PM  1    FEELINGS, YOUR CONCERNS, OR LACK OF CONCERNS, AND YOU SHOULD

03:41PM  2    FEEL FREE TO ASK ME ANY QUESTIONS ABOUT ANY OF THIS.

03:41PM  3         SO I WANT TO ASK YOU IF THERE'S ANYTHING THAT YOU WOULD

03:41PM  4    LIKE ME TO KNOW ABOUT ANY OF THE INFORMATION THAT YOU'VE

03:41PM  5    SUPPLIED IN YOUR QUESTIONNAIRE THAT YOU HAVE CONCERNS ABOUT,

03:41PM  6    AND THIS RELATES TO YOUR SAFETY, YOUR COMFORT, ANY PRIVACY

03:41PM  7    ISSUE YOU MIGHT HAVE.

03:42PM  8         I'M CURIOUS WHETHER OR NOT ANY OF THIS INFORMATION OR THE

03:42PM  9    RELEASE OF THIS INFORMATION CREATES, IN YOUR MIND, ANY SAFETY,

03:42PM  10   SECURITY ISSUES, OR CAUSES YOU OTHER CONCERNS FOR YOUR PRIVACY.

03:42PM  11        SO DO YOU HAVE ANY THOUGHTS ABOUT THOSE QUESTIONS AND YOUR

03:42PM  12   ANSWERS TO THE QUESTIONNAIRE AND THE FACT THAT I'M BEING ASKED

03:42PM  13   TO RELEASE SOME OF YOUR INFORMATION?

03:42PM  14        JUROR:  YES.  █████████████████████████████

03:42PM  15   ███████████████████████████████████████████

03:42PM  16   ██████

03:42PM  17        ███████████████

03:42PM  18        ███████████████████████████

03:42PM  19   ████████████████████████

03:42PM  20        ███████████████████████████

03:42PM  21   ██████████████████████████

03:43PM  22        ████████████████████

03:43PM  23        █████████████████████████████

03:43PM  24   ███████████

03:43PM  25        ███████████████

SEALED PROCEEDINGS
3219



SEALED PROCEEDINGS



SEALED PROCEEDINGS





03:46PM  1

03:47PM  2

03:47PM  3

03:47PM  4

03:47PM  5          THE COURT:  OKAY.  THE LAST QUESTION I HAVE FOR YOU

03:47PM  6  IS IN REGARDS TO WHAT WE HAVE JUST DONE, IN THIS PROCESS, THIS

03:47PM  7  QUESTION ABOUT THE JUROR QUESTIONNAIRES AND THE MEDIA'S REQUEST

03:47PM  8  FOR ACCESS TO THE INFORMATION, IS THERE ANYTHING ABOUT THIS

03:47PM  9  THAT YOU THINK WOULD IMPAIR OR AFFECT YOUR ABILITY TO CONTINUE

03:47PM  10 TO BE A FAIR AND IMPARTIAL JUROR TO BOTH SIDES IN THIS CASE?

03:47PM  11         JUROR:  NO.

03:47PM  12         THE COURT:  OKAY.  CAN YOU CONTINUE TO BE A FAIR AND

03:47PM  13 IMPARTIAL TO BOTH SIDES IN THE CASE?

03:47PM  14         JUROR:  YEP.

03:47PM  15         THE COURT:  OKAY.  THANK YOU VERY MUCH.  YOU CAN GO

03:47PM  16 HOME.  YOU CAN LEAVE YOUR QUESTIONNAIRE ON THE DESK THERE.

03:47PM  17     THANK YOU SO MUCH.  THANKS FOR YOUR TIME.

03:47PM  18         JUROR:  THANK YOU.

03:47PM  19         THE COURT:  YOU'RE WELCOME.

03:48PM  20     NUMBER 6, I THINK.

03:49PM  21     (PAUSE IN PROCEEDINGS.)

03:49PM  22         THE CLERK:  HAVE A SEAT ON THE SOFA.  THIS IS JUROR

03:49PM  23 NUMBER 6.

03:49PM  24         THE COURT:  ALL RIGHT.  GOOD AFTERNOON.

03:49PM  25         JUROR:  GOOD AFTERNOON.

03:49PM   1          THE COURT:  JUROR NUMBER 6 -- FIRST OF ALL, HAVE A

03:49PM   2   SEAT.  THANKS FOR JOINING US AND THANKS FOR YOUR PATIENCE IN

03:49PM   3   STICKING AROUND.

03:49PM   4      I JUST WANT YOU TO KNOW THAT I'M GOING TO REFER TO YOU,

03:49PM   5   FOR PURPOSES OF THIS CONVERSATION, BY YOUR JUROR NUMBER AND NOT

03:49PM   6   BY YOUR NAME, SO IT WILL BE JUROR NUMBER 6.

03:49PM   7          JUROR:  OKAY.

03:49PM   8          THE COURT:  FIRST OF ALL, WE'RE IN CHAMBERS AND ON

03:49PM   9   THE RECORD AND THIS IS A SEALED TRANSCRIPT FOR NOW, AND I MAY

03:49PM  10   UNSEAL THE TRANSCRIPT.

03:49PM  11      PRESENT ARE MR. SCHENK, MR. DOWNEY, TWO OF MY LAW CLERKS,

03:49PM  12   AND MS. KRATZMANN.

03:49PM  13      I WANT TO TALK TO YOU ABOUT THE QUESTIONNAIRE ISSUES THAT

03:49PM  14   WE DISCUSSED THIS MORNING, THAT I MENTIONED THIS MORNING.

03:49PM  15      FIRST OF ALL, I'D LIKE TO ASK YOUR COMFORT LEVEL ABOUT

03:49PM  16   MASKS.  IF YOU WANT TO KEEP YOUR MASK ON, I'M HAPPY TO -- IF

03:49PM  17   YOU WOULD LIKE ME TO TAKE OUR MASKS OFF, WE CAN DO THAT, TOO.

03:50PM  18   IT'S YOUR CALL.

03:50PM  19          JUROR:  THIS IS FINE.

03:50PM  20          THE COURT:  WE'LL KEEP OUR MASKS ON.  THANK YOU.

03:50PM  21      I TALKED THIS MORNING ABOUT THE MEDIA COALITION'S REQUEST

03:50PM  22   TO UNSEAL THE QUESTIONNAIRES.

03:50PM  23      AS YOU KNOW, I PROMISED YOU IN THE QUESTIONNAIRE THAT YOUR

03:50PM  24   INFORMATION WOULD BE CONFIDENTIAL AND WOULD NOT BE RELEASED

03:50PM  25   WITH SOME CIRCUMSTANCES, NAMES AND THINGS LIKE THAT MIGHT BE

3224

| | |
|---|---|
| 03:50PM | 1 |

REDACTED.

I TOLD YOU ABOUT THE MEDIA COALITION FILING A MOTION

ASKING THAT AND CITING LAW TO ME THAT SUGGESTS THAT SOME OF THE

INFORMATION SHOULD BE RELEASED UNLESS A SIGNIFICANT SHOWING TO

THE CONTRARY IS PRESENTED.

THE REASON I WANT TO MEET WITH YOU AND YOUR COLLEAGUES

INDIVIDUALLY IS TO ASK YOU QUESTIONS ABOUT YOUR QUESTIONNAIRE

AND HAVE -- GET FROM YOU YOUR INFORMATION, CONCERNS, OR NOT,

ABOUT THE COURT RELEASING ANY OF THIS INFORMATION.

AND THIS WOULD INCLUDE YOUR NAME AND EMPLOYMENT, ADDRESS,

ALTHOUGH IT DIDN'T CALL FOR YOUR ADDRESS, THE GEOGRAPHIC

LOCATION I THINK IS WHAT THE QUESTIONNAIRE CALLED FOR, OR ANY

OTHER PERSONAL INFORMATION THAT YOU WOULD NOT WANT TO BE

REVEALED.

THE COURT MAY ORDER CERTAIN INFORMATION REDACTED IF THERE

ARE GOOD REASONS FOR DOING SO.

SO I WOULD ASK YOU TO BE VERY CANDID WITH ME ABOUT YOUR

FEELINGS AND CONCERNS, OR LACK OF CONCERNS, AND YOU SHOULD FEEL

FREE TO ASK ME ANY QUESTIONS YOU MIGHT HAVE ABOUT ANYTHING

ABOUT THIS QUESTION.

SO IS THERE ANYTHING YOU WOULD LIKE ME TO KNOW ABOUT ANY

OF THE INFORMATION IN YOUR QUESTIONNAIRE THAT YOU HAVE CONCERNS

ABOUT?

AND THIS REALLY RELATES TO QUESTIONS OF SAFETY, SECURITY,

THOSE KINDS OF -- OR PRIVACY CONCERNS.  IS THERE ANYTHING IN

03:51PM  1    YOUR QUESTIONNAIRE THAT YOU WOULD LIKE ME TO -- YOU'D LIKE TO

03:51PM  2    COMMENT ON?

03:51PM  3                JUROR:  NO.  NOTHING BOTHERS ME ABOUT ANY OF THE

03:52PM  4    QUESTIONS OR MY ANSWERS.

03:52PM  5                THE COURT:  OKAY.  SO IF THE COURT WERE TO RELEASE,

03:52PM  6    THAT IS, TO ALLOW FOR YOUR QUESTIONNAIRE TO BE RELEASED TO THE

03:52PM  7    PRESS, YOU DON'T HAVE ANY CONCERNS ABOUT THAT?

03:52PM  8                JUROR:  MY QUESTION WOULD BE, WHY WOULD YOU RELEASE

03:52PM  9    IT?

03:52PM 10                THE COURT:  WELL --

03:52PM 11                JUROR:  JUST BECAUSE THEY WANT IT AND THEY BELIEVE

03:52PM 12    THEY HAVE A RIGHT TO IT?

03:52PM 13                THE COURT:  WELL, IT WAS A MOTION THAT WAS FILED, A

03:52PM 14    LEGAL MOTION, WE HAD A HEARING, AS I SAID, ABOUT A WEEK, TEN

03:52PM 15    DAYS AGO --

03:52PM 16                JUROR:  RIGHT.

03:52PM 17                THE COURT:  -- AND THEY CITED CASE LAW FROM THE

03:52PM 18    SUPREME COURT AND CONSTITUTION THAT DREW THE COURT'S ATTENTION

03:52PM 19    TO THE REASONS TO KEEP PRIVACY ISSUES REGARDING JUROR

03:52PM 20    INFORMATION PRIVATE AND THE STANDARDS THAT HAVE TO BE SHOWN TO

03:52PM 21    KEEP THAT PRIVATE AS OPPOSED TO RELEASING IT TO THE PRESS FOR

03:52PM 22    WHATEVER DESIRE THEY HAVE ON IT.

03:52PM 23        I'VE HEARD THAT MOTION, I'VE RECEIVED PLEADINGS FROM THE

03:53PM 24    PARTIES ON THAT, AND I HAVE TO MAKE A LEGAL DECISION ABOUT

03:53PM 25    THAT.

03:53PM 1        THAT'S WHY I'M CALLING YOU IN TO FIND OUT, YOU AND YOUR

03:53PM 2    COLLEAGUES, TO GET YOUR INPUT ON THIS PROCESS.

03:53PM 3            JUROR:  HAS THIS OCCURRED BEFORE?

03:53PM 4            THE COURT:  I BEG YOUR PARDON?

03:53PM 5            JUROR:  HAS THIS OCCURRED BEFORE?  IS THIS A NEW --

03:53PM 6            THE COURT:  IT HAS HAPPENED IN OTHER COURTS.  AS I

03:53PM 7    SAID, THERE IS PRECEDENT.  THERE ARE SUPREME COURT CASES.

03:53PM 8            JUROR:  AND DO YOU KNOW WHAT THE RESULTS WERE IN

03:53PM 9    THOSE CASES?

03:53PM 10           THE COURT:  WELL, MANY OF THOSE CASES, THE CASES

03:53PM 11   THAT WENT TO THE SUPREME COURT, THE COURT CITED WITH SOME

03:53PM 12   LIMITATIONS AND SOME OTHERS NOT WITH LIMITATIONS ON THE FIRST

03:53PM 13   AMENDMENT RIGHT AND THE RIGHT FOR THE PUBLIC TO KNOW.

03:53PM 14       SO I'M TRYING TO DISCERN WHETHER OR NOT YOU HAVE CONCERNS,

03:53PM 15   AGAIN, SAFETY, SECURITY, ANY OF THOSE?

03:53PM 16           JUROR:  NO, I DON'T HAVE CONCERNS.  I WAS JUST

03:53PM 17   CURIOUS, AND IT WOULDN'T BOTHER ME IF ANY OF THIS WAS RELEASED.

03:53PM 18           THE COURT:  ALL RIGHT.

03:53PM 19           JUROR:  IT'S THE TRUTH, SO --

03:53PM 20           THE COURT:  THANK YOU.  I APPRECIATE YOUR CANDOR.  I

03:53PM 21   APPRECIATE THAT.

03:53PM 22       ONE LAST QUESTION I HAVE FOR YOU BEFORE I RELEASE YOU TO

03:54PM 23   GO HOME FOR THE DAY.

03:54PM 24       AS A RESULT OF THIS CONVERSATION AND THE ISSUES ABOUT IT,

03:54PM 25   CAN YOU CONTINUE TO BE A FAIR AND IMPARTIAL JUROR TO BOTH

03:54PM 1     SIDES?

03:54PM 2               JUROR:  I BELIEVE SO.

03:54PM 3               THE COURT:  OKAY.  ALL RIGHT.

03:54PM 4               JUROR:  ALL RIGHT.

03:54PM 5               THE COURT:  YOU CAN JUST LEAVE YOUR QUESTIONNAIRE

03:54PM 6     THERE.

03:54PM 7               JUROR:  OKAY.

03:54PM 8               THE COURT:  WE'LL SEE YOU IN THE MORNING.

03:54PM 9               JUROR:  OKAY.

03:54PM 10              THE COURT:  THANK YOU.

03:54PM 11              JUROR:  YOU'RE WELCOME.

03:54PM 12              THE COURT:  JUROR NUMBER 7 IS NEXT.

03:54PM 13          (PAUSE IN PROCEEDINGS.)

03:54PM 14          (JUROR NUMBER 7 PRESENT.)

03:55PM 15              THE COURT:  GOOD AFTERNOON.  PLEASE HAVE A SEAT.

03:55PM 16              JUROR:  HELLO.

03:55PM 17              THE COURT:  WE'RE IN CHAMBERS AND I'LL IDENTIFY YOU

03:55PM 18    BY YOUR JUROR NUMBER, JUROR NUMBER --

03:55PM 19              JUROR:  7, YES.

03:55PM 20              THE COURT:  -- 7.

03:55PM 21          WE'RE MEETING IN MY OFFICE, AND PRESENT ARE MR. SCHENK,

03:55PM 22    AND WE ALSO HAVE A REPRESENTATIVE, MR. DOWNEY, FROM THE

03:55PM 23    DEFENSE, MY LAW CLERKS, AND MS. KRATZMANN YOU KNOW.

03:55PM 24          I WANTED, AS I SAID EARLIER, TO HAVE A CONVERSATION WITH

03:55PM 25    YOU IN REGARDS TO THE MOTION THAT WAS FILED BY THE MEDIA

SEALED PROCEEDINGS
3228

03:56PM  1    COALITION, PRESS MEDIA COALITION --

03:56PM  2            PROSPECTIVE JUROR:  RIGHT.

03:56PM  3            THE COURT:  -- REGARDING THE RELEASE OF ANY OF YOUR

03:56PM  4    INFORMATION.

03:56PM  5        FIRST OF ALL, I WANT TO ASK YOU YOUR THOUGHTS ABOUT

03:56PM  6    CONTINUING TO WEAR YOUR MASK.  DO YOU WANT ME TO KEEP MY MASK

03:56PM  7    ON?  WOULD YOU LIKE ME TO KEEP MY MASK ON?

03:56PM  8            JUROR:  I'M OKAY WITH IT OFF.

03:56PM  9            THE COURT:  OFF?  OKAY.  AS I SAID EARLIER WHEN THE

03:56PM  10   TRIAL STARTED, WE'VE ALL BEEN VACCINATED.

03:56PM  11           JUROR:  RIGHT.

03:56PM  12           THE COURT:  THANK YOU.  WE'LL REMOVE OUR MASK FOR

03:56PM  13   PURPOSES OF THIS CONVERSATION.

03:56PM  14       SO I TOLD YOU ABOUT THE MOTION THAT THE MEDIA COALITION

03:56PM  15   FILED.

03:56PM  16       WHEN YOU COMPLETED THE QUESTIONNAIRES, YOU COMPLETED THEM

03:56PM  17   AND I GAVE YOU MY PROMISE, I SIGNED IT ABOVE MY SIGNATURE, AND

03:56PM  18   THE PROMISE THAT YOUR INFORMATION WOULD REMAIN CONFIDENTIAL.

03:56PM  19           JUROR:  RIGHT.

03:56PM  20           THE COURT:  THE MEDIA COALITION FILED A MOTION AND

03:56PM  21   THEY'RE ASKING THAT THEY HAVE ACCESS TO THE QUESTIONNAIRES.

