1

2                   UNITED STATES DISTRICT COURT

3                  NORTHERN DISTRICT OF CALIFORNIA

4                       SAN JOSE DIVISION

5

    UNITED STATES OF AMERICA,      )  CR-18-00258-EJD
6                                  )
                   PLAINTIFF,      )  SAN JOSE, CALIFORNIA
7                                  )
             VS.                   )  VOLUME 18
8                                  )
    ELIZABETH A. HOLMES,           )  OCTOBER 13, 2021
9                                  )
                   DEFENDANT.      )  PAGES 3279 - 3537
10   _____ )  **PAGES 3292 - 3364 SEALED**
                                       **PAGES 3534 - 3537 SEALED**
11

12

                    TRANSCRIPT OF TRIAL PROCEEDINGS
13            BEFORE THE HONORABLE EDWARD J. DAVILA
                    UNITED STATES DISTRICT JUDGE
14

    A P P E A R A N C E S:
15

    FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
16                         BY:  JOHN C. BOSTIC
                                JEFFREY B. SCHENK
17                         150 ALMADEN BOULEVARD, SUITE 900
                           SAN JOSE, CALIFORNIA 95113
18
                           BY:  ROBERT S. LEACH
19                              KELLY VOLKAR
                           1301 CLAY STREET, SUITE 340S
20                         OAKLAND, CALIFORNIA 94612

21       (APPEARANCES CONTINUED ON THE NEXT PAGE.)

22   OFFICIAL COURT REPORTERS:
                           IRENE L. RODRIGUEZ, CSR, RMR, CRR
23                         CERTIFICATE NUMBER 8074
                           LEE-ANNE SHORTRIDGE, CSR, CRR
24                         CERTIFICATE NUMBER 9595

25       PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
              TRANSCRIPT PRODUCED WITH COMPUTER

1      A P P E A R A N C E S: (CONT'D)

2

3      FOR DEFENDANT HOLMES:    WILLIAMS & CONNOLLY LLP
                               BY:  KEVIN M. DOWNEY
4                                   LANCE A. WADE
                                    KATHERINE TREFZ
5                                   ANDREW LEMENS
                                    J.R. FLEURMONT
6                                   PATRICK LOOBY
                                    RICHARD CLEARY
7                              725 TWELFTH STREET, N.W.
                               WASHINGTON, D.C. 20005
8
                               LAW OFFICE OF JOHN D. CLINE
9                              BY:  JOHN D. CLINE
                               ONE EMBARCADERO CENTER, SUITE 500
10                             SAN FRANCISCO, CALIFORNIA 94111

11
       ALSO PRESENT:          FEDERAL BUREAU OF INVESTIGATION
12                            BY:  ADELAIDA HERNANDEZ

13                            OFFICE OF THE U.S. ATTORNEY
                              BY:  LAKISHA HOLLIMAN, PARALEGAL
14                                 MADDI WACHS, PARALEGAL

15                            WILLIAMS & CONNOLLY
                              BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL
16
                              TBC
17                            BY:  BRIAN BENNETT, TECHNICIAN

18

19

20

21

22

23

24

25

1
<u>INDEX OF PROCEEDINGS</u>

2
GOVERNMENT'S:

3

4
**WADE MIQUELON**

DIRECT EXAM BY MR. SCHENK (RES.)        P. 3368
5
CROSS-EXAM BY MR. DOWNEY               P. 3413
REDIRECT EXAM BY MR. SCHENK           P. 3509

6

7
**ROBERTO AMENTA**

DIRECT EXAM BY MR. BOSTIC              P. 3521
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         INDEX OF EXHIBITS

2

                                        IDENT.     EVIDENCE
3       GOVERNMENT'S:

4       372                                        3368
        488                                        3379
5       503                                        3383
        617                                        3395
6       971                                        3402
        1254                                       3407
7       1083                                       3477
        1387                                       3482
8       4845                                       3527

9

10

        DEFENDANT'S:

11

        7312                                       3473
12      7383                                       3485
        12510, PAGES 6786 - 6804                   3490
13      13952                                      3502
        7618                                       3504
14      7622                                       3505
        7657                                       3506
15      7676                                       3508

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| | 1 | SAN JOSE, CALIFORNIA                              OCTOBER 14, 2021 |
| 08:33AM | 2 | P R O C E E D I N G S |
| 08:33AM | 3 | (COURT CONVENED AT 8:33 A.M.) |
| 08:33AM | 4 | (JURY OUT AT 8:33 A.M.) |
| 08:33AM | 5 | THE COURT:  WE'RE BACK ON THE RECORD IN THE HOLMES |
| 08:33AM | 6 | MATTER.  ALL COUNSEL ARE PRESENT AND MS. HOLMES IS PRESENT. |
| 08:33AM | 7 | WE'RE OUTSIDE OF THE PRESENCE OF THE JURY AND MEETING |
| 08:33AM | 8 | BEFORE THEY ARRIVE. |
| 08:33AM | 9 | I UNDERSTAND THE DEFENSE WANTED TO RAISE A QUESTION? |
| 08:34AM | 10 | MR. DOWNEY:  GOOD MORNING, YOUR HONOR. |
| 08:34AM | 11 | THE COURT:  GOOD MORNING. |
| 08:34AM | 12 | MR. DOWNEY:  THREE ISSUES THAT JUST CAME UP, TWO OF |
| 08:34AM | 13 | WHICH I THINK MR. SCHENK AND I HAVE BEEN ABLE TO DEAL WITH ON |
| 08:34AM | 14 | OUR OWN, BUT THEY RELATE TO A WITNESS NOT YET TESTIFYING, BUT |
| 08:34AM | 15 | IT WILL BE MR. JHAVERI WHO IS ANOTHER WITNESS FORMERLY EMPLOYED |
| 08:34AM | 16 | AT WALGREENS. |
| 08:34AM | 17 | THERE ARE TWO QUESTIONS IN CONNECTION WITH HIS TESTIMONY |
| 08:34AM | 18 | THAT WE WERE CONCERNED ABOUT BECAUSE STATEMENTS ABOUT THEM |
| 08:34AM | 19 | APPEARED IN A 302 THAT WAS PRODUCED YESTERDAY. |
| 08:34AM | 20 | ONE IS THAT HE WANTED TO -- IN THE STATEMENT, HE |
| 08:34AM | 21 | REFERENCED THERANOS'S DECISION TO VOID TESTS, WHICH AS |
| 08:34AM | 22 | YOUR HONOR KNOWS WAS THE SUBJECT OF MOTION IN LIMINE PRACTICE. |
| 08:34AM | 23 | THE SUBSTANCE OF HIS STATEMENT WAS THAT WALGREENS MADE A |
| 08:34AM | 24 | DECISION TO CLOSE ITS STORES IN RESPONSE TO THAT ACTION BY |
| 08:34AM | 25 | THERANOS. |

08:34AM  1        MR. SCHENK AND I SPOKE THIS MORNING AND MR. SCHENK ASSURES

08:35AM  2    ME THAT THE ISSUE OF VOIDING WILL NOT BE PART OF THE

08:35AM  3    PRESENTATION, ALTHOUGH THE ISSUE OF THE DECISION TO CLOSE --

08:35AM  4    THE FACT THAT THE STORES WERE CLOSED IS SOMETHING THAT WILL BE

08:35AM  5    PRESENTED, WHICH IS CERTAINLY FINE BY US.

08:35AM  6        THE OTHER ISSUE IS HE WAS PRESENTED DURING THAT INTERVIEW

08:35AM  7    WITH A "WALL STREET JOURNAL" ARTICLE AND ASKED TO CONTRAST THE

08:35AM  8    KNOWLEDGE THAT HE HAD WITH CERTAIN ASSERTIONS IN "THE

08:35AM  9    WALL STREET JOURNAL" ARTICLE.  WE WERE CONCERNED ABOUT THAT

08:35AM  10   METHOD OF PRESENTING EVIDENCE.

08:35AM  11       AGAIN, MR. SCHENK ASSURES ME THAT NOT ONLY WILL THERE NOT

08:35AM  12   BE REFERENCE TO OR INTRODUCTION OF THE ARTICLE, BUT THAT HE'LL

08:35AM  13   SIMPLY BE ASKED ABOUT THE STATE OF HIS KNOWLEDGE AT THE TIME.

08:35AM  14       SO I THINK AS TO THOSE TWO ISSUES THEY HAVE BEEN RESOLVED,

08:35AM  15   BUT I JUST WANT TO MAKE THE COURT AWARE OF THEM IN CASE

08:35AM  16   ANYTHING COMES UP DURING THE TESTIMONY.

08:35AM  17            THE COURT:  OKAY.  LET ME JUST ASK MR. SCHENK IF HE

08:35AM  18   HAS ANY COMMENT ON ANY OF THOSE TWO ISSUES.

08:36AM  19       MR. SCHENK?

08:36AM  20            MR. SCHENK:  THANK YOU, YOUR HONOR.

08:36AM  21       WITH REGARD TO THE VOIDING OF THE TESTS, I DO NOT INTEND

08:36AM  22   TO ASK MR. JHAVERI WHETHER HE HAS KNOWLEDGE OF THAT IN FACT.

08:36AM  23       I THINK THERE'S A SEPARATE ISSUE ABOUT THE ADMISSIBILITY

08:36AM  24   OF VOIDING OF THE TESTS.  WE DON'T HAVE TO ADDRESS THAT WITH

08:36AM  25   MR. JHAVERI.  I DO NOT INTEND TO ASK HIM IF THERANOS VOIDED THE

08:36AM  1    TESTS.

08:36AM  2        I DO INTEND TO ASK HIM WHETHER THE THERANOS BLOOD TESTING

08:36AM  3    SERVICES AT SOME POINT BECAME UNAVAILABLE AT WALGREENS, THEY

08:36AM  4    STOPPED OFFERING BLOOD TESTING AT WALGREENS AND YOU CAN'T GO

08:36AM  5    THERE ANYMORE AND GET THEM.

08:36AM  6        I THINK IT'S MR. JHAVERI'S BELIEF OR KNOWLEDGE THAT PART

08:36AM  7    OF THE REASON WAS BECAUSE TESTS WERE VOIDED.  WE DON'T HAVE TO

08:36AM  8    GET INTO THE REASON, RATHER WHAT I'M INTERESTED IN IS THE FACT

08:36AM  9    THAT THERANOS SERVICES ARE NO LONGER AVAILABLE AT WALGREENS AND

08:36AM  10   THAT THAT HAPPENED WHILE MR. JHAVERI WAS ENGAGED IN THE

08:36AM  11   PROJECT.

08:36AM  12            THE COURT:  YOU HAVE NO OBJECTION TO THAT?

08:36AM  13            MR. DOWNEY:  NO OBJECTION TO THAT.

08:36AM  14       THE ONLY REQUEST WE HAVE IN CONNECTION WITH THAT, WHICH

08:36AM  15   I'M SURE MR. SCHENK WILL COMPLY WITH, IS JUST THAT THE WITNESS

08:37AM  16   BE APPRISED OF OUR AGREEMENT ON THAT SUBJECT.

08:37AM  17            THE COURT:  ALL RIGHT.  ANYTHING ELSE INVOLVING --

08:37AM  18   MR. SCHENK, ANYTHING ELSE YOU WANT TO COMMENT ON?

08:37AM  19            MR. SCHENK:  THE SECOND ISSUE THAT MR. DOWNEY RAISED

08:37AM  20   WAS "THE WALL STREET JOURNAL" ARTICLE.

08:37AM  21       MR. JHAVERI READ IT.  I INTEND TO HAVE HIM TESTIFY THAT

08:37AM  22   GENERALLY IT WAS NEGATIVE, THAT HE DIDN'T READ IT AND THINK

08:37AM  23   THAT THE RELATIONSHIP WITH THERANOS HAD ANYTHING OTHER THAN A

08:37AM  24   NEW OBSTACLE OR HURDLE AND HE NEEDED TO DO SOME INFORMATION

08:37AM  25   GATHERING, SOMETHING LIKE THAT.

08:37AM 1      I'M NOT GOING TO ASK HIM ABOUT THIS LINE OR THAT FACT OR

08:37AM 2  DETAILS IN THE ARTICLE.

08:37AM 3      THE POINT OF IT IS THAT MR. JHAVERI'S ROLE IN THE

08:37AM 4  RELATIONSHIP CHANGED AT THAT POINT.  OTHER PEOPLE AT WALGREENS,

08:37AM 5  LIKE LAWYERS, GOT MORE INVOLVED IN THE RELATIONSHIP AT THAT

08:37AM 6  POINT.

08:37AM 7      SO IT WAS SORT OF A CAUSE OF HIM STEPPING BACK A LITTLE

08:37AM 8  BIT IN SOME OF THE INTERACTIONS IN THE RELATIONSHIP, AND THAT'S

08:37AM 9  THE FACT THAT I INTEND TO ELICIT.

08:37AM 10     BUT I'M NOT GOING TO SHOW HIM THE ARTICLE, I'M NOT GOING

08:38AM 11  TO ASK HIM ABOUT FACTS OR SENTENCES OR LINES IN THE ARTICLE,

08:38AM 12  JUST GENERALLY THAT IT WAS NEGATIVE AND THAT IT CAUSED HIM TO

08:38AM 13  STEP BACK A LITTLE BIT IN THE RELATIONSHIP.

08:38AM 14          MR. DOWNEY:  I THINK THE FACT THAT THERE WAS A

08:38AM 15  NEGATIVE ARTICLE IS NOT SOMETHING THAT WE OBJECT TO, AND,

08:38AM 16  AGAIN, I WOULD JUST REQUEST THAT THE WITNESS BE ADVISED OF THAT

08:38AM 17  LINE.

08:38AM 18          THE COURT:  OKAY.  ALL RIGHT.

08:38AM 19     THANK YOU.  THANK YOU.

08:38AM 20     MR. SCHENK, YOU HAD --

08:38AM 21          MR. DOWNEY:  I HAD ONE OTHER ISSUE.

08:38AM 22          THE COURT:  YES?

08:38AM 23          MR. DOWNEY:  WHICH I DON'T WANT TO DISCUSS IN DETAIL

08:38AM 24  BECAUSE IT RELATES TO OUR UNDER SEAL SESSION YESTERDAY, BUT I

08:38AM 25  WANTED TO MAKE A COMMENT AND REQUEST IN CONNECTION WITH THAT.

08:38AM 1      WITHOUT GOING INTO THE SUBSTANCE OF THAT HEARING, UPON

08:38AM 2   READING THE TRANSCRIPT, I DID HAVE A CONCERN THAT THAT ISSUE BE

08:38AM 3   RESOLVED PROMPTLY IN LIGHT OF SOME OF THE COMMENTS THAT WERE

08:38AM 4   MADE BY THE JURORS WHO WERE AVAILABLE FOR THAT SESSION LAST

08:38AM 5   NIGHT.

08:38AM 6      I DON'T WANT TO ARTICULATE THOSE COMMENTS.  YOUR HONOR MAY

08:39AM 7   BE AWARE OF WHAT I HAVE IN MIND.

08:39AM 8      SO THAT THE JURY CAN BE IN A POSITION TO FULLY FULFILL ITS

08:39AM 9   SERVICE OBLIGATIONS HERE, MY REQUEST WOULD BE THAT WE DEAL WITH

08:39AM 10   THE ISSUES RELATED TO THE UNSEALING OF THE QUESTIONNAIRES,

08:39AM 11   REDACTIONS THERETO, AND ANYTHING ELSE THAT IS PROPHYLACTIC THAT

08:39AM 12   WE NEED TO DEAL WITH AS SOON AS POSSIBLE.

08:39AM 13            THE COURT:  THIS MORNING BEFORE WE START EVIDENCE?

08:39AM 14            MR. DOWNEY:  YES, BEFORE WE START EVIDENCE WOULD BE

08:39AM 15   OUR REQUEST.

08:39AM 16            MR. SCHENK:  YOUR HONOR, I DON'T SHARE THE SAME

08:39AM 17   CONCERN.  I ALSO WAS PRESENT FOR THE HEARING.  I'M HAPPY TO, AT

08:39AM 18   THE RIGHT TIME, PROVIDE ADDITIONAL THOUGHTS ON THAT SUBJECT.

08:39AM 19   BUT I DID NOT LEAVE THE SESSION OR AFTER HAVING NOW SEEN THE

08:39AM 20   TRANSCRIPT WITH THE CONCERNS THAT MR. DOWNEY HAS RAISED.

08:39AM 21      I WILL ALSO NOTE THAT THE COURT'S PLAN IS TO DEAL WITH THE

08:39AM 22   REMAINING JURORS TODAY.  THE COURT JUST DOESN'T INTEND TO TAKE

08:40AM 23   TRIAL TRANSCRIPT TIME TO DO IT.

08:40AM 24      WE HAVE OUT OF TOWN WITNESSES WHO ARE HERE THIS WEEK AND

08:40AM 25   ARE READY TO TESTIFY.

08:40AM  1        IT WOULD BE THE GOVERNMENT'S PREFERENCE TO GET THROUGH THE

08:40AM  2   WITNESSES TODAY AND THEN USE, AS THE COURT HAD PLANNED, OUR

08:40AM  3   POST-TRIAL TIME TO HANDLE THAT.

08:40AM  4        MR. DOWNEY:  WELL, YOUR HONOR, THE ONLY ISSUE I'M

08:40AM  5   FOCUSSED ON IS TO THE EXTENT FOR ANY JUROR, WITHOUT COMMENTING

08:40AM  6   ON ANYTHING, TO THE EXTENT THAT THIS ISSUE HANGS OVER ANY JUROR

08:40AM  7   AND THEY WOULD LIKE TO KNOW HOW IT BE RESOLVED, I WOULD RATHER

08:40AM  8   HAVE THAT ADDRESSED NOW SO THAT WE'RE NOT IN A PERIOD WHERE

08:40AM  9   THERE'S EFFECTIVELY A FULL DAY OF TRIAL FROM THE TIME THEY KNOW

08:40AM  10  ABOUT THE ISSUE UNTIL THE TIME THE ISSUE IS ADDRESSED.

08:40AM  11       THE COURT:  WELL, THAT RAISES THE TOPIC IS ONCE WE

08:40AM  12  COMPLETE THE QUESTIONING OF THE JURORS AND WHAT I WILL DO IS

08:40AM  13  COLLECT THAT INFORMATION AND THEN RESPOND TO THE MOTION.

08:41AM  14       I THINK WHAT YOU'RE ASKING ME TO DO IS TO PUT THIS TRIAL

08:41AM  15  ON HOLD AND RESOLVE THAT ENTIRE MOTION, THAT IS, THE MEDIA

08:41AM  16  COALITION'S MOTION BEFORE WE GO FORWARD.

08:41AM  17       IS THAT WHAT YOU'RE ASKING ME TO DO?

08:41AM  18       MR. DOWNEY:  WELL, WHAT I'M ASKING -- I GUESS

08:41AM  19  EFFECTIVELY WHAT I'M ASKING, BUT WHAT I'M ASKING IS THAT THE

08:41AM  20  COURT IS SURE THE JURY IS SERVING IN A MANNER CONSISTENT WITH

08:41AM  21  THE DEFENDANT'S FIFTH AND SIXTH AMENDMENT RIGHTS, WHICH I KNOW

08:41AM  22  THE COURT IS DEEPLY DEDICATED TO.

08:41AM  23       I THINK SOME OF THE COMMENTS RAISE CONCERNS ABOUT THAT, SO

08:41AM  24  I THINK IT'S AN ISSUE THAT WE NEED TO GET RESOLVED.

08:41AM  25       I CERTAINLY APPRECIATE MR. SCHENK'S COMMENTS ABOUT WITNESS

08:41AM  1    LOGISTICS.  WE'VE TRIED TO WORK WITH HIM ON THAT.

08:41AM  2        BUT I THINK WE HAVE THE BULK OF THE JURORS INTERVIEWED.  I

08:41AM  3    THINK WE OUGHT TO TAKE THE TIME TO RESOLVE WITH THE OTHER

08:41AM  4    JURORS AND MAKE SURE THAT WE DON'T HAVE JURORS WHO ARE

08:41AM  5    REPORTING A REACTION TO THAT, THAT IS AFFECTING THEIR ABILITY

08:42AM  6    TO SERVE.

08:42AM  7        THE COURT:  I THINK WE HAVE SIX REMAINING TO

08:42AM  8    INTERVIEW, AND THE TIMING OF THINGS LAST NIGHT, I THINK IT TOOK

08:42AM  9    US LONGER THAN I THINK ANY OF US ANTICIPATED.  I THINK WE

08:42AM  10   FINISHED AFTER 5:00.

08:42AM  11       AND HAVING -- I THINK WE STOPPED AT 3:00, AND IT TOOK US A

08:42AM  12   COUPLE OF HOURS TO GET THROUGH NINE PEOPLE IF I RECALL

08:42AM  13   CORRECTLY.

08:42AM  14       SO IF WE WERE TO CONTINUE OUR CONVERSATION WITH THE OTHER

08:42AM  15   SIX TODAY, I CAN DO THAT, AND THEN WHAT YOU'RE ASKING TO DO IS

08:42AM  16   TO HAVE COLLOQUY AFTER THAT REGARDING --

08:42AM  17       MR. DOWNEY:  I THINK IF THE AGGREGATION OF THE

08:42AM  18   COMMENTS RAISES THE CONCERNS THAT I SUSPECT THE FIRST NINE DID,

08:42AM  19   THEN I THINK IT IS AN ISSUE, YEAH, I THINK WE SHOULD RESOLVE

08:42AM  20   IT.

08:42AM  21       THE COURT:  WELL, I THINK -- AS YOU ALL KNOW, THE --

08:43AM  22   I ASKED THE QUESTION ABOUT CONTINUED SERVICE, AND I THINK WE

08:43AM  23   GOT AFFIRMATIVE ANSWERS FROM EVERY JUROR, THAT THEY WOULD

08:43AM  24   CONTINUE TO BE FAIR AND IMPARTIAL TO BOTH SIDES IN THE CASE.

08:43AM  25       I WANTED TO KNOW THAT BECAUSE THAT'S THE PRIMARY DIRECTIVE

08:43AM  1    OF A JUROR'S SERVICE, AND THEY ALL INDICATED THAT THEY COULD DO

08:43AM  2    THAT.

08:43AM  3          AND I THINK I KNOW WHAT YOU'RE TALKING ABOUT.  WE KNOW

08:43AM  4    WHAT WE'RE TALKING ABOUT.

08:43AM  5          AND THE THOUGHT OCCURRED TO ME THAT THERE MIGHT BE SOME --

08:43AM  6    I DON'T WANT TO USE THE WORD "EFFICIENCY," I HATE TO USE THAT

08:43AM  7    IN A CRIMINAL CASE, BUT THERE MIGHT BE SOME ADVANTAGE TO

08:43AM  8    RESOLVING AN ISSUE, A JURY ISSUE, EARLIER THAN LATER IT SEEMS

08:43AM  9    TO ME.

08:43AM  10          LET'S DO THIS.  LET'S -- MS. KRATZMANN, ARE ALL OF OUR

08:43AM  11    JURORS PRESENT NOW?

08:43AM  12              THE CLERK:  I HAVE NOT CHECKED YET, YOUR HONOR.

08:43AM  13              THE COURT:  OKAY.  IT'S A QUARTER TO 9:00 AND I TOLD

08:44AM  14    THEM WE ARE STARTING AT 9:00.  AND THIS IS A TERRIFIC JURY AND

08:44AM  15    THEY'VE BEEN EXTENDING THEIR TIME WITHOUT ANY COMPLAINTS.

08:44AM  16          MY SENSE IS THAT I'M TAKING THAT AS THEIR DESIRE TO

08:44AM  17    CONTINUE TO DEVOTE THEIR EFFORTS TO THE TRIAL AND THEY'RE NOT

08:44AM  18    AT ALL DISENGAGED ABOUT STAYING LATER.  I'VE CREEPED THAT TIME

08:44AM  19    BACK FROM 2:00 TO 3:00, AND THEN TODAY I THINK IT WAS 4:00.  IF

08:44AM  20    I TOLD THEM, LET'S GO TO A NORMAL SCHEDULE OF 5:00, I THINK

08:44AM  21    THEY WOULD NOT REVOLT.  I BET THEY WOULD APPRECIATE THAT.

08:44AM  22          ALL RIGHT.  LET'S DO THIS, LET ME -- I THINK WHAT I WOULD

08:44AM  23    LIKE TO DO IS TO FINISH WITH OUR CONVERSATION WITH THE JURORS

08:44AM  24    THIS MORNING AND DO THAT IN A SEALED SESSION, CONTINUE OUR

08:44AM  25    SEALED SESSION.

08:44AM  1          AND WE HAVE SIX JURORS REMAINING TO SPEAK WITH, AND WE'LL

08:44AM  2     TALK WITH THEM, AND LET'S SEE WHERE THAT LAYS.

08:45AM  3          I HOPE WE CAN GET THIS DONE IN PERHAPS AN HOUR.  I THINK

08:45AM  4     WE CAN.  AND THEN WE CAN PRESS ON WITH THE TRIAL AND DO OUR

08:45AM  5     SCHEDULE ACCORDINGLY.

08:45AM  6          MAYBE WE'LL GO UNTIL 5:00 INSTEAD OF ENDING AT 4:00 TODAY.

08:45AM  7          SO, MR. SCHENK, IF YOUR TEAM COULD ADVISE YOUR WITNESSES.

08:45AM  8     I HOPE THIS IS NOT TOO DISRUPTIVE OF THEIR SCHEDULES.  BUT

08:45AM  9     WE'LL TRY TO BE AS EFFICIENT AS WE CAN.

08:45AM 10          MS. KRATZMANN, WHEN AT LEAST THE SIX HAVE ARRIVED, PLEASE

08:45AM 11     LET ME KNOW AND THEN WE'LL SCHEDULE THEIR INTERVIEWS THIS

08:45AM 12     MORNING.  OF COURSE WE'LL DO THAT IN CHAMBERS AGAIN.

08:45AM 13          I ASSUME THE SAME PARTIES WANT TO JOIN.

08:45AM 14               MR. SCHENK:  YES, YOUR HONOR.

08:45AM 15               MR. DOWNEY:  YES, YOUR HONOR.

08:45AM 16               THE COURT:  ALL RIGHT.  THANK YOU.

08:45AM 17               MR. DOWNEY:  THANK YOU.

08:45AM 18          (RECESS FROM 8:45 A.M. UNTIL 9:00 A.M.)

08:45AM 19          (SEALED PROCEEDINGS IN CHAMBERS.)

        20

        21

        22

        23

        24

        25

```
08:45AM   1        ///

09:00AM   2        ///

09:00AM   3            (SEALED PROCEEDINGS HELD IN CHAMBERS.)

09:00AM   4             THE COURT:  ANYTHING YOU WANT TO COMMENT ON?  I

09:00AM   5    INTEND TO FOLLOW THE SAME PROTOCOL WE DID YESTERDAY.

09:00AM   6        COFFEE, TEA?

09:00AM   7             MR. SCHENK:  NO.  THANK YOU.

09:00AM   8             MR. DOWNEY:  NO.

09:00AM   9             THE COURT:  ALL RIGHT.  LET'S BRING IN NUMBER 2.

09:01AM  10        (PAUSE IN PROCEEDINGS.)

09:01AM  11        (JUROR NUMBER 2 PRESENT.)

09:02AM  12             THE CLERK:  GO AHEAD AND HAVE A SEAT ON THE SOFA,

09:02AM  13    THIS IS JUROR NUMBER 2.

09:02AM  14             THE COURT:  GOOD MORNING.

09:02AM  15             JUROR:  GOOD MORNING.

09:02AM  16             THE COURT:  WE ARE ON THE RECORD IN CHAMBERS WITH

09:02AM  17    COUNSEL, MR. SCHENK, MR. DOWNEY, MY LAW CLERKS, YOU KNOW

09:02AM  18    MS. KRATZMANN.

09:02AM  19             JUROR:  YES.

09:02AM  20             THE COURT:  AND I'M GOING TO CALL YOU AND IDENTIFY

09:02AM  21    YOU AS JUROR NUMBER 2, YOUR JUROR NUMBER.

09:02AM  22             JUROR:  OKAY.

09:02AM  23             THE COURT:  I MEAN NO DISRESPECT.

09:02AM  24        AS I SAID TWO DAYS AGO, I WANTED TO DISCUSS THE

09:02AM  25    QUESTIONNAIRE ISSUE WITH EACH JUROR.  WE DECIDED THAT I WOULD
```

09:02AM  1      DO THIS THIS MORNING BEFORE WE CONTINUE WITH EVIDENCE.

09:02AM  2          BUT FIRST OF ALL, BEFORE WE BEGIN, I WANT TO ASK, JUROR

09:02AM  3      NUMBER 2, YOUR COMFORT LEVEL WITH YOUR MASK.  DO YOU WANT TO

09:02AM  4      CONTINUE TO WEAR THE MASK?  WOULD YOU LIKE TO REMOVE THE MASK?

09:02AM  5          I CAN TELL YOU WE'VE ALL BEEN VACCINATED, BUT IT'S YOUR

09:02AM  6      CALL.

09:02AM  7              JUROR:  I'M FINE, I CAN TAKE IT OFF.

09:03AM  8              THE COURT:  WE'LL TAKE IT OFF, TOO.

09:03AM  9              JUROR:  ALL RIGHT.

09:03AM  10             THE COURT:  THANK YOU FOR THAT.

09:03AM  11         AS I INDICATED TO YOU, I AM HAVING A CONVERSATION WITH

09:03AM  12     EACH OF OUR JURORS REGARDING THE QUESTIONNAIRE AND THE MEDIA

09:03AM  13     COALITION'S REQUEST FOR INFORMATION FROM THE QUESTIONNAIRE.

09:03AM  14         AS I'VE TOLD YOU, I HAD -- YOU FILLED OUT THE

09:03AM  15     QUESTIONNAIRE WITH MY PROMISE THAT IT WOULD REMAIN

09:03AM  16     CONFIDENTIAL.

09:03AM  17             JUROR:  UH-HUH.

09:03AM  18             THE COURT:  IT SAYS IT ON THERE RIGHT ABOVE MY

09:03AM  19     SIGNATURE.

09:03AM  20         THE MEDIA COALITION HAS FILED A MOTION AND THEY HAVE CITED

09:03AM  21     CASES TO ME, SUPREME COURT CASES.  THEY HAVE, OF COURSE, CITED

09:03AM  22     THE FIRST AMENDMENT AND OTHER LEGAL CASES THAT SUGGEST THAT I

09:03AM  23     CANNOT KEEP INFORMATION ON THIS QUESTIONNAIRE CONFIDENTIAL

09:03AM  24     ABSENT SOME SHOWING.

09:03AM  25         THAT'S WHY I'M HAVING THE CONVERSATION WITH EACH OF YOU.

SEALED PROCEEDINGS

09:03AM 1          WHAT I WANT TO DO, AND I HAVE A SCRIPT HERE IF I REFER TO

09:03AM 2    IT, BECAUSE I WANT TO ASK EACH OF YOU THE SAME QUESTIONS

09:03AM 3    OBVIOUSLY.

09:03AM 4          JUROR:  ALL RIGHT.

09:03AM 5          THE COURT:  SO I WANT TO ASK YOU IF YOU HAVE

09:03AM 6    CONCERNS REGARDING ANY OF THE INFORMATION TO ANY OF YOUR

09:04AM 7    ANSWERS ON THE QUESTIONNAIRE, OR NO CONCERNS ABOUT THAT

09:04AM 8    INFORMATION.  THIS WOULD INCLUDE YOUR NAME, EMPLOYMENT,

09:04AM 9    ADDRESS, ANY QUESTION THAT CALLS FOR PERSONAL IDENTIFICATION

09:04AM 10   INFORMATION THAT YOU WOULD NOT WISH TO BE REVEALED.

09:04AM 11         NOW, I CAN TELL YOU THE COURT MAY ORDER CERTAIN

09:04AM 12   INFORMATION REDACTED IF THERE IS A SUFFICIENT LEGAL SHOWING

09:04AM 13   THAT ALLOWS ME LEGALLY TO DO THAT.

09:04AM 14         I'D ASK YOU TO PLEASE BE CANDID WITH ME ABOUT YOUR

09:04AM 15   FEELINGS AND CONCERNS, OR LACK OF CONCERNS, ABOUT ANY OF THE

09:04AM 16   INFORMATION THAT YOU HAVE.

09:04AM 17         I'M PARTICULARLY CONSIDERING AND INTERESTED IN ISSUES OF

09:04AM 18   PRIVACY, SAFETY, SECURITY, OR OTHER -- ANY OTHER REASONS THAT

09:04AM 19   YOU WISH TO EXPRESS AS TO ANY INFORMATION THAT YOU'VE PUT IN

09:04AM 20   YOUR QUESTIONNAIRES.

09:04AM 21         SO WHAT WOULD YOU LIKE ME TO KNOW ABOUT THE INFORMATION

09:04AM 22   THAT IS IN YOUR QUESTIONNAIRE?

09:05AM 23         JUROR:  MY BIGGEST CONCERN WOULD BE PERSONAL

09:05AM 24   IDENTIFIABLE INFORMATION JUST CONSIDERING THERE'S SO MUCH MEDIA

09:05AM 25   IN THE COURTROOM, OUTSIDE OF THE COURTROOM, JUST THE RISK OF

09:05AM   1    ANY ATTENTION COMING TO ME OR WHO I LIVE WITH DURING OR AFTER

09:05AM   2    THE CASE.

09:05AM   3         IN TERMS OF THE SPECIFIC QUESTIONS THAT ARE IDENTIFIABLE,

09:05AM   4    I'M FINE WITH ALL OF THOSE.  NOTHING IN THERE IS THAT SENSITIVE

09:05AM   5    I WOULD SAY.

09:05AM   6         BUT PRIMARILY WHO I AM, WHO I LIVE WITH, WHERE I WORK.

09:05AM   7              THE COURT:  OKAY.

09:05AM   8         SO LET ME GO -- YOUR NAME, NUMBER 1.

09:05AM   9              JUROR:  YEAH.

09:05AM   10             THE COURT:  OKAY.  YOUR EMPLOYMENT?  AND SO YOUR

09:05AM   11   NAME IS -- I'M JUST GOING TO GO THROUGH QUESTIONS.  IT'S

09:05AM   12   QUESTION 11.

09:05AM   13             JUROR:  UH-HUH.

09:05AM   14             THE COURT:  AND THEN YOUR EMPLOYER?

09:05AM   15             JUROR:  YES, 16.

09:05AM   16             THE COURT:  OKAY, 16.  SO IF THE COURT WERE TO JUST

09:05AM   17   STRIKE THE NAME OF YOUR EMPLOYER BUT LEFT YOUR JOB TITLE, WOULD

09:06AM   18   THAT GIVE YOU SOME COMFORT?

09:06AM   19             JUROR:  NO.  THE DIRECTORY FOR OUR CAMPUS IS PUBLIC,

09:06AM   20   SO YOU COULD SEARCH THAT.

09:06AM   21             THE COURT:  OH, IF I WERE TO ELIMINATE QUESTION B,

09:06AM   22   OR REDACT QUESTION B.

09:06AM   23             JUROR:  OH, THAT WOULD BE FINE.

09:06AM   24             THE COURT:  OKAY.  AND YOUR CONCERN THERE IN REGARDS

09:06AM   25   TO THIS INFORMATION, IS IT SECURITY BASED?  IS IT PRIVACY

09:06AM  1    BASED?  IS IT SAFETY ISSUES?

09:06AM  2              JUROR:  I WOULD SAY BOTH SAFETY, PERSONAL

09:06AM  3    INFORMATION.

09:06AM  4              THE COURT:  AND YOU -- LET'S SEE.  I'M TRYING TO SEE

09:06AM  5    THE QUESTION THAT TALKS ABOUT -- QUESTION 22 TALKS ABOUT -- I

09:07AM  6    THINK THAT WOULD BE THE PLACE WHERE ANY OTHER INFORMATION ABOUT

09:07AM  7    ROOMMATES, ET CETERA, AND THAT'S NOT FILLED OUT.

09:07AM  8          DO YOU SEE THAT?

09:07AM  9              JUROR:  IT'S PRESENT SPOUSE OR PARTNER, AND I LEFT

09:07AM 10    THAT BLANK BECAUSE I'M CURRENTLY SINGLE.

09:07AM 11          THE ONLY OTHER QUESTION THAT HAD ANY INFORMATION WITH

09:07AM 12    REGARD TO PEOPLE I LIVE WITH WAS QUESTION 26, AND IT IS PRETTY

09:07AM 13    GENERIC INFORMATION, AND SO I WOULD BE OKAY WITH THAT BEING

09:07AM 14    RELEASED.

09:07AM 15              THE COURT:  OKAY.  AND YOU INDICATED SAFETY AND

09:07AM 16    SECURITY.

09:07AM 17          COULD YOU TELL ME A LITTLE BIT ABOUT YOUR CONCERNS, OR

09:07AM 18    TELL ME A LOT ABOUT YOUR CONCERNS ABOUT SAFETY IN REGARDS TO

09:07AM 19    THE RELEASE OF YOUR INFORMATION?

09:07AM 20              JUROR:  LIKE I SAID, BECAUSE THERE'S SO MUCH MEDIA

09:07AM 21    SPOTLIGHT ON THIS CASE, I WOULD JUST BE CONCERNED ABOUT NOT

09:07AM 22    NECESSARILY ANYTHING WITH EITHER THE DEFENDANT OR THE

09:07AM 23    GOVERNMENT, BUT JUST THE SPOTLIGHT THEN SHIFTING OVER TO MYSELF

09:07AM 24    OR ANY OF THE OTHER JURORS AND JUST THE POTENTIAL IMPACT THAT

09:08AM 25    WOULD HAVE ON MY PERSONAL LIFE, WHEREAS -- IT WAS MY

09:08AM 1    UNDERSTANDING THAT THE CASE WOULD HAPPEN, WE WOULD COMPLETE OUR

09:08AM 2    DUTY, AND WE WOULD BE FREE TO LIVE OUR LIVES AS WE DID

09:08AM 3    PREVIOUSLY.  AND MY CONCERN IS THAT MAY NOT BE THE CASE IF MY

09:08AM 4    INFORMATION IS RELEASED AND I CAN BE IDENTIFIED AND CONTACTED,

09:08AM 5    FOUND --

09:08AM 6            THE COURT:  BY --

09:08AM 7            JUROR:  -- BY THE MEDIA.

09:08AM 8            THE COURT:  OR ANY OTHER PUBLIC PERSON OR ANY OTHER

09:08AM 9    PRIVATE PERSON?

09:08AM 10           JUROR:  YES.

09:08AM 11           THE COURT:  I SEE.  AND DO YOU HAVE ANY LIFE

09:08AM 12   EXPERIENCES WITH THAT OR KNOW PEOPLE WHO HAVE HAD THOSE TYPES

09:08AM 13   OF SITUATIONS?

09:08AM 14           JUROR:  NOT PERSONALLY.  BUT JUST THE IDEA OF IT IS

09:08AM 15   CONCERNING, THE POTENTIAL FOR IT TO HAPPEN.

09:08AM 16           THE COURT:  OKAY.  I SEE.  OKAY.

09:08AM 17       ANYTHING ELSE YOU WOULD LIKE ME TO KNOW ABOUT ANY ISSUE

09:08AM 18   THAT YOU HAVE ABOUT YOUR QUESTIONNAIRE INFORMATION?

09:08AM 19           JUROR:  I DON'T BELIEVE SO.

09:08AM 20           THE COURT:  OKAY.

09:08AM 21       LET ME ASK YOU, AS A RESULT OF THIS, THAT IS, US TALKING

09:08AM 22   ABOUT YOUR QUESTIONNAIRE -- ACTUALLY, I HAVE TWO QUESTIONS.

09:09AM 23       IF THE COURT WERE NOT ABLE TO LEGALLY REDACT THE

09:09AM 24   INFORMATION THAT YOU HAVE REQUESTED, WOULD THAT IN ANY WAY

09:09AM 25   INTERFERE WITH YOUR ABILITY TO CONTINUE TO BE FAIR AND

09:09AM 1   IMPARTIAL AS A JUROR IN THIS CASE?

09:09AM 2   JUROR:  I'M NOT SURE.  I FEEL LIKE I TOOK THE OATH

09:09AM 3   AND JUST THE DUTIES OF BEING A JUROR FAIRLY SERIOUSLY, SO I

09:09AM 4   WOULD DO MY BEST.  BUT NOT KNOWING HOW I WOULD FEEL IF IT

09:09AM 5   ACTUALLY HAPPENED, I CAN'T SPEAK ON THAT BECAUSE IT HASN'T

09:09AM 6   HAPPENED.

09:09AM 7   THE COURT:  WHAT DO YOU MEAN, WHAT HASN'T HAPPENED?

09:09AM 8   JUROR:  I'M SORRY.  IF THIS INFORMATION WERE

09:09AM 9   RELEASED, I DON'T KNOW -- I DON'T FEEL LIKE IT WOULD CHANGE MY

09:09AM 10  OPINION OR MY ABILITY TO DO THE JOB, BUT I CAN'T SAY FOR SURE

09:09AM 11  UNTIL IT POTENTIALLY HAPPENS, IF THAT MAKES SENSE.

09:10AM 12  SO I FEEL LIKE, YES, I WOULD STILL BE ABLE TO DO THE JOB

09:10AM 13  AND IT WOULD NOT CHANGE MY ABILITY TO BE IMPARTIAL, BUT I CAN'T

09:10AM 14  SAY FOR CERTAIN.

09:10AM 15  THE COURT:  OKAY.  YOU KNOW, ONE THING THAT IN

09:10AM 16  TRIALS -- YOU'VE NEVER HAD JURY EXPERIENCE?

09:10AM 17  JUROR:  NO.  THIS IS MY FIRST ONE.

09:10AM 18  THE COURT:  RIGHT.  SOME TRIALS, THE QUESTIONS ARE

09:10AM 19  ASKED IN THE PUBLIC ARENA.

09:10AM 20  JUROR:  UH-HUH.

09:10AM 21  THE COURT:  HERE WE CHOSE TO DO A QUESTIONNAIRE, THE

09:10AM 22  PARTIES ASKED FOR A QUESTIONNAIRE.

09:10AM 23  JUROR:  YES.

09:10AM 24  THE COURT:  AND THE ISSUE HERE WAS THE INFORMATION

09:10AM 25  BEING CONFIDENTIAL.

09:10AM   1                    JUROR:  UH-HUH.

09:10AM   2                    THE COURT:  SO KNOWING WHAT YOU KNOW NOW ABOUT THIS

09:10AM   3       PROCESS --

09:10AM   4                    JUROR:  UH-HUH.

09:10AM   5                    THE COURT:  -- AND WHAT COULD HAPPEN, CAN YOU TELL

09:10AM   6       ME, CAN YOU CONTINUE TO BE FAIR AND IMPARTIAL TO BOTH SIDES AS

09:10AM   7       A JUROR IN THIS CASE?

09:10AM   8                    JUROR:  YES.

09:10AM   9                    THE COURT:  OKAY.

09:10AM  10                    JUROR:  I THINK THAT THIS IS VERY SEPARATE FROM THE

09:10AM  11       CASE ITSELF.

09:10AM  12                    THE COURT:  RIGHT.

09:10AM  13                    JUROR:  AND I THINK THAT MY INFORMATION BEING

09:10AM  14       RELEASED OR NOT DOESN'T NECESSARILY AFFECT MY ABILITY TO BE

09:10AM  15       IMPARTIAL AND HEAR BOTH SIDES FAIRLY.

09:11AM  16                    THE COURT:  YOU WOULD -- YOU COULD CONTINUE TO DO

09:11AM  17       THAT IN THE CASE?

09:11AM  18                    JUROR:  UH-HUH.

09:11AM  19                    THE COURT:  AND YOU CAN GIVE ME AND THESE LAWYERS

09:11AM  20       ASSURANCES THAT YOU CAN CONTINUE TO DO THAT, YES OR NO?

09:11AM  21                    JUROR:  YES.

09:11AM  22                    THE COURT:  OKAY.  ANY DOUBT ABOUT THAT IN YOUR

09:11AM  23       MIND?

09:11AM  24                    JUROR:  NO.

09:11AM  25                    THE COURT:  OKAY.  ALL RIGHT.

SEALED PROCEEDINGS

09:11AM 1          MR. SCHENK, DO YOU HAVE ANY QUESTIONS FOR JUROR NUMBER 2?

09:11AM 2                  MR. SCHENK:  NO.  THANK YOU.

09:11AM 3                  THE COURT:  MR. DOWNEY?

09:11AM 4                  MR. DOWNEY:  I DON'T, YOUR HONOR.  THANK YOU.

09:11AM 5                  THE COURT:  THANK YOU VERY MUCH.

09:11AM 6                  JUROR:  THANK YOU.

09:11AM 7                  THE COURT:  YOU CAN JUST LEAVE YOUR QUESTIONNAIRE

09:11AM 8      THERE.

09:11AM 9                  JUROR:  ALL RIGHT.

09:11AM 10                 THE COURT:  AND I HOPE WE CAN GET THIS DONE.  I HOPE

09:11AM 11     THERE'S ENOUGH FOOD IN THE ROOM TO TIDE THE JURORS OVER WHILE

09:11AM 12     WE GO THROUGH THIS PROCESS.

09:11AM 13                 JUROR:  I THINK SO.

09:11AM 14                 THE COURT:  BUT WE'LL DO IT AS QUICKLY AS WE CAN.

09:11AM 15                 JUROR:  THANK YOU.

09:11AM 16                 THE COURT:  YOU'RE WELCOME.

09:12AM 17             (PAUSE IN PROCEEDINGS.)

09:12AM 18             (JUROR NUMBER 4 PRESENT.)

09:13AM 19                 THE CLERK:  JUROR NUMBER 4.

09:13AM 20                 THE COURT:  THANK YOU.  GOOD MORNING.

09:13AM 21                 JUROR:  HELLO.

09:13AM 22                 THE COURT:  WE ARE IN MY OFFICE IN CHAMBERS WITH

09:13AM 23     MR. DOWNEY, MR. SCHENK, MY LAW CLERKS, AND OUR COURT REPORTERS.

09:13AM 24             GOOD MORNING, JUROR NUMBER 4.

09:13AM 25             I'M GOING TO IDENTIFY YOU BY YOUR NUMBER AND NOT BY YOUR

09:13AM  1          NAME.

09:13AM  2                  JUROR:  UH-HUH.

09:13AM  3                  THE COURT:  AND I MEAN NO DISRESPECT.

09:13AM  4          AS I SAID THE OTHER DAY, I WANT TO SPEAK WITH EACH JUROR

09:13AM  5     TO ASK THEM THEIR CONCERNS, OR NONCONCERNS, ABOUT THE

09:13AM  6     INFORMATION ON THE QUESTIONNAIRE.

09:13AM  7          BUT BEFORE I DO THAT, I'D LIKE TO ASK YOU, JUROR NUMBER 4,

09:13AM  8     ABOUT YOUR DESIRE TO CONTINUE WEARING YOUR MASK OR NOT.  IF YOU

09:13AM  9     WANT TO KEEP IT ON, THAT'S FINE.  IF YOU WOULD LIKE TO TAKE IT

09:13AM 10     OFF, YOU CAN TAKE IT OFF.

09:13AM 11                  JUROR:  OKAY.

09:13AM 12                  THE COURT:  OKAY.  AND WE WILL DO IT, TOO.  THANK

09:13AM 13     YOU.

09:13AM 14          SO AS I SAID EARLIER THIS WEEK, THIS MEDIA COALITION HAS

09:13AM 15     FILED A MOTION TO ASK ME TO UNSEAL THE QUESTIONNAIRES.  WHEN

09:14AM 16     YOU FILLED OUT THE QUESTIONNAIRE, YOU DID SO WITH ME PROMISING

09:14AM 17     YOU THAT THE INFORMATION WOULD REMAIN CONFIDENTIAL AND WOULD BE

09:14AM 18     RELEASED, IF AT ALL, WITH REDACTIONS ON IT.

09:14AM 19                  JUROR:  UH-HUH.

09:14AM 20                  THE COURT:  THE MEDIA COALITION AND THEIR LAWYER

09:14AM 21     FILED A MOTION, AND THEY HAVE CITED SUPREME COURT CASES, THE

09:14AM 22     FIRST AMENDMENT, AND OTHER CASES THAT THEY SUGGEST MEAN THAT I

09:14AM 23     SHOULD NOT KEEP CERTAIN INFORMATION CONFIDENTIAL, BUT THAT IT

09:14AM 24     MUST BE RELEASED.

09:14AM 25          SO I AM ASKING EACH JUROR, THAT'S WHY WE'RE TALKING ABOUT

09:14AM 1       THIS, I WANT TO KNOW YOUR FEELINGS ABOUT THAT, WHETHER YOU HAVE

09:14AM 2       CONCERNS, NO CONCERNS, WHETHER YOU HAVE CONCERNS ABOUT CERTAIN

09:14AM 3       INFORMATION OR NOT.

09:14AM 4            AND THIS INFORMATION WOULD INCLUDE NAMES, EMPLOYMENT, ANY

09:14AM 5       INFORMATION IN THE QUESTIONNAIRE THAT YOU BELIEVE IS PERSONAL

09:14AM 6       AND OTHERWISE -- PERSONAL INFORMATION THAT YOU OTHERWISE WOULD

09:15AM 7       NOT WISH TO BE RELEASED PUBLICLY.

09:15AM 8            THE COURT DOES HAVE CERTAIN AUTHORITY, CERTAIN RIGHTS.  I

09:15AM 9       DO HAVE THE AUTHORITY TO REDACT CERTAIN INFORMATION AND KEEP

09:15AM 10      THAT PRIVATE --

09:15AM 11                 JUROR:  UH-HUH.

09:15AM 12                 THE COURT:  -- UPON A PROPER SHOWING, THOUGH.  THERE

09:15AM 13      HAS TO BE A PROPER LEGAL SHOWING FOR THAT.

09:15AM 14           SO WHAT I'M DOING IS ASKING EACH JUROR WHETHER OR NOT THEY

09:15AM 15      HAVE CONCERNS ABOUT THE INFORMATION IN THE QUESTIONNAIRE.

09:15AM 16                 JUROR:  UH-HUH.

09:15AM 17                 THE COURT:  AND THIS TYPICALLY WOULD RELATE TO

09:15AM 18      PRIVACY ISSUES, SECURITY, OR SAFETY ISSUES IN REGARDS TO ANY OF

09:15AM 19      THE INFORMATION AND THE REASONS FOR THAT.

09:15AM 20           SO LET ME ASK YOU TO BE CANDID WITH ME AND OPEN WITH ME

09:15AM 21      ABOUT THAT.

09:15AM 22           ARE THERE ANY CONCERNS?  DO YOU HAVE ANY CONCERNS ABOUT

09:15AM 23      ANY OF YOUR INFORMATION?

09:15AM 24                 JUROR:  WELL, THIS IS TOTALLY NEW, AS I TOLD YOU,

09:15AM 25      TOTALLY NEW FOR ME.

09:15AM  1          I'M A HOUSEWIFE AND I'M NOT USED TO DEAL WITH THIS.  SO

09:16AM  2     OVER HERE I'M SO SCARED AND INTIMIDATED BECAUSE I'VE NEVER BEEN

09:16AM  3     WITH PEOPLE LIKE YOU GUYS.

09:16AM  4          THE COURT:  WELL, I UNDERSTAND THAT, AND THAT'S WHY

09:16AM  5     WE'RE HERE, I'VE IDENTIFIED WHO THE PEOPLE ARE IN THE ROOM.

09:16AM  6          I TOLD EVERYONE, I DON'T WANT THIS TO BE INTIMIDATING.

09:16AM  7     THAT'S WHY I DON'T HAVE A ROBE ON.

09:16AM  8          I DON'T WANT THIS TO BE INTIMIDATING.  I JUST WANT THIS TO

09:16AM  9     BE AN OPEN CONVERSATION.

09:16AM  10          JUROR:  OKAY.  SO FOR ME IT'S A BIG DEAL.  AND I

09:16AM  11     TOOK IT HOME.  I TOLD THE TRUTH AND NOTHING BUT THE TRUTH HERE.

09:16AM  12          BUT WE ARE SUPER PRIVATE IN OUR HOUSE.  AS PRIVATE AS MY

09:16AM  13     HUSBAND HERE, YOU SAW WHERE HE WORKS, AND IF YOU ASK ME WHAT HE

09:16AM  14     DOES, I DON'T HAVE AN IDEA BECAUSE I CANNOT KNOW WHAT HE DOES.

09:16AM  15          THE COURT:  OKAY.

09:16AM  16          JUROR:  SO THAT'S ONE OF THE -- NOT THE RULES, BUT

09:16AM  17     IT IS SOMETHING THAT WE RESPECT ONE FROM THE OTHER.

09:17AM  18          THE COURT:  LET ME TURN YOU TO QUESTION 16 IN YOUR

09:17AM  19     DOCUMENT, AND YOU LIST AN OCCUPATION.

09:17AM  20          IS THAT YOUR OCCUPATION OR IS THAT YOUR HUSBAND'S?

09:17AM  21          JUROR:  MY HUSBAND'S.

09:17AM  22          THE COURT:  I SEE.  SO YOU PUT YOUR HUSBAND'S

09:17AM  23     INFORMATION IN QUESTION 16.

09:17AM  24          JUROR:  WELL, YOU WERE ASKING ME FOR IT AND I

09:17AM  25     ANSWERED THAT.

09:17AM 1          THE COURT:  NO, NO, I --

09:17AM 2          JUROR:  16?  WHAT IS 16?

09:17AM 3      OH, THAT WAS MY PREVIOUS OCCUPATION.

09:17AM 4          THE COURT:  OH, I SEE.  OKAY.

09:17AM 5          JUROR:  BUT IN QUESTION -- WHERE IS THAT? -- 22, YOU

09:17AM 6      ARE ASKING ME FOR MY HUSBAND.

09:17AM 7          THE COURT:  YES.

09:17AM 8          JUROR:  AND I LIST IT.

09:17AM 9          THE COURT:  OKAY.  SO --

09:17AM 10          JUROR:  SO WE ARE SO PRIVATE AND WE DON'T SPEAK

09:17AM 11      ABOUT HIS JOB, I DON'T SPEAK ABOUT WHAT I'M DOING NOW.

09:18AM 12      BUT I DON'T WANT ANYTHING TO BE RELEASED.  I DON'T HAVE AN

09:18AM 13      INTEREST ON ANYBODY TO KNOW WHO I AM, HOW MANY KIDS, IF I'M

09:18AM 14      MARRIED, SINGLE, WHERE DO I LIVE.

09:18AM 15          THE COURT:  OKAY.

09:18AM 16          JUROR:  FOR ME IT'S ENOUGH TO DEAL WITH CAMERAS AND

09:18AM 17      PEOPLE DOWNSTAIRS AND GOING THROUGH SECURITY AND EVERYTHING.

09:18AM 18      THAT'S ENOUGH.  YOU KNOW?

09:18AM 19      I DON'T WANT ANYBODY TO START BOTHERING ME OR CALLING OR,

09:18AM 20      YOU KNOW, I DON'T WANT ANYTHING LIKE THAT.

09:18AM 21          THE COURT:  OKAY.  CAN YOU TELL ME, JUROR NUMBER 4,

09:18AM 22      DO YOU HAVE SECURITY OR SAFETY CONCERNS ABOUT THE RELEASE OF

09:18AM 23      THIS INFORMATION?

09:18AM 24          JUROR:  I -- AS I TOLD YOU, I DIDN'T KNOW WHAT YOU

09:18AM 25      WERE TALKING ABOUT WHEN YOU DESCRIBED HERE (INDICATING), AND I

09:18AM 1    DIDN'T KNOW HOW BIG IT WAS.  AND I'M REALIZING HOW BIG IT IS.

09:18AM 2    AND NOW WITH THIS DEAL, I'M REALIZING THAT IT'S PRETTY BIG.

09:19AM 3              THE COURT:  AND DO YOU HAVE SAFETY OR SECURITY

09:19AM 4    CONCERNS?  OR CAN YOU TELL ME A LITTLE BIT ABOUT YOUR CONCERNS?

09:19AM 5        WHAT YOU'RE TELLING ME IS THAT YOU'RE PRIVATE AND YOU

09:19AM 6    WOULD LIKE TO MAINTAIN YOUR PRIVACY.

09:19AM 7              JUROR:  YES, THAT'S THE POINT.

09:19AM 8              THE COURT:  OKAY.

09:19AM 9              JUROR:  BUT NO SECURITY LIKE SOMEBODY IS FOLLOWING

09:19AM 10   ME TO MY HOUSE AND DO SOMETHING TO ME, NO.

09:19AM 11       BUT I DON'T WANT THE MEDIA TO BE CLOSE TO ME.  I DON'T

09:19AM 12   KNOW HOW TO DEAL WITH MEDIA.  I KNOW HOW TO DEAL WITH TEACHERS

09:19AM 13   AND PARENTS, BUT NOT AS FAR AS THAT.

09:19AM 14             THE COURT:  YOU HAD AN ANSWER IN QUESTION 32 --

09:19AM 15             JUROR:  UH-HUH.

09:19AM 16             THE COURT:  -- AND I'M JUST CURIOUS WHETHER THAT

09:19AM 17   SITUATION --

09:19AM 18             JUROR:  I FEEL SO, LIKE, VIOLATED BECAUSE IT DOESN'T

09:20AM 19   HAPPEN IN A WAL-MART PARKING LOT.  IT HAPPENED IN MY KID'S

09:20AM 20   SCHOOL.

09:20AM 21             THE COURT:  YES.

09:20AM 22             JUROR:  IT WAS IN A PRIVATE SCHOOL IN A GOOD

09:20AM 23   NEIGHBORHOOD, AND AFTER THAT I GOT IN SHOCK, I GET SICK, I WAS

09:20AM 24   SICK FOR A MONTH, ALL OF MY SYSTEM WENT DOWN, AND IT WAS A BIG

09:20AM 25   DEAL FOR US.

SEALED PROCEEDINGS                                                                    3306

```
09:20AM   1              THE COURT:  SO DOES THAT, DOES THAT CAUSE YOU SOME

09:20AM   2    CONCERN THAT IF YOUR PERSONAL INFORMATION IS RELEASED, AS A

09:20AM   3    RESULT OF THAT INCIDENT YOU SUFFERED, YOU HAVE SOME CONCERNS

09:20AM   4    ABOUT SECURITY IF PEOPLE FOUND OUT WHERE YOU LIVED?

09:20AM   5              JUROR:  I DON'T THINK SO BECAUSE THEY ARE NOT

09:20AM   6    RELATED.

09:20AM   7              THE COURT:  OKAY.

09:20AM   8              JUROR:  BUT IF MY INFORMATION WILL BE PUBLISHED, I

09:20AM   9    DON'T WANT -- ONE THING DOESN'T CONNECT WITH THE OTHER, YOU

09:20AM  10    KNOW?

09:20AM  11         BUT I DON'T LIKE FEELING IN THAT SITUATION.

09:20AM  12              THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

09:20AM  13         LET ME ASK YOU IF -- AS I SAID, THE COURT CAN KEEP CERTAIN

09:21AM  14    ITEMS PRIVATE IF THERE'S A SUFFICIENT SHOWING FOR THAT.

09:21AM  15         BUT IF LEGALLY I CANNOT KEEP CERTAIN INFORMATION

09:21AM  16    PRIVATE --

09:21AM  17              JUROR:  LIKE WHAT?

09:21AM  18              THE COURT:  LIKE LET'S SAY THAT IF I CAN KEEP YOUR

09:21AM  19    NAME PRIVATE AND PERHAPS KEEP THE EMPLOYMENT, THE PLACE OF

09:21AM  20    EMPLOYMENT PRIVATE --

09:21AM  21              JUROR:  I JUST ASK YOU, KEEP AS MUCH INFORMATION

09:21AM  22    PRIVATE AS YOU CAN.

09:21AM  23              THE COURT:  OKAY.  WELL, THANK YOU FOR THAT

09:21AM  24    DIRECTION.  I APPRECIATE IT.

09:21AM  25              JUROR:  I DON'T WANT MY HUSBAND'S INFORMATION THERE,
```

09:21AM  1    IF I HAVE KIDS HOW OLD ARE THEY, OR IF YOU WANT TO SAY WE HAVE

09:21AM  2    A STAY-AT-HOME MOM ON THE JURY, OKAY, GO AHEAD AND DO IT, AND

09:21AM  3    THAT'S IT.

09:21AM  4           THE COURT:  IF THOSE ARE THE THINGS AND IF I'M NOT

09:22AM  5    ABLE TO KEEP EVERYTHING YOU WANT PRIVATE, WILL THAT AFFECT YOU

09:22AM  6    TO BE A FAIR AND IMPARTIAL JUROR TO BOTH SIDES?  CAN YOU

09:22AM  7    CONTINUE TO DO THAT EVEN IF I CAN'T KEEP EVERYTHING PRIVATE?

09:22AM  8           JUROR:  MAYBE.

09:22AM  9           THE COURT:  OKAY.

09:22AM  10           JUROR:  BECAUSE I'VE BEEN THINKING WHY IS THIS

09:22AM  11    HAPPENING?

09:22AM  12           THE COURT:  WHY WHAT IS HAPPENING?

09:22AM  13           JUROR:  THIS IS HAPPENING?  WHY DO YOU HAVE TO

09:22AM  14    OPEN --

09:22AM  15           THE COURT:  WHY I'M TALKING TO YOU ABOUT THE

09:22AM  16    QUESTIONNAIRE?

09:22AM  17           JUROR:  YES.  NO.  I'M TALKING ABOUT THE ENTIRE

09:22AM  18    SITUATION, WHY THE MEDIA WANTS OUR LIVES TO BE REVEALED.

09:22AM  19           THE COURT:  WELL, THE MEDIA HAS FILED THIS MOTION

09:22AM  20    ASKING THAT THE QUESTIONNAIRES BE RELEASED TO THEM SO THAT THEY

09:23AM  21    CAN KNOW WHO THE JURY IS, I SUPPOSE.  THAT'S THE INFORMATION

09:23AM  22    THAT THEY WANT.

09:23AM  23      THEY WANT THE INFORMATION THAT IS IN THE QUESTIONNAIRE.

09:23AM  24      AS I'VE SAID, I CAN, UNDER CERTAIN CIRCUMSTANCES IF THERE

09:23AM  25    IS AN APPROPRIATE SHOWING, I CAN KEEP SOME INFORMATION PRIVATE,

09:23AM  1    BUT I MAY NOT BE ABLE TO KEEP ALL OF IT PRIVATE, AND THAT'S WHY

09:23AM  2    I'M ASKING YOU THE QUESTION.

09:23AM  3         KNOWING THAT, KNOWING THAT IT MAY BE THAT IT MAY BE JUST

09:23AM  4    YOUR NAME, IT MAY BE YOUR HUSBAND'S EMPLOYMENT AND MAYBE YOUR

09:23AM  5    CHILDREN'S AGES, CERTAINLY NOT THEIR NAMES, THEIR NAMES ARE NOT

09:23AM  6    IN THE QUESTIONNAIRE.

09:23AM  7         JUROR:  NO.

09:23AM  8         THE COURT:  BUT THAT INFORMATION MIGHT BE THE ONLY

09:23AM  9    THINGS THAT I'M ABLE TO KEEP PRIVATE OR WOULD KEEP PRIVATE.

09:23AM 10         KNOWING THAT, CAN YOU CONTINUE TO BE FAIR AND IMPARTIAL IN

09:23AM 11    THIS CASE?  CAN YOU CONTINUE TO DO THAT?

09:23AM 12         JUROR:  I THINK SO.  I'M --

09:23AM 13         THE COURT:  I'M SORRY?

09:24AM 14         JUROR:  I THINK SO.  I'M NOT 100 PERCENT SURE.  BUT,

09:24AM 15    AGAIN, PLEASE KEEP AS MUCH AS YOU CAN.

09:24AM 16         THE COURT:  OKAY.  WELL, I NEED TO KNOW, AND I'M

09:24AM 17    SORRY, BUT I DO NEED TO KNOW, AND THESE LAWYERS NEED TO KNOW,

09:24AM 18    WHETHER OR NOT YOU CAN CONTINUE WITH YOUR JURY SERVICE IN THE

09:24AM 19    CASE AND KEEP THIS ISSUE SEPARATE FROM YOUR ABILITY TO HEAR THE

09:24AM 20    EVIDENCE AND PERFORM YOUR DUTIES AS A JUROR.  CAN YOU DO THAT?

09:24AM 21         JUROR:  SO YOU'RE TALKING THAT YOU'RE GOING TO

09:24AM 22    REVEAL SOMETHING?

09:24AM 23         THE COURT:  I'M SORRY?

09:24AM 24         JUROR:  YOU'RE SAYING THAT YOU'RE GOING TO REVEAL

09:24AM 25    SOMETHING?

09:24AM   1          THE COURT:  SOME THINGS I THINK I HAVE TO REVEAL,

09:24AM   2     THAT'S RIGHT, I BELIEVE I WILL IN THE QUESTIONNAIRE.

09:24AM   3          THERE IS CERTAIN INFORMATION HERE THAT I THINK IS PERSONAL

09:24AM   4     INFORMATION, AS YOU'VE SAID, THAT MIGHT NOT NEED TO BE

09:25AM   5     RELEASED.

09:25AM   6          I DON'T INTEND TO RELEASE YOUR NAMES.

09:25AM   7          JUROR:  I DON'T WANT TO BE DEALING WITH PRESS.

09:25AM   8          THE COURT:  YOU DON'T WANT TO BE DEALING WITH THE

09:25AM   9     PRESS?

09:25AM   10          JUROR:  YES.

09:25AM   11          THE COURT:  I APPRECIATE THAT.  THANK YOU FOR SAYING

09:25AM   12     THAT.

09:25AM   13          JUROR:  THIS IS SO STRESSFUL FOR ME.

09:25AM   14          SO KEEP PRIVATE AS MUCH AS YOU CAN.

09:25AM   15          THE COURT:  OKAY.  LET ME TELL YOU, I HAD A

09:25AM   16     HEARING -- I TOLD YOU ABOUT THE HEARING THAT I HAD WITH THE

09:25AM   17     LAWYER FOR THE PRESS WHO MADE THIS MOTION, AND THEY DID TELL

09:25AM   18     ME, THE LAWYER DID TELL ME THAT DURING THE TRIAL, NONE OF THE

09:25AM   19     PRESS ARE GOING TO REACH OUT TO ANY OF THE JURORS.  THEY'RE NOT

09:25AM   20     GOING TO CONTACT THE JURORS DURING THE TRIAL.

09:25AM   21          AFTER THE TRIAL IS OVER, HE WOULD NOT, THE LAWYER COULD

09:25AM   22     NOT TELL ME THAT THEY -- WHAT THEY WOULD DO.

09:25AM   23          BUT HE DID TELL ME THAT DURING THE TRIAL, NONE OF THE

09:25AM   24     REPORTERS OR ANY OF THE PEOPLE THAT HE REPRESENTS INTEND TO

09:26AM   25     CONTACT A JUROR.  THEY KNOW THAT THEY'RE NOT SUPPOSED TO DO

```
09:26AM   1    THAT DURING THE TRIAL.

09:26AM   2              JUROR:  YEAH, BUT IF YOU REVEAL NAME OR ADDRESS OR

09:26AM   3    SOMETHING LIKE THAT, AFTER THEY WILL COME TO ME.

09:26AM   4              THE COURT:  I DON'T KNOW IF THEY WILL OR NOT.

09:26AM   5              JUROR:  SO I, I ASK YOU, PLEASE KEEP MY NAME AND MY

09:26AM   6    ADDRESS SECRET.

09:26AM   7              THE COURT:  YOUR ADDRESS ISN'T IN THE QUESTIONNAIRE,

09:26AM   8    SO THAT WILL NOT BE RELEASED.

09:26AM   9              JUROR:  OKAY.  BUT I PUT IN THE QUESTIONNAIRE WHICH

09:26AM  10    COUNTY I AM, WHICH CITY I AM LIVING.

09:26AM  11              THE COURT:  UH-HUH.

09:26AM  12              JUROR:  AND IT WILL BE EASY TO FIGURE IT OUT ON

09:26AM  13    GOOGLE IF YOU RELEASE MY NAME.

09:26AM  14              THE COURT:  OKAY.

09:26AM  15              JUROR:  RIGHT?  THAT'S WHAT I THINK.

09:26AM  16              THE COURT:  I DON'T DO GOOGLE FOR THAT PURPOSE, SO I

09:26AM  17    DON'T KNOW, BUT I ASSUME THAT'S TRUE.

09:26AM  18         SO AGAIN, JUROR NUMBER 4, I JUST NEED TO KNOW WHETHER OR

09:26AM  19    NOT YOU COULD CONTINUE TO BE A FAIR AND IMPARTIAL JUROR.

09:26AM  20              JUROR:  I THINK SO, YES.  YES.

09:27AM  21              THE COURT:  ALL RIGHT.  THANK YOU.

09:27AM  22         ANYTHING ELSE YOU WANT ME TO KNOW?

09:27AM  23              JUROR:  NO.  I JUST HIGHLIGHTED THE THINGS THAT I

09:27AM  24    PREFER NOT TO BE REVEALED.

09:27AM  25              THE COURT:  OKAY.  IF YOU COULD LEAVE THAT FOR ME.
```

SEALED PROCEEDINGS

09:27AM 1          JUROR:  YEAH.

09:27AM 2          THE COURT:  BEFORE YOU LEAVE, I NEED TO ASK THESE

09:27AM 3   LAWYERS IF THEY HAVE A QUESTION FOR YOU.

09:27AM 4        MR. SCHENK?

09:27AM 5          MR. SCHENK:  NO, YOUR HONOR.

09:27AM 6          THE COURT:  MR. DOWNEY?

09:27AM 7          MR. DOWNEY:  NO.  THANK YOU.

09:27AM 8          THE COURT:  ALL RIGHT.  THANK YOU.

09:27AM 9          JUROR:  THANK YOU.

09:27AM 10          THE COURT:  YOU'RE WELCOME.

09:27AM 11        (PAUSE IN PROCEEDINGS.)

09:27AM 12        (JUROR NUMBER 9 PRESENT.)

09:28AM 13          THE CLERK:  JUROR NUMBER 9.

09:28AM 14          THE COURT:  THANK YOU.  GOOD MORNING.

09:28AM 15          JUROR:  GOOD MORNING.

09:28AM 16          THE COURT:  FIRST OF ALL, I'M GOING TO REFER TO YOU

09:29AM 17   BY YOUR JUROR NUMBER, NOT BY YOUR NAME, PLEASE, AND I MEAN NO

09:29AM 18   DISRESPECT IN THAT REGARD.

09:29AM 19        WE'RE HERE IN MY CHAMBERS, IN MY OFFICE.  MR. DOWNEY,

09:29AM 20   MR. SCHENK ARE HERE, MY TWO LAW CLERKS ARE HERE.  THEY'RE

09:29AM 21   BEHIND YOU.

09:29AM 22        (LAUGHTER.)

09:29AM 23          THE COURT:  AND OF COURSE MY COURTROOM DEPUTY IS

09:29AM 24   HERE.

09:29AM 25        I WANTED TO TALK TO YOU, AS I SAID EARLIER, ABOUT THE

SEALED PROCEEDINGS
3312

09:29AM   1    MEDIA COALITION'S MOTION TO RELEASE CERTAIN INFORMATION.  I

09:29AM   2    WANT TO GET YOUR THOUGHTS ON THAT.

09:29AM   3        BUT, FIRST OF ALL, I WANT TO ASK YOU ABOUT MASKS.  DO YOU

09:29AM   4    WANT TO CONTINUE TO WEAR YOUR MASK?  IF YOU WOULD LIKE TO

09:29AM   5    REMOVE IT, YOU MAY.  WE'VE ALL BEEN VACCINATED.  IF YOU WANT TO

09:29AM   6    CONTINUE, WE'RE CERTAINLY HAPPY TO KEEP OUR MASKS ON.

09:29AM   7             JUROR:  OKAY.  I'M COMFORTABLE TAKING IT OFF.

09:29AM   8             THE COURT:  OKAY.  THANK YOU.  WE WILL, TOO.  THANK

09:29AM   9    YOU.

09:29AM  10        AS I SAID, THE MEDIA COALITION, AND I IDENTIFIED WHO THEY

09:29AM  11    ARE, BROUGHT A MOTION ASKING THAT THE COURT, FOR LEGAL REASONS,

09:29AM  12    AND THEY CITE SUPREME COURT CASES AND THE FIRST AMENDMENT,

09:30AM  13    AMONGST OTHERS, IN SUPPORT OF THEIR MOTION TO HAVE ME RELEASE

09:30AM  14    THE QUESTIONNAIRES AND THE INFORMATION THAT IS CONTAINED IN THE

09:30AM  15    QUESTIONNAIRES.

09:30AM  16        YOU FILLED OUT THE QUESTIONNAIRE WITH MY PROMISE THAT IT

09:30AM  17    WOULD BE CONFIDENTIAL.

09:30AM  18             JUROR:  UH-HUH.

09:30AM  19             THE COURT:  IT SAYS SO RIGHT THERE RIGHT ABOVE MY

09:30AM  20    NAME.

09:30AM  21        AND THEN THIS MOTION HAS BEEN FILED.  WHAT I'M DOING NOW

09:30AM  22    IS CONSIDERING THE MOTION, THE LEGAL REASONS FOR THE MOTION,

09:30AM  23    BUT PART OF THE PROCESS IS FOR ME CONTACTING, INTERVIEWING EACH

09:30AM  24    OF THE JURORS TO ASK YOUR FEELINGS ABOUT THE MOTION, THE

09:30AM  25    RELEASE OF ANY INFORMATION THAT YOU MIGHT HAVE AND ANY

09:30AM 1    CONCERNS, OR LACK OF CONCERNS, THAT THE JURORS MIGHT HAVE ABOUT

09:30AM 2    RELEASING INFORMATION, AND THIS INFORMATION INCLUDES NAME,

09:30AM 3    EMPLOYMENT, ADDRESS, OR ANY OTHER PERSONAL INFORMATION THAT A

09:30AM 4    JUROR WOULD OTHERWISE WISH NOT TO HAVE REVEALED.

09:30AM 5        I'D ASK YOU TO PLEASE BE CANDID WITH ME ABOUT YOUR

09:31AM 6    FEELINGS, OR LACK OF FEELINGS, ABOUT THE INFORMATION, WHATEVER

09:31AM 7    THEY ARE, AND ASK YOU TO TELL ME ABOUT YOUR COMFORT LEVEL IN

09:31AM 8    THAT REGARD.

09:31AM 9        I'M PARTICULARLY INTERESTED IN ANY -- IF YOU HAVE ANY

09:31AM 10   CONCERNS REGARDING SAFETY, PRIVACY, OR SECURITY ISSUES THAT ANY

09:31AM 11   OF THE RELEASE MIGHT RAISE TO YOU.

09:31AM 12       SO PLEASE.

09:31AM 13           JUROR:  YEAH, I CERTAINLY HAVE PRIVACY.

09:31AM 14           THE COURT:  OKAY.

09:31AM 15           JUROR:  YEAH.  SO I WOULD BE CONCERNED ABOUT

09:31AM 16   IDENTIFYING INFORMATION LIKE MY NAME.

09:31AM 17           THE COURT: OKAY.

09:31AM 18           JUROR:  AND HOW SPECIFIC OF WHERE I LIVE.

09:31AM 19           THE COURT:  OKAY.

09:31AM 20           JUROR:  I MEAN, BECAUSE YOU GOT DOWN TO THE

09:31AM 21   NEIGHBORHOOD THAT I LIVED AND THE CITY.

09:31AM 22           THE COURT:  NOT THE ADDRESS, WE DIDN'T ASK THE

09:31AM 23   ADDRESS.

09:31AM 24           JUROR:  NO, BUT YOU GOT DOWN TO THE NEIGHBORHOOD.

09:31AM 25           THE COURT:  OKAY.

09:31AM  1              JUROR:  YEAH, THAT'S MY PRIMARY CONCERN.

09:31AM  2              THE COURT:  NAME AND GEOGRAPHIC LOCATION OF YOUR

09:31AM  3     RESIDENCE?

09:31AM  4              JUROR:  CORRECT.

09:31AM  5              THE COURT:  OKAY.  IS THERE ANY OTHER INFORMATION?

09:32AM  6              JUROR:  NO.  I MEAN, I WAS SOMEWHAT CONCERNED

09:32AM  7     ABOUT -- BECAUSE THEY ASKED ABOUT MY WIFE AND MY HOUSEMATE, BUT

09:32AM  8     I WAS LESS CONCERNED BECAUSE MY WIFE DOESN'T LIVE IN STATE.

09:32AM  9              THE COURT:  OKAY.  THE CONCERNS THAT YOU RAISE ABOUT

09:32AM 10     PRIVACY ISSUES, TELL ME A LITTLE BIT MORE ABOUT YOUR, YOUR

09:32AM 11     CONCERNS ABOUT THAT.

09:32AM 12         HAVE YOU -- FOR EXAMPLE, HAVE YOU EXPERIENCED ANY

09:32AM 13     INTRUSIONS, PRIVACY INTRUSIONS THAT CAUSE YOU CONCERNS?

09:32AM 14              JUROR:  UM, WELL, NOT BEFORE THE OUTSIDE WORLD, NO.

09:32AM 15              THE COURT:  OKAY.

09:32AM 16              JUROR:  I MEAN, I HAVE --

09:32AM 17              THE COURT:  I'M NOT SURE I KNOW WHAT THAT MEANS.

09:32AM 18              JUROR:  I MEAN, I HAVE FRIENDS, SO THEY'RE CURIOUS.

09:32AM 19              THE COURT:  RIGHT.

09:32AM 20              JUROR:  BUT I'M NOT CONCERNED ABOUT THAT.

09:32AM 21         I GUESS I'M MORE CONCERNED ABOUT THE PRESS.

09:32AM 22              THE COURT:  AND WHAT THE PRESS WILL DO WITH THE

09:32AM 23     INFORMATION?

09:32AM 24              JUROR:  RIGHT.

09:32AM 25              THE COURT:  I CAN TELL YOU DURING THE HEARING THAT I

09:32AM  1    HAD WITH THE LAWYER FOR THE PRESS, THE MEDIA COALITION, HE DID

09:33AM  2    TELL ME, WHEN I ASKED HIM WHAT THEY INTENDED TO DO WITH THE

09:33AM  3    INFORMATION, HE DID TELL ME THAT, WITH ASSURANCES, THAT NONE OF

09:33AM  4    HIS CLIENTS WOULD CONTACT OR REACH OUT TO ANY JUROR DURING

09:33AM  5    THEIR JURY SERVICE.

09:33AM  6         I THINK HE RECOGNIZED THE, THE -- HOW THAT WOULD NOT BE

09:33AM  7    PROPER AND COULD BE SEEN AS TAMPERING WITH A JUROR.  AND HE

09:33AM  8    SAID THAT THEY, OF COURSE, WILL NOT DO THAT.

09:33AM  9         HE COULD NOT GIVE ME ANY GUARANTEE, OR HE DID NOT GIVE ANY

09:33AM  10   GUARANTEE AS TO WHAT ANY OF HIS CLIENTS WOULD DO AFTER THE

09:33AM  11   VERDICT WERE OVER.

09:33AM  12             JUROR:  IS THAT INFORMATION USUALLY RELEASED AFTER

09:33AM  13   THE TRIAL, JUROR'S NAMES AND --

09:33AM  14             THE COURT:  IT'S, IT'S -- YOU KNOW, IN A -- I DON'T

09:33AM  15   KNOW IF THERE IS SUCH A THING AS A USUAL TRIAL.

09:33AM  16             JUROR:  WELL, HIGH PUBLICITY TRIAL.  HOW'S THAT?

09:33AM  17             THE COURT:  WHAT I CAN TELL YOU IS THAT IT'S NOT

09:33AM  18   UNUSUAL IN STATE CASES, AND IN SOME FEDERAL CASES, FOR THE VOIR

09:34AM  19   DIRE, THE QUESTIONING OF JURORS, TO BE DONE IN OPEN COURT.

09:34AM  20             JUROR:  RIGHT.

09:34AM  21             THE COURT:  HERE WE DID IT PRIMARILY THROUGH THE --

09:34AM  22   WE USED A QUESTIONNAIRE FOR MANY OF THE QUESTIONS THAT WOULD

09:34AM  23   OTHERWISE BE ASKED IN PUBLIC.

09:34AM  24        SO THERE IS THAT DISTINCTION.  IT'S A PUBLIC FORUM.

09:34AM  25             JUROR:  UH-HUH.

09:34AM  1          THE COURT:  SOME OF THE JURORS, AS YOU RECALL, WERE

09:34AM  2   ASKED QUESTIONS, FOLLOW-UP QUESTIONS, ABOUT THE QUESTIONNAIRE

09:34AM  3   IN THE PUBLIC FORUM WHERE THE PUBLIC HAS ACCESS TO THE

09:34AM  4   INFORMATION.

09:34AM  5          AT THE -- I WILL TELL YOU THIS:  AT THE CONCLUSION OF THE

09:34AM  6   CASE, IN THE FINAL INSTRUCTIONS AT THE END OF THE CASE, I WILL

09:34AM  7   INFORM THE JURORS THAT THEY HAVE THE RIGHT TO SPEAK TO ANYBODY

09:34AM  8   THAT THEY WANT TO, IT'S THEIR CHOICE.  BUT THEY ALSO CAN SAY NO

09:34AM  9   IF THEY DON'T WANT TO TALK TO SOMEBODY.  THAT'S PART OF THE

09:34AM 10   FINAL INSTRUCTIONS THAT A JUROR RECEIVES IN EVERY CASE.

09:34AM 11          AND PART OF MY PARTING INSTRUCTION IS THAT IF A JUROR

09:35AM 12   FEELS THAT THEY ARE BEING HARASSED, ANNOYED, OR THEIR REQUEST

09:35AM 13   TO BE LEFT ALONE IS NOT BEING ADHERED TO, THEY SHOULD REPORT IT

09:35AM 14   TO THE COURT.  THAT'S A FINAL INSTRUCTION THAT I GIVE IN EVERY

09:35AM 15   CASE I'VE DONE BOTH IN STATE COURT AND IN THE FEDERAL COURT.

09:35AM 16          I THINK MY COLLEAGUES ON STATE AND FEDERAL COURTS GIVE THE

09:35AM 17   SAME INSTRUCTION.

09:35AM 18          I DON'T KNOW IF THAT CAUSES YOU ANY COMFORT OR NOT, BUT

09:35AM 19   THAT'S SOMETHING THAT IS DONE IN EVERY CASE.

09:35AM 20          SO AS I UNDERSTAND IT, YOUR NAME AND NEIGHBORHOOD ARE YOUR

09:35AM 21   PRIMARY CONCERNS?

09:35AM 22          PROSPECTIVE JUROR:  RIGHT.

09:35AM 23          THE COURT:  RIGHT.  NOW, LET ME ASK YOU THIS:  AS I

09:35AM 24   SAID, THERE ARE CERTAIN LEGAL, CERTAIN LEGAL CONSTRAINTS THAT

09:35AM 25   THE COURT HAS CITED BY THE MEDIA COALITION --

SEALED PROCEEDINGS

09:35AM  1          JUROR:  UH-HUH.

09:35AM  2          THE COURT:  -- THAT MIGHT NOT ALLOW ME TO REDACT

09:35AM  3     CERTAIN INFORMATION.

09:35AM  4        IF THAT WERE TO HAPPEN, IF I COULD NOT ACCEDE TO YOUR

09:36AM  5     REQUEST, WOULD THAT IN ANY WAY AFFECT YOUR ABILITY TO CONTINUE

09:36AM  6     TO BE A FAIR AND IMPARTIAL JUROR TO BOTH SIDES IN THIS CASE?

09:36AM  7          JUROR:  NO, I DON'T THINK SO.

09:36AM  8          THE COURT:  OKAY.  ANY QUESTION ABOUT THAT?

09:36AM  9          JUROR:  NO.

09:36AM 10          THE COURT:  OKAY.  I'M GOING TO ASK THESE LAWYERS IF

09:36AM 11     THEY HAVE ANY QUESTIONS FOR YOU.

09:36AM 12        MR. SCHENK?

09:36AM 13          MR. SCHENK:  NO.  THANK YOU.

09:36AM 14          THE COURT:  MR. DOWNEY?

09:36AM 15          MR. DOWNEY:  NO.  THANK YOU.

09:36AM 16          THE COURT:  ANYTHING ELSE YOU WOULD LIKE ME TO KNOW?

09:36AM 17          JUROR:  NO, THAT'S IT.

09:36AM 18          THE COURT:  IS THE BREAKFAST FOOD OKAY?  ARE YOU

09:36AM 19     GETTING ENOUGH?  DO WE NEED TO DO ANYTHING WITH THAT?

09:36AM 20        (LAUGHTER.)

09:36AM 21          JUROR:  NO, WE'RE GOOD.

09:36AM 22          THE COURT:  YOU CAN LEAVE YOUR JUROR QUESTIONNAIRE

09:36AM 23     HERE, JUROR NUMBER 9.  THANK YOU SO MUCH.  WE APPRECIATE IT.

09:36AM 24          JUROR:  OKAY.

09:36AM 25        (PAUSE IN PROCEEDINGS.)

09:36AM 1             (JUROR NUMBER 11 PRESENT.)

09:38AM 2                     THE CLERK:  JUROR NUMBER 11.

09:38AM 3                     THE COURT:  GOOD MORNING.

09:38AM 4             JUROR:  GOOD MORNING.

09:38AM 5                     THE COURT:  WE ARE IN CHAMBERS WITH JUROR NUMBER 11.

09:38AM 6      I'M GOING TO CALL YOU BY YOUR NUMBER AND NOT YOUR NAME.  I MEAN

09:38AM 7      NO DISRESPECT.  BUT FOR PURPOSES OF THIS DISCUSSION, THAT'S

09:38AM 8      WHAT I'D LIKE TO DO.

09:38AM 9             WE'RE IN CHAMBERS NOW WITH MR. SCHENK, THE GOVERNMENT, AND

09:38AM 10     MR. DOWNEY, THE DEFENSE, AND THE LAW CLERKS AND OF COURSE MY

09:38AM 11     COURT STAFF IS HERE.

09:38AM 12            AS I TOLD YOU, I WANTED TO TALK TO EACH JUROR ABOUT

09:38AM 13     RELEASING INFORMATION ON THE QUESTIONNAIRE.

09:38AM 14            BEFORE WE BEGIN, I WOULD LIKE TO ASK YOU YOUR COMFORT

09:38AM 15     LEVEL ABOUT MASKS?  WOULD YOU LIKE TO CONTINUE WEARING A MASK?

09:39AM 16                    JUROR:  NO, I'M FINE.

09:39AM 17                    THE COURT:  YOU WOULD LIKE TO KEEP IT ON?

09:39AM 18                    JUROR:  YES.

09:39AM 19                    THE COURT:  OKAY.  WE WILL, TOO.  THANK YOU.

09:39AM 20            AS I SAID THE OTHER DAY, THE MEDIA COALITION BROUGHT THIS

09:39AM 21     MOTION.  YOU FILLED OUT THE QUESTIONNAIRE WITH MY PROMISE THAT

09:39AM 22     THE INFORMATION WOULD REMAIN CONFIDENTIAL.

09:39AM 23                    JUROR:  UH-HUH.

09:39AM 24                    THE COURT:  THE LAWYER FOR THE MEDIA HAS BROUGHT

09:39AM 25     THIS MOTION, AND PART OF THEIR MOTION IS BASED ON LEGAL CASES,

09:39AM  1    INCLUDING SUPREME COURT CASES, THE FIRST AMENDMENT, AND OTHER

09:39AM  2    CASES THAT SUGGEST THAT THE INFORMATION CANNOT LEGALLY BE KEPT

09:39AM  3    CONFIDENTIAL WITHOUT AN APPROPRIATE SHOWING.

09:39AM  4         THE PURPOSE OF ME DISCUSSING THIS WITH EACH JUROR IS TO

09:39AM  5    DETERMINE AND TO GAIN INFORMATION FROM EACH JUROR AS TO WHETHER

09:39AM  6    OR NOT THEY HAVE CONCERNS, OR LACK OF CONCERN, ABOUT THE

09:39AM  7    RELEASE OF ANY OF THE INFORMATION THAT IS CONTAINED IN THE

09:39AM  8    QUESTIONNAIRE.

09:39AM  9         THIS REALLY RELATES TO INFORMATION ABOUT ADDRESS,

09:39AM  10   EMPLOYMENT, ANY QUESTION THAT CALLS FOR PERSONAL INFORMATION

09:40AM  11   THAT A JUROR MIGHT HAVE SOME CONCERNS ABOUT.

09:40AM  12        I'M INTERESTED IN THAT REGARD IN ISSUES REGARDING

09:40AM  13   SECURITY, SAFETY, OR OTHER PRIVACY ISSUES, OR NOT, AND THAT'S

09:40AM  14   WHY I'M TALKING TO EACH JUROR ABOUT THIS.  AND I WOULD ASK YOU

09:40AM  15   TO BE CANDID WITH ME AND IF YOU HAVE CONCERNS OR NO CONCERNS,

09:40AM  16   PLEASE, THIS IS THE OPPORTUNITY TO EXPRESS THOSE.

09:40AM  17             JUROR:  WELL, I'M CONCERNED ABOUT THE SAFETY ISSUES.

09:40AM  18             THE COURT:  OKAY.

09:40AM  19             JUROR:  THAT'S MY PRIORITY IS THE SAFETY IS KEY.

09:40AM  20             THE COURT:  OKAY.

09:40AM  21             JUROR:  PRIVACY IS SECOND.  AND IT'S NOT JUST ME,

09:40AM  22   IT'S MY FAMILY AS WELL.

09:40AM  23             THE COURT:  OKAY.  AND TELL ME ABOUT THE SAFETY

09:40AM  24   ISSUE, YOUR CONCERNS.

09:40AM  25             JUROR:  WELL, I WORRY THAT I COULD FIND SOMEBODY

09:41AM  1    FINDING OUR PROPERTY AND UNINVITED PERSONS ENTERING OUR

09:41AM  2    PROPERTY TO FIND OUT MORE ABOUT US, AND THAT JUST ISN'T

09:41AM  3    ACCEPTABLE.

09:41AM  4              THE COURT:  HAVE YOU HAD OR DO YOU KNOW PEOPLE OR

09:41AM  5    PEOPLE WHO ARE CLOSE TO YOU WHO HAVE HAD EXPERIENCES WITH

09:41AM  6    PEOPLE SEEKING THEM OUT, FINDING OUT WHERE THEY ARE AND CAUSING

09:41AM  7    ISSUES?

09:41AM  8              JUROR:  NO, NO, NO.

09:41AM  9              THE COURT:  OKAY.  YOU WANT TO PREVENT THAT FROM

09:41AM  10   HAPPENING?

09:41AM  11             JUROR:  YEAH, I WANT TO PREVENT THAT FROM HAPPENING.

09:41AM  12             THE COURT:  OKAY.

09:41AM  13             JUROR:  THAT'S REALLY WHAT IS ON MY MIND.

09:41AM  14        AND IT'S DISTRACTING AS WELL.  I FOUND YESTERDAY WHEN WE

09:41AM  15   WERE IN COURT, I WAS TRYING TO THINK ABOUT WHAT THE TESTIMONY

09:41AM  16   WAS, AND I'M THINKING ABOUT THIS, AND IT'S VERY DISTRACTING.

09:41AM  17             THE COURT:  RIGHT.

09:41AM  18             JUROR:  AND IT'S JUST -- TIMING-WISE, I FELT THAT IT

09:41AM  19   WAS --

09:41AM  20             THE COURT:  RIGHT.  IT, IT -- THE -- AS I'VE SAID,

09:42AM  21   THIS WAS A MOTION THAT WAS BROUGHT BY THE MEDIA COALITION AND

09:42AM  22   THEIR LAWYER, AND THE TIMING OF IT IS WHAT IT IS, ISN'T IT?

09:42AM  23   AND I HAVE TO DEAL WITH IT AND THAT'S WHY WE'RE INTERRUPTING

09:42AM  24   THE PROCEEDINGS IN THIS WAY.

09:42AM  25             JUROR:  YES.

09:42AM 1      THE COURT:  AND THAT'S WHY I'M DOING IT THIS MORNING

09:42AM 2  BECAUSE I RECOGNIZE THAT THIS MIGHT CAUSE SOME CONCERN,

09:42AM 3  STRESS --

09:42AM 4      JUROR:  YEAH.

09:42AM 5      THE COURT:  -- UNTIL WE RESOLVE THE ISSUE.

09:42AM 6   AND THEN ONCE IT'S RESOLVED, I'M ALSO CURIOUS ABOUT

09:42AM 7  WHETHER A JUROR CAN CONTINUE TO BE FAIR AND IMPARTIAL IN THE

09:42AM 8  CASE, AND THAT'S THE QUESTION THAT I WANT TO POSE TO YOU, JUROR

09:42AM 9  NUMBER 11.

09:42AM 10   AND THAT IS, IF I'M NOT ABLE TO REDACT ALL OF THE

09:42AM 11  INFORMATION THAT YOU WISH --

09:42AM 12      JUROR:  UH-HUH.

09:42AM 13      THE COURT:  -- AND LET ME JUST SAY THAT MY SENSE IS

09:42AM 14  THAT I WOULD LIKE TO KEEP NAMES OUT AT A MINIMUM.

09:42AM 15      JUROR:  YEAH.

09:42AM 16      THE COURT:  BUT IF I'M NOT ABLE TO OTHERWISE REDACT

09:42AM 17  EVERYTHING THAT YOU WANT, WOULD THAT IN ANY WAY AFFECT YOUR

09:42AM 18  ABILITY TO CONTINUE TO BE FAIR AND IMPARTIAL AS A JUROR IN THIS

09:43AM 19  CASE?

09:43AM 20      JUROR:  YES.  I WOULD STILL BE FAIR AND IMPARTIAL AS

09:43AM 21  YOU'RE ASKING.

09:43AM 22      THE COURT:  I'M SORRY, YOU COULD STILL BE A FAIR AND

09:43AM 23  IMPARTIAL JUROR IN THE CASE?

09:43AM 24      JUROR:  YES, YES.

09:43AM 25   THAT'S NOT A PROBLEM.

09:43AM  1          THE COURT:  OKAY.

09:43AM  2          JUROR:  IT'S JUST THAT I FEEL LIKE IT COULD BE

09:43AM  3   EMBARRASSING AND JUST TOO DISTRACTING AND I JUST FEEL IT COULD

09:43AM  4   BE AWFUL.

09:43AM  5          THE COURT:  OKAY.  WOULD, WOULD -- AND AGAIN, IF

09:43AM  6   THIS WERE TO HAPPEN, THAT IS, IF I'M NOT ABLE TO KEEP, LEGALLY

09:43AM  7   KEEP EVERYTHING THAT YOU WANT PRIVATE, WOULD THAT INTERFERE

09:43AM  8   WITH YOUR ABILITY TO CONTINUE TO LISTEN TO THE EVIDENCE AND TO

09:43AM  9   OTHERWISE PERFORM YOUR DUTIES AS A JUROR?

09:43AM  10          JUROR:  NO, NO.  I WILL BE OKAY.

09:43AM  11          THE COURT:  YOU CAN STILL DO THAT?

09:43AM  12          JUROR:  NO.

09:43AM  13          THE COURT:  ANY DOUBT IN YOUR MIND.

09:43AM  14          JUROR:  I TRUST THAT YOU'LL WATCH OUT FOR US AND FOR

09:44AM  15   ME.  I'M ALL RIGHT.

09:44AM  16          THE COURT:  OKAY.  OKAY.

09:44AM  17      ANYTHING ELSE YOU WOULD LIKE ME TO KNOW?

09:44AM  18          JUROR:  DO YOU HAVE ANY FOLLOW-UP QUESTIONS?  HAVE

09:44AM  19   YOU REVIEWED THIS?

09:44AM  20          THE COURT:  OH, I HAVE THE COPIES, I DO, YES.

09:44AM  21          JUROR:  OKAY.  SO YESTERDAY DURING TESTIMONY THERE

09:44AM  22   WAS MENTION OF MY WIFE'S PREVIOUS EMPLOYER.  IT STILL DOES NOT

09:44AM  23   AFFECT MY LISTENING TO THE CASE, BUT THAT WAS MR. ELLISON, AND

09:44AM  24   IT WAS AT THE END OF THE DAY.

09:44AM  25          THE COURT:  OKAY.

| | | |
|---|---|---|
| 09:44AM | 1 | JUROR:  SO I KNOW I NEEDED TO MENTION THAT TO YOU. |
| 09:44AM | 2 | SHE WORKED FOR ORACLE.  SO THAT'S IN HERE. |
| 09:44AM | 3 | THE COURT:  OKAY.  SO LET ME ASK YOU, AND I SHOULD |
| 09:44AM | 4 | HAVE SAID I DON'T -- THANK YOU FOR RAISING THIS, IT'S |
| 09:44AM | 5 | APPROPRIATE TO DO THAT. |
| 09:44AM | 6 | JUROR:  UH-HUH. |
| 09:44AM | 7 | THE COURT:  BUT I DON'T WANT TO ASK ANY JUROR ABOUT |
| 09:44AM | 8 | ANYTHING ABOUT THE CASE AT ALL OR TALK ABOUT THE EVIDENCE IN |
| 09:44AM | 9 | THE CASE. |
| 09:44AM | 10 | YOU'VE RAISED AN ISSUE THAT A NAME CAME UP IN THE |
| 09:44AM | 11 | TESTIMONY YESTERDAY AND YOUR WIFE WORKED AT ORACLE. |
| 09:45AM | 12 | JUROR:  YES. |
| 09:45AM | 13 | THE COURT:  IS THERE ANYTHING ABOUT THAT |
| 09:45AM | 14 | RELATIONSHIP THAT YOU THINK IMPAIRS YOUR ABILITY TO CONTINUE TO |
| 09:45AM | 15 | BE FAIR AND IMPARTIAL? |
| 09:45AM | 16 | JUROR:  NO.  NO.  HUH-UH. |
| 09:45AM | 17 | THE COURT:  OKAY. |
| 09:45AM | 18 | JUROR:  I JUST NEEDED TO PUT THAT OUT THERE FOR YOU. |
| 09:45AM | 19 | THE COURT:  OKAY.  THANK YOU.  I APPRECIATE YOUR |
| 09:45AM | 20 | CANDOR IN THAT REGARD.  THANK YOU FOR THAT. |
| 09:45AM | 21 | IF, AS I SAID, IF I'M NOT ABLE TO KEEP PRIVATE EVERYTHING |
| 09:45AM | 22 | THAT YOU WANT, I THINK YOU'VE TOLD ME, YOU'VE ANSWERED THIS |
| 09:45AM | 23 | QUESTION, BUT CAN YOU CONTINUE TO BE A FAIR AND IMPARTIAL JUROR |
| 09:45AM | 24 | IN THIS CASE? |
| 09:45AM | 25 | JUROR:  YES. |

```
09:45AM   1              THE COURT:  OKAY.  ANYTHING ELSE YOU WOULD LIKE ME

09:45AM   2       TO KNOW --

09:45AM   3              JUROR:  NOT AT THIS TIME.

09:45AM   4              THE COURT:  -- UNDER THE CONSTRAINTS OF WHAT I'VE

09:45AM   5       TOLD YOU?

09:45AM   6              JUROR:  NO.

09:45AM   7              THE COURT:  OKAY.  I'M GOING TO ASK THESE LAWYERS IF

09:45AM   8       THEY HAVE ANY QUESTIONS FOR YOU --

09:45AM   9              JUROR:  SURE, THAT'S FINE.

09:45AM   10             THE COURT:  -- AS WELL.

09:45AM   11          MR. SCHENK?

09:45AM   12             MR. SCHENK:  NO.

09:45AM   13             THE COURT:  MR. DOWNEY?

09:45AM   14             MR. DOWNEY:  YOUR HONOR, I JUST HAD ONE QUESTION.

09:45AM   15             THE COURT:  YEAH, SURE.

09:45AM   16             MR. DOWNEY:  I THINK JUROR NUMBER 11 MENTIONED THAT

09:45AM   17       IT MIGHT BE EMBARRASSING AND DISTRACTING, AND I JUST WONDER

09:46AM   18       WHAT HE MEANT WHEN HE SAID IT MIGHT BE EMBARRASSING?

09:46AM   19             JUROR:  WELL, THE FIRST THING THAT OCCURRED TO ME

09:46AM   20       WAS MY HANDWRITING IS REALLY AWFUL BECAUSE OF MY DISABILITY.

09:46AM   21          (LAUGHTER.)

09:46AM   22             JUROR:  AND I DON'T WANT SOMEBODY TO LOOK AT THAT

09:46AM   23       AND SAY, WHAT THE HECK IS THIS?  WHO WROTE THIS?

09:46AM   24             THE COURT:  WELL, IF I GIVE A WRITING EXEMPLAR OF MY

09:46AM   25       OWN, THAT MIGHT LESSEN THE CONSTRAINT.
```

09:46AM  1                      JUROR:  WELL, YEAH.

09:46AM  2             THAT'S ONE THING THAT I THOUGHT WOULD BE EMBARRASSING.

09:46AM  3                      THE COURT:  OKAY.

09:46AM  4                      JUROR:  MY EDUCATIONAL BACKGROUND ISN'T EXACTLY

09:46AM  5      STELLAR.  BUT I'M -- YOU KNOW, I'M BRIGHT IN AREAS THAT I'VE

09:46AM  6      STUDIED.

09:46AM  7             SO, YOU KNOW, THERE'S THAT AS WELL.  YEAH.

09:46AM  8                      THE COURT:  OKAY.

09:46AM  9                      MR. DOWNEY:  NOTHING FURTHER, YOUR HONOR.

09:46AM 10                      JUROR:  OKAY.

09:46AM 11                      THE COURT:  ANYTHING ELSE YOU WOULD LIKE US TO KNOW?

09:46AM 12                      JUROR:  NO.  THAT'S PRETTY MUCH IT.

09:46AM 13                      THE COURT:  OKAY.  THANK YOU SO MUCH.  I APPRECIATE

09:47AM 14      IT.  THANK YOU.

09:47AM 15                      JUROR:  THANK YOU.

09:47AM 16                      THE COURT:  YOU CAN JUST LEAVE YOUR QUESTIONNAIRE ON

09:47AM 17      THE TABLE.

09:47AM 18                      JUROR:  YOU BET.

09:47AM 19             (PAUSE IN PROCEEDINGS.)

09:47AM 20             (ALTERNATE JUROR NUMBER 4 PRESENT.)

09:48AM 21                      THE CLERK:  ALTERNATE NUMBER 4.

09:48AM 22                      THE COURT:  THANK YOU.  GOOD MORNING.  PLEASE HAVE A

09:48AM 23      SEAT.

09:48AM 24             I AM GOING TO REFER TO YOU BY YOUR JUROR NUMBER, NOT BY

09:48AM 25      YOUR NAME, PLEASE, AND I MEAN NO DISRESPECT.  THAT'S JUST HOW I

09:48AM   1    WOULD LIKE TO CONDUCT THESE PROCEEDINGS.

09:49AM   2         WE'RE IN MY OFFICE NOW.

09:49AM   3         MR. SCHENK IS HERE FROM THE GOVERNMENT, AND MR. DOWNEY IS

09:49AM   4    HERE FROM THE DEFENSE, MY LAW CLERKS, SOME OF MY LAW CLERKS ARE

09:49AM   5    HERE, AND OF COURSE YOU KNOW STAFF.

09:49AM   6         I WANT TO ASK, AND I AM ASKING, EACH JUROR QUESTIONS ABOUT

09:49AM   7    THE QUESTIONNAIRES, THEIR ANSWERS TO THE QUESTIONS, AS WELL AS

09:49AM   8    THE MEDIA COALITION'S MOTION TO RELEASE THIS INFORMATION.

09:49AM   9         BEFORE I BEGIN, I'D LIKE TO ASK YOUR COMFORT LEVEL ABOUT

09:49AM  10    MASKS.  WOULD YOU LIKE TO REMOVE YOUR MASK?  WOULD YOU LIKE TO

09:49AM  11    KEEP YOUR MASK ON?

09:49AM  12              JUROR:  I CAN REMOVE IT.

09:49AM  13              THE COURT:  OKAY.  WE WILL, TOO.  THANK YOU.

09:49AM  14         AS I SAID THE OTHER DAY, THE MEDIA COALITION HAS FILED A

09:49AM  15    MOTION ASKING THAT I RELEASE THE QUESTIONNAIRES AND THE

09:49AM  16    INFORMATION THAT IS CONTAINED IN THE QUESTIONNAIRES.

09:49AM  17         YOU FILLED THIS OUT WITH MY PROMISE THAT IT WOULD BE

09:49AM  18    CONFIDENTIAL.  IT'S RIGHT THERE RIGHT ABOVE MY NAME.

09:49AM  19         AND THIS MOTION SUGGESTS THAT THE SUPREME COURT IN SOME OF

09:50AM  20    THEIR DECISIONS, AS WELL AS OTHER DECISIONS, SUGGEST THAT I'M

09:50AM  21    NOT ABLE TO DO THAT.  I MAY BE ABLE TO DO THAT IN CERTAIN

09:50AM  22    CIRCUMSTANCES FOR CERTAIN INFORMATION IF SUFFICIENT COMPELLING

09:50AM  23    REASONS ARE STATED FOR DOING SO.

09:50AM  24         THE PURPOSE OF MY SPEAKING WITH EACH OF YOU, THE JURORS,

09:50AM  25    IS TO DETERMINE YOUR CONCERNS, IF ANY, REGARDING ANY OF THE

09:50AM  1    INFORMATION THAT YOU HAVE PUT IN THE QUESTIONNAIRES IN RESPONSE

09:50AM  2    TO THE QUESTIONS.  AND THIS WOULD INCLUDE NAME, ADDRESS, OF

09:50AM  3    COURSE WE DON'T ASK FOR YOUR STREET ADDRESS, EMPLOYMENT, AND

09:50AM  4    ANY OTHER PERSONAL IDENTIFYING INFORMATION THAT A JUROR MIGHT

09:50AM  5    BE UNCOMFORTABLE WITH OR HAVE COMFORT BEING RELEASED.

09:50AM  6        I'D ASK YOU TO BE CANDID WITH ME ABOUT YOUR THOUGHTS AND

09:50AM  7    FEELINGS ABOUT THIS.

09:50AM  8        I'M PARTICULARLY INTERESTED IN ANY SAFETY, SECURITY, OR

09:51AM  9    OTHER PRIVACY ISSUES THAT YOU MIGHT HAVE WITH ANY OF THIS

09:51AM  10   INFORMATION, IF YOU HAVE ANY.

09:51AM  11       SO -- AND I ENCOURAGE YOU TO ASK ME ANY QUESTIONS THAT YOU

09:51AM  12   MIGHT HAVE ALSO.

09:51AM  13       SO WHAT WOULD YOU LIKE ME TO KNOW?

09:51AM  14            JUROR:  I THINK MY BIGGEST THING IS WE TALKED ABOUT

09:51AM  15   IT BEING CONFIDENTIAL.  I GET IT.

09:51AM  16       IT COMPLETELY BLEW MY MIND WHEN YOU TALKED ABOUT IT

09:51AM  17   YESTERDAY AND I THINK I HAD TO PICK MY JAW UP OFF THE GROUND,

09:51AM  18   BUT I COMPLETELY UNDERSTAND IT.

09:51AM  19       I THINK WITH EVERYTHING GOING ON THE WORLD TODAY, YOU

09:51AM  20   THINK ABOUT SAFETY, RIGHT?  IN MY JOB, YOU KNOW, I WORK FOR A

09:51AM  21   FORTUNE 500 COMPANY, I WORK FOR ████████ , SO I'M OUT IN THE

09:51AM  22   PUBLIC.  AND I WORK AT A MARKET LEVEL, DISTRICT LEVEL.

09:51AM  23       SO FOR ME IT'S ABOUT THE SAFETY OF ME WHEN IT COMES TO

09:51AM  24   WORK AND THE SAFETY OF MY FAMILY AT HOME BECAUSE THERE'S TROLLS

09:51AM  25   OUT THERE AND THERE'S PEOPLE OUT THERE, BECAUSE WHEN THEY GET

SEALED PROCEEDINGS
3328

09:51AM  1    ANY OF THIS INFORMATION THEY WILL FOLLOW YOU, THEY COULD DO

09:51AM  2    THINGS TO HARM YOU, AND I THINK THAT'S MY BIGGEST -- ANYTHING I

09:51AM  3    ANSWERED HERE IS THE TRUTH.

09:52AM  4         SO IT'S ABOUT THE SAFETY OF MY FAMILY AND, YOU KNOW, THE

09:52AM  5    SAFETY OF ME WHEN I'M AT WORK.  THAT'S REALLY THE BIGGEST

09:52AM  6    CONCERN THAT I HAVE.

09:52AM  7              THE COURT:  OKAY.

09:52AM  8         SO IS IT YOUR NAME, THOUGH?  FIRST OF ALL, THE NAME WOULD

09:52AM  9    BE, LET'S START THERE.

09:52AM  10             JUROR:  RIGHT.

09:52AM  11             THE COURT:  YOU WOULD PREFER YOUR NAME TO BE

09:52AM  12   REDACTED?

09:52AM  13             JUROR:  IF YOU COULD, THAT WOULD BE GREAT.

09:52AM  14        I MEAN, THEY'LL OBVIOUSLY FIND OUT SOMETHING ABOUT ME IF

09:52AM  15   THEY FIND OUT WHERE I WORK, AND YOU KNOW -- I KNOW THERE'S NO

09:52AM  16   NAMES IN HERE WITH MY FAMILY, BUT IT DOES STATE WHAT THEY DID

09:52AM  17   AND WHAT THEY CURRENTLY DO AS FAR AS MY STEPDAUGHTER AND MY

09:52AM  18   WIFE, WHAT THEY DID AND WHERE THEY WORKED, NOT THEIR NAMES.

09:52AM  19        BUT WITH THE WAY THE WORLD IS TODAY, THEY CAN FIND OUT

09:52AM  20   ANYTHING ABOUT YOU NO MATTER WHAT THEY DO.

09:52AM  21        SO FOR ME IT'S REALLY ABOUT THE SAFETY, YOU KNOW, AND THE

09:52AM  22   CONCERNS OF -- YOU KNOW, ███████ IS IN THE NEWS OR THE HOLIDAY

09:52AM  23   SEASON OR JUST AM I GOING TO HAVE PEOPLE FOLLOWING ME AT WORK?

09:52AM  24   AM I GOING TO HAVE PEOPLE DRIVING BY?  YOU KNOW, IT'S JUST ONE

09:52AM  25   OF THOSE THINGS.

09:52AM 1      AND ESPECIALLY WHERE WE ARE AT IN THE WORLD TODAY AND

09:53AM 2   WHERE WE ARE AT IN SILICON VALLEY.  IT'S A LITTLE BIT DIFFERENT

09:53AM 3   THAN IF I WAS, LET'S SAY, IN SACRAMENTO, UP IN THE NORTHERN

09:53AM 4   PART OF CALIFORNIA, IT'S COMPLETELY DIFFERENT.

09:53AM 5           THE COURT:  RIGHT.

09:53AM 6           JUROR:  SO THAT'S MY BIGGEST THING.

09:53AM 7           THE COURT:  ALL RIGHT.  THANK YOU FOR THAT.

09:53AM 8      LET ME ASK YOU, DOES YOUR JOB ENTAIL A CERTAIN SECURITY

09:53AM 9   COMPONENT?

09:53AM 10          JUROR:  SO KIND OF I REALLY DEAL WITH THE DIGITAL

09:53AM 11  PIECE.  SO I DEAL WITH ANYTHING DEALING WITH ███████ WHEN IT

09:53AM 12  COMES TO THE APPS TO ORDERING ONLINE, THINGS LIKE THAT.

09:53AM 13          THE COURT:  I SEE.  OKAY.

09:53AM 14     AND LET ME ASK YOU, HAVE YOU HAD ANY, EXCUSE ME, ANY

09:53AM 15  SECURITY ISSUES IN THE PAST RELATED TO YOUR PERSONAL

09:53AM 16  INFORMATION, OR DO YOU KNOW ANYONE WHO HAS HAD THAT, ANYONE

09:53AM 17  CLOSE TO YOU SUCH THAT IT INCREASES THE CONCERN THAT YOU HAVE?

09:53AM 18          JUROR:  NOT THAT I KNOW OF.

09:53AM 19          THE COURT:  OKAY.  DO YOU HAVE -- AS I SAID, I MAY

09:54AM 20  BE ABLE TO KEEP CERTAIN INFORMATION PRIVATE, AND THAT'S WHY I'M

09:54AM 21  ASKING EACH JUROR THIS, THERE MAY BE LEGAL REASONS THAT I

09:54AM 22  CAN'T, AND SOME INFORMATION MAY HAVE TO BE RELEASED.

09:54AM 23     IF THAT WERE THE CASE, IF I WAS -- AND I'M LOOKING YOU IN

09:54AM 24  THE EYE AND I'M TELLING YOU, JUROR NUMBER 4, I'M BREAKING MY

09:54AM 25  PROMISE TO YOU, I TOLD YOU IT WOULD BE CONFIDENTIAL AND NOW

09:54AM  1    HERE THIS FEDERAL JUDGE IS SAYING, WELL, SORRY ABOUT THAT.

09:54AM  2        AND THE MEDIA COALITION, AS I SAID, HAS CITED CERTAIN

09:54AM  3    LEGAL DOCTRINES THAT THEY BELIEVE COMPELS ME TO RELEASE

09:54AM  4    INFORMATION.

09:54AM  5        IF THAT WERE TO HAPPEN, THAT IS, IF I WERE UNABLE TO KEEP

09:54AM  6    INFORMATION THAT YOU WANT PRIVATE, WOULD THAT IN ANY WAY AFFECT

09:54AM  7    YOUR ABILITY TO CONTINUE TO BE A FAIR AND IMPARTIAL JUROR IN

09:54AM  8    THIS CASE?

09:54AM  9            JUROR:  NO.

09:54AM 10            THE COURT:  OKAY.  YOU COULD CONTINUE TO DO THAT?

09:54AM 11            JUROR:  YES.

09:54AM 12            THE COURT:  NO DOUBT ABOUT THAT?

09:54AM 13            JUROR:  NO DOUBT ABOUT IT.

09:54AM 14            THE COURT:  OKAY.  ALL RIGHT.

09:54AM 15        IS THERE ANYTHING ELSE YOU WOULD LIKE ME TO KNOW OR --

09:55AM 16            JUROR:  NO.

09:55AM 17            THE COURT:  -- ANY OTHER QUESTION YOU HAVE FOR ME?

09:55AM 18            JUROR:  NO.

09:55AM 19            THE COURT:  OKAY.  I'M GOING TO ASK THESE LAWYERS IF

09:55AM 20    THEY HAVE ANY QUESTIONS FOR YOU.

09:55AM 21        MR. SCHENK?

09:55AM 22            MR. SCHENK:  NO.  THANK YOU.

09:55AM 23            THE COURT:  MR. DOWNEY?

09:55AM 24            MR. DOWNEY:  NO.  THANK YOU.

09:55AM 25            JUROR:  GREAT.

09:55AM  1          THE COURT:  THANK YOU.  YOU CAN LEAVE YOUR

09:55AM  2  QUESTIONNAIRE HERE.  THANK YOU SO MUCH.

09:55AM  3          JUROR:  THANK YOU.

09:55AM  4       (PAUSE IN PROCEEDINGS.)

09:55AM  5       (ALTERNATE JUROR NUMBER 5 PRESENT.)

09:56AM  6          THE CLERK:  ALTERNATE NUMBER 5.

09:56AM  7          THE COURT:  GOOD MORNING.

09:56AM  8          JUROR:  GOOD MORNING.

09:56AM  9          THE COURT:  PLEASE HAVE A SEAT.  THANK YOU.

09:56AM  10  WE'RE IN CHAMBERS NOW.

09:56AM  11       FIRST OF ALL, I'M GOING TO CALL YOU BY YOUR JUROR NUMBER

09:56AM  12  AND NOT BY YOUR NAME, AND I MEAN NO DISRESPECT FOR THAT.  JUST

09:56AM  13  FOR THIS PROCEEDING I'D LIKE TO GO THAT WAY.

09:56AM  14       SO THANK YOU FOR THAT.

09:56AM  15          JUROR:  UH-HUH.

09:56AM  16          THE COURT:  I'M INVITING EACH JUROR TO COME BACK AND

09:56AM  17  TALK WITH ME.  YOU REMEMBER THAT I TALKED TO YOU ABOUT THE

09:57AM  18  MEDIA COALITION AND THE MOTION THAT THEIR LAWYER FILED IN

09:57AM  19  REGARDS TO RELEASING INFORMATION, AND I WANT TO ASK YOU SOME

09:57AM  20  QUESTIONS ABOUT THAT.

09:57AM  21       BEFORE WE BEGIN, THOUGH, I DO WANT TO ASK YOU YOUR COMFORT

09:57AM  22  LEVEL ABOUT YOUR MASK.

09:57AM  23          JUROR:  UH-HUH.

09:57AM  24          THE COURT:  DO YOU WANT TO LEAVE YOUR MASK ON OR

09:57AM  25  TAKE IT OFF?

SEALED PROCEEDINGS
3332

09:57AM 1          JUROR:  I CAN LEAVE IT ON.  IF EVERYONE CAN HEAR ME,

09:57AM 2     I CAN LEAVE IT ON.

09:57AM 3          THE COURT:  THAT'S FINE.  WE'LL LEAVE OURS ON, TOO.

09:57AM 4      NOW, AS I MENTIONED, YOU FILLED OUT THE QUESTIONNAIRE WITH

09:57AM 5     THE PROMISE MADE BY ME THAT THE INFORMATION WOULD REMAIN

09:57AM 6     CONFIDENTIAL.

09:57AM 7      THE MEDIA COALITION, THROUGH THEIR LAWYER, HAS FILED A

09:57AM 8     MOTION SUGGESTING THAT THERE IS CERTAIN CASE LAW, INCLUDING

09:57AM 9     SUPREME COURT CASES, THE FIRST AMENDMENT, AND OTHER LAW AND

09:57AM 10    LEGAL DOCTRINES THAT SUGGEST THAT THE INFORMATION ON THE

09:57AM 11    QUESTIONNAIRES AND THE QUESTIONNAIRES THEMSELVES MUST BE MADE

09:57AM 12    PUBLIC.

09:57AM 13     I'M ASKING EACH JUROR TO TALK WITH ME ABOUT ANY CONCERNS,

09:58AM 14    OR LACK OF CONCERNS, THAT THEY MIGHT HAVE ABOUT THE RELEASE OF

09:58AM 15    THIS INFORMATION, AND THIS INFORMATION INCLUDES NAME,

09:58AM 16    EMPLOYMENT, ADDRESS, ALTHOUGH YOUR ADDRESS IS NOT IN HERE, THE

09:58AM 17    GEOGRAPHIC LOCATION IS, AND ANY OTHER PERSONAL INFORMATION THAT

09:58AM 18    A JUROR MIGHT FEEL OR HAVE A CONCERN ABOUT RELEASING TO THE

09:58AM 19    PUBLIC.

09:58AM 20     AND I'M SPECIFICALLY INTERESTED IN ANY SECURITY, SAFETY,

09:58AM 21    OR OTHER PRIVACY ISSUES THAT A JUROR MAY HAVE ABOUT SOME OF

09:58AM 22    THIS INFORMATION.

09:58AM 23          JUROR:  UH-HUH.

09:58AM 24          THE COURT:  I'D ASK YOU TO PLEASE BE CANDID WITH ME

09:58AM 25    ABOUT YOUR THOUGHTS ABOUT THAT, AND IF YOU COULD EXPRESS TO ME

09:58AM   1    ANY CONCERNS THAT YOU HAVE, AGAIN OR NOT, ABOUT THAT.

09:58AM   2         WHAT WOULD YOU LIKE ME TO KNOW ABOUT THAT?

09:58AM   3         AND PLEASE FEEL FREE TO ASK ANY QUESTIONS ALSO.

09:58AM   4             JUROR:  YEAH.  OF COURSE MY PREFERENCE IS THAT IT'S

09:58AM   5    NOT RELEASED.

09:58AM   6         I'LL BE HONEST, I'M A LITTLE INDIFFERENT, BUT THE CONCERNS

09:58AM   7    THAT I DO HAVE WOULD BE JUST, I GUESS, YOU KNOW, COMING INTO

09:59AM   8    THIS AS A JUROR, YOU THINK ONCE YOU SERVE YOUR TIME, IT'S KIND

09:59AM   9    OF DONE.  AND TO HAVE PEOPLE TO CONTINUE TO TRY TO TALK TO YOU

09:59AM  10    AFTERWARDS, IT'S -- IT COULD BE, LIKE, INTRUSIVE.

09:59AM  11         ANOTHER CONCERN THAT I HAVE IS I WORK FOR ███ AND IT

09:59AM  12    SEEMS LIKE WE'RE ALWAYS UNDER THE MEDIA ATTENTION, WHETHER IT'S

09:59AM  13    POSITIVE OR NEGATIVE.  I JUST DO NOT WANT TO BE LINKED TO MY

09:59AM  14    WORK AND WHATNOT --

09:59AM  15             THE COURT:  OKAY.

09:59AM  16             JUROR:  -- JUST FOR THAT PURPOSE IN PARTICULAR.

09:59AM  17         BESIDES THAT, YEAH, THAT'S MY ONLY CONCERN IS WORK AND

09:59AM  18    WHAT HAPPENS AFTER THIS.  I WOULD LIKE FOR IT NOT TO HAVE TO

09:59AM  19    FOLLOW ME AROUND AND WHATNOT.

09:59AM  20         BUT, AGAIN, THAT'S REALLY MY ONLY CONCERN.

09:59AM  21             THE COURT:  OKAY.  DO YOU HAVE -- ARE YOU CONCERNED

09:59AM  22    WITH YOUR EMPLOYMENT, ARE YOU CONCERNED THAT THIS MIGHT AFFECT

10:00AM  23    YOUR EMPLOYMENT IN SOME WAY, YOUR ABILITY TO CONTINUE TO BE

10:00AM  24    EMPLOYED?

10:00AM  25             JUROR:  NO, NOT THAT.  BUT JUST I KNOW WHEN

10:00AM 1    HISTORICALLY IN THE PAST ANYTHING THAT HAS KIND OF COME UP WITH

10:00AM 2    ██████, YOU KNOW, WE'RE VERY SENSITIVE WHEN IT COMES TO JUST OUR

10:00AM 3    NAME BEING USED IN ANY TYPE OF CONTENT THAT WASN'T APPROVED,

10:00AM 4    AND I DON'T KNOW, I JUST FEEL LIKE THE MEDIA WILL SAY WHAT THEY

10:00AM 5    WANT TO SAY TO GET THE VIEWS, AND I JUST DON'T WANT THAT TO BE

10:00AM 6    AN ISSUE WHERE IT DOES BECOME A PROBLEM WITH MY EMPLOYMENT.

10:00AM 7              THE COURT:  I SEE.  OKAY.

10:00AM 8         WELL, THANK YOU FOR THAT.  THANK YOU.

10:00AM 9         SO IT SOUNDS LIKE YOU WOULD HAVE GREATER COMFORT IF THE

10:00AM 10   COURT WERE ABLE TO REDACT YOUR EMPLOYER --

10:00AM 11             JUROR:  UH-HUH.

10:00AM 12             THE COURT:  -- AND PERHAPS YOUR NAME.

10:00AM 13             JUROR:  YEAH.  IF THIS WAS NOT ASSOCIATED WITH ME

10:00AM 14   BESIDES WHATEVER MY RESPONSES WERE WITH NO NAME ATTACHED TO IT,

10:00AM 15   AND PREFERABLY MY EMPLOYER'S NAME, THEN IT'S REALLY NOT AN

10:01AM 16   ISSUE FOR ME.

10:01AM 17             THE COURT:  OKAY.  ALL RIGHT.

10:01AM 18             JUROR:  YEAH.

10:01AM 19             THE COURT:  WELL, AS I SAID, THERE ARE CERTAIN

10:01AM 20   LEGAL, I'LL CALL THEM CONSTRAINTS, BUT THERE ARE LEGAL

10:01AM 21   DOCTRINES THAT CONTROL THE COURT'S DECISION, MY DISCUSSION AS

10:01AM 22   TO WHAT CAN BE RELEASED AND WHAT CANNOT BE RELEASED.

10:01AM 23        AND JUROR NUMBER 5, IF THE COURT FOUND THAT LEGALLY I

10:01AM 24   COULD NOT KEEP THE INFORMATION THAT YOU WANT ME TO KEEP --

10:01AM 25             JUROR:  UH-HUH.

3335

10:01AM 1      THE COURT:  -- PRIVATE, IF I FOUND THAT LEGALLY I

10:01AM 2   CANNOT DO THAT, I WANT TO ASK YOU, AND IF THAT WAS MY FINDING,

10:01AM 3   WOULD THAT IN ANY WAY AFFECT YOUR ABILITY TO CONTINUE TO BE A

10:01AM 4   FAIR AND IMPARTIAL JUROR TO BOTH SIDES IN THIS CASE?

10:01AM 5      JUROR:  IT WOULDN'T.

10:01AM 6      THE COURT:  OKAY.  DO YOU HAVE ANY DOUBT ABOUT THAT?

10:01AM 7      JUROR:  NO, NO DOUBTS.

10:01AM 8      THE COURT:  DO YOU HAVE ANY OTHER QUESTIONS FOR ME,

10:01AM 9   ANYTHING ELSE ON THIS ISSUE THAT --

10:01AM 10      JUROR:  TO BE HONEST, NONE IN PARTICULAR THAT I CAN

10:01AM 11   THINK OF RIGHT NOW.

10:01AM 12      THE COURT:  OKAY.

10:02AM 13      JUROR:  YEAH, THOSE WERE REALLY MY ONLY CONCERNS

10:02AM 14   WHEN YOU BROUGHT IT TO MY ATTENTION THAT IT COULD POTENTIALLY

10:02AM 15   GO OUT.

10:02AM 16      THE COURT:  OKAY.

10:02AM 17      JUROR:  BESIDES WHAT I WROTE ABOUT MY GIRLFRIEND

10:02AM 18   BEING NOSY, YES, I JUST DON'T WANT THAT TO COME BACK.

10:02AM 19      THE COURT:  YOU WANT ME TO KEEP THAT PRIVATE FROM

10:02AM 20   HER?

10:02AM 21      JUROR:  YEAH, AND EVERYONE ELSE IN THIS ROOM TO

10:02AM 22   KNOW.

10:02AM 23      THE COURT:  OKAY.

10:02AM 24      JUROR:  BUT, YEAH, GOING INTO IT, I ALREADY TOLD

10:02AM 25   HER, LIKE, HEY, THIS IS -- I CAN'T TALK ABOUT IT, SO I WOULD

10:02AM   1    APPRECIATE IF YOU RIGHT NOW NOT EVEN ASK ABOUT IT KIND OF

10:02AM   2    THING.

10:02AM   3              THE COURT:  OKAY.

10:02AM   4              JUROR:  SO THAT'S WHAT I SET FORWARD, AND I DON'T

10:02AM   5    WANT IT TO COME BACKWARDS TO SAY, OH, IT'S IN THE NEWS THAT

10:02AM   6    THIS POTENTIAL JUROR MADE THIS COMMENT TO HIS GIRLFRIEND OR

10:02AM   7    KIND OF SITUATION EITHER.

10:02AM   8              THE COURT:  RIGHT.

10:02AM   9              JUROR:  BUT BESIDES THAT, I REALLY HAVE NO CONCERNS.

10:02AM  10              THE COURT:  WELL, THANK YOU.  THANK YOU FOR YOUR

10:02AM  11    CONTINUED FIDELITY TO MY QUESTIONS, I APPRECIATE THAT, AND THE

10:02AM  12    ADMONITIONS THAT I MADE.  I KNOW IT'S DIFFICULT TO DO, AND I

10:03AM  13    APPRECIATE YOU AND YOUR COLLEAGUES', FELLOW JURORS', ATTENTION

10:03AM  14    TO THAT.

10:03AM  15         THANK YOU.

10:03AM  16         I'M GOING TO ASK THESE LAWYERS IF THEY HAVE A QUESTION FOR

10:03AM  17    YOU OR NOT.

10:03AM  18              JUROR:  THAT'S FINE.

10:03AM  19              THE COURT:  MR. SCHENK?

10:03AM  20              MR. SCHENK:  NO.

10:03AM  21              THE COURT:  MR. DOWNEY?

10:03AM  22              MR. DOWNEY:  NO.  THANK YOU.

10:03AM  23              THE COURT:  YOU CAN LEAVE YOUR QUESTIONNAIRE ON THE

10:03AM  24    TABLE.

10:03AM  25         THANK YOU VERY MUCH.

SEALED PROCEEDINGS

10:03AM  1              JUROR:  THANKS.  I'LL SEE YOU IN THE COURTROOM.

10:03AM  2              THE COURT:  THANK YOU.  I THINK THAT EXHAUST OUR

10:03AM  3      JUROR'S INTERVIEWS FOR THE MORNING.

10:03AM  4          COUNSEL?

10:03AM  5              MR. SCHENK:  IF WE WANT TO MAKE FURTHER ARGUMENTS

10:03AM  6      ABOUT TIMING FOR RELEASE, FOR INSTANCE, WAITING UNTIL AFTER

10:03AM  7      TRIAL TO RELEASE, IS THAT SOMETHING THAT THE COURT WOULD

10:03AM  8      ENTERTAIN?  WOULD WE HAVE A NEW HEARING ON IT?  OR THE SHIP HAS

10:03AM  9      SAILED?

10:03AM 10              THE COURT:  WELL, THE MOTION IS UNDER SUBMISSION.  I

10:03AM 11      DID INDICATE, AS YOU RECALL, TO THE MOVING PARTY THAT I

10:04AM 12      INTENDED TO INTERVIEW EACH OF THE JURORS, GET THEIR FEELINGS,

10:04AM 13      RESPECTIVE FEELINGS, REVIEW THAT INFORMATION, AND THEN REVIEW

10:04AM 14      THEM, THE MOTION, AND ISSUE AN ORDER AS TO WHAT INFORMATION IS

10:04AM 15      GOING TO BE RELEASED OR NOT.

10:04AM 16          THAT'S THE PROTOCOL.

10:04AM 17          MR. DOWNEY, ANYTHING YOU'D LIKE TO SAY NOW?

10:04AM 18              MR. DOWNEY:  WELL, I THINK, YOUR HONOR, AND WE CAN

10:04AM 19      SAY THIS IN WHATEVER FORUM YOU THINK, BUT I MUST SAY THAT WHAT

10:04AM 20      THE COLLOQUIES REVEALED WAS MORE THAN I EXPECTED.  MAYBE IT

10:04AM 21      SHOULDN'T HAVE BEEN.

10:04AM 22          BUT I THOUGHT WE SAW A NUMBER OF REACTIONS THAT HAVE

10:04AM 23      IMPLICATIONS FOR OUR TRIAL THAT WERE CONCERNING FOR ME.

10:04AM 24          I APPRECIATE THAT THE COURT ASKED THE JURORS IF THEY FELT

10:04AM 25      THEY COULD BE FAIR AND IMPARTIAL, AND I AGREE WITH YOUR HONOR,

10:05AM 1   I THINK WE HAVE A GOOD SOLID JURY WHICH INDICATES IT BELIEVES

10:05AM 2   IT CAN BE FAIR AND IMPARTIAL, I THINK LARGELY WITHOUT

10:05AM 3   QUALIFICATION.

10:05AM 4       THAT BEING SAID, I THINK ONLY ONE JUROR OUT OF THE 15

10:05AM 5   EXPRESSED NO CONCERN WHATSOEVER ABOUT THE INFORMATION BEING

10:05AM 6   RELEASED.

10:05AM 7       AND I THINK A NUMBER OF THE CONCERNS FELL INTO, YOU KNOW,

10:05AM 8   RELATED BUT SLIGHTLY DIFFERENT CATEGORIES, SOME OF WHICH ARE,

10:05AM 9   YOU KNOW, IN ANTICIPATION OF THINGS THAT MIGHT HAPPEN, YOU

10:05AM 10  KNOW, A CONCERN ABOUT THINGS THAT MIGHT HAPPEN THAT I DON'T

10:05AM 11  THINK WE CAN ASSURE THEM AND GIVE THEM ANY REAL SOLID ASSURANCE

10:05AM 12  OF.

10:05AM 13      YOU KNOW, FOR EXAMPLE, A NUMBER OF THEM ARE CONCERNED

10:05AM 14  ABOUT RELEASE OF PERSONAL IDENTIFYING INFORMATION.  I THINK THE

10:05AM 15  COURT TRIED TO ADDRESS THAT WITH THE JURY, WITH EACH INDIVIDUAL

10:06AM 16  JUROR.  BUT, OF COURSE, DURING VOIR DIRE THE LAST NAMES OF SOME

10:06AM 17  OF THE JURORS WERE USED AND THIS WILL BE CAPABLE OF BEING

10:06AM 18  RECONSTRUCTED AND THE INFORMATION COULD BE TIED TOGETHER TO

10:06AM 19  CAUSE SOME OF THE CONSEQUENCES THAT THEY'RE CONCERNED ABOUT.

10:06AM 20      SO I THINK, YOU KNOW, TO DATE WHEN THIS MOTION WAS FILED,

10:06AM 21  WE DON'T REPRESENT THE JURORS, I'M VERY SYMPATHETIC TO, YOU

10:06AM 22  KNOW, MUCH OF WHAT THEY SAID.

10:06AM 23      BUT I -- MY CONCERN IS ONLY AS IT AFFECTS THE DEFENDANT.

10:06AM 24      I THINK THE COURT CONDUCTED AN INQUIRY AS TO WHAT EFFECT

10:06AM 25  IT WOULD HAVE ON A VARIETY OF ISSUES, INCLUDING THE TRIAL.

10:06AM  1          I THINK IT'S, IT'S CLEAR TO ME THAT IT WILL -- THAT

10:06AM  2     DISCLOSURE OF THE QUESTIONNAIRES WILL RAISE A NUMBER OF FIFTH

10:06AM  3     AND SIXTH AMENDMENT ISSUES, SO I THINK IT WOULD BE OUR VIEW

10:06AM  4     THAT THE MOTION SHOULD BE EITHER, YOU KNOW, DENIED, OR DENIED

10:07AM  5     WITHOUT PREJUDICE TO BE REVIEWED AT A TIME THAT IT WON'T AFFECT

10:07AM  6     THE JURY.  AND I CAN ARTICULATE THOSE CONCERNS NOW OR I CAN

10:07AM  7     ARTICULATE THEM AT ANOTHER TIME.

10:07AM  8          BUT I THINK ONE DIFFERENCE BETWEEN WHERE THE RECORD HAS

10:07AM  9     BEEN AND WHERE WE ARE AS A RESULT OF THE COLLOQUIES IS, YOU

10:07AM 10     KNOW, THE BALANCING TEST THAT THE COURT WOULD ENGAGE IN, WITH

10:07AM 11     THE DEFENDANT NOT TAKING A POSITION, REALLY RELATES TO ISSUES

10:07AM 12     LIKE THE SAFETY, SECURITY ISSUES OF THE JURORS.

10:07AM 13          YOU KNOW, I, I THINK YOU SAID YESTERDAY, YOUR HONOR, YOU

10:07AM 14     THANKED US FOR SUGGESTING WE BE HERE.  I DON'T KNOW IF THAT WAS

10:07AM 15     JOCULAR OR NOT, BUT I APPRECIATE THE COURT HAVING THIS DIALOGUE

10:07AM 16     WITH THE JURORS BECAUSE I THINK THAT IT SHARPENED A NUMBER OF

10:07AM 17     ISSUES THAT ARE BURIED IN THIS ISSUE.

10:08AM 18          SO I THINK IN ADDITION TO WEIGHING THE SAFETY, SECURITY,

10:08AM 19     PRIVACY CONSIDERATIONS THAT THE COURT HAS TO DO IN READING THE

10:08AM 20     CASE LAW, I WOULD ALSO SAY THAT I THINK THE COURT NOW HAS TO

10:08AM 21     CONSIDER WHAT THE EFFECTS ON THE TRIAL ARE AND WHETHER THERE

10:08AM 22     ARE FIFTH AND SIXTH AMENDMENT ISSUES IMPLICATED FOR MS. HOLMES.

10:08AM 23          I THINK THE STATEMENTS AS TO DISTRACTION ALONE RAISE THAT

10:08AM 24     CONCERN.

10:08AM 25          BUT I THINK, YOU KNOW, THERE WERE ALSO A NUMBER OF

10:08AM 1    ANXIETIES PRESENTED ABOUT CERTAIN SCENARIOS THAT I DON'T THINK

10:08AM 2    WE CAN ASSURE THE JURORS WON'T, WON'T COME TO PASS.

10:08AM 3         YOU KNOW, WE HAVE A 12-PERSON JURY WITH THREE ALTERNATES,

10:08AM 4    BUT I COULD COUNT UP SOME OF THE CONCERNS EXPRESSED AND SAY

10:08AM 5    I'VE GOT A CONCERN THAT, YOU KNOW, WE'LL MAKE IT WITH SOME OF

10:08AM 6    WHAT THESE JURORS SAID.

10:08AM 7         SO I WOULD ASK, I THINK I HAVEN'T TAKEN THIS POSITION, BUT

10:08AM 8    I WOULD JOIN IN THE GOVERNMENT'S POSITION THAT THIS BE, THIS

10:08AM 9    MOTION BE DENIED WITHOUT PREJUDICE OVER RENEWAL UNTIL AFTER WE

10:09AM 10   HAVE A VERDICT OR UNTIL AFTER WE OTHERWISE CONCLUDE THE TRIAL.

10:09AM 11             THE COURT:  MR. SCHENK?

10:09AM 12             MR. SCHENK:  I THINK THE GOVERNMENT AND THE DEFENSE

10:09AM 13   ARE IN AGREEMENT ON THIS ISSUE.

10:09AM 14        I THINK THAT THE STATE OF THE RECORD AT THE TIME OF THE

10:09AM 15   HEARING DIDN'T INCLUDE OBVIOUSLY SOME OF THE COMMENTS THAT THE

10:09AM 16   COURT HAS NOW HEARD FROM JURORS, AND JURORS HAVE EXPRESSED SOME

10:09AM 17   HESITANCY OR CONCERNS THAT SORT OF FALL INTO A COUPLE DIFFERENT

10:09AM 18   AREAS, AND ONE OF THEM WE CAN'T SOLVE.

10:09AM 19        AS MR. DOWNEY SUGGESTED, THE ABILITY TO LOOK AT

10:09AM 20   TRANSCRIPTS FROM THE ORIGINAL VOIR DIRE AND CONNECT NAMES WITH

10:09AM 21   INFORMATION EITHER BEFORE TRIAL, DURING TRIAL, OR AFTER TRIAL,

10:09AM 22   THAT POSSIBILITY REMAINS.

10:09AM 23        BUT WE CAN SOLVE AT LEAST ONE OF THE ISSUES, AND THAT IS

10:09AM 24   THE JURORS BEING APPROACHED NOT BY MEMBERS OF THE MEDIA

10:10AM 25   COALITION, WHO HAVE SUGGESTED TO THE COURT THEY DON'T INTEND TO

SEALED PROCEEDINGS

10:10AM   1    DO THAT DURING THE TRIAL.

10:10AM   2         I THINK THE JURORS WOULD FEEL A MEASURE OF COMFORT IF THE

10:10AM   3    COURT TOLD THEM, I'VE HEARD WHAT YOU SAID, I APPRECIATE THE

10:10AM   4    CONCERNS THAT YOU ALL HAVE EXPRESSED TO ME, AND I'VE DECIDED

10:10AM   5    THAT I'M GOING TO DEFER RULING ON THE MEDIA MOTION UNTIL AFTER

10:10AM   6    THE TRIAL SO THAT WE CAN ALL FOCUS ON THE ISSUE AT HAND, AND

10:10AM   7    THE COURT HEARD THAT FROM SEVERAL JURORS WHO SAID, I'M TAKING

10:10AM   8    MY SERVICE AND DUTY VERY SERIOUSLY, AND I WANT TO FOCUS ON THIS

10:10AM   9    TRIAL, AND THAT RECORD DIDN'T EXIST AT THE TIME OF THE LAST

10:10AM  10    HEARING.

10:10AM  11         SO IT DOES SEEM TO ME THAT THE JURORS HAVE GIVEN THE COURT

10:10AM  12    NOW NEW INFORMATION TO DECIDE RELEASE, IF THAT IS THE RIGHT

10:10AM  13    ANSWER AND IF THAT IS SOMETHING THAT IS GOING TO HAPPEN

10:10AM  14    EVENTUALLY, THERE'S STILL MORE WORK TO BE DONE AS TO THE TIMING

10:11AM  15    QUESTION, AND THE BALANCING OF THE FIRST AMENDMENT AND THE

10:11AM  16    MEDIA'S RIGHT TO HAVE THIS INFORMATION AGAINST THE SPECIFIC

10:11AM  17    EXPRESSED CONCERNS OF JURORS REGARDING RELEASE WHILE THEY'RE

10:11AM  18    STILL SERVING.

10:11AM  19         JURORS NOTED THE CAMERAS OUTSIDE OF THE COURTROOM, THE

10:11AM  20    MEDIA ATTENTION IN THE COURTROOM, THE SORT OF HEIGHTENED

10:11AM  21    INTEREST WHILE THE TRIAL IS GOING ON, AND IT SEEMS REASONABLE

10:11AM  22    TO THINK THAT SOME OF THAT ATTENTION WILL DISSIPATE ONCE THE

10:11AM  23    TRIAL IS OVER, AND AS A RESULT IT SEEMS THAT BALANCE SUGGESTS

10:11AM  24    WE CAN ACHIEVE THE IMPORTANT GOAL OF MAINTAINING THE JURY'S

10:11AM  25    FOCUS ON THE TRIAL BY DELAYING THE RELEASE OF THE

| | |
|---|---|
| 10:11AM | 1 |  QUESTIONNAIRES OR THE COURT'S RULING ON IT.
| 10:11AM | 2 |       AND THAT SORT OF BRINGS ME TO THE NEXT POINT, AND THAT IS
| 10:11AM | 3 |  THE NEXT PROCEDURAL STEP.  WE SORT OF HAVE SUGGESTED SOME IDEAS
| 10:11AM | 4 |  ABOUT HOW TO PROCEED, BUT I'M NOT SURE EXACTLY WHAT THE NEXT
| 10:12AM | 5 |  THING THE COURT WOULD DO IS.
| 10:12AM | 6 |       DOES THE COURT HAVE ANOTHER HEARING WHERE THE MEDIA
| 10:12AM | 7 |  COALITION IS INFORMED OF THIS?  I DON'T KNOW, GIVEN AN
| 10:12AM | 8 |  OPPORTUNITY TO SAY ALL THE REASONS WHY THE ARGUMENTS THAT
| 10:12AM | 9 |  MR. DOWNEY AND I MAKE ARE WRONG?
| 10:12AM | 10 |      DOES THE COURT INFORM THE JURY -- AND MR. DOWNEY MADE A
| 10:12AM | 11 |  POINT THAT I AGREE WITH -- THE JURY WOULD LIKE MORE INFORMATION
| 10:12AM | 12 |  TO SORT OF HELP ME UNDERSTAND WHAT IS GOING TO HAPPEN NEXT, AND
| 10:12AM | 13 |  WOULD THE NEXT STEP BE FOR THE COURT TO SHARE WITH THE JURY ITS
| 10:12AM | 14 |  REFLECTIONS OR ITS THOUGHTS AFTER IT'S NOW MET WITH ALL OF THE
| 10:12AM | 15 |  JURY TO MAYBE TELL THEM THAT IT IS GOING TO DELAY OR MAYBE
| 10:12AM | 16 |  REJECT THIS IDEA AND PROVIDE SOME MEASURE OF CLOSURE?
| 10:12AM | 17 |      BUT IT STRIKES ME THAT IN ADDITION TO SORT OF HAVING IDEAS
| 10:12AM | 18 |  ABOUT WHAT THE NEXT STEP IS, THERE'S A PROCEDURAL QUESTION
| 10:12AM | 19 |  HERE?  WHAT, DO WE HAVE ANOTHER HEARING WITH THE MEDIA OR DOES
| 10:13AM | 20 |  THE COURT ISSUE AN ORDER?  AND I DON'T HAVE A BEST SUGGESTION
| 10:13AM | 21 |  ON THAT NEXT STEP WOULD BE.
| 10:13AM | 22 |          THE COURT:  THANK YOU FOR THOSE OBSERVATIONS.
| 10:13AM | 23 |      MR. DOWNEY?
| 10:13AM | 24 |        MR. DOWNEY:  I THINK I'M IN AGREEMENT WITH
| 10:13AM | 25 |  MR. SCHENK'S COMMENTS.

10:13AM 1      THE ONLY THING I WOULD ADD IS THAT I THINK THE RECORD

10:13AM 2  WOULD BENEFIT FROM THE DEFENSE ARTICULATING THE CONCERNS IT HAS

10:13AM 3  SO THAT THEY'RE PROPERLY PART OF THE COURT'S BALANCING

10:13AM 4  ANALYSIS, BECAUSE I THINK A GOOD DEAL OF THE CASE LAW FOCUSES

10:13AM 5  ON, YOU KNOW, IS THERE A FIFTH OR SIXTH AMENDMENT ISSUE

10:13AM 6  IMPLICATED?  AND I THINK WE WOULD ALL BENEFIT FROM THAT

10:13AM 7  FORMALLY BEING INJECTED INTO THE COURT'S BALANCING JUDGMENT.

10:13AM 8      THE COURT:  WELL, THANK YOU.

10:13AM 9      AND ONE OF THE THINGS THAT -- AND I ASKED YOU TO COMMENT,

10:13AM 10 BUT WE'RE TALKING ABOUT THE MOTION NOW, AND OBVIOUSLY WE SHOULD

10:13AM 11 HAVE THE MOVING PARTY PRESENT BEFORE WE ENGAGE IN ANY

10:13AM 12 DISCUSSIONS, AND I WANT TO BE CLEAR ON THAT.

10:13AM 13     I DON'T WANT TO TALK ABOUT THE COURT'S IMPRESSIONS AT ALL

10:14AM 14 ABOUT THIS WITHOUT THE MOVING PARTY BEING PART OF THE

10:14AM 15 CONVERSATION.

10:14AM 16     I WAS ASKING YOU FOR YOUR JUST THOUGHTS ABOUT PROCEDURAL

10:14AM 17 MATTERS, NOT SUBSTANTIVE MATTERS ON THE MOTION.  I APPRECIATE

10:14AM 18 YOUR SUGGESTIONS ON THAT.

10:14AM 19     IT DOES SEEM TO ME THAT THE COURT WOULD, AND PART OF THE

10:14AM 20 BALANCING ON THIS MOTION WOULD BENEFIT FROM THE PARTIES -- THAT

10:14AM 21 IS, THE GOVERNMENT AND THE DEFENSE -- IF YOU WISH TO PROVIDE

10:14AM 22 SOME ADDITIONAL BRIEFING OR SOMETHING IN THE ORDER,

10:14AM 23 OBSERVATIONS BASED ON WHAT YOU'VE SEEN HERE, THAT WOULD BE

10:14AM 24 HELPFUL FOR THE COURT AS FAR AS DEFERRING THE MOTION.

10:14AM 25     I THINK WHAT I WOULD DO IS GIVE YOU TIME TO FILE THAT, AND

10:14AM  1    I WOULD PROBABLY SET ANOTHER HEARING DATE FOR THE MOTION PROPER

10:14AM  2    TO BE HEARD BASED ON WHAT YOU FILE AND BASED ON WHAT I'LL SHARE

10:14AM  3    WITH THE COALITION AS WELL AND THEIR LAWYER.

10:15AM  4         IT MAY BE THAT THEIR LAWYER SHOULD HAVE BENEFIT OF THE

10:15AM  5    TRANSCRIPT SO THAT HE KNOWS WHAT THE CONVERSATION WAS.  I THINK

10:15AM  6    THAT WOULD BE FAIR, AND I CAN UNSEAL THE TRANSCRIPT TO THE

10:15AM  7    LAWYER FOR HIS EYES ONLY AT THIS POINT SO HE WOULD BE INFORMED.

10:15AM  8    I THINK THAT'S ONLY FAIR TO HAVE HIM UNDERSTAND THE COLLOQUY OF

10:15AM  9    THE INTERVIEWS THAT WE'VE HAD.

10:15AM 10         AND I WOULD LIKE THE TRIAL TO CONTINUE.  I AM, I AM

10:15AM 11    GRATIFIED, AND I THINK ALL OF US ARE, THAT THE QUESTION THAT I

10:15AM 12    POSED TO THE JURORS, THAT FINAL QUESTION FOR THE JURORS AS TO

10:15AM 13    WHETHER OR NOT THEY COULD CONTINUE TO BE FAIR AND IMPARTIAL, WE

10:15AM 14    GOT AFFIRMATIVE YESES FROM ALL OF THEM.  THERE WERE SOME

10:15AM 15    PAUSES, THINKING ABOUT IT.  ONE OF THE JURORS THIS MORNING I

10:15AM 16    THINK WAS PROBABLY THE ONE WHO PAUSED THE MOST FROM MY

10:15AM 17    OBSERVATIONS, AND SHE LOOKED AND TWISTED HER HEAD, AND THEN SHE

10:16AM 18    SAID YES.  I ASKED HER AGAIN, WHAT DID YOU SAY?  AND SHE SAID,

10:16AM 19    YES, YES I CAN.  SO I'M TAKEN BY THAT.

10:16AM 20         I DO, HOWEVER, WISH TO REVISIT JUROR NUMBER 12, AND SHE

10:16AM 21    TALKED WITH US YESTERDAY.  YOU RECALL HER.  SHE WAS THE JUROR

10:16AM 22    WHO WAS FOLLOWED IN HER DRIVEWAY BY AN AGGRESSIVE DRIVER.

10:16AM 23         SHE EXPRESSED TO US YESTERDAY THAT SHE WAS CONCERNED ABOUT

10:16AM 24    THE QUESTIONS, AND I THINK DURING THE TESTIMONY OF ONE OF THE

10:16AM 25    WITNESSES, SHE TOLD US, I WASN'T PAYING ATTENTION, I WAS

SEALED PROCEEDINGS

10:16AM 1    WRITING OUT MY ANSWERS TO WHAT THE QUESTIONS WERE.

10:16AM 2        AND THAT CAUSES ME SOME CONCERN AS TO WHETHER SHE WAS

10:16AM 3    DISTRACTED UNTOWARDLY SUCH THAT HER ABILITY TO CONTINUE TO

10:16AM 4    FOCUS MIGHT BE AT ISSUE.

10:16AM 5        AND I THOUGHT I WOULD BRING HER BACK AND ASK HER ANY

10:16AM 6    ADDITIONAL -- SOMETIMES IT'S A GOOD IDEA NOT TO ASK THE WITNESS

10:17AM 7    ANY ADDITIONAL QUESTIONS --

10:17AM 8        (LAUGHTER.)

10:17AM 9        THE COURT:  -- BUT I THOUGHT I MIGHT BRING HER BACK

10:17AM 10   JUST TO GET DEFINITIVE WORD ON THAT.

10:17AM 11       I DON'T KNOW WHAT YOUR THOUGHTS ARE ON THAT.

10:17AM 12       MR. SCHENK?

10:17AM 13       MR. SCHENK:  I THINK THAT'S APPROPRIATE.  THANK YOU.

10:17AM 14       MR. DOWNEY:  YOUR HONOR, THE ONLY CONCERN -- I HAVE

10:17AM 15   NO ISSUE WITH BRINGING HER BACK AT AN APPROPRIATE TIME.

10:17AM 16       THE ONLY ISSUE IS THAT I'M A LITTLE CONCERNED ABOUT THE

10:17AM 17   IMPLICATIONS OF THE COLLOQUY WITH RESPECT TO THE OTHER JURORS.

10:17AM 18   I THINK A NUMBER OF THEM USED THE WORD "DISTRACTION," AND I

10:17AM 19   DON'T MEAN IF IT MEANS THAT WE WOULD NEED TO COLLOQUY ALL OF

10:17AM 20   THEM.

10:17AM 21       I THINK SHE DID AT THE END ANSWER THE QUESTION IN A

10:17AM 22   SIMILAR OR IDENTICAL WAY TO THE WAY THAT THE OTHER JURORS DID.

10:17AM 23       BUT I, I DO ACKNOWLEDGE THAT SHE SAID SHE WAS DISTRACTED

10:17AM 24   DURING THE PROCEEDINGS YESTERDAY.

10:17AM 25       I THOUGHT ANOTHER OF THE JURORS TODAY HAD MADE A SIMILAR

10:17AM  1     COMMENT, AND --

10:17AM  2              THE COURT:  I THINK THAT JUROR SAID IT WAS A

10:17AM  3     DISTRACTION.  IT WAS NOT -- FROM MY PERSPECTIVE, FACING THE

10:18AM  4     JUROR, I DID NOT RECEIVE THAT IN THE SAME WAY AS JUROR NUMBER

10:18AM  5     12.  THE DISTRACTION, IT WAS ON MY MIND, AND I TOOK IT NOT AS

10:18AM  6     SOMETHING THAT WAS AS SERIOUS OR A GREAT IMPLICATION THAT THAT

10:18AM  7     JUROR WAS NOT PAYING ATTENTION.

10:18AM  8          IT WAS A DISTRACTION LIKE PARKING OR SOMETHING LIKE THAT.

10:18AM  9     THAT'S THE WAY I TOOK IT, AND THAT'S THE WAY THE FACIAL

10:18AM 10     EXPRESSIONS AND THE INTONATION WERE, THAT IT WAS NOT AN

10:18AM 11     INTERFERENCE.

10:18AM 12          JUROR NUMBER 12 TOLD US THAT SHE WAS WRITING PROSPECTIVE

10:18AM 13     QUESTIONS FOR PURPOSES OF THE INTERVIEW DURING TESTIMONY.  YOU

10:18AM 14     KNOW, AS VETERAN TRIAL LAWYERS AND JUDGES KNOW, THAT YOU CAN'T

10:18AM 15     POLICE A JUROR'S ATTENTION.  THEIR ATTENTION WANDERS AT

10:19AM 16     DIFFERENT POINTS.

10:19AM 17          AND WE CAN'T ASK THEM, YOU KNOW, IF SOMEONE STOPS TAKING

10:19AM 18     NOTES, DOES THAT MEAN THAT THEY'RE NOT PAYING ATTENTION OR

10:19AM 19     THEY'RE JUST LISTENING PERHAPS MORE INTENTLY?  WE JUST DON'T

10:19AM 20     KNOW THAT.

10:19AM 21          THIS JUROR AFFIRMATIVELY SAID SHE WAS DOING SOMETHING

10:19AM 22     DIFFERENT, AND SO THAT'S WHY I WANTED TO FOLLOW UP WITH HER.

10:19AM 23          I DON'T GET THE SAME SENSE FROM IT THE OTHER JURORS WHO

10:19AM 24     TALKED ABOUT A DISTRACTION.  I THINK ONE OF THEM SAID, WELL,

10:19AM 25     THIS IS A DISTRACTION.  IT'S A DISTRACTION FROM THE TRIAL.

10:19AM 1       I TOOK IT, BECAUSE WE'RE TAKING EVIDENTIARY TIME TO TALK

10:19AM 2   ABOUT THE ISSUE, THAT WAS THE DISTRACTION, I THINK, IN THE

10:19AM 3   CONTEXT OF THAT RESPONSE.

10:19AM 4       SO I THOUGHT I WOULD BRING JUROR NUMBER 12 BACK JUST TO

10:19AM 5   SEE WHAT HER SITUATION WAS AND WHETHER THERE'S BEEN ANY CHANGE.

10:19AM 6       SHE'S THE ONE ALSO WHO -- JUROR NUMBER 12 ALSO ASKED,

10:19AM 7   WELL, WHAT IF I'M RELEASED TODAY?  WHAT ABOUT MY INFORMATION?

10:19AM 8   AND THAT SEEMED TO BE A PRIMARY CONCERN TO HER.

10:19AM 9       AND I'LL JUST BE VERY CANDID, IF THERE'S AN ISSUE WITH

10:20AM 10  HER, I DON'T WANT -- I'D RATHER DEAL WITH IT UP-FRONT NOW THAN

10:20AM 11  HAVING TO DEAL WITH HER ON THE ROAD.  AND I WOULD LIKE TO GET

10:20AM 12  OUR TRIAL GOING AGAIN ON TRACK, AND I KNOW YOU WOULD, TOO.

10:20AM 13  NOBODY WANTS A MISTRIAL, NOBODY DOES.

10:20AM 14      I'D LIKE TO DO THE BEST WE CAN TO KEEP THE TRIAL MOVING

10:20AM 15  WITH RESPECT TO BOTH OF YOUR INTERESTS HERE.

10:20AM 16      SO LET'S ASK JUROR NUMBER 12 HERE.

10:20AM 17          MR. DOWNEY:  YOUR HONOR, JUST ONE QUESTION HERE.

10:20AM 18  THIS IS UNRELATED TO JUROR 12, BUT IT OCCURS TO ME IN LIGHT OF

10:20AM 19  THE ANSWERS.

10:20AM 20      HAVE THE JURORS BEEN ADVISED EVEN INFORMALLY NOT TO

10:20AM 21  DISCUSS THIS ISSUE AMONGST THEMSELVES?

10:20AM 22          THE COURT:  NOT BY THE COURT, NO.

10:20AM 23          THE CLERK:  YOUR HONOR, I CAN SPEAK FOR THE RECORD.

10:20AM 24      I DID INDICATE TO THEM THAT THIS IS JUST LIKE NOT

10:20AM 25  DISCUSSING THE CASE, THIS IS NOT TO BE DISCUSSED.

SEALED PROCEEDINGS
3348

10:20AM 1        THE COURT:  THANK YOU, MS. KRATZMANN.

10:20AM 2        THE CLERK:  ANY OF THIS, THIS TOPIC, PLEASE, HONOR

10:20AM 3    THAT.

10:20AM 4      IT'S THE SAME ADMONISHMENT THAT THE COURT HAD GIVEN YOU.

10:21AM 5        THE COURT:  THANK YOU, MS. KRATZMANN.  I APPRECIATE

10:21AM 6    YOUR ATTENTION TO DETAIL AND INFORMING THEM IN THAT.

10:21AM 7      AND MS. KRATZMANN SPEAKS FOR THE COURT AND I THINK THE

10:21AM 8    JURORS RESPECT THAT, AND YOU HEARD THAT THIS MORNING AND

10:21AM 9    YESTERDAY.

10:21AM 10     ANYTHING FURTHER?

10:21AM 11       MR. DOWNEY:  JUST ON THE PROCEDURE.  WILL AN ORDER

10:21AM 12   ISSUE AS TO ANY FURTHER PROCEDURE?

10:21AM 13       THE COURT:  I WILL -- WE WILL ISSUE A SHORT ORDER

10:21AM 14   INDICATING THAT I'M GOING TO ASK FOR ADDITIONAL BRIEFING, AND

10:21AM 15   WE'LL LOOK AT OUR SCHEDULES AND SET A BRIEFING SCHEDULE FOR

10:21AM 16   THAT.

10:21AM 17     WHAT DO YOU THINK YOU NEED FOR THAT?  DO YOU WANT TEN DAYS

10:21AM 18   OR SOMETHING?

10:21AM 19       MR. SCHENK:  YEAH, A WEEK TO TEN DAYS WOULD BE

10:21AM 20   GREAT.  THANK YOU.

10:21AM 21       MR. DOWNEY:  THAT SOUNDS FINE, YOUR HONOR.

10:21AM 22       THE COURT:  I WAS WAITING FOR DECEMBER.

10:21AM 23     (LAUGHTER.)

10:21AM 24       MR. DOWNEY:  WELL, THERE IS A TRANSCRIPT THAT WE

10:21AM 25   HAVE TO GET THROUGH.

| | | |
|---|---|---|
| 10:21AM | 1 | (PAUSE IN PROCEEDINGS.) |
| 10:21AM | 2 | (JUROR NUMBER 12 PRESENT.) |
| 10:22AM | 3 | THE COURT:  GOOD MORNING. |
| 10:22AM | 4 | JUROR:  GOOD MORNING. |
| 10:22AM | 5 | THE COURT:  PLEASE HAVE A SEAT.  THANK YOU.  WE'RE |
| 10:22AM | 6 | BACK ON THE RECORD WITH JUROR NUMBER 12.  I'M GOING TO IDENTIFY |
| 10:22AM | 7 | YOU BY YOUR NUMBER AGAIN.  THANK YOU. |
| 10:22AM | 8 | AND I BROUGHT YOU BACK THIS MORNING TO SPEAK -- WE'RE IN |
| 10:22AM | 9 | CHAMBERS AGAIN.  ALL PARTIES PREVIOUSLY PRESENT YESTERDAY ARE |
| 10:22AM | 10 | PRESENT HERE AGAIN WITH YOU. |
| 10:22AM | 11 | AND I BROUGHT YOU BACK TO TALK WITH YOU ABOUT, AGAIN, SOME |
| 10:23AM | 12 | OF YOUR COMMENTS YESTERDAY WHEN WE WERE HAVING THIS DISCUSSION. |
| 10:23AM | 13 | JUROR:  CAN WE TAKE OUR MASKS OFF? |
| 10:23AM | 14 | THE COURT:  OH, YES, WE'LL TAKE OUR MASKS OFF. |
| 10:23AM | 15 | THANK YOU FOR THE INVITATION. |
| 10:23AM | 16 | SO I JUST WANT TO FOLLOW UP WITH SOME OF THE THINGS THAT |
| 10:23AM | 17 | YOU SAID YESTERDAY. |
| 10:23AM | 18 | ONE OF THE THINGS THAT I'M INTERESTED IN IS YOU TOLD US |
| 10:23AM | 19 | THAT DURING THE LATTER PART OF THE AFTERNOON, I THINK, THAT YOU |
| 10:23AM | 20 | WERE -- DURING SOME OF THE TESTIMONY, YOU WERE ACTUALLY |
| 10:23AM | 21 | FOCUSSED ON OUR INTERVIEW AND YOU WERE WRITING QUESTIONS DOWN |
| 10:23AM | 22 | ABOUT THINGS THAT YOU WANTED TO ASK ME OR CONCERNS YOU MIGHT |
| 10:23AM | 23 | HAVE HAD. |
| 10:23AM | 24 | JUROR:  UH-HUH. |
| 10:23AM | 25 | THE COURT:  AND THAT CAUSED ME SOME CONCERN ABOUT |

10:23AM 1    WHETHER OR NOT YOU --

10:23AM 2              JUROR:  MY FOCUS, YEAH.

10:23AM 3              THE COURT:  RIGHT, RIGHT.  CAN YOU TELL ME A LITTLE

10:23AM 4    BIT ABOUT THAT?

10:23AM 5              JUROR:  I THINK IT WAS SUCH AN UNEXPECTED EPISODE TO

10:23AM 6    HAVE THAT, YOU KNOW, WHAT YOU HAD DISCUSSED WITH US.

10:23AM 7         AND, YOU KNOW, THOUGHTS ARE GOING THROUGH YOUR HEAD AND

10:23AM 8    WHAT DOES THIS MEAN, HOW DOES THIS -- IF OUR INFORMATION GETS

10:24AM 9    OUT, WHERE IS IT GOING AND WHO IS GOING TO DO WHAT WITH IT?

10:24AM 10        AND SO JUST ALL OF THOSE THINGS.

10:24AM 11        AND WHEN YOU SAID THAT WE WERE GOING TO TALK TO YOU, AND

10:24AM 12   JUST KIND OF BEING PREPARED, YOU KNOW?

10:24AM 13             THE COURT:  OKAY.

10:24AM 14             JUROR:  SO, YOU KNOW, I'LL ADMIT, IT WAS

10:24AM 15   DISTRACTING.

10:24AM 16             THE COURT:  OKAY.  WERE YOU, WERE YOU -- DID IT --

10:24AM 17   AND I JUST NEED TO PROBE THAT FOR A MOMENT.

10:24AM 18        DID THE DISTRACTION THAT IT CAUSED YOU YESTERDAY, DID THAT

10:24AM 19   IN ANY WAY AFFECT YOUR ABILITY TO HEAR THE EVIDENCE AND TO --

10:24AM 20             JUROR:  NONE OF THIS HAS ANYTHING TO DO WITH, WITH

10:24AM 21   BEING WILLING TO PARTICIPATE IN THIS TRIAL.

10:24AM 22             THE COURT:  I SEE.

10:24AM 23             JUROR:  I CAN SEPARATE IT.

10:24AM 24        IT WAS ENCOMPASSING WITH MY THOUGHTS, THOUGH, AT THAT

10:24AM 25   MOMENT.

SEALED PROCEEDINGS
3351

10:24AM   1          BUT, YOU KNOW, I'VE HAD SOME TIME TO THINK ABOUT IT AND

10:24AM   2     CALM DOWN.  I MEAN, I'M STILL CONCERNED ABOUT IT.

10:24AM   3               THE COURT:  YES.

10:24AM   4               JUROR:  AGAIN, WHO IS GETTING THIS INFORMATION?

10:25AM   5     WHAT ARE THEY GOING TO DO WITH IT?  HOW IS IT GOING TO BE

10:25AM   6     EXPOSED?  WHO IS GOING TO SEE WHAT?  YOU KNOW, JUST ALL OF THE

10:25AM   7     UNKNOWNS.

10:25AM   8          SO I STILL HAVE QUESTIONS ABOUT THAT, SO --

10:25AM   9               THE COURT:  OKAY.  WILL THOSE QUESTIONS BE A

10:25AM  10     DISTRACTION TO YOU TO SIT AS A JUROR?

10:25AM  11               JUROR:  NO, BECAUSE I'VE CALLED DOWN NOW.  I WAS

10:25AM  12     ACTUALLY -- I WAS ACTUALLY ANGRY THAT THIS WAS HAPPENING, THAT

10:25AM  13     WE WERE BEING EXPOSED.

10:25AM  14               THE COURT:  OKAY.

10:25AM  15               JUROR:  BUT, YOU KNOW, YOU HAVE TO BE ANGRY TO GET

10:25AM  16     OVER BEING ANGRY.

10:25AM  17          SO, YEAH, I MEAN, I'VE HAD SOME TIME TO THINK ABOUT IT AND

10:25AM  18     BE -- BE CALM WITH MY THOUGHTS.

10:25AM  19               THE COURT:  OKAY.  IS THAT HOW YOU FEEL TODAY?

10:25AM  20               JUROR:  YEAH.  I MEAN, I JUST -- ESPECIALLY AFTER

10:25AM  21     TALKING TO YOU AND JUST, YOU KNOW, HAVING SOME SUBSTANCE ADDED

10:25AM  22     TO WHAT IS GOING ON SORT OF JUST PUTS YOU IN A -- PUTS ME IN A

10:26AM  23     BETTER PLACE.

10:26AM  24               THE COURT:  OKAY.  I DON'T KNOW IF I TOLD YOU, I DID

10:26AM  25     MENTION THIS TO OTHER JURORS, BUT THE LAWYER FOR THE MEDIA

10:26AM 1    COALITION DID TELL ME THAT NONE OF HIS CLIENTS WILL CONTACT A

10:26AM 2    JUROR DURING THE TRIAL, THEY'RE JUST NOT GOING TO DO THAT.

10:26AM 3    THEY'RE NOT GOING TO REACH OUT.  THEY'RE NOT GOING TO TALK TO A

10:26AM 4    JUROR DURING THEIR JURY SERVICE.  AND HE DID TELL ME THAT.

10:26AM 5              JUROR:  BUT THEY COULD AFTER?

10:26AM 6              THE COURT:  HE TOLD ME THAT HE REALIZED THAT'S

10:26AM 7    IMPROPER.

10:26AM 8         HE COULD NOT GIVE THAT ASSURANCE --

10:26AM 9              JUROR:  WHAT IS IMPROPER?  DURING THE TRIAL?

10:26AM 10             THE COURT:  CORRECT.

10:26AM 11             JUROR:  BUT HE COULD CONTACT US AFTER?

10:26AM 12             THE COURT:  HE WOULD NOT AND COULD NOT GIVE ME THAT

10:26AM 13   SAME ASSURANCE POST-TRIAL OF WHAT HIS CLIENTS WILL DO.

10:26AM 14             JUROR:  RIGHT.

10:26AM 15             THE COURT:  I JUST WANT TO TELL YOU THAT.

10:26AM 16             JUROR:  YEAH, WE'RE NOT UNDER THE BLANKET OF

10:26AM 17   PROTECTION AFTER THE TRIAL IS OVER.

10:26AM 18             THE COURT:  WELL, ONE THING I DID MENTION TO ONE OR

10:26AM 19   TWO OTHER JURORS WAS THAT IN MY FINAL COMMENTS WHEN THE TRIAL

10:26AM 20   IS OVER, I WILL, AND I DO, TELL THE JURORS IN EVERY CASE I'VE

10:27AM 21   BEEN A JUDGE ON, THAT THEY ARE PERMITTED --

10:27AM 22             JUROR:  YEAH, RIGHT.

10:27AM 23             THE COURT:  -- TO SPEAK IF THEY WISH.

10:27AM 24             JUROR:  RIGHT.

10:27AM 25             THE COURT:  AND THEY'RE RELEASED FROM THE

10:27AM    1    CONSTRAINT, THE ADMONITION --

10:27AM    2                    JUROR:  RIGHT.

10:27AM    3                    THE COURT:  -- YOU'RE RELEASED FROM THAT AT THE END

10:27AM    4    OF YOUR SERVICE.  YOU CAN TALK TO WHOEVER YOU WANT.

10:27AM    5                    JUROR:  OR CHOOSE NOT TO?

10:27AM    6                    THE COURT:  OR YOU HAVE THE RIGHT TO CHOOSE NOT TO

10:27AM    7    TALK TO ANYONE.

10:27AM    8         AND IN MY FINAL PARTING COMMENTS, I DO INFORM A JUROR THAT

10:27AM    9    YOU CAN SAY NO, AND IF YOU ARE -- IF A JUROR IS CONTINUED TO BE

10:27AM   10    CONTACTED BY SOMEONE, WHOEVER IT MIGHT BE, EVEN AFTER THEY'VE

10:27AM   11    SAID PLEASE STOP, THEY SHOULD BRING THAT TO THE COURT'S

10:27AM   12    ATTENTION.

10:27AM   13                    JUROR:  YEAH.

10:27AM   14                    THE COURT:  AND I JUST -- THAT'S WHAT YOU'LL HEAR.

10:27AM   15                    JUROR:  YEAH, I KNOW THAT.  I'VE KNOWN THAT.

10:27AM   16                    THE COURT:  YOU'VE SAT ON JURIES.

10:27AM   17                    JUROR:  YES, AND PEOPLE -- YOU WATCH "20/20" AND YOU

10:27AM   18    HAVE SIX JURORS WHO WANT TO TALK TO THE WORLD, SO --

10:27AM   19                    THE COURT:  RIGHT.  SO LET ME FOCUS BACK TO THE

10:28AM   20    CONCERNS THAT I HAVE, AND I WILL USE THAT WORD, A CONCERN THAT

10:28AM   21    I HAVE.

10:28AM   22         JUROR NUMBER 12, I'M CONCERNED THAT YESTERDAY YOU MAY HAVE

10:28AM   23    MISSED TESTIMONY BECAUSE OF YOUR DISTRACTION WITH OUR

10:28AM   24    INTERVIEWS.

10:28AM   25         AND DO YOU FEEL THAT YOU MISSED EVIDENCE OR TESTIMONY?

10:28AM   1          JUROR:  I MEAN, I WAS PAYING ATTENTION AND, I MEAN,

10:28AM   2     TO BE QUITE FRANK WITH YOU, THERE ARE TIMES WHERE THE TESTIMONY

10:28AM   3     IS QUITE BORING AND IT SEEMS, YOU KNOW, REPEAT.

10:28AM   4          THE COURT:  OKAY.  AND LET ME SAY, I DON'T WANT YOU

10:28AM   5     TO TALK TO ME AT ALL ABOUT YOUR FEELINGS ABOUT THE EVIDENCE AT

10:28AM   6     ALL.

10:28AM   7          JUROR:  OH, SORRY.

10:28AM   8          THE COURT:  I'M NOT ASKING YOU THAT.

10:28AM   9          JUROR:  OKAY.

10:28AM  10          THE COURT:  I'M JUST ASKING YOU ABOUT YOUR ABILITY

10:28AM  11     TO FOCUS.

10:28AM  12          JUROR:  YEAH, YEAH.

10:28AM  13          THE COURT:  AND WHETHER OR NOT --

10:28AM  14          JUROR:  I JUST MADE A FEW NOTES.

10:28AM  15          THE COURT:  OKAY.

10:28AM  16          JUROR:  BUT IT WASN'T LIKE I WAS NOT PAYING

10:28AM  17     ATTENTION AT ALL.  YOU KNOW, BEING DISTRACTED DOESN'T MEAN THAT

10:28AM  18     YOU'RE, YOU KNOW, YOU'RE IN ONE SPACE COMPLETELY.

10:28AM  19          THE COURT:  RIGHT.

10:28AM  20          JUROR:  BUT YOU'VE GOT MORE IN ONE SPACE MORE THAN

10:28AM  21     THE OTHER.

10:28AM  22          THE COURT:  OKAY.

10:29AM  23          JUROR:  SO THAT'S KIND OF WHERE I WAS YESTERDAY.

10:29AM  24          THE COURT:  OKAY.  DO YOU FEEL THAT YESTERDAY YOU

10:29AM  25     WERE ABLE, AND DURING YOUR SERVICE YESTERDAY, INCLUDING THE

10:29AM  1    TIME THAT WE'RE TALKING ABOUT HERE, DO YOU FEEL YOU WERE

10:29AM  2    PERFORMING THE DUTIES AND OBLIGATIONS OF A JUROR?  WERE YOU

10:29AM  3    ABLE TO DO THAT?

10:29AM  4           JUROR:  YEAH, I DO.  I DON'T THINK I WAS DISTRACTED

10:29AM  5    TO THE POINT WHERE I -- YOU KNOW, SOMETIMES WORDS JUST CATCH

10:29AM  6    YOU, YOUR ATTENTION, SO I FELT THAT I COULD -- SOMETHING THAT I

10:29AM  7    THOUGHT WAS IMPORTANT, THAT I HAD AN EAR OPEN TO.

10:29AM  8           THE COURT:  OKAY.  AND AGAIN, I WANT TO ASK YOU

10:29AM  9    AGAIN THE QUESTION ABOUT, AGAIN, KNOWING EVERYTHING THAT WE'VE

10:29AM 10    TALKED ABOUT YESTERDAY AND THIS MORNING, CAN YOU CONTINUE TO BE

10:29AM 11    A FAIR AND IMPARTIAL JUROR IN THIS CASE?

10:29AM 12           JUROR:  I FEEL I CAN DO THAT.

10:29AM 13           THE COURT:  OKAY.  ANY DOUBT IN YOUR MIND ABOUT

10:29AM 14    THAT?

10:29AM 15           JUROR:  NO DOUBT ABOUT THAT, BUT I JUST -- THE

10:29AM 16    COMPROMISE THAT I FEEL WE'RE ALL UNDER RIGHT NOW, YOU KNOW --

10:30AM 17           THE COURT:  OKAY.

10:30AM 18           JUROR:  -- LIKE I SAID, I DON'T KNOW THAT I WILL

10:30AM 19    EVER BE WILLING TO SERVE ON ANOTHER JURY AGAIN.

10:30AM 20           THE COURT:  OKAY.  WELL, LET ME ASK YOU ANOTHER

10:30AM 21    QUESTION, AND I HOPE YOU'LL PARDON ME, BUT I JUST WANT TO ASK

10:30AM 22    THIS.  DO YOU WANT TO CONTINUE YOUR JURY SERVICE IN THIS CASE?

10:30AM 23           JUROR:  IF DOING -- IF I DISCONTINUE MY SERVICE,

10:30AM 24    WILL MY NAME NOT BE, MY QUESTIONNAIRE NOT BE EXPOSED?

10:30AM 25           THE COURT:  I CAN'T GUARANTEE THAT.  I CAN'T.  I

10:30AM  1      CAN'T ANSWER THAT QUESTION TODAY.

10:30AM  2                  JUROR:  WELL, LET ME ASK YOU THIS, WHERE IS THIS?  I

10:30AM  3      MEAN, DOES THIS PERSON HAVE -- I KNOW IT'S YOUR DECISION, BUT

10:30AM  4      IT'S ON A CASE-BY-CASE BASIS AND IT'S SORT OF

10:30AM  5      INFORMATION-BY-INFORMATION BASIS WHETHER OR NOT THIS PERSON IS

10:30AM  6      GOING TO BE GIVEN OUR INFORMATION?

10:30AM  7                  THE COURT:  WELL, LET ME TELL YOU WHAT IS GOING TO

10:31AM  8      HAPPEN NEXT.  I'VE INTERVIEWED YOU AND YOUR COLLEAGUES, YOUR

10:31AM  9      FELLOW JURORS AND I'VE RECEIVED ALL OF YOUR COMMENTS.

10:31AM 10          ONE THING I'M GOING TO DO NEXT IS THAT WE'RE GOING TO HAVE

10:31AM 11      ANOTHER HEARING ON THE ISSUE, I'M GOING TO HAVE ANOTHER HEARING

10:31AM 12      ON THE ISSUE, AND I'M GOING TO ASK LAWYERS, THE LAWYERS BEHIND

10:31AM 13      YOU, THE GOVERNMENT AND MS. HOLMES'S LAWYERS, TO ALSO GIVE ME

10:31AM 14      THEIR THOUGHTS AND OPINIONS.

10:31AM 15          THEY'RE GOING TO FILE BRIEFS AND THEY'RE GOING TO TELL ME

10:31AM 16      THEIR THOUGHTS ABOUT THIS.  SO WE'RE GOING TO HAVE ANOTHER

10:31AM 17      HEARING.

10:31AM 18          THAT PROBABLY WON'T TAKE PLACE FOR ANOTHER THREE OR FOUR

10:31AM 19      WEEKS MAYBE, PROBABLY CLOSER TO FOUR MORE WEEKS.

10:31AM 20          BEFORE WE HAVE THAT HEARING, I'LL HEAR FROM THE MOVING

10:31AM 21      PARTY, THE MEDIA COALITION'S LAWYER, AND THEN I'LL MAKE A

10:31AM 22      DECISION AFTER I HEAR ALL OF THAT.

10:31AM 23          SO IT'S A FEW WEEKS OUT BEFORE I'M GOING TO MAKE A

10:31AM 24      DECISION, AND I'M GOING TO TELL YOUR COLLEAGUES THAT, TOO.

10:31AM 25                  JUROR:  RIGHT.  BUT I GUESS MY CONCERN IS, IS

10:31AM  1    THIS -- IS THIS A FLAT YES, THEY'RE ENTITLED TO THIS

10:32AM  2    INFORMATION AND WE AS INDIVIDUALS HAVE TO JUSTIFY WHY WE DON'T

10:32AM  3    WANT IT AND THEN YOU DECIDE WHETHER OR NOT WE HAVE A TRUE

10:32AM  4    JUSTIFICATION?

10:32AM  5             THE COURT:  WELL, THAT IS PART OF THE PROCESS.

10:32AM  6    THAT'S WHY I WAS ASKING YOU QUESTIONS.

10:32AM  7             JUROR:  SO IT'S SORT OF LIKE THEY'RE ENTITLED TO IT,

10:32AM  8    PERIOD, AND NOW WE JUST HAVE TO SAY YOU'RE ENTITLED TO ALL OF

10:32AM  9    THIS EXCEPT THIS, THIS, AND THAT.

10:32AM 10             THE COURT:  THEIR LAWYER -- LET ME JUST SAY, THEIR

10:32AM 11    LAWYER, THE MEDIA COALITION'S LAWYER HAS TOLD ME JUST WHAT YOU

10:32AM 12    SAID, HE HAS SAID IN HIS PAPERS IN THE BRIEFS THAT HE HAS FILED

10:32AM 13    THAT SUPREME COURT PRECEDENT AND THE FIRST AMENDMENT INDICATE,

10:32AM 14    THE LAW INDICATES THAT THIS INFORMATION SHOULD OTHERWISE REMAIN

10:32AM 15    PUBLIC.

10:32AM 16        HOWEVER, THERE ARE CERTAIN SITUATIONS WHERE A COURT CAN IN

10:32AM 17    ITS DISCRETION SAY THAT IT'S NOT.

10:32AM 18        SO THAT'S THE LEGAL -- AND I DON'T WANT TO GET YOU

10:32AM 19    INVOLVED IN THE LEGAL PART OF IT, BUT TO YOUR QUESTION, YES,

10:32AM 20    THAT'S, THAT'S WHY I'M ASKING THESE QUESTIONS.

10:32AM 21        THE LAWYERS BEHIND YOU ARE GOING TO HELP ME WITH THEIR

10:32AM 22    MOTIONS AND THEIR THOUGHTS ON THE QUESTION.

10:33AM 23        BUT I'M JUST CONCERNED ABOUT YOUR JURY SERVICE AND YOUR

10:33AM 24    ABILITY TO CONTINUE TO BE FAIR AND IMPARTIAL IN THE CASE, AND

10:33AM 25    IF YOU CAN, THAT'S GREAT.  AND IF YOU CAN'T, THAT'S GREAT ALSO.

10:33AM 1          JUROR:  FOR ME THAT'S NOT THE ISSUE.  AGAIN, IT'S

10:33AM 2     JUST THE EXPOSURE THAT WE'RE ALL OPEN TO RIGHT NOW.

10:33AM 3          THE COURT:  OKAY.  AND I ASKED YOU THAT QUESTION,

10:33AM 4     AND PARDON ME, IT WAS A VERY BLUNT QUESTION, BUT I THINK IT

10:33AM 5     DOES GET TO THE POINT, THAT IS, DO YOU -- WITH ALL OF THIS

10:33AM 6     GOING ON, DO YOU WANT TO STAY AND CONTINUE AS A JUROR IN THE

10:33AM 7     CASE?  IS THAT SOMETHING THAT YOU WISH TO DO?

10:33AM 8          JUROR:  I MEAN, THE QUESTION I'VE ASKED MYSELF THAT

10:33AM 9     SINCE --

10:33AM 10          THE COURT:  YEAH.

10:33AM 11          JUROR:  -- YOU KNOW, SINCE YESTERDAY, AND --

10:33AM 12          THE COURT:  I THOUGHT YOU MIGHT HAVE JUST FROM OUR

10:33AM 13     CONVERSATION, AND THAT'S WHY I'M BEING VERY BLUNT WITH YOU THIS

10:33AM 14     MORNING AND ASKING YOU THAT.

10:33AM 15          JUROR:  AND I TRIED TO WEIGH THE, YOU KNOW, THE PROS

10:33AM 16     AND CONS OF THAT, AND THE VALUE.

10:33AM 17      I DIDN'T COME UP WITH AN ANSWER YET, SO I DON'T KNOW IF

10:34AM 18     THAT'S SOMETHING THAT YOU WANT TO HAVE AN ANSWER TO RIGHT NOW

10:34AM 19     TODAY, RIGHT AT THIS VERY SECOND.

10:34AM 20          THE COURT:  WELL, I THINK I DO.  I THINK I DO.  AND

10:34AM 21     I'M SORRY TO PRESS YOU, BUT IT'S IMPORTANT FOR ME TO KNOW IF WE

10:34AM 22     CONTINUE THE TRIAL.

10:34AM 23      YOU'VE TOLD ME YOU CAN CONTINUE TO BE FAIR AND IMPARTIAL,

10:34AM 24     AND THANK YOU FOR THAT, I APPRECIATE THAT.  YOU'VE TOLD ME THAT

10:34AM 25     THREE OR FOUR TIMES.

10:34AM  1    BUT I SUPPOSE JUST BECAUSE OF OUR CONVERSATION AND OUR

10:34AM  2    COLLOQUY AND THE EXCHANGE OF INFORMATION AND YOU TELLING ME

10:34AM  3    YOUR CONCERNS, I'M PROBING A LITTLE DEEPER WITH YOU AND ASKING

10:34AM  4    YOU, DO YOU -- YOU KNOW?

10:34AM  5        JUROR:  AGAIN, I THINK IT'S MORE THE PRINCIPLE.

10:34AM  6    I'VE LOOKED AT MY QUESTIONNAIRE AND THERE ISN'T A LOT ON THERE

10:34AM  7    THAT -- YOU KNOW, IF MY NAME IS REDACTED ESPECIALLY, THERE'S

10:34AM  8    NOT VERY MANY DOTS TO PUT TOGETHER TO FIGURE ANYTHING OUT, AND

10:34AM  9    THERE'S NOT ANYTHING REALLY, OH MY GOSH, SHE'S THIS OR SHE'S

10:34AM  10   THAT.

10:35AM  11       I GUESS, LIKE I SAID YESTERDAY, IT'S THE PRINCIPLE.

10:35AM  12       I'M ALSO LIKE IF THIS HAS NEVER BEEN DONE BEFORE AND NOW

10:35AM  13   THEY'RE DOING IT AND THEY CAN DO, THEN IT CAN BE DONE AGAIN.

10:35AM  14       SO, YOU KNOW, I KNOW THIS AFFECTS MY ABILITY AND

10:35AM  15   WILLINGNESS TO SERVE AGAIN EVER IN A JURY.

10:35AM  16       LIKE I SAY, THERE'S NOT A LOT OF INFORMATION IN MY

10:35AM  17   QUESTIONNAIRE THAT I'M SO, OH, MY GOSH, YOU KNOW, THIS IS GOING

10:35AM  18   TO BE TOO EMBARRASSING OR I'LL BE HUMILIATED OR NOT.

10:35AM  19       BUT, AGAIN, IT'S MORE THE PRINCIPLE.

10:35AM  20        THE COURT:  SO THAT'S WHY I ASKED THE QUESTION

10:35AM  21   BECAUSE YOU JUST TOLD ME, I MAY NEVER WANT TO SERVE ON A JURY

10:35AM  22   AGAIN FOR THESE REASONS.

10:35AM  23       AND MY QUESTION IS GEARED TOWARDS THAT.  YOU HAVE THAT --

10:35AM  24   YOU'VE TOLD US THAT IS YOUR FEELING NOW FOR FUTURE JURY

10:35AM  25   SERVICE.

SEALED PROCEEDINGS
3360

```
10:35AM   1        AND I SUPPOSE MY QUESTION IS, DOES THAT FEELING OVERWHELM

10:35AM   2   YOU NOW, OR IS IT YOUR FEELING NOW SUCH THAT YOU DON'T WANT TO

10:35AM   3   BE PART OF THIS JURY FOR THE SAME REASONS?

10:35AM   4        LET ME BE STRAIGHT.  I'M NOT TRYING TO TALK YOU OFF THE

10:36AM   5   JURY.

10:36AM   6             JUROR:  NO, NO.  I KNOW.

10:36AM   7             THE COURT:  I'M TRYING TO BE OBJECTIVE, BUT I REALLY

10:36AM   8   DO NEED TO KNOW AND WANT TO KNOW YOUR THOUGHTS ABOUT THAT.

10:36AM   9             JUROR:  YEAH, AND I EVEN THOUGHT ABOUT THEN -- I

10:36AM  10   DON'T KNOW HOW MUCH THIS, THIS TRIAL IS ON THE NEWS OR

10:36AM  11   WHATEVER.

10:36AM  12        BUT THEN AGAIN, MAY I BE EXPOSING MYSELF TO EVEN MORE OF

10:36AM  13   WHAT I DON'T WANT TO BE EXPOSED TO IF I REMOVE MYSELF FROM THE

10:36AM  14   JURY, OR DO I JUST GO AHEAD AND STAND IN LINE AND, YOU KNOW,

10:36AM  15   AND CONTINUE?

10:36AM  16        AGAIN, I JUST DON'T THINK THAT THERE'S ENOUGH IN MY

10:36AM  17   QUESTIONNAIRE THAT I'M WORRIED ABOUT AT THIS TIME.

10:36AM  18        AGAIN, THERE MAY BE SOMETHING IN ANOTHER TYPE OF JURY

10:36AM  19   WHERE I AM EXPOSING MORE PERSONAL OR FAMILY OR FRIENDS OR

10:36AM  20   MYSELF, YOU KNOW, SITUATIONS THAT I WOULDN'T WANT PUBLIC.

10:36AM  21             THE COURT:  OKAY.

10:36AM  22             JUROR:  SO THERE'S BEEN A LOT INVESTED IN THIS, AND

10:37AM  23   I FEEL THAT IT IS OUR RESPONSIBILITY AND EVERYONE SHOULD -- I

10:37AM  24   WANT TO HAVE A FAIR TRIAL IF EVER I'M PUT ON, YOU KNOW, ON

10:37AM  25   TRIAL.
```

| | | |
|---|---|---|
| 10:37AM | 1 | AND I KNOW I CAN BE IMPARTIAL AND, YOU KNOW, BE FAIR.  SO |
| 10:37AM | 2 | I WANT SOMEONE LIKE ME ON MY JURY.  SO, AGAIN -- |
| 10:37AM | 3 | THE COURT:  SO WOULD YOU LIKE TO STAY ON THIS JURY? |
| 10:37AM | 4 | JUROR:  I THINK -- YES, I WOULD. |
| 10:37AM | 5 | THE COURT:  OKAY.  GREAT.  THANK YOU. |
| 10:37AM | 6 | JUROR:  OKAY. |
| 10:37AM | 7 | THE COURT:  ANYTHING ELSE YOU WOULD LIKE ME TO KNOW? |
| 10:37AM | 8 | JUROR:  NO.  I HAD A QUESTION FOR YOU AND I ASKED |
| 10:37AM | 9 | AND THAT WAS GOING TO BE SOMETHING THAT I WANTED TO TALK TO YOU |
| 10:37AM | 10 | ABOUT, BUT YOU ANSWERED MY QUESTION. |
| 10:37AM | 11 | THE COURT:  OKAY.  I'M GOING TO ASK THESE LAWYERS IF |
| 10:37AM | 12 | THEY HAVE A QUESTION FOR YOU. |
| 10:37AM | 13 | MR. SCHENK? |
| 10:37AM | 14 | MR. SCHENK:  NO.  THANK YOU, YOUR HONOR. |
| 10:37AM | 15 | MR. DOWNEY:  NO.  THANKS. |
| 10:37AM | 16 | THE COURT:  ALL RIGHT.  THANKS. |
| 10:37AM | 17 | JUROR:  THANK YOU. |
| 10:37AM | 18 | THE COURT:  YOU'RE WELCOME.  OKAY.  JUROR NUMBER 12 |
| 10:38AM | 19 | HAS LEFT. |
| 10:38AM | 20 | COUNSEL, ANY COMMENT? |
| 10:38AM | 21 | MR. SCHENK:  AFTER OUR SESSION YESTERDAY WHEN SHE |
| 10:38AM | 22 | EXPRESSED THE LEVEL OF DISTRACTION THAT SHE FELT, I LOOKED AT |
| 10:38AM | 23 | SOME CASES LAST NIGHT ON THE ISSUE.  THE QUICK RESEARCH I DID |
| 10:38AM | 24 | SUGGESTED THAT IT'S NOT SORT OF A PER SE EXCLUSION IF A JUROR |
| 10:38AM | 25 | EXPRESSES A CONCERN ABOUT DISTRACTION.  THERE'S A LINE OF CASES |

10:38AM  1    ABOUT JURORS WHO FALL ASLEEP DURING TRIAL, SO WE KNOW THEY'RE

10:38AM  2    NOT PAYING ATTENTION, AND THE COURT DOES AN INQUIRY AT THAT

10:38AM  3    POINT, EXACTLY LIKE THE COURT JUST DID NOW.

10:38AM  4         AND TODAY WE LEARNED A LITTLE BIT MORE ABOUT THE LEVEL OF

10:38AM  5    DISTRACTION, AND IT WAS LESS THAN WHAT SHE EXPRESSED YESTERDAY.

10:38AM  6    THE UNDERSTANDING I TOOK FROM HER COMMENTS JUST NOW WAS THAT IT

10:38AM  7    WAS SOMETHING THAT SHE WAS THINKING ABOUT, BUT SHE ALSO HAD THE

10:39AM  8    ABILITY TO LISTEN TO THE TESTIMONY YESTERDAY AND SHE, I THINK,

10:39AM  9    SAID THAT SHE HAD AN EAR OPEN AND SHE COULD HEAR WHAT THE

10:39AM 10    WITNESS WAS TESTIFYING TO AND QUESTIONS THAT THE LAWYERS WERE

10:39AM 11    ASKING YESTERDAY.

10:39AM 12         SO I DON'T THINK THAT THERE IS A BASIS TO EXCUSE HER FOR

10:39AM 13    THE DISTRACTION QUESTION.

10:39AM 14              THE COURT:  THANK YOU.

10:39AM 15              MR. DOWNEY:  I THINK THAT'S RIGHT IN TERMS OF THE

10:39AM 16    TOTALITY OF THE COLLOQUY BETWEEN YESTERDAY AND TODAY.  I THINK

10:39AM 17    IT BASICALLY FITS TOGETHER AS MR. SCHENK HAD SAID.

10:39AM 18         I'M NOT SURE ALL OF THE COMMENTARY IS TOTALLY CONSISTENT,

10:39AM 19    BUT I THINK IN RESPONSE TO YOUR HONOR'S FUNDAMENTAL QUESTIONS

10:39AM 20    TODAY, THE ANSWERS SHE GAVE WOULD NOT BE A BASIS FOR DISMISSAL

10:39AM 21    AT THIS TIME.

10:39AM 22              THE COURT:  ALL RIGHT.  WELL, THANK YOU.  AND I

10:39AM 23    ASKED HER THE BLUNT QUESTION WHETHER SHE WANTED TO STAY BASED

10:39AM 24    ON EVERYTHING AND I GAVE HER AN OPPORTUNITY TO EXPRESS, AND SHE

10:40AM 25    DID, SHE DID.  HER THOUGHT PROCESS WAS -- IT WAS ENGAGED, AND

10:40AM 1    FINALLY I THINK SHE SAID YES.  SHE RECOGNIZED -- AND I APPLAUD

10:40AM 2    HER -- SHE RECOGNIZED HER CIVIC OBLIGATION AND THE SOLEMNITY OF

10:40AM 3    JURY SERVICE AND SHE TOLD US, I WOULD WANT ME ON THE JURY, SO I

10:40AM 4    THINK I'LL STAY.

10:40AM 5         SO I THINK THAT'S PROFOUND.  SO I'M NOT GOING TO REMOVE

10:40AM 6    HER, BUT I'M GLAD I CALLED HER IN TO FOLLOW UP ON THAT.

10:40AM 7         OKAY.  ANYTHING FURTHER BEFORE WE GO OFF THE RECORD?

10:40AM 8              MR. SCHENK:  NO.  THANK YOU.

10:40AM 9              MR. DOWNEY:  YOUR HONOR, JUST TWO HOUSEKEEPING

10:40AM 10   MATTERS.

10:40AM 11        IN LIGHT OF THE -- IN LIGHT OF WHERE WE ARE WITH RESPECT

10:40AM 12   TO THIS MATTER, IS IT THE COURT'S PLAN TO INFORM THE JURY TODAY

10:40AM 13   OF THAT, OR --

10:40AM 14             THE COURT:  I THINK SO.  I THINK I WILL.  I DON'T

10:40AM 15   WANT TO KEEP THEM IN SUSPENSE.

10:40AM 16        SO I THINK WHEN WE GO OUT ON THE RECORD, WHAT I'M GOING TO

10:40AM 17   TELL THEM IS WE HAD THE INTERVIEW, I'M GOING TO ASK COUNSEL FOR

10:41AM 18   SOME ADDITIONAL BRIEFING ON THE ISSUE, WE'LL HAVE THAT MOTION,

10:41AM 19   THAT IS, THE MEDIA COALITION'S MOTION AS A SEPARATE HEARING,

10:41AM 20   AND I INTEND TO SCHEDULE A HEARING ON THAT SOMETIME DOWN THE

10:41AM 21   ROAD AFTER ALL COUNSEL HAVE HAD AN OPPORTUNITY TO REVIEW AND

10:41AM 22   PROVIDE INFORMATION, THEIR POSITIONS, TO THE COURT, INCLUDING

10:41AM 23   THE MOVING PARTY.  THAT WILL PROBABLY TAKE FOUR OR FIVE WEEKS

10:41AM 24   BEFORE THE HEARING IS SET I'M JUST THINKING OF THE SCHEDULE.

10:41AM 25             MR. DOWNEY:  AND I WOULD JUST ASK THAT, AS PART OF

10:41AM 1    THAT, THE ADMONITION BE GIVEN THAT THE JURORS NOT CONSIDER THIS

10:41AM 2    AMONGST THEMSELVES OR DISCUSS IT AMONGST THEMSELVES CONSISTENT

10:41AM 3    WITH THEIR OBLIGATIONS WITH RESPECT TO OTHER TRIAL MATTERS.

10:41AM 4        THE OTHER QUESTION I HAD, YOUR HONOR, RELATED TO THE

10:41AM 5    PRESENCE OF THE DEFENDANT.  I THINK I INDICATED THAT WE WERE

10:41AM 6    WILLING TO WAIVE THE DEFENDANT'S APPEARANCE FOR THIS

10:41AM 7    CONFERENCE.

10:41AM 8        I WANT TO JUST MAKE SURE THAT THAT'S SUFFICIENT FOR THE

10:42AM 9    COURT AND THERE'S NOT SOMETHING ELSE THAT THE COURT WANTS TO

10:42AM 10   SEE FILED.

10:42AM 11           THE COURT:  NO.  I DON'T THINK SO.  I THINK YOU TOLD

10:42AM 12   ME PRIOR TO COMING BACK HERE THAT YOU WOULD WAIVE HER

10:42AM 13   APPEARANCE --

10:42AM 14           MR. DOWNEY:  THAT'S CORRECT.

10:42AM 15           THE COURT:  -- AND THAT'S NOTED.  THANK YOU FOR

10:42AM 16   THAT.

10:42AM 17       OKAY.  THANK YOU.  WE'RE OFF THE RECORD.

10:42AM 18       (SEALED PROCEEDINGS ARE CONCLUDED.)

10:45AM 19   ///

10:45AM 20   ///

21

22

23

24

25

```
10:45AM   1        ///

10:45AM   2        ///

11:04AM   3              (PROCEEDINGS IN OPEN COURT.)

11:04AM   4              (COURT CONVENED AT 11:04 A.M.)

11:04AM   5              (JURY IN AT 11:04 A.M.)

11:04AM   6              THE COURT:  THANK YOU.  WE'RE BACK ON THE RECORD.

11:04AM   7        ALL COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT.

11:04AM   8              OUR JURY AND ALTERNATES ARE PRESENT.

11:04AM   9              GOOD MORNING AGAIN, LADIES AND GENTLEMEN.

11:04AM  10              BEFORE WE BEGIN, I DO WANT TO ASK OUR JURY IF OVER THE

11:04AM  11        EVENING WHETHER OR NOT ANY OF YOU HAD COME ACROSS ANY

11:04AM  12        INFORMATION ABOUT THE CASE, IF YOU'VE HAD ANYONE TALK TO YOU

11:04AM  13        ABOUT THE CASE IN ANY WAY, WHETHER YOU'VE LEARNED ANY

11:04AM  14        INFORMATION ABOUT THE CASE FROM ANY MEDIA OR ANY OTHER

11:04AM  15        INSTANCE.

11:04AM  16              IF THAT HAS HAPPENED, WOULD YOU PLEASE RAISE YOUR HAND,

11:05AM  17        PLEASE.

11:05AM  18              I SEE NO HANDS.

11:05AM  19              THANK YOU, LADIES AND GENTLEMEN, FOR YOUR CONTINUED

11:05AM  20        FIDELITY TO THE ADMONITION.

11:05AM  21              I DO WANT TO ASK COUNSEL AND THE JURY A QUESTION.  WE'RE

11:05AM  22        GOING UNTIL 4:00 TODAY, AND I HOPE YOU'VE GOT THAT IN YOUR

11:05AM  23        SCHEDULE.

11:05AM  24              I'VE JUST REALIZED THAT WE HAVE CLEARED OUR CALENDAR

11:05AM  25        TOMORROW.  ON THURSDAYS YOU RECALL THAT I HAVE A CIVIL
```

11:05AM 1   CALENDAR, BUT WE'VE CLEARED OUR CALENDAR TOMORROW, SO IT WOULD

11:05AM 2   BE POSSIBLE THAT WE COULD HAVE TESTIMONY TOMORROW.

11:05AM 3        WOULD THAT -- IS THAT SOMETHING THAT ANY JUROR IS NOT ABLE

11:05AM 4   TO MAKE?  I KNOW WE'VE TRADITIONALLY HAD THURSDAYS OFF, AND I

11:05AM 5   EXPECT THAT YOU HAVE PLANNED ACCORDINGLY.  BUT IF WE WERE ABLE

11:05AM 6   TO HAVE EVIDENCE TOMORROW, WE WOULD PROBABLY GO UNTIL 3:00

11:05AM 7   TOMORROW, IS THAT SOMETHING THAT IS -- THAT THE JURY WOULD BE

11:05AM 8   ABLE TO DO?

11:06AM 9        RESTRAIN YOUR ENTHUSIASM, PLEASE.

11:06AM 10       YES?

11:06AM 11           JUROR:  I MIGHT HAVE TO MOVE SOME THINGS AROUND, BUT

11:06AM 12   POTENTIALLY I COULD.

11:06AM 13           THE COURT:  OKAY.  LET ME DO THIS, LET ME SAY THIS,

11:06AM 14   WHY DON'T -- MAY I FLOAT THAT IDEA FOR YOU NOW?  DURING OUR

11:06AM 15   BREAK, OUR NEXT BREAK, IF YOU COULD MAKE SOME INQUIRIES, IF YOU

11:06AM 16   NEED TO, ABOUT OTHER ARRANGEMENT TO BE MADE, AND THEN I'LL ASK

11:06AM 17   YOU THAT QUESTION WHEN WE COME BACK, WOULD THAT BE SUFFICIENT?

11:06AM 18           JUROR:  (NODS HEAD UP AND DOWN.)

11:06AM 19           THE COURT:  ALL RIGHT.  LET ME ASK THE LAWYERS, IS

11:06AM 20   THAT SOMETHING THAT YOU CAN DO?

11:06AM 21           MR. SCHENK:  YES.

11:06AM 22           MR. DOWNEY:  THAT'S FINE WITH US, YOUR HONOR.

11:06AM 23           THE COURT:  OKAY.  LET'S TRY TO DO THAT.  AND I'M

11:06AM 24   DOING THIS -- WE'VE LOST SOME COURT TIME FOR SOME OTHER

11:06AM 25   PROCEDURES.  I'M TRYING TO CATCH UP AND SEE IF WE CAN KEEP OUR

11:06AM 1    CASE ON SCHEDULE FOR EVERYONE'S CONVENIENCE, INCLUDING YOURS,

11:06AM 2    LADIES AND GENTLEMEN OF THE JURY.

11:06AM 3        SO I APPRECIATE, DURING OUR BREAK, IF YOU COULD MAKE ANY

11:06AM 4    INQUIRIES ABOUT ADJUSTING THINGS.  SO TOMORROW WE WOULD -- MY

11:06AM 5    ANTICIPATION WOULD BE, IF WE'RE ABLE TO, WE WOULD BEGIN AT 9:00

11:07AM 6    AND THEN END AT 3:00 TOMORROW.  PLEASE REMEMBER THAT WE'RE

11:07AM 7    ENDING AT 1:00 O'CLOCK ON FRIDAY.

11:07AM 8        IF, WHEN YOU CHECK IN WITH YOUR EMPLOYERS OR WHATEVER

11:07AM 9    OTHER OBLIGATIONS THAT YOU HAVE, IF THERE'S AN ALTERATION IN

11:07AM 10   THAT SCHEDULE, I WOULD APPRECIATE KNOWING THAT, TOO.  FOR

11:07AM 11   EXAMPLE, IF STARTING LATER AND ENDING EARLIER IS SOMETHING THAT

11:07AM 12   MAKES IT EASIER, I WOULD WELCOME THAT INFORMATION SO WE COULD

11:07AM 13   ADJUST OUR SCHEDULE.

11:07AM 14       ALL RIGHT.  THANK YOU VERY MUCH.  THANK YOU FOR THAT.

11:07AM 15       MR. SCHENK, YOU HAVE A WITNESS?

11:07AM 16           MR. SCHENK:  YES.  THE UNITED STATES RECALLS

11:07AM 17   WADE MIQUELON.

11:07AM 18           THE COURT:  SIR, IF YOU WOULD TAKE THE STAND AGAIN.

11:08AM 19   THANK YOU.

11:08AM 20       AGAIN, ADJUST THE MICROPHONE AS YOU NEED, AND THE CHAIR,

11:08AM 21   AND THERE'S WATER THERE FOR YOUR REFRESHMENT.  I ASSURE YOU WE

11:08AM 22   CHANGE THAT WATER EVERY DAY, SIR, SO IT'S FRESH.

11:08AM 23       (LAUGHTER.)

11:08AM 24           THE WITNESS:  THANK YOU.

11:08AM 25           THE COURT:  WHEN YOU ARE COMFORTABLE, WOULD YOU

11:08AM   1    PLEASE STATE YOUR NAME AGAIN, PLEASE.

11:08AM   2              THE WITNESS:  MY NAME IS WADE MIQUELON.

11:08AM   3              THE COURT:  THANK YOU.  AND I'LL REMIND YOU, SIR,

11:08AM   4    YOU ARE STILL UNDER OATH.

11:08AM   5              **(GOVERNMENT'S WITNESS, WADE MIQUELON, WAS PREVIOUSLY**

11:08AM   6    **SWORN.)**

11:08AM   7              THE COURT:  COUNSEL.

11:08AM   8              MR. SCHENK:  THANK YOU, YOUR HONOR.

11:08AM   9                    **DIRECT EXAMINATION (RESUMED)**

11:08AM  10    Q.   GOOD MORNING, MR. MIQUELON.

11:08AM  11         DO YOU STILL HAVE THE BINDER OF DOCUMENTS IN FRONT OF YOU?

11:08AM  12    A.   I DO.

11:08AM  13    Q.   IF YOU WOULD OPEN THE BINDER UP TO TAB 372, PLEASE.

11:08AM  14         YOUR HONOR, I BELIEVE THIS IS BEING MOVED IN BASED ON A

11:08AM  15    STIPULATION BETWEEN THE PARTIES.

11:08AM  16              MR. DOWNEY:  THAT'S CORRECT, YOUR HONOR.  NO

11:08AM  17    OBJECTION.

11:08AM  18              THE COURT:  THANK YOU.  IT'S ADMITTED, AND IT MAY BE

11:08AM  19    PRESENTED TO THE JURY.  I'M SORRY.

11:08AM  20         (GOVERNMENT'S EXHIBIT 372 WAS RECEIVED IN EVIDENCE.)

11:08AM  21              MR. SCHENK:  THANK YOU, YOUR HONOR.

11:08AM  22    Q.   MR. MIQUELON, WE'RE LOOKING AT A DOCUMENT THAT IS ENTITLED

11:09AM  23    THERANOS MASTER PURCHASE AGREEMENT.

11:09AM  24         DO YOU SEE THAT?

11:09AM  25    A.   YES.

11:09AM 1    Q.   YESTERDAY AT THE CLOSE OF YOUR TESTIMONY WE DISCUSSED

11:09AM 2    EXHIBIT 300, WHICH WAS AN EMAIL THAT YOU WROTE TO OTHERS AT

11:09AM 3    WALGREENS IN ADVANCE OF A PRESENTATION BY FOLKS FROM THERANOS.

11:09AM 4         DO YOU RECALL THAT?

11:09AM 5    A.   YES.

11:09AM 6    Q.   AND THAT WAS AROUND APRIL OF 2010?

11:09AM 7    A.   CORRECT.

11:09AM 8    Q.   AND NOW WE'RE LOOKING AT THE AGREEMENT DATED IN JULY OF

11:09AM 9    2010.

11:09AM 10        COULD YOU BRIEFLY DESCRIBE FOR THE JURY WHAT WAS HAPPENING

11:09AM 11   IN THE THERANOS-WALGREENS RELATIONSHIP BETWEEN THOSE

11:09AM 12   INTERVENING MONTHS FROM THE APRIL MEETING UNTIL THIS JULY

11:09AM 13   AGREEMENT?

11:09AM 14   A.   IN THOSE EARLY MONTHS THERE WAS, AGAIN, INITIAL DILIGENCE

11:09AM 15   DONE IN TERMS OF UNDERSTANDING THERANOS, THE TECHNOLOGY, AND

11:09AM 16   UNDERSTANDING HOW IT MIGHT FIT IN TERMS OF A PARTNERSHIP WITH

11:09AM 17   WALGREENS.

11:09AM 18   Q.   OKAY.  AND DESCRIBE THE PROCESS OF GETTING TO THE STEP OF

11:09AM 19   PUTTING TOGETHER A MASTER PURCHASE AGREEMENT.

11:10AM 20   A.   THERE WAS A MULTI FUNCTIONAL TEAM THAT WAS FORMED,

11:10AM 21   INCLUDING HEALTH CARE PROFESSIONALS.  THERE WAS A CONSULTING

11:10AM 22   FIRM THAT WAS BROUGHT IN THAT HAD EXPERTISE IN LABS TO LOOK AT

11:10AM 23   THERANOS, AS WELL AS THE COMPETITIVE SET OF OTHER COMPANIES OUT

11:10AM 24   THERE.

11:10AM 25        THERE WAS ALSO A CONSULTING FIRM THAT WAS BROUGHT IN THAT

11:10AM  1    SPECIALIZES IN DEFINING NEW BUSINESS MODELS AND HOW THEY MIGHT

11:10AM  2    WORK.

11:10AM  3    Q.   AND AS CFO, WHAT WAS YOUR ROLE IN THIS?

11:10AM  4    A.   I WOULD SAY AN EXECUTIVE SPONSOR TO HELP SUPPORT THE TEAM

11:10AM  5    TO HELP ENABLE THEM AND PROVIDE RESOURCES FOR THEM TO FORM

11:10AM  6    THEIR CONCLUSIONS.

11:10AM  7    Q.   OKAY.  AND WHEN YOU SAY "TO SUPPORT THEM," WHAT DO YOU

11:10AM  8    MEAN?

11:10AM  9    A.   THE TEAM, THE MULTI FUNCTIONAL TEAM AT WALGREENS THAT WAS

11:10AM 10    WORKING ON THE PROJECT.

11:10AM 11    Q.   OKAY.  NOW LET'S TURN TO THE DOCUMENT.  ON THE FIRST PAGE

11:10AM 12    TOWARDS THE BOTTOM THERE'S A SIGNATURE.

11:10AM 13         DO YOU SEE THAT?

11:10AM 14    A.   YES.

11:10AM 15    Q.   AND WHOSE SIGNATURE IS THAT?

11:10AM 16    A.   THAT'S MINE.

11:10AM 17    Q.   ON THE SECOND PAGE TOWARDS THE BOTTOM THERE'S ALSO A

11:11AM 18    SIGNATURE.

11:11AM 19    A.   YES.

11:11AM 20    Q.   AND WHOSE SIGNATURE IS THAT?

11:11AM 21    A.   IT SAYS MS. HOLMES.

11:11AM 22    Q.   OKAY.  NOW LET'S LOOK AT THE THIRD PAGE.  THE THIRD PAGE

11:11AM 23    IS LABELLED SCHEDULE A, AND UNDER NUMBER 2, I'D LIKE TO ASK YOU

11:11AM 24    A QUESTION.  NUMBER 2 IS PROGRAM OBJECTIVES.

11:11AM 25         DO YOU SEE THAT?

11:11AM  1    A.   YES.

11:11AM  2    Q.   IT SAYS THAT "THE OBJECTIVES OF THIS PROGRAM INCLUDE" MAKE

11:11AM  3    BLOOD LAB -- I'M SORRY -- "MAKE BLOOD TESTING FASTER, FAR MORE

11:11AM  4    ACCESSIBLE, EFFECTIVE, ACTIONABLE BY INTRODUCING A MORE COST

11:11AM  5    EFFECTIVE, REAL-TIME BLOOD TESTING SERVICE AT WALGREENS STORES

11:11AM  6    AND WALGREENS' OTHER CLINICAL OPERATIONS NATIONWIDE."

11:11AM  7         IS THAT YOUR UNDERSTANDING OF WHAT THE OBJECTIVE WAS?

11:11AM  8    A.   YES.

11:11AM  9    Q.   AND IT DESCRIBES MAKING BLOOD TESTING FASTER AND MORE

11:11AM 10    ACCESSIBLE, EFFECTIVE AND ACTIONABLE, WHAT DID THAT MEAN?

11:12AM 11    A.   THAT WAS THE NOTION OF HAVING THERANOS LAB TESTING AT

11:12AM 12    WALGREENS.

11:12AM 13    Q.   AND WHY WAS THERANOS BLOOD TESTING AT WALGREENS FASTER?

11:12AM 14    A.   AGAIN, AS WE HAVE TALKED A LITTLE BIT YESTERDAY, WHEN YOU

11:12AM 15    LOOK AT THE THERANOS TECHNOLOGY AND THE ABILITY TO ENTER A

11:12AM 16    BLOOD SAMPLE INTO AN EDISON AND GET RESULTS IN, YOU KNOW,

11:12AM 17    15 MINUTES THAT THEN COULD BE MOVED TO THE CLOUD FOR

11:12AM 18    ASSESSMENT, THAT WOULD BE A FASTER PROCESS THAN CONVENTIONAL

11:12AM 19    LAB.

11:12AM 20    Q.   AND AT THIS STAGE OF THE RELATIONSHIP BETWEEN WALGREENS

11:12AM 21    AND THERANOS, WAS YOUR UNDERSTANDING THAT THE EDISON DEVICE

11:12AM 22    WOULD BE USED TO TEST PATIENT'S BLOOD?

11:12AM 23    A.   YES.  BUT THERE WAS A LOT OF BACK AND FORTH OVER THE

11:12AM 24    SUBJECT OF MONTHS IN TERMS OF WHETHER IT WAS BETTER TO HAVE

11:12AM 25    THAT DEVICE IN A STORE OR NOT IN A STORE, AND WHETHER IT SHOULD

11:12AM  1    ONLY BE THE NANOTAINER OR THE BLOOD DRAW THAT WOULD BE IN THE

11:12AM  2    STORE OR WHETHER THE EDISON DEVICE WOULD BE THERE AS WELL.

11:13AM  3    Q.   OKAY.  SO THERE WAS SOME DISCUSSION ABOUT WHERE THE DEVICE

11:13AM  4    WOULD BE LOCATED.  BUT HOW ABOUT ON WHAT DEVICE THE BLOOD WOULD

11:13AM  5    BE TESTED.

11:13AM  6    A.   RIGHT.

11:13AM  7    Q.   WHAT WAS YOUR UNDERSTANDING?

11:13AM  8    A.   MY UNDERSTANDING WAS THAT THE BLOOD WOULD BE TESTED ON THE

11:13AM  9    EDISON DEVICE.

11:13AM  10   Q.   AND WHERE DID YOU GET THAT UNDERSTANDING?

11:13AM  11   A.   FROM MY DISCUSSIONS WITH SUNNY AND ELIZABETH, AND THROUGH

11:13AM  12   OUR DILIGENCE, THAT WAS OUR COMPANY'S UNDERSTANDING.

11:13AM  13   Q.   OKAY.  IF YOU COULD TURN THE PAGE NOW TO PAGE 6.  PAGE 6

11:13AM  14   IS SCHEDULE B.  AND UNDER NUMBER 2, BEST PRICE GUARANTEE.

11:13AM  15       DO YOU SEE THAT?

11:13AM  16   A.   AGAIN, WHICH SECTION?

11:13AM  17   Q.   PAGE 6, SCHEDULE B, AND THEN THE SECOND SECTION, 2.

11:13AM  18   A.   YES.

11:13AM  19   Q.   BEST PRICE GUARANTEE?

11:13AM  20   A.   RIGHT.

11:13AM  21   Q.   ON THE BOTTOM, TOWARDS THE BOTTOM OF THIS PARAGRAPH IT

11:13AM  22   SAYS, FOR PURPOSES OF THIS AGREEMENT AVAILABLE CARTRIDGES

11:14AM  23   INCLUDE FIRST GENERATION CARTRIDGES OF THERANOS SYSTEMS

11:14AM  24   VERSIONS 1, 2, AND 3 AS DEFINED BELOW, AND NOW WE SEE A, B, AND

11:14AM  25   C, VERSION 1, OR V1, VERSION 2 AND VERSION 3.

11:14AM    1        DO YOU SEE THAT?

11:14AM    2   A.   YES.

11:14AM    3   Q.   AND WHAT WAS YOUR UNDERSTANDING ABOUT THE INFORMATION

11:14AM    4   CONVEYED IN THIS SECTION OF THE AGREEMENT?

11:14AM    5   A.   ESSENTIALLY MY UNDERSTANDING OF THIS SECTION WAS TO MAKE

11:14AM    6   SURE THAT BY WORKING WITH THERANOS WE WOULD HAVE SOME FORM OF

11:14AM    7   EXCLUSIVITY, AS WELL AS BEST -- MOST FAVORED NATION PRICING

11:14AM    8   AROUND THE TESTS THAT WERE CURRENTLY AVAILABLE ALSO AROUND THE

11:14AM    9   TESTS THAT WOULD HOPEFULLY BE DEVELOPED IN THE FUTURE.

11:14AM   10   Q.   AND WHY WAS THAT IMPORTANT TO WALGREENS?  WHY WAS FAVORED

11:14AM   11   PRICING IMPORTANT TO WALGREENS?

11:14AM   12   A.   WELL, I THINK IT WAS THE NOTION THAT IF WE WERE GOING TO

11:14AM   13   HAVE A DEEP PARTNERSHIP AND BE INVESTING TOGETHER IN RESOURCES

11:14AM   14   AND TIME AND MONEY, THAT THAT SHOULD GIVE THE COMPANY SOME

11:15AM   15   COMPETITIVE ADVANTAGE VERSUS SOMEONE ELSE WHO HADN'T DONE THAT

11:15AM   16   AND WHO MIGHT CHOOSE TO PARTNER WITH THEM.

11:15AM   17   Q.   UNDER A VERSION 1, OR V1, IT SAYS "ALL ROUTINE LABORATORY

11:15AM   18   TESTS SPECIFIED ON SCHEDULE D."

11:15AM   19        NOW, IF YOU'LL FOLLOW ME TO PAGE 23.

11:15AM   20        DO YOU SEE ON SCHEDULE D, PAGE 23, WHERE IT SAYS "ROUTINE

11:15AM   21   LABORATORY TESTS (VERSION 1); LIST ATTACHED TO END OF

11:15AM   22   AGREEMENT."

11:15AM   23        DO YOU SEE THAT?

11:15AM   24   A.   YES, I SEE THAT.

11:15AM   25   Q.   AND THEN IF WE GO TO PAGE 37, THE END OF THE AGREEMENT, DO

11:15AM    1    YOU SEE THE FIRST PAGE OF EIGHT PAGES OF THERANOS BASE ASSAY

11:16AM    2    LIBRARY?

11:16AM    3    A.   YES.

11:16AM    4    Q.   AND IF WE COULD ON THE SCREEN SCROLL THROUGH THE NEXT

11:16AM    5    EIGHT PAGES TO SHOW THE JURY THE ASSAY LIBRARY BEGINNING ON

11:16AM    6    PAGE 37.

11:16AM    7         MR. MIQUELON, WHAT WAS YOUR UNDERSTANDING OF WHAT THIS

11:16AM    8    WAS, THE BASE ASSAYS LIBRARY?

11:16AM    9    A.   THIS WAS MY UNDERSTANDING OF THE TESTS THAT THEY WOULD BE

11:16AM   10    ABLE TO DO, AS WELL AS SCALE.  AND BY "SCALE" I MEAN DOING ONES

11:16AM   11    ON A BETA MACHINE WOULD BE ONE THING, BUT TO BE ABLE TO DEVELOP

11:16AM   12    CONSISTENT MACHINES, MULTIPLE CARTRIDGES, I.T. INFRASTRUCTURE

11:16AM   13    SYSTEMS AROUND IT WERE PART OF THE PROPOSITION, THIS WOULD BE

11:16AM   14    KIND OF THE, KIND OF THE BASE LEVEL TESTING, IF YOU WILL, THAT

11:16AM   15    WOULD BE READY FOR A LAUNCH AT SOME POINT.

11:16AM   16    Q.   OKAY.  AND NOW IF WE COULD GO BACK JUST BRIEFLY TO

11:16AM   17    EXHIBIT 300.

11:17AM   18         AT THE BOTTOM NUMBER 2 UNDER YOUR LIST OF REASONS, NUMBER

11:17AM   19    2 IS THE REASONS WHY WE'RE SO ENCOURAGED ARE 96 PERCENT OF

11:17AM   20    TESTS DONE AT BIG LABS WILL BE ABLE TO BE DONE ON THESE

11:17AM   21    DEVICES.

11:17AM   22         DID YOU UNDERSTAND THAT THE THERANOS BASE ASSAYS LIBRARY

11:17AM   23    WAS 96 PERCENT OF THE LAB TESTS DONE AT BIG LABS?

11:17AM   24    A.   MY UNDERSTANDING WAS THAT, AGAIN, THE PLATFORM THAT WAS

11:17AM   25    BUILT FOR THAT BASE LEVEL TESTING WOULD BE ABLE TO DO

11:17AM 1    96 PERCENT OF THE TESTING DONE AT LABS THROUGH, AGAIN, THE

11:17AM 2    BLOOD, SALIVA OR THE URINE THROUGH THE IMMUNOASSAY TESTING.

11:17AM 3    Q.   AND DID YOU GET THIS UNDERSTANDING FROM YOUR CONVERSATIONS

11:17AM 4    WITH MS. HOLMES?

11:17AM 5    A.   IT WAS FROM MY CONVERSATION WITH BOTH SUNNY AND ELIZABETH.

11:17AM 6    Q.   AND ALSO FROM THE POWERPOINT SLIDE OR DOCUMENTS THAT THEY

11:17AM 7    SHOWED TO YOU, DID YOU GET THE UNDERSTANDING FROM DOCUMENTS

11:18AM 8    ALSO?

11:18AM 9    A.   THAT WAS MY UNDERSTANDING.

11:18AM 10   Q.   OKAY.  NOW, IF WE COULD GO TO -- BACK TO EXHIBIT 372,

11:18AM 11   PAGE 6.

11:18AM 12       WE TALKED ABOUT THE V1.  NOW I'D LIKE TO MOVE DOWN TO

11:18AM 13   VERSION 2.

11:18AM 14       DO YOU SEE THAT?

11:18AM 15   A.   YES.

11:18AM 16   Q.   NO, I'M SORRY.  ON 372, PAGE 6 AT THE TOP 2B UNDER BEST

11:18AM 17   PRICE GUARANTEE B?

11:18AM 18   A.   YES.

11:18AM 19   Q.   B READS, THE FOLLOWING LABORATORY TESTS INCLUDING, BUT NOT

11:18AM 20   LIMITED TO, INFLUENZA/STREP, PREGNANCY, FERTILITY,

11:18AM 21   PRENATAL/TRIMESTER, AND THEN IT CONTINUES, THAT THEY WILL

11:19AM 22   MEMORIALIZE THE CPT CODES THAT ARE INCLUDED IN VERSION TO AS

11:19AM 23   SUCH CODES BECOME AVAILABLE.

11:19AM 24       WHAT WAS YOUR UNDERSTANDING ABOUT VERSION 2?

11:19AM 25   A.   MY UNDERSTANDING ABOUT VERSION 2 IS THOSE WOULD BE PERHAPS

11:19AM 1    MORE COMPLEX TESTS AND LESS COMMONPLACE THAN THE V1 TESTS, THAT

11:19AM 2    THEY WERE WORKING ON THOSE TO SOME DEGREE TO BRING THEM INTO

11:19AM 3    THE FUTURE.

11:19AM 4    Q.   AND THEN HOW ABOUT VERSION 3?  VERSION 3 TALKS ABOUT

11:19AM 5    PREDICTIVE TESTS.  DID YOU HAVE AN UNDERSTANDING ABOUT THOSE

11:19AM 6    TESTS?

11:19AM 7    A.   AGAIN, AS I ALLUDED TO YESTERDAY, VERSION 3 WAS IN SOME

11:19AM 8    WAYS PREDICTIVE TESTS THAT WERE NEW TO THE WORLD, AND AGAIN,

11:19AM 9    THEY WERE WORKING ON SEVERAL OF THOSE WITHOUT ANY GUARANTEE OR

11:19AM 10   PROMISE THAT THOSE WOULD COME TO FRUITION.  BUT TO THE EXTENT

11:19AM 11   THAT THEY DID, WE WOULD HOPE THAT WE WOULD HAVE PRIORITY ON

11:19AM 12   THOSE AS WELL.

11:19AM 13   Q.   SO IN 2010 WHEN YOU WERE NEGOTIATING AND SIGNING THIS

11:19AM 14   AGREEMENT, DID YOU HAVE AN UNDERSTANDING THAT THERANOS HAD THE

11:19AM 15   ABILITY TO DO SOME TESTS, LIKE THE VERSION 1 TESTS, PRESENTLY,

11:20AM 16   AND THAT THERE WERE OTHER TESTS THAT THEY WERE WORKING ON AND

11:20AM 17   WOULD BECOME AVAILABLE IN THE FUTURE?

11:20AM 18   A.   THAT WAS MY UNDERSTANDING.

11:20AM 19        AND AGAIN, TO THE EXTENT THAT THEY BECAME AVAILABLE, OR

11:20AM 20   NOT, AGAIN, VERSION 3 IS IN SOME WAYS VERY FUTURISTIC STILL,

11:20AM 21   BUT IF THEY WERE TO BECOME AVAILABLE, WE WOULD BE FIRST IN THE

11:20AM 22   QUEUE TO BE ABLE TO VISUALIZE THOSE.

11:20AM 23   Q.   I SEE.  IF YOU WOULD NOW TURN TO PAGE 10 IN THIS EXHIBIT,

11:20AM 24   THERE'S A SECTION CALLED CRITICAL VALUES.

11:20AM 25        UNDER CRITICAL VALUES IT SAYS, IN THE EVENT A RESULT

11:20AM 1    REFLECTS ONE OR MORE VALUES AT SUCH VARIANCE WITH NORMAL AS TO

11:20AM 2    BE POTENTIALLY LIFE-THREATENING, OTHERWISE KNOWN AS A CRITICAL

11:20AM 3    VALUE, THERANOS WOULD BE SOLELY RESPONSIBLE FOR NOTIFYING THE

11:20AM 4    ORDERING PRACTITIONER, THE TECHNICIAN THAT PERFORMED THE TEST,

11:20AM 5    AND TO THE EXTENT REQUIRED BY STATE LAW, ANY OTHER INDIVIDUALS

11:21AM 6    OR ENTITIES OF THE CRITICAL VALUE AND USING COMMERCIALLY

11:21AM 7    REASONABLE EFFORTS TO VERIFY THAT THE ORDERING PRACTITIONER

11:21AM 8    RECEIVED NOTIFICATION OF THE CRITICAL VALUE.

11:21AM 9        DID YOU HAVE AN UNDERSTANDING REGARDING WHOSE OBLIGATION

11:21AM 10   IT WAS TO NOTIFY PHYSICIANS IF A BLOOD TEST RESULTED IN A

11:21AM 11   CRITICAL VALUE?

11:21AM 12   A.   YEAH, I'M NOT A HEALTH CARE PROFESSIONAL, BUT MY

11:21AM 13   UNDERSTANDING WAS THAT THE PATIENT WAS EFFECTIVELY THEIR

11:21AM 14   PATIENT AND SO IT WAS VERY IMPORTANT BECAUSE THEY WOULD HAVE

11:21AM 15   THEIR DATA, AND BECAUSE OF THE STARK LAWS THAT HAS TO BE

11:21AM 16   PROTECTED, THAT IT WOULD BE THEIR RESPONSIBILITY TO DO ANY OF

11:21AM 17   THE FOLLOW-UP WORK AROUND THE DATA OF THEIR PATIENT.

11:21AM 18   Q.   AND DID YOU EXPECT THERANOS TO FOLLOW THROUGH ON THIS?

11:21AM 19   A.   MY ASSUMPTION WOULD BE YES.

11:21AM 20   Q.   IF YOU'LL TURN NOW TO PAGE 24.

11:21AM 21       ON PAGE 24 THERE ARE SOME DEFINITIONS, AND THE ONE I WOULD

11:22AM 22   LIKE TO ASK YOU ABOUT IS NUMBER 10, DEVICE.

11:22AM 23       DEVICE READS, "DEVICE MEANS THERANOS'S READER CAPABLE OF

11:22AM 24   RUNNING CARTRIDGES, EXTRACTING DATA FROM A CARTRIDGE OR OTHER

11:22AM 25   ANALYTICAL DEVICE, TRANSMITTING DATA TO A DATABASE HOSTED BY

11:22AM  1    THERANOS, COMMUNICATING WITH AUTHORIZED PARTIES AND PROVIDING

11:22AM  2    ANALYTICAL INFORMATION."

11:22AM  3        DID YOU UNDERSTAND THAT THE DEVICE THAT THERANOS WOULD BE

11:22AM  4    USING TO TEST BLOOD WAS THE EDISON DEVICE?

11:22AM  5    A.   THAT WAS MY UNDERSTANDING.  I DON'T KNOW AT WHAT TIME IT

11:22AM  6    WAS COINED AS THE EDISON, BUT IT WAS ESSENTIALLY THE SAME

11:22AM  7    DEVICE.

11:22AM  8    Q.   YOU UNDERSTOOD IT WAS A DEVICE MANUFACTURED BY THERANOS?

11:22AM  9    A.   RIGHT.

11:22AM 10    Q.   DID YOU UNDERSTAND THAT THERANOS WOULD BE TESTING

11:22AM 11    PATIENT'S BLOOD ON MODIFIED THIRD PARTY OR OTHER MANUFACTURER'S

11:22AM 12    DEVICE?

11:22AM 13    A.   IT WASN'T MY UNDERSTANDING, NO.

11:22AM 14    Q.   DID YOU UNDERSTAND THAT THERANOS WOULD BE TESTING BLOOD ON

11:22AM 15    UNMODIFIED THIRD PARTY DEVICES, DEVICES MANUFACTURED BY OTHER

11:22AM 16    COMPANIES AND NOT MODIFIED BY THERANOS?

11:23AM 17    A.   AGAIN, MY UNDERSTANDING WAS TO THE EXTENT THAT THEY WERE

11:23AM 18    DOING THAT, THAT WAS PART OF THE CALIBRATION PROCESS TO BE ABLE

11:23AM 19    TO MAKE SURE THAT THERANOS WAS AS ACCURATE AS.

11:23AM 20    Q.   IS THE CONCEPT THAT YOU EXPLAINED TO ME YESTERDAY, THAT

11:23AM 21    THEY MAY HAVE USED, THERANOS MAY HAVE USED THIRD PARTY DEVICES,

11:23AM 22    BUT FOR THE PURPOSE OF CONFIRMING THE ACCURACY OF THEIR DEVICE;

11:23AM 23    IS THAT RIGHT?

11:23AM 24    A.   THAT WAS MY UNDERSTANDING, YES.

11:23AM 25    Q.   IF NOW YOU'LL TURN TO EXHIBIT 488.

11:23AM  1          DO YOU RECOGNIZE EXHIBIT 488?

11:23AM  2     A.   YES, I DO.

11:23AM  3     Q.   IS THIS AN EMAIL WITHIN WALGREENS, INCLUDING YOU, THAT

11:23AM  4     CONTAINS AS AN ATTACHMENT SOMETHING CALLED PROJECT BETA SLIDES?

11:23AM  5     A.   YES, THAT'S CORRECT.

11:23AM  6     Q.   AND WERE THOSE SLIDES DISCUSSING THE THERANOS PROJECT?

11:23AM  7     A.   YES.

11:24AM  8          MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 488.

11:24AM  9          MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

11:24AM 10          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:24AM 11     (GOVERNMENT'S EXHIBIT 488 WAS RECEIVED IN EVIDENCE.)

11:24AM 12          MR. SCHENK:  THANK YOU.

11:24AM 13     Q.   FIRST LET'S JUST TALK ABOUT THE RECIPIENTS ON THE EMAIL.

11:24AM 14          DO YOU KNOW WHO THIS, GENERALLY SPEAKING, WHO THIS GROUP

11:24AM 15     OF INDIVIDUALS, WHO THIS WAS?

11:24AM 16     A.   YES.

11:24AM 17     Q.   WHO?

11:24AM 18     A.   THE GROUP THAT IT'S TO WOULD INCLUDE MANY OF THE SENIOR

11:24AM 19     LEADERS OF THE COMPANY, AS WELL AS HEALTH CARE EXPERTS IN THE

11:24AM 20     COMPANY, AS WELL AS OTHER LEADERS WHO HAVE BEEN IDENTIFIED TO

11:24AM 21     BE ON THE PROJECT TEAM.

11:24AM 22     Q.   OKAY.  AND WHEN YOU SAY "THE PROJECT TEAM"?

11:24AM 23     A.   THE THERANOS PARTNERSHIP PROJECT TEAM.

11:24AM 24     Q.   OKAY.  THE DATE ON THIS IS -- IT WAS SENT AT THE BEGINNING

11:24AM 25     OF NOVEMBER, BUT FOR A MEETING IT LOOKS LIKE AT THE BEGINNING

11:24AM 1    OF DECEMBER OF 2011.

11:24AM 2        DO YOU SEE THAT?

11:24AM 3    A.   YES.

11:24AM 4    Q.   AND THE LAST DOCUMENT THAT WE WERE LOOKING AT WAS THE

11:24AM 5    AGREEMENT THAT WAS SIGNED IN THE SUMMER OF 2010.

11:24AM 6    A.   YES.

11:24AM 7    Q.   NOW, WE'VE MOVED ABOUT A YEAR AND A HALF LATER TO THE END

11:25AM 8    OF 2011?

11:25AM 9    A.   YES.

11:25AM 10   Q.   I WONDER IF YOU'LL EXPLAIN TO THE JURY WHAT HAPPENED IN

11:25AM 11   THAT YEAR AND A HALF WITH REGARD TO THE THERANOS PROJECT?  WHAT

11:25AM 12   WORK WAS HAPPENING?

11:25AM 13   A.   THERE WAS A LOT MORE TO DO THAN JUST SPECIFIC TO THE

11:25AM 14   TECHNOLOGY.  SO THERE WAS A LOT OF WORK TO DO TO UNDERSTAND,

11:25AM 15   FOR EXAMPLE, THE BUSINESS MODEL.

11:25AM 16       BY BUSINESS MODEL, YOU KNOW, WHERE WOULD THE MACHINES

11:25AM 17   RESIDE IN A WALGREENS ESSENTIALLY?  WHO WOULD OWN THE PATIENT?

11:25AM 18   HOW WOULD MEDICAL BILLING WOULD WORK?  WHAT I.T. AND

11:25AM 19   INFORMATION WOULD BE REQUIRED?  WHAT APPROVALS MIGHT BE

11:25AM 20   REQUIRED?

11:25AM 21       SO JUST A LOT OF OTHER WORK THAT HAD TO BE DONE TO SUPPORT

11:25AM 22   THE TECHNOLOGY.

11:25AM 23   Q.   OKAY.  AND THAT WORK WAS HAPPENING AFTER SIGNING THAT

11:25AM 24   PURCHASE AGREEMENT UP THROUGH THIS TIME WHEN WE'RE LOOKING AT

11:25AM 25   THESE SLIDES?

11:25AM  1    A.   YEAH, THAT WORK HAD CONTINUED ON FOR PROBABLY YEARS AFTER

11:25AM  2    THIS AS WELL.

11:25AM  3    Q.   OKAY.  IF YOU'LL TURN NOW TO THE FIRST PAGE OF THE SLIDES,

11:25AM  4    IT'S PAGE 3.  IT'S CALLED PROJECT BETA.

11:26AM  5         WHAT DOES THAT MEAN?

11:26AM  6    A.   THE PROJECT HAD DIFFERENT CODE NAMES OVER TIME.  BETA WAS

11:26AM  7    ONE CODE NAME, AND I THINK AT SOME POINT IT WAS CALLED PROJECT

11:26AM  8    NORMANDY.  BUT IT WAS DIFFERENT NAMES FOR THE SAME PROJECT,

11:26AM  9    WHICH WAS THE THERANOS PARTNERSHIP.

11:26AM 10    Q.   WAS THAT AN INTERNAL WALGREENS NAME FOR THE PROJECT?

11:26AM 11    A.   CORRECT.  I DON'T KNOW -- I THINK MAYBE THE JOINT NAME WE

11:26AM 12    HAD WAS NORMANDY ULTIMATELY, BUT I'M NOT CERTAIN.

11:26AM 13    Q.   OKAY.  AND NOW IF YOU'LL TURN TO PAGE 8.

11:26AM 14         ON PAGE 8, NUMBER 6 IS WHAT I WANT TO ASK YOU ABOUT.

11:26AM 15         NUMBER 6 SAYS, "THERANOS NATIONAL ROLLOUT WITH WALGREENS

11:26AM 16    (PENDING PILOT OUTCOME)."

11:26AM 17         WHAT DOES THAT MEAN?

11:26AM 18    A.   THIS WAS THE HYPOTHESIS OR THE ILLUSTRATIVE VERSION OF IF

11:26AM 19    WE WERE TO DO A PILOT AND GET CERTAIN SUCCESS METRICS, THEN WE

11:27AM 20    WOULD EXPAND TO THE NEXT LEVEL, AND IF THAT WAS SUCCESSFUL,

11:27AM 21    THEN WE WOULD EXPAND TO THE NEXT LEVEL.

11:27AM 22         SO THIS WAS, AGAIN, KIND OF AN ILLUSTRATIVE TIMELINE OF

11:27AM 23    WHAT SUCCESS COULD LOOK LIKE AT THAT POINT.

11:27AM 24    Q.   WHEN YOU SAY HAVE A PILOT, WHAT DO YOU MEAN BY THAT?

11:27AM 25    A.   SOME LEVEL OF YOU, YOU KNOW, NUMBER OF STORES, YOU KNOW,

11:27AM  1    WHETHER ONE OR A FEW TO BE ABLE TO UNDERSTAND, YOU KNOW, WHAT

11:27AM  2    IS THE PATIENT EXPERIENCE LIKE?  IS IT GOING WELL?  IS MEDICAL

11:27AM  3    BILLING HAPPENING PROPERLY?  ARE HEALTH CARE PLANS ACCEPTING

11:27AM  4    IT?  ARE DOCTORS RECOMMENDING IT?  THOSE KINDS OF THINGS.

11:27AM  5    Q.   AND THEN WOULD WALGREENS EVALUATE THE SUCCESS, SORT OF THE

11:27AM  6    METRICS YOU'VE DESCRIBED, TO DETERMINE WHETHER TO MOVE TO THE

11:27AM  7    NEXT PHASE?

11:27AM  8    A.   YEAH, I WOULD SAY IT WOULD BE A JOINT EVALUATION.  YOU

11:27AM  9    KNOW, BOTH PARTIES WOULD WANT THE KEY METRICS THAT WERE

11:27AM  10    IMPORTANT TO BE SATISFIED.

11:27AM  11    Q.   WAS A NATIONAL ROLLOUT EVER GUARANTEED?

11:27AM  12    A.   NO, NEVER GUARANTEED.  ALWAYS PENDING SUCCESS.

11:27AM  13    Q.   WAS THERE A PILOT AT SOME POINT?

11:27AM  14    A.   THERE WAS A PILOT.

11:27AM  15    Q.   AND WAS THERE ONE OR MORE PEOPLE AT WALGREENS WHOSE JOB IT

11:28AM  16    WAS TO EVALUATE SUCCESS TO DETERMINE WHETHER SOME OF THE

11:28AM  17    METRICS HAD BEEN MET?

11:28AM  18    A.   MULTIPLE PEOPLE.

11:28AM  19    Q.   WAS THAT YOUR JOB OR SOMEBODY ELSE'S?

11:28AM  20    A.   IT WAS NOT MY JOB.  IT WAS THE PROJECT TEAM'S.

11:28AM  21    Q.   OKAY.  NOW WE CAN TURN TO PAGE 5 -- I'M SORRY,

11:28AM  22    EXHIBIT 503.

11:28AM  23        503 LOOKS LIKE AN EMAIL FROM DR. ROSAN TO YOU CONTAINING

11:28AM  24    SOME SLIDES.

11:28AM  25        DO YOU SEE THAT?

11:28AM   1       A.   YES.

11:28AM   2       Q.   AND ARE THE SLIDES, SLIDES THAT WERE PRESENTED TO

11:28AM   3   WALGREENS BY THERANOS?

11:28AM   4       A.   YES.

11:28AM   5              MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 503.

11:28AM   6              MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

11:28AM   7              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:28AM   8       (GOVERNMENT'S EXHIBIT 503 WAS RECEIVED IN EVIDENCE.)

11:28AM   9   BY MR. SCHENK:

11:28AM  10       Q.   THE DATE ON THIS ONE IS JANUARY 2012.  SO WE'VE NOW MOVED

11:28AM  11   INTO THE BEGINNING OF THE NEXT YEAR, 2012.

11:28AM  12           THE SUBJECT IS, HERE IS THE SLIDE SHOW THAT WAS PRESENTED

11:28AM  13   TO US BY SUNNY AND ELIZABETH.

11:29AM  14           MR. BALWANI AND MS. HOLMES; IS THAT CORRECT?

11:29AM  15       A.   CORRECT.

11:29AM  16       Q.   AND NOW IF WE CAN TURN TO SOME OF THE SLIDES.  THE

11:29AM  17   FIRST -- LET'S LOOK AT THE FIRST PAGE OF THE SLIDES.  IT'S

11:29AM  18   PAGE 2 OF THE EXHIBIT.

11:29AM  19           IT'S ENTITLED PROJECT NORMANDY BRIEFING.

11:29AM  20           WHAT IS PROJECT NORMANDY?

11:29AM  21       A.   PROJECT NORMANDY IS -- IT'S BASICALLY THE SAME AS PROJECT

11:29AM  22   BETA.  I THINK IT'S WHAT THE NAME MORPHED INTO.

11:29AM  23       Q.   OKAY.  THE RELATIONSHIP BETWEEN WALGREENS AND THERANOS --

11:29AM  24       A.   RIGHT.

11:29AM  25       Q.   -- WAS CALLED PROJECT NORMANDY?

11:29AM 1    A.   RIGHT.

11:29AM 2    Q.   IF WE CAN TURN TO PAGE 3.

11:29AM 3         PAGE 3 IS CALLED WALGREENS THERANOS PARTNERSHIP

11:29AM 4    OBJECTIVES.

11:29AM 5         DO YOU SEE THAT?

11:29AM 6    A.   YES.

11:29AM 7    Q.   AND ABOUT THREE UP FROM IT THE BOTTOM WE SEE, "NEW GROWTH

11:29AM 8    DRIVER FOR EMPLOYER BUSINESS.

11:29AM 9         "LOWEST COST, HIGHEST QUALITY TESTING FROM A FINGERSTICK."

11:29AM 10        WHEN MS. HOLMES AND MR. BALWANI WERE DESCRIBING THE

11:30AM 11   BUSINESS OPPORTUNITY FOR WALGREENS, DID THEY TALK ABOUT COST?

11:30AM 12   A.   WE DID.

11:30AM 13   Q.   AND WHAT DID YOU HEAR?

11:30AM 14   A.   WE TALKED ABOUT THE OPPORTUNITY AT SCALE, AGAIN, TO BE

11:30AM 15   ABLE TO BE BETTER, FASTER, AND CHEAPER THAN A CONVENTIONAL LAB

11:30AM 16   BECAUSE YOU WERE EFFECTIVELY CUTTING OUT A LOT OF WASTE IN

11:30AM 17   TERMS OF REAL ESTATE, SUPPLY CHAIN, HANDOFFS, EXPENSES,

11:30AM 18   CONVENTIONAL MACHINES.

11:30AM 19   Q.   AND IF THERANOS USED CONVENTIONAL MACHINES, FOR EXAMPLE,

11:30AM 20   WOULD YOU LOSE SOME OF THE COST BENEFIT THAT YOU JUST

11:30AM 21   DESCRIBED?

11:30AM 22   A.   YOU WOULD.

11:30AM 23   Q.   AND IF YOU NEEDED TO USE COURIERS, OR HANDOFF AS YOU JUST

11:30AM 24   DESCRIBED, WOULD YOU ALSO LOSE SOME OF THE COST BENEFIT?

11:30AM 25   A.   YOU WOULD LOSE SOME.

11:30AM  1    Q.   IT NEXT SAYS, "HIGHEST QUALITY TESTING FROM A

11:30AM  2    FINGERSTICK."

11:30AM  3         WHAT WAS YOUR UNDERSTANDING OF WHAT THAT REFERRED TO?

11:30AM  4    A.   MY UNDERSTANDING WAS THAT THE TEST RESULTS FOR THE TESTS

11:30AM  5    THAT THEY WERE DOING AND VALIDATING WERE AS GOOD AS, THEY WERE

11:31AM  6    HIGHLY CORRELATED TO A TRADITIONAL LAB.

11:31AM  7         THE QUALITY COMES IN AGAIN BECAUSE, LIKE I SAID BEFORE, A

11:31AM  8    FEW REASONS.  NUMBER ONE IS I WAS TOLD THAT YOU COULD CALIBRATE

11:31AM  9    EVERY MACHINE VERSUS ANOTHER MACHINE SO YOU DON'T HAVE THIS

11:31AM 10    ISSUE OF DIFFERENT CALIBRATIONS FOR DIFFERENT MACHINES FOR

11:31AM 11    DIFFERENT TESTS, AS WELL AS THE FACT THAT SOME TESTS ARE

11:31AM 12    ULTIMATELY REJECTED BY A CONVENTIONAL LAB AND THAT THEIR

11:31AM 13    REJECTION RATE WAS THUS FAR LOWER THAN THAT.

11:31AM 14         AND ALSO JUST IS THE FACT THAT IF YOU'RE ABLE TO, YOU

11:31AM 15    KNOW, GET A TEST DONE AND RESULTS BACK SOONER, THAT'S ALSO

11:31AM 16    BENEFICIAL FOR A PATIENT.

11:31AM 17    Q.   YOU DESCRIBED THE CALIBRATION BETWEEN MACHINES.

11:31AM 18         COULD YOU EXPLAIN THAT TO ME?

11:31AM 19    A.   AGAIN, MY UNDERSTANDING IS THAT THERE'S AN ACCEPTABLE

11:31AM 20    RANGE FOR ANY GIVEN MACHINE FOR WHAT THE TOLERANCE CAN BE, BUT

11:31AM 21    THAT TWO DIFFERENT MACHINES FROM TWO DIFFERENT MANUFACTURERS

11:31AM 22    FOR THE SAME TEST MIGHT HAVE SLIGHTLY DIFFERENT CALIBRATION

11:31AM 23    PARAMETERS.

11:31AM 24         SO IF YOU -- AGAIN, I USE THE EXAMPLE IF YOU GOT A PSA

11:32AM 25    TEST ONE DAY ON ONE MACHINE AND THE RESULTS CAME BACK ON

11:32AM  1    ANOTHER MACHINE, THEY MAY NOT BE EXACTLY APPLES AND APPLES, BUT

11:32AM  2    BECAUSE IF YOU STAYED WITHIN THE THERANOS SYSTEM ON THEIR

11:32AM  3    MACHINES, THAT THOSE MACHINES ESSENTIALLY WOULD BE CALIBRATED

11:32AM  4    VERSUS EACH OTHER AND THEN YOU WOULD BE RELYING UPON THAT DATA

11:32AM  5    AT A HIGHER LEVEL.

11:32AM  6    Q.   AND WHO DID YOU GET THAT UNDERSTANDING FROM?

11:32AM  7    A.   JUST I THINK THROUGH THE DISCUSSIONS WITH ELIZABETH AND

11:32AM  8    SUNNY.

11:32AM  9    Q.   AND IT ALSO SAYS THIS HIGHEST QUALITY TESTING FROM A

11:32AM  10   FINGERSTICK.

11:32AM  11        DID YOU HAVE AN UNDERSTANDING ABOUT HOW THE BLOOD WOULD BE

11:32AM  12   DRAWN?

11:32AM  13   A.   I DID.

11:32AM  14   Q.   AND WHAT WAS YOUR UNDERSTANDING?

11:32AM  15   A.   AGAIN, FROM WHAT I WITNESSED AND EXPERIENCED PERSONALLY IS

11:32AM  16   A FINGERSTICK WOULD GO, WOULD PROBABLY GO INTO WHAT WAS CALLED

11:32AM  17   A NANOTAINER OR A BCD, AND THAT BCD WOULD GO INTO THE THERANOS

11:32AM  18   MACHINE.

11:32AM  19   Q.   YOU SAID WHAT YOU EXPERIENCED PERSONALLY.  WHAT DO YOU

11:32AM  20   MEAN?

11:32AM  21   A.   MYSELF AND A FEW OTHER EXECUTIVES HAD OUR BLOOD TESTED.  I

11:32AM  22   THINK I HAD MY TESTED TWICE.

11:32AM  23   Q.   AND DO YOU RECALL WHERE YOU WERE WHEN THAT HAPPENED?

11:33AM  24   A.   I BELIEVE I WAS ONE TIME -- THE FIRST TIME WAS IN THE

11:33AM  25   PALO ALTO THERANOS OFFICE, AND THE SECOND TIME I THINK I WAS AT

11:33AM 1     THE PILOT IN PHOENIX.

11:33AM 2     Q.   WOULD THAT HAVE BEEN THE MEETING IN 2010 AROUND THE MARCH

11:33AM 3     TIMEFRAME WHEN YOU WENT OUT TO PALO ALTO, OR WAS THAT A

11:33AM 4     DIFFERENT TIME?

11:33AM 5     A.   I DON'T RECALL THE FIRST TIME EXACTLY THE DATE.

11:33AM 6     Q.   WAS THE BLOOD DRAWN FROM YOUR FINGER?

11:33AM 7     A.   YES.

11:33AM 8     Q.   AND WHAT DO YOU RECALL FROM THAT?

11:33AM 9     A.   JUST GETTING MY RESULTS LATER.  AGAIN, IT HAD TO GO, FOR

11:33AM 10    LEGAL REASONS, THROUGH A PHYSICIAN.  SO I THINK THE FIRST TIME

11:33AM 11    DR. ROSAN, WHO WAS A PHYSICIAN, GOT THE RESULTS AND THEN

11:33AM 12    PROVIDED THOSE TO ME.

11:33AM 13    Q.   AND WHEN YOU HAD THE DEMO, DID MS. HOLMES EXPLAIN ANYTHING

11:33AM 14    TO YOU ABOUT THE EXPERIENCE YOUR FINGERSTICK, OR YOUR BLOOD WAS

11:33AM 15    BEING TESTED VIA A FINGERSTICK, BUT IN THE FUTURE WALGREENS

11:33AM 16    PATIENTS MIGHT NOT HAVE THEIR BLOOD TESTED THROUGH A

11:34AM 17    FINGERSTICK?  DO YOU RECALL HER SAYING ANYTHING LIKE THAT?

11:34AM 18    A.   NOT AT THE TIME.

11:34AM 19    Q.   COULD WE NOW TURN TO PAGE 8.

11:34AM 20         PAGE 8, THE SLIDE IS ENTITLED PROJECT NORMANDY:  THE

11:34AM 21    WORLD'S FIRST FINGERSTICK BASED CLIA-CERTIFIED LAB THROUGH

11:34AM 22    RETAIL.

11:34AM 23         AND THE FIRST BULLET SAYS 99.9 PERCENT LESS BLOOD.

11:34AM 24         WHAT WAS YOUR UNDERSTANDING THAT THAT WAS A REFERENCE TO?

11:34AM 25    A.   THAT'S JUST A RELATIVE COMPARISON OF THE AMOUNT OF BLOOD

11:34AM 1    IN A NANOTAINER VERSUS THE AMOUNT OF BLOOD TAKEN THROUGH

11:34AM 2    VENIPUNCTURE.

11:34AM 3    Q.   AND IF THERANOS WAS TESTING PATIENT'S BLOOD WITH A VEIN

11:34AM 4    DRAW, WOULD IT DRAW LESS BLOOD THEN OR ONLY IF IT USED

11:34AM 5    FINGERSTICK?

11:34AM 6    A.   MY UNDERSTANDING -- I NEVER SAW -- IF YOUR QUESTION IS I

11:34AM 7    NEVER SAW THE NANOTAINER DRAW BLOOD FROM A VEIN.  IT WAS ALWAYS

11:34AM 8    FROM A FINGER.

11:34AM 9    Q.   NO, I'M SORRY.

11:34AM 10       THE SLIDE SUGGESTS 99.9 PERCENT LESS BLOOD, AND I'M JUST

11:35AM 11   WONDERING IF THAT IS ONLY TRUE IF YOU RECEIVE A FINGERSTICK AS

11:35AM 12   OPPOSED TO A VEIN DRAW?

11:35AM 13   A.   YES, YES.

11:35AM 14   Q.   THE NEXT BULLET SAYS, "STATE OF THE ART RESULT TURN

11:35AM 15   AROUND:  4-24 HOURS."

11:35AM 16       WHAT DID YOU UNDERSTAND THAT TO MEAN?

11:35AM 17   A.   AGAIN, THAT WAS THE RANGE THAT WE WERE LOOKING AT, AND HOW

11:35AM 18   LONG IT TAKES WAS TO SOME EXTENT WAS DEPENDENT UPON THE

11:35AM 19   BUSINESS MODEL WE RELIED UPON.

11:35AM 20       IF YOU WERE GOING TO HAVE AN EDISON DEVICE IN A WALGREENS,

11:35AM 21   THEORETICALLY YOU COULD GET A RESULT MUCH FASTER THAN IF YOU

11:35AM 22   WERE TAKING NANOTAINERS AND MOVING THEM TO A SITE WHERE YOU HAD

11:35AM 23   MACHINES AT CENTRALLY.

11:35AM 24   Q.   AND WAS FASTER TURN AROUND TIME ATTRACTIVE TO WALGREENS?

11:35AM 25   A.   I THINK IT'S ATTRACTIVE TO PATIENTS AGAIN, JUST BECAUSE IF

11:35AM  1    YOU THINK ABOUT GATEWAY TO HEALTH CARE, LAB IS A LARGE GATEWAY.

11:35AM  2    SO FOR SURE TO WALGREENS.

11:35AM  3         ALSO WE TALKED ABOUT THE POSSIBILITY IN RURAL AREAS IN

11:35AM  4    MARKETS THAT ARE LESS DEVELOPED AND WHERE PEOPLE DON'T HAVE

11:36AM  5    IMMEDIATE ACCESS AND IT CAN LEAD TO VERY PROBLEMATIC HEALTH

11:36AM  6    SITUATIONS.

11:36AM  7    Q.   AND THE THIRD BULLET SAYS "NATION'S LOWEST COST AND

11:36AM  8    HIGHEST QUALITY LABORATORY PROVIDER."

11:36AM  9         DID YOU HAVE AN UNDERSTANDING THAT THERANOS WAS

11:36AM  10   REPRESENTING ITSELF TO BE THE HIGHEST QUALITY LAB?

11:36AM  11   A.   I THINK OUR COMMON UNDERSTANDING WAS THAT IF THE

11:36AM  12   TECHNOLOGY WORKED AS WE WERE TOLD, THAT IT WOULD BE BETTER,

11:36AM  13   FASTER, CHEAPER, AND THAT WE WOULD BE ABLE TO PROVIDE THE BEST

11:36AM  14   AND LOWEST, YOU KNOW, COST NETWORK TOGETHER.

11:36AM  15   Q.   AND WHERE DID THAT GET THAT UNDERSTANDING FROM?

11:36AM  16   A.   I THINK BOTH FROM THE ATTESTATIONS THAT WERE MADE TO US

11:36AM  17   ABOUT THE TECHNOLOGY, AS WELL AS OUR JOINT WORK AS FAR AS

11:36AM  18   UNDERSTANDING THE MARKET SIZE, CURRENT COSTS, THE PAYOR

11:36AM  19   PREFERENCES AND THE LIKE.

11:36AM  20   Q.   THE NEXT PAGE, PAGE 9, THIS DESCRIBES THE PROCESS, THE

11:36AM  21   PROJECT NORMANDY PROCESS.

11:36AM  22        AND UNDER THE PSC COLUMN THERE'S A SECTION CALLED SAMPLE

11:37AM  23   COLLECTION.

11:37AM  24        DO YOU SEE THE SECOND BULLET UNDER SAMPLE COLLECTION?

11:37AM  25   A.   YES.

11:37AM  1    Q.   THE SECOND BULLET READS "TECHNICIAN PRICKS PATIENT'S

11:37AM  2    FINGER."

11:37AM  3         DOES THIS DESCRIPTION, A SAMPLE COLLECTION, DESCRIBE VEIN

11:37AM  4    DRAWS?

11:37AM  5    A.   NO.

11:37AM  6    Q.   UNDER THE SECOND COLUMN, CLIA LAB, IN THE SECOND BULLET IT

11:37AM  7    READS "SAMPLES ACCESSED AND QUEUED FOR ANALYSIS ON THERANOS

11:37AM  8    DEVICES USING THERANOS LDT'S IN THERANOS LAB."

11:37AM  9         DOES THIS COLUMN SUGGEST THAT THE SAMPLES ARE GOING TO BE

11:37AM  10   TESTED ON THIRD PARTY DEVICES?

11:37AM  11   A.   NO.

11:37AM  12   Q.   WOULD YOU TURN TO PAGE 11, PLEASE.

11:37AM  13        PAGE 11 IS ENTITLED FASTER SCALEABILITY AT WAG.

11:38AM  14        UNDER SCALEABILITY, THE FIRST BULLET SAYS, "SMALLER SPACE

11:38AM  15   REQUIREMENTS AT RETAIL."

11:38AM  16        WHAT DID YOU UNDERSTAND THAT TO MEAN?

11:38AM  17   A.   AGAIN, I THINK IT'S THE WHOLE NOTION THAT RATHER THAN

11:38AM  18   HAVE, YOU KNOW, INCREMENTAL ASSETS OF LAB TESTING AND

11:38AM  19   INDUSTRIAL COURTS AND BUILDINGS AND THEN ULTIMATELY EVEN GOING

11:38AM  20   TO CONVENTIONAL LAB WITH VERY LARGE FACILITIES AND MACHINES,

11:38AM  21   THAT IT DOESN'T TAKE A LOT OF INCREMENTAL SPACE TO DO THAT.

11:38AM  22        IN FACT, AT THE TIME WE HAD A LOT OF TAKE CARE CLINICS, SO

11:38AM  23   YOU COULD ARGUE THAT THE INFRASTRUCTURE IS ALREADY BUILT THERE

11:38AM  24   AND THERE'S REALLY NO INCREMENTAL INVESTMENT FROM THAT POINT OF

11:38AM  25   VIEW.

11:38AM  1    Q.   OKAY.  WAS IT ATTRACTIVE TO WALGREENS TO NEED LESS RETAIL

11:38AM  2    SPACE?

11:38AM  3    A.   WELL, I THINK WHAT WAS ATTRACTIVE WAS BEING ABLE TO

11:38AM  4    LEVERAGE THE CURRENT FOOTPRINT OF 8,000 STORES POTENTIALLY

11:38AM  5    WITHOUT ADDING EXTRA, YOU KNOW, RETAIL SPACE.

11:38AM  6    Q.   AND WAS THE ASSUMPTION THAT THE AMOUNT OF SPACE THE DEVICE

11:39AM  7    TOOK UP WAS A FACTOR IN THE AMOUNT OF RETAIL SPACE GENERALLY

11:39AM  8    THAT WAS NEEDED?

11:39AM  9    A.   I MEAN, AT THE END OF THE DAY IT DIDN'T TAKE UP ANY SPACE

11:39AM  10   REALLY.

11:39AM  11        IT'S ALSO THE OTHER NOTIONS IN HERE JUST ABOUT BEING ABLE

11:39AM  12   TO LEVERAGE YOUR CURRENT STAFF, YOUR PHARMACIES, YOUR NURSE

11:39AM  13   PRACTITIONERS, YOUR PHARMACY TECHS.

11:39AM  14   Q.   AND WHEN YOU SAID IT DIDN'T TAKE UP ANY SPACE, WHAT DID

11:39AM  15   YOU MEAN?

11:39AM  16   A.   EFFECTIVELY HOUSING, YOU KNOW, NANOTAINERS IS NOT -- IT

11:39AM  17   DOESN'T TAKE UP A LOT OF SPACE.

11:39AM  18   Q.   I SEE.  OKAY.

11:39AM  19        FURTHER DOWN IN THE SLIDE IT TALKS ABOUT STAGES 1, 2, AND

11:39AM  20   3.  THE THIRD ONE WAS A NATIONAL ROLLOUT.

11:39AM  21        DID YOU DISCUSS THE IDEA OF A NATIONAL ROLLOUT WITH

11:39AM  22   MS. HOLMES AND MR. BALWANI?

11:39AM  23   A.   YES.

11:39AM  24   Q.   AND DID YOU TELL THEM THAT A NATIONAL ROLLOUT WAS

11:39AM  25   GUARANTEED?

11:39AM 1    A.   NO.

11:39AM 2    Q.   AND WHAT WAS NECESSARY BEFORE WALGREENS WOULD GO NATIONAL

11:39AM 3    WITH THERANOS?

11:39AM 4    A.   JUST TO BE SUCCESSFUL AT EVERY PHASE OF EXPANSION, SO

11:39AM 5    STARTING WITH, YOU KNOW, ONE OR A FEW STORES AND MOVING TO

11:40AM 6    MORE, OR A STATE AND MOVING TO MORE.

11:40AM 7         BUT BEING ABLE TO BE SUCCESSFUL IN TERMS OF EFFICACY,

11:40AM 8    SAFETY, BUSINESS MODEL, CLINICAL ACCEPTANCE, INSURANCE COMPANY

11:40AM 9    ACCEPTANCE.

11:40AM 10        I MEAN, THERE ARE A LOT OF DIFFERENT VARIABLES, BUT

11:40AM 11   EFFECTIVELY TESTING FOR EACH OF THOSE TO ENSURE SUCCESS AND, IF

11:40AM 12   NOT, TRYING TO MODIFY AND RECTIFY AND FIX THE BUSINESS MODEL IF

11:40AM 13   POSSIBLE.

11:40AM 14   Q.   OKAY.  WOULD YOU TURN TO PAGE 28?

11:40AM 15        THIS SLIDE IS ENTITLED THERANOS'S FINGERSTICK BASED

11:40AM 16   LABORATORY.

11:40AM 17        THE SECOND BULLET IS, "NO REGULATORY RISK."

11:40AM 18        DO YOU HAVE A RECOLLECTION, WHAT DOES THAT MEAN?

11:40AM 19   A.   THERE WAS, AGAIN, A LOT OF DISCUSSIONS ON WHAT REGULATORY

11:40AM 20   REQUIREMENTS WERE OR WERE NOT BOTH FROM A, YOU KNOW, A CMS

11:41AM 21   STANDPOINT AS WELL AS FDA.  TO SOME EXTENT THIS TECHNOLOGY WAS

11:41AM 22   NEW TO THE WORLD AND SO IT RAISED QUESTIONS THAT MAYBE HADN'T

11:41AM 23   BEEN RAISED BEFORE.

11:41AM 24        SO, FOR EXAMPLE, IF YOU NEED LAB CERTIFICATION, WHERE IS

11:41AM 25   THE LAB?  IF YOU HAD A THERANOS MACHINE IN A WALGREENS STORE,

11:41AM  1    DOES THAT MEAN THAT'S THE LAB?  OR IF THE DATA IS GOING TO

11:41AM  2    PALO ALTO, IS THAT THE LAB?

11:41AM  3        BUT AGAIN, THESE WERE DIFFERENT DISCUSSIONS THAT WERE

11:41AM  4    EVOLVING AND WE WERE TRYING TO REFINE OUR UNDERSTANDING TO

11:41AM  5    UNDERSTAND WHAT WAS REQUIRED AND WHAT WAS NOT.

11:41AM  6    Q.   OKAY.  AND WAS THERANOS SUGGESTING TO YOU THAT THERE WAS

11:41AM  7    NO OR THERE WAS LESS REGULATORY RISK CREATING THIS PARTNERSHIP

11:41AM  8    WITH THERANOS AND WALGREENS?

11:41AM  9    A.   I THINK IN FAIRNESS, THIS WAS A DISCUSSION THAT WENT ON AT

11:41AM  10   LEAST A YEAR OR MORE IN TERMS OF WHAT WAS THEIR UNDERSTANDING.

11:41AM  11   WE WERE SEEKING ADVICE, INCLUDING EXTERNALLY ON THE MATTER.

11:41AM  12       I'M PRETTY SURE THEY WERE SEEKING ADVICE, TOO, AND HAVING

11:41AM  13   SOME CONVERSATIONS.

11:41AM  14       BUT, AGAIN, BECAUSE OF THE NEW TO THE WORLD NATURE OF THIS

11:42AM  15   TECHNOLOGY, IT REQUIRED SOME WORK TO UNDERSTAND.

11:42AM  16   Q.   FROM A REGULATORY PERSPECTIVE?

11:42AM  17   A.   YES.

11:42AM  18   Q.   OKAY.  AT THE BOTTOM OF THE SLIDE WE CAN SEE "LOWEST COST,

11:42AM  19   HIGHEST QUALITY TESTING FROM A FINGERSTICK."

11:42AM  20       AGAIN, WAS THAT SORT OF CONSISTENT WITH YOUR UNDERSTANDING

11:42AM  21   OF WHAT THERANOS WAS OFFERING?

11:42AM  22   A.   YES, THAT WHAT WE BELIEVED IT WAS OFFERING, YES.

11:42AM  23   Q.   IF YOU'LL TURN TO THE NEXT PAGE, 29.

11:42AM  24       IT'S ENTITLED ONE DISRUPTION AT A TIME.  THERE ARE A FEW

11:42AM  25   BULLETS.  THE FIRST ONE IS THE FIRST LAUNCH IN 2012, AND THE

11:42AM  1    SECOND LAUNCH EARLY TO MID-2013, AND THE THIRD LAUNCH 2014 AND

11:42AM  2    AFTER.

11:42AM  3         THE THIRD LAUNCH SAYS "THERANOS MINILABS IN ALL WALGREENS

11:42AM  4    STORES (AS APPROPRIATE)."

11:42AM  5         DID YOU UNDERSTAND THAT THERE WERE STAGES THAT WERE

11:42AM  6    NECESSARY TO SUCCESSFULLY COMPLETE BEFORE THE THERANOS DEVICE

11:42AM  7    WOULD ENTER ALL STORES, ALL WALGREENS STORES?

11:42AM  8    A.   YES.  EVERY STAGE IS ALWAYS CONTINGENT UPON SUCCESS OF THE

11:43AM  9    PRIOR STAGE.

11:43AM  10   Q.   AND WAS THAT COMMUNICATED TO MS. HOLMES?

11:43AM  11   A.   I'M SURE THAT WAS CLEARLY UNDERSTOOD.

11:43AM  12   Q.   AND WHY DO YOU SAY THAT?

11:43AM  13   A.   WELL, FOR ONE BECAUSE WE WOULD DEFINE SUCCESS OBJECTIVES

11:43AM  14   AND TALK ABOUT WHAT HAD TO HAPPENED FOR THE NEXT PHASE.

11:43AM  15        I BELIEVE ALSO AS WE WENT ALONG CONTRACTUALLY, THERE WERE

11:43AM  16   PARAMETERS PUT ON THE CONTRACT BECAUSE WE WERE GOING TO A NEW

11:43AM  17   FRONTIER.

11:43AM  18        BUT, AGAIN, AT THE END OF THE DAY, THAT'S THE REASON THAT

11:43AM  19   YOU PILOT AND YOU EXPAND THE PILOT AND YOU HAVE EXPAND THE

11:43AM  20   PILOT PILOT IS BECAUSE YOU WANT TO BE ABLE TO ENSURE THAT

11:43AM  21   YOU'VE GOT IT RIGHT.

11:43AM  22   Q.   IF YOU'LL NOW TURN TO EXHIBIT 617.

11:43AM  23        YOUR HONOR, I BELIEVE WE'RE OFFERING THIS BASED ON A

11:43AM  24   STIPULATION OF THE PARTIES.

11:43AM  25             MR. DOWNEY:  WE HAVE NO OBJECTION, YOUR HONOR.

| 11:43AM | 1 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |

11:43AM 1    THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:43AM 2    (GOVERNMENT'S EXHIBIT 617 WAS RECEIVED IN EVIDENCE.)

11:44AM 3    BY MR. SCHENK:

11:44AM 4    Q.  EXHIBIT 617 LOOKS TO BE AN AMENDED AND RESTATED THERANOS

11:44AM 5    MASTER SERVICES AGREEMENT.

11:44AM 6    DO YOU SEE THAT?

11:44AM 7    A.  YES.

11:44AM 8    Q.  AND THIS ONE IS DATED IN JUNE OF 2012.  YOU DESCRIBED

11:44AM 9    ONGOING WORK AND NEGOTIATION BETWEEN WALGREENS AND THERANOS.

11:44AM 10   WAS THAT STILL HAPPENING NOW, BRINGING US UP TO MID-2012?

11:44AM 11   A.  YES.

11:44AM 12   Q.  ON THE SECOND PAGE OF THIS DOCUMENT THERE'S A SIGNATURE.

11:44AM 13   DO YOU SEE THAT?

11:44AM 14   A.  YES.

11:44AM 15   Q.  IS THAT SIGNATURE ABOVE MS. HOLMES'S NAME?

11:44AM 16   A.  YES.

11:44AM 17   Q.  AND ON THE THIRD PAGE THERE'S A SIGNATURE.

11:44AM 18   IS THAT YOUR SIGNATURE?

11:44AM 19   A.  YES.

11:44AM 20   Q.  AND NOW LET'S TURN TO THE FOURTH PAGE, SCHEDULE A.

11:45AM 21   ON PAGE 4 THERE'S A PARAGRAPH ENTITLED PHASED DISRUPTION.

11:45AM 22   A.  OKAY.

11:45AM 23   Q.  DO YOU SEE THAT PARAGRAPH?

11:45AM 24   A.  YES.

11:45AM 25   Q.  AND THERE'S A SENTENCE WITHIN IT THAT READS, "WITH THAT IN

11:45AM  1    MIND, AT THE COMMENCEMENT OF THIS AGREEMENT, IT IS THE PARTIES'

11:45AM  2    INTENTION FOR WALGREENS TO ACT AS A PATIENT SERVICE CENTER AND

11:45AM  3    COLLECT BLOOD SAMPLES VIA FINGERSTICK TECHNOLOGY, SMALL SAMPLES

11:45AM  4    OF URINE, SALIVA, FECES OR SWABS WITH LABORATORY TESTING TO BE

11:45AM  5    PERFORMED BY THERANOS IN A CLIA-CERTIFIED OFFSITE LABORATORY."

11:45AM  6         DO YOU SEE THAT?

11:45AM  7              THE COURT:  MR. SCHENK, JUST GIVE ME A MOMENT.

11:45AM  8         (PAUSE IN PROCEEDINGS.)

11:45AM  9              MR. SCHENK:  MS. KRATZMANN, CAN WE SHIFT TO THE

11:45AM  10   ELMO?

11:45AM  11              THE CLERK:  YES, COUNSEL.

11:46AM  12              MR. SCHENK:  THANK YOU.

11:46AM  13              THE COURT:  ALL RIGHT.  THANK YOU, MR. SCHENK.  YOU

11:46AM  14   MAY PROCEED.

11:46AM  15              MR. SCHENK:  THANK YOU.

11:46AM  16   Q.  SO I JUST READ TO YOU A SENTENCE IN THE MIDDLE OF

11:46AM  17   PARAGRAPH 3.

11:46AM  18        DO YOU SEE THAT SENTENCE?

11:46AM  19   A.  YES.

11:46AM  20   Q.  IS THAT ACCURATE?  WAS IT THE PARTIES' INTENTION AND WAS

11:46AM  21   IT YOUR UNDERSTANDING THAT THERANOS WAS GOING TO OFFER THIS

11:46AM  22   BLOOD TESTING SERVICES AND COLLECT BLOOD SAMPLES VIA

11:46AM  23   FINGERSTICK TECHNOLOGY?

11:46AM  24   A.  YES.

11:46AM  25   Q.  AND THIS IS AN AMENDED AGREEMENT.  THE FINGERSTICK ASPECT

11:46AM  1    DID NOT CHANGE FROM THE FIRST TO THE SECOND; IS THAT RIGHT?

11:46AM  2    A.   THAT'S CORRECT.

11:46AM  3    Q.   YOUR UNDERSTANDING WAS STILL THAT THERANOS WAS GOING TO

11:46AM  4    PERFORM BLOOD TESTING ON BLOOD DRAWN FROM THE FINGER?

11:46AM  5    A.   YES.

11:46AM  6    Q.   IF YOU COULD TURN IN YOUR BINDER TO PAGE 6.

11:47AM  7        DO YOU SEE AT THE BOTTOM OF PAGE 6 THERE'S A SECTION THAT

11:47AM  8    BEGINS INNOVATION FEE?

11:47AM  9    A.   YES.

11:47AM 10    Q.   AND THEN THE LANGUAGE ABOUT AN INNOVATION FEE CONTINUES ON

11:47AM 11    THE NEXT PAGE.

11:47AM 12        WHAT WAS THE INNOVATION FEE?

11:47AM 13    A.   THE INNOVATION FEE, TO MY UNDERSTANDING, WAS THAT WE WERE

11:47AM 14    AT THE POINT WHERE WE HAD EVOLVED A BUSINESS MODEL AND WE WERE

11:47AM 15    GETTING READY TO COMMERCIALIZE, AND SO THIS AGREEMENT

11:47AM 16    SUPERSEDED THE PRIOR AGREEMENT FROM THE STANDPOINT THAT IT

11:47AM 17    REFLECTED THE LATEST UNDERSTANDING.

11:47AM 18        THE INNOVATION FEE WAS DERIVED TO SECURE THE PARTNERSHIP

11:48AM 19    IN EXCLUSIVITY, THE PRICING, ET CETERA, AND PROVIDE FUNDS TO

11:48AM 20    THERANOS THAT WOULD HELP ENABLE THEM TO CREATE THE SCALE TO

11:48AM 21    BEGIN EXPANDING THE VALUE PROPOSITION.

11:48AM 22    Q.   MONEY WOULD BE PAID FROM WALGREENS TO THERANOS?

11:48AM 23    A.   THAT'S CORRECT.

11:48AM 24    Q.   AND IT HAS A SCHEDULE HERE, OR MILESTONES THAT SHOULD BE

11:48AM 25    MET BEFORE MONEY IS DISTRIBUTED.

11:48AM   1        DO YOU SEE THAT?

11:48AM   2   A.   YES.

11:48AM   3   Q.   DID WALGREENS END UP MAKING PAYMENTS TO THERANOS?

11:48AM   4   A.   MY UNDERSTANDING IS YES.

11:48AM   5   Q.   AND DO YOU RECALL THE AMOUNT OF MONEY THAT WALGREENS PAID

11:48AM   6   TO THERANOS?

11:48AM   7   A.   I BELIEVE THERE WAS $100 MILLION IN INNOVATION FEE, AND

11:48AM   8   MAYBE A $40 MILLION CONVERTIBLE NOTE.

11:48AM   9   Q.   AND WHAT IS A CONVERTIBLE NOTE?

11:48AM  10   A.   A WAY TO FUND THEM, BUT IT HAS THE -- EFFECTIVELY A LOAN

11:48AM  11   TO THE COMPANY THAT ALSO PROVIDED THE COMPANY WITH THE ABILITY

11:48AM  12   TO CONVERT THAT INTO EQUITY.

11:49AM  13   Q.   SO THE INNOVATION FEE AND THE CONVERTIBLE NOTE ARE

11:49AM  14   DIFFERENT IN THE EQUITY ASPECT?

11:49AM  15   A.   CORRECT.

11:49AM  16   Q.   AND THE INNOVATION FEE DIDN'T GIVE WALGREENS EQUITY, ANY

11:49AM  17   OWNERSHIP OF THERANOS; IS THAT RIGHT?

11:49AM  18   A.   THAT'S CORRECT.

11:49AM  19   Q.   BUT WALGREENS ALSO PURCHASED EQUITY IN THERANOS; IS THAT

11:49AM  20   RIGHT?

11:49AM  21   A.   CORRECT.

11:49AM  22   Q.   WAS WALGREENS THEREFORE AN INVESTOR IN THERANOS IN

11:49AM  23   ADDITION TO BEING A BUSINESS PARTNER?

11:49AM  24   A.   THAT WOULD BE CORRECT.

11:49AM  25   Q.   IF YOU COULD TURN NOW TO PAGE 9.

11:49AM  1          ON PAGE 9 THERE'S ANOTHER SECTION ABOUT CRITICAL VALUES.

11:49AM  2          DO YOU SEE THAT?

11:49AM  3     A.   YES.

11:49AM  4     Q.   AND DID YOU CONTINUE TO UNDERSTAND THAT IF THERANOS TESTED

11:49AM  5     A PATIENT'S BLOOD AND THE VALUE, THE RESULT WAS DETERMINED TO

11:50AM  6     BE CRITICAL, THERE WAS AN OBLIGATION PLACED ON ONE OF THE

11:50AM  7     PARTIES TO ALERT THE RELEVANT PHYSICIAN OR SOMEONE ELSE?

11:50AM  8     A.   THAT WAS MY UNDERSTANDING, AGAIN, BECAUSE IT WAS THEIR

11:50AM  9     PATIENT, THEY HAD THE DATA, THEY HAD THE LAB EXPERTISE, SO THAT

11:50AM  10    WOULD BE THEIR RESPONSIBILITY.

11:50AM  11    Q.   OKAY.  IF YOU COULD NOW TURN TO PAGE 23.

11:50AM  12         ON PAGE 23 WE AGAIN SEE THE TERM "DEVICE" DEFINED.

11:50AM  13         DO YOU SEE THAT?

11:50AM  14    A.   YES.

11:50AM  15    Q.   DID YOU CONTINUE TO UNDERSTAND THAT THE DEVICE THAT

11:50AM  16    THERANOS WOULD USE TO TEST PATIENT'S BLOOD WAS THE THERANOS

11:50AM  17    ANALYZER?

11:50AM  18    A.   YES.

11:50AM  19    Q.   AND DID YOU UNDERSTAND THAT THERANOS WOULD BE MODIFYING

11:51AM  20    THIRD PARTY DEVICES TO TEST PATIENT'S BLOOD BY THIS TIME?  DID

11:51AM  21    YOU HAVE THAT UNDERSTANDING?

11:51AM  22    A.   NO.

11:51AM  23    Q.   HOW ABOUT USING UNMODIFIED THIRD PARTY DEVICES TO TEST

11:51AM  24    PATIENT'S BLOOD?  LEAVING ASIDE THE POINT YOU MADE TO ME ABOUT

11:51AM  25    USING THIRD PARTY DEVICES TO CONFIRM ACCURACY OF THERANOS'S

11:51AM 1    DEVICES, HOW ABOUT PURE USE OF A THIRD PARTY DEVICES TO TEST

11:51AM 2    PATIENT'S BLOOD?

11:51AM 3    A.   I WOULD SAY IF THAT WOULD BE DONE, THAT WOULD BE A VERY

11:51AM 4    SMALL PART OF THE VALUE PROPOSITION.  THERE MIGHT BE ESOTERIC

11:51AM 5    TESTS OR SOMETHING THAT WOULD REQUIRE THAT.  THAT WOULDN'T

11:51AM 6    BE -- YOU KNOW, THAT WOULDN'T SURPRISE ME.

11:51AM 7        BUT, AGAIN, THE VAST MAJORITY OF TESTS WE UNDERSTOOD WOULD

11:51AM 8    BE DONE ON A THERANOS MACHINE.

11:51AM 9    Q.   IF YOU'LL TURN TO PAGE 26.

11:52AM 10       AT THE BOTTOM OF PAGE 26 THERE'S SOME CRITERIA FOR A

11:52AM 11   NATIONAL ROLLOUT.  AND I'M WONDERING IF IN THIS AGREEMENT THE

11:52AM 12   NATIONAL ROLLOUT WAS PROMISED OR GUARANTEED, OR IF INSTEAD

11:52AM 13   CERTAIN CRITERIA HAD TO BE MET BEFORE WALGREENS WOULD GO

11:52AM 14   NATIONAL WITH THE THERANOS TECHNOLOGY?

11:52AM 15   A.   I THINK IT WAS ALWAYS UNDERSTOOD THAT EACH LEVEL OF

11:52AM 16   EXPANSION WOULD HAVE TO BE SUCCESSFUL TO MOVE TO THE NEXT

11:52AM 17   LEVEL.

11:52AM 18   Q.   OKAY.  YOU SAID YOU THINK IT WAS ALWAYS UNDERSTOOD.  WHERE

11:52AM 19   DID YOU GET THAT UNDERSTANDING FROM?

11:52AM 20   A.   I THINK THROUGH ALL OF OUR DIALOGUE AND OUR TEAM DIALOGUE

11:52AM 21   AND OUR PROJECT MANAGER DIALOGUE AND THE MULTI PEOPLE THAT

11:52AM 22   SUPPORTED THAT.

11:52AM 23       SO, AGAIN, UNDERSTANDING A LOT OF THINGS ABOUT THE

11:52AM 24   TESTING, NOT JUST THE TESTING ACCURACY, BUT ALSO THE PATIENT

11:52AM 25   EXPERIENCE, THE ACCEPTANCE OF PAYORS, THE ACCEPTANCE OF

11:52AM   1    CLINICIANS.

11:52AM   2    Q.   DID YOU EVER TELL MS. HOLMES OR MR. BALWANI THAT A

11:52AM   3    NATIONAL ROLLOUT WAS GUARANTEED?

11:53AM   4    A.   NO.

11:53AM   5    Q.   DID YOU EVER HEAR ANYONE ELSE FROM WALGREENS TELL

11:53AM   6    MS. HOLMES OR MR. BALWANI THAT A NATIONAL ROLLOUT WITH

11:53AM   7    WALGREENS WAS GUARANTEED?

11:53AM   8    A.   NO.

11:53AM   9    Q.   WOULD YOU NOW TURN TO PAGE 29.

11:53AM  10        PAGE 29 IS ENTITLED CONVERTIBLE PROMISSORY NOTE.  IS THIS

11:53AM  11    THE PURCHASE OF EQUITY THAT YOU REFERRED TO A MOMENT AGO?

11:53AM  12    A.   IT'S MY RECOLLECTION, YES.

11:53AM  13    Q.   HOW MUCH DID WALGREENS SPEND TO PURCHASE THIS NOTE?

11:53AM  14    A.   HOW MUCH MONEY?

11:53AM  15    Q.   YES.

11:53AM  16    A.   I BELIEVE IT WAS A $40 MILLION NOTE.

11:53AM  17    Q.   I'M SORRY?

11:53AM  18    A.   I BELIEVE IT WAS A $40 MILLION NOTE.

11:53AM  19    Q.   THANK YOU.

11:53AM  20        WOULD YOU NOW TURN TO EXHIBIT 971?

11:54AM  21        DO YOU SEE THAT EXHIBIT?

11:54AM  22    A.   YES.

11:54AM  23    Q.   WHAT IS THIS DOCUMENT?

11:54AM  24    A.   THIS IS JUST AN EMAIL CHAIN FROM ELIZABETH TO ME AND A

11:54AM  25    NOTE FROM MYSELF TO MS. DEBBIE GARZA.

11:54AM   1     Q.   THANK YOU.

11:54AM   2          THE GOVERNMENT OFFERS 971, YOUR HONOR.

11:54AM   3             MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

11:54AM   4             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:54AM   5          (GOVERNMENT'S EXHIBIT 971 WAS RECEIVED IN EVIDENCE.)

11:54AM   6     BY MR. SCHENK:

11:54AM   7     Q.   IF WE CAN START WITH AN EMAIL ON THE BOTTOM, MS. HOLMES'S

11:54AM   8     EMAIL TO MR. MIQUELON IN AUGUST OF 2013.

11:54AM   9          SO MORE TIME NOW HAS PASSED.  THE AMENDED AGREEMENT WAS

11:54AM  10     JUNE OF 2012.  WE'VE NOW MOVED ABOUT A YEAR LATER, AUGUST 2013.

11:55AM  11     MS. HOLMES IS WRITING YOU THIS EMAIL, AND THE SUBJECT IS FINAL

11:55AM  12     ROLLOUT PLAN.

11:55AM  13          DO YOU SEE THAT?

11:55AM  14     A.   YES.

11:55AM  15     Q.   AND IN THE EMAIL SHE WRITES, "WE HAVE CEMENTED WHAT WE

11:55AM  16     BELIEVE TO BE THE MOST EFFECTIVE ROLLOUT STRATEGY FOR REALIZING

11:55AM  17     BROAD NATIONAL SCALE AS FAR AS POSSIBLE."

11:55AM  18          IN THE NEXT PARAGRAPH SHE TALKS ABOUT MAXIMIZING SPEED OF

11:55AM  19     DEPLOYMENT.  "THIS DEPLOYMENT PLAN ACHIEVES NATIONAL

11:55AM  20     DISTRIBUTION OF THERANOS SERVICES AT WALGREENS BY THE END OF

11:55AM  21     2014."

11:55AM  22          DO YOU SEE THAT?

11:55AM  23     A.   YES.

11:55AM  24     Q.   AND IF WE TURN THE PAGE, THERE'S A NUMBERED LIST THAT

11:55AM  25     MS. HOLMES WRITES, THE WORK THAT NEEDS TO BE DONE IN ORDER TO

11:55AM 1    ACHIEVE THAT GOAL.

11:55AM 2        DO YOU SEE THAT LIST?

11:55AM 3    A.   YES.

11:55AM 4    Q.   IN THE LIST THE FIRST PARAGRAPH DISCUSSES TRAINING.  WHO

11:55AM 5    NEEDS TO BE TRAINED?

11:55AM 6    A.   THIS WAS SPEAKING TO THE ABILITY FOR WALGREENS TO MAKE

11:56AM 7    SURE OUR STAFF WAS PROPERLY TRAINED WITH RESPECT TO PATIENTS.

11:56AM 8    Q.   OKAY.  SO TO ACHIEVE THIS NATIONAL ROLLOUT, THE FIRST

11:56AM 9    OBLIGATION, THE FIRST NEED WAS WALGREENS, WALGREENS NEEDED TO

11:56AM 10   TRAIN?

11:56AM 11   A.   RIGHT.

11:56AM 12   Q.   THE SECOND IS TALKING ABOUT SPACE.  WHAT SPACE IS BEING

11:56AM 13   DISCUSSED?

11:56AM 14   A.   WE JUST HAD LOTS OF DISCUSSIONS ABOUT, TO PROVIDE A GREAT

11:56AM 15   PATIENT EXPERIENCE, WHAT WOULD NEED TO BE TRUE IN A WALGREENS

11:56AM 16   STORE?  HOW MUCH PRIVACY WOULD YOU WANT?  WHAT WOULD THE

11:56AM 17   ENVIRONMENT BE LIKE?

11:56AM 18       AND SO THERE WAS A LOT OF DISCUSSION ON HOW WE MIGHT TIER

11:56AM 19   THOSE BASED UPON PATIENT VOLUME.

11:56AM 20   Q.   AND WAS THAT WORK THAT ALSO WALGREENS NEEDED TO DO, THE

11:56AM 21   PHYSICAL SPACE INSIDE OF A WALGREENS STORE?

11:56AM 22   A.   YES.

11:56AM 23   Q.   AND THE THIRD PARAGRAPH TALKS ABOUT PREPURCHASE PAYMENTS

11:56AM 24   FROM WALGREENS SOONER THAN ANTICIPATED.

11:56AM 25       DO YOU SEE THAT?  THAT'S IN THE THIRD LINE?

MIQUELON DIRECT BY MR. SCHENK (RES.)

11:56AM   1    A.   YES.

11:56AM   2    Q.   AND WHAT IS THAT A REFERENCE TO?

11:57AM   3    A.   I BELIEVE THAT'S A REFERENCE TO THE $100 MILLION AND

11:57AM   4    ACCELERATING THAT.

11:57AM   5    Q.   THE INNOVATION FEE?

11:57AM   6    A.   THE INNOVATION FEE.

11:57AM   7    Q.   AND MS. HOLMES WAS SUGGESTING THAT THERANOS NEEDED THAT

11:57AM   8    MONEY SOONER?

11:57AM   9    A.   CORRECT.

11:57AM  10    Q.   AND SO WALGREENS NEEDED TO PAY THE INNOVATION FEE SOONER

11:57AM  11    THAN THE SCHEDULE IN THE AGREEMENT?

11:57AM  12    A.   THAT WAS THE REQUEST.

11:57AM  13    Q.   AND THE FOURTH WAS THE OPERATIONAL STRUCTURE.  WHAT WAS

11:57AM  14    YOUR UNDERSTANDING ABOUT THAT WORK?

11:57AM  15    A.   AGAIN, I DON'T KNOW IF I HAVE A DEEP UNDERSTANDING, BUT I

11:57AM  16    THINK WHAT IT'S REFERRING TO IS, AGAIN, TO MAKE SURE THAT WE

11:57AM  17    HAVE THE PROPER TAKING OF THE SAMPLE, STORAGE OF THE SAMPLE,

11:57AM  18    PROTECTING THE SAMPLE, SHIPPING OF THE SAMPLE TO MAKE SURE THAT

11:57AM  19    THE ENTIRE SUPPLY CHAIN IN THIS BUSINESS MODEL WOULD NOT BE

11:57AM  20    COMPROMISED.

11:57AM  21    Q.   AND THEN FINALLY THE FIFTH AREA THAT NEEDS WORK IS

11:57AM  22    MARKETING.

11:57AM  23         DO YOU SEE THAT?

11:57AM  24    A.   YES.

11:57AM  25    Q.   AND IN THIS LIST THAT MS. HOLMES WROTE IN AUGUST OF 2013

11:58AM   1    OF THE THINGS THAT NEEDED TO BE DONE IN ORDER TO SPEED TOWARDS

11:58AM   2    A NATIONAL ROLLOUT, DID SHE DISCUSS WORK ON THERANOS'S

11:58AM   3    TECHNOLOGY?

11:58AM   4    A.   NO.

11:58AM   5    Q.   DID SHE TALK ABOUT THE FINGERSTICK CAPABILITY OF

11:58AM   6    THERANOS'S TECHNOLOGY?

11:58AM   7    A.   NO.

11:58AM   8    Q.   DID SHE TALK ABOUT THE NEED TO VALIDATE ASSAYS?

11:58AM   9    A.   NO.

11:58AM  10    Q.   DID -- OF THESE FIVE, ARE ANY OF THEM WORK THAT THERANOS

11:58AM  11    ITSELF NEEDS TO DO?

11:58AM  12    A.   NO.

11:58AM  13    Q.   AND THEN IF WE GO BACK TO THE FIRST PAGE AT THE TOP, YOU

11:58AM  14    FORWARDED THIS EMAIL TO SOMEONE NAMED DEBBIE GARZA.

11:58AM  15         DO YOU SEE THAT?

11:58AM  16    A.   YES.

11:58AM  17    Q.   AND WHO IS GARZA?

11:58AM  18    A.   SHE WAS OUR HEAD OF GOVERNMENT RELATIONS.

11:58AM  19    Q.   AND YOU WROTE IN THE SECOND SENTENCE, "I'M NOT WORRIED

11:58AM  20    ABOUT THEM OR LABS... I'M WORRIED ABOUT US."

11:59AM  21         WHAT DID YOU MEAN BY THAT?

11:59AM  22    A.   MY UNDERSTANDING AT THE TIME WAS THAT THE TECHNOLOGY WAS

11:59AM  23    WORKING PERFECTLY AND IT WAS ALL ABOUT RAMPING UP FOR SCALE,

11:59AM  24    AND SO IT WAS, I THINK, A POINT OF FRUSTRATION THAT MAYBE WE

11:59AM  25    WEREN'T DOING OUR PART BECAUSE OF THE ITEMS THAT SHE HAD

11:59AM  1    LISTED, THAT MAYBE WE WEREN'T TRAINING PEOPLE FAST ENOUGH

11:59AM  2    PROPERLY, MAYBE WE WEREN'T GETTING OUR EXPERIENCE RIGHT FAST

11:59AM  3    ENOUGH.

11:59AM  4    Q.   THANK YOU.

11:59AM  5         WOULD YOU NOW TURN TO EXHIBIT 1254.

11:59AM  6         WHAT IS THIS DOCUMENT?

11:59AM  7    A.   I BELIEVE THIS IS AN EMAIL THAT FORWARDS AN ARTICLE ON

11:59AM  8    THERANOS.

11:59AM  9    Q.   FIRST AN EMAIL FROM MR. BALWANI TO FOLKS AT WALGREENS AND

11:59AM 10    THEN FROM MR. -- DR. ROSAN AT WALGREENS TO YOU; IS THAT RIGHT?

11:59AM 11    A.   THAT'S CORRECT.  THAT'S RIGHT.

12:00PM 12              MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 1254.

12:00PM 13              MR. DOWNEY:  YOUR HONOR, I DON'T OBJECT TO THE

12:00PM 14    EMAIL, BUT THE ARTICLE CONTAINS A GOOD AMOUNT OF HEARSAY, THE

12:00PM 15    ATTACHMENT.

12:00PM 16              MR. SCHENK:  YOUR HONOR, I'M CERTAINLY NOT OFFERING

12:00PM 17    THE ARTICLE FOR ITS TRUTH.

12:00PM 18              THE COURT:  IT'S BEING OFFERED FOR WHAT PURPOSE?

12:00PM 19              MR. SCHENK:  I'M SORRY?

12:00PM 20              THE COURT:  WHAT PURPOSE?

12:00PM 21              MR. SCHENK:  TO SHOW THE STATE OF MIND OF THE

12:00PM 22    INDIVIDUAL WHO SENT IT.  I THINK IT'S ALSO 801(D)(2)(E).

12:00PM 23              THE COURT:  ALL RIGHT.  I'LL ADMIT THIS.

12:00PM 24         LADIES AND GENTLEMEN, THE ARTICLE THAT YOU'LL SEE IN JUST

12:00PM 25    A MOMENT IS NOT BEING OFFERED FOR THE TRUTH OF THE MATTER

12:00PM 1    ASSERTED IN THE ARTICLE.  IT'S ONLY FOR THE STATE OF MIND OF

12:00PM 2    THE SENDERS, SO IT WILL BE RECEIVED FOR THAT PURPOSE ONLY.

12:00PM 3              MR. SCHENK:  THANK YOU, YOUR HONOR.

12:00PM 4         (GOVERNMENT'S EXHIBIT 1254 WAS RECEIVED IN EVIDENCE.)

12:00PM 5              THE COURT:  IT MAY BE PUBLISHED.

12:00PM 6    BY MR. SCHENK:

12:00PM 7    Q.   MR. MIQUELON, LET'S START FIRST WITH THE EMAIL AT THE

12:00PM 8    BOTTOM.

12:00PM 9         MR. BALWANI SENT AN EMAIL TO DR. ROSAN, SOMEONE NAMED

12:01PM 10   BRAD WASSON.  WHO WAS THAT?

12:01PM 11   A.   THAT WAS THE BROTHER OF THE CEO GREG WASSON, AND HE WAS A

12:01PM 12   HEALTH CARE PHARMACY LEADER WHO WAS ON THE MULTI FUNCTIONAL

12:01PM 13   TEAM AT THAT TIME.

12:01PM 14   Q.   AND ON THE CC LINE, MR. ASHWORTH, WHO WAS THAT?

12:01PM 15   A.   HE WAS ANOTHER HEALTH CARE EXECUTIVE AT WALGREENS AND HE

12:01PM 16   WAS ALSO INVOLVED IN THE PROJECT IN TERMS OF I BELIEVE HELPING

12:01PM 17   TO MAKE SURE THAT WE WERE OPERATIONALIZING IT TO THE BEST

12:01PM 18   STANDARD POSSIBLE.

12:01PM 19   Q.   AND THE ARTICLE WAS SENT ON NOVEMBER 18TH, 2013.

12:01PM 20        DO YOU REMEMBER WHAT WAS HAPPENING SORT OF ROUGHLY AROUND

12:01PM 21   THAT TIME?

12:01PM 22   A.   I BELIEVE THAT WAS SHORTLY AFTER, I DON'T REMEMBER THE

12:01PM 23   EXACT DATE, THAT WE HAD LAUNCHED THE PILOTS IN PHOENIX.

12:01PM 24   Q.   LAUNCHED THE PILOTS WITH THERANOS?

12:01PM 25   A.   CORRECT.

12:01PM   1    Q.   AND THEN JUST ABOVE THIS EMAIL, DR. ROSAN FORWARDED THIS

12:02PM   2    TO YOU; IS THAT RIGHT?

12:02PM   3    A.   CORRECT.

12:02PM   4    Q.   AND IF YOU'LL NOW TURN TO PAGE 2, I WANT TO ASK YOU SOME

12:02PM   5    QUESTIONS ABOUT THE ARTICLE.

12:02PM   6         AND WHAT I'M WONDERING IS IF THE SENTENCES OR STATEMENTS

12:02PM   7    I'M GOING TO BE READING TO YOU, IF THEY'RE CONSISTENT WITH YOUR

12:02PM   8    UNDERSTANDING OF THE THERANOS TECHNOLOGY AT THE TIME, NOVEMBER

12:02PM   9    OF 2013.

12:02PM  10    A.   OKAY.

12:02PM  11    Q.   SO THE ARTICLE BEGINS, "A NUMBER OF STARTUPS ARE SELLING

12:02PM  12    PORTABLE DIAGNOSTIC LABORATORIES THAT REQUIRE JUST A DROP OF

12:02PM  13    THE PATIENT'S BLOOD, MADE POSSIBLE BY ADVANCES IN THE FIELD OF

12:02PM  14    MICROFLUIDICS.  BUT PERHAPS LAB TESTS CAN BE MADE FASTER,

12:02PM  15    EASIER, AND MORE ACCURATE WITH A TURN-OF-THE-LAST CENTURY

12:02PM  16    TECHNOLOGY AUTOMATION."

12:02PM  17         DID YOU HAVE AN UNDERSTANDING THAT THAT WAS THE

12:02PM  18    DESCRIPTION OF THE THERANOS TECHNOLOGY?

12:02PM  19    A.   YES.

12:02PM  20    Q.   AND THE ARTICLE IS PLACED INTO AN EMAIL BY MR. BALWANI; IS

12:02PM  21    THAT RIGHT?

12:02PM  22    A.   YES.

12:02PM  23    Q.   AND ABOVE THE ARTICLE -- OR BELOW THE ARTICLE, DOES

12:02PM  24    MR. BALWANI PUT ANY CAVEATS?  DOES MR. BALWANI SAY, LOOK WHAT

12:03PM  25    THEY'RE WRITING, THE PRESS DOESN'T UNDERSTAND OUR TECHNOLOGY,

MIQUELON DIRECT BY MR. SCHENK (RES.)

12:03PM 1    OR WE NEED TO CORRECT THIS?  OR ARE THERE ANY CAVEATS?

12:03PM 2    A.   NOT THAT I SEE.

12:03PM 3    Q.   THE NEXT PARAGRAPH READS, "THAT'S THE BET THE

12:03PM 4    SILICON VALLEY COMPANY THERANOS IS MAKING AND THE COMPANY

12:03PM 5    RECENTLY SEALED A DEAL WITH WALGREENS'S PHARMACY TO DELIVER

12:03PM 6    ON-SITE LABORATORY SERVICES TO MANY OF ITS STORES."

12:03PM 7        IS THAT CONSISTENT WITH YOUR UNDERSTANDING?

12:03PM 8    A.   THAT'S CONSISTENT.

12:03PM 9    Q.   IN THE NEXT PARAGRAPH IT TALKS ABOUT HENRY FORD AND IT

12:03PM 10   SAYS, "THERANOS'S SELLING POINT IS MUCH SMALLER THAN A MODEL T,

12:03PM 11   A CAPSULE-SIZED LAB VIAL, AND JUST ONE NEEDS TO BE FILLED FOR

12:03PM 12   THE COMPANY TO RUN NEARLY ANY STANDARD LAB TEST."

12:03PM 13       WAS THAT CONSISTENT WITH YOUR UNDERSTANDING OF THE

12:03PM 14   THERANOS TECHNOLOGY CAPABILITIES?

12:03PM 15   A.   YES.

12:03PM 16   Q.   FURTHER DOWN IT SAYS, "HERE HOW IT WORKS:  BLOOD IS DRAWN

12:03PM 17   WITH A FINGERSTICK RATHER THAN A NEEDLE IN THE ARM.  (IT CAN

12:04PM 18   ALSO RUN URINE TESTS WITH JUST A DROP OF THAT.)  THERE ARE NO

12:04PM 19   BOTCHED STICKS - OF COURSE THERE ARE NO PHLEBOTOMISTS, ONLY

12:04PM 20   MACHINES IN THERANOS LABS."

12:04PM 21       IS THAT CONSISTENT WITH THE WAY THE TECHNOLOGY WAS

12:04PM 22   DESCRIBED TO YOU?

12:04PM 23   A.   YES.

12:04PM 24   Q.   THE NEXT PARAGRAPH READS, "THE BAD NEWS FOR WORKERS MAY BE

12:04PM 25   GOOD NEWS FOR ACCURACY BECAUSE HUMAN HANDLING OF SAMPLES

12:04PM  1    ACCOUNTS FOR THE LION'S SHARE OF VARIATION AMONG RESULTS,

12:04PM  2    FOUNDER AND CEO ELIZABETH HOLMES SAID LAST WEEK AT A TECHNOLOGY

12:04PM  3    CONFERENCE IN NEW YORK.  AUTOMATION ELIMINATES SPILLS, TESTS

12:04PM  4    DONE IN ERROR, AND OTHER MISHANDLING OF THE SAMPLE."

12:04PM  5         WAS THAT CONSISTENT WITH YOUR UNDERSTANDING OF THE

12:04PM  6    THERANOS CAPABILITIES?

12:04PM  7    A.   THAT WAS MY UNDERSTANDING, AND ANOTHER REASON WHY THE

12:04PM  8    RESULTS WOULD BE BETTER IS BECAUSE OF THE HANDLING CHAIN FOR

12:04PM  9    CONVENTIONAL LAB.

12:04PM  10   Q.   AND WHAT DO YOU MEAN BY THAT, THE HANDLING CHAIN?

12:04PM  11   A.   AGAIN, IF SOMEONE IS DRAWING A VENIPUNCTURE AND MULTIPLE

12:04PM  12   TEST TUBES, IT MIGHT BE COURIERRED ONCE OR TWICE, IT MIGHT BE

12:05PM  13   SITTING AROUND AWHILE.  THERE ARE JUST MORE THINGS THAT COULD

12:05PM  14   GO WRONG.

12:05PM  15   Q.   OKAY.  NOW, IF YOU'LL TURN TO THE NEXT PAGE, PAGE 3 OF THE

12:05PM  16   EXHIBIT.  THE SECOND PARAGRAPH READS, "THE MACHINES METE OUT

12:05PM  17   BITS OF 'MICRO-SAMPLE' FOR EACH TEST A DOCTOR HAS ORDERED.  IN

12:05PM  18   CONVENTIONAL TESTING, EACH TEST REQUIRED A DEDICATED VIAL,

12:05PM  19   WHICH ADDS DRAMATICALLY TO THE AMOUNT OF BLOOD REQUIRED.

12:05PM  20   THERANOS IS EVEN ABLE TO SAVE SOME OF THE TINY SAMPLE IN CASE

12:05PM  21   THE DOCTOR REQUESTS FURTHER TESTS AFTER SEEING THE INITIAL

12:05PM  22   RESULTS."

12:05PM  23        WAS THAT CONSISTENT WITH YOUR UNDERSTANDING OF THE

12:05PM  24   THERANOS TECHNOLOGY?

12:05PM  25   A.   MY UNDERSTANDING WAS THAT THEORETICALLY IT WAS POSSIBLE.

12:05PM  1    I DON'T KNOW IF THEY WERE DOING IT THEN.

12:05PM  2        BUT IF YOU HAD -- AGAIN, A CARTRIDGE WOULD HAVE TESTS ON

12:05PM  3    IT, YOU COULD MAYBE RUN 13 TESTS, AND THEN IF THE MARKERS CAME

12:05PM  4    UP A CERTAIN WAY AND YOU WANTED TO GO BACK AND RERUN ANOTHER

12:06PM  5    ONE, THAT COULD BE DONE.

12:06PM  6        I DON'T KNOW IF IT COULD BE DONE AT THAT TIME OR IF THAT

12:06PM  7    WAS PART OF THE VISION --

12:06PM  8    Q.   IF -- I'M SORRY.  GO AHEAD.

12:06PM  9    A.   SO I DON'T KNOW IF IT WAS FUTURISTIC OR CURRENT, BUT THAT

12:06PM  10   WAS PART OF THE VISION AT LEAST.

12:06PM  11   Q.   IN YOUR DISCUSSIONS WITH EITHER MS. HOLMES OR MR. BALWANI,

12:06PM  12   THEY DESCRIBED THIS CAPABILITY OR THIS POSSIBILITY?

12:06PM  13   A.   I THINK MORE OF A POSSIBILITY VERSUS A CURRENT CAPABILITY

12:06PM  14   TO BE HONEST.

12:06PM  15   Q.   THE NEXT PARAGRAPH READS, "ALL OF THE DIAGNOSTIC

12:06PM  16   TECHNOLOGY IS INTEGRATED, WHICH INCREASES PRECISION.  EACH

12:06PM  17   MACHINE IN A CONVENTIONAL LAB MAY CALIBRATE DIFFERENTLY, AND

12:06PM  18   THE MIX OF BRANDS AND AGES IN MEANS RESULTS COME WITH AN

12:06PM  19   IMPLIED 'OR SO' AT THE END.  PLOTTING RESULTS OVER TIME IS

12:06PM  20   THEREFORE MOSTLY USELESS."

12:06PM  21       IS THIS THE CONCEPT THAT YOU WERE EXPLAINING TO ME EARLIER

12:06PM  22   ABOUT THE CALIBRATION BETWEEN MACHINES?

12:06PM  23   A.   CORRECT.

12:06PM  24   Q.   SO WAS THIS CONSISTENT WITH YOUR UNDERSTANDING OF THE

12:06PM  25   THERANOS TECHNOLOGY?

12:06PM  1    A.   CORRECT.

12:06PM  2    Q.   WAS THERE A TIME WHEN YOU WERE MEETING WITH MS. HOLMES AND

12:07PM  3    MR. BALWANI THAT THEY SHOWED YOU A THERANOS DEVICE THAT WAS

12:07PM  4    COVERED IN PLASTIC OR IN SOME TYPE OF COVERING?

12:07PM  5    A.   YES.

12:07PM  6    Q.   AND WHEN WAS THAT?

12:07PM  7    A.   I DON'T RECALL IF IT WAS MY FIRST OR SECOND TRIP TO

12:07PM  8    THERANOS, BUT IT WAS PRETTY EARLY ON IN THE CONVERSATIONS.

12:07PM  9    Q.   AND WHAT DO YOU RECALL -- FIRST OF ALL, DO YOU RECALL

12:07PM  10   EITHER MS. HOLMES OR MR. BALWANI DESCRIBING THAT DEVICE TO YOU?

12:07PM  11           MR. DOWNEY:  I WOULD OBJECT TO THE FORM.  I THINK HE

12:07PM  12   COULD ASK INDIVIDUALLY ABOUT THE TWO INDIVIDUALS.  HE'S ASKING

12:07PM  13   A COMPOUND QUESTION EFFECTIVELY THAT I BELIEVE ASKS FOR AN

12:07PM  14   AMBIGUOUS ANSWER.

12:07PM  15           MR. SCHENK:  I CAN CLARIFY.

12:07PM  16           THE COURT:  SURE.  GO AHEAD.

12:07PM  17   BY MR. SCHENK:

12:07PM  18   Q.   DO YOU RECALL MS. HOLMES TALKING TO YOU ABOUT THIS DEVICE

12:07PM  19   THAT WAS COVERED IN SOME MATERIAL?

12:07PM  20   A.   MY RECOLLECTION IS MORE MR. BALWANI DESCRIBING IT AND

12:07PM  21   SHOWING IT TO ME.

12:07PM  22   Q.   OKAY.  AND WHAT DO YOU RECALL MR. BALWANI SAYING?

12:07PM  23   A.   THAT THEY WERE DOING SOME KIND OF WORK FOR THE MILITARY,

12:08PM  24   EARLY WORK UNDER NDA, COULDN'T SAY MUCH, BUT THAT THEY HAD

12:08PM  25   EFFECTIVELY HAD ONE OF THESE HELIVAC I BELIEVE IN AFGHANISTAN.

12:08PM   1          BUT TO BE ABLE TO SEE IN THE FUTURE, IF THERE WAS AN

12:08PM   2     OPPORTUNITY FOR THE MILITARY TO BE ABLE TO DO ACCURATE

12:08PM   3     ON-LOCATION REALTIME DIAGNOSTICS WERE NEEDED.

12:08PM   4     Q.   AND WERE YOU IMPRESSED BY THAT?

12:08PM   5     A.   YES, I WAS IMPRESSED BY THAT.

12:08PM   6     Q.   WHY?

12:08PM   7     A.   AGAIN, I THINK TO BE ABLE TO HAVE, YOU KNOW, THE MILITARY

12:08PM   8     PILOTING A NEW TECHNOLOGY IS -- ESPECIALLY OF THIS SORT IS

12:08PM   9     IMPRESSIVE.

12:08PM   10    Q.   THANK YOU.

12:08PM   11         YOUR HONOR, MAY I HAVE JUST ONE MOMENT?

12:08PM   12              THE COURT:  YES.

12:09PM   13         (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

12:09PM   14              MR. SCHENK:  NO FURTHER QUESTIONS, YOUR HONOR.

12:09PM   15              THE COURT:  CROSS-EXAMINATION?

12:09PM   16              MR. DOWNEY:  YES, YOUR HONOR.

12:09PM   17              THE COURT:  FOLKS, STAND UP AND STRETCH FOR A MOMENT

12:09PM   18    WHILE WE DO THE LINE CHANGE.

12:09PM   19         YOU CAN STRETCH IF YOU WOULD LIKE TO, SIR.  IF YOU WANT TO

12:09PM   20    STAND UP, GO AHEAD AND FEEL FREE.

12:09PM   21              THE WITNESS:  THANK YOU.  I APPRECIATE THAT.

12:10PM   22                          **CROSS-EXAMINATION**

12:10PM   23    BY MR. DOWNEY:

12:10PM   24    Q.   GOOD AFTERNOON, MR. MIQUELON.  MY NAME IS KEVIN DOWNEY AND

12:10PM   25    I REPRESENT MS. HOLMES.

MIQUELON CROSS BY MR. DOWNEY

12:10PM  1          I'M GOING TO REMOVE MY MASK SO WE CAN HEAR EACH OTHER MORE

12:10PM  2   CLEARLY.

12:10PM  3          I'D LIKE TO ASK YOU ABOUT WALGREENS IN 2010.

12:10PM  4   A.    UH-HUH.

12:10PM  5   Q.    AS I UNDERSTAND IT, IN THAT TIME PERIOD YOU HAD AROUND

12:11PM  6   8,000 STORES OR SO?

12:11PM  7   A.    ROUGHLY.

12:11PM  8   Q.    AND DID THAT NUMBER CONTINUE TO BE TRUE IN 2014 WHEN YOU

12:11PM  9   LEFT?

12:11PM 10   A.    MORE OR LESS.

12:11PM 11   Q.    OKAY.  AND MOST OF THE BUSINESS OF WALGREENS AT THAT TIME

12:11PM 12   WAS PHARMACY BUSINESS ON ONE SIDE OF THE BUSINESS; CORRECT?

12:11PM 13   A.    THE BUSINESS -- THE PHARMACY WOULD BE BROKEN CONCEPTUALLY

12:11PM 14   INTO TWO PARTS.  THERE WAS WHAT WE CALL THE FRONT END, SO IT

12:11PM 15   WAS THE EVERYDAY KIND OF CONSUMER PRODUCTS THAT EVERYBODY BUYS,

12:11PM 16   AND THEN THE PHARMACY IN THE BACK OF THE STORE.

12:11PM 17   Q.    AND WERE THOSE WALGREENS STORES IN OTHER BUSINESSES AT

12:11PM 18   THAT TIME?

12:11PM 19   A.    WALGREENS WAS IN SOME HEALTH CARE CLINICS, SOME INFUSION

12:11PM 20   AND SPECIALTY TYPE BUSINESSES IN PHARMACY.

12:11PM 21   Q.    AND WOULD THOSE FACILITIES TYPICALLY BE EITHER IN THE

12:11PM 22   STORE OR ADJACENT TO THE STORE?

12:11PM 23   A.    THE HEALTH CARE CLINICS WOULD BE IN THE STORE, BUT THE

12:11PM 24   INFUSION AND OTHER SPECIALTY CLINICS WOULD BE COMPLETELY

12:12PM 25   SEPARATE.

12:12PM   1    Q.   OKAY.  AND TELL US WHETHER IN 2010 WALGREENS WAS LOOKING

12:12PM   2    TO EXPAND ITS OFFERING OF HEALTH SERVICES.

12:12PM   3    A.   I THINK THAT'S BEEN AN EVOLVING STRATEGY OF THE COMPANY

12:12PM   4    FOR -- EVEN BEFORE THAT.

12:12PM   5    Q.   WOULD YOU DESCRIBE WHAT THAT STRATEGY WAS?

12:12PM   6    A.   TO CONTINUE TO MOVE DEEPER INTO HEALTH CARE, TO PROVIDE

12:12PM   7    SERVICES THAT MADE HEALTH CARE MORE ACCESSIBLE TO CUSTOMERS.

12:12PM   8    Q.   SO THAT WOULD INCLUDE THINGS LIKE THE VACCINATION THAT YOU

12:12PM   9    MENTIONED?

12:12PM  10    A.   CORRECT.

12:12PM  11    Q.   AND IT WOULD ALSO INCLUDE NEW BUSINESSES, LIKE POTENTIALLY

12:12PM  12    BLOOD TESTING; CORRECT?

12:12PM  13    A.   YES.

12:12PM  14    Q.   AND IN 2010 WITHIN THE COMPANY, WAS THERE A TEAM LOOKING

12:12PM  15    FOR OPPORTUNITIES IN TERMS OF PROVIDING HEALTH CARE

12:12PM  16    OPPORTUNITIES WITHIN THE STORES?

12:12PM  17    A.   YES.

12:12PM  18    Q.   AND WHO LED THAT TEAM?

12:12PM  19    A.   I BELIEVE IN 2010 IT WAS COLLIN WATTS WHO WAS OUR HEAD OF

12:13PM  20    INNOVATION.

12:13PM  21    Q.   AND WERE YOU INVOLVED IN THOSE EFFORTS?

12:13PM  22    A.   I WAS ONE OF THE SPONSORS TO THAT TEAM.

12:13PM  23    Q.   AND CAN YOU SAY A LITTLE BIT ABOUT WHY OFFERING THESE

12:13PM  24    HEALTH CARE SERVICES WAS GOOD FOR WALGREENS BUSINESS?  DID IT

12:13PM  25    INCREASE THE NUMBER OF CUSTOMERS WHO CAME INTO THE STORE?

12:13PM   1    A.   I THINK PHILOSOPHICALLY ANYTHING THAT IS GOOD FOR

12:13PM   2    WALGREENS, YOU KNOW, CUSTOMERS AS A PATIENT IS GOOD FOR

12:13PM   3    EVERYONE.

12:13PM   4         BUT, AGAIN, THE CONCEPT WAS TO SAY THAT IF YOU COULD MAKE

12:13PM   5    THESE SERVICES MORE ACCESSIBLE TO THE AVERAGE PERSON, THAT THAT

12:13PM   6    WOULD LEAD TO PEOPLE TAKING BETTER CONTROL OF THEIR HEALTH CARE

12:13PM   7    WHICH WOULD LEAD TO BETTER OUTCOMES.

12:13PM   8    Q.   AND DID YOU ALSO BELIEVE THAT JUST AS PART OF THE BUSINESS

12:13PM   9    MODEL IT WOULD BRING MORE CUSTOMERS TO WALGREENS?

12:13PM  10    A.   THAT WOULD BE PART OF IT, BUT THERE ARE MANY ASPECTS OF

12:14PM  11    BENEFITS.

12:14PM  12    Q.   AND WAS THERE ANY ANALYSIS DONE OF THE EFFECT ON

12:14PM  13    NON-HEALTH CARE SERVICE SALES IF THOSE TYPES OF SERVICES WERE

12:14PM  14    PLACED IN A STORE?

12:14PM  15    A.   I DON'T KNOW IF THERE WAS OR NOT, WHETHER THERE WAS AN

12:14PM  16    ANALYSIS AND WHAT WOULD THAT MEAN FOR INCREMENTAL PRESCRIPTIONS

12:14PM  17    OR FOR FRONT-END PURCHASES.

12:14PM  18         PART OF WHAT WAS VERY IMPORTANT, I THINK, WAS JUST

12:14PM  19    BECOMING MORE RELEVANT TO CUSTOMERS AND MORE RELEVANT TO HEALTH

12:14PM  20    PLANS.

12:14PM  21    Q.   OKAY.  SO IN 2010, YOU WERE LOOKING AT A NUMBER OF

12:14PM  22    POTENTIAL PARTNERS IN THAT SPACE; IS THAT RIGHT?

12:14PM  23    A.   WE WERE.

12:14PM  24    Q.   AND FROM THE PERSPECTIVE OF THE POTENTIAL PARTNERS,

12:14PM  25    WALGREENS WAS AN ATTRACTIVE OPTION AS WELL; CORRECT?

12:14PM  1    A.    I WOULD THINK SO.

12:14PM  2    Q.    AND THAT'S IN PART BECAUSE YOU HAD SO MANY STORES AND

12:14PM  3    LOCATIONS?

12:14PM  4    A.    CORRECT.

12:14PM  5    Q.    AND ALSO YOUR STORES TEND TO BE CONVENIENTLY LOCATED?

12:14PM  6    THEY'RE IN PLACES THAT PEOPLE CAN GET TO AND SHOP AND GET THEIR

12:15PM  7    PRESCRIPTIONS; RIGHT?

12:15PM  8    A.    CORRECT.  ALSO I BELIEVE AT THAT TIME THE COMPANY WAS

12:15PM  9    DOING CLOSE TO A THIRD OF ALL PRESCRIPTIONS IN THE COUNTRY, SO

12:15PM 10    YOU COULD ARGUE THAT YOU WOULD ALREADY HAVE A LARGE PATIENT

12:15PM 11    BASE FROM WHICH TO GIVE THEM ADDITIONAL BENEFITS.

12:15PM 12    Q.    AND DID THE COMPANY ALSO HAVE A LOT OF EXPERTISE IN RETAIL

12:15PM 13    AND CONSUMER OFFERINGS?

12:15PM 14    A.    I WOULD SAY YES.

12:15PM 15    Q.    AND WERE YOU LOOKING FOR WAYS TO TAKE THAT EXPERTISE AND

12:15PM 16    PUT IT IN NEW KINDS OF SERVICES?

12:15PM 17    A.    I MIGHT SAY IT DIFFERENTLY.  I THINK WE WERE LOOKING FOR

12:15PM 18    PEOPLE WHO HAD EXPERTISE IN DIFFERENT PARTS OF HEALTH CARE THAT

12:15PM 19    WOULD MARRY NICELY WITH THE CAPABILITIES THAT WE COULD BRING.

12:15PM 20    Q.    OKAY.  LET ME ASK YOU TO LOOK BACK AT EXHIBIT 300, WHICH I

12:15PM 21    THINK MR. SCHENK SHOWED YOU AND WHICH I BELIEVE IS IN EVIDENCE.

12:16PM 22          AND THIS IS AN EMAIL FROM YOU TO GREG WASSON AND OTHERS

12:16PM 23    FORWARDING THE BRIEFING POWERPOINT THAT YOU GOT FROM THERANOS.

12:16PM 24          DO YOU RECALL THAT?

12:16PM 25    A.    YES.

12:16PM  1    Q.   AND IN THE EMAIL THAT YOU SENT TO MR. WASSON, YOU SAY, I

12:16PM  2    THINK YOU OMITTED A WORD, BUT YOU SAY "AS MOST OF YOU KNOW,

12:16PM  3    PROVIDING DIAGNOSTIC SERVICES IN THE STORES, RETAIL CLINICS,

12:16PM  4    WORKSITE HEALTH CENTERS, HOME CARE, ET CETERA, IS IN OUR

12:16PM  5    STRATEGIC DOCUMENT AND HAS BEEN PART OF BOARD DISCUSSIONS."

12:16PM  6         WHAT IS THE -- WHAT WAS THE STRATEGIC DOCUMENT?

12:16PM  7    A.   THE COMPANY HAS, YOU KNOW, A STRATEGIC PLAN AND A PROCESS

12:17PM  8    AROUND EVOLVING THAT AND DEVELOPING THAT.

12:17PM  9         BUT, AGAIN, THAT EXTENSION INTO DEEPER, MORE ACCESSIBLE

12:17PM 10    HEALTH CARE SERVICES WAS A MULTI-YEAR OBJECTIVE.

12:17PM 11    Q.   AND WAS THAT SOMETHING THAT WAS BEING ENCOURAGED BY THE

12:17PM 12    BOARD OF DIRECTORS AS WELL?

12:17PM 13    A.   YES.

12:17PM 14    Q.   AND THAT WAS THE SUBJECT OF DISCUSSION AT BOARD MEETINGS?

12:17PM 15    A.   SOMETIMES.

12:17PM 16    Q.   YOU TALKED ABOUT THE MEETING THAT YOU HAD WITH MR. BALWANI

12:17PM 17    AND MS. HOLMES IN PALO ALTO.

12:17PM 18         DID YOU ALSO MEET WITH OTHER POTENTIAL PARTNERS AT CERTAIN

12:17PM 19    TIMES?

12:17PM 20    A.   WE DID.

12:17PM 21    Q.   WERE YOU PERSONALLY INVOLVED IN THAT?

12:17PM 22    A.   I WAS INVOLVED IN A FEW OF THOSE.

12:17PM 23    Q.   AND WERE THOSE -- WERE ANY OF THOSE RELATED TO PROVIDING

12:17PM 24    BLOOD TESTING SERVICES OR CLINICAL LAB SERVICES?

12:17PM 25    A.   YES.

12:17PM  1    Q.   AND WHICH ENTITY DID YOU PARTICIPATE IN THOSE MEETINGS

12:18PM  2    FOR?

12:18PM  3    A.   I DON'T KNOW IF I COULD REMEMBER THE NAMES.  THERE WAS A

12:18PM  4    GENTLEMAN, A SMALL STARTUP OUT OF RICE UNIVERSITY; THERE WAS A

12:18PM  5    STARTUP OUT OF ISRAEL; WE DID HIRE A CONSULTING FIRM TO LOOK AT

12:18PM  6    THE SPACE AND THEY IDENTIFIED 180 COMPANIES THAT WERE DOING

12:18PM  7    SOMETHING IN THE LAB TECHNOLOGY SPACE TO ASSESS.  BUT WE DIDN'T

12:18PM  8    TALK TO ALL 180, BUT WE HAD THE ANALYSIS DONE.

12:18PM  9    Q.   BUT THIS WAS ENOUGH OF A PRIORITY THAT YOU TOOK ALL OF

12:18PM  10   THOSE STEPS; IS THAT CORRECT?

12:18PM  11   A.   YES.

12:18PM  12   Q.   OKAY.  WHEN YOU FIRST HEARD ABOUT THERANOS, FIRST OF ALL,

12:18PM  13   DID YOU HEAR ABOUT IT INTERNALLY OR EXTERNALLY?

12:18PM  14   A.   INTERNALLY THROUGH DR. ROSAN.

12:18PM  15   Q.   DR. ROSAN IS DR. JAY ROSAN?

12:19PM  16   A.   THAT'S CORRECT.

12:19PM  17   Q.   AND REMIND US WHAT HIS TITLE WAS AT WALGREENS?

12:19PM  18   A.   I DON'T RECALL HIS TITLE, BUT HE WAS EFFECTIVELY THE CHIEF

12:19PM  19   MEDICAL EXPERT, IF YOU WILL, FOR THE INNOVATION TEAM.

12:19PM  20   Q.   AND WHEN YOU SAY "INNOVATION TEAM," WHAT WAS THE

12:19PM  21   INNOVATION TEAM?

12:19PM  22   A.   THE INNOVATION TEAM WAS A TEAM THAT WAS LOOKING TO

12:19PM  23   IDENTIFY NOT ONLY NEW, NEW PROJECTS, JOINT VENTURES AND

12:19PM  24   PARTNERSHIPS IN THE HEALTH CARE SPACE, BUT ALSO ULTIMATELY

12:19PM  25   PEOPLE FROM THAT TEAM WOULD BECOME PART OF THE WORKING TEAM TO

MIQUELON CROSS BY MR. DOWNEY

12:19PM 1   HELP COMMERCIALIZE IT.

12:19PM 2   Q.   AND I THINK YOU INDICATED BEFORE THAT YOU WENT TO THE

12:19PM 3   FIRST MEETING AT THERANOS WITH DR. ROSAN?

12:19PM 4   A.   I DID.

12:19PM 5   Q.   AND PRIOR TO THAT MEETING, DO YOU RECALL WHAT HE SAID TO

12:19PM 6   YOU ABOUT THERANOS?

12:19PM 7   A.   MORE OR LESS, BECAUSE WE HAD TALKED TO THESE OTHER

12:19PM 8   COMPANIES AND HE SAID THAT HE HAD HEARD ABOUT A COMPANY CALLED

12:19PM 9   THERANOS, AND FROM WHAT HE HAD HEARD, THIS MAY BE THE MOST

12:20PM 10  EXCITING AND FARTHEST AHEAD COMPANY IN THIS SPACE.

12:20PM 11  Q.   AND HE WANTED YOU TO TAKE THE TIME TO MEET WITH THEM?

12:20PM 12  A.   YES.

12:20PM 13  Q.   AT THE TIME THAT HE MADE THAT REQUEST TO YOU, YOU WERE THE

12:20PM 14  CHIEF FINANCIAL OFFICER OF THE COMPANY; CORRECT?

12:20PM 15  A.   CORRECT.

12:20PM 16  Q.   AND YOU HAD A BROAD PORTFOLIO; CORRECT?

12:20PM 17  A.   CORRECT.

12:20PM 18  Q.   AND YOU HAD SEVERAL HUNDRED PEOPLE REPORTING TO YOU AT

12:20PM 19  THAT TIME?

12:20PM 20  A.   MORE OR LESS, YEAH.

12:20PM 21  Q.   AND YOU WOULD, FROM THAT POINT FORWARD IN 2010 UNTIL THE

12:20PM 22  TIME THAT YOU LEFT WALGREENS IN 2014, HAVE SOME ENGAGEMENT WITH

12:20PM 23  THERANOS; CORRECT?

12:20PM 24  A.   YES.

12:20PM 25  Q.   AND GIVE US A SENSE OF HOW MUCH OF YOUR TIME YOU SPENT

12:20PM   1   DEALING WITH THERANOS DURING THE PERIOD OF 2010 TO 2014?

12:20PM   2   A.   IT WOULD BE HARD TO QUANTIFY THE HOURS.  I WOULD SAY I

12:21PM   3   PROBABLY INTERACTED WITH, YOU KNOW, SUNNY AND ELIZABETH I'M

12:21PM   4   GUESSING MAYBE 10 TO 15 TIMES.

12:21PM   5        I, AGAIN, VISITED THERANOS I DON'T KNOW HOW MANY TIMES,

12:21PM   6   PROBABLY FOUR OR FIVE TIMES.

12:21PM   7        I MADE A LOT OF INTRODUCTIONS TO OTHER PARTNERS THAT I

12:21PM   8   THOUGHT WOULD BE BENEFIT INITIAL TO THE MODEL.

12:21PM   9        BUT I WOULD SAY AROUND THE LAUNCH OF THE PILOT IN 2013 IS

12:21PM  10   WHERE MY INVOLVEMENT DIMINISHED BECAUSE WE HAD A WORKING TEAM

12:21PM  11   THAT WAS TAKING OVER.  SO I WOULD SAY THAT'S PROBABLY WHERE MY

12:21PM  12   TIME BECAME, YOU KNOW, VERY MINUSCULE.

12:21PM  13   Q.   OKAY.  AND WERE THERE OTHERS AT WALGREENS WHO SPENT A

12:21PM  14   SUBSTANTIAL AMOUNT OF THEIR TIME ON THERANOS?

12:21PM  15   A.   THERE WERE PEOPLE WHO WERE FULLY DEDICATED.

12:21PM  16   Q.   AND WOULD THAT INCLUDE DR. ROSAN?

12:21PM  17   A.   I WOULDN'T SAY HE WAS FULLY DEDICATED.  MAYBE HE WAS, IF I

12:21PM  18   HAD TO GUESS, MAYBE A THIRD OF HIS TIME OR SOMETHING.

12:21PM  19   Q.   SO, SO DR. ROSAN WAS INTERACTING A LOT WITH MR. BALWANI

12:22PM  20   AND MS. HOLMES?

12:22PM  21   A.   MORE FREQUENTLY THAN ME FOR SURE.

12:22PM  22   Q.   OKAY.  AND OTHERS AT WALGREENS WERE INTERACTING WITH

12:22PM  23   INDIVIDUALS AT THERANOS; CORRECT?

12:22PM  24   A.   CORRECT.

12:22PM  25   Q.   IS IT FAIR TO SAY THAT GIVEN YOUR SENIOR ROLE, YOU REALLY

12:22PM  1    ENGAGED ONLY ON SIGNIFICANT ISSUES?

12:22PM  2    A.   THAT'S PROBABLY SAFE TO SAY.  I THINK THE ROLE OF A

12:22PM  3    SPONSOR ON THESE TEAMS IS TO ENABLE THE TEAM.

12:22PM  4         AGAIN, I THINK AS I SAID BEFORE, I NEVER PRETENDED TO BE A

12:22PM  5    HEALTH CARE PROFESSIONAL, SO MY JOB IS MORE IN LINE OF HELPING

12:22PM  6    TO COMMERCIALIZE AND MAKING SURE THE TEAM HAS THE RIGHT

12:22PM  7    RESOURCES TO DO THEIR JOB.

12:22PM  8    Q.   OKAY.  AND IN CONNECTION WITH THERANOS, IS IT TRUE THAT

12:22PM  9    YOU TRIED TO MAINTAIN A HIGH LEVEL RELATIONSHIP WITH MS. HOLMES

12:22PM  10   AS THE PROJECT MOVED FORWARD?

12:22PM  11   A.   DEFINITELY.

12:22PM  12   Q.   DO YOU RECALL WHEN YOU FIRST ENGAGED WITH DR. ROSAN ABOUT

12:23PM  13   THERANOS AND HE DESCRIBED IT, DID HE DESCRIBE IT AS BEING THE

12:23PM  14   TECHNOLOGY THAT HE SAW AS THE FURTHEREST ALONG TO BE

12:23PM  15   COMMERCIALIZED?

12:23PM  16   A.   THAT -- I DON'T KNOW THAT HE WAS A LAB EXPERT PER SE

12:23PM  17   EITHER, BUT HIS UNDERSTANDING FROM WHAT HE HAD HEARD THAT THEY

12:23PM  18   WERE FARTHEST ALONG.

12:23PM  19        HE ALSO MET WITH SOME OF THE COMPANIES THAT I HAD MET

12:23PM  20   WITH, BUT I BELIEVE IT MIGHT HAVE BEEN AT HIS DIRECTION THAT WE

12:23PM  21   HIRED A CONSULTING FIRM TO BE ABLE TO GIVE US A BETTER

12:23PM  22   ASSESSMENT OF THE LAB SPACE.

12:23PM  23   Q.   AND THAT CONSULTANT REPORTED TO HIM FOR PURPOSES OF

12:23PM  24   ASSESSING OPPORTUNITIES?

12:23PM  25   A.   I CAN'T SAY THAT FOR CERTAIN.

12:23PM  1    Q.    LET'S TALK A LITTLE BIT ABOUT THE FIRST MEETING THAT YOU

12:24PM  2    TALKED ABOUT DURING YOUR DIRECT EXAMINATION.

12:24PM  3         HOW MUCH INFORMATION DID YOU KNOW ABOUT THERANOS BEFORE

12:24PM  4    YOU SHOWED UP FOR THE MEETING?

12:24PM  5    A.    VERY LITTLE.

12:24PM  6    Q.    OKAY.  BUT DID YOU RECOGNIZE THAT MS. HOLMES WAS A VERY

12:24PM  7    YOUNG ENTREPRENEUR?

12:24PM  8    A.    YES.

12:24PM  9    Q.    SHE WAS IN HER MID-TWENTIES AT THE TIME?

12:24PM  10   A.    YES.

12:24PM  11   Q.    AND I THINK YOU TESTIFIED THAT THE COMPANY WAS SIX AND A

12:24PM  12   HALF, SEVEN YEARS OLD; IS THAT CORRECT?

12:24PM  13   A.    YES.

12:24PM  14   Q.    AND YOU KNEW AT THAT TIME THAT THEY WERE TRYING TO DO A

12:24PM  15   CONSUMER FOCUSSED DEPLOYMENT?

12:24PM  16   A.    I DON'T KNOW IF IT WAS THAT DAY OR NOT -- YOU MEAN WITH

12:24PM  17   RESPECT TO SAFEWAY?  IS THAT THE QUESTION?

12:24PM  18   Q.    THE QUESTION WAS IN GENERAL.  YOU UNDERSTOOD THAT THEY

12:24PM  19   WERE LOOKING FOR A RETAIL PARTNER TO DO A CONSUMER DEPLOYMENT

12:24PM  20   WITH?

12:24PM  21   A.    YES.  WE SHARED THE VISION THAT PART OF THE DISRUPTIVE

12:25PM  22   FORCE WOULD BE BRINGING LABORATORY SERVICES AS CLOSE TO THE

12:25PM  23   CUSTOMER INTO THE COMMUNITY.

12:25PM  24   Q.    AND THIS WAS SOMETHING THAT THEY HAD NOT DONE BEFORE;

12:25PM  25   CORRECT?

12:25PM 1    A.    THAT THERANOS HAD NOT DONE?

12:25PM 2    Q.    RIGHT.

12:25PM 3    A.    AGAIN, I DON'T KNOW WHAT DEGREE THEY WERE IN SAFEWAY, I

12:25PM 4    DON'T HAVE KNOWLEDGE OF THAT.  BUT I DO KNOW THEY WERE DOING

12:25PM 5    SOMETHING WITH SAFEWAY.

12:25PM 6    Q.    THEY WERE HAVING DISCUSSIONS WITH SAFEWAY IN PARALLEL WITH

12:25PM 7    WALGREENS?

12:25PM 8    A.    I'M NOT TOTALLY PRIVY TO IT, BUT I KNEW THERE WERE SOME

12:25PM 9    DISCUSSIONS, BUT I DON'T KNOW THE EXTENT OF IT.

12:25PM 10   Q.    AND AFTER YOU CAME BACK FROM THAT MEETING, YOU SENT AN

12:25PM 11   EMAIL TO THE CEO OF WALGREENS; CORRECT?

12:25PM 12   A.    CORRECT.

12:25PM 13   Q.    I WANT YOU TO LOOK AGAIN AT THAT EMAIL WHICH IS

12:25PM 14   EXHIBIT 278 WHICH MR. SCHENK SHOWED YOU DURING YOUR DIRECT

12:25PM 15   EXAMINATION.

12:26PM 16        AND THIS IS AN EMAIL THAT YOU SENT SHORTLY AFTER THE

12:26PM 17   MEETING; CORRECT?

12:26PM 18   A.    YES.

12:26PM 19   Q.    AND YOU WROTE TO INFORM GREG WASSON, WHO WAS THE CEO AT

12:26PM 20   THE TIME; CORRECT?

12:26PM 21   A.    YEP.

12:26PM 22   Q.    AND YOU SAID, "WORTH A PEEK, BUT PLEASE DON'T FORWARD DUE

12:26PM 23   TO CONFIDENTIAL AGREEMENT."

12:26PM 24   A.    YEP.

12:26PM 25   Q.    "MANY COMPANIES TECHNOLOGIES AND ACCURACY NOW SURPASS THAT

12:26PM 1    OF LABS BUT THE KEY IS WHO GETS FDA APPROVAL FIRST."

12:26PM 2         IS THAT -- DID YOU -- WHERE DID YOU GET THAT KNOWLEDGE?

12:26PM 3    A.   I BELIEVE THAT WAS -- THAT KNOWLEDGE WAS FROM DR. ROSAN

12:26PM 4    WHICH CAME TO BE NOT ONLY FOR FDA DEVICES, BUT ALSO FOR CMS

12:26PM 5    APPROVALS.

12:26PM 6    Q.   AND THEN YOU GO ON AND SAY "AND THEY APPEAR IN THE LEAD."

12:26PM 7    CORRECT?

12:26PM 8    A.   YES.

12:26PM 9    Q.   AND THAT REFERS TO THERANOS?

12:26PM 10   A.   YES, BECAUSE A LOT OF THE COMPANIES THAT WE BENCHMARKED

12:27PM 11   WERE ABLE TO DO, YOU KNOW, ONE TEST WELL, BUT THEY WEREN'T ABLE

12:27PM 12   TO -- YOU KNOW, AGAIN, AS I DESCRIBED, THE PLATFORM TO DO A

12:27PM 13   BROAD ARRAY OF TESTS ON A SINGLE PLATFORM.

12:27PM 14   Q.   SO WHEN YOU SAY THEY COULD DO ONE TEST WELL, THEY MIGHT BE

12:27PM 15   ABLE TO SAY TEST, FOR EXAMPLE, FOR GLUCOSE?

12:27PM 16   A.   RIGHT.

12:27PM 17   Q.   BUT NOT FOR A RANGE OF TESTS; RIGHT?

12:27PM 18   A.   CORRECT.

12:27PM 19   Q.   AND PART OF WHAT ATTRACTED YOU TO WHAT THERANOS WAS DOING

12:27PM 20   WAS THAT THEY WERE DEVELOPING TESTS THAT WOULD DO IT ON A BROAD

12:27PM 21   RANGE OF ASSAYS; CORRECT?

12:27PM 22   A.   YES.

12:27PM 23   Q.   YOU GO ON IN THIS EMAIL TO SAY TO MR. WASSON, "NOTICE THE

12:27PM 24   CORRELATION DATA OF WHAT IS THE TOUGHEST OF ALL TESTS...

12:27PM 25   99 PERCENT."

12:27PM  1          AND I WANT TO ASK YOU TO LOOK AT SLIDE 8 IN THE ATTACHED

12:27PM  2     SLIDES.

12:28PM  3          I BEG YOUR PARDON.  IT'S PAGE 10 AT THE BOTTOM OF THE

12:28PM  4     ATTACHED SLIDE.

12:28PM  5          IS THIS THE CORRELATION DATA THAT YOU WERE REFERRING TO IN

12:28PM  6     YOUR COVER EMAIL?

12:28PM  7     A.   I BELIEVE SO.

12:28PM  8     Q.   AND CAN YOU EXPLAIN, AS YOU UNDERSTOOD IT AT THE TIME,

12:28PM  9     WHAT CORRELATION DATA WAS?

12:28PM  10    A.   IT WAS THERANOS VALIDATING FOR ANY GIVEN TEST HOW ACCURATE

12:28PM  11    A THERANOS MACHINE WAS VERSUS A CONVENTIONAL LAB MACHINE.

12:28PM  12    Q.   SO DOES, DOES -- IS THAT A COMPARISON OF HOW THE TWO TESTS

12:28PM  13    PERFORM RELATIVE TO SOME FORM OF STANDARD MEASUREMENT?

12:28PM  14    A.   THAT WAS MY UNDERSTANDING, YES.

12:28PM  15    Q.   OKAY.  AND YOU -- WHEN YOU REVIEWED THIS SLIDE IN THE

12:28PM  16    POWERPOINT, YOU THOUGHT THAT THIS WAS THE CORRELATION DATA FOR

12:29PM  17    THE TOUGHEST OF ALL TESTS; CORRECT?

12:29PM  18    A.   THAT WAS MY UNDERSTANDING, YES.

12:29PM  19    Q.   AND YOU NOTE THAT THE CORRELATION DATA WAS 99 PERCENT;

12:29PM  20    CORRECT?

12:29PM  21    A.   CORRECT.  AGAIN, I'M NOT A HEALTH CARE PROFESSIONAL, SO

12:29PM  22    THAT WAS MY UNDERSTANDING.  BUT, YES.

12:29PM  23    Q.   AND WHY WAS THE CORRELATION DATA IMPORTANT TO YOU IN

12:29PM  24    EVALUATING THIS ON WALGREENS'S BEHALF?

12:29PM  25    A.   WELL, MY ASSUMPTION WAS THAT IN ORDER TO BE ABLE TO GET

12:29PM 1    THE PROPER APPROVALS AND PROVIDE THE PATIENT ACCURACY, THAT THE

12:29PM 2    BETTER THE CORRELATOR, THE BETTER.

12:29PM 3    Q.   SO YOU RECOGNIZED THE CORRELATION DATA MIGHT BE IMPORTANT

12:29PM 4    FOR PURPOSES OF GETTING FDA APPROVAL, FOR EXAMPLE?

12:29PM 5    A.   OR CMS.  THAT WAS MY UNDERSTANDING.

12:29PM 6    Q.   AND ONE OF THE REGULATORS MIGHT BE INTERESTED IN THAT

12:29PM 7    DATA; CORRECT?

12:29PM 8    A.   CORRECT.

12:29PM 9    Q.   AND IN CONNECTION WITH THIS PRESENTATION, THAT'S THE SLIDE

12:30PM 10   THAT YOU POINTED OUT TO THE CEO WHEN YOU TRANSMITTED IT TO HIM

12:30PM 11   AFTER THE MEETING; CORRECT?

12:30PM 12   A.   IT APPEARS THAT WAY.

12:30PM 13   Q.   NOW, YOU TESTIFIED ABOUT THE THERANOS PLATFORM, AND I WANT

12:30PM 14   TO TAKE A MOMENT JUST TO BREAK THAT DOWN TO MAKE SURE THAT

12:30PM 15   WE'RE USING COMMON TECHNOLOGY, COMMON TERMINOLOGY ABOUT THE

12:30PM 16   TECHNOLOGY.

12:30PM 17        IN THE MEETING WITH MS. HOLMES AND MR. BALWANI, THEY

12:30PM 18   SHOWED YOU A SLIDE WHICH DESCRIBED THE THERANOS SYSTEMS;

12:30PM 19   CORRECT?

12:30PM 20   A.   YES.

12:30PM 21   Q.   AND IS THAT THE PLATFORM THAT YOU HAVE BEEN REFERRING TO

12:30PM 22   IN YOUR TESTIMONY?

12:30PM 23   A.   YES.

12:30PM 24   Q.   AND THAT CONSISTED OF ACTUALLY SEVERAL DIFFERENT

12:30PM 25   TECHNOLOGIES, DIDN'T IT?

12:30PM  1    A.   YES.

12:31PM  2    Q.   AND ONE OF THE TECHNOLOGIES WAS AN ANALYZER; CORRECT?

12:31PM  3    A.   YES.

12:31PM  4    Q.   AND ANOTHER PIECE OF THE TECHNOLOGY WAS THE ASSAY WHICH

12:31PM  5    WAS PLACED IN A CARTRIDGE THAT WOULD BE PUT INTO THE DEVICE FOR

12:31PM  6    PURPOSES OF BEING ANALYZED; CORRECT?

12:31PM  7    A.   THAT'S CORRECT.

12:31PM  8    Q.   AND YOU RECOGNIZED THAT THE ASSAYS WERE, WERE -- EACH OF

12:31PM  9    THEM HAD TO BE DEVELOPED BEFORE THEY WERE CAPABLE OF BEING USED

12:31PM  10   IN CONNECTION WITH A CARTRIDGE; CORRECT?

12:31PM  11   A.   CORRECT.

12:31PM  12   Q.   BUT THERANOS HAD DEVELOPED TO A CERTAIN LEVEL, AT LEAST,

12:31PM  13   SOME OF THOSE ASSAYS UNDER A METHOD; CORRECT?

12:31PM  14   A.   MY UNDERSTANDING WAS YES.

12:31PM  15   Q.   AND THEY BELIEVED THAT USING THAT METHOD, THEY WOULD BE,

12:31PM  16   THEY WOULD BE ABLE TO REPLICATE IT FOR ESSENTIALLY ALL COMMONLY

12:31PM  17   ORDERED ASSAYS; CORRECT?

12:31PM  18   A.   THAT WAS MY UNDERSTANDING, YES.

12:31PM  19   Q.   AND THAT'S WHAT THEY SUGGESTED IN THAT MEETING IN MARCH OF

12:32PM  20   2010; CORRECT?

12:32PM  21   A.   CORRECT.

12:32PM  22   Q.   AND ANOTHER PIECE OF THE TECHNOLOGY WAS THE GOVERNMENT

12:32PM  23   SOFTWARE THAT ASSOCIATED WITH THE SYSTEM; CORRECT?

12:32PM  24   A.   CORRECT.

12:32PM  25   Q.   AND THERE WAS SOFTWARE THAT WAS PART OF THE DEVICE;

12:32PM 1      CORRECT?

12:32PM 2      A.   CORRECT.

12:32PM 3      Q.   AND THERE WAS SOFTWARE THAT WAS PLACED WITHIN SYSTEMS AT

12:32PM 4      THERANOS TO COMMUNICATE WITH THE DEVICES; CORRECT?

12:32PM 5      A.   CORRECT.

12:32PM 6      Q.   AND IT WAS REALLY THAT SOFTWARE THAT OPENED UP A LOT OF

12:32PM 7      THE CAPABILITIES OF THERANOS TECHNOLOGY FOR THE FUTURE;

12:32PM 8      CORRECT?

12:32PM 9      A.   PART OF WHAT DID, YES, CORRECT.

12:32PM 10     Q.   WELL, LET ME ASK YOU TO LOOK WITHIN EXHIBIT 278.

12:33PM 11          THAT'S EXHIBIT 278, SLIDE 11.

12:33PM 12          DO YOU SEE THAT?

12:33PM 13     A.   SLIDE 11 YOU SAID?

12:33PM 14     Q.   IT'S LABELLED THERANOS:  CUSTOMIZED DATA INTEGRATION AND

12:33PM 15     STANDARDIZATION.

12:33PM 16     A.   YES, I SEE THAT.

12:33PM 17     Q.   AND THIS IS ONE MUCH THE SLIDES THAT YOU DISCUSSED IN THAT

12:33PM 18     MARCH OF 2010 MEETING; CORRECT?

12:33PM 19     A.   YES, CORRECT.

12:33PM 20     Q.   AND ONE OF THE CAPACITIES THAT THERANOS WAS INTERESTED IN

12:33PM 21     DEVELOPING WAS PREDICTIVE HEALTH ASSETS; CORRECT?

12:33PM 22     A.   I BELIEVE THAT WAS KIND OF THE END GAME, IF YOU WILL, IN

12:33PM 23     TERMS OF ASPIRATION FOR THEM.

12:33PM 24     Q.   AND EXPLAIN WHAT THAT MEANT AND WHAT THEY DESCRIBED TO YOU

12:33PM 25     THAT THEY WERE TRYING TO DO?

12:33PM   1    A.    A LOT OF DIFFERENT DISCUSSIONS.

12:33PM   2          YOU KNOW, ONE DISCUSSION WOULD BE IF YOU HAD YOUR, YOU

12:33PM   3    KNOW, LIKE A 23 & ME TEST, IT MIGHT SAY THAT YOU HAVE A MARKER

12:34PM   4    FOR A CERTAIN CANCER MAYBE, BUT IT DOESN'T MEAN THAT YOU'RE

12:34PM   5    GOING TO GET IT.  IT JUST MEANS THAT YOU MIGHT.

12:34PM   6          AND, YOU KNOW, PREDICTIVE TESTING WHERE YOU COULD BE

12:34PM   7    LOOKING AT IT, AND SO THAT WAS ONLY USEFUL TO SOME EXTENT.

12:34PM   8          BEING ABLE TO MEASURE BLOOD FREQUENTLY, ACCURATELY, ACROSS

12:34PM   9    A LOT OF DIFFERENT MARKERS MIGHT HELP THAT PERSON INTERVENE THE

12:34PM  10    PROCESS UPSTREAM, AND THAT BECOMES A MUCH HIGHER LEVEL OF

12:34PM  11    CLINICAL OUTCOME THAN JUST HELPING SOMEBODY WHO IS ALREADY

12:34PM  12    SICK.

12:34PM  13    Q.    AND WAS ANOTHER POTENTIAL CAPACITY OF THE TECHNOLOGY THAT

12:34PM  14    THEY WERE INVENTING THE ABILITY TO AGGREGATE DATA TO OBSERVE

12:34PM  15    EITHER TRENDS IN HEALTH IN THE LARGER POPULATION OR OTHER

12:34PM  16    THINGS?

12:34PM  17    A.    I THINK FOR SURE THAT WAS PART OF WHAT THEY WERE WORKING

12:34PM  18    ON.

12:34PM  19    Q.    AND SOME OF IT COULD HAVE PUBLIC HEALTH APPLICATIONS;

12:34PM  20    CORRECT?

12:34PM  21    A.    YES.

12:34PM  22    Q.    AND ALL OF THAT WAS DISCUSSED IN THIS EARLY MEETING;

12:35PM  23    CORRECT?

12:35PM  24    A.    I CAN'T SAY IF ALL OF THAT WAS DISCUSSED ON THE FIRST DAY,

12:35PM  25    BUT OVER TIME WE DISCUSSED A LOT OF THAT.

12:35PM 1    Q.   YOU RECALL AT SOME POINT DURING YOUR 10 OR 15 MEETINGS

12:35PM 2    WITH THEM THOSE DISCUSSIONS?

12:35PM 3    A.   YES.

12:35PM 4         MR. DOWNEY:  YOUR HONOR, IS THIS A GOOD TIME TO

12:35PM 5    BREAK?

12:35PM 6         THE COURT:  I'M NOT CERTAIN.  I THINK WE -- PERHAPS

12:35PM 7    WE SHOULD TAKE ABOUT A 25 MINUTE BREAK.

12:35PM 8         MR. DOWNEY:  OKAY.  I THINK I'M AT A LOGICAL POINT.

12:35PM 9         THE COURT:  OKAY.  LET'S DO THAT.  LADIES AND

12:35PM 10   GENTLEMEN, LET'S TAKE ABOUT A 25 MINUTE BREAK NOW.

12:35PM 11        BEFORE WE DO THAT, I DO WANT TO FOLLOW UP WITH MY

12:35PM 12   CONVERSATION WITH YOU BOTH THIS MORNING AND YESTERDAY, LADIES

12:35PM 13   AND GENTLEMEN.

12:35PM 14        I DO WANT TO TELL YOU ABOUT NEXT STEPS, AND I THINK YOU

12:35PM 15   INQUIRED, SOME OF YOU INQUIRED ABOUT THAT.

12:35PM 16        WHAT I INTEND TO DO -- AND THIS IS IN RELATION TO OUR

12:35PM 17   CONVERSATIONS REGARDING THE QUESTIONNAIRES.

12:35PM 18        WHAT I INTEND TO DO IS I'M GOING TO GET -- I'VE ASKED THE

12:35PM 19   LAWYERS TO PROVIDE ME ANY BRIEFING THAT THEY WISH ON SOME OF

12:36PM 20   THE LEGAL ISSUES, THAT IS, THE LAWYERS IN THE COURTROOM.

12:36PM 21        I'LL RECEIVE THOSE, I'LL TALK TO THE MOVING PARTY, YOU

12:36PM 22   HEARD ME TALK ABOUT THE MOVING PARTY FOR THE MOTION, AND

12:36PM 23   PROVIDE INFORMATION TO HIM.

12:36PM 24        IN ALL LIKELIHOOD, I AM GOING TO SET ANOTHER HEARING FOR

12:36PM 25   THAT MOVING PARTY'S MOTION TO RELEASE THE INFORMATION IN THE

MIQUELON CROSS BY MR. DOWNEY

12:36PM  1    QUESTIONNAIRES.

12:36PM  2         JUST GIVEN THE BRIEFING SCHEDULE, WHAT THAT MEANS IS EACH

12:36PM  3    SIDE IS PERMITTED AN OPPORTUNITY TO PRESENT TO ME THEIR LEGAL

12:36PM  4    OPINIONS ABOUT WHAT THE LAW IS ON THIS ISSUE, AND THEY'RE GIVEN

12:36PM  5    CERTAIN TIME, ONCE THEY RECEIVE THE OTHER SIDE'S MOTION, AND I

12:36PM  6    GIVE THEM TIME TO RESPOND, SO WE HAVE A BACK AND FORTH.

12:36PM  7         I THEN SET A HEARING, ANOTHER HEARING.  AND THAT'S WHAT I

12:36PM  8    INTEND TO DO IN REGARDS TO THIS ISSUE.

12:36PM  9         THAT HEARING, I DON'T HAVE A DATE FOR IT YET, BUT I

12:36PM  10   ANTICIPATE THAT HEARING WILL BE ANOTHER FIVE WEEKS AWAY,

12:36PM  11   SOMETHING LIKE THAT, JUST GIVEN THE BRIEFING SCHEDULE.  THAT'S

12:37PM  12   MY SENSE OF IT.  BUT I'LL KEEP YOU INFORMED OF THAT.

12:37PM  13        AND THEN AFTER THE HEARING I'LL HEAR FROM ALL OF THE

12:37PM  14   PARTIES, AND AT THAT POINT THEN I BELIEVE THAT I'LL BE ABLE TO

12:37PM  15   MAKE DECISIONS AS TO THE THINGS THAT WE TALKED ABOUT AND THE

12:37PM  16   THINGS THAT WERE RAISED IN THE MOTION BY THE MOVING PARTY, THE

12:37PM  17   MEDIA COALITION.

12:37PM  18        SO I JUST WANT TO KEEP YOU UP TO DATE ON THAT.  THAT'S THE

12:37PM  19   STATUS OF THINGS NOW.  NOTHING IS GOING TO CHANGE UNTIL I'VE

12:37PM  20   HAD ALL OF THOSE HEARINGS.

12:37PM  21        SO THE MATERIAL REMAINS AS IT CURRENTLY IS, AND THAT WON'T

12:37PM  22   CHANGE UNTIL AFTER I'VE HAD AN OPPORTUNITY TO HEAR FROM

12:37PM  23   EVERYONE.

12:37PM  24        SO THAT'S THE LATEST UPDATE.  THANK YOU VERY MUCH FOR YOUR

12:37PM  25   PATIENCE THIS MORNING.

12:37PM 1        ONE MORE THING.  I THINK I'VE TALKED TO YOU ABOUT TOMORROW

12:37PM 2   BEING -- I'VE BEEN ABLE TO CLEAR THAT FOR OUR PURPOSES.

12:37PM 3        DURING THIS BREAK I'M GOING TO ASK YOU IF YOU COULD,

12:37PM 4   PLEASE, TO CONTACT THE PARTIES THAT YOU NEED TO TO SEE IF YOU

12:37PM 5   CAN MAKE THAT WORK, COME TO COURT TOMORROW AND MAKE IT WORK.

12:38PM 6        IT WOULD BE FROM 9:00 TO 3:00.  I WOULDN'T WANT TO KEEP

12:38PM 7   YOU UNTIL 4:00 TOMORROW, BUT 9:00 TO 3:00 TOMORROW.  IF YOU

12:38PM 8   NEED TO ADJUST THAT, I'LL BE HAPPY TO HEAR THAT INFORMATION

12:38PM 9   WHEN WE COME BACK FROM OUR BREAK IF YOU'RE ABLE TO MAKE IT

12:38PM 10  TOMORROW OR IF WE NEED TO ADJUST THAT SCHEDULE.

12:38PM 11       ALL RIGHT.  LET'S TAKE OUR BREAK.

12:38PM 12       SIR, YOU CAN STAND DOWN.

12:38PM 13           THE CLERK:  COURT IS IN RECESS.

12:38PM 14       (JURY OUT AT 12:38 P.M.)

12:38PM 15           THE COURT:  PLEASE BE SEATED.  THANK YOU.

12:38PM 16       THE RECORD SHOULD REFLECT THAT OUR JURY HAS LEFT FOR THE

12:38PM 17  BREAK, AND OUR WITNESS HAS LEFT THE COURTROOM.  ALL COUNSEL AND

12:39PM 18  MS. HOLMES ARE PRESENT.

12:39PM 19       ANYTHING FURTHER BEFORE WE BREAK, MR. SCHENK?

12:39PM 20           MR. SCHENK:  NO, YOUR HONOR.  THANK YOU.

12:39PM 21           MR. DOWNEY:  NO, YOUR HONOR.  THANK YOU.

12:39PM 22           THE COURT:  SO IF WE ARE ABLE TO CONVENE TOMORROW,

12:39PM 23  HAVE A SESSION TOMORROW, YOU'LL BE ABLE TO HAVE WITNESSES I

12:39PM 24  TAKE IT, MR. SCHENK.

12:39PM 25           MR. SCHENK:  YES.

12:39PM   1              THE COURT:  OKAY.  GREAT.  THANK YOU.

12:39PM   2              THE CLERK:  COURT IS IN RECESS.

12:39PM   3          (LUNCH RECESS TAKEN AT 12:39 P.M.)

          4

          5

          6

          7

          8

          9

         10

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

12:39PM  1                      **AFTERNOON SESSION**

01:12PM  2          (JURY IN AT 1:12 P.M.)

01:12PM  3               THE COURT:  THANK YOU.  WE'RE BACK ON THE RECORD.

01:12PM  4          ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.

01:12PM  5          MR. DOWNEY, YOU'D LIKE TO CONTINUE WITH YOUR EXAMINATION?

01:12PM  6               MR. DOWNEY:  YES, SIR.  THANK YOU.

01:12PM  7     Q.   MR. MIQUELON, BEFORE THE BREAK WE WERE TALKING ABOUT THE

01:12PM  8     THERANOS SYSTEMS THAT WERE PRESENTED TO YOU IN MARCH OF 2010 IN

01:12PM  9     YOUR VERY FIRST MEETING WITH MS. HOLMES AND MR. BALWANI.

01:12PM  10          I'D LIKE TO JUST ESTABLISH WHAT THE CHRONOLOGY WAS OF YOUR

01:13PM  11    RELATIONSHIP WITH THERANOS, OR I SHOULD SAY WALGREENS'S

01:13PM  12    RELATIONSHIP WITH THERANOS BETWEEN THAT MEETING AND THE TIME

01:13PM  13    THAT YOU LEFT IN AUGUST OF 2014.

01:13PM  14          AM I RIGHT THAT YOUR FIRST MEETING AND INTRODUCTION INTO

01:13PM  15    THERANOS WAS IN THE MEETING OF MARCH OF 2010; CORRECT?

01:13PM  16    A.   CORRECT.

01:13PM  17    Q.   AND COMING OUT OF THAT MEETING, BOTH SIDES MET AND

01:13PM  18    EVALUATED THE POSSIBILITY OF A DEAL FOR A FEW MONTHS; CORRECT?

01:13PM  19    A.   CORRECT.

01:13PM  20    Q.   AND IN JULY OF 2010, THE PARTIES SIGNED THEIR FIRST

01:13PM  21    AGREEMENT; CORRECT?

01:13PM  22    A.   THAT'S CORRECT.

01:13PM  23    Q.   AND THAT AGREEMENT CONTEMPLATED AT THAT TIME THAT THERANOS

01:13PM  24    DEVICES WOULD BE DEPLOYED WITHIN WALGREENS STORES; CORRECT?

01:13PM  25    A.   AT SOME POINT, YES, CORRECT.

01:14PM  1    Q.   AND FROM THAT POINT IN JULY OF 2010 FOR ABOUT A YEAR AND A

01:14PM  2    HALF, THE PARTIES WORKED ON ALL OF THE THINGS THAT WOULD GO

01:14PM  3    INTO HAVING THAT TYPE OF LAUNCH; CORRECT?

01:14PM  4    A.   THAT'S CORRECT.

01:14PM  5    Q.   AND THAT INCLUDED THINGS LIKE INSURANCE REIMBURSEMENT;

01:14PM  6    CORRECT?

01:14PM  7    A.   YES.

01:14PM  8    Q.   BUSINESS MODEL; CORRECT?

01:14PM  9    A.   YES.

01:14PM  10   Q.   AND OTHER ITEMS?

01:14PM  11   A.   YES.

01:14PM  12   Q.   IN EARLY 2012, THOUGH, THE PARTIES STARTED TO DISCUSS A

01:14PM  13   POTENTIAL CHANGE IN THE BUSINESS MODEL; CORRECT?

01:14PM  14   A.   YES.

01:14PM  15   Q.   AND THAT CHANGE WOULD INVOLVE THERANOS DEVICES NOT BEING

01:14PM  16   DEPLOYED IN THERANOS STORES; CORRECT?  IN WALGREENS STORES?

01:14PM  17   A.   CORRECT.

01:14PM  18   Q.   AND THE PARTIES WORKED ON A NEW AGREEMENT TO GOVERN THEIR

01:14PM  19   RELATIONSHIP FOR SEVERAL MONTHS AFTER THOSE DISCUSSIONS IN

01:14PM  20   EARLY 2012; CORRECT?

01:14PM  21   A.   YES.

01:14PM  22   Q.   AND THE PARTIES ENTERED INTO A NEW AGREEMENT AMENDING THE

01:14PM  23   FIRST AGREEMENT IN JUNE OF 2012; CORRECT?

01:15PM  24   A.   YES.

01:15PM  25   Q.   AND FROM THAT POINT FORWARD, THE INTENT WAS NOT THAT

01:15PM 1    THERANOS DEVICES WOULD BE PLACED IN WALGREENS STORES, BUT

01:15PM 2    RATHER THAT THERE WOULD BE CENTRAL LABS IN WHICH THE BLOOD

01:15PM 3    ANALYSIS WOULD BE DONE; CORRECT?

01:15PM 4    A.   MY UNDERSTANDING WAS THAT THERE WOULD BE A CENTRAL

01:15PM 5    LOCATION WHERE THE THERANOS MACHINES WOULD DO THE LAB WORK.

01:15PM 6    Q.   AND THAT WOULD BE A LABORATORY CERTIFIED UNDER CLIA;

01:15PM 7    CORRECT?

01:15PM 8    A.   CORRECT.

01:15PM 9    Q.   AND IT WAS POSSIBLE ALSO THAT THERE WOULD BE MORE THAN ONE

01:15PM 10   LAB?  THERE MIGHT BE REGIONAL LABS WHERE THAT WAS DONE;

01:15PM 11   CORRECT?

01:15PM 12   A.   I THINK THAT WAS PART OF THE DISCUSSIONS, THAT OVER TIME

01:15PM 13   IT MIGHT MAKE SENSE TO HAVE MULTIPLE LABS WITH THERANOS

01:15PM 14   MACHINES, CORRECT.

01:15PM 15   Q.   AND AFTER THAT POINT WHEN THAT AGREEMENT WAS REACHED IN

01:15PM 16   JUNE OF 2012, A LITTLE OVER A YEAR LATER THERANOS STORES -- OR

01:15PM 17   THERANOS SITES WERE LAUNCHED IN WALGREENS STORES ORIGINALLY IN

01:16PM 18   PALO ALTO; CORRECT?

01:16PM 19   A.   I BELIEVE THERE WAS ONE IN PALO ALTO FIRST.

01:16PM 20   Q.   AND THAT HAPPENED AROUND SOMETIME -- I THINK WITH FRIENDS

01:16PM 21   AND FAMILY FIRST IN SEPTEMBER OF 2013; CORRECT?

01:16PM 22   A.   THAT DATE SOUNDS CORRECT.

01:16PM 23   Q.   AND THEN THERE WAS A LAUNCH IN -- A COMMERCIAL LAUNCH IN

01:16PM 24   PALO ALTO AND IN SOME STORES IN ARIZONA IN NOVEMBER OF 2013;

01:16PM 25   CORRECT?

01:16PM   1    A.   THAT'S ABOUT THE RIGHT TIMEFRAME.

01:16PM   2    Q.   NOW, WHEN YOU LOOK AT THE REPRESENTATIONS THAT WERE MADE

01:16PM   3    IN THE ORIGINAL MEETING THAT YOU HAD WITH MS. HOLMES, MANY OF

01:16PM   4    THOSE REPRESENTATIONS WOULD NO LONGER BE RELEVANT TO THE SECOND

01:16PM   5    BUSINESS MODEL; CORRECT?

01:16PM   6    A.   YOU WOULD PROBABLY HAVE TO PARSE THEM ONE BY ONE FOR ME TO

01:16PM   7    SAY THAT.

01:16PM   8    Q.   OKAY.  WELL, LET'S TALK, FOR EXAMPLE, ABOUT

01:16PM   9    REPRESENTATIONS RELATED TO THE SPEED OF PROCESSING THE SAMPLES.

01:16PM  10         DO YOU RECALL TALKING ABOUT THAT ON YOUR DIRECT

01:17PM  11    EXAMINATION?

01:17PM  12    A.   YES.

01:17PM  13    Q.   AND THERE WERE REPRESENTATIONS WHICH INDICATED THAT

01:17PM  14    THERANOS PROJECTED THAT BLOOD TESTS COULD BE PERFORMED IN LESS

01:17PM  15    THAN 30 MINUTES.

01:17PM  16         DO YOU RECALL THAT?

01:17PM  17    A.   YES.

01:17PM  18    Q.   AND THE ASSUMPTION BEHIND THAT WAS THAT THE BUSINESS MODEL

01:17PM  19    WOULD BE THAT THE DEVICES WORK IN THE WALGREENS STORES;

01:17PM  20    CORRECT?

01:17PM  21    A.   THAT WAS THE ORIGINAL -- YES, FOR THAT ASSUMPTION, THAT

01:17PM  22    WAS THE ORIGINAL DESIGN.

01:17PM  23    Q.   BUT THE AGREEMENT THAT THE PARTIES REACHED IN THE SUMMER

01:17PM  24    OF 2012 CHANGED HOW THAT MODEL WOULD WORK; CORRECT?

01:17PM  25    A.   THAT'S CORRECT.

01:17PM  1    Q.   AND THE TESTING WOULD NOT BE IN STORES, BUT IT WOULD BE

01:17PM  2    OFFSITE; CORRECT?

01:17PM  3    A.   THAT'S CORRECT.

01:17PM  4    Q.   AND BOTH PARTIES AGREED TO THAT; CORRECT?

01:17PM  5    A.   CORRECT.

01:17PM  6    Q.   AND THAT WOULD ELIMINATE THE CAPACITY TO TEST WITHIN 15 TO

01:17PM  7    30 MINUTES; CORRECT?

01:17PM  8    A.   THAT'S CORRECT.

01:17PM  9    Q.   AND ALSO THERE WERE DISCUSSIONS IN 2010 THAT CERTAIN COSTS

01:18PM  10   ASSOCIATED WITH BLOOD TESTING WOULD BE ELIMINATED IF THE

01:18PM  11   DEVICES WERE IN THE STORE; CORRECT?

01:18PM  12   A.   CORRECT.

01:18PM  13   Q.   AND THINGS LIKE COURIER SERVICES THAT WOULD HAVE TO TAKE

01:18PM  14   THE BLOOD FROM ONE LOCATION TO ANOTHER, FOR EXAMPLE?

01:18PM  15   A.   THAT'S CORRECT.

01:18PM  16   Q.   AND AN INFRASTRUCTURE TO REFRIGERATE SAMPLES FOR A PERIOD

01:18PM  17   BEFORE THEY WERE TRANSPORTED?

01:18PM  18   A.   THAT'S -- FROM MY UNDERSTANDING, THAT'S CORRECT.

01:18PM  19   Q.   OKAY.  BUT WHEN THE MODEL CHANGED IN THE SUMMER OF 2012,

01:18PM  20   SOME OF THOSE COSTS WOULD HAVE TO BE INCURRED; CORRECT?

01:18PM  21   A.   RIGHT.  AND AGAIN, FROM MY UNDERSTANDING WHAT CHANGED IN

01:18PM  22   THE MODEL IS FORSAKE OF THE PILOT -- A COUPLE OF THINGS.

01:18PM  23        ONE IS THAT, AS WE THOUGHT ABOUT THE APPROVALS IN THIS

01:18PM  24   UNDEFINED, YOU KNOW, WHERE IS THE LAB BY BEING ABLE TO PILOT

01:18PM  25   WITHOUT THE MACHINE IN THE WALGREENS STORE, IT MITIGATED THAT

MIQUELON CROSS BY MR. DOWNEY

01:19PM 1    CONCERN UNTIL THAT COULD BE CLARIFIED.

01:19PM 2         SECOND, JUST IN TERMS OF MAKING SURE THAT WE COULD EXECUTE

01:19PM 3    WITH EXCELLENCE, YOU KNOW, THERE IS A LITTLE BIT MORE

01:19PM 4    COMPLEXITY IN ASKING A PHARMACY TO KEEP CARTRIDGES AND TO

01:19PM 5    UNDERSTAND HOW TO USE THOSE PROPERLY.

01:19PM 6         AND SO WE FELT THAT IT WAS A GOOD WAY TO KEEP THE PATIENT

01:19PM 7    LEARNING, WHICH WAS VERY IMPORTANT.

01:19PM 8    Q.   AT THE TIME THAT YOU LEFT WALGREENS IN AUGUST OF 2014,

01:19PM 9    THERE WERE ABOUT 40 THERANOS LOCATIONS OPERATING IN WALGREENS

01:19PM 10   STORES; CORRECT?

01:19PM 11   A.   IT MIGHT HAVE BEEN.  I DON'T KNOW THE EXACT NUMBER.

01:19PM 12   Q.   YOU KNOW THERE WERE SEVERAL DOZEN, WHATEVER THE EXACT

01:19PM 13   NUMBER WAS?

01:19PM 14   A.   RIGHT.

01:19PM 15   Q.   AND YOU KNOW THAT THOSE LOCATIONS WERE IN BOTH ARIZONA AND

01:19PM 16   CALIFORNIA; CORRECT?

01:19PM 17   A.   I THINK THAT'S MY RECOLLECTION.

01:19PM 18   Q.   OKAY.  AND IN THE TERMINOLOGY THAT THE PARTIES USED, THE

01:19PM 19   PHASE OF THE AGREEMENT WHEN THE DEVICES WOULD BE IN A CENTRAL

01:19PM 20   LAB WAS REFERRED TO AS PHASE I; CORRECT?

01:20PM 21   A.   I'D HAVE TO GO BACK TO THE AGREEMENT TO BE SURE ABOUT

01:20PM 22   THAT.

01:20PM 23   Q.   OKAY.  BUT THERE WAS A SECOND PHASE THAT ASSUMED IF THE

01:20PM 24   DEVICES GOT CERTAIN REGULATORY APPROVALS, THAT THE DEVICES

01:20PM 25   MIGHT THEN BE DEPLOYED TO THE WALGREENS STORES AS ORIGINALLY

01:20PM   1   CONTEMPLATED WHEN YOU TALKED TO MS. HOLMES IN MARCH OF 2010?

01:20PM   2   A.   YES.  BUT TO SOME EXTENT THAT WAS JUST BASED UPON THE

01:20PM   3   MATH.  IF YOU HAD A SPECIFIC SITE THAT WAS DOING LOTS OF

01:20PM   4   VOLUME, IT MIGHT MAKE SENSE TO HAVE A MACHINE THERE AND THE

01:20PM   5   CARTRIDGE INVENTORY, VERSUS ANOTHER SITE WHERE YOU MIGHT HAVE

01:20PM   6   VERY LOW VOLUME, THAT MIGHT MAKE SENSE.  BUT I WOULD SAY THE

01:20PM   7   ECONOMICS WOULD HAVE DICTATED THAT.

01:20PM   8   Q.   SO IN CERTAIN CASES THE ECONOMICS MIGHT LEAD THE PARTIES

01:20PM   9   TO THINK THAT IT'S REALLY NOT WORTH DEPLOYING A DEVICE IN A

01:20PM   10   STORE; CORRECT?

01:20PM   11   A.   RIGHT.  I THINK THAT WAS ALWAYS A CONSIDERATION, WHAT IS

01:20PM   12   THE SMARTEST EXECUTION BASED ON WHAT IS ACCEPTABLE.

01:20PM   13   Q.   SO THAT STORE MIGHT STICK WITH THE MODEL WHERE THE SAMPLES

01:20PM   14   WERE PROCESSED WITHIN THE CENTRAL CLIA LAB; IS THAT CORRECT?

01:21PM   15   A.   RIGHT.

01:21PM   16   Q.   BUT WE SAW REFERENCE IN SOME OF THE DOCUMENTS THAT WE LOOK

01:21PM   17   AT TO REGULATORY RISKS.  IS THIS ONE OF THE ISSUES THAT

01:21PM   18   MOTIVATED PEOPLE TO MOVE -- MOTIVATED WALGREENS AND THERANOS TO

01:21PM   19   ELECT TO GO TO THIS MODEL?

01:21PM   20   A.   AGAIN, I THINK EARLY ON THAT WAS PART OF THE

01:21PM   21   CONSIDERATION, AGAIN, BECAUSE OF THIS ISSUE OF WHERE IS THE

01:21PM   22   LAB?  IS IT WHERE THE EDISON IS OR IS IT WHERE THE DATA

01:21PM   23   ULTIMATELY RESIDES IN THE CLOUD?

01:21PM   24        THAT WAS SOMETHING THAT I BELIEVE AT THAT TIME WAS NOT

01:21PM   25   CLEAR YET, AND SO WHAT WAS SEEN AS THE, YOU KNOW, THE MORE

01:21PM 1    PRUDENT CHOICE WAS TO KEEP THE LAB OUTSIDE OF THE STORE.

01:21PM 2        BUT ALSO JUST IN TERMS OF PATIENT EXPERIENCE, MAKING SURE

01:21PM 3    THERE WAS NO RISK OF STORES NOT USING THE RIGHT CARTRIDGE OR

01:21PM 4    UNDERSTANDING HOW TO RUN IT.  WE FELT THAT THAT WAS GOING TO BE

01:21PM 5    A BETTER WAY TO LEARN.

01:21PM 6    Q.   OKAY.  AND I WANT TO GO BACK THROUGH THAT CHRONOLOGY WITH

01:22PM 7    YOU A LITTLE BIT AND FILL IN WHAT HAPPENED AT THE CRITICAL

01:22PM 8    POINTS.

01:22PM 9        BUT IS IT FAIR TO SAY THAT IF YOU WANT TO EVALUATE THE

01:22PM 10   REPRESENTATIONS THAT THE PARTIES WERE MAKING TO EACH OTHER, YOU

01:22PM 11   HAVE TO LOOK AT THE POINT IN TIME WHERE THE PARTIES WERE IN THE

01:22PM 12   COURSE OF THE CHRONOLOGY THAT WE'VE JUST DISCUSSED?

01:22PM 13   A.   I THINK CONTEXT IS IMPORTANT, RIGHT.

01:22PM 14   Q.   ALL RIGHT.  NOW, WE WERE DISCUSSING BEFORE THE BREAK THE

01:22PM 15   ORIGINAL MEETING THAT YOU HAD, AND THEN YOUR TRANSMISSION OF

01:22PM 16   THE THERANOS POWERPOINT TO THE CEO, AND WE DISCUSSED THE

01:22PM 17   TECHNOLOGY.

01:22PM 18       DID -- WERE THERE THEN MEETINGS WITHIN WALGREENS TO

01:22PM 19   CONSIDER WHETHER OR NOT TO PROCEED WITH A DEAL WITH THERANOS?

01:22PM 20   A.   MULTIPLE.

01:22PM 21   Q.   AND WERE THEY AT SENIOR LEVELS?

01:22PM 22   A.   AT EVERY LEVEL FROM LOWER WORKING TEAM TO HIGHER LEVEL ON

01:23PM 23   THE TEAM TO THE HIGHEST LEVEL OF THE COMPANY.

01:23PM 24   Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 300, WHICH WILL BE IN

01:23PM 25   YOUR WHITE BINDER.

01:23PM   1          YOUR HONOR, I BELIEVE 300 IS --

01:23PM   2                  THE COURT:  IT'S IN EVIDENCE.

01:23PM   3                  MR. DOWNEY:  IT'S IN EVIDENCE, YES.  IT IS IN

01:23PM   4    EVIDENCE.

01:23PM   5    Q.   THE ADDRESSEES FOR THE EMAIL THAT YOU SENT IN LATE APRIL

01:23PM   6    ARE ALL OF THE -- AMONG THE MOST SENIOR EXECUTIVES, INCLUDING

01:23PM   7    THE MOST SENIOR EXECUTIVES IN THE COMPANY; CORRECT?

01:23PM   8    A.   THAT IS CORRECT.

01:23PM   9    Q.   AND DO YOU RECALL THE DISCUSSION THAT FOLLOWED FROM

01:23PM  10    SETTING UP THIS MEETING?

01:24PM  11    A.   I DON'T KNOW IF I RECALL THE DISCUSSION THAT FOLLOWED.  I

01:24PM  12    RECALL HAVING THE MEETING.

01:24PM  13    Q.   AND WAS THERE A DISCUSSION IN THE MEETING ABOUT WHETHER OR

01:24PM  14    NOT TO PURSUE A RELATIONSHIP WITH THERANOS?

01:24PM  15    A.   YES.

01:24PM  16    Q.   OKAY.  AND THEN WHAT WAS THE CONCLUSION OF THAT MEETING?

01:24PM  17    A.   I THINK THE CONCLUSION OF THE MEETING WAS THAT THIS

01:24PM  18    APPEARS TO BE REALLY EXCITING, LET'S KEEP WORKING WITH THEM,

01:24PM  19    LET'S SEE WHERE THIS WILL GO.

01:24PM  20    Q.   AND DID THE COMPANY DECIDE THAT YOU WANTED TO TAKE FURTHER

01:24PM  21    STEPS TO TRY TO EVALUATE WHETHER OR NOT SUCH A RELATIONSHIP

01:24PM  22    WOULD BE GOOD FOR WALGREENS?

01:24PM  23    A.   YES.

01:24PM  24    Q.   AND WERE SOME OF THOSE STEPS TO EVALUATE HOW A BUSINESS

01:24PM  25    MODEL MIGHT WORK?

01:24PM  1    A.   YES.

01:24PM  2    Q.   AND WERE SOME OF THOSE STEPS TO EVALUATE THE FINANCIAL

01:24PM  3    CONDITION OF THERANOS?

01:24PM  4    A.   TO THE EXTENT THAT WE COULD.

01:24PM  5    Q.   OKAY.  WELL, YOU BECAME A BIT FAMILIAR WITH THE INVESTOR

01:24PM  6    BASE OF THERANOS; CORRECT?

01:24PM  7    A.   JUST THROUGH TIDBITS OF CONVERSATION.  BUT WE NEVER GOT,

01:24PM  8    YOU KNOW, TO MY KNOWLEDGE A CAP TABLE, IF YOU WILL, THAT SHOWS

01:25PM  9    SPECIFIC INVESTORS AND INVESTMENTS.

01:25PM  10   Q.   OKAY.  AND DID YOU AT THE TIME ALSO LOOK AT WHETHER OR NOT

01:25PM  11   IT WAS POSSIBLE THAT INSURERS MIGHT REIMBURSE FOR THERANOS

01:25PM  12   SYSTEMS WHICH WOULD BE A KEY TO THE SUCCESS OF THE PROGRAM?

01:25PM  13   A.   WE DID.

01:25PM  14   Q.   AND WHY WAS THAT IMPORTANT TO THE PROGRAM?

01:25PM  15   A.   YOU KNOW, THE VAST MAJORITY OF HEALTH CARE REIMBURSEMENT

01:25PM  16   COMES THROUGH SOME INTERMEDIARY, SO WHETHER IT'S A PRESCRIPTION

01:25PM  17   OR A VACCINE OR A LAB, MAKING SURE THOSE PAYORS ARE WILLING TO

01:25PM  18   PAY FOR IT IS FAIRLY IMPORTANT.

01:25PM  19   Q.   DID YOU ALSO LOOK AT THE PATENTS THAT THERANOS HAD

01:25PM  20   OBTAINED?

01:25PM  21   A.   I DIDN'T PERSONALLY.  I DO KNOW, THOUGH, THAT THERE WAS

01:25PM  22   SOME WORK TO TRY TO UNDERSTAND THE BREADTH OF PATENTS.

01:25PM  23   Q.   OKAY.  AND DO YOU RECALL WHAT THE CONCLUSION OF THAT WORK

01:25PM  24   WAS?

01:25PM  25   A.   AGAIN, I'M NOT A PATENT ATTORNEY EITHER.  MY RECOLLECTION

01:26PM  1    IS THAT THERE WERE, YOU KNOW, DOZENS, IF NOT MORE, PATENTS.

01:26PM  2    Q.   OKAY.   AND DO YOU KNOW WHAT THE CONCLUSION -- DO YOU KNOW

01:26PM  3    WHAT THE CONCLUSION WAS, IF ANY, AS TO THE STRENGTH OF THOSE

01:26PM  4    PATENTS?

01:26PM  5    A.   AGAIN, I'M NOT A PATENT ATTORNEY.   I CAN ONLY SPECULATE.

01:26PM  6    Q.   DID YOU ALSO TRY TO TAKE STEPS -- DID WALGREENS TRY TO

01:26PM  7    TAKE STEPS TO EVALUATE THE TECHNOLOGY AND HOW DEVELOPED IT WAS?

01:26PM  8    A.   AS BEST WE COULD.

01:26PM  9    Q.   OKAY.   WHAT DID YOU DO TO DO THAT?

01:26PM  10   A.   AGAIN, YOU KNOW, ONE OF THE STEPS WE TOOK, AGAIN, WAS TO

01:26PM  11   HIRE A LAB FIRM TO LOOK AT THE SPACE AND TO DO THE BEST VETTING

01:26PM  12   THAT THEY COULD.

01:26PM  13       ANOTHER STEP THAT WE TOOK WAS WE INTRODUCED THERANOS TO

01:26PM  14   JOHNS HOPKINS AND THERE WAS I KNOW SOME DISCUSSION THERE AS

01:26PM  15   WELL.

01:26PM  16   Q.   DID THE LAB FIRM MAKE CONCLUSIONS REGARDING THERANOS?

01:26PM  17   A.   THEY DID.

01:26PM  18   Q.   DID THOSE CONCLUSIONS LEAD YOU TO BELIEVE THAT A

01:27PM  19   PARTNERSHIP WITH THERANOS WOULD BE WORTHWHILE?

01:27PM  20   A.   I BELIEVE A GENERAL CONCLUSION THAT THEY HAD, AND I THINK

01:27PM  21   THAT THEY WERE OPERATING ON, THE DATA THAT THEY WERE VERSUS

01:27PM  22   TAKING A MACHINE APART, IF YOU WILL, THEY THOUGHT THERANOS WAS

01:27PM  23   PROBABLY, OF THE 150 OR 180 COMPANIES IN THIS SPACE, THEY

01:27PM  24   THOUGHT, FOR WHAT WE WERE LOOKING FOR, THAT WAS PROBABLY THE

01:27PM  25   FARTHEST AHEAD.

01:27PM 1        I THINK THE ONE CONCERN THEY VOICED WAS WHETHER THE I.T.

01:27PM 2   SYSTEMS WOULD BE ABLE TO BE, YOU KNOW, READY AND BUILT OUT.

01:27PM 3        BUT THAT WAS MY UNDERSTANDING OF THE CONCLUSION.

01:27PM 4   Q.   AND THE I.T. SYSTEMS RELATED TO THE COORDINATION BETWEEN

01:27PM 5   THE CENTRAL LAB AND THE DEVICES, OR WAS IT OTHER ISSUES?

01:27PM 6   A.   I MEAN, I THINK THE CLOUD FEED WAS PROBABLY NOT WHAT THEY

01:27PM 7   WERE GETTING AT.

01:27PM 8        IT WAS MORE AROUND SYSTEMS FOR REIMBURSEMENT, PERHAPS DATA

01:27PM 9   MANAGEMENT TO DRIVE ALGORITHMS.

01:28PM 10        BUT THE MORE SOPHISTICATED I.T. INFRASTRUCTURE, AS WELL AS

01:28PM 11   A PATIENT CHECK-IN EXPERIENCE, HOW DO YOU MAKE SURE THAT PEOPLE

01:28PM 12   HAVE PRIOR AUTHORIZATION IF THEY'RE RECEIVING SOME

01:28PM 13   REIMBURSEMENT?  HOW DO YOU KEEP PATIENT DATA SAFE THROUGH HIPAA

01:28PM 14   AND ALL OF THE CONCERNS OF PRIVACY?

01:28PM 15        I THINK THAT WAS MORE OF THE POINT.

01:28PM 16   Q.   OKAY.  AND YOU ALSO MENTIONED THAT WALGREENS CONTACTED

01:28PM 17   JOHNS HOPKINS TO UNDERTAKE SOME EVALUATION OF THE TECHNOLOGY;

01:28PM 18   IS THAT RIGHT?

01:28PM 19   A.   THAT'S CORRECT.

01:28PM 20   Q.   AND DID WALGREENS HAVE A RELATIONSHIP WITH JOHNS HOPKINS

01:28PM 21   PRIOR TO THIS?

01:28PM 22   A.   YES.

01:28PM 23   Q.   AND CAN YOU TELL US WHAT THAT WAS?

01:28PM 24   A.   WE HAD BUILT A RELATIONSHIP WITH JOHNS HOPKINS IN THEIR

01:28PM 25   BUSINESS DEVELOPMENT GROUP JUST TO BE ABLE TO COLLABORATE BACK

01:28PM  1    AND FORTH, AND IT WAS MYSELF AND A FEW OTHER GENTLEMEN PUT THAT

01:28PM  2    INTO PLACE.

01:28PM  3         WE WORKED TOGETHER AND BUILT A PHARMACY THERE AND TRIED TO

01:28PM  4    DRIVE, YOU KNOW, CLINICAL OUTCOMES FOR PATIENTS.

01:28PM  5         WE WORKED TO FUND A BRANCATI FUND FOR A GENTLEMAN WHO WAS

01:29PM  6    THERE AND WHO DIED OF LOU GEHRIG'S DISEASE, SO JUST A VARIETY

01:29PM  7    OF FACTORS.

01:29PM  8         AND WITH THERANOS WE ASKED IF THEY WERE WILLING TO MEET

01:29PM  9    WITH ELIZABETH AND SUNNY, AND I THINK THEY HAD THEIR HEAD OF

01:29PM  10   LABS THERE TO GIVE US THEIR UNDERSTANDING AND TAKE ON THE

01:29PM  11   TECHNOLOGY.

01:29PM  12   Q.   AND DID THAT MEETING TAKE PLACE?

01:29PM  13   A.   IT DID TAKE PLACE.

01:29PM  14   Q.   WERE YOU PRESENT FOR THAT MEETING?

01:29PM  15   A.   I WAS NOT.

01:29PM  16   Q.   WAS A WRITTEN REPORT OF THAT MEETING PREPARED?

01:29PM  17   A.   I HAD SEEN A REPORT.

01:29PM  18   Q.   LET ME ASK YOU TO LOOK IN THE GOVERNMENT'S NOTEBOOK AT

01:29PM  19   WHAT IS MARKED AS EXHIBIT 302.

01:29PM  20        IS THIS THE REPORT FROM JOHNS HOPKINS THAT WAS PREPARED

01:29PM  21   FOR WALGREENS IN CONNECTION WITH THE POTENTIAL THERANOS DEAL?

01:29PM  22   A.   THIS IS WHAT I RECALL.

01:29PM  23   Q.   OKAY.  AND DID YOU REVIEW THIS AT THE TIME?

01:29PM  24   A.   I READ THE NOTES AFTER THE MEETING, BUT, AGAIN, I WASN'T

01:30PM  25   AT THE MEETING.

01:30PM   1      Q.   OKAY.  LET ME ASK YOU TO --

01:30PM   2           YOUR HONOR, I MOVE THE ADMISSION OF 302.

01:30PM   3              MR. SCHENK:  NO OBJECTION.

01:30PM   4              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:30PM   5           (GOVERNMENT'S EXHIBIT 302 WAS RECEIVED IN EVIDENCE.)

01:30PM   6      BY MR. DOWNEY:

01:30PM   7      Q.   IF YOU GO TO THE TOP LIST, DO YOU SEE THAT DR. ROSAN WAS

01:30PM   8      AT THIS MEETING; CORRECT?

01:30PM   9      A.   CORRECT.

01:30PM  10      Q.   AND MS. HOLMES AND MR. BALWANI?

01:30PM  11      A.   YES.

01:30PM  12      Q.   AND ARE YOU FAMILIAR WITH ANY OF THE INDIVIDUALS FROM

01:30PM  13      JOHNS HOPKINS?

01:30PM  14      A.   I KNEW DR. BRANCATI BEFORE HE PASSED AWAY, AND THEN I

01:30PM  15      WORKED WITH MARK SHAVER ON A COUPLE OF PROJECTS.

01:30PM  16      Q.   OKAY.  IF YOU GO TO THE VERY BOTTOM BULLET POINT ON THAT

01:30PM  17      VERY FIRST PAGE, DO YOU SEE THAT IT REFLECTS THAT "DR. ROSAN

01:31PM  18      COMMENTED ON WALGREENS' PRELIMINARY STRATEGY TO EXPLORE

01:31PM  19      EXPANDING INTO THE LABORATORY SPACE, EXPANDING ITS HEALTH

01:31PM  20      SERVICES OFFERINGS TO INCLUDE LAB AND PATHOLOGY TESTING WITHIN

01:31PM  21      WALGREENS RETAIL SPACE."

01:31PM  22           DO YOU SEE THAT?

01:31PM  23      A.   I DO.

01:31PM  24      Q.   AND THAT WAS CONSISTENT WITH YOUR UNDERSTANDING OF WHERE

01:31PM  25      THE COMPANY WAS AND WHAT THE COMPANY WAS EVALUATING; CORRECT?

01:31PM 1    A.   GENERALLY, YES.

01:31PM 2    Q.   OKAY.  AND IF YOU LOOK BACK AT THE MEETING OBJECTIVES,

01:31PM 3    THEY'RE LISTED IN THIS DOCUMENT AS THE "HOPKINS TEAM WAS ASKED

01:31PM 4    TO COMMENT ON THE VALIDITY AND USEFULNESS OF THE THERANOS

01:31PM 5    PRODUCT, SPECIFICALLY RELATED TO THE SCIENCE THAT SUPPORTS THE

01:31PM 6    TECHNOLOGY AND THE APPLICATION OF THE TECHNOLOGY IN A WIDE

01:31PM 7    VARIETY OF SETTINGS INCLUDING HOSPITAL, CLINIC, LABORATORY, AND

01:32PM 8    POTENTIALLY WITHIN WALGREENS AS AN ADD ON TO CLINICAL PROGRAMS

01:32PM 9    AND RETAIN PHARMACY BUSINESS THAT CURRENTLY EXISTS."

01:32PM 10        WAS THAT CONSISTENT WITH THE OBJECTIVE AND REASON THAT YOU

01:32PM 11   WANTED TO ASK JOHNS HOPKINS TO EVALUATE THERANOS TECHNOLOGY?

01:32PM 12   A.   YES, EFFECTIVELY THEIR HEAD OF LABS I BELIEVE WAS

01:32PM 13   PARTICIPATING, AND BEING ABLE TO GET THAT LEVEL OF EXPERTISE WE

01:32PM 14   FELT WAS A GOOD PART OF THE DILIGENCE PROCESS.

01:32PM 15   Q.   OKAY.  AND THEN UNDER METHODOLOGY, IF YOU LOOK AT THE

01:32PM 16   FIRST TWO BULLET POINTS, IT INDICATES THAT THE HOPKINS TEAM

01:32PM 17   REVIEWED PROPRIETARY DATA, AND IT GOES ON TO DESCRIBE THAT.

01:32PM 18        AND THEN IT INDICATES THAT THERANOS PRESENTED ADDITIONAL

01:32PM 19   DATA ON, AND BUSINESS VISION, AND THAT IT DEMONSTRATED THE

01:32PM 20   TECHNOLOGY ON SITE.

01:33PM 21        WERE THOSE STEPS THAT YOU UNDERSTOOD HAD BEEN TAKEN WHEN

01:33PM 22   YOU WERE EVALUATING THE DEAL?

01:33PM 23   A.   THAT WAS MY UNDERSTANDING.

01:33PM 24        BUT IT WAS MY UNDERSTANDING THAT HOPKINS NOR THE LAB

01:33PM 25   CONSULTING FIRM EVER HAD AN ACTUAL EDISON TO PLAY WITH, IF YOU

01:33PM  1    WILL.

01:33PM  2    Q.   THEY DIDN'T LEAVE THE TECHNOLOGY THERE?

01:33PM  3    A.   NO.

01:33PM  4    Q.   BUT AT SOME POINT WALGREENS GOT AN EDISON, DIDN'T IT?

01:33PM  5    A.   I DON'T KNOW IF WE HAD IT OR NOT.  I CAN'T SPEAK TO THAT

01:33PM  6    FOR SURE.  YOU KNOW, WE WEREN'T CRACKING IT OPEN, IF YOU WILL,

01:33PM  7    AND TRYING TO DO OUR OWN RESEARCH.

01:33PM  8    Q.   WELL, DO YOU KNOW IF DR. ROSAN AT SOME POINT AFTER THE

01:33PM  9    AGREEMENT ACTUALLY GOT AN EDISON AND HOSTED IT IN HIS OFFICE?

01:33PM  10   A.   I DON'T KNOW.

01:33PM  11        BUT PHILOSOPHICALLY, I SEE THIS AS THE SAME AS DRUG

01:33PM  12   DEVELOPMENT.  YOU KNOW, IF A DRUG GETS APPROVED FROM THE FDA,

01:33PM  13   WE DON'T TELL PFIZER WE WANT TO RERUN A CLINICAL TRIAL.  WE

01:33PM  14   JUST ASSUMED THAT'S THEIR EXPERTISE, RIGHT?

01:33PM  15   Q.   SURE.

01:33PM  16   A.   SO I CAN'T SPEAK FOR WHAT DR. ROSAN HAD OR DID NOT HAVE.

01:33PM  17   Q.   OKAY.  ON THE SECOND PAGE IT INDICATES KEY FINDINGS IN

01:34PM  18   CONNECTION WITH THIS EVALUATION, AND IT SETS FORTH THE

01:34PM  19   CONSENSUS.

01:34PM  20        AND IT SETS FORTH THE CONCLUSION THAT "THE TECHNOLOGY IS

01:34PM  21   NOVEL AND SOUND.  IT CAN ACCURATELY RUN A WIDE RANGE OF ROUTINE

01:34PM  22   AND SPECIAL ASSAYS."

01:34PM  23        IS THAT THE GIST OF WHAT WAS COMMUNICATED TO YOU ABOUT THE

01:34PM  24   RESULTS OF HOPKINS'S EVALUATION?

01:34PM  25   A.   WHAT WAS TOLD TO ME IS BASED UPON THE DATA AND INFORMATION

01:34PM  1    THAT THEY WERE GIVING.  THIS WAS THEIR ASSESSMENT.

01:34PM  2         BUT THAT WITHOUT ACTUALLY, YOU KNOW, HAVING THE TECHNOLOGY

01:34PM  3    TO RUN ITSELF, THEY HAD TO RELY UPON THOSE ATTESTATIONS.

01:34PM  4    Q.   AND ESSENTIALLY THEY TOLD YOU WE'VE DONE AN EVALUATION OF

01:34PM  5    WHAT'S AVAILABLE TO US, BUT WE HAVEN'T BROKEN THE TECHNOLOGY

01:34PM  6    DOWN AND RECREATED IT AND EVALUATED FROM THAT PERSPECTIVE?

01:34PM  7    A.   RIGHT, JUST TO BE FAIR TO THEM, YES.

01:34PM  8    Q.   ALL RIGHT.  IF YOU LOOK AT THE THIRD BULLET POINT, IT

01:34PM  9    LISTS SPECIAL STRENGTHS OF THE TECHNOLOGY.

01:35PM 10         AND IT INDICATES ACCURACY, MINIATURIZATION, FLEXIBILITY,

01:35PM 11    CONNECTIVITY, ADAPTABILITY FOR RESEARCH, AND COST PER STUDY.

01:35PM 12         I THINK YOU WERE ASKED ON YOUR DIRECT EXAMINATION IF

01:35PM 13    ACCURACY WAS IMPORTANT, AND YOU REPLIED THAT IT WAS; CORRECT?

01:35PM 14    A.   CORRECT.

01:35PM 15    Q.   AND POTENTIALLY MINIATURIZATION WAS IMPORTANT TO

01:35PM 16    WALGREENS; CORRECT?

01:35PM 17    A.   PART OF THE VALUE PROPOSITION, AGAIN, AS I UNDERSTAND IT,

01:35PM 18    IS THAT THERANOS WASN'T, THEY WEREN'T REINVENTING HOW LAB GETS

01:35PM 19    DONE.

01:35PM 20         WHAT THEY WERE EFFECTIVELY DOING WAS COMTEMPORIZING IT.

01:35PM 21    SO YOU STILL HAD ANTIGENS, YOU STILL HAD BLOOD, YOU STILL HAD

01:35PM 22    OPTICAL READERS, BUT DOING IT MUCH MORE EFFICIENTLY ON, AGAIN,

01:35PM 23    THAT ANALOGY OF MOVING FROM MAINFRAME TO LAPTOP IN THE LAB

01:35PM 24    SPACE.

01:35PM 25    Q.   OKAY.  AND IF YOU LOOK AT THE FOURTH BULLET POINT, UNDER

01:35PM  1    KEY FINDINGS IT INDICATES, "THE HOPKINS TEAM THOUGHT THAT THE

01:36PM  2    TECHNOLOGY WOULD BE USEFUL IN THE RETAIL CLINIC SETTING, WITH

01:36PM  3    THE PROVISO THAT THE THROUGHPUT FOR AN INDIVIDUAL SAMPLE (30-45

01:36PM  4    MINUTES) WOULD REQUIRE MULTIPLE UNITS PER SITE AND IMPOSE AN

01:36PM  5    UPPER LIMIT FOR GROUP THROUGHPUT."

01:36PM  6         FIRST OF ALL, DO YOU KNOW WHAT THEY'RE REFERRING TO WHEN

01:36PM  7    THEY REFERENCE "GROUP THROUGHPUT"?

01:36PM  8    A.   NOT SPECIFICALLY.  I KNOW MY INTERPRETATION OF THAT.

01:36PM  9    Q.   WHICH WAS WHAT?

01:36PM  10   A.   MY INTERPRETATION OF THE GENERAL OVERALL STATEMENT IS THAT

01:36PM  11   IF YOU LOOK AT THE NUMBER OF PATIENTS YOU MIGHT BE DOING PER

01:36PM  12   DAY AND RECOGNIZE THAT A TEST TAKES 15 OR 20 MINUTES TO DO ON

01:36PM  13   ONE MACHINE, YOUR PATIENT LOAD COULD EXCEED THE CAPABILITY OF

01:36PM  14   ANY SINGLE MACHINE.

01:36PM  15   Q.   SO YOU MIGHT GET A LINE OF SAMPLES WAITING TO BE

01:36PM  16   PROCESSED?

01:36PM  17   A.   CORRECT.

01:36PM  18   Q.   UNDER THE INDICATION -- UNDER THE HEADING ADDITIONAL

01:36PM  19   INFORMATION, IT INDICATES THE FOLLOWING, THAT DR. CLARK -- WHO

01:37PM  20   YOU DON'T KNOW, I ASSUME.

01:37PM  21   A.   I BRIEFLY RECALL DR. CLARK, BUT NOT AS WELL AS I RECALL

01:37PM  22   THE OTHER TWO.

01:37PM  23   Q.   OKAY.  "DR. CLARK INDICATED OVER THE PAST TWO YEARS HE HAS

01:37PM  24   HAD NUMEROUS CONVERSATIONS WITH THERANOS ABOUT UTILIZING THEIR

01:37PM  25   TECHNOLOGY AT JOHNS HOPKINS FOR RESEARCH ACTIVITIES.  THE

01:37PM  1    CONVERSATIONS CONTINUE TO BE FAVORABLE AND BOTH PARTIES WILL

01:37PM  2    CONTINUE TO EXPLORE OPPORTUNITIES FOR COLLABORATION."

01:37PM  3         DO YOU RECALL LEARNING THAT THAT WAS PART OF HOPKINS

01:37PM  4    COMMENTARY AT THE TIME?

01:37PM  5    A.   I RECALL LEARNING THAT, YES.

01:37PM  6    Q.   OKAY.  HOW IMPORTANT WAS THE HOPKINS EVALUATION TO YOU IN

01:37PM  7    YOUR DECISION TO ENTER INTO THE FIRST AGREEMENT WITH THERANOS?

01:37PM  8    A.   I'D SAY JUST A PIECE OF A MOSAIC.  IT'S NOT DEFINITIVE,

01:37PM  9    BUT IT'S ONE OF MANY PIECES THAT FIT TOGETHER.

01:37PM 10    Q.   AND YOU WERE EVALUATING SEVERAL ISSUES; CORRECT?

01:37PM 11    A.   SEVERAL ISSUES?

01:37PM 12    Q.   SEVERAL ISSUES RELATED TO A POTENTIAL DEAL, LIKE BUSINESS

01:37PM 13    MODEL AND SO FORTH?

01:37PM 14    A.   DOES THE TECHNOLOGY WORK?  CAN THE TECHNOLOGY BE SCALED?

01:38PM 15    IS THE BUSINESS MODEL SOUND?  WILL THE ECOSYSTEM OF PAYORS AND

01:38PM 16    PHYSICIANS AND CLINICIANS BE ACCEPTING?  A LOT OF THINGS THAT

01:38PM 17    HAVE TO FIT TOGETHER.

01:38PM 18    Q.   OKAY.  AND SOME OF THAT ANALYSIS WAS DONE BEFORE THE

01:38PM 19    AGREEMENT WAS SIGNED; CORRECT?

01:38PM 20    A.   BEFORE WHICH AGREEMENT?

01:38PM 21    Q.   THE FIRST AGREEMENT BETWEEN WALGREENS AND THERANOS, WHICH

01:38PM 22    WAS IN -- AT THE END OF JULY 2010 I THINK WE'VE ESTABLISHED.

01:38PM 23    A.   SOME.  BUT I WOULD ALSO KIND OF DEFINE DILIGENCE AS SORT

01:38PM 24    OF AN UNFOLDING OVER A COUPLE YEARS, RIGHT.

01:38PM 25         YOU KEEP LEARNING NEW THINGS.  THINGS KEEP CHANGING.  SO

01:38PM   1    DILIGENCE CONTINUES, AND THAT'S ONE REASON THEN WHY YOU HAVE A

01:38PM   2    REVISED AGREEMENT AND THEN AN ADDENDUM TO THAT IS BECAUSE

01:38PM   3    YOU'RE DOING DILIGENCE AND LEARNING THINGS AND YOU'RE TRYING TO

01:38PM   4    BUILD THAT INTO THE BEST THINKING.

01:38PM   5    Q.   OKAY.   NOW, IS IT ALSO THE CASE THAT DURING THE PERIOD OF

01:39PM   6    EVALUATING THE DEAL, WALGREENS LOOKED AT SOME OF THE POTENTIAL

01:39PM   7    REGULATORY ISSUES?

01:39PM   8    A.   WE DID, AND I BELIEVE WE HAD REGULATORY COUNSEL TO HELP

01:39PM   9    WITH THAT ENDEAVOR AS WELL.

01:39PM   10   Q.   IS IT FAIR TO SAY THAT YOUR UNDERSTANDING THAT THOSE

01:39PM   11   ISSUES WERE FAIRLY COMPLEX?

01:39PM   12   A.   THEY'RE CERTAINLY NOT IN MY AREA OF EXPERTISE.

01:39PM   13        BUT, AGAIN, AS I SAID BEFORE, YOU KNOW, ONE AREA OF

01:39PM   14   COMPLEXITY WOULD CERTAINLY BE THIS NOTION OF WHERE IS THE LAB,

01:39PM   15   AND I DON'T THINK THAT THAT HAD BEEN CONTEMPLATED NECESSARILY

01:39PM   16   BEFORE BY REGULATORS.

01:39PM   17   Q.   AND WHEN YOU, WHEN YOU SAY THE ISSUE OF WHERE IS THE LAB,

01:39PM   18   CAN YOU EXPLAIN WHAT THAT MEANS?

01:39PM   19   A.   SURE.   SO YOU HAVE THE EDISON DEVICE WHICH, YOU KNOW,

01:39PM   20   WHICH PROCESSES THE CARTRIDGES AND THE BLOOD INFORMATION; AND

01:39PM   21   THEN THE RESULTS FROM THAT, AFTER THE OPTICAL READER DOES ITS

01:39PM   22   THING, WOULD GO INTO THE CLOUD, WHICH WOULD GO INTO THE

01:39PM   23   PALO ALTO LAB WHERE YOU WOULD HAVE, I ASSUME, PATHOLOGISTS AND

01:40PM   24   DATA AND OTHERS WORKING THERE.

01:40PM   25        SO IF YOU WERE TO PUT AN EDISON, FOR EXAMPLE, IN A

01:40PM 1    WALGREENS, BUT THE INFORMATION IS GOING TO PALO ALTO, IS THE

01:40PM 2    LAB IN WALGREENS?  IS IT IN PALO ALTO?  IS IT IN BOTH?

01:40PM 3        AND THAT WAS THAT ISSUE OF TRYING TO UNDERSTAND THAT.

01:40PM 4    Q.   AND DID YOU UNDERSTAND THAT IF THE LAB WERE CONSIDERED TO

01:40PM 5    BE IN THE STORES, THAT THAT WOULD HAVE SOME REGULATORY

01:40PM 6    CONSEQUENCES?

01:40PM 7    A.   I UNDERSTOOD THAT IT MIGHT.

01:40PM 8    Q.   AND THAT WAS A RESULT OF WHAT THE COMPANY CONTINUED TO

01:40PM 9    LEARN DURING ITS DILIGENCE PROCESS?

01:40PM 10   A.   I THINK -- IF I REMEMBER THE SECOND AGREEMENT, I THINK

01:40PM 11   THERE WAS SOME LANGUAGE AROUND CONTINUING TO DISCUSS WITH

01:40PM 12   REGULATORS, FDA AND OTHERS, THESE CONCEPTS TO GET

01:40PM 13   CLARIFICATION.

01:40PM 14       SO I THINK IT WAS A WORK-IN-PROGRESS ON GETTING THAT

01:40PM 15   CLARIFIED.

01:40PM 16   Q.   OKAY.  AND BEFORE THE FIRST AGREEMENT WAS ENTERED, HOW

01:40PM 17   MANY PEOPLE DO YOU THINK WERE ENGAGED IN ANALYZING THE

01:41PM 18   AGREEMENT AND DILIGENCE RELATED TO IT?

01:41PM 19   A.   BEFORE THE FIRST AGREEMENT?

01:41PM 20   Q.   YES.

01:41PM 21   A.   I MEAN, I SORT OF WOULD BE GUESSING, BUT EIGHT TO TEN AT

01:41PM 22   LEAST INTERNALLY, AND AGAIN, A COUPLE OF DIFFERENT EXTERNAL

01:41PM 23   FIRMS.  SO PROBABLY A DOZEN OR MORE.

01:41PM 24   Q.   OKAY.  BUT ULTIMATELY AT THE END OF JULY 2010, WALGREENS

01:41PM 25   DECIDED TO ENTER INTO AN AGREEMENT WITH THERANOS; CORRECT?

01:41PM  1      A.   YES.

01:41PM  2      Q.   AND AS WE DISCUSSED BEFORE, WHEN THAT AGREEMENT WAS

01:41PM  3      SIGNED, THE PRESUMPTION WAS THAT THE PARTIES WOULD TRY TO PUT

01:41PM  4      THE DEVICES IN THE STORES; CORRECT?

01:41PM  5      A.   I THINK THE PRESUMPTION WAS THAT WE WERE ON A PATH OF

01:41PM  6      WORKING TOGETHER TO FIGURE OUT HOW TO COMMERCIALIZE IT

01:41PM  7      TOGETHER.

01:41PM  8      Q.   OKAY.  LET ME ASK YOU TO PULL BACK UP EXHIBIT 372, WHICH

01:41PM  9      IS THE AGREEMENT THAT WAS SIGNED AT THE END OF JULY.

01:42PM 10           I'LL ASK YOU TO LOOK AT -- AND WE'LL PUT IT ON THE SCREEN

01:42PM 11      AS WELL -- AT PAGE 2.

01:42PM 12           THIS IS ALREADY IN EVIDENCE, YOUR HONOR.

01:42PM 13           PAGE 2 OF THE AGREEMENT, WHICH HAS THE NUMBER 8 IN THE

01:42PM 14      BOTTOM RIGHT-HAND CORNER.

01:42PM 15      A.   OKAY.

01:42PM 16      Q.   AND IT'S ON THE SCREEN.

01:42PM 17           THIS STATES THE BACKGROUND THAT HAS LED TO THE AGREEMENT;

01:42PM 18      CORRECT?

01:42PM 19      A.   IT'S PART OF THE BACKGROUND.  IT'S THE FIRST TWO

01:42PM 20      PARAGRAPHS OF THE BACKGROUND SECTION.

01:42PM 21      Q.   OKAY.  AND THE FIRST PARAGRAPH SAYS, "THERANOS HAS

01:43PM 22      DEVELOPED, AND IS DEVELOPING, GENERATIONS OF MINI-LAB DEVICES

01:43PM 23      THAT CAN RUN ANY BLOOD TEST IN REAL-TIME FOR LESS THAN THE

01:43PM 24      TRADITIONAL COST OF CENTRAL LAB TESTS."

01:43PM 25           DO YOU SEE THAT?

01:43PM  1    A.   YES.

01:43PM  2    Q.   AND DID YOU COME TO UNDERSTAND, AS A RESULT OF THE

01:43PM  3    DISCUSSIONS YOU WERE PART OF, THAT THERANOS HAD ALREADY

01:43PM  4    DEVELOPED SOME GENERATIONS OF A MINILAB?

01:43PM  5    A.   YES.

01:43PM  6    Q.   AND THAT THEY WERE WORKING TO DEVELOP MORE GENERATIONS OF

01:43PM  7    MINILABS?

01:43PM  8    A.   YES.

01:43PM  9    Q.   AND THAT THOSE GENERATIONS HAD DIFFERENT CAPACITIES?

01:43PM 10    A.   TECHNOLOGY IS ALWAYS AN EVOLUTION.

01:43PM 11    Q.   IF YOU LOOK AT PAGE 8 OF THE AGREEMENT, WHICH HAS THE

01:43PM 12    BATES 12 IN THE BOTTOM RIGHT-HAND CORNER.  THIS DESCRIBES --

01:43PM 13    I'LL GIVE YOU A MINUTE TO GET THERE.

01:43PM 14        I'M INTERESTED IN THE PARAGRAPH THAT IS NUMBERED 6, WHICH

01:44PM 15    IS CAPTIONED CARTRIDGE PRE-PURCHASE COMMITMENTS.

01:44PM 16        DO YOU SEE THAT?

01:44PM 17    A.   UH-HUH, YES.

01:44PM 18    Q.   I WANT TO GO TO THE PARAGRAPH THAT DESCRIBES HOW THE

01:44PM 19    ECONOMICS OF THE DEAL WILL WORK, AND THAT'S THE PARAGRAPH THAT

01:44PM 20    BEGINS "THE FIRST 30 MILLION."

01:44PM 21        DO YOU SEE THAT?

01:44PM 22    A.   YES.

01:44PM 23    Q.   AND IT INDICATES THAT "THE FIRST 30 MILLION PRE-PURCHASE

01:44PM 24    PAYMENT WILL BE INVOICED AT THE EFFECTIVE DATE OF THIS

01:44PM 25    AGREEMENT."

01:44PM  1          CORRECT?

01:44PM  2     A.   THAT'S WHAT IT SAYS.

01:44PM  3     Q.   AND THEN IT SAYS "THE SECOND 20 MILLION PAYMENT WILL BE

01:44PM  4     INVOICED AFTER THERANOS OBTAINS ANY AND ALL OFFICIAL, WRITTEN

01:44PM  5     FDA APPROVALS, CLIA-WAIVED STATUS AND ANY OTHER FEDERAL

01:45PM  6     REGULATORY APPROVALS NECESSARY IN ORDER FOR WALGREENS TO

01:45PM  7     COMMENCE UTILIZING THE THERANOS SYSTEM AND CARTRIDGES TO

01:45PM  8     PERFORM TESTS," AND IT GOES ON AND DESCRIBES THE PROGRAM

01:45PM  9     FURTHER.

01:45PM  10         DO YOU RECALL THAT BEING A TERM OF THE AGREEMENT?

01:45PM  11    A.   LOOSELY.  IT'S BEEN 11 YEARS.  I DON'T RECALL IT.

01:45PM  12    Q.   OKAY.  BUT YOU RECALL THAT PRIOR TO THE AGREEMENT THEY HAD

01:45PM  13    NOT OBTAINED THOSE APPROVALS; CORRECT?

01:45PM  14    A.   CORRECT.

01:45PM  15    Q.   AND WITH RESPECT TO CLIA CERTIFICATION, THAT WAS AN

01:45PM  16    APPROVAL THAT THEY OBTAINED, BUT AFTER THE ORIGINAL AGREEMENT;

01:45PM  17    CORRECT?

01:45PM  18    A.   THAT'S CORRECT.  ORIGINALLY THERE WAS DISCUSSION ON CLIA

01:45PM  19    WAIVED VERSUS CLIA APPROVAL, AND ULTIMATELY I BELIEVE THE

01:45PM  20    COMPANY SAID IT HAD TO BE CLIA-APPROVED TO BE ABLE TO MOVE

01:45PM  21    FORWARD.

01:45PM  22    Q.   AND THE LAST SENTENCE READS, "IF THERANOS FAILS TO OBTAIN

01:45PM  23    APPROVALS BY DECEMBER 31ST, 2010, SUCH FAILURE SHALL ENTITLE

01:45PM  24    WALGREENS TO TERMINATE THIS AGREEMENT."

01:46PM  25         SO THAT GAVE THERANOS -- WALGREENS A RIGHT TO VOID THE

01:46PM   1    AGREEMENT IF THERE WAS NOT -- IF THERANOS WAS UNSUCCESSFUL IN

01:46PM   2    OBTAINING THE REGULATORY APPROVALS THAT IT NEEDED; CORRECT?

01:46PM   3    A.   CORRECT.

01:46PM   4    Q.   LET ME ASK YOU TO LOOK NOW AT BATES 22 WITHIN THE

01:46PM   5    AGREEMENT, PAGE 16.

01:46PM   6         I'M SORRY, BATES 22.  IT WILL BE PAGE 18 OF THE AGREEMENT.

01:46PM   7    YEAH.

01:46PM   8         I'M LOOKING AT THE PARAGRAPH THAT IS LABELED 23(B),

01:47PM   9    TERMINATION DUE TO UNSATISFACTORY PILOT.

01:47PM  10         DO YOU SEE THAT?

01:47PM  11    A.   YES.

01:47PM  12    Q.   AND THIS SETS FORTH TERMS UNDER WHICH THE PARTIES MIGHT

01:47PM  13    HAVE THE RIGHT TO TERMINATE IT AFTER AN UNSATISFACTORY PILOT;

01:47PM  14    CORRECT?

01:47PM  15    A.   THAT'S WHAT IT APPEARS TO SAY, YES.

01:47PM  16    Q.   AND THE PILOT PROGRAM IS WHAT YOU DESCRIBED ON YOUR DIRECT

01:47PM  17    EXAMINATION, A ROLLOUT TO A SMALL NUMBER OF STORES TO TEST HOW

01:47PM  18    THE PROGRAM WORKED; CORRECT?

01:47PM  19    A.   CORRECT.

01:47PM  20    Q.   AND BOTH PARTIES HAD THE RIGHT UNDER THE AGREEMENT TO

01:47PM  21    TERMINATE THE RELATIONSHIP IF THEY WERE NOT SATISFIED WITH THE

01:47PM  22    PILOT PROGRAM; CORRECT?

01:47PM  23    A.   I'D HAVE TO READ IT TO BE DEFINITIVE, BUT IF THAT'S WHAT

01:47PM  24    IT SAYS.

01:47PM  25    Q.   WELL, DO YOU RECALL THAT THAT WAS THE NATURE OF THE

01:47PM   1    ARRANGEMENT?

01:47PM   2    A.   AGAIN, IT'S BEEN 11 YEARS, SO WITHOUT GETTING INTO THE

01:47PM   3    SPECIFICS AND REREADING IT.

01:47PM   4    Q.   YEAH, SURE.

01:47PM   5         DO YOU RECALL HAVING A, A CONCERN IN NEGOTIATING THE

01:47PM   6    AGREEMENT OR ENTERING INTO THE AGREEMENT THAT YOU WANTED TO

01:48PM   7    PROTECT WALGREENS IN THE EVENT THAT THINGS DID NOT WORK OUT?

01:48PM   8    A.   I THINK ALL PARTIES DO, ALL AGREEMENTS HAVE THAT MINDSET.

01:48PM   9    Q.   OKAY.  AND SO THAT WAS PART OF HOW YOU WERE THINKING ABOUT

01:48PM   10   DEALING WITH THIS SITUATION; CORRECT?

01:48PM   11   A.   SURE.

01:48PM   12   Q.   AND THAT RELATED TO SOME OF THESE PROVISIONS THAT WOULD

01:48PM   13   ALLOW YOU TO TERMINATE THE AGREEMENT UNDER CERTAIN SCENARIOS;

01:48PM   14   RIGHT?

01:48PM   15   A.   YOU COULD SAY THAT.

01:48PM   16   Q.   OKAY.  I'D LIKE TO ASK YOU NOW TO LOOK AT PAGE 10.

01:49PM   17   ACTUALLY, I WANT TO FLIP TO PAGE 11.

01:49PM   18        AND DO YOU SEE IN THE PARAGRAPH 10(A) THAT THERE'S A

01:49PM   19   LICENSE GRANT TO WALGREENS?

01:49PM   20   A.   YES.

01:49PM   21   Q.   AND WITHOUT REQUIRING US TO READ IT, CAN YOU JUST TAKE A

01:49PM   22   MOMENT TO READ IT AND THEN EXPLAIN WHAT THIS TERM DID.

01:49PM   23        (PAUSE IN PROCEEDINGS.)

01:49PM   24          THE WITNESS:  AGAIN, IT APPEARS THAT IT'S GIVING

01:49PM   25   WALGREENS THE RIGHT TO USE THE THERANOS SOFTWARE.

01:50PM   1    BY MR. DOWNEY:

01:50PM   2    Q.   AND YOU HAD A LICENSE TO DO THAT UNDER THE AGREEMENT?

01:50PM   3    A.   YES, IT APPEARS AS I READ IT.

01:50PM   4    Q.   OKAY.  WAS THAT IMPORTANT TO OBTAIN A LICENSE TO BE ABLE

01:50PM   5    TO USE THE DATA SO THAT WALGREENS MIGHT UTILIZE DATA FOR ITS

01:50PM   6    OWN PURPOSES DISTINCT FROM WHAT THERANOS WAS DOING?

01:50PM   7    A.   I THINK ANY TIME TWO COMPANIES THAT ARE NOT RELATED SHARE

01:50PM   8    INFORMATION AND DATA, THERE'S TYPICALLY SOME TYPE OF AGREEMENT

01:50PM   9    THAT GOVERNS HOW IT'S USED SO IT'S NOT MISUSED.

01:50PM  10    Q.   OKAY.  AND, YOU KNOW, THE PARTIES HAD BEEN NEGOTIATING FOR

01:50PM  11    ABOUT THREE MONTHS, I GUESS, PRIOR TO THE TIME THAT THE

01:50PM  12    AGREEMENT WAS SIGNED.

01:50PM  13         DO YOU RECALL THAT WHEN THE PARTIES SIGNED THE AGREEMENT,

01:50PM  14    THEY INCLUDED A CLAUSE CALLED AN INTEGRATION CLAUSE?

01:50PM  15    A.   I DON'T RECALL THAT.

01:50PM  16    Q.   OKAY.  DO YOU KNOW WHAT AN INTEGRATION CLAUSE IS?

01:50PM  17    A.   NOT SPECIFICALLY.

01:50PM  18    Q.   OKAY.  COULD I ASK YOU TO LOOK AT BATES NUMBER 17.

01:51PM  19         I'M SORRY.  IT'S BATES 23, PAGE 17.

01:51PM  20    A.   OKAY.

01:51PM  21    Q.   AND I WANT TO DIRECT YOUR ATTENTION TO G, THE ENTIRE

01:51PM  22    AGREEMENT.

01:51PM  23         AND DO YOU SEE THAT THIS IS A TERM WHICH PROVIDES "THE

01:51PM  24    TERMS AND CONDITIONS CONTAINED IN THIS AGREEMENT, INCLUDING ALL

01:51PM  25    SCHEDULES, CONSTITUTE THE ENTIRE AGREEMENT BETWEEN THE PARTIES

01:51PM 1    AND SUPERSEDE ALL PREVIOUS AGREEMENTS AND UNDERSTANDINGS,

01:51PM 2    WHETHER ORAL OR WRITTEN, BETWEEN THE PARTIES HERETO WITH

01:51PM 3    RESPECT TO THE SUBJECT MATTER OF THIS AGREEMENT AND NO

01:51PM 4    AGREEMENT OR UNDERSTANDING VARYING OR EXTENDING THE SAME SHALL

01:51PM 5    BE BINDING UPON EITHER PARTY UNLESS IN A WRITTEN DOCUMENT."

01:52PM 6        DO YOU SEE THAT?

01:52PM 7    A.   YES.

01:52PM 8    Q.   AND ARE PROVISIONS LIKE THIS FAIRLY STANDARD IN COMMERCIAL

01:52PM 9    ARRANGEMENTS BETWEEN SOPHISTICATED PARTIES?

01:52PM 10   A.   I'M NOT AN ATTORNEY, BUT IT STANDS TO REASON THAT IF YOU

01:52PM 11   WANT TO MAKE SURE AN AGREEMENT STANDS BY ITSELF VERSUS THE

01:52PM 12   HISTORY OF DIFFERENT AGREEMENTS, THAT MAKES SENSE.

01:52PM 13   Q.   OKAY.  SO AT THIS POINT AFTER THE EXECUTION OF THE

01:52PM 14   AGREEMENT, THIS IS JULY 2010, AND I THINK YOU MENTIONED A

01:52PM 15   SERIES OF STEPS THAT WOULD HAVE TO BE TAKEN TO SEE HOW THE

01:52PM 16   ARRANGEMENT WOULD WORK.  IF I MIGHT USE AN ABBREVIATION, IT'S

01:52PM 17   POST-AGREEMENT DUE DILIGENCE.

01:52PM 18       IS THAT A FAIR TERM?

01:52PM 19   A.   I WOULD ARGUE EVERY STEP OF THE WAY, RIGHT?

01:52PM 20       SO EVEN WHEN YOU GET TO PILOT AND EXPANSION, YOU'RE STILL

01:52PM 21   DOING DUE DILIGENCE ON IS THE BUSINESS MODEL EXPANDABLE AND

01:52PM 22   DOES IT WORK?

01:52PM 23   Q.   AND THAT'S TO EVALUATE WHETHER THIS IS AN ARRANGEMENT THAT

01:52PM 24   YOU WANT TO REMAIN A PARTY TO; CORRECT?

01:52PM 25   A.   RIGHT, AND IF BOTH PARTIES FIND IT VIABLE.

01:53PM  1    Q.   OKAY.  AND AFTER THE AGREEMENT WAS SIGNED, DID WORK WITHIN

01:53PM  2    WALGREENS HAVE TO BE TRANSFERRED FROM THE INNOVATIONS TEAM TO

01:53PM  3    AN OPERATIONS TEAM TO TRY TO BUILD THE PROGRAM UP?

01:53PM  4    A.   WE HAD AN OPERATIONS EXECUTION TEAM, WHATEVER YOU WOULD

01:53PM  5    CALL IT, THAT WE BUILT UP.  WE BROUGHT IN AN EXECUTIVE WHO HAD

01:53PM  6    LAB EXPERIENCE TO BE ON THAT TEAM, AND WE BROUGHT AN EMPLOYEE

01:53PM  7    WHO HAD LAB EXPERIENCE IN THE COMPANY OVER ON THAT TEAM, AND WE

01:53PM  8    BROUGHT A VARIETY OF DIFFERENT TALENTS TO BE ON THAT WORKING

01:53PM  9    TEAM.

01:53PM 10    Q.   OKAY.  SO THERE WAS A LOT THAT WENT INTO THAT OPERATIONS

01:53PM 11    TEAM?

01:53PM 12    A.   THERE WAS A LOT.

01:53PM 13    Q.   AND AMONG THAT IS MARKETING AND BRANDING; CORRECT?

01:53PM 14    A.   FOR THE MOST PART MARKETING AND BRANDING WAS REALLY A

01:53PM 15    THERANOS ACTIVITY.

01:53PM 16    Q.   OKAY.  AND WITH INSURERS AND PAYORS -- YOU RECALL THAT WE

01:54PM 17    TALKED ABOUT THAT BEFORE?

01:54PM 18    A.   YES.

01:54PM 19    Q.   AND IT WAS IMPORTANT TO WORK OUT THE RELATIONSHIPS BETWEEN

01:54PM 20    THERANOS AND THOSE INSURERS AND PAYORS; CORRECT?

01:54PM 21    A.   CORRECT.

01:54PM 22    Q.   AND WAS SOMEONE AT WALGREENS ASSISTING WITH THAT?

01:54PM 23    A.   I BELIEVE THERE WAS WORK DONE ON BOTH SIDES, BOTH THROUGH

01:54PM 24    OUR CONTACTS AND THROUGH THEIR WORK.

01:54PM 25    Q.   OKAY.  AND WAS THERE WORK TO INTEGRATE THE I.T. SYSTEMS OF

01:54PM  1    THERANOS AND WALGREENS?

01:54PM  2    A.   I DON'T KNOW TO WHAT EXTENT INTEGRATE, BUT THERE WAS A LOT

01:54PM  3    OF WORK ON THERANOS'S END TO SUPPORT THE SYSTEM.

01:54PM  4    Q.   AND WITHIN THE BUSINESS MODEL, WAS THERE ALSO AN EFFORT TO

01:54PM  5    TRY TO FIGURE OUT HOW THE CUSTOMER SERVICE COMPONENTS OF THE

01:54PM  6    PROGRAM WOULD WORK?

01:54PM  7    A.   YES.

01:54PM  8    Q.   AND SOME OF THAT RELATED TO WHO WOULD EMPLOY WHO, FOR

01:54PM  9    EXAMPLE?

01:54PM 10    A.   RIGHT, OR JUST IF A POTENTIAL PATIENT WALKS THROUGH THE

01:54PM 11    DOOR WITH A LAB PRESCRIPTION, DO THEY KNOW WHERE TO GO?  ARE

01:54PM 12    THEY GREETED?  ARE THEY RECEIVED?  YOU KNOW, ALL OF THAT FROM

01:54PM 13    HOW A PATIENT PERCEIVES THE EXPERIENCE.

01:54PM 14    Q.   OKAY.  SO ALL OF THOSE ISSUES AND OTHER ISSUES WERE ISSUES

01:55PM 15    ON WHICH THE COMPANIES CONTINUED TO WORK FOR THE REST OF 2010

01:55PM 16    AND 2011; CORRECT?

01:55PM 17    A.   AND I'D ARGUE 2012 AND INTO '13 AS WELL.

01:55PM 18    Q.   BUT AT THE BEGINNING OF 2012, DO YOU RECALL THE

01:55PM 19    DISCUSSIONS BEGAN ABOUT THE MODEL EVOLVING WHERE THE DEVICES

01:55PM 20    WOULD NO LONGER BE PART OF THE -- NO LONGER BE PLACED IN THE

01:55PM 21    STORES BUT WOULD INSTEAD GO IN A CENTRAL LAB?

01:55PM 22    A.   I REMEMBER LOTS OF DISCUSSIONS.  I DON'T REMEMBER IF IT

01:55PM 23    WAS IN 2012.  BUT IT SEEMS TO HAVE MANIFESTED ITSELF INTO A

01:55PM 24    LATER AGREEMENT.

01:55PM 25    Q.   OKAY.  WELL, LET ME JUST ASK YOU TO LOOK AT EXHIBIT 503,

01:55PM  1    THIS IS ALREADY IN EVIDENCE, BUT JUST TO HELP YOU ORIENT

01:55PM  2    YOURSELF RELATIVE TO THE CHRONOLOGY.

01:55PM  3        THIS IS THE POWERPOINT PRESENTATION THAT YOU LOOKED AT ON

01:56PM  4    YOUR DIRECT EXAMINATION, AND I'D JUST DIRECT YOUR ATTENTION

01:56PM  5    FIRST TO -- THIS WAS SENT TO YOU BY DR. ROSAN; CORRECT?

01:56PM  6    A.    THAT'S CORRECT.

01:56PM  7    Q.    AND THIS WAS SOMETHING THAT HE HAD RECEIVED FROM THERANOS;

01:56PM  8    CORRECT?

01:56PM  9    A.    THAT'S WHAT IT APPEARS TO BE.

01:56PM  10   Q.    AND IF YOU GO TO PAGE -- ON THE EXHIBIT NUMBER PAGE 9,

01:56PM  11   WHICH IS THE CENTER NUMBER AT THE BOTTOM.

01:56PM  12       THIS IS A DEMONSTRATIVE THAT BASICALLY SHOWS HOW THE MODEL

01:56PM  13   THAT IS GOING TO BE ADOPTED WOULD WORK; CORRECT?

01:57PM  14   A.    THAT'S CORRECT.

01:57PM  15   Q.    OKAY.  AND TO JUST TAKE THE TOP PORTION OF THE

01:57PM  16   DEMONSTRATIVE, YOU SEE THAT THE FIRST ITEM -- WELL, IT'S

01:57PM  17   LABELED PROJECT NORMANDY PROCESS.

01:57PM  18       DO YOU SEE THAT?

01:57PM  19   A.    YES.

01:57PM  20   Q.    AND PROJECT NORMANDY WAS JUST A REFERENCE TO THE LAUNCH

01:57PM  21   UNDER A MODEL WHERE THE DEVICES WERE NO LONGER IN THE STORES;

01:57PM  22   CORRECT?

01:57PM  23   A.    I DON'T KNOW WHAT THE BASIS WAS FOR CHANGING THE NAME, BUT

01:57PM  24   WHAT BECAME BETA BECAME NORMANDY.  I DON'T KNOW WHY, BUT --

01:57PM  25   Q.    OKAY.  AND ON THE ARROWS ACROSS THERE'S A REFERENCE TO PSC

01:57PM   1    ON THE LEFT-HAND SIDE.

01:57PM   2         DO YOU SEE THAT?

01:57PM   3    A.   CORRECT.

01:57PM   4    Q.   AND IS THAT A REFERENCE TO PATIENT SERVICE CENTER?

01:57PM   5    A.   IT MIGHT BE.  I DON'T RECALL.

01:57PM   6    Q.   OKAY.  AND THEN IT HAS AN ARROW POINTING TOWARDS A CLIA

01:57PM   7    LAB; CORRECT?

01:57PM   8    A.   CORRECT.

01:57PM   9    Q.   AND THEN FROM THE CLIA LAB, THERE'S AN ARROW WITH RESULTS

01:58PM   10   REPORTING; CORRECT?

01:58PM   11   A.   CORRECT.

01:58PM   12   Q.   AND THIS IS SETTING FORTH THE MODEL WHERE TESTING IS DONE

01:58PM   13   IN THE STORE, PATIENT SERVICE CENTER, IT'S TRANSMITTED TO THE

01:58PM   14   CLIA LAB, AND THEN RESULTS ARE REPORTED BACK; CORRECT?

01:58PM   15   A.   THAT'S MY INTERPRETATION.

01:58PM   16   Q.   OKAY.  AND UNDERNEATH EACH OF THESE ITEMS THERE'S A

01:58PM   17   DESCRIPTION OF DIFFERENT ELEMENTS OF THE PROCESS AS YOU MOVE

01:58PM   18   THROUGH TRANSMITTING THE SAMPLE; CORRECT?

01:58PM   19   A.   EFFECTIVELY WHAT HAS TO HAPPEN.

01:58PM   20   Q.   RIGHT.  SO YOU SEE AT THE BOTTOM, FOR EXAMPLE, THAT IT

01:58PM   21   SETS FORTH SHIPPING AND IT INDICATES THAT THE VESSEL IS SHIPPED

01:58PM   22   TO THE THERANOS LAB, AND THAT'S A REFERENCE TO THE BLOOD

01:58PM   23   SAMPLE; CORRECT?

01:58PM   24   A.   YES.

01:58PM   25   Q.   OKAY.  AND THEN I THINK WE TALKED BEFORE ABOUT, YOU KNOW,

MIQUELON CROSS BY MR. DOWNEY

01:58PM  1   SOME OF THE NEW FEATURES OF THE AGREEMENT, LIKE REFRIGERATION,

01:58PM  2   AND THAT'S REFERENCED UNDER CLIA LAB; CORRECT?

01:58PM  3   A.   THAT'S CORRECT.

01:58PM  4   Q.   AND THIS WAS ALL PART OF THE DISCUSSION WHEN THE PARTIES

01:59PM  5   BEGAN LOOKING AT A POTENTIAL PROCESS WHERE YOU WOULD SWITCH

01:59PM  6   FROM DEVICES IN THE STORES TO A CENTRAL LAB; CORRECT?

01:59PM  7   A.   YES.

01:59PM  8   Q.   AND THIS STRATEGY WAS DISCUSSED OVER A LONG PERIOD OF

01:59PM  9   TIME; RIGHT?

01:59PM  10  A.   YES.

01:59PM  11  Q.   BUT ULTIMATELY THERE WAS AN AGREEMENT, AND THAT WAS THE

01:59PM  12  AGREEMENT THAT WAS ENTERED INTO LATER IN 2012; CORRECT?

01:59PM  13  A.   YES.

01:59PM  14  Q.   MAY I ASK YOU, AT THIS POINT, HAD YOU BECOME SKEPTICAL OF

01:59PM  15  THE BUSINESS MODEL WHERE DEVICES WOULD BE DEPLOYED IN THE

01:59PM  16  STORES?

01:59PM  17  A.   NO.

01:59PM  18  Q.   OKAY.  WHEN DID YOU START TO EVALUATE THE ECONOMICS ALONG

01:59PM  19  THE LINES OF WHAT YOU DESCRIBED EARLIER?

01:59PM  20  A.   THE ECONOMICS OF HAVING THE DEVICE IN THE LAB?

01:59PM  21  Q.   RIGHT.  RECALL THAT YOU MENTIONED EARLIER THAT FOR SOME

01:59PM  22  STORES IT MIGHT NOT MAKE SENSE TO HAVE A DEVICE?

01:59PM  23  A.   RIGHT.

01:59PM  24  Q.   EVEN IF IT WAS LAWFUL AND OTHERWISE DESIRABLE?

02:00PM  25  A.   RIGHT.

02:00PM  1    Q.   WHEN DID YOU START THINKING ABOUT THAT?

02:00PM  2    A.   PRETTY EARLY IN THE RELATIONSHIP.  I DON'T KNOW EXACTLY

02:00PM  3    WHEN, BUT I THINK I HAD COME TO A CONCLUSION THAT ULTIMATELY

02:00PM  4    YOU MAY HAVE VERY FEW IN STORES BECAUSE IT MIGHT BE MUCH MORE

02:00PM  5    EFFICIENT TO HAVE A SECOND CLIA LAB IN NEW YORK, FOR EXAMPLE,

02:00PM  6    THAT SERVICES 100 STORES THAN HAVING 100 DIFFERENT MACHINES

02:00PM  7    WITH INVENTORY.

02:00PM  8         SO I THINK IN MY MIND PROBABLY -- IT WOULD PROBABLY MORPH

02:00PM  9    OVER TIME TO HAVING MULTIPLE LABS IN DIFFERENT MSA MARKETS, BUT

02:00PM  10   NOT ONE IN EVERY STORE.

02:00PM  11   Q.   AND WHEN YOU SAY MSA, WHAT DOES THAT MEAN?

02:00PM  12   A.   YOU KNOW, LIKE A METROPOLITAN AREA, NEW YORK, OR CHICAGO,

02:00PM  13   OR, YOU KNOW, AGAIN, WHERE YOU HAVE MAYBE ONE LAB SERVICING

02:00PM  14   100, 200, 300 STORES AROUND IT.

02:00PM  15        SO YOU CAN DO VERY EFFICIENT DAILY DELIVERIES AND HAVE

02:00PM  16   TESTS RUN EFFICIENTLY WITH PEOPLE THAT ARE CONSTANTLY PICKING

02:00PM  17   THE RIGHT CARTRIDGE.

02:00PM  18        BUT THAT'S WHERE I THOUGHT THE ECONOMICS WOULD PROBABLY GO

02:01PM  19   OVER TIME TO BE THE BEST FOR BOTH PARTIES.

02:01PM  20   Q.   OKAY.  AND IF YOU LOOK AT EXHIBIT 617 IN YOUR WHITE

02:01PM  21   NOTEBOOK, I JUST WANT TO ASK YOU IF THIS IS THE AGREEMENT WHICH

02:01PM  22   CHANGED THE WAY IN WHICH THE PARTIES WERE PLANNING TO OPERATE.

02:01PM  23   A.   I WOULD SAY THAT THIS, TO MY UNDERSTANDING, WOULD BE BASED

02:01PM  24   ON EVERYTHING THAT HAPPENED IN THE PRIOR, YOU KNOW, TWO YEARS,

02:01PM  25   EVERYTHING THAT WE LEARNED, THIS NOW MEMORIALIZES A NEW

02:01PM  1    AGREEMENT FOR BOTH PARTIES BASED UPON ALL OF THOSE LEARNINGS.

02:01PM  2    Q.   AND IF YOU LOOK AT PAGE 4 OF THE EXHIBIT, IT SETS FORTH A

02:01PM  3    SCHEDULE, WHICH IS THE PROGRAM OVERVIEW.

02:01PM  4         DO YOU SEE THAT?

02:01PM  5    A.   I DO.

02:02PM  6    Q.   AND IF YOU WOULD GO TO THE THIRD SENTENCE -- THE THIRD

02:02PM  7    PARAGRAPH LABELLED PHASED DISRUPTION.

02:02PM  8         AND IF YOU LOOK AT THE THIRD SENTENCE, IT SAYS,

02:02PM  9    "NOTWITHSTANDING THE PREVIOUS, THE PARTIES ACKNOWLEDGE THE

02:02PM  10   MUTUAL DESIRE TO BRING THERANOS'S TECHNOLOGY TO MARKET AS

02:02PM  11   QUICKLY AS IS REASONABLY POSSIBLE.  WITH THAT IN MIND, AT THE

02:02PM  12   COMMENCEMENT OF THIS AGREEMENT, IT IS THE PARTIES' INTENTION

02:02PM  13   FOR WALGREENS TO ACT AS A PATIENT SERVICE CENTER AND COLLECT

02:02PM  14   BLOOD SAMPLES VIA FINGERSTICK TECHNOLOGY, SMALL SAMPLES OF

02:02PM  15   URINE, SALIVA, FECES, OR SWABS, WITH LABORATORY TESTING TO BE

02:02PM  16   PERFORMED BY THERANOS AT A CLIA CERTIFIED OFFSITE LABORATORY."

02:02PM  17        CORRECT?

02:02PM  18   A.   CORRECT.

02:02PM  19   Q.   AND SO FROM THE DATE OF THIS AGREEMENT FORWARD, THE

02:02PM  20   UNDERSTANDING WAS THAT THIS IS HOW THE PROGRAM WITH WALGREENS

02:03PM  21   AND THERANOS WOULD WORK, AT LEAST UNTIL WALGREENS GOT CERTAIN

02:03PM  22   REGULATORY APPROVAL -- AT LEAST UNTIL THERANOS GOT CERTAIN

02:03PM  23   REGULATORY APPROVALS?

02:03PM  24   A.   CORRECT.

02:03PM  25   Q.   AND I THINK FROM THIS PROGRAM FORWARD IN THE MIDDLE OF

02:03PM  1      2012, YOU WERE WORKING TOWARDS THE LAUNCH THAT ULTIMATELY

02:03PM  2      HAPPENED IN THE LATTER PART OF 2013; CORRECT?

02:03PM  3      A.   CORRECT.

02:03PM  4      Q.   NOW, AT THE TIME OF THE ORIGINAL AGREEMENT, THE

02:03PM  5      CONTEMPLATION WAS THAT ULTIMATELY THE PARTIES WOULD WORK

02:03PM  6      TOWARDS A NATIONAL ROLLOUT OF THERANOS TECHNOLOGY; CORRECT?

02:04PM  7      A.   YES, WITH THE PREREQUISITE BEING EVERYTHING WORKING AS

02:04PM  8      PLANNED.

02:04PM  9      Q.   BUT THAT WAS AN OBJECTIVE OF THE AGREEMENT; CORRECT?

02:04PM  10     A.   YES.

02:04PM  11     Q.   AND WHEN THIS -- WHEN THE 2012 AGREEMENT WAS SIGNED, IT

02:04PM  12     REFERENCED EXPECTATIONS AS TO HOW THE ROLLOUT WOULD WORK;

02:04PM  13     CORRECT?

02:04PM  14     A.   THAT'S CORRECT.

02:04PM  15     Q.   AND LET ME JUST DRAW THAT UP IN EXHIBIT 617, AND THAT'S AT

02:04PM  16     SCHEDULE F, WHICH IS BATES 53.

02:04PM  17          AND IF YOU LOOK UNDER NUMBER 2, THAT SETS FORTH WHAT THE

02:04PM  18     PROGRAM OBJECTIVES WERE; CORRECT?

02:05PM  19     A.   CORRECT.

02:05PM  20     Q.   AND IF YOU LOOK UNDER A, IT DESCRIBES HOW THE TESTING WILL

02:05PM  21     WORK, ET CETERA, AND IT SAYS, "IT WILL INTRODUCE A MORE

02:05PM  22     COST-EFFECTIVE, BLOOD TESTING SERVICE AT WALGREENS STORES AND

02:05PM  23     WALGREENS'S OTHER CLINICAL OPERATIONS NATIONWIDE (WHICH, BY

02:05PM  24     EXAMPLE, INCLUDE BUT ARE NOT LIMITED TO)," AND IT DESCRIBES

02:05PM  25     INFUSION CENTERS AND OTHER CLINICS; CORRECT?

02:05PM 1    A.   CORRECT.

02:05PM 2    Q.   AND FROM THAT AGREEMENT, FROM THAT TIME UNTIL THE TIME

02:05PM 3    SHORTLY BEFORE THE LAUNCH, THE PARTIES CONTINUED TO DISCUSS A

02:05PM 4    POTENTIAL SCHEDULE FOR A NATIONWIDE ROLLOUT; CORRECT?

02:05PM 5    A.   CORRECT.

02:05PM 6    Q.   AND THERE WERE DIFFERENT IDEAS AT VARIOUS TIMES AS TO HOW

02:05PM 7    THAT ROLLOUT MIGHT WORK; CORRECT?

02:06PM 8    A.   CORRECT.

02:06PM 9    Q.   AND IF YOU LOOK AT -- IN YOUR BLACK BINDER NOW AT

02:06PM 10   EXHIBIT 7312.

02:06PM 11   A.   IS THAT BINDER 2 OR BINDER 1?

02:06PM 12   Q.   IT'S THE BINDER THAT SHOULD HAVE --

02:06PM 13   A.   BINDER 2 I THINK.

02:06PM 14   Q.   YEAH.

02:06PM 15        THIS IS AN EMAIL FROM MS. HOLMES TO YOU; CORRECT?

02:06PM 16   A.   YES.

02:06PM 17   Q.   AND SHE ATTACHED TO THIS A POWERPOINT THAT SETS FORTH A

02:07PM 18   PROPOSED ROLLOUT PLAN; CORRECT?

02:07PM 19   A.   CORRECT.

02:07PM 20   Q.   AND YOU LOOKED AT THIS ON YOUR DIRECT EXAMINATION;

02:07PM 21   CORRECT?

02:07PM 22   A.   CORRECT.

02:07PM 23        MR. DOWNEY:  YOUR HONOR, I THINK I'VE USED A

02:07PM 24   DIFFERENT EXHIBIT NUMBER FOR AN EXHIBIT ALREADY MENTIONED, BUT

02:07PM 25   I THINK SINCE THE WITNESS IS OPEN TO THERE, WITH THE

02:07PM  1    STIPULATION OF THE GOVERNMENT, I'LL AGREE TO MODIFY THAT NUMBER

02:07PM  2    LATER.

02:07PM  3              THE COURT:  ALL RIGHT.  MR. SCHENK?  I THINK --

02:07PM  4    YOU'D LIKE TO INTRODUCE THIS NOW OR HAVE THIS WITNESS --

02:07PM  5              MR. DOWNEY:  I THINK IT'S ACTUALLY ALREADY IN

02:07PM  6    EVIDENCE.

02:07PM  7              THE COURT:  OKAY.  DO WE KNOW THE NUMBER?

02:07PM  8        LET'S ALLOW YOU TO GO FORWARD WITH THIS.  WE'LL GET THE

02:07PM  9    NUMBER IN A SECOND.

02:07PM  10   BY MR. DOWNEY:

02:07PM  11   Q.   WELL, IN AN ABUNDANCE OF CAUTION, LET ME SAY, IS THIS AN

02:07PM  12   EMAIL COMMUNICATION FROM MS. HOLMES TO YOU IN AUGUST OF 2013?

02:07PM  13   A.   YES.

02:07PM  14   Q.   AND SHE ATTACHED HERE A POWERPOINT THAT SETS FORTH A

02:07PM  15   WALGREENS DEPLOYMENT PLAN?

02:08PM  16   A.   A PROPOSAL.

02:08PM  17   Q.   AND THIS WAS HER PROPOSAL AS TO HOW A ROLLOUT OF THERANOS

02:08PM  18   MIGHT WORK IN STORES ACROSS THE COUNTRY; CORRECT?

02:08PM  19   A.   CORRECT.

02:08PM  20   Q.   AND SHE WAS SENDING THIS TO YOU FOR YOUR COMMENT AND

02:08PM  21   REACTION AND FEEDBACK; CORRECT?

02:08PM  22   A.   I THINK YOU'D HAVE TO ASK HER, BUT AT LEAST FOR MY

02:08PM  23   INFORMATION.

02:08PM  24   Q.   OKAY.  WELL, THAT'S WHAT YOU UNDERSTOOD.  THIS WAS A

02:08PM  25   DOCUMENT PROPOSING HOW IT MIGHT WORK; CORRECT?

02:08PM  1      A.   RIGHT.

02:08PM  2      Q.   AND IF YOU LOOK AT THE SECOND PARAGRAPH OF THE EMAIL, SHE

02:08PM  3      SAYS, "WE HAVE CEMENTED WHAT WE BELIEVE TO BE THE MOST

02:08PM  4      EFFECTIVE ROLLOUT STRATEGY FOR REALIZING BROAD NATIONAL SCALE

02:08PM  5      AS FAST AS POSSIBLE."

02:08PM  6              THE COURT:  LET ME STOP YOU THERE.  I DON'T THINK

02:08PM  7      THIS IS IN EVIDENCE YET.  I DON'T BELIEVE IT IS.

02:08PM  8              MR. DOWNEY:  OKAY.  WELL, YOUR HONOR, I MOVE THE

02:08PM  9      ADMISSION OF 7312.

02:08PM  10             MR. SCHENK:  NO OBJECTION.  I BELIEVE 971 --

02:08PM  11             THE COURT:  971?

02:08PM  12             MR. SCHENK:  971.

02:08PM  13             MR. DOWNEY:  IN THE EVENT THERE IS SOME DEVIATION,

02:08PM  14     I'LL USE 7312 FOR NOW.

02:09PM  15             THE COURT:  7312.  UNDERSTOOD.  SO IT'S ADMITTED,

02:09PM  16     AND IT MAY BE PUBLISHED.

02:09PM  17         (DEFENDANT'S EXHIBIT 7312 WAS RECEIVED IN EVIDENCE.)

02:09PM  18     BY MR. DOWNEY:

02:09PM  19     Q.   SO IN THAT SECOND PARAGRAPH SHE TALKS ABOUT EFFECTIVELY A

02:09PM  20     ROLLOUT STRATEGY FOR A BROAD NATIONAL ROLLOUT; CORRECT?

02:09PM  21     A.   YES.

02:09PM  22     Q.   AND IF YOU LOOK AT THE DATE OF THIS, THIS IS AUGUST 7TH,

02:09PM  23     2013; CORRECT?

02:09PM  24     A.   CORRECT.

02:09PM  25     Q.   AND THAT IS ABOUT A MONTH BEFORE THERANOS AND WALGREENS

```
02:09PM   1    WOULD ANNOUNCE THEIR PARTNERSHIP PUBLICLY --

02:09PM   2              THE COURT:  JUST A MOMENT.  I DON'T THINK IT'S ON

02:09PM   3    OUR SCREEN.

02:09PM   4              MR. DOWNEY:  OH, I BEG YOUR PARDON.

02:09PM   5              THE CLERK:  LET ME DO A RESET.  ONE MOMENT.

02:09PM   6              THE COURT:  WE'RE GOING TO RESET THE SYSTEM SO IT

02:09PM   7    WILL HOPEFULLY CATCH UP.

02:10PM   8         (PAUSE IN PROCEEDINGS.)

02:10PM   9              JUROR:  JUST ONE.

02:10PM  10              THE COURT:  I THINK ALL OF THE MONITORS ARE UP, SO

02:10PM  11    SORRY FOR THE SCOREBOARD BREAKDOWN.

02:10PM  12    BY MR. DOWNEY:

02:10PM  13    Q.   SORRY.  WE WERE DISCUSSING AN EMAIL OF A NATIONAL ROLLOUT

02:11PM  14    PLAN FROM MS. HOLMES TO YOU IN AUGUST OF 2013.

02:11PM  15         AND JUST TO MAKE SURE THAT WE'RE ORIENTED TO THE SCHEDULE,

02:11PM  16    THIS IS ABOUT A YEAR BEFORE YOU LEAVE WALGREENS; CORRECT?

02:11PM  17    A.   CORRECT.

02:11PM  18    Q.   AND IT'S SHORTLY BEFORE THE CONSUMER LAUNCH OF THERANOS;

02:11PM  19    CORRECT?

02:11PM  20    A.   CORRECT.

02:11PM  21    Q.   AND MS. HOLMES WAS PROPOSING THAT THERE BE A SCHEDULE AS

02:11PM  22    SET FORTH IN THE ATTACHED POWERPOINT TO THIS; CORRECT?

02:11PM  23    A.   CORRECT.

02:11PM  24    Q.   AND IN THE SECOND PARAGRAPH OF THE COVER EMAIL, SHE SAYS,

02:11PM  25    "WE HAVE CEMENTED WHAT WE BELIEVE TO BE THE MOST EFFECTIVE
```

02:11PM 1    ROLLOUT STRATEGY FOR REALIZING BROAD NATIONAL SCALE AS FAST AS

02:11PM 2    POSSIBLE."

02:11PM 3        DO YOU SEE THAT?

02:11PM 4    A.   YES.

02:11PM 5    Q.   AND YOU LOOKED AT THIS DURING YOUR DIRECT EXAMINATION, BUT

02:11PM 6    IF YOU GO TO THE FIFTH PARAGRAPH, SHE SETS FORTH THAT THERE IS

02:12PM 7    A SIGNIFICANT AMOUNT OF WORK THAT THE WALGREENS TEAM WILL HAVE

02:12PM 8    TO DO, INCLUDING ESTABLISHING A MORE ROBUST FORMAL TECHNICIAN

02:12PM 9    TRAINING PROGRAM AND PREPARING SPACE IN NEW YORK CITY, ET

02:12PM 10   CETERA; CORRECT?

02:12PM 11   A.   CORRECT.

02:12PM 12   Q.   AND SO THIS EMAIL WAS ONE IN WHICH SHE WAS RAISING WHAT

02:12PM 13   THERANOS WAS ASKING WALGREENS TO DO; CORRECT?

02:12PM 14   A.   CORRECT.

02:12PM 15   Q.   OKAY.  AND HER PROPOSAL IS SET FORTH IN THE ATTACHMENT, SO

02:12PM 16   IF YOU GO TO THE PAGE OF THE POWERPOINT THAT HAS A 2 AT THE

02:13PM 17   BOTTOM LABELLED EXECUTIVE SUMMARY.

02:13PM 18       DO YOU HAVE THAT?

02:13PM 19   A.   YES.

02:13PM 20   Q.   AND SHE SETS FORTH A PLAN UNDER WHICH THERANOS WOULD OPEN

02:13PM 21   ON A SMALL SCALE CERTAIN LOCATIONS IN ARIZONA IN THE NEAR

02:13PM 22   FUTURE; CORRECT?

02:13PM 23   A.   YES.

02:13PM 24   Q.   AND THEN SHE PROPOSED THAT IN THE FOURTH QUARTER

02:13PM 25   THERANOS'S PRESENCE BE EXPANDED IN PHOENIX AND NEW YORK;

02:13PM  1      CORRECT?

02:13PM  2      A.   CORRECT.

02:13PM  3      Q.   AND THEN SHE PROPOSED THAT THROUGHOUT 2014 THERANOS AND

02:13PM  4      WALGREENS WOULD EXECUTE A NATIONAL ROLLOUT STRATEGY; CORRECT?

02:13PM  5      A.   CORRECT.

02:13PM  6      Q.   AND IF YOU LOOK AT THE PAGES THAT FOLLOW AND JUST SCROLL

02:14PM  7      THROUGH THEM, YOU SEE THAT SHE WAS PROPOSING THE LOCATIONS IN

02:14PM  8      THE DARKER COLOR AS TO WHAT -- WHICH STATES WOULD LAUNCH IN

02:14PM  9      WHICH QUARTER; CORRECT?

02:14PM  10     A.   CORRECT.

02:14PM  11     Q.   AND SHE PROPOSED THAT BY THE END OF THE YEAR THAT THERANOS

02:14PM  12     BE IN ABOUT 60 -- 6,250 WALGREENS STORES AT THE END OF THE YEAR

02:14PM  13     2014; CORRECT?

02:14PM  14     A.   CORRECT.

02:14PM  15     Q.   AND YOU RESPONDED TO THIS EMAIL AFTER RECEIVING IT

02:14PM  16     INTERNALLY IN EXHIBIT 971, AND MR. SCHENK SHOWED YOU THAT ON

02:15PM  17     YOUR DIRECT EXAMINATION; CORRECT?

02:15PM  18     A.   CORRECT.

02:15PM  19     Q.   AND YOU'RE HAVING A DIALOGUE INTERNALLY AT WALGREENS HERE;

02:15PM  20     CORRECT?

02:15PM  21     A.   CORRECT.

02:15PM  22     Q.   AND YOU DISCUSSED WITH MR. SCHENK THE LAST SENTENCE WHERE

02:15PM  23     YOU SAY "I'M NOT WORRIED ABOUT THEM OR LABS... I'M WORRIED

02:15PM  24     ABOUT US," WITH A FROWN.

02:15PM  25          I JUST WANT TO ASK YOU, WHAT DOES "LABS" REFER TO THERE?

02:15PM   1    A.   I THINK I'M NOT WORRIED ABOUT THEM OR THE EFFICACY OF

02:15PM   2    THEIR LAB EQUIPMENT.

02:15PM   3    Q.   BUT YOU'RE WORRIED ABOUT WALGREENS; CORRECT?

02:15PM   4    A.   RIGHT, BECAUSE SHE'S OUTLINED AT LEAST FOUR AREAS WHERE I

02:15PM   5    THINK IT'S IMPLICIT THAT SHE'S SAYING THAT WE'RE NOT DOING OUR

02:15PM   6    PART.

02:15PM   7    Q.   OKAY.  LET ME ASK YOU TO LOOK NOW AT EXHIBIT 1083, AND MY

02:16PM   8    QUESTION WILL BE WHETHER THIS IS A RESPONSE TO YOUR PROPOSAL?

02:16PM   9    A.   WHICH BOOK IS IT IN?

02:16PM   10   Q.   I THINK IT SHOULD BE 2.

02:16PM   11          THE CLERK:  IS THAT 1083, COUNSEL?

02:16PM   12          MR. DOWNEY:  YES.  THIS IS A NEW EXHIBIT.

02:16PM   13          THE CLERK:  DO YOU MEAN 10,000 --

02:16PM   14          MR. DOWNEY:  NO 1-0-8-3.  1083.

02:16PM   15   Q.   AND IS THIS AN EMAIL FROM YOU TO MS. HOLMES SETTING FORTH

02:16PM   16   A PROPOSAL ABOUT THE THERANOS-WALGREENS RELATIONSHIP?

02:16PM   17   A.   THIS IS.

02:16PM   18   Q.   OKAY.  AND IF YOU LOOK ON THE COVER --

02:17PM   19          WELL, YOUR HONOR, I MOVE THE ADMISSION OF EXHIBIT 1083.

02:17PM   20          MR. SCHENK:  NO OBJECTION.

02:17PM   21          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:17PM   22      (GOVERNMENT'S EXHIBIT 1083 WAS RECEIVED IN EVIDENCE.)

02:17PM   23   BY MR. DOWNEY:

02:17PM   24   Q.   LOOK AT THE COVER EMAIL.  YOU INDICATE TO MS. HOLMES THAT,

02:17PM   25   "ATTACHED IS THE CONCEPTUAL FRAMEWORK I SHARED LAST NIGHT.

02:17PM  1    TAKE A LOOK AND LET ME KNOW YOUR IDEAS OF HOW YOU MIGHT MODIFY,

02:17PM  2    ET CETERA."

02:17PM  3         AND THIS APPARENTLY FOLLOWED A CONVERSATION THAT YOU HAD

02:17PM  4    WITH MS. HOLMES?

02:17PM  5    A.   CORRECT.

02:17PM  6    Q.   AND AMONG THE ISSUES THAT YOU WERE DISCUSSING WAS THE

02:17PM  7    TIMELINE FOR ROLLING OUT THERANOS IN WALGREENS STORES; CORRECT?

02:17PM  8    A.   RIGHT.  THE CRUX OF THIS DISCUSSION WAS ACTUALLY THERANOS

02:17PM  9    WAS WANTING US TO CREATE A VERY HIGH-LEVEL PATIENT EXPERIENCE

02:18PM  10   IN ALL OF OUR PHARMACIES AKIN TO WHAT EVERY SAFEWAY HAD DONE,

02:18PM  11   AND WE HAD DONE SOME THINKING AND SOME WORK TO SAY, YOU KNOW,

02:18PM  12   IT'S NOT REALLY PRACTICAL, IT WOULD BE VERY EXPENSIVE, BUT

02:18PM  13   PERHAPS A TIERING SYSTEM OF WHAT WE THINK WOULD BE THE MOST,

02:18PM  14   THE HEAVIEST USE STORES VERSUS THE LIGHTEST AND MAYBE WE COULD

02:18PM  15   ALIGN IN TERMS OF REALLY BUILDING THE EXPERIENCE TO SUIT THE

02:18PM  16   SPECIFIC STORE ENVIRONMENT.

02:18PM  17   Q.   OKAY.  SO YOU -- THERANOS THOUGHT SOME STORES WERE MORE

02:18PM  18   DESIRABLE TO BE LOCATED IN THAN OTHERS?

02:18PM  19   A.   WELL, I THINK THAT WAS AT LEAST OUR PROPOSAL IS THAT WE

02:18PM  20   REALLY SHOULDN'T DO A ONE-SIZE-FITS-ALL.  SOME STORES WE COULD

02:18PM  21   USE THE CLINIC AND SOME WE MIGHT BUILD OUT A SPACE, BUT OTHERS

02:18PM  22   PERHAPS JUST A SCREEN WOULD BE GOOD ENOUGH.

02:18PM  23   Q.   OKAY.  AND SO YOU, YOU RANKED CERTAIN STORES AND INDICATED

02:19PM  24   THAT BY COLOR; CORRECT?

02:19PM  25   A.   I BELIEVE IT WAS -- I DON'T KNOW IF IT WAS A GOLD, SILVER,

02:19PM  1    BRONZE SYSTEM OR SOME KIND OF A THREE-TIER SYSTEM I RECALL.

02:19PM  2    Q.   OKAY.   IN GOLD STORES YOU MIGHT HAVE A FULLER FACILITY?

02:19PM  3    A.   THE BEST OF THE BEST EXPERIENCE THAT WE COULD PROVIDE.

02:19PM  4    Q.   AND IN THE SILVER YOU MIGHT HAVE A PRIVATE BATHROOM, BUT

02:19PM  5    IT WOULD NOT BE AS NICE AS THE GOLD; CORRECT?

02:19PM  6    A.   CORRECT.

02:19PM  7    Q.   AND THEN THE BRONZE WOULD BE THE STORES WITH JUST THE

02:19PM  8    SCREENS?

02:19PM  9    A.   THAT'S MY RECOLLECTION.

02:19PM  10   Q.   AND YOU WERE MAKING A PROPOSAL HERE AS TO HOW MANY STORES

02:19PM  11   WOULD BE WITHIN EACH TIER; CORRECT?

02:19PM  12   A.   YES.

02:19PM  13   Q.   AND YOU WERE PROPOSING HOW THOSE LOCATIONS MIGHT BE ROLLED

02:19PM  14   OUT; CORRECT?

02:19PM  15   A.   CORRECT.

02:19PM  16   Q.   AND IN THE PARAGRAPH LABELED 1, YOU SET FORTH THE SCALE

02:19PM  17   TIMELINE AND VOLUME AND SPACE COMMITMENTS THAT YOU WERE

02:20PM  18   PROPOSING; CORRECT?

02:20PM  19   A.   CORRECT.   EVERYTHING PREDICATED ON THE TECHNOLOGY WORKING

02:20PM  20   AND THE PILOTS BEING SUCCESSFUL.

02:20PM  21   Q.   OKAY.   AND SO YOU PROPOSED THAT AFTER COMPLETION OF THE

02:20PM  22   PILOT, WALGREENS WAS WILLING TO COMMIT TO DEVELOPING SERVICES,

02:20PM  23   LAB SERVICES AT 1500 LOCATIONS WITHIN THE FIRST YEAR; CORRECT?

02:20PM  24   A.   ASSUMING IT WAS SUCCESSFUL, YES.

02:20PM  25   Q.   AND THAT WAS MORE THAN SHE HAD PROPOSED; CORRECT?

02:20PM  1    A.   I'D HAVE TO GO BACK AND CHECK HER NOTES.

02:20PM  2    Q.   OKAY.  BUT IN THE SECOND YEAR, YOU WOULD ROLL OUT AN

02:20PM  3    ADDITIONAL 1500 LOCATIONS; CORRECT?

02:20PM  4    A.   THAT'S WHAT IT SAYS HERE.

02:20PM  5    Q.   OKAY.  AND YOU JUST SET FORTH BELOW THE ALLOCATION OF

02:20PM  6    THOSE AMONGST THE GOLD, SILVER, AND BRONZE RANKING; CORRECT?

02:21PM  7    A.   CORRECT.

02:21PM  8    Q.   AND IF YOU GO TO THE NEXT PAGE OF THE EXHIBIT, YOU SET

02:21PM  9    FORTH AN INNOVATION FEE PAYMENT SCHEDULE.

02:21PM 10         WHAT WAS THE INNOVATION FEE A REFERENCE TO?

02:21PM 11    A.   AGAIN, THIS WAS THIS HUNDRED MILLION DOLLARS WHICH WE

02:21PM 12    TALKED ABOUT EARLIER WHICH WERE PAYMENTS TO BE STAGED THAT

02:21PM 13    EFFECTIVELY THERANOS WOULD BE ABLE TO USE MORE OR LESS AS

02:21PM 14    WORKING CAPITAL TO INVEST IN THE SCALEUP, AND THEN I BELIEVE

02:21PM 15    BASED UPON WHAT DEGREE OF VOLUME OVER TIME THOSE FEES TO SOME

02:21PM 16    DEGREE WOULD BE PAID BACK OR NOT.

02:21PM 17    Q.   OKAY.  AND THIS SETS FORTH A PROPOSAL AS TO THOSE PAYMENTS

02:21PM 18    OCCURRING OVER THE REST OF THE CALENDAR YEAR 2013; CORRECT?

02:21PM 19    A.   CORRECT.  AND AGAIN, AS I RECALL, ELIZABETH WAS ASKING IF

02:21PM 20    WE COULD AGAIN EXPEDITE THESE PAYMENTS IN ORDER TO HELP THEIR

02:21PM 21    ABILITY TO SCALE THE CARTRIDGES AND THE INFRASTRUCTURE.

02:22PM 22    Q.   AND WAS IT ALSO AN ELEMENT OF THIS AGREEMENT THAT YOU WERE

02:22PM 23    PROPOSING THAT YOU WOULD ASSIST THERANOS WITH LAUNCHING

02:22PM 24    INTERNATIONALLY AND OPENING STORES ABROAD?

02:22PM 25    A.   I BELIEVE THERE WAS A LOOSE AGREEMENT TO MAYBE DO

02:22PM 1   SOMETHING WITH ALLIANCE BOOTS, BUT IT WAS, I BELIEVE IT WAS --

02:22PM 2   WELL, HERE'S THE COMMENT TO ASSIST THEM, BUT IT WASN'T

02:22PM 3   DEFINITIVE.

02:22PM 4       ALLIANCE BOOTS WAS INDEPENDENT AT THE TIME, SO THERE WAS

02:22PM 5   NO WAY THAT WE COULD, YOU KNOW, GUARANTEE OR MANDATE, BUT WE

02:22PM 6   COULD MAKE INTRODUCTIONS.

02:22PM 7   Q.   AND ALL OF THESE -- SO, IN OTHER WORDS, WALGREENS HAD AN

02:22PM 8   AFFILIATION WITH ALLIANCE BOOTS AND YOU WERE GOING TO USE THAT

02:22PM 9   RELATIONSHIP TO ENCOURAGE THE OPENING OF STORES OVERSEAS; IS

02:22PM 10  THAT RIGHT?

02:22PM 11  A.   RIGHT.  WE HAD A MINORITY INVESTMENT STAKE.

02:22PM 12  Q.   OKAY.  AND THE DOCUMENTS THAT WE JUST LOOKED AT, THEY'RE

02:23PM 13  BASICALLY PART OF THE NEGOTIATION BETWEEN THERANOS AND

02:23PM 14  WALGREENS AS TO HOW A ROLLOUT WOULD WORK; CORRECT?

02:23PM 15  A.   CORRECT.

02:23PM 16      I THINK IT'S SAFE TO SAY WHEN YOU'RE DOING SOMETHING NEW

02:23PM 17  TO THE WORLD, THINGS CHANGE, AND IT NEEDS TO KEEP BEING

02:23PM 18  REFLECTED THAT IT'S THE BEST AGREEMENT FOR BOTH PARTIES.

02:23PM 19  Q.   AND YOU CONTINUED TO NEGOTIATE THAT AGREEMENT THROUGHOUT

02:23PM 20  THE REMAINDER OF 2013; CORRECT?

02:23PM 21  A.   I DON'T RECALL.  I BELIEVE THERE WAS AN ADDENDUM THAT

02:23PM 22  REFLECTED WHAT YOU'VE SHOWN ME, BUT I DON'T RECALL IF THERE WAS

02:23PM 23  ANOTHER AGREEMENT OR NOT.

02:23PM 24  Q.   OKAY.  LET ME ASK YOU TO LOOK AT EXHIBIT 1387, WHICH WOULD

02:23PM 25  BE IN NUMBER 2, THE DEFENSE BINDER.

02:24PM  1          I BEG YOUR PARDON.  IT'S ACTUALLY IN YOUR WHITE BINDER.

02:24PM  2                  THE COURT:  1387?

02:24PM  3                  MR. DOWNEY:  1387.

02:24PM  4                  THE COURT:  THERE IS SUCH A DOCUMENT IN THE BLACK

02:24PM  5     BINDER.

02:24PM  6                  MR. DOWNEY:  YOU HAVE A BETTER BLACK BINDER THAN I

02:24PM  7     DO.

02:24PM  8     Q.   MY QUESTION TO YOU SIMPLY, MR. MIQUELON, IS, IS THIS THE

02:24PM  9     AGREEMENT THAT WAS ENTERED INTO BETWEEN THERANOS AND WALGREENS

02:24PM 10     THAT WAS DESIGNED TO ADDRESS THERANOS'S ROLLOUT IN WALGREENS

02:25PM 11     STORES?

02:25PM 12     A.   I BELIEVE SO.

02:25PM 13     Q.   AND IF YOU LOOK AT PAGE 2 OF THAT EXHIBIT, THE FIRST

02:25PM 14     PARAGRAPH IS NATIONAL, NUMBER 1 SAID NATIONAL ROLLOUT, NEW

02:25PM 15     MARKET ENTRY, AND IT INDICATES THE PARTIES SHALL WORK TOGETHER

02:25PM 16     TO DEVELOP A FORECAST --

02:25PM 17                  MR. SCHENK:  YOUR HONOR, BEFORE WE READ THE

02:25PM 18     DOCUMENT, LET'S MOVE IT INTO EVIDENCE.  NO OBJECTION.

02:25PM 19                  MR. DOWNEY:  I BEG YOUR PARDON.

02:25PM 20          YES, I DO MOVE IT INTO EVIDENCE.

02:25PM 21                  THE COURT:  IT'S IN EVIDENCE AND IT MAY BE

02:25PM 22     PUBLISHED.

02:25PM 23                  MR. DOWNEY:  I MISTAKENLY THOUGHT HE HAD SHOWN THE

02:25PM 24     WITNESS THE DOCUMENT.

02:25PM 25          (GOVERNMENT'S EXHIBIT 1387 WAS RECEIVED IN EVIDENCE.)

02:25PM   1    BY MR. DOWNEY:

02:25PM   2    Q.   IF YOU LOOK AT THE FIRST PARAGRAPH, IT SAYS, "THE PARTIES

02:25PM   3    SHALL WORK TOGETHER TO DEVELOP A FORECAST THAT DETAILS THE

02:25PM   4    ANTICIPATED ROLLOUT DATES FOR THERANOS SERVICES IN INDIVIDUAL

02:25PM   5    U.S. STATES/TERRITORIES," ET CETERA.

02:25PM   6         AND THEN THE SECOND SENTENCE SAYS, "THE PARTIES ARE

02:25PM   7    COMMITTED TO TAKING ALL STEPS REASONABLY NECESSARY TO ENSURE A

02:26PM   8    SUCCESSFUL NATIONAL ROLLOUT OF THE THERANOS SERVICES, AND AGREE

02:26PM   9    THAT A QUALITY STORE AND PATIENT EXPERIENCE IS AN IMPORTANT

02:26PM  10    COMPONENT OF THIS SUCCESS AS PATIENT ADOPTION AND ACCEPTANCE OF

02:26PM  11    THERANOS'S LABORATORY SERVICES WILL BE HIGHLY IMPACTED BY THE

02:26PM  12    PATIENT EXPERIENCE."

02:26PM  13         SO THAT'S WHAT THIS AGREEMENT RELATED TO, AT LEAST

02:26PM  14    CREATING A PROCESS UNDER WHICH THAT ROLLOUT WOULD BE -- WOULD

02:26PM  15    TAKE PLACE?

02:26PM  16    A.   CORRECT.

02:26PM  17    Q.   AND THEN IF YOU LOOK BACK AT THE FIRST PAGE OF

02:26PM  18    EXHIBIT 1387, THE SECOND PARAGRAPH SAYS, "IT IS THE INTENTION

02:26PM  19    OF THE PARTIES TO DEVELOP A MUTUALLY BENEFICIAL STRATEGIC

02:26PM  20    RELATIONSHIP THAT FACILITATES THE SUCCESSFUL DEPLOYMENT OF

02:27PM  21    THERANOS NATIONALLY, ESTABLISHES WALGREENS AS THE NATIONAL

02:27PM  22    PARTNER FOR LABORATORY SERVICES THAT THERANOS IS ABLE TO

02:27PM  23    PROVIDE AND THERANOS AS WALGREENS NATIONAL PARTNER FOR SUCH

02:27PM  24    THERANOS SERVICES AND PROTECTS THE LONG-TERM STRATEGIC AND

02:27PM  25    COMPETITIVE POSITIONING OF THERANOS AND WALGREENS WITH RESPECT

02:27PM   1    TO COMPETITIVE TECHNOLOGIES AND SERVICES."

02:27PM   2         DO YOU SEE THAT?

02:27PM   3    A.   YES.

02:27PM   4    Q.   SO THAT IS THE INTENT WITH WHICH THE PARTIES WERE ENTERING

02:27PM   5    INTO THIS AGREEMENT; CORRECT?

02:27PM   6         BUT THERANOS WOULD HAVE TO BE ABLE TO SCALE ITS SERVICES;

02:27PM   7    CORRECT?

02:27PM   8    A.   YES.

02:27PM   9    Q.   AND IT HAD NOT YET DONE THAT; CORRECT?

02:27PM   10   A.   AT THAT POINT IN TIME?

02:27PM   11   Q.   YES.

02:27PM   12   A.   I MEAN, IT HAD SCALED TO WHAT WAS BEING PILOTED.

02:27PM   13   Q.   IT HAD SCALED TO THE PILOT PROJECT?

02:27PM   14   A.   RIGHT.

02:27PM   15   Q.   BUT IT HAD NOT YET SCALED TO BEYOND THAT; CORRECT?

02:27PM   16   A.   NO.  BUT THAT'S PART OF WHAT THIS ACCELERATED FUNDING WAS

02:28PM   17   FOR WAS TO HELP WITH THAT.

02:28PM   18   Q.   THAT'S RIGHT.  SO PART OF THE MONEY -- PART OF THE

02:28PM   19   AGREEMENT WAS THE EXCHANGE OF MONEY THAT YOU DESCRIBED;

02:28PM   20   CORRECT?

02:28PM   21   A.   CORRECT.

02:28PM   22   Q.   AND THAT WAS FOR PURPOSES OF ALLOWING THERANOS TO BUILD UP

02:28PM   23   TOWARDS THIS NATIONAL ROLLOUT; CORRECT?

02:28PM   24   A.   CORRECT.

02:28PM   25   Q.   I'D LIKE TO ASK YOU TO LOOK AT, IN THE DEFENSE BINDER,

02:28PM    1    EXHIBIT 7383.

02:28PM    2         THIS IS A -- IS THIS AN EMAIL FROM AMONGST EXECUTIVES AND

02:28PM    3    EMPLOYEES AT WALGREENS?

02:28PM    4    A.   IT'S AN EMAIL FROM MARK VAINISI.

02:29PM    5    Q.   AND YOU SEE THAT THE RECIPIENTS APPEAR TO ALL BE WALGREENS

02:29PM    6    PERSONNEL?

02:29PM    7    A.   YES.

02:29PM    8    Q.   AND THAT YOU WERE COPIED ON THIS EMAIL?

02:29PM    9    A.   YES.

02:29PM   10         MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

02:29PM   11    EXHIBIT 7383.

02:29PM   12         MR. SCHENK:  NO OBJECTION.

02:29PM   13         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:29PM   14    (DEFENDANT'S EXHIBIT 7383 WAS RECEIVED IN EVIDENCE.)

02:29PM   15    BY MR. DOWNEY:

02:29PM   16    Q.   WHO IS MARK VAINISI, THE SENDER OF THIS EMAIL?

02:29PM   17    A.   MARK WAS THE HEAD OF MERGERS AND ACQUISITIONS AND HE WAS,

02:29PM   18    I WOULD SAY, THE QUARTERBACK OF MOST OF THE AGREEMENTS BETWEEN

02:29PM   19    THERANOS AND WALGREENS.

02:29PM   20    Q.   AND IN THIS EMAIL, IS HE SUMMARIZING THE TERMS OF THE

02:29PM   21    AGREEMENT THAT HAD JUST BEEN REACHED BETWEEN THERANOS AND

02:29PM   22    WALGREENS?

02:29PM   23    A.   YES.

02:29PM   24    Q.   AND IF YOU LOOK UNDER HIS DESCRIPTION OF KEY TERMS, HE

02:30PM   25    DESCRIBES THE RESTATEMENT OF INTENT; CORRECT?

02:30PM   1     A.   CORRECT.

02:30PM   2     Q.   AND THAT'S CONSISTENT WITH WHAT WE JUST READ IN THE

02:30PM   3     AGREEMENT; CORRECT?

02:30PM   4     A.   CORRECT.

02:30PM   5     Q.   AND HE SETS FORTH THE TERMS UNDER WHICH THERE WILL BE AN

02:30PM   6     ACCELERATED PAYMENT; CORRECT?

02:30PM   7     A.   CORRECT.

02:30PM   8     Q.   AND HE ALSO REFERENCES ENHANCED EXCLUSIVITY.

02:30PM   9          WHAT IS THAT A REFERENCE TO?

02:30PM  10     A.   WELL, AS I READ THE NOTES, HE'S JUST TALKING ABOUT MAKING

02:30PM  11     SURE THAT CERTAIN COMPETITORS ARE NOT GOING TO BE ABLE TO HAVE

02:30PM  12     THE SAME RIGHTS THAT WALGREENS WOULD HAVE.

02:30PM  13     Q.   IN EXCHANGE FOR ENTERING THE AGREEMENT, WALGREENS WOULD

02:30PM  14     OBTAIN A CERTAIN PERIOD UNDER WHICH COMPETITORS COULD NOT USE

02:30PM  15     THERANOS'S TECHNOLOGY OR SERVICES; CORRECT?

02:30PM  16     A.   I BELIEVE THAT'S PROBABLY PART OF THE TRADEOFF FROM

02:30PM  17     ACCELERATING PAYMENTS IS MAKING SURE THAT WE GET BETTER

02:30PM  18     DEFINITION OF EXCLUSIVITY.

02:30PM  19     Q.   OKAY.  AND THEN IF YOU SEE AT THE BOTTOM OF THE FIRST PAGE

02:31PM  20     OF HIS EMAIL, HE REFERENCES ROLLOUT PLANS AND HE SAYS, "BOTH

02:31PM  21     SIDES AGREED TO WORK IN GOOD FAITH TO DEVELOP A NEW MARKET

02:31PM  22     ENTRY PLAN."

02:31PM  23          DO YOU SEE THAT?

02:31PM  24     A.   YES.

02:31PM  25     Q.   AND DID BOTH PARTIES THEN BEGIN TO WORK ON THAT IN EARLY

02:31PM 1    2014 IF YOU KNOW?

02:31PM 2    A.   WORK ON IT OR WORK IN GOOD FAITH?  IT'S SOME --

02:31PM 3    Q.   WELL, WERE THERE EXCHANGES BETWEEN THE PARTIES AS TO HOW A

02:31PM 4    ROLLOUT PLAN MIGHT WORK?

02:31PM 5    A.   I CAN'T SAY DEFINITIVELY SO.  I DON'T RECALL.

02:31PM 6    Q.   OKAY.  IT WAS NOT SOMETHING THAT YOU PERSONALLY WERE

02:31PM 7    INVOLVED IN?

02:31PM 8    A.   NOT IN THAT GRANULARITY AT THAT TIME, NO.

02:31PM 9    Q.   OKAY.  BUT LET ME ASK YOU TO REORIENT US FOR TIME

02:31PM 10   PURPOSES.  THIS AGREEMENT IS SIGNED AND THERANOS IS ALREADY IN

02:31PM 11   CERTAIN WALGREENS STORES; CORRECT?

02:31PM 12   A.   PRIMARILY THE PHOENIX MARKET.

02:31PM 13   Q.   OKAY.  AND THAT, THAT PARTNERSHIP HAS BEEN ANNOUNCED

02:31PM 14   PUBLICLY; CORRECT?

02:31PM 15   A.   CORRECT.

02:32PM 16   Q.   AND THE PARTIES EACH HAD MADE PUBLIC STATEMENTS ABOUT THE

02:32PM 17   PARTNERSHIP CHARACTERIZING IT; CORRECT?

02:32PM 18   A.   CORRECT.

02:32PM 19   Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 1113.

02:32PM 20       DO YOU SEE THIS DOCUMENT AND DO YOU RECOGNIZE IT AS A

02:32PM 21   JOINT ANNOUNCEMENT BY THERANOS AND WALGREENS IN SEPTEMBER OF

02:32PM 22   2013?

02:32PM 23   A.   YES.

02:32PM 24   Q.   AND IF YOU LOOK AT THE SECOND PAGE OF THIS EXHIBIT, PAGE 2

02:32PM 25   IN THE LAST PARAGRAPH WHERE -- ABOVE WHERE IT SAYS ABOUT

02:33PM   1    THERANOS, THIS JOINT ANNOUNCEMENT SAID, "AS THE NATION'S

02:33PM   2    LARGEST RETAIL PHARMACY CHAIN WITH MORE THAN 8100 NEIGHBORHOOD

02:33PM   3    PHARMACIES, WALGREENS HAS THE INFRASTRUCTURE TO HELP BRING

02:33PM   4    THERANOS TO CONSUMERS NATIONWIDE."

02:33PM   5        AND THAT'S A STATEMENT THAT WALGREENS SIGNED OFF ON

02:33PM   6    JOINTLY MAKING?

02:33PM   7    A.   SURE.

02:33PM   8    Q.   OKAY.  AND THEN THERE WAS ANOTHER JOINT ANNOUNCEMENT A

02:33PM   9    COUPLE MONTHS LATER IN 2013.

02:33PM  10        LET ME ASK YOU TO LOOK AT EXHIBIT 4036.  I'LL ASK YOU IF

02:33PM  11    THAT IS ANOTHER JOINT ANNOUNCEMENT WHEN YOU HAVE A CHANCE TO

02:33PM  12    TAKE A LOOK AT IT.

02:33PM  13    A.   YES.

02:33PM  14    Q.   AND IF YOU LOOK AT THE FIRST PARAGRAPH.

02:34PM  15        YOUR HONOR, I MOVE THE ADMISSION OF 4036.

02:34PM  16            MR. SCHENK:  YOUR HONOR, FOUNDATION.

02:34PM  17    BY MR. DOWNEY:

02:34PM  18    Q.   WELL, DO YOU RECOGNIZE THIS AS A JOINT ANNOUNCEMENT

02:34PM  19    BETWEEN THERANOS AND WALGREENS ISSUED WHEN YOU WERE THE CFO OF

02:34PM  20    WALGREENS?

02:34PM  21    A.   YES.

02:34PM  22            MR. DOWNEY:  I MOVE THE ADMISSION OF 4036.

02:34PM  23            MR. SCHENK:  YOUR HONOR, IT LOOKS LIKE A DRAFT TO

02:34PM  24    ME.

02:34PM  25            THE WITNESS:  IT'S MISSING A QUOTE I CAN SEE, SO IT

02:34PM   1    MIGHT BE A DRAFT.

02:34PM   2              MR. DOWNEY:  OH, YOU'RE RIGHT.  LET ME SEE IF I CAN,

02:34PM   3    IF I CAN CORRECT THAT.  I DON'T KNOW -- LET ME SEE IF I CAN GET

02:34PM   4    YOU THAT EXHIBIT.  BUT LET'S MOVE FORWARD FROM HERE.

02:34PM   5    Q.   NOW, THE THERANOS -- AFTER THE THERANOS PARTNERSHIP WAS

02:34PM   6    ANNOUNCED --

02:34PM   7              THE COURT:  YOU'RE GOING TO PASS THIS?

02:34PM   8              MR. DOWNEY:  I'LL PASS THIS EXHIBIT AND COME BACK.

02:34PM   9              THE COURT:  ALL RIGHT.

02:34PM  10    BY MR. DOWNEY:

02:34PM  11    Q.   AFTER THE PUBLIC ANNOUNCEMENT OF THE PARTNERSHIP, DID YOU,

02:35PM  12    DID YOU HAVE DISCUSSIONS -- WELL, STRIKE THAT.

02:35PM  13         CAN YOU EXPLAIN TO US WHAT AN EARNINGS CALL IS?

02:35PM  14    A.   AN EARNINGS CALL IS A QUARTERLY CALL FOR PUBLIC COMPANIES

02:35PM  15    WHICH BASICALLY DISCUSSES THE PUBLISHED FINANCIAL RESULTS FOR

02:35PM  16    THE QUARTER.

02:35PM  17    Q.   AND IS THAT A CALL DURING -- IN WHICH YOU PERSONALLY

02:35PM  18    PARTICIPATED?

02:35PM  19    A.   ALL CFO'S AND CEO'S PARTICIPATE.

02:35PM  20    Q.   AND DURING THOSE CALLS, DO ANALYSTS WHO FOLLOW THE COMPANY

02:35PM  21    FOR PURPOSES OF PREPARING ADVICE AND SO FORTH, DO THEY

02:35PM  22    PARTICIPATE IN THOSE CALLS?

02:35PM  23    A.   THEY PARTICIPATE, THEY LISTEN, AND THEN THEY'RE ALLOWED TO

02:35PM  24    ASK QUESTIONS AS WELL.

02:35PM  25    Q.   OKAY.  DO YOU REMEMBER PARTICIPATING IN A DECEMBER 2013

02:36PM 1    EARNINGS CALL WHERE THE SUBJECT OF THERANOS CAME UP?

02:36PM 2    A.   NOT SPECIFICALLY.

02:36PM 3    Q.   OKAY.  LET ME ASK YOU TO LOOK AT EXHIBIT 12510.  AND I'M

02:36PM 4    NOT REALLY INTERESTED IN THE BREAKDOWN OF THE CALL THAT IS

02:36PM 5    CONTAINED IN THE EMAIL.  I'M REALLY JUST INTERESTED IN THE

02:36PM 6    ATTACHMENT TO THE EMAIL, AND I WOULD JUST ASK IF YOU RECOGNIZE

02:36PM 7    THIS AS A TRANSCRIPT OF AN EARNINGS CALL WITH WALGREENS SENIOR

02:36PM 8    MANAGEMENT IN DECEMBER OF 2013?

02:36PM 9    A.   IT'S WHAT A TRANSCRIPT LOOKS LIKE, SO --

02:37PM 10   Q.   OKAY.

02:37PM 11        YOUR HONOR, I MOVE THE ADMISSION OF 12510, ALTHOUGH I

02:37PM 12   REALLY ONLY NEED THE ATTACHMENT.  I DON'T NEED THE EMAIL

02:37PM 13   DISCUSSION.

02:37PM 14        THE COURT:  WHAT PAGES THEN WOULD YOU SEEK TO

02:37PM 15   INTRODUCE?

02:37PM 16        MR. DOWNEY:  I THINK THE PAGES WHERE THE BATES LABEL

02:37PM 17   IN THE BOTTOM RIGHT-HAND CORNER IS 6786 THROUGH 6804.

02:37PM 18        THE COURT:  MR. SCHENK?

02:37PM 19        MR. SCHENK:  NO OBJECTION.

02:37PM 20        THE COURT:  THOSE PAGES ARE ADMITTED AS THIS EXHIBIT

02:37PM 21   NUMBER AND THEY MAY BE PUBLISHED.

02:37PM 22        (DEFENDANT'S EXHIBIT 12510, BATES PAGES 6786 THROUGH 6804,

02:37PM 23   WAS RECEIVED IN EVIDENCE.)

02:37PM 24   BY MR. DOWNEY:

02:37PM 25   Q.   AND THESE CALLS ARE AN OPPORTUNITY FOR ANALYSTS TO ASK

02:37PM   1    QUESTIONS ABOUT THE PERFORMANCE OF THE COMPANY; CORRECT?

02:37PM   2    A.   CORRECT.

02:37PM   3    Q.   AND EXPECTATIONS THAT THE COMPANY HAS AS TO WHAT ITS

02:38PM   4    PERFORMANCE IN THE FUTURE MIGHT BE?

02:38PM   5    A.   TO THE EXTENT THAT THE COMPANY PROVIDES THAT GUIDANCE,

02:38PM   6    CORRECT.

02:38PM   7    Q.   IN SOME INSTANCES THE COMPANIES DECLINE TO PROVIDE

02:38PM   8    GUIDANCE; CORRECT?

02:38PM   9    A.   CORRECT.

02:38PM   10   Q.   AND THESE ARE CALLS FOR WHICH YOU PREPARE?

02:38PM   11   A.   YES, DOZENS OF PEOPLE PREPARE.

02:38PM   12   Q.   AND THEY'RE IMPORTANT CALLS BECAUSE THEY CAN INFLUENCE THE

02:38PM   13   VALUE OF WALGREENS STOCK; CORRECT?

02:38PM   14   A.   THEY'RE IMPORTANT FOR LOTS OF REASONS.

02:38PM   15   Q.   OKAY.  NOT JUST THE REASON THAT I NOTED, BUT THEY'RE

02:38PM   16   IMPORTANT CALLS?

02:38PM   17   A.   IMPORTANT CALLS.

02:38PM   18   Q.   OKAY.  LET ME ASK YOU TO LOOK IN THE EXHIBIT THAT I'M

02:38PM   19   SHOWING YOU, 12510, AT THE PAGE THAT -- WHERE THE BATES

02:38PM   20   LABELLED NUMBER IS 6778.  I'LL PUT THAT UP ON YOUR SCREEN IF

02:38PM   21   THAT MAKES IT EASIER FOR YOU.

02:39PM   22        I THINK WE HAVE IT UP ON THE FIRST PAGE JUST TO

02:39PM   23   FAMILIARIZE YOU WITH THE PARTICIPANTS IN THE CALL.  AND DO YOU

02:39PM   24   SEE THAT THERE ARE SEVERAL --

02:39PM   25        WOULD YOU JUST GO BACK TO THAT?

MIQUELON CROSS BY MR. DOWNEY                                      3492

02:39PM  1          DO YOU SEE AT THE TOP THIS LIST OF PARTICIPANTS IN THE

02:39PM  2     EARNINGS CALL AND DO YOU SEE THAT -- WELL, DO YOU SEE THAT, THE

02:39PM  3     PARTICIPANTS ON TOP OF THE EARNINGS CALL TRANSCRIPT?

02:39PM  4     A.   YES.

02:39PM  5     Q.   AND DO YOU SEE AT THE TOP THERE'S A GROUP OF CORPORATE

02:39PM  6     PARTICIPANTS FROM WALGREENS?

02:39PM  7     A.   YES.

02:39PM  8     Q.   AND THAT INCLUDES YOURSELF; CORRECT?

02:39PM  9     A.   YES.

02:39PM 10     Q.   AND THEN UNDER THAT THERE'S A LIST OF OTHER PARTICIPANTS;

02:39PM 11     CORRECT?

02:39PM 12     A.   YES.

02:39PM 13     Q.   AND THOSE ARE ANALYSTS WHO FOLLOW WALGREENS'S PERFORMANCE;

02:39PM 14     CORRECT?

02:39PM 15     A.   YES.

02:39PM 16     Q.   AND LET ME ASK YOU TO LOOK NOW AT THE NEXT PAGE.

02:40PM 17          AT THE BEGINNING OF THE CALL THERE IS A DISCUSSION BY

02:40PM 18     MR. WASSON, WHO WAS THE CHIEF EXECUTIVE OFFICER.

02:40PM 19          DO YOU SEE THAT?

02:40PM 20     A.   YES.

02:40PM 21     Q.   AND IF YOU GO DOWN TO THE SECOND PARAGRAPH, HE NOTES THAT

02:40PM 22     HE'S GOING TO GET INTO SOME HIGHLIGHTS OF THE COMPANY.

02:40PM 23          DO YOU SEE THAT?

02:40PM 24     A.   YES.

02:40PM 25     Q.   AND IF YOU GO FURTHER DOWN ON THAT PAGE, IF YOU BRING UP

02:40PM  1    THE SECOND HALF, DO YOU SEE THE DISCUSSION OF WALGREENS AND

02:40PM  2    THERANOS THERE?

02:40PM  3    A.   YES.

02:40PM  4    Q.   AND YOU SEE THAT HE REFERENCED THAT -- IT SAYS THAT

02:40PM  5    "WALGREENS AND THERANOS ALSO TOOK THE NEXT STEP IN OUR PLANNED

02:40PM  6    NATIONAL ROLLOUT OF GROUND BREAKING NEW LAB SERVICES WITH THE

02:40PM  7    OPENING OF THERANOS WELLNESS CENTERS IN TWO STORES IN PHOENIX."

02:41PM  8        DO YOU SEE THAT?

02:41PM  9    A.   YES.

02:41PM 10    Q.   AND AS OF THIS DATE, DECEMBER 20TH OF 2013, THERE WAS

02:41PM 11    STILL A PROJECTION THAT THERE WOULD BE A NATIONAL ROLLOUT;

02:41PM 12    CORRECT?

02:41PM 13    A.   I THINK THERE'S A PROJECTION -- EVERYTHING IS PREDICATED

02:41PM 14    ON EACH STEP BEING SUCCESSFUL, SO ASSUMING THE PILOT IS

02:41PM 15    SUCCESSFUL, YOU'LL MOVE TO THE NEXT STEP.

02:41PM 16    Q.   AND THAT'S BEEN TRUE SINCE THE BEGINNING OF THE AGREEMENT;

02:41PM 17    RIGHT?

02:41PM 18    A.   THAT'S ALWAYS IMPLICIT.

02:41PM 19    Q.   RIGHT.  IF YOU GO TO PAGE 9 OF THE TRANSCRIPT, BOTTOM

02:41PM 20    RIGHT-HAND CORNER, I WANT TO FOCUS ON AN EXCHANGE BETWEEN YOU

02:41PM 21    AND AN ANALYST, MARK MILLER.

02:41PM 22        IT'S AT THE BOTTOM OF THAT PAGE IF YOU HAVE IT.

02:42PM 23        DO YOU SEE THE DISCUSSION OF THERANOS IN THE LAST FEW

02:42PM 24    SENTENCES THERE?

02:42PM 25    A.   YES.

02:42PM   1    Q.   AND THIS IS AN EXCHANGE BETWEEN YOU AND AN ANALYST FROM

02:42PM   2    WILLIAM BLAIR & COMPANY; CORRECT?

02:42PM   3    A.   YES.

02:42PM   4    Q.   AND HE WAS ASKING A QUESTION ABOUT WHAT THE BUSINESS

02:42PM   5    EXPANSION PLANS AND NEW INITIATIVES OF THE COMPANY WERE;

02:42PM   6    CORRECT?

02:42PM   7    A.   YES.

02:42PM   8    Q.   AND YOU REPLIED IN PART SAYING, "ALSO, THINGS LIKE

02:43PM   9    THERANOS, WHICH WE BELIEVE HAS VERY MEANINGFUL POTENTIAL.

02:43PM  10    WE'RE VERY EXCITED ABOUT.  IN VARIOUS GEOGRAPHIES, WE'VE GOT A

02:43PM  11    STRONG FOOTPRINT, BUT WE'VE GOT OPPORTUNITIES TO DO EVEN MORE

02:43PM  12    BREADTH OF SERVICES IN THOSE MARKETS AND GET DEEPER AND BROADER

02:43PM  13    AND WORKING WITH OUR PARTNERS, ALLIANCE BOOTS, WE'RE DOING

02:43PM  14    EXACTLY THAT."

02:43PM  15         SO THAT WAS A DESCRIPTION OF YOUR THINKING ABOUT THERANOS

02:43PM  16    AS OF THIS DATE; CORRECT?

02:43PM  17    A.   I'M NOT SURE I BELIEVED THAT "IN VARIOUS GEOGRAPHIES"

02:43PM  18    MIGHT BE IN REFERENCE TO ALLIANCE BOOTS.

02:43PM  19    Q.   OKAY.  THAT MIGHT BE RELATED TO INTERNATIONAL?

02:43PM  20    A.   YES.  I THINK WHAT WE WERE EXCITED ABOUT IS THE END OF MY

02:43PM  21    THOUGHTS ON THERANOS.

02:43PM  22    Q.   OKAY.  BUT, BUT YOU REFERENCED YOU THOUGHT THE COMPANY HAD

02:43PM  23    VERY MEANINGFUL POTENTIAL; CORRECT?

02:43PM  24    A.   YES.

02:43PM  25    Q.   ALL RIGHT.  LET ME ASK YOU TO LOOK NOW AT PAGE 12 OF THAT

02:43PM  1    TRANSCRIPT, AND I'M LOOKING AT THE -- DO YOU SEE WHERE, ABOUT A

02:44PM  2    THIRD OF THE WAY DOWN THE PAGE, IT SAYS, "OKAY.  AND THEN,"

02:44PM  3    NEXT TO RICKY GOLDWASSER?

02:44PM  4    A.   YES.

02:44PM  5    Q.   AND MR. GOLDWASSER WAS ANOTHER ANALYST; CORRECT?

02:44PM  6    A.   I BELIEVE IT WAS A SHE.

02:44PM  7    Q.   EXCUSE ME.  MS. GOLDWASSER WAS ANOTHER ANALYST?

02:44PM  8    A.   YES.

02:44PM  9    Q.   AND SHE SAYS TO YOU, "AND THEN, I KNOW YOU'VE TALKED VERY

02:44PM  10   POSITIVELY ABOUT THERANOS.  CAN YOU SHARE WITH US KIND OF LIKE

02:44PM  11   YOUR EXPERIENCE, I THINK, THE TECHNOLOGY HAS BEEN IN YOUR

02:44PM  12   PHARMACIES FOR A COUPLE OF MONTHS NOW.  WHAT ARE YOU SEEING IN

02:44PM  13   THE MARKETPLACE?"

02:44PM  14        SHE ASKED YOU THAT QUESTION; CORRECT?

02:44PM  15   A.   CORRECT.

02:44PM  16   Q.   AND YOU RESPONDED, "YEAH, I MEAN, WE'RE VERY, VERY

02:45PM  17   POSITIVE ON THERANOS.  I MEAN, IT'S REALLY A -- ONE OF THE

02:45PM  18   DISRUPTIVE PLAYS, IT'S A BETTER PATIENT EXPERIENCE WITH A PRICK

02:45PM  19   OF BLOOD.  IT'S THE HIGHEST STANDARD OF QUALITY IN LAB WITH

02:45PM  20   COSTS, HALF OF THE COST OF MEDICARE.  AND THE PATIENT FEEDBACK

02:45PM  21   WE'RE GETTING IS VERY GOOD, BUT IT'S REALLY A BETTER, FASTER,

02:45PM  22   CHEAPER, MORE CONVENIENTLY PLAY.  AND WE'RE GOING TO -- AS WE

02:45PM  23   EXPAND HERE, WE'LL KEEP LEARNING AND PERFECTING THE PATIENT

02:45PM  24   EXPERIENCE WHICH IS REALLY THE CASE -- THE KEY THING.  BUT

02:45PM  25   WE'RE VERY, VERY POSITIVE."

MIQUELON CROSS BY MR. DOWNEY

02:45PM  1           AND THEN YOU GO ON TO DESCRIBE THAT THIS IS ANOTHER

02:45PM  2  EXAMPLE OF HOW A COMMUNITY PHARMACY CAN PROVIDE BROADER HEALTH

02:45PM  3  CARE.

02:45PM  4           DO YOU SEE THAT?

02:45PM  5  A.   YES.

02:45PM  6  Q.   AND THAT'S WHAT YOUR THINKING WAS ABOUT THERANOS AS OF

02:45PM  7  THAT TIME; CORRECT?

02:45PM  8  A.   THAT'S HOW I FELT AS OF THE TIME, YES.

02:46PM  9  Q.   OKAY.  I WANT TO ASK YOU ABOUT YOUR INTERACTIONS WITH A

02:46PM  10  WALGREENS SHAREHOLDER RELATED TO THERANOS, AND I WANT TO PUT

02:46PM  11  YOUR MIND IN THE TIMEFRAME OF ABOUT EARLY 2014.  SO THIS WOULD

02:46PM  12  BE --

02:46PM  13           THE COURT:  MR. DOWNEY, BEFORE YOU GO THERE, LET ME

02:46PM  14  ASK YOU, WE HAD SOME CONVERSATION ABOUT TAKING A WITNESS OUT OF

02:46PM  15  ORDER.

02:46PM  16           IS THAT SOMETHING WE SHOULD CONSIDER DOING?

02:46PM  17           MR. DOWNEY:  IT'S FINE WITH ME IF -- I DON'T THINK I

02:46PM  18  HAVE JUST TEN MINUTES.  I THINK I HAVE A LITTLE MORE THAN THAT.

02:46PM  19           SO I THINK IF THE WITNESS IS HERE AND THAT'S THE

02:46PM  20  GOVERNMENT'S PREFERENCE, IT'S FINE WITH ME.

02:46PM  21           THE COURT:  LET'S, LET'S CHECK ON THAT.

02:47PM  22           LET ME TURN TO THE JURY.  MAYBE WE SHOULD TAKE A TEN

02:47PM  23  MINUTE BREAK HERE AND THEN COME BACK.

02:47PM  24           MR. SCHENK, WHAT ARE YOUR THOUGHTS ON A WITNESS OUT OF

02:47PM  25  ORDER?

02:47PM  1              MR. SCHENK:  I'VE TALKED TO THE TEAM.  I DO NOT

02:47PM  2     THINK IT'S NECESSARY.  BUT THE TEN MINUTE BREAK MIGHT BE

02:47PM  3     HELPFUL FOR US TO CONFER.

02:47PM  4              THE COURT:  OKAY.  LET'S DO THAT.  LET'S TAKE

02:47PM  5     12 MINUTES.  I'LL BE GENEROUS.  LET'S TAKE 12 MINUTES.

02:47PM  6          YOU CAN STAND DOWN, SIR.  THANK YOU.

02:47PM  7          (LAUGHTER.)

02:48PM  8          (JURY OUT AT 2:48 P.M.)

02:48PM  9              THE COURT:  PLEASE BE SEATED.  THANK YOU.

02:48PM  10         THE RECORD SHOULD REFLECT THAT OUR JURY HAS LEFT AND OUR

02:48PM  11    LAST WITNESS HAS LEFT THE COURTROOM NOW.

02:48PM  12         WE'LL TAKE OUR BREAK, AND THEN DO YOU WANT TO JUST CHECK

02:48PM  13    AND SEE, MR. SCHENK, WHETHER OR NOT THAT'S SOMETHING THAT YOU

02:48PM  14    WOULD LIKE TO GO FORWARD WITH?

02:48PM  15             MR. SCHENK:  YES.  CAN I ASK IF THE COURT HAS HEARD

02:48PM  16    FEEDBACK FROM THE JURY ABOUT TOMORROW?  IT MIGHT HELP IN OUR

02:48PM  17    CONVERSATION.

02:48PM  18             THE COURT:  OH.  I MEANT TO ASK THEM THAT BEFORE THE

02:48PM  19    BREAK.  I'LL GET THAT WHEN THEY COME BACK, BUT WE'LL JUST HAVE

02:48PM  20    TO DO IT THAT WAY WHEN THEY COME BACK AND WE'LL SEE.

02:48PM  21             MR. DOWNEY:  YOUR HONOR, WE'LL KEEP MS. KRATZMANN

02:48PM  22    APPRISED.

02:48PM  23         A SLIGHT CONCERN THAT WE MIGHT BE JUST A LITTLE OVER

02:48PM  24    10 MINUTES, MAYBE MORE LIKE 15, BUT WE'LL STAY IN TOUCH WITH

02:48PM  25    MS. KRATZMANN.

MIQUELON CROSS BY MR. DOWNEY                                    3498

02:48PM   1              THE COURT:  OKAY.  ON YOUR -- AS TO THIS OTHER

02:48PM   2     WITNESS?

02:48PM   3              MR. DOWNEY:  NO, JUST A COMFORT BREAK.

02:48PM   4              THE COURT:  OH, OKAY.  WELL, LET'S GO 15.  I DON'T

02:48PM   5     THINK THAT THE JURY WILL OBJECT.

02:48PM   6          ALL RIGHT.  THANK YOU.

02:48PM   7              THE CLERK:  COURT IS IN RECESS.

02:49PM   8              THE COURT:  TAKE 20 IF WE NEED 20.

02:49PM   9          (RECESS FROM 2:49 P.M. UNTIL 3:11 P.M.)

03:11PM  10          (JURY IN AT 3:11 P.M.)

03:12PM  11              THE COURT:  ALL RIGHT.  THANK YOU.  PLEASE BE

03:12PM  12     SEATED.

03:12PM  13          WE'RE BACK ON THE RECORD.  OUR JURY IS PRESENT AND ALL

03:12PM  14     PARTIES PREVIOUSLY PRESENT ARE PRESENT AGAIN.

03:12PM  15          LADIES AND GENTLEMEN, BEFORE WE START AGAIN, CAN I ASK THE

03:12PM  16     JURY, DURING THE BREAK, WERE YOU ABLE TO DISCERN WHETHER YOU

03:12PM  17     ARE ABLE TO COME TOMORROW, THURSDAY, FOR A SESSION?

03:13PM  18          LET ME ASK FOR A SHOW OF HANDS.  IS THERE ANYONE WHO

03:13PM  19     CANNOT DO THAT?

03:13PM  20          OH MY GOODNESS, WHAT A WONDERFUL JURY.

03:13PM  21          I SEE NO HANDS.

03:13PM  22          IS THERE ANY -- DO WE NEED TO MAKE AN ADJUSTMENT OF THE

03:13PM  23     SCHEDULE AT ALL?  THE PROPOSED SCHEDULE TOMORROW WOULD BE 9:00

03:13PM  24     UNTIL 3:00.  DO WE NEED TO ADJUST THE SCHEDULE FOR ANYONE OTHER

03:13PM  25     THAN THAT 9:00 TO 3:00?

03:13PM  1        I SEE NO HANDS.

03:13PM  2        OKAY.  THANK YOU VERY MUCH.  THANK YOU.

03:13PM  3        LET ME ASK THE QUESTION THEN OF MR. SCHENK.  SHOULD WE

03:13PM  4   TAKE A WITNESS OUT OF ORDER?

03:13PM  5             MR. SCHENK:  NO, THAT IS NOT NECESSARY.  THANK YOU.

03:13PM  6             THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

03:13PM  7        MR. DOWNEY.

03:13PM  8   BY MR. DOWNEY:

03:13PM  9   Q.   MR. MIQUELON, I WANT TO ASK YOU ABOUT AN INVESTOR IN

03:13PM 10   WALGREENS CALLED PARTNER FUND MANAGEMENT.  IS THAT AN INVESTOR

03:13PM 11   THAT YOU'RE FAMILIAR WITH?

03:13PM 12   A.   IT DOESN'T RING A BELL.

03:13PM 13   Q.   THEY SOMETIMES GO BY THE ACRONYM PFM.

03:14PM 14   A.   I'M SORRY.

03:14PM 15   Q.   OKAY.  LET ME ASK YOU TO LOOK AT EXHIBIT 13952.  DO YOU

03:14PM 16   RECOGNIZE THIS AS AN EMAIL EXCHANGE BETWEEN YOU AND

03:14PM 17   ASHISH KOHLI AT WALGREENS IN 2014?

03:14PM 18   A.   I DO.

03:14PM 19             MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

03:14PM 20   13952.

03:14PM 21             MR. SCHENK:  YOUR HONOR, I BELIEVE THIS IS BEYOND

03:14PM 22   THE SCOPE.

03:14PM 23             MR. DOWNEY:  YOUR HONOR, I THINK THIS RELATES TO THE

03:14PM 24   QUESTION OF WHICH WE'VE BEEN --

03:14PM 25             THE COURT:  WHY DON'T YOU LAY A FOUNDATION FOR THIS

03:15PM   1    IF YOU CAN, AND THEN WE'LL SEE.

03:15PM   2             MR. DOWNEY:  OKAY.

03:15PM   3    Q.   I'LL DIRECT YOUR ATTENTION TO THE BOTTOM.  IS THE NAME

03:15PM   4    VIVEK KHANNA KNOWN TO YOU?

03:15PM   5    A.   I DON'T REMEMBER THAT.

03:15PM   6    Q.   OKAY.  AND IS IT THE CASE THAT IF YOU WERE GOING TO CHANGE

03:15PM   7    ANY ASPECTS OF YOUR RELATIONSHIP WITH THERANOS, YOU WOULD WANT

03:15PM   8    TO ANNOUNCE IT TO ALL INVESTORS AT THE SAME TIME?

03:15PM   9    A.   THAT'S THE POLICY.  ANYTHING THAT WOULD BE MATERIAL AND OF

03:15PM  10    IMPORTANCE SHOULD BE GIVEN TO EVERYONE EQUALLY.

03:15PM  11    Q.   OKAY.  AND AS OF MARCH 2014, WERE YOU SOMETIMES ASKED FOR

03:15PM  12    COMMENT ON HOW THE THERANOS PROJECT WAS GOING?

03:15PM  13    A.   I DON'T RECALL, BUT PROBABLY --

03:15PM  14    Q.   OKAY.

03:15PM  15    A.   -- AT SOME POINT.

03:15PM  16             MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

03:15PM  17    13952.  THIS RELATES TO THE QUESTIONING ON DIRECT ABOUT TIMING

03:15PM  18    OF THE ROLLOUT, ET CETERA, AND THIS IS COMMENTARY ON IT.

03:16PM  19             MR. SCHENK:  SAME OBJECTION.

03:16PM  20             THE COURT:  YOU KNOW, I THINK YOU CAN USE THIS TO

03:16PM  21    REFRESH HIS RECOLLECTION AS TO WHETHER OR NOT HE DID SOMETHING,

03:16PM  22    BUT THE DOCUMENT ITSELF I DON'T THINK NEEDS TO BE -- FOR THE

03:16PM  23    INFORMATION THAT YOU WANT TO GET IT IN, I THINK YOU CAN SEE IF

03:16PM  24    YOU CAN REFRESH HIS RECOLLECTION OF THAT.

03:16PM  25             MR. DOWNEY:  WELL, LET ME ASK HIM.

03:16PM 1          THE COURT:  SURE.

03:16PM 2     BY MR. DOWNEY:

03:16PM 3     Q.   DO YOU RECALL THIS EMAIL EXCHANGE IN MARCH OF 2014?

03:16PM 4     A.   NO.

03:16PM 5          MR. DOWNEY:  OKAY.  YOUR HONOR, I HATE TO HAVE HIM

03:16PM 6     BACK FOR ONE QUESTION.

03:16PM 7          THE COURT:  WELL, I -- THE QUESTION I WAS

03:16PM 8     SUGGESTING -- AND AGAIN, I DON'T MEAN TO TELL YOU HOW TO ASK

03:16PM 9     QUESTIONS -- BUT IF HIS MEMORY OF THIS CAN BE REFRESHED -- HE

03:16PM 10    DOESN'T REMEMBER THIS, BUT IF THIS REFRESHES HIS RECOLLECTION

03:16PM 11    ABOUT SOMETHING THAT HE DID, THAT MIGHT SUFFICE FOR YOUR

03:16PM 12    PURPOSE I THINK.

03:16PM 13         MR. DOWNEY:  LET'S TRY IT THAT WAY.

03:16PM 14    Q.   HAVE YOU HAD THE OPPORTUNITY TO REVIEW EXHIBIT 13952?

03:17PM 15    A.   YES.

03:17PM 16    Q.   DOES THAT REFRESH YOUR RECOLLECTION THAT YOU WERE ASKED A

03:17PM 17    QUESTION BY ASHISH KOHLI IN MARCH OF 2014 ABOUT THERANOS?

03:17PM 18    A.   NO, BUT I WOULD GET HUNDREDS OF EMAILS A DAY, SO --

03:17PM 19    Q.   OKAY.

03:17PM 20         YOUR HONOR, I THINK I NEED TO MOVE ITS ADMISSION.

03:17PM 21         THE COURT:  I UNDERSTAND WHY YOU WANT TO MOVE IT IN.

03:17PM 22    THE QUESTION THAT MR. SCHENK SUGGESTS IS IT'S NOT APPROPRIATE

03:17PM 23    BECAUSE IT'S BEYOND THE SCOPE.

03:17PM 24         I'LL ALLOW IT TO COME IN, AND SO I'LL OVERRULE THE

03:17PM 25    OBJECTION.  IT'S ADMITTED, AND IT CAN BE PUBLISHED.

03:17PM 1          (DEFENDANT'S EXHIBIT 13952 WAS RECEIVED IN EVIDENCE.)

03:17PM 2               THE COURT:  IS SOMETHING WRONG WITH OUR SCREENS?

03:18PM 3               THE CLERK:  I DID A TEST ON THE BREAK.  LET ME TRY

03:18PM 4      IT AGAIN.

03:18PM 5               THE COURT:  JUST A MOMENT.  I'M SORRY.

03:18PM 6          (PAUSE IN PROCEEDINGS.)

03:18PM 7               THE CLERK:  NO?

03:18PM 8               THE COURT:  NOT MINE OR IRENE'S.

03:18PM 9               THE CLERK:  HOW ABOUT IF WE TURN OFF THE MONITOR?

03:19PM 10              THE COURT:  THIS BUTTON HERE (INDICATING)?

03:19PM 11     THAT WORKED FOR ME.

03:19PM 12     I AM JUST GOING TO POUR WATER.

03:19PM 13     ALL RIGHT.  I THINK WE'RE READY.

03:19PM 14              MR. DOWNEY:  OKAY.

03:19PM 15     Q.   WHO WAS ASHISH KOHLI?

03:19PM 16     A.   HE WAS THE DIRECTOR OF INVESTOR RELATIONS, SO THE SECOND

03:19PM 17     HIGHEST PERSON IN INVESTOR RELATIONS.

03:19PM 18     Q.   OKAY.  SO HE WOULD SOMETIMES FIELD QUESTIONS FROM

03:19PM 19     INVESTORS, OR POTENTIAL INVESTORS?

03:19PM 20     A.   YES.

03:19PM 21     Q.   OKAY.  DOES THIS APPEAR TO BE AN EXCHANGE THAT YOU HAD

03:19PM 22     WITH MR. KOHLI IN MARCH OF 2014?

03:19PM 23     A.   YES.

03:19PM 24     Q.   AND DO YOU SEE AT THE BOTTOM MR. KOHLI WAS ASKED A

03:19PM 25     QUESTION, "I CANNOT HELP NOTICE NO MENTION OF THERANOS IN THE

03:19PM   1        PRESS RELEASE OR IN THE PREPARED COMMENTS.  IS THERE A CHANGE

03:19PM   2        IN UPTAKE OR ROLLOUT SCHEDULE?"

03:20PM   3            DO YOU SEE THAT?

03:20PM   4        A.   YES.

03:20PM   5        Q.   AND THEN HE ASKED, "HOW WOULD YOU LIKE ME TO RESPOND?"

03:20PM   6            AND YOU RESPONDED, "PROJECT IS GOING WELL.  WHEN WE HAVE A

03:20PM   7        NEW MILESTONE TO SHARE WE WILL SHARE IT."

03:20PM   8            SIGNED WADE?

03:20PM   9        A.   YES.

03:20PM  10        Q.   OKAY.  DO YOU KNOW AN INVESTOR NAMED BRIAN GROSSMAN?

03:20PM  11        A.   I DON'T RECALL.

03:20PM  12        Q.   DO YOU RECALL HAVING ANY CONVERSATIONS WITH MR. GROSSMAN

03:20PM  13        ABOUT THERANOS?

03:20PM  14        A.   NOT SPECIFICALLY.

03:20PM  15        Q.   LET ME SHOW YOU A DOCUMENT FOR PURPOSES OF SEEING IF IT

03:20PM  16        REFRESHES YOUR RECOLLECTION.

03:20PM  17        A.   OKAY.

03:20PM  18        Q.   IT'S EXHIBIT 4170.

03:21PM  19            AND THERE'S A FAIRLY LONG DISCUSSION HERE, BUT I'M ONLY

03:21PM  20        INTERESTED AND WOULD DRAW YOUR ATTENTION TO THE SECOND TO THE

03:21PM  21        LAST PARAGRAPH DOWN THE SECOND PAGE WHICH STARTS THERANOS.

03:21PM  22        THAT PARAGRAPH AND THE FOLLOWING TWO PARAGRAPHS.

03:21PM  23        A.   YES.

03:21PM  24        Q.   DOES THAT REFRESH YOUR RECOLLECTION OF HAVING A

03:21PM  25        CONVERSATION WITH MR. GROSSMAN IN THE SUMMER OF 2014?

03:21PM  1      A.   IT DOES NOT.

03:21PM  2      Q.   OKAY.  YOU LEFT FOR REASONS UNRELATED TO THERANOS IN THE

03:21PM  3      LATE SUMMER OF 2014; CORRECT?

03:21PM  4      A.   CORRECT.

03:21PM  5      Q.   AND AFTER THAT TIME DID YOU STAY IN TOUCH WITH MS. HOLMES

03:21PM  6      AND OTHERS AT THERANOS?

03:21PM  7      A.   MS. HOLMES.

03:21PM  8      Q.   OKAY.  LET ME ASK YOU TO LOOK IN YOUR NOTEBOOK AT

03:22PM  9      EXHIBIT 7168?

03:22PM  10     A.   YEP.

03:22PM  11     Q.   IS THIS AN EMAIL EXCHANGE BETWEEN YOU AND MS. HOLMES IN

03:22PM  12     OCTOBER OF 2015?

03:22PM  13     A.   YES, IT IS.

03:22PM  14          MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT 7618.

03:22PM  15          THE COURT:  7618?

03:22PM  16          MR. DOWNEY:  7618.

03:22PM  17          THE CLERK:  OR 7168?

03:22PM  18          THE COURT:  TELL US THE NUMBER AGAIN, PLEASE.

03:22PM  19          MR. DOWNEY:  7618.

03:22PM  20          MR. SCHENK:  NO OBJECTION.

03:22PM  21          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:22PM  22       (DEFENDANT'S EXHIBIT 7618 WAS RECEIVED IN EVIDENCE.)

03:22PM  23     BY MR. DOWNEY:

03:22PM  24     Q.   OKAY.  AND THIS IS AN EMAIL EXCHANGE BETWEEN YOU AND

03:23PM  25     MS. HOLMES.  AND I REALLY WANT TO JUST FOCUS ON THE BOTTOM

03:23PM   1    EXCHANGE.

03:23PM   2         DO YOU RECALL AT SOME POINT DURING THE FALL OF 2015 THERE

03:23PM   3    WAS A LOT OF CRITICISM OF MS. HOLMES AND THERANOS?

03:23PM   4    A.   I DO.

03:23PM   5    Q.   AND IS THIS AN EMAIL THAT YOU SENT IN THIS TIMEFRAME TO

03:23PM   6    MS. HOLMES?

03:23PM   7    A.   YES.

03:23PM   8    Q.   LET ME ASK YOU NOW TO LOOK AT EXHIBIT 7622.

03:23PM   9    A.   YEP.

03:23PM   10   Q.   IS THIS AN EMAIL EXCHANGE BETWEEN YOU AND MS. HOLMES IN

03:23PM   11   DECEMBER OF 2015?

03:23PM   12   A.   YEP.

03:23PM   13        MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

03:24PM   14   7622.

03:24PM   15        MR. SCHENK:  NO OBJECTION.

03:24PM   16        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:24PM   17        (DEFENDANT'S EXHIBIT 7622 WAS RECEIVED IN EVIDENCE.)

03:24PM   18   BY MR. DOWNEY:

03:24PM   19   Q.   AND I WANT TO FOCUS YOUR ATTENTION FIRST ON THE DATE.

03:24PM   20        DO YOU SEE THAT THIS IS DECEMBER 1ST, 2015?

03:24PM   21   A.   YES.

03:24PM   22   Q.   AND THIS IS A YEAR AND A QUARTER OR SO AFTER YOU LEFT

03:24PM   23   WALGREENS?

03:24PM   24   A.   YES.

03:24PM   25   Q.   AND IN THE FIRST PARAGRAPH YOU MENTION COMING BACK WITH

03:24PM  1    MORE DETAILED THOUGHTS ON HOW WE COULD DO SOMETHING REALLY GAME

03:24PM  2    CHANGING AS TALKED.

03:24PM  3    A.   YEP.

03:24PM  4    Q.   AND DO YOU RECALL WHAT THAT RELATES TO?

03:24PM  5    A.   I BELIEVE IT WAS SOME WORK THAT I WAS DOING IN THE MIDDLE

03:24PM  6    EAST WITH SOME OF THE SOVEREIGN FUNDS AND OTHER FUNDS IN

03:24PM  7    ABU DHABI AND OTHER AREAS WHERE I THOUGHT THERE WOULD BE A LOT

03:24PM  8    OF INTEREST IN WHAT THERANOS HAD TO OFFER.

03:24PM  9    Q.   OKAY.  AND WAS THAT FOR PURPOSES OF OFFERING THE SERVICE

03:25PM  10   OR WHAT PURPOSE WAS THAT FOR?

03:25PM  11   A.   JUST THE TECHNOLOGY.  AGAIN, WHEN I LEFT WALGREENS IN

03:25PM  12   AUGUST I WAS STILL VERY, YOU KNOW, POSITIVE ON THE TECHNOLOGY.

03:25PM  13        OBVIOUSLY LATER ON, YOU KNOW, THINGS WERE WRITTEN, BUT I

03:25PM  14   STILL VERY MUCH BELIEVED IN ELIZABETH AND WHAT SHE WAS UP TO,

03:25PM  15   AND I REALLY WANTED HER TO HAVE A CHANCE TO BE ABLE TO LEVERAGE

03:25PM  16   THAT FOR GOOD.

03:25PM  17   Q.   OKAY.  ALL RIGHT.  LET ME ASK YOU TO LOOK AT EXHIBIT 7657

03:25PM  18   AND JUST ASK YOU BRIEFLY TO CONFIRM WHETHER THIS IS AN EMAIL

03:25PM  19   EXCHANGE BETWEEN YOU AND MS. HOLMES IN MARCH OF 2016?

03:25PM  20   A.   IT IS.

03:25PM  21        MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

03:26PM  22   7657.

03:26PM  23        MR. SCHENK:  NO OBJECTION.

03:26PM  24        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:26PM  25        (DEFENDANT'S EXHIBIT 7657 WAS RECEIVED IN EVIDENCE.)

03:26PM   1    BY MR. DOWNEY:

03:26PM   2    Q.   AND DO YOU SEE IN THE ADDRESS LINE THAT THIS IS AN EMAIL

03:26PM   3    FROM YOU TO MS. HOLMES COPYING SOME OTHER PARTIES?

03:26PM   4    A.   YES.

03:26PM   5    Q.   AND IN THE SECOND PARAGRAPH HERE YOU REFERENCE GCC BEING A

03:26PM   6    FABULOUS ENVIRONMENT FOR THERANOS.

03:26PM   7         WHAT IS GCC?

03:26PM   8    A.   IT'S THE MIDDLE EAST, THE GREATER AREA THAT INCLUDES

03:26PM   9    SEVERAL COUNTRIES.

03:26PM  10    Q.   OKAY.  AND IS THAT A -- WHAT WERE YOU DISCUSSING HERE WHEN

03:26PM  11    YOU SUGGESTED GCC WOULD BE A FABULOUS ENVIRONMENT FOR THERANOS?

03:26PM  12    A.   WELL CAPITALIZED IN TERMS OF FUNDS, ACTUALLY EMBRACING

03:26PM  13    TECHNOLOGY IN MANY WAYS, IN HEALTH CARE IN PARTICULAR, AND I

03:26PM  14    FELT IT WOULD BE A GREAT OPPORTUNITY FOR HER TO SEE WHAT WAS

03:26PM  15    POSSIBLE THERE.

03:26PM  16    Q.   OKAY.  AND DID YOU CONTINUE THEREAFTER TO HAVE EMAIL

03:27PM  17    EXCHANGES WITH MS. HOLMES ABOUT PERSONAL MATTERS AND

03:27PM  18    PROFESSIONAL OPPORTUNITIES?

03:27PM  19    A.   I DON'T KNOW AFTER THIS IF I DID OR NOT, BUT --

03:27PM  20    Q.   WELL, LET ME SHOW YOU ONE MORE EMAIL.

03:27PM  21    A.   OKAY.

03:27PM  22    Q.   EXHIBIT 7676.

03:27PM  23         IS THIS AN EMAIL EXCHANGE BETWEEN YOU AND MS. HOLMES IN

03:27PM  24    AUGUST OF 2016?

03:27PM  25    A.   IT IS.

03:27PM  1    Q.   OKAY.

03:27PM  2         YOUR HONOR, I MOVE THE ADMISSION OF EXHIBIT 7676.

03:27PM  3         MR. SCHENK:  NO OBJECTION.

03:27PM  4         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:27PM  5         (DEFENDANT'S EXHIBIT 7676 WAS RECEIVED IN EVIDENCE.)

03:27PM  6    BY MR. DOWNEY:

03:27PM  7    Q.   IF WE CAN LOOK AT THE EMAIL ON THE BOTTOM.  YOU SAY TO

03:27PM  8    MS. HOLMES, "NICE JOB WITH DR. GUPTA."

03:27PM  9         WHAT WAS THAT A REFERENCE TO?

03:27PM  10   A.   HONESTLY, I CAN'T REMEMBER.

03:27PM  11   Q.   YOU SAY, "I HOPE YOU ARE WELL.  DON'T STOP WORKING TO HELP

03:28PM  12   THE WORLD."

03:28PM  13        MS. HOLMES'S RESPONSE TO YOU, "YOU KNOW HOW MUCH THAT

03:28PM  14   MEANS TO ME.  HOPE ALL IS WONDERFUL WITH YOU."

03:28PM  15        AND DO YOU RECALL ANY CONTACT WITH MS. HOLMES AFTER THIS

03:28PM  16   EMAIL EXCHANGE?

03:28PM  17   A.   I DON'T RECALL THE LAST TIME, BUT I DEFINITELY CARED ABOUT

03:28PM  18   HER VERY MUCH AND WANTED HER TO BE SUCCESSFUL.

03:28PM  19   Q.   OKAY.

03:28PM  20        YOUR HONOR, I THINK I'M DONE WITH CROSS-EXAMINATION, BUT

03:28PM  21   LET ME HAVE JUST ONE MOMENT.

03:28PM  22        THE COURT:  SURE.

03:28PM  23        (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

03:29PM  24   BY MR. DOWNEY:

03:29PM  25   Q.   THANK YOU, MR. MIQUELON.

03:29PM  1          THAT'S ALL I HAVE FOR CROSS-EXAMINATION.

03:29PM  2              THE COURT:  ALL RIGHT.  ANY REDIRECT?  MR. SCHENK?

03:29PM  3              MR. SCHENK:  YES.

03:29PM  4                      **REDIRECT EXAMINATION**

03:29PM  5      BY MR. SCHENK:

03:29PM  6      Q.   GOOD AFTERNOON AGAIN, MR. MIQUELON.

03:29PM  7      A.   GOOD AFTERNOON.

03:29PM  8      Q.   I'D LIKE TO COVER SOME OF THE TOPICS THAT YOU DISCUSSED

03:29PM  9      WITH MR. DOWNEY, AND THE FIRST PLACE I'D LIKE TO START IS WITH

03:29PM 10      THE PHASED ROLLOUT.

03:29PM 11          MR. DOWNEY ASKED YOU SOME QUESTIONS ABOUT PHASE I AND

03:29PM 12      PHASE II.

03:29PM 13          DO YOU RECALL THOSE QUESTIONS?

03:29PM 14      A.   BRIEFLY.

03:29PM 15      Q.   GENERALLY AT LEAST.

03:29PM 16      A.   GENERALLY, YEAH.

03:29PM 17      Q.   THE REASON FOR THE DIFFERENT PHASES, I THINK YOU TESTIFIED

03:29PM 18      TO, WAS SOME REGULATORY CONCERNS, OR REGULATORY ISSUES THAT HAD

03:30PM 19      BEEN IDENTIFIED AND THE QUESTION IS WHAT IS THE LAB?  AM I

03:30PM 20      RIGHT ABOUT THAT?

03:30PM 21      A.   CORRECT.  THAT IS ONE OF THE QUESTIONS WHICH, AGAIN, WHAT

03:30PM 22      IS THE LAB AND WHERE IS THE LAB, IF YOU HAVE AN EDISON DEVICE

03:30PM 23      THAT FEEDS TO THE CLOUD THAT FEEDS INTO A LABORATORY OF

03:30PM 24      ANALYTICS.

03:30PM 25          AGAIN, THAT IS SOMETHING THAT I THINK HAD NEVER BEEN

03:30PM  1    CONTEMPLATED BY REGULATORS.

03:30PM  2    Q.   SO THE DECISION WAS MADE TO ROLL OUT IN PHASES TO HAVE THE

03:30PM  3    EDISON DEVICE AT A CENTRAL LAB INITIALLY AND THEN EVENTUALLY AS

03:30PM  4    I THINK YOU SAID DEPENDING ON THE ECONOMICS OF IT PUTTING THE

03:30PM  5    DEVICE IN STORES?

03:30PM  6    A.   AND I THINK IT WAS PRACTICAL IF YOU WERE GOING TO HAVE,

03:30PM  7    LET'S JUST MAKE IT FIVE LAB TESTS A DAY IN A GIVEN WALGREENS,

03:30PM  8    IT DOESN'T MAKE A LOT OF SENSE TO HAVE EQUIPMENT AND

03:30PM  9    INFRASTRUCTURE THERE.

03:30PM  10   Q.   I SEE.  WHEN YOU WERE DISCUSSING THIS PHASED APPROACH WITH

03:30PM  11   MS. HOLMES, DID SHE EVER TELL YOU ONE REASON WE COULDN'T PUT

03:31PM  12   THE DEVICE IN THE STORES WAS BECAUSE THEY DIDN'T DO THEIR BLOOD

03:31PM  13   TESTING FULLY ON THE DEVICE, THAT IT WASN'T ACTUALLY REGULATORY

03:31PM  14   BUT RATHER IT WAS A DEVICE ISSUE?  DID YOU EVER TALK ABOUT

03:31PM  15   THAT?

03:31PM  16   A.   I NEVER HEARD THAT.

03:31PM  17   Q.   IF WE COULD BRING UP GOVERNMENT'S EXHIBIT 302.

03:31PM  18        DO YOU REMEMBER THAT YOU TALKED TO MR. DOWNEY ABOUT THE

03:31PM  19   JOHNS HOPKINS DOCUMENT?

03:31PM  20        DO YOU RECALL THAT LINE OF QUESTIONING?

03:31PM  21   A.   I DO.

03:31PM  22   Q.   YOU WEREN'T AT -- YOU DIDN'T GO TO BALTIMORE FOR THE

03:31PM  23   MEETING; IS THAT RIGHT?

03:31PM  24   A.   I DID NOT.

03:31PM  25   Q.   DO YOU KNOW HOW LONG THE DEVICE WAS WITH THE FOLKS AT

03:31PM   1    HOPKINS?

03:31PM   2    A.   I HAVE NO IDEA.

03:31PM   3    Q.   DO YOU KNOW HOW LONG THE MEETING LASTED?

03:31PM   4    A.   I HAVE NO IDEA.

03:31PM   5    Q.   DO YOU KNOW WHO PREPARED THE DATA THAT JOHNS HOPKINS

03:31PM   6    LOOKED AT?

03:31PM   7    A.   I HAVE NO IDEA.

03:31PM   8    Q.   IF YOU COULD TURN TO THE SECOND PAGE OF THIS DOCUMENT.  AT

03:32PM   9    THE VERY BOTTOM THERE'S A SECTION CALLED DISCLAIMER.

03:32PM  10         DO YOU SEE THAT?

03:32PM  11    A.   YES.

03:32PM  12    Q.   DID YOU READ THAT WITH MR. DOWNEY DO YOU RECALL?

03:32PM  13    A.   ASK THE QUESTION AGAIN, I'M SORRY.

03:32PM  14    Q.   WHEN YOU WERE BEING ASKED QUESTIONS ABOUT THIS ON

03:32PM  15    CROSS-EXAMINATION --

03:32PM  16    A.   RIGHT.

03:32PM  17    Q.   -- DID YOU READ THIS OUT LOUD?

03:32PM  18    A.   NO.

03:32PM  19    Q.   LET'S TAKE A LOOK AT IT NOW.

03:32PM  20         IT SAYS, "THIS INFORMATION IS BEING PROVIDED SOLELY FOR

03:32PM  21    THE BENEFIT OF WALGREENS AND SHALL BE USED BY WALGREENS FOR ITS

03:32PM  22    INTERNAL PURPOSES ONLY.  IN ADDITION, THE MATERIALS PROVIDED IN

03:32PM  23    NO WAY SIGNIFY AN ENDORSEMENT BY JOHNS HOPKINS MEDICINE TO ANY

03:32PM  24    PRODUCT OR SERVICE."

03:32PM  25         DID YOU GIVE MS. HOLMES PERMISSION TO SHARE THIS DOCUMENT

03:32PM   1    WITH INVESTORS?

03:32PM   2    A.   I DIDN'T PERSONALLY, NO.

03:32PM   3    Q.   DO YOU KNOW WHETHER ANYBODY AT WALGREENS GAVE THERANOS OR

03:32PM   4    MS. HOLMES THAT PERMISSION?

03:32PM   5    A.   I DON'T KNOW.

03:32PM   6    Q.   MR. DOWNEY ASKED YOU SOME QUESTIONS ABOUT WHAT HE WAS

03:33PM   7    CALLING AN INTEGRATION CLAUSE.

03:33PM   8         DO YOU REMEMBER THAT?

03:33PM   9    A.   YES.

03:33PM  10    Q.   ALL OF THE AGREEMENTS OF THE PARTIES ARE CONTAINED IN THIS

03:33PM  11    DOCUMENT; IS THAT RIGHT?

03:33PM  12    A.   THAT'S MY UNDERSTANDING.

03:33PM  13    Q.   WAS YOUR UNDERSTANDING THAT WHEN YOU INTERACTED WITH

03:33PM  14    MS. HOLMES OR MR. BALWANI THAT EVEN IF THERE WAS AN INTEGRATION

03:33PM  15    CLAUSE, THEY STILL HAD TO BE TRUTHFUL TO YOU?

03:33PM  16    A.   THAT WOULD BE MY ASSUMPTION, YES.

03:33PM  17    Q.   IF WE COULD NOW BRING UP EXHIBIT 617, AND I THINK IT'S ON

03:33PM  18    PAGE 4.

03:33PM  19         UNDER PROGRAM OBJECTIVES (A), MR. DOWNEY ASKED YOU A

03:33PM  20    QUESTION ABOUT THIS.

03:33PM  21         DO YOU RECALL UNDER (A) I THINK HE ASKED YOU ABOUT THE

03:34PM  22    NATIONWIDE ROLLOUT.

03:34PM  23         DO YOU SEE IN THE THIRD LINE OF (A) THE WORD NATIONWIDE?

03:34PM  24    A.   YES.

03:34PM  25    Q.   AND IF YOU GO A LITTLE FURTHER UP IN (A), STILL WITHIN (A)

03:34PM   1    IT SAYS, "MAKING TESTING LESS INVASIVE, FASTER, AND FAR MORE

03:34PM   2    ACCESSIBLE, EFFECTIVE, AND ACTIONABLE BY INTRODUCING A FAR MORE

03:34PM   3    COST-EFFECTIVE, BLOOD TESTING SERVICE AT WALGREENS STORES AND

03:34PM   4    WALGREENS'S OTHER CLINICAL OPERATIONS NATIONWIDE."

03:34PM   5         DID YOU UNDERSTAND THAT IN ORDER TO ACHIEVE THE NATIONWIDE

03:34PM   6    OBJECTIVE THAT TESTING WOULD HAVE TO BE LESS INVASIVE?

03:34PM   7    A.   YES.  I MEAN, MY UNDERSTANDING WAS, YOU KNOW, THE VAST

03:34PM   8    MAJORITY OF TESTS WOULD BE ON A FINGER PRICK.

03:34PM   9    Q.   LESS INVASIVE IS A REFERENCE TO?

03:34PM   10   A.   I THINK IT'S TALKING FINGERSTICK VERSUS A VENIPUNCTURE.

03:34PM   11   Q.   FINGERSTICK VERSUS A VEIN DRAW?

03:35PM   12   A.   THAT'S HOW I INTERPRET IT.

03:35PM   13             MR. SCHENK:  IF WE CAN NOW SWITCH TO THE ELMO,

03:35PM   14   MS. KRATZMANN?

03:35PM   15             THE CLERK:  YES, COUNSEL.

03:35PM   16             MR. SCHENK:  THANK YOU.

03:35PM   17             THE CLERK:  THIS IS ADMITTED?

03:35PM   18             MR. SCHENK:  YES.

03:35PM   19   Q.   MR. MIQUELON, I'M SHOWING YOU EXHIBIT 7312.  THIS WAS

03:35PM   20   ADMITTED DURING CROSS-EXAMINATION, SOME SLIDES THAT MS. HOLMES

03:35PM   21   SENT TO YOU.

03:35PM   22        DO YOU RECALL THAT?

03:35PM   23   A.   I RECALL BEING SHOWN IT.

03:35PM   24   Q.   SO I'M SHOWING YOU THE FIRST PAGE OF THE EXHIBIT.  THIS

03:36PM   25   WAS THE EMAIL THAT MS. HOLMES SENT TO YOU IN AUGUST OF 2013

03:36PM 1    ATTACHING THESE SLIDES.  THE EMAIL HAD THAT NUMBERED LIST?

03:36PM 2    A.   YES, I RECALL.

03:36PM 3    Q.   AND IN THE EXECUTIVE SUMMARY THE FIRST BULLET SAYS THAT

03:36PM 4    "THERANOS WILL OPEN ITS FIRST PATIENT SERVICE CENTER IN

03:36PM 5    DOWNTOWN PALO ALTO RIGHT AFTER LABOR DAY OF 2013."

03:36PM 6         LABOR DAY IS NOT IN NOVEMBER, RIGHT, IT'S IN SEPTEMBER?

03:36PM 7    A.   RIGHT.

03:36PM 8    Q.   AND IS IT YOUR UNDERSTANDING THAT THERANOS WAS GOING TO

03:36PM 9    OPEN ITS FIRST PATIENT SERVICE CENTER IN SEPTEMBER OF 2013?

03:36PM 10   A.   THAT SOUNDS ABOUT RIGHT.

03:36PM 11   Q.   AND THAT'S ALSO WHAT THE DOCUMENT SAYS; IS THAT RIGHT?

03:36PM 12   A.   YES.

03:36PM 13   Q.   MR. DOWNEY ASKED YOU SOME QUESTIONS ABOUT THE EARNINGS

03:36PM 14   CALL, AND IN THE EARNINGS CALL TRANSCRIPT YOU WERE VERY, VERY

03:36PM 15   EXCITED OR INTERESTED IN THE PROSPECTS OF THERANOS?

03:36PM 16   A.   YES.

03:36PM 17   Q.   WAS YOUR EXCITEMENT BASED ON WHAT YOU LEARNED ABOUT

03:37PM 18   THERANOS, BASED ON REPRESENTATIONS THAT MS. HOLMES AND

03:37PM 19   MR. BALWANI HAD MADE TO YOU?

03:37PM 20   A.   YES.

03:37PM 21   Q.   AND DID THAT INCLUDE THAT THE TECHNOLOGY WORKED?

03:37PM 22   A.   YES.

03:37PM 23   Q.   DID THAT INCLUDE THAT THE TESTS, THE BLOOD TESTS WERE DONE

03:37PM 24   VIA FINGERSTICK?

03:37PM 25   A.   AT LEAST THE VAST MAJORITY WOULD BE.

03:37PM 1    Q.   AND IF THOSE THINGS HAD NOT BEEN TRUE, WOULD YOU HAVE BEEN

03:37PM 2    AS EXCITED?

03:37PM 3    A.   I WOULD HAVE SERIOUS CONCERNS THAT THEY WEREN'T TRUE.

03:37PM 4    Q.   YOU WOULD HAVE --

03:37PM 5    A.   I WOULD HAVE SERIOUS CONCERNS.

03:37PM 6    Q.   WHY?

03:37PM 7    A.   WELL, IT WOULD GO TO THE HEART OF A FEW THINGS.  IT WOULD

03:37PM 8    GO TO THE HEART OF THE VALUE PROPOSITION, CAN YOU DO IT BETTER,

03:37PM 9    FASTER, CHEAPER, OR ONLY ONE OR ONLY TWO OF THE ABOVE?

03:37PM 10       IT WOULD ALSO PROBABLY GO TO THE HEART OF JUST CREDIBILITY

03:37PM 11   IN TERMS OF WHAT HAD BEEN REPRESENTED TO ME.

03:37PM 12   Q.   AND WHOSE CREDIBILITY?  WHAT DO YOU MEAN?

03:37PM 13   A.   THERANOS'S CREDIBILITY.

03:37PM 14   Q.   AND WOULD THAT INCLUDE MS. HOLMES?

03:37PM 15   A.   ANYONE WHO WOULD MAKE THOSE ATTESTATIONS IT WOULD INCLUDE.

03:38PM 16   Q.   AND WHO MAKE THOSE REPRESENTATIONS TO YOU?

03:38PM 17   A.   OVER TIME SUNNY AND ELIZABETH GAVE US ATTESTATIONS THAT

03:38PM 18   THE TECHNOLOGY WORKED AND NEEDED TO BE SCALED AND SO THAT'S

03:38PM 19   WHAT I BELIEVED.

03:38PM 20   Q.   WHEN MS. HOLMES WOULD MAKE A REPRESENTATION TO YOU, WERE

03:38PM 21   THERE OCCASIONS WHEN MR. BALWANI WAS PRESENT?

03:38PM 22   A.   MOST OF THE TIME WHEN I WAS WITH WALGREENS MY

03:38PM 23   CONVERSATIONS WERE WITH BOTH OF THEM TYPICALLY.

03:38PM 24   Q.   AND THEY WERE BOTH PRESENT YOU SAY?

03:38PM 25   A.   TYPICALLY, YES.

03:38PM  1    Q.   AND WAS THERE EVER AN OCCASION WHEN MS. HOLMES SAID

03:38PM  2    SOMETHING TO YOU AND MR. BALWANI SAID, WAIT, THAT'S NOT TRUE, I

03:38PM  3    NEED TO CORRECT THAT?

03:38PM  4         DO YOU RECALL THAT EVER HAPPENING?

03:38PM  5    A.   NOT THAT I RECALL.

03:38PM  6    Q.   HOW ABOUT THE REVERSE?  WAS THERE EVER A TIME THAT

03:38PM  7    MR. BALWANI SAID SOMETHING TO YOU AND MS. HOLMES SAID, WAIT, I

03:38PM  8    NEED TO CORRECT THAT, THAT'S NOT TRUE?

03:38PM  9    A.   I DON'T RECALL THAT.

03:38PM  10   Q.   MR. DOWNEY SHOWED YOU SEVERAL EMAILS THAT YOU SENT TO

03:38PM  11   MS. HOLMES IN THE 2015 AND 2016 TIMEFRAME, SUPPORTIVE EMAILS?

03:39PM  12   A.   RIGHT.

03:39PM  13   Q.   AND I THINK YOU SAID THAT YOU HAD POSITIVE FEELINGS ABOUT

03:39PM  14   MS. HOLMES AND ABOUT THERANOS AT THE TIME?

03:39PM  15   A.   CORRECT.  WHEN I LEFT THE COMPANY I STILL FELT VERY GOOD

03:39PM  16   ABOUT THE COMPANY, AND AGAIN, OBVIOUSLY THERE WAS -- LATER ON

03:39PM  17   THERE WERE, YOU KNOW, THERE'S BAD PRESS, ET CETERA, BUT

03:39PM  18   HONESTLY, I DON'T PAY MUCH ATTENTION TO IT, RIGHT?  SO MY LAST

03:39PM  19   EXPERIENCE WHEN I LEFT THE COMPANY WAS FAVORABLE.

03:39PM  20   Q.   AND YOU SAID THAT THERE WAS BAD PRESS, BUT YOU STILL HAD A

03:39PM  21   FAVORABLE IMPRESSION OF THERANOS?

03:39PM  22   A.   YEAH.

03:39PM  23   Q.   AND WHERE DID YOU GET THAT FAVORABLE IMPRESSION FROM?

03:39PM  24   A.   I THINK I DIDN'T WANT TO BELIEVE THERE WERE THINGS THAT I

03:39PM  25   BELIEVED WEREN'T TRUE IN TERMS OF TECHNOLOGY BEING ABLE TO WORK

03:39PM  1    THEY WAY THAT IT WAS REPRESENTED TO US.

03:39PM  2    Q.   YOU STILL WANTED TO BELIEVE THAT THE TECHNOLOGY WORKED?

03:39PM  3    A.   YES.  I MEAN, I -- YES.

03:39PM  4    Q.   WAS THERE A POINT IN TIME AFTER -- I THINK THE MOST RECENT

03:39PM  5    EMAIL THAT MR. DOWNEY SHOWED YOU WAS IN AUGUST OF 2016?

03:39PM  6    A.   YEAH.

03:39PM  7    Q.   AND WAS THERE A PERIOD OF TIME AFTER THAT WHERE YOUR

03:40PM  8    OPINION CHANGED AND YOU NO LONGER HAD A FAVORABLE IMPRESSION?

03:40PM  9    A.   I WOULD JUST SAY THIS, I WOULD SAY THAT I DON'T HAVE ALL

03:40PM  10   OF THE FACTS.  I ONLY KNOW WHAT WAS REPRESENTED TO ME SO I CAN

03:40PM  11   ONLY REALLY SPEAK TO WHAT I WAS TOLD.

03:40PM  12       THAT'S ALL I KNOW REALLY.

03:40PM  13   Q.   AND IN THE 2015 TO 2016 TIMEFRAME WHEN YOU WERE SENDING

03:40PM  14   THESE EMAILS, THESE SUPPORTIVE EMAILS TO MS. HOLMES --

03:40PM  15   A.   YEAH.

03:40PM  16   Q.   -- DID YOU KNOW WHAT MS. HOLMES HAD TOLD HER INVESTORS?

03:40PM  17   A.   NO.

03:40PM  18   Q.   WHEN YOU WERE SENDING THESE SUPPORTIVE EMAILS TO

03:40PM  19   MS. HOLMES, WERE YOU DOING THAT BASED ON YOUR INTERACTIONS WITH

03:40PM  20   HER, THAT'S WHERE YOU --

03:40PM  21   A.   YES.

03:40PM  22   Q.   -- GOT THE INFORMATION?

03:40PM  23   A.   YES.

03:40PM  24   Q.   AND WAS THERE A TIME WHILE YOU STILL WORKED AT WALGREENS

03:40PM  25   BUT TOWARDS THE END WHEN YOU HAD A PHONE CALL WITH MS. HOLMES?

```
03:40PM   1    A.   MAYBE.  PROBABLY.  WE HAD, YOU KNOW, MULTIPLE PHONE CALLS

03:41PM   2    OVER THE COURSE OF OUR FRIENDSHIP.

03:41PM   3    Q.   AND WAS THERE ONES WHEN YOU DISCUSSED VENOUS DRAWS IN

03:41PM   4    WALGREENS STORES?

03:41PM   5    A.   THERE WAS.

03:41PM   6    Q.   AND WHAT DO YOU RECALL ABOUT THAT?

03:41PM   7    A.   WHAT I RECALL IS THAT IN THE EARLY PILOTS WE, I THINK,

03:41PM   8    INITIALLY THOUGHT 90 PERCENT OF A TEST WOULD BE DONE VIA A

03:41PM   9    FINGERSTICK, BUT IT ENDED UP BEING VERY LOW FOR A WHILE, ALMOST

03:41PM   10   CLOSE TO ZERO, AND JUST HAVING A CONVERSATION TO UNDERSTAND WHY

03:41PM   11   VENOUS PUNCTURE WAS THE PREDOMINANT METHOD VERSUS FINGERSTICKS.

03:41PM   12   Q.   AND DID MS. HOLMES GIVE YOU SOME REASONS?

03:41PM   13   A.   SHE DID.  SHE EXPRESSED THERE WAS A COUPLE REASONS.  ONE

03:41PM   14   IS THE DIFFICULTY OF GETTING CLINICIANS TO DO THE KIND OF

03:41PM   15   MASSAGE, THE FINGER MASSAGE PROPERLY TO GET THE PROPER BLOOD

03:41PM   16   SAMPLE.

03:41PM   17        SHE ALSO EXPRESSED THAT THERE WAS A POSSIBILITY THAT SOME

03:42PM   18   OF THE MORE OBSCURED TESTS WERE BEING ORDERED AT A MAGNITUDE

03:42PM   19   FAR HIGHER THAN THEY SHOULD HAVE BEEN SO PERHAPS CLINICIANS OR

03:42PM   20   LAB PREPARERS MIGHT BE TRYING TO TEST THE WATERS TO SEE WHAT

03:42PM   21   WAS POSSIBLE.  SO WE TALKED ABOUT THAT A BIT.  AND LIKE THE

03:42PM   22   TEAM HAD TALKED TO ME ABOUT IT AS WELL.  SHE GAVE ME SOME

03:42PM   23   PERSPECTIVE ON WHAT WE MIGHT LOOK TO IN TERMS OF HOW THAT MIGHT

03:42PM   24   RAMP OVER TIME.

03:42PM   25   Q.   SO WHEN YOU WERE ASKING MS. HOLMES ABOUT THE AMOUNT OF
```

03:42PM  1    VEIN DRAWS THAT WERE HAPPENING, DID SHE TELL YOU ANYTHING ABOUT

03:42PM  2    TECHNOLOGICAL LIMITATIONS OF THE THERANOS DEVICE?

03:42PM  3    A.   NOT THAT I RECALL.

03:42PM  4    Q.   AND WAS IT THAT KIND OF PHONE CALL THAT YOU WERE THINKING

03:42PM  5    ABOUT IN 2015 AND 2016 WHEN YOU WERE SENDING THESE SUPPORTIVE

03:42PM  6    EMAILS TO MS. HOLMES?  WERE YOU THINKING THAT THE THINGS THAT

03:42PM  7    SHE TOLD YOU ON THE PHONE CALL WE JUST DISCUSSED WERE TRUE?

03:42PM  8    A.   YES.

03:42PM  9    Q.   THANK YOU.

03:42PM  10       NO FURTHER QUESTIONS, YOUR HONOR.

03:42PM  11            MR. DOWNEY:  NOTHING FROM US, YOUR HONOR.

03:42PM  12            THE COURT:  MAY THIS WITNESS BE EXCUSED?

03:42PM  13            MR. SCHENK:  YES, YOUR HONOR.

03:43PM  14            THE COURT:  MR. DOWNEY?

03:43PM  15            MR. DOWNEY:  YES.

03:43PM  16            THE COURT:  THANK YOU, SIR.  YOU'RE EXCUSED.  YOU

03:43PM  17    CAN STAND DOWN.

03:43PM  18            THE WITNESS:  THANK YOU, YOUR HONOR.

03:43PM  19            THE COURT:  THANK YOU VERY MUCH.  JUST LEAVE ALL OF

03:43PM  20    THOSE BINDERS THERE.  THANK YOU.

03:43PM  21       DOES THE GOVERNMENT HAVE A WITNESS YOU WISH TO CALL THIS

03:43PM  22    AFTERNOON?

03:43PM  23            MR. BOSTIC:  WE HAVE A WITNESS READY, YOUR HONOR,

03:43PM  24    AND WE CAN MOVE FORWARD TODAY.  WE WON'T FINISH THE WITNESS

03:43PM  25    BEFORE 4:00 P.M., OR WE CAN START WITH THIS WITNESS TOMORROW.

03:43PM   1          THE COURT:  WHY DON'T WE AT LEAST INTRODUCE THE

03:43PM   2     WITNESS TO THE PROCEEDINGS.

03:43PM   3        MS. KRATZMANN NEEDS A COUPLE OF MINUTES, BUT LET'S DO

03:43PM   4     THAT.

03:43PM   5          MR. BOSTIC:  YES, YOUR HONOR.  THE GOVERNMENT CALLS

03:43PM   6     ROBERT AMENTA.

03:44PM   7        (PAUSE IN PROCEEDINGS.)

03:44PM   8          THE COURT:  THANK YOU, MR. WADE.  THANK YOU.

03:44PM   9          THE CLERK:  THANK YOU.

03:44PM   10         THE COURT:  SIR, IF YOU COULD JUST STAND THERE FOR

03:44PM   11    JUST A MOMENT.  AND IF YOU COULD FACE OUR COURTROOM DEPUTY

03:44PM   12    WHILE YOU RAISE YOUR RIGHT HAND, SHE HAS A QUESTION FOR YOU.

03:44PM   13         **(GOVERNMENT'S WITNESS, ROBERTO AMENTA, WAS SWORN.)**

03:44PM   14         THE WITNESS:  YES.

03:44PM   15         THE COURT:  LET ME INVITE YOU TO HAVE A SEAT HERE,

03:44PM   16    SIR, AND MAKE YOURSELF COMFORTABLE.

03:44PM   17         THE WITNESS:  THANK YOU.

03:44PM   18         THE COURT:  YOU'RE WELCOME.

03:44PM   19    FEEL FREE TO ADJUST THE CHAIR AND MICROPHONE AS YOU NEED.

03:44PM   20    I'LL ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE MICROPHONE.

03:44PM   21    WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

03:45PM   22    AND THEN SPELL IT, PLEASE.

03:45PM   23         THE WITNESS:  SURE.  IT'S ROBERTO.  LAST NAME IS

03:45PM   24    AMENTA, A-M-E-N-T-A.

03:45PM   25         THE COURT:  THANK YOU.  MR. BOSTIC.

03:45PM  1          MR. BOSTIC:  THANK YOU, YOUR HONOR.

03:45PM  2                      **DIRECT EXAMINATION**

03:45PM  3     BY MR. BOSTIC:

03:45PM  4     Q.   GOOD AFTERNOON, MR. AMENTA.

03:45PM  5     A.   GOOD AFTERNOON.

03:45PM  6     Q.   MR. AMENTA, IF YOU'RE FULLY VACCINATED AND COMFORTABLE

03:45PM  7     DOING SO, YOU'RE WELCOME TO TESTIFY WITHOUT A MASK.

03:45PM  8     A.   I AM.

03:45PM  9     Q.   CAN YOU START BY TELLING US WHERE YOU'RE CURRENTLY

03:45PM 10     EMPLOYED, PLEASE?

03:45PM 11     A.   I'M EMPLOYED AT THE FEDERAL RESERVE BANK OF NEW YORK.

03:45PM 12     Q.   AND WHAT IS YOUR CURRENT JOB TITLE AT THE FEDERAL RESERVE

03:45PM 13     BANK OF NEW YORK?

03:45PM 14     A.   I'M THE DEPUTY CHIEF INVESTIGATOR.

03:45PM 15     Q.   I WANT TO CIRCLE BACK TO YOUR JOB RESPONSIBILITIES THERE,

03:45PM 16     BUT FIRST CAN YOU SUMMARIZE FOR US AT A HIGH LEVEL YOUR

03:45PM 17     EDUCATIONAL BACKGROUND AND YOUR WORK HISTORY BEFORE YOU JOINED

03:45PM 18     THE FEDERAL RESERVE BANK?

03:45PM 19     A.   SURE.  I'M A GRADUATE OF ST. FRANCIS COLLEGE IN BROOKLYN

03:45PM 20     WITH A BACHELOR'S OF SCIENCE.

03:45PM 21          AND MY EMPLOYMENT PRE THE FEDERAL RESERVE WAS AT A LAW

03:46PM 22     FIRM CALLED CULLEN AND DYKMAN.

03:46PM 23     Q.   AND WHAT WAS YOUR POSITION AT THAT LAW FIRM?

03:46PM 24     A.   PARALEGAL.

03:46PM 25     Q.   WHEN DID YOU START WORKING AT THE FEDERAL RESERVE BANK OF

AMENTA DIRECT BY MR. BOSTIC

```
03:46PM   1    NEW YORK?

03:46PM   2    A.   IN NOVEMBER OF 1993.

03:46PM   3    Q.   AND HAVE YOU BEEN EMPLOYED THERE EVER SINCE?

03:46PM   4    A.   I HAVE.

03:46PM   5    Q.   AND YOU SAID YOUR CURRENT JOB TITLE?  ONE MORE TIME.

03:46PM   6    A.   DEPUTY CHIEF INVESTIGATOR.

03:46PM   7    Q.   AND HAS THAT BEEN YOUR JOB TITLE THERE THE ENTIRE TIME OR

03:46PM   8    HAS IT CHANGED?

03:46PM   9    A.   NO.  SO IN NOVEMBER OF 1993 I STARTED AS A PARALEGAL, ROSE

03:46PM  10    THROUGH THE RANKS, BECAME AN INVESTIGATOR IN 2001, ROSE THROUGH

03:46PM  11    THE INVESTIGATOR RANKS AND INTO 2019 WAS NAMED DEPUTY CHIEF

03:46PM  12    INVESTIGATOR.

03:46PM  13    Q.   AND WHAT IS THE FEDERAL RESERVE BANK?

03:46PM  14    A.   SURE.  SO THE FEDERAL RESERVE BANK IS REGIONAL BANKS, SO

03:46PM  15    THERE ARE 12 FEDERAL RESERVE BANKS, WHICH NEW YORK IS ONE OF

03:46PM  16    THEM, ALONG WITH THE BOARD OF GOVERNORS MAKE UP THE FEDERAL

03:47PM  17    RESERVE SYSTEM WHICH IS THE CENTRAL BANK FOR THE UNITED STATES.

03:47PM  18    Q.   AND HOW DOES THE FEDERAL RESERVE BANK COMPARE TO BANKS

03:47PM  19    THAT CITIZENS LIKE YOU OR I MIGHT HAVE ACCOUNTS AT?

03:47PM  20    A.   SURE.  SO I THINK MOST FOLKS ASSOCIATE THE FEDERAL RESERVE

03:47PM  21    WITH MONETARY POLICY, SO FORMULATING AND IMPLEMENTING MONETARY

03:47PM  22    POLICY, BUT IT'S ALSO A BANK SUPERVISOR FOR FINANCIAL

03:47PM  23    INSTITUTIONS, AND IT ALSO PROVIDES BANKING SERVICES TO THE

03:47PM  24    FINANCIAL INDUSTRY, TO FINANCIAL INSTITUTIONS.

03:47PM  25         SO IT WON'T HAVE ACCOUNTS FOR INDIVIDUALS.  IT HAS
```

03:47PM 1    ACCOUNTS FOR BANKS.

03:47PM 2    Q.   SO IT'S A BANK FOR BANKS?

03:47PM 3    A.   THAT'S RIGHT.

03:47PM 4    Q.   HOW ABOUT YOUR SPECIFIC JOB RESPONSIBILITIES THERE, CAN

03:47PM 5    YOU SUMMARIZE THOSE FOR US?

03:47PM 6    A.   SURE.  SO THE INVESTIGATIONS GROUP IS WITHIN A GROUP IN

03:47PM 7    LEGAL CALLED THE FINANCIAL INTELLIGENCE AND INVESTIGATIONS

03:47PM 8    UNIT.  YOU KNOW, THE PRIMARY RESPONSIBILITY IS TO MAKE SURE

03:47PM 9    THAT WE WORK ON CASES WITH FINANCIAL INSTITUTION ISSUES AND

03:48PM 10   BANKER ISSUES, SO INSTITUTION AFFILIATED PARTIES AT FINANCIAL

03:48PM 11   INSTITUTIONS.

03:48PM 12       WE'RE ALSO THE FACE OF THE FED WITH REGARDS TO FRAUD THAT

03:48PM 13   MENTION THE FEDERAL RESERVE NAME AND THAT OF ITS EMPLOYEES, AND

03:48PM 14   WE'RE ALSO THE GROUP RESPONSIBLE FOR SUBPOENA COMPLIANCE WITH

03:48PM 15   REGARDS TO FEDWIRE FUNDS TRANSFER.

03:48PM 16   Q.   AND YOU MENTIONED FEDWIRE FUNDS TRANSFER.

03:48PM 17       WHAT IS FEDWIRE?

03:48PM 18   A.   FEDWIRE IS A FINANCIAL PRODUCT THAT THE FEDERAL RESERVE

03:48PM 19   PUTS OUT TO THE BANKING INDUSTRY.

03:48PM 20   Q.   AND WHAT IS IT USED FOR AND HOW DOES IT WORK?

03:48PM 21   A.   SURE.  SO IT'S AN ELECTRONIC COMMUNICATION IN WHICH THE

03:48PM 22   FINANCIAL INSTITUTIONS THAT ARE CUSTOMERS AT THE FED CAN SEND

03:48PM 23   PAYMENTS FOR THEMSELVES OR FOR THEIR CUSTOMERS TO MAKE A

03:48PM 24   PAYMENT.

03:48PM 25   Q.   SO IT'S A WAY OF MOVING MONEY FROM ONE ACCOUNT TO ANOTHER?

03:48PM  1    A.   IT'S AN ELECTRONIC WAY OF MOVING MONEY, CORRECT.

03:48PM  2    Q.   IF AN INDIVIDUAL OR A COMPANY WANT TO ENTER INTO A

03:48PM  3    TRANSACTION AND THEY RECEIVE, LET'S SAY, WIRE INSTRUCTIONS TO

03:49PM  4    SEND MONEY SOMEWHERE, IS FEDWIRE A VEHICLE OR A TOOL TO

03:49PM  5    ACCOMPLISH THAT TRANSFER?

03:49PM  6    A.   THROUGH THEIR BANKS.  SO, YES, THROUGH THEIR BANKS.

03:49PM  7    Q.   IS FEDWIRE COMMONLY USED -- OR LET ME ASK, DO YOU KNOW

03:49PM  8    WHAT THE APPROXIMATE DAILY VOLUME IS FOR FEDWIRE TRANSFERS?

03:49PM  9    A.   I DO.  IT'S ABOUT 500- TO 600,000 TRANSACTIONS A DAY AND

03:49PM  10   THE VOLUME IS $3 TRILLION A DAY.

03:49PM  11   Q.   CAN YOU WALK US THROUGH THE STEPS IN A FEDWIRE TRANSFER?

03:49PM  12   AND LET'S TALK ABOUT THE TIME PERIOD IN 2013 AND 2014.

03:49PM  13        ARE YOU AWARE OF HOW FEDWIRE WORKED DURING THAT TIME

03:49PM  14   PERIOD?

03:49PM  15   A.   I AM.  SO A FINANCIAL INSTITUTION WILL SEND A

03:49PM  16   COMMUNICATION TO THE FEDERAL RESERVE AND IN THAT TIME PERIOD

03:49PM  17   THE COMMUNICATION WOULD HAVE BEEN RECEIVED BY THE DALLAS FED IN

03:49PM  18   THE STATE OF TEXAS.

03:49PM  19        THE DALLAS FED WILL THEN SEND THAT COMMUNICATION TO THE

03:50PM  20   FEDERAL RESERVE BANK OF NEW YORK'S NEW JERSEY PROCESSING

03:50PM  21   FACILITY.

03:50PM  22        AND THEN THAT FACILITY WILL THEN DEBIT AND CREDIT AND SEND

03:50PM  23   THE ADVICE OVER TO THE FINANCIAL INSTITUTIONS.

03:50PM  24   Q.   YOU'RE DESCRIBING COMMUNICATIONS BETWEEN BANKS AND FEDWIRE

03:50PM  25   FACILITIES ON THE ONE HAND?

AMENTA DIRECT BY MR. BOSTIC

03:50PM 1    A.   CORRECT.  SO THE FEDERAL RESERVE COMMUNICATES IN THAT TIME

03:50PM 2    PERIOD BETWEEN DALLAS FED AND THE FEDERAL RESERVE BANK IN

03:50PM 3    NEW YORK, BUT THEIR FACILITY IS IN TEXAS AND NEW JERSEY.

03:50PM 4        THE ORIGINATING BANK WILL SEND THE INSTRUCTIONS TO THE

03:50PM 5    FEDERAL RESERVE BANK OF DALLAS IN TEXAS FIRST.

03:50PM 6    Q.   AND THEN THE COMMUNICATION BETWEEN THE TEXAS FACILITY AND

03:50PM 7    THE NEW JERSEY FACILITY, WHAT IS THE NATURE OF THAT

03:50PM 8    COMMUNICATION?  ARE WE TALKING ABOUT A STAFF MEMBER PICKING UP

03:50PM 9    A PHONE AND CALLING THE OTHER FACILITY?

03:50PM 10   A.   NO, NO.  SO IT'S A COMPUTER COMMUNICATION BETWEEN SERVERS.

03:51PM 11   Q.   AND IS THAT SOMETHING THAT HAPPENS AUTOMATICALLY AS PART

03:51PM 12   OF EVERY TRANSFER DURING THAT TIME PERIOD?

03:51PM 13   A.   YEAH.  SO ANY TRANSFER -- THE DATE IS ANY TRANSFER AFTER

03:51PM 14   APRIL 27 OF '09 GOES THROUGH TWO PROCESSING FACILITIES.

03:51PM 15   Q.   DURING 2013 AND 2014 WOULD IT HAVE BEEN POSSIBLE FOR A

03:51PM 16   FEDWIRE TRANSFER TO OCCUR WITHOUT THAT ELECTRONIC COMMUNICATION

03:51PM 17   HAPPENING ACROSS STATE LINES?

03:51PM 18   A.   NO.

03:51PM 19   Q.   HOW ABOUT -- WELL, LET ME START.

03:51PM 20       YOU MENTIONED THAT THE FIRST COMMUNICATION WOULD BE TO THE

03:51PM 21   TEXAS FEDWIRE FACILITY; IS THAT CORRECT?

03:51PM 22   A.   IN THAT TIME PERIOD, YES.

03:51PM 23   Q.   WHAT IF A WIRE TRANSFER IS BEING SENT, LET'S SAY, FROM A

03:51PM 24   BANK IN TEXAS, TO ANOTHER BANK IN TEXAS, WOULD THAT PROCESS

03:51PM 25   GOING THROUGH FEDWIRE STILL REQUIRE AN INTERSTATE WIRE

03:51PM  1    COMMUNICATION?

03:51PM  2    A.   YES.  SO IT WILL ENTER THROUGH THE DALLAS FED TEXAS, AND

03:51PM  3    THEN IT WILL GO THROUGH THE FEDERAL BANK OF NEW YORK'S NEW

03:52PM  4    JERSEY FACILITY.

03:52PM  5    Q.   YOU MENTIONED THE VOLUME OF WIRE TRANSFERS HANDLED BY THE

03:52PM  6    FEDWIRE SYSTEM; CORRECT?

03:52PM  7    A.   YES.

03:52PM  8    Q.   ARE RECORDS OF THOSE TRANSFERS CREATED AND MAINTAINED BY

03:52PM  9    FEDWIRE?

03:52PM  10   A.   THEY ARE.

03:52PM  11   Q.   CAN YOU DESCRIBE HOW THOSE RECORDS ARE CREATED?

03:52PM  12   A.   THEY ARE CREATED CONTEMPORANEOUSLY AS A BUSINESS RECORD AT

03:52PM  13   THE FEDERAL RESERVE BANK OF NEW YORK.

03:52PM  14   Q.   ARE THEY CREATED MANUALLY OR AUTOMATICALLY?

03:52PM  15   A.   AUTOMATICALLY.

03:52PM  16   Q.   AND HOW ABOUT PRESERVATION, ARE THOSE RECORDS OF THE FUNDS

03:52PM  17   TRANSFERRED MAINTAINED WITHIN FEDWIRE?

03:52PM  18   A.   THEY ARE.

03:52PM  19   Q.   AND IS FEDWIRE IN CONTROL OF THAT RECORD SYSTEM?

03:52PM  20   A.   YES.

03:52PM  21   Q.   AND FOR HOW LONG ARE THOSE RECORDS RETAINED?

03:52PM  22   A.   IT'S FOR SEVEN YEARS.

03:52PM  23   Q.   DID YOU -- ACTUALLY LET ME ASK, DID FEDWIRE RECEIVE A

03:53PM  24   SUBPOENA FOR RECORDS IN CONNECTION WITH THIS CASE?

03:53PM  25   A.   IT DID.

03:53PM   1                MR. BOSTIC:  MAY I APPROACH, YOUR HONOR?

03:53PM   2                THE COURT:  YES.

03:53PM   3                MR. BOSTIC:  (HANDING.)

03:53PM   4                THE COURT:  DO YOU HAVE THIS?

03:53PM   5                MR. BOSTIC:  THE DEFENSE HAS THIS, YOUR HONOR.

03:53PM   6                MS. TREFZ:  YES.

03:53PM   7                MR. BOSTIC:  (HANDING.)

03:53PM   8                THE WITNESS:  THANK YOU.

03:53PM   9       BY MR. BOSTIC:

03:53PM  10       Q.   MR. AMENTA, DO YOU HAVE IN FRONT OF YOU A DOCUMENT MARKED

03:53PM  11       EXHIBIT 4845 AT THE BOTTOM?

03:53PM  12       A.   YES.

03:53PM  13       Q.   HAVE YOU REVIEWED THIS RECORD BEFORE?

03:53PM  14       A.   I HAVE.

03:53PM  15       Q.   AND SPECIFICALLY ARE YOU LOOKING AT PAGES 18 THROUGH 23 OF

03:53PM  16       EXHIBIT 4845?

03:53PM  17       A.   CORRECT.

03:53PM  18       Q.   DO YOU RECOGNIZE THIS DOCUMENT AS PART OF THE RECORDS THAT

03:53PM  19       FEDWIRE PRODUCED IN RESPONSE TO THAT SUBPOENA?

03:53PM  20       A.   YES.

03:53PM  21                MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT MOVES TO

03:53PM  22       ADMIT EXHIBIT 4845.

03:53PM  23                MS. TREFZ:  NO OBJECTION.

03:53PM  24                THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:53PM  25                (GOVERNMENT'S EXHIBIT 4845 WAS RECEIVED IN EVIDENCE.)

03:54PM    1    BY MR. BOSTIC:

03:54PM    2    Q.   MR. AMENTA, ARE YOU LOOKING NOW ON THE SCREEN AT

03:54PM    3    EXHIBIT 4845?

03:54PM    4    A.   YES.

03:54PM    5    Q.   CAN YOU DESCRIBE FOR US WHAT EXHIBIT 4845 CONTAINS, WHAT

03:54PM    6    IT REFLECTS?

03:54PM    7    A.   SO IT'S DEFINITELY A FEDWIRE BECAUSE IT HAS IMADS AND

03:54PM    8    OMADS, I-M-A-D AND O-M-A-D, INPUT MESSAGE ACCOUNTABILITY DATA

03:54PM    9    AND OMADS.

03:54PM   10            JUROR:  YOUR HONOR --

03:54PM   11            THE WITNESS:  I AM SORRY.  IS THAT BETTER?

03:54PM   12            THE COURT:  OH, THE SCREENS ARE OUT AGAIN.  SORRY.

03:54PM   13       IS IT JUST ONE SCREEN?  IT'S THAT CORNER.

03:54PM   14            THE CLERK:  I'M GOING TO SHUT DOWN AND START OVER

03:54PM   15    AGAIN.

03:54PM   16        (PAUSE IN PROCEEDINGS.)

03:55PM   17            THE CLERK:  NOPE?  NOW NONE OF THEM?

03:55PM   18        (LAUGHTER.)

03:56PM   19            THE COURT:  NOT IN THE CORNER.

03:56PM   20       ARE THE JUROR SCREENS ON?

03:56PM   21        (PAUSE IN PROCEEDINGS.)

03:56PM   22            THE COURT:  WELL, MAYBE THIS IS A GOOD TIME TO TAKE

03:56PM   23    OUR EVENING BREAK AND ALLOW US TO POUR SOME WATER IN THESE

03:56PM   24    DEVICES.

03:56PM   25        (LAUGHTER.)

03:56PM 1          THE COURT:  SORRY.  WE'RE GOING TO INTERRUPT YOUR

03:56PM 2    TESTIMONY THIS AFTERNOON, SIR.

03:56PM 3          LET'S TAKE OUR MORNING BREAK NOW, AND WE'LL RESUME

03:56PM 4    TOMORROW AT 9:00 A.M., 9:00 A.M.

03:56PM 5          LADIES AND GENTLEMEN, LET ME ONCE AGAIN GIVE YOU THE

03:56PM 6    ADMONISHMENT.  PLEASE DO NOT DO ANY INVESTIGATION ABOUT

03:56PM 7    ANYTHING INVOLVING THIS CASE, DO NOT READ ANYTHING, DO NOT

03:56PM 8    LISTEN TO OR WATCH ANYTHING THAT DEALS WITH THIS CASE.

03:56PM 9          IF THAT DOES HAPPEN, I'M GOING TO ASK YOU TO PLEASE TURN

03:56PM 10   AWAY, CLOSE THE BOOK, WHATEVER YOU ARE READING, AND I'LL ASK

03:57PM 11   YOU TOMORROW MORNING WHETHER ANY OF THOSE THINGS HAVE HAPPENED.

03:57PM 12         THANK YOU FOR YOUR CONTINUED VIGILANCE, AND I APPRECIATE

03:57PM 13   THAT.

03:57PM 14         THANK YOU FOR YOUR AVAILABILITY TOMORROW.  WE'LL SEE YOU

03:57PM 15   TOMORROW MORNING AT 9:00 A.M., 9:00 A.M.  THANK YOU.

03:57PM 16         YOU CAN STAND DOWN, SIR.  THANK YOU.

03:57PM 17         (JURY OUT AT 3:57 P.M.)

03:57PM 18         THE COURT:  PLEASE BE SEATED.  THANK YOU.

03:57PM 19         THE RECORD SHOULD REFLECT THAT OUR JURY HAS LEFT FOR THE

03:57PM 20   DAY.  THEY'LL RESUME TOMORROW AT 9:00 A.M., AND THE WITNESS HAS

03:58PM 21   NOW LEFT THE COURTROOM.

03:58PM 22         ALL COUNSEL AND MS. HOLMES IS PRESENT.

03:58PM 23         MR. BOSTIC, DO YOU THINK THAT THIS WITNESS IS -- THE

03:58PM 24   TOTALITY OF THE DIRECT IS WHAT LENGTH?  I'M SORRY.

03:58PM 25         MR. BOSTIC:  I WOULD SAY APPROXIMATELY ANOTHER

3530

```
03:58PM   1    15 MINUTES OR SO.
03:58PM   2             THE COURT:  OKAY.
03:58PM   3             MS. TREFZ:  I GUESS IT'S ABOUT TWO MINUTES.
03:58PM   4             THE COURT:  OKAY.  THANK YOU.
03:58PM   5        THEN WE'LL HAVE THEN THE FULL DAY FOR ANOTHER WITNESS THAT
03:58PM   6    WILL BE READY TO PROCEED, MR. SCHENK?
03:58PM   7             MR. SCHENK:  YES, YES, YOUR HONOR.
03:58PM   8             THE COURT:  GREAT.  OKAY.
03:58PM   9        AND DO WE ANTICIPATE THAT WITNESS WILL TAKE THE BALANCE OF
03:58PM  10    THE DAY?
03:58PM  11             MR. SCHENK:  CAN I HAVE JUST ONE MOMENT?
03:58PM  12             THE COURT:  OF COURSE.
03:58PM  13        (DISCUSSION AMONGST COUNSEL OFF THE RECORD.)
03:59PM  14        (PAUSE IN PROCEEDINGS.)
03:59PM  15             MR. SCHENK:  YOUR HONOR, OUR NEXT WITNESS AFTER
03:59PM  16    FEDWIRE IS MR. JHAVERI WHO ALSO WORKED AT WALGREENS.  I EXPECT
03:59PM  17    THAT THE DIRECT WILL BE ABOUT 90 MINUTES OR SO.
03:59PM  18        MR. DOWNEY AND I WERE TALKING ABOUT WHETHER THAT WOULD
03:59PM  19    REQUIRE ANOTHER GOVERNMENT WITNESS FOR THE BALANCE OF THE DAY
03:59PM  20    AFTER CROSS-EXAMINATION, AND IT SOUNDS LIKE IT PROBABLY WILL.
03:59PM  21             MR. DOWNEY:  I THINK SO, YOUR HONOR.  I THINK JUST
03:59PM  22    TO BE CERTAIN AND TAKE ADVANTAGE OF THE FACT THAT WE'RE HERE, I
03:59PM  23    DON'T KNOW -- I THINK THAT WOULD ANTICIPATE SORT OF A
03:59PM  24    THREE-HOUR CROSS WHICH WOULD TAKE THE REST OF THE DAY OR MAYBE,
03:59PM  25    MORE, WHICH I DON'T THINK WILL BE NECESSARY.
```

3531

03:59PM  1          THE COURT:  SO YOU THINK WE'LL HAVE -- WE'LL FINISH

03:59PM  2     WITH WITNESS JHAVERI TOMORROW AND THEN HAVE A LITTLE BIT OF

04:00PM  3     TIME LEFT AT THE END OF THE DAY?

04:00PM  4          MR. SCHENK:  YES.

04:00PM  5          THE COURT:  AND THEN WILL YOU HAVE A WITNESS ON CALL

04:00PM  6     IN THE ON-DECK CIRCLE?

04:00PM  7          MR. SCHENK:  I WILL SPEND THIS EVENING FINDING THAT

04:00PM  8     PERSON.  WE WILL MAKE SURE THAT -- WE WILL AT LEAST DO WHATEVER

04:00PM  9     WE CAN TO IDENTIFY THAT PERSON.

04:00PM 10          THE COURT:  OKAY.

04:00PM 11          MR. SCHENK:  AND WE'LL LET THE COURT KNOW IF WE WERE

04:00PM 12     UNSUCCESSFUL AND MR. JHAVERI WILL BE THE DAY.

04:00PM 13          THE COURT:  OKAY.  AND THEN WE'LL HAVE FRIDAY

04:00PM 14     MIDMORNING UNTIL 1:00 O'CLOCK.

04:00PM 15          MR. SCHENK:  YES.

04:00PM 16          THE COURT:  AND YOU'LL EXPLAIN TO MR. BOSTIC THE

04:00PM 17     ON-DECK CIRCLE CONCEPT.

04:00PM 18        (LAUGHTER.)

04:00PM 19          MR. DOWNEY:  LET ME KNOW.

04:00PM 20          THE COURT:  I DO --

04:00PM 21          MR. DOWNEY:  YOUR HONOR, I JUST WANTED TO REMIND YOU

04:00PM 22     OF THE WHAT I'LL TERM "THE KRATZMANN ADMONITION," I DON'T THINK

04:00PM 23     THAT WAS DELIVERED YET.  SO IT MIGHT BE TOMORROW.

04:00PM 24          THE COURT:  AND TO THAT POINT, LET ME SAY I'D LIKE

04:00PM 25     TO SEE ON THE ISSUE THAT WE TALKED ABOUT THIS MORNING AND THE

3532

04:00PM 1    QUESTIONNAIRE, MS. KRATZMANN IS GOING TO INVITE COUNSEL BACK IN

04:01PM 2    WITH ME ON THAT ISSUE, TOO, AND THAT AGAIN WILL BE A SEALED

04:01PM 3    TRANSCRIPT.  IT'S A CONTINUATION OF OUR DISCUSSION.

04:01PM 4              MR. DOWNEY:  OKAY.  WILL THAT BE AT 9:00 TOMORROW?

04:01PM 5              THE COURT:  IT WILL BE IN FIVE MINUTES.

04:01PM 6              MR. DOWNEY:  FIVE MINUTES.

04:01PM 7              MR. SCHENK:  ONE LAST THING.  I THINK WE HAVE A

04:01PM 8    COURT APPEARANCE TOMORROW AFTERNOON AT 1:30 BEFORE

04:01PM 9    MAGISTRATE COUSINS.

04:01PM 10             THE COURT:  OH.  SO WE SHOULD PROBABLY FINISH, TO

04:01PM 11   GIVE YOU TIME FOR THAT?  WHAT DO YOU SUGGEST?

04:01PM 12             MR. CLINE:  YOUR HONOR, I'M HANDLING THAT FOR

04:01PM 13   MS. HOLMES.

04:01PM 14             THE COURT:  OKAY.  MR. CLINE.  THANK YOU.

04:01PM 15             MR. CLINE:  I'M HAPPY TO STEP OUT AND GO DO IT WHILE

04:01PM 16   YOU CONTINUE.

04:01PM 17        I DON'T KNOW IF THE GOVERNMENT IS IN A SIMILAR POSITION.

04:01PM 18             THE COURT:  WELL, I WAS GOING TO SAY WE CAN END AT

04:01PM 19   1:00 IF THAT'S HELPFUL.

04:01PM 20             MR. SCHENK:  MS. VOLKAR IS GOING TO HANDLE THE

04:01PM 21   ARGUMENTS FOR THE GOVERNMENT AT THAT HEARING.  SO IF THE COURT

04:01PM 22   IS STILL GOING ON SHE COULD DO LIKEWISE AND STEP OUT AND HANDLE

04:01PM 23   THAT MATTER FOR JUDGE COUSINS.

04:01PM 24        BUT WE ALSO -- I KNOW THAT THE PROSECUTORS ARE ALL

04:01PM 25   PLANNING TO ATTEND THAT HEARING.  SO WE'LL DEFER TO THE COURT.

3533

04:02PM  1          IF WE STILL HAVE A WITNESS ON, MAYBE WE SHOULD KEEP THE

04:02PM  2   TRIAL GOING, BUT WE WILL DO WHATEVER THE COURT PREFERS.

04:02PM  3          THE COURT:  OKAY.

04:02PM  4          MR. CLINE:  THE HEARING, BY THE WAY, IS BY ZOOM.  SO

04:02PM  5   I'M GOING TO GO BACK TO MY HOTEL ROOM TO DO THE HEARING RATHER

04:02PM  6   THAN DOWNSTAIRS.

04:02PM  7          THE COURT:  AND DO YOU HAVE A ROOM HERE TO DO THAT

04:02PM  8   ZOOM HEARING?

04:02PM  9          MR. SCHENK:  YES, WE CAN DO THAT FROM THE

04:02PM  10  COURTHOUSE.

04:02PM  11         THE COURT:  OKAY.  WELL, LET'S SEE IF WE CAN FINISH

04:02PM  12  THINGS FRIDAY AT 1:00.

04:02PM  13         MR. CLINE:  IT'S TOMORROW, YOUR HONOR.  IT'S

04:02PM  14  TOMORROW.

04:02PM  15         THE COURT:  OH, I BEG YOUR PARDON.  OH, WELL, WE'LL

04:02PM  16  KEEP OUR FINGERS CROSSED.  LET'S SEE WHAT WE CAN DO.  OKAY.

04:02PM  17  THANK YOU.

04:02PM  18         THE CLERK:  COURT ADJOURNED OTHERWISE EXCEPT FOR THE

04:02PM  19  SEALED HEARING.

04:02PM  20      (COURT ADJOURNED AT 4:02 P.M.)

04:02PM  21      (SEALED PROCEEDINGS IN CHAMBERS.)

22

23

24

25

```
04:02PM   1          ///

09:00AM   2          ///

09:00AM   3               (SEALED PROCEEDINGS HELD IN CHAMBERS.)

04:20PM   4               THE COURT:  ALL RIGHT.  LET'S GO ON THE RECORD.

04:20PM   5          THIS IS A CONTINUATION OF THE SEALED HEARING THAT WE HAD

04:20PM   6     THIS MORNING WITH OUR JURORS PRESENT IN MY CHAMBERS.

04:20PM   7               RIGHT NOW ARE MR. DOWNEY AND MR. SCHENK, MY LAW CLERKS,

04:20PM   8     AND MS. KRATZMANN, AND OF COURSE OUR COURT REPORTER.

04:20PM   9               I WANTED TO BRING YOU IN, COUNSEL, AS A CONTINUATION OF

04:20PM  10     OUR DISCUSSION THIS MORNING REGARDING THE QUESTIONNAIRE AND

04:20PM  11     THOSE ISSUES.

04:20PM  12               MS. KRATZMANN RECEIVED A NOTE DURING ONE OF THE BREAKS

04:20PM  13     FROM JUROR NUMBER 12, AND YOU RECALL WE SPOKE WITH JUROR NUMBER

04:20PM  14     12 THIS MORNING AS WELL.

04:20PM  15               I'VE SHARED THE NOTE WITH YOU, AND THE NOTE -- AND I'LL

04:20PM  16     JUST READ IT FOR THE RECORD.  IT'S DATED OCTOBER 13TH, 2021.

04:20PM  17               IT READS, "YOUR HONOR, JUDGE DAVILA, I KINDLY REQUEST THE

04:20PM  18     INFORMATION ON MY JUROR QUESTIONNAIRE REGARDING ███

04:20PM  19     ██████████████████████  BE COMPLETELY REDACTED.

04:20PM  20     RESPECTFULLY, JUROR NUMBER 12."

04:20PM  21               AND I THINK SHE TOLD US THIS IN HER COMMENTS WHEN WE WENT

04:20PM  22     THROUGH THE QUESTIONNAIRE WITH HER, BUT I JUST WANTED TO

04:20PM  23     PROVIDE THIS TO YOU, AND WE'LL MAKE A COPY OF THIS IN A SEALED

04:20PM  24     ENVELOPE AS PART OF THE RECORD OF THIS PROCEEDING.

04:20PM  25               I ALSO WANTED TO SHARE WITH YOU THE INFORMATION THAT I
```

04:20PM   1    RECEIVED, AND THIS TOUCHES ON SAFETY ISSUES I SUPPOSE, SECURITY

04:20PM   2    ISSUES THAT I THINK ARE APPROPRIATE FOR US TO CONSIDER, YOU TO

04:20PM   3    CONSIDER AS WELL AS THE COURT.

04:20PM   4         I WAS INFORMED -- I THINK MS. KRATZMANN TOLD ME ABOUT --

04:20PM   5    WHERE DID I GET THE INFORMATION?  I WAS INFORMED OR TOLD TODAY

04:20PM   6    THAT APPARENTLY WINDOWS IN TWO CARS THAT WERE IN THE GARAGE,

04:20PM   7    PARKING GARAGE, BACK WINDOWS I THINK, WERE BROKEN.

04:20PM   8         MS. KRATZMANN, DID YOU TELL US THIS?

04:20PM   9              THE CLERK:  YES.  IT'S NOT ANY OF THE JURORS, BUT

04:20PM  10    THE JURORS BROUGHT IT TO MY ATTENTION.  WHEN THEY PARK OVER

04:20PM  11    THERE, A COUPLE OF THEM SAW THAT TWO CARS HAD SMASHED IN BACK

04:20PM  12    WINDOWS.

04:20PM  13              THE COURT:  OKAY.  █████████████████████████████

04:20PM  14    █████████████████████████████████████████████████████████████

04:20PM  15    █████████████████████████████████████████████████████████████

04:20PM  16    ███████████████████████████████████

04:20PM  17         SO I SHARE THIS WITH YOU.  THIS MAY BE -- AND JURORS

04:20PM  18    SHARED THIS WITH YOU, MS. KRATZMANN?

04:20PM  19              THE CLERK:  THEY DID, AND THEY INQUIRED, IF THEIR

04:20PM  20    CARS SHOULD BE DAMAGED, WOULD THEY GET REIMBURSED?

04:20PM  21         I COMMUNICATED WITH THE CLERK'S OFFICE.  I WAS INFORMED BY

04:20PM  22    THE SUPERVISOR FROM THE CLERK'S OFFICE THAT, NO, THEY WOULD NOT

04:20PM  23    BE REIMBURSED.

04:20PM  24         I DID CONVEY THAT INFORMATION TO THE JURORS.

04:20PM  25              THE COURT:  OKAY.

04:20PM 1          THE CLERK:  AND THEN ONE JUROR SAID, "WE WOULD HAVE

04:20PM 2    TO FILE A CLAIM?"

04:20PM 3       I DIDN'T RESPOND.  I JUST SAID YOU WOULD NOT BE

04:20PM 4    REIMBURSED.

04:20PM 5          THE COURT:  OKAY.  OKAY.  ALL RIGHT.  I JUST WANTED

04:20PM 6    TO SHARE THAT WITH COUNSEL.

04:20PM 7       I THINK IT'S SOMETHING THAT THE COURT SHOULD CONSIDER.  I

04:20PM 8    SHARE IT WITH AN INTRODUCTION WITH ANY THOUGHTS THAT YOU WOULD

04:20PM 9    LIKE TO SHARE WITH ME IN YOUR BRIEFINGS.

04:20PM 10      BASED ON OUR CONVERSATIONS WITH EACH OF THE JURORS AND

04:20PM 11   BASED ON OUR CONVERSATIONS WITH THE THREE OF US POST INTERVIEWS

04:20PM 12   THIS MORNING, I KNOW WE TOUCHED ON SECURITY ISSUES AND ISSUES

04:20PM 13   THAT MIGHT AFFECT THE JURORS CONTINUING SERVICE, AND THEIR

04:20PM 14   FEELINGS ABOUT CONTINUED SERVICE AND HOW THAT MIGHT BE

04:20PM 15   AFFECTED.

04:20PM 16      SO I JUST WANTED TO SHARE THIS WITH YOU.

04:20PM 17         APPARENTLY NO JUROR'S CAR WAS AFFECTED.  HOWEVER, THEY

04:20PM 18   OBSERVED IT.  BASED ON THEIR SENTIMENTS, IF ALL OF THEM

04:20PM 19   EXPRESSED THAT THEY WERE TO SEE, HEAR, OR LEARN OF THIS, IT MAY

04:20PM 20   CAUSE THEM SOME OTHER CONCERN.  SO THAT'S ALL I WANTED TO

04:20PM 21   INFORM YOU.  I WANTED TO GIVE YOU A COPY OF THE NOTE AND INFORM

04:20PM 22   YOU OF THAT.

04:20PM 23         ANY QUESTIONS OR COMMENTS YOU WANT TO PUT ON THE RECORD,

04:20PM 24   MR. SCHENK?

04:20PM 25         MR. SCHENK:  NO.  ON THE SAFETY ISSUE, I THINK I

SEALED PROCEEDINGS

04:20PM  1    WOULD LIKE TO REFLECT ON IT A LITTLE BIT MORE.  I DON'T HAVE

04:20PM  2    ANY COMMENTS AT THIS POINT.

04:20PM  3          FOR JUROR NUMBER 12, I AGREE, MY RECOLLECTION IS I DON'T

04:20PM  4    KNOW IF THE JUROR RAISED IT OR YOUR HONOR RAISED IT, BUT THERE

04:20PM  5    WAS -- I THINK IT WAS IN THE ADDITIONAL NOTES SECTION TO THE

04:20PM  6    QUESTIONNAIRE WHERE SHE INCLUDED SOME INFORMATION ABOUT THAT

04:20PM  7    TOPIC, AND I CAN'T RECALL IF YOUR HONOR ASKED HER ABOUT --

04:20PM  8    ASKED THE JUROR ABOUT IT OR IF THE JUROR RAISED THAT TO THE

04:20PM  9    COURT, BUT, YES, THAT WAS SOMETHING DISCUSSED.

04:20PM 10          THE COURT:  ALL RIGHT.

04:20PM 11       MR. DOWNEY, ANYTHING YOU WOULD LIKE TO SAY?

04:20PM 12          MR. DOWNEY:  NO, YOUR HONOR.  I THINK SIMILARLY I'LL

04:20PM 13    REFLECT ON IT, AND I KNOW MR. SCHENK AND I BOTH REGRET TO HEAR

04:20PM 14    OF THE CIRCUMSTANCE.

04:20PM 15          THE COURT:  OKAY.  THANK YOU.

04:20PM 16       WE'RE OFF THE RECORD NOW.

04:20PM 17       AGAIN, THIS IS SEALED.

04:20PM 18       (SEALED PROCEEDINGS ARE CONCLUDED.)

        19

        20

        21

        22

        23

        24

        25

1

2

3                    CERTIFICATE OF REPORTERS

4

5

6

7         WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11        THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16   _____
     IRENE RODRIGUEZ, CSR, CRR
     CERTIFICATE NUMBER 8076
17

18   _____

19   LEE-ANNE SHORTRIDGE, CSR, CRR
     CERTIFICATE NUMBER 9595
20

21        DATED:  OCTOBER 13, 2021

22

23

24

25