03:56PM  22   THEY'VE CITED CASE LAW, SUPREME COURT LAW, FIRST AMENDMENT LAW

03:57PM  23   THAT SUGGESTS FROM THEIR POSITION THAT THEY HAVE A RIGHT AND

03:57PM  24   THE PUBLIC HAS A RIGHT TO THIS INFORMATION.

03:57PM  25       I WANTED TO ASK YOU, AND I'M DOING THIS FOR ALL OF YOUR

03:57PM   1    COLLEAGUES, WHETHER OR NOT YOU HAVE ANY CONCERNS REGARDING THE

03:57PM   2    RELEASE OF ANY OF YOUR INFORMATION IN YOUR QUESTIONNAIRE AND

03:57PM   3    WHAT CONCERNS, OR LACK OF CONCERNS, THIS MIGHT BE, AND THIS

03:57PM   4    WOULD INCLUDE --

03:57PM   5              JUROR:  OKAY.

03:57PM   6              THE COURT:  LET ME --

03:57PM   7              JUROR:  I'M SORRY.

03:57PM   8              THE COURT:  I HAVE A SCRIPT HERE AND I'M ASKING ALL

03:57PM   9    OF YOUR COLLEAGUES THE SAME QUESTIONS SO WE DON'T DEVIATE TOO

03:57PM   10   MUCH.

03:57PM   11             JUROR:  OKAY.

03:57PM   12             THE COURT:  THIS WOULD INCLUDE YOUR NAME,

03:57PM   13   EMPLOYMENT, ADDRESS, AND ANY QUESTIONS THAT CALL FOR PERSONAL

03:57PM   14   INFORMATION THAT YOU WOULD NOT WANT TO BE REVEALED.

03:57PM   15        THE COURT MAY ORDER CERTAIN INFORMATION REDACTED IF THERE

03:57PM   16   ARE GOOD REASONS FOR DOING SO.

03:57PM   17        SO I'D LIKE YOU TO BE CANDID WITH ME ABOUT YOUR FEELINGS

03:57PM   18   AND CONCERNS OR, AGAIN, ANY LACK OF CONCERNS YOU HAVE ABOUT THE

03:57PM   19   COURT RELEASING ANY OF THE INFORMATION IN HERE, AND THE

03:57PM   20   CONCERNS SPECIFICALLY OR I SHOULD SAY RELATE TO SECURITY

03:58PM   21   ISSUES, SAFETY ISSUES, PRIVACY ISSUES, THOSE ARE THE MAIN

03:58PM   22   TOPICS THAT I'D LIKE TO ASK YOU ABOUT.

03:58PM   23        SO PLEASE LET ME KNOW YOUR THOUGHTS.

03:58PM   24             JUROR:  OKAY.  YES, I DO HAVE CONCERNS, OKAY?

03:58PM   25             THE COURT:  SURE.

03:58PM 1      JUROR:  I DO, AND I REMEMBER READING THE

03:58PM 2   CONFIDENTIALITY STATEMENT, RIGHT, AND IT SAYS THAT THE

03:58PM 3   INFORMATION WILL BE DISCLOSED, IF AT ALL, WITH NAMES AND OTHER

03:58PM 4   IDENTIFYING INFORMATION REMOVED.

03:58PM 5      I WOULD JUST ASK THAT IF IT IS RELEASED, THAT THAT

03:58PM 6   IDENTIFYING INFORMATION ADHERES TO THE PII GUIDELINES BY THE

03:58PM 7   DEPARTMENT OF LABOR, WHICH IS PERSONALLY IDENTIFIED

03:58PM 8   INFORMATION.

03:58PM 9      I'M VERY FAMILIAR WITH THOSE GUIDELINES, AND IT IS A

03:58PM 10  COMBINATION OF INFORMATION THAT CAN PERSONALLY IDENTIFY A

03:58PM 11  PERSON, RIGHT?  IT'S NOT JUST THEIR NAME OR WHERE THEY WERE

03:58PM 12  BORN, OR, YOU KNOW, ANY OTHER ITEM IN THERE.

03:59PM 13     AND I'VE HIGHLIGHTED ALL OF THE THINGS THAT I BELIEVE CAN

03:59PM 14  BE COMBINED TO UNIQUELY IDENTIFY SOMEONE.

03:59PM 15          THE COURT:  OKAY.

03:59PM 16          JUROR:  AND I'LL JUST STATE THAT IN ADDITION TO THE

03:59PM 17  ITEMS THAT YOU LISTED, YOU KNOW, PRIVACY AND ALL OF THAT, I

03:59PM 18  TAKE THIS CASE VERY SERIOUSLY, RIGHT?  SOMEONE'S LIFE AND

03:59PM 19  LIKELIHOOD IS AT STAKE HERE, AND IN ORDER TO MAKE IT A FAIR

03:59PM 20  TRIAL, IT'S NOT ABOUT ME, IT'S NOT ABOUT MY FELLOW JURORS, IT'S

03:59PM 21  ABOUT THE CASE AND THE PERSON.

03:59PM 22     I THINK THE RISK OF RELEASING THIS INFORMATION TO THE

03:59PM 23  MEDIA MAY SUPERSEDE THAT AND CAUSE THE FOCUS TO BE ON THE

03:59PM 24  JURORS, RIGHT, WHICH WOULD DISTRACT US FROM PROVIDING A FAIR

03:59PM 25  ASSESSMENT OF WHAT IS GOING ON, YOU KNOW, WITH THE TRIAL

03:59PM  1    ITSELF.

03:59PM  2         THAT'S REALLY MY PRIMARY CONCERN.

03:59PM  3              THE COURT:  SO LET ME --

03:59PM  4              JUROR:  YOU KNOW, I WANT THE FOCUS TO BE THE CASE,

03:59PM  5    NOT ON ME AS A JUROR.

03:59PM  6              THE COURT:  OKAY.  SO DO YOU HAVE CONCERNS THAT IF

04:00PM  7    THE MEDIA WERE TO SOMEHOW GET -- IF THEY GET INFORMATION FROM

04:00PM  8    THE QUESTIONNAIRE, THAT THEY MIGHT PUT YOUR NAME AND PERSONAL

04:00PM  9    INFORMATION IN THE PUBLIC AND THAT WOULD DETRACT FROM -- WOULD

04:00PM  10   IT AFFECT YOUR ABILITY TO BE A FAIR AND IMPARTIAL JUROR IF THAT

04:00PM  11   WERE TO HAPPEN?

04:00PM  12             JUROR:  WELL, IT WOULD SURE BE DISTRACTING, RIGHT?

04:00PM  13   BECAUSE I HAVE AN AGREEMENT WITH MY FAMILY AND MY COWORKERS,

04:00PM  14   DON'T TALK ABOUT THE CASE.  YOU KNOW, MY WIFE WANTS TO WATCH

04:00PM  15   THE NEWS, THAT'S FINE.  I GO FOR A WALK, YOU KNOW, BECAUSE SHE

04:00PM  16   WANTS TO SEE WHAT IS GOING ON, RIGHT?  AND SHE DOESN'T ASK ME

04:00PM  17   ANYTHING ABOUT IT.

04:00PM  18        AND I HAVE THE SAME THING WITH MY NEIGHBORS.  IF ANYONE

04:00PM  19   SAYS, WHAT IS GOING ON WITH THE TRIAL?  I'LL SAY, WHAT TRIAL?

04:00PM  20   YOU KNOW?

04:00PM  21             THE COURT:  OKAY.

04:00PM  22             JUROR:  AND IT WOULD DEFINITELY BE DISTRACTING AND

04:00PM  23   IT WOULD COME UP IN CONVERSATION I KNOW.

04:00PM  24             THE COURT:  OKAY.  LET ME ASK YOU, IF YOU HAVE YOUR

04:00PM  25   QUESTIONNAIRE THAT WE PROVIDED YOU, OR A COPY OF IT, CAN YOU

SEALED PROCEEDINGS

04:00PM   1      IDENTIFY THE QUESTIONS THAT YOU HAVE CONCERNS ABOUT IT AS YOU

04:01PM   2      GO THROUGH IT AND I'LL TAKE SOME NOTES ON THAT.

04:01PM   3              JUROR:  THE BACKGROUND INFORMATION.

04:01PM   4              THE COURT:  WHAT QUESTIONS --

04:01PM   5              JUROR:  I'M SORRY.  PAGE 4 UNDER BACKGROUND.

04:01PM   6              THE COURT:  OKAY.

04:01PM   7              JUROR:  WHERE IT HAS ITEM NUMBER 11, NAME, 12,

04:01PM   8      RESIDENCE, ALL OF THAT INFORMATION.  BECAUSE EVEN IF YOU TOOK

04:01PM   9      OUT THE NAME AND LEFT THE RESIDENCE IN THERE, IF SOMEONE LOOKED

04:01PM  10      UP, YOU KNOW, WHERE A PERSON WAS BORN, WHAT COUNTY THEY'RE IN,

04:01PM  11      WHAT NEIGHBORHOOD THEY'RE IN, THEY CAN PRETTY MUCH IDENTIFY WHO

04:01PM  12      YOU ARE, RIGHT?

04:01PM  13              THE COURT:  SO THE QUESTIONNAIRE DOES NOT CALL FOR

04:01PM  14      YOUR STREET ADDRESS, OF COURSE.  IT CALLS FOR GEOGRAPHIC AREAS.

04:01PM  15              JUROR:  NO, NO.

04:01PM  16              THE COURT:  BUT YOU WOULD LIKE TO HAVE AT LEAST

04:01PM  17      THOSE GEOGRAPHIC IDENTIFIERS REDACTED?

04:01PM  18              JUROR:  BECAUSE I COULD COMBINE 12 AND UNIQUELY

04:01PM  19      IDENTIFY SOMEONE, YEAH, PRETTY EASILY.

04:01PM  20              THE COURT:  OKAY.  WELL, LET'S GO THROUGH THIS AND

04:01PM  21      THEN I WANT TO ASK YOU YOUR COLLECTIVE CONCERNS ABOUT THESE.

04:02PM  22              JUROR:  THE SAME ON NUMBER 16, OCCUPATION.  SOMEONE

04:02PM  23      COULD EASILY IDENTIFY ME AS SOMEONE AT MY PLACE OF EMPLOYMENT

04:02PM  24      FOR THE NUMBER OF YEARS WORKING IN THAT ORGANIZATION HAVING SO

04:02PM  25      MANY EMPLOYEES REPORTING TO ME.  I COULD NAIL THAT DOWN IN TWO

04:02PM  1    OR THREE PEOPLE REALLY EASILY.

04:02PM  2              THE COURT:  SURE.  I THINK I SAID I WAS GOING TO

04:02PM  3    WAIT, BUT I THINK I'LL ASK YOU YOUR CONCERNS ABOUT EACH OF

04:02PM  4    THESE RIGHT NOW.

04:02PM  5          DO YOU HAVE SAFETY, SECURITY, PRIVACY CONCERNS AND IF YOU

04:02PM  6    DO, IF YOU COULD EXPRESS THOSE TO ME.

04:02PM  7              JUROR:  NOT SO MUCH SAFETY OR SECURITY, BUT MAINLY

04:02PM  8    PRIVACY.

04:02PM  9              THE COURT:  OKAY.

04:02PM 10              JUROR:  LIKE I SAID, THE NUMBER ONE CONCERN IS

04:02PM 11    HAVING THE MEDIA -- HAVING MY NAME PUT OUT IN THE MEDIA AND

04:02PM 12    HAVING MULTIPLE PEOPLE COME TO ME SAYING, HEY, I SAW YOUR NAME

04:02PM 13    OUT THERE AND YOU'RE ON THAT TRIAL.

04:03PM 14          BECAUSE YOUR INSTRUCTIONS OF NOT GETTING THE INFORMATION

04:03PM 15    OUT THERE, NOT TELLING PEOPLE WHAT TRIAL WE'RE ON, THAT WE NOT

04:03PM 16    PAY ATTENTION TO ANY OF THE MEDIA AND WE DON'T TALK TO PEOPLE

04:03PM 17    ABOUT IT.

04:03PM 18              THE COURT:  OKAY.

04:03PM 19              JUROR:  WELL, THEY'RE GOING TO COME TO ME IF THEY

04:03PM 20    KNOW THAT I'M ON THIS PARTICULAR CASE.

04:03PM 21              THE COURT:  ON QUESTION 16, IF I WERE TO REDACT YOUR

04:03PM 22    PLACE OF EMPLOYMENT, THAT WOULD BRING YOU SOME COMFORT I

04:03PM 23    EXPECT.

04:03PM 24              JUROR:  SURE, YES.

04:03PM 25              THE COURT:  OKAY.  AND WHAT OTHER QUESTIONS?

04:03PM  1          JUROR:  QUESTION 20, EDUCATIONAL BACKGROUND.

04:03PM  2          QUESTION 22 ON A AND B FOR MY SPOUSE, WHO HAPPENS TO BE A

04:03PM  3  PUBLIC SCHOOL TEACHER.  WE HAVE TO MONITOR HER SOCIAL MEDIA

04:03PM  4  EXTREMELY CAREFULLY BECAUSE THERE ARE VERY STRICT GUIDELINES

04:03PM  5  FOR PUBLIC EDUCATORS ON WHAT THEY'RE ASSOCIATED WITH ON THEIR

04:04PM  6  SOCIAL MEDIA ACCOUNTS, RIGHT.

04:04PM  7          AND I'M VERY UNCOMFORTABLE FROM A PRIVACY CONCERN AND A

04:04PM  8  SECURITY CONCERN AND AN EMPLOYMENT CONCERN, BECAUSE I

04:04PM  9  PERSONALLY KNOW PUBLIC SCHOOL TEACHERS WHO HAVE BEEN TERMINATED

04:04PM 10  NOT BECAUSE OF WHAT THEY POSTED, BUT WHAT THEIR FRIENDS HAVE

04:04PM 11  POSTED, SOMETHING OBJECTIONABLE, BUT IT CAME THROUGH THEIR FEED

04:04PM 12  AND THEY END UP GETTING TERMINATED FOR IT.

04:04PM 13          THE COURT:  OKAY.  IS THIS A SITUATION ALSO, JUROR

04:04PM 14  NUMBER 7, WHERE IF THE EMPLOYMENT NAME WAS REDACTED, THAT WOULD

04:04PM 15  BRING YOU GREATER COMFORT?

04:04PM 16          JUROR:  IT WOULD HAVE TO BE THE EMPLOYER NAME -- IT

04:04PM 17  WOULD HAVE TO BE A, B, AND C.  YEAH, A, B, AND C --

04:04PM 18          THE COURT:  OKAY.

04:04PM 19          JUROR:  -- ON NUMBER 22.

04:04PM 20          THE COURT:  ALL RIGHT.  AND WERE THERE OTHERS?

04:05PM 21          JUROR:  23, AGAIN, JUST LIKE QUESTION 20.

04:05PM 22          THE COURT:  I PRESUME THAT IF THE SCHOOLS THAT

04:05PM 23  CONFERRED DEGREES WERE REDACTED, THAT WOULD GIVE YOU GREATER

04:05PM 24  COMFORT AS TO QUESTION 23?

04:05PM 25          JUROR:  YES.

04:06PM  1          THE COURT:  OKAY.  AND WHAT ELSE WOULD YOU --

04:06PM  2          JUROR:  AND THEN THE OTHER SECTION HERE, I HAD ONE

04:06PM  3   MORE MARKED, 47.

04:06PM  4      I HAD A QUESTION ON THAT.

04:06PM  5      IS IT PUBLIC RECORD ON PREVIOUS CASES WHO JURORS ARE

04:06PM  6   BECAUSE I DID SERVE ON A PREVIOUS JURY ███████ AT THE STATE

04:06PM  7   LEVEL FOR A MURDER CASE.

04:06PM  8          THE COURT:  YEAH, I SEE THAT HERE.

04:06PM  9      YOU KNOW, I DON'T KNOW THE ANSWER TO THAT QUESTION.  I

04:06PM  10  THINK THAT -- LET ME SAY THAT I DON'T KNOW THE SPECIFIC ANSWER,

04:06PM  11  WHETHER OR NOT STATE COURTS KEEP RECORDS OF THAT OR NOT.

04:06PM  12         JUROR:  RIGHT.

04:06PM  13         THE COURT:  I WOULD EXPECT THAT IF SOMEBODY WANTED

04:06PM  14  TO PURCHASE A TRANSCRIPT OF THE TRIAL, THEY COULD DO THAT AND

04:07PM  15  IF THERE WAS, DURING THAT QUESTIONING PROCESS OF JURORS, IF

04:07PM  16  THEY ASKED NAMES OF THE JURORS, I SUPPOSE THAT --

04:07PM  17         JUROR:  THEN IT'S PROCESS OF ELIMINATION BASICALLY.

04:07PM  18         THE COURT:  THAT --

04:07PM  19         JUROR:  THAT COULD DEFINITELY LEAD TO AN INDIVIDUAL.

04:07PM  20         THE COURT:  AS YOU RECALL FROM THE STATE VOIR DIRE,

04:07PM  21  IT WAS SIGNIFICANTLY LONGER THAN OURS -- IT'S PROBABLY HARD TO

04:07PM  22  BELIEVE -- BUT I'M SURE IT WENT DAYS.

04:07PM  23         JUROR:  IT WENT MONTHS.

04:07PM  24         THE COURT:  YEAH, RIGHT.

04:07PM  25      SO I DO BELIEVE THAT THE TRANSCRIPT OF THE TRIAL CERTAINLY

04:07PM 1    COULD BE PURCHASED IF SOMEONE -- THEY WOULD HAVE TO TRACK DOWN

04:07PM 2    THE COURT REPORTER AND GET THE INFORMATION THAT WAY.

04:07PM 3            JUROR:  YEAH, BECAUSE I HAPPENED TO BE THE FOREMAN

04:07PM 4    OF THAT JURY AND READ THE VERDICT AT THE END OF DELIBERATIONS,

04:07PM 5    AND JUST LIKE THIS ONE, IT WAS PUBLIC, BUT THERE WAS A LOT OF

04:07PM 6    PEOPLE IN THE, YOU KNOW, IN THE AUDIENCE.

04:07PM 7            THE COURT:  SURE.  YEAH.

04:07PM 8        SO I DON'T KNOW THE ANSWER SPECIFICALLY.

04:07PM 9            JUROR:  SO I WOULD ASK THAT THAT BE REDACTED AS

04:08PM 10   WELL.

04:08PM 11           THE COURT:  OKAY.  IF WE -- IF THE COURT REDACTED

04:08PM 12   THE LOCATION OF THE TRIAL, THAT WOULD PROBABLY GIVE YOU GREATER

04:08PM 13   COMFORT.

04:08PM 14           JUROR:  RIGHT, THE WHEN AND THE WHERE.

04:08PM 15           THE COURT:  AGAIN, THOSE ARE CONCERNS THAT ARE

04:08PM 16   SAFETY CONCERNS?  SECURITY CONCERNS?

04:08PM 17           JUROR:  OH, SAFETY AND SECURITY AND DISTRACTION.

04:08PM 18           THE COURT:  OKAY.  ALL RIGHT.

04:08PM 19       ANYTHING ELSE IN YOUR QUESTIONNAIRE?

04:08PM 20           JUROR:  BASED ON THE ANSWERS THAT I GAVE ON THIS,

04:08PM 21   NO.

04:08PM 22       OF COURSE THE JUROR OATH.

04:08PM 23           THE COURT:  YES, RIGHT, YOUR NAME.

04:08PM 24           JUROR:  YEAH, RIGHT.

04:08PM 25           THE COURT:  OKAY.

04:08PM   1                    JUROR:  OKAY.

04:08PM   2                    THE COURT:  GREAT.  THANK YOU.

04:09PM   3          I JUST HAVE ONE LAST QUESTION FOR YOU.

04:09PM   4                    JUROR:  OKAY.

04:09PM   5                    THE COURT:  AND THAT IS IN REGARDS TO WHAT WE HAVE

04:09PM   6     GONE THROUGH AND THIS PROCESS AND THIS MOTION, THIS WHOLE

04:09PM   7     PROCESS, AS I SAID, I HAVE TO NOW MAKE A DECISION, BASED ON THE

04:09PM   8     LAW, AS TO WHAT I CAN AND CAN'T REDACT, AND I'LL MAKE THAT

04:09PM   9     DECISION.

04:09PM  10                    JUROR:  RIGHT.

04:09PM  11                    THE COURT:  AND I'LL ISSUE AN ORDER.

04:09PM  12          BUT IS THERE ANYTHING ABOUT THIS PROCESS, WHAT WE'VE JUST

04:09PM  13     GONE THROUGH, THE NATURE OF THIS MOTION, THAT YOU THINK WILL

04:09PM  14     AFFECT YOUR ABILITY TO CONTINUE TO BE A FAIR AND IMPARTIAL

04:09PM  15     JUROR TO BOTH SIDES?

04:09PM  16                    JUROR:  I DON'T THINK SO, BECAUSE I GAVE IT SOME

04:09PM  17     THOUGHT AFTER YOUR FIRST DISCUSSION IN THE COURT ON POTENTIALLY

04:09PM  18     DISCLOSING OUR QUESTIONNAIRES.

04:09PM  19                    THE COURT:  YES.

04:09PM  20                    JUROR:  AND THAT'S WHAT POPPED RIGHT TO THE TOP OF

04:09PM  21     MY MIND WAS, COULD I BE FAIR AND IMPARTIAL AND PROVIDE A FAIR,

04:09PM  22     YOU KNOW, ASSESSMENT IF, YOU KNOW, INFORMATION GOT OUT?  AND

04:09PM  23     THAT'S WHY I REALLY WANT TO HAVE A LOT OF THIS INFORMATION

04:10PM  24     REDACTED --

04:10PM  25                    THE COURT:  OF COURSE.

04:10PM  1        JUROR:  -- SO THAT THAT RISK ISN'T THERE SO THAT I

04:10PM  2   CAN CONTINUE TO DO -- TO PROVIDE A FAIR ASSESSMENT.

04:10PM  3        THE COURT:  IF, IF LEGALLY I CAN'T GRANT EVERY ONE

04:10PM  4   OF YOUR REQUESTS, THAT'S WHY I'M ASKING YOU THESE QUESTIONS

04:10PM  5   ABOUT CERTAIN REDACTIONS, BUT IF I DON'T AND I CAN'T, I LEGALLY

04:10PM  6   CANNOT AND I DON'T GRANT EACH OF YOUR REQUESTS AND SOME OF THE

04:10PM  7   INFORMATION IS RELEASED, WOULD THAT AFFECT YOUR ABILITY TO STAY

04:10PM  8   AND REMAIN AS A NEUTRAL FAIR AND IMPARTIAL JUROR FOR BOTH

04:10PM  9   SIDES.

04:10PM  10        JUROR:  NOT FROM MY PERSPECTIVE.

04:10PM  11      BUT I'VE GOT TO TELL YOU, THE RISK IS HIGH THAT I AM GOING

04:10PM  12   TO LEARN INFORMATION FROM THE OUTSIDE, RIGHT, WHICH I'M WORKING

04:10PM  13   HARD RIGHT NOW TO BLOCK.

04:10PM  14        THE COURT:  WELL, YOU KNOW, AS I CONTINUE TO SAY, I

04:10PM  15   APPRECIATE YOUR VIGILANCE IN THAT REGARD, AND I GET THE SENSE

04:10PM  16   THAT THIS WOULD CALL UPON YOU TO BE EXTRA, MORE VIGILANT IN

04:11PM  17   THAT REGARD.

04:11PM  18        JUROR:  RIGHT.

04:11PM  19        THE COURT:  ANYTHING ELSE YOU WOULD LIKE ME TO KNOW?

04:11PM  20        JUROR:  NO.

04:11PM  21        THE COURT:  THANKS.  YOU CAN LEAVE THE QUESTIONNAIRE

04:11PM  22   ON THE TABLE AND WE'LL SEE YOU TOMORROW MORNING.

04:11PM  23        JUROR:  THANK YOU.

04:11PM  24        THE COURT:  THANKS SO MUCH FOR YOUR PATIENCE.

04:11PM  25   THANKS.

04:11PM  1              (PAUSE IN PROCEEDINGS.)

04:11PM  2              (JUROR NUMBER 8 PRESENT.)

04:12PM  3                   THE CLERK:  JUROR NUMBER 8.

04:12PM  4                   THE COURT:  THANK YOU.  PLEASE HAVE A SEAT.

04:12PM  5      WELCOME.

04:12PM  6          WE ARE ON THE RECORD.  THIS TRANSCRIPT IS SEALED

04:12PM  7      CURRENTLY, BUT I MAY UNSEAL IT.

04:12PM  8          I'VE ASKED YOU TO COME IN, AS I'VE SAID EARLIER THIS

04:12PM  9      MORNING, TO ASK QUESTIONS ABOUT THE MOTION THAT WAS FILED BY

04:12PM  10     THE MEDIA COALITION IN REGARDS TO THE PROMISE THAT I MADE WHEN

04:12PM  11     YOU FILLED OUT THE QUESTIONNAIRE THAT THE INFORMATION WOULD

04:12PM  12     REMAIN CONFIDENTIAL.

04:12PM  13         I DO WANT TO ASK YOU SOME QUESTIONS ABOUT THAT.

04:13PM  14         I'M GOING TO IDENTIFY YOU AS JUROR NUMBER 8, AND I MEAN NO

04:13PM  15     DISRESPECT, BUT THAT'S HOW I WOULD LIKE TO PROCEED.

04:13PM  16         FIRST OF ALL, LET ME ASK YOU, WHAT IS YOUR COMFORT LEVEL

04:13PM  17     ABOUT CONTINUING TO WEAR YOUR MASK?  IF YOU WOULD LIKE TO

04:13PM  18     REMOVE IT, YOU MAY.

04:13PM  19                   JUROR:  OKAY.  YEAH, I WOULD LOVE TO.

04:13PM  20                   THE COURT:  THANK YOU.  WE'LL ALL REMOVE OUR MASKS.

04:13PM  21     WE'RE ALL VACCINATED HERE, AND THANK YOU FOR THAT.

04:13PM  22                   JUROR:  OKAY.

04:13PM  23                   THE COURT:  SO AS I MENTIONED THIS MORNING, WHEN YOU

04:13PM  24     COMPLETED THE QUESTIONNAIRE, YOU DID SO WITH MY PROMISE THAT IT

04:13PM  25     WOULD REMAIN CONFIDENTIAL.  I TOLD YOU THIS MORNING, AND AGAIN

SEALED PROCEEDINGS

04:13PM 1     THIS AFTERNOON, THAT THE GROUP IDENTIFYING THEMSELVES AS THE

04:13PM 2     MEDIA COALITION, AND I TOLD YOU WHO THEY WERE, FILED A MOTION

04:13PM 3     ASKING THAT THE COURT UNSEAL OR OTHERWISE RELEASE THE JUROR

04:13PM 4     QUESTIONNAIRES TO THE PRESS.

04:13PM 5         WE HAD A HEARING ON THAT A WEEK OR SO AGO AND MEMBERS OF

04:13PM 6     THE LAWYERS TEAMS BEHIND YOU WERE PRESENT.

04:13PM 7         ACTUALLY MR. SCHENK IS HERE AND MR. DOWNEY IS HERE AND MY

04:14PM 8     LAW CLERKS ARE HERE.

04:14PM 9             JUROR:  OKAY.

04:14PM 10            THE COURT:  AND WE DISCUSSED THAT, WE DISCUSSED THE

04:14PM 11    LEGAL, SOME OF THE LEGAL OPINIONS AND POSITIONS OF THE SUPREME

04:14PM 12    COURT --

04:14PM 13            JUROR:  OKAY.

04:14PM 14            THE COURT:  -- REGARDING THIS.

04:14PM 15        SO I WANTED TO ASK, PART OF THE PROCESS IS FOR ME TO ASK

04:14PM 16    EACH OF OUR JURORS AND OUR ALTERNATE JURORS QUESTIONS

04:14PM 17    REGARDING, FIRST OF ALL, ANY CONCERNS THAT A JUROR MAY HAVE IN

04:14PM 18    REGARDS TO THE COURT RELEASING ANY INFORMATION, AND THIS WOULD

04:14PM 19    INCLUDE NAMES, EMPLOYMENT, ADDRESSES, ALTHOUGH THE

04:14PM 20    QUESTIONNAIRES DON'T CALL FOR YOUR STREET ADDRESS, IT DOES CALL

04:14PM 21    FOR A GEOGRAPHIC AREA, OR ANY OTHER PERSONAL INFORMATION THAT

04:14PM 22    YOU WOULD WISH NOT TO BE REVEALED.

04:14PM 23        NOW, THE COURT MAY ORDER CERTAIN INFORMATION REDACTED OR

04:14PM 24    OTHERWISE NOT RELEASED IF THERE ARE GOOD REASONS FOR DOING SO.

04:14PM 25        SO I'D ASK YOU TO PLEASE BE CANDID WITH ME ABOUT YOUR

04:14PM  1    FEELINGS ABOUT YOUR CONCERNS, OR LACK OF CONCERNS, REGARDING

04:15PM  2    THE COURT'S RELEASING ANY OF THIS INFORMATION.

04:15PM  3         REALLY THE FOCUS IS ON YOUR CONCERNS AS TO WHETHER ANY

04:15PM  4    RELEASE OF INFORMATION CREATES ANY SAFETY, SECURITY, OR PRIVACY

04:15PM  5    ISSUE IN REGARDS TO RELEASING ANY PERSONAL INFORMATION.

04:15PM  6         SO LET ME ASK YOU, DO YOU HAVE ANY -- WHAT WOULD YOU LIKE

04:15PM  7    ME TO KNOW ABOUT ANY CONCERNS THAT YOU HAVE ABOUT, ABOUT

04:15PM  8    RELEASING YOUR INFORMATION FROM YOUR QUESTIONNAIRE?

04:15PM  9              JUROR:  I WOULD BE CONCERNED ABOUT THE RELEASE OF

04:15PM  10   PRETTY MUCH EVERYTHING IN THE QUESTIONNAIRE, PARTICULARLY THE

04:15PM  11   PERSONALLY IDENTIFYING INFORMATION JUST BECAUSE I THINK THAT,

04:15PM  12   YOU KNOW, RESOURCEFUL MEDIA PEOPLE COULD, YOU KNOW, USE

04:15PM  13   ANYTHING THEY FIND IN THERE TO POSSIBLY IDENTIFY ME AND FIND

04:15PM  14   OUT WHERE I LIVE, AND I JUST WORRY ABOUT THE PRIVACY

04:15PM  15   CONSIDERATIONS FOR MYSELF AND FOR MY FAMILY AS WELL.  SO --

04:15PM  16              THE COURT:  OKAY.  DO YOU HAVE -- AND TELL ME

04:16PM  17   ABOUT -- AS I SAID, I CAN REDACT CERTAIN INFORMATION FOR

04:16PM  18   CERTAIN REASONS.

04:16PM  19        DO YOU HAVE ANY -- LET'S START WITH SECURITY ISSUES.

04:16PM  20        DO YOU HAVE SECURITY ISSUES ABOUT IF, IF THE PUBLIC, IF

04:16PM  21   THE PRESS WERE TO OBTAIN YOUR INFORMATION AND THAT INFORMATION

04:16PM  22   WERE TO BECOME PUBLIC, DO YOU HAVE ISSUES REGARDING SECURITY,

04:16PM  23   FIRST OF ALL?

04:16PM  24              JUROR:  YOU MEAN LIKE MY NAME OR WHERE I WORK OR --

04:16PM  25              THE COURT:  WELL, THOSE, YES, THAT INCLUDE THAT.

04:16PM  1    YOUR FAMILY, WHATEVER, AND I'M GOING TO ASK YOU TO EXPRESS

04:16PM  2    THOSE SECURITY CONCERNS TO ME.

04:16PM  3              JUROR:  YEAH, I MEAN, I DO -- I DON'T KNOW WHO IS

04:16PM  4    GOING TO HAVE THIS INFORMATION OR WHAT THEY MIGHT WANT TO DO

04:16PM  5    WITH IT.

04:16PM  6         AND SO I JUST HAVE CONCERNS ABOUT PEOPLE TRYING TO, AGAIN,

04:16PM  7    FIND OUT WHERE I LIVE OR, I DON'T KNOW, TRY TO CONTACT ME.  YOU

04:16PM  8    KNOW, UNWANTED CONTACT.

04:17PM  9              THE COURT:  YOUR COMFORT LEVEL WOULD BE -- LET ME

04:17PM 10    ASK YOU, WOULD YOUR COMFORT LEVEL BE GREATER IF THE COURT

04:17PM 11    REDACTED YOUR NAME?  LET'S START WITH YOUR NAME.

04:17PM 12              PROSPECTIVE JUROR:  OH, YES.  YES.

04:17PM 13              THE COURT:  AND THEN THE GEOGRAPHIC REGION OF WHERE

04:17PM 14    YOU LIVE?

04:17PM 15              JUROR:  YES.

04:17PM 16              THE COURT:  WHAT ABOUT YOUR EMPLOYMENT?  I'M GOING

04:17PM 17    THROUGH THE QUESTIONNAIRE JUST LOOKING AT IT, YOUR EMPLOYMENT?

04:17PM 18    DO YOU THINK -- ARE THERE CONCERNS AT YOUR WORKPLACE THAT YOU

04:17PM 19    THINK RELEASE OF THIS INFORMATION MIGHT CAUSE YOU DIFFICULTIES

04:17PM 20    AT WORK OR IN SOME WAY AFFECT YOUR WORK ENVIRONMENT?

04:17PM 21              JUROR:  IF IT WERE RELEASED DURING THE TRIAL?

04:17PM 22              THE COURT:  YES.

04:17PM 23              JUROR:  I MIGHT BE CONCERNED THAT I MIGHT GET

04:17PM 24    UNWANTED QUESTIONS FROM OTHER PEOPLE AT MY COMPANY.

04:17PM 25              THE COURT:  DO YOU THINK THAT THAT WOULD AFFECT YOUR

04:18PM 1      JURY SERVICE?

04:18PM 2                  JUROR:  NO.  I DON'T THINK IT -- IT WOULDN'T AFFECT

04:18PM 3      MY JURY SERVICE.  IT WOULD JUST AFFECT MY WORK, MY ABILITY TO

04:18PM 4      DO MY JOB WITHOUT HASSLES OR OUTSIDE CONSIDERATION.

04:18PM 5                  THE COURT:  OKAY.  ALL RIGHT.

04:18PM 6          EDUCATION, IF IT THE COURT WERE TO REDACT THE INSTITUTIONS

04:18PM 7      THAT CONFIRMED DEGREES, WOULD THAT BRING YOU GREATER COMFORT?

04:18PM 8                  JUROR:  YES.

04:18PM 9                  THE COURT:  AND YOUR SPOUSE'S EMPLOYMENT, DO YOU

04:18PM 10     HAVE CONCERNS ABOUT THAT?

04:18PM 11                 JUROR:  YES.

04:18PM 12                 THE COURT:  TELL ME ABOUT THOSE.

04:18PM 13                 JUROR:  WELL, MY SPOUSE IS RETIRED SO HE DOESN'T

04:18PM 14     HAVE A PLACE OF EMPLOYMENT RIGHT NOW, SO ACTUALLY I GUESS I

04:18PM 15     DON'T HAVE CONCERNS ABOUT HIS EMPLOYMENT BECAUSE HE'S RETIRED.

04:18PM 16                 THE COURT:  OKAY.  SAME CONCERNS ABOUT THE

04:18PM 17     UNIVERSITIES THAT CONFERRED DEGREES?

04:19PM 18                 JUROR:  YES.  YES.

04:19PM 19                 THE COURT:  THERE'S A QUESTION ABOUT CHILDREN.  DO

04:19PM 20     YOU HAVE ANY CONCERNS ABOUT THAT INFORMATION?

04:19PM 21                 JUROR:  YES.

04:19PM 22                 THE COURT:  OKAY.  TELL ME THOSE CONCERNS.

04:19PM 23                 JUROR:  I KNOW IT DOESN'T INCLUDE THEIR NAMES, BUT I

04:19PM 24     JUST HAVE THE -- I DON'T KNOW.  I HAVE A CONCERN ABOUT ANYTHING

04:19PM 25     ABOUT MY CHILDREN BEING -- YOU KNOW, THE FACT THAT -- WHO THEY

04:19PM  1        ARE, THEIR AGES, I WOULD HAVE A CONCERN ABOUT THAT BEING KNOWN.

04:19PM  2                THE COURT:  DO YOU -- JUROR NUMBER 8, DO YOU HAVE

04:19PM  3        ANY EXPERIENCE -- DO YOU KNOW ANYONE OR DO YOU KNOW OF A

04:19PM  4        SITUATION WHERE SOMEONE HAS OBTAINED THE PERSONAL INFORMATION

04:19PM  5        OF AN INDIVIDUAL AND IT'S CAUSED THEM SECURITY CONCERNS?  I'M

04:19PM  6        JUST CURIOUS, WHAT IS THE GENESIS OF YOUR SECURITY CONCERN?  DO

04:20PM  7        YOU KNOW -- HAS IT HAPPENED TO SOMEONE YOU KNOW OR YOU'VE READ

04:20PM  8        ABOUT SOMETHING?

04:20PM  9                PROSPECTIVE JUROR:  RIGHT.  IT HASN'T HAPPENED TO

04:20PM 10        ANYONE I KNOW, AND I CAN'T NAME ANY SPECIFIC STORIES IN THE

04:20PM 11        PUBLIC THAT I'VE READ ABOUT.

04:20PM 12           BUT IT'S JUST -- IT FELT LIKE SORT OF AN AUTOMATIC CONCERN

04:20PM 13        IF I, IF I KNEW THAT THE MEDIA WERE GOING TO HAVE MY

04:20PM 14        INFORMATION.  IT JUST FELT LIKE SOMETHING THAT WOULD BE EASY TO

04:20PM 15        GET OUT THERE AND, YOU KNOW, SOMEONE TO USE IT IN THE WRONG

04:20PM 16        WAY.

04:20PM 17                THE COURT:  RIGHT.  OKAY.

04:20PM 18           IF -- AS I MENTIONED, THERE ARE CERTAIN LEGAL LIMITATIONS,

04:20PM 19        AND LET ME JUST BE FRANK, THE FIRST AMENDMENT, THERE ARE

04:20PM 20        SUPREME COURT CASES THAT THE LAWYER WHO BROUGHT THIS MOTION HAS

04:20PM 21        CITED THAT TALK ABOUT FREEDOM OF THE PRESS AND FREE SPEECH AND

04:20PM 22        DISSEMINATION OF INFORMATION AND THOSE THINGS, AND SO THE COURT

04:21PM 23        DOES HAVE, I HAVE SOME AUTHORITY TO REDACT CERTAIN INFORMATION

04:21PM 24        AND THERE'S SOME INFORMATION THAT I, AT LEAST THE LAW SUGGESTS,

04:21PM 25        I DON'T OF THE AUTHORITY TO DO, UNLESS THERE'S A SIGNIFICANT

04:21PM   1      SHOWING OF SECURITY ISSUE OR THOSE TYPES OF THINGS.

04:21PM   2          IF THE COURT WERE -- AND I'M TAKING EVERYTHING THAT YOU

04:21PM   3      TOLD ME AND TAKING NOTES, AND WE'RE ALL TAKING NOTES ABOUT

04:21PM   4      THIS -- IF THE COURT WERE NOT TO BE ABLE TO OR DOESN'T GRANT

04:21PM   5      EVERY ONE OF YOUR REQUESTS, WOULD THAT AFFECT YOUR ABILITY TO

04:21PM   6      REMAIN A FAIR AND IMPARTIAL JUROR IN THIS CASE?

04:21PM   7              JUROR:  NO.

04:21PM   8              THE COURT:  OKAY.  ALL RIGHT.

04:21PM   9          AND MY LAST QUESTION FOR YOU IS, AS A RESULT OF OUR

04:21PM  10      CONVERSATION AND THIS ISSUE, WOULD THIS IN ANY WAY IMPAIR YOUR

04:21PM  11      ABILITY TO CONTINUE TO BE A FAIR AND IMPARTIAL JUROR TO BOTH

04:21PM  12      SIDES?

04:21PM  13              JUROR:  I DON'T THINK SO.

04:21PM  14              THE COURT:  OKAY.

04:21PM  15              JUROR:  NOT BEING ABLE TO FORESEE EVERYTHING THAT

04:21PM  16      MIGHT HAPPEN AS A RESULT OF THIS, I DON'T THINK SO.  I WOULD

04:22PM  17      SAY NO.

04:22PM  18              THE COURT:  OKAY.  OKAY.

04:22PM  19          ANYTHING ELSE YOU WOULD LIKE ME TO KNOW?

04:22PM  20              JUROR:  NO.  THAT'S IT.

04:22PM  21              THE COURT:  THANK YOU VERY MUCH.

04:22PM  22          YOU CAN JUST LEAVE YOUR QUESTIONNAIRE THERE, AND WE'LL SEE

04:22PM  23      YOU TOMORROW MORNING.

04:22PM  24              JUROR:  OKAY.  THANK YOU.

04:22PM  25              THE COURT:  THANK YOU.

04:22PM   1           OKAY.  WHO IS NEXT?  NUMBER 10.

04:22PM   2           (PAUSE IN PROCEEDINGS.)

04:22PM   3           (JUROR NUMBER 10 PRESENT.)

04:23PM   4               THE CLERK:  JUROR NUMBER 10.

04:23PM   5               THE COURT:  ALL RIGHT.  THANK YOU.

04:23PM   6           GOOD AFTERNOON.  PLEASE HAVE A SEAT.

04:23PM   7           FIRST OF ALL, I'M GOING TO CALL YOU NOT BY YOUR NAME, BUT

04:23PM   8       BY YOUR JUROR NUMBER, NUMBER 10.  OKAY?  I MEAN NO DISRESPECT.

04:23PM   9               JUROR:  OKAY.

04:23PM  10               THE COURT:  I WANT TO TALK TO YOU ABOUT THE

04:23PM  11       QUESTIONNAIRE AND WHAT I MENTIONED THIS MORNING.

04:23PM  12           WE'RE HERE WITH MR. SCHENK FROM THE GOVERNMENT, MR. DOWNEY

04:23PM  13       FROM MS. HOLMES'S TEAM, MY LAW CLERKS, AND MS. KRATZMANN WHO

04:23PM  14       YOU KNOW, AND THE COURT REPORTERS.

04:23PM  15           FIRST OF ALL, CAN YOU TELL ME, WHAT IS YOUR COMFORT LEVEL

04:24PM  16       ABOUT KEEPING YOUR MASK ON?

04:24PM  17               JUROR:  I WANT TO TAKE --

04:24PM  18               THE COURT:  YOU WANT TO KEEP IT ON?

04:24PM  19               JUROR:  NO.

04:24PM  20               THE COURT:  THANK YOU.  WE'LL TAKE OURS OFF, TOO.

04:24PM  21       THANK YOU.  I THINK I'VE TOLD YOU BEFORE, WE'VE ALL BEEN

04:24PM  22       VACCINATED HERE.

04:24PM  23               JUROR:  YES.

04:24PM  24               THE COURT:  THANK YOU.  I WANT TO ASK YOU SOME

04:24PM  25       QUESTIONS ABOUT YOUR QUESTIONNAIRE AND THE ANSWERS THAT YOU PUT

04:24PM  1    ON YOUR QUESTIONNAIRE.

04:24PM  2              JUROR:  UH-HUH.

04:24PM  3              THE COURT:  WHEN YOU FILLED IT OUT, I TOLD YOU AND I

04:24PM  4    MADE A PROMISE IN THE QUESTIONNAIRE THAT ALL OF THAT

04:24PM  5    INFORMATION WOULD REMAIN PRIVATE, AND IF IT WOULD BE RELEASED,

04:24PM  6    IT WOULD BE RELEASED WITH CERTAIN THINGS ERASED, LIKE YOUR NAME

04:24PM  7    AND OTHER THINGS.

04:24PM  8         I TOLD YOU THIS MORNING THAT A GROUP OF INDIVIDUALS FROM

04:24PM  9    NEWSPAPERS AND OTHER MEDIA FILED A MOTION ASKING ME TO RELEASE

04:24PM  10   THIS INFORMATION, AND THEY FILED A MOTION AND WE HAD A HEARING

04:24PM  11   ON THAT MOTION.

04:24PM  12        PART OF MY DECISION PROCESS IS ASKING EACH OF THE JURORS

04:24PM  13   WHETHER OR NOT THEY HAVE CONCERNS ABOUT RELEASING THIS

04:25PM  14   INFORMATION TO THE MEDIA AS THEY WISH.

04:25PM  15        AND PART OF THE CONCERNS THAT I HAVE WOULD TOUCH ON

04:25PM  16   WHETHER THE JURORS HAVE CONCERNS ABOUT THE INFORMATION THAT

04:25PM  17   INCLUDES NAME, EMPLOYMENT, GEOGRAPHIC AREA WHERE THEY LIVE, AND

04:25PM  18   ANY OTHER ISSUES OF PERSONAL INFORMATION THAT MIGHT BE CONCERNS

04:25PM  19   FOR PRIVACY, SECURITY, OR SAFETY ISSUES, ANY OF THOSE ISSUES

04:25PM  20   THAT COME UP.

04:25PM  21        NOW, I DO HAVE SOME AUTHORITY TO KEEP CERTAIN INFORMATION

04:25PM  22   REDACTED, HIGHLIGHTED OUT SO NOBODY CAN FIND IT, BUT THEY'RE --

04:25PM  23   I CAN ONLY DO THAT IN CERTAIN CIRCUMSTANCES.  AND THE LAWYER

04:25PM  24   WHO BROUGHT THE MOTION REMINDED ME OF THAT.

04:25PM  25        I'M NOW TRYING TO MAKE A DECISION ABOUT WHAT I CAN AND

04:25PM 1    CAN'T DO, AND THAT'S PART OF WHY I'M ASKING EACH OF THE JURORS

04:25PM 2    THIS.

04:25PM 3         SO I WANT TO ASK YOU, JUROR NUMBER 10, DO YOU HAVE ANY

04:25PM 4    CONCERNS ABOUT ANYTHING IN YOUR QUESTIONNAIRE THAT YOU WOULD --

04:26PM 5    EITHER CONCERNS ABOUT RELEASING THAT INFORMATION, OR NO

04:26PM 6    CONCERNS ABOUT RELEASING THE INFORMATION?

04:26PM 7              JUROR:  LIKE, JUST MY NAME.

04:26PM 8              THE COURT:  JUST YOUR NAME?

04:26PM 9              JUROR:  YEAH.  AND I THINK I PUT ONE OF MY NIECE'S

04:26PM 10   NAMES, TOO.

04:26PM 11             THE COURT:  OKAY.  LET ME -- LET'S LOOK THROUGH

04:26PM 12   THAT.

04:26PM 13        SO YOUR NAME, AND THEN YOUR NIECE'S NAME.  LET ME SEE.

04:26PM 14   LET ME FIND OUT -- OH, YES, THAT'S ON QUESTION NUMBER 27 I

04:26PM 15   THINK.

04:26PM 16             JUROR:  UH-HUH.

04:26PM 17             THE COURT:  AND YOU'D LIKE HER NAME NOT LISTED.

04:26PM 18        WHY IS THAT?  TELL ME WHY THAT IS.

04:26PM 19             JUROR:  I JUST DON'T WANT TO EXPOSE HER TO ALL OF

04:26PM 20   THIS.

04:26PM 21             THE COURT:  OKAY.  AND I WANT TO ASK YOU ABOUT --

04:26PM 22   BECAUSE I LOOKED AT YOUR QUESTIONNAIRE, AND I HAD SOME

04:26PM 23   QUESTIONS ABOUT SOME OF YOUR PERSONAL INFORMATION.

04:26PM 24        QUESTION NUMBER 49.

04:27PM 25             JUROR:  UH-HUH.

04:27PM   1                    THE COURT:  DO YOU HAVE ANY PRIVACY ISSUES ABOUT

04:27PM   2      THAT INFORMATION --

04:27PM   3                    JUROR:  NO.

04:27PM   4                    THE COURT:  -- THAT YOU WOULD NOT WANT THE PUBLIC TO

04:27PM   5      KNOW?

04:27PM   6                    JUROR:  NO, THAT'S FINE.

04:27PM   7                    THE COURT:  OKAY.  SO YOUR NAME IS THE BIG CONCERN

04:27PM   8      THAT YOU HAVE?

04:27PM   9                    JUROR:  YEAH.

04:27PM  10                    THE COURT:  RIGHT.  LET ME JUST ASK YOU, BECAUSE

04:27PM  11      THIS SOMETIMES COMES UP, WHAT ABOUT YOUR JOB, WHERE YOU WORK?

04:27PM  12      DOES THAT CAUSE YOU ANY CONCERN?

04:27PM  13                    JUROR:  PROBABLY THAT, TOO.

04:27PM  14                    THE COURT:  OKAY.  THAT'S NUMBER 16.

04:27PM  15                 AND YOU WOULD LIKE TO HAVE THAT REMOVED IF POSSIBLE?

04:27PM  16                    JUROR:  YEAH, UH-HUH.

04:27PM  17                    THE COURT:  OKAY.  ANYTHING ELSE?

04:27PM  18                    JUROR:  NO, THAT'S IT.

04:27PM  19                    THE COURT:  OKAY.  ALL RIGHT.

04:27PM  20                 LET ME ASK YOU A COUPLE OF OTHER QUESTIONS.  AS I SAID, I

04:27PM  21      CAN, I CAN REMOVE SOME INFORMATION IF IT'S LEGALLY PERMITTED.

04:27PM  22                 IF I'M NOT ABLE TO RELEASE THIS INFORMATION, WILL THAT

04:28PM  23      CAUSE YOU ANY PROBLEM TO CONTINUE AS A FAIR JUROR IN THIS CASE?

04:28PM  24                    JUROR:  NO.

04:28PM  25                    THE COURT:  OKAY.

SEALED PROCEEDINGS

04:28PM  1          AND MY NEXT QUESTION, MY LAST QUESTION, IS AS A RESULT OF

04:28PM  2    ANY OF THIS, OUR CONVERSATION OR ANY OF THIS, DOES THAT AFFECT

04:28PM  3    YOUR ABILITY TO BE A FAIR AND IMPARTIAL JUROR IN THIS CASE?

04:28PM  4              JUROR:  NO.

04:28PM  5              THE COURT:  NO?  YOUR ANSWER WAS?

04:28PM  6              JUROR:  NO.

04:28PM  7              THE COURT:  NO.  OKAY.  ALL RIGHT.

04:28PM  8        YOU CAN JUST LEAVE YOUR QUESTIONNAIRE ON THE TABLE.

04:28PM  9              JUROR:  ALL RIGHT.

04:28PM 10              THE COURT:  THANK YOU VERY MUCH.  WE'LL SEE YOU

04:28PM 11    TOMORROW MORNING.

04:28PM 12              JUROR:  THANK YOU.

04:28PM 13              THE COURT:  YOU'RE WELCOME.

04:29PM 14          (PAUSE IN PROCEEDINGS.)

04:29PM 15          (JUROR NUMBER 12 PRESENT.)

04:29PM 16              THE CLERK:  JUROR 12.

04:29PM 17              JUROR:  HI.

04:29PM 18              THE COURT:  HI.  EXCUSE ME.

04:30PM 19        ALL RIGHT.  WE'RE IN CHAMBERS WITH JUROR NUMBER 12.  I'M

04:30PM 20    GOING TO IDENTIFY YOU AS YOUR JUROR NUMBER, NOT YOUR NAME, AND

04:30PM 21    I MEAN NO DISRESPECT.

04:30PM 22        WE'RE HERE WITH MR. DOWNEY, MR. SCHENK BEHIND YOU FROM THE

04:30PM 23    GOVERNMENT AND FROM MS. HOLMES'S TEAM.

04:30PM 24        TWO OF MY LAW CLERKS ARE HERE, AND OF COURSE YOU KNOW

04:30PM 25    MS. KRATZMANN.

SEALED PROCEEDINGS

04:30PM 1      AND WE'RE HERE TO DISCUSS WHAT I MENTIONED THIS MORNING

04:30PM 2  ABOUT THIS MOTION THAT WAS FILED BY THE MEDIA COALITION.

04:30PM 3      FIRST OF ALL, LET ME ASK YOU YOUR COMFORT LEVEL ABOUT YOUR

04:30PM 4  MASK.

04:30PM 5          JUROR:  YES.

04:30PM 6          THE COURT:  DO YOU WANT TO KEEP IT ON OR TAKE IT

04:30PM 7  OFF?

04:30PM 8          JUROR:  YES, I'LL TAKE IT OFF.

04:30PM 9          THE COURT:  FAIR ENOUGH.  WE'LL DO THE SAME.  THANK

04:30PM 10 YOU.

04:30PM 11     SO AS I MENTIONED THIS MORNING, WHEN YOU FILLED OUT THE

04:30PM 12 QUESTIONNAIRE, YOU DID SO UNDER THE PROMISE THAT I MADE TO YOU

04:30PM 13 THAT YOUR INFORMATION WOULD BE CONFIDENTIAL AND THAT IT WOULD

04:30PM 14 REMAIN CONFIDENTIAL.  I THINK IT SAYS SOMETHING ABOUT YOUR

04:31PM 15 NAMES MIGHT BE REDACTED OR THOSE TYPES OF THINGS.

04:31PM 16     THE MEDIA COALITION THAT I IDENTIFIED THIS MORNING FILED A

04:31PM 17 MOTION ASKING THAT I UNSEAL THE QUESTIONNAIRES AND PROVIDE

04:31PM 18 THOSE TO THE MEDIA FOR THEIR USE.

04:31PM 19     LET ME TELL YOU THAT THERE ARE CERTAIN FIRST AMENDMENT

04:31PM 20 ISSUES THAT THE MOTION RAISED AND I HAVE TO CONSIDER THOSE,

04:31PM 21 INCLUDING SUPREME COURT PRECEDENT AND OTHER PRECEDENT FROM

04:31PM 22 COURTS REGARDING DECISIONS LIKE THIS.

04:31PM 23     I, AS PART OF THIS PROCESS, I WANT TO SPEAK TO EACH OF OUR

04:31PM 24 JURORS TO ASK THEM WHETHER OR NOT THEY HAVE ANY CONCERNS OR NO

04:31PM 25 CONCERNS ABOUT THE COURT RELEASING INFORMATION IN THE

04:31PM 1    QUESTIONNAIRES, AND THIS INCLUDES PERSONAL INFORMATION, NAME,

04:31PM 2    EMPLOYMENT, GEOGRAPHIC LOCATIONS, WHERE SOMEONE MIGHT LIVE, AND

04:31PM 3    ANY OTHER PERSONAL INFORMATION THAT A JUROR MIGHT FEEL IS -- OR

04:32PM 4    HAVE CONCERNS ABOUT RELEASING.

04:32PM 5        AS I SAID, THE COURT MAY ORDER CERTAIN INFORMATION

04:32PM 6    REDACTED IF THERE ARE GOOD REASONS, GOOD LEGAL REASONS FOR

04:32PM 7    DOING SO.

04:32PM 8        I'D LIKE YOU TO BE CANDID WITH ME ABOUT YOUR QUESTIONNAIRE

04:32PM 9    AND THE INFORMATION IN IT, AND I WANT TO KNOW WHETHER OR NOT

04:32PM 10   THERE IS ANY INFORMATION IN THERE, WHETHER YOU HAVE CONCERNS

04:32PM 11   ABOUT THE COURT RELEASING ANY OF THE INFORMATION AND THE

04:32PM 12   REASONS WHY IF YOU HAVE ANY.

04:32PM 13       I'M CURIOUS ABOUT ISSUES REGARDING SECURITY, SAFETY, OR

04:32PM 14   PRIVACY, THOSE TYPES OF CONCERNS, OR ANY OTHER CONCERNS THAT

04:32PM 15   YOU MIGHT HAVE.

04:32PM 16       SO JUROR NUMBER 12, COULD YOU JUST SHARE WITH ME YOUR

04:32PM 17   THOUGHTS ABOUT THAT?

04:32PM 18           JUROR:  WELL, I DON'T THINK THERE'S ANYTHING

04:32PM 19   PARTICULAR IN MY QUESTIONNAIRE THAT I'M CONCERNED ABOUT.

04:32PM 20       I THINK IT'S JUST THE PRINCIPLE.  SO I FEEL WE'RE IN A

04:32PM 21   CONTRACT AND, YOU KNOW, I WOULD EXPECT THAT YOU WOULD KEEP UP

04:33PM 22   YOUR END OF THE BARGAIN, AS I HAVE KEPT UP MY END OF THE

04:33PM 23   BARGAIN.

04:33PM 24       AND, YOU KNOW, I COME BEFORE YOU BEFORE BECAUSE I, YOU

04:33PM 25   KNOW, SHARED SOME INFORMATION THAT I THOUGHT MIGHT -- THAT I

04:33PM 1    THOUGHT SHOULD JUST BE OUT THERE AND NOT NECESSARILY THAT IT

04:33PM 2    HAD ANY IMPACT, BUT I JUST WANTED TO BE REVEALING OF ANY

04:33PM 3    CONCERNS THAT I HAD.

04:33PM 4         SO AS I KNEW THAT THAT WAS, I WANTED TO KNOW THAT I SHARED

04:33PM 5    THAT AND THERE WOULD BE NO QUESTIONS LATER.

04:33PM 6         BUT I GUESS MY CONCERN IS JUST A CONCERN, YOU KNOW, I'VE

04:33PM 7    BEEN -- I DON'T WIN THE LOTTERY, BUT I CERTAINLY GET ASKED TO

04:33PM 8    COME TO JURY ALL OF THE TIME.

04:33PM 9         THIS IS AT LEAST MY EIGHTH SUMMONS.

04:33PM 10             THE COURT:  OH MY GOODNESS.

04:33PM 11             JUROR:  I'VE SERVED ON THREE JURIES, THIS IS MY

04:33PM 12   THIRD, AND I HAVE BEEN PLACED AS A JUROR THREE TIMES BUT THEN

04:34PM 13   RELEASED, YOU KNOW, DISMISSED.

04:34PM 14        SO CHANCES ARE I'M GOING TO BE ASKED TO GO TO JURY DUTY

04:34PM 15   AGAIN, AND I KNOW DEPENDING ON WHAT KIND OF CASE IT IS, THE

04:34PM 16   QUESTIONS VARY.

04:34PM 17        SO IF IT'S SOMETHING MORE OF A PERSONAL SITUATION WHERE ME

04:34PM 18   OR MY FAMILY OR FRIENDS HAVE BEEN INVOLVED IN THAT TYPE OF

04:34PM 19   CASE, IT MIGHT BE MORE PERSONAL INFORMATION THAT I'M RELEASING.

04:34PM 20        SO THE THOUGHT THAT THAT COULD BEING RELEASED IN THE

04:34PM 21   FUTURE CONCERNS ME.

04:34PM 22        SO I FEEL IT'S OUR DUTY TO DO THIS AND TO JUST BE -- I

04:34PM 23   DON'T KNOW IF "EXPOSED" IS THE RIGHT WORD, BUT YOU KNOW, I

04:34PM 24   WATCH A LOT OF "20/20" AND THEN THERE ARE ALWAYS THESE JURORS

04:34PM 25   THAT GO ON "20/20" AND THEY'RE ON A PANEL AND THEY TALK ABOUT

04:35PM 1    THIS AND THAT.

04:35PM 2         AND I'M NOT DOING THAT.  I KNOW THIS IS A HIGH VISIBILITY

04:35PM 3    CASE, BUT, YOU KNOW, I'M JUST -- I'M A VERY PRIVATE PERSON.  IF

04:35PM 4    YOU LOOK -- I'M NOT REALLY ON SOCIAL MEDIA AND I'M ONLY THERE

04:35PM 5    BECAUSE OF MY SON AND GRANDCHILDREN.  OTHERWISE I DON'T HAVE

04:35PM 6    PICTURES AND I DON'T HAVE LIKES, I DON'T DO HEARTS, I DON'T DO

04:35PM 7    ANYTHING ON SOCIAL MEDIA.  I HAVE NO PICTURES.  I BARELY PUT A

04:35PM 8    PICTURE ON LINKEDIN BECAUSE SOMEBODY SAID IF YOU WANT A JOB,

04:35PM 9    PUT YOUR PICTURE UP.

04:35PM 10        BUT OTHERWISE I DON'T DO ANY SOCIAL MEDIA WHATSOEVER.

04:35PM 11        SO THE THOUGHT OF HAVING ANYTHING ABOUT MY PERSONAL LIFE

04:35PM 12   OUT THERE THAT I DIDN'T GIVE TO YOU OR I DIDN'T SHARE WITH YOU

04:35PM 13   OR TALK TO YOU ABOUT IS NOT SOMETHING THAT SITS WELL WITH ME.

04:35PM 14            THE COURT:  OKAY.  WELL, THANK YOU FOR YOUR CANDOR,

04:35PM 15   AND I APPRECIATE THAT, AND THANK YOU FOR CALLING ME OUT ON MY

04:35PM 16   PROMISE.

04:35PM 17        AND I MENTIONED THAT DURING OUR HEARING, I WANT YOU TO

04:35PM 18   KNOW, I MENTIONED TO THE LAWYER WHO BROUGHT THE MOTION, I SAID,

04:35PM 19   YOU KNOW, SIR, I MADE THE PROMISE TO THE JURY THAT THEIR

04:36PM 20   INFORMATION WOULD BE PRIVATE, AND YOU'RE TELLING ME, FROM HIS

04:36PM 21   POSITION, THAT SUPREME COURT LAW AND OTHER LAW SUGGESTS

04:36PM 22   OTHERWISE, YOU'RE KIND OF WAGGING YOUR FINGER AT ME TELLING ME

04:36PM 23   YOU SHOULDN'T HAVE MADE THAT PROMISE, JUDGE.

04:36PM 24        SO THAT'S WHY WE'RE HAVING THIS HEARING AND THE HEARING

04:36PM 25   WITH THAT MOTION AND WHY I'M HAVING THIS CONVERSATION WITH YOU.

SEALED PROCEEDINGS

04:36PM  1          LET ME ASK YOU SPECIFICALLY, JUROR NUMBER 12, IF I WERE TO

04:36PM  2   REDACT YOUR NAME FROM THE QUESTIONNAIRE AND NOT ALLOW THAT TO

04:36PM  3   BE RELEASED, WOULD THAT GIVE YOU COMFORT?

04:36PM  4          JUROR:  CAN I HAD TAKE A QUICK LOOK?

04:36PM  5          THE COURT:  YES, PLEASE.  THAT'S NUMBER 11.

04:36PM  6      (PAUSE IN PROCEEDINGS.)

04:36PM  7          JUROR:  I MEAN, I DO MENTION THAT I HAVE A SON.  I

04:36PM  8   DON'T MENTION HIS NAME.

04:36PM  9          ON NUMBER 2, I ███████████████████████████, AND I DON'T

04:36PM  10  TELL ANYBODY THAT.  SO TO HAVE IT ON HERE, AND I WAS CONCERNED

04:36PM  11  ABOUT JUST BEING ABLE TO, YOU KNOW, ██████████████████████

04:37PM  12  ██████████████████████  SO THAT'S SOMETHING THAT I KEEP

04:37PM  13  PRIVATE.

04:37PM  14          THE COURT:  THAT'S A PERSONAL HEALTH ISSUE THAT YOU

04:37PM  15  WOULD LIKE TO KEEP PRIVATE.

04:37PM  16          JUROR:  I DON'T DISCLOSE IT WHEN I'M APPLYING FOR

04:37PM  17  JOBS, EITHER.

04:37PM  18          THE COURT:  OKAY.

04:37PM  19          JUROR:  I DON'T WANT THE WORLD TO KNOW THAT.  IF I

04:37PM  20  WANT YOU TO KNOW, I'LL TELL YOU.

04:37PM  21          THE COURT:  OKAY.

04:37PM  22          JUROR:  BUT, YEAH, I MEAN --

04:37PM  23          THE COURT:  SO YOUR NAME FOR QUESTION 11.

04:37PM  24          JUROR:  I'M SORRY, THE NAME I WOULD DEFINITELY WANT

04:37PM  25  REDACTED.

SEALED PROCEEDINGS

04:37PM 1           THE COURT:  OKAY.  SURE.

04:37PM 2           JUROR:  AGAIN, I MENTIONED I HAVE A SON.  I MENTION

04:37PM 3   HIS FATHER, BUT, AGAIN, NOT HIS NAME.

04:37PM 4           THE COURT:  I NOTICED YOU WORKED IN MILPITAS.

04:37PM 5           JUROR:  ███████████████████

04:37PM 6           THE COURT:  YEAH.

04:37PM 7           JUROR:  AND I WOULDN'T WANT THAT IN THERE, EITHER.

04:37PM 8           THE COURT:  IS THAT FOR REASON OF SAFETY REASONS AS

04:37PM 9   A FORMER EMPLOYEE OF ██████?

04:37PM 10          JUROR:  YES, FOR THE RECORD.

04:37PM 11     AND THAT I SERVED ON OTHER JURIES THAT WERE, YOU KNOW,

04:38PM 12   WHERE WE DID GUILTY PLEAS.

04:38PM 13          THE COURT:  OKAY.  I SEE.  THAT'S QUESTION 47, YOUR

04:38PM 14   EXPERIENCE WITH THE LEGAL SYSTEM.

04:38PM 15          JUROR:  YOU KNOW, HAVE I EVER BEEN TO COURT?  I

04:38PM 16   DON'T WANT PEOPLE TO KNOW THAT I WAS IN FAMILY COURT.

04:38PM 17          THE COURT:  YES, I SEE.

04:38PM 18     LET ME FINISH 47 IF I MAY.

04:38PM 19          JUROR:  OH, SORRY.  47.

04:38PM 20          THE COURT:  I HAVE TO KEEP IT NUMERICAL, OTHERWISE

04:38PM 21   I'LL LOSE TRACK.

04:38PM 22          JUROR:  YES.

04:38PM 23          THE COURT:  SO 47 SPEAKS ABOUT EXPERIENCE WITH THE

04:38PM 24   LEGAL SYSTEM AND JURY EXPERIENCE.

04:38PM 25          JUROR:  RIGHT.

04:38PM  1          THE COURT:  IF THE COURT WERE TO REDACT THE LOCATION

04:38PM  2     OF YOUR SERVICE, WOULD THAT BRING YOU GREATER COMFORT?

04:38PM  3          JUROR:  YEAH.  LOCATION MEANING ███████████?

04:38PM  4          THE COURT:  YES, AND JUST LEFT THE YEAR.

04:38PM  5          JUROR:  DO WE HAVE TO LEAVE THE VERDICT?  I GUESS IT

04:38PM  6     DOESN'T MATTER BECAUSE THERE'S NO NAMES ATTACHED TO IT.

04:39PM  7          THE COURT:  WELL, IT DOESN'T ASK FOR WHAT THE

04:39PM  8     VERDICT WAS.  IT JUST ASKS WHETHER YOU WERE ABLE TO REACH ONE.

04:39PM  9          JUROR:  RIGHT.  RIGHT.

04:39PM  10        AND THE DATES.

04:39PM  11         THE COURT:  WELL, IT SOUNDS LIKE YOUR PREFERENCE

04:39PM  12    WOULD BE TO STRIKE LOCATION AND DATES.

04:39PM  13         JUROR:  YEAH.

04:39PM  14         THE COURT:  AND -- OKAY.  THANK YOU FOR GIVING ME

04:39PM  15    THAT INFORMATION.

04:39PM  16        LET'S GO TO 48.  THIS WAS -- THIS IS AN ISSUE ABOUT YOUR

04:39PM  17    PERSONAL EXPERIENCE --

04:39PM  18         JUROR:  YES.

04:39PM  19         THE COURT:  -- IN FAMILY COURT.  THIS WAS SOMETHING

04:39PM  20    THAT, PARDON ME, YOU WERE SEEKING SUPPORT, AND YOU HAD TO RELY

04:39PM  21    ON THE JUDICIAL PROCESS TO DO THAT.

04:39PM  22         PROSPECTIVE JUROR:  RIGHT.

04:39PM  23         THE COURT:  AND THAT'S A PERSONAL ISSUE.

04:39PM  24         JUROR:  YEAH, IT IS.

04:39PM  25         THE COURT:  OKAY.

SEALED PROCEEDINGS

04:39PM 1        JUROR:  I DON'T THINK THERE'S MUCH AFTER THAT;

04:39PM 2    RIGHT?

04:39PM 3        OH, AND JUST THE LAST -- ONE OF THE LAST PAGES AT LEAST.

04:40PM 4        THE COURT:  PAGE 23 HAS YOUR NAME AND I'LL -- AND

04:40PM 5    THEN PAGE 24 HAS SOME OTHER COMMENTS.

04:40PM 6        JUROR:  YEAH, 24.

04:40PM 7        THE COURT:  AND THE MIDDLE PARAGRAPH TALKS ABOUT THE

04:40PM 8    WORK THAT YOU DID FOR ███████████.

04:40PM 9        JUROR:  YEAH.

04:40PM 10        THE COURT:  IS THAT PRIVATE AND OTHERWISE?

04:40PM 11        JUROR:  YEAH, I MEAN, I JUST DON'T PUT THAT KIND OF

04:40PM 12   STUFF OUT THERE.  IF I WANT YOU TO KNOW, I'LL TELL YOU.

04:40PM 13        THE COURT:  OKAY.

04:40PM 14        JUROR:  IF I WANT TO WISH YOU HAPPY BIRTHDAY, I

04:40PM 15   DON'T PUT IT ON FACEBOOK.  I'LL SEND YOU A CARD OR A CALL YOU.

04:40PM 16   I JUST DON'T PUT IT OUT THERE FOR THE WORLD.

04:40PM 17        THE COURT:  OKAY.

04:40PM 18        JUROR:  AND JUST AS I MENTIONED BEFORE, THIS WOULD

04:40PM 19   SORT OF GIVE ME SECOND THOUGHTS IF I EVER WAS PLACED ON ANOTHER

04:40PM 20   JURY, IF THEY ASKED ME IF I HAD ANY OTHER CONCERNS, IT WOULD

04:40PM 21   BE, YES, YOU KNOW, THAT THE FEDERAL GOVERNMENT, YOU KNOW,

04:40PM 22   POSSIBLY EXPOSED OUR INFORMATION TO THE WORLD.

04:41PM 23        AND I WOULD -- I WOULD PROBABLY BE COMPELLED TO ASK TO BE

04:41PM 24   REMOVED.

04:41PM 25        THE COURT:  I SEE.  OKAY.  THE --

04:41PM   1        JUROR:  I WOULDN'T FEEL COMFORTABLE.  AGAIN, IT

04:41PM   2   DEPENDS ON -- THE QUESTIONS DEPEND ON THE KIND OF, YOU KNOW,

04:41PM   3   CRIME YOU'RE BEING ON A JURY FOR.  AND IF -- AGAIN, IT'S NOT

04:41PM   4   EVEN THAT.  IT'S THE PRINCIPLE OF KNOWING THAT WHATEVER

04:41PM   5   INFORMATION YOU'RE RELEASING, IT COULD BE PUBLIC INFORMATION.

04:41PM   6        THE COURT:  YOU MENTION THE FEDERAL GOVERNMENT.

04:41PM   7   THIS IS A MOTION THAT WAS BROUGHT BY THE MEDIA COALITION THAT

04:41PM   8   WAS -- I JUST WANT YOU TO UNDERSTAND THAT.

04:41PM   9        JUROR:  RIGHT.  BUT YOU'RE --

04:41PM  10        THE COURT:  AND IT'S BROUGHT TO THE JUDGE WHO WILL

04:41PM  11   HAVE TO MAKE A DECISION ABOUT RELEASING THAT INFORMATION.

04:41PM  12      BUT IT'S NOT WHAT THEY CALL SUA SPONTE, IT'S NOT ON THE

04:41PM  13   COURT'S -- IT'S THE MEDIA'S MOTION.

04:41PM  14        JUROR:  BUT I'M JUST SAYING, WHATEVER, APPROVED OR

04:41PM  15   JUDGMENT IS FOR THEM, THEN IT'S THE FEDERAL GOVERNMENT

04:41PM  16   RELEASING IT TO THEM.

04:41PM  17        THE COURT:  IT'S ME.

04:41PM  18        JUROR:  IT'S YOU.

04:41PM  19        THE COURT:  IT'S ME.  I AM THE ONE WHO WILL MAKE

04:42PM  20   THIS DECISION AS TO WHETHER OR NOT --

04:42PM  21        JUROR:  SO THAT'S AS HIGH OF THE COURT THAT YOU'RE

04:42PM  22   GOING TO GET IN.

04:42PM  23        THE COURT:  THANK YOU FOR THAT, BUT THERE ARE COURTS

04:42PM  24   HIGHER THAN MINE, I HAVE TO TELL YOU.

04:42PM  25        JUROR:  WELL, THIS IS THE HIGHEST ONE THAT I'VE EVER

04:42PM 1    BEEN IN.

04:42PM 2         (LAUGHTER.)

04:42PM 3         JUROR:  WELL, MY THOUGHT IS IF THE FEDERAL

04:42PM 4    GOVERNMENT IS GOING TO DO IT, THEN SANTA CLARA, CITY, STATE IS

04:42PM 5    GOING TO DO IT, TOO.

04:42PM 6         THE COURT:  I THINK WHAT YOU'RE TELLING ME IS THAT

04:42PM 7    THAT CAUSES YOU SOME PERSONAL CONCERN ABOUT THAT.

04:42PM 8         JUROR:  YES.  IT'S THE PRINCIPLE.  IT'S NOT

04:42PM 9    NECESSARILY WHAT I TALKED ABOUT EVERYTHING I DON'T WANT IN

04:42PM 10   HERE, BUT, AGAIN, THERE COULD BE QUESTIONNAIRES OR QUESTIONS

04:42PM 11   ASKED.

04:42PM 12        AND I DON'T KNOW IF IT'S DONE DIFFERENTLY IN FEDERAL, BUT

04:42PM 13   BEFORE IN THE EXPERIENCES THAT I'VE HAD, THEY ALWAYS SEAT THE

04:42PM 14   JURY, THE 12, AND THEN THEY, YOU KNOW, DO THE VETTING THEN, AND

04:42PM 15   THEN AS THEY'RE ELIMINATED, THEN YOU'RE SEATED WITH OTHER

04:42PM 16   JURORS.

04:42PM 17        THE COURT:  RIGHT.

04:42PM 18        JUROR:  SO THAT'S VERBAL AND THAT'S ALREADY OUT

04:42PM 19   THERE.  THIS WAS A QUESTIONNAIRE IN BLACK AND WHITE AND NOW

04:42PM 20   THEY HAVE TO ASK FOR PERMISSION.

04:43PM 21        SO IF YOU'RE SITTING IN A JURY BOX AND THEY'RE VETTING

04:43PM 22   YOU, IT'S OUT THERE AND THEY'RE TAKING NOTES AND THEY'RE DOING

04:43PM 23   WHATEVER THEY DO.

04:43PM 24        AND NOW IT'S LIKE I DON'T HAVE A CHOICE, SO THAT'S A

04:43PM 25   CONCERN FOR ME.

04:43PM  1            THE COURT:  OKAY.

04:43PM  2            JUROR:  AGAIN, I DON'T KNOW IF IT'S DIFFERENT IN

04:43PM  3    FEDERAL, BUT THAT'S -- YOU KNOW.

04:43PM  4            THE COURT:  SO LET ME ASK YOU, JUROR NUMBER 12, IF

04:43PM  5    THE COURT WERE NOT ABLE TO GRANT EACH OF YOUR REQUESTS FOR

04:43PM  6    REDACTION AND IF I FOUND THAT LEGALLY THAT I WAS COMPELLED OR

04:43PM  7    THAT I HAD TO RELEASE SOME OF THE INFORMATION, MAYBE NOT YOUR

04:43PM  8    NAME, BUT SOME OF THE INFORMATION --

04:43PM  9            JUROR:  MAYBE NOT MY NAME.

04:43PM 10            THE COURT:  NOT YOUR NAME, LET ME PUT IT THAT WAY,

04:43PM 11    IF YOUR NAME IS NOT RELEASED AND KEPT CONFIDENTIAL, BUT SOME OF

04:43PM 12    THE OTHER INFORMATION WAS NOT, WOULD THAT AFFECT YOUR ABILITY

04:43PM 13    TO BE A FAIR AND IMPARTIAL JUROR IN THIS CASE?  COULD YOU

04:43PM 14    CONTINUE TO BE A FAIR AND IMPARTIAL JUROR TO BOTH SIDES IN THIS

04:44PM 15    CASE?

04:44PM 16            JUROR:  I MEAN, I COULD FAIR AND IMPARTIAL, BUT IF I

04:44PM 17    REQUEST TO REMOVE MYSELF TODAY, WOULD THAT TAKE ME OUT OF THE

04:44PM 18    POOL OF INFORMATION TO BE RELEASED?

04:44PM 19        I MEAN, THAT'S SOMETHING -- HONEST TO GOSH, I WASN'T EVEN

04:44PM 20    TAKING NOTES ON THE TRIAL.  I WAS WRITING NOTES ON WHAT I WAS

04:44PM 21    GOING TO SAY TO YOU ON THIS LAST SESSION, BUT THOSE WERE THINGS

04:44PM 22    THAT I WAS THINKING ABOUT.

04:44PM 23        WELL, IF I GET DISMISSED TODAY, DOES THAT TAKE ME OUT OF

04:44PM 24    THE INFORMATION RELEASE POOL?

04:44PM 25        SO I CAN BE FAIR AS FAR AS THE TRIAL GOES.

04:44PM    1            AGAIN, THERE'S NOT A LOT THAT I'M SUPER CONCERNED ABOUT AS

04:44PM    2    FAR AS THE INFORMATION THAT YOU HAVE.

04:44PM    3                 THE COURT:  RIGHT.

04:44PM    4                 JUROR:  SO -- BUT, YES, THE QUESTION IS, WILL I?  I

04:45PM    5    WILL.

04:45PM    6                 THE COURT:  OKAY.  THANK YOU.

04:45PM    7            AND THEN MY LAST QUESTION IS, CAN YOU CONTINUE TO BE A

04:45PM    8    FAIR AND IMPARTIAL JUROR TO BOTH SIDES IN THIS CASE?

04:45PM    9                 JUROR:  I CAN.

04:45PM   10                 THE COURT:  OKAY.  GREAT.

04:45PM   11            ANYTHING ELSE YOU WOULD LIKE ME TO KNOW?

04:45PM   12                 JUROR:  SO -- NO.  BUT I HAVE QUESTIONS.

04:45PM   13                 THE COURT:  OKAY.  SURE.

04:45PM   14                 JUROR:  SO THE DECISION IS YOURS?

04:45PM   15                 THE COURT:  IT IS.

04:45PM   16                 JUROR:  AND, OF COURSE, YOU'LL LET US KNOW WHAT THAT

04:45PM   17    DECISION IS?

04:45PM   18                 THE COURT:  I WILL.

04:45PM   19                 JUROR:  BEFORE THE INFORMATION GETS RELEASED?

04:45PM   20                 THE COURT:  LET ME TELL YOU, WHAT I'M GOING TO DO IS

04:45PM   21    COLLECT ALL OF THE INFORMATION, YOURS AND YOUR COLLEAGUES, AND

04:45PM   22    THEN I HAVE TO COMPARE THE REQUESTS, THE REASONS FOR

04:45PM   23    REDACTIONS, THE REASONS THAT THE PEOPLE HAVE STATED, AND THEN I

04:45PM   24    HAVE TO DETERMINE WHETHER OR NOT THE REASONS MEET THE LEGAL

04:45PM   25    REQUIREMENTS THAT PERMIT ME TO KEEP SOMETHING CONFIDENTIAL OR

04:45PM 1    NOT.

04:45PM 2         IN SOME CASES IT MAY, AND IN SOME CASES IT MAY NOT, AND

04:45PM 3    CERTAIN INFORMATION MAY BE RELEASED TO THE MEDIA PURSUANT TO

04:46PM 4    THEIR MOTION.

04:46PM 5         WHAT I INTEND TO DO IS TO DRAFT AN ORDER, AND THAT ORDER

04:46PM 6    WILL BE PUBLIC, THAT ORDER WILL BE A PUBLIC INFORMATION.

04:46PM 7         AND WHAT I WILL MOST LIKELY DO IS TO -- ONCE THAT ORDER IS

04:46PM 8    PREPARED, I'LL PROBABLY HAVE ANOTHER CONVERSATION WITH THE JURY

04:46PM 9    TO ASK, RECOGNIZING THAT NOW, DOES THAT CHANGE OR IN ANY WAY

04:46PM 10   AFFECT YOUR ABILITY TO CONTINUE TO BE FAIR AND IMPARTIAL?

04:46PM 11        I'M ASKING THAT QUESTION NOW IN ADVANCE OF THAT JUST TO

04:46PM 12   SEE?

04:46PM 13             JUROR:  SO DO YOU HAVE A HARD YES OR NO?  OR DO YOU

04:46PM 14   HAVE TO REVIEW THE REASONS FOR THE REQUEST FOR REDACTION?

04:46PM 15             THE COURT:  YES, I DO HAVE TO REVIEW THE REASONS FOR

04:46PM 16   THE REDACTION, YES.

04:46PM 17             JUROR:  SO CAN YOU SAY A HARD, NO, I'M NOT DOING

04:46PM 18   THIS?  OR ARE YOU GOING TO GO CASE BY CASE?

04:46PM 19             THE COURT:  I'M GOING TO GO JUROR BY JUROR.

04:46PM 20             JUROR:  SO SOME JURORS, IF THEY HAVE ENOUGH

04:46PM 21   COMPELLING REASON, IT'S JUST, NO, WE'RE NOT GOING TO DO IT?

04:47PM 22             THE COURT:  IT MAY BE FOR CERTAIN JURORS, YES,

04:47PM 23   RIGHT.

04:47PM 24             JUROR:  OKAY.

04:47PM 25             THE COURT:  IT'S NOT -- YOU KNOW, IT'S NOT JUST ME

04:47PM  1    DECIDING THIS ON A WHIM, GEE, I LIKE JUROR NUMBER 7.

04:47PM  2              JUROR:  WELL, I WAS THINKING ONE JUROR, IF YOU PUT

04:47PM  3    YOU US ALL IN A PILE AND SAY, NO, THERE'S ENOUGH REASONS,

04:47PM  4    WHETHER IT'S JUROR 1, 2, OR 3 OR 6, 7, 8, I'M JUST NOT GOING TO

04:47PM  5    DO IT, IT'S JUST A HARD NO, GOOD-BYE.

04:47PM  6              THE COURT:  WELL, I HAVE TO LOOK AT EACH JUROR'S

04:47PM  7    SITUATION SO IT'S SEPARATE.

04:47PM  8              JUROR:  SO IT'S JUROR NUMBER 1 A DECISION, JUROR

04:47PM  9    NUMBER 2 A DECISION.

04:47PM 10              THE COURT:  CORRECT, AND THE REASONS FOR THE

04:47PM 11    REQUEST, BECAUSE EVERYBODY IS DIFFERENT.  EVERYBODY HAS

04:47PM 12    DIFFERENT REASONS AND DIFFERENT CIRCUMSTANCES.

04:47PM 13              JUROR:  RIGHT.

04:47PM 14              THE COURT:  THEY MIGHT NOT WANT THE SAME INFORMATION

04:47PM 15    REDACTED.  SOME MIGHT NOT CARE ABOUT CERTAIN THINGS, AND THAT'S

04:47PM 16    WHY I'M DOING IT INDIVIDUALLY AS OPPOSED TO ALL OF YOU TOGETHER

04:47PM 17    BECAUSE YOU'RE ALL DIFFERENT.

04:47PM 18              JUROR:  SO IS THE INFORMATION REQUESTED BEING

04:47PM 19    REDACTED, IS THAT HELD DIFFERENT THAN MY -- THAN REASONS THAT I

04:48PM 20    JUST -- THE PRINCIPLE OF IT ALL?

04:48PM 21              THE COURT:  I WILL TELL YOU THAT HAVING AN OBJECTION

04:48PM 22    BASED JUST ON THE PRINCIPLE IS NOT LEGALLY SUFFICIENT.  I WILL

04:48PM 23    TELL YOU THAT.  THAT'S NOT LEGALLY SUFFICIENT IN MY MIND NOW,

04:48PM 24    JUST THINKING THAT I DON'T WANT THE MEDIA TO HAVE THIS BECAUSE

04:48PM 25    I DON'T THINK THEY SHOULD, OR SOME SIMILAR, THAT'S NOT ENOUGH,

04:48PM 1    A LEGAL REASON.

04:48PM 2              JUROR:  OKAY.  WELL, THAT MAKES SENSE I GUESS.

04:48PM 3        ARE WE GOING TO KNOW FINALLY WHAT INFORMATION WILL BE

04:48PM 4    REDACTED?

04:48PM 5              THE COURT:  YES.  I WILL LET -- I WILL PREPARE AN

04:48PM 6    ORDER THAT INDICATES WHAT IS GOING TO BE REDACTED AS TO EACH

04:48PM 7    JUROR.

04:48PM 8              JUROR:  AND YOU MAY NOT KNOW THE ANSWER TO THIS, BUT

04:48PM 9    WHAT IS THEIR PURPOSE FOR WANTING THIS INFORMATION?  I MEAN,

04:48PM 10   YOU KNOW, MS. KRATZMANN WAS TELLING US THAT THIS IS VERY

04:49PM 11   UNUSUAL --

04:49PM 12       I DON'T KNOW IF I SAID YOUR LAST NAME RIGHT.  I ALWAYS

04:49PM 13   CALL YOU ADRIANA.

04:49PM 14       -- BUT THAT THIS WAS UNUSUAL.  BUT WHAT WOULD BE THE

04:49PM 15   PURPOSE?  WHAT --

04:49PM 16             THE COURT:  SO I CAN TELL YOU DURING THE MOTION --

04:49PM 17   AND THIS WAS IN A PUBLIC HEARING, IT WAS ON ZOOM, BECAUSE WE DO

04:49PM 18   ZOOM HEARINGS FOR THIS PURPOSE -- I ASKED, AND THIS IS PART OF

04:49PM 19   THE PUBLIC RECORD, I ASKED THE LAWYER FOR THE PRESS WHAT HIS

04:49PM 20   CLIENTS INTENDED TO DO WITH THE INFORMATION, AND HE DIDN'T --

04:49PM 21   HE DIDN'T REALLY HAVE AN ANSWER.  HE SAID, I DON'T KNOW WHAT

04:49PM 22   THEY'RE GOING TO DO WITH IT, I THINK WAS HIS RESPONSE.

04:49PM 23       AND I DID THINK HE DID OFFER SOME ASSURANCES, A STATEMENT

04:49PM 24   THAT HIS CLIENTS DID NOT INTEND TO DO ANYTHING UNTOWARD WITH

04:49PM 25   IT, BUT I DON'T KNOW WHAT THAT MEANS.

SEALED PROCEEDINGS

04:49PM  1          JUROR:  BUT ONCE IT'S OUT THERE, OTHER PEOPLE CAN

04:49PM  2  DECIDE TO DO OTHER THINGS WITH IT.

04:49PM  3          THE COURT:  THAT'S WHY I'M ASKING IF PEOPLE HAVE

04:49PM  4  CONCERNS AND WHAT THEY ARE AND --

04:49PM  5          JUROR:  I MEAN, YOU JUST NEVER KNOW.  YOU KNOW, THE

04:50PM  6  REVENGE FACTOR, YOU KNOW, SHE WAS MY BEST FRIEND FACTOR.

04:50PM  7          THE COURT:  IS THAT A CONCERN THAT YOU HAVE ABOUT

04:50PM  8  HAVING YOUR INFORMATION OUT THERE?

04:50PM  9          JUROR:  OH, YEAH.

04:50PM 10          THE COURT:  AND TELL ME A LITTLE BIT ABOUT THAT.

04:50PM 11          JUROR:  WELL, I LIVE BY MYSELF SO, YOU KNOW, I JUST

04:50PM 12  AM ALWAYS CONCERNED JUST, YOU KNOW, SAYING THE WRONG THING,

04:50PM 13  DOING THE WRONG THING AND UPSETTING SOMEONE.  YOU KNOW, YOU

04:50PM 14  KNOW, WHEN YOU'RE DRIVING AND YOU HONK AT SOMEBODY, ARE THEY

04:50PM 15  GOING TO FOLLOW YOU HOME?

04:50PM 16      YOU KNOW, I HAD SOMEONE RIGHT DOWN THE STREET FROM ME,

04:50PM 17  THERE'S A LANE TO GO STRAIGHT AND NOT REALLY A SHOULDER BUT,

04:50PM 18  YOU KNOW, YOU CAN TURN RIGHT, AND I WAS ON MY LINE AND SO I

04:50PM 19  WENT STRAIGHT AND THE GUY NEXT TO ME GOES STRAIGHT RIGHT BEHIND

04:50PM 20  ME, AND I THOUGHT OKAY, I THOUGHT HE WAS GOING TO TURN RIGHT.

04:50PM 21          AND THEN I GET INTO MY DRIVEWAY AND HE STOPS AND HE SAYS,

04:50PM 22  DO YOU ALWAYS DO THAT?

04:50PM 23          AND THEN I SAID, DO WHAT?

04:51PM 24      I WON'T SAY WORD FOR WORD, YOU KNOW.

04:51PM 25          BUT DO YOU ALWAYS DRIVE LIKE AN A...

04:51PM   1        YOU KNOW, I THOUGHT -- I WAS IN THE RIGHT LANE ON THE LEFT

04:51PM   2   SIDE, AND THAT WAS SO CLOSE TO MY HOUSE AND I DIDN'T DO

04:51PM   3   ANYTHING AND I DIDN'T HONK OR DO ANYTHING AND I JUST UPSET THIS

04:51PM   4   GUY.

04:51PM   5        SO I WAS A LITTLE CONCERNED, AND NOW THIS GUY KNOWS WHERE

04:51PM   6   I LIVE, AND IF HE'S GOING TO BE UPSET WITH ME BECAUSE, YOU

04:51PM   7   KNOW -- SO, YEAH, I THINK ABOUT THOSE KINDS OF THINGS ALL OF

04:51PM   8   THE TIME.  I MEAN, YOU KNOW.

04:51PM   9             THE COURT:  I KNOW.  THANK YOU.  THIS IS HELPFUL TO

04:51PM  10   ME.  THANK YOU.

04:51PM  11             JUROR:  ALL THEY NEED IS A NAME THESE DAYS AND

04:51PM  12   THEY'LL FIND YOU ANYWHERE.

04:51PM  13             THE COURT:  OKAY.  ALL RIGHT.

04:51PM  14        WELL, THANK YOU VERY MUCH.  I APPRECIATE YOUR COMMENTS.

04:51PM  15   THEY'RE VERY HELPFUL.  THANK YOU.

04:51PM  16             JUROR:  OKAY.

04:51PM  17             THE COURT:  YOU CAN JUST LEAVE YOUR QUESTIONNAIRE ON

04:51PM  18   THE TABLE THERE AND WE'LL TAKE CARE OF IT.

04:51PM  19             JUROR:  THANK YOU.

04:51PM  20             THE COURT:  WE'LL SEE YOU TOMORROW MORNING.  THANK

04:51PM  21   YOU.

04:51PM  22             JUROR:  OKAY.  THANK YOU.

04:51PM  23        (PAUSE IN PROCEEDINGS.)

04:51PM  24        (ALTERNATE JUROR NUMBER 3 PRESENT.)

04:53PM  25             THE CLERK:  ALTERNATE NUMBER 3.

04:53PM  1          THE COURT:  ALL RIGHT.  THANK YOU.

04:53PM  2          THANK YOU.  GOOD AFTERNOON.  I'M GOING TO REFER TO YOU AS

04:53PM  3   ALTERNATE NUMBER 3, PLEASE.  I MEAN NO DISRESPECT.

04:53PM  4          BUT I DID WANTED TO BRING YOU IN, AS I SAID THIS MORNING,

04:53PM  5   AND SPEAK WITH EACH JUROR ABOUT THE MOTION THAT WAS FILED BY

04:53PM  6   THE MEDIA COALITION AND THEIR REQUEST FOR THE COURT TO RELEASE

04:53PM  7   THE INFORMATION THAT IS CONTAINED IN THE QUESTIONNAIRES.  THEY

04:53PM  8   WANT THE QUESTIONNAIRES IS WHAT THEY'RE ASKING FOR.

04:53PM  9          I WANT TO TALK, AND I HAVE BEEN TALKING, TO EACH JUROR

04:53PM  10  ABOUT THEIR CONCERNS, OR LACK OF CONCERN, ABOUT THAT REQUEST.

04:53PM  11         FIRST OF ALL, LET ME ASK YOU, DO YOU HAVE A PREFERENCE FOR

04:53PM  12  A MASK?  WOULD YOU LIKE TO KEEP YOUR MASK ON?

04:53PM  13         JUROR:  YES.

04:53PM  14         THE COURT:  OKAY.  WE'LL KEEP OUR MASKS ON.  THANK

04:53PM  15  YOU FOR THAT.

04:54PM  16         PRESENT -- WE'RE IN MY CHAMBERS AND PRESENT ARE MR. SCHENK

04:54PM  17  AND MR. DOWNEY FROM THE RESPECTIVE SIDES, AND TWO OF MY LAW

04:54PM  18  CLERKS ARE HERE, AND OF COURSE MS. KRATZMANN IS HERE.

04:54PM  19         SO I WANTED TO ASK QUESTIONS OF OUR JURORS AS TO ANY

04:54PM  20  CONCERNS, OR LACK OF CONCERNS, THAT A JUROR MAY HAVE ABOUT

04:54PM  21  RELEASING INFORMATION THAT IS CONTAINED IN THE QUESTIONNAIRE.

04:54PM  22         AS I SAID THIS MORNING, WHEN YOU FILLED OUT THE

04:54PM  23  QUESTIONNAIRE, YOU DID SO WITH MY PROMISE, I TOLD YOU THAT THEY

04:54PM  24  WOULD REMAIN CONFIDENTIAL, THAT THEY WOULD BE RELEASED, IF AT

04:54PM  25  ALL, WITH YOUR NAMES REDACTED.

SEALED PROCEEDINGS

04:54PM 1          THE MEDIA COALITION, AND I IDENTIFIED WHO THAT IS THIS

04:54PM 2    MORNING, FILED A MOTION ASKING THAT THE COURT RELEASE THE

04:54PM 3    QUESTIONNAIRES TO THE MEDIA FOR THEIR USE.  THEY HAVE CITED

04:54PM 4    SUPREME COURT LAW, FIRST AMENDMENT LAW AND RIGHTS, AND THAT

04:54PM 5    MOTION IS PENDING BEFORE ME.

04:55PM 6          PART OF MY DECISION PROCESS IS TO SPEAK WITH EACH JUROR TO

04:55PM 7    GET FROM THEM, TO OBTAIN FROM THE JURORS INFORMATION THAT THEY

04:55PM 8    HAVE ABOUT A CONCERN, OR A LACK OF CONCERN, ABOUT THE RELEASE

04:55PM 9    OF THIS INFORMATION.

04:55PM 10         AND THIS INFORMATION INCLUDES NAMES, EMPLOYMENT, ADDRESS,

04:55PM 11   ALTHOUGH YOUR ADDRESS IS NOT CALLED FOR, GEOGRAPHIC LOCATION

04:55PM 12   WAS, NOT THE ADDRESS, ANY INFORMATION THAT CAUSED -- OR

04:55PM 13   QUESTION THAT CALLED FOR PERSONAL INFORMATION THAT A JUROR

04:55PM 14   WOULD NOT WISH TO BE REVEALED.

04:55PM 15         SO I'D ASK YOU TO PLEASE BE VERY CANDID AND OPEN WITH ME

04:55PM 16   ABOUT YOUR FEELINGS AND CONCERNS, OR LACK OF CONCERNS, ABOUT

04:55PM 17   ANY INFORMATION THAT IS IN YOUR QUESTIONNAIRE THAT YOU WOULD

04:55PM 18   LIKE TO HAVE REDACTED OR NOT BE RELEASED.

04:55PM 19         AND THE AREAS THAT I'M INTERESTED IN ARE SAFETY, SECURITY,

04:55PM 20   OR PRIVACY ISSUES, AND IF YOU HAVE THOSE CONCERNS, YOUR REASONS

04:55PM 21   FOR THEM AND IF YOU COULD TELL ME THAT.

04:56PM 22         SO JUROR NUMBER 3, IS THERE ANYTHING YOU WOULD LIKE ME TO

04:56PM 23   KNOW?

04:56PM 24              JUROR:  YES, YOUR HONOR.  I JUST -- YOU ALREADY

04:56PM 25   BROUGHT IT UP ABOUT, LIKE, PERSONAL INFORMATION.  SO I DID KIND

04:56PM   1    OF MARK STUFF THAT I HAVE PUT IN THERE THAT I WOULDN'T WANT TO

04:56PM   2    BE DISCLOSED.  BUT EVERYTHING --

04:56PM   3            THE COURT:  WHY DON'T YOU TELL ME -- I'M SORRY, I

04:56PM   4    DIDN'T MEAN TO INTERRUPT YOU.  I WAS GOING TO ASK YOU TO

04:56PM   5    IDENTIFY THE QUESTIONS THAT YOU WOULD LIKE ME TO LOOK AT.

04:56PM   6            JUROR:  I PUT NUMBER 8.

04:56PM   7            THE COURT:  OKAY.

04:56PM   8            JUROR:  AND NUMBER 11 AND 12.

04:56PM   9            THE COURT:  OKAY.

04:56PM  10            JUROR:  AND 16 AND 19 AND 20.

04:56PM  11            THE COURT:  OKAY.  LET'S GO OVER THOSE.

04:56PM  12        AND NUMBER 8 SPEAKS TO YOU BEING A SINGLE MOTHER AND

04:56PM  13    HAVING TO PICK UP YOUR SON.

04:56PM  14            JUROR:  YES.

04:56PM  15            THE COURT:  WHAT ARE YOUR CONCERNS ABOUT THAT?  DO

04:57PM  16    YOU HAVE SAFETY, SECURITY?

04:57PM  17            JUROR:  YEAH, SAFETY.  JUST MORE CONCERN OVER MY SON

04:57PM  18    IF ANYTHING GETS DISCLOSED.

04:57PM  19            THE COURT:  OKAY.  AND THEN 11 I THINK IS YOUR NAME

04:57PM  20    AND YOUR GEOGRAPHIC LOCATION, WHERE YOU LIVE IN THE AREA?

04:57PM  21            JUROR:  YES.

04:57PM  22            THE COURT:  AND 16 IS YOUR OCCUPATION.

04:57PM  23        AND IS THIS SOMETHING THAT THE IDENTITY OF YOUR EMPLOYER,

04:57PM  24    IN OTHER WORDS, IF THAT WERE REDACTED, WOULD THAT GIVE YOU

04:57PM  25    GREATER COMFORT?

SEALED PROCEEDINGS
3271

```
04:57PM   1                    JUROR:  YES.

04:57PM   2               THE COURT:  AND IS THAT FOR SECURITY REASONS ALSO?

04:57PM   3      OR TELL ME THE REASONS FOR THAT.

04:57PM   4                    JUROR:  I JUST DON'T WANT, LIKE, MY COWORKERS TO

04:57PM   5      KNOW STUFF OR DISCUSS IT WITH ME OR --

04:57PM   6               THE COURT:  DO YOU THINK THAT WOULD CAUSE YOU SOME

04:57PM   7      DIFFICULTY OR PROBLEMS AT YOUR EMPLOYMENT IF THAT WERE KNOWN?

04:57PM   8                    JUROR:  I DON'T BELIEVE SO, BUT I JUST DON'T WANT TO

04:58PM   9      COMPROMISE, LIKE, SOMEONE STARTING TO TALK TO ME ABOUT THE

04:58PM   10     CASE.

04:58PM   11               THE COURT:  I SEE.  OKAY.

04:58PM   12          AND THEN YOUR EDUCATION.  IF -- LET ME ASK YOU THIS, IF

04:58PM   13     THE COURT WERE TO REDACT, ERASE THE INSTITUTION THAT AWARDED

04:58PM   14     YOU YOUR DEGREE, WOULD THAT GIVE YOU GREATER COMFORT?

04:58PM   15                    JUROR:  YES.

04:58PM   16               THE COURT:  OKAY.  ALL RIGHT.

04:58PM   17          QUESTION 25 CALLS FOR CHILDREN.  IS THERE ANYTHING ABOUT

04:58PM   18     THAT THAT YOU HAVE CONCERNS ABOUT?

04:58PM   19                    JUROR:  NO, NOT REALLY.  NUMBER 8 I DON'T THINK

04:59PM   20     WILL.

04:59PM   21               THE COURT:  YOU WOULD LEAVE 25?

04:59PM   22                    JUROR:  ACTUALLY, NO.

04:59PM   23               THE COURT:  NOW THAT YOU'VE LOOKED AT IT, YOU WANT

04:59PM   24     IT REDACTED?

04:59PM   25                    JUROR:  YES.
```

04:59PM  1           THE COURT:  NOW THAT I'VE CALLED IT TO YOUR

04:59PM  2   ATTENTION, IT SEEMS LIKE IT WOULD BE CONSISTENT.

04:59PM  3        TELL ME ABOUT, EXCUSE ME, THOSE ARE SAFETY CONCERNS?

04:59PM  4           JUROR:  YES, TO MY SON.

04:59PM  5           THE COURT:  YOUR MINOR SON.  HE'S A MINOR.

04:59PM  6           JUROR:  YES.

04:59PM  7           THE COURT:  AND HE'S IN SCHOOL?

04:59PM  8           JUROR:  YES.

04:59PM  9           THE COURT:  ALL RIGHT.

04:59PM  10       AND YOU'RE A SINGLE MOTHER.  AND YOU THINK IF THE FACT

04:59PM  11  THAT YOU HAD A SON WHOSE AGE AND THAT INFORMATION WERE OUT

04:59PM  12  THERE, YOU THINK THAT WOULD CAUSE YOU CONCERNS FOR HIS SAFETY?

04:59PM  13          JUROR:  YEAH, WITH -- JUST FOR HIM, NOT FOR ME.

04:59PM  14          THE COURT:  OKAY.

05:00PM  15          JUROR:  I GUESS IT'S KIND OF LIKE --

05:00PM  16          THE COURT:  YOU DON'T WANT THEM TO KNOW --

05:00PM  17          JUROR:  THAT I HAVE A SON.

05:00PM  18          THE COURT:  OH, YOU DON'T WANT THEM TO KNOW THAT YOU

05:00PM  19  HAVE A SON WHO IS IN SCHOOL, OR I DON'T THINK IT IDENTIFIES THE

05:00PM  20  SCHOOL LOCATION.

05:00PM  21          JUROR:  NO.

05:00PM  22          THE COURT:  SO ALTERNATE JUROR NUMBER 3, LET ME SAY

05:00PM  23  I CAN REDACT CERTAIN THINGS, I CAN ERASE CERTAIN THINGS, BUT

05:00PM  24  THERE ARE CERTAIN THINGS THAT I'M NOT LEGALLY ABLE TO DO SO,

05:00PM  25  AND I APOLOGIZE FOR TELLING YOU I COULD DO AND THE LAWYERS ARE

SEALED PROCEEDINGS

05:00PM 1    TELLING ME THAT THE LAW SAYS SOMETHING DIFFERENT, JUDGE.  I

05:00PM 2    HAVE TO MAKE THAT DECISION.

05:00PM 3        BUT IT MAY BE THAT I CANNOT GRANT ALL OF YOUR REQUESTS TO

05:00PM 4    KEEP SOME OF THIS INFORMATION OUT.  I DO THINK THAT I WILL BE

05:00PM 5    KEEP ABLE TO KEEP THE NAMES OF THE JURORS OUT AT A MINIMUM.

05:00PM 6        BUT IF I WERE NOT ABLE TO GRANT ALL OF YOUR REQUESTS,

05:00PM 7    WOULD THAT AFFECT YOUR ABILITY TO CONTINUE TO BE FAIR AND

05:01PM 8    IMPARTIAL TO BOTH SIDES?

05:01PM 9            JUROR:  NO.

05:01PM 10           THE COURT:  NO?  OKAY.

05:01PM 11       I THINK YOUR ANSWER WAS?

05:01PM 12           JUROR:  NO.

05:01PM 13           THE COURT:  NO.  OKAY.  THANK YOU.

05:01PM 14       MY LAST QUESTION IS, AS A RESULT OF ALL OF THIS, TALKING

05:01PM 15   HERE, COMING IN, AND WAITING UNTIL 5:00 O'CLOCK --

05:01PM 16           JUROR:  I KNOW, THE LAST ONE.

05:01PM 17           THE COURT:  -- IS THERE ANYTHING ABOUT THAT THAT YOU

05:01PM 18   THINK WOULD AFFECT YOUR ABILITY TO BE FAIR AND IMPARTIAL AS A

05:01PM 19   JUROR?

05:01PM 20           JUROR:  NO.

05:01PM 21           THE COURT:  CAN YOU CONTINUE TO BE FAIR AND

05:01PM 22   IMPARTIAL AS A JUROR?

05:01PM 23           JUROR:  YES.

05:01PM 24           THE COURT:  OKAY.  ANYTHING ELSE YOU WOULD LIKE ME

05:01PM 25   TO KNOW?

05:01PM  1                    JUROR:  NO.

05:01PM  2                    THE COURT:  OKAY.  GREAT.  YOU CAN LEAVE YOUR

05:01PM  3    QUESTIONNAIRE.  WE'LL SEE YOU TOMORROW MORNING.  THANK YOU FOR

05:01PM  4    YOUR PATIENCE.  THANK YOU.

05:01PM  5                    JUROR:  THANK YOU.

05:01PM  6                    THE COURT:  YOU'RE WELCOME.

05:01PM  7            (NO JURORS PRESENT.)

05:01PM  8                    THE COURT:  I THINK THAT CONCLUDES THE QUESTIONING

05:01PM  9    OF THE IDENTIFIED JURORS WHO REQUESTED TO GO TODAY.  WE'LL HAVE

05:02PM 10    SIX TOMORROW.

05:02PM 11            BEFORE WE CONCLUDE, ANYTHING COUNSEL WANT TO PUT ON THE

05:02PM 12    RECORD?

05:02PM 13                    MR. SCHENK:  NO.  THANK YOU.

05:02PM 14                    MR. DOWNEY:  YOUR HONOR, I DON'T HAVE ANY REQUESTS

05:02PM 15    AT THIS POINT, BUT I WAS CONCERNED BY SOME OF THE JURORS

05:02PM 16    COMMENTS THAT ANTICIPATE FUTURE EVENTS AS OPPOSED TO ANYTHING

05:02PM 17    THAT THEY SAY THAT HAS HAPPENED THUS FAR.

05:02PM 18            I THINK, LET ME JUST MENTION THAT I THINK JUROR 12 SAID

05:02PM 19    SHE WAS DISTRACTED DURING COURT TODAY BECAUSE SHE WAS WRITING

05:02PM 20    NOTES AS TO WHAT SHE MIGHT SAY TO YOUR HONOR.

05:02PM 21            I THINK JUROR 7 MENTIONED THE POSSIBILITY OF DISTRACTION

05:02PM 22    IN THE FUTURE.  I THINK A NUMBER OF THE JURORS, JURORS 5 AND 8

05:02PM 23    AMONG THEM, EXPRESSED A CONCERN NOT TODAY, BUT ON THE

05:02PM 24    CONSEQUENCES OF THE RELEASE OF CERTAIN INFORMATION IN TERMS OF

05:02PM 25    THEIR ABILITY TO COMPLY WITH YOUR COURT'S -- WITH THE COURT'S

SEALED PROCEEDINGS
3275

05:02PM  1    DIRECTIVES ON PUBLICITY, WHICH I WAS -- I THINK IT WAS VERY

05:02PM  2    CLEAR THEY'VE BEEN CONSCIENTIOUS ABOUT TO DATE, SO NOTHING HAS

05:03PM  3    HAPPENED YET.

05:03PM  4         BUT I WAS CONCERNED ABOUT THE CONCEPT THAT THEY THOUGHT

05:03PM  5    IDENTIFICATION OF THEM MIGHT GENERATE THAT CONSEQUENCE.

05:03PM  6         AND I THINK THERE WERE, THERE WAS COMMENTS BY A COUPLE OF

05:03PM  7    THE JURORS, I THINK JURORS 6 AND 7, WHICH REQUESTED ESSENTIALLY

05:03PM  8    THAT THE QUESTIONNAIRES BE REDACTED IN A FORM THAT WOULD MAKE

05:03PM  9    PERSONAL IDENTIFICATION DIFFICULT OR IMPOSSIBLE.

05:03PM  10        I DON'T KNOW WHAT THE COURT WILL DO, BUT I THINK THOSE

05:03PM  11   COMMENTS OBVIOUSLY GIVE US CONCERN ON THE DEFENSE SIDE.

05:03PM  12        WE THINK, FROM WHAT THEY SAID TODAY, WE HAVE EVERY REASON

05:03PM  13   TO BELIEVE THAT THEY'VE BEEN COMPLYING WITH THE COURT'S ORDER.

05:03PM  14   WE HAVE EVERY REASON TO BELIEVE THAT THEY'VE BEEN PAYING

05:03PM  15   ATTENTION AND NOT DISTRACTED.

05:03PM  16        BUT TO HEAR A JUROR SAY THAT SHE WAS DISTRACTED TODAY BY

05:03PM  17   THIS ISSUE IS CONCERNING.

05:03PM  18        SO I DON'T HAVE A REQUEST NOW, BUT I WOULD ONLY ASK THAT

05:04PM  19   WHEN THE COURT MAKES ITS FINAL DETERMINATIONS, THE IMPACT OF

05:04PM  20   ALL OF THIS ON THE TRIAL PROCESS BE PART OF THE COURT'S

05:04PM  21   CONSIDERATION AS WELL.

05:04PM  22        WE HAVEN'T TAKEN A POSITION TO DATE ON THIS, BUT IF SOME

05:04PM  23   OF THE CONSEQUENCES THE JURORS IDENTIFIED WERE TO COME TO

05:04PM  24   FRUITION, IT WOULD BE OF CONCERN TO US.

05:04PM  25             THE COURT:  WELL, THAT'S ALWAYS A CONCERN IN A

SEALED PROCEEDINGS

05:04PM   1    TRIAL, WHETHER OR NOT A JUROR BECOMES PRIVY TO OR HAS CONTACT

05:04PM   2    WITH INFORMATION OUTSIDE OF THE COURTROOM.  THAT'S CONSISTENT

05:04PM   3    AND THAT'S WHY WE TELL THEM, AS I'VE DONE EVERY DAY AND EVERY

05:04PM   4    MORNING AND EVERY EVENING, NOT TO DO THAT.  THAT DOESN'T

05:04PM   5    CHANGE.

05:04PM   6        I UNDERSTAND YOUR COMMENTS ABOUT ONE OF THE JUROR'S

05:04PM   7    FEELINGS, AND I DON'T THINK THIS IS UNUSUAL FOR THEM.

05:04PM   8        MY SENSE IS THAT THEY WERE QUITE SURPRISED TODAY WHEN I

05:04PM   9    TALKED ABOUT THE MOTION, AND IT IS THE PRESS'S MOTION FOR THE

05:04PM  10    INFORMATION.

05:04PM  11        I THINK I WAS ACCURATE WHEN I RESPONDED TO ONE OF THE

05:04PM  12    JURORS THAT THE MOVING PARTY DID NOT TELL US WHAT HIS CLIENTS

05:05PM  13    WISHED TO DO WITH IT OTHER THAN CITING THEIR RIGHTS UNDER THE

05:05PM  14    FIRST AMENDMENT AND THE CONSTITUTION TO HAVE THE INFORMATION.

05:05PM  15        I THINK HE DID SAY THAT THEY WEREN'T GOING TO REVEAL ANY

05:05PM  16    JUROR'S NAME.  I THINK I RECALL HIM SAYING THAT.  I'LL HAVE TO

05:05PM  17    CHECK THE RECORD OF THE TRANSCRIPT, BUT I BELIEVE HE SAID

05:05PM  18    SOMETHING LIKE THAT.  HE CERTAINLY INDICATED OR INTIMATED TO

05:05PM  19    THE COURT AND THE PARTIES THAT HIS CLIENTS DID NOT HAVE AN

05:05PM  20    INTENT TO DO HARM.

05:05PM  21        SO ARE YOU MAKING A MOTION TODAY FOR A MISTRIAL?

05:05PM  22            MR. DOWNEY:  NO, CERTAINLY NOT, YOUR HONOR.

05:05PM  23            THE COURT:  OKAY.

05:05PM  24            MR. DOWNEY:  I DON'T KNOW WHAT THE REACTIONS OF THE

05:05PM  25    JURORS WILL BE WHEN THEY KNOW THE ULTIMATE REDACTIONS.  I KNOW

SEALED PROCEEDINGS

05:05PM 1     IT WASN'T REALLY POSSIBLE TO DO THAT ALL IN THIS SESSION.

05:05PM 2          SO I THINK AT THIS POINT, IN LIGHT OF THE CONCERNS I'M

05:05PM 3     RAISING, I GUESS I'M JUST ASKING IF -- WILL THERE BE FURTHER

05:05PM 4     PROCESS SO THAT YOUR HONOR CAN ASSURE THAT WHERE THEY ARE IS IN

05:06PM 5     A PLACE THAT'S OKAY TO CONTINUE IN A FAIR WAY AFTER THOSE

05:06PM 6     DETERMINATIONS ARE MADE AND THEY'VE HAD A CHANCE TO REVIEW IT?

05:06PM 7          THE COURT:  WELL, I'VE ASKED THAT QUESTION OF EACH

05:06PM 8     JUROR WHETHER OR NOT -- AND I THINK I'VE ASKED EACH OF THE

05:06PM 9     JURORS THAT I SPOKE WITH TODAY, IF I DID NOT GRANT THEIR

05:06PM 10    REQUEST, WHETHER OR NOT THAT WOULD AFFECT THEIR ABILITY TO

05:06PM 11    CONTINUE TO BE FAIR AND IMPARTIAL.

05:06PM 12         THERE WERE -- ONE OF THE JURORS SAID, WELL, SHE EXPRESSED

05:06PM 13    SOME RESERVATION, BUT MY RECOLLECTION IS EVERY JUROR SAID THAT

05:06PM 14    THEY COULD CONTINUE TO BE FAIR AND IMPARTIAL.  THERE WERE SOME

05:06PM 15    CONCERNS EXPRESSED, AND I, I TAKE IT SERIOUSLY.

05:06PM 16         WHEN I MENTIONED WHO THE MEDIA COALITION IS AND WHAT THEIR

05:06PM 17    GROUP CONSISTED OF, I COULD SEE THAT CAUSED SOME RAISED

05:06PM 18    EYEBROWS FROM THE JURORS, IF NOT THE COURTROOM, AS TO WHO THE

05:06PM 19    MOVING PARTIES ARE AND WHAT THAT MEANT.

05:07PM 20         SO I WILL LOOK AT THIS AND PREPARE AN ORDER AT THE

05:07PM 21    APPROPRIATE TIME, AND I THINK WHAT WE'LL HAVE TO DO IS HAVE

05:07PM 22    ANOTHER CONVERSATION WITH THE JURORS RECOGNIZING WHAT THE COURT

05:07PM 23    INTENDS TO DO AND GETTING CONFIRMATION, OBTAINING CONFIRMATION

05:07PM 24    FROM THE JUROR WHETHER OR NOT, BASED ON THE COURT'S RULING,

05:07PM 25    THEY CAN CONTINUE TO BE FAIR AND IMPARTIAL, AND WE'LL SEE WHAT

SEALED PROCEEDINGS 3278

05:07PM 1      THEIR ANSWERS ARE.

05:07PM 2          I WAS IMPRESSED -- I JUST WANT TO SAY, I WAS IMPRESSED

05:07PM 3      WITH THE FOLKS THAT WE SPOKE WITH TODAY, AND I'M GLAD YOU BOTH

05:07PM 4      WERE HERE AND THANK YOU FOR PRESSING ME TO ALLOW THE DEFENSE

05:07PM 5      AND PROSECUTION TO BE HERE, BECAUSE I THINK IT'S IMPORTANT THAT

05:07PM 6      YOU OBSERVED THEIR DEMEANOR AS WELL, AND THEY WERE VERY CANDID

05:07PM 7      AND OPEN.

05:07PM 8          I DON'T THINK THEIR RESPONSES WERE THAT UNUSUAL ACTUALLY,

05:07PM 9      YOU KNOW, WHEN THEY HEAR THE MEDIA WANTS MY INFORMATION, WHAT

05:07PM 10     DOES THAT MEAN?  THEY EXPRESSED -- SOME OF THEM EXPRESSED

05:07PM 11     CONCERNS THAT ARE, I THINK, GENERALLY HELD ABOUT THEIR

05:07PM 12     INFORMATION BEING IN THE PUBLIC REALM.

05:08PM 13         SO -- AND WITH SOME SPECIFICS AS WELL.

05:08PM 14         BUT IN ANY EVENT, WE'LL -- WE'LL CONTINUE THE PROCESS

05:08PM 15     TOMORROW, AND THEN WE'LL GO FORWARD AND SEE WHAT IT YIELDS.

05:08PM 16             MR. DOWNEY:  THANK YOU, YOUR HONOR.

05:08PM 17             THE COURT:  OKAY.

05:08PM 18             MR. LEACH:  THANK YOU, YOUR HONOR.

05:08PM 19             THE COURT:  GREAT.  WE'RE OFF THE RECORD.

05:08PM 20         (COURT ADJOURNED AT 5:08 P.M.)

        21

        22

        23

        24

        